# THE CARLYLE GROUP

520 Madison Avenue • New York, New York 10022
Tel (212) 381-4900 • Fax (212) 381-4843

**HIGHLY CONFIDENTIAL**

January 17, 2007

Mr. Michael Costa
Merrill Lynch & Co.
4 World Financial Center, 30th Floor
New York, NY 10080

Ms. Christina Mohr
Citigroup Global Markets Inc.
388 Greenwich Street, 36th Floor
New York, NY 10013

Dear Michael and Christina:

The Carlyle Group ("Carlyle") is pleased to submit this offer to purchase all of the outstanding capital stock and other equity interests of Tribune Broadcasting (a/k/a the Transferred Entities, as such term is defined in the Stock Purchase Agreement) (the "Business" or the "Company") from the Tribune Company ("Tribune"). We believe that our proposal optimally addresses Tribune's objectives with respect to value, speed and assurance of closure. We are prepared to work with your team "around the clock" to consummate a transaction as soon as practicable.

Carlyle has a reputation for closing transactions quickly due to our vast capital resources and extensive transactional experience. Furthermore, since we have no attributable interests in any media properties which would prevent or delay regulatory approvals, we believe that we are ideally positioned to obtain FCC approval and close this transaction expeditiously.

During the past two months, we have performed extensive operational and business due diligence and have gained a strong appreciation for the assets of the Business and the Company's market position. We believe there is a significant opportunity to create value by repositioning the Business as a standalone entity in a private market setting. A committed, long-term investor such as Carlyle will be an important value-added partner for management. We will bring substantial industry expertise and resources to the Business, particularly as management continues to execute on the turnaround in an environment of increased secular challenges.

*Carlyle's Qualifications*

Carlyle is one of the world's largest private equity firms with $47 billion of capital under management across 46 funds. Since 1987, the firm has invested $24 billion of equity in 576 transactions. Media and telecommunications has been a long-standing area of investment focus for Carlyle and we have a history of successfully investing in regulated businesses. Since 2001, Carlyle has committed over $4 billion of equity in telecom and media investments globally. In the United States, Carlyle's Media and Telecom team is anchored by 15 dedicated investment professionals focused on completing leveraged acquisitions in partnership with strong management teams.

Page 1 of 174

Tribune Company
c/o Merrill Lynch & Co. and Citigroup Global Markets Inc.
January 17, 2007

Our commitment to investing in the media industry is highlighted by our recent acquisitions of VNU, Loews Entertainment (now AMC), Insight Communications and Dex Media. Our investment in Dex Media, in particular, had similar characteristics to Tribune Broadcasting. In Dex, we partnered with the existing management team to buy a large, traditional media business (yellow pages) with a plan to invest in its operations to drive improved revenue growth and profitability, all in the face of substantial secular business challenges. As part of this "carve-out" transaction, Carlyle worked closely with management to enable a successful separation of the business from Qwest Communications. Furthermore, we worked closely with Qwest to navigate the complex regulatory approval process and to obtain the fastest closure by structuring the transaction as a two-step closing.

Our deep understanding of the FCC approval process has frequently differentiated us vis-à-vis other bidders in securing and expeditiously completing complex deals. In addition to Dex, we have recently obtained FCC approvals for our investments in Insight Communications and Hawaiian Telcom. Our regulatory experience will be particularly relevant as the FCC will have considerable influence in this process. In addition, we have a number of partners who are highly experienced in dealing with the FCC, each of whom has been and will continue to be personally involved in various aspects of this transaction. They include:

- Daniel F. Akerson, former President, CFO and COO of MCI, former Chairman and CEO of General Instrument, former Chairman and CEO of Nextel Communications, former Chairman and CEO of XO Communications, current member of the Board of Directors ("BOD") of American Express, Freescale Semiconductor, MultiPlan, WILLCOM and Hawaiian Telcom and former BOD member of AOL Time Warner
- James A. Attwood, Jr., former EVP of Strategy, Development and Planning for Verizon and GTE, current member of the BOD of Insight Communications, VNU, WILLCOM and Hawaiian Telcom
- Michael J. Connelly, former Managing Director (Media & Communications) at Credit Suisse First Boston and at Donaldson, Lufkin & Jenrette, current BOD member of AMC Entertainment and Insight Communications
- William E. Kennard, former Chairman of the Federal Communications Commission ("FCC"), current BOD member of The New York Times Company, Insight Communications, Sprint Nextel and Hawaiian Telecom

If Carlyle is selected as the preferred bidder, our partners would be fully engaged in working with Tribune to secure rapid regulatory approval for the transaction and to develop a comprehensive transition plan.

### *Summary of Proposal*

We are prepared to offer a purchase price of $4.8 billion for the Transferred Entities, on a cash-free and debt-free basis, and subject to the other terms and conditions to be set forth in the definitive documentation and the satisfactory completion of our pending confirmatory due diligence. Our purchase price assumes that we agree to a group of 338(h)(10) election entities, which includes WPIX, and that final transition, severance, parachute and related transaction payments are paid for by Tribune.

Professionals' Eyes Only

Tribune Company
c/o Merrill Lynch & Co. and Citigroup Global Markets Inc.
January 17, 2007

The form of consideration would be 100% cash. The acquisition would be financed with a combination of committed debt and equity. The debt portion of the purchase price would be financed with fully committed debt capital from Merrill Lynch Capital Corporation, Citigroup Global Markets Inc. and/or Lehman Brothers Inc. (the "Bank Group"). Each member of the Bank Group has committed to provide 100% of the required debt financing. Executed documentation related to these commitments is enclosed herewith as Exhibit A. We are continuing to analyze the relative merits of the financing commitments that we have obtained, and accordingly, we have not yet made a final determination regarding which financing source(s) we would use or how much of the total amount of leverage being offered by the banks we would draw on to finance this transaction. Carlyle will fund 100% of the required equity capital from Carlyle Partners IV, our flagship US buyout fund with over $7.85 billion of committed capital. We are also in the process of raising Carlyle Partners V, a new U.S. buyout fund, which we expect to be substantially larger than Carlyle Partners IV.

We have received all necessary approvals from our Investment Committee for this transaction and no further internal or external approvals are required with respect to our equity commitment. We would be pleased to review with you the details of the overall financing structure at your convenience.

*Management*

Carlyle and its advisors have had the opportunity to interact with the Tribune Broadcasting management team during the past few weeks and we have all been impressed with their knowledge of the Business and the industry and their overall business acumen. We are excited about partnering with the management team on this transaction as we believe that there are synergies to be gained by leveraging the resources of Carlyle. We therefore would request that we be given the opportunity prior to closing to negotiate with key members of the current management team to enter into new employment agreements that would replace or supersede existing arrangements or understandings. We will also offer certain members of the management team the opportunity to purchase equity in the transaction on the same basis as Carlyle. The specific terms of this equity investment will be determined in consultation with management. In addition, we will establish a significant time- and performance-based option pool for key employees. This equity participation via a combination of direct investment and option grants is an important component of our investment approach as it aligns our interests with those of the management team.

*Legal*

Carlyle has previously delivered to your counsel a memorandum summarizing our principal comments on the Stock Purchase Agreement. We look forward to further discussing the foregoing with your counsel and providing a detailed mark-up of the contract at the appropriate time.

Our offer is subject to the completion of confirmatory business, tax, accounting, IT and legal diligence. We have listed the principal confirmatory diligence items in Exhibit B that we will need to address prior to signing definitive documentation. We expect that this remaining due diligence could be completed concurrent with our negotiation of definitive documentation for the transaction.

Professionals' Eyes Only

Tribune Company
c/o Merrill Lynch & Co. and Citigroup Global Markets Inc.
January 17, 2007

*Next Steps*

Carlyle is prepared to move quickly to consummate this transaction with Tribune.  With your cooperation, we believe we could be in a position to sign definitive documentation within a limited number of days.

This letter does not constitute a binding agreement to enter into any transaction, which agreement would only be evidenced by the parties' execution of mutually acceptable definitive documentation.  Our offer is subject to receipt of necessary governmental, regulatory, Major League Baseball and other third party consents, filings, permits or approvals.  This proposal will expire at 5:00 PM Eastern Daylight Time on January 24, 2007.

We are eager to move forward with the purchase of the Business and look forward to your response.  Please feel free to contact us if you have any questions or would like to discuss our proposal further.  I can be reached at (212) 381-4889 or by email at james.attwood@carlyle.com.  In addition, we would be pleased to make our legal advisors at Latham & Watkins available to explain our comments on the proposed Stock Purchase Agreement.  Contact information for our attorneys is attached hereto as Exhibit C.  We look forward to hearing from you.

Sincerely,

James A. Attwood, Jr.
Managing Director

Exhibits Attached Hereto:

A. Executed Financing Documentation

B. Confirmatory Due Diligence Items

C. Advisor Contact Information

Professionals' Eyes Only

TRB0009272

Tribune Company
c/o Merrill Lynch & Co. and Citigroup Global Markets Inc.
January 17, 2007

## Exhibit A. Executed Financing Documentation

A-I.    Citigroup Financing Documents (Page 6)
A-II.   Lehman Financing Documents (Page 61)
A-III.  Merrill Lynch Financing Documents (Page 122)

Professionals' Eyes Only                    TRB0009273

Tribune Company
c/o Merrill Lynch & Co. and Citigroup Global Markets Inc.
January 17, 2007

## Exhibit A-I – Citigroup Financing Documents

Professionals' Eyes Only                                    TRB0009274

CITIGROUP GLOBAL MARKETS INC.
390 GREENWICH STREET
NEW YORK, NEW YORK  10013

CONFIDENTIAL

January 17, 2007

[Holdings]
c/o The Carlyle Group
520 Madison Avenue
New York, New York  10022
Attention:   James Attwood

Commitment Letter

Ladies and Gentlemen:

The Carlyle Group (together with certain of its affiliates, the "Sponsor") has advised
Citigroup that the Sponsor and [Holdings], a newly formed Delaware corporation controlled by the
Sponsor ("Holdings" or "you"), intend to enter into a purchase and sale agreement (together with the
schedules and exhibits thereto, the "Acquisition Agreement") pursuant to which Holdings directly and
indirectly through its subsidiaries will purchase (the "Acquisition") certain of the assets owned and
operated directly or indirectly by Tribune Company ("Seller") (such assets, collectively, the "Acquired
Business").[1]  [_____], a Delaware corporation and newly formed, wholly-owned
subsidiary of Holdings, shall be the "Borrower".  All references to "dollars" or "$" in this agreement and
the attachments hereto (collectively, this "Commitment Letter") are references to United States dollars.
For purposes of this Commitment Letter, "Citigroup," "we" or "us" shall mean Citigroup Global Markets
Inc. ("CGMI"), Citibank, N.A., Citicorp USA, Inc. ("CUSA"), Citicorp North America, Inc. and/or any of
their affiliates as Citigroup shall determine to be appropriate to provide the services contemplated herein.

---

[1]    Assets are the broadcasting group of the Seller, which operates 23 television stations, Superstation WGN on
national cable, Chicago's WGN-AM radio station, the Chicago Cubs baseball team, Tribune Media
Entertainment and unconsolidated equity investments (31% stake in Food Network and 25% stake in Comcast
SportsNet Chicago).

Professionals' Eyes Only                                                                           TRB0009275

We understand that the sources of funds required to fund the Acquisition consideration, to repay certain existing indebtedness of the Acquired Business (the "Refinancing"), to pay fees, commissions and expenses in connection with the Transactions (as defined below) and to provide ongoing working capital requirements of the Borrower and its subsidiaries following the Transactions will include:

- senior secured first lien credit facilities consisting of (i) a senior secured term loan facility to the Borrower of $1,940 million (the "Term Loan Facility"), as described in the Summary of Principal Terms and Conditions attached hereto as Annex I (the "Bank Term Sheet") and (ii) a senior secured revolving credit facility to the Borrower of $300 million (the "Revolving Credit Facility" and, together with the Term Loan Facility, the "Bank Facilities"), as described in the Bank Term Sheet, an amount to be agreed of which may be drawn on the Closing Date (as defined below);

- either (A) the issuance by the Borrower of $1,400 million aggregate gross proceeds of unsecured senior notes and $500 million aggregate gross proceeds of unsecured senior notes with a pay-in-kind toggle (collectively, the "Senior Notes") pursuant to a Rule 144A or other private placement (the "Senior Notes Offering") or (B) in the event less than all of the Senior Notes are issued at the time the Transactions are consummated, borrowings by the Borrower of up to $1,900 million under a unsecured senior credit facility partly with a pay-in-kind toggle (the "Senior Bridge Facility") as described in the Summary of Principal Terms and Conditions attached hereto as Annex II (the "Senior Bridge Term Sheet");

- either (A) the issuance by the Borrower of $600 million aggregate gross proceeds of unsecured senior subordinated notes (the "Senior Subordinated Notes" and, together with the Senior Notes, the "Notes"), in each case pursuant to a Rule 144A or other private placement (the "Senior Subordinated Notes Offering") or (B) in the event less than all of the Senior Subordinated Notes are issued at the time the Transactions are consummated, borrowings by the Borrower of up to $600 million under an unsecured senior subordinated credit facility (the "Senior Subordinated Bridge Facility" and, together with the Senior Bridge Facility, the "Bridge Facilities", and together with the Bank Facilities, the "Facilities") as described in the Summary of Principal Terms and Conditions attached hereto as Annex III (the "Senior Subordinated Bridge Term Sheet" and, together with the Bank Term Sheet and the Senior Bridge Term Sheet, the "Term Sheets"); and

- equity investments in Holdings (the "Equity Financing") in an aggregate amount not less than 15% of the total pro forma capitalization of the Borrower after giving effect to the Transactions (excluding, for the avoidance of doubt, any of letters of credit issued on the Closing Date) from the Sponsor, certain of its affiliates, members of management of the Acquired Business and other co-investors reasonably acceptable to the Arranger (as defined below) (the Sponsor and such affiliates, members of senior management and other co-investors, in such capacity, being collectively referred to as the "Equity Investors"), all of which investments shall be contributed to the Borrower in cash as preferred equity on terms reasonably acceptable to the Arranger or as common equity.

No other new debt financing will be required for the Acquisition and the Refinancing. Immediately following the Transactions, neither Holdings nor any of its subsidiaries will have any material indebtedness other than the Bank Facilities, the Notes or the Bridge Facilities, as applicable, the Equity Financing and other limited indebtedness to be agreed. As used herein, (i) the term "Closing Date" means the date of the closing of the Acquisition and the initial funding of the Facilities and (ii) the term "Transactions" means the Acquisition, the Refinancing, the initial borrowings under the Bank Facilities

-2-

Professionals' Eyes Only                                                        TRB0009276

on the Closing Date, the issuance of the Senior Notes or the borrowings under the Senior Bridge Facility, the issuance of the Senior Subordinated Notes or the borrowings under the Senior Subordinated Bridge Facility, the Equity Financing and the payments of fees, commissions and expenses in connection with each of the foregoing.

      1.    <u>Commitments</u>.

      You have requested that Citigroup (in such capacity, a "<u>Bank</u>" and together with any other financial institutions that may with our and your consent act as initial commitment parties, the "<u>Banks</u>") commit to provide the Facilities and the Arranger agree to structure, arrange and syndicate the Facilities.

      Citigroup is pleased to advise you of its commitment to provide to the Borrower 100% of the principal amount of the Bank Facilities (the "<u>Bank Commitment</u>") and Citigroup is pleased to advise you of its commitment to provide 100% of the principal amount of each of the Bridge Facilities (the "<u>Bridge Commitment</u>" and, together with the Bank Commitment, the "<u>Commitments</u>"), in each case, upon the terms and subject to the conditions set forth in this Commitment Letter and in the Term Sheets and the Conditions Annex referred to below. Notwithstanding the appointment of other financial institutions as initial commitment parties, Citigroup shall retain at least 40% of the economics of each Facility and shall have "left" placement on each Facility.

      In addition, at your request, Citigroup has delivered to you a separate engagement letter dated the date hereof (the "<u>Engagement Letter</u>") setting forth, among other things, the terms on which Citigroup has, in response to your request, proposed terms for it to act, on a sole and exclusive basis, as bookrunning manager, underwriter, initial purchaser and placement agent for (a) the Notes or (b) if any Bridge Facility is funded on the Closing Date, the issuance or sale of any debt for the purpose of refinancing all or a portion of the outstanding amounts under such Bridge Facility (including any exchange notes issued in connection therewith).

      2.    <u>Syndication</u>.

      It is agreed that Citigroup acting alone or through one of its affiliates selected by it, will act as sole lead arranger (in such capacity, the "<u>Arranger</u>") and as sole bookrunner for the Facilities. It is also agreed that Citigroup will act as Administrative Agent and Syndication Agent in connection with the Bank Facilities and the Bridge Facilities. It is further agreed that the Arranger will exclusively manage the syndication of the Facilities, and will, in such capacity, exclusively perform the duties and exercise the authority customarily associated with its role as an Arranger. No Lender (as defined below) will receive compensation from you or the Borrower or your subsidiaries with respect to any of the Facilities outside the terms contained herein and in the letter of even date herewith addressed to you providing, among other things, for certain fees relating to the Facilities (the "<u>Fee Letter</u>") in order to obtain its commitment to participate in such Facilities, in each case unless you and we so agree.

      Citigroup reserves the right, prior to or after execution of the Bank Documentation (as defined in the Conditions Annex referred to below), to syndicate all or a portion of its Commitment in respect of the Bank Facilities to one or more institutions (other than certain institutions designated in writing by you) with your consent (not to be unreasonably withheld) that will become parties to the Bank Documentation (Citigroup and the institutions becoming parties to the Bank Documentation, the "<u>Bank Lenders</u>"). Citigroup reserves the right, prior to or after the execution of the Bridge Documentation (as defined in the Conditions Annex referred to below), to syndicate all or a portion of its Commitment in respect of each Bridge Facility to one or more institutions (other than certain institutions designated in writing by you) with your consent (not to be unreasonably withheld) that will become parties to the

-3-

Professionals' Eyes Only                    TRB0009277

Bridge Documentation applicable to such Bridge Facility (Citigroup and the institutions becoming parties to such Bridge Documentation, collectively, the "Bridge Lenders," and, together with the Bank Lenders, the "Lenders"). Notwithstanding the foregoing, the Banks shall not be released from their Commitments hereunder by any such syndication unless and until the applicable assignee first funds its Commitment hereunder and the completion of such syndication is not a condition to the Commitments hereunder.

