Borrower, which information includes the name, address and tax identification number of the Borrower and other information regarding the Borrower that will allow the Banks, the Arranger, or such Lender to identify the Borrower in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to the Banks, the Arranger, and the Lenders.

Please indicate your acceptance of the terms hereof and of the Term Sheets, the Conditions Annex and the Fee Letter by returning to us (electronically or otherwise) executed counterparts of this Commitment Letter and the Fee Letter (and, if you have accepted this Commitment Letter with respect to the Bridge Facilities, an executed counterpart of the Engagement Letter) not later than 5:00 p.m., New York City time, on January 31, 2007. This Commitment Letter and the agreement of the Arranger to provide the services described herein are also conditioned upon your acceptance hereof and of the Fee Letter as set forth above and, if applicable, the Engagement Letter. Upon the earlier to occur of (A) the execution and delivery of the Financing Documentation by all of the parties thereto and the initial funding of the Facilities, (B) the date which is fourteen days after the "[Termination Date]" as defined in the Acquisition Agreement, if the Financing Documentation shall not have been executed and delivered by all such parties prior to that date or (C) upon notice from Holdings of the termination of the Acquisition Agreement, this Commitment Letter and the agreement of the Arranger to provide the services described herein shall automatically terminate unless each of the Borrower and the Arranger shall, in its discretion, agree to an extension. The confidentiality, indemnification and governing law and forum provisions hereof and in the Term Sheets and the Fee Letter shall survive termination of this Commitment Letter (or any portion hereof) or the commitments of the Lenders hereunder (provided that such provisions of the Commitment Letter shall be superseded by the same provisions of the Financing Documentation on and after the Closing Date). The provisions under Section 2 (Syndication) above shall survive the execution and delivery of the Financing Documentation.

BY SIGNING THIS COMMITMENT LETTER, EACH OF THE PARTIES HERETO HEREBY ACKNOWLEDGES AND AGREES THAT (A) LCPI IS OFFERING TO PROVIDE THE BANK FACILITIES SEPARATE AND APART FROM THE OFFER OF LCPI TO PROVIDE THE BRIDGE FACILITIES AND (B) LCPI IS OFFERING TO PROVIDE THE BRIDGE FACILITIES SEPARATE AND APART FROM THE OFFER BY LCPI TO PROVIDE THE BANK FACILITY. YOU MAY, AT YOUR OPTION, ELECT TO ACCEPT THIS COMMITMENT LETTER (AND THE APPLICABLE PROVISIONS OF THE FEE LETTER) WITH RESPECT TO EITHER THE BANK FACILITY OR THE BRIDGE FACILITIES OR BOTH.

*[Signature Page Follows]*

-10-

Professionals' Eyes Only                                                                   TRB0009339

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

LEHMAN COMMERCIAL PAPER INC.

By: _William J. Hughes_

Name:    WILLIAM J. HUGHES
Title:    MANAGING DIRECTO.

LEHMAN BROTHERS INC.

By: _William J. Hughes_

Name:    WILLIAM J. HUGHES
Title:    MANAGING DIRECTOR

*[commitment letter sig page]*

Professionals' Eyes Only

TRB0009340

Accepted and agreed to as of the date first
written above:

[HOLDINGS]

By: _____
     Name:
     Title:

*[commitment letter signature page]*

Professionals' Eyes Only　　　　　　　　　　　　　　　　　　　　　TRB0009341

ANNEX I

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

Bank Facilities[1]

| | |
|---|---|
| Borrower: | The Borrower. |
| Lead Arranger and Bookrunner: | Lehman Brothers Inc. (in such capacity, the "Arranger"). |
| Lenders: | A syndicate of banks, financial institutions and other entities, including Lehman Commercial Paper Inc. ("LCPI"), arranged by the Arranger and reasonably acceptable to the Borrower (collectively, the "Lenders"). |
| Administrative Agent, Issuing Bank and Swing Line Lender and Collateral Agent: | LCPI as Administrative Agent, Issuing Bank and Swing Line Lender (in such capacities the "Administrative Agent", the "Issuing Bank" or the "Swing Line Lender", as the case may be) and as Collateral Agent for the Bank Facilities referred to below (in such capacity, the "Collateral Agent"); it being understood that any resignation of the Administrative Agent or the Collateral Agent shall not be effective until a successor administrative agent reasonably acceptable to the Borrower has been appointed. |
| Type and Amount of Bank Facilities: | Term Loan Facility: |
| | Term B Loan Facility (the "Term Loan Facility") in an aggregate principal amount of $3,175 million. |
| | Revolving Credit Facility: |
| | A revolving first lien credit facility (the "Revolving Credit Facility") in an aggregate principal amount of $250 million.  The Term Loan Facility and the Revolv- |

---

[1] All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

Professionals' Eyes Only                    TRB0009342

ing Credit Facility are herein referred to collectively as the "Bank Facilities".

| | |
|---|---|
| Purpose: | Proceeds of the Bank Facilities will be used on the Closing Date to finance a portion of the Acquisition consideration and the Refinancing and to pay fees, commissions and expenses in connection therewith. Following the Closing Date, the Revolving Credit Facility will be used by the Borrower and its subsidiaries for working capital and general corporate purposes, including permitted acquisitions and investments. |
| Closing Date: | The date of consummation of the Acquisition and the initial funding of the Facilities. |
| Definitive Documentation: | Consistent with transactions for companies owned by the Sponsor, subject to the penultimate and final sentence of the second paragraph of Section 5 of the Commitment Letter. |
| Maturity Dates: | Term Loan Facility:  Seven (7) years from the Closing Date.

Revolving Credit Facility: Six (6) years from the Closing Date. |
| Availability: | Term Loan Facility:  A single drawing may be made on the Closing Date of the full amount of the Term Loan Facility.

Revolving Credit Facility:  Borrowings may be made at any time on or after the Closing Date to but excluding the business day preceding the maturity date of the Revolving Credit Facility; provided that the borrowings on the Closing Date (excluding the issuance of any letters of credit) shall not exceed an amount to be agreed. |
| Letters of Credit: | Up to an amount to be agreed of the Revolving Credit Facility will be available for letters of credit, on customary terms and conditions to be set forth in the Bank Documentation.

Each letter of credit shall expire not later than the earlier of (a) 12 months after its date of issuance (provided that any letter of credit with a one-year tenor may provide for the renewal thereof for additional one-year pe- |

I-2

Professionals' Eyes Only                                                            TRB0009343

riods) and (b) the fifth day prior to the maturity date of the Revolving Credit Facility.

**Swing Line Facility:** Up to an amount to be agreed of the Revolving Credit Facility will be available for Swing Line Loans, on terms and conditions to be set forth in the Bank Documentation.

**Amortization:** Term Loan Facility: Commencing after the fiscal period ending at least two years after the Closing Date, the Term Loan Facility will amortize in equal quarterly installments in an amount equal to 1% *per annum* with the balance at the end of year seven.

Revolving Credit Facility: None.

**Interest:** At the Borrower's option, loans will bear interest based on the Base Rate or LIBOR, as described below:

A. Base Rate Option

Interest will be at the Base Rate plus the applicable Interest Margin (as defined below). The Base rate is defined as the higher of (a) the Federal Funds Rate, as published by the Federal Reserve Bank of New York plus 1/2 of 1% and (b) the prime commercial lending rate of the Administrative Agent, as established from time to time at its principal U.S. office (which such rate is an index or base rate and will not necessarily be its lowest or best rate charged to its customers or other banks). Interest shall be payable quarterly in arrears and with respect to Base Rate Loans shall be calculated on the basis of the actual number of days elapsed in a year of 365/366 days.

Base Rate borrowings will be made on same day notice and will be in minimum amounts to be agreed upon.

B. LIBOR Option

Interest will be determined for periods ("Interest Periods") of one, two, three or six months (or nine or twelve months if available from all relevant Lenders) as selected by the Borrower and will be at an annual rate equal to the London Interbank Offered Rate ("LIBOR") for the corresponding deposits of U.S. dollars plus the

I-3

Professionals' Eyes Only

TRB0009344

applicable Interest Margin. LIBOR will be determined by the Administrative Agent at the start of each Interest Period and will be fixed through such period; *provided* that the Borrower may reset an Interest Period at any time so long as it reimburses the Lenders for any break-age costs they actually incur as a result. Interest will be paid at the end of each Interest Period or, in the case of Interest Periods longer than three months, quarterly, and will be calculated on the basis of the actual number of days elapsed in a year of 360 days. LIBOR will be adjusted for maximum statutory reserve requirements (if any).

LIBOR borrowings will require three business days' prior notice and will be in minimum amounts to be agreed upon.

Swingline loans will bear interest at the Base Rate plus the applicable Interest Margin.

Default Interest:

At the request of the Requisite Lenders (as defined be-low), upon the occurrence and during the continuance of a payment default, interest will accrue on any over-due amount of a loan or other overdue amount payable under the Bank Facilities at a rate of 2.00% per annum in excess of the rate (including the applicable Interest Margin) otherwise applicable to such loan or other overdue amount, and will be payable on demand.

Interest Margins:

The applicable Interest Margin with respect to the Term Loan Facility will be 2.25% in the case of LIBOR Loans and 1.25% in the case of Base Rate Loans. The applicable Interest Margin with respect to the Revolv-ing Credit Facility will be 2.00% in the case of LIBOR Loans and 1.00% in the case of Base Rate Loans.

Notwithstanding the foregoing, after the date on which the Borrower will have delivered financial statements for the first full fiscal quarter after the Closing Date, the Interest Margin with respect to the Term Loan Facility and the Revolving Credit Facility will be determined in accordance with a leverage based pricing grid set forth on Exhibit A to this Annex I.

I-4

Professionals' Eyes Only

TRB0009345

| | |
|---|---|
| Commitment Fee: | A Commitment Fee shall accrue on the unused amounts of the commitments under the Revolving Credit Facility. Such Commitment Fee will initially be 0.35% per annum and after delivery of financial statements for the first full fiscal quarter ending after the Closing Date will be determined in accordance with a leverage based pricing grid set forth on Annex I-A. Accrued Commitment Fees will be payable quarterly in arrears (calculated on a 360-day basis) for the account of the Lenders from the Closing Date. |
| Letter of Credit Fees: | The Borrower will pay (i) the Issuing Bank a fronting fee equal to 12.5 basis points per annum and (ii) the Lenders under the Revolving Credit Facility stand-by letter of credit participation fees equal to the Applicable Margin for LIBOR Loans under the Revolving Credit Facility minus the fronting fee referred to in clause (i), in each case, on the undrawn amount of all outstanding letters of credit. In addition, the Borrower will pay the Issuing Bank customary issuance fees. |
| Mandatory Prepayments of Term Loan Facility: | An amount equal to 100% of the net proceeds received from the sale or other permanent disposition of all or any part of the assets of the Borrower or any Guarantor other than amounts reinvested or committed to be reinvested in the Borrower's consolidated business within 15 months of such disposition and subject to other exceptions to be agreed (*provided* that (a) so long as if at any time during the reinvestment period, and on a pro forma basis after giving effect to the asset sale and the application of the proceeds thereof, the Total Leverage Ratio (as defined below) is less than or equal to 5.50 to 1.0, up to $200 million in asset sale proceeds (other than from a sale of the Chicago Cubs) may be retained by the Borrower and added to the available investment basket described in the Negative Covenants below and (b) if at any time Borrower sells or causes its subsidiaries to sell the Chicago Cubs major league baseball franchise and related assets to be specified prior to the Closing Date, then, after repayment of $350 million aggregate principal amount of the Term Loan Facility, (x) if the Total Leverage Ratio is greater than 7.25 to 1.0, up to 50% percent of the asset sale proceeds may be retained by the Borrower and added to the available in- |

I-5

Professionals' Eyes Only

TRB0009346

vestment basket described in the Negative Covenants below and which may be used to pay dividends to the equity investors or (y) if the Total Leverage Ratio is less than or equal to 7.25 to 1.0 then 100% of the proceeds may be retained by the Borrower and added to the available investment basket described in the Negative Covenants below and which may be used to pay dividends to the equity investors).

If the Total Leverage Ratio (as defined below) is greater than 5.50 to 1.0, then: (a) 100% of the net proceeds received by the Borrower or any Guarantor from the issuance of debt after the Closing Date, other than any debt permitted under the Bank Documentation, ), with step-downs to be agreed based on Borrower's Total Leverage Ratio, and (b) beginning with the first full fiscal year of the Borrower after the Closing Date, 25% of excess cash flow of the Borrower and its subsidiaries (to be defined in a manner to be agreed but in any event to include deductions, without duplication among periods, for operating cash used to finance acquisitions, investments and capital expenditures or then committed to be used to finance acquisitions, investments and capital expenditures for which a binding agreement then exists); *provided* that any voluntary prepayments and certain mandatory prepayments of loans (including loans under the Revolving Credit Facility to the extent accompanied by permanent reductions of the commitments thereunder), other than prepayments funded with the proceeds of certain indebtedness, shall be credited against excess cash flow prepayment obligations on a dollar-for-dollar basis.

There will be no prepayment penalties (except actual LIBOR breakage costs) for mandatory or other prepayments.

Notwithstanding the foregoing, each Lender under the Term Facility shall have the right to reject its *pro rata* share of any mandatory prepayments described above, in which case the amounts so rejected may be retained by the Borrower.

| | |
|---|---|
| Optional Prepayments: | Permitted in whole or in part, with prior notice but without premium or penalty (except actual LIBOR |

I-6

Professionals' Eyes Only

TRB0009347

breakage costs) and including accrued and unpaid interest, subject to limitations as to minimum amounts of prepayments to be agreed.

| | |
|---|---|
| Application of Prepayments: | Mandatory prepayments shall be applied to the remaining amortization payments of the Term Loan Facility in forward order for the next twelve unpaid quarterly amounts after such prepayment and thereafter on a pro rata basis.  Optional prepayments shall be applied to remaining amortization payments in the manner directed by the Borrower. |
| Guarantees: | The Bank Facilities will be fully and unconditionally guaranteed on a joint and several basis by Holdings and all of the existing and future, direct and indirect, wholly-owned, restricted, material domestic subsidiaries of the Borrower except any indirect subsidiaries constituting controlled foreign corporations (collectively, the "Guarantors"). |
| Unrestricted Subsidiaries: | The Bank Documentation will contain provisions pursuant to which, subject to limitations on investments, loans, advances and guarantees, pro forma covenant compliance and other customary conditions and provisions, in each case, consistent with documentation for recent transactions for companies owned by Sponsor, the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently redesignate any such unrestricted subsidiary as a restricted subsidiary.  Unrestricted subsidiaries will not be subject to the affirmative or negative covenant or event of default and other provisions of the Bank Documentation, and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of determining compliance with the financial covenants contained in the Bank Documentation. |
| Security: | The Bank Facilities and any hedging obligations and, as determined by the Borrower, cash management arrangements to which a Lender or an affiliate of a Lender is a counterparty will be secured (subject to: (i) on the Closing Date, liens disclosed in the schedules to the Acquisition Agreement or as are not otherwise pro- |

I-7

Professionals' Eyes Only

TRB0009348

hibited by the terms of the Bank Documentation and (ii) thereafter to such liens to the extent they are not to be discharged in connection with the consummation of the Refinancing and other transactions or are otherwise not prohibited by the terms of the Bank Documentation) by perfected first priority pledges of all of the equity interests of the Borrower and each of the Borrower's direct and indirect material, restricted, domestic subsidiaries and of 65% of the equity interests of the Borrower's and any Guarantor's direct "first-tier" foreign subsidiaries, and perfected first priority security interests in substantially all tangible and intangible assets (including, without limitation, accounts receivable, inventory, equipment, general intangibles, intercompany notes in excess of an amount to be agreed, insurance policies, investment property, intellectual property, material owned real property and proceeds of the foregoing) of the Borrower and the Guarantors, wherever located, now or hereafter owned.  Notwithstanding the foregoing, collateral shall not include (a) motor vehicles and other equipment subject to a certificate of title statute, (b) letter-of-credit rights, (c) certain commercial tort claims, (d) fee interests in real property valued at less than an amount to be agreed, (e) leaseholds, (f) fixtures, except to the extent that the same are equipment under the UCC or are related to real property covered by a mortgage in favor of the Lenders, (g) crops or farm products or as-extracted collateral, (e) cash, deposit accounts or securities accounts (which shall constitute collateral but the liens in such assets need not be perfected to the extent perfection requires actions other than the filing of customary financing statements), (f) foreign-law pledges, (g) assets in which such pledge or security interest would be prohibited by contractual provisions or, in the case of any foreign subsidiary, would be prohibited by applicable law or would result in materially adverse tax consequences, (h) assets to the extent the cost of obtaining a pledge or security interest in which is excessive in relation to the benefit thereof, and (i) such other exceptions as are agreed.

To the extent any guarantee or collateral (other than collateral that can be perfected by the filing of uniform commercial code financing statements in a jurisdiction

I-8

Professionals' Eyes Only

TRB0009349

within the United States of America or the delivery of the stock certificate(s) of the Borrower and its material domestic restricted subsidiaries to the extent delivered pursuant to the Acquisition Agreement (together with undated stock powers executed in blank with respect thereto)) is not provided on the Closing Date after the use of commercially reasonable efforts to do so, the delivery of such guarantee and/or collateral shall not constitute a condition precedent to the availability of the Credit Facilities on the Closing Date but shall be required to be delivered after the Closing Date pursuant to arrangements to be mutually agreed.

