(x)     any minority interest expense that reduced Consolidated Net Income for the respective period;

(xi)    cash dividends received from unconsolidated investments; and

(xii)   equity contributions made pursuant to the equity cure rights described in Annex I to the Commitment Letter,

minus (b) the sum of (without duplication and to the extent the amounts described in this clause (b) increased such Consolidated Net Income for the respective period for which Adjusted EBITDA is being determined) non-cash items increasing Consolidated Net Income of the Borrower and the Subsidiaries for such period (but excluding any such items (i) in respect of which cash was received in a prior period or will be received in a future period or (ii) which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges in any prior period).

Adjusted EBITDA shall be calculated on a pro forma basis to give effect to any acquisitions (including (i) the Acquisition and (ii) the commencement of activities constituting any new operations) or dispositions (including the termination or discontinuance of activities constituting such operations) of business entities or properties or assets (constituting a division or line of business of any business entity) that is the subject of any such acquisition or disposition, including any synergies and cost savings as certified by the Borrower as having been determined in good faith to be reasonably anticipated to be realizable within 12 months following any such acquisition or disposition.  All calculations of Adjusted EBITDA and Consolidated Net Income shall be calculated on a pro forma basis and set forth in an officers' certificate signed by the chief financial officer of the Borrower that states (i) the amount of such calculations and (ii) that such calculations are based on the reasonable good faith beliefs of the officers executing such officers' certificate at the time of such execution.

The calculation of Adjusted EBITDA shall not include any non-cash impact attributable to purchase accounting adjustments as a result of the fair value exercise undertaken as required by purchase accounting for the transactions contemplated by such acquisition, in accordance with GAAP (without duplication of clause (xi) of Consolidated Net Income).

"Consolidated Net Income" shall mean, with respect to any person for any period, the aggregate of the Net Income of such person and its subsidiaries for such period, on a consolidated basis; provided, however, that, without duplication,

(i)     any net after-tax (A) extraordinary, (B) unusual or (C) nonrecurring gains or losses or income or expenses (less all fees and expenses relating thereto), including without limitation any severance expenses, and fees, expenses or charges related to any offering of Equity Interests of Holdings, any Investment, acquisition or Indebtedness permitted to be incurred hereunder or retirement of Indebtedness (including termination of the associated hedging arrangements) (in each case, whether or not successful), including any such fees, expenses, charges or change in control payments related to the Transactions, in each case, shall be excluded;

(ii)    any net after-tax income or loss from discontinued operations and any net after-tax gain or loss on disposal of discontinued operations shall be excluded;

(iii)   any net after-tax gain or loss (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course

of business (as determined in good faith by the Board of Directors of the Borrower) shall be excluded;

(iv)     any net after-tax income or loss (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of indebtedness shall be excluded;

(v)      (A) the Net Income for such period of any person that is not a subsidiary of such person, or is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting, shall be excluded and (B) the Net Income for such period shall include any ordinary course dividend distribution or other payment in cash received from any person described in clause (A);

(vi)     the cumulative effect of a change in accounting principle during such period shall be excluded;

(vii)    any increase in amortization or depreciation or any one-time non-cash charges resulting from purchase accounting in connection with the Transactions or any acquisition that is consummated after the Closing Date shall be excluded;

(viii)   any non-cash impairment charges resulting from the application of Statement of Financial Accounting Standards ("SFAS") No. 142 and No. 144, and the amortization of intangibles arising pursuant to SFAS No. 141, shall be excluded;

(ix)     any non-cash compensation expenses realized from grants of stock appreciation or similar rights, stock options or other rights to officers, directors and employees of such person or any of its subsidiaries shall be excluded;

(x)      accruals and reserves relating to the operations of the Acquired Business prior to the Closing Date that are established within twelve months after the Closing Date and that are so required to be established in accordance with GAAP shall be excluded; provided that such accruals and reserves shall not exceed an aggregate amount to be agreed; and

(xi)     any non-cash impact attributable to purchase accounting adjustments as a result of the fair value exercise undertaken as required by purchase method of accounting for the transaction contemplated by any Acquisition, in accordance with GAAP shall be excluded.

Professionals' Eyes Only

TRB0009420

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

### Senior Bridge Facility[1]

| | |
|---|---|
| Borrower: | The Borrower. |
| Sole Lead Arranger: | Merrill Lynch, Pierce, Fenner & Smith Incorporated (in such capacity, the "Arranger"). |
| Sole Bookrunner: | Merrill Lynch, Pierce, Fenner & Smith Incorporated. |
| Lenders: | A syndicate of banks, financial institutions and other entities, including Merrill Lynch Capital Corporation, arranged by the Arranger and reasonably acceptable to the Borrower (collectively, the "Lenders"). |
| Administrative Agent: | Merrill Lynch Capital Corporation or one of its affiliates (in such capacity, the "Administrative Agent") (it being understood that any resignation of the Administrative Agent shall not be effective until a successor administrative agent reasonably acceptable to the Borrower has been appointed). |
| Bridge Facility: | Unsecured senior bridge loans with pay-in-kind toggle (the "Senior Bridge Loans") in an aggregate principal amount of $575.0 million (the "Senior Bridge Facility"). |
| Guarantors: | Same Guarantors as the Bank Term Sheet other than Holdings (each, a "Guarantor"; and its guarantee is referred to herein as a "Guarantee"). The Borrower and the Guarantors are herein referred to as the "Loan Parties" and individually as a "Loan Party." In the event that a subsidiary is released from its obligations under its guarantee of the Bank Facilities, its guarantee under the Senior Bridge Facility will be automatically released. Certain subsidiaries may be designated and treated as "unrestricted" on terms consistent with documentation for recent transactions for companies owned by the Sponsor or its affiliates; *provided* that no such designation shall be permitted until after the occurrence of the Senior Bridge Initial Maturity Date (as defined below). |
| Ranking: | The Senior Bridge Loans and the Guarantees thereof will be unsecured senior obligations of the Borrower and the Guarantors, will rank (i) *pari passu* in right of payment with all other senior indebtedness of the Borrower or such Guarantor, as the case may be, (ii) senior in right of payment to all subordinated indebtedness of the Borrower or such Guarantor, |

