CONFIDENTIAL

To be disclosed only to
Members of the Special Committee

TRIBUNE COMPANY

SPECIAL COMMITTEE OF THE

BOARD OF DIRECTORS MEETING

FEBRUARY 12, 2007

Pursuant to notice, a meeting of the Special Committee (the "Committee") of the Board of Directors of Tribune Company (the "Company") was held at 3:00 P.M. on February 12, 2007 at the offices of the Company. All of the members of the Committee were in attendance: William A. Osborn, Chairman, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, J. Christopher Reyes, Dudley S. Taft and Miles D. White. Also in attendance were Dennis J. FitzSimons, Chairman and CEO of the Company, and Charles W. Mulaney, Jr. of Skadden, Arps, Slate, Meagher & Flom LLP.

Mr. FitzSimons reported on the Company's current operating results, ongoing discussions with Messrs. Broad and Burkle, the contents of a letter from the Chandler Trusts concerning revisions to their proposal and meetings with representatives of Mr. Samuel Zell of Equity Group Investments in connection with his proposal. During the following discussion, Mr. Hernandez reported on a call he had received from Mr. William Stinehart, Jr. concerning the Chandler Trusts' evaluation of management's revised plan in connection with their proposal.

Following Mr. Osborn's outline of the meeting agenda, the following joined the meeting: Michael Costa and Todd Kaplan of Merrill Lynch & Co., Christina Mohr of Citigroup, Paul Taubman and Thomas Whayne of Morgan Stanley, Thomas A. Cole of Sidley Austin LLP, Steven A. Rosenblum of Wachtell, Lipton, Rosen & Katz, and Scott Smith, Donald C. Grenesko, Thomas D. Leach and Crane H. Kenney of the Company.

Mr. Costa distributed materials prepared by Merrill Lynch and Citigroup and reported on the revisions to proposals that had been received from the Chandler Trusts, The Broad Investment Company/The Yucaipa Companies and Mr. Zell. He summarized the letter received from the Chandler Trusts, dated February 12, 2007, and he discussed their request for additional due diligence, indicated economic terms and conditions to closing. He reported on a revised Broad/Yucaipa offer, noting a decrease in the cash to be paid to stockholders from $27 to $23 per share, the addition of a contingent value right regarding the proceeds, if any, of the Bender litigation, the variety of corporate governance and control issues that remain outstanding

TRIB 000048
HIGHLY CONFIDENTIAL

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0007808

and the demand that the Company indemnify Broad/Yucaipa post closing for breaches of the Company's representations. Questions and a discussion followed.

Mr. Costa then outlined the revised Zell proposal and the tax consequences associated with an S corporation with an employee stock ownership plan ("ESOP") as a majority stockholder. He discussed various forms of cash compensation that would need to be replaced by allocations of Company shares in the ESOP to employees, the consequences of the Company being private as opposed to publicly traded, and various issues in structuring an ESOP given the different strategic directions the Company's two businesses might pursue in the future. The corporate governance issues involved in having employees own a majority of the equity of the Company were discussed. **REDACTED** The time involved to complete due diligence, negotiate and close the transaction proposed by Mr. Zell was discussed, as well as the willingness of employees and potential new hires to forego cash compensation of approximately $100 million per year in the form of retirement plan contributions (401(k) matching contributions) and annual cash bonuses. There were questions and a discussion of the Zell proposal.

Mr. Costa also reported on the revisions to the proposal from the Carlyle Group to acquire the Company's broadcasting and entertainment operations and discussed the after tax benefits to the Company of such a proposal as compared to the likely market value of this division as a publicly traded company.

Mr. FitzSimons then distributed a presentation of management's recommendation for a recapitalization and restructuring of the Company which would return $18-20 per share in cash to stockholders followed by tax free spin-off of broadcasting. The publishing business would also be reorganized by accelerating revenue growth initiatives and implementing additional cost reductions, consolidating the publishing group office with the corporate offices, and selling the Cubs, the Company's ownership stake in Comcast SportsNet and other non-core assets. He indicated that this proposal would represent a meaningful return of capital to stockholders, take advantage of the Company's strong cash flow and current debt market conditions, resolve cross ownership issues, provide strategic flexibility for both the publishing and broadcasting businesses, and enable publishing to continue to consider accepting an equity investment from one or more strategic partners. He then outlined a proposed timetable for such a recapitalization and restructuring.

Mr. Grenesko then described the current environment for the Company's businesses and presented management's revised operating plan and projections. Referring to the distributed materials, he outlined the 2007 revised operating plan and its publishing and broadcasting components. The directors asked numerous questions regarding the revised operating plan and projections, the assumptions upon which they were based and management's level of comfort with such revised operating plan and projections in light of the current operating environment for the Company's businesses and the issues such operating environment could present with respect to the preparation of operating plans and projections.

TRIB 000049
HIGHLY CONFIDENTIAL

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0007809

Mr. Smith set forth various strategic initiatives for the publishing division, including growing interactive revenue, increasing profitable print revenue and accelerating cost reductions. Mr. Grenesko described the proposed consolidation of the publishing group office and corporate offices and outlined additional cost reduction opportunities in a freestanding publishing business. Mr. Smith then outlined local print alliances and the additional profit potential that could be achieved.

Mr. FitzSimons discussed the potential for various strategic partners to make an equity investment in a freestanding publishing company. He also described a number of non-core assets that could be sold and the expected pre and post tax proceeds thereof. Questions and a discussion followed.

