| | |
|---|---|
| **From:** | Grenesko, Don <DGrenesko@tribune.com> |
| **Sent:** | Monday, March 5, 2007 2:34 PM (GMT) |
| **To:** | Bigelow, Chandler <CBigelow@tribune.com> |
| **Subject:** | FW: Project Tower - Revised Term Sheet |
| **Attach:** | Term Sheet -Tower - 030407.doc;Term Sheet -Tower - 030407 - Compare 022207.doc |

-----Original Message-----
From: Wolf, Michael T. [mailto:MWolf@jenner.com]
Sent: Sunday, March 04, 2007 9:22 AM
To: Kenney, Crane H
Cc: BPate@egii.com; NLarsen@egii.com; SARosenblum@WLRK.com; Gromacki, Joseph P; Boch, Brian R; Monson, Thomas A; Grenesko, Don; ptinkler@egii.com; msotir@egii.com; chochschild@egii.com; JPaolucci@egii.com; mhauser@egii.com; pdevine@wlrk.com
Subject: Project Tower - Revised Term Sheet


Crane,

Attached, please find a revised draft of the Summary Term Sheet. In addition, I have also attached a version of the draft marked to show changes from the February 22nd draft of the Summary Term Sheet.


Regards,

Michael

Rules governing our practice before the Internal Revenue Service require that we advise you that any tax advice in this communication (and any attachments) (i) is intended only for the addressee and (ii) is not written with the intent that it be used, and in fact it cannot be used, to avoid penalties imposed under the Internal Revenue Code or to promote, market, or recommend to another person any tax-related idea.

---------------------------------------------------------

Michael T. Wolf
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603
Tel (312) 840-7271
Fax (312) 840-7371
MWolf@jenner.com
www.jenner.com


CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

---------------------------------------------------------

PRIVILEGED AND CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY
REVISED MARCH 4, 2007

SUMMARY TERM SHEET

PROJECT TOWER

This Summary Term Sheet summarizes the principal terms by which the Tribune Company (the "Target") will be taken private in an ESOP leveraged buyout transaction (the "Transaction").

The completion of the Transaction will be subject to, among other things, satisfactory completion of financial and legal due diligence by the Acquiror (as defined below) and the ESOP Fiduciary (as defined below), as well as the execution and delivery of final documents acceptable to the Acquiror, the ESOP Fiduciary and the Target ("Definitive Documents"). The Acquiror already has completed substantial diligence and is in an excellent position to promptly conclude its review. This Summary Term Sheet does not constitute a binding contract or commitment but rather is solely for the purpose of outlining those terms pursuant to which Definitive Documents may ultimately be entered into.

I.   TARGET SHARE REPURCHASE

   *(A) General*

   Promptly following execution of the Merger Agreement (as defined below), the Target will launch a tender offer for up to [109.2] million shares of the Target's outstanding common stock at a purchase price of $[33.00] per share (the "Share Repurchase").

   *(B) Repurchase Financing*

   The Target will finance the cost of the acquisition of shares of common stock tendered into the Share Repurchase and related expenses with a new term loan facility (the "Repurchase Financing"). The Repurchase Financing may be prepaid without penalty and will otherwise be on terms and conditions no less favorable than the Acquisition Financing (as defined below).

II.   ACQUIROR ACQUISITION:

   *(A) General*

   A Delaware limited liability company with Sam Zell, individually, as its sole member (the "Acquiror"), initially capitalized with $225 million of cash, will acquire all of Target's outstanding common stock pursuant to a merger of a merger subsidiary of the Acquiror organized as a Delaware corporation (the "Merger Subsidiary") with and into the Target (the "Merger"). The Target will be the surviving entity following consummation of the Merger. Mr. Zell will provide a firm equity commitment to the Acquiror, and the Target will be a third-party beneficiary of his commitment. Mr. Zell anticipates inviting a small group of his senior executives to participate in his equity commitment. In addition, the Robert R. McCormick Tribune Foundation and Cantigny Foundation will be invited to provide up to $150 million of additional equity capital, which additional equity capital would reduce dollar-for-dollar the consideration to be paid by the ESOP (defined below) in connection with the ESOP Purchase (defined below) and proportionately reduce the ESOP's percentage equity interest in the Target from the levels described below under the heading *ESOP Purchase* and elsewhere in this Summary Term Sheet (any such adjustments, the "Foundation Adjustments").

