| | |
|---|---|
| **From:** | Kenney, Crane H |
| **Sent:** | Wednesday, March 7, 2007 2:33 PM (GMT) |
| **To:** | Hianik, Mark W. <MHianik@tribune.com> |
| **Subject:** | FW: Project Tower - Revised Term Sheet |
| **Attach:** | Term Sheet -Tower - 030607 - Compare 030407.doc;Term Sheet -Tower - 030607.doc |

-----Original Message-----
**From:** Wolf, Michael T. [mailto:MWolf@jenner.com]
**Sent:** Wednesday, March 07, 2007 1:46 AM
**To:** Kenney, Crane H
**Cc:** BPate@egii.com; NLarsen@egii.com; SARosenblum@WLRK.com; Gromacki, Joseph P; Boch, Brian R; Monson, Thomas A; Grenesko, Don; ptinkler@egii.com; msotir@egii.com; chochschild@egii.com; JPaolucci@egii.com; mhauser@egii.com; pdevine@wlrk.com; christina.mohr@citigroup.com; michael_costa@ml.com; dackerman@morganlewis.com
**Subject:** Project Tower - Revised Term Sheet

Crane,

Attached, please find a revised draft of the term sheet reflecting changes to the structure discussed earlier today. For your convenience, I have also attached a draft marked to show changes from the version distributed to you on Sunday. Please note that, given the late hour of this distribution, our client has not yet had the opportunity to review this draft and therefore it remains subject to their review and comment.

Best regards,

Michael

Rules governing our practice before the Internal Revenue Service require that we advise you that any tax advice in this communication (and any attachments) (i) is intended only for the addressee and (ii) is not written with the intent that it be used, and in fact it cannot be used, to avoid penalties imposed under the Internal Revenue Code or to promote, market, or recommend to another person any tax-related idea.

**Michael T. Wolf**
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603
Tel (312) 840-7271
Fax (312) 840-7371
MWolf@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

Professionals' Eyes Only

TRB0058928

**PRIVILEGED AND CONFIDENTIAL**
**FOR DISCUSSION PURPOSES ONLY**
**REVISED MARCH** [1]4,[2]6, **2007**

SUMMARY TERM SHEET

PROJECT TOWER

This Summary Term Sheet summarizes the principal terms by which the Tribune Company (the [3]"[4]"Target[5]"[6]") will be taken private in an ESOP leveraged buyout transaction (the [7]"[8]"Transaction[9]"[10]").

The completion of the Transaction will be subject to, among other things, satisfactory completion of financial and legal due diligence by the Acquiror (as defined below) and the ESOP Fiduciary (as defined below), as well as the execution and delivery of final documents acceptable to the Acquiror, the ESOP Fiduciary and the Target ([11]"[12]"Definitive Documents[13]"[14]"). The Acquiror already has completed substantial diligence and is in an excellent position to promptly conclude its review. This Summary Term Sheet does not constitute a binding contract or commitment but rather is solely for the purpose of outlining those terms pursuant to which Definitive Documents may ultimately be entered into.

I.   [15]~~TARGET SHARE REPURCHASE~~[16]**AQUIROR PURCHASE**

   *(A)   General*

   [17] ~~Promptly following execution of the Merger Agreement[18] (as defined below)[19], the Target will launch a tender offer for up to [[20]109.2[21]] million shares of the Target's outstanding common stock at a purchase price of $[33.00] per share (the "Share Repurchase").~~

   [22] ~~*(B)   Repurchase Financing*~~

   [23] ~~The Target will finance the cost of the acquisition of shares of common stock tendered into the Share Repurchase and related expenses with a new term loan facility (the "Repurchase Financing"). The Repurchase Financing may be prepaid without penalty and will otherwise be on terms and conditions no less favorable than the Acquisition Financing (as defined below).~~

[24]~~II.   ACQUIROR ACQUISITION:~~

   [25]~~*(A)   General*~~

   [26]~~A Delaware limited liability company with Sam Zell, individually, as its sole member (the "Acquiror"), initially capitalized with $225 million of cash,[27] will acquire all of Target's outstanding common stock pursuant to a merger of a merger subsidiary of the [28]Acquiror[29] organized as a Delaware corporation (the [30]"Merger Subsidiary"[31]) with and into the Target (the [32]"Merger"[33]). The Target will be the surviving entity following consummation of the Merger. [34]Mr. Zell will provide a firm equity commitment to the Acquiror, and the Target will be a third-party beneficiary of his commitment. Mr. Zell anticipates inviting a small group of his senior executives to participate in his equity commitment. In addition, the Robert R. McCormick Tribune Foundation and Cantigny Foundation will be invited to provide up to $150 million of additional equity capital, which additional equity capital would reduce dollar-for-dollar the consideration to be paid by the ESOP (defined below) in connection with the ESOP Purchase (defined below) and proportionately reduce the ESOP's percentage equity interest in the Target from the levels described below under the heading *ESOP Purchase* and elsewhere in this Summary Term Sheet (any such adjustments, the "Foundation Adjustments").~~

[36] ~~(B)~~ [37] ~~Agreement and Plan of Merger~~

[38] A Delaware limited liability company with Sam Zell, individually, as its sole member (the "Acquiror"), will purchase from the Target [7,575,757] newly-issued shares Target's common stock for $[33.00] per share for aggregate consideration of approximately $250,000,000 (the "Acquiror Purchase").

