SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES


FRANK GARAMELLA, Derivatively)   No. BC362110

on Behalf of TRIBUNE COMPANY,)

        Plaintiff,     )

  vs.                 ) HIGHLY CONFIDENTIAL

DENNIS J. FITZSIMONS, et al.,)UNDER THE PROTECTIVE

        Defendants,   )      ORDER

  -and-                )

TRIBUNE COMPANY, a Delaware )

corporation,            )

     Nominal Defendant. )


   The videotaped highly confidential discovery

deposition of DENNIS J. FITZSIMONS, taken in the

above-entitled cause, before DERALYN GORDON,

a notary public of Cook County, Illinois, on the

14th day of May, 2007, at One South Dearborn

Street, Chicago, Illinois, beginning at

approximately 11:15 a.m., pursuant to Notice.


REPORTED BY:  DERALYN GORDON, CSR, RPR, CRR

LICENSE NO:  084-003957

Page 2

```
1   PRESENT:
2
3     LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS
4     BY STEPHEN J. ODDO, ESQ.,
5     655 West Broadway, Suite 1900
6     San Diego, California 92101
7     (619) 231-1058
8     soddo@lerachlaw.com
9       appeared on behalf of plaintiff;
10
11    SIDLEY AUSTIN LLP
12    BY JAMES W. DUCAYET, ESQ.,
13    One South Dearborn
14    Chicago, Illinois 60603
15    (312) 853-7621
16    jducayet@sidley.com
17      appeared on behalf of defendant
18      Dennis J. FitzSimons;
19
20
21
22
23
24
25
```

Page 3

```
1   PRESENT: (CONT'D)
2
3     GIBSON, DUNN & CRUTCHER LLP
4     BY MELISSA J. EPSTEIN, ESQ.,
5     333 South Grand Avenue
6     Los Angeles, California 90071
7     (213) 229-7314
8     mepstein@gibsondunn.com
9       appeared on behalf of defendants
10      Jeffrey Chandler, Roger Goodan, and
11      William Stinehart, Jr.;
12
13
14    ALSO PRESENT:
15      Mr. John Sheehan, Legal Videographer.
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1       THE VIDEOGRAPHER:  Good morning.  This
2   begins videotape number one of the video
3   deposition of Mr. Dennis J. FitzSimons taken in
4   the matter of Garamella, et al., versus
5   FitzSimons, et al., in the Superior Court of the   11:15AM
6   State of California, County of Los Angeles, case
7   number BC362110.
8       This deposition is being taken on
9   the 14th day of May, 2007 at the offices of
10  Sidley Austin at One South Dearborn Street,        11:15AM
11  Chicago, Illinois.
12      My name is John Sheehan in association
13  with Eastwood-Stein Deposition Management of
14  Chicago; I'm the videographer.  The court
15  reporter is Deralyn Gordon also in association     11:15AM
16  with Eastwood-Stein.
17      At this point I'd like the counselors to
18  please introduce themselves audibly.
19      MR. DUCAYET:  Jim Ducayet from Sidley
20  Austin LLP on behalf of the witness.              11:15AM
21      MR. ODDO:  Steven Oddo on behalf of
22  plaintiff.
23      MS. EPSTEIN:  Melissa Epstein on behalf of
24  defendants William Stinehart, Jr., Jeffrey
25  Chandler and Roger Goodan.                        11:16AM
```

Page 5

```
1       THE VIDEOGRAPHER:  Thank you.  At this
2   point will the court reporter please administer
3   the oath and we may begin.
4       (Whereupon the witness was
5           sworn.)              11:16AM
6       THE VIDEOGRAPHER:  Pardon me, starting
7   time is 11:16 a.m.  Thank you.
8       DENNIS J. FITZSIMONS
9   called as a witness herein, having been first duly
10  sworn, was examined and testified as follows:     11:16AM
11      EXAMINATION
12  BY MR. ODDO:
13  Q.  Mr. FitzSimons, my name is Steve Oddo, I
14  am with the law firm of Lerach Coughlin; we
15  represent Plaintiff in the action for which you're 11:16AM
16  being deposed today.
17      Could you please state your full name and
18  address for the record?
19  A.  Dennis J. FitzSimons, 72 Woodley Road,
20  Winnetka, Illinois, 60093.                        11:16AM
21  Q.  Okay.  You mentioned before we started
22  that you had been deposed before.  How many times
23  have you been deposed?
24  A.  Three or four.
25  Q.  Okay.  When was the most recent?              11:17AM
```

Page 6

1      A.  Probably 5, 10 years ago; I'm not exactly
2   sure.
3      Q.  Okay.  Let's go over some of the ground
4   rules then just to reacquaint you with the process
5   so we can go as efficiently as possible.    11:17AM
6         My questions and your responses are being
7   taken down by the court reporter.  And even though
8   we do have a videographer here today, you need to
9   answer audibly to my questions because those are
10  the only responses that the court reporter can    11:17AM
11  take down, so head shakes or anything like that
12  she can't take down, so please answer audibly to
13  my questions, okay?
14     A.  Sure.
15     Q.  And also in order to make it as efficient  11:17AM
16  as possible for the court reporter, we need to
17  avoid talking over each other.  So even though you
18  may know where I'm going with a question and
19  chomping at the bit to start, let me finish, and
20  I'll extend you the same courtesy by not starting  11:17AM
21  my questions before you end your responses.  Okay?
22     A.  Sure.
23     Q.  Okay.  The videotapes last approximately
24  an hour, so we'll break every hour or so.  If you
25  need a break at any other time, just let me know,  11:18AM

Page 7

1   and I'll do my best to accommodate you.
2         Is there any reason you can think of that
3   would preclude you from either understanding my
4   questions here today or formulating responses to
5   them?                      11:18AM
6      A.  I don't think so.
7      Q.  Okay.  Well, you're not on any sort of
8   medication that would hinder your ability to --
9      A.  No.
10     Q.  Okay.  You've just taken an oath to tell  11:18AM
11  the truth.  Do you understand that even though
12  that that oath -- even though we're in a rather
13  informal setting here in a law office that it's
14  the same oath you'd take as if you were in a court
15  of law with the same repercussions?           11:18AM
16     A.  Yes.
17     Q.  Okay.  Can you take me through your post
18  secondary education?
19     A.  Sure.  A graduate of Fordham University,
20  class of 1972, I majored in political science.    11:19AM
21     Q.  Any graduate degrees?
22     A.  No.
23     Q.  Okay.  Can you take me through your
24  employment history beginning after you graduated?
25     A.  Sure.                   11:19AM

Page 8

1      Q.  Up until the time that you joined the
2   Tribune, and then we'll get a little more
3   specific.
4      A.  Sure.  First job out of college was
5   Bradford Shareholder Services for about 6 months,  11:19AM
6   then I worked at Grey Advertising.
7      Q.  What position did you have at Bradford
8   Shareholder Services?
9      A.  I was an account officer.  It was a share
10  sort of back room shareholder transfer company.  I  11:20AM
11  did work for banks.
12     Q.  Okay.  What was the position you were --
13     A.  Grey Advertising I was an Assistant
14  Television Buyer.
15     Q.  Okay.  What came next?             11:20AM
16     A.  Peters Griffin Woodword.
17     Q.  What was the position?
18     A.  Research Analyst, then Account Executive.
19     Q.  When were you there?
20     A.  It would have been 1973 to '74.        11:20AM
21     Q.  Okay.
22     A.  Blair Television, '74, Account Executive,
23  let's say, late '74 to '76, Telerep, Inc., Account
24  Executive then Sales Manager, and then Viacom, and
25  then I had two positions, Director of National     11:21AM

Page 9

1   Advertiser Sales, and then Director of Sales and
2   Marketing for WVIT in Hartford, which was also
3   owned by Viacom.
4      Q.  Okay.  Approximately when was that?
5      A.  Viacom was 1981 and then to '82.  And in   11:21AM
6   July of '82 I joined the Tribune Company at WGNTV.
7      Q.  In what position?
8      A.  Director of Sales.
9      Q.  Okay.  Can you take me through the
10  different positions you've held at Tribune?       11:22AM
11     A.  This is going to be a long time.  Sure.
12  After a year and a half, about 18 months at WGN,
13  I went down to -- we bought a station in
14  New Orleans, I became General Manager of that
15  television station, WGNOTV, that was 1984.  I came  11:22AM
16  back in late '85, so 18 months.  At that point I
17  was -- became Director of Operations for the
18  station group, so that would have been '85 to
19  April of '87, then I became General Manager of
20  WGNTV.                      11:23AM
21        In '92 I became President of Tribune
22  Television TV Group, in probably '98 I became
23  President of Tribune Broadcasting, which included
24  radio as well as the Chicago Cubs it included
25  responsibility for and Tribune Entertainment       11:23AM

Page 10

1  Company also.
2      Q.  Were you a member of the Tribune Board at
3  this point in time?
4      A.  No.
5      Q.  Okay.                          11:23AM
6      A.  2000 I became Executive Vice President of
7  the Tribune Company overall with responsibility
8  for the newspaper division also.
9      Q.  Did you have a specific area of authority
10  that you were Executive Vice President, was it --  11:24AM
11  were there more than one Executive Vice Presidents
12  or --
13      A.  No, just one.
14      Q.  Okay.  Did you have oversight over the
15  entire operation then?                  11:24AM
16      A.  Yes.
17      Q.  Okay.  And how long were you in that
18  position?
19      A.  I was in that position probably until
20  '01 when I became, '01 or '02, President and Chief  11:24AM
21  Operating Officer.  We can double check these
22  dates; they're all pretty close.
23      Q.  That's fine.
24      A.  And then in '03, January of '03 I became
25  CEO, January of '04 Chairman.           11:25AM

Page 11

1      Q.  And those are the positions you currently
2  hold?
3      A.  Yes.
4      Q.  Okay.  When did you join the Board?
5      A.  I believe 2000, either 2000 or -- I      11:25AM
6  believe it's, yes, it's 2000.
7      Q.  Okay.  What position did you hold at the
8  time of the Times Mirror merger?
9      A.  I had just taken over as Executive Vice
10  President, I'd just been promoted to that     11:25AM
11  position.
12      Q.  Did you sit on any other boards of
13  directors of public companies?
14      A.  No.
15      Q.  How about any private companies?      11:26AM
16      A.  No.
17      Q.  Okay.  What is Off the Street Club?
18      A.  Off the Street Club is a boys and girls
19  club on the West Side of Chicago that serves about
20  3,000 children in a very tough neighborhood; West  11:26AM
21  Garfield Park is the neighborhood.
22      Q.  Okay.  What is the Robert R. McCormick
23  Tribune Foundation?
24      A.  That is the foundation that was set up
25  when Colonel Robert McCormick died in 1955 and set  11:27AM

Page 12

1  up -- and bequeathed his estate to the Foundation,
2  which was set up to benefit the Chicago area and
3  communities in which the Company did business.
4  Its main areas of focus now are early childhood
5  education, communities, journalism, and those are  11:27AM
6  the three primary areas.
7      Q.  Okay.  And what's your association with
8  the Foundation?
9      A.  I'm the Chairman of the Foundation.
10      Q.  When did you --                  11:28AM
11      A.  Chairman and Director.
12      Q.  When did you become a Director of the
13  Foundation?
14      A.  Also around 2000 I believe.
15      Q.  And when did you become Chairman?      11:28AM
16      A.  Probably in '05 I would say after
17  John Madigan retired, probably a year, year and
18  a half after John Madigan had retired, and he had
19  retired in January of '04.
20      Q.  Okay.  Does the Foundation have some sort  11:28AM
21  of affiliation with Tribune?
22      A.  Totally separate entities.
23      Q.  Is the Foundation an investor in Tribune?
24      A.  Yes.
25      Q.  Is that the extent of its connection with  11:29AM

Page 13

1  Tribune?
2      A.  No.  Also there are community programs
3  where the Foundation will provide a match for
4  funds of the Foundation, I'll give you an example,
5  WGNTV Children's Charities here in Chicago is a  11:29AM
6  fund of the Robert R. McCormick Foundation, and
7  WGNTV Children's Charities will raise funds, and
8  then the Foundation will provide a match in the --
9  those funds come into the Foundation, and then
10  they are granted to community organizations with a  11:29AM
11  50 percent match.
12      Q.  Okay.  So they have joint projects
13  together with certain parts of the Tribune
14  organization?
15      A.  Philanthropic profits -- philanthropic --  11:29AM
16      Q.  Projects?
17      A.  -- projects, yes.
18      Q.  Okay.  What are the Foundation's assets?
19      A.  Primarily Tribune stock, the Foundation
20  elected about a billion three to a billion four in  11:30AM
21  assets, and the Foundation agreed to tender shares
22  back in July and sold 25 percent of their shares
23  in that tender offer.
24          So right now the position is about
25  $300 million in diversified assets and the      11:30AM

Page 14

1  remainder in stock.
2    Q.  For a total of 1.3 or 1.4?
3    A.  Yes.  That's divided in two foundations,
4  McCormick Tribune Foundation and the Cantigny
5  Foundation; of that the Cantigny Foundation is 2.8  11:30AM
6  Tribune shares.
7    Q.  What is the -- how do you pronounce that?
8    A.  It's spelled C-a-n-t-i-g-n-y, and that is
9  the name of Colonel McCormick's estate in Wheaton,
10  Illinois.                          11:31AM
11        And the Cantigny Foundation, those assets
12  go to support the estate of Colonel McCormick
13  which consists of the First Division Army Museum,
14  his home, which is now a museum open to the public
15  as well as a golf course and park that is open     11:31AM
16  to the citizens of Illinois, that was, again,
17  bequeathed in the Colonel's will.
18    Q.  What's the affiliation of the two
19  foundations?
20    A.  The Directors are the same, but it was set  11:31AM
21  up in the Colonel's will as two separate
22  foundations.
23    Q.  The 1.3 to 1.4 billion you mentioned
24  before, does that include --
25    A.  It includes both.            11:32AM

Page 15

1    Q.  What's the breakdown, do you know?
2    A.  It's 2.8 million for Cantigny and the
3  remainder would be the McCormick Tribune shares.
4  The combination is 13 percent.
5    Q.  Who are the beneficiaries --        11:32AM
6    A.  Excuse me, of Tribune shares outstanding.
7    Q.  Okay.  Who are the beneficiaries of the
8  McCormick Foundation?
9    A.  Beneficiaries?  I'm not sure -- the
10  Directors are either retired or existing     11:32AM
11  executives of the company, but the beneficiary,
12  it's a public charity.
13    Q.  So are the investments that the Foundation
14  makes left to the discretion of the trustees?
15    A.  Yes.  It's specified in the Colonel's   11:33AM
16  will.  Wide latitude is given to the Directors
17  as to how to invest as far as diversification
18  requirements, these matters were -- or I should
19  say the Directors were given wide latitude in
20  these matters according to the will.         11:33AM
21    Q.  Are the Foundations set up to continue to
22  operate in perpetuity?
23    A.  Yes -- I'm not sure of that answer, I need
24  to ask, but there's no sunset provision that I'm
25  aware of.                         11:34AM

Page 16

1        Again, the Foundation was set up to
2  benefit the people of Illinois as well as the
3  communities where the company does business.
4    Q.  Okay.  Besides the investment in Tribune,
5  what other types of investments do the Foundations  11:34AM
6  have?
7    A.  Bonds, other index funds, those kinds of
8  things.
9    Q.  Who monitors the investments?
10    A.  There's an outside independent financial   11:34AM
11  advisor, Brien O'Brien is the individual's name;
12  I'd have to double check the name of his firm.
13    Q.  Okay.  Are you compensated for your role
14  on the Tribune Foundation?
15    A.  Yes.                         11:35AM
16    Q.  In what manner?
17    A.  There's an annual compensation paid
18  quarterly of  Redacted
19    Q.  How long have you known Sam Zell?
20    A.  Very -- I met him for the first time in    11:35AM
21  probably late January.
22    Q.  How did that come about?
23    A.  When Sam and his organization reentered
24  the process, he had requested a meeting with
25  myself and several other Tribune managers.      11:36AM

Page 17

1    Q.  Okay.
2    A.  And we went over to his office where we
3  met with Sam and a couple of his people.
4    Q.  Okay.  And what was the substance of what
5  was discussed at that meeting?              11:36AM
6    A.  Well, the substance was they wanted to
7  get to know us, understand our view of the media
8  industry.  And I believe that meeting was prior to
9  their receiving the full management presentation
10  that all bidders or all potential bidders had     11:36AM
11  received in the fourth quarter and in some cases
12  in January.
13    Q.  Was an employee stock ownership program
14  discussed at that meeting?
15    A.  I don't specifically remember if it was   11:36AM
16  brought up at that meeting.  I think it was more
17  of a general conversation at that point.
18    Q.  When was the first time you recall hearing
19  an ESOP discussed in connection with Mr. Zell's
20  interest in the company?              11:37AM
21    A.  It's tough to say exactly but it's
22  probably sometime in February.
23    Q.  Do you recall how you came to learn about
24  it?
25    A.  In one of our many meetings, but I do   11:37AM

Page 18

1   recall that we were all struck by the complexity
2   because we needed to learn about ESOP's, we needed
3   to understand more about the S corp feature of
4   this proposed structure.
5        So there was a lot that we didn't        11:37AM
6   understand about how this transaction could
7   possibly work.
8   Q.   Was it a structure that was being proposed
9   by Mr. Zell and/or Equity Group Investments?
10   A.   Yes.                    11:38AM
11   Q.   Did they give an explanation as to why
12   they were proposing it in such a way?
13   A.   They felt it could create additional value
14   for shareholders and in that way advantage them
15   versus other bidders.             11:38AM
16   Q.   In what way did they communicate that they
17   thought it could create additional value for
18   shareholders?
19   A.   Just because of the tax advantages
20   inherent in the structure, which initially we     11:38AM
21   didn't quite understand.
22   Q.   Do you have an understanding of those now?
23   A.   Yes.
24   Q.   Can you describe them for me?
25   A.   Well, because of the laws governing    11:39AM

Page 19

1   Employee Stock Ownership Plans, there isn't
2   federal tax paid by an ESOP, and S corp structures
3   also don't pay corporate level tax, but the tax is
4   passed on to the individuals in the S corp.
5   That's my understanding.             11:39AM
6   Q.   Okay.  In what way is that an advantage?
7   A.   Well, if there's a reduction in the amount
8   of tax that can be paid -- or in the amount of tax
9   that is paid, that leaves additional cash to pay
10   down debt or service debt, both service and pay    11:39AM
11   down debt.
12   Q.   So that's an advantage to the Company once
13   the ESOP is established?
14        MR. DUCAYET:  Objection to the form.
15        You can go ahead and answer.        11:40AM
16   A.   Once the transaction closes and the
17   ESOP and S corp then both exist, S corp election
18   is made, then you have both advantages in place in
19   the intersection of the ESOP and the S corp.
20   BY MR. ODDO:                    11:40AM
21   Q.   Okay.  We'll get into that a little more a
22   little later when we talk about steps that have
23   been taken to form that.
24        So prior to January of this year, you'd
25   never met Sam Zell?               11:40AM

Page 20

1   A.   No.
2   Q.   Okay.
3   A.   You know, not that I recall certainly.
4   Q.   You don't recall coming across him in any
5   social circles or anything like that in Chicago?   11:40AM
6   A.   No.
7   Q.   Do you -- are you aware of whether anybody
8   else on the Board of Directors had any prior
9   relationship with Mr. Zell prior to this here?
10   A.   I think some of our Directors may have --   11:41AM
11   well, that would be speculation on my part.
12   Q.   Sitting here today you're not aware?
13   A.   No.  I just know Bill Osborn did say that
14   he knew Sam, but as far as any of our other
15   Directors, I don't know.             11:41AM
16   Q.   Prior to January did you know anybody else
17   at Equity Group Investments?
18   A.   No.
19   Q.   How long have you known Mr. Holden?
20   A.   Betsy Holden?                11:42AM
21   Q.   I'm sorry, yes, the board member,
22   Ms. Holden.
23   A.   Let's see, probably since the mid '90s.
24   Q.   And how did you come to know her?
25   A.   She was also involved with Off the Street   11:42AM

Page 21

1   Club, and then she was co-CEO of Kraft.
2   Q.   How long have you known Mr. Morrison?
3   A.   I met Bob when he first came on the Board.
4   Q.   When was that?
5   A.   Which would have been I believe in '03 or   11:43AM
6   '04 possibly.
7   Q.   How about Mr. Osborn?
8   A.   When he joined the Board.
9   Q.   And Mr. Reyes?
10   A.   I knew Chris going back to probably the    11:43AM
11   mid '80s, but not well; I met him because he was
12   a client of WGNTV.
13   Q.   How long have you known Mr. Hernandez?
14   A.   I met him when he joined the Board.
15   Q.   When was that do you know?        11:45AM
16   A.   It would be '03.
17   Q.   Mr. Taft?
18   A.   We can double check these dates to make
19   sure.
20   Q.   I just need an approximation.        11:45AM
21        And Mr. Taft?
22   A.   Since the '80s.
23   Q.   Okay.  In what context?
24   A.   He was client of the -- he was President
25   of Taft Broadcasting, that was a client of   11:45AM

Page 22

1  Telerep, one of the firms that I had worked for.
2  I would not have had any contact with him.
3       And then in 1992 the Company bought his
4  television station in Philadelphia.  Several years
5  after that he joined the Board.        11:46AM
6     Q.  Okay.  And Mr. White?
7     A.  Mr. White, when he joined the Board,
8  although slightly before I'd met him in social
9  situations and in charitable situations around
10  Chicago.                          11:46AM
11    Q.  Okay.  I want to take you back to
12  December of 2005, and there was discussion at the
13  Board level at that time about certain strategic
14  alternatives that the Company was looking at,
15  including a potential sale or spinoff of the        11:47AM
16  Broadcasting and Entertainment Group; do you
17  recall that?
18    A.  Yes.
19    Q.  Okay.  What precipitated the discussions
20  at that point in time about looking at a potential  11:47AM
21  sale or spinoff of the Broadcasting and
22  Entertainment Group?
23    A.  I don't remember the exact timing, but
24  we had looked at the possibility of selling the
25  Broadcast Group to Time Warner.  Time Warner was    11:47AM

Page 23

1  the approximately 80 percent owner of the Warner
2  Brothers network, the WB; it was always viewed
3  as logical that they would like to be the owner
4  of the station group that carried the network.
5       So we considered these things as to        11:47AM
6  whether we could maximize shareholder value by
7  splitting the company up and doing a cash sale of
8  the television group.
9     Q.  Okay.  Was this an alternative that was
10  proposed by somebody or any of your advisors?  How  11:48AM
11  did the thought materialize?
12    A.  Well, it was proposed by me and the
13  management of the TV group.
14    Q.  What was the Board's response to that
15  suggestion?                         11:48AM
16    A.  See if there's an acceptable price that
17  will create value.
18    Q.  What steps did you take to find that out?
19    A.  I went out to see Barry Meyer and
20  Bruce Rosenblum.  I believe this is -- I want       11:48AM
21  to double check the dates on this, but this may
22  have been December of '04, and this may have
23  taken place in actually '05 where we had the
24  conversation with Time Warner.
25       And it was, I believe, in May of '05 we       11:49AM

Page 24

1  exchanged information, they did due diligence, and
2  while Warner Brothers studios was very interested
3  in the station group, Time Warner Corporate in
4  New York felt the investment wouldn't have met
5  their hurdle rate.                    11:49AM
6     Q.  Okay.  Were there any other potential
7  parties contacted besides Time Warner?
8     A.  Over time there was.  Time Warner was
9  viewed as the logical buyer, but during the course
10  of our process, a number of other -- I had talked  11:49AM
11  to -- well, actually, around that time after
12  Time Warner said no, I had conversations with ABC,
13  with Les Moonves at CBS, Bob Wright at NBC to
14  see what -- if not a complete sale if there were
15  a joint venture structure or anything else that     11:50AM
16  could enhance value for shareholders.
17    Q.  Are these the discussions that took
18  place in December of '05 and afterwards?
19    A.  I believe that would have occurred in '05.
20  I'd need to double check my notes, but I believe    11:50AM
21  those conversations were in '05.
22    Q.  Okay.  Now, the Tribune had an ownership
23  interest in a couple of limited liability
24  companies; is that correct?
25    A.  Which LLCs?                      11:50AM

Page 25

1     Q.  TMCT I and II?
2     A.  Yes.
3     Q.  Okay.  How were those limited liability
4  companies formed?  What was the context?
5     A.  They were formed prior to our acquisition  11:51AM
6  of Times Mirror, I believe it was '97 and '98 when
7  the Times -- when the Chandler family wanted to
8  diversify their holdings in Times Mirror stock, so
9  they were inherited in the merger.
10    Q.  And at some point in late 2005 and         11:51AM
11  early 2006 were there discussions at the Board
12  level about restructuring those LLCs?
13    A.  Yes.
14    Q.  Okay.  And what was the purpose of trying
15  to restructure those?                 11:51AM
16    A.  The purpose was to really simplify our
17  capital structure and the Chandlers' interests
18  were as the 7-year period for the second LLC was
19  approaching, they were anxious to unwind those
20  partnerships.                       11:52AM
21    Q.  Okay.  Did they convey to you why they
22  were anxious to unwind them?
23    A.  Yes.  If there was any type of cash
24  transaction that occurred for the Company, it
25  would entail a significant tax consequence for      11:52AM

Page 26

1   the Chandler Trusts.
2   Q.  When you say a cash transaction, do you
3   mean a sale of the Company?
4   A.  Yes.
5   Q.  Did you view the existence of the LLC as    11:53AM
6   a potential deterrent to an interested party who
7   was examining the potential acquisition of the
8   Tribune?
9   A.  Yes.  It could be because there were
10  certain strategic alternatives then that would    11:53AM
11  have been problematic without an unwind of the
12  TMCTs.
13      So the spinoff of Broadcasting, for
14  example, would have required the unwind of the
15  TMCTs.                                            11:54AM
16  Q.  What steps did the Board and/or Management
17  take to unwind the LLCs in early 2006?
18  A.  We started negotiation with
19  representatives of the Chandler Trusts to
20  accomplish that, because it really did make sense  11:54AM
21  for everyone if that could be accomplished.
22      First of all, we just started TMCT I
23  because that was the only one that had passed the
24  7-year holding period or required holding period,
25  and those negotiations continued, but an           11:55AM

Page 27

1   acceptable transaction that was fair to all
2   shareholders we couldn't reach.
3   Q.  Okay.  Why not?
4   A.  Well, we felt from the Company's
5   standpoint that the demands from the Chandler      11:55AM
6   Trusts were such that there was a tremendous
7   advantage to what the Chandler Trusts would
8   receive in terms of the unwind versus what all
9   other shareholders would receive.
10  Q.  What were the potential alternatives for   11:55AM
11  unwinding?  How do you go about doing that and
12  what were the alternatives that you were looking
13  at and suggesting to the Chandlers?
14  A.  Well, there were -- A, this is a very
15  complex transaction, there were a number of issues  11:56AM
16  that had to be dealt with, the value of the real
17  estate in the TMCT I, also the value of the
18  preferred stock.  I believe those were the two
19  biggest issues.
20  Q.  Okay.                                        11:56AM
21  A.  So it was evaluation of those two elements
22  of the TMCTs, and I'm sure there were other issues
23  also.
24  Q.  Were there disputes with the Chandlers
25  over the values of the real estate and the        11:56AM

Page 28

1   preferred stock?
2   A.  Yes.
3   Q.  Did you have financial advisors assisting
4   you?
5   A.  Yes.                                          11:57AM
6   Q.  Who was that?
7   A.  Merrill Lynch.
8   Q.  Did the Chandlers have financial advisors?
9   A.  Yes.
10  Q.  Who was that?                                 11:57AM
11  A.  Goldman Sachs and Rustic Canyon,
12  Mike Smith and Tom Unterman, Mike Smith
13  from Goldman Sachs, Tom Unterman from
14  Rustic Canyon.
15  Q.  How involved were you in the discussions   11:57AM
16  about the restructure?
17  A.  I was sort of one level removed.  Our
18  two main negotiators were Crane Kenney, the
19  general counsel, and Don Grenesko, the CFO, along
20  with Michael Costa from Merrill Lynch.            11:57AM
21  Q.  Aside from the real estate and the
22  preferred stock, what other assets did the
23  LLCs have or was that --
24  A.  Common shares, Tribune common shares.
25  Q.  Anything else?                                11:58AM

Page 29

1   A.  I'm sure there were other things, other
2   assets in there, but that's what I remember right
3   now.
4   Q.  Okay.  Was the Company also talking to a
5   private equity firm in early 2006?               11:58AM
6   A.  Yes.
7   Q.  Who was that?
8   A.  Madison Dearborn Partners.
9   Q.  What was the substance of the
10  conversations you were having with the private   11:58AM
11  equity folks?
12  A.  We had been approached initially by
13  Madison Dearborn, they're Chicago based, that we
14  might be interested in hearing what was being said
15  out there about our -- by investment banks about  11:59AM
16  our company.
17      So on that basis I agreed to a meeting
18  with Madison Dearborn, and we heard the range of
19  interest that was being talked about.  So that was
20  the substance of the meeting initially.  That     11:59AM
21  would have been in December of '05.
22  Q.  Okay.  And what was this range of interest
23  that they had described to you?
24  A.  At that point around 38 to $40 a share if
25  I remember correctly.                             11:59AM

Page 30

1    Q.  So were they conveying to you that they
2    had understood that there were parties out there
3    that were talking about that valuation for the
4    Company, or was this a valuation that they were
5    talking themselves about for the Company?    12:00PM
6    A.  Well, this was an indication of a range
7    that based on numbers, public numbers they had
8    seen that might be in the range where a private
9    equity firm could make their returns by doing a
10   leverage buyout based on the available credit in    12:00PM
11   the market at that point.
12       So it was sort of a general conversation
13   that we had in a listen mode primarily in
14   December of '05.
15   Q.  Did they express an interest in pursuing a    12:00PM
16   potential LBO?
17   A.  Well, they said they had a lot of respect
18   for our company and the assets that we had, and
19   they could have interest.
20   Q.  Following that did the Board take any    12:01PM
21   actions to pursue the potential LBL with private
22   equity firms?
23   A.  This was discussed at our February meeting
24   in '06 where we requested authorization to speak
25   or explore further a possible going private    12:01PM

Page 31

1    transaction; Management expressed that interest in
2    exploring further the private equity transaction,
3    and the Board said we're not prepared to authorize
4    that.
5    Q.  Okay.  Did they give a reason?    12:01PM
6    A.  They felt it might be premature.  Also,
7    the discussions that related to the TMCTs were
8    going on, as it noted in our disclosure for the
9    tender offer, and we also received a letter from
10   the Chandler Trusts immediately prior to the Board    12:02PM
11   meeting suggesting that if the TMCTs were not
12   unwound before May 31st, the Chandler Trusts would
13   consider a transaction or joining with other
14   shareholders to precipitate a transaction,
15   fundamental transaction for all of Tribune.    12:02PM
16       Let's remember a private equity
17   transaction at that point would have involved a
18   big tax consequence for the Chandler Trusts.
19   Q.  So was it the Chandler Trusts who were
20   opposed to initiating discussions with private    12:03PM
21   equity at that point in time?
22   A.  I believe it was the general sense of the
23   Board.
24   Q.  Did they convey a sense that once the
25   LLCs had been restructured, that that was an    12:03PM

Page 32

1    alternative they might want to pursue?
2    A.  No, it was just a general sense let's not
3    rush into a private equity transaction at this
4    point.
5    Q.  Okay.    12:03PM
6    A.  Or let's not -- let me be more precise on
7    that.
8       We asked for permission to further explore
9    a private equity transaction, and that request was
10   denied at that meeting.    12:03PM
11   Q.  Okay.  Aside from the LLCs, were there any
12   other reasons why the Board conveyed they felt it
13   was premature to explore that option at that time?
14   A.  I shouldn't probably link those two.
15   There should be no linkage between the -- we had    12:04PM
16   the negotiation that we were going to enter into
17   for the unwind of the TMCTs --
18   Q.  Uh-huh.
19   A.  -- and then we had the Board suggesting
20   that it was not the right time to enter into a    12:04PM
21   negotiation for a going private transaction.
22   Q.  Okay.  Then what were the reasons for --
23   that the Board conveyed for it not being the right
24   time?
25   A.  There were individual comments made, but    12:04PM

