IMAGED

GreatBanc Trust Company
ESOP Committee Meeting Minutes
For March 29, 2007

A meeting of the ESOP Committee (the "Committee") of GreatBanc Trust Company ("GreatBanc") was called to order at 3:00 p.m. (CDT) on March 29, 2007 at the offices of GreatBanc in Oak Brook, Illinois. The following individuals from GreatBanc were present in person: Danielle Montesano, Jim Staruck, Julie Williams, Marilyn Marchetti, Kevin Kolb, John Culhane, and John Marino. Vaughn Gordy, Karen Bonn and Steve Hartman of GreatBanc participated via telephone conference. Michael Welgat of GreatBanc participated by invitation. Elyse Bluth, Robert Bartell, Chris Janssen, Scott Bednas, Sam Pollack, Dan Christoffel and Phil Rosengren of Duff & Phelps, LLC ("D&P"), the financial advisor to GreatBanc, were present in person. Charles Smith and Henry Snyder of Kirkpatrick & Lockhart Preston Gates Ellis, LLP, counsel to GreatBanc were also present in person.

The purpose of the meeting was to review a proposed transaction (the "Proposed Transaction") pursuant to which The Tribune Company (the "Company") enters into a number of transactions with a newly formed employee stock ownership plan ("ESOP"), EGI-TRB, LL.C., a wholly owned entity of Samuel Zell ("EGI-TRB") and the stockholders of the Company. Under the proposed transaction:

- The ESOP as trustee, purchases approximately 8,928,571 shares (the "ESOP Shares") of newly issued common stock, par value $.01 per share of the Company (the "Company Common Stock") for an aggregate purchase price of $250 million, or $28.00 per share. Under the current structure, the ESOP finances the purchase of the ESOP Shares by issuing a note in the principal amount of $250 million (the "ESOP Note") to the Company.

PI-1751276 v4

Bluth    DEP. EX. NO. __
FOR ID. AS OF ___12|7|09___

GBTRIB 00008112

- EGI-TRB, subject to required governmental consents, purchases (x) a convertible exchangeable subordinated note of the Company (the "Exchange Note") in the principal amount of $212.0 million and (y) 1,151,515 shares of Company Common Stock for an aggregate purchase price of $38.0 million.

- The ESOP forms a new Delaware corporation, Tesop Corporation, which is a wholly-owned subsidiary of the ESOP.

- The ESOP, Tesop and the Company execute and deliver an Agreement and Plan of Merger (the "Merger Agreement") pursuant to which Tesop Corporation is merged with and into the Company (the "Merger"). Pursuant to the Merger, all issued and outstanding shares of Company Common Stock other than shares of Company Common Stock held by the ESOP are converted into the right to receive $33.00 per share in cash, the ESOP Shares are cancelled and the shares of Tesop stock held by the ESOP are converted into approximately 51%-60% of the equity of the Company on a fully diluted basis.

In addition, the Committee discussed that the following transactions would be also be consummated (i) the Exchange Note repaid, (ii) EGI-TRB purchases a Subordinated Note of the Company in the principal amount of $185 million, (iii) EGI-TRB purchases a warrant to acquire approximately 36%-38% of the shares of the Company Common Stock for approximately $40.0 million, (iv) the management of the Company (the "Management Group") invests approximately $37.0 million (consisting of the right to receive deferred compensation) in the Company in exchange for approximately 3.5% of the equity of the Company, and (v) the Company adopts a Management Incentive Plan that provides equity based compensation to the Management Group in an amount equal to 5% to 10% of the equity of the Company. After taking into account these transactions, the ESOP will own approximately 51%-60% of the equity of the Company on a fully diluted basis.

In the event the Merger Agreement is not consummated, the ESOP retains the ESOP Shares and the Company continues to be publicly-traded.

- 2 -

GBTRIB 00008113

Financing for the Proposed Transaction will be completed in two steps: Step one involves borrowing approximately $7.0 billion, the proceeds of which will be utilized to repay approximately $2.8 billion of existing debt, with the balance of approximately $4.2 billion being used to repurchase 125 million currently issued and outstanding shares of Company Common Stock. Step two involves borrowing approximately $4.2 billion, the proceeds of which will be utilized to fund the merger consideration payable to the remaining holders of Company Common Stock.

Marilyn Marchetti led the Committee through an overview of the Proposed Transaction and the principal elements of the Proposed Transaction. After the overview, D&P reviewed with the Committee its preliminary financial analysis of the Proposed Transaction. D&P will issue its opinion to the Committee with respect to:

- whether the purchase price of the Company common stock to be purchased by the ESOP is fair and reasonable to the ESOP;

- whether the terms of the ESOP Note are fair and reasonable to the ESOP; and

- whether the terms of the Proposed Transaction are fair and reasonable to the ESOP.

