## Schedule I

### Commitments; List of Applicable Lending Offices

| Lender | Commitment |
|---|---|
| Merrill Lynch Capital Corporation | $448,800,000 |
| JPMorgan Chase Bank, N.A. | 448,800,000 |
| Citicorp North America, Inc. | 374,000,000 |
| Banc of America Bridge LLC | 224,400,000 |
| Barclays Bank PLC | 32,000,000 |
| Sumitomo Mitsui Banking Corporation | 24,000,000 |
| Lehman Brothers Commercial Bank | 24,000,000 |
| LaSalle Bank National Association | 24,000,000 |
| **Total** | **$1,600,000,000** |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517070

## Schedule I-A

Interest on the Advances shall not exceed 15.25% per annum (the "Total Cap") and to the extent the interest payable on Advances exceeds 14.5% per annum (the "Cash Cap"), Borrower may, at its option, cause such excess interest to be added to the principal amount of the Advances (such additional 0.75% difference between the Total Cap and Cash Cap being referred to as "PIK Interest").

Schedule I-A

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517071

## Schedule 1.01(a)

### Refinancing Debt

$2,250,000,000 Amended and Restated Credit Agreement, dated as of June 27, 2006 (amending and restating the Credit Agreement dated as of June 19, 2006), among Tribune Company, as borrower, the initial lenders named therein, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., Bank of America, N.A., Morgan Stanley Bank and the Bank of Tokyo-Mitsubishi UFJ, Ltd., Chicago Branch, as co-documentation agents, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners, as the same has been amended from time to time.

$2,150,000,000 Amended and Restated Bridge Credit Agreement, dated as of June 27, 2006 (amending and restating the Bridge Credit Agreement dated as of June 19, 2006), among Tribune Company, as borrower, the initial lenders named therein, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., as documentation agent, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners, as the same has been amended from time to time.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517072

## Schedule 1.01(b)

### TMCT Real Property

| Address(es) |
|---|
| • 202 West 1st St., Los Angles, CA 90012 (North) |
| • 145 South Spring St., Los Angeles, CA 90012 (South) |
| • 121 South Spring St., Los Angeles, CA 90012 (Plant) |
| • 110-130 South Broadway, Los Angeles, CA 90012 |
| • 220 West 1st St., Los Angeles, CA 90012 (Chandler) |
| • 220 West 1st St., Los Angeles, CA 90012 (Garage) |
| • 285-305 Broad St., Hartford, CT 06115 |
| • 300 East Cromwell St., Baltimore, MD 21230 (Sun Park) |
| • 401 Calvert Street, Baltimore, MD 21278 |
| • 501 Calvert Street, Baltimore, MD 21278 |
| • 601 Calvert Street, Baltimore, MD 21278 |
| • 11830 Westline Industrial Dr., St. Louis, MO 63146 |
| • Broome Corp. Pkwy, 136 Carlin Road, Conklin NY 13748 |
| • 25 Deshon Dr., Melville, NY 11747 (Patterson) |
| • 235 Pinelawn Rd, Melville NY 11747-4250 |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517073

<u>**Schedule 1.01(c)**</u>

<u>**Pro Forma Basis**</u>

1.  Disposition of any of the assets of, or of any Equity Interests in, Chicago National Ball Club, Inc., a Delaware corporation, or its Subsidiaries or any other assets or properties related thereto

2.  Disposition of Borrower's indirect Equity Interest in Comcast SportsNet Chicago

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517074

## Schedule 1.01(d)

**Certain Intercompany Indebtedness**

[See Attached]

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517075

Schedule 1.01(d)
Certain Intercompany Indebtedness

Holder of Debt: Los Angeles Times International, Ltd.

| Obligor | Origination Date | Maturity Date | Balance at 5/31/2007 Note Payable | Accrued Interest 1/1/07 to 5/31/07 | Total |
|---|---|---|---|---|---|
| Tribune Television Company | 03/24/1997 | 03/24/2007 | 74,960,000 | 1,448,884 | 76,408,884 |
| Tribune Television Company | 12/26/1997 | 12/26/2007 | 110,000,000 | 3,895,835 | 113,895,835 |
| The Daily Press, Inc. | 06/27/1997 | 06/30/2007 | 8,442,811 | 299,015 | 8,741,826 |
| Tribune Broadcasting Company | 05/01/1998 | 04/30/2008 | 117,200,000 | 4,150,835 | 121,350,835 |
| KHWB Inc. | 12/28/1998 | 12/31/2008 | 40,000,000 | 1,250,000 | 41,250,000 |
| Tribune Television Northwest, Inc. | 12/28/1998 | 12/31/2008 | 18,000,000 | 562,500 | 18,562,500 |
| Tribune Television New Orleans, Inc. | 12/28/1998 | 12/31/2008 | 18,000,000 | 562,500 | 18,562,500 |
| WBDC Broadcasting, Inc. | 12/20/1999 | 12/20/2009 | 60,000,000 | 1,875,000 | 61,875,000 |
| Newsday, Inc. | 06/12/2000 | 06/12/2010 | 772,000,000 | 23,320,835 | 795,320,835 |
| The Baltimore Sun Company | 06/12/2000 | 06/12/2010 | 420,000,000 | 12,687,500 | 432,687,500 |
| The Hartford Courant Company | 06/12/2000 | 06/12/2010 | 284,000,000 | 8,579,165 | 292,579,165 |
| The Morning Call, Inc. | 06/12/2000 | 06/12/2010 | 164,000,000 | 4,954,165 | 168,954,165 |
| Southern Connecticut Newspaper, Inc. | 06/12/2000 | 06/12/2010 | 40,000,000 | 1,208,335 | 41,208,335 |
| Los Angeles Times Communication LLC | 06/12/2000 | 06/12/2010 | 1,000,000,000 | 30,208,335 | 1,030,208,335 |
| Virginia Gazette Companies, LLC | 12/20/2001 | 12/20/2011 | 25,000,000 | 739,585 | 25,739,585 |
| WTXX, Inc. | 12/20/2001 | 12/20/2011 | 5,000,000 | 147,915 | 5,147,915 |
| Tower Distribution Company | 12/20/2001 | 12/20/2011 | 84,000,000 | 2,485,000 | 86,485,000 |
| KPLR, Inc. | 03/21/2003 | 03/21/2013 | 100,000,000 | 2,016,665 | 102,016,665 |
| Tribune Broadcast Holdings, Inc. | 03/21/2003 | 03/21/2013 | 10,000,000 | 201,665 | 10,201,665 |
| Tribune Broadcast Holdings, Inc. | 01/01/2003 | 01/01/2013 | 80,000,000 | 1,683,335 | 81,683,335 |
| Tribune National Marketing Company | 01/01/2003 | 01/01/2013 | 233,313,323 | 4,850,975 | 238,164,298 |
| Tribune Media Services, Inc. | 07/24/2003 | 07/24/2013 | 53,000,000 | 1,064,415 | 54,064,415 |
| Tribune Media Net | 12/20/2006 | 12/20/2016 | 6,600,000 | 206,250 | 6,806,250 |
| Tribune Media Net | 12/20/2006 | 12/20/2016 | 142,000,000 | 4,437,500 | 146,437,500 |
| Total | | | 3,865,516,134 | 112,816,209 | 3,978,332,343 |

TRB0517076

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**Schedule 1.01(e)**

**Closing Date Guarantors**

The Baltimore Sun Company
Chicago Tribune Company
The Daily Press, Inc.
The Hartford Courant Company
Orlando Sentinel Communications Company
The Morning Call, Inc.
Sun-Sentinel Company
Newsday, Inc.
Tribune Interactive, Inc.
Tribune Los Angeles, Inc.
Tribune Media Services, Inc.
Tribune Broadcasting Company
KHCW Inc.
KSWB Inc.
KPLR, Inc.
KTLA Inc.
KWGN Inc.
Tower Distribution Company
Tribune Broadcast Holdings, Inc.
Tribune Entertainment Company
Tribune Television Company
Channel 40, Inc.
Channel 39, Inc.
Tribune Television Holdings, Inc.
Tribune Television New Orleans, Inc.
Tribune Television Northwest, Inc.
WDCW Broadcasting, Inc.
WGN Continental Broadcasting Company
WPIX, Inc.
Tribune Finance, LLC
Homestead Publishing Company
Patuxent Publishing Company
Chicagoland Publishing Company
Tribune Direct Marketing, Inc.
Virginia Gazette Companies, LLC
Forum Publishing Group, Inc.
Courant Specialty Products, Inc.
New Mass Media, Inc.
TMLH2, Inc.
Southern Connecticut Newspapers, Inc.
TMLS I, Inc.
Gold Coast Publications, Inc.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517077

Distribution Systems of America, Inc.
Los Angeles Times Communications LLC
Tribune Manhattan Newspaper Holdings, Inc.
Tribune New York Newspaper Holdings, LLC
TMS Entertainment Guides, Inc.
Tribune Media Net, Inc.
Tribune National Marketing Company
Tribune Broadcasting Holdco, LLC
ChicagoLand Television News, Inc.
5800 Sunset Productions Inc.
Tribune (FN) Cable Ventures, Inc.
WTXX Inc.
Chicago National League Ball Club, Inc.
Tribune California Properties, Inc.
California Community News Corporation
Hoy Publications, LLC
Eagle New Media Investments, LLC
Newport Media, Inc.
Star Community Publishing Group, LLC
Stemweb, Inc.
ForSaleByOwner.com Corp.
Homeowners Realty, Inc.
Internet Foreclosure Service, Inc.
Eagle Publishing Investments, LLC

Schedule 1.01(e)

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**
TRB0517078

Schedule 2.04(a)

**Fiscal Quarters**

December 30, 2007
March 30, 2008
June 29, 2008
September 28, 2008
December 28, 2008
March 29, 2009
June 28, 2009
September 27, 2009
December 27, 2009
March 28, 2010
June 27, 2010
September 26, 2010
December 26, 2010
March 27, 2011
June 26, 2011
September 25, 2011
December 25, 2011
March 25, 2012
June 24, 2012
September 23, 2012
December 30, 2012
March 31, 2013
June 30, 2013
September 29, 2013
December 29, 2013
March 30, 2014
June 29, 2014
September 28, 2014
December 28, 2014
March 29, 2015
June 28, 2015
September 27, 2015
December 27, 2015

Schedule 2.04(a)

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0517079

**Schedule 4.01(f)**

**Litigation**

FCC Matters

On November 30, 2007, the FCC issued an order (the "Order") granting the applications of Tribune Company to transfer control of the Company to the Tribune Employee Stock Ownership Plan as implemented through the Tribune Employee Stock Ownership Trust, EGI-TRB, L.L.C., and Sam Zell. In the Order, the FCC denied the Company's requests for temporary waivers of the FCC newspaper-broadcast cross-ownership rule, 47 C.F.R. § 73.3555(d), pending the outcome of the rulemaking proceeding in which that rule is being reviewed by the FCC, in order to permit continued common ownership of newspapers and broadcast stations in the following markets:

- Miami, Florida – WSFL-TV and the *South Florida Sun-Sentinel*;

- Hartford, Connecticut – WTXX(TV), WTIC-TV and the *Hartford Courant*;

- Los Angeles, California – KTLA(TV) and the *Los Angeles Times*; and

- New York, New York – WPIX(TV) and *Newsday*.

Instead, the FCC granted the Company temporary waivers of the newspaper-broadcast cross-ownership rule in Miami, Hartford, Los Angeles, and New York for a six month period beginning January 1, 2008. The six-month waiver is automatically extended under two conditions: (1) if the Company appeals the Order, the waivers are extended for two years or six months after the conclusion of the litigation over the Order, whichever is longer; or (2) if the FCC adopts a revised newspaper-broadcast cross-ownership rule prior to January 1, 2008, the waivers are extended for a two year period, provided that in the event that the revised rule is the subject of a judicial stay, the waiver is extended until six months after the expiration of any such stay.

The Order also granted Tribune a permanent waiver of the newspaper-broadcast cross-ownership rule to permit continued common ownership of WGN(AM), WGN-TV, and the *Chicago Tribune* in Chicago, Illinois; a "failing station" waiver of the television duopoly rule to permit continued common ownership of WTXX(TV) and WTIC-TV in Hartford, Connecticut, and granted satellite station status to WTTK(TV), Kokomo, Indiana, to permit continued common ownership with WTTV(TV), Bloomington, Indiana.

The Company filed an appeal of the Order in the United States Court of Appeals for the District of Columbia Circuit on December 3, 2007, thus automatically extending the waivers for two years or until six months after the conclusion of that appeal, whichever is longer. The Order may be the subject of other court challenges or petitions for reconsideration at the FCC.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517080

**Schedule 4.01(p)**

**Subsidiaries**

| Subsidiary | Owner of Equity Interest | Type of Entity |
|---|---|---|
| Tribune Finance, LLC | Tribune Company | Limited Liability Company |
| Tribune Publishing Company | Tribune Company | Corporation |
| The Baltimore Sun Company | Tribune Company | Corporation |
|   Homestead Publishing Company | The Baltimore Sun Company | Corporation |
|     Patuxent Publishing Company | Homestead Publishing Company | Corporation |
|       Baltimore Newspaper Network, Inc. | Patuxent Publishing Company | Corporation |
|   Signs of Distinction, Inc. (Forfeited) | The Baltimore Sun Company | Corporation |
| Chicago Tribune Company | Tribune Company | Corporation |
|   Chicagoland Publishing Company | Chicago Tribune Company | Corporation |
|   Chicago Tribune Newspapers, Inc. | Chicago Tribune Company | Corporation |
|   Chicago Tribune Press Service, Inc. | Chicago Tribune Company | Corporation |
|   Newspaper Readers Agency, Inc. | Chicago Tribune Company | Corporation |
|   Tribune Direct Marketing, Inc. | Chicago Tribune Company | Corporation |
| The Daily Press, Inc. | Tribune Company | Corporation |
|   Virginia Gazette Companies, LLC | The Daily Press, Inc. | Limited Liability Company |
|   Virginia Community Shoppers, LLC | The Daily Press, Inc. | Limited Liability Company |
| Forum Publishing Group, Inc. | Tribune Company | Corporation |
| The Hartford Courant Company | Tribune Company | Corporation |
|   Courant Specialty Products, Inc. | The Hartford Courant Company | Corporation |
|     New Mass Media, Inc. | Courant Specialty Products, Inc. | Corporation |
|   Heart & Crown Advertising, Inc. | The Hartford Courant Company | Corporation |
|   TMLH2, Inc. | The Hartford Courant Company | Corporation |
| Orlando Sentinel Communications Company | Tribune Company | Corporation |
|   Neocomm, Inc. | Orlando Sentinel Communications Company | Corporation |
|   Sentinel Communications News Ventures, Inc. | Orlando Sentinel Communications Company | Corporation |
| The Morning Call, Inc. | Tribune Company | Corporation |
|   Direct Mail Associates, Inc. | The Morning Call, Inc. | Corporation |
| Southern Connecticut Newspapers, Inc. | Tribune Company | Corporation |
|   TMLS I, Inc. | Southern Connecticut Newspapers, Inc. | Corporation |
| Sun-Sentinel Company | Tribune Company | Corporation |
|   Gold Coast Publications, Inc. | Sun-Sentinel Company | Corporation |
| Newsday, Inc. | Tribune Company | Corporation |
|   Distribution Systems of America, Inc. | Newsday, Inc. | Corporation |
| Hoy Publications, LLC | Tribune Company | Limited Liability Company |
| Tribune Interactive, Inc. | Tribune Company (88.5%) Chicago Tribune Company (11.5%) | Corporation |
| Tribune Los Angeles, Inc. | Tribune Company | Corporation |

Schedule 4.01(p)

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0517081

| Subsidiary | Owner of Equity Interest | Type of Entity |
|---|---|---|
| Los Angeles Times Communications LLC | Tribune Los Angeles, Inc. | Limited Liability Company |
| Los Angeles Times Newspapers, Inc. | Tribune Company | Corporation |
| Tribune Manhattan Newspaper Holdings, Inc. | Tribune Company | Corporation |
| Tribune New York Newspaper Holdings, LLC | Tribune Manhattan Newspaper Holdings, Inc. | Limited Liability Company |
| Tribune Media Services, Inc. | Tribune Company | Corporation |
| TMS Entertainment Guides, Inc. | Tribune Media Services, Inc. | Corporation |
| TMS Entertainment Guides Canada Corp | TMS Entertainment Guides, Inc. | Corporation |
| Tribune Media Services, BV | Tribune Company | Foreign Entity |
| Tribune Media Net, Inc. | Tribune Company | Corporation |
| Tribune National Marketing Company | Tribune Company | Corporation |
| Tribune Broadcasting Holdco, LLC | Tribune Company | Limited Liability Company |
| Tribune Broadcasting Company | Tribune Broadcasting Holdco, LLC | Corporation |
| ChicagoLand Microwave Licensee, Inc. | Tribune Broadcasting Company | Corporation |
| ChicagoLand Television News, Inc. | Tribune Broadcasting Company | Corporation |
| KHCW Inc. | Tribune Broadcasting Company | Corporation |
| KSWB Inc. | Tribune Broadcasting Company | Corporation |
| KPLR, Inc. | Tribune Broadcasting Company | Corporation |
| KTLA Inc. | Tribune Broadcasting Company | Corporation |
| KWGN Inc. | Tribune Broadcasting Company | Corporation |
| Oak Brook Productions, Inc. | Tribune Broadcasting Company | Corporation |
| Tower Distribution Company | Tribune Broadcasting Company | Corporation |
| Tribune Broadcasting News Network, Inc. | Tribune Broadcasting Company | Corporation |
| Tribune Broadcast Holdings, Inc. | Tribune Broadcasting Company | Corporation |
| Tribune Entertainment Company | Tribune Broadcasting Company | Corporation |
| Magic T Music Publishing Company | Tribune Entertainment Company | Corporation |
| Tribune Entertainment Production Company | Tribune Entertainment Company | Corporation |
| 435 Production Company | Tribune Entertainment Production Company | Corporation |
| 5800 Sunset Productions Inc. | Tribune Entertainment Production Company | Corporation |
| Chicago River Production Company | Tribune Entertainment Production Company | Corporation |
| North Michigan Production Company | Tribune Entertainment Production Company | Corporation |
| Towering T Music Publishing Company | Tribune Entertainment Company | Corporation |
| Tribune (FN) Cable Ventures, Inc. | Tribune Broadcasting Company | Corporation |
| Tribune Network Holdings Company | Tribune Broadcasting Company | Corporation |
| Tribune Television Company | Tribune Broadcasting Company | Corporation |
| Channel 20, Inc. | Tribune Television Company | Corporation |
| Channel 40, Inc. | Tribune Television Company | Corporation |
| Channel 39, Inc. | Tribune Television Company | Corporation |
| WDCW Broadcasting, Inc. | Tribune Television Company | Corporation |
| WTXX Inc. | Tribune Television Company | Corporation |
| Tribune Television Holdings, Inc. | Tribune Broadcasting Company | Corporation |

Schedule 4.01(p)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517082

| Subsidiary | Owner of Equity Interest | Type of Entity |
|---|---|---|
| Tribune Television New Orleans, Inc. | Tribune Broadcasting Company | Corporation |
| Tribune Television Northwest, Inc. | Tribune Broadcasting Company | Corporation |
| WATL, LLC | Tribune Broadcasting Company | Limited Liability Company |
| WGN Continental Broadcasting Company | Tribune Broadcasting Company | Corporation |
| Tribune Sports Network Holdings, LLC | WGN Continental Broadcasting Company | Limited Liability Company |
| WPIX, Inc. | Tribune Broadcasting Company | Corporation |
| WLVI, Inc. | Tribune Broadcasting Company | Corporation |
| WCWN, LLC | WLVI, Inc. | Limited Liability Company |
| Chicago National League Ball Club, Inc. | Tribune Company | Corporation |
| Chicago Cubs Dominican Baseball Operations, Inc. | Chicago National League Ball Club, Inc. | Corporation |
| Diana-Quentin, Inc. | Tribune Company | Corporation |
| Wrigley Field Premium Ticket Services, Inc. | Tribune Company | Corporation |
| Tribune California Properties, Inc. | Tribune Company | Corporation |
| California Community News Corporation | Tribune Company | Corporation |
| Los Angeles Times International, Ltd. | Tribune Company | Corporation |
| Newscom Services, Inc. | Los Angeles Times International, Ltd. | Corporation |
| Chicago Avenue Construction Company | Chicago Tribune Company | Corporation |
| Greenco, Inc. | Tribune Company | Corporation |
| JuliusAir Company, LLC | Tribune Company | Limited Liability Company |
| JuliusAir Company II, LLC | Tribune Company | Limited Liability Company |
| Riverwalk Center I Joint Venture | Tribune Company (93%) Sun-Sentinel Company (7%) | Partnership |
| Tribune Finance Service Center, Inc. | Tribune Company | Corporation |
| Fairfax Media, Inc. | Tribune Company (72.4%) | Corporation |
| North Orange Avenue Properties, Inc. (Inactive) | Orlando Sentinel Communications Company | Corporation |
| New River Maintenance Association | Tribune Company | Corporation |
| TM Payroll Processing Co. Inc. | Tribune Company | Corporation |
| Tribune Hong Kong Ltd. | Tribune Company | Foreign Entity |
| TM Services Co., Inc. | Tribune Company | Corporation |
| Times Mirror Land & Timber Company | Tribune Company | Corporation |
| Shepard's, Inc. | Tribune Company | Corporation |
| Publisher's Forest Products Company of Washington | Tribune Company | Corporation |
| Multimedia Insurance Company | Tribune Company | Corporation |
| Tribune License, Inc. | Los Angeles Times Communications, LLC (40.4%) California Community News Corporation (1.1%) The Baltimore Sun Company (10.9%) TMLH 2, Inc. (13%) The Morning Call, Inc. (5.8%) Newsday, Inc. (26.7%) TMLS1, Inc. (2.1%) | Corporation |
| Candle Holdings Corp. | Tribune Company | Corporation |

Schedule 4.01(p)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517083

| Subsidiary | Owner of Equity Interest | Type of Entity |
|---|---|---|
| Fortify Holdings Corp. | Tribune Company | Corporation |
| Eagle New Media Investments, LLC | Tribune Company | Limited Liability Company |
| Newport Media, Inc. | Eagle New Media Investments, LLC | Corporation |
| Star Community Publishing Group, LLC | Newport Media, Inc. (50%) Distribution Systems of America, Inc. (50%) | Limited Liability Company |
| ValuMail, Inc. | Eagle New Media Investments, LLC | Corporation |
| Stemweb, Inc. | Eagle New Media Investments, LLC | Corporation |
| ForSaleByOwner.com Corp. | Stemweb, Inc. | Corporation |
| Homeowners Realty, Inc. (reinstatement pending) | Stemweb, Inc. | Corporation |
| Internet Foreclosure Service, Inc. | Stemweb, Inc. | Corporation |
| Eagle Publishing Investments, LLC | Tribune Company | Limited Liability Company |

| Classes of Equity Interests in Tribune Company[1] |
|---|
| 1.  Tribune Company common stock, par value $0.01 per share (and warrants to purchase same) |

---

[1] This disclosure assumes consummation of the Second Step Transactions.

Schedule 4.01(p)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517084

## Schedule 5.02(a)

### Existing Liens

Attached.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517085

## Schedule 5.02(c)(ii)

### Existing Debt

See Note 12 in the Form 10-Q filed by Borrower for the quarterly period ended September 30, 2007 for a list of Debt outstanding as of September 30, 2007.

Guaranty by Newsday, Inc. in connection with sublease by Tribune New York Newspaper Holdings, LLC (as assignee from Hoy, LLC, as assignee from DSA Community Publishing, LLC) of approximately 21,000 square feet of space located at 330 West 34th Street, New York, New York pursuant to a Sublease Agreement dated as of August 8, 2003, as amended.

Guaranty by Borrower for up to 50% of the purchase price for Microsoft's contemplated investment of up to 5% in CareerBuilder, LLC in the event that CareerBuilder does not have sufficient funds to consummate the repurchase of Microsoft's interest in CareerBuilder following the exercise of a put right granted to Microsoft in connection with its investment in CareerBuilder.

Schedule 5.02(c)(ii)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517086

## Schedule 5.02(e)

### Asset Sales

1. Disposition of any of the assets of, or of any Equity Interests in, Chicago National Ball Club, Inc., a Delaware corporation, or its Subsidiaries or any other assets or properties related thereto

2. Disposition of Borrower's indirect Equity Interest in Comcast SportsNet Chicago

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517087

EXHIBIT A

## [FORM OF] NOTE

$__   _____                                              _____ _____ ___, 20___

FOR VALUE RECEIVED, TRIBUNE COMPANY, a Delaware corporation (the "Bor-rower"), promises to pay to the order of [NAME OF LENDER] (the "Lender") on the Initial Ma-turity Date (or, pursuant to Section 2.06(d) of the Credit Agreement (as defined below), the Final Maturity Date) the principal sum of _____ _____ DOLLARS ($_____ ___) or, if less, the aggregate unpaid principal amount of all Advances shown on the schedule attached hereto made by the Lender pursuant to that certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lender and certain other lenders party thereto and Merrill Lynch Capital Corporation, as the Agent. Terms used in this Note, unless otherwise defined herein, have the meanings provided in the Credit Agreement.

The Borrower also promises to pay interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until the Initial Maturity Date (or, pursuant to Sec-tion 2.06(d) of the Credit Agreement, the Final Maturity Date) (whether by acceleration or oth-erwise) and, after the Initial Maturity Date (or, pursuant to Section 2.06(d) of the Credit Agree-ment, the Final Maturity Date), until paid, at the rates per annum and on the dates specified in the Credit Agreement.

Payments of both principal and interest are to be made in Dollars in same day funds to the account designated by the Agent pursuant to the Credit Agreement.

This Note is one of the Notes referred to in, and evidences Debt incurred under, the Credit Agreement, to which reference is made for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments of principal of the Debt evidenced by this Note and on which such Debt may be declared to be immediately due and payable.

All parties hereto, whether as makers, endorsers, or otherwise, severally waive present-ment for payment, demand, protest and notice of dishonor.

