(4)     Indebtedness of the Company to a Restricted Subsidiary of the Company for so long as such Indebtedness is held by a Restricted Subsidiary of the Company or the holder of a Lien permitted under the Indenture, in each case subject to no Lien other than a Lien permitted under the Indenture; *provided* that (a) any Indebtedness of the Company to any Restricted Subsidiary of the Company that is not a Guarantor is unsecured and subordinated, pursuant to a written agreement, to the Company's obligations under the Indenture and the Notes and (b) if as of any date any Person other than a Restricted Subsidiary of the Company or the holder of a Lien permitted under the Indenture owns or holds any such Indebtedness or any Person holds a Lien in respect of such Indebtedness, such date shall be deemed the incurrence of Indebtedness not constituting Permitted Indebtedness under this clause (4) by the Company;

(5)     other Indebtedness of the Company and its Restricted Subsidiaries outstanding on the Effective Date and listed on the applicable schedule or letter to the Bridge Loan Agreement;

(6)     Indebtedness of a Person existing at the time such Person is merged into or consolidated with the Company or a Restricted Subsidiary of the Company or becomes a Subsidiary of the Company in connection with an acquisition; *provided,* that such Indebtedness is not created in contemplation of such acquisition; *provided further,* that after giving effect to such incurrence of Indebtedness:

(A) the Company shall be able to incur at least $1.00 of additional Indebtedness pursuant to first paragraph of the covenant described under "Limitations on Incurrence of Additional Indebtedness"; or

(B) the Consolidated Fixed Charge Coverage Ratio of the Company shall immediately after such transaction be no less than such ratio immediately prior to such transaction; or

(C) such Indebtedness, together with amounts incurred and outstanding under clauses (7) and (26) below, shall not exceed $150.0 million at any one time outstanding;

(7)     Indebtedness represented by Capitalized Lease Obligations and Purchase Money Indebtedness and other Indebtedness not otherwise permitted hereunder of the Company and its Restricted Subsidiaries incurred in the ordinary course of business not to exceed, together with amounts incurred and outstanding under clause (6) above and clause (26) below, $150.0 million at any one time outstanding and any guarantee in respect thereof;

(8)     endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

(9)     (A) Indebtedness of the Company and its Restricted Subsidiaries owing to the seller in any acquisition and (B) any guarantee in respect thereof so long as such Indebtedness does not, when taken together with all other Indebtedness incurred pursuant to this clause (9) and any refinancings thereof exceed more than $100.0 million in aggregate principal amount outstanding at any time; *provided, however,* that any Restricted Subsidiary may incur Indebtedness pursuant to this clause (9) in excess of $100.0 million for a period of time not to exceed 30 consecutive days if such Indebtedness is created or assigned in anticipation of a sale or any other disposition of a Restricted Subsidiary or in anticipation of the dividend or distribution or other spin-off transaction of the Capital Stock of such Restricted Subsidiary to the Company's shareholders permitted pursuant to the covenant described under "—Certain Covenants—Merger, Consolidation and Sale of Assets" hereunder;

-44-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

(10)    to the extent constituting Indebtedness, obligations in respect of net working capital adjustments and/or earn out arrangements pursuant to an acquisition;

(11)    Refinancing Indebtedness;

(12)    [Reserved];

(13)    [Reserved];

(14)    (A) Indebtedness in respect of Hedging Obligations (other than Secured Hedging Obligations) that does not exceed $25,000,000 in an aggregate principal amount out-standing at any time; provided, however, that such limitation shall not apply to Hedging Obligations with respect to the PHONES and (B) Indebtedness in respect of Secured Hedging Obligations with respect to interest rates, foreign currency exchange rates or commodity prices; *provided* that all Hedge Agreements shall be entered into in the ordinary course of business or as required by the Indenture and not for speculative purposes;

(15)    Indebtedness of the Company or any of its Restricted Subsidiaries in respect of performance bonds, bankers' acceptances, workers' compensation claims (and letter of credit obligations to provide security in respect thereof), surety or appeal bonds, payment obligations in connection with self-insurance or similar obligations, and bank overdrafts (and letters of credit in respect thereof) in the ordinary course of business;

(16)    to the extent constituting Indebtedness, obligations in respect of bank overdrafts not more than five business days overdue;

(17)    to the extent constituting Indebtedness, indemnification obligations and other similar obligations of the Company and its Subsidiaries in favor of directors, officers, employees, consultants or agents of the Company or any of its Subsidiaries extended in the ordinary course of business;

(18)    Indebtedness represented by guarantees by the Company or its Restricted Subsidiaries of Indebtedness otherwise permitted to be incurred under the Indenture; *provided* that no Subsidiary shall guarantee the Existing Notes;

(19)    Indebtedness owing to insurance companies to finance insurance premiums incurred in the ordinary course of business;

(20)    additional letters of credit in an aggregate amount not to exceed $75.0 million at any one time outstanding;

(21)    the Zell Sub Note (and any pay-in-kind interest thereon);

(22)    Indebtedness incurred to finance the purchase of the TMCT Real Property in an aggregate principal amount not to exceed $175.0 million, and any guarantees in respect thereof;

(23)    Junior Capital issued as part of a Special Contribution;

(24)    Indebtedness arising in connection with a Receivables Facility or the sale or financing of accounts receivable, and any guarantees of a Receivables Subsidiary in respect

-45-

thereof, in an aggregate amount not to exceed $450.0 million incurred by the Company or any of its Subsidiaries at any time outstanding;

(25)    Indebtedness in an aggregate amount not to exceed $50.0 million at any one time outstanding arising from agreements with any governmental authority or political subdivision or agency thereof relating to the construction of buildings, and the purchase and installation of equipment, to be used in the business of the Company and its Restricted Subsidiaries;

(26)    additional Indebtedness of the Company and its Restricted Subsidiaries in an aggregate principal amount not to exceed, together with amounts incurred and outstanding under clauses (6) and (7) above, $150.0 million at any one time outstanding (which amount under this clause (26) may, but need not, be incurred in whole or in part under the Credit Agreement);

(27)    Indebtedness under the PHONES;

(28)    Indebtedness incurred in connection with a Permitted Disposition Transaction; and

(29)    Indebtedness of the Company incurred to finance an acquisition; *provided* that (x) such Indebtedness (A) is not secured and is subordinated Indebtedness of the Company, (B) does not require any principal amortization prior to maturity and matures no earlier than six months after the final maturity of the Notes and (C) is not guaranteed by any Subsidiary of the Company and (y) after giving effect to such incurrence of Indebtedness either (A) the Company shall be able to incur at least $1.00 of additional Indebtedness pursuant to first paragraph of the covenant described under "Limitations on Incurrence of Additional Indebtedness" or (B) the Consolidated Fixed Charge Coverage Ratio of the Company shall immediately after such transaction be no less than such ratio immediately prior to such transaction.

For purposes of determining compliance with the "Limitation on Incurrence of Additional Indebtedness" covenant, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in clauses (1) through (29) above or is entitled to be incurred pursuant to the Consolidated Fixed Charge Coverage Ratio provisions of such covenant, the Company shall, in its sole discretion, classify (or later reclassify) such item of Indebtedness in any manner that complies with this covenant; *provided* that all Indebtedness outstanding under the Credit Agreement up to the maximum amount permitted under clause (2) above shall be deemed to have been incurred pursuant to clause (2). Accrual of interest, accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Capital Stock in the form of additional shares of the same class of Disqualified Capital Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Capital Stock for purposes of the "Limitations on Incurrence of Additional Indebtedness" covenant.

*"Permitted Investments"* means

(1)    any Investment existing on the Effective Date and listed on any applicable schedule or letter to the Bridge Loan Agreement or made pursuant to binding commitments in effect on the Effective Date or listed on any applicable schedule or letter to the Bridge Loan Agreement or an Investment consisting of any extension, modification or renewal of any Investment existing on the Effective Date or listed on any applicable schedule or letter to the Bridge Loan Agreement; *provided* that the amount of any such Investment may be increased (x) as required by the terms of such Investment as in existence on the Effective Date or (y) as otherwise permitted under the Indenture;

-46-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

(2)       any Investment by the Company or its Restricted Subsidiaries involving (w) the acquisition and holding of accounts receivable owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (x) investment in, or the acquisition and holding of cash and Cash Equivalents, (y) the endorsement of negotiable instruments held for collection in the ordinary course of business or (z) making lease, utility and other similar deposits in the ordinary course of business;

(3)       [Reserved];

(4)       Hedging Obligations permitted under clause (14) of the definition of "Permitted Indebtedness";

(5)       loans and advances to employees, directors and officers of the Company and its Restricted Subsidiaries for bona fide business purposes or to purchase Capital Stock of the Company in an aggregate amount not to exceed of $10.0 million at any one time outstanding; *provided* that no loans in violation of Section 402 of the Sarbanes-Oxley Act shall be permitted hereunder;

(6)       Investments by the Company or any Restricted Subsidiary of the Company in any Person that is or will become immediately after such Investment a Restricted Subsidiary of the Company or that will merge or consolidate into the Company or a Restricted Subsidiary of the Company;

(7)       Investments in the Company by any Restricted Subsidiary of the Company; *provided* that any Indebtedness evidencing such Investment and held by a Restricted Subsidiary that is not a Guarantor is unsecured and subordinated, pursuant to a written agreement, to the Company's obligations under the Notes and the Indenture;

(8)       Investments (i) by the Company or any Restricted Subsidiary in the Company or any Restricted Subsidiary (including, without limitation, the Intercompany Junior Subordinated Notes), (ii) by the Company or any Restricted Subsidiary in any Person that, in connection with an Investment that is an acquisition, becomes a Restricted Subsidiary, (iii) by any Person that is not a Restricted Subsidiary in any other Person that is not a Restricted Subsidiary, and (iv) by any Company or any Restricted Subsidiary in any Subsidiary that is not a Restricted Subsidiary in an amount not to exceed $50.0 million in any fiscal year;

(9)       Investments in securities of trade creditors or customers received pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers or in good faith settlement of delinquent obligations of such trade creditors or customers;

(10)      Investments made by the Company or its Restricted Subsidiaries as a result of consideration received in connection with an Asset Sale made in compliance with the "Limitation on Asset Sales" covenant;

(11)      the ESOP Note and ESOP Pledge Agreement;

(12)      additional Investments not otherwise permitted under the Indenture in an aggregate amount not to exceed the sum of (i) $100.0 million in any fiscal year plus (ii) the aggregate unused amounts under this clause (12) in any prior fiscal year; *provided* that the maximum amount of additional Investments under this clause (12) shall not exceed $200.0 million in any fiscal year; and

-47-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

(13)     without duplication to any dividends paid pursuant to the covenant described under "—Certain Covenants—Limitation on Restricted Payments," ESOP Related Distributions;

(14)     the creation or formation of new Subsidiaries so long as such Person has complied with any applicable obligations under the Indenture;

(15)     Investments in connection with any Receivables Facility or sale or financing of accounts receivable permitted under the terms of the Indenture;

(16)     additional Investments not otherwise permitted hereunder in an aggregate amount not to exceed $50.0 million at any one time outstanding;

(17)     the Broadcasting Holdco Transaction and the Tribune Finance LLC Transaction;

(18)     Investments represented by guarantees that are otherwise permitted under the Indenture;

(19)     Investments the payment for which consists of Qualified Capital Stock (including Common Stock) of the Company; *provided, however,* that such Qualified Capital Stock will not increase the amount available for Restricted Payments under clause (iii) of the first paragraph under the covenant described under "—Certain Covenants—Limitation on Restricted Payments";

(20)     Investments in connection with a Permitted Disposition Transaction.

(21)     any net exercise of the Warrant in accordance with the terms thereof;

(22)     Investments in cash and Cash Equivalents; and

(23)     Investments in securities of trade creditors or customers in the ordinary course of business received upon foreclosure or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers.

"*Permitted Liens*" means the following types of Liens:

(1)     Liens for unpaid utilities and for taxes, assessments or governmental charges or claims either (a) not delinquent or (b) contested in good faith by appropriate proceedings and as to which the Company or any of its Restricted Subsidiaries shall have set aside on its books such reserves as may be required pursuant to GAAP;

(2)     statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, workmen, materialmen, repairmen and other Liens imposed by law incurred in the ordinary course of business for sums not yet overdue for a period of more than 60 days or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made in respect thereof;

(3)     Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security or employment laws or similar legislation, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or to secure the performance of tenders, statutory or regulatory obligations, surety and appeal bonds, bids, leases,

-48-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517196

government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(4)      easements, rights-of-way, zoning restrictions and other similar charges or encumbrances in respect of real property not interfering in any material respect with the ordinary conduct of the business of the Company or any of its Restricted Subsidiaries;

(5)      judgment Liens not giving rise to an Event of Default or other surety bonds related to such judgments;

(6)      Liens securing Capitalized Lease Obligation permitted to be incurred pursuant to clause (7) of the definition of "Permitted Indebtedness" or extensions, renewals or replacement thereof for the same or a lesser amount; *provided* that such Liens do not extend to any property, equipment or assets which is not leased property subject to such Capitalized Lease Obligation;

(7)      any interest or title of a lessor, sublessor, licensee or licensor under any operating lease or license agreement entered into in the ordinary course of business and not interfering in any material respect with the rights, benefits or privileges of such lease or licensing agreement, as the case may be;

(8)      banker's Liens, rights of setoff and similar Liens with respect to cash and Cash Equivalents on deposit in one or more bank accounts in the ordinary course of business, and Liens in favor of payor financial institutions having a right of setoff, revocation, refund or chargeback with respect to money or instruments of the Company or any Restricted Subsidiary of the Company on deposit with or in possession of such financial institution;

(9)      leases, subleases, licenses and sublicense granted to others that do not materially interfere with the ordinary course of business of the Company and its Restricted Subsidiaries;

(10)     Liens arising from filing Uniform Commercial Code financing statements regarding leases or as a precautionary measure in any transaction not prohibited by the Indenture;

(11)     Liens securing (i) Purchase Money Indebtedness permitted to be incurred pursuant to clause (7) of the definition of "Permitted Indebtedness"; *provided, however,* that (a) such Purchase Money Indebtedness shall not exceed the purchase price or other cost of acquiring, installing, constructing or improving such property, equipment or asset and shall not be secured by any property, equipment or asset of the Company or any Restricted Subsidiary of the Company other than the property, equipment or asset so acquired, installed, constructed or improved and (b) the Lien securing such Purchase Money Indebtedness shall be created within 180 days of such acquisition, installation, construction or improvement or shall exist on such property, equipment or asset at the time of acquisition and (ii) other Indebtedness (without duplication of clause (6) above) permitted to be secured pursuant to clause (7) of the definition of "Permitted Indebtedness";

(12)     Liens to secure Indebtedness permitted to be incurred pursuant to (A) clause (15) and clause (24) of the definition of "Permitted Indebtedness" and (B) clause (22) of the definition of "Permitted Indebtedness" in connection with the TMCT Real Property;

(13)     other Liens securing obligations in an aggregate principal amount not to exceed $100.0 million;

-49-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

(14)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of custom duties in connection with the importation of goods;

(15)    Liens on assets of a Restricted Subsidiary of the Company that is not a Guarantor to secure Indebtedness of such Restricted Subsidiary that is otherwise permitted under the Indenture;

(16)    Liens securing Acquired Indebtedness (including Purchase Money Indebtedness that is Acquired Indebtedness) incurred in accordance with the covenant described under "—Certain Covenants—Limitation on Incurrence of Additional Indebtedness"; *provided* that

(1)    such Liens secured such Acquired Indebtedness at the time of and prior to the incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary of the Company and were not granted in connection with, or in anticipation of, the incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary of the Company; and

(2)    such Liens do not extend to or cover any property or assets of the Company or of any of its Restricted Subsidiaries other than (A) the property or assets that secured the Acquired Indebtedness prior to the time such Indebtedness became Acquired Indebtedness of the Company or a Restricted Subsidiary of the Company, (B) those of the Person merged or consolidated with or into the Company or such Restricted Subsidiary or (C) improvements on or proceeds of the assets described in (A) or (B) above;

(17)    Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(18)    Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(19)    Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual or warranty requirements of the Company or any of its Restricted Subsidiaries, including rights of offset and setoff; and

(20)    Liens securing Secured Hedging Obligations.

