quired, or which requires the grant of any security for an obligation if security is granted for an-other obligation, except the following: (i) this Agreement and the other Loan Documents; (ii) covenants in documents creating Liens not prohibited by Section 5.02(a) prohibiting further Liens on the properties encumbered thereby; (iii) any other agreement that does not restrict in any manner (directly or indirectly) Liens created pursuant to the Loan Documents on any Collateral securing the Secured Obligations and does not require the direct or indirect granting of any Lien securing any Debt or other obligation by virtue of the granting of Liens on or pledge of property of any Loan Party to secure the Secured Obligations; (iv) any prohibition or limitation that (a) exists pursuant to applicable requirements of law, (b) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Sec-tion 5.02(e) pending the consummation of such sale, (c) restricts subletting or assignment of leasehold interests contained in any lease or sublease governing a leasehold interest of Borrower or a Subsidiary, (d) exists in any agreement in effect at the time such Subsidiary becomes a Sub-sidiary of Borrower, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary or (e) is imposed by any amendments or refinancings that are oth-erwise permitted by the Loan Documents or the contracts, instruments or obligations referred to in clause (iii) or (iv)(d); provided that such amendments and refinancings are no more materially restrictive with respect to such prohibitions and limitations than those prior to such amendment or refinancing; (v) the indentures and agreements related to the Existing Notes; (vi) all Transaction Documents; (vii) restrictions on assignment contained in any contract entered into by any Com-pany; and (viii) limitations imposed in connection with a Permitted Disposition Transaction, so long as such limitations do not extend beyond the asset subject to the Disposition and any In-vestments received as consideration for such Disposition.

(n)    Limitation on Tribune Finance, LLC.  Tribune Finance, LLC may not hold any material properties (other than the Intercompany Junior Subordinated Notes), become liable for any material obligations, engage in any trade or business, or conduct any business activity, other than (1) the issuance of its Equity Interests to Borrower, (2) the incurrence of Debt as a co-obligor or guarantor, as the case may be, of Borrower Acquisition Bridge Loans and Borrower High Yield Notes and the Loan Documents, (3) Investments pursuant to the Intercompany Junior Sub-ordinated Notes; and (4) activities incidental thereto.  Neither Borrower nor any Subsidiary shall engage in any transactions with Tribune Finance, LLC in violation of the immediately preceding sentence.

(o)    ERISA.  For plan years beginning after December 31, 2007, from and after the consummation of the Acquisition, Borrower shall not make, and shall cause its Subsidiaries not to make, any contributions (other than "elective contributions" within the meaning of Treas. Reg. § 1.401(k)-6) to the Tribune Company 401(k) Savings and Profit Sharing Plan; provided, that for the 2007 plan year, Borrower shall be permitted to make contributions with respect to such year in 2008.

## ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01.    Events of Default.  If any of the following events ("Events of De-fault") shall occur and be continuing:

(a)    Borrower shall fail to pay any principal of any Advance when the same becomes due and payable; or Borrower shall fail to pay any interest on any Advance or make any other

-85-

TRB0520862

payment of fees or other amounts payable under any Loan Document within five Business Days after the same becomes due and payable; or

(b)     any representation or warranty made by or on behalf of any Loan Party in any Loan Document or by or on behalf of any Loan Party (or any of its officers) in connection with any Loan Document shall prove to have been incorrect in any material respect when made or deemed made; or

(c)     (i) any Loan Party shall fail to perform or observe any term, covenant or agreement contained in Section 5.01(d) (solely with respect to the existence of Borrower), 5.01(i)(iv)(a), 5.01(n) or 5.02, or (ii) any Loan Party shall fail to perform or observe any other term, covenant or agreement (other than those referred to in clause (a) or (b) above) contained in this Agreement on its part to be performed or observed if such failure shall remain unremedied for 30 days after written notice thereof shall have been given to Borrower by the Agent or any Lender; or

(d)     Borrower or any of its Subsidiaries (other than an Immaterial Subsidiary) shall fail to pay any principal of or premium or interest on any Debt that is outstanding in a principal amount of at least $75,000,000 in the aggregate (but excluding Debt outstanding hereunder and provided that with respect to Hedge Agreements such amount shall be the then effective net payment obligations of Borrower or any Subsidiary of Borrower (other than an Excluded Subsidiary) in respect of such Hedge Agreements) of Borrower or such Subsidiary (as the case may be), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt; or any such Debt shall be declared to be due and payable, or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or an offer to prepay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof; or

(e)     Borrower or any of its Subsidiaries (other than an Immaterial Subsidiary) shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Borrower or any of its Subsidiaries (other than an Immaterial Subsidiary) seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of 60 days, or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or for any substantial part of its property) shall occur; or

(f)     judgments or orders for the payment of money in excess of $75,000,000 in the aggregate shall be rendered against Borrower or any of its Subsidiaries (other than an Immaterial Subsidiary) and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 60 consecutive days during which

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520863

payment for such judgment or order shall remain unsatisfied or a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; provided, however, that any such amount shall be calculated after deducting from the sum so payable any amount of such judgment or order that is covered by a valid and binding policy of insurance in favor of Borrower or such Subsidiary; or

     (g)    any Change in Control shall occur; or

     (h)    Borrower or any of its ERISA Affiliates shall incur, or shall be reasonably likely to incur, liability as a result of one or more of the following which would be reasonably likely to have a Material Adverse Effect: (i) the occurrence of any ERISA Event; (ii) the partial or complete withdrawal of Borrower or any of its ERISA Affiliates from a Multiemployer Plan; (iii) the reorganization or termination of a Multiemployer Plan; or (iv) a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code for which there is no exemption under Section 408 of ERISA or Section 4975 of the Code, respectively; or

     (i)    any Loan Document shall cease to be legal, valid and binding obligations of Borrower or a Guarantor, enforceable against Borrower and the Guarantor as party thereto in accordance with their respective terms (except, in any case, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity) or the enforceability of any Loan Document shall be contested by Borrower or a Guarantor; or

     (j)    the Liens created by the Pledge Agreement shall at any time not constitute a valid and perfected Lien on the Collateral intended to be covered thereby (to the extent perfection by filing, registration, recordation, or possession is required herein or therein) in favor of the Agent, having the priority contemplated by the Pledge Agreement (except to the extent such Liens have been released in accordance with this Agreement or such other Loan Document), or shall be asserted by Borrower or any Subsidiary not to be a valid, perfected, security interest in or Lien on the Collateral covered thereby;

then, and in any such event, the Agent (i) shall at the request, or may with the consent, of the Required Lenders, by notice to Borrower, declare the obligation of each Lender to make Advances (other than Advances to be made by an Issuing Bank or a Revolving Credit Lender pursuant to Section 2.03(c)) and of the Issuing Banks to issue Letters of Credit to be terminated, whereupon the same shall forthwith terminate, and (ii) shall at the request, or may with the consent, of the Required Lenders, by notice to Borrower, declare the Advances, all interest thereon and all other amounts payable under this Agreement to be forthwith due and payable, whereupon the Advances, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Borrower; provided, however, that in the event of an actual or deemed entry of an order for relief with respect to Borrower under the Federal Bankruptcy Code, (A) the obligation of each Lender to make Advances (other than Advances to be made by an Issuing Bank or a Revolving Credit Lender pursuant to Section 2.03(c)) and of the Issuing Banks to issue Letters of Credit shall automatically be terminated and (B) the Advances, all such interest and all such amounts shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by Borrower.

     SECTION 6.02.   Actions in Respect of the Letters of Credit upon Default. If any Event of Default shall have occurred and be continuing, the Agent may with the consent, or shall at the request, of the Required Revolving Credit Lenders, irrespective of whether it is taking any of the actions described in Section 6.01 or otherwise, make demand upon Borrower to, and forthwith upon such demand

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520864

Borrower will, (a) pay to the Agent on behalf of the Revolving Credit Lenders in same day funds at the Agent's office designated in such demand, for deposit in the L/C Cash Deposit Account, an amount equal to the aggregate Available Amount of all Letters of Credit then outstanding or (b) make such other arrangements in respect of the outstanding Letters of Credit as shall be acceptable to the Required Revolving Credit Lenders and not more disadvantageous to Borrower than the foregoing clause (a); provided, however, that in the event of an actual or deemed entry of an order for relief with respect to Borrower under the Federal Bankruptcy Code, an amount equal to the aggregate Available Amount of all outstanding Letters of Credit shall be immediately due and payable to the Agent for the account of the Revolving Credit Lenders without notice to or demand upon Borrower, which are expressly waived by Borrower, to be held in the L/C Cash Deposit Account. If at any time an Event of Default is continuing the Agent determines that any funds held in the L/C Cash Deposit Account are subject to any right or claim of any Person other than the Agent and the Revolving Credit Lenders or that the total amount of such funds is less than the aggregate Available Amount of all Letters of Credit, Borrower will, forthwith upon demand by the Agent, pay to the Agent, as additional funds to be deposited and held in the L/C Cash Deposit Account, an amount equal to the excess of (a) such aggregate Available Amount over (b) the total amount of funds, if any, then held in the L/C Cash Deposit Account that the Agent determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit, to the extent funds are on deposit in the L/C Cash Deposit Account, such funds shall be applied to reimburse the Issuing Banks to the extent permitted by applicable law. Upon the earlier of (i) no Event of Default continuing and (ii) all Letters of Credit having expired or been fully drawn upon, the balance, if any, in such L/C Cash Deposit Account shall be returned to Borrower and deposited into Borrower's Account for Borrower's sole use.

## ARTICLE VII

## THE AGENT

SECTION 7.01.    Authorization and Action. Each Lender (in its capacity as a Lender and Issuing Bank, as applicable) hereby appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement as are delegated to the Agent by the terms hereof, together with such powers and discretion as are reasonably incidental thereto. As to any matters not expressly provided for by this Agreement (including, without limitation, enforcement or collection of the Notes), the Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders (or such greater number of Lenders as may be required pursuant to Section 8.01), and such instructions shall be binding upon all Lenders and all holders of Notes; provided, however, that the Agent shall not be required to take any action that exposes the Agent to personal liability or that is contrary to this Agreement or applicable law. The Agent agrees to give to each Lender prompt notice of each notice given to it by Borrower pursuant to the terms of this Agreement. The Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care. Notwithstanding the foregoing, unless and until a replacement Agent shall have been appointed and shall have accepted such appointment in accordance with Section 7.06, the Agent shall remain liable for the performance of all of its duties and obligations hereunder.

SECTION 7.02.    Agent's Reliance, Etc. Neither the Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement, except to the extent resulting from its or their own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final, non-appealable judgment). Without limitation of the generality of the foregoing, the Agent: (i) may treat the Lender that

-88-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520865

made any Advance as the holder of the Debt resulting therefrom until the Agent receives and accepts an Assignment and Acceptance entered into by such Lender, as assignor, and an Eligible Assignee, as assignee, as provided in <u>Section 8.07</u>; (ii) may consult with legal counsel (including counsel for Borrower), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (iii) except as expressly required herein, makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with this Agreement; (iv) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of this Agreement on the part of Borrower or the existence at any time of any Event of Default or to inspect the property (including the books and records) of Borrower; (v) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, this Agreement or any other instrument or document furnished pursuant hereto; and (vi) shall incur no liability under or in respect of this Agreement by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopier) believed by it to be genuine and signed or sent by the proper party or parties.

SECTION 7.03.    <u>The Agent and Affiliates</u>.  With respect to its Commitments, the Advances made by it and any Note or Notes issued to it, the Agent shall have the same rights and powers under this Agreement as any other Lender and may exercise the same as though it were not the Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include the Agent in its individual capacity.  The Agent and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, Borrower, any of its Subsidiaries and any Person who may do business with or own securities of Borrower or any such Subsidiary, all as if the Agent were not the Agent and without any duty to account therefor to the Lenders.  The Agent shall have no duty to disclose any information obtained or received by it or any of its Affiliates relating to Borrower or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as Agent.  In the event that the Agent or any of its Affiliates shall be or become an indenture trustee under the Trust Indenture Act of 1939 (as amended from time to time, the "<u>Trust Indenture Act</u>") in respect of any securities issued or guaranteed by Borrower, the parties hereto acknowledge and agree that any payment or property received in satisfaction of or in respect of any obligation of Borrower hereunder by or on behalf of the Agent in its capacity as the Agent for the benefit of any Lender under this Agreement or any Note (other than the Agent or an Affiliate of the Agent) and which is applied in accordance with this Agreement shall be deemed to be exempt from the requirements of Section 311 of the Trust Indenture Act pursuant to Section 311(b)(3) of the Trust Indenture Act.

SECTION 7.04.    <u>Lender Credit Decision</u>.  Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender and based on the financial statements referred to in <u>Section 4.01</u> and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

SECTION 7.05.    <u>Indemnification</u>.

(a)    The Lenders agree to indemnify the Agent (to the extent not reimbursed by Borrower, but without limiting Borrower's reimbursement obligations), ratably according to the respective principal amounts of the Advances then owed to each of them (or if no Advances are at the time out-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520866

standing, ratably according to the respective amounts of their Commitments) ("Ratably"), from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel) of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Agreement or any action taken or omitted by the Agent under this Agreement (collectively, the "Indemnified Costs"), provided that no Lender shall be liable for any portion of the Indemnified Costs, except to the extent any such Indemnified Cost is found in a final, non-appealable judgment to have resulted from the Agent's gross negligence or willful misconduct. Without limitation of the foregoing, each Lender agrees to Ratably reimburse the Agent promptly upon demand for any out-of-pocket expenses (including reasonable counsel fees) incurred by the Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, to the extent that the Agent is not reimbursed for such expenses by Borrower. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 7.05 applies whether any such investigation, litigation or proceeding is brought by the Agent, any Lender or a third party.

(b)    Each Revolving Credit Lender severally (but not jointly) agrees to indemnify each Issuing Bank (to the extent not promptly reimbursed by Borrower) from and against such Lender's Ratable Share of any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel) of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against any such Issuing Bank in its capacity as such in any way relating to or arising out of this Agreement or any action taken or omitted by such Issuing Bank in its capacity as such hereunder or in connection herewith, in each case whether or not such investigation, litigation or proceeding is brought by any Lender, its directors, shareholders or creditors or the Agent is otherwise a party thereto, provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements, except to the extent any such Indemnified Cost is found in a final, non-appealable judgment to have resulted from such Issuing Bank's gross negligence or willful misconduct. Without limitation of the foregoing, each Lender agrees to reimburse any such Issuing Bank promptly upon demand for its Ratable Share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by Borrower under Section 8.04, to the extent that such Issuing Bank is not promptly reimbursed for such costs and expenses by Borrower.

(c)    The failure of any Lender to reimburse the Agent or any Issuing Bank promptly upon demand for its Ratable Share or Ratably, as the case may be, of any amount required to be paid by the Lenders to the Agent or an Issuing Bank as provided herein shall not relieve any other Lender of its obligation hereunder to reimburse the Agent or such Issuing Bank Ratably or for its Ratable Share of such amount, as the case may be, but no Lender shall be responsible for the failure of any other Lender to reimburse the Agent or any Issuing Bank for such other Lender's share of such amount. Without prejudice to the survival of any other agreement of any Lender hereunder, the agreement and obligations of each Lender contained in this Section 7.05 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the Notes. Each of the Agent and each Issuing Bank agrees to return to the Lenders their respective shares of any amounts paid under this Section 7.05 that are subsequently reimbursed by Borrower, together with any interest received thereon.

SECTION 7.06.    Successor Agent. The Agent may resign at any time by giving written notice thereof to the Lenders and Borrower and may be removed at any time with or without cause by the Required Lenders. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Agent; provided that, unless an Event of Default has occurred and is continuing, such successor Agent shall be reasonable satisfactory to Borrower. If no successor Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the

-90-

TRB0520867

retiring Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Agent, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent, which shall be (i) a commercial bank organized under the laws of the United States of America or of any State thereof and having a combined capital and surplus of at least $500,000,000 and (ii) unless an Event of Default has occurred and is continuing, reasonably satisfactory to Borrower. Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement. After any retiring Agent's resignation or removal hereunder as Agent, the provisions of this Article VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

SECTION 7.07.    Other Agents.  Each Lender hereby acknowledges that none of the syndication agent, any Lead Arranger, any co-documentation agent or any other Lender designated as any "Agent" on the signature pages hereof has any liability hereunder other than in its capacity (if any) as a Lender.

