**EXECUTION COPY**

        PLEDGE AGREEMENT dated as of June 4, 2007, among TRIBUNE COMPANY, a Delaware corporation ("<u>Borrower</u>" or "<u>Pledgor</u>") and JPMORGAN CHASE BANK, N.A., a national banking corporation ("<u>JPMorgan</u>"), as agent (in such capacity, the "<u>Agent</u>") for the Secured Parties (as defined below).

        Reference is made to the Credit Agreement dated as of May 17, 2007 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among Borrower, the lenders from time to time party thereto (the "<u>Lenders</u>"), the Agent and the other parties thereto.

        The Lenders have agreed to make Advances to Borrower, and the Issuing Banks have agreed to issue Letters of Credit for the account of Borrower and its Subsidiaries, pursuant to, and upon the terms and subject to the conditions specified in, the Credit Agreement. Each of the Guarantors have agreed to guarantee, among other things, all the obligations of Borrower under the Credit Agreement (upon the terms specified in the Guarantee Agreement). The obligations of the Lenders to make Advances and of the Issuing Banks to issue Letters of Credit are conditioned upon, among other things, the execution and delivery by the Pledgor of a Pledge Agreement in the form hereof to secure (a) the Obligations, (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of the Borrower and each Loan Party under or pursuant to the Credit Agreement and the other Loan Documents, (c) Secured Hedging Obligations and (d) Secured Cash Management Obligations (all the monetary and other obligations described in the preceding clauses (a) through (d) being collectively called the "<u>Credit Agreement Obligations</u>"). Capitalized terms used herein and not defined herein shall have meanings assigned to such terms in the Credit Agreement.

        In connection with the granting of a security interest in the Collateral to secure the Secured Obligations, the Pledgor is required by the indentures governing the Existing Notes (the "<u>Existing Notes Indentures</u>") to grant an equal and ratable security interest in the Collateral to secure the due and punctual payment by the Pledgor of the principal and interest on the Existing Notes and any other obligations under the Existing Notes Indentures owed to the trustees thereunder (collectively, the "<u>Existing Notes Trustees</u>") or any "Holder" (as defined the Existing Notes Indentures) of any Existing Notes (collectively, the "<u>Existing Notes Holders</u>"), when and as due (collectively, the "<u>Existing Notes Obligations</u>" and, together with the Credit Agreement Obligations (as defined above), the "<u>Secured Obligations</u>").

        Accordingly, the Pledgor and the Agent, on behalf of itself and the Lenders, the Issuing Banks, each counterparty to a Secured Hedging Obligation, each counterparty to a Cash Management Agreement (to the extent the Pledgor elects to treat the obligations under such Cash Management Agreement as "Secured Cash Management Obligations"), each co-agent or sub-agent appointed by the Agent from time to time pursuant to Section 7.01 of the Credit Agreement, the Existing Notes Trustees, the Existing Notes Holders and the other Persons the obligations owing to which constitute Secured Obligations and each of their respective successors or assigns (collectively, the "<u>Secured Parties</u>"), hereby agree as follows:

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0521017

SECTION 1.    Pledge. As security for the payment and performance, as the case may be, in full of the Secured Obligations, the Pledgor hereby transfers, grants, bargains, sells, conveys, hypothecates, pledges, sets over and delivers unto the Agent, its successors and assigns, and hereby grants to the Agent, its successors and assigns, for the ratable benefit of the Secured Parties, a security interest in all of the Pledgor's right, title and interest in, to and under (a) the shares of capital stock or equity interests owned by it and listed on Schedule I hereto (the "Pledged Stock"); (b) all other property that may be delivered to and held by the Agent pursuant to the terms hereof; (c) subject to Section 5, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed, in respect of, in exchange for or upon the conversion of the securities referred to in clauses (a) and (b) above; (d) subject to Section 5, all rights and privileges of the Pledgor with respect to the securities and other property referred to in clauses (a), (b) and (c) above; and (e) all proceeds of any of the foregoing (the items referred to in clauses (a) through (e) above being collectively referred to as the "Collateral"). If required pursuant to Section 2, upon delivery to the Agent, (a) any stock certificates or other securities now or hereafter included in the Collateral (the "Pledged Securities") shall be accompanied by stock powers duly executed in blank or other instruments of transfer satisfactory to the Agent and by such other instruments and documents as the Agent may reasonably request and (b) all other property comprising part of the Collateral shall be accompanied by proper instruments of assignment duly executed by the Pledgor and such other instruments or documents as the Agent may reasonably request. Each delivery of Pledged Securities shall be accompanied by a schedule describing the securities theretofore and then being pledged hereunder, which schedule shall be attached hereto as Schedule I and made a part hereof. Each schedule so delivered shall supplement any prior schedules so delivered. The security interest in the Collateral granted herein shall also secure all future advances and re-advances that may be made by the Lenders under the Credit Agreement to, or for the benefit of, the Loan Parties.

