2136201908

COPY

1  LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
2  DARREN J. ROBBINS (168593)
   RANDALL J. BARON (150796)
3  DAVID T. WISSBROECKER (243867)
   655 West Broadway, Suite 1900
4  San Diego, CA 92101
   Telephone: 619/231-1058
5  619/231-7423 (fax)

6  Attorneys for Plaintiff

7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    COUNTY OF LOS ANGELES

10

11 FRANK GARAMELLA, Derivatively On       )  VIA FAX
   Behalf of TRIBUNE COMPANY,             )
12                                        )  Case No.
              Plaintiff,                  )
13                                        )  CLASS AND DERIVATIVE ACTION
         vs.                              )
14                                        )  VERIFIED SHAREHOLDER CLASS AND
   DENNIS J. FITZSIMONS,                  )  DERIVATIVE COMPLAINT FOR BREACH
15 ENRIQUE HERNANDEZ, JR.,                )  OF FIDUCIARY DUTY, ABUSE OF
   BETSEY D. HOLDEN,                      )  CONTROL, GROSS MISMANAGEMENT
16 ROBERT S. MORRISON,                    )  AND CORPORATE WASTE
   WILLIAM A. OSBORN,                     )
17 J. CHRISTOPHER REYES,                  )
   DUDLEY S. TAFT,                        )
18 MILES D. WHITE,                        )
   JEFFREY CHANDLER,                      )
19 ROGER GOODAN                           )
   WILLIAM STINEHART, JR., and            )
20 DOES 1-25, inclusive,                  )
                                          )
21            Defendants,                 )
                                          )
22      — and —                           )
                                          )
23 TRIBUNE COMPANY, a Delaware            )
   corporation,                           )
24                                        )
              Nominal Defendant.          )  DEMAND FOR JURY TRIAL
25 _____)

26

27

28

         VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

BC362110  BY FAX

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

NOV 17 2006

John A. Clark, Executive Officer/Clerk
By _____, Deputy

## INTRODUCTION

1. This is a shareholder class and derivative action brought by plaintiff on behalf of the Tribune Company ("Tribune" or the "Company") and its public shareholders  Plaintiff brings this action against Tribune's directors arising out of their ongoing breaches of fiduciary duty in attempting to entrench themselves and Company management, and their steadfast refusal to act reasonably or in good faith in response to repeated opportunities to maximize shareholder value.  Such actions are improper, unfair and are continuing to harm Tribune and its public shareholders.

2. In refusing to act in good faith and in accordance with the fiduciary duties owed to Tribune and its public shareholders. the Company's management and Tribune's Board of Directors (the "Board"), named as defendants herein. each violated applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing.

3. Instead of pursuing a course of action that would benefit the Company, defendants have entrenched themselves by, among other things, saddling Tribune with a risky and costly share repurchase program, the purpose of which is to dispose of Tribune's cash while making the Company less attractive to potential acquirers so that defendants can maintain their dominion and control over Tribune's corporate machinery.  The share repurchase program was designed to and did cause the Company to: (i) consume the vast majority of the Company's cash on hand; and (ii) be furthered crippled and appear less attractive to potential purchasers by adding $2.4 billion of debt to Tribune's balance sheet  Thus the share repurchase plan was designed to and has had the effect of creating a defensive barrier. or an "anti-takeover" hurdle, akin to a "suicide pill," that significantly decreases the likelihood that any potential acquirer will make an offer for the Company.

4. After completing the share repurchase program, defendants continue to refuse to respond in good faith to potential business combinations that will enhance shareholder value.  Although the

- 1 -
VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1  Board has purportedly undertaken an examination of strategic alternatives, such undertaking has proved

2  to be only a ploy to temporarily placate shareholders outraged with defendants' entrenchment conduct.

3  And, although the Board has purportedly embarked on a process to sell the Company, such process has

4  not been tailored towards actually finding a buyer for the Company.

5

6      5.      Indeed, the Board has rejected out-of-hand several preliminary offers by private equity

7  buyout groups, informing interested bidders that the Company has decided to change course and solicit

8  bids for individual sales of the Company's assets, as opposed to a sale of the Company as a whole.

9      6.      Most recently, the Board has failed to consider in good faith an offer for the entire

10  Company made jointly by investors Eli Broad and Ronald Burkle  The Board has already rejected these

11  two bidders once, on July 31, 2006, when it was reported that defendants had unequivocally rebuffed

12  offers from Broad, Burkle, and David Geffen to purchase the *Los Angeles Times* from Tribune at a

13  substantial premium.

14

15      7.      The share repurchase program and defendants' out-of-hand rejections of potential value-

16  maximizing strategic alternatives are just the latest in a long list of entrenchment barriers defendants

17  have erected to entrench themselves by dissuading potential offers for the Company.[1]  Even before

18  defendants wasted Company cash and saddled the Company with an additional $2.4 million in debt

19  pursuant to the share repurchase program, the combined effect of the Company's draconian defensive

20  measures was so preclusive of a successful acquisition of the Company that the Internet Web site

21

22

23  [1]    In addition to the share repurchase program, the Company has the following defensive measures in place: (1) a "poison pill" that precludes any potential acquirer from accumulating more than 10% of

24  the Company's outstanding shares or announcing an intention to accumulate more than 10% of the Company's shares; (2) a staggered board; (3) a supermajority vote provision that requires approval of

25  two-thirds of the Company's shareholders for a merger with an entity holding 10% or more of the Company's shares; (4) no shareholder action outside of a meeting without unanimous written consent;

26  and (5) the inability of shareholders to call a special meeting. Moreover, the Company has not opted out of Del. Corp. Code §203, which prevents a shareholder who owns more than 15% of the Company's

27  shares from entering into a business combination with the Company for a period of three years after the shareholder crosses the 15% threshold level, unless certain onerous conditions are met

28

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

www.sharkrepellant.net rated the Company's takeover defenses a "9.5" on a scale of 1 to 10, with 10 being the most onerous.  After the share repurchase program, the Company has no doubt earned a perfect "10" on the entrenchment scale

8.     Defendants have held and are holding the Company and its shareholders hostage by continuing to employ the panoply of defensive measures detailed herein and refusing to act in good faith to maximize Company and shareholder value   Defendants have instead erected draconian defensive barriers that prevent any potential acquirer from, among other things, attempting to buy the Company directly from shareholders.

9.     The law imposes upon defendants the obligation to act in the best interests of Tribune and its public stockholders and ensure that no conflicts of interest exist between defendants' own interests and their fiduciary obligation to act in good faith.  Defendants must immediately terminate their refusal to protect and advance the interests of Tribune and its public shareholders, to whom the defendants owe the highest duty known to the law, by, among other things: (i) redeeming the poison pill; (ii) declassifying the staggered board; (iii) rescinding the remaining preclusive defensive measures; and (iv) providing shareholders with a fair process by undertaking a good faith examination of the strategic alternatives available to the Company and taking decisive action to maximize Company and shareholder value.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over defendants because they conduct business in California, are citizens of California, and/or have engaged in conduct that has had a substantial impact on California.

