1 | LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
2 | DARREN J. ROBBINS (168593)
RANDALL J. BARON (150796)
3 | DAVID T. WISSBROECKER (243867)
655 West Broadway, Suite 1900
4 | San Diego, CA 92101
Telephone: 619/231-1058
5 | 619/231-7423 (fax)

6 | Attorneys for Plaintiff

7 |
SUPERIOR COURT OF THE STATE OF CALIFORNIA
8 |
COUNTY OF LOS ANGELES
9 |

| | |
|---|---|
| 10   FRANK GARAMELLA, Derivatively on<br>Brainf of TRIBUNE COMPANY,<br><br>11<br><br>            Plaintiff,<br>12<br><br>        vs.<br>13<br><br>  DENNIS J. FITZSIMONS, ENRIQUE<br>14  HERNANDEZ, JR., BETSEY D. HOLDEN,<br>  ROBERT S. MORRISON, WILLIAM A.<br>15  OSBORN, J. CHRISTOPHER REYES,<br>  DUDLEY S. TAFT, MILES D. WHITE,<br>16  JEFFREY CHANDLER, ROGER GOODAN,<br>  WILLIAM STEINHART, JR., and DOES 1-<br>17  25, inclusive,<br><br>18            Defendants,<br><br>19     – and –<br><br>20  TRIBUNE COMPANY, a Delaware<br>  corporation,<br>21<br>          Nominal Defendant.<br>22 | Case No. BC362110<br><br>FIRST AMENDED VERIFIED<br>SHAREHOLDER CLASS AND<br>DERIVATIVE COMPLAINT FOR BREACH<br>OF FIDUCIARY DUTY, ABUSE OF<br>CONTROL, GROSS MISMANAGEMENT<br>AND CORPORATE WASTE<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

23

24

25

26

27

28

# INTRODUCTION

1.    This is a shareholder class and derivative action brought by plaintiff on behalf of the Tribune Company ("Tribune" or the "Company") and its public shareholders.  Plaintiff brings this action against Tribune's directors arising out of their ongoing breaches of fiduciary duty by first attempting to entrench themselves and Company management, and then ultimately tailoring the process of selling the Company to meet their personal needs rather than to maximize value for all Tribune's public shareholders.  Such actions are improper, unfair and are continuing to harm Tribune and its public shareholders.

2.    In refusing to act in good faith and in accordance with the fiduciary duties owed to Tribune and its public shareholders, the Company's management and Tribune's Board of Directors (the "Board"), named as defendants herein, each violated applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing.

3.    Faced with pressure from several large shareholders angered by the Company's lagging stock price and sagging performance, defendants took nearly a year to purportedly examine strategic alternatives.  Defendants were guided in the process not by their duty to pursue a course of action that would benefit the Company and its shareholders, but instead by their desire to entrench themselves in their current positions at Tribune.  They accomplished this first by, among other things, saddling Tribune with a risky and costly share repurchase program, the purpose of which was to dispose of Tribune's cash while making the Company less attractive to potential acquirers so that defendants could maintain their dominion and control over Tribune's corporate machinery.  The share repurchase program was designed to and did cause the Company to consume the vast majority of the Company's cash on hand and appear less attractive to potential purchasers by adding $2.4 billion of debt to Tribune's balance sheet.

4.    After completing the share repurchase program, defendants refused to respond in good faith to potential business combinations that would have enhanced shareholder value.  The Board rejected, out-of-hand, several preliminary offers by private equity buyout groups, then informed interested bidders that the Company had decided to change course and solicit bids for individual sales of

1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1  the Company's assets, as opposed to a sale of the Company as a whole. The Board's purported
2  examination of strategic alternatives proved to be only a ploy to temporarily placate shareholders
3  outraged with defendants' entrenchment conduct until such time as a bidder came forward who was
4  willing to construct a transaction that would cater to their demands.

5       5.      On April 2, 2007, the Company announced they had found just such a bidder. On that
6  date, defendants agreed to accept an offer from Chicago billionaire real estate magnate Sam Zell
7  ("Zell") to acquire Tribune for $34.00 per share (the "Proposed Acquisition"). The Proposed
8  Acquisition is structured in such a way as to favor the Company's management and major insider
9  shareholders at the expense of and to the detriment of Tribune's public shareholders. Specifically, the
10 Proposed Acquisition, in addition to preserving the jobs and Board seats of existing management and
11 most current Board members, calls for the transaction to be accomplished via the creation of an
12 Employee Stock Ownership Plan ("ESOP"). The proposed ESOP is a type of benefit plan for
13 employees, where the Company would contribute money, as it would to a pension or similar kind of
14 retirement savings account. But instead of investing in stocks or bonds, as most pension plans do, the
15 ESOP would use those contributions to pay down the Company's debt and buy stock in the Company,
16 which would then be distributed to employees as a benefit.

17      6.      If the ESOP plan proposed by Zell is implemented, Tribune management and insider
18 shareholders like the Chandler Trusts and the McCormick Tribune Foundation, both of which have
19 representatives on the Tribune Board, would be able to defer capital gains on the sale of their stock. It
20 would also permit the ESOP, which would be owned by Tribune management and employees, to deduct
21 interest and principal payments on the debt incurred in setting up the ESOP. Defendants were able to
22 extract this type of arrangement from Zell in exchange for permitting Zell to acquire a 40% stake in the
23 private Company for only $315 million of his own money.

24      7.      In agreeing to the Proposed Acquisition, defendants failed to consider in good faith a
25 competing offer for the Company made jointly by billionaire investors Eli Broad ("Broad") and Ronald
26 Burkle ("Burkle"). The Board had already rejected these two bidders twice; first, on July 31, 2006,
27 when defendants unequivocally rebuffed offers from Broad, Burkle, and entertainment mogul David
28 Geffen ("Geffen") to purchase the *Los Angeles Times* from Tribune at a substantial premium. Again in

- 2 -

1 March 2007, defendants shunned Broad and Burkle's \$34.00 per share offer, even though at the time it
2 represented \$1 more per share then Zell's offer, because it was not structured as an ESOP. Even after
3 Broad and Burkle complained of being treated unfairly in the process, they submitted a revised proposal
4 that included an ESOP structure. In order to keep their promise to Zell, defendants arbitrarily cut short
5 even this limited bidding process. Ultimately, the Board went with Zell even though he was not the
6 highest bidder.

7        8.      Beyond the unfair price and unfair bidding process, the defendants have also imposed
8 upon shareholders a means to accomplish the Proposed Acquisition that is structurally coercive and
9 unlawful. Pursuant to the agreement with Zell, Zell will fund a tender offer to repurchase
10 approximately 126 million shares of its common stock for \$34 per share, or approximately \$4.3 billion.
11 The tender offer portion of the Proposed Acquisition is expected to be completed in the second quarter
12 of 2007. Following the tender offer, Tribune and the ESOP will merge and all remaining Tribune stock
13 will be converted to cash at \$34 per share. Shareholders who do not tender their shares immediately,
14 will be forced to wait at least until the end of the year before they can vote on the second step of the
15 Proposed Acquisition. In that time period, however, they lose time value of their investment and risk
16 the merger not being accomplished because of industry or company-specific issues, but they get none of
17 the upside benefits for fiscal improvement. Thus, shareholders unaffiliated with the Company or its
18 large shareholders only real choice is to tender, and give the buyout group sufficient ownership interest
19 to assure shareholder approval of the second step. Public shareholders, as the majority, will have no
20 real say as to whether or not the Proposed Acquisition actually takes place.

21 **JURISDICTION AND VENUE**

22        9.      This Court has jurisdiction over defendants because they conduct business in California,
23 are citizens of California, and/or have engaged in conduct that has had a substantial impact on
24 California.

25       10.     Venue is proper in this Court because a substantial amount of the misconduct at issue in
26 this case took place and/or had an effect in this County.

27

28

- 3 -
1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1        (a)    One of Tribune's principal businesses is the *Los Angeles Times* daily newspaper,

2    which business is located at 202 West First Street, Los Angeles, California, and defendants Jeffrey

3    Chandler, Enrique Hernandez, Jr., and William Stinehart, Jr. are residents and citizens of California.

4    **PARTIES AND OTHER ENTITIES**

5        11.    Plaintiff Frank Garamella is, and at all times relevant hereto was, a shareholder of

6    Tribune.

7        12.    Nominal party Tribune is incorporated under the laws of Delaware. Tribune is engaged

8    in newspaper publishing, television and radio broadcasting and entertainment.

