1 | LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
2 | DARREN J. ROBBINS (168593)
RANDALL J. BARON (150796)
3 | STEPHEN J. ODDO (174828)
DAVID T. WISSBROECKER (243867)
4 | 655 West Broadway, Suite 1900
San Diego, CA  92101
5 | Telephone: 619/231-1058
619/231-7423 (fax)
6
Attorneys for Plaintiff
7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF LOS ANGELES

10

11 | FRANK GARAMELLA, Derivatively on
Behalf of TRIBUNE COMPANY,

12 |               Plaintiff,

13 |     vs.

14 | DENNIS J. FITZSIMONS, et al.,

15 |              Defendants,

16 |   – and –

17 | TRIBUNE COMPANY, a Delaware
corporation,

18

19 |          Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. BC362110

CORRECTED MEMORANDUM IN
SUPPORT OF PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

DATE:     May 22, 2007
TIME:     9:00 a.m.
DEPT:    324
DATE ACTION FILED:  11/17/06

**FILED CONDITIONALLY UNDER SEAL PURSUANT TO C.R.C. 2.551 AND ¶14 OF THE
STIPULATED PROTECTIVE ORDER**

# TABLE OF AUTHORITIES

**Page**

I.    A PRELIMINARY INJUNCTION IS WARRANTED ........................................................ 1

II.   THE TENDER OFFER MUST BE ENJOINED BECAUSE DEFENDANTS
      FAILED TO MAXIMIZE SHAREHOLDER VALUE ........................................................ 3

III.  THE TENDER OFFER MUST BE ENJOINED BECAUSE IT IS
      STRUCTURALLY COERCIVE ........................................................................................ 11

IV.   THE TENDER OFFER MUST BE ENJOINED BECAUSE IT COERCES TENDER
      THROUGH MISINFORMATION ...................................................................................... 17

      A.    Defendants Failed to Disclose the Reason Why the Proposed Buyout Is
            Structure as a Two-Tiered Tender Offer/Merger ...................................................... 19

      B.    Defendants Failed to Disclose Their Failure to Deal Fairly with the
            Broad/Burkle Group at the Tail End of the Process .................................................. 21

V.    CONCLUSION ................................................................................................................ 23

# TABLE OF AUTHORITIES

**Page**

## CASES

*AC Acquisitions Corp. v. Anderson, Clayton & Co.*,
519 A.2d 103 (Del. Ch. 1986) ............................................................. 2, 12, 13

*Arnold v. Society for Sav. Bancorp.*,
650 A.2d 1270 (Del. 1994) .......................................................................... 18

*Barkan v. Amsted Industries, Inc.*,
567 A.2d 1279 (Del. 1989) ............................................................................ 3

*Blanchette v. Providence & Worcester Co.*,
428 F. Supp. 347 (D. Del. 1977) ............................................................. 17, 18

*Butt v. State*,
4 Cal. 4th 668 (1992) ..................................................................................... 1

*Clements v. Rogers*,
790 A.2d 1222 (Del. Ch. 2001) .................................................................... 23

*Eisenberg v. Chicago Milwaukee Corp.*,
537 A.2d 1051 (Del. Ch. 1987) .............................................................. *passim*

*Gilmartin v. Adobe Resources Corp.*,
No. 12467, 1992 Del. Ch. LEXIS 80
(Del. Ch. Apr. 6, 1992) ................................................................................. 2

*Gimbel v. The Signal Companies, Inc.*,
316 A.2d 599 (Del. Ch. 1974) ....................................................................... 1

*Heckmann v. Ahmanson*,
168 Cal. App. 3d 119 (1985) ......................................................................... 1

*In re Holly Farms Corp. S'holders Litig.*,
No. 10350, 1988 Del. Ch. LEXIS 164
(Del. Ch. Dec. 30, 1988) ......................................................................... 10, 11

*In re NetSmart Techs., Inc. S'holders Litig.*,
No. 2563-VCS, 2007 Del. Ch. LEXIS 35
(Del. Ch. Mar. 14, 2007) .................................................................. 3, 11, 22, 23

*In re Pure Res., Inc., S'holders Litig.*,
808 A.2d 421 (Del. Ch. 2002) ................................................................... 2, 3

*In re Staples, Inc. S'holders Litig.*,
792 A.2d 934 (Del. Ch. 2001) ....................................................................... 3

*In re Toys "R" Us, Inc., S'holder Litig.*,
877 A.2d 975 (Del. Ch. 2005) .................................................................... 4, 5

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

*IT Corp. v. County of Imperial*,
    35 Cal. 3d 63 (1983) ............................................................................1

*Joseph v. Shell Oil Co.*,
    482 A.2d 335 (Del. Ch. 1984) ..............................................................2

*Millenco L.P. v. Mevc Draper Fisher Jurvetson Fund I*,
    824 A.2d 11 (Del. Ch. 2002) ..............................................................21

*Mills Acquisition Co. v. MacMillan, Inc.*,
    559 A.2d 1261 (Del. 1989) ................................................................10

*ODS Techs., L.P. v. Marshall*,
    832 A.2d 1254 (Del. Ch. 2003) ............................................................2

*Omnicare, Inc. v. NCS Healthcare, Inc.*,
    818 A.2d 914 (Del. 2003) ....................................................................3

*Paramount Commc'ns v. QVC Network*,
    637 A.2d 34 (Del. 1994) ......................................................................3

*Plaza Securities Co. v. Fruehauf Corp.*,
    643 F. Supp. 1535 (E.D. Mich. 1986) ................................................18

*QVC Network v. Paramount Commc'ns*,
    635 A.2d 1245 (Del. Ch. 1993) ............................................................2

*Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*,
    506 A.2d 173 (Del. 1986) ..........................................................passim

*Robbins v. Superior Court*,
    38 Cal. 3d 199 (1985) ..........................................................................1

*Rosenblatt v. Getty Oil Co.*,
    493 A.2d 929 (Del. 1985) ..................................................................18

*Sealy Mattress Co. v. Sealy, Inc.*,
    532 A.2d 1324 (Del. Ch. 1987) ............................................................2

*Skeen v. Wadsworth*,
    No. 20110, 2003 Del. Ch. LEXIS 63
    (Del. Ch. June 18, 2003) ....................................................................21

*Zirn v. VLI Corp.*,
    621 A.2d 773 (Del. 1993) ..................................................................18

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1

2

3   **SECONDARY AUTHORITIES**

4   Guhan Subramanian, *A New Takeover Defense Mechanism: Using an Equal Treatment*
          *Agreement as an Alternative to the Poison Pill* 23 Del. J. Corp. L. 375 (1998) ............. 16, 17
5
    Guhan Subramanian, *Bargaining in the Shadow of Takeover Defenses,*
6          113 Yale L.J. 621 (2003) ................................................................................................. 14

7   Lucian A. Bebchuk, *Symposium: Management & Control of the Modern Business*
          *Corporation: Corporate Control Transactions: The Case Against Board Veto in*
8          *Corporate Takeovers,*
          69 U. Chi. L. Rev. 973 (2002) ...................................................................................... 14
9
    Martin Lipton, *Takeover Bids in the Target's Boardroom,*
10         35 Bus. Law. 101 (1979) ......................................................................................... 17

11  Sarah Ellison and Dennis K. Berman, "Tribune Likely to Forgo Bids and Set 'Self-Help'
          Plan," *Wall Street Journal*, Feb. 12, 2007 ............................................................ 5
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **I.    A PRELIMINARY INJUNCTION IS WARRANTED**

2        The granting of a preliminary injunction is within the sound discretion of the trial court and will

3  not be set aside unless it exceeds the bounds of reason or contravenes the uncontradicted evidence. *IT*

4  *Corp. v. County of Imperial*, 35 Cal. 3d 63, 69 (1983).  In determining whether a temporary injunction

5  should be granted, two factors are relevant: (1) is there a reasonable probability that the plaintiff will

6  prevail on the merits; and (2) is the plaintiff likely to suffer greater injury from denial of the injunction

7  than the defendants are likely to suffer from its grant. *Robbins v. Superior Court*, 38 Cal. 3d 199, 206

8  (1985); *see also Heckmann v. Ahmanson*, 168 Cal. App. 3d 119, 125 (1985).  "The trial court's

9  determination must be guided by a 'mix' of the potential-merit and interim-harm factors; the greater the

10  plaintiff's showing on one, the less must be shown on the other to support an injunction." *Butt v. State*,

11  4 Cal. 4th 668, 678 (1992).[1]

12        Here, plaintiff is seeking injunctive relief based on defendants' violations of three distinct

13  corporate principles: (i) the failure to maximize shareholder value in connection with the agreement to

14  sell Tribune Company ("Tribune" or the "Company") to billionaire Sam Zell for $34.00 per share via a

15  Tender Offer (the "Tender Offer") and subsequent merger (the "Proposed Buyout"); (ii) the coercive

16  nature of the Tender Offer; (iii) the failure to disclose material information to Tribune shareholders in

17  the Tender Offer Statement which contains the offer to purchase (the "TO") which has been

18  disseminated to Tribune shareholders in connection with the Tender Offer.[2]  Under well-settled

19  Delaware law, a violation of a board's fiduciary obligation in connection with any of these principles is

20  _____

21  [1]     The California standard is consistent with the standard in Delaware where courts will issue an
22  injunction upon a showing by plaintiff of "a reasonable probability of success on the merits, a
     reasonable likelihood of irreparable harm if injunctive relief is not granted, and that the harm to the
23  plaintiff if injunctive relief is denied outweighs the harm to the defendants if relief is granted."
     *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1055-56 (Del. Ch. 1987) (citing *Revlon, Inc. v.*
24  *MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179 (Del. 1986); *Gimbel v. The Signal*
     *Companies, Inc.*, 316 A.2d 599, 602-03 (Del. Ch. 1974); *aff'd*, 316 A.2d 619 (Del. 1974)).

25  [2]     Plaintiff's operative complaint contains numerous other class and derivative allegations
26  concerning defendants' misconduct in connection with the management of the Company and the
     process undertaken by the Board to review strategic alternatives.  This motion focuses solely on
27  defendants' misconduct related to the Tender Offer which is scheduled to expire on May 24, 2007, and
     is solely designed to obtain preliminary relief pending a full trial on the merits.

28

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

irreparable harm *per se*.  As a Delaware Chancery Court noted in granting a preliminary injunction, "[s]ince the opportunity for shareholders to receive a superior control premium would be irrevocably lost if injunctive relief were not granted, that alone would be sufficient to constitute irreparable harm."[3] *QVC Network v. Paramount Commc'ns*, 635 A.2d 1245, 1273 n.50 (Del. Ch. 1993) (citing *Revlon*, 506 A.2d at 185).

The existence of a structurally coercive tender offer is also *per se* irreparable injury.  Delaware courts have consistently recognized that "the possibility that structural coercion will taint the tendering process also gives rise . . . to injury sufficient to support an injunction." *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 452 (Del. Ch. 2002); *see also Sealy Mattress Co. v. Sealy, Inc.*, 532 A.2d 1324, 1342 (Del. Ch. 1987) (holding that injunctive relief is proper to eliminate an offers' coercive aspects). The issuance of an injunction in a complicated two-step coercive tender transaction serves an important function, "allowing a restructured offer to proceed, potentially obviating the need for a complex, after-the-fact damages case." *AC Acquisitions Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103, 114 (Del. Ch. 1986).

Finally, the vindication of the recognized right to make an informed decision "requires a specific remedy such as an injunction, rather than a substitutionary remedy such as damages." *Gilmartin v. Adobe Resources Corp.*, No. 12467, 1992 Del. Ch. LEXIS 80, at *43 (Del. Ch. Apr. 6, 1992); *Eisenberg*, 537 A.2d 1051; *Joseph v. Shell Oil Co.*, 482 A.2d 335, 344 (Del. Ch. 1984).  No other right would be effective, as once the Tender Offer is effectuated, it cannot easily be undone.  As the court in *Gilmartin* noted:

> To allow the merger to go forward would deprive the . . . Stockholders of [the right to full disclosure], whereas a preliminary injunction for a brief period to enable the defendants to make corrective disclosure is the remedy most likely to vindicate that right.

1992 Del. Ch. LEXIS 80, at *43; *see also ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1262 (Del. Ch. 2003) ("'It is appropriate for the court to address material disclosure problems through the issuance of a

---

[3]      Unless otherwise noted, all emphasis is added, and citations and footnotes are omitted.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1  preliminary injunction that persists until the problems are corrected.'") (quoting *In re Staples, Inc.*

2  *S'holders Litig.*, 792 A.2d 934, 960 (Del. Ch. 2001)); *Pure Res.*, 808 A.2d at 452-53.

3      Since a violation of any of these principles is irreparable harm *per se*, the second prong of the

4  injunction requirement is easily met where the moving party establishes a likelihood of success on the

5  merits. And, as demonstrated below, that is easily established based upon the record before the Court.

6  **II.    THE TENDER OFFER MUST BE ENJOINED BECAUSE DEFENDANTS
       FAILED TO MAXIMIZE SHAREHOLDER VALUE**

7      Under Delaware law, in the context of a sale of control, "'directors must act in accordance with

8  their fundamental duties of care and loyalty'" to shareholders. *Paramount Commc'ns v. QVC Network*,

9  637 A.2d 34, 43 (Del. 1994) (quoting *Barkan v. Amsted Industries, Inc.*, 567 A.2d 1279, 1286 (Del.

10 1989)). "[D]irectors must focus on one primary objective – to secure the transaction offering the best

11 value reasonably available for the stockholders – and they must exercise their fiduciary duties to further

12 that end." *Id.* at 44.  In the context of a change of control – such as the case here – courts review

13 directors' conduct under the enhanced scrutiny standard and must employ "less tolerance for slack by

14 the directors" and be cognizant of the fact that "[a]lthough the directors have a choice of means, they do

15 not comply with their *Revlon* duties unless they undertake ***reasonable*** steps to get the best deal." *In re*

16 *NetSmart Techs., Inc. S'holders Litig.*, No. 2563-VCS, 2007 Del. Ch. LEXIS 35, at *58-*59 (Del. Ch.

17 Mar. 14, 2007).[4]

18

19     Indeed, it is well-settled that in the context of the sale of the Company, the Board is simply not

20 permitted to play favorites among the bidders based on issues unrelated to the consideration

21 _____

[4]    Defendants' decision to "enter into a merger transaction that will result in a change of control" is
22 subject to "enhanced judicial scrutiny under [the] *Revlon* . . . standard of review." *Omnicare, Inc. v.
   NCS Healthcare, Inc.*, 818 A.2d 914, 928 (Del. 2003); *see Revlon*, 506 A.2d 173.  The enhanced
23 scrutiny test requires:

24     (a) a judicial determination regarding the adequacy of the decisionmaking process
       employed by the directors, including the information on which the directors based their
25     decision; and (b) a judicial examination of the reasonableness of the directors' action in
       light of the circumstances then existing.

26 *Paramount*, 637 A.2d at 45; *Omnicare*, 818 A.2d at 931.  Under the enhanced scrutiny test, "[t]he
   directors have the burden of proving that they were adequately informed and acted reasonably."
27 *Paramount*, 637 A.2d at 45.

28

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1    shareholders will receive.  "[A] selfish or idiosyncratic desire by the board to tilt the playing field

2    towards a particular bidder for reasons unrelated to the stockholders' ability to get top dollar" is a

3    violation of a directors' fiduciary obligations.  *See In re Toys "R" Us, Inc., S'holder Litig.*, 877 A.2d

4    975, 1000-01 (Del. Ch. 2005).  But that is exactly what the Board did here.  Defendants agreed to a

5    transaction with Zell at the very same time that a coalition comprised of billionaires Eli Broad and Ron

6    Burkle (the "Broad/Burkle Group") stood ready, willing and able to continue to engage in a competitive

7    bidding process.

8         Defendants' antipathy toward the Broad/Burkle Group began early on in the process.  In

9    December 2006, the Broad/Burkle Group's request to talk to either of the Company's "historic

10   shareholders," the Chandler Trusts and the McCormick Tribune Foundation, to discuss potentially

11   partnering on a proposal, was summarily denied without explanation by the Special Committee.

12   Declaration of Randall J. Baron in Support of Plaintiff's Motion for Preliminary Injunction ("Baron

13   Decl."), Exs. A-B (TRIB 015564, TRIB 009832).  Specifically, the Broad/Burkle Group told the Board

14   in a December 11, 2006 letter that "[a]fter exhaustive analysis of the tax issues surrounding the

15   transaction, we have concluded that partnering with a 'historic shareholder' of Tribune will provide

16   significantly more flexibility and value."  *Id.*, Ex. A (TRIB 015564).  Nonetheless, defendants curtly

17   denied the Broad/Burkle Group's request while at the same time allowing certain other potential

18   bidders, including the Chandler Trusts and the McCormick Tribune Foundation, to discuss partnering

19   with each other and/or with private equity firms on a potential transaction.  *Id.*, Exs. B-D (TRIB

20   009832; TRIB 000037-38; Deposition Transcript of William A. Osborn ("Osborn Tr.") at 24-27).

21        Despite the disparate treatment, on January 17, 2007, the Broad/Burkle Group sent a letter to the

22   Board proposing a transaction worth $34.00 per share to Tribune shareholders via an equity investment

23   by the group of $500 million, to be followed by a leveraged recapitalization.  *Id.*, Ex. E (TRIB 044509-

24   10).  The $34.00 per share proposal was the highest bid for the Company at any point in the process and

25

26

27

28

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1  equaled the stated amount ultimately agreed to with Zell. *Id.*, Ex. F (TRIB 012050-51).[5] The Board on

2  February 13, 2007 rejected as inadequate the Broad/Burkle Group offer, along with the two other

3  proposals they received: the first, from The Carlyle Group only for the Broadcasting and Entertainment

4  ("B&E") sector, and the second, from the Chandler Trusts, for a spin-off of the B&E sector coupled

5  with a recapitalization. *Id.*, Ex. H (TRIB 000053-54).

6      No subsequent effort was made to solicit an improved offer from the Broad/Burkle Group, nor

7  did the Board and/or its advisors have any subsequent discussions with the Broad/Burkle Group. *Id.*,

8  Exs. D, F, I-J (Osborn Tr. at 54; TRIB 012050-51; Deposition Transcript of Michael R. Costa ("Costa

9  Tr.") at 35; Deposition Transcript of Thomas Whayne ("Whayne Tr.") at 108). In fact, Osborn testified

10  that he was not aware of whether the Company's advisors even told the Broad/Burkle Group that their

11  proposal was inadequate nor did he or the Special Committee instruct them to do so. *Id.*, Ex. D (Osborn

12  Tr. at 50-51). Merrill Lynch representative Costa testified that they did not give the Broad/Burkle

13  Group an opportunity to improve their proposal at that time, stating that "[w]e had advised Broad and

14  Burkle that their proposal, revised proposal . . . – was economically inferior to our other alternatives

15  that Tribune was pursuing and therefore there was no basis on which to have continued discussions."

16  *Id.*, Ex. I (Costa Tr. at 132). Instead, Osborn, the Special Committee, and its advisors just allowed the

17  Broad/Burkle Group to "go quiet" by leading them to believe that the process concerning anything but a

18  "self-help" alternative had ended.[6]

19      Unbeknownst to the Broad/Burkle Group, defendants and their advisors had shifted their focus

20  not only to the "self-help" approach which contemplated a spin-off of the B&E Group coupled with a

21

22  ────────────────

[5]    After receiving revised forecasts from the Company which portended significantly lower results, Broad/Burkle subsequently amended its proposal to reflect the softer forecasts. *Id.*, Ex. G (TRIB 000048-52).

23

24  [6]    That defendants had ***not*** committed to an "auction" to sell the Company was made clear in its public updates on the process, including the January 20, 2007 press release which stated that the

25  alternatives being considered by the Company "include potential transactions involving third parties as well as actions the company may take alone." *Id.*, Ex. K ("Tribune Company Updates Strategic Review

26  Process," *PRNewswire*, Jan. 20, 2007). The *Wall Street Journal* reported on February 12, 2007, that Tribune intended to proceed with the "self-help" plan rather than a sale of the Company. Baron Decl.,

27  Ex. L (Sarah Ellison and Dennis K. Berman, "Tribune Likely to Forgo Bids and Set 'Self-Help' Plan," *Wall Street Journal*, Feb. 12, 2007).

28

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1 leveraged recapitalization of the publishing empire, but also to Zell's Employee Stock Ownership Plan

2 ("ESOP") proposal, which defendants had begun working with Zell on in late January 2007 and was

3 outlined in a February 6, 2007 letter.[7] The Zell proposal suggested an ESOP transaction at $33.00 per

4 share, that was essentially a private recapitalization, and would perpetuate the current management and

5 Board structure. *Id.*, Ex. M (TRIB 013614-16).

6     At a time when the Special Committee should have been pitting bidders against each other to

7 foster a competitive process, the minutes of the February 24, 2007 Special Committee Meeting indicate

8 that defendants instead abandoned any semblance of a competitive process to focus solely on the two

9 self-serving alternatives. *Id.*, Ex. N (TRIB 002640-42). Merrill Lynch representative Costa testified

10 that there was "some discussion around whether there might be other investors who could duplicate

11 [Zell's] proposal" but that the Special committee decided to wait to see if such a "proposal, regardless

12 of the investor, could be developed." *Id.*, Ex. I (Costa Tr. at 36). According to Costa, however, that

13 determination was not made until April 1, 2007, when the Board determined to approve the Zell buyout.

14 Defendants simultaneously decided *not* to investigate the interest of other bidders in an ESOP

15 transaction and openly thwarted the Broad/Burkle Group's attempt to surpass Zell's deal. *Id.*

16     More than a month after being led to believe that defendants were only interested in a "self-

17 help" alternative, the Broad/Burkle Group learned through rumors in press reports that the Board and its

18 advisors were working with Zell on the ESOP deal. In response, on March 23, 2007, the Broad/Burkle

19 Group sent a letter to the Board requesting that it be allowed to submit a similar proposal. *Id.* The

20 letter stated in relevant part:

21     Given the amount of time and expense that we have invested in developing an attractive
proposal for Tribune shareholders, we simply do not ***understand why we have not been***
22 ***contacted about our interest in pursuing the ESOP transaction currently being***
***developed.*** Our prior efforts should more than qualify us as serious bidders. In fact,
23 after the Board decided to halt discussions with us, we received information that
suggested that some critical information affecting Tribune's value was not being made
24

25 [7]     The proposed ESOP is a type of benefit plan for employees, where the Company would
contribute money, as it would to a pension or similar kind of retirement savings account. But instead of
26 investing in stocks or bonds, as most pension plans do, the ESOP would use those contributions to pay
down the Company's debt and buy stock in the Company, which would then be distributed to
27 employees as a benefit.

28

1    available to us as we were developing our original proposal. . . . We clearly have
demonstrated our strong belief in the value of the Company's assets and have tried to
2    follow the process you established. Why has that process now been abandoned?

3    Baron Decl., Ex. O (TRIB 012048-51). In the letter, the Broad/Burkle Group also posed an important

4    question - one the Board in order to comply with its fiduciary duty to maximize shareholder value

5    should have asked itself: *"How can the Board now be certain that another investor would not be*

6    *willing to pursue a transaction using this ESOP structure at a higher price?"* Id.

7        The unilateral efforts of the Broad/Burkle Group to reenter the process resulted in a proposal on

8    March 29, 2007 for an ESOP-structured transaction. The proposal letter was unambiguous in its intent,

9    stating in relevant part: "Please consider this letter as our willingness to enter a definitive contract

10    offering shareholders *$34 per share*, our making a $500 million investment and receiving warrants for

11    40% of the Company."[8] Baron Decl., Ex. P (TRIB 006184). After sending the letter, however, the

12    repeated efforts by the Broad/Burkle Group to secure from defendants a draft merger agreement and

13    supporting documents based on an ESOP structure were ignored.

14        In a subsequent letter to the Board dated March 31, 2007, the Broad/Burkle Group noted their

15    frustration:

16        Since submitting our offer to acquire Tribune at $34 per share per our letter dated March
29, 2007, we have requested a draft definitive contract from the Company's advisors or
17        failing that to meet, agree and execute definitive documentation. Despite this, we have
not been provided with a draft contract or the opportunity to meet. *We reiterate our*
18        *commitment to delivering what we believe is a superior proposal to Tribune's*
*shareholders.*
19
Id., Ex. Q (TRIB 006159). Both the Morgan Stanley and the Merrill Lynch representatives and Osborn
20
acknowledged that the requested information was never provided to the Broad/Burkle Group.[9] *See Id.*,
21
Exs. D, I-J (Whayne Tr. at 139; Costa Tr. at 54-55; Osborn Tr. at 76-77).
22

23    _____

24    [8]    Whayne testified that he had no reason to believe that the Broad/Burkle Group would not be
able to provide the equity and debt commitments promised in the letter because the commitments "were
25    similar to the amount they had discussed when they had proposed their public recapitalization back in
January." Baron Decl., Ex. J (Whayne Tr. at 110).

26    [9]    The only instruction the Broad/Burkle Group received was Merrill Lynch's reference to the draft
27    merger agreement that had been circulated to potential bidders in the fall of 2006, but which did not
contain any provisions related to an ESOP structure. *Id.*, Ex. I (Costa Tr. at 54-55), and a vague
28    direction that the Broad/Burkle Group "should come forward with" "a stock purchase agreement." *Id.*,

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1    Ultimately, neither defendants nor their advisors ever provided the Broad/Burkle Group with

2  any meaningful guidance as to how to participate in a process designed to improve upon Zell's ESOP

3  proposal, nor did they ever even inquire as to whether the Broad/Burkle Group might be willing to

4  increase their offer. As Osborn noted, "we didn't really follow up to get – see if they wanted to offer a

5  higher price . . . ." *Id.*, Ex. D (Osborn Tr. at 77).[10]  Instead, the Board met on April 1, 2007, and

6  decided to enter into the agreement with Zell that simply matched the last unsolicited price offered by

7  the Broad/Burkle Group. *Id.*, Ex. R (TRIB 002651-53).  The Broad/Burkle Group, after learning of

8  defendants' actions, sent a final letter to the Board on April 5, 2007, expressing its grave concerns about

9  being shut out of the Board's deliberations: "We understand from reading press reports that your

10  advisors ***offered Mr. Zell the opportunity to give his best and final offer last Sunday evening***. We are

11  disappointed that we were not afforded the same opportunity." *Id.*, Ex. S (TRIB 002923).   ⎯

12    The only rationale expressed by defendants and their advisors for the decision to cater

13  exclusively to Zell, and then arbitrarily shut the process down before securing a best and final bid from

14  the Broad/Burkle Group, is their contention that the Broad/Burkle Group proposal was not as definitive

15  as Zell's, would need additional time to finalize, and would cause the Company to continue the process

16  beyond its self-imposed deadline of the end of the first quarter of 2007, which was March 31, 2007.

17  But these were all hurdles erected by defendants – not the Broad/Burkle Group – and were in no way

18  designed to maximize shareholder value.

19

20

21  Ex. J (Whayne Tr. at 128). The Broad/Burkle Group was informed that "a variety of other agreements"

22  were necessary, *id.*, but were never told what specific documents were needed to submit a proposal
     structured like Zell's. *Id.*, Ex. I (Costa Tr. at 60-61). Costa was asked: "Did you ever at any point tell
     them what specific documents they needed to submit?" *Id.* at 60. Costa replied: "Not sure we told

23  them anything specifically." *Id.*

24  [10]      Costa stated at his deposition that the only direction that Merrill Lynch received from the special
     committee was "to ask Broad and Burkle to submit a definitive marked merger agreement." *Id.*, Ex. I

25  (Costa Tr. at 70). When asked (repeatedly) whether the special committee had asked Merrill Lynch to
     see if the Broad/Burkle Group would be willing to contribute additional equity and raise their offer,

26  Costa would say only that "I can't speculate as to all the different things the committee didn't ask us to
     go do." *Id.* at 71. As for Morgan Stanley, Whayne testified that when he spoke to the Broad/Burkle

27  Group's advisors on March 31, 2007, he made no attempt to discuss the price issue. Baron Decl., Ex. J
     (Whayne Tr. at 173).

28

1    Osborn specifically testified that the Broad/Burkle Group proposal was similar to Zell's and that

2    the only two significant areas where the proposals differed were (1) the Broad/Burkle Group did not

3    have a trustee lined up for the ESOP; and (2) the staple financing that was being provided by Merrill

4    Lynch and Citigroup had not been finalized. *Id.*, Ex. D (Osborn Tr. at 66). The first point was truly a

5    non-issue because by this time, the ESOP had already been created and there was nothing to preclude

6    the Broad/Burkle Group from accepting the Trustee the Board had already approved in connection with

7    the contemplated Zell transaction – the trustee was not selected by Zell in the first place. Osborn Tr. at

8    107-08. The second reason was similarly a red herring. As Merrill Lynch representative Costa

9    confirmed, "Merrill Lynch communicated to Broad and Burkle that subject to similar equity

10   commitments and rating agency use that that *financing would be equally available to Broad and*

11   *Burkle.*" *Id.*, Ex. I (Costa Tr. at 25). And, although the Board's financial advisors both testified that a

12   proposal from the Broad/Burkle Group would also need rating agency approval, the rating agency

13   presentations used in connection with the Zell proposal were developed in large part by the Company,

14   and thus could be adapted for use in connection with a Broad/Burkle Group proposal. *Id.*, Exs. I-J

15   (Costa Tr. at 64-65; Whayne Tr. at 146). Indeed, neither advisor could come up with a single reason

16   why the Broad/Burkle Group, given time to develop such a proposal, could not have structured a

17   transaction to mirror (or exceed) the Proposed Buyout. *Id.*, Ex. I-J (Costa Tr. at 63-67; Whayne Tr. at

18   144-48). Nonetheless, Osborn testified that the Special Committee did not even inquire as to the status

19   of those issues before agreeing to the Zell proposal. *Id.*, Ex. D (Osborn Tr. at 66).

20   Moreover, defendants purported rationale lacks merit for several other reasons:

21   • the Broad/Burkle Group were never given the opportunity to make their proposal more
     definitive. In fact, information they needed to make the proposal more definitive was
22   withheld from them, rather than provided to them, *Id.*, Exs. I-J (Costa Tr. at 54-55;
     Whayne Tr. at 139);

23
24   • the purported end of quarter deadline was illusory. The non-Chandler directors had
     already ignored the Chandler's insistence to move quickly and taken months before
     even deciding upon a course of conduct. Defendants had twice extended the purported
25   deadlines under the guise of needing more time to figure out what strategic direction to
     take. And, defendants went past the arbitrary deadline anyway when they did not reach

26
27
28

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

agreement with Zell until April 1, 2007 and did not publicly announce the deal until April 2, 2007;[11] and

- There was no threat that Zell would walk away because he had imposed no deadline on the Company for acceptance of his offer. *Id.*, Ex. J (Whayne Tr. at 80) (Q. Did Mr. Zell ever give the Special Committee any specific deadlines? A. Not that I am aware of.); *Id.*, Ex. U (Deposition Transcript of Dennis J. FitzSimons ("FitzSimons Tr.") at 122-23).[12]

As the Delaware Supreme Court made clear in *Revlon*, although "[f]avoritism for a white knight to the total exclusion of a [competing] bidder might be justifiable when the [competing bidder's] offer adversely affects shareholder interests, . . . when bidders make relatively similar offers, or dissolution of the company becomes inevitable, the ***directors cannot fulfill their enhanced . . . duties by playing favorites with the contending factions***." *Revlon*, 506 A.2d at 184. Here, the Board was required to cast aside its affinity to Zell and undertake all efforts to seek "the highest price attainable for the stockholders' benefit." *Id.* at 184 n.16. In failing to treat the Broad/Burkle Group on a level playing field with Zell, and thereby cutting short the auction process, the Board violated its duty to get the best price available for shareholders. *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261 (Del. 1989).

*In re Holly Farms Corp. S'holders Litig.*, No. 10350, 1988 Del. Ch. LEXIS 164 (Del. Ch. Dec. 30, 1988), is also highly instructive. In *Holly Farms*, where the Holly Farms board accepted an offer from ConAgra without making any attempt to ascertain if a second, actively-engaged bidder, Tyson Foods, was willing to raise its bid and offer higher value for shareholders. *Holly Farms*, 1988 Del. Ch. LEXIS 164, at *5-*7. The *Holly Farms* court held that, under the circumstances presented, the sales process "was so substantially flawed that the Board's actions . . . were not likely to have maximized the value of the corporation for its shareholders and, therefore, its actions cannot be viewed as being rational." *Id.* at *14. The *Holly Farms* court concluded that the board had violated its *Revlon*

---

[11]    The purported deadline comes from defendants' February 13, 2007 press release that contained at non-binding forecast that "[t]he board ***expects to make*** a decision on a course of action and have an announcement before the end of the first quarter." Baron Decl., Ex. T ("Tribune Company Updates Strategic Review Process," *PRNewswire*, Jan. 13, 2007).

[12]    Indeed, any claim that time was of the essence is completely disingenuous for a Board that plodded methodically through a review of strategic alternatives and in doing so squandered numerous attempts to maximize shareholder value while the Company's prospects going forward grew dimmer.

- 10 -

1  duties and enjoined the merger. *Id.* at *14-*16. Here the Board could have, and should have, gone back

2  to the Broad/Burkle Group to see what their highest bid would be. Unlike *Holly Farms*, where the

3  board violated its duty even though it took the *highest* bid then on the table, the Board here cut the

4  process short based simply on its White Knight's willingness to match the once superior bid.[13]

5  **III.    THE TENDER OFFER MUST BE ENJOINED BECAUSE IT IS
STRUCTURALLY COERCIVE**

6

7          "[A] tender offer – particularly one made by a corporation for its own shares – may be voluntary

in appearance and form but involuntary as a matter of reality and substance." *Eisenberg*, 537 A.2d at

8  1056. A tender offer is impermissibly coercive when the Court finds that "defendants have taken

9
actions that operate inequitably to induce . . . shareholders to tender their shares *for reasons unrelated*

10
*to the economic merits of the offer.*" *Id.* at 1061. Courts do not hesitate to enjoin a tender offer in

11
"cases where the offer, by reason of its terms or the circumstances under which it is made, is wrongfully

12
coercive." *Id.* at 1056-57.

13
         Defendants have structured the Tender Offer here to coerce shareholders into tendering their

14
shares into the first step of the transaction, at a price that is less than fair. The Tender Offer is coercive

15
because it is the only means by which shareholders can: (i) avoid holding shares in a Company saddled

16
with massive debt after the tender offer closes; and (ii) avoid receiving a discount to the $34 per share

17
offer currently on the table. Thus shareholders are being coerced to tender for reasons unrelated to the

18

19

20  [13]     Any claim by defendants that their wrongdoing in connection with dealing with the
Broad/Burkle Group could somehow be sanitized by the possibility that the Broad/Burkle Group or
21  another third party might still come forward with a superior bid for the Company now is a red herring.
Such a possibility, does not, as a matter of law, insulate defendants for failing to maximize shareholder
22  value prior to signing the merger agreement. Indeed, just recently Vice Chancellor Strine soundly
rejected the "rote assumption . . . that an implicit, post signing market check would stimulate a hostile
23  bid." *NetSmart*, 2007 Del. Ch. LEXIS 35, at *8-*9. In *NetSmart*, Vice Chancellor Strine explained:

24           The "no single blueprint" mantra is not a one way principle. The mere fact that a
technique was used in different market circumstances by another board and approved by
25           the court does not mean that it is reasonable in other circumstances that involve very
different market dynamics.
26
27  *Id.* at *72. The argument is even weaker here where the complex machinations of the ESOP structure
contemplated by the Zell deal already have been implemented.

28

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1   "economic merits of the offer" – the very definition of a coercive tender offer. *See Eisenberg*, 537 A.2d

2   at 1061.

3         The coercive effect of the prospect of being left holding shares with considerably less value is

4   well-documented in Delaware case law.  For example, in *AC Acquisitions*, a tender offer was found to

5   be structurally coercive where shareholders who did not tender into a company's self-tender would

6   "experience a substantial loss in [the] market value of his holdings."  519 A.2d at 113.  In *AC*

7   *Acquisitions*, the company's board had offered shareholders the option either tendering their shares to

8   the Company for $65 per share, or continuing to hold their shares in the company that, after the self-

9   tender, would be worth no more than $57 per share. *Id.* at 108, 113.  The *AC Acquisitions* court held

10  that, ***"as a factual matter," "no rational shareholder could afford not to tender into the Company's***

11  ***self-tender offer."*** *Id.*  Similarly, in *Eisenberg*, a company's board offered to purchase all the

12  company's shares of preferred stock for $55 per share following the stock market crash of October 19,

13  1987, even though the preferred shares had a redemption value of $100 per share. *Eisenberg*, 537 A.2d

14  at 1053-54.  If preferred shareholders had chosen not to tender, however, their preferred shares would

15  have potentially been worth less than the tender price because the company planned to delist the shares

16  from the NYSE and cut any dividend payments following the self-tender. *Id.* at 1054-55.  Under the

17  circumstances, the *Eisenberg* court held that the self-tender was coercive because it left shareholders

18  with no real choice but to tender; the only other option was to continue to hold shares that would not

19  trade in the public market and have little or no intrinsic value. *Id.* at 1062.

20        The facts here put shareholders in the same coercive dilemma.  If they choose not to tender their

21  shares into the first step of the Proposed Buyout, they will be left holding shares in a Company saddled

22  with an additional $4.3 billion in debt when the Tender Offer closes.  At that point, the Company's

23  bond ratings will be cut deeper into junk status, a reality Special Committee Chairman Osborn

24  acknowledged the directors understood.[14]  Indeed, the Company will be so close to bankruptcy at that

---

26  [14]    A.    I'm sure they're on the . . . watch for a downgrade once this [the Tender Offer] gets
        completed.

27

28          Q.    And that was something that was anticipated?

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1  point that the Proposed Buyout is contingent on not one, but two solvency opinions – at the close of the

2  Tender Offer and at the close of the back-end merger.[15]  Baron Decl., Ex. V (Tender Offer at 6, 62).

3  And if the Proposed Buyout should not be consummated for whatever reason, such as lack of solvency,

4  or failure to secure the requisite, substantial regulatory approvals, shareholders who do not tender will

5  "experience a substantial loss in [the] market value of [their] holdings." *AC Acquisitions*, 519 A.2d at

6  113.  Threatened with this very real possibility, "no rational shareholder could afford not to tender into

7  the Company's self-tender offer."[16]  *Id.*

8      In fact, each of the Company's largest shareholders, the Chandler Trusts and the McCormick

9  Tribune Foundation, recognized the defective nature of Zell's original ESOP Proposal at $33.00 per

10  share.  Although the original proposal did not contain an initial tender offer component (which was

11  added to placate the Chandler Trusts' demand for instant liquidity), the concerns raised by these

12  shareholders are even more acute in the new tender offer structure.  In a letter they sent to the Special

13

14

---

15      A.    Oh, yes.

16  Baron Decl., Ex. D (Osborn Tr. at 118).

17  [15]   Importantly, the Proposed Buyout is so highly leveraged that "there was a point in time when
18  the Company became concerned about the Zell proposal and had called off discussions."  Baron Decl.,
    Ex. J (Whayne Tr. at 70).  Whayne testified that management was concerned about *the risk inherent*
19  *in incurring a lot of leverage in the business given the uncertainty with regards to the business and*
    *the decline and the top line year over year.*"  *Id.* at 71.  Whayne explained that declining business
20  posed a risk because "if you don't have enough cash flow to service your debt, then the company could
    potentially be faced with a restructuring or in the ultimate extreme a bankruptcy."  *Id.*  When asked
21  "what was done to address the concern that additional leverage could [lead] to such events as a
    restructuring or a bankruptcy," Whayne replied "[n]othing."  *Id.* at 71-72.

22  [16]   Notably, the regulatory approval issues facing the Company in order to consummate the deal are
23  so significant that Zell and FitzSimons are calling on their political contacts to try and secure the
    necessary approvals before the end of the year.  *See, e.g.*, Baron Decl., Exs. W-X (TRIB 002697; TRIB
24  002694).  On this issue, Costa stated that "the Company and Zell are using all of their resources on the
    regulatory and political front in Washington to [ac]cellerate approval from the FCC."  *Id.*, Ex. I (Costa
25  Tr. at 107).  Indeed, Company management has taken the position that "[t]he deal has to be completed
    this year or it could unravel."  *Id.*, Ex. X (TRIB 002694).  In addition, Stinehart notes that the "second
26  half" of the Proposed Buyout, the back end merger, is "potentially at risk" because it needs SEC
    approval.  *Id.*, Ex. Y (Deposition Transcript of William Stinehart, Jr. ("Stinehart Tr.") at 133-34).  That
27  risk, of course, goes away if shareholders tender into the front end.  *Id.* at 135 ("It's not a risk on the
    front end.  You get your dollars up front, and it's there.").

28

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Committee in early March expressing their opposition to Zell's original proposal at $33.00 per share, the McCormick Tribune Foundation specifically identified these risks:

- with respect to timing, they commented that "we believe the ESOP proposal will not close (assuming the FCC approves it) for nine to 12 months from the date the FCC publishes notice of the proceeding [which] creates a discount from the $33 per share face value"; and

- with respect to execution risks, they commented that "[b]oth the ESOP and the FCC considerations create, in our view, serious impediments to the successful execution of the ESOP Proposal." They specifically noted the "bring down fairness opinion" for the ESOP trustee, which it described as "problematic especially in an industry that is in transaction and which may deteriorate between now and closing." Finally, they pointed to anticipated "material adverse change provisions [in the financing of the ESOP Proposal] that could come into play if Tribune business results decline."

Baron Decl., Ex. DD (MS TRIB000004-05).

The Chandler Trusts raised similar concerns, stating that "[o]ur main concern with the ESOP Proposal is the length of time it would take to consummate a transaction and the execution risk that this involves. Completion of the ESOP Proposal would require approval from the Federal Communications Commission. There is uncertainty as to whether the approval would be granted in light of the current cross-ownership roles and, if granted, about both the form that this approval would take and whether it would be acceptable to the proponent of the ESOP Proposal [Zell]." *Id.*, Ex. BB (MS TRIB000002-03).

The views of these large shareholders are consistent with all the corporate law literature that explains that the timing and risk of consummation of back-end mergers demonstrate structural coercion. *See* Lucian A. Bebchuk, *Symposium: Management & Control of the Modern Business Corporation: Corporate Control Transactions: The Case Against Board Veto in Corporate Takeovers*, 69 U. Chi. L. Rev. 973, 982-84 (2002) (discussing how front end tender offers followed by a cash-out merger at the same price remain coercive because shareholders on the back end receive their cash later than shareholders who tender into the front end); Guhan Subramanian, *Bargaining in the Shadow of Takeover Defenses*, 113 Yale L.J. 621, 632 & n.59 (2003) (same). Here, even assuming a conservative discount rate of return of 6% per year, the present value on December 31, 2007 of the $34 per share consideration is only $32.98. Thus shareholders who do not tender will lose out on $1.02 per share,

1   more than incentive enough to tender into the front end regardless of the fairness of the offering price.[17]

2   As discussed by Prof. Bebchuk in *The Case Against Board Veto in Corporate Takeovers*, the prospect

3   of receiving consideration on the back end of a two-tiered offer, even if the difference is as little as 2%,

4   is "sufficient to make tendering clearly preferable." Bebchuk, *supra*, at 983.

5           The Special Committee's own financial advisors, in fact, analyzed this time value of money

6   issue in their presentations. In Morgan Stanley's April 1, 2007 presentation to the Board, the banker

7   valued Zell's proposal, looking at "net present value" of the consideration and using "assumed cost of

8   equity" of *8%, 10%* and *12%*. Baron Decl., Exs. Z, AA (Project-Over Presentation Materials, dated

9   April 1, 2004; MS TRIB0001418). Thus, under Morgan Stanley's approach, shareholders who do not

10  tender in the front end are substantially worse off (by a factor as much as six times) than the

11  hypothetical shareholders considered by Prof. Bebchuk. Discounting the Proposed Buyout

12  consideration by the higher values chosen by Morgan Stanley demonstrates that the $34 per share

13  offered in the Proposed Buyout is worth no more that $32.64 per share, and as little as $31.96.[18] Faced

14  with such an economic gap between the consideration offered in the Tender Offer and the back-end

15  merger, shareholders are given no choice but to tender.[19]

16          Osborn acknowledged as much when he testified that "we all understood that there is a time

17  value of money. So even though someone would receive $33 to $33.50 – and the same amount six

18  months later, the second value received would be on a present value a little bit less." *Id.*, Ex. D (Osborn

19

---

20  [17]    Not to mention, defendants agreed with Zell to suspend all dividend payments. Accordingly
21  shareholders will also lose their expected return for holding their Tribune shares.

22  [18]    The numbers Morgan Stanley arrives at are considerably higher than those set forth here because
    Morgan Stanley uses a blended rate of consideration, a premise that assumes all shareholders will tender
23  into the front end, and thus receive half their consideration up front. *Id.* Thus Morgan Stanley only
    discounts the back half of the consideration under this approach, or $17.50. Importantly, even
24  defendants own financial advisors assume that shareholders will rush to tender up front to avoid
    receiving less consideration in the back-end merger. *Id.; see also* Baron Decl., Exs. I-J (Costa Tr. at
25  123; Whayne Tr. at 67-68).

26  [19]    Ironically, Merrill Lynch testified incorrectly that non-tendering shareholders who believe they
    are entitled to more than $34.00 per share could seek appraisal rights. Baron Decl., Ex. I (Costa Tr. at
27  124). As Mr. Costa should know, however, appraisal rights are ***not*** available to Tribune shareholders in
    connection with the Tender Offer.

28

Tr. at 130). This reality caused Stinehart to concede that there are material economic reasons why shareholders would feel compelled to tender into the front end of the Proposed Buyout. *Id.*, Ex. Y (Stinehart Tr. at 134). A front-end tender puts "dollars in pocket today" and "[y]ou're going to have the use of the $34 on your money immediately." *Id.* Moreover, shareholders who continue to hold on the back-end will "lose[] the dividend." *Id.* at 134. Thus, "[t]here's no reason not to tender." *Id.* And, once the tender is accepted, the Company will be confronting substantial debt – thereby necessitating that shareholders not only tender on the front end, but also agree to the merger on the back end.[20]

Finally, even a straightforward analysis under "game theory" demonstrates the coercive structure of the Tender Offer. The only way for shareholders to share proportionately in the consideration offered by the Proposed Buyout and to equally bear the risk is by coordinated action. *See* Guhan Subramanian, *A New Takeover Defense Mechanism: Using an Equal Treatment Agreement as an Alternative to the Poison Pill*, 23 Del. J. Corp. L. 375, 407 n.194 (1998). However, because true coordinated action among shareholders is impossible in the tender offer context, "the combination of risk aversion and uncertainty as to the actions of the majority will lead shareholders to tender. . . . That is, within some reasonable range of offers, a risk-averse shareholder will choose the certainty of the tender offer premium to the possibility of being frozen out in the bank-end at an unattractive price, or, even worse, being left with an illiquid minority position." *Id.* As Martin Lipton, the guru of takeover defense has put it, "the special dynamics of a tender offer are such that the decision of shareholders is almost always a foregone conclusion – they will tender, therefore, it is misleading to speak of a free

---

[20]     Prof. Bebchuk further notes that the only way to dispel the coercion present in a scenario like the one presented to shareholders here is to require that the back-end price "be equal to the bid price plus interest." Bebchuk, *supra*, at 984. Importantly, no such price protection was made available to shareholders here. The 8% ticking fee that defendants will no doubt tout as a boon to shareholders does nothing to diminish the time-value of money problem that reduces the back-end merger consideration by as much as $2 per share. Moreover, it does not take effect unless the Proposed Buyout fails to close by December 31, 2007, and defendants have predicted that if the Proposed Buyout is "not completed this year . . . it could unravel." Baron Decl., Ex. X (TRIB 002694).

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1   shareholder choice at all." Martin Lipton, *Takeover Bids in the Target's Boardroom*, 35 Bus. Law. 101,

2   113 (1979).[21]

3   **IV.    THE TENDER OFFER MUST BE ENJOINED BECAUSE IT COERCES
          TENDER THROUGH MISINFORMATION**

4

5       A tender offer is also actionably coercive when the corporation's board makes "materially false

6   or misleading disclosures to shareholders in connection with the offer." *Eisenberg*, 537 A.2d at 1056.

7   As with structurally coercive tender offers, "preliminary injunctive relief will follow" when a board

8   fails to fully and fairly disclose all material information before asking shareholders to tender their

    shares. *Id.* at 1056-57.

9

10      Defendants owe a fiduciary duty to shareholders "to disclose all facts material to the transaction

11  in an atmosphere of entire candor." *Id.* at 1057. That duty is heightened where, as here, defendants are

12  causing the Company to tender for its own shares – "the exacting duty of disclosure imposed upon

13  [defendants] is even 'more onerous' than in a contested offer." *Id.* The reasons why courts impose a

14  heightened duty of disclosure in the self-tender context is two-fold: (i) defendants are corporate insiders

15  in sole possession of the material information shareholders need to have before tendering their shares,

16  and their disclosures "are unilateral and not counterbalanced by opposing points of view," *see id.*;

17  *Blanchette v. Providence & Worcester Co.*, 428 F. Supp. 347, 356 (D. Del. 1977); and (ii) because of

18  the "built-in conflicts of interest between the fiduciaries responsible for conducting the [self-tender],"

19  whose interest "is to pay the lowest price possible," and the stockholders to whom the offer is directed,"

20  _____

21  [21]    The fact that the Tender Offer is at a price above where the Company's stock was trading prior
    to the announcement of the Proposed Buyout, and both Merrill Lynch and Morgan Stanley have opined

22  that the consideration offered is in the range of fairness, does nothing to dispel the coercion inherent in
    the structure. As Prof. Subramanian points out in his article, *A New Takeover Defense Mechanism:*

23  *Using an Equal Treatment Agreement as an Alternative to the Poison Pill*, 23 Del. J. Corp. L. 375, 388-
    90 (1998), this is true because, regardless of the objective views on fairness, "the tender offer [price]

24  will always be unfair to some fraction of shareholders" who place a higher subjective value on their
    holdings in the Company. *Id.* "For these shareholders, the coercive nature of the offer forces them to

25  tender even though they attach a higher value to the shares than the offer price . . . for these
    shareholders the offer is both coercive and unfair." *Id.* Importantly, plaintiff is an example of such a

26  shareholder. Mr. Garamella paid $51.50 for his share in 2003, almost $20 more than the price offered
    in the Proposed Buyout, and subjectively believes his shares are worth much more than $34. Thus the

27  Proposed Buyout threatens to have the actual effect of coercing Mr. Garamella and shareholders like
    him into tendering his shares.

28

1    whose interest "is to receive as high a price as possible." *Eisenberg*, 537 A.2d at 1057; *Blanchette*, 428

2    F. Supp. at 356; *Plaza Securities Co. v. Fruehauf Corp.*, 643 F. Supp. 1535, 1544 (E.D. Mich. 1986).

3    　　　When shareholders allege that a Board has failed to disclose or misrepresent material

4    information in connection with a tender offer, the primary inquiry involves the materiality of the alleged

5    omissions or misrepresentations. As the court noted in *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929 (Del.

6    1985):

7    　　　"An omitted fact is material if there is a substantial likelihood that a reasonable
       shareholder would consider it important in deciding how to vote. . . . It does not require

8    　　　proof of a substantial likelihood that disclosure of the omitted fact would have caused
       the reasonable investor to change his vote. What the standard does contemplate is a

9    　　　showing of a substantial likelihood that, under all the circumstances, the omitted fact
       would have assumed actual significance in the deliberations of the reasonable

10   　　　shareholder. Put another way, there must be a substantial likelihood that the disclosure
       of the omitted fact would have been viewed by the reasonable investor as having

11   　　　significantly altered the 'total mix' of information made available."

12   *Id.* at 944. This materiality standard contemplates "'a showing of a substantial likelihood that, under all

13   the circumstances, the omitted fact would have assumed actual significance in the deliberations of the

14   reasonable shareholder,'" but it is not necessary that the omitted information would have actually

15   changed the shareholders' decision. *Arnold v. Society for Sav. Bancorp.*, 650 A.2d 1270, 1277 (Del.

16   1994). Furthermore, materiality is to be assessed from the viewpoint of the "reasonable" stockholder,

17   not from a director's subjective perspective. *Zirn v. VLI Corp.*, 621 A.2d 773, 779 (Del. 1993).

18   　　　Here, on April 25, 2007, defendants disseminated to Tribune shareholders a Tender Offer

19   Statement containing an Offer to Purchase, which purports to describe the circumstances concerning the

20   Tender Offer and contains a recommendation from the Board that Tribune shareholders tender their

21   shares. In this document and all other associated with the Tender Offer, defendants have withheld from

22   Tribune shareholders certain material information critical to shareholders being able to decide whether

23   to tender their shares. Specifically, defendants have failed to disclose: (i) all the reasons why the

24   Proposed Acquisition is structured as a two-tiered tender offer/merger; and (ii) the Board's failure to

25

26

27

28

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1   deal fairly with the Board/Burkle Group at the end of the process. Because defendants have failed to

2   provide this information, the Tender Offer is coercive.[22]

     **A.   Defendants Failed to Disclose the Reason Why the**
3
          **Proposed Buyout Is Structure as a Two-Tiered Tender**
4           **Offer/Merger**

5   Tribune's shareholders "are entitled to an accurate, candid presentation of why the self-tender

6   offer is being made." *Eisenberg*, 537 A.2d at 1059. Thus, defendants have a duty to disclose fully and

7   fairly all underlying motivations that were incorporated into their decision to undertake a self tender –

8   even if these reasons are not improper. *Id.* Defendants have failed in this duty here.

9   The TO states that the only reason for the Proposed Acquisition's structure is to provide faster

10   liquidity to shareholders. Baron Decl., Ex. V at 3-4 (stating that "we . . . negotiated for a first-step cash

11   tender offer . . . as a means of delivering a portion of the Merger price to our stockholders more

12   quickly"). That is, at best, only part of the story. Structuring the Proposed Buyout to provide liquidity

13   up front was done primarily to satisfy the demands by the Company largest affiliated shareholders, the

14   Chandlers and the McCormick Tribune Foundation. *Id.*, Ex. J (Whayne Tr. at 23-24).[23] By providing

15   liquidity to this special group of shareholders, defendants sought to ensure that the Company's largest

16   shareholders would not oppose the Proposed Buyout structure in favor of the public restructuring that

17   the Board's advisors had been focused on until Zell entered the scene in February 2007.

18   Tellingly, in a March 2, 2007, letter to the Board, the Chandlers stated their position that,

19   because of the "risks and uncertainties" in Zell's proposal, they did not view it as "in the best interests

20   of any of Tribune's stockholders." *Id.*, Ex. BB (MS_TRIB000002-03). Instead, the Chandlers wanted

21 _____

22 [22]   The foregoing list is by no means exhaustive, as plaintiff has uncovered literally dozens more material non-disclosures that need to be further developed through more complete discovery. In the
23 interests of brevity and clarity, plaintiff did not brief these issues for the Court. Instead plaintiff focused on the material non-disclosures most pertinent to the coercive aspects of the Tender Offer. Plaintiff's
24 decision not to brief these issues should not be construed as a waiver. Plaintiff reserves his right to brief this issues in more detail at the dispositive stage of these proceedings.

25 [23]   Whayne stated "there was a request from a number of the shareholders that a distribution be
26 provided to shareholders as quickly as possible and the Special Committee as well as the company requested that the Zell party consider a first step Tender Offer to provide a significant distribution to
27 shareholders as soon as possible . . . . the Chandlers were one [of these shareholders along with] the Foundation." *Id.* at 23.

28

1   the Board to focus on the "self-help" restructuring that included, among other things, a "handshake

2   agreement" for the Foundation to buy 25 million of the Chandler's Tribune shares. *Id.*, Exs. BB-CC

3   (MS_TRIB000002-03; TRIB 014020). The McCormick Tribune Foundation made similar demands on

4   the Board in a letter addressed to the Board on March 2, 2007, wherein it expressed a concern that the

5   ESOP transaction being discussed with Zell would take too long to close, thus "creat[ing] a discount

6   from the $33 per share face value" proposed by Zell at that time. *Id.*, Ex. DD (MS_TRIB000004-05).

7   The McCormick Tribune Foundation also preferred "the self-help proposal presently under

8   consideration." *Id.* By providing an up-front cash payment, defendants were able to secure the support

9   of the Chandlers and the McCormick Tribune Foundation at the expense of shareholders with

10   significantly smaller interests.

11        An additional undisclosed consideration in structuring the Proposed Buyout to facilitate the

12   Chandlers' need for equity was a desire to remove the dissident Chandler representatives from the

13   Board. As Whayne stated in his deposition, the Chandlers "had submitted a letter threatening to engage

14   in a proxy fight" and "were considering running an alternate slate of directors to replace two . . . non-

15   Chandler directors that were up for reelection this spring." Baron Decl., Ex. J (Whayne Tr. at 33-35).

16   One solution proposed to address the Chandler's desire for change was to "announce self tender at 33 or

17   more . . . Chandlers decide what they want to do on their own. Chandlers can't afford not to tender

18   given their views on value. They tender and they are off the board." *Id.*, Ex. EE (TRIB 014023). This

19   notion, first discussed in the context of the self-help plan, was a "benefit" that defendants secured by

20   structuring the transaction with an up-front tender. *Id.*, Ex. J (Whayne Tr. at 36). As Costa stated, "as

21   soon as the Chandlers sell down to a certain percentage of ownership of the company, they lose their

22   right over time to be on the board of directors . . . . [and] [d]epending on whether they tender into the

23   Tender Offer and depending on the number of shares they tender and get accepted for purchase, that

24   would potentially trigger loss of Board seats." *Id.*, Ex. I (Costa Tr. at 95-96). Indeed, as part of the

25   Proposed Buyout, the Chandler have contractually bound themselves to both tender their shares, vote in

26   favor of the merger, and "agree to step off the Board." *Id.*, Ex. J (Whayne Tr. at 38). Thus, structuring

27   the Proposed Buyout with an up-front tender offer was a way to ensure that the Chandlers were out of

28   the picture. *Id.*

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1    Understanding that the up-front cash payment was structured in part to secure approval from the

2    Chandlers and the McCormick Tribune Foundation, and to ensure that the Chandlers were no longer a

3    threat to the Board, gives shareholders an accurate picture of where the motivations of the Board differ

4    from their own.  Under Delaware law, potential and actual conflicts of interest that burden the Board

5    must be disclosed to shareholders when making a recommendation to tender or vote in favor of a

6    merger.  *See Millenco L.P. v. Mevc Draper Fisher Jurvetson Fund I*, 824 A.2d 11, 18 (Del. Ch. 2002);

7    *Skeen v. Wadsworth*, No. 20110, 2003 Del. Ch. LEXIS 63, at *6 (Del. Ch. June 18, 2003).

8    **B.    Defendants Failed to Disclose Their Failure to Deal Fairly with the
         Broad/Burkle Group at the Tail End of the Process**

9
10    The entire process by which the Special Committee dealt with the Broad/Burkle Group is

11    misrepresented in the TO.  Defendants do not disclose: (i) that the Broad/Burkle Group sought

12    permission from the Special Committee in December 2006 to communicate with the Chandler Trusts

13    and/or the McCormick Tribune Foundation about partnering to formulate a proposal; (ii) were

14    summarily denied permission to do so; and (iii) defendants nonetheless agreed to let other interested

15    parties, including the Chandler Trusts and the McCormick Tribune Foundation, talk to private equity

16    firms. Baron Decl., Exs. A-D (TRIB 015564; TRIB 009832; TRIB 000037-38; Osborn Tr. at 24-27).

17    Likewise, defendants do not disclose that during the week leading up to approval of the Zell transaction,

18    the Broad/Burkle Group stood waiting to negotiate a definitive agreement, but the Special Committee

19    and its advisors refused to provide them with a proposed merger agreement and supporting documents

20    based on an ESOP structure and they also refused to enter into any negotiations over deal terms and/or

21    value.  The failure to deal fairly with the Broad/Burkle Group is set out in a series of letters and

22    communications between the Broad/Burkle Group and defendants.  Specifically, the Broad/Burkle

23    Group sent letters to defendants:

24    •    on March 23, 2007, requesting that it be permitted to submit an ESOP proposal and
           questioning why the Board had not continued discussions with it about such a proposal;
           Baron Decl., Ex. O;

25    •    on March 29, 2007, outlining a $34.00 per share offer based on an ESOP structure and a
26         $500 million equity contribution from Messrs. Broad and Burkle; *id.*, Ex. P;

27    •    on March 31, 2007, expressing frustration with defendants for not providing relevant
           information and declining to meet with them; *id.*, Ex. W; and

28

- 21 -

1      • on April 5, 2007, expressing their disappointment at not being offered the opportunity to give a "best and final offer." *Id.*, Ex. S.

2

3    The TO fails to adequately describe the positions being taken by the Broad/Burkle Group, the

4    complaints made by the Group and defendants' failure to adequately communicate with and respond to

5    the Broad/Burkle Group.[24]

6          The situation here is analogous to one recently addressed in the *NetSmart* case. In *NetSmart*, the

7    court was faced with a scenario where the NetSmart board had failed to fulfill its *Revlon* duties to get

8    the best deal it could for shareholders in the context of a sale of the company when it did not "take any

9    reasonable to steps to explore whether strategic buyers might be interested" in buying the Company.

10   *NetSmart*, 2007 Del. Ch. LEXIS, at *68. Worse, the NetSmart board, when soliciting shareholder

11   proxies in support of the merger the Board had agreed to, was attempting to give shareholder the false

12   "impression that a more reasoned and thorough decision-making process had been used" in determining

13   not to seek interest from strategic bidders. *Id.* at *111-*112. In fashioning a remedy for the NetSmart

14   board's misconduct, the *NetSmart* court concluded that the proposed merger should be enjoined until

15   defendants disclosed a "fuller, more balanced description of the board's actions with regard to the

16   possibility of finding a strategic buyer." *Id.* at *111. Specifically, the *NetSmart* court ordered the

17   defendants to disclose a full description of their failure to seek a strategic bidder for the Company, and

18   strongly suggested that the defendants do so by disclosing the opinion authored by the *NetSmart* court,

19   which gave a detailed account of the NetSmart board's inadequate shopping process. *Id.*

20

21   _____

22   [24]    The only disclosure in the TO relating to these communications is the following:

23        In the first letter, the third-party group sought access to further information and,
         thereafter, additional information was provided to them. In the second letter, the third-

24        party group expressed its interest in participating with a $500 million equity investment
         in an ESOP transaction in which the Company's stockholders would receive $34 per

25        share. This second letter was not accompanied by any further documents or financing
         commitments. Thereafter, the Company's financial advisors had further discussions

26        with the financial advisors to the third-party group in order to obtain further details
         about the proposal.

27   Baron Decl., Ex. V at 24-25.

28

                                    - 22 -

1    Just as in the *NetSmart* case, defendants here have presented a materially misleading recitation

2    of how the Broad/Burkle Group was (mis)treated throughout the bidding process.    Defendants

3    discussion of the manner in which they dealt with the Broad/Burkle Group leaves shareholders with the

4    decidedly false impression that defendants treated the Broad/Burkle Group on an even playing field

5    with other bidders.    As set forth *supra*, this is a far from accurate depiction of how the process

6    developed.    As in *NetSmart*, this misleading account must be corrected before the Tender Offer closes.

7    Defendants must be made to disclose "a fuller, more balanced description of the board's actions with

8    regard to" their refusal to deal fairly with the Broad/Burkle Group.    *Id.*[25]

9    **V.    CONCLUSION**

10    For the foregoing reasons, plaintiff respectfully requests that the Court grant plaintiff's motion

11    in its entirety and enjoin the Tender Offer unless and until defendants take steps to maximize

12    shareholder value, remove the coercive aspects of the Tender Offer, and disclose all material

13    information about the Tender Offer to shareholders.

14    DATED: May 19, 2007                                Respectfully submitted,

15                                                                      LERACH COUGHLIN STOIA GELLER
                                                                              RUDMAN & ROBBINS LLP
16                                                                      DARREN J. ROBBINS
                                                                              RANDALL J. BARON
17                                                                      DAVID T. WISSBROECKER

18

19                                                                      _____
                                                                              RANDALL J. BARON
20
                                                                              655 West Broadway, Suite 1900
21                                                                      San Diego, CA  92101
                                                                              Telephone:  619/231-1058
22                                                                      619/231-7423 (fax)

23                                                                      Attorneys for Plaintiff
         S:\CasesSD\Tribune Derivative\BRF00041945_v3.doc
24

25    [25]    Because the Board set up a special committee in a (failed) attempt to insulate themselves from
         liability, they have a duty to disclose all information that bears on the fundamental question of whether
26    "the Special Committee process functioned effectively" regardless of whether disclosure of such
         information might otherwise be termed "self-flagellation." *Clements v. Rogers*, 790 A.2d 1222, 1243
27    (Del. Ch. 2001).

28

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## DECLARATION OF SERVICE BY FEDERAL EXPRESS DELIVERY

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      That on May 19, 2007, declarant served by Federal Express, next day delivery, the CORRECTED MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION to the parties listed on the attached Service List.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of May, 2007, at San Diego, California.

_____
JAIME MESKE

TRIBUNE DERIVATIVE
ervice List - 5/18/2007   (06-0218)
Page 1 of  1

**Counsel For Defendant(s)**

Dean J. Kitchens
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
    213/229-7000
    213/229-7520 (Fax)

James W. Ducayet
Sidley Austin LLP
One South Dearborn Street
Chicago, IL  60603
    312/853-7000
    312/853-7036 (Fax)

Michael C. Kelley
Jennifer A. Landau
John  Fitzgibbons
Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA  90013-1010
    213/896-6000
    213/896-6600 (Fax)

**ounsel For Plaintiff(s)**

Darren J. Robbins
Randall J. Baron
David T. Wissbroecker
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
    619/231-1058
    619/231-7423 (Fax)

**OPPOSITION TO
PLAINTIFF'S MOTION**

1  Michael C. Kelley (SBN 90062)
   Jennifer Altfeld Landau (SBN 153780)
2  Anne Mayer Turk (SBN 200011)
   SIDLEY AUSTIN LLP
3  555 West Fifth Street, Suite 4000
   Los Angeles, California  90013-1010
4  Telephone:  (213) 896-6000
   Facsimile:  (213) 896-6600
5
   Attorneys For Defendants
6  Dennis J. FitzSimons, Enrique
   Hernandez, Jr., Betsey D. Holden,
7  Robert S. Morrison, William A.
   Osborn, J. Christopher Reyes,
8  Dudley S. Taft, Miles D. White
   and Tribune Company
9

10           SUPERIOR COURT OF THE STATE OF CALIFORNIA

11               FOR THE COUNTY OF LOS ANGELES

12  FRANK GARAMELLA, Derivatively On      )  Case No. BC 362110
    Behalf of TRIBUNE COMPANY,            )
13                                        )
                                          )
14            Plaintiff,                  )  **MEMORANDUM OF POINTS AND**
                                          )  **AUTHORITIES IN OPPOSITION TO**
15     vs.                                )  **PLAINTIFFS' MOTION FOR**
                                          )  **PRELIMINARY INJUNCTION AND**
16  DENNIS J. FITZSIMONS, et al.,         )  **SUPPORTING DECLARATIONS OF**
                                          )  **WILLIAM A. OSBORN, MICHAEL**
17            Defendants,                 )  **COSTA, DONALD C. GRENESKO, AND**
                                          )  **BERNARD BLACK**
18     and                               )
                                          )  **[Filed concurrently with:**
19  TRIBUNE COMPANY, a Delaware           )  **1.  Declaration of Jennifer Altfeld Landau**
    corporation,                          )  **2.  Compendium of Non-California**
20                                        )      **Authorities]**
                                          )
21            Nominal Defendant.          )
                                          )  Date:   May 22, 2007
22  _____  )  Time:  9:00 a.m.
                                             Place:  324
23

24

25  **FILED CONDITIONALLY UNDER SEAL PURSUANT TO C.R.C. 2.551 AND ¶14 OF THE**
    **STIPULATED PROTECTIVE ORDER**
26

27

28

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

LA1 930826v.1

# TABLE OF CONTENTS

                                                                                    Page

INTRODUCTION ............................................................................................1

ARGUMENT .................................................................................................1

I.     THE STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF. ....................2

II.    PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF SUCCESS AS TO ANY
       OF HIS CLAIMS.......................................................................................3

       A.    Plaintiff Has Not Established A Likelihood of Success As His Failure To
             Maximize Shareholder Value Claims. ..............................................3

             1.   The Strategic Review Process Was Sound, Thorough And
                  Complete.......................................................................5

             2.   The Process Was Conducted In A Fair Manner That In No Way
                  Discriminated Against The Broad/Burkle Group. ........................7

                  a.    The Special Committee Did Not Unreasonably Deal with
                        the Broad/Burkle Group. ..........................................7

                  b.    The Special Committee Did Not Act Unreasonably With
                        Respect To The Broad/Burkle Group's Eleventh-Hour
                        Letter........................................................................8

             3.   The Process Provided for An Effective Post-Agreement Market
                  Check. ........................................................................12

       B.    Plaintiff Has Not Shown A Reasonable Probability Of Success As His Claim
             That The Tender Offer Is Wrongfully "Coercive.".............................13

             1.   The Company's Leverage Following The Tender Offer Does Not
                  Render The Tender Offer Wrongfully Coercive. ........................15

             2.   Plaintiff's Claim That The "Time Value" of Money Makes the
                  Tender Offer Wrongfully Coercive Is Without Merit. ..................17

       C.    Plaintiff Has Not Shown A Reasonable Probability Of Success As His Claimed
             Disclosure Violations. .................................................................19

             1.   Defendants Did Not Fail To Disclose The Reasons Why The
                  Proposed Acquisition Is Structured As A Two-Step Transaction ..........20

             2.   Plaintiff Cannot Establish A Likelihood Of Success On His
                  Disclosure Claim Relating To The Broad/Burkle Group
                  Negotiations...............................................................22

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS

## TABLE OF CONTENTS
*(continued)*

Page

III.  THE BALANCE OF INTERIM HARMS WEIGHS IN DEFENDANTS' FAVOR. ................................................................................................24

    A.    Plaintiff Has Not Demonstrated That He Is Threatened With Any Significant, Irreparable Harm. ..........................................................................25

    B.    Defendants And Other Tribune Shareholders Will Suffer The Greater Harm Should The Tender Offer Be Enjoined. ...............................................26

IV.  BEFORE ANY PRELIMINARY INJUNCTION MAY TAKE EFFECT, PLAINTIFF MUST POST A BOND COMMENSURATE WITH THE DAMAGES CAUSED BY AN IMPROVIDENTLY ISSUED INJUNCTION ...............29

CONCLUSION ....................................................................................................30

LA1 930826v.1

# TABLE OF AUTHORITIES

## FEDERAL CASES

PAGES

Sampson v. Murray,
  415 U.S. 61 (1974) .............................................. 25

## STATE CASES

Abba Rubber Co. v. Seaquist,
  235 Cal. App. 3d 1 (1991) ................................ 29, 30

Abrons v. Maree,
  911 A.2d 805 (Del. Ch. 2006) ............................. 25

AC Acquisitions Corp. v. Anderson, Clayton, & Co.,
  519 A.2d 103 (Del. Ch. 1986) ........................... 16, 25

Alessi v. Beracha,
  849 A.2d 939 (Del. Ch. 2004) ............................. 22

In re Anderson, Clayton S'holders Litigation,
  519 A.2d 669 (Del. Ch. 1986) ............................. 12

In re Aquila S'holders Litigation,
  805 A.2d 184 (Del. Ch. 2002) ............................. 29

Art Movers, Inc. v. Ni West, Inc.,
  3 Cal. App. 4th 640 (1992) ................................ 27

Bebchuk v. CA, Inc.,
  902 A.2d 737 (Del. Ch. 2006) ............................. 18

Citron v. Steego Corp.,
  1988 WL 94738 (Del.Ch. Sept. 9, 1988) ................. 2, 3

City Capital Associate L.P. v. Interco Inc.,
  551 A.2d 787 (Del. Ch. 1988) ............................. 27

Clements v. Rogers,
  790 A.2d 1222 (Del. Ch. 2001) ........................... 24

Condor Enterprises, Ltd. v. Valley View State Bank,
  25 Cal. App. 4th 734 (1994) .............................. 29

Cottle v. Standard Brands Paint Co.,
  1990 WL 34824 (Del. Ch. Mar. 22, 1990) ............... 16

- iii -

LA1 930826v.1

**TABLE OF AUTHORITIE**
*(continued)*

Page

*In re Digex, Inc. S'holders Litigation,*
  789 A.2d 1176 (Del. Ch. 2000) ...................................................................27

*Eisenberg v. Chicago Milwaukee Corp.,*
  537 A.2d 1051 (Del. Ch. 1987) ...........................................................16, 17

*Fleishman v. Superior Court,*
  102 Cal. App. 4th 350 (2002) .......................................................................2

*Frank v. Arnelle,*
  1998 WL 668649 (Del. Ch. Sept. 16, 1998) ............................................21

*Freedman v. Restaurant Associates Industrial, Inc.,*
  1987 WL 14323 (Del. Ch. Oct. 16, 1987) ................................................29

*Gilbert v. El Paso Co.,*
  575 A.2d 1131 (Del. 1990) .....................................................................4, 14

*Goodwin v. Live Entertainment, Inc.,*
  1999 WL 64265 (Del. Ch. Jan. 25, 1999) ..................................................6

*Hecco Ventures v. Sea-Land Corp.,*
  1986 WL 5840 (Del. Ch. May 19, 1986) ..................................................29

*In re Holly Farms Corp. S'Holders Litigation,*
  1988 WL 143010 (Del. Ch. Dec. 30, 1988) ..............................................12

*Jasinover v. Rouse Co.,*
  2004 WL 3135516 (Md. Cir. Ct. Oct. 25, 2004) ....................................26

*Kahn v. United States Sugar Corp.,*
  1985 WL 4449 (Del. Ch. Dec. 10, 1985) ..................................................16

*Katz v. Oak Industrial, Inc.,*
  508 A.2d 873 (Del. Ch. 1986) ....................................................................13

*Khanna v. McMinn,*
  2006 WL 1388744 (Del. Ch. May 9, 2006)..............................................24

*Kohls v. Duthie,*
  765 A.2d 1274 (Del. Ch. 2000) ..................................................................29

*Krim v. ProNet, Inc.,*
  744 A.2d 523 (Del. Ch. 1999) ......................................................................4

*Lieb v. Clark,*
  1987 WL 11903 (Del. Ch. June 1, 1987)..................................................13

- iv -

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

TABLE OF AUTHORITIES
*(continued)*

**Page**

*Loudon v. Archer-Daniels-Midland Co.,*
  700 A.2d 135 (Del. 1997)................................................................19, 23, 24

*Malpiede v. Townson,*
  780 A.2d 1075 (Del. 2001)..................................................................20

*Matador Capital Management Corp. v. BRC Holdings, Inc.,*
  729 A.2d 280 (Del. Ch. 1998) .............................................................12

*Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.,*
  824 A.2d 11 (Del. Ch. 2002)...............................................................21

*In re Netsmart Techs., Inc. S'holders Litigation,*
  2007 WL 926213 (Del. Ch. Mar. 14, 2007) ............................................13

*Newman v. Warren,*
  684 A.2d 1239 (Del. Ch. 1996) ............................................................20

*O'Connell v. Superior Court,*
  141 Cal. App. 4th 1452 (2006) .......................................................18, 24, 26

*Oksner v. Superior Court,*
  229 Cal. App. 2d 672 (1964) ...............................................................29

*Paramount Commc'ns Inc. v. QVC Network Inc.,*
  637 A.2d 34 (Del. 1994) ......................................................................5

*Paramount Commc'ns Inc. v. Time Inc.,*
  571 A.2d 1140 (Del. 1990)...................................................................14

*In re Pennaco Energy, Inc. S'holders Litigation,*
  787 A.2d 691 (Del. Ch. 2001) ........................................................4, 5, 13

*In re Pure Resources, Inc. S'holders Litigation,*
  808 A.2d 421 (Del. Ch. 2002) .............................................................24

*QVC Network v. Paramount Communications,*
  635 A.2d 1245 (Del. Ch. 1993) ...........................................................24

*In re RJR Nabisco, Inc. S'holders Litigation,*
  1989 WL 7036 (Del. Ch. Jan. 31, 1989)................................................12

*Rosenblatt v. Getty Oil Co.,*
  493 A.2d 929 (Del. 1985).....................................................................20

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

LA1 930826v.1

## TABLE OF AUTHORITIES
*(continued)*

Page

*Schwartz v. Arata,*
    45 Cal. App. 596 (1920) ...........................................................................2

*Sealy Mattress Co. v. Sealy, Inc.,*
    532 A.2d 1324 (Del. Ch. 1987) ...................................................24, 25

*In re Siliconix, Inc. S'holders Litigation,*
    2001 WL 716787 (Del. Ch. June 19, 2001) ...............................13

*Skeen v. Jo-Ann Stores, Inc.,*
    1999 WL 803974 (Del. Ch. Sept. 27, 1999) ...........................22, 23

*Skeen v. Wadsworth,*
    2003 WL 21448617 (Del. Ch. June 18, 2003)...........................21

*Tahoe Keys Prop. Owners' Associate v. State Water Resources Control Board,*
    23 Cal. App. 4th 1459 (1994) ....................................2, 25, 27

*In re The MONY Group Inc. Shareholder Litigation,*
    852 A.2d 9 (Del. Ch. 2004) ...............................................13

*In re The MONY Group, Inc. Shareholder Litigation,*
    853 A.2d 661 (Del. Ch. 2004) ...........................................20

*Top Cat Products, Inc. v. Michael's Los Feliz,*
    102 Cal. App. 4th 474 (2002) ...........................................29

*In re Toys "R" Us, Inc. Shareholder Litigation,*
    877 A.2d 975 (Del. Ch. 2005) ......................................passim

*Unitrin, Inc. v. American General Corp.,*
    651 A.2d 1361 (Del. 1995) ...............................................2

*Vo v. City of Garden Grove,*
    115 Cal. App. 4th 425 (2004) .............................................2

*Weiss v. Samsonite Corp.,*
    741 A.2d 366 (Del. Ch. 1999) .......................................13, 15

*White v. Davis,*
    30 Cal. 4th 528 (2003) .................................................2, 3

*Yanow v. Scientific Leasing, Inc.,*
    1988 WL 8772 (Del. Ch. Feb. 8, 1988) ...................................2

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

LA1 930826v.1

# TABLE OF AUTHORITIE
*(continued)*

1

## STATE STATUTES

Cal. Civ. Proc. Code § 526(a)(2) ................................................................24

Cal. Civ. Proc. Code § 529(a) ....................................................................29

8 Del. Code § 141(e) ...................................................................................6

8 Del. Code § 262 .......................................................................................19

## MISCELLANEOUS

*Lucian A. Bebchuk, Symposium: Corporate Control Transactions: The Case Against Board Veto in Corporate Takeovers*, 69 U. Chi. L. Rev. 973, 983-84 ................................................18

LA1 930826v.1

1      Defendants Dennis J. FitzSimons, Enrique Hernandez, Jr., Betsey D. Holden, Robert S.

2 Morrison, William A. Osborn, J. Christopher Reyes, Dudley S. Taft, and Miles D. White

3 (collectively, the "Board" or the "Directors") respectfully submit the following memorandum of

4 points and authorities in opposition to Plaintiff's Motion for Preliminary Injunction.[1]

5                                   **INTRODUCTION**

6      Plaintiff's motion for a preliminary injunction constitutes an attempt by a single individual to

7 disrupt the ability of thousands of other Tribune shareholders to have the opportunity to accept an

8 economically advantageous tender offer ("Tender Offer"), made by Tribune itself, which is

9 scheduled to close on May 24, 2007. The request for such extraordinary relief is not only meritless,

10 it is dangerous and should be denied.

11      In making this request, this lone plaintiff has not bothered to submit any declarations, even as

12 to himself, or an iota of evidence demonstrating that the Tender Offer is not economically

13 advantageous to shareholders, whether considered by itself *or* in combination with the anticipated

14 subsequent Merger. Nor, tellingly, do plaintiff's submissions even address the balance of harms,

15 much less provide any evidence at all in that regard. This alone should be fatal to his application,

16 and the omission is no accident. As described below, and detailed in declarations being submitted

17 by defendants, enjoining this Tender Offer would cause enormous harm to Tribune shareholders –

18 which is, presumably, why plaintiff has been unable to muster any support from others for his

19 efforts.

20      As to the merits, at bottom, plaintiff asks this Court to engage in a second-guessing exercise

21 and substitute plaintiff's judgments for those that were the result of a six-month process conducted

22 by a Special Committee composed of disinterested directors, assisted by numerous financial and

23 legal experts. There is no legal warrant for such a usurpation, especially under the circumstances

24 here. Moreover, not only are plaintiff's positions legally unsupported, the factual narrative that he

25 seeks to craft through snippets is largely an exercise in invention, bearing little resemblance to the

26
27
28

---

[1] Based on the stipulation of the parties, the Court authorized oversized briefs as follows: (1) plaintiff -- 32 pages; (2) the Special Committee director defendants and Mr. FitzSimons -- 25 pages; and (3) the Chandler defendants -- 7 pages. The FitzSimons defendants and the Chandler defendants agreed to re-allocate their 32 pages, so that the FitzSimons defendants' brief is 30 pages and the Chandler defendants' brief is 2 pages.

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

true facts.  In that regard, we particularly urge this Court to read the accompanying Declaration of

William A. Osborn, Chairman of the Special Committee, which describes in detail not only the

Special Committee's processes and decisions but why the Tender Offer plays a critically important

role in protecting shareholders' interests here.  For these and other reasons explained below,

plaintiff's motion is plainly deficient and the request for a preliminary injunction should be denied.

## ARGUMENT

## I.    THE STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF.

An injunction is an "extraordinary power, and is to be exercised always with great caution."

*Schwartz v. Arata*, 45 Cal. App. 596, 601 (1920); *Fleishman v. Superior Court*, 102 Cal. App. 4th

350, 355 (2002).  In determining whether to grant an injunction, the trial court must consider the

following two factors:  "(1) the likelihood the plaintiff will prevail on the merits, and (2) the relative

balance of harms that is likely to result from the granting or denial of interim injunctive relief."

*White v. Davis*, 30 Cal. 4th 528, 554 (2003).  To evaluate the relative harm to the parties, the court

must consider "(1) the inadequacy of any other remedy; (2) the degree of irreparable injury the

denial of the injunction will cause; (3) the necessity to preserve the status quo; and (4) the degree of

adverse effect on the public interest or interests of third parties the granting of the injunction will

cause." *Vo v. City of Garden Grove,* 115 Cal. App. 4th 425, 435 (2004) (internal citation omitted).

An injunction may not issue if monetary damages are a sufficient remedy.  *See Tahoe Keys Prop.*

*Owners' Assoc. v. State Water Res. Control Bd.*, 23 Cal. App. 4th 1459, 1471 (1994) ("if the plaintiff

may be fully compensated by the payment of damages in the event he or she prevails, then

preliminary injunctive relief should be denied").  Plaintiff bears the burden of proof on these issues.

And while Delaware courts apply a substantially similar standard,[2] their experience in corporate

transactions has led to a strong presumption against enjoining tender offers, since such action

"inescapably involves a risk that the shareholders will lose the opportunity to cash in their

investment at a substantial premium."  *Citron v. Steego Corp.*, 1988 WL 94738, at *2 (Del.Ch. Sept.

9, 1988) (citation omitted); *Yanow v. Scientific Leasing, Inc.,* 1988 WL 8772, at *4 (Del. Ch. Feb. 8,

---

[2] *See Unitrin, Inc. v. American Gen. Corp.*, 651 A.2d 1361, 1371 (Del. 1995).

- 2 -

LA1 930826v.1

1    1988) ("This Court has exercised its power to enjoin a corporate tender offer on only the rarest

2    occasions, and even then, only most sparingly."). As such, enjoining a tender offer "requires not

3    only a special conviction about the strengths of the legal claim asserted, but also a strong sense that

4    the risk in granting the preliminary relief of an untoward financial result from the stockholders' point

5    of view is small." *Citron*, 1988 WL 94738 at *2.

6         The "ultimate goal of any test to be used in deciding whether a preliminary injunction should

7    issue is to minimize the harm which an erroneous interim decision may cause." *White*, 30 Cal. 4th at

8    554 (citation omitted). This test is critical to the determination of whether to grant a preliminary

9    injunction because the injunction itself could cause irreparable injury to the shareholders.

10   **II.    PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF SUCCESS AS TO ANY OF**

11   **HIS CLAIMS.**

12       **A.    Plaintiff Has Not Established A Likelihood of Success As To His Failure To Maximize Shareholder Value Claims.**

13        Plaintiff seeks to enjoin the Tender Offer on the grounds that the Board "failed to maximize

14   shareholder value" in connection with the Special Committee's extensive and lengthy review of

15   strategic alternatives. According to plaintiff, the process was flawed because the Special Committee

16   "played favorites" and, due to "selfish" reasons and "antipathy" toward the Broad/Burkle Group,

17   "tilted the playing field" against their bid for reasons unrelated to its perceived merits (Mem. at 3-4)

18   – particularly with respect to the eleventh-hour expression of interest in pursing an ESOP-type

19   transaction similar to the one being considered with EGI. As discussed below, that claim is both

20   factually and legally deficient and therefore presents no reasonable likelihood of success. Before

21   addressing the specifics of plaintiff's claim, however, three fundamental points warrant mention.

22        *First*, the only conceivable justification for the request that the Tender Offer be enjoined until

23   defendants "maximize shareholder value" (Mem. 23), is if a third party stands willing to pay more

24   for the Company's shares than the current $34 per share consideration being offered. On this score,

25   however, plaintiff offers nothing – no evidence that any of the bidders during the six-month bidding

26   process offered to acquire the Company at a higher price, no evidence that any third party is willing

27   to make such a higher offer, not even an expert willing to opine that a higher price would have been

28   obtained if only the Special Committee did things differently. It is difficult to fathom how a "failure

- 3 -

LA1 930826v.1

1    to maximize shareholder value" claim has any likelihood of success at trial if plaintiff cannot offer

2    any proof that additional value is, in fact, available.

3        *Second*, plaintiff has now entirely abandoned his fanciful claim that the Special Committee

4    preferred an EGI acquisition because of their "entrenchment" objectives, which were supposedly

5    imperiled by the Broad/Burkle Group.  That is not surprising, because the evidence has now revealed

6    those "entrenchment motive" allegations were entirely baseless.  None of the Special Committee

7    members received any promises or assurances of continuing as directors[3]; their continuation as

8    directors never arose during the course of negotiations with EGI; and, as Mr. Osborn explains, he

9    has little desire to continue serving should he be asked to do so.  Osborn Decl. ¶ 25; Osborn Depo

10   138:22-140:18.[4]  The absence of an "entrenchment" or other improper motive is significant, since it

11   bears directly on the appropriate level of scrutiny of the reasonableness of the Special Committee's

12   conduct.  *See, e.g., In re Pennaco Energy, Inc. S'holders Litig.*, 787 A.2d 691, 704-07 (Del. Ch.

13   2001) (affirming reasonableness of sale process overseen by independent directors).

14       *Third*, Delaware courts have repeatedly emphasized that directors have considerable latitude

15   in deciding how best to maximize shareholder value.  Here, plaintiff's challenges to the Special

16   Committee's decisions, including those related to the Broad/Burkle Group, are simply improper

17   attempts at second-guessing, and fall short of demonstrating the sort of fundamental process flaws

18   that would warrant the extraordinary relief that he seeks.  Delaware courts have long cautioned

19   judges to be leery of second-guessing – with the clarity of hindsight – the host of difficult judgments

20   made in real time, so long as the board's actions as a whole fall within a broad range of

21   reasonableness.  That is plainly the case here.  Moreover, plaintiff has now entirely abandoned his

22   claims that the merger agreement impermissibly "locks" up the EGI merger transaction and poses no

23   meaningful impediments to anyone who is willing to make a superior offer.  Put simply, if the

24   _____

25   [3] Even if, *arguendo*, such a prospect had been raised, as a matter of law this would not, by itself, suffice to demonstrate a
     material self-interest.  That some directors might retain board seats is insufficient to establish a disabling conflict of
     interest.  *See, e.g., Gilbert v. El Paso Co.*, 575 A.2d 1131, 1146 (Del. 1990); *Krim v. ProNet, Inc.*, 744 A.2d 523, 528
26   n.16 (Del. Ch. 1999) ("[T]he fact that several directors would retain board membership in the merged entity does not,
     standing alone, create a conflict of interest.").

27   [4] Nor is there any evidence of "entrenchment" creating some discriminatory motive for Mr. FitzSimons, since he was
     invited to remain as CEO by the Broad/Burkle group.  FitzSimons Depo. at 113:13-19 (Landau Decl., Ex. A at 4).

28

-4-

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

1    Broad/Burkle Group or anyone else is actually able to make a superior offer, there is not an iota of

2    evidence presented by plaintiff that anything prevents them from doing so. *See* Declaration of

3    Professor Bernard S. Black, ¶ 25-33.

### 1.    The Strategic Review Process Was Sound, Thorough And Complete.

5    Under Delaware law, in the context of a sale of control of a company, a director's fiduciary

6    duties require her to act "reasonably to seek the transaction offering the best value reasonably

7    available to the stockholders." *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43

8    (Del. 1994). Although some degree of substantive scrutiny is applied to such "change of control"

9    decisions, Delaware courts have made clear that directors retain considerable flexibility in deciding

10    how to achieve the best value reasonably available, and they are held to a standard of

11    reasonableness, not perfection. *See Pennaco*, 787 A.2d at 705 (court's "task is to examine whether

12    the directors have undertaken reasonable efforts to fulfill their obligation to secure the best available

13    price, and not to determine whether the directors have performed flawlessly"). As the Delaware

14    Supreme Court has explained,

> Although an enhanced scrutiny test involves a review of the
> reasonableness of the substantive merits of a board's actions, a court
> should not ignore the complexity of the directors' task in a sale of
> control. There are many business and financial considerations
> implicated in investigating and selecting the best value reasonably
> available. The board of directors is the corporate decisionmaking
> body best equipped to make these judgments. Accordingly, a court
> applying enhanced judicial scrutiny should be deciding whether the
> directors made a reasonable decision, not a perfect decision. If a board
> selected one of several reasonable alternatives, a court should not
> second-guess that choice even though it might have decided otherwise
> or subsequent events may have cast doubt on the board's
> determination. Thus, courts will not substitute their business judgment
> for that of the directors, but will determine if the directors' decision
> was, on balance, within a range of reasonableness.

23    *Paramount*, 637 A.2d at 45. The ultimate touchstone for assessing the reasonableness of a sale

24    process is whether that process was reasonably designed to inform the directors of the value of the

25    corporation and to permit some form of "market check." *See In re Toys "R" Us, Inc. S'holder Litig.*,

26    877 A.2d 975, 1008 (Del. Ch. 2005) (board's process in evaluating strategic alternatives "enabled

27    the board to develop a rich body of knowledge regarding the value . . . of the Company's operations

28    and [assets and] . . . provided the board with a firm foundation to analyze potential strategic

- 5 -

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

1    options"). In this regard, directors may rely on experts to collect and analyze information and

2    communicate it to the Board. *See, e.g.*, 8 Del. C. § 141(e); *Goodwin v. Live Entm't, Inc.*, 1999 WL

3    64265, *22 (Del. Ch. Jan. 25, 1999) (board's reliance "upon expert advice in reaching its decision . .

4    . also supports the reasonableness of its efforts"), *aff'd*, 741 A.2d 16 (Del. 1999). Moreover, it may

5    be perfectly legitimate for a board to capture a perceived "bird in the hand" provided that the deal

6    terms allow for the possibility of acceptance of a subsequent, superior offer. *See, e.g., Toys "R" Us*,

7    877 A.2d at 1017. In short, considerable latitude is afforded provided that the process used is not an

8    unreasonable or uninformed one.

9         The full details of the strategic review process the Tribune Board established, and the Special

10    Committee executed, are set forth in great detail in the Declarations of William Osborn, Chairman of

11    the Special Committee, and Michael Costa, one of the Company's financial advisors from Merrill

12    Lynch. The process they describe includes significant indicia of a fair, independent, deliberative

13    process designed to maximize shareholder value:

- **The process was comprehensive and lengthy.** The process extended for the six-month period from September 2006. Osborn Decl. ¶ 70. The Company and its advisors actively solicited numerous financial and strategic buyers, and the process was also widely-publicized. Costa Decl. ¶¶ 7, 9, 13, 21, 26; Osborn Decl. ¶¶ 15, 31, 70, 81. A total of 31 different potential bidders participated in the process. Costa Decl. ¶ 9; Osborn Decl. ¶ 70.

- **The process was free of conflicts of interest.** The Special Committee was comprised entirely of outside, wholly-disinterested directors, independent from any of the bidders, who met often and had the benefit of independent legal and financial advisors, and the benefit of advice from three different prominent investment banks and three different prominent law firms. Costa Decl. ¶¶ 2, 4, 5; Osborn Decl. ¶¶ 27, 29-30, 71-72.

- **The Special Committee secured through negotiations with EGI a firm result – $34 per share – that was the highest amount ever mentioned by any bidder in proposals or even tentative expressions of interest at any time during the process.** Plaintiff does not contest this. Nor has plaintiff come forward with any evidence at all that this is not a fair price. The Special Committee also secured an agreement for the Tender Offer at issue, as a mechanism for ensuring that all shareholders are able immediately to be provided with the economic equivalent of $17.50 per share in cash, thereby further maximizing shareholder value. Osborn Decl. ¶¶ 10-11, 79-80.

- **The Special Committee negotiated to ensure that a superior offer may be made and accepted if one is available.** The terms of the Merger Agreement permit the Company to accept a superior offer if one arises prior to closing. And the termination fee payable if the merger agreement is terminated in favor of a superior offer is *de minimus* – only $25 million. Costa Decl. ¶ 47; Osborn Decl. ¶¶ 22-23, 65, 81.

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

1
2

**2.    The Process Was Conducted In A Fair Manner That In No Way
Discriminated Against The Broad/Burkle Group.**

3        Notwithstanding all of this, plaintiff claims that the process was "unreasonable" because the

4    Special Committee was driven by "antipathy" toward the Broad/Burkle Group unrelated to the

5    merits of their proposals.  This charge is entirely unsupported, and distorts the relevant facts.

6                    **a.    The Special Committee Did Not Unreasonably Deal with the
Broad/Burkle Group.**

7

8        Before turning to the discussions with the Broad/Burkle Group during the week prior to the

9    announcement of the EGI transaction, which are discussed below (at II.A.2.b, infra), two claims of

10    "discriminatory" treatment prior to that point can be dispensed of summarily.

11        *First*, plaintiff claims that personal "antipathy" to the Broad/Burkle Group caused the Special

12    Committee, in early December 2006, to deny their request to speak to two of the Company's

13    significant shareholders about "partnering" on an acquisition proposal.  Plaintiff seeks to contrast

14    this with a later decision to permit the Chandler Trusts and the McCormick Tribune Foundation

15    ("MTF") to have discussions with one another about a transaction not in the context of a third party

16    sale.  This misleadingly conflates different events from two very different timeframes.  When the

17    Broad/Burkle Group made their request in December 2006, they were treated no differently than

18    other potential bidders.  Costa Decl. ¶ 20.  *None* of the potential bidders was permitted at this

19    juncture to contact others for the purposes of partnering, because of a concern that this could be

20    collusive and reduce the number of parties who might submit bids in January 2007.  *Id.*  Indeed, the

21    Chandler Trusts, one of the parties the Broad/Burkle Group wanted to contact about "partnering,"

22    turned out to be the only other bidder which in January 2007 submitted a proposal for an equity

23    transaction for the entire company.  It was only *after* the January 2007 bids had been received (with

24    none from MTF) that the Chandler Trusts and MTF were permitted to discuss potential arrangements

25    between them in connection with a Company-sponsored "self-help" leveraged recapitalization

26    transaction.  *Id.*  These arrangements related to MTF's potential purchase of the shares of the

27
28

                                    - 7 -

LA1 930826v.1

1 Chandler Trusts, not a bid for the Company. *See also* 2/13/07 Spec. Comm. minutes (Landau Decl.,

2 Ex. B at 5-6).[5]

3          *Second*, plaintiff claims that the Special Committee made "no effort to solicit an improved

4 offer from the Broad/Burkle Group" following the determination at a February 13, 2007 Board

5 meeting that the Broad/Burkle Group proposal was not acceptable and economically inferior, which

6 position was conveyed to them.  Plaintiff seems to contend that the Company was under some

7 obligation to do more "to solicit an improved offer." Mem. at 5.  Not surprisingly, plaintiff cites no

8 legal authority in support of such a proposition, because none exists.  A sophisticated party such as

9 the Broad/Burkle Group plainly would have known, at that point, that any further progress would

10 require an increase in their offer. *See Toys "R" Us*, 877 A.2d at 1007.  Yet the Broad/Burkle Group

11 not only failed to provide any such increase, they ceased communications altogether.  The notion

12 that the Special Committee was required to do something more when the ball was clearly in the

13 Broad/Burkle Group's court has matters entirely upside down.  Most fundamentally, though, none of

14 this displays "antipathy" or self-interestedly motivated "discrimination" against the Broad/Burkle

15 Group – especially given the undisputed fact that the Broad/Burkle Group's proposal at the time

16 was, in fact, inferior on the merits.  At most, plaintiff inappropriately seeks to second-guess the

17 Special Committee's tactics.

18                    **b.        The Special Committee Did Not Act Unreasonably With Respect
                              To The Broad/Burkle Group's Eleventh-Hour Letter.**
19

20          On March 23, 2007, the Broad/Burkle Group resurfaced out of the blue after weeks of

21 silence, Costa Depo. at 129:3-22 (Landau Decl., Ex. C at 17), with a letter complaining that the

22 Company had failed to contact them about a potential ESOP transaction, which the letter claimed the

23 Company itself had developed. *See* 3/23/07 Broad/Burkle Group letter (Landau Decl., Ex. D

24 at 18-19).  While plaintiff attempts to suggest that the Broad/Burkle Group was unaware that the

25 [5] The Broad/Burkle Group never renewed their December 2006 request after submission of the January 2007 bids.  Costa
26 Decl. ¶ 20.  And plaintiff offers no evidence that (i) the Broad/Burkle Group was interested in discussing a potential
transaction with the Chandler Trusts or MTF at any time after they submitted their initial bid in January 2007; (ii) such a
27 renewed request would not have been fairly considered by the Special Committee and the Company if made; or (iii) any
partnership between the Broad/Burkle Group and the major shareholders would have produced a transaction offering
Tribune shareholders more value that the current transaction.
28

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

1   Company was considering an ESOP transaction with EGI until late March (Mem. at 5-6), the

2   suggestion is unsupported and unfounded.  In fact, a little over a week after the February 13, 2007

3   Special Committee meeting, the press reported that Zell was in discussions with the Company about

4   an ESOP transaction that was being considered as an alternative to the "self-help" leveraged

5   recapitalization.  *See* 2/24/07 Chicago Tribune article (Landau Decl., Ex. E at 20-22).  Nevertheless,

6   the Broad/Burkle Group waited more than a month, until March 23, 2007, before sending a letter

7   expressing an interest in participating in an ESOP transaction themselves.[6]

8         Utilizing this March 23, 2007 letter, and other self-serving correspondence sent by the

9   Broad/Burkle Group – which constitutes inadmissible hearsay – plaintiff complains that the Special

10  Committee improperly gave short-shrift to the eleventh-hour Broad/Burkle Group indication of

11  interest.  These claims are wholly without merit.

12        *First*, echoing assertions in the Broad/Burkle Group letters, plaintiff suggests some

13  discriminatory failure to provide the Broad/Burkle Group with information about the potential ESOP

14  structure for an acquisition.  But the Broad/Burkle Group was wrong – the *Company* did not develop

15  the ESOP structure and then shop it to EGI, as Mr. Osborn informed them by letter dated March 30,

16  2007.  *See* 3/30/07 Osborn letter (Landau Decl., Ex. G at 26-27).  Rather, it was EGI, not the

17  Company, that had developed the structure of the transaction.  Osborn Decl. ¶ 18.  That difference is

18  significant; it is not "discriminatory" to pursue a proposal with the party that introduced that

19  proposal.  Moreover, under the terms of the November 2006 non-disclosure agreement with EGI, the

20  Company was forbidden from disclosing "any of the terms, conditions or other facts with respect to

21  any possible transaction between [EGI] and the Company," including sharing EGI work product and

22  documentation with third parties.  *See* 11/8/06 NDA (Landau Decl., Ex. H at 29).  In short, the

23  Broad/Burkle Group was not denied Company information that was made available to other bidders.

---

25  [6] Plaintiff suggests that the Special Committee made a "decision" on February 24, 2007 not to investigate whether other
    buyers could duplicate the possible EGI ESOP transaction. Mem. at 6.  That claim is unsupported by either the minutes
26  of the Special Committee or Mr. Costa's testimony that plaintiff cites. *See* 2/24/07 Spec. Comm. minutes (Landau Decl.,
    Ex. F at 23-24); Costa Depo. at 36:16-23 (Landau Decl., Ex. C at 8).  And in any event, as Mr. Costa explained, given
27  the considerable uncertainties in late February and early March about whether the EGI proposal could ever be
    accomplished, the decision to let EGI continue to work up the proposal to see if it was feasible was eminently
    reasonable. Costa Depo. at 36:16-23 (Landau Decl., Ex. C at 8).

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

1  Costa Decl. ¶ 39; Osborn Decl. ¶ 19; Whayne Depo. at 113:2-15 (Landau Decl., Ex. I at 40).

2  Moreover, the Special Committee made very clear that the Company's advisors should make every

3  reasonable effort to ensure that the Broad/Burkle Group was treated seriously and given whatever

4  information the Company could provide.  Costa Decl. ¶ 38; Osborn Decl. ¶¶ 19, 56.

5      *Second*, plaintiff suggests that rather than executing agreements with EGI on April 1, 2007,

6  the Special Committee and Board should have delayed the process – plaintiff does not specify for

7  how long – in order to allow further development of an ESOP acquisition proposal by the

8  Broad/Burkle Group contained in a one-page letter dated March 29, 2007.  In that letter, coming just

9  days before a deadline that the Company had publicly announced for making a decision, Costa Decl.

10  ¶ 26; Osborn Decl. ¶ 46, the Broad/Burkle Group indicated their interest in utilizing an ESOP

11  structure and their "*willingness* to enter a definitive contract offering shareholders $34 per share, our

12  making a $500 million investment, and receiving warrants for 40% of the Company."  *See* 3/29/07

13  Broad/Burkle Group letter (Landau Decl., Ex. J at 43) (emphasis supplied).

14      Plaintiff claims no legitimate business reason existed for the failure to delay the EGI

15  transaction in order to provide the Broad/Burkle Group with "time to develop such a proposal."

16  Mem. at 9.  Based on that inaccurate predicate, he seeks to characterize this as merely a matter of

17  playing favorites.  The reality is to the contrary.  While reasonable people might disagree about what

18  would have been the best course at that stage, there can be no dispute that the Special Committee's

19  decision to capture the "bird in the hand" – a decision that accorded with the recommendations of

20  three sets of financial advisors – was hardly unreasonable under the circumstances.  Black. Decl.

21  ¶ 34-36.  And plaintiff's attempt to second-guess that decision is entirely improper.  In fact, the

22  Special Committee had a host of reasons to finalize the EGI Transaction and not delay any further,

23  which are explained in the Osborn Declaration, ¶¶ 74-82 and Costa Declaration, ¶¶ 44-51.  While

24  there are too many to such reasons to repeat in full here, they include the following:

25      • **Given the amount of work and documentation necessary to fully develop the
        Broad/Burkle Group proposal, further negotiations would have taken a substantial**
26      **period of time.**  The Broad/Burkle Group never provided deal documentation – even a
        markup of the draft merger agreement that had been provided by the Company to all
27      bidders the previous autumn.  Osborn Decl. ¶ 75.  Instead, they repeatedly demanded
        access to the documents that were being negotiated between the Company and EGI.  *Id.*
28      ¶¶ 56-57.  The Company's advisors declined to do so, consistent with customary

- 10 -

LA1 930826v.1

practices to not "shop" one bidder's terms and conditions to another bidder,[7] and as required by the non-disclosure agreement. *Id.* ¶ 19. As a result, there was a great deal of work still to be done, if agreement could even be reached.[8] In this regard, plaintiff's suggestion that that the Special Committee should have requested a "best and final" offer ignores the fact that a "best and final offer" can be made only when a proposal's documentation has been developed to the point where it is capable of being accepted. Costa Decl. ¶ 50. That was simply not possible here.

- *The delay necessary to continue negotiations posed legitimate threats to the shareholders.* While EGI had not made any express threats, its representatives had clearly indicated that they were expecting, consistent with the Company's public statements, that a decision would be reached by the end of that weekend and that EGI had found the whole process "frustrating."[9] As a result, there was serious and legitimate concern that EGI could walk away if the bidding process was extended. Osborn Decl. ¶¶ 21, 64; Costa Decl. ¶ 48. Moreover, there was concern that taking the weeks necessary to negotiate with the Broad/Burkle Group might still not result in any acceptable definitive agreement, especially given the Company's continuing deteriorating financial performance. Osborn Decl. ¶¶ 20-21, 64. That was not just an abstract concern –the Broad/Burkle Group had previously revised their January 2007 proposal substantially downward after being provided with revised financial estimates from management. *Id.* Delay also increased the potential damage to the Company's reputation and market credibility (i.e., additional delay likely being perceived as an inability to find acceptable solutions), declining morale among Company employees from continued uncertainty, and the real but unquantifiable risk of market changes affecting financing options and costs or other key matters (including as a result of a decline in the Company's business). *Id.* ¶ 16.

- *The fully-negotiated EGI Transaction offered a price that was the same as that indicated by the Broad/Burkle Group, and the EGI transaction contains no material impediments to the Broad/Burkle Group making a higher offer, if they had one to make.* The EGI price of $34 per share was as high as that only tentatively indicated in the Broad/Burkle Group's March 29, 2007 letter, and it was also the highest price that had ever been mentioned by any bidder in proposals or even tentative expressions of interest at any time during the process. Osborn Decl. ¶ 75. And the fully-negotiated EGI transaction contained an unprecedentedly low termination fee and a "fiduciary out" clause permitting the Company to negotiate and accept a superior offer. *Id.* ¶ 81. These provisions, as well as the fact that the Company would be required to publicly file all of the EGI transaction documents promptly after the announcement of the transaction, meant that there would be no meaningful impediments to the Broad/Burkle Group (or anyone else, for that matter) from making a superior offer if one was to be had. *Id.* ¶¶ 81-82; Black Decl. ¶¶ 25-30.

---

[7] Costa Depo. at 58:23-59:3 (Landau Decl., Ex. C at 11-12); Costa Decl. ¶ 40; Osborn Decl. ¶ 19; Whayne Depo. at 135:15-136:2 (Landau Decl., Ex. I at 41-42).

[8] Costa Decl. ¶ 44; Costa Depo. at 46:12-47:4 (Landau Decl., Ex. C at 9-10). Plaintiff attempts to downplay the delay by claiming that Mr. Osborn identified only two significant areas of difference. But this is a distortion of Mr. Osborn's testimony – as he made clear, while these may have been significant differences, they were far from the *only* things that needed to be accomplished. Osborn Depo. at 79:24-80:6; 138:3-10 (Landau Decl., Ex. K at 46-47 and 49, respectively); see also Costa Decl. ¶ 44; Osborn Decl. ¶¶ 60-61, 64. And plaintiff entirely misunderstands the issue of the ESOP trustee – the delay was not in obtaining a trustee, it was in obtaining the trustee's agreement to the terms, conditions and details of any transaction. Osborn Decl. ¶ 61.

[9] Plaintiff claims that the "purported end of quarter deadline was 'illusory'" because of prior extensions and because the EGI Transactions were dated April 1, 2007. In fact, however, the last day of the Company's first quarter was Sunday, April 1, 2007. Osborn Depo. at 78:20-79:1 (Landau Decl., Ex. K at 45-46); Osborn Decl. ¶ 59, n.3.

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

LA1 930826v.1

1    In short, the Board made an entirely reasonable business judgment to lock in the benefit for

2    shareholders of the "bird in the hand" with the understanding that this would not preclude a

3    subsequent superior offer, if the Broad/Burkle Group or anyone else was prepared to make one.

4    Delaware law has repeatedly and consistently held that such judgments are firmly within the

5    business judgment of the board, and should not be second-guessed in hindsight. *See, e.g., Toys R*

6    *Us*, 877 A.2d at 1017 ("It is this tradeoff – between getting the highest price the board could from [a

7    bidder] right then and there, and the limited opportunity of receiving a higher bid from a well-

8    canvassed market ... which the board and its advisors had to address, and which the plaintiffs ...

9    refuse to realistically engage"); *Matador Capital Mgmt. Corp. v. BRC Holdings, Inc.*, 729 A.2d 280,

10    292-93 (Del. Ch. 1998) (decision not to solicit definitive offer from competing bidder reasonable

11    given effective post-agreement market check); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL

12    7036, *17 (Del. Ch. Jan. 31, 1989) (where bidding process ended in a tie, "the decision not to

13    attempt to break the tie but to accept one of the bids at that point and thus avoid the risk of the loss

14    of that bid – no matter that my personal view might be that the risk was rather small – can in no

15    event be seen as justifying an inference that [the board] must have had some motivation other than

16    the honest pursuit of the corporation's welfare"); *see also In re Anderson, Clayton S'holders Litig.*,

17    519 A.2d 669, 676 (Del. Ch. 1986) ("directors of a Delaware corporation have no duty to delay an

18    otherwise appropriate transaction just because at the last minute a possible alternative arises that

19    might, if it could be arranged, be more beneficial to the corporation or its shareholders then the

20    transaction with which the company has been proceeding").[10]

21        **3.    The Process Provides for An Effective Post-Agreement Market Check.**

22    Finally, plaintiff's "failure to maximize" value claim is fatally undermined by his failure to

23    submit any evidence in support of his prior allegation that the provisions of the EGI merger

24    _____

25    [10] *Holly Farms Corp. S'Holders Litig.*, 1988 WL 143010 (Del. Ch. Dec. 30, 1988), is inapposite. There, it was
    uncontested that the spurned bidder, Tyson Foods, was willing to make a higher bid (*id.* at *3); there is no similar
    evidence with respect to the Broad/Burkle Group. Moreover, in *Holly Farms* the transaction was not preceded by a

26    widely-publicized sales process, and the prospective bidder, Tyson Foods, did not know about the other suitor, or even
    the decision to sell, until the agreement with the other party was signed – a situation plainly different than that here. *Id.*

27    at *5. Indeed, the board even refused to tell Tyson Foods, in response to a direct question, that it had decided to sell and
    that it was negotiating with another party. *Id.* at *3, 5.

28

- 12 -

1   agreement or other alleged barriers meaningfully preclude a subsequent superior offer from being

2   negotiated and accepted by the Company.  As discussed in the Declarations of Black, Osborn, and

3   Costa, there are no such material impediments here, especially considering the extraordinarily low

4   $25 million termination fee.  Black Decl. ¶ 25-33; Osborn Decl. ¶¶ 22-23, 65, 81-82; Costa Decl. ¶¶

5   47, 49, 51.  "[A] board can fulfill its duty [under *Revlon*] to obtain the best transaction reasonably

6   available by entering into a merger agreement with a single bidder . . . and then testing the

7   agreement with a post-agreement market check."  *In re The MONY Group Inc. S'holder Litig.*, 852

8   A.2d 9, 19 (Del. Ch. 2004); *Pennaco*, 787 A.2d at 706-07.[11]  That is precisely what has occurred

9   here – and it is telling that no superior offer has emerged.

    **B.      Plaintiff Has Not Shown A Reasonable Probability Of Success On His Claim
10            That The Tender Offer Is Wrongfully "Coercive."**

11

12          Plaintiff claims that the Tender Offer is "coercive."  But as one Delaware court has noted,

13  "[f]ew words more perfectly illustrate the deceptive dependability of language than the term

14  'coercion'...."  *Katz v. Oak Indus., Inc.*, 508 A.2d 873, 875 (Del. Ch. 1986).  That is because

15  transactions that are entirely beneficial in nature can be labeled "coercive," in the sense that they are

16  too good to resist.  Accordingly, "[t]he relevant question is whether the transaction is *wrongfully*,

17  *i.e.*, actionably, coercive."  *Lieb v. Clark*, 1987 WL 11903, at * 4 (Del. Ch. June 1, 1987) (emphasis

18  supplied).  "As a general matter, a tender offer is not actionably coercive unless the shareholders are

19  being *wrongfully* induced to accept the offer *for reasons unrelated to its merits*."  *Id.* (emphasis

20  added); *see also, e.g., Weiss v. Samsonite Corp.*, 741 A.2d 366, 372 (Del. Ch. 1999).

21          Here, as discussed below, the claim of "coercion" is nothing more than the fact that the

22  Tender Offer is economically attractive and designed to benefit shareholders,[12] *i.e.*, to ensure that

23

24  [11] In this regard, plaintiff's citation to *In re Netsmart Techs., Inc. S'holders Litig.*, 2007 WL 926213 (Del. Ch. Mar. 14,
    2007) is inapposite.  That case involved a so-called "micro-cap" company that was not widely covered by analysts or the
25  press, and a transaction that had not been preceded by any type of public sale process and that had otherwise had
    garnered no significant attention.  *See, e.g., Netsmart*, 2007 WL 926213, *19.  Here, by contrast, the Company is widely
    covered by financial analysts and the press, and both the Special Committee's process and the EGI transaction itself has
26  received considerable attention.  There is simply no reasonable basis for concluding, as was the case in *Netsmart*, that
    anyone with the inclination and ability to make an offer is unaware that the Tribune is for sale, or somehow precluded
27  from making a better offer if willing to do so.

    [12] Delaware law treats tender offers as voluntary investment decisions left to the discretion of individual shareholders,
28  who are entitled to decide for themselves whether to tender their shares in light of their own particular circumstances and
                                                                                                    *(Footnote continued)*

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

1    they will receive as much of an assured return as soon as possible. Put simply, shareholders would

2    be worse off without the Tender Offer, even if the merger goes forward. Black Decl. ¶ 13. That is

3    precisely why the Special Committee wanted this first-step return included in the transaction, as

4    explained in detail in the Declaration of William Osborn. Osborn Decl. ¶¶ 7-11, 79-80. In fact, the

5    Broad/Burkle Group itself proposed an initial first step tender offer (*see* 3/29/07 letter (Landau

6    Decl., Ex. J at 43)), presumably because they recognized that the structure offered greater overall

7    economic value to shareholders.

8         Nor is the Tender Offer a mechanism to accomplish some other wrongful purpose, and it is

9    not being effectuated through "inequitable" means. The paradigm of a "wrongfully coercive" tender

10   offer is a so-called "two tiered" offer, in which a hostile third party seeks to acquire a company for

11   an overall price that is less than fair through "structural coercion." In a two-tiered structure, the third

12   party offers to acquire a majority of shares for one price in a tender offer, and threatens, once having

13   gained majority control, to then cash-out the remaining shareholders at a far lower price – producing

14   a blended, overall price to shareholders less than what the company is worth. *See, e.g., Gilbert*, 575

15   A.2d at 1135 n.7, 1145. In such situations, "the threat is obvious" because shareholders "are

16   compelled to tender to avoid being treated adversely in the second stage of the transaction."

17   *Paramount Commc'ns Inc. v. Time Inc.*, 571 A.2d 1140, 1152 (Del. 1990). This Tender Offer has

18   none of these characteristics. Black Decl. ¶ 18-24. It is a self-tender, not a third party tender offer.

19   As such, it does not result in any change in control but just a retirement of tendered shares, on a *pro*

20   *rata* basis. The same dispersed shareholder base that had control before the tender offer will have

21   control after. Id. ¶ 12. (A change of control will occur here only if a majority of shareholders later

22   vote to approve the merger agreement.) Nor has plaintiff submitted any evidence, or made any

23   serious attempt to argue, that $34 per share is somehow substantively "unfair."     As discussed

24   below, defendants are unaware of any case, in Delaware or elsewhere, holding that a tender offer

25   followed by a merger is "structurally coercive" where, as here, the price per share offered in both

26   _____

27   investment objectives. *See In re Siliconix, Inc. S'holders Litig*, 2001 WL 716787, at *6 (Del. Ch. June 19, 2001)
     ("shareholders of Delaware corporations are free to accept or reject the tender based upon their own evaluation of their
     best interests").

28

- 14 -

LA1 930826v.1

1    stages is the same nominal amount. According to plaintiff, however, the Tender Offer is wrongfully

2    coercive in two respects. *First*, plaintiff contends that the Tender Offer is wrongfully coercive

3    because it is being funded by debt, and non-tendering shareholders will be left with shares in a

4    company burdened with that "massive debt." *Second*, plaintiff contends that the timing of the

5    payment of the Tender Offer and merger consideration makes the Tender Offer wrongfully coercive

6    because of the "time value" of money. As discussed below, plaintiff has not established a reasonable

7    likelihood of prevailing on either claim.

       **1.      The Company's Leverage Following The Tender Offer Does Not Render
8              The Tender Offer Wrongfully Coercive.**

9

10    According to plaintiff, the Tender Offer is wrongfully coercive because it will require the

11    Company to incur substantial debt, and thus non-tendered shares will represent ownership in a

12    significantly more leveraged business enterprise. Mem. at 12-13. But the fact that the Company

13    takes on additional debt to fund the tender offer does not make it *wrongfully* coercive.[13] Delaware

14    courts have squarely rejected claims that a company's borrowing substantial funds to pay

15    shareholders in a tender offer, resulting in a more highly-leveraged entity after the tender, makes the

16    tender offer wrongfully coercive. *Weiss*, 741 A.2d 366, *aff'd*, 746 A.2d 277 (Del. 1999), is

17    illustrative. *Weiss* involved a decision by a board of directors, following a review of strategic

18    alternatives, to deliver shareholders a return on their investment through a cash self-tender for 51%

19    of the company's outstanding shares at a premium to the company's then trading price. *Id.* at 368.

20    As here, the self-tender was equally available to all shareholders and was pro rated – *i.e.*, the

21    Company accepted the same proportion of each shareholder's stock as corresponded to the

22    percentage of all shares tendering, and all shares accepted would become non-voting treasury shares.

23    *Id.* Furthermore, as here, the tender offer was funded in part by the issuance of substantial new debt.

24    The court rejected a wrongful coercion claim, noting that the fact that acceptance of the tender offer

---

[13] Plaintiff apparently assumes that the value of the Company's shares will decline "substantially" following the Tender Offer. Mem at 15. But that is merely counsel's *ipse dixit* -- plaintiff has offered no evidence to support this claim. In fact, the evidence is to the contrary: the post-tender offer share price will likely continue to trade at or near the merger consideration of $34, subject only to slight discounts reflecting the market's perception that the deal will not close (i.e., an "arbitrage" discount) and the fact that the merger consideration will not be paid until the merger closes. Black Decl. ¶ 16; Costa Depo. at 90:9-16 (Landau Decl., Ex. C at 13).

28

LA1 930826v.1

1    might be economically compelling compared to the alternative was not by itself sufficient.[14]  *Id.* at

2    372.  The court also pointed out that, because this was a self-tender, equally available to all

3    shareholders on a ratable basis, relative ownership interests would not materially change. *Id.* at 373.

4    Finally, the court observed that "[f]rom a purely functional, economic point of view, the [self-tender]

5    was identical to an extraordinary dividend," and therefore "manifestly a business judgment matter."

6    *Id.*  This apt observation is of particular relevance here, because, as explained at length in the

7    Declaration of William Osborn, the primary other alternative being considered by the Special

8    Committee at the end of the process was a "self help" leveraged recapitalization that would have

9    entailed such an "extraordinary dividend."  Osborn Decl. ¶¶ 7-11, 79-80.  Indeed, it was precisely

10   because the Special Committee sought to ensure that shareholders would be guaranteed to receive at

11   least as much in the leveraged ESOP transaction as they would have received up-front in a "self

12   help" recapitalization that there was insistence on including a first-step Company self-tender,

13   designed to duplicate the economic results. *Id.*  In short, far from there being some "inequitable"

14   motive or conduct here, the self-tender was deliberately designed to *benefit* shareholders. *Id.* ¶ 79.

15          Plaintiff (Mem. 12) cites *AC Acquisitions Corp. v. Anderson, Clayton, & Co.*, 519 A.2d 103

16   (Del. Ch. 1986), and *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051 (Del. Ch. 1987);

17   neither case is apposite.  *AC Acquisitions Corp.* involved a very different factual situation – i.e., a

18   tender offer that was a defensive response to a competing third party tender offer to acquire the

19   company.  The Court held the tender offer effectively deprived shareholders of the opportunity to

20   decide on the merits whether to accept the existing, competing alternative offer.  Here, of course,

21   there is no such competing offer on the table.  In addition, *AC Acquisition*, unlike here, involved a

22   tender offer that was not followed by a second step merger at the same price.[15]  *Eisenberg* involved a

23

24   [14] *See also Cottle v. Standard Brands Paint Co.*, 1990 WL 34824 at *3 (Del. Ch. Mar. 22, 1990) (holding that partial
     self-tender offer at a market premium not actionably coercive "even if paying that premium may adversely affect the
25   market value of the remaining outstanding shares...."); *Kahn v. United States Sugar Corp.*, 1985 WL 4449 at *7 (Del.
     Ch. Dec. 10, 1985) (holding that "there would not be any problem" even with a self-tender designed to benefit a majority
26   shareholder, and which would have resulted in a company burdened with debt and remaining shares de-listed, if the tender
     offer price had been fair and not artificially set).

27   [15] The evidence in *AC Acquisitions* also suggested that the post-tender offer shareholders would experience a "substantial
     loss" in the value of their shares following the tender offer. *AC Acquisitions*, 519 A.2d at 113-14.  But as noted (p. 15, n.
28   13, supra), there is no such evidence here.

- 16 -

LA1 930826v.1

1  self-interested board of directors which sought to force holders of preferred stock to tender their

2  shares at far less than redemption value.  A majority of the directors in *Eisenberg* had a direct

3  financial interest in seeing the preferred stock eliminated at as low a price as possible, and the price

4  was set to take advantage of an historical low caused by the stock drop on "Black Monday" in 1987.

5  537 A.2d at 1062.  In addition, the Board told the preferred shareholders that it would no longer pay

6  dividends on their shares after the tender.  Notwithstanding all of these factors, the court was still

7  disposed to *deny* an injunction, indicating that it had "difficulty concluding" that the tender offer was

8  inequitably coercive.  *Id.*  Instead, the Court held the tender offer coercive only because the Board

9  also announced its intention to de-list the shares from the New York Stock Exchange following the

10  tender offer.  *Id.*  Importantly, this de-listing threat was wholly gratuitous – as the Court noted, there

11  was absolutely no evidence that the Board considered or discussed the need to de-list the preferred

12  shares or the effect of doing so.  Here, by contrast, there is no absolutely no evidence that any aspect

13  of the Tender Offer has been structured to include a gratuitous and punitive threat to non-tendering

14  shareholders, such as the threat of de-listing in *Eisenberg*.

   **2.    Plaintiff's Claim That The "Time Value" of Money Makes the Tender Offer Wrongfully Coercive Is Without Merit.**

17       Plaintiff also asserts that the tender is wrongfully coercive because he must tender his shares

18  or lose the "time value" of his investment.  According to plaintiff, even though the Tender Offer and

19  merger consideration are the same, the $34 per share that he will receive in the merger is worth less

20  than the value of the $34 per share that shareholders will receive in the tender offer because the

21  merger is not expected to close until the end of the year, if not later.  But plaintiff does not cite a

22  single case – and defendants are unaware of any– even remotely suggesting that a two step self-

23  tender followed by a merger at the very same set price is wrongfully coercive.  None.  That is not

24  surprising, because the effect of such a rule would be that two-step transactions would never be

25  permissible, regardless of how economically advantageous such a structure might be for

26  shareholders, including by delivering more consideration sooner.  Black Decl. ¶ 21.  The only

27  "authority" plaintiff cites are two academic articles that simply observe that money received sooner

28  is worth more than the same amount received later, and that this provides an economic incentive to

- 17 -

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

1   tender. But neither article suggests that such a deal structure violates current Delaware law.[16] The

2   Court should obviously decline such an invitation to rewrite Delaware law, especially on a limited

3   and expedited record of a preliminary injunction proceeding, and given the very substantial harms

4   that could befall the Company and shareholders if the injunction were to be granted. *See* pp. 26-29,

5   *infra*.[17]

6       In any event, however, while it is certainly true that the time value of money may provide an

7   incentive to tender, there is no evidentiary basis for claiming that such a structure is *wrongfully*

8   coercive. In this regard, there is no evidence that this aspect of the Tender Offer was intended to

9   constitute a threat or be punitive to non-tendering shareholders. To the contrary, the overall deal

10  structure, including the Tender Offer, was intended to, and does, benefit shareholders. Black Decl.

11  ¶ 14. As Mr. Osborn and Mr. Costa explain, the Tender Offer was intended to essentially "mimic"

12  the economic result of the other alternative the Special Committee was considering in March 2007,

13  the leveraged recapitalization, and thereby permit the Company to accomplish one of the

14  fundamental goals of the strategic alternatives review that began in September 2006 – returning a

15  substantial portion of shareholders' investment as quickly as possible. Osborn Decl. ¶¶ 10, 80;

16  Costa Decl. ¶ 30. The Tender Offer simply permits shareholders to realize a portion of the merger

17  consideration earlier than would otherwise be the case, and thereby also mitigates the risks

18  associated with the possibility that the merger may not close for whatever reason. Plaintiff's

19  proposed injunction would perversely *increase* shareholders' collective exposure to such risks,

20  making them worse off, not better.[18]

21

22  [16] In fact, read carefully, Prof. Bebchuk's argument is that a two-step tender offer followed by a merger at the same price
    is *not* "structurally coercive" as that term is used in the Delaware cases, and, because of this, Delaware should enact

23  *other* protections not currently provided for. *See* Lucian A. Bebchuk, *Symposium: Corporate Control Transactions: The
    Case Against Board Veto in Corporate Takeovers*, 69 U. Chi. L. Rev. 973, 983-84.

24  [17] Neither Professor Bebchuk nor Prof. Subramanian are strangers to the Delaware courts, and Delaware opinions reflect
    – and often reject – their advocacy efforts. Prof. Bebchuk is a well-known shareholder activist who has been a personal
    plaintiff in litigation filed in connection with a proxy fight. *Bebchuk v. CA, Inc.*, 902 A.2d 737 (Del. Ch. 2006). And

25  Prof. Subramanian appeared as a witness on behalf of plaintiffs in the *Toys-R-Us* case, having been retained by the same
    lawyers as are representing Mr. Garamella here. *Toys "R" Us*, 877 A.2d 975. Vice Chancellor Strine emphatically

26  rejected Prof. Subramanian's views in that case. 877 A.2d at 1015 n.16.

27  [18] Plaintiff suggests in a footnote that the fact that the Company will not pay dividends until the merger closes makes the
    Tender Offer wrongfully coercive. There is good reason why plaintiff does not seriously advance this argument – the
    fact that the Company will not pay dividends is a specific term of the EGI *merger agreement*; it is not a condition, or

28  otherwise any part, of the Tender Offer. Thus, the Company will not pay dividends regardless of whether plaintiff's
                                                                                          *(Footnote continued)*

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

1    Finally, it bears mention that, under Delaware law, because the merger agreement is a

2    fundamental transaction that will result in the elimination of a shareholder's ongoing interest in the

3    company, a shareholder who votes against the transaction may seek a judicial appraisal of the fair

4    value of her shares under the Delaware statutory appraisal process. *See* 8 Del. Code § 262.  Thus, no

5    shareholder is "forced" to accept a later merger price that she considers inadequate.  Plaintiff's

6    wrongful coercion claims are entirely without merit.

7    **C.    Plaintiff Has Not Shown A Reasonable Probability Of Success On His Claimed**
     **Disclosure Violations.**
8

9    Finally, plaintiff seeks to enjoin the Tender Offer because the Schedule TO allegedly fails to

10   disclose the purported reasons why the proposed acquisition was structured as a two-step tender

11   offer-merger and because the Board supposedly failed "to deal fairly with the Broad/Burkle Group at

12   the end of the process." Mem. at 18-19.  There is no reasonable likelihood of success with respect to

13   either claim.

14   Preliminarily, plaintiff's disclosure claims fail for the simple reason that he has not submitted

15   any evidence that anyone would view the allegedly missing information as significant.  There is no

16   declaration even from Mr. Garamella.  That failure is not surprising -- Mr. Garamella admitted

17   during his deposition that he had made little serious effort to read the materials that were provided to

18   shareholders.  Garamella Depo. at 175:13-177:5 (plaintiff reviewed only the first three pages of the

19   Offer to Purchase) (Landau Decl., Ex. L at 53-55).  There is likewise no declaration from an expert.

20   There is no evidence of any kind.  As a result, plaintiff has failed to satisfy his burden, and his

21   request can and should be denied on this ground alone.  *See Loudon v. Archer-Daniels-Midland Co.*,

22   700 A.2d 135, 141 (Del. 1997).

23   Moreover, the fact that plaintiff's counsel was able to identify a few additional items that he

24   contends might have been disclosed in greater detail is irrelevant.  The relevant standard is well

25   _____

26   requested relief – an injunction prohibiting the Tender Offer from closing – is granted.  Under such circumstances, there
     is simply no basis on which to enjoin the Tender Offer. *O'Connell v. Superior Court*, 141 Cal. App. 4th 1452, 1464
     (2006) (noting that "a judicial remedy must be tailored to the harm at issue").  In any event, rather than being intended to
27   harm shareholders, the provision in the EGI merger agreement that restricts it from paying dividends until the merger
     closing was part of the bargained-for consideration with the ESOP and EGI that resulted in *all* shareholders being
28   entitled to receive $34 per share in cash for their shares.

- 19 -

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

1    established:  shareholders are entitled to disclosure of all *material* facts.  Information is not material

2    unless there is "a substantial likelihood that the disclosure of the omitted fact would have been

3    viewed by the reasonable investor as having significantly altered the 'total mix' of information made

4    available." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985); *accord Malpiede v.*

5    *Townson,* 780 A.2d 1075, 1086 (Del. 2001) (citation omitted).  And the pertinent question for

6    shareholders here is whether the $34 per share in cash being offered is economically attractive.

7    Plaintiff does not explain how the additional disclosure he seeks would materially alter any

8    reasonable assessment about whether $34 per share is a good value for shareholders.  The fact is that

9    it would not.  Black. Decl. ¶¶ 40-45.

> **1.    Defendants Did Not Fail To Disclose The Reasons Why The Proposed Acquisition Is Structured As A Two-Step Transaction**

12    Plaintiff concedes that the Board disclosed that the proposed transaction is structured to

13    provide faster liquidity to all shareholders, which would include the Chandler Trusts.  Mem. at 19.

14    Plaintiff claims, however, that the Offer to Purchase also should have disclosed that, in

15    recommending the proposed transaction, the Board had the following two ulterior motives: (1) to

16    ensure that the Chandlers and MTF would support the proposed acquisition; and (2) to remove the

17    Chandler directors from the Board.  *Id.* at 19-20.  This claim is without merit.

18    *First*, as a legal matter, there is no requirement for a Company to disclose the subjective

19    motivations for taking a particular action as long as the material facts in connection with that

20    transaction are disclosed, as here.  *In re The MONY Group, Inc. S'holder Litig.*, 853 A.2d 661, 682

21    (Del. Ch. 2004) (disclosures relating to subjective motivation of Board are not *per se* material as

22    long as Board discloses all material facts); *Newman v. Warren*, 684 A.2d 1239, 1246 (Del. Ch.

23    1996).

24    *Second*, plaintiff has not established the factual premise for this claim.  Mr. Osborn's

25    deposition testimony flatly contradicts it:

> To be fair we didn't – we had the letters for both McCormick Tribune and the Chandlers[.  ***T]hat really had very little to do with how we eventually structured the deal.  They were not the drivers to what we were trying to do.***

- 20 -

LA1 930826v.1

1
2
3

We wanted ourselves to get more money upfront, we felt that was an
important issue. So we were – some of their issues that they may raise
we were already trying to do because we wanted to get a higher
portion of certainty in terms of payment for the shareholders.

4   Osborn Depo. at 105:4-14 (Landau Decl., Ex. K at 48) (emphasis added).[19]  In any event, even if

5   (contrary to fact) the Board had structured the proposed transaction in such a way to placate the

6   Chandler Trusts, it does not follow that the disclosures were inadequate. *Frank v. Arnelle*, 1998 WL

7   668649 (Del. Ch. Sept. 16, 1998), is instructive. There, plaintiff argued that the disclosure regarding

8   the purpose of a tender offer misleadingly omitted that the transaction was designed to appease one

9   of the company's largest shareholders. The court found the purpose of the tender was to enhance

10  stockholder value while reducing excess cash and the fact that the transaction *also* satisfied the

11  wishes of a major stockholder did not render the disclosures misleading or incomplete. *Id.* at *6.[20]

12      And the claim that the transaction was structured so as to effectuate the removal of the

13  directors affiliated with the Chandler Trusts also fails. There is no evidence that the Special

14  Committee or the Board ever discussed the structure of the proposed transaction as providing the

15  "benefit" of removing the Chandler Trust Director nominees from the Board. The sole "evidence"

16  cited by Plaintiff is a February 10, 2007 email from Michael Costa of Merrill Lynch to Crane

17  Kenney, General Counsel of the Tribune Company. As Mr. Costa explained during his deposition,

18  the email raised the issue of the Chandler Trust Directors resigning in connection with the Board's

19  consideration of the "self-help" leveraged recapitalization. Costa Depo. at 97:4-98:22 (Landau

20

21  [19] Further, in response to a direct question as to whether it was important to the Special Committee to have had the
22  support of the Chandler Trusts and MTF, Mr. Osborn further replied, "Well, they were major shareholders, clearly we
    needed to listen to them, but our job was not to pay attention to their demands but to think of the broader shareholder
23  base." Osborn Depo. at 105:19-22 (Landau Decl. Ex. K at 48). Nor does Mr. Whayne of Morgan Stanley provide any
    support. Mr. Whayne testified only that *numerous* shareholders, including the Chandler Trusts, MTF, Ariel, and others,
24  had expressed a desire for a return of capital. Whayne Depo. at 22:18-23:15 (Landau Decl., Ex. I at 36-37). He nowhere
    suggested that the Special Committee or the Board was motivated by a desire to placate the Chandler Trusts and MTF or
    that the issue was even discussed among the Special Committee.
25  [20] The cases cited by plaintiff are wholly inapposite. *Millenco* and *Skeen* both involved situations in which proxy
    materials failed to disclose facts that pertained to the independence of the directors. *Millenco L.P. v. meVC Draper*
26  *Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11 (Del. Ch. 2002)  (elections of two outside directors invalidated because proxy
    materials failed to disclose relationship between inside director and two outside directors); *Skeen v. Wadsworth*, 2003
27  WL 21448617 (Del. Ch. June 18, 2003) (claim based on failure to disclose relationship between special committee
    member and inside director (when inside director had ability to affect special committee member's compensation) was
28  sufficient to survive motion to dismiss).

- 21 -

LA1 930826v.1

1  Decl., Ex. C at 14-15). Mr. Costa testified that the issue was never even discussed in connection

2  with the proposed transaction with Mr. Zell. *Id.* at 98:13-99:6 (Landau Decl. Ex. C. at 15-16).

3  Mr. Whayne's testimony confirms Mr. Costa's statements. Whayne Depo. at 34:13-35:12 (stating

4  that the issue of the Chandler Trust Directors' resignation arose in connection with the discussion of

5  the recapitalization and was not germane to the Zell transaction) (Landau Decl., Ex. I at 38-39). In

6  any event, neither Mr. Costa nor Mr. Kenney served on the Special Committee, nor has plaintiff

7  provided any evidence that the Special Committee or the Board ever discussed this issue.

8      Moreover, even if plaintiff's claim were correct as a factual matter, which it is not, such

9  information is plainly immaterial in light of the factual disclosure in the Tender Offer materials that

10 the Chandler Trust Directors will step down from the Board in connection with the transaction, and

11 that the Chandler Trusts had entered into a Voting Agreement to vote in favor of the transaction.[21]

12 Given these disclosures, plaintiff has not even attempted to explain why any more information

13 would be material to a shareholder's economic decision whether to tender his or her shares, much

14 less provided any evidence of materiality. *Compare* Black Decl. ¶ 40-45.

15      **2.    Plaintiff Cannot Establish A Likelihood Of Success On His Disclosure
         Claim Relating To The Broad/Burkle Group Negotiations**
16

17      Plaintiff argues that the Board should have disclosed that it treated the Broad/Burkle Group

18 unfairly. Mem. at 21. That is also incorrect, for three separate and independent reasons.

19      *First*, the Offer to Purchase disclosed all material information regarding the negotiations with

20 the Broad/Burkle Group. Delaware law does not require a "play-by-play" of merger negotiations.

21 *Alessi v. Beracha*, 849 A.2d 939, 948 (Del. Ch. 2004); *accord Skeen v. Jo-Ann Stores, Inc.,* 1999

22 WL 803974, at *7 (Del. Ch. Sept. 27, 1999). Nevertheless, the Offer includes extensive discussion

23 of the Broad/Burkle Group's initial proposal in January 2007 (Offer to Purchase at 19-20 (Osborn

24

25

26 [21] *See* Offer to Purchase at 2 ("The Chandler Trusts have entered into agreements whereby they have committed to … vote all of the shares held by them … in favor of the Merger Agreement") and 25 ("The Chandler Trusts agreed to the
27 voting agreement and, in connection with the registration rights agreement, agreed to tender their shares of Company Common Stock in the Offer, and to cause the directors nominated by the Chandler Trusts to resign upon the closing of the Offer (or under certain other circumstances)") (Osborn Decl., Ex. 3 at 135-136 and 156, respectively).
28

- 22 -

LA1 930826v.1

1    Decl., Ex. 3 at 150-152))[22] and its subsequent downward revisions of that proposal in early February

2    (*id.*), and it provides extensive details of the discussions and correspondence between the Company

3    and the Broad/Burkle Group beginning on March 23, 2007. The Offer to Purchase disclosed the

4    March 23, 2007 letter and that the Broad/Burkle Group "sought access to further information, and,

5    thereafter, additional information was provided to them." *Id.* At 24 (Osborn Decl. Ex. 3 at 155).

6    The Offer also states that in the second letter, the Broad/Burkle Group "expressed its interest in

7    participating with a $500 million equity investment in an ESOP transaction in which the Company's

8    stockholders would receive $34 per share." *Id.* However, the Offer disclosed that the Broad/Burkle

9    Group's second letter was not accompanied by additional documents or financing, but that while the

10   Broad/Burkle Group proposal "required additional work and documentation," the Special Committee

11   directed the Company and its advisors to continue discussions with the Broad/Burkle Group. *Id.* at

12   25 (Osborn Decl. Ex. 3 at 155). Finally, the Offer discloses that on April 1, the Special Committee

13   decided to pursue the Zell transaction instead of the Broad/Burkle Group proposal, given that the

14   two deals offered the same value to shareholders and the Broad/Burkle Group proposal still involved

15   significant additional work and documentation. *Id* (Osborn Decl. Ex. 3 at 156). In short, the

16   disclosures regarding the negotiations with the Broad/Burkle Group were extensive, and included all

17   material information.

18        *Second*, to the extent that plaintiff's disclosure claim is premised on the notion that the

19   Special Committee or the Board treated the Broad/Burkle Group "unfairly," it is simply untrue. As

20   set forth above, the uncontroverted evidence establishes that the Special Committee and its advisors

21   entertained offers from any and all bidders. The Broad/Burkle Group were treated consistently with

22   other bidders. *See* pp. 7-10, *supra*.

23        *Third* and finally, plaintiff's suggestion that defendants improperly failed to disclose that

24   they treated the Broad/Burkle Group "unfairly" is inconsistent with Delaware law, which does not

25   require a Board to characterize its own conduct in a negative light. *Loudon*, 700 A.2d at 143. It is a

26   "long-standing principle of disclosure jurisprudence that a Board need not engage in self-

---

27   [22] Because of the confidentiality agreements with the Broad/Burkle Group, it is not referred to by name in the Offer to
28   Purchase but instead is referred generically as a "third party."

- 23 -

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

1  flagellation." *Khanna v. McMinn*, 2006 WL 1388744, at *29 (Del. Ch. May 9, 2006). Even in

2  instances where material facts must be disclosed, "negative inferences or characterizations of

3  misconduct or breach of fiduciary duty need not be articulated." *Loudon*, 700 A.2d at 143. The

4  information plaintiff claims was omitted – that the Board treated the Broad/Burkle Group "unfairly"

5  – is nothing more than a pejorative description. This is precisely the situation that the rule against

6  self-flagellation was designed to prevent. *Id.* at 145.[23]

7  ## III.    THE BALANCE OF INTERIM HARMS WEIGHS IN DEFENDANTS' FAVOR.

8       In determining whether to grant a preliminary injunction, the Court must seek "to minimize

9  the harm which an erroneous interim decision may cause." *O'Connell*, 141 Cal. App. 4th at 1468.

10 Here, plaintiff has submitted no evidence at all attempting to demonstrate that he will suffer any

11 "irreparable injury" if the Court declines to enjoin the tender offer. Cal. Civ. Pro. Code § 526(a)(2).

12 Instead, the opposite is true – the disruption and harms defendants and other Tribune shareholders

13 would suffer if the Court enters a preliminary injunction far outweigh any harm plaintiff may suffer

14 if the Court denies his motion.

15      Plaintiff seeks to avoid this issue entirely by asserting that his claims constitute a *per se*

16 irreparable injury that renders any balancing unnecessary. That position is contrary to California

17 law, *see O'Connell*, 141 Cal. App. 4th at 1467, and also ignores the fundamental point that a final

18 determination on the merits is not being made. Indeed, one of the reasons that a balancing of harms

19 is critical is precisely because of the risk of error at this preliminary stage. Moreover, plaintiff's

20 position is not even supported by the Delaware cases he cites.[24] To earn a preliminary injunction,

21 ---

[23] Plaintiff miscites *Clements v. Rogers*, 790 A.2d 1222, 1243 n. 62 (Del. Ch. 2001), for the proposition that the self-flagellation rule does not apply because the conduct of the Special Committee is at issue here. Mem. at 23 n. 25. *Clements* refers only to the unremarkable proposition a Board cannot rely on the self-flagellation rule to prevent the disclosure of material facts, which have been disclosed here, as opposed to the negative characterization of such facts.

[24] Plaintiff's suggestion that *QVC Network v. Paramount Communications*, 635 A.2d 1245 (Del. Ch. 1993), sets a *per se* standard is wrong. In fact, the court in *QVC* did balance the relative harms to the parties in enjoining a two-step transaction that consisted of a third-party tender offer followed by a merger. The court in *QVC* explicitly found that the irreparable harm plaintiff stood to suffer in the absence of an injunction "was not outweighed by any countervailing equity favoring the defendants" and that the loss of a control premium constituted irreparable harm. *QVC*, 635 A.2d at 1273 n.50. *QVC* does not stand for the proposition that once a potential violation is shown the court will not engage in a balancing of the harms analysis. In any event, for the reasons stated above, the irreparable harm the court found to be present in *QVC* is absent here because the Tender Offer does not constitute a change in control transaction. Nor do the other cases plaintiff cites for this proposition, *In re Pure Resources, Inc. S'holders Litig.*, 808 A.2d 421 (Del. Ch. 2002), or *Sealy Mattress Co. v. Sealy, Inc.*, 532 A.2d 1324 (Del. Ch. 1987), even remotely suggest that a showing of irreparable harm obviates the need for a balancing of harms inquiry.

- 24 -

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

LA1 930826v.1

1    plaintiff must demonstrate both irreparable harm and that the irreparable harm he stands to suffer is

2    not outweighed by any harm defendants would suffer from the issuance of an injunction. *See id.*;

3    *Abrons v. Maree*, 911 A.2d 805, 810 (Del. Ch. 2006); *AC Acquisitions Corp. v. Anderson, Clayton &*

4    *Co.*, 519 A.2d 103 (Del. Ch. 1986) ("[A] court of equity will not act preliminarily unless it is also

5    persuaded that the injury that plaintiff seeks to avoid outweighs the risk of injury that may befall

6    defendant in the event defendant is improvidently enjoined."). Thus, even if, *arguendo*, plaintiff

7    could show that his claims have a reasonable likelihood of success on the merits and he stands to

8    suffer irreparable harm (which he cannot for all the reasons discussed below), the balancing of harms

9    inquiry remains as a separate, independent element of the preliminary injunction standard. Plaintiff

10   cannot satisfy it.

11   **A.    Plaintiff Has Not Demonstrated That He Is Threatened With Any Significant,
         Irreparable Harm.**

12

13        Plaintiff has not shown irreparable harm. Irreparable injury occurs only where money

14   damages are an inadequate form of relief. *See Tahoe Keys Property Owners' Assoc. v. State Water*

15   *Resources Control Bd.*, 23 Cal. App. 4th 1459, 1472 (1994); *Sampson v. Murray*, 415 U.S. 61, 90

16   (1974) (the possibility that adequate monetary relief will be available at a later date, in the ordinary

17   course of litigation, "weighs heavily" against an irreparable harm claim). Not only are plaintiff's

18   substantive claims meritless, but he has not provided any evidence that he personally will be harmed

19   by the Tender Offer, let alone that he will personally suffer harm that is "irreparable" or incapable of

20   remedy through money damages. And while he seeks to invoke the mantle of acting in the interests

21   of a purported class of Tribune shareholders, the reality is that this plaintiff, who only owns 200

22   shares of Tribune stock (*See* Summary of Holdings (Landau Decl., Ex. M at 58-59)), describes his

23   Tribune investment activity as a "hobby" (Garamella Depo. at 90:11-91:1 (Landau Decl., Ex. L at

24   51-52)), has no knowledge of the claims in the complaint (*id.* at 249:17-250:10 (Landau Decl. Ex. L

25   at 56-47)), and merely represents his own personal interests. While the proceedings before this

26   Court have been pending for nearly seven months (and plaintiff filed his first, nearly identical,

27   complaint nine months ago in the Northern District of Illinois), plaintiff has never sought

28   certification of the class he purports to represent, or attempted to demonstrate that he speaks on

- 25 -

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

1  behalf of sentiments shared by any other shareholders (much less most of them).  As courts in

2  similar circumstances have held, an individual plaintiff's alleged injury – the only injury at stake at

3  this stage of the proceedings – "has only the weight of a feather in the weighing process that this

4  Court must conduct" with respect to enjoining a transaction.  *Jasinover v. Rouse Co.*, 2004 WL

5  3135516, at *14 (Md. Cir. Ct. Oct. 25, 2004).

6      **B.    Defendants And Other Tribune Shareholders Will Suffer The Greater Harm
7             Should The Tender Offer Be Enjoined.**

8      Plaintiffs' purported irreparable injuries must be balanced against the very serious harms that

9  unquestionably will be suffered if a preliminary injunction is granted.  *See O'Connell*, 141 Cal. App.

10  4th at 1467 ("[I]n determining whether to issue an injunction, a court must weigh and balance ... the

11  relative interim harm to the parties if the injunction is granted, or not granted.").  In the event the

12  injunction is granted, Tribune shareholders face the loss of their opportunity to receive $34 per share

13  in the Tender Offer, face the risk of a decline in the Company's stock price, and face the risk of

14  adverse Company-specific, industry-wide or market-wide developments that could jeopardize the

15  closing of the merger agreement itself.  Osborn Decl. ¶¶ 12-13.  Under these circumstances, the

16  balancing of harms in this case decidedly favors defendants.

17      *First,* as a preliminary matter, in considering the harm to Tribune shareholders, it is

18  important to consider the scope of the relief that is being sought.  In this regard, plaintiff asks that,

19  among other things, the Tender Offer be enjoined until such time as defendants "remove the coercive

20  aspects of the Tender Offer."  *See* Proposed Order Granting Plaintiff's Motion for Preliminary

21  Injunction.  Plaintiff makes no effort to explain what that means.  But elsewhere plaintiff suggests

22  that incurring debt necessary to fund the self-tender is "coercive," as is the pendency of a "back-end

23  merger" at the same price. Mem. at 11-17.  But no tender offer can be accomplished here without

24  the incurrence of debt and the merger agreement cannot be unilaterally revised.  Thus, as a practical

25  matter, were plaintiff's "preliminary" injunction request granted, the Tender Offer would need to be

26  abandoned entirely, because it cannot be effectuated in a manner that would cure plaintiff's

27

28

LA1 930826v.1

complaints.[25]  As such, while plaintiff purports to be seeking a preliminary injunction, in reality he

is asking that the Tender Offer be *permanently* enjoined, without a full trial on the merits.[26]  Thus,

granting plaintiff the relief he seeks in a preliminary proceeding would permanently deny the

Tribune shareholders the benefits of the Tender Offer.

   *Second*, there is a direct monetary harm to Tribune's shareholders stemming from any

preliminary injunction that prevents the Tender Offer from closing as currently scheduled on May

24, 2007: the lost time value of money.  Under the terms of the Tender Offer, Tribune contemplates

paying out to shareholders approximately $4.28 billion in order to repurchase up to 126 million

shares.  Grenesko Decl. ¶ 2.  Even assuming a relatively conservative 6% interest rate, shareholders

stand to lose $21 million every month the Tender Offer close is delayed.  Black Decl. ¶ 17.  Using a

10% rate for the time value of money – which is the figure that the Company's financial advisors

have estimated as the Company's cost of equity (*i.e.*, the return needed to attract shareholders to

invest in Tribune stock, compared to their other investment alternatives) – shareholders will lose

approximately $35 million each and every month that the Tender Offer closing is delayed.  *Id.*  The

assured imposition of a shareholder loss in such circumstances decidedly tips the scale against entry

of a preliminary injunction.  *See Toys 'R' Us*, 877 A.2d at 1023 (refusing to issue injunction because

delaying shareholders' receipt of merger consideration "poses more potential to do them harm").

Moreover, abandoning the tender entirely could cost shareholders, at a minimum, $242 million.  *Id.*

   *Third*, the Company's stock price will also almost certainly decline materially if the

injunction is granted, thereby adversely affecting all current shareholders.  As of Friday, May 18,

---

[25] The same problem exists with respect to plaintiff's request that the Tender Offer be enjoined until defendants "take steps to maximize shareholder value." Mem. at 23. Not only are these steps not specified, the Company is contractually bound in the EGI merger agreement not to affirmatively "shop" itself.

[26] *See Tahoe Keys*, 23 Cal. App. 4th at 1466. *Cf. Art Movers, Inc. v. Ni West, Inc.*, 3 Cal. App. 4th 640, 646 (1992) (recognizing that "[a] permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action" and must be supported by substantial evidence); *see also Toys 'R' Us*, 877 A.2d at 999 (where plaintiff's motion for preliminary injunction sought declaration that merger agreement's termination fee and matching rights were invalid, as opposed to just a stay of the merger closing, plaintiff was required to make the same kind of evidentiary showing required for the entry of final relief); *In re Digex, Inc. S'holders Litig.*, 789 A.2d 1176, 1215 (Del. Ch. 2000) ("It is an extraordinarily rare event for a party to obtain the equivalent of final relief at a provisional stage of the proceedings."); *City Capital Assoc. L.P. v. Interco Inc.*, 551 A.2d 787, 795 (Del. Ch. 1988) (holding that plaintiff's motion for preliminary injunction actually sought final relief and such final relief should not be awarded unless plaintiff can demonstrate it is warranted based upon facts not legitimately in dispute).

- 27 -

1    2007, the stock closed at $33.05 per share. It is important to understand, however, that Tribune's

2    stock price has been trading at the levels it has not because of the Company's performance but

3    because of the pendency of the scheduled transactions; the "unaffected" stock price would be far

4    less. Gresko Decl. ¶ 9. The expected value of receiving $34 per share for 54% of the outstanding

5    shares in the immediate future is a significant component of the stock price; by removing the

6    expectation of such an assured, prompt return, the stock is economically worth less, and the stock

7    price will presumably drop to reflect that fact. *Id.* If all that is left is the potential receipt of

8    consideration in connection with an eventual merger, the market will adjust the stock price to reflect

9    the loss of time value of the current receipt of funds. *Id.* As plaintiff himself suggests (Mem. at 14),

10   the differential should (conservatively) be in excess of $1 per share – and there are approximately

11   242 million outstanding shares. Black Decl. ¶ 17. Moreover, shareholders and market analysts are

12   likely to perceive an injunction of the Tender Offer as an indication that there is greater uncertainty

13   regarding the eventual closure of the merger transaction itself, and that the merger itself may be at

14   risk (particularly if the ground for any such injunction is one having potential bearing on the merger

15   agreement). Gresko Decl. ¶ 10. That could cause the stock price to fall far further. *Id.*

16   Shareholders then would be left with shares far less valuable than they are now.

17          *Finally*, it is important to recognize that there can be no assurance that, if the current Tender

18   Offer is enjoined, shareholders will be able to receive $34 per share at any time in the foreseeable

19   future. Of course, if the current merger agreement reaches fruition, that opportunity will again arise.

20   But while Tribune is optimistic that will occur, it is an event subject to risks and contingencies

21   beyond the control of the Company or this Court. For example, both the merger agreement and the

22   financing commitments for the transactions which have been secured from lenders contain "material

23   adverse effect" clauses that excuse performance in certain situations. Gresko Decl. ¶ 11. And, the

24   merger agreement is also subject to various other conditions, including shareholder and regulatory

25   approvals. The reality is that the future is unpredictable, and delaying receipt of a shareholder return

26   of capital now poses an unquantifiable but real risk that there may be no such opportunity in the

27   future – which is precisely why the Special Committee wanted such an early self-tender to be part of

28   any transaction, so as to benefit shareholders and mitigate risk. Courts are understandably extremely

- 28 -

1    reluctant to enjoin a proposed transaction that promises to provide shareholders with certain value

2    when there is no assured alternative on the table. *See, e.g., In re Aquila S'holders Litig.*, 805 A.2d

3    184, 186 (Del. Ch. 2002) (refusing to enjoin third party tender offer because of the risk that an

4    injunction "might deprive Aquila stockholders of the valuable opportunity to determine for

5    themselves whether or not to accept this offer, in circumstances in which no other offer is available

6    to them").[27]

7    **IV.    BEFORE ANY PRELIMINARY INJUNCTION MAY TAKE EFFECT, PLAINTIFF**
               **MUST POST A BOND COMMENSURATE WITH THE DAMAGES CAUSED BY AN**
8                **IMPROVIDENTLY ISSUED INJUNCTION**

9         A bond is an "*indispensable* prerequisite" to the issuance of a preliminary injunction. *Abba*

10    *Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1, 10 (1991); *see also,* Cal. Civ. Proc. Code § 529(a);

11    *Condor Enters., Ltd. v. Valley View State Bank*, 25 Cal. App. 4th 734, 741 (1994). The Court must

12    require an undertaking from the applicant upon granting a preliminary injunction. *See Abba Rubber*,

13    235 Cal. App. 3d at 10. In fact, the preliminary injunction does not even become operative until the

14    bond is required and furnished. *See Condor*, 25 Cal. App. 4th at 741; *Oksner v. Superior Court*, 229

15    Cal. App. 2d 672, 687 (1964) ("Without the bond a preliminary injunction is a nullity.") (citation

16    omitted). The purpose of the bond is to cover any damages to the defendant caused by the issuance

17    of the preliminary *injunction* if it is finally determined that the plaintiff was not entitled to the

18    injunction. *See* Cal. Civ. Proc. Code § 529(a); *Top Cat Prods., Inc. v. Michael's Los Feliz*, 102 Cal.

19    App. 4th 474, 478 (2002). The court should set the amount of the bond to "estimate the harmful

20    effect which the injunction is likely to have on the restrained party and to set the undertaking at that

21    sum." *Abba Rubber*, 235 Cal. App. 3d at 14. The value of the bond should reflect the reasonably

22    foreseeable damages proximately caused by a wrongfully issued injunction and reasonable

23

24    [27] *See also Kohls v. Duthie*, 765 A.2d 1274, 1289 (Del. Ch. 2000) (refusing to enjoin a tender offer where the tender offer
price represented a premium, market had been thoroughly canvassed, and where there was no "realistic prospect of a
25    superior alternative, or for that matter, any alternative"); *Freedman v. Restaurant Assocs. Indus., Inc.*, 1987 WL 14323,
at *10 (Del. Ch. Oct. 16, 1987) (denying motion to preliminarily enjoin tender offer where tender offer price represented
26    a premium and, since there was no competing offer, any financial benefit from an injunction was purely speculative);
*Hecco Ventures v. Sea-Land Corp.*, 1986 WL 5840, at *6 (Del. Ch. May 19, 1986) (declining to preliminarily enjoin
27    merger because the court's action itself would create a risk that the offer, "due to market changes occasioned by a court-
ordered delay, might not go forward" and finding that "to interfere with or to deny shareholders the opportunity to
28    receive $28 per share for their shares would be a disservice which I decline to inflict upon them").

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS**

1  attorney's fees and expenses incurred in successfully obtaining a final decision dissolving the

2  injunction. *Id.* at 14-15.

3     Here, the required bond must be substantial.  Plaintiff is seeking to enjoin a $4.2 billion

4  Tender Offer that would provide shareholders with a substantial premium above the trading price of

5  their shares.  A preliminary injunction would cause direct monetary harm to shareholders.  If the

6  Tender Offer were cancelled, it is expected that Tribune's price would fall from the current trading

7  level of $33 per share to at least $32 per share.  Black Decl. ¶ 17.  This alone would cost Tribune

8  shareholders approximately $242 million ($1 per share x 242 million outstanding shares).[28]  Id.

9  Moreover, this does not include the even larger risks discussed above.  Thus, in order to mitigate the

10  risk posed to Tribune and its shareholders by the wrongful issuance of the requested injunction, the

11  Court should require plaintiff to file a bond of not less than $242 million.[29]

## CONCLUSION

13     For the foregoing reasons, Defendants FitzSimons, Hernandez, Holden, Morrison, Osborn,

14  Reyes, Taft, and White respectfully request that the Court deny Plaintiff's Motion for Preliminary

15  Injunction.

16  DATED:  May 22, 2007

17  Michael C. Kelley (SBN 90062)
   Jennifer Altfeld Landau (SBN 153780)
   Anne Mayer Turk (SBN 200011)
18  SIDLEY AUSTIN LLP
   555 West Fifth Street, Suite 4000
19  Los Angeles, CA 90013-1010

20  David F. Graham
   James W. Ducayet
21  Kathleen M. McNamara
   SIDLEY AUSTIN LLP
22  One South Dearborn Street
   Chicago, IL 60603

24  *Counsel for Defendants FitzSimons, Hernandez,*
   *Holden, Morrison, Osborn, Reyes, Taft, White*
   *and Nominal Defendant Tribune Company*

---

[28] A delay to the Tender Offer would cause smaller but still substantial hardship to shareholders in the form of the lost time value of money.  Applying the same discount rate used by plaintiff, 6% (0.5% per month) the monthly cost to Tribune shareholders would be  $21 million ($34 x 126 million shares x 0.5%).  Black Decl. ¶ 17.

[29] Notably, this requested amount does not include the reasonable and anticipated attorneys' fees and expenses that would be incurred by defendants in obtaining final relief dissolving the injunction.

- 30 -

LA1 930826v.1

**THIS PAGE INTENTIONALLY LEFT BLANK**

**DECLARATION OF
WILLIAM A OSBORN**

# DECLARATION OF WILLIAM A. OSBORN

I, William A. Osborn, declare and say:

1.     I am a Director of Tribune Company ("Tribune" or "Company"), a Delaware corporation. I have served as a Director of Tribune since 2001. I also have served as chairman of the Special Committee of Independent Directors ("Special Committee") established by the Tribune Board of Directors ("Board") in September, 2006.

2.     Since 1995, I have served as Chief Executive Officer and Chairman of the Board of The Northern Trust Corporation ("Northern Trust"), which I joined in 1970. In addition to the Tribune and Northern Trust boards, I serve on the board of directors of Caterpillar Inc., as well as those of numerous non-profit entities.

3.     Following extensive negotiations with Equity Group Investments, LLC ("EGI"), an entity affiliated with Sam Zell, Tribune entered into an Agreement and Plan of Merger dated as of April 1, 2007 ("Merger Agreement") with EGI and the Tribune Employee Stock Ownership Plan ("ESOP") pursuant to which Tribune will be sold – if Tribune's shareholders approve the sale in a shareholder vote expected to be held later this year. Specifically, the Merger Agreement calls for a merger of Tribune with a subsidiary entity owned by the ESOP (the "Merger"). In the Merger, all Tribune shares will be cashed out at $34 per share.

4.     In addition to shareholder approval, the Merger will also require certain regulatory approvals, including by the Federal Communications Commission. All of this is anticipated to take some time. In order to assure some substantial return to shareholders in the interim, Tribune has initiated an Offer to Purchase up to 126,000,000 shares of Tribune stock (approximately 54% of the issued and outstanding shares) at the price of $34 per share (the "Tender Offer"). Shareholders currently have until May 24, 2007 to decide whether to participate in the Tender Offer. The Merger Agreement specifically authorizes the Tender Offer, which was, from my perspective and that of the Special Committee and its advisors, a critically important element in these transactions, as I will explain further below.

5.     It is my understanding that Plaintiff in this litigation has asked that this Court enjoin the Tender Offer. I am submitting this affidavit in opposition to that request, which I believe

1

1   would be affirmatively detrimental to the Company and its shareholders if granted.  In this affidavit I

2   will explain why I believe that to be the case.  I will also set forth facts relevant to certain

3   contentions made by Plaintiff in connection with his request, including facts relating to Plaintiff's

4   attacks upon the process adopted by the Tribune Board and run by the Special Committee for

5   considering various strategic options for enhancing Tribune shareholder value.

6           6.      In this affidavit, I will lay out a chronology of facts, particularly with respect

7   to the Special Committee's processes and decisions.   I first wish, however, to draw together and

8   highlight several critical and overarching points.

9           7.      *First, it is critically important that this Court understand that the Tender*

10  *Offer plays a key role in protecting shareholders and delivering value to them.*  As I describe below,

11  during the course of the more than six-month process that the Special Committee pursued, including

12  comprehensive efforts to unearth potential bidders, it became clear that there were, in fact, few

13  bidders actually interested in making any meaningful proposal for the Company.  Thus, after

14  numerous parties were afforded information and opportunities to make an offer, by January 2007

15  there were only two potential bidders who expressed an interest in a transaction involving the equity

16  of the Company – one of which was the Chandler Trusts, which proposed acquiring the equity of the

17  Company following a spin-off of its Broadcast and Entertainment Group ("B&E Group").  And the

18  other bidding group, Broad/Yucaipa, proposed acquiring an initial minority position in the Company

19  and subsequently significantly reduced its proposal after disappointing new results regarding

20  Tribune's performance became available.

21          8.      At that juncture, it appeared that the Company's best course of action for

22  maximizing and delivering value for shareholders was a self-sponsored "leveraged recapitalization."

23  Basically, this would have entailed the Company taking advantage of the current availability of debt

24  financing at attractive prices.  Specifically, utilizing its ability to obtain significant funds through

25  debt financing (secured, in part, by Company assets), the Company would then largely distribute the

26  funds obtained in a special dividend to shareholders, which would have had the effect of returning a

27  significant amount of capital to the Company's shareholders.   Although there were some risks

28  accompanying this approach – including uncertainty as to the value of the Company's stock on a

going-forward basis – it was my judgment (and that voiced by other Special Committee members) that it was critically important that funds be delivered to shareholders as soon as possible, especially given the risks that the Company's performance could continue to deteriorate.

9.    The only other potential transaction capable of generating equivalent returns to shareholders, according to the analyses performed by our financial advisors, was an innovative ESOP acquisition structure proposed by EGI in late January/early February 2007. The advantage of this alternative, compared to a "self-help" leveraged recapitalization, was that shareholders would be fully cashed out at an attractive price, and not subject to the significant going-forward risks that would otherwise remain (including the risk of continued deterioration of the Company's business).[1] The disadvantage was that the ESOP acquisition structure was complicated, and it could take some significant time for necessary regulatory approvals to be obtained, thereby creating deal risk.

10.    Accordingly, it was critically important to the Special Committee that if a merger using the ESOP acquisition structure was to be pursued, that it incorporate a mechanism to assure, regardless of what happened down the line with respect to the merger, that shareholders would have the opportunity to obtain up-front, while conditions remained favorable, at least as much cash as the Company would have been able to provide to them in a "self-help" leveraged recapitalization. From my perspective, this would provide shareholders with the "best of both worlds": combining the assured, quick return offered by a self-help leveraged recapitalization with the bonus of an attractive, agreed deal for all remaining shares at the same price. Accordingly, the Merger Agreement eventually entered into expressly provided for an immediate Company self-tender, to replicate the benefits that the Company could have delivered to shareholders through a self-help leveraged recapitalization.

11.    As discussed below, the Broad/Yucaipa offer dated March 29, 2007 to adopt the EGI structure also expressly incorporated the very same type of first-step tender offer. In short, all three of the options conceivably on the table at the end of March 2007 – the EGI-ESOP offer, the

---

[1] Due to the unique tax attributes of an ESOP, combined with the tax benefits of a proposed "S" corporation structure (which would eliminate any obligation for the Company to pay corporate level federal income taxes), higher debt leverage would be possible then otherwise, theoretically allowing as well for higher payments to shareholders. This structure would not be possible, however, if the Company remained publicly held and traded.

DECLARATION OF WILLIAM A. OSBORN                                      0034

1   self-help recapitalization possibility, and the Broad/Yucaipa ESOP proposal – entailed an immediate

2   Company leveraging so as to enable promptly putting significant funds in shareholders' pockets,

3   either through a self-tender or a dividend. Yet it is this very assurance of a prompt return of capital

4   that Plaintiff's request for a preliminary injunction seeks to de-rail.

5          12.     *Second, enjoining the Tender Offer would cause immediate harm to*

6   *shareholders, as well as subject them to the very risks that an immediate delivery of value was*

7   *designed to avoid.*  As discussed above, the entire concept of the Tender Offer was to provide some

8   assurance to shareholders that, regardless what might or might not happen to the Merger Agreement

9   down the road, they would at least have the opportunity to obtain as much immediately as could be

10  produced in a self-help leveraged recapitalization, which was the other major structural option under

11  consideration. Enjoining the current Tender Offer would defeat that purpose and leave shareholders

12  exposed to precisely the set of risks it was designed to avoid – including risks that the Company's

13  business may suffer additional unexpected deteriorations or that market or industry conditions could

14  change.   These risks are hardly academic.  For example, as one analyst recently reported, "Tribune

15  reported weak April revenues with a significant drop in newspaper advertising…. April revenues fell

16  3.6%, with publishing revenue down 8.6%.  Newspaper advertising and circulation revenues were

17  down 10.3% and 7.2%, respectively." Bear Stearns May 14, 2007 Report, attached as Exhibit 1.

18         13.     Accordingly, I would expect the Company's current stock price to decline

19  promptly and significantly in response to any enjoining of the Tender Offer, given the deprivation of

20  the assured return represented by the Tender Offer as well as the general deal uncertainty that any

21  such ruling would engender.  There is also, of course, the economic reality that each and every day

22  that shareholders are prevented from obtaining money they would otherwise have been paid for their

23  shares through the Tender Offer is another significant loss, given the time-value of money and other

24  investment opportunities.  Collectively, this loss would amount to many hundreds of thousands of

25  dollars *each and every day* for shareholders.

26         14.     *Third, the $34 per share price contained in **both** the Tender Offer and as*

27  *consideration under the Merger Agreement is the highest per share price offered during the six-*

28  *month period that the Special Committee conducted its exhaustive processes.*  I believe that the

4

1  Tender Offer and Merger transactions are an excellent result for Tribune shareholders considering

2  the challenging circumstances facing the Company, as well as the entire industry.  In early 2006,

3  Tribune's share price stood at $28 per share and was in the midst of a steep decline from over $40

4  per share just twelve months prior (and over $50 per share in early 2004), as the Company continued

5  to report increasingly disappointing results, including repeatedly failing to achieve projections or

6  meet market expectations.  I must emphasize that, absent a merger, share buyback or other corporate

7  restructuring or transaction (or speculation that such activities might occur), the prospect for a

8  rebound in the Tribune share price from its early 2006 levels has been dim.  Instead, the share price

9  has clearly been buoyed not by results but by the expectation that a significant transaction will occur.

10  As widely-reported in the financial press, the Tribune's core businesses – traditional newspaper

11  publishing and television broadcasting – face intense competition from the Internet and other

12  technological advances in the way news and entertainment are conveyed to consumers, and

13  consequently in how advertisers seek to reach those consumers.  Such competition has eroded the

14  profitability of those core businesses.  Whether any new approach will succeed is inherently

15  uncertain and might not be known for many years.  Investors are therefore quite circumspect of

16  Tribune, as well as its peers in the industry.[2]

17          15.    For nearly six months, beginning in September, 2006, the Special Committee

18  engaged in a very public process in which it explored strategic alternatives for Tribune.  This process

19  included extensive efforts to solicit offers to purchase either the Company as a whole or individual

20  business units, such as the B&E Group, which houses Tribune's television and radio stations, cable

21  television properties, and Chicago Cubs baseball organization.  I am firmly convinced that this

22  highly-visible, thorough canvass of the market provided potential buyers ample opportunity to

23  submit a bid.  Also, all potential bidders had access to abundant financial and other data regarding

24  Tribune.  Yet, at no time during this six-month period did the Special Committee receive any offers

25

26

---

27  [2] As one recent stock analyst report observed, commenting on Tribune's weak April revenues and the generally negative trends facing publishing companies, "We believe the stocks [] in our publishing universe will remain under pressure as

28  the market digests these poor results and earnings are once again revised downward."  Bear Stearns May 14, 2007 Report, attached as Exhibit 1.

**DECLARATION OF WILLIAM A. OSBORN**

1   having, even nominally, a per share value higher than the $34 to be provided under the Tender Offer

2   and Merger.

3         16.    *Fourth, Plaintiff's suggestion that the process was somehow "cut short" in*

4   *favor of the EGI ESOP transaction, and so as to disfavor Broad/Yucaipa, is at odds with reality and*

5   *ignores the very serious risks of continued delay as opposed to seizing the "bird in hand."*  To begin

6   with, Plaintiff's contention has very little to do with his request that the Tender Offer be enjoined;

7   indeed, Broad/Yucaipa themselves proposed just such a first-step tender offer.  In any event,

8   contrary to Plaintiff's contention, the Special Committee gave full consideration to Broad/Yucaipa,

9   including to their tentative, eleventh-hour expression of interest in a possible transaction using an

10  ESOP in the mold of the EGI proposal, which apparently forms the basis for Plaintiff's position on

11  this point.  But there was no secret that the Special Committee wanted its processes to be concluded

12  by the end of the first quarter of 2007; indeed, public announcements to that effect had been made by

13  the Tribune.  And it was critically important, in the eyes of the Special Committee, that matters not

14  be permitted to drag on, especially since the Special Committee had already once publicly extended

15  its process.  There were multiple reasons for this concern about additional delay, including concerns

16  about the potential damage to the Company's reputation and market credibility (i.e., additional delay

17  likely being perceived as an inability to find acceptable solutions), declining morale among

18  Company employees from continued uncertainty, and the real but unquantifiable risk of market

19  changes affecting financing options and costs or other key matters (including as a result of a decline

20  in the Company's business).

21        17.    As I explain in more detail below, Broad/Yucaipa participated in the

22  solicitation process and submitted an offer in January, 2007.  (Unlike others who submitted offers at

23  that time, however, Broad/Yucaipa did not, as had been requested of all bidders, submit any mark-

24  ups or other response to draft deal agreements that Tribune had provided to all interested parties in

25  late 2006.)  At the time, Broad/Yucaipa claimed that their offer to acquire a minority interest in the

26  Company had an overall value of $34 to shareholders, of which $27 was proposed to be in the nature

27  of a cash dividend (accomplished through a leveraged recapitalization).  We, however, were advised

28  by our financial advisors that the value of the offer was several dollars less and involved an effective

**DECLARATION OF WILLIAM A. OSBORN**

1  sale of control of the Company. Subsequently, though, after Tribune management issued

2  downwardly revised projections for Tribune's performance in February 2007, and Broad/Yucaipa's

3  representatives were informed of that fact, Broad/Yucaipa revised their proposal, including reducing

4  their cash dividend offer by $4 per share. This was not an economically attractive offer, as we

5  concluded and our financial advisors advised us, especially compared to the leveraged

6  recapitalization alternative, which the Company could pursue by itself. And thereafter,

7  Broad/Yucaipa showed little interest in continuing their pursuit of a transaction. In the jargon used

8  by our financial advisors, they "went quiet," and neither we nor our financial advisors received any

9  communications for weeks.

10      18.    Broad/Yucaipa suddenly resurfaced with a letter dated March 23, 2007, the

11  contents of which indicated that it had been prompted by press reports that Tribune was discussing

12  an ESOP transaction with Sam Zell. Operating under the erroneous assumption that the Company

13  itself had developed the ESOP transaction concept and documentation, and had then approached EGI

14  and Mr. Zell, Broad/Yucaipa complained in the letter that the Company had not provided them with

15  an equivalent opportunity or the same information. In fact, these accusations were entirely wrong;

16  EGI had conceived and developed the use of an ESOP acquisition structure here, not Tribune, and

17  EGI had provided us with the extensive draft documentation for such a complicated transaction, not

18  vice-versa. I corrected these and other errors in a letter I sent to Broad/Yucaipa on March 30, 2007.

19      19.    Notwithstanding this, I specifically instructed our advisors to make sure that

20  we fully explored Broad/Yucaipa's apparent expression of interest in making an offer involving an

21  ESOP acquisition structure (a structure which Broad/Yucaipa claimed to have experience with). To

22  that end, I instructed management and the investment bankers promptly to contact Broad/Yucaipa's

23  representatives and offer to provide them with any additional information they requested that had

24  been made available to others. All of that was done, and I was kept apprised in that regard.

25  However, Broad/Yucaipa's representatives requested certain information that we were not in a

26  position to make available, *i.e.*, the ESOP transaction documents that had been provided by and

27  negotiated with EGI. Indeed, the confidentiality agreement that the Company had entered into with

28  EGI in November 2006, *i.e.*, when EGI together with other interested parties first was invited to

1    consider a transaction, prohibited disclosure of such "terms and conditions" information provided by

2    EGI to the Company, which would not have been appropriate in any event.  In my experience, it is

3    far from standard procedure for one bidder to seek another's work product when that work product

4    has not been publicly disclosed.  Yet that is what Broad/Yucaipa wanted, apparently unaware that

5    these materials had not been generated in the first instance by the Company, but by EGI itself.

6         20.    Broad/Yucaipa submitted a one-page proposal dated March 29, 2007, which

7    indicated a "willingness to enter into a definitive contract offering shareholders $34 per share."

8    Like the EGI proposed transaction, the Broad/Yucaipa proposal called for a two-step transaction, the

9    first step of which would be a tender offer by the Company.  But the proposal was unaccompanied

10   by any proposed deal documentation at all, a point underscored by the reference to a "*willingness* to

11   enter into a definitive contract" (emphasis supplied).  Not only were no contractual documents

12   provided, none of the other documentation or specifics necessary for a complicated transaction of

13   this sort was tendered, including no financing documents or agreements between Broad/Yucaipa and

14   an ESOP Trustee (which would be a necessary step).  This was hardly a trivial omission.

15   Preparation and negotiation (with multiple parties) of the documents necessary for such a

16   complicated transaction would take an extensive period of time, as we were advised and I believed,

17   likely lasting at least several weeks.  In short, pursuing the Broad/Yucaipa proposal at this juncture

18   would have required delaying the possibility of entering into any definitive deal for a significant

19   period of time – with nothing binding Broad/Yucaipa and no assurance that, at the end of the day,

20   any deal would be able to be agreed upon or signed up.  In that sense, this potential path would, in

21   essence, have created an element of optionality for Broad/Yucaipa regarding whether or not to

22   proceed, allowing them, for example, to alter their offer or withdraw from the process if additional

23   disappointing results were received – which is precisely what had happened, of course, earlier in the

24   year when Broad/Yucaipa downwardly revised their January offer after new, disappointing results.

25         21.    It was the judgment of the Special Committee's advisors, and one in which I

26   and other Special Committee members fully concurred, that this was not a prudent path as opposed

27   to capturing a "bird in the hand" by getting EGI and the ESOP to enter into a binding agreement

28   with the Company – particularly since that agreement involved a price every bit as high as that

1   proposed by Broad/Yucaipa. Also, by the end of March 2007, Mr. Zell and EGI had expressed

2   "frustration," and it was both my sense and that of our advisors that they were quickly losing

3   patience with what had already been a quite lengthy process, and might very well walk away unless

4   a deal was concluded on the schedule they had been led by us to anticipate.

5           22.     *Fifth, while the Board secured a very attractive and beneficial "bird in hand"*

6   *transaction by entering into the Merger Agreement with EGI and the ESOP, it kept the door open to*

7   *a still better deal if one is available.*  The potential for a better deal exists because the Special

8   Committee demanded a flexible Merger Agreement that contains generous so-called "fiduciary

9   outs." Those fiduciary outs permit the Board to consider and negotiate (and ultimately accept) any

10  unsolicited proposal from another bidder that the Board believes "could reasonably be expected to

11  result" in a proposal superior to the EGI deal. Agreement and Plan of Merger, §5.3(b), attached as

12  Exhibit 2. Also, the Board insisted upon, and obtained, an almost unprecedentedly low

13  "termination" fee that must be paid to EGI – $25 million, amounting to about 10 cents per share – if

14  Tribune terminates the merger agreement in favor of superior proposal. The fact that no other

15  bidders have emerged following execution of the Merger Agreement despite the lack of any material

16  barriers, in my mind, provides additional assurance that the $34 per share price secured in the EGI

17  transaction is the best available price.

18          23.     I understand that Plaintiff has claimed that the Tender Offer, if effectuated,

19  might somehow be preclusive of another party making a superior offer.  That contention makes little

20  sense to me and is precisely contrary to the advice we have received from our financial advisors.  If

21  anything, effectuation of the Tender Offer would facilitate any third party interested in making a

22  superior proposal. Here is why. To begin with, the Tender Offer will significantly reduce the

23  number of shares needed to be acquired by any third party acquiror, thereby also allowing the third

24  party to pay more per share. Moreover, if a third party believes that the Company is worth more

25  than $34 per share, the self-tender at that price will have served to enhance the value of the

26  Company in the eyes of such a third party – for the simple reason that the Company would have

27  acquired shares at a price less than the value that the third party might (hypothetically) attach to

28  those shares.  (Nor is it any answer to say that debt financing will have been incurred to purchase

9

1    the shares in the self-tender; in the absence of a tender offer, a third party acquiror would itself

2    almost certainly likewise have to obtain financing for the purchase of those same shares.)  In short,

3    there is nothing about effectuation of the Tender Offer that would materially impede a subsequent,

4    superior third party offer.  I remain dubious, however, that there actually exist any third parties out

5    there who are in fact willing to pay materially more than $34 per share for the Company, especially

6    in light of the Company's recently reported results.

7          24.    *Sixth*, I understand that Plaintiff has, in earlier proceedings in this case,

8    attempted to suggest or imply that I and other members of the Special Committee may have made

9    the decisions and recommendations that we did due to "entrenchment" motives, and that the desire to

10    remain as Directors of Tribune somehow may have motivated the Board and Special Committee to

11    favor the EGI ESOP transaction.  Nothing could be farther from the truth.  To begin with, if

12    "entrenchment" were our goal – which it has never been – we would not have embraced the sale of

13    the Company to third parties, as called for by the Merger Agreement.   Indeed, we chose such a sale

14    in preference to other alternatives that would have entailed the current structure remaining intact,

15    *i.e.*, a self-help "leveraged recapitalization" of the Company.

16          25.    Plaintiff appears also to have some misapprehension that I or other members

17    of the Special Committee have been invited by EGI or its representatives to continue as directors of

18    the Company after any merger.  That is simply not the case.  Whether any of the current Board

19    members who are members of the Special Committee will or will not be asked to serve as board

20    members in a privately held Tribune was never even discussed by me (or, to my knowledge, anyone

21    else) with EGI or any of its representatives in the course of negotiations regarding the EGI ESOP

22    proposal.  Nor to this day have I discussed such matters with, much less received any such

23    assurances from, anyone associated with EGI.  And, frankly, I have little desire to serve as a director

24    in the new company.  While I believe that my service on the Tribune Board has been important,

25    particularly at this challenging time in the Company's history, it has been exhausting and occupied

26    hundreds and hundreds of hours in the last year alone, for no remuneration beyond ordinary director

27    fees (which are not of economic significance to me).

28

DECLARATION OF WILLIAM A. OSBORN                    0041

26.     I also understand that Plaintiff has accused the Special Committee of trying to "tilt the playing field" in favor of EGI and against Broad/Yucaipa "based on issues unrelated to the consideration shareholders will receive." That is simply false. All of the Special Committee's discussions and decisions, and all of the advice received from the various financial and other advisors, were entirely focused on what would produce the most beneficial transaction for shareholders. There was no "favoritism" at all by me or demonstrated, to my knowledge, by other Special Committee members, just a careful consideration of the pros and cons of various options. Moreover, prior to this transaction, the extent of my contacts with Mr. Zell is that I had lunch with him once, about ten years ago; to my recollection, I had no prior contact at all with anyone else from EGI.

## Formation of the Special Committee, and the Search for Buyers and Consideration of Other Strategic Options

27.     After considering several different options for enhancing shareholder value, on September 21, 2006 the Board created the Special Committee to oversee a formal process of exploring strategic alternatives, including seeking proposals for acquiring Tribune (or its component parts) from third parties. The Special Committee consisted of all Directors except for Mr. Fitzsimons, who as Tribune CEO represented the only member of Tribune management who sat on the Board, and the three Directors nominated by trusts held for the benefit of the Chandler family ("Chandler Trusts").

28.     The Tender Offer materials dated April 25, 2007, and subsequently updated in relevant part by Amendment No. 6, contain an extensive and accurate recitation of the events of the strategic review process. (The April 25, 2007 Offer to Purchase and Amendment No. 6, attached as Exhibits 3 and 4.) Set forth below is a summary chronology that highlights the most relevant considerations of, and actions taken by, the Special Committee as they pertain to Plaintiff's allegations.

29.     Prior to forming the Special Committee, the Board had been working with Merrill Lynch as its financial advisor. To further ensure independence, the Special Committee decided to retain its own financial advisor, Morgan Stanley. For the same reason, the Special

11

1  Committee likewise retained its own, independent legal advisor, Skadden Arps Slate Meagher &
2  Flom, LLP. I believe that the Special Committee was very well-advised in this regard. Our financial
3  advisors at Morgan Stanley were extremely sophisticated and experienced in mergers and
4  acquisitions, and have an excellent reputation in the field. Skadden is one of the preeminent
5  corporate law firms in the country, and is one of the most sought-after firms in the country for
6  advising on merger and acquisition issues.

7        30.    Merrill Lynch continued to serve as a financial advisor for Tribune, and
8  Tribune also engaged Citigroup to act as a co-advisor with Merrill Lynch. Both Tribune
9  management and the Special Committee decided that the best way to proceed was for Merrill Lynch
10 and Citigroup to be mainly responsible for contacting potential bidders and facilitating due diligence
11 and management presentations. Morgan Stanley would oversee that work and report to the Special
12 Committee, as well as provide valuation and, if requested, a fairness opinion to the Special
13 Committee. As the entity in control of the process of seeking bidders and reviewing strategic
14 alternatives, the Special Committee had the authority to direct Tribune management and all financial
15 advisors in that context.

16       31.    Shortly after retaining its financial and legal advisors, the Special Committee
17 directed Merrill Lynch and Citigroup to contact a diverse array of potential "financial" buyers, such
18 as private equity firms, as well as "strategic" buyers (*i.e.*, companies in the broadcasting or
19 publishing industries) to solicit their interest in acquiring Tribune. Tribune signed preliminary
20 confidentiality agreements with many parties and over the ensuing weeks shared information with
21 and permitted due diligence by numerous parties interested in exploring a possible transaction.

22       32.    On October 18, 2006, the Special Committee, together with Merrill Lynch,
23 Citigroup and its own financial and legal advisors, reviewed the status of the strategic review process
24 to date, and considered the financing that Merrill Lynch and Citigroup proposed to make available to
25 potential buyers. Additionally, the Special Committee and Morgan Stanley reviewed the risks and
26 benefits associated with exploring a sale of parts of Tribune along with simultaneously exploring the
27 possible sale of Tribune as a whole. Also, a two-step process was adopted for consideration of bids.
28 Step one involved contacting potential financial and strategic buyers and asking those interested to

12

1   enter into confidentiality, or "standstill," agreements and to provide preliminary indications of

2   interest by October 27, 2007.  Step two involved selecting the initial indications of interest that

3   showed promise, and developing them further through due diligence, which included granting access

4   to a "data room" that contained financial and other information, management presentations and

5   review of a draft merger agreement.

6        33.    The Special Committee reviewed the status of the process on October 31,

7   2006, after the date set for initial expressions of interest passed.  At that time:  seventeen potential

8   bidders signed confidentiality agreements (a total of 31 confidentiality agreements would be signed

9   during the entire process); five parties (or groups) submitted preliminary indications of interest, with

10  indications of price ranging from $30 to $34 per share; one group stated that it would soon submit an

11  indication of interest; and another requested an extension of time to submit an indication of interest.

12  At this same meeting, the Special Committee reviewed with Tribune management and advisors the

13  possible use of asset sales to enhance the sale process, and the possibility of a further leveraged

14  recapitalization of the Company.  Following these discussions, the Special Committee instructed

15  Tribune's management and the Company's financial advisors to continue seeking a buyer for all of

16  Tribune, but also to explore the sale of Tribune's B&E Group, the sale of the major market assets of

17  the B&E group, and the sale of Tribune's largest newspaper.  Six parties continued in the process

18  going forward, and acquired additional information via both the data room and management

19  presentations.

20       34.    On November 8, 2006, EGI and the Company signed a confidentiality

21  agreement.  At EGI's insistence, the confidentiality agreement did not only impose obligations on

22  EGI with respect to information it received from the Company, but, conversely, also prohibited the

23  Company from disclosing to others "any of the terms, conditions or other facts with respect to any

24  such possible Transaction between [EGI] and the Company…."  However, EGI dropped out of the

25  process not long thereafter.

26       35.    In November 2006, the Special Committee received further updates from the

27  Company's financial advisors regarding the process, and learned that several parties fell out of the

28  process after their initial interest, and that several parties had expressed interest in discrete assets of

1  Tribune. During this time, Tribune's financial advisors reported that the Chandler Trusts had

2  entered the fray and proposed a transaction involving a spin-off of the B&E Group, with the

3  Chandler Trusts acquiring the remaining portions of the Company following the spin-off. Also, the

4  Special Committee learned from the Company's financial advisors that the recently announced sale

5  of Clear Channel Communications could impact the Special Committee's process, including the

6  timing of when final bids should be requested, by virtue of potential regulatory issues that the buyers

7  in the Clear Channel transaction would have with respect to a subsequent acquisition of the

8  Company. In light of these and other uncertainties, and the strong desire for an extension expressed

9  by the remaining potential bidders in the process, on November 28, 2006, at the direction of the

10  Special Committee, Tribune publicly announced that it had extended the bidding process and it

11  expected to receive a final recommendation from the Special Committee during the first quarter of

12  2007.

13  　　　　36.　　On December 12, 2006, Tribune management, Merrill Lynch and Citigroup

14  updated the Special Committee on the process. They reported that five parties remained interested in

15  bidding for the entire Company, and several others expressed interest in parts of the Company,

16  including the Chandler Trusts. Further, at this time, the Special Committee had concerns with the

17  possibility that no satisfactory bid would emerge from the process. Accordingly, the Special

18  Committee consulted with the advisors about possible alternatives to an acquisition of the entire

19  Company. The Special Committee also directed Merrill Lynch and Citigroup to request that

20  interested parties submit bids by January 12, 2007.

21  　　　　37.　　On January 12, 2007 – the day the bids were due – management and the

22  Company advisors met with the Special Committee to discuss what was expected from the bidding

23  process. The Special Committee learned that several potential bidders had decided not to submit a

24  final proposal. Two bidder groups, including Broad/Yucaipa, were still pursuing bids for the entire

25  Company. Also, one remaining bidder was likely to pursue a deal involving the B&E Group only,

26  and the Chandler Trusts remained interested in their spin-off / buyout transaction. The Special

27  Committee also reviewed, both with the Company advisors and Morgan Stanley, all of the various

28  strategic alternatives available to Tribune, including: (a) sale of the entire Company; (b) a leveraged

14

1  recapitalization of the Company; (c) sale of the B&E Group; and (d) a split-off of the publishing

2  business.

3          38.     The sale process ultimately produced only three proposals – one of the two

4  bidder groups seeking to acquire the entire Company chose not to submit a bid.  The three proposals

5  consisted of:  (a) a transaction, proposed by Broad/Yucaipa, in which the Company would issue a

6  $27 per share dividend, followed by a $500 million infusion of equity by the buyer, with Tribune

7  shareholders retaining an interest in the Company that Broad/Yucaipa asserted (based on certain

8  assumptions) would have a value of $7 per share or more – for a total value of $34 per share as

9  estimated by the bidders; (b) a proposal from a third party to acquire the B&E Group for $4.8 billion

10  in cash; and (c) the Chandler Trusts' proposal to spin-off the B&E Group and acquire the remaining

11  Company, which the Chandler Trusts estimated would provide Tribune shareholders with cash and

12  equity in the B&E Group having a total aggregate value of $31.70 per share.

13          39.     The Special Committee convened on January 20, 2007 to review the three

14  proposals with the Company's advisors.  The financial advisors placed a significantly lower value on

15  the Broad/Yucaipa and Chandler Trusts' proposals than that assigned by the bidders, including

16  valuing the Chandler Trusts' proposal approximately $4.00 less than they claimed, and valuing the

17  Broad/Yucaipa proposal at approximately $2.30 less than they claimed (with this $2.30 figure later

18  revised further downward to $3.35 less than the value claimed).  The Special Committee also

19  considered the conditional nature and tax consequences of these two proposals.  Following a

20  separate meeting on January 20, 2007 with its own financial and legal advisors, the Special

21  Committee concluded that none of the proposals were satisfactory for Tribune shareholders.

22  Consequently, the Special Committee directed Merrill Lynch and Citigroup to seek improvements in

23  the proposals, and additionally ordered those advisors to analyze alternatives for increasing

24  shareholder value that Tribune could execute on its own.  Following the meeting, the Company

25  issued a press release informing the market that the strategic review process would continue, and

26  stating that a decision was expected by the end of the first quarter of 2007.

27          40.     On January 27, 2007, the Company's advisors updated the Special Committee

28  on the offers reviewed on January 20, 2007.  Little progress had been made, as each of the bidders

15