may increase upon the effectiveness of the Incremental Facility, if any, depending on the interest rate applicable to the Incremental Facility at such time and the interest rate on the Revolving Credit Facility is subject to reduction in accordance with a leverage-based grid to be agreed among the parties. The Senior Bridge Facility (a one-year facility which may be extended for seven additional years) will bear interest per annum at a variable rate equal to either the applicable base rate plus a margin of 350 basis points or LIBOR plus a margin of 450 basis points, in each case subject to 50 basis point increases every three months for failure to repay in whole subject to certain limitations. If the Senior Bridge Facility is not refinanced on or before the first anniversary of the Merger, the Senior Bridge Loans will convert into extended term loans maturing on the eighth anniversary of the Merger. Holders of any such extended term loans may choose to exchange such loans for exchange notes maturing on the eighth anniversary of the Merger and also may fix the interest rate of such exchange note. The Company would be required to register any exchange notes for public sale under a registration statement in compliance with applicable securities laws.

Undrawn amounts under the Delayed Draw Facility are currently expected to accrue a commitment fee at a per annum rate of 75 basis points and undrawn amounts under the Revolving Credit Facility will accrue a commitment fee at a per annum rate of 50 basis points; the commitment fee applicable to the Revolving Credit Facility is subject to reduction in accordance with a leverage-based grid to be agreed among the parties.

The Term Loan Facility and the Incremental Facility, if any, will amortize at a rate of 1.0% per annum (payable quarterly) prior to maturity, on which date the remaining principal amount will be payable in full. The Delayed Draw Facility will automatically become part of the Term Loan Facility when made and will amortize based upon the Term Loan Facility amortization schedule. The Term Loan Facility, the Incremental Facility, if any, and the Delayed Draw Facility will be payable at any time prior to maturity without penalty and the unutilized portion of the commitments under the Delayed Draw Facility may be reduced at the option of the Company without penalty.

The Senior Bridge Facility will not amortize, and will be optionally pre-payable at any time prior to maturity without penalty.

Loans under the Term Loan Facility, the Incremental Facility, if any, and the Delayed Draw Facility will be required to be repaid with, and commitments under the Revolving Loan Facility will be required to be reduced by, an amount equal to (a) 100% of the net cash proceeds of the issuance or incurrence of funded debt (subject to certain exclusions) or of any sale and lease-back by the Company or any of its subsidiaries (subject to baskets and exceptions to be agreed), (b) 50% of excess cash flow (subject to a leverage based step-down to be agreed), (c) 100% of the net cash proceeds from all non-ordinary course asset sales or other dispositions of property by the Company and its subsidiaries (including insurance and condemnation proceeds in excess of an amount to be agreed) subject to customary and other specified exceptions, limited thresholds and specified reinvestment rights and (d) net cash proceeds received by the Company from certain investments made in the Company.

With respect to the Senior Bridge Facility, the Company will be required to make prepayments with (a) the net cash proceeds of the incurrence of certain debt (to be agreed) by the Company or any of its subsidiaries or the issuance of any equity by the Company or any of its subsidiaries or (b) the net cash proceeds from all non-ordinary course asset sales by the Company or any of its subsidiaries, in each case after deduction of, among other things, mandatory prepayments and permitted reinvestments described in the immediately preceding paragraph and subject to certain baskets and exceptions to be described in the definitive credit agreement.

The Term Loan Facility, the Delayed Draw Facility, the Incremental Facility, if any, and the Revolving Loan Facility are expected to be guaranteed by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the capital stock of certain specified subsidiaries of the Company. Certain outstanding senior notes of the Company (the "Existing Notes") will be secured on

71

an equal and ratable basis with the First Step Credit Facilities and the Incremental Facility, if any, as required by the terms of the indentures governing such Existing Notes. The Senior Bridge Facility and the New Notes (subject to any changes made during the syndication process), as applicable, are expected to be guaranteed on a senior subordinated basis by all of the Company's subsidiaries which guarantee the First Step Credit Facilities and the Incremental Facility.

The Credit Facilities will contain representations and warranties, affirmative and negative covenants and events of default which are usual and customary for credit facilities and transactions of the type and size of the Credit

Facilities, in each case subject to customary exceptions and limitations, as applicable. In addition, the Term Loan Facility, the Delayed Draw Facility, the Incremental Facility, if any, and the Revolving Credit Facility will include three financial covenants as follows: (i) a minimum ratio of trailing four quarter EBITDA to total interest expense for the same period (A) prior to the date on which the Second Step Facilities become effective, of 1.75:1 through December 31, 2007 and 2.00:1 thereafter and (B) after the date on which the Second Step Facilities become effective, ranging from 1.1:1 to 1.25:1, (ii) a maximum ratio of total indebtedness of the Company that is guaranteed by any of its subsidiaries and indebtedness of any of the guarantors of the Credit Facilities (on a consolidated basis) to trailing four quarter EBITDA as of the last day of the most recently completed fiscal quarter (A) prior to the date on which the Second Step Facilities become effective, starting with less than or equal to 6.25:1 and stepping down over time to 5.25:1 and (B) after the date on which the Second Step Facilities become effective, starting with less than or equal to 9:1 and stepping down over time to 8.25:1 and (iii) limitations on capital expenditures to be agreed.

There is a possibility that the Company will not be able to borrow funds under the Credit Facilities if any of the conditions in the Commitment Letters or the documents evidencing the Credit Facilities are not met. The Company currently has no alternative financing arrangements in place if the proceeds of the Credit Facilities are not available to it.

*General.* We will incur substantially increased indebtedness in connection with the Tender Offer and, as a result, will be more leveraged. Increased leverage could have certain material adverse effects on us, including, but not limited to, the following: (i) our ability to obtain additional financing in the future for acquisitions, working capital, capital expenditures and general corporate or other purposes could be impaired, or any such financing may not be available, on terms favorable to us; (ii) a substantial portion of our cash flow could be required for interest payments and, as a result, might not be available for our operations or other purposes; (iii) any substantial decrease in net operating cash flows or any substantial increase in expenses could make it difficult for us to meet our debt service requirements or force us to modify our operations or sell assets; (iv) our ability to withstand competitive pressures may be decreased; and (v) our level of indebtedness may make us more vulnerable to economic downturns and reduce our flexibility in responding to changing business, regulatory and economic conditions.

72

---

## THE TENDER OFFER

### Terms of the Tender Offer

*General.* Upon the terms and subject to the conditions of the Tender Offer, we will purchase up to 126,000,000 shares of Company Common Stock, or if fewer shares are properly tendered, all shares that are properly tendered and not properly withdrawn in accordance with "The Tender Offer—Withdrawal Rights," at a price of $34.00 per share, net to the seller in cash, less any applicable withholding tax and without interest.

The term "Expiration Time" means 5:00 p.m., New York City time, on May 24, 2007, unless we, in our sole discretion, extend the period of time during which the Tender Offer will remain open, in which event the term "Expiration Time" shall refer to the latest time and date at which the Tender Offer, as so extended by us, shall expire. See "The Tender Offer—Extension of the Tender Offer; Termination; Amendment" for a description of our right to extend, delay, terminate or amend the Tender Offer.

In the event of an over-subscription of the Tender Offer as described below, shares properly tendered and not properly withdrawn will be subject to proration, except for "odd lots." The proration period and, except as described herein, withdrawal rights, expire at the Expiration Time.

If we:

- increase the price to be paid for shares above $34.00 per share or decrease the price to be paid for shares below $34.00 per share;

- increase the number of shares being sought in the Tender Offer and such increase in the number of shares being sought exceeds 2% of our outstanding shares (or approximately 4.8 million shares); or

- decrease the number of shares being sought in the Tender Offer; and

the Tender Offer is scheduled to expire at any time earlier than the expiration of a period ending at 12:00 midnight, New York City time, on the tenth business day (as defined below) from, and including, the date that notice of any such increase or decrease is first published, sent or given in the manner specified in "The Tender Offer—Extension

of the Tender Offer; Termination; Amendment," then the Tender Offer will be extended until the expiration of such period of ten business days. For the purposes of the Tender Offer, a "business day" means any day other than a Saturday, Sunday or United States federal holiday and consists of the time period from 12:01 a.m. to approximately 12:00 midnight, New York City time.

**The Tender Offer is not conditioned on any minimum number of shares being tendered. The Tender Offer is, however, subject to satisfaction of certain conditions, including the satisfaction of the Financing Condition.**

All shares purchased pursuant to the Tender Offer will be purchased at $34.00 per share net to the seller in cash, less any applicable withholding tax and without interest. All shares not purchased pursuant to the Tender Offer, including shares not purchased because of proration, will be returned to the tendering stockholders at the Company's expense promptly following the Expiration Time. See "The Tender Offer—Price Range of the Shares/Dividends" for recent market prices for the shares.

Stockholders also can specify the order in which we will purchase the specified portions in the event that, as a result of the proration provisions or otherwise, we purchase some but not all of the tendered shares pursuant to the Tender Offer. In the event a stockholder does not designate the order and fewer than all shares are purchased due to proration, the Depositary will select the order of shares purchased.

73

If the number of shares properly tendered and not properly withdrawn prior to the Expiration Time is less than or equal to 126,000,000 shares, or such greater number of shares as we may elect to accept for payment, we will, subject to applicable law and upon the terms and subject to the conditions of the Tender Offer, purchase all shares so tendered.

*Priority of Purchases.*    Upon the terms and subject to the conditions of the Tender Offer, if more than 126,000,000 shares, or such greater number of shares as we may elect to accept for payment, have been properly tendered at prices at the purchase price selected by us and not properly withdrawn prior to the Expiration Time, we will, subject to applicable law, purchase properly tendered shares on the basis set forth below:

- *First*, we will purchase all shares tendered by any Odd Lot Holder (as defined below) who:

- tenders all shares owned beneficially of record by the Odd Lot Holder (tenders of less than all of the shares owned by an Odd Lot Holder will not qualify for this preference); and

- completes the section entitled "Odd Lots" in the Letter of Transmittal and, if applicable, in the Notice of Guaranteed Delivery.

- *Second*, subject to the conditional tender provisions described in "The Tender Offer—Conditional Tender of Shares," we will purchase all other shares properly tendered on a pro rata basis with appropriate adjustments to avoid purchases of fractional shares, as described below.

- *Third*, if necessary to permit us to purchase 126,000,000 shares, shares conditionally tendered (for which the condition requiring us to purchase a specified number of shares was not initially satisfied) and not properly withdrawn, will, to the extent feasible, be selected for purchase by random lot. To be eligible for purchase by random lot, stockholders whose shares are conditionally tendered must have tendered all of their shares.

As a result of the foregoing priorities applicable to the purchase of shares tendered, it is possible that all of the shares that a stockholder tenders in the Tender Offer may not be purchased. In addition, if a tender is conditioned upon the purchase of a specified number of shares, it is possible that none of those shares will be purchased.

*Odd Lots.*    The term "odd lots" means all shares properly tendered prior to the Expiration Time and not properly withdrawn by any person (an "Odd Lot Holder") who owned beneficially or of record a total of fewer than 100 shares and so certified in the appropriate place on the Letter of Transmittal and, if applicable, on the Notice of Guaranteed Delivery.

To qualify for this priority, an Odd Lot Holder must tender all shares owned by the Odd Lot Holder in accordance with the procedures described in "The Tender Offer—Procedures for Tendering Shares." Odd lots will be accepted for payment before any proration of the purchase of other tendered shares. This preference is not available to partial tenders or to beneficial or record holders of an aggregate of 100 or more shares, even if these holders have separate accounts or certificates representing fewer than 100 shares. By tendering in the Tender Offer, an Odd Lot Holder who holds shares in its name and tenders its shares directly to the Depositary would not only avoid the payment of brokerage commissions, but also would avoid any applicable odd lot discounts in a sale of the holder's shares. Any Odd Lot Holder wishing to tender all of its shares pursuant to the Tender Offer should complete the section entitled "Odd Lots" in the Letter of Transmittal and, if applicable, in the Notice of Guaranteed Delivery.

*Proration.*    If proration of tendered shares is required, we will determine the proration factor promptly following the Expiration Time. Subject to adjustment to avoid the purchase of fractional shares and subject to the provisions governing conditional tenders described in "The Tender Offer—Conditional Tender of Shares," proration for each stockholder tendering shares, other than Odd Lot

74

---

Holders, will be based on the ratio of the number of shares properly tendered and not properly withdrawn by the stockholder to the total number of shares properly tendered and not properly withdrawn by all stockholders, other than Odd Lot Holders. Because of the difficulty in determining the number of shares properly tendered and not properly withdrawn, and because of the odd lot procedure described above and the conditional tender procedure described in "The Tender Offer—Conditional Tender of Shares," we expect that we will not be able to announce the final proration factor or commence payment for any shares purchased pursuant to the Tender Offer until up to seven business days after the Expiration Time. The preliminary results of any proration will be announced by press release promptly after the Expiration Time. After the Expiration Time, stockholders may obtain preliminary proration information from the Information Agent and also may be able to obtain the information from their brokers.

As described in "The Tender Offer—United States Federal Income Tax Consequences," the number of shares that we will purchase from a stockholder in the Tender Offer may affect the United States federal income tax consequences to that stockholder and, therefore, may be relevant to a stockholder's decision whether or not to tender shares and whether to condition any tender upon our purchase of a stated number of shares held by such stockholder.

This Offer to Purchase and the related Letter of Transmittal will be mailed to record holders of shares and will be furnished to brokers, dealers, commercial banks and trust companies whose names, or the names of whose nominees, appear on our stockholder list or, if applicable, who are listed as participants in a clearing agency's security position listing for subsequent transmittal to beneficial owners of shares.

*Appraisal Rights.*    No appraisal or dissenters' rights are available to holders of Company Common Stock under applicable law in connection with the Tender Offer. Any appraisal rights available in connection with the Merger will be described in the proxy statement for the Company stockholders meeting at which stockholders will be asked to vote on the Merger Agreement.

## Procedures for Tendering Shares

*Valid Tender.*    For a stockholder to make a valid tender of shares in the Tender Offer, the Depositary must receive, at one of its addresses set forth on the back cover of this Offer to Purchase and prior to the Expiration Time:

- a Letter of Transmittal, properly completed and duly executed, together with any required signature guarantees, or, in the case of a book-entry transfer, an "agent's message" (see "The Tender Offer—Procedures For Tendering Shares—Book-Entry Transfer" below), and any other required documents; and

- either certificates representing the tendered shares or, in the case of tendered shares delivered in accordance with the procedures for book-entry transfer we describe below, a book-entry confirmation of that delivery (see "The Tender Offer—Procedures For Tendering Shares—Book-Entry Transfer" below).

In the alternative, the tendering stockholder must, before the Expiration Time, comply with the guaranteed delivery procedures we describe below.

If a broker, dealer, commercial bank, trust company or other nominee holds your shares, it is likely the nominee has established an earlier deadline for you to act to instruct the nominee to accept the Tender Offer on your behalf. We recommend that you contact your broker, dealer, commercial bank, trust company or other nominee to find out the nominee's applicable deadline.

75

The valid tender of shares by you through one of the procedures described in this "The Tender Offer—Procedures for Tendering Shares" will constitute a binding agreement between you and us on the terms of, and subject to the conditions to, the Tender Offer.

We recommend that stockholders who hold shares through brokers or banks consult the brokers or banks to determine whether transaction costs are applicable if they tender shares through the brokers or banks and not directly to the Depositary.

Stockholders also can specify the order in which we will purchase the specified portions in the event that, as a result of the proration provisions or otherwise, we purchase some but not all of the tendered shares pursuant to the Tender Offer. In the event a stockholder does not designate the order and fewer than all shares are purchased due to proration, the Depositary will select the order of shares purchased.

Odd Lot Holders who tender all their shares must also complete the section captioned "Odd Lots" in the Letter of Transmittal and, if applicable, in the Notice of Guaranteed Delivery, to qualify for the preferential treatment available to Odd Lot Holders as set forth in "The Tender Offer—Terms of the Tender Offer."

*Book-Entry Transfer.*    For purposes of the Tender Offer, the Depositary will establish an account for the shares at The Depository Trust Company (the "book-entry transfer facility") within two business days after the date of this Offer to Purchase. Any financial institution that is a participant in the book-entry transfer facility's system may make book-entry delivery of shares by causing the book-entry transfer facility to transfer those shares into the Depositary's account in accordance with the book-entry transfer facility's procedures for that transfer. Although delivery of shares may be effected through book-entry transfer into the Depositary's account at the book-entry transfer facility, the Letter of Transmittal, properly completed and duly executed, with any required signature guarantees, or an agent's message, and any other required documents must, in any case, be transmitted to, and received by, the Depositary at one of its addresses set forth on the back cover of this Offer to Purchase prior to the Expiration Time, or the tendering stockholder must comply with the guaranteed delivery procedures we describe below.

The confirmation of a book-entry transfer of shares into the Depositary's account at the book-entry transfer facility as we describe above is referred to herein as a "book-entry confirmation." **Delivery of documents to the book-entry transfer facility in accordance with the book-entry transfer facility's procedures will not constitute delivery to the Depositary.**

The term "agent's message" means a message transmitted by the book-entry transfer facility to, and received by, the Depositary and forming a part of a book-entry confirmation, stating that the book-entry transfer facility has received an express acknowledgment from the participant tendering shares through the book-entry transfer facility, that the participant has received and agrees to be bound by the terms of the Letter of Transmittal and that we may enforce that agreement against that participant.

*Method of Delivery.*    **The method of delivery of shares, the Letter of Transmittal and all other required documents, including delivery through the book-entry transfer facility, is at the election and risk of the tendering stockholder. Shares will be deemed delivered only when actually received by the Depositary (including, in the case of a book-entry transfer, by book-entry confirmation). If you plan to make delivery by mail, we recommend that you deliver by registered mail with return receipt requested and obtain proper insurance. In all cases, sufficient time should be allowed to ensure timely delivery.**

76

*Signature Guarantees.*    No signature guarantee will be required on a Letter of Transmittal for shares tendered thereby if:

• 

the "registered holder(s)," as defined below, of those shares signs the Letter of Transmittal and has not completed either the box entitled "Special Delivery Instructions" or the box entitled "Special Payment Instructions" in the Letter of Transmittal; or

- those shares are tendered for the account of an "eligible institution," as defined below.

A "registered holder" of tendered shares will include any participant in the book-entry transfer facility's system whose name appears on a security position listing as the owner of those shares, and an "eligible institution" is a "financial institution," which term includes most commercial banks, savings and loan associations and brokerage houses, that is a participant in any of the following: (1) the Securities Transfer Agents Medallion Program; (2) the New York Stock Exchange, Inc. Medallion Signature Program; or (3) the Stock Exchange Medallion Program.

Except as described above, all signatures on any Letter of Transmittal for shares tendered thereby must be guaranteed by an eligible institution. See Instructions 1 and 6 to the Letter of Transmittal. If the certificates for shares are registered in the name of a person other than the signer of the Letter of Transmittal, or if payment is to be made or certificates for shares not tendered or not accepted for payment are to be returned to a person other than the registered holder of the certificates surrendered, then the tendered certificates must be endorsed or accompanied by appropriate stock powers, in either case signed exactly as the name or names of the registered holders or owners appear on the certificates, with the signatures on the certificates or stock powers guaranteed as aforesaid. See Instructions 1 and 6 to the Letter of Transmittal.

*Guaranteed Delivery.*   If you wish to tender shares in the Tender Offer and your certificates for shares are not immediately available or the procedures for book-entry transfer cannot be completed on a timely basis or time will not permit all required documents to reach the Depositary prior to the Expiration Time, your tender may be effected if all the following conditions are met:

- your tender is made by or through an eligible institution;

- a properly completed and duly executed Notice of Guaranteed Delivery in the form we have provided is received by the Depositary, as provided below, prior to the Expiration Time; and

- the Depositary receives, at one of its addresses set forth on the back cover of this Offer to Purchase and within the period of three business days after the date of execution of that Notice of Guaranteed Delivery, either: (1) the certificates representing the shares being tendered, in the proper form for transfer, together with all other required documents and a Letter of Transmittal, which has been properly completed and duly executed and includes all signature guarantees required thereon; or (2) confirmation of book-entry transfer of the shares into the Depositary's account at the book-entry transfer facility, together with all other required documents and either a Letter of Transmittal, which has been properly completed and duly executed and includes all signature guarantees required thereon, or an agent's message.

A Notice of Guaranteed Delivery must be delivered to the Depositary by hand, overnight courier, facsimile transmission or mail before the Expiration Time and must include a guarantee by an eligible institution in the form set forth in the Notice of Guaranteed Delivery.

*Retirement Plans.*   Participants in our Retirement Plans who wish to have the trustee tender eligible shares attributable to their plan account must complete, execute and return to the plan trustee the tender direction form included in the "Letter from the Northern Trust Company to Participants in the Tribune Company Retirement Plans" sent to each participant of the plans. Participants in our Retirement Plans may not use the Letter of Transmittal to direct the tender of their shares held in the plans, but instead must follow the separate direction form sent to them. Although the Tender Offer will

remain open to all stockholders until the Expiration Time, if the trustee does not receive a participant's instructions two business days prior to the Expiration Time, the trustee will not tender shares attributable to the participant's account. We recommend that participants read the "Letter from Tribune Company to Participants in its Retirement Plans" and the separate direction form carefully.

*Employee Stock Purchase Plan.*   Participants in our Stock Purchase Plan who wish to have the trustee tender eligible shares attributable to their plan account, must complete, execute and return to the plan trustee the tender direction form included in the "Letter from Tribune Company to Participants in the Tribune Company Employee Stock Purchase Plan" sent to each participant of the plan. Participants in our Stock Purchase Plan may not use the

Letter of Transmittal to direct the tender of their shares held in the plan, but instead must follow the separate direction form sent to them. Although the Tender Offer will remain open to all stockholders until the Expiration Time, if the trustee does not receive a participant's instructions two business days prior to the Expiration Time, the trustee will not tender shares attributable to the participant's account. We recommend that participants read the "Letter from Tribune Company to Participants in the Tribune Company Employee Stock Purchase Plan" and the separate direction form carefully.

*Stock Option Plans; Restricted Stock and Restricted Stock Units.* Holders of vested but unexercised options may exercise such options in accordance with the terms of the Stock Option Plans and tender the shares received upon such exercise in accordance with the Tender Offer. Holders of vested but unexercised options should evaluate this Offer to Purchase carefully to determine if participation would be advantageous to them, based on their stock option exercise prices, the date of their stock option grants and the years left to exercise their options, the range of tender prices and the provisions for pro rata purchases by the Company described in "The Tender Offer—Terms of the Tender Offer." We strongly encourage those holders to discuss the Tender Offer with their tax advisor or broker. Holders of restricted stock and restricted stock units may not tender those shares or the shares represented by such units because of the restrictions imposed on such shares or the shares represented by such units by the relevant Stock Option Plan and award agreement unless such restrictions have lapsed.

*Return of Unpurchased Shares.* The Depositary will return certificates for unpurchased shares promptly after the expiration or termination of the Tender Offer or the proper withdrawal of the shares, as applicable, or, in the case of shares tendered by book-entry transfer at the book-entry transfer facility, the Depositary will credit the shares to the appropriate account maintained by the tendering stockholder at the book-entry transfer facility, in each case without expense to the stockholder.

*Tendering Stockholders' Representation and Warranty; Our Acceptance Constitutes an Agreement.* It is a violation of Rule 14e-4 promulgated under the Exchange Act for a person acting alone or in concert with others, directly or indirectly, to tender shares for such person's own account unless at the time of tender and at the Expiration Time such person has a "net long position" in (1) a number of shares that is equal to or greater than the amount tendered and will deliver or cause to be delivered such shares for the purpose of tendering to us within the period specified in the Tender Offer or (2) other securities immediately convertible into, exercisable for or exchangeable into shares ("Equivalent Securities") that is equal to or greater than the number of shares tendered and, upon the acceptance of such tender, will acquire such shares by conversion, exchange or exercise of such Equivalent Securities to the extent required by the terms of the Tender Offer and will deliver or cause to be delivered such shares so acquired for the purpose of tender to us within the period specified in the Tender Offer. Rule 14e-4 also provides a similar restriction applicable to the tender or guarantee of a tender on behalf of another person. A tender of shares made pursuant to any method of delivery set forth herein will constitute the tendering stockholder's acceptance of the terms and conditions of the Tender Offer, as well as the tendering stockholder's representation and warranty to us that (1) such stockholder has a "net long position" in a number of shares or Equivalent Securities at least equal to

78

---

the shares being tendered within the meaning of Rule 14e-4 and (2) such tender of shares complies with Rule 14e-4. Our acceptance for payment of shares tendered pursuant to the Tender Offer will constitute a binding agreement between the tendering stockholder and us upon the terms and subject to the conditions of the Tender Offer.

*Determination of Validity; Rejection of Shares; Waiver of Defects; No Obligation to Give Notice of Defects.* All questions as to the number of shares to be accepted, the price to be paid for shares to be accepted and the validity, form, eligibility (including time of receipt) and acceptance for payment of any tender of shares will be determined by us, in our sole discretion, and our determination will be final and binding on all parties. We reserve the absolute right prior to the expiration of the Tender Offer to reject any or all tenders we determine not to be in proper form or the acceptance for payment of or payment for which may, in the opinion of our counsel, be unlawful. We also reserve the absolute right subject to applicable law to waive any conditions of the Tender Offer with respect to all stockholders or any defect or irregularity in any tender with respect to any particular shares or any particular stockholder whether or not we waive similar defects or irregularities in the case of other stockholders. No tender of shares will be deemed to have been validly made until all defects or irregularities relating thereto have been cured or waived. None of us, the Co-Dealer Managers, the Depositary, the Information Agent or any other person will be under any duty to give notification of any defects or irregularities in tenders or incur any liability for failure to give any such notification. Our reasonable interpretation of the terms of and conditions to the Tender Offer, including the Letter of Transmittal and the instructions thereto, will be final and binding on all parties. By tendering shares to us,

you agree to accept all decisions we make concerning these matters and waive any right you might otherwise have to challenge those decisions.

*Lost Certificates.*    If the share certificates which a registered holder wants to surrender have been lost, destroyed or stolen, the stockholder should promptly notify the Depositary at (800) 245-7630. The Depositary will instruct the stockholder as to the steps that must be taken in order to replace the certificates.

*United States Federal Income Tax Withholding.*    Under the United States backup withholding rules, 28% of the gross proceeds payable to a stockholder or other payee pursuant to the Tender Offer must be withheld and remitted to the United States Treasury, unless the stockholder or other payee provides its taxpayer identification number (i.e., its employer identification number or social security number) to the Depositary and certifies that such number is correct or an exemption otherwise applies under applicable Treasury regulations. Therefore, unless an exemption exists and is proven in a manner satisfactory to the Depositary, each tendering stockholder that is a U.S. Holder (as defined in "The Tender Offer—United States Federal Income Tax Consequences") should complete and sign the Substitute Form W-9 included as part of the Letter of Transmittal so as to provide the information and certification necessary to avoid backup withholding. Certain stockholders (including, among others, all corporations and certain foreign individuals) are not subject to these backup withholding and reporting requirements. In order for a foreign stockholder to qualify as an exempt recipient, that stockholder must submit a statement (generally, an IRS Form W-8BEN), signed under penalties of perjury, attesting to that stockholder's exempt status. Such statements can be obtained from the Depositary. See Instruction 10 of the Letter of Transmittal.

ANY TENDERING STOCKHOLDER OR OTHER PAYEE THAT FAILS TO COMPLETE FULLY AND SIGN THE SUBSTITUTE FORM W-9 INCLUDED WITH THE LETTER OF TRANSMITTAL (OR SUCH OTHER IRS FORM AS MAY BE APPLICABLE) MAY BE SUBJECT TO REQUIRED UNITED STATES BACKUP WITHHOLDING AT A RATE EQUAL TO 28% OF THE GROSS PROCEEDS PAID TO SUCH STOCKHOLDER OR OTHER PAYEE PURSUANT TO THE TENDER OFFER.

Gross proceeds payable pursuant to the Tender Offer to a foreign stockholder or its agent will be subject to withholding of United States federal income tax at a rate of 30%, unless we determine that a reduced rate of withholding is applicable pursuant to a tax treaty or that an exemption from withholding is applicable because such gross proceeds are effectively connected with the conduct of a trade or business within the United States and, in either case, the foreign stockholder provides the appropriate certification, as described below. For this purpose, a foreign stockholder is any stockholder that is not for United States federal income tax purposes: (a) an individual citizen or resident of the United States, (b) a corporation or a partnership created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (c) an estate the income of which is subject to United States federal income taxation regardless of its source or (d) a trust if a court within the United States can exercise primary supervision of the trust's administration and one or more United States persons have the authority to control all substantial decisions of the trust. A foreign stockholder may be eligible to file for a refund of such tax or a portion of such tax withheld if such stockholder meets the "complete redemption," "substantially disproportionate" or "not essentially equivalent to a dividend" tests described in "The Tender Offer—United States Federal Income Tax Consequences" or if such stockholder is entitled to a reduced rate of withholding pursuant to a tax treaty and we withheld at a higher rate. In order to obtain a reduced rate of withholding under a tax treaty, a foreign stockholder must deliver to the Depositary before the payment a properly completed and executed IRS Form W-8BEN claiming such an exemption or reduction. Such forms can be obtained from the Depositary. In order to claim an exemption from withholding on the grounds that gross proceeds paid pursuant to the Tender Offer are effectively connected with the conduct of a trade or business within the United States, a foreign stockholder must deliver to the Depositary a properly completed and executed IRS Form W-8ECI claiming such exemption. Such forms can be obtained from the Depositary. See Instruction 10 of the Letter of Transmittal. Backup withholding generally will not apply to amounts subject to the 30% or a treaty-reduced rate of withholding. We recommend that foreign stockholders consult their own tax advisors regarding the application of United States federal income tax withholding, including eligibility for a withholding tax reduction or exemption and the refund procedure.

## Withdrawal Rights

Except as this section "The Tender Offer—Withdrawal Rights" otherwise provides, tenders of shares are irrevocable. You may withdraw shares that you have previously tendered in the Tender Offer according to the procedures we describe below at any time prior to the Expiration Time for all shares. You may also withdraw your

previously tendered shares at any time after midnight, New York City time, on June 20, 2007, unless such shares have been accepted for payment as provided in the Tender Offer.

For a withdrawal to be effective, a written notice of withdrawal must:

- be received in a timely manner by the Depositary at one of its addresses set forth on the back cover of this Offer to Purchase; and

- specify the name of the person having tendered the shares to be withdrawn, the number of shares to be withdrawn and the name of the registered holder of the shares to be withdrawn, if different from the name of the person who tendered the shares.

If certificates for shares have been delivered or otherwise identified to the Depositary, then, prior to the physical release of those certificates, the serial numbers shown on those certificates must be submitted to the Depositary and, unless an eligible institution has tendered those shares, an eligible institution must guarantee the signatures on the notice of withdrawal.

80

---

If a stockholder has used more than one Letter of Transmittal or has otherwise tendered shares in more than one group of shares, the stockholder may withdraw shares using either separate notices of withdrawal or a combined notice of withdrawal, so long as the information specified above is included.

If shares have been delivered in accordance with the procedures for book-entry transfer described in "The Tender Offer—Procedures for Tendering Shares," any notice of withdrawal must also specify the name and number of the account at the book-entry transfer facility to be credited with the withdrawn shares and otherwise comply with the book-entry transfer facility's procedures.

Withdrawals of tenders of shares may not be rescinded, and any shares properly withdrawn will thereafter be deemed not validly tendered for purposes of the Tender Offer. Withdrawn shares may be retendered at any time prior to the Expiration Time by again following one of the procedures described in "The Tender Offer—Procedures for Tendering Shares."

We will decide, in our sole discretion, all questions as to the form and validity, including time of receipt, of notices of withdrawal, and each such decision will be final and binding on all parties. We also reserve the absolute right to waive any defect or irregularity in the withdrawal of shares by any stockholder, whether or not we waive similar defects or irregularities in the case of any other stockholder. None of us, the Co-Dealer Managers, the Depositary, the Information Agent or any other person will be under any duty to give notification of any defects or irregularities in any notice of withdrawal or incur any liability for failure to give any such notification.

Participants in our Retirement Plans who wish to have the trustee withdraw previously tendered shares attributable to their plan account must follow the procedures set forth in the "Letter from the Northern Trust Company to Participants in the Tribune Company Retirement Plans" sent to each plan participant.

Participants in our Stock Purchase Plan who wish to have the trustee withdraw previously tendered shares attributable to their plan account must follow the procedures set forth in the "Letter from Tribune Company to Participants in the Tribune Company Employee Stock Purchase Plan" sent to each plan participant.

If we extend the Tender Offer, are delayed in our purchase of shares or are unable to purchase shares in the Tender Offer as a result of a failure of a condition disclosed in "The Tender Offer—Conditions of the Tender Offer," then, without prejudice to our rights in the Tender Offer, the Depositary may, subject to applicable law, retain tendered shares on our behalf, and such shares may not be withdrawn except to the extent tendering stockholders are entitled to withdrawal rights as described in this "The Tender Offer—Withdrawal Rights." Our reservation of the right to delay payment for shares which we have accepted for payment is limited by Rule 13e-4(f)(5) promulgated under the Exchange Act, which requires that we must pay the consideration offered or return the shares tendered promptly after termination or withdrawal of a tender offer.

## Purchase of Shares and Payment of Purchase Price

For purposes of the Tender Offer, we will be deemed to have accepted for payment (and therefore purchased), subject to the "odd lot" priority, proration and conditional tender provisions of this Tender Offer, shares that are properly tendered and not properly withdrawn only when, as and if we give oral or written notice to the Depositary of our acceptance of the shares for payment pursuant to the Tender Offer.

Upon the terms and subject to the conditions of the Tender Offer, we will accept for payment and pay the per share purchase price for all of the shares accepted for payment pursuant to the Tender Offer promptly after the Expiration Time. In all cases, payment for shares tendered and accepted for

81

payment pursuant to the Tender Offer will be made promptly, subject to possible delay in the event of proration, but only after timely receipt by the Depositary of:

- certificates for shares, or a timely book-entry confirmation of the deposit of shares into the Depositary's account at the book-entry transfer facility;

- a properly completed and duly executed Letter of Transmittal, or, in the case of a book-entry transfer, an agent's message; and

- any other required documents.

We will pay for shares purchased pursuant to the Tender Offer by depositing the aggregate purchase price for the shares with the Depositary, which will act as agent for tendering stockholders for the purpose of receiving payment from us and transmitting payment to the tendering stockholders.

In the event of proration, we will determine the proration factor and pay for those tendered shares accepted for payment promptly after the Expiration Time. However, we expect that we will not be able to announce the final results of any proration or commence payment for any shares purchased pursuant to the Tender Offer until up to seven business days after the Expiration Time. All shares tendered and not purchased, including shares not purchased due to proration or conditional tender, will be returned or, in the case of shares tendered by book-entry transfer, will be credited to the account maintained with the book-entry transfer facility by the participant who delivered the shares, to the tendering stockholder at our expense promptly after the Expiration Time or termination of the Tender Offer.

**Under no circumstances will we pay interest on the purchase price, including but not limited to, by reason of any delay in making payment. In addition, if certain events occur, we may not be obligated to purchase shares pursuant to the Tender Offer. See "The Tender Offer—Purchase of Shares and Payment of Purchase Price" and "The Tender Offer—Conditions of the Tender Offer."**

We will pay all stock transfer taxes, if any, payable on the transfer to us of shares purchased pursuant to the Tender Offer. If, however, payment of the purchase price is to be made to, or (in the circumstances permitted by the Tender Offer) if unpurchased shares are to be registered in the name of, any person other than the registered holder, or if tendered certificates are registered in the name of any person other than the person signing the Letter of Transmittal, the amount of all stock transfer taxes, if any (whether imposed on the registered holder or the other person), payable on account of the transfer to the person will be deducted from the purchase price unless satisfactory evidence of the payment of the stock transfer taxes, or exemption from payment of the stock transfer taxes, is submitted. See Instruction 7 of the Letter of Transmittal.

**Any tendering stockholder or other payee that fails to complete fully, sign and return to the Depositary the Substitute Form W-9 included with the Letter of Transmittal (or such other IRS form as may be applicable) may be subject to required United States backup withholding at a rate equal to 28% of the gross proceeds paid to the stockholder or other payee pursuant to the Tender Offer. See "The Tender Offer— Procedures for Tendering Shares." Also see "The Tender Offer—United States Federal Income Tax Consequences" regarding U.S. federal income tax consequences for foreign stockholders.**

**Conditional Tender of Shares**

Subject to the exception for Odd Lot Holders, in the event of an over-subscription of the Tender Offer, shares tendered prior to the Expiration Time will be subject to proration. See "The Tender Offer—Terms of the Tender Offer." As discussed in "The Tender Offer—United States Federal Income Tax Consequences," the number of shares to be purchased from a particular stockholder may affect the tax treatment of the purchase to the stockholder and the stockholder's decision whether to tender. Accordingly, a stockholder may tender shares subject to the condition that a specified minimum

82

number of the stockholder's shares tendered pursuant to a Letter of Transmittal must be purchased if any shares tendered are to be purchased. Any stockholder desiring to make a conditional tender must so indicate in the box entitled "Conditional Tender" in the Letter of Transmittal, and, if applicable, in the Notice of Guaranteed Delivery.

Any tendering stockholder wishing to make a conditional tender must calculate and appropriately indicate the minimum number of shares that must be purchased if any are to be purchased. After the Tender Offer expires, if more than 126,000,000 shares (or such greater number of shares as we may elect to accept for payment, subject to applicable law) are properly tendered and not properly withdrawn, so that we must prorate our acceptance of and payment for tendered shares, we will calculate a preliminary proration percentage based upon all shares properly tendered, conditionally or unconditionally. If the effect of this preliminary proration would be to reduce the number of shares to be purchased from any stockholder below the minimum number specified, the tender will automatically be regarded as withdrawn (except as provided in the next paragraph). All shares tendered by a stockholder subject to a conditional tender and regarded as withdrawn as a result of proration will be returned at our expense, promptly after the Expiration Time.

After giving effect to these withdrawals, we will accept the remaining shares properly tendered, conditionally or unconditionally, on a pro rata basis, if necessary. If conditional tenders would otherwise be regarded as withdrawn and would cause the total number of shares to be purchased to fall below 126,000,000 then, to the extent feasible, we will select enough of the conditional tenders that would otherwise have been withdrawn to permit us to purchase 126,000,000 shares. In selecting among the conditional tenders, we will select by random lot, treating all tenders by a particular taxpayer as a single lot, and will limit our purchase in each case to the designated minimum number of shares to be purchased. To be eligible for purchase by random lot, stockholders whose shares are conditionally tendered must have tendered all of their shares.

## Conditions of the Tender Offer

Notwithstanding any other provision of the Tender Offer, we will not be required to accept for payment, purchase or pay for any shares tendered, and may terminate or amend the Tender Offer or may postpone the acceptance for payment of, or the purchase of and the payment for shares tendered, subject to Rule 13e-4(f)(5) under the Exchange Act (which requires that the issuer making the tender offer shall either pay the consideration offered or return tendered securities promptly after the termination or withdrawal of the tender offer), if at the Expiration Time (whether any shares have theretofore been accepted for payment) any of the following circumstances exist or events have occurred (or shall have been reasonably determined by us to exist or to have occurred) that, in our reasonable judgment and regardless of the circumstances giving rise to the event or events (other than any such event or events that are proximately caused by our action or failure to act), make it inadvisable to proceed with the Tender Offer or with acceptance for payment:

- we have not received the necessary financing for the Tender Offer as contemplated by the First Step Commitment Letter, substantially on the terms contemplated thereby;

- we have not received an opinion from Valuation Research Corporation or another nationally recognized valuation firm satisfactory to us, in form and substance satisfactory to us, as to the solvency of the Company after giving effect to the Tender Offer;

- the agreements relating to the Leveraged ESOP Transactions do not remain in full force and effect or any party to any of those agreements is in material breach thereof, or any condition to the obligation of any party to those agreements has become incapable of satisfaction; or

- a restraining order, injunction or other order by any court or other tribunal of competent jurisdiction is in effect, or any statute, rule or regulation has been promulgated, enforced or

83

deemed to be applicable, which would prohibit the consummation of the Tender Offer or any of the other Leveraged ESOP Transactions.

The conditions referred to above are for our sole benefit and may be asserted by us regardless of the circumstances giving rise to any of these conditions (other than conditions that are proximately caused by our action or failure to act), and may be waived by us, in whole or in part, at any time and from time to time in our reasonable discretion before the Expiration Time. Our failure at any time to exercise any of the foregoing rights will not be deemed a waiver of any right, and each such right will be deemed an ongoing right that may be asserted at any time and from time to time prior to the Expiration Time. Any determination by us concerning the events described above will be final and binding on all parties.

## Price Range of the Shares/Dividends

The shares are traded on the NYSE under the symbol "TRB." The following table sets forth, for each of the periods indicated, the high and low sales prices per share as reported by the NYSE based on published financial sources.

|  | High | Low |
|---|---|---|
| **Year Ending December 30, 2007:** | | |
| First Quarter | $ 32.30 | $ 28.59 |
| Second Quarter (through April 24, 2007) | $ 33.10 | $ 32.11 |
| **Year Ended December 31, 2006:** | | |
| First Quarter | $ 31.84 | $ 27.79 |
| Second Quarter | $ 32.94 | $ 27.09 |
| Third Quarter | $ 34.28 | $ 28.66 |
| Fourth Quarter | $ 33.99 | $ 30.74 |
| **Year Ended December 25, 2005:** | | |
| First Quarter | $ 42.37 | $ 38.59 |
| Second Quarter | $ 40.14 | $ 35.02 |
| Third Quarter | $ 39.56 | $ 34.53 |
| Fourth Quarter | $ 36.15 | $ 30.05 |

On March 30, 2007, the last full trading day before we announced our intention to make the Tender Offer, the last reported sales price of the shares reported by the NYSE was $32.11 per share. On April 24, 2007, the last full trading day before commencement of the Tender Offer, the last reported sales price of the shares reported by the NYSE was $32.55 per share. **We recommend that stockholders obtain a current market price for the shares before deciding whether to tender their shares.**

Quarterly cash dividends declared on Company Common Stock were $0.18 per share for each quarter during 2006 and 2005. Total cash dividends declared on Company Common Stock by the Company were $195 million for 2006 and $225 million for 2005. The Company announced in February 2007 that its first quarter 2007 cash dividend would be $0.18 per share. Under the Merger Agreement, we are not permitted to pay further dividends on the shares pending completion of the Merger.

## Source and Amount of Funds

Assuming that 126,000,000 shares are purchased in the Tender Offer at the purchase price of $34.00 per share, the aggregate purchase price will be approximately $4.3 billion.

Together with our cash on hand, we anticipate that we will pay for the shares tendered in the Tender Offer from a draw-down under the First Step Credit Facilities pursuant to the terms and

84

---

conditions thereof and of the First Step Commitment Letter (as described above under "Special Factors—Financing Commitments"). While we have obtained a financing commitment pursuant to the First Step Commitment Letter, it is contingent on the satisfaction of various conditions. Accordingly, as discussed in "The Tender Offer—Conditions of the Tender Offer," in addition to the other conditions described in this Offer to Purchase, the Tender Offer will be subject to our satisfying the terms and conditions to borrowing under the First Step Commitment Letter and the First Step Credit Facilities. We do not plan to have alternative financing plans in place prior to the expiration of the Tender Offer.

Our ability to repay expected borrowings under the First Step Credit Facilities and to meet our other debt or other contractual obligations (including continued compliance with applicable financial covenants) will depend upon our future performance, our cash flow from operations and our ability to execute our business plan, including completion of the Leveraged ESOP Transactions, all of which are subject to prevailing economic conditions and financial, business and other known and unknown risks and uncertainties, certain of which are beyond our control. These factors include, without limitation, those described in this Offer to Purchase under "Cautionary Note on Forward-Looking Statements."

Management believes that cash flows from operations and amounts available under the proposed First Step Credit Facilities are sufficient to meet the Company's expected liquidity needs with respect to the Tender Offer.

We will incur increased indebtedness in connection with the Tender Offer and, as a result, will be more leveraged. Increased leverage could have certain material adverse effects on us, including, but not limited to, the following: (1) our ability to obtain additional financing in the future for acquisitions, working capital, capital expenditures and general corporate or other purposes could be impaired, or any such financing may not be available, on terms favorable to us; (2) a substantial portion of our cash flow could be required for interest payments and, as a result, might not be available for our operations or other purposes; (3) any substantial decrease in net operating cash flows or any substantial increase in expenses could make it difficult for us to meet our debt service requirements or force us to modify our operations or sell assets; (4) our ability to withstand competitive pressures may be decreased; and (5) our level of indebtedness may make us more vulnerable to economic downturns and reduce our flexibility in responding to changing business, regulatory and economic conditions.

## Certain Financial Information

*Historical Financial Information.*    We incorporate by reference the financial statements and notes thereto set forth in Item 8 of our Annual Report on Form 10-K for the year ended December 31, 2006. You should refer to "The Tender Offer—Information About Tribune Company" for instructions on how you can obtain copies of our SEC filings, including filings that contain our financial statements.

*Summary Historical Consolidated Financial Data.*    The following table sets forth our summary historical consolidated financial data for the years ended December 31, 2006, December 25, 2005 and December 26, 2004, certain selected ratios for the years ended December 31, 2006, December 25, 2005 and December 26, 2004, and our financial position at December 31, 2006. This financial data has been derived from, and should be read in conjunction with, our audited consolidated financial statements and the related notes filed as part of our Annual Report on Form 10-K for the year ended December 31, 2006. The Company's fiscal year ends on the last Sunday in December. The Company's 2006 fiscal year ended on December 31, 2006 and encompassed a 53-week period. Fiscal years 2005 and 2004 each encompassed a 52-week period.

85

| | Years Ended | | |
|---|---|---|---|
| | December 31, 2006 | December 25, 2005 | December 26, 2004 |
| | (Dollars in thousands, except per share amounts) | | |
| **Operating Revenues** | $    5,517,708 | $    5,511,283 | $    5,631,431 |
| **Operating Expenses** | | | |
| Cost of sales (exclusive of items shown below) | 2,736,411 | 2,695,818 | 2,668,969 |
| Selling, general and administrative | 1,469,274 | 1,447,233 | 1,545,067 |
| Depreciation | 207,200 | 222,153 | 211,561 |
| Amortization of intangible assets | 19,813 | 18,888 | 18,556 |
| Total operating expenses | 4,432,698 | 4,384,092 | 4,444,153 |
| **Operating Profit** | 1,085,010 | 1,127,191 | 1,187,278 |
| Net income on equity investments | 80,773 | 41,209 | 17,931 |
| Interest and dividend income | 14,145 | 7,539 | 3,053 |
| Interest expense | (273,902) | (155,191) | (153,118) |
| Gain (loss) on change in fair values of derivatives and | 11,088 | 62,184 | (18,497) |

related investments

| | | | |
|---|---|---|---|
| Loss on early debt retirement | — | — | (140,506) |
| Gain on TMCT transactions | 59,596 | — | — |
| Gain on sales of investments, net | 36,732 | 6,780 | 20,347 |
| Other non-operating gain (loss), net | (4,447) | 897 | (6,388) |
| **Income from Continuing Operations Before Income Taxes and Cumulative Effect of Change in Accounting Principle** | 1,008,995 | 1,090,609 | 910,100 |
| Income taxes | (348,142) | (567,820) | (355,724) |
| **Income from Continuing Operations Before Cumulative Effect of Change in Accounting Principle** | 660,853 | 522,789 | 554,376 |
| Income (Loss) From Discontinued Operations, net of tax | (66,858) | 11,900 | 18,948 |
| **Income Before Cumulative Effect of Change in Accounting Principle** | 593,995 | 534,689 | 573,324 |
| Cumulative effect of change in accounting principle, net of tax | — | — | (17,788) |
| **Net Income** | 593,995 | 534,689 | 555,536 |
| Preferred dividends | (6,309) | (8,364) | (8,308) |
| **Net Income Attributable to Common Shares** | $ 587,686 | $ 526,325 | $ 547,228 |

**Earnings Per Share**

**Basic:**

| | | | |
|---|---|---|---|
| Continuing operations before cumulative effect of change in accounting principle | $ 2.40 | $ 1.64 | $ 1.69 |
| Discontinued operations | (.25) | .04 | .06 |
| Cumulative effect of change in accounting principle, net of tax | — | — | (.05) |
| Net income | $ 2.16 | $ 1.68 | $ 1.70 |

86

| | Years Ended | | |
|---|---|---|---|
| | December 31, 2006 | December 25, 2005 | December 26, 2004 |
| | (Dollars in thousands, except per share amounts) | | |

**Diluted:**

| | | | |
|---|---|---|---|
| Continuing operations before cumulative effect of change in accounting principle | $ 2.39 | $ 1.63 | $ 1.67 |
| Discontinued operations | (.24) | .04 | .06 |
| Cumulative effect of change in accounting principle, net of tax | — | — | (.05) |
| Net income | $ 2.14 | $ 1.67 | $ 1.67 |

0212

| | | | |
|---|---|---|---|
| Dividends per common share | $ .72 | $ .72 | $ .48 |

| | Years Ended | | |
|---|---|---|---|
| | December 31, 2006 | December 25, 2005 | December 26, 2004 |

**Selected Ratio:**

| | | | |
|---|---|---|---|
| Ratio of earnings to fixed charges | 4.3x | 7.1x | 6.2x |

At December 31, 2006

(Dollars in thousands, except per share amounts)

**Financial Position:**

| | |
|---|---|
| Assets | 13,400,772 |
| Current liabilities | 2,546,714 |
| Long-term debt | 3,576,211 |
| Other non-current liabilities | 2,958,231 |
| Shareholders' equity | 4,319,616 |
| Book value per common share | $ 18.06 |

*Summary Unaudited Pro Forma Consolidated Financial Data.* The following unaudited pro forma condensed consolidated financial statements present the Company's pro forma consolidated financial position at December 31, 2006 and its pro forma consolidated results of operations for the year then ended. These unaudited pro forma consolidated financial statements are derived from our historical consolidated financial statements and give effect to the repurchase of shares of Company Common Stock pursuant to the Tender Offer and the related refinancings of certain indebtedness of the Company, as if such repurchase and refinancings had occurred at the beginning of fiscal year 2006 for purposes of the pro forma condensed consolidated statement of income and as if such repurchase and refinancings had occurred at the end of fiscal year 2006 for purposes of the pro forma condensed consolidated balance sheet. In addition, these unaudited pro forma condensed consolidated financial statements give effect to the Step One Purchase Transaction and the ESOP Purchase Agreement as if they had been consummated at the beginning of fiscal year 2006 for purposes of the pro forma condensed consolidated statement of income and as if such agreements had been consummated at the end of fiscal year 2006 for purposes of the pro forma condensed consolidated balance sheet.

The unaudited pro forma condensed consolidated financial statements include adjustments directly attributable to the Tender Offer and related refinancings that are expected to have a continuing impact on the Company. The unaudited pro forma condensed consolidated financial statements do not give effect to the consummation of the Merger, the repayment of the Exchangeable Note held by the Zell Entity or the issuance of the $225 million Subordinated Note or the 15-year Warrant to the Zell Entity in the Step Two Purchase Transaction because the consummation of such transactions is subject to the satisfaction of certain conditions, including stockholder approval, receipt of financing, FCC approval and the receipt of a solvency opinion. The pro forma adjustments are described in the accompanying

87

notes to the unaudited pro forma condensed consolidated financial statements. We believe the assumptions used, and pro forma adjustments derived from such assumptions, are reasonable based upon currently available information. However, such adjustments are subject to change based on finalization of the Tender Offer and related refinancings, and the Purchase Agreements. The Tender Offer is subject to a number of conditions, and there can be no assurance that the Tender Offer will be consummated or when such consummation might occur.

These unaudited pro forma condensed consolidated financial statements should be read in conjunction with our audited consolidated financial statements and the related notes filed as part of our Annual Report on Form 10-K for the year ended December 31, 2006 which is incorporated herein by reference. These unaudited pro forma condensed consolidated financial statements are not necessarily indicative of either our financial position or the results of operations that actually would have been attained had the repurchase of shares of Company Common Stock and related refinancings pursuant to the Tender Offer, and consummation of the Step One Purchase Transaction and the ESOP Purchase Agreement had been completed at the dates indicated, or that will be achieved in the future. These unaudited pro forma condensed consolidated financial statements have been included herein for informational and

comparative purposes only. Our future results are subject to prevailing economic and industry specific conditions and financial, business and other known and unknown risks and uncertainties, certain of which are beyond our control. These factors include, without limitation, those described in this prospectus under "Cautionary Note on Forward-Looking Statements."

88

## Pro Forma Condensed Consolidated Statement of Income (Unaudited)
### Year Ended December 31, 2006

| | Historical | Pro Forma Adjustments | Pro Forma |
|---|---|---|---|
| | (In thousands, except per share data) | | |
| **Operating Revenues** | $ 5,517,708 | $ — | $ 5,517,708 |
| | | | |
| **Operating Expenses:** | | | |
| Cost of sales (exclusive of items shown below) | 2,736,411 | — | 2,736,411 |
| Selling, general and administrative | 1,469,274 | — | 1,469,274 |
| Depreciation | 207,200 | — | 207,200 |
| Amortization of intangible assets | 19,813 | — | 19,813 |
| Total operating expenses | 4,432,698 | — | 4,432,698 |
| | | | |
| **Operating Profit:** | 1,085,010 | — | 1,085,010 |
| Net income on equity investments | 80,773 | — | 80,773 |
| Interest and dividend income | 14,145 | — | 14,145 |
| Interest expense | (273,902) | (481,885)(a) | (755,787) |
| Gain on change in fair values of derivatives and related investments | 11,088 | — | 11,088 |
| Gain on TMCT transactions | 59,596 | — | 59,596 |
| Gain on sales of investments, net | 36,732 | — | 36,732 |
| Other non-operating loss, net | (4,447) | — | (4,447) |
| | | | |
| **Income From Continuing Operations Before Income Taxes** | 1,008,995 | (481,885) | 527,110 |
| Income taxes | (348,142) | 180,707 (b) | (167,435) |
| | | | |
| **Income From Continuing Operations** | $ 660,853 | $ (301,178) | $ 359,675 |
| | | | |
| **Earnings Per Share From Continuing Operations:** | | | |
| Basic | $ 2.40 | | $ 2.39 |
| Diluted | $ 2.39 | | $ 2.31 |
| | | | |
| **Weighted-average Common Shares Outstanding:** | | | |
| Basic | 272,672 | (124,529)(c) | 148,143 |
| Diluted | 274,411 | (118,647)(c) | 155,764 |
| | | | |
| Book value per common share | $ 18.06 | | $ 0.58 |
| Ratio of earnings to fixed charges | 4.3 | | 1.7 |

See "Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements".

89

0214

**Pro Forma Condensed Consolidated Balance Sheet (Unaudited)**
As of December 31, 2006

| | Historical | Pro Forma Adjustments | Pro Forma |
|---|---|---|---|
| | | (In thousands of dollars) | |
| **Assets** | | | |
| **Current Assets:** | | | |
| Cash and cash equivalents | $ 174,686 | $ — | $ 174,686 |
| Accounts receivable, net | 765,871 | — | 765,871 |
| Inventories | 40,962 | — | 40,962 |
| Broadcast rights | 271,995 | — | 271,995 |
| Deferred income taxes | 74,450 | — | 74,450 |
| Prepaid expenses and other | 49,466 | — | 49,466 |
| Total current assets | 1,377,430 | — | 1,377,430 |
| **Properties:** | | | |
| Property, plant and equipment | 3,592,477 | — | 3,592,477 |
| Accumulated depreciation | (1,907,365) | — | (1,907,365) |
| Net properties | 1,685,112 | — | 1,685,112 |
| **Other Assets:** | | | |
| Broadcast rights | 295,186 | — | 295,186 |
| Goodwill | 5,837,208 | — | 5,837,208 |
| Other intangible assets, net | 2,846,057 | — | 2,846,057 |
| Time Warner stock related to PHONES debt | 348,480 | — | 348,480 |
| Other investments | 564,750 | — | 564,750 |
| Prepaid pension costs | 293,455 | — | 293,455 |
| Assets held for sale | 9,172 | — | 9,172 |
| Other | 143,922 | 108,857 (d) | 252,779 |
| Total other assets | 10,338,230 | 108,857 | 10,447,087 |
| Total assets | $ 13,400,772 | $ 108,857 | $ 13,509,629 |
| **Liabilities and Shareholders' Equity** | | | |
| **Current Liabilities:** | | | |
| Borrowings under bridge credit facility | $ 1,310,000 | $ (1,310,000)(e) | $ — |
| Other debt due within one year | 119,007 | (97,019)(e) | 21,988 |
| Contracts payable for broadcast rights | 317,945 | — | 317,945 |
| Deferred income | 108,607 | — | 108,607 |
| Accounts payable, accrued expenses and other current liabilities | 691,155 | (7,929)(d) | 683,226 |

| | | | |
|---|---:|---:|---:|
| Total current liabilities | 2,546,714 | (1,414,948) | 1,131,766 |
| **Long-Term Debt:** | | | |
| PHONES debt related to Time Warner stock | 572,960 | — | 572,960 |
| Other long-term debt (less portions due within one year) | 3,003,251 | 5,776,539 (e) | 8,779,790 |
| Total long-term debt | 3,576,211 | 5,776,539 | 9,352,750 |
| **Other Non-Current Liabilities:** | | | |
| Deferred income taxes | 1,974,672 | — | 1,974,672 |
| Contracts payable for broadcast rights | 425,927 | — | 425,927 |
| Compensation and other obligations | 557,632 | — | 557,632 |
| Total other non-current liabilities | 2,958,231 | — | 2,958,231 |
| **Shareholders' Equity:** | | | |
| Common stock and additional paid-in capital | 6,837,029 | (1,784,235)(g) | 5,052,794 |
| Retained earnings | 3,138,313 | (13,214)(d) | 565,526 |
| | | (54,288)(f) | |
| | | (2,505,285)(g) | |
| Treasury common stock (at cost) | (5,288,341) | 354,288 (f) | (4,934,053) |
| Unearned ESOP shares | — | (250,000)(f) | (250,000) |
| Accumulated other comprehensive income (loss) | (367,385) | — | (367,385) |
| Total shareholders' equity | 4,319,616 | (4,252,734) | 66,882 |
| Total liabilities and shareholders' equity | $  13,400,772 | $       108,857 | $  13,509,629 |

See "Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements".

90

**Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements**
    On April 1, 2007, our Board, based on the recommendation of the Special Committee, approved the Company's entry into the Leveraged ESOP Transactions. In connection with the Leveraged ESOP Transactions, the Company agreed to launch the Tender Offer to repurchase up to 126,000,000 shares of Company Common Stock that are currently outstanding at a price of $34.00 per share. On April 1, 2007, the Company also entered into the Zell Entity Purchase Agreement and the ESOP Purchase Agreement. The terms of these agreements included the following:

- Pursuant to the ESOP Purchase Agreement, on April 1, 2007, the ESOP purchased from the Company 8,928,571 shares of Company Common Stock at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of Company Common Stock held by the ESOP.

- Pursuant to the Zell Entity Purchase Agreement, on April 23, 2007, the Zell Entity made an initial investment of $250 million in the Company in exchange for (1) 1,470,588 shares of Company Common Stock at $34.00 per share and (2) an unsecured subordinated exchangeable promissory note of the

0216

Company in the principal amount of $200 million. The promissory note is exchangeable at the Company's option, or automatically upon termination of the Merger Agreement, into an aggregate of 5,882,353 shares of Company Common Stock, subject to antidilution adjustments.

To finance the Tender Offer and to refinance indebtedness under its existing Credit Facilities, the Company has secured financing commitments from certain lenders.

The unaudited pro forma condensed consolidated statement of income does not reflect material non-recurring charges, which we anticipate will affect income from continuing operations within 12 months following the Tender Offer and related refinancings. The most significant of these charges are costs related to the extinguishment of the Company's existing term facility and bridge credit facility. We currently estimate that the income statement charges related to the extinguishment will be approximately $9 million after-tax. The unaudited pro forma condensed consolidated balance sheet reflects the impact of these non-recurring charges.

The pro forma adjustments for the Tender Offer and related refinancings, and the Purchase Agreements are described below.

(a)

The pro forma interest expense adjustment assumes the issuance of approximately $7.1 billion of new variable rate debt to finance the Tender Offer and to refinance the Company's existing term facility, existing bridge credit facility, and outstanding commercial paper. A rate of 7.86%, based on LIBOR (at April 19, 2007) plus a spread of 2.5%, has been used to compute pro forma interest expense on the new borrowings. The pro forma interest expense adjustment is net of the historical interest expense on the Company's term facility, bridge credit facility and commercial paper that were assumed to be refinanced and includes the amortization of estimated debt issuance costs of $130 million using an average life of seven years. A one-eighth percentage point change in the assumed interest rate on the new borrowings would increase or decrease pro forma interest expense by approximately $9 million.

In addition, the pro forma interest expense adjustment also includes interest on the $200 million subordinated exchangeable promissory note assumed to be issued in connection with the Zell Entity Purchase Agreement. A rate of 4.81%, based on the rate specified in the Zell Entity Purchase Agreement, has been used to compute interest expense on the promissory note.

91

The following table summarizes the pro forma interest expense adjustment.

| Pro forma interest expense adjustment ($ in millions) | | |
|---|---|---:|
| New variable rate debt | $ | 556 |
| $200 million promissory note | | 10 |
| Amortization of debt issuance costs | | 19 |
| Less: existing term facility | | (54) |
| Less: existing bridge credit facility | | (44) |
| Less: existing commercial paper | | (5) |
| Interest expense adjustment | $ | 482 |

(b)

Reflects the income tax effect of the pro forma interest expense adjustment utilizing the applicable statutory tax rate for the year ended December 31, 2006.

(c)

The pro forma adjustment to basic weighted-average common shares outstanding reflects the repurchase of 126,000,000 shares of Company Common Stock and the issuance of 1,470,588 shares of Company Common Stock as of the beginning of fiscal year 2006 in connection with the Zell Entity Purchase Agreement. The pro forma adjustment to diluted weighted-average common shares outstanding also reflects the assumed conversion of the $200 million subordinated exchangeable promissory note into 5,882,353 shares of Company Common Stock as of the beginning of fiscal year 2006.

(d)

Reflects $130 million of debt issuance costs in connection with the new borrowings and the write-off of $21 million of debt issuance costs ($13 million after-tax) as a result of the extinguishment of the term facility and bridge credit facility.

(e)
To record the issuance of the new borrowings and the refinancing of the existing term facility, existing bridge credit facility and $97 million of the Company's outstanding commercial paper.

(f)
To record the issuance of shares of Company Common Stock to the ESOP and Zell Entity in connection with the Purchase Agreements. The shares were assumed to have been issued from our existing treasury common stock at the average value of $34.07 per share.

(g)
To record the repurchase and subsequent retirement of 126,000,000 shares of Company Common Stock at $34.00 per share in connection with the Tender Offer, including $5.5 million of related transaction costs.

## Certain Projections

The Company does not as a matter of course make public projections as to its future performance, earnings or other results, and is especially wary of making projections for earnings periods due to the unpredictability of the underlying assumptions and estimates. However, in connection with the due diligence review of the Company by the ESOP, the Zell Entity, the Chandler Trusts and other interested parties, the Company provided to the ESOP, the Zell Entity, the Chandler Trusts and to other interested parties certain non-public financial projections. These internal financial projections were also provided to the Board and the Special Committee and their respective financial and legal advisors. We have included below a summary of these projections to give our shareholders access to certain non-public information that was furnished to third parties and was considered by the financial advisors and by our Board and Special Committee for purposes of evaluating the Leveraged ESOP Transactions.

The internal financial projections set forth below were prepared at the dates indicated for internal use and to assist the financial advisors to each of the Board and the Special Committee and other parties in their due diligence investigations of the Company, and not with a view toward public disclosure or toward compliance with U.S. generally accepted accounting principles, the published guidelines of the SEC regarding projections, or the guidelines established by the American Institute of

92

Certified Public Accountants for preparation and presentation of prospective financial information. Neither the Company's independent auditors nor any other independent accountants have compiled, examined or performed any procedures with respect to the prospective financial information contained in the projections, nor have they expressed any opinion or given any form of assurance on the projections or their achievability.

These internal financial projections were based on numerous estimates, variables and assumptions that are inherently subject to economic and competitive uncertainties, all of which are difficult to predict and beyond the control of the Company's management and may not prove to have been, or may no longer be, accurate. Important factors that may affect actual results and result in the forecasted results not being achieved include, but are not limited to: changes in advertising demand; circulation levels and audience shares; regulatory and judicial rulings; availability and cost of broadcast rights; competition and other economic conditions; changes in newsprint prices; changes in the Company's credit ratings and interest rates; changes in accounting standards; adverse results from litigation, governmental investigations or tax-related proceedings or audits; the effect of labor strikes, lock-outs and negotiations; the effect of acquisitions, investments and divestitures; the effect of derivative transactions; the Company's reliance on third-party vendors for various services; the effect of the Leveraged ESOP Transactions, and other risks described in the Company's Annual Report on Form 10-K filed with the SEC for the fiscal year ended December 31, 2006.

Furthermore, the internal financial projections were prepared at the dates indicated below and do not necessarily reflect revised prospects for the Company's business, changes in general business or economic conditions, or any other transaction or event that has occurred or that may occur and that was not anticipated at the time the projections were prepared. Moreover, the projections are not necessarily indicative of future performance, which may be significantly more or less favorable than as contemplated by the projections and accordingly should

not be regarded as a representation that they will be achieved. In addition, the projections were prepared prior to the Board's approval of the Leveraged ESOP Transactions and, accordingly, the projections do not reflect the effects of such transactions. Since the date of the projections, the Company has made publicly available the results of operations for the fiscal year ended December 31, 2006 and the fiscal quarter ended April 1, 2007. Stockholders should review the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and the Company's Current Report on Form 8-K dated April 19, 2007 to obtain this information.

The inclusion of the internal financial projections in this document should not be regarded as an indication that the Company or its affiliates, advisors or representatives considered or consider the projections to be predictive of actual future events, and the projections should not be relied upon as such. None of the Company or its affiliates, advisors, officers, directors or representatives can give you any assurance that actual results will not differ from the projections, and none of them undertakes any obligation to update or otherwise revise or reconcile the projections to reflect circumstances existing after the date such projections were generated or to reflect the occurrence of future events even in the event that any or all of the assumptions underlying the projections are shown to be in error. None of the Company, nor, to the knowledge of the Company, the ESOP, the Zell Entity or the Chandler Trusts intends to make publicly available any update or other revisions to the projections. None of the Company or its affiliates, advisors, officers, directors or representatives has made or makes any representation to any shareholder or other person regarding the ultimate performance of the Company compared to the information contained in the projections or that projected results will be achieved. The Company has made no representation to the ESOP, the Zell Entity or the Chandler Trusts in the Merger Agreement or otherwise, concerning the projections.

93

### Company Projected Financial Information
### 2007 Management Projections

As described above, in February 2007 the Company provided the following financial projections ("2007 Management Projections") to the Company's Board and the Special Committee and their respective financial advisors as well as to the ESOP, the Zell Entity, the Chandler Trusts and to other interested parties.

## TRIBUNE COMPANY
## SUMMARY CONSOLIDATED INCOME STATEMENT(a)
### ($ in millions)

| | 2006(d) | 2007 | 2008 | 2009 | 2010 | 2011 | '06-'10 4Y CAGR | '07-'11 4Y CAGR | '06-'11 5Y CAGR |
|---|---|---|---|---|---|---|---|---|---|
| Operating Revenues | | | | | | | | | |
| Publishing | $ 4,025 | $ 3,984 | $ 4,007 | $ 4,036 | $ 4,063 | 4,093 | 0.2% | 0.7% | 0.? |
| Broadcasting & Entertainment | 1,408 | 1,401 | 1,480 | 1,487 | 1,531 | 1,537 | 2.1% | 2.3% | 1.? |
| Total Revenues | 5,433 | 5,385 | 5,487 | 5,523 | 5,594 | 5,630 | 0.7% | 1.1% | 0.? |
| Operating Cash Expenses(b) | | | | | | | | | |
| Publishing | 3,094 | 3,069 | 3,072 | 3,089 | 3,104 | 3,123 | 0.1% | 0.4% | 0.? |
| Broadcasting & Entertainment | 970 | 985 | 1,012 | 1,003 | 1,030 | 1,048 | 1.5% | 1.6% | 1.? |
| Corporate | 61 | 61 | 65 | 66 | 69 | 71 | 3.0% | 3.8% | 3.0 |
| Total Operating Cash Expenses | 4,125 | 4,115 | 4,149 | 4,158 | 4,203 | 4,242 | 0.5% | 0.8% | 0.? |
| Operating Cash Flow (c) | | | | | | | | | |
| Publishing | 931 | 915 | 935 | 947 | 959 | 970 | 0.7% | 1.5% | 0.? |
| Broadcasting & Entertainment | 437 | 416 | 468 | 484 | 501 | 490 | 3.5% | 4.2% | 2.? |
| Corporate | (61) | (61) | (65) | (66) | (69) | (71) | 3.0% | 3.8% | 3.0 |

| | | | | | | | | | Cumulative FCF ('07-'11) |
|---|---|---|---|---|---|---|---|---|---|
| Total Operating Cash | 1,308 | 1,270 | 1,339 | 1,364 | 1,391 | 1,389 | 1.6% | 2.3% | 1.? |
| Equity Income | 75 | 67 | 95 | 129 | 159 | 191 | 20.7% | 29.9% | 20.? |
| Adjusted Operating Cash Flow | 1,383 | 1,337 | 1,434 | 1,493 | 1,550 | 1,580 | 2.9% | 4.3% | 2.? |
| Capital Expenditures | | | | | | | | | |
| Publishing | 173 | 165 | 140 | 100 | 100 | 100 | | | |
| Broadcasting & Entertainment | 42 | 28 | 28 | 27 | 27 | 27 | | | |
| Corporate | 6 | 7 | 7 | 3 | 3 | 3 | | | |
| Total Capital Expenditures | 222 | 200 | 175 | 130 | 130 | 130 | | | |
| Investments | 222 | 100 | 275(e) | 100 | 100 | 100 | | | |
| Total Capital Usage | 444 | 300 | 450 | 230 | 230 | 230 | | | |
| Pre-tax Free Cash Flow | $ 939 $ | 1,037 $ | 983 $ | 1,264 $ | 1,320 $ | 1,350 | | | $5,954 |

(a)    Excludes non-operating items and discontinued operations (Atlanta, Albany and Boston).

(b)    Includes non-cash stock-based compensation and non-cash pension expense.

(c)    Operating Cash Flow represents operating revenue less cash expenses, including non-cash stock-based compensation expense and non-cash pension expense. It should be noted that operating cash flow is not a measure of performance under generally accepted accounting principles and should not be considered as an alternative to operating income or net income as a measure of operating performance or cash flows as a measure of liquidity. Further, management's calculation of operating cash flows may differ from that used by others.

(d)    Excludes fiscal year 2006's additional week. A 53rd week occurs every six years as the Company's fiscal year ends on the last Sunday of the year. 2006 excludes the following special items: approximately $20 million of severance and other payments

94

associated with new union contracts at Newsday, $9 million of other severance expense, a $4 million charge for the disposition of a press, $7 million of gains from property sales and a $7 million gain from the sale of the corporate airplane.

(e)    Includes $175 million in 2008 for the purchase of TMCT real estate.

The material assumptions made by the Company in developing the 2007 Management Projections were as follows:

*Publishing*

•

Revenue decline of 1% in 2007 due to a challenging advertising environment;

•

Print advertising revenue decline of 3% in 2007, which will be partially offset by Interactive revenue growth;

- Modest improvement in 2008-2011 revenues as compared to 2007 due to annual Interactive revenue growth of 16% and improvements in classified;

- Circulation revenue declines of 4% annually in years 2007-2011 from modest volume declines and continued selective discounting;

- Expense decline of 1% in 2007 due to more favorable newsprint prices and other cost reductions;

- Continued focus on cost reductions beyond 2007;

- Growth in equity income from CareerBuilder and Classified Ventures; and

- Declining capital expenditures due to the completion of ongoing systems projects by early 2009.

*Broadcasting and Entertainment*

- Advertising sales growth of nearly 2% annually in years 2006-2011;

- Base television spot market growth of 1% annually;

- Expected improvements in political spending;

- An expected increase in revenue share to 14.3% in 2011 from a projected 13.3% in 2006;

- Improved ratings for The CW network as compared to The WB network and continued ratings momentum of FOX network programming;

- Increase in revenue share due to debuts of new syndicated programming in fall 2007;

- Continued growth of WGN Superstation distribution (volume and rate) and renewal of carriage agreements;

- Increase in annual operating expenses of approximately 1.6%; and

- Continued growth of the TV Food Network.

The Company subsequently slightly refined the 2007 Management Projections discussed above. The material difference in the revised version of the projections was a decrease of approximately $75 million in capital expenditures and investments in 2007, resulting in an increase of the same amount in pre-tax free cash flow in 2007. These updated projections were shared with the Board, the Special Committee and their respective financial advisors, as well as with the Chandler Trusts and the Zell Entity.

The Board, the Special Committee and their respective financial advisors also considered certain downside sensitivity cases, two of which are described as "Downside Case A" and "Downside Case B" in "Special Factors—Opinion of the Special Committee's Financial Advisor." Downside Case A

95

assumes a 2% annual decline in publishing revenues and no growth in broadcasting and entertainment operating cash flow, in each case, from 2007 through 2011. Downside Case B assumes a 3% annual decline in publishing revenues and a 1% annual decline in broadcasting and entertainment operating cash flow, in each case, from 2007 through 2011. The downside sensitivity cases were not provided to the Zell Entity; however, they were provided to the ESOP and other interested parties. The Downside Case A and the Downside Case B are described in the April 1, 2007 Presentation to the Committee of Independent Directors of the Board of Directors of Tribune prepared by Morgan Stanley, which was filed by the Company with the SEC as Exhibit (c)(10) to the Schedule TO dated April 25, 2007.

### First Quarter 2007 Results

On April 19, 2007, the Company reported its 2007 first quarter results and furnished such results on a Current Report on Form 8-K. Consolidated operating cash flow for the first quarter of 2007 was 2% lower than planned results factored into the 2007 Management Projections, primarily due to lower publishing revenues, which were partially offset by lower expenses in both the publishing and broadcasting segments. Consolidated operating cash flow for the first quarter of 2007 was down approximately 12% from 2006. Excluding one-time items in 2007 and 2006, consolidated operating cash flow declined by approximately 17%. Stockholders should review the Company's Current Report on Form 8-K dated April 19, 2007 to obtain further information regarding the Company's first quarter results.

### Certain 2006 Management Projections

In October and December 2006, the Company prepared certain other non-public financial projections which, during the strategic review process, were provided or made available to the Board, the Special Committee, the Zell Entity and other interested parties and their respective legal and financial advisors (respectively, the "October 2006 Projections" and the "December 2006 Projections"). The October 2006 Projections and December 2006 Projections were fully superseded by the 2007 Management Projections described above.

The October 2006 Projections included projected financial information for the remainder of the 2006 fiscal year through the 2010 fiscal year and reflected (i) 2006 publishing operating revenues of $4,042 million, increasing at a five-year compound annual growth rate ("CAGR") of 2.1%, (ii) 2006 broadcasting and entertainment operating revenues of $1,390 million, increasing at a five-year CAGR of 1.7% and (iii) 2006 consolidated operating cash flow of $1,303 million, increasing at a five-year CAGR of 2.9%.

In December 2006, management reviewed the October 2006 Projections in light of the most recent operating results and revised the October 2006 Projections. As compared to the October 2006 Projections, the December 2006 Projections included projected financial information for the remainder of the 2006 fiscal year through the 2010 fiscal year and reflected (i) 2006 publishing operating revenues of $4,022 million, increasing at a five-year CAGR of 2.1%, (ii) 2006 broadcasting and entertainment operating revenues of $1,399 million, increasing at a five-year CAGR of 2.3% and (iii) 2006 consolidated operating cash flow of $1,307 million, increasing at a five-year CAGR of 3.4%.

In February 2007, in connection with the Company's preparation of its 2007 operating plan and in light of the 2006 year-end operating results and Period 1, 2007 operating results, management reviewed and revised the December 2006 Projections and prepared the 2007 Management Projections described above.

## Information About Tribune Company

The Company is a media and entertainment company, operating primarily in the United States, that conducts our operations through two business segments: publishing and broadcasting and

96

entertainment. In publishing, our leading daily newspapers include the *Los Angeles Times*, *Chicago Tribune* and *Newsday* (Long Island, NY), *The Sun* (Baltimore), *South Florida Sun-Sentinel*, *Orlando Sentinel* and *Hartford Courant*. Our broadcasting group operates 23 television stations, Superstation WGN on national cable, Chicago's WGN-AM and the Chicago Cubs baseball team. Popular news and information websites complement our print and

broadcast properties and extend our nationwide audience. These segments reflect the manner in which we sell our products to the marketplace, manage our operations and make business decisions. Our media operations are principally in major metropolitan areas of the United States and compete against all types of media on both a local and national basis. We were founded in 1847 and incorporated in Illinois in 1861. As a result of a corporate restructuring in 1968, we became a holding company incorporated in Delaware.

*Prior Public Offerings.*    The Company has for several years maintained active debt shelf registration statements for its medium-term note program and other financing needs. A $1 billion shelf registration statement was declared effective in February 2006. In July 2006, a new shelf registration statement was filed and declared effective, replacing the shelf registration statement declared effective in February 2006. The new shelf registration statement does not have a designated amount, but the Board has authorized the issuance and sale of up to $3 billion of debt securities, inclusive of the $1 billion that was registered pursuant to the February 2006 registration statement.

*Company Common Stock Repurchases.*    The Company's repurchases of shares of Company Common Stock totaled 71 million shares for $2.3 billion in 2006 and 12 million shares for $440 million in 2005. The following table summarizes the Company's 2006 repurchases (in thousands):

| | Shares | | Cost |
|---|---|---|---|
| Repurchases in first quarter | 4,604 | $ | 137,746 |
| May 2006 tender offer repurchases | 45,027 | | 1,468,270 |
| Repurchases from the Robert R. McCormick Tribune Foundation and Cantigny Foundation | 10,000 | | 325,300 |
| Repurchases subsequent to the May 2006 tender offer | 11,053 | | 330,952 |
| Total Company Common Stock repurchases | 70,684 | $ | 2,262,268 |

On May 30, 2006, the Company initiated a modified "Dutch Auction" tender offer to repurchase up to 53 million shares of Company Common Stock at a price per share not greater than $32.50 and not less than $28.00. That tender offer closed on June 26, 2006, and the Company acquired 45 million shares of Company Common Stock on July 5, 2006 at a price of $32.50 per share before transaction costs. The Company also acquired 10 million shares of Company Common Stock from the Foundations on July 12, 2006 at a price of $32.50 per share before transaction costs. The Foundations are affiliated non-profit organizations, which together held 13.6% of the Company's outstanding shares when that tender offer was launched. In connection with that tender offer, the Board also authorized the repurchase of an additional 12 million shares of Company Common Stock commencing on the eleventh business day following the completion of the tender offer. In the third quarter of 2006, the Company repurchased an additional 11.1 million shares under that authorization at a weighted average cost of $29.94 per share. In addition, the Company repurchased and retired 4.6 million shares of Company Common Stock in the first quarter of 2006.

***Certain Relationships and Transactions***

*Chandler Trusts.*    Three members of the Board, Jeffrey Chandler, Roger Goodan and William Stinehart, Jr., are trustees of the Chandler Trusts. Mr. Chandler and Mr. Goodan are also beneficiaries of these trusts. The Chandler Trusts were the principal shareholders of The Times Mirror Company prior to the merger of Times Mirror into the Company on June 12, 2000. In connection with the merger, the Chandler Trusts exchanged their Times Mirror common stock for 36,304,135 shares of

97

Company Common Stock and the Company amended its by-laws to grant the Chandler Trusts the right to nominate three directors, one for each of the Board's three classes. As long as the Chandler Trusts have these rights, neither the Board nor any Board committee may nominate any person in opposition to the three Chandler Trust nominees. Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. were the Chandler Trusts' initial nominees and became directors of the Company following the merger. Mr. Chandler and Mr. Goodan are cousins.

As described above in "Special Factors—Other Transaction Agreements—Registration Rights Agreements," the Chandler Trusts have agreed that they will tender into the Tender Offer all shares held by them at the expiration of the Tender Offer, and have also agreed to cause Messrs. Chandler, Goodman and Stinehart, each of whom are

currently serving on the Board as a representative of the Chandler Trusts, to resign as directors of the Company, effective upon the purchase of shares of Company Stock in the Tender Offer or earlier in certain circumstances.

In 1997, the Chandler Trusts and Times Mirror entered into a transaction which, through the formation of TMCT, LLC ("TMCT"), enabled Times Mirror to retire for accounting purposes a substantial block of Times Mirror stock. Times Mirror and its affiliates contributed to TMCT real property used in Times Mirror's business operations and cash and the Chandler Trusts contributed Times Mirror stock. Times Mirror leased back the real property under long-term leases. Upon completion of the merger of Times Mirror into the Company, the Company assumed these leases and the Times Mirror stock held by the limited liability company was converted into Company Common Stock. In 2006, $20,300,792 of lease payments and $4,005,936 in dividends received on the Company Common Stock held by TMCT were allocated to the Chandler Trusts.

In 1999, the Chandler Trusts and Times Mirror formed TMCT II, LLC ("TMCT II") and entered into a similar transaction that again enabled Times Mirror to retire for accounting purposes a substantial block of stock. Times Mirror's contribution to TMCT II consisted of cash and securities. The Chandler Trusts again contributed Times Mirror stock that was converted into Company Common Stock upon completion of the merger of Times Mirror into the Company. In 2006, $7,440,746 in dividends received on the Company Common Stock held by TMCT II were allocated to the Chandler Trusts.

On September 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. Under the terms of the agreements, the Company received on September 22, 2006, a total of 38.9 million shares of Company Common Stock and all 1.1 million shares of the Company's preferred stock held collectively by TMCT and TMCT II. Following the distributions by TMCT and TMCT II, the Company's interests in each of TMCT and TMCT II were reduced to approximately five percent. The agreements also provided for certain put and call options, which are exercisable at fair market value beginning in September 2007, relating to the Company's remaining ownership interests in TMCT and TMCT II.

In addition, on September 22, 2006, the Company and TMCT amended the lease agreement for the eight properties the Company leases from TMCT. Under the terms of the amended lease, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company was also granted an option to acquire the leased properties from February 8, 2008 to three months prior to the expiration of the amended lease at the higher of fair market value or $195 million. In addition, the amendment extended the properties' current fixed rental rate through August 7, 2021.

On October 20, 2006, the remaining 12.4 million shares of Company Common Stock held by TMCT and TMCT II were distributed to the Company and the Chandler Trusts in accordance with their respective ownership interests. The Company received 0.6 million shares and the Chandler Trusts received 11.8 million shares. Until October 20, 2007, the trustees of the Chandler Trusts have agreed to vote the 11.8 million shares in the same proportion as all other shares are voted on any matter

98

requiring a shareholder vote, including the proposals to be voted on at the 2007 annual meeting. Information pertaining to the Company's investments in TMCT and TMCT II is provided in Note 7 to the consolidated financial statements included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006.

### *Significant Events*

*Credit Agreements.*    On June 19, 2006, the Company entered into a five-year credit agreement and a 364-day bridge credit agreement, both of which were amended and restated on June 27, 2006. The five-year credit agreement provides for a $1.5 billion unsecured term facility, of which $250 million was used to refinance the medium-term notes that matured on November 1, 2006, and a $750 million unsecured revolving facility. The 364-day bridge credit agreement provided for a $2.15 billion unsecured bridge facility.

The Company entered into these agreements to finance the Company's tender offer initiated on May 30, 2006; to repurchase shares of the Company Common Stock from the Foundations; to repurchase shares of the Company Common Stock pursuant to open market or privately negotiated transactions; to refinance certain indebtedness; and to pay fees and expenses incurred in connection with the repurchases. In addition, the revolving facility is available for working capital and general corporate purposes, including acquisitions.

In general, borrowings under the credit agreements bear interest at a rate equal to LIBOR plus a spread ranging from 0.35% to 1.25%. The applicable spread is determined on the basis of the Company's debt ratings by S&P and Moody's. The Company's debt ratings are also used in determining the annual facility fee, which may range from 0.07% to 0.25% of the aggregate unused commitments. In addition, the Company has agreed to pay customary fees to the lenders under the credit agreements.

As of December 31, 2006, the Company had outstanding borrowings of $1.5 billion and $1.3 billion under the term facility and the bridge facility, respectively, and the Company had no borrowings under the revolving facility. As of December 31, 2006, the applicable interest rate on both the term facility and the bridge facility was 6.2%.

The credit agreements contain certain restrictive covenants, including financial covenants that require the Company to maintain a maximum total leverage ratio and a minimum interest coverage ratio. At December 31, 2006, the Company was in compliance with the covenants.

*TMCT Transactions.*    As a result of the Company's acquisition of Times Mirror in 2000, the Company holds investment interests in TMCT and TMCT II. TMCT and TMCT II were formed in 1997 and 1999, respectively, as a result of transactions involving agreements between Times Mirror and its largest shareholders, the Chandler Trusts. Additional information pertaining to the Company's investments in TMCT and TMCT II is provided in Note 7 to the consolidated financial statements in Item 8 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006. See "Information About Tribune Company—Certain Relationships and Related Transactions—Chandler Trusts."

*Sales of WATL-TV, Atlanta, WCWN-TV, Albany and WLVI-TV, Boston.*    On June 5, 2006, the Company announced the sale of WATL-TV, Atlanta to Gannett Co., Inc. for $180 million. The sale closed on August 7, 2006. On June 19, 2006, the Company announced the sale of WCWN-TV, Albany to Freedom Communications, Inc. for $17 million. The sale closed on December 6, 2006. On September 14, 2006, the Company announced the sale of WLVI-TV, Boston, to Sunbeam Television Corp. for $113.7 million. The sale closed on December 19, 2006.

*Acquisition of Additional Equity in CareerBuilder, ShopLocal and Topix.*    In August 2006, the Company completed its acquisition of additional equity interests in each of CareerBuilder, LLC,

99

ShopLocal, LLC (formerly CrossMedia Services, Inc.) and Topix, LLC for an aggregate purchase price of $155 million. The negotiated equity purchases followed the exercise of call options by the Company and Gannett Co., Inc. on Knight-Ridder, Inc.'s equity ownership in the three online businesses after The McClatchy Company's announcement of its proposed acquisition of Knight-Ridder, Inc. As a result of this transaction, the Company and Gannett Co., Inc. each increased their respective ownership of CareerBuilder, LLC and ShopLocal, LLC to 42.5% with The McClatchy Company retaining a 15% interest in both entities. Additionally, each of the Company's and Gannett Co., Inc.'s interest in Topix, LLC increased to 31.9%. As a result of subsequent funding, the current ownership of Topix, LLC is approximately 33.7% for both the Company and Gannett Co., Inc., 11.9% for The McClatchy Company and 20.7% for management of Topix, LLC.

*Network Affiliations.*    On January 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 16 of its television stations which were at that time affiliated with the former WB Network (including those in New York, Los Angeles and Chicago) with a new broadcast network, the CW Network. The new network was launched in September 2006 by Warner Bros. Entertainment and CBS. The new network airs a portion of the programming previously carried on the WB Network and the UPN Network, as well as new programming. The WB Network has shut down. The Company did not incur any costs related to the shutdown of the WB Network.

In the second quarter of 2006, the Company announced that its other three former WB Network affiliates (Philadelphia, Atlanta and Seattle) would become affiliates of the new broadcast network, MyNetworkTV, which was launched in September 2006 by the FOX Television Stations Network Inc. and Twentieth Century Television. The new network airs primarily primetime dramas. The Company subsequently sold its Atlanta station in August 2006 and its Albany and Boston stations in December 2006.

### Recent Developments

On February 12, 2007, Tribune Publishing, a division of the Company, announced the sale of *Hoy* New York, its Spanish-language daily newspaper, to ImpreMedia, LLC. The sale, which is expected to close during the first quarter of 2007, does not include the *Hoy* publications in Los Angeles and Chicago. On March 6, 2007, Tribune Publishing announced the sale of its Southern Connecticut Newspapers, *The Advocate* (Stamford) and *Greenwich Time*, to Gannett Co., Inc., for $73 million.

### Where You Can Find More Information

We are subject to the informational filing requirements of the Exchange Act, and, accordingly, are obligated to file reports, statements and other information with the SEC relating to our business, financial condition and other matters. Information, as of particular dates, concerning directors and officers, their remuneration, options granted to them, the principal holders of our securities and any material interest of these persons in transactions with us is required to be disclosed in proxy statements distributed to our stockholders and filed with the SEC. We also have

filed a Tender Offer Statement and Rule 13e-3 Transaction Statement under cover of Schedule TO with the SEC that includes additional information relating to the Tender Offer.

These reports, statements and other information can be inspected and copied at the public reference facilities maintained by the SEC at 100 F Street, N.E., Room 1580, Washington, DC 20549 and at the library of the NYSE at 20 Broad Street, New York, NY 10005. Copies of this material may also be obtained by mail, upon payment of the SEC's customary charges, from the Public Reference Section of the SEC at 100 F Street, N.E., Washington, DC 20549. The SEC also maintains a web site on the Internet at http://www.sec.gov that contains reports, proxy and information statements and other information regarding registrants that file electronically with the SEC.

100

### Incorporation by Reference

The rules of the SEC allow us to "incorporate by reference" information into this Offer to Purchase, which means that we can disclose important information to you by referring you to another document filed separately with the SEC. The Tender Offer incorporates by reference the documents listed below, including the financial statements and the notes related thereto contained in those documents that have been previously filed with the SEC. These documents contain important information about us.

| SEC Filing (File No. 1-8572) | Period or Date Filed |
| --- | --- |
| *Annual Report on Form 10-K* | *Fiscal Year Ended December 31, 2006, filed February 26, 2007* |
| *Current Reports on Form 8-K* | *February 16, 2007; April 5, 2007; April 24, 2007* |

Any statement contained in this Offer to Purchase or in a document incorporated herein by reference into this Offer to Purchase shall be deemed to be modified or superseded to the extent such statement is modified or superseded in any subsequently filed document. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Offer to Purchase.

You can obtain any of the documents incorporated by reference in this Offer to Purchase from us or from the SEC's web site at the address described above. Documents incorporated by reference are available from us without charge, excluding any exhibits to those documents. You may request a copy of these filings at no cost, by writing or telephoning us at: Tribune Company, Attention: Corporate Relations Department, 435 North Michigan Avenue, Chicago, Illinois, Telephone: (800) 757-1694. Please be sure to include your complete name and address in your request. If you request any incorporated documents, we will mail them to you by first class mail, or another equally prompt means, within one business day after we receive your request. You can find additional information by visiting our website at: *http://www.tribune.com*. Information contained on our website is not part of, and is not incorporated into, this Tender Offer.

### Information About the ESOP

In connection with the Leveraged ESOP Transactions, the Board adopted the ESOP on April 1, 2007, effective as of January 1, 2007. The ESOP is intended to be a qualified employee benefit plan under Sections 401(a), 409 and 4975 of the Code, and the ESOP Trust is intended to be tax-exempt under Section 501(a) of the Code. The Trustee of the ESOP is GreatBanc Trust Company, 1301 West 22nd Street, Suite 702, Oak Brook, Illinois 60523; telephone (530) 572-5121 or (630) 572-5120. See "Other Transaction Agreements—ESOP Plan Documents."

### Interest of Directors and Executive Officers; Transactions and Arrangements Concerning the Shares

See "Special Factors—Interest of Directors and Executive Officers" for a description of certain benefits and other interests arising out of the Leveraged ESOP Transactions.

As of April 1, 2007, there were 240,573,299 shares of Company Common Stock issued and outstanding, excluding 60,671,319 shares of Company Common Stock held by our subsidiaries and affiliates, 8,928,571 shares of Company Common Stock held by the ESOP. The maximum number of shares we are offering to purchase in the Tender Offer, 126,000,000 shares, represents approximately 52% of the total number of issued and outstanding shares as of April 1, 2007.

As of April 1, 2007, our directors and executive officers as a group (20 persons) beneficially owned an aggregate of approximately 6,891,911 shares, representing approximately 2.8% of the total number of outstanding shares. To the best of the Company's knowledge, all of the Company's directors and

101

executive officers intend to tender into the Tender Offer all shares owned of record, other than certain shares subject to options and certain unvested restricted shares.

As of April 1, 2007, the aggregate number and percentage of shares of Company Common Stock that were beneficially owned by our current directors, current executive officers and each person who owns (to our knowledge) 5% or more of our outstanding shares were as appears in the second and third columns of the table below.

Unless otherwise indicated, the address of each person listed is c/o Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611.

| Name of Beneficial Owner | Prior to the Tender Offer | | After the Tender Offer |
|---|---|---|---|
| | Amount and Nature of Beneficial Ownership(1)(2) | Percentage of Shares | Percentage of Shares(3) |
| **5% Stockholders:** | | | |
| The Chandler Trusts(4) | 48,753,788 | 20.25% | 20.14% |
| 350 West Colorado Boulevard, Suite 230 | | | |
| Pasadena, CA 91105 | | | |
| Robert R. McCormick Tribune Foundation | 31,282,788 | 13.00% | 12.94% |
| Cantigny Foundation(5) | | | |
| 435 North Michigan Avenue, Room 770 | | | |
| Chicago, IL 60611 | | | |
| T. Rowe Price Associates, Inc.(6) | 17,655,120 | 7.34% | 7.30% |
| 100 E. Pratt Street | | | |
| Baltimore, MD 21202 | | | |
| Ariel Capital Management, LLC(7) | 15,337,568 | 6.38% | 6.34% |
| 200 E. Randolph Drive, Suite 2900 | | | |
| Chicago, IL 60601 | | | |
| **Directors and Executive Officers:** | | | |
| Jeffrey Chandler(8) | | | |
| Amount of shares | 11,187 | | |
| Options exercisable within 60 days | 19,200 | | |
| Total | 30,387 | * | * |
| Dennis J. FitzSimons(9)(10) | | | |
| Amount of shares | 498,299 | | |
| Options exercisable within 60 days | 1,561,556 | | |
| Total | 2,059,855 | * | * |
| Roger Goodan(8) | | | |
| Amount of shares | 17,246 | | |
| Options exercisable within 60 days | 45,200 | | |
| Total | 62,446 | * | * |
| Donald C. Grenesko | | | |
| Amount of shares | 242,188 | | |
| Options exercisable within 60 days | 630,956 | | |
| Total | 873,144 | * | * |
| Enrique Hernandez, Jr. | | | |
| Amount of shares | 11,330 | | |
| Options exercisable within 60 days | 15,200 | | |
| Total | 26,530 | * | * |

102

| | | | |
|---|---|---|---|
| Betsy D. Holden | | | |
| Amount of shares | 8,661 | | |

| | | | |
|---|---:|:---:|:---:|
|   Options exercisable within 60 days | 7,200 | | |
|   Total | 15,861 | * | * |
| Crane H. Kenney | | | |
|   Amount of shares | 51,669 | | |
|   Options exercisable within 60 days | 485,063 | | |
|   Total | 536,732 | * | * |
| Timothy J. Landon | | | |
|   Amount of shares | 45,982 | | |
|   Options exercisable within 60 days | 367,015 | | |
|   Total | 412,997 | * | * |
| Thomas D. Leach(10) | | | |
|   Amount of shares | 50,741 | | |
|   Options exercisable within 60 days | 242,408 | | |
|   Total | 293,149 | * | * |
| Luis E. Lewin | | | |
|   Amount of shares | 22,710 | | |
|   Options exercisable within 60 days | 392,310 | | |
|   Total | 415,020 | * | * |
| R. Mark Mallory | | | |
|   Amount of shares | 108,234 | | |
|   Options exercisable within 60 days | 213,745 | | |
|   Total | 321,979 | * | * |
| Robert S. Morrison | | | |
|   Amount of shares | 13,148 | | |
|   Options exercisable within 60 days | 11,200 | | |
|   Total | 24,348 | * | * |
| Ruthellyn Musil | | | |
|   Amount of shares | 65,391 | | |
|   Options exercisable within 60 days | 349,379 | | |
|   Total | 414,770 | * | * |
| William A. Osborn | | | |
|   Amount of shares | 11,959 | | |
|   Options exercisable within 60 days | 11,200 | | |
|   Total | 23,159 | * | * |
| John E. Reardon(10) | | | |
|   Amount of shares | 63,782 | | |
|   Options exercisable within 60 days | 323,487 | | |
|   Total | 387,269 | * | * |
| J. Christopher Reyes | | | |
|   Amount of shares | 14,969 | | |
|   Options exercisable within 60 days | 0 | | |
|   Total | 14,969 | * | * |
| Scott C. Smith(9)(10) | | | |
|   Amount of shares | 225,273 | | |
|   Options exercisable within 60 days | 577,394 | | |
|   Total | 802,667 | * | * |

103

| | | | |
|---|---:|:---:|:---:|
| William Stinehart, Jr.(8)(10) | | | |
|   Amount of shares | 12,650 | | |
|   Options exercisable within 60 days | 31,700 | | |
|   Total | 44,350 | * | * |
| Dudley S. Taft(11) | | | |
|   Amount of shares | 94,660 | | |
|   Options exercisable within 60 days | 31,200 | | |

| | | | |
|---|---|---|---|
| Total | 125,860 | * | * |
| Miles D. White | | | |
| Amount of shares | 6,419 | | |
| Options exercisable within 60 days | 0 | | |
| Total | 6,419 | * | * |

\*

    Less than 1% of the issued and outstanding Company Common Stock.

(1)

    "Beneficial ownership" generally means any person who, directly or indirectly, has or shares voting or investment power with respect to a security or has the right to acquire such power within 60 days.

(2)

    Includes shares of Company Common Stock beneficially owned by executive officers under the Tribune Company 401(k) Savings and Profit Sharing Plan. The executive officers have the right to direct the voting of shares allocated to their accounts. Totals for Ms. Musil and Messrs. FitzSimons, Grenesko, Lewin, Mallory and Smith do not include unvested restricted stock units held by them; however, each such individual has reached the minimum retirement age and the required years of service and, therefore, the restrictions on the unvested restricted stock units held by them lapse upon the executive's retirement Ms. Musil holds 28,667 unvested restricted stock units and Messrs. FitzSimons, Grenesko, Lewin, Mallory and Smith hold 175,000, 71,417, 33,334, 21,934 and 70,000 unvested restricted stock units, respectively.

(3)

    Reflects the issuance of 1,470,588 shares of Company Common Stock to the Zell Entity following the consummation of the Step One Purchase Transaction and assumes all issued and outstanding shares of Company Common Stock, other than shares owned by the Zell Entity or the ESOP, will be tendered in the Tender Offer resulting in each of the 5% beneficial holders listed above being limited to selling approximately 52% of the shares of Company Common Stock that it presently holds.

(4)

    The trustees of Chandler Trust No. 1 share voting and investment power with respect to 22,881,590 shares and the trustees of Chandler Trust No. 2 share voting and investment power with respect to 25,244,751 shares. In addition, certain trustees beneficially own shares of Company Common Stock, as follows: Jeffrey Chandler, 30,387 shares (including 19,200 options exercisable within 60 days of April 1, 2007); Camilla Chandler Frost, 427,662 shares; Roger Goodan, 62,446 shares (including 45,200 options exercisable within 60 days of April 1, 2007); William Stinehart, Jr., 44,350 shares (including 31,700 options exercisable within 60 days of April 1, 2007); and Warren B. Williamson, 62,602 shares (including 25,102 options exercisable within 60 days of April 1, 2007).

(5)

    The Robert R. McCormick Tribune Foundation ("McCormick") owns 28,023,788 shares and the Cantigny Foundation ("Cantigny") owns 3,259,000 shares. The investment and voting power of each of the Robert R. McCormick Tribune Foundation and the Cantigny Foundation is vested in a

104

    board of five directors, consisting of Dennis J. FitzSimons, David D. Hiller, Scott C. Smith and two former Company officers. Mr. Hiller is the Publisher of the *Los Angeles Times*.

(6)

    Based upon information contained in a Schedule 13G filed with the Securities and Exchange Commission on February 14, 2007. According to information provided by T. Rowe Price Associates, Inc., these securities are owned by various individual and institutional investors for which T. Rowe Price Associates, Inc. serves as investment adviser with power to direct investments and/or sole power to vote the securities. T. Rowe Price Associates, Inc. has sole voting control over 3,632,545 of the shares and has sole dispositive power over all the shares. For purposes of the reporting requirements of the Securities Exchange

Act of 1934, T. Rowe Price Associates, Inc. is deemed to be a beneficial owner of such securities; however, T. Rowe Price Associates, Inc. expressly disclaims that it is, in fact, the beneficial owner of such securities.

(7)

Based upon information contained in a Schedule 13G filed with the Securities and Exchange Commission on February 14, 2007. According to the Schedule 13G, the shares are owned by investment advisory clients of Ariel Capital Management, LLC and include 13,688,638 shares over which Ariel Capital Management, LLC has the sole voting control and 15,252,628 shares over which Ariel Capital Management, LLC has sole dispositive power.

(8)

Does not include 22,881,590 shares owned by Chandler Trust No. 1 and 25,244,751 shares owned by Chandler Trust No. 2 (see (4) above).

(9)

Does not include 28,023,788 shares owned by the Robert R. McCormick Tribune Foundation and 3,259,000 shares owned by the Cantigny Foundation (see (5) above).

(10)

Includes shares held by family members or in family trusts, as follows: Mr. FitzSimons, 7,299 shares; Mr. Leach, 222 shares; Mr. Reardon, 177 shares; Mr. Smith, 800 shares; and Mr. Stinehart, 7,002 shares.

(11)

Includes 71,209 shares held by Taft Broadcasting Company. Mr. Taft is the sole shareholder of Taft Broadcasting Company.

*Other Agreements Involving the Company's Securities.*   Except as otherwise described herein and for the outstanding stock options, stock awards and other restricted equity interests granted to our directors, executive officers and other employees pursuant to the Company's various equity benefits plans, which are described in Note 16 to the financial statements contained in our Annual Report on Form 10-K for the year ended December 31, 2006, which descriptions are incorporated herein by reference, neither the Company nor any affiliate nor, to the Company's knowledge, any of the Company's executive officers or directors, nor associate of the foregoing persons, is a party to any agreement, arrangement, understanding or relationship with the Company or any other person relating, directly or indirectly, to any of the Company's securities. For more information regarding the terms of our equity incentive plans and certain other agreements, we refer you to the entire text of the documents filed as Exhibits (d)(20) through (d)(37) to the Schedule TO filed by the Company on April 25, 2007, as the same may be amended from time to time, which are incorporated herein by reference.

*Recent Securities Transactions*

Based on our records and on information provided to us by our directors, executive officers, affiliates, and subsidiaries, neither we nor any of our affiliates, subsidiaries, directors, or executive officers have effected any transactions involving shares of our Company Common Stock during the 60 days prior to April 20, 2007, except that on April 17, 2007, Dudley S. Taft acquired 4,000 shares of Company Common Stock upon the exercise of a stock option that was scheduled to expire on May 6, 2007.

**Effects of the Tender Offer on the Market for Shares; Registration under the Exchange Act**

The purchase by us of shares in the Tender Offer will reduce the number of shares that might otherwise be traded publicly and may reduce the number of stockholders. As a result, the trading of the shares after consummation of the Tender Offer may have a greater impact on trading prices than would be the case prior to consummation of the Tender Offer.

We believe that there will be a sufficient number of shares outstanding and publicly traded following completion of the Tender Offer to ensure a continued trading market for the shares. Based upon published guidelines of the NYSE, we do not believe that our purchase of shares in the Tender Offer will cause the remaining outstanding shares to be delisted from the NYSE.

Shares are currently "margin securities" under the rules of the Federal Reserve Board. This has the effect, among other things, of allowing brokers to extend credit to their customers using such shares as collateral. We believe that, following the purchase of shares in the Tender Offer, the shares will continue to be "margin securities" for purposes of the Federal Reserve Board's margin rules and regulations.

The shares are registered under the Exchange Act, which requires, among other things, that we furnish certain information to our stockholders and the SEC and comply with the SEC's proxy rules in connection with meetings of our stockholders. We believe that our purchase of shares in the Tender Offer pursuant to the terms of the Tender Offer will not result in the shares becoming eligible for deregistration under the Exchange Act.

## Legal Matters; Regulatory Approvals

*Legal Matters.*   On September 19, 2006, a Company stockholder filed a complaint in the Northern District of Illinois against the Company's directors, with the exception of Messrs. Chandler, Goodan and Stinehart, and the Company as a nominal defendant, alleging direct and derivative claims on behalf of a purported class of Company stockholders for breach of fiduciary duty in connection with the Company's May 2006 share repurchase program and the manner in which the Board was handling its exploration of strategic alternatives. After the judge in that case issued a memorandum questioning whether plaintiff had satisfied the requirements for diversity jurisdiction in order to maintain the case in federal court, plaintiff moved to dismiss the case voluntarily without prejudice. The district court dismissed the case on September 27, 2006.

Approximately seven weeks later, on November 17, 2006, the same plaintiff filed a complaint captioned *Garamella v. FitzSimons, et al.*, No. BC362110, in the Superior Court of California, Los Angeles County, alleging substantially identical direct and derivative claims on behalf of a purported class of Company stockholders against all Company directors, including Messrs. Chandler, Goodan and Stinehart, and the Company as a nominal defendant. After the Company announced the Leveraged ESOP Transactions on April 2, 2007, and before any responsive pleading was due, plaintiff amended the California complaint to include claims alleging that the Company's directors breached their fiduciary duties to stockholders in connection with the negotiation of the Leveraged ESOP Transactions and execution of the related documents. Specifically, plaintiff claims that the directors' desire to entrench themselves on the Company's Board caused them to breach their fiduciary duties by undertaking the May 2006 share repurchase program which caused the Company to take on additional debt and, according to plaintiff, become less attractive to potential bidders. Plaintiff further alleges that the directors' entrenchment motives caused them to breach their fiduciary duties by rejecting certain strategic alternatives for the Company, such as a sale of individual Company assets or a tax-free spin-off, and by keeping in place certain of the Company's corporate governance mechanisms such as the shareholder rights plan and the staggered structure of the Board. With respect to the Merger Agreement, plaintiff claims that the directors breached their fiduciary duties by setting a bid deadline of March 31, 2007 and thereby "cutting short" the bidding process, by structuring the transaction to include an up-front tender offer which plaintiff characterizes as "coercive," and by structuring the

106

transaction so that "insider shareholders" such as the Chandler Trusts and McCormick Tribune Foundation obtain additional unique benefits from the transaction that are not available to other stockholders. Among other things, the California complaint seeks to enjoin the impending Tender Offer and the consummation of the Merger. Defendants filed motions to dismiss the California complaint on April 20, 2007, and those motions currently are pending before the court. As of this date, plaintiff has not filed a motion for preliminary injunction and the court has not set any schedule for preliminary injunction proceedings. The foregoing description does not purport to be complete and is qualified in its entirety by reference to Exhibit (a)(5)(A), which is incorporated herein by reference.

On April 5, 2007, a Company stockholder filed a complaint captioned *Simpson v. Tribune Co., et al.*, No. 07CH9519, in the Chancery Division of the Circuit Court of Cook County, Illinois, against the Company and each of the Company's directors. The *Simpson* complaint alleges that the Company's directors breached their fiduciary duties in negotiating and executing the Merger Agreement which unfairly favors the Company's management and major insider stockholders at the expense of the Company's public stockholders. The foregoing description does not purport to be complete and is qualified in its entirety by reference to Exhibit (a)(5)(B), which is incorporated herein by reference.

These actions will be defended vigorously.

The Company received a letter dated April 9, 2007, (1) stating that it was written on behalf of two hedge funds purporting to hold approximately 37% of the Company's 8,000,000 PHONES[SM] Exchangeable Subordinated Debentures due 2029 (the "PHONES"), (2) purporting to give a "notice of default" that the Company has violated

the "maintenance of properties" covenant in the indenture under which the PHONES were issued (the "PHONES Indenture") and (3) informing the Company that failure to remedy such purported violation within 60 days of notice will result in an "event of default" under the PHONES Indenture (which could, if properly declared, result in an acceleration of principal and interest payable with respect to the PHONES).

The particular covenant in question, Section 10.05 of the PHONES Indenture, requires the Company to "cause all properties used or useful in the conduct of its business or the business of any Subsidiary to be maintained and kept in good condition, repair and working order (normal wear and tear excepted) and supplied with all necessary equipment . . . all as in the judgment of the Company may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times . . . ." Section 10.05 of the PHONES Indenture expressly provides that the covenant does not "prevent the Company from discontinuing the operation and maintenance of any such properties, or disposing of any of them, if such discontinuance or disposal is, in the judgment of the Company or of the Subsidiary concerned, desirable in the conduct of its business or the business of any Subsidiary and not disadvantageous in any material respect to the Holders [of the PHONES]." The letter suggests that the Company's recent sales of three television stations, announced intention to sell the Chicago Cubs baseball team and recent and proposed issuances of debt and return of capital to stockholders violated or will violate this maintenance of properties covenant.

The Company believes that the hedge funds' claims are without merit and that the Company remains in full compliance with Section 10.05 of the PHONES Indenture. The Company will enforce and defend vigorously its rights under the PHONES Indenture.

*Regulatory Approvals.*    We are not aware of any license or regulatory permit that is material to our business that might be adversely affected by our acquisition of shares as contemplated by the Tender Offer or of any approval or other action by any government or governmental, administrative or regulatory authority or agency, domestic, foreign or supranational, that would be required for the acquisition or ownership of shares by us as contemplated by the Tender Offer that is material to the success of the Tender Offer. Should any such approval or other action be required, we presently contemplate that we will seek that approval or other action where practicable within the time period

contemplated by the Tender Offer. We are unable to predict whether we will be required to delay the acceptance for payment of or payment for shares tendered in the Tender Offer pending the outcome of any such matter. There can be no assurance that any such approval or other action, if needed, would be obtained, or would be obtained without substantial cost or conditions, or that the failure to obtain the approval or other action might not result in adverse consequences to its business and financial condition. Our obligations in the Tender Offer to accept for payment and pay for shares is subject to conditions. See "The Tender Offer—Conditions of the Tender Offer."

In connection with the Leveraged ESOP Transactions, the parties to the Merger Agreement and the Zell Entity Purchase Agreement will be required to file applications with the FCC for consent to the transfer of control of the Company from its public shareholders to the ESOP, the Zell Entity and Zell. The parties will also request that the FCC waive its rule prohibiting the common ownership of daily English language newspapers and broadcast stations (the "cross-ownership rule") in the five markets where the Company owns such combinations. The applications will also require that the FCC address the Company's pending license renewal applications. The FCC can address the pending license renewal applications by taking action on the renewal applications themselves in connection with the transfer application or, alternatively by accepting the transferee's willingness to be bound by the FCC's subsequent action on the pending license renewal applications following the completion of the current FCC rulemaking process. The parties will also request a "failing station waiver" to permit the continued common ownership of the Company's two television stations in Hartford, Connecticut, as well as a "satellite waiver" to permit the continued common ownership and operation of WTTK, Kokomo, Indiana, as a satellite station of WTTV, Indianapolis, Indiana.

The Company is currently permitted to own its five cross-ownerships as follows:

•

In New York, the Company acquired *Newsday* after the grant of its last renewal application for WPIX(TV), and is permitted to own both until the FCC acts on the next renewal application for WPIX(TV), which is currently pending, under the FCC's applicable policy, known as the "note 25 exception."

•

In Chicago, the Company's common ownership of WGN-TV, WGN(AM), and the *Chicago Tribune* was grandfathered when the FCC adopted its cross-ownership rule in 1975.

- In Los Angeles, the Company owns both the *Los Angeles Times* and KTLA under the note 25 exception. An application for renewal of KTLA's license is pending before the FCC.

- In Miami-Ft. Lauderdale, in 1998 the Company was granted a waiver to permit it to own WSFL-TV and the *South Florida Sun-Sentinel* until six months after the FCC completes its still-pending rulemaking proceeding addressing the cross-ownership rule.

- In Hartford, the Company was granted a permanent waiver of the rules to permit it to own both WTIC-TV and WTXX(TV) because it had shown WTXX to be a "failing station." The Company is permitted to own both WTIC and the Hartford Courant under the note 25 exception, and it is permitted to own both WTXX and the Hartford Courant under a waiver permitting such common ownership until after the FCC acts on WTXX's currently pending renewal application.

The Company has filed renewal applications for all twenty-four of its television stations and for WGN(AM) during the recently concluded renewal cycle. Renewal applications have been granted for WGN(AM), for WSFL-TV, Miami, Florida, and for five other television stations. The renewal applications for the other eighteen television stations remain pending before the FCC. The pending renewal applications for the New York, Los Angeles and Hartford stations each contain a request for permanent waiver of the cross-ownership rule or, in the alternative, a waiver pending the outcome of the rulemaking. Those requests were opposed in Los Angeles and Hartford. The date for oppositions in New York is May 1, 2007.

108

None of the cross-ownership waivers can be transferred under a transfer of control application. New waivers will be required in each of the five markets, including Chicago, which was otherwise grandfathered. Because there is a rulemaking proceeding pending in which, on remand from the United States Court of Appeals for the Third Circuit, the FCC is reviewing its ownership rules, including the cross-ownership rule, and because in that proceeding the FCC has previously adopted a rule which would have permitted each of the cross-ownerships, the parties will request waivers of the cross-ownership rule pending the outcome of that rulemaking proceeding. In connection with this pending rulemaking, we anticipate that certain parties may file petitions to deny or other objections with the FCC which will oppose the grant of cross-ownership waivers to us in connection with our transfer of control application. The FCC may also grant a cross-ownership waiver that could require us to come into compliance with the cross-ownership rule within a specified time period, which might require us to divest either our newspaper or broadcast assets in one or more of the five cross-ownership markets.

The FCC also generally will not act on a transfer of control application for a broadcast station when a license renewal application is pending for such station. While the FCC could accelerate the processing of the pending renewal applications and act upon them at the same time it acts on the transfer of control applications, in the event that it does not elect to do so, there is a possibility that these renewal applications could remain pending until after the FCC completes its current rulemaking process.

The "failing station waiver" permitting the common ownership of the two television stations in Hartford does not transfer. In order to obtain a new "failing station waiver," the parties will be required to show that WTXX is in financial distress, that it has poor viewership ratings, that it cannot be sold to an out of market buyer, and that the grant of the waiver would be in the public interest. The "satellite waiver" in the Indianapolis market, permitting the common ownership of WTTK and WTTV, similarly cannot be transferred but must be requested again by the parties. The Company has previously made the necessary showing to obtain the "satellite waiver" when it acquired these stations and currently believes that the parties will be able to make the necessary showing to obtain a new "satellite waiver."

Neither the Tender Offer nor the Merger is subject to the filing and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

## United States Federal Income Tax Consequences

*Circular 230.*    Any discussions of United States federal tax matters set forth in this Offer to Purchase and in the related Letter of Transmittal were written in connection with the promotion and marketing by the Company and

the Co-Dealer Managers of the Tender Offer. Such discussions were not intended or written to be legal or tax advice to any person and were not intended or written to be used, and they cannot be used, by any person for the purpose of avoiding any United States federal tax penalties that may be imposed on such person. Each holder should seek advice based on its particular circumstances from an independent tax advisor.

*Discussion.* The following describes material United States federal income tax consequences relevant to the Tender Offer for U.S. Holders (as defined below). This discussion is based upon the Internal Revenue Code of 1986, as amended (the "Code"), existing and proposed Treasury Regulations, administrative pronouncements and judicial decisions, changes to which could materially affect the tax consequences described herein and could be made on a retroactive basis.

This discussion deals only with shares held as capital assets and does not deal with all tax consequences that may be relevant to all categories of holders (such as dealers in securities or commodities, traders in securities that elect to mark their holdings to market, financial institutions, regulated investment companies, real estate investment trusts, holders whose functional currency is not

109

the United States dollar, insurance companies, tax-exempt organizations or persons who hold shares as part of a hedging, integrated, conversion or constructive sale transaction or as a position in a straddle). In particular, different rules may apply to shares acquired as compensation (including shares acquired upon the exercise of employee stock options or otherwise as compensation). This discussion does not address the state, local or foreign tax consequences of participating in the Tender Offer. Holders of shares should consult their tax advisors as to the particular consequences to them of participation in the Tender Offer.

As used herein, a "U.S. Holder" means a beneficial holder of shares that is for United States federal income tax purposes: (a) an individual citizen or resident of the United States, (b) a corporation or a partnership created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (c) an estate the income of which is subject to United States federal income taxation regardless of its source, or (d) a trust if a court within the United States can exercise primary supervision of the trust's administration and one or more United States persons have the authority to control all substantial decisions of the trust.

Holders of shares that are not U.S. Holders ("foreign stockholders") should consult their tax advisors regarding the United States federal income tax consequences and any applicable foreign tax consequences of the Tender Offer and also should see "The Tender Offer—Procedures for Tendering Shares" for a discussion of the applicable United States withholding rules and the potential for obtaining a refund of all or a portion of any tax withheld.

If a partnership holds shares, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. Holders that are partners of a partnership holding shares should consult their own tax advisors.

*Non-Participation in the Tender Offer.* U.S. Holders that do not participate in the Tender Offer will not incur any tax liability as a result of the consummation of the Tender Offer.

*Exchange of Shares Pursuant to the Tender Offer.* An exchange of shares for cash pursuant to the Tender Offer will be a taxable transaction for United States federal income tax purposes. A U.S. Holder that participates in the Tender Offer will be treated, depending on such U.S. Holder's particular circumstances, either as recognizing gain or loss from the disposition of the shares or as receiving a dividend distribution from us.

Under Section 302 of the Code, a U.S. Holder will recognize gain or loss on an exchange of shares for cash if the exchange (a) results in a "complete termination" of all such U.S. Holder's equity interest in us, (b) results in a "substantially disproportionate" redemption with respect to such U.S. Holder, or (c) is "not essentially equivalent to a dividend" with respect to the U.S. Holder. In applying the Section 302 tests, a U.S. Holder must take into account stock that such U.S. Holder constructively owns under attribution rules, pursuant to which the U.S. Holder will be treated as owning our shares owned by certain family members (except that in the case of a "complete termination," a U.S. Holder may waive, under certain circumstances, attribution from family members) and related entities and our stock that the U.S. Holder has the right to acquire by exercise of an option. An exchange of shares for cash will be a substantially disproportionate redemption with respect to a U.S. Holder if the percentage of the then-outstanding shares owned by such U.S. Holder in us immediately after the exchange is less than 80% of the percentage of the shares owned by such U.S. Holder in us immediately before the exchange. If an exchange of shares for cash fails to satisfy the "substantially disproportionate" test, the U.S. Holder nonetheless may satisfy the "not essentially equivalent to a dividend" test. An exchange of shares for cash will satisfy the "not essentially equivalent to a dividend" test if it results in a "meaningful reduction" of the U.S. Holder's equity interest in us. An exchange of shares for cash that results in a reduction of the proportionate equity interest in us of a U.S. Holder

whose relative equity interest in us is minimal (an interest of less than 1% should satisfy this requirement) and that does not exercise any control over or participate in the management of our corporate affairs should be treated

110

as "not essentially equivalent to a dividend." U.S. Holders should consult their tax advisors regarding the application of the rules of Section 302 in their particular circumstances.

If a U.S. Holder is treated as recognizing gain or loss from the disposition of the shares for cash, such gain or loss will be equal to the difference between the amount of cash received and such U.S. Holder's adjusted tax basis in the shares exchanged therefor. Any such gain or loss will be capital gain or loss and will be long-term capital gain or loss if the holding period of the shares exceeds one year as of the date of the exchange.

If a U.S. Holder is not treated under the Section 302 tests as recognizing gain or loss on an exchange of shares for cash, the entire amount of cash received by such U.S. Holder pursuant to the exchange will be treated as a dividend to the extent of the portion of our current and accumulated earnings and profits allocable to such shares. Provided certain holding period requirements are satisfied, non-corporate holders generally will be subject to United States federal income tax at a maximum rate of 15% on amounts treated as dividends, i.e., the entire amount of cash received without reduction for the tax basis of the shares exchanged. To the extent that cash received in exchange for shares is treated as a dividend to a corporate U.S. Holder, (1) it will be eligible for a dividends-received deduction (subject to applicable limitations) and (2) it will be subject to the "extraordinary dividend" provisions of the Code. Corporate U.S. Holders should consult their tax advisors concerning the availability of the dividends-received deduction and the application of the "extraordinary dividend" provisions of the Code in their particular circumstances.

To the extent that amounts received pursuant to the Tender Offer exceed a U.S. Holder's allocable share of our current and accumulated earnings and profits, the distribution will first be treated as a non-taxable return of capital, causing a reduction in the adjusted tax basis of such U.S. Holder's shares, and any amounts in excess of the U.S. Holder's adjusted tax basis will constitute capital gain. Any remaining adjusted tax basis in the shares tendered will be transferred to any remaining shares held by such U.S. Holder.

We cannot predict whether or the extent to which the Tender Offer will be oversubscribed. If the Tender Offer is oversubscribed, proration of tenders pursuant to the Tender Offer will cause us to accept fewer shares than are tendered. Therefore, a U.S. Holder can be given no assurance that a sufficient number of such U.S. Holder's shares will be purchased pursuant to the Tender Offer to ensure that such purchase will be treated as a sale or exchange, rather than as a dividend, for United States federal income tax purposes pursuant to the rules discussed above.

See "The Tender Offer—Procedures for Tendering Shares" with respect to the application of United States federal income tax withholding and backup withholding.

**Extension of the Tender Offer; Termination; Amendment**

We expressly reserve the right, in our sole discretion, at any time and from time to time, and regardless of whether or not any of the events set forth in "The Tender Offer—Conditions of the Tender Offer" shall have occurred or shall be deemed by us to have occurred, to extend the period of time during which the Tender Offer is open and thereby delay acceptance for payment of, and payment for, any shares by giving oral or written notice of such extension to the Depositary and making a public announcement of such extension. We also expressly reserve the right, in our sole discretion, if any event set forth in "The Tender Offer—Conditions of the Tender Offer" has not occurred or has occurred or is deemed by us to have occurred, to terminate the Tender Offer and reject for payment and not pay for any shares not theretofore accepted for payment or paid for or, subject to applicable law, to postpone payment for shares by giving oral or written notice of such termination or postponement to the Depositary and making a public announcement of such termination or postponement. Our reservation of the right to delay payment for shares which we have accepted for payment is limited by Rule 13e-4(f)(5) promulgated under the Exchange Act, which requires that we must pay the consideration offered or return the shares tendered promptly after termination or withdrawal of a

111

tender offer. Subject to compliance with applicable law, we further reserve the right, in our sole discretion, and regardless of whether any of the events set forth in "The Tender Offer—Conditions of the Tender Offer" shall have occurred or shall be deemed by us to have occurred, to amend the Tender Offer in any respect, including, without limitation, by decreasing or increasing the consideration offered in the Tender Offer to holders of shares or by decreasing or increasing the number of shares being sought in the Tender Offer. Amendments to the Tender Offer

may be made at any time and from time to time effected by public announcement, such announcement, in the case of an extension, to be issued no later than 9:00 a.m., New York City time, on the next business day after the last previously scheduled or announced Expiration Time. Any public announcement made in the Tender Offer will be disseminated promptly to stockholders in a manner reasonably designed to inform stockholders of such change. Without limiting the manner in which we may choose to make a public announcement, except as required by applicable law, we shall have no obligation to publish, advertise or otherwise communicate any such public announcement other than by making a release through PR Newswire or another comparable service. In addition, we would file such press release as an exhibit to the Schedule TO.

If we materially change the terms of the Tender Offer or the information concerning the Tender Offer, we will extend the Tender Offer to the extent required by Rules 13e-4(d)(2), 13e-4(e)(3) and 13e-4(f)(1) promulgated under the Exchange Act. These rules and certain related releases and interpretations of the Commission provide that the minimum period during which a tender offer must remain open following material changes in the terms of the Tender Offer or information concerning the Tender Offer (other than a change in price or a change in percentage of securities sought) will depend on the facts and circumstances, including the relative materiality of such terms or information; however, in no event will the Tender Offer remain open for fewer than five business days following such a material change in the terms of, or information concerning, the Tender Offer. If (1)(A) we increase or decrease the price to be paid for shares, (B) decrease the number of shares being sought in the Tender Offer, or (C) increase the number of shares being sought in the Tender Offer by more than 2% of our outstanding shares (or six million shares) and (2) the Tender Offer is scheduled to expire at any time earlier than the expiration of a period ending on the tenth business day from, and including, the date that such notice of an increase or decrease is first published, sent or given to stockholders in the manner specified in this "The Tender Offer—Extension of the Tender Offer; Termination; Amendment," the Tender Offer will be extended until the expiration of such period of ten business days.

### Fees and Expenses

As set forth under "Special Factors—Background of the Transactions," the Company retained Merrill Lynch and Citi to act as the Company's co-financial advisors and the Special Committee retained Morgan Stanley to act as its financial advisor. In addition, affiliates of Merrill Lynch and Citi will provide a portion of the financing for the Tender Offer and the Merger, subject to specified conditions. The fees payable to Morgan Stanley for its advisory services and to Merrill Lynch for its advisory and financing services are described under "Special Factors—Opinion of the Special Committee's Financial Advisor" and "Special Factors—Opinion of the Company's Financial Advisor," respectively. Total advisory and financing fees payable to Citi (before syndication costs, capital allocation costs and financing credits) aggregate approximately $68.9 million, of which approximately $35.8 million are contingent on the Merger closing and approximately $33.1 million relate to financing the Tender Offer.

We have retained Merrill Lynch, Citi, JPMorgan and BAS to act as the Co-Dealer Managers in connection with the Tender Offer. The Co-Dealer Managers may contact brokers, dealers and similar entities and may provide information regarding the Tender Offer to those that it contacts or persons that contact it. The Co-Dealer Managers will receive reasonable and customary compensation. We also have agreed to reimburse the Co-Dealer Managers for reasonable out-of-pocket expenses incurred in

112

connection with the Tender Offer, including reasonable fees and expenses of counsel, and to indemnify the Co-Dealer Managers against certain liabilities in connection with the Tender Offer, including certain liabilities under the federal securities laws.

The Co-Dealer Managers and their affiliates have provided, and may in the future provide, various investment banking and other services to us for which future services we would expect they would receive customary compensation from us. In the ordinary course of business, including in their trading and brokerage operations and in a fiduciary capacity, the Co-Dealer Managers and their affiliates may hold positions, both long and short, for their own accounts and for those of their customers, in our securities.

Merrill Lynch & Co., Citigroup Global Markets Inc., J.P. Morgan Securities Inc. and Banc of America Securities LLC and their affiliates have undertaken to provide financing for the Tender Offer subject to the terms and conditions of the Credit Facilities Commitment Letter described in "The Tender Offer—Source and Amount of Funds" hereof, and will receive customary fees in connection therewith.

We have retained Innisfree M&A Incorporated to act as Information Agent and Computershare Trust Company, N.A. to act as Depositary in connection with the Tender Offer. The Information Agent may contact

holders of shares by mail, facsimile and personal interviews and may request brokers, dealers and other nominee stockholders to forward materials relating to the Tender Offer to beneficial owners. The Information Agent and the Depositary will each receive reasonable and customary compensation for their respective services, will be reimbursed by us for reasonable out-of-pocket expenses and will be indemnified against certain liabilities in connection with the Tender Offer, including certain liabilities under the federal securities laws.

We will not pay any fees or commissions to brokers, dealers or other persons (other than fees to the Co-Dealer Managers and the Information Agent as described above) for soliciting tenders of shares in the Tender Offer. We recommend that stockholders holding shares through brokers or banks consult the brokers or banks to determine whether transaction costs may apply if stockholders tender shares through the brokers or banks and not directly to the Depositary. We will, however, upon request, reimburse brokers, dealers and commercial banks for customary mailing and handling expenses incurred by them in forwarding the Tender Offer and related materials to the beneficial owners of shares held by them as a nominee or in a fiduciary capacity. No broker, dealer, commercial bank or trust company has been authorized to act as our agent or the agent of the Co-Dealer Manager, the Information Agent or the Depositary for purposes of the Tender Offer. We will pay or cause to be paid all stock transfer taxes, if any, on our purchase of shares, except as otherwise provided in Instruction 7 in the Letter of Transmittal.

**Miscellaneous**

Pursuant to Rule 13e-4(c)(2) and Rule 13e-3(d) under the Exchange Act, we have filed a Tender Offer Statement and Rule 13E-3 Transaction Statement under cover of Schedule TO with the SEC, which contain additional information with respect to the Tender Offer. These materials, including the exhibits and any amendments and supplements thereto, may be examined, and copies may be obtained, at the same places and in the same manner as is set forth in "The Tender Offer—Information About Tribune Company" with respect to information concerning us.

Under the Merger Agreement and the Securities Purchase Agreement with the Zell Entity, we are not permitted to repurchase shares before we close the Merger, other than the shares we are offering to purchase in the Tender Offer, without the consent of the ESOP and the Zell Entity. In addition, Rule 13e-4(f) under the Exchange Act prohibits us from purchasing any shares other than in the Tender Offer until at least ten business days after the Expiration Time. We have no plans to purchase any such additional shares other than pursuant to the Tender Offer.

113

---

This Offer to Purchase and Letter of Transmittal do not constitute an offer to purchase securities in any jurisdiction in which such offer is not permitted or would not be permitted. If we become aware of any jurisdiction where the making of the Tender Offer or the acceptance of shares pursuant thereto is not in compliance with applicable law, we will make a good faith effort to comply with the applicable law where practicable. If, after such good faith effort, we cannot comply with the applicable law, the Tender Offer will not be made to (nor will tenders be accepted from or on behalf of) the holders of shares in such jurisdiction.

You should only rely on the information contained in this Offer to Purchase or to which we have referred to you. We have not authorized any person to make any recommendation on behalf of us as to whether you should tender or refrain from tendering your shares in the Tender Offer. We have not authorized any person to give any information or to make any representation in connection with the Tender Offer other than those contained in this Offer to the Purchase or in the Letter of Transmittal. If given or made, any recommendation or any such information or representation must not be relied upon as having been authorized by us, the Co-Dealer Managers, the Depositary or the Information Agent.

Tribune Company
April 25, 2007

114

---

The Letter of Transmittal, certificates for shares and any other required documents should be sent or delivered by each stockholder of the Company or his or her bank, broker, dealer, trust company or other nominee to the Depositary as follows:

*The Depositary for the Tender Offer is:*
Computershare Trust Company, N.A.

*By Mail:*                                    *By Hand or Overnight Courier:*

Computershare Trust Company, N.A.            Computershare Trust Company, N.A.

Attention: Corporate Actions                     Attention: Corporate Actions
P.O. Box 859208                                  161 Bay State Drive
Braintree, MA 02185-9208                         Braintree, MA 02184

**Delivery of the letter of transmittal to an address other than as set forth above will not constitute a valid delivery to the Depositary.**

Questions and requests for assistance may be directed to the Information Agent, or to the Co-Dealer Managers, at their addresses and telephone numbers set forth below. Requests for additional copies of this Offer to Purchase, the related Letter of Transmittal or the Notice of Guaranteed Delivery should be directed to the Information Agent.

*The Information Agent for the Tender Offer is:*

**Innisfree M&A Incorporated**

501 Madison Avenue
New York, NY 10022
Stockholders Call Toll-free: (877) 825-8621
Banks and Brokerage Firms Call Collect: (212) 750-5833

*The Co-Dealer Managers for the Tender Offer are:*

Merrill Lynch & Co.                              Citigroup Global Markets Inc.
**Special Equity Transactions**                  **Special Equity Transactions Group**
**4 World Financial Center**                     **390 Greenwich Street, 5th Floor**
**New York, NY 10080**                           **New York, NY 10013**
**(609) 818-8000 (collect)**                     **(212) 723-7838 (collect)**
**(877) 653-2948 (toll free)**                   **(877) 531-8365 (toll free)**


J.P. Morgan Securities Inc.                      Banc of America Securities LLC
**Special Equities Group**                       **9 West 57th Street**
**277 Park Avenue, 9th Floor**                 **New York, NY 10019**
**New York, NY 10172**                           **Tel: (212) 583-8426**
**(212) 622-2922 (collect)**                     **Toll Free: (888) 583-8900 ext. 8426**
**(877) 371-5947 (toll free)**

---

QuickLinks

Exhibit (a)(1)(A)
Offer to Purchase for Cash Up to 126,000,000 Shares of Its Common Stock (including the Associated Preferred Share Purchase Rights) for a Purchase Price of $34.00 Net Per Share
IMPORTANT
TABLE OF CONTENTS
SUMMARY TERM SHEET
What is the purpose of the Tender Offer?
What are the Leveraged ESOP Transactions?
Why is the Company engaging in the Leveraged ESOP Transactions?
Has the Company or the Board adopted a position on the Tender Offer?
Is this the first step in a going-private transaction?
Who is offering to purchase my shares?
What will the purchase price for the shares be and what will be the form of payment?
How was the $34.00 per share purchase price arrived at?
How many shares is the Company offering to purchase in the Tender Offer?
What are the "associated preferred share purchase rights"?
How will the Company pay for the shares?
How long do I have to tender my shares; can the Tender Offer be extended, amended or terminated?
How will I be notified if the Company extends the Tender Offer or amends the terms of the Tender Offer?
Following the Tender Offer, will the Company continue as a public company?
Are there conditions to the Tender Offer?
How do I tender my shares?
How do participants in our Retirement Plans participate in the Tender Offer?

How do participants in our Employee Stock Purchase Plan participate in the Tender Offer?
How do holders of vested stock options participate in the Tender Offer?
What happens if more than 126,000,000 shares are tendered?
If I own fewer than 100 shares and I tender all of my shares, will I be subject to proration?
Once I have tendered shares in the Tender Offer, can I withdraw my tender?
How do I withdraw shares I previously tendered?
Do the directors and executive officers of the Company intend to tender their shares in the Tender Offer?
If I decide not to tender, how will the Tender Offer affect my shares?
What is the recent market price of my shares?
Will the Tender Offer affect the Company's credit ratings?
When will the Company pay for the shares I tender?
Will I have to pay brokerage commissions if I tender my shares?
What are the United States federal income tax consequences if I tender my shares?
Will I have to pay stock transfer tax if I tender my shares?
Does the Company intend to repurchase any shares other than pursuant to the Tender Offer during or after the Tender Offer?
To whom can I talk if I have questions?
CAUTIONARY NOTE ON FORWARD-LOOKING STATEMENTS
INTRODUCTION
SPECIAL FACTORS
    Background of the Transactions
    Reasons for and Fairness of the Transactions; Recommendations of the Special Committee and the Board
    Reports of the Special Committee's Financial Advisor
    Reports of the Company's Financial Advisors
    Opinion of the Special Committee's Financial Advisor
    Opinion of the Company's Financial Advisor
    Position of the ESOP as to Fairness
    Certain Effects of the Transactions
    Interest of Directors and Executive Officers
    United States Federal Income Tax Consequences
    The Merger Agreement
    The Securities Purchase Agreements
    Other Transaction Agreements
    Financing Commitments
THE TENDER OFFER
Terms of the Tender Offer
Procedures for Tendering Shares
Withdrawal Rights
Purchase of Shares and Payment of Purchase Price
Conditional Tender of Shares
Conditions of the Tender Offer
Price Range of the Shares/Dividends
Source and Amount of Funds
Certain Financial Information
Pro Forma Condensed Consolidated Statement of Income (Unaudited)
Pro Forma Condensed Consolidated Balance Sheet (Unaudited)
    Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements
    Certain Projections
TRIBUNE COMPANY SUMMARY CONSOLIDATED INCOME STATEMENT(a) ($ in millions)
    Information About Tribune Company
    Information About the ESOP
    Interest of Directors and Executive Officers; Transactions and Arrangements Concerning the Shares
    Effects of the Tender Offer on the Market for Shares; Registration under the Exchange Act
    Legal Matters; Regulatory Approvals
    United States Federal Income Tax Consequences
    Extension of the Tender Offer; Termination; Amendment

Fees and Expenses
Miscellaneous

Exhibit 4

SC TO-I/A 1 a2178040zscto-ia.htm SC TO-I/A
QuickLinks -- Click here to rapidly navigate through this document

---

**United States**
**Securities and Exchange Commission**
Washington, D.C. 20549

# SCHEDULE TO

(Amendment No. 6)

Tender Offer Statement Under Section 14(d)(1) or 13(e)(1)
of the Securities Exchange Act of 1934

## TRIBUNE COMPANY
*(Name of Subject Company (Issuer))*

## TRIBUNE COMPANY
*(Name of Filing Person (Offeror and Issuer))*

Common Stock, Par Value $0.01 Per Share
(including the associated Preferred Share Purchase Rights)
*(Title of Class of Securities)*

896047 10 7
*(CUSIP Number of Class of Securities)*

# SCHEDULE 13E-3

Rule 13e-3 Transaction Statement
Under Section 13(e) of the Securities Exchange Act of 1934

Tribune Company
Samuel Zell
EGI-TRB, L.L.C.
Sam Investment Trust
Tribune Employee Stock Ownership Plan
Tesop Corporation
*(Name of Person(s) Filing Statement)*

Common Stock, Par Value $0.01 Per Share
(including the associated Preferred Share Purchase Rights)
*(Title of Class of Securities)*

896047 10 7
*(CUSIP Number of Class of Securities)*

---

| Tribune Company | Samuel Zell | EGI-TRB, L.L.C. | Sam Investment Trust | Tribune Employee Stock Ownership Plan | Tesop Corporation |
|---|---|---|---|---|---|
| 435 North Michigan Avenue Chicago, Illinois 60611 Attn: Crane Kenney (312) 222-9100 | Two North Riverside Plaza, Suite 600 Chicago, Illinois 60606 (312) 454-0100 | Two North Riverside Plaza, Suite 600 Chicago, Illinois 60606 Attn: Joseph M. Paolucci (312) 454-0100 | c/o Chai Trust Company, LLC Two North Riverside Plaza, Suite 600 Chicago, Illinois 60606 Attn: Joseph M. Paolucci (312) 454-0100 | c/o GreatBanc Trust Company 1301 West 22nd Street, Suite 800 Oak Brook, Illionois 60523 Attn: Marilyn H. Marchetti (630) 572-5130 | c/o GreatBanc Trust Company 1301 West 22nd Street, Suite 800 Oak Brook, Illinois 60523 Attn: Marilyn H. Marchetti (630) 572-5130 |

*(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications on Behalf of Person(s) Filing Statement)*

---

*Copies to:*

| Steven A. Rosenblum | Thomas A. Cole | Charles W. Mulaney, Jr. | Joseph P. Gromacki | Charles R. Smith |
|---|---|---|---|---|
| Wachtell, Lipton, Rosen & Katz 51 West 52nd Street New York, New York 10019 (212) 403-1000 | Larry A. Barden Sidley Austin LLP One South Dearborn Street Chicago, Illinois 60603 (312) 853-7000 | Richard C. Witzel, Jr. Skadden, Arps, Slate, Meagher & Flom, LLP 333 West Wacker Dr. Chicago, Illinois 60606 (312) 407-0700 | Jenner & Block LLP 330 N. Wabash Avenue Chicago, Illinois 60611 (312) 222-9350 | K&L Gates Henry W. Oliver Building 535 Smithfield Street Pittsburgh, PA 15222 (412) 355-6500 |

---

## CALCULATION OF FILING FEE

| Transaction Valuation* | Amount of Filing Fee** |
|---|---|
| $4,284,000,000 | $131,519 |

\*
Estimated for purposes of calculating the amount of the filing fee only, this amount is based on the purchase of 126,000,000 shares of common stock at a price of $34.00 per share.

\*\*
The amount of the filing fee, calculated in accordance with Rule 0-11 of the Securities Exchange Act of 1934, as amended, equals $30.70 per million of the value of the transaction.

☒  Check the box if any part of the filing fee is offset as provided by Rule 0-11(a)(2) and identify the filing with which the offsetting fee was previously paid. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

| Amount Previously Paid: $131,519.00 | Filing Party: Tribune Company |
|---|---|
| Form or Registration No.: Schedule TO | Date Filed: April 25, 2007 |

☐
Check the box if the filing relates solely to preliminary communications made before the commencement of a tender offer.

Check the appropriate boxes below to designate any transaction to which the statement relates:

☐
third party tender offer subject to Rule 14d-1.

☒
issuer tender offer subject to Rule 13e-4.

☒
going private transaction subject to Rule 13e-3.

☐
amendment to Schedule 13D under Rule 13d-2.

Check the following box if the filing is a final amendment reporting the results of the tender offer: ☐

---

## INTRODUCTION

This Amendment No. 6 (this "Amendment No. 6") filed under cover of Schedule TO and Schedule 13E-3 amends and supplements Amendment No. 5 filed with the Securities and Exchange Commission (the "SEC") on May 11, 2007, Amendment No. 4 filed with the SEC on May 4, 2007, Amendment No. 3 filed with the SEC on May 1, 2007, Amendment No. 2 filed with the SEC on April 27, 2007, Amendment No. 1 filed with the SEC on April 26, 2007 and the Tender Offer Statement and Rule 13e-3 Transaction Statement under cover of a Schedule TO filed by Tribune Company, a Delaware corporation (the "Company"), on April 25, 2007 (as amended, the "Filing"), in connection with the Agreement and Plan of Merger, dated as of April 1, 2007 (the "Merger Agreement"), by and among the Company, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation wholly owned by the ESOP and, for limited purposes, EGI-TRB, L.L.C., a Delaware limited liability company wholly owned by a trust established for the benefit of Samuel Zell and his family. In connection with the Merger Agreement, the Company is offering to purchase up to 126,000,000 shares of its common stock, par value $0.01 per share, including the associated preferred share purchase rights issued under the Rights Agreement, dated as of December 12, 1997, as amended, between the Company and Computershare Trust Company, N.A. (as successor to First Chicago Trust Company of New York), as Rights Agent, at a price of $34.00 per share, net to the seller in cash, less any applicable withholding taxes and without interest, upon the terms and subject to the conditions set forth in the Offer to Purchase, dated April 25, 2007 (the "Offer to Purchase"), and in the related Letter of Transmittal (the "Letter of Transmittal," which, together with the Offer to Purchase, as amended or supplemented from time to time, constitute the "Tender Offer"), copies of which are attached to the Filing as Exhibits (a)(1)(A) and (a)(1)(B), respectively.

The information in the Tender Offer, including all schedules and annexes thereto, which were previously filed with the Filing, is hereby expressly incorporated by reference into this Amendment No. 6, except that such information is hereby amended and supplemented to the extent specifically provided herein.

## Item 4. *Terms of the Transaction.*

Item 4(a) of the Filing is hereby amended and supplemented by adding the following at the end thereof:

> As discussed in the Offer to Purchase under "The Tender Offer—Conditions of the Tender Offer," one of the conditions to the Tender Offer is the receipt of the necessary financing for the Tender Offer as contemplated by the First Step Commitment Letter, substantially on the terms contemplated thereby (the "Financing Condition"). In the event that the Financing Condition is satisfied less than five business days prior to the scheduled expiration date of the Tender Offer, the Tender Offer will be extended to ensure that at least five business days remain in the Tender Offer following the satisfaction of the Financing Condition.

## Item 5. *Past Contacts, Transactions, Negotiations and Agreements.*

Item 5(e) of the Filing is hereby amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "Special Factors—Background of the Transactions" by adding the following sentences after the first sentence of the fourth paragraph from the end thereof:

> Based on its review, and after consultation with its advisors, the Special Committee determined that the proposed ESOP transaction was a more attractive transaction than the proposed recapitalization and spin-off. In particular, the Special Committee noted that the proposed price for the ESOP transaction was at the high end of the valuation ranges presented for the recapitalization and spin-off transaction. See "Special Factors—Reports of the Special Committee's Financial Advisor" and "Special Factors—Reports of the Company's Financial Advisors." In addition, the Special Committee believed that the execution risk of the recapitalization and spin-off transaction was higher, given that the

2

---

> valuation ranges presented depended on the ability of the Company to meet the projections that the advisors had used in developing these valuation ranges.

Item 5(e) of the Filing is hereby further amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "Special Factors—Interest of Directors and Executive Officers" by adding the following new subsection therein and by incorporating such new subsection by reference in Item 5(e):

### Samuel Zell and the Zell Entity

The Zell Entity is wholly owned by Sam Investment Trust, a trust established for the benefit of Mr. Zell and his family. As more fully described elsewhere herein, the Zell Entity is party to certain of the agreements entered into in connection with the Leveraged ESOP Transactions and has an interest in the Leveraged ESOP Transactions. Mr. Zell was elected to the Company's board of directors on May 9, 2007.

Item 5(e) of the Filing is hereby further amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "The Tender Offer-Interest of Directors and Executive Officers" as described under Item 8 below.

### Item 6. *Purposes of the Transaction and Plans or Proposals.*

Item 6(a) of the Filing is hereby amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "Special Factors—Reasons for and Fairness of the Transactions; Recommendations of the Special Committee and the Board" by restating the subsection "The Special Committee" to read as follows:

> *The Special Committee.* In reaching its determination to recommend the Leveraged ESOP Transactions, including the Merger Agreement, the Merger, the Tender Offer and the other transactions contemplated by the Merger Agreement, the Special Committee, in consultation with its legal and financial advisors, and the Company's management and legal and financial advisors, considered the following material factors and benefits of the Leveraged ESOP Transactions, each of which the Special Committee believed supported its recommendation:
>
> •

recent and historical market prices for the shares of Company Common Stock and the fact that the value offered in the Leveraged ESOP Transactions was as high as any proposal received from any third party, and the consideration offered in the Tender Offer and the Merger of $34.00 per share represented a premium of approximately 5.9% to the closing price of Company Common Stock on March 30, 2007, the last trading day before the proposal was made public, approximately 12.5% to the average closing price of Company Common Stock for the 30 calendar day period ending on March 30, 2007 and approximately 9.5% to the average closing price for the 52 weeks ended March 30, 2007;

- the business, operations, properties and assets, financial condition (as described under "Certain Financial Information"), business strategy and prospects (including as described under "Certain Projections") of the Company (as well as the risks involved in achieving those prospects), the nature of the industry in which the Company competes, industry trends and economic and market conditions, both on a historical and on a prospective basis, including in particular

- the weakened demand for advertising in the newspaper industry;

- the proliferation of media sources and the increased competition with these sources;

- declines and potential declines in newspaper circulation and broadcasting audience as consumers migrate to other media alternatives;

- possible volatility in newsprint prices and cost of broadcast programming rights; and

- the uncertain status of the FCC's cross-ownership rules and other regulatory requirements.

- the fact that the Company had explored a variety of strategic alternatives over an extended period of time, the thoroughness of the process for exploring and reviewing these alternatives, and the Special Committee's view that the Leveraged ESOP Transactions were in the best interests of the Company and its unaffiliated stockholders compared to the alternatives considered;

- the Special Committee's belief that the values potentially offered by the recapitalization and spin-off plan were subject to a number of risks and uncertainties, and that there was no certainty as to the achievability of those values;

- the arm's-length negotiation of the transactions and related agreements, including the economic improvements to the transactions resulting from those negotiations;

- the fact that the transactions were structured to permit the Tender Offer as a means of purchasing a significant portion of the Company Common Stock on an accelerated timetable and without the requirement of satisfying

3

the regulatory requirements necessary for the Merger, and the increased consideration to be paid in the Merger, in the form of the 8% annualized "ticking fee," in the event the Merger does not close by January 1, 2008;

- the fact that the Zell Entity would be making an initial investment of $250 million in the Company, which investment was not conditional on the closing of the Merger;

- the conditions to the Merger Agreement, which the Special Committee viewed as providing a reasonable level of assurance that the Merger could be completed;

- the other terms of the Merger Agreement, including the fact that the Merger Agreement does not preclude unsolicited offers from other parties, subject to specified conditions, and permits the Company to terminate the Merger Agreement to accept a superior proposal through the date of meeting of the Company's stockholders to consider the Merger, subject to payment by the Company of a $25 million termination fee;

- the availability of financing commitments for the Tender Offer and the Merger, and the agreement by Zell and the Zell Entity to pay a $25 million termination fee to the Company if financing is not obtained for any reason other than a breach by the Company or the ESOP;

- the favorable tax treatment available to the Company following the Merger upon its election to become an S-corporation for federal income tax purposes, the proposed elimination of the Company's 401(k) cash contributions following creation of the ESOP, and the ability to support increased levels of borrowing by the Company as a result of this favorable tax treatment and these savings in order to permit the acquisition of all the shares at $34.00 per share;

- the analysis and written opinion of Morgan Stanley to the effect that, as of April 1, 2007, and based upon the factors and subject to the assumptions set forth in its written opinion, the Merger Consideration to be received by the holders of Company Common Stock (other than certain affiliated entities) was fair from a financial point of view to such shareholders, as more fully described below under "Special Factors—Opinion of the Special Committee's Financial Advisor";

- the analysis and written opinion of Merrill Lynch to the effect that, as of April 1, 2007, and based upon the factors and subject to the assumptions set forth in its written opinion, the Merger Consideration to be received by the holders of Company Common Stock (other than certain affiliated entities) was fair from a financial point of view to such shareholders, as more fully described below under "Special Factors—Opinion of the Company's Financial Advisor";

- the prices paid by the Company in other purchases of Company Common Stock and the fact that the consideration offered in the Tender Offer and the Merger of $34.00 per share exceeded the highest price paid per share for purchases of Company Common Stock by the Company during 2006, including the $32.50 per share that the Company paid to purchase shares of Company Common Stock in the June 2006 modified "dutch-auction" tender offer; and

-

the fact that a vote of stockholders on the Merger is required under Delaware law, and that stockholders who do not tender their shares into the Tender Offer and who do not vote in favor of the Merger will have the right to dissent from the Merger and to demand appraisal of the fair value of their shares under Delaware law.

The Special Committee also took into consideration a variety of risks and other potentially negative factors concerning the Leveraged ESOP Transactions, including the following:

- the risk that the conditions to the Merger will not be met, including the conditions requiring receipt of FCC approval, the receipt of financing and receipt of a solvency opinion, and the potential adverse impact on the Company if the Merger does not close, including the diversion of management and employee attention, potential employee attrition and the effect on business and customer relationships;

- the fact that the Company's stockholders who tender their shares (or whose shares are converted into cash in the Merger) will not participate in any future earnings or growth of the Company and will not benefit from any appreciation in the value of the Company or from any increased consideration available in connection with a superior proposal accepted by the Company should such a proposal be presented after the consummation of the Tender Offer;

- the Merger Agreement's limitations on the Company's ability to solicit other offers;

- the fact that the all-cash consideration in the transactions will be taxable to the Company's stockholders that are U.S. persons for U.S. federal income tax purposes; and

4

- the fact that the Zell Entity is a newly formed limited liability company with essentially no assets and, accordingly, that the Company's remedy in connection with a breach of the Merger Agreement by the Zell Entity, even a breach that is deliberate or willful, may be limited to a $25 million termination fee.

In considering various analyses related to the "going concern value" of the Company, the Special Committee relied on the analyses undertaken by Morgan Stanley and Merrill Lynch described below under "Special Factors—Opinion of the Special Committee's Financial Advisor" and "Special Factors—Opinion of the Company's Financial Advisor." In relying on such analyses, the Special Committee adopted (for purposes of this discussion) such analyses as appearing reasonable. The members of the Special Committee did not consider the liquidation value of the Company because they considered the Company to be a viable, going concern and therefore did not consider liquidation value to be a relevant methodology. Merrill Lynch's analysis referred to above did, however, include an analysis of implied per share valuations of the Company on an after-tax basis assuming the sale of the B&E Group followed by a sale of the Company's publishing business. Further, the members of the Special Committee did not consider net book value, which is an accounting concept, as a factor because they believed that net book value is not a material indicator of the value of the Company as a going concern but rather is indicative of historical costs.

The foregoing discussion summarizes the material factors considered by the Special Committee in its consideration of the Leveraged ESOP Transactions, including the Merger and the Tender Offer. After considering these factors, the Special Committee concluded that the positive factors relating to the Merger Agreement and the Tender Offer and the other Leveraged ESOP Transactions substantially outweighed the potential negative factors. In view of the wide variety of factors considered by the Special Committee, and the complexity of these matters, the Special Committee did not find it practicable to quantify or otherwise assign relative weights to the foregoing factors. In addition, individual members of the Special Committee may have assigned different weights to various factors. The Special Committee approved and recommended the Leveraged ESOP Transactions, including the Merger Agreement and the Tender Offer, based upon the totality of the information presented to and considered by it.

Item 6(a) of the Filing is hereby further amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "Special Factors—Reasons for and Fairness of the Transactions; Recommendations of the Special Committee and the Board" by adding the following paragraph before the second to last paragraph in the subsection "The Board":

In considering various analyses related to the "going concern value" of the Company, the Board relied on the analyses undertaken by Morgan Stanley and Merrill Lynch described below under "Special Factors—Opinion of the Special Committee's Financial Advisor" and "Special Factors—Opinion of the Company's Financial Advisor." In relying on such analyses, the Board adopted (for purposes of this discussion) such analyses as appearing reasonable. The Board did not consider the liquidation value of the Company because it considered the Company to be a viable, going concern and therefore did not consider liquidation value to be a relevant methodology. Merrill Lynch's analysis referred to above did, however, include an analysis of implied per share valuations of the Company on an after-tax basis assuming the sale of the B&E Group followed by a sale of the Company's publishing business. Further, the members of the Board did not consider net book value, which is an accounting concept, as a factor because they believed that net book value is not a material indicator of the value of the Company as a going concern but rather is indicative of historical costs.

**Item 8. _Interest in Securities of the Subject Company_.**

Items 8(a) and (b) of the Filing are hereby amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "The Tender Offer—Interest of Directors and Executive Officers; Transactions and Arrangements Concerning the Shares" by adding the following disclosure therein and by incorporating such new subsection by reference in Item 5(e):

Samuel Zell was elected to the Company's board of directors on May 9, 2007. As of May 14, 2007, Mr. Zell beneficially owned 2,278 shares of Company Common Stock, which Mr. Zell acquired from the Company on May 9, 2007. In addition, the Zell Entity is the beneficial owner of 1,470,588 shares of Company Common Stock and a promissory note made by the Company which is exchangeable into 5,882,352 shares of Company Common Stock (subject to certain adjustments), although such exchange is not in the control of the Zell Entity. Sam Investment Trust ("SIT"), the sole member of the Zell Entity, is an irrevocable trust established for the benefit of Mr. Zell and his family. Chai Trust Company, LLC ("Chai Trust"), the trustee of SIT, has investment control with respect to SIT. Mr. Zell is not a managing director or officer of Chai

5

Trust, and does not otherwise exercise investment control with respect to SIT or the Zell Entity. As such, the amount of shares indicated as beneficially owned by Mr. Zell in this

paragraph does not include the securities of the Company beneficially owned by the Zell Entity.

**Item 11. *Additional Information.***

Item 11(b) of the Filing is hereby amended and supplemented by adding the following at the end thereof:

The Company currently expects that the Merger will close by the end of 2007, subject to the satisfaction of the conditions to the Merger.

**Item 12. *Exhibits.***

Item 12 of the Filing is hereby amended and supplemented by adding the following exhibit:

(a)(5)(K)    Tender Offer Employee Questions and Answers, made available May 16, 2007.

6

---

**Item 13. *Additional Information Required by Schedule 13E-3.***

**Schedule 13E-3, Item 3. Identity and Background of Filing Person.**

Item 13, Schedule 13E-3, Item 3, of the Filing is hereby amended and supplemented by adding a new Item 3(a):

(a)
The Company, the ESOP, Merger Sub, Samuel Zell, the Zell Entity and Sam Investment Trust are filing persons.

The Company's address is 435 North Michigan Avenue, Chicago, Illinois 60611 and its telephone number is (312) 222-9100.

The ESOP's address is c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 702, Oak Brook, Illinois 60523 and its telephone number is (530) 572-5121 or (630) 572-5120. Merger Sub's address is c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523 and its telephone number is (630) 572-5130.

The address of each of Mr. Zell and the Zell Entity is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606 and the telephone number of each is (312) 454-0100. The address of Sam Investment Trust is c/o Chai Trust Company, LLC, Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606 and its telephone number is (312) 454-0100.

Item 13, Schedule 13E-3, Item 3(b), of the Filing is hereby amended and supplementing the information set forth in the Offer to Purchase under "The Tender Offer" by adding the following new subsections after the subsection entitled "Information About the ESOP" and by incorporating such new subsections by reference in Item 13, Schedule 13E-3, Item 3(b):

**Information About Merger Sub**

0249

Tesop Corporation is a Delaware corporation wholly owned by the ESOP with its principal executive offices at c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523. Merger Sub's telephone number is (630) 572-5130. Merger Sub was formed solely for purposes of entering into and consummating the Leveraged ESOP Transactions. Merger Sub has not conducted any activities to date other than activities incidental to its formation and in connection with the Leveraged ESOP Transactions.

### Information About the Zell Investors

The "Zell Investors" consist of Samuel Zell, the Zell Entity and Sam Investment Trust.

Mr. Zell is the President of the Zell Entity and is also President and Chairman of Equity Group Investments, L.L.C. ("EGI"). Mr. Zell also serves as the Chairman of the Board of Anixter International Inc.; Capital Trust, Inc.; Equity Lifestyle Properties, Inc.; Equity Residential; and Covanta Holding Corporation. Mr. Zell has been a Director of Tribune Company since May 2007, and served as Chairman of the Board of Equity Office Properties Trust until its sale in February 2007. Mr. Zell's address is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606. His telephone number is (312) 454-0100.

The Zell Entity is a Delaware limited liability company wholly owned by Sam Investment Trust, a trust established for the benefit of Mr. Zell and his family. Its address is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606. The Zell Entity's telephone number is (312) 454-0100. The Zell Entity was formed solely for purposes of entering into and consummating the Leveraged ESOP Transactions. The Zell Entity has not conducted any activities to date other than activities incidental to its formation and in connection with the Leveraged ESOP Transactions.

The Zell Entity's sole member is Sam Investment Trust, an Illinois trust established for the benefit of Mr. Zell and his family. The trustee of Sam Investment Trust is Chai Trust Company, LLC, an Illinois limited liability company ("Chai Trust"). Chai Trust's business address is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606. Its telephone number is (312) 454-0100.

EGI is a private corporate and real estate investment firm co-founded by Mr. Zell in 1968, and is owned by trusts established for the benefit of Mr. Zell and his family (but not Sam Investment Trust). Mr. Zell is the President and Chairman of EGI, which provides investment advisory services to Chai Trust. However, EGI does not have investment control over Chai Trust and the assets held by the trusts controlled by Chai Trust.

7

As such, EGI has no ownership or beneficial interest in either the Zell Entity or Sam Investment Trust, is not a party to any of the agreements entered into in connection with the Leveraged ESOP Transactions, and has no beneficial interest therein.

Item 13, Schedule 13E-3, Item 3(c), of the Filing is hereby amended and supplemented by amending and supplementing the information set forth in Schedule I to the Filing by adding the following new sections at the end thereof and incorporating Schedule I to the Filing by reference in Item 13, Schedule 13E-3, Item 3(c):

### Merger Sub

Tesop Corporation is a Delaware corporation wholly owned by the ESOP with its principal executive offices at c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523. Merger Sub's telephone number is (630) 572-5130. Merger Sub was formed solely for purposes of entering into and consummating the Leveraged ESOP Transactions. Merger Sub has not conducted any activities to date other than activities incidental to its formation and in connection with the Leveraged ESOP Transactions.

The names of each of the members of Merger Sub's board of directors and each of Merger Sub's executive officers and their business experience and principal positions held during the past five years are set forth below. The business address and telephone number of each of the below directors or executive officers is c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523; telephone number (630) 572-5130.

During the past five years, none of the persons described below or Merger Sub has been (i) convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or (ii) party to any judicial or administrative proceeding (except for matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining the person from future violations of, or prohibiting activities subject to, federal or state securities laws or a finding of any violation of federal or state securities laws. Each person identified below is a United States citizen.

### *Director*

*Michael Welgat.* President and Chief Executive Officer of GreatBanc Trust Company since 1989; President of U.S. Fiduciary Services, Inc., the parent holding company of GreatBanc Trust Company, and Executive Vice President of Pennant Management, Inc., a subsidiary of U.S. Fiduciary Services, Inc.

### *Executive Officers*

*Marilyn Marchetti.* President. Senior Vice President of GreatBanc Trust since 1999.

*Danielle Montesano.* Secretary/Treasurer. Senior Vice President of GreatBanc Trust since 2005 and associated with GreatBanc Trust since 1999, including formerly as Chief Compliance Officer, Secretary and General Counsel.

## The Zell Investors

EGI-TRB, L.L.C. is a Delaware limited liability company wholly owned by Sam Investment Trust, a trust established for the benefit of Zell and his family. Its address is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606. The Zell Entity's telephone number is (312) 454-0100. The Zell Entity was formed solely for purposes of entering into and consummating the Leveraged ESOP Transactions. The Zell Entity has not conducted any activities to date other than activities incidental to its formation and in connection with the Leveraged ESOP Transactions.

The Zell Entity has no board of directors or similar board of managers. The names of each of the Zell Entity's executive officers and their business experience and principal positions held during the past five years are set forth below. The business address and telephone number of each of the below executive officers of the Zell Entity is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606; telephone number (312) 454-0100.

### *Zell Entity Executive Officers*

*Samuel Zell.*    President. President and Chairman, Equity Group Investments, L.L.C. ("EGI"). Chairman of the Board of Anixter International Inc.; Capital Trust, Inc.; Equity Lifestyle Properties, Inc.;

8

Equity Residential; and Covanta Holding Corporation. Director of Tribune Company since May 2007. Chairman of the Board of Equity Office Properties Trust until its sale in February 2007.

*William C. Pate.* Vice President. Chief Investment Officer, EGI, since March 2006; Managing Director from July 2000 until March 2006. Director of Hanover Compressor Company since January 2007. Director of Covanta Holding Corporation since 1999, and Chairman of the Board from October 2004 until September 2005. Director of Adams Respiratory Therapeutics, Inc. from 2000 until April 2007. Director of Home Products International, Inc. from December 2004 to January 2006.

*Philip G. Tinkler.* Vice President. Chief Financial Officer and Chief Operating Officer, EGI; Vice President — Accounting from December 2002 until March 2006. President and Chief Executive Officer, First Capital Financial, L.L.C., since March 2006; served in other capacities since 2001. Chief Financial Officer, Covanta Holding Corporation, from January 2003 until October 2004. Director of Home Products International, Inc. since January 2006.

The Zell Entity's sole member is Sam Investment Trust, an Illinois trust established for the benefit of Zell and his family. The trustee of Sam Investment Trust is Chai Trust Company, LLC, an Illinois limited liability company ("Chai Trust"). The names of each of Chai Trust's officers and managing directors and their business experience and principal positions held during the past five years are set forth below. Except as set forth below, the business address and telephone number of Chai Trust and each of the below officers and managing directors of Chai Trust is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606; telephone number (312) 454-0100.

### Chai Trust Executive Officers

*Donald J. Liebentritt.* President. Senior Advisor, EGI, since January 2006; President from 2000 until 2005. Chief Executive Officer and President, First Capital Financial, L.L.C., from December 2002 until March 2006. Director, Adams Respiratory Therapeutics, Inc. since February 2005. Director, Rewards Network Inc. since 2005. Director, Home Products International, Inc., from December 2004 until March 2007.

*Robert M. Levin.* Senior Trust Officer. Partner, Levin & Schreder, Ltd., 120 North LaSalle Street, Suite 3800, Chicago, Illinois 60602; 312-332-6300.

*James Bunegar.* Vice President, Chief Financial Officer, Assistant Trust Officer and Treasurer. Vice President — Taxes, EGI.

### Chai Trust Managing Directors

*Donald J. Liebentritt.* Senior Advisor, EGI since January 2006; President from 2000 until 2005. Chief Executive Officer and President, First Capital Financial, L.L.C., from December 2002 until March 2006. Director, Adams Respiratory Therapeutics, Inc. since February 2005. Director,

Rewards Network Inc. since 2005. Director, Home Products International, Inc., from December 2004 until March 2007.

*Robert M. Levin.* Partner, Levin & Schreder, Ltd., 120 North LaSalle Street, Suite 3800, Chicago, Illinois 60602; 312-332-6300.

*Bert Cohen.* Private Investor, 5000-4A Estate Enighed, #65, St. John, VI 00830.

*Kellie Zell Harper.* Homemaker.

*Leah Zell Wanger.* Private Investor, 227 West Monroe Street, Chicago, Illinois 60603.

*JoAnn Zell Gillis.* Physician.

*Matthew Zell.* Managing Director, EGI. Director, Anixter International Inc. since 2001. Director of Desarrolladora Homex, S.A. de C.V. since 2004.

During the past five years, none of the Zell Investors nor, to any of the Zell Investors' knowledge, any of the Zell Entity's executive officers or any of Chai Trust's officers or managing directors has been (i) convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or (ii) party to any judicial or administrative proceeding (except for matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining the person from future violations of, or prohibiting activities subject to, federal or state securities laws or a finding of any violation of federal or state securities

9

laws. Mr. Zell and each other executive officer of the Zell Entity and each officer or managing director of Chai Trust is a United States citizen.

**Schedule 13E-3, Item 5. Past Contacts, Transactions, Negotiations and Agreements.**

Item 13, Schedule 13E-3, Items 5(a)-(c) of the Filing are hereby amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "Special Factors— Background of the Transactions" as described under Item 5 above.

**Schedule 13E-3, Item 6. Purposes of the Transaction and Plans or Proposals.**

Item 13, Schedule 13E-3, Item 6(a) of the Filing is hereby amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "Special Factors—Reasons for and Fairness of the Transactions; Recommendations of the Special Committee and the Board" as described under Item 6 above.

Item 13, Schedule 13E-3, Item 6(b) and (c), of the Filing is hereby amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "Special Factors" by adding the following new subsection after the subsection entitled "Certain Effects of the Transactions" and by incorporating such new subsection by reference in Item 13, Schedule 13E-3, Item 6(b) and (c):

**Zell Investor Plans for the Company after the Leveraged ESOP Transactions**

After the Leveraged ESOP Transactions, the Zell Investors anticipate that the Company's operations will be conducted substantially as they are currently being conducted, and that the Company will retain its core operating assets. With the exception of the proposed sale of the Chicago Cubs and the Company's interest in Comcast SportsNet Chicago, the Zell Investors have no present plans or proposals that relate to or would result in an extraordinary corporate transaction involving the Company's corporate structure, business or management, such as a merger, reorganization, liquidation, relocation of any material operations or sale or transfer of a material amount of assets. However, in conjunction with management, the Zell Investors will continue to evaluate the Company's entire asset portfolio, business and operations from time to time, and may propose or develop new plans and proposals which they consider to be in the best interests of the Company and its equityholders, including the disposition or acquisition of material assets, alliances, joint ventures and other forms of cooperation with third parties or other extraordinary transactions. In particular, to the extent the Zell Investors believe greater value can be realized through disposition, the Zell Investors may encourage the Company to pursue appropriate disposition transactions, as with the proposed sale of the Chicago Cubs and the Company's interest in Comcast SportsNet Chicago. After completion of the Leveraged ESOP Transactions, the Zell Entity intends to retain its interests in the Company, and has no current plans to retire or otherwise dispose of such interests.

**Schedule 13E-3, Item 7. Purposes, Alternatives, Reasons and Effects.**

Item 13, Schedule 13E-3, Items 7(a) and (c) of the Filing are hereby amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase by adding the following new section after the section entitled "Special Factors—Opinion of the Company's Financial Advisor" by incorporating such new section by reference into Item 13, Schedule 13E-3, Items 7(a) and (c):

### Purposes and Reasons of the ESOP and Merger Sub

For the ESOP and Merger Sub, the primary purpose for the Merger is to benefit from any future earnings and growth of the Company after shares of the Company cease to be publicly traded. The transaction structure will have the effect of the Company becoming a privately held company wholly owned by the ESOP.

### Purposes and Reasons of the Zell Investors

For Samuel Zell, the Zell Entity and Sam Investment Trust (which are collectively referred to as the "Zell Investors"), the purpose of the Leveraged ESOP Transactions, including the Tender Offer and the Merger, is to allow the Zell Entity to benefit from increases in value of the Company through the Zell Entity's ownership of the Warrant and to allow the Zell Entity to earn an interest return on the $225 million subordinated promissory note. The Zell Investors believe that the Company's future business prospects can be

10

improved through the active participation of Mr. Zell in the strategic direction and operations of the Company and through the Company's experienced management team.

The Zell Investors believe that it is best for the Company to operate as a privately held entity. As a privately held entity, the Company will have the flexibility to focus on continuing improvements to its business without the constraints, distractions and expenses associated with publicly held companies, especially in light of the fundamental changes occurring in publishing and in the

media industry generally. In addition, as an entity whose common stock is not publicly traded, the Company will be able to more easily make strategic decisions that may negatively affect short-term financial performance but that may, in the long run, increase the value of the Company because it is often difficult for a public company to make decisions that could negatively affect it in the short term when the result of those decisions is often a reduction in the per share price of the publicly traded equity securities of such company. As a result of the Company Common Stock being privately held, the Company will also enjoy certain additional efficiencies, such as a reduction of the time devoted by its management and certain other employees to compliance with certain SEC reporting requirements.

In addition, the Zell Investors expect that the Company will derive significant cost and tax savings from the favorable tax treatment available to the Company following the Leveraged ESOP Transactions upon the Company's election to become an S-corporation for federal income tax purposes and the proposed elimination of the Company's 401(k) cash contributions following the creation of the ESOP.

The Zell Investors' expectations are based upon publicly available information regarding the Company, their due diligence, investigation or knowledge of the Company, and the experience of the Zell Investors and their affiliates in investing in or managing companies generally. While the Zell Investors believe that there will be significant opportunities associated with the Zell Entity's investment in the Company, and that the value of its Warrant could become considerably greater than the original cost thereof, they realize that there also are substantial and significant risks that such opportunities may never be fully realized.

Item 13, Schedule 13E-3, Items 7(a)-(c) of the Filing are hereby further amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "Special Factors—Reasons for and Fairness of the Transactions; Recommendations of the Special Committee and the Board" as described under Item 6 above. Item 13, Schedule 13E-3, Items 7(b)-(c) of the Filing are hereby further amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "Special Factors—Background of the Transactions" as described under Item 5 above.

Item 13, Schedule 13E-3, Item 7(d), of the Filing is hereby amended and supplemented by amending and restating the information set forth in the Offer to Purchase under "Special Factors—Certain Effects of the Transactions—Certain Effects of the Merger" to read as follows and incorporating such new subsection by reference in Item 13, Schedule 13E-3, Item 7(d):

> *Certain Effects of the Merger.* If the conditions to the Merger are met and the Merger closes, the Company will become wholly owned by the ESOP, and all remaining shares, other than shares held by the ESOP and shares held by stockholders who validly exercise any dissenters' rights that may be available under Delaware law, will be converted into the right to receive $34.00 per share in cash. If the Merger does not close by January 1, 2008, stockholders will receive an additional 8% annualized "ticking fee," calculated from January 1, 2008 through the date of closing of the Merger. In the Merger, the Zell Entity will receive this Merger Consideration for the shares of Company Common Stock it owns and, to the extent not already repaid or converted, the Company will repay the exchangeable promissory note held by the Zell Entity immediately prior to the Merger. In the Merger, Zell will receive the Merger Consideration for the shares of Company Common Stock that he owns, which as of May 14, 2007 consisted solely of the 2,278 shares of Company Common Stock granted by the Company when he became a director on May 9, 2007. In the Merger, all of the shares of Company Common Stock held by the ESOP will be cancelled and the shares of Merger Sub (all of which are owned by the ESOP) will convert into an aggregate of 56,521,739 shares of common stock of the Company (all of which will be held by the ESOP).

> In addition, in the Merger, each outstanding Company stock option, each share of restricted Company Common Stock and each right of any kind to receive shares of Company Common Stock or benefits measured in whole or in part by the value of shares of Company Common Stock

granted under Company stock or benefit plans will become fully vested and cashed out as described below under "The Merger Agreement—Stock Options and Other Stock-Based Awards; Employee Benefits."

11

Immediately following the consummation of the Merger, the Zell Entity will purchase from the Company, for an aggregate purchase price of $315 million, a $225 million subordinated promissory note and the Warrant. The Warrant will entitle the Zell Entity to purchase 43,478,261 shares of Company Common Stock (subject to adjustment), which will represent approximately 40.3% of the economic equity interest in the Company immediately following the Merger (on a fully diluted basis, including after giving effect to share equivalents under a management equity incentive plan). The Warrant will have an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first ten years of the Warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment).

As stockholders and Warrant holders, as the case may be, the ESOP and the Zell Entity do not and will not have any direct interest in or ability to access the Company's net book value or net income. The Company's net book value was $4,304 million as of April 1, 2007. The Company's net income for the fiscal year ended December 31, 2006 was $594.0 million, and its net loss for the three months ended April 1, 2007 was $23.3 million.

**Schedule 13E-3, Item 8. Fairness of the Transaction.**

Item 13, Schedule 13E-3, Items 8(a), (b) and (e) of the Filing are hereby amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "Special Factors—Reasons for and Fairness of the Transactions; Recommendations of the Special Committee and the Board" as described under Item 6 above. Item 13, Schedule 13E-3, Items 8(a) and (b) of the Filing are hereby further amended and supplemented by amending and restating in its entirety the section in the Offer to Purchase entitled "Special Factors—Position of the ESOP as to Fairness" to read as follows and incorporating such new section by reference into Item 13, Schedule 13E-3, Items 8(a) and (b):

### Position of the ESOP and Merger Sub as to Fairness

The rules of the SEC require the ESOP and Merger Sub to express their belief as to the fairness of the proposed Leveraged ESOP Transactions, including the Tender Offer and the Merger, to the Company's stockholders who are not affiliated with the ESOP. The view of the ESOP and Merger Sub as to the fairness of the proposed Leveraged ESOP Transactions, including the Tender Offer and the Merger, should not be construed as a recommendation to any stockholder as to whether to tender shares in the Tender Offer or how such stockholder should vote on the proposal to approve and adopt the Merger Agreement.

The Trustee for the ESOP negotiated the terms of a transaction that would be most favorable to the ESOP and Merger Sub, and not to stockholders of the Company and, accordingly, it did not negotiate the Merger Agreement and other agreements relating to the Leveraged ESOP Transactions with the goal of obtaining terms that were fair to the Company's unaffiliated stockholders. The ESOP and Merger Sub did not participate in the deliberations of the Board or the Special Committee regarding, or receive advice from the Company's or the Special Committee's legal or financial advisors as to, the substantive and procedural fairness of the proposed Leveraged ESOP Transactions, including the Tender Offer and the Merger, nor did the

ESOP or Merger Sub undertake any independent evaluation of the fairness of the proposed Leveraged ESOP Transactions, including the Tender Offer and the Merger, to the Company's unaffiliated stockholders, or engage a financial advisor for such purposes. The ESOP and Merger Sub believe, however, that the proposed Leveraged ESOP Transactions, including the Tender Offer and the Merger, are fair to the Company's unaffiliated stockholders based on the following factors:

- the consideration offered in the Tender Offer and the Merger of $34.00 per share represents a premium of approximately 5.9% to the closing price of Company Common Stock on March 30, 2007, the last trading day before the proposal was made public, and approximately 12.5% to the average closing price of Company Common Stock for the 30 calendar day period ending on March 30, 2007 and approximately 9.5% to the average closing price for the 52 weeks ended March 30, 2007;

- the $34.00 per share consideration offered in the Tender Offer and the Merger and other terms and conditions of the Merger Agreement resulted from extensive arm's-length negotiations among the Special Committee and its advisors, the ESOP and its advisors, and the Zell Entity and its advisors;

- the Merger is conditioned upon the approval of the holders of a majority of the outstanding shares; the ESOP and Merger Sub assume that the Company's stockholders are capable of evaluating the fairness of the Merger Consideration and further assumes that an informed decision by holders of a

12

---

majority of outstanding shares provides meaningful procedural protections for the Company's stockholders;

- the Special Committee consists solely of directors who are not officers or significant stockholders of the Company, or affiliated with the ESOP or its affiliates, or the Zell Entity or its affiliates;

- the Special Committee determined that the Merger Agreement and the Tender Offer and the Merger are fair to the unaffiliated stockholders of the Company and in the best interests of such stockholders;

- the Board determined, based on the recommendation of the Special Committee, that the Merger Agreement and the Tender Offer and the Merger are fair to the unaffiliated stockholders of the Company and in the best interests of such stockholders;

- the Tender Offer and the Merger will provide consideration to the stockholders entirely in cash, which provides certainty of value;

-

the Special Committee and the Board received the advice of financial and legal advisors, each of which has extensive experience in going-private transactions; the Special Committee retained and received financial advice from Morgan Stanley, and the Board retained and received financial advice from Citi and Merrill Lynch, which included receipt of the fairness opinions referred to above under "Special Factors—Opinion of the Special Committee's Financial Advisor" and "Special Factors—Opinion of the Company's Financial Advisor;" the Company and the Board retained and received legal advice from Wachtell, Lipton, Rosen & Katz, Sidley Austin LLP and, for ESOP matters, McDermott Will & Emery; and the Special Committee retained and received legal advice from Skadden, Arps, Slate, Meagher & Flom LLP;

- the fact that the ESOP and Merger Sub did not participate in the deliberative process of, or the conclusions reached by, the Special Committee or the negotiating positions of the Special Committee;

- the fact that appraisal rights under Delaware law are available to holders of shares of Company Common Stock who do not vote in favor of the Merger and comply with all of the required procedures under Delaware law, which provides stockholders who dispute the fairness of the Merger consideration with an opportunity to have a court determine the fair value of their shares, which may be more than, less than, or the same as the amount such stockholders would have received under the Merger Agreement; and

- the fact that the Merger Agreement allows the Board or the Special Committee to withdraw or change its recommendation of the Merger Agreement, and to terminate the Merger Agreement and to accept a Superior Proposal (as described below under "The Merger Agreement"), subject to a payment by the Company to the Zell Entity of a $25 million termination fee.

The ESOP and Merger Sub did not consider the liquidation value or net book value of the Company. The foregoing discussion of the information and factors known by the ESOP and Merger Sub in connection with the fairness of the Tender Offer and the Merger is not intended to be exhaustive and the ESOP and Merger Sub assigned no relative weights to the individual factors.

Item 13, Schedule 13E-3, Items 8(a) and (b) of the Filing are hereby further amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "Special Factors" by adding the following new subsection after the subsection entitled "Position of the ESOP and Merger Sub as to Fairness" and by incorporating such new subsection by reference in Item 13, Schedule 13E-3, Items 8(a) and (b):

### Position of the Zell Investors as to Fairness

The rules of the SEC may require Mr. Zell, the Zell Entity and Sam Investment Trust (which are collectively referred to as the "Zell Investors") to express their belief as to the fairness of the proposed Leveraged ESOP Transactions, including the Tender Offer and the Merger, to the Company's stockholders who are not affiliated with the Zell Investors. The view of the Zell Investors as to the fairness of the proposed Leveraged ESOP Transactions, including the Tender Offer and the Merger, should not be construed as a recommendation to any stockholder as to whether to tender shares in the Tender Offer or how such stockholder should vote on the proposal to approve and adopt the Merger Agreement.

The Zell Investors negotiated the terms of a transaction that would be most favorable to the Zell Investors, and not to stockholders of the Company and, accordingly, they did not negotiate the Merger

13

Agreement and other agreements relating to the Leveraged ESOP Transactions with the goal of obtaining terms that were fair to the Company's unaffiliated stockholders. The Zell Investors did not participate in the deliberations of the Board or the Special Committee regarding, or receive advice from the Company's or the Special Committee's legal or financial advisors as to, the substantive and procedural fairness of the proposed Leveraged ESOP Transactions, including the Tender Offer and the Merger, nor did the Zell Investors undertake any independent evaluation of the fairness of the proposed Leveraged ESOP Transactions, including the Tender Offer and the Merger, to the Company's unaffiliated stockholders, engage a financial advisor for such purposes, or receive any report, opinion or appraisal from any financial advisor for such purposes. The Zell Investors believe, however, that the proposed Leveraged ESOP Transactions, including the Tender Offer and the Merger, are fair to the Company's unaffiliated stockholders based on the following factors:

- the consideration offered in the Tender Offer and the Merger of $34.00 per share represents a premium of approximately 5.9% to the closing price of Company Common Stock on March 30, 2007, the last trading day before the proposal was made public, and approximately 12.5% to the average closing price of Company Common Stock for the 30 calendar day period ending on March 30, 2007 and approximately 9.5% to the average closing price for the 52 weeks ended March 30, 2007;

- the $34.00 per share consideration offered in the Tender Offer and the Merger and other terms and conditions of the Merger Agreement resulted from extensive arm's-length negotiations among the Special Committee and its advisors, the ESOP and its advisors, and the Zell Entity and its advisors;

- the Tender Offer and Merger will provide consideration to the stockholders entirely in cash, which provides certainty of value;

- the fact that the Company had publicly disclosed numerous times its willingness to consider strategic alternatives, including a merger or a recapitalization;

- the Merger is conditioned upon the approval of the holders of a majority of the outstanding shares; the Zell Investors assume that the Company's stockholders are capable of evaluating the fairness of the Tender Offer and the Merger and further assume that an informed decision by holders of a majority of outstanding shares provides meaningful procedural protections for the Company's stockholders;

- the Special Committee consists solely of directors who are not officers or significant stockholders of the Company, or affiliated with the ESOP or its affiliates, or the Zell Investors or their affiliates;

-

the Special Committee determined that the Merger Agreement and the Tender Offer and the Merger are fair to the unaffiliated stockholders of the Company and in the best interests of such stockholders;

- the Board determined, based on the recommendation of the Special Committee, that the Merger Agreement and the Tender Offer and the Merger are fair to the unaffiliated stockholders of the Company and in the best interests of such stockholders;

- the Special Committee and the Board received the advice of financial and legal advisors, each of which has extensive experience in going private transactions; the Special Committee retained and received financial advice from Morgan Stanley, and the Board retained and received financial advice from Citi and Merrill Lynch, which included receipt of the fairness opinions referred to above under "Special Factors—Opinion of the Special Committee's Financial Advisor" and "Special Factors—Opinion of the Company's Financial Advisor;" the Company and the Board retained and received legal advice from Wachtell, Lipton, Rosen & Katz, Sidley Austin LLP and, for ESOP matters, McDermott Will & Emery; and the Special Committee retained and received legal advice from Skadden, Arps, Slate, Meagher & Flom LLP;

- the fact that the Zell Investors did not participate in the deliberative process of, or the conclusions reached by, the Special Committee or the negotiating positions of the Special Committee;

- the fact that appraisal rights under Delaware law are available to holders of shares of Company Common Stock who do not vote in favor of the Merger and comply with all of the required procedures under Delaware law, which provides stockholders who dispute the fairness of the Merger consideration with an opportunity to have a court determine the fair value of their shares, which may be more than, less than, or the same as the amount such stockholders would have received under the Merger Agreement; and

14

---

- the fact that the Merger Agreement allows the Board or the Special Committee to withdraw or change its recommendation of the Merger Agreement, and to terminate the Merger Agreement and to accept a Superior Proposal (as described below under "The Merger Agreement"), subject to a payment by the Company to the Zell Entity of a $25 million termination fee.

The Zell Investors did not consider liquidation value of the Company as a relevant methodology because they considered the Company to be a viable, going concern business. Further, the Zell Investors did not consider net book value, which is an accounting concept, as a factor because they believed that net book value is not a material indicator of the value of the Company as a going concern but rather is indicative of historical costs. The foregoing discussion of the information and factors known by the Zell Investors in connection with the fairness of the Tender Offer and the Merger is not intended to be exhaustive and the Zell Investors assigned no relative weights to the individual factors.

Item 13, Schedule 13E-3, Item 8(f) of the Filing is hereby amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "Special Factors—Background of the Transactions" as described under Item 5 above.

**Schedule 13E-3, Item 9. Reports, Opinions, Appraisals and Negotiations.**

Item 13, Schedule 13E-3, Item 9(a), of the Filing is hereby amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "Special Factors — Opinion of the Special Committee's Financial Advisor" by adding the following sentences after the second sentence of the last paragraph thereof:

> The terms of the engagement letter do not quantify the amount of the additional discretionary fee. The Special Committee has not yet determined whether to pay Morgan Stanley a discretionary fee and does not anticipate making any determination with respect to the discretionary fee prior to the expiration of the Tender Offer.

Item 13, Schedule 13E-3, Item 9(a) of the Filing is hereby further amended and supplemented by amending and supplementing the Offer to Purchase to add the information set forth under "Special Factors — Position of the Zell Investors as to Fairness" as described under Item 13, Schedule 13E-3, Item 8 above.

Item 13, Schedule 13E-3, Item 9(b), of the Filing is hereby amended and supplemented by amending and supplementing the information set forth in the Offer to Purchase under "Special Factors — Opinion of the Special Committee's Financial Advisor' as described under Item 13, Schedule 13E-3, Item 9(a) above.

15

---

**SIGNATURES**

Tribune Company is filing this statement as a combined Schedule TO and Schedule 13E-3, and each of the Tribune Employee Stock Ownership Plan, Tesop Corporation, Samuel Zell, EGI-TRB, L.L.C. and Sam Investment Trust is filing this statement as a Schedule 13E-3. After due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: May 16, 2007

**TRIBUNE COMPANY**

By:    /s/ CRANE H. KENNEY

Name:    Crane H. Kenney
Title:    Senior Vice President, General Counsel and Secretary

Date: May 16, 2007

**TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN**

By:    GreatBanc Trust Company, as Trustee

By:    /s/ MARILYN H. MARCHETTI

Name:    Marilyn H. Marchetti
Title:    Senior Vice President

Date: May 16, 2007

**TESOP CORPORATION**

By:    /s/ MARILYN H. MARCHETTI

Name:  Marilyn H. Marchetti
Title:  President

Date: May 16, 2007

**SAMUEL ZELL**

/s/ SAMUEL ZELL

Samuel Zell

Date: May 16, 2007

**EGI-TRB, L.L.C.**

By:      /s/ PHILIP G. TINKLER

Name:  Philip G. Tinkler
Title:   Vice President

Date: May 16, 2007

**SAM INVESTMENT TRUST**

By:      Chai Trust Company, LLC, as Trustee

By:      /s/ DONALD J. LIEBENTRITT

Name:  Donald J. Liebentritt
Title:   President

16

## Exhibit Index

| | |
|---|---|
| (a)(1)(A)* | Offer to Purchase, dated April 25, 2007. |
| (a)(1)(B)* | Letter of Transmittal including Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9. |
| (a)(1)(C)* | Notice of Guaranteed Delivery. |
| (a)(1)(D)* | Letter to Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees, dated April 25, 2007. |
| (a)(1)(E)* | Letter to Clients for use by Brokers, Dealers, Commercial Banks, Trust Companies and Other Nominees, dated April 25, 2007. |
| (a)(1)(F)* | Form of Summary Advertisement, dated April 25, 2007. |
| (a)(1)(G)* | Form of Letter From Tribune Company to Participants in the Tribune Company Employee Stock Purchase Plan, dated April 25, 2007. |
| (a)(1)(H)* | Form of Letter From the Northern Trust Company to Participants in the Tribune Company Retirement Plans, dated April 25, 2007. |
| (a)(2) | Not Applicable. |
| (a)(3) | Not Applicable. |
| (a)(4) | Not Applicable. |
| (a)(5)(A)* | First Amended Complaint filed in the Superior Court of California, Los Angeles County, captioned Garamella v. FitzSimons, et al., Case No. BC362110, filed on April 4, 2007. |
| (a)(5)(B)* | Complaint filed in the Chancery Division of the Circuit Court of Cook County, Illinois, |

|  |  |
|---|---|
| | captioned Simpson v. Tribune Co., et al., Case No. 07CH9519, filed on April 5, 2007. |
| (a)(5)(C)** | Tender Offer Employee Questions and Answers, made available April 25, 2007. |
| (a)(5)(D)** | Press Release, dated April 25, 2007. |
| (a)(5)(E)** | Tender Offer Employee Questions and Answers, made available April 26, 2007. |
| (a)(5)(F)*** | Transcript of a video message addressed to Tribune employees on April 27, 2007. |
| (a)(5)(G)*** | Tender Offer Employee Questions and Answers, made available April 27, 2007. |
| (a)(5)(H)**** | Tender Offer Employee Question and Answer, made available May 1, 2007. |
| (a)(5)(I)***** | Tender Offer Employee Questions and Answers, made available May 4, 2007. |
| (a)(5)(J) | Press Release of Tribune Company, dated May 9, 2007 (incorporated by reference to Exhibit 99.1 of the Company's Current Report on Form 8-K, filed with the Securities and Exchange Commission on May 10, 2007). |
| (a)(5)(K)******* | Tender Offer Employee Questions and Answers, made available May 16, 2007. |
| (b)(1)(A) | Amended and Restated First Step Commitment Letter, dated as of April 5, 2007, by and among Tribune Company, J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., Banc of America Securities LLC and Bank of America, N.A., incorporated by reference to Exhibit 10.10 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (b)(1)(B) | Amended and Restated Second Step Commitment Letter, dated as of April 5, 2007, by and among Tribune Company, J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., Banc of America Securities LLC, Banc of America Bridge LLC and Bank of America, N.A., incorporated by reference to Exhibit 10.11 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (b)(2)(A)* | Exhibit A to Amended and Restated First Step Commitment Letter, dated as of April 5, 2007, by and among Tribune Company, J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., Banc of America Securities LLC and Bank of America, N.A. |
| (b)(2)(B)* | Exhibit A to Amended and Restated Second Step Commitment Letter, dated as of April 5, 2007, by and among Tribune Company, J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., Banc of America Securities LLC, Banc of America Bridge LLC and Bank of America, N.A. |
| (c)(1)* | Opinion of Morgan Stanley & Co. Incorporated, dated April 1, 2007 (included as Annex I to this Statement). |
| (c)(2)* | Opinion of Merrill Lynch & Co., dated April 1, 2007 (included as Annex II to this Statement). |
| (c)(3)* | Excerpt from financial analysis presentation materials, dated February 12, 2007, prepared by Merrill Lynch & Co. and Citigroup Global Markets Inc., for the Committee of Independent Directors of the Board of Directors of Tribune. |

17

| (c)(4)* | Excerpt from financial analysis presentation materials, dated February 24, 2007, prepared by Merrill Lynch & Co. and Citigroup Global Markets Inc., for the Committee of Independent Directors of the Board of Directors of Tribune. |
|---|---|
| (c)(5)* | Financial analysis presentation materials, dated March 21, 2007, prepared by Merrill Lynch & Co. and Citigroup Global Markets Inc., for the Committee of Independent Directors of the Board of Directors of Tribune. |
| (c)(6)* | Financial analysis presentation materials, dated March 30, 2007, prepared by Merrill Lynch & Co. and Citigroup Global Markets Inc., for the Committee of Independent Directors of the Board of Directors of Tribune. |
| (c)(7)* | Financial analysis presentation materials, dated March 21, 2007, prepared by Morgan Stanley & Co. Incorporated, for the Committee of Independent Directors of the Board of |

| | |
|---|---|
| | Directors of Tribune. |
| (c)(8)* | Financial analysis presentation materials, dated March 30, 2007, prepared by Morgan Stanley & Co. Incorporated, for the Committee of Independent Directors of the Board of Directors of Tribune. |
| (c)(9)* | Financial analysis presentation materials, dated March 30, 2007, prepared by Morgan Stanley & Co. Incorporated, for the Committee of Independent Directors of the Board of Directors of Tribune. |
| (c)(10)* | Financial analysis presentation materials, dated April 1, 2007, prepared by Morgan Stanley & Co. Incorporated, for the Committee of Independent Directors of the Board of Directors of Tribune. |
| (c)(11)****** | Opinion of Valuation Research Corporation, dated May 9, 2007. |
| (c)(12)****** | Tribune Company Solvency Opinion Analysis, dated May 9, 2007, prepared by Valuation Research Corporation for the Board of Directors of Tribune. |
| (d)(1) | Agreement and Plan of Merger, dated as of April 1, 2007, by and among Tribune Company, Tesop Corporation, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan and EGI-TRB, L.L.C. (solely for the limited purposes of Section 8.12 thereof), incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(2) | Registration Rights Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan, incorporated by reference to Exhibit 4.1 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(3) | Registration Rights Agreement, dated as of April 1, 2007, by and between Tribune Company and each of Chandler Trust No. 1 and Chandler Trust No. 2, incorporated by reference to Exhibit 4.2 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(4) | Securities Purchase Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and Samuel Zell, incorporated by reference to Exhibit 10.2 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(5) | Form of Subordinated Exchangeable Promissory Note of Tribune Company, incorporated by reference to Exhibit 10.3 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(6) | Form of Subordinated Promissory Note of Tribune Company, incorporated by reference to Exhibit 10.4 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(7) | Form of Warrant Agreement, incorporated by reference to Exhibit 10.5 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(8) | ESOP Purchase Agreement, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust created under the Tribune Employee Stock Ownership Plan, incorporated by reference to Exhibit 10.6 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(9) | ESOP Loan Agreement, dated as of April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan, incorporated by reference to Exhibit 10.7 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |

| | |
|---|---|
| (d)(10) | ESOP Note, dated as of April 1, 2007, executed by GreatBanc Trust Company, not in its individual or corporate capacity, but solely in its capacity as trustee of the Tribune Employee Stock Ownership Trust, which implements and forms a part of the Tribune Employee Stock Ownership Plan in favor of Tribune Company, incorporated by reference to Exhibit 10.8 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(11) | ESOP Pledge Agreement, dated as of April 1, 2007, between the Company and GreatBanc Trust Company, not in its individual or corporate capacity but solely in its capacity as trustee of the Tribune Employee Stock Ownership Trust which forms a part of the Tribune Employee Stock Ownership Plan, incorporated by reference to Exhibit 10.9 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(12) | Investor Rights Agreement, dated as of April 1, 2007, by and among Tribune Company, EGI-TRB, L.L.C. and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan, incorporated by reference to Exhibit 10.12 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(13) | Voting Agreement, dated as of April 1, 2007, by and among Tribune Company, and each of Chandler Trust No. 1 and Chandler Trust No. 2, incorporated by reference to Exhibit 10.13 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(14) | Tribune Employee Stock Ownership Plan, incorporated by reference to Exhibit 10.14 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(15) | Tribune Employee Stock Ownership Trust, dated April 1, 2007, by and between Tribune Company and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, incorporated by reference to Exhibit 10.15 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007. |
| (d)(16) | Rights Agreement between Tribune Company and First Chicago Trust Company of New York, as Rights Agent, dated as of December 12, 1997, incorporated by reference from Exhibit 4.1 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 1 to Current Report on Form 8-K, dated December 12, 1997. |
| (d)(17) | Amendment No. 1, dated as of June 12, 2000, to the Rights Agreement between Tribune Company and First Chicago Trust Company of New York, as Rights Agent, incorporated by reference from Exhibit 4.1 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 4.1 to Current Report on Form 8-K, dated June 12, 2000. |
| (d)(18) | Amendment No. 2, dated as of September 21, 2006, to the Rights Agreement between Tribune Company and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent, incorporated by reference from Exhibit 4.1 to Current Report on Form 8-K, dated September 21, 2006. |
| (d)(19) | Amendment No. 3, dated as of April 1, 2007, to the Rights Agreement between Tribune Company and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent, as amended by Amendment No. 1, dated as of June 12, 2000, and Amendment No. 2, dated as of September 21, 2006, incorporated by reference to Exhibit |

|         |                                                                                                                                                                                                                                                                                                                                                                                                                                            |
|---------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|         | 4.3 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 5, 2007.                                                                                                                                                                                                                                                                                                                      |
| (d)(20) | Tribune Company Supplemental Retirement Plan, as amended and restated October 18, 2006, incorporated by reference from Exhibit 10.1 of the Company's Form 10-K for the fiscal year ended December 31, 2006, as filed with the Securities and Exchange Commission on February 26, 2007, incorporating by reference from Exhibit 10.3 to Current Report on Form 8-K, dated October 18, 2006.                                                      |
| (d)(21) | Tribune Company Directors' Deferred Compensation Plan, as amended and restated effective as of January 1, 2005, incorporated by reference from Exhibit 10.2 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.2 to Current Report on Form 8-K, dated December 22, 2005.                              |

19

|         |                                                                                                                                                                                                                                                                                                                                                                                                                                            |
|---------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| (d)(22) | The Times Mirror Company Deferred Compensation Plan for Non-Employee Directors, incorporated by reference from Exhibit 10.3 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.7 to The Times Mirror Company's Annual Report on Form 10-K as filed March 29, 1995.                                    |
| (d)(23) | Tribune Company Bonus Deferral Plan, as amended and restated as of October 18, 2006, incorporated by reference from Exhibit 10.4 of the Company's Form 10-K for the fiscal year ended December 31, 2006, as filed with the Securities and Exchange Commission on February 26, 2007, incorporating by reference from Exhibit 10.1 to Current Report on Form 8-K, dated October 18, 2006.                                                          |
| (d)(24) | Tribune Company 1992 Long-Term Incentive Plan, effective as of April 29, 1992, as amended April 19, 1994, incorporated by reference from Exhibit 10.5 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.11 to Annual Report on Form 10-K as filed March 22, 1995.                                    |
| (d)(25) | First Amendment to Tribune Company 1992 Long-Term Incentive Plan, effective October 24, 2000, incorporated by reference from Exhibit 10.5a of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.6a to Annual Report on Form 10-K as filed March 27, 2001.                                               |
| (d)(26) | Tribune Company Executive Financial Counseling Plan, effective October 19, 1988, as amended January 1, 1994, incorporated by reference from Exhibit 10.6 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.13 to Annual Report on Form 10-K as filed March 23, 1994.                                 |
| (d)(27) | Tribune Company Transitional Compensation Plan for Executive Employees, amended and restated effective as of July 19, 2006, incorporated by reference from Exhibit 10.7 of the Company's Form 10-K for the fiscal year ended December 31, 2006, as filed with the Securities and Exchange Commission on February 26, 2007.                                                                                                                      |
| (d)(28) | Tribune Company Supplemental Defined Contribution Plan, as amended and effective as of October 18, 2006, incorporated by reference from Exhibit 10.8 of the Company's Form 10-K for the fiscal year ended December 31, 2006, as filed with the Securities and Exchange Commission on February 26, 2007, incorporating by reference from Exhibit 10.2 to Current Report on Form 8-K, dated October 18, 2006.                                      |
| (d)(29) | Tribune Company Employee Stock Purchase Plan, as amended and restated July 27, 1999, incorporated by reference from Exhibit 10.9 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.10 to                                                                                                             |

|           |   |
|-----------|---|
|           | Annual Report on Form 10-K as filed March 16, 2000. |
| (d)(30)   | First Amendment to Tribune Company Employee Stock Purchase Plan, as amended and restated July 27, 1999, incorporated by reference from Exhibit 10.9a of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.10a to Quarterly Report on Form 10-Q for the quarter ended September 24, 2000. |
| (d)(31)   | Second Amendment to Tribune Company Employee Stock Purchase Plan, effective as of May 7, 2002, incorporated by reference from Exhibit 10.9b of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.8b to Annual Report on Form 10-K as filed March 12, 2003. |
| (d)(32)   | Tribune Company 1995 Non-employee Director Stock Option Plan, as amended and restated effective December 9, 2003, incorporated by reference from Exhibit 10.10 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.9 to Annual Report on Form 10-K as filed February 27, 2004. |
| (d)(33)   | Tribune Company 1996 Non-employee Director Stock Compensation Plan, as amended and restated effective January 1, 2005, incorporated by reference from Exhibit 10.11 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.4 to Current Report of Form 8-K dated December 22, 2005. |

20

| (d)(34)   | Tribune Company Incentive Compensation Plan, as amended and restated effective May 12, 2004, incorporated by reference from Exhibit 10.12 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.1 to Quarterly Report on Form 10-Q for the quarter ended June 27, 2004. |
| (d)(35)   | Form of Notice of Grant and Stock Option Term Sheet, incorporated by reference from Exhibit 10.12a of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.1 to Current Report on Form 8-K dated February 11, 2005. |
| (d)(36)   | Form of Restricted Stock Unit Award Notice, incorporated by reference from Exhibit 10.12b of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.1 to Current Report on Form 8-K dated February 21, 2006. |
| (d)(37)   | The Times Mirror Company 1997 Directors Stock Option Plan, incorporated by reference from Exhibit 10.13 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.15 to The Times Mirror Company's Annual Report on Form 10-K as filed March 18, 1997. |
| (d)(38)   | Limited Liability Company Agreement of TMCT, LLC, dated August 8, 1997, incorporated by reference from Exhibit 10.14 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.1 to The Times Mirror Company's Current Report on Form 8-K, dated August 8, 1997. |
| (d)(39)   | Lease Agreement between TMCT, LLC and Times Mirror, dated August 8, 1997, incorporated by reference from Exhibit 10.15 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.4 to The Times Mirror Company's Current Report on Form 8-K, dated August 8, 1997. |
| (d)(40)   | Amended and Restated Limited Liability Company Agreement of TMCT II, LLC, dated |

|  | September 3, 1999, incorporated by reference from Exhibit 10.16 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.1 to The Times Mirror Company's Current Report on Form 8-K, dated September 3, 1999. |
| (d)(41) | First Amendment to Amended and Restated Limited Liability Agreement of TMCT II, LLC, dated as of August 14, 2000, incorporated by reference from Exhibit 10.16a of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.17a to Annual Report on Form 10-K as filed March 27, 2001. |
| (d)(42) | Second Amendment to Amended and Restated Limited Liability Agreement of TMCT II, LLC, dated as of August 1, 2002, incorporated by reference from Exhibit 10.16 of the Company's Form 10-K for the fiscal year ended December 25, 2005, as filed with the Securities and Exchange Commission on February 28, 2006, incorporating by reference from Exhibit 10.14b to Annual Report on Form 10-K, as filed March 12, 2003. |
| (d)(43) | Subordinated Exchangeable Promissory Note of Tribune Company, dated April 23, 2007, incorporated by reference to Exhibit 10.1 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 24, 2007. |
| (d)(44) | Letter Agreement, dated April 23, 2007, among Tribune Company, EGI-TRB, L.L.C. and Samuel Zell, incorporated by reference to Exhibit 10.2 of the Company's Current Report on Form 8-K, as filed with the Securities and Exchange Commission on April 24, 2007. |
| (f) | Not Applicable. |
| (g) | Not Applicable. |
| (h) | Not Applicable. |

\*

Previously filed on the Filing on April 25, 2007.

\*\*

Previously filed on Amendment No. 1 to the Filing on April 26, 2007.

\*\*\*

Previously filed on Amendment No. 2 to the Filing on April 27, 2007.

21

\*\*\*\*

Previously filed on Amendment No. 3 to the Filing on May 1, 2007.

\*\*\*\*\*

Previously filed on Amendment No. 4 to the Filing on May 4, 2007.

\*\*\*\*\*\*

Previously filed on Amendment No. 5 to the Filing on May 11, 2007.

\*\*\*\*\*\*\*

Filed herewith.

22

0268

QuickLinks

INTRODUCTION
SIGNATURES
Exhibit Index

Exhibit 5

**Tribune Company**
**435 North Michigan Avenue**
**Chicago, Illinois 60611**


March 30, 2007


Mr. Eli Broad
Broad Investment Company
10900 Wilshire Boulevard, Suite 1200
Los Angles, CA 90024


Mr. Ronald W. Burkle
The Yucaipa Companies LLC
9130 W. Sunset Blvd.
Los Angles, CA 90069


Dear Messrs. Broad and Burkle:

Following receipt of your letter of March 23, 2007, our representatives contacted you and provided all the information that you requested. Prior to receiving your letter, we had not been contacted by you or your representatives for over three weeks, even though our advisors have always been ready, willing and able to respond to your inquiries or information requests.

Your letter's assertion that "the Tribune Board decided to halt discussions" with you is not accurate. You decided to halt discussions with us over a month ago. Prior to your doing so, we treated your proposal seriously, responded promptly to all your inquires, gave you access to management and company data, and, on January 20, 2007, afforded you and your advisors the opportunity to present your proposal in person to the Special Committee of the Board of Directors for a full and comprehensive discussion.

Since your letter states that you are knowledgeable about ESOP transactions, you have been free for months to formulate a proposal involving an ESOP and to present it to us. You, not we, bear responsibility for the fact that you did not do so in the past.

Your letter of March 23, 2007 contains a number of other statements that are not true. The facts are that the Company and its advisors did not "develop" an ESOP transaction and



EXHIBIT
Osborn - 9
5-16-07

TRIB 066805
HIGHLY CONFIDENTIAL

"limit" discussions about it to Mr. Sam Zell. Our advisors did not "shop" your proposal to anyone and have always respected the confidentiality of the terms and conditions of third party proposals. If the Company is currently in discussions with Mr. Zell, these discussions are in response to the initiatives of Mr. Zell and are confidential, just as our discussions with you were and are confidential.

       The Special Committee, its advisors and management have worked tirelessly for months with you and others in a fair and impartial way to develop and evaluate alternative proposals for the Company. After your decision not to pursue further discussions with us over a month ago, we are happy to respond to your renewed interest.

       Sincerely,

       William A. Osborn
       Chairman, Special Committee
       Board of Directors

TRIB 066806
HIGHLY CONFIDENTIAL

DECLARATION OF
MICHAEL COSTA

# DECLARATION OF MICHAEL COSTA

I, Michael Costa, having been duly sworn, hereby testify as to the following matters within my personal knowledge:

1.    I am currently a Managing Director, Mergers & Acquisitions, of Merrill Lynch & Co. ("Merrill Lynch").  I have held that position for 10 years and have advised on numerous transactions in the media and telecom industries totaling in excess of $100 billion.

2.    From time to time over a number of years, Merrill Lynch has been engaged to serve as a financial advisor to the Tribune Company ("Tribune" or the "Company") on a variety of assignments.  From time to time this has included providing advice regarding strategic assessments. As described in more detail below, in September 2006, a Special Committee of the Board of Tribune ("Special Committee") was formed for the purposes of reviewing strategic alternatives.  The Special Committee retained its own financial and legal advisors.  However, at the request of the Special Committee, the Company engaged Merrill Lynch and Citigroup ("Citi") to provide financial advisory services, as requested and directed, in connection with a potential strategic transaction. Eventually, the Special Committee's and Board's processes culminated in the Merger Agreement between Tribune, GreatBanc as trustee of the Tribune ESOP, Tesop Corporation, and EGI-TRB, LLC dated April 2, 2007 and additional transactions contemplated therein (collectively, the "EGI Transactions").

3.    I am submitting this affidavit in opposition to the motion for preliminary injunction made by the plaintiffs in this matter.

## THE SPECIAL COMMITTEE'S STRATEGIC REVIEW PROCESS

### The Initial Solicitation of Interest and Due Diligence

4.    On September 21, 2006, Merrill Lynch and Citi met with the Tribune Board to discuss the Company's strategic alternatives.  We reviewed various options, included continuing to operate without further restructurings, continuing to pursue a separation of the Company's Broadcasting & Entertainment ("B&E") Group, alternatives with respect to the publishing business, and seeking proposals from third parties for the acquisition of the entire Company.  Following this review, the Board created the Special Committee, consisting of all of the members of the Board

0272

1   other than the Chief Executive Officer and the three directors nominated by the Chandler Trusts, to

2   oversee a formal process of exploring strategic alternatives.  As part of this process, the Board

3   authorized the Company to seek third-party proposals for the acquisition of the Company.

4       5.      Following the formation of the Special Committee, the Special Committee retained its

5   own financial advisors, Morgan Stanley, as well as its own legal advisors, Skadden Arps Slate

6   Meagher & Flom, LLP ("Skadden Arps.").  In addition, the Company engaged Merrill Lynch and

7   Citi to act as co-financial advisors to the Company.

8       6.      The Company and the Special Committee directed that Merrill Lynch and Citi would

9   have exclusive responsibility for contacting potential bidders, coordinating due diligence and

10  management presentations.  Morgan Stanley would actively oversee the process and report directly

11  to the Special Committee, and would provide separate valuation opinions, including a final fairness

12  opinion, to the Special Committee.  In the first few weeks of October, we and Citi met with

13  Company management and Morgan Stanley to review prior presentations that had been provided to

14  management and the Board, and previous strategic alternatives that we had considered and presented

15  to the Company.

16      7.      At the same time, the Special Committee directed us and Citi to begin contacting a

17  wide range of private equity firms and potential strategic buyers to invite them to indicate their

18  interest in an acquisition of the Company, and the Company entered into confidentiality agreements

19  and began sharing information about the Company with interested parties.  Over the next several

20  weeks, these parties began receiving information and conducting due diligence with respect to the

21  Company for purposes of determining whether to submit a preliminary bid for the acquisition of the

22  Company.

23      8.      We met with the Special Committee on October 18, 2006 to provide them with an

24  update on our work, a preliminary analysis and review of strategy.  We told the Special Committee

25  at that meeting that there were a variety of potential strategic alternatives worthy of consideration,

26  ranging from a leveraged buyout transaction, a leveraged spin-off of the B&E group, as well as

27  selected asset sales.  We proposed an initial strategy that was designed as a two-step process to allow

28  all potentially interested parties to submit "whole company" proposals.

0273

**DECLARATION OF MICHAEL COSTA, MANAGING DIRECTOR, MERRILL LYNCH & CO.**

9.      During the month of October, Merrill Lynch and Citi conducted an extensive canvass of both strategic buyers (those in the similar or complimentary industries) and financial buyers (private equity and other firms who would be interested in a financial investment).  This market canvass resulted in seventeen (17) confidentiality agreements signed prior to October 27, 2006.  (Ultimately, 31 confidentiality agreements were signed).

10.      On October 31, 2006, Merill Lynch and Citi met with the Special Committee and reviewed with them the process to date, including information about who had submitted preliminary indications of interest and those who had dropped out after receiving initial information.  We also told the Special Committee that there were certain potential bidders who were only interested in selected assets rather than the entire Company.

11.      During the meeting, we also reviewed for the Special Committee other strategic alternatives it might consider, including the sale or spin off of the B&E group and/or other assets prior to a sale of the entire Company.  We also discussed the alternative possibility of a leveraged recapitalization, in which the company would borrow money to fund a significant return of capital to shareholders.

12.      We were then excused and the meeting continued with Morgan Stanley and the Special Committee only.  Following the meeting, we received instructions to continue with the process of seeking offers, as well as exploring selected asset sales and other transactions.

13.      Following the October 31, 2006 meeting, we and Citi continued to work with potential bidders by providing them with access to due diligence materials and coordinating management presentations.  In addition, Merrill Lynch had contact with representatives of one of Company's largest shareholders, the Chandler Trusts.  The Chandler Trusts raised the possibility of participating in a transaction in which the Chandler Trusts would acquire the Company's publishing business, and the B&E business would be spun-off to the Company's other shareholders.  We believed, and advised the Special Committee, that the Chandler Trusts' involvement would be beneficial to the process provided they participated on the same terms and conditions as the other potential bidders.

**0274**

**DECLARATION OF MICHAEL COSTA, MANAGING DIRECTOR, MERRILL LYNCH & CO.**

14.    On November 27, 2006, we met with the Special Committee. We provided them with information about the process, and informed them of the status of various bidders. We told the Special Committee that those bidders who remained interested expressed the need for additional time to prepare a definitive proposal, and therefore, we recommended that we extend the process into January 2007. After considering the matter with Morgan Stanley, the Special Committee accepted our recommendation to request final bids by January 12, 2007. Those bids are discussed below.

**The January 2007 Bids**

15.    On January 12, 2006, the Company received three bids – one from the Chandler Trusts, one from a group affiliated with Eli Broad and Ron Burkle ("Broad/Burkle"), and one from The Carlyle Group ("Carlyle"). The bids are discussed below.

16.    <u>Chandler Trusts</u>.  The bid from the Chandler Trusts purported to be valued at $31.50. (The Chandler Trusts had previously sent a letter on December 11, 2006 with a non-binding preliminary indication of interest in a transaction valued at $32-34.) The Chandler Trusts proposed a spin-off of the B&E group (minus selected assets, discussed below) to public shareholders, while the Chandler Trusts would acquire the publishing business, along with selected entertainment and internet assets, including the Chicago Cubs, Tribune Entertainment, and Comcast SportsNet. The transaction contemplated a cash payment to shareholders of $19.50, and an indicated value of $12.40 per share for the remaining B&E business to be retained by shareholders. Merrill Lynch and Citi provided the Special Committee with our analysis of the value of the transaction. Our opinion was that the overall value of the transaction was between <u>$26.52 and $27.72 per share.</u>

17.    <u>Broad/Burkle</u>.  The second proposal was made by a group led by Eli Broad and Ron Burkle. The Broad/Burkle proposal contemplated a "leveraged recapitalization" that they asserted was worth $34 per share. Under a leveraged recapitalization, money is borrowed (*i.e.*, "leverage") to return capital to investors. Shareholders would continue to have an ownership interest in the Company. The Broad/Burkle transaction contemplated that shareholders would receive a one-time cash dividend that was worth $27 per share. Broad/Burkle would simultaneously invest $500 million into a "preferred" security, which would be convertible, at their option, into 125 million

0275

- 4 -

DECLARATION OF MICHAEL COSTA, MANAGING DIRECTOR, MERRILL LYNCH & CO.