The Arranger will, in consultation with you, exclusively manage all aspects of the syndication of the Facilities, including selection of additional Lenders reasonably acceptable to you, determination of when the Arranger will approach potential additional Lenders, and the final allocations of the Commitments in respect of the Facilities among the additional Lenders; *provided* that, except as otherwise set forth herein, any naming rights shall be subject to your consent. You agree to, and will use commercially reasonable efforts to cause appropriate members of management of the Acquired Business to, actively assist the Arranger in achieving a syndication of the Facilities. To assist the Arranger in its syndication efforts, you agree that you will, and will cause your representatives and non-legal advisors to, and will use commercially reasonable efforts to cause appropriate members of management of the Acquired Business to, (a) promptly provide all financial and other information reasonably available to you as we may reasonably request with respect to you, the Acquired Business, your and their respective subsidiaries and the transactions contemplated hereby, including but not limited to financial projections to be prepared by you including financial projections for the Acquired Business on an annual basis through 2014 and on a quarterly basis through 2008 (the "Projections") relating to the foregoing, (b) use commercially reasonable efforts to ensure that the syndication efforts benefit from existing lending relationships of the Sponsor and the Acquired Business, (c) make available to prospective Lenders senior management and non-legal advisors of Holdings and (to the extent reasonable and practical) appropriate members of management of the Acquired Business, (d) host, with the Arranger, one meeting with prospective Lenders under each of the Facilities, (e) assist the Arranger in the preparation of one or more confidential information memoranda and other marketing materials to be used in connection with the syndication of each of the Facilities, (f) retain one or more investment banks satisfactory to Arranger (collectively, the "Investment Bank") to publicly sell or privately place the Notes and to provide the Arranger and the Investment Bank, not later than 20 days prior to the Closing Date, a complete printed preliminary prospectus or preliminary offering memorandum or preliminary private placement memorandum (collectively, an "Offering Document") suitable for use in a customary "high-yield road show" relating to each of the Senior Notes and the Senior Subordinated Notes and in customary form for offering memoranda used in Rule 144A offerings by affiliates of the Sponsor, in each case, which contains, except as otherwise agreed by such Investment Bank, all financial statements and other data required to be included therein (including all audited financial statements, all unaudited financial statements and all appropriate pro forma financial statements prepared in accordance with, or reconciled to, generally accepted accounting principles in the United States and prepared in accordance with Regulation S-X under the Securities Act of 1933, as amended), and all other data reasonably necessary for the Investment Bank to receive customary "comfort" (including negative assurance comfort) from independent accountants in connection with the offering of such series of Notes, (g) afford the Investment Bank a period of at least 20 calendar days following receipt of an Offering Document including the information described in clause (f) to seek to place any series of Notes with qualified purchasers thereof, and (h) obtain, at your expense, monitored public ratings of the Facilities and the Notes from Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Group ("S&P") and to participate actively in the process of securing such ratings, including having senior management of Holdings and (to the extent reasonable and practical) appropriate members of management of the Acquired Business meet with such rating agencies.

-4-

Professionals' Eyes Only                                                                 TRB0009278

3.    Information.

You hereby represent and covenant that to your knowledge (a)(i) all written factual information (other than the Projections and information of a general economic or industry nature) that has been or will be made available to the Banks by you or any of your representatives and (ii) all information contained in any official presentation made by you or any of your representatives to prospective Lenders, in each case in connection with the transactions contemplated hereby (the "Information"), when taken as a whole, is, and in the case of Information made available after the date hereof, will be, correct in all material respects and does not, and in the case of Information made available after the date hereof, will not, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which such statements are made (including customary bank syndication practices), not materially misleading, and (b) the Projections that have been or will be made available to the Arranger by you or any of your representatives in connection with the transactions contemplated hereby have been and will be prepared in good faith based upon assumptions believed by you to be reasonable at the time made, it being understood that actual results may vary materially from the Projections. You agree to supplement the Information if necessary so that the representations and warranties in clause (a) of the preceding sentence remain correct on the Closing Date. You acknowledge that the Banks and the Arranger may share with any of their affiliates (it being understood that such affiliates will be subject to the confidentiality agreements between you and us), and such affiliates may share with Banks and the Arranger, any information related to the Acquired Business, or any of its subsidiaries or affiliates (including, without limitation, in each case, information relating to creditworthiness) and the transactions contemplated hereby.

You hereby acknowledge and agree that we will make available the Information, Projections and other marketing materials and presentations prepared or approved by you, including confidential information memoranda (collectively, the "Informational Materials"), to the potential Lenders by posting the Informational Materials on Intralinks or by other similar electronic means (collectively, the "Electronic Means"). You hereby further acknowledge and agree that (i) potential Lenders (the "Public Lenders") may not wish to receive material non-public information with respect to the Borrower, Holdings, the Acquired Business and their respective subsidiaries or any of their respective securities, (ii) you will assist, and cause your affiliates, advisors, the Sponsor and, to the extent possible using your commercially reasonable efforts, the Acquired Business to assist, the Arranger in the preparation of Informational Materials to be used in connection with the syndication of the Facilities to Public Lenders, which will only include data and materials that are either (A) publicly available or (B) not material with respect to the Borrower, Holdings, the Acquired Business and their respective subsidiaries or any of their respective securities for purposes of United States federal and state securities laws (such Informational Materials and any other information, data and materials, collectively, "Public Information"), (iii) you will identify and conspicuously mark any Informational Materials that consist solely of Public Information as "*PUBLIC*", and (iv) you will identify and conspicuously mark any Informational Materials that include any information, data and materials that are not Public Information as "*PRIVATE AND CONFIDENTIAL*".

4.    Compensation.

If the Closing Date occurs, as consideration for the Commitments of the Banks hereunder with respect to the Facilities and the agreement of the Arranger to structure, arrange and syndicate the Facilities, you agree to pay, or cause to be paid, to the Banks the fees set forth in the Term Sheets and the Fee Letter in accordance with the terms thereof. Once paid, such fees shall not be refundable under any circumstances, except as provided in the Fee Letter.

-5-

Professionals' Eyes Only                    TRB0009279

5.    <u>Conditions</u>.

The initial funding of the Facilities by the Banks hereunder is subject to the conditions set forth in Annex IV hereto (the "<u>Conditions Annex</u>"), which shall have been satisfied or waived.

Notwithstanding anything in this Commitment Letter, the Fee Letter, the Term Sheets, the Financing Documentation or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (i) the only representations and warranties the making of which shall be a condition to availability of the Facilities on the Closing Date shall be (A) such of the representations made by the Seller or the Acquired Business in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that you have the right to terminate your obligations under the Acquisition Agreement as a result of a breach of such representations in the Acquisition Agreement, and (B) the Specified Representations (as defined below), (ii) the terms of the Financing Documentation shall contain no condition precedent (including, without limitation, written notice of borrowing and absence of any default or potential event of default) and shall not impair availability of the Facilities on the Closing Date if the conditions set forth in this Section 5 of this Commitment Letter and in the Conditions Annex are satisfied and (iii) it is understood that (A) other than with respect to any UCC Filing Collateral or Stock Certificates (each as defined below), to the extent any guarantee or collateral is not provided on the Closing Date after your use of commercially reasonable efforts to do so, the delivery of such guarantee and/or collateral shall not constitute a condition precedent to the availability of the Facilities on the Closing Date but shall be required to be delivered after the Closing Date pursuant to arrangements to be mutually agreed by the parties hereto acting reasonably, (B) with respect to perfection of security interests in UCC Filing Collateral, your sole obligation shall be to deliver, or cause to be delivered, necessary UCC financing statements to the Administrative Agent or to cause Borrower or the applicable Guarantor (as defined in the Bank Term Sheet) to irrevocably authorize the Administrative Agent to file necessary UCC financing statements, and (C) with respect to perfection of security interests in Stock Certificates, your sole obligation shall be to deliver such Stock Certificates to the Administrative Agent as and to the extent they are delivered to you pursuant to the Acquisition Agreement.  For purposes hereof, (1) "<u>Specified Representations</u>" means the representations and warranties set forth in the Term Sheets relating to corporate power and authority, the enforceability of the Facilities documentation, Federal Reserve margin regulations and the Investment Company Act and the status of indebtedness under the applicable Facility (other than the Senior Subordinated Bridge Facility) as senior debt, (2) "<u>UCC Filing Collateral</u>" means collateral for which a security interest can be perfected by filing a Uniform Commercial Code financing statement and (3) "<u>Stock Certificates</u>" means collateral consisting of stock certificates representing capital stock of the domestic material restricted subsidiaries of the Acquired Business for which a security interest can be perfected by delivering such stock certificates.

6.    <u>Clear Market</u>.

From the date of this Commitment Letter until the Closing Date, you will ensure that no debt financing for Holdings, the Borrower or any of your subsidiaries is announced, syndicated or placed without the prior written consent of the Arranger if such financing, syndication or placement would have, in the reasonable judgment of the Arranger, a materially detrimental effect upon the syndication of the Bank Facilities or, if applicable, the Notes Offerings.

7.    <u>Indemnity</u>.

By your acceptance below, you hereby agree to indemnify and hold harmless each of the Banks and the Arranger and their respective affiliates (including, without limitation, controlling persons) and the directors, officers, employees, advisors and agents of the foregoing (each, an "<u>Indemnified Person</u>") from and against any and all losses, claims, costs, expenses, damages or liabilities to which any

-6-

Professionals' Eyes Only

TRB0009280

such Indemnified Person shall become subject arising out of or in connection with any action, investigation, suit or proceeding (whether commenced or threatened) relating to or arising out of or in connection with this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Facilities or any of the transactions contemplated hereby or the providing or syndication of the Facilities, and to reimburse each Indemnified Person for any legal or other expenses incurred in connection with investigating, preparing to defend or defending against, or participating in, any such suit, investigation, action or other proceeding (whether or not such Indemnified Person is a party to any action or proceeding), other than any of the foregoing of any Indemnified Person to the extent determined by a court of competent jurisdiction to have resulted by reason of the gross negligence, bad faith or willful misconduct of, or breach of this Commitment Letter, the Term Sheets, the Conditions Annex, or the Fee Letter by, such Indemnified Person or any of its affiliates, or the directors, officers, employees, advisors or agents of any of them. You shall not be liable for any settlement of any such proceeding effected without your written consent, but if settled with such consent, you shall indemnify the Indemnified Persons from and against any loss or liability by reason of such settlement, subject to your rights in this paragraph to claim exemption from your indemnity obligations. None of the Banks, the Arranger or any other Lender (or any of their respective affiliates) shall be responsible or liable to Holdings or the Sponsor or any of their subsidiaries, affiliates or stockholders for any consequential damages which may be alleged as a result of this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Facilities or the transactions contemplated hereby. In addition, you hereby agree to reimburse each of the Banks and the Arranger upon the Closing Date (if the Closing Date occurs) for (i) all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable legal fees and expenses for one counsel per jurisdiction of the Banks and the Arranger) and (ii) all reasonable printing, reproduction, document delivery, travel and communication costs incurred in connection with the syndication and execution of the Facilities and the preparation, review, negotiation, execution and delivery of this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter and the Financing Documentation (as defined in the Conditions Annex). Holdings further agrees to pay all costs and expenses of Citigroup (including, without limitation, reasonable fees and disbursements of counsel) incurred in connection with the enforcement of any of its rights or remedies hereunder.

## 8.    Confidentiality.

This Commitment Letter is furnished for your benefit, and may not be relied on by any other person or entity. This Commitment Letter is entered into upon the condition that neither the existence of this Commitment Letter, the Term Sheets, the Conditions Annex or the Fee Letter nor any of their contents shall be disclosed by the Banks or the Arranger or any of their affiliates, or by you or any of your affiliates, directly or indirectly, to any other person, except that such existence and contents may be disclosed (i) as may be compelled in a judicial or administrative proceeding or as otherwise required by law, legal process or regulatory review (in which case the applicable party shall promptly inform the other parties hereto of such disclosure) and (ii) to the Banks and the Arranger and their affiliates' directors, officers, employees, advisors and agents and to you, the Equity Investors and your and their directors, officers, employees, advisors and agents, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby, and as reasonably required for the syndication. In addition, this Commitment Letter, the Term Sheets, the Conditions Annex, and (to the extent portions thereof have been redacted in a manner reasonably satisfactory to us) the Fee Letter may be disclosed to the Seller and the Acquired Business and each of its directors, officers, employees, advisors and agents, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby.

Professionals' Eyes Only

TRB0009281

9.     Other Services.

          You acknowledge and agree that the Banks, the Arranger and/or their affiliates may be requested to provide additional services with respect to the Sponsor, the Acquired Business and/or their respective affiliates or other matters contemplated hereby. Any such services will be set out in and governed by a separate agreement(s) (containing terms relating, without limitation, to services, fees and indemnification) in form and substance satisfactory to the parties thereto. Nothing in this Commitment Letter is intended to obligate or commit the Banks or the Arranger or any of their affiliates to provide any services other than as set out herein.

          You acknowledge that the Arranger and its affiliates (the term "Arranger" as used in this paragraph being understood to include such affiliates) may be providing debt financing, equity capital or other services (including financial advisory services) to other companies with which you, Holdings, the Sponsor, the Acquired Business, the shareholders of the Acquired Business or your or their respective affiliates may have conflicting interests regarding the Transactions and otherwise and that the Arranger may act as it deems appropriate in acting in such capacities. You and your affiliates further acknowledge and agree that in connection with all aspects of the Transactions and the transactions contemplated by this Commitment Letter, you and your affiliates, on the one hand, and the Arranger, on the other hand, have an arm's length business relationship that creates no fiduciary duty on the part of the Arranger and each expressly disclaims any fiduciary relationship. The Arranger will not use confidential information obtained from you, the selling shareholders or the Acquired Business in connection with the performance by the Arranger of services for other companies and will not furnish any such information to other companies. You also acknowledge that the Arranger has no obligation in connection with the Transactions to use, or to furnish to you, Holdings, the Sponsor, the selling shareholders, the Acquired Business or your or their respective subsidiaries, confidential information obtained from other companies or entities.

          You further acknowledge that the Arranger is a full service securities firm and it and each Bank may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of Holdings, the Borrower, their affiliates and other companies that may be the subject of the transactions contemplated by this Commitment Letter.

10.     Governing Law, Etc.

          This Commitment Letter and the commitment of the Banks shall not be assignable by you without the prior written consent of the Banks and the Arranger, and any purported assignment without such consent shall be void. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Banks, the Arranger and you. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or electronic transmission shall be effective as delivery of a manually executed counterpart of this Commitment Letter. Headings are for convenience only. This Commitment Letter is intended to be for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto, the Lenders and, with respect to the indemnification provided under Section 7 (Indemnity) above, each Indemnified Person. This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of law to the extent that the application of the laws of another jurisdiction will be required thereby. Any right to trial by jury with respect to any claim or action arising out of this Commitment Letter is hereby waived. The parties hereto hereby submit to the non-exclusive jurisdiction of the federal and New York State courts located in The

-8-

Professionals' Eyes Only                                                                    TRB0009282

City of New York (and appellate courts thereof) in connection with any dispute related to this Commitment Letter or any of the matters contemplated hereby. The parties hereto agree that service of any process, summons, notice or document by registered mail addressed to you shall be effective service of process against you for any suit, action or proceeding relating to any such dispute. The parties hereto irrevocably and unconditionally waive any objection to the laying of such venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. A final judgment in any such suit, action or proceeding brought in any such court may be enforced in any other courts to whose jurisdiction you are or may be subject by suit upon judgment.

           11.    <u>Patriot Act</u>.

        We hereby notify you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "<u>Patriot Act</u>"), the Banks, the Arranger, and the Lenders are required to obtain, verify and record information that identifies you and the Borrower, which information includes the name, address and tax identification number of you and the Borrower and other information regarding you and the Borrower that will allow the Banks, the Arranger, or such Lender to identify you and the Borrower in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to the Banks, the Arranger, and the Lenders.

        Please indicate your acceptance of the terms hereof and of the Term Sheets, the Conditions Annex and the Fee Letter by returning to us (electronically or otherwise) executed counterparts of this Commitment Letter and the Fee Letter (and, if you have accepted this Commitment Letter with respect to the Bridge Facilities, an executed counterpart of the Engagement Letter) not later than 5:00 p.m., New York City time, on January 31, 2007. This Commitment Letter and the agreement of the Arranger to provide the services described herein are also conditioned upon your acceptance hereof and of the Fee Letter as set forth above and, if applicable, the Engagement Letter. Upon the earlier to occur of (A) the execution and delivery of the Financing Documentation by all of the parties thereto and the initial funding of the Facilities or (B) and the date which is fourteen days after the "[Termination Date]" as defined in the Acquisition Agreement, if the Financing Documentation shall not have been executed and delivered by all such parties prior to that date, this Commitment Letter and the agreement of the Arranger to provide the services described herein shall automatically terminate unless each of the Borrower and the Arranger shall, in its discretion, agree to an extension. The confidentiality, compensation, indemnification and governing law and forum provisions hereof and in the Term Sheets and the Fee Letter shall survive termination of this Commitment Letter (or any portion hereof) or the commitments of the Lenders hereunder (provided that such confidentiality provisions of the Commitment Letter shall be superseded by the same provisions of the Financing Documentation on and after the Closing Date). The provisions under Section 2 (Syndication) above shall survive the execution and delivery of the Financing Documentation.

<i>[Signature Page Follows]</i>

-9-

Professionals' Eyes Only

TRB0009283

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

CITIGROUP GLOBAL MARKETS INC.

By: _Caesar W Wyszomirski_
Name: CAESAR WYSZOMIRSKI
Title: DIRECTOR

*[commitment letter signature page]*

Professionals' Eyes Only

TRB0009284

Accepted and agreed to as of the date first
written above:

[HOLDINGS]

By: _____
     Name:
     Title:

*[commitment letter sigature page]*

Professionals' Eyes Only                          TRB0009285

SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

Bank Facilities[1]

| | |
|---|---|
| Borrower: | The Borrower. |
| Lead Arranger and Bookrunner: | Citigroup (in such capacity, the "Arranger"). |
| Lenders: | A syndicate of banks, financial institutions and other entities, including Citigroup, arranged by the Arranger and reasonably acceptable to the Borrower (collectively, the "Lenders"). |
| Administrative Agent, Issuing Bank and Swing Line Lender and Collateral Agent: | Citigroup as Administrative Agent, Issuing Bank and Swing Line Lender (in such capacities the "Administrative Agent", the "Issuing Bank" or the "Swing Line Lender", as the case may be) and as Collateral Agent for the Bank Facilities referred to below (in such capacity, the "Collateral Agent"). Each of the Administrative Agent and the Collateral Agent may resign as the Administrative Agent or the Collateral Agent, as applicable upon thirty (30) days' notice. If the Administrative Agent or the Collateral Agent resigns, the Requisite Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall be consented to by the Borrower absent a bankruptcy default (which consent of shall not be unreasonably withheld or delayed). If no successor agent is appointed prior to the effective date of the resignation of the Administrative Agent or the Collateral Agent, as applicable, the Administrative Agent or the Collateral Agent, as applicable, may appoint, after consulting with the Borrower, a successor agent from among the Lenders. |
| Type and Amount of Bank Facilities: | Term Loan Facility: |
| | Term B Loan Facility (the "Term Loan Facility") in an aggregate principal amount of $1,940 million. |
| | Revolving Credit Facility: |
| | A revolving first lien credit facility (the "Revolving Credit Facility") in an aggregate principal amount of $300 million. The Term Loan Facility and the Revolving Credit Facility are herein referred to collectively as the "Bank Facilities". |

---

[1]    All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

Professionals' Eyes Only                                                                                    TRB0009286

I-2

| | |
|---|---|
| Purpose: | Proceeds of the Bank Facilities will be used on the Closing Date to finance a portion of the Acquisition consideration and the Refinancing and to pay fees, commissions and expenses in connection therewith.  Following the Closing Date, the Revolving Credit Facility will be used by the Borrower and its subsidiaries for working capital and general corporate purposes, including permitted acquisitions and investments. |
| Closing Date: | The date of consummation of the Acquisition and the initial funding of the Facilities. |
| Definitive Documentation: | Consistent with transactions for companies owned by the Sponsor, subject to the penultimate and final sentence of the second paragraph of Section 5 of the Commitment Letter. |
| Maturity Dates: | Term Loan Facility: Seven (7) years from the Closing Date.

Revolving Credit Facility: Six (6) years from the Closing Date. |
| Availability: | Term Loan Facility:  A single drawing may be made on the Closing Date of the full amount of the Term Loan Facility.

Revolving Credit Facility:  Borrowings may be made at any time on or after the Closing Date to but excluding the business day preceding the maturity date of the Revolving Credit Facility; *provided* that the borrowings on the Closing Date (excluding the issuance of any letters of credit) shall not exceed an amount to be agreed. |
| Letters of Credit: | Up to an amount to be agreed of the Revolving Credit Facility will be available for letters of credit, on customary terms and conditions to be set forth in the Bank Documentation.

Each letter of credit shall expire not later than the earlier of (a) 12 months after its date of issuance (*provided* that any letter of credit with a one-year tenor may provide for the renewal thereof for additional one-year periods) and (b) the fifth day prior to the maturity date of the Revolving Credit Facility. |
| Swing Line Facility: | Up to an amount to be agreed of the Revolving Credit Facility will be available for Swing Loans, on terms and conditions to be set forth in the Bank Documentation. |
| Amortization: | Term Loan Facility:  Commencing after the fiscal period ending at least two years after closing, the Closing Date Term Loan Facility will amortize in equal quarterly installments in an amount equal to 1% *per annum* with the balance at the end of year seven.

Revolving Credit Facility:  None. |

Professionals' Eyes Only                                                    TRB0009287

Interest:                          At the Borrower's option, loans will bear interest based on the Base Rate or LIBOR, as described below:

A.  Base Rate Option

Interest will be at the Base Rate plus the applicable Interest Margin (as defined below).  The Base Rate is defined as the higher of (a) the Federal Funds Rate, as published by the Federal Reserve Bank of New York plus 1/2 of 1% and (b) the prime commercial lending rate of the Administrative Agent, as established from time to time at its principal U.S. office (which such rate is an index or base rate and will not necessarily be its lowest or best rate charged to its customers or other banks).  Interest shall be payable quarterly in arrears and with respect to Base Rate Loans shall be calculated on the basis of the actual number of days elapsed in a year of 365/366 days.

Base Rate borrowings will be made on one business days' notice and will be in minimum amounts to be agreed upon.

B.  LIBOR Option

Interest will be determined for periods ("Interest Periods") of one, two, three or six months (or nine or twelve months if agreed to by all relevant Lenders) as selected by the Borrower and will be at an annual rate equal to the London Interbank Offered Rate ("LIBOR") for the corresponding deposits of U.S. dollars plus the applicable Interest Margin.  LIBOR will be determined by the Administrative Agent at the start of each Interest Period and will be fixed through such period; *provided* that the Borrower may reset an Interest Period at any time so long as it reimburses the Lenders for any breakage costs they actually incur as a result.  Interest will be paid at the end of each Interest Period or, in the case of Interest Periods longer than three months, quarterly, and will be calculated on the basis of the actual number of days elapsed in a year of 360 days.  LIBOR will be adjusted for maximum statutory reserve requirements (if any).

LIBOR borrowings will require three business days' prior notice and will be in minimum amounts to be agreed upon.

Swingline loans will bear interest at the Base Rate plus the applicable Interest Margin.

Default Interest:                  Upon the occurrence and during the continuance of a payment default, interest will accrue on any overdue amount of a loan or other overdue amount payable under the Bank Facilities at a rate of 2.0% per annum in excess of the rate (including the applicable Interest Margin) otherwise applicable to such loan

Professionals' Eyes Only                                             TRB0009288

or other overdue amount, and will be payable on demand.

| | |
|---|---|
| Interest Margins: | The applicable Interest Margin with respect to the Bank Facilities will be 2.25% in the case of LIBOR loans and 1.25% in the case of Base Rate Loans. |

Notwithstanding the foregoing, after the date on which the Borrower will have delivered financial statements for the first full fiscal quarter after the Closing Date, the Interest Margin with respect to the Bank Facilities will be determined in accordance with a leverage based pricing grid set forth on Exhibit A to this Annex I.

| | |
|---|---|
| Commitment Fee: | A Commitment Fee shall accrue on the unused amounts of the commitments under the Revolving Credit Facility. Such Commitment Fee will initially be 0.50% per annum and after delivery of financial statements for the first full fiscal quarter ending after the Closing Date will be determined in accordance with a leverage based pricing grid set forth on Annex I-A. Accrued Commitment Fees will be payable quarterly in arrears (calculated on a 360-day basis) for the account of the Lenders from the Closing Date. |

| | |
|---|---|
| Letter of Credit Fees: | The Borrower will pay (i) the Issuing Bank a fronting fee equal to 12.5 basis points per annum and (ii) the Lenders under the Revolving Credit Facility stand-by letter of credit participation fees equal to the Applicable Margin for LIBOR Loans under the Revolving Credit Facility minus the fronting fee referred to in clause (i), in each case, on the undrawn amount of all outstanding letters of credit. In addition, the Borrower will pay the Issuing Bank customary issuance fees. |

| | |
|---|---|
| Mandatory Prepayments of Term Loan Facility: | An amount equal to 100% of the net proceeds received from the sale or other permanent disposition of all or any part of the assets of the Borrower or any Guarantor other than amounts reinvested in the Borrower's consolidated business within 15 months of such disposition (or if committed to be reinvested within such 15 months, reinvested within 6 months of such commitment) and subject to other exceptions to be agreed (*provided* that (a) so long as if at any time during the reinvestment period, and on a pro forma basis after giving effect to the asset sale and the application of the proceeds thereof, the Total Leverage Ratio (as defined below) is less than or equal to 6.5 to 1.0, up to $75,000,000 in asset sale proceeds may be retained by the Borrower and added to the available investment basket described in the Negative Covenants below and (b) if at any time Borrower sells or causes its subsidiaries to sell the Chicago Cubs major league baseball franchise and related assets to be specified at the time of sale (the "Chicago Cubs"), then Borrower shall either (i) |

Professionals' Eyes Only

apply the net proceeds to repay the Term Loan Facility as follows: (x) 100% of that portion of such net proceeds that, when applied to repay the Term Loan Facility, would result in the Total Leverage Ratio (without netting any proceeds received from the sale of the Chicago Cubs) remaining unchanged on a pro forma basis for such sale and repayment and (y) 50% of any remaining amount of such net proceeds from such sale of the Chicago Cubs and Borrower shall be able to distribute the other 50% of such asset sale proceeds to Holdings and the Equity Investors as a return of capital or (ii) so long as the Total Leverage Ratio is less than a ratio to be agreed both at the time of such asset sale and after giving pro forma effect thereto (without netting any proceeds received from the sale of the Chicago Cubs), retain such amount of the proceeds from such asset sale and distribute such retained asset sale proceeds to Holdings and the Equity Investors as a return of capital, it being understood that Borrower and the Administrative Agent will agree on whether (i) or (ii) will be applicable prior to executing the Bank Documentation).

100% of the net proceeds received by the Borrower or any Guarantor from the issuance of debt after the Closing Date, (other than any debt permitted under the Bank Documentation to be agreed), with a step-down to 50% to be agreed based on Borrower's Total Leverage Ratio, and (b) beginning with the first full fiscal year of the Borrower after the Closing Date, 50% of excess cash flow of the Borrower and its subsidiaries (to be defined in a manner to be agreed but in any event to include deductions, without duplication among periods, for operating cash used to finance acquisitions, investments and capital expenditures or then committed to be used to finance acquisitions, investments and capital expenditures for which a binding agreement then exists), with step-downs to 25% and 0% if the Borrower's Total Leverage Ratio is less than 7.00:1.00 and 5.50:1.00, respectively; *provided* that any voluntary prepayments and certain mandatory prepayments of loans (including loans under the Revolving Credit Facility to the extent accompanied by permanent reductions of the commitments thereunder), other than prepayments funded with the proceeds of certain indebtedness, shall be credited against excess cash flow prepayment obligations on a dollar-for-dollar basis.

There will be no prepayment penalties (except actual LIBOR breakage costs) for mandatory or other prepayments.

Notwithstanding the foregoing, each Lender under the Term Facility shall have the right to reject its *pro rata* share of any mandatory prepayments described above, in which case the amounts so rejected may be retained by the Borrower.

Professionals' Eyes Only

I-6

| | |
|---|---|
| Optional Prepayments: | Permitted in whole or in part, with prior notice but without premium or penalty (except actual LIBOR breakage costs) and including accrued and unpaid interest, subject to limitations as to minimum amounts of prepayments to be agreed. |
| Application of Prepayments: | Mandatory prepayments shall be applied to the remaining amortization payments of the Term Loan Facility in forward order for the next twelve unpaid quarterly amounts after such prepayment and thereafter on a pro rata basis. Optional prepayments shall be applied to remaining amortization payments in the manner directed by the Borrower. |
| Guarantees: | The Bank Facilities will be fully and unconditionally guaranteed on a joint and several basis by Holdings and all of the existing and future, direct and indirect, wholly-owned, restricted, material domestic subsidiaries of the Borrower except any indirect subsidiaries constituting controlled foreign corporations (collectively, the "<u>Guarantors</u>"). |
| Unrestricted Subsidiaries: | The Bank Documentation will contain provisions pursuant to which, subject to limitations on investments, loans, advances and guarantees, pro forma covenant compliance and other customary conditions and provisions, in each case, consistent with documentation for recent transactions for companies owned by Sponsor, the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary. Unrestricted subsidiaries will not be subject to the affirmative or negative covenant or event of default and other provisions of the Bank Documentation, and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of determining compliance with the financial covenants contained in the Bank Documentation. Once designated an unrestricted subsidiary a subsidiary may not be redesignated, either directly or indirectly, an unrestricted subsidiary. |
| Security: | The Bank Facilities and any hedging obligations and, as determined by the Borrower, cash management arrangements to which a Lender or an affiliate of a Lender is a counterparty will be secured (subject to: (i) on the Closing Date, liens disclosed in the schedules to the Acquisition Agreement or as are not otherwise prohibited by the terms of the Bank Documentation and (ii) thereafter to such liens to the extent they are not to be discharged in connection with the consummation of the Refinancing and other transactions or are otherwise not prohibited by the terms of the Bank Documentation) by perfected first priority pledges of all of the equity interests of the Borrower and each of the Borrower's direct and indirect material domestic subsidiaries and of 65% |

Professionals' Eyes Only

TRB0009291

of the equity interests of the Borrower's and any Guarantor's direct "first-tier" foreign subsidiaries, and perfected first priority security interests in substantially all tangible and intangible assets (including, without limitation, accounts receivable, inventory, equipment, general intangibles, intercompany notes in excess of an amount to be agreed, insurance policies, investment property, intellectual property, material owned real property and proceeds of the foregoing) of the Borrower and the Guarantors, wherever located, now or hereafter owned. Notwithstanding the foregoing, collateral shall not include (a) motor vehicles and other equipment subject to a certificate of title statute, (b) letter-of-credit rights, (c) certain commercial tort claims, (d) fee interests in real property valued at less than an amount to be agreed, (e) leaseholds, (f) fixtures, except to the extent that the same are equipment under the UCC or are related to real property covered by a mortgage in favor of the Lenders, (g) crops or farm products or as-extracted collateral, (e) cash, deposit accounts or securities accounts (which shall constitute collateral but the liens in such assets need not be perfected to the extent perfection requires actions other than the filing of customary financing statements), (f) foreign-law pledges, (g) assets in which such pledge or security interest would be prohibited by contractual provisions or, in the case of any foreign subsidiary, would be prohibited by applicable law or would result in materially adverse tax consequences, (h) assets to the extent the cost of obtaining a pledge or security interest in which is excessive in relation to the benefit thereof in the reasonable determination of the Administrative Agent, and (i) such other exceptions as are agreed.

To the extent any guarantee or collateral (other than collateral that can be perfected by the filing of uniform commercial code financing statements in a jurisdiction within the United States of America or the delivery of the stock certificate(s) of the Borrower and its material domestic restricted subsidiaries to the extent delivered pursuant to the Acquisition Agreement (together with undated stock powers executed in blank with respect thereto)) is not provided on the Closing Date after the use of commercially reasonable efforts to do so, the delivery of such guarantee and/or collateral shall not constitute a condition precedent to the availability of the Credit Facilities on the Closing Date but shall be required to be delivered after the Closing Date pursuant to arrangements to be mutually agreed.

Incremental Loans:

The Borrower shall be entitled to incur additional term loans under a new term facility that may be included in the Term Loan Facility and/or incremental revolving loans that may be included as a part of the Revolving Credit Facility, in an aggregate principal amount of up to $350 million with such additional loans having the same terms (including the same

Professionals' Eyes Only

TRB0009292

margins unless the Borrower shall otherwise agree), the same guarantees from the Guarantors, and being secured on a *pari passu* basis by the same collateral, as the applicable Bank Facility (the "Incremental Loans"); *provided* that (i) no default or event of default shall exist immediately prior or after giving effect thereto, (ii) in the case of Incremental Loans that are term loans, the other terms and documentation in respect thereof, to the extent not consistent with the applicable Bank Facility, shall be reasonably satisfactory to the Administrative Agent and (iii) no Lender shall be required to provide any such Incremental Loans; *provided* that, at the request of the Borrower, the Arranger (in consultation with the Borrower), will use its commercially reasonable efforts to obtain financial institutions to provide a commitment to the extent necessary to satisfy the Borrower's request for the Incremental Loans, subject to prevailing market conditions and payment by the Borrower of customary fees; *provided further* that any such additional lender(s) shall be reasonably satisfactory to the Borrower. The proceeds of Incremental Loans may be used to finance permitted acquisitions and for other working capital and general corporate purposes of the Borrower and its subsidiaries.

**Conditions to Initial Borrowings:** Conditions precedent to initial borrowings under the Bank Facilities will be those set forth in Section 5 (Conditions) of the Commitment Letter and in the Conditions Annex.

**Conditions to Each Borrowing other than Initial Borrowings:** Conditions precedent to each borrowing or issuance under the Bank Facilities occurring after the Closing Date: (1) the absence of any continuing default or event of default and (2) the accuracy of all representations and warranties in all material respects.

**Representations and Warranties:** Customary for the Sponsor and its affiliates in similar transactions and limited to the following (which shall apply to the Borrower and its subsidiaries and be subject to materiality thresholds and exceptions to be agreed): representations and warranties as to financial statements (including pro forma financial statements); no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of the Bank Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve regulations; ERISA and labor matters; Investment Company Act; subsidiaries; environmental matters; solvency; accuracy of disclosure; status of Bank Facilities as senior debt; and creation and perfection of security interests.

**Affirmative Covenants:** Customary for the Sponsor and its affiliates and limited to the

Professionals' Eyes Only

TRB0009293

following (which shall apply to the Borrower and its restricted subsidiaries and be subject to materiality thresholds and exceptions to be agreed):

Delivery of financial and other reasonably requested information: certified quarterly and audited annual financial statements, notices of defaults, litigation and other events that would have a material adverse effect, budgets and other information customarily supplied in a transaction of this type; payment of taxes; continuation of business and maintenance of existence and material licenses and permits; compliance with all applicable laws and regulations (including, without limitation, environmental matters, taxation and ERISA); maintenance of property and customary insurance; maintenance of books and records; right of the Lenders to inspect property and books and records (subject to certain limitations to be agreed); and further assurances (including, without limitation, with respect to security interests in after-acquired property).

**Negative Covenants:**   Customary for the Sponsor and its affiliates in similar transactions and limited to the following (which shall apply to the Borrower and its restricted subsidiaries and be subject to materiality thresholds and exceptions to be agreed (including, in any event, an available basket amount ("Additional Investment Amount") that will be available upon pro forma achievement of a Total Leverage Ratio to be agreed and will be built by retained excess cash flow, the proceeds of asset sales not otherwise applied to prepay the Term Loan Facility (other than proceeds from the sale of the Chicago Cubs), and issuances of equity that may be used for, among other things, permitted investments and other merger and acquisition activities, capital expenditures, restricted payments and the prepayment of subordinated debt):

1.  Limitation on mergers, dispositions of assets and changes of business.

2.  Limitation on stock and asset acquisitions (it being understood that the Borrower will be permitted to make acquisitions as long as (i) no event of default exists and Borrower is in pro forma compliance with the Total Net Senior Secured Leverage Ratio, and (ii) if the acquisition is a stock purchase or of assets that include the stock of subsidiaries, (A) any domestic entities acquired (including their domestic subsidiaries) will become Guarantors of the Bank Facilities (to the extent otherwise required by the Bank Documentation) and (B) acquisitions of entities that do not become Guarantors will be limited to an aggregate amount to be mutually agreed).

Professionals' Eyes Only

TRB0009294

3. Limitations on dividends and stock and subordinated debt repurchases and redemptions (with permitted dividends, repurchases and redemptions to be agreed and other than dividends, repurchases, prepayments of subordinated indebtedness and stock redemptions in each case from the proceeds of equity issuances and retained excess cash flow, dividends of the proceeds from the sale of the Chicago Cubs to Holdings and the Equity Investors to the extent set forth under "Mandatory Prepayments" and regularly scheduled dividends to Holdings up to an amount to be agreed to cover existence and basic operating expenses).

4. Limitation on indebtedness (including guarantees), other than (i) the incurrence of subordinated indebtedness and (ii) the incurrence of other indebtedness, in each case so long as, on a pro forma basis for such incurrence, Borrower would be in compliance with a Total Leverage Ratio to be agreed.

5. Limitation on loans and investments (with permitted investments to be agreed and other than investments from the proceeds of equity issuances and excess cash flow not required to be used to prepay the Term Loans).

6. Limitation on liens and further negative pledge clauses and clauses restricting subsidiary distributions.

7. Limitation on transactions with affiliates.

8. Limitation on speculative hedging agreements.

9. No modification or waiver of the Senior Subordinated Notes (if any) and or other subordinated debt in a manner that is materially adverse to the Lenders without the consent of the Requisite Lenders.

10. No change to fiscal year.

Financial Covenants:    With regard to the Term Loan Facility: None.

With regard to the Revolving Credit Facility only:

Financial covenants will only consist of a maximum Total Net Senior Secured Leverage Ratio.

The Total Net Senior Secured Leverage Ratio shall be set based on the projections contained in the model provided by the Sponsor to the Arranger (as the same may be adjusted by Sponsor prior to the launch of syndication) and set at a cushion of 30% to Adjusted EBITDA (as defined in Exhibit B to this

Professionals' Eyes Only

TRB0009295

Annex I) provided in such model. The financial covenant will
be calculated at any time there is usage under the Revolving
Credit Facility as of the last day of each fiscal quarter on a
consolidated basis for the Borrower and its subsidiaries for the
applicable trailing consecutive four fiscal quarter period on a
pro forma basis for asset acquisitions and dispositions;
*provided* that the first period for which compliance with the
financial covenant will be determined will be the first such
four fiscal quarter period ending at least six months after the
Closing Date.

Certain Financial Definitions:

As used herein:

(a) "Total Leverage Ratio" shall mean the ratio of (i) the
Borrower's total consolidated funded debt (to be defined in a
manner to be agreed and in any event net of cash and cash
equivalents) to (ii) the Borrower's consolidated Adjusted
EBITDA; and

(b) "Total Net Senior Secured Leverage Ratio" shall mean the
ratio of (i) the Borrower's total consolidated senior secured
funded debt (net of cash and cash equivalents) to (ii) the
Borrower's consolidated Adjusted EBITDA.

See Exhibit B to this Annex I for a definition of "Adjusted
EBITDA."

Equity Cure:

For purposes of determining compliance with the financial
covenants, any equity contribution (which equity shall be
common equity or other equity on terms and conditions
reasonably acceptable to the Administrative Agent) made to
the Borrower after the Closing Date and on or prior to the day
that is 15 days after the day on which financial statements are
required to be delivered for a fiscal quarter will, at the request
of the Borrower, be included in the calculation of Adjusted
EBITDA for the purposes of determining compliance with
financial covenants at the end of such fiscal quarter and
applicable subsequent periods (any such equity contribution so
included in the calculation of Adjusted EBITDA, a "Specified
Equity Contribution"); *provided* that (a) in each four fiscal
quarter period there shall be a period of at least two fiscal
quarters in which no Specified Equity Contribution is made,
(b) the amount of any Specified Equity Contribution shall be
no greater than the amount required to cause the Borrower to
be in compliance with the financial covenants and (c) all
Specified Equity Contributions shall be disregarded for
purposes of determining any baskets with respect to the
covenants contained in the Bank Documentation.

Activities of Holdings:

Holdings will not engage at any time in any business or other
activity other than (a) financing activities including, without

Professionals' Eyes Only

TRB0009296

limitation, holdco notes or loans, (b) ownership and acquisition of equity interests in Borrower or in any other acquired entity engaging in a permitted business, together with activities directly related thereto, (c) performance of its obligations in connection with the Acquisition Agreement and the other agreements contemplated thereby and hereby, (d) actions incidental to the consummation of the Transactions, and (e) activities incidental to its maintenance and continuance and to the foregoing activities. Holdings shall not permit any liens on the equity interests of the Borrower other than liens in favor of the Lenders or that would otherwise not be prohibited by the terms of the Bank Documentation if Holdings were a party thereto.

| | |
|---|---|
| Events of Default: | Customary for the Sponsor and its affiliates in similar transactions and limited to the following (which shall apply to Holdings, the Borrower and its subsidiaries and be subject to materiality thresholds, grace periods and exceptions to be agreed (*provided* that there will be longer grace periods for foreign entities)): nonpayment (after a grace period of 5 days in the case of non-principal defaults), breach of representations in any material respect, breach of covenants, cross defaults to material indebtedness (other than hedging obligations), loss of lien on material collateral, invalidity of significant guarantees, invalidity of subordination provisions, bankruptcy and insolvency events, ERISA events, material judgments and change of control (as defined below). |

"Change of Control" shall mean any event or circumstance after which: (i) Holdings shall cease to own, directly or indirectly, 100% of the Capital Stock of the Borrower; or (ii) if Holdings' capital stock is not traded on a nationally-recognized stock exchange, the Equity Investors shall cease to own, directly or indirectly, at least 50.1% of the voting stock of Holdings; or (iii) if Holdings' capital stock is traded on a nationally-recognized stock exchange (a) any party other than the Equity Investors shall own, directly or indirectly, at least 35% of the voting stock of Holdings and the Equity Investors shall own a lesser amount of such voting stock, or (b) a majority of the board of directors of Holdings shall not be Continuing Directors.

"Continuing Directors" shall mean the directors of Holdings on the Closing Date and each other director of Holdings, if, in each case, such other director's nomination for election to the board of directors of Holdings is recommended by at least 51% of the then Continuing Directors or such other director receives the vote of the Sponsor, as applicable, in his or her election by the shareholders of Holdings.

| | |
|---|---|
| Assignments and Participations: | Each Lender may assign all or, subject to minimum amounts to |

Professionals' Eyes Only

be agreed, a portion of its loans and commitments under one or more of the Bank Facilities (other than to certain persons designated by the Borrower); *provided* that any assignment in respect of the Revolving Credit Agreement shall be in a minimum amount equal to $5 million and any assignment of the Term Loan Facility shall be in a minimum amount equal to $1 million. Assignments will require payment of an administrative fee of $3,500 to the Administrative Agent and the consent of the Administrative Agent, the Issuing Bank (with respect to revolving credit facility loans and commitments) and the Borrower, which consents shall not be unreasonably withheld; *provided* that (i) no consents shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of the Borrower shall be required during a bankruptcy or payment event of default. In addition, each Lender may sell participations in all or a portion of its loans and commitments under one or more of the Bank Facilities (other than to certain persons designated in writing by the Borrower); *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Bank Facilities (except as to certain customary issues). Assignees and participants may not include competitors of the Borrower.

| | |
|---|---|
| Expenses and Indemnification: | All reasonable out-of-pocket expenses (including but not limited to reasonable legal fees and expenses of not more than one counsel plus, if necessary, one local counsel per jurisdiction and reasonable expenses incurred in connection with due diligence and travel, courier, reproduction, printing and delivery expenses) of the Banks, the Arranger and the Administrative Agent and the Syndication Agent associated with the syndication of the Bank Facilities and with the preparation, execution and delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the documentation contemplated hereby are to be paid by the Borrower on and after Closing Date, if it occurs. In addition, all out-of-pocket expenses (including but not limited to legal fees and expenses of not more than one counsel plus, if necessary, one local counsel per jurisdiction) of the Lenders and the Agents for workout proceedings, enforcement costs and documentary taxes associated with the Bank Facilities are to be paid by the Borrower. |

The Borrower will indemnify the Lenders, the Banks, the Arranger and the Agents and their respective affiliates, and hold them harmless from and against all out-of-pocket costs, expenses (including but not limited to legal fees and expenses of not more than one counsel plus, if necessary, one local counsel per jurisdiction) and liabilities arising out of or relating to any action, investigation, suit or proceeding relating to or

Professionals' Eyes Only

TRB0009298

arising out of the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the Bank Facilities; *provided, however,* that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a court of competent jurisdiction to have been incurred by reason of the gross negligence, bad faith or willful misconduct of, or breach of the Bank Documentation by, such person or any of its affiliates, or the directors, officers, employees, advisors or agents of any of them.

**Yield Protection, Taxes and Other Deductions:**

The Bank Documentation will contain yield protection provisions, customary for facilities of this nature, protecting the Lenders in the event of unavailability of LIBOR, breakage losses, reserve and capital adequacy requirements.

All payments are to be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than certain income taxes). The Lenders will use reasonable efforts to minimize to the extent possible any applicable taxes and the Borrower will indemnify the Lenders and the Administrative Agent for such taxes paid by the Lenders or the Administrative Agent. The Borrower will have the right to replace any Lender who requests any such indemnification, *provided* that (i) the Borrower has satisfied all of the outstanding obligations owing to such Lender under the Revolving Credit Facility, the Term Loan Facility and/or the Bridge Facilities, as applicable, and (ii) any replacement Lender is reasonably acceptable to the Administrative Agent to the extent that assignments to such Lender would otherwise require the Administrative Agent's consent under the provisions of "Assignments and Participations" above and such replacement lender requires less indemnification than the replaced lender.

**Requisite Lenders:**

Lenders holding at least a majority of total loans and commitments under the Bank Facilities (the "Requisite Lenders"), with (i) the consent of each Lender directly and adversely affected thereby to be required with respect to (a) reductions in the unpaid principal amount or extensions of the date for any scheduled payment of any loan, (b) reductions in interest rates (but not by virtue of a default waiver or change to a financial ratio) or fees or extensions of the dates for payment thereof, (c) increases in the amounts or extensions of the expiry date of any commitments and (d) modifications to any of the voting percentages and pro rata provisions and (ii) the consent of all Lenders to be required with respect to releases of all or substantially all of the collateral or all or substantially all of the Guarantors (other than in connection with permitted asset sales). The consent of Administrative Agent, Issuing Bank and/or Swingline Lender will be required with respect to any amendment affecting the rights or obligations thereof. The

Professionals' Eyes Only                                TRB0009299

|  | Borrower will have the "yank-a-bank" right to replace or prepay any Lender who does not consent to any amendment or waiver requiring the consent of such Lender but approved by the Requisite Lenders; *provided* that (i) the Borrower or such replacement lender has satisfied all of the outstanding obligations owing to such Lender under the Revolving Credit Facility and/or the Term Facility, as applicable, and (ii) any replacement Lender is reasonably acceptable to the Administrative Agent to the extent that assignments to such Lender would otherwise require the Administrative Agent's consent under the provisions of "Assignments and Participations" above and such replacement lender will consent to such amendment. The majority vote of a class of lenders will be required where such class is materially adversely affected in a manner different from other classes. |
|---|---|
| Governing Law and Forum: | The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York. |
| Counsel to the Banks, the Arranger and the Agents: | Cahill Gordon & Reindel LLP. |

Professionals' Eyes Only

Revolving Credit Facility Pricing Grid

| Total Net Senior Secured Leverage Ratio | Interest Margin for LIBOR Loans | Interest Margin for Base Rate Loans | Commitment Fee |
|---|---|---|---|
| >3.25:1.00 | 2.25% | 1.25% | 0.50% |
| ≤3.25:1.00 and >2.75:1.00 | 2.00% | 1.00% | 0.50% |
| ≤2.75:1.00 and >2.25:1.00 | 1.75% | 0.75% | 0.375% |
| ≤2.25:1.00 | 1.50% | 0.50% | 0.375% |

Term Loan Facility Pricing Grid

| Total Net Senior Secured Bank Leverage Ratio | Interest Margin for LIBOR Loans | Interest Margin for Base Rate Loans |
|---|---|---|
| >3.00:1.00 | 2.25% | 1.25% |
| ≤3.00:1.00 | 2.00% | 1.00% |

Professionals' Eyes Only

TRB0009301

Certain Definitions

Capitalized terms used but not defined herein have the meanings given (or incorporated by reference) in the Summary of Principal Terms and Conditions of the Bank Facility to which this Exhibit B is attached and, if not defined therein, shall be defined consistent with documentation for recent transactions for companies owned by Sponsor.

"Adjusted EBITDA" shall mean, with respect to Borrower and the Subsidiaries on a consolidated basis for any period, the Consolidated Net Income of Borrower and the Subsidiaries for such period plus (a) the sum of (in each case without duplication and to the extent the respective amounts described in subclauses (i) through (x) of this clause (a) reduced such Consolidated Net Income (as defined below) for the respective period for which Adjusted EBITDA is being determined):

(i)      provision for Taxes based on income, profits, dividends, or capital of the Borrower and the Subsidiaries for such period, including, without limitation, state, franchise and similar taxes;

(ii)     Interest Expense of the Borrower and the Subsidiaries for such period (net of interest income of the Borrower and its Subsidiaries for such period);

(iii)    depreciation and amortization expenses of the Borrower and the Subsidiaries for such period;

(iv)     any transition services expenses or incremental stand-alone expenses in each case to the extent duplicative of current operating expenses and non-recurring one-time transition service set-up costs;

(v)      any business optimization expenses and other restructuring charges; *provided* that with respect to each business optimization expense or other restructuring charge, the Borrower shall have delivered to the Administrative Agent an officers' certificate specifying and quantifying such expense or charge and stating that such expense or charge is a business optimization expense or other restructuring charge, as the case may be;

(vi)     any extraordinary, unusual or non-recurring charges, expenses or losses, including without limitation relocation costs and curtailments or modifications to pension and post retirement employee benefit plans;

(vii)    any non-cash pension and other post-employment benefit expenses;

(viii)   any other non-cash charges, expenses or losses; *provided* that, for purposes of this clause (viii), any non-cash charges, expenses or losses shall be treated as cash charges, expenses or losses in any subsequent period during which cash disbursements attributable thereto are made;

(ix)     the amount of management, consulting, monitoring, transaction and advisory fees and related expenses paid to the Sponsor or any of its affiliates (or any accruals related to such fees and related expenses) during such period;

(x)      any non-cash minority interest expense that reduced Consolidated Net Income for the respective period; and

Professionals' Eyes Only                                                      TRB0009302

I-B-2

(xi)    cash dividends received from unconsolidated investments,

minus (b) the sum of (without duplication and to the extent the amounts described in this clause (b) increased such Consolidated Net Income for the respective period for which Adjusted EBITDA is being determined) non-cash items increasing Consolidated Net Income of the Borrower and the Subsidiaries for such period (but excluding any such items (i) in respect of which cash was received in a prior period or will be received in a future period or (ii) which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges in any prior period).

Adjusted EBITDA shall be calculated on a pro forma basis to give effect to any acquisitions (including (i) the Acquisition and (ii) the commencement of activities constituting any new operations) or dispositions (including the termination or discontinuance of activities constituting such operations) of business entities or properties or assets (constituting a division or line of business of any business entity) that is the subject of any such acquisition or disposition, including any synergies and cost savings as certified by the Borrower as having been determined in good faith to be reasonably identifiable, factually supportable and reasonably anticipated to be realizable within 12 months following any such acquisition or disposition. All calculations of Adjusted EBITDA and Consolidated Net Income shall be calculated on a pro forma basis and set forth in an officers' certificate signed by the chief financial officer of the Borrower that states (i) the amount of such calculations and (ii) that such calculations are based on the reasonable good faith beliefs of the officers executing such officers' certificate at the time of such execution.

The calculation of Adjusted EBITDA shall not include any non-cash impact attributable to purchase accounting adjustments as a result of the fair value exercise undertaken as required by purchase accounting for the transactions contemplated by such acquisition, in accordance with GAAP (without duplication of clause (xi) of Consolidated Net Income).

"Consolidated Net Income" shall mean, with respect to any person for any period, the aggregate of the Net Income of such person and its subsidiaries for such period, on a consolidated basis; provided, however, that, without duplication,

(i)    any net after-tax (A) extraordinary, (B) unusual or (C) nonrecurring gains or losses or income or expenses (less all fees and expenses relating thereto), including without limitation any severance expenses, and fees, expenses or charges related to any offering of Equity Interests of Holdings, any Investment, acquisition or Indebtedness permitted to be incurred hereunder or retirement of Indebtedness (including termination of the associated hedging arrangements) (in each case, whether or not successful), including any such fees, expenses, charges or change in control payments related to the Transactions, in each case, shall be excluded;

(ii)    any net after-tax income or loss from discontinued operations and any net after-tax gain or loss on disposal of discontinued operations shall be excluded;

(iii)    any net after-tax gain or loss (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by the Board of Directors of the Borrower) shall be excluded;

(iv)    any net after-tax income or loss (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of indebtedness shall be excluded;

Professionals' Eyes Only                                                    TRB0009303

(v)   (A) the Net Income for such period of any person that is not a subsidiary of such person, or is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting, shall be excluded and (B) the Net Income for such period shall include any ordinary course dividend distribution or other payment in cash received from any person described in clause (A);

(vi)   the cumulative effect of a change in accounting principle during such period shall be excluded;

(vii)   any increase in amortization or depreciation or any one-time non-cash charges resulting from purchase accounting in connection with the Transactions or any acquisition that is consummated after the Closing Date shall be excluded;

(viii)   any non-cash impairment charges resulting from the application of Statement of Financial Accounting Standards ("SFAS") No. 142 and No. 144, and the amortization of intangibles arising pursuant to SFAS No. 141, shall be excluded;

(ix)   any non-cash compensation expenses realized from grants of stock appreciation or similar rights, stock options or other rights to officers, directors and employees of such person or any of its subsidiaries shall be excluded;

(x)   accruals and reserves that are established within twelve months after the Closing Date and that are so required to be established in accordance with GAAP shall be excluded; and

(xi)   any non-cash impact attributable to purchase accounting adjustments as a result of the fair value exercise undertaken as required by purchase method of accounting for the transaction contemplated by any Acquisition, in accordance with GAAP shall be excluded.

Professionals' Eyes Only

TRB0009304

SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

Senior Bridge Facility[1]

| | |
|---|---|
| Borrower: | The Borrower. |
| Sole Lead Arranger: | Citigroup (in such capacity, the "Arranger"). |
| Sole Bookrunner: | Citigroup. |
| Lenders: | A syndicate of banks, financial institutions and other entities, including Citigroup arranged by the Arranger and reasonably acceptable to the Borrower (collectively, the "Lenders"). |
| Administrative Agent: | Citigroup or one of its affiliates (in such capacity, the "Administrative Agent"). The Administrative Agent may resign as the Administrative Agent upon thirty (30) days' notice. If the Administrative Agent resigns, the Requisite Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall be consented to by the Borrower absent a bankruptcy default (which consent of shall not be unreasonably withheld or delayed). If no successor agent is appointed prior to the effective date of the resignation of the Administrative Agent the Administrative Agent may appoint, after consulting with the Borrower, a successor agent from among the Lenders. |
| Bridge Facility: | Unsecured senior bridge loans (the "Senior Bridge Loans") in an aggregate principal amount of $1,900 million (the "Senior Bridge Facility"). |
| Guarantors: | Same Guarantors as the Bank Term Sheet other than Holdings (each, a "Guarantor"; and its guarantee is referred to herein as a "Guarantee"). The Borrower and the Guarantors are herein referred to as the "Loan Parties" and individually as a "Loan Party." In the event that a subsidiary is released from its obligations under its guarantee of the Bank Facilities, its guarantee under the Senior Bridge Facility will be automatically released. Certain subsidiaries may be designated and treated as "unrestricted" on terms consistent with documentation for recent transactions for companies owned by the Sponsor or its affiliates. |
| Ranking: | The Senior Bridge Loans and the Guarantees thereof will be unsecured senior obligations of the Borrower and the Guarantors, will rank (i) *pari passu* in right of payment with all other senior indebtedness of the Borrower or such Guarantor, as |

---

[1]    All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

Professionals' Eyes Only                                                          TRB0009305

the case may be, and (ii) senior in right of payment to all subordinated indebtedness of the Borrower or such Guarantor, as the case may be.

| | |
|---|---|
| Availability/Use of Proceeds: | The Senior Bridge Facility will be available on the Closing Date in one drawing. The proceeds of the Senior Bridge Loans shall be used solely (a) to finance the Acquisition subject to the terms and conditions set forth in the Senior Bridge Documentation, and (b) to pay related fees, commissions and expenses. |
| Documentation: | Usual and customary for the Sponsor and its affiliates in similar transactions for facilities of this type. The Senior Bridge Documentation will include, among others, a bridge loan agreement and other appropriate documents, including an exhibit with the form of the indenture in connection with the issuance of any Senior Exchange Notes as contemplated below; *provided* that Adjusted EBITDA shall be defined as set forth in Exhibit B to Annex I attached to the Commitment Letter. |
| Interest: | The Senior Bridge Loans will bear interest at a variable rate per annum (the "Applicable Interest Rate") equal to the sum of (i) three-month LIBOR plus (ii) a spread equal to 3.25% (the "Spread"). The Spread will increase by an additional 0.50% on the six month anniversary of the Closing Date and a further additional 0.50% for each additional three-month period thereafter so long as any part of the Senior Bridge Loans are outstanding. |

Other than with respect to $500 million principal amount of Senior Bridge Loans (the "Toggle Portion"), interest will be paid in cash. Solely with respect to the Toggle Portion until the fourth anniversary of the Funding, interest will be paid, at the Borrower's option, in cash (a "Cash Election") or by adding such interest to the principal amount of the outstanding Toggle Portion of the Senior Bridge Loans (a "PIK Election" and, together with a Cash Election, an "Election"), in each case, quarterly in arrears. With respect to each interest period, the Borrower may elect to (i) pay interest on the entire principal amount of the outstanding Senior Bridge Loans in cash, (ii) pay interest on the entire Toggle Portion (including any capitalized interest thereon) of the Senior Bridge Loans by adding such interest to such principal amount and pay interest on the non-Toggle Portion in cash or (iii) pay interest on 50% of the Toggle Portion (including any capitalized interest thereon) of the Senior Bridge Loans, and on the non-Toggle Portion, in cash and pay interest on the remaining portion of such Toggle Portion by adding such interest to such principal amount of the Toggle Portion. Notwithstanding anything to the contrary herein, with respect to each interest period for which the Borrower has made a PIK Election, interest shall be payable (as to the portion of the interest subject to the PIK Election only) at the applicable rate

Professionals' Eyes Only

TRB0009306

for such interest period as set forth in the immediately preceding paragraph plus 75 basis points (such 75 basis point increase, the "PIK Margin Increase"). After the fourth anniversary of the Funding, interest on the Toggle Portion will be paid solely in cash.

The Borrower shall make an Election with respect to each interest period by providing at least 30 days' notice to the Administrative Agent prior to the beginning of such interest period. If an Election is not made by the Borrower in a timely fashion or at all with respect to the method of payment of interest for an interest period, the Borrower shall pay all such interest in cash. Any Cash Election or PIK Election provided above shall apply to all outstanding Senior Bridge Loans constituting part of the Toggle Portion (with the aggregate amount of the Toggle Portion to be allocated ratably among each such instrument). The Administrative Agent shall provide written notice of the Borrower's Election to all Lenders under the Senior Bridge Facility.

Notwithstanding anything to the contrary, other than as set forth below under "Other Terms", at no time shall the per annum yield on the non-Toggle Portion of the Senior Bridge Loans exceed 9.25% or on the Toggle Portion of the Senior Bridge Loans exceed 9.50% (without giving effect to any PIK Election).

**Other Terms:**

Interest will be payable quarterly, in arrears.

Interest will be calculated on the basis of actual days elapsed in a year of 360 days.

Upon the occurrence and during the continuance of a payment default, interest will accrue on any overdue amount payable in respect of Senior Bridge Loans at a rate of 2.0% per annum in excess of the rate otherwise applicable to such loans or amounts payable and will be payable on demand.

**Maturity:**

The Senior Bridge Loans will mature on the date (the "Senior Bridge Initial Maturity Date") that is twelve months after the initial funding date (the "Funding"); *provided, however,* that the maturity date of the Senior Bridge Loans shall be automatically extended on the Senior Bridge Initial Maturity Date to the date that is eight years after the Funding so long as no payment default has occurred and is continuing and none of Holdings, Borrower or any of their material subsidiaries is subject to a bankruptcy or other insolvency proceeding. In addition, after the Senior Bridge Initial Maturity Date and extension of the maturity date of the Senior Bridge Loans as described in the preceding sentence, the Senior Bridge Loans may be exchanged

Professionals' Eyes Only

TRB0009307

for Senior Exchange Notes as provided in Exhibit A attached hereto.

| | |
|---|---|
| Mandatory Redemption: | Subject to the mandatory prepayment provisions of the Bank Facilities and certain exceptions to be agreed upon, to the extent proceeds are available, the Borrower will repay the Senior Bridge Loans with the net proceeds from (a) the incurrence by the Borrower of any debt (other than borrowings under the Bank Facilities and permitted incurrences pursuant to the Bank Documentation), (b) asset sales, subject to reinvestment rights at least as favorable as those set forth in the Bank Documentation and other exceptions usual and customary for Sponsor and its affiliates in similar transactions for facilities of this type and (c) public equity issuances by Holdings or its Subsidiaries. Proceeds of Notes shall repay the Bridge Loans prior to the Bank Facilities as determined by the Arranger. |
| | Each such prepayment shall be made together with accrued interest to the date of prepayment, but, except as noted above, without premium or penalty (except actual breakage costs related to prepayments not made on the last day of the relevant interest period). |
| | The Borrower will also be required to make an offer to prepay the Senior Bridge Loans following the occurrence of a Change of Control at 100% of the outstanding principal amount thereof. |
| Optional Redemption: | The Senior Bridge Loans may be prepaid at any time, in whole or in part, at the option of the Borrower, upon notice and in a minimum principal amount and in multiples to be agreed upon, together with accrued interest to the date of pre-payment, but without premium or penalty (except actual breakage costs not including loss of margin related to prepayments not made on the last day of the relevant interest period). |
| Conditions Precedent to Funding: | The Funding of the Senior Bridge Loans will be subject to satisfaction of the conditions set forth on the Conditions Annex and subject to Section 5 of the Commitment Letter (1) the absence of any continuing default or event of default and (2) the accuracy of all representations and warranties in all material respects. |
| Representations and Warranties: | Substantially the same as those described in Bank Term Sheet and limited to the following (which shall apply to the Borrower and its material restricted subsidiaries and be subject to materiality thresholds and exceptions to be agreed): representations and warranties as to financial statements (including pro forma financial statements); no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of the Senior Bridge Documentation; no conflict with law or contractual obligations; |

Professionals' Eyes Only

TRB0009308

no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve regulations; ERISA and labor matters; Investment Company Act; subsidiaries; environmental matters; solvency; and accuracy of disclosure.

**Covenants:** Substantially the same as those affirmative covenants described in the Bank Term Sheet. Incurrence-based and other negative covenants consistent with those described in the Bank Term Sheet, with such changes as are necessary or appropriate for the Senior Bridge Facility, and negative covenants applicable to Senior Bridge Loans after the Initial Maturity Date and usual and customary for the Sponsor and its affiliates in similar transactions for facilities of this type, in each case, no more restrictive than applicable to the Bank Facilities.

**Events of Default:** Usual and customary for the Sponsor and its affiliates in similar transactions for facilities similar to the Senior Bridge Facility.

**Assignments and Participations:** Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans under the Senior Bridge Facility (other than to certain persons designated in writing by Borrower). Assignments will require, the consent of the Administrative Agent which consents shall not be unreasonably withheld; *provided* that no consents shall be required for an assignment to an existing Lender or an affiliate of an existing Lender; *provided* that, for the twelve month period commencing on the Closing Date, the consent of the Borrower (not to be unreasonably withheld or delayed) shall be required with respect to any assignment that would result in the Lenders on the Closing Date collectively holding less than 50.1% of the aggregate outstanding principal amount of the Senior Bridge Facility. In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Senior Bridge Facility (other than to certain persons designated in writing by Borrower); *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Senior Bridge Facility (except as to certain customary issues). Assignees and participants may not include competitors of the Borrower.

**Required Lenders:** Lenders having a majority of the outstanding credit exposure, except (1) the consent of all Lenders directly and adversely affected thereby to be required with respect to (a) reductions in the unpaid principal amount or extensions of the maturity date of any loan, (b) reductions in interest rates (but not by virtue of a default waiver or change to a financial ratio) or fees or extensions of the dates for payment thereof, and (c) increases in the amounts or extensions of the expiry date of a Lender's commitments and (2) the consent of all Lenders to be required with respect to (i) modifications to any of the voting

Professionals' Eyes Only     TRB0009309

percentages and pro rata provisions and (ii) at any time prior to the Senior Bridge Initial Maturity Date, releases of all or substantially all the Guarantors and thereafter, releases of any significant Guarantors (in each case other than automatic releases of any such Guarantors).

| | |
|---|---|
| Expenses and Indemnification: | The Borrower will pay (a) all reasonable out-of-pocket costs and expenses of the Arranger, the Administrative Agent and the Lenders (including the reasonable, disbursements and other charges of not more than one counsel in each applicable jurisdiction) in connection with the preparation, execution, delivery and administration of, and any waiver or modification (whether or not effective) and administration of, the Senior Bridge Documentation and in arranging and syndicating the Senior Bridge Facility on the Closing Date and thereafter, within 30 days of the delivery of a reasonably detailed invoice with respect thereto, and (b) all reasonable out-of-pocket costs and expenses of the Arranger, the Administrative Agent and the Lenders (including the reasonable fees and disbursements of not more than one counsel in each applicable jurisdiction) in connection with the enforcement of the Senior Bridge Facility, within 30 days of the delivery of a reasonably detailed invoice with respect thereto. |
| | The Borrower will indemnify the Arranger, the Administrative Agent and the Lenders and hold them harmless against all costs and expenses (including reasonable fees and disbursements of counsel) and all losses, claims, damages and liabilities in connection with any action, suit or proceeding arising from or relating to the proposed financing contemplated hereby and the other transactions connected therewith, except to the extent finally determined to have resulted from such indemnified party's bad faith, gross negligence or willful misconduct or the bad faith, gross negligence or willful misconduct of any of its affiliates, directors, officers, employees, representatives or agents. |
| Government Law and Forum: | The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York. |
| Miscellaneous: | Customary provisions regarding consent to jurisdiction, waiver of jury trial, service of process, yield protection, tax gross ups and other miscellaneous matters. |
| Counsel to the Arranger: | Cahill Gordon & Reindel LLP. |

Professionals' Eyes Only

TRB0009310

Summary of Principal Terms and Conditions
of Senior Exchange Notes

Capitalized terms used but not defined herein have the meanings given (or incorporated by reference) in the Summary of Principal Terms and Conditions of the Senior Bridge Facility to which this Exhibit A is attached.

| | |
|---|---|
| Issuer: | The Borrower. |
| Guarantors: | Same as the Guarantors of the Senior Bridge Loans. |
| Exchange: | If the Senior Bridge Loans have not been previously repaid in full for cash on or prior to the Initial Maturity Date and the maturity of the Senior Bridge Loans shall have been extended as provided in the Senior Bridge Term Sheet, Lenders shall have the option to require the Issuer to issue unsecured senior notes ("Senior Exchange Notes") under an indenture that complies with the Trust Indenture Act of 1939 to such Lender under the Senior Bridge Facility in the aggregate outstanding principal amount of such Lender's outstanding portion of the Senior Bridge Loans; *provided* that the Borrower may defer the first issuance of Senior Exchange Notes until such time as the Borrower has received requests to issue an aggregate amount of Senior Exchange Notes equal to at least 10% of the aggregate principal amount of all Senior Bridge Loans issued on the Closing Date. |
| Principal Amount: | The Senior Exchange Notes will be available only to satisfy the Senior Bridge Loans. The principal amount of the Senior Exchange Notes will equal 100% of the aggregate principal amount of the Senior Bridge Loans for which they are exchanged and will have the same ranking as the Senior Bridge Loans for which they are exchanged. |
| Interest Rate: | The Senior Exchange Notes (other than any Fixed Rate Senior Exchange Notes) will bear interest at a rate (the "Applicable Senior Exchange Note Interest Rate") equal to the Initial Rate (as defined below) plus the Applicable Spread (as defined below). The Senior Exchange Notes shall include provisions customary in securities of this type protecting the holders in the event of unavailability of funding, illegality, capital adequacy requirements, increased costs, withholding taxes and funding losses. |
| | Other than with respect to $500 million principal amount of Senior Exchange Notes (the "Toggle Portion"), interest will be paid in cash. Solely with respect to the Toggle Portion until the fourth anniversary of the Funding, interest will be paid, at the Borrower's option, in cash (a "Cash Election") or by adding such interest to the principal amount of the outstanding Toggle |

Professionals' Eyes Only                                                                 TRB0009311

Portion of the Senior Exchange Notes (a "PIK Election" and, together with a Cash Election, an "Election"), in each case, semiannually in arrears. With respect to each interest period, the Borrower may elect to (i) pay interest on the entire principal amount of the outstanding Senior Exchange Notes in cash, (ii) pay interest on the entire Toggle Portion (including any capitalized interest thereon) of the Senior Exchange Notes by adding such interest to such principal amount and pay interest on the non-Toggle Portion in cash or (iii) pay interest on 50% of the Toggle Portion (including any capitalized interest thereon) of the Senior Exchange Notes, and on the non-Toggle Portion, in cash and pay interest on the remaining portion of such Toggle Portion by adding such interest to such principal amount of the Toggle Portion. Notwithstanding anything to the contrary herein, with respect to each interest period for which the Borrower has made a PIK Election, interest shall be payable (as to the portion of the interest subject to the PIK Election only) at the applicable rate for such interest period as set forth in the immediately preceding paragraph plus 75 basis points (such 75 basis point increase, the "PIK Margin Increase"). After the fourth anniversary of the Funding, interest on the Toggle Portion will be paid solely in cash.

The Borrower shall make an Election with respect to each interest period by providing at least 30 days' notice to the Administrative Agent prior to the beginning of such interest period. If an Election is not made by the Borrower in a timely fashion or at all with respect to the method of payment of interest for an interest period, the Borrower shall pay all such interest in cash. Any Cash Election or PIK Election provided above shall apply to all outstanding Senior Bridge Loans constituting part of the Toggle Portion (with the aggregate amount of the Toggle Portion to be allocated ratably among each such instrument). The Administrative Agent shall provide written notice of the Borrower's Election to all Lenders under the Senior Bridge Facility.

Notwithstanding anything to the contrary, other than as set forth below under "Other Terms", at no time shall the per annum yield on the non-Toggle Portion of the Senior Exchange Notes exceed 9.25% or on the Toggle Portion of the Senior Exchange Notes exceed 9.50% (without giving effect to any PIK Election).

"Applicable Spread" shall mean zero during the three-month period commencing on the exchange date of the Senior Exchange Notes and shall increase by 0.50% *per annum* at the beginning of each subsequent three-month period.

"Initial Rate" shall be determined on the Initial Maturity Date of the Senior Bridge Loans and shall equal the interest rate of the

Senior Bridge Loans on the day immediately preceding the Initial Maturity Date plus 0.50% *per annum*.

Each holder of Senior Exchange Notes shall have the option to fix the interest rate on the Senior Exchange Notes to a rate that is equal to the then Applicable Interest Rate borne by the Senior Exchange Notes ("Fixed Rate Senior Exchange Notes").

| | |
|---|---|
| Other Terms: | Interest will be payable semiannually, in arrears. |

Interest will be calculated on the basis of actual days elapsed in a year of 360 days.

Upon the occurrence and during the continuance of a payment default, interest will accrue on any overdue amount payable in respect of Senior Exchange Notes at a rate of 2.0% per annum in excess of the rate otherwise applicable to such loans or amounts payable and will be payable on demand.

**Maturity:** Eight years from the date of the Funding.

**Ranking:** Same as the Senior Bridge Loans.

**Mandatory Offer to Purchase:** The Issuer will make an offer to purchase the Fixed Rate Senior Exchange Notes upon any change of control of the Issuer at a redemption price of 101% of par plus accrued and unpaid interest and will make an offer to purchase the Senior Exchange Notes not bearing interest at a fixed rate upon any change of control of the Issuer at a redemption price of par plus accrued and unpaid interest.

Subject to the mandatory pre-payment provisions of the Bank Facilities, to the extent proceeds are available, the Issuer will make offers to repurchase the Senior Exchange Notes for such events and on such terms and conditions as are customary for publicly traded high yield debt securities issued by affiliates of the Sponsor.

**Optional Redemption:** The Senior Exchange Notes (other than Fixed Rate Senior Exchange Notes) will be callable, in whole or in part, upon not less than 10 days written notice, at the option of the Issuer, at any time at par plus accrued and unpaid interest to the redemption date. The Fixed Rate Senior Exchange Notes will be callable in whole or in part at any time subject to customary make-whole provisions and in such other instances and subject to such other restrictions and premiums as are typical for similar fixed-rate high-yield debt securities issued by affiliates of the Sponsor.

**Right to Resell Notes:** Any Lender (and any subsequent holder) shall have the absolute and unconditional right to resell the Senior Exchange Notes to

Professionals' Eyes Only

TRB0009313

one or more third parties, whether by assignment or participation and subject to compliance with applicable securities laws.

| | |
|---|---|
| Representations and Warranties; Covenants; Events of Default: | Customary for publicly traded high yield debt securities of companies affiliated with the Sponsor. |
| Governing Law and Forum: | The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York. |
| Miscellaneous: | Customary provisions regarding consent to jurisdiction, waiver of jury trial, service of process, yield protection, tax gross ups and other miscellaneous matters. |
| Registration Rights: | The Borrower shall use commercially reasonable efforts to file, within 90 days after the first issuance of Senior Exchange Notes (the date of such issuance, the "Issue Date"), and will use commercially reasonable efforts to cause to become effective, as soon thereafter as practicable, a shelf registration statement with respect to the Senior Exchange Notes (such registration statement, a "Shelf Registration Statement") which Shelf Registration Statement shall contain all financial statements required under the Securities Act of 1933, as amended. If a Shelf Registration Statement is filed, the Borrower will keep such Shelf Registration Statement effective and available (subject to customary exceptions) until it is no longer needed to permit unrestricted resales of the Senior Exchange Notes; *provided* that in no event shall the Borrower be required to keep such Shelf Registration Statement effective and available for more than two years after the Issue Date. The Borrower shall cause the Shelf Registration Statement to be declared effective by the date (the "Effectiveness Date") that is 180 days from the Issue Date. Any failure on the part of the Borrower to cause the Shelf Registration Statement to be declared effective in accordance with the preceding sentence is referred to as a "Registration Default". In the event of a Registration Default with respect to any Senior Exchange Note, the Borrower will pay liquidated damages in the form of increased interest of $0.05 per week per $1,000 principal amount of such Senior Exchange Note to the holder of such Senior Exchange Note, to the extent that such holder is unable to freely transfer such Senior Exchange Note, from and including the Effectiveness Date to but excluding the effective date of the Shelf Registration Statement with respect to such Senior Exchange Note. On the 90th day after the Effectiveness Date with respect to any such Senior Exchange Note, the liquidated damages shall increase by an additional $0.05 per week per $1,000 principal amount and, on each 90 day anniversary of the Effectiveness Date thereafter, shall increase by an additional $0.05 per week per $1,000 |

Professionals' Eyes Only

TRB0009314

II-A-5

principal amount to a maximum increase in interest of $0.20 per week per $1,000 principal amount. The Borrower will also pay such liquidated damages to the holder of a Senior Exchange Note for any period of time (subject to customary exceptions) following the effectiveness of the Shelf Registration Statement with respect to such Senior Exchange Note that such Shelf Registration Statement is not available for sales thereunder. All accrued liquidated damages will be paid in arrears on each semi-annual interest payment date.

In lieu of a Shelf Registration Statement, the Borrower at its option may file a registration statement with respect to notes having terms identical to the Senior Exchange Notes (the "Substitute Notes") to effect a registered exchange offer (the "Exchange Registration Statement") in which the Borrower offers to holders of Senior Exchange Notes registered Substitute Notes in exchange for the Senior Exchange Notes. In such case, if the Exchange Registration Statement has not been declared effective and an exchange offer for the Senior Exchange Notes pursuant to the Exchange Registration Statement has not been consummated by the Effectiveness Date, the Borrower will pay liquidated damages in the form of increased interest for the same periods and at the same rates as described in the previous paragraph.

| | |
|---|---|
| Counsel to the Arranger | Cahill Gordon & Reindel LLP. |

Professionals' Eyes Only

TRB0009315

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

Senior Subordinated Bridge Facility[1]

| | |
|---|---|
| Borrower: | The Borrower. |
| Sole Lead Arranger: | Citigroup (in such capacity, the "Arranger"). |
| Sole Bookrunner: | Citigroup. |
| Lenders: | A syndicate of banks, financial institutions and other entities, including Citigroup arranged by the Arranger and reasonably acceptable to the Borrower (collectively, the "Lenders"). |
| Administrative Agent: | Citigroup or one of its affiliates (in such capacity, the "Administrative Agent"). The Administrative Agent may resign as the Administrative Agent upon thirty (30) days' notice. If the Administrative Agent resigns, the Requisite Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall be consented to by the Borrower absent a bankruptcy default (which consent of shall not be unreasonably withheld or delayed). If no successor agent is appointed prior to the effective date of the resignation of the Administrative Agent the Administrative Agent may appoint, after consulting with the Borrower, a successor agent from among the Lenders. |
| Bridge Facility: | Unsecured senior subordinated bridge loans (the "Senior Subordinated Bridge Loans") in an aggregate principal amount of $600 million (the "Senior Subordinated Bridge Facility"). |
| Guarantors: | Same Guarantors as the Bank Term Sheet other than Holdings (each, a "Guarantor"; and its guarantee is referred to herein as a "Guarantee"). The Borrower and the Guarantors are herein referred to as the "Loan Parties" and individually as a "Loan Party." In the event that a subsidiary is released from its obligations under its guarantee of the Bank Facilities, its guarantee under the Senior Subordinated Bridge Facility will be automatically released. Certain subsidiaries may be designated and treated as "unrestricted" on terms consistent with documentation for recent transactions for companies owned by the Sponsor or its affiliates. |
| Ranking: | The Senior Subordinated Bridge Loans and the Guarantees thereof will be unsecured senior subordinated obligations of the Borrower and the Guarantors, will rank (i) junior in right of payment to all senior indebtedness of the Borrower or such |

---

[1]    All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

Professionals' Eyes Only                                                          TRB0009316

Guarantor, as the case may be, (ii) *pari passu* in right of payment with all other senior subordinated indebtedness of the Borrower or such Guarantor, as the case may be, (iii) senior in right of payment to all subordinated indebtedness of the Borrower or such Guarantor, as the case may be.

| | |
|---|---|
| Availability/Use of Proceeds: | The Senior Subordinated Bridge Facility will be available on the Closing Date in one drawing. The proceeds of the Senior Subordinated Bridge Loans shall be used solely (a) to finance the Acquisition subject to the terms and conditions set forth in the Senior Subordinated Bridge Documentation, and (b) to pay related fees, commissions and expenses. |
| Documentation: | Usual and customary for the Sponsor and its affiliates in similar transactions for facilities of this type. The Senior Subordinated Bridge Documentation will include, among others, a bridge loan agreement and other appropriate documents, including an exhibit with the form of the indenture in connection with the issuance of any Senior Subordinated Exchange Notes as contemplated below; *provided* that Adjusted EBITDA shall be defined as set forth in Exhibit B to Annex I attached to the Commitment Letter. |
| Interest: | The Senior Subordinated Bridge Loans will bear interest at a variable rate per annum (the "<u>Applicable Interest Rate</u>") equal to the sum of (i) three-month LIBOR plus (ii) a spread equal to 4.75% (the "<u>Spread</u>"). The Spread will increase by an additional 0.50% on the six month anniversary of the Closing Date and a further additional 0.50% for each additional three-month period thereafter so long as any part of the Senior Subordinated Bridge Loans are outstanding. Notwithstanding the foregoing, the interest rate on the Senior Subordinated Bridge Loans shall not at any time exceed 11.25% *per annum*. |
| Interest Payments: | Interest will be payable quarterly, in arrears.

Interest will be calculated on the basis of actual days elapsed in a year of 360 days.

Upon the occurrence and during the continuance of a payment default, interest will accrue on any overdue amount payable in respect of Senior Subordinated Bridge Loans at a rate of 2.0% per annum in excess of the rate otherwise applicable to such loans or amounts payable and will be payable on demand. |
| Maturity: | The Senior Subordinated Bridge Loans will mature on the date (the "<u>Senior Subordinated Bridge Initial Maturity Date</u>") that is twelve months after the initial funding date (the "<u>Funding</u>"); *provided, however,* that the maturity date of the Senior Subordinated Bridge Loans shall be automatically extended on the Senior Subordinated Bridge Initial Maturity Date to the date |

TRB0009317

that is ten years after the Funding so long as no payment default has occurred and is continuing and none of Holdings, Borrower or any of their material subsidiaries is subject to a bankruptcy or other insolvency proceeding. In addition, after the Senior Subordinated Bridge Initial Maturity Date and extension of the maturity date of the Senior Subordinated Bridge Loans as described in the preceding sentence, the Senior Subordinated Bridge Loans may be exchanged for Senior Subordinated Exchange Notes as provided in Exhibit A attached hereto.

|  |  |
|---|---|
| Mandatory Redemption: | Subject to the mandatory prepayment provisions of the Bank Facilities and certain exceptions to be agreed upon, to the extent proceeds are available, the Borrower will repay the Senior Subordinated Bridge Loans with the net proceeds from (a) the incurrence by the Borrower of any debt (other than borrowings under the Bank Facilities and permitted incurrences pursuant to the Bank Documentation), (b) asset sales, subject to reinvestment rights at least as favorable as those set forth in the Bank Documentation and other exceptions usual and customary for Sponsor and its affiliates in similar transactions for facilities of this type and (c) public equity issuances by Holdings or its Subsidiaries. Proceeds of Notes shall repay the Bridge Loans prior to the Bank Facilities as determined by the Arranger. |

Each such prepayment shall be made together with accrued interest to the date of prepayment, but, except as noted above, without premium or penalty (except actual breakage costs related to prepayments not made on the last day of the relevant interest period).

The Borrower will also be required to make an offer to prepay the Senior Bridge Loans following the occurrence of a Change of Control at 100% of the outstanding principal amount thereof.

|  |  |
|---|---|
| Optional Redemption: | The Senior Subordinated Bridge Loans may be prepaid at any time, in whole or in part, at the option of the Borrower, upon notice and in a minimum principal amount and in multiples to be agreed upon, together with accrued interest to the date of pre-payment, but without premium or penalty (except actual breakage costs not including loss of margin related to prepayments not made on the last day of the relevant interest period). |
| Conditions Precedent to Funding: | The Funding of the Senior Subordinated Bridge Loans will be subject to satisfaction of the conditions set forth on the Conditions Annex and subject to Section 5 of the Commitment Letter (1) the absence of any continuing default or event of default and (2) the accuracy of all representations and warranties in all material respects. |
| Representations and Warranties: | Substantially the same as those described in Bank Term Sheet |

Professionals' Eyes Only

and limited to the following (which shall apply to the Borrower and its material restricted subsidiaries and be subject to materiality thresholds and exceptions to be agreed): representations and warranties as to financial statements (including pro forma financial statements); no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of the Senior Subordinated Bridge Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve regulations; ERISA and labor matters; Investment Company Act; subsidiaries; environmental matters; solvency; and accuracy of disclosure.

|  |  |
|---|---|
| Covenants: | Substantially the same as those affirmative covenants described in the Bank Term Sheet. Incurrence-based and other negative covenants consistent with those described in the Bank Term Sheet, with such changes as are necessary or appropriate for the Senior Subordinated Bridge Facility, and negative covenants applicable to Senior Subordinated Bridge Loans after the Initial Maturity Date and usual and customary for the Sponsor and its affiliates in similar transactions for facilities of this type, in each case, no more restrictive than applicable to the Bank Facilities. |
| Events of Default: | Usual and customary for the Sponsor and its affiliates in similar transactions for facilities similar to the Senior Subordinated Bridge Facility. |
| Assignments and Participations: | Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans under the Senior Subordinated Bridge Facility (other than to certain persons designated in writing by Borrower). Assignments will require, the consent of the Administrative Agent which consent shall not be unreasonably withheld; *provided* that no consent shall be required for an assignment to an existing Lender or an affiliate of an existing Lender; *provided* that, for the twelve month period commencing on the Closing Date, the consent of the Borrower (not to be unreasonably withheld or delayed) shall be required with respect to any assignment that would result in the Lenders on the Closing Date collectively holding less than 50.1% of the aggregate outstanding principal amount of the Senior Subordinated Bridge Facility. In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Senior Subordinated Bridge Facility (other than to certain persons designated in writing by Borrower); *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Senior Subordinated Bridge Facility (except as to certain customary issues). Assignees and participants may not include competitors of the |

Professionals' Eyes Only

TRB0009319

III-5

Borrower.

Required Lenders:

Lenders having a majority of the outstanding credit exposure, except (1) the consent of all Lenders directly and adversely affected thereby to be required with respect to (a) reductions in the unpaid principal amount or extensions of the maturity date of any loan, (b) reductions in interest rates (but not by virtue of a default waiver or change to a financial ratio) or fees or extensions of the dates for payment thereof, and (c) increases in the amounts or extensions of the expiry date of a Lender's commitments and (2) the consent of all Lenders to be required with respect to (i) modifications to any of the voting percentages and pro rata provisions and (ii) at any time prior to the Senior Subordinated Bridge Initial Maturity Date, releases of all or substantially all the Guarantors and thereafter, releases of any significant Guarantors (in each case other than automatic releases of any such Guarantors).

Expenses and Indemnification:

The Borrower will pay (a) all reasonable out-of-pocket costs and expenses of the Arranger, the Administrative Agent and the Lenders (including the reasonable, disbursements and other charges of not more than one counsel in each applicable jurisdiction) in connection with the preparation, execution, delivery and administration of, and any waiver or modification (whether or not effective) and administration of, the Senior Subordinated Bridge Documentation and in arranging and syndicating the Senior Subordinated Bridge Facility on the Closing Date and thereafter, within 30 days of the delivery of a reasonably detailed invoice with respect thereto, and (b) all reasonable out-of-pocket costs and expenses of the Arranger, the Administrative Agent and the Lenders (including the reasonable fees and disbursements of not more than one counsel in each applicable jurisdiction) in connection with the enforcement of the Senior Subordinated Bridge Facility, within 30 days of the delivery of a reasonably detailed invoice with respect thereto.

The Borrower will indemnify the Arranger, the Administrative Agent and the Lenders and hold them harmless against all costs and expenses (including reasonable fees and disbursements of counsel) and all losses, claims, damages and liabilities in connection with any action, suit or proceeding arising from or relating to the proposed financing contemplated hereby and the other transactions connected therewith, except to the extent finally determined to have resulted from such indemnified party's bad faith, gross negligence or willful misconduct or the bad faith, gross negligence or willful misconduct of any of its affiliates, directors, officers, employees, representatives or agents.

Government Law and Forum:

The laws of the State of New York. Each party to the Bank

Professionals' Eyes Only                                                      TRB0009320

III-6

|                        | Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York. |
|---|---|
| Miscellaneous: | Customary provisions regarding consent to jurisdiction, waiver of jury trial, service of process, yield protection, tax gross ups and other miscellaneous matters. |
| Counsel to the Arranger: | Cahill Gordon & Reindel LLP. |

Professionals' Eyes Only

TRB0009321

Summary of Principal Terms and Conditions
of Senior Subordinated Exchange Notes

Capitalized terms used but not defined herein have the meanings given (or incorporated by reference) in the Summary of Principal Terms and Conditions of the Senior Subordinated Bridge Facility to which this Exhibit A is attached.

| | |
|---|---|
| Issuer: | The Borrower. |
| Guarantors: | Same as the Guarantors of the Senior Subordinated Bridge Loans. |
| Exchange: | If the Senior Subordinated Bridge Loans have not been previously repaid in full for cash on or prior to the Initial Maturity Date and the maturity of the Senior Subordinated Bridge Loans shall have been extended as provided in the Senior Subordinated Bridge Term Sheet, Lenders shall have the option to require the Issuer to issue unsecured senior subordinated notes ("Senior Subordinated Exchange Notes") under an indenture that complies with the Trust Indenture Act of 1939 to such Lender under the Senior Subordinated Bridge Facility in the aggregate outstanding principal amount of such Lender's outstanding portion of the Senior Subordinated Bridge Loans; *provided* that the Borrower may defer the first issuance of Senior Subordinated Exchange Notes until such time as the Borrower has received requests to issue an aggregate amount of Senior Subordinated Exchange Notes equal to at least 10% of the aggregate principal amount of all Senior Subordinated Bridge Loans issued on the Closing Date. |
| Principal Amount: | The Senior Subordinated Exchange Notes will be available only to satisfy the Senior Subordinated Bridge Loans. The principal amount of the Senior Subordinated Exchange Notes will equal 100% of the aggregate principal amount of the Senior Subordinated Bridge Loans for which they are exchanged and will have the same ranking as the Senior Subordinated Bridge Loans for which they are exchanged. |
| Interest Rate: | The Senior Subordinated Exchange Notes (other than any Fixed Rate Senior Subordinated Exchange Notes) will bear interest at a rate (the "Applicable Senior Subordinated Exchange Note Interest Rate") equal to the Initial Rate (as defined below) plus the Applicable Spread (as defined below). Notwithstanding the foregoing, the Applicable Senior Subordinated Exchange Note Interest Rate shall not exceed 11.25% *per annum*. The Senior Subordinated Exchange Notes shall include provisions customary in securities of this type protecting the holders in the event of unavailability of funding, illegality, capital adequacy requirements, increased costs, withholding taxes and funding |

                                                                                              TRB0009322

III-A-2

losses.

"Applicable Spread" shall mean zero during the three-month period commencing on the exchange date of the Senior Subordinated Exchange Notes and shall increase by 0.50% *per annum* at the beginning of each subsequent three-month period.

"Initial Rate" shall be determined on the Initial Maturity Date of the Senior Subordinated Bridge Loans and shall equal the interest rate of the Senior Subordinated Bridge Loans on the day immediately preceding the Initial Maturity Date plus 0.50% *per annum*.

Each holder of Senior Subordinated Exchange Notes shall have the option to fix the interest rate on the Senior Subordinated Exchange Notes to a rate that is equal to the then Applicable Interest Rate borne by the Senior Subordinated Exchange Notes ("Fixed Rate Senior Subordinated Exchange Notes").

| | |
|---|---|
| Interest Payments: | Interest will be payable semiannually, in arrears. |
| | Interest will be calculated on the basis of actual days elapsed in a year of 360 days. |
| | Upon the occurrence and during the continuance of a payment default, interest will accrue on any overdue amount payable in respect of Senior Subordinated Exchange Notes at a rate of 2.0% per annum in excess of the rate otherwise applicable to such loans or amounts payable and will be payable on demand. |
| Maturity: | Ten years from the date of the Funding. |
| Ranking: | Same as the Senior Subordinated Bridge Loans. |
| Mandatory Offer to Purchase: | The Issuer will make an offer to purchase the Fixed Rate Senior Subordinated Exchange Notes upon any change of control of the Issuer at a redemption price of 101% of par plus accrued and unpaid interest and will make an offer to purchase the Senior Subordinated Exchange Notes not bearing interest at a fixed rate upon any change of control of the Issuer at a redemption price of par plus accrued and unpaid interest. |
| | Subject to the mandatory pre-payment provisions of the Bank Facilities, to the extent proceeds are available, the Issuer will make offers to repurchase the Senior Subordinated Exchange Notes for such events and on such terms and conditions as are customary for publicly traded high yield debt securities issued by affiliates of the Sponsor. |
| Optional Redemption: | The Senior Subordinated Exchange Notes (other than Fixed Rate Senior Subordinated Exchange Notes) will be callable, in |

Professionals' Eyes Only

TRB0009323

whole or in part, upon not less than 10 days written notice, at the option of the Issuer, at any time at par plus accrued and unpaid interest to the redemption date. The Fixed Rate Senior Subordinated Exchange Notes will be callable in whole or in part at any time subject to customary make-whole provisions and in such other instances and subject to such other restrictions and premiums as are typical for similar fixed-rate high-yield debt securities issued by affiliates of the Sponsor.

Right to Resell Notes:

Any Lender (and any subsequent holder) shall have the absolute and unconditional right to resell the Senior Subordinated Exchange Notes to one or more third parties, whether by assignment or participation and subject to compliance with applicable securities laws.

Representations and Warranties; Covenants; Events of Default:

Customary for publicly traded high yield debt securities of companies affiliated with the Sponsor.

Governing Law and Forum:

The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York.

Miscellaneous:

Customary provisions regarding consent to jurisdiction, waiver of jury trial, service of process, yield protection, tax gross ups and other miscellaneous matters.

Registration Rights:

The Borrower shall use commercially reasonable efforts to file, within 90 days after the first issuance of Senior Subordinated Exchange Notes (the date of such issuance, the "Issue Date"), and will use commercially reasonable efforts to cause to become effective, as soon thereafter as practicable, a shelf registration statement with respect to the Senior Subordinated Exchange Notes (such registration statement, a "Shelf Registration Statement") which Shelf Registration Statement shall contain all financial statements required under the Securities Act of 1933, as amended. If a Shelf Registration Statement is filed, the Borrower will keep such Shelf Registration Statement effective and available (subject to customary exceptions) until it is no longer needed to permit unrestricted resales of the Senior Subordinated Exchange Notes; *provided* that in no event shall the Borrower be required to keep such Shelf Registration Statement effective and available for more than two years after the Issue Date. The Borrower shall cause the Shelf Registration Statement to be declared effective by the date (the "Effectiveness Date") that is 180 days from the Issue Date. Any failure on the part of the Borrower to cause the Shelf Registration Statement to be declared effective in accordance with the preceding sentence is referred to as a "Registration Default". In the event of a Registration Default with respect to any Senior Subordinated Exchange Note, the Borrower will pay

Professionals' Eyes Only

TRB0009324

liquidated damages in the form of increased interest of $0.05 per week per $1,000 principal amount of such Senior Subordinated Exchange Note to the holder of such Senior Subordinated Exchange Note, to the extent that such holder is unable to freely transfer such Senior Subordinated Exchange Note, from and including the Effectiveness Date to but excluding the effective date of the Shelf Registration Statement with respect to such Senior Subordinated Exchange Note. On the 90th day after the Effectiveness Date with respect to any such Senior Subordinated Exchange Note, the liquidated damages shall increase by an additional $0.05 per week per $1,000 principal amount and, on each 90 day anniversary of the Effectiveness Date thereafter, shall increase by an additional $0.05 per week per $1,000 principal amount to a maximum increase in interest of $0.20 per week per $1,000 principal amount. The Borrower will also pay such liquidated damages to the holder of a Senior Subordinated Exchange Note for any period of time (subject to customary exceptions) following the effectiveness of the Shelf Registration Statement with respect to such Senior Subordinated Exchange Note that such Shelf Registration Statement is not available for sales thereunder. All accrued liquidated damages will be paid in arrears on each semi-annual interest payment date.

In lieu of a Shelf Registration Statement, the Borrower at its option may file a registration statement with respect to notes having terms identical to the Senior Subordinated Exchange Notes (the "Substitute Notes") to effect a registered exchange offer (the "Exchange Registration Statement") in which the Borrower offers to holders of Senior Subordinated Exchange Notes registered Substitute Notes in exchange for the Senior Subordinated Exchange Notes. In such case, if the Exchange Registration Statement has not been declared effective and an exchange offer for the Senior Subordinated Exchange Notes pursuant to the Exchange Registration Statement has not been consummated by the Effectiveness Date, the Borrower will pay liquidated damages in the form of increased interest for the same periods and at the same rates as described in the previous paragraph.

Counsel to the Arranger                    Cahill Gordon & Reindel LLP.

Professionals' Eyes Only

TRB0009325

CONDITIONS TO THE INITIAL FUNDING[1]

The initial funding of the Facilities by the Banks under the Commitment Letter is subject to the conditions set forth in the Commitment Letter and satisfaction or waiver of each of the conditions precedent set forth below.

1. The Acquisition and the Refinancing shall be consummated concurrently with the initial funding of the Facilities (i) in accordance with the definitive Acquisition Agreement and the related disclosure schedules and exhibits thereto, subject to paragraph 7 below, without waiver or amendment thereof (other than any such waivers or amendments (including, without limitation, with respect to any representations and warranties in the Acquisition Agreement) as are not materially adverse to Banks or the Arranger) unless consented to by the Arranger (which consent shall not be unreasonably withheld or delayed) or (ii) on such other terms and conditions as are reasonably satisfactory to the Arranger.[2]

2. The Borrower shall have received the cash from the Equity Financing which together shall comprise not less than 15% of the pro forma capitalization of the Borrower after giving effect to the Transaction (excluding, for the avoidance of doubt, any letters of credit issued in the Closing Date).

3. The Arranger shall have received (i) copies of audited consolidated financial statements for the Acquired Business for the 2004, 2005 and 2006 fiscal years, (ii) interim unaudited financial statements for the Acquired Business for each quarterly period ended during 2007 and at least 45 days prior to the Closing Date, and (iii) pro forma consolidated financial statements for the Borrower and its subsidiaries for, and as of the end of, the four-quarter period most recently ended prior to the Closing Date for which financial statements are available giving pro forma effect to the Acquisition and any other material acquisitions effected during or subsequent to such period (prepared in accordance with Regulation S-X and including other adjustments previously agreed to by the Arranger and with such further adjustments as are consistent with recent financings for companies owned by the Sponsor and are otherwise reasonably satisfactory to the Arranger).

4. The Administrative Agent shall have received a reasonably satisfactory solvency certificate from the chief financial officer of Holdings that shall document the solvency of Holdings and its subsidiaries on a consolidated basis after giving effect to the Transactions.

5. Holdings, the Borrower and each of the Guarantors shall have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

6. All documents and instruments required to perfect or evidence the Administrative Agent's first priority security interest in the personal property collateral under the Bank Facilities (including

---

[1]    All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this Annex IV is attached.

[2]    This assumes the Arranger has seen and is satisfied with the definitive Acquisition Agreement and the related disclosure schedules and exhibits thereto.

Professionals' Eyes Only                                                      TRB0009326

IV-2

delivery of customary lien searches, stock certificates and undated stock powers executed in blank) shall have been executed and be in proper form for filing, but subject to the terms set forth in paragraph 7 below.

7.  Citigroup's completion of, and satisfaction in all respects with, its confirmatory business, tax, accounting, IT and legal diligence; the principal confirmatory diligence items that we will need to address are listed in your bid letter dated the date hereof.

8.  Definitive documentation for the Bank Facilities (the "Bank Documentation"), the Senior Bridge Facility (the "Senior Bridge Documentation") and the Senior Subordinated Bridge Facility (the "Senior Subordinated Bridge Documentation" and, together with the Senior Bridge Documentation, the "Bridge Documentation"; the Bank Documentation and the Bridge Documentation collectively, the "Financing Documentation"), in each case reflecting and consistent with the terms and conditions set forth herein and in the applicable Term Sheet or otherwise reasonably satisfactory to the Borrower and the Arranger, shall have been executed and delivered, and the Administrative Agent shall have received such customary legal opinions (including opinions (i) from counsel to the Borrower and its subsidiaries, (ii) if reasonably available, delivered pursuant to the Acquisition Agreement, accompanied by reliance letters in favor of the Lenders and (iii) from such special and local counsel as may be required by the Administrative Agent and consented to by the Borrower (such consent not to be unreasonably withheld)), documents and other instruments as are customary for transactions of this type or as it may reasonably request.

Notwithstanding anything in this Commitment Letter, the Fee Letter, the Term Sheets, the Financing Documentation or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (i) the only representations and warranties the making of which shall be a condition to availability of the Facilities on the Closing Date shall be (A) such of the representations made by the Seller or the Acquired Business in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that you have the right to terminate your obligations under the Acquisition Agreement as a result of a breach of such representations in the Acquisition Agreement, and (B) the Specified Representations (as defined below), (ii) the terms of the Financing Documentation shall contain no condition precedent (including, without limitation, written notice of borrowing and absence of any default or potential event of default) and shall not impair availability of the Facilities on the Closing Date if the conditions set forth in Section 5 of the Commitment Letter and in the Conditions Annex are satisfied and (iii) it is understood that (A) other than with respect to any UCC Filing Collateral or Stock Certificates (each as defined below), to the extent any guarantee or collateral is not provided on the Closing Date after your use of commercially reasonable efforts to do so, the delivery of such guarantee and/or collateral shall not constitute a condition precedent to the availability of the Facilities on the Closing Date but shall be required to be delivered after the Closing Date pursuant to arrangements to be mutually agreed by the parties hereto acting reasonably, (B) with respect to perfection of security interests in UCC Filing Collateral, your sole obligation shall be to deliver, or cause to be delivered, necessary UCC financing statements to the Administrative Agent or to cause Borrower or the applicable Guarantor (as defined in the Bank Term Sheet) to irrevocably authorize the Administrative Agent to file necessary UCC financing statements, and (C) with respect to perfection of security interests in Stock Certificates, your sole obligation shall be to deliver such Stock Certificates to the Administrative Agent as and to the extent they are delivered to you pursuant to the Acquisition Agreement.  For purposes hereof, (1) "Specified Representations" means the representations and warranties set forth in the Term Sheets relating to corporate power and authority, the enforceability of the Facilities documentation, Federal Reserve margin regulations and the Investment Company Act and the status of indebtedness under the applicable Facility (other than the Senior Subordinated Bridge Facility) as senior debt, (2) "UCC Filing Collateral" means collateral for which a security interest can be perfected by filing a Uniform Commercial Code financing

Professionals' Eyes Only                                                        TRB0009327

statement and (3) "Stock Certificates" means collateral consisting of stock certificates representing capital stock of the domestic material restricted subsidiaries of the Acquired Business for which a security interest can be perfected by delivering such stock certificates.

Professionals' Eyes Only

TRB0009328

Tribune Company
c/o Merrill Lynch & Co. and Citigroup Global Markets Inc.
January 17, 2007

**Exhibit A-II – Lehman Financing Documents**

Professionals' Eyes Only

TRB0009329

**Lehman Commercial Paper Inc.**
**745 Seventh Avenue**
**New York, New York  10019**

**Lehman Brothers Inc.**
**745 Seventh Avenue**
**New York, New York 10019**

January 17, 2007

PERSONAL AND CONFIDENTIAL

[TBD]
c/o The Carlyle Group
520 Madison Avenue
New York, New York  10022
Attention:  James Attwood

Commitment Letter

Ladies and Gentlemen:

   The Carlyle Group (together with certain of its affiliates, the "<u>Sponsor</u>") has advised Lehman Commercial Paper Inc. ("<u>LCPI</u>") and Lehman Brothers Inc. ("<u>Lehman Brothers</u>" and, together with LCPI, "<u>we</u>" or "<u>us</u>") that the Sponsor and [Holdings], a newly formed Delaware corporation controlled by the Sponsor ("<u>Holdings</u>" or "<u>you</u>"), intend to enter into a purchase and sale agreement (together with the schedules and exhibits thereto, the "<u>Acquisition Agreement</u>") pursuant to which Holdings directly and indirectly through its subsidiaries will purchase (the "<u>Acquisition</u>") certain of the assets owned and operated directly or indirectly by Tribune Company ("<u>Seller</u>") (such assets, collectively, the "<u>Acquired Business</u>").[1]
[_____], a Delaware corporation and newly formed, wholly-owned subsidiary of Holdings, shall be the "<u>Borrower</u>".  All references to "<u>dollars</u>" or "<u>$</u>" in this agreement and the attachments hereto (collectively, this "<u>Commitment Letter</u>") are references to United States dollars.

   We understand that the sources of funds required to fund the Acquisition consideration, to repay certain existing indebtedness of the Acquired Business (the "<u>Refinancing</u>"), to pay fees, commissions and expenses in connection with the Transactions (as defined below) and to provide ongoing working capital requirements of the Borrower and its subsidiaries following the Transactions will include:

---

[1] Structure under review; assets are the broadcasting group of the Seller, which operates 23 television stations, Superstation WGN on national cable, Chicago's WGN-AM radio station, the Chicago Cubs baseball team, Tribune Media Entertainment and unconsolidated equity investments (31% stake in Food Network and 25% stake in Comcast SportsNet Chicago).

Professionals' Eyes Only

- senior secured first lien credit facilities consisting of (i) a senior secured term loan facility to the Borrower of $3,175 million (the "Term Loan Facility"), as described in the Summary of Principal Terms and Conditions attached hereto as Annex I (the "Bank Term Sheet") and (ii) a senior secured revolving credit facility to the Borrower of $250 million (the "Revolving Credit Facility" and, together with the Term Loan Facility, the "Bank Facilities"), as described in the Bank Term Sheet, an amount to be agreed of which may be drawn on the Closing Date (as defined below);

- either (A) the issuance by the Borrower of $470 million aggregate gross proceeds of unsecured senior notes with a pay-in-kind toggle (the "Senior Notes") pursuant to a Rule 144A or other private placement (the "Senior Notes Offering") or (B) in the event less than all of the Senior Notes are issued at the time the Transactions are consummated, borrowings by the Borrower of up to $470 million under a unsecured senior credit facility with a pay-in-kind toggle (the "Senior Bridge Facility") as described in the Summary of Principal Terms and Conditions attached hereto as Annex II (the "Senior Bridge Term Sheet");

- either (A) the issuance by the Borrower of $465 million aggregate gross proceeds of unsecured senior subordinated notes (the "Senior Subordinated Notes" and, together with the Senior Notes, the "Notes"), in each case pursuant to a Rule 144A or other private placement (the "Senior Subordinated Notes Offering") or (B) in the event less than all of the Senior Subordinated Notes are issued at the time the Transactions are consummated, borrowings by the Borrower of up to $465 million under an unsecured senior subordinated credit facility (the "Senior Subordinated Bridge Facility" and, together with the Senior Bridge Facility, the "Bridge Facilities") as described in the Summary of Principal Terms and Conditions attached hereto as Annex III (the "Senior Subordinated Bridge Term Sheet" and, together with the Bank Term Sheet and the Senior Bridge Term Sheet, the "Term Sheets");

- equity investments in Holdings (the "Equity Financing") in an aggregate amount not less than 15% of the total pro forma capitalization of the Borrower after giving effect to the Transactions (excluding, for the avoidance of doubt, any of letters of credit issued on the Closing Date) from the Sponsor, certain of its affiliates, members of management of the Acquired Business and other co-investors reasonably acceptable to the Arranger (as defined below) (the Sponsor and such affiliates, members of senior management and other co-investors, in such capacity, being collectively referred to as the "Equity Investors"), all of which investments shall be contributed to the Borrower in cash as preferred equity on terms reasonably acceptable to the Arranger or as common equity.

No other new debt financing will be required for the Acquisition and the Refinancing. Immediately following the Transactions, neither Holdings nor any of its subsidiaries will have any material indebtedness other than the Bank Facilities, the Notes or the Bridge Facilities, as applicable, the Equity Financing and other indebtedness permitted by the definitive Financing Documenta-

-2-

Professionals' Eyes Only    TRB0009331

tion (as defined in the Conditions Annex (as defined below)). As used herein, (i) the term "Clos-ing Date" means the date of the closing of the Acquisition and the initial funding of the Facilities and (ii) the term "Transactions" means the Acquisition, the Refinancing, the initial borrowings under the Bank Facilities on the Closing Date, if applicable, the issuance of the Senior Notes or the borrowings under the Senior Bridge Facility, the issuance of the Senior Subordinated Notes or the borrowings under the Senior Subordinated Bridge Facility, the Equity Financing and the payments of fees, commissions and expenses in connection with each of the foregoing.

   1.  Commitments.

   You have requested that LCPI (in such capacity, a "Bank" and together with any other financial institutions that may with our and your consent act as initial commitment parties, the "Banks") commit to provide the Facilities and the Arranger agree to structure, arrange and syndicate the Facilities.

   LCPI is pleased to advise you of its commitment to provide to the Borrower 100% of the principal amount of the Bank Facilities (the "Bank Commitment") and LCPI is pleased to advise you of its commitment to provide 100% of the principal amount of the each of the Bridge Facilities (the "Bridge Commitment" and, together with the Bank Commitment, the "Commit-ments"), in each case, upon the terms and subject to the conditions set forth in this Commitment Letter and in the Term Sheets and the Conditions Annex referred to below.

   In addition, at your request, Lehman Brothers has delivered to you a separate en-gagement letter dated the date hereof (the "Engagement Letter") setting forth, among other things, the terms on which Lehman Brothers has, in response to your request, proposed terms for it to act, on a sole and exclusive basis, as bookrunning manager, underwriter, initial purchaser and placement agent for (a) the Notes or (b) if any Bridge Facility is funded on the Closing Date, the issuance or sale of any debt for the purpose of refinancing all or a portion of the outstanding amounts under such Bridge Facility (including any exchange notes issued in connection therewith).

   2.  Syndication.

   It is agreed that Lehman Brothers acting alone or through one of its affiliates se-lected by it, will act as sole lead arranger (in such capacity, the "Arranger") and as sole bookrun-ner for the Facilities. It is also agreed that LCPI will act as Administrative Agent and Syndica-tion Agent in connection with the Bank Facilities and the Bridge Facilities. It is further agreed that the Arranger will exclusively manage the syndication of the Facilities, and will, in such ca-pacity, exclusively perform the duties and exercise the authority customarily associated with its role as an Arranger. No Lender (as defined below) will receive compensation from you or the Borrower with respect to any of the Facilities outside the terms contained herein and in the letter of even date herewith addressed to you providing, among other things, for certain fees relating to the Facilities (the "Fee Letter") in order to obtain its commitment to participate in such Facilities, in each case unless you and we so agree.

   LCPI reserves the right, prior to or after execution of the Bank Documentation (as defined in the Conditions Annex referred to below), to syndicate all or a portion of its Commit-

-3-

Professionals' Eyes Only                          TRB0009332

ment in respect of the Bank Facilities to one or more institutions (other than certain institutions designated in writing by you prior to syndication) with your consent (not to be unreasonably withheld) that will become parties to the Bank Documentation (LCPI and the institutions becoming parties to the Bank Documentation, the "Bank Lenders"). LCPI reserves the right, prior to or after the execution of the Bridge Documentation (as defined in the Conditions Annex referred to below), to syndicate all or a portion of its Commitment in respect of each Bridge Facility to one or more institutions (other than certain institutions designated in writing by you prior to syndication) with your consent (not to be unreasonably withheld) that will become parties to the Bridge Documentation applicable to such Bridge Facility (LCPI and the institutions becoming parties to such Bridge Documentation, collectively, the "Bridge Lenders," and, together with the Bank Lenders, the "Lenders"). Notwithstanding the foregoing, the Banks shall not be released from their Commitments hereunder by any such syndication unless and until the applicable assignee first funds its Commitment hereunder and the completion of such syndication is not a condition to the Commitments hereunder.

The Arranger will, in consultation with you, exclusively manage all aspects of the syndication of the Facilities, including selection of additional Lenders reasonably acceptable to you, determination of when the Arranger will approach potential additional Lenders, and the final allocations of the Commitments in respect of the Facilities among the additional Lenders; *provided* that, except as otherwise set forth herein, any naming rights shall be subject to your consent. You agree to, and will use commercially reasonable efforts to cause appropriate members of management of the Acquired Business to, actively assist the Arranger in achieving a syndication of the Facilities. To assist the Arranger in its syndication efforts, you agree that you will, and will cause your representatives and non-legal advisors to, and will use commercially reasonable efforts to cause appropriate members of management of the Acquired Business to, (a) promptly provide all financial and other information reasonably available to you as we may reasonably request with respect to you, the Acquired Business, your and their respective subsidiaries and the transactions contemplated hereby, including but not limited to financial projections to be prepared by you (the "Projections") relating to the foregoing, (b) use commercially reasonable efforts to ensure that the syndication efforts benefit from existing lending relationships of the Sponsor and the Acquired Business, (c) make available to prospective Lenders senior management and non-legal advisors of Holdings and (to the extent reasonable and practical) appropriate members of management of the Acquired Business, (d) host, with the Arranger, one meeting with prospective Lenders under each of the Facilities, (e) assist the Arranger in the preparation of one or more confidential information memoranda and other marketing materials to be used in connection with the syndication of each of the Facilities, and (f) obtain, at your expense, monitored public ratings of the Facilities and the Notes from Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Group ("S&P") and to participate actively in the process of securing such ratings, including having senior management of Holdings and (to the extent reasonable and practical) appropriate members of management of the Acquired Business meet with such rating agencies.

     3.    Information.

You hereby represent and covenant that to your knowledge (a)(i) all written factual information (other than the Projections and information of a general economic or industry

-4-

Professionals' Eyes Only

nature) that has been or will be made available to the Banks by you or any of your representatives and (ii) all information contained in any official presentation made by you or any of your representatives to prospective Lenders, in each case in connection with the transactions contemplated hereby (the "Information"), when taken as a whole, is, and in the case of Information made available after the date hereof, will be, correct in all material respects and does not, and in the case of Information made available after the date hereof, will not, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which such statements are made (including customary bank syndication practices), not materially misleading, and (b) the Projections that have been or will be made available to the Arranger by you or any of your representatives in connection with the transactions contemplated hereby have been and will be prepared in good faith based upon assumptions believed by you to be reasonable at the time made, it being understood that actual results may vary materially from the Projections. You agree to supplement the Information if necessary so that the representations and warranties in clause (a) of the preceding sentence remain correct on the Closing Date. You acknowledge that the Banks and the Arranger may share with any of their affiliates (it being understood that such affiliates will be subject to the confidentiality agreements between you and us), and such affiliates may share with Banks and the Arranger, any information related to the Acquired Business, or any of its subsidiaries or affiliates (including, without limitation, in each case, information relating to creditworthiness) and the transactions contemplated hereby.

You hereby acknowledge and agree that we will make available the Information, Projections and other marketing materials and presentations prepared or approved by you, including confidential information memoranda (collectively, the "Informational Materials"), to the potential Lenders by posting the Informational Materials on Intralinks or by other similar electronic means (collectively, the "Electronic Means"). You hereby further acknowledge and agree that (i) potential Lenders (the "Public Lenders") may not wish to receive material non-public information with respect to the Borrower, Holdings, the Acquired Business and their respective subsidiaries or any of their respective securities, (ii) you will assist, and cause your affiliates, advisors, the Sponsor and, to the extent possible using your commercially reasonable efforts, the Acquired Business to assist, the Arranger in the preparation of Informational Materials to be used in connection with the syndication of the Facilities to Public Lenders, which will only include data and materials that are either (A) publicly available or included in any prospectus, offering memorandum or preliminary private placement memorandum for the Notes or (B) not material with respect to the Borrower, Holdings, the Acquired Business and their respective subsidiaries or any of their respective securities for purposes of United States federal and state securities laws (such Informational Materials and any other information, data and materials, collectively, "Public Information"), (iii) you will identify and conspicuously mark any Informational Materials that consist solely of Public Information as "*PUBLIC*", and (iv) you will identify and conspicuously mark any Informational Materials that include any information, data and materials that are not Public Information as "*PRIVATE AND CONFIDENTIAL*".

4.    Compensation.

If the Closing Date occurs, as consideration for the Commitments of the Banks hereunder with respect to the Facilities and the agreement of the Arranger to structure, arrange

Professionals' Eyes Only

and syndicate the Facilities, you agree to pay, or cause to be paid, to the Banks the fees set forth in the Term Sheets and the Fee Letter in accordance with the terms thereof. Once paid, such fees shall not be refundable under any circumstances, except as provided in the Fee Letter.

      5.    <u>Conditions</u>.

      The initial funding of the Facilities by the Banks hereunder is subject to the conditions set forth in Annex IV hereto (the "<u>Conditions Annex</u>"), which shall have been satisfied or waived.

      Notwithstanding anything in this Commitment Letter, the Fee Letter, the Term Sheets, the Financing Documentation or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (i) the only representations and warranties the making of which shall be a condition to availability of the Facilities on the Closing Date shall be (A) such of the representations made by the Seller in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that you have the right to terminate your obligations under the Acquisition Agreement as a result of a breach of such representations in the Acquisition Agreement, and (B) the Specified Representations (as defined below), (ii) the terms of the Financing Documentation shall contain no condition precedent (including, without limitation, written notice of borrowing and absence of any default or potential event of default) and shall not impair availability of the Facilities on the Closing Date if the conditions set forth in this Section 5 of this Commitment Letter and in the Conditions Annex are satisfied and (iii) it is understood that (A) other than with respect to any UCC Filing Collateral or Stock Certificates (each as defined below), to the extent any guarantee or collateral is not provided on the Closing Date after your use of commercially reasonable efforts to do so, the delivery of such guarantee and/or collateral shall not constitute a condition precedent to the availability of the Facilities on the Closing Date but shall be required to be delivered after the Closing Date pursuant to arrangements to be mutually agreed by the parties hereto acting reasonably, (B) with respect to perfection of security interests in UCC Filing Collateral, your sole obligation shall be to deliver, or cause to be delivered, necessary UCC financing statements to the Administrative Agent or to cause Borrower or the applicable Guarantor (as defined in the Bank Term Sheet) to irrevocably authorize the Administrative Agent to file necessary UCC financing statements, and (C) with respect to perfection of security interests in Stock Certificates, your sole obligation shall be to deliver such Stock Certificates to the Administrative Agent as and to the extent they are delivered to you pursuant to the Acquisition Agreement. For purposes hereof, (1) "<u>Specified Representations</u>" means the representations and warranties set forth in the Term Sheets relating to corporate power and authority, the enforceability of the Facilities documentation, Federal Reserve margin regulations and the Investment Company Act, (2) "<u>UCC Filing Collateral</u>" means collateral for which a security interest can be perfected by filing a Uniform Commercial Code financing statement and (3) "<u>Stock Certificates</u>" means collateral consisting of stock certificates representing capital stock of the domestic material restricted subsidiaries of the Acquired Business for which a security interest can be perfected by delivering such stock certificates.

      6.    <u>Clear Market</u>.

      From the date of this Commitment Letter until the Closing Date, you will ensure that no debt financing for Holdings, the Borrower or any of your subsidiaries is announced, syn-

-6-

Professionals' Eyes Only

dicated or placed without the prior written consent of the Arranger if such financing, syndication or placement would have, in the reasonable judgment of the Arranger, a materially detrimental effect upon the syndication of the Bank Facilities or, if applicable, the Notes Offerings.

       7.   <u>Indemnity</u>.

      By your acceptance below, you hereby agree to indemnify and hold harmless each of the Banks and the Arranger and their respective affiliates (including, without limitation, controlling persons) and the directors, officers, employees, advisors and agents of the foregoing (each, an "<u>Indemnified Person</u>") from and against any and all losses, claims, costs, expenses, damages or liabilities to which any such Indemnified Person shall become subject arising out of or in connection with any action, investigation, suit or proceeding (whether commenced or threatened) relating to or arising out of or in connection with this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Facilities or any of the transactions contemplated hereby or the providing or syndication of the Facilities, and to reimburse each Indemnified Person for any legal or other expenses incurred in connection with investigating, preparing to defend or defending against, or participating in, any such suit, investigation, action or other proceeding (whether or not such Indemnified Person is a party to any action or proceeding), other than any of the foregoing of any Indemnified Person to the extent determined by a court of competent jurisdiction to have resulted by reason of the gross negligence, bad faith or willful misconduct of, or breach of this Commitment Letter, the Term Sheets, the Conditions Annex, or the Fee Letter by, such Indemnified Person or any of its affiliates, or the directors, officers, employees, advisors or agents of any of them. You shall not be liable for any settlement of any such proceeding effected without your written consent, but if settled with such consent, you shall indemnify the Indemnified Persons from and against any loss or liability by reason of such settlement, subject to your rights in this paragraph to claim exemption from your indemnity obligations. None of the Banks, the Arranger or any other Lender (or any of their respective affiliates) shall be responsible or liable to the Sponsor or any of their subsidiaries, affiliates or stockholders for any consequential damages which may be alleged as a result of this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Facilities or the transactions contemplated hereby. In addition, you hereby agree to reimburse each of the Banks and the Arranger upon the Closing Date (if the Closing Date occurs) for (i) all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable legal fees and expenses for one counsel per jurisdiction of the Banks and the Arranger) and (ii) all reasonable printing, reproduction, document delivery, travel and communication costs incurred in connection with the syndication and execution of the Facilities and the preparation, review, negotiation, execution and delivery of this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter and the Financing Documentation (as defined in the Conditions Annex).

       8.   <u>Confidentiality</u>.

      This Commitment Letter is furnished for your benefit, and may not be relied on by any other person or entity. This Commitment Letter is entered into upon the condition that neither the existence of this Commitment Letter, the Term Sheets, the Conditions Annex or the Fee Letter nor any of their contents shall be disclosed by the Banks or the Arranger or any of their affiliates, or by you or any of your affiliates, directly or indirectly, to any other person, ex-

Professionals' Eyes Only

cept that such existence and contents may be disclosed (i) as may be compelled in a judicial or administrative proceeding or as otherwise required by law and (ii) to the Banks and the Arranger and their affiliates' directors, officers, employees, advisors and agents and to you, the Equity Investors and your and their directors, officers, employees, advisors and agents, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby, and as reasonably required for the syndication. In addition, this Commitment Letter, the Term Sheets, the Conditions Annex, and (to the extent portions thereof have been redacted in a manner reasonably satisfactory to us) the Fee Letter may be disclosed to the Seller and the Acquired Business and each of its directors, officers, employees, advisors and agents, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby.

9.    Other Services.

    You acknowledge and agree that the Banks, the Arranger and/or their affiliates may be requested to provide additional services with respect to the Sponsor, the Acquired Business and/or their respective affiliates or other matters contemplated hereby. Any such services will be set out in and governed by a separate agreement(s) (containing terms relating, without limitation, to services, fees and indemnification) in form and substance satisfactory to the parties thereto. Nothing in this Commitment Letter is intended to obligate or commit the Banks or the Arranger or any of their affiliates to provide any services other than as set out herein.

    You acknowledge that the Arranger and its affiliates (the term "Arranger" as used in this paragraph being understood to include such affiliates) may be providing debt financing, equity capital or other services (including financial advisory services) to other companies with which you, Holdings, the Sponsor, the Acquired Business, the shareholders of the Acquired Business or your or their respective affiliates may have conflicting interests regarding the Transactions and otherwise and that the Arranger may act as it deems appropriate in acting in such capacities. You and your affiliates further acknowledge and agree that in connection with all aspects of the Transactions and the transactions contemplated by this Commitment Letter, you and your affiliates, on the one hand, and the Arranger, on the other hand, have an arm's length business relationship that creates no fiduciary duty on the part of the Arranger and each expressly disclaims any fiduciary relationship. The Arranger will not use confidential information obtained from you, the selling shareholders or the Acquired Business in connection with the performance by the Arranger of services for other companies and will not furnish any such information to other companies. You also acknowledge that the Arranger has no obligation in connection with the Transactions to use, or to furnish to you, Holdings, the Sponsor, the selling shareholders, the Acquired Business or your or their respective subsidiaries, confidential information obtained from other companies or entities.

    You further acknowledge that the Arranger is a full service securities firm and it and each Bank may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of Holdings, the Borrower, their affiliates and other companies that may be the subject of the transactions contemplated by this Commitment Letter.

-8-

Professionals' Eyes Only

TRB0009337

10.    Governing Law, Etc.

This Commitment Letter and the commitment of the Banks shall not be assignable by you without the prior written consent of the Banks and the Arranger, and any purported assignment without such consent shall be void.  This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Banks, the Arranger and you.  This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement.  Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart of this Commitment Letter.  Headings are for convenience only.  This Commitment Letter is intended to be for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto, the Lenders and, with respect to the indemnification provided under Section 7 (Indemnity) above, each Indemnified Person.  This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of law to the extent that the application of the laws of another jurisdiction will be required thereby; *provided, however,* that the interpretation of the definition of Material Adverse Effect (and whether or not a Material Adverse Effect has occurred) in the Acquisition Agreement shall be governed by, and construed in accordance with, the laws of the State of [_____][2], regardless of the laws that might otherwise govern under applicable principles of conflicts of laws.  Any right to trial by jury with respect to any claim or action arising out of this Commitment Letter is hereby waived.  The parties hereto hereby submit to the non-exclusive jurisdiction of the federal and New York State courts located in The City of New York (and appellate courts thereof) in connection with any dispute related to this Commitment Letter or any of the matters contemplated hereby; *provided, however,* that any court of the State of [_____] or any federal court sitting in the State of [_____] shall also have jurisdiction over any such suit, action or proceeding.  The parties hereto agree that service of any process, summons, notice or document by registered mail addressed to you shall be effective service of process against you for any suit, action or proceeding relating to any such dispute.  The parties hereto irrevocably and unconditionally waive any objection to the laying of such venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum.  A final judgment in any such suit, action or proceeding brought in any such court may be enforced in any other courts to whose jurisdiction you are or may be subject by suit upon judgment.

11.    Patriot Act.

We hereby notify you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Patriot Act"), the Banks, the Arranger, and the Lenders are required to obtain, verify and record information that identifies the

---

[2]    To conform to the governing law chosen in the Acquisition Agreement.

-9-

Professionals' Eyes Only    TRB0009338