Incremental Loans:

The Borrower shall be entitled to incur additional term loans under a new term facility that may be included in the Term Loan Facility and/or incremental revolving loans that may be included as a part of the Revolving Credit Facility, in an aggregate principal amount of up to $500 million with such additional loans having the same terms (including the same margins unless the Borrower shall otherwise agree), the same guarantees from the Guarantors, and being secured on a *pari passu* basis by the same collateral, as the applicable Bank Facility (the "Incremental Loans"); *provided* that (i) no event of default shall exist immediately prior or after giving effect thereto, (ii) in the case of Incremental Loans that are term loans, the other terms and documentation in respect thereof, to the extent not consistent with the applicable Bank Facility, shall be reasonably satisfactory to the Administrative Agent, (iii) no Lender shall be required to provide any such Incremental Loans and (iv) after giving effect to such Incremental Loans, the Borrower shall be in pro forma compliance with the Total Net Senior Secured Bank Leverage Ratio covenant. The proceeds of Incremental Loans may be used to finance permitted acquisitions and for other working capital and general corporate purposes of the Borrower and its subsidiaries.

Conditions to Initial Borrowings:

Conditions precedent to initial borrowings under the Bank Facilities will be those set forth in Section 5 (Conditions) of the Commitment Letter and in the Conditions Annex.

I-9

Professionals' Eyes Only

TRB0009350

| | |
|---|---|
| Conditions to Each Borrowing other than the Initial Borrowings: | Conditions precedent to each borrowing or issuance under the Bank Facilities occurring after the Closing Date: (1) the absence of any continuing default or event of default and (2) the accuracy of all representations and warranties in all material respects. |
| Representations and Warranties: | Customary for the Sponsor and its affiliates in similar transactions and limited to the following (which shall apply to the Borrower and its material restricted subsidiaries and be subject to materiality thresholds and exceptions to be agreed):  representations and warranties as to financial statements (including pro forma financial statements); no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of the Bank Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; solvency; accuracy of disclosure; status of Bank Facilities as senior debt; and creation and perfection of security interests. |
| Affirmative Covenants: | Customary for the Sponsor and its affiliates and limited to the following (which shall apply to the Borrower and its material restricted subsidiaries and be subject to materiality thresholds and exceptions to be agreed): |
| | Delivery of financial and other reasonably requested information: certified quarterly and audited annual financial statements, notices of defaults, litigation and other events that would have a material adverse effect, budgets and other information customarily supplied in a transaction of this type; payment of material taxes; continuation of business and maintenance of existence and material licenses and permits; compliance with all applicable laws and regulations (including, without limitation, environmental matters, taxation and ERISA); maintenance of property and customary insurance; maintenance of books and records; right of the Lenders to inspect property and books and records (subject to certain limitations to be agreed); and further assurances (including, without limitation, with respect to security |

Professionals' Eyes Only

TRB0009351

interests in after-acquired property).

Negative Covenants:

Customary for the Sponsor and its affiliates in similar transactions and limited to the following (which shall apply to the Borrower and its material restricted subsidiaries and be subject to materiality thresholds and exceptions to be agreed (including, in any event, an available basket amount ("Additional Investment Amount") that will be built by retained excess cash flow, the proceeds of asset sales not otherwise applied to prepay the Term Loan Facility (other than proceeds from the sale of the Chicago Cubs) and issuances of equity that may be used for, among other things, permitted investments and other merger and acquisition activities, capital expenditures, restricted payments and the prepayment of subordinated debt):

1.  Limitation on dispositions of assets and changes of business.

2.  Limitation on stock and asset acquisitions (it being understood that the Borrower will be permitted to make acquisitions as long as (i) no default or event of default exists and on a pro forma basis Borrower will be in compliance with the Financial Covenant described below, and (ii) if the acquisition is a stock purchase or of assets that include the stock of subsidiaries, (A) any domestic entities acquired (including their domestic subsidiaries) will become Guarantors of the Bank Facilities and will grant liens on their assets (to the extent otherwise required by the Bank Documentation) and (B) acquisitions of entities that do not become Guarantors will be limited to an aggregate amount to be mutually agreed).

3.  Limitations on dividends and stock repurchases and redemptions (with permitted dividends, repurchases and redemptions to be agreed and other than dividends, repurchases, prepayments of subordinated indebtedness and redemptions from the proceeds of equity issuances and retained excess cash flow, dividends of the proceeds from the sale of the Chicago Cubs to Holdings and the Equity Investors to the extent set forth under "Man-

I-11

Professionals' Eyes Only

TRB0009352

datory Prepayments" and regularly scheduled dividends to Holdings (with annual limitations to be agreed).

4.  Limitation on indebtedness (including guarantees), other than (i) the incurrence of subordinated indebtedness and (ii) the incurrence of other unsecured indebtedness, in each case so long as, on a pro forma basis for such incurrence, Borrower would be in compliance with the then-applicable leverage ratio covenant.

5.  Limitation on loans and investments (with permitted investments to be agreed and other than investments from the proceeds of equity issuances and excess cash flow not required to be used to prepay the Term Loans).

6.  Limitation on liens and further negative pledge clauses and clauses restricting subsidiary distributions.

7.  Limitation on transactions with affiliates.

8.  Limitation on speculative hedging agreements.

9.  No modification or waiver of the Senior Subordinated Notes (if any) in a manner that is, when taken as a whole, materially adverse to the Lenders without the consent of the Requisite Lenders.

10. No change to fiscal year.

Financial Covenants:    With regard to the Term Loan Facility: None.

With regard to the Revolving Credit Facility only:

Financial covenants will only consist of a maximum Total Net Senior Secured Bank Leverage Ratio.

The Total Net Senior Secured Bank Leverage Ratio shall be set based on the projections contained in the model provided by the Sponsor to the Arranger (as the same may be adjusted by Sponsor prior to the Closing Date) and set at a cushion of 30% to Adjusted EBITDA (as defined in Exhibit B to this Annex I) provided in

I-12

Professionals' Eyes Only

such model. The financial covenant will be calculated as of the last day of each fiscal quarter on a consolidated basis for the Borrower and its subsidiaries for the applicable trailing consecutive four fiscal quarter period on a pro forma basis for asset acquisitions and dispositions; *provided* that the first period for which compliance with the financial covenant will be determined will be the first such four fiscal quarter period ending at least six months after the Closing Date.

Certain Financial Definitions:    As used herein:

(a) "Total Leverage Ratio" shall mean the ratio of (i) the Borrower's total consolidated funded debt (to be defined in a manner to be agreed and in any event net of cash and cash equivalents) to (ii) the Borrower's consolidated Adjusted EBITDA; and

(b) "Total Net Senior Secured Bank Leverage Ratio" shall mean the ratio of (i) the Borrower's total consolidated funded debt under the Bank Facilities (net of cash and cash equivalents) to (ii) the Borrower's consolidated Adjusted EBITDA.

See Exhibit B to this Annex I for a definition of "Adjusted EBITDA."

Equity Cure:    For purposes of determining compliance with the financial covenants, any equity contribution (which equity shall be common equity or other equity on terms and conditions reasonably acceptable to the Administrative Agent) made to the Borrower after the Closing Date and on or prior to the day that is 15 days after the day on which financial statements are required to be delivered for a fiscal quarter will, at the request of the Borrower, be included in the calculation of Adjusted EBITDA for the purposes of determining compliance with financial covenants at the end of such fiscal quarter and applicable subsequent periods (any such equity contribution so included in the calculation of Adjusted EBITDA, a "Specified Equity Contribution"); *provided* that (a) in each four fiscal quarter period there shall be a period of at least two fiscal quarters in which no Specified Equity Contribution is made, (b) the amount of any Specified Equity Contribution shall be no greater than

I-13

Professionals' Eyes Only

TRB0009354

the amount required to cause the Borrower to be in compliance with the financial covenants and (c) all Specified Equity Contributions shall be disregarded for purposes of determining any baskets with respect to the covenants contained in the Bank Documentation.

Activities of Holdings:

Holdings will not engage at any time in any business or other activity other than (a) financing activities including, without limitation, holdco notes, (b) ownership and acquisition of equity interests in Borrower or in any other acquired entity engaging in a permitted business, together with activities directly related thereto, (c) performance of its obligations in connection with the Acquisition Agreement and the other agreements contemplated thereby and hereby, (d) actions incidental to the consummation of the Transactions, and (e) activities incidental to its maintenance and continuance and to the foregoing activities. Holdings shall not permit any liens on the equity interests of the Borrower other than liens in favor of the Lenders or that would otherwise not be prohibited by the terms of the Bank Documentation if Holdings were a party thereto.

Events of Default:

Customary for the Sponsor and its affiliates in similar transactions and limited to the following (which shall apply to Holdings, the Borrower and its subsidiaries and be subject to materiality thresholds, grace periods and exceptions to be agreed (*provided* that there will be longer grace periods for foreign entities)):  nonpayment (after a grace period of 5 days in the case of non-principal defaults), breach of representations in any material respect, breach of covenants, cross defaults to material indebtedness for borrowed money (it being understood that a breach of the Total Net Senior Secured Bank Leverage Ratio shall not cause a cross default of the Term Loan Facility), loss of lien on material collateral, invalidity of significant guarantees, invalidity of subordination provisions, bankruptcy and insolvency events, ERISA events, material judgments and change of control (as defined below).

"Change of Control" shall mean any event or circumstance after which: (i) Holdings shall cease to own, directly or indirectly, 100% of the Capital Stock of the Borrower; or (ii) if Holdings' capital stock is not traded

I-14

Professionals' Eyes Only

TRB0009355

on a nationally-recognized stock exchange, the Equity Investors shall cease to own, directly or indirectly, at least 50.1% of the capital stock of Holdings; or (iii) if Holdings' capital stock is traded on a nationally-recognized stock exchange (a) the Equity Investors shall cease to own, directly or indirectly, at least 30% of the capital stock of Holdings and any other shareholder shall own a greater amount, or (b) a majority of the board of directors of Holdings shall not be Continuing Directors.

"Continuing Directors" shall mean the directors of Holdings on the Closing Date and each other director of Holdings, if, in each case, such other director's nomination for election to the board of directors of Holdings is recommended by at least 51% of the then Continuing Directors or such other director receives the vote of the Sponsor, as applicable, (excluding any portfolio companies of the Sponsor) in his or her election by the shareholders of Holdings.

Assignments and Participations:

Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans and commitments under one or more of the Bank Facilities (other than to certain persons designated by the Borrower prior to the Closing Date); *provided* that any assignment in respect of the Revolving Credit Agreement shall be in a minimum amount equal to $5 million and any assignment of the Term Loan Facility shall be in a minimum amount equal to $1 million. Assignments will require payment of an administrative fee of $3,500 to the Administrative Agent and the consent of the Administrative Agent, the Issuing Bank (with respect to revolving credit facility loans and commitments) and the Borrower, which consents shall not be unreasonably withheld; *provided* that (i) no consents shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of the Borrower shall be required during a bankruptcy or payment event of default. In addition, each Lender may sell participations in all or a portion of its loans and commitments under one or more of the Bank Facilities (other than to certain persons designated in writing by the Borrower); *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling

I-15

Professionals' Eyes Only

TRB0009356

Lender to exercise voting rights in respect of the Bank Facilities (except as to certain customary issues). Assignees and participants may not include competitors of the Borrower.

Expenses and Indemnification:

All reasonable out-of-pocket expenses (including but not limited to reasonable legal fees and expenses of not more than one counsel plus, if necessary, one local counsel per jurisdiction and reasonable expenses incurred in connection with due diligence and travel, courier, reproduction, printing and delivery expenses) of the Banks, the Arranger and the Administrative Agent and the Syndication Agent associated with the syndication of the Bank Facilities and with the preparation, execution and delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the documentation contemplated hereby are to be paid by the Borrower on and after Closing Date, if it occurs. In addition, all reasonable out-of-pocket expenses (including but not limited to reasonable legal fees and expenses of not more than one counsel plus, if necessary, one local counsel per jurisdiction) of the Lenders and the Agents for workout proceedings, enforcement costs and documentary taxes associated with the Bank Facilities are to be paid by the Borrower.

The Borrower will indemnify the Lenders, the Banks, the Arranger and the Agents and their respective affiliates, and hold them harmless from and against all reasonable out-of-pocket costs, expenses (including but not limited to reasonable legal fees and expenses of not more than one counsel plus, if necessary, one local counsel per jurisdiction) and liabilities arising out of or relating to any action, investigation, suit or proceeding relating to or arising out of the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the Bank Facilities; *provided, however*, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a court of competent jurisdiction to have been incurred by reason of the gross negligence, bad faith or willful misconduct of, or breach of the Bank Documentation by, such person or any of its affiliates, or the directors, officers, employees, advisors or agents

I-16

Professionals' Eyes Only                                    TRB0009357

of any of them.

**Yield Protection, Taxes
and Other Deductions:**

The Bank Documentation will contain yield protection provisions, customary for facilities of this nature, protecting the Lenders in the event of unavailability of LIBOR, breakage losses, reserve and capital adequacy requirements.

All payments are to be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than certain income taxes). The Lenders will use reasonable efforts to minimize to the extent possible any applicable taxes and the Borrower will indemnify the Lenders and the Administrative Agent for such taxes paid by the Lenders or the Administrative Agent. The Borrower will have the right to replace or prepay any Lender who requests any such indemnification, *provided* that (i) the Borrower has satisfied all of the outstanding obligations owing to such Lender under the Revolving Credit Facility, the Term Loan Facility and/or the Bridge Facilities, as applicable, and (ii) any replacement Lender is reasonably acceptable to the Administrative Agent to the extent that assignments to such Lender would otherwise require the Administrative Agent's consent under the provisions of "Assignments and Participations" above.

**Requisite Lenders:**

Lenders holding at least a majority of total loans and commitments under the Bank Facilities (the "Requisite Lenders"), with (i) the consent of each Lender directly and adversely affected thereby to be required with respect to (a) reductions in the unpaid principal amount or extensions of the date for any scheduled payment of any loan, (b) reductions in interest rates (but not by virtue of a default waiver or change to a financial ratio) or fees or extensions of the dates for payment thereof, (c) increases in the amounts or extensions of the expiry date of any commitments and (d) modifications to any of the voting percentages and (ii) the consent of all Lenders to be required with respect to releases of all or substantially all of the collateral or all or substantially all of the Guarantors (other than in connection with permitted asset sales). The consent of Administrative Agent, Issuing Bank and/or Swingline Lender will be

I-17

Professionals' Eyes Only

TRB0009358

required with respect to any amendment affecting the rights or obligations thereof. The Borrower will have the "yank-a-bank" right to replace or prepay any Lender who does not consent to any amendment or waiver requiring the consent of such Lender but approved by the Requisite Lenders; *provided* that (i) the Borrower or such replacement lender has satisfied all of the outstanding obligations owing to such Lender under the Revolving Credit Facility and/or the Term Facility, as applicable, and (ii) any replacement Lender is reasonably acceptable to the Administrative Agent to the extent that assignments to such Lender would otherwise require the Administrative Agent's consent under the provisions of "Assignments and Participations" above.

Governing Law and Forum:

The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York.

Counsel to the Banks,
the Arranger and
the Agents:

Cahill Gordon & Reindel LLP.

Professionals' Eyes Only

TRB0009359

Revolving Credit Facility Pricing Grid

| Total Net Senior Se-cured Bank Leverage Ratio | Interest Margin for LIBOR Loans | Interest Margin for Base Rate Loans | Commitment Fee |
|---|---|---|---|
| ≥5.50:1.00 | 2.00% | 1.00% | 0.35% |
| >5.50:1.00 and <4.50:1.00 | 1.75% | 0.75% | 0.25% |
| ≤4.50:1.00 | 1.50% | 0.50% | 0.25% |

Term Loan Facility Pricing Grid

| Total Net Senior Se-cured Bank Leverage Ratio | Interest Margin for LIBOR Loans | Interest Margin for Base Rate Loans |
|---|---|---|
| ≥5.50:1.00 | 2.25% | 1.25% |
| <5.50:1.00 | 2.00% | 1.00% |

I-A-1

Professionals' Eyes Only

TRB0009360

EXHIBIT B<br>TO ANNEX I

Certain Definitions

Capitalized terms used but not defined herein have the meanings given (or incorporated by reference) in the Summary of Principal Terms and Conditions of the Bank Facility to which this Exhibit B is attached and, if not defined therein, shall be defined consistent with documentation for recent transactions for companies owned by Sponsor. For purposes of this Exhibit the term "Subsidiaries" shall exclude unrestricted subsidiaries.

"Adjusted EBITDA" shall mean, with respect to Borrower and the Subsidiaries on a consolidated basis for any period, the Consolidated Net Income of Borrower and the Subsidiaries for such period plus (a) the sum of (in each case without duplication and to the extent the respective amounts described in subclauses (i) through (x) of this clause (a) reduced such Consolidated Net Income (as defined below) for the respective period for which Adjusted EBITDA is being determined):

(i)     provision for Taxes based on income, profits, dividends, or capital of the Borrower and the Subsidiaries for such period, including, without limitation, state, franchise and similar taxes;

(ii)    Interest Expense of the Borrower and the Subsidiaries for such period (net of interest income of the Borrower and its Subsidiaries for such period);

(iii)   depreciation and amortization expenses of the Borrower and the Subsidiaries for such period;

(iv)    any transition services expenses and non-recurring one-time transition service set-up costs;

(v)     any business optimization expenses and other restructuring charges (subject to limitations to be agreed); provided that with respect to each business optimization expense or other restructuring charge, the Borrower shall have delivered to the Administrative Agent an officers' certificate specifying and quantifying such expense or charge and stating that such expense or charge is a business optimization expense or other restructuring charge, as the case may be;

(vi)    any extraordinary, unusual or non-recurring charges, expenses or losses, including without limitation relocation costs and curtailments or modifications to pension and post retirement employee benefit plans;

(vii)   any non-cash pension and other post-employment benefit expenses;

(viii)  any other non-cash charges, expenses or losses; provided that, for purposes of this clause (viii), any non-cash charges, expenses or losses shall be treated as

I-B-1

Page 93 of 174

Professionals' Eyes Only

cash charges, expenses or losses in any subsequent period during which cash disbursements attributable thereto are made;

(ix)     the amount of management, consulting, monitoring, transaction and advisory fees and related expenses paid to the Sponsor or any of its affiliates (or any accruals related to such fees and related expenses) during such period (subject to limitations to be agreed);

(x)      any minority interest expense that reduced Consolidated Net Income for the respective period;

(xi)     cash dividends received from unconsolidated investments; and

(xii)    equity contributions made pursuant to the equity cure rights described in Annex I to the Commitment Letter,

minus (b) the sum of (without duplication and to the extent the amounts described in this clause (b) increased such Consolidated Net Income for the respective period for which Adjusted EBITDA is being determined) non-cash items increasing Consolidated Net Income of the Borrower and the Subsidiaries for such period (but excluding any such items (i) in respect of which cash was received in a prior period or will be received in a future period or (ii) which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges in any prior period).

Adjusted EBITDA shall be calculated on a pro forma basis to give effect to any acquisitions (including the Acquisition) or dispositions (including the termination or discontinuance of activities constituting such operations) of business entities or properties or assets (constituting a division or line of business of any business entity) that is the subject of any such acquisition or disposition, including any synergies and cost savings as certified by the Borrower as having been determined in good faith to be reasonably anticipated to be realizable within 12 months following any such acquisition or disposition. All calculations of Adjusted EBITDA and Consolidated Net Income shall be calculated on a pro forma basis and set forth in an officers' certificate signed by the chief financial officer of the Borrower that states (i) the amount of such calculations and (ii) that such calculations are based on the reasonable good faith beliefs of the officers executing such officers' certificate at the time of such execution.

The calculation of Adjusted EBITDA shall not include any non-cash impact attributable to purchase accounting adjustments as a result of the fair value exercise undertaken as required by purchase accounting for the transactions contemplated by such acquisition, in accordance with GAAP (without duplication of clause (xi) of Consolidated Net Income).

"Consolidated Net Income" shall mean, with respect to any person for any period, the aggregate of the Net Income of such person and its subsidiaries for such period, on a consolidated basis; *provided, however*, that, without duplication,

I-B-2

Professionals' Eyes Only

TRB0009362

(i)    any net after-tax (A) extraordinary, (B) unusual or (C) nonrecurring gains or losses or income or expenses (less all fees and expenses relating thereto), including without limitation any severance expenses, and fees, expenses or charges related to any offering of Equity Interests of Holdings, any Investment, acquisition or Indebtedness permitted to be incurred hereunder or retirement of Indebtedness (including termination of the associated hedging arrangements) (in each case, whether or not successful), including any such fees, expenses, charges or change in control payments related to the Transactions, in each case, shall be excluded;

(ii)    any net after-tax income or loss from discontinued operations and any net after-tax gain or loss on disposal of discontinued operations shall be excluded;

(iii)    any net after-tax gain or loss (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by the Board of Directors of the Borrower) shall be excluded;

(iv)    any net after-tax income or loss (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of indebtedness shall be excluded;

(v)    the Net Income for such period shall include every ordinary course dividend distribution or other payment in cash received from any person;

(vi)    the cumulative effect of a change in accounting principle during such period shall be excluded;

(vii)    any increase in amortization or depreciation or any one-time non-cash charges resulting from purchase accounting in connection with the Transactions or any acquisition that is consummated after the Closing Date shall be excluded;

(viii)    any non-cash impairment charges resulting from the application of Statement of Financial Accounting Standards ("SFAS") No. 142 and No. 144, and the amortization of intangibles arising pursuant to SFAS No. 141, shall be excluded;

(ix)    any non-cash compensation expenses realized from grants of stock appreciation or similar rights, stock options or other rights to officers, directors and employees of such person or any of its subsidiaries shall be excluded;

(x)    accruals and reserves relating to the operations of the Acquired Business prior to the Closing Date that are established within twelve months after the Closing Date and that are so required to be established in accordance with GAAP shall be excluded; provided that such accruals and reserves shall not exceed $20 million in the aggregate; and

I-B-3

Professionals' Eyes Only

TRB0009363

(xi)   any non-cash impact attributable to purchase accounting adjustments as a re-
sult of the fair value exercise undertaken as required by purchase method of
accounting for the transaction contemplated by any Acquisition, in accordance
with GAAP shall be excluded.

I-B-4

Professionals' Eyes Only

TRB0009364

ANNEX II

SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

Senior Bridge Facility[1]

| | |
|---|---|
| Borrower: | The Borrower. |
| Sole Lead Arranger: | Lehman Brothers Inc. ("<u>Lehman Brothers</u>") (in such capacity, the "<u>Arranger</u>"). |
| Sole Bookrunner: | Lehman Brothers. |
| Lenders: | A syndicate of banks, financial institutions and other entities, including Lehman Commercial Paper Inc. ("<u>LCPI</u>") arranged by the Arranger and reasonably acceptable to the Borrower (collectively, the "<u>Lenders</u>"). |
| Administrative Agent: | LCPI or one of its affiliates (in such capacity, the "<u>Administrative Agent</u>") (it being understood that any resignation of the Administrative Agent shall not be effective until a successor administrative agent reasonably acceptable to the Borrower has been appointed). |
| Bridge Facility: | Unsecured senior bridge loans with pay-in-kind toggle (the "<u>Senior Bridge Loans</u>") in an aggregate principal amount of $470 million (the "<u>Senior Bridge Facility</u>"). |
| Guarantors: | Same Guarantors as the Bank Term Sheet other than Holdings (each, a "<u>Guarantor</u>"; and its guarantee is referred to herein as a "<u>Guarantee</u>").  The Borrower and the Guarantors are herein referred to as the "<u>Loan Parties</u>" and individually as a "<u>Loan Party</u>."  In the event that a subsidiary is released from its obligations under its guarantee of the Bank Facilities, its guarantee under the Senior Bridge Facility will be automatically released. Certain subsidiaries may be designated and treated as "unrestricted" on terms consistent with documentation |

---

[1]    All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

II-1

Professionals' Eyes Only

for recent transactions for companies owned by the Sponsor or its affiliates.

Ranking:

The Senior Bridge Loans and the Guarantees thereof will be unsecured senior obligations of the Borrower and the Guarantors, will rank (i) *pari passu* in right of payment with all other senior indebtedness of the Borrower or such Guarantor, as the case may be, (ii) senior in right of payment to all subordinated indebtedness of the Borrower or such Guarantor, as the case may be.

Availability/Use of Proceeds:

The Senior Bridge Facility will be available on the Closing Date in one drawing. The proceeds of the Senior Bridge Loans shall be used solely (a) to finance the Acquisition subject to the terms and conditions set forth in the Senior Bridge Documentation, and (b) to pay related fees, commissions and expenses.

Documentation:

Usual and customary for the Sponsor and its affiliates in similar transactions for facilities of this type. The Senior Bridge Documentation will include, among others, a bridge loan agreement and other appropriate documents, including an exhibit with the form of the indenture in connection with the issuance of any Senior Exchange Notes as contemplated below; *provided* that Adjusted EBITDA shall be defined as set forth in Exhibit B to Annex I attached to the Commitment Letter.

Interest:

The Senior Bridge Loans will bear interest at a variable rate per annum (the "Applicable Interest Rate") equal to the sum of (i) three-month LIBOR plus (ii) a spread equal to 3.25% (the "Spread"). The Spread will increase by an additional 0.50% on the six month anniversary of the Closing Date and a further additional 0.50% for each additional three-month period thereafter so long as any part of the Senior Bridge Loans are outstanding. Notwithstanding the foregoing, the interest rate on the Senior Bridge Loans shall not at any time exceed 9.25% *per annum* (exclusive of the 0.75% increase with respect to PIK Elections (as defined below)).

II-2

Professionals' Eyes Only

TRB0009366

Interest Payment

| | |
|---|---|
| Cash/PIK Option: | With respect to each interest period, the Borrower may, in its sole discretion, elect to pay interest on 50% of the principal amount of the Senior Bridge Loans then outstanding by adding such interest to such principal amount (any such election, a "PIK Election"). If a PIK Election is made, the Applicable Interest Rate with respect to principal subject to such PIK Election shall be increased by 0.75%). |
| | The Borrower shall make a PIK Election with respect to each interest period by providing at least 15 days' notice to the Administrative Agent prior to the date on which such interest payment is due. If a PIK Election is not made by the Borrower in a timely fashion or at all with respect to an interest period, the Borrower shall pay all such interest in cash. |
| | Any PIK Election shall apply to all outstanding Senior Loans. The Administrative Agent shall provide written notice of the Borrower's election to all Lenders. |
| Other Terms: | Interest will be payable quarterly, in arrears. |
| | Interest will be calculated on the basis of actual days elapsed in a year of 360 days. |
| | Upon the occurrence and during the continuance of a payment default, interest will accrue on any overdue amount payable in respect of Senior Bridge Loans at a rate of 2.0% per annum in excess of the rate otherwise applicable to such loans or amounts payable and will be payable on demand. |
| Maturity: | The Senior Bridge Loans will mature on the date (the "Senior Bridge Initial Maturity Date") that is twelve months after the initial funding date (the "Funding"); *provided, however*, that the maturity date of the Senior Bridge Loans shall be automatically extended on the Senior Bridge Initial Maturity Date to the date that is eight years after the Funding so long as no payment default has occurred and is continuing and none of Holdings, Borrower or any of their material subsidiaries is subject to a bankruptcy or other insolvency proceeding. |

II-3

Professionals' Eyes Only                                                  TRB0009367

In addition, after the Senior Bridge Initial Maturity Date and extension of the maturity date of the Senior Bridge Loans as described in the preceding sentence, the Senior Bridge Loans may be exchanged for Senior Exchange Notes as provided in Exhibit A attached hereto.

**Mandatory Redemption:** The Borrower will be required to repay the entire principal amount of the Senior Bridge Loans upon any change of control of the Borrower or its subsidiaries in cash, without any prepayment or penalty (but including all breakage and similar costs), on usual and customary terms and conditions for the Sponsor and its affiliates for senior facilities similar to the Senior Bridge Facility.

Subject to the mandatory prepayment provisions of the Bank Facilities and certain exceptions to be agreed upon, to the extent proceeds are available, the Borrower will repay the Senior Bridge Loans with the net proceeds received by the Borrower from (a) the incurrence by the Borrower of any debt (other than borrowings under the Bank Facilities and permitted incurrences pursuant to the Bank Documentation) and (b) asset sales, subject to reinvestment rights at least as favorable as those set forth in the Bank Documentation and other exceptions usual and customary for Sponsor and its affiliates in similar transactions for facilities of this type.

Each such prepayment shall be made together with accrued interest to the date of prepayment, but, except as noted above, without premium or penalty (except actual breakage costs related to prepayments not made on the last day of the relevant interest period).

**Optional Redemption:** The Senior Bridge Loans may be prepaid at any time, in whole or in part, at the option of the Borrower, upon notice and in a minimum principal amount and in multiples to be agreed upon, together with accrued interest to the date of pre-payment, but without premium or penalty (except actual breakage costs not including loss of margin related to prepayments not made on the last day of the relevant interest period).

**Conditions Precedent to Funding:** The Funding of the Senior Bridge Loans will be subject to satisfaction of the conditions set forth on the Condi-

II-4

Professionals' Eyes Only

TRB0009368

tions Annex.

| | |
|---|---|
| Representations and Warranties: | Substantially the same as those described in Bank Term Sheet and limited to the following (which shall apply to the Borrower and its material restricted subsidiaries and be subject to materiality thresholds and exceptions to be agreed): representations and warranties as to financial statements (including pro forma financial statements); no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of the Senior Bridge Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; solvency; and accuracy of disclosure. |
| Covenants: | Substantially the same as those affirmative covenants described in the Bank Term Sheet. Incurrence-based and other negative covenants consistent with those described in the Bank Term Sheet, with such changes as are necessary or appropriate for the Senior Bridge Facility, and negative covenants applicable to Senior Bridge Loans after the Initial Maturity Date and usual and customary for the Sponsor and its affiliates in similar transactions for facilities of this type, in each case, no more restrictive than applicable to the Bank Facilities. |
| Events of Default: | Usual and customary for the Sponsor and its affiliates in similar transactions for facilities similar to the Senior Bridge Facility. |
| Assignments and Participations: | Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans under the Senior Bridge Facility (other than to certain persons designated in writing by Borrower prior to the Closing Date). Assignments will require, the consent of the Administrative Agent and the Borrower, which consents shall not be unreasonably withheld; *provided* that (i) no consents shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of the Borrower shall be required during a bankruptcy or payment event of default. In addition, each Lender may sell participations in all or a portion of |

II-5

Professionals' Eyes Only

TRB0009369

its loans and commitments under the Senior Bridge Facility (other than to certain persons designated in writing by Borrower); *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Senior Bridge Facility (except as to certain customary issues). Assignees and participants may not include competitors of the Borrower.

Required Lenders:

Lenders having a majority of the outstanding credit exposure, except (1) the consent of all Lenders directly and adversely affected thereby to be required with respect to (a) reductions in the unpaid principal amount or extensions of the maturity date of any loan, (b) reductions in interest rates (but not by virtue of a default waiver or change to a financial ratio) or fees or extensions of the dates for payment thereof, and (c) increases in the amounts or extensions of the expiry date of a Lender's commitments and (2) the consent of all Lenders to be required with respect to (i) modifications to any of the voting percentages and (ii) at any time prior to the Senior Bridge Initial Maturity Date, releases of all or substantially all the Guarantors and thereafter, releases of any significant Guarantors (in each case other than automatic releases of any such Guarantors). The voting provisions of the Senior Bridge Facility shall contain a "yank-a-bank" provision comparable to that contained in the Bank Documentation.

Expenses and Indemnification:

The Borrower will pay (a) all reasonable out-of-pocket costs and expenses of the Arranger, the Administrative Agent and the Lenders (including the reasonable, disbursements and other charges of not more than one counsel) in connection with the preparation, execution, delivery and administration of, and any waiver or modification (whether or not effective) and administration of, the Senior Bridge Documentation and in arranging and syndicating the Senior Bridge Facility on the Closing Date and thereafter, within 30 days of the delivery of a reasonably detailed invoice with respect thereto, and (b) all reasonable out-of-pocket costs and expenses of the Arranger, the Administrative Agent and the Lenders (including the reasonable fees and disbursements of not more than one counsel) in connection with the enforce-

II-6

Professionals' Eyes Only

TRB0009370

ment of the Senior Bridge Facility, within 30 days of the delivery of a reasonably detailed invoice with respect thereto.

The Borrower will indemnify the Arranger, the Administrative Agent and the Lenders and hold them harmless against all costs and expenses (including reasonable fees and disbursements of counsel) and all losses, claims, damages and liabilities in connection with any action, suit or proceeding arising from or relating to the proposed financing contemplated hereby and the other transactions connected therewith, except to the extent finally determined to have resulted from such indemnified party's bad faith, gross negligence or willful misconduct or the bad faith, gross negligence or willful misconduct of any of its affiliates, directors, officers, employees, representatives or agents.

Government Law and Forum:

The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York.

Miscellaneous:

Customary provisions regarding consent to jurisdiction, waiver of jury trial, service of process, yield protection, tax gross ups and other miscellaneous matters.

Counsel to the Arranger:

Cahill Gordon & Reindel LLP.

II-7

Professionals' Eyes Only

TRB0009371

Exhibit A to<br>
ANNEX II

Summary of Principal Terms and Conditions
of Senior Exchange Notes

Capitalized terms used but not defined herein have the meanings given (or incorporated by reference) in the Summary of Principal Terms and Conditions of the Senior Bridge Facility to which this Exhibit A is attached.

| | |
|---|---|
| Issuer: | The Borrower. |
| Guarantors: | Same as the Guarantors of the Senior Bridge Loans. |
| Exchange: | If the Senior Bridge Loans have not been previously repaid in full for cash on or prior to the Initial Maturity Date and the maturity of the Senior Bridge Loans shall have been extended as provided in the Senior Bridge Term Sheet, Lenders shall have the option to require the Issuer to issue unsecured senior notes ("Senior Exchange Notes") under an indenture that complies with the Trust Indenture Act of 1939 to such Lender under the Senior Bridge Facility in the aggregate outstanding principal amount of such Lender's outstanding portion of the Senior Bridge Loans; *provided* that the Borrower may defer the first issuance of Senior Exchange Notes until such time as the Borrower has received requests to issue an aggregate amount of Senior Exchange Notes equal to at least 25% of the aggregate principal amount of all Senior Bridge Loans issued on the Closing Date. |
| Principal Amount: | The Senior Exchange Notes will be available only to satisfy the Senior Bridge Loans. The principal amount of the Senior Exchange Notes will equal 100% of the aggregate principal amount of the Senior Bridge Loans for which they are exchanged and will have the same ranking as the Senior Bridge Loans for which they are exchanged. |
| Interest Rate: | The Senior Exchange Notes (other than any Fixed Rate Senior Exchange Notes) will bear interest at a rate (the "Applicable Senior Exchange Note Interest Rate") equal to the Initial Rate (as defined below) plus the Applicable Spread (as defined below). Notwithstanding the foregoing, the Applicable Senior Exchange Note Interest Rate |

II-A-1

Professionals' Eyes Only

shall not exceed 9.25% *per annum* (exclusive of the 0.75% increase with respect to PIK Elections (as defined below)) (such maximum interest rate together with those relating to the Senior Bridge Loans, an "Interest Cap"). The Senior Exchange Notes shall include provisions customary in securities of this type protecting the holders in the event of unavailability of funding, illegality, capital adequacy requirements, increased costs, withholding taxes and funding losses.

"Applicable Spread" shall mean zero during the three-month period commencing on the exchange date of the Senior Exchange Notes and shall increase by 0.50% *per annum* at the beginning of each subsequent three-month period.

"Initial Rate" shall be determined on the Initial Maturity Date of the Senior Bridge Loans and shall equal the interest rate of the Senior Bridge Loans on the day immediately preceding the Initial Maturity Date plus 0.50% *per annum*.

Each holder of Senior Exchange Notes shall have the option to fix the interest rate on the Senior Exchange Notes to a rate that is equal to the then Applicable Interest Rate borne by the Senior Exchange Notes ("Fixed Rate Senior Exchange Notes").

Interest Payment

Cash/PIK Option:

With respect to each interest period, the Borrower may, in its sole discretion, elect to pay interest on 50% of the aggregate principal amount of Fixed Rate Senior Exchange Notes then outstanding by adding such interest to such principal amount (any such election, a "PIK Election"). If a PIK Election is made, the Interest Rate with respect to principal subject to such PIK Election shall be increased by 0.75%.

The Borrower shall make a PIK Election with respect to each interest period by providing at least 15 days' notice to the Administrative Agent prior to the date on which such interest payment is due. If a PIK Election is not made by the Borrower in a timely fashion or at all with

II-A-2

Professionals' Eyes Only

TRB0009373

respect to an interest period, the Borrower shall pay all such interest in cash.

Any PIK Election shall apply to all outstanding Senior Exchange Notes.  The Administrative Agent shall provide written notice of the Borrower's election to all Lenders.

Other Terms:

Interest will be payable semi-annually, in arrears.

Interest will be calculated on the basis of actual days elapsed in a year of 360 days.

Upon the occurrence and during the continuance of a payment default, interest will accrue on any overdue amount payable in respect of Senior Exchange Notes at a rate of 2.0% per annum in excess of the rate otherwise applicable to such loans or amounts payable and will be payable on demand.

Maturity:

Eight years from the date of the Funding.

Ranking:

Same as the Senior Bridge Loans.

Mandatory Offer to Purchase:

The Issuer will make an offer to purchase the Fixed Rate Senior Exchange Notes upon any change of control of the Issuer at a redemption price of 101% of par plus accrued and unpaid interest and will redeem the Senior Exchange Notes not bearing interest at a fixed rate upon any change of control of the Issuer at a redemption price of par plus accrued and unpaid interest.

Subject to the mandatory pre-payment provisions of the Bank Facilities, to the extent proceeds are available, the Issuer will make offers to repurchase the Senior Exchange Notes for such events and on such terms and conditions as are customary for publicly traded high yield debt securities issued by affiliates of the Sponsor.

Optional Redemption:

The Senior Exchange Notes (other than Fixed Rate Senior Exchange Notes) will be callable, in whole or in part, upon not less than 30 nor more than 60 days written notice, at the option of the Issuer, at any time at par plus accrued and unpaid interest to the redemption date.  The Fixed Rate Senior Exchange Notes will be callable in

II-A-3

Professionals' Eyes Only                                                                 TRB0009374

whole or in part at any time subject to customary make-whole provisions and in such other instances and subject to such other restrictions and premiums as are typical for similar fixed-rate high-yield debt securities issued by affiliates of the Sponsor.

Right to Resell Notes:

Any Lender (and any subsequent holder) shall have the absolute and unconditional right to resell the Senior Exchange Notes to one or more third parties, whether by assignment or participation and subject to compliance with applicable securities laws.

Representations and Warranties;
Covenants; Events of Default:

Customary for publicly traded high yield debt securities of companies affiliated with the Sponsor.

Governing Law and Forum:

The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York.

Miscellaneous:

Customary provisions regarding consent to jurisdiction, waiver of jury trial, service of process, yield protection, tax gross ups and other miscellaneous matters.

Counsel to the Arranger

Cahill Gordon & Reindel LLP.

II-A-4

Professionals' Eyes Only

TRB0009375

SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

Senior Subordinated Bridge Facility[1]

| | |
|---|---|
| Borrower: | The Borrower. |
| Sole Lead Arranger: | Lehman Brothers Inc. ("Lehman Brothers") (in such capacity, the "Arranger"). |
| Sole Bookrunner: | Lehman Brothers. |
| Lenders: | A syndicate of banks, financial institutions and other entities, including Lehman Commercial Paper Inc. ("LCPI") arranged by the Arranger and reasonably acceptable to the Borrower (collectively, the "Lenders"). |
| Administrative Agent: | LCPI or one of its affiliates (in such capacity, the "Administrative Agent") (it being understood that any resignation of the Administrative Agent shall not be effective until a successor administrative agent reasonably acceptable to the Borrower has been appointed). |
| Bridge Facility: | Unsecured senior subordinated bridge loans (the "Senior Subordinated Bridge Loans") in an aggregate principal amount of $465 million (the "Senior Subordinated Bridge Facility"). |
| Guarantors: | Same Guarantors as the Bank Term Sheet other than Holdings (each, a "Guarantor"; and its guarantee is referred to herein as a "Guarantee"). The Borrower and the Guarantors are herein referred to as the "Loan Parties" and individually as a "Loan Party." In the event that a subsidiary is released from its obligations under its guarantee of the Bank Facilities, its guarantee under the Senior Subordinated Bridge Facility will be automatically released. Certain subsidiaries may be designated |

---

[1]   All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

III-1

Professionals' Eyes Only

TRB0009376

and treated as "unrestricted" on terms consistent with documentation for recent transactions for companies owned by the Sponsor or its affiliates.

Ranking:

The Senior Subordinated Bridge Loans and the Guarantees thereof will be unsecured senior subordinated obligations of the Borrower and the Guarantors, will rank (i) junior in right of payment to all senior indebtedness of the Borrower or such Guarantor, as the case may be, (ii) *pari passu* in right of payment with all other senior subordinated indebtedness of the Borrower or such Guarantor, as the case may be, (iii) senior in right of payment to all subordinated indebtedness of the Borrower or such Guarantor, as the case may be.

Availability/Use of Proceeds:

The Senior Subordinated Bridge Facility will be available on the Closing Date in one drawing. The proceeds of the Senior Subordinated Bridge Loans shall be used solely (a) to finance the Acquisition subject to the terms and conditions set forth in the Senior Subordinated Bridge Documentation, and (b) to pay related fees, commissions and expenses.

Documentation:

Usual and customary for the Sponsor and its affiliates in similar transactions for facilities of this type. The Senior Subordinated Bridge Documentation will include, among others, a bridge loan agreement and other appropriate documents, including an exhibit with the form of the indenture in connection with the issuance of any Senior Subordinated Exchange Notes as contemplated below; *provided* that Adjusted EBITDA shall be defined as set forth in Exhibit B to Annex I attached to the Commitment Letter.

Interest:

The Senior Subordinated Bridge Loans will bear interest at a variable rate per annum (the "Applicable Interest Rate") equal to the sum of (i) three-month LIBOR plus (ii) a spread equal to 4.75% (the "Spread"). The Spread will increase by an additional 0.50% on the six month anniversary of the Closing Date and a further additional 0.50% for each additional three-month period thereafter so long as any part of the Senior Subordinated Bridge Loans are outstanding. Notwithstanding the foregoing, the interest rate on the Senior Subordinated Bridge

III-2

Professionals' Eyes Only

TRB0009377

Loans shall not at any time exceed 11.25% *per annum*.

Interest Payments:

Interest will be payable quarterly, in arrears.

Interest will be calculated on the basis of actual days elapsed in a year of 360 days.

Upon the occurrence and during the continuance of a payment default, interest will accrue on any overdue amount payable in respect of Senior Subordinated Bridge Loans at a rate of 2.0% per annum in excess of the rate otherwise applicable to such loans or amounts payable and will be payable on demand.

Maturity:

The Senior Subordinated Bridge Loans will mature on the date (the "Senior Subordinated Bridge Initial Maturity Date") that is twelve months after the initial funding date (the "Funding"); *provided, however*, that the maturity date of the Senior Subordinated Bridge Loans shall be automatically extended on the Senior Subordinated Bridge Initial Maturity Date to the date that is eight years after the Funding so long as no payment default has occurred and is continuing and none of Holdings, Borrower or any of their material subsidiaries is subject to a bankruptcy or other insolvency proceeding. In addition, after the Senior Subordinated Bridge Initial Maturity Date and extension of the maturity date of the Senior Subordinated Bridge Loans as described in the preceding sentence, the Senior Subordinated Bridge Loans may be exchanged for Senior Subordinated Exchange Notes as provided in Exhibit A attached hereto.

Mandatory Redemption:

The Borrower will be required to repay the entire principal amount of the Senior Subordinated Loans upon any change of control of the Borrower or its subsidiaries in cash, without any prepayment or penalty (but including all breakage and similar costs), on ususal and customary terms and conditions for the Sponsor and its affiliates for senior facilities similar to the Senior Subordinated Facility.

Subject to the mandatory prepayment provisions of the Bank Facilities and certain exceptions to be agreed upon, to the extent proceeds are available, the Borrower will

III-3

Professionals' Eyes Only

repay the Senior Subordinated Bridge Loans with the net proceeds received by the Borrower from (a) the incurrence by the Borrower of any debt (other than borrowings under the Bank Facilities and permitted incurrences pursuant to the Bank Documentation) and (b) asset sales, subject to reinvestment rights at least as favorable as those set forth in the Bank Documentation and other exceptions usual and customary for Sponsor and its affiliates in similar transactions for facilities of this type.

Each such prepayment shall be made together with accrued interest to the date of prepayment, but, except as noted above, without premium or penalty (except actual breakage costs related to prepayments not made on the last day of the relevant interest period).

Optional Redemption:

The Senior Subordinated Bridge Loans may be prepaid at any time, in whole or in part, at the option of the Borrower, upon notice and in a minimum principal amount and in multiples to be agreed upon, together with accrued interest to the date of pre-payment, but without premium or penalty (except actual breakage costs not including loss of margin related to prepayments not made on the last day of the relevant interest period).

Conditions Precedent to Funding:

The Funding of the Senior Subordinated Bridge Loans will be subject to satisfaction of the conditions set forth on the Conditions Annex.

Representations and Warranties:

Substantially the same as those described in Bank Term Sheet and limited to the following (which shall apply to the Borrower and its material restricted subsidiaries and be subject to materiality thresholds and exceptions to be agreed): representations and warranties as to financial statements (including pro forma financial statements); no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of the Senior Subordinated Bridge Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; solvency; and accu-

III-4

Professionals' Eyes Only

TRB0009379

racy of disclosure.

| | |
|---|---|
| Covenants: | Substantially the same as those affirmative covenants described in the Bank Term Sheet. Incurrence-based and other negative covenants consistent with those described in the Bank Term Sheet, with such changes as are necessary or appropriate for the Senior Subordinated Bridge Facility, and negative covenants applicable to Senior Subordinated Bridge Loans after the Initial Maturity Date and usual and customary for the Sponsor and its affiliates in similar transactions for facilities of this type, in each case, no more restrictive than applicable to the Bank Facilities. |
| Events of Default: | Usual and customary for the Sponsor and its affiliates in similar transactions for facilities similar to the Senior Subordinated Bridge Facility. |
| Assignments and Participations: | Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans under the Senior Subordinated Bridge Facility (other than to certain persons designated in writing by Borrower prior to the Closing Date). Assignments will require, the consent of the Administrative Agent and the Borrower, which consents shall not be unreasonably withheld; *provided* that (i) no consents shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of the Borrower shall be required during a bankruptcy or payment event of default. In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Senior Subordinated Bridge Facility (other than to certain persons designated in writing by Borrower); *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Senior Subordinated Bridge Facility (except as to certain customary issues). Assignees and participants may not include competitors of the Borrower. |
| Required Lenders: | Lenders having a majority of the outstanding credit exposure, except (1) the consent of all Lenders directly and adversely affected thereby to be required with respect to (a) reductions in the unpaid principal amount or exten- |

III-5

Professionals' Eyes Only

TRB0009380

sions of the maturity date of any loan, (b) reductions in interest rates (but not by virtue of a default waiver or change to a financial ratio) or fees or extensions of the dates for payment thereof, and (c) increases in the amounts or extensions of the expiry date of a Lender's commitments and (2) the consent of all Lenders to be required with respect to (i) modifications to any of the voting percentages and (ii) at any time prior to the Senior Subordinated Bridge Initial Maturity Date, releases of all or substantially all the Guarantors and thereafter, releases of any significant Guarantors (in each case other than automatic releases of any such Guarantors). The voting provisions of the Senior Subordinated Bridge Facility shall contain a "yank-a-bank" provision comparable to that contained in the Bank Documentation.

Expenses and Indemnification:

The Borrower will pay (a) all reasonable out-of-pocket costs and expenses of the Arranger, the Administrative Agent and the Lenders (including the reasonable, disbursements and other charges of not more than one counsel) in connection with the preparation, execution, delivery and administration of, and any waiver or modification (whether or not effective) and administration of, the Senior Subordinated Bridge Documentation and in arranging and syndicating the Senior Subordinated Bridge Facility on the Closing Date and thereafter, within 30 days of the delivery of a reasonably detailed invoice with respect thereto, and (b) all reasonable out-of-pocket costs and expenses of the Arranger, the Administrative Agent and the Lenders (including the reasonable fees and disbursements of not more than one counsel) in connection with the enforcement of the Senior Subordinated Bridge Facility, within 30 days of the delivery of a reasonably detailed invoice with respect thereto.

The Borrower will indemnify the Arranger, the Administrative Agent and the Lenders and hold them harmless against all costs and expenses (including reasonable fees and disbursements of counsel) and all losses, claims, damages and liabilities in connection with any action, suit or proceeding arising from or relating to the proposed financing contemplated hereby and the other transactions connected therewith, except to the extent fi-

III-6

Professionals' Eyes Only

TRB0009381

nally determined to have resulted from such indemnified party's bad faith, gross negligence or willful misconduct or the bad faith, gross negligence or willful misconduct of any of its affiliates, directors, officers, employees, representatives or agents.

| | |
|---|---|
| Government Law and Forum: | The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York. |
| Miscellaneous: | Customary provisions regarding consent to jurisdiction, waiver of jury trial, service of process, yield protection, tax gross ups and other miscellaneous matters. |
| Counsel to the Arranger: | Cahill Gordon & Reindel LLP. |

Professionals' Eyes Only

TRB0009382

Exhibit A to
ANNEX III

Summary of Principal Terms and Conditions
of Senior Subordinated Exchange Notes

Capitalized terms used but not defined herein have the meanings given (or in-corporated by reference) in the Summary of Principal Terms and Conditions of the Senior Subordinated Bridge Facility to which this Exhibit A is attached.

| | |
|---|---|
| Issuer: | The Borrower. |
| Guarantors: | Same as the Guarantors of the Senior Subordinated Bridge Loans. |
| Exchange: | If the Senior Subordinated Bridge Loans have not been previously repaid in full for cash on or prior to the Initial Maturity Date and the maturity of the Senior Subordi-nated Bridge Loans shall have been extended as pro-vided in the Senior Subordinated Bridge Term Sheet, Lenders shall have the option to require the Issuer to is-sue unsecured senior subordinated notes ("Senior Subor-dinated Exchange Notes") under an indenture that com-plies with the Trust Indenture Act of 1939 to such Lender under the Senior Subordinated Bridge Facility in the aggregate outstanding principal amount of such Lender's outstanding portion of the Senior Subordinated Bridge Loans; *provided* that the Borrower may defer the first issuance of Senior Subordinated Exchange Notes until such time as the Borrower has received requests to issue an aggregate amount of Senior Subordinated Ex-change Notes equal to at least 25% of the aggregate principal amount of all Senior Subordinated Bridge Loans issued on the Closing Date. |
| Principal Amount: | The Senior Subordinated Exchange Notes will be avail-able only to satisfy the Senior Subordinated Bridge Loans.  The principal amount of the Senior Subordinated Exchange Notes will equal 100% of the aggregate prin-cipal amount of the Senior Subordinated Bridge Loans for which they are exchanged and will have the same ranking as the Senior Subordinated Bridge Loans for which they are exchanged. |

III-A-1

Professionals' Eyes Only

Interest Rate:

The Senior Subordinated Exchange Notes (other than any Fixed Rate Senior Subordinated Exchange Notes) will bear interest at a rate (the "Applicable Senior Subordinated Exchange Note Interest Rate") equal to the Initial Rate (as defined below) plus the Applicable Spread (as defined below). Notwithstanding the foregoing, the Applicable Senior Subordinated Exchange Note Interest Rate shall not exceed 11.25% *per annum* (such maximum interest rate together with those relating to the Senior Subordinated Bridge Loans, an "Interest Cap"). The Senior Subordinated Exchange Notes shall include provisions customary in securities of this type protecting the holders in the event of unavailability of funding, illegality, capital adequacy requirements, increased costs, withholding taxes and funding losses.

"Applicable Spread" shall mean zero during the three-month period commencing on the exchange date of the Senior Subordinated Exchange Notes and shall increase by 0.50% *per annum* at the beginning of each subsequent three-month period.

"Initial Rate" shall be determined on the Initial Maturity Date of the Senior Subordinated Bridge Loans and shall equal the interest rate of the Senior Subordinated Bridge Loans on the day immediately preceding the Initial Maturity Date plus 0.50% *per annum*.

Each holder of Senior Subordinated Exchange Notes shall have the option to fix the interest rate on the Senior Subordinated Exchange Notes to a rate that is equal to the then Applicable Interest Rate borne by the Senior Subordinated Exchange Notes ("Fixed Rate Senior Subordinated Exchange Notes").

Interest Payments:

Interest will be payable semi-annually, in arrears.

Interest will be calculated on the basis of actual days elapsed in a year of 360 days.

Upon the occurrence and during the continuance of a payment default, interest will accrue on any overdue amount payable in respect of Senior Subordinated Exchange Notes at a rate of 2.0% per annum in excess of

III-A-2

Professionals' Eyes Only

TRB0009384

the rate otherwise applicable to such loans or amounts payable and will be payable on demand.

| | |
|---|---|
| Maturity: | Eight years from the date of the Funding. |
| Ranking: | Same as the Senior Subordinated Bridge Loans. |

Mandatory Offer to Purchase:

The Issuer will make an offer to purchase the Fixed Rate Senior Subordinated Exchange Notes upon any change of control of the Issuer at a redemption price of 101% of par plus accrued and unpaid interest and will redeem the Senior Subordinated Exchange Notes not bearing interest at a fixed rate upon any change of control of the Issuer at a redemption price of par plus accrued and unpaid interest.

Subject to the mandatory pre-payment provisions of the Bank Facilities, to the extent proceeds are available, the Issuer will make offers to repurchase the Senior Subordinated Exchange Notes for such events and on such terms and conditions as are customary for publicly traded high yield debt securities issued by affiliates of the Sponsor.

Optional Redemption:

The Senior Subordinated Exchange Notes (other than Fixed Rate Senior Subordinated Exchange Notes) will be callable, in whole or in part, upon not less than 30 nor more than 60 days written notice, at the option of the Issuer, at any time at par plus accrued and unpaid interest to the redemption date. The Fixed Rate Senior Subordinated Exchange Notes will be callable in whole or in part at any time subject to customary make-whole provisions and in such other instances and subject to such other restrictions and premiums as are typical for similar fixed-rate high-yield debt securities issued by affiliates of the Sponsor.

Right to Resell Notes:

Any Lender (and any subsequent holder) shall have the absolute and unconditional right to resell the Senior Subordinated Exchange Notes to one or more third parties, whether by assignment or participation and subject

III-A-3

Professionals' Eyes Only

TRB0009385

to compliance with applicable securities laws.

| | |
|---|---|
| Representations and Warranties; Covenants; Events of Default: | Customary for publicly traded high yield debt securities of companies affiliated with the Sponsor. |
| Governing Law and Forum: | The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York. |
| Miscellaneous: | Customary provisions regarding consent to jurisdiction, waiver of jury trial, service of process, yield protection, tax gross ups and other miscellaneous matters. |
| Counsel to the Arranger | Cahill Gordon & Reindel LLP. |

III-A-4

Professionals' Eyes Only                TRB0009386

ANNEX IV

CONDITIONS TO THE INITIAL FUNDING[1]

The initial funding of the Facilities by the Banks under the Commitment Letter is subject to the conditions set forth in the Commitment Letter and satisfaction or waiver of each of the conditions precedent set forth below.[2]

1.    The Acquisition and the Refinancing shall be consummated concurrently with the initial funding of the Facilities (i) in accordance with the definitive Acquisition Agreement dated as of the date hereof and the related disclosure schedules and exhibits thereto, subject to paragraph 7 below, without waiver or amendment thereof (other than any such waivers or amendments (including, without limitation, with respect to any representations and warranties in the Acquisition Agreement) as are not materially adverse to Banks or the Arranger) unless consented to by the Arranger (which consent shall not be unreasonably withheld or delayed) or (ii) on such other terms and conditions as are reasonably satisfactory to the Arranger.

2.    The Borrower shall have received the cash from the Equity Financing which together shall comprise not less than 15% of the pro forma capitalization of the Borrower after giving effect to the Transaction (excluding, for the avoidance of doubt, any letters of credit issued in the Closing Date).

3.    The Arranger will have received (i) copies of audited consolidated financial statements for the Acquired Business for any audited period after the date hereof for which financial statements are available, (ii) interim unaudited financial statements for the Acquired Business for each quarterly period ended after December 31, 2006 and at least 45 days prior to the Closing Date, and (iii) pro forma consolidated financial statements for the Borrower and its subsidiaries for, and as of the end of, the four-quarter period most recently ended prior to the Closing Date for which financial statements are available giving pro forma effect to the Acquisition and any other material acquisitions effected during or subsequent to such period (including adjustments previously agreed

---

[1]    All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this Annex IV is attached.

[2]    Subject to the completion of confirmatory business, tax, accounting, IT and legal diligence, which condition is expected to be removed prior to the signing of the Acquisition Agreement.

IV-1

Professionals' Eyes Only                                                         TRB0009387

to by the Arranger and with such further adjustments as are consistent with re-
cent financings for companies owned by the Sponsor and are otherwise rea-
sonably satisfactory to the Arranger).[3]

4.  The Administrative Agent shall have received a reasonably satisfactory sol-
    vency certificate from the chief financial officer of Holdings that shall docu-
    ment the solvency of Holdings and its subsidiaries on a consolidated basis after
    giving effect to the Transactions.

5.  Holdings, the Borrower and each of the Guarantors shall have provided the
    documentation and other information to the Lenders that is required by regula-
    tory authorities under applicable "know your customer" and anti-money-
    laundering rules and regulations, including, without limitation, the Patriot Act.

6.  All documents and instruments required to perfect or evidence the Administra-
    tive Agent's first priority security interest in the personal property collateral
    under the Bank Facilities (including delivery of customary lien searches, stock
    certificates and undated stock powers executed in blank) shall have been exe-
    cuted and be in proper form for filing, but subject to the terms set forth in
    paragraph 7 below.

7.  Definitive documentation for the Bank Facilities (the "Bank Documentation"),
    the Senior Bridge Facility (the "Senior Bridge Documentation") and the Senior
    Subordinated Bridge Facility (the "Senior Subordinated Bridge Documenta-
    tion" and, together with the Senior Bridge Documentation, the "Bridge Docu-
    mentation"; the Bank Documentation and the Bridge Documentation collec-
    tively, the "Financing Documentation"), in each case reflecting and consistent
    with the terms and conditions set forth herein and in the applicable Term Sheet
    or otherwise reasonably satisfactory to the Borrower and the Arranger, shall
    have been executed and delivered, and the Administrative Agent shall have re-
    ceived such customary legal opinions (including opinions (i) from counsel to
    the Borrower and its subsidiaries, (ii) if reasonably available, delivered pursu-
    ant to the Acquisition Agreement, accompanied by reliance letters in favor of
    the Lenders and (iii) from such special and local counsel as may be required by
    the Administrative Agent and consented to by the Borrower (such consent not
    to be unreasonably withheld)), documents and other instruments as are cus-
    tomary for transactions of this type or as it may reasonably request.

---

[3]  Arranger expects to be provided with three years of audited financial statements in form satisfactory to
     the Arranger, prior to marketing.

IV-2

Professionals' Eyes Only                                    TRB0009388

Notwithstanding anything in the Commitment Letter, the Fee Letter, the Term Sheets, the Financing or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (i) the only representations and warranties the making of which shall be a condition to availability of the Facilities on the Closing Date shall be (A) such of the representations made by the Seller in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that you have the right to terminate your obligations under the Acquisition Agreement as a result of a breach of such representations in the Acquisition Agreement, and (B) the Specified Representations (as defined below), (ii) the terms of the Financing Documentation shall contain no condition precedent (including, without limitation, written notice of borrowing and absence of any default or potential event of default) and shall not impair availability of the Facilities on the Closing Date if the conditions set forth herein, in the Term Sheets and in the Conditions Annex are satisfied and (iii) it is understood that (A) other than with respect to any UCC Filing Collateral or Stock Certificates (each as defined below), to the extent any guarantee or collateral is not provided on the Closing Date after your use of commercially reasonable efforts to do so, the delivery of such guarantee and/or collateral shall not constitute a condition precedent to the availability of the Facilities on the Closing Date but shall be required to be delivered after the Closing Date pursuant to arrangements to be mutually agreed by the parties hereto acting reasonably, (B) with respect to perfection of security interests in UCC Filing Collateral, your sole obligation shall be to deliver, or cause to be delivered, necessary UCC financing statements to the Administrative Agent or to cause Borrower or the applicable Guarantor (as defined in the applicable Bank Term Sheet) to irrevocably authorize the Administrative Agent to file necessary UCC financing statements, and (C) with respect to perfection of security interests in Stock Certificates, your sole obligation shall be to deliver such Stock Certificates to the Administrative Agent as and to the extent they are delivered to you pursuant to the Acquisition Agreement. For purposes hereof, (1) "Specified Representations" means the representations and warranties set forth in the Term Sheets relating to corporate power and authority, the enforceability of the Facilities documentation, Federal Reserve margin regulations and the Investment Company Act, (2) "UCC Filing Collateral" means collateral for which a security interest can be perfected by filing a Uniform Commercial Code financing statement and (3) "Stock Certificates" means collateral consisting of stock certificates representing capital stock of the domestic restricted material subsidiaries of the Acquired Business for which a security interest can be perfected by delivering such stock certificates. For the avoidance of doubt, this paragraph is intended to be identical in substance to the second paragraph of Section 5 (Conditions) of the Commitment Letter.

IV-3

Professionals' Eyes Only

TRB0009389

Tribune Company
c/o Merrill Lynch & Co. and Citigroup Global Markets Inc.
January 17, 2007

**Exhibit A-III – Merrill Lynch Financing Documents**

Professionals' Eyes Only

TRB0009390

# MERRILL LYNCH CAPITAL CORPORATION
## MERRILL LYNCH, PIERCE, FENNER & SMITH
### INCORPORATED
4 World Financial Center, North Tower
250 Vesey Street
New York, NY 10080

CONFIDENTIAL

January 17, 2007

[TBD]
c/o The Carlyle Group
520 Madison Avenue
New York, New York 10022
Attention:  James Attwood

Commitment Letter

Ladies and Gentlemen:

The Carlyle Group (together with certain of its affiliates, the "Sponsor") has advised Merrill Lynch Capital Corporation ("Merrill Lynch") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S" and, together with Merrill Lynch, "we" or "us") that the Sponsor and [Holdings], a newly formed Delaware corporation controlled by the Sponsor ("Holdings" or "you"), intend to enter into a purchase and sale agreement (together with the schedules and exhibits thereto, the "Acquisition Agreement") pursuant to which Holdings directly and indirectly through its subsidiaries will purchase (the "Acquisition") certain of the assets owned and operated directly or indirectly by Tribune Company ("Seller") (such assets, collectively, the "Acquired Business").[1] [_____], a Delaware corporation and newly formed, wholly-owned subsidiary of Holdings, shall be the "Borrower." All references to "dollars" or "$" in this agreement and the attachments hereto (collectively, this "Commitment Letter") are references to United States dollars.

---

[1]  Structure under review; assets are the broadcasting group of the Seller, which operates 23 television stations, Superstation WGN on national cable, Chicago's WGN-AM radio station, the Chicago Cubs baseball team, Tribune Media Entertainment and unconsolidated equity investments (31% stake in Food Network and 25% stake in Comcast SportsNet Chicago). *If you propose that the major league baseball franchise asset be financed separately, please provide separate draft commitment papers for that proposal.*

Professionals' Eyes Only

TRB0009391

We understand that the sources of funds required to fund the Acquisition consideration, to repay certain existing indebtedness of the Acquired Business (the "Refinancing"), to pay fees, commissions and expenses in connection with the Transactions (as defined below) and to provide ongoing working capital requirements of the Borrower and its subsidiaries following the Transactions will include:

- senior secured first lien credit facilities consisting of (i) a senior secured term loan facility to the Borrower of $3,360.0 million (the "Term Loan Facility"), as described in the Summary of Principal Terms and Conditions attached hereto as Annex I (the "Bank Term Sheet") and (ii) a senior secured revolving credit facility to the Borrower of $200.0 million (the "Revolving Credit Facility" and, together with the Term Loan Facility, the "Bank Facilities"), as described in the Bank Term Sheet, an amount to be agreed of which may be drawn on the Closing Date (as defined below);

- either (A) the issuance by the Borrower of $575.0 million aggregate gross proceeds of unsecured senior notes with a pay-in-kind toggle (the "Senior Notes") pursuant to a Rule 144A or other private placement (the "Senior Notes Offering") or (B) in the event less than all of the Senior Notes are issued at the time the Transactions are consummated, borrowings by the Borrower of up to $575.0 million under a unsecured senior credit facility with a pay-in-kind toggle (the "Senior Bridge Facility") as described in the Summary of Principal Terms and Conditions attached hereto as Annex II (the "Senior Bridge Term Sheet");

- either (A) the issuance by the Borrower of $575.0 million aggregate gross proceeds of unsecured senior subordinated notes (the "Senior Subordinated Notes" and, together with the Senior Notes, the "Notes"), in each case pursuant to a Rule 144A or other private placement (the "Senior Subordinated Notes Offering"; each of the Senior Notes Offering and the Senior Subordinated Notes Offering being referred to as a "Notes Offering") or (B) in the event less than all of the Senior Subordinated Notes are issued at the time the Transactions are consummated, borrowings by the Borrower of up to $575.0 million under an unsecured senior subordinated credit facility (the "Senior Subordinated Bridge Facility" and, together with the Senior Bridge Facility, the "Bridge Facilities") as described in the Summary of Principal Terms and Conditions attached hereto as Annex III (the "Senior Subordinated Bridge Term Sheet" and, together with the Bank Term Sheet and the Senior Bridge Term Sheet, the "Term Sheets");

- equity investments in Holdings (the "Equity Financing") in an aggregate amount not less than 15% of the total pro forma capitalization of the Borrower after giving effect to the Transactions (excluding, for the avoidance of doubt, any of letters of credit issued on the Closing Date) from the Sponsor, certain of its affiliates, members of management of the Acquired Business and other co-investors reasonably acceptable to the Arranger (as defined below) (the Sponsor and such affiliates, members of senior management and other co-investors, in such capacity, being collectively referred to as the "Equity Investors"), all of which investments shall be contributed to the Borrower in cash as preferred equity on terms reasonably acceptable to the Arranger or as common equity.

No other new debt financing will be required for the Acquisition and the Refinancing. Immediately following the Transactions, neither Holdings nor any of its subsidiaries will have any material indebtedness other than the Bank Facilities, the Notes or the Bridge Facilities, as applicable, the Equity Financing and other indebtedness permitted by the definitive Financing Documentation (as defined in the Conditions Annex (as defined below)). As used herein, (i) the term "Closing Date" means the date of the closing of the Acquisition and the initial funding of the Facilities and (ii) the term "Transactions" means

Professionals' Eyes Only

TRB0009392

the Acquisition, the Refinancing, the initial borrowings under the Bank Facilities on the Closing Date, if applicable, the issuance of the Senior Notes or the borrowings under the Senior Bridge Facility, the issuance of the Senior Subordinated Notes or the borrowings under the Senior Subordinated Bridge Facility, the Equity Financing and the payments of fees, commissions and expenses in connection with each of the foregoing.

      1.     <u>Commitments</u>.

      You have requested that Merrill Lynch (in such capacity, a "<u>Bank</u>" and together with any other financial institutions that may with our and your consent act as initial commitment parties, the "<u>Banks</u>") commit to provide the Facilities and the Arranger agree to structure, arrange and syndicate the Facilities.

      Merrill Lynch is pleased to advise you of its commitment to provide to the Borrower 100% of the principal amount of the Bank Facilities (the "<u>Bank Commitment</u>") and Merrill Lynch is pleased to advise you of its commitment to provide 100% of the principal amount of the each of the Bridge Facilities (the "<u>Bridge Commitment</u>" and, together with the Bank Commitment, the "<u>Commitments</u>"), in each case, upon the terms and subject to the conditions set forth in this Commitment Letter and in the Term Sheets and the Conditions Annex referred to below.

      2.     <u>Syndication</u>.

      It is agreed that MLPF&S acting alone or through one of its affiliates selected by it, will act as sole lead arranger (in such capacity, the "<u>Arranger</u>") and as sole bookrunner for the Facilities. It is also agreed that Merrill Lynch (or one of its affiliates) will act as Administrative Agent and Syndication Agent in connection with the Bank Facilities and the Bridge Facilities. It is further agreed that the Arranger will exclusively manage the syndication of the Facilities, and will, in such capacity, exclusively perform the duties and exercise the authority customarily associated with its role as an Arranger. No Lender (as defined below) will receive compensation from you or the Borrower with respect to any of the Facilities outside the terms contained herein and in the letter of even date herewith addressed to you providing, among other things, for certain fees relating to the Facilities (the "<u>Fee Letter</u>") in order to obtain its commitment to participate in such Facilities, in each case unless you and we so agree.

      Merrill Lynch reserves the right, prior to or after execution of the Bank Documentation (as defined in the Conditions Annex referred to below), to syndicate all or a portion of its Commitment in respect of the Bank Facilities to one or more institutions (other than certain institutions designated in writing by you) with your consent (not to be unreasonably withheld) that will become parties to the Bank Documentation (Merrill Lynch and the institutions becoming parties to the Bank Documentation, the "<u>Bank Lenders</u>"). MLPF&S reserves the right, prior to or after the execution of the Bridge Documentation (as defined in the Conditions Annex referred to below), to syndicate all or a portion of its Commitment in respect of each Bridge Facility to one or more institutions (other than certain institutions designated in writing by you) with your consent (not to be unreasonably withheld) that will become parties to the Bridge Documentation applicable to such Bridge Facility (MLPF&S and the institutions becoming parties to such Bridge Documentation, collectively, the "<u>Bridge Lenders</u>," and, together with the Bank Lenders, the "<u>Lenders</u>"). Notwithstanding the foregoing, the Banks shall not be released from their Commitments hereunder by any such syndication unless and until the applicable assignee first funds its Commitment hereunder and the completion of such syndication is not a condition to the Commitments hereunder.

      The Arranger will, in consultation with you, exclusively manage all aspects of the syndication of the Facilities, including selection of additional Lenders reasonably acceptable to you,

Professionals' Eyes Only

TRB0009393

determination of when the Arranger will approach potential additional Lenders, and the final allocations of the Commitments in respect of the Facilities among the additional Lenders; *provided* that, except as otherwise set forth herein, any naming rights shall be subject to your consent. You agree to, and will use commercially reasonable efforts to cause appropriate members of management of the Acquired Business to, actively assist the Arranger in achieving a syndication of the Facilities. To assist the Arranger in its syndication efforts, you agree that you will, and will cause your representatives and non-legal advisors to, and will use commercially reasonable efforts to cause appropriate members of management of the Acquired Business to, (a) promptly provide all financial and other information reasonably available to you as we may reasonably request with respect to you, the Acquired Business, your and their respective subsidiaries and the transactions contemplated hereby, including but not limited to financial projections to be prepared by you (including updated projections, if any, the "Projections") relating to the foregoing, (b) use commercially reasonable efforts to ensure that the syndication efforts benefit from existing lending relationships of the Sponsor and the Acquired Business, (c) make available to prospective Lenders senior management and non-legal advisors of Holdings and (to the extent reasonable and practical) appropriate members of management of the Acquired Business, (d) host, with the Arranger, one (or, if reasonably deemed necessary or appropriate by the Arranger, more than one) meeting with prospective Lenders under each of the Facilities, (e) assist the Arranger in the preparation of one or more confidential information memoranda and other marketing materials to be used in connection with the syndication of each of the Facilities, (f) obtain, at your expense, monitored public ratings of the Facilities and the Notes from Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Group ("S&P") and to participate actively in the process of securing such ratings, including having senior management of Holdings and (to the extent reasonable and practical) appropriate members of management of the Acquired Business meet with such rating agencies and (g) provide to the Arranger, as soon as reasonably practicable and in no event later than 10 business days prior to the anticipated pricing date for the Notes (such period shall exclude traditional blackout periods in the high yield market), a complete preliminary offering memorandum suitable for use in a customary high-yield road show relating to the issuance of the Notes (with financial statements necessary to receive customary "comfort" (including "negative assurance" comfort) from independent accountants in connection with the Notes Offerings) and Holdings and its affiliates shall have used their commercially reasonable efforts to deliver drafts of such printed preliminary offering memorandum to the Arranger prior to the delivery of the complete printed version thereof.

3.    Information.

You hereby represent and covenant that to your knowledge (a)(i) all written factual information (other than the Projections and information of a general economic or industry nature) that has been or will be made available to the Banks by you or any of your representatives and (ii) all information contained in any presentation made by you or any of your representatives to prospective Lenders, in each case in connection with the transactions contemplated hereby (the "Information"), when taken as a whole, is, and in the case of Information made available after the date hereof, will be, correct in all material respects and does not, and in the case of Information made available after the date hereof, will not, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which such statements are made (including customary bank syndication practices), not materially misleading, and (b) the Projections that have been or will be made available to the Arranger by you or any of your representatives in connection with the transactions contemplated hereby have been and will be prepared in good faith based upon assumptions believed by you to be reasonable at the time made, it being understood that actual results may vary materially from the Projections. You agree to supplement the Information if necessary so that the representations and warranties in clause (a) of the preceding sentence remain correct on the Closing Date. You acknowledge that the Banks and the Arranger may share with any of their affiliates (it being understood that such affiliates will be subject to the confidentiality agreements between you and us), and

-4-

Professionals' Eyes Only

TRB0009394

such affiliates may share with Banks and the Arranger, any information related to the Acquired Business, or any of its subsidiaries or affiliates (including, without limitation, in each case, information relating to creditworthiness) and the transactions contemplated hereby.

You hereby acknowledge and agree that we will make available the Information, Projections and other marketing materials and presentations prepared or approved by you, including confidential information memoranda (collectively, the "Informational Materials"), to the potential Lenders by posting the Informational Materials on SyndTrak Online or by other similar electronic means (collectively, the "Electronic Means"). You hereby further acknowledge and agree that (i) potential Lenders (the "Public Lenders") may not wish to receive material non-public information with respect to the Borrower, Holdings, the Acquired Business and their respective subsidiaries or any of their respective securities, (ii) you will assist, and cause your affiliates, advisors, the Sponsor and, to the extent possible using your commercially reasonable efforts, the Acquired Business to assist, the Arranger in the preparation of Informational Materials to be used in connection with the syndication of the Facilities to Public Lenders, which will only include data and materials that are either (A) publicly available or (B) not material with respect to the Borrower, Holdings, the Acquired Business and their respective subsidiaries or any of their respective securities for purposes of United States federal and state securities laws (such Informational Materials and any other information, data and materials, collectively, "Public Information"), (iii) you will identify and conspicuously mark any Informational Materials that consist solely of Public Information as "*PUBLIC*", and (iv) you will identify and conspicuously mark any Informational Materials that include any information, data and materials that are not Public Information as "*PRIVATE AND CONFIDENTIAL*."

> 4.    Compensation.

If the Closing Date occurs, as consideration for the Commitments of the Banks hereunder with respect to the Facilities and the agreement of the Arranger to structure, arrange and syndicate the Facilities, you agree to pay, or cause to be paid, to the Banks the fees set forth in the Term Sheets and the Fee Letter in accordance with the terms thereof. Once paid, such fees shall not be refundable under any circumstances, except as provided in the Fee Letter.

> 5.    Conditions.

The initial funding of the Facilities by the Banks hereunder is subject to the conditions set forth in Annex IV hereto (the "Conditions Annex"), which shall have been satisfied or waived.

Notwithstanding anything in this Commitment Letter, the Fee Letter, the Term Sheets, the Financing Documentation or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (i) the only representations and warranties the making of which shall be a condition to availability of the Facilities on the Closing Date shall be (A) such of the representations made by the Seller in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that you have the right to terminate your obligations under the Acquisition Agreement as a result of a breach of such representations in the Acquisition Agreement, and (B) the Specified Representations (as defined below), (ii) the terms of the Financing Documentation shall contain no condition precedent (including, without limitation, written notice of borrowing and absence of any default or potential event of default) and shall not impair availability of the Facilities on the Closing Date if the conditions set forth in this Section 5 of this Commitment Letter and in the Conditions Annex are satisfied and (iii) it is understood that (A) other than with respect to any UCC Filing Collateral or Stock Certificates (each as defined below), to the extent any guarantee or collateral is not provided on the Closing Date after your use of commercially reasonable efforts to do so, the delivery of such guarantee and/or collateral shall not constitute a condition precedent to the availability of the Facilities on the

Page 127 of 174

Professionals' Eyes Only

TRB0009395

Closing Date but shall be required to be delivered after the Closing Date pursuant to arrangements to be mutually agreed by the parties hereto acting reasonably, (B) with respect to perfection of security interests in UCC Filing Collateral, your sole obligation shall be to deliver, or cause to be delivered, necessary UCC financing statements to the Administrative Agent or to cause Borrower or the applicable Guarantor (as defined in the Bank Term Sheet) to irrevocably authorize the Administrative Agent to file necessary UCC financing statements, and (C) with respect to perfection of security interests in Stock Certificates, your sole obligation shall be to deliver such Stock Certificates to the Administrative Agent as and to the extent they are delivered to you pursuant to the Acquisition Agreement. For purposes hereof, (1) "Specified Representations" means the representations and warranties set forth in the Term Sheets relating to corporate power and authority, the enforceability of the Facilities documentation, Federal Reserve margin regulations and the Investment Company Act, (2) "UCC Filing Collateral" means collateral for which a security interest can be perfected by filing a Uniform Commercial Code financing statement and (3) "Stock Certificates" means collateral consisting of stock certificates representing capital stock of the domestic material restricted subsidiaries of the Acquired Business for which a security interest can be perfected by delivering such stock certificates.

6.    Clear Market.

From the date of this Commitment Letter until the Closing Date, you will ensure that no debt financing for Holdings, the Borrower or any of your subsidiaries is announced, syndicated or placed without the prior written consent of the Arranger if such financing, syndication or placement would have, in the reasonable judgment of the Arranger, a materially detrimental effect upon the syndication of the Bank Facilities or, if applicable, the Notes Offerings.

7.    Indemnity.

By your acceptance below, you hereby agree to indemnify and hold harmless each of the Banks and the Arranger and their respective affiliates (including, without limitation, controlling persons) and the directors, officers, employees, advisors, agents and successors of the foregoing (each, an "Indemnified Person") from and against any and all losses, claims, costs, expenses, damages or liabilities to which any such Indemnified Person shall become subject arising out of or in connection with any claim, action, investigation, suit or proceeding (whether commenced or threatened) relating to or arising out of or in connection with this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Facilities or any of the transactions contemplated hereby or the providing or syndication of the Facilities (and regardless of whether such matter is initiated by a third party or by the Acquired Business or any of its affiliates), and to reimburse each Indemnified Person upon demand for any legal or other expenses incurred in connection with investigating, preparing to defend or defending against, or participating in, any such claim, suit, investigation, action or other proceeding (whether or not such Indemnified Person is a party to any action or proceeding), other than any of the foregoing of any Indemnified Person to the extent finally determined by a court of competent jurisdiction to have resulted by reason of the gross negligence, bad faith or willful misconduct of such Indemnified Person or any of its affiliates, or the directors, officers, employees, advisors, agents or successors of any of them. You shall not be liable for any settlement of any such proceeding effected without your written consent, but if settled with such consent, you shall indemnify the Indemnified Persons from and against any loss or liability by reason of such settlement, subject to your rights in this paragraph to claim exemption from your indemnity obligations. None of the Banks, the Arranger or any other Lender (or any of their respective affiliates) shall be responsible or liable to the Sponsor or any of their subsidiaries, affiliates or stockholders for any indirect, special, punitive or consequential damages which may be alleged as a result of this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter, the Facilities or the transactions contemplated hereby. In addition, you hereby agree to reimburse each of the Banks and the Arranger upon the Closing Date (if the Closing Date occurs) for (i) all reasonable out-of-pocket costs and

Professionals' Eyes Only

TRB0009396

expenses (including, without limitation, reasonable legal fees and expenses of one counsel per jurisdiction of the Banks and the Arranger) and (ii) all reasonable printing, reproduction, document delivery, travel and communication costs incurred in connection with the syndication and execution of the Facilities and the preparation, review, negotiation, execution and delivery of this Commitment Letter, the Term Sheets, the Conditions Annex, the Fee Letter and the Financing Documentation (as defined in the Conditions Annex).

      8.   Confidentiality.

      This Commitment Letter is furnished for your benefit, and may not be relied on by any other person or entity. This Commitment Letter is entered into upon the condition that neither the existence of this Commitment Letter, the Term Sheets, the Conditions Annex or the Fee Letter nor any of their contents shall be disclosed by the Banks or the Arranger or any of their affiliates, or by you or any of your affiliates, directly or indirectly, to any other person, except that such existence and contents may be disclosed (i) as may be compelled in a judicial or administrative proceeding or as otherwise required by law and (ii) to the Banks and the Arranger and their affiliates' directors, officers, employees, advisors and agents and to you, the Equity Investors and your and their directors, officers, employees, advisors and agents, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby, and as reasonably required for the syndication. In addition, this Commitment Letter, the Term Sheets, the Conditions Annex, and (to the extent portions thereof have been redacted in a manner reasonably satisfactory to us) the Fee Letter may be disclosed to the Seller and the Acquired Business and each of its directors, officers, employees, advisors and agents, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby.

      9.   Other Services.

      You acknowledge and agree that the Banks, the Arranger and/or their affiliates may be requested to provide additional services with respect to the Sponsor, the Acquired Business and/or their respective affiliates or other matters contemplated hereby. Any such services will be set out in and governed by a separate agreement(s) (containing terms relating, without limitation, to services, fees and indemnification) in form and substance satisfactory to the parties thereto. Nothing in this Commitment Letter is intended to obligate or commit the Banks or the Arranger or any of their affiliates to provide any services other than as set out herein.

      You acknowledge that the Arranger and its affiliates (the term "Arranger" as used in this paragraph being understood to include such affiliates) may be providing debt financing, equity capital or other services (including financial advisory services) to other companies with which you, Holdings, the Sponsor, the Acquired Business, the shareholders of the Acquired Business or your or their respective affiliates may have conflicting interests regarding the Transactions and otherwise and that the Arranger may act as it deems appropriate in acting in such capacities. You and your affiliates further acknowledge and agree that in connection with all aspects of the Transactions and the transactions contemplated by this Commitment Letter, you and your affiliates, on the one hand, and the Arranger and its affiliates, on the other hand, have an arm's length business relationship that creates no fiduciary duty on the part of the Arranger or its affiliates and each expressly disclaims any fiduciary relationship. The Arranger and its affiliates will not use confidential information obtained from you, the selling shareholders or the Acquired Business in connection with the performance by the Arranger or its affiliates of services for other companies and will not furnish any such information to other companies. You also acknowledge that the Arranger has no obligation in connection with the Transactions to use, or to furnish to you, Holdings, the Sponsor, the selling shareholders, the Acquired Business or your or their respective subsidiaries, confidential information obtained from other companies or entities.

-7-

Professionals' Eyes Only

TRB0009397

The Arranger and/or its affiliates have been retained as the sell-side financial advisors (in such capacity, the "Financial Advisor") to the Sellers in connection with the Transactions.    You agree to any such retention, and further agree not to assert any claim you might allege based solely on any actual or potential conflicts of interest that could reasonably be expected to arise or result from, on the one hand, the engagement of the Financial Advisor and, on the other hand, our and our affiliates' relationships with you as described and referred to herein. You acknowledge that, in such capacity, the Financial Advisor may recommend to the Seller that the Seller not pursue or accept your offer or proposal for the Acquisition or advise the Seller in other manners adverse to your interests.

You further acknowledge that the Arranger is a full service securities firm and it and each Bank may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of Holdings, the Borrower, their affiliates and other companies that may be the subject of the transactions contemplated by this Commitment Letter.

10.    Governing Law, Etc.

This Commitment Letter and the commitment of the Banks shall not be assignable by you without the prior written consent of the Banks and the Arranger, and any purported assignment without such consent shall be void.  This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Banks, the Arranger and you.  This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement.  Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart of this Commitment Letter.  Headings are for convenience only.  This Commitment Letter is intended to be for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto, the Lenders and, with respect to the indemnification provided under Section 7 (Indemnity) above, each Indemnified Person.  This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of law to the extent that the application of the laws of another jurisdiction will be required thereby; *provided, however,* that the interpretation of the definition of [Material Adverse Effect] (and whether or not a Material Adverse Effect has occurred) in the Acquisition Agreement shall be governed by, and construed in accordance with, the laws of the State of [          ]$^2$, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws.  Any right to trial by jury with respect to any claim or action arising out of this Commitment Letter is hereby waived.  The parties hereto hereby submit to the non-exclusive jurisdiction of the federal and New York State courts located in The City of New York (and appellate courts thereof) in connection with any dispute related to this Commitment Letter or any of the matters contemplated hereby; *provided, however,* that any court of the State of [          ] or any federal court sitting in the State of [          ] shall also have jurisdiction over any such suit, action or proceeding. The parties hereto agree that service of any process, summons, notice or document by registered mail addressed to you shall be effective service of process against you for any suit, action or proceeding relating to any such dispute.  The parties hereto irrevocably and unconditionally waive any objection to the laying of such venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum.  A final judgment in any such suit, action or proceeding brought in any such court may be enforced in any other courts to whose jurisdiction you are or may be subject by suit upon judgment.

---

2    To conform to the governing law chosen in the Acquisition Agreement.

Professionals' Eyes Only                                                        TRB0009398

11.    Patriot Act.

We hereby notify you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Patriot Act"), the Banks, the Arranger, and the Lenders are required to obtain, verify and record information that identifies the Borrower, which information includes the name, address and tax identification number of the Borrower and other information regarding the Borrower that will allow the Banks, the Arranger, or such Lender to identify the Borrower in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to the Banks, the Arranger, and the Lenders.

Please indicate your acceptance of the terms hereof and of the Term Sheets, the Conditions Annex and the Fee Letter by returning to us (electronically or otherwise) executed counterparts of this Commitment Letter and the Fee Letter not later than 5:00 p.m., New York City time, on January 31, 2007. This Commitment Letter and the agreement of the Arranger to provide the services described herein are also conditioned upon your acceptance hereof and of the Fee Letter as set forth above. Upon the earlier to occur of (A) the execution and delivery of the Financing Documentation by all of the parties thereto and the initial funding of the Facilities and (B) the date which is fourteen days after the "[Termination Date]³" as defined in the Acquisition Agreement, if the Financing Documentation shall not have been executed and delivered by all such parties prior to that date, this Commitment Letter and the agreement of the Arranger to provide the services described herein shall automatically terminate unless each of the Borrower and the Arranger shall, in its discretion, agree to an extension. The confidentiality, indemnification and governing law and forum provisions hereof and in the Term Sheets and the Fee Letter shall survive termination of this Commitment Letter (or any portion hereof) or the commitments of the Lenders hereunder (provided that such provisions of the Commitment Letter shall be superseded by the same provisions of the Financing Documentation on and after the Closing Date). The provisions under Section 2 (Syndication) above shall survive the execution and delivery of the Financing Documentation.

BY SIGNING THIS COMMITMENT LETTER, EACH OF THE PARTIES HERETO HEREBY ACKNOWLEDGES AND AGREES THAT (A) MERRILL LYNCH IS OFFERING TO PROVIDE THE BANK FACILITIES SEPARATE AND APART FROM THE OFFER OF MERRILL LYNCH TO PROVIDE THE BRIDGE FACILITIES AND (B) MERRILL LYNCH IS OFFERING TO PROVIDE THE BRIDGE FACILITIES SEPARATE AND APART FROM THE OFFER BY MERRILL LYNCH TO PROVIDE THE BANK FACILITIES. YOU MAY, AT YOUR OPTION, ELECT TO ACCEPT THIS COMMITMENT LETTER (AND THE APPLICABLE PROVISIONS OF THE FEE LETTER) WITH RESPECT TO EITHER THE BANK FACILITIES OR THE BRIDGE FACILITIES OR BOTH.

*[Signature Page Follows]*

---

[3]    Merrill Lynch expects to conform to the termination date in the Acquisition Agreement, subject to review thereof.

Professionals' Eyes Only                                    TRB0009399

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

MERRILL LYNCH CAPITAL CORPORATION

By: _____
Name: Barry S. Pierce
Title: Vice President

MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED

By: _____
Name: Barry S. Pierce
Title: Managing Director

*[commitment letter signature page]*

Page 132 of 174

Professionals' Eyes Only

TRB0009400

Accepted and agreed to as of the date first
written above:

[HOLDINGS]

By:  _____
       Name:
       Title:

Professionals' Eyes Only                                                    TRB0009401

SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

Bank Facilities[1]

| | |
|---|---|
| Borrower: | The Borrower, as defined in the Commitment Letter. |
| Lead Arranger and Bookrunner: | Merrill Lynch, Pierce, Fenner & Smith Incorporated (in such capacity, the "Arranger"). |
| Lenders: | A syndicate of banks, financial institutions and other entities, including Merrill Lynch Capital Corporation, arranged by the Arranger and reasonably acceptable to the Borrower (collectively, the "Lenders"). |
| Administrative Agent, Issuing Bank and Swing Line Lender and Collateral Agent: | Merrill Lynch Capital Corporation as Administrative Agent, Issuing Bank and Swing Line Lender (in such capacities the "Administrative Agent", the "Issuing Bank" or the "Swing Line Lender", as the case may be) and as Collateral Agent for the Bank Facilities referred to below (in such capacity, the "Collateral Agent"); it being understood that any resignation of the Administrative Agent shall not be effective until a successor administrative agent reasonably acceptable to the Borrower has been appointed. |
| Type and Amount of Bank Facilities: | Term Loan Facility: |
| | Term B Loan Facility (the "Term Loan Facility") in an aggregate principal amount of $3,360.0 million. |
| | Revolving Credit Facility: |
| | A revolving first lien credit facility (the "Revolving Credit Facility") in an aggregate principal amount of $200.0 million. The Term Loan Facility and the Revolving Credit Facility are herein referred to collectively as the "Bank Facilities." |
| Purpose: | Proceeds of the Bank Facilities will be used on the Closing Date to finance a portion of the Acquisition consideration and the Refinancing and to pay fees, commissions and expenses in connection therewith. Following the Closing Date, the Revolving Credit Facility will be used by the Borrower and its subsidiaries for working capital and general corporate purposes, including permitted acquisitions and investments. |

---

[1]   All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

Professionals' Eyes Only

TRB0009402

I-2

| | |
|---|---|
| Closing Date: | The date of consummation of the Acquisition and the initial funding of the Facilities. |
| Definitive Documentation: | Consistent with transactions for companies owned by the Sponsor, subject to the penultimate and final sentence of the second paragraph of Section 5 of the Commitment Letter. |
| Maturity Dates: | Term Loan Facility: Seven (7) years from the Closing Date. |
| | Revolving Credit Facility: Six (6) years from the Closing Date. |
| Availability: | Term Loan Facility: A single drawing may be made on the Closing Date of the full amount of the Term Loan Facility. |
| | Revolving Credit Facility: Borrowings may be made at any time on or after the Closing Date to but excluding the business day preceding the maturity date of the Revolving Credit Facility; *provided* that the borrowings on the Closing Date (excluding the issuance of any letters of credit) shall not exceed an amount to be agreed. |
| Letters of Credit: | Up to an amount to be agreed of the Revolving Credit Facility will be available for letters of credit, on customary terms and conditions to be set forth in the Bank Documentation. |
| | Each letter of credit shall expire not later than the earlier of (a) 12 months after its date of issuance (*provided* that any letter of credit with a one-year tenor may provide for the renewal thereof for additional one-year periods) and (b) the fifth day prior to the maturity date of the Revolving Credit Facility. |
| Swing Line Facility: | Up to an amount to be agreed of the Revolving Credit Facility will be available for Swing Line Loans, on terms and conditions to be set forth in the Bank Documentation. |
| Amortization: | Term Loan Facility: Commencing after the fiscal period ending at least one full quarter after closing, the Term Loan Facility will amortize in equal quarterly installments in an amount equal to 1% *per annum* with the balance at the end of year seven. |
| | Revolving Credit Facility: None. |
| Interest: | At the Borrower's option, loans will bear interest based on the Base Rate or LIBOR, as described below: |
| | A. Base Rate Option |
| | Interest will be at the Base Rate plus the applicable Interest Margin (as defined below). The Base Rate is defined as the higher of (a) the Federal Funds Rate, as published by the |

Page 135 of 174

Professionals' Eyes Only

Federal Reserve Bank of New York plus 1/2 of 1% and (b) the prime commercial lending rate of the Administrative Agent, as established from time to time at its principal U.S. office (which such rate is an index or base rate and will not necessarily be its lowest or best rate charged to its customers or other banks). Interest shall be payable quarterly in arrears and with respect to Base Rate Loans shall be calculated on the basis of the actual number of days elapsed in a year of 365/366 days.

Base Rate borrowings will be made on same day notice and will be in minimum amounts to be agreed upon.

B. LIBOR Option

Interest will be determined for periods ("Interest Periods") of one, two, three or six months (or nine or twelve months if available from all relevant Lenders) as selected by the Borrower and will be at an annual rate equal to the London Interbank Offered Rate ("LIBOR") for the corresponding deposits of U.S. dollars plus the applicable Interest Margin. LIBOR will be determined by the Administrative Agent at the start of each Interest Period and will be fixed through such period; *provided* that the Borrower may reset an Interest Period at any time so long as it reimburses the Lenders for any breakage costs they actually incur as a result. Interest will be paid at the end of each Interest Period or, in the case of Interest Periods longer than three months, quarterly, and will be calculated on the basis of the actual number of days elapsed in a year of 360 days. LIBOR will be adjusted for maximum statutory reserve requirements (if any).

LIBOR borrowings will require three business days' prior notice and will be in minimum amounts to be agreed upon.

Swingline loans will bear interest at the Base Rate plus the applicable Interest Margin.

Default Interest:

At the request of the Requisite Lenders (as defined below), upon the occurrence and during the continuance of a payment default, interest will accrue on any overdue amount of a loan or other overdue amount payable under the Bank Facilities at a rate of 2.0% per annum in excess of the rate (including the applicable Interest Margin) otherwise applicable to such loan or other overdue amount, and will be payable on demand.

Interest Margins:

The applicable Interest Margin with respect to the Bank Facilities will be 2.25% in the case of LIBOR loans and 1.25% in the case of Base Rate Loans.

Notwithstanding the foregoing, after the date on which the Borrower will have delivered financial statements for the first

full fiscal quarter after the Closing Date, the Interest Margin with respect to the Bank Facilities will be determined in accordance with a leverage based pricing grid set forth on Exhibit A to this Annex I.

Commitment Fee:

A Commitment Fee shall accrue on the unused amounts of the commitments under the Revolving Credit Facility. Such Commitment Fee will initially be 0.35% per annum and after delivery of financial statements for the first full fiscal quarter ending after the Closing Date will be determined in accordance with a leverage based pricing grid set forth on Annex I-A. Accrued Commitment Fees will be payable quarterly in arrears (calculated on a 360-day basis) for the account of the Lenders from the Closing Date.

Letter of Credit Fees:

The Borrower will pay (i) the Issuing Bank a fronting fee equal to 12.5 basis points per annum and (ii) the Lenders under the Revolving Credit Facility stand-by letter of credit participation fees equal to the Applicable Margin for LIBOR Loans under the Revolving Credit Facility minus the fronting fee referred to in clause (i), in each case, on the undrawn amount of all outstanding letters of credit. In addition, the Borrower will pay the Issuing Bank customary issuance fees.

Mandatory Prepayments of Term Loan Facility:

An amount equal to 100% of the net proceeds received from the sale or other permanent disposition of all or any part of the assets of the Borrower or any Guarantor other than amounts reinvested in the Borrower's consolidated business within 15 months (or, if committed to be reinvested within 15 months, within 180 days of such commitment) of such disposition and subject to other exceptions to be agreed, *provided* that (a) so long as if at any time during the reinvestment period, and on a pro forma basis after giving effect to the asset sale and the application of the proceeds thereof, the Total Leverage Ratio (as defined below) is less than or equal to [    ][4] to 1.0, up to $[    ] million in asset sale proceeds may be retained by the Borrower and added to the available investment basket described in the Negative Covenants below and (b) if at any time Borrower sells or causes its subsidiaries to sell the Chicago Cubs major league baseball franchise and related assets to be specified at the time of sale (the "Chicago Cubs"), then Borrower may (i) retain up to (A) 25% of the net proceeds from such asset sale so long as the Total Leverage Ratio is less than or equal to 7.5 to 1.0 or (B) 50% of the net proceeds from such asset sale so long as the Total Leverage Ratio is less than or equal to 7.0 to 1.0, in each case after giving pro forma effect thereto (it being understood that no proceeds may be so

---

[4]    Leverage ratio and basket size to be discussed.

Professionals' Eyes Only

retained if the Total Leverage Ratio after giving pro forma effect thereto is greater than 7.5 to 1.0) and (ii) distribute such retained asset sale proceeds to Holdings and the Equity Investors as a return of capital; *provided further* that, with respect to clause (b) above only, (X) the Borrower's ability to make a distribution as described by clause (ii) shall not expire if such distribution is permitted by such clause and not promptly consummated, (Y) the aggregate of all distributions made pursuant to clause (b) above shall not exceed 33.3% of the Equity Financing, and (Z) no default or event of default shall have occurred and be continuing or result from the consummation of such distribution.

If the Total Leverage Ratio (as defined below) is greater than 6.0 to 1.0, then: (a) 100% of the net proceeds received by the Borrower or any Guarantor from the issuance of debt after the Closing Date, other than any debt permitted under the Bank Documentation, ), with step-downs to be agreed based on Borrower's Total Leverage Ratio, and (b) beginning with the first full fiscal year of the Borrower after the Closing Date, 50% of excess cash flow of the Borrower and its subsidiaries (to be defined in a manner to be agreed but in any event to include deductions, without duplication among periods, for operating cash used to finance acquisitions, investments and capital expenditures or then committed to be used to finance acquisitions, investments and capital expenditures for which a binding agreement then exists), with step-downs to 25% and 0% if the Borrower's Total Leverage Ratio is less than 7.0 to 1.0, and 6.0 to 1.0, respectively; *provided* that any voluntary prepayments and certain mandatory prepayments of loans (including loans under the Revolving Credit Facility to the extent accompanied by permanent reductions of the commitments thereunder), other than prepayments funded with the proceeds of certain indebtedness, shall be credited against excess cash flow prepayment obligations on a dollar-for-dollar basis.

There will be no prepayment penalties (except actual LIBOR breakage costs) for mandatory or other prepayments.

Notwithstanding the foregoing, each Lender under the Term Facility shall have the right to reject its *pro rata* share of any mandatory prepayments described above, in which case the amounts so rejected may be retained by the Borrower.

| | |
|---|---|
| Optional Prepayments: | Permitted in whole or in part, with prior notice but without premium or penalty (except actual LIBOR breakage costs) and including accrued and unpaid interest, subject to limitations as to minimum amounts of prepayments to be agreed. |
| Application of Prepayments: | Mandatory prepayments shall be applied to the remaining |

Professionals' Eyes Only

amortization payments of the Term Loan Facility in forward order for the next twelve unpaid quarterly amounts after such prepayment and thereafter on a pro rata basis. Optional prepayments shall be applied to remaining amortization payments in the manner directed by the Borrower.

Guarantees:

The Bank Facilities will be fully and unconditionally guaranteed on a joint and several basis by Holdings and all of the existing and future, direct and indirect, wholly-owned, restricted, material domestic subsidiaries of the Borrower except any indirect subsidiaries constituting controlled foreign corporations (collectively, the "Guarantors").

Unrestricted Subsidiaries:

The Bank Documentation will contain provisions pursuant to which, subject to limitations on investments, loans, advances and guarantees, pro forma covenant compliance and other customary conditions and provisions, in each case, consistent with documentation for recent transactions for companies owned by Sponsor, the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary. Unrestricted subsidiaries will not be subject to the affirmative or negative covenant or event of default and other provisions of the Bank Documentation, and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of determining compliance with the financial covenants contained in the Bank Documentation.

Security:

The Bank Facilities and any hedging obligations and, as determined by the Borrower, cash management arrangements to which a Lender or an affiliate of a Lender is a counterparty will be secured (subject to: (i) on the Closing Date, liens disclosed in the schedules to the Acquisition Agreement or as are not otherwise prohibited by the terms of the Bank Documentation and (ii) thereafter such liens to the extent they are not to be discharged in connection with the consummation of the Refinancing and other transactions or are otherwise not prohibited by the terms of the Bank Documentation) by perfected first priority pledges of all of the equity interests of the Borrower and each of the Borrower's direct and indirect material, restricted, domestic subsidiaries and of 65% of the equity interests of the Borrower's and any Guarantor's direct "first-tier" foreign subsidiaries, and perfected first priority security interests in substantially all tangible and intangible assets (including, without limitation, accounts receivable, inventory, equipment, general intangibles, intercompany notes in excess of an amount to be agreed, insurance policies, investment property, intellectual property, material owned real property and proceeds of the foregoing) of

Professionals' Eyes Only

TRB0009407

the Borrower and the Guarantors, wherever located, now or hereafter owned. Notwithstanding the foregoing, collateral shall not include (a) motor vehicles and other equipment subject to a certificate of title statute, (b) letter-of-credit rights, (c) certain commercial tort claims, (d) fee interests in real property valued at less than an amount to be agreed, (e) leaseholds, (f) fixtures, except to the extent that the same are equipment under the UCC or are related to real property covered by a mortgage in favor of the Lenders, (g) crops or farm products or as-extracted collateral, (h) cash, deposit accounts or securities accounts (which shall constitute collateral but the liens in such assets need not be perfected to the extent perfection requires actions other than the filing of customary financing statements, and in any event except to the extent that the same constitutes proceeds of other collateral), (i) foreign-law pledges, (j) assets in which such pledge or security interest would be prohibited by contractual provisions or, in the case of any foreign subsidiary, would be prohibited by applicable law or would result in materially adverse tax consequences, (k) assets to the extent the cost of obtaining a pledge or security interest in which is excessive in relation to the benefit thereof, and (l) such other exceptions as are agreed.

To the extent any guarantee or collateral (other than collateral that can be perfected by the filing of uniform commercial code financing statements in a jurisdiction within the United States of America or the delivery of the stock certificate(s) of the Borrower and its material domestic restricted subsidiaries to the extent delivered pursuant to the Acquisition Agreement (together with undated stock powers executed in blank with respect thereto)) is not provided on the Closing Date after the use of commercially reasonable efforts to do so, the delivery of such guarantee and/or collateral shall not constitute a condition precedent to the availability of the Credit Facilities on the Closing Date but shall be required to be delivered after the Closing Date pursuant to arrangements to be mutually agreed.

Incremental Loans:

The Borrower shall be entitled to incur additional term loans under a new term facility that may be included in the Term Loan Facility and/or incremental revolving loans that may be included as a part of the Revolving Credit Facility, in an aggregate principal amount of up to $500.0 million with such additional loans having the same terms (including the same margins unless the Borrower shall otherwise agree), the same guarantees from the Guarantors, and being secured on a *pari passu* basis by the same collateral, as the Bank Facilities (the "Incremental Loans"); *provided* that (i) no default or event of default shall exist immediately prior or after giving effect thereto, (ii) in the case of Incremental Loans that are term loans, the other terms and documentation in respect thereof, to the extent not consistent with the Bank Facilities, shall be

Professionals' Eyes Only

reasonably satisfactory to the Administrative Agent and (iii) no Lender shall be required to provide any such Incremental Loans; *provided* that, at the request of the Borrower, the Arranger (in consultation with the Borrower), will use their commercially reasonable efforts to obtain financial institutions to provide a commitment to the extent necessary to satisfy the Borrower's request for the Incremental Loans, subject to prevailing market conditions and payment of customary fees, *provided further* that any such additional lender(s) shall be reasonably satisfactory to the Borrower. The proceeds of Incremental Loans may be used to finance permitted acquisitions and for other working capital and general corporate purposes of the Borrower and its subsidiaries.

|  |  |
|---|---|
| Conditions to Initial Borrowings: | Conditions precedent to initial borrowings under the Bank Facilities will be those set forth in Section 5 (Conditions) of the Commitment Letter and in the Conditions Annex. |
| Conditions to Each Borrowing other than the Initial Borrowings: | Conditions precedent to each borrowing or issuance under the Bank Facilities occurring after the Closing Date: (1) the absence of any continuing default or event of default and (2) the accuracy of all representations and warranties in all material respects. |
| Representations and Warranties: | Customary for the Sponsor and its affiliates in similar transactions and limited to the following (which shall apply to the Borrower and its material restricted subsidiaries and be subject to materiality thresholds and exceptions to be agreed): representations and warranties as to financial statements (including pro forma financial statements); no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of the Bank Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; solvency; accuracy of disclosure; status of Bank Facilities as senior debt; and creation and perfection of security interests. |
| Affirmative Covenants: | Customary for the Sponsor and its affiliates and limited to the following (which shall apply to the Borrower and its material restricted subsidiaries and be subject to materiality thresholds and exceptions to be agreed):<br><br>Delivery of financial and other reasonably requested information: certified quarterly and audited annual financial statements, notices of defaults, litigation and other events that would have a material adverse effect, budgets and other information customarily supplied in a transaction of this type; |

Professionals' Eyes Only

payment of material taxes; continuation of business and maintenance of existence and material licenses and permits; compliance with all applicable laws and regulations (including, without limitation, environmental matters, taxation and ERISA); maintenance of property and customary insurance; maintenance of books and records; right of the Lenders to inspect property and books and records (subject to certain limitations to be agreed); and further assurances (including, without limitation, with respect to security interests in after-acquired property).

**Negative Covenants:**

Customary for the Sponsor and its affiliates in similar transactions and limited to the following (which shall apply to the Borrower and its material restricted subsidiaries and be subject to materiality thresholds and exceptions to be agreed (including, in any event, an available basket amount ("Additional Investment Amount") that will be built by retained excess cash flow, the proceeds of asset sales not otherwise applied to prepay the Term Loan Facility (other than proceeds from the sale of the Chicago Cubs), and issuances of equity that may be used for, among other things, permitted investments and other merger and acquisition activities, capital expenditures, restricted payments and the prepayment of subordinated debt):

1. Limitation on dispositions of assets and changes of business.

2. Limitation on stock and asset acquisitions (it being understood that the Borrower will be permitted to make acquisitions as long as (i) no event of default exists, and (ii) if the acquisition is a stock purchase or of assets that include the stock of subsidiaries, (A) any domestic entities acquired (including their domestic subsidiaries) will become Guarantors of the Bank Facilities (to the extent otherwise required by the Bank Documentation) and (B) acquisitions of entities that do not become Guarantors will be limited to an aggregate amount to be mutually agreed).

3. Limitations on dividends and stock repurchases and redemptions (with permitted dividends, repurchases and redemptions to be agreed and other than dividends, repurchases, prepayments of subordinated indebtedness and redemptions from the proceeds of equity issuances and retained excess cash flow, dividends of the proceeds from the sale of the Chicago Cubs to Holdings and the Equity Investors to the extent set forth under "Mandatory Prepayments" and regularly scheduled dividends to Holdings up to an amount to be agreed).

Professionals' Eyes Only

TRB0009410

4.  Limitation on indebtedness (including guarantees), other than (i) the incurrence of subordinated indebtedness and (ii) the incurrence of other indebtedness, in each case so long as, on a pro forma basis for such incurrence, Borrower would be in compliance with the then-applicable leverage ratio covenant.

5.  Limitation on loans and investments (with permitted investments to be agreed and other than investments from the proceeds of equity issuances and excess cash flow not required to be used to prepay the Term Loans).

6.  Limitation on liens and further negative pledge clauses and clauses restricting subsidiary distributions.

7.  Limitation on transactions with affiliates.

8.  Limitation on speculative hedging agreements.

9.  No modification or waiver of the Senior Subordinated Notes (if any) in a manner that is, when taken as a whole, materially adverse to the Lenders without the consent of the Requisite Lenders.

10. No change to fiscal year.

| | |
|---|---|
| Financial Covenants: | With regard to the Term Loan Facility: None. |

With regard to the Revolving Credit Facility only:

Financial covenants will only consist of a maximum Total Net Senior Secured Bank Leverage Ratio.

The Total Net Senior Secured Bank Leverage Ratio shall be set based on the projections contained in the model provided by the Sponsor to the Arranger (as the same may be adjusted by mutual agreement of Sponsor and the Arranger prior to the Closing Date) and set at a cushion of 30% to Adjusted EBITDA (as defined in <u>Exhibit B</u> to this Annex I) provided in such model. The financial covenant will be calculated as of the last day of each fiscal quarter on a consolidated basis for the Borrower and its subsidiaries for the applicable trailing consecutive four fiscal quarter period on a pro forma basis for asset acquisitions and dispositions; *provided* that the first period for which compliance with the financial covenant will be determined will be the first such four fiscal quarter period ending at least six months after the Closing Date.

| | |
|---|---|
| Certain Financial Definitions: | As used herein: |

(a) "<u>Total Leverage Ratio</u>" shall mean the ratio of (i) the

Professionals' Eyes Only

Borrower's total consolidated funded debt (to be defined in a manner to be agreed and in any event net of cash and cash equivalents) to (ii) the Borrower's consolidated Adjusted EBITDA; and

(b) "Total Net Senior Secured Bank Leverage Ratio" shall mean the ratio of (i) the Borrower's total consolidated funded debt under the Bank Facilities (net of cash and cash equivalents) to (ii) the Borrower's consolidated Adjusted EBITDA.

See Exhibit B to this Annex I for a definition of "Adjusted EBITDA."

**Equity Cure:**

For purposes of determining compliance with the financial covenants, any equity contribution (which equity shall be common equity or other equity on terms and conditions reasonably acceptable to the lenders holding at least a majority of the Revolving Credit Facility exposure) made to the Borrower after the Closing Date and on or prior to the day that is 10 days after the day on which financial statements are required to be delivered for a fiscal quarter will, at the request of the Borrower, be included in the calculation of Adjusted EBITDA for the purposes of determining compliance with financial covenants at the end of such fiscal quarter and applicable subsequent periods (any such equity contribution so included in the calculation of Adjusted EBITDA, a "Specified Equity Contribution"); *provided* that (a) in each four fiscal quarter period there shall be a period of at least two fiscal quarters in which no Specified Equity Contribution is made, (b) the amount of any Specified Equity Contribution shall be no greater than the amount required to cause the Borrower to be in compliance with the financial covenants and (c) all Specified Equity Contributions shall be disregarded for purposes of determining any baskets with respect to the covenants contained in the Bank Documentation.

**Activities of Holdings:**

Holdings will not engage at any time in any business or other activity other than (a) financing activities including, without limitation, holdco notes, (b) ownership and acquisition of equity interests in Borrower or in any other acquired entity engaging in a permitted business, together with activities directly related thereto, (c) performance of its obligations in connection with the Acquisition Agreement and the other agreements contemplated thereby and hereby, (d) actions incidental to the consummation of the Transactions, and (e) activities incidental to its maintenance and continuance and to the foregoing activities. Holdings shall not permit any liens on the equity interests of the Borrower other than liens in favor of the Lenders or that would otherwise not be prohibited by the terms of the Bank Documentation if Holdings were a party

Professionals' Eyes Only

thereto.

Events of Default:

Customary for the Sponsor and its affiliates in similar transactions and limited to the following (which shall apply to Holdings, the Borrower and its subsidiaries and be subject to materiality thresholds, grace periods and exceptions to be agreed (*provided* that there will be longer grace periods for foreign entities)):  nonpayment (after a grace period of 5 days), breach of representations in any material respect, breach of covenants, cross defaults to material indebtedness for borrowed money and other funded debt (excluding (a), in any case, obligations under hedge agreements and (b), in the case of the Term Loan Facility, a cross-default to the Revolving Credit Facility covenants set forth under "Financial Covenants"), loss of lien on material collateral, invalidity of significant guarantees, invalidity of subordination provisions, bankruptcy and insolvency events, ERISA events, material judgments and change of control (as defined below).

"Change of Control" shall mean any event or circumstance after which: (i) Holdings shall cease to own, directly or indirectly, 100% of the Capital Stock of the Borrower; or (ii) if Holdings' capital stock is not traded on a nationally-recognized stock exchange, the Equity Investors shall cease to own, directly or indirectly, at least 50.1% of the capital stock of Holdings; or (iii) if Holdings' capital stock is traded on a nationally-recognized stock exchange (a) any Person or group other than the Equity Investors shall own, directly or indirectly, at least 30% of the capital stock of Holdings and the Equity Investors shall not own, directly or indirectly, a greater amount, or (b) a majority of the board of directors of Holdings shall not be Continuing Directors.

"Continuing Directors" shall mean the directors of Holdings on the Closing Date and each other director of Holdings, if, in each case, such other director's nomination for election to the board of directors of Holdings is recommended by at least 51% of the then Continuing Directors or such other director receives the vote of the Sponsor, as applicable, (excluding any portfolio companies of the Sponsor) in his or her election by the shareholders of Holdings.

Assignments and Participations:

Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans and commitments under one or more of the Bank Facilities (other than to certain persons designated by the Borrower to the Administrative Agent in a manner to be agreed); *provided* that any assignment in respect of the Revolving Credit Agreement shall be in a minimum amount equal to $5 million and any assignment of the Term Loan Facility shall be in a minimum amount equal to $1 million.  Assignments will require the consent of the

Professionals' Eyes Only

Administrative Agent, the Issuing Bank (with respect to revolving credit facility loans and commitments) and the Borrower, which consents shall not be unreasonably withheld; *provided* that (i) no consents shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of the Borrower shall be required during a bankruptcy or payment event of default. In addition, each Lender may sell participations in all or a portion of its loans and commitments under one or more of the Bank Facilities (other than to certain persons designated in writing by the Borrower); *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Bank Facilities (except as to certain customary issues). Assignees and participants may not include competitors of Borrower identified by the Borrower to the Administrative Agent in a manner to be agreed.

Expenses and Indemnification:

All reasonable out-of-pocket expenses (including but not limited to reasonable legal fees and expenses of not more than one counsel plus, if necessary, one local counsel per jurisdiction and reasonable expenses incurred in connection with due diligence and travel, courier, reproduction, printing and delivery expenses) of the Banks, the Arranger and the Administrative Agent and the Syndication Agent associated with the syndication of the Bank Facilities and with the preparation, execution and delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the documentation contemplated hereby are to be paid by the Borrower on and after Closing Date, if it occurs. In addition, all reasonable out-of-pocket expenses (including but not limited to reasonable legal fees and expenses of not more than one counsel plus, if necessary, one local counsel per jurisdiction) of the Lenders and the Agents for workout proceedings, enforcement costs and documentary taxes associated with the Bank Facilities are to be paid by the Borrower.

The Borrower will indemnify the Lenders, the Banks, the Arranger and the Agents and their respective affiliates, and hold them harmless from and against all reasonable out-of-pocket costs, expenses (including but not limited to reasonable legal fees and expenses of not more than one counsel plus, if necessary, one local counsel per jurisdiction) and liabilities arising out of or relating to any action, investigation, suit or proceeding relating to or arising out of the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the Bank Facilities; *provided, however*, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final judgment of a court of competent jurisdiction to have been

Professionals' Eyes Only                                                            TRB0009414

incurred by reason of the gross negligence, bad faith or willful misconduct of such person or any of its affiliates, or the directors, officers, employees, advisors or agents of any of them.

Yield Protection, Taxes
and Other Deductions:

The Bank Documentation will contain yield protection provisions, customary for facilities of this nature, protecting the Lenders in the event of unavailability of LIBOR, breakage losses, reserve and capital adequacy requirements.

All payments are to be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than certain income taxes). The Lenders will use commercially reasonable efforts to minimize to the extent possible any applicable taxes and the Borrower will indemnify the Lenders and the Administrative Agent for such taxes paid by the Lenders or the Administrative Agent. The Borrower will have the right to replace or prepay any Lender who requests any such indemnification, *provided* that (i) the Borrower has satisfied all of the outstanding obligations owing to such Lender under the Revolving Credit Facility, the Term Loan Facility and/or the Bridge Facilities, as applicable, and (ii) any replacement Lender is reasonably acceptable to the Administrative Agent to the extent that assignments to such Lender would otherwise require the Administrative Agent's consent under the provisions of "Assignments and Participations" above.

Requisite Lenders:

Lenders holding at least a majority of total loans and commitments under the Bank Facilities (the "Requisite Lenders"), with (i) the consent of each Lender directly and adversely affected thereby to be required with respect to (a) reductions in the unpaid principal amount or extensions of the date for any scheduled payment of any loan, (b) reductions in interest rates (but not by virtue of a default waiver or change to a financial ratio) or fees or extensions of the dates for payment thereof, (c) increases in the amounts or extensions of the expiry date of any commitments and (d) modifications to any of the voting percentages and (ii) the consent of all Lenders to be required with respect to releases of all or substantially all of the collateral or all or substantially all of the Guarantors (other than in connection with permitted asset sales). The consent of Administrative Agent, Issuing Bank and/or Swingline Lender will be required with respect to any amendment affecting the rights or obligations thereof. The Borrower will have the "yank-a-bank" right to replace or prepay any Lender who does not consent to any amendment or waiver requiring the consent of such Lender but approved by the Requisite Lenders; *provided* that (i) the Borrower or such replacement lender has satisfied all of the outstanding obligations owing to such

Professionals' Eyes Only

TRB0009415

Lender under the Revolving Credit Facility and/or the Term Facility, as applicable, and (ii) any replacement Lender is reasonably acceptable to the Administrative Agent to the extent that assignments to such Lender would otherwise require the Administrative Agent's consent under the provisions of "Assignments and Participations" above.

| | |
|---|---|
| Governing Law and Forum: | The laws of the State of New York.  Each party to the Bank Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York. |
| Counsel to the Banks, the Arranger and the Agents: | Cahill Gordon & Reindel LLP |

Page 148 of 174

Professionals' Eyes Only

Revolving Credit Facility Pricing Grid

| Total Net Senior Secured Bank Leverage Ratio | Interest Margin for LIBOR Loans | Interest Margin for Base Rate Loans | Commitment Fee |
|---|---|---|---|
| ≥6.0:1.00 | 2.25% | 1.25% | 0.50% |
| ≥5.25:1.00 and <6.0:1.00 | 2.00% | 1.00% | 0.50% |
| ≥4.50:1.00 and <5.25:1.00 | 1.75% | 0.75% | 0.375% |
| ≤4.50:1.00 | 1.50% | 0.50% | 0.375% |

Term Loan Facility Pricing Grid

| Total Net Senior Secured Bank Leverage Ratio | Interest Margin for LIBOR Loans | Interest Margin for Base Rate Loans |
|---|---|---|
| ≥5.50:1.00 | 2.25% | 1.25% |
| <5.50:1.00 | 2.00% | 1.00% |

Professionals' Eyes Only

TRB0009417

EXHIBIT B
TO ANNEX I

## Certain Definitions

Capitalized terms used but not defined herein have the meanings given (or incorporated by reference) in the Summary of Principal Terms and Conditions of the Bank Facility to which this Exhibit B is attached and, if not defined therein, shall be defined consistent with documentation for recent transactions for companies owned by Sponsor.

"Adjusted EBITDA" shall mean, with respect to the Borrower and its Subsidiaries on a consolidated basis for any period, the Consolidated Net Income of the Borrower and the Subsidiaries for such period plus (a) the sum of (in each case without duplication and to the extent the respective amounts described in subclauses (i) through (x) of this clause (a) reduced such Consolidated Net Income (as defined below) for the respective period for which Adjusted EBITDA is being determined):

(i)     provision for Taxes based on income, profits, dividends, or capital of the Borrower and the Subsidiaries for such period, including, without limitation, state, franchise and similar taxes;

(ii)    Interest Expense of the Borrower and the Subsidiaries for such period (net of interest income of the Borrower and its Subsidiaries for such period);

(iii)   depreciation and amortization expenses of the Borrower and the Subsidiaries for such period;

(iv)    any transition services expenses or incremental stand-alone expenses to the extent duplicative of current operating expenses and non-recurring one-time transition service set-up costs;

(v)     any business optimization expenses and other restructuring charges; *provided* that with respect to each business optimization expense or other restructuring charge, the Borrower shall have delivered to the Administrative Agent an officers' certificate specifying and quantifying such expense or charge and stating that such expense or charge is a business optimization expense or other restructuring charge, as the case may be;

(vi)    any extraordinary, unusual or non-recurring charges, expenses or losses, including without limitation relocation costs and curtailments or modifications to pension and post retirement employee benefit plans;

(vii)   any non-cash pension and other post-employment benefit expenses;

(viii)  any other non-cash charges, expenses or losses; *provided* that, for purposes of this clause (viii), any non-cash charges, expenses or losses shall be treated as cash charges, expenses or losses in any subsequent period during which cash disbursements attributable thereto are made;

(ix)    the amount of management, consulting, monitoring, transaction and advisory fees and related expenses paid to the Sponsor or any of its affiliates (or any accruals related to such fees and related expenses) during such period, subject to a maximum amount per annum to be mutually agreed;

Page 150 of 174

Professionals' Eyes Only