---

[1]    All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

Professionals' Eyes Only                    TRB0009421

as the case may be.

| | |
|---|---|
| Availability/Use of Proceeds: | The Senior Bridge Facility will be available on the Closing Date in one drawing. The proceeds of the Senior Bridge Loans shall be used solely (a) to finance the Acquisition subject to the terms and conditions set forth in the Senior Bridge Documentation, and (b) to pay related fees, commissions and expenses. |
| Documentation: | Usual and customary for the Sponsor and its affiliates in similar transactions for facilities of this type. The Senior Bridge Documentation will include, among others, a bridge loan agreement and other appropriate documents, including an exhibit with the form of the indenture in connection with the issuance of any Senior Exchange Notes as contemplated below; *provided* that Adjusted EBITDA shall be defined as set forth in Exhibit B to Annex I attached to the Commitment Letter. |
| Interest: | The Senior Bridge Loans will bear interest at a variable rate per annum (the "Applicable Interest Rate") equal to the sum of (i) three-month LIBOR plus (ii) a spread equal to 3.40% (the "Spread"). The Spread will increase by an additional 0.50% on the six month anniversary of the Closing Date and a further additional 0.50% for each additional three-month period thereafter so long as any part of the Senior Bridge Loans are outstanding. Notwithstanding the foregoing, the interest rate on the Senior Bridge Loans shall not at any time exceed 9.50% *per annum.* |

Interest Payment

| | |
|---|---|
| Cash/PIK Option: | With respect to each interest period, the Borrower may, in its sole discretion, elect to pay interest on up to 50% of the principal amount of the Senior Bridge Loans then outstanding by adding such interest to such principal amount (any such election, a "PIK Election"). Notwithstanding anything to the contrary herein, with respect to each interest period for which the Borrower has made a PIK Election, interest shall be payable (as to the portion of the interest subject to such PIK Election only) at the applicable rate set forth above under the caption "Interest" for such period applicable to such portion of the Senior Bridge Loans plus 75 basis points. |

The Borrower shall make a PIK Election with respect to each interest period by providing at least 15 days' written notice to the Administrative Agent prior to the date on which such interest is due. If a PIK Election is not made by the Borrower in a timely fashion or at all with respect to an interest period, the Borrower shall pay all such interest in cash.

Any PIK Election shall apply to all outstanding Senior Loans. The Administrative Agent shall provide written notice of the

Professionals' Eyes Only

TRB0009422

Borrower's election to all Lenders.

Other Terms:

Interest will be payable quarterly, in arrears.

Interest will be calculated on the basis of actual days elapsed in a year of 360 days.

Upon the occurrence and during the continuance of a payment default, interest will accrue on any overdue amount payable in respect of Senior Bridge Loans at a rate of 2.0% per annum in excess of the rate otherwise applicable to such loans or amounts payable and will be payable on demand.

Maturity:

The Senior Bridge Loans will mature on the date (the "Senior Bridge Initial Maturity Date") that is twelve months after the initial funding date (the "Funding"); *provided, however,* that the maturity date of the Senior Bridge Loans shall be automatically extended on the Senior Bridge Initial Maturity Date to the date that is eight years after the Funding so long as no payment default has occurred and is continuing and none of Holdings, Borrower or any of their material subsidiaries is subject to a bankruptcy or other insolvency proceeding.  In addition, after the Senior Bridge Initial Maturity Date and extension of the maturity date of the Senior Bridge Loans as described in the preceding sentence, the Senior Bridge Loans may be exchanged for Senior Exchange Notes as provided in Exhibit A attached hereto.

Mandatory Redemption:

The Borrower will be required to repay the entire principal amount of the Senior Bridge Loans upon any change of control of the Borrower or its subsidiaries in cash, without any prepayment or penalty (but including all breakage and similar costs), on usual and customary terms and conditions for the Sponsor and its affiliates for senior facilities similar to the Senior Bridge Facility.

Subject to the mandatory prepayment provisions of the Bank Facilities and certain exceptions to be agreed upon, to the extent proceeds are available, the Borrower will repay the Senior Bridge Loans with the net proceeds received by the Borrower from (a) the incurrence by the Borrower of any debt (other than borrowings under the Bank Facilities and permitted incurrences pursuant to the Bank Documentation) and (b) asset sales, subject to reinvestment rights at least as favorable as those set forth in the Bank Documentation and other exceptions usual and customary for Sponsor and its affiliates in similar transactions for facilities of this type.

Each such prepayment shall be made together with accrued interest to the date of prepayment, but, except as noted above,

without premium or penalty (except actual breakage costs related to prepayments not made on the last day of the relevant interest period).

| | |
|---|---|
| Optional Redemption: | The Senior Bridge Loans may be prepaid at any time, in whole or in part, at the option of the Borrower, upon notice and in a minimum principal amount and in multiples to be agreed upon, together with accrued interest to the date of pre-payment, but without premium or penalty (except actual breakage costs not including loss of margin related to prepayments not made on the last day of the relevant interest period). |
| Conditions Precedent to Funding: | The Funding of the Senior Bridge Loans will be subject to satisfaction of the conditions set forth on the Conditions Annex. |
| Representations and Warranties: | Substantially the same as those described in Bank Term Sheet and limited to the following (which shall apply to the Borrower and its material restricted subsidiaries and be subject to materiality thresholds and exceptions to be agreed): representations and warranties as to financial statements (including pro forma financial statements); no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of the Senior Bridge Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; solvency; and accuracy of disclosure. |
| Covenants: | Substantially the same as those affirmative covenants described in the Bank Term Sheet.  Incurrence-based and other negative covenants consistent with those described in the Bank Term Sheet, with such changes as are necessary or appropriate for the Senior Bridge Facility, and negative covenants applicable to Senior Bridge Loans after the Initial Maturity Date and usual and customary for the Sponsor and its affiliates in similar transactions for facilities of this type, in each case, no more restrictive than applicable to the Bank Facilities. |
| Events of Default: | Usual and customary for the Sponsor and its affiliates in similar transactions for facilities similar to the Senior Bridge Facility. |
| Assignments and Participations: | Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans under the Senior Bridge Facility (other than to certain persons designated in writing by Borrower).  Assignments will require, the consent of the Administrative Agent and the Borrower, which consents shall not be unreasonably withheld; *provided* that (i) no consents shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of the Borrower shall be required during a bankruptcy or payment |

Professionals' Eyes Only

TRB0009424

event of default. In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Senior Bridge Facility (other than to certain persons designated in writing by Borrower); *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Senior Bridge Facility (except as to certain customary issues). Assignees and participants may not include competitors of Borrower identified by the Borrower to the Administrative Agent in a manner to be agreed.

| | |
|---|---|
| Required Lenders: | Lenders having a majority of the outstanding credit exposure, except (1) the consent of all Lenders directly and adversely affected thereby to be required with respect to (a) reductions in the unpaid principal amount or extensions of the maturity date of any loan, (b) reductions in interest rates (but not by virtue of a default waiver or change to a financial ratio) or fees or extensions of the dates for payment thereof, and (c) increases in the amounts or extensions of the expiry date of a Lender's commitments and (2) the consent of all Lenders to be required with respect to (i) modifications to any of the voting percentages and (ii) at any time prior to the Senior Bridge Initial Maturity Date, releases of all or substantially all the Guarantors and thereafter, releases of any significant Guarantors (in each case other than automatic releases of any such Guarantors). The voting provisions of the Senior Bridge Facility shall contain a "yank-a-bank" provision comparable to that contained in the Bank Documentation. |
| Expenses and Indemnification: | The Borrower will pay (a) all reasonable out-of-pocket costs and expenses of the Arranger, the Administrative Agent and the Lenders (including the reasonable, disbursements and other charges of not more than one counsel plus, if necessary, one local counsel per jurisdiction approved by the Borrower) in connection with the preparation, execution, delivery and administration of, and any waiver or modification (whether or not effective) and administration of, the Senior Bridge Documentation and in arranging and syndicating the Senior Bridge Facility on the Closing Date and thereafter, within 30 days of the delivery of a reasonably detailed invoice with respect thereto, and (b) all reasonable out-of-pocket costs and expenses of the Arranger, the Administrative Agent and the Lenders (including the reasonable fees and disbursements of not more than one counsel plus, if necessary, one local counsel per jurisdiction approved by the Borrower) in connection with the enforcement of the Senior Bridge Facility, within 30 days of the delivery of a reasonably detailed invoice with respect thereto. |

The Borrower will indemnify the Arranger, the Administrative Agent and the Lenders and their respective affiliates and hold them harmless against all costs and expenses (including

Professionals' Eyes Only                                    TRB0009425

II-6

reasonable fees and disbursements of counsel) and all losses, claims, damages and liabilities in connection with any action, suit or proceeding arising from or relating to the proposed financing contemplated hereby and the other transactions connected therewith, except to the extent finally determined by a final judgment of a court of competent jurisdiction to have resulted from the bad faith, gross negligence or willful misconduct of such person or any of its affiliates, directors, officers, employees, representatives or agents.

| | |
|---|---|
| Government Law and Forum: | The laws of the State of New York.  Each party to the Bank Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York. |
| Miscellaneous: | Customary provisions regarding consent to jurisdiction, waiver of jury trial, service of process, yield protection, tax gross ups and other miscellaneous matters. |
| Counsel to the Arranger: | Cahill Gordon & Reindel LLP. |

Page 158 of 174

Professionals' Eyes Only

Summary of Principal Terms and Conditions
of Senior Exchange Notes

Capitalized terms used but not defined herein have the meanings given (or incorporated by reference) in the Summary of Principal Terms and Conditions of the Senior Bridge Facility to which this Exhibit A is attached.

| | |
|---|---|
| Issuer: | The Borrower. |
| Guarantors: | Same as the Guarantors of the Senior Bridge Loans. |
| Exchange: | If the Senior Bridge Loans have not been previously repaid in full for cash on or prior to the Initial Maturity Date and the maturity of the Senior Bridge Loans shall have been extended as provided in the Senior Bridge Term Sheet, Lenders shall have the option to require the Issuer to issue unsecured senior notes ("Senior Exchange Notes") under an indenture that complies with the Trust Indenture Act of 1939 to such Lender under the Senior Bridge Facility in the aggregate outstanding principal amount of such Lender's outstanding portion of the Senior Bridge Loans; *provided* that the Borrower may defer the first issuance of Senior Exchange Notes until such time as the Borrower has received requests to issue an aggregate amount of Senior Exchange Notes equal to at least 25.0% of the aggregate principal amount of all Senior Bridge Loans issued on the Closing Date. |
| Principal Amount: | The Senior Exchange Notes will be available only to satisfy the Senior Bridge Loans.  The principal amount of the Senior Exchange Notes will equal 100% of the aggregate principal amount of the Senior Bridge Loans for which they are exchanged and will have the same ranking as the Senior Bridge Loans for which they are exchanged. |
| Interest Rate: | The Senior Exchange Notes (other than any Fixed Rate Senior Exchange Notes) will bear interest at a rate (the "Applicable Senior Exchange Note Interest Rate") equal to the Initial Rate (as defined below) plus the Applicable Spread (as defined below).  Notwithstanding the foregoing, the Applicable Senior Exchange Note Interest Rate shall not exceed 9.50% *per annum* (such maximum interest rate together with those relating to the Senior Bridge Loans, an "Interest Cap").  The Senior Exchange Notes shall include provisions customary in securities of this type protecting the holders in the event of unavailability of funding, illegality, capital adequacy requirements, increased costs, withholding taxes and funding losses.

"Applicable Spread" shall mean zero during the three-month period commencing on the exchange date of the Senior Exchange Notes and shall increase by 0.50% *per annum* at the |

Professionals' Eyes Only                                                  TRB0009427

beginning of each subsequent three-month period.

"Initial Rate" shall be determined on the Initial Maturity Date of the Senior Bridge Loans and shall equal the interest rate of the Senior Bridge Loans on the day immediately preceding the Initial Maturity Date plus 0.50% *per annum.*

Each holder of Senior Exchange Notes shall have the option to fix the interest rate on the Senior Exchange Notes to a rate that is equal to the then Applicable Interest Rate borne by the Senior Exchange Notes ("Fixed Rate Senior Exchange Notes").

**Interest Payment**

**Cash/PIK Option:**      With respect to each interest period, the Borrower may, in its sole discretion, elect to pay interest on up to 50% of the aggregate principal amount of Fixed Rate Senior Exchange Notes then outstanding by adding such interest to such principal amount (any such election, a "PIK Election"). Notwithstanding anything to the contrary herein, with respect to each interest period for which the Borrower has made a PIK Election, interest shall be payable (as to the portion of the interest subject to such PIK Election only) at the applicable rate set forth above under the caption "Interest" for such period applicable to such portion of the Senior Exchange Notes plus 75 basis points.

The Borrower shall make a PIK Election with respect to each interest period by providing at least 15 days' written notice to the Administrative Agent prior to the date on which such interest is due. If a PIK Election is not made by the Borrower in a timely fashion or at all with respect to an interest period, the Borrower shall pay all such interest in cash.

Any PIK Election shall apply to all outstanding Senior Exchange Notes. The Administrative Agent shall provide written notice of the Borrower's election to all Lenders.

**Other Terms:**      Interest will be payable quarterly, in arrears.

Interest will be calculated on the basis of actual days elapsed in a year of 360 days.

Upon the occurrence and during the continuance of a payment default, interest will accrue on any overdue amount payable in respect of Senior Exchange Notes at a rate of 2.0% per annum in excess of the rate otherwise applicable to such loans or amounts payable and will be payable on demand.

**Maturity:**      Eight years from the date of the Funding.

     TRB0009428

II-A-3

| | |
|---|---|
| Ranking: | Same as the Senior Bridge Loans. |
| Mandatory Offer to Purchase: | The Issuer will make an offer to purchase the Fixed Rate Senior Exchange Notes upon any change of control of the Issuer at a redemption price of 101% of par plus accrued and unpaid interest and will redeem the Senior Exchange Notes not bearing interest at a fixed rate upon any change of control of the Issuer at a redemption price of par plus accrued and unpaid interest. |
| | Subject to the mandatory pre-payment provisions of the Bank Facilities, to the extent proceeds are available, the Issuer will make offers to repurchase the Senior Exchange Notes for such events and on such terms and conditions as are customary for publicly traded high yield debt securities issued by affiliates of the Sponsor. |
| Optional Redemption: | The Senior Exchange Notes (other than Fixed Rate Senior Exchange Notes) will be callable, in whole or in part, upon not less than 10 days written notice, at the option of the Issuer, at any time at par plus accrued and unpaid interest to the redemption date. The Fixed Rate Senior Exchange Notes will be callable in whole or in part at any time subject to customary make-whole provisions and in such other instances and subject to such other restrictions and premiums as are typical for similar fixed-rate high-yield debt securities issued by affiliates of the Sponsor. |
| Right to Resell Notes: | Any Lender (and any subsequent holder) shall have the absolute and unconditional right to resell the Senior Exchange Notes to one or more third parties, whether by assignment or participation and subject to compliance with applicable securities laws. |
| Representations and Warranties; Covenants; Events of Default: | Customary for publicly traded high yield debt securities of companies affiliated with the Sponsor in similar transactions of this type. |
| Governing Law and Forum: | The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York. |
| Miscellaneous: | Customary provisions regarding consent to jurisdiction, waiver of jury trial, service of process, yield protection, tax gross ups and other miscellaneous matters. |
| Counsel to the Arranger | Cahill Gordon & Reindel LLP. |

Page 161 of 174

Professionals' Eyes Only

TRB0009429

ANNEX III

SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

Senior Subordinated Bridge Facility[1]

Borrower:                    The Borrower.

Sole Lead Arranger:          Merrill Lynch, Pierce, Fenner & Smith Incorporated (in such capacity, the "Arranger").

Sole Bookrunner:             Merrill Lynch, Pierce, Fenner & Smith Incorporated.

Lenders:                     A syndicate of banks, financial institutions and other entities, including Merrill Lynch Capital Corporation, arranged by the Arranger and reasonably acceptable to the Borrower (collectively, the "Lenders").

Administrative Agent:        Merrill Lynch Capital Corporation or one of its affiliates (in such capacity, the "Administrative Agent") (it being understood that any resignation of the Administrative Agent shall not be effective until a successor administrative agent reasonably acceptable to the Borrower has been appointed).

Bridge Facility:             Unsecured senior subordinated bridge loans (the "Senior Subordinated Bridge Loans") in an aggregate principal amount of $575.0 million (the "Senior Subordinated Bridge Facility").

Guarantors:                  Same Guarantors as the Bank Term Sheet other than Holdings (each, a "Guarantor"; and its guarantee is referred to herein as a "Guarantee"). The Borrower and the Guarantors are herein referred to as the "Loan Parties" and individually as a "Loan Party." In the event that a subsidiary is released from its obligations under its guarantee of the Bank Facilities, its guarantee under the Senior Subordinated Bridge Facility will be automatically released. Certain subsidiaries may be designated and treated as "unrestricted" on terms consistent with documentation for recent transactions for companies owned by the Sponsor or its affiliates; *provided* that no such designation shall be permitted until after the occurrence of the Senior Subordinated Bridge Initial Maturity Date (as defined below).

Ranking:                     The Senior Subordinated Bridge Loans and the Guarantees thereof will be unsecured senior subordinated obligations of the Borrower and the Guarantors, will rank (i) junior in right of payment to all senior indebtedness of the Borrower or such Guarantor, as the case may be, (ii) *pari passu* in right of payment with all other senior subordinated indebtedness of the Borrower or such Guarantor, as the case may be, (iii) senior in

---

[1]    All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

Professionals' Eyes Only                    TRB0009430

right of payment to all subordinated indebtedness of the Borrower or such Guarantor, as the case may be.

Availability/Use of Proceeds:

The Senior Subordinated Bridge Facility will be available on the Closing Date in one drawing. The proceeds of the Senior Subordinated Bridge Loans shall be used solely (a) to finance the Acquisition subject to the terms and conditions set forth in the Senior Subordinated Bridge Documentation, and (b) to pay related fees, commissions and expenses.

Documentation:

Usual and customary for the Sponsor and its affiliates in similar transactions for facilities of this type. The Senior Subordinated Bridge Documentation will include, among others, a bridge loan agreement and other appropriate documents, including an exhibit with the form of the indenture in connection with the issuance of any Senior Subordinated Exchange Notes as contemplated below; *provided* that Adjusted EBITDA shall be defined as set forth in Exhibit B to Annex I attached to the Commitment Letter.

Interest:

The Senior Subordinated Bridge Loans will bear interest at a variable rate per annum (the "Applicable Interest Rate") equal to the sum of (i) three-month LIBOR plus (ii) a spread equal to 4.65% (the "Spread"). The Spread will increase by an additional 0.50% on the six month anniversary of the Closing Date and a further additional 0.50% for each additional three-month period thereafter so long as any part of the Senior Subordinated Bridge Loans are outstanding. Notwithstanding the foregoing, the interest rate on the Senior Subordinated Bridge Loans shall not at any time exceed 11.25% *per annum*.

Interest Payments:

Interest will be payable quarterly, in arrears.

Interest will be calculated on the basis of actual days elapsed in a year of 360 days.

Upon the occurrence and during the continuance of a payment default, interest will accrue on any overdue amount payable in respect of Senior Subordinated Bridge Loans at a rate of 2.0% per annum in excess of the rate otherwise applicable to such loans or amounts payable and will be payable on demand.

Maturity:

The Senior Subordinated Bridge Loans will mature on the date (the "Senior Subordinated Bridge Initial Maturity Date") that is twelve months after the initial funding date (the "Funding"); *provided, however*, that the maturity date of the Senior Subordinated Bridge Loans shall be automatically extended on the Senior Subordinated Bridge Initial Maturity Date to the date that is eight years after the Funding so long as no payment default has occurred and is continuing and none of Holdings, Borrower or any of their material subsidiaries is subject to a

Professionals' Eyes Only                                    TRB0009431

bankruptcy or other insolvency proceeding. In addition, after the Senior Subordinated Bridge Initial Maturity Date and extension of the maturity date of the Senior Subordinated Bridge Loans as described in the preceding sentence, the Senior Subordinated Bridge Loans may be exchanged for Senior Subordinated Exchange Notes as provided in Exhibit A attached hereto.

| | |
|---|---|
| Mandatory Redemption: | The Borrower will be required to repay the entire principal amount of the Senior Subordinated Bridge Loans upon any change of control of the Borrower or its subsidiaries in cash, without any prepayment or penalty (but including all breakage and similar costs), on usual and customary terms and conditions for the Sponsor and its affiliates for senior facilities similar to the Senior Subordinated Bridge Facility. |

Subject to the mandatory prepayment provisions of the Bank Facilities and certain exceptions to be agreed upon, to the extent proceeds are available, the Borrower will repay the Senior Subordinated Bridge Loans with the net proceeds received by the Borrower from (a) the incurrence by the Borrower of any debt (other than borrowings under the Bank Facilities and permitted incurrences pursuant to the Bank Documentation) and (b) asset sales, subject to reinvestment rights at least as favorable as those set forth in the Bank Documentation and other exceptions usual and customary for Sponsor and its affiliates in similar transactions for facilities of this type.

Each such prepayment shall be made together with accrued interest to the date of prepayment, but, except as noted above, without premium or penalty (except actual breakage costs related to prepayments not made on the last day of the relevant interest period).

| | |
|---|---|
| Optional Redemption: | The Senior Subordinated Bridge Loans may be prepaid at any time, in whole or in part, at the option of the Borrower, upon notice and in a minimum principal amount and in multiples to be agreed upon, together with accrued interest to the date of pre-payment, but without premium or penalty (except actual breakage costs not including loss of margin related to prepayments not made on the last day of the relevant interest period). |
| Conditions Precedent to Funding: | The Funding of the Senior Subordinated Bridge Loans will be subject to satisfaction of the conditions set forth on the Conditions Annex. |
| Representations and Warranties: | Substantially the same as those described in Bank Term Sheet and limited to the following (which shall apply to the Borrower and its material restricted subsidiaries and be subject to materiality thresholds and exceptions to be agreed): |

Professionals' Eyes Only

representations and warranties as to financial statements (including pro forma financial statements); no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of the Senior Subordinated Bridge Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; solvency; and accuracy of disclosure.

| | |
|---|---|
| Covenants: | Substantially the same as those affirmative covenants described in the Bank Term Sheet. Incurrence-based and other negative covenants consistent with those described in the Bank Term Sheet, with such changes as are necessary or appropriate for the Senior Subordinated Bridge Facility, and negative covenants applicable to Senior Subordinated Bridge Loans after the Initial Maturity Date and usual and customary for the Sponsor and its affiliates in similar transactions for facilities of this type, in each case, no more restrictive than applicable to the Bank Facilities. |
| Events of Default: | Usual and customary for the Sponsor and its affiliates in similar transactions for facilities similar to the Senior Subordinated Bridge Facility. |
| Assignments and Participations: | Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans under the Senior Subordinated Bridge Facility (other than to certain persons designated in writing by Borrower). Assignments will require, the consent of the Administrative Agent and the Borrower, which consents shall not be unreasonably withheld; *provided* that (i) no consents shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of the Borrower shall be required during a bankruptcy or payment event of default. In addition, each Lender may sell participations in all or a portion of its loans and commitments under the Senior Subordinated Bridge Facility (other than to certain persons designated in writing by Borrower); *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the Senior Subordinated Bridge Facility (except as to certain customary issues). Assignees and participants may not include competitors of Borrower identified by the Borrower to the Administrative Agent in a manner to be agreed. |
| Required Lenders: | Lenders having a majority of the outstanding credit exposure, except (1) the consent of all Lenders directly and adversely affected thereby to be required with respect to (a) reductions in the unpaid principal amount or extensions of the maturity date of any loan, (b) reductions in interest rates (but not by virtue of a default waiver or change to a financial ratio) or fees or |

TRB0009433

extensions of the dates for payment thereof, and (c) increases in the amounts or extensions of the expiry date of a Lender's commitments and (2) the consent of all Lenders to be required with respect to (i) modifications to any of the voting percentages and (ii) at any time prior to the Senior Subordinated Bridge Initial Maturity Date, releases of all or substantially all the Guarantors and thereafter, releases of any significant Guarantors (in each case other than automatic releases of any such Guarantors). The voting provisions of the Senior Subordinated Bridge Facility shall contain a "yank-a-bank" provision comparable to that contained in the Bank Documentation.

Expenses and Indemnification:

The Borrower will pay (a) all reasonable out-of-pocket costs and expenses of the Arranger, the Administrative Agent and the Lenders (including the reasonable, disbursements and other charges of not more than one counsel plus, if necessary, one local counsel per jurisdiction approved by the Borrower) in connection with the preparation, execution, delivery and administration of, and any waiver or modification (whether or not effective) and administration of, the Senior Subordinated Bridge Documentation and in arranging and syndicating the Senior Subordinated Bridge Facility on the Closing Date and thereafter, within 30 days of the delivery of a reasonably detailed invoice with respect thereto, and (b) all reasonable out-of-pocket costs and expenses of the Arranger, the Administrative Agent and the Lenders (including the reasonable fees and disbursements of not more than one counsel plus, if necessary, one local counsel per jurisdiction approved by the Borrower) in connection with the enforcement of the Senior Subordinated Bridge Facility, within 30 days of the delivery of a reasonably detailed invoice with respect thereto.

The Borrower will indemnify the Arranger, the Administrative Agent and the Lenders and their respective affiliates and hold them harmless against all costs and expenses (including reasonable fees and disbursements of counsel) and all losses, claims, damages and liabilities in connection with any action, suit or proceeding arising from or relating to the proposed financing contemplated hereby and the other transactions connected therewith, except to the extent finally determined by a final judgment of a court of competent jurisdiction to have resulted from the bad faith, gross negligence or willful misconduct of such person or any of its affiliates, directors, officers, employees, representatives or agents.

Government Law and Forum:

The laws of the State of New York. Each party to the Bank Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York.

Professionals' Eyes Only

TRB0009434

III-6

| | |
|---|---|
| Miscellaneous: | Customary provisions regarding consent to jurisdiction, waiver of jury trial, service of process, yield protection, tax gross ups and other miscellaneous matters. |
| Counsel to the Arranger: | Cahill Gordon & Reindel LLP. |

Professionals' Eyes Only

TRB0009435

Summary of Principal Terms and Conditions
of Senior Subordinated Exchange Notes

Capitalized terms used but not defined herein have the meanings given (or incorporated by reference) in the Summary of Principal Terms and Conditions of the Senior Subordinated Bridge Facility to which this Exhibit A is attached.

| | |
|---|---|
| Issuer: | The Borrower. |
| Guarantors: | Same as the Guarantors of the Senior Subordinated Bridge Loans. |
| Exchange: | If the Senior Subordinated Bridge Loans have not been previously repaid in full for cash on or prior to the Initial Maturity Date and the maturity of the Senior Subordinated Bridge Loans shall have been extended as provided in the Senior Subordinated Bridge Term Sheet, Lenders shall have the option to require the Issuer to issue unsecured senior subordinated notes ("Senior Subordinated Exchange Notes") under an indenture that complies with the Trust Indenture Act of 1939 to such Lender under the Senior Subordinated Bridge Facility in the aggregate outstanding principal amount of such Lender's outstanding portion of the Senior Subordinated Bridge Loans; *provided* that the Borrower may defer the first issuance of Senior Subordinated Exchange Notes until such time as the Borrower has received requests to issue an aggregate amount of Senior Subordinated Exchange Notes equal to at least 25.0% of the aggregate principal amount of all Senior Subordinated Bridge Loans issued on the Closing Date. |
| Principal Amount: | The Senior Subordinated Exchange Notes will be available only to satisfy the Senior Subordinated Bridge Loans. The principal amount of the Senior Subordinated Exchange Notes will equal 100% of the aggregate principal amount of the Senior Subordinated Bridge Loans for which they are exchanged and will have the same ranking as the Senior Subordinated Bridge Loans for which they are exchanged. |
| Interest Rate: | The Senior Subordinated Exchange Notes (other than any Fixed Rate Senior Subordinated Exchange Notes) will bear interest at a rate (the "Applicable Senior Subordinated Exchange Note Interest Rate") equal to the Initial Rate (as defined below) plus the Applicable Spread (as defined below). Notwithstanding the foregoing, the Applicable Senior Subordinated Exchange Note Interest Rate shall not exceed 11.25% *per annum* (such maximum interest rate together with those relating to the Senior Subordinated Bridge Loans, an "Interest Cap"). The Senior Subordinated Exchange Notes shall include provisions customary in securities of this type protecting the holders in the event of unavailability of funding, illegality, capital adequacy |

requirements, increased costs, withholding taxes and funding losses.

"Applicable Spread" shall mean zero during the three-month period commencing on the exchange date of the Senior Subordinated Exchange Notes and shall increase by 0.50% *per annum* at the beginning of each subsequent three-month period.

"Initial Rate" shall be determined on the Initial Maturity Date of the Senior Subordinated Bridge Loans and shall equal the interest rate of the Senior Subordinated Bridge Loans on the day immediately preceding the Initial Maturity Date plus 0.50% *per annum*.

Each holder of Senior Subordinated Exchange Notes shall have the option to fix the interest rate on the Senior Subordinated Exchange Notes to a rate that is equal to the then Applicable Interest Rate borne by the Senior Subordinated Exchange Notes ("Fixed Rate Senior Subordinated Exchange Notes").

| | |
|---|---|
| Interest Payments: | Interest will be payable quarterly, in arrears. |
| | Interest will be calculated on the basis of actual days elapsed in a year of 360 days. |
| | Upon the occurrence and during the continuance of a payment default, interest will accrue on any overdue amount payable in respect of Senior Subordinated Exchange Notes at a rate of 2.0% per annum in excess of the rate otherwise applicable to such loans or amounts payable and will be payable on demand. |
| Maturity: | Eight years from the date of the Funding. |
| Ranking: | Same as the Senior Subordinated Bridge Loans. |
| Mandatory Offer to Purchase: | The Issuer will make an offer to purchase the Fixed Rate Senior Subordinated Exchange Notes upon any change of control of the Issuer at a redemption price of 101% of par plus accrued and unpaid interest and will redeem the Senior Subordinated Exchange Notes not bearing interest at a fixed rate upon any change of control of the Issuer at a redemption price of par plus accrued and unpaid interest. |
| | Subject to the mandatory pre-payment provisions of the Bank Facilities, to the extent proceeds are available, the Issuer will make offers to repurchase the Senior Subordinated Exchange Notes for such events and on such terms and conditions as are customary for publicly traded high yield debt securities issued by affiliates of the Sponsor. |

Professionals' Eyes Only

TRB0009437

| | |
|---|---|
| Optional Redemption: | The Senior Subordinated Exchange Notes (other than Fixed Rate Senior Subordinated Exchange Notes) will be callable, in whole or in part, upon not less than 10 days written notice, at the option of the Issuer, at any time at par plus accrued and unpaid interest to the redemption date.  The Fixed Rate Senior Subordinated Exchange Notes will be callable in whole or in part at any time subject to customary make-whole provisions and in such other instances and subject to such other restrictions and premiums as are typical for similar fixed-rate high-yield debt securities issued by affiliates of the Sponsor. |
| Right to Resell Notes: | Any Lender (and any subsequent holder) shall have the absolute and unconditional right to resell the Senior Subordinated Exchange Notes to one or more third parties, whether by assignment or participation and subject to compliance with applicable securities laws. |
| Representations and Warranties; Covenants; Events of Default: | Customary for publicly traded high yield debt securities of companies affiliated with the Sponsor in similar transactions of this type. |
| Governing Law and Forum: | The laws of the State of New York.  Each party to the Bank Documentation will waive the right to trial by jury and will consent to the non-exclusive jurisdiction of the state and federal courts located in The City of New York. |
| Miscellaneous: | Customary provisions regarding consent to jurisdiction, waiver of jury trial, service of process, yield protection, tax gross ups and other miscellaneous matters. |
| Counsel to the Arranger | Cahill Gordon & Reindel LLP. |

Professionals' Eyes Only

TRB0009438

CONDITIONS TO THE INITIAL FUNDING[1]

The initial funding of the Facilities by the Banks under the Commitment Letter is subject to the conditions set forth in the Commitment Letter and satisfaction or waiver of each of the conditions precedent set forth below.

1.  The Acquisition and the Refinancing shall be consummated concurrently with the initial funding of the Facilities (i) in accordance with the definitive Acquisition Agreement dated as of the date hereof and the related disclosure schedules and exhibits thereto, subject to paragraph 7 below, without waiver or amendment thereof (other than any such waivers or amendments (including, without limitation, with respect to any representations and warranties in the Acquisition Agreement) as are not materially adverse to Banks or the Arranger) unless consented to by the Arranger (which consent shall not be unreasonably withheld or delayed) or (ii) on such other terms and conditions as are reasonably satisfactory to the Arranger.

2.  The Borrower shall have received the cash from the Equity Financing which together shall comprise not less than 15% of the pro forma capitalization of the Borrower after giving effect to the Transaction (excluding, for the avoidance of doubt, any letters of credit issued in the Closing Date).

3.  The Arranger will have received (i) copies of audited consolidated financial statements for the Acquired Business for any audited period after the date hereof for which financial statements are available, (ii) interim unaudited financial statements for the Acquired Business for each quarterly period ended after December 31, 2006 and at least 45 days prior to the Closing Date, and (iii) pro forma consolidated financial statements for the Borrower and its subsidiaries for, and as of the end of, the four-quarter period most recently ended prior to the Closing Date for which financial statements are available giving pro forma effect to the Acquisition and any other material acquisitions effected during or subsequent to such period (including adjustments previously agreed to by the Arranger and with such further adjustments as are consistent with recent financings for companies owned by the Sponsor and are otherwise reasonably satisfactory to the Arranger).

4.  The Administrative Agent shall have received a reasonably satisfactory solvency certificate from the chief financial officer of Holdings that shall document the solvency of Holdings and its subsidiaries on a consolidated basis after giving effect to the Transactions.

5.  Holdings, the Borrower and each of the Guarantors shall have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

6.  All documents and instruments required to perfect or evidence the Administrative Agent's first priority security interest in the personal property collateral under the Bank Facilities (including delivery of customary lien searches, stock certificates and undated stock powers executed in blank) shall have been executed and be in proper form for filing, but subject to the terms set forth in paragraph 7 below.

---

[1]  All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this <u>Annex IV</u> is attached.

Professionals' Eyes Only                                                    TRB0009439

7.  Definitive documentation for the Bank Facilities (the "Bank Documentation"), the Senior Bridge Facility (the "Senior Bridge Documentation") and the Senior Subordinated Bridge Facility (the "Senior Subordinated Bridge Documentation" and, together with the Senior Bridge Documentation, the "Bridge Documentation"; the Bank Documentation and the Bridge Documentation collectively, the "Financing Documentation"), in each case reflecting and consistent with the terms and conditions set forth herein and in the applicable Term Sheet and, to the extent not otherwise set forth herein and in the applicable Term Sheet, otherwise reasonably satisfactory to the Borrower and the Arranger, shall have been executed and delivered, and the Administrative Agent shall have received such customary legal opinions (including opinions (i) from counsel to the Borrower and its subsidiaries, (ii) if reasonably available, delivered pursuant to the Acquisition Agreement, accompanied by reliance letters in favor of the Lenders and (iii) from such special and local counsel as may be required by the Administrative Agent and consented to by the Borrower (such consent not to be unreasonably withheld)), documents and other instruments as are customary for transactions of this type or as it may reasonably request.

8.  All costs, fees, expenses and other compensation payable to the Bank pursuant to the Fee Letter, the Arranger or the Administrative Agent on the Closing Date, and for which invoices have been delivered, shall have been paid.

Notwithstanding anything in the Commitment Letter, the Fee Letter, the Term Sheets, the Financing Documentation or any other letter agreement or other undertaking concerning the financing of the Transactions to the contrary, (i) the only representations and warranties the making of which shall be a condition to availability of the Facilities on the Closing Date shall be (A) such of the representations made by the Seller in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that you have the right to terminate your obligations under the Acquisition Agreement as a result of a breach of such representations in the Acquisition Agreement, and (B) the Specified Representations (as defined below), (ii) the terms of the Financing Documentation shall contain no condition precedent (including, without limitation, written notice of borrowing and absence of any default or potential event of default) and shall not impair availability of the Facilities on the Closing Date if the conditions set forth herein, in the Term Sheets and in the Conditions Annex are satisfied and (iii) it is understood that (A) other than with respect to any UCC Filing Collateral or Stock Certificates (each as defined below), to the extent any guarantee or collateral is not provided on the Closing Date after your use of commercially reasonable efforts to do so, the delivery of such guarantee and/or collateral shall not constitute a condition precedent to the availability of the Facilities on the Closing Date but shall be required to be delivered after the Closing Date pursuant to arrangements to be mutually agreed by the parties hereto acting reasonably, (B) with respect to perfection of security interests in UCC Filing Collateral, your sole obligation shall be to deliver, or cause to be delivered, necessary UCC financing statements to the Administrative Agent or to cause Borrower or the applicable Guarantor (as defined in the applicable Bank Term Sheet) to irrevocably authorize the Administrative Agent to file necessary UCC financing statements, and (C) with respect to perfection of security interests in Stock Certificates, your sole obligation shall be to deliver such Stock Certificates to the Administrative Agent as and to the extent they are delivered to you pursuant to the Acquisition Agreement. For purposes hereof, (1) "Specified Representations" means the representations and warranties set forth in the Term Sheets relating to corporate power and authority, the enforceability of the Facilities documentation, Federal Reserve margin regulations and the Investment Company Act, (2) "UCC Filing Collateral" means collateral for which a security interest can be perfected by filing a Uniform Commercial Code financing statement and (3) "Stock Certificates" means collateral consisting of stock certificates representing capital stock of the domestic restricted material subsidiaries of the Acquired Business for which a security interest can be perfected by delivering such stock certificates. For the avoidance of doubt, this paragraph is intended to be identical in substance to the second paragraph of Section 5 (Conditions) of the Commitment Letter.

Professionals' Eyes Only

TRB0009440

Tribune Company
c/o Merrill Lynch & Co. and Citigroup Global Markets Inc.
January 17, 2007

**Exhibit B. Confirmatory Due Diligence Items**

I.  Business Due Diligence
- Cubs, Food Network and Comcast SportsNet
  - Review of detailed historical and projected financial and operating information
  - Understand economic and contractual arrangements between Cubs, Superstation, WGN, WGN-AM and Comcast SportsNet

II. Accounting & Tax Due Diligence
- Quality of earnings analysis
- Standalone costs
- Review of reported assets and liabilities and working capital trends
- Federal, state & local taxes
- Pension, OPEB, health & welfare due diligence

III. Legal Due Diligence
- Broadcasting agreements and leases
- Subsidiary corporate documents
- Historical liabilities
- Company assets / agreements (IP, insurance)
- Chicago Cubs - material contracts
- Employment agreements, employee benefits
- Real estate and environmental

II. IT Due Diligence
- Review of the Company's IT systems and issues related to severability of "shared" systems with Tribune

Page 173 of 174

Professionals' Eyes Only

TRB0009441

Tribune Company
c/o Merrill Lynch & Co. and Citigroup Global Markets Inc.
January 17, 2007

**Exhibit C.  Advisor Contact Information**

*Latham & Watkins*

Ron Hopkinson
Partner, Corporate Department
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY  10022-4834
Tel (212) 906-1840
Fax (212) 751-4864
Email ron.hopkinson@lw.com

Dennis Lamont
Partner, Corporate Finance
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY  10022-4834
Tel (212) 906-1231
Fax (212) 751-4864
Email dennis.lamont@lw.com

Professionals' Eyes Only                                                              TRB0009442