Mr. Leach then outlined the broadcasting company that would result from a spin-off, describing its assets and projected performance. He described the advantages and other considerations of a broadcasting spin-off. He compared a freestanding broadcasting company to industry peers under various metrics and analyzed its standalone expenses as a public company. He discussed employee compensation and benefit matters for the new company. He outlined various value creation opportunities for broadcasting and the mechanics and timing of effecting a tax free spin-off.

Mr. Osborn asked the financial advisors to comment on the proposed recapitalization and restructuring. Referencing materials previously distributed, Mr. Costa outlined and analyzed the steps in such a transaction and the possible ownership interests of the Chandler Trusts and the McCormick Foundation in each of the two public companies. He reported on the possibility that the McCormick Foundation might use a portion of the capital it received to purchase shares from the Chandler Trusts. He indicated that these two parties were in discussions on this topic. He noted the benefits from separating publishing from broadcasting based on the experience of the last several months of discussing strategic alternatives with third parties. Mr. Kaplan outlined likely sources and uses of capital for a $20 per share cash distribution and various credit statistics on a pro forma basis for the publishing business pre and post spin-off and following the sale of non-core assets. Mr. Costa observed that proposals from third parties contained more leverage than in the recapitalization under discussion. He discussed the possible advantages of lowering the cost of capital for the Company, noting the difference between how the debt market values the Company's cash flows and the equity market values its common stock. He discussed the possible benefits of giving stockholders equity in separate publishing and broadcasting companies and the possible value enhancements from consolidation in each of these industries in the future. Ms. Mohr outlined the management and research estimates for revenue and EBITDA in publishing and discussed the potential range of values for the recapitalization and restructuring in terms of cash distributed and the equity trading value of both publishing and broadcasting. She indicated the degree of the significance of various unconsolidated entities owned by the Company in the valuation analysis. She outlined the rate of debt payment under the management plan, and under a scenario where there was a 2% decline in publishing ad revenue, and the implications of both scenarios for the projected price of publishing's equity value over the next five years. Similarly with respect to a freestanding

TRIB 000050
HIGHLY CONFIDENTIAL

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0007810

broadcasting company, she described the revised management plan as compared with a no growth EBITDA analysis and the effects of each on debt pay-down and the likely equity values of broadcasting over a five-year time frame. There were questions and a discussion.

Mr. Costa then outlined and compared two methods of effecting the recapitalization: a special dividend to stockholders or a self-tender offer by the Company for approximately 60% of its shares. The benefits and disadvantages of each alternative were discussed and questions answered. Mr. Costa noted that the McCormick Foundation and the Chandler Trusts have been in discussions concerning the Foundation using some of the recapitalization cash proceeds to purchase shares from the Chandler Trusts.

**REDACTED**

At this point, Mr. Osborn excused everyone from the meeting except the Committee members and Messrs. Taubman, Whayne and Mulaney for an executive session. A written presentation by Morgan Stanley was distributed and Mr. Taubman began the discussion by considering a recapitalization that would distribute a range of between $15 and $20 of cash per share. Mr. Whayne then outlined three sets of projections for 2007-2011: management, research and management downside. Revenue and EBITDA for the Company on a consolidated basis and for each of publishing and broadcasting under each set of projections were described and analyzed. Mr. Whayne then provided Morgan Stanley's overview of the proposed recapitalization and restructuring, the pro forma capitalization of the Company after a cash distribution before a spin-off, after a spin-off and after non-core assets sales. The debt to EBITDA ratio, free cash flow and adjusted EBITDA to interest ratio on a consolidated basis were described and analyzed. The per share value of the proposed plan under the three sets of projections was analyzed using broadcasting multiples of 9 and 11 times EBITDA. A similar analysis was considered for publishing on a pro forma standalone basis and for broadcasting on a pro forma standalone basis, showing pro forma publishing equity values per share and pro forma broadcasting equity values per share at various multiples of EBITDA. There were questions and a discussion.

Mr. Whayne then compared the estimated value of the plan under the three sets of projections (management, research and management downside) with the revised version of the Chandler Trusts proposal and the revised Broad/Yucaipa proposal, noting that the plan is better than either proposal under the first two sets of projections. He observed that the Zell proposal involved substantial delay before the feasibility of such a transaction could be known, the uncertainty about whether Mr. Zell and the ESOP would assume the FCC regulatory risk and issues about its acceptability to employees of the Company. A discussion followed.

Mr. Taubman and Mr. Whayne then discussed the alternatives of effecting the recapitalization by dividend or self-tender offer. Questions and a discussion followed. The possible management teams for each of the publishing and broadcasting companies in the recapitalization proposal were discussed.

TRIB 000051
HIGHLY CONFIDENTIAL

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0007811

    Messrs. Taubman and Whayne then left the meeting and Mr. FitzSimons rejoined the meeting. Mr. Osborn initiated a discussion of the management teams for each of the publishing and broadcasting businesses in the recapitalization and restructuring scenario. Mr. FitzSimons gave his thoughts and suggestions on the matter and questions and a discussion followed.

    Messrs. Kaplan, Taubman, Whayne, Rosenblum, Cole, Smith, Grenesko, Leach and Kenney and Ms. Mohr rejoined the meeting. Mr. Osborn summarized various issues the Committee was considering, including whether a recapitalization, if decided upon, should be effected by a dividend or a self-tender. He requested further analysis from the investment bankers on the dividend and self-tender options.

    The Special Committee meeting was adjourned until 9:30 A.M. tomorrow, February 13, 2007.

TRIB 000052
HIGHLY CONFIDENTIAL

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0007812