*(B) Agreement and Plan of Merger*

The Target, the Acquiror and the Merger Subsidiary will enter into an agreement and plan of merger (the "Merger Agreement"), which will provide, among other things, that each holder of Target's outstanding common stock (including vested options, restricted stock and other equity equivalents under Target equity incentive plans but excluding treasury shares) will receive an amount equal to (i) $33.00 per share (the "Merger Consideration") plus (ii) a ticking fee of eight percent (8%) per annum accruing daily on the Merger Consideration beginning on the date that is six (6) months from the date of the Merger Agreement through and including the date of consummation of the Merger (less, in the case of vested options and other common stock equivalents having exercise prices, the applicable exercise price thereof), pursuant to the Merger. All of Target's preferred stock received by the Target Affiliates (described below) in exchange for Target common stock immediately prior to consummation of the Merger will remain outstanding following consummation of the Merger (see below).

The Merger Agreement will be approved by the boards of directors of the Target, the Acquiror and the Merger Subsidiary. The Merger Agreement will be approved by the Acquiror, as the sole stockholder of the Merger Subsidiary, and will be submitted for the requisite approval by the stockholders of the Target.

The Merger Agreement will contain representations, warranties and covenants customary for transactions of the nature contemplated by this Summary Term Sheet. In addition, the Merger Agreement will contain certain conditions to closing, including, without limitation, conditions related to: (i) the accuracy of the representations and warranties, (ii) compliance with covenants, (iii) receipt of an FCC Order, the approval of Major League Baseball and any other required regulatory and third-party consents and approvals, including HSR clearance, (iv) no Target material adverse effect, **[(v) availability of the Acquisition Financing (as defined below),] [(vi) no broadcasting material adverse effect has occurred in connection with receipt of the FCC Order]** (vii) completion of the Affiliate Exchange (as defined below) and (viii) satisfaction of all conditions precedent to the closing of the ESOP Purchase (as defined below) (other than consummation of the Merger). The Target may continue to pay quarterly dividends on its common stock not in excess of the current effective dividend yield.

*(C) Voting Agreement*

Concurrently with the execution and delivery of the Merger Agreement, the Acquiror and each of the Robert R. McCormick Tribune Foundation, Cantigny Foundation and the Chandler Trusts (and any affiliated stockholders, as appropriate) will enter into a voting agreement pursuant to which the Robert R. McCormick Tribune Foundation, Cantigny Foundation and the Chandler Trusts (and any affiliated stockholders, as appropriate) will agree to, among other things, vote in favor of the Merger Agreement and the Merger and take other actions generally designed to ensure approval of the Merger Agreement and the Merger (the "Voting Agreement").

III. ACQUISITION FINANCING:

*(A) Revolving and Term Loan Facility*

The Repurchase Financing will be refinanced without prepayment penalties or other costs and additional financing will be provided without additional lender fees or charges or other additional costs in order to fund the Merger Consideration and related expenses and refinance certain other

Professionals' Eyes Only                                                                                                                                            TRB0057942

obligations of the Target pursuant to a revolving credit and term loan facility as set forth in the attached commitment letter (collectively, the "Bank Financing").

*(B) High Yield Debt Financing*

The Target will conduct a high yield debt financing in connection with the Bank Financing as set forth in the attached commitment letter (the "Debt Financing", and together with the Bank Financing, the "Acquisition Financing").

IV. ESOP PURCHASE:

*(A) General*

Immediately following consummation of the Merger and subject to any Foundation Adjustments, an employee stock ownership plan ("ESOP") will purchase from the Target a number of shares that will result in the ESOP owning ninety percent (90%) of the Target's then outstanding common stock (calculated without giving effect to the Warrant (as defined below) and the Management Incentive Plan (as defined below)), subject to the Foundation Adjustments, if any, at purchase price equal to the fair market value of the shares purchased (the "ESOP Purchase") as determined at the time of the Merger.

*(B) Equity Purchase Agreement*

Concurrently with the execution and delivery of the Merger Agreement, the Target and a nationally-recognized institutional trustee with an established reputation as an ESOP fiduciary (the "ESOP Fiduciary"), on behalf of the ESOP, will enter into an equity purchase or subscription agreement setting forth the terms of the ESOP Purchase (the "Equity Purchase Agreement"). It is contemplated that the ESOP Fiduciary will have made a finding that the consideration to be paid in connection with the ESOP Purchase does not exceed adequate consideration (within the meaning of ERISA § 3(18)(B)) and that the ESOP Fiduciary will have received an opinion of its financial advisor that the consideration to be paid by the ESOP in connection with the ESOP Purchase does not exceed the fair market value of the stock to be purchased by the ESOP and that the Transaction is fair to the ESOP, in each case, prior to executing and delivering the Equity Purchase Agreement.

The Equity Purchase Agreement will contain representations, warranties and covenants substantially consistent with the representations, warranties and covenants set forth in the Merger Agreement. In addition, the Equity Purchase Agreement will contain certain conditions to closing, including, without limitation, conditions related to: (i) the accuracy of the representations and warranties, (ii) compliance with certain covenants, (iii) receipt of all required regulatory and third-party consents and approvals, (iv) availability of the ESOP Financing (as defined below), (v) execution and delivery of the ESOP Loan Agreement, the ESOP Note, the Stock Pledge Agreement, and the Investor Rights Agreement (all defined below), and (vi) consummation of the Merger.

V. ESOP FINANCING:

*(A) General*

To finance the ESOP Purchase, the Target and the ESOP will enter into an ESOP Loan Agreement and a Stock Pledge Agreement whereby the Target will make a loan to the ESOP in

Professionals' Eyes Only

TRB0057943

the amount of the consideration to be paid for the ESOP Purchase (collectively, the "ESOP Financing"). The ESOP Loan will be evidenced by a promissory note to be delivered by the ESOP Trustee to the Target (the "ESOP Note"). As currently contemplated, the Target will make annual contributions of $[100] million to the ESOP, and, conversely, the ESOP will make annual principal and interest payments of $[100] million to the Target in respect of the ESOP Financing based on an 8.6% interest rate and a 15-year amortization. The amount of the note, but not the tenor or rate, shall be adjusted to reflect the fair market value of the ESOP Purchase.

VI. ESOP TRUST:

   *(A) General*

   The Target will establish a stand-alone, tax-qualified stock bonus plan and trust that will comply with the tax and ERISA rules applicable to leveraged ESOPs. Substantially all non-union employees of the Target and its subsidiaries will participate in the ESOP, subject to such restrictions as are determined from time to time by the Board (as defined below).

   *(B) Terms*

   Shares held by the ESOP will generally be released to eligible participant accounts based upon contributions to the ESOP by the Target with shares released to individual participant accounts in proportion to eligible compensation of the participants. Participant accounts will vest over a six (6) year period (including pre-participation service) with twenty percent (20%) vesting per year during years two (2) through six (6). Union employees may participate in the ESOP to the extent provided by applicable collective bargaining agreements. As a general matter, shares held by the ESOP will be voted either by an ESOP voting committee or by the ESOP Fiduciary if other corporate governance documents prescribe the composition of the Board; provided, however, shares held by the ESOP and allocated to participant accounts will be voted as directed by the participants on such matters for which votes are required to be passed through to participants by Internal Revenue Code Section 409(e).

VII. WARRANT:

   *(A) General*

   Immediately following consummation of the ESOP Purchase, the Target will issue to the Acquiror, a warrant to purchase from the Target a number of shares equal to thirty-one percent (31%) of the Target's then outstanding common stock (on a fully diluted basis after giving effect to the ESOP Purchase and the Management Incentive Plan) at the same price per share paid by the ESOP in the ESOP Purchase, subject to customary adjustments (the "Warrant").

   *(B) Warrant Agreement*

   The Target and the Acquiror will enter into a warrant agreement in connection with consummation of the Merger (the "Warrant Agreement"). The Warrant will be fully vested and exercisable at the time of grant, will have a term of twenty (20) years and will be subject to appropriate restrictions on transfer. The Warrant Agreement will provide, among other things, for customary adjustments to the number and type of shares covered by the Warrant, including anti-dilution protection. In connection with a sale of the Target subsequent to the ESOP Purchase, in lieu of exercising the Warrant, the Acquiror will have the right to put the Warrant to the Company at the value implied from such sale.

Professionals' Eyes Only                                                                                                    TRB0057944

VIII.  STOCKHOLDERS' RIGHTS:

(A) *Investor Rights Agreement*

The Target, the Acquiror, and the ESOP Fiduciary, on behalf of the ESOP, will enter into an Investor Rights Agreement (the "Investor Rights Agreement") in connection with the consummation of the Merger and the ESOP Purchase.

(B) *Board Composition*

Immediately following consummation of the Merger and the ESOP Purchase, pursuant to the Investor Rights Agreement and the amended and restated certificate of incorporation and bylaws of the Target, or such other corporate governance documents into which the parties may enter, the board of directors of the Target (the "Board") will consist of seven (7) directors, two (2) of whom will be designated by the Acquiror, one (1) of whom will be the chief executive officer of Target, and the remaining four (4) of whom will be designated by a nominating committee of the Board, provided two (2) of the four (4) will be selected initially from independent members of the current Board. Sam Zell will serve as the chairman of the Board with duties customarily attendant thereto. If Sam Zell is not serving on the Board for any reason, the Acquiror will be entitled to replace him with another Acquiror designee, but the selection of chairman will be the Board's prerogative. Members of the Board will be entitled to receive such fees as are reasonably determined by the Board and will be reimbursed for reasonable travel expenses in connection with Board or committee meetings.

(C) *Pre-emptive Rights*

Pursuant to the Investor Rights Agreement, each of the Acquiror and the ESOP will have a right of first refusal to purchase its pro rata portion of future equity or convertible securities offered by the Target (other than certain excluded transactions). For the avoidance of doubt, the shares underlying the Warrant to be issued to the Acquiror will be included for purposes of determining pro rata participation in such issuances. All such preemptive rights will not apply to, and will expire upon, a qualified public offering.

(D) *Other Rights and Obligations*

Pursuant to the Investor Rights Agreement, the holders of stock and other equity interests in the Target will be subject to certain limitations on transfer of their interests in the Target and other covenants generally designed to preserve the Target's status as an S corporation under the Internal Revenue Code. All equity holders in the Target, including the ESOP, will have customary co-sale rights and rights of first refusal on secondary transfers. In addition, all equity holders in the Target will be subject to drag along rights.

(E) *Minority Consent Rights*

The Acquiror will have the right to consent to any transaction or arrangement between the Target and the ESOP (other than as contemplated by the Transaction), and will have other customary minority consent rights to be discussed.

Professionals' Eyes Only

TRB0057945

*(F) Information*

The Target will provide financial reports to each holder of ten percent (10%) or more of the Target's equity interests (including the holder of the Warrant), including monthly and year-to-date income, balance sheet and cash flow statements as compared to budget and comparable period in prior year, and will provide a written summary of operations each month. An annual audit of the Target's financial statements will be performed by Target's independent, nationally recognized accounting firm. Further, such holders will also be entitled to standard inspection and visitation rights. All such information and inspection rights will expire upon a qualified public offering.

IX. AFFILIATE EXCHANGE:

    *(A) General*

Immediately prior to consummation of the Merger, the Target will exchange (the "<u>Affiliate Exchange</u>") its newly issued participating preferred stock for all of the outstanding Target common stock held by certain affiliates of Target (the "<u>Target Affiliates</u>").

    *(B) Exchange Agreement*

In connection with the execution and delivery of the Merger Agreement, the Target and each of the Target Affiliates will enter into an exchange agreement (the "<u>Exchange Agreement</u>"). The Exchange Agreement will provide, among other things, that the board of directors of the Target will approve, and cause to be filed, a certificate of designation related to a newly-designated class of participating preferred stock, which will remain outstanding following consummation of the Merger, and that each of the Target Affiliates will agree to exchange all of their Target common stock for a like number of shares of such participating preferred stock immediately prior to consummation of the Merger. Such common stock will become treasury stock of the Target and be canceled in the Merger without consideration in respect thereof.

X.    MISCELLANEOUS:

    *(A) S Corporation Election*

The Target will elect, and the Target's shareholders will consent to the Target's election, to be treated as an S corporation for purposes of the Internal Revenue Code after completion of the contemplated transactions, or as soon as the Target is eligible to make the S election. In addition, the Target will elect to treat each of its eligible subsidiaries as a "qualified subchapter S subsidiary" for federal income tax purposes.

    *(B) Management Equity Incentive Plan*

The Target will establish a management equity incentive plan (in the form of a stock appreciation right or similar incentive program), customary for a transaction of this size and for comparable businesses, and providing for the issuance to key members of management of the Target of equity participation rights with a value of up to five percent (5%) of the Target's total equity value (calculated after giving effect to the ESOP Purchase and the Warrant) (the "<u>Management Incentive Plan</u>"). Awards under the Management Incentive Plan will be administered by the Board of Target, or by a compensation committee of the Board, and will be subject to customary vesting and call protections and other terms and conditions, and will also have certain additional

Professionals' Eyes Only    TRB0057946

limitations designed to ensure preservation of the Target's election to be treated as an S corporation. The Management Incentive Plan shall provide that the participants in the Plan shall be entitled to receive benefits upon the occurrence of specified events or upon a specified date, with the value of their benefits to be determined by reference to the value of the Target's stock, determined on an enterprise value basis, with no discount for lack of control or lack of marketability.

* * * *

Professionals' Eyes Only

TRB0057947

## Bank Financing and Debt Financing

Attached.

Professionals' Eyes Only                                                                                          TRB0057948

PRIVILEGED AND CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY
REVISED [4]~~FEBRUARY 22,~~ [5]MARCH 4, 2007

## SUMMARY TERM SHEET

## PROJECT TOWER

This Summary Term Sheet summarizes the principal terms by which the Tribune Company (the "Target") will be taken private in an ESOP leveraged buyout transaction (the "Transaction").

The completion of the Transaction will be subject to, among other things, satisfactory completion of financial and legal due diligence by the Acquiror (as defined below) and the ESOP Fiduciary (as defined below), as well as the execution and delivery of final documents acceptable to the Acquiror, the ESOP Fiduciary and the Target ("Definitive Documents"). The Acquiror already has completed substantial diligence and is in an excellent position to promptly conclude its review. This Summary Term Sheet does not constitute a binding contract or commitment but rather is solely for the purpose of outlining those terms pursuant to which Definitive Documents may ultimately be entered into.

**I.** [6][7]**TARGET SHARE REPURCHASE**

[8]*(A) General*

[9] Promptly following execution of the Merger Agreement (as defined below), the Target will launch a tender offer for up to [109.2] million shares of the Target'[10]s outstanding common stock [11] at a purchase price of $[33.00] per share (the "Share Repurchase").

[12]*(B) Repurchase Financing*

[13] The Target will finance the cost of the acquisition of shares of common stock tendered into the Share Repurchase and related expenses with a new term loan facility (the "Repurchase Financing"). The Repurchase Financing may be prepaid without penalty and will otherwise be on terms and conditions no less favorable than the Acquisition Financing (as defined below).

**II.** ~~I.~~ [14]ACQUIROR ACQUISITION:

*(A) General*

A Delaware limited liability company with Sam Zell, individually, as its sole member (the "Acquiror"), initially capitalized with $225 million of cash, will acquire all of Target's outstanding common stock pursuant to a merger of a merger subsidiary of the Acquiror organized as a Delaware corporation (the "Merger Subsidiary") with and into the Target (the "Merger"). The Target will be the surviving entity following consummation of the Merger. Mr. Zell will provide a firm equity commitment to the Acquiror, and the Target will be a third-party beneficiary of his commitment. Mr. Zell anticipates inviting a small group of his senior executives to participate in his equity commitment. In addition, the Robert R. McCormick Tribune Foundation and Cantigny Foundation will be invited to provide up to $150 million of additional equity capital, which additional equity capital would reduce dollar-for-dollar the consideration to be paid by the ESOP (defined below) in connection with the ESOP Purchase (defined below) and proportionately reduce the ESOP's percentage equity interest in the Target

from the levels described below under the heading *ESOP Purchase* and elsewhere in this Summary Term Sheet (any such adjustments, the "[15]Foundation Adjustments").

(B) *Agreement and Plan of Merger*

The Target, the Acquiror and the Merger Subsidiary will enter into an agreement and plan of merger (the "Merger Agreement"), which will provide, among other things, that each holder of Target's outstanding common stock (including vested options, restricted stock and other equity equivalents under Target equity incentive plans but excluding treasury shares) will receive [17]~~$33.00 per share~~[18]**an amount equal to (i) $33.00 per share (the "Merger Consideration") plus (ii) a ticking fee of eight percent (8%) per annum accruing daily on the Merger Consideration beginning on the date that is six (6) months from the date of the Merger Agreement through and including the date of consummation of the Merger** (less, in the case of vested options and other common stock equivalents having exercise prices, the applicable exercise price thereof)[19], pursuant to the Merger[20] ~~(collectively, the "Merger Consideration")~~. All of Target's preferred stock received by the Target Affiliates (described below) in exchange for Target common stock immediately prior to consummation of the Merger will remain outstanding following consummation of the Merger (see below).

The Merger Agreement will be approved by the boards of directors of the Target, the Acquiror and the Merger Subsidiary. The Merger Agreement will be approved by the Acquiror, as the sole stockholder of the Merger Subsidiary, and will be submitted for the requisite approval by the stockholders of the Target.

The Merger Agreement will contain representations, warranties and covenants customary for transactions of the nature contemplated by this Summary Term Sheet. In addition, the Merger Agreement will contain certain conditions to closing, including, without limitation, conditions related to: (i) the accuracy of the representations and warranties, (ii) compliance with covenants, (iii) receipt of [21]**an FCC Order,** the approval of Major League Baseball and any [22]**other** required regulatory and [23]~~other~~ third-party consents and approvals, [24]~~if any~~[25]**including HSR clearance**, (iv) no [26]**Target** material adverse [27]~~change in the Target's print and broadcast businesses,~~[28]**effect,** [[29]**(v) availability of the Acquisition Financing (as defined below),**[30] ~~(vi) issuance of the Warrant (as defined below), (vii) execution and delivery of the [31]Investor Rights Agreement[32] (as defined below), (ix[33]~~**] [(vi) no broadcasting material adverse effect has occurred in connection with receipt of the FCC Order] (vii)** completion of the Affiliate Exchange (as defined below) and (viii) satisfaction of all conditions precedent to the closing of the ESOP Purchase (as defined below) (other than consummation of the Merger)[34]**. The Target may continue to pay quarterly dividends on its common stock not in excess of the current effective dividend yield**.

(C) *Voting Agreement*

Concurrently with the execution and delivery of the Merger Agreement, the [35]~~Target, the Acquiror[36], the Merger Subsidiary~~ and each of the Robert R. McCormick Tribune Foundation, Cantigny Foundation and the Chandler Trusts (and any affiliated stockholders, as appropriate) will enter into a voting agreement pursuant to which the Robert R. McCormick Tribune Foundation, Cantigny Foundation and the Chandler Trusts (and any affiliated stockholders, as appropriate) will agree to, among other things, vote in favor of the Merger Agreement and the Merger and take other actions generally designed to ensure approval of the Merger Agreement and the Merger (the "Voting Agreement").

[1]~~2[2]~~

---

[3]~~I:\WPDOCS\General\JXP\WORD\Tribune\Term Sheet - Tower - Feb 22v2.doc~~

III. II.[37]ACQUISITION FINANCING:

(A) *Revolving and Term Loan Facility*

The [38]terms of the[39]**Repurchase Financing will be refinanced without prepayment penalties or other costs and additional financing will be provided without additional lender fees or charges or other additional costs in order to fund the Merger Consideration and related expenses and refinance certain other obligations of the Target pursuant to a** revolving credit and term loan [40]facilities are[41]**facility as** set forth in the attached commitment letter (collectively, the "Bank Financing").

(B) *High Yield Debt Financing*

The [42]terms of the senior notes are[43]**Target will conduct a high yield debt financing in connection with the Bank Financing as** set forth in the attached commitment letter (the "Debt Financing", and together with the Bank Financing, the "Acquisition Financing").

IV. III.[44]ESOP PURCHASE:

(A) *General*

Immediately following consummation of the Merger and subject to any Foundation Adjustments, an employee stock ownership plan ("ESOP") will purchase from the Target a number of shares that will result in the ESOP owning [45]78.6%[46]**ninety percent (90%)** of the Target's then outstanding common stock (calculated without giving effect to the Warrant (as defined below) and the Management Incentive Plan (as defined below))[47] for aggregate consideration of $825 million (the "ESOP Purchase"). After giving effect to the ESOP Purchase and subject to any[48], **subject to the** Foundation Adjustments, [49]the Acquiror will hold 21.4% of the Target[50]'s outstanding common stock [51](calculated without giving effect to the Warrant and the Management Incentive Plan).[52]**if any, at purchase price equal to the fair market value of the shares purchased (the "ESOP Purchase") as determined at the time of the Merger.**

(B) *Equity Purchase Agreement*

Concurrently with the execution and delivery of the Merger Agreement, the Target and a nationally-recognized institutional trustee with an established reputation as an ESOP fiduciary (the "ESOP Fiduciary"), on behalf of the ESOP, will enter into an equity purchase or subscription agreement setting forth the terms of the ESOP Purchase (the "Equity Purchase Agreement"). It is contemplated that the ESOP Fiduciary will have made a finding that the consideration to be paid in connection with the ESOP Purchase does not exceed adequate consideration (within the meaning of ERISA § 3(18)(B)) and that the ESOP Fiduciary will have received an opinion of its financial advisor that the consideration to be paid by the ESOP in connection with the ESOP Purchase does not exceed the fair market value of the stock to be purchased by the ESOP and that the Transaction is fair to the ESOP, in each case, prior to executing and delivering the Equity Purchase Agreement.

The Equity Purchase Agreement will contain representations, warranties and covenants [53]customary for transactions of the nature contemplated by this Summary Term Sheet, relating to title to the Target's stock, due authorization of the transaction, and the absence of

litigation[54]**substantially consistent with the representations, warranties and covenants set forth in the Merger Agreement**.  In addition, the Equity Purchase Agreement will contain certain conditions to closing, including, without limitation, conditions related to: (i) the accuracy of the representations and warranties, (ii) compliance with certain covenants, (iii) receipt of all required regulatory and third-party consents and approvals, (iv) [55]~~no affirmative finding by the ESOP Fiduciary that the ESOP would be effecting the ESOP Purchase for more than adequate consideration (within the meaning of ERISA § 3(18)(B)), (v) receipt by the ESOP Fiduciary of a "bring-down" opinion of its financial advisor that the consideration to be paid by the ESOP in connection with the ESOP Purchase does not exceed the fair market value of the purchased shares and that the Transaction is fair to the ESOP, (vi)~~ availability of the ESOP Financing (as defined below), ([56]~~vii~~[57]**v**) execution and delivery of the ESOP Loan Agreement, the ESOP Note, the Stock Pledge Agreement, and the Investor Rights Agreement (all defined below), and ([58]~~viii~~[59]**vi**) consummation of the Merger.

**V.** ~~IV.~~[60]ESOP FINANCING:

*(A) General*

To finance the ESOP Purchase, the Target and the ESOP will enter into an ESOP Loan Agreement and a Stock Pledge Agreement whereby the Target will make a loan to the ESOP in the amount of the consideration to be paid for the ESOP Purchase (collectively, the "**ESOP Financing**").  The ESOP Loan will be evidenced by a promissory note to be delivered by the ESOP Trustee to the Target (the "ESOP Note").  As currently contemplated, the Target will make annual contributions of $[61][[62]**100**[63]] million to the ESOP, and, conversely, the ESOP will make annual principal and interest payments of $[64][[65]**100**[66]] million to the Target in respect of the ESOP Financing based on an 8.6% interest rate and a 15-year amortization.[67] **The amount of the note, but not the tenor or rate, shall be adjusted to reflect the fair market value of the ESOP Purchase.**

**VI.** ~~V.~~[69]ESOP TRUST:

*(A) General*

The Target will establish a stand-alone, tax-qualified stock bonus plan and trust that will comply with the tax and ERISA rules applicable to leveraged ESOPs.  Substantially all non-union employees of the Target and its subsidiaries will participate in the ESOP, subject to such restrictions as are determined from time to time by the Board (as defined below).

*(B) Terms*

Shares held by the ESOP will generally be released to eligible participant accounts based upon contributions to the ESOP by the Target with shares released to individual participant accounts in proportion to eligible compensation of the participants.  Participant accounts will vest over a six (6) year period (including pre-participation service) with twenty percent (20%) vesting per year during years two (2) through six (6).  Union employees may participate in the ESOP to the extent provided by applicable collective bargaining agreements.  As a general matter, shares held by the ESOP will be voted either by an ESOP voting committee or by the ESOP Fiduciary if other corporate governance documents prescribe the composition of the Board; provided,

Professionals' Eyes Only      TRB0057952

however, shares held by the ESOP and allocated to participant accounts will be voted as directed by the participants on such matters for which votes are required to be passed through to participants by Internal Revenue Code Section 409(e).

## VII. ~~VI.~~ [70]WARRANT:

(A) *General*

Immediately following consummation of the [71]~~Merger~~[72]**ESOP Purchase**, the Target will issue to the Acquiror, a warrant to purchase from the Target a number of shares equal to [73]~~20.0%~~[74]**thirty-one percent (31%)** of the Target's then outstanding common stock (on a fully diluted basis after giving effect to the ESOP Purchase and the Management Incentive Plan) at the same price per share paid by the ESOP in the ESOP Purchase, subject to customary adjustments (the "Warrant").

(B) *Warrant Agreement*

The Target and the Acquiror will enter into a warrant agreement in connection with consummation of the Merger (the "Warrant Agreement"). The Warrant will be fully vested and exercisable at the time of grant, will have a term of twenty (20) years and will be subject to appropriate restrictions on transfer. The Warrant Agreement will provide, among other things, for customary adjustments to the number and type of shares covered by the Warrant, including anti-dilution protection. In connection with a sale of the Target subsequent to the ESOP Purchase, in lieu of exercising the Warrant, the Acquiror will have the right to put the Warrant to the Company at the value implied from such sale.

## VIII. ~~VII.~~ [76] STOCKHOLDERS' RIGHTS:

(A) *Investor Rights Agreement*

The Target, the Acquiror, and the ESOP Fiduciary, on behalf of the ESOP, will enter into an Investor Rights Agreement (the "Investor Rights Agreement") in connection with the consummation of the Merger and the ESOP Purchase.

(B) *Board Composition*

Immediately following consummation of the Merger and the ESOP Purchase, pursuant to the Investor Rights Agreement and the amended and restated certificate of incorporation and bylaws of the Target, or such other corporate governance documents into which the parties may enter, the board of directors of the Target (the "Board") will consist of seven (7) directors, two (2) of whom will be designated by the Acquiror, one (1) of whom will be the chief executive officer of Target, and the remaining four (4) of whom will be designated by a nominating committee of the Board, provided two (2) of the four (4) will be selected initially from independent members of the current Board. Sam Zell will serve as the chairman of the Board with duties customarily attendant thereto. If Sam Zell is not serving on the Board for any reason, the Acquiror will be entitled to replace him with another Acquiror designee, but the selection of chairman will be the Board's prerogative. Members of the Board will be entitled to receive such fees as are reasonably determined by the Board and will be reimbursed for reasonable travel expenses in connection with Board or committee meetings.

(C) [78]~~Mutual~~ Pre-emptive Rights

[1]~~5~~[2]

Pursuant to the Investor Rights Agreement, each of the Acquiror and the ESOP will have a right of first refusal to purchase its pro rata portion of future equity or convertible securities offered by the Target (other than certain excluded transactions). For the avoidance of doubt, the shares underlying the Warrant to be issued to the Acquiror will be included for purposes of determining pro rata participation in such issuances. All such preemptive rights will not apply to, and will expire upon, a qualified public offering.

(D) Other [79]~~Mutual~~ Rights and Obligations

Pursuant to the [80]~~Target's certificate of incorporation and by-laws, and pursuant to Target's other corporate governance documents~~[81]Investor Rights Agreement, the holders of stock and other equity interests in the Target will be subject to certain limitations on transfer of their interests in the Target and other covenants generally designed to preserve the Target's status as an S corporation under the Internal Revenue Code. All equity holders in the Target, including the ESOP, will have customary co-sale rights and rights of first refusal on secondary transfers. In addition, all equity holders in the Target will be subject to drag along rights.

(E) Minority Consent Rights

The Acquiror will have the right to consent to any transaction or arrangement between the Target and the ESOP (other than as contemplated by the Transaction), and will have other customary minority consent rights to be discussed.

(F) Information

The Target will provide financial reports to each holder of ten percent (10%) or more of the Target's equity interests (including the holder of the Warrant), including monthly and year-to-date income, balance sheet and cash flow statements as compared to budget and comparable period in prior year, and will provide a written summary of operations each month. An annual audit of the Target's financial statements will be performed by Target's independent, nationally recognized accounting firm. Further, such holders will also be entitled to standard inspection and visitation rights. All such information and inspection rights will expire upon a qualified public offering.

## IX. ~~VIII.~~ [84]AFFILIATE EXCHANGE:

(A) General

Immediately prior to consummation of the Merger, the Target will exchange (the "Affiliate Exchange") its newly issued participating preferred stock for all of the outstanding Target common stock held by certain affiliates of Target (the "Target Affiliates").

(B) Exchange Agreement

In connection with the execution and delivery of the Merger Agreement, the Target and each of the Target Affiliates will enter into an exchange agreement (the "Exchange Agreement"). The Exchange Agreement will provide, among other things, that the board of directors of the Target will approve, and cause to be filed, a certificate of designation related to a newly-designated class of participating preferred stock, which will remain outstanding following consummation of the Merger, and that each of the Target Affiliates will agree to exchange all of their Target common

$^1\underset{=}{-}6^2\underset{=}{-}$

---

$^3$ ~~I:\WPDOCS\General\JXP\WORD\Tribune\Term Sheet - Tower - Feb 22v2.doc~~

stock for a like number of shares of such participating preferred stock immediately prior to consummation of the Merger. Such common stock will become treasury stock of the Target and be canceled in the Merger without consideration in respect thereof.

X. ~~IX.~~ [85]    MISCELLANEOUS:

*(A) S Corporation Election*

The Target will elect, and the Target's shareholders will consent to the Target's election, to be treated as an S corporation for purposes of the Internal Revenue Code after completion of the contemplated transactions, or as soon as the Target is eligible to make the S election. In addition, the Target will elect to treat each of its eligible subsidiaries as a "qualified subchapter S subsidiary" for federal income tax purposes.

*(B) Management Equity Incentive Plan*

The Target will establish a management equity incentive plan (in the form of a stock appreciation right or similar incentive program), customary for a transaction of this size and for comparable businesses, and providing for the issuance to key members of management of the Target of equity participation rights with a value of up to five percent (5%) of the Target's total equity value (calculated after giving effect to the ESOP Purchase and the Warrant) (the "Management Incentive Plan"). Awards under the Management Incentive Plan will be administered by the Board of Target, or by a compensation committee of the Board, and will be subject to customary vesting and call protections and other terms and conditions, and will also have certain additional limitations designed to ensure preservation of the Target's election to be treated as an S corporation. The Management Incentive Plan shall provide that the participants in the Plan shall be entitled to receive benefits upon the occurrence of specified events or upon a specified date, with the value of their benefits to be determined by reference to the value of the Target's stock, determined on an enterprise value basis, with no discount for lack of control or lack of marketability.

\* \* \* \*

~~[1] 7 [2]~~

---

[3] ~~I:\WPDOCS\General\JXP\WORD\Tribune\Term-Sheet--Tower--Feb-22v2.doc~~

Professionals' Eyes Only        TRB0057955

## Bank Financing and Debt Financing

Attached.

[87] I:\WPDOCS\General\JXP\WORD\Tribune\Term Sheet -- Tower -- Feb 22v2.doc

Professionals' Eyes Only
TRB0057956