[39] ~~The Target, the~~ [40] ~~Acquiror~~ [41] ~~and the Merger Subsidiary will enter into an agreement and plan of merger (the~~ [42] ~~"Merger Agreement"~~ [43] ~~), which will provide, among other things, that each holder of Target's outstanding common stock (including vested options, restricted stock and other equity equivalents under Target equity incentive plans but excluding treasury shares) will receive an amount equal to (i) $33.00 per share (the "Merger Consideration") plus (ii) a ticking fee of~~ [44] ~~eight percent (8~~[45]~~%) per annum accruing daily on the Merger Consideration beginning on the date~~ [46] ~~that is six (6) months from the date~~ [47] ~~of the Merger Agreement through and including the date of consummation of the Merger (less, in the case of vested options and other common stock equivalents having exercise prices, the applicable exercise price thereof), pursuant to the Merger. All of Target's~~ [48] ~~preferred stock received by the Target Affiliates (described below) in exchange for Target common~~ [49] ~~stock immediately prior to consummation of the Merger will remain outstanding following consummation of the Merger (see below).~~

[50] **(B)    Acquiror Purchase Agreement**

[51] ~~The Merger Agreement will be approved by the boards of directors of the Target~~ [52]~~, the Acquiror~~ [53] ~~and the Merger Subsidiary~~ [54]~~. The Merger Agreement will be approved by the~~ [55] ~~Acquiror~~ [56]~~, as the sole stockholder of the Merger Subsidiary, and will be submitted for the requisite approval by the stockholders of the Target.~~

[57] Concurrently with the execution and delivery of the Merger Agreement (as defined below), the Target and the Acquiror will enter into an equity purchase agreement setting forth the terms of the Acquiror Purchase (the "Acquiror Purchase Agreement"). In addition, the Acquiror Purchase Agreement will provide that the Aquiror will purchase and the Target will sell, on the terms and subject to the conditions set forth therein (i) the Subordinated Note (as defined below) and (ii) the Warrant (as defined below), such purchases to close immediately following consummation of the Merger (collectively, the "Follow-on Acquisition").

[58] ~~The Merger Agreement will contain representations, warranties and covenants customary for transactions of the nature contemplated by this Summary Term Sheet. In addition, the Merger Agreement will contain certain conditions to closing~~[59] The Acquiror Purchase Agreement will contain representations, warranties and covenants substantially consistent with the representations, warranties and covenants set forth in the Merger Agreement. In addition, the Acquiror Purchase Agreement will contain certain conditions to the closing of each purchase[60], including, without limitation, conditions related to: (i) the accuracy of the representations and warranties, (ii) compliance with [61] ~~covenants, (iii) receipt of an FCC Order, the approval of Major League Baseball and any other required regulatory and third-party consents and approvals, including HSR clearance, (iv) no Target material adverse effect,~~ [62] ~~[(v) availability of the Acquisition Financing (as defined below),]~~ [ [63] (vi) no broadcasting material adverse effect has occurred in connection with [64] ~~receipt of the FCC Order]~~[65] ~~(vii) completion of the Affiliate Exchange~~[66] ~~(as defined below) and (viii)~~[67] certain covenants, (iii) expiration (or early termination) of any applicable HSR waiting period and receipt of all required regulatory and third-party consents and approvals, (iv) in the case of the Acquiror Purchase, execution

Professionals' Eyes Only                                    TRB0058930

and delivery of a Registration Rights Agreement (as defined below), (v) in the case of the Acquiror Purchase, no termination of the Merger Agreement, (v) in the case of the Acquiror Purchase, satisfaction of all conditions precedent to the closing of the ESOP Purchase (as defined below)[68] ~~(other than~~[69], (vi) in the case of the Follow-on Acquisition,[70] consummation of the Merger[71]~~). The Target may continue to pay quarterly~~[72] ~~dividends on its common stock~~[73] ~~not in excess of the current effective dividend yield.~~[74] on the terms specified in the Merger Agreement and (vii) in the case of the Follow-on Acquisition, execution and delivery of the Investor Rights Agreement (as defined below).

[75] ~~(C)      Voting Agreement~~

[77](C)      Registration Rights Agreement

Concurrently with the execution and delivery of the [78]~~Merger Agreement, the Acquiror~~[79] ~~and each of the Robert R. McCormick Tribune Foundation, Cantigny Foundation and the Chandler Trusts (and any affiliated stockholders, as appropriate) will enter into a voting agreement pursuant to which the~~[80] ~~Robert R. McCormick Tribune Foundation, Cantigny Foundation and the Chandler Trusts (and any affiliated stockholders, as appropriate) will agree to, among other things, vote in favor of the Merger Agreement and the Merger and take other actions generally designed to ensure approval of the Merger Agreement and the Merger (the~~ [81]~~"Voting Agreement")~~[82]Acquiror Purchase Agreement, the Target and the Acquiror will enter into a customary registration rights agreement covering the shares acquired in the Acquiror Purchase (to the extent the Merger Agreement is terminated) and the shares underlying the Warrant.

[83]~~III.     ACQUISITION FINANCING~~[84]~~:~~

[85]~~(A)~~      [86]~~Revolving and Term Loan Facility~~

[87]~~The Repurchase Financing will be refinanced without prepayment penalties or other costs and additional financing will be provided without additional lender fees or charges or other additional costs in order to fund the Merger Consideration and related expenses and refinance certain other obligations of the Target pursuant to a revolving credit and term loan facility as set forth in the attached commitment letter (collectively, the~~ [88]~~"Bank Financing"~~[89]~~).~~

[90]~~(B)~~      [91]~~High Yield Debt Financing~~

[92]~~The Target will conduct a high yield debt financing in connection with the Bank Financing as set forth in the attached commitment letter (the~~ [93]~~"Debt Financing"~~[94]~~, and together with the Bank Financing, the~~ [95]~~"Acquisition Financing").~~

II.  ~~IV.~~ [96]ESOP PURCHASE:

(A) General

[97]~~Immediately following~~[98]Concurrently with the consummation of the [99]~~Merger and subject to any Foundation Adjustments~~[100]Acquiror Purchase, an employee stock ownership plan ([101]"[102]"ESOP[103]"[104]") will purchase from the Target a number of [105]~~shares that will result in the ESOP owning ninety percent (90%) of the Target~~[106]newly-issued shares of Target's [107]then

Professionals' Eyes Only                                                                                                                          TRB0058931

~~outstanding common stock (calculated without giving effect to the Warrant (as defined below) and the Management Incentive Plan (as defined below)), subject to the Foundation Adjustments, if any, at purchase price equal to the fair market value of the shares purchased (the "ESOP Purchase") as determined at the time of the Merger~~[108] **common stock equal to (i) $250,000,000 divided by (ii) [the average closing share price of Target's common stock over the [20]-day period ending on the last trading day before closing] (the "ESOP Purchase")**.

(B) [109]~~Equity~~[110]**ESOP** Purchase Agreement

Concurrently with the execution and delivery of the Merger Agreement, the Target and a nationally-recognized institutional trustee with an established reputation as an ESOP fiduciary (the [111]~~"~~[112]**"**ESOP Fiduciary[113]~~"~~[114]**"**), on behalf of the ESOP, will enter into an equity purchase [115]~~or subscription~~ agreement setting forth the terms of the ESOP Purchase (the [116]~~"Equity~~[117]**"ESOP** Purchase Agreement[118]~~"~~[119]**"**). It is contemplated that the ESOP Fiduciary will have made a finding that the consideration to be paid in connection with the ESOP Purchase does not exceed adequate consideration (within the meaning of ERISA § 3(18)(B)) and that the ESOP Fiduciary will have received an opinion of its financial advisor that the consideration to be paid by the ESOP in connection with the ESOP Purchase does not exceed the fair market value of the stock to be purchased by the ESOP and that the Transaction is fair to the ESOP, in each case, prior to executing and delivering the [120]~~Equity~~[121]**ESOP** Purchase Agreement.

The [122]~~Equity~~[123]**ESOP** Purchase Agreement will contain representations, warranties and covenants substantially consistent with the representations, warranties and covenants set forth in the Merger Agreement. In addition, the [124]~~Equity~~[125]**ESOP** Purchase Agreement will contain certain conditions to closing, including, without limitation, conditions related to: (i) the accuracy of the representations and warranties, (ii) compliance with certain covenants, (iii) receipt of all required regulatory and third-party consents and approvals, (iv) [126]~~availability~~[127]**no termination** of the [128]~~ESOP Financing (as defined below)~~[129]**Merger Agreement**, (v) execution and delivery of the ESOP Loan Agreement[130] **(as defined below)**, the ESOP Note[131] **(as defined below)**, the Stock Pledge Agreement[132] **(as defined below)**, and the Investor Rights Agreement ([133]~~all~~[134] **as** defined below), and (vi) [135]~~consummation of the Merger~~[136]**satisfaction of all conditions precedent to the closing of the Acquiror Purchase**.

III. ~~V.~~ [137]ESOP FINANCING:

[138]~~(A)   General~~

To finance the ESOP Purchase, the Target and the ESOP will enter into an ESOP Loan Agreement [139]**(the "ESOP Loan Agreement")** and a Stock Pledge Agreement[140] **(the "Stock Pledge Agreement")** whereby the Target will make a loan to the ESOP in the amount of [141]~~the consideration to be paid for the ESOP Purchase~~[142]**$250,000,000** (collectively, the [143]~~"~~[144]**"**ESOP Financing[145]~~"~~[146]**"**). The ESOP Loan will be evidenced by a promissory note to be [147]~~delivered~~[148]**issued** by the ESOP[149] ~~Trustee~~ to the Target (the "[150]ESOP Note").

As currently contemplated, the Target will make annual contributions of $[[151]~~100~~[152]____] million to the ESOP, and, conversely, the ESOP will make annual principal and interest payments of $[[153]~~100~~[154]____] million to the Target in respect of the ESOP Financing based on an [155]8.6[156][__]% interest rate and a [157]~~15~~[158][**30**]-year amortization. [159]~~The amount of the note, but not the tenor or rate, shall be adjusted to reflect the fair market value of the ESOP Purchase.~~

- 4 -

Professionals' Eyes Only
TRB0058932

IV. ~~VI.~~ [160]ESOP TRUST:

(A) General

[161]~~The~~ [162]**In connection with the execution and delivery of the ESOP Purchase Agreement, the** Target will establish a stand-alone, tax-qualified stock bonus plan and trust that will comply with the tax and ERISA rules applicable to leveraged ESOPs. Substantially all non-union employees of the Target and its subsidiaries will participate in the ESOP, subject to such restrictions as are determined from time to time by the Board (as defined below).

(B) Terms

Shares held by the ESOP will generally be released to eligible participant accounts based upon contributions to the ESOP by the Target with shares released to individual participant accounts in proportion to eligible compensation of the participants. Participant accounts will vest over a six (6) year period (including pre-participation service) with twenty percent (20%) vesting per year during years two (2) through six (6). Union employees may participate in the ESOP to the extent provided by applicable collective bargaining agreements. As a general matter, shares [163]~~held by the ESOP will be voted either by an ESOP voting committee or by the ESOP Fiduciary if other corporate governance documents prescribe the composition of the Board; provided, however, shares held by the ESOP and~~[164]**of Target's common stock** allocated to [165]~~participant~~[166]**the** accounts [167]**of plan participants** will be voted as directed by the participants[168]~~on such matters for which votes are required to be passed through to participants by Internal Revenue Code Section 409(e)~~. [169]**Unallocated shares of Target's common stock will be voted by the ESOP Fiduciary in the same proportion as the allocated shares.**

V. [170] [171]**TARGET SHARE REPURCHASE**

[172]*(A) General*

[173] **Promptly following execution of the Merger Agreement**[174], **the Target will launch a tender offer for up to [**[175]**145**[176]**] million shares of the Target's outstanding common stock at a purchase price of $[33.00] per share (the "Share Repurchase").**[177] **The Share Repurchase will be consummated following closing of the Acquiror Purchase and the ESOP Purchase; however, neither the Acquiror or the ESOP will tender into the Share Repurchase.**

[178]*(B) Repurchase Financing*

[179] **The Target will finance the cost of the acquisition of shares of common stock tendered into the Share Repurchase and related expenses with a new term loan facility (the "Repurchase Financing"). The Repurchase Financing may be prepaid without penalty and will otherwise be on terms and conditions no less favorable than the Acquisition Financing (as defined below).**

VI. [180] [181]MERGER:

*(A)* [182] [183]*General*

Professionals' Eyes Only                                                                                                                                    TRB0058933

[184]The ESOP[185] will acquire all of Target's outstanding common stock pursuant to a merger of a merger subsidiary of the [186]ESOP[187] organized as a Delaware corporation (the [188]"Merger Subsidiary"[189]) with and into the Target (the [190]"Merger"[191]). The Target will be the surviving entity following consummation of the Merger.

(B) [192] [193]*Agreement and Plan of Merger*

[194]The Target, the [195]ESOP[196] and the Merger Subsidiary will enter into an agreement and plan of merger (the [197]"Merger Agreement"[198]), which will provide, among other things, that each holder of Target's outstanding common stock (including vested options, restricted stock and other equity equivalents under Target equity incentive plans but excluding treasury shares) will receive an amount equal to (i) $33.00 per share (the "Merger Consideration") plus (ii) a ticking fee of [199]**five percent (5**[200]**%)** per annum accruing daily on the Merger Consideration beginning on the date [201]of the Merger Agreement through and including the date of consummation of the Merger (less, in the case of vested options and other common stock equivalents having exercise prices, the applicable exercise price thereof), pursuant to the Merger. All of Target's [202]**newly issued participating** [203]preferred stock received by the Target Affiliates (described below) in exchange for Target common [204]**and preferred** [205]stock immediately prior to consummation of the Merger will remain outstanding following consummation of the Merger (see below).[206] **In addition, all of Target's common stock held by the ESOP immediately prior to the Merger will remain outstanding.**

[207]The Merger Agreement will be approved by the boards of directors of the Target[208] and the Merger Subsidiary[209]**, and the ESOP Fiduciary on behalf of the ESOP**[210]. The Merger Agreement will be approved by the [211]ESOP[212], as the sole stockholder of the Merger Subsidiary, and will be submitted for the requisite approval by the stockholders of the Target.

[213]The Merger Agreement will contain representations, warranties and covenants customary for transactions of the nature contemplated by this Summary Term Sheet. In addition, the Merger Agreement will contain certain conditions to closing[214], including, without limitation, conditions related to: (i) the accuracy of the representations and warranties, (ii) compliance with [215]covenants, (iii) receipt of an FCC Order, the approval of Major League Baseball and any other required regulatory and third-party consents and approvals, including HSR clearance, (iv) no Target material adverse effect, [216](v) availability of the Acquisition Financing, [217](vi) no broadcasting material adverse effect has occurred in connection with [218]receipt of the FCC Order and[219] (vii) completion of the Affiliate Exchange[220] (as defined below). There will be no reverse break-up fees or liquidated damages payable in connection with a termination resulting from the failure to satisfy the financing or FCC closing conditions. Prior to consummation of the Merger, the Target will be prohibited from paying[221] dividends on its common stock[222]. The Acquiror will be a third-party beneficiary of the Merger Agreement.

(C) [223] [224]*Voting Agreement*

[225]Concurrently with the execution and delivery of the Merger Agreement, the Acquiror, the ESOP[226] and each of the Robert R. McCormick Tribune Foundation, Cantigny

Professionals' Eyes Only                                                                                                                                                   TRB0058934

Foundation and the Chandler Trusts (and any affiliated stockholders, as appropriate) will enter into a voting agreement pursuant to which the[227] Acquiror, the ESOP,[228] Robert R. McCormick Tribune Foundation, Cantigny Foundation and the Chandler Trusts (and any affiliated stockholders, as appropriate) will agree to, among other things, vote in favor of the Merger Agreement and the Merger and take other actions generally designed to ensure approval of the Merger Agreement and the Merger (the [229]"Voting Agreement").

VII.  [230] ACQUISITION AND PERMANENT FINACING[232]:

(A)  [233][234]*Revolving and Term Loan Facility*

[235]The Repurchase Financing will be refinanced without prepayment penalties or other costs and additional financing will be provided without additional lender fees or charges or other additional costs in order to fund the Merger Consideration and related expenses and refinance certain other obligations of the Target pursuant to a revolving credit and term loan facility as set forth in the attached commitment letter (collectively, the [236]"Bank Financing"[237]).

(B)  [238][239]*High Yield Debt Financing*

[240]The Target will conduct a high yield debt financing in connection with the Bank Financing as set forth in the attached commitment letter (the [241]"Debt Financing"[242], and together with the Bank Financing, the [243]"Acquisition Financing").

VIII.  [244][245]SUBORDIANTED NOTE:

[246]Immediately following consummation of the Merger, the Acquiror will purchase from the Target an unsecured, subordinated promissory note with an initial principal amount of $[185] million (the "Subordinated Note"). The Subordinated Note will be fully subordinated to the extent provided in then-existing senior obligations for borrowed money, accrue interest at a rate equal to the then in effect Long-Term Applicable Federal Rate and mature 11 years from the date of issuance.

IX. ~~VII.~~ [247]WARRANT:

[248]~~(A) General~~

[249]~~Immediately following consummation of the ESOP Purchase, the Target will issue to the Acquiror~~[250]Concurrently with the purchase of the Subordinated Note, the Acquiror will purchase from the Target for aggregate consideration of $[40] million, a warrant to purchase [251]~~from the Target~~ a number of shares [252]of Target common stock equal to thirty-[253]~~one~~[254]eight percent ([255]~~31~~[256]38%) of the Target's then outstanding common stock (on a fully diluted basis after giving effect to the [257]~~ESOP Purchase and the~~ Management Incentive Plan) [258]~~at the same price per share paid by the ESOP in the ESOP Purchase~~[259]for aggregate consideration of $[351] million, subject to customary adjustments (the [260]"[261]"Warrant[262]"[263]").

[264]~~(B) Warrant Agreement~~

Professionals' Eyes Only                                                                                                                    TRB0058935

The Target and the Acquiror will enter into a warrant agreement in connection with consummation of the Merger (the [265,266]"Warrant Agreement[267,268]"). The Warrant will be fully vested and exercisable at the time of grant, will have a term of twenty (20) years and will be subject to appropriate restrictions on transfer. The Warrant Agreement will provide, among other things, for customary adjustments to the number and type of shares covered by the Warrant, including anti-dilution protection. In connection with a sale of the Target subsequent to the [269]~~ESOP Purchase~~[270]Merger, in lieu of exercising the Warrant, the Acquiror will have the right to put the Warrant to the Company at the value implied from such sale.

X. ~~VIII.~~[271]STOCKHOLDERS' RIGHTS:

   (A) *Investor Rights Agreement*

   The Target, the Acquiror, and the ESOP Fiduciary, on behalf of the ESOP, will enter into an Investor Rights Agreement (the [272,273]"Investor Rights Agreement[274,275]") in connection with the consummation of the Merger and the ESOP Purchase.

[276]

   (B) *Board Composition*

   Immediately following [277]execution and delivery of the Merger Agreement, it is expected that Sam Zell will be appointed to serve on the board of directors of the Target. Immediately following consummation of the Merger[278] ~~and the ESOP Purchase~~, pursuant to the Investor Rights Agreement and the amended and restated certificate of incorporation and bylaws of the Target, or such other corporate governance documents into which the parties may enter, the board of directors of the Target (the [279,280]"Board[281]"~~) will consist of seven (7) directors, two (2) of whom will be designated by the Acquiror, one (1) of whom~~[282] ~~will be the chief executive officer of~~[283] ~~Target, and the remaining four (4) of whom will be~~[284]") will consist of nine (9) directors designated by a nominating committee of the Board, [285]~~provided two (2) of the four (4)~~[286]of which five (5) directors will be [287]~~selected initially from independent members of the current Board. Sam Zell will serve as the chairman of the Board with duties customarily attendant thereto. If Sam Zell is not serving on the Board for any reason, the Acquiror will be entitled to replace him with another Acquiror designee, but the selection of chairman will be the Board's prerogative~~[288]independent and one (1) director[289] will be the chief executive officer of[290] the Target. Notwithstanding the foregoing, no more than two (2) persons affiliated with each of the Target or the Acquiror may serve on the Board at any given time. In addition, it is expected that Sam Zell will continue to serve on Board following consummation of the Merger. Members of the Board will be entitled to receive such fees as are reasonably determined by the Board and will be reimbursed for reasonable travel expenses in connection with Board or committee meetings.

   (C) *Pre-emptive Rights*

   Pursuant to the Investor Rights Agreement, each of the Acquiror and the ESOP will have a right of first refusal to purchase its pro rata portion of future equity or convertible securities offered by the Target (other than certain excluded transactions). [291]In addition, the Target will use reasonable best efforts to obtain debt or equity financing to loan the ESOP an amount sufficient to permit the ESOP to purchase such securities. For the avoidance of doubt, the shares underlying the Warrant to be issued to the Acquiror will be included for purposes of

- 8 -

Professionals' Eyes Only

TRB0058936

determining pro rata participation in such issuances. All such preemptive rights will not apply to, and will expire upon, a qualified public offering.

*(D) Other Rights and Obligations*

Pursuant to the Investor Rights Agreement, the holders of stock and other equity interests in the Target will be subject to certain limitations on transfer of their interests in the Target and other covenants generally designed to preserve the Target's status as an S corporation under the Internal Revenue Code. All equity holders in the Target, including the ESOP, will have customary co-sale rights and rights of first refusal on secondary transfers.[292] ~~In addition, all equity holders in the Target will be subject to drag along rights.~~

*(E) Minority Consent Rights*

The Acquiror will have the right to consent to any transaction or arrangement between the Target and the ESOP (other than as contemplated by the Transaction), and will have other customary minority consent rights to be discussed.
[293]

*(F) Information*

The Target will provide financial reports to each holder of ten percent (10%) or more of the Target's equity interests (including the holder of the Warrant), including monthly and year-to-date income, balance sheet and cash flow statements as compared to budget and comparable period in prior year, and will provide a written summary of operations each month. An annual audit of the Target's financial statements will be performed by Target's independent, nationally recognized accounting firm. Further, such holders will also be entitled to standard inspection and visitation rights. All such information and inspection rights will expire upon a qualified public offering.

## XI. ~~IX.~~ [294 295] AFFILIATE EXCHANGE:

*(A) General*

Immediately prior to consummation of the Merger, the Target will exchange (the [296][297] "Affiliate Exchange[298][299]") its newly issued participating preferred stock for all of the outstanding Target common [300] **and preferred** stock held by certain affiliates of Target (the [301][302] "Target Affiliates[303][304]").

*(B) Exchange Agreement*

In connection with the execution and delivery of the Merger Agreement, the Target and each of the Target Affiliates will enter into an exchange agreement (the [305][306] "Exchange Agreement[307][308]"). The Exchange Agreement will provide, among other things, that the board of directors of the Target will approve, and cause to be filed, a certificate of designation related to a newly-designated class of participating preferred stock, which will remain outstanding following consummation of the Merger, and that each of the Target Affiliates will agree to exchange all of their Target common stock [309] **and preferred stock** for a like number of shares of such participating preferred stock immediately prior to consummation of the Merger. Such common [310] **and preferred** stock will become treasury stock of the Target and be canceled in the Merger without consideration in respect thereof.

- 9 -

Professionals' Eyes Only
TRB0058937

**XII.**   X.———[311]MISCELLANEOUS:

*(A) S Corporation Election*

The Target will elect, and the Target's shareholders will consent to the Target's election, to be treated as an S corporation for purposes of the Internal Revenue Code after completion of the contemplated transactions, or as soon as the Target is eligible to make the S election. In addition, the Target will elect to treat each of its eligible subsidiaries as a "qualified subchapter S subsidiary" for federal income tax purposes.

*(B) Management Equity Incentive Plan*

The Target will establish a management equity incentive plan (in the form of a stock appreciation right or similar incentive program), customary for a transaction of this size and for comparable businesses, and providing for the issuance to key members of management of the Target of equity participation rights with a value of up to [312][[313]five percent (5%)[314]] of the Target's total equity value (calculated after giving effect to the ESOP Purchase and the Warrant) (the [315][316]"Management Incentive Plan[317]"[318]"). Awards under the Management Incentive Plan will be administered by the Board of Target, or by a compensation committee of the Board, and will be subject to customary vesting and call protections and other terms and conditions, and will also have certain additional limitations designed to ensure preservation of the Target's election to be treated as an S corporation. The Management Incentive Plan shall provide that the participants in the Plan shall be entitled to receive benefits upon the occurrence of specified events or upon a specified date, with the value of their benefits to be determined by reference to the value of the Target's stock, determined on an enterprise value basis, with no discount for lack of control or lack of marketability.

*   *   *   *

Professionals' Eyes Only                                                                                                                  TRB0058938

## Bank Financing and Debt Financing

Attached.

Professionals' Eyes Only					TRB0058939

PRIVILEGED AND CONFIDENTIAL<br>
FOR DISCUSSION PURPOSES ONLY<br>
REVISED MARCH 6, 2007

## SUMMARY TERM SHEET

## PROJECT TOWER

This Summary Term Sheet summarizes the principal terms by which the Tribune Company (the "Target") will be taken private in an ESOP leveraged buyout transaction (the "Transaction").

The completion of the Transaction will be subject to, among other things, satisfactory completion of financial and legal due diligence by the Acquiror (as defined below) and the ESOP Fiduciary (as defined below), as well as the execution and delivery of final documents acceptable to the Acquiror, the ESOP Fiduciary and the Target ("Definitive Documents"). The Acquiror already has completed substantial diligence and is in an excellent position to promptly conclude its review. This Summary Term Sheet does not constitute a binding contract or commitment but rather is solely for the purpose of outlining those terms pursuant to which Definitive Documents may ultimately be entered into.

I. AQUIROR PURCHASE

   *(A) General*

   A Delaware limited liability company with Sam Zell, individually, as its sole member (the "Acquiror"), will purchase from the Target [7,575,757] newly-issued shares Target's common stock for $[33.00] per share for aggregate consideration of approximately $250,000,000 (the "Acquiror Purchase").

   *(B) Acquiror Purchase Agreement*

   Concurrently with the execution and delivery of the Merger Agreement (as defined below), the Target and the Acquiror will enter into an equity purchase agreement setting forth the terms of the Acquiror Purchase (the "Acquiror Purchase Agreement"). In addition, the Acquiror Purchase Agreement will provide that the Aquiror will purchase and the Target will sell, on the terms and subject to the conditions set forth therein (i) the Subordinated Note (as defined below) and (ii) the Warrant (as defined below), such purchases to close immediately following consummation of the Merger (collectively, the "Follow-on Acquisition").

   The Acquiror Purchase Agreement will contain representations, warranties and covenants substantially consistent with the representations, warranties and covenants set forth in the Merger Agreement. In addition, the Acquiror Purchase Agreement will contain certain conditions to the closing of each purchase, including, without limitation, conditions related to: (i) the accuracy of the representations and warranties, (ii) compliance with certain covenants, (iii) expiration (or early termination) of any applicable HSR waiting period and receipt of all required regulatory and third-party consents and approvals, (iv) in the case of the Acquiror Purchase, execution and delivery of a Registration Rights Agreement (as defined below), (v) in the case of the Acquiror Purchase, no termination of the Merger Agreement, (v) in the case of the Acquiror Purchase, satisfaction of all conditions precedent to the closing of the ESOP Purchase (as defined below), (vi) in the case of the Follow-on Acquisition, consummation of the Merger on the terms specified in the Merger Agreement and (vii) in the case of the Follow-on Acquisition, execution and delivery of the Investor Rights Agreement (as defined below).

Professionals' Eyes Only

TRB0058940

*(C) Registration Rights Agreement*

Concurrently with the execution and delivery of the Acquiror Purchase Agreement, the Target and the Acquiror will enter into a customary registration rights agreement covering the shares acquired in the Acquiror Purchase (to the extent the Merger Agreement is terminated) and the shares underlying the Warrant.

II. ESOP PURCHASE:

*(A) General*

Concurrently with the consummation of the Acquiror Purchase, an employee stock ownership plan ("ESOP") will purchase from the Target a number of newly-issued shares of Target's common stock equal to (i) $250,000,000 divided by (ii) **[the average closing share price of Target's common stock over the [20]-day period ending on the last trading day before closing]** (the "ESOP Purchase").

*(B) ESOP Purchase Agreement*

Concurrently with the execution and delivery of the Merger Agreement, the Target and a nationally-recognized institutional trustee with an established reputation as an ESOP fiduciary (the "ESOP Fiduciary"), on behalf of the ESOP, will enter into an equity purchase agreement setting forth the terms of the ESOP Purchase (the "ESOP Purchase Agreement"). It is contemplated that the ESOP Fiduciary will have made a finding that the consideration to be paid in connection with the ESOP Purchase does not exceed adequate consideration (within the meaning of ERISA § 3(18)(B)) and that the ESOP Fiduciary will have received an opinion of its financial advisor that the consideration to be paid by the ESOP in connection with the ESOP Purchase does not exceed the fair market value of the stock to be purchased by the ESOP and that the Transaction is fair to the ESOP, in each case, prior to executing and delivering the ESOP Purchase Agreement.

The ESOP Purchase Agreement will contain representations, warranties and covenants substantially consistent with the representations, warranties and covenants set forth in the Merger Agreement. In addition, the ESOP Purchase Agreement will contain certain conditions to closing, including, without limitation, conditions related to: (i) the accuracy of the representations and warranties, (ii) compliance with certain covenants, (iii) receipt of all required regulatory and third-party consents and approvals, (iv) no termination of the Merger Agreement, (v) execution and delivery of the ESOP Loan Agreement (as defined below), the ESOP Note (as defined below), the Stock Pledge Agreement (as defined below), and the Investor Rights Agreement (as defined below), and (vi) satisfaction of all conditions precedent to the closing of the Acquiror Purchase.

III. ESOP FINANCING:

To finance the ESOP Purchase, the Target and the ESOP will enter into an ESOP Loan Agreement (the "ESOP Loan Agreement") and a Stock Pledge Agreement (the "Stock Pledge Agreement") whereby the Target will make a loan to the ESOP in the amount of $250,000,000 (collectively, the "ESOP Financing"). The ESOP Loan will be evidenced by a promissory note to be issued by the ESOP to the Target (the "ESOP Note").

Professionals' Eyes Only                                                                                                      TRB0058941

As currently contemplated, the Target will make annual contributions of $[___] million to the ESOP, and, conversely, the ESOP will make annual principal and interest payments of $[___] million to the Target in respect of the ESOP Financing based on an [_._]% interest rate and a [30]-year amortization.

IV. ESOP TRUST:

*(A) General*

In connection with the execution and delivery of the ESOP Purchase Agreement, the Target will establish a stand-alone, tax-qualified stock bonus plan and trust that will comply with the tax and ERISA rules applicable to leveraged ESOPs. Substantially all non-union employees of the Target and its subsidiaries will participate in the ESOP, subject to such restrictions as are determined from time to time by the Board (as defined below).

*(B) Terms*

Shares held by the ESOP will generally be released to eligible participant accounts based upon contributions to the ESOP by the Target with shares released to individual participant accounts in proportion to eligible compensation of the participants. Participant accounts will vest over a six (6) year period (including pre-participation service) with twenty percent (20%) vesting per year during years two (2) through six (6). Union employees may participate in the ESOP to the extent provided by applicable collective bargaining agreements. As a general matter, shares of Target's common stock allocated to the accounts of plan participants will be voted as directed by the participants. Unallocated shares of Target's common stock will be voted by the ESOP Fiduciary in the same proportion as the allocated shares.

V. TARGET SHARE REPURCHASE

*(A) General*

Promptly following execution of the Merger Agreement, the Target will launch a tender offer for up to **[145]** million shares of the Target's outstanding common stock at a purchase price of $**[33.00]** per share (the "Share Repurchase"). The Share Repurchase will be consummated following closing of the Acquiror Purchase and the ESOP Purchase; however, neither the Acquiror or the ESOP will tender into the Share Repurchase.

*(B) Repurchase Financing*

The Target will finance the cost of the acquisition of shares of common stock tendered into the Share Repurchase and related expenses with a new term loan facility (the "Repurchase Financing"). The Repurchase Financing may be prepaid without penalty and will otherwise be on terms and conditions no less favorable than the Acquisition Financing (as defined below).

VI. MERGER:

*(A) General*

The ESOP will acquire all of Target's outstanding common stock pursuant to a merger of a merger subsidiary of the ESOP organized as a Delaware corporation (the "Merger Subsidiary")

Professionals' Eyes Only

TRB0058942

with and into the Target (the "Merger"). The Target will be the surviving entity following consummation of the Merger.

(B) *Agreement and Plan of Merger*

The Target, the ESOP and the Merger Subsidiary will enter into an agreement and plan of merger (the "Merger Agreement"), which will provide, among other things, that each holder of Target's outstanding common stock (including vested options, restricted stock and other equity equivalents under Target equity incentive plans but excluding treasury shares) will receive an amount equal to (i) $33.00 per share (the "Merger Consideration") plus (ii) a ticking fee of five percent (5%) per annum accruing daily on the Merger Consideration beginning on the date of the Merger Agreement through and including the date of consummation of the Merger (less, in the case of vested options and other common stock equivalents having exercise prices, the applicable exercise price thereof), pursuant to the Merger. All of Target's newly issued participating preferred stock received by the Target Affiliates (described below) in exchange for Target common and preferred stock immediately prior to consummation of the Merger will remain outstanding following consummation of the Merger (see below). In addition, all of Target's common stock held by the ESOP immediately prior to the Merger will remain outstanding.

The Merger Agreement will be approved by the boards of directors of the Target and the Merger Subsidiary, and the ESOP Fiduciary on behalf of the ESOP. The Merger Agreement will be approved by the ESOP, as the sole stockholder of the Merger Subsidiary, and will be submitted for the requisite approval by the stockholders of the Target.

The Merger Agreement will contain representations, warranties and covenants customary for transactions of the nature contemplated by this Summary Term Sheet. In addition, the Merger Agreement will contain certain conditions to closing, including, without limitation, conditions related to: (i) the accuracy of the representations and warranties, (ii) compliance with covenants, (iii) receipt of an FCC Order, the approval of Major League Baseball and any other required regulatory and third-party consents and approvals, including HSR clearance, (iv) no Target material adverse effect, (v) availability of the Acquisition Financing, (vi) no broadcasting material adverse effect has occurred in connection with receipt of the FCC Order and (vii) completion of the Affiliate Exchange (as defined below). There will be no reverse break-up fees or liquidated damages payable in connection with a termination resulting from the failure to satisfy the financing or FCC closing conditions. Prior to consummation of the Merger, the Target will be prohibited from paying dividends on its common stock. The Acquiror will be a third-party beneficiary of the Merger Agreement.

(C) *Voting Agreement*

Concurrently with the execution and delivery of the Merger Agreement, the Acquiror, the ESOP and each of the Robert R. McCormick Tribune Foundation, Cantigny Foundation and the Chandler Trusts (and any affiliated stockholders, as appropriate) will enter into a voting agreement pursuant to which the Acquiror, the ESOP, Robert R. McCormick Tribune Foundation, Cantigny Foundation and the Chandler Trusts (and any affiliated stockholders, as appropriate) will agree to, among other things, vote in favor of the Merger Agreement and the Merger and take other actions generally designed to ensure approval of the Merger Agreement and the Merger (the "Voting Agreement").

Professionals' Eyes Only                                                                                                                                   TRB0058943

VII. ACQUISITION AND PERMANENT FINACING:

(A) *Revolving and Term Loan Facility*

The Repurchase Financing will be refinanced without prepayment penalties or other costs and additional financing will be provided without additional lender fees or charges or other additional costs in order to fund the Merger Consideration and related expenses and refinance certain other obligations of the Target pursuant to a revolving credit and term loan facility as set forth in the attached commitment letter (collectively, the "Bank Financing").

(B) *High Yield Debt Financing*

The Target will conduct a high yield debt financing in connection with the Bank Financing as set forth in the attached commitment letter (the "Debt Financing", and together with the Bank Financing, the "Acquisition Financing").

VIII. SUBORDIANTED NOTE:

Immediately following consummation of the Merger, the Acquiror will purchase from the Target an unsecured, subordinated promissory note with an initial principal amount of $[185] million (the "Subordinated Note"). The Subordinated Note will be fully subordinated to the extent provided in then-existing senior obligations for borrowed money, accrue interest at a rate equal to the then in effect Long-Term Applicable Federal Rate and mature 11 years from the date of issuance.

IX. WARRANT:

Concurrently with the purchase of the Subordinated Note, the Acquiror will purchase from the Target for aggregate consideration of $[40] million, a warrant to purchase a number of shares of Target common stock equal to thirty-eight percent (38%) of the Target's then outstanding common stock (on a fully diluted basis after giving effect to the Management Incentive Plan) for aggregate consideration of $[351] million, subject to customary adjustments (the "Warrant").

The Target and the Acquiror will enter into a warrant agreement in connection with consummation of the Merger (the "Warrant Agreement"). The Warrant will be fully vested and exercisable at the time of grant, will have a term of twenty (20) years and will be subject to appropriate restrictions on transfer. The Warrant Agreement will provide, among other things, for customary adjustments to the number and type of shares covered by the Warrant, including anti-dilution protection. In connection with a sale of the Target subsequent to the Merger, in lieu of exercising the Warrant, the Acquiror will have the right to put the Warrant to the Company at the value implied from such sale.

X. STOCKHOLDERS' RIGHTS:

(A) *Investor Rights Agreement*

The Target, the Acquiror, and the ESOP Fiduciary, on behalf of the ESOP, will enter into an Investor Rights Agreement (the "Investor Rights Agreement") in connection with the consummation of the Merger and the ESOP Purchase.

Professionals' Eyes Only

TRB0058944

*(B) Board Composition*

Immediately following execution and delivery of the Merger Agreement, it is expected that Sam Zell will be appointed to serve on the board of directors of the Target. Immediately following consummation of the Merger, pursuant to the Investor Rights Agreement and the amended and restated certificate of incorporation and bylaws of the Target, or such other corporate governance documents into which the parties may enter, the board of directors of the Target (the "Board") will consist of nine (9) directors designated by a nominating committee of the Board, of which five (5) directors will be independent and one (1) director will be the chief executive officer of the Target. Notwithstanding the foregoing, no more than two (2) persons affiliated with each of the Target or the Acquiror may serve on the Board at any given time. In addition, it is expected that Sam Zell will continue to serve on Board following consummation of the Merger. Members of the Board will be entitled to receive such fees as are reasonably determined by the Board and will be reimbursed for reasonable travel expenses in connection with Board or committee meetings.

*(C) Pre-emptive Rights*

Pursuant to the Investor Rights Agreement, each of the Acquiror and the ESOP will have a right of first refusal to purchase its pro rata portion of future equity or convertible securities offered by the Target (other than certain excluded transactions). In addition, the Target will use reasonable best efforts to obtain debt or equity financing to loan the ESOP an amount sufficient to permit the ESOP to purchase such securities. For the avoidance of doubt, the shares underlying the Warrant to be issued to the Acquiror will be included for purposes of determining pro rata participation in such issuances. All such preemptive rights will not apply to, and will expire upon, a qualified public offering.

*(D) Other Rights and Obligations*

Pursuant to the Investor Rights Agreement, the holders of stock and other equity interests in the Target will be subject to certain limitations on transfer of their interests in the Target and other covenants generally designed to preserve the Target's status as an S corporation under the Internal Revenue Code. All equity holders in the Target, including the ESOP, will have customary co-sale rights and rights of first refusal on secondary transfers.

*(E) Minority Consent Rights*

The Acquiror will have the right to consent to any transaction or arrangement between the Target and the ESOP (other than as contemplated by the Transaction), and will have other customary minority consent rights to be discussed.

*(F) Information*

The Target will provide financial reports to each holder of ten percent (10%) or more of the Target's equity interests (including the holder of the Warrant), including monthly and year-to-date income, balance sheet and cash flow statements as compared to budget and comparable period in prior year, and will provide a written summary of operations each month. An annual audit of the Target's financial statements will be performed by Target's independent, nationally recognized accounting firm. Further, such holders will also be entitled to standard inspection and visitation rights. All such information and inspection rights will expire upon a qualified public offering.

Professionals' Eyes Only

TRB0058945

XI. AFFILIATE EXCHANGE:

    *(A) General*

    Immediately prior to consummation of the Merger, the Target will exchange (the "Affiliate Exchange") its newly issued participating preferred stock for all of the outstanding Target common and preferred stock held by certain affiliates of Target (the "Target Affiliates").

    *(B) Exchange Agreement*

    In connection with the execution and delivery of the Merger Agreement, the Target and each of the Target Affiliates will enter into an exchange agreement (the "Exchange Agreement"). The Exchange Agreement will provide, among other things, that the board of directors of the Target will approve, and cause to be filed, a certificate of designation related to a newly-designated class of participating preferred stock, which will remain outstanding following consummation of the Merger, and that each of the Target Affiliates will agree to exchange all of their Target common stock and preferred stock for a like number of shares of such participating preferred stock immediately prior to consummation of the Merger. Such common and preferred stock will become treasury stock of the Target and be canceled in the Merger without consideration in respect thereof.

XII. MISCELLANEOUS:

    *(A) S Corporation Election*

    The Target will elect, and the Target's shareholders will consent to the Target's election, to be treated as an S corporation for purposes of the Internal Revenue Code after completion of the contemplated transactions, or as soon as the Target is eligible to make the S election. In addition, the Target will elect to treat each of its eligible subsidiaries as a "qualified subchapter S subsidiary" for federal income tax purposes.

    *(B) Management Equity Incentive Plan*

    The Target will establish a management equity incentive plan (in the form of a stock appreciation right or similar incentive program), customary for a transaction of this size and for comparable businesses, and providing for the issuance to key members of management of the Target of equity participation rights with a value of up to **[five percent (5%)]** of the Target's total equity value (calculated after giving effect to the ESOP Purchase and the Warrant) (the "Management Incentive Plan"). Awards under the Management Incentive Plan will be administered by the Board of Target, or by a compensation committee of the Board, and will be subject to customary vesting and call protections and other terms and conditions, and will also have certain additional limitations designed to ensure preservation of the Target's election to be treated as an S corporation. The Management Incentive Plan shall provide that the participants in the Plan shall be entitled to receive benefits upon the occurrence of specified events or upon a specified date, with the value of their benefits to be determined by reference to the value of the Target's stock, determined on an enterprise value basis, with no discount for lack of control or lack of marketability.

* * * *

Professionals' Eyes Only    TRB0058946

**Bank Financing and Debt Financing**

Attached.

Professionals' Eyes Only

TRB0058947