Page 33

1    the general feeling was this might be premature,
2    and they were not ready to entertain a going
3    private transaction.
4    Q.  Okay.  Did they give any specific reasons
5    why they thought it was premature?    12:05PM
6    A.  No, that was it because I think they just
7    heard about this, these conversations had just
8    started, and felt it would perhaps be rushing to
9    do this.
10       I should probably add one thing to that    12:05PM
11   because at the time I believe the majority of the
12   Board members felt that it would not be in the
13   interest, the best interest, of shareholders.
14   Q.  Again, did they give any specific reason
15   as to why not?    12:06PM
16   A.  The Board felt there was a lot of value
17   in our assets, and they felt the timing was not
18   right.
19   Q.  Was the 38 to $40 range that Madison
20   Dearborn had conveyed to you conveyed to the Board    12:06PM
21   also?
22   A.  Yes.
23   Q.  And did they have any thoughts on that
24   that you became aware of?
25   A.  No, other than the I think normal thoughts    12:06PM

Page 34

1  of, well, is that real, is that -- is this based
2  on public information or -- because certainly we
3  weren't authorized to give out any nonpublic
4  information, so that was a range that was put on
5  the table with no real requirement or no real, no   12:07PM
6  real, what's the right word, no real obligation.
7  It was an indication of maybe there's some
8  interest, and this is the number that was being
9  discussed.
10  Q.  Okay.                        12:07PM
11  A.  The range of number, the range of value.
12  Q.  What did they indicate was their basis for
13  coming up with that range that they conveyed to
14  you?
15      MR. DUCAYET:  Objection, asked and       12:07PM
16  answered.
17      You can answer.
18  A.  Analysis of public information.
19  BY MR. ODDO:
20  Q.  So was this their own internal analysis   12:07PM
21  based on public information or was this as a
22  result of conversations they had had with other
23  private equity firms?  Did they convey that to
24  you?
25      MR. DUCAYET:  Same objection.          12:07PM

Page 35

1  A.  I have no idea if they had conversations
2  with other private equity firms.
3  BY MR. ODDO:
4  Q.  Okay.  So the basis was, that they
5  indicated to you, was that was the range that they  12:08PM
6  had come up with based on their analysis of the
7  public information?
8  A.  I believe so, yes.
9  Q.  By the way, your counsel has objected a
10  couple of times; that's primarily to preserve the  12:08PM
11  objections for trial.
12      If -- unless he specifically instructs you
13  not to answer based on some sort of privilege, let
14  him make his objection, and then you can go ahead
15  and answer.                       12:08PM
16  A.  Sure.
17  Q.  Also, if there's at any point in time that
18  I ask a question for some reason you don't
19  understand, just ask me to rephrase it, and I'll
20  try to make it understandable to you.          12:08PM
21  A.  Sure.
22      MR. ODDO:  We've been going about an hour,
23  why don't we take --
24      MR. DUCAYET:  Yes, let's take a quick
25  break.                          12:08PM

Page 36

1      MR. ODDO:  -- a quick break.
2      THE VIDEOGRAPHER:  This will conclude
3  videotape number one, the time is 12:08 a.m., and
4  the deposition will continue on videotape number
5  two.                          12:09PM
6      (Lunch recess taken.)
7      THE VIDEOGRAPHER:  Good afternoon.  This
8  will begin videotape number two of the deposition
9  of Mr. Dennis J. FitzSimons taken the 14th day of
10  May, 2007 regarding case number BC362110.  The   12:36PM
11  time now is approximately 12:36 p.m.  And I'll
12  remind the witness he remains under oath, and we
13  may continue.
14  BY MR. ODDO:
15  Q.  When was the first time that the Board    12:37PM
16  began to discuss a potential share repurchase in
17  2006?
18  A.  At the May meeting.
19  Q.  How did that --
20  A.  This is -- although as we considered       12:37PM
21  strategic alternatives, that was one of the
22  possibilities that was considered along with a
23  whole range of alternatives probably prior to the
24  May meeting.
25  Q.  Was it before or after the May meeting     12:38PM

Page 37

1  that the Management had proposed approaching
2  private equity groups?
3  A.  It was before.
4  Q.  Who proposed the share repurchase plan?
5  A.  Our advisors.                   12:38PM
6  Q.  Merrill Lynch?
7  A.  And Citigroup.
8  Q.  What was the basis for the recommendation?
9  A.  Creating shareholder value.
10  Q.  How did they say that would do, would      12:39PM
11  create --
12  A.  Returning capital to shareholders.  We
13  announced that in conjunction with a divestiture
14  plan as well as an expense reduction plan, we call
15  that a performance improvement plan.            12:39PM
16  Q.  How is the share repurchase financed?
17  A.  Through debt.
18  Q.  Do you recall how much?
19  A.  I don't remember the exact number.
20  Q.  Who was the debt secured through?          12:39PM
21  A.  I don't remember.  I'd have to -- I would
22  have to check.
23  Q.  Was there any discussion at the Board
24  level of whether or not undertaking the share
25  purchase would make the -- or had the potential to  12:40PM

Page 38

1  make the Company less attractive to either a
2  private equity group or a strategic buyer?
3    A.  No, not that I recall.
4      MR. ODDO:  Okay.  Let's mark as FitzSimons
5  Exhibit No. 1 this document.          12:40PM
6        (FitzSimons Deposition Exhibit
7         No. 1 marked for
8         identification.)
9  BY MR. ODDO:
10   Q.  I'm going to be asking you some questions  12:41PM
11 about primarily the first two pages, but feel free
12 to review as much as the document as you want to
13 feel comfortable discussing it.
14   A.  (Indicating.)
15   Q.  Can you tell me what this document is?    12:44PM
16   A.  This is a letter that was received on
17 June 13th from the Chandler Trusts to the
18 Directors of Tribune Company.
19   Q.  Okay.  Have you seen this document before?
20   A.  Yes.                  12:44PM
21   Q.  The Chandler Trusts raised several issues
22 in this letter.  Were these issues that were
23 discussed with the Chandler Board Members prior to
24 the decision to initiate the share repurchase
25 plan?                    12:45PM

Page 39

1      MR. DUCAYET:  Objection to the form of the
2  question.
3    A.  What issues are you referring to?
4  BY MR. ODDO:
5    Q.  Okay.  I'll get into the specifics then.    12:45PM
6  In the first paragraph they contend that the
7  process by which the share repurchase was
8  considered by the Board was fundamentally flawed,
9  and that it was a purely financial device.  Did
10 you ever have any discussions with the Chandler    12:45PM
11 Directors about their concerns about the share
12 repurchase?
13   A.  In board meetings, yes.
14   Q.  Okay.  What can you --
15   A.  It was discussed.            12:46PM
16   Q.  Can you relate to me your recollection of
17 what their concerns were?
18   A.  Over time the Chandler Trusts or the
19 Chandler Directors, particularly Bill Stinehart,
20 had mentioned their desire as shareholders not to  12:46PM
21 be further concentrated in Tribune stock, so that
22 was a consistent theme.
23   Q.  Had the Chandler Directors proposed any
24 alternative to the stock repurchase?
25      MR. DUCAYET:  Objection to the form.    12:47PM

Page 40

1  Yeah, I mean, at what point in time?
2      MR. ODDO:  Prior to sending this letter.
3    A.  Yes, they had voted against the repurchase
4  or the tender offer at the meeting I believe it
5  was at the end of May.            12:47PM
6  BY MR. ODDO:
7    Q.  Had they proposed an alternative?
8    A.  Their alternative had been the unwind
9  of the TMCTs on terms acceptable to them, and
10 a spinoff of Broadcasting was dependent on the    12:47PM
11 unwind of the TMCTs.
12   Q.  Did you ever discuss the contents of this
13 letter with any of the Chandler Directors after
14 you received it?
15   A.  No.  The Directors replied to this      12:48PM
16 letter and filed that at the SEC also effectively
17 creating -- really just suggesting quite
18 concretely that this letter was totally inaccurate
19 in suggesting that the Board's action was hasty
20 and ill informed given that a lengthy process that  12:49PM
21 it started the previous summer with a Boston
22 Consulting Group study and then a Board retreat
23 in October of the same year going through all
24 possible ways to create shareholder value.
25      So the suggestion that various options had  12:49PM

Page 41

1  not been considered, strategic options had not
2  been considered, was totally inaccurate.  That was
3  the response from the Board.
4    Q.  Was the share repurchase -- let me
5  rephrase this.  Did you view the share repurchase  12:50PM
6  as the strategic alternative that -- let me try
7  one more time.
8      What did you hope to accomplish via the
9  share repurchase?
10   A.  What we hoped to accomplish was through    12:50PM
11 a combination of the share repurchase, asset
12 divestitures, and expense reductions, improved
13 performance, take advantage of the conditions
14 and the credit markets so that we could see an
15 improvement in our share price for all        12:50PM
16 shareholders.
17   Q.  Did you view this as a step in the process
18 or was this the strategic alternative or
19 alternatives that you felt were appropriate at
20 that time and nothing further needed to be done?  12:51PM
21   A.  Well, one of the advantages of this action
22 at this time was, again, take advantage of the
23 favorable conditions in the credit markets, and
24 then this would not preclude any other strategic
25 options that the Board chose to take.        12:51PM

Highly Confidential

Page 42

1    Q.  Now, was there any discussion about the
2  potential impact on the Company's credit ratings
3  of incurring the debt to fund the share
4  repurchase?
5    A.  There was a realization that the credit    12:51PM
6  ratings would go down just because of the amount
7  of debt that was being taken on.
8        But a number of our shareholders expressed
9  that a return of capital would be a positive
10  development.                            12:52PM
11    Q.  What shareholders?
12    A.  I should say -- I should correct myself,
13  number of analysts, again, given the conditions in
14  the credit markets, not shareholders, analysts.
15    Q.  Okay.  Did this have any impact on the    12:52PM
16  Company's credit ratings?
17    A.  Yes.
18        MR. DUCAYET:  Objection, asked and
19  answered.
20  BY MR. ODDO:                            12:52PM
21    Q.  And what was that impact?
22    A.  We went from I believe we were at A minus,
23  and I'm not sure what the level was, but there it
24  certainly declined from A minus.
25        Actually, just to perhaps correct myself,  12:53PM

Page 43

1  A minus may not have been the right rating at
2  that point because in September of 2005 the
3  negative tax, the IRS ruling came down in the
4  Matthew Bender and Mosbey case where we had to
5  borrow close to $1 billion to pay for the    12:53PM
6  settlement again, and something that was inherited
7  at the time was Mirror merger, which had a
8  negative impact on our stock and our credit
9  rating.
10    Q.  Was the Company approached by Mr. Broad,  12:53PM
11  Burkle and/or Geffen about the potential
12  acquisition of the LA Times in this time period,
13  say, spring and summer of 2006?
14    A.  Mr. Geffen had approached us at some point
15  prior to that.                            12:54PM
16    Q.  And what was the nature of his approach to
17  the Company?
18    A.  The initial approach came through a mutual
19  friend when Mr. Geffen requested a meeting with me
20  not really stating his purpose, and then towards  12:54PM
21  the end of the meeting suggested that he was very
22  interested in the Los Angeles Times.
23    Q.  When did that meeting take place?
24    A.  Probably a year before, you know, I'd
25  have to check.  But it was prior to all of this  12:55PM

Page 44

1  discussion of the sale of the Company coming up.
2    Q.  So sometime in 2005?
3    A.  I would say 2005, yes.
4    Q.  Okay.  Did he reapproach the Company --
5  let me backtrack.                        12:55PM
6        What response did you have to his inquiry
7  about the LA Times?
8    A.  I explained at that point that the
9  LA Times was not for sale, I explained that
10  there would be major tax implications for the    12:55PM
11  Company involved in a cash sale of the LA Times.
12    Q.  Okay.  Did you convey the substance of
13  your conversation to the Board?
14    A.  Yes, to our lead outside director, yes.
15    Q.  Mr. Osborn?                        12:56PM
16    A.  Yes.
17    Q.  What about the rest of the Board members?
18    A.  I don't recall if this was discussed
19  at a Board meeting or not, but I did not make
20  individual calls around each director.        12:56PM
21    Q.  Okay.  You don't have any recollection of
22  whether it was brought up at a Board meeting for
23  discussion?
24    A.  I do not recall specifically.
25    Q.  Did Mr. Geffen come back to you at some    12:56PM

Page 45

1  point?
2    A.  Yes.
3    Q.  To renew his interest?
4    A.  Yes.
5    Q.  And when did that take place?            12:56PM
6    A.  It may have been right around this time,
7  I'm not exactly sure of that, but...
8    Q.  Okay.  And how did that come about?
9    A.  Via a letter.
10    Q.  And what did the letter say?            12:57PM
11    A.  Effectively that Mr. Geffen was interested
12  in purchasing the newspaper.
13    Q.  Was this letter to you?
14    A.  Yes, I believe it was, yes.
15    Q.  Did the letter say anything else?        12:57PM
16    A.  I'm not sure if this particular letter
17  mentioned a price or not, but this letter I do
18  believe I forwarded to the full Board.
19    Q.  Did a subsequent letter from Mr. Geffen
20  reference a price?                        12:57PM
21        MR. DUCAYET:  Objection to the form.
22    A.  I'm not sure if that came in letter form
23  or if it was leaked to the press.
24  BY MR. ODDO:
25    Q.  What was the price that you heard he was  12:58PM

Page 46

1   interested in paying?
2   A.  $2 billion.
3   Q.  Did he ever convey that to you directly?
4   A.  Price?  I don't believe so.
5   Q.  Okay.  After you forwarded the letter to  12:58PM
6   the other members of the Board, did the Board
7   discuss Mr. Geffen's interest?
8   A.  Well, as the advisors looked at this
9   and considered the implications, there was a
10  determination made that it would be a negative  12:58PM
11  event for shareholders at $2 billion given the tax
12  considerations.
13  Q.  Was there ever any discussion about
14  providing Mr. Geffen with any sort of nonpublic
15  information about the newspaper to enable him to  12:59PM
16  perhaps increase his interest level?
17  A.  Not at that point that I recall.
18  Q.  Okay.  Was there a reason that that wasn't
19  suggested?
20  A.  So this would have been -- your question  12:59PM
21  would refer to the time period when?
22  Q.  When you forwarded the letter to the Board
23  members.
24  A.  I'm not exactly sure when that would have
25  been; it may have been June of '06.  At that point 12:59PM

Page 47

1   we would have just been -- have announced the
2   share buyback, so there was no discussion about
3   providing further information to Mr. Geffen.
4   Q.  Did he ever request additional
5   information?                                01:00PM
6   A.  Not specifically that I can recall.
7   Q.  Did you have any further conversations
8   with him about the LA Times?
9   A.  I did not, no.
10  Q.  Did he ever convey to you that he had  01:00PM
11  other people working with him who were also
12  interested in an acquisition of the LA Times?
13  A.  No.
14  Q.  Did Mr. Geffen ever indicate that he was
15  interested in acquiring any other assets of  01:01PM
16  Tribune besides the LA Times?
17  A.  No.
18  Q.  Did the Company ever enter into
19  any negotiations with him about a potential
20  acquisition of the LA Times?              01:01PM
21  A.  No.
22  Q.  Was Mr. Geffen ever provided any nonpublic
23  information about the LA Times?
24  A.  No.
25  Q.  Okay.  The Foundation did sell some of  01:01PM

Page 48

1   their shares in the share repurchase; is that
2   correct?
3   A.  Yes.
4   Q.  Okay.  And why did they do so?
5   A.  Well, first of all, I recused myself from  01:02PM
6   all deliberations, and an advisory committee was
7   set up consisting of the two directors who were
8   not executives of the Company.
9       They made the determination that it would
10  make some sense at the price being offered by the  01:02PM
11  Company for the Foundation to diversify to some
12  extent.
13  Q.  Okay.  When you're talking about an
14  advisory committee, you're talking with respect to
15  the Foundation, correct?                     01:03PM
16  A.  Correct, yes.
17  Q.  The Chandlers in this letter also suggest
18  that a committee of independent directors be
19  established.
20  A.  Yes.                                    01:03PM
21  Q.  Was that discussed at the Board level
22  after receiving this letter?  I know one was
23  formed later in the fall, but at this point in
24  time after receiving the letter, was there a Board
25  discussion about that?                       01:03PM

Page 49

1   A.  I think what I said earlier was that the
2   Board responded to this June 13th letter that you
3   referenced earlier suggesting that it was totally
4   inaccurate, but in terms of a discussion about
5   setting up an independent committee, I believe  01:04PM
6   there was some discussion about that, but it was
7   determined not to proceed at that point.
8   Q.  Okay.  Why?
9   A.  Because the Board at the meeting of
10  May 26th determined a course of action, and that  01:04PM
11  was to pursue the recapitalization and the share
12  repurchase, and that was the action that was
13  decided on, which would not preclude further
14  strategic action in the future if the Board felt
15  it made sense from a shareholder value creation  01:05PM
16  standpoint.
17  Q.  Did the Chandler Directors ever voice
18  their rationale for wanting an independent
19  committee established to the other Board members?
20  A.  Outside of this letter?  I don't believe  01:05PM
21  so.
22  Q.  You don't recall them bringing it up at
23  any of the Board meetings?
24  A.  No.
25  Q.  How frequently did you have contact with  01:05PM

Page 50

1  the three Chandler related directors?
2    A.  About as frequently as with the other
3  directors, which would be via e-mail, also phone
4  conversations every few weeks.
5    Q.  So you did have communication --        01:06PM
6    A.  In addition to the --
7    Q.  You did have communications with them
8  outside of the Board meetings?
9    A.  Yes.  It became less as the
10  TMCT negotiations became more contentious and        01:06PM
11  less after this letter was sent.
12    Q.  And why was that?
13    A.  Given the inaccuracy of the letter.
14    Q.  Did you ever -- I understand that the
15  Board sent a letter back.  Did you ever have any        01:06PM
16  discussions with the other -- with the Chandler
17  Board members about the perceived inaccuracy of
18  the letter?
19    A.  The letter from the Board spoke for
20  itself.                                01:06PM
21    Q.  You didn't have any specific discussions
22  with any of them about your views on the
23  inaccuracies?
24    A.  No.
25    Q.  Now, the TMCTs were ultimately        01:07PM

Page 51

1  restructured at some point; is that correct?
2    A.  Correct, yes.
3    Q.  Okay.  When did that take place?
4    A.  At the -- well, finally it took place
5  September 21st, but negotiations resumed after the   01:07PM
6  July board meeting.
7    Q.  What precipitated their resumption?
8    A.  The TM- -- it always made sense to unwind
9  the TMCTs, both side agreed on that.  It was the
10  terms that couldn't be agreed on.           01:07PM
11    Q.  How did you break the logjam with respect
12  to the terms?
13    A.  Well, first of all, both sides agreed to
14  go back to the table, we thought it made sense,
15  our Board thought it made sense.  And ultimately   01:07PM
16  the logjam was broken when significant value swung
17  back from the Chandler Trusts' position on what
18  was appropriate value for the assets in the trust
19  and what was an appropriate division of that value
20  to the trust versus the other shareholders.        01:08PM
21         Between July and September we were able,
22  as a management group, to come to a position where
23  we felt there was a significant swing of value
24  from the prior position that the trust held to the
25  position in September where we felt it was a fair   01:08PM

Page 52

1  deal for all shareholders at that point, and we
2  recommended it to the Board.
3    Q.  Okay.  Did -- I'm not sure I'm following
4  you.  Did the Chandler's position change or the
5  position of the Chandler Trusts change or was it   01:08PM
6  Management's position changed between July and
7  September?
8    A.  The position of the Chandler Trusts
9  changed.  Management's position may have changed a
10  little bit, but there was a significant swing in   01:09PM
11  value that came towards all other shareholders
12  from the Chandler Trusts.
13    Q.  When you say a swing in value, what do you
14  mean?
15    A.  Economic value.                     01:09PM
16    Q.  I understand economic value, but a swing
17  in value -- economic value from where to where?
18    A.  I believe the number in our calculations
19  was about $140 million coming back to all
20  shareholders from the respective positions of        01:09PM
21  the negotiating teams when negotiations stalled
22  in May.
23    Q.  What were the Company's holdings in the
24  TMCTs percentagewise?
25    A.  About 50/50 approximately.  It varied a   01:10PM

Page 53

1  little bit, but not too far out of that 50/50.
2    Q.  Then via the restructuring, what were the
3  respective percentages?
4    A.  Pretty similar.  It went up a little bit.
5  I'd have to review it.  They're pretty complex        01:10PM
6  negotiations, so I'm not sure I can give you an
7  exact answer on that.
8    Q.  Okay.  And what exactly took place via the
9  restructure?
10    A.  Well, the shares of -- the common shares   01:10PM
11  of stock were distributed, the preferred shares
12  were redeemed, and an agreement was reached as to
13  an option that the Tribune Company would have to
14  acquire the real estate assets.
15         MR. ODDO:  Okay.  Let's mark as FitzSimons   01:12PM
16  Exhibit 2 a document that is Bates stamped
17  TRIB2044 through 2052.
18              (FitzSimons Deposition Exhibit
19                No. 2 marked for
20                identification.)           01:12PM
21         MR. ODDO:  Let's also mark as FitzSimons
22  Exhibit No. 3 a document that's Bates stamped
23  TRIB2061 through 2107.
24
25                                01:12PM

Page 54

1        (FitzSimons Deposition Exhibit
2        No. 3 marked for
3        identification.)
4   BY MR. ODDO:
5   Q.   With respect to Exhibit 3, my questions      01:13PM
6   are going to focus primarily on pages 5, 6 and 7,
7   but, again, feel free to review as much or as
8   little of the document as you'd like to?
9   A.   So which are you going to deal with first,
10  Exhibit 3?                              01:13PM
11  Q.   We'll start with Exhibit 2, actually, the
12  minutes.
13  A.   Okay.
14  Q.   Have you seen this document before?
15  A.   Yes.                               01:14PM
16  Q.   Can you tell me what it is?
17  A.   You'd better give me time to review it.
18  Q.   Sure.
19  A.   Given the redacted -- all right.  So this
20  is from the July 19th meeting, okay.        01:15PM
21      MR. DUCAYET:  You should know that we
22  produced this document and redacted out, that's
23  our doing.
24      THE WITNESS:  Yes.
25      MR. ODDO:  So don't blame me.          01:15PM

Page 55

1       THE WITNESS:  Okay.
2   A.   All right.
3   BY MR. ODDO:
4   Q.   Have you seen this document before?
5   A.   Yes, I have.                       01:16PM
6   Q.   And what is it?
7   A.   These are the minutes from the --
8   presented at the September 21st board meeting
9   related to the July 19th board meeting.
10  Q.   Okay.  And then you were present at this   01:17PM
11  meeting?
12  A.   Yes.
13  Q.   Okay.  Calling your attention to page 4
14  under the strategic initiatives updated, it
15  indicates that you described the strategic review  01:17PM
16  process undertaken since the Board's July 19, 2006
17  meeting; do you see that?
18  A.   Yes.
19  Q.   Okay.  What did you say to the -- what did
20  you describe to the Board members?        01:17PM
21  A.   What I described was the continuation of
22  the process with our advisors as to looking at the
23  various alternatives we had been considering since
24  the prior year, spinoff of Broadcasting, sale of
25  Broadcasting, analyses as to a going-private     01:17PM

Page 56

1   transaction, those kinds of alternatives.
2   Q.   Okay.  Anything new in this time period
3   from July to September as compared to the
4   strategic alternatives that had been considered
5   before?  Were there any new alternatives that you   01:18PM
6   had asked Merrill Lynch or Citigroup to look at?
7       MR. DUCAYET:  Objection to the form of the
8   question.
9   A.   Not that I'm aware of.  We continued to
10  look at some of the same types of transactions and  01:18PM
11  alternatives.
12  BY MR. ODDO:
13  Q.   Did -- I'm sorry.  Did Merrill Lynch or
14  Citigroup propose any new types of alternatives
15  for the Board to consider?              01:18PM
16      MR. DUCAYET:  Objection to the form.
17  A.   I believe these were the alternatives
18  that we had been looking at since our
19  October retreat of the proceeding year, and this
20  was a continuation of the update given change      01:19PM
21  market conditions as to how these alternatives
22  would change in terms of creation of shareholder
23  value.
24      So, again, Merrill and Citi looked at
25  what would the likely outcome be for shareholders  01:19PM

Page 57

1   of these various alternatives.
2   MR. ODDO:
3   Q.   Had the situation improved for the
4   consideration of any of these alternatives
5   according to Merrill Lynch or Citigroup?       01:19PM
6   A.   What had changed was at the
7   September meeting the Board approved the
8   negotiation of the TMCT unwind, which made
9   other alternatives now structurally possible.
10  Q.   They approved the resumption of         01:20PM
11  negotiations or they approved the actual
12  terms?
13  A.   No, they approved the terms of what had
14  been negotiated.
15  Q.   What effect did that have on the range of  01:20PM
16  alternatives available to the Company?
17  A.   Well, it made the spinoff of Broadcasting
18  possible, the going-private transaction would no
19  longer result in a negative tax implication for
20  the Chandler Trusts, our capital structure had    01:20PM
21  been simplified.
22  Q.   Okay.  It indicates that you then
23  described actions taken by the Company to address
24  the decline in operating performance throughout
25  2005 and 2006; can you describe those for me?    01:21PM

Highly Confidential

Page 58

1    A.  They were mostly in the way of interactive
2   investments in growth that had -- when I say
3   interactive, mostly related to our Internet
4   investments and 100 percent owned investments
5   as well as equity investments in other companies,   01:21PM
6   also divestitures that we had announced in
7   conjunction with the share repurchase, and also
8   our expense control plan that we had put into
9   place.
10    Q.  What were the -- go ahead.        01:21PM
11        What were the Internet investments you
12  refer to?
13    A.  What we -- we're talking about our own
14  websites, all our newspaper.coms across the
15  company as well as careerbuilder.com, topics.net,   01:22PM
16  shoplocal.com, our investments in classified
17  ventures, which is cars.com, apartments.com, those
18  kinds of revenue enhancing investments that were
19  in a faster growth area.
20        On the other hand we had revenue        01:22PM
21  challenges in the newspaper industry; after a
22  very strong May period we started to see a
23  slowdown in print revenue.
24        We also had continued challenges in the
25  television arena given the aging program lineups   01:23PM

Page 59

1   at some of our television stations and some rating
2   methodology changes that had impacted our
3   television stations.
4        So those are the kinds of updates and
5   information that I was giving out.        01:23PM
6    Q.  Okay.  What specifically had you done with
7   respect to the newspapers, web sites, and the
8   other entities, like careerbuilder.com and so
9   forth?
10    A.  Well, we had continued to invest.        01:23PM
11  careerbuilder.com had become the number one online
12  recruitment site surpassing Monster or was
13  supposed to surpass Monster in terms of traffic
14  by the end of '06, in terms of revenue also.
15        Cars.com and apartments.com continued at a   01:23PM
16  good growth rate, and -- so those are the kinds of
17  normal updates I would give to the Board.
18    Q.  Had you received any inquiries about an
19  acquisition of careerbuilder.com?
20        MR. DUCAYET:  Objection to the form.  At   01:24PM
21  what point in time?
22        MR. ODDO:  Any point.
23    A.  Not to my recollection.
24  BY MR. ODDO:
25    Q.  Had the Board ever discussed the potential   01:24PM

Page 60

1   sale of careerbuilder.com?
2    A.  No, the discussion was -- would come up
3   every now and then did it make sense to take
4   CareerBuilder public.
5    Q.  And when was that discussed?        01:24PM
6    A.  I could not give you a specific time on
7   that.
8    Q.  Did you ever authorize any valuation work
9   by any advisors to determine what an IPO could
10  produce?                01:25PM
11    A.  No, we didn't because of the structure
12  that CareerBuilder is in, that is most of the
13  economics reside at the affiliates, which would be
14  our newspapers.
15        So the way we structured the business was   01:25PM
16  that the network would operate at not an enormous
17  profit, and most of the cash flow would accrue to
18  the affiliates.
19    Q.  Was there ever any discussion about
20  restructuring careerbuilder.com to perhaps        01:25PM
21  facilitate either a sale or an IPO?
22    A.  Not a lot of specifics, again, because it
23  would be very high margin revenue that we would be
24  receiving at our newspapers and their interactive
25  divisions at the individual newspapers.        01:26PM

Page 61

1        So the judgment was made to, along with
2   our partners, who would have been at the time
3   Gannett, and then Knight Ridder, who was a
4   33 percent partner, sold to McClatchy, and we
5   then actually bought down some of McClatchy's   01:26PM
6   interest in CareerBuilder to increase our own
7   interest.
8        So we wanted to really build up our
9   position in CareerBuilder because, again, we
10  felt this was a high growth area for us.        01:27PM
11    Q.  Okay.  The minutes indicate that Merrill
12  Lynch then made a presentation based on its review
13  of strategic alternatives.  Is that what is
14  contained in Exhibit No. 3?
15    A.  Yes.                01:27PM
16    Q.  Okay.  Have you seen Exhibit No. 3 before?
17    A.  Yes, I have.
18    Q.  Okay.  Did you and/or your management team
19  assist Merrill Lynch in its preparation of this?
20  Not necessarily the specific preparation of the   01:27PM
21  document, but the information that they present
22  here.
23    A.  Yes.  We would need to give them as much
24  information as possible as they requested it in
25  order for them to come to their conclusions.        01:28PM

Page 62

```
 1      Q.  Okay.  Let's take a look at page 5.  The
 2   page is entitled "Merrill Lynch Review of Tribune
 3   Alternatives."
 4      A.  Yes.
 5      Q.  In the first box there on the left it says  01:28PM
 6   "Execute Operating Plan."
 7      A.  Yes.
 8      Q.  And there's a reference there to "monetize
 9   non-strategic assets?"
10      A.  Yes.                            01:28PM
11      Q.  What was that in reference to, do you
12   recall?
13      A.  Assets that wouldn't damage our scale in
14   our two major businesses, those assets could be
15   television stations in smaller markets, our       01:29PM
16   interest in Television Food Network, there were
17   continued discussions about whether the Chicago
18   Cubs was -- were a strategic asset, those are the
19   kinds of assets that were being considered, our
20   smaller newspapers.                   01:29PM
21      Q.  Had there been any discussion up until
22   this time about the potential sale of the Cubs as
23   a separate entity?
24      A.  Yes, periodically the Board would
25   ask about that, and the view was given the        01:29PM
```

Page 63

```
 1   interrelation of the Cubs with our radio station,
 2   our television station, our national superstation,
 3   that, as well as the significant increase in value
 4   in the Cubs and the likelihood that it would as an
 5   asset continue to grow in value, we thought and    01:30PM
 6   the Board agreed that it did not necessarily make
 7   sense to monetize that asset at this point and
 8   also given the significant tax implications that
 9   there would be.
10      Q.  Had the Company been approached by any      01:30PM
11   suitors for the Cubs?
12      A.  Periodically there would be expressions
13   of interest sometimes in the press, sometimes to
14   us directly.
15      Q.  Who approached you directly?               01:30PM
16      A.  Wealthy individuals for the most part.
17      Q.  Can you give me an example?
18          THE WITNESS:  Can I ask my attorney a
19   question?
20          MR. DUCAYET:  Yes, sure.  Why don't we      01:31PM
21   just go off the record for a second.  And,
22   incidentally, now is an appropriate time to do
23   this, but let me just make clear for the record we
24   would like to designate the transcript here as
25   highly confidential under the protective order.    01:31PM
```

Page 64

```
 1          THE WITNESS:  If we do that, I can answer
 2   the question.
 3          MR. DUCAYET:  Okay, yes.  This will be
 4   protected via a confidentiality order that's been
 5   signed by the Judge.                   01:31PM
 6          THE WITNESS:  Okay.
 7      A.  Bill Wrigley, Larry Levy, Greg Duchossois,
 8   among others.  That's all I can remember right
 9   now.
10   BY MR. ODDO:                           01:31PM
11      Q.  Any of these, any of these approaches from
12   these people lead to any sort of investigation as
13   to whether a sale might be appropriate?
14      A.  Value, no, we did not get into those
15   discussions.                          01:32PM
16          THE VIDEOGRAPHER:  Counselor, there's five
17   minutes remaining.
18      A.  I should say, though, the Board always
19   asked -- made the questions and Management
20   responded to those questions as to the -- were     01:32PM
21   the Cubs a strategic asset.
22   BY MR. ODDO:
23      Q.  What did you --
24      A.  And, again, the answer was the
25   relationship between the radio, television and     01:32PM
```

Page 65

```
 1   superstation made it a strategic asset.
 2      Q.  How do you define a strategic asset?
 3      A.  One that enhances the value of other
 4   assets that it may be connected to.
 5      Q.  Okay.  Can you describe the             01:32PM
 6   interrelationship between the Cubs and the
 7   TV station and the superstation?
 8      A.  The Cubs as a franchise enters into
 9   license agreements for telecast rights with those
10   entities, and those need to be -- those are arm's  01:33PM
11   length transactions as audited by Major League
12   Baseball.
13      Q.  Okay.  Is there anything about the
14   interrelationship between the Cubs and the station
15   or the superstation that differs from other teams' 01:33PM
16   relationship with their stations?
17      A.  No, just that ownership of both enables
18   you an element of control and assurance that the
19   rights would go at a fair market value to the
20   related station.                       01:33PM
21      Q.  Okay.  And Tribune owns all of these
22   interrelated parts, correct?
23      A.  Yes.
24          MR. ODDO:  All right.  Why don't we break
25   so we can change the tape.             01:33PM
```

Page 66

1    THE VIDEOGRAPHER:  This will conclude
2  videotape number two.  The time now is
3  approximately 1:33 p.m., and the elapsed time
4  is approximately 57 minutes on this tape.  The
5  deposition will continue with videotape number      01:34PM
6  three.
7        (Recess taken.)
8    THE VIDEOGRAPHER:  Good afternoon,
9  this will begin videotape number three of the
10  deposition of Mr. Dennis J. FitzSimons taken      01:41PM
11  the 14th day of May, 2007.  The time now is
12  approximately 1:41 p.m.
13      I will remind the witness he remains under
14  oath, and we may continue.
15  BY MR. ODDO:                      01:41PM
16    Q.  If you look at page 6 of this document,
17  it's "Summary of Alternatives Analyzed."  There
18  appear to be five alternatives described by
19  Merrill Lynch.
20      The minutes indicate that Mr. Costa      01:41PM
21  from Merrill Lynch indicated that a business
22  combination for the strategic or private equity
23  buyer was likely to produce the greatest value to
24  Tribune shareholders; do you recall him conveying
25  that to the Board?                  01:42PM

Page 67

1    A.  Yes.
2    Q.  Did you share that belief based on the
3  alternatives that were presented by Merrill Lynch?
4    A.  Yes.
5    Q.  Okay.  Why?                  01:42PM
6    A.  We had a lot of experts analyzing our
7  situation, and their opinion was given the
8  availability of credit in the market that private
9  equity players, private equity firms, would have
10  a strong interest in media assets, and also with      01:42PM
11  the ability that a strategic buyer might have
12  to eliminate corporate costs that there would be
13  a premium for shareholders given that ability to
14  reduce costs.
15      THE VIDEOGRAPHER: Pardon me, sir, your      01:43PM
16  microphone.
17      THE WITNESS: Excuse me.
18  BY MR. ODDO:
19    Q.  The last item on this page, the
20  "Pursue Transaction for All of Tribune" mentions      01:43PM
21  a combination of a strategic buyer, and then in
22  parenthesis it says Gannett.  Had the Company been
23  engaged in any such discussions with Gannett?
24    A.  No.
25    Q.  You had some joint ventures with Gannett,      01:43PM

Page 68

1  is that correct, CareerBuilder; were there any
2  others?
3    A.  That is correct.
4    Q.  Any others besides that?
5    A.  They were also involved in topics.net at      01:43PM
6  the time, shoplocal.com, they're also an owner,
7  part owner, as Tribune is, of classified ventures.
8    Q.  Have you had any -- ever had any
9  discussions with your counterpart at Gannett or
10  any of his executive team about exploring a      01:44PM
11  business combination?
12    A.  A number of years ago, yes.
13    Q.  How long ago?
14    A.  Probably in '03, 2003, and early 2004.
15    Q.  And what was the substance of those      01:44PM
16  discussions?
17    A.  Initially talked about putting our
18  broadcast groups together, and then those
19  conversations lead to a potential combination
20  of both companies.                  01:45PM
21    Q.  How far did the talks go?
22    A.  Could you be more specific?
23    Q.  Sure.  Did they proceed to the point where
24  nonpublic information was shared?
25    A.  It proceeded to the point that A,      01:45PM

Page 69

1  our Board was very much aware and there was
2  information shared, I'm not sure if it was
3  nonpublic information or not.
4    Q.  Okay.
5    A.  But certainly our Board was made aware of  01:45PM
6  it.
7    Q.  And what is your recollection as to why
8  the deal didn't materialize?
9    A.  Mainly because at that time we -- news day
10  one of our newspapers had a circulation scandal      01:46PM
11  that hit where they had misstated circulation
12  figures, which caused uncertainty and caused us to
13  need to withdraw and Gannett to withdraw from the
14  discussions.
15    Q.  Was the issue approached at all between      01:46PM
16  2004 -- or 2003 and 2004 and the fall of 2006?
17    A.  No.
18    Q.  Okay.  Let's take a look at page 7.
19    A.  (Witness complies.)
20    Q.  It contains valuation ranges for the      01:46PM
21  various alternatives that Merrill Lynch had put
22  forward; do you recall the Board discussing these
23  valuation ranges?
24    A.  Yes.
25    Q.  Did -- what was the substance of the      01:47PM

Highly Confidential

Page 70

1  conversation, do you recall?
2     A.  Really the Board quizzed Merrill Lynch
3  and Citigroup also as to their assessment and
4  rationale for the assessment behind these range --
5  these ranges of value that are listed on this     01:47PM
6  page.
7     Q.  Did the Board come to a comfort level with
8  the assumptions underlying the ranges?
9     A.  I'm not sure that they did because the
10 ranges are so wide, but I believe what was decided  01:47PM
11 at this Board meeting was to enter into a market
12 test, which is effectively our auction process, to
13 let the market decide.
14    Q.  If you look back at Exhibit No. 2, page
15 I guess it's 5, although it doesn't have a number.  01:48PM
16 It's Bates stamped number 2048.  And it references
17 you presenting Management's assessment of the
18 strategic alternatives; do you recall what you
19 told the Board?
20    A.  What it says here is that I concluded with  01:48PM
21 a statement of support for the conclusions reached
22 by Merrill Lynch and Citigroup.
23    Q.  Do you recall what the substance of your
24 comments to the Board was at that time?
25    A.  I believe we said that -- I said that     01:49PM

Page 71

1  Management supported an exploration of these
2  alternatives to determine which would produce
3  the greatest value for shareholders.
4     Q.  Were there any of the alternatives
5  proposed that you or your management team opposed   01:50PM
6  pursuing?
7     A.  No.
8     Q.  You didn't see any downside to any of them
9  or downside to the pursuit of any of them?
10    A.  No.  By this point we were in a position    01:50PM
11 and certainly our own position as management with
12 significant stock holdings in the company was to
13 pursue the transaction that created the most value
14 for all shareholders.
15    Q.  On the next page it says the Board then    01:50PM
16 unanimously approved the engagement of Merrill
17 Lynch and Citigroup.
18       Had Merrill Lynch and Citigroup not been
19 operating under an official engagement up until
20 that point?                            01:51PM
21       MR. DUCAYET:  Objection to the form.
22    A.  I think your statement is correct.
23 BY MR. ODDO:
24    Q.  Okay.  Did you have an understanding with
25 Merrill Lynch and/or Citigroup about how they     01:51PM

Page 72

1  would be compensated for the work they had been
2  doing?
3     A.  No.
4     Q.  Was Merrill Lynch and/or Citigroup
5  involved at all in the share repurchase?       01:51PM
6     A.  Yes.
7     Q.  What role did they play in that?
8     A.  Well, they were advisors to the Company in
9  terms of assessing the viability and the potential
10 for that alternative versus other alternatives     01:51PM
11 back in May of 2006.
12    Q.  And did they do that work in connection
13 with an engagement for which they were paid?
14    A.  This is a question you had asked before,
15 and it now -- Merrill and Citi were involved in     01:52PM
16 the financing of the share repurchase now that
17 it's coming back to me.
18    Q.  Okay.
19    A.  But in terms of advisory fees for the
20 share repurchase, I'm not sure they were operating  01:52PM
21 under an advisory fee engagement letter; and I'd
22 have to review that, but my recollection is that
23 no, that their involvement was on the financing
24 end.
25    Q.  Have you worked with financial advisors    01:53PM

Page 73

1  besides Merrill Lynch and Citigroup?  And by you I
2  mean the Board of Directors and Management.
3       MR. DUCAYET:  Object to the form.
4     A.  Over what period of time?
5  BY MR. ODDO:                           01:53PM
6     Q.  In 2006.
7     A.  No.  We talked to lots of different
8  investment banks to hear ideas, to get their view
9  of the markets, but Merrill Lynch has been our
10 primary advisor.                        01:53PM
11    Q.  For how long?
12    A.  Since the Times Mirror merger they were
13 the primary advisor to the Company at that point,
14 and I believe prior to that, although I -- they
15 actually are our primary advisor going back to a   01:54PM
16 transaction we did for multiple television
17 stations back in '97.
18    Q.  Okay.  The last thing at least on the
19 printed portion of these minutes is a reference to
20 the creation of a Special Committee.  Do you      01:54PM
21 recall why a Special Committee was created at this
22 point in time?
23    A.  Because these were the directors that were
24 independent precluding the Chandler Directors and
25 precluding or excluding I should say myself as     01:55PM

Page 74

1 Management Director.
2    Q.  And why was it determined that it was
3 appropriate to create such a committee at that
4 point in time?
5    A.  Entering into a review of strategic      01:55PM
6 alternatives that involved a potential auction of
7 the Company, it was determined by the Board that
8 this was the best way to go about it.
9    Q.  Okay.  How did the situation differ in
10 September of 2001 from, you know, the past year      01:55PM
11 and a half when the strategic alternatives were
12 being considered by the Company?
13    A.  I believe the Board determined that the
14 Chandler interests at this point had diverged from
15 the interests of all shareholders to the interest      01:55PM
16 of the Chandler Trusts, and that Management
17 interest could possibly be -- if the Board
18 determined if the Chandlers were going to be
19 excluded, then Management should also be excluded
20 or the one Management Director, namely me.      01:56PM
21    Q.  The Chandlers had proposed an independent
22 committee in their letter from June, correct?
23    A.  Yes.
24    Q.  Okay.  After the committee was created,
25 what was your role vis-a-vis the committee?      01:56PM

Page 75

1    A.  My role was to keep the committee informed
2 about developments at the company, to manage the
3 process by which management presentations were
4 created for potential bidders.
5    Q.  Okay.  So did you attend the Special      01:57PM
6 Committee meetings?
7    A.  Parts of the Special Committee meetings,
8 yes.
9    Q.  Were there any Special Committee meetings
10 that you did not attend to your under- -- to your      01:57PM
11 recollection?
12    A.  Yes.  I couldn't give you dates on those,
13 but normally the Special Committee would meet,
14 they would ask questions of management, of
15 advisors, and then there would be executive      01:58PM
16 sessions that management and the advisors were
17 excluded from.
18    Q.  Okay.  So you normally participated in all
19 but the executive session, executive sessions; is
20 that correct?      01:58PM
21    A.  I'd phrase it differently.  I participated
22 in the parts of the meetings that the Special
23 Committee felt it was appropriate for me to
24 participate in and also where they were looking
25 for information from me and other members of      01:58PM

Page 76

1 management.
2    Q.  Okay.  Did you typically participate in
3 portions of the meetings where the financial
4 advisors made their presentations or there was
5 discussions about the --      01:58PM
6    A.  I remember there -- I'm sorry.  Go ahead.
7    Q.  Go ahead.
8    A.  There were multiple financial advisors.
9 So the Special Committee had its own financial
10 advisor in Morgan Stanley.      01:58PM
11    Q.  Uh-huh.
12    A.  So Morgan Stanley would be present for the
13 parts of the meeting where the Company's advisors
14 would make presentations, when I or others in
15 management would make presentations, and then at      01:59PM
16 a time that the Committee felt it was appropriate,
17 we would be excused, and the Committee would meet
18 with its own financial advisor and legal counsel.
19    Q.  Now, what was the distribution of
20 authority between the financial advisors in the      01:59PM
21 process moving forward?
22    A.  Well, the Company's advisors were close,
23 A, to the financial metrics of the Company, they
24 were familiar with the Company's operations, and
25 they also assisted in the preparation of the      01:59PM

Page 77

1 management presentation.  Their familiarity with
2 processes of this type sort of guided our format
3 of the presentations to make it as meaningful and
4 time efficient as possible to the potential
5 bidders.      02:00PM
6         So we, of course, have all of the detailed
7 information about the Company's operations, but
8 the advisors helped us format it in a way that
9 would make it as, like I said, time efficient to
10 the people we were presenting to as possible.      02:00PM
11    Q.  Okay.  So Management worked with
12 Merrill Lynch and Citigroup to put together
13 the presentations to the potential bidders?
14    A.  Yes.
15    Q.  Okay.  And who was responsible for      02:00PM
16 identifying the potential bidders to whom
17 presentations would be made?
18    A.  Both the Company's advisors as well as
19 Morgan Stanley.  There were points in the process
20 when Morgan Stanley suggested specific companies      02:01PM
21 that should be approached.
22    Q.  What did you understand the special
23 committee's role in the process to be?
24    A.  Maximize value for all shareholders.
25    Q.  And specifically as the process unfolded,      02:01PM

Page 78

1    what was their role?  Was it to negotiate a
2    potential transaction, was it oversight of
3    management and its advisors, some combination
4    thereof?
5        MR. DUCAYET:  Objection to the form.      02:01PM
6    BY MR. ODDO:
7    Q.  Do you understand the question?
8    A.  I'm not sure I do.
9    Q.  What authority did the Board vest in the
10   Special Committee?                            02:01PM
11   A.  The Special Committee would be the
12   independent arbiter as to what would create the
13   most value for all shareholders, it should be what
14   alternative would create the most value for all
15   shareholders.                                 02:02PM
16   Q.  Was it given any specific authority to
17   take certain actions in furtherance of that?
18   A.  Basically to hold an auction process.
19   Q.  Okay.  Were they given authority to
20   negotiate directly with potential bidders?    02:02PM
21   A.  It was left to their discretion as to what
22   the best method of maximizing shareholder value
23   would be in their business judgment.
24   Q.  Was there anything that the Special
25   Committee was precluded from doing as part of the  02:03PM

Page 79

1    process?
2    A.  Not that I'm aware of.
3    Q.  Did the, to your knowledge, did the
4    Special Committee participate in any direct
5    negotiations with any of the potential bidders?  02:03PM
6        MR. DUCAYET:  Object to the form.
7    A.  Yes.
8        MR. DUCAYET:  Are you talking about the
9    Special Committee as a whole or members of the
10   Special Committee?                            02:04PM
11       MR. ODDO:  The Special Committee or its
12   members.
13       MR. DUCAYET:  You could answer.
14   A.  Yes.
15   BY MR. ODDO:                                  02:04PM
16   Q.  Okay.  Under what circumstances?
17   A.  Towards the end of the process.
18   Q.  Who did they negotiate with?
19   A.  There were some conversations between
20   Mr. Osborn and Mr. Zell and also between I believe  02:04PM
21   Eli Broad and Mr. Osborn.
22   Q.  How did you become aware of those?
23   A.  In the Special Committee meetings, I
24   believe that's how I would hear about that.
25   Q.  Okay.  What did you learn of the          02:04PM

Page 80

1    conversations between Mr. Osborn and Mr. Zell?
2    A.  Just general information, where we would
3    go, what we needed to respond to if there were
4    specific requests, how management should produce
5    either additional information or respond to   02:05PM
6    questions that may have been asked.
7    Q.  What about the conversations between
8    Mr. Broad and Mr. Osborn?
9        MR. DUCAYET:  I'm sorry, what was the
10   question?                                     02:05PM
11       (Record read.)
12       MR. ODDO:  It's the same as the previous
13   question.  Can you go back up?
14   BY MR. ODDO:
15   Q.  What did you learn about the conversations  02:06PM
16   that Mr. Osborn had with Mr. Broad and the
17   substance?
18   A.  Some of them would be, as I recall,
19   somewhat general in form just about the interest
20   level being high.                             02:06PM
21       I'm not sure that most of the very
22   detailed conversations, as I understand it,
23   happened with the -- advisor to advisor, but
24   some of the other conversations were more general
25   in nature, and those are the conversations that  02:06PM

Page 81

1    I would hear about.
2    Q.  The negotiations over price and the terms
3    of the deal, were those primarily negotiated by
4    the advisors?
5        MR. DUCAYET:  Objection to the form.      02:06PM
6        Can we just be clear which transaction
7    we're talking about or which negotiation we're
8    talking about?
9        MR. ODDO:  With any of the parties
10   that expressed an interest in acquiring the   02:07PM
11   Company.
12   A.  Most of those conversations would be
13   advisor to advisor.
14   BY MR. ODDO:
15   Q.  And were you kept abreast of what was     02:07PM
16   being negotiated?
17   A.  For the most part, yes.
18   Q.  How were you kept apprised of what was
19   going on?
20   A.  Well, I'd be talking with the Company's   02:07PM
21   advisors, both Merrill and Citi, who would be
22   talking to the advisors of the various bidders.
23   So they would, as the Company's advisors and in my
24   position, they would let me know what was
25   happening.                                    02:07PM

Page 82

1    Q.  Okay.  Who was your primary contact person
2  at Merrill Lynch?
3    A.  Michael Costa.
4    Q.  And at Citigroup?
5    A.  Christina Mohr.              02:08PM
6    Q.  Now, at some point as the process got
7  going in the fall of 2006, Mr. Zell and his group
8  had expressed some interest in participating; is
9  that correct?
10    A.  Yes.                        02:08PM
11    Q.  Okay.  And how did you learn about that?
12    A.  I believe that there were about 36, if
13  I remember the number correctly, individuals or
14  firms that signed nondisclosure agreements; I
15  believe the Zell organization was one of those.   02:08PM
16    Q.  And at the time they decided not to pursue
17  a transaction; is that correct?
18    A.  I really hadn't heard that they hadn't
19  decided to or had decided not to pursue a
20  transaction, I just didn't hear anything that they  02:09PM
21  were particularly interested.  And I don't believe
22  we made management presentations to them in the
23  first round.
24    Q.  Okay.  Was the first management
25  presentation the one we talked about earlier in    02:09PM

Page 83

1  the day when you and your management team met
2  with the folks at EGI?
3    A.  That was actually prior to the -- I
4  believe it was prior to the detailed management
5  presentation that we had given to all parties.    02:09PM
6  That was more of an introductory meeting.
7    Q.  Okay.  At the outset of this process of
8  approaching potential acquirors, did the Board
9  have any sort of time frame in mind for when they
10  wanted something accomplished?             02:10PM
11    A.  By the end of the year, that was what we
12  stated publicly.
13    Q.  Okay.  What was that based on?
14    A.  That was based on our advisor's view
15  that the amount of time it would take to create    02:10PM
16  and actually present to potential -- create
17  presentations and then meet with potential
18  bidders, allow the bidders enough time to, you
19  know, to assess our assets and the outlook and
20  come up with bids.                      02:11PM
21    Q.  From your perspective was there any sense
22  of urgency in having this process go rapidly or
23  not rapidly?
24    A.  Sure.  I wanted to see it go as rapidly as
25  possible given the uncertainty that it causes    02:11PM

Page 84

1  within the company and the distraction it causes
2  within the company that has the potential to be
3  value negative towards value for shareholders.
4    Q.  Now, the process was extended at certain
5  points; is that correct?              02:12PM
6    A.  Correct.
7    Q.  And what's your understanding of why the
8  process was extended?
9    A.  Because given the number of presentations
10  and given the additional due diligence request    02:12PM
11  that we received from a number of the private
12  equity firms, the goal of a December final bid the
13  advisors pretty much were told that it wasn't
14  going to happen.
15      So the process was extended until beyond    02:12PM
16  the 1st of the year.  I believe final bids were
17  due January 17th.  And then there was a -- we put
18  out a press release suggesting that the end of the
19  quarter was the deadline, the new deadline, end of
20  the first quarter.                     02:13PM
21      And then we thought that would give the
22  process more than enough time.  As it turned out,
23  it went right up until the last day.
24    Q.  Was there any internal discussion at the
25  Board level or to the extent you were present for   02:13PM

Page 85

1  Special Committee discussions about a cutoff point
2  where if we don't have a deal by such-and-such a
3  date, we're just not going to pursue it any
4  longer?
5    A.  Well, there was, again, always a        02:13PM
6  discussion of what's going to create the most
7  value for shareholders, and if at some point
8  none of the alternatives looked particularly
9  attractive, there was always the option of doing
10  nothing, although that wouldn't have been a very   02:13PM
11  popular option, and only if the Board felt that
12  that was clearly the best option would that have
13  been pursued.
14    Q.  So you don't recall there ever being any
15  sort of, you know, specific deadline that if we    02:14PM
16  don't reach an agreement with any of the parties
17  by, you know, March 1st, April 1st, May 1st, that
18  we are not going to continue down that path?
19    A.  No.
20    Q.  At some point in the fall the Chandler    02:14PM
21  Trusts proposed to do a spinoff of the
22  Broadcasting Entertainment Group and acquire the
23  publishing portion of the company; is that
24  correct?
25    A.  Yes.                        02:15PM

Page 86

1   Q.  Is that your recollection?
2   A.  Yes.
3   Q.  What did you think about that proposal?
4   A.  I thought it was interesting.
5   Q.  Did you have unfavorable/favorable        02:15PM
6   thoughts about it when you heard about it?
7   A.  It really wasn't my role to be favorable
8   or unfavorable; it was my role to be involved in
9   the process that created maximum value for all
10  shareholders.                                 02:15PM
11  Q.  You didn't formulate any personal opinion
12  about that as a strategic alternative for the
13  company?
14  A.  I relied on the advisors as to how they
15  would value that, as I relied on them for a    02:15PM
16  valuation of all proposals.
17  Q.  Did you ever have any internal analyses
18  done of any of the strategic alternatives?
19  A.  We did rely on our financial experts, our
20  outside advisors to give us their view, and then  02:16PM
21  of course the Committee had Morgan Stanley to give
22  them an independent view.
23  Q.  By internal I mean not outside advisors,
24  your executive management team.  Did you ever
25  perform any analyses to take a look at the     02:16PM

Page 87

1   alternatives or was it primarily reviewing what
2   had been prepared by the financial advisors?
3   A.  We would give the financial advisors lots
4   of information, and then they had primarily the
5   models that would if you were talking about a spin  02:16PM
6   and a range of value, we would rely on their
7   expertise.
8       We have a lot of financial expertise
9   within the company, but it's more specific to
10  operating our businesses.                      02:17PM
11  Q.  Were you aware of whether or not there
12  were any restrictions placed on the Chandler
13  Trusts' ability to talk to any of the private
14  equity firms about assisting in their transaction?
15  A.  Well, each of the bidders was required and  02:17PM
16  had a range of other bidders, I believe, that they
17  could talk to.
18      And my understanding of these matters is
19  that they're -- the bankers try to run the process
20  in such a way that firms can't club up with the  02:17PM
21  intent being that there are a maximum number of
22  bidders financially able to complete a
23  transaction.
24      So I believe each of the bidders was given
25  a list of potential partners that they either   02:18PM

Page 88

1   requested or partners that were made available to
2   them.
3   Q.  Was that list party specific, in other
4   words, each interested party had their own list,
5   or was it a generic list that was given to each of  02:18PM
6   the parties and this was the list of people they
7   could contact?
8   A.  I believe it was a specific list.
9   Q.  And the Chandler Trusts were one of those
10  parties that received the list of specific parties  02:18PM
11  that they could contact; is that your
12  recollection?
13  A.  That's my recollection, yes.
14      MR. ODDO:  Okay.  Let's mark as
15  Plaintiff's Exhibit No. 4 a document Bates stamped  02:19PM
16  TRIB37 through 38.
17      (FitzSimons Deposition Exhibit
18       No. 4 marked for
19       identification.)
20  THE WITNESS:  Yes.                             02:21PM
21  BY MR. ODDO:
22  Q.  Can you tell me what this document is?
23  A.  These are the minutes of the Special
24  Committee Meeting of December 12th.
25  Q.  Okay.  And were you present for at least   02:21PM

Page 89

1   part of this meeting?
2   A.  Yes.
3   Q.  Okay.  On the second page there's a
4   reference, it may have been after you were not
5   present at the meeting, but it has to do with the  02:22PM
6   McCormick Tribune and Cantigny's Foundations and
7   also Management's involvement with the Foundations
8   and a role in the process for the Foundations.
9       Were you aware of what potential role the
10  Foundations might have in the process?          02:22PM
11      MR. DUCAYET:  At that point in time?
12      MR. ODDO:  Yes.
13      MR. DUCAYET:  Okay.
14  A.  This is the first I'm seeing of the
15  minutes of the Special Committee Meeting, so    02:23PM
16  that's logical that I wouldn't have seen this,
17  but...
18  BY MR. ODDO:
19  Q.  I guess I can ask the question without
20  even reference to the document.  Were you aware of  02:23PM
21  whether or not the Foundations were discussing a
22  potential role in the process that was being
23  undertaken?
24  A.  What I'm trying to do is place this in
25  time because, as I mentioned earlier, I recused   02:23PM

Page 90

1   myself given my position with the Company from
2   deliberations in the Foundation's decision to sell
3   into the -- or offer back in July of '06.
4       I also recused myself from this process at
5   a period of time, but I believe it was after this.  02:23PM
6   So I'm not sure if at this point there was any
7   specific role for the Foundations as to whether
8   the Foundations would be a bidder for the Company.
9   I'm not exactly sure what is being referred to
10  here.                            02:24PM
11      Q.  Let me show you another document, maybe
12  this will refresh your recollection.
13      MR. ODDO:  We'll mark it as Plaintiff's
14  Exhibit No. 5. It's Bates stamped TRIB2296
15  through 2297.                    02:24PM
16      (FitzSimons Deposition Exhibit
17        No. 5 marked for
18        identification.)
19      THE WITNESS:  Yes.
20  BY MR. ODDO:                     02:25PM
21      Q.  Have you seen this document before?
22      A.  I don't recall seeing it.
23      Q.  Were you generally aware of the substance
24  of what's in the letter at or around the beginning
25  of 2007?                         02:26PM

Page 91

1       A.  Yes.
2       Q.  Okay. And what was your understanding of
3   the proposal that the McCormick Foundation was
4   making?
5       A.  I believe at this time the Foundation was  02:26PM
6   looking to make an offer similar to what the
7   Chandler Trusts were making.
8       Q.  And what was that comprised of?
9       A.  What's stated in the letter.
10      Q.  So that would contemplate a          02:26PM
11  tax-free spinoff of the B&E segment and a
12  recapitalization of the publishing section?
13      A.  Yes, that's what the letter states.
14      Q.  Okay. Were you involved at all in the
15  formulation of this proposal?               02:27PM
16      A.  No.
17      Q.  Okay. Who was it at the Foundation?
18      A.  It would have been John Madigan and
19  Jim Dowdle, D-o-w-d-l-e.
20      Q.  Okay. And did they consult with you at   02:27PM
21  all about the proposal in general?
22      A.  No. They -- at this point they had hired
23  Blackstone as their advisor. But at this point
24  I had recused myself, as had Scott Smith and
25  David Hiller, the two other company employees who  02:27PM

Page 92

1   are also directors of the Foundation.
2       Q.  The contact with Blackstone, was that
3   strictly on a financial advisory capacity?
4       A.  I believe so.
5       Q.  Do you know whether there was any        02:28PM
6   discussions between the Foundation and Blackstone
7   about partnering together in some sort of
8   transaction with -- involving Tribune?
9       A.  I don't know.
10      Q.  You weren't -- you're not aware of any?   02:28PM
11      A.  Not aware of any.
12      Q.  Do you have any knowledge of whether or
13  not the Foundation had any communications with
14  Blackstone about Mr. Zell?
15      A.  I'm not aware of any. I don't know.      02:28PM
16      Q.  What happened with this proposal?
17      A.  I believe, as with the Chandler proposal,
18  the independent Special Committee viewed it as not
19  providing superior value to shareholders.
20      Q.  Had the Foundation used Blackstone as a   02:29PM
21  financial advisor in prior circumstances?
22      A.  Not in my experience with the Foundation.
23      Q.  Okay. Were you made aware at all as to
24  how they chose Blackstone to assist in this
25  particular circumstance?                  02:29PM

Page 93

1       A.  Actually, in early December prior to --
2   or at some point in December I actually prior to
3   recusing myself did suggest some names as to
4   advisors the Foundation might hire.
5       I then got legal counsel suggesting that   02:30PM
6   I really needed to be, you know, needed to recuse
7   myself given the potential for a perceived
8   conflict or an actual conflict.
9       Q.  Who did you suggest, do you recall?
10      A.  One of the names was Blackstone, because I 02:30PM
11  believe by that point Blackstone -- so there's
12  Blackstone advisory, there's Blackstone private
13  equity, and private equity had indicated not a lot
14  of interest as a bidder.
15      But on their advisory side they had       02:30PM
16  somebody very capable, Jill Greenthal, who had
17  worked with the Company before, not with me
18  personally, but with the Company.
19      Q.  With the Tribune?
20      A.  Yes, with the Tribune, but in the distant 02:30PM
21  past, and one of her other -- one of the other
22  investment banks she had been with at some point
23  during her career.
24      MR. ODDO:  Okay. Let's mark as Exhibit
25  No. 6 a document that's Bates stamped TRIB2637  02:31PM

Page 94

1  through 2639.
2      (FitzSimons Deposition Exhibit
3      No. 6 marked for
4      identification.)
5      THE WITNESS:  Yes.                    02:34PM
6  BY MR. ODDO:
7      Q.  Can you tell me what this document is?
8      A.  These are the minutes from a Special
9  Committee Meeting from January 20th of 2007.
10     Q.  Okay.  Did you participate in this        02:34PM
11 meeting?
12     A.  Yes, I did.
13     Q.  Okay.  The Merrill Lynch presentation
14 indicates that at this point in time the three
15 proposals that had been received for the -- the  02:35PM
16 one from the Carlisle Group, the Chandler
17 Trusts, and the Broad and Burkle, is that your
18 recollection that those were the three at this
19 point in time that were under consideration?
20     A.  That's my recollection, yes.            02:35PM
21     Q.  Okay.  And it indicates that Mr. Broad and
22 Mr. Burkle were present for at least part of that
23 meeting to make a presentation; do you recall
24 that?
25     A.  Yes.                                    02:35PM

Page 95

1      Q.  What do you recall from that presentation?
2      A.  Both Mr. Broad and Mr. Burkle were there
3  as well as their advisors I believe who were from
4  UBS, and they explained the proposal and why
5  they felt it would be a good proposal from a    02:36PM
6  shareholder perspective.  That's what I recall
7  about the presentation.
8      Q.  Do you recall any specific questions being
9  asked of these gentlemen or their advisors, either
10 by the Board or its advisors?                    02:36PM
11     A.  I remember there were questions; as to the
12 specifics, I don't recall.
13     Q.  Do you recall whether they -- there were
14 any specific concerns with their proposal that
15 were brought to their attention?                02:36PM
16     A.  Not specifically.
17         THE VIDEOGRAPHER:  Five minutes.
18         MR. ODDO:  Okay.
19 BY MR. ODDO:
20     Q.  And then the Chandler Trusts            02:37PM
21 representatives and their advisors also made
22 a presentation; what do you recall from that?
23     A.  Again, there were questions, but as to the
24 specific questions I couldn't tell you at this
25 point.                                          02:37PM

Page 96

1      Q.  You don't have any recollection of any
2  specific concerns being raised about their
3  proposal during this presentation?
4      A.  I do remember one, actually, it related to
5  the June 13th letter that was -- that referenced a  02:37PM
6  price in the 40s for Tribune stock, and now that
7  they were bidders, they reference an unaffected
8  share price of 27 or $28.
9      Q.  How did they respond to that?
10     A.  I don't really recall other than -- you   02:38PM
11 know, I don't recall.
12     Q.  Okay.  The minutes indicate that you
13 provided Management's observations about these
14 proposals; do you recall what you conveyed to the
15 Committee?                                      02:38PM
16     A.  What I conveyed to the Committee was
17 basically based on what the advisors had suggested
18 to me, so there was a headline price and then
19 there was an actual value to shareholders, and my
20 commentary was pretty much based on that.       02:38PM
21     Q.  By headline price, what do you mean?
22     A.  Well, the price that was put out in the
23 press as the -- both from the Chandlers and the
24 Broad and Burkle camp as to how they valued their
25 proposal, and then it was the job of the Company's  02:39PM

Page 97

1  advisors and the Special Committee's advisor to
2  come up with what their view of the true value was
3  and was it fair in the case of the Chandler Trusts
4  as to the value they were -- would likely receive
5  from a transaction versus all other shareholders.  02:39PM
6         And there were significant differences
7  in the Company's advisor's valuation and the, I
8  believe, the Special Committee's advisors, but I
9  was not as familiar with their -- I didn't
10 actually see what their valuation was.          02:39PM
11        So the headline price was different from
12 the actual price that the advisors valued the
13 offers at.
14     Q.  Okay.  What was the basis for the
15 Company's advisors coming up with a different     02:40PM
16 value price than what the offerors had stated was
17 their price?
18     A.  Well, the complexity of these offers
19 given the amount of equity, the amount of debt,
20 the capital return to shareholders, the timing of  02:40PM
21 that, the time value of money, lots of different
22 factors go into what is a true valuation now.
23        So there are, you know, there are
24 different ways of looking at this.  So the
25 Company's advisors and the Special Committee's   02:40PM

Highly Confidential

Page 98

1  advisors, that's what they're being paid for.
2     Q.  Okay.  We'll take a look at the
3  Merrill Lynch presentation from that day and
4  go into some of the specifics after we change
5  tapes.                          02:41PM
6     A.  Okay.
7        THE VIDEOGRAPHER:  This will conclude
8  videotape number three.  The time now is 2:40 p.m.
9  and one hour elapsed time on the tape.
10       (Recess taken.)           02:41PM
11       THE VIDEOGRAPHER:  Good afternoon, this
12 will begin videotape tape number four of the
13 deposition of Dennis J. FitzSimons taken the
14 14th day of May, 2007 in regard to case number
15 BC362110.                       02:49PM
16       The time now is approximately 2:49 p.m.,
17 and I will remind the witness he remains under
18 oath, and we may continue.
19       MR. ODDO:  Okay, I've just handed the
20 witness what we'll mark as Plaintiff's Exhibit    02:50PM
21 No. 7, which is Bates stamped TRIB2380 through
22 2416.
23       (FitzSimons Deposition Exhibit
24        No. 7 marked for
25        identification.)          02:50PM

Page 99

1
2  BY MR. ODDO:
3     Q.  Again I'm going to ask you about certain
4  pages in here.  You're free to review as much or
5  as little of the document as you'd like until you   02:50PM
6  feel comfortable discussing it or you can review
7  the pages as we get to them, however you feel
8  comfortable doing it.
9     A.  Sure.  Why don't you tell me what pages
10 you're focusing in on.              02:51PM
11    Q.  Let's take a look at page 1.
12    A.  (Witness complies.)
13    Q.  And there's a "Process Summary" page.
14    A.  Yes.
15    Q.  And there's a reference here to Gannett     02:51PM
16 being permitted to talk to McCormick Foundation;
17 do you see that?
18    A.  Yes.
19    Q.  Were you aware at all whether or not
20 Gannett had been in discussions with the            02:51PM
21 McCormick Found- -- excuse me, Foundation?
22    A.  I was not.
23    Q.  Okay.  Was this the first you've learned
24 of it or did you subsequently learn of it?
25    A.  I must have learned of it at this meeting    02:51PM

Page 100

1  on the 20th.
2     Q.  Okay.  But you hadn't been informed by
3  anybody from the McCormick Tribune Trust that --
4     A.  No.
5     Q.  -- they hadn't been in contact with        02:52PM
6  Gannett?
7     A.  No.
8     Q.  Were you aware whether or not there
9  were discussions between the Chandler Trusts and
10 the McCormick Trust, the McCormick Foundation?     02:52PM
11    A.  At what point?
12    Q.  In early 2007.
13    A.  I'm not sure at that point.
14    Q.  When do you recall becoming aware that
15 they had been in -- that they had had some         02:52PM
16 contact?
17    A.  Later on I did hear that there
18 were discussions related to the potential
19 recapitalization that might include a sale
20 from the Chandler Trusts to the Foundation of      02:53PM
21 part of their shares, but that was later, but I
22 couldn't tell you exactly when.
23       (Discussion held off the
24        record.)
25 BY MR. ODDO:                      02:53PM

Page 101

1     Q.  Okay.  If you look at this page 2 -- no,
2  page 3, there's a reference to David Geffen
3  Company submitted unsolicited indication for
4  LA Times; do you recall whether or not that was
5  something that had taken place recently or was     02:53PM
6  that -- I think we already talked about Geffen's
7  prior indication of interest, but was that in
8  reference to that do you know?
9     A.  I'm not sure.
10    Q.  Okay.  Did you become aware that Geffen     02:54PM
11 had renewed his interest in the LA Times at all in
12 the late 2006, early 2007 time frame?
13    A.  See, I'm not sure when the letter or the
14 indication that his interest level in the LA Times
15 was for $2 billion.  I don't recall exactly how    02:54PM
16 and when that came in.
17    Q.  But you do remember that number?
18    A.  Yes.
19    Q.  And is your recollection of that number
20 based on actually hearing it from Mr. Geffen or    02:54PM
21 in the context of a letter or from media reports?
22    A.  I certainly didn't hear it directly from
23 Mr. Geffen, so it's got to be either the media
24 report or the letter, and based on this document
25 I'm not sure if the $2 billion number was          02:55PM

Eastwood-Stein
Deposition Services & Litigation Support (800) 343-0733

Page 102

1  indicated in the letter, it just says unsolicited
2  indication for LA Times. So I'm not sure.
3     Q.  Okay. Look at page 4, it has the
4  "Overview of Proposals."
5     A.  (Witness complies.)          02:55PM
6        MR. DUCAYET: Steve, can we just confirm
7  there's some handwriting on here? I don't know if
8  it's yours.
9        MR. ODDO: I didn't get them all.
10       MR. DUCAYET: I'm happy to substitute a   02:55PM
11 clean copy if you want.
12       MR. ODDO: Okay. That's fine. It's
13 nothing too confidential.
14       MR. DUCAYET: Nonwaiver basis if you want,
15 that's fine.                          02:55PM
16       MR. ODDO: Yes.
17 BY MR. ODDO:
18    Q.  Just so you know, the writing in the upper
19 right-hand part of that page is my writing, it's
20 not --                                02:55PM
21    A.  I see.
22    Q.  -- notes from anybody who produced the
23 document.
24    A.  Okay.
25    Q.  What is presented here on page 4?    02:56PM

Page 103

1     A.  This appears to be a Merrill Lynch and
2  Citigroup, their analysis of the proposal that had
3  been received as of January 20, 2007.
4     Q.  So does this contain their adjusted
5  valuations of the proposals that had been      02:56PM
6  submitted?
7     A.  Yes.
8     Q.  Okay. So under the Broad and Burkle plan,
9  they have the adjusted value is $31.72, whereas
10 you called it the headline value that they had   02:57PM
11 indicated was $34, correct?
12    A.  No, I think what this indicates is that
13 the Broad/Yucaipa proposal would be worth in the
14 estimation of Merrill and Citi between 29.45 and
15 31.72, $29.45 per share and $31.72 per share.   02:57PM
16    Q.  Okay. Did they explain how they came to
17 the conclusion that the headline value of Broad
18 and Burkle had attributed to their proposal,
19 produced a different value than what they had
20 produced or what they had come up with here?   02:57PM
21       MR. DUCAYET: Objection to the form.
22       MR. ODDO: That probably wasn't the most
23 articulate.
24       MR. DUCAYET: Do you mean other than
25 what's in the deck?                    02:58PM

Page 104

1        MR. ODDO: Yes.
2  BY MR. ODDO:
3     Q.  I mean, do you recall the discussion about
4  Merrill Lynch explaining why they valued the
5  proposal lower than Broad and Burkle had?     02:58PM
6     A.  I don't remember the specifics of exactly
7  how they came to this valuation, but there is
8  another section in this proposal that gets more
9  detailed. This is a summary page.
10    Q.  Okay. Looking at that can that refresh   02:58PM
11 your memory? That's the section that begins on --
12       MR. DUCAYET: Page 12.
13 BY MR. ODDO:
14    Q.  -- page 12.
15    A.  That's correct, yes.               02:59PM
16    Q.  Okay. Did Merrill Lynch seek your
17 input, you and/or your management team's input,
18 in analyzing these proposals?
19    A.  Not that I'm aware of.
20    Q.  Okay. And looking at this material from   02:59PM
21 page 12 forward, does it refresh your recollection
22 as to how Merrill Lynch came up with the adjusted
23 valuations for the proposal?
24    A.  Yes, and I think you can view page 14;
25 there seems to be an indication of the difference  03:00PM

Page 105

1  between the stated value and the valuation of
2  Citigroup and Merrill Lynch.
3     Q.  What's the basis for that difference based
4  on, that analysis?
5     A.  As I read this, if I'm interpreting it    03:00PM
6  correctly, there's a value at the stated price
7  which then indicates there is a time value of
8  money discount and then an equity, stated value
9  of the equity remaining, and then an implied
10 equity value, and then an adjusted equity value.   03:01PM
11    Q.  What's your understanding then of the
12 primary basis for the difference in valuations
13 between what Merrill Lynch came up with and the
14 proposal from Broad and Burkle, was there --
15    A.  Well, the question would best be asked to   03:01PM
16 Merrill or Citi --
17    Q.  I understand.
18    A.  -- because it's their document.
19    Q.  I'm just asking for your understanding.
20    A.  There's just a difference of opinion in   03:01PM
21 terms of the value of what would remain of the
22 equity as well as the time value of money between
23 the -- today or what this offer would represent
24 when it was given as to when the shareholders
25 would actually receive their money.           03:02PM

Page 106

1    Q.  So those are the two primary components,
2  the time value of money and the equity value of
3  what remained after the dividend?
4    A.  I believe that is true, yes.
5    Q.  Okay.  And do you recall Merrill       03:02PM
6  explaining why they believed the value of the
7  Company after the dividend would be less than
8  what Broad and Burkle had estimated?
9    A.  The value of the dividend or the value of
10  the equity?                        03:02PM
11    Q.  The value of the equity, I'm sorry.
12    A.  I believe it had some -- you know, I
13  don't have a specific recollection, but I believe
14  if you look at page 14, you can see the value of
15  the stated price where they stated value or       03:03PM
16  stated value, they talk about an EBITDA multiple
17  of 8.9 versus 8.3 in the bar or below the bar on
18  the right.
19    Q.  So did Merrill believe that the figures
20  that Broad and Burkle were using to support the       03:03PM
21  valuation at 34 including the EBITDA multiple of
22  8.9 was too high?
23        MR. DUCAYET:  Objection to the form, lacks
24  foundation, the document speaks for itself.
25    A.  It appears that that is the case, yes.       03:04PM

Page 107

1  BY MR. ODDO:
2    Q.  Do you recall there being any discussion
3  about that during the presentation?
4    A.  I don't.  There may have been in
5  executive session, but I -- with their own       03:04PM
6  advisor, Morgan Stanley.
7    Q.  Okay.  Do you know whether or not Merrill
8  participated in any of the executive sessions or
9  was that just Morgan Stanley and Special Committee
10  Directors?                        03:04PM
11    A.  I believe that was Morgan Stanley.
12    Q.  During Broad and Burkle's presentation
13  did any of the members of the committee or
14  Merrill Lynch question any of their assumptions
15  underlying the value of their proposal?       03:04PM
16    A.  I believe the -- I don't recall
17  specifically, but I do believe there were
18  advisor-to-advisor questions, so it may have been
19  Merrill or Citi or Morgan Stanley to UBS.
20    Q.  Did you or members of your management team   03:05PM
21  make any recommendations concerning these
22  proposals?
23    A.  We listened, as did the Special
24  Committee, in the part of the meeting that we were
25  invited to as to how these stated values were       03:06PM

Page 108

1  viewed by the experts.
2    Q.  Did the Special Committee ask for any
3  sort of recommendation from you?  I know that the
4  minutes indicate that you made some observations,
5  but did they ask for any sort of recommendation as   03:06PM
6  to --
7    A.  They did ask as to how I viewed the, you
8  know, the possibilities, what would the impact be
9  on employees, but I am not a -- I wouldn't suggest
10  that I have the, you know, my knowledge of finance  03:07PM
11  is very good, it's reasonable, but I don't have
12  the expertise that an investment banker has to
13  analyze these issues and exactly how an equity
14  stub is going to trade, those kinds of things, but
15  as I recall the Board just said well, what are       03:07PM
16  your views on this, and my views were what's going
17  to make the best sense for shareholders and our
18  employees' own 23 million shares of Tribune stock,
19  so what's best for employees is going to be
20  probably best for all shareholders.       03:07PM
21    Q.  Did you form any opinion as to the
22  structure of the Broad and Burkle proposal?
23    A.  There was general agreement that it was
24  a creative structure and that enabled a -- at
25  that point anyway -- it enabled a return of, a       03:08PM

Page 109

1  significant return of capital to shareholders; it
2  also involved significant debt.
3    Q.  Did the -- was management working on a
4  proposal for a restructuring on its own during
5  this time period too?                 03:09PM
6    A.  No.
7    Q.  Was there any discussion about a
8  recapitalization?
9    A.  That was always one of the, always one
10  of the possibilities going back, should we, in       03:09PM
11  other words, do another recapitalization and share
12  buyback.  So if that's what you're referring to,
13  that was being discussed, but we were still in the
14  auction process.
15        And ultimately the value created through   03:09PM
16  the auction process would be compared to what was
17  being described as a self-help plan.
18    Q.  Okay.  And what were the parameters of the
19  self-help plan?  Let's start there.
20    A.  The self-help plan was going to involve   03:10PM
21  a spinoff, tax-free spinoff of Broadcasting and
22  Entertainment, and use of that -- those proceeds
23  and additional debt to finance a return of capital
24  to shareholders.
25    Q.  When were the characteristics of that       03:10PM

Page 110

1  self-help plan developed?
2     A.  Well, they were being considered, again,
3  that was something throughout this process that
4  had been considered sort of as a benchmark versus
5  other things.                          03:11PM
6        So what could you do, what could
7  Management do on its own or the Company do on
8  its own that might create more shareholder value
9  than other alternatives that surface through the
10  auction process.                      03:11PM
11    Q.  Was there a point in time after the
12  proposals had been received on the 17th that
13  you either recommended to the Special Committee or
14  the Special Committee asked you to help flush out
15  the self-help program more as a potential  03:11PM
16  alternative?
17    A.  That can -- all proposals were being --
18  the Special Committee was asking all alternatives
19  to be brought to, you know, as fully baked a
20  position as possible so they had the fairest means  03:11PM
21  of comparison.
22    Q.  Did anything change after the 17th after
23  the three proposals were received?
24    MR. DUCAYET:  Object to the form.
25    A.  In what time frame?            03:12PM

Page 111

1  BY MR. ODDO:
2     Q.  Well, immediately after, in other words,
3  was there a sense of dissatisfaction with the
4  proposals that had come in?
5     MR. DUCAYET:  Object, vague.        03:12PM
6     A.  There was a concern on the conditionality
7  of the Chandler proposal and also the fairness of
8  the Chandler proposal to the other shareholders
9  versus the Chandler Trusts.
10       There were valuation issues also, because  03:13PM
11  I'm not sure at this point going back where the
12  stock was trading at this point in anticipation of
13  a transaction, but whether the range of values
14  posited by Merrill and Citi and Morgan Stanley,
15  if the bottom end of that range was about the low  03:13PM
16  the trading price of the stock currently, but I do
17  recall a conditionality certainly in the Chandler
18  proposal was an issue.
19  BY MR. ODDO:
20    Q.  But you don't recall a point in time  03:13PM
21  where the Special Committee said okay, it's time
22  to change gears and look more at the self-help
23  plan as a more viable alternative?
24    MR. DUCAYET:  Object to the form.
25    Go ahead.                         03:14PM

Page 112

1     A.  That will -- that ultimately happened
2  because at the end of the process there were
3  effectively two proposals that were being
4  considered, one being the self-help proposal.
5  BY MR. ODDO:                          03:14PM
6     Q.  And what was the other?
7     A.  The other was, at the very end of the
8  process, was the Zell/ESOP proposal.
9     MR. ODDO:  Let's mark as Plaintiff's
10  Exhibit No. 8 a document Bates stamped TRIB23  03:14PM
11  through -- actually, TRIB46 through 47.
12       (FitzSimons Deposition Exhibit
13        No. 8 marked for
14        identification.)
15  THE WITNESS:  Yes.                    03:17PM
16  BY MR. ODDO:
17    Q.  Can you tell me what this document is?
18    A.  It's the minutes of the Special Committee
19  Meeting of February 3, 2007.
20    Q.  You were present for at least part of this  03:17PM
21  meeting?
22    A.  Yes.
23    Q.  The third paragraph references an update
24  to the status of the proposals from the Chandler
25  Trusts and the Broad and Burkle Group including  03:17PM

Page 113

1  modifications to the proposal since the last
2  meeting.
3        Had you had any direct contact with either
4  the representatives of the Chandler Trusts and/or
5  Mr. Broad and Burkle?                  03:18PM
6     A.  I had not had any direct contact with the
7  Chandler Trusts representatives.
8        At some point during this time, I did have
9  dinner with Mr. Broad and Mr. Burkle.
10    Q.  Okay.  Here in Chicago or in Los Angeles?  03:18PM
11    A.  Here in Chicago.
12    Q.  And what was the topic of conversation?
13    A.  Pretty much about they wanted to get
14  to know me a little bit, express to me that they
15  would like me to stay on to run the Company, how  03:18PM
16  they would interact with Management, how they saw
17  their roles, and just to indicate their continued
18  interest in seeing their proposal through to
19  fruition.
20    Q.  What did you take from that meeting?  03:19PM
21    A.  Just what I said.  It was a very pleasant
22  dinner and two very impressive, successful people.
23    Q.  When approximately did that take place, do
24  you recall?
25    A.  I can't offhand.  It certainly would be on  03:19PM

Highly Confidential

Page 114

1  my calendar, but I don't remember.
2     Q.  Was it --
3     A.  It should have been around this time I
4  would think.
5     Q.  It wasn't towards the end of the process?   03:19PM
6     A.  No.
7        MR. ODDO:  Okay.
8        (Discussion held off the
9           record.)
10 BY MR. ODDO:                          03:20PM
11    Q.  What did they tell you about how they
12 intended to interact with Management and what they
13 saw as their roles if their proposal was
14 successful?
15    A.  Well, they saw themselves as co-chairmen   03:20PM
16 and directors.
17    Q.  Active as co-chairmen and directors or
18 passive?
19    A.  I don't know that they fully described
20 that.                                 03:20PM
21       They expressed their interest in further
22 developing our interactive assets.  Ron Burkle
23 mentioned his role as a director on the Yahoo
24 Board and felt he could add expertise in that
25 area.  It was more of a general conversation,   03:21PM

Page 115

1  not specific to exactly what they would be doing
2  versus what I would be doing.
3     Q.  Did you discuss at all the merits of their
4  proposal?
5     A.  No.                           03:21PM
6     Q.  Did they ask for any guidance as to how
7  you thought their proposal might be improved?
8     A.  No, not specifically.  I would say our
9  conversations were more general.
10    Q.  Did they -- did you ever have any          03:21PM
11 conversations with either Mr. Broad or Mr. Burkle
12 about -- or in which they solicited any advice
13 from you as to how their offer could be improved?
14    A.  There was a conversation, a phone call
15 that Mr. Broad put in to me related to their      03:22PM
16 projections requesting our opinion as to whether
17 their projections were in the ball park to which I
18 agreed send the projections in and we'll take a
19 look.
20    Q.  Okay.  Did that happen?              03:22PM
21    A.  Yes.
22    Q.  What was your response after looking at
23 the projections?
24    A.  Well, it was around the time that we saw
25 business conditions worsening for the industry,   03:22PM

Page 116

1  and around -- I believe, if my recollection is
2  correct, that it was around the time we were going
3  to -- we had -- we just received January results,
4  revenue results, and we elected to, given the
5  confidentiality agreement, release those results   03:23PM
6  to the bidders still in the process, which made
7  their projections overly positive given the
8  slowdown that we were witnessing in the business,
9  particularly on the print side.
10    Q.  Is that at or about the time that          03:23PM
11 they reduced the amount of the dividend from
12 27 to $23?
13    A.  Yes.  Actually, it wasn't immediate, but
14 I believe after their advisors analyzed how --
15 what their view of the impact on their proposal   03:23PM
16 should be, they then came back verbally with that
17 reduction in the dividend but never really
18 followed up with a revised proposal in written
19 form.
20    Q.  Now, you'll see on the second page here   03:24PM
21 after you had been excused from the meeting that
22 there was a reference to the Committee determining
23 to instruct management to provide a detailed
24 presentation of its proposed restructuring
25 alternative to the Committee at its February 12th   03:24PM

Page 117

1  meeting; do you see that?
2     A.  Yes.
3     Q.  Were those instructions ultimately given
4  to you?
5     A.  Yes.                           03:24PM
6     Q.  What specifically were you asked to do?
7     A.  To make a presentation as to the leverage
8  levels and that would be needed to create value
9  for shareholders, manage the Company, as well as
10 the possibility of, you know, could this be fully   03:25PM
11 determined as to the other, you know, as to the
12 benefit to shareholder versus the other proposal.
13    Q.  So did they ask you to put forth some sort
14 of presentation that would allow them to compare
15 it to the other analysis?                  03:25PM
16    A.  Yes.
17    Q.  Is that what they were asking for?
18    A.  Yes.
19    Q.  Was this proposed restructuring
20 alternative, is that the same term for the        03:25PM
21 self-help --
22    A.  Self-help, yes.
23    Q.  And forgive me if I'm being repetitive,
24 but was that self-help plan something that was
25 developed as an alternative by the advisors or   03:26PM

Page 118

1  you and your management team?
2      A.  I would say in combination
3          MR. ODDO:  Let's mark as Plaintiff's
4  Exhibit No. 10 a document that's Bates stamped
5  TRIB13614 through 13616.          03:26PM
6          (FitzSimons Deposition Exhibit
7          No. 9 marked for
8          identification.)
9          (Discussion held off the
10         record.)                    03:27PM
11         MR. ODDO:  We'll mark this as Exhibit 9.
12  BY MR. ODDO:
13     Q.  Can you tell me what this document is?
14     A.  This is a letter dated February 6, 2007
15  from Sam Zell of Equity Group Investments    03:29PM
16  detailing his proposal for an acquisition of
17  Tribune Company.
18     Q.  Okay.  Did you receive this letter?
19     A.  As a member of the Board of Directors,
20  yes, I would have received this letter.    03:29PM
21     Q.  Did it go to you and then you distributed
22  it to the Board or do you recall what the --
23     A.  I don't recall.
24     Q.  Okay.  What were your thoughts when you
25  had a chance to take a look at this?          03:30PM

Page 119

1          MR. DUCAYET:  Objection to form.
2      A.  Initially the complexity of the
3  transaction caused me to seek counsel from our
4  advisors.
5  BY MR. ODDO:                        03:30PM
6      Q.  Did you do so?
7      A.  Yes.
8      Q.  And what kind of counsel did you get?
9      A.  That it was intriguing from a very
10  substantive and smart group of people headed by    03:30PM
11  Sam Zell, but that they needed more information to
12  fully understand it.
13     Q.  What type of information?
14     A.  They needed to understand the implications
15  of the Employee Stock Ownership Program, of the    03:30PM
16  S corporation, and the way those two elements of
17  this proposal interacted, so it needed to be
18  studied.
19     Q.  Had Merrill Lynch or Citigroup been
20  involved in an ESOP transaction before?    03:31PM
21     A.  I don't know.
22     Q.  Did you meet with Mr. Zell after this?
23     A.  Yes.  And, again, I need to check my
24  calendar, but it may have been that first meeting
25  took place after receipt of this letter.    03:32PM

Page 120

1      Q.  Did you ever meet individually with him
2  just the two of you?
3      A.  Yes, one time.
4      Q.  When did that take place approximately?
5      A.  That would have been after the initial    03:32PM
6  meeting that I described earlier.
7      Q.  What was the substance of your
8  conversation during the one-on-one meeting?
9      A.  Well, at that point I wanted to let him
10  know that the complexity of the transaction was    03:32PM
11  causing us some difficulty in wondering could the
12  transaction be, you know, could it be completed.
13         It was not any type of, you know, we were
14  looking for more information that the advisors
15  needed to talk more, but wanted to be as outfront    03:32PM
16  as possible saying that we were struggling with
17  some of the complexities surrounding the
18  transaction.
19     Q.  And was he fine with, you know, allowing
20  you and the advisors to take some time to get    03:33PM
21  up to speed on the proposal and how it would
22  operate?
23     A.  Yes, except he, you know, was looking
24  for, you know, a clear path to completion of the
25  transaction, and so I think from that standpoint    03:33PM

Page 121

1  there may have been some disappointment, but
2  clearly given the structure we needed to -- and
3  when I say we, certainly the Company and the
4  independent directors who were really running the
5  show, so my view was, you know, certainly    03:34PM
6  determined by the Special Committee.
7          But, anyway, we tried to be as open,
8  straight forward with everybody in this process as
9  we possibly could.
10         So, anyway, after more and more          03:34PM
11  examination, so after that -- I should try to
12  clarify this.
13         So after the meeting that I just
14  described, the one meeting I had with Sam that was
15  one on one, about a week later in a conversation    03:34PM
16  with Bill Osborn he said let's make sure we have
17  every proposal as fully baked as possible so the
18  Special Committee has a good means to compare.
19         And at this point it became the -- it
20  became what was left was the self-help and the    03:35PM
21  Zell proposal.  Given this very complex and
22  creative structure that they had brought to the
23  table, the Committee said let's make sure we
24  forget all of the complexities, let's eliminate as
25  much as we can of the conditionality, you know,    03:35PM

Page 122

1 further negotiate this proposal so there is a good
2 comparison between that proposal and its, you
3 know, the fact as to whether it was actionable
4 versus a self-help plan, and that's what we did.
5    Q.  Okay.  Did you ever get any sense from    03:35PM
6 Mr. Zell or anyone at equity group investments
7 that they had any sense of urgency as far as
8 effectuating a transaction?
9    A.  Yes.
10       MR. DUCAYET:  Object to the form.          03:36PM
11       Go ahead.
12    A.  I think everybody, and certainly
13 Management, was in the same boat.  This process
14 had gone on for a long time, and we were anxious
15 to end it as quickly as we could at the best      03:36PM
16 solution.  So sure, there was a sense of urgency
17 there.
18 BY MR. ODDO:
19    Q.  On their part.  I understand Management's
20 part, but did you ever -- was it ever conveyed to  03:36PM
21 you by anybody at EGI or Mr. Zell himself that he
22 had a specific time line in mind for effectuating?
23    A.  Not a specific time line.
24    Q.  Did he ever say that there were any
25 specific deadlines by which a deal had to get done 03:36PM

Page 123

1 or we would not be interested?
2    A.  Well, there was a frustration level that
3 built during this process.
4       As the advisors were looking to get and
5 maximize value, there were sort of multiple       03:37PM
6 parties involved in the negotiations.
7       So there was a significant frustration
8 level that boiled over at one point that Mr. Zell
9 said hey, what's going on here, who am I really
10 negotiating with, the advisors or, you know, who   03:37PM
11 is it?  Who can I make a deal with?
12       And it was quite, you know, quite
13 understandable given on the one hand everyone was
14 trying to do the right thing to maximize value, on
15 the other hand here's somebody who wants to get a  03:37PM
16 deal done that wasn't happening in the most
17 logical -- I shouldn't say that, not the most
18 logical, but in the -- the path was not totally
19 clear because there were multiple advisors trying
20 to -- everybody trying to get the price up.        03:38PM
21       (Discussion held off the
22       record.)
23 BY MR. ODDO:
24    Q.  Was Mr. Zell or his group ever given
25 conflicting information from any of your advisors? 03:38PM

Page 124

1    A.  I wouldn't say conflicting information.  I
2 would say that during the process, so after our
3 one-on-one meeting where I was explaining that the
4 complexity was making this difficult, then a week
5 later we reengaged after the discussion that I    03:39PM
6 described with Bill Osborn between Bill Osborn and
7 myself, we then made progress tying down some of
8 the conditions in the proposal to make it more
9 actionable knowing there would be some risks
10 involved, but, again, the negotiation moved       03:39PM
11 forward.
12       At one point the Committee's advisors,
13 Morgan Stanley, got involved to try to raise the
14 price.  This was getting towards the end of the
15 process of the time frame that we're talking about 03:40PM
16 getting close to the final weekend of March 31st.
17 And there was enormous frustration voiced at that
18 point saying who are we dealing with?  Now we've
19 got another advisor in here.  But that was an
20 attempt on the part of the Special Committee,      03:40PM
21 again, to get the price up.
22       So at that point there was some concern
23 would that -- you know, would Sam walk from this.
24    Q.  Okay.  Did they ever indicate that they
25 were on the verge of doing that?                   03:40PM

Page 125

1    A.  Yes, they were indicating let's, you know,
2 is it possible to reach a deal here or let's call
3 use our time more productively.
4    Q.  Did they give you or to your knowledge
5 anyone associated with the Company any specific    03:41PM
6 deadline that the deal had to be reached by X date
7 or we're going to walk away?
8    A.  I wouldn't say there was anything as
9 specific at that -- as that, but there was clearly
10 a very high frustration level.                     03:41PM
11    Q.  You mentioned before that there were
12 conditions to his offer that you needed to work
13 through in order to resolve and make it more
14 actionable; what were those conditions?
15    A.  Well, what -- if I recall correctly, the   03:41PM
16 issue of "outs" for the second stage.
17       (Discussion held off the
18       record.)
19 BY MR. ODDO:
20    Q.  So the circumstances under which the       03:42PM
21 second stage would not go forward?
22    A.  Correct.  And those needed to be tightened
23 up.
24    Q.  Any others?  Any other conditions that you
25 recall being problematical, problematic?          03:42PM

Page 126

1    A.  Over the course of the negotiation, a lot
2  of these things were tightened up.  That is a
3  significant -- as significant piece.  There was
4  also the ticking fee that was initially starting
5  6 months after signing of the merger agreement,      03:43PM
6  then it was from day one at a lower rate, then it
7  was starting January of 2008, I believe that's
8  where we ultimately ended up.
9        So a lot of these things were moving
10  around all with the intent of getting value up for  03:43PM
11  all shareholders.
12    Q.  The proposal that ultimately was agreed to
13  with Mr. Zell and Equity Group Investments, aside
14  from price how did it differ from the initial
15  proposal?                                            03:43PM
16        MR. DUCAYET:  Object to the form.
17    A.  Well, the price was higher, conditionality
18  was lower, the employee stock ownership plan, the
19  trustee had been involved and negotiated on behalf
20  of employees, so certainly that was an element      03:44PM
21  that everyone knew had to be involved but at the
22  beginning you don't know how that trustee is going
23  to negotiate on behalf of the employees, but the
24  trustee was retained and came in and played their
25  role at the table.  So it had to be a -- it was a    03:44PM

Page 127

1  three-way negotiation.
2    Q.  Okay.  When was the ESOP actually created?
3    A.  I want to say April 23rd.  I'd need to
4  double check that date.
5    Q.  Okay.  So it was created after the           03:45PM
6  announcement that the deal had been approved?
7    A.  Yes.
8        THE VIDEOGRAPHER:  Five minutes on the
9  videotape.
10        MR. ODDO:  Okay.                              03:45PM
11  BY MR. ODDO:
12    Q.  The -- if it was created after the deal
13  was announced, how did it retain a trustee and
14  advisors prior to that?
15    A.  We should probably make sure that our       03:45PM
16  terms are precise here.  So the merger agreement
17  was signed with the trustee.  So on the last
18  weekend of March 31st and April 1st, negotiations
19  took place between the three parties, the
20  ESOP trustee and its financial advisor, the Zell   03:45PM
21  organization and Tribune, and all terms were
22  agreed to at that point.
23        So agreement took place, announcement took
24  place, and then implementation took place after
25  that.                                               03:46PM

Page 128

1    Q.  Okay.  So the trustee and its advisors
2  were -- well, who actually hired them?
3    A.  The Company hired the trustee.
4    Q.  In anticipation of the creation post
5  acquisition or post announcement?                   03:46PM
6    A.  Yes.
7        MR. ODDO:  All right.  It's a good time to
8  break.
9        THE VIDEOGRAPHER:  Okay.  This will
10  conclude videotape number four.  The time now is    03:46PM
11  approximately 3:46 p.m.  The elapsed time on this
12  tape is 57 minutes.  And we will continue on
13  videotape number five.
14        (Recess taken.)
15        THE VIDEOGRAPHER:  Good afternoon.  This    03:56PM
16  will begin videotape number five of the videotaped
17  deposition of Mr. Dennis J. FitzSimons taken the
18  14th day of May, 2007, in regards to case number
19  BC362110.  The time now is approximately, pardon
20  me, 3:56 p.m.                                       03:56PM
21        I'll remind the witness he remains under
22  oath, and we may continue.
23  BY MR. ODDO:
24    Q.  Okay.  We were talking about the formation
25  of the ESOP before the break.                       03:56PM

Page 129

1    A.  (Indicating.)
2    Q.  What was the first step the Company took
3  to implement the ESOP and when did that take
4  place?
5    A.  Well, the first step was hiring the        03:57PM
6  trustee, the trustee then had to hire a financial
7  advisor, and this was -- and both of those steps
8  took place after we determined that -- after our
9  legal counsel determined that, in fact, this
10  structure could possibly work and be a way to     03:57PM
11  surface more value for shareholders given its tax
12  advantages, the trustee, trustee's financial
13  advisor, then the negotiations on behalf of
14  employees with the trustee representing their
15  interests, then the Company loaned money to the    03:58PM
16  ESOP, the ESOP then purchased $250 million of
17  newly issued Tribune stock, and that's where we
18  are right now.
19    Q.  Okay.  Let's go back to the determination
20  that the structure could work, when was that made?  03:58PM
21    A.  At some point -- well, right as we
22  tightened up the conditionality of the proposal,
23  and legal and financial counsel suggest yes, the
24  tax structure did work, was unlikely to be
25  challenged, took consideration of the various       03:59PM

Highly Confidential

Page 130

1   public reaction that might result from this, and
2   after taking that all into consideration saying
3   with our best counsel this is a transaction that
4   can work, if it provides the most value to
5   shareholders.                          03:59PM
6       Q.   And approximately when did that take
7   place?
8       A.   I would say mid to late March.
9       Q.   Okay.  And then how was it determined who
10  would be hired as a trustee?            04:00PM
11      A.   GreatBanc, which we were not really aware
12  of as somebody that did this kind of work, and
13  then we found out that they had purchased LaSalle
14  Bank's trust division, Marine Midland's trust
15  division, that they were a quite reputable expert  04:00PM
16  in this field.
17       So they were interviewed, hired, and then
18  they hired Duff & Phelps.
19      Q.   Okay.  Who interviewed them?
20      A.   Who interviewed them?  Crane Kenney,      04:00PM
21  Don Grenesko.
22      Q.   Members of your management team?
23      A.   Yes.
24      Q.   Was there actual Board authorization for
25  the hiring of a trustee at some point?   04:01PM

Page 131

1       A.   I don't know if -- there was sort of -- I
2   don't know if there was an actual resolution to
3   that effect.  I don't know.
4       Q.   Okay.  And how was it determined that the
5   Company would loan the ESOP the money to buy the  04:01PM
6   shares?
7       A.   Well, that was a necessary part of this
8   transaction if we were going to go down this road.
9       Q.   They wanted it to become evident that that
10  was a necessary component?              04:02PM
11      A.   Mid March.
12      Q.   Why was it necessary that the ESOP borrow
13  the money from the Company?
14      A.   Because the ESOP had no money of its own.
15      Q.   Oh, I understand that, but why the Company  04:02PM
16  as opposed to a lender?
17      A.   The ESOP has no assets.
18      Q.   Well, the ESOP had no ability to -- or
19  potential ability to borrow money from any source
20  other than the Company?                04:02PM
21      A.   I don't know that I can answer that
22  question, but if you would think about it as the
23  ESOP is a Company-funded plan, so the employees
24  are not paying into the ESOP, it will be a
25  retirement benefit that will be provided by the   04:03PM

Page 132

1   Company to eligible employees.
2       Q.   Okay.  What were the terms of the loan?
3       A.   I don't know.  Of -- I don't know.
4       Q.   The loan from the Company.
5       A.   I don't know the specific terms.    04:03PM
6       Q.   Who negotiated those?
7       A.   The Trustee I would imagine negotiated it
8   with our financial people, our Treasurer and CFO.
9       Q.   Now, at some point did Broad and Burkle
10  come forward with their own ESOP proposal?   04:04PM
11      A.   They came forward with a letter that
12  suggested that we, the Company, developed this
13  proposal and then negotiated exclusively with
14  Zell, when, in fact, we did not develop this
15  structure.  The Zell organization developed this   04:04PM
16  structure and then came to us with it.
17      Q.   Okay.  And did they propose a transaction
18  on a similar structure?
19      A.   As I said, they wrote a letter not fully
20  understanding the structure and suggested that   04:04PM
21  they would want to make an offer based on a
22  structure that they really were not aware of,
23  again, suggesting that we had developed the
24  structure --
25      Q.   Okay.                          04:05PM

Page 133

1       A.   -- when we had not.
2       Q.   Did they make a proposal based on any
3   structure subsequent to that letter that you
4   referred to?
5       A.   They wrote a letter suggesting -- but   04:05PM
6   there was no structure that they had.
7        The bankers, our advisors, were instructed
8   to go and give to the Broad and Burkle advisors as
9   much information as they could fully explaining to
10  them that this was not a structure that had been   04:06PM
11  developed by the Company, pointed them to the
12  merger agreement, which they had had for months,
13  and suggested that they mark up the merger
14  agreement and submit a proposal.
15       To the best of my knowledge, that did not  04:06PM
16  happen.
17      Q.   Did you get any communications from them
18  that they were preparing to submit a proposal?
19      A.   Other than the letter that I mentioned,
20  they had asked for documents, they were provided  04:06PM
21  with documents, but under the terms of the
22  confidentiality agreement that each bidder
23  received, we wouldn't have been able to share the
24  documents from the Zell organization with Broad
25  and Burkle.  But they were given documents that   04:07PM

Page 134

1 would have made it possible for them to make an
2 offer that would have been competitive.
3     Q.  Okay.  And did they indicate that such a
4 proposal was forthcoming?
5     A.  They may have.                    04:07PM
6     Q.  Okay.  Are you aware of whether or not
7 they did or not?
8     A.  There was a flurry of letters that went
9 back and forth over that final weekend, but,
10 again, I don't have them in front of me, and I     04:07PM
11 couldn't tell you exactly what the wording was as
12 to what we could expect or not expect.
13     Q.  Was there any discussion at the Board
14 level as to whether the creation of the ESOP and
15 the implementation of it after the announcement of  04:08PM
16 the Zell transaction might have an adverse effect
17 on the probability of another party coming forward
18 with a proposal for more consideration?
19     A.  I don't remember.  We've been in this
20 process for 6 months.  Everybody had lots of time   04:08PM
21 to come forward with proposals.
22     Q.  I understand.  But you negotiated a
23 relatively small termination fee, correct,
24 $25 million, is that --
25     A.  Yes.                             04:09PM

Page 135

1     Q.  And was that done with the idea that
2 it being that small, it wouldn't deter another
3 interested party from coming forward with a
4 potentially superior proposal?
5     A.  I believe the Special Committee felt that  04:09PM
6 was very important.
7     Q.  My question was whether or not there was
8 any discussion that you recall about whether or
9 not the creation and implementation of the ESOP
10 might have any deterrent effect on a potential     04:09PM
11 third party bidder.
12     A.  No, given that this was by far the
13 proposal that generated the most value for
14 shareholders, the Committee felt it was evaluating
15 what was possible now, and so as far as, again,    04:10PM
16 having been in this process for 6 months, having
17 set a deadline, revised that deadline, fully
18 anticipating being completed with the process by
19 February, everybody who was going to be in this
20 process was going to be in it, and especially      04:10PM
21 given that Broad and Burkle had not provided after
22 seeing the January numbers even a full written
23 proposal, I don't know that the Committee saw
24 anything but that this ESOP S corp proposal was an
25 opportunity to maximize value and didn't want to   04:11PM

Page 136

1 let it get away.
2     Q.  But was there any discussion about whether
3 or not the creation and implementation of the ESOP
4 structure might be a deterrent to another third
5 party coming forward?                    04:11PM
6         MR. DUCAYET:  Objection, asked and
7 answered.
8     A.  Not to my -- I'm not aware of any.
9 BY MR. ODDO:
10     Q.  Obviously I'm just asking about          04:11PM
11 conversations that you were privy to.  To the
12 extent that the Special Committee may or may not
13 have discussed it while you weren't there you
14 obviously wouldn't know, but I'm just asking about
15 your recollection of whether there was such a      04:11PM
16 discussion.
17         Now, the structure also contemplated an
18 initial investment by Mr. Zell, correct?
19     A.  Yes.
20     Q.  And how much was that?                04:12PM
21     A.  Initially 250 million.
22     Q.  Okay.  And what did he receive in exchange
23 for that?
24     A.  He bought $50 million of newly issued
25 stock and a $200 subordinated note.              04:12PM

Page 137

1     Q.  Okay.  Was there any discussion at the
2 Board level of whether this investment by Mr. Zell
3 that was contemplated by the transaction might
4 have any deterrent effect on a third party coming
5 forward with a superior proposal?                04:12PM
6         MR. DUCAYET:  Object to the form.
7     A.  I'm not aware of any, but it was that
8 investment that was going to -- the initial
9 investment, anyway, which would morph into a
10 different type of investment that was making $34 a  04:13PM
11 share in cash possible.
12         MR. ODDO:  All right.  Let's take a look
13 at a document we'll mark as, excuse me,
14 Plaintiff's Exhibit No. 10.  It's Bates stamped
15 TRIB2521 through 2539.                    04:14PM
16         (FitzSimons Deposition Exhibit
17             No. 10 marked for
18             identification.)
19     THE WITNESS:  Yes.
20 BY MR. ODDO:                            04:15PM
21     Q.  Can you tell me what this document is?
22     A.  This is a presentation that was made to
23 the independent directors on February 12, 2007, on
24 a management recommendation for a recapitalization
25 of Tribune Company.                        04:16PM

Page 138

1  BY MR. ODDO:
2      Q.  Okay, is this the self-help plan?
3      A.  Yes.
4      Q.  What was contemplated by this plan?
5      A.  As we discussed before, a spinoff of the   04:16PM
6  broadcasting business in a tax efficient manner,
7  a return of capital to shareholders in the 18 to
8  $20 a share range, and then the sale of certain
9  assets, including the Chicago Cubs and our Comcast
10  SportsNet stake as well as other noncore assets as   04:17PM
11  well as additional cost savings measures involved
12  in consolidating certain publishing group office
13  and corporate office functions.
14      Q.  Was it ever determined which method of
15  return, difficult vend versus share repurchase,   04:17PM
16  that the Company would pursue if it went down this
17  path?
18      A.  There was a lot of discussion around this,
19  but I don't believe that we ultimately came to a
20  decision on this point.   04:17PM
21      Q.  Okay.
22      A.  For this particular alternative.
23      Q.  Were there any time constraints on
24  implementing this strategic alternative?
25      A.  Well, it says here end of quarter one,   04:18PM

Page 139

1  but if I look at the date here at February 12th,
2  this was at a point where none of the proposals
3  were really showing a significant premium over
4  where the stock was trading, and that's why we
5  were developing this at this point.   04:18PM
6      Q.  Okay.  But there wasn't any sort of time
7  frame by which this would have to be done if it
8  was, in fact, the strategic alternative that the
9  Board and the Special Committee decided to go
10  with; is that fair?   04:19PM
11      A.  I think that's true.  What we had
12  committed to was announcing a course of action by
13  the end of the first quarter, that's what we
14  originally committed to the end of the year of
15  '06, and then we committed to the end of the year   04:19PM
16  of the first quarter, but what was happening here
17  is the uncertainty within the Company was not a
18  positive for the operation of the Company.
19          So while there was no financial reason why
20  this had to be done from an operating standpoint,   04:19PM
21  trying to at least give some certainty for those
22  inside the Company for recruitment and retention
23  purposes was very important.
24          MR. ODDO:  Okay.  Let's mark as
25  Plaintiff's Exhibit No. 11 a document that's Bates   04:20PM

Page 140

1  stamped TRIB2648 through 2450.
2          (FitzSimons Deposition Exhibit
3          No. 11 marked for
4          identification.)
5          THE WITNESS:  Yes.   04:24PM
6  BY MR. ODDO:
7      Q.  Can you tell me what this document is?
8      A.  These are minutes of the meeting of the
9  Board of Directors meeting of March 30, 2007,
10  Special Committee Meeting, excuse me.   04:24PM
11      Q.  And you were present for at least a
12  portion of this meeting?
13      A.  Yes.
14      Q.  And let me call your attention to the
15  third paragraph there where it talks about   04:24PM
16  Mr. Whayne discussing the Company's recent credit
17  rating by two agencies noting that the financial
18  performance of the Company in line with management
19  downside case could pose a risk to the Company's
20  ability to consummate a transaction involving   04:24PM
21  forward-looking financing conditions.  What was
22  the substance of what Mr. Whayne was talking about
23  there?
24      A.  Well, this relates to the decline in ad
25  sales that I referenced before, particularly on   04:24PM

Page 141

1  the print side of the business, and if that were
2  to continue or worsen, Mr. Whayne was as financial
3  advisor to the Special Committee pointing out the
4  potential risk of the ability to consummate the
5  second stage of the transaction.   04:25PM
6      Q.  What was the Board and/or Special
7  Committee's reaction to his comments?
8      A.  They asked, I believe, what was the
9  cushion, what were the covenants like and how
10  severe would the downturn have to be before the   04:25PM
11  transaction would not close.
12      Q.  All right.  What was his response?
13      A.  His response as -- and I'm not sure whose
14  response it was, whether it was Mr. Whayne or
15  somebody from Merrill or Citi, but they went   04:26PM
16  through the covenants and what those covenants
17  allowed, and there was a very significant cushion
18  in terms of the cash flow of the Company and what
19  it would need to be before the banks would not be
20  obligated to provide financing.   04:26PM
21      Q.  When you say significant cushion, what do
22  you mean?
23      A.  A $200 million decline in cash flow from
24  projected levels.
25      Q.  Okay.  The next paragraph talks about the   04:27PM

Highly Confidential

Page 142

1  conditionality of the financing associated with
2  Mr. Zell's proposal, and then notes that Merrill
3  Lynch was one of the principal lenders financing
4  the Zell proposal.
5       When did you first become aware that      04:27PM
6  Merrill Lynch was one of the lenders financing
7  Mr. Zell's proposal?
8    A.  Well, Merrill Lynch and Citigroup provided
9  staple financing to all bidders.
10   Q.  In connection with each other or        04:27PM
11 separately?
12      MR. DUCAYET:  Object to the form.
13   A.  So Merrill and Citi in connection with
14 each other?
15 BY MR. ODDO:                                   04:27PM
16   Q.  Yes.
17   A.  I believe that's correct, yes.
18   Q.  Was that approved at the Board or Special
19 Committee level, that they would be allowed to
20 participate in that way?                        04:28PM
21   A.  Yes.  My understanding that's customary
22 in auction processes like this.  There's no
23 requirement for bidders to use that financing,
24 but it is available to them.
25   Q.  Okay.  On the second page there's        04:28PM

Page 143

1  a reference to you providing your views on
2  the likely positive employee reaction to the
3  Zell proposal; what was that based on?
4    A.  Well, that was based on the very
5  successful experience that our employees had    04:28PM
6  with an ESOP plan that was implemented in 1988 and
7  lasted until 2003 where employees benefited from
8  that at a time when stock prices were moving up.
9  It was a very positive experience that employees
10 had with that ESOP plan.                        04:29PM
11   Q.  Okay.
12      THE VIDEOGRAPHER:  Sir, could you lower
13 your hand?
14      THE WITNESS:  Oh, excuse me.  Sorry.
15      THE VIDEOGRAPHER:  Thank you very much.    04:29PM
16 BY MR. ODDO:
17   Q.  The next paragraph talks about
18 Mr. Osborn's perspective on the Broad and Burkle
19 reengagement.  What did Mr. Osborn say, do you
20 recall?                                         04:29PM
21   A.  As it indicated in the minutes, he said
22 that the Company and all advisors should cooperate
23 with Mr. Broad and Mr. Burkle and respond to
24 reasonable requests for additional due diligence.
25   Q.  That was the extent of his perspective as 04:29PM

Page 144

1  referenced there?
2    A.  Yes.  He made it clear that whatever it
3  was appropriate to give to the Broad and Burkle
4  Group should be given to them.
5    Q.  Was there any discussion about reaching   04:30PM
6  out to the Broad and Burkle coalition to let them
7  know that the process was coming to an end?
8    A.  That had been announced publicly and was
9  very -- there was an awareness in the market in
10 anticipation that there was going to be an       04:30PM
11 announcement.
12   Q.  Do you know whether or not either the
13 Special Committee or its advisors or the Company's
14 advisors had any communications with Broad and
15 Burkle about the timing of any proposal?         04:30PM
16   A.  Well, there were communications going on
17 towards the end of that week, and this was just a
18 -- so March 30th was Friday.  The announced end of
19 the -- or the announced self-imposed deadline for
20 the Committee and the Board was to announce the   04:31PM
21 direction, the strategic direction, of the
22 Company, which alternative was going to be chosen
23 by the end of the first quarter.  So -- and then
24 on Friday, as you can see from the minutes, the
25 Company and advisors were really mandated to --   04:31PM

Page 145

1  they were given a mandate to engage and give
2  Mr. Broad and Mr. Burkle any information possible.
3    Q.  What was your understanding of the status
4  of Mr. Broad and Burkle's proposal at that point
5  in time on the 30th?                             04:32PM
6    A.  Well, as I think I mentioned earlier,
7  after the January results were given, they had
8  reduced their prior proposal, had not given a
9  proposal in writing, and really had not said a lot
10 more or there was very little communication       04:32PM
11 between I guess it would have been mid
12 February and this point.
13      A letter was received, I'm not sure at
14 what point the letter came in, suggesting, again,
15 as I mentioned, that the Company had developed a   04:32PM
16 proposal and chosen to negotiate with only one
17 bidder, and that letter was in error because we
18 had not, the Company nor its advisors, developed
19 this proposal.
20   Q.  Did you ever become aware that Broad and   04:33PM
21 Burkle had communicated that they might be willing
22 to pay $34 in an ESOP structured type transaction
23 during this time frame?
24   A.  I believe I stated earlier that that
25 letter did come in, yes.                          04:33PM

Page 146

1    Q.  Okay.  And that's what the letter
2  indicated?
3    A.  It indicated in an ESOP transaction with
4  no specificity.
5    Q.  But it did indicate the $34 --          04:33PM
6    A.  That's what the piece of paper said, yes.
7      MR. ODDO:  Okay.  Let's mark as
8  Plaintiff's Exhibit No. 12 a document that's Bates
9  stamped TRIB2651 through 2653.
10          (FitzSimons Deposition Exhibit    04:34PM
11          No. 12 marked for
12          identification.)
13      THE WITNESS:  Yes.
14  BY MR. ODDO:
15    Q.  Can you tell me what this document is?    04:37PM
16    A.  These are the minutes of the Special
17  Committee Meeting of April 1, 2007.
18    Q.  Okay.  And you were present for at least
19  part of this meeting?
20    A.  Yes.                      04:37PM
21    Q.  Okay.  Let's take a look at the second
22  page where there's the discussion of the Broad and
23  Burkle interest that Mr. Mulaney was describing.
24      It says here that he reported on the
25  numerous other communications that had taken place  04:37PM

Page 147

1  with Broad and Burkle's advisors over the last
2  week and since Friday regarding the steps that
3  Broad and Burkle should take to submit financing
4  commitments and other documentation relating to a
5  firm proposal for consideration for the Committee;  04:37PM
6  do you see that?
7    A.  Yes.
8    Q.  What specifically did he say had been
9  done, do you recall?
10    A.  I don't specifically recall other than.    04:38PM
11  It looks like it was reported to the committee
12  what the communication and what the advisors had
13  had with Broad and Burkle's advisors.
14    Q.  Do you recall what the -- what the
15  substance of those communications that he had had  04:38PM
16  with Broad and Burkle's advisors was?
17    A.  As I had indicated earlier, what they
18  would need to do to -- short of providing them
19  with the documents that they were asking for,
20  which were confidential in nature and governed by  04:39PM
21  a confidentiality agreement giving them as much
22  information as they could to allow them to make a
23  bid.
24    Q.  Okay.  Now, the documents that you're
25  saying were covered by the confidentiality      04:39PM

Page 148

1  agreement are the precise ESOP documents that were
2  contemplated by the Zell transaction, correct?
3    A.  I assume the merger agreement is -- well,
4  what could not be shared would be confidential
5  documents that were either prepared by the Zell    04:39PM
6  organization, so my understanding is we wouldn't
7  be able to share Broad and Burkle documents with
8  another bidder, it's just sort of common practice
9  that you would not share documents between
10  bidders.                     04:40PM
11    Q.  Okay.  What had they asked for that you
12  understood could not be given to them because of
13  the confidentiality agreement?
14    A.  Well, again, in their initial letter, as I
15  understand this, and I'm not an attorney, was an   04:40PM
16  assumption made that the Company had developed a
17  structure, and if the Company had developed the
18  structure, then that would be something that could
19  be shared, and another bidder would expect to have
20  the same structure that was developed by the      04:40PM
21  Company, and why would the Company want to develop
22  a structure and only then negotiate with one
23  bidder.
24    Q.  Understood.  Did they -- once they were
25  informed that it wasn't the Company's structure,   04:40PM

Page 149

1  did they continue to request that information?
2    A.  That I don't know.
3      MR. ODDO:  Okay.  Why don't we break for
4  five minutes and let me just go over the last few
5  documents and show him and get organized, then    04:41PM
6  we'll finish up.
7      MR. DUCAYET:  Great.
8      THE COURT:  All right.  I'll take this
9  opportunity then to conclude videotape number
10  five.  The time now is 4:41 p.m., and the elapsed  04:41PM
11  time on this tape is 45 minutes, 30 seconds.
12      (Recess taken.)
13      THE VIDEOGRAPHER:  Good afternoon, this
14  will begin videotape number six of the videotaped
15  deposition of Mr. Dennis J. FitzSimons taken the  04:52PM
16  14th day of May, 2007.  The time now is
17  approximately 4:51 p.m. taken in the matter of
18  case number BC362110.
19      I'll remind the witness he remains under
20  oath, and we may continue.            04:52PM
21      MR. ODDO:  Let's mark as Plaintiff's
22  Exhibit No. 13 a document that's Bates stamped
23  TRIB2951.
24
25                        04:52PM

## Page 150

1          (FitzSimons Deposition Exhibit
2          No. 13 marked for
3          identification.)
4     THE WITNESS:  Yes.
5   BY MR. ODDO:                          04:53PM
6     Q.  Can you tell me what this document is?
7     A.  It appears to be an e-mail from
8   Michael Costa to Christina Mohr at Citigroup,
9   myself, Crane Kenney and Don Grenesko questioning
10  the wisdom of proceeding further on the Zell        04:54PM
11  proposal.
12    Q.  What was his basis of questioning the Zell
13  proposal?
14    A.  I think this was at the stage of many
15  people were questioning was the Zell proposal       04:54PM
16  really actionable, what were the odds given we had
17  been at this process about 5 months, what I see in
18  the second to last line here, it says best case
19  upside of 10 percent plus with Zell proposal, why
20  are we delaying the recapitalization announcement?  04:54PM
21        So Michael Costa's view at this point in
22  time seems to be given the complexity of the Zell
23  transaction why not go forward with the spinoff
24  broadcasting and the recapitalization.
25    Q.  Was that plan ready to implement at that      04:55PM

## Page 151

1   point?
2     A.  It could have been.  I don't recall if
3   it was -- he references at this point -- it's
4   difficult to place all of these events in
5   time, but he says why are we delaying recap         04:55PM
6   announcements beyond next week.  This was on
7   a Friday night.  So whether it was fully baked
8   at that point I don't know.
9     Q.  Okay.  Now, he says he still hadn't heard
10  a convincing rationale for why employees will buy   04:55PM
11  into the ESOP; do you see that?
12    A.  Yes.
13    Q.  Did he -- did you have a discussion with
14  him about that at all?
15    A.  Ultimately we did, yes.                        04:55PM
16    Q.  Was he ultimately swayed, and if so, what
17  was the rationale that swayed him?
18    A.  Well, later beyond this point we added to
19  our package of employee retirement benefits a cash
20  balance plan.  So at this point I don't believe we  04:56PM
21  had that included.  So as an employee might look
22  at the plan of benefits being offered to them,
23  they now have a cash balance plan that would
24  effectively be viewed as a floor benefit, a floor
25  pension benefit.  On top of that would be the       04:56PM

## Page 152

1   allocation of ESOP shares that they would get
2   every year, which would have the risk, you know,
3   in a positive growth, cash flow growth situation
4   tremendous upside, in a negative cash flow or can
5   cash flow declining, it would have little value.    04:56PM
6         So putting a floor pension benefit in
7   there now I think would probably change Michael's
8   view that this could be viewed by employees in a
9   positive way.
10    MR. ODDO:  All right.  Let's mark as              04:57PM
11  Plaintiff's Exhibit No. 14 a document Bates
12  stamped TRIB2947 through 2948.
13          (FitzSimons Deposition Exhibit
14          No. 14 marked for
15          identification.)                            04:58PM
16    THE WITNESS:  Yes.
17  BY MR. ODDO:
18    Q.  Can you tell me what this document is?
19    A.  This is an e-mail, a series of e-mails
20  actually going back and forth between Michael       04:58PM
21  Costa and a group from Tribune Company, an e-mail
22  from -- in reply from me to Michael and then his
23  reply to me discussing what had occurred on
24  our conference call of earlier in the day on
25  February 24th where we were at different positions  04:59PM

## Page 153

1   regarding the Zell proposal as to whether it
2   should be further -- pursued further.
3     Q.  Okay.  What were the different positions?
4     A.  Well, again, I think the last exhibit
5   that you had showed me, Michael indicated his       04:59PM
6   view, Michael Costa, indicated that his view was
7   the Zell proposal had very little likelihood of
8   being actionable, and he mentioned in that the
9   reason he didn't think employees would buy into
10  the ESOP.                                           05:00PM
11        I expressed that I thought employees would
12  view it positively and the Zell proposal was worth
13  trying to go further on to see if it was
14  actionable.
15        Michael was asked his opinion and he          05:00PM
16  disagreed.  So it was an honest disagreement in
17  front of the Board of Directors or the Special
18  Committee I should say.
19    Q.  Did the Special Committee comment at all
20  on the disagreement?                                05:00PM
21    A.  They may have in executive session, I
22  don't know.
23    Q.  But not that you were privy to?
24    A.  Yes, I was not privy to what they may have
25  said.                                               05:00PM

Page 154

1    Q.  Okay.  They didn't say anything about it
2  in your presence about the disagreement between --
3    A.  There was some comment made given that the
4  advisors were in many different places, again, I
5  think it just speaks to the complexity of this    05:01PM
6  possible transaction and the different views that
7  different people had at different times during
8  this process.
9        MR. ODDO:  Okay.  Let's mark as
10  Plaintiff's Exhibit No. 15 a document Bates    05:01PM
11  stamped TRIB2774 through 2775.
12        (FitzSimons Deposition Exhibit
13          No. 15 marked for
14          identification.)
15        THE WITNESS:  Yes.              05:02PM
16  BY MR. ODDO:
17    Q.  Can you tell me what this document is?
18    A.  It seems to be an exchange between
19  Michael Costa and Crane Kenney and Crane's
20  response with my being cc'd -- or no, then, I'm    05:02PM
21  sorry, then a forwarding of Michael Costa's e-mail
22  to me and Don Grenesko with Crane's commentary,
23  and it refers to Morgan Stanley's being involved
24  or not being involved in the financing of the
25  Zell/ESOP transaction.              05:03PM

Page 155

1    Q.  And had Morgan Stanley proposed to be
2  involved in that?
3    A.  Yes.
4    Q.  Did you have any further conversations
5  with Mr. Crane or Mr. Costa about this issue?    05:03PM
6    A.  Ultimately Morgan Stanley needed to be --
7  and this was part of their engagement with the
8  Special Committee, which I had nothing to do with
9  negotiating or anybody else at the Company had
10  nothing to do with negotiating their engagement    05:03PM
11  arrangement.  And ultimately they have not been
12  involved in the financing, but we were able to use
13  some of their suggestions in order to negotiate
14  better terms with Citi and Merrill.
15    Q.  Does this e-mail reflect a desire by    05:03PM
16  Morgan Stanley to be involved somehow in the
17  financing?  Is that what was being discussed?
18        MR. DUCAYET:  Objection to the form.
19  BY MR. ODDO:
20    Q.  To your understanding?              05:04PM
21    A.  Yes, that's my understanding.
22        MR. ODDO:  Okay.  Let's mark as Exhibit
23  No. 16 a document that's Bates stamped TRIB2722
24  through 2723.
25                              05:04PM

Page 156

1        (FitzSimons Deposition Exhibit
2          No. 16 marked for
3          identification.)
4        THE WITNESS:  Yes.
5  BY MR. ODDO:                      05:05PM
6    Q.  Can you tell me what this document is?
7    A.  This is an e-mail from Tom Leach to me,
8  Crane Kenney, Don Grenesko, Scott Smith and
9  Tim Landon regarding a Gannett/Microsoft proposal,
10  which was a proposal suggesting that if there was  05:05PM
11  a tax-free spin off in broadcasting, Gannett and
12  Microsoft would make an equity investment in the
13  remaining publishing company, a minority equity
14  investment.
15    Q.  Of what amount?              05:06PM
16    A.  I believe it was 500 million.
17    Q.  Okay.  And they apparently backed out of
18  that interest?
19    A.  Yes.  At the same time the -- we had been
20  negotiating with Microsoft to make an investment    05:06PM
21  in a joint venture that Tribune and Gannett have,
22  and that's CareerBuilder, careerbuilder.com, which
23  is that recruitment website I referenced earlier.
24  And Microsoft was going to take a minority
25  investment in that.  We just announced this last    05:07PM

Page 157

1  week, actually, so it took a long time to get
2  done.
3    Q.  Who is Tom Leach?
4    A.  Tom Leach is the director of corporate
5  development at Tribune.              05:07PM
6    Q.  Okay.  There's a reference here to the
7  fact that the Gannett representative expressed
8  some frustration that they had not received
9  feedback from the bankers since January; was that
10  addressed at all with the bankers?              05:07PM
11    A.  I'm not sure whether it was or not.
12        MR. ODDO:  Okay.  Let's mark as
13  Plaintiff's Exhibit 17 a document Bates stamped
14  305---
15        THE WITNESS:  Excuse me, let me add one    05:08PM
16  thing.
17        MR. ODDO:  Sure.
18        THE WITNESS:  We're now sort of on a path
19  of whole company transaction or a self-help plan.
20  With a self-help plan this could have been    05:08PM
21  possible down the road but...
22        MR. ODDO:  All right, Exhibit 17 is Bates
23  stamped 3057 through 3059.
24
25                              05:08PM

Highly Confidential

Page 158

1    (FitzSimons Deposition Exhibit
2    No. 17 marked for
3    identification.)
4    THE WITNESS: Yes.
5    BY MR. ODDO:                                05:10PM
6    Q.  Can you tell me what this document is?
7    A.  This is back and forth regarding some of
8  the terms that were being negotiated in the
9  ESOP/Zell transaction.
10   Q.  Okay.  In the last couple of strings     05:10PM
11 there's a reference to a leverage issue and a
12 shadow campaign against it, and your response was
13 shadow campaign with a question mark; do you
14 recall what that was in reference to?
15   A.  I'm trying to get the sense of the       05:10PM
16 interplay of these e-mails.  I don't know.
17   Q.  Do you know who Scott would refer to?
18   A.  That would be Scott Smith.
19   Q.  And who is he?
20   A.  Scott Smith is the President of the      05:11PM
21 publishing division.
22      Now I see the other reference to shadow
23 campaign.  I was questioning what he meant by
24 shadow campaign.
25   Q.  Okay.  Did you ever get a response or    05:12PM

Page 159

1  either in writing or in conversation about what he
2  meant?
3    A.  No, I did not.  Reading -- that would be
4  speculation on my part, so I shouldn't speculate.
5    Q.  Had people within the Company expressed  05:12PM
6  concern about the leverage that might be
7  associated with an ESOP transaction?
8    A.  At different times people had expressed
9  concern about the leverage, whether it was
10 involved in a recap or the ESOP/Zell transaction   05:12PM
11 or the Broad and Burkle transaction, leverage was
12 an issue.
13   Q.  Do you know how the leverage compared
14 between the Zell/ESOP transaction and Broad and
15 Burkle's proposal?                            05:13PM
16   A.  It was different in that the tax
17 advantages of the ESOP S corp structured enabled
18 for free cash flow to service debt and pay down
19 principal, and because of that the leverage levels
20 were similar.  There was more leverage in the   05:13PM
21 Zell/ESOP transaction, but it was in a private
22 setting with approximately $200 million in tax
23 savings able to service the debt about equal to
24 what it would have been in the recap scenario, and
25 I believe similar to the Broad and Burkle     05:13PM

Page 160

1  scenario.
2    MR. ODDO:  Okay.  Let's mark as
3  Plaintiff's Exhibit No. 18 a document that is
4  Bates stamped 6159.
5    (FitzSimons Deposition Exhibit    05:14PM
6    No. 18 marked for
7    identification.)
8    THE WITNESS: Yes.
9  BY MR. ODDO:
10   Q.  Can you tell me what this document is?    05:15PM
11   A.  It's a letter dated March 31st from
12 Eli Broad and Ron Burkle regarding their continued
13 interest in an acquisition of Tribune at $34 per
14 share.
15      MR. ODDO:  I'll just note for the record   05:15PM
16 that there's a fax notation at the top that was
17 from yesterday.  This document was faxed to me at
18 my hotel, and it's not part of the original
19 document.  It's surplusage I guess.
20      THE WITNESS:  Yes.                         05:15PM
21      MR. ODDO:  You don't need to pay attention
22 to that.
23      THE WITNESS:  Okay.
24 BY MR. ODDO:
25   Q.  Have you seen this document before?       05:15PM

Page 161

1    A.  I believe I have, yes.
2    Q.  When approximately do you recall seeing
3  it?
4    A.  Probably on March 31st.
5    Q.  Okay.  And was there any Board or Special  05:15PM
6  Committee discussion that you were a part of that
7  concerned this letter?
8    A.  Well, again, this was part of the flurry
9  of letters that went back and forth between the
10 communication that went back and forth between the  05:16PM
11 advisors and the -- the Company's advisors and
12 Broad and Burkle's advisors, and this was another
13 request, if I'm reading this letter right, if it
14 says a draft definitive contract from the
15 Company's advisors.  Now, if that contract refers  05:16PM
16 to the merger agreement, they had the same merger
17 agreement that was given to all bidders.  If they
18 were looking for a marked up, you know, the Zell
19 markup, that was something that the advisors were
20 not authorized to give out.                   05:16PM
21   Q.  Okay.  Were you made aware of -- that
22 there had been any request to meet about the
23 proposal?
24   A.  All I know is that the advisors were in
25 contact with them since prior to March 31st giving  05:17PM

Highly Confidential

Page 162

1  them the kind of direction that they needed to
2  make a meaningful offer.
3      Q.  Okay.  Were you made aware of any specific
4  requests that -- from Broad or Burkle to meet with
5  either the advisors or the Special Committee?      05:17PM
6      A.  Well, if you remember from the minutes of
7  the meeting of March 30th, Bill Osborn -- Friday,
8  March 30th Bill Osborn had made it clear to the
9  advisors that Broad and Burkle and their advisors
10  were to be given every consideration.            05:17PM
11     Q.  Do you recall any discussion about or do
12  you recall having learned that they may have
13  requested to meet with either the advisors or the
14  Special Committee?
15         MR. DUCAYET:  Objection, asked and       05:18PM
16  answered.
17     A.  I do not know.
18  BY MR. ODDO:
19     Q.  Okay.  Did you recall any specific
20  discussion at either the Board or committee       05:18PM
21  meeting, or Special Committee Meeting about
22  this particular letter?
23     A.  No, other than a continuation of the
24  direction that Bill Osborn had given the day
25  before this letter was sent, and that was to      05:18PM

Page 163

1  give Broad and Burkle every consideration.
2      Q.  Okay.  The letter seems to indicate that
3  at least from their perspective that they weren't
4  getting whatever they were asking for, and I guess
5  my question is not taking it as true, but whether  05:18PM
6  or not the substance of the letter was discussed
7  at the Board or Special Committee level.
8         MR. DUCAYET:  Objection to the form.
9      A.  I'm trying to remember as we go back there
10  was a -- an in-person meeting on March 30th.  I   05:19PM
11  know I was in the office all weekend, the 31st and
12  the 1st.  I know there was a 10:00 a.m. meeting
13  and a 10:00 p.m. meeting on the 1st, and I can't
14  remember if there was another meeting on the 31st,
15  but -- so about the specifics of a meeting, all I  05:19PM
16  know is the instructions that were operative over
17  this weekend were from Bill Osborn, chairman of
18  the committee, give them whatever we can to help
19  them put in a bid.
20  BY MR. ODDO:                                05:19PM
21     Q.  Okay.  Was there any discussion about
22  allowing for additional time for any of the things
23  that they requested in this letter to take place?
24     A.  I think the committee weighed -- I'm not
25  exactly sure what happened in executive session -- 05:20PM

Page 164

1  but weighed the risk of losing a fully negotiated
2  $34 per share offer with a situation with a very
3  indefinite offer not fully baked from a bidder
4  that had been out of the action since mid
5  February, and the risk of having Zell walk away    05:20PM
6  and then having only one bidder to deal with.
7      Q.  Okay.  Was there any assessment of what
8  that risk of Zell walking away was?
9      A.  Given the frustration, and you can see it
10  indicated in this e-mail correspondence that      05:20PM
11  you've just shown me, the frustration level was
12  very high, and it was related during the course at
13  one of the board meetings that if Zell walks away,
14  believe me, he's walking away and he won't be
15  back.                                      05:21PM
16     Q.  Okay.  Did he indicate that he was at the
17  point of being ready to walk away?
18     A.  As I said, the frustration level was very
19  high.  I don't know if there was an absolute
20  threat made, but this was a tense negotiation, and 05:21PM
21  the committee in discussion, it was brought up,
22  what is the risk of Zell walking away and those
23  who have dealt with him seem to indicate there was
24  a risk.
25     Q.  Okay.  I can bring that up with Mr. Osborn 05:21PM

Page 165

1  on Wednesday.
2         MR. ODDO:  Okay, the last document we'll
3  mark as Plaintiff's Exhibit No. 19 is Bates
4  stamped 2922 through 2923.
5         (FitzSimons Deposition Exhibit      05:21PM
6         No. 19 marked for
7         identification.)
8         THE WITNESS:  Yes.
9  BY MR. ODDO:
10     Q.  Can you tell me what this document is?    05:22PM
11     A.  Well, the second page of this document is
12  a letter dated April 5th from Eli Broad and
13  Ron Burkle to Tribune's Board of Directors, which
14  states we understand from reading press reports
15  that your advisors offered Zell the opportunity to 05:23PM
16  give his best and final offer last Sunday evening.
17  We're disappointed that we were not afforded the
18  same opportunity.
19         And then they indicate in the second
20  paragraph a longstanding interest in the          05:23PM
21  Los Angeles Times, and if you were considering a
22  transaction with -- regarding this asset, we're
23  ready to engage in discussions immediately.
24     Q.  Have any of those discussions taken place
25  about a potential LA Times transaction?          05:23PM

Page 166

1    A.  No.  I believe there have been indications
2  of interest that have come in but not to me.
3    Q.  Okay.  To whom?
4    A.  My understanding is to Sam Zell but prior
5  to Sam Zell being a director.           05:23PM
6    Q.  Okay.  Now, was there any discussion that
7  at the Board level or Special Committee level that
8  you were privy to about going back to Broad and
9  Burkle and seeing if they had any ability to
10  increase the consideration that they were       05:24PM
11  offering?
12    A.  What that would have entailed -- none that
13  I am aware of.  But understand what that would
14  have entailed would have been a -- the necessity
15  of fully negotiating a merger agreement with all   05:24PM
16  of these terms, and there are so many variables,
17  and the amount of time that would have taken
18  weighed against the risk of Zell saying hey,
19  you're jerking me around, I'm going away.
20    Q.  Yeah, I understand.  But do you recall     05:25PM
21  whether or not there was any discussion about
22  getting on the phone with them and saying, you
23  know, can you do any better or anything to that
24  effect?
25    A.  The discussion was to give them as much   05:25PM

Page 167

1  information as we could give them to enable them
2  to submit an offer; beyond that I can't tell you.
3    Q.  Okay.  Do you have an understanding of
4  what type of FCC review is involved in this
5  transaction?                            05:25PM
6    A.  Yes.
7    Q.  Okay.  Can you explain that for me?
8    A.  Sure.  There will be licensed transfers
9  for all of our television stations, and then
10  waivers that we are requesting of cross-ownership  05:25PM
11  situations, of which we have five, and those are
12  newspaper, television and radio cross-ownership
13  situations, South Florida, Hartford, New York,
14  Los Angeles and Chicago.
15      So we are asking for temporary waivers      05:26PM
16  on the cross-ownership situations pending the
17  completion of a local ownership rule making
18  currently in progress at the FCC.
19    Q.  Okay.  How long does that process
20  generally take?                         05:26PM
21    MR. DUCAYET:  I'm sorry, which process?
22    MR. ODDO:  The process of the license
23  transfer and the waivers of cross-ownership.
24    A.  It depends.  It can be as soon as
25  3 months.  In situations like this we have sort of  05:26PM

Page 168

1  budgeted 6 to 8 months.
2  BY MR. ODDO:
3    Q.  Okay.  And was there an assessment prior
4  to entering the deal as to what the risk of
5  success was on seeking that from the FCC?       05:27PM
6    A.  Yes.
7    Q.  What was --
8    A.  There was discussion of that, yes.
9    Q.  Okay.  What was the consensus?
10    A.  The consensus was seeing that we were not  05:27PM
11  asking the FCC to break any new ground in terms of
12  allowing new cross ownership situations, and that
13  we were really only asking them to give us a
14  waiver until they themselves finished their own
15  rule making, that our request was reasonable, and  05:27PM
16  that we in addition to having good -- a good
17  reputation and support at the FCC, there would
18  also be some political support that we would hope
19  would enable the commission to grant us waivers
20  and do it by the end of the year.           05:27PM
21    Q.  Okay.  Political support in what manner?
22    A.  Just some support from some potentially
23  some key legislators that might be supportive of
24  the transaction.
25    Q.  Okay.  What -- have you encountered       05:28PM

Page 169

1  situations where the relief that you're seeking
2  here has been denied?
3    A.  No.  We have waivers in place in
4  South Florida and in Hartford, so it has not
5  been denied.                            05:28PM
6      We certainly have -- there's no guarantee,
7  but we think what we're asking for is reasonable
8  from the Commission.
9    MR. ODDO:  Okay.  I don't have any other
10  questions.                              05:28PM
11    MR. DUCAYET:  Okay.  I have no questions.
12    THE COURT REPORTER:  Signature?
13    MR. DUCAYET:  Yes.
14    THE VIDEOGRAPHER:  Okay.  This
15  will conclude videotape number six and the      05:29PM
16  videotaped deposition on this date.  The time
17  now is 5:28 p.m., and the elapsed time on this
18  tape is 37 minutes, 20 seconds.
19      (WITNESS EXCUSED.)
20
21
22
23
24
25

Page 170

1          I N D E X
2          VOLUME I
3
4   Monday, May 14, 2007
5
6   WITNESS                    EXAMINATION
7   DENNIS J. FITZSIMONS
8       By Mr. Oddo              5
9
10
11
12      DEPOSITION EXHIBITS - HIGHLY CONFIDENTIAL
13          DENNIS J. FITZSIMONS
14
15  NUMBER        DESCRIPTION        IDENTIFIED
16  1    Letter from William Stinehart,     38
17       Jr., to the Board of Directors
18       dated 6.13.06
19
20  2    Tribune Company Board of Directors  53
21       Meeting Minutes for September 21, 2006
22       Bates TRIB002044 through TRIB002052
23
24
25

Page 171

1       DEPOSITION EXHIBITS - HIGHLY CONFIDENTIAL
2           DENNIS J. FITZSIMONS
3
4   NUMBER        DESCRIPTION        IDENTIFIED
5   3    Confidential Discussion Materials   54
6        Prepared for: The Board of
7        Directors of Tribune
8        September 21, 2006
9        Bates TRIB002061 through TRIB002107
10
11  4    Minutes of the Tribune Company      88
12       Special Committee of the Board of
13       Directors Meeting December 12, 2006
14       Bates TRIB000037 through TRIB000038
15
16  5    Letter from John Madigan to the     90
17       Independent Special Committee of
18       the Board of Directors dated 1.5.07
19       Bates TRIB002296 through TRIB002297
20
21  6    Tribune Company Special Committee   94
22       of the Board of Directors Meeting
23       Minutes dated January 20, 2007
24       Bates TRIB002637 through TRIB002639
25

Page 172

1       DEPOSITION EXHIBITS - HIGHLY CONFIDENTIAL
2           DENNIS J. FITZSIMONS
3
4   NUMBER        DESCRIPTION        IDENTIFIED
5   7    Confidential Discussion Materials  98
6        Prepared for: Committee of Independent
7        Directors of the Board of Directors of
8        Tribune January 20, 2007
9        Bates TRIB002380 through TRIB002416
10
11  8    Tribune Company Special Committee   112
12       of the Board of Directors Meeting
13       Minutes February 3, 2007
14       Bates TRIB000046 through TRIB00047
15
16  9    Letter from Sam Zell to Board of    118
17       Directors dated 2.6.07
18       Bates TRIB013614 through TRIB013616
19
20  10   Tribune Meeting of Committee of     137
21       Independent Directors of the Board
22       of Directors February 12, 2007
23       Bates TRIB002521 through TRIB002539
24
25

Page 173

1       DEPOSITION EXHIBITS - HIGHLY CONFIDENTIAL
2           DENNIS J. FITZSIMONS
3
4   NUMBER        DESCRIPTION        IDENTIFIED
5   11   Tribune Company Special Committee  140
6        of the Board of Directors Meeting
7        Minutes March 30, 2007
8        Bates TRIB002648 through TRIB002650
9
10  12   Tribune Company Special Committee  146
11       of the Board of Directors Meeting
12       Minutes April 1, 2007
13       Bates TRIB002651 through TRIB002653
14
15  13   E-mail from Michael Costa to        150
16       Christina Mohr, et al.,
17       dated 2.23.07
18       Bates TRIB002951
19
20  14   E-mail from Michael Costa to        152
21       Dennis FitzSimons dated 2.24.07
22       Bates TRIB002947 through TRIB002948
23
24
25

Page 174

```
 1      DEPOSITION EXHIBITS - HIGHLY CONFIDENTIAL
 2              DENNIS J. FITZSIMONS
 3
 4   NUMBER        DESCRIPTION        IDENTIFIED
 5    15   E-mail from Crane Kenney to      154
 6         Dennis FitzSimons, et al.,
 7         dated 2.24.07
 8         Bates TRIB002774 through TRIB002775
 9
10    16   E-mail from Tom Leach to Dennis   156
11         FitzSimons, et al., dated 2.27.07
12         Bates TRIB002722 through TRIB002723
13
14    17   E-mail from Dennis FitzSimons to  158
15         Crane Kenney dated 3.19.07
16         Bates TRIB003057 through TRIB003059
17
18    18   Letter from Eli Broad and         160
19         Ronald Burkle to the Board of
20         Directors dated 3.31.07
21         Bates TRIB006159
22
23    19   E-mail from Michael Costa to      165
24         Dennis FitzSimons, et al., dated 4.5.07
25         Bates TRIB002922 through 002923
```

Page 175

```
 1      SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2              COUNTY OF LOS ANGELES
 3
 4   FRANK GARAMELLA, Derivatively)  No. BC362110
     on Behalf of TRIBUNE COMPANY,)
 5          Plaintiff,    )
         vs.              ) HIGHLY CONFIDENTIAL
 6   DENNIS J. FITZSIMONS, et al.,)UNDER THE PROTECTIVE
             Defendants,  )    ORDER
 7    -and-               )
     TRIBUNE COMPANY, a Delaware )
 8   corporation,         )
          Nominal Defendant. )
 9
10       This is to certify that I have read
11   the highly confidential transcript of my
12   deposition taken in the above-entitled cause by
13   Deralyn Gordon, Certified Shorthand Reporter, on
14   May 14, 2007, and that the foregoing transcript
15   accurately states the questions asked and the
16   answers given by me as they now appear.
17
18       _____
19              DENNIS J. FITZSIMONS
20
21   Subscribed and sworn to
22   before me this_____ day
23   of_____, 2007.
24   _____
25     Notary Public
```

Page 176

```
 1   Case Name:  Garamella vs. FitzSimons and Tribune
 2   Deposition of:  Dennis J. FitzSimons
 3   Date Taken:  May 14, 2007
 4
 5   Page  Line   Change:
 6   ____  ____   _____
 7   ____  ____   _____
 8   ____  ____   _____
 9   ____  ____   _____
10   ____  ____   _____
11   ____  ____   _____
12   ____  ____   _____
13   ____  ____   _____
14   ____  ____   _____
15   ____  ____   _____
16   ____  ____   _____
17   ____  ____   _____
18   ____  ____   _____
19   ____  ____   _____
20   ____  ____   _____
21   ____  ____   _____
22
23   Date:  _____
24   Signature:  _____
25
```

Page 177

```
 1   Case Name:  Garamella vs. FitzSimons and Tribune
 2   Deposition of:  Dennis J. FitzSimons
 3   Date Taken:  May 14, 2007
 4
 5   Page  Line   Change:
 6   ____  ____   _____
 7   ____  ____   _____
 8   ____  ____   _____
 9   ____  ____   _____
10   ____  ____   _____
11   ____  ____   _____
12   ____  ____   _____
13   ____  ____   _____
14   ____  ____   _____
15   ____  ____   _____
16   ____  ____   _____
17   ____  ____   _____
18   ____  ____   _____
19   ____  ____   _____
20   ____  ____   _____
21   ____  ____   _____
22
23   Date:  _____
24   Signature:  _____
25
```

Page 178

1   STATE OF ILLINOIS )
2                    )  SS:
3   COUNTY OF C O O K  )
4       I, Deralyn Gordon, a notary public within and
5   for the County of Cook and State of Illinois, do
6   hereby certify that heretofore, to-wit, on the
7   14th of May, 2007, personally appeared before me
8   at One South Dearborn, Chicago, Illinois,
9   DENNIS J. FITZSIMONS, in a cause now pending and
10  undetermined in the Superior Court of the State
11  of California County of Los Angeles, wherein
12  Frank Garamella, Derivatively on Behalf of
13  Tribune Company, is the Plaintiff, and
14  Dennis J. FitzSimons, et al., is the Defendant,
15  and Tribune Company, a Delaware corporation, is
16  the Nominal Defendant.
17      I further certify that the said witness was
18  first duly sworn to testify the truth, the whole
19  truth and nothing but the truth in the cause
20  aforesaid; that the testimony then given by said
21  witness was reported stenographically by me in the
22  presence of the said witness, and afterwards
23  reduced to typewriting by Computer-Aided
24  Transcription, and the foregoing is a true and
25  correct transcript of the testimony so given by

Page 179

1   said witness as aforesaid.
2       I further certify that the signature to the
3   foregoing deposition was not waived by counsel for
4   the respective parties.
5       I further certify that the taking of this
6   deposition was pursuant to Notice, and that there
7   were present at the deposition the attorneys
8   hereinbefore mentioned.
9       I further certify that I am not counsel for
10  nor in any way related to the parties to this
11  suit, nor am I in any way interested in the
12  outcome thereof.
13      IN TESTIMONY WHEREOF:  I have hereunto set my
14  hand and affixed my notarial seal this 15th day of
15  May, 2007.
16
17
18
19
20      _____
21      Notary Public, Cook County, Illinois
22
23
24
25

Page 180

1           EASTWOOD-STEIN DEPOSITION SERVICES
2              550 West "C" Street, Suite 600
                San Diego, California 92101
                    (619) 235-2400
3
4   May 15, 2007
5
    Sidley Austin LLP
    One South Dearborn
    Chicago, Illinois 60603
6   Attention:  James W. Ducayet, Esq.,
7   IN RE:  Garamella vs. FitzSimons and Tribune
        COURT NUMBER:  BC362110
8   DATE TAKEN:  May 14, 2007
    DEPONENT:  Dennis J. FitzSimons
9
    Dear Mr. Ducayet:
10
11  Enclosed is the deposition transcript for the
    aforementioned deponent in the above-entitled
12  cause.  Also enclosed are additional signature
    pages, if applicable, and errata sheets.
13  Per your agreement to secure signature, please
    submit the transcript to the deponent for review
14  and signature.  All changes or corrections must be
    made on the errata sheets, not on the transcript
15  itself.  All errata sheets should be signed and
    all signature pages need to be signed and
16  notarized.
17  After the deponent has completed the above, please
    return all signature pages and errata sheets to me
18  at the above address, and I will handle
    distribution to the respective parties.
19
    If you have any questions, please call me at the
20  phone number above.
21
    Sincerely,
22
    Signature Department          Court Reporter
23  Steve Artstein                Deralyn Gordon
24  cc:  Stephen J. Oddo, Esq.,
        Melissa J. Epstein, Esq.
25

Highly Confidential

| A | | | | |
|---|---|---|---|---|
| **ABC** 24:12 | **Active** 114:17 | 76:4,8,13,20,22 | 115:18 126:12 | **amount** 19:7,8 |
| **ability** 7:8 67:11 | **actual** 57:11 93:8 | 77:8,18 78:3 81:4 | 127:22 | 42:6 83:15 97:19 |
| 67:13 87:13 | 96:19 97:12 | 81:21,22,23 | **agreement** 53:12 | 97:19 116:11 |
| 131:18,19 140:20 | 130:24 131:2 | 84:13 86:14,20 | 85:16 108:23 | 156:15 166:17 |
| 141:4 166:9 | **ad** 140:24 | 86:23 87:2,3 93:4 | 116:5 126:5 | **analyses** 55:25 |
| **able** 51:21 87:22 | **add** 33:10 114:24 | 95:3,9,10,21 | 127:16,23 133:12 | 86:17,25 |
| 133:23 148:7 | 157:15 | 96:17 97:1,8,12 | 133:14,22 147:21 | **analysis** 34:18,20 |
| 155:12 159:23 | **added** 151:18 | 97:15,25 98:1 | 148:1,3,13 | 35:6 103:2 105:4 |
| **above-entitled** | **addition** 50:6 | 116:14 117:25 | 161:16,17 166:15 | 117:15 |
| 1:18 175:12 | 168:16 | 119:4 120:14,20 | 180:13 | **Analyst** 8:18 |
| 180:11 | **additional** 18:13 | 123:4,10,19,25 | **agreements** 65:9 | **analysts** 42:13,14 |
| **abreast** 81:15 | 18:17 19:9 47:4 | 124:12 127:14 | 82:14 | **analyze** 108:13 |
| **absolute** 164:19 | 80:5 84:10 | 128:1 133:7,8 | **ahead** 19:15 35:14 | **analyzed** 66:17 |
| **acceptable** 23:16 | 109:23 138:11 | 143:22 144:13,14 | 58:10 76:6,7 | 116:14 |
| 27:1 40:9 | 143:24 163:22 | 144:25 145:18 | 111:25 122:11 | **analyzing** 67:6 |
| **accommodate** 7:1 | 180:11 | 147:1,12,13,16 | **al** 1:8 4:4,5 173:16 | 104:18 |
| **accomplish** 26:20 | **address** 5:18 57:23 | 154:4 161:11,11 | 174:6,11,24 | **and/or** 18:9 26:16 |
| 41:8,10 | 180:18 | 161:12,15,19,24 | 175:6 178:14 | 43:11 61:18 |
| **accomplished** | **addressed** 157:10 | 162:5,9,9,13 | **allocation** 152:1 | 71:25 72:4 |
| 26:21 83:10 | **adjusted** 103:4,9 | 165:15 | **allow** 83:18 117:14 | 104:17 113:4 |
| **account** 8:9,18,22 | 104:22 105:10 | **advisory** 48:6,14 | 147:22 | 141:6 |
| 8:23 | **administer** 5:14 | 72:19,21 92:3 | **allowed** 141:17 | **Angeles** 1:2 3:6 4:6 |
| **accrue** 60:17 | **advantage** 18:14 | 93:12,15 | 142:19 | 43:22 113:10 |
| **accurately** 175:15 | 19:6,12 27:7 | **advisor's** 83:14 | **allowing** 120:19 | 165:21 167:14 |
| **acquire** 53:14 | 41:13,22 | 97:7 | 163:22 168:12 | 175:2 178:11 |
| 85:22 | **advantages** 18:19 | **advisor-to-advisor** | **alternative** 23:9 | **announce** 144:20 |
| **acquiring** 47:15 | 19:18 41:21 | 107:18 | 32:1 39:24 40:7,8 | **announced** 37:13 |
| 81:10 | 129:12 159:17 | **affiliates** 60:13,18 | 41:6,18 72:10 | 47:1 58:6 127:13 |
| **acquirors** 83:8 | **adverse** 134:16 | **affiliation** 12:21 | 78:14 86:12 | 144:8,18,19 |
| **acquisition** 25:5 | **Advertiser** 9:1 | 14:18 | 110:16 111:23 | 156:25 |
| 26:7 43:12 47:12 | **Advertising** 8:6,13 | **affixed** 179:14 | 116:25 117:20,25 | **announcement** |
| 47:20 59:19 | **advice** 115:12 | **afforded** 165:17 | 138:22,24 139:8 | 127:6,23 128:5 |
| 118:16 128:5 | **advisor** 16:11 | **aforementioned** | 144:22 | 134:15 144:11 |
| 160:13 | 73:10,13,15 | 180:11 | **alternatives** 22:14 | 150:20 |
| **action** 5:15 40:19 | 76:10,18 80:23 | **aforesaid** 178:20 | 26:10 27:10,12 | **announcements** |
| 41:21 49:10,12 | 80:23 81:13,13 | 179:1 | 36:21,23 41:19 | 151:6 |
| 49:14 139:12 | 91:23 92:21 97:1 | **afternoon** 36:7 | 55:23 56:1,4,5,11 | **announcing** |
| 164:4 | 107:6 124:19 | 66:8 98:11 | 56:14,17,21 57:1 | 139:12 |
| **actionable** 122:3 | 127:20 129:7,13 | 128:15 149:13 | 57:4,9,16 61:13 | **annual** 16:17 |
| 124:9 125:14 | 141:3 | **agencies** 140:17 | 62:3 66:17,18 | **answer** 6:9,12 |
| 150:16 153:8,14 | **advisors** 23:10 | **aging** 58:25 | 67:3 69:21 70:18 | 15:23 19:15 |
| **actions** 30:21 | 28:3,8 37:5 46:8 | **ago** 6:1 68:12,13 | 71:2,4 72:10 74:6 | 34:17 35:13,15 |
| 57:23 78:17 | 55:22 60:9 72:8 | **agreed** 13:21 29:17 | 74:11 85:8 86:18 | 53:7 64:1,24 |
| | 72:25 75:15,16 | 51:9,10,13 63:6 | 87:1 110:9,18 | 79:13 131:21 |

**answered** 34:16
  42:19 136:7
  162:16
**answers** 175:16
**anticipating**
  135:18
**anticipation**
  111:12 128:4
  144:10
**anxious** 25:19,22
  122:14
**anybody** 20:7,16
  100:3 102:22
  122:21 155:9
**anyway** 108:25
  121:7,10 137:9
**apartments.com**
  58:17 59:15
**apparently** 156:17
**appear** 66:18
  175:16
**appeared** 2:9,17
  3:9 178:7
**appears** 103:1
  106:25 150:7
**applicable** 180:12
**apprised** 81:18
**approach** 43:16,18
**approached** 29:12
  43:10,14 63:10
  63:15 69:15
  77:21
**approaches** 64:11
**approaching** 25:19
  37:1 83:8
**appropriate** 41:19
  51:18,19 63:22
  64:13 74:3 75:23
  76:16 144:3
**approved** 57:7,10
  57:11,13 71:16
  127:6 142:18
**approximately**
  1:22 6:23 9:4

23:1 36:11 52:25
  66:3,4,12 98:16
  113:23 120:4
  128:11,19 130:6
  149:17 159:22
  161:2
**approximation**
  21:20
**April** 9:19 85:17
  127:3,18 146:17
  165:12 173:12
**arbiter** 78:12
**area** 10:9 12:2
  58:19 61:10
  114:25
**areas** 12:4,6
**arena** 58:25
**Army** 14:13
**arm's** 65:10
**arrangement**
  155:11
**articulate** 103:23
**Artstein** 180:23
**aside** 28:21 32:11
  126:13
**asked** 32:8 34:15
  42:18 56:6 64:19
  72:14 80:6 95:9
  105:15 110:14
  117:6 133:20
  136:6 141:8
  148:11 153:15
  162:15 175:15
**asking** 38:10
  105:19 110:18
  117:17 136:10,14
  147:19 163:4
  167:15 168:11,13
  169:7
**assess** 83:19
**assessing** 72:9
**assessment** 70:3,4
  70:17 164:7
  168:3

**asset** 41:11 62:18
  63:5,7 64:21 65:1
  65:2 165:22
**assets** 13:18,21,25
  14:11 28:22 29:2
  30:18 33:17
  47:15 51:18
  53:14 62:9,13,14
  62:19 65:4 67:10
  83:19 114:22
  131:17 138:9,10
**assist** 61:19 92:24
**Assistant** 8:13
**assisted** 76:25
**assisting** 28:3
  87:14
**associated** 125:5
  142:1 159:7
**association** 4:12,15
  12:7
**assume** 148:3
**assumption** 148:16
**assumptions** 70:8
  107:14
**assurance** 65:18
**attempt** 124:20
**attend** 75:5,10
**attention** 55:13
  95:15 140:14
  160:21 180:6
**attorney** 63:18
  148:15
**attorneys** 179:7
**attractive** 38:1
  85:9
**attributed** 103:18
**auction** 70:12 74:6
  78:18 109:14,16
  110:10 142:22
**audibly** 4:18 6:9
  6:12
**audited** 65:11
**Austin** 2:11 4:10
  4:20 180:4

**authority** 10:9
  76:20 78:9,16,19
**authorization**
  30:24 130:24
**authorize** 31:3
  60:8
**authorized** 34:3
  161:20
**availability** 67:8
**available** 30:10
  57:16 88:1
  142:24
**Avenue** 3:5
**avoid** 6:17
**aware** 15:25 20:7
  20:12 33:24 56:9
  69:1,5 79:2,22
  87:11 89:9,20
  90:23 92:10,11
  92:15,23 99:19
  100:8,14 101:10
  104:19 130:11
  132:22 134:6
  136:8 137:7
  142:5 145:20
  161:21 162:3
  166:13
**awareness** 144:9
**a.m** 1:22 5:7 36:3
  163:12

———————————
**B**
**back** 8:10 9:16
  13:22 21:10
  22:11 44:25
  50:15 51:14,17
  52:19 70:14
  72:11,17 73:15
  73:17 80:13 90:3
  109:10 111:11
  116:16 129:19
  134:9 152:20
  158:7 161:9,10
  163:9 164:15

166:8
**backed** 156:17
**backtrack** 44:5
**baked** 110:19
  121:17 151:7
  164:3
**balance** 151:20,23
**ball** 115:17
**banker** 108:12
**bankers** 87:19
  133:7 157:9,10
**banks** 8:11 29:15
  73:8 93:22
  141:19
**Bank's** 130:14
**bar** 106:17,17
**Barry** 23:19
**Baseball** 65:12
**based** 29:13 30:7
  30:10 34:1,21
  35:6,13 61:12
  67:2 83:13,14
  96:17,20 101:20
  101:24 105:3
  132:21 133:2
  143:3,4
**basically** 78:18
  96:17
**basis** 29:17 34:12
  35:4 37:8 97:14
  102:14 105:3,12
  150:12
**Bates** 53:16,22
  70:16 88:15
  90:14 93:25
  98:21 112:10
  118:4 137:14
  139:25 146:8
  149:22 152:11
  154:10 155:23
  157:13,22 160:4
  165:3 170:22
  171:9,14,19,24
  172:9,14,18,23

Highly Confidential

173:8,13,18,22
174:8,12,16,21
174:25
**BC362110** 1:4 4:7
36:10 98:15
128:19 149:18
175:4 180:7
**becoming** 100:14
**began** 36:16
**beginning** 1:21
7:24 90:24
126:22
**begins** 4:2 104:11
**behalf** 1:5 2:9,17
3:9 4:20,21,23
126:19,23 129:13
175:4 178:12
**belief** 67:2
**believe** 11:5,6
12:14 17:8 21:5
23:20,25 24:19
24:20 25:6 27:18
31:22 33:11 35:8
40:4 42:22 45:14
45:18 46:4 49:5
49:20 52:18
56:17 70:10,25
73:14 74:13
79:20,24 82:12
82:15,21 83:4
84:16 87:16,24
88:8 90:5 91:5
92:4,17 93:11
95:3 97:8 106:4
106:12,13,19
107:11,16,17
116:1,14 126:7
135:5 138:19
141:8 142:17
145:24 151:20
156:16 159:25
161:1 164:14
166:1
**believed** 106:6

**benchmark** 110:4
**Bender** 43:4
**beneficiaries** 15:5
15:7,9
**beneficiary** 15:11
**benefit** 12:2 16:2
117:12 131:25
151:24,25 152:6
**benefited** 143:7
**benefits** 151:19,22
**bequeathed** 12:1
14:17
**best** 7:1 33:13 74:8
78:22 85:12
105:15 108:17,19
108:20 122:15
130:3 133:15
150:18 165:16
**Betsy** 20:20
**better** 54:17
155:14 166:23
**beyond** 84:15
151:6,18 167:2
**bid** 84:12 147:23
163:19
**bidder** 90:8 93:14
133:22 135:11
145:17 148:8,19
148:23 164:3,6
**bidders** 17:10,10
18:15 75:4 77:5
77:13,16 78:20
79:5 81:22 83:18
83:18 87:15,16
87:22,24 96:7
116:6 142:9,23
148:10 161:17
**bids** 83:20 84:16
**big** 31:18
**biggest** 27:19
**Bill** 20:13 39:19
64:7 121:16
124:6,6 162:7,8
162:24 163:17

**billion** 13:20,20
14:23 43:5 46:2
46:11 101:15,25
**bit** 6:19 52:10 53:1
53:4 113:14
**Blackstone** 91:23
92:2,6,14,20,24
93:10,11,12,12
**Blair** 8:22
**blame** 54:25
**board** 10:2 11:4
20:8,21 21:3,8,14
22:5,7,13 25:11
26:16 30:20 31:3
31:10,23 32:12
32:19,23 33:12
33:16,20 36:15
37:23 38:23 39:8
39:13 40:22 41:3
41:25 44:13,17
44:19,22 45:18
46:6,6,22 48:21
48:24 49:2,9,14
49:19,23 50:8,15
50:17,19 51:6,15
52:2 55:8,9,20
56:15 57:7 59:17
59:25 62:24 63:6
64:18 66:25 69:1
69:5,22 70:2,7,11
70:19,24 71:15
73:2 74:7,13,17
78:9 83:8 84:25
85:11 95:10
108:15 114:24
118:19,22 130:24
134:13 137:2
139:9 140:9
141:6 142:18
144:20 153:17
161:5 162:20
163:7 164:13
165:13 166:7
170:17,20 171:6

171:12,18,22
172:7,12,16,21
173:6,11 174:19
**boards** 11:12
**Board's** 23:14
40:19 55:16
**boat** 122:13
**Bob** 21:3 24:13
**boiled** 123:8
**Bonds** 16:7
**borrow** 43:5
131:12,19
**Boston** 40:21
**bottom** 111:15
**bought** 9:13 22:3
61:5 136:24
**box** 62:5
**boys** 11:18
**Bradford** 8:5,7
**break** 6:24,25
35:25 36:1 51:11
65:24 128:8,25
149:3 168:11
**breakdown** 15:1
**Brien** 16:11
**bring** 164:25
**bringing** 49:22
**Broad** 43:10 79:21
80:8,16 94:17,21
95:2 96:24 103:8
103:17 104:5
105:14 106:8,20
107:12 108:22
112:25 113:5,9
115:11,15 132:9
133:8,24 135:21
143:18,23 144:3
144:6,14 145:2,4
145:20 146:22
147:1,3,13,16
148:7 159:11,14
159:25 160:12
161:12 162:4,9
163:1 165:12

166:8 174:18
**broadcast** 22:25
68:18
**broadcasting** 9:23
21:25 22:16,21
26:13 40:10
55:24,25 57:17
85:22 109:21
138:6 150:24
156:11
**Broadway** 2:5
**Broad/Yucaipa**
103:13
**broken** 51:16
**Brothers** 23:2 24:2
**brought** 17:16
44:22 95:15
110:19 121:22
164:21
**Bruce** 23:20
**budgeted** 168:1
**build** 61:8
**built** 123:3
**Burkle** 43:11
94:17,22 95:2
96:24 103:8,18
104:5 105:14
106:8,20 108:22
112:25 113:5,9
114:22 115:11
132:9 133:8,25
135:21 143:18,23
144:3,6,15 145:2
145:21 146:23
147:3 148:7
159:11,25 160:12
162:4,9 163:1
165:13 166:9
174:19
**Burkle's** 107:12
145:4 147:1,13
147:16 159:15
161:12
**business** 12:3 16:3

Highly Confidential

60:15 66:21
68:11 78:23
115:25 116:8
138:6 141:1
**businesses** 62:14
87:10
**buy** 131:5 151:10
153:9
**buyback** 47:2
109:12
**buyer** 8:14 24:9
38:2 66:23 67:11
67:21
**buyout** 30:10
**B&E** 91:11

___

**C**

**C** 178:3 180:1
**calculations** 52:18
**calendar** 114:1
119:24
**California** 1:1 2:6
3:6 4:6 175:1
178:11 180:2
**call** 37:14 115:14
125:2 140:14
152:24 180:19
**called** 5:9 103:10
**Calling** 55:13
**calls** 44:20
**camp** 96:24
**campaign** 158:12
158:13,23,24
**Cantigny** 14:4,5,11
15:2
**Cantigny's** 89:6
**Canyon** 28:11,14
**capable** 93:16
**capacity** 92:3
**capital** 25:17 37:12
42:9 57:20 97:20
109:1,23 138:7
**career** 93:23
**CareerBuilder**

60:4,12 61:6,9
68:1 156:22
**careerbuilder.com**
58:15 59:8,11,19
60:1,20 156:22
**Carlisle** 94:16
**carried** 23:4
**cars.com** 58:17
59:15
**case** 4:6 36:10 43:4
97:3 98:14
106:25 128:18
140:19 149:18
150:18 176:1
177:1
**cases** 17:11
**cash** 19:9 23:7
25:23 26:2 44:11
60:17 137:11
141:18,23 151:19
151:23 152:3,4,5
159:18
**cause** 1:18 175:12
178:9,19 180:11
**caused** 69:12,12
119:3
**causes** 83:25 84:1
**causing** 120:11
**CBS** 24:13
**cc** 180:24
**cc'd** 154:20
**CEO** 10:25
**certain** 13:13
22:13 26:10
78:17 84:4 99:3
138:8,12
**certainly** 20:3 34:2
42:24 69:5 71:11
101:22 111:17
113:25 121:3,5
122:12 126:20
169:6
**certainty** 139:21
**Certified** 175:13

**certify** 175:10
178:6,17 179:2,5
179:9
**CFO** 28:19 132:8
**chairman** 10:25
12:9,11,15
163:17
**challenged** 129:25
**challenges** 58:21
58:24
**chance** 118:25
**Chandler** 3:10
4:25 25:7 26:1,19
27:5,7 31:10,12
31:18,19 38:17
38:21,23 39:10
39:18,19,23
40:13 49:17 50:1
50:16 51:17 52:5
52:8,12 57:20
73:24 74:14,16
85:20 87:12 88:9
91:7 92:17 94:16
95:20 97:3 100:9
100:20 111:7,8,9
111:17 112:24
113:4,7
**Chandlers** 25:17
27:13,24 28:8
48:17 74:18,21
96:23
**Chandler's** 52:4
**change** 52:4,5
56:20,22 65:25
98:4 110:22
111:22 152:7
176:5 177:5
**changed** 52:6,9,9
57:6
**changes** 59:2
180:14
**characteristics**
109:25
**charitable** 22:9

**Charities** 13:5,7
**charity** 15:12
**check** 10:21 16:12
21:18 23:21
24:20 37:22
43:25 119:23
127:4
**Chicago** 1:21 2:14
4:11,14 9:24
11:19 12:2 13:5
20:5 22:10 29:13
62:17 113:10,11
138:9 167:14
178:8 180:5
**Chief** 10:20
**childhood** 12:4
**children** 11:20
**Children's** 13:5,7
**chomping** 6:19
**chose** 41:25 92:24
**chosen** 144:22
145:16
**Chris** 21:10
**Christina** 82:5
150:8 173:16
**circles** 20:5
**circulation** 69:10
69:11
**circumstance**
92:25
**circumstances**
79:16 92:21
125:20
**Citi** 56:24 72:15
81:21 103:14
105:16 107:19
111:14 141:15
142:13 155:14
**Citigroup** 37:7
56:6,14 57:5 70:3
70:22 71:17,18
71:25 72:4 73:1
77:12 82:4 103:2
105:2 119:19

142:8 150:8
**citizens** 14:16
**clarify** 121:12
**class** 7:20
**classified** 58:16
68:7
**clean** 102:11
**clear** 63:23 81:6
120:24 123:19
144:2 162:8
**clearly** 85:12 121:2
125:9
**client** 21:12,24,25
125:9
**close** 10:22 43:5
76:22 124:16
141:11
**closes** 19:16
**club** 11:17,18,19
21:1 87:20
**coalition** 144:6
**college** 8:4
**Colonel** 11:25 14:9
14:12
**Colonel's** 14:17,21
15:15
**combination** 15:4
41:11 66:22
67:21 68:11,19
78:3 118:2
**Comcast** 138:9
**come** 13:9 16:22
20:24 35:6 44:25
45:8 51:22 60:2
61:25 70:7 83:20
97:2 103:20
111:4 132:10
134:21 145:25
166:2
**comfort** 70:7
**comfortable** 38:13
99:6,8
**coming** 20:4 34:13
44:1 52:19 72:17
97:15 134:17

135:3 136:5
137:4 144:7
**comment** 153:19
154:3
**commentary** 96:20
154:22
**comments** 32:25
70:24 141:7
**commission**
168:19 169:8
**commitments**
147:4
**committed** 139:12
139:14,15
**committee** 48:6,14
48:18 49:5,19
73:20,21 74:3,22
74:24,25 75:1,6,7
75:9,13,23 76:9
76:16,17 78:10
78:11,25 79:4,9
79:10,11,23 85:1
86:21 88:24
89:15 92:18 94:9
96:15,16 107:9
107:13,24 108:2
110:13,14,18
111:21 112:18
116:22,25 121:6
121:18,23 124:20
135:5,14,23
136:12 139:9
140:10 141:3
142:19 144:13,20
146:17 147:5,11
153:18,19 155:8
161:6 162:5,14
162:20,21 163:7
163:18,24 164:21
166:7 171:12,17
171:21 172:6,11
172:20 173:5,10
**committee's** 77:23
97:1,8,25 124:12

141:7
**common** 28:24,24
53:10 148:8
**communicate**
18:16
**communicated**
145:21
**communication**
50:5 145:10
147:12 161:10
**communications**
50:7 92:13
133:17 144:14,16
146:25 147:15
**communities** 12:3
12:5 16:3
**community** 13:2
13:10
**companies** 11:13
11:15 24:24 25:4
58:5 68:20 77:20
**company** 1:5,11
8:10 9:6 10:1,7
12:3 15:11 16:3
17:20 19:12 22:3
22:14 23:7 25:24
26:3 29:4,16 30:4
30:5,18 38:1,18
43:10,17 44:1,4
44:11 47:18 48:8
48:11 53:13
57:16,23 58:15
63:10 67:22
71:12 72:8 73:13
74:7,12 75:2
76:23 81:11 84:1
84:2 85:23 86:13
87:9 90:1,8 91:25
93:17,18 101:3
106:7 110:7
113:15 117:9
118:17 121:3
125:5 128:3
129:2,15 131:5

131:13,15,20
132:1,4,12
133:11 137:25
138:16 139:17,18
139:22 140:18
141:18 143:22
144:22,25 145:15
145:18 148:16,17
148:21,21 152:21
155:9 156:13
157:19 159:5
170:20 171:11,21
172:11 173:5,10
175:4,7 178:13
178:15
**Company's** 27:4
42:2,16 52:23
76:13,22,24 77:7
77:18 81:20,23
96:25 97:7,15,25
140:16,19 144:13
148:25 161:11,15
**Company-funded**
131:23
**compare** 117:14
121:18
**compared** 56:3
109:16 159:13
**comparison**
110:21 122:2
**compensated**
16:13 72:1
**compensation**
16:17
**competitive** 134:2
**complete** 24:14
87:22
**completed** 120:12
135:18 180:17
**completion** 120:24
167:17
**complex** 27:15
53:5 121:21
**complexities**

120:17 121:24
**complexity** 18:1
97:18 119:2
120:10 124:4
150:22 154:5
**complies** 69:19
99:12 102:5
**component** 131:10
**components** 106:1
**comprised** 91:8
**Computer-Aided**
178:23
**concentrated**
39:21
**concern** 111:6
124:22 159:6,9
**concerned** 161:7
**concerning** 107:21
95:14 96:2
**conclude** 36:2 66:1
98:7 128:10
149:9 169:15
**concluded** 70:20
**conclusion** 103:17
**conclusions** 61:25
70:21
**concretely** 40:18
**conditionality**
111:6,17 121:25
126:17 129:22
142:1
**conditions** 41:13
41:23 42:13
56:21 115:25
124:8 125:12,14
125:24 140:21
**conference** 152:24
**confidential** 1:7,16
63:25 102:13
147:20 148:4
170:12 171:1,5
172:1,5 173:1
174:1 175:5,11

**confidentiality**
64:4 116:5
133:22 147:21,25
148:13
**confirm** 102:6
**conflict** 93:8,8
**conflicting** 123:25
124:1
**conjunction** 37:13
58:7
**connected** 65:4
**connection** 12:25
17:19 72:12
142:10,13
**consensus** 168:9
168:10
**consequence** 25:25
31:18
**consider** 31:13
56:15
**consideration** 57:4
94:19 129:25
130:2 134:18
147:5 162:10
163:1 166:10
**considerations**
46:12
**considered** 23:5
36:20,22 39:8
41:1,2 46:9 56:4
62:19 74:12
110:2,4 112:4
**considering** 55:23
165:21
**consistent** 39:22
**consisting** 48:7
**consists** 14:13
**consolidating**
138:12
**constraints** 138:23
**consult** 91:20
**Consulting** 40:22
**consummate**
140:20 141:4

contact 22:2 49:25
  82:1 88:7,11 92:2
  100:5,16 113:3,6
  161:25
contacted 24:7
contain 103:4
contained 61:14
contains 69:20
contemplate 91:10
contemplated
  136:17 137:3
  138:4 148:2
contend 39:6
contentious 50:10
contents 40:12
context 21:23 25:4
  101:21
continuation 55:21
  56:20 162:23
continue 15:21
  36:4,13 63:5 66:5
  66:14 85:18
  98:18 128:12,22
  141:2 149:1,20
continued 26:25
  56:9 58:24 59:10
  59:15 62:17
  113:17 160:12
contract 161:14,15
control 58:8 65:18
CONT'D 3:1
conversation 17:17
  23:24 30:12
  44:13 70:1
  113:12 114:25
  115:14 120:8
  121:15 159:1
conversations
  24:12,21 29:10
  33:7 34:22 35:1
  47:7 50:4 68:19
  79:19 80:1,7,15
  80:22,24,25
  81:12 115:9,11

136:11 155:4
convey 25:21
  31:24 34:23
  44:12 46:3 47:10
conveyed 32:12,23
  33:20,20 34:13
  96:14,16 122:20
conveying 30:1
  66:24
convincing 151:10
Cook 1:19 178:5
  179:21
cooperate 143:22
copy 102:11
corp 18:3 19:2,4
  19:17,17,19
  135:24 159:17
corporate 19:3
  24:3 67:12
  138:13 157:4
corporation 1:12
  119:16 175:8
  178:15
correct 24:24
  42:12,25 48:2,15
  48:16 51:1,2
  65:22 68:1,3
  71:22 74:22
  75:20 82:9,17
  84:5,6 85:24
  103:11 104:15
  116:2 125:22
  134:23 136:18
  142:17 148:2
  178:25
corrections 180:14
correctly 29:25
  82:13 105:6
  125:15
correspondence
  164:10
cost 138:11
Costa 28:20 66:20
  82:3 150:8

152:21 153:6
  154:19 155:5
  173:15,20 174:23
Costa's 150:21
  154:21
costs 67:12,14
Coughlin 2:3 5:14
counsel 28:19 35:9
  76:18 93:5 119:3
  119:8 129:9,23
  130:3 179:3,9
Counselor 64:16
counselors 4:17
counterpart 68:9
County 1:2,19 4:6
  175:2 178:3,5,11
  179:21
couple 17:3 24:23
  35:10 158:10
course 14:15 24:9
  49:10 77:6 86:21
  126:1 139:12
  164:12
court 1:1 4:5,14
  5:2 6:7,10,16
  7:14 149:8
  169:12 175:1
  178:10 180:7,22
courtesy 6:20
covenants 141:9
  141:16,16
covered 147:25
co-CEO 21:1
co-chairmen
  114:15,17
Crane 28:18
  130:20 150:9
  154:19 155:5
  156:8 174:5,15
Crane's 154:19,22
create 18:13,17
  23:17 37:11
  40:24 74:3 78:12
  78:14 83:15,16

85:6 110:8 117:8
created 71:13
  73:21 74:24 75:4
  86:9 109:15
  127:2,5,12
creating 37:9
  40:17
creation 49:15
  56:22 73:20
  128:4 134:14
  135:9 136:3
creative 108:24
  121:22
credit 30:10 41:14
  41:23 42:2,5,14
  42:16 43:8 67:8
  140:16
cross 168:12
cross-ownership
  167:10,12,16,23
CRR 1:24
CRUTCHER 3:3
CSR 1:24
Cubs 9:24 62:18
  62:22 63:1,4,11
  64:21 65:6,8,14
  138:9
currently 11:1
  111:16 167:18
cushion 141:9,17
  141:21
customary 142:21
cutoff 85:1
C-a-n-t-i-g-n-y
  14:8

——————————
            D
——————————
D 170:1
damage 62:13
date 85:3 125:6
  127:4 139:1
  169:16 176:3,23
  177:3,23 180:8
dated 118:14

160:11 165:12
  170:18 171:18,23
  172:17 173:17,21
  174:7,11,15,20
  174:24
dates 10:22 21:18
  23:21 75:12
David 91:25 101:2
day 1:20 4:9 36:9
  66:11 69:9 83:1
  84:23 98:3,14
  126:6 128:18
  149:16 152:24
  162:24 175:22
  179:14
deadline 84:19,19
  85:15 125:6
  135:17,17 144:19
deadlines 122:25
deal 52:1 54:9 69:8
  81:3 85:2 122:25
  123:11,16 125:2
  125:6 127:6,12
  164:6 168:4
dealing 124:18
dealt 27:16 164:23
Dear 180:9
Dearborn 1:20
  2:13 4:10 29:8,13
  29:18 33:20
  178:8 180:5
debt 19:10,10,11
  37:17,20 42:3,7
  97:19 109:2,23
  159:18,23
December 22:12
  23:22 24:18
  29:21 30:14
  84:12 88:24 93:1
  93:2 171:13
decide 70:13
decided 49:13
  70:10 82:16,19
  82:19 139:9

decision 38:24
  90:2 138:20
deck 103:25
decline 57:24
  140:24 141:23
declined 42:24
declining 152:5
defendant 1:13
  2:17 175:8
  178:14,16
defendants 1:9 3:9
  4:24 175:6
define 65:2
definitive 161:14
degrees 7:21
Delaware 1:11
  175:7 178:15
delaying 150:20
  151:5
deliberations 48:6
  90:2
demands 27:5
denied 32:10 169:2
  169:5
Dennis 1:8,17 2:18
  4:3 5:8,19 36:9
  66:10 98:13
  128:17 149:15
  170:7,13 171:2
  172:2 173:2,21
  174:2,6,10,14,24
  175:6,19 176:2
  177:2 178:9,14
  180:8
Department
  180:22
dependent 40:10
depends 167:24
deponent 180:8,11
  180:13,17
deposed 5:16,22,23
deposition 1:17 4:3
  4:8,13 36:4,8
  38:6 53:18 54:1

66:5,10 88:17
  90:16 94:2 98:13
  98:23 112:12
  118:6 128:17
  137:16 140:2
  146:10 149:15
  150:1 152:13
  154:12 156:1
  158:1 160:5
  165:5 169:16
  170:12 171:1
  172:1 173:1
  174:1 175:12
  176:2 177:2
  179:3,6,7 180:1
  180:10
Deralyn 1:18,24
  4:15 175:13
  178:4 180:23
Derivatively 1:4
  175:4 178:12
describe 18:24
  55:20 57:25 65:5
described 29:23
  55:15,21 57:23
  66:18 109:17
  114:19 120:6
  121:14 124:6
describing 146:23
DESCRIPTION
  170:15 171:4
  172:4 173:4
  174:4
designate 63:24
desire 39:20
  155:15
detailed 77:6 80:22
  83:4 104:9
  116:23
detailing 118:16
deter 135:2
determination
  46:10 48:9
  129:19

determine 60:9
  71:2
determined 49:7
  49:10 74:2,7,13
  74:18 117:11
  121:6 129:8,9
  130:9 131:4
  138:14
determining
  116:22
deterrent 26:6
  135:10 136:4
  137:4
develop 132:14
  148:21
developed 110:1
  117:25 132:12,15
  132:23 133:11
  145:15,18 148:16
  148:17,20
developing 114:22
  139:5
development 42:10
  157:5
developments 75:2
device 39:9
died 11:25
Diego 2:6 180:2
differ 74:9 126:14
difference 104:25
  105:3,12,20
differences 97:6
different 9:10 73:7
  97:11,15,21,24
  103:19 137:10
  152:25 153:3
  154:4,6,7,7 159:8
  159:16
differently 75:21
differs 65:15
difficult 124:4
  138:15 151:4
difficulty 120:11
diligence 24:1

84:10 143:24
dinner 113:9,22
direct 79:4 113:3,6
direction 144:21
  144:21 162:1,24
directly 46:3 63:14
  63:15 78:20
  101:22
director 8:25 9:1,8
  9:17 12:11,12
  44:14,20 74:1,20
  114:23 157:4
  166:5
directors 11:13
  14:20 15:10,16
  15:19 20:8,10,15
  38:18 39:11,19
  39:23 40:13,15
  48:7,18 49:17
  50:1,3 73:2,23,24
  92:1 107:10
  114:16,17 118:19
  121:4 137:23
  140:9 153:17
  165:13 170:17,20
  171:7,13,18,22
  172:7,7,12,17,21
  172:22 173:6,11
  174:20
disagreed 153:16
disagreement
  153:16,20 154:2
disappointed
  165:17
disappointment
  121:1
disclosure 31:8
discount 105:8
discovery 1:16
discretion 15:14
  78:21
discuss 36:16
  40:12 46:7 115:3
discussed 17:5,14

17:19 30:23 34:9
  38:23 39:15
  44:18 48:21
  59:25 60:5
  109:13 136:13
  138:5 155:17
  163:6
discussing 38:13
  69:22 89:21 99:6
  140:16 152:23
discussion 22:12
  37:23 42:1 44:1
  44:23 46:13 47:2
  48:25 49:4,6 60:2
  60:19 62:21
  84:24 85:6
  100:23 104:3
  107:2 109:7
  114:8 118:9
  123:21 124:5
  125:17 134:13
  135:8 136:2,16
  137:1 138:18
  144:5 146:22
  151:13 161:6
  162:11,20 163:21
  164:21 166:6,21
  166:25 168:8
  171:5 172:5
discussions 22:19
  24:17 25:11
  28:15 31:7,20
  39:10 50:16,21
  62:17 64:15
  67:23 68:9,16
  69:14 76:5 85:1
  92:6 99:20 100:9
  100:18 165:23,24
disputes 27:24
dissatisfaction
  111:3
distant 93:20
distraction 84:1
distributed 53:11

Highly Confidential

118:21
**distribution** 76:19
  180:18
**diverged** 74:14
**diversification**
  15:17
**diversified** 13:25
**diversify** 25:8
  48:11
**divestiture** 37:13
**divestitures** 41:12
  58:6
**divided** 14:3
**dividend** 106:3,7,9
  116:11,17
**division** 10:8 14:13
  51:19 130:14,15
  158:21
**divisions** 60:25
**document** 38:5,12
  38:15,19 53:16
  53:22 54:8,14,22
  55:4 61:21 66:16
  88:15,22 89:20
  90:11,21 93:25
  94:7 99:5 101:24
  102:23 105:18
  106:24 112:10,17
  118:4,13 137:13
  137:21 139:25
  140:7 146:8,15
  149:22 150:6
  152:11,18 154:10
  154:17 155:23
  156:6 157:13
  158:6 160:3,10
  160:17,19,25
  165:2,10,11
**documentation**
  147:4
**documents** 133:20
  133:21,24,25
  147:19,24 148:1
  148:5,7,9 149:5

**doing** 23:7 27:11
  30:9 54:23 72:2
  78:25 85:9 99:8
  115:1,2 124:25
**Don** 28:19 130:21
  150:9 154:22
  156:8
**double** 10:21 16:12
  21:18 23:21
  24:20 127:4
**Dowdle** 91:19
**downside** 71:8,9
  140:19
**downturn** 141:10
**draft** 161:14
**Ducayet** 2:12 4:19
  4:19 19:14 34:15
  34:25 35:24 39:1
  39:25 42:18
  45:21 54:21 56:7
  56:16 59:20
  63:20 64:3 71:21
  73:3 78:5 79:6,8
  79:13 80:9 81:5
  89:11,13 102:6
  102:10,14 103:21
  103:24 104:12
  106:23 110:24
  111:5,24 119:1
  122:10 126:16
  136:6 137:6
  142:12 149:7
  155:18 162:15
  163:8 167:21
  169:11,13 180:6
  180:9
**Duchossois** 64:7
**due** 24:1 84:10,17
  143:24
**Duff** 130:18
**duly** 5:9 178:18
**DUNN** 3:3
**D-o-w-d-l-e** 91:19

|   |   |
| --- | --- |
|   | **E** |

**E** 170:1
**earlier** 49:1,3
  82:25 89:25
  120:6 145:6,24
  147:17 152:24
  156:23
**early** 12:4 25:11
  26:17 29:5 68:14
  93:1 100:12
  101:12
**Eastwood-Stein**
  4:13,16 180:1
**EBITDA** 106:16
  106:21
**economic** 52:15,16
  52:17
**economics** 60:13
**education** 7:18
  12:5
**effect** 57:15 131:3
  134:16 135:10
  137:4 166:24
**effectively** 40:16
  45:11 70:12
  112:3 151:24
**effectuating** 122:8
  122:22
**efficient** 6:15 77:4
  77:9 138:6
**efficiently** 6:5
**EGI** 83:2 122:21
**either** 7:3 11:5
  15:10 38:1 60:21
  80:5 87:25 95:9
  101:23 110:13
  113:3 115:11
  144:12 148:5
  159:1 162:5,13
  162:20
**elapsed** 66:3 98:9
  128:11 149:10
  169:17
**elected** 13:20

116:4
**election** 19:17
**element** 65:18
  126:20
**elements** 27:21
  119:16
**Eli** 79:21 160:12
  165:12 174:18
**eligible** 132:1
**eliminate** 67:12
  121:24
**employee** 17:13
  19:1 119:15
  126:18 143:2
  151:19,21
**employees** 91:25
  108:9,18,19
  126:20,23 129:14
  131:23 132:1
  143:5,7,9 151:10
  152:8 153:9,11
**employment** 7:24
**enable** 46:15 167:1
  168:19
**enabled** 108:24,25
  159:17
**enables** 65:17
**enclosed** 180:10,11
**encountered**
  168:25
**ended** 126:8
**engage** 145:1
  165:23
**engaged** 67:23
**engagement** 71:16
  71:19 72:13,21
  155:7,10
**enhance** 24:16
**enhances** 65:3
**enhancing** 58:18
**enormous** 60:16
  124:17
**entail** 25:25
**entailed** 166:12,14

**enter** 32:16,20
  47:18 70:11
**entering** 74:5
  168:4
**enters** 65:8
**entertain** 33:2
**Entertainment**
  9:25 22:16,22
  85:22 109:22
**entire** 10:15
**entities** 12:22 59:8
  65:10
**entitled** 62:2
**entity** 62:23
**Epstein** 3:4 4:23
  4:23 180:24
**equal** 159:23
**equity** 18:9 20:17
  29:5,11 30:9,22
  31:2,16,21 32:3,9
  34:23 35:2 37:2
  38:2 58:5 66:22
  67:9,9 84:12
  87:14 93:13,13
  97:19 105:8,9,10
  105:10,22 106:2
  106:10,11 108:13
  118:15 122:6
  126:13 156:12,13
**errata** 180:12,14
  180:15,17
**error** 145:17
**ESOP** 17:19 19:2
  19:13,17,19
  119:20 127:2,20
  128:25 129:3,16
  129:16 131:5,12
  131:14,17,18,23
  131:24 132:10
  134:14 135:9,24
  136:3 143:6,10
  145:22 146:3
  148:1 151:11
  152:1 153:10

159:7,17
ESOP's 18:2
ESOP/Zell 158:9
  159:10
especially 135:20
Esq 2:4,12 3:4
  180:6,24,24
established 19:13
  48:19 49:19
estate 12:1 14:9,12
  27:17,25 28:21
  53:14
estimated 106:8
estimation 103:14
et 1:8 4:4,5 173:16
  174:6,11,24
  175:6 178:14
evaluating 135:14
evaluation 27:21
evening 165:16
event 46:11
events 151:4
everybody 121:8
  122:12 123:20
  134:20 135:19
evident 131:9
exact 22:23 37:19
  53:7
exactly 6:1 17:21
  45:7 46:24 53:8
  90:9 100:22
  101:15 104:6
  108:13 115:1
  134:11 163:25
examination 5:11
  121:11 170:6
examined 5:10
examining 26:7
example 13:4
  26:14 63:17
exchange 136:22
  154:18
exchanged 24:1
excluded 74:19,19

75:17
excluding 73:25
exclusively 132:13
excuse 15:6 67:17
  99:21 137:13
  140:10 143:14
  157:15
excused 76:17
  116:21 169:19
Execute 62:6
executive 8:18,22
  8:24 10:6,10,11
  11:9 68:10 75:15
  75:19,19 86:24
  107:5,8 153:21
  163:25
executives 15:11
  48:8
exhibit 38:5,6
  53:16,18,22 54:1
  54:5,10,11 61:14
  61:16 70:14
  88:15,17 90:14
  90:16 93:24 94:2
  98:20,23 112:10
  112:12 118:4,6
  118:11 137:14,16
  139:25 140:2
  146:8,10 149:22
  150:1 152:11,13
  153:4 154:10,12
  155:22 156:1
  157:13,22 158:1
  160:3,5 165:3,5
EXHIBITS 170:12
  171:1 172:1
  173:1 174:1
exist 19:17
existence 26:5
existing 15:10
expect 134:12,12
  148:19
expense 37:14
  41:12 58:8

experience 92:22
  143:5,9
expert 130:15
expertise 87:7,8
  108:12 114:24
experts 67:6 86:19
  108:1
explain 103:16
  167:7
explained 44:8,9
  95:4
explaining 104:4
  106:6 124:3
  133:9
explanation 18:11
exploration 71:1
explore 30:25 32:8
  32:13
exploring 31:2
  68:10
express 30:15
  113:14
expressed 31:1
  42:8 81:10 82:8
  114:21 153:11
  157:7 159:5,8
expressions 63:12
extend 6:20
extended 84:4,8,15
extent 12:25 48:12
  84:25 136:12
  143:25
e-mail 50:3 150:7
  152:19,21 154:21
  155:15 156:7
  164:10 173:15,20
  174:5,10,14,23
e-mails 152:19
  158:16

_____
F
_____
facilitate 60:21
fact 122:3 129:9
  132:14 139:8

157:7
factors 97:22
fair 27:1 51:25
  65:19 97:3
  139:10
fairest 110:20
fairness 111:7
fall 48:23 69:16
  82:7 85:20
familiar 76:24
  97:9
familiarity 77:1
family 25:7
far 15:17 20:14
  53:1 68:21 122:7
  135:12,15
faster 58:19
favorable 41:23
  86:7
fax 160:16
faxed 160:17
FCC 167:4,18
  168:5,11,17
feature 18:3
February 17:22
  30:23 112:19
  116:25 118:14
  135:19 137:23
  139:1 145:12
  152:25 164:5
  172:13,22
federal 19:2
fee 72:21 126:4
  134:23
feedback 157:9
feel 38:11,13 54:7
  99:6,7
feeling 33:1
fees 72:19
felt 18:13 24:4 27:4
  31:6 32:12 33:8
  33:12,16,17
  41:19 49:14
  51:23,25 61:10

75:23 76:16
  85:11 95:5
  114:24 135:5,14
field 130:16
figures 69:12
  106:19
filed 40:16
final 84:12,16
  124:16 134:9
  165:16
finally 51:4
finance 108:10
  109:23
financed 37:16
financial 16:10
  28:3,8 39:9 72:25
  76:3,8,9,18,20,23
  86:19 87:2,3,8
  92:3,21 127:20
  129:6,12,23
  132:8 139:19
  140:17 141:2
financially 87:22
financing 72:16,23
  140:21 141:20
  142:1,3,6,9,23
  147:3 154:24
  155:12,17
find 23:18
fine 10:23 102:12
  102:15 120:19
finish 6:19 149:6
finished 168:14
firm 5:14 16:12
  29:5 30:9 147:5
firms 22:1 30:22
  34:23 35:2 67:9
  82:14 84:12
  87:14,20
first 5:9 8:4 14:13
  16:20 17:18 21:3
  26:22 36:15
  38:11 39:6 48:5
  51:13 54:9 62:5

82:23,24 84:20
89:14 99:23
119:24 129:2,5
139:13,16 142:5
144:23 178:18
**FitzSimons** 1:8,17
2:18 4:3,5 5:8,13
5:19 36:9 38:4,6
53:15,18,21 54:1
66:10 88:17
90:16 94:2 98:13
98:23 112:12
118:6 128:17
137:16 140:2
146:10 149:15
150:1 152:13
154:12 156:1
158:1 160:5
165:5 170:7,13
171:2 172:2
173:2,21 174:2,6
174:11,14,24
175:6,19 176:1,2
177:1,2 178:9,14
180:7,8
**five** 64:16 66:18
95:17 127:8
128:13,16 149:4
149:10 167:11
**flawed** 39:8
**floor** 151:24,24
152:6
**Florida** 167:13
169:4
**flow** 60:17 141:18
141:23 152:3,4,5
159:18
**flurry** 134:8 161:8
**flush** 110:14
**focus** 12:4 54:6
**focusing** 99:10
**folks** 29:11 83:2
**followed** 116:18
**following** 30:20

52:3
**follows** 5:10
**Food** 62:16
**Fordham** 7:19
**foregoing** 175:14
178:24 179:3
**forget** 121:24
**forgive** 117:23
**form** 19:14,23 39:1
39:25 45:21,22
56:7,16 59:20
71:21 73:3 78:5
79:6 80:19 81:5
103:21 106:23
108:21 110:24
111:24 116:19
119:1 122:10
126:16 137:6
142:12 155:18
163:8
**format** 77:2,8
**formation** 128:24
**formed** 25:4,5
48:23
**formulate** 86:11
**formulating** 7:4
**formulation** 91:15
**forth** 59:9 117:13
134:9 152:20
158:7 161:9,10
**forthcoming** 134:4
**forward** 69:22
76:21 104:21
121:8 124:11
125:21 132:10,11
134:17,21 135:3
136:5 137:5
150:23
**forwarded** 45:18
46:5,22
**forwarding** 154:21
**forward-looking**
140:21
**found** 99:21

130:13
**foundation** 11:23
11:24 12:1,8,9,13
12:20,23 13:3,4,6
13:8,9,19,21 14:4
14:5,5,11 15:8,13
16:1,14 47:25
48:11,15 91:3,5
91:17 92:1,6,13
92:20,22 93:4
99:16,21 100:10
100:20 106:24
**foundations** 14:3
14:19,22 15:21
16:5 89:6,7,8,10
89:21 90:7,8
**Foundation's**
13:18 90:2
**four** 5:24 13:20
98:12 128:10
**fourth** 17:11
**frame** 83:9 101:12
110:25 124:15
139:7 145:23
**franchise** 65:8
**Frank** 1:4 175:4
178:12
**free** 38:11 54:7
99:4 159:18
**frequently** 49:25
50:2
**Friday** 144:18,24
147:2 151:7
162:7
**friend** 43:19
**front** 134:10
153:17
**fruition** 113:19
**frustration** 123:2,7
124:17 125:10
157:8 164:9,11
164:18
**full** 5:17 17:9
45:18 135:22

**fully** 110:19
114:19 117:10
119:12 121:17
132:19 133:9
135:17 151:7
164:1,3 166:15
**functions** 138:13
**fund** 13:6 42:3
**fundamental** 31:15
**fundamentally**
39:8
**funds** 13:4,7,9 16:7
**further** 30:25 31:2
32:8 39:21 41:20
47:3,7 49:13
114:21 122:1
150:10 153:2,2
153:13 155:4
178:17 179:2,5,9
**furtherance** 78:17
**future** 49:14

___

**G**

**Gannett** 61:3
67:22,23,25 68:9
69:13 99:15,20
100:6 156:11,21
157:7
**Gannett/Micros...**
156:9
**Garamella** 1:4 4:4
175:4 176:1
177:1 178:12
180:7
**Garfield** 11:21
**gears** 111:22
**Geffen** 43:11,14,19
44:25 45:11,19
46:14 47:3,14,22
101:2,10,20,23
**Geffen's** 46:7
101:6
**GELLER** 2:3
**general** 9:14,19

17:17 28:19
30:12 31:22 32:2
33:1 80:2,19,24
91:21 108:23
114:25 115:9
**generally** 90:23
167:20
**generated** 135:13
**generic** 88:5
**gentlemen** 95:9
**getting** 124:14,16
126:10 163:4
166:22
**GIBSON** 3:3
**girls** 11:18
**give** 13:4 18:11
31:5 33:4,14 34:3
53:6 54:17 59:17
60:6 61:23 63:17
75:12 84:21
86:20,21 87:3
125:4 133:8
139:21 144:3
145:1 161:20
163:1,18 165:16
166:25 167:1
168:13
**given** 15:16,19
40:20 42:13
46:11 50:13
54:19 56:20
58:25 62:25 63:8
67:7,13 78:16,19
83:5,25 84:9,10
87:24 88:5 90:1
93:7 97:19
105:24 116:4,7
117:3 121:2,21
123:13,24 129:11
133:25 135:12,21
144:4 145:1,7,8
148:12 150:16,22
154:3 161:17
162:10,24 164:9

175:16 178:20,25
**giving** 59:5 147:21
161:25
**go** 6:3,5 14:12
19:15 27:11
35:14 42:6 51:14
58:10 63:21
65:19 68:21 74:8
76:6,7 80:3,13
83:22,24 97:22
98:4 111:25
118:21 122:11
125:21 129:19
131:8 133:8
139:9 149:4
150:23 153:13
163:9
**goal** 84:12
**going** 6:18 9:11
21:10 30:25 31:8
32:16,21 33:2
35:22 38:10
40:23 54:6,9
73:15 74:18
81:19 82:7 84:14
85:3,6,18 99:3
108:14,16,19
109:10,20 111:11
116:2 123:9
125:7 126:22
131:8 135:19,20
137:8 144:10,16
144:22 152:20
156:24 166:8,19
**going-private**
55:25 57:18
**Goldman** 28:11,13
**golf** 14:15
**good** 4:1 36:7
59:16 66:8 95:5
98:11 108:11
121:18 122:1
128:7,15 149:13
168:16,16

**Goodan** 3:10 4:25
**Gordon** 1:18,24
4:15 175:13
178:4 180:23
**governed** 147:20
**governing** 18:25
**graduate** 7:19,21
**graduated** 7:24
**Grand** 3:5
**grant** 168:19
**granted** 13:10
**Great** 149:7
**GreatBanc** 130:11
**greatest** 66:23 71:3
**Greenthal** 93:16
**Greg** 64:7
**Grenesko** 28:19
130:21 150:9
154:22 156:8
**Grey** 8:6,13
**Griffin** 8:16
**ground** 6:3 168:11
**group** 9:18,22 18:9
20:17 22:16,22
22:25 23:4,8,13
24:3 38:2 40:22
51:22 82:7 85:22
94:16 112:25
118:15 119:10
122:6 123:24
126:13 138:12
144:4 152:21
**groups** 37:2 68:18
**grow** 63:5
**growth** 58:2,19
59:16 61:10
152:3,3
**guarantee** 169:6
**guess** 70:15 89:19
145:11 160:19
163:4
**guidance** 115:6
**guided** 77:2

| **H** |
| --- |

**half** 9:12 12:18
74:11
**hand** 58:20 123:13
123:15 143:13
179:14
**handed** 98:19
**handle** 180:18
**handwriting** 102:7
**happen** 84:14
115:20 133:16
**happened** 80:23
92:16 112:1
163:25
**happening** 81:25
123:16 139:16
**happy** 102:10
**Hartford** 9:2
167:13 169:4
**hasty** 40:19
**head** 6:11
**headed** 119:10
**headline** 96:18,21
97:11 103:10,17
**hear** 73:8 79:24
81:1 82:20
100:17 101:22
**heard** 29:18 33:7
45:25 82:18 86:6
151:9
**hearing** 17:18
29:14 101:20
**held** 9:10 51:24
100:23 114:8
118:9 123:21
125:17
**help** 110:14 163:18
**helped** 77:8
**hereinbefore** 179:8
**heretofore** 178:6
**hereunto** 179:13
**Hernandez** 21:13
**hey** 123:9 166:18
**high** 60:23 61:10

80:20 106:22
125:10 164:12,19
**higher** 126:17
**highly** 1:7,16
63:25 170:12
171:1 172:1
173:1 174:1
175:5,11
**Hiller** 91:25
**hinder** 7:8
**hire** 93:4 129:6
**hired** 91:22 128:2
128:3 130:10,17
130:18
**hiring** 129:5
130:25
**history** 7:24
**hit** 69:11
**hold** 11:2,7 78:18
**Holden** 20:19,20
20:22
**holding** 26:24,24
**holdings** 25:8
52:23 71:12
**home** 14:14
**honest** 153:16
**hope** 41:8 168:18
**hoped** 41:10
**hotel** 160:18
**hour** 6:24,24 35:22
98:9
**hurdle** 24:5

| **I** |
| --- |

**idea** 35:1 135:1
**ideas** 73:8
**identification** 38:8
53:20 54:3 88:19
90:18 94:4 98:25
112:14 118:8
137:18 140:4
146:12 150:3
152:15 154:14
156:3 158:3

160:7 165:7
**IDENTIFIED**
170:15 171:4
172:4 173:4
174:4
**identifying** 77:16
**II** 25:1
**ill** 40:20
**Illinois** 1:19,21
2:14 4:11 5:20
14:10,16 16:2
178:1,5,8 179:21
180:5
**imagine** 132:7
**immediate** 116:13
**immediately** 31:10
111:2 165:23
**impact** 42:2,15,21
43:8 108:8
116:15
**impacted** 59:2
**implement** 129:3
150:25
**implementation**
127:24 134:15
135:9 136:3
**implemented**
143:6
**implementing**
138:24
**implication** 57:19
**implications** 44:10
46:9 63:8 119:14
**implied** 105:9
**important** 135:6
139:23
**impressive** 113:22
**improved** 41:12
57:3 115:7,13
**improvement**
37:15 41:15
**inaccuracies** 50:23
**inaccuracy** 50:13
50:17

inaccurate 40:18
  41:2 49:4
incidentally 63:22
include 14:24
  100:19
included 9:23,24
  151:21
includes 14:25
including 22:15
  106:21 112:25
  138:9
increase 46:16
  61:6 63:3 166:10
incurring 42:3
indefinite 164:3
independent 16:10
  48:18 49:5,18
  73:24 74:21
  78:12 86:22
  92:18 121:4
  137:23 171:17
  172:6,21
index 16:7
indicate 34:12
  47:14 61:11
  66:20 96:12
  108:4 113:17
  124:24 134:3
  146:5 163:2
  164:16,23 165:19
indicated 35:5
  66:21 93:13
  102:1 103:11
  143:21 146:2,3
  147:17 153:5,6
  164:10
indicates 55:15
  57:22 94:14,21
  103:12 105:7
indicating 38:14
  125:1 129:1
indication 30:6
  34:7 101:3,7,14
  102:2 104:25

indications 166:1
individual 32:25
  44:20 60:25
individually 120:1
individuals 19:4
  63:16 82:13
individual's 16:11
industry 17:8
  58:21 115:25
informal 7:13
information 24:1
  34:2,4,18,21 35:7
  46:15 47:3,5,23
  59:5 61:21,24
  68:24 69:2,3
  75:25 77:7 80:2,5
  87:4 119:11,13
  120:14 123:25
  124:1 133:9
  145:2 147:22
  149:1 167:1
informed 40:20
  75:1 100:2
  148:25
inherent 18:20
inherited 25:9 43:6
initial 43:18 120:5
  126:14 136:18
  137:8 148:14
initially 18:20
  29:12,20 68:17
  119:2 126:4
  136:21
initiate 38:24
initiating 31:20
initiatives 55:14
input 104:17,17
inquiries 59:18
inquiry 44:6
inside 139:22
instruct 116:23
instructed 133:7
instructions 117:3
  163:16

instructs 35:12
intended 114:12
intent 87:21
  126:10
interact 113:16
  114:12
interacted 119:17
interactive 58:1,3
  60:24 114:22
interest 17:20
  24:23 29:19,22
  30:15,19 31:1
  33:13,13 34:8
  45:3 46:7,16 61:6
  61:7 62:16 63:13
  67:10 74:15,17
  80:19 81:10 82:8
  93:14 101:7,11
  101:14 113:18
  114:21 146:23
  156:18 160:13
  165:20 166:2
interested 24:2
  26:6 29:14 43:22
  45:11 46:1 47:12
  47:15 82:21 88:4
  123:1 135:3
  179:11
interesting 86:4
interests 25:17
  74:14,15 129:15
internal 34:20
  84:24 86:17,23
Internet 58:3,11
interplay 158:16
interpreting 105:5
interrelated 65:22
interrelation 63:1
interrelationship
  65:6,14
intersection 19:19
interviewed
  130:17,19,20
intriguing 119:9

introduce 4:18
introductory 83:6
invest 15:17 59:10
investigation 64:12
investment 16:4
  24:4 29:15 73:8
  93:22 108:12
  136:18 137:2,8,9
  137:10 156:12,14
  156:20,25
investments 15:13
  16:5,9 18:9 20:17
  58:2,4,4,5,11,16
  58:18 118:15
  122:6 126:13
investor 12:23
invited 107:25
involve 109:20
involved 20:25
  28:15 31:17
  44:11 68:5 72:5
  72:15 74:6 86:8
  91:14 109:2
  119:20 123:6
  124:10,13 126:19
  126:21 138:11
  154:23,24 155:2
  155:12,16 159:10
  167:4
involvement 72:23
  89:7
involving 92:8
  140:20
in-person 163:10
IPO 60:9,21
IRS 43:3
issue 69:15 111:18
  125:16 155:5
  158:11 159:12
issued 129:17
  136:24
issues 27:15,19,22
  38:21,22 39:3
  108:13 111:10

item 67:19

― J ―

J 1:8,17 2:4,18 3:4
  4:3 5:8,19 36:9
  66:10 98:13
  128:17 149:15
  170:7,13 171:2
  172:2 173:2
  174:2 175:6,19
  176:2 177:2
  178:9,14 180:8
  180:24,24
James 2:12 180:6
January 10:24,25
  12:19 16:21
  17:12 19:24
  20:16 84:17 94:9
  103:3 116:3
  126:7 135:22
  145:7 157:9
  171:23 172:8
jducayet@sidley...
  2:16
Jeffrey 3:10 4:24
jerking 166:19
Jill 93:16
Jim 4:19 91:19
job 8:4 96:25
John 3:15 4:12
  12:17,18 91:18
  171:16
join 11:4
joined 8:1 9:6 21:8
  21:14 22:5,7
joining 31:13
joint 13:12 24:15
  67:25 156:21
journalism 12:5
Jr 3:11 4:24
  170:17
Judge 64:5
judgment 61:1
  78:23

Highly Confidential

**July** 9:6 13:22 51:6
  51:21 52:6 54:20
  55:9,16 56:3 90:3
**June** 38:17 46:25
  49:2 74:22 96:5

_____
**K**

**K** 178:3
**keep** 75:1
**Kenney** 28:18
  130:20 150:9
  154:19 156:8
  174:5,15
**kept** 81:15,18
**key** 168:23
**kind** 119:8 130:12
  162:1
**kinds** 16:7 56:1
  58:18 59:4,16
  62:19 108:14
**knew** 20:14 21:10
  126:21
**Knight** 61:3
**know** 6:18,25 15:1
  17:7 20:3,13,15
  20:16,24 21:15
  43:24 48:22
  54:21 74:10
  81:24 83:19
  85:15,17 92:5,9
  92:15 93:6 96:11
  97:23 101:8
  102:7,18 106:12
  107:7 108:3,8,10
  110:19 113:14
  114:19 117:10,11
  119:21 120:10,12
  120:13,19,23,24
  121:5,25 122:3
  123:10,12 124:23
  125:1 126:22
  131:1,2,3,21
  132:3,3,5 135:23
  136:14 144:7,12

149:2 151:8
  152:2 153:22
  158:16,17 159:13
  161:18,24 162:17
  163:11,12,16
  164:19 166:23
**knowing** 124:9
**knowledge** 79:3
  92:12 108:10
  125:4 133:15
**known** 16:19 20:19
  21:2,13
**Kraft** 21:1

_____
**L**

**LA** 43:12 44:7,9,11
  47:8,12,16,20,23
  101:4,11,14
  102:2 165:25
**lacks** 106:23
**Landon** 156:9
**Larry** 64:7
**LaSalle** 130:13
**lasted** 143:7
**late** 8:23 9:16
  16:21 25:10
  101:12 130:8
**latitude** 15:16,19
**law** 5:14 7:13,15
**laws** 18:25
**LBL** 30:21
**LBO** 30:16
**Leach** 156:7 157:3
  157:4 174:10
**lead** 44:14 64:12
  68:19
**League** 65:11
**leaked** 45:23
**learn** 17:23 18:2
  79:25 80:15
  82:11 99:24
**learned** 99:23,25
  162:12
**leaves** 19:9

**left** 15:14 62:5
  78:21 121:20
**legal** 3:15 76:18
  93:5 129:9,23
**legislators** 168:23
**lender** 131:16
**lenders** 142:3,6
**length** 65:11
**lengthy** 40:20
**Lerach** 2:3 5:14
**Les** 24:13
**letter** 31:9 38:16
  38:22 40:2,13,16
  40:18 45:9,10,13
  45:15,16,17,19
  45:22 46:5,22
  48:17,22,24 49:2
  49:20 50:11,13
  50:15,18,19
  72:21 74:22
  90:24 91:9,13
  96:5 101:13,21
  101:24 102:1
  118:14,18,20
  119:25 132:11,19
  133:3,5,19
  145:13,14,17,25
  146:1 148:14
  160:11 161:7,13
  162:22,25 163:2
  163:6,23 165:12
  170:16 171:16
  172:16 174:18
**letters** 134:8 161:9
**let's** 6:3 8:23 20:23
  31:16 32:2,6
  35:24 38:4 53:15
  53:21 62:1 69:18
  88:14 93:24
  99:11 109:19
  112:9 118:3
  121:16,23,24
  125:1,2 129:19
  137:12 139:24

146:7,21 149:21
  152:10 154:9
  155:22 157:12
  160:2
**level** 19:3 22:13
  25:12 28:17
  37:24 42:23
  46:16 48:21 70:7
  80:20 84:25
  101:14 123:2,8
  125:10 134:14
  137:2 142:19
  163:7 164:11,18
  166:7,7
**levels** 117:8 141:24
  159:19
**leverage** 30:10
  117:7 158:11
  159:6,9,11,13,19
  159:20
**Levy** 64:7
**liability** 24:23 25:3
**license** 1:25 65:9
  167:22
**licensed** 167:8
**likelihood** 63:4
  153:7
**limited** 24:23 25:3
**line** 122:22,23
  140:18 150:18
  176:5 177:5
**lineups** 58:25
**link** 32:14
**linkage** 32:15
**list** 87:25 88:3,4,5
  88:6,8,10
**listed** 70:5
**listen** 30:13
**listened** 107:23
**little** 8:2 19:21,22
  52:10 53:1,4 54:8
  99:5 113:14
  145:10 152:5
  153:7

**LLC** 25:18 26:5
**LLCs** 24:25 25:12
  26:17 28:23
  31:25 32:11
**LLP** 2:11 3:3 4:20
  180:4
**loan** 131:5 132:2,4
**loaned** 129:15
**local** 167:17
**logical** 23:3 24:9
  89:16 123:17,18
**logjam** 51:11,16
**long** 9:11 10:17
  16:19 20:19 21:2
  21:13 68:13
  73:11 122:14
  157:1 167:19
**longer** 57:19 85:4
**longstanding**
  165:20
**look** 56:6,10 62:1
  66:16 69:18
  70:14 86:25 98:2
  99:11 101:1
  102:3 106:14
  111:22 115:19
  118:25 137:12
  139:1 146:21
  151:21
**looked** 22:24 46:8
  56:24 85:8
**looking** 22:14,20
  27:12 55:22
  56:18 75:24 91:6
  97:24 104:10,20
  115:22 120:14,23
  123:4 161:18
**looks** 147:11
**Los** 1:2 3:6 4:6
  43:22 113:10
  165:21 167:14
  175:2 178:11
**losing** 164:1
**lot** 18:5 30:17

Highly Confidential

33:16 60:22 67:6
87:8 93:13 126:1
126:9 138:18
145:9
**lots** 73:7 87:3
97:21 134:20
**low** 111:15
**lower** 104:5 126:6
126:18 143:12
**Lunch** 36:6
**Lynch** 28:7,20
37:6 56:6,13 57:5
61:12,19 62:2
66:19,21 67:3
69:21 70:2,22
71:17,18,25 72:4
73:1,9 77:12 82:2
94:13 98:3 103:1
104:4,16,22
105:2,13 107:14
119:19 142:3,6,8

**M**

**Madigan** 12:17,18
91:18 171:16
**Madison** 29:8,13
29:18 33:19
**main** 12:4 28:18
**major** 44:10 62:14
65:11
**majored** 7:20
**majority** 33:11
**making** 91:4,7
124:4 137:10
167:17 168:15
**manage** 75:2 117:9
**management** 4:13
17:9 23:13 26:16
31:1 37:1 51:22
61:18 64:19 71:1
71:5,11 73:2 74:1
74:16,19,20 75:3
75:14,16 76:1,15
77:1,11 78:3 80:4

82:22,24 83:1,4
86:24 104:17
107:20 109:3
110:7 113:16
114:12 116:23
118:1 122:13
130:22 137:24
140:18
**Management's**
52:6,9 70:17 89:7
96:13 122:19
**Manager** 8:24 9:14
9:19
**managers** 16:25
**mandate** 145:1
**mandated** 144:25
**manner** 16:16
138:6 168:21
**March** 85:17
124:16 127:18
130:8 131:11
140:9 144:18
160:11 161:4,25
162:7,8 163:10
173:7
**margin** 60:23
**Marine** 130:14
**mark** 38:4 53:15
53:21 88:14
90:13 93:24
98:20 112:9
118:3,11 133:13
137:13 139:24
146:7 149:21
152:10 154:9
155:22 157:12
158:13 160:2
165:3
**marked** 38:7 53:19
54:2 88:18 90:17
94:3 98:24
112:13 118:7
137:17 140:3
146:11 150:2

152:14 154:13
156:2 158:2
160:6 161:18
165:6
**market** 30:11
56:21 65:19 67:8
70:11,13 144:9
**Marketing** 9:2
**markets** 41:14,23
42:14 62:15 73:9
**markup** 161:19
**match** 13:3,8,11
**material** 104:20
**materialize** 23:11
69:8
**Materials** 171:5
172:5
**matter** 4:4 149:17
**matters** 15:18,20
87:18
**Matthew** 43:4
**maximize** 23:6
77:24 123:5,14
135:25
**maximizing** 78:22
**maximum** 86:9
87:21
**McClatchy** 61:4
**McClatchy's** 61:5
**McCormick** 11:22
11:25 13:6 14:4
14:12 15:3,8 89:6
91:3 99:16,21
100:3,10,10
**McCormick's** 14:9
**mean** 26:3 40:1
52:14 73:2 86:23
96:21 103:24
104:3 141:22
**meaningful** 77:3
162:2
**means** 110:20
121:18
**meant** 158:23

159:2
**measures** 138:11
**media** 17:7 67:10
101:21,23
**medication** 7:8
**meet** 75:13 76:17
83:17 119:22
120:1 161:22
162:4,13
**meeting** 16:24 17:5
17:8,14,16 29:17
29:20 30:23
31:11 32:10
36:18,24,25 40:4
43:19,21,23
44:19,22 49:9
51:6 54:20 55:8,9
55:11,17 57:7
70:11 76:13 83:6
88:24 89:1,5,15
94:9,11,23 99:25
107:24 112:19,21
113:2,20 116:21
117:1 119:24
120:6,8 121:13
121:14 124:3
140:8,9,10,12
146:17,19 162:7
162:21,21 163:10
163:12,13,14,15
170:21 171:13,22
172:12,20 173:6
173:11
**meetings** 17:25
39:13 49:23 50:8
75:6,7,9,22 76:3
79:23 164:13
**Melissa** 3:4 4:23
180:24
**member** 10:2
20:21 118:19
**members** 33:12
38:23 44:17 46:6
46:23 49:19

50:17 55:20
75:25 79:9,12
107:13,20 130:22
**memory** 104:11
**mentioned** 5:21
14:23 39:20
45:17 89:25
114:23 125:11
133:19 145:6,15
153:8 179:8
**mentions** 67:20
**mepstein@gibso...**
3:8
**merger** 11:8 25:9
43:7 73:12 126:5
127:16 133:12,13
148:3 161:16,16
166:15
**merits** 115:3
**Merrill** 28:7,20
37:6 56:6,13,24
57:5 61:11,19
62:2 66:19,21
67:3 69:21 70:2
70:22 71:16,18
71:25 72:4,15
73:1,9 77:12
81:21 82:2 94:13
98:3 103:1,14
104:4,16,22
105:2,13,16
106:5,19 107:7
107:14,19 111:14
119:19 141:15
142:2,6,8,13
155:14
**met** 16:20 17:3
19:25 21:3,11,14
22:8 24:4 83:1
**method** 78:22
138:14
**methodology** 59:2
**metrics** 76:23
**Meyer** 23:19

Highly Confidential

**Michael** 28:20
82:3 150:8,21
152:20,22 153:5
153:6,15 154:19
154:21 173:15,20
174:23
**Michael's** 152:7
**microphone** 67:16
**Microsoft** 156:12
156:20,24
**mid** 20:23 21:11
130:8 131:11
145:11 164:4
**Midland's** 130:14
**Mike** 28:12,12
**million** 13:25 15:2
52:19 108:18
129:16 134:24
136:21,24 141:23
156:16 159:22
**mind** 83:9 122:22
**minority** 156:13
156:24
**minus** 42:22,24
43:1
**minutes** 54:12 55:7
61:11 64:17 66:4
66:20 73:19
88:23 89:15 94:8
95:17 96:12
108:4 112:18
127:8 128:12
140:8 143:21
144:24 146:16
149:4,11 162:6
169:18 170:21
171:11,23 172:13
173:7,12
**Mirror** 11:8 25:6,8
43:7 73:12
**misstated** 69:11
**mode** 30:13
**models** 87:5
**modifications**

113:1
**Mohr** 82:5 150:8
173:16
**Monday** 170:4
**monetize** 62:8 63:7
**money** 97:21 105:8
105:22,25 106:2
129:15 131:5,13
131:14,19
**monitors** 16:9
**Monster** 59:12,13
**months** 8:5 9:12,16
126:5 133:12
134:20 135:16
150:17 167:25
168:1
**Moonves** 24:13
**Morgan** 76:10,12
77:19,20 86:21
107:6,9,11,19
111:14 124:13
154:23 155:1,6
155:16
**morning** 4:1
**morph** 137:9
**Morrison** 21:2
**Mosbey** 43:4
**moved** 124:10
**moving** 76:21
126:9 143:8
**Mulaney** 146:23
**multiple** 73:16
76:8 106:16,21
123:5,19
**museum** 14:13,14
**mutual** 43:18

**N**

**N** 170:1
**name** 4:12 5:13,17
14:9 16:11,12
176:1 177:1
**names** 93:3,10
**national** 8:25 63:2

**nature** 43:16 80:25
147:20
**NBC** 24:13
**necessarily** 61:20
63:6
**necessary** 131:7,10
131:12
**necessity** 166:14
**need** 6:8,16,25
15:23 21:20
24:20 61:23
65:10 69:13
119:23 127:3
141:19 147:18
160:21 180:15
**needed** 18:2,2
41:20 80:3 93:6,6
117:8 119:11,14
119:17 120:15
121:2 125:12,22
155:6 162:1
**negative** 43:3,8
46:10 57:19 84:3
152:4
**negotiate** 78:1,20
79:18 122:1
126:23 145:16
148:22 155:13
**negotiated** 57:14
81:3,16 126:19
132:6,7,13
134:22 158:8
164:1
**negotiating** 52:21
123:10 155:9,10
156:20 166:15
**negotiation** 26:18
32:16,21 57:8
81:7 124:10
126:1 127:1
164:20
**negotiations** 26:25
47:19 50:10 51:5
52:21 53:6 57:11

79:5 81:2 123:6
127:18 129:13
**negotiators** 28:18
**neighborhood**
11:20,21
**network** 23:2,4
60:16 62:16
**never** 19:25 116:17
**new** 9:14 24:4 56:2
56:5,14 84:19
167:13 168:11,12
**newly** 129:17
136:24
**news** 69:9
**newspaper** 10:8
45:12 46:15
58:21 167:12
**newspapers** 59:7
60:14,24,25
62:20 69:10
**newspaper.coms**
58:14
**night** 151:7
**Nominal** 1:13
175:8 178:16
**noncore** 138:10
**nondisclosure**
82:14
**nonpublic** 34:3
46:14 47:22
68:24 69:3
**Nonwaiver** 102:14
**non-strategic** 62:9
**normal** 33:25
59:17
**normally** 75:13,18
**notarial** 179:14
**notarized** 180:16
**notary** 1:19 175:25
178:4 179:21
**notation** 160:16
**note** 136:25 160:15
**noted** 31:8
**notes** 24:20 102:22

142:2
**Notice** 1:22 179:6
**noting** 140:17
**number** 4:2,7
24:10 27:15 34:8
34:11 36:3,4,8,10
37:19 42:8,13
52:18 59:11 66:2
66:5,9 68:12
70:15,16 82:13
84:9,11 87:21
98:8,12,14
101:17,19,25
128:10,13,16,18
149:9,14,18
169:15 170:15
171:4 172:4
173:4 174:4
180:7,20
**numbers** 30:7,7
135:22
**numerous** 146:25

**O**

**O** 178:3,3
**oath** 5:3 7:10,12,14
36:12 66:14
98:18 128:22
149:20
**Object** 73:3 79:6
110:24 111:5,24
122:10 126:16
137:6 142:12
**objected** 35:9
**objection** 19:14
34:15,25 35:14
39:1,25 42:18
45:21 56:7,16
59:20 71:21 78:5
81:5 103:21
106:23 119:1
136:6 155:18
162:15 163:8
**objections** 35:11