Having previously distributed copies of its preliminary ESOP Analysis, Valuation Analysis and Financing Analysis to the Committee, D&P began a review of the matters presented therein. D&P explained that the Proposed Transaction and its financial analysis were still preliminary and while the basic elements of the Proposed Transaction were in place, certain economic issues were not yet resolved. These issues include (i) the amount of equity in the Company that the ESOP would receive on a fully diluted basis upon the consummation of the Merger, (ii) the investment level by EGI-TRB and the members of the Management Group of the

- 3 -

GBTRIB 00008114

Company on a post-Merger basis, (iii) the economic terms of the Management Group's equity incentive package, and (iv) the allocation of EGI-TRB's investment in the Company between debt and equity.

Next, Elyse Bluth, Dan Christoffel and Sam Pollock led the Committee through the ESOP Analysis:

Key points of the review included:

- the structure of the ESOP Purchase, the Acquirer Purchase and the Share Repurchase (page 6);

- the sources and issues of funds required to consummate the Share Repurchase and the Acquirer Purchase (page 2);

- the structure of the Merger (page 8);

- the sources and uses of funds to consummate the Merger (page 9);

- the historical stock price of the Company Common Stock for the past twelve months (page 17) and the trading price of the Company Common Stock as compared with the Dow Jones Index, the S&P 500 Index, the broadcasting company comparable index and the publishing company comparable index;

- a review of the strategic alternatives reviewed by the Company (page 19). In this regard, it is believed that the Company has been disappointed in the number and pricing of third party proposals. The Company believes that the lengthy regulatory review process (principally FCC approvals), the complicated structure of the Company's business (publishing, broadcasting and other investments), as well as other board-related issues have had a chilling impact on both the number of third party bidders as well as the prices third party bidders have offered.

- review of the self-help plan (page 19), which consisted of a special dividend funded by additional borrowings, and the spin-off to the shareholders of the stock of the broadcasting business;

With respect to the other strategic alternatives considered by the Board, Mr. Bartell stated that he believed that the Company had been disappointed in the number and

- 4 -

GBTRIB 00008115

pricing of third party proposals and believes that the lengthy regulatory review process (principally FCC approvals), the complicated structure of the Company's business (publishing, broadcasting and other investments), as well as other board-related issues have had a chilling impact on both the number of third party bidders as well as the prices third party bidders have offered.

Mrs. Bluth noted that while the Proposed Transaction does not represent a significant premium to market, the lack of a premium may be the result of the lengthy auction process and the general availability of information in the market concerning the auction process.

Next, D&P reviewed the Valuation Analysis of the Company. Ms. Bluth stated that the value of the Company is the aggregate of the value of the Company's publishing business, the broadcasting business and the Company's other assets.

Sam Pollock then led a review of the determination of the enterprise value of the publishing business. The enterprise value of the publishing business is based on a discounted cash flow analysis and a comparable public company transaction analysis. Based upon its analysis, D&P was of the preliminary view that the enterprise value of the publishing business ranged from $7.1 to $8.0 billion dollars.

Mr. Pollack then led the Committee through D&P's valuation of the broadcasting business using a discounted cash flow analysis and a comparable public company transaction analysis. Based upon its analysis, D&P's preliminary view of the enterprise value of the publishing business was a range of $3.5 to $3.8 billion dollars.

GBTRIB 00008116

Next, D&P reviewed its analysis of the value of the Company's other investments. These investments were valued on a discounted cash flow basis and/or by reference to public company comparables, to the extent appropriate information was available. In other instances, D&P relied upon comparable sales, implied values derived from recent sales of equity interests in                                the                                venture.

Ms. Bluth noted that aggregating the enterprise value of the Company's businesses and assets yields a total enterprise value of between $12.6 billion and $14.2 billion or approximately $31.50 to $36.20 per share. The Committee discussed numerous aspects of the valuation and questioned the overall valuation conclusions relative to the trading price of the Company prior to announcements related to the Proposed Transaction. All questions were addressed to the satisfaction of the Committee.

At the request of the Committee, Ms. Bluth described and summarized the Company's debt described as Phones. Ms. Bluth stated that Phones is a debt security tied to the value of Time Warner stock. A redemption of Phones by the Company could cost approximately $900 million (the value of Phones at $1.2 billion, less the value of the Times Warner stock of $300 million). On the other hand, Phones is subject to exchange at a value equal to two times the value of Time Warner stock or approximately $600.0 million.

D&P then reviewed the implied enterprise value based upon the price of the Proposed Transaction. Importantly, the implied enterprise value falls within the range of enterprise values developed by D&P. Julie Williams noted for the benefit of the Committee that implied enterprise value can be misleading as it is based on deal pricing rather than the analytical framework of the D&P analysis. As a consequence, as the deal price climbs, there is an illusion that the fair market value of the Company is climbing. The Committee indicated its agreement

- 6 -

GBTRIB 00008117

with this principle and the need to base pricing decisions on an analytical approach rather than the price of the bid.

As an additional check on value, Mr. Bartell stated that D&P analyzed the value of the ESOP's interest in the Company by valuing such interest as an option. He stated that the option methodology recognizes that the lenders to the Company may in fact be accepting risk without full consideration and this fact shifts value from the lenders to the equity holders. A discussion followed. In response to a question from the Committee, Ms. Bluth stated that while not dispositive, the methodology provides an additional check on value.

Dan Christoffel then reviewed potential returns to the ESOP. Mr. Christoffel stated that the rates of return were based upon the Company's five year projections and an extrapolation of projections for years six through ten. Mr. Christoffel stated that based upon the structure of EGI-TRB's note and warrant, EGI-TRB receives the first $185 million in value, and that the ESOP receives substantially all of the return above $185 million up to $1.0 billion. Thereafter the ESOP receives its allocable share of any additional value.

Next, Mr. Christoffel stated that based upon the projections, D&P performed an internal rate of return analysis on three separate models and each model indicated that the IRR for the ESOP is in excess of 30% for the 10-year period. He also noted that, under each of the models, the ESOP enjoys a higher rate of return than EGI-TRB or the Management Group. The Committee discussed the assumptions used for the analysis, specifically focusing on the downside scenario.

D&P then reviewed the value of the S corporation tax shield and determined that the present value of the S corporation tax shield is approximately $900 million.

- 7 -

GBTRIB 00008118

The Committee then asked D&P if the Management Group of the Company had any significant experience in operating a highly leveraged company. D&P responded that to its knowledge, the management team did not have specialized experience in that area, but noted that Sam Zell has significant experience in operating in high leverage environments. A discussion then followed.

Next, Bob Bartell lead a discussion of D&P's financing analysis. A discussion followed.

Marilyn Marchetti then summarized D&P's prior engagement by the Company, stating that D&P had been engaged by the Company to provide advice with regard to management self-help plan. However, when the Company elected to pursue the Proposed Transaction, the Company restructured its relationship with D&P in order to permit D&P to serve as a financial advisor to the ESOP. A discussion followed relating to potential conflict of interest issues. Mr. Smith stated that he believed that no such conflicts existed. A discussion followed.

Bob Bartell of D&P then led the Committees through D&P's financial analysis with regard to the solvency of the Company. Mr. Bartell noted that there is no such thing as a solvency opinion. Rather, there are a series of financial opinions which the market commonly describes as a solvency opinion. These financial opinions are as follows:

- that the book assets are greater than the book liabilities;
- that the present fair salable value of assets is greater than the liabilities;
- that the entity would not be left with an unreasonable small capital; and
- the entity will have the ability to meet its debts as they come due.

- 8 -

GBTRIB 00008119

The Committee asked Mr. Bartell if he was aware of any LBOs with the level of leverage in the Proposed Transaction. Mr. Bartell responded that the Proposed Transaction had a debt to equity ratio in excess of 95% while traditional LBOs possessed debt to equity ratios of 70% to 80%. Mr. Bartell then noted that traditional LBOs do not possess the cash flow enhancements provided by the proposed ESOP structure.

Mr. Bartell then reviewed the tax benefits of the transaction. These benefits consist of the ESOP tax benefit (the tax deduction available on contributions to the ESOP in order to permit the ESOP to repay the ESOP Note) and the S corporation tax shield. Mr. Bartell stated that while the S corporation tax shield is not available to other buyers of the Company, it is of significant value to the Company and creates additional positive operating cash flow.

D&P stated that as a preliminary matter, in its opinion, on a post-transaction basis, taking into account the S corporation tax shield, the fair salable value of the Company's assets is greater than its liabilities. In response to a question from the Committee, Mr. Bartell stated that as a preliminary matter, on a post-transaction basis, taking into account the S corporation tax shield, the Company will be able to pay its debts as they become due.

Mr. Bartell explained that D&P's analysis is based upon the Company's projections and certain downside adjustments in order to permit D&P to test the sensitivity of such projections. Mr. Bartell also cautioned the Committee that D&P is able to issue its financing opinion because of the anticipated benefits of the S corporation tax shield. If those tax benefits are not considered, D&P would be unable to render its opinion. A discussion followed.

The Committee then discussed the differing viewpoint of the Board of Directors of the Company and the Committee regarding solvency. Mr. Bartell stated that the Board is

- 9 -

GBTRIB 00008120

concerned about the fairness of a transaction and its duty to the creditors. The Committee as a buyer is concerned about the viability of the Company post-transaction and whether the investment is prudent. A discussion followed.

The Committee then discussed what steps should be taken to provide assurance that the Company's projections of financial performance, cost cutting proposals and projected sales of assets would be achieved. Further, what is the sensitivity of the Company's projections if certain assumptions are not achieved or achieved on a delayed basis. D&P indicated that upon the request of GreatBanc and D&P, the Company will provide a representation letter to D&P detailing the amount and timing of proposed cost cuts and will provide assurance on the projections. Danielle Montesano asked whether D&P had performed any sensitivity analysis with regard to (i) the Company's failure to sell the Cubs prior to December 31, 2007, or (ii) the inability to elect S corporation status effective January 1, 2008. D&P responded that they had not analyzed these points but they would do so prior to the issuance of the opinions.

Mr. Bartell then reported that the preliminary indication of the Company's debt post-transaction would be B- with a negative outlook.

Mr. Bartell and Mr. Bednas then reviewed D&P's financial analysis with the Committee. Based on projections, the Company's assets will exceed liabilities after consummation of the Proposed Transaction. Additionally, based upon management projections for years one through five with an extrapolation of those projections for years six through ten, the Company is expected to generate surplus cash in most years which will permit optional debt repayment. In addition, the projections suggest that the Company's revolving credit facility has sufficient availability to handle hiccups should they occur. While the Company will be highly

GBTRIB 00008121

leveraged, the projections suggest that the Company will not be in danger of violating any debt covenants under the terms of its financing.

D&P then reviewed the Company's base projections, a Company downside projection and a D&P downside projection. In the downside projections, the Company does not violate its financing covenants. The Committee noted that in the downside projections the Company does not show any meaningful debt reduction. The Committee questioned the downside assumptions to assess probabilities of such performance. D&P noted that the downside projection represents an extremely negative outcome particularly given that it provides for a very conservative assumption regarding the earnings generated by the Company's other investments. Danielle Montesano asked whether the downside projections considered the impact of (i) a failure to sell the Cubs in the near term; or (ii) the Company's inability to make an S corporation election effective for 2008 whether as a result of the failure to consummate the Merger in 2007 or the Company's inability to resolve the Eagles structure in 2007. In this regard it was noted that the Eagles structure consisted of several limited liability companies that were formed in conjunction with the sale of Mathew Bender by the Times Mirror Corporation prior to the acquisition of the Times Mirror by the Company. The Company believes the Eagles structure can be resolved prior to the consummation of the Merger but if cannot be resolved the Company would issue shares of preferred stock to the Eagles in the Merger and these shares of preferred stock would later be redeemed. Of concern is the fact that if the preferred shares are outstanding at any time in 2008, the Company would not be able to elect S corporation status for 2008. D&P indicated that they had not considered these possibilities in its downside analysis but that it would revise its downside analysis to consider the impact of these events.

- 11 -

GBTRIB 00008122

Michael Welgat noted that given the extent of the leverage, management would be forced to operate in an environment where there would be no capital to adapt to the market and that no acquisitions would be possible and accordingly, the ability to take advantage of opportunities would be limited. As a result, if the Company required additional funds, the only source of funds would be additional equity funding. Any additional equity would dilute the equity interests of the existing shareholders. In response to Mr. Welgat's comments, D&P indicated that the Company possessed a revolving credit facility which would be available on a post transaction basis to fund operating needs and the Company possessed non-core assets that could be sold if matters were dire.

Next, Michael Welgat asked about Sam Zell's history. D&P responded noting that Zell is sophisticated and accustomed to managing companies with debt. Moreover, he has a history as a successful business person. Mr. Welgat suggested that Marilyn Marchetti contact Mr. Zell and develope a personal relationship with Mr. Zell. The Committee agreed.

Danielle Montesano summarized stating that given the current flux in the Projected Transaction, the Committee was not being asked to approve the Proposed Transaction. Rather, the Committee was being asked to review the transaction, the basic financial analysis and terms of the Proposed Transaction. Given the nature and complexity of the deal, such a preliminary meeting was thought necessary to give the Committee time to review the Proposed Transaction and to discuss any concerns about the Proposed Transaction and determine whether there were objections to proceeding further. After further discussion and there being no further objections, upon motion duly made and seconded, the Committee voted unanimously to continue to work to finalize the terms of the Proposed Transaction.

GBTRIB 00008123

There being no further business, the meeting was adjourned at 5:00 p.m.


*Danielle C. Montesano*

Danielle C. Montesano, as drafted by Henry Snyder
of K & L Gates, L LC

GBTRIB 00008124