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517089**

TRIBUNE COMPANY

By: _____
     Name:
     Title:

A-2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517090

## ADVANCES AND PRINCIPAL PAYMENTS

| Date | Amount of Advance | Amount of Principal Payment | Outstanding Principal Balance | Notation Made By |
|------|-------------------|-----------------------------|-------------------------------|------------------|
|      |                   |                             |                               |                  |
|      |                   |                             |                               |                  |
|      |                   |                             |                               |                  |
|      |                   |                             |                               |                  |
|      |                   |                             |                               |                  |
|      |                   |                             |                               |                  |
|      |                   |                             |                               |                  |
|      |                   |                             |                               |                  |

A-3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517091

EXHIBIT B

[FORM OF] NOTICE OF BORROWING

Merrill Lynch Capital Corporation,
   as Agent for the Lenders parties to
   the Credit Agreement referred to below
[                     ]

Attention: [        ]

TRIBUNE COMPANY

     The undersigned, Tribune Company, refers to the Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007 (as amended or modified from time to time, the "Credit Agreement", the terms defined therein being used herein as therein defined), among the undersigned, certain Lenders parties thereto and Merrill Lynch Capital Corporation, as Agent for said Lenders, and hereby gives you notice, irrevocably, pursuant to Section 2.02 of the Credit Agreement that the undersigned hereby requests a Borrowing under the Credit Agreement, and in connection therewith sets forth below the information relating to such Borrowing (the "Proposed Borrowing") as required by Section 2.02(a) of the Credit Agreement:

        (i)     The Business Day of the Proposed Borrowing is [_____], 20[__].

        (ii)    The Type of Advances comprising the Proposed Borrowing are [Base Rate Advances] [Eurodollar Rate Advances].

        (iii)   The aggregate amount of the Proposed Borrowing is $[_____].

        [(iv)   The initial Interest Period for each Eurodollar Rate Advance made as part of the Proposed Borrowing is [_] month[s].]

     The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

        (A)    the representations and warranties contained in Section 4.01 of the Credit Agreement (except the representations set forth in the last sentence of clause (c)(i) thereof are correct in all material respects (except to the extent such representation and warranty is already qualified by materiality or Material Adverse Effect, in which case such representation or warranty shall be correct in all respects), before and after giving effect to the Proposed Borrowing and to the application of the proceeds therefrom, as though made on and as of such date, except to the extent any such representation or warranty, by its terms, refers to a different specific date other than the date of such Borrowing, in which case as of such specific date; and

B-1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0517092

    (B)        no event has occurred and is continuing, or would result from such Proposed Borrowing or from the application of the proceeds therefrom, that would result in a Default.

IN WITNESS WHEREOF, the Borrower has caused this Notice of Borrowing to be executed and delivered, and the certifications and warranties contained herein to be made, by its duly authorized officer this \_\_\_\_\_ day of _____, _____.

TRIBUNE COMPANY

By:   _____

        Name:

        Title:

B-2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517093

EXHIBIT C

[FORM OF] ASSIGNMENT AND ACCEPTANCE

This Assignment and Assumption (the "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "<u>Assignor</u>") and [*Insert name of Assignee*] (the "<u>Assignee</u>"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex I attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "<u>Assigned Interest</u>"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.   Assignor: _____

2.   Assignee: _____
     [and is an Affiliate of [*identify Lender*]¹]

3.   Borrower:   Tribune Company

_____

¹ Select as applicable.

C-1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517094**

4.    Agent :                    Merrill Lynch Capital Corporation,

5.    Credit Agreement:    The $1,600,000,000 Senior Unsecured Interim Loan Agreement
                            dated as of December 20, 2007 among Tribune Company, each
                            lender from time to time party thereto and Merrill Lynch Capital
                            Corporation, as Agent.

6.    Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/Advances for all Lenders | Amount of Commitment/ Advances Assigned | Percentage Assigned of Commitment/ Advances [2] |
|---|---|---|---|
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |

Effective Date:  _____, 20___  [TO BE INSERTED BY AGENT AND WHICH
SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE
REGISTER THEREFOR.]

*The Assignee agrees to deliver to the Agent a completed Administrative Questionnaire in which
the Assignee designates one or more credit contacts to whom all syndicate-level information
(which may contain material non-public information about the Loan Parties and their related
parties or their respective securities) will be made available, who will comply with Section 8.08
of the Credit Agreement and who may receive such information in accordance with the As-
signee's compliance procedures and applicable laws, including Federal and state securities
laws.*

---

[2] Set forth, to at least 9 decimals, as a percentage of the Commitment/ Advances of all Lenders there-
under.

C-2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

[NAME OF ASSIGNOR]

By _____
      Title:

ASSIGNEE

[NAME OF ASSIGNEE]

By _____
      Title:

C-3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517096

[Consented to and][3] Accepted:

Merill Lynch Capital Corporation,
   as Agent

By   _____    _____
     Title:

[Consented to:][4]

[NAME OF RELEVANT PARTY]

By   _____    _____
     Title:

---

[3] To be added only if the consent of the Agent is required by the terms of the Credit Agreement.

[4] To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

C-4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517097

ANNEX 1

## STANDARD TERMS AND CONDITIONS FOR
## ASSIGNMENT AND ASSUMPTION

1.    Representations and Warranties.

1.1    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received and/or had the opportunity to review a copy of the Credit Agreement to the extent it has in its sole discretion deemed necessary, together with copies of the most recent financial statements delivered pursuant to Section 5.01(i) thereof, as applicable, and such other documents and information as it has in its sole discretion deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Agent or any other Lender, and (v) if it is a Non-U.S. Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

C-5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

2.      Payments. From and after the Effective Date, the Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.      General Provisions. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

C-6

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0517099

EXHIBIT D

[FORM OF] OPINION OF
COUNSEL FOR THE COMPANY


[Distributed Separately]

D-1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

EXHIBIT E

[FORM OF]
SOLVENCY CERTIFICATE

TRIBUNE COMPANY

This Solvency Certificate (this "Certificate"), dated as of December 20, 2007, is delivered pursuant to Section 3.01(b)(i) of the Senior Unsecured Interim Loan Agreement, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), among Tribune Company, a Delaware corporation (the "Borrower"), the Lenders party thereto and Merrill Lynch Capital Corporation, as the administrative agent (in such capacity, the "Agent") for the Lenders. Capitalized terms used herein, unless otherwise defined herein, have the meanings provided in the Credit Agreement.

I hereby certify to you and each Lender, in good faith and to the best of my knowledge and belief, in my capacity as Chief Financial Officer of the Borrower, and not individually, as follows:

I am the duly qualified and acting Chief Financial Officer of the Borrower.

I have reviewed such information as I have deemed relevant for purposes of this certificate, including the opinion of Valuation Research Corporation, dated December [  ], 2007, which opinion provides by its terms that it may be relied upon by the officers of the Company.

As of the date hereof, immediately after giving effect to the Second Step Transactions, the Borrower is Solvent.

[SIGNATURE ON FOLLOWING PAGE]

E-1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0517101

IN WITNESS WHEREOF, the undersigned has executed and delivered this Certificate as of the date first above written.

TRIBUNE COMPANY

By: _____
       Name:
       Title:

E-2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517102**

EXHIBIT F

[FORM OF] GUARANTEE AGREEMENT dated as of December 20, 2007, among Tribune Company ("Borrower"), each of the subsidiaries of Borrower listed on Annex I hereto (each such subsidiary individually, a "Guarantor" and, collectively, the "Guarantors") and MERRILL LYNCH CAPITAL CORPORATION ("Merrill Lynch"), as administrative agent (the "Agent") for the Lenders (as defined below).

Reference is made to the Credit Agreement dated as of December 20, 2007 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Borrower, the lenders from time to time party thereto (the "Lenders"), the Agent and the other parties thereto. Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The Lenders have agreed to make Advances to Borrower, pursuant to, and upon the terms and subject to the conditions specified in, the Credit Agreement. Each of the Guarantors acknowledges that it will derive substantial benefit from the making of the Advances by the Lenders. The obligations of the Lenders to make Advances are conditioned on, among other things, the execution and delivery by the Guarantors of a Guarantee Agreement in the form hereof. As consideration therefor and in order to induce the Lenders to make Advances, the Guarantors are willing to execute this Agreement.

Accordingly, the parties hereto agree as follows:

SECTION 1. Guarantee. Subject to Section 3 hereof, each Guarantor unconditionally guarantees, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, all of (a) the Obligations and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of the Borrower and each Loan Party under or pursuant to the Credit Agreement and the other Loan Documents (all the monetary and other obligations described in the preceding clauses (a) and (b) being collectively called the "Guaranteed Obligations"). Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice to or further assent from it, and that it will remain bound upon its guarantee notwithstanding any extension or renewal of any Guaranteed Obligation.

SECTION 2. Guaranteed Obligations Not Waived. Subject to Section 3 hereof, to the fullest extent permitted by applicable law, each Guarantor waives presentment to, demand of payment from and protest to Borrower of any of the Guaranteed Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment. To the fullest extent permitted by applicable law, the obligations of each Guarantor hereunder shall not be affected by (a) the failure of the Agent or any other Lender to assert any claim or demand or to enforce or exercise any right or remedy against Borrower or any other Guarantor under the provisions of the Credit Agreement, any other Loan Document or otherwise, (b) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement, any other Loan Document, any Guarantee or any other agreement, including with respect to any other Guarantor under this Agreement, (c) the failure to perfect any security interest in, or the release of, any of the security held by or on behalf of the Agent or any other Lender or (d) any other act or omission that may or might in any manner or to any extent vary

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

-2-

the risk of any Guarantor or otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of all the Guaranteed Obligations).

SECTION 3. Subordination. The payment of all Guaranteed Obligations is subordinated in right of payment to the prior payment in full in cash or Cash Equivalents of all obligations guaranteed by the Guarantors with respect to the Senior Secured Credit Agreement (or any replacement agreement in accordance with the Credit Agreement).

The lenders under the Senior Secured Credit Agreement will be entitled to receive payment in full in cash or Cash Equivalents of all obligations due in respect of the Senior Secured Credit Agreement (including interest accruing after the commencement of any bankruptcy or other like proceeding at the rate specified in the Senior Secured Credit Agreement whether or not such interest is an allowed claim in any such proceeding) before the Lenders will be entitled to receive any payment or distribution of any kind or character with respect to any Guaranteed Obligations in the event of any distribution to creditors of any Guarantor (a) in a total or partial liquidation, dissolution or winding up of such Guarantor; (b) in a bankruptcy, reorganization, insolvency, receivership or similar proceeding relating to such Guarantor or its property; (c) in an assignment for the benefit of creditors; or (d) in any marshalling of such Guarantor's assets and liabilities.

No Guarantor may make any payment or distribution of any kind or character with respect to any Guaranteed Obligations or the Advances or acquire any Advances for cash or property or otherwise if (a) a payment default under the Senior Secured Credit Agreement occurs and is continuing; or (b) any other default occurs and is continuing under the Senior Secured Credit Agreement that permits lenders under the Senior Secured Credit Agreement to accelerate its maturity and the Agent receives a written notice of such default (a "Payment Blockage Notice") from the agent under the Senior Secured Credit Agreement.

Payments on and distributions with respect to any Guaranteed Obligations may and shall be resumed (a) in the case of a payment default, upon the date on which such default is cured or waived; and (b) in case of a nonpayment default, the earliest of (x) the date on which all nonpayment defaults are cured or waived (so long as no other event of default under the Senior Secured Credit Agreement exists), (y) 180 days after the date on which the applicable Payment Blockage Notice is received by the Agent or (z) the date on which the Agent receives notice from the agent under the Senior Secured Credit Agreement rescinding the Payment Blockage Notice, in each case unless the maturity of the Senior Secured Credit Agreement has been accelerated.

No new Payment Blockage Notice may be delivered or shall be effective unless and until 360 days have elapsed since the effectiveness of the immediately prior Payment Blockage Notice.

No nonpayment default that existed or was continuing on the date of delivery of any Payment Blockage Notice to the Agent shall be, or be made, the basis for a subsequent Payment Blockage Notice unless such default shall have been cured or waived for a period of not less than 90 consecutive days (it being acknowledged that any subsequent action, or any breach

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517104**

-3-

of any financial covenants for a period commencing after the date of delivery of such initial Payment Blockage Notice that in either case would give rise to a default pursuant to any provisions under which a default previously existed or was continuing shall constitute a new default for this purpose).

If there are amounts outstanding under the Senior Secured Credit Agreement, no Guarantor may pay its Guaranteed Obligations until five Business Days after the administrative agent under the Senior Secured Credit Agreement receives notice of such acceleration and, thereafter, may pay its Guaranteed Obligations only if the Credit Agreement and this Guarantee otherwise permits payment at that time.

If a distribution is made to Lenders that, due to this Section 3, should not have been made to them, such Lenders shall hold it in trust for the lenders under the Senior Secured Credit Agreement and pay it over to them as their interests may appear.

No right of any lender under the Senior Secured Credit Agreement to enforce the subordination of the obligations of a Guarantor under this Agreement shall be impaired by any act or failure to act by such Guarantor or by its failure to comply with this Agreement.

SECTION 4.  Guarantee of Payment.  Subject to Section 3 hereof, each Guarantor further agrees that its guarantee constitutes a guarantee of payment when due and not of collection, and waives any right to require that any resort be had by the Agent or any other Lender to any security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of the Agent or any other Lender in favor of Borrower or any other person.

SECTION 5.  No Discharge or Diminishment of Guarantee.  The obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including any claim of waiver, release, surrender, alteration or compromise of any of the Guaranteed Obligations, and shall not be subject to any defense (other than a defense of payment) or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Lender to assert any claim or demand or to enforce any remedy under the Credit Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Guarantor or that would otherwise operate as a discharge of each Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of all the Guaranteed Obligations).

SECTION 6.  Defenses of Borrower Waived.  To the fullest extent permitted by applicable law, each of the Guarantors waives any defense based on or arising out of any defense of Borrower (other than the defense of payment in full) or the unenforceability of the Guaranteed

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

-4-

Obligations or any part thereof from any cause, or the cessation from any cause of the liability of Borrower, other than the final and indefeasible payment in full in cash of the Guaranteed Obligations. The Agent and the other Lenders may, at their election if applicable, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with Borrower or any other guarantor or exercise any other right or remedy available to them against Borrower or any other guarantor, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Guaranteed Obligations have been fully, finally and indefeasibly paid in cash. Pursuant to applicable law, each of the Guarantors waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Guarantor against any Borrower or any other Guarantor or guarantor, as the case may be, or any security.

SECTION 7. Agreement to Pay; Subordination of Obligations other than Senior Secured Credit Agreement. Subject to Section 3 hereof, in furtherance of the foregoing and not in limitation of any other right that the Agent or any other Lender has at law or in equity against any Guarantor by virtue hereof, upon the failure of Borrower or any other Loan Party to pay any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each Guarantor hereby promises to and upon written demand will promptly pay, or cause to be paid, to the Agent or such other Lender as designated thereby in cash the amount of such unpaid Guaranteed Obligations. Upon payment by any Guarantor of any sums to the Agent or any Lender as provided above, all rights of such Guarantor against Borrower arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Guaranteed Obligations. Subject to Section 3 hereof, in addition, any indebtedness of Borrower now or hereafter held by any Guarantor is hereby subordinated in right of payment to the prior payment in full in cash of the Guaranteed Obligations, except to the extent payments, prepayments or redemptions of any such indebtedness are permitted under Section 5.02(j) of the Credit Agreement. Subject to Section 3 hereof, if any amount shall erroneously be paid to any Guarantor on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of Borrower (other than any indebtedness permitted to be paid, repaid or redeemed pursuant to Section 5.02(j) of the Credit Agreement), such amount shall be held in trust for the benefit of the Lenders and shall forthwith be paid to the Agent to be credited against the payment of the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Loan Documents. Each Guarantor, for the benefit of the Agent and the Lenders, shall enter into an indemnity, subrogation and contribution agreement substantially in the form of Exhibit 2 hereto.

SECTION 8. Information. Each of the Guarantors assumes all responsibility for being and keeping itself informed of Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

-5-

agrees that none of the Agent or the other Lenders will have any duty to advise any of the Guarantors of information known to it or any of them regarding such circumstances or risks.

SECTION 9.  Representations and Warranties.  Each of the Guarantors represents and warrants as to itself that all representations and warranties relating to it contained in the Credit Agreement are true and correct.

SECTION 10.  Termination.  The Guarantees made hereunder (a) shall terminate when all the Guaranteed Obligations (other than contingent obligations for unasserted claims) have been paid in full in cash and the Lenders have no further commitments to lend under the Credit Agreement and (b) shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Guaranteed Obligation is rescinded or must otherwise be restored by any Lender or any Guarantor upon the bankruptcy or reorganization of Borrower, any Guarantor or otherwise.  In connection with the foregoing, the Agent shall execute and deliver to such Guarantor or Guarantor's designee, at such Guarantor's expense, any documents or instruments which such Guarantor shall reasonably request from time to time to evidence such termination and release.

SECTION 11.  Binding Effect; Several Agreement; Assignments; Release. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Guarantors that are contained in this Agreement shall bind and inure to the benefit of each party hereto and their respective successors and assigns.  This Agreement shall become effective as to any Guarantor when a counterpart hereof (or a Supplement referred to in Section 20) executed on behalf of such Guarantor shall have been delivered to the Agent, and a counterpart hereof (or a Supplement referred to in Section 20) shall have been executed on behalf of the Agent, and thereafter shall be binding upon such Guarantor and the Agent and their respective successors and assigns, and shall inure to the benefit of such Guarantor, the Agent and the other Lenders, and their respective successors and assigns, except that no Guarantor shall have the right to assign its rights or obligations hereunder or any interest herein (and any such attempted assignment shall be void).  If a Guarantor shall become an Immaterial Subsidiary or if all of the Equity Interests or all or substantially all of the assets of a Guarantor are sold, transferred or otherwise disposed of pursuant to a transaction permitted by Section 5.02(b) of the Credit Agreement or if a Guarantor is otherwise no longer required to be a "Guarantor" pursuant to the Credit Agreement or the Senior Secured Credit Agreement, in each case such Guarantor shall be released from its obligations under this Agreement without further action.  This Agreement shall be construed as a separate agreement with respect to each Guarantor and may be amended, modified, supplemented, waived or released with respect to any Guarantor without the approval of any other Guarantor and without affecting the obligations of any other Guarantor hereunder.

SECTION 12.  Waivers; Amendment.  (a) No failure or delay of the Agent in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

-6-

any other right or power. The rights and remedies of the Agent hereunder and of the other Lenders under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any Guarantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any Guarantor in any case shall entitle such Guarantor to any other or further notice or demand in similar or other circumstances.

(b) Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to a written agreement entered into between the Guarantors with respect to which such waiver, amendment or modification relates and the Agent, with the prior written consent of the Required Lenders (except as otherwise provided in the Credit Agreement including Section 8.20 thereof).

SECTION 13. Governing Law. This agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 14. Notices. All communications and notices hereunder shall be in writing and given as provided in Section 8.02 of the Credit Agreement. All communications and notices hereunder to each Guarantor shall be given to it in care of Borrower at Borrower's address set forth in Section 8.02 of the Credit Agreement.

SECTION 15. Survival of Agreement; Severability. (a) All covenants, agreements, representations and warranties made by the Guarantors herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Agent and the other Lenders and shall survive the making by the Lenders of the Advances regardless of any investigation made by the Lenders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Guaranteed Obligation (other than contingent obligations for unasserted claims) is outstanding and unpaid and as long as the Commitments have not been terminated or have not expired.

(b) In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 16. Counterparts. This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract (subject to Section 11), and shall become effective as provided in Section 11.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

-7-

Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

SECTION 17. Rules of Interpretation. The rules of interpretation specified in Sections 1.02 and 8.17 of the Credit Agreement shall be applicable to this Agreement.

SECTION 18. Jurisdiction; Consent to Service of Process. (a) Each Guarantor hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Agent or any other Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against any Guarantor or its properties in the courts of any jurisdiction.

(b) Each Guarantor hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

SECTION 19. Waiver of Jury Trial. Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or the other Loan Documents. Each party hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement and the other Loan Documents, as applicable, by, among other things, the mutual waivers and certifications in this Section 19.

SECTION 20. Additional Guarantors. Pursuant to Section 5.01(l) of the Credit Agreement, each wholly owned Domestic Subsidiary of Borrower (to the extent such Subsidiary (i) is not an Immaterial Subsidiary after the Closing Date, a Subsidiary of a Foreign Subsidiary of Borrower or a Receivables Subsidiary or (ii) is not merged or consolidated with and into Borrower or any Guarantor in compliance with Section 5.02(b) on or prior to the 30th day after such Subsidiary shall become a Subsidiary) that was not in existence or not a wholly owned Domestic Subsidiary on the date of the Credit Agreement is required to enter into this Agreement as a Guarantor upon becoming a wholly owned Domestic Subsidiary. Upon execution and

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

-8-

delivery after the date hereof by the Agent and any such wholly owned Domestic Subsidiary of an instrument ("Supplement") in the form of Exhibit 1, such Subsidiary shall become a Guarantor hereunder with the same force and effect as if originally named as a Guarantor herein. The execution and delivery of any Supplement adding an additional Guarantor as a party to this Agreement shall not require the consent of any other Guarantor hereunder or of any Lender. Subject to Section 11, the rights and obligations of each Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any new Guarantor as a party to this Agreement.

SECTION 21. Right of Setoff. Upon (a) the occurrence and during the continuance of any Event of Default, (b) the making of the request or the granting of the consent specified by Section 6.01 of the Credit Agreement to authorize the Agent to declare the Advances due and payable pursuant to the provisions of Section 6.01 of the Credit Agreement and (c) subject to Section 3 hereof, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of any Guarantor against any or all the obligations of such Guarantor now or hereafter existing under this Agreement and the other Loan Documents held by such Lender, whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured. Each Lender agrees promptly to notify Guarantor after any such set-off and application; provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Lender under this Section 21 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0517110

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

EACH OF THE SUBSIDIARIES LISTED
ON SCHEDULE I HERETO,

by

_____
Name:
Title:

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517111

MERRILL LYNCH CAPITAL CORPORATION,
as Agent,

by

_____

Name:
Title:

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517112

ANNEX I TO THE
GUARANTEE AGREEMENT

Guarantor

The Baltimore Sun Company
Chicago Tribune Company
The Daily Press, Inc.
The Hartford Courant Company
Orlando Sentinel Communications Company
The Morning Call, Inc.
Sun-Sentinel Company
Newsday, Inc.
Tribune Interactive, Inc.
Tribune Los Angeles, Inc.
Tribune Media Services, Inc.
Tribune Broadcasting Company
KHCW Inc.
KSWB Inc.
KPLR, Inc.
KTLA Inc.
KWGN Inc.
Tower Distribution Company
Tribune Broadcast Holdings, Inc.
Tribune Entertainment Company
Tribune Television Company
Channel 40, Inc.
Channel 39, Inc.
Tribune Television Holdings, Inc.
Tribune Television New Orleans, Inc.
Tribune Television Northwest, Inc.
WDCW Broadcasting, Inc.
WGN Continental Broadcasting Company
WPIX, Inc.
Tribune Finance, LLC
Homestead Publishing Company
Patuxent Publishing Company
Chicagoland Publishing Company
Tribune Direct Marketing, Inc.
Virginia Gazette Companies, LLC
Forum Publishing Group, Inc.
Courant Specialty Products, Inc.
New Mass Media, Inc.
TMLH2, Inc.
TMLS1, Inc.
Gold Coast Publications, Inc.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Distribution Systems of America, Inc.
Los Angeles Times Communications LLC
Tribune Manhattan Newspaper Holdings, Inc.
Tribune New York Newspaper Holdings, LLC
TMS Entertainment Guides, Inc.
Tribune Media Net, Inc.
Tribune National Marketing Company
Tribune Broadcasting Holdco, LLC
ChicagoLand Television News, Inc.
5800 Sunset Productions Inc.
Tribune (FN) Cable Ventures, Inc.
WTXX Inc.
Chicago National League Ball Club, Inc.
Tribune California Properties, Inc.
California Community News Corporation
Hoy Publications, LLC
Eagle New Media Investments, LLC
Stemweb, Inc.
ForSaleByOwner.com
Homeowners Realty, Inc.
Internet Foreclosure Service, Inc.
Newport Media, Inc.
Eagle Publishing Investments, LLC
Star Community Publishing Group, LLC

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517114**

EXHIBIT 1 TO THE
GUARANTEE AGREEMENT

SUPPLEMENT NO. [ ] dated as of [          ] , to the Guarantee Agreement (the "Guarantee Agreement") dated as of December 20, 2007, among TRIBUNE COMPANY (the "Borrower"), each of the subsidiaries of Borrower listed on Annex I thereto (each such subsidiary individually, a "Guarantor" and, collectively, the "Guarantors") and MERRILL LYNCH CAPITAL CORPORATION ("Merrill Lynch"), as administrative agent (the "Agent") for the Lenders (as defined below).

A.  Reference is made to the Credit Agreement dated as of December 20, 2007 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Borrower, the lenders from time to time party thereto (the "Lenders"), the Agent and the other parties thereto.

B.  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Guarantee Agreement and the Credit Agreement.

C.  The Guarantors have entered into the Guarantee Agreement in order to induce the Lenders to make Advances.  Section 20 of the Guarantee Agreement provides that additional Subsidiaries (subject to the terms and conditions of Section 20) of Borrower may become Guarantors under the Guarantee Agreement by execution and delivery of an instrument in the form of this Supplement.  The undersigned Subsidiary of Borrower (the "New Guarantor") is executing this Supplement to become a Guarantor under the Guarantee Agreement in order to induce the Lenders to make any Advances and as consideration for Advances previously made.

Accordingly, the Agent and the New Guarantor agree as follows:

SECTION 1.  In accordance with Section 20 of the Guarantee Agreement, the New Guarantor by its signature below becomes a Guarantor under the Guarantee Agreement with the same force and effect as if originally named therein as a Guarantor and the New Guarantor hereby (a) agrees to all the terms and provisions of the Guarantee Agreement applicable to it as a Guarantor thereunder and (b) represents and warrants that the representations and warranties made by it as a Guarantor thereunder are true and correct on and as of the date hereof.  Each reference to a Guarantor in the Guarantee Agreement shall be deemed to include the New Guarantor.  The Guarantee Agreement is hereby incorporated herein by reference.

SECTION 2.  The New Guarantor represents and warrants to the Agent and the other Lenders that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517115**

2

SECTION 3.  This Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Supplement shall become effective when the Agent shall have received counterparts of this Supplement that, when taken together, bear the signatures of the New Guarantor and the Agent.  Delivery of an executed signature page to this Supplement by facsimile transmission shall be as effective as delivery of a manually executed counterpart of this Supplement.

SECTION 4.  Except as expressly supplemented hereby, the Guarantee Agreement shall remain in full force and effect.

SECTION 5.  This supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 6.  In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and in the Guarantee Agreement shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision hereof in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.  All communications and notices hereunder shall be in writing and given as provided in Section 14 of the Guarantee Agreement.  All communications and notices hereunder to the New Guarantor shall be given to it in care of Borrower at Borrower's address set forth in Section 8.02 of the Credit Agreement.

SECTION 8.  The New Guarantor agrees to reimburse the Agent for its reasonable and documented out-of-pocket expenses in connection with this Supplement, including the reasonable and documented fees, disbursements and other charges of counsel for the Agent.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

3

IN WITNESS WHEREOF, the New Guarantor and the Agent have duly executed this Supplement to the Guarantee Agreement as of the day and year first above written.

[Name of New Guarantor], by

by

Name:
Title:

MERRILL LYNCH CAPITAL CORPORATION,
as Agent,

by

Name:
Title:

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

EXHIBIT 2 TO THE GUARANTEE AGREEMENT

FORM OF

INDEMNITY, SUBROGATION and CONTRIBUTION AGREEMENT dated as of December 20, 2007, among Tribune Company, a Delaware corporation ("Borrower"), each of the subsidiaries of the Borrower listed on Schedule I hereto (each such subsidiary individually, a "Guarantor" and collectively, the "Guarantors") and MERRILL LYNCH CAPITAL CORPORATION ("Merrill Lynch"), as administrative agent (in such capacity, the "Agent") for the Lenders (as defined below).

Reference is made to (a) the Credit Agreement dated as of December 20, 2007 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the lenders from time to time party thereto (the "Lenders"), the Agent and the other agent bank party thereto and (b) the Guarantee Agreement dated as of December 20, 2007 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Guarantee Agreement"), among the Guarantors and the Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The Lenders have agreed to make Advances to the Borrower for the account of the Borrower and the Subsidiaries, pursuant to, and upon the terms and subject to the conditions specified in, the Credit Agreement. Each of the Guarantors has agreed to guarantee, among other things, all the obligations of the Borrower under the Credit Agreement (upon the terms specified in the Guarantee Agreement). The obligations of the Lenders to make Advances are conditioned on, among other things, the execution and delivery by the Borrower and the Guarantors of an agreement in the form hereof.

Accordingly, the parties hereto agree as follows:

SECTION 1. Indemnity and Subrogation. In addition to all such rights of indemnity and subrogation as the Guarantors may have under applicable law (but subject to Section 3), the Borrower agrees that (a) in the event a payment shall be made by any Guarantor under, and to the extent required by, the Guarantee Agreement, the Borrower shall indemnify such Guarantor for the full amount of such payment and such Guarantor shall be subrogated to the rights of the person to whom such payment shall have been made to the extent of such payment and (b) in the event any assets of any Guarantor shall be sold to satisfy a claim of any Lender, the Borrower shall indemnify such Guarantor in an amount equal to the greater of the book value or the fair market value of the assets so sold.

SECTION 2. Contribution and Subrogation. Each Guarantor (a "Contributing Guarantor") agrees (subject to Section 3) that, in the event a payment shall be made by any other Guarantor under, and to the extent required by, the Guarantee Agreement or assets of any other Guarantor shall be sold to satisfy a claim of any Lender and such other Guarantor (the "Claiming Guarantor") shall not have been fully

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

indemnified by the Borrower as provided in Section 1, the Contributing Guarantor shall indemnify the Claiming Guarantor in an amount equal to the amount of such payment, in each case multiplied by a fraction of which the numerator shall be the net worth (computed by the Borrower and the Guarantors, as applicable, in their sole discretion) of the Contributing Guarantor on the date hereof (or, in the case of any Guarantor becoming a party hereto pursuant to Section 12, the date of the Supplement hereto executed and delivered by such Guarantor) and the denominator shall be the aggregate net worth (computed by the Borrower and the Guarantors, as applicable, in their sole discretion) of all the Guarantors on the date hereof (or, in the case of any Guarantor becoming a party hereto pursuant to Section 12, the date of the Supplement hereto executed and delivered by such Guarantor). Valuation of the net worth of the Contributing Guarantor (and all Guarantors) on a fair market value basis will be determined by application of appropriate valuation methodologies (income, market and/or cost approaches) in the sole discretion of the Borrower and the Guarantors, as applicable. Any Contributing Guarantor making any payment to a Claiming Guarantor pursuant to this Section 2 shall be subrogated to the rights of such Claiming Guarantor under Section 1 to the extent of such payment.

SECTION 3. Subordination. Notwithstanding any provision of this Agreement to the contrary, all rights of the Guarantors under Sections 1 and 2 and all other rights of indemnity, contribution or subrogation under applicable law or otherwise shall be fully subordinated to the indefeasible payment in full in cash of the Obligations. No failure on the part of the Borrower or any Guarantor to make the payments required by Sections 1 and 2 (or any other payments required under applicable law or otherwise) shall in any respect limit the obligations and liabilities of any Guarantor with respect to its obligations hereunder, and each Guarantor shall remain liable for the full amount of the obligations of such Guarantor hereunder.

SECTION 4. Termination. This Agreement shall survive and be in full force and effect so long as any Obligation is outstanding and has not been indefeasibly paid in full in cash or any of the Commitments under the Credit Agreement have not been terminated, and shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Obligation is rescinded or must otherwise be restored by any Lender or any Guarantor upon the bankruptcy or reorganization of the Borrower, any Guarantor or otherwise. In connection with the foregoing, the Agent shall execute and deliver to such Guarantor or Guarantor's designee, at such Guarantor's expense, any documents or instruments which such Guarantor shall reasonably request from time to time to evidence such termination and release.

SECTION 5. Governing Law. This agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 6. No Waiver; Amendment. No failure on the part of the Agent or any Guarantor to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy by the Agent or any Guarantor preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

6

by law. None of the Agent and the Guarantors shall be deemed to have waived any rights hereunder unless such waiver shall be in writing and signed by such parties.

Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to a written agreement entered into between the Borrower, the Guarantors and the Agent, with the prior written consent of the Required Lenders (except as otherwise provided in the Credit Agreement); provided that the Agent's and the Required Lenders' consent shall not be required for modifications which, if not made hereto, would result in material adverse tax consequences to either the Borrower or any Guarantor as a result of Borrower's making a Subchapter S Corporation election.

SECTION 7. Notices. All communications and notices hereunder shall be in writing and given as provided in the Guarantee Agreement and addressed as specified therein.

SECTION 8. Binding Agreement; Assignments. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the parties that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns. Neither the Borrower nor any Guarantor may assign or transfer any of its rights or obligations hereunder (and any such attempted assignment or transfer shall be void) without the prior written consent of the Required Lenders. Notwithstanding the foregoing, at the time any Guarantor is released from its obligations under the Guarantee Agreement in accordance with such Guarantee Agreement and the Credit Agreement, such Guarantor will cease to have any rights or obligations under this Agreement.

SECTION 9. Survival of Agreement; Severability. All covenants and agreements made by the Borrower and each Guarantor herein and in the certificates or other instruments prepared or delivered in connection with this Agreement or the other Loan Documents shall be considered to have been relied upon by the Agent, the other Lenders and each Guarantor and shall survive the making by the Lenders of the Advances, and shall continue in full force and effect as long as the principal of or any accrued interest on any Advances or any other fee or amount payable under the Credit Agreement or this Agreement or under any of the other Loan Documents is outstanding and unpaid and as long as the Commitments have not been terminated.

SECTION 10. Severability. In case any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517120

SECTION 11. <u>Counterparts.</u> This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract (subject to Section 8), and shall become effective as provided in Section 8. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

SECTION 12. <u>Rules of Interpretation.</u> The rules of interpretation specified in Section 1.02 and 8.17 of the Credit Agreement shall be applicable to this Agreement.

SECTION 13. <u>Additional Guarantors.</u> Pursuant to Section 5.01(l) of the Credit Agreement, each wholly owned Domestic Subsidiary of Borrower (to the extent such Subsidiary (i) is not an Immaterial Subsidiary after the Closing Date, a Subsidiary of a Foreign Subsidiary of Borrower or a Receivables Subsidiary or (ii) is not merged or consolidated with and into Borrower or any Guarantor in compliance with Section 5.02(b) of the Credit Agreement on or prior to the 30th day after such Subsidiary shall become a Subsidiary) that was not in existence or not a wholly owned Domestic Subsidiary on the date of the Credit Agreement is required to enter into the Guarantee Agreement as a Guarantor upon becoming a wholly owned Domestic Subsidiary. Upon execution and delivery after the date hereof by the Agent and any such wholly owned Domestic Subsidiary of an instrument in the form of Exhibit 1 to the Guarantee Agreement, such Subsidiary shall become a Guarantor thereunder with the same force and effect as if originally named as a Guarantor therein. Section 7 of the Guarantee Agreement requires that any such Guarantor enter into this Agreement. Upon execution and delivery after the date hereof by the Agent and any such Guarantor of an instrument ("<u>Supplement</u>") in the form of Annex 1 hereto, such Guarantor shall become a party hereto as a Guarantor with the same force and effect as if originally named as a Guarantor herein. The execution and delivery of any Supplement adding an additional Guarantor as a party to this Agreement shall not require the consent of any other Guarantor under the Guarantee Agreement or hereunder or of any Lender. Subject to <u>Section 8</u>, the rights and obligations of each Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any new Guarantor as a party to this Agreement.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517121**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date first appearing above.

TRIBUNE COMPANY, as the Borrower,

by

_____
Name:
Title:

EACH OF THE SUBSIDIARIES LISTED ON SCHEDULE 1 HERETO, as a Guarantor,

by

_____
Name:
Title:

MERRILL LYNCH CAPITAL CORPORATION, as Agent,

by

_____
Name:
Title:

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0517122

SCHEDULE I
TO THE INDEMNITY SUBROGATION
AND CONTRIBUTION AGREEMENT

Guarantors

The Baltimore Sun Company
Chicago Tribune Company
The Daily Press, Inc.
The Hartford Courant Company
Orlando Sentinel Communications Company
The Morning Call, Inc.
Sun-Sentinel Company
Newsday, Inc.
Tribune Interactive, Inc.
Tribune Los Angeles, Inc.
Tribune Media Services, Inc.
Tribune Broadcasting Company
KHCW Inc.
KSWB Inc.
KPLR, Inc.
KTLA Inc.
KWGN Inc.
Tower Distribution Company
Tribune Broadcast Holdings, Inc.
Tribune Entertainment Company
Tribune Television Company
Channel 40, Inc.
Channel 39, Inc.
Tribune Television Holdings, Inc.
Tribune Television New Orleans, Inc.
Tribune Television Northwest, Inc.
WDCW Broadcasting, Inc.
WGN Continental Broadcasting Company
WPIX, Inc.
Tribune Finance, LLC
Homestead Publishing Company
Patuxent Publishing Company
Chicagoland Publishing Company
Tribune Direct Marketing, Inc.
Virginia Gazette Companies, LLC
Forum Publishing Group, Inc.
Courant Specialty Products, Inc.
New Mass Media, Inc.
TMLH2, Inc.
TMLS1, Inc.
Gold Coast Publications, Inc.
Distribution Systems of America, Inc.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Los Angeles Times Communications LLC
Tribune Manhattan Newspaper Holdings, Inc.
Tribune New York Newspaper Holdings, LLC
TMS Entertainment Guides, Inc.
Tribune Media Net, Inc.
Tribune National Marketing Company
Tribune Broadcasting Holdco, LLC
ChicagoLand Television News, Inc.
5800 Sunset Productions Inc.
Tribune (FN) Cable Ventures, Inc.
WTXX Inc.
Chicago National League Ball Club, Inc.
Tribune California Properties, Inc.
California Community News Corporation
Hoy Publications, LLC
Eagle New Media Investments, LLC
Stemweb, Inc.
ForSaleByOwner.com
Homeowners Realty, Inc.
Internet Foreclosure Service, Inc.
Newport Media, Inc.
Eagle Publishing Investments, LLC
Star Community Publishing Group, LLC

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

ANNEX 1 TO
THE INDEMNITY, SUBROGATION AND
CONTRIBUTION AGREEMENT

SUPPLEMENT NO. [ ] dated as of [          ], to the
Indemnity, Subrogation and Contribution Agreement dated as of
December 20, 2007 (the "Indemnity, Subrogation and Contribution
Agreement"), among TRIBUNE COMPANY, a Delaware limited
liability company (the "Borrower"), each of the subsidiaries of the
Borrower listed on Schedule I thereto (each such subsidiary indi-
vidually, a "Guarantor" and, collectively, the "Guarantors") and
MERRILL LYNCH CAPITAL CORPORATION ("Merrill
Lynch"), as administrative agent (the "Agent") for the Lenders (as
defined below).

A. Reference is made to (a) the Credit Agreement dated as of December 20, 2007 (as
amended, amended and restated, supplemented or otherwise modified from time to time,
the "Credit Agreement"), among the Borrower, the lenders from time to time party
thereto (the "Lenders"), the Agent and the other agent banks thereto and (b) the Guaran-
tee Agreement dated as of December 20, 2007 (as amended, amended and restated, sup-
plemented or otherwise modified from time to time, the "Guarantee Agreement"), among
the Guarantors and the Agent.

B. Capitalized terms used herein and not otherwise defined herein shall have the
meanings assigned to such terms in the Indemnity, Subrogation and Contribution Agree-
ment and the Credit Agreement.

C. The Borrower and the Guarantors have entered into the Indemnity, Subrogation and
Contribution Agreement in order to induce the Lenders to make Advances. Pursuant to
Section 5.01(l) of the Credit Agreement, certain subsidiaries that were not in existence or
not such a subsidiary on the date of the Credit Agreement are required to enter into the
Guarantee Agreement as a Guarantor. Section 12 of the Indemnity, Subrogation and
Contribution Agreement provides that additional Subsidiaries may become Guarantors
under the Indemnity, Subrogation and Contribution Agreement by execution and delivery
of an instrument in the form of this Supplement. The undersigned Subsidiary (the "New
Guarantor") is executing this Supplement in accordance with the requirements of the
Credit Agreement to become a Guarantor under the Indemnity, Subrogation and Contri-
bution Agreement in order to induce the Lenders to make the Advances.

Accordingly, the Agent and the New Guarantor agree as follows:

SECTION 1. In accordance with Section 12 of the Indemnity, Subroga-
tion and Contribution Agreement, the New Guarantor by its signature below becomes a
Guarantor under the Indemnity, Subrogation and Contribution Agreement with the same
force and effect as if originally named therein as a Guarantor and the New Guarantor
hereby agrees to all the terms and provisions of the Indemnity, Subrogation and Contri-
bution Agreement applicable to it as a Guarantor thereunder. Each reference to a Guarantor
in the Indemnity, Subrogation and Contribution Agreement shall be deemed to include

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

the New Guarantor. The Indemnity, Subrogation and Contribution Agreement is hereby incorporated herein by reference.

SECTION 2. The New Guarantor represents and warrants to the Agent and the Lenders that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

SECTION 3. This Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Supplement shall become effective when the Agent shall have received counterparts of this Supplement that, when taken together, bear the signatures of the New Guarantor and the Agent. Delivery of an executed signature page to this Supplement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4. Except as expressly supplemented hereby, the Indemnity, Subrogation and Contribution Agreement shall remain in full force and effect.

SECTION 5. This Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 6. In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, neither party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Indemnity, Subrogation and Contribution Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7. All communications and notices hereunder shall be in writing and given as provided in Section 7 of the Indemnity, Subrogation and Contribution Agreement.

SECTION 8. The New Guarantor agrees to reimburse the Agent for its reasonable out-of-pocket expenses in connection with this Supplement, including the reasonable fees, other charges and disbursements of counsel for the Agent.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

3

IN WITNESS WHEREOF, the New Guarantor and the Agent have duly executed this Supplement to the Indemnity, Subrogation and Contribution Agreement as of the day and year first above written.

[Name of New Guarantor],

by

_____

Name:

Title:


MERRILL LYNCH CAPITAL CORPORATION, as Agent,

by

_____

Name:

Title:

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517127**

SCHEDULE I
TO SUPPLEMENT NO. [   ] TO THE INDEMNITY
SUBROGATION AND CONTRIBUTION AGREEMENT

Guarantors

Name                                    Address

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0517128

EXHIBIT G

> INTERIM LOAN PLEDGE AGREEMENT dated as of [          ],
> among TRIBUNE COMPANY, a Delaware corporation ("Borrower" or
> "Pledgor") and MERRILL LYNCH CAPITAL CORPORATION, a na-
> tional banking corporation ("Merrill Lynch"), as agent (in such capacity,
> the "Agent") for the Second Lien Secured Parties (as defined below).

Reference is made to the Senior Unsecured Interim Loan Agreement dated as of Decem-
ber 20, 2007 (as amended, amended and restated, supplemented or otherwise modified from time
to time, the "Credit Agreement"), among Borrower, the lenders from time to time party thereto
(the "Lenders"), the Agent and the other parties thereto.

The Lenders have agreed to make Advances to Borrower, pursuant to, and upon the terms
and subject to the conditions specified in, the Credit Agreement. Each of the Guarantors have
agreed to guarantee, among other things, all the obligations of Borrower under the Credit
Agreement (upon the terms specified in the Guarantee Agreement. The parties hereto are execut-
ing this Agreement to secure on a second lien basis (a) the Obligations and (b) the due and punc-
tual performance of all covenants, agreements, obligations and liabilities of the Borrower and
each Loan Party under or pursuant to the Credit Agreement and the other Loan Documents (all
the monetary and other obligations described in the preceding clauses (a) and (b) being collec-
tively called the "Credit Agreement Obligations"). Capitalized terms used herein and not de-
fined herein shall have meanings assigned to such terms in the Credit Agreement.

In connection with the granting of a first lien security interest in the Collateral to secure
the Secured Hedging Obligations, the Secured Cash Management Obligations and the obligations
(collectively, the "Senior Secured Obligations") under the credit agreement dated as of May 17,
2007 (as amended, modified, supplemented or replaced from time to time in accordance with the
terms thereof, the "Senior Secured Credit Agreement"), the Pledgor was required to grant an
equal and ratable security interest in the Collateral to secure the due and punctual payment by the Pledgor of
the principal and interest on the Existing Notes and any other obligations under the Existing
Notes Indentures owed to the trustees thereunder (collectively, the "Existing Notes Trustees") or
any "Holder" (as defined the Existing Notes Indentures) of any Existing Notes (collectively, the
"Existing Notes Holders"), when and as due (collectively, the "Existing Notes Obligations" and,
together with the Senior Secured Obligations, the "First Lien Secured Obligations"). The rela-
tive rights and priorities of the grantees in respect of the Collateral will be governed by an inter-
creditor agreement (the "Intercreditor Agreement") to be entered into among the Agent and the
First Lien Agent (as defined below).

Accordingly, the Pledgor and the Agent, on behalf of itself and the Lenders, each co-
agent or sub-agent appointed by the Agent from time to time pursuant to Section 7.01 of the
Credit Agreement and each of their respective successors or assigns (collectively, the "Second
Lien Secured Parties"), hereby agree as follows:

SECTION 1.      Pledge.  As security for the payment and performance, as the case may
be, in full of the Credit Agreement Obligations, the Pledgor hereby transfers, grants, bargains,

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

sells, conveys, hypothecates, pledges, sets over and delivers unto the Agent, its successors and assigns, and hereby grants to the Agent, its successors and assigns, for the benefit of the Second Lien Secured Parties, a security interest in all of the Pledgor's right, title and interest in, to and under (a) the shares of capital stock or equity interests owned by it and listed on Schedule I hereto (the "Pledged Stock"); (b) all other property that may be delivered to and held by the Agent pursuant to the terms hereof; (c) subject to Section 5, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed, in respect of, in exchange for or upon the conversion of the securities referred to in clauses (a) and (b) above; (d) subject to Section 5, all rights and privileges of the Pledgor with respect to the securities and other property referred to in clauses (a), (b) and (c) above; and (e) all proceeds of any of the foregoing (the items referred to in clauses (a) through (e) above being collectively referred to as the "Collateral"). If required pursuant to Section 2, upon delivery to the Agent, (a) any stock certificates or other securities now or hereafter included in the Collateral (the "Pledged Securities") shall be accompanied by stock powers duly executed in blank or other instruments of transfer satisfactory to the Agent and by such other instruments and documents as the Agent may reasonably request and (b) all other property comprising part of the Collateral shall be accompanied by proper instruments of assignment duly executed by the Pledgor and such other instruments or documents as the Agent may reasonably request. Each delivery of Pledged Securities shall be accompanied by a schedule describing the securities theretofore and then being pledged hereunder, which schedule shall be attached hereto as Schedule I and made a part hereof. Each schedule so delivered shall supplement any prior schedules so delivered. The security interest in the Collateral granted herein shall also secure all future advances and re-advances that may be made by the Lenders under the Credit Agreement to, or for the benefit of, the Loan Parties.

Notwithstanding anything herein to the contrary, prior to (a) the payment in full in cash of the First Lien Secured Obligations that are outstanding and unpaid at the time all Debt under the Senior Secured Credit Agreement and the Existing Notes is paid in full in cash, including (if applicable) with respect to amounts available to be drawn under outstanding letters of credit issued thereunder (or indemnities or other undertakings issued pursuant thereto in respect of outstanding letters of credit) and delivery or provision of cash or backstop letters of credit in respect thereof in compliance with the terms of the Senior Secured Credit Agreement and (b) the termination of all then outstanding commitments to extend credit under the Senior Secured Credit Agreement (the "Discharge of First Lien Secured Obligations"), (i) the requirements of this Agreement to endorse, assign or deliver Collateral to the Agent shall be deemed satisfied by endorsement, assignment or delivery of such Collateral to the agent under the Senior Secured Credit Agreement (the "First Lien Agent") (as bailee for Agent) and (ii) any endorsement, assignment or delivery to the First Lien Agent (as bailee for the Agent) shall be deemed an endorsement, assignment or delivery to the Agent for all purposes hereunder

TO HAVE AND TO HOLD the Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Agent, its successors and assigns, for the benefit of the Second Lien Secured Parties, forever; subject, however, to the terms, covenants and conditions hereinafter set forth.

-2-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517130

SECTION 2.    Delivery of the Collateral.  The Pledgor agrees to (i) not amend or modify any of its Organizational Documents to make an election to treat any Collateral as a "security" under Section 8-103 of the UCC or (ii) if the Pledgor makes such an election, within 10 Business Days thereof, to deliver or cause to be delivered to the Agent, for the benefit of the Second Lien Secured Parties, any and all Pledged Securities, and any and all certificates or other instruments or documents representing the Collateral.

SECTION 3.    Representations, Warranties and Covenants.  The Pledgor hereby represents, warrants and covenants, as to itself and the Collateral pledged by it hereunder, to and with the Agent that:

(a)    the Pledged Stock represents that percentage as set forth on Schedule I of the issued and outstanding shares of each class of the capital stock and equity interest of the issuer with respect thereto;

(b)    except for the Lien securing the First Lien Secured Obligations (the "First Lien") and the second lien security interest granted hereunder, the Pledgor (i) is and will at all times continue to be the direct owner, beneficially and of record, of the Pledged Securities indicated on Schedule I (except in connection with any Asset Sale permitted under the Credit Agreement or the Senior Secured Credit Agreement), (ii) holds the same free and clear of all Liens (other than Liens created by the Loan Documents, the First Lien and Permitted Liens), (iii) will make no assignment, pledge, hypothecation or transfer of the Collateral, other than pursuant hereto and except in connection with any Asset Sale permitted under the Credit Agreement or the Senior Secured Credit Agreement, and (iv) subject to Section 5, will cause any and all Collateral, whether for value paid by the Pledgor or otherwise, to be forthwith deposited with the Agent and pledged or assigned hereunder;

(c)    the Pledgor (i) has the power and authority to pledge the Collateral in the manner hereby done or contemplated and (ii) will defend its title or interest thereto or therein against any and all Liens (other than Liens created by the Loan Documents, the First Lien and Permitted Liens), however arising, of all persons whomsoever;

(d)    no consent of any other person (including stockholders or creditors of the Pledgor) and no consent or approval of any Governmental Authority or any securities exchange was or is necessary to the validity of the pledge effected hereby (other than such as have been obtained and are in full force and effect);

(e)    by virtue of the execution and delivery by the Pledgor of this Agreement, and, solely to the extent that the Pledgor makes an election to treat any Collateral as a "security" under Section 8-103 of the UCC, when the Pledged Securities, certificates or other documents representing or evidencing such Collateral are delivered to the Agent in accordance with this Agreement, and upon the proper filing of UCC-1 financing statements, the Agent will obtain a valid and perfected lien upon and second lien security interest in such Pledged Securities as security for the payment and performance of the Credit Agreement Obligations;

-3-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517131

(f)     the pledge effected hereby is effective to vest in the Agent, on behalf of the Second Lien Secured Parties, the rights of the Agent in the Collateral as set forth herein, in each case, subject to the terms of the Intercreditor Agreement; and

(g)     to the extent applicable, all of the Pledged Stock has been duly authorized and validly issued and is fully paid and nonassessable.

SECTION 4.     Registration in Nominee Name; Denominations.  If an Event of Default shall have occurred and be continuing and the Agent shall have given the Pledgor notice of its intent to exercise such right, in each case, subject to the terms of the Intercreditor Agreement, (a) the Agent, on behalf of the Second Lien Secured Parties, shall have the right (in its reasonable discretion) to hold the Pledged Securities in its own name as pledgee, the name of its nominee (as pledgee or as sub-agent) or the name of the Pledgor, endorsed or assigned in blank or in favor of the Agent and the Pledgor will promptly give to the Agent copies of any notices or other communications received by it with respect to Pledged Securities registered in the name of the Pledgor and (b) the Agent shall have the right to exchange the certificates representing Pledged Securities for certificates of smaller or larger denominations for any purpose consistent with this Agreement.

SECTION 5.     Voting Rights; Dividends and Interest, etc.

(a)     Unless and until an Event of Default shall have occurred and be continuing and the Agent shall, after the Discharge of the First Lien Secured Obligations, have notified the Pledgor that the rights of the Pledgor under this Section 5 are being suspended:

(i)     The Pledgor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Securities or any part thereof for any purpose not prohibited by the terms of this Agreement, the Credit Agreement and the other Loan Documents or the Senior Secured Credit Agreement and related loan documents thereunder;

(ii)     The Agent shall execute and deliver to the Pledgor, or cause to be executed and delivered to the Pledgor, all such proxies, powers of attorney and other instruments as the Pledgor may reasonably request for the purpose of enabling the Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to subparagraph (i) above and to receive the cash dividends it is entitled to receive pursuant to subparagraph (iii) below; and

(iii)     The Pledgor shall be entitled to receive and retain any and all cash dividends, interest and principal paid on the Pledged Securities to the extent and only to the extent that such cash dividends, interest and principal are permitted by, and otherwise paid in accordance with, the terms and conditions of the Credit Agreement, the other documents evidencing the Credit Agreement Obligations and applicable laws.  All non-cash dividends, interest and principal, and all dividends, interest and principal paid or payable in cash or otherwise in connection with a partial or total liquidation or dissolution, return of capital, capital surplus or paid-in surplus, and all other distributions (other than distributions referred to in the preceding sentence) made on or in respect of the

-4-

TRB0517132

Pledged Securities, whether paid or payable in cash or otherwise, whether resulting from a subdivision, combination or reclassification of the outstanding capital stock of the issuer of any Pledged Securities or received in exchange for Pledged Securities or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Collateral, and the Pledgor shall be entitled to receive the same.

(b)     Upon the occurrence and during the continuance of an Event of Default, subject to the terms of the Intercreditor Agreement, after the Agent shall have notified the Pledgor of the suspension of the rights of the Pledgor under paragraph (a)(iii) above, then all rights of the Pledgor to dividends, interest, principal or other distributions that the Pledgor is authorized to receive pursuant to paragraph (a)(iii) above shall cease, and, after the Discharge of First Lien Secured Obligations, all such rights shall thereupon become vested in the Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest or principal. All dividends, interest or principal received by the Pledgor contrary to the provisions of this Section 5 shall be held in trust for the benefit of the Agent, shall be segregated from other property or funds of the Pledgor and shall be forthwith delivered to the Agent upon demand in the same form as so received (with any necessary endorsement reasonably requested by the Agent). Any and all money and other property paid over to or received by the Agent pursuant to the provisions of this paragraph (b) shall be retained by the Agent in an account to be established by the Agent upon receipt of such money or other property and shall be applied in accordance with the provisions of Section 7. After all Events of Default have been cured or waived, the Agent shall, within five Business Days after all such Events of Default have been cured or waived, repay to the Pledgor all cash dividends, interest or principal (without interest) and all other property and assets, that the Pledgor would otherwise be permitted to retain pursuant to the terms of paragraph (a)(iii) above and which remain in such account.

(c)     Upon the occurrence and during the continuance of an Event of Default, subject to the terms of the Intercreditor Agreement, after the Agent shall have notified the Pledgor of the suspension of the rights of the Pledgor under paragraph (a)(i) of this Section 5, then all rights of the Pledgor to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section 5, and the obligations of the Agent under paragraph (a)(ii) of this Section 5, shall cease, and, after the Discharge of First Lien Secured Obligations, all such rights shall thereupon become vested in the Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers during the continuance of such Event of Default, provided that, unless otherwise directed by the Required Lenders, the Agent shall have the right from time to time following and during the continuance of an Event of Default to permit the Pledgor to exercise such rights; provided, further that the approval of the FCC shall be obtained prior to any exercise of such rights by the Agent to the extent any such approval is required at such time under the Communications Act of 1934, as amended, or the rules of the FCC. After all Events of Default have been cured or waived, all rights vested in the Agent pursuant to this clause (c) shall cease and the Pledgor will have the right to exercise the voting and consensual rights and powers that it would otherwise be entitled to exercise pursuant to the terms of paragraph (a)(i) of this Section 5.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517133

SECTION 6.    Remedies upon Default. Subject to the terms of the Intercreditor Agreement, upon the occurrence and during the continuance of an Event of Default after the Discharge of the First Lien Secured Obligations and subject to notification from the Agent to the Pledgor of its intent to exercise such rights, subject to applicable regulatory and legal requirements, including without limitation, those imposed by the Federal Communications Commission (the "FCC"), the Agent may sell the Collateral, or any part thereof, at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Agent shall deem appropriate. The Agent shall be authorized at any such sale (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale the Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of the Pledgor, and, to the extent permitted by applicable law, the Pledgor hereby waives (to the extent permitted by applicable law) all rights of redemption, stay, valuation and appraisal the Pledgor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Notwithstanding anything to the contrary herein, the approval of the FCC shall be obtained prior to any exercise of remedies, transfer, assignment or other disposition of the Pledged Securities by the Agent or any other Second Lien Secured Party to the extent any such approval is required at such time under the Communications Act of 1934, as amended, or the rules of the FCC.

The Agent shall give a Pledgor 10 days' prior written notice (which the Pledgor agrees is reasonable notice within the meaning of Section 9-611 of the Uniform Commercial Code as in effect in the State of New York or its equivalent in other jurisdictions) of the Agent's intention to make any sale of the Collateral. Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Agent may fix and state in the notice of such sale. At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Agent may (in its sole and absolute discretion) determine. The Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. The Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Agent until the sale price is paid in full by the purchaser or purchasers thereof, but the Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. At any public (or, to the extent permitted by applicable law, private) sale made pursuant to this Section 6, any Second Lien Secured Party may bid for or purchase, free (to the extent permitted by applicable law) from any right of redemption, stay or appraisal on the part of the Pledgor (all said rights being also hereby waived and released (to the extent permitted by ap-

-6-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517134

plicable law)), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to it from the Pledgor as a credit against the purchase price, and it may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to the Pledgor therefor. For purposes hereof, (a) a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof, (b) the Agent shall be free to carry out such sale pursuant to such agreement and (c) the Pledgor shall not be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Credit Agreement Obligations paid in full. As an alternative to exercising the power of sale herein conferred upon it, the Agent may proceed by a suit or suits at law or in equity to foreclose upon the Collateral and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Any sale pursuant to the provisions of this Section 6 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610 of the Uniform Commercial Code as in effect in the State of New York or its equivalent in other jurisdictions.

SECTION 7.    Application of Proceeds of Sale.

(a)    Subject to the provisions of the Intercreditor Agreement, upon the occurrence and during the continuance of an Event of Default, the proceeds of any sale of Collateral pursuant to Section 6 (including any Collateral consisting of cash), shall be applied by the Agent as follows:

FIRST, to the payment of all reasonable costs and expenses incurred by the Agent in connection with such sale or otherwise in connection with this Agreement or any of the Credit Agreement Obligations, including all court costs and the reasonable fees and expenses of its agents and legal counsel, and any other reasonable costs or expenses incurred in connection with the exercise of any right or remedy hereunder;

SECOND, to the payment in full of the Credit Agreement Obligations (the amounts so applied to be distributed among the Second Lien Secured Parties pro rata in accordance with the amounts of the Credit Agreement Obligations owed to them on the date of any such distribution); and

THIRD, to the Pledgor, its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement and the Intercreditor Agreement. Upon any sale of the Collateral by the Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the purchase money by the Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Agent or such officer or be answerable in any way for the misapplication thereof.

-7-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

SECTION 8.    Reimbursement of Agent.

(a)    The Pledgor agrees to pay upon demand to the Agent the amount of any and all reasonable expenses, including the reasonable fees, other charges and disbursements of its counsel and of any experts or agents, that the Agent may incur in connection with (i) the administration of this Agreement, (ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, (iii) the exercise or enforcement of any of the rights of the Agent hereunder or (iv) the failure by the Pledgor to perform or observe any of the provisions hereof.

(b)    Any amounts payable as provided hereunder shall be additional Credit Agreement Obligations secured hereby. The provisions of this Section 8 shall remain operative and in full force and effect regardless of the termination of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Credit Agreement Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document or any investigation made by or on behalf of the Agent or any other Second Lien Secured Party. All amounts due under this Section 8 shall be payable on written demand therefor and shall bear interest at the rate specified in Section 2.07(b) of the Credit Agreement.

SECTION 9.    Agent Appointed Attorney-in-Fact. The Pledgor hereby appoints the Agent its attorney-in-fact for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Agent may reasonably deem necessary or advisable to accomplish the purposes hereof, in each case, subject to the terms of the Intercreditor Agreement, which appointment is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, the Agent shall have the right, upon the occurrence and during the continuance of an Event of Default after the Discharge of the First Lien Secured Obligations, with full power of substitution either in the Agent's name or in the name of the Pledgor, to ask for, demand, sue for, collect, receive and give acquittance for any and all moneys due or to become due under and by virtue of any Collateral, to endorse checks, drafts, orders and other instruments for the payment of money payable to the Pledgor representing any interest or dividend or other distribution payable in respect of the Collateral or any part thereof or on account thereof and to give full discharge for the same, to settle, compromise, prosecute or defend any action, claim or proceeding with respect thereto, and to sell, assign, endorse, pledge, transfer and to make any agreement respecting, or otherwise deal with, the same; provided, however, that nothing herein contained shall be construed as requiring or obligating the Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby. The Agent and the other Second Lien Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to the Pledgor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

-8-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

SECTION 10.    Waivers; Amendment.

(a)    No failure or delay of the Agent in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agent hereunder and of the Agent and the Lenders under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provisions of this Agreement or consent to any departure by the Pledgor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on the Pledgor in any case shall entitle the Pledgor to any other or further notice or demand in similar or other circumstances.

(b)    Subject to the terms of the Intercreditor Agreement, neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to a written agreement entered into between the Agent and the Pledgor, subject to any consent required in accordance with Section 8.01 of the Credit Agreement.

SECTION 11.    Securities Act, etc. In view of the position of the Pledgor in relation to the Pledged Securities, or because of other current or future circumstances, a question may arise under the Securities Act of 1933, as now or hereafter in effect, or any similar statute hereafter enacted analogous in purpose or effect (such Act and any such similar statute as from time to time in effect being called the "Federal Securities Laws") with respect to any disposition of the Pledged Securities permitted hereunder. The Pledgor understands that compliance with the Federal Securities Laws might very strictly limit the course of conduct of the Agent if the Agent were to attempt to dispose of all or any part of the Pledged Securities, and might also limit the extent to which or the manner in which any subsequent transferee of any Pledged Securities could dispose of the same. Similarly, there may be other legal restrictions or limitations affecting the Agent in any attempt to dispose of all or part of the Pledged Securities under applicable Blue Sky or other state securities laws or similar laws analogous in purpose or effect. The Pledgor recognizes that in light of such restrictions and limitations the Agent may, with respect to any sale of the Pledged Securities, limit the purchasers to those who will agree, among other things, to acquire such Pledged Securities for their own account, for investment, and not with a view to the distribution or resale thereof. The Pledgor acknowledges and agrees that in light of such restrictions and limitations, the Agent, in its sole and absolute discretion and in accordance with applicable law, (a) may proceed to make such a sale whether or not a registration statement for the purpose of registering such Pledged Securities or part thereof shall have been filed under the Federal Securities Laws and (b) may approach and negotiate with a single potential purchaser to effect such sale. The Pledgor acknowledges and agrees that any such sale might result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions. In the event of any such sale, the Agent shall incur no responsibility or liability for selling all or any part of the Pledged Securities at a price that the Agent, in its sole and absolute discretion, may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might have been realized if the sale were deferred until after registration as aforesaid or if more than a single purchaser were approached. The provi-

-9-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517137

sions of this Section 11 will apply notwithstanding the existence of a public or private market upon which the quotations or sales prices may exceed substantially the price at which the Agent sells.

SECTION 12.    [Reserved].

SECTION 13.    Security Interest Absolute.  All rights of the Agent hereunder, the grant of a second lien security interest in the Collateral and all obligations of the Pledgor hereunder, shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Loan Document, any agreement with respect to any of the Credit Agreement Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Credit Agreement Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document or any other agreement or instrument relating to any of the foregoing, (c) any exchange, release or nonperfection of any other collateral, or any release or amendment or waiver of or consent to or departure from any guaranty, for all or any of the Credit Agreement Obligations or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Pledgor in respect of the Credit Agreement Obligations or in respect of this Agreement (other than the indefeasible payment in full of all the Credit Agreement Obligations).

SECTION 14.    Termination or Release.

(a)    This Agreement and the security interests granted hereby shall terminate with respect to the Credit Agreement, the other Loan Documents and the Agent when all the Advances and the other Credit Agreement Obligations (other than contingent obligations for unasserted claims) shall have been paid in full, the Guarantee shall have been terminated, and the Commitments have been terminated.

(b)    [Reserved]

(c)    Subject to the terms of the Intercreditor Agreement, upon any sale or other transfer by the Pledgor of any Collateral that is permitted under the Credit Agreement or the Senior Secured Credit Agreement to any other person, or, upon the effectiveness of any written consent by the First Lien Agent to the release of the security interest in any Collateral pursuant to Section 8.20(a) of the Senior Secured Credit Agreement, the security interest granted hereby in such Collateral shall be automatically released.

(d)    In connection with any termination or release pursuant to paragraph (a) or (c), the Agent shall (i) promptly deliver to Pledgor all Collateral pledged to the Agent herein that is subject to such termination or release and (ii) execute and deliver to the Pledgor, at the Pledgor's expense, all documents that the Pledgor shall reasonably request from time to time to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section 14 shall be without recourse to or warranty by the Agent.

-10-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517138

SECTION 15.    Notices.  All communications and notices hereunder shall (except as otherwise provided herein) be in writing and given as provided in Section 8.02 of the Credit Agreement.

SECTION 16.    Further Assurances.  The Pledgor agrees to do such further acts and things, and to execute and deliver such additional conveyances, assignments, agreements and instruments, as the Agent may at any time reasonably request in connection with the administration and enforcement of this Agreement or with respect to the Collateral or any part thereof or in order better to assure and confirm unto the Agent its rights and remedies hereunder.

SECTION 17.    Binding Effect; Several Agreement; Assignments.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Pledgor that are contained in this Agreement shall bind and inure to the benefit of its successors and assigns.  This Agreement shall become effective as to the Pledgor when a counterpart hereof executed on behalf of the Pledgor shall have been delivered to the Agent and a counterpart hereof shall have been executed on behalf of the Agent, and thereafter shall be binding upon the Pledgor and the Agent and their respective successors and assigns, and shall inure to the benefit of the Pledgor, the Agent and the other Second Lien Secured Parties, and their respective successors and assigns, except that the Pledgor shall not have the right to assign its rights hereunder or any interest herein or in the Collateral (and any such attempted assignment shall be void), except as expressly contemplated by this Agreement or the other Loan Documents or the Senior Secured Credit Agreement or the loan documents related thereto.

SECTION 18.    Severability.

In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 19.    Governing Law.  This agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 20.    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute a single contract (subject to Section 17), and shall become effective as provided in Section 17.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually executed counterpart of, this Agreement.

SECTION 21.    Rules of Interpretation.  The rules of interpretation specified in Section 1.02 of the Credit Agreement shall be applicable to this Agreement.  Section headings used

-11-

TRB0517139

herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting this Agreement.

SECTION 22.    Jurisdiction; Consent to Service of Process.

(a)    The Pledgor hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that, to the extent permitted by applicable law, all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Agent or any other Second Lien Secured Party may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the Pledgor or its properties in the courts of any jurisdiction.

(b)    The Pledgor hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 15. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 23.    WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 24.    Limitation of Agent's Responsibilities.

-12-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

(a)     This Agreement shall not create any liability of the Agent to the Second Lien Secured Parties by reason of actions taken with respect to the creation, perfection or continuation of the security interest on the Collateral, actions with respect to the occurrence of an Event of Default, actions with respect to the foreclosure upon, sale, release, or depreciation of, or failure to realize upon, any of the Collateral or action with respect to the collection of any claim for all or any part of the Credit Agreement Obligations from any guarantor or any other party or the valuation, use or protection of the Collateral.

(b)     The Agent may execute any of the powers granted under this Agreement and perform any duty hereunder either directly or by or through agents or attorneys-in-fact, and shall not be responsible for the gross negligence or willful misconduct of any agents or attorneys-in-fact selected by it with reasonable care and without gross negligence or willful misconduct.

(c)     The Agent shall not be deemed to have actual, constructive, direct or indirect notice or knowledge of the occurrence of any Event of Default unless and until the Agent shall have received a notice of Event of Default or a notice from the Pledgor or the Second Lien Secured Parties to the Agent in its capacity as Agent indicating that an Event of Default has occurred. The Agent shall have no obligation either prior to or after receiving such notice to inquire whether an Event of Default has, in fact, occurred and shall be entitled to rely conclusively, and shall be fully protected in so relying, on any notice so furnished to it.

(i)     The Agent, on behalf of itself and the other Second Lien Secured Parties, acknowledges and agrees that any provision of this Agreement to the contrary notwithstanding, (i) no Pledgor shall be required to act or refrain from acting (A) in a manner that is inconsistent with the terms and provisions of the Intercreditor Agreement or (B) with respect to any Collateral in any manner that would be inconsistent with any instructions received from the First Lien Agent or that would result in a violation of or a default under the terms and provisions of the documents governing the First Lien Secured Obligations and (ii) any action required to be taken by a Pledgor (or omission to act) pursuant to the terms of any document governing the First Lien Secured Obligations in respect of Collateral will not put such Pledgor in violation of or result in a default under the terms of this Agreement or any other Loan Document; *provided, however,* that (x) other than as required by the Intercreditor Agreement, this Agreement or any other Loan Document, this clause (ii) shall in no event require the release of any Liens securing the Credit Agreement Obligations or (y) except as required by the Intercreditor Agreement, this clause (ii) shall not impair the right of the Second Lien Secured Parties to be secured by any Collateral. In the event of any conflict between this Agreement and the Intercreditor Agreement, the provisions of the Intercreditor Agreement shall govern and control.

SECTION 25.     Execution of Financing Statements.  Pursuant to Section 9-402 of the Uniform Commercial Code as in effect in the State of New York or its equivalent in other jurisdictions, the Pledgor authorizes the Agent to file financing statements with respect to the Collateral owned by it without the signature of the Pledgor in such form and in such filing offices as the Agent reasonably determines appropriate to perfect the security interests of the Agent under this Agreement.

-13-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

TRIBUNE COMPANY,

By: _____   _____
     Name:

-14-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517142

MERRILL LYNCH CAPITAL CORPORATION, as
Agent,

By: _____

    Name:
    Title:

-15-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517143

EXHIBIT G

Schedule I to the
Pledge Agreement

CAPITAL STOCK

| Issuer | Sole Member | State of Formation | Percentage of Membership Interests |
|---|---|---|---|
| Tribune Broadcasting HoldCo, LLC | Tribune Company | Delaware | 100% |
| Tribune Finance, LLC | Tribune Company | Delaware | 100% |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517144

EXHIBIT H

[FORM OF] ADMINISTRATIVE QUESTIONNAIRE

TRIBUNE COMPANY

Agent Address: <u>Merrill Lynch Capital Corpo-</u>
<u>ration</u>

Return form to: _____

Telephone: _____

Facsimile: _____

E-mail: _____

_____

_____

> It is very important that <u>all</u> of the requested information be completed accurately and that this questionnaire be re-
> turned promptly. If your institution is sub allocating its allocation, please fill out an administrative questionnaire for
> each legal entity.

Legal Name of Lender to appear in Documentation:

_____

**Tax ID Number:** _____

Signature Block Information: _____

- Signing Credit Agreement     [Yes]          [No]

- Coming in via Assignment     [Yes]          [No]

Type of Lender:
Bank ☐ Asset Manager ☐ Broker/Dealer ☐ CLO/CDO ☐ Finance Company ☐ Hedge Fund ☐ Insurance ☐
Mutual Fund ☐ Pension Fund ☐ Other Regulated Investment Fund ☐ Special Purpose Vehicle ☐ Other-please
specify) ☐

Lender Parent: _____

<u>Domestic Address</u>                          <u>Eurodollar Address</u>

_____          _____

_____          _____

_____          _____

H-1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## Contacts/Notification Methods: Borrowings, Paydowns, Interest, Fees, etc.

|  Primary Credit Contact | Secondary Credit Contact |

**Syndicate-level information (which may contain material non-public information about the Borrower and its related parties or their respective securities) will be made available to the Credit Contact(s). The Credit Contacts identified must be able to receive such information in accordance with his/her institution's compliance procedures and applicable laws, including Federal and state securities laws.**

Name: _____    _____
Company: _____    _____
Title: _____    _____
Address: _____    _____
_____    _____
Telephone: _____    _____
Facsimile: _____    _____
E-Mail Address: _____    _____

|  Primary Operations Contact | Secondary Operations Contact |

Name: _____    _____
Company: _____    _____
Title: _____    _____
Address: _____    _____
_____    _____
Telephone: _____    _____
Facsimile: _____    _____
E-Mail Address: _____    _____

|  Bid Contact | L/C Contact |

Name: _____    _____
Company: _____    _____
Title: _____    _____
Address: _____    _____
_____    _____
Telephone: _____    _____
Facsimile: _____    _____
E-Mail Address: _____    _____

II-2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517146

## Lender's Domestic Wire Instructions

Bank Name: _____

ABA/Routing No.: _____

Account Name: _____

Account No.: _____

FFC Account Name: _____

FFC Account No.: _____

Attention: _____

Reference: _____

## Lender's Foreign Wire Instructions

Currency: _____

Bank Name: _____

Swift/Routing No.: _____

Account Name: _____

Account No.: _____

FFC Account Name: _____

FFC Account No.: _____

Attention: _____

Reference: _____

## Agent's Wire Instructions

Bank Name: _____

ABA/Routing No.: _____

Account Name: _____

Account No.: _____

FFC Account Name: _____

FFC Account No.: _____

Attention: _____

Reference: _____

H-3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517147

**Tax Documents**

NON-U.S. LENDER INSTITUTIONS:

I. *Corporations:*

If your institution is incorporated outside of the United States for U.S. federal income tax purposes, and is the beneficial owner of the interest and other income it receives, you must complete one of the following three tax forms, as applicable to your institution: a.) *Form W-8BEN (Certificate of Foreign Status of Beneficial Owner)*, b.) *Form W-8ECI (Income Effectively Connected to a U.S. Trade or Business)*, or c.) *Form W-8EXP (Certificate of Foreign Government or Governmental Agency)*.

A U.S. taxpayer identification number is required for any institution submitting Form W-8ECI. It is also required on Form W-8BEN for certain institutions claiming the benefits of a tax treaty with the U.S. Please refer to the instructions when completing the form applicable to your institution. In addition, please be advised that U.S. tax regulations do not permit the acceptance of faxed forms. **An original tax form must be submitted.**

II. *Flow-Through Entities:*

If your institution is organized outside the U.S., and is classified for U.S. federal income tax purposes as either a Partnership, Trust, Qualified or Non-Qualified Intermediary, or other non-U.S. flow-through entity, an original *Form W-8IMY (Certificate of Foreign Intermediary, Foreign Flow-Through Entity, or Certain U.S. Branches for United States Tax Withholding)* must be completed by the intermediary together with a withholding statement. Flow-through entities other than Qualified Intermediaries are required to include tax forms for each of the underlying beneficial owners.

Please refer to the instructions when completing this form. In addition, please be advised that U.S. tax regulations do not permit the acceptance of faxed forms. **Original tax form(s) must be submitted.**

U.S. LENDER INSTITUTIONS:

If your institution is incorporated or organized within the United States, you must complete and return *Form W-9 (Request for Taxpayer Identification Number and Certification)*. **Please be advised that we request that you submit an original Form W-9.**

*Pursuant to the language contained in the tax section of the Credit Agreement, the applicable tax form for your institution must be completed and returned prior to the first payment of income. Failure to provide the proper tax form when requested may subject your institution to U.S. tax withholding.*

H-4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517148

**Exhibit I**

## Description of the Exchange Notes

Reference is hereby made to that certain Senior Unsecured Interim Loan Agreement dated as of December 20, 2007 among Tribune Company, the lenders and agents from time to time parties thereto, Merrill Lynch Capital Corporation, as Administrative Agent, and Merrill Lynch, Pierce, Fenner & Smith Incorporated, J.P. Morgan Securities Inc, Citigroup Global Markets Inc. and Banc of America Securities LLC, as Joint Lead Arrangers. This is the Description of Exchange Notes contemplated thereby.

The Company will issue up to $1.6 billion aggregate principal amount of either senior fixed rate notes due 2015 (the "*Fixed Rate Notes*") and/or senior increasing rate notes due 2015 (the "*Increasing Rate Notes*" and, together with the Fixed Rate Notes, the "*Notes*") under an indenture (the "*Indenture*"), among itself, the Guarantors and [          ], as Trustee (the "*Trustee*"). The following is a summary of the material provisions of the Indenture. It does not include all of the provisions of the Indenture. We urge you to read the Indenture because it defines your rights. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended (the "*TIA*"). You can find definitions of certain capitalized terms used in this description under "—Certain Definitions." For purposes of this section, references to the "*Company*" include only Tribune Company, and not its Subsidiaries.

The Notes will be senior unsecured obligations of the Company, ranking equal in right of payment with all other senior unsecured obligations of the Company. The Notes will be effectively subordinated to all existing and future secured debt of the Company and the Guarantors to the extent of the assets securing such debt. The Notes also will be effectively subordinated to any debt, preferred stock obligations and other liabilities of the Company's Subsidiaries that are not Guarantors.

The Company will issue the Notes in fully registered form in denominations of $2,000 and integral multiples of $1,000 in excess thereof. The Trustee will initially act as paying agent (in such capacity, the "*Paying Agent*") and registrar (in such capacity, the "*Registrar*") for the Notes. The Notes may be presented for registration or transfer and exchange at the offices of the Registrar. The Company may change any Paying Agent and Registrar without notice to holders of the Notes (the "*Holders*"). The Company will pay principal (and premium, if any) on the Notes at the Trustee's corporate office in _____. At the Company's option, interest may be paid at the Trustee's corporate trust office or by check mailed to the registered address of Holders. Any Notes that remain outstanding after the completion of the exchange offer contemplated by the Registration Rights Agreement, together with the exchange notes issued in connection with the exchange offer, will be treated as a single class of securities under the Indenture.

The Notes will be issued in the form of global notes that will be deposited upon issuance with the Trustee as custodian for The Depository Trust Company (the "*DTC*"), and purchases of Notes will not receive or be entitled to receive physical, certificated Notes (except in very limited circumstances described in the Indenture).

### Principal, Maturity and Interest

The Company will issue up to $1.6 billion of Notes in exchange for a like principal amount of Bridge Loans as set forth in the Bridge Loan Agreement. The Notes will mature on December 20, 2015. Except for Notes issued in exchange for Bridge Loans, the Indenture will not permit the issuance of any additional Notes (except replacement Notes and Notes as a result of a PIK Payment as described below). The Notes will be issued in denominations of $2,000 and integral multiples of $1,000 in excess thereof and, to the extent a PIK Payment (as defined below) is made, denominations of $1.00 and any integral multiples of $1.00 in excess thereof.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Notes issued in exchange for Bridge Loans will be issued with accrued interest in an amount equal to the amount of interest that had accrued on such Bridge Loans prior to the date of exchange if such interest is not paid by the Company in cash on such date of exchange in accordance with the Bridge Loan Agreement. Interest on the Increasing Rate Notes will accrue at a rate per annum equal to the lesser of (x) the Initial Rate plus the Exchange Spread and (y) 15.25% per annum (subject to the third following paragraph of this Section) and will be payable quarterly in arrears on January 1, April 1, July 1 and October 1, commencing on the first such date following the initial issuance of Notes under the Indenture to the Holders of Increasing Rate Notes of record on the immediately preceding December 15, March 15, June 15 and September 15, respectively. Interest on the Fixed Rate Notes will bear interest at a fixed rate per annum specified by the Holder of such Note that is not higher than the rate of interest borne on the Bridge Loans exchanged for such Fixed Rate Notes on the date of exchange (or, in the case of any Increasing Rate Note that is converted into a Fixed Rate Note as provided below, at a rate specified by the Holder of such Note that is not higher than the rate applicable to such Increasing Rate Note on the date of conversion to a Fixed Rate Note) and will be payable semi-annually in arrears on January 1 and July 1, commencing on the first such date to occur following the issuance of any Fixed Rate Notes to the Holders of Fixed Rate Notes of record on the immediately preceding December 15 and June 15. Interest on each Note will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the date of issuance of such Note or the most recent date to which interest has been paid on the Bridge Loans exchanged for such Note, if applicable. Interest on the Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

Each Holder of an Increasing Rate Note or Bridge Loan will have the right to convert such Increasing Rate Note or Bridge Loan into a Fixed Rate Note by following the procedures set forth in the Indenture in connection with a bona fide transfer of such Notes or Bridge Loans to a third party transferee; *provided* that no Increasing Rate Note that has been unconditionally called for redemption may be converted to a Fixed Rate Note after such notice of redemption has been provided.

The Notes will not be entitled to the benefit of any mandatory sinking fund.

Notwithstanding the foregoing, to the extent that the interest rate applicable to the Notes exceeds 14.50% per annum, the Company shall have the right to pay (any such payment, a "*PIK Payment*") such additional interest by either increasing the outstanding principal amount of Notes or issuing additional Notes (such additional Notes, "*PIK Notes*") under the Indenture on the same terms and conditions as the Notes. Unless the context requires otherwise, references to "Notes" for all purposes of the Indenture and this "Description of Exchange Notes" include any PIK Notes that are actually issued and any increase in the principal amount of the outstanding Notes (including PIK Notes) as a result of a PIK Payment and references to "principal amount" of the Notes include any increase in the principal amount of the outstanding Notes (including PIK Notes) as a result of a PIK Payment. PIK interest will payable (a) with respect to the Notes represented by one or more global notes registered in the name of, or held by, the DTC or its nominee on the relevant record date, by increasing the principal amount of the outstanding Notes represented by such global notes by an amount equal to the amount of the PIK Amount for the applicable interest period (rounded up to the nearest whole dollar) and (b) with respect to Notes represented by certificated notes, by issuing PIK Notes in certificated form in an aggregate principal amount equal to the amount of the PIK Amount for the applicable interest period (rounded up to the nearest whole dollar) and the Trustee will, at the request of the Company, authenticate and deliver such PIK Notes in certificated form for original issuance to the holders on the relevant record date, as shown by the records of the register. Following an increase in the principal amount of the outstanding Notes represented by global notes as a result of a PIK Payment, such Notes will bear interest on such increased principal amount from and after the date of such PIK Payment. Any PIK Notes issued in certificated form will be dated as of the applicable interest payment date and will bear interest from and after such date. All PIK Notes issued pursuant to a PIK Payment will mature on December 20, 2015, and will be governed by, and subject to

-2-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

the terms, provisions and conditions of, the Indenture and shall have the same rights and benefits as the Notes issued on the Issue Date. Any certificated PIK Notes will be issued with the description "PIK" on the face of such PIK Note.

Principal of, premium, if any, and interest on the Notes will be payable at the office or agency of the Company maintained for such purpose within the City and State of New York or, at the option of the Company, payment of interest may be made by check mailed to the Holders of the Notes at their respective addresses set forth in the register of Holders; *provided* that all payments of principal, premium, if any, and interest with respect to the Notes represented by one or more global notes registered in the name of or held by DTC or its nominee will be made by wire transfer of immediately available funds to the accounts specified by the Holder or Holders thereof. Unless otherwise designated by the Company, the Company's office or agency in New York will be the office of the Trustee maintained for such purpose.

## Additional interest

Additional interest may accrue on the Notes in certain circumstances pursuant to the Registration Rights Agreement. All references in the Indenture, in any context, to any interest or other amount payable on or with respect to the Notes shall be deemed to include any Additional Interest pursuant to the Registration Rights Agreement.

## Redemption

*Optional Redemption of the Increasing Rate Notes.* The Company may redeem the Increasing Rate Notes, in whole or in part, upon notice as described under the heading "—Selection and Notice of Redemption" at a redemption price equal to 100% of the principal amount thereof plus accrued and unpaid interest thereon and Additional Interest, if any, to the applicable redemption date, subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date.

*Optional Redemption of the Fixed Rate Notes.* Except as described below, the Fixed Rate Notes are not redeemable before December 20, 2011. Thereafter, the Company may redeem the Fixed Rate Notes at its option, in whole or in part, upon not less than 30 nor more than 60 days' notice, at a redemption price equal to 100% of the principal amount thereof plus a premium equal to the percentage of the annual interest coupon on the Fixed Rate Notes to be redeemed set forth below, plus accrued and unpaid interest thereon (and any Additional Interest, if any) to the applicable redemption date, subject to the rights of Holders on the relevant record date to receive interest due on the relevant interest payment date, if redeemed during the twelve-month period commencing on December 20 of the year set forth below:

| Year | Premium as a Percentage of Annual Interest Coupon |
|------|---------------------------------------------------|
| 2011 | 50.0% |
| 2012 | 25.0% |
| 2013 | 12.5% |
| 2014 and thereafter | 0% |

In addition, at any time prior to December 20, 2011, the Fixed Rate Notes may also be redeemed in whole or in part, at the Company's option, at a price equal to 100% of the principal amount thereof plus the Applicable Premium as of, and accrued but unpaid interest, if any, to, the date of redemption.

-3-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

The Company may also acquire the Notes by means other than redemption, whether by tender offer, open market purchases, negotiated transactions or otherwise, so long as such acquisition does not otherwise violate applicable securities laws and/or regulation or the terms of the Indenture.

*Optional Redemption upon Equity Offerings.* At any time, or from time to time, on or prior to December 20, 2010, the Company may, at its option, use the net cash proceeds of one or more Equity Offerings (as defined below) to redeem up to 35% of the aggregate principal amount of the Fixed Rate Notes issued under the Indenture at a redemption price equal to 100% of the principal amount thereof plus a premium equal to the interest rate in effect on the Fixed Rate Notes on the date for which notice of redemption is given, plus accrued and unpaid interest thereon, if any, to the date of redemption; *provided* that

(1)     at least 65% of the principal amount of Fixed Rate Notes issued under the Indenture remains outstanding immediately after any such redemption; and

(2)     the Company makes such redemption not more than 90 days after the consummation of any such Equity Offering.

"*Equity Offering*" means any public or private offering of Qualified Capital Stock of the Company other than (x) to an Affiliate, (y) pursuant to the ESOP or (z) pursuant to a registration statement on Form S-8.

If the Company redeems less than all of the outstanding Notes, the Trustee shall select the applicable Notes to be purchased in the manner described under "—Selection and Notice of Redemption."

## Selection and Notice of Redemption

In the event that the Company chooses to redeem less than all of the Increasing Rate Notes and/or Fixed Rate Notes issued by it at any time, the Trustee will select the Notes to be redeemed:

(1)     if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed; or,

(2)     on a *pro rata* basis (it being understood that redemptions of Increasing Rate Notes, on the one hand, and Fixed Rate Notes, on the other hand, need not be on a *pro rata* basis), by lot or by such method as the Trustee shall deem fair and appropriate.

No Notes of a principal amount of $2,000 or less shall be redeemed in part. If a partial redemption is made with the proceeds of an Equity Offering, the Trustee will select the Notes only on a *pro rata* basis or on as nearly a *pro rata* basis as is practicable (subject to the procedures of DTC) (it being understood that redemptions of Increasing Rate Notes, on the one hand, and Fixed Rate Notes, on the other hand, need not be on a *pro rata* basis). Notice of redemption will be mailed by first-class mail at least 30 but not more than 60 days before the redemption date to each Holder of Notes to be redeemed at its registered address. If any Note is to be redeemed in part only, then the notice of redemption that relates to such Note must state the portion of the principal amount thereof to be redeemed. A new Note in a principal amount equal to the unredeemed portion thereof will be issued in the name of the Holder thereof upon cancellation of the original Note. The Company will pay accrued and unpaid interest on any Notes redeemed in accordance with the terms of the Indenture. On and after the redemption date, interest will cease to accrue on Notes or portions thereof called for redemption as long as the Company has deposited with the Paying Agent funds in satisfaction of the applicable redemption price.

-4-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517152**

Any such notice may be given prior to the completion of a related Equity Offering and any redemption or notice of redemption (including but not limited to a notice of redemption related to an Equity Offering) may, at the Company's discretion, be subject to the satisfaction of one or more conditions precedent (including but not limited to the completion of the related Equity Offering). In addition, the Company may provide in such notice that payment of the redemption price and performance of the Company's obligations with respect to such redemption or purchase may be performed by another Person.

#### Guarantees

On the Issue Date, the Company's obligations under the Indenture and the Notes will be jointly and severally guaranteed on a senior subordinated unsecured basis by each Restricted Subsidiary that guarantees the Company's obligations under the Credit Agreement. On the Issue Date, the Guarantors will include each of the Company's Domestic Subsidiaries that guarantee its obligations under the Credit Agreement. If a Guarantor is released from its obligations under the Credit Agreement, the Guarantee of such Guarantor will also be released. The obligations of each Guarantor under its Guarantee will be limited as necessary to prevent the Guarantee from constituting a fraudulent conveyance or fraudulent transfer under applicable law.

Each Guarantor may consolidate with or merge into or sell its assets to the Company or another Guarantor that is a Wholly Owned Restricted Subsidiary of the Company without limitation, or with other Persons upon the terms and conditions set forth in the Indenture. In the event all of the Capital Stock of a Guarantor is sold or otherwise disposed of by the Company and the sale or other disposition complies with the provisions set forth in "—Certain Covenants—Limitation on Asset Sales," the Guarantor's Guarantee will be released. In addition, if the Company designates any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary in accordance with the provisions of the Indenture, the Guarantee of such Guarantor may, at the election of the Company, be released.

#### *Subordination of Guarantees*

The payment of all Obligations on or relating to any Guarantee is subordinated in right of payment to the prior payment in full in cash or Cash Equivalents of all Obligations of the Guarantor with respect to the Credit Agreement. Notwithstanding the foregoing, payments and distributions made relating to the Guarantees pursuant to the trust described under "Legal Defeasance and Covenant Defeasance" shall not be so subordinated in right of payment so long as the payments into the trust were made in accordance with the requirements described under "Legal Defeasance and Covenant Defeasance" and did not violate the subordination provisions when they were made.

The lenders under the Credit Agreement will be entitled to receive payment in full in cash or Cash Equivalents of all Obligations due in respect of the Credit Agreement (including interest accruing after the commencement of any bankruptcy or other like proceeding at the rate specified in the Credit Agreement whether or not such interest is an allowed claim in any such proceeding) before the Holders of Notes will be entitled to receive any payment or distribution of any kind or character with respect to any Obligations on, or relating to, the Guarantees in the event of any distribution to creditors of the Guarantor:

    (1)    in a total or partial liquidation, dissolution or winding up of the Guarantor;

    (2)    in a bankruptcy, reorganization, insolvency, receivership or similar proceeding relating to the Guarantor or its property;

    (3)    in an assignment for the benefit of creditors; or

-5-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

(4)      in any marshalling of the Guarantor's assets and liabilities.

The Guarantor also may not make any payment or distribution of any kind or character with respect to any Obligations on, or relating to, the Guarantee or the Notes or acquire any Notes for cash or property or otherwise if:

(1)      a payment default under the Credit Agreement occurs and is continuing; or

(2)      any other default occurs and is continuing under the Credit Agreement that permits lenders under the Credit Agreement to accelerate its maturity and the Trustee receives a notice of such default (a "Payment Blockage Notice") from the agent under the Credit Agreement.

Payments on and distributions with respect to any Obligations on, or with respect to, the Guarantee may and shall be resumed:

(1)      in the case of a payment default, upon the date on which such default is cured or waived; and

(2)      in case of a nonpayment default, the earliest of (x) the date on which all nonpayment defaults are cured or waived (so long as no other event of default under the Credit Agreement exists), (y) 180 days after the date on which the applicable Payment Blockage Notice is received or (z) the date on which the Trustee receives notice from the agent under the Credit Agreement rescinding the Payment Blockage Notice, unless the maturity of the Credit Agreement has been accelerated.

No new Payment Blockage Notice may be delivered unless and until 360 days have elapsed since the effectiveness of the immediately prior Payment Blockage Notice.

No nonpayment default that existed or was continuing on the date of delivery of any Payment Blockage Notice to the Trustee shall be, or be made, the basis for a subsequent Payment Blockage Notice unless such default shall have been cured or waived for a period of not less than 90 consecutive days (it being acknowledged that any subsequent action, or any breach of any financial covenants for a period commencing after the date of delivery of such initial Payment Blockage Notice that in either case would give rise to a default pursuant to any provisions under which a default previously existed or was continuing shall constitute a new default for this purpose).

The Company must promptly notify lenders under the Credit Agreement if payment of the Notes is accelerated because of an Event of Default.

**Change of Control**

Upon the occurrence of a Change of Control, each Holder will have the right to require that the Company purchase all or a portion of such Holder's Notes (not previously called for redemption) pursuant to the offer described below (the "Change of Control Offer"), at a purchase price equal to 100% in the case of the Increasing Rate Notes and 101% with respect to the Fixed Rate Notes, in each case, of the principal amount thereof plus accrued interest, if any, to the date of purchase. In advance of any Change of Control, the Company may repurchase some or all of the Notes as described under "Redemption— Optional Redemption."

Within 30 days following the date upon which the Change of Control occurred, the Company must send, by first-class mail, a notice to each Holder, with a copy to the Trustee, which notice shall gov-

-6-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

ern the terms of the Change of Control Offer. Such notice shall state, among other things, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date such notice is mailed, other than as may be required by law (the "Change of Control Payment Date"). Holders electing to have a Note purchased pursuant to a Change of Control Offer will be required to surrender the Note, with the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note completed, to the Paying Agent at the address specified in the notice prior to the close of business on the third business day prior to the Change of Control Payment Date. No Note will be repurchased in part if less than $2,000 in original principal amount of such Note would be left outstanding.

The Company will not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compli-ance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by the Company and purchases all Notes validly tendered and not withdrawn under such Change of Control Of-fer. In addition, the Company (or a third party) may make a Change of Control Offer in advance of, and conditioned upon, a Change of Control in the manner provided in the Indenture.

If a Change of Control Offer is made, there can be no assurance that the Company will have available funds sufficient to pay the Change of Control purchase price for all the Notes that might be de-livered by Holders seeking to accept the Change of Control Offer. In the event the Company is required to purchase outstanding Notes pursuant to a Change of Control Offer, the Company expects that it would seek third party financing to the extent it does not have available funds to meet its purchase obligations. However, there can be no assurance that the Company would be able to obtain such financing.

Neither the Board of Directors of the Company nor the Trustee may waive the covenant relating to a Holder's right to require repurchase upon a Change of Control. Restrictions in the Indenture de-scribed herein on the ability of the Company and its Restricted Subsidiaries to incur additional Indebted-ness, to grant liens on their property, to make Restricted Payments and to make Asset Sales may also make more difficult or discourage a takeover of the Company, whether favored or opposed by the man-agement of the Company. Consummation of any such transaction in certain circumstances may require redemption or repurchase of the Notes, and there can be no assurance that the Company or the acquiring party will have sufficient financial resources to effect such redemption or repurchase. Such restrictions and the restrictions on transactions with Affiliates may, in certain circumstances, make more difficult or discourage any leveraged buyout of the Company or any of its Subsidiaries by the management of the Company. While such restrictions cover a wide variety of arrangements which have traditionally been used to effect highly leveraged transactions, the Indenture may not afford the Holders protection in all circumstances from the adverse aspects of a highly leveraged transaction, reorganization, restructuring, merger or similar transaction.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with the repurchase of Notes pursuant to a Change of Control Offer. To the extent that the provisions of any securities laws or regulations conflict with the "Change of Control" provisions of the Indenture, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under the "Change of Control" provisions of the Indenture by virtue thereof.

**Certain Covenants**

The covenants set forth in the Bridge Loan Agreement will be deleted and the covenants set forth below will apply under the Bridge Loan Agreement (modified as appropriate so as to apply to the Bridge Loans and Bridge Loan Agreement rather than the Notes and the Indenture) and the Indenture, beginning

-7-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

on the Initial Maturity Date. Upon the Initial Maturity Date, all items that would be treated as Indebtedness, Restricted Payments, Investments or Liens under this "Description of Exchange Notes" that were incurred or made after the Effective Date and prior to the Initial Maturity Date in reliance upon a provision in the Bridge Loan Agreement permitting the incurrence or making of such Indebtedness, Restricted Payment, Investment, or Lien, but in an amount that is limited numerically through a "dollar basket" and/or "ratio test" (any such amount, being referred to as "Limited" Indebtedness or a "Limited" Restricted Payment, Investment or Lien, as applicable), will be required to be treated as incurred or made under the covenants set forth below under this "Description of Exchange Notes." For such purposes:

(A)    the Company may classify or designate each such item in any manner that would have satisfied the Indenture had the Indenture been in effect on the date such item was incurred or made, including, for the avoidance of doubt, incurring such Indebtedness under the Consolidated Fixed Charge Coverage Ratio exception set forth in the first paragraph of the covenant described under "Certain covenants—Limitation on Incurrence of Additional Indebtedness", except that Indebtedness under the Credit Agreement will be deemed to be outstanding in reliance on the exception provided by clause (2) of the definition of "Permitted Indebtedness"; and

(B)    to the extent that the Company determines to designate such item as using a basket that provides capacity to incur such amount on a rolling four quarter basis (or other time period), such item shall be deemed to have been incurred on the date it actually was incurred, and to roll off such basket four quarters (or if applicable such other relevant time period) after it was first made.

Notwithstanding the foregoing, if any Indebtedness, Lien, Restricted Payment or Investment referred to above was incurred or made prior to the Initial Maturity Date in violation of the Bridge Loan Agreement and is outstanding as of the Initial Maturity Date, such incurrence shall be deemed a Default hereunder to the extent and solely to the extent such event would have constituted a Default had the Indenture been in effect at all times since the Effective Date.

Set forth below are summaries of certain covenants to be contained in the Indenture.

*Limitation on Incurrence of Additional Indebtedness.* The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume, guarantee, acquire, become liable, contingently or otherwise, with respect to, or otherwise become responsible for payment of (collectively, "incur") any Indebtedness (other than Permitted Indebtedness); *provided, however,* that if no Default or Event of Default shall have occurred and be continuing at the time of or as a consequence of the incurrence of any such Indebtedness, the Company or any of its Restricted Subsidiaries that is or, upon such incurrence, becomes a Guarantor may incur Indebtedness (including, without limitation, Acquired Indebtedness) and any Restricted Subsidiary of the Company that is not or will not, upon such incurrence, become a Guarantor may incur Acquired Indebtedness, in each case if on the date of the incurrence of such Indebtedness, after giving effect to the incurrence thereof, the Consolidated Fixed Charge Coverage Ratio of the Company would have been greater than 2.0 to 1.0.

The Company will not, and will not permit any Guarantor to, directly or indirectly, incur any Indebtedness which by its terms (or by the terms of any agreement governing such Indebtedness) is expressly subordinated in right of payment to any other Indebtedness of the Company or such Guarantor, as the case may be, unless such Indebtedness is also by its terms (or by the terms of any agreement governing such Indebtedness) made expressly subordinate to the Notes or the applicable Guarantee, as the case may be, to the same extent and in the same manner as such Indebtedness is subordinated to other Indebtedness of the Company or such Guarantor, as the case may be. For purposes of the foregoing, no Indebtedness will be deemed to be subordinated in right of payment to any other Indebtedness of the Company

-8-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

or any Guarantor solely by virtue of such Indebtedness being unsecured or by virtue of the fact that the holders of such Indebtedness have entered into one or more intercreditor agreements giving one or more of such holders priority over the other holders in the collateral held by them.

*Limitation on Restricted Payments.* The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly:

      (1)     declare or pay any dividend or make any distribution (other than dividends or distributions payable in Qualified Capital Stock of the Company) on or in respect of shares of the Company's Capital Stock to holders of such Capital Stock;

      (2)     purchase, redeem or otherwise acquire or retire for value any Capital Stock of the Company;

      (3)     make any principal payment on, purchase, defease, redeem, prepay, decrease or otherwise acquire or retire for value, prior to any scheduled final maturity, scheduled or mandatory repayment or scheduled sinking fund payment, any Subordinated Indebtedness; or

      (4)     make any Investment (other than Permitted Investments)

(each of the foregoing actions set forth in clauses (1), (2), (3) and (4) being referred to as a "Restricted Payment"), if at the time of such Restricted Payment or immediately after giving effect thereto,

      (i)     a Default or an Event of Default shall have occurred and be continuing; or

      (ii)     the Company is not able to incur at least $1.00 of additional Indebtedness (other than Permitted Indebtedness) in compliance with the "Limitation on Incurrence of Additional Indebtedness" covenant; or

      (iii)     such Restricted Payment, together with the aggregate amount of Restricted Payments (including Restricted Payments made pursuant to clause (2), (3), (5), (8), (9), (16), (17)(ii) and (18)(ii)(a) of the next succeeding paragraph but excluding all other Restricted Payments permitted by the next succeeding paragraph) made subsequent to the Effective Date (the amount expended for such purposes, if other than in cash, being the fair market value of such property as determined in good faith by the Board of Directors of the Company) shall exceed the sum of:

      (w)     50% of the cumulative Consolidated Net Income (or if cumulative Consolidated Net Income shall be a loss, minus 100% of such loss) of the Company earned subsequent to the Effective Date and on or prior to the date the Restricted Payment occurs (the "Reference Date") (treating such period as a single accounting period); *plus*

      (x)     100% of the aggregate net cash proceeds received by the Company from any Person (other than a Subsidiary of the Company) from the issuance and sale subsequent to the Effective Date and on or prior to the Reference Date of Qualified Capital Stock of the Company or warrants, options or other rights to acquire Qualified Capital Stock of the Company (but excluding (A) any debt security that is convertible into, or exchangeable for, Qualified Capital Stock and (B) any issuance or sale pursuant to the ESOP); *plus*

      (y)     without duplication of any amounts included in clause (iii)(x) above, 100% of the aggregate net cash proceeds of any equity contribution received by the

-9-

TRB0517157

Company from a holder of the Company's Capital Stock subsequent to the Effective Date and on or prior to the Reference Date (excluding, in the case of clause (iii)(x) and this clause (iii)(y), (A) any net cash proceeds from an Equity Offering to the extent used to redeem the Notes in compliance with the provisions set forth under "Redemption— Optional Redemption upon Equity Offerings" and (B) any proceeds received from any issuance or sale of Capital Stock pursuant to the ESOP); *plus*

(z)     without duplication, the sum of:

(1)     the aggregate amount returned in cash on or with respect to Investments (other than Permitted Investments) made subsequent to the Effective Date whether through interest payments, principal payments, dividends or other distributions or payments;

(2)     the net cash proceeds received by the Company or any of its Restricted Subsidiaries from the disposition of all or any portion of such Investments (other than to a Subsidiary of the Company); and

(3)     upon redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary, the fair market value of such Subsidiary;

*provided, however,* that the sum of clauses (1), (2) and (3) above shall not exceed the aggregate amount of all such Investments made subsequent to the Effective Date.

Notwithstanding the foregoing, the provisions set forth in the immediately preceding paragraph do not prohibit:

(1)     Restricted Payments by the Company or any Restricted Subsidiary to the Company or any Guarantor that is a wholly owned Subsidiary of the Company and Restricted Payments by any Restricted Subsidiary to its direct parent; and

(2)     the repurchase or redemption of common stock equivalents of the Company held by officers, directors or employees or former officers, directors or employees (or their transferees, estates or beneficiaries under their estates) of the Company, in accordance with the terms of the Tribune Management Equity Incentive Plan;

(3)     (A) payments by the Company (directly or indirectly) to or on behalf of the ESOP in an amount sufficient to pay franchise taxes and other fees required to maintain the legal existence of the ESOP and (B) payments by the Company to or on behalf of the ESOP in an amount sufficient to pay out-of-pocket legal, accounting and filing costs and other expenses in the nature of overhead in the ordinary course of administration of the ESOP;

(4)     Restricted Payments made in connection with the Transactions;

(5)     without duplication of any ESOP Related Distributions, subsequent to the consummation of the Acquisition, dividends to the ESOP (a) in an amount not to exceed the ESOP Note Repayment Amounts as and when due and payable, (b) to enable the ESOP to prepay a portion of the ESOP Note to provide for targeted allocations to ESOP participants as approved by the Board of Directors of the Company and (c) ratable (except with respect to contributions to the ESOP, which will not be ratable) Dividends to all other holders of the Company's Common Stock;

-10-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517158

(6)        without duplication to any ESOP Related Distributions, the repurchase and re-demption of the Company's Capital Stock to satisfy the ESOP's and the Company's obligations to repurchase the Company's Capital Stock pursuant to the ESOP Documentation or applicable law from accounts allocated to participants in the ESOP in accordance with the terms of the ESOP;

(7)        the repurchase or redemption of Junior Capital that is Capital Stock issued in connection with a Special Contribution in an amount not to exceed the Junior Capital Reduction Amount on the date of such repurchase or redemption;

(8)        ESOP Related Distributions;

(9)        other Restricted Payments not otherwise permitted hereunder in an aggregate amount not to exceed $50.0 million; *provided* that the Total Guaranteed Leverage Ratio would be no greater than 6.0:1.0 on a *pro forma* basis taking into account the making of such Restricted Payment; *provided further* that Restricted Payments made using this clause (9) shall not be used to repurchase or redeem Junior Capital issued in connection with a Special Contribution;

(10)       dispositions made as part of a Permitted Disposition Transaction;

(11)       prepayments or redemptions of Junior Capital that is not Capital Stock issued in connection with a Special Contribution not to exceed the Junior Capital Reduction Amount on the date of such repayment or redemption;

(12)       prepayments and redemptions of any Indebtedness with the proceeds of other Re-financing Indebtedness permitted to be incurred under the Indenture;

(13)       prepayments, repurchases or redemptions of the Zell Note in accordance with its terms;

(14)       prepayments or redemptions of Indebtedness secured by an asset sold in connec-tion with any Asset Sale permitted under the Indenture with the Net Cash Proceeds of such Asset Sale;

(15)       prepayments of the Zell Sub Note to the extent not prohibited by the terms of any applicable subordination provisions;

(16)       the payment of any dividend within 60 days after the date of declaration of such dividend if the dividend would have been permitted on the date of declaration;

(17)       if no Default or Event of Default shall have occurred and be continuing, the ac-quisition of any shares of Capital Stock of the Company, either (i) solely in exchange for shares of Qualified Capital Stock of the Company or (ii) through the application of net proceeds of a substantially concurrent sale for cash (other than to a Subsidiary of the Company) of shares of Qualified Capital Stock of the Company;

(18)       if no Default or Event of Default shall have occurred and be continuing, the ac-quisition of any Subordinated Indebtedness either (i) solely in exchange for shares of Qualified Capital Stock of the Company, or (ii) through the application of net proceeds of a substantially concurrent sale for cash (other than to a Subsidiary of the Company) of (a) shares of Qualified Capital Stock of the Company or (b) Refinancing Indebtedness; and

-11-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

(19)    redemptions, repurchases or other repayments of all or any portion of the PHONES with the proceeds of the equity interests associated with the PHONES so long as the Company contemporaneously purchases call options or otherwise enters into hedge agreements sufficient (in the discretion of the Company) to ensure the Company's ability to perform under the terms of any remaining PHONES as then in effect.

*Limitation on Asset Sales.* The Company will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless

(1)    the Company or the applicable Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the fair market value of the assets sold or otherwise disposed of (as determined in good faith by the Company's Board of Directors);

(2)    at least 70% of the consideration received by the Company or the Restricted Subsidiary, as the case may be, from such Asset Sale shall be in the form of cash, Cash Equivalents and/or Replacement Assets (as defined below) and is received at the time of such disposition; *provided* that the amount of any liabilities (as shown on the Company's or such Restricted Subsidiary's most recent balance sheet) of the Company or any such Restricted Subsidiary (other than liabilities that are by their terms subordinated to the Notes or any Guarantee of a Guarantor) that are assumed by the transferee of any such assets shall be deemed to be cash for purposes of this provision; and

(3)    upon the consummation of an Asset Sale, the Company shall apply, or cause such Restricted Subsidiary to apply, the Net Cash Proceeds relating to such Asset Sale within five business days after the end of the Reinvestment Period relating to such Asset Sale either:

(a)    to permanently reduce Indebtedness under the Credit Agreement; and, in the case of any such Indebtedness under any revolving credit facility, effect a permanent reduction in the availability under such revolving credit facility;

(b)    to make an investment in properties and assets that replace the properties and assets that were the subject of such Asset Sale or in the business of the Company or any of its Subsidiaries or in businesses reasonably related thereto or reasonable extension thereof ("Replacement Assets"); and/or

(c)    a combination of prepayment and investment permitted by the foregoing clauses (3)(a) and (3)(b).

Pending the final application of such Net Cash Proceeds, the Company may temporarily reduce borrowings under the Credit Agreement or any other revolving credit facility. On or prior to the last day of the Reinvestment Period related to an Asset Sale or such earlier date, if any, as the Board of Directors of the Company or of such Restricted Subsidiary determines not to apply the Net Cash Proceeds relating to such Asset Sale as set forth in clauses (3)(a), (3)(b) and (3)(c) of the preceding paragraph (each, a "Net Proceeds Offer Trigger Date"), such aggregate amount of Net Cash Proceeds which have not been applied on or before such Net Proceeds Offer Trigger Date as permitted in clauses (3)(a), (3)(b) and (3)(c) of the preceding paragraph (each, a "Net Proceeds Offer Amount") shall be applied by the Company or such Restricted Subsidiary to make an offer to purchase (the "Net Proceeds Offer") to all Holders and, to the extent required by the terms of any Pari Passu Indebtedness, to all holders of such Pari Passu Indebtedness, on a date (the "Net Proceeds Offer Payment Date") not less than 30 nor more than 60 days following the applicable Net Proceeds Offer Trigger Date, from all Holders (and holders of any such Pari Passu In-

-12-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517160**

debtedness) on a *pro rata* basis, that amount of Notes (and Pari Passu Indebtedness) equal to the Net Proceeds Offer Amount at a price equal to 100% of the principal amount of the Notes (and Pari Passu Indebtedness) to be purchased, plus accrued and unpaid interest thereon, if any, to the date of purchase; *provided, however*, that if at any time any non-cash consideration received by the Company or any Restricted Subsidiary of the Company, as the case may be, in connection with any Asset Sale is converted into or sold or otherwise disposed of for cash (other than interest received with respect to any such non-cash consideration), then such conversion or disposition shall be deemed to constitute an Asset Sale hereunder and the Net Cash Proceeds thereof shall be applied in accordance with this covenant.

The Company may defer the Net Proceeds Offer until there is an aggregate unutilized Net Proceeds Offer Amount equal to or in excess of $10.0 million resulting from one or more Asset Sales (at which time, the entire unutilized Net Proceeds Offer Amount, and not just the amount in excess of $10.0 million, shall be applied as required pursuant to the preceding paragraph).

In the event of the transfer of substantially all (but not all) of the property and assets of the Company and its Restricted Subsidiaries as an entirety to a Person in a transaction permitted under "—Merger, Consolidation and Sale of Assets," which transaction does not constitute a Change of Control, the successor corporation shall be deemed to have sold the properties and assets of the Company and its Restricted Subsidiaries not so transferred for purposes of this covenant, and shall comply with the provisions of this covenant with respect to such deemed sale as if it were an Asset Sale. In addition, the fair market value of such properties and assets of the Company or its Restricted Subsidiaries deemed to be sold shall be deemed to be Net Cash Proceeds for purposes of this covenant.

Each Net Proceeds Offer will be mailed to the record Holders as shown on the register of Holders within 25 days following the Net Proceeds Offer Trigger Date, with a copy to the Trustee, and shall comply with the procedures set forth in the Indenture. Upon receiving notice of the Net Proceeds Offer, Holders may elect to tender their Notes in whole or in part in integral multiples of $1,000 in exchange for cash. To the extent Holders properly tender Notes and holders of Pari Passu Indebtedness properly tender such Pari Passu Indebtedness in an amount exceeding the Net Proceeds Offer Amount, the tendered Notes and Pari Passu Indebtedness will be purchased on a *pro rata* basis based on the aggregate amounts of Notes and Pari Passu Indebtedness tendered (and the Trustee shall select the tendered Notes of tendering Holders on a *pro rata* basis based on the amount of Notes tendered). A Net Proceeds Offer shall remain open for a period of 20 business days or such longer period as may be required by law. If any Net Cash Proceeds remain after the consummation of any Net Proceeds Offer, the Company may use those Net Cash Proceeds for any purpose not otherwise prohibited by the Indenture. Upon completion of each Net Proceeds Offer, the amount of Net Cash Proceeds will be reset at zero.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with the repurchase of Notes pursuant to a Net Proceeds Offer. To the extent that the provisions of any securities laws or regulations conflict with the "Asset Sale" provisions of the Indenture, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under the "Asset Sale" provisions of the Indenture by virtue thereof.

*Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries.* The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or permit to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary of the Company to

(1)     pay dividends or make any other distributions on or in respect of its Capital Stock;

-13-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517161

(2)      make loans or advances to the Company or any other Restricted Subsidiary or to pay any Indebtedness owed to the Company or any other Restricted Subsidiary of the Company; or

(3)      transfer any of its property or assets to the Company or any other Restricted Subsidiary of the Company,

except in each case for such encumbrances or restrictions existing under or by reason of:

(1)      restrictions, limitations, conditions and prohibitions under or imposed by any indenture, agreement, instrument or other contractual arrangement (A) imposed or binding upon Eagle New Media Investments, LLC, Eagle Publishing Investments, LLC or any Subsidiary established, in the good faith judgment of the Company, to insure risks of the Company and its Subsidiaries, including, without limitation, Multimedia Insurance Company, (B) in effect on the Effective Date and any similar indentures, agreements or instruments to the extent such restrictions, limitations, conditions and prohibitions are no more restrictive, taken as a whole, than those set forth in such existing indentures, agreements or instruments, (C) created in connection with any Receivables Facility if such restrictions are necessary or advisable, in the good faith judgment of the Company, to effect such Receivables Facility or (D) imposed on a Guarantor or PDT Entity, so long as such limitations do not, in the good faith judgment of the Company, materially and adversely affect such Person's ability to make interest and principal payments under its Guarantee or on the Notes when due, as applicable;

(2)      the Credit Agreement;

(3)      restrictions consisting of customary provisions contained in leases, licenses, joint venture and other agreements, organizational documents, stockholder agreements and other similar agreements (in each case relating solely to the respective joint venture or similar entity or the equity interests therein);

(4)      restrictions imposed by any agreement to sell assets or Capital Stock permitted under the Indenture to any Person pending the closing of such sale;

(5)      restrictions or encumbrances on the transfer of assets subject to any Lien permitted under the Indenture;

(6)      any agreement or instrument in effect at the time a Person first became a Subsidiary of the Company or the date such agreement or instrument is otherwise assumed by the Company or any of its Subsidiaries, so long as such agreement or instrument was not entered into in contemplation of such Person becoming a Subsidiary of the Company or such assumption;

(7)      all documents in connection with the Transactions, including without limitation the Acquisition Agreement and the Warrant;

(8)      customary provisions in organizational documents, asset sale and stock sale agreements and other similar agreements that restrict the transfer of ownership interests in any partnership, limited liability company or similar Person;

(9)      restrictions on cash or other deposits or net worth imposed by suppliers or landlords or customers under contracts entered into in the ordinary course of business;

-14-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517162

(10)    any instrument governing Indebtedness assumed in connection with any acquisition, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired;

(11)    applicable law, rule or regulation;

(12)    any agreement governing Indebtedness incurred to Refinance the Indebtedness issued, assumed or incurred pursuant to an agreement referred to in clauses (1), (5), (6), (7), (8) and (9) above or (13), (14) or (16) below; *provided, however*, that the provisions relating to such encumbrance or restriction contained in any such Indebtedness are no less favorable to the Company in any material respect as determined by the Company in its reasonable and good faith judgment than the provisions relating to such encumbrance or restriction contained in agreements referred to in such clauses (1), (5), (6), (7), (8) and (9) above or (13), (14) or (16) below;

(13)    any encumbrance or restriction imposed by any agreement or instrument imposing an encumbrance or restriction on the ability of the Company or any Guarantor to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, in each case to the extent in the good faith judgment of the Company do not materially and adversely affect the Company's ability to make interest and principal payments on the Notes when due;

(14)    the Indenture or the Bridge Loan Agreement;

(15)    customary provisions of any contract, license, joint venture agreement or other agreement or of any lease governing a leasehold interest of any Restricted Subsidiary of the Company; and

(16)    any instrument governing Acquired Indebtedness, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired.

*Limitation on Preferred Stock of Restricted Subsidiaries.* The Company will not permit any of its Restricted Subsidiaries to issue any Preferred Stock (other than to the Company or to a Wholly Owned Restricted Subsidiary of the Company) or permit any Person (other than the Company or a Wholly Owned Restricted Subsidiary of the Company) to own any Preferred Stock of any Restricted Subsidiary of the Company, in each case, other than:

(1)    issuances of Preferred Stock made in connection with re-incorporating a Subsidiary in a different jurisdiction, issuances of Preferred Stock made in connection with mergers of Subsidiaries effected for purposes of relocating such Subsidiaries in a different jurisdiction or becoming a limited liability company and conversions of corporations into limited liability companies, in each case so long as the owners of Preferred Stock remain the same immediately after such conversions;

(2)    issuances of Preferred Stock as part of a Permitted Disposition Transaction;

(3)    stock splits, stock dividends and additional issuances of Preferred Stock that do not decrease the percentage ownership of any Subsidiaries in any class of Preferred Stock of such Subsidiary; and

-15-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517163

(4)     issuances of Preferred Stock necessary to comply with applicable local laws.

*Limitation on Liens.* The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or permit or suffer to exist any Liens of any kind against or upon any property or assets of the Company or any of its Restricted Subsidiaries whether owned on the Issue Date or acquired after the Issue Date, or any proceeds therefrom, or assign or otherwise convey any right to receive income or profits therefrom unless:

(1)     in the case of Liens securing Subordinated Indebtedness, the Notes or the Guarantee of such Guarantor, as the case may be, is secured by a Lien on such property, assets or proceeds that is senior in priority to such Liens; and

(2)     in all other cases, the Notes or the Guarantee of such Guarantor, as the case may be, is equally and ratably secured,

except for:

(1)     Permitted Liens.

(2)     Liens existing as of the Effective Date to the extent and in the manner such Liens are in effect on the Effective Date;

(3)     Liens securing (A) borrowings under the Credit Agreement incurred pursuant to clause (2) of the definition of "Permitted Indebtedness", (B) any Receivables Facility incurred pursuant to clause (24) of the definition of "Permitted Indebtedness" and (C) the Existing Notes equally and ratably with the Credit Agreement;

(4)     the replacement, extension or renewal of any Lien permitted by clause (2) hereof or clauses (12)(B) or (16) of the definition of "Permitted Liens" or this clause (4) upon or in the same property theretofore subject thereto, and any improvements on or proceeds of such property and any property covered by an after-acquired property clause in such Lien or Liens securing Refinancing Indebtedness which is incurred to Refinance any Indebtedness which has been secured by a Lien permitted under the Indenture and which has been incurred in accordance with the provisions of the Indenture; *provided, however,* that such Liens: (i) are no less favorable to the Holders in any material respect and are not more favorable to the lienholders in any material respect with respect to such Liens than the Liens in respect of the Indebtedness being Refinanced; and (ii) do not extend to or cover any property or assets of the Company or any of its Restricted Subsidiaries not securing the Indebtedness so Refinanced;

(5)     Liens securing the Notes, the Bridge Loans and the Guarantees; and

(6)     Liens in favor of the Company or a Wholly Owned Restricted Subsidiary of the Company on assets of any Restricted Subsidiary of the Company.

*Merger, Consolidation and Sale of Assets.* The Company will not, in a single transaction or series of related transactions (other than the Transactions), consolidate or merge with or into any Person, or sell, assign, transfer, lease, convey or otherwise dispose of (or cause or permit any Restricted Subsidiary of the Company to sell, assign, transfer, lease, convey or otherwise dispose of) all or substantially all of the Company's assets (determined on a consolidated basis for the Company and the Company's Restricted Subsidiaries) whether as an entirety or substantially as an entirety to any Person unless:

-16-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

(1)    either:

    (a)    the Company shall be the surviving or continuing corporation; or

    (b)    the Person (if other than the Company) formed by such consolidation or into which the Company is merged or the Person which acquires by sale, assignment, transfer, lease, conveyance or other disposition the properties and assets of the Company and of the Company's Restricted Subsidiaries substantially as an entirety (the "Surviving Entity")

        (x)    shall be a corporation organized and validly existing under the laws of the United States, any State or territory thereof or the District of Columbia (and if such Person is a limited liability company, a corporate co-issuer shall be designated); and

        (y)    shall expressly assume, by supplemental indenture (in form and substance satisfactory to the Trustee), executed and delivered to the Trustee, the due and punctual payment of the principal of, and premium, if any, and interest on all of the Notes and the performance of every covenant of the Notes, the Indenture and the Registration Rights Agreement on the part of the Company to be performed or observed;

(2)    in the case of a merger or consolidation of the Company with or into any Person, immediately after giving *pro forma* effect to such transaction and any related financing transactions and the assumption contemplated by clause (1)(b)(y) above (including giving effect to any Indebtedness and Acquired Indebtedness incurred or anticipated to be incurred in connection with or in respect of such transaction), either (x) the Company or such Surviving Entity, as the case may be, shall be able to incur at least $1.00 of additional Indebtedness (other than Permitted Indebtedness) pursuant to the covenant described under "Limitation on Incurrence of Additional Indebtedness" or (y) the Consolidated Fixed Charge Coverage Ratio of the Company or such Surviving Entity, as the case may be, shall immediately after such transaction, be no less than such ratio immediately prior to such transaction;

(3)    immediately before and immediately after giving *pro forma* effect to such transaction and any related financing transactions and the assumption contemplated by clause (1)(b)(y) above (including, without limitation, giving effect to any Indebtedness and Acquired Indebtedness incurred or anticipated to be incurred and any Lien granted in connection with or in respect of the transaction), no Default or Event of Default shall have occurred or be continuing; and

(4)    the Company or the Surviving Entity shall have delivered to the Trustee an officers' certificate and an opinion of counsel, each stating that such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture comply with the applicable provisions of the Indenture and that all conditions precedent in the Indenture relating to such transaction have been satisfied.

For purposes of the foregoing, the transfer (by lease, assignment, sale or otherwise, in a single transaction or series of transactions) of all or substantially all of the properties or assets of one or more Restricted Subsidiaries of the Company, the Capital Stock of which constitutes all or substantially all of the properties and assets of the Company, shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

-17-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517165

The Indenture will provide that upon any consolidation, combination or merger or any transfer of all or substantially all of the assets of the Company in accordance with the foregoing in which the Company is not the continuing corporation, the Surviving Entity formed by such consolidation or into which the Company is merged or to which such conveyance, lease or transfer is made shall succeed to, and be substituted for, and may exercise every right and power of, the Company under the Indenture and the Notes with the same effect as if such surviving entity had been named as such.

Each Guarantor (other than any Guarantor whose Guarantee is to be released in accordance with the terms of the Guarantee and the Indenture in connection with any transaction complying with the provisions described under of " —Limitation on Asset Sales") will not, and the Company will not cause or permit any Guarantor to, consolidate with or merge with or into any Person other than the Company or any other Guarantor unless:

(1)      the entity formed by or surviving any such consolidation or merger (if other than the Guarantor) or to which such sale, lease, conveyance or other disposition shall have been made is a corporation organized and existing under the laws of the United States, any State or territory thereof or the District of Columbia;

(2)      such entity assumes by supplemental indenture all of the obligations of the Guarantor on the Guarantee;

(3)      immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing; and

(4)      immediately after giving *pro forma* effect to such transaction and any related financing transactions and the use of any net proceeds therefrom, the Company could satisfy the provisions of clause (2) of the first paragraph of this covenant.

Notwithstanding the foregoing, (i) (x) any Restricted Subsidiary of the Company may merge or consolidate with or into, or dispose of assets to any Guarantor, (y) any Restricted Subsidiary of the Company that is a holding company with no stand-alone operations or income may merge or consolidate with or into or dispose of all or substantially all of such Restricted Subsidiary's assets to the Company, or (z) any Restricted Subsidiary of the Company may distribute to the Company any Capital Stock of such Restricted Subsidiary's Subsidiaries; *provided* that, in each case, no Default exists or would result therefrom; (ii) any Restricted Subsidiary of the Company may merge into or consolidate with any other Person or permit any other Person to merge into or consolidate with it so long as, either (1) such Restricted Subsidiary shall be the survivor thereof, or (2) if the other Person shall be the survivor thereof, such other Person surviving such consolidation or merger shall be a U.S. organized entity and, if such other Person is merging with a Guarantor, such Person shall assume all the obligations of such Guarantor under the Indenture and the Notes pursuant to the terms of the Indenture; *provided* that no Event of Default exists or would result therefrom; (iii) as part of any Asset Sale otherwise permitted by the Indenture, any Restricted Subsidiary of the Company may merge into or consolidate with any other Person or permit any other Person to merge into or consolidate with it; *provided* that no Event of Default exists or would result therefrom; (iv) any Subsidiary of the Company may merge into the Company or any other Subsidiary or liquidate or dissolve if the Company determines in good faith that such liquidation or dissolution is in the best interest of the Company and is not materially disadvantageous to the Holders and (v) the Company may merge with an Affiliate that is a Person that has no material assets or liabilities and that was organized solely for the purpose of reorganizing the Company in another jurisdiction; *provided* that no Event of Default exists or would result therefrom.

-18-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517166

*Limitations on Transactions with Affiliates.* The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction or series of related transactions (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service) with, or for the benefit of, any of its Affiliates (each an "Affiliate Transaction") with a fair market value in excess of $1.0 million, other than (x) Affiliate Transactions permitted under the paragraphs below and (y) Affiliate Transactions on terms that are no less favorable to the Company or such Restricted Subsidiary than those that might reasonably have been obtained in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate of the Company or such Restricted Subsidiary.

All Affiliate Transactions (and each series of related Affiliate Transactions which are similar or part of a common plan) involving aggregate payments or other property with a fair market value in excess of $25.0 million shall be approved by the Board of Directors of the Company or such Restricted Subsidiary, as the case may be, such approval to be evidenced by a Board Resolution stating that such Board of Directors has determined that such transaction complies with the foregoing provisions. If the Company or any Restricted Subsidiary of the Company enters into an Affiliate Transaction (or a series of related Affiliate Transactions related to a common plan) that involves an aggregate fair market value of more than $100.0 million, the Company or such Restricted Subsidiary, as the case may be, shall, prior to the consummation thereof, obtain a favorable opinion as to the fairness of such transaction or series of related transactions to the Company or the relevant Restricted Subsidiary, as the case may be, from a financial point of view, from an Independent Financial Advisor and file the same with the Trustee.

The restrictions set forth in this covenant shall not apply to:

    (1)    reasonable fees and compensation paid to, expense reimbursement (including pursuant to plans or policies approved by the Board) and indemnity provided on behalf of, officers, directors, employees or consultants of the Company or any Restricted Subsidiary of the Company as determined in good faith by the Company's Board of Directors;

    (2)    transactions, including, without limitation, licenses of intellectual property exclusively between or among the Company and any of its Subsidiaries or exclusively between or among such Subsidiaries, *provided* that such transactions are not otherwise prohibited by the Indenture;

    (3)    any agreement as in effect as of the Effective Date or any amendment thereto or any transaction contemplated thereby (including pursuant to any amendment thereto) or any replacement agreement thereto so long as any such amendment or replacement agreement is not more disadvantageous to the Holders in any material respect than the original agreement as in effect on the Effective Date;

    (4)    Restricted Payments permitted by the Indenture and any Permitted Investments;

    (5)    transactions with customers, clients, suppliers, joint venture partners or purchasers or sellers of goods and services, in each case in the ordinary course of business and otherwise not prohibited by the Indenture;

    (6)    the acquisition of the TMCT Real Property pursuant to the terms and conditions of that certain Amended and Restated Lease Agreement, dated September 22, 2006, by and between the Company and TMCT, LLC;

-19-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

(7)     the existence of, and the performance by the Company or any Guarantor of its obligations under the terms of, any limited liability company, limited partnership or other organizational document or securityholders agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party on the Effective Date and similar agreements that it may enter into thereafter (including any amendments thereto); *provided, however,* that the existence of, or the performance by the Company or any Guarantor of obligations under, any amendment to any such existing agreement or any such similar agreement entered into after the Effective Date shall only be permitted by this clause (6) to the extent not materially more adverse to the interest of the Holders, when taken as a whole, than any of such documents and agreements as in effect on the Effective Date;

(8)     sales of common stock of the Company to Affiliates of the Company not otherwise prohibited by the Indenture and the granting of registration and other customary rights in connection therewith and the exercise by any Person of warrants issued in connection with the Transactions;

(9)     any transaction with an Affiliate where the only consideration paid by the Company or any Guarantor is Common Stock of the Company;

(10)     the Transactions (including, without limitation, the Company's reimbursement of certain of EGI-TRB, L.L.C. expenses);

(11)     transactions in connection with the recapitalization of Eagle New Media Investments, LLC and Eagle Publishing Investments, LLC (and the reimbursement of reasonable expenses in connection therewith) as described in this offering memorandum;

(12)     sales of accounts receivable, payment intangibles and related assets or participations therein, in connection with any Receivables Facility and Standard Receivables Facility Undertakings;

(13)     the transactions contemplated by the Zell Note, the Zell Sub Note or the Warrant;

(14)     reimbursement by the Company of the reasonable expenses of employees of Equity Group Investments, L.L.C. in connection with its or its affiliates' investment in the Company; and

(15)     the ESOP Loan Agreement, the ESOP Note, the ESOP Pledge Agreement and ESOP Related Distributions; and

(16)     any Permitted Disposition Transactions.

*Limitations on the Modification of Certain Documents.* The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, amend or modify, or permit the amendment or modification of:

(1)     the PHONES; or

(2)     the ESOP Documentation

in each case, in any manner that is adverse in any material respect to the Holders of the Notes; *provided* that, in each case, the Company may amend the ESOP Documentation to the extent required by the Inter-

-20-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

nal Revenue Service in order to obtain a favorable determination letter with respect to the ESOP or to comply with changes in applicable law.

*Limitation on Tribune Finance, LLC.* Tribune Finance, LLC may not hold any material properties (other than the Intercompany Junior Subordinated Notes), become liable for any material obligations, engage in any trade or business, or conduct any business activity, other than (1) the issuance of its Capital Stock to the Company, (2) the incurrence of Indebtedness as a co-obligor or Guarantor of the Notes, the Bridge Loans and/or the Credit Agreement, (3) Investments pursuant to the Intercompany Junior Subordinated Notes and (4) activities incidental thereto. Neither the Company nor any Subsidiary shall engage in any transactions with Tribune Finance, LLC in violation of the immediately preceding sentence.

*Additional Subsidiary Guarantees.* The Company will not permit any of its Wholly Owned Restricted Subsidiaries (other than (x) Receivables Subsidiaries, (y) Immaterial Subsidiaries and (z) Foreign Subsidiaries), directly or indirectly, by way of the pledge of any intercompany note or otherwise, to assume, guarantee or in any other manner become liable with respect to any Indebtedness of the Company or any other Restricted Subsidiary of the Company (other than: (1) Permitted Indebtedness of a Restricted Subsidiary of the Company or (2) Indebtedness under Hedge Agreements incurred in reliance on clause (14) of the definition of "Permitted Indebtedness", unless, in any such case, such Restricted Subsidiary executes and delivers, within 30 days, a supplemental indenture to the Indenture, providing a guarantee of payment of the Notes by such Restricted Subsidiary.

Any such Guarantee by a Restricted Subsidiary of the Notes shall provide by its terms that it shall be automatically and unconditionally released and discharged, without any further action required on the part of the Trustee or any Holder, upon:

> (1)    the unconditional release of such Restricted Subsidiary from its liability in respect of the Indebtedness in connection with which such Guarantee was executed and delivered pursuant to the preceding paragraph; or

> (2)    any sale or other disposition (by merger or otherwise) to any Person which is not a Restricted Subsidiary of the Company of all of the Company's Capital Stock in, or all or substantially all of the assets of, such Restricted Subsidiary; *provided* that (a) such sale or disposition of such Capital Stock or assets is otherwise in compliance with the terms of the Indenture and (b) such assumption, guarantee or other liability of such Restricted Subsidiary has been released by the holders of the other Indebtedness so guaranteed.

Notwithstanding the foregoing, in no event shall any Subsidiary guarantee the Existing Notes.

*Conduct of Business.* The Company and its Restricted Subsidiaries will not engage in any businesses which are not the same general type, similar, ancillary, incidental or reasonably related to, or reasonable extensions of or reasonably similar or complementary to, the businesses in which the Company and its Restricted Subsidiaries are engaged on the Issue Date, except to the extent that after engaging in any new business, the Company and its Restricted Subsidiaries, taken as a whole, remain substantially engaged in similar lines of business as are conducted by them on the Issue Date.

*Payments for Consent.* The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Holder of Notes for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of the Indenture or the Notes unless such consideration is offered to be paid and is paid to all Holders of the Notes that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

-21-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

*Reports to Holders.* The Indenture will provide that, whether or not required by the rules and regulations of the Commission, so long as any Notes are outstanding, the Company will furnish the Holders of Notes

(1)    all quarterly and annual financial information that would be required to be contained in a filing with the Commission on Forms 10-Q and 10-K if the Company were required to file such forms, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of the Company and its consolidated Subsidiaries (showing in reasonable detail, either on the face of the financial statements or in the footnotes thereto and in Management's Discussion and Analysis of Financial Condition and Results of Operations, the financial condition and results of operations of the Company and its Restricted Subsidiaries separately from the financial condition and results of operations of the Unrestricted Subsidiaries of the Company, if any) no later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 45 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements) (or, in each case, such longer period as may be permitted by the Commission if the Company were subject to the then applicable reporting requirements of the Commission as a required filer, voluntary filer or otherwise); *provided,* however, that in the event that as of the date of the most recently available consolidated balance sheet of the Company and its Subsidiaries, all such Unrestricted Subsidiaries collectively comprise less than 5% of the consolidated assets of the Company and its Subsidiaries, then such presentation shall not be required and, with respect to the annual information only, a report thereon by the Company's certified independent accountants; and

(2)    all current reports that would be required to be filed with the Commission on Form 8-K if the Company were required to file such reports, in each case within the time periods specified in the Commission's rules and regulations.

In addition, following the consummation of the Exchange Offer, whether or not required by the rules and regulations of the Commission, the Company will file a copy of all such information and reports with the Commission for public availability within the time periods specified in the Commission's rules and regulations (unless the Commission will not accept such a filing for a filer that is not an "accelerated filer") and make such information available to securities analysts and prospective investors upon request. In addition, the Company has agreed that, for so long as any Notes remain outstanding, it will furnish to the Holders and to securities analysts and prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

The Company shall be deemed to have furnished any such information, report or other document to the Holders of Notes if it shall have either made it available on the Company's website or it is available on the Commission's website on "EDGAR" at www.sec.gov or any successor Commission website for such filings.

## Events of Default

The following events are defined in the Indenture as "Events of Default":

(1)    the failure to pay interest on any Notes when the same becomes due and payable and the default continues for a period of 30 days;

(2)    the failure to pay the principal on any Notes when such principal becomes due and payable, at maturity, upon redemption or otherwise (including the failure to make a payment to purchase Notes tendered pursuant to a Change of Control Offer or a Net Proceeds Offer);

-22-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517170

(3)      a default in the observance or performance of any other covenant or agreement contained in the Indenture which default continues for a period of 60 days after the Company receives written notice specifying the default (and demanding that such default be remedied) from the Trustee or the Holders of at least 25% of the outstanding principal amount of the Notes (except in the case of a default with respect to the "Merger, Consolidation and Sale of Assets" covenant, which will constitute an Event of Default with such notice requirement but without such passage of time requirement);

(4)      the failure to pay at final maturity (giving effect to any applicable grace periods and any extensions thereof) the stated principal amount of any Indebtedness of the Company or any Restricted Subsidiary of the Company (other than Indebtedness owed to the Company or any Restricted Subsidiary), or the acceleration of the final stated maturity of any such Indebtedness (which acceleration is not rescinded, annulled or otherwise cured within 20 days of receipt by the Company or such Restricted Subsidiary of notice of any such acceleration), if the aggregate principal amount of such Indebtedness, together with the principal amount of any other such Indebtedness in default for failure to pay principal at final stated maturity or which has been accelerated (in each case with respect to which the 20-day period described above has elapsed), aggregates $75.0 million or more at any time;

(5)      one or more judgments in an aggregate amount in excess of $75.0 million shall have been rendered against the Company or any of its Restricted Subsidiaries, which judgments are not covered by indemnities or third party insurance as to which such insurer has not disclaimed coverage and such judgments remain undischarged, unpaid or unstayed for a period of 60 days after such judgment or judgments become final and non-appealable;

(6)      certain events of bankruptcy affecting the Company or any of its Significant Subsidiaries; or

(7)      any Guarantee of a Significant Subsidiary ceases to be in full force and effect or any Guarantee of a Significant Subsidiary is declared to be null and void and unenforceable or any Guarantee of a Significant Subsidiary is found to be invalid or any Guarantor that is a Significant Subsidiary denies its liability under its Guarantee (other than by reason of release of a Guarantor in accordance with the terms of the Indenture).

If an Event of Default (other than an Event of Default specified in clause (6) above with respect to the Company) shall occur and be continuing, the Trustee or the Holders of at least 25% in principal amount of outstanding Notes may declare the principal of and accrued interest on all the Notes to be due and payable by notice in writing to the Company and the Trustee specifying the respective Event of Default and that it is a "notice of acceleration," and the same shall become immediately due and payable.

If an Event of Default specified in clause (6) above with respect to the Company occurs and is continuing, then all unpaid principal of, and premium, if any, and accrued and unpaid interest on all of the outstanding Notes shall *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

The Indenture will provide that, at any time after a declaration of acceleration with respect to the Notes as described in the preceding paragraph, the Holders of a majority in principal amount of the Notes, on behalf of all Holders of Notes may rescind and cancel such declaration and its consequences

(1)      if the rescission would not conflict with any judgment or decree;

-23-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517171

(2)    if all existing Events of Default have been cured or waived except nonpayment of principal or interest that has become due solely because of the acceleration;

(3)    to the extent the payment of such interest is lawful, interest on overdue installments of interest and overdue principal, which has become due otherwise than by such declaration of acceleration, has been paid;

(4)    if the Company has paid the Trustee its reasonable compensation and reimbursed the Trustee for its expenses, disbursements and advances; and

(5)    in the event of the cure or waiver of an Event of Default of the type described in clause (6) of the description above of Events of Default, the Trustee shall have received an officers' certificate and an opinion of counsel that such Event of Default has been cured or waived.

No such rescission or cancellation shall affect any subsequent Default or impair any right consequent thereto.

The Holders of a majority in principal amount of the Notes then outstanding, on behalf of all Holders of the Notes, may waive any existing Default or Event of Default under the Indenture, and its consequences, except a default in the payment of the principal of or interest on any Notes.

Holders of the Notes may not enforce the Indenture or the Notes except as provided in the Indenture and under the TIA. Subject to the provisions of the Indenture relating to the duties of the Trustee, the Trustee is under no obligation to exercise any of its rights or powers under the Indenture at the request, order or direction of any of the Holders, unless such Holders have offered to the Trustee reasonable indemnity. Subject to all provisions of the Indenture and applicable law, the Holders of a majority in aggregate principal amount of the then outstanding Notes have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

Under the Indenture, the Company is required to provide an officers' certificate to the Trustee promptly upon any such officer obtaining knowledge of any Default or Event of Default (*provided* that such officers shall provide such certification at least annually whether or not they know of any Default or Event of Default) that has occurred and, if applicable, describe such Default or Event of Default and the status thereof.

**Legal Defeasance and Covenant Defeasance**

The Company may, at its option and at any time, elect to have its obligations and the obligations of the Guarantors discharged with respect to the outstanding Notes ("Legal Defeasance"). Such Legal Defeasance means that the Company shall be deemed to have paid and discharged the entire indebtedness represented by the outstanding Notes, except for

(1)    the rights of Holders to receive payments in respect of the principal of, premium, if any, and interest on the Notes when such payments are due;

(2)    the Company's obligations with respect to the Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payments;

-24-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0517172

(3)     the rights, powers, trust, duties and immunities of the Trustee and the Company's obligations in connection therewith; and

(4)     the Legal Defeasance provisions of the Indenture.

In addition, the Company may, at its option and at any time, elect to have the obligations of the Company released with respect to certain covenants that are described in the Indenture ("Covenant Defeasance") and thereafter any omission to comply with such obligations shall not constitute a Default or Event of Default with respect to the Notes. In the event Covenant Defeasance occurs, certain events (not including nonpayment, bankruptcy, receivership, reorganization and insolvency events) described under "—Events of Default" will no longer constitute an Event of Default with respect to the Notes. If the Company exercises Legal Defeasance or Covenant Defeasance, each Guarantor will be released from all of its obligations with respect to the Guarantee.

In order to exercise either Legal Defeasance or Covenant Defeasance:

(1)     the Company must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders cash in U.S. dollars, non-callable U.S. government obligations, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of, premium, if any, and interest on the Notes on the stated date for payment thereof or on the applicable redemption date, as the case may be;

(2)     in the case of Legal Defeasance, the Company shall have delivered to the Trustee an opinion of counsel in the United States reasonably acceptable to the Trustee confirming that:

(a)     the Company has received from, or there has been published by, the Internal Revenue Service a ruling; or

(b)     since the date of the Indenture, there has been a change in the applicable federal income tax law,

in either case to the effect that, and based thereon such opinion of counsel shall confirm that, the Holders will not recognize income, gain or loss for federal income tax purposes as a result of such Legal Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)     in the case of Covenant Defeasance, the Company shall have delivered to the Trustee an opinion of counsel in the United States reasonably acceptable to the Trustee confirming that the Holders will not recognize income, gain or loss for federal income tax purposes as a result of such Covenant Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)     no Default or Event of Default shall have occurred and be continuing on the date of such deposit (other than a Default or an Event of Default resulting from the borrowing of funds to be applied to such deposit and the grant of any Lien securing such borrowings);

(5)     such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under, the Indenture (other than a Default or an Event of Default resulting from the borrowing of funds to be applied to such deposit and the grant of any Lien

-25-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

securing such borrowings) or any other material agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound;

(6)    the Company shall have delivered to the Trustee an officers' certificate stating that the deposit was not made by the Company with the intent of preferring the Holders over any other creditors of the Company or with the intent of defeating, hindering, delaying or defrauding any other creditors of the Company or others;

(7)    the Company shall have delivered to the Trustee an officers' certificate and an opinion of counsel, each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance have been complied with; and

(8)    certain other customary conditions precedent specified in the Indenture are satisfied.

Notwithstanding the foregoing, the opinion of counsel required by clause (2) above with respect to a Legal Defeasance need not be delivered if all Notes not theretofore delivered to the Trustee for cancellation (1) have become due and payable or (2) will become due and payable on the maturity date within one year under arrangements reasonably satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Company.

**Satisfaction and Discharge**

The Indenture will be discharged and will cease to be of further effect (except as to surviving rights or registration of transfer or exchange of the Notes, as expressly provided for in the Indenture) as to all outstanding Notes when

(1)    either:

(a)    all the Notes theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Company and thereafter repaid to the Company or discharged from such trust) have been delivered to the Trustee for cancellation; or

(b)    all Notes not theretofore delivered to the Trustee for cancellation (1) have become due and payable or (2) will become due and payable within one year, or are to be called for redemption within one year, under arrangements reasonably satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Company, and the Company has irrevocably deposited or caused to be deposited with the Trustee funds in an amount sufficient to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of maturity or redemption, as the case may be, together with irrevocable instructions from the Company directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be; *provided* that if such redemption is made pursuant to the provisions described in the third paragraph under "Redemption—Optional Redemption," (x) the amount of funds that the Company must irrevocably deposit or cause to be deposited will be determined using an assumed Applicable Premium calculated as of the date of such deposit and (y) the Company must irrevocably deposit or cause to be deposited

-26-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

additional money in trust on the date of redemption as necessary to pay the Applicable Premium as determined on such date;

(2)     the Company has paid all other sums payable under the Indenture by the Company; and

(3)     the Company has delivered to the Trustee an officers' certificate and an opinion of counsel stating that all conditions precedent under the Indenture relating to the satisfaction and discharge of the Indenture have been complied with.

## Modification of the Indenture

From time to time, the Company, the Guarantors and the Trustee, without the consent of the Holders, may amend the Indenture for certain specified purposes, including curing ambiguities, defects or inconsistencies, so long as such change does not, in the opinion of the Trustee, adversely affect the rights of any of the Holders in any material respect. In formulating its opinion on such matters, the Trustee will be entitled to rely on such evidence as it deems appropriate, including, without limitation, solely on an opinion of counsel. Other modifications and amendments of the Indenture may be made with the consent of the Holders of a majority in principal amount of the then outstanding Notes issued under the Indenture, except that, without the consent of each Holder affected thereby, no amendment may

(1)     reduce the amount of Notes whose Holders must consent to an amendment;

(2)     reduce the rate of or change or have the effect of changing the time for payment of interest, including defaulted interest, on any Notes;

(3)     reduce the principal of or change or have the effect of changing the fixed maturity of any Notes, or change the date on which any Notes may be subject to redemption or reduce the redemption price therefore (other than provisions relating to the covenants described above under "Change of Control" and "Limitation on Asset Sales";

(4)     make any Notes payable in money other than that stated in the Notes;

(5)     make any change in provisions of the Indenture protecting the right of each Holder to receive payment of principal of and interest on any Note on or after the due date thereof or to bring suit to enforce such payment, or permitting Holders of a majority in principal amount of Notes to waive Defaults or Events of Default;

(6)     after the Company's obligation to purchase Notes arises thereunder, amend, change or modify in any material respect the obligation of the Company to make and consummate a Change of Control Offer in the event of a Change of Control or make and consummate a Net Proceeds Offer with respect to any Asset Sale that has been consummated or, after such Change of Control has occurred or such Asset Sale has been consummated, modify any of the provisions or definitions with respect thereto;

(7)     modify or change any provision of the Indenture or the related definitions affecting the ranking of the Notes or any Guarantee in a manner which adversely affects the Holders; or

(8)     release any Guarantor that is a Significant Subsidiary from any of its obligations under its Guarantee or the Indenture otherwise than in accordance with the terms of the Indenture.

-27-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## Governing Law

The Indenture will provide that it, the Notes and the Guarantees will be governed by, and construed in accordance with, the laws of the State of New York but without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.

## The Trustee

The Indenture will provide that, except during the continuance of an Event of Default, the Trustee will perform only such duties as are specifically set forth in the Indenture. During the existence of an Event of Default, the Trustee will exercise such rights and powers vested in it by the Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of his own affairs.

The Indenture and the provisions of the TIA contain certain limitations on the rights of the Trustee, should it become a creditor of the Company, to obtain payments of claims in certain cases or to realize on certain property received in respect of any such claim as security or otherwise. Subject to the TIA, the Trustee will be permitted to engage in other transactions; *provided* that if the Trustee acquires any conflicting interest as described in the TIA, it must eliminate such conflict or resign.

## No Personal Liability of Directors, Officers, Employees and Stockholders

No past, present or future director, officer, employee, incorporator, agent or stockholder of the Company, as such, shall have any liability for any obligations of the Company under the Notes, the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. No past, present or future director, officer, employee, incorporator, agent or stockholder of any of the Guarantors, as such, shall have any liability for any obligations of the Guarantors under the Guarantee, the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of Notes and Guarantee by accepting a Note and a Guarantee waives and releases all such liabilities. The waiver and release are part of the consideration for issuance of the Notes and the Guarantee.

## Certain Definitions

Set forth below is a summary of certain of the defined terms used in the Indenture. Reference is made to the Indenture for the full definition of all such terms, as well as any other terms used herein for which no definition is provided.

"*Acquired Indebtedness*" means Indebtedness of a Person or any of its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary of the Company or at the time it merges or consolidates with or into the Company or any of its Subsidiaries or assumed in connection with the acquisition of assets from such Person and in each case not incurred by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Restricted Subsidiary of the Company or such acquisition, merger or consolidation.

"*Acquisition*" means the merger providing for Merger Sub to be merged with and into the Company, and following such merger, the Company to continue as the surviving corporation wholly owned by the ESOP.

"*Acquisition Agreement*" means the Agreement and Plan of Merger, dated as of April 1, 2007, by and among the Company, Merger Sub, GreatBanc Trust Company, not in its individual or corporate ca-

-28-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

pacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the ESOP, and, for the limited purposes set forth therein, EGI-TRB, L.L.C., as the same may be waived, amended, supplemented or otherwise modified from time to time.

"*Additional Interest*" means all additional interest then owing pursuant to Section 2.5 of the Registration Rights Agreement.

"*Affiliate*" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to vote 10% or more of the Voting Stock of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by contract or otherwise.

"*Applicable Premium*" means, with respect to a Fixed Rate Note to be redeemed in accordance with the provisions above under "Redemption—Optional Redemption of Fixed Rate Notes," at the date for such redemption, the greater of (i) 1.0% of the principal amount of such Fixed Rate Note and (ii) the excess of (A) the present value at such date of redemption of (1) the redemption price of such Fixed Rate Note on December 20, 2011 plus (2) all required remaining scheduled interest payments due on such Fixed Rate Note through such date (excluding accrued but unpaid interest to such date of redemption), computed using a discount rate equal to the Treasury Rate plus 50 basis points, over (B) the principal amount of such Fixed Rate Note on such date of redemption, in each case as calculated by the Company or on behalf of the Company by such Person as the Company shall designate; *provided*, that such calculation shall not be a duty or obligation of the Trustee.

"*Asset Acquisition*" means (1) an Investment by the Company or any Restricted Subsidiary of the Company in any other Person pursuant to which such Person shall become a Restricted Subsidiary of the Company or any Restricted Subsidiary of the Company, or shall be merged with or into the Company or any Restricted Subsidiary of the Company, or (2) the acquisition by the Company or any Restricted Subsidiary of the Company of the assets of any Person (other than a Restricted Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprise any division or line of business of such Person or any other properties or assets of such Person other than in the ordinary course of business.

"*Asset Sale*" means any sale, issuance, conveyance, transfer, lease (other than operating leases entered into in the ordinary course of business), assignment or other transfer for value by the Company or any of its Restricted Subsidiaries (including any Sale and Leaseback Transaction) to any Person other than the Company or a Restricted Subsidiary of the Company of: (1) any Capital Stock of any Restricted Subsidiary of the Company; or (2) any other property or assets of the Company or any Restricted Subsidiary of the Company other than in the ordinary course of business; *provided, however*, that Asset Sales or other dispositions shall not include:

> (a)       a transaction or series of related transactions by the Company or its Restricted Subsidiaries having an aggregate fair market value of less than $10.0 million;

> (b)       disposition of used, damaged, worn out, obsolete or surplus property by the Company or any of its Subsidiaries in the ordinary course of business and the abandonment or other disposition of the Company's intellectual property, in each case as determined by the Company in its reasonable judgment to be no longer economically practicable to maintain or useful in the conduct of the business of the Company and its Subsidiaries taken as a whole;

-29-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517177

(c)     the Transactions and any dispositions as part of a Permitted Disposition Transaction to the extent the proceeds of any such disposition are not required to be used to pay down Indebtedness or to be reinvested under the Credit Agreement;

(d)     leases of real or personal property in the ordinary course of business;

(e)     (i) any Restricted Payment permitted by the covenant described under "—Certain Covenants—Limitation on Restricted Payments" or (ii) that constitutes a Permitted Investment or (iii) any sale, disposition or other transfer of assets described in clause (19) of the covenant described under "—Certain Covenants—Limitation on Restricted Payments" so long as the proceeds of such sale, disposition or other transfer of such assets shall be used to effect a Restricted Payment permitted by clause (19) of the covenant described under "—Certain Covenants—Limitation on Restricted Payments";

(f)     the sale, lease, conveyance, disposition or other transfer of all or substantially all of the assets of the Company as permitted under the covenant described under "—Certain Covenants—Merger, Consolidation and Sale of Assets";

(g)     dispositions of cash and Cash Equivalents and inventory and goods held for sale in the ordinary course of business;

(h)     Asset Sales where (x) property is exchanged for credit against the purchase price of similar replacement property or (y) the proceeds of such Asset Sale are promptly applied to the purchase price of such replacement property;

(i)     Asset Sales to the Company or to a Subsidiary (including through the dissolution of any Subsidiary); *provided* that if the transferor of such property is a Guarantor or the Company and only to the extent that such property does not constitute cash or Cash Equivalents, (i) the transferee thereof must either be the Company or a Guarantor or (ii) to the extent such transaction constitutes an Investment, such transaction is otherwise permitted under the Indenture;

(j)     dispositions of (x) accounts receivable in connection with the collection or compromise thereof or (y) accounts receivable, payment intangibles and related assets in connection with any Receivables Facility or sale or financing of accounts receivable permitted under the Indenture;

(k)     leases, subleases, assignments, licenses or sublicenses, in each case in the ordinary course of business and which do not materially interfere with the business of the Company and its Restricted Subsidiaries;

(l)     Liens not prohibited by the Indenture (including Permitted Liens); and

(m)     transfers of property subject to Casualty Events upon receipt of the Net Cash Proceeds of such Casualty Event.

(n)     to the extent allowable under Section 1031 of the Internal Revenue Code (or comparable or successor provision), any exchange of like property for use in the ordinary course of the business of the Company and its Subsidiaries taken as a whole; and

(o)     Sale and Leaseback Transactions in respect of the sale of fixed or capital assets for gross proceeds not to exceed $50.0 million in any fiscal year.

-30-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517178

"*Attributable Debt*" shall mean, when used with respect to any Sale and Lease-Back Transaction, as at the time of determination, the present value (discounted at a rate equivalent to the Company's then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Lease-Back Transaction.

"*Board of Directors*" means, as to any Person, the board of directors (or similar governing body) of such Person or any duly authorized committee thereof.

"*Board Resolution*" means, with respect to any Person, a copy of a resolution certified by the Secretary or an Assistant Secretary of such Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"*Bridge Loan Agreement*" means Senior Unsecured Interim Loan Agreement dated as of December 20, 2007 among the Company and the lenders and agents named therein, including any notes, security or guarantee agreement related thereto, in each case as amended, restated or modified from time to time.

"*Bridge Loans*" means loans outstanding under the Bridge Loan Agreement.

"*Broadcasting Holdco Transaction*" means the contribution by the Company of 100% of its equity interests in Tribune Broadcasting Company to its newly-formed, direct Wholly Owned Subsidiary, Tribune Broadcasting Holdco, LLC.

"*Capital Stock*" means

(1)     with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Preferred Stock of such Person, and all options, warrants or other rights to purchase or acquire any of the foregoing; and

(2)     with respect to any Person that is not a corporation, any and all partnership, membership or other equity interests of such Person, and all options, warrants or other rights to purchase or acquire any of the foregoing.

"*Capitalized Lease Obligation*" means, as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real (or personal) property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date, determined in accordance with GAAP.

"*Cash Equivalents*" means:

(1)     securities issued, or directly, unconditionally and fully guaranteed or insured, by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such Person;

(2)     time deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517179**

the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $500.0 million and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such Person;

(3)    repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (1) above entered into with any bank meeting the qualifications specified in clause (2) above;

(4)    commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by Standard & Poor's Ratings Group ("S&P") or at least P-1 or the equivalent thereof by Moody's Investors Services, Inc. ("Moody's"), and in each case maturing not more than one year after the date of acquisition by such Person;

(5)    investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (1), (2) and (4) above;

(6)    demand deposit accounts maintained in the ordinary course of business;

(7)    money market funds that (A) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended from time to time, (B) are rated AAA by S&P or Aaa by Moody's and (C) have portfolio assets of at least $5,000,000,000;

(8)    marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof, maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's; and

(9)    investments in auction rate securities or similar securities with a rating of AA and a maximum holding period of 90 days, for which the reset date will be used to determine the potential maturity date.

"*Casualty Event*" means, with respect to any equipment, fixed assets or real property (including any improvements thereon) of the Company or any Subsidiary, any loss of or damage to, or any condemnation or other taking by a governmental authority of, such property, the date on which the Company or any of the Subsidiaries receives insurance proceeds, or proceeds of a condemnation award or other compensation to replace or repair such property, in each case, in excess of $10.0 million with respect to any such event.

"*Change of Control*" means the occurrence of one or more of the following events:

(1)    any Person or group of Persons (within the meaning of Sections 13(d) and 14(d) under the Exchange Act), other than, in the aggregate, Zell, EGI-TRB, L.L.C., the ESOP, the ESOP Trust or any Permitted Transferee, shall become the ultimate "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of Voting Stock representing 50% or more of the Voting Stock of the Company (or other securities convertible or exercisable into such Voting Stock) on a fully diluted basis (including common stock equivalents issued pursuant to the Tribune Management Equity Incentive Plan) or shall obtain the power (whether or not exercised) to elect a majority of the Company's directors; or

-32-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

(2)      during any period of 24 consecutive months, individuals who at the beginning of such period constituted the Board of Directors of the Company (together with any new directors whose election to such board or whose nomination for election by the stockholders of the Company was approved by a vote of a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of the Company then in office; *provided*, that the consummation of the Transactions (including the change in Board of Directors pursuant thereto) shall not constitute a "Change of Control".

"*Commission*" means the U.S. Securities and Exchange Commission.

"*Common Stock*" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of, such Person's common stock, whether outstanding on the Issue Date or issued after the Issue Date, and includes, without limitation, all series and classes of such common stock.

"*Consolidated EBITDA*" means, for any period, and with respect to any Person and its Restricted Subsidiaries, consolidated net income (or net loss) (determined in accordance with GAAP) of such Person and its Restricted Subsidiaries, exclusive of, without duplication,

(1)      the income or loss resulting from extraordinary items for such period, and all losses or gains resulting from non-cash, non-operating items and one-time charges,

(2)      the income of any transaction involving a transfer or other disposition of property to a Subsidiary that is not a Guarantor and any Person accounted for by such Person or any of its Restricted Subsidiaries on the equity method for such period, but any such income so excluded may be included in such period or any later period to the extent of any cash dividends or distributions actually paid in the relevant period or any later period to such Person or any Subsidiary of such Person,

(3)      whether or not recurring, non-cash charges and, non-cash stock-based compensation charges determined in accordance with GAAP during such period, and whether or not recurring, non-cash retirement expense, including such expense from ESOP, pension and cash balance plans and

(4)      expected or actual gains resulting from the disposition of discontinued operations, (excluding in the case of clauses (1) and (3) (i) any non-cash charge representing an accrual or a reserve for potential cash charges in any future period and (ii) the accrual of revenue or recording of receivables in the ordinary course of business),

*plus* the sum of:

(5)      Consolidated Interest Expense of such Person and its Restricted Subsidiaries for such period,

(6)      consolidated income tax expense of such Person and its Restricted Subsidiaries for such period,

(7)      depreciation expense of such Person and its Restricted Subsidiaries for such period,

-33-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517181**

(8)    amortization expense of such Person and its Restricted Subsidiaries for such period, in each case determined in accordance with GAAP for such period,

(9)    transaction fees and costs associated or incurred by such Person or any of its Restricted Subsidiaries in connection with the First Step Transactions, the Second Step Transactions and such Person's existing credit facilities,

(10)    for the four quarter periods ending December 30, 2007, March 30, 2008, June 29, 2008 and September 28, 2008, $60.0 million in each such four quarter period consisting of pro forma cash savings resulting from termination of contributions into the Tribune Company 401(k) Savings and Profit Sharing Plan,

(11)    expected or actual losses resulting from the disposition of discontinued operations,

(12)    to the extent deducted in calculating consolidated net income (or net loss) of such Person and its Restricted Subsidiaries, Dividends by such Person to the ESOP to the extent the amount so Dividended to the ESOP is used to fund the ESOP Note Repayment Amounts (and to the extent such ESOP Note Repayment Amounts are themselves not included in Consolidated net income (or net loss) of such Person and its Restricted Subsidiaries), and

(13)    business optimization expenses and other restructuring charges in connection with the Transactions, in a manner consistent with presentation of "Adjusted EBITDA" as described in the preliminary offering memorandum dated as of November 21, 2007; *provided*, that with respect to each business optimization expense or other restructuring charge, the Company shall have delivered to the Trustee an officer's certificate specifying and quantifying such expense or charge.

"*Consolidated Fixed Charge Coverage Ratio*" means, with respect to any Person, the ratio of Consolidated EBITDA of such Person during the four full fiscal quarters (the "Four Quarter Period") ending prior to the date of the transaction giving rise to the need to calculate the Consolidated Fixed Charge Coverage Ratio for which financial statements are available (the "Transaction Date") to Consolidated Fixed Charges of such Person for the Four Quarter Period. In addition to and without limitation of the foregoing, for purposes of this definition, "Consolidated EBITDA" and "Consolidated Fixed Charges" shall be calculated after giving effect on a *pro forma* basis for the period of such calculation to:

(1)    the incurrence or repayment of any Indebtedness of such Person or any of its Restricted Subsidiaries (and the application of the proceeds thereof) giving rise to the need to make such calculation and any incurrence or repayment of other Indebtedness (and the application of the proceeds thereof), other than the incurrence or repayment of Indebtedness in the ordinary course of business for working capital purposes pursuant to working capital facilities, occurring during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date, as if such incurrence or repayment, as the case may be (and the application of the proceeds thereof), occurred on the first day of the Four Quarter Period; and

(2)    any asset sales or other dispositions or Asset Acquisitions (including, without limitation, any Asset Acquisition giving rise to the need to make such calculation as a result of such Person or one of its Restricted Subsidiaries (including any Person who becomes a Restricted Subsidiary as a result of the Asset Acquisition) incurring, assuming or otherwise being liable for Acquired Indebtedness and also including any Consolidated EBITDA (including any *pro forma*

-34-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

expense and cost reductions, business optimization expenses and/or synergies or restrictions calculated on a basis consistent with Regulation S-X under the Exchange Act) attributable to the assets which are the subject of the Asset Acquisition or asset sale or other disposition during the Four Quarter Period) occurring during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date, as if such asset sale or other disposition or Asset Acquisition (including the incurrence, assumption or liability for any such Acquired Indebtedness) occurred on the first day of the Four Quarter Period. If such Person or any of its Restricted Subsidiaries directly or indirectly guarantees Indebtedness of a third Person, the preceding sentence shall give effect to the incurrence of such guaranteed Indebtedness as if such Person or any Restricted Subsidiary of such Person had directly incurred or otherwise assumed such guaranteed Indebtedness.

Furthermore, in calculating "Consolidated Fixed Charges" for purposes of determining the denominator (but not the numerator) of this "Consolidated Fixed Charge Coverage Ratio":

(1)    interest on outstanding Indebtedness determined on a fluctuating basis as of the Transaction Date and which will continue to be so determined thereafter shall be deemed to have accrued at a fixed rate per annum equal to the rate of interest on such Indebtedness in effect on the Transaction Date; and

(2)    notwithstanding clause (1) above, interest on Indebtedness determined on a fluctuating basis, to the extent such interest is covered by agreements relating to Hedge Obligations, shall be deemed to accrue at the rate per annum resulting after giving effect to the operation of such agreements.

"*Consolidated Fixed Charges*" means, with respect to any Person for any period, the sum, without duplication, of:

(1)    Consolidated Interest Expense; plus

(2)    the product of (x) the amount of all dividend payments on any series of Preferred Stock of such Person (other than dividends paid in Qualified Capital Stock) paid, accrued or scheduled to be paid or accrued during such period times (y) a fraction, the numerator of which is one and the denominator of which is one minus the then current effective consolidated federal, state and local income tax rate of such Person, expressed as a decimal.

"*Consolidated Interest Expense*" means, for any period, the total consolidated interest expense of any Person and its Restricted Subsidiaries for such period, including without duplication:

(a)    imputed interest on Capitalized Lease Obligations and Attributable Debt of such Person and its Restricted Subsidiaries for such period;

(b)    commissions, discounts and other fees and charges owed by such Person or any of its Restricted Subsidiaries with respect to letters of credit securing financial obligations, bankers' acceptance financing and receivables financings for such period;

(c)    amortization of debt issuance costs, original issue discount and other financing, legal and accounting fees, costs and expenses (whether or not deferred) and any interest expense on deferred compensation arrangements, in each case incurred by such Person or any of its Restricted Subsidiaries for such period;

-35-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

(d)        cash contributions to any employee stock ownership plan or similar trust made by such Person or any of its Restricted Subsidiaries to the extent such contributions are used by such plan or trust to pay interest or fees to such Person (other than such Person or a wholly owned Subsidiary) in connection with Indebtedness incurred by such plan or trust for such period;

(e)        all interest paid or payable with respect to discontinued operations of such Person or any of its Restricted Subsidiaries for such period;

(f)        the interest portion of any deferred payment obligations of such Person or any of its Restricted Subsidiaries for such period; and

(g)        all interest on any Indebtedness of such Person or any of its Restricted Subsidiaries of the type described in clause (3) or (4) of the definition of "Indebtedness" for such period to the extent paid by such Person and its Restricted Subsidiaries;

*provided* that (a) to the extent directly related to the Transactions, debt issuance costs, debt discount or premium and other financing fees, costs and expenses shall be excluded from the calculation of Consolidated Interest Expense and (b) Consolidated Interest Expense shall be calculated after giving effect to Hedge Agreements related to interest rates (including associated costs), but excluding unrealized gains and losses with respect to Hedge Agreements related to interest rates.

"*Consolidated Net Income*" means, with respect to any Person, for any period, the aggregate net income (or loss) of such Person and its Restricted Subsidiaries for such period on a consolidated basis, determined in accordance with GAAP; *provided* that there shall be excluded therefrom

(1)        after-tax gains from Asset Sales (without regard to the $10.0 million limitation set forth in the definition thereof) or abandonments or reserves relating thereto;

(2)        after-tax items classified as extraordinary or nonrecurring gains;

(3)        the net income of any Person acquired in a "pooling of interests" transaction accrued prior to the date it becomes a Restricted Subsidiary of the referent Person or is merged or consolidated with the referent Person or any Restricted Subsidiary of the referent Person;

(4)        the net income (but not loss) of any Restricted Subsidiary of the referent Person to the extent that the declaration of dividends or similar distributions by that Restricted Subsidiary of that income is restricted by a contract, operation of law or otherwise;

(5)        the net income of any Person, other than a Restricted Subsidiary of the referent Person, except to the extent of cash dividends or distributions paid to the referent Person or to a Wholly Owned Restricted Subsidiary of the referent Person by such Person;

(6)        any restoration to income of any contingency reserve, except to the extent that provision for such reserve was made out of Consolidated Net Income accrued at any time following the Effective Date;

(7)        income or loss attributable to discontinued operations (including, without limitation, operations disposed of during such period whether or not such operations were classified as discontinued); and

-36-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

(8)    in the case of a successor to the referent Person by consolidation or merger or as a transferee of the referent Person's assets, any earnings of the successor corporation prior to such consolidation, merger or transfer of assets.

"*Credit Agreement*" means the Credit Agreement dated as of May 17, 2007, by and among the Company, the lenders party thereto in their capacities as lenders thereunder and JPMorgan Chase Bank, N.A., as administrative agent, together with the related documents thereto (including, without limitation, any guarantee agreements and security documents), in each case as such agreements may be amended (including any amendment and restatement thereof), supplemented or otherwise modified from time to time, including one or more credit agreements, loan agreements, indentures or similar agreements extending the maturity of, refinancing, replacing or otherwise restructuring (including increasing the amount of available borrowings thereunder or adding Restricted Subsidiaries of the Company as additional borrowers or guarantors thereunder) all or any portion of the Indebtedness under such agreement or agreements or any successor or replacement agreement or agreements and whether by the same or any other agent, lender or group of lenders.

"*Debt for Borrowed Money*" means, as of any date of determination and without duplication, all items that, in accordance with GAAP, would be classified as debt on the Company's consolidated balance sheet; *provided* that Debt for Borrowed Money shall exclude, to the extent otherwise included the preceding clause, (i) accounts payable and accrued liabilities in the ordinary course of business of the Company and its Subsidiaries, (ii) to the extent constituting an "effective" hedge in accordance with GAAP, prepaid variable forward derivative instruments and prepaid variable forward contract obligations, (iii) notes, bills and checks presented in the ordinary course of business by the Company or any of its Subsidiaries to banks for collection or deposit, (iv) all obligations of the Company and its Subsidiaries of the character referred to in this definition to the extent owing to the Company or any of its Subsidiaries; *provided, further*, that, with respect to Hedge Agreements, Debt for Borrowed Money shall include only net payment obligations of such Person in respect of Hedge Agreements and (v) Debt of the type otherwise permitted under clauses (10), (15) or (16) of the definition of "Permitted Indebtedness"; and *provided, further*, that Debt for Borrowed Money shall include, without duplication, whether or not reflected as debt on the Company's Consolidated balance sheet, all payment obligations outstanding to Persons that are not Affiliates of the Company in connection with a Receivables Facility.

"*Default*" means an event or condition the occurrence of which is, or with the lapse of time or the giving of notice or both would be, an Event of Default.

"*Disqualified Capital Stock*" means that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event (other than an event which would constitute a Change of Control), matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof (except, in each case, upon the occurrence of a Change of Control), on or prior to the final maturity date of the Notes.

"*Dividend*" means with respect to any Person that such Person has declared or paid a dividend or returned any equity capital to the holders of its Capital Stock or authorized or made any other distribution, payment or delivery of property (other than common stock of such Person) or cash to the holders of its Capital Stock as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Capital Stock outstanding (or any options or warrants issued by such Person with respect to its Capital Stock), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any of the Capital Stock of such Person outstanding (or any options or warrants issued by such Person with respect to its Capital Stock). Without limiting the foregoing, "*Dividends*" with respect to any Person shall also include (i) all

-37-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

payments made or required to be made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes and (ii) contributions to the ESOP.

"*Domestic Subsidiary*" means any Subsidiary that is organized or existing under the laws of the United States, any state thereof or the District of Columbia; *provided*, that the definition of "Domestic Subsidiary" shall exclude any such Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary.

"*Effective Date*" means December 20, 2007.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"*ESOP*" means the Tribune Employee Stock Ownership Plan.

"*ESOP Documentation*" means, collectively (a) the Tribune Employee Stock Ownership Plan, effective as of January 1, 2007, (b) the Tribune Employee Stock Ownership Trust, dated April 1, 2007, (c) the ESOP Loan Agreement, ESOP Loan and ESOP Pledge Agreement, (d) the ESOP Purchase Agreement, (e) the Acquisition Agreement, (f) the Investor Rights Agreement and (g) all amendments, supplements or other modifications to the foregoing, all schedules, exhibits and annexes thereto and all agreements affecting the terms thereof or entered into in connection therewith.

"*ESOP Investment*" means the purchase by the ESOP of $250.0 million of the Company's common equity made by the ESOP on April 1, 2007.

"*ESOP Loan*" means the extension of credit made under the ESOP Note and the ESOP Loan Agreement.

"*ESOP Loan Agreement*" means the ESOP Loan Agreement, dated as of April 1, 2007, by and between the Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the ESOP Trust, which implements and forms a part of the ESOP, as the same may be supplemented, amended, restated or otherwise modified from time to time.

"*ESOP Note*" means the ESOP's 30-year amortizing 5.01% note as in effect on June 4, 2007.

"*ESOP Note Repayment Amounts*" means, for any period, the aggregate amount of principal and interest payments due to the Company in respect of the ESOP Note.

"*ESOP Pledge Agreement*" means the ESOP Pledge Agreement made April 1, 2007, between GreatBanc Trust Company, not in its individual or corporate capacity but solely in its capacity as trustee of the ESOP Trust which forms a part of the ESOP and the Company, as the same may be supplemented, amended, restated or otherwise modified from time to time.

"*ESOP Purchase Agreement*" means the ESOP Purchase Agreement made April 1, 2007, between the Company and GreatBanc Trust Company, as trustee of the ESOP Trust, a separate trust created under the ESOP, as the same may be amended, restated or otherwise modified from time to time.

"*ESOP Related Distributions*" means payments, loans, advances, distributions or dividends made by the Company to satisfy its obligations to repurchase the Company's common stock pursuant to the ESOP Documentation or ERISA (including contributions to the ESOP to enable the ESOP to purchase

-38-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

common stock that the Company would otherwise be required to purchase under the ESOP Documentation or ERISA).

"*ESOP Trust*" means the Tribune Employee Stock Ownership Trust, dated April 1, 2007.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"*Exchange Spread*" means 0 basis points during the three-month period commencing on the Initial Maturity Date and shall increase by 50 basis points at the beginning of each subsequent three-month period thereafter.

"*Existing Notes*" means the Medium Term Notes and the Company's 4.875% senior notes due 2010, 7.25% senior debentures due 2013, 5.25% senior notes due 2015, 7.5% senior debentures due 2023, 6.25% series D medium-term notes due 2026, 6.61% senior debentures due 2027 and 7.25% senior debentures due 2096.

"*fair market value*" means, with respect to any asset or property, the price which could be negotiated in an arm's-length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction. Fair market value shall be determined by the Board of Directors of the Company acting reasonably and in good faith and shall be evidenced by a Board Resolution of the Board of Directors of the Company delivered to the Trustee.

"*First Step Refinancing*" means the refinancing of certain of the Company's existing indebtedness on or about June 4, 2007.

"*First Step Transactions*" means (i) the Stock Repurchase, (ii) the First Step Refinancing, (iii) the Initial Zell Investment and issuance of the Zell Note, (iv) the formation of the ESOP, (v) the execution and delivery of the Acquisition Agreement, (vi) the ESOP Investment, (vii) the execution, delivery and performance of the Credit Agreement and the documents related thereto (including, without limitation, any guarantee agreements and security documents) made on or about June 4, 2007, (viii) the ESOP Loan and the pledge of shares by the ESOP to secure the ESOP Loan, (ix) the Tribune Finance LLC Transaction and the Broadcasting Holdco Transaction, (x) all other transactions necessary to effect or incidental to the foregoing and (xi) the payment of fees, costs and expenses related to the foregoing.

"*Foreign Subsidiary*" shall mean a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any state thereof or the District of Columbia.

"*GAAP*" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, which are in effect as of the Effective Date.

"*Guarantee*" means a guarantee of the Notes by a Guarantor.

"*Guarantor*" means, as of the Issue Date, each of the Company's Restricted Subsidiaries that guarantee the Company's obligations under the Credit Agreement and each of the Company's Restricted Subsidiaries that in the future executes a supplemental indenture in which such Restricted Subsidiary agrees to be bound by the terms of the Indenture as a Guarantor; *provided* that any Person constituting a

-39-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Guarantor as described above shall cease to constitute a Guarantor when its respective Guarantee is released in accordance with the terms of the Indenture.

"*Hedge Agreements*" means interest rate swap, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other similar agreements.

"*Hedging Obligations*" means obligations under or with respect to Hedge Agreements.

"*Immaterial Subsidiary*" means, at any time of determination, any Subsidiary of the Company that (i) has total annual revenues and total assets of less than $10.0 million for the immediately preceding period of 12 consecutive fiscal months and (ii) does not have any Indebtedness in respect of which the Company or any Subsidiary of the Company shall have any guarantee or has not granted or permitted to exist any Lien on any of the Company's or any of its Wholly Owned Subsidiaries' assets.

"*Indebtedness*" means with respect to any Person, without duplication,

      (1)     all indebtedness of such Person for borrowed money;

      (2)     all payment obligations of such Person for the deferred purchase price of property or services (other than trade payables not overdue by more than 120 days incurred in the ordinary course of such Person's business);

      (3)     all payment obligations of such Person evidenced by notes, bonds, debentures or other similar instruments;

      (4)     all Purchase Money Obligations, Capitalized Lease Obligations, Attributable Debt and under synthetic, off-balance sheet or tax retention leases (excluding, however, operating leases) of such Person;

      (5)     all payment obligations , contingent or otherwise, of such Person in respect of acceptances, standby letters of credit or similar extensions of credit;

      (6)     all net payment obligations of such Person in respect of Hedge Agreements;

      (7)     all payment obligations outstanding to Persons that are not Affiliates of the Company in connection with a Receivables Facility;

      (8)     all Indebtedness of others referred to in clauses (1) through (7) above or clause (9) below (collectively, "Guaranteed Debt") guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person, through an agreement (1) to pay or purchase such Guaranteed Debt or to advance or supply funds for the payment or purchase of such Guaranteed Debt, (2) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Guaranteed Debt or to assure the holder of such Guaranteed Debt against loss in respect of such Guaranteed Debt, (3) to supply funds to or in any other manner invest funds in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (4) otherwise to assure a creditor against loss in respect of such Guaranteed Debt;

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0517188

(9)    all Indebtedness of any other Person of the type referred to in clauses (1) through (8) which is secured by any Lien on any property or asset of such Person, the amount of such Indebtedness being deemed to be the lesser of the fair market value (in such Person's good faith estimate) of such property or asset or the amount of the Indebtedness so secured; and

(10)    all Disqualified Capital Stock issued by such Person with the amount of Indebtedness represented by such Disqualified Capital Stock being equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any.

For purposes hereof, the "maximum fixed repurchase price" of any Disqualified Capital Stock which does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were purchased on any date on which Indebtedness shall be required to be determined pursuant to the Indenture, and if such price is based upon, or measured by, the fair market value of such Disqualified Capital Stock, such fair market value shall be determined reasonably and in good faith by the Board of Directors of the issuer of such Disqualified Capital Stock. In addition, the amount of any Guaranteed Debt shall be deemed to be an amount equal to the lesser of (a) the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made and (b) the maximum amount for which such guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guaranteed Debt, unless such primary obligation and the maximum amount for which such guaranteeing Person may be liable are not stated or determinable, in which case the amount of the Guaranteed Debt shall be such guaranteeing Person's reasonably anticipated liability in respect thereof as determined by the Company in good faith.

Notwithstanding anything to the contrary, the Company's obligation to pay Dividends to the ESOP pursuant to the terms of the ESOP Purchase Agreement shall not constitute Indebtedness.

"*Independent Financial Advisor*" means a firm (1) which does not, and whose directors, officers and employees or Affiliates do not, have a direct or indirect financial interest in the Company; and (2) which, in the judgment of the Board of Directors of the Company, is otherwise independent and qualified to perform the task for which it is to be engaged.

"*Initial Maturity Date*" means December 20, 2008.

"*Initial Rate*" the rate of interest equal to the rate borne by the Bridge Loans on the day immediately preceding the Initial Maturity Date plus 50 basis points.

"*Initial Zell Investment*" means the investment by EGI-TRB, L.L.C. in the Company pursuant to the Zell Note and the purchase by EGI-TRB, L.L.C. of $50.0 million of the Company's Common Stock.

"*Intercompany Junior Subordinated Notes*" means the junior subordinated notes of certain Guarantors issued by Tribune Finance, LLC on June 4, 2007 in an aggregate principal amount of not less than $3.0 billion.

"*Investment*" means, with respect to any Person, any direct or indirect loan or other extension of credit (including, without limitation, a guarantee) or capital contribution or any purchase or acquisition by such Person of any Capital Stock, bonds, notes, debentures or other securities or evidences of Indebtedness issued by, any other Person. "Investment" shall exclude extensions of trade credit by the Company and its Restricted Subsidiaries on commercially reasonable terms in accordance with normal trade practices of the Company or such Restricted Subsidiary, as the case may be.

-41-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517189

"*Investor Rights Agreement*" means the Investor Rights Agreement dated April 1, 2007 by and among the Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the ESOP Trust, which implements and forms a part of the ESOP, as the same may be supplemented, amended, restated or otherwise modified from time to time.

"*Issue Date*" means the first date on which any Note is issued under the Indenture.

"*Junior Capital*" means (i) common equity of the Company that does not (a) provide for scheduled payments of dividends in cash prior to December 20, 2015 or (b) become mandatorily redeemable pursuant to a sinking fund obligation or otherwise prior to December 20, 2015 and (ii) Indebtedness of the Company that (a) is unsecured and not guaranteed by any Subsidiary, (b) is expressly subordinated to the prior payment in full in cash of the Notes, (c) has a final maturity date that is not earlier than, and provides for no scheduled payments of principal or mandatory redemption obligations prior to December 20, 2015 and (d) provides for payments of interest solely in-kind until December 20, 2015.

"*Junior Capital Reduction Amount*" means, on any date of determination, the result of (a) 50% of the aggregate net cash proceeds by the Company or any Subsidiary from (including any tax savings associated therewith) from any sale, transfer or disposition of certain asset sales designated under the Credit Agreement and in excess of the amount so designated in such Credit Agreement received before such date of determination minus (b) the amount of dividends, repayments or redemptions previously made of the type described in clause (7) of the second paragraph of the covenant described under "Limitation on Restricted Payments".

"*Lien*" means any lien, security interest or other charge of any kind, or any other type of preferential arrangement intending to have the effect of a lien or security interest, including, without limitation, (x) any lien or retained security title of a conditional vendor, (y) any easement, right of way or other encumbrance on title to real property and (z) any assignment of income or proceeds intended to secure Debt for Borrowed Money.

"*Medium Term Notes*" means the following medium-term notes of the Company: (i) the 6.35% Series E Medium-Term Notes issued on February 3, 1998 and maturing on February 1, 2008 with an initial face amount of $25,000,000, (ii) the 5.50% Series E Medium-Term Notes issued on October 6, 1998 and maturing on October 6, 2008 with an initial face amount of $167,915,000 and (iii) the 5.67% Series E Medium-Term Notes issued on December 8, 1998 and maturing on December 8, 2008 with an initial face amount of $69,550,000.

"*Net Cash Proceeds*" means, with respect to any Asset Sale, the proceeds in the form of cash or Cash Equivalents including payments in respect of deferred payment obligations when received in the form of cash or Cash Equivalents (other than the portion of any such deferred payment constituting interest) received by the Company or any of its Restricted Subsidiaries from such Asset Sale net of:

(1)     selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes and the Company's good faith estimate of income taxes paid or payable in connection with such sale);

(2)     amounts provided as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by the Company or any of its Subsidiaries associated with the properties sold in such Asset Sale (*provided* that, to the extent and at the time any such amounts are released from such reserve (other than in satisfaction of any such liabilities), such amounts shall constitute Net Cash Proceeds);

-42-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517190

(3)      the Company's good faith estimate of payments required to be made with respect to unassumed liabilities relating to the properties sold within 90 days of such Asset Sale (*provided* that, to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within 90 days of such Asset Sale, such cash proceeds shall constitute Net Cash Proceeds); and

(4)      the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness which is secured by a Lien on the properties sold in such Asset Sale and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties).

"*Obligations*" means all payment obligations for unpaid principal, premium, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"*Pari Passu Indebtedness*" means any Indebtedness of the Company or any Guarantor that ranks *pari passu* in right of payment with the Notes or the Guarantee of such Guarantor, as applicable.

"*PDT Entity*" has the meaning set forth in the Credit Agreement as in effect on the Effective Date (whether or not such Credit Agreement is in existence at such time).

"*Permitted Disposition Transactions*" has the meaning set forth in the Credit Agreement as in effect on the Effective Date (whether or not such Credit Agreement is in existence at such time).

"*Permitted Indebtedness*" means, without duplication, each of the following:

(1)      Indebtedness represented by (A) the Notes (including any PIK Notes) issued under the Indenture and the Guarantees and any Exchange Notes (including payment in kind interest in respect thereof) issued in accordance with the Indenture and Registration Rights Agreement, (B) Bridge Loans under the Bridge Loan Agreement and any guarantees thereof (including any payment in kind interest in respect thereof);

(2)      Indebtedness incurred pursuant to the Credit Agreement in an aggregate principal amount at any time outstanding not to exceed $10.019 billion less (x) the amount of all mandatory principal payments actually made by the Company in respect of the term loans thereunder (excluding any such payments to the extent refinanced at the time of payment under a replaced Credit Agreement), (y) any required permanent repayments (which are accompanied by a corresponding permanent commitment reduction) thereunder and (z) any amounts not drawn under delayed draw term loans intended but not used to refinance the Medium Term Notes on or prior to their maturity date;

(3)      Indebtedness of a Restricted Subsidiary of the Company to the Company or to a Restricted Subsidiary of the Company for so long as such Indebtedness is held by the Company or a Restricted Subsidiary of the Company or the holder of a Lien permitted under the Indenture, in each case subject to no Lien other than a Lien permitted under the Indenture; *provided* that if as of any date any Person other than the Company or a Restricted Subsidiary of the Company or the holder of a Lien permitted under the Indenture owns or holds any such Indebtedness or holds a Lien in respect of such Indebtedness, such date shall be deemed the incurrence of Indebtedness not constituting Permitted Indebtedness under this clause (3) by the issuer of such Indebtedness;

-43-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517191