"*Permitted Transferee*" means (i) any direct or indirect Affiliate of EGI-TRB, L.L.C., Equity Group Investments, L.L.C. or Zell, (ii) any direct or indirect member of EGI-TRB, L.L.C. and any direct or indirect Affiliate thereof, (iii) Zell or his spouse, lineal ancestors and descendants (whether natural or adopted), or (iv) any trust or retirement account primarily for the benefit of Zell and/or his spouse, lineal ancestors and descendants, any entity formed and wholly owned by any such trust or retirement account and any private foundation formed by Zell and /or any one or more of his descendants.

"*Person*" means an individual, partnership, corporation, limited liability company, unincorporated organization, trust or joint venture, or a governmental agency or political subdivision thereof.

"*PHONES*" means the Exchangeable Subordinated Debentures of the Company due 2029 and outstanding as of the Issue Date.

-50-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517198**

"*Preferred Stock*" of any Person means any Capital Stock of such Person that has preferential rights to any other Capital Stock of such Person with respect to dividends or redemptions or upon liquidation.

"*Purchase Money Indebtedness*" means Indebtedness of the Company and its Restricted Subsidiaries incurred for the purpose of financing all or any part of the purchase price, or the cost of installation, construction or improvement, of property or equipment or any fixed or capital asset.

"*Qualified Capital Stock*" means any Capital Stock that is not Disqualified Capital Stock.

"*Receivables Facility*" means one or more receivables financing facilities, in each case, as amended, supplemented, modified, extended, renewed, restated, refunded, replaced or refinanced from time to time, the Indebtedness of which is non-recourse (except for Standard Receivables Facility Undertakings) to the Company and its Subsidiaries, other than any Receivables Subsidiary, pursuant to which the Company or any of its Subsidiaries sells its accounts, payment intangibles and related assets to either (a) a Person that is not a Guarantor or (b) a Receivables Subsidiary.

"*Receivables Facility Repurchase Obligation*" means any obligation of the Company or a Subsidiary that is a seller of assets in a Receivables Facility to repurchase the assets it sold thereunder as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"*Receivables Subsidiary*" means any Subsidiary formed solely for the purpose of engaging, and that engages only, in one or more Receivables Facilities.

"*Refinance*" means, in respect of any security or Indebtedness, to refinance, extend, renew, refund, repay, prepay, redeem, defease or retire, or to issue a security or Indebtedness in exchange or replacement for, such security or Indebtedness in whole or in part. "*Refinanced*" and "*Refinancing*" shall have correlative meanings.

"*Refinancing Indebtedness*" means any Refinancing by the Company or any Restricted Subsidiary of the Company of Indebtedness incurred in accordance with the "Limitation on Incurrence of Additional Indebtedness" covenant (other than pursuant to clause (3), (4), (9), (10), (12), (13), (14), (15), (16), (18), (23), (24), (25) or (26) of the definition of "Permitted Indebtedness"), in each case that does not:

> (1)    result in an increase in the aggregate principal amount of such Indebtedness of such Person as of the date of such proposed Refinancing (plus the amount of any accrued and unpaid interest and premium required to be paid under the terms of the instrument governing such Indebtedness and plus the amount of reasonable fees and expenses incurred by the Company in connection with such Refinancing); or

> (2)    create Indebtedness with a final maturity earlier than six months after the final maturity date of the Notes; or

> (3)    change the direct and contingent obligors with respect to such Indebtedness (except that any Refinancing Indebtedness may provide for guarantees by the Guarantors; *provided*, that any such guarantees are on a subordinated basis to such Guarantor's obligations under the Guarantee).

-51-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0517199

"*Reinvestment Period*" means 15 months following the date of an Asset Sale (or, if later, 180 days after the date the Company or a Subsidiary has entered into a binding commitment to reinvest the proceeds of any such Asset Sale prior to the expiration of such 15 months).

"*Registration Rights Agreement*" means a registration rights agreement substantially in the form of the applicable exhibit to the Bridge Loan Agreement.

"*Restricted Subsidiary*" of any Person means any Subsidiary of such Person which at the time of determination is not an Unrestricted Subsidiary.

"*S Corp Election*" means the Company has qualified and elected to be treated as an "S Corporation" under Subchapter S of the Internal Revenue Code, and shall have filed all forms and taken all other actions necessary to qualify and elect that each Domestic Subsidiary of the Company (other than (x) Immaterial Subsidiaries, (y) any other Subsidiaries for which the Company reasonably determines the failure to be treated as a "qualified subchapter S subsidiary" for U.S. federal income tax purposes would not result in material adverse tax consequences to the Company and (z) any such Subsidiary that is an "Ineligible Corporation" under Section 1361(b)(2) of the Code) be treated as a "qualified subchapter S subsidiary" for U.S. federal income tax purposes, in each case in accordance with all requirements of law.

"*Sale and Leaseback Transaction*" means any arrangement with any Person or to which any such Person is a party, providing for the leasing to the Company or a Restricted Subsidiary of any real or tangible property, whether owned by the Company or any Restricted Subsidiary at the Effective Date or later acquired, which has been or is to be sold or transferred by the Company or such Restricted Subsidiary to such Person or to any other Person from whom funds have been or are to be advanced by such Person on the security of such Property.

"*Second Step Transactions*" means (i) the consummation of the Acquisition pursuant to the Acquisition Agreement (including the purchase of common stock owned by EGI-TRB, L.L.C.), (ii) the borrowing of approximately $2.105 billion of term loans under the Credit Agreement and the borrowing under the Bridge Loan Agreement (and subsequent issuance of the Notes offered hereby or any other permitted refinancing of the Bridge Loan Agreement), (iii) the issuance of the Zell Sub Note and the repayment of the Zell Note, (iv) the purchase by EGI-TRB, L.L.C. of the Warrant, (v) entry into the Zell Investment Agreement, (vi) all other transactions necessary to effect or incidental to the foregoing and (vii) the payment of fees, costs and expenses related to the foregoing.

"*Secured Hedging Obligations*" means all obligations owing by the Company or any Restricted Subsidiary to any agent or arranger under the Senior Secured Credit Agreement or any Affiliate of any of the foregoing or a Person that is or, at the time such obligation arose, was a lender under the Senior Secured Credit Agreement or an Affiliate of a lender under the Senior Secured Credit Agreement, in each case under a Hedge Agreement.

"*Significant Subsidiary*" with respect to any Person, means any Restricted Subsidiary of such Person that satisfies the criteria for a "significant subsidiary" set forth in Rule 1.02(w) of Regulation S-X under the Exchange Act.

"*Special Contribution*" means an Investment in Junior Capital of the Company made in connection with an S Corp Election.

"*Standard Receivables Facility Undertakings*" means representations, warranties, covenants and indemnities entered into by the Company or any Subsidiary that the Company has determined in good faith to be customary in financings similar to a Receivables Facility, including, without limitation, those

-52-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517200

relating to the servicing of the assets of a Receivables Facility Subsidiary, it being understood that any Receivables Facility Repurchase Obligation shall be deemed to be a Standard Receivables Facility Undertaking.

"*Stock Repurchase*" means the repurchase of certain shares of the Company's Capital Stock by the Company on or about June 4, 2007.

"*Subordinated Indebtedness*" means Indebtedness of the Company or any Guarantor that is subordinated or junior in right of payment to the Notes or the Guarantee of such Guarantor, as the case may be.

"*Subsidiary*," with respect to any Person, means:

(1)    any corporation of which the outstanding Capital Stock having at least a majority of the votes entitled to be cast in the election of directors under ordinary circumstances shall at the time be owned, directly or indirectly, by such Person; or

(2)    any other Person of which at least a majority of the voting interest under ordinary circumstances is at the time, directly or indirectly, owned by such Person.

"*TMCT Real Property*" means certain real property owned in fee by TMCT, LLC that is leased to the Company on the Effective Date and listed on the applicable schedule to the Bridge Loan Agreement.

"*Total Guaranteed Leverage Ratio*" means, at any date, the ratio of (x) the aggregate principal amount of Debt for Borrowed Money of the Company that is Guaranteed by any of the Guarantors and the aggregate principal amount of Debt for Borrowed Money of the Guarantors (on a consolidated basis) to (y) Consolidated EBITDA for the period of four fiscal quarters most recently then ended.

"*Transactions*" means the First Step Transactions and the Second Step Transactions.

"*Treasury Rate*" means, with respect to a date of redemption, the yield to maturity at the time of computation of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15(519) that has become publicly available at least two business days prior to such date of redemption (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the date of redemption to December 20, 2011; *provided, however*, that if the period from the date of redemption to such date is not equal to the constant maturity of a United States Treasury security for which a weekly average yield is given, the Treasury Rate shall be obtained by linear interpolation (calculated to the nearest one-twelfth of a year) from the weekly average yields of United States Treasury securities for which such yields are given, except that if the period from the date of redemption to such date is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year shall be used.

"*Tribune Finance LLC Transaction*" means (a) the satisfaction of the intercompany indebtedness owed by certain Subsidiaries, (b) the contribution by the Company of not less than $3.0 billion to its newly-formed, direct wholly owned subsidiary, Tribune Finance, LLC, (c) the issuance by certain Subsidiaries of the Intercompany Junior Subordinated Notes to Tribune Finance, LLC and (d) the direct or indirect dividend or other distribution by such Subsidiaries of the aggregate amount of such loaned funds to the Company.

-53-

TRB0517201

"*Tribune Management Equity Incentive Plan*" means the Tribune Management Equity Incentive Plan as in effect on the Effective Date.

"*Unrestricted Subsidiary*" of any Person means:

(1)    any Subsidiary of such Person that at the time of determination shall be or continue to be designated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided below; and

(2)    any Subsidiary of an Unrestricted Subsidiary.

The Board of Directors may designate any Subsidiary (including any newly acquired or newly-formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary owns any Capital Stock of, or owns or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated; *provided* that:

(1)    the Company certifies to the Trustee that such designation complies with the "Limitation on Restricted Payments" covenant; and

(2)    each Subsidiary to be so designated and each of its Subsidiaries has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness (other than Permitted Indebtedness incurred pursuant to clause (2) of the definition of Permitted Indebtedness) pursuant to which the lender has recourse to any of the assets of the Company or any of its Restricted Subsidiaries.

For purposes of making the determination of whether any such designation of a Subsidiary as an Unrestricted Subsidiary complies with the "Limitation on Restricted Payments" covenant, the portion of the fair market value of the net assets of such Subsidiary of the Company at the time that such Subsidiary is designated as an Unrestricted Subsidiary that is represented by the interest of the Company and its Restricted Subsidiaries in such Subsidiary, in each case as determined in good faith by the Board of Directors of the Company, shall be deemed to be an Investment. Such designation will be permitted only if such Investment would be permitted at such time under the "Limitation on Restricted Payments" covenant.

The Board of Directors may designate any Unrestricted Subsidiary to be a Restricted Subsidiary only if:

(1)    immediately after giving effect to such designation, either (x) the Company is able to incur at least $1.00 of additional Indebtedness (other than Permitted Indebtedness) in compliance with the first paragraph of the covenant described under "Limitation on Incurrence of Additional Indebtedness" or (y) the Consolidated Fixed Charge Coverage Ratio of the Company shall immediately after such transaction be no less than such ratio immediately prior to such transaction; and

(2)    immediately before and immediately after giving effect to such designation, no Default or Event of Default shall have occurred and be continuing.

Any such designation by the Board of Directors shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the Board Resolution giving effect to such designation and an officers' certificate certifying that such designation complied with the foregoing provisions.

-54-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0517202

Exhibit J

# REGISTRATION RIGHTS AGREEMENT

Dated As of [ ]

among

TRIBUNE COMPANY

and

MERRILL LYNCH & CO.,

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,

J.P. MORGAN SECURITIES INC.,

CITIGROUP GLOBAL MARKETS INC.

and

BANC OF AMERICA SECURITIES LLC

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (the "Agreement") is made and entered into this [ ] day of [        ], 200[ ], among Tribune Company, a Delaware corporation (the "Company"), Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), J.P. Morgan Securities Inc., Citigroup Global Markets Inc., and Banc of America Securities LLC (collectively, the "Initial Purchasers").

This Agreement is made pursuant to that certain Senior Unsecured Interim Loan Agreement, dated December 20, 2007, among the Company and the banks named therein (the "Credit Agreement"), which provides for the issuance by the Company to the lenders thereunder (the "Lenders") of an aggregate of up to $1.6 billion principal amount of the Company's Senior Fixed Rate Notes due 2015, Series A and/or Senior Increasing Rate Notes due 2015, Series A (collectively, and together with the Guarantees (as defined below), the "Securities") upon exchange of a like aggregate principal amount of Advances (as defined in the Credit Agreement) for such Securities pursuant to Section 2.17 of the Credit Agreement. The Securities will be guaranteed (the "Guarantees") by each of the Company's current and future subsidiaries that is a guarantor under the Credit Agreement (the "Guarantors"). The Company has agreed to provide to the Lenders and their direct and indirect transferees the registration rights set forth in this Agreement. In satisfaction of a condition to the exchange of Advances for the Securities, the Company agrees with the Administrative Agent (as defined herein) for the benefit of the Lenders and the other Holders (as defined herein) from time to time of the Registrable Securities (as defined herein) as follows:

1.    Definitions. As used in this Agreement, the following capitalized defined terms shall have the following meanings:

"1933 Act" shall mean the Securities Act of 1933, as amended from time to time.

"1934 Act" shall mean the Securities Exchange Act of 1934, as amended from time to time.

"Administrative Agent" shall have the meaning set forth in the Credit Agreement.

"Company" shall have the meaning set forth in the preamble and shall also include the Company's successors.

"Depositary" shall mean The Depository Trust Company, or any other depositary appointed by the Company, *provided, however,* that such depositary must have an address in the Borough of Manhattan, in the City of New York.

"Exchange Offer" shall mean the exchange offer by the Company and the Guarantors of Exchange Securities for Registrable Securities pursuant to Section 2.1 hereof.

"*Voting Stock*" means capital stock issued by a corporation, or equivalent interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or Persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"*Warrant*" means that certain 15-year warrant of the Company issued to EGI-TRB, L.L.C. evidencing rights to purchase 43,478,261 shares (subject to adjustment) of the Company's common stock.

"*Wholly Owned Restricted Subsidiary*" of any Person means any Wholly Owned Subsidiary of such Person which at the time of determination is a Restricted Subsidiary of such Person.

"*Wholly Owned Subsidiary*" of any Person means any Subsidiary of such Person of which all the Voting Stock (other than in the case of a foreign Subsidiary, directors' qualifying shares or an immaterial amount of shares required to be owned by other Persons pursuant to applicable law) are owned by such Person or any Wholly Owned Subsidiary of such Person.

"*Zell*" means Samuel Zell, a natural person.

"*Zell Investment Agreement*" means that certain agreement among Zell, as guarantor, EGI-TRB, L.L.C. and the Company, dated November 1, 2007. It being acknowledged and agreed that the Zell Investment Agreement has been duly executed and delivered and has terminated in accordance with its terms.

"*Zell Note*" means that certain $200.0 million aggregate principal amount unsecured subordinated exchangeable promissory note of the Company issued to EGI-TRB, L.L.C., and held by EGI-TRB, L.L.C. or its Permitted Transferees and/or any senior employee of Equity Group Investments, L.L.C. or any direct or indirect Affiliates thereof.

"*Zell Sub Note*" means an 11-year $225.0 million initial principal amount pay-in-kind subordinated note of the Company issued to EGI-TRB, L.L.C. or its Permitted Transferees and/or any senior employee of Equity Group Investments, L.L.C. or any direct or indirect Affiliates thereof.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517205

"Exchange Offer Registration" shall mean a registration under the 1933 Act effected pursuant to Section 2.1 hereof.

"Exchange Offer Registration Statement" shall mean an exchange offer registration statement on Form S-4 (or, if applicable, on another appropriate form), and all amendments and supplements to such registration statement, including the Prospectus contained therein, all exhibits thereto and all documents incorporated by reference therein.

"Exchange Period" shall have the meaning set forth in Section 2.1 hereof.

"Exchange Securities" shall mean the Senior Notes due 2015, Series B issued by the Company under the Indenture and related Guarantees of the Guarantors containing terms identical to the Securities in all material respects (except for references to certain interest rate provisions, restrictions on transfers and restrictive legends), to be offered to Holders of Securities in exchange for Registrable Securities pursuant to the Exchange Offer.

"Exchange Trigger Date" shall mean the date on which the Indenture related to the Securities is first executed.

"Holder" shall mean an Initial Purchaser, for so long as it owns any Registrable Securities, and each of its successors, assigns and direct and indirect transferees who become registered owners of Registrable Securities under the Indenture and each Participating Broker-Dealer that holds Exchange Securities for so long as such Participating Broker-Dealer is required to deliver a prospectus meeting the requirements of the 1933 Act in connection with any resale of such Exchange Securities.

"Indenture" shall mean the Indenture relating to the Securities, dated as of [      ], between the Company and [          ], as trustee, as the same may be amended, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof.

"Majority Holders" shall mean the Holders of a majority of the aggregate principal amount of outstanding Registrable Securities; provided that whenever the consent or approval of Holders of a specified percentage of Registrable Securities is required hereunder, Registrable Securities held by the Company and other obligors on the Securities or any affiliate (as such term is defined in Rule 405 under the 1933 Act) of the Company shall be disregarded in determining whether such consent or approval was given by the Holders of such required percentage amount.

"Participating Broker-Dealer" shall mean any of Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, J.P. Morgan Securities Inc., Citigroup Global Markets Inc., and Banc of America Securities LLC and any other broker-dealer which makes a market in the Securities and exchanges Registrable Securities in the Exchange Offer for Exchange Securities.

-2-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517206

"Person" shall mean an individual, partnership (general or limited), corporation, limited liability company, trust or unincorporated organization, or a government or agency or political subdivision thereof.

"Prospectus" shall mean the prospectus included in a Registration Statement, including any preliminary prospectus, and any such prospectus as amended or supplemented by any prospectus supplement, including any such prospectus supplement with respect to the terms of the offering of any portion of the Registrable Securities covered by a Shelf Registration Statement, and by all other amendments and supplements to a prospectus, including post-effective amendments, and in each case including all material incorporated by reference therein.

"Registrable Securities" shall mean the Securities; *provided, however,* that Securities shall cease to be Registrable Securities when (i) a Registration Statement with respect to such Securities shall have been declared effective under the 1933 Act and such Securities shall have been disposed of pursuant to such Registration Statement, (ii) such Securities have been sold to the public pursuant to Rule 144 (or any similar provision then in force, but not Rule 144A) under the 1933 Act, (iii) such Securities have become eligible to be sold in compliance with Rule 144(d)(1)(i) or (ii), as applicable, under the 1933 Act, by a Person who is not an affiliate of the Company, (iv) such Securities shall have ceased to be outstanding or (v) the Exchange Offer is consummated (except in the case of Securities purchased from the Company and continued to be held by any Lender who meets the conditions specified in clause (iii) of Section 2.2 hereof).

"Registration Expenses" shall mean any and all expenses incident to performance of or compliance by the Company with this Agreement, including without limitation:  (i) all SEC, stock exchange or National Association of Securities Dealers, Inc. (the "NASD") registration and filing fees, including, if applicable, the fees and expenses of any "qualified independent underwriter" (and its counsel) that is required to be retained by any holder of Registrable Securities in accordance with the rules and regulations of the NASD, (ii) all fees and expenses incurred in connection with compliance with state securities or blue sky laws and compliance with the rules of the NASD (including reasonable fees and disbursements of counsel for any underwriters or Holders in connection with blue sky qualification of any of the Exchange Securities or Registrable Securities and any filings with the NASD), (iii) all expenses of any Persons in preparing or assisting in preparing, word processing, printing and distributing any Registration Statement, any Prospectus, any amendments or supplements thereto, any underwriting agreements, securities sales agreements and other documents relating to the performance of and compliance with this Agreement, (iv) all fees and expenses incurred in connection with the listing, if any, of any of the Registrable Securities on any securities exchange or exchanges, (v) all rating agency fees, (vi) the fees and disbursements of counsel for the Company and of the independent public accountants of the Company, including the expenses of any special audits or "cold comfort" letters required by or incident to such performance and compliance, (vii) the fees and expenses of the Trustee, and any escrow agent or custodian, (viii) the reasonable fees and expenses of the Initial Purchasers in connection with the Exchange Offer, including the reasonable fees and expenses of counsel to the Initial Purchasers in connection therewith, (ix) the reasonable fees and disbursements of one counsel for the Holders of Registrable Securities (which counsel shall be selected

-3-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

by the Majority Holders and which counsel may also be counsel for the Initial Purchasers) and (x) any fees and disbursements of the underwriters customarily required to be paid by issuers or sellers of securities and the fees and expenses of any special experts retained by the Company in connection with any Registration Statement, but excluding underwriting discounts and commissions and transfer taxes, if any, relating to the sale or disposition of Registrable Securities by a Holder.

"Registration Statement" shall mean any registration statement of the Company and the Guarantors which covers any of the Exchange Securities or Registrable Securities pursuant to the provisions of this Agreement, and all amendments and supplements to any such Registration Statement, including post-effective amendments, in each case including the Prospectus contained therein, all exhibits thereto and all material incorporated by reference therein.

"SEC" shall mean the Securities and Exchange Commission or any successor agency or government body performing the functions currently performed by the United States Securities and Exchange Commission.

"Shelf Registration" shall mean a registration effected pursuant to Section 2.2 hereof.

"Shelf Registration Statement" shall mean a "shelf" registration statement of the Company and the Guarantors pursuant to the provisions of Section 2.2 hereof which covers all of the Registrable Securities on an appropriate form under Rule 415 under the 1933 Act, or any similar rule that may be adopted by the SEC, and all amendments and supplements to such registration statement, including post-effective amendments, in each case including the Prospectus contained therein, all exhibits thereto and all material incorporated by reference therein.

"Trustee" shall mean the trustee with respect to the Securities under the Indenture.

2.      Registration Under the 1933 Act.

2.1      Exchange Offer. The Company shall, and shall cause the Guarantors to, for the benefit of the Holders, at the Company's cost, (A) prepare and, as soon as reasonably practicable following the Exchange Trigger Date, file with the SEC an Exchange Offer Registration Statement on an appropriate form under the 1933 Act with respect to a proposed Exchange Offer and the issuance and delivery to the Holders, in exchange for the Registrable Securities, of a like principal amount of Exchange Securities, (B) use its and their respective commercially reasonable efforts to cause the Exchange Offer Registration Statement to be declared effective under the 1933 Act, (C) use its and their respective commercially reasonable efforts to keep the Exchange Offer Registration Statement effective until the closing of the Exchange Offer and (D) use its and their respective commercially reasonable efforts to cause the Exchange Offer to be consummated not later than 255 days following the Exchange Trigger Date. The Exchange Securities will be issued under the Indenture. Upon the effectiveness of the Exchange Offer Registration Statement, the Company shall, and shall cause the Guarantors to, promptly commence the Exchange Offer, it being the objective of such Exchange Offer to enable each Holder eligible and electing to exchange Registrable Securities for Exchange Securities (assuming that

-4-

such Holder (a) is not an affiliate of the Company within the meaning of Rule 405 under the 1933 Act, (b) is not a broker-dealer tendering Registrable Securities acquired directly from the Company for its own account, (c) acquired the Exchange Securities in the ordinary course of such Holder's business (d) has no arrangements or understandings with any Person to participate in the Exchange Offer for the purpose of distributing the Exchange Securities and (e) is not prohibited by any law or policy of the SEC from participating in the Exchange Offer) to transfer such Exchange Securities from and after their receipt without any limitations or restrictions under the 1933 Act and under state securities or blue sky laws.

In connection with the Exchange Offer, the Company shall, and shall cause the Guarantors to:

(a)     mail as promptly as practicable  to each Holder a copy of the Prospectus forming part of the Exchange Offer Registration Statement, together with an appropriate letter of transmittal and related documents;

(b)     keep the Exchange Offer open for acceptance for a period of not less than 30 calendar days after the date notice thereof is mailed to the Holders (or longer if required by applicable law) (such period referred to herein as the "Exchange Period");

(c)     utilize the services of the Depositary for the Exchange Offer;

(d)     permit Holders to withdraw tendered Registrable Securities at any time prior to 5:00 p.m. (Eastern Time), on the last business day of the Exchange Period, by sending to the institution specified in the notice, a telegram, telex, facsimile transmission or letter setting forth the name of such Holder, the principal amount of Registrable Securities delivered for exchange, and a statement that such Holder is withdrawing such Holder's election to have such Registrable Securities exchanged;

(e)     notify each Holder that any Registrable Security not tendered will remain outstanding and continue to accrue interest, but will not retain any rights under this Agreement (except in the case of the Initial Purchasers and Participating Broker-Dealers as provided herein); and

(f)     otherwise comply in all respects with all applicable laws relating to the Exchange Offer.

The Exchange Securities shall be issued under (i) the Indenture or (ii) an indenture identical in all material respects to the Indenture and which, in either case, has been qualified under the Trust Indenture Act of 1939, as amended (the "TIA"), or is exempt from such qualification and shall provide that the Exchange Securities shall not be subject to the transfer restrictions set forth in the Indenture. The Indenture or such indenture shall provide that the Exchange Securities and the Securities shall vote and consent together on all matters as one class and that none of the Exchange Securities or the Securities will have the right to vote or consent as a separate class on any matter.

-5-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

As soon as practicable after the close of the Exchange Offer, the Company shall, and shall cause the Guarantors to:

(i)      accept for exchange all Registrable Securities duly tendered and not validly withdrawn pursuant to the Exchange Offer in accordance with the terms of the Exchange Offer Registration Statement and the letter of transmittal which shall be an exhibit thereto;

(ii)     deliver to the Trustee for cancellation all Registrable Securities so accepted for exchange; and

(iii)    cause the Trustee promptly to authenticate and deliver Exchange Securities to each Holder of Registrable Securities so accepted for exchange in a principal amount equal to the principal amount of the Registrable Securities of such Holder so accepted for exchange.

Interest on each Exchange Security will accrue from the last date on which interest was paid on the Registrable Securities surrendered in exchange therefor or, if no interest has been paid on the Registrable Securities, from the date of original issuance. The Exchange Offer shall not be subject to any conditions, other than (i) that the Exchange Offer, or the making of any exchange by a Holder, does not violate applicable law or any applicable interpretation of the staff of the SEC, (ii) the due tendering of Registrable Securities in accordance with the Exchange Offer, (iii) that each Holder of Registrable Securities exchanged in the Exchange Offer shall have represented that all Exchange Securities to be received by it shall be acquired in the ordinary course of its business and that at the time of the consummation of the Exchange Offer it shall have no arrangement or understanding with any person to participate in the distribution (within the meaning of the 1933 Act) of the Exchange Securities and shall have made such other representations as may be reasonably necessary under applicable SEC rules, regulations or interpretations to render the use of Form S-4 or other appropriate form under the 1933 Act available and (iv) that no action or proceeding shall have been instituted or threatened in any court or by or before any governmental agency with respect to the Exchange Offer which, in the Company's judgment, would reasonably be expected to impair the ability of the Company to proceed with the Exchange Offer. The Company shall inform the Administrative Agent of the names and addresses of the Holders to whom the Exchange Offer is made, and the Administrative Agent shall have the right to contact such Holders and otherwise facilitate the tender of Registrable Securities in the Exchange Offer.

2.2    Shelf Registration. (i) If, because of any changes in law, SEC rules or regulations or applicable interpretations thereof by the staff of the SEC, the Company and the Guarantors are not permitted to effect the Exchange Offer as contemplated by Section 2.1 hereof, (ii) if for any other reason the Exchange Offer Registration Statement is not declared effective following the original issue of the Registrable Securities or the Exchange Offer is not consummated, or (iii) if a Lender or Participating Broker-Dealer is not eligible to participate in the Exchange Offer or does not receive fully tradeable Exchange Securities pursuant to the Exchange Offer and such Lender or Participating Broker-Dealer has provided the Company with written notice of such inability to participate in the Exchange Offer or failure to receive fully tradeable

-6-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Exchange Securities pursuant to the Exchange Offer within 60 days following the consummation of the Exchange Offer, then in case of each of clauses (i) through (iii) the Company shall, and shall cause the Guarantors to, at its and their respective cost:

(a)   As promptly as practicable, file with the SEC, and thereafter shall use its and their respective commercially reasonable efforts to cause to be declared effective on or prior to the later of (i) 255 days after the Exchange Trigger Date and (ii) 150 days after such obligation arises, a Shelf Registration Statement relating to the offer and sale of the Registrable Securities by the Holders from time to time in accordance with the methods of distribution elected by the Majority Holders participating in the Shelf Registration and set forth in such Shelf Registration Statement.

(b)   Subject to the terms of this Agreement, use its and their respective commercially reasonable efforts to keep the Shelf Registration Statement continuously effective in order to permit the Prospectus forming part thereof to be usable by Holders for a period of no longer than two years from the date the Shelf Registration Statement is declared effective by the SEC, or for such shorter period that will terminate when all Registrable Securities covered by the Shelf Registration Statement have been sold pursuant to the Shelf Registration Statement or cease to be outstanding or otherwise to be Registrable Securities (the "Effectiveness Period"); *provided, however,* that the Effectiveness Period in respect of the Shelf Registration Statement shall be extended to the extent required to permit dealers to comply with the applicable prospectus delivery requirements of Rule 174 under the 1933 Act and as otherwise provided herein.

(c)   Use its and their respective commercially reasonable efforts to ensure that (i) any Shelf Registration Statement and any amendment thereto and any Prospectus forming part thereof and any supplement thereto complies in all material respects with the 1933 Act and the rules and regulations thereunder, (ii) any Shelf Registration Statement and any amendment thereto does not, when it becomes effective, contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading and (iii) any Prospectus forming part of any Shelf Registration Statement, and any supplement to such Prospectus (as amended or supplemented from time to time), does not include an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

Notwithstanding anything to the contrary contained in this Agreement, but subject to the limitation set forth in the next succeeding paragraph, the Company and the Guarantors shall be entitled to suspend their obligation to file any amendment to the Shelf Registration Statement, furnish any supplement or amendment to a Prospectus included in the Shelf Registration Statement, make any other filing with the SEC, cause the Shelf Registration Statement or other filing with the SEC to remain effective or take any similar action (collectively, "Registration Actions") upon (A) the issuance by the SEC of a stop order suspending the effectiveness of the Shelf Registration Statement or the initiation of proceedings with respect to the Shelf Registration Statement under Section 8(d) or 8(e) of the Securities Act, (B) the occurrence of any

-7-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517211**

event or the existence of any fact as a result of which the Shelf Registration Statement would or shall contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, or the related Prospectus would or shall contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, or (C) the occurrence or existence of any corporate development that, in the discretion of the Company, makes it appropriate to postpone or suspend the availability of the Shelf Registration Statement and the related Prospectus, it being understood that the Company may not invoke this clause C for the purpose of avoiding their obligations under this Agreement. Upon the occurrence of any of the conditions described in (A), (B) or (C) above, the Company shall give prompt notice (a "Suspension Notice") thereof to the Holders. Upon the termination of such condition, the Company shall give prompt notice thereof to the Holders and shall promptly proceed with all Registration Actions that were suspended pursuant to this paragraph and comply as promptly as practicable with the requirements of Section 3(l) hereof, if applicable.

The Company and the Guarantors may only suspend Registration Actions pursuant to the preceding paragraph for one or more periods (each, a "Suspension Period") not to exceed, in the aggregate, (x) thirty (30) days (whether or not consecutive) in any three month period or (y) ninety (90) days (whether or not consecutive) in any twelve month period, during which no Additional Interest (as defined in Section 2.5) shall be payable. Each Suspension Period shall be deemed to begin on the date the relevant Suspension Notice is given to the Holders and shall be deemed to end on the earlier to occur of (1) the date on which the Company gives the Holders a notice that the Suspension Period has terminated and (2) the date on which the number of days during which a Suspension Period has been in effect exceeds, in the aggregate, ninety days in any twelve month period. The Company shall, and shall cause the Guarantors to, extend the Effectiveness Period (or the period during which Participating Broker-Dealers are entitled to use the Prospectus included in the Exchange Offer Registration Statement in connection with the resale of the Exchange Securities, as the case may be) by the total number of days during which a Suspension Period was in effect, so long as there are Registrable Securities.

The Company and the Guarantors shall not permit any securities other than Registrable Securities to be included in the Shelf Registration Statement. The Company further agrees, if necessary, to supplement or amend the Shelf Registration Statement, as required by Section 3(b) below, and to furnish to the Holders of Registrable Securities copies of any such supplement or amendment promptly after its being used or filed with the SEC.

2.3    Expenses. The Company shall pay all Registration Expenses in connection with the registration pursuant to Section 2.1 or 2.2. Each Holder shall pay all underwriting discounts and commissions and transfer taxes, if any, relating to the sale or disposition of such Holder's Registrable Securities pursuant to the Shelf Registration Statement.

2.4    Effectiveness.

(a)    The Company will be deemed not have used its commercially reasonable efforts to cause the Exchange Offer Registration Statement or the Shelf Registration Statement,

-8-

as the case may be, to become, or to remain, effective during the requisite period if the Company voluntarily takes any action that would, or omits to take any action which omission would, result in any such Registration Statement not being declared effective or in the Holders of Registrable Securities covered thereby not being able to exchange or offer and sell such Registrable Securities during that period as and to the extent contemplated hereby, unless such action is required by applicable law, any applicable interpretation of the staff of the SEC or any court or governmental agency or contemplated by Section 2.2 hereof or otherwise undertaken by the Company in good faith and for valid business reasons (not including avoidance of the Company's obligations hereunder), including the acquisition and divestiture of assets.

(b)    An Exchange Offer Registration Statement pursuant to Section 2.1 hereof or a Shelf Registration Statement pursuant to Section 2.2 hereof will not be deemed to have become effective unless it has been declared effective by the SEC; *provided, however,* that if, after it has been declared effective, the offering of Registrable Securities pursuant to an Exchange Offer Registration Statement or a Shelf Registration Statement is interfered with by any stop order, injunction or other order or requirement of the SEC or any other governmental agency or court, such Registration Statement will be deemed not to have become effective during the period of such interference, until the offering of Registrable Securities pursuant to such Registration Statement may legally resume.

2.5    Interest. The Indenture executed in connection with the Securities will provide that in the event that either (a) the Exchange Offer is not consummated on or prior to the 255th calendar day following the Exchange Trigger Date or (b) a Shelf Registration Statement is not declared effective on or prior to the later of (i) 255 days after the Exchange Trigger Date and (ii) 150 days after the obligation to file a Shelf Registration Statement arises (each such event referred to in clauses (a) and (b) above, a "Registration Default"), the interest rate borne by the Securities shall (subject to Section 2.2 hereof) be increased ("Additional Interest") by one-quarter of one percent per annum upon the occurrence of each Registration Default, which rate will increase by one quarter of one percent each 90-day period that such Additional Interest continues to accrue under any such circumstance, provided that the maximum aggregate increase in the interest rate will in no event exceed one percent (1%) per annum. Following the cure of all Registration Defaults the accrual of Additional Interest will cease and the interest rate will revert to the original rate.

Subject to the Company's ability to declare Suspension Periods, if the Shelf Registration Statement has become effective and thereafter either ceases to be effective or the Prospectus contained therein ceases to be usable, and the aggregate number of days in any consecutive twelve-month period for which such failure to remain effective or usable exists exceeds 30 days in the aggregate, then the interest rate borne by the Registrable Securities which are covered by such Shelf Registration Statement and/or Prospectus which have not been sold thereunder will be increased by 0.25% per annum of the principal amount of such Registrable Securities for the first 90-day period (or portion thereof) beginning on the 31st such date that such Shelf Registration Statement ceases to be effective or such Prospectus ceases to be usable, which rate shall be increased by an additional 0.25% per annum of the principal amount of such Registrable Securities at the beginning of each subsequent 90-day period, provided that the maximum aggregate

-9-

increase in the interest rate will in no event exceed one percent (1%) per annum. Any amounts payable under this paragraph shall also be deemed "Additional Interest" for purposes of this Agreement. Upon the Shelf Registration Statement once again becoming effective or the Prospectus contained therein once again becoming usable, as applicable, the interest rate borne by the relevant Registrable Securities will be reduced to the original interest rate if the Company is otherwise in compliance with this Agreement at such time. Additional Interest shall be computed based on the actual number of days elapsed in each 90-day period in which the Shelf Registration Statement is not effective or the Prospectus contained therein unusable. Any such Additional Interest shall be paid in a manner provided in the Indenture.

The Company shall notify the Trustee within three business days after each and every date on which an event occurs in respect of which Additional Interest is required to be paid (an "Event Date"). Additional Interest shall be paid by depositing with the Trustee, in trust, for the benefit of the Holders of the relevant Registrable Securities, on or before the applicable semi-annual interest payment date, immediately available funds in sums sufficient to pay the Additional Interest then due. The Additional Interest due shall be payable on each interest payment date to the record Holder of Securities entitled to receive the interest payment to be paid on such date as set forth in the Indenture. Each obligation to pay Additional Interest shall be deemed to accrue from and including the day following the applicable Event Date.

3.    Registration Procedures.  In connection with the obligations of the Company and the Guarantors with respect to Registration Statements pursuant to Sections 2.1 and 2.2 hereof, the Company shall, and shall cause the Guarantors to:

(a)    prepare and file with the SEC a Registration Statement, within the relevant time period specified in Section 2, on the appropriate form under the 1933 Act, which form (i) shall be selected by the Company, (ii) shall, in the case of a Shelf Registration, be available for the sale of the Registrable Securities by the selling Holders thereof, (iii) shall comply as to form in all material respects with the requirements of the applicable form and include or incorporate by reference all financial statements required by the SEC to be filed therewith or incorporated by reference therein, and (iv) shall comply in all material respects with the requirements of Regulation S-T under the 1933 Act, and use its and their respective commercially reasonable efforts to cause such Registration Statement to become effective and remain effective in accordance with Section 2 hereof;

(b)    prepare and file with the SEC such amendments and post-effective amendments to each Registration Statement as may be necessary under applicable law to keep such Registration Statement effective for the applicable period; and cause each Prospectus to be supplemented by any required prospectus supplement, and as so supplemented to be filed pursuant to Rule 424 (or any similar provision then in force) under the 1933 Act and comply with the provisions of the 1933 Act, the 1934 Act and the rules and regulations thereunder applicable to them with respect to the disposition of all securities covered by each Registration Statement during the applicable period in accordance with the intended method or methods of distribution by the selling Holders thereof (including sales by any Participating Broker-Dealer);

-10-

(c)      in the case of a Shelf Registration, (i) notify each Holder of Registrable Securities, at least five business days prior to filing, that a Shelf Registration Statement with respect to the Registrable Securities is being filed and advising such Holders that the distribution of Registrable Securities will be made in accordance with the method selected by the Majority Holders participating in the Shelf Registration; (ii) furnish to each Holder of Registrable Securities and to each underwriter of an underwritten offering of Registrable Securities, if any, without charge, as many copies of each Prospectus, including each preliminary Prospectus, and any amendment or supplement thereto and such other documents as such Holder or underwriter may reasonably request, including financial statements and schedules and, if the Holder so requests, all exhibits in order to facilitate the public sale or other disposition of the Registrable Securities; and (iii) hereby consent to the use of the Prospectus or any amendment or supplement thereto by each of the selling Holders of Registrable Securities in connection with the offering and sale of the Registrable Securities covered by the Prospectus or any amendment or supplement thereto;

(d)      use its and their respective commercially reasonable efforts to register or qualify the Registrable Securities under all applicable state securities or "blue sky" laws of such jurisdictions as any Holder of Registrable Securities covered by a Registration Statement and each underwriter of an underwritten offering of Registrable Securities shall reasonably request in writing by the time the applicable Registration Statement is declared effective by the SEC, and do any and all other acts and things which may be reasonably necessary or advisable to enable each such Holder and underwriter to consummate the disposition in each such jurisdiction of such Registrable Securities owned by such Holder; *provided, however,* that the Company shall not be required to (i) qualify as a foreign corporation or as a dealer in securities in any jurisdiction where it would not otherwise be required to qualify but for this Section 3(d), or (ii) take any action which would subject it to general service of process or taxation in any such jurisdiction where it is not then so subject;

(e)      notify promptly each Holder of Registrable Securities under a Shelf Registration or any Participating Broker-Dealer who has notified the Company that it is utilizing the Exchange Offer Registration Statement as provided in paragraph (f) below and, if requested by such Holder or Participating Broker-Dealer, confirm such advice in writing promptly (i) when a Registration Statement has become effective and when any post-effective amendments and supplements thereto become effective, (ii) of any request by the SEC or any state securities authority for post-effective amendments and supplements to a Registration Statement and Prospectus or for additional information after the Registration Statement has become effective, (iii) of the issuance by the SEC or any state securities authority of any stop order suspending the effectiveness of a Registration Statement or the initiation of any proceedings for that purpose, (iv) in the case of a Shelf Registration, if, between the effective date of a Registration Statement and the closing of any sale of Registrable Securities covered thereby, the representations and warranties of the Company contained in any underwriting agreement, securities sales agreement or other similar agreement, if any, relating to the offering cease to be true and correct in all material re-

-11-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517215

spects, (v) of the happening of any event or the discovery of any facts during the period a Shelf Registration Statement is effective which makes any statement made in such Registration Statement or the related Prospectus untrue in any material respect or which requires the making of any changes in such Registration Statement or Prospectus in order to make the statements therein not misleading, (vi) of the receipt by the Company of any notification with respect to the suspension of the qualification of the Registrable Securities or the Exchange Securities, as the case may be, for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose and (vii) of any determination by the Company that a post-effective amendment to such Registration Statement would be appropriate;

(f)    (A) in the case of the Exchange Offer Registration Statement (i) include in the Exchange Offer Registration Statement a section entitled "Plan of Distribution" which section shall be reasonably acceptable to Merrill Lynch on behalf of the Participating Broker-Dealers, and which shall contain a summary statement of the positions taken or policies made by the staff of the SEC with respect to the potential "underwriter" status of any broker-dealer that holds Registrable Securities acquired for its own account as a result of market-making activities or other trading activities and that will be the beneficial owner (as defined in Rule 13d-3 under the Exchange Act) of Exchange Securities to be received by such broker-dealer in the Exchange Offer, whether such positions or policies have been publicly disseminated by the staff of the SEC or such positions or policies, in the reasonable judgment of Merrill Lynch on behalf of the Participating Broker-Dealers and its counsel, represent the prevailing views of the staff of the SEC, including a statement that any such broker-dealer who receives Exchange Securities for Registrable Securities pursuant to the Exchange Offer may be deemed a statutory underwriter and must deliver a prospectus meeting the requirements of the 1933 Act in connection with any resale of such Exchange Securities, (ii) furnish to each Participating Broker-Dealer who has delivered to the Company the notice referred to in Section 3(e) hereof, without charge, as many copies of each Prospectus included in the Exchange Offer Registration Statement, including any preliminary prospectus, and any amendment or supplement thereto, as such Participating Broker-Dealer may reasonably request, (iii) hereby consent to the use of the Prospectus forming part of the Exchange Offer Registration Statement or any amendment or supplement thereto, by any Person subject to the prospectus delivery requirements of the SEC, including all Participating Broker-Dealers, in connection with the sale or transfer of the Exchange Securities covered by the Prospectus or any amendment or supplement thereto, and (iv) include in the transmittal letter or similar documentation to be executed by an exchange offeree in order to participate in the Exchange Offer (x) the following provision:

"If the exchange offeree is a broker-dealer holding Registrable Securities acquired for its own account as a result of market-making activities or other trading activities, it will deliver a prospectus meeting the requirements of the 1933 Act in connection with any resale of Exchange Securities received in respect of such Registrable Securities pursuant to the Exchange Offer;" and

-12-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

(y) a statement to the effect that by a broker-dealer making the acknowledgment described in clause (x) and by delivering a Prospectus in connection with the exchange of Registrable Securities, the broker-dealer will not be deemed to admit that it is an underwriter within the meaning of the 1933 Act; and

(B)    in the case of any Exchange Offer Registration Statement, the Company agrees to deliver to Merrill Lynch on behalf of the Participating Broker-Dealers upon the effectiveness of the Exchange Offer Registration Statement (i) an opinion of counsel or opinions of counsel substantially in the form attached hereto as Exhibit A, (ii) officers' certificates substantially in the form customarily delivered in a public offering of debt securities and (iii) a comfort letter or comfort letters in customary form to the extent permitted by Statement on Auditing Standards No. 72 of the American Institute of Certified Public Accountants (or if such a comfort letter is not permitted, an agreed upon procedures letter in customary form) from the Company's independent certified public accountants (and, if necessary, any other independent certified public accountants of any subsidiary of the Company or of any business acquired by the Company for which financial statements are, or are required to be, included in the Registration Statement);

(g)    (i) in the case of an Exchange Offer, furnish counsel for the Lenders and (ii) in the case of a Shelf Registration, furnish counsel for the Holders of Registrable Securities copies of any comment letters received from the SEC or any other request by the SEC or any state securities authority for amendments or supplements to a Registration Statement and Prospectus or for additional information;

(h)    make every reasonable effort to obtain the withdrawal of any order suspending the effectiveness of a Registration Statement at the earliest possible moment;

(i)    in the case of a Shelf Registration, furnish to each Holder of Registrable Securities, and each underwriter, if any, without charge, at least one conformed copy of each Registration Statement and any post-effective amendment thereto, including financial statements and schedules (without documents incorporated therein by reference and all exhibits thereto, unless requested);

(j)    in the case of a Shelf Registration, cooperate with the selling Holders of Registrable Securities to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold and not bearing any restrictive legends; and enable such Registrable Securities to be in such denominations (consistent with the provisions of the Indenture) and registered in such names as the selling Holders or the underwriters, if any, may reasonably request at least two business days prior to the closing of any sale of Registrable Securities;

(k)    in the case of a Shelf Registration, subject to Section 2.2 hereof, upon the occurrence of any event or the discovery of any facts, each as contemplated by Sections 3(e)(v) and 3(e)(vi) hereof, as promptly as practicable after the occurrence of such an event, use its and their respective commercially reasonable efforts to prepare a supplement or post-effective amendment to the Registration Statement or the related Pro-

-13-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

spectus or any document incorporated therein by reference or file any other required document so that, as thereafter delivered to the purchasers of the Registrable Securities or Participating Broker-Dealers, such Prospectus will not contain at the time of such delivery any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading or will remain so qualified. At such time as such public disclosure is otherwise made or the Company determines that such disclosure is not necessary, in each case to correct any misstatement of a material fact or to include any omitted material fact, the Company agrees promptly to notify each Holder of such determination and to furnish each Holder such number of copies of the Prospectus as amended or supplemented, as such Holder may reasonably request;

(l)     in the case of a Shelf Registration, a reasonable time prior to the filing of any Registration Statement, any Prospectus, any amendment to a Registration Statement or amendment or supplement to a Prospectus (excluding any document which is to be incorporated by reference into a Registration Statement or a Prospectus after initial filing of a Registration Statement or any amendment to any document incorporated by reference) provide copies of such document to Merrill Lynch on behalf of such Holders; and make representatives of the Company as shall be reasonably requested by the Holders of Registrable Securities, or Merrill Lynch on behalf of such Holders, available for discussion of such document;

(m)     obtain a CUSIP number for all Exchange Securities or Registrable Securities, as the case may be, not later than the effective date of a Registration Statement, and provide the Trustee with printed certificates for the Exchange Securities or the Registrable Securities, as the case may be, in a form eligible for deposit with the Depositary;

(n)     (i) cause the Indenture to be qualified under the TIA in connection with the registration of the Exchange Securities or Registrable Securities, as the case may be, (ii) cooperate with the Trustee and the Holders to effect such changes to the Indenture as may be required for the Indenture to be so qualified in accordance with the terms of the TIA and (iii) execute, and use its and their respective commercially reasonable efforts to cause the Trustee to execute, all documents as may be required to effect such changes, and all other forms and documents required to be filed with the SEC to enable the Indenture to be so qualified in a timely manner;

(o)     in the case of a Shelf Registration, enter into agreements (including underwriting agreements) and take all other customary and appropriate actions in order to expedite or facilitate the disposition of such Registrable Securities and in such connection whether or not an underwriting agreement is entered into and whether or not the registration is an underwritten registration:

(i)     make such representations and warranties to the Holders of such Registrable Securities and the underwriters, if any, in form, substance and scope as are customarily made by issuers to underwriters in similar underwritten offerings as may be reasonably requested by them;

-14-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

(ii)    obtain opinions of counsel to the Company and updates thereof (which counsel and opinions (in form, scope and substance) shall be reasonably satisfactory to the managing underwriters, if any, and the holders of a majority in principal amount of the Registrable Securities being sold) addressed to each selling Holder and the underwriters, if any, covering the matters customarily covered in opinions requested in sales of securities or underwritten offerings and such other matters as may be reasonably requested by such Holders and underwriters;

(iii)    obtain "cold comfort" letters and updates thereof from the Company's independent certified public accountants (and, if necessary, any other independent certified public accountants of any subsidiary of the Company or of any business acquired by the Company for which financial statements are, or are required to be, included in the Registration Statement) addressed to the underwriters, if any, and use reasonable efforts to have such letter addressed to the selling Holders of Registrable Securities (to the extent consistent with Statement on Auditing Standards No. 72 of the American Institute of Certified Public Accounts), such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters to underwriters in connection with similar underwritten offerings;

(iv)    enter into a securities sales agreement with the Holders and an agent of the Holders providing for, among other things, the appointment of such agent for the selling Holders for the purpose of soliciting purchases of Registrable Securities, which agreement shall be in form, substance and scope customary for similar offerings;

(v)    if an underwriting agreement is entered into, cause the same to set forth indemnification provisions and procedures substantially equivalent to the indemnification provisions and procedures set forth in Section 4 hereof with respect to the underwriters and all other parties to be indemnified pursuant to said Section or, at the request of any underwriters, in the form customarily provided to such underwriters in similar types of transactions; and

(vi)    deliver such documents and certificates as may be reasonably requested and as are customarily delivered in similar offerings to the Holders of a majority in principal amount of the Registrable Securities being sold and the managing underwriters, if any.

The above shall be done at (i) the effectiveness of such Registration Statement (and each post-effective amendment thereto) and (ii) each closing under any underwriting or similar agreement as and to the extent required thereunder;

(p)    in the case of a Shelf Registration or if a Prospectus is required to be delivered by any Participating Broker-Dealer in the case of an Exchange Offer, make available for inspection by representatives of the Holders of the Registrable Securities, any underwriters participating in any disposition pursuant to a Shelf Registration Statement,

-15-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

any Participating Broker-Dealer and any counsel or accountant retained by any of the foregoing, all financial and other records, pertinent corporate documents and properties of the Company reasonably requested by any such persons, and cause the respective officers, directors, employees, and any other agents of the Company to supply all information reasonably requested by any such representative, underwriter, special counsel or accountant in connection with a Registration Statement (provided, however, that any information that is designated in writing by the Company, in good faith, as confidential at the time of delivery of such information shall be kept confidential by the requesting party or any such attorney, accountant or agent, unless such disclosure is made in connection with a court proceeding or required by law, or such information becomes available to the public generally or through a third party (other than as a result of a breach of such confidentiality provisions) without an accompanying obligation of confidentiality), and make such representatives of the Company available for discussion of such documents as shall be reasonably requested by the Initial Purchasers;

(q)     (i)  in the case of an Exchange Offer Registration Statement, a reasonable time prior to the filing of any Exchange Offer Registration Statement, any Prospectus forming a part thereof, any amendment to an Exchange Offer Registration Statement or amendment or supplement to such Prospectus, provide copies of such document to the Administrative Agent and to counsel to the Holders of Registrable Securities and make such changes in any such document prior to the filing thereof as Merrill Lynch or counsel to the Holders of Registrable Securities may reasonably request and, except as otherwise required by applicable law, not file any such document in a form to which the Initial Purchasers on behalf of the Holders of Registrable Securities and counsel to the Holders of Registrable Securities shall not have previously been advised and furnished a copy of or to which Merrill Lynch on behalf of the Holders of Registrable Securities or counsel to the Holders of Registrable Securities shall reasonably object (provided that in each such case the Company shall not be required to provide the Administrative Agent or counsel for such Holders any document required to be filed by the Company pursuant to the 1934 Act), and make the representatives of the Company available for discussion of such documents as shall be reasonably requested by Merrill Lynch; and

(ii)    in the case of a Shelf Registration, a reasonable time prior to filing any Shelf Registration Statement, any Prospectus forming a part thereof, any amendment to such Shelf Registration Statement or amendment or supplement to such Prospectus, provide copies of such document to the Holders of Registrable Securities, to Merrill Lynch, to counsel for the Holders and to the underwriter or underwriters of an underwritten offering of Registrable Securities, if any, make such changes in any such document prior to the filing thereof as Merrill Lynch, the counsel to the Holders or the underwriter or underwriters reasonably request and not file any such document in a form to which the Majority Holders, Merrill Lynch on behalf of the Holders of Registrable Securities, counsel for the Holders of Registrable Securities or any underwriter shall not have previously been advised and furnished a copy of or to which the Majority Holders, Merrill Lynch on behalf of the Holders of Registrable Securities, counsel to the Holders of Registrable Securities or any underwriter shall reasonably object (provided that in each such case the

-16-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517220

Company shall not be required to provide such Holders, Merrill Lynch, counsel for such Holders or underwriter or underwriters any document required to be filed by the Company pursuant to the 1934 Act), and make the representatives of the Company available for discussion of such document as shall be reasonably requested by the Holders of Registrable Securities, Merrill Lynch on behalf of such Holders, counsel for the Holders of Registrable Securities or any underwriter.

(r)     in the case of a Shelf Registration, use its and their respective commercially reasonable efforts to cause all Registrable Securities to be listed on any securities exchange on which similar debt securities issued by the Company are then listed if requested by the Majority Holders, or if requested by the underwriter or underwriters of an underwritten offering of Registrable Securities, if any, in each case to the extent such Registrable Securities satisfy applicable listing requirements;

(s)     in the case of a Shelf Registration, use its and their respective commercially reasonable efforts to cause the Registrable Securities to be rated by the appropriate rating agencies, if so requested by the Majority Holders, or if requested by the underwriter or underwriters of an underwritten offering of Registrable Securities, if any;

(t)     otherwise comply with all applicable rules and regulations of the SEC and make available to its security holders, as soon as reasonably practicable, an earnings statement covering at least 12 months which shall satisfy the provisions of Section 11(a) of the 1933 Act and Rule 158 thereunder;

(u)     cooperate and assist in any filings required to be made with the NASD and, in the case of a Shelf Registration, in the performance of any due diligence investigation by any underwriter and its counsel (including any "qualified independent underwriter" that is required to be retained in accordance with the rules and regulations of the NASD); and

(v)     upon consummation of an Exchange Offer, obtain a customary opinion of counsel to the Company addressed to the Trustee for the benefit of all Holders of Registrable Securities participating in the Exchange Offer, and which includes an opinion that (i) the Company has duly authorized, executed and delivered the Exchange Securities, as applicable, and the related indenture, and (ii) each of the Exchange Securities and related indenture constitute a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its respective terms (with customary exceptions).

In the case of a Shelf Registration Statement, the Company may (as a condition to such Holder's participation in the Shelf Registration) require each Holder of Registrable Securities to furnish to the Company such information regarding the Holder and the proposed distribution by such Holder of such Registrable Securities as the Company may from time to time reasonably request in writing.

-17-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517221

In the case of a Shelf Registration Statement, each Holder agrees that, upon receipt of any notice from the Company of the happening of any event or the discovery of any facts, each of the kind described in Section 3(e)(v) or (vii) hereof, such Holder will forthwith discontinue disposition of Registrable Securities pursuant to a Registration Statement until such Holder's receipt of the copies of the supplemented or amended Prospectus contemplated by Section 3(k) hereof, and, if so directed by the Company, such Holder will deliver to the Company (at its expense) all copies in such Holder's possession, other than permanent file copies then in such Holder's possession, of the Prospectus covering such Registrable Securities current at the time of receipt of such notice.

If any of the Registrable Securities covered by any Shelf Registration Statement are to be sold in an underwritten offering, the underwriter or underwriters and manager or managers that will manage such offering will be selected by the Majority Holders of such Registrable Securities included in such offering, subject to approval of the Company. No Holder of Registrable Securities may participate in any underwritten registration hereunder unless such Holder (a) agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the persons entitled hereunder to approve such arrangements and (b) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents required under the terms of such underwriting arrangements.

4.      Indemnification; Contribution.

(a)   —The Company agrees to indemnify and hold harmless the Lenders, each Holder, each Participating Broker-Dealer, each Person who participates as an underwriter (any such Person being an "Underwriter") and each Person, if any, who controls any Holder or Underwriter within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act as follows:

(i)      against any and all loss, liability, claim, damage and expense whatsoever, as incurred, arising out of any untrue statement or alleged untrue statement of a material fact contained in any Registration Statement (or any amendment or supplement thereto) pursuant to which Exchange Securities or Registrable Securities were registered under the 1933 Act, including all documents incorporated therein by reference, or the omission or alleged omission therefrom of a material fact required to be stated therein or necessary to make the statements therein not misleading, or arising out of any untrue statement or alleged untrue statement of a material fact contained in any Prospectus (or any amendment or supplement thereto) or the omission or alleged omission therefrom of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(ii)     against any and all loss, liability, claim, damage and expense whatsoever, as incurred, to the extent of the aggregate amount paid in settlement of any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or of any claim whatsoever based upon any such untrue statement or omission, or any such alleged untrue statement or omission; provided that (subject to Sec-

-18-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517222

tion 4(d) below) any such settlement is effected with the written consent of the Company; and

(iii)     against any and all expense whatsoever, as incurred (including the reasonable fees and disbursements of counsel chosen by any indemnified party), reasonably incurred in investigating, preparing or defending against any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever based upon any such untrue statement or omission, or any such alleged untrue statement or omission, to the extent that any such expense is not paid under subparagraph (i) or (ii) above;

provided, however, that this indemnity agreement shall not apply to any loss, liability, claim, damage or expense to the extent arising out of any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with written information furnished to the Company by the Holder or Underwriter expressly for use in a Registration Statement (or any amendment thereto) or any Prospectus (or any amendment or supplement thereto).

(b)     Each Holder severally, but not jointly, agrees to indemnify and hold harmless the Company, the Lenders, each Underwriter and the other selling Holders, and each of their respective directors and officers, and each Person, if any, who controls the Company, the Initial Purchasers, any Underwriter or any other selling Holder within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act, against any and all loss, liability, claim, damage and expense described in the indemnity contained in Section 4(a) hereof, as incurred, but only with respect to untrue statements or omissions, or alleged untrue statements or omissions, made in the Shelf Registration Statement (or any amendment thereto) or any Prospectus included therein (or any amendment or supplement thereto) in reliance upon and in conformity with written information with respect to such Holder furnished to the Company by such Holder expressly for use in the Shelf Registration Statement (or any amendment thereto) or such Prospectus (or any amendment or supplement thereto); provided, however, that no such Holder shall be liable for any claims hereunder in excess of the amount of net proceeds received by such Holder from the sale of Registrable Securities pursuant to such Shelf Registration Statement.

(c)     Each indemnified party shall give notice as promptly as reasonably practicable to each indemnifying party of any action or proceeding commenced against it in respect of which indemnity may be sought hereunder, but failure to so notify an indemnifying party shall not relieve such indemnifying party from any liability hereunder to the extent it is not materially prejudiced as a result thereof and in any event shall not relieve it from any liability which it may have otherwise than on account of this indemnity agreement. An indemnifying party may participate at its own expense in the defense of such action; provided, however, that counsel to the indemnifying party shall not (except with the consent of the indemnified party) also be counsel to the indemnified party. In no event shall the indemnifying party or parties be liable for the fees and expenses of more than one counsel (in addition to any local counsel) separate from their own counsel for all indemnified parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances. No indemnifying party shall, without the prior written consent of the indemnified par-

-19-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517223

ties, settle or compromise or consent to the entry of any judgment with respect to any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever in respect of which indemnification or contribution could be sought under this Section 4 (whether or not the indemnified parties are actual or potential parties thereto), unless such settlement, compromise or consent (i) includes an unconditional release of each indemnified party from all liability arising out of such litigation, investigation, proceeding or claim and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any indemnified party.

(d)     If at any time an indemnified party shall have requested an indemnifying party to reimburse the indemnified party for reasonable fees and expenses of counsel, such indemnifying party agrees that it shall be liable for any settlement of the nature contemplated by Section 4(a)(ii) effected without its written consent if (i) such settlement is entered into more than 45 days after receipt by such indemnifying party of the aforesaid request, (ii) such indemnifying party shall have received notice of the terms of such settlement at least 30 days prior to such settlement being entered into and (iii) such indemnifying party shall not have reimbursed such indemnified party in accordance with such request prior to the date of such settlement, unless such indemnifying party is disputing in good faith whether such fees and expenses are reasonable.

(e)     If the indemnification provided for in this Section 4 is for any reason unavailable to or insufficient to hold harmless an indemnified party in respect of any losses, liabilities, claims, damages or expenses referred to therein, then each indemnifying party shall contribute to the aggregate amount of such losses, liabilities, claims, damages and expenses incurred by such indemnified party, as incurred, in such proportion as is appropriate to reflect the relative fault of the Company on the one hand and the Holders and the Initial Purchasers on the other hand in connection with the statements or omissions which resulted in such losses, liabilities, claims, damages or expenses, as well as any other relevant equitable considerations.

The relative fault of the Company on the one hand and the Holders and the Lenders on the other hand shall be determined by reference to, among other things, whether any such untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by the Company, the Holders or the Lenders and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The Company, the Holders and the Lenders agree that it would not be just and equitable if contribution pursuant to this Section 4 were determined by pro rata allocation (even if the Lenders were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this Section 4. The aggregate amount of losses, liabilities, claims, damages and expenses incurred by an indemnified party and referred to above in this Section 4 shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in investigating, preparing or defending against any litigation, or any investigation or proceeding by any governmental agency or body,

-20-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517224

commenced or threatened, or any claim whatsoever based upon any such untrue or alleged untrue statement or omission or alleged omission.

Notwithstanding the provisions of this Section 4, no Lender shall be required to contribute any amount in excess of the amount by which the total price at which the Securities sold by it were offered exceeds the amount of any damages which such Lender has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.

No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

For purposes of this Section 4, each Person, if any, who controls a Lender or Holder within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act shall have the same rights to contribution as such Lender or Holder, and each director of the Company, and each Person, if any, who controls the Company within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act shall have the same rights to contribution as the Company. The Lenders' respective obligations to contribute pursuant to this Section 7 are several in proportion to the principal amount of Advances set forth opposite their respective names in the applicable schedule to the Credit Agreement and not joint.

5.   Miscellaneous.

5.1   Rule 144 and Rule 144A.  For so long as the Company is subject to the reporting requirements of Section 13 or 15 of the 1934 Act, the Company covenants that it will file the reports required to be filed by it under the 1933 Act and Section 13(a) or 15(d) of the 1934 Act and the rules and regulations adopted by the SEC thereunder. If the Company ceases to be so required to file such reports, the Company covenants that it will upon the request of any Holder of Registrable Securities (a) make publicly available such information as is necessary to permit sales pursuant to Rule 144 under the 1933 Act, (b) deliver such information to a prospective purchaser as is necessary to permit sales pursuant to Rule 144A under the 1933 Act and it will take such further action as any Holder of Registrable Securities may reasonably request, and (c) take such further action that is reasonable in the circumstances, in each case, to the extent required from time to time to enable such Holder to sell its Registrable Securities without registration under the 1933 Act within the limitation of the exemptions provided by (i) Rule 144 under the 1933 Act, as such Rule may be amended from time to time, (ii) Rule 144A under the 1933 Act, as such Rule may be amended from time to time, or (iii) any similar rules or regulations hereafter adopted by the SEC. Upon the request of any Holder of Registrable Securities, the Company will deliver to such Holder a written statement as to whether it has complied with such requirements.

5.2   No Inconsistent Agreements.  The Company has not entered into and the Company will not after the date of this Agreement enter into any agreement which is inconsistent with the rights granted to the Holders of Registrable Securities in this Agreement or otherwise conflicts with the provisions hereof. The rights granted to the Holders hereunder do not and will

-21-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517225

not for the term of this Agreement in any way conflict with the rights granted to the holders of the Company's other issued and outstanding securities under any such agreements.

5.3    Amendments and Waivers. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given unless the Company has obtained the written consent of Holders of at least a majority in aggregate principal amount of the outstanding Registrable Securities affected by such amendment, modification, supplement, waiver or departure.

5.4    Notices. All notices and other communications provided for or permitted hereunder shall be made in writing by hand delivery, registered first-class mail, telex, telecopier, or any courier guaranteeing overnight delivery (a) if to a Holder, at the most current address given by such Holder to the Company by means of a notice given in accordance with the provisions of this Section 5.4, which address initially is the address set forth in the Credit Agreement with respect to the Lenders; and (b) if to the Company, initially at the Company's address set forth in the Credit Agreement, and thereafter at such other address of which notice is given in accordance with the provisions of this Section 5.4.

All such notices and communications shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; two business days after being deposited in the mail, postage prepaid, if mailed; when answered back, if telexed; when receipt is acknowledged, if telecopied; and on the next business day if timely delivered to an air courier guaranteeing overnight delivery.

Copies of all such notices, demands, or other communications shall be concurrently delivered by the person giving the same to the Trustee under the Indenture, at the address specified in such Indenture.

5.5    Successor and Assigns. This Agreement shall inure to the benefit of and be binding upon the successors, assigns and transferees of each of the parties, including, without limitation and without the need for an express assignment, subsequent Holders; provided that nothing herein shall be deemed to permit any assignment, transfer or other disposition of Registrable Securities in violation of the terms of the Credit Agreement or the Indenture. If any transferee of any Holder shall acquire Registrable Securities, in any manner, whether by operation of law or otherwise, such Registrable Securities shall be held subject to all of the terms of this Agreement, and by taking and holding such Registrable Securities such Person shall be conclusively deemed to have agreed to be bound by and to perform all of the terms and provisions of this Agreement, including the restrictions on resale set forth in this Agreement and, if applicable, the Credit Agreement, and such person shall be entitled to receive the benefits hereof.

5.6    Third Party Beneficiaries. The initial Lenders (even if the initial Lenders are not Holders of Registrable Securities) shall be third party beneficiaries to the agreements made hereunder between the Company, on the one hand, and the Holders, on the other hand, and shall have the right to enforce such agreements directly to the extent they deem such enforcement necessary or advisable to protect their rights or the rights of Holders hereunder. Each

-22-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Holder of Registrable Securities shall be a third party beneficiary to the agreements made here-under between the Company, on the one hand, and the initial Lenders, on the other hand, and shall have the right to enforce such agreements directly to the extent it deems such enforcement necessary or advisable to protect its rights hereunder.

5.7    Specific Enforcement. Without limiting the remedies available to the Lenders and the Holders, the Company acknowledges that any failure by the Company to com-ply with its obligations under Sections 2.1 through 2.4 hereof may result in material irreparable injury to the Lenders or the Holders for which there is no adequate remedy at law, that it would not be possible to measure damages for such injuries precisely and that, in the event of any such failure, the Lenders or any Holder may obtain such relief as may be required to specifically en-force the Company's obligations under Sections 2.1 through 2.4 hereof.

5.8    Restriction on Resales. Until the expiration of two years after the original issuance of the Securities, the Company will not, and will cause their "affiliates" (as such term is defined in Rule 144(a)(1) under the 1933 Act) not to, resell any Securities which are "restricted securities" (as such term is defined under Rule 144(a)(3) under the 1933 Act) that have been re-acquired by any of them and shall immediately upon any purchase of any such Securities submit such Securities to the Trustee for cancellation.

5.9    Counterparts. This Agreement may be executed in any number of coun-terparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

5.10    Headings. The headings in this Agreement are for convenience of refer-ence only and shall not limit or otherwise affect the meaning hereof.

5.11    GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF.

5.12    Severability. In the event that any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein shall not be affected or impaired thereby.

-23-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

TRIBUNE COMPANY

By: _____
   Name:
   Title:

Confirmed and accepted as of
the date first above written:

MERRILL LYNCH, PIERCE, FENNER & SMITH
      INCORPORATED

For itself and on behalf of the
several Lenders

BY:  MERRILL LYNCH, PIERCE, FENNER & SMITH
        INCORPORATED

By: _____
   Name:
   Title:

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517228

Exhibit A

## Form of Opinion of Counsel

Merrill Lynch, Pierce, Fenner & Smith
    Incorporated,
as representative of the Participating Broker-Dealers
(as defined in the Registration Rights Agreement (as defined herein))
c/o Merrill Lynch, Pierce, Fenner & Smith
    Incorporated
Merrill Lynch World Headquarters
North Tower
World Financial Center
New York, New York 10281-1209

Ladies and Gentlemen:

    We have acted as counsel for Tribune Company, a Delaware corporation (the "Company"), in connection with the registration statement on Form S-4 (File No. 333-_____ ) filed by the Company and certain subsidiaries of the Company (the "Guarantors") on _____ with the Securities and Exchange Commission (the "Commission") under the Securities Act of 1933, as amended (the "Securities Act"), relating to the registration of $_____ aggregate principal amount of the Company's [Senior Notes due 2015, Series B][1] (the "Exchange Notes") and the guarantees by the Guarantors of the Exchange Notes (the "Guarantees" and, collectively with the Exchange Notes, the "Exchange Securities"). The Exchange Notes (and the related Guarantees) are to be offered in exchange (the "Exchange Offer") for an equivalent aggregate principal amount of currently outstanding [Senior Notes due 2015, Series A][2] (the "Outstanding Notes"), which are also guaranteed by the Guarantors. The Exchange Offer is being effected pursuant to the Registration Rights Agreement, dated as of _____ (the "Registration Rights Agreement"), among the Company, Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, J.P. Morgan Securities Inc., Citigroup Global Markets Inc. and Banc of America Securities LLC. Unless otherwise defined herein, capitalized terms used in this letter that are defined in the Registration Rights Agreement are used herein as so defined.

    As used in this letter, (i) the term "Registration Statement" shall mean the registration statement on Form S-4 (File No. 333-_____ ) filed by the Company and the Guarantors

---

[1] Exact title of securities registered to be specified.

[2] Exact title of securities to be specified.

A-1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

on _____ with the Commission, including all exhibits thereto (but excluding Form T-1), [as amended by _____,[3]] which registration statement was declared effective by the Commission on _____; and (ii) the term "Prospectus" shall mean the Company's basic prospectus dated _____[4] included in the Registration Statement.

This letter is furnished to you, on behalf of the Participating Broker-Dealers, pursuant to Section 3(f)(B) of the Registration Rights Agreement.

Subject to the limitations, qualifications and exceptions set forth herein, we are of the opinion that the Registration Statement, as of the date it first became effective under the Securities Act, and the Prospectus, as of its date (in each case other than the financial statements, notes or schedules thereto and other financial data and supplemental schedules included or incorporated by reference therein or omitted therefrom and the Form T-1, as to which we express no opinion), complied as to form in all material respects with the requirements of the Securities Act and the applicable rules and regulations promulgated under the Securities Act.

In the course of the preparation of the Registration Statement and the Prospectus, we have considered the information set forth therein in light of the matters required to be set forth therein and we have participated in conferences with representatives of and counsel for the Participating Broker-Dealers and officers and other representatives of the Company, including its independent public accountants, during the course of which the contents of the Registration Statement and the Prospectus and related matters were discussed. We have not independently checked the accuracy or completeness of, or otherwise verified and accordingly are not passing upon, and do not assume responsibility for, the accuracy, completeness or fairness of the statements contained in the Registration Statement or the Prospectus. However, as a result of such consideration and participation, no facts have come to our attention which have caused us to believe that the Registration Statement (other than the financial statements, notes or schedules thereto and other financial data and supplemental schedules included or incorporated by reference therein or omitted therefrom and the Form T-1, as to which we express no belief) at the time it became effective contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading or that the Prospectus[5] (other than financial statements, notes or schedules and other financial data and supplemental schedules included or incorporated by reference therein or omitted therefrom, as to which we express no belief), as of its date,[6] or as of the date hereof, included or in-

---

[3] Any amendment to the registration statement to be described.

[4] To be modified, as appropriate, if any amendment or supplement to the basic prospectus.

[5] To be modified, as appropriate, if any amendment or supplement to the basic prospectus.

[6] To be modified, as appropriate, if any amendment or supplement to the basic prospectus.

A-2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517230

cludes an untrue statement of a material fact or omitted or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

This letter is limited to the federal laws of the United States of America. We express no opinion as to the laws, rules or regulations of any other jurisdiction.

We assume no obligation to update or supplement this letter to reflect any facts or circumstances which may hereafter come to our attention with respect to the opinion and statements expressed above, including any changes in applicable law which may hereafter occur.

This letter is being delivered solely for the benefit of the persons to whom it is addressed in connection with the matter described above; accordingly, it may not be quoted or otherwise delivered or relied upon by any other person (including, without limitation, any person who acquires the Exchange Securities from or through the persons to whom this letter is addressed) for any other purpose without our prior written consent.

Very truly yours,

A-3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517231

Exhibit K-1

## FORM OF OPINION OF COUNSEL TO BORROWER

[Date]

Merrill Lynch Capital Corporation, as
        Administrative Agent
under Tribune Company's Senior Unsecured Interim
Loan Agreement, dated as of December 20, 2007
600 E. Las Colinas Blvd., Suite 1300
Irving, Texas 75039

Re:     Tribune Company Exchange Notes due 2015

Ladies and Gentlemen:

          We have acted as counsel to Tribune Company, a Delaware corporation (the
"Company"), in connection with (i) the Senior Unsecured Interim Loan Agreement, dated as of
December 20, 2007 (the "Bridge Credit Agreement"), among the Company, the initial lenders
named therein, you, as administrative agent (the "Agent"), JPMorgan Chase Bank, N.A., as
syndication agent, Citicorp North America, Inc. and Bank of America, N.A. as co-documentation
agents, and J.P. Morgan Securities Inc., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner &
Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint
lead arrangers and joint bookrunners, and (ii) the issuance of $[●] aggregate principal amount of
the Company's [●]% senior fixed rate notes due 2015, Series A and $[●] aggregate principal
amount of the Company's senior increasing rate notes due 2015, Series A (collectively, the
"Exchange Notes") in exchange for Advances in accordance with the Bridge Credit Agreement.
The Exchange Notes are guaranteed (the "Senior Subordinated Guarantee") pursuant to the
Guarantee Agreement, dated as of December 20, 2007 (the "Senior Subordinated Guarantee
Agreement"), among the Company, each of the subsidiaries of the Company listed on Annex I
hereto (each such subsidiary individually, a "Guarantor" and, collectively, the "Guarantors") and
the Agent, as administrative agent, for the lenders from time to time party to the Bridge Credit
Agreement. The Exchange Notes are being issued under the Indenture, dated as of [●] (the
"Exchange Notes Indenture"), between the Company and [●], as trustee (the "Exchange Note
Trustee"), and are subject to the terms of the Registration Rights Agreement dated as of [●] (the
"Exchange Notes Registration Rights Agreement"), among the Company and Merrill Lynch &
Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, J.P. Morgan Securities Inc., Citigroup
Global Markets Inc. and Banc of America Securities LLC.  Capitalized terms used but not
defined herein have the respective meanings set forth in the Bridge Credit Agreement.

          For purposes of this letter, "Indentures" means, collectively, (i) the Indenture,
dated as of January 1, 1997, between the Company and Citibank, N.A. (successor to Bank of
Montreal Trust Company and Bank of New York), as trustee, (ii) the Indenture, dated as of April
1, 1999, between the Company and Citibank, N.A. (successor to Bank of Montreal Trust

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Merrill Lynch Capital Corporation
[Date]
Page 2

Company and Bank of New York), as trustee, (iii) the Indenture, dated as of January 30, 1995, between the Company (as successor pursuant to the First Supplemental Indenture to The Times Mirror Company, f/k/a New TMC Inc.) and Citibank, N.A. (successor to Bank of New York, Wells Fargo Bank, N.A. and First Interstate Bank of California), as trustee, as supplemented, (iv) the Indenture, dated as of March 19, 1996, between the Company (as successor pursuant to the Second Supplemental Indenture to The Times Mirror Company) and Citibank, N.A., as trustee, as supplemented, and (v) the Indenture, dated as of March 1, 1992 between the Company and Citibank, N.A. (successor to Continental Bank, National Association, Bank of Montreal Trust Company and Bank of New York), as trustee.

This letter is furnished to you at the request of the Company. Pursuant to Section 2.17(d) of the Bridge Credit Agreement, this will advise you that, subject to the assumptions, qualifications and limitations set forth herein, in the opinion of the undersigned:

1.    The Exchange Notes Indenture and the Exchange Notes Registration Rights Agreement constitute valid and binding agreements of the Company, enforceable against the Company in accordance with their terms, except (i) to the extent enforceability thereof may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar laws of general applicability relating to or affecting the enforcement of creditors' rights and by the effect of general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law) and (ii) to the extent that rights of indemnification and contribution under the Exchange Notes Registration Rights Agreement may be limited by applicable law or public policy.

2.    The Exchange Notes are in the form contemplated by the Exchange Notes Indenture and, when executed by the Company and authenticated by the Exchange Note Trustee in the manner provided in the Exchange Notes Indenture and issued and delivered in exchange for Advances in accordance with the Bridge Credit Agreement, will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, except to the extent enforceability thereof may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium, or other similar laws of general applicability relating to or affecting enforcement of creditor's rights and by the effect of general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law), and will be entitled to the benefits of the Exchange Notes Indenture.

3.    The Senior Subordinated Guarantee Agreement constitutes a valid and binding agreement of the Company and each Guarantor, enforceable against the Company and each Guarantor in accordance with its terms, except (i) to the extent enforceability thereof may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other similar laws of general applicability relating to or affecting the enforcement of creditors' rights and by the effect of general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

4.    (i) The execution, delivery and performance by the Company of the Exchange Notes Registration Rights Agreement, the Exchange Notes Indenture and the Exchange Notes, and compliance by the Company with its obligations under the Exchange Notes Registration

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Merrill Lynch Capital Corporation
[Date]
Page 3

Rights Agreement, the Exchange Notes Indenture and the Exchange Notes and (ii) the execution, delivery and performance by the Company and the Guarantors of the Senior Subordinated Guarantee Agreement, and compliance by the Company and the Guarantors with their obligations under the Senior Subordinated Guarantee Agreement, do not contravene any material contractual restriction contained in the Credit Agreement, dated as of May 17, 2007, among the Company, as the Borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, Merrill Lynch Capital Corporation, as Syndication Agent, Citicorp North America, Inc., Bank of America, N.A. and Barclays Bank PLC, as Co-Documentation Agents, and J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as Joint Lead Arrangers and Joint Bookrunners, as modified by the Increase Joinder, dated as of December 20, 2007, among the Company, as the Borrower, the Lenders party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent, the Bridge Credit Agreement or any of the Indentures, subject to the following: we express no opinion as to (A) compliance by the Company or any Guarantor with any financial covenants or (B) any cross default or cross acceleration provisions which may be triggered by a default under any agreement to which the Company or any Guarantor is a party.

5.    No filing with, or authorization, approval, consent, license, order, registration, qualification or decree of, any court or governmental authority or agency is required under Applicable Laws for the due execution, delivery or performance of the Exchange Notes Indenture or the Exchange Notes Registration Rights Agreement by the Company or the Senior Subordinated Guarantee Agreement by the Guarantors and the Company. As used herein, the term "Applicable Laws" means the laws of the State of New York and the federal laws of the United States of America which, in our experience and without independent investigation, are normally applicable to transactions of the type contemplated by the Bridge Credit Agreement (provided that the term "Applicable Laws" shall not include federal or state securities laws or blue sky laws or any rules or regulations thereunder (including, without limitation, the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, the Trust Indenture Act of 1939, as amended, and the Investment Company Act of 1940, as amended and the rules and regulations thereunder) or any anti-fraud or similar laws).

For the purpose of rendering the foregoing opinions, we have relied to the extent we have deemed appropriate, as to various questions of fact material to such opinions, upon the representations made by the parties in the Bridge Credit Agreement, the Exchange Notes Registration Rights Agreement and the Senior Subordinated Guarantee Agreement and upon certificates of officers of the Company. We also have examined originals, or copies of originals certified to our satisfaction, of such agreements, documents, certificates and other statements of governmental officials and other instruments, have examined such questions of law and have satisfied ourselves as to such matters of fact as we have considered relevant and necessary as a basis for this letter. We have assumed the genuineness of all signatures, the legal capacity of all natural persons, the authenticity of all documents submitted to us as originals and the conformity with the original documents of all documents submitted to us as certified or photostatic copies or by facsimile or other means of electronic transmission. With respect to any instrument or agreement executed or to be executed by any party, we have assumed, to the extent relevant to the opinions set forth herein, that (i) such party has been duly organized or formed and is validly

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Merrill Lynch Capital Corporation
[Date]
Page 4

existing and in good standing under the laws of its jurisdiction of organization or formation and (ii) such party has full right, power and authority to execute, deliver and perform its obligations under each instrument or agreement to which it is a party and each such instrument or agreement has been duly authorized, executed and delivered by, and, with respect to any party other than the Company, is a valid, binding and enforceable agreement or obligation, as the case may be, of, such party.

Except to the extent expressly set forth in this letter, we have not undertaken any independent investigation to determine the existence or absence of any fact, and no inference as to our knowledge of the existence or absence of any fact should be drawn from our representation of the Company or the rendering of this letter.

This letter is limited to the laws of the State of New York and the federal laws of the United States of America. This letter is based on the law in effect, and the facts and circumstances existing, on the date of this letter. We assume no obligation to update or supplement this letter to reflect any facts or circumstances which may hereafter come to our attention with respect to the opinions expressed above, including any changes in applicable law which may hereafter occur.

This letter is being rendered and delivered solely to and for the benefit of the Agent and the Lenders in connection with the matters described above; accordingly, it may not be delivered to or relied upon by any other person, quoted or filed with any governmental authority or other regulatory agency or otherwise circulated or utilized for any other purpose without our prior written consent.

Very truly yours,

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

ANNEX I

GUARANTORS

The Baltimore Sun Company
Chicago Tribune Company
The Daily Press, Inc.
The Hartford Courant Company
Orlando Sentinel Communications
Company
The Morning Call, Inc.
Sun-Sentinel Company
Newsday, Inc.
Tribune Interactive, Inc.
Tribune Los Angeles, Inc.
Tribune Media Services, Inc.
Tribune Broadcasting Company
KHCW Inc.
KSWB Inc.
KPLR, Inc.
KTLA Inc.
KWGN Inc.
Tower Distribution Company
Tribune Broadcast Holdings, Inc.
Tribune Entertainment Company
Tribune Television Company
Channel 40, Inc.
Channel 39, Inc.
Tribune Television Holdings, Inc.
Tribune Television New Orleans, Inc.
Tribune Television Northwest, Inc.
WDCW Broadcasting, Inc.
WGN Continental Broadcasting Company
WPIX, Inc.
Tribune Finance, LLC
Homestead Publishing Company
Patuxent Publishing Company
Chicagoland Publishing Company
Tribune Direct Marketing, Inc.

Virginia Gazette Companies, LLC
Forum Publishing Group, Inc.
Courant Specialty Products, Inc.
New Mass Media, Inc.
TMLH2, Inc.
Southern Connecticut Newspapers, Inc.
TMLS I, Inc.
Gold Coast Publications, Inc.
Distribution Systems of America, Inc.
Los Angeles Times Communications LLC
Tribune Manhattan Newspaper Holdings,
Inc.
Tribune New York Newspaper Holdings,
LLC
TMS Entertainment Guides, Inc.
Tribune Media Net, Inc.
Tribune National Marketing Company
Tribune Broadcasting Holdco, LLC
ChicagoLand Television News, Inc.
5800 Sunset Productions Inc.
Tribune (FN) Cable Ventures, Inc.
WTXX Inc.
Chicago National League Ball Club, Inc.
Tribune California Properties, Inc.
California Community News Corporation
Hoy Publications, LLC
Eagle New Media Investments, LLC
Newport Media, Inc.
Star Community Publishing Group, LLC
Stemweb, Inc.
ForSaleByOwner.com Corp.
Homeowners Realty, Inc.
Internet Foreclosure Service, Inc.
Eagle Publishing Investments, LLC

CH1 4086038v.8

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517236

Exhibit K-2

FORM OF OPINION OF
THE SENIOR VICE PRESIDENT AND GENERAL COUNSEL OF TRIBUNE COMPANY

[Date]


Merrill Lynch Capital Corporation, as
        Administrative Agent
under Tribune Company's Senior Unsecured Interim
Loan Agreement, dated as of December 20, 2007
600 E. Las Colinas Blvd., Suite 1300
Irving, Texas 75039


Ladies and Gentlemen:

I am rendering this letter in my capacity as Senior Vice President, General Counsel and Secretary
of Tribune Company, a Delaware corporation (the "Company"), in connection with the issuance
of $[●] aggregate principal amount of the Company's senior fixed rate notes due 2015, Series A
and $[●] aggregate principal amount of the Company's [●]% senior increasing rate notes due
2015, Series A (collectively, the "Exchange Notes"), contemplated by the Senior Unsecured
Interim Loan Agreement, dated as of December 20, 2007 (the "Bridge Credit Agreement"),
among the Company, the initial lenders named therein, you, as administrative agent (the
"Agent"), JPMorgan Chase Bank, N.A., as syndication agent, Citicorp North America, Inc. and
Bank of America, N.A. as co-documentation agents, and J.P. Morgan Securities Inc., Merrill
Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets
Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners. The
Exchange Notes are guaranteed (the "Senior Subordinated Guarantee") pursuant to the
Guarantee Agreement, dated as of December 20, 2007 (the "Senior Subordinated Guarantee
Agreement"), among the Company, each of the subsidiaries of the Company listed on Annex I
hereto (each such subsidiary individually, a "Guarantor" and, collectively, the "Guarantors") and
the Agent, as administrative agent, for the lenders from time to time party to the Bridge Credit
Agreement. The Exchange Notes are being issued under the Indenture, dated as of [●] (the
"Exchange Notes Indenture"), between the Company and [●], as trustee (the "Exchange Note
Trustee"), and are subject to the terms of the Registration Rights Agreement dated as of [●] (the
"Exchange Notes Registration Rights Agreement"), among the Company and Merrill Lynch &
Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, J.P. Morgan Securities Inc., Citigroup
Global Markets Inc. and Banc of America Securities LLC.  Capitalized terms used but not
defined herein have the respective meanings set forth in the Bridge Credit Agreement.

For purposes of this letter, "Indentures" means, collectively, (i) the Indenture, dated as of
January 1, 1997, between the Company and Citibank, N.A. (successor to Bank of Montreal Trust
Company and Bank of New York), as trustee, (ii) the Indenture, dated as of April 1, 1999,
between the Company and Citibank, N.A. (successor to Bank of Montreal Trust Company and

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0517237

Merrill Lynch Capital Corporation
[Date]
Page 2

Bank of New York), as trustee, (iii) the Indenture, dated as of January 30, 1995, between the
Company (as successor pursuant to the First Supplemental Indenture to The Times Mirror
Company, f/k/a New TMC Inc.) and Citibank, N.A. (successor to Bank of New York, Wells
Fargo Bank, N.A. and First Interstate Bank of California), as trustee, as supplemented, (iv) the
Indenture, dated as of March 19, 1996, between the Company (as successor pursuant to the
Second Supplemental Indenture to The Times Mirror Company) and Citibank, N.A., as trustee,
as supplemented, and (v) the Indenture, dated as of March 1, 1992 between the Company and
Citibank, N.A. (successor to Continental Bank, National Association, Bank of Montreal Trust
Company and Bank of New York), as trustee: and "Guarantees" means the Senior Subordinated
Guarantee and the guarantee pursuant to the Guarantee Agreement, dated June 4, 2007, among
the Company, the Guarantors and JPMorgan Chase Bank, N.A., as Administrative Agent.

I have examined originals, or copies certified or otherwise identified to my satisfaction, of such
documents, corporate and other records, certificates and other papers as I have deemed it
necessary to examine for the purpose of this letter.

This letter is subject to the qualification that I express no opinion as to (i) the effect of
compliance or non-compliance by any party to the Exchange Notes, the Exchanges Notes
Registration Rights Agreement, the Exchange Notes Indenture or the Senior Subordinated
Guarantee Agreement (the "Bridge Documents") with any state, federal, foreign or other laws or
regulations applicable to it, or with any provision of the Bridge Documents, (ii) the legal or
regulatory status or the nature of the business of any party to the Bridge Documents (other than
the Guarantors and the Company, as applicable), (iii) the failure of any party to the Bridge
Documents (other than the Guarantors and the Company, as applicable) to be authorized to do
business in any jurisdiction, or (iv) whether each of the Bridge Documents constitutes the valid
and binding obligation of each of the parties thereto, enforceable against such parties in
accordance with its terms.

Pursuant to the requirements of Section 2.17(d) of the Bridge Credit Agreement, this will advise
you that, subject to the assumptions, qualifications and limitations set forth herein, it is my
opinion that:

1. The Company has been duly incorporated and is validly existing as a corporation in good
standing under the laws of the State of Delaware and has the corporate power and
authority to own, lease and operate its properties and to conduct its business.

2. The Company is duly qualified as a foreign corporation to transact business and is in
good standing in each jurisdiction in which such qualification is required, whether by
reason of the ownership or leasing of property or the conduct of business, except where
the failure so to qualify or to be in good standing would not result in a Material Adverse
Effect.

3. Each Significant Subsidiary (as defined in Rule 1-02 of Regulation S-X under the
Securities Act of 1933, as amended) has been duly incorporated or formed and is validly
existing as a corporation, limited liability company or limited partnership in good

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Merrill Lynch Capital Corporation
[Date]
Page 3

standing under the laws of the jurisdiction of its incorporation or formation, has the power and authority to own, lease and operate its properties and to conduct its business and is duly qualified to transact business and is in good standing in each jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except where the failure to so qualify or to be in good standing would not result in a Material Adverse Effect. All of the issued and outstanding capital stock, membership interests or partnership interests of each Significant Subsidiary have been duly authorized and validly issued, (and in the case of capital stock) are fully paid and non-assessable, and, to my knowledge (except for directors' qualifying shares), are owned by the Company, directly or through Subsidiaries, free and clear of any security interest, mortgage, pledge, lien, encumbrance, claim or equity, other than the pledge of, and security interest granted in, the membership interests of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, with respect to certain indebtedness of the Company, and the Guarantees.

4.  The Exchange Notes Indenture and the Exchange Notes Registration Rights Agreement have been duly authorized, executed and delivered by the Company and the Exchange Notes have been duly authorized by the Company.

5.  The Senior Subordinated Guarantee Agreement has been duly authorized, executed and delivered by the Company and the Guarantors.

6.  To my knowledge, there is not pending or threatened, any action, suit, proceeding, inquiry or investigation, to which the Company or any Subsidiary is a party, or to which the property of the Company or any Subsidiary thereof is subject, before or brought by any court or governmental agency or body, which would reasonably be expected to result in a Material Adverse Effect, or which would reasonably be expected to materially and adversely affect the properties or assets thereof or the performance by the Company of its obligations under the Exchange Notes Indenture or the Exchange Notes Registration Rights Agreement or the obligation of the Company or the Guarantors under the Senior Subordinated Guarantee Agreement.

7.  (i) The execution, delivery and performance of the Exchange Notes Indenture, the Exchange Notes Registration Rights Agreement and the Exchange Notes and compliance by the Company with its obligations under the Exchange Notes Indenture, the Exchange Notes Registration Rights Agreement and the Exchange Notes and (ii) the execution, delivery and performance by the Company and the Guarantors of the Senior Subordinated Guarantee Agreement, and compliance by the Company and the Guarantors with their obligations under the Senior Subordinated Guarantee Agreement, do not and will not, whether with or without the giving of notice or lapse of time or both, conflict with or constitute a breach of, or default under, or result in the creation or imposition of any lien, charge or encumbrance upon (other than pursuant to the Senior Subordinated Guarantee Agreement), any property or assets of the Company or any Subsidiary thereof pursuant to any contract, indenture, mortgage, deed of trust, loan or credit agreement, note, lease or any other agreement or instrument, known to me (other than the Indentures), to which the Company or any of its Subsidiaries is a party or by which it or any of them may be

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Merrill Lynch Capital Corporation
[Date]
Page 4

        bound, or to which any of the property or assets of the Company or any Subsidiary
thereof is subject (except for such conflicts, breaches, defaults or liens, charges or
encumbrances that would not have a Material Adverse Effect), nor will such action result
in any violation of the provisions of the charter or by-laws (or similar organizational
documents) of the Company or any of its Subsidiaries, or any applicable law, statute,
rule, regulation, judgment, order, writ or decree, known to me, of any government,
government instrumentality or court, having jurisdiction over the Company or any of its
Subsidiaries or any of their respective properties, assets or operations (provided, however
that I express no opinion as to (A) compliance by the Company or any Guarantor with
any financial covenants or (B) any cross default or cross acceleration provisions which
may be triggered by a default under any agreement to which the Company or any
Guarantor is a party).

For the purpose of rendering the foregoing opinions, I have relied, as to various questions of fact
material to such opinions, upon the representations and warranties of the parties in the Bridge
Credit Agreement, the Exchange Notes Registration Rights Agreement and the Senior
Subordinated Guarantee Agreement. For the purpose of the opinion set forth in paragraph 3, I
have exclusively relied upon copies of (i) the certificates or articles of incorporation or
formation, and all amendments thereto, as applicable, of each Significant Subsidiary as certified
by the relevant authority of the jurisdiction of organization of such Significant Subsidiary as of a
recent date and (ii) a certificate of good standing of each Significant Subsidiary as of a recent
date, issued by the secretary of state of its jurisdiction of organization (to the extent such concept
exists in such jurisdiction) to the effect that such Significant Subsidiary is duly organized under
the laws of such State, is in good standing and has a legal corporate, limited liability company or
limited partnership existence, as applicable. I have assumed the genuineness of all signatures,
the legal capacity of all natural persons, the authenticity of all documents submitted to me as
originals and the conformity with the original documents of all documents submitted to me as
certified or photostatic copies or by facsimile or other means of electronic transmission.

Any opinion herein which is expressed to be "to my knowledge" or "known to me" or is
otherwise qualified by words of like import means that I have no current conscious awareness of
any facts or information contrary to such opinion. Except to the extent expressly set forth in this
letter or as I otherwise believe to be necessary with respect to the foregoing opinions, I have not
undertaken any independent investigation to determine the existence or absence of any fact, and
no inference as to my knowledge of the existence or absence of any fact should be drawn from
my employment by the Company or the rendering of this letter.

This letter is limited to the General Corporation Law of the State of Delaware and I express no
opinion with respect to the laws of any other state or jurisdiction.

This letter is being delivered solely for the benefit of the Agent and the Lenders in connection
with the matters described above; accordingly, it may not be quoted, filed with any governmental
authority or other regulatory agency or otherwise circulated or utilized for any other purpose
without my prior written consent. I assume no obligation to update or supplement this letter to

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Merrill Lynch Capital Corporation
[Date]
Page 5

reflect any facts or circumstances which may hereafter come to my attention with respect to the opinions expressed above, including any changes in applicable law which may hereafter occur.

Very truly yours,

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0517241**

ANNEX I

GUARANTORS

The Baltimore Sun Company
Chicago Tribune Company
The Daily Press, Inc.
The Hartford Courant Company
Orlando Sentinel Communications
Company
The Morning Call, Inc.
Sun-Sentinel Company
Newsday, Inc.
Tribune Interactive, Inc.
Tribune Los Angeles, Inc.
Tribune Media Services, Inc.
Tribune Broadcasting Company
KHCW Inc.
KSWB Inc.
KPLR, Inc.
KTLA Inc.
KWGN Inc.
Tower Distribution Company
Tribune Broadcast Holdings, Inc.
Tribune Entertainment Company
Tribune Television Company
Channel 40, Inc.
Channel 39, Inc.
Tribune Television Holdings, Inc.
Tribune Television New Orleans, Inc.
Tribune Television Northwest, Inc.
WDCW Broadcasting, Inc.
WGN Continental Broadcasting Company
WPIX, Inc.
Tribune Finance, LLC
Homestead Publishing Company
Patuxent Publishing Company
Chicagoland Publishing Company
Tribune Direct Marketing, Inc.
Virginia Gazette Companies, LLC
Forum Publishing Group, Inc.
Courant Specialty Products, Inc.
New Mass Media, Inc.
TMLH2, Inc.
Southern Connecticut Newspapers, Inc.

TMLS I, Inc.
Gold Coast Publications, Inc.
Distribution Systems of America, Inc.
Los Angeles Times Communications LLC
Tribune Manhattan Newspaper Holdings,
Inc.
Tribune New York Newspaper Holdings,
LLC
TMS Entertainment Guides, Inc.
Tribune Media Net, Inc.
Tribune National Marketing Company
Tribune Broadcasting Holdco, LLC
ChicagoLand Television News, Inc.
5800 Sunset Productions Inc.
Tribune (FN) Cable Ventures, Inc.
WTXX Inc.
Chicago National League Ball Club, Inc.
Tribune California Properties, Inc.
California Community News Corporation
Hoy Publications, LLC
Eagle New Media Investments, LLC
Newport Media, Inc.
Star Community Publishing Group, LLC
Stemweb, Inc.
ForSaleByOwner.com Corp.
Homeowners Realty, Inc.
Internet Foreclosure Service, Inc.
Eagle Publishing Investments, LLC

CH1 4092528v.5

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**