## ARTICLE VIII

## MISCELLANEOUS

SECTION 8.01.    Amendments, Etc.  Except as provided in Section 2.17, no amendment or waiver of any provision of this Agreement or the Notes, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by Borrower and the Required Lenders, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that (a) no amendment, waiver or consent shall, unless in writing and signed by Borrower and all the Lenders, do any of the following: (i) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Advances or participations in Letters of Credit, the number of Lenders that shall be required for the Lenders or any of them to take any action hereunder, or the definition of "Required Lenders" or "Required Revolving Credit Lenders", (ii) release any material Guarantor from its obligations under the Guarantee Agreement (except as otherwise permitted herein or in the other Loan Documents), (iii) except as provided in Section 8.20(a), release all or substantially all of the Collateral, (iv) amend the proviso of Section 8.06, or (v) amend this Section 8.01 and (b) no amendment, waiver or consent shall, unless in writing and signed by Borrower and each Lender that has or is owed obligations under this Agreement that are adversely modified by such amendment, waiver or consent, do any of the following: (i) increase any Commitment of such Lenders other than as provided in Section 2.17, (ii) reduce or forgive the principal of, or interest on, the Advances or any fees or other amounts payable hereunder (including, without limitation, any amounts that become due pursuant to Section 2.10(c)) or change the currency in which the Advances or any fees or other amounts are made by such Lender or are payable to such Lender; provided that only the consent of the Required Lenders shall be necessary to amend Section 2.07(b) or to waive any obligation of Borrower to pay any increased interest pursuant to Section 2.07(b), (iii) postpone any date fixed for any payment of principal of, or interest on, the Advances or any fees or other amounts payable hereunder or (iv) change Section 2.13(a) or (f), Section 2.15 or Section 7 of the Pledge Agreement in a manner that would alter the manner in which payments are shared; and provided further that (x) no amendment, waiver or consent shall, unless in writing and signed by the Agent in addition to Borrower and the Lenders required above to take such action, affect the rights or duties of the Agent under this Agreement or any Note and (y) no amendment, waiver or consent shall, unless in writing and signed by the Issuing Banks in addition to Borrower and the Lenders required above to take such action, adversely affect the rights or obligations of the Issuing Banks in their capacities as such under this Agreement; provided further that no amendment, waiver or consent shall (x) change or waive any condition in Section 3.02 to any Revolving Credit Advance without the written consent of Borrower and the Required Revolving Credit

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520868

Lenders and (y) on or before the expiration or termination of all Delayed Draw Tranche B Commitments, change or waive any condition in Section 3.02 to any Delayed Draw Tranche B Advance without the written consent of Borrower and the Lenders holding at least a majority of the aggregate outstanding Delayed Draw Tranche B Commitments. Notwithstanding the foregoing, any amendment that shall cure any ambiguity, omission, mistake, defect or inconsistency shall be effective if the same shall be in writing and signed by Borrower and the Agent.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Required Lenders, Borrower may replace such non-consenting Lender (a "Non-Consenting Lender") or replace such Non-Consenting Lender from the class of Advances for which consent is being sought, in each case, in accordance with Section 8.15; provided that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by Borrower to be made pursuant to this paragraph).

If any Non-Consenting Lender is required to assign any Tranche X Advances or Tranche B Advances pursuant to Section 8.07 in connection with such Non-Consenting Lender's failure to approve any amendment to this Agreement that would, as of the effective date of such amendment, reduce the Applicable Margin applicable to such Tranche X Advances or Tranche B Advances, as the case may be, and such assignment will become effective on or prior to the first anniversary of the Closing Date (excluding any such assignment in connection with a refinancing of all of the Facilities outstanding under this Agreement), then Borrower agrees to pay such Non-Consenting Lender a fee in an amount equal to 1.00% of the aggregate amount of such assigned Tranche X Advances or Tranche B Advances, as the case may be, outstanding on the effective date of such assignment. Notwithstanding anything to the contrary in this Section, this paragraph shall not be waived, amended or modified without the written consent of each Lender adversely affected thereby.

SECTION 8.02.    Notices, Etc.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)    if to Borrower, to it at 435 North Michigan Avenue, 6th Floor, Chicago, Illinois 60611, Attention of General Counsel (Telecopy No. (312) 222-4206), with a copy to Sidley Austin LLP, at 1 South Dearborn Street, Chicago, Illinois 60603, Attention: Robert Lewis, Esq. (Telecopy No. (312) 853-7036; Email: rlewis@sidley.com);

(ii)    if to the Agent, the Swing Line Lender or the Initial Issuing Bank, to JPMorgan Chase Bank, Loan and Agency Services Group, 1111 Fannin, 8th Floor, Houston, Texas 77002, Attention of Gloria Javier (Telecopy No. (713) 750-2358; Email: gloria.javier@jpmorgan.com), with a copy to JPMorgan Chase Bank, 270 Park Avenue, New York 10017, Attention of John Kowalczuk (Telecopy No. (212) 270-5127; Email: john.kowalczuk@jpmorgan.com); and

if to any other Lender or Issuing Bank, to it at its address (or telecopy number or email address) set forth in its Administrative Questionnaire.

(b)    Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the Agent or the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be

-92-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only
TRB0520869

deemed to have been given on the date delivered, mailed or telecopied, except that notices to the Agent pursuant to Article II, III or IV shall not be effective until the date of receipt.

(c)    Electronic Communications. Notices and other communications to the Lenders and the Issuing Banks hereunder may (subject to Section 8.02(d)) be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent and Borrower; provided that the foregoing shall not apply to notices to any Lender or any Issuing Bank pursuant to Article II if such Lender or such Issuing Bank, as applicable, has notified the Agent that it is incapable of receiving notices under such Section by electronic communication. The Agent or Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it (including as set forth in Section 8.02(d)); provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(d)    Posting. Each Loan Party hereby agrees that it will provide to the Agent all written information, documents and other materials that it is obligated to furnish to the Agent pursuant to this Agreement and any other Loan Document, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new, or a conversion of an existing, Advance or other extension of credit (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder (all such non-excluded communications, collectively, the "Communications"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Agent at such e-mail address(es) provided to Borrower from time to time or in such other form, including hard copy delivery thereof, as the Agent shall reasonably require. In addition, each Loan Party agrees to continue to provide the Communications to the Agent in the manner specified in this Agreement or any other Loan Document or in such other form, including hard copy delivery thereof, as the Agent shall reasonably require. Nothing in this Section 8.02 shall prejudice the right of the Agent, any Lender or any Loan Party to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document or as the Agent shall reasonably require.

The Agent agrees that receipt of the Communications by the Agent at its e-mail address(es) set forth above shall constitute effective delivery of the Communications to the Agent for purposes of the Loan Documents.

Each Loan Party further agrees that Agent may make the Communications available to the Lenders on a confidential basis by posting the Communications on Intralinks or a substantially similar electronic transmission system (the "Platform"). The Platform is provided "as is" and "as available". The Agent does not warrant the accuracy or completeness of the Communications, or the adequacy of the Plat-

-93-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520870

form and expressly disclaims liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by the Agent in connection with the Communications or the Platform.  In no event shall the Agent or any of its Affiliates have any liability to the Loan Parties, any Lender or any other Person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Agent's transmission of communications through the Internet, except to the extent the liability of the Agent or any of its affiliates results solely from such Person's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final, non-appealable judgment) or material breach of its express obligations.

(e)      Each Lender agrees that notice to it (as provided in the next sentence) (a "Notice") specifying that any Communications have been posted to the Platform shall constitute effective delivery of such information, documents or other materials to such Lender for purposes of this Agreement; provided that if requested by any Lender the Agent shall deliver a copy of the Communications to such Lender by email or telecopier.  Each Lender agrees (i) to notify the Agent in writing of such Lender's e-mail address to which a Notice may be sent by electronic transmission (including by electronic communication) on or before the date such Lender becomes a party to this Agreement (and from time to time thereafter to ensure that the Agent has on record an effective e-mail address for such Lender) and (ii) that any Notice may be sent to such e-mail address.

SECTION 8.03.    No Waiver; Remedies.  No failure on the part of any Lender or the Agent to exercise, and no delay in exercising, any right hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 8.04.    Costs and Expenses; Indemnity; Survival.

(a)      Borrower agrees to pay promptly following demand, all reasonable and documented out-of-pocket costs and expenses of the Agent and the Lead Arrangers in connection with the preparation, execution, delivery, administration, modification and amendment (whether or not effective) of this Agreement, the Notes and the other documents to be delivered hereunder, including, without limitation, (A) all due diligence, syndication (including printing, distribution and bank meetings), transportation, computer and duplication expenses and (B) the reasonable fees and expenses of Cahill Gordon & Reindel LLP, special outside counsel for the Agent, with respect thereto and with respect to advising the Agent as to its rights and responsibilities under this Agreement.  Borrower further agrees to pay promptly following demand all reasonable and documented out-of-pocket costs and expenses of the Agent, the Lead Arrangers and the Lenders, if any (including, without limitation, reasonable and documented counsel fees and expenses), in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of this Agreement, the Notes and the other documents to be delivered hereunder, including, without limitation, reasonable and documented fees and expenses of counsel for the Agent and each Lender in connection with the enforcement of rights under this Section 8.04(a).

(b)      Borrower agrees to indemnify and hold harmless the Agent, each Lead Arranger and each Lender and each of their Affiliates and their officers, directors, employees, agents, trustees and advisors (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or

-94-

preparation of a defense in connection therewith) the Advances, the Notes, this Agreement, any Letter of Credit, any of the transactions contemplated herein or the actual or proposed use of the proceeds of the Advances or Letters of Credit, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 8.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by Borrower, its directors, equity-holders or creditors or an Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. The parties hereto also agree not to assert any claim for special, indirect, consequential or punitive damages against any other party hereto, or any of their respective directors, officers, employees, attorneys and agents, on any theory of liability, arising out of or otherwise relating to the Notes, this Agreement, any of the transactions contemplated herein or the actual or proposed use of the proceeds of the Advances or Letters of Credit.

(c)     If any payment of principal of, or Conversion of, any Eurodollar Rate Advance is made by Borrower to or for the account of a Lender (i) other than on the last day of the Interest Period for such Advance, as a result of a payment or Conversion pursuant to Section 2.08, 2.09, 2.10 or 2.12, acceleration of the maturity of the Notes pursuant to Section 6.01 or for any other reason, or by an Eligible Assignee to a Lender other than on the last day of the Interest Period for such Advance upon an assignment of rights and obligations under this Agreement pursuant to Section 8.07 as a result of a demand by Borrower pursuant to Section 8.07(a) or (ii) as a result of a payment or Conversion pursuant to Section 2.10 or 2.12, Borrower shall, promptly following demand by such Lender (with a copy of such demand to the Agent), pay to the Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses (other than lost profits) that it may reasonably incur as a result of such payment or Conversion, including, without limitation, any loss, cost or expense (other than lost profits) incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Advance.

(d)     In the event any Lender shall incur any loss or expense (including any loss or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to make or continue any portion of the principal amount of any Advance as, or to convert any portion of the principal amount of any Advance into, a Eurodollar Rate Advance) as a result of (i) any Advances not being made as Eurodollar Rate Advances in accordance with the Notice of Borrowing therefor or (ii) any Advances not being continued as, or converted into, Eurodollar Rate Advances in accordance with the notice of Conversion therefor, Borrower shall, promptly following demand by such Lender (with a copy of such demand to the Agent), pay to the Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses (other than lost profits) that it may reasonably incur as a result of such loss or expense, including, without limitation, any loss, cost or expense (other than lost profits) incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Advance.

(e)     Without prejudice to the survival of any other agreement of Borrower hereunder, the agreements and obligations of Borrower contained in Sections 2.11, 2.14 and 8.04 shall survive the payment in full of principal, interest and all other Obligations (other than contingent obligations for unasserted claims) hereunder and under the Notes.

SECTION 8.05.    Right of Set-off. Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 6.01 to authorize the Agent to declare the Advances due and payable pursuant to the provisions of Section 6.01, each Lender and each of its Affiliates is hereby authorized at any time and from time to

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520872

time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or such Affiliate to or for the credit or the account of Borrower against any and all of the obligations of Borrower now or hereafter existing under this Agreement and the Note held by such Lender, whether or not such Lender shall have made any demand under this Agreement or such Note and although such obligations may be unmatured. Each Lender agrees promptly to notify Borrower after any such set-off and application, provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Lender and its Affiliates under this Section 8.05 are in addition to other rights and remedies (including, without limitation, other rights of set-off) that such Lender and its Affiliates may have.

SECTION 8.06.    Binding Effect.  This Agreement shall become effective when it shall have been executed by Borrower and the Agent and when the Agent shall have been notified by each Initial Lender that such Initial Lender has executed it and thereafter shall be binding upon and inure to the benefit of Borrower, the Agent and each Lender and their respective successors and assigns, provided, however that Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of all the Lenders.

SECTION 8.07.    Assignments and Participations.

(a)    Each Lender may, with the consent of the Agent, each Issuing Bank (in the case of any assignment of the Revolving Credit Commitments) and Borrower (such consents not to be unreasonably withheld or delayed), and, if demanded by Borrower pursuant to Section 8.15 upon at least five Business Days' notice to such Lender and the Agent, shall, assign to one or more Persons all or a portion of its rights and obligations under any Facility under this Agreement (including, without limitation, all or a portion of its Commitments, the Advances owing to it and the Note or Notes held by it); provided, however, that the consent of Borrower shall not be required for assignments (i) of Term Advances, (ii) to any Lender or one or more of such Lender's Affiliates or Approved Funds and (iii) if a Default or Event of Default under clause (a) or (e) of Section 6.01 shall have occurred and be continuing; and provided, further, that (A) each such assignment shall be of a constant, and not a varying, percentage of all rights and obligations under this Agreement with respect to one or more Facilities, (B) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender or an assignment of all of a Lender's rights and obligations under this Agreement with respect to a Facility, the amount of the Commitment under such Facility of the assigning Lender being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment and on an aggregate basis with respect to Related Funds (as defined below)) shall in no event be less than (x) $1,000,000, with respect to a Term Advance, or (y) $5,000,000, with respect to a Revolving Credit Advance, or, in each case, an integral multiple of $1,000,000 in excess thereof unless Borrower and the Agent otherwise agree, (C) each such assignment shall be to an Eligible Assignee, (D) each such assignment made as a result of a demand by Borrower pursuant to this Section 8.07(a) shall be arranged by Borrower after consultation with the Agent and shall be either an assignment of all of the rights and obligations of the assigning Lender under this Agreement or an assignment of a portion of such rights and obligations made concurrently with another such assignment or other such assignments that together cover all of the rights and obligations of the assigning Lender under this Agreement or, in the case of any Non-Consenting Lender, all or the portion of all of the rights and obligations of such Non-Consenting Lender relating to the class of Advances for which consent is being sought, (E) no Lender shall be obligated to make any such assignment as a result of a demand by Borrower pursuant to this Section 8.07(a) unless and until such Lender shall have received one or more payments from either Borrower or one or more Eligible Assignees in an aggregate amount at least equal to the aggregate outstanding principal amount of the Advances owing to such Lender, together with accrued interest thereon to the date of payment of such principal amount and all other amounts payable (including amounts payable, if any, pursuant to Section

-96-

TRB0520873

2.10(c)) to such Lender under this Agreement, (F) the consent of the Agent and/or each Issuing Bank (as applicable) shall not be required for an assignment to any Lender or one or more of such Lender's Affiliates or Approved Funds, (G) any term or provision hereof to the contrary notwithstanding, the parties to each such assignment shall execute and deliver to the Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, together with any Note subject to such assignment and a processing and recordation fee of $3,500 payable by the parties to each such assignment (it being understood that only one fee shall be required to be paid by a Lender in respect of concurrent assignments to two or more Related Funds) (unless such fee shall otherwise be waived by the Agent), and (H) if the Eligible Assignee is not a Lender, it shall deliver to the Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about any of the Loan Parties and their respective related parties or their respective securities) will be made available, who will comply with Section 8.08 and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws; provided, however, that in the case of each assignment made as a result of a demand by Borrower pursuant to Section 8.15, such recordation fee shall be payable by Borrower except that no such recordation fee shall be payable in the case of an assignment made at the request of Borrower to an Eligible Assignee that is an existing Lender or an Affiliate of an existing Lender or shall otherwise be waived by the Agent. Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, (x) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (y) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under Sections 2.11, 2.14 and 8.04 to the extent any claim thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(b)    By executing and delivering an Assignment and Acceptance, the Lender assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, this Agreement or any other instrument or document furnished pursuant hereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrower or the performance or observance by Borrower of any of its obligations under this Agreement or any other instrument or document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement as are delegated to the Agent by the terms hereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender.

-97-

(c)     Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee representing that it is an Eligible Assignee, together with any Note or Notes subject to such assignment, the Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of Exhibit C hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to Borrower.

(d)     The Agent shall maintain at its address referred to in Section 8.02 a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and the Commitments of, and principal amount of the Advances owing to, each Lender from time to time (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and Borrower, the Agent and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice. The Agent, in maintaining the Register, is acting solely for such purpose, as an agent for Borrower.

(e)     Each Lender may sell participations to one or more banks or other entities (other than Borrower or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment, the Advances owing to it and any Note or Notes held by it); provided, however, that (i) such Lender's obligations under this Agreement (including, without limitation, its Commitment to Borrower hereunder) shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) Borrower, the Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of this Agreement or any Note, or any consent to any departure by Borrower therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Notes or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, or postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable hereunder, in each case to the extent subject to such participation.

(f)     Each Lender that sells a participating interest in all or a portion of its rights and obligations under this Agreement to a participant shall, as agent of Borrower solely for the purpose of this Section 8.07, record in book entries maintained by such Lender the name and the amount of the participating interest of each participant entitled to receive payments in respect of such participating interests.

(g)     Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 8.07, disclose to the assignee or participant or proposed assignee or participant, any information relating to Borrower furnished to such Lender by or on behalf of Borrower; provided that, prior to any such disclosure, (i) the assignee or participant or proposed assignee or participant shall agree in writing to preserve the confidentiality of any Borrower Information relating to Borrower received by it from such Lender on substantially the same terms as provided in Section 8.08 and (ii) such Lender shall notify Borrower of such assignment or participation.

(h)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

-98-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only
TRB0520875

SECTION 8.08.    Confidentiality.  Until the first anniversary of the date on which no Advance shall remain unpaid, no Letter of Credit is outstanding and no Lender shall have any Commitment hereunder, neither the Agent nor any Lender may disclose to any Person any Borrower Information, except that each of the Agent and each of the Lenders may disclose Borrower Information (i) to its and its affiliates' employees, officers, directors, agents, trustees and advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of Borrower Information and instructed to keep Borrower Information confidential on substantially the same terms as provided herein), (ii) to the extent requested by any regulatory authority, (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (iv) to any other party to this Agreement, (v) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section 8.08, to (A) any assignee or participant or prospective assignee or participant or (B) any actual or prospective counterparty (or its advisors) to any Hedge Agreements evidencing Secured Hedging Obligations, (vii) to the extent Borrower Information (A) is or becomes generally available to the public on a non-confidential basis other than as a result of a breach of this Section 8.08 by the Agent or such Lender, or (B) is or becomes available to the Agent or such Lender on a nonconfidential basis from a source other than Borrower, (viii) rating agencies, subject to their confidentiality guidelines and procedures, and (ix) with the consent of Borrower.  Each Lender shall be deemed to have complied with this Section 8.08 if it exercises the same degree of care with respect to the confidentiality of Borrower Information as it accords to its own confidential information in accordance with safe and sound banking practices.  For the purposes of this Section, "Borrower Information" means all information received from Borrower or any of its Subsidiaries relating to Borrower, any of its Subsidiaries or any of their businesses, other than any such information that is available to the Agent, the Issuing Banks or any Lender on a non-confidential basis and not in contravention of any applicable confidentiality or similar provision prior to disclosure by Borrower or any of its Subsidiaries.  Any Person required to maintain the confidentiality of Borrower Information as provided in this Section 8.08 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Borrower Information as such Person would accord to its own confidential information.

**EACH LENDER ACKNOWLEDGES THAT BORROWER INFORMATION AS DEFINED IN SECTION 8.08 FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING ANY OF THE LOAN PARTIES AND THEIR RESPECTIVE RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION AND ALL BORROWER INFORMATION IN COMPLIANCE WITH THIS SECTION 8.08 AND IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.**

**ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY BORROWER OR THE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT ANY OF THE LOAN PARTIES AND THEIR RESPECTIVE RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO BORROWER AND THE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE BORROWER INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520876

ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW AND
WILL COMPLY WITH THIS SECTION 8.08.

SECTION 8.09.    Governing Law.  THIS AGREEMENT AND THE NOTES
SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF
THE STATE OF NEW YORK.

SECTION 8.10.    Execution in Counterparts.  This Agreement may be executed in any
number of counterparts and by different parties hereto in separate counterparts, each of which when so
executed shall be deemed to be an original and all of which taken together shall constitute one and the
same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier
shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 8.11.    Jurisdiction, Etc.

(a)    Each of the parties hereto hereby irrevocably and unconditionally submits, for it-
self and its property, to the nonexclusive jurisdiction of any New York State court or federal court of the
United States of America sitting in New York City, and any appellate court from any thereof, in any ac-
tion or proceeding arising out of or relating to this Agreement or the Notes, or for recognition or enforce-
ment of any judgment arising out of or relating to this Agreement or any Notes, and each of the parties
hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or pro-
ceeding may be heard and determined in any such New York State court or, to the extent permitted by
law, in such federal court.  Borrower hereby irrevocably consents to the service of process in any action
or proceeding in such courts by the mailing thereof by any parties hereto by registered or certified mail,
postage prepaid, to Borrower at its address specified pursuant to Section 8.02.  Each of the parties hereto
agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in
other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this
Agreement shall affect any right that any party may otherwise have to bring any action or proceeding re-
lating to this Agreement or the Notes in the courts of any jurisdiction.

(b)    Each of the parties hereto irrevocably and unconditionally waives, to the fullest
extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying
of venue of any suit, action or proceeding arising out of or relating to this Agreement or the Notes in any
New York State court or federal court sitting in New York City.  Each of the parties hereto hereby irrevo-
cably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the mainte-
nance of such action or proceeding in any such court.

SECTION 8.12.    No Liability of the Issuing Banks.  Borrower assumes all risks of the
acts or omissions of any beneficiary or transferee of any Letter of Credit with respect to its use of such
Letter of Credit.  Neither an Issuing Bank nor any of its officers or directors shall be liable or responsible
for: (a) the use that may be made of any Letter of Credit or any acts or omissions of any beneficiary or
transferee in connection therewith; (b) the validity, sufficiency or genuineness of documents, or of any
endorsement thereon, even if such documents should prove to be in any or all respects invalid, insuffi-
cient, fraudulent or forged; (c) payment by such Issuing Bank against presentation of documents that do
not comply with the terms of a Letter of Credit, including failure of any documents to bear any reference
or adequate reference to the Letter of Credit; or (d) any other circumstances whatsoever in making or fail-
ing to make payment under any Letter of Credit, except that Borrower shall have a claim against such Is-
suing Bank, and such Issuing Bank shall be liable to Borrower, to the extent of any direct, but not conse-
quential, damages suffered by Borrower that Borrower proves were caused by (i) such Issuing Bank's
willful misconduct or gross negligence when determining whether drafts and other documents presented
under a Letter of Credit comply with the terms thereof or (ii) any Issuing Bank's willful failure to make

-100-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520877

lawful payment under a Letter of Credit after presentation to it of a draft and certificates, and at a time and place, strictly complying with the terms and conditions of the Letter of Credit. In furtherance and not in limitation of the foregoing, such Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation; provided that nothing herein shall be deemed to excuse such Issuing Bank if it acts with gross negligence or willful misconduct in accepting such documents.

SECTION 8.13.    Patriot Act Notice. Each Lender and the Agent (for itself and not on behalf of any Lender) hereby notifies Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow such Lender or the Agent, as applicable, to identify Borrower in accordance with the Patriot Act. Borrower shall provide such information and take such actions as are reasonably requested by the Agent or any Lenders in order to assist the Agent and the Lenders in maintaining compliance with the Patriot Act.

SECTION 8.14.    **Waiver of Jury Trial.** EACH OF BORROWER, THE AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE NOTES OR THE ACTIONS OF THE AGENT OR ANY LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

SECTION 8.15.    Replacement of Lenders.

(a)    If (A) any Lender requests compensation under Section 2.11(a) or (b), (B) Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, (C) any Lender gives notice pursuant to Section 2.12 with respect to an occurrence or state of affairs not applicable to all Lenders, (D) any Lender is a Defaulting Lender, (E) any Lender is a Non-Consenting Lender under Section 8.01 or (F) any Lender becomes insolvent and its assets become subject to a receiver, liquidator, trustee, custodian or other Person having similar powers, then Borrower may, at its sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 8.07), all of its interests, rights and obligations under this Agreement and its Note, if any, to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i)    Borrower shall have paid to the Agent the assignment fee specified in Section 8.07(a) or the Agent shall have waived receipt of such fee in writing;

(ii)    such replaced Lender shall have received payment of an amount equal to the outstanding principal of its Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under its Note (including any amounts under Sections 2.10(c), 2.11 and 2.14) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrower (in the case of all other amounts);

(iii)    in the case of any such assignment resulting from a claim for compensation under Section 2.11(a) or (b) or payments required to be made pursuant to Section 2.14, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)    the assignee shall be an Eligible Assignee and shall agree to accept such assignment and to assume all obligations of such Lender hereunder in accordance with Section 8.07;

-101-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520878**

(v)    any such replacement shall not be deemed to be a waiver of any rights that any party shall have against any other party;

(vi)    in the case of any such assignment of a Non-Consenting Lender under Section 8.01, the assignee shall grant its consent with respect to the applicable proposed amendment, waiver or consent;

(vii)    the consent of any Non-Consenting Lender to any such assignment shall not be required; and

(viii)    such assignment does not conflict with applicable law.

Upon compliance with the provisions of this Section 8.15, the replacement Lender shall become a Lender hereunder and the Lender so replaced shall cease to constitute a Lender hereunder. A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower to require such assignment and delegation cease to apply.

SECTION 8.16.    Acknowledgments. Each of the Loan Parties hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    neither the Agent nor any Lender has any fiduciary relationship with or duty to any Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Agent and Lenders, on one hand, and the Loan Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Loan Parties and the Lenders.

SECTION 8.17.    Headings. Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 8.18.    Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 8.19.    Reliance. All covenants, agreements, representations and warranties made by the Loan Parties herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Advances and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agent, any Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Advance or any

-102-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520879

fee or any other Obligation under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding (other than contingent obligations for unasserted claims) or all outstanding Letters of Credit have been cash collateralized or secured by a back-up letter of credit and so long as the Commitments have not expired or terminated.

SECTION 8.20.    Releases of Guarantees and Liens.

(a)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 8.01) to take any action requested by Borrower having the effect of releasing any Collateral or Guarantee obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 8.01 or (ii) under the circumstances described in paragraph (b) below.

(b)    At such time as the Advances and the other Obligations (other than contingent obligations for unasserted claims) shall have been paid in full, the Commitments have been terminated and no Letters of Credit shall be outstanding or all outstanding Letters of Credit have been cash collateralized or secured by a back-up letter of credit, the Collateral shall be released from the Liens created by the Pledge Agreement, and the Loan Documents and all Obligations (other than those expressly stated to survive such termination) of the Agent and each Loan Party under the Loan Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520880

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

TRIBUNE COMPANY

By: _____
Name: Donald C. Grenesko
Title:   Senior Vice President / Finance and
          Administration

[Tribune Credit Agreement]

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520881

JPMORGAN CHASE BANK, N.A.,
as Agent and Lender

By:
Name:          ROBERT ANASTASIO
Title:            VICE PRESIDENT

[Tribune Credit Agreement]

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520882

Bank of America, N.A.
as Co-Documentation Agent and Lender

By: _____

Name: Daniel R. Petrik
Title: Senior Vice President

[Tribune Credit Agreement]

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520883

BARCLAYS BANK PLC,
as Co-Documentation Agent and Lender

By: _____

Name: David Barton
Title:   Associate Director

[Tribune Credit Agreement]

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520884

CITICORP NORTH AMERICA, INC.,
as Co-Documentation Agent and Lender

By: _____
Name:
Title:

~~ Julie Persily~~
~~...aging Director~~

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520885

CIT Lending Services Corp.

as Lender

By: _____
Name: Donald F. Cheng, Jr.
Title: Vice President

[If a second signature block is necessary]

By: _____
Name:
Title:

[Tribune Credit Agreement]

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

LaSalle Bank National Association,
as Lender

By: _____

    Name:   Paul B. Cronin
    Title:   Senior Vice President

[Tribune Credit Agreement]

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**Lehman Brothers Commercial Bank**,
as Lender

By: _____
    Name:    BRIAN McNANY
    Title:   AUTHORIZED SIGNATORY

[If a second signature block is necessary]

By: _____
    Name:
    Title:

[Tribune Credit Agreement]

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

MERRILL LYNCH CAPITAL CORPORATION,
as Syndication Agent and Lender

By: _____
Name: David Tuvlin
Title: Vice President

[Tribune Credit Agreement]

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520889

Sumitomo Mitsui Banking Corporation,
as Lender

By: _____
    Name: Leo E. Pagarigan
    Title:  General Manager

[If a second signature block is necessary]

By: _____
    Name:
    Title:

[Tribune Credit Agreement]

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520890

## AMENDMENT NO. 1

AMENDMENT NO. 1, dated as of June 4, 2007 (this "Amendment"), to the Credit Agreement, dated as of May 17, 2007 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), among TRIBUNE COMPANY, a Delaware corporation ("Tribune" or "Borrower"), each lender from time to time party thereto (collectively, the "Lenders" and individually, a "Lender"), JPMORGAN CHASE BANK, N.A., as administrative agent (the "Agent"), MERRILL LYNCH CAPITAL CORPORATION, as syndication agent (in such capacity, the "Syndication Agent"), and CITICORP NORTH AMERICA, INC., BANK OF AMERICA, N.A. and Barclays Bank PLC, as co-documentation agents (in such capacity, the "Documentation Agents"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement (as amended hereby).

WHEREAS, the Borrower, the Lenders, JPMorgan Chase Bank, N.A., as Agent, Merrill Lynch Capital Corporation, as Syndication Agent and Citicorp North America, Inc. and Bank of America, N.A., as Documentation Agents entered into the Credit Agreement, dated as of May 17, 2007, pursuant to which the Lenders made certain loans and other extensions of credit to the Borrower;

WHEREAS, Section 8.01 of the Credit Agreement provides the Borrower may, with the consent of the Required Lenders amend the Credit Agreement (and with respect to the amendment to the definition of "Eurodollar Rate", all Lenders); and

WHEREAS, the Borrower, the Lenders and the Administrative Agent desire to amend the Credit Agreement to effect the changes described below;

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

Section 1.        **Amendments**.  The Credit Agreement is hereby amended effective as of the date hereof as follows:

(a)        Section 1.01 of the Credit Agreement is hereby amended by deleting the phrase "of its business" immediately preceding the period in the definition of "Fund".

(b)        Section 1.01 of the Credit Agreement is hereby further amended by deleting the definition of "Eurodollar Rate" in its entirely and replacing it with the following:

"Eurodollar Rate" means, for any Interest Period for each Eurodollar Rate Advance comprising part of the same Borrowing, an interest rate per annum equal to the rate per annum obtained by dividing (a) the rate per annum appearing on Reuters LIBOR 01 (or any successor page) as the London interbank offered rate for deposits in U.S. dollars at approximately 11:00 A.M. (London time) two Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period or, if for any reason such rate is not available, the average of the rate per annum at which deposits in U.S. dollars are offered by the principal office of each of the Reference Banks in London, England to prime banks in the London interbank market at 11:00 A.M. (London time) two Business Days before the first day of such Interest Period in an amount substantially equal to such Reference Bank's Eurodollar Rate Advance comprising part of such Borrowing to be outstanding during such Interest Period and for a period equal to such Interest Period by (b) a percentage equal to 100% minus the Eurodollar Rate Reserve Percentage for such In-

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

-2-

terest Period. If the Reuters LIBOR 01 (or any successor page) is unavailable, the Euro-dollar Rate for any Interest Period for each Eurodollar Rate Advance comprising part of the same Borrowing shall be determined by the Agent on the basis of applicable rates furnished to and received by the Agent from the Reference Banks two Business Days be-fore the first day of such Interest Period, subject, however, to the provisions of Section 2.08.

(c)     Section 1.01 of the Credit Agreement is hereby further amended by adding ", the Guarantee" immediately after the words "this Agreement" in the definition of "Loan Documents".

(d)     Section 4.01(j) is hereby amended by deleting the words "within the meaning of" and replacing them with the following::

"registered or required to be registered as an "investment company" under"

(e)     Section 8.07(a) of the Credit Agreement is hereby amended by adding the fol-lowing immediately after the word "Lender" in clause (B) of the second proviso of such section:

"an Affiliate of a Lender or an Approved Fund".

Section 2.     **Effectiveness**. This Amendment will become effective upon receipt by the Agent of executed signature pages hereto from the Borrower, the Agent and the Lenders. The amend-ments contemplated hereby shall apply only from and after the date of effectiveness of this Amendment.

Section 3.     **Counterparts**. This Amendment may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all of which when taken together shall constitute a single instrument. Delivery of an executed counterpart of a signature page of this Amendment by facsimile or electronic .pdf transmission shall be effective as delivery of a manually executed counterpart hereof.

Section 4.     **Applicable Law**. THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

Section 5.     **Headings**. The headings of this Amendment are for purposes of refer-ence only and shall not limit or otherwise affect the meaning hereof.

Section 6.     **Effect of Amendment**. Except as expressly set forth herein, this Amendment shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Lenders or the Agent under the Credit Agreement or any other Loan Document, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obliga-tions, covenants or agreements contained in the Credit Agreement or any other provision of the Credit Agreement or any other Loan Document, all of which are ratified and affirmed in all respects and shall continue in full force and effect.

[Remainder of Page Intentionally Blank]

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

TRIBUNE COMPANY

By: _____
Name:
Title:

[amendment no. 1]

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520893

JPMORGAN CHASE BANK, N.A.,
as Agent

By:

Name:
Title:    ROBERT ANASTASIO
VICE PRESIDENT

[amendment no. 1]

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520894

JPMORGAN CHASE BANK, N.A.,
as a Lender

By:

Name:
Title:          ROBERT ANASTASIO
                VICE PRESIDENT

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520895

Bank of America, N.A.,
as Co-Documentation Agent and Lender

By: _____

Name:  Daniel R. Petrik
Title: Senior Vice President

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520896

BARCLAYS BANK PLC,
   as a Lender

By: _____
   Name: David Barton
   Title: Associate Director

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

CITICORP NORTH AMERICA, INC.,
as a Lender

By: _____

Name: Julie Persily

Title: VP and Managing Director

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520898

CIT Lending Services, Inc.

as a Lender

By: _____
Name: Charles J. Dreifus
Title: Vice President

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520899

LaSalle Bank National Association
as a Lender

By:
Name: Paul B. Cronin
Title:   Senior Vice President

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520900

Lehman Brothers Commercial Bank,
    as a Lender

By: _____

    Name:  George Janes
    Title: Chief Credit Officer

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Merill Lynch Capital Corporation,
as a Lender

By: _____

Name: David Trublin
Title: Vice President

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520902

**Sumitomo Mitsui Banking Corporation,**
as a Lender

By:

Name:
Title:    **Yoshihiro Hyakutome**
          **General Manager**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

CIT Lending Services Corp.,
   as a Lender

By: _____
   Name: Douglas S. Witte
   Title: Vice President

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520904

## Schedule I

## Commitments; List of Applicable Lending Offices

(in $ millions)

| Lender | Revolving Credit Commitment | Term Loan B Commitment | Term Loan X Commitment | Revolving Credit Applicable Percentage | Term Loan B Applicable Percentage | Term Loan X Applicable Percentage |
|---|---|---|---|---|---|---|
| Bank of America, N.A. | $105.0 | $0.0 | $0.0 | 14.0% | 0.0% | 0.0% |
| Barclays Bank Plc | 70.0 | 0.0 | 0.0 | 9.3 | 0.0 | 0.0 |
| CIT Group Inc. | 50.0 | 0.0 | 0.0 | 6.7 | 0.0 | 0.0 |
| Citicorp North America Inc. | 117.0 | 0.0 | 0.0 | 15.6 | 0.0 | 0.0 |
| JP Morgan Chase & Co. | 129.0 | 2,757.5 | 750.0 | 17.2 | 50.0 | 50.0 |
| LaSalle Bank, N.A. | 50.0 | 0.0 | 0.0 | 6.7 | 0.0 | 0.0 |
| Lehman Brothers Commercial Bank | 50.0 | 0.0 | 0.0 | 6.7 | 0.0 | 0.0 |
| Merrill Lynch Capital Corporation | 129.0 | 2,757.5 | 750.0 | 17.2 | 50.0 | 50.0 |
| Sumitomo Mitsui Banking Corporation | 50.0 | 0.0 | 0.0 | 6.7 | 0.0 | 0.0 |
| | | | | | | |
| Total | $750.0 | $5,515.0 | $1,500.0 | 100.0% | 100.0% | 100.0% |

** The Lending Office of each Lender is set forth opposite its name in the Assignment and Acceptance pursuant to which it became a Lender.

CHI 3545888v.6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520905

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520906

**Schedule 1.01(a)**

**Refinancing Debt**

$2,250,000,000 Amended and Restated Credit Agreement, dated as of June 27, 2006 (amending and restating the Credit Agreement dated as of June 19, 2006), among Tribune Company, as borrower, the initial lenders named therein, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., Bank of America, N.A., Morgan Stanley Bank and the Bank of Tokyo-Mitsubishi UFJ, Ltd., Chicago Branch, as co-documentation agents, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners, as the same has been amended from time to time.

$2,150,000,000 Amended and Restated Bridge Credit Agreement, dated as of June 27, 2006 (amending and restating the Bridge Credit Agreement dated as of June 19, 2006), among Tribune Company, as borrower, the initial lenders named therein, Citicorp North America, Inc., as administrative agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as syndication agent, JPMorgan Chase Bank, N.A., as documentation agent, and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners, as the same has been amended from time to time.

CHI 3545888v.6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520907

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520908

## Schedule 1.01(b)

### TMCT Real Property

| Address(es) |
|---|
| • 202 West 1st St., Los Angles, CA 90012 (North) |
| • 145 South Spring St., Los Angeles, CA 90012 (South) |
| • 121 South Spring St., Los Angeles, CA 90012 (Plant) |
| • 110-130 South Broadway, Los Angeles, CA 90012 |
| • 220 West 1st St., Los Angeles, CA 90012 (Chandler) |
| • 220 West 1st St., Los Angeles, CA 90012 (Garage) |
| • 285-305 Broad St., Hartford, CT 06115 |
| • 300 East Cromwell St., Baltimore, MD 21230 (Sun Park) |
| • 401 Calvert Street, Baltimore, MD 21278 |
| • 501 Calvert Street, Baltimore, MD 21278 |
| • 601 Calvert Street, Baltimore, MD 21278 |
| • 11830 Westline Industrial Dr., St. Louis, MO 63146 |
| • Broome Corp. Pkwy, 136 Carlin Road, Conklin NY 13748 |
| • 25 Deshon Dr., Melville, NY 11747 (Patterson) |
| • 235 Pinelawn Rd. Melville NY 11747-4250 |

CHI 3545888v 6

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520909

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520910

## Schedule 1.01(c)

### Pro Forma Basis

1.  Sale or other Disposition of any of the assets of, or of any Equity Interests in, Chicago National Ball Club, Inc., a Delaware corporation, or its Subsidiaries or any other assets or properties related thereto

2.  Sale or other Disposition of Borrower's indirect Equity Interest in Comcast SportsNet Chicago

Schedule 1.01(c)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520911

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520912

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Schedule 1.01(d)
Certain Intercompany Indebtedness

**Holder of Debt: Los Angeles Times International, Ltd.**

| Obligor | Origination Date | Maturity Date | Balance at 5/31/2007 Note Payable | Accrued Interest 1/1/07 to 5/31/07 | Total |
|---|---|---|---|---|---|
| Tribune Television Company | 03/24/1997 | 03/24/2007 | 74,960,000 | 1,448,884 | 76,408,884 |
| Tribune Television Company | 12/26/1997 | 12/26/2007 | 110,000,000 | 3,895,835 | 113,895,835 |
| The Daily Press, Inc. | 06/27/1997 | 06/30/2007 | 8,442,811 | 299,015 | 8,741,826 |
| Tribune Broadcasting Company | 05/01/1998 | 04/30/2008 | 117,200,000 | 4,150,835 | 121,350,835 |
| KHWB Inc. | 12/28/1998 | 12/31/2008 | 40,000,000 | 1,250,000 | 41,250,000 |
| Tribune Television Northwest, Inc. | 12/28/1998 | 12/31/2008 | 18,000,000 | 562,500 | 18,562,500 |
| Tribune Television New Orleans, Inc. | 12/28/1998 | 12/31/2008 | 18,000,000 | 562,500 | 18,562,500 |
| WBDC Broadcasting, Inc. | 12/20/1999 | 12/20/2009 | 60,000,000 | 1,875,000 | 61,875,000 |
| Newsday, Inc. | 06/12/2000 | 06/12/2010 | 772,000,000 | 23,320,835 | 795,320,835 |
| The Baltimore Sun Company | 06/12/2000 | 06/12/2010 | 420,000,000 | 12,687,500 | 432,687,500 |
| The Hartford Courant Company | 06/12/2000 | 06/12/2010 | 284,000,000 | 8,579,165 | 292,579,165 |
| The Morning Call, Inc. | 06/12/2000 | 06/12/2010 | 164,000,000 | 4,954,165 | 168,954,165 |
| Southern Connecticut Newspaper, Inc. | 06/12/2000 | 06/12/2010 | 40,000,000 | 1,208,335 | 41,208,335 |
| Los Angeles Times Communication LLC | 06/12/2000 | 06/12/2010 | 1,000,000,000 | 30,208,335 | 1,030,208,335 |
| Virginia Gazette Companies, LLC | 12/20/2001 | 12/20/2011 | 25,000,000 | 739,585 | 25,739,585 |
| WTXX, Inc. | 12/20/2001 | 12/20/2011 | 5,000,000 | 147,915 | 5,147,915 |
| Tower Distribution Company | 12/20/2001 | 12/20/2011 | 84,000,000 | 2,485,000 | 86,485,000 |
| KPLR, Inc. | 03/21/2003 | 03/21/2013 | 100,000,000 | 2,016,665 | 102,016,665 |
| Tribune Broadcast Holdings, Inc. | 03/21/2003 | 03/21/2013 | 10,000,000 | 201,665 | 10,201,665 |
| Tribune Broadcast Holdings, Inc. | 01/01/2003 | 01/01/2013 | 80,000,000 | 1,663,335 | 81,663,335 |
| Tribune National Marketing Company | 01/01/2003 | 01/01/2013 | 233,313,323 | 4,850,975 | 238,164,298 |
| Tribune Media Services, Inc. | 07/24/2003 | 07/24/2013 | 53,000,000 | 1,064,415 | 54,064,415 |
| Tribune Media Net | 12/20/2006 | 12/20/2016 | 6,600,000 | 206,250 | 6,806,250 |
| Tribune Media Net | 12/20/2006 | 12/20/2016 | 142,000,000 | 4,437,500 | 146,437,500 |
| Total | | | 3,865,516,134 | 112,816,209 | 3,978,332,343 |

TRB0520913

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520914

## Supplement to Schedule 1.01(e)

### Closing Date Guarantors

The Baltimore Sun Company
Chicago Tribune Company
The Daily Press, Inc.
The Hartford Courant Company
Orlando Sentinel Communications Company
The Morning Call, Inc.
Sun-Sentinel Company
Newsday, Inc.
Tribune Interactive, Inc.
Tribune Los Angeles, Inc.
Tribune Media Services, Inc.
Tribune Broadcasting Company
KHCW Inc.
KSWB Inc.
KPLR, Inc.
KTLA Inc.
KWGN Inc.
Tower Distribution Company
Tribune Broadcast Holdings, Inc.
Tribune Entertainment Company
Tribune Television Company
Channel 40, Inc.
Channel 39, Inc.
Tribune Television Holdings, Inc.
Tribune Television New Orleans, Inc.
Tribune Television Northwest, Inc.
WDCW Broadcasting, Inc.
WGN Continental Broadcasting Company
WPIX, Inc.

### Additional Guarantors

Tribune Finance, LLC
Homestead Publishing Company
Patuxent Publishing Company
Chicagoland Publishing Company
Tribune Direct Marketing, Inc.
Virginia Gazette Companies, LLC
E Z Buy & E Z Sell Recycler Corporation of Southern California
Forum Publishing Group, Inc.
Courant Specialty Products, Inc.
New Mass Media, Inc.

Supplement to Schedule 1.01(e)

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TMLH2, Inc.
Southern Connecticut Newspapers, Inc.
TMLS I, Inc.
Gold Coast Publications, Inc.
TMD, Inc.
Distribution Systems of America, Inc.
Los Angeles Times Communications LLC
Tribune Manhattan Newspaper Holdings, Inc.
Tribune New York Newspaper Holdings, LLC
TMS Entertainment Guides, Inc.
Tribune Media Net, Inc.
Tribune National Marketing Company
Tribune Broadcasting Holdco, LLC
ChicagoLand Television News, Inc.
5800 Sunset Productions Inc.
Tribune (FN) Cable Ventures, Inc.
WTXX Inc.
Chicago National League Ball Club, Inc.
Tribune California Properties, Inc.
California Community News Corporation
Hoy Publications, LLC

Supplement to Schedule 1.01(e)

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520916

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520917

**Schedule 2.04(a)**

**Fiscal Quarters**

September 30, 2007
December 30, 2007
March 30, 2008
June 29, 2008
September 28, 2008
December 28, 2008
March 29, 2009
June 28, 2009
September 27, 2009
December 27, 2009
March 28, 2010
June 27, 2010
September 26, 2010
December 26, 2010
March 27, 2011
June 26, 2011
September 25, 2011
December 25, 2011
March 25, 2012
June 24, 2012
September 23, 2012
December 30, 2012
March 31, 2013
June 30, 2013
September 29, 2013
December 29, 2013
March 30, 2014

CHI 3545888v.6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520918

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520919

**Schedule 4.01(f)**

**Litigation**

<u>FCC Matters</u>

Borrower has requested waivers of the FCC's ownership rules, 47 C.F.R. § 73.3555, in the following markets:

- Chicago, Illinois – a temporary waiver of the newspaper-broadcast cross-ownership restriction to permit common ownership of WGN(AM), WGN-TV, and the *Chicago Tribune* pending completion of the FCC's rulemaking proceeding on the newspaper-broadcast cross-ownership rule;

- Miami, Florida – a temporary waiver of the newspaper-broadcast cross-ownership restriction to permit common ownership of WSFL-TV and the *South Florida Sun-Sentinel* pending completion of the FCC's rulemaking proceeding on the newspaper-broadcast cross-ownership rule;

- Hartford, Connecticut – a temporary waiver of the newspaper-broadcast cross-ownership restriction to permit common ownership of WTXX(TV) and the *Hartford Courant* pending completion of the FCC's rulemaking proceeding on the newspaper-broadcast cross-ownership rule; a temporary waiver of the newspaper-broadcast cross-ownership restriction to permit common ownership of WTIC-TV and the *Hartford Courant* pending completion of the FCC's rulemaking proceeding on the newspaper-broadcast cross-ownership rule; a permanent waiver of the duopoly rule to permit common ownership of WTXX(TV) and WTIC-TV under the FCC's "failing station" standard;

- Los Angeles, California   a temporary waiver of the newspaper-broadcast cross-ownership restriction to permit common ownership of KTLA(TV) and the *Los Angeles Times* pending completion of the FCC's rulemaking proceeding on the newspaper-broadcast cross-ownership rule;

- New York, New York – a temporary waiver of the newspaper-broadcast cross-ownership restriction to permit common ownership of WPIX(TV) and *Newsday* pending completion of the FCC's rulemaking proceeding on the newspaper-broadcast cross-ownership rule.

CHI 3545888v 6

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520920**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520921

**Schedule 4.01(p)**

**Subsidiaries**

| Subsidiary | Owner of Equity Interest | Type of Entity |
|---|---|---|
| Tribune Finance, LLC | Tribune Company | Limited Liability Company |
| Tribune Publishing Company | Tribune Company | Corporation |
| The Baltimore Sun Company | Tribune Company | Corporation |
| Homestead Publishing Company | The Baltimore Sun Company | Corporation |
| Patuxent Publishing Company | Homestead Publishing Company | Corporation |
| Baltimore Newspaper Network, Inc. | Patuxent Publishing Company | Corporation |
| Signs of Distinction, Inc. (Forfeited) | The Baltimore Sun Company | Corporation |
| Chicago Tribune Company | Tribune Company | Corporation |
| Chicagoland Publishing Company | Chicago Tribune Company | Corporation |
| Chicago Tribune Newspapers, Inc. | Chicago Tribune Company | Corporation |
| Chicago Tribune Press Service, Inc. | Chicago Tribune Company | Corporation |
| Newspaper Readers Agency, Inc. | Chicago Tribune Company | Corporation |
| Tribune Direct Marketing, Inc. | Chicago Tribune Company | Corporation |
| The Daily Press, Inc. | Tribune Company | Corporation |
| Virginia Gazette Companies, LLC | The Daily Press, Inc. | Limited Liability Company |
| Virginia Community Shoppers, LLC | The Daily Press, Inc. | Limited Liability Company |
| E Z Buy & E Z Sell Recycler Corporation | Tribune Company | Corporation |
| E Z Buy & E Z Sell Recycler Corporation of Southern California | E Z Buy & E Z Sell Recycler Corporation | Corporation |
| The Renter, Inc. | E Z Buy & E Z Sell Recycler Corporation of Southern California | Corporation |
| Forum Publishing Group, Inc. | Tribune Company | Corporation |
| The Hartford Courant Company | Tribune Company | Corporation |
| Courant Specialty Products, Inc. | The Hartford Courant Company | Corporation |
| New Mass Media, Inc. | Courant Specialty Products, Inc. | Corporation |
| Heart & Crown Advertising, Inc. | The Hartford Courant Company | Corporation |
| TMLH2, Inc. | The Hartford Courant Company | Corporation |
| Orlando Sentinel Communications Company | Tribune Company | Corporation |
| Neocomm, Inc. | Orlando Sentinel Communications Company | Corporation |
| Sentinel Communications News Ventures, Inc. | Orlando Sentinel Communications Company | Corporation |
| The Morning Call, Inc. | Tribune Company | Corporation |
| Direct Mail Associates, Inc. | The Morning Call, Inc. | Corporation |
| Southern Connecticut Newspapers, Inc. | Tribune Company | Corporation |
| TMLS I, Inc. | Southern Connecticut Newspapers, Inc. | Corporation |
| Sun-Sentinel Company | Tribune Company | Corporation |
| Gold Coast Publications, Inc. | Sun-Sentinel Company | Corporation |

Schedule 4.01(p)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520922

| Subsidiary | Owner of Equity Interest | Type of Entity |
|---|---|---|
| TMD, Inc. | Tribune Company | Corporation |
| Newsday, Inc. | TMD, Inc. | Corporation |
| Distribution Systems of America, Inc. | Newsday, Inc. | Corporation |
| Hoy Publications, LLC | Tribune Company | Limited Liability Company |
| Tribune Interactive, Inc. | Tribune Company (88.5%) Chicago Tribune Company (11.5%) | Corporation |
| Tribune Los Angeles, Inc. | Tribune Company | Corporation |
| Los Angeles Times Communications LLC | Tribune Los Angeles, Inc. | Limited Liability Company |
| Los Angeles Times Newspapers, Inc. | Tribune Company | Corporation |
| Tribune Manhattan Newspaper Holdings, Inc. | Tribune Company | Corporation |
| Tribune New York Newspaper Holdings, LLC | Tribune Manhattan Newspaper Holdings, Inc. | Limited Liability Company |
| Tribune Media Services, Inc. | Tribune Company | Corporation |
| TMS Entertainment Guides, Inc. | Tribune Media Services, Inc. | Corporation |
| TMS Entertainment Guides Canada Corp | TMS Entertainment Guides, Inc. | Corporation |
| Tribune Media Services, BV | Tribune Company | Foreign Entity |
| Tribune Media Net, Inc. | Tribune Company | Corporation |
| Tribune National Marketing Company | Tribune Company | Corporation |
| Tribune Broadcasting Holdco, LLC | Tribune Company | Limited Liability Company |
| Tribune Broadcasting Company | Tribune Broadcasting Holdco, LLC | Corporation |
| ChicagoLand Microwave Licensee, Inc. | Tribune Broadcasting Company | Corporation |
| ChicagoLand Television News, Inc. | Tribune Broadcasting Company | Corporation |
| KHCW Inc. | Tribune Broadcasting Company | Corporation |
| KSWB Inc. | Tribune Broadcasting Company | Corporation |
| KPLR, Inc. | Tribune Broadcasting Company | Corporation |
| KTLA Inc. | Tribune Broadcasting Company | Corporation |
| KWGN Inc. | Tribune Broadcasting Company | Corporation |
| Oak Brook Productions, Inc. | Tribune Broadcasting Company | Corporation |
| Tower Distribution Company | Tribune Broadcasting Company | Corporation |
| Tribune Broadcasting News Network, Inc. | Tribune Broadcasting Company | Corporation |
| Tribune Broadcast Holdings, Inc. | Tribune Broadcasting Company | Corporation |
| Tribune Entertainment Company | Tribune Broadcasting Company | Corporation |
| Magic T Music Publishing Company | Tribune Entertainment Company | Corporation |
| Tribune Entertainment Production Company | Tribune Entertainment Company | Corporation |
| 435 Production Company | Tribune Entertainment Production Company | Corporation |
| 5800 Sunset Productions Inc. | Tribune Entertainment Production Company | Corporation |
| Chicago River Production Company | Tribune Entertainment Production Company | Corporation |
| North Michigan Production Company | Tribune Entertainment Production Company | Corporation |
| Towering T Music Publishing Company | Tribune Entertainment Company | Corporation |
| Tribune (FN) Cable Ventures, Inc. | Tribune Broadcasting Company | Corporation |
| Tribune Network Holdings Company | Tribune Broadcasting Company | Corporation |

Schedule 4.01(p)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520923

| Subsidiary | Owner of Equity Interest | Type of Entity |
|---|---|---|
| Tribune Television Company | Tribune Broadcasting Company | Corporation |
| Channel 20, Inc. | Tribune Television Company | Corporation |
| Channel 40, Inc. | Tribune Television Company | Corporation |
| Channel 39, Inc. | Tribune Television Company | Corporation |
| WDCW Broadcasting, Inc. | Tribune Television Company | Corporation |
| WTXX Inc. | Tribune Television Company | Corporation |
| Tribune Television Holdings, Inc. | Tribune Broadcasting Company | Corporation |
| Tribune Television New Orleans, Inc. | Tribune Broadcasting Company | Corporation |
| Tribune Television Northwest, Inc. | Tribune Broadcasting Company | Corporation |
| WATL, LLC | Tribune Broadcasting Company | Limited Liability Company |
| WGN Continental Broadcasting Company | Tribune Broadcasting Company | Corporation |
| Tribune Sports Network Holdings, LLC | WGN Continental Broadcasting Company | Limited Liability Company |
| WPIX, Inc. | Tribune Broadcasting Company | Corporation |
| WLVI, Inc. | Tribune Broadcasting Company | Corporation |
| WCWN, LLC | WLVI, Inc. | Limited Liability Company |
| Chicago National League Ball Club, Inc. | Tribune Company | Corporation |
| Chicago Cubs Dominican Baseball Operations, Inc. | Chicago National League Ball Club, Inc. | Corporation |
| Diana-Quentin, Inc. | Tribune Company | Corporation |
| Wrigley Field Premium Ticket Services, Inc. | Tribune Company | Corporation |
| Tribune California Properties, Inc. | Tribune Company | Corporation |
| California Community News Corporation | Tribune Company | Corporation |
| Los Angeles Times International, Ltd. | Tribune Company | Corporation |
| Newscom Services, Inc. | Los Angeles Times International, Ltd. | Corporation |
| Chicago Avenue Construction Company | Chicago Tribune Company | Corporation |
| Greenco, Inc. | Tribune Company | Corporation |
| Julius Air, LLC | Tribune Company | Limited Liability Company |
| Riverwalk Center I Joint Venture | Tribune Company (93%) Sun-Sentinel Company (7%) | [Partnership] |
| Tribune Finance Service Center, Inc. | Tribune Company | Corporation |
| Fairfax Media, Inc. | Tribune Company (72.4%) | Corporation |
| North Orange Avenue Properties, Inc. (Inactive) | Orlando Sentinel Communications Company | Corporation |
| Times Mirror CT, Inc. | Tribune Company | Corporation |
| New River Maintenance Association | Tribune Company | Corporation |
| TM Payroll Processing Co. Inc. | Tribune Company | Corporation |
| Tribune Hong Kong Ltd. | Tribune Company | Foreign Entity |
| TM Services Co., Inc. | Tribune Company | Corporation |
| Times Mirror Land & Timber Company | Tribune Company | Corporation |
| Shepard's, Inc. | Tribune Company | Corporation |
| Publisher's Forest Products Company of Washington | Tribune Company | Corporation |
| Multimedia Insurance Company | Tribune Company | Corporation |
| Tribune License, Inc. | Los Angeles Times Communications, LLC (40.4%) California Community News Corporation | Corporation |

Schedule 4.01(p)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

| Subsidiary | Owner of Equity Interest | Type of Entity |
|---|---|---|
| | (1.1%)<br>The Baltimore Sun Company (10.9%)<br>TMLH 2, Inc. (13%)<br>The Morning Call, Inc. (5.8%)<br>Newsday, Inc. (26.7%)<br>TMLS1, Inc. (2.1%) | |
| Fortification Holdings Corp. | Tribune Company | Corporation |
| Wick Holdings Corp. | Tribune Company | Corporation |
| Candle Holdings Corp. | Tribune Company | Corporation |
| Fortify Holdings Corp. | Tribune Company | Corporation |

| | Classes of Equity Interests in Tribune Company |
|---|---|
| 1. | Tribune Company common stock, par value $0.01 per share (and warrants and options to purchase the same) |
| 2. | Series A junior participating preferred stock, without par value |
| 3. | Series D-1 convertible preferred stock (137,643 shares authorized, no shares outstanding and 137,643 shares held by subsidiaries of Borrower) |

Schedule 4.01(p)

CH1 3887376v.1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520926**

**Schedule 5.02(a)**

**Existing Liens**

Attached.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520927

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

| TAB | DEBTOR NAME | UCC SEARCH JURISDICTION | THROUGH DATE | SECURED PARTY | FILING INFORMATION |
|---|---|---|---|---|---|
| 1 | Tribune Publishing Company | SOS: Delaware | 3-30-07 | | Clear |
| 2 | The Baltimore Sun Company | Dept. Assessments & Taxation: Maryland | 4-4-07 | | Clear |
| 3 | Homestead Publishing Company | Dept. Assessments & Taxation: Maryland | 4-4-07 | US Express Leasing, Inc. | File No. 181265157 dated 4-14-06 covering: All items of personal property leased pursuant to that certain Lease Agreement dated 4/12/06 between Secured Party, as Lessor and Debtor, as Lessee |
| 4 | Patuxent Publishing Company | Dept. Assessments & Taxation: Maryland | 4-4-07 | | Clear |
| 5 | Baltimore Newspaper Network, Inc. | Dept. Assessments & Taxation: Maryland | 4-4-07 | | Clear |
| 6 | Chicago Tribune Company | SOS: Illinois | 4-6-07 | GELCO Corporation DBA GE Capital Fleet Services | File No. 12-21-01, continued 11-22-06 covering: 60 items described by year, make, model, VIN and body type, together with all accounts, documents, general intangibles, Security deposits, or reserves; all repairs, accessories, etc.; all insurance proceeds Financing Statement is filed for precautionary purposes only and does not and is not intended to change the characterization of the transactions as a lease |
| | | | | Crown Credit Company | File No. 06267904 dated 12-16-02 covering: (1) Deka Battery and (1) Hobart Charger |
| | | | | Crown Credit Company | File No. 06474047 dated 1-29-03 covering: (2) Crown Lift Trucks |
| | | | | Crown Credit Company | File No. 06511619 dated 2-5-03 covering: (2) Crown Lift Trucks |
| | | | | Crown Credit Company | File No. 6792448  dated 4-3-03 |

CH1 384659 v.1

TRB0520928

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

| TAB | DEBTOR NAME | UCC SEARCH JURISDICTION | THROUGH DATE | SECURED PARTY | FILING INFORMATION |
|---|---|---|---|---|---|
| | | | | | covering: (7) Crown Lift Trucks; (3) Deka Batteries and (7) Hobart Chargers |
| | | | | Crown Credit Company | File No. 6792782 dated 4-3-03 covering: (2) Crown Lift Trucks |
| | | | | Crown Credit Company | File No. 6805760 dated 4-7-03 covering: (2) Crown Lift Trucks; (6) Deka Batteries and (3) Hobart Chargers |
| | | | | Crown Credit Company | File No. 7490194 dated 9-2-03 covering: (2) Crown Lift Trucks; (2) Deka Batteries |
| | | | | Crown Credit Company | File No. 76040331 dated 10-3-03 covering: (2) Crown Lift Trucks; (2) Deka Batteries |
| | | | | Crown Credit Company | File No. 7765444 dated 10-31-03 covering: (1) Crown Lift Truck; (1) Deka Battery and (1) Hobart Charger |
| | | | | Crown Credit Company | File No. 7874006 dated 11-24-03 covering: (2) Crown Lift Trucks |
| | | | | Crown Credit Company | File No. 8203350 dated 2-4-04 covering: (2) Crown Lift Trucks; (4) Deka Batteries (2) Hobart Chargers |
| | | | | Crown Credit Company | File No. 8203431 dated 2-4-04 covering: (2) Crown Lift Trucks |
| | | | | Crown Credit Company | File No. 8295611 dated 2-26-04 covering: (2) Crown Lift Trucks |
| | | | | Crown Credit Company | File No. 9444106 dated 1-12-05 covering: (2) Deka batteries and (2) Hobart Chargers |
| | | | | Crown Credit Company | File No. 9558977 dated 2/22/05 covering: (1) Crown Lift Truck; (1) GNB Battery and (1) GNB Charger |
| | | | | Crown Credit Company | File No. 9568670 dated 2-24-05 |

CH: 3846591v.1

TRB0520929

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

| TAB | DEBTOR NAME | UCC SEARCH JURISDICTION | THROUGH DATE | SECURED PARTY | FILING INFORMATION |
|---|---|---|---|---|---|
| | | | | | covering: (2) Komatsu Lift Trucks and (2) Cascade Attachments |
| | | | | Crown Credit Company | File No. 998925 dated 7-5-05 covering: All of Lessee's right, title and interest in all equipment leased from Lessor to Lessee pursuant to Master Lease Agreement dated 1-19-99 between Lessor and Lessee, together with all schedules and exhibits, supplements, amendments, renewals and modifications thereto, including but not limited to, all material handling equipment, batteries, chargers, attachments, trucks, miscellaneous battery handling equipment and related equipment and all additions, accessions, etc. (including, but not limited to accounts, contract rights, chattel paper and general intangibles and insurance proceeds) |
| 7 | Chicagoland Publishing Company | SOS: Delaware | 3-30-07 | | Clear |
| 8 | Chicago Tribune Newspapers, Inc. | SOS: Illinois | 4-6-07 | | Clear |
| 9 | Chicago Tribune Press Service, Inc. | SOS: Illinois | 4-6-07 | | Clear |
| 10 | Newspaper Readers Agency, Inc. | SOS: Illinois | 4-6-07 | | Clear |
| 11 | Tribune Direct Marketing, Inc. | SOS: Delaware | 3-30-07 | IBM Corporation | File No. 23268582 dated 12/12/02 Covering: All equipment together with related software described on IBM Credit Supplements # 8XZNNV: IBM Equipment Type 2710 |
| 12 | The Daily Press, Inc. | SOS: Delaware | 3-30-07 | | Clear |

CH1 3846591v.1

3

TRB0520930

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

| TAB | DEBTOR NAME | UCC SEARCH JURISDICTION | THROUGH DATE | SECURED PARTY | FILING INFORMATION |
|-----|-----------|-----------------------|--------------|---------------|---------------------|
| 13 | Virginia Gazette Companies, LLC | SOS: Delaware | 3-30-07 | | Clear |
| 14 | Virginia Community Shoppers, LLC | SOS: Delaware | 3-30-07 | | Clear |
| 15 | E Z Buy & E Z Sell Recycler Corporation | SOS: Delaware | 3-30-07 | | Clear |
| 16 | E Z Buy & E Z Sell Recycler Corporation of Southern California | SOS: Delaware | 3-30-07 | | Clear |
| 17 | The Renter, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 18 | Forum Publishing Group, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 19 | The Hartford Courant Company | SOS: Connecticut | 4-3-07 | NMHG Financial Services, Inc. | File No. 0002307859 dated 1-3-05 covering: All of the equipment leased by Lessor to Lessee and all proceeds including insurance proceeds thereof |
| 20 | Courant Specialty Products, Inc. | SOS: Connecticut | 4-3-07 | | Clear |
| 21 | New Mass Media, Inc. | SOC: Massachusetts | 4-10-07 | | Clear |
| 22 | Heart & Crown Advertising, Inc. | SOS: Connecticut | 4-3-07 | | Clear |
| 23 | TMLH2, Inc. | SOS: California | 4-3-07 | | Clear |
| 24 | Hoy Publications, LLC | SOS: Delaware | 3-30-07 | | Clear |
| 25 | Orlando Sentinel Communications Company | SOS: Delaware | 3-30-07 | General Electric Capital Corporation | File No. 50319526 dated 1/28/05 covering: E (1) Kodak Digisource 9110 Copier System; Financing Statement filed for notice purposes only and shall not be deemed to create a security interest |
| | | | | Goss International Americas, Inc. | File No. 63633021 dated 10/19/06 covering one (1) new Goss Digital Inking System and all related equipment as more fully described in P&S Agreement dated 6-15-06 and referred to as CSO# A-300745 |

4

TRB0520931

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

| TAB | DEBTOR NAME | UCC SEARCH JURISDICTION | THROUGH DATE | SECURED PARTY | FILING INFORMATION |
|---|---|---|---|---|---|
| 26 | Neocomm, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 27 | Sentinel Communications News Ventures, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 28 | The Morning Call, Inc. | DOS: Pennsylvania | 4-5-07 | | Clear |
| 29 | Direct Mail Associates, Inc. | DOS: Pennsylvania | 4-5-07 | | Clear |
| 30 | Southern Connecticut Newspapers, Inc. | SOS: Connecticut | 4-3-07 | Global Imaging Systems, Inc. | File No. 000199791 dated 5-26-00, continued 5-17-05 covering: Ricoh Copier System equipment; lease transaction filed for notification purposes only |
| | | | | Citicorp Vendor Finance, Inc. | File No. 0002190039 dated 3-10-03 covering: Ricoh copier and Adapter, Lease # 0774872 |
| | | | | Citicorp Vendor Finance, Inc. | File No. 0002194528 dated 3-27-03 covering: Ricoh copiers and related equipment  Lease # 0774873 |
| | | | | Citicorp Vendor Finance, Inc. | File No. 0002203043 dated 5-13-03 covering: Ricoh copiers and related equipment  Lease # 37602201 |
| | | | | Citicorp Vendor Finance, Inc. | File No. 0002299524 dated 11-15-04 covering: Ricoh copiers and related equipment |
| | | | | Citicorp Vendor Finance, Inc. | File No. 0002326403 dated 4-27-05 covering: Ricoh copiers and related equipment |
| 31 | TMLS1, Inc. | SOS: California | 4-3-07 | | Clear |
| 32 | Sun-Sentinel Company | SOS: Delaware | 3-30-07 | US Bancorp | File No. 31350845 dated 5-28-03 covering: specified equipment, Lease #1135045SAVIN |
| | | | | EPLUS Group | File No. 32647710 dated 10-10-03 covering: the Assets listed and described in Schedule No. 1 dated 9-3-03 to Lease Agreement  No |

CHI 3846591v.1

TRB0520932

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

| TAB | DEBTOR NAME | UCC SEARCH JURISDICTION | THROUGH DATE | SECURED PARTY | FILING INFORMATION |
|---|---|---|---|---|---|
| | | | | | FLC114 dated 9-30-03 for Konica equipment; filed for informational and notification purposes only |
| | | | | Man Roland Inc. | File No. 50689423 dated 3-3-05 covering: one (1) Colorman system described on six-page annex thereto, and all proceeds thereof and receivables therefrom |
| | | | | Crown Credit Company | File No. 53257152 dated 10-20-05 covering (1) Crown Lift Truck |
| | | | | Crown Credit Company | File No. 53257194 dated 10-20-05 covering (1) Crown Lift Truck |
| | | | | Crown Credit Company | File No. 3257210 dated 10-20-05 covering (1) Crown Lift Truck |
| | | | | Crown Credit Company | File No. 53257285 dated 10-20-05 covering (1) Crown Lift Truck |
| | | | | Crown Credit Company | File No. 53257301 dated 10-20-05 covering (1) Crown Lift Truck |
| | | | | Crown Credit Company | File No. 61836170 dated 10-20-05 covering (1) Crown Lift Truck |
| | | | | Crown Credit Company | File No. 53257210 dated 5-31-06 covering (1) Crown Lift Truck |
| | | | | Crown Credit Company | File No. 62642601 dated 8-1-06 covering (1) Crown Lift Truck |
| | | | | Crown Credit Company | File No. 6322782 dated 10-20-05 covering (1) Crown Lift Truck |
| | | | | Crown Credit Company | File No. 53257210 dated 9-19-06 covering (1) Crown Lift Truck |
| | | | | Crown Credit Company | File No. 63228400 dated 9-19-06 covering (1) Crown Lift Truck |
| | | | | Crown Credit Company | File No. 6380961 dated 11-1--06 covering (1) Crown Lift Truck |
| | | | | US Bancorp | File No. 0367507 dated 1-3-07 |

CHI 3846591v 1

TRB0520933

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

| TAB | DEBTOR NAME | UCC SEARCH JURISDICTION | THROUGH DATE | SECURED PARTY | FILING INFORMATION |
|---|---|---|---|---|---|
| | | | | | covering specified copiers; filing for informational purposes only |
| | | | | Crown Credit Company | File No. 0780915 dated 3-1-07 covering (1) Crown Lift Truck |
| | | | | Crown Credit Company | File No. 1040822 dated 3-20-07 covering (1) Crown Lift Truck |
| 33 | Gold Coast Publications, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 34 | TMD, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 35 | Newsday, Inc. | DOS: New York | 4-6-07 | Hyster Credit Company | File No. 167319 dated 8-4-98, continued 5-23-03 covering: (2) Hyster Forklifts, with all present and future attachments, accessories, etc., all proceeds thereof |
| | | | | AT & T Commercial Finance Corp. | File No. 205028 dated 9-25-98, continued 7-14-03 covering: specified equipment, with all present and future attachments, accessories, etc., all proceeds thereof |
| | | | | Yale Financial Services, Inc. | File No 218440 dated 9-25-02 covering (2) new Yale motorized handtrucks, accessions, additions, etc. proceeds thereof |
| | | | | IBM Credit LLC | File No. 200402120155640 dated 2-2-04 covering specified equipment and related software described on IBM Credit LLC Supplement; notice/ precautionary filing |
| | | | | OCE Financial Services, Inc. | File No. 200506015483623 dated 6-1-05 covering equipment described therein (illegible) |
| | | | | OCE Financial Services, Inc. | File No. 200506015483636 dated 6-1-05 covering equipment described therein (illegible) |

CH1 384659rv 1

TRB0520934

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

| TAB | DEBTOR NAME | UCC SEARCH JURISDICTION | THROUGH DATE | SECURED PARTY | FILING INFORMATION |
|---|---|---|---|---|---|
| 36 | Distribution Systems of America, Inc. | DOS: New York | 4-6-07 | | Clear |
| 37 | Star Community Publishing Group, LLC | SOS: Delaware | 3-30-07 | | Clear |
| 38 | Hoy, LLC | DOS: New York | 4-6-07 | | Clear |
| 39 | Tribune Interactive, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 40 | Tribune Los Angeles, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 41 | Los Angeles Times Communications LLC | SOS: Delaware | 3-30-07 | | Clear |
| 42 | Los Angeles Times Newspapers, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 43 | Tribune Manhattan Newspaper Holdings, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 44 | Tribune New York Newspaper Holdings, LLC | SOS: Delaware | 3-30-07 | | Clear |
| 45 | Tribune Media Services, Inc. | SOS: Delaware | 3/30/07 | Cisco Systems Capital Corporation | File No. 11284517 dated 10-22-01 covering: all Equipment from time to time subject to that certain Master Agreement to Lease Equipment No. 1088 dated 9-30-97 between Debtor, as lessee and Secured Party, as lessor, all books, records and proceeds relating to foregoing; intended as precautionary filing |
| | | | | Cisco Systems Capital Corporation | File No. 30690720 dated 3-19-03 covering: all Equipment from time to time subject to that certain Master Agreement to Lease Equipment No. 1088 dated 9-30-97 between Debtor, as lessee and Secured Party, as lessor, all books, records and proceeds relating to foregoing; intended as precautionary filing |

8

CH1 3846591v.1

TRB0520935

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

| TAB | DEBTOR NAME | UCC SEARCH JURISDICTION | THROUGH DATE | SECURED PARTY | FILING INFORMATION |
|---|---|---|---|---|---|
| 46 | TMS Entertainment Guides, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 47 | TMS Entertainment Guides Canada Corp | ROD: District of Columbia | 2-2-07 | | Clear |
| 48 | Tribune Media Services, BV | ROD: District of Columbia | 2-2-07 | | Clear |
| 49 | Tribune Media Net, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 50 | Tribune National Marketing Company | SOS: Delaware | 3-30-07 | | Clear |
| 51 | Tribune Broadcasting Company | SOS: Delaware | 3-30-07 | Minolta Business Solutions | File No. 30660442 dated 2-24-03 covering: Lease #5775602MINOLTA D1551 Quantity One: transaction being filed for notification purposes only |
| 52 | ChicagoLand Microwave Licensee, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 53 | ChicagoLand Television News, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 54 | KHCW Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 55 | KSWB Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 56 | KPLR, Inc. | SOS: Missouri | 3-26-07 | | Clear |
| 57 | KTLA Inc. | SOS: California | 4-3-07 | | Clear |
| 58 | KWGN Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 59 | Oak Brook Productions, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 60 | Tower Distribution Company | SOS: Delaware | 3-30-07 | | Clear |
| 61 | Tribune Broadcasting News Network, Inc. | SOS: Delaware | 3-30-07 | Wells Fargo Financial Leasing | File No. 32398389 dated 8-29-03 covering: 1-Canon 1180 Copier System |
| 62 | Tribune Broadcast Holdings, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 63 | Tribune Entertainment Company | SOS: Delaware | 3-30-07 | Fremantle Media North America, Inc. | File No. 1153280 dated 11/26/01 and continued 11/14/06 covering: all right, title and interest of Debtor in following, including all products and |

CHI 3846591v.1

TRB0520936

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520937

| TAB | DEBTOR NAME | UCC SEARCH JURISDICTION | THROUGH DATE | SECURED PARTY | FILING INFORMATION |
|---|---|---|---|---|---|
| | | | | | proceeds thereof: each of the three television series entitled "Card Sharks", "Family Feud" and "To tell the Truth" produced for first run exhibition during the 2001-2002, 2002, 2003 and 2003-2004 television broadcast seasons; Debtor and Secured Party have entered into that certain letter agreement dated as of 10/22/01 regarding the exploitation of certain television programming and the possible production, and financing of new television programming |
| 64 | Magic T Music Publishing Company | SOS: Delaware | 3-30-07 | | Clear |
| 65 | Tribune Entertainment Production Company | SOS: Delaware | 3-30-07 | | Clear |
| 66 | 435 Production Company | SOS: Delaware | 3-30-07 | | Clear |
| 67 | 5800 Sunset Productions Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 68 | Chicago River Production Company | SOS: Delaware | 3-30-07 | | Clear |
| 69 | North Michigan Production Company | SOS: Delaware | 3-30-07 | | Clear |
| 70 | Towering T Music Publishing Company | SOS: Delaware | 3-30-07 | | Clear |
| 71 | Tribune (FN) Cable Ventures, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 72 | Tribune Network Holdings Company | SOS: Delaware | 3-30-07 | | Clear |
| 73 | Tribune Television Company | SOS: Delaware | 3-30-07 | | Clear |
| 74 | Channel 20, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 75 | Channel 40, Inc. | SOS: Delaware | 3-30-07 | | Clear |

CHI 3846591v 1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

| TAB | DEBTOR NAME | UCC SEARCH JURISDICTION | THROUGH DATE | SECURED PARTY | FILING INFORMATION |
|---|---|---|---|---|---|
| 76 | Channel 39, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 77 | Tribune Television Holdings, Inc. | SOS: Delaware | 3-30-07 | CIT Technology Financing Services Inc. | File No. 20560056 dated 2/8/02 "True Lease" filed for information purposes only covering: Canon CLC 1120, 0114A001AA plus all other types of office equipment lease and/or financed for Debtor by Secured Party |
| 78 | Tribune Television New Orleans, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 79 | Tribune Television Northwest, Inc. | SOS: Delaware | 3-30-07 | CIT Technology Financing Services Inc. | File No. 71161784 dated 3/28/07 "True Lease" filed for information purposes only covering: specified Konica equipment plus all other types of office equipment leased and/or financed for Debtor by Secured Party |
| | | | | CIT Technology Financing Services Inc. | File No. 40021206 dated 1-6-04 "True Lease" filed for information purposes only covering: specified Sharp equipment plus all other types of office equipment leased and/or financed for Debtor by Secured Party |
| | | | | CIT Technology Financing Services Inc. | File No. 40021263 dated 1-6-04 "True Lease" filed for information purposes only covering: specified Konica equipment plus all other types of office equipment leased and/or financed for Debtor by Secured Party |
| 80 | WDCW Broadcasting, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 81 | WGN Continental Broadcasting Company | SOS: Delaware | 3-30-07 | | Clear |
| 82 | Tribune Sports Network Holdings, LLC | SOS: Delaware | 3-30-07 | | Clear |
| 83 | WPIX, Inc. | SOS: Delaware | 3-30-07 | | Clear |

CH1 3846591v.1

TRB0520938

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

| TAB | DEBTOR NAME | UCC SEARCH JURISDICTION | THROUGH DATE | SECURED PARTY | FILING INFORMATION |
|---|---|---|---|---|---|
| 84 | WTXX Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 85 | Chicago National League Ball Club, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 86 | Diana-Quentin, Inc. | SOS: Illinois | 4-6-07 | | Clear |
| 87 | Tribune California Properties, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 88 | California Community News Corporation | SOS: Delaware | 3-30-07 | | Clear |
| 89 | Chicago Avenue Construction Company | SOS: Illinois | 4-6-07 | | Clear |
| 90 | Eagle New Media Investments, LLC | SOS: Delaware | 3-30-07 | | Clear |
| 91 | Stemweb, Inc. | DOS: New York | 4-6-07 | | Clear |
| 92 | ForSaleByOwner.com | DOS: New York | 4-6-07 | | Clear |
| 93 | Homeowners Realty, Inc. | SOS: Utah | 4-9-07 | | Clear |
| 94 | Internet Foreclosure Service, Inc. | DOS: New York | 4-6-07 | | Clear |
| 95 | Newport Media, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 96 | ValuMail, Inc. | SOS: Connecticut | 4-3-07 | | Clear |
| 97 | Eagle Publishing Investments, LLC | SOS: Delaware | 3-30-07 | | Clear |
| 98 | GreenCo, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 99 | Los Angeles Times International, Ltd. | SOS: California | 4-30-07 | | Clear |
| 100 | JuliusAir II, LLC | SOS: Delaware | 3-30-07 | | Clear |
| 101 | Multimedia Insurance Company | SOS: Vermont | 4-09-07 | | Clear |
| 102 | Riverwalk Center I Joint Venture | SOS: Florida | 3-29-07 | | Clear |
| 103 | Tribune License, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 104 | Tribune Finance Service Center, Inc. | SOS: Delaware | 3-30-07 | | Clear |
| 105 | Wrigley Field Premium Ticket Services, Inc. | SOS: Delaware | 3/30/07 | | Clear |

CHI 3846591v.1

TRB0520939

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

| TAB | DEBTOR NAME | UCC SEARCH JURISDICTION | THROUGH DATE | SECURED PARTY | FILING INFORMATION |
|---|---|---|---|---|---|
| 106 | Fairfax Media, Inc. | DOC:  Virginia | 4-5-07 | | Clear |
| 107 | Juliusair Company, LLC | SOS:   Delaware | 4-3-07 | | Clear |
| 108 | Newscom, LLC | SOS:   Delaware | 4-3-07 | | Clear |
| 109 | North Orange Avenue Properties, Inc. | DOS:   Florida | 4-4-07 | | Clear |
| 110 | Times Mirror CT, Inc. | SOS:   Connecticut | 4-10-07 | | Clear |
| 111 | Fortification Holdings Corp. | SOS:   Delaware | 4-3-07 | | Clear |
| 112 | Wick Holdings Corp. | SOS:   Delaware | 4-3-07 | | Clear |
| 113 | Candle Holdings Corp. | SOS:   Delaware | 4-3-07 | | Clear |
| 114 | Fortify Holdings Corp. | SOS:   Delaware | 4-3-07 | | Clear |
| 115 | Newscom Services, Inc. | SOS:   Delaware | 4-3-07 | | Clear |
| 116 | TM Payroll Process. Co. Inc. | SOS:   Delaware | 4-3-07 | | Clear |
| 117 | Tribune Hong Kong Ltd. | ROD:   D.C. | 2-5-07 | | Clear |
| 118 | Distinction, Inc. | DOS: NY | 4-16-07 | | Clear |
| 119 | Times Mirror Land & Timber Company | SOS: OR | 4-13-07 | | Clear |
| 120 | Publisher's Forest Products Company of Washington | DOL: WA | 4-5-07 | | Clear |
| 121 | Signs of Distinction | Dept. Assessments & Taxation: Maryland | 4-17-07 | General Electric Capital Corporation | File No. 18113684 dated 9-16-02 covering: one (1) Gerber Edge II securing Debtor's obligations under that certain Equipment Lease Agreement between Secured Party and Debtor |
| 122 | M Services Co., Inc. | SOS: DE | 4-9-07 | | Clear |
| 123 | Shepard's Inc. | SOS: DE | 4-9-07 | | Clear |
| 124 | River Center Maintenance Association | SOS: DE | 4-9-07 | | Clear |
| 125 | TMS Acquisition Canada, LLC | SOS: DE | 4-9-07 | | Clear |

CH1 3846591v.1

TRB0520940

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520941

**Schedule 5.02(c)(ii)**

**Existing Debt**

See Note 11 in the Form 10-Q filed by Borrower for the quarterly period ended April 1, 2007 for a list of Debt outstanding as of April 1, 2007 (other than refinancing indebtedness listed on Schedule 1.01(a) hereto).

Guaranty by Newsday, Inc. in connection with sublease by Tribune New York Newspaper Holdings, LLC (as assignee from Hoy, LLC, as assignee from DSA Community Publishing, LLC) of approximately 21,000 square feet of space located at 330 West 34th Street, New York, New York pursuant to a Sublease Agreement dated as of August 8, 2003, as amended.

Guaranty by Borrower for up to 50% of the purchase price for Microsoft's contemplated investment of up to 5% in CareerBuilder, LLC in the event that CareerBuilder does not have sufficient funds to consummate the repurchase of Microsoft's interest in CareerBuilder following the exercise of a put right granted to Microsoft in connection with its investment in CareerBuilder

CH1 3545888v.6

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520942

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520943**

**Schedule 5.02(e)**

**Asset Sales**

1.  Sale or other Disposition of any of the assets of, or of any Equity Interests in, Chicago National Ball Club, Inc., a Delaware corporation, or its Subsidiaries or any other assets or properties related thereto

2.  Sale or other Disposition of Borrower's indirect Equity Interest in Comcast SportsNet Chicago

3.  Sale of Southern Connecticut Newspapers—*The Advocate* (Stamford) and *Greenwich Time*

CHI 3545888v.6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520944

EXHIBIT A-1

## [FORM OF] REVOLVING CREDIT NOTE

$_____ _____                                          _____ __, 20_____

     FOR VALUE RECEIVED, TRIBUNE COMPANY, a Delaware corporation (the "Bor-rower"), promises to pay to the order of [NAME OF LENDER] (the "Lender") on the Revolving Credit Facility Maturity Date the principal sum of _____ ___ ___ DOLLARS ($_____ ____) or, if less, the aggregate unpaid principal amount of all Revolving Credit Advances shown on the schedule attached hereto made by the Lender pursuant to that certain Credit Agreement, dated as of May 17, 2007 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lender and certain other lenders party thereto and JPMorgan Chase Bank, N.A., as the Agent.  Terms used in this Note, unless otherwise defined herein, have the meanings provided in the Credit Agreement.

     The Borrower also promises to pay interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until the Revolving Credit Commitment Termination Date (whether by acceleration or otherwise) and, after the Revolving Credit Termination Date, until paid, at the rates per annum and on the dates specified in the Credit Agreement.

     Payments of both principal and interest are to be made in Dollars in same day funds to the account designated by the Agent pursuant to the Credit Agreement.

     This Note is one of the Revolving Credit Notes referred to in, and evidences Debt incurred under, the Credit Agreement, to which reference is made for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments of principal of the Debt evidenced by this Note and on which such Debt may be declared to be immediately due and payable.

     All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

A-1-1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRIBUNE COMPANY

By: _____
    Name:
    Title:

A-1-2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520946

## REVOLVING CREDIT ADVANCES AND PRINCIPAL PAYMENTS

| Date | Amount of Revolving Credit Advance | Amount of Principal Payment | Outstanding Principal Balance | Notation Made By |
|------|------|------|------|------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

A-1-3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520947

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

EXHIBIT A-2

## [FORM OF] TRANCHE X NOTE

$_____                                      _____ ___, 20_____

  FOR VALUE RECEIVED, TRIBUNE COMPANY, a Delaware corporation (the "Borrower"), promises to pay to the order of [NAME OF LENDER] (the "Lender") on the Tranche X Maturity Date the principal sum of _____ DOLLARS ($_____) or, if less, the aggregate unpaid principal amount of all Tranche X Advances shown on the schedule attached hereto made by the Lender pursuant to that certain Credit Agreement, dated as of May 17, 2007 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lender and certain other lenders party thereto and JPMorgan Chase Bank, N.A., as the Agent. Terms used in this Note, unless otherwise defined herein, have the meanings provided in the Credit Agreement.

  The Borrower also promises to pay interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until the Tranche X Maturity Date (whether by acceleration or otherwise) and, after the Tranche X Maturity Date, until paid, at the rates per annum and on the dates specified in the Credit Agreement.

  Payments of both principal and interest are to be made in Dollars in same day funds to the account designated by the Agent pursuant to the Credit Agreement.

  This Note is one of the Tranche X Notes referred to in, and evidences Debt incurred under, the Credit Agreement, to which reference is made for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments of principal of the Debt evidenced by this Note and on which such Debt may be declared to be immediately due and payable.

  All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

  **THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

A-2-1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRIBUNE COMPANY

By: _____

     Name:

     Title:

A-2-2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520950

TRANCHE X ADVANCES AND PRINCIPAL PAYMENTS

| Date | Amount of Tranche X Advance | Amount of Principal Payment | Outstanding Principal Balance | Notation Made By |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

A-2-3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520951

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520952**

### [FORM OF] TRANCHE B NOTE

$_____                                              _____ ___, 20_____

      FOR VALUE RECEIVED, TRIBUNE COMPANY, a Delaware corporation (the "Bor-rower"), promises to pay to the order of [NAME OF LENDER] (the "Lender") on the Tranche B Maturity Date the principal sum of _____ DOLLARS ($_____) or, if less, the aggregate unpaid principal amount of all Tranche B Advances shown on the schedule at-tached hereto made by the Lender pursuant to that certain Credit Agreement, dated as of May 17, 2007 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lender and certain other lenders party thereto and JPMorgan Chase Bank, N.A., as the Agent. Terms used in this Note, unless other-wise defined herein, have the meanings provided in the Credit Agreement.

      The Borrower also promises to pay interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until the Tranche B Maturity Date (whether by ac-celeration or otherwise) and, after Tranche B Maturity Date, until paid, at the rates per annum and on the dates specified in the Credit Agreement.

      Payments of both principal and interest are to be made in Dollars in same day funds to the account designated by the Agent pursuant to the Credit Agreement.

      This Note is one of the Tranche B Notes referred to in, and evidences Debt incurred un-der, the Credit Agreement, to which reference is made for a statement of the terms and condi-tions on which the Borrower is permitted and required to make prepayments and repayments of principal of the Debt evidenced by this Note and on which such Debt may be declared to be im-mediately due and payable.

      All parties hereto, whether as makers, endorsers, or otherwise, severally waive present-ment for payment, demand, protest and notice of dishonor.

      **THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

A-3-1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRIBUNE COMPANY

By: _____

Name:

Title:

A-3-2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520954**

TRANCHE B ADVANCES AND PRINCIPAL PAYMENTS

| Date | Amount of Tranche B Advance | Amount of Principal Payment | Outstanding Principal Balance | Notation Made By |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

A-3-3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520955

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520956**

EXHIBIT A-4

## [FORM OF] SWING LINE NOTE

$_____                                    _____, 20_____

     FOR VALUE RECEIVED, TRIBUNE COMPANY, a Delaware corporation (the "Borrower"), promises to pay to the order of [NAME OF LENDER] (the "Lender") on the Revolving Credit Facility Maturity Date the principal sum of _____ DOLLARS ($_____) or, if less, the aggregate unpaid principal amount of all Swing Line Advances shown on the schedule attached hereto made by the Lender pursuant to that certain Credit Agreement, dated as of May 17, 2007 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lender and certain other lenders party thereto and JPMorgan Chase Bank, N.A., as the Agent.  Terms used in this Note, unless otherwise defined herein, have the meanings provided in the Credit Agreement.

     The Borrower also promises to pay interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until the Revolving Credit Commitment Termination Date (whether by acceleration or otherwise) and, after the Revolving Credit Commitment Termination Date, until paid, at the rates per annum and on the dates specified in the Credit Agreement.

     Payments of both principal and interest are to be made in Dollars in same day funds to the account designated by the Agent pursuant to the Credit Agreement.

     This Note is one of the Swing Line Notes referred to in, and evidences Debt incurred under, the Credit Agreement, to which reference is made for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments of principal of the Debt evidenced by this Note and on which such Debt may be declared to be immediately due and payable.

     All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

     **THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520957**

TRIBUNE COMPANY

By: _____

Name:

Title:

A-4-2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520958

## SWING LINE ADVANCES AND PRINCIPAL PAYMENTS

| Date | Amount of Swing Line Advance | Amount of Principal Payment | Outstanding Principal Balance | Notation Made By |
|------|------|------|------|------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

A-4-3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520959

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

EXHIBIT B

## [FORM OF] NOTICE OF BORROWING

JPMorgan Chase Bank, N.A.,
    as Agent for the Lenders parties to
    the Credit Agreement referred to below
1111 Fannin, 8th Floor
Houston, Texas 77002

Attention: [           ]

### TRIBUNE COMPANY

The undersigned, Tribune Company, refers to the Credit Agreement, dated as of May 17, 2007 (as amended or modified from time to time, the "Credit Agreement", the terms defined therein being used herein as therein defined), among the undersigned, certain Lenders parties thereto and JPMorgan Chase Bank, N.A., as Agent for said Lenders, and hereby gives you notice, irrevocably, pursuant to Section 2.02 of the Credit Agreement that the undersigned hereby requests a Borrowing under the Credit Agreement, and in connection therewith sets forth below the information relating to such Borrowing (the "Proposed Borrowing") as required by Section 2.02[(a)][(b)] of the Credit Agreement:

    (i)    The Proposed Borrowing is to be made under the [Revolving Credit] [Tranche X] [Tranche B][1] [Swing Line] Facility.

    (ii)    The Business Day of the Proposed Borrowing is [_____], 20[__].

    (iii)    The Type of Advances comprising the Proposed Borrowing are [Base Rate Advances] [Eurodollar Rate Advances].

    (iv)    The aggregate amount of the Proposed Borrowing is S[_____].

    [(v)    The initial Interest Period for each Eurodollar Rate Advance made as part of the Proposed Borrowing is [_] month[s].]

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

---

[1]    If a Proposed Borrowing is being requested under the Tranche B Facility, specify whether such Proposed Borrowing is comprised of Initial Tranche B Advances or Delayed Draw Tranche B Advances.

CG&R DRAFT:  6/3/07 6:34 PM        #855041 v7 (Q30107_.DOC)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520961

(A)    the representations and warranties contained in Section 4.01 of the Credit Agreement [(except the representations set forth in the last sentence of clause (e)(i) thereof][2] are correct in all material respects (except to the extent such representation and warranty is already qualified by materiality or Material Adverse Effect, in which case such representation or warranty shall be correct in all respects), before and after giving effect to the Proposed Borrowing and to the application of the proceeds therefrom, as though made on and as of such date, except to the extent any such representation or warranty, by its terms, refers to a different specific date other than the date of such Borrowing or issuance or renewal or increase, in which case as of such specific date; and

(B)    no event has occurred and is continuing, or would result from such Proposed Borrowing or from the application of the proceeds therefrom, that would result in a Default.

IN WITNESS WHEREOF, the Borrower has caused this Notice of Borrowing to be executed and delivered, and the certifications and warranties contained herein to be made, by its duly authorized officer this _____ day of _____, _____.

TRIBUNE COMPANY

By:    _____
       Name:
       Title:

---

[2]    Bracketed language to be included only with respect to Borrowings made on the Closing Date.

B-2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520962

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520963**

EXHIBIT C

[FORM OF] ASSIGNMENT AND ACCEPTANCE

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any letters of credit, guarantees, and swingline loans included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.    Assignor:          _____

2.    Assignee:          _____
                         [and is an Affiliate of [*identify Lender*][3]]

3.    Borrower:          Tribune Company

_____

[3] Select as applicable.

C-1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

4.  Agent :                JPMorgan Chase Bank, N.A.,

5.  Credit Agreement:      The S8,028,000,000 Credit Agreement dated as of May 17, 2007
                           among Tribune Company, each lender from time to time party
                           thereto and JPMorgan Chase Bank, N.A., as Agent.

6.  Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/Advances for all Lenders | Amount of Commitment/ Advances Assigned | Percentage Assigned of Commitment/ Advances [4] |
|---|---|---|---|
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |

Effective Date: _____, 20___  [TO BE INSERTED BY AGENT AND WHICH
SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE
REGISTER THEREFOR.]

*The Assignee agrees to deliver to the Agent a completed Administrative Questionnaire in which
the Assignee designates one or more credit contacts to whom all syndicate-level information
(which may contain material non-public information about the Loan Parties and their related
parties or their respective securities) will be made available, who will comply with Section 8.08
of the Credit Agreement and who may receive such information in accordance with the As-
signee's compliance procedures and applicable laws, including Federal and state securities
laws.*

---

[4] Set forth, to at least 9 decimals, as a percentage of the Commitment/ Advances of all Lenders there-
under.

C-2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520965

The terms set forth in this Assignment and Assumption are hereby agreed to:

<u>ASSIGNOR</u>

[NAME OF ASSIGNOR]

By _____
     Title:

<u>ASSIGNEE</u>

[NAME OF ASSIGNEE]

By _____
     Title:

C-3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

[Consented to and][5] Accepted:

JPMorgan Chase Bank, N.A,
   as Agent

By _____
       Title:

[Consented to:][6]

[NAME OF RELEVANT PARTY]

By _____
       Title:

---

[5] To be added only if the consent of the Agent is required by the terms of the Credit Agreement.

[6] To be added only if the consent of the Borrower and/or other parties (e.g. Swingline Lender, Issuing Bank) is required by the terms of the Credit Agreement.

C-4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520967

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.    Representations and Warranties.

1.1    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal
and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear
of any lien, encumbrance or other adverse claim and (iii) it has full power and authority,
and has taken all action necessary, to execute and deliver this Assignment and Assump-
tion and to consummate the transactions contemplated hereby; and (b) assumes no re-
sponsibility with respect to (i) any statements, warranties or representations made in or in
connection with the Credit Agreement or any other Loan Document, (ii) the execution,
legality, validity, enforceability, genuineness, sufficiency or value of the Loan Docu-
ments or any collateral thereunder, (iii) the financial condition of the Borrower, any of its
Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document
or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affili-
ates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee.  The Assignee (a) represents and warrants that (i) it has full
power and authority, and has taken all action necessary, to execute and deliver this As-
signment and Assumption and to consummate the transactions contemplated hereby and
to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any,
specified in the Credit Agreement that are required to be satisfied by it in order to acquire
the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall
be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the
extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it
has received and/or had the opportunity to review a copy of the Credit Agreement to the
extent it has in its sole discretion deemed necessary, together with copies of the most re-
cent financial statements delivered pursuant to Section 5.01(i) thereof, as applicable, and
such other documents and information as it has in its sole discretion deemed appropriate
to make its own credit analysis and decision to enter into this Assignment and Assump-
tion and to purchase the Assigned Interest on the basis of which it has made such analysis
and decision independently and without reliance on the Agent or any other Lender, and
(v) if it is a Non-U.S. Lender, attached to the Assignment and Assumption is any docu-
mentation required to be delivered by it pursuant to the terms of the Credit Agreement,
duly completed and executed by the Assignee; and (b) agrees that (i) it will, independ-
ently and without reliance on the Agent, the Assignor or any other Lender, and based on
such documents and information as it shall deem appropriate at the time, continue to
make its own credit decisions in taking or not taking action under the Loan Documents,
and (ii) it will perform in accordance with their terms all of the obligations which by the
terms of the Loan Documents are required to be performed by it as a Lender.

C-5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

2.    <u>Payments</u>.  From and after the Effective Date, the Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.    <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

C-6

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520969

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520970**

EXHIBIT D-1

[FORM OF] OPINION OF
COUNSEL FOR THE COMPANY


[To be provided separately]

D-1-1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520972

EXHIBIT D-2

[FORM OF] OPINION OF
COUNSEL TO THE TRUSTEE OF THE ESOP TRUST

[To be provided separately]

D-2-1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520973**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520974**

[FORM OF]
<u>SOLVENCY CERTIFICATE</u>

TRIBUNE COMPANY

This Solvency Certificate (this "<u>Certificate</u>"), dated as of May 17, 2007, is delivered pursuant to Section 3.01(b)(i) of the Credit Agreement, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among Tribune Company, a Delaware corporation (the "<u>Borrower</u>"), the Lenders party thereto and JPMorgan Chase Bank, N.A., as the administrative agent (in such capacity, the "<u>Agent</u>") for the Lenders.  Capitalized terms used herein, unless otherwise defined herein, have the meanings provided in the Credit Agreement.

I hereby certify to you and each Lender, in good faith and to the best of my knowledge and belief, in my capacity as Chief Financial Officer of the Borrower, and not individually, as follows:

I am the duly qualified and acting Chief Financial Officer of the Borrower.

I have reviewed such information as I have deemed relevant for purposes of this certificate, including the opinion of Valuation Research Corporation, dated May 9, 2007[7], which opinion provides by its terms that it may be relied upon by the officers of the Company.

As of the date hereof, immediately after giving effect to the First Step Transactions, the Borrower is Solvent.

[SIGNATURE ON FOLLOWING PAGE]

---

[7]    To be updated to include a reference to any bring-down opinion provided by VRC on the Closing Date.

E-1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**                                    **TRB0520975**

IN WITNESS WHEREOF, the undersigned has executed and delivered this Certificate as of the date first above written.

TRIBUNE COMPANY

By: _____

     Name:

     Title:

E-2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520976**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520977

EXHIBIT F

[FORM OF] GUARANTEE

F-1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520978

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

EXHIBIT G

[FORM OF] PLEDGE AGREEMENT

G-1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520980**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520981

[FORM OF] COMPLIANCE CERTIFICATE

To:  The Lenders parties to the
     Credit Agreement described below

The Credit Agreement dated as of May 17, 2007 (the "Credit Agreement"), among Tribune Company (the "Borrower"), a Delaware corporation, each Lender from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent for the Lenders thereunder (in such capacity, the "Agent") and the other parties thereto from time to time. Capitalized terms used herein without definition have the meanings specified in the Credit Agreement. The financial statements relating to [quarterly] [annual] period ended [          ] required to be delivered to the Agent pursuant to Section 5.01(i)[(i)]|[(ii)] of the Credit Agreement (the "Financial Statements") have been filed with the Securities and Exchange Commission (and are available at www.sec.gov) as part of the Borrower's [quarterly] [annual] report on Form [10-Q] [10-K] for the [quarterly] [annual] period ended [          ] in accordance with the last paragraph of Section 5.01(i) of the Credit Agreement.

THE UNDERSIGNED HEREBY CERTIFIES THAT:

1.    I am the duly elected _____ of the Borrower and, as such, I am authorized to execute and deliver this Certificate to the Agent on behalf of Borrower[8];

2.    I have reviewed the terms of the Credit Agreement and I have made, or have caused to be made under my supervision, a review of the transactions and conditions of the Borrower and its Subsidiaries under the Credit Agreement during the accounting period covered by the Financial Statements;

3.    Except as set forth below, to the best of my knowledge, no Default or Event of Default has occurred during or at the end of the Test Period covered by the Financial Statements or as of the date of this Certificate;

4.    Schedule I attached hereto sets forth in reasonable detail calculations of Borrower's Interest Coverage Ratio as of the end of the Test Period covered by the Financial Statements, which was [___:1.0] as of the end of such Test Period, and such ratio [complies] [does not comply] with the provisions of Section 5.02(i)(B) of the Credit Agreement;

5.    Schedule II sets forth in reasonable detail calculations of Borrower's Total Guaranteed Leverage Ratio as of the end of the Test Period covered by the Financial Statements,

---

[8]    Certificate must be delivered by the Chief Financial Officer, Chief Accounting Officer or Treasurer of the Borrower.

H-1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520982

which was [___:1.0] as of the end of such Test Period, and such ratio [complies] [does not comply] with the provisions of Section 5.02(i)(A) of the Credit Agreement;

6.     Schedule III sets forth in reasonable detail calculations of Borrower's Capital Expenditures as of the end of the Test Period covered by the Financial Statements and such expenditures [exceed] [do not exceed] the amount permitted by Section 5.02(i)(C) of the Credit Agreement; and

7.     [For annual certificates, add: Schedule IV hereto sets forth the computations necessary to determine the Borrower's calculation of Excess Cash Flow for such fiscal year.]

The description below sets forth the exceptions, if any, to paragraph 3 by listing, in reasonable detail, the action which the Borrower has taken, is taking, or proposes to take with respect to each such Default or Event of Default:

_____

_____

_____

The foregoing certifications, together with the information set forth in the Schedules hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this ___ day of _____, 20_.

TRIBUNE COMPANY

By: _____
       Name:
       Title:

H-2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

SCHEDULE I

Calculations of Borrower's
Interest Coverage Ratio

**Interest Coverage Ratio**

The ratio of:

(a) Consolidated EBITDA of Borrower and its Subsidiaries (as set forth in Section A below)                    $_____

to

(b) Cash Interest Expense of Borrower and its Subsidiaries (as set forth in Section C below)                    $_____

**Interest Coverage Ratio** ...................................................... [   ]: 1

**Covenant Requirement as of the date of determination**........................................................................ Not less than [   ]:1

H-3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520984

## A. Calculation of EBITDA:

Consolidated Net Income (or net loss) of Borrower and its Sub-
sidiaries for the Test Period:                                          $_____

(a) decreased by (without duplication):

  (i) the income or loss resulting from extraordinary items            $_____
      for such period, and all losses or gains resulting from
      non-cash, non-operating items and one-time charges;

  (ii) the income of any PDT Entity and any Person ac-                  _____
      counted for by Borrower or any of its Subsidiaries on
      the equity method for such period, but any such income
      so excluded may be included in such period or any later
      period to the extent of any cash dividends or distribu-
      tions actually paid in the relevant period or any later pe-
      riod to Borrower or any Subsidiary of Borrower;

  (iii)whether or not recurring, non-cash charges and, non-            _____
      cash stock-based compensation charges determined in
      accordance with GAAP during such period, and
      whether or not recurring, non-cash retirement expense,
      including such expense from ESOP, pension and cash
      balance plans; and

  (iv)expected or actual gains resulting from the disposition         _____
      of discontinued operations, (excluding in the cases of
      items (i) and (iii) above (A) any non-cash charge repre-
      senting an accrual or reserve for potential cash charges
      in any future period and (B) the accrual of revenue or
      recording of receivables in the ordinary course of busi-
      ness);

(b) increased by (without duplication):

  (i) Consolidated Interest Expense (as calculated in Section          $_____
      B below) of Borrower and its Subsidiaries for such pe-
      riod;

  (ii) Consolidated income tax expense of Borrower and its             _____
      Subsidiaries for such period;

  (iii)depreciation expense of Borrower and its Subsidiaries           _____
      for such period;

  (iv)amortization expense of Borrower and its Subsidiaries            _____
      for such period, in each case determined in accordance
      with GAAP;

  (v) transaction fees and costs associated or incurred by Bor-        _____
      rower or any of its Subsidiaries in connection with the

H-4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520985

First Step Transactions, the Second Step Transactions and Borrower's existing credit facilities;

(vi) for the four quarter periods ending December 30, 2007, March 30, 2008, June 29, 2008 and September 28, 2008, $60.0 million in each such four quarter period consisting of pro forma cash savings resulting from termination of contributions into the Tribune Company 401(k) Savings and Profit Sharing Plan;  _____

(vii) expected or actual losses resulting from the disposition of discontinued operations; and  _____

(viii) to the extent deducted in calculating Consolidated net income (or net loss) of Borrower and its Subsidiaries, Dividends by Borrower to the ESOP to the extent the amount so Dividended to the ESOP is used to fund the ESOP Note Repayment Amounts (and to the extent such ESOP Note Repayment Amounts are themselves not included in Consolidated net income (or net loss) of Borrower and its Subsidiaries.  _____

EBITDA ................................................................. $_____

**B. Calculation of Consolidated Interest Expense:**

The total Consolidated interest expense of Borrower and its Subsidiaries for such period  $_____

(a) increased by (without duplication):

(i) imputed interest on Capital Lease Obligations and Attributable Debt of Borrower and its Subsidiaries for such period;  $_____

(ii) commissions, discounts and other fees and charges owed by Borrower or any of its Subsidiaries with respect to letters of credit securing financial obligations, bankers' acceptance financing and receivables financing for such period;  _____

(iii) amortization of debt issuance costs, original issue discount and other financing, legal and accounting fees, costs and expenses (whether or not deferred) and any interest expense on deferred compensation arrangements, in each case incurred by Borrower or any of its Subsidiaries for such period;  _____

(iv) cash contributions to any employee stock ownership plan or similar trust made by Borrower or any of its Subsidiaries to the extent such contributions are used by such plan or trust to pay interest or fees to any Person  _____

H-5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520986

(other than Borrower or a wholly owned Subsidiary) in connection with Debt incurred by such plan or trust for such period;

(v) all interest paid or payable with respect to discontinued operations of Borrower or any of its Subsidiaries for such period;

(vi) the interest portion of any deferred payment obligations of Borrower or any of its Subsidiaries for such period; and

(vii) all interest on any Debt of Borrower or any of its Subsidiaries of the type described in clause (h) or (i) of the definition of "Debt" set forth in the Credit Agreement for such period to the extent paid by Borrower and its Subsidiaries;

(b) decreased by (without duplication):

(i) to the extent directly related to the Transactions, debt issuance costs, debt discount or premium and other financing fees, costs and expenses; and

(ii) unrealized gains and losses with respect to Hedge Agreements related to interest rates, after giving effect to such Hedge Agreements (including associated costs).

**Consolidated Interest Expense**........................................................ $_____

**B. Calculation of Cash Interest Expense:**

Consolidated Interest Expense for such period $_____

decreased by (without duplication)

(a) interest on any debt paid by the increase in the principal amount of such debt including by issuance of additional debt of such kind,

(b) items described in clause (a)(iii) of the calculation of "Consolidated Interest Expense" set forth above, and

(c) non-cash interest expense related to PHONES

**Cash Interest Expense** ................................................................ $_____

H-6

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520987

SCHEDULE II

Calculation of Borrower's
Total Guaranteed Leverage Ratio

**Total Guaranteed Leverage Ratio**

The ratio of (a) the sum of

    (i)  the aggregate principal amount of Debt for Borrowed Money of Borrower that is Guaranteed by any of the Guarantors <u>and</u>        $_____

    (ii)  the aggregate principal amount of Debt for Borrowed Money of the Guarantors (on a Consolidated basis)        $_____

    Calculation of clause (a)        $_____

to (b)  EBITDA (as set forth in Section A on Schedule I)        $_____

    **Consolidated Total Guaranteed Leverage Ratio** ............ **[   ]: 1**

    **Covenant Requirement as of the date of determination**................................................................................ **Not greater than [   ]:1**

H-7

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520988

Calculation of Borrower's
Compliance with Limitation on Capital Expenditures

**Limitation on Capital Expenditures**

1.  Capital Expenditures made during fiscal year to date[9]:    $_____

2.  Amount set for the Fiscal Year of the Borrower, including the Test Period, as set forth in the table in Section 5.02(i)(C) of the Credit Agreement:    $_____

3.  Retained Amount:    $_____

4.  Capital Expenditures that could have made during prior fiscal year but which were not made:    $_____

5.  Maximum permitted Capital Expenditures (Line 2 + Line 3 + Line 4):    $_____

5.  Excess (deficient) for covenant compliance (Line 5 – Line 1):    $_____

---

[9]    For purposes of the calculations hereunder, the following Capital Expenditures shall be excluded: (i) the purchase of the TMCT Real Property, (ii) expenditures of insurance proceeds to rebuild or replace any asset, (iii) leasehold improvement expenditures for which Borrower or a Subsidiary is reimbursed by the lessor, sublessor or sublessee and (iv) expenditures of proceeds (including Net Cash Proceeds) of any asset sale permitted under Section 5.02(e) of the Credit Agreement.

H-8

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520989

Calculation of Borrower's
Excess Cash Flow

## Calculation of Excess Cash Flow

EBITDA for such fiscal year (as set forth in Section A to Schedule I):                                                                                          $ _____

(1) decreased by (without duplication):

    (a) Debt Service for such fiscal year;                                                                                          $ _____

    (b) any prepayments of Term Advances or Borrower Acquisition Bridge Loans, any prepayments of Revolving Credit Advances and Swingline Advances to the extent accompanied by corresponding permanent reductions in the Revolving Credit Commitments, and any prepayments of other Debt for Borrowed Money, during such fiscal year, in each case other than amounts already reflected in Debt Service;                                                                                          _____

    (c) Capital Expenditures during such fiscal year (excluding Capital Expenditures made in such fiscal year where a certificate in the form contemplated by the following clause (d) was previously delivered) that are paid in cash;                                                                                          _____

    (d) Capital Expenditures that Borrower or any of its Subsidiaries shall, during such fiscal year, become obligated to make but that are not made during such fiscal year; provided that Borrower shall deliver a certificate to the Agent not later than 90 days after the end of such fiscal year, signed by a financial officer of Borrower and certifying that such Capital Expenditures will be made in the following fiscal year;                                                                                          _____

    (e) the aggregate amount of expenditures made in cash during such period pursuant to Sections 5.02(h)(v) and (x) and 5.02(f)(vi) of the Credit Agreement;                                                                                          _____

    (f) Taxes of Borrower and its Subsidiaries that were paid in cash during such fiscal year or will be paid within six months after the end of such fiscal year and for which reserves have been established in accordance with GAAP;                                                                                          _____

    (g) the absolute value of the difference, if negative, of the amount of Net Working Capital at the end of the prior fiscal year (or the beginning of the fiscal year in the case of 2008) over the amount of Net Working Capital                                                                                          _____

H-9

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520990

at the end of such fiscal year;

(h) losses resulting from (i) non-ordinary course Asset Sales and related tax impact and (ii) extraordinary losses together with any tax effect, in each case, paid in cash during such fiscal year excluded from Consolidated net income;

(i) to the extent (x) deducted in determining Consolidated net income and added back to determine EBITDA or (y) not deducted in determining EBITDA, in each case, the aggregate amount of expenditures made in cash during such period pursuant to Sections 5.02(g)(ii), (iii), (vii) and (ix) of the Credit Agreement;

(j) the aggregate amount of all net cash payments received (i) under any Hedge Agreements and (ii) in respect of reserves relating to a prior fiscal year;

(k) without duplication of any of sub-clauses (a) – (j) and (l) through (n) of this clause (1), any amounts paid in connection with an Asset Sale for indemnification obligations, which obligations are not deducted from the definition of "Net Cash Proceeds" set forth in the Credit Agreement;

(l) to the extent included in EBITDA, proceeds from any sale of certain Equity Interests held by Borrower or its Subsidiaries listed in the Side Letter;

(m) to the extent included in EBITDA, the aggregate amount of cash proceeds received by Borrower after April 1, 2007 and prior to any date of determination from the litigation and proceedings listed in the Side Letter; and

(n) to the extent added to determine EBITDA, all items that did not result from a cash payment to Borrower or any of its Subsidiaries on a consolidated basis during such fiscal year;     S_____

(2)    increased by, without duplication:

(i) the difference, if positive, of the amount of Net Working Capital at the end of the prior fiscal year (or the beginning of the fiscal year in the case of 2008) over the amount of Net Working Capital at the end of such fiscal year;

(ii) all proceeds received during such fiscal year of any Debt (other than Debt under this Agreement) to the extent used to finance any Capital Expenditure or pre-

H-10

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

payments of Debt for Borrowed Money, in each case to the extent there is a corresponding deduction to Excess Cash Flow above in respect of the use of such borrowings;

(iii) to the extent any permitted Capital Expenditures referred to in subclause (d) of clause (1) above do not occur in the fiscal year specified in the certificate of Borrower provided pursuant to subclause (d) of clause (1) above, such amounts of Capital Expenditures that were not so made in the fiscal year specified in such certificates;    _____

(iv) any return on investments received in cash (other than from a Subsidiary) during such period, which investments were made pursuant to Section 5.02(h)(v), (x) or (xvi) of the Credit Agreement;    _____

(v) income or gain excluded from consolidated net income resulting from (a) non-ordinary course Asset Sales and any related provision for taxes on such gain or (b) extraordinary gains and any related provision for taxes, in each case realized in cash during such fiscal year (except to the extent such gain is subject to Section 2.10(b)(iii) of the Credit Agreement);    _____

(vi) if deducted in the computation of EBITDA, cash interest income; and    _____

(vii) to the extent subtracted in determining EBITDA, all items that did not result from a cash payment by Borrower or any of its Subsidiaries on a consolidated basis during such fiscal year.    _____

**Excess Cash Flow** .......................................................... $_____

H-11

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0520992

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520993**

EXHIBIT I

[FORM OF] ADMINISTRATIVE QUESTIONNAIRE

TRIBUNE COMPANY

Agent Address:    <u>JPMorgan Chase Bank, N.A.</u>

<u>JPMorgan Loan Services</u>     Return form to:    <u>Sharon Coté</u>

<u>1111 Fannin Street, 10th Fl.</u>    Telephone:    <u>713.750.7911</u>

<u>Houston, TX 77002</u>    Facsimile:    <u>713.750.2666</u>

E-mail:    <u>sharon.p.craft@jpmchase.com</u>

---

It is very important that **all** of the requested information be completed accurately and that this questionnaire be returned promptly. If your institution is sub allocating its allocation, please fill out an administrative questionnaire for each legal entity.

---

Legal Name of Lender to appear in Documentation:

**Tax ID Number:**_____

Signature Block Information:_____

- Signing Credit Agreement    ☐ Yes    ☐ No

- Coming in via Assignment    ☐ Yes    ☐ No

Type of Lender:
Bank ☐ Asset Manager ☐ Broker/Dealer ☐ CLO/CDO ☐ Finance Company ☐ Hedge Fund ☐ Insurance ☐ Mutual Fund ☐ Pension Fund ☐ Other Regulated Investment Fund ☐ Special Purpose Vehicle ☐ Other-please specify) ☐

Lender Parent:

<u>Domestic Address</u>    <u>Eurodollar Address</u>

I-1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**Contacts/Notification Methods:  Borrowings, Paydowns, Interest, Fees, etc.**

Primary Credit Contact                    Secondary Credit Contact

Syndicate-level information (which may contain material non-public information about the Borrower and its related parties or their respective securities) will be made available to the Credit Contact(s).  The Credit Contacts identified must be able to receive such information in accordance with his/her institution's compliance procedures and applicable laws, including Federal and state securities laws.

Name:

Company:

Title:

Address:


Telephone:

Facsimile:

E-Mail Address:


Primary Operations Contact                    Secondary Operations Contact

Name:

Company:

Title:

Address:


Telephone:

Facsimile:

E-Mail Address:


Bid Contact                    L/C Contact

Name:

Company:

Title:

Address:


Telephone:

Facsimile:

E-Mail Address:


I-2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520995

### Lender's Domestic Wire Instructions

Bank Name: _____

ABA/Routing No.: _____

Account Name: _____

Account No.: _____

FFC Account Name: _____

FFC Account No.: _____

Attention: _____

Reference: _____

### Lender's Foreign Wire Instructions

Currency: _____

Bank Name: _____

Swift/Routing No.: _____

Account Name: _____

Account No.: _____

FFC Account Name: _____

FFC Account No.: _____

Attention: _____

Reference: _____

### Agent's Wire Instructions

Bank Name: _____

ABA/Routing No.: _____

Account Name: _____

Account No.: _____

FFC Account Name: _____

FFC Account No.: _____

Attention: _____

Reference: _____

I-3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520996

> **Tax Documents**

NON-U.S. LENDER INSTITUTIONS:

*I. Corporations:*

If your institution is incorporated outside of the United States for U.S. federal income tax purposes, <u>and</u> is the bene-
ficial owner of the interest and other income it receives, you must complete one of the following three tax forms, as
applicable to your institution: *a.) Form W-8BEN (Certificate of Foreign Status of Beneficial Owner),* *b.) Form W-
8ECI (Income Effectively Connected to a U.S. Trade or Business),* or *c.) Form W-8EXP (Certificate of Foreign
Government or Governmental Agency).*

A U.S. taxpayer identification number is required for any institution submitting Form W-8ECI.  It is also required on
Form W-8BEN for certain institutions claiming the benefits of a tax treaty with the U.S.  Please refer to the instruc-
tions when completing the form applicable to your institution.  In addition, please be advised that U.S. tax regula-
tions do not permit the acceptance of faxed forms.  **An original tax form must be submitted.**

II. *Flow-Through Entities:*

If your institution is organized outside the U.S., and is classified for U.S. federal income tax purposes as either a
Partnership, Trust, Qualified or Non-Qualified Intermediary, or other non-U.S. flow-through entity, an original
*Form W-8IMY (Certificate of Foreign Intermediary, Foreign Flow-Through Entity, or Certain U.S. Branches for
United States Tax Withholding)* must be completed by the intermediary together with a withholding statement.
Flow-through entities other than Qualified Intermediaries are required to include tax forms for each of the underly-
ing beneficial owners.

Please refer to the instructions when completing this form.  In addition, please be advised that U.S. tax regulations
do not permit the acceptance of faxed forms.  **Original tax form(s) must be submitted.**

U.S. LENDER INSTITUTIONS:

If your institution is incorporated or organized <u>within</u> the United States, you must complete and return *Form W-9
(Request for Taxpayer Identification Number and Certification).*  **Please be advised that we request that you
submit an original Form W-9.**

*Pursuant to the language contained in the tax section of the Credit Agreement, the applicable tax form for your
institution must be completed and returned prior to the first payment of income.  Failure to provide the proper tax
form when requested may subject your institution to U.S. tax withholding.*

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0520997**