TO HAVE AND TO HOLD the Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Agent, its successors and assigns, for the ratable benefit of the Secured Parties, forever; subject, however, to the terms, covenants and conditions hereinafter set forth.

SECTION 2.    Delivery of the Collateral. The Pledgor agrees to (i) not amend or modify any of its Organizational Documents to make an election to treat any Collateral as a "security" under Section 8-103 of the UCC or (ii) if the Pledgor makes such an election, within 10 Business Days thereof, to deliver or cause to be delivered to the Agent, for the benefit of the Secured Parties, any and all Pledged Securities, and any and all certificates or other instruments or documents representing the Collateral.

SECTION 3.    Representations, Warranties and Covenants. The Pledgor hereby represents, warrants and covenants, as to itself and the Collateral pledged by it hereunder, to and with the Agent that:

(a)    the Pledged Stock represents that percentage as set forth on Schedule I of the issued and outstanding shares of each class of the capital stock and equity interest of the issuer with respect thereto;

-2-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only
TRB0521018

(b) except for the security interest granted hereunder, the Pledgor (i) is and will at all times continue to be the direct owner, beneficially and of record, of the Pledged Securities indicated on Schedule I (except in connection with any Asset Sale permitted under the Credit Agreement), (ii) holds the same free and clear of all Liens (other than Liens created by the Loan Documents and Permitted Liens), (iii) will make no assignment, pledge, hypothecation or transfer of the Collateral, other than pursuant hereto and except in connection with any Asset Sale permitted under the Credit Agreement, and (iv) subject to Section 5, will cause any and all Collateral, whether for value paid by the Pledgor or otherwise, to be forthwith deposited with the Agent and pledged or assigned hereunder;

(c) the Pledgor (i) has the power and authority to pledge the Collateral in the manner hereby done or contemplated and (ii) will defend its title or interest thereto or therein against any and all Liens (other than Liens created by the Loan Documents and Permitted Liens), however arising, of all persons whomsoever;

(d) no consent of any other person (including stockholders or creditors of the Pledgor) and no consent or approval of any Governmental Authority or any securities exchange was or is necessary to the validity of the pledge effected hereby (other than such as have been obtained and are in full force and effect);

(e) by virtue of the execution and delivery by the Pledgor of this Agreement, and, solely to the extent that the Pledgor makes an election to treat any Collateral as a "security" under Section 8-103 of the UCC, when the Pledged Securities, certificates or other documents representing or evidencing such Collateral are delivered to the Agent in accordance with this Agreement, and upon the proper filing of UCC-1 financing statements required pursuant to the Credit Agreement, the Agent will obtain a valid and perfected lien upon and security interest in such Pledged Securities as security for the payment and performance of the Secured Obligations;

(f) the pledge effected hereby is effective to vest in the Agent, on behalf of the Secured Parties, the rights of the Agent in the Collateral as set forth herein; and

(g) to the extent applicable, all of the Pledged Stock has been duly authorized and validly issued and is fully paid and nonassessable.

SECTION 4.   Registration in Nominee Name; Denominations.   If an Event of Default shall have occurred and be continuing and the Agent shall have given the Pledgor notice of its intent to exercise such right, (a) the Agent, on behalf of the Secured Parties, shall have the right (in its reasonable discretion) to hold the Pledged Securities in its own name as pledgee, the name of its nominee (as pledgee or as sub-agent) or the name of the Pledgor, endorsed or assigned in blank or in favor of the Agent and the Pledgor will promptly give to the Agent copies of any notices or other communications received by it with respect to Pledged Securities registered in the name of the Pledgor and (b) the Agent shall have the right to exchange the certificates representing Pledged Securities for certificates of smaller or larger denominations for any purpose consistent with this Agreement.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0521019

SECTION 5.   Voting Rights; Dividends and Interest, etc.

(a)   Unless and until an Event of Default shall have occurred and be continuing and the Agent shall have notified the Pledgor that the rights of the Pledgor under this Section 5 are being suspended:

(i)   The Pledgor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Securities or any part thereof for any purpose not prohibited by the terms of this Agreement, the Credit Agreement and the other Loan Documents;

(ii)   The Agent shall execute and deliver to the Pledgor, or cause to be executed and delivered to the Pledgor, all such proxies, powers of attorney and other instruments as the Pledgor may reasonably request for the purpose of enabling the Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to subparagraph (i) above and to receive the cash dividends it is entitled to receive pursuant to subparagraph (iii) below; and

(iii)   The Pledgor shall be entitled to receive and retain any and all cash dividends, interest and principal paid on the Pledged Securities to the extent and only to the extent that such cash dividends, interest and principal are permitted by, and otherwise paid in accordance with, the terms and conditions of the Credit Agreement, the other or documents evidencing the Secured Obligations and applicable laws. All noncash dividends, interest and principal, and all dividends, interest and principal paid or payable in cash or otherwise in connection with a partial or total liquidation or dissolution, return of capital, capital surplus or paid-in surplus, and all other distributions (other than distributions referred to in the preceding sentence) made on or in respect of the Pledged Securities, whether paid or payable in cash or otherwise, whether resulting from a subdivision, combination or reclassification of the outstanding capital stock of the issuer of any Pledged Securities or received in exchange for Pledged Securities or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Collateral, and the Pledgor shall be entitled to receive the same.

(b)   Upon the occurrence and during the continuance of an Event of Default, after the Agent shall have notified the Pledgor of the suspension of the rights of the Pledgor under paragraph (a)(iii) above, then all rights of the Pledgor to dividends, interest, principal or other distributions that the Pledgor is authorized to receive pursuant to paragraph (a)(iii) above shall cease, and all such rights shall thereupon become vested in the Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest or principal. All dividends, interest or principal received by the Pledgor contrary to the provisions of this Section 5 shall be held in trust for the benefit of the Agent, shall be segregated from other property or funds of the Pledgor and shall be forthwith delivered to the Agent upon demand in the same form as so received (with any necessary endorsement reasonably requested by the Agent). Any and all money and other property paid over to or received by the Agent pursuant to the provisions of this paragraph (b) shall be retained by the Agent in an account to be established by the Agent upon receipt of such money or other property and shall be applied in accordance with the provisions of

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0521020

Section 7. After all Events of Default have been cured or waived, the Agent shall, within five Business Days after all such Events of Default have been cured or waived, repay to the Pledgor all cash dividends, interest or principal (without interest) and all other property and assets, that the Pledgor would otherwise be permitted to retain pursuant to the terms of paragraph (a)(iii) above and which remain in such account.

(c)     Upon the occurrence and during the continuance of an Event of Default, after the Agent shall have notified the Pledgor of the suspension of the rights of the Pledgor under paragraph (a)(i) of this Section 5, then all rights of the Pledgor to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section 5, and the obligations of the Agent under paragraph (a)(ii) of this Section 5, shall cease, and all such rights shall thereupon become vested in the Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers during the continuance of such Event of Default, provided that, unless otherwise directed by the Required Lenders, the Agent shall have the right from time to time following and during the continuance of an Event of Default to permit the Pledgor to exercise such rights; provided, further that the approval of the FCC shall be obtained prior to any exercise of such rights by the Agent to the extent any such approval is required at such time under the Communications Act of 1934, as amended, or the rules of the FCC. After all Events of Default have been cured or waived, all rights vested in the Agent pursuant to this clause (c) shall cease and the Pledgor will have the right to exercise the voting and consensual rights and powers that it would otherwise be entitled to exercise pursuant to the terms of paragraph (a)(i) of this Section 5.

SECTION 6.     Remedies upon Default. Upon the occurrence and during the continuance of an Event of Default and the Agent shall have notified the Pledgor of its intent to exercise such rights, subject to applicable regulatory and legal requirements, including without limitation, those imposed by the Federal Communications Commission (the "FCC"), the Agent may sell the Collateral, or any part thereof, at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Agent shall deem appropriate. The Agent shall be authorized at any such sale (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale the Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of the Pledgor, and, to the extent permitted by applicable law, the Pledgor hereby waives (to the extent permitted by applicable law) all rights of redemption, stay, valuation and appraisal the Pledgor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Notwithstanding anything to the contrary herein, the approval of the FCC shall be obtained prior to any exercise of remedies, transfer, assignment or other disposition of the Pledged Securities by the Agent or any other Secured Party to the extent any such approval is required at such time under the Communications Act of 1934, as amended, or the rules of the FCC.

The Agent shall give a Pledgor 10 days' prior written notice (which the Pledgor agrees is reasonable notice within the meaning of Section 9-504(3) of the Uniform Commercial Code as in

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0521021

effect in the State of New York or its equivalent in other jurisdictions) of the Agent's intention to make any sale of the Collateral. Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Agent may fix and state in the notice of such sale. At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Agent may (in its sole and absolute discretion) determine. The Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. The Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Agent until the sale price is paid in full by the purchaser or purchasers thereof, but the Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. At any public (or, to the extent permitted by applicable law, private) sale made pursuant to this Section 6, any Secured Party may bid for or purchase, free (to the extent permitted by applicable law) from any right of redemption, stay or appraisal on the part of the Pledgor (all said rights being also hereby waived and released (to the extent permitted by applicable law)), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to it from the Pledgor as a credit against the purchase price, and it may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to the Pledgor therefor. For purposes hereof, (a) a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof, (b) the Agent shall be free to carry out such sale pursuant to such agreement and (c) the Pledgor shall not be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Secured Obligations paid in full. As an alternative to exercising the power of sale herein conferred upon it, the Agent may proceed by a suit or suits at law or in equity to foreclose upon the Collateral and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Any sale pursuant to the provisions of this Section 6 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-504(3) of the Uniform Commercial Code as in effect in the State of New York or its equivalent in other jurisdictions.

    SECTION 7.    Application of Proceeds of Sale.

    (a)    Upon the occurrence and during the continuance of an Event of Default, the proceeds of any sale of Collateral pursuant to Section 6 (including any Collateral consisting of cash), shall be applied by the Agent as follows:

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0521022

FIRST, to the payment of all reasonable costs and expenses incurred by the Agent in connection with such sale or otherwise in connection with this Agreement or any of the Secured Obligations, including all court costs and the reasonable fees and expenses of its agents and legal counsel, and any other reasonable costs or expenses incurred in connection with the exercise of any right or remedy hereunder;

SECOND, to the payment in full of the Secured Obligations (the amounts so applied to be distributed among the Secured Parties pro rata in accordance with the amounts of the Secured Obligations owed to them on the date of any such distribution); and

THIRD, to the Pledgor, its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement. Upon any sale of the Collateral by the Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the purchase money by the Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Agent or such officer or be answerable in any way for the misapplication thereof.

(b)     If at any time any moneys collected or received by the Agent pursuant to this Agreement are distributable pursuant to paragraph (a) above to the Existing Notes Trustees, and if any Existing Notes Trustee shall notify the Agent in writing that no provision is made under any Existing Notes Indenture for the application by such Existing Notes Trustee of such moneys (whether because such Existing Notes Indenture does not effectively provide for the receipt and the holding by such Existing Notes Trustee of such moneys pending the application thereof or otherwise), then the Agent, after receipt of such moneys pending the application thereof, shall at the direction of such Existing Notes Trustee, invest such amounts in Cash Equivalents maturing within 90 days after they are acquired by the Agent or, in the absence of such direction, hold such moneys uninvested and shall hold all such amounts so distributable and all such investments and the net proceeds thereof in trust solely for such Existing Notes Trustee (in its capacity as trustee) and for no other purpose until such time as such Existing Notes Trustee shall request in writing the delivery thereof by the Agent for application pursuant to such Existing Notes Indenture. The Agent shall not be responsible for any diminution in funds resulting from any such investment or any liquidation thereof prior to maturity.

(c)     In making the determination and allocations required by this Section 7, the Agent may conclusively rely upon information supplied by the Existing Notes Trustees as to the amounts of unpaid principal and interest and other amounts outstanding with respect to the Existing Notes Obligations, and the Agent shall have no liability to any of the Secured Parties for actions taken in reliance on such information, provided that nothing in this sentence shall prevent the Pledgor from contesting any amounts claimed by any Secured Party in any information so supplied. All distributions made by the Agent pursuant to this Section 7 shall be (subject to any decree of any court of competent jurisdiction) fi-

-7-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0521023

nal (absent manifest error), and the Agent shall have no duty to inquire as to the application by the Existing Notes Trustees of any amounts distributed to them.

SECTION 8.    Reimbursement of Agent.

(a)    The Pledgor agrees to pay upon demand to the Agent the amount of any and all reasonable expenses, including the reasonable fees, other charges and disbursements of its counsel and of any experts or agents, that the Agent may incur in connection with (i) the administration of this Agreement, (ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, (iii) the exercise or enforcement of any of the rights of the Agent hereunder or (iv) the failure by the Pledgor to perform or observe any of the provisions hereof.

(b)    Any amounts payable as provided hereunder shall be additional Secured Obligations secured hereby. The provisions of this Section 8 shall remain operative and in full force and effect regardless of the termination of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Secured Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document or any Existing Notes Indenture or any investigation made by or on behalf of the Agent or any other Secured Party. All amounts due under this Section 8 shall be payable on written demand therefor and shall bear interest at the rate specified in Section 2.07(b) of the Credit Agreement.

SECTION 9.    Agent Appointed Attorney-in-Fact. The Pledgor hereby appoints the Agent its attorney-in-fact for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Agent may reasonably deem necessary or advisable to accomplish the purposes hereof, which appointment is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, the Agent shall have the right, upon the occurrence and during the continuance of an Event of Default, with full power of substitution either in the Agent's name or in the name of the Pledgor, to ask for, demand, sue for, collect, receive and give acquittance for any and all moneys due or to become due under and by virtue of any Collateral, to endorse checks, drafts, orders and other instruments for the payment of money payable to the Pledgor representing any interest or dividend or other distribution payable in respect of the Collateral or any part thereof or on account thereof and to give full discharge for the same, to settle, compromise, prosecute or defend any action, claim or proceeding with respect thereto, and to sell, assign, endorse, pledge, transfer and to make any agreement respecting, or otherwise deal with, the same; provided, however, that nothing herein contained shall be construed as requiring or obligating the Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby. The Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to the Pledgor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0521024

SECTION 10.    Waivers; Amendment.

(a)    No failure or delay of the Agent in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agent hereunder and of the Agent and the Lenders under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provisions of this Agreement or consent to any departure by the Pledgor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on the Pledgor in any case shall entitle the Pledgor to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to a written agreement entered into between the Agent and the Pledgor, subject to any consent required in accordance with Section 8.01 of the Credit Agreement; provided, however, that clauses FIRST and SECOND of Section 7(a) of this Agreement may not be amended, released, waived or otherwise modified in a manner that is materially adverse to the Existing Notes Holders under the Existing Notes Indentures without the requisite written consent of the Existing Notes Holders or the Existing Notes Trustee under any Existing Notes Indenture. Except as set forth in this Section 10, neither the Existing Notes Holders nor the Existing Notes Trustees shall have any rights to approve any release, waiver, amendment, modification, charge, discharge or termination with respect to this Agreement.

SECTION 11.    Securities Act, etc.  In view of the position of the Pledgor in relation to the Pledged Securities, or because of other current or future circumstances, a question may arise under the Securities Act of 1933, as now or hereafter in effect, or any similar statute hereafter enacted analogous in purpose or effect (such Act and any such similar statute as from time to time in effect being called the "Federal Securities Laws") with respect to any disposition of the Pledged Securities permitted hereunder. The Pledgor understands that compliance with the Federal Securities Laws might very strictly limit the course of conduct of the Agent if the Agent were to attempt to dispose of all or any part of the Pledged Securities, and might also limit the extent to which or the manner in which any subsequent transferee of any Pledged Securities could dispose of the same. Similarly, there may be other legal restrictions or limitations affecting the Agent in any attempt to dispose of all or part of the Pledged Securities under applicable Blue Sky or other state securities laws or similar laws analogous in purpose or effect. The Pledgor recognizes that in light of such restrictions and limitations the Agent may, with respect to any sale of the Pledged Securities, limit the purchasers to those who will agree, among other things, to acquire such Pledged Securities for their own account, for investment, and not with a view to the distribution or resale thereof. The Pledgor acknowledges and agrees that in light of such restrictions and limitations, the Agent, in its sole and absolute discretion and in accordance with applicable law, (a) may proceed to make such a sale whether or not a registration statement for the purpose of registering such Pledged Securities or part thereof shall have been filed under the Federal Securities Laws and (b) may approach and negotiate with a single potential purchaser to effect such sale. The Pledgor acknowledges and agrees that any such sale might result in

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0521025

prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions. In the event of any such sale, the Agent shall incur no responsibility or liability for selling all or any part of the Pledged Securities at a price that the Agent, in its sole and absolute discretion, may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might have been realized if the sale were deferred until after registration as aforesaid or if more than a single purchaser were approached. The provisions of this Section 11 will apply notwithstanding the existence of a public or private market upon which the quotations or sales prices may exceed substantially the price at which the Agent sells.

SECTION 12.    [Reserved].

SECTION 13.    Security Interest Absolute. All rights of the Agent hereunder, the grant of a security interest in the Collateral and all obligations of the Pledgor hereunder, shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Loan Document, any Existing Notes Indenture, any agreement with respect to any of the Secured Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document, any Existing Notes Indenture or any other agreement or instrument relating to any of the foregoing, (c) any exchange, release or nonperfection of any other collateral, or any release or amendment or waiver of or consent to or departure from any guaranty, for all or any of the Secured Obligations or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Pledgor in respect of the Secured Obligations or in respect of this Agreement (other than the indefeasible payment in full of all the Secured Obligations).

SECTION 14.    Termination or Release.

(a)    This Agreement and the security interests granted hereby (including, without limitation, any security interests granted hereby for the benefit of the Existing Notes Holders and the Existing Notes Trustees) shall terminate with respect to the Credit Agreement, the other Loan Documents and the Agent and the Existing Notes Trustee and the Existing Notes Holders of any series of Existing Notes when all the Advances and the other Credit Agreement Obligations (other than contingent obligations for unasserted claims) shall have been paid in full, the Guarantee shall have been terminated, the Commitments have been terminated and no Letters of Credit shall be outstanding under the Credit Agreement or all outstanding Letters of Credit have been cash collateralized or secured by a back-up letter of credit.

(b)    If, at any time prior to the termination and release under clause (a) above, this Agreement and the security interests granted hereby shall terminate with respect the Existing Notes Trustee and the Existing Notes Holders of any series of Existing Notes when all Existing Notes Obligations under the applicable Existing Notes Indenture have been indefeasibly paid in full.

(c)    Upon any sale or other transfer by the Pledgor of any Collateral that is permitted under the Credit Agreement to any other person, or, upon the effectiveness of any written con-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0521026

sent to the release of the security interest granted hereby in any Collateral pursuant to Section 8.20(a) of the Credit Agreement, the security interest in such Collateral shall be automatically released.

(d) In connection with any termination or release pursuant to paragraph (a), (b) or (c), the Agent shall (i) promptly deliver to Pledgor all Collateral pledged to the Agent herein that is subject to such termination or release and (ii) execute and deliver to the Pledgor, at the Pledgor's expense, all documents that the Pledgor shall reasonably request from time to time to evidence such termination or release. Any execution and delivery of documents pursuant to this Section 14 shall be without recourse to or warranty by the Agent.

SECTION 15. Notices. All communications and notices hereunder shall (except as otherwise provided herein) be in writing and given as provided in Section 8.02 of the Credit Agreement or the applicable notice requirements under the applicable Existing Notes Indentures.

SECTION 16. Further Assurances. The Pledgor agrees to do such further acts and things, and to execute and deliver such additional conveyances, assignments, agreements and instruments, as the Agent may at any time reasonably request in connection with the administration and enforcement of this Agreement or with respect to the Collateral or any part thereof or in order better to assure and confirm unto the Agent its rights and remedies hereunder.

SECTION 17. Binding Effect; Several Agreement; Assignments. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Pledgor that are contained in this Agreement shall bind and inure to the benefit of its successors and assigns. This Agreement shall become effective as to the Pledgor when a counterpart hereof executed on behalf of the Pledgor shall have been delivered to the Agent and a counterpart hereof shall have been executed on behalf of the Agent, and thereafter shall be binding upon the Pledgor and the Agent and their respective successors and assigns, and shall inure to the benefit of the Pledgor, the Agent and the other Secured Parties, and their respective successors and assigns, except that the Pledgor shall not have the right to assign its rights hereunder or any interest herein or in the Collateral (and any such attempted assignment shall be void), except as expressly contemplated by this Agreement or the other Loan Documents.

SECTION 18. Severability.

In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 19. Governing Law. This agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0521027

SECTION 20.   Counterparts. This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute a single contract (subject to Section 17), and shall become effective as provided in Section 17. Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually executed counterpart of, this Agreement.

SECTION 21.   Rules of Interpretation. The rules of interpretation specified in Section 1.02 of the Credit Agreement shall be applicable to this Agreement. Section headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting this Agreement.

SECTION 22.   Jurisdiction; Consent to Service of Process.

(a) The Pledgor hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that, to the extent permitted by applicable law, all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Agent or any other Secured Party may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the Pledgor or its properties in the courts of any jurisdiction.

(b) The Pledgor hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 15. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 23.   WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0521028

(B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 24. Limitation of Agent's Responsibilities.

(a) The obligations of the Agent to the Existing Notes Holders and the Existing Notes Trustees hereunder shall be limited solely to (i) holding the Collateral for the ratable benefit of the Existing Notes Holders and the Existing Notes Trustees under each Existing Notes Indenture for so long as (A) any Existing Notes Obligations remain outstanding under such Existing Notes Indenture and (B) such Existing Notes Obligations are secured by the Collateral, (ii) solely to the extent instructed by the Required Lenders, enforcing the rights of the Existing Notes Holders in their capacity as Secured Parties in respect of the Collateral and (iii) distributing any proceeds received by the Agent from the sale, collection or realization of the Collateral to the Existing Notes Holders and the Existing Notes Trustees in respect of the Existing Notes Obligations in accordance with the terms of this Agreement. Neither the Existing Notes Holders nor the Existing Notes Trustees shall be entitled to exercise (or direct the Agent to exercise) any rights or remedies hereunder with respect to the Existing Notes Obligations, including without limitation the right to enforce the security interest in the Collateral, request any action, institute proceedings, give any instructions, make any election, make collections, sell or otherwise foreclose on any portion of the Collateral or execute any amendment, supplement, or acknowledgment hereof. This Agreement shall not create any liability of the Agent to the Secured Parties by reason of actions taken with respect to the creation, perfection or continuation of the security interest on the Collateral, actions with respect to the occurrence of an Event of Default, actions with respect to the foreclosure upon, sale, release, or depreciation of, or failure to realize upon, any of the Collateral or action with respect to the collection of any claim for all or any part of the Secured Obligations from any guarantor or any other party or the valuation, use or protection of the Collateral. By acceptance of any of the benefits under this Agreement, the Existing Notes Holders and each Existing Notes Trustee will be deemed to have acknowledged and agreed that the provisions of the preceding sentence are intended to induce the Lenders to permit such Persons to be Secured Parties under this Agreement and are being relied upon by the Lenders as consideration therefor.

(b) The Agent shall not be required to ascertain or inquire as to the performance by the Pledgor or any other obligor of the Existing Notes Obligations.

(c) The Agent may execute any of the powers granted under this Agreement and perform any duty hereunder either directly or by or through agents or attorneys-in-fact, and shall not be responsible for the gross negligence or willful misconduct of any agents or attorneys-in-fact selected by it with reasonable care and without gross negligence or willful misconduct.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0521029

(d) The Agent shall not be deemed to have actual, constructive, direct or indirect notice or knowledge of the occurrence of any Event of Default unless and until the Agent shall have received a notice of Event of Default or a notice from the Pledgor or the Secured Parties to the Agent in its capacity as Agent indicating that an Event of Default has occurred. The Agent shall have no obligation either prior to or after receiving such notice to inquire whether an Event of Default has, in fact, occurred and shall be entitled to rely conclusively, and shall be fully protected in so relying, on any notice so furnished to it.

(e) Notwithstanding anything to the contrary herein, nothing in this Agreement shall or shall be construed to (i) result in the security interest in the Collateral not securing the Existing Notes Obligations less than equally and ratably with the Credit Agreement Obligations pursuant to the Existing Notes Indentures to the extent required or (ii) modify or affect the rights of the Existing Notes Holders to receive the pro rata share specified in Section 7 of any proceeds of any collection or sale of Collateral.

(f) The parties hereto agree that the Existing Notes Obligations and the Credit Agreement Obligations are, and will be, equally and ratably secured with each other by the Liens on the Collateral, and that it is their intention to give full effect to the equal and ratable provision of the Existing Notes Indentures, as in effect on the date hereof. To the extent that the rights and benefits herein conferred on the Existing Notes Holders or the Existing Notes Trustees shall be held to exceed the rights and benefits required so to be conferred by such provisions, such rights and benefits shall be limited so as to provide such Existing Notes Holders and the Existing Notes Trustees only those rights and benefits that are required by such provisions. Any and all rights not herein expressly given to the Existing Notes Trustees are expressly reserved to the Agent and the Secured Parties other than the Existing Notes Holders and the Existing Notes Trustees.

SECTION 25.   Execution of Financing Statements. Pursuant to Section 9-402 of the Uniform Commercial Code as in effect in the State of New York or its equivalent in other jurisdictions, the Pledgor authorizes the Agent to file financing statements with respect to the Collateral owned by it without the signature of the Pledgor in such form and in such filing offices as the Agent reasonably determines appropriate to perfect the security interests of the Agent under this Agreement.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0521030

     IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**TRIBUNE COMPANY**

By: _____
Name: Chandler Bigelow
Title: Vice President & Treasurer

[pledge agreement]

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0521031

JPMORGAN CHASE BANK, N.A.,
as Agent

By: _____
Name: ROBERT ANASTASIO
Title: VICE PRESIDENT

[pledge agreement]

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0521032

Schedule I to the<br>Pledge Agreement

## CAPITAL STOCK

| Issuer | Sole Member | State of Formation | Percentage of Membership Interests |
|---|---|---|---|
| Tribune Broadcasting HoldCo, LLC | Tribune Company | Delaware | 100% |
| Tribune Finance, LLC | Tribune Company | Delaware | 100% |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0521033