11.     (a)     Venue is proper in this Court because a substantial amount of the misconduct at issue in this case took place and/or had an effect in this County.

- 3 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1    (b)    One of Tribune's principal businesses is the *Los Angeles Times* daily newspaper,

2    which business is located at 202 West First Street, Los Angeles, California, and defendants Jeffrey

3    Chandler, Enrique Hernandez, Jr. and William Stinehart, Jr. are residents and citizens of California

4    **PARTIES AND OTHER ENTITIES**

5    12.    Plaintiff Frank Garamella is, and at all times relevant hereto was, a shareholder of

6    Tribune

7    13.    Nominal party Tribune is incorporated under the laws of Delaware  Tribune is engaged

8    in newspaper publishing, television and radio broadcasting and entertainment

9

10    14.    Defendant Dennis J FitzSimons ("FitzSimons") is President and Chief Executive Officer

11    ("CEO") of Tribune and the Chairman of its Board of Directors  FitzSimons has been President since

12    2001, CEO since 2003, and Chairman since 2004. Previously, FitzSimons served as Chief Operating

13    Officer, from July 2001 until December 2002, Executive Vice President from January 2000 until July

14    2001, and as President of Tribune Broadcasting Company, a subsidiary of Tribune Company, from May

15    1997 until January 2003. FitzSimons has been a director since 2000. FitzSimons is also Chairman of

16    the Board's Executive Committee. FitzSimons received $950,385 in salary in 2005 alone. That same

17
     year, FitzSimons was also given 200,000 stock options valued at $2,101,900, a $250,000 bonus, a
18
     contribution to his 401(k) of $85,535, and other perquisites valued at $72,180. By virtue of his high-
19
20    ranking positions within Tribune, FitzSimons effectively controls the Robert R McCormick Tribune

21    Foundation, one of Tribune's largest shareholders. FitzSimons has longstanding personal, social and

22    financial relationships with several of the defendants which preclude him from objectively considering

23    a demand to take action against his fellow board members. For example, FitzSimons sits on the boards

24
     of several charitable institutions with the remaining defendants, as set forth below:
25
26    (a)    FitzSimons sits on the board of the Museum of Science and Industry with

27    defendants Betsy D Holden ("Holden"), Robert S. Morrison ("Morrison"), William A. Osborn

28    ("Osborn"), J. Christopher Reyes ("Reyes") and Miles D. White ("White");

- 4 -

        (b)    FitzSimons sits on the Civic Committee with defendants Osborn, Reyes and White;

        (c)    FitzSimons sits on the board of Northwestern University with defendants Osborn and White;

        (d)    FitzSimons sits on the board of the Off the Street Club with defendant Holden; and

        (e)    FitzSimons sits on the board of the United Way with Osborn.

15.    Defendant Enrique Hernandez Jr. ("Hernandez") is a citizen of California. Hernandez has been a director since 2001, serves as Chairman of the Board's Nominating and Governance Committee, and is a member of the Board's Compensation and Organization Committee. For Board service, Hernandez receives annual compensation of $150,000 in cash and stock, or $16,667 per board meeting, which equates to several thousand dollars per hour. Hernandez has longstanding personal, social and financial relationships with several of the defendants which preclude him from objectively considering a demand to take action against his fellow board members. Hernandez also receives $10,000 for serving as the Chairman of the Nominating and Governance Committee. Hernandez is currently the CEO of Inter-Con Security Systems Inc., and is thus pre-conditioned to side with Company management, a proclivity he has demonstrated by supporting any and all initiatives advanced by Company management.

16    Defendant Betsey D. Holden ("Holden") has been a director since 2002, and is a member of the Board's Audit Committee. For Board service, Holden receives annual compensation of more than $150,000 in cash and stock, or $16,667 per board meeting, which equates to several thousand dollars per hour. Holden also receives $6,000 for serving on the Board's Audit Committee. Holden has longstanding personal, social and financial relationships with several of the defendants which preclude her from objectively considering a demand to take action against her fellow board members. For

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

example, Holden serves with defendants FitzSimons, Morrison, Osborn, Reyes and White on the board of the Museum of Science and Industry, and with defendant FitzSimons on the board of the Off the Street Club. In 2003, the Tribune Foundation, which is controlled by FitzSimons, donated $200,000 to the Off the Street Club  Holden is formerly the Co-CEO of Kraft Foods. Inc., and is thus pre-conditioned to side with Company management, a proclivity she has demonstrated by supporting any and all initiatives advanced by Company management.

17.    Defendant Robert S. Morrison ("Morrison") has been a board member since 2001, serves as Chairman of the Board's Compensation and Organization Committee, and is a member of the Board's Nominating and Governance Committee and Executive Committee  For Board service, Morrison receives annual compensation of more than $150,000 in cash and stock, or $16,667 per board meeting, which equates to several thousand dollars per hour.  Morrison also receives $10,000 for serving as the Chairman of the Compensation and Organization Committee  Morrison has longstanding personal, social and financial relationships with several of the defendants which preclude him from objectively considering a demand to take action against his fellow board members  For example, Morrison serves with defendants FitzSimons, Holden, Osborn, Reyes and White on the Board of the Museum of Science and Industry. Morrison is formerly the CEO of Quaker Oats Co., and is thus pre-conditioned to side with Company management, a proclivity he has demonstrated by supporting any and all initiatives advanced by Company management.

18.    Defendant William A. Osborn ("Osborn") has been a director since 2001, serves as Chairman of the Board's Audit Committee and is a member of the Board's Executive Committee. For Board service, Osborn receives annual compensation of more than $150,000 in cash and stock, or $16,667 per board meeting. which equates to several thousand dollars per hour.  Osborn also receives $15,000 a year for serving as the Chairman of the Audit Committee. Osborn is also Chairman and CEO of Northern Trust Corporation. which has benefited through Osborn's affiliation with Tribune, receiving

- 6 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

$710,449 for trust and custody services, cash management and related services, and bank credit facility fees in 2005 from Tribune. In addition, effective January 1, 2006, Tribune retained The Northern Trust Company, the principal subsidiary of Northern Trust Corporation, as the trustee of each of Tribune's 401(k) savings plans. All told, in the time since Osborn has been a director of Tribune, the Company has paid Northern Trust $3.4 million in fees. Because of the numerous business relationships between Tribune and Northern Trust, the Corporate Library has classified Osborn as an "outside related" director. Based on his resume, Osborn is allied with FitzSimons, because like FitzSimons, he himself heads a conservative Chicago business institution, Northern Trust, and is thus pre-conditioned to side with Company management, a proclivity he has demonstrated by supporting any and all initiatives advanced by Company management. Osborn has longstanding personal, social and financial relationships with several of the defendants which preclude him from objectively considering a demand to take action against his fellow board members. For example, Osborn sits on the boards of various non-profit institutions with his fellow defendants:

    (a)   Osborn serves with defendants FitzSimons, Holden, Morrison, Reyes and White on the board of the Museum of Science and Industry;

    (b)   Osborn serves with defendants FitzSimons, Reyes and White on the Civic Committee;

    (c)   Osborn serves with defendants FitzSimons and White on the board of Northwestern University; and

    (d)   Osborn serves with defendant FitzSimons on the board of the United Way.

19.   Defendant J. Christopher Reyes ("Reyes") has been a board member since 2005, and serves on the Board's Compensation and Organization Committee and Nominating and Governance Committee. For Board service, Reyes receives annual compensation of more than $150,000 in cash and stock, or $16,667 per board meeting, which equates to several thousand dollars per hour. Reyes has

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

longstanding personal, social and financial relationships with several of the defendants which preclude him from objectively considering a demand to take action against his fellow board members.  For example, Reyes serves with defendants FitzSimons, Holden, Morrison, Osborn and White on the board of the Museum of Science and Industry, and with defendants FitzSimons, White and Osborn on the Civic Committee. Reyes is currently Chairman of Reyes Holdings, LLC, and is thus pre-conditioned to side with Company management, a proclivity he has demonstrated by supporting any and all initiatives advanced by Company management.

20     Defendant Dudley S. Taft ("Taft") has been a board member since 1996, and serves on the Board's Audit Committee.  For Board service, Taft receives annual compensation of more than $150,000 in cash and stock, or $16,667 per board meeting, which equates to several thousand dollars per hour.  Taft also receives $6,000 a year for serving on the Audit Committee  Taft has longstanding personal, social and financial relationships with several of the defendants which preclude him from objectively considering a demand to take action against his fellow board members. Taft is the President of Taft Broadcasting Co., and is thus pre-conditioned to side with Company management, a proclivity he has demonstrated by supporting any and all initiatives advanced by Company management.  Taft also had and continues to have direct business connections with Tribune, to which he sold a television station.

21.     Defendant Miles D. White ("White") has been a director since 2005, and serves on the Board's Compensation and Organization Committee.  For Board service, White receives annual compensation of more than $150,000 in cash and stock, or $16,667 per board meeting, which equates to several thousand dollars per hour.  White has longstanding personal, social and financial relationships with several of the defendants which preclude him from objectively considering a demand to take action against his fellow board members.  For example, White serves with defendants FitzSimons, Holden, Morrison, Osborn and Reyes on the board of the Museum of Science and Industry, with defendants

- 8 -

FitzSimons, Osborn and Reyes on the Civic Committee, and with defendants FitzSimons and Osborn on the board of Northwestern University.   White is CEO of Abbot Laboratories, and is thus pre-conditioned to side with Company management, a proclivity he has demonstrated by supporting any and all initiatives advanced by Company management.

22      Defendant Jeffrey Chandler ("Chandler") is a citizen of California. Chandler has been a director since 2000, and is a member of the Board's Compensation & Organization Committee  For Board service, Chandler receives annual compensation of $150,000 in cash and stock, or $16,667 per board meeting, which equates to several thousand dollars per hour.  Chandler has longstanding personal, social and financial relationships with several of the defendants which preclude him from objectively considering a demand to take action against his fellow board members.

23      Defendant Roger Goodan ("Goodan") has been a director since 2000, and is a member of the Board's Nominating & Corporate Governance Committee.  For Board service, Goodan receives annual compensation of $150,000 in cash and stock, or $16,667 per board meeting, which equates to several thousand dollars per hour   Goodan has longstanding personal, social and financial relationships with several of the defendants which preclude him from objectively considering a demand to take action against his fellow board members.

24      Defendant William Stinehart, Jr. ("Stinehart") is a citizen of California  Stinehart has been a director since 2000, and is a member of the Board's Nominating & Governance Committee and Executive Committee. For Board service, Stinehart receives annual compensation of $150,000 in cash and stock, or $16,667 per board meeting, which equates to several thousand dollars per hour.  Stinehart has longstanding personal, social and financial relationships with several of the defendants which preclude him from objectively considering a demand to take action against his fellow board members.

25      The defendants named above in ¶¶14-24 are sometimes collectively referred to as the "Individual Defendants."

- 9 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

26.     The true names and capacities of defendants sued herein under California Code of Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiff, who therefore sues these defendants by such fictitious names  Plaintiff will seek to amend this Complaint and include these Doe defendants' true names and capacities when they are ascertained  Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by the Class

## DEFENDANTS' FIDUCIARY DUTIES

27.     By reason of the defendants' positions with the Company as officers and/or directors, said individuals owe fiduciary duties to Tribune and its public stockholders including duties of good faith, fair dealing, loyalty and full, candid and adequate disclosure.

28.     As corporate directors, defendants are required to act in good faith, in the best interests of the corporation's shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person. In a situation where the Company is presented with potential value-maximizing strategic alternatives, directors are required to take all steps reasonably required to properly evaluate such alternatives and choose the alternative that is in the best interests of the Company and its shareholders. To diligently comply with this duty, the directors of a corporation may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     contractually prohibits the directors from complying with or carrying out their fiduciary duties;

(c)     discourages or inhibits offers to purchase the corporation or its assets; or

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders.

- 10 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

29.     In accordance with their duties of loyalty and good faith. the defendants, as directors and/or officers of Tribune. are obligated to refrain from:

(a)     participating in any act or transaction where the directors' or officers' loyalties are divided;

(b)     using their positions of control to harm Tribune or extract personal financial benefits not equally shared by the public shareholders of the corporation;

(c)     unjustly entrenching or enriching themselves at the expense or to the detriment of Tribune's public shareholders; and/or

(d)     unjustly entrenching themselves as managers and/or officers of the Company by failing to give good faith consideration to potential value-maximizing alternatives for the Company and its shareholders.

30.     The defendants, separately and together. have violated the fiduciary duties owed to plaintiff and the other public shareholders of Tribune, including their duties of loyalty, good faith, candor and independence, insofar as they have refused to give good faith consideration to value-maximizing opportunities for the Company, including; (i) a tax-free spin-off. (ii) a divestiture of certain Company assets; or (iii) a sale of the entire Company. Defendants have been steadfast in their refusal to consider any of these alternatives in good faith and instead have chosen to impair the Company and make it much less attractive to a potential acquirer by undertaking the share repurchase program that has consumed Company cash and caused the Company to take on an additional $2 4 billion in debt

31.     As a result of their failure to consider these alternatives in good faith, the defendants, as a matter of law. have breached their fiduciary duties of good faith and fair dealing owed to the Company and its shareholders.

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

## CLASS ALLEGATIONS

32.     Plaintiff brings this action on his own behalf and as a class action pursuant to Cal. Code Civ P. §382 on behalf of all holders of Tribune stock who are being and will be harmed by defendants' actions described below (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any defendant.

33.     This action is properly maintainable as a class action

34.     The Class is so numerous that joinder of all members is impracticable. According to Tribune's SEC filings, there are more than 245 million shares of Tribune common stock outstanding.

35.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)     whether defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to plaintiff and the other members of the Class as a result of their repeated rejection of and failure to consider in good faith value-maximizing alternatives for the Company and their entrenchment and/or maintenance of entrenchment devices;

(b)     whether defendants are attempting to entrench themselves in order to preserve their lucrative and prestigious positions at the expense of maximizing shareholder value by, among other things, failing to give reasonable and good faith consideration to value-maximizing alternatives for the Company and their entrenchment and/or maintenance of entrenchment devices;

(c)     whether defendants have breached their fiduciary duties by entrenching themselves as officers and/or directors of the Company and/or attempting to use their control over Tribune's operations to extract personal benefits for themselves;

(d)     whether defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with their rejection and refusal to consider in good

- 12 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

faith value-maximizing alternatives for the Company and their entrenchment and/or maintenance of entrenchment devices, including the duties of good faith, diligence, candor and fair dealing; and

(e) whether defendants, in bad faith or for improper motives, have taken steps to impair the Company to make it less attractive to potential acquirers or otherwise erected barriers to impede or discourage offers for the Company or its assets.

36. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class

37. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

38. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

39. Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy

40. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole

## DERIVATIVE ALLEGATIONS

41. Plaintiff brings this action, under California Corporations Code §800. derivatively in the right and for the benefit of Tribune to redress injuries that have been suffered and are continuing to be suffered by Tribune as a direct result of the defendants' violations of law. Tribune is named as a nominal party in this derivative action solely in a derivative capacity.

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

42.     Plaintiff has delivered to the Company and the Board a true copy of this Complaint prior to filing.

43.     Plaintiff will adequately and fairly represent the interests of Tribune in enforcing and prosecuting its rights, and has retained counsel experienced and competent in litigating complex actions and shareholder litigation.

44.     Plaintiff is an owner of Tribune stock and was an owner of Tribune stock during times relevant to defendants' illegal and wrongful course of conduct alleged herein.

45.     Any demand made by plaintiff to the Tribune Board to institute this action is excused. Based on all the allegations in this Complaint and defendants' actions to date, including their repeated acts of entrenchment, including refusal to protect the interests of Tribune and its shareholders by responding in good faith to value-maximizing alternatives for the Company, such demand would be a futile and useless act. The Board consists of eleven directors, all of whom are defendants to the action. These defendants maintain complete voting control over any decisions required to be made by the Board, including any action to be taken in response to a demand made by shareholders. Each of the members of the Board have directly participated in the wrongs complained of herein, which disables them from acting independently, objectively or in good faith to advance the interests of Tribune or respond to a demand by shareholders. The Board and senior management are not disinterested or independent as detailed herein and set forth below:

(a)     Each of the defendants served on the Tribune Board during the relevant period and as board members each was charged with oversight and operation of the Company and the conduct of its business affairs. Each of the defendants has breached the fiduciary duties owed to Tribune and its shareholders by, among other things, failing to take reasonable steps to maximize shareholder value and failing to consider in good faith value-maximizing alternatives for the Company.

- 14 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

(b)     Instead of responding in good faith to offers to purchase Tribune, management and the Board acted to protect and promote their personal interests and ensure themselves ongoing control over Tribune and thereby ensure their continued ability to receive the benefits of their positions as senior insiders and/or directors of Tribune

(c)     Each of the defendants has acted to ensure he or she continues to receive the substantial financial benefits and perquisites provided to them as directors of Tribune. For example, those defendants who served on the Board in 2005 received compensation for serving as Tribune directors at an annual rate of more than $150,000 a year. The Tribune Board met only 9 times in 2005, which means that each defendant was compensated an average of $16,667, or several thousand dollars per hour for each meeting attended. Defendant FitzSimons received more than $3 million in salary and benefits in 2005 alone.

(d)     Even though certain defendants claim to be independent directors because they are not directly employed by the Company, none of these defendants are truly independent because they are all part of Chicago's tight-knit business community. A majority of defendants are senior members of the business community in Chicago, and often sit on the same civic committees and attend the same social events. For instance, defendants FitzSimons, Holden, Morrison, Osborn, Reyes and White all serve together on the board of the Museum of Science and Industry, defendants Osborn, Reyes, White and FitzSimons sit together on the Civic Committee, and defendants Osborn, White and FitzSimons sit together on the board of Northwestern University. Moreover, Chicago boards are well-known for their solidarity and insular nature, and the Board consists entirely of current or former CEO's of corporations that have demonstrated their alignment with Company management by supporting each and every course of action favored by Company management.

(e)     Because the Board has taken defensive measures to fend off potential offers to purchase the Company, the Board's defensive actions are subject to enhanced judicial scrutiny because

- 15 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

of the omnipresent specter that the Board may be acting in its own interests rather than the interests of the Company and its shareholders.

(f)  In taking unreasonable defensive measures, the Board demonstrated that their primary purpose in doing so was to retain control of the Company. Under such circumstances, there is more than reasonable doubt as to the disinterestedness and independence of the Board, thus making demand futile.

(g)  As more fully detailed herein, the Board participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Tribune's shareholders or recklessly and/or negligently disregarded the wrongs complained of herein  Its members are, therefore, not disinterested parties.

46.  The defendants named herein have not exercised and cannot exercise independent or objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of the Board members has participated in and/or acquiesced to the misconduct alleged herein.

47.  The members of the Board have demonstrated their unwillingness to act in compliance with federal or state law or sue themselves and/or their fellow directors and allies in the top ranks of the corporation for failure to do so, as they have developed professional relationships with their fellow board members who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action

48  Tribune's senior insiders and directors named as defendants herein have shown their interests to be antagonistic to Tribune and this lawsuit as they have refused to consider in good faith options to maximize shareholder value for Tribune and its shareholders.  The members of the Board have not and will not authorize a suit against themselves as such a suit would require these defendants to expose themselves to a huge personal liability to Tribune *in excess of $750 million*, as, due to the

particular language of currently utilized directors' and officers' liability insurance policies (*i.e*, the insured vs. insured exclusion), such an action would not be an insured claim

49.    The underlying misconduct of defendants is not a product of a valid exercise of business judgment, and can not be properly ratified by the Board.

## DEFENDANTS' DEFENSIVE ENTRENCHMENT MEASURES

**Poison Pill**

50    Tribune has a poison pill that contains a flip-in provision that entitles shareholders to purchase additional shares of the Company's stock at a nominal price in the event that one entity obtains more than 10% of the Company's outstanding stock, or announces an intention to accumulate more than 10% of the Company's shares  If a potential acquirer attempted to purchase 10% or more of the Company's outstanding stock, or announced an intention to purchase 10% or more of the Company's outstanding stock, the poison pill would be triggered and the price to purchase the entire Company would become exorbitant  The poison pill also contains a provision that grants shareholders the right to purchase shares of an acquiring entity's stock at a nominal price if a merger is actually consummated and Tribune does not survive (the "flip-over" provision).  If the flip-over provision is triggered, the capital structure of an acquiring entity would be significantly impaired, and the interest of its stockholders drastically diluted.   Only the Tribune Board, which consists of defendants named herein, has the power and authority to redeem the poison pill, and has demonstrated a refusal to do so. Thus, the existence of the poison pill is an unyielding impediment to a hostile takeover attempt by any other interested third party. and forces potential acquirers to either persuade the Board to negotiate a "friendly" merger or seek to take control of the Company through a proxy fight

**Staggered Board**

51. .   Defendants have also caused the Company to provide for a staggered board of directors in the Company's Certificate of Incorporation.  The Company's staggered board is an additional entrenchment measure that makes it almost impossible for any potential acquirer to take control of the

- 17 -
VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

Company, even by waging a proxy fight. The staggered board provision allows defendants to protect two-thirds of the Board from having to stand for re-election by shareholders each year. In order to take over the Board via a proxy fight, a potential acquirer must therefore win two consecutive shareholder elections, a feat too costly for any would-be acquirer to realistically accomplish. In addition, the Articles of Incorporation set forth that no director may be removed for cause, and that the staggered board provision may not be altered without a supermajority vote of at least 80% of all shareholders. Such a staggered board is known in takeover parlance as an "Effective Staggered Board" ("ESB"), because shareholders lack the effective power to terminate its existence. Moreover, defendants have imposed additional entrenchment mechanisms, including a Certificate of Incorporation and Company by-laws designed to provide that defendants may increase the size of the Board without shareholder approval, and that only defendants may fill vacancies on the Board.

52.    Barred from any realistic opportunity to wage a successful proxy fight for control of the Board, no would-be acquirer could ever cause the Board to redeem the poison pill. The combination of the ESB and the poison pill creates a draconian defensive barrier that precludes any attempt to purchase the Company. With these measures in place, no proposal to purchase the Company can be successful without defendants' approval. Defendants are improperly and unreasonably using the poison pill and the ESB to block and frustrate any attempts to acquire control of the Company, and to further entrench themselves as officers and/or directors of the Company.

**Additional Entrenchment Devices**

53.    In addition to the poison pill and the ESB, defendants have put in place a number of other obstacles that prevent any potential acquirer from acquiring the Company without defendants' approval, which will not be forthcoming because defendants intend to rebuff and refuse to negotiate with any potential acquirer. Defendants are also entrenching themselves through the use of:

- 18 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

(a)     a supermajority vote provision that is a preclusive, unjustified impairment of Tribune shareholders' right to vote in favor of a potential acquisition because it requires approval of two-thirds of the Company's shareholders for a merger with an entity holding 10% or more of the Company's shares;

(b)     a bar on shareholder action outside of a meeting without unanimous written consent, a measure by which the entrenched defendants maintain control over the ballot box;

(c)     a bar on shareholders calling a special meeting, which prevents potential acquirers from directly soliciting shareholders to oust defendants from the boardroom outside of the context of the Company's annual meeting.

54.     In engaging in the share repurchase program, defendants have erected another defensive barrier to a potential acquirer attempting an acquisition. By reducing the amount of shares outstanding, defendants have proportionately increased the strength of their own stockholdings and those of stockholders they control or are aligned with. In doing so, defendants have aggrandized their ability to block any acquisition by virtue of the proportionately increased voting strength of the shares they control.

55.     Furthermore, defendants have made the Company substantially less attractive to potential acquirers by increasing the cost of acquisition and decreasing the available equity to finance a transaction by using all available Company cash on hand to complete the share repurchase program, and correspondingly swelling the Company's debt by over $2.4 billion dollars. Such "suicide pill" measures were instituted for the sole purpose of perpetuating defendants' control over the Company, and in doing so defendants have significantly decreased the value of the Company and the holdings of its public shareholders. Such actions are taken in breach of defendants' fiduciary duties of loyalty, good faith, due care and candor.

- 19 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

56    Even before defendants undertook the share repurchase program, the combined effect of the Company's draconian defensive measures was so preclusive that the Internet Web site www.sharkrepellant.net rated the Company's takeover defenses an incredible "9.5" on a scale of 1 to 10. After the share repurchase program, defendants have no doubt now earned the Company a perfect "10" for its "bulletproof" rating

57.    Defendants' chosen combination of defensive measures prevents any potential acquirer from, among other things, attempting to buy the Company directly from shareholders. Defendants have held and are holding the Company and its shareholders hostage for the benefit of defendants and management.

## BACKGROUND

58.    Tribune is a media and entertainment company that, through its subsidiaries, is engaged in newspaper publishing, television and radio broadcasting and entertainment. The Company was founded in 1847, and incorporated in Illinois in 1861. As a result of corporate restructuring in 1968, the Company became a holding company incorporated in Delaware.

59.    Tribune's primary line of business is publishing, which represented 73% of its operating revenues in 2005. The Company's primary daily newspapers are the *Los Angeles Times*, *Chicago Tribune*, *Newsday*, *South Florida Sun-Sentinel*, *The Baltimore Sun*, *Orlando Sentinel*, *The Hartford Courant*, *The Morning Call*, *Daily Press*, *The Advocate* and *Greenwich Time*.

60    The Chandler family founded the *Los Angeles Times* in 1881. The Chandler family owned the *Los Angeles Times* and its parent company, Times Mirror Co., until 2000, when Tribune completed an $8.3 billion merger with Times Mirror ("Times Mirror Merger"). As part of the Times Mirror Merger, the Company gained ownership of not just the *Los Angeles Times*, but also *Newsday*, *The Baltimore Sun*, *The Hartford Courant*, *The Morning Call*, *Daily Press*, *The Advocate* and *Greenwich Time*.

- 20 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

61    The Times Mirror Merger also resulted in the Chandler family becoming a 12% shareholder of the Company, and being awarded three seats on the Tribune Board. The current members of the Board who represent the Chandler family interests at Tribune are defendants Chandler, Goodan and Stinehart

62    Tribune also has significant interests in television and radio broadcasting, including ownership of numerous affiliate of the WB Television Network (the "WB"), several Fox Network Television affiliates, and an ABC television affiliate in New Orleans, the Chicago Cubs baseball team, the WGN-AM radio station in Chicago, and Tribune Entertainment, a company that distributes its own programming licensed from third parties.

63.    The Company's foray into television with the WB has been less than successful. In the Fall of 2006, the WB was shut down, and Tribune affiliated most of its former WB stations with a new network, the CW Network. As a result of the WB's failure, Tribune will be forced to write off approximately $15 million before taxes.

64.    On May 30, 2006, defendants caused the Company to announce that defendants had authorized the repurchase of up to 53 million shares of the Company's common stock in a modified "Dutch Auction" tender offer. The share repurchase plan also included a purchase of an additional 10 million shares from the McCormick Tribune Foundation and Cantigny Foundation, the Company's largest shareholder, holding 13.6% of the Company's outstanding shares. Defendants stated their intention to cause the Company to follow up the tender offer with a purchase of up to 12 million additional shares on the open market.

65.    After defendants' announcement of the share repurchase plan, Moody's Investors Service cut the Company's bond rating to "junk" status because of the amount of debt the plan will cause the Company to undertake

- 21 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

66    On June 13, 2006. the Board received a letter written on behalf of the Chandler Trusts.
which represent the economic interests of the Chandler family in Tribune (the "Chandler Trust Letter").
The Chandler Trust Letter publicly proposed alternatives to the share repurchase program that the Board
had been asked to consider in non-public board meetings prior to adoption of the share repurchase
program. The Chandler Trust Letter revealed that *the Company had received "inquiries" "from very
credible private equity firms" regarding a possible leveraged buyout of the Company that "could be
accomplished at a price in excess of $35 a share*," an option that defendants had refused to consider
before embarking on the costly and risky share repurchase program.

67.   The Chandler Trust Letter described the process by which the share repurchase program
was adopted as "fundamentally flawed." and deemed the share repurchase program "a purely financial
device that fails altogether to address the real business issues facing Tribune." The Chandler Trust
Letter decried the Board's non-existent deliberative process in considering the share repurchase
program:

> *We believe management and its advisors created a false sense of urgency in
> representing to directors that immediate action was required on the self-tender
> transaction. As a result, the Board's action was hasty and ill-informed. Tactical
> alternatives were superficially listed and dismissed without addressing the failure of
> the company's fundamental strategy or its poor performance. Prudence should have
> required that management first determine a cogent and realistic strategy for restoring
> the value of Tribune's businesses and assets prior to creating a financial structure
> that limits strategic options*

68.   The Chandler Trust Letter noted that "Tribune has significantly underperformed industry
averages and there is scant evidence to suggest the next two years will be any different." The Chandler
Trust Letter described how Tribune's stock has declined 38% since the beginning of 2003, when current
management was put in place – "substantially worse than both the newspaper peer group (down 8.8%)
and the broadcasting peer group (down 29.0%)." and demonstrated how management had failed to
maximize value for shareholders' equity by delineating; (i) "a sum-of-the-parts analysis" from Morgan
Stanley and Bear Stearns that "suggest[s] a breakup value of $42 per share" or a 50% premium over the

- 22 -

pre-share repurchase price of $28 per share. and the same analysis from Prudential that "pegg[ed] the value at $43 per share"; and (ii) a breakup analysis from "Ariel Capital, one of Tribune's biggest stockholders." that showed the Company "would be worth $44 to $46 per share in a breakup involving a subsequent sale of the parts."

69.    The Chandler Trust Letter demanded that the Management Directors undertake, in good faith, certain steps to maximize shareholder value, including: (i) implementing a "tax-free spin-off" involving a "major private equity firm to make a significant investment in the television company and act as its 'sponsor'"; (ii) exploring "other strategic alternatives. including breaking up and selling. or disposing in tax-free spin-offs, some or all of its newspaper properties," or alternatively, "the possibility of an acquisition of Tribune as a whole at an attractive premium"; and (iii) appointing "a committee of independent directors as soon as possible to oversee a thorough review and evaluation of the management, business and strategic issues facing Tribune and to promptly execute alternatives to restore and enhance stockholder value."

70.    The Chandler Trust Letter noted in closing that if defendants did not act quickly, the Chandler Trusts "intend to begin actively pursing possible changes in Tribune's management and other transactions to enhance the value realized by all Tribune stockholders by engaging with other stockholders and other parties."

71.    Defendants demonstrated that their main design was entrenchment in a response to the Chandler Trusts, in a letter dated June 15, 2006, in which they defended their decision to side with Company management and undertake the share repurchase program as an additional defensive measure to make the Company less attractive to potential acquirers

72.    On June 30, 2006, defendants announced that the Company had completed the share repurchase plan. Via the share repurchase plan defendants were able to significantly reduce public holdings in the Company, repurchasing nearly 45 million shares.

- 23 -
VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

73.  The share repurchase plan was not a complete success for defendants, however, as far fewer shareholders tendered than defendants expected. To make up the shortfall, defendants announced that they intend to repurchase up to an additional 20 million shares in the open market on or after July 12, 2006

74.  Analysts attribute the less-than-successful share repurchase plan to a lack of shareholder confidence in the current plan for the Company. An analyst for Morgan Stanley opined that "[t]he fact that the tender came in below expectations indicates to us that investors are expecting additional actions by the company to realize value."

75.  Analysts note that, given the existing defensive barriers defendants have erected, replacing the Board will be difficult. "Tribune's board cannot be replaced in one fell swoop because elections are staggered over several years." Analysts also noted that forcing defendants to pursue a sale of the Company will also be difficult with defendants' defensive barriers in place because "private equity firms, potential buyers of Tribune assets, are usually reluctant to make hostile bids."

76.  An article in *ChicagoBusiness Com*, entitled "Tribune board finds itself in the spotlight," delineated just how tough it will be for the Chandler Trusts, the Company and its shareholders to force defendants to forego their entrenchment tactics and take steps to maximize shareholder value rather than side with Company management:

The boardroom brawl at Tribune Co. poses a loyalty test for a group of homegrown directors with deep ties to company management and the Chicago business community.

*A majority of Tribune's 11 directors, including CEO Dennis FitzSimons, are drawn from a tight circle of the city's corporate elite. Directors like Northern Trust Corp. CEO William A. Osborn and Abbott Laboratories chief Miles D. White run in the same circles, often serving together on civic and charitable boards.*

"*Outside relationships — whether they're at a country club or other directorships or private business relationships — could potentially influence the objectivity of a director,*" says Rob Kellogg, a managing director for research at Rockville, Md.-based proxy adviser Institutional Shareholder Services Inc.

- 24 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

As the fight for control of Tribune unfolds, the six local directors will face increasing tension between their fiduciary duties to shareholders and any affinity they may feel for company management or Tribune itself as an iconic Chicago institution.

*　　*　　*

*So far the local directors, along with two other out-of-town board members, have backed management.* . .

Among the Chicago directors, only former Quaker Oats Co. CEO Robert Morrison has a track record in unloading a company outright. In 2000 he announced the sale of the century-old Chicago company, which, like Tribune, stumbled with a big, ill-fated acquisition.

*Corporate Library, a watchdog group in Maine, classifies Mr. Osborn, the Tribune's lead director, as an "outside related" director because of business relationships between Northern Trust and Tribune*

77.     Analysts agree that Tribune shareholders would be much better served by a break-up or sale of assets instead of being held hostage by defendants' entrenchment tactics   Edward Atorino, an analyst at The Benchmark Company, has stated about the Company that "[t]hese are very salable assets." "The company was put together through acquisition. And it could be taken apart by divestiture and yield what some people on Wall Street feel – and I would concur – is worth more than $40 a share."

78.     Some analysts have opined that the Company would be worth as much as $50 per share if it were sold outright.

79.     Defendants' focus on retaining their control over Tribune's corporate machinery and recalcitrance in refusing to pursue any value-maximizing opportunities for shareholders is especially problematic given increasing interest in the market in potential deals for all or part of Tribune's assets

80.     A number of wealthy investors have publicly expressed their interest in purchasing the *Los Angeles Times*, including philanthropist Eli Broad, former Major League Baseball Commissioner Peter Ueberroth, Ron Burkle, head of Yucaipa Company, an investment firm that recently expressed interest in buying some of the Knight Ridder newspapers. and David Geffen, the record executive, Some analysts have opined that the *Los Angeles Times* alone could be sold for as much as $3 billion.

- 25 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

81.    In addition, Mark Cuban, owner of the Dallas Mavericks, has stated that he will pay "any price" to purchase the Chicago Cubs from the Company.

82.    On July 31, 2006, it was reported that defendants had formally refused to negotiate with Burkle, Geffen or Broad regarding a possible purchase of the *Los Angeles Times*. Defendants told all three investors that the *Los Angeles Times* was not for sale, and that they would not agree to have any further discussions.

83    The same reports that announced defendants' out-of-hand rejection of the offers made by Burkle, Geffen and Broad also reported that several investors were interested in purchasing outright both *The Baltimore Sun* and *Newsday*

84.    In September, however, defendants took steps to temporarily placate the Chandler Trusts by agreeing to restructure two partnerships the Company inherited six years ago in the Times Mirror Merger    Defendants contend that restructuring the partnerships was necessary to enable the Board to take steps to maximize shareholder value. Accordingly, on September 21, 2006, defendants set up a so-called independent special committee to undertake an assessment of strategic alternatives.    The committee is not independent, however, as it consists entirely of directors who are aligned with management: Hernandez, Heldon, Morrison, Osborn, Reyes, Taft and White.

85.    On October 23, 2006, it was announced that several private equity firms had expressed interest in purchasing Tribune and intended to present indications of interest by the end of the month. These private equity firms included two groups. one consisting of Madison Dearborn Partners, Providence Equity Partners and Apollo Management, and another comprised of Thomas H Lee Partners and Texas Pacific Group.    Another private equity group, Carlyle Group, had also made entreaties

86    On October 27, 2006, a group of Baltimore businessmen mad an offer to purchase one of Tribune's daily newspapers, the Baltimore newspaper the *Sun*.

- 26 -

87.    On November 2, 2006, defendants announced that they were shifting the focus of their purported pursuit of strategic alternatives away from a sale of the entire Company and towards individual sales of different business entities within the Company. Defendants announcement was a signal to the market that their set up of a so-called special committee and a strategic review process was nothing but a sham to temporarily placate angry shareholders fed up with defendants' entrenchment tactics.

88    Despite defendants' demonstrated resistance to a full and fair sales process, potential acquirers continue to express interest in purchasing the Company. On November 8, 2006, private investors Eli Broad and Ron Burkle made a renewed offer to purchase the entire Company. Not surprisingly, defendants have failed to publicly respond to Broad and Burkle or offer to negotiate with the two California-based investors.

89.    Unless defendants are compelled to immediately act to pursue value-maximizing alternatives for the Company, shareholders' equity will continue to be adversely affected. Defendants must immediately cease their steadfast refusal to act in the best interests of Tribune and its public shareholders.

90.    Defendants must, without delay, appoint a committee of truly independent directors to examine the strategic alternatives available to the Company and take prompt decisive action to maximize shareholder value. In addition, this committee of independent directors must be allowed to retain a financial advisor and legal counsel of their choice that have no material prior or ongoing relationship with Tribune

91.    By reason of their positions with Tribune, the defendants are obligated to act in accordance with their fiduciary duties of good faith and fair dealing and not to entrench themselves for the sole purpose of aggrandizing their personal positions of wealth and/or prestige. As fiduciaries of a publicly traded company, defendants are obligated to consider any bona fide offers which represent a

- 27 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

premium to the shareholders of the Company and not unjustly disregard such offers to the extent that they conflict with defendants' plans to dominate the Company.

92.    As a result of defendants' unlawful actions, plaintiff and the other members of the Class continue to be harmed in that they have been and will continue to be prevented from obtaining the real value of their equity ownership of the Company.

## FIRST CAUSE OF ACTION

### Class and Derivative Claim Against all Defendants for Breach of Fiduciary Duty

93    Plaintiff repeats and realleges each allegation as though fully set forth herein  Plaintiff brings this claim derivatively on behalf of Tribune and directly on behalf of himself and all other Class members.

94.    The defendants failed to act reasonably or in good faith in an effort to maximize shareholder value. Rather, the defendants have taken actions designed to impede the maximization of shareholder value in order to allow defendants to retain their control over and emoluments associated with their positions as directors and/or senior insiders of Tribune.

95.    The defendants have violated fiduciary duties of care, loyalty, candor and independence owed to Tribune and its public shareholders and have acted to put their personal interests ahead of the interests of Tribune shareholders.

96.    The Individual Defendants were and are under a duty to:

(a)    fully inform themselves of the market value of Tribune before taking, or agreeing to refrain from taking, action;

(b)    act in the best interest of Tribune and its shareholders; and

(c)    act in accordance with their fundamental duties of due care, good faith, loyalty and candor

- 28 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

97.    The Individual Defendants have violated their fiduciary duties by failing to give reasonable and good faith consideration to alternatives to maximize shareholder value.  Defendants directly breached and/or aided and abetted the other defendants' fiduciary duties to Tribune and the public stockholders of Tribune.

98.    As demonstrated by the allegations above, the defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of Tribune because, among other reasons, they failed to properly and adequately consider offers to purchase Tribune and take other necessary steps to maximize the value of Tribune to its public shareholders

99.    Because the Individual Defendants dominate and control the business and corporate affairs of Tribune, and are in possession of private corporate information concerning Tribune's assets (including the knowledge during the relevant period of other undisclosed bids for the Company), business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Tribune which makes it inherently unfair for them to reject any proposed transaction or strategic alternatives for the Company for the sole purpose of entrenching themselves as managers and directors of the Company, to the exclusion of maximizing shareholder value.

100.    By reason of the foregoing acts, practices and course of conduct, the defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

101    Defendants are engaging in self dealing, are not acting in good faith toward plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the Class.

- 29 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

102    Each of the Individual Defendants has knowingly participated in the unlawful conduct alleged herein in order to advance his or her own economic interests, or the interests of friends and colleagues, to the detriment of Tribune and its shareholders.

103.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, on their own and as part of a common plan, and in breach of their fiduciary duties to Tribune and its shareholders, are engaging in acts that will irreparably harm the Company and/or its shareholders.

104.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Tribune.

105    As a result of the defendants' unlawful actions, Tribune and its public shareholders are being and will be irreparably harmed unless defendants actions are enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to Tribune and Tribune shareholders and will continue to engage in a process that harms Tribune and its shareholders and inhibits the maximization of shareholder value.

## SECOND CAUSE OF ACTION

### Derivative Claim Against all Defendants for Abuse of Control

106    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein

107.    Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at and control over, Tribune, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at Tribune. As part of this scheme, defendants erected unreasonable and draconian defensive barriers to prevent potential offers for the Company, undertook a costly and risky share repurchase plan to damage the

- 30 -

1  Company and make it less attractive to potential acquirers, and made affirmative misrepresentations

2  concerning their unlawful misconduct.

3  108. Defendants' conduct constituted an abuse of their ability to control and influence

4  Tribune.

5  109. By reason of the foregoing, Tribune has been damaged

6

7  ### THIRD CAUSE OF ACTION

8  ### Derivative Claim Against All Defendants for Gross Mismanagement

9  110. Plaintiff incorporates by reference and realleges each and every allegation set forth

10  above, as though fully set forth herein.

11  111. Defendants had a duty to Tribune and its shareholders to prudently supervise, manage

12  and control the operations and business of Tribune

13  112. Defendants, by their actions and by engaging in the wrongdoing described herein,

14  abandoned and abdicated their responsibilities and duties with regard to prudently managing the

15  businesses of Tribune in a manner consistent with the duties imposed upon them by law. By

16  committing the misconduct alleged herein, defendants breached their duties of due care, diligence and

17  candor in the management and administration of Tribune's affairs and in the use and preservation of

18  Tribune's assets.

19  113. During the course of the discharge of their duties, defendants knew or recklessly

20  disregarded the unreasonable risks and losses associated with their misconduct, yet defendants caused

21  Tribune to engage in the scheme complained of herein which they knew had an unreasonable risk of

22  damage to Tribune, thus breaching their duties to the Company. As a result, defendants grossly

23  mismanaged Tribune

24

25  114. By reason of the foregoing, Tribune has been damaged.

26

27

28

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

# FOURTH CAUSE OF ACTION

## Derivative Claim Against all Defendants for Corporate Waste

115.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

116   By failing to properly consider the interests of the Company and its public shareholders, and by causing the Company to expend its cash on hand and incur $2.4 billion dollars in additional unnecessary debt in undertaking the share repurchase plan, defendants have caused Tribune to waste valuable corporate assets.

117.   As a result of defendants' corporate waste, they are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands preliminary and permanent relief, including injunctive relief, as follows:

A.   Declaring that this action is properly maintainable as a class and derivative action;

B.   Declaring and decreeing that the defendants conduct has been in breach of the fiduciary duties owed by the defendants to Tribune and its public stockholders;

C.   Declaring and decreeing that defendants' refusal to consider in good faith potential value-maximizing opportunities for the Company and its shareholders is in breach of the fiduciary duties owed by defendants to Tribune and its shareholders and ordering defendants to comply with said fiduciary duties;

D.   Directing defendants to refrain from advancing their own interests at the expense of Tribune or its shareholders and exercise their fiduciary duties to act reasonably and respond in good faith to offers which are in the best interest of Tribune and its shareholders;

E.   Directing defendants to establish a committee of truly independent directors, evaluate strategic alternatives and potential offers for the Company, and to take decisive steps to maximize shareholder value;

- 32 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

F.     Prohibiting defendants from entering into any contractual provisions which harm Tribune or its shareholders or prohibit defendants from maximizing shareholder value;

G.     Invalidating the poison pill and/or directing defendants to rescind or redeem it, declassifying the staggered board, rescinding the remaining preclusive defensive measures and restraining defendants from adopting, implementing or instituting any defensive measures that has or is intended to have the effect of making the consummation of an offer to purchase the Company more difficult or costly for a potential acquirer;

H.     Awarding compensatory damages and punitive damages thereon;

I.     Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

J.     Granting such other and further relief as this Court may deem just and proper

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 16, 2006

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
RANDALL J. BARON
DAVID T. WISSBROECKER

DAVID T. WISSBROECKER

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

S:\Cases\SD\Tribune Derivative\CPT00034631.doc

- 33 -

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

# COPY

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
David T. Wissbroecker (343827)
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 W. Broadway, Suite 1900, San Diego, CA 92101

TELEPHONE NO.: 619/231-1058    FAX NO.: 619/231-7423

ATTORNEY FOR (Name): Plaintiff Frank Garamella

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME:

CASE NAME:
Garamella v. Fitzsimons, et al.

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

NOV 17 2006

John A. Clark, Executive Officer/Clerk

By _____, Deputy
D. Gaines

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER |
|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) / ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 1811) | BC362110  JUDGE  DEPT |

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☑ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

**BY FAX**

2. This case ☑ is ☐ is not    complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☑ Large number of separately represented parties    d. ☐ Large number of witnesses
   b. ☑ Extensive motion practice raising difficult or novel    e. ☐ Coordination with related actions pending in one or more courts issues that will be time-consuming to resolve    in other counties, states, or countries, or in a federal court
   c. ☑ Substantial amount of documentary evidence    f. ☐ Substantial postjudgment judicial supervision
3. Type of remedies sought (check all that apply):
   a. ☑ monetary    b. ☑ nonmonetary; declaratory or injunctive relief    c. ☑ punitive
4. Number of causes of action (specify): 4
5. This case ☑ is ☐ is not    a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: November 16, 2006

David T. Wissbroecker
(TYPE OR PRINT NAME)    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2006]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 201.8, 1800–1812;
Standards of Judicial Administration § 19
www.courtinfo.ca.gov

2138281908,                    11:08:15 a.m.    11-17-2006    10/10

## COPY

| SHORT TITLE: Garamella v. Fitzsimons, et al. | CASE NUMBER: EC362110 |
|---|---|

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**
**(CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)**

This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES   CLASS ACTION? ☐ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL __10__ ☐ HOURS/☑ DAYS

Item II. Select the correct district and courthouse location (4 steps – if you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check one Superior Court type of action in Column B below which best describes the nature of this case.

**Step 3:** In Column C, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

**Applicable Reasons for Choosing Courthouse Location (see Column C below)**

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Offices.

**BY FAX**

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death - Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070 Asbestos Property Damage | 2. |
| | | ☐ A7221 Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260 Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | ☐ A7240 Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | ☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | ☐ A7270 Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | ☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☑ A6029 Other Commercial/Business Tort (not fraud/breach of contract) | (1.), 2., 3. |
| | Civil Rights (08) | ☐ A6005 Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010 Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013 Fraud (no contract) | 1., 2., 3. |

CIV 109 03-04 (Rev. 03/06)
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 1 of 4