9        13.    Defendant Dennis J. FitzSimons ("FitzSimons") is President and Chief Executive Officer

10    ("CEO") of Tribune and the Chairman of its Board of Directors. FitzSimons has been President since

11    2001, CEO since 2003, and Chairman since 2004. Previously, FitzSimons served as Chief Operating

12    Officer, from July 2001 until December 2002, Executive Vice President from January 2000 until July

13    2001, and as President of Tribune Broadcasting Company, a subsidiary of Tribune, from May 1997

14    until January 2003. FitzSimons has been a director since 2000. FitzSimons is also Chairman of the

15    Board's Executive Committee. FitzSimons received $950,385 in salary in 2005 alone. That same year,

16    FitzSimons was also given 200,000 stock options valued at $2,101,900, a $250,000 bonus, a

17    contribution to his 401(k) of $85,535, and other perquisites valued at $72,180. By virtue of his high-

18    ranking positions within Tribune, FitzSimons effectively controls the Robert R. McCormick Tribune

19    Foundation, one of Tribune's largest shareholders. FitzSimons is also a member of the board for the

20    Cantigny Foundation, a Tribune affiliate. FitzSimons has longstanding personal, social and financial

21    relationships with several of the defendants which preclude him from objectively considering a demand

22    to take action against his fellow board members. For example, FitzSimons sits on the boards of several

23    charitable institutions with the remaining defendants, as set forth below:

24        (a)    FitzSimons sits on the board of the Museum of Science and Industry with

25    defendants Betsy D. Holden ("Holden"), Robert S. Morrison ("Morrison"), William A. Osborn

26    ("Osborn"), J. Christopher Reyes ("Reyes") and Miles D. White ("White");

27        (b)    FitzSimons sits on the Civic Committee with defendants Osborn, Reyes and

28    White;

1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1        (c)    FitzSimons sits on the board of Northwestern University with defendants Osborn

2  and White;

3        (d)    FitzSimons sits on the board of the Off The Street Club with defendant Holden;

4  and

5        (e)    FitzSimons sits on the board of the United Way with defendants Osborn and

6  Reyes.

7        14.    Defendant Enrique Hernandez Jr. ("Hernandez") is a citizen of California. Hernandez

8  has been a director since 2001, serves as Chairman of the Board's Nominating and Governance

9  Committee, and is a member of the Board's Compensation and Organization Committee. For Board

10  service, Hernandez receives annual compensation of $150,000 in cash and stock, or $16,667 per board

11  meeting, which equates to several thousand dollars per hour. Hernandez has longstanding personal,

12  social and financial relationships with several of the defendants which preclude him from objectively

13  considering a demand to take action against his fellow board members. Hernandez also receives

14  $10,000 for serving as the Chairman of the Nominating and Governance Committee. Hernandez is a

15  member of the board of trustees of the University of Notre Dame, of which defendant Reyes is also a

16  member. Hernandez is currently the CEO of Inter-Con Security Systems Inc., and is thus pre-

17  conditioned to side with Company management, a proclivity he has demonstrated by supporting any

18  and all initiatives advanced by Company management.

19        15.    Defendant Holden has been a director since 2002, and is a member of the Board's Audit

20  Committee. For Board service, Holden receives annual compensation of more than $150,000 in cash

21  and stock, or $16,667 per Board meeting, which equates to several thousand dollars per hour. Holden

22  also receives $6,000 for serving on the Board's Audit Committee. Holden has longstanding personal,

23  social and financial relationships with several of the defendants which preclude her from objectively

24  considering a demand to take action against her fellow Board members. For example, Holden serves

25  with defendants FitzSimons, Morrison, Osborn, Reyes and White on the board of the Museum of

26  Science and Industry; with defendant Reyes on the board of trustees of the Ravinia Music Festival; and

27  with defendant FitzSimons on the board of the Off The Street Club. In 2003, the Tribune Foundation,

28  which is controlled by FitzSimons, donated $200,000 to the Off The Street Club. In addition, Holden

- 5 -

1   has the following affiliations: (i) Advisory Board of the Kellogg School of Management of
2   Northwestern University with defendants Osborn and Reyes; and (ii) The Chicago Club with defendants
3   Morrison, Osborn, Reyes and White. Holden formerly was a director of the Economic Club of Chicago,
4   of which defendants Osborn, Reyes and White currently are affiliated. Holden also held a number of
5   positions at Kraft Foods, Inc., of which Morrison was Chairman of the Board and CEO from 1994 to
6   1997. Based on the foregoing, Holden is thus pre-conditioned to side with Company management, a
7   proclivity she has demonstrated by supporting any and all initiatives advanced by Company
8   management.

9        16.    Defendant Morrison has been a board member since 2001, serves as Chairman of the
10   Board's Compensation and Organization Committee, and is a member of the Board's Nominating and
11   Governance Committee and Executive Committee. For Board service, Morrison receives annual
12   compensation of more than $150,000 in cash and stock, or $16,667 per board meeting, which equates to
13   several thousand dollars per hour. Morrison also receives $10,000 for serving as the Chairman of the
14   Compensation and Organization Committee. Morrison has longstanding personal, social and financial
15   relationships with several of the defendants which preclude him from objectively considering a demand
16   to take action against his fellow board members. For example, Morrison serves with defendants
17   FitzSimons, Holden, Osborn, Reyes and White on the board of the Museum of Science and Industry.
18   Morrison is also affiliated with The Chicago Club, of which defendants Holden, Osborn, Reyes and
19   White are affiliated, and the Lyric Opera, of which defendants Osborn and Reyes are affiliated. From
20   1994 to 1997 Morrison was the Chairman of the Board and CEO of Kraft Foods, Inc., of which
21   defendant Holden was affiliated from 1984-2005. Based on the foregoing, Morrison is thus pre-
22   conditioned to side with Company management, a proclivity he has demonstrated by supporting any
23   and all initiatives advanced by Company management.

24        17.    Defendant Osborn has been a director since 2001, serves as Chairman of the Board's
25   Audit Committee and is a member of the Board's Executive Committee. For Board service, Osborn
26   receives annual compensation of more than $150,000 in cash and stock, or $16,667 per board meeting,
27   which equates to several thousand dollars per hour. Osborn also receives $15,000 a year for serving as
28   the Chairman of the Audit Committee. Osborn is also Chairman and CEO of Northern Trust

- 6 -

1 Corporation, which has benefited through Osborn's affiliation with Tribune, receiving $710,449 for
2 trust and custody services, cash management and related services, and bank credit facility fees in 2005
3 from Tribune. In addition, effective January 1, 2006, Tribune retained The Northern Trust Company,
4 the principal subsidiary of Northern Trust Corporation, as the trustee of each of Tribune's 401(k)
5 savings plans. All told, in the time since Osborn has been a director of Tribune, the Company has paid
6 Northern Trust $3.4 million in fees. Because of the numerous business relationships between Tribune
7 and Northern Trust, the Corporate Library has classified Osborn as an "outside related" director. Based
8 on his resume, Osborn is allied with FitzSimons, because like FitzSimons, he himself heads a
9 conservative Chicago business institution, Northern Trust, and is thus pre-conditioned to side with
10 Company management, a proclivity he has demonstrated by supporting any and all initiatives advanced
11 by Company management. Osborn has longstanding personal, social and financial relationships with
12 several of the defendants which preclude him from objectively considering a demand to take action
13 against his fellow board members. For example, Osborn sits on the boards of various non-profit
14 institutions with his fellow defendants:

15           (a)     Osborn serves with defendants FitzSimons, Holden, Morrison, Reyes and White
16 on the board of the Museum of Science and Industry;

17           (b)     Osborn serves with defendants FitzSimons, Reyes and White on the Civic
18 Committee;

19           (c)     Osborn serves with defendants FitzSimons and White on the board of
20 Northwestern University; and

21           (d)     Osborn serves with defendant FitzSimons on the board of the United Way.
22 Osborn is also affiliated with the Advisory Board of the Kellogg School of Management of
23 Northwestern University with defendants Holden and Reyes; Northwestern Memorial Healthcare with
24 defendant Reyes; The Chicago Club, with defendants Holden, Morrison, Reyes and White; the Lyric
25 Opera, with defendants Morrison, Osborn and Reyes; and the Commercial Club of Chicago and the
26 Economic Club of Chicago, of which defendant Holden was a director. In addition, Osborn formerly
27 was a director of the Federal Reserve Bank of Chicago, of which defendant White is the current
28 Chairman of the Board.

- 7 -

1          18.    Defendant Reyes has been a board member since 2005, and serves on the Board's
2  Compensation and Organization Committee and Nominating and Governance Committee. For Board
3  service, Reyes receives annual compensation of more than $150,000 in cash and stock, or $16,667 per
4  board meeting, which equates to several thousand dollars per hour. Reyes has longstanding personal,
5  social and financial relationships with several of the defendants which preclude him from objectively
6  considering a demand to take action against his fellow board members. For example, Reyes serves with
7  defendants FitzSimons, Holden, Morrison, Osborn and White on the board of the Museum of Science
8  and Industry; with defendant Hernandez on the board of trustees of the University of Notre Dame; with
9  defendant Holden on the board of trustees of the Ravinia Music Festival; and with defendants
10  FitzSimons, White and Osborn on the Civic Committee. Reyes, with defendants Holden and Osborn, is
11  affiliated with the Advisory Board of the Kellogg School of Management of Northwestern University;
12  with defendants Holden, Morrison, Osborn and White, is affiliated with The Chicago Club; with
13  defendants Morrison and Osborn, is affiliated with the Lyric Opera; and with defendant Osborn, is
14  affiliated with Northwestern Memorial Healthcare. In addition, Reyes is affiliated with the Boys &
15  Girls Clubs of America and of Chicago and defendant Dudley S. Taft ("Taft") is affiliated with the
16  Boys & Girls Clubs of Cincinnati. Reyes, along with defendants Osborn and White, is also affiliated
17  with the Commercial Club of Chicago and the Economic Club of Chicago, of which defendant Holden
18  formerly was a director. Reyes is currently Chairman of Reyes Holdings, LLC, and is thus pre-
19  conditioned to side with Company management, a proclivity he has demonstrated by supporting any
20  and all initiatives advanced by Company management.

21          19.    Defendant Taft has been a board member since 1996, and serves on the Board's Audit
22  Committee. For Board service, Taft receives annual compensation of more than $150,000 in cash and
23  stock, or $16,667 per board meeting, which equates to several thousand dollars per hour. Taft also
24  receives $6,000 a year for serving on the Audit Committee. Taft has longstanding personal, social and
25  financial relationships with several of the defendants which preclude him from objectively considering
26  a demand to take action against his fellow board members. Taft is the President of Taft Broadcasting
27  Co., and is thus pre-conditioned to side with Company management, a proclivity he has demonstrated
28  by supporting any and all initiatives advanced by Company management. Taft also had and continues

- 8 -

1    to have direct business connections with Tribune, to which he sold a television station. Taft is also
2    affiliated with the Boys & Girls Clubs of Cincinnati, while defendant Reyes is affiliated with the Boys
3    & Girls Clubs of America and of Chicago.

4        20.    Defendant White has been a director since 2005, and serves on the Board's
5    Compensation and Organization Committee. For Board service, White receives annual compensation
6    of more than $150,000 in cash and stock, or $16,667 per board meeting, which equates to several
7    thousand dollars per hour. White has longstanding personal, social and financial relationships with
8    several of the defendants which preclude him from objectively considering a demand to take action
9    against his fellow board members. For example, White serves with defendants FitzSimons, Holden,
10   Morrison, Osborn and Reyes on the board of the Museum of Science and Industry; with defendants
11   FitzSimons, Osborn and Reyes on the Civic Committee; and with defendants FitzSimons and Osborn on
12   the board of Northwestern University. White is CEO of Abbott Laboratories, and is thus pre-
13   conditioned to side with Company management, a proclivity he has demonstrated by supporting any
14   and all initiatives advanced by Company management.

15       21.    Defendant Jeffrey Chandler ("Chandler") is a citizen of California. Chandler has been a
16   director since 2000, and is a member of the Board's Compensation & Organization Committee. For
17   Board service, Chandler receives annual compensation of $150,000 in cash and stock, or $16,667 per
18   board meeting, which equates to several thousand dollars per hour. Chandler has longstanding
19   personal, social and financial relationships with several of the defendants which preclude him from
20   objectively considering a demand to take action against his fellow board members.

21       22.    Defendant Roger Goodan ("Goodan") has been a director since 2000, and is a member of
22   the Board's Nominating & Corporate Governance Committee. For Board service, Goodan receives
23   annual compensation of $150,000 in cash and stock, or $16,667 per board meeting, which equates to
24   several thousand dollars per hour. Goodan has longstanding personal, social and financial relationships
25   with several of the defendants which preclude him from objectively considering a demand to take action
26   against his fellow board members.

27       23.    Defendant William Stinehart, Jr. ("Stinehart") is a citizen of California. Stinehart has
28   been a director since 2000, and is a member of the Board's Nominating & Governance Committee and

- 9 -

1  Executive Committee. For Board service, Stinehart receives annual compensation of $150,000 in cash
2  and stock, or $16,667 per board meeting, which equates to several thousand dollars per hour. Stinehart
3  has longstanding personal, social and financial relationships with several of the defendants which
4  preclude him from objectively considering a demand to take action against his fellow board members.

5      24.     The defendants named above in ¶¶13-23 are sometimes collectively referred to as the
6  "Individual Defendants."

7      25.     The true names and capacities of defendants sued herein under California Code of Civil
8  Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiff, who therefore
9  sues these defendants by such fictitious names. Plaintiff will seek to amend this Complaint and include
10  these Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously
11  named defendants is responsible in some manner for the conduct alleged herein and for the injuries
12  suffered by the Class.

13                          **DEFENDANTS' FIDUCIARY DUTIES**

14      26.     By reason of the defendants' positions with the Company as officers and/or directors,
15  said individuals owe fiduciary duties to Tribune and its public stockholders including duties of good
16  faith, fair dealing, loyalty and full, candid and adequate disclosure.

17      27.     As corporate directors, defendants are required to act in good faith, in the best interests
18  of the corporation's shareholders and with such care, including reasonable inquiry, as would be
19  expected of an ordinarily prudent person. In a situation where the Company is presented with potential
20  value-maximizing strategic alternatives, directors are required to take all steps reasonably required to
21  properly evaluate such alternatives and choose the alternative that is in the best interests of the
22  Company and its shareholders. To diligently comply with this duty, the directors of a corporation may
23  not take any action that:

24          (a)    adversely affects the value provided to the corporation's shareholders;

25          (b)    contractually prohibits the directors from complying with or carrying out their
26  fiduciary duties;

27          (c)    discourages or inhibits offers to purchase the corporation or its assets; or

28

                                    - 10 -
                1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1         (d)     will otherwise adversely affect their duty to search and secure the best value

2 reasonably available under the circumstances for the corporation's shareholders.

3      28.    In accordance with their duties of loyalty and good faith, the defendants, as directors

4 and/or officers of Tribune, are obligated to refrain from:

5         (a)     participating in any act or transaction where the directors' or officers' loyalties

6 are divided;

7         (b)     using their positions of control to harm Tribune or extract personal financial

8 benefits not equally shared by the public shareholders of the corporation;

9         (c)     unjustly entrenching or enriching themselves at the expense or to the detriment of

10 Tribune's public shareholders; and/or

11         (d)     unjustly entrenching themselves as managers and/or officers of the Company by

12 failing to give good faith consideration to potential value-maximizing alternatives for the Company and

13 its shareholders.

14      29.    The defendants, separately and together, have violated the fiduciary duties owed to

15 plaintiff and the other public shareholders of Tribune, including their duties of loyalty, good faith,

16 candor and independence, insofar as they have refused to give good faith consideration to value-

17 maximizing opportunities for the Company, including: (i) a tax-free spin-off; (ii) a divestiture of certain

18 Company assets; or (iii) a sale of the entire Company. Defendants have been steadfast in their refusal to

19 consider any of these alternatives in good faith and instead have chosen to impair the Company and

20 make it much less attractive to a potential acquirer by undertaking the share repurchase program that

21 has consumed Company cash and caused the Company to take on an additional $2.4 billion in debt.

22      30.    As a result of their failure to consider these alternatives in good faith, the defendants, as

23 a matter of law, have breached their fiduciary duties of good faith and fair dealing owed to the

24 Company and its shareholders.

25                     **CLASS ALLEGATIONS**

26      31.    Plaintiff brings this action on his own behalf and as a class action pursuant to Cal. Code

27 Civ. P. §382 on behalf of all holders of Tribune stock who are being and will be harmed by defendants'

28

1 actions described below (the "Class"). Excluded from the Class are defendants herein and any person,

2 firm, trust, corporation or other entity related to or affiliated with any defendant.

3    32.    This action is properly maintainable as a class action.

4    33.    The Class is so numerous that joinder of all members is impracticable. According to

5 Tribune's SEC filings, there are more than 245 million shares of Tribune common stock outstanding.

6    34.    There are questions of law and fact which are common to the Class and which

7 predominate over questions affecting any individual Class member. The common questions include,

8 *inter alia*, the following:

9        (a)    whether defendants have breached their fiduciary duties of undivided loyalty,

10 independence or due care with respect to plaintiff and the other members of the Class as a result of their

11 repeated rejection of and failure to consider in good faith value-maximizing alternatives for the

12 Company and their entrenchment and/or maintenance of entrenchment devices;

13        (b)    whether defendants are attempting to entrench themselves in order to preserve

14 their lucrative and prestigious positions at the expense of maximizing shareholder value by, among

15 other things, agreeing to the Proposed Acquisition and failing to give reasonable and good faith

16 consideration to value-maximizing alternatives for the Company and their entrenchment and/or

17 maintenance of entrenchment devices;

18        (c)    whether defendants have breached their fiduciary duties by entrenching

19 themselves as officers and/or directors of the Company and/or attempting to use their control over

20 Tribune's operations to extract personal benefits for themselves;

21        (d)    whether defendants have breached any of their other fiduciary duties to plaintiff

22 and the other members of the Class in connection with their rejection and refusal to consider in good

23 faith value-maximizing alternatives for the Company and their entrenchment and/or maintenance of

24 entrenchment devices, including the duties of good faith, diligence, candor and fair dealing; and

25        (e)    whether defendants, in bad faith or for improper motives, have taken steps to

26 impair the Company to make it less attractive to potential acquirers or otherwise erected barriers to

27 impede or discourage offers for the Company or its assets.

28

- 12 -

1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1    35.    Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff
2    does not have any interests adverse to the Class.

3    36.    Plaintiff is an adequate representative of the Class, has retained competent counsel
4    experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

5    37.    The prosecution of separate actions by individual members of the Class would create a
6    risk of inconsistent or varying adjudications with respect to individual members of the Class which
7    would establish incompatible standards of conduct for the party opposing the Class.

8    38.    Plaintiff anticipates that there will be no difficulty in the management of this litigation.
9    A class action is superior to other available methods for the fair and efficient adjudication of this
10    controversy.

11    39.    Defendants have acted on grounds generally applicable to the Class with respect to the
12    matters complained of herein, thereby making appropriate the relief sought herein with respect to the
13    Class as a whole.

14    **DERIVATIVE ALLEGATIONS**

15    40.    Plaintiff brings this action, under California Corporations Code §800, derivatively in the
16    right and for the benefit of Tribune to redress injuries that have been suffered and are continuing to be
17    suffered by Tribune as a direct result of the defendants' violations of law.  Tribune is named as a
18    nominal party in this derivative action solely in a derivative capacity.

19    41.    Plaintiff has delivered to the Company and the Board a true copy of this Complaint prior
20    to filing.

21    42.    Plaintiff will adequately and fairly represent the interests of Tribune in enforcing and
22    prosecuting its rights, and has retained counsel experienced and competent in litigating complex actions
23    and shareholder litigation.

24    43.    Plaintiff is an owner of Tribune stock and was an owner of Tribune stock during times
25    relevant to defendants' illegal and wrongful course of conduct alleged herein.

26    44.    Any demand made by plaintiff to the Tribune Board to institute this action is excused.
27    Based on all the allegations in this Complaint and defendants' actions to date, including their repeated
28    acts of entrenchment, including refusal to protect the interests of Tribune and its shareholders by

- 13 -
1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1 responding in good faith to value-maximizing alternatives for the Company, such demand would be a
2 futile and useless act. The Board consists of eleven directors, all of whom are defendants to the action.
3 These defendants maintain complete voting control over any decisions required to be made by the
4 Board, including any action to be taken in response to a demand made by shareholders. Each of the
5 members of the Board have directly participated in the wrongs complained of herein, which disables
6 them from acting independently, objectively or in good faith to advance the interests of Tribune or
7 respond to a demand by shareholders. The Board and senior management are not disinterested or
8 independent as detailed herein and set forth below:

9          (a)     Each of the defendants served on the Tribune Board during the relevant period
10 and as board members each was charged with oversight and operation of the Company and the conduct
11 of its business affairs. Each of the defendants has breached the fiduciary duties owed to Tribune and its
12 shareholders by, among other things, failing to take reasonable steps to maximize shareholder value and
13 failing to consider in good faith value-maximizing alternatives for the Company.

14          (b)     Instead of responding in good faith to offers to purchase Tribune, management
15 and the Board acted to protect and promote their personal interests and ensure themselves ongoing
16 control over Tribune and thereby ensure their continued ability to receive the benefits of their positions
17 as senior insiders and/or directors of Tribune.

18          (c)     Each of the defendants has acted to ensure he or she continues to receive the
19 substantial financial benefits and perquisites provided to them as directors of Tribune. For example,
20 those defendants who served on the Board in 2005 received compensation for serving as Tribune
21 directors at an annual rate of more than $150,000 a year. The Tribune Board met only nine times in
22 2005, which means that each defendant was compensated an average of $16,667, or several thousand
23 dollars per hour for each meeting attended. Defendant FitzSimons received more than $3 million in
24 salary and benefits in 2005 alone.

25          (d)     Even though certain defendants claim to be independent directors because they
26 are not directly employed by the Company, none of these defendants are truly independent because they
27 are all part of Chicago's tight-knit business community. A majority of defendants are senior members
28 of the business community in Chicago, and often sit on the same civic committees and attend the same

- 14 -
1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1 social events. For instance, defendants FitzSimons, Holden, Morrison, Osborn, Reyes and White all
2 serve together on the board of the Museum of Science and Industry; defendants Osborn, Reyes, White
3 and FitzSimons sit together on the Civic Committee; and defendants Osborn, White and FitzSimons sit
4 together on the board of Northwestern University. Moreover, Chicago boards are well-known for their
5 solidarity and insular nature, and the Board consists entirely of current or former CEO's of corporations
6 that have demonstrated their alignment with Company management by supporting each and every
7 course of action favored by Company management.

8          (e)    Because the Board has taken defensive measures to fend off potential offers to
9 purchase the Company, the Board's defensive actions are subject to enhanced judicial scrutiny because
10 of the omnipresent specter that the Board may be acting in its own interests rather than the interests of
11 the Company and its shareholders.

12          (f)    In taking unreasonable defensive measures, the Board demonstrated that their
13 primary purpose in doing so was to retain control of the Company. Under such circumstances, there is
14 more than reasonable doubt as to the disinterestedness and independence of the Board, thus making
15 demand futile.

16          (g)    As more fully detailed herein, the Board participated in, approved and/or
17 permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise
18 those wrongs from Tribune's shareholders or recklessly and/or negligently disregarded the wrongs
19 complained of herein. Its members are, therefore, not disinterested parties.

20     45.    The defendants named herein have not exercised and cannot exercise independent or
21 objective judgment in deciding whether to bring this action or whether to vigorously prosecute this
22 action because each of the Board members has participated in and/or acquiesced to the misconduct
23 alleged herein.

24     46.    The members of the Board have demonstrated their unwillingness to act in compliance
25 with federal or state law or sue themselves and/or their fellow directors and allies in the top ranks of the
26 corporation for failure to do so, as they have developed professional relationships with their fellow
27 board members who are their friends and with whom they have entangling financial alliances, interests
28 and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

- 15 -

1    47.    Tribune's senior insiders and directors named as defendants herein have shown their
2   interests to be antagonistic to Tribune and this lawsuit as they have refused to consider in good faith
3   options to maximize shareholder value for Tribune and its shareholders. The members of the Board
4   have not and will not authorize a suit against themselves as such a suit would require these defendants
5   to expose themselves to a huge personal liability to Tribune *in excess of $750 million*, as, due to the
6   particular language of currently utilized directors' and officers' liability insurance policies (*i.e.*, the
7   insured vs. insured exclusion), such an action would not be an insured claim.

8    48.    The underlying misconduct of defendants is not a product of a valid exercise of business
9   judgment, and can not be properly ratified by the Board.

10                        **DEFENDANTS' DEFENSIVE ENTRENCHMENT MEASURES**

11   **Poison Pill**

12    49.    Tribune has a poison pill that contains a flip-in provision that entitles shareholders to
13   purchase additional shares of the Company's stock at a nominal price in the event that one entity
14   obtains more than 10% of the Company's outstanding stock, or announces an intention to accumulate
15   more than 10% of the Company's shares. If an unwanted potential acquirer attempted to purchase 10%
16   or more of the Company's outstanding stock, or announced an intention to purchase 10% or more of the
17   Company's outstanding stock, the poison pill would be triggered and the price to purchase the entire
18   Company would become exorbitant. The poison pill also contains a provision that grants shareholders
19   the right to purchase shares of an acquiring entity's stock at a nominal price if a merger is actually
20   consummated and Tribune does not survive (the "flip-over" provision). If the flip-over provision is
21   triggered, the capital structure of an acquiring entity would be significantly impaired, and the interest of
22   its stockholders drastically diluted. Only the Tribune Board, which consists of defendants named
23   herein, has the power and authority to redeem the poison pill, and has demonstrated a refusal to do so.
24   Thus, the existence of the poison pill is an unyielding impediment to a hostile takeover attempt by any
25   other interested third party, and forces potential acquirers to either persuade the Board to negotiate a
26   "friendly" merger or seek to take control of the Company through a proxy fight.

27
28

- 16 -
IST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1 | **Staggered Board**

2      50.    Defendants have also caused the Company to provide for a staggered board of directors
3 in the Company's Certificate of Incorporation. The Company's staggered board is an additional
4 entrenchment measure that makes it almost impossible for any potential acquirer to take control of the
5 Company, even by waging a proxy fight. The staggered board provision allows defendants to protect
6 two-thirds of the Board from having to stand for re-election by shareholders each year. In order to take
7 over the Board via a proxy fight, a potential acquirer must therefore win two consecutive shareholder
8 elections, a feat too costly for any would-be acquirer to realistically accomplish. In addition, the
9 Articles of Incorporation set forth that no director may be removed for cause, and that the staggered
10 board provision may not be altered without a supermajority vote of at least 80% of all shareholders.
11 Such a staggered board is known in takeover parlance as an "Effective Staggered Board" ("ESB"),
12 because shareholders lack the effective power to terminate its existence. Moreover, defendants have
13 imposed additional entrenchment mechanisms, including a Certificate of Incorporation and Company
14 by-laws designed to provide that defendants may increase the size of the Board without shareholder
15 approval, and that only defendants may fill vacancies on the Board.

16      51.    Barred from any realistic opportunity to wage a successful proxy fight for control of the
17 Board, no unwanted would-be acquirer could ever cause the Board to redeem the poison pill. The
18 combination of the ESB and the poison pill creates a draconian defensive barrier that precludes any
19 attempt to purchase the Company. With these measures in place, no proposal to purchase the Company
20 can be successful without defendants' approval. Defendants are improperly and unreasonably using the
21 poison pill and the ESB to block and frustrate any attempts to acquire control of the Company, and to
22 further entrench themselves as officers and/or directors of the Company.

23 | **Additional Entrenchment Devices**

24      52.    In addition to the poison pill and the ESB, defendants have put in place a number of
25 other obstacles that prevent any potential acquirer from acquiring the Company without defendants'
26 approval, which will not be forthcoming because defendants intend to rebuff and refuse to negotiate
27 with any potential acquirer. Defendants are also entrenching themselves through the use of:

28

1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1            (a)     a supermajority vote provision that is a preclusive, unjustified impairment of

2 Tribune shareholders' right to vote in favor of a potential acquisition because it requires approval of

3 two-thirds of the Company's shareholders for a merger with an entity holding 10% or more of the

4 Company's shares;

5            (b)     a bar on shareholder action outside of a meeting without unanimous written

6 consent, a measure by which the entrenched defendants maintain control over the ballot box; and

7            (c)     a bar on shareholders calling a special meeting, which prevents unwanted

8 potential acquirers from directly soliciting shareholders to oust defendants from the boardroom outside

9 of the context of the Company's annual meeting.

10      53.     In engaging in the share repurchase program, defendants have erected another defensive

11 barrier to any unwanted potential acquirer attempting an acquisition. By reducing the amount of shares

12 outstanding, defendants have proportionately increased the strength of their own stockholdings and

13 those of stockholders they control or are aligned with. In doing so, defendants have aggrandized their

14 ability to block any unwanted acquisition by virtue of the proportionately increased voting strength of

15 the shares they control.

16      54.     Furthermore, defendants have made the Company substantially less attractive to

17 unwanted potential acquirers by increasing the cost of acquisition and decreasing the available equity to

18 finance a transaction by using all available Company cash on hand to complete the share repurchase

19 program, and correspondingly swelling the Company's debt by over $2.4 billion dollars. Such "suicide

20 pill" measures were instituted for the sole purpose of perpetuating defendants' control over the

21 Company, and in doing so defendants have significantly decreased the value of the Company and the

22 holdings of its public shareholders. Such actions are taken in breach of defendants' fiduciary duties of

23 loyalty, good faith, due care and candor.

24      55.     Even before defendants undertook the share repurchase program, the combined effect of

25 the Company's draconian defensive measures was so preclusive that the Internet Web site

26 www.sharkrepellant.net rated the Company's takeover defenses an incredible "9.5" on a scale of 1 to

27 10. After the share repurchase program, defendants have no doubt now earned the Company a perfect

28 "10" for its "bulletproof" rating.

1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1    56.    Defendants' chosen combination of defensive measures prevents any unwanted potential
2    acquirer from, among other things, attempting to buy the Company directly from shareholders.
3    Defendants have held and are holding the Company and its shareholders hostage for the benefit of
4    defendants and management.

5                    **BACKGROUND TO THE PROPOSED ACQUISITION**

6    57.    Tribune is a media and entertainment company that, through its subsidiaries, is engaged
7    in newspaper publishing, television and radio broadcasting and entertainment.  The Company was
8    founded in 1847, and incorporated in Illinois in 1861.  As a result of corporate restructuring in 1968, the
9    Company became a holding company incorporated in Delaware.

10    58.    Tribune's primary line of business is publishing, which represented 73% of its operating
11    revenues in 2005.  The Company's primary daily newspapers are the *Los Angeles Times, Chicago*
12    *Tribune, Newsday, South Florida Sun-Sentinel, The Baltimore Sun, Orlando Sentinel, The Hartford*
13    *Courant, The Morning Call, Daily Press, The Advocate* and *Greenwich Time.*

14    59.    The Chandler family founded the Los Angeles Times in 1881.  The Chandler family
15    owned the Los Angeles Times and its parent company, Times Mirror Co., until 2000, when Tribune
16    completed an $8.3 billion merger with Times Mirror ("Times Mirror Merger").  As part of the Times
17    Mirror Merger, the Company gained ownership of not just the *Los Angeles Times*, but also *Newsday,*
18    *The Baltimore Sun, The Hartford Courant, The Morning Call, Daily Press, The Advocate* and
19    *Greenwich Time.*

20    60.    The Times Mirror Merger also resulted in the Chandler family becoming a 12%
21    shareholder of the Company, and being awarded three seats on the Tribune Board.  The current
22    members of the Board who represent the Chandler family interests at Tribune are defendants Chandler,
23    Goodan and Stinehart.

24    61.    Tribune also has significant interests in television and radio broadcasting, including
25    ownership of numerous affiliates of the WB Television Network (the "WB"), several Fox Network
26    Television affiliates, and an ABC television affiliate in New Orleans, the Chicago Cubs baseball team,
27    the WGN-AM radio station in Chicago, and Tribune Entertainment, a company that distributes its own
28    programming licensed from third parties.

1    62.    The Company's foray into television with the WB has been less than successful. In the
2  Fall of 2006, the WB was shut down, and Tribune affiliated most of its former WB stations with a new
3  network, the CW Network. As a result of the WB's failure, Tribune will be forced to write off
4  approximately $15 million before taxes.

5    63.    On May 30, 2006, defendants caused the Company to announce that defendants had
6  authorized the repurchase of up to 53 million shares of the Company's common stock in a modified
7  "Dutch Auction" tender offer. The share repurchase plan also included a purchase of an additional 10
8  million shares from the McCormick Tribune Foundation and Cantigny Foundation, the Company's two
9  largest shareholders, holding 11.7% and 13.6% of the Company's outstanding shares respectively.
10  Defendants also stated their intention to cause the Company to follow up the tender offer with a
11  purchase of up to 12 million additional shares on the open market.

12    64.    After defendants' announcement of the share repurchase plan, Moody's Investors
13  Service cut the Company's bond rating to "junk" status because of the amount of debt the plan will
14  cause the Company to undertake.

15    65.    On June 13, 2006, the Board received a letter written on behalf of the Chandler Trusts,
16  which represent the economic interests of the Chandler family in Tribune (the "Chandler Trust Letter").
17  The Chandler Trust Letter publicly proposed alternatives to the share repurchase program that the Board
18  had been asked to consider in non-public board meetings prior to adoption of the share repurchase
19  program. The Chandler Trust Letter revealed that *the Company had received "inquiries" "from very*
20  *credible private equity firms" regarding a possible leveraged buyout of the Company that "could be*
21  *accomplished at a price in excess of $35 a share*," an option that defendants had refused to consider
22  before embarking on the costly and risky share repurchase program.

23    66.    The Chandler Trust Letter described the process by which the share repurchase program
24  was adopted as "fundamentally flawed," and deemed the share repurchase program "a purely financial
25  device that fails altogether to address the real business issues facing Tribune." The Chandler Trust
26  Letter decried the Board's non-existent deliberative process in considering the share repurchase
27  program:

28

- 20 -

1

2

3

4

5

*We believe management and its advisors created a false sense of urgency in representing to directors that immediate action was required on the self-tender transaction. As a result, the Board's action was hasty and ill-informed. Tactical alternatives were superficially listed and dismissed without addressing the failure of the company's fundamental strategy or its poor performance. Prudence should have required that management first determine a cogent and realistic strategy for restoring the value of Tribune's businesses and assets prior to creating a financial structure that limits strategic options.*

6

7

8

9

10

11

12

13

14

15

16

67.     The Chandler Trust Letter noted that "Tribune has significantly underperformed industry averages and there is scant evidence to suggest the next two years will be any different." The Chandler Trust Letter described how Tribune's stock has declined 38% since the beginning of 2003, when current management was put in place – "substantially worse than both the newspaper peer group (down 8.8%) and the broadcasting peer group (down 29.0%)," and demonstrated how management had failed to maximize value for shareholders' equity by delineating: (i) "a sum-of-the-parts analysis" from Morgan Stanley and Bear Stearns that "suggest[s] a breakup value of $42 per share" or a 50% premium over the pre-share repurchase price of $28 per share, and the same analysis from Prudential that "pegg[ed] the value at $43 per share"; and (ii) a breakup analysis from "Ariel Capital, one of Tribune's biggest stockholders," that showed the Company "would be worth $44 to $46 per share in a breakup involving a subsequent sale of the parts."

17

18

19

20

21

22

23

24

68.     The Chandler Trust Letter demanded that the Management Directors undertake, in good faith, certain steps to maximize shareholder value, including: (i) implementing a "tax-free spin-off" involving a "major private equity firm to make a significant investment in the television company and act as its 'sponsor'"; (ii) exploring "other strategic alternatives, including breaking up and selling, or disposing in tax-free spin-offs, some or all of its newspaper properties," or alternatively, "the possibility of an acquisition of Tribune as a whole at an attractive premium"; and (iii) appointing "a committee of independent directors as soon as possible to oversee a thorough review and evaluation of the management, business and strategic issues facing Tribune and to promptly execute alternatives to restore and enhance stockholder value."

25

26

27

69.     The Chandler Trust Letter noted in closing that if defendants did not act quickly, the Chandler Trusts "intend to begin actively pursing possible changes in Tribune's management and other

28

- 21 -

1 │ transactions to enhance the value realized by all Tribune stockholders by engaging with other
2 │ stockholders and other parties."

3 │      70.    Defendants demonstrated that their main design in a response to the Chandler Trusts was
4 │ entrenchment, in a letter dated June 15, 2006, in which they defended their decision to side with
5 │ Company management and undertake the share repurchase program as an additional defensive measure
6 │ to make the Company less attractive to potential acquirers.

7 │      71.    On June 30, 2006, defendants announced that the Company had completed the share
8 │ repurchase plan. Via the share repurchase plan defendants were able to significantly reduce public
9 │ holdings in the Company, repurchasing nearly 45 million shares.

10 │      72.    The share repurchase plan was not a complete success for defendants, however, as far
11 │ fewer shareholders tendered than defendants expected. To make up the shortfall, defendants announced
12 │ that they intend to repurchase up to an additional 20 million shares in the open market on or after July
13 │ 12, 2006.

14 │      73.    Analysts attributed the less-than-successful share repurchase plan to a lack of
15 │ shareholder confidence in the current plan for the Company. An analyst for Morgan Stanley opined that
16 │ "[t]he fact that the tender came in below expectations indicates to us that investors are expecting
17 │ additional actions by the company to realize value."

18 │      74.    Analysts noted that, given the existing defensive barriers defendants have erected,
19 │ replacing the Board will be difficult. "Tribune's board cannot be replaced in one fell swoop because
20 │ elections are staggered over several years." Analysts also noted that forcing defendants to pursue a sale
21 │ of the Company will also be difficult with defendants' defensive barriers in place because "private
22 │ equity firms, potential buyers of Tribune assets, are usually reluctant to make hostile bids."

23 │      75.    An article in ChicagoBusiness.Com, entitled "Tribune board finds itself in the spotlight,"
24 │ delineated just how tough it would be for the Chandler Trusts, the Company and its shareholders to
25 │ force defendants to forego their entrenchment tactics and take steps to maximize shareholder value
26 │ rather than side with Company management:

27 │           The boardroom brawl at Tribune Co. poses a loyalty test for a group of
   │          homegrown directors with deep ties to company management and the Chicago business
28 │          community.

- 22 -

1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1       *A majority of Tribune's 11 directors, including CEO Dennis FitzSimons, are
        drawn from a tight circle of the city's corporate elite. Directors like Northern Trust*
2       *Corp. CEO William A. Osborn and Abbott Laboratories chief Miles D. White run in
        the same circles, often serving together on civic and charitable boards.*
3
        *"Outside relationships – whether they're at a country club or other
4       directorships or private business relationships – could potentially influence the
        objectivity of a director,"* says Rob Kellogg, a managing director for research at
5       Rockville, Md.-based proxy adviser Institutional Shareholder Services Inc.

6               As the fight for control of Tribune unfolds, the six local directors will face
        increasing tension between their fiduciary duties to shareholders and any affinity they
7       may feel for company management or Tribune itself as an iconic Chicago institution.

8                                    *        *        *

9       *So far the local directors, along with two other out-of-town board members,
        have backed management. . . .*
10
        Among the Chicago directors, only former Quaker Oats Co. CEO Robert
11      Morrison has a track record in unloading a company outright. In 2000 he announced the
        sale of the century-old Chicago company, which, like Tribune, stumbled with a big, ill-
12      fated acquisition.

13      ʹ       *Corporate Library, a watchdog group in Maine, classifies Mr. Osborn, the
        Tribune's lead director, as an "outside related" director because of business*
14      *relationships between Northern Trust and Tribune.*

15      76.     Analysts agreed that Tribune shareholders would have been much better served by a

16  break-up or sale of assets instead of being held hostage by defendants' entrenchment tactics. Edward

17  Atorino, an analyst at The Benchmark Company, stated about the Company that "[t]hese are very

18  salable assets." "The company was put together through acquisition. And it could be taken apart by

19  divestiture and yield what some people on Wall Street feel – and I would concur – *is worth more than*

20  *$40 a share.*"

21      77.     Some analysts opined that the Company would be worth as much as $50 per share if it

22  were sold outright.

23      78.     Defendants' focus on retaining their control over Tribune's corporate machinery and

24  recalcitrance in refusing to pursue any value-maximizing opportunities for shareholders was especially

25  problematic given increasing interest in the market in potential deals for all or part of Tribune's assets.

26      79.     Meanwhile, a number of wealthy investors publicly expressed their interest in purchasing

27  the *Los Angeles Times*, including philanthropist Eli Broad, former Major League Baseball

28  Commissioner Peter Ueberroth, Ron Burkle, head of Yucaipa Company, an investment firm that

                                        - 23 -

1 recently expressed interest in buying some of the Knight Ridder newspapers, and David Geffen, the
2 record executive. Some analysts opined that the *Los Angeles Times* alone could be sold for as much as
3 $3 billion.

4      80.    In addition, Mark Cuban, owner of the Dallas Mavericks, stated that he would pay "any
5 price" to purchase the Chicago Cubs from the Company.

6      81.    On July 31, 2006, it was reported that defendants had formally refused to negotiate with
7 Burkle, Geffen or Broad regarding a possible purchase of the *Los Angeles Times*. Defendants told all
8 three investors that the *Los Angeles Times* was not for sale, and that they would not agree to have any
9 further discussions.

10      82.    The same reports that announced defendants' out-of-hand rejection of the offers made by
11 Burkle, Geffen and Broad also reported that several investors were interested in purchasing outright
12 both *The Baltimore Sun* and *Newsday*.

13      83.    In September, however, defendants took steps to temporarily placate the Chandler Trusts
14 and other disenchanted shareholders by agreeing to restructure two partnerships the Company inherited
15 six years ago in the Times Mirror Merger. Defendants contended that restructuring the partnerships was
16 necessary to enable the Board to take steps to maximize shareholder value. Accordingly, on September
17 21, 2006, defendants set up a so-called independent Special Committee to undertake an assessment of
18 strategic alternatives. The committee was not independent, however, as it consisted entirely of directors
19 who were aligned with management: Hernandez, Heldon, Morrison, Osborn, Reyes, Taft and White.
20 The Committee hired Morgan Stanley as its financial advisor shortly thereafter.

21      84.    On October 23, 2006, it was announced that several private equity firms had expressed
22 interest in purchasing Tribune and intended to present indications of interest by the end of the month.
23 These private equity firms included two groups, one consisting of Madison Dearborn Partners,
24 Providence Equity Partners and Apollo Management, and another comprised of Thomas H. Lee
25 Partners and Texas Pacific Group. Another private equity group, Carlyle Group, had also made
26 entreaties.

27
28

1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

85.     On November 2, 2006, defendants rebuffed the interested bidders when they announced that they were shifting the focus of their purported pursuit of strategic alternatives away from a sale of the entire Company and towards individual sales of different business entities within the Company.

86.     Despite defendants' demonstrated resistance to a full and fair sales process, potential acquirers continued to express interest in purchasing the Company. On November 8, 2006, private investors Broad and Burkle made a renewed offer to purchase the entire Company. Not surprisingly, defendants made no initial efforts to publicly respond to Broad and Burkle or to negotiate with the two California-based investors.

87.     By late November 2006, defendants announced that they had extended their review of strategic alternatives to January 2007 and that the process had "generated a strong interest from a number of parties." The Company also announced that the Special Committee would make a recommendation to the Board before the end of the first quarter of 2007.

88.     At a December 12, 2006 meeting, the Committee also discussed possible roles for the McCormick Tribune Foundation and Cantigny Foundation in the process and management's involvement with the foundations.

89.     On December 14, 2006, it was reported that billionaire Geffen in November 2006 had reviewed his proposal to buy the *Los Angeles Times* from Tribune for $2 billion. Defendants responded by saying they would not consider Geffen's bid until the Company had fielded offers for the entire Company.

90.     In January 2007, the McCormick Tribune Foundation, which holds an 11.7% stake in Tribune and is run by current and former Tribune Co. executives, including defendant FitzSimons, announced it had enlisted the support of the Blackstone Group, to facilitate a bid for the Company. At the time, the Blackstone Group was finalizing plans to take Equity Office Properties private, which it accomplished in February 2007 for $39 billion. Pursuant to that transaction, Zell, who was founder, Chairman and CEO of Equity Office Properties and who at the time was formulating his own plan to acquire Tribune, cashed out his holdings in Equity Office Properties for hundreds of millions of dollars.

91.     Shortly thereafter, the *Chicago Tribune* reported that the McCormick Tribune Foundation had spoken with Zell about a way to structure an offer to take the Company private.

- 25 -

1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1  Blackstone subsequently never pursued a proposal with the McCormick Tribune Foundation to acquire
2  Tribune.

3      92.    Defendants initially set January 17, 2007 as the deadline for the submission of bids from
4  interested parties.  By that date, three parties submitted bids.  The first, from the Chandlers,
5  contemplated a stock and cash deal with two private equity firms estimated at $31.70 per share.  The
6  second, from Broad and Burkle, estimated at $34.00 per share, involved a privately-sponsored
7  recapitalization plan pursuant to which Broad and Burkle would inject $500 million cash into the
8  Company and arrange a debt package to pay out a $27.00 per share dividend in exchange for 30% of the
9  Company. Finally, the Carlyle Group put forth a bid solely for the Company's television station group.

10     93.    In response to the bids, the Special Committee leaked to the press that they were
11  favoring an internal restructuring that would keep them in place, but also announced it was reviewing
12  the bids and placed a self-imposed March 31, 2007 deadline on its process.

13     94.    Meanwhile, in early February, media reports again surfaced concerning Zell's discussion
14  with Tribune. On March 1, 2007, Zell was quoted as saying in an online edition of Crain's Chicago
15  Business "[t]o the extent we may get involved with the Tribune, I can guarantee you our interests are
16  100% economic."

17     95.    Later in March 2007, Barron's reported that Zell would personally put in as much as
18  $300 million toward his proposal, that he had commitments from lenders for all the debt required, that
19  the proposal involved creation of an ESOP and that the proposed transaction would be valued at about
20  $13 billion.

21     96.    On March 23, 2007, it was disclosed that defendant Zell had made an acquisition
22  proposal for $33.00 per share which called for an ESOP.  Under such an arrangement, the McCormick
23  Tribune Foundation, the Chandler Trust, Tribune management and defendants would reap windfalls of
24  millions of dollars through the deferral of capital gains on the sale of their stock, and management and
25  Board members would stay in control of the Company.

26     97.    Shortly after the Zell's agreement was disclosed, Burkle and Broad complained to the
27  Tribune Board that they had not received fair treatment in the bidding process.  Specifically, the two
28  California billionaires sent a letter to the Board objecting to the disparate treatment they believed Zell

- 26 -

1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1   had enjoyed by being given access to detailed internal information necessary to structure his acquisition

2   proposal as an ESOP. Furthermore, the structure would benefit management as owners of the ESOP by

3   allowing them to deduct interest and principal payments on the debt incurred in setting up the ESOP.

4       98.    Knowing their current proposal would not receive any genuine consideration from

5   defendants as it neither benefited the large shareholders nor allowed management and Board members

6   to retain control, despite it being worth $1 per share more than Zell's agreement, Burkle and Broad

7   adjusted the terms of their proposal to include an ESOP structure. The motivation was clear. Wachovia

8   Securities analyst John Janedis commented that "[w]e think this benefit could be one of the reasons that

9   the company has favored the Zell bid, as the Chandlers, the McCormick Trust, and management could

10  all potentially benefit from this." On March 30, 2007, Burkle and Broad submitted a revised proposal at

11  $34 per share which included an ESOP structure. The proposal contemplated an investment of $500

12  million by Broad and Burkle.

13      99.    At some point prior to April 2, 2007, Zell increased his offer to $34.00 per share.

14  Despite the active participation of Zell and the Broad and Burkle coalition, defendants adhered to their

15  arbitrary deadline without giving Broad and Burkle the opportunity to beat Zell's offer, and agreed to a

16  transaction with Zell on Sunday, April 1, 2007.

17                    **THE PROPOSED ACQUISITION**

18      100.    On Sunday, April 2, 2007, defendants announced that they had agreed to the Zell

19  proposal. The press release stated (in part):

20  Tribune to Go Private for $34 Per Share

21  Employee Stock Ownership Plan (ESOP) Created; Sam Zell to Invest, Join Board; Chicago Cubs and Comcast SportsNet Interest to be Sold

22

23      CHICAGO, April 2 /PRNewswire-FirstCall/ -- With the completion of its strategic review process, Tribune Company (NYSE: TRB) today announced a transaction which will result in the company going private and Tribune shareholders

24  receiving $34 per share. Sam Zell is supporting the transaction with a $315 million investment. Shareholders will receive their consideration in a two-stage transaction.

25

26      Upon completion of the transaction, the company will be privately held, with an Employee Stock Ownership Plan (ESOP) holding all of Tribune's then-outstanding common stock and Zell holding a subordinated note and a warrant entitling him to

27  acquire 40 percent of Tribune's common stock. Zell will join the Tribune board upon completion of his initial investment and will become chairman when the merger closes.

28

- 27 -

1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

The first stage of the transaction is a cash tender offer for approximately 126 million shares at $34 per share. The tender offer will be funded by incremental borrowings and a $250 million investment from Sam Zell. It is anticipated to be completed in the second quarter of 2007. The second stage is a merger expected to close in the fourth quarter of 2007 in which the remaining publicly-held shares will receive $34 per share. Zell will make an additional investment of $65 million in connection with the merger, bringing his investment in Tribune to $315 million.

The board of directors of Tribune, on the recommendation of a special committee comprised entirely of independent directors, has approved the agreements and will recommend Tribune shareholder approval. Representatives of the Chandler Trusts on the board abstained from voting as directors. However, the Chandler Trusts have agreed to vote in favor of the transaction.

The agreements reached between Tribune, the ESOP and Zell and announced today include the following transactions:

• The ESOP will immediately purchase $250 million of newly issued Tribune common stock for $28 per share.

• Zell will invest $250 million in Tribune and join its board of directors. Of this initial investment, $50 million will purchase approximately 1.5 million newly-issued shares of Tribune common stock for $34 per share and $200 million will purchase a note exchangeable for common stock at a $34 per share exchange price. The Zell investment will be completed upon expiration or early termination of the Hart-Scott-Rodino waiting period, subject to other customary conditions.

• Tribune will launch a tender offer to repurchase approximately 126 million shares of its common stock for $34 per share, returning approximately $4.3 billion of capital to shareholders. The tender offer will be subject to the completion of financing arrangements, receipt of a solvency opinion and other customary conditions; it is expected to be completed in the second quarter of 2007.

• Following the tender offer, Tribune and the ESOP will merge and all remaining Tribune stock will be converted to cash at $34 per share. The merger will be subject to Tribune shareholder approval, FCC and other regulatory approvals, receipt of financing and a solvency opinion, and other conditions reflected in the definitive agreements that will be filed later this week with the SEC. If the merger has not closed by Jan. 1, 2008, shareholders will receive an additional amount of cash based upon an 8 percent annualized "ticking fee" that will accrue from Jan. 1, 2008, until the closing.

• Up to the time of shareholder approval, Tribune's board of directors will be entitled, subject to specified conditions, to consider unsolicited alternative proposals that may lead to a superior proposal. In the event such a superior proposal is selected, the break-up fee to Zell would be $25 million.

• In conjunction with the execution of these agreements, Tribune will suspend its regular quarterly dividend.

• Upon completion of the merger, Zell's initial $250 million investment will be redeemed and Zell will make a new investment through the purchase of a subordinated note for $225 million with an 11-year maturity and a warrant for $90 million with a 15-year maturity. The warrant can be exercised by Zell at any time to acquire 40 percent of Tribune's common stock for an aggregate exercise price initially of $500 million.

1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

• The company will be led by a board of directors with an independent majority. Dennis FitzSimons, as Tribune president and chief executive officer, will remain a member of the board, along with at least five independent directors and an additional director affiliated with Zell.

101. In order to obtain the significant tax benefits from the ESOP structure, the Chandler Trusts have entered into a voting agreement with Tribune pursuant to which they are obligated to vote in favor of the post-tender merger. Others Board members, however, who will remain on the Board and also have divergent interests, did not *abstain*. Significantly, representatives of the Chandler Trusts on the Tribune Board abstained from the Board vote on the Proposed Acquisition – a clear admission that their interests diverged from other public shareholders.

102. Beyond the unfair price and unfair bidding process, the defendants have also imposed upon shareholders a means to accomplish the Proposed Acquisition that is structurally coercive and unlawful. Pursuant to the agreement with Zell, Zell will fund a tender offer to repurchase approximately 126 million shares of its common stock for $34 per share, or approximately $4.3 billion. The tender offer portion of the Proposed Acquisition is expected to be completed in the second quarter of 2007. Following the tender offer, Tribune and the ESOP will merge and all remaining Tribune stock will be converted to cash at $34 per share. Shareholders who do not tender their shares immediately, will be forced to wait at least until the end of the year before they can vote on the second step of the Proposed Acquisition. In that time period, however, they lose time value of their investment and risk the merger not being accomplished because of industry or company-specific issues, but they get none of the upside benefits for fiscal improvement. Thus, shareholders unaffiliated with the Company or its large shareholders only real choice is to tender, and give the buyout group sufficient ownership interest to assure shareholder approval of the second step. Public shareholders, as the majority, will have no real say as to whether or not the Proposed Acquisition actually takes place.

### FIRST CAUSE OF ACTION

**Class and Derivative Claim Against all Defendants for Breach of Fiduciary Duty**

103. Plaintiff repeats and realleges each allegation as though fully set forth herein. Plaintiff brings this claim derivatively on behalf of Tribune and directly on behalf of himself and all other Class members.

- 29 -

1    104.    The defendants failed to act reasonably or in good faith in an effort to maximize
2 shareholder value. Rather, the defendants have taken actions designed to impede the maximization of
3 shareholder value in order to allow defendants to retain their control over and emoluments associated
4 with their positions as directors and/or senior insiders of Tribune.

5    105.    The defendants have violated fiduciary duties of care, loyalty, candor and independence
6 owed to Tribune and its public shareholders and have acted to put their personal interests ahead of the
7 interests of Tribune shareholders.

8    106.    The Individual Defendants were and are under a duty to:

9         (a)    fully inform themselves of the market value of Tribune before taking, or agreeing
10 to refrain from taking, action;

11         (b)    act in the best interest of Tribune and its shareholders; and

12         (c)    act in accordance with their fundamental duties of due care, good faith, loyalty
13 and candor.

14    107.    The Individual Defendants have violated their fiduciary duties by failing to give
15 reasonable and good faith consideration to alternatives to maximize shareholder value. Defendants
16 directly breached and/or aided and abetted the other defendants' fiduciary duties to Tribune and the
17 public stockholders of Tribune.

18    108.    As demonstrated by the allegations above, the defendants failed to exercise the care
19 required, and breached their duties of loyalty, good faith, candor and independence owed to the
20 shareholders of Tribune because, among other reasons, they failed to properly and adequately consider
21 offers to purchase Tribune and take other necessary steps to maximize the value of Tribune to its public
22 shareholders.

23    109.    Because the Individual Defendants dominate and control the business and corporate
24 affairs of Tribune, and are in possession of private corporate information concerning Tribune's assets
25 (including the knowledge during the relevant period of other undisclosed bids for the Company),
26 business and future prospects, there exists an imbalance and disparity of knowledge and economic
27 power between them and the public shareholders of Tribune which makes it inherently unfair for them
28 to reject any proposed transaction or strategic alternatives for the Company for the sole purpose of

- 30 -

1    entrenching themselves as managers and directors of the Company, to the exclusion of maximizing
2    shareholder value.

3        110.    By reason of the foregoing acts, practices and course of conduct, the defendants have
4    failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward
5    plaintiff and the other members of the Class.

6        111.    Defendants are engaging in self dealing, are not acting in good faith toward plaintiff and
7    the other members of the Class, and have breached and are breaching their fiduciary duties to the
8    members of the Class.

9        112.    Each of the Individual Defendants has knowingly participated in the unlawful conduct
10    alleged herein in order to advance his or her own economic interests, or the interests of friends and
11    colleagues, to the detriment of Tribune and its shareholders.

12        113.    By the acts, transactions and courses of conduct alleged herein, the Individual
13    Defendants, on their own and as part of a common plan, and in breach of their fiduciary duties to
14    Tribune and its shareholders, are engaging in acts that will irreparably harm the Company and/or its
15    shareholders.

16        114.    By reason of the foregoing acts, practices and course of conduct, the Individual
17    Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary
18    obligations toward Tribune.

19        115.    As a result of the defendants' unlawful actions, Tribune and its public shareholders are
20    being and will be irreparably harmed unless defendants' actions are enjoined by the Court, the
21    Individual Defendants will continue to breach their fiduciary duties owed to Tribune and Tribune
22    shareholders and will continue to engage in a process that harms Tribune and its shareholders and
23    inhibits the maximization of shareholder value.

24                        **SECOND CAUSE OF ACTION**

25            **Derivative Claim Against all Defendants for Abuse of Control**

26        116.    Plaintiff incorporates by reference and realleges each and every allegation set forth
27    above, as though fully set forth herein.

28

                                - 31 -

1    117.    Defendants employed the alleged scheme for the purpose of maintaining and entrenching
2 || themselves in their positions of power, prestige and profit at, and control over, Tribune, and to continue
3 || to receive the substantial benefits, salaries and emoluments associated with their positions at Tribune.
4 || As part of this scheme, defendants erected unreasonable and draconian defensive barriers to prevent
5 || potential offers for the Company, undertook a costly and risky share repurchase plan to damage the
6 || Company and make it less attractive to potential acquirers, and made affirmative misrepresentations
7 || concerning their unlawful misconduct.

8    118.    Defendants' conduct constituted an abuse of their ability to control and influence
9 || Tribune.

10    119.    By reason of the foregoing, Tribune has been damaged.

11                                    **THIRD CAUSE OF ACTION**

12                **Derivative Claim Against All Defendants for Gross Mismanagement**

13    120.    Plaintiff incorporates by reference and realleges each and every allegation set forth
14 || above, as though fully set forth herein.

15    121.    Defendants had a duty to Tribune and its shareholders to prudently supervise, manage
16 || and control the operations and business of Tribune.

17    122.    Defendants, by their actions and by engaging in the wrongdoing described herein,
18 || abandoned and abdicated their responsibilities and duties with regard to prudently managing the
19 || businesses of Tribune in a manner consistent with the duties imposed upon them by law.  By
20 || committing the misconduct alleged herein, defendants breached their duties of due care, diligence and
21 || candor in the management and administration of Tribune's affairs and in the use and preservation of
22 || Tribune's assets.

23    123.    During the course of the discharge of their duties, defendants knew or recklessly
24 || disregarded the unreasonable risks and losses associated with their misconduct, yet defendants caused
25 || Tribune to engage in the scheme complained of herein which they knew had an unreasonable risk of
26 || damage to Tribune, thus breaching their duties to the Company.  As a result, defendants grossly
27 || mismanaged Tribune.

28    124.    By reason of the foregoing, Tribune has been damaged.

- 32 -
1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1

## FOURTH CAUSE OF ACTION

2

### Derivative Claim Against all Defendants for Corporate Waste

3      125.    Plaintiff incorporates by reference and realleges each and every allegation set forth

4    above, as though fully set forth herein.

5      126.    By failing to properly consider the interests of the Company and its public shareholders,

6    and by causing the Company to expend its cash on hand and incur $2.4 billion dollars in additional

7    unnecessary debt in undertaking the share repurchase plan, defendants have caused Tribune to waste

8    valuable corporate assets.

9      127.    As a result of defendants' corporate waste, they are liable to the Company.

10

### PRAYER FOR RELIEF

11      WHEREFORE, plaintiff demands preliminary and permanent relief, including injunctive relief,

12    as follows:

13      A.      Declaring that this action is properly maintainable as a class and derivative action;

14      B.      Declaring and decreeing that the defendants conduct has been in breach of the fiduciary

15    duties owed by the defendants to Tribune and its public stockholders;

16      C.      Declaring and decreeing that defendants' refusal to consider in good faith potential

17    value-maximizing opportunities for the Company and its shareholders is in breach of the fiduciary

18    duties owed by defendants to Tribune and its shareholders and ordering defendants to comply with said

19    fiduciary duties;

20      D.      Directing defendants to refrain from advancing their own interests at the expense of

21    Tribune or its shareholders and exercise their fiduciary duties to act reasonably and respond in good

22    faith to offers which are in the best interest of Tribune and its shareholders;

23      E.      Directing defendants to establish a committee of truly independent directors, evaluate

24    strategic alternatives and potential offers for the Company, and to take decisive steps to maximize

25    shareholder value;

26      F.      Prohibiting defendants from entering into any contractual provisions which harm

27    Tribune or its shareholders or prohibit defendants from maximizing shareholder value;

28

1    G.    Invalidating the poison pill and/or directing defendants to rescind or redeem it,

2  declassifying the staggered board, rescinding the remaining preclusive defensive measures and

3  restraining defendants from adopting, implementing or instituting any defensive measures that has or is

4  intended to have the effect of making the consummation of an offer to purchase the Company more

5  difficult or costly for a potential acquirer;.

6    H.    Awarding compensatory damages and punitive damages thereon;

7    I.    Awarding plaintiff the costs and disbursements of this action, including reasonable

8  attorneys' and experts' fees; and

9    J.    Granting such other and further relief as this Court may deem just and proper.

10                            **JURY DEMAND**

11    Plaintiff demands a trial by jury.

12  DATED: April 4, 2007                    LERACH COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
13                                          DARREN J. ROBBINS
                                            RANDALL J. BARON
14                                          DAVID T. WISSBROECKER

15

16                                                    RANDALL L. BARON

17
                                            655 West Broadway, Suite 1900
18                                          San Diego, CA 92101
                                            Telephone: 619/231-1058
19                                          619/231-7423 (fax)

20                                          Attorneys for Plaintiff

21  S:\Cases\SD\Tribune Derivative\cpt00040626 1st Amd.doc

22

23

24

25

26

27

28

                                    - 34 -
            1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

1                                            **VERIFICATION**

2         I, RANDALL J. BARON, hereby declare as follows:

3         1.       I am a partner of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP,

4 one of the counsel for plaintiff Frank Garamella in the above-captioned action. I have read the

5 foregoing complaint and know the contents thereof. I am informed and believe the matters therein are

6 true and on that ground allege that the matters stated therein are true.

7         2.       I make this Verification because plaintiff is absent from the County of San Diego where

8

9 I maintain my office.

10         Executed this 4th day of April, 2007 at San Diego, California.

11

12                                       RANDALL J. BARON

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE BY UPS DELIVERY

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      That on April 4, 2007, declarant served by UPS, next day delivery, the FIRST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND CORPORATE WASTE to the parties listed on the attached Service List. Declarant also served the parties by facsimile.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of April, 2007, at San Diego, California.

DEBORAH D. HAYES

1ST AMENDED VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT

TRIBUNE DERIVATIVE
Service List - 4/4/2007    (06-0218)
Page 1 of 1

### Counsel For Defendant(s)

Dean J. Kitchens
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
  213/229-7000
  213/229-7520 (Fax)

James W. Ducayet
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
  312/853-7000
  312/853-7036 (Fax)

Michael C. Kelley
Jennifer A. Landau
John Fitzgibbons
Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013-1010
  213/896-6000
  213/896-6600 (Fax)

### Counsel For Plaintiff(s)

Darren J. Robbins
Randall J. Baron
David T. Wissbroecker
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
  619/231-1058
  619/231-7423 (Fax)