1  shares of Tribune common stock (*i.e.*, a price equivalent of $4 per share). If converted, the

2  "preferred" security would result in a 34% ownership interest. In addition, the Broad/Burkle

3  proposal called for the issuance of "warrants" to them, entitling them to purchase additional stock,

4  which if exercised would bring their ownership interest to 47%. We and Citi provided the Special

5  Committee with our analysis of the value of the transaction. Our opinion was that the Broad/Burkle

6  proposal was valued  between $29.45 to $31.72 per share.

7       18.    The reason why our valuation of the Broad/Burkle was less than the value that the

8  $34 per share value related to our differing valuations of the remaining equity interest to be held by

9  the shareholders. Broad/Burkle valued the remaining equity at $7 per share.

10       19.    <u>Carlyle</u>. Finally, we reviewed a proposal from Carlyle to acquire the B&E group

11  alone for $4.8 billion. The opinion that we and Citi provided the Special Committee was that, once

12  the value of the remaining business was taken into account, the transaction was worth approximately

13  $24.81 to $28.49 per share.

14       20.    On December 11, 2006, the Company received a request from Broad and Burkle that

15  they be permitted to communicate with two other potential bidders, the Chandler Trusts and/or the

16  McCormick Tribune Foundation. (Burkle and Broad were prohibited from doing so under the terms

17  of the non-disclosure agreement that all bidders had signed). We discussed this request with the

18  Company and the Special Committee, who determined that it would not be in the interest of

19  maximizing shareholder value to allow them to discuss their bids and collude. On December 14,

20  2006, the Company sent a response, indicating that based on its consideration of the interests of all

21  shareholders and the potential impact of the request on the ongoing review of strategic alternatives, it

22  had been determined that the request should be denied at the present time. Later, after the January

23  2007 bids that are discussed below were made, the Special Committee determined to develop the

24  self-help leveraged recapitalization. In connection with that transaction, the Chandler Trusts were

25  permitted to discuss a possible deal between themselves and the McCormick Tribune Foundation.

26  At that point in time it was clear that neither the Chandler Trusts nor the Foundation were going to

27  be bidders for the Company, and, as a result, the concerns about collusion were not present. Burkle

28

**0276**

**DECLARATION OF MICHAEL COSTA, MANAGING DIRECTOR, MERRILL LYNCH & CO.**

1  and Broad never made any subsequent request that they be permitted to talk to any competing

2  bidders.

3       21.    The Special Committee met on January 20, 2007 to discuss each of these proposals,

4  as well as to consider other alternatives that would not involve third parties.  In addition, the Special

5  Committee also heard presentations from representatives of the Chandler Trusts and Broad/Burkle.

6  After the Special Committee met alone with its financial and legal advisors, we were told that the

7  Special Committee had determined that none of the third party proposals was satisfactory, and that

8  Merrill Lynch and Citi should attempt to seek improvements in the proposals.  We also noted that

9  while we had received some draft documentation from the Chandler Trusts and Carlyle, we had only

10  received term sheets from Broad/Burkle, as opposed to a mark up of the draft merger agreement we

11  had provided to potential bidders.  The Special Committee also directed Merrill Lynch and Citi to

12  further analyze alternatives that the Company could implement on its own.

13       22.    During the next few weeks, we and Citi continued to negotiate with each of the three

14  bidders to attempt to get them to improve the terms of their respective offers.  However, in early

15  February, management prepared a set of revised projections based on results for January that showed

16  a further deterioration of the business.  In particular, the projections showed a further decline in the

17  publishing business as a result of declining revenue from print advertising sales.

18       23.    Those revised projections were shared with the bidders.  In the case of Broad/Burkle,

19  their representatives from UBS informed Citi that they were withdrawing their prior offer, and that

20  they would be willing to consider a modified offer that reduced the dividend to be returned to

21  shareholders from $27 per share to $23 per share.  They offered to put that bid into writing if the

22  Company so desired.  In the case of the Chandler Trusts, they also revised downward the amount of

23  cash to be paid to shareholders, and requested additional due diligence.

24       **The EGI Proposal And The Special Committee's Consideration of Alternatives**

25       24.    On February 2, 2007, we received a proposal from EGI.  EGI indicated that they

26  would be interested in pursuing a transaction involving the formation of an employee stock

27  ownership plan ("ESOP") in which EGI and the ESOP would acquire the Company at a price of $30

28  per share.  The idea for this particular transaction (*i.e.*, in which the ESOP would own all of the

0277

- 6 -

1  outstanding shares and the Company would elect an "S corporation" status for tax purposes)

2  originated with EGI, and was not something that had been considered and discussed within Tribune

3  up to that time. EGI told us that they had previously been involved in a similar deal structure.

4      25.    On February 12, 2007, the Special Committee met to discuss the status of the process.

5  At that point, the alternatives on the table were a proposed recapitalization and spin-off plan, which

6  contemplated a dividend of $20 per share and a subsequent spin-off of the B&E Group.  In addition,

7  since February 2, 2007, the EGI proposal had been revised to provide for an acquisition by EGI and

8  a Company ESOP of the entire Company at $33 per share.  In our opinion, which we shared with the

9  Special Committee, neither the Chandler Trusts' proposal or the Broad/Burkle proposals offered as

10  much value as the recapitalization and spin-off plan or the EGI proposal.

11     26.    We noted the decrease in the consideration to be provided to shareholders from the

12  two offers, and further noted that there were also a number of corporate governance and control

13  issues with respect to Broad/Burkle proposal.  After hearing from us and Citi, and then meeting

14  separately with Morgan Stanley and Skadden, the Special Committee decided that it would

15  recommend to the Board that the Company proceed with the recapitalization and spin-off plan and

16  not continue to pursue the Chandler Trusts' or Broad/Burkle proposals.  However, the Special

17  Committee directed us to continue to negotiate with EGI to determine whether its proposal was

18  feasible.  The next day, the full board met and authorized the Company to move forward towards

19  completion of the recapitalization and spin-off plan.  Following that Board meeting, the Company

20  issued a press release stating  that the Special Committee's process was continuing and that the

21  Board expected to make a decision before the end of the first quarter, *i.e.*, before March 31, 2007.

22     27.    During the next few weeks, we and Citi engaged in negotiations with EGI.  The

23  Company hired ERISA counsel to advise it on the legal issues associated with a potential ESOP

24  transaction, and in addition, the Company retained GreatBanc Trust to serve as the Trustee for the

25  ESOP. (The Trustee, in turn, hired Duff & Phelps as its financial advisors).

26     28.    On February 19, 2007, we received a term sheet from EGI; that term sheet was

27  revised on February 22, 2007 to set forth the proposed financing for the transaction.  The term sheet

28  contemplated a transaction that would acquire all of the outstanding shares at $33 per share in cash.

**0278**

- 7 -

1  EGI would make an investment of $224 million and would hold 21.4% of the post-merger shares,

2  with warrants that, if exercised, would provide EGI with an additional 20% equity stake.  The ESOP

3  would make an investment valued at $825 million.  Under the terms of the proposal, EGI and the

4  Company would acquire the existing shares of the Company, to be followed by the ESOP purchasing

5  Company equity from EGI.  The proposal also contemplated voting agreements with the Company's

6  significant shareholders, the Chandler Trusts and the McCormick Tribune Foundation.

7       29.    On March 1, 2007, EGI sent us a markup of the form merger agreement that had

8  previously been provided to all bidders.  We followed up with them the next day to discuss, among

9  other things, various conditions to completion of the transaction as well as the potential termination

10  fee that would be contained in the merger agreement.  It was our desire to secure the lowest possible

11  termination fee in order to ensure that there would be minimal impediments to another bidder who

12  might wish to make an acquisition proposal after the merger agreement was signed.

13       30.    Between March 4 and March 7, 2007, we continued in intensive discussions with

14  EGI.  Among the major points of discussion were the structure of the transaction, the amount of

15  equity investment that EGI would make, as well as the protections to shareholders from the risks of a delay

16  in the closing of the transaction.  On March 4, EGI sent a term sheet suggesting that proposed

17  transaction include a first step tender offer by the Company for a portion of its shares as a way to

18  meet the Company's expressed desire to provide an immediate return of capital to shareholders up

19  front (as would be the case under the "self-help" alternative also under consideration) and avoid

20  some the risks associated with the complex nature of the ESOP merger transaction being proposed

21  and need for, inter alia, regulatory approvals.  EGI also proposed that it would make a $250 million

22  initial investment in order to provide more certainty to the transaction, along with a similar initial

23  equity investment from ESOP.

24       31.    Although we continued to make progress with EGI, there were still serious concerns

25  about the feasibility of the transaction.  We were directed by the Special Committee to continue to

26  work up alternative transactions, including a modification of the previously-considered leveraged

27  recapitalization proposal followed by a spin-off of the B&E group.  The Special Committee made

28                                                             0279

- 8 -
**DECLARATION OF MICHAEL COSTA, MANAGING DIRECTOR, MERRILL LYNCH & CO.**

1   clear to us and to management that it wanted to be able to consider two different fully developed

2   alternatives at its next Special Committee meeting, to be held on March 21.

3       32.     At the March 21, 2007 Special Committee meeting, we and Citi presented our

4   analysis of the two different alternatives, which are discussed below.

5       33.     *First*, we provided an analysis of a leveraged ESOP transaction with EGI in which

6   there would be a first step partial self-tender by the Company for slightly more than half of its shares

7   at a price of $33 per share.  Our opinion was that the overall economic value of that first step

8   transaction to all shareholders was $17.50 – *i.e.*, if all shareholders tendered their shares, the

9   Company would accept the tenders on a *pro rata* basis.  This meant that the economic effect for such

10  shareholders would be to acquire slightly more half of their shares at $33, *i.e.*, would be

11  economically equivalent (on a pre-tax basis) of paying a $17.50 million dividend.  The critical

12  difference was that if the merger closed, all shareholders would then receive a cash payment for the

13  remainder of their shares and would not have any continuing equity interest in the Company.

14      34.     *Second*, we considered a leveraged recapitalization in which shareholders would

15  receive an immediate special dividend of $17.50 per share, followed by a recapitalization and

16  reorganization resulting in the formation of two different corporations, one holding the existing

17  company's publishing business, and a new company holding the company's B&E business.

18  Shareholders would be provided with equity interests in both companies.

19      35.     We pointed out that the economic impact of the first step of the EGI transaction and

20  the leveraged recapitalization were essentially the same to shareholders.  Under both proposals,

21  shareholder would received the economic equivalent of $17.50 in cash for each of their shares in the

22  first step of the transaction.  This was very important, because it meant that even if the EGI merger

23  was unable to close for some reason, the Company and shareholders would essentially be in the

24  same position as if it had done a leveraged recapitalization – *i.e.*, it could still pursue a spin-off of the

25  B&E business at a later date.  We noted that the EGI transaction would involve higher levels of debt,

26  but that because of the special tax considerations associated with an ESOP, the amount of cash

27  generated by the Company to repay that debt under the EGI transaction scenario was substantially

28  similar to the leveraged recapitalization.

**0280**

DECLARATION OF MICHAEL COSTA, MANAGING DIRECTOR, MERRILL LYNCH & CO.

1    36.    We provided the Special Committee our opinions with respect to the overall value of

2    the two different alternatives.  This analysis required us to provide a value to the EGI transaction –

3    *i.e.*, determining the current value of a two-step payment of $33 per share to shareholders, and, with

4    respect to the leveraged recapitalization proposal, to provide a valuation of the remaining broadcast

5    and B&E business in which shareholders would hold a remaining equity interest.  This valuation of

6    the remaining equity interest was highly dependent upon the Company's projections of the financial

7    performance of those business.  As a result, we provided the Special Committee with a range of

8    possible values for that transaction.  In comparing the two different alternatives, we stated that the

9    value of the cash received in the current version of the proposed EGI transaction represented a 24%

10   premium to the low end and a 4% discount to the high end of the recapitalization plan valuation.  We

11   were then excused from the meeting, and the Special Committee's financial advisors, Morgan

12   Stanley, presented their own valuation of the two proposals.  Following the meeting, we were

13   instructed to continue to negotiate possible improvements in the EGI transaction, and to present two

14   fully developed alternatives to the Special Committee at a meeting on March 30, 2007 for a final

15   determination.

16   **Discussions with Broad/Burkle**

17   37.    On March 24, 2007, I received a letter dated the prior day from representatives of

18   Messrs. Broad and Burkle addressed to the Company's Board of Directors.  Among other things, the

19   letter stated that Broad and Burkle had learned from press reports that the Company was considering

20   a possible transaction involving an ESOP.  The letter noted that Mr. Burkle's company, Yucaipa,

21   had been involved in similar transactions in the past and was familiar with them, and requested that

22   it be given the opportunity to review the contemplated transaction to allow them to advise the Board

23   as to whether Broad/Burkle could offer a higher value to shareholders than the proposal currently on

24   the table.

25   38.    I promptly forwarded the letter to the management and the Special Committee's

26   advisors.  In my cover email, I pointed out that Broad/Burkle had previously reduced the value of the

27   bid described in their letter.  I also noted that I would be happy to get on the phone with their

28   representatives and walk them through the basic outline of the EGI transaction and see if

0281

- 10 -

**DECLARATION OF MICHAEL COSTA, MANAGING DIRECTOR, MERRILL LYNCH & CO.**

1 | Broad/Burkle came back with something. I subsequently spoke to Charles Mulaney of Skadden
2 | Arps (legal counsel to the Special Committee) who had spoken to William Osborn (the chairman of
3 | the Special Committee) about the letter. Mr. Mulaney instructed me to promptly contact
4 | representatives of Broad/Burkle to explore more detail. Both were very clear that we should make
5 | every reasonable effort to ensure that Broad/Burkle were treated seriously and provided with
6 | whatever information the Company could provide.

7 | 39. The Broad/Burkle letter (and in my subsequent conversations with persons from
8 | UBS, the investment bankers representing Broad/Burkle) wrongly assumed that the *Company* that
9 | had first formulated an S Corp/ESOP transaction and had undertaken the documentation and analysis
10 | necessary to develop it. In fact, as I told representatives of Broad/Burkle (and as Mr. Osborn
11 | explained in a letter to them dated March 31, 2007), it was *EGI*, not the Company, that had first
12 | proposed this particular S Corp/ESOP transaction structure, and it was EGI, not the Company, (nor
13 | Merrill Lynch) that developed the proposal and documentation for the structure. In addition, as I
14 | explained to them, Broad/Burkle had never been denied any material information that was made
15 | available to other bidders.

16 | 40. Over the course of the next few days, I and members of my team and Citi had a
17 | number of conversations with representatives of Broad/Burkle. We reviewed the basic structure of
18 | the EGI transaction and the financing. We offered to provide Broad/Burkle with access to the
19 | financing team originally constituted to assist Broad/Burkle in their recapitalization proposal and
20 | described in detail the presentation that the Company and EGI had made to ratings agencies in order
21 | to secure a debt rating for the debt in connection with the EGI transaction. We were not given
22 | permission to share drafts of the EGI transaction documents with Broad/Burkle, however, which was
23 | consistent with customary practices to not "shop" one bidders' terms and conditions to another
24 | bidder.

25 | 41. At the same time, negotiations with EGI continued on multiple fronts. Among other
26 | things, the Company sought to increase the certainty with respect to the transaction, to limit any
27 | breakup fees the Company would have to pay, and to require a breakup fee from EGI in the event
28 | financing was not obtained for any reason other than a breach by the Company or the ESOP. The

- 11 -

**DECLARATION OF MICHAEL COSTA, MANAGING DIRECTOR, MERRILL LYNCH & CO.**

1  Company also required that its obligation to complete the merger would be conditioned on the

2  receipt of a satisfactory solvency opinion, among other conditions.  As a result of negotiations with

3  the Company and the ESOP, the initial investment by EGI was restructured so that EGI would

4  purchase $50 million in Company Common Stock and $200 million in a subordinated exchangeable

5  note that would be exchangeable into Company Common Stock at the Company's election, or

6  automatically if the Merger Agreement was terminated.  The parties also negotiated the terms of

7  proposed financing, with the goal of increasing the certainty that the financing would be available,

8  and agreed that receipt of financing would be a condition to the merger.  As of the time of the

9  Special Committee meeting, the terms of the transactions were still somewhat in flux, but EGI had

10  committed to a transaction with an economic value of $33.50 per share.

11       42.     Shortly before the March 30, 2007 Special Committee meeting, and before the

12  previously announced deadline, we received a letter from Broad/Burkle.  The letter contained

13  significantly less detail than their January 2007 proposal, but indicated their interest in utilizing the

14  ESOP structure that EGI had developed and "willingness to enter a definitive contract offering

15  shareholders $34 per share, our making a $500 million investment, and receiving warrants for 40%

16  of the Company."  The letter requested that the Company provide them with a draft of a definitive

17  agreement for such an ESOP transaction.  We promptly provided copies of the letter to advisors to

18  the Special Committee.

19       43.     Immediately following the Special Committee meeting, we were instructed by the

20  Special Committee to continue to work with Broad/Burkle and request answers to certain questions

21  raised by their letter.  During the next 24 hours, we had a number of conversations with

22  representatives of Broad/Burkle to discuss the EGI transaction and to provide them an opportunity to

23  answer our questions.  They asked us to provide them with a copy of the deal documents being

24  negotiated by EGI.  We informed them that they already had been provided a draft merger

25  agreement earlier in the process, and that EGI was working off of that draft agreement.

26  Burkle/Broad's representatives also clearly understood the timeframe for the Board's decision – I

27  informed them of the very real possibility that the Board would take definitive action by the next

28  day, April 1, 2007.

**0283**

**DECLARATION OF MICHAEL COSTA, MANAGING DIRECTOR, MERRILL LYNCH & CO.**

1    44.    We concluded, based on these discussions, that there was a great deal of work still to

2    be done if the Broad/Burkle transaction were to be developed to the same degree as the EGI

3    transaction., and the process could likely take a substantial amount of time to arrive at final

4    documentation, if agreement could even be reached.  Among other things, (1) Burkle/Broad would

5    need to obtain a similar indicative rating as EGI and the Company from the ratings agencies; (2) the

6    parties would have to negotiate the terms of a merger agreement (which had taken considerable time

7    and effort with EGI); (3) subsidiary agreements with the ESOP would then have to be negotiated; (4)

8    other agreements, including potentially agreements with other significant shareholders, would have

9    to be negotiated; (5) Broad/Burkle would have to negotiate and reach agreement on the financing of

10   the transaction, which could also require substantial additional work.  There was, of course, also no

11   assurance that satisfactory terms could be agreed to as to any of these issues.

12    45.    Moreover, we determined and shared with the Special Committee our analysis that

13   that under the financing potentially available, any increase in the economic value of the transaction

14   would not be possible through additional borrowing – *i.e.*, the financing was at its upper limit in the

15   current market conditions.  Thus, any increase in price would have to have been funded by direct

16   investments by the sponsors, *i.e.*, Broad/Burkle themselves.  We estimated that under the current

17   financing structure at $34 per share, each additional $1 per share increase in the price offered to

18   share would required about an additional $250 million in equity from Broad/Burkle.

19    46.    While these discussions with representatives of Broad/Burkle were continuing, the

20   Special Committee and its advisors continued to negotiate with EGI.  EGI agreed to increase its

21   price to $34 per share.  This increase came primarily from an increase in the EGI equity contribution

22   as EGI increased the amount it was prepared to invest after the merger closed.

23    47.    Significantly, EGI also agreed to a $25 million termination fee.  In my years of

24   experience, this is an extremely low termination fee, representing about $0.10 per share or about

25   0.003% of the overall transaction value.  It was, in fact, the smallest termination fee as a percentage

26   of transaction value I have ever seen in my experience as an investment banker.  It was my opinion,

27   which I expressed to the Special Committee and its advisors, that such a  termination would pose no

28   meaningful barrier to a subsequent superior bid, if one were available.

**0284**

- 13 -

**DECLARATION OF MICHAEL COSTA, MANAGING DIRECTOR, MERRILL LYNCH & CO.**

1     48.    The Special Committee met again on April 1, 2007. There was an extensive

2    discussion about the improvements to the EGI transaction and the discussions we had had with

3    Broad/Burkle. We discussed the possibility of extending the bidding process, which had already

4    been very lengthy. We also discussed the fact that while EGI had not put a specific deadline on its

5    offer, its representatives had clearly indicated that they were expecting that a decision would be

6    reached by the end of that weekend and that EGI had found the whole process frustrating. As a

7    result, concern was expressed that EGI could walk away if the bidding process was extended; there

8    was also concern that even if Zell came back to the table Burkle/Broad wouldn't be there anymore.

9     49.    We also discussed the fact that with an extremely small termination fee, the

10    "fiduciary out" clause in the merger agreement, as well as the fact that we would be required to

11    publicly file all of the EGI transaction documents promptly after the announcement of the

12    transaction, there would be no meaningful impediments to Broad/Burkle (or anyone else, for that

13    matter) from making a superior offer, which the Board would be obligated to negotiate and consider.

14     50.    On April 5, 2007, Burkle and Broad sent a letter to the Board indicating their

15    disappointment that they had not been given an opportunity to make a "best and final" offer. In my

16    experience, however, a "best and final offer" can be made only when a proposal has been developed

17    to the point where it is capable of being accepted. We had expressly told Broad/Burkle that any

18    proposal would, at a minimum, have to be accompanied by a marked-up merger agreement to be

19    capable of consideration by the Company. In contrast to the other potential purchasers, however,

20    Broad/Burkle never submitted any of their own documentation or mark-ups of the Company's

21    documentation to support their S Corp/ESOP transaction other than the one-page March 29 letter.

22     51.    Under these circumstances, and given the absence of any material impediments to a

23    subsequent superior offer, the Special Committee concluded, with the advice of its advisors and the

24    Company's advisors including Merrill Lynch, that it was advisable to take the "bird in the hand" and

25    leave open the possibility of a subsequent bid, as opposed to jeopardizing both bids. That judgment

26    is supported by the fact that no higher offer has since been made, even though the termination fee

27    agreed to by EGI is extremely low and the deal documents are now publicly available for potential

28    bidders to use.

**0285**

DECLARATION OF MICHAEL COSTA, MANAGING DIRECTOR, MERRILL LYNCH & CO.

1

2　I declare under penalty of perjury that the foregoing is true and correct.

3　Executed on May 21st, 2007

4

5　*Michael R Costa*

6　MICHAEL COSTA

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 15 -

**DECLARATION OF MICHAEL COSTA, MANAGING DIRECTOR, MERRILL LYNCH & CO.**

0286

DECLARATION OF
DONALD C. GRENESKO

# DECLARATION OF DONALD C. GRENESKO

I, Donald C. Grenesko, declare and say:

1.      I am Senior Vice President/Finance and Administration of Tribune Company ("Tribune" or the "Company"), a Delaware corporation.  I have served as Senior Vice President/Finance and Administration of Tribune since 1996 and have been employed by the Company since 1980.  I joined the Company in 1980 as treasury manager and was appointed Treasurer of the Company in 1984.  In 1985, I was named Executive Vice President for business operations for the Chicago Cubs ("Cubs"), a Tribune subsidiary.  From 1988 to 1991 I served as President and Chief Executive Officer of the Cubs.  From 1991 to 1996 I served as Chief Financial Officer of Tribune Company and in 1993 I was also named Senior Vice President of Tribune responsible for the Company's corporate financial functions.

2.      I have been deeply involved in efforts to obtain and negotiate the terms of financing for the Company's $34 per share Tender Offer, currently scheduled to close on May 24, 2007, and the merger of Tribune Employee Stock Ownership Plan, Tesop Corporation, Tribune Company, and EGI-TRB, L.L.C.  Under the terms of the Tender Offer, Tribune contemplates paying out to shareholders approximately $4.28 billion.

3.      Over the past several years, Tribune's financial condition has steadily deteriorated. The Company's main businesses – newspaper publishing, which represented 74% of the Company's consolidated operating revenues in 2006, and television broadcasting – are suffering from the effects of intense competition from the internet, including declining advertising revenues.  This competition has eroded the profitability of the Company's main businesses, and has forced Tribune and other traditional media companies to alter their business approach.  Over the past several years, Tribune's share price has also decreased.  In early 2004 Tribune's share price was over $50; a year later, in early 2005 it had fallen to $40 per share and in early 2006, Tribune's share price stood at just $28 per share.

1    4.    After months of discussing potential strategic alternatives for the Company with its

2    financial advisors, on September 21, 2006, the Company's Board of Directors established a Special

3    Committee to oversee a formal process of exploring strategic alternatives.  As part of this process, the

4    Board authorized the Company to seek third-party proposals for the acquisition of the Company.  For

5    the next six months, the Special Committee, with the assistance of its own financial and legal

6    advisors, solicited interested parties, including both strategic and financial buyers, and conducted a

7    formal bidding process for the sale of the Company.

8    5.    The formal process undertaken by the Special Committee culminated in the Board's

9    acceptance of the EGI merger proposal on April 2, 2007.  The EGI merger will be preceded by a

10    Tender Offer whereby Tribune plans to repurchase a majority of its outstanding shares for $34 per

11    share.  The Tender Offer currently is scheduled to close on May 24, 2007.  All Tribune shareholders

12    remaining after the Tender Offer will be "cashed out" in the course of the subsequent EGI merger and

13    will receive $34 in cash for each share that they own.

14    6.    At the time the Company agreed to the EGI merger it was also contemplating an

15    alternative course of action, often referred to as the "self help" alternative, which required the

16    Company to borrow money to fund a significant return of capital (*i.e.* special dividend or tender

17    offer) to shareholders followed by a reorganization of the Company.  The Tender Offer preceding the

18    EGI merger, which will provide shareholders with the opportunity to gain cash for their shares at a

19    premium price up front, is very similar in both nature and amount to the return of capital feature of

20    the self help alternative.  Furthermore, if the merger does not close, shareholders will be no worse off

21    than if the Company had pursued the self help alternative, leaving the Company free to revisit the

22    alternatives of spinning off the Broadcasting & Entertainment group, selling any number of stand-

23    alone assets such as the Chicago Cubs, or doing any number of other transactions that it believes will

24    maximize shareholder value.

25    7.    Nor does the Tender Offer facilitate or "lock up" the EGI merger as the completion of

26    the Tender Offer does not make the ultimate success of the merger more likely, nor does it preclude

27    any higher offers from being made.  I understand that plaintiff has suggested that the fact that the EGI

28

2

1   and ESOP received stock will make it more expensive for another buyer to purchase the Company

2   because that other buyer would have to purchase those shares.  However, the Company received

3   value for (in EGI's case, at a premium to the market price) for those shares, and a subsequent

4   acquiror would receive the benefit of what the Company has received in that regard.  And even if any

5   incremental costs from the issuance of those shares were considered and combined with the $25

6   million termination fee, they would still be very small – a little over 1% of the overall transaction

7   value.  Moreover, if the Tender Offer achieves maximum shareholder participation, Tribune will

8   repurchase approximately 126 million of its outstanding shares.  When combined with the newly-

9   issued shares purchased by EGI and the ESOP, the Tender Offer will reduce the total number of

10   outstanding Tribune shares by 116 million shares.  Thus, it would actually be *easier* for a potential

11   acquiror to gain control of Tribune after the Tender Offer has closed because that potential acquiror

12   would have 116 million fewer shares to purchase.

13         8.       The Company's financial position continues to deteriorate.  On May 9, 2007, the

14   Company filed its Form 10-Q with the Securities and Exchange Commission which disclosed the

15   Company's financial performance during the first quarter of 2007.  Compared to the first quarter of

16   2006, total operating revenues fell by over 4% and publishing operating revenues fell by

17   approximately 5½%, total operating profits fell by over 16% and publishing operating profits fell by

18   nearly 18%.  The financial position of the Company makes it highly likely that, in the absence of the

19   Tender Offer, Tribune's share price would be far below what it is currently, $33.05.

20         9.       Tribune's shares have been trading at their current price, $33.05, because of the

21   pendency of the Tender Offer and merger.  Tribune's "unaffected" stock price would be far less.

22   Investors' expectation of receiving $34 per share for 54% of Tribune's outstanding shares in the

23   immediate future is a significant component of the current stock price and by removing the

24   expectation of such an assured and prompt return the stock is economically worth less, and the stock

25   price presumably will drop to reflect that fact.  If, in the absence of the Tender Offer, all that it left is

26   the potential receipt of consideration in connection with an eventual merger, the market will adjust

27   the stock price to reflect the loss of time value of the current receipt of funds.

28

3

DECLARATION OF DONALD C. GRENESKO

0289

10.     If the Tender Offer is enjoined, shareholders and financial analysts are likely to perceive that event as an indication that there is greater uncertainty regarding the eventual closing of the merger transaction itself, and that the merger may be at risk.  Given Tribune's financial condition and the historical performance of its stock, this perception is certain to drive Tribune's stock price downward, leaving Tribune shareholders with shares that are less valuable.

11.     In order to pay the $4.28 billion that Tribune expects to pay its shareholders in connection with the Tender Offer, Tribune has secured financing commitments from a number of lenders.  These financing commitments, and the EGI merger agreement itself, contain clauses that excuse performance if any event having a "material adverse effect" on the Company occurs.  "Material adverse effect" is defined as:

> [A]ny facts, circumstances, events or changes that are materially adverse to the business, assets, financial condition, results of operations on an ongoing basis or continuing operations of the Company and its Subsidiaries, taken as a whole, or that have a material adverse effect on the ability of the Company to perform its obligations under this Agreement ....

Any delay of the Tender Offer exposes shareholders to the risk that there could be any number of adverse developments, including in the financial markets, the industry, or the Company's business, that could give rise to a claim by the Company's lenders or another party to the merger agreement that they are not obligated to perform under the financing commitments or the merger agreement because of the existence of a "material adverse effect."  Such a result would likely preclude the Tender Offer and merger from closing at all.  While I do not wish to be understood as suggesting that any of these possibilities is likely, my point is that the longer the Tender Offer remains open and the Tender Offer consideration remains in the hands of the lenders rather than in the hands of shareholders, the greater the exposure such shareholders face to the potential of such adverse developments.

4

0290

1    I declare under penalty of perjury that the foregoing is true and correct and that this

2 declaration is executed this 20th day of May, 2007 in Winnetka, Illinois.

3

4

5

6                                                          Donald C. Grenesko

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CHI 3876652v.1          DECLARATION OF DONALD C. GRENESKO

0291

DECLARATION OF
BERNARD S. BLACK

Exhibit A

# *CURRICULUM VITAE*
**Bernard S. Black**
*April 2007*
Hayden W. Head Regents Chair for Faculty Excellence, School of Law, and
Professor of Finance, Red McCombs School of Business
*University of Texas at Austin*

| | |
|---|---|
| tel: (512) 471-4632 | My recent research is available from the Social |
| fax: (512) 232-1767 | Science Research Network (SSRN) at: |
| cell: (650) 773-0955 | *http://papers.ssrn.com/author=16042* |
| e-mail: bblack@law.utexas.edu | |

---

## EMPLOYMENT

2004-  Hayden W. Head Regents Chair for Faculty Excellence and Professor of Law, University of Texas School of Law

Professor of Finance, McCombs School of Business, University of Texas

Co-Director, Center for Law, Business, and Economics, University of Texas

principal courses:    Corporations
Corporate Finance
Corporate Acquisitions
Law and Economics

1998-2004:  Professor of Law, Stanford Law School (George E. Osborne Professor 2003-2004)

1988-1998:  Professor of Law, Columbia Law School (Associate Professor 1988-1991)

1994-1995:  Senior Policy Advisor (resident in Moscow, Russia), Harvard Institute for International Development, Russia Legal Reform Project (advisor to Russian Government on corporate and securities law)

1987-1988:  Counsel to Commissioner Joseph A. Grundfest, Securities and Exchange Commission

1983-1987:  Private practice with Skadden, Arps, Slate, Meagher & Flom, New York, specializing in mergers and acquisitions, securities law, and corporate law

1982-1983:  Law clerk to Judge Patricia M. Wald, U.S. Court of Appeals, District of Columbia Circuit

## PROFESSIONAL BOOKS

Bernard Black, Reinier Kraakman & Anna Tarassova, **A Guide to the Russian Law on Joint Stock Companies** (Kluwer Law International 1998, 1088 pp.) (Russian version published as Комментарий Федерального Закона об Акционерных Обществах

0308

(Издательство Лабиринт (Labirint Press) 1999, 720 pp.) (Russian version available at (http://ssrn.com/abstract=246670) (second edition, with Vasilisa Strizh, forthcoming 2004)

Ronald Gilson & Bernard Black, **The Law and Finance of Corporate Acquisitions** (Foundation Press, 2d ed. 1995, 1603 pp.), and 2003-2004 supplement (460 pp.) (3d. edition, with Jeff Gordon, forthcoming 2007)

**Negotiating and Drafting the Acquisition Agreement** (ALI-ABA Transactional Skills Series 1998, 303 pp.)

Ronald Gilson & Bernard Black, **(Some of) the Essentials of Finance and Investment** (Foundation Press 1993; 252 pp.)

## PROFESSIONAL ARTICLES

2008    Charles Silver, Kathryn Zeiler, Bernard Black, David Hyman & William Sage, *Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003*, xx **Geneva Papers on Risk and Insurance** yyy-zzz (forthcoming 2008) (http://ssrn.com/abstract=983199)

2007    Bernard Black, David Hyman, Charles Silver & William Sage, *The Costs of Litigating Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004* (working paper, April 2007) (http://ssrn.com/abstract=979163)

Bernard Black and Vikramaditya Khanna, *Can Corporate Governance Reforms Increase Firms' Market Values? Event Study Evidence from India*, 4 **Journal of Empirical Legal Studies** yyy-zzz (forthcoming 2007) (http://ssrn.com/abstract=914440)

David Hyman, Bernard Black, Charles Silver & William Sage, *The Effect of Non-Economic Damages Caps on Medical Malpractice Payouts* (working paper May 2007) (http://ssrn.com/abstract=xxxxxx)

Vladimir Atanasov, Bernard Black & Conrad Ciccotello, *Option Megagrants* (working paper, Feb. 2007) (http://ssrn.com/abstract=xxxxxx)

Kathryn Zeiler, Charles Silver, Bernard Black, David Hyman & William Sage, *Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims, 1990-2003*, xx **Journal of Legal Studies** yyy-zzz (forthcoming 2007) (http://ssrn.com/abstract=981192)

David Hyman, Bernard Black, Kathryn Zeiler, Charles Silver & William Sage, *Do Defendants Pay What Juries Award?: Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003*, 4 **Journal of Empirical Legal Studies** 3-68 (2007) (http://ssrn.com/abstract=914415)

Henry Hu & Bernard Black, *Hedge Funds, Insiders, and the Decoupling of Economic and Voting Ownership: Empty Voting and Hidden (Morphable) Ownership*, xx **Journal of Corporate Finance** (forthcoming 2007) (finance-oriented version of *The New Vote Buying*) (http://ssrn.com/abstract=874098)

0309

Bernard Black & Woochan Kim, *The Effect of Board Structure on Firm Value in an Emerging Market: IV, DiD, and Firm Fixed Effects Evidence from Korea* (working paper March 2007) (http://ssrn.com/abstract=968287)

N. Balasubramanian, Bernard Black & Vikramaditya Khanna, *An Overview of Indian Corporate Governance* (working paper, Nov. 2006) (http://ssrn.com/abstract=xxxxxx)

Vladimir Atanasov, Bernard Black, Conrad Ciccotello & Stanley Gyoshev, *How Does Law Affect Finance? An Examination of Financial Tunneling in an Emerging Market* (working paper January 2007) (http://ssrn.com/abstract=902766)

Bernard Black, Woochan Kim, Hasung Jang & Kyung-Suh Park, *Does Corporate Governance Predict Firms' Market Values: Time-Series Evidence from Korea* (working paper November 2005) (http://ssrn.com/abstract=844744)

2006    Bernard Black, Hasung Jang & Woochan Kim, *Does Corporate Governance Affect Firms' Market Values? Evidence from Korea*, 22 **Journal of Law, Economics and Organization** 366-413 (2006) (nearly final version at http://ssrn.com/abstract=311275)[1]

Bernard Black, Hasung Jang & Woochan Kim, *Predicting Firms' Corporate Governance Choices: Evidence from Korea,* 12 **Journal of Corporate Finance** 660-691 (2006) (nearly final version at http://ssrn.com/abstract=428662)

Henry Hu & Bernard Black, *The New Vote Buying: Empty Voting and Hidden Ownership*, 79 **Southern California Law Review** 811-908 (2006) (http://ssrn.com/abstract=904004)

Henry Hu & Bernard Black, *Empty Voting and Hidden Ownership: Taxonomy, Implications, and Reforms*, 61 **Business Lawyer** 1011-1070 (2006) (http://ssrn.com/abstract=887183)[2]

Bernard Black, Brian Cheffins & Michael Klausner, *Outside Director Liability*, 58 **Stanford Law Review** 1055-1159 (2006) (http://ssrn.com/abstract=894921)[3]

Brian Cheffins & Bernard Black, *Outside Director Liability Across Countries*, 84 **Texas Law Review** 1385-1480 (2006) (http://ssrn.com/abstract=438321)

Bernard Black, Brian Cheffins & Michael Klausner, *Outside Director Liability: A Policy Analysis*, 162 **Journal of Institutional and Theoretical Economics** 5-31 (2006) (http://ssrn.com/abstract=878135)[4]

Bernard Black, Brian Cheffins & Michael Klausner, *Nicht-geschäftsführende Direktoren, Haftungsrisiko und Corporate Governance: Eine rechtsvergleichende Analyse (Outside*

---

[1]  Received Maekyung Economist Award (2007) from Maeil Business News as best article in economics and business for 2006 written by Korean authors.    Summarized in Korean in Bank of Korea, **Economic and Monetary Policy** (forthcoming 2007).

[2]  Chosen as one of top ten corporate and securities law articles for 2006 (survey conducted by Robert Thompson, **[url to come]**.  For a short, practitioner-oriented version, see Henry Hu & Bernard Black, *Empty Voting and Hidden (Morphable) Ownership*, **M&A Lawyer**, March 2007, at 9-12.

[3]  Chosen as one of top ten corporate and securities law articles for 2006 (survey conducted by Robert Thompson, **[url to come]**.

[4]  Reprinted in xx **ICFAI** (Institute of Chartered Financial Analysts of India) **Journal of Corporate and Securities Law** yy-zz (forthcoming 2007).

0310

*Directors, Liability Risk and Corporate Governance: A Comparative Analysis)*, in Stefan Grundmann, Hans-Peter Schwintowski, Reinhard Singer & Martin Weber, eds., **Anleger- und Funktionsschutz durch Kapitalmarktrecht (Investor and Market Protection through Capital Market Laws)** 121-145 (2006) (English version at (http://ssrn.com/abstract=800584) (German version at http://ssrn.com/abstract=800604)

Bernard Black, Inessa Love & Andrei Rachinsky, *Corporate Governance Indices and Firms' Market Values: Time-Series Evidence from Russia*, 7 **Emerging Markets Review** 361-379 (2006) (nearly final version at http://ssrn.com/abstract=966988)

Bernard Black & Paul Caron, *Ranking Law Schools: Using SSRN to Measure Scholarly Performances, in* Symposium, *The Next Generation of Law School Rankings*, 81 **Indiana Law Journal** 83-139 (2006) (http://ssrn.com/abstract=784764)

2005    Bernard Black, Charles Silver, David Hyman & William Sage, *Stability, Not Crisis: Medical Malpractice Claim Outcomes In Texas, 1988-2002*, 2 **Journal of Empirical Legal Studies** 207-259 (2005) (http://ssrn.com/abstract=770844)

Bernard Black, Brian Cheffins & Michael Klausner, *Liability Risk for Outside Directors: A Cross-Border Analysis* 11 **European Financial Management** 153-171 (2005) (http://ssrn.com/abstract=682507) (summary, finance-oriented version of *Outside Director Liability After WorldCom and Enron* and *Outside Director Liability Across Countries*)[5]

Bernard Black, Brian Cheffins & Michael Klausner, *Shareholder Suits and Outside Director Liability: The Case of Korea*, in Young-Jae Lim, ed., **Corporate Governance and the Capital Market in Korea** xxx-yyy (forthcoming 2005) (http://ssrn.com/abstract=628223)[6]

Bernard Black, Brian Cheffins & Michael Klausner, *Outside Director Liability Risk: Much Did WorldCom and Enron Change the Rules?*, **Bloomberg Law Reports: Corporate Governance** 1, 8-11 (July 2005) (http://ssrn.com/abstract=xxxxxx)[7]

2004    Sanjai Bhagat, Bernard Black & Margaret Blair, *Relational Investing and Firm Performance*, 27 **Journal of Financial Research** 1-30 (2004) (http://ssrn.com/abstract=391262)

Bernard Black, Brian Cheffins & Michael Klausner, *Outside Directors and Lawsuits: What are the Real Risks?*, **McKinsey Quarterly** 70-78 (2004, No. 4) (http://ssrn.com/abstract=590913) (condensed version of *Liability Risk for Outside Directors: A Cross-Border Analysis)*[8]

---

[5]   Revised version published in John Armour & Joseph McCahery eds., **After Enron: Improving Corporate Law and Modernising Securities Regulation in Europe and the US** 343-366 (2006).

[6]   Reprinted in 3 **ICFAI** (Institute of Chartered Financial Analysts of India) **Journal of Corporate and Securities Law** 66-89 (May 2006).

[7]   Earlier version published as *Outside Directors' Liability: Have WorldCom and Enron Changed the Rules?*, **Stanford Lawyer** 36-39 (Winter 2005).

[8]   A Europe-UK-centered version of this article was published as *Non-Executive Directors? How Worried Should They Be?*, **European Lawyer**, 2004/Jan. 2005, at 30-31 (with Simon Whitney).

0311

Bernard Black, Brian Cheffins & Michael Klausner, *Outside Director Liability (Before Enron and WorldCom)*, (working paper 2004) ((http://ssrn.com/abstract=382422) (early version of *Outside Director Liability*, not separately published*)*

2003    Bernard Black & Anna Tarassova, *Institutional Reform in Transition: A Case Study of Russia*, in 10 **Supreme Court Economic Review** 211-278 (2003) (conference issue, also published as Todd Zywicki ed., **The Rule of Law, Freedom, and Prosperity**) (http://ssrn.com/abstract=311276)

*The Role of Self-Regulation in Supporting Korea's Securities Markets* , 2(3) **Journal of Korean Law** 17-38 (2003) (http://ssrn.com/abstract=293565)[9]

2002    Bernard Black & Reinier Kraakman, *Delaware's Takeover Law: The Uncertain Search for Hidden Value*, 96 **Northwestern University Law Review** 521-566 (2002) (http://ssrn.com/abstract=279376)[10]

Sanjai Bhagat & Bernard Black, *The Non-Correlation Between Board Independence and Long-Term Firm Performance*, 27 **Journal of Corporation Law** 231-274 (2002) (http://ssrn.com/abstract=133808)

2001    *The Legal and Institutional Preconditions for Strong Securities Markets*, 48 **UCLA Law Review** 781-855 (2001) (http://ssrn.com/abstract=182169)[11]

Bernard Black, Barry Metzger, Timothy O'Brien & Young Moo Shin, *Corporate Governance in Korea at the Millennium: Enhancing International Competitiveness* (Report to the Korean Ministry of Justice, May 2000), 26 **Journal of Corporation Law** 537-609 (2001) (http://ssrn.com/abstract=222491)

*The Corporate Governance Behavior and Market Value of Russian Firms*, 2 **Emerging Markets Review** 89-108 (2001) (nearly final version at (http://ssrn.com/abstract=263014)[12]

*Does Corporate Governance Matter?: A Crude Test Using Russian Data*, 149 **University of Pennsylvania Law Review** 2131-2150 (2001) (http://ssrn.com/abstract=252706) (conference version of *The Corporate Governance Behavior and Market Value of Russian Firms*)

---

[9]    Also published in Korean in 4 **Korean Journal of Securities Law** xxx-yyy (2003) and in Chinese in **Journal of Comparative Studies** (forthcoming 2003). An earlier conference version was published in Hwa-Jin Kim ed., **Self-Regulation in the Korean Securities Market** 17-30 (2003).

[10]    Reprinted in 44 **Corporate Practice Commentator** 519-566 (2002).

[11]    Conference version published in **OECD, Corporate Governance in Asia: A Comparative Perspective** 55-84 (2001). Reprinted in 2002-2003 **Corporate Practice Commentator** xxx-yyy and in 2002 **Securities Law Review**. Published in Chinese in **Corporate Governance Theory, Criteria and Practice** xxx-yyy (2001).

[12]    *Reprinted in* Stephen LH Phua ed., **Singapore Conference on International Business Law: Current Developments in Financial Regulation and Capital Markets** 249-275 (2002), summarized in Torrey Clark, *Russia's Corporate Values*, 90 **Foreign Policy** 90-91 (Nov./Dec. 2001), Russian version at (http://ssrn.com/abstract=367141).

0312

*The Core Fiduciary Duties of Outside Directors*, **Asia Business Law Review** 3-16 (July 2001) (http://ssrn.com/abstract=270749)[13]

2000    Bernard Black, Reinier Kraakman & Anna Tarassova, *Russian Privatization and Corporate Governance: What Went Wrong?*, 52 **Stanford Law Review** 1731-1808 (2000) (http://ssrn.com/abstract=181348)[14]

*The Core Institutions that Support Strong Securities Markets*, 55 **Business Lawyer** 1565-1607 (2000) (shorter version of *The Legal and Institutional Preconditions for Strong Securities Markets*) (http://ssrn.com/abstract=231120)

*The First International Merger Wave (and the Fifth and Last U.S. Wave)*, 54 **University of Miami Law Review** 799-818 (2000) (http://ssrn.com/abstract=231101)

*Is This the First International Merger Wave?*, **M&A Lawyer**, July/Aug. 2000, at 20-26 (shorter version of *The First International Merger Wave (and the Fifth U.S. Wave)* (http://ssrn.com/abstract=243631)

*Strengthening Brazil's Securities Markets*, 120 **Revista de Direito Mercantil, Economico e Financiero [Journal of Commercial, Economic and Financial Law]** 41-55 (2000) (http://ssrn.com/abstract=247673)

1999    Gainan Avilov, Bernard Black, Dominique Carreau, Oksana Kozyr, Stilpon Nestor & Sarah Reynolds, *General Principles of Company Law for Transition Economies*, 24 **Journal of Corporation Law** 190-293 (1999) (in English and Russian) (http://ssrn.com/abstract=126539); Russian version at (http://ssrn.com/abstract=127208)[15]

Bernard Black & Ronald Gilson, *Does Venture Capital Require an Active Stock Market?*, **Journal of Applied Corporate Finance** 36-48 (Winter 1999) (shorter version of *Venture Capital and the Structure of Capital Markets: Banks Versus Stock Markets*) (http://ssrn.com/abstract=146492)[16]

---

[13]    Shorter version published in **Directors and Boards** (2001) [need issue and page number]. Published in Chinese in 11 **Commercial Law Review** xxx-yyy (2004) (Hui Huang trans.) (Chinese version available at http://ssrn.com/abstract-xxxxxx).

[14]    Reprinted in Michael A. Heller & Merritt Fox, eds, **Corporate Governance Lessons from Transition Economy Reforms** 113-193 (Princeton Univ. Press 2006); Gerrit de Geest & Roger Van den Bergh eds., **Comparative Law and Economics** vol. x, pp. ___-___ (2003); 2001-2002 *Corporate Practice Commentator* 215-294, Ekonomski Anali [Economic Annals], no. 147-48 29-105 (Dec. 2000-March 2001) (Belgrade University). Also excerpted in 10 **Transition** (World Bank Dec. 1999), summarized in **Economic Intuition** 8-9 (Summer 2001), and published in Chinese in **Tsinghua Law Journal** (forthcoming 2003).

[15]    Also translated into Serbian.

[16]    Published in Korean in 2 **Korean Journal of Securities Law** 349-379 (2001).

0313

Sanjai Bhagat & Bernard Black, *Is There a Relationship Between Board Composition and Firm Performance?*, 54 **Business Lawyer** 921-963 (1999) (http://ssrn.com/abstract=11417)[17]

1998    Bernard Black & Ronald Gilson, *Venture Capital and the Structure of Capital Markets: Banks Versus Stock Markets*, 47 **Journal of Financial Economics** 243-277 (1998) (http://ssrn.com/abstract=46909)[18]

*Information Asymmetry, the Internet, and Securities Offerings*, in 2 **Journal of Small and Emerging Business Law** 91-99 (1998), and **Journal of Applied Corporate Finance** xxx-yyy (2000) (http://ssrn.com/abstract=84489)

*The Uncertain Relationship Between Board Composition and Firm Performance* (conference version of *The Non-Correlation_Between Board Composition and Long-Term Firm Performance?*), in Klaus Hopt, Hideki Kanda, Mark Roe, Eddy Wymeersch & Stefan Prigge, eds., **Comparative Corporate Governance:  The State of the Art and Emerging Research** 281-306 (1998)[19]

*Shareholder Activism and Corporate Governance in the United States*, in Peter Newman, ed., 3 **The New Palgrave Dictionary of Economics and the Law** 459-465 (1998) and **Corporate Governance Advisor**, Jan./Feb. 1999, at 14-22 (http://ssrn.com/abstract=45100)[20]

Sanjai Bhagat & Bernard Black, *Independent Directors*, in Peter Newman, ed., 2 **The New Palgrave Dictionary of Economics and the Law** 283-287 (1998)

1997    *The Board Game*, **Chief Executive** 82-83 (Oct. 1997)

1996    Bernard Black & Reinier Kraakman, *A Self-Enforcing Model of Corporate Law*, 109 **Harvard Law Review** 1911-1981 (1996) (http://ssrn.com/abstract=10037)[21]

Bernard Black, Reinier Kraakman & Jonathan Hay, *Corporate Law from Scratch*, in Roman Frydman, Cheryl W. Gray & Andrzej Rapaczynski eds., **Corporate Governance in Central Europe and Russia, vol. 2:  Insiders and the State** 245-302 (1996) (conference version of *A Self-Enforcing Model of Corporate Law*)

---

[17]    Published in French as **Indépendance du conseil et performance corporative**, 1(1) **Gouvernance** 68-95 (2000).

[18] Reprinted in **Corporate Governance Today:  The Sloan Project on Corporate Governance at Columbia Law School** 1-36 (1999); Lowell Busenitz, Harry Sapienza & Mike Wright eds., **Venture Capital ___-___** (2002); Joseph McCahery & Luc Renneboog eds., **Venture Capital Contracting and the Valuation of High Technology Firms** 29-59 (2003), and Robert Watson ed., **Governance and Ownership** 68-102 (2005).

[19]  Also published in Roy Smith, ed., **The Power and Influence of Pension and Mutual Funds ___-___** (1998) and in **Corporate Governance Today:  The Sloan Project on Corporate Governance at Columbia Law School** 291-316 (1999).

[20]    Shorter version published as *Does Shareholder Activism Improve Corporate Performance?*, **The Corporate Board** 1-6 (Mar./Apr. 1998).

[21]    Published in Spanish in __ **Revista Argentina de Teoria Juridica ___-___** (forthcoming 2003).

0314

1995    *The Russian Civil Code: A Straightjacket for Joint Stock Companies*, **International Practitioner's Notebook** 33-36 (August 1995)

1994    *A Proposal for Implementing Retail Competition in the Electricity Industry*, **Electricity Journal** 58-72 (Oct. 1994)

Bernard Black & John Coffee, *Hail Britannia?: Institutional Investor Behavior under Limited Regulation*, 92 **Michigan Law Review** 1997-2087 (1994) (http://ssrn.com/abstract=276991)[22]

1993    Bernard Black & Richard Pierce, *The Choice Between Markets and Central Planning in Regulating the U.S. Electricity Industry*, 93 **Columbia Law Review** 1339-1441 (1993), reprinted in 18 **Public Utilities Law Anthology** (1994)

*Next Steps in Corporate Governance Reform: 13(d) Rules and Control Person Liability*, in Kenneth Lehn & Robert Kamphuis eds., **Modernizing U.S. Securities Regulation: Economic and Legal Perspectives** 225-238 (1993)[23]

1992    *Next Steps in Proxy Reform*, 18 **Journal of Corporation Law** 1-55 (1992), reprinted in 26 **Securities Law Review** 397-451 (1994)

*Institutional Investors and Corporate Governance: The Case for Institutional Voice*, 5 **Journal of Applied Corporate Finance** 19-32 (Fall 1992)[24]

*Agents Watching Agents: The Promise of Institutional Investor Voice*, 39 **UCLA Law Review** 811-893 (1992)[25]

*The Value of Institutional Investor Monitoring: The Empirical Evidence*, 39 **UCLA Law Review** 895-939 (1992)

1991    *Disclosure, Not Censorship: The Case for Proxy Reform*, 17 **Journal of Corporation Law** 49-86 (1991)

1990    *Shareholder Passivity Reexamined*, 89 **Michigan Law Review** 520-608 (1990) (http://ssrn.com/abstract=366820)

*Is Corporate Law Trivial?: A Political and Economic Analysis*, 84 **Northwestern University Law Review** 542-597 (1990) (http://ssrn.com/abstract=329240)

---

[22] Reprinted in 37 **Corporate Practice Commentator** 245-337 (1995) and in Kevin Keasey ed., **Corporate Governance** xxx-yyy (1998); conference version published in John Coffee, Ronald Gilson & Louis Lowenstein eds., **Meaningful Relationships: Institutional Investors, Relational Investing, and the Future of Corporate Governance** ___-___ (1998)

[23] Also published in **Journal of Applied Corporate Finance** 49-55 (Winter 1993); and 9 **Bank & Corporate Governance Law Reporter** 751-757 (1992).

[24] Reprinted in **Studies in International Corporate Finance and Governance Systems** 160-173 (Donald Chew ed. 1997).

[25] Excerpted in Thomas Joo, ed., **Corporate Governance: Law, Theory, and Policy** 282-294 (2004).

1989    *Bidder Overpayment in Takeovers*, 41 **Stanford Law Review** 597-660 (1989); reprinted in 22 **Securities Law Review** 381-444 (1990)

1988    Bernard Black & Joseph Grundfest, *Shareholder Gains from Takeovers and Restructurings Between 1981 and 1986*, 1 **Journal of Applied Corporate Finance** 5-15 (Spring 1988)

1982    Project, *Law Firms and Lawyers with Children: An Empirical Analysis of Family/Work Conflict*, 34 **Stanford Law Review** 1263-1308 (1982)

1981    Note, *A Model Plain Language Law*, 33 **Stanford Law Review** 255-300 (1981)

1979    Robert Westervelt, James Culbertson & Bernard Black, *Discovery of the Immobility of Electron-Hole Drops in Germanium at Low Excitation*, 42 **Physical Review Letters** 267-272 (1979)

## WORK IN PROGRESS

David Hyman, Bernard Black & Charles Silver *Contingent Fees in Personal Injury Litigation: Evidence from Texas*

John Armour, Bernard Black & Brian Cheffins, *Shareholder Lawsuits and Corporate Governance: UK and US Evidence*

Bernard Black, Hwa-Jin Kim & Woochan Kim, *Korean Corporate Governance: Progress Report and Reform Recommendations* (working paper May 2005) (http://ssrn.com/abstract=xxxxxx)

*Corporate Governance and the Market Value of Brazilian Firms* (with Érica Gorga and Antonio Gledson de Carvalho)

N. Balasubramanian, Bernard Black, Dhammika Dharmapala & Vikramaditya Khanna, *Does Corporate Governance Predict Firms' Market Values:  Evidence from India* (working paper forthcoming 2007)

*The Elements of Corporate Governance Risk: Evidence from Russian Firms* (with Inessa Love and Andrei Rachinski)

*Outside Director Liability:  Market and Regulatory Equilibrium* (with Brian Cheffins and Michael Klausner) (plus book project including this and our two prior papers on outside director liability)

*Corporate Law and Residual Claimants* (working paper May 2001) (plus book project including the next two papers)

*The Building Blocks of Corporate Governance* (working paper January 1998) (with Charles Sabel)

*Employees as Residual Claimants: What Control Rights Should They Have?*

*Market-Supporting Laws and Transition Success* (with Larysa Snisarenko)

9

0316

*Path-Dependent Competition for Corporate Charters: Manager Choice, Shareholder Veto* (with Reinier Kraakman)

*The Essentials of Corporate Finance and Investment* (with Henry Hu) (textbook; completion expected 2008)

*An Information Asymmetry Analysis of Lock-Up Options* (with Henry Hu)

## LANGUAGES

Native English

Moderate reading and conversational fluency in Russian (Advanced-Mid level)

## LEGISLATIVE AND REGULATORY TESTIMONY AND ADVICE

### Non-U.S. Advice

- Policy advisor to the Russian Federal Service on the Capital Market on (i) a draft law on insider trading and market manipulation, and (ii) amendments to the Civil Code, Law on Joint Stock Companies, and Law on Limited Liability Companies with respect to fiduciary duties of directors, managers, and controlling shareholders, 2006
- Policy advisor to the Ministry of Justice of Indonesia on company law reform, 2000
- Policy advisor to the Ministry of Justice of South Korea on corporate governance, 1999-2000
- Policy advisor to the Government of Mongolia 1996-2001 on company law and securities law; principal drafter for *Law on Companies* (1999)
- Policy advisor (1997-1999) to the Government of Vietnam for *Law on Enterprises* (1999)
- Policy advisor for draft Armenian law on joint stock companies, 1999
- Policy advisor (1998-2000) on company law and mutual fund law to the Ukrainian Securities Commission
- Policy advisor (1993-1997) on company law, securities law, investment fund law, and privatization of state-owned enterprises to the Russian Privatization Ministry (Госкомимущество) and the Russian Federal Securities Commission (Федеральная комиссия по ценным бумагам); advisor on *Law of the Russian Federation on Limited Liability Societies* (1998); advisor and co-drafter for *Law of the Russian Federation on Joint Stock Companies* (1996); advisor and co-drafter of *Decree of the President of the Russian Federation on Unit Investment Funds* (issued 1995), portions incorporated into *Law of the Russian Federation on Investment Funds* (2002)

### U.S. Advice

- Written testimony to the Securities and Exchange Commission on proposed amendments to the proxy rules (1997)
- Oral and written testimony on *Electricity Markets - 2005*, before the New York Public Service Commission (1995)
- Oral and written testimony on *What's at Stake in Retail Wheeling*, before the California Public Utilities Commission (1994)
- Written testimony on *Proxy Reform* to Securities and Exchange Commission (1991-1992)

0317

- Participant, Securities and Exchange Commission Roundtable on *Corporate Governance and American Economic Competitiveness* (1992)
- Written testimony on *Unbundled Stock Units* to Securities and Exchange Commission (1989)

## OTHER PROFESSIONAL ACTIVITIES

- Managing director (1998-    ), Social Science Research Network and its Legal Scholarship Network (family of electronic journals that publish abstracts of working papers in different areas of law, and related online database)

- Editor (1995-    ), Corporate and Takeover Law Abstracts, Corporate Governance Law Abstracts, Law and Finance Abstracts, and Securities Law Abstracts (electronic journals of abstracts published by Legal Scholarship Network)

- Research Fellow, European Corporate Governance Institute (2005-    )

- Founding Board Member and Senior Research Associate, Global Corporate Governance Academic Network (2004-    )

- Member, Board of Directors of Kookmin Bank (largest Korean commercial bank), and its Risk Management and Management Strategy Committees (2003-2005)

- Co-director, Directors' Consortium (director training program run by Stanford Law School and Chicago and Wharton Business Schools) (2002-2004)

- Editorial board member: M&A Lawyer; Corporate Ownership and Control

- Member (1995-1998) of the Committee on the Independent States of the Former Soviet Union of the Association of the Bar of the City of New York

- Special Master, *Union Carbide Corp. v. Montell N.V.* (S.D.N.Y. 1998)

- Member, Board of Directors (1989-1996) and Chair of the Audit Committee of Homeland Holding Corporation and its principal subsidiary, Homeland Stores (midsized publicly traded corporation)

- Chair (1994-1995) and chair-elect (1993-1994) of the Business Associations section of the Association of American Law Schools

- Member (1989-1992) of the Corporation Law Committee of the Association of the Bar of the City of New York

- *Bar memberships*: New York; Washington, D.C;. U.S. Supreme Court

- *Professional associations (not listed above)*: American Finance Association; American Law & Economics Association; American Bar Association; New York State and District of Columbia Bars

- *Served as referee for*: Economic Inquiry; International Review of Law & Economics; Journal of Banking and Finance, Journal of Corporate Finance, Journal of Finance, Journal of Financial Economics; Journal of Law, Economics & Organization; Journal of Legal Studies; Journal of Risk and Insurance, Research in Law & Economics; National Science Foundation; Sloan Foundation

11

## CONFERENCES ORGANIZED

- Founding chairman, *Society for Empirical Legal Studies* (2006-2007)
- Organizer or co-organizer:

  University of Texas, *First Annual Conference on Empirical Legal Studies* (2006)

  Stanford Law School, *Conference on Cross-Listing of Emerging Market Companies on Foreign Exchanges* (2002)

  Columbia Law School, *Conference on Alternative Perspectives on Corporate Governance* (1998)

## EDUCATION

Stanford Law School -- J.D. 1982:  Senior projects editor, *Stanford Law Review*; Sontheimer 3d-Year Honor (2d-highest 3-year GPA); Second-Year Honor (highest 2-year GPA); Johnson & Swanson Law Review Award

University of California at Berkeley: M.A. (A.B.D. in physics) 1977

Princeton University:  A.B. 1975 magna cum laude in physics

## PRESENTATIONS AT WORKSHOPS AND SEMINARS

American Bar Association Annual Meeting
Amer. Law & Econ. Ass'n Annual Meeting (10)
ALEA (presentation by coauthor) (3)
Asian Institute of Corporate Governance (2)
Association of American Law Schools (4)
Ass'n for Comparative Economic Studies
Atlanta Finance Forum
Austin Bar Association
Australian National University
BSI Gamma Foundation
Brazil Securities Commission (CVM)
Canadian Law and Economics Association (4)
Chicago-Kent Law School
Columbia Business School
Columbia Law School (3)
Columbia Univ. Department of Economics
Conf. on Empirical Legal Studies (presentation by coauthor) (2)
Cornell Law School
Dartmouth Univ., Tuck School of Business
Fin. Mgm Ass'n Annual Meeting
Fried, Frank, Harris, Shriver & Jacobsen
George Mason Law School (2)
Georgetown Law Center (2)
George Washington Law School
Georgia State Law School
Griffith University Law School, Australia
Harvard Business School
Harvard Law School (3)
Institutional Investor Forum

International Monetary Fund (2)
Int'l Society for New Institutional Economics
Kookmin Bank, Korea
Korea Corporate Governance Service
Korean Securities Law Institute
Korean Stock Exchange
Law and Society Association
Malaysian Securities Commission (2)
Michigan Law School
Moody's
Nanyang Business School, Singapore
National Bureau of Economic Research (2)
New Economic School, Moscow, Russia (2)
New York Stock Exchange
New York Univ., Stern School of Business (2)
Northeastern Univ., Gorbachev Foundation
Princeton Univ., Wilson School of Public Affairs
Sao Paolo Stock Exchange, Brazil
Seoul Nat'l Univ, Korea, School of Business
Singapore Conference on Int'l Business Law
Stanford Business School
Stanford Center Russian & East European Studies
Stanford Law School (8)
Texas A&M College of Business
UCLA/USC Corporate Gov Roundtable (3)
U.S. Department of Justice, Antitrust Division
U.S. Securities & Exchange Commission
Univ. of Cal.-Berkeley, Boalt Hall of Law (2)
Univ. of Cal.-Berkeley, Haas School of Bus. (2)
Univ. of Chicago Law School

0319

Univ. of Colorado - Boulder, College of Business
Univ. of Melbourne Law School, Australia
Univ. of Miami Law School
Univ. of Michigan Law School
Univ. of Michigan, Ross School of Business
Univ. of Missouri - Columbia Law School
Univ. of Pennsylvania Law School
Univ. of Rochester, Simon School of Business
Univ. of Sao Paolo, Brazil, Law Faculty

Univ. of Southern California Law Center
Univ. of Texas, McCombs School of Business (3)
Univ. of Texas School of Law (3)
Vanderbilt Law School
Woo Yun Kang Jeong & Han
World Bank (3)

## CONFERENCES, SPEECHES, OP-EDs and COMMENTS

2007    Comment on Tom Chang and Antoinette Schoar, *The Effect of Judicial Bias in Chapter 11 Reorganizations* (Conference on Financial Contracting: Theory and Evidence, Mannheim, Germany, April 2007)

Keynote speaker on *Empty Voting*, European Corporate Governance Institute 2007 Annual Meeting (Apr. 2007) (Frankfurt, Germany)

Presentation of *Can Corporate Governance Reforms Increase Firms' Market Values? Event Study Evidence from India*, Univ. of Virginia Law School Conference on Law and Finance (Mar. 2007)

Webcast on *Empty Voting - How Borrowed Shares Can Swing Votes*, National Investor Relations Institute (Mar. 2007)

Comment on Helen Bowers and William Latham, *Information Asymmetry, Litigation Risk, Uncertainty and the Demand for Fairness Opinions: Evidence from U.S. Mergers and Acquisitions, 1980-2002* (Frontiers of Finance conference, Curacao, Jan. 2007)

2006:    Presentation of *The Value of Board Independence in an Emerging Market: IV, DiD, and Time-Series Evidence from Korea*, Conference on Mel Eisenberg's The Structure of the Corporation: Thirty Years Later (Columbia Law School, Nov. 2006)

Presentation of *An Overview of Indian Corporate Governance Practices*, International Corporate Governance Forum-Asian Centre for Corporate Governance International Conference on Corporate Governance: Role of Corporate Governance in Improving India's Investment Climate (Mumbai, India, Nov. 2006)

Presentation of *Hedge Funds, Insiders, and Empty Voting: Decoupling of Economic and Voting Ownership in Public Companies*, Boundaries of SEC Regulation Conference at Financial Economics Institute, Claremont-McKenna College (Feb. 2006); Weil, Gotshal & Manges Roundtable at Yale Law School (Apr. 2006)

2005:    Invited panelist on *The Future of Corporate Governance Research*, Financial Management Association annual meeting (Oct. 2005)

Lecture on *Takeover defenses: US/UK Experience and Implications for Korea*, Korea Corporate Governance Service conference on The Market for Corporate Control and Corporate Governance (Sept. 2005)

Presentation on *Executive Compensation: How to Stop the Pay Spiral*, $IC^2$ Institute Conference in 21st Century Governance for Early Stage Companies (Austin, TX, June 2005)

Presentation of *Korean Corporate Governance: A 2005 Progress Report*, Korea University conference on Korea Toward the Next Hundred Years: Reality and Vision (Seoul, Korea, May 24, 2005)

0320

Presentation of *Does Corporate Governance Predict Firms' Market Values: Time-Series Evidence from Korea*, 4th Asian Corporate Governance Conference (Seoul, Korea, May 19, 2005)

Presentation of *Ranking Law Schools: Using SSRN to Measure Scholarly Performances, in* Symposium, *The Next Generation of Law School Rankings* (Apr. 15, 2005)

Commentator on John Coffee, *Gatekeepers: The Role (and Reform) of the Professions in Corporate Governance*, Columbia Law School, First Annual Deals Roundtable: Gatekeepers and Corporate Governance (Apr. 1, 2005)

Presentation of *Stability, Not Crisis*: *Medical Malpractice Claim Outcomes In Texas, 1988-2002*, AEI Health Policy Forum, Is There a Crisis in Medical Malpractice? New Evidence from Texas (March 31, 2005)

Bernard Black, Charles Silver, David Hyman & William Sage, *False Diagnosis*, **The New York Times**, March 10, 2005 (editorial based on *Stability, Not Crisis*: *Medical Malpractice Claim Outcomes In Texas, 1988-2002)* (http://ssrn.com/abstract=xxxxxx), expanded version published as *Hunting Down the Facts on Medical Malpractice*, **Austin American-Statesman**, March 14, 2005

Bernard Black, Brian Cheffins & Michael Klausner, *Why Directors Damages May Harm Investors*, **Financial Times**, Jan. 20, 2005, at 19, and **Financial Post (Canada)**, Jan. 21, 2005, at xx (http://ssrn.com/abstract=xxxxxx) (editorial based on our work on outside director liability)

Commentator on Eric Talley & Gudrun Johnsen, *Corporate Governance, Executive Compensation, and Securities Litigation*, First Annual NYU/Penn Conference on Law and Finance (Feb. 2005)

Interview, *Corporate Governance Ups Co Value*, **Economic Times** (business section of **India Times**), Jan. 27, 2005, at (http://economictimes.indiatimes.com/articleshow/1001951.cms)

Presentation of *Does Corporate Governance Affect Firms' Market Values? Evidence from Korea*, Roundtable on Financing of Early Stage ad Emerging Growth Companies, Foreign Investment Capital and the Indian Venture Capital Markets (Bangalore, India, Jan. 2005)

Presentation of *Predicting Firms' Corporate Governance Choices: Evidence from Korea*, Seminar on Venture Capital and Corporate Governance - India and the USA (Hyderabad, India, Jan. 2005)

2004:  Commentator on Jerry Davis and E. Han Kim, *Would Mutual Funds Bite the Hand that Feeds Them? Business Ties and Proxy Voting*, Journal of Financial Economics and Federal Reserve Bank of New York conference on Agency Problems and Conflicts of Interest in Financial Intermediaries (Dec. 2004)

Interview about *Outside Director Liability*, published as *Worried About Shareholder Suits? Fuhgedaboudit!*, **Corporate Board Member**, March/April 2004, at 20-25

Panelist, Columbia Law School Interdisciplinary Workshop on Law, Finance, and Political Economy (April 2004)

Presentation of *Liability Risk for Outside Directors: A Cross-Border Analysis*, Across the Board: An Interdisciplinary Conference on Corporate Governance, Univ. of Texas, McCombs School of Business (April 2004)

Comment on Marcus Cole, *The Preference for Preferences*, Willamette Law School Conference on Venture Capital After the Bust (March 2004)

2003:  Presentation of *Predicting Firms' Corporate Governance Choices: Evidence from Korea*, KDI Conference on Corporate Governance and Capital Market in Korea (Dec. 2003); comments on Sung Wook Joh & Kayoun Yi, *Does Market React to Public Disclosure on Related Party*

0321

*Transactions in Korea,* and Choong-Kee Lee, *The Directors' Duties Regarding Compliance and Governance and the Operation of the Corporate Personality in the Context of a Financial Group.* Comments published in Young-Jae Lim ed., **Corporate Governance and Capital Market in Korea** (forthcoming 2005)

Commentator on Lawrence Hamermesh, *Premiums in Stock-for-Stock Mergers,* University of Pennsylvania Law School, Symposium on Control Transactions (Feb. 2003)

Presentation of *Institutional Reform in Transition,* Asian Development Bank Institute, 4th Asian Policy Forum on Corporate Governance in China (Oct. 2002); Stanford Institute for International Studies Conference on Corruption: its Consequences and Cures (Jan 2003)

2002:     Commentator on Darius Miller, *ADRs, Analysts, and Accuracy,* Stanford Law School, Conference on Cross-Listing of Emerging Market Companies on Foreign Exchanges (Nov. 2002)

Presentation of *Outside Director Liability,* Columbia Law School Conference on Global Markets, Domestic Institutions: Corporate Law and Governance in a New Era of Cross-Border Deals (Oct. 2001; Apr. 2002)

Participant, National Bureau of Economic Research Conference on Corporate Alliances, Cambridge MA (Nov. 2001) & Islamorada FL (Mar. 2002)

2001:     Keynote speaker on *The Role of Self-Regulation in Supporting Korea's Securities Markets,* Korea Stock Exchange International Conference on Self-Regulatory Institutions in the Korean Securities Markets (Dec. 2001)

Commentator, Stanford/Yale Junior Faculty Forum (June 2001)

Presentation on *The Core Fiduciary Duties of Directors,* Third Asian Roundtable on Corporate Governance (OECD & World Bank, Singapore, April 2001)

Presentations of *The Corporate Governance Behavior and Market Value of Russian Firms,* OECD Roundtable on Russian Corporate Governance, the Responsibility of Boards, and the Role of Stakeholders in Corporate Governance (June 2001); Conference on The Reform of Economic Law in East Asia, Stanford Law School (Mar. 2001)

Participant, Dykstra Corporate Governance Symposium, Univ. of California Davis Law School (Feb. 2001)

2000:     Presentation of *Does Corporate Governance Matter? A Crude Test Using Russian Data,* University of Pennsylvania Law School, Symposium on Norms and Corporate Law (Dec. 2000)

Participant, University of Pennsylvania Law School Roundtable on Corporate Law (May 2000)

1999:     Presentation of *Russian Privatization and Corporate Governance: What Went Wrong?,* OECD Conference on Corporate Governance in Russia (Moscow, Russia, May 1999); Davidson Institute at Univ. of Michigan Conference on Corporate Governance Lessons from Transition Economy Reforms (Sept. 1999)

Participant, Conference on *The Anatomy of Corporate Law: A Comparative and Functional Approach* (Paris, France, July 1999)

Workshop leader, International Monetary Fund Workshop on Comparative Corporate Governance in Developing and Transition Economies (June 1999)

Presentation of *The Legal and Institutional Prerequisites for Strong Securities Markets*, OECD Conference on Corporate Governance in Asia: A Comparative Perspective (Seoul Korea, Mar. 1999)

Participant, Workshop on Innovation in Business Law Education, American Bar Association Section of Business Law annual meeting (Apr. 1999)

Presentation of *The Non-Correlation Between Board Independence and Long-Term Firm Performance*, Directors' College, Stanford Law School (Mar. 1999); Federalist Society Conference on Corporate Governance (NY, Sept. 1998) (remarks published in **Bank and Corporate Governance Reporter** (1999))

Participant, Conference on Armenian Company Law, Washington DC (Jan. 1999) (conference with drafters of the Armenian company law to discuss concepts of company law)

1998:   *Shareholder Robbery, Russian Style*, in Institutional Shareholder Services, **ISSue Alert**, Oct. 1998, at 3, 14 (editorial in newsletter for institutional investors) (http://ssrn.com/abstract=510123)

A Test Case for Shareholder Rights, **Moscow Times**, Jan. 30, 1998 (editorial)

Participant, Conference on Ukrainian Company Law, Kiev, Ukraine, (Oct. 1998) (seminar for legislators and government officials on draft company law)

Participant, Corporate Law Bridge Group conference (June 1998)

Presentation of *Path-Dependent Competition for Corporate Charters: Manager Choice, Shareholder Veto*, Comparative Law Workshop on the Regulatory State and Corporate Governance, Goethe Universitat, Frankfurt, Germany, (May 1998)

Speaker on comparative and international aspects of corporate law scholarship, Association of American Law Schools, Workshop on Business Associations (May 1998)

Speaker, U.S. Securities and Exchange Commission, *International Institute for Securities Market Development* (Apr. 1998)

Presented paper, *Russian Firms: Preventing Manager/Investor Disputes from Arising*, Conference on *The Changing Landscape of Investment in Russia*, Moscow, Russia, (Apr. 1998)

Invited speaker, *Seminar on the Draft Company Law*, Hanoi, Vietnam (Mar. 1998) (week-long seminar for legislators and government officials on the draft company law, for which I was an advisor)

Presentation of *The Building Blocks of Corporate Governance*, Columbia Law School Conference on Alternative Perspectives on Corporate Governance (Jan. 1998)

Speaker, *Seminar on the Law on Joint Stock Companies*, Ulaanbaatar, Mongolia (Jan. 1998 (seminar for legislators and government officials on the Law on Joint Stock Companies, for which I was the principal drafter)

1997:   *The Struggle for Control of Russia's Securities Markets*, **Moscow Times**, July 9, 1997 (editorial)

Participant in *Symposium, Check-the-Box and Beyond: The Future of Limited Liability Entities* (Larry Ribstein & Mark Sargent eds.), 52 **Business Lawyer** 605-652 (1997)

Presentations of *Board Composition and Firm Performance: The Uneasy Case for Majority Independent Boards*, Max-Planck Institute Conference on Comparative Corporate Governance (Hamburg, Germany, May 15-17, 1997); NYU Salomon Center Conference on The Power and Influence of Pension and Mutual Funds (Feb. 21, 1997)

0323

Lecturer, Open Society Institute workshop for Russian law teachers, on *the Russian Law on Joint Stock Companies* (Moscow, Russia, Nov. 11-15, 1997)

Presentation of *Information Asymmetry, the Internet, and Securities Offerings*, Lewis & Clark Law Forum, Financing Innovation: The Future of Capital Formation for Small and Emerging Businesses (Sept. 26, 1997)

Address on *The Struggle for Control of Russia's Securities Markets*, Harriman Institute Conference on Russian Securities on the American and Russian Capital Markets (New York, June 10, 1997)

Speaker for Plenary Session on *Stranded Costs*, National Conference of State Legislatures Conference, The Electric Industry in the Balance (New York, May 29-30, 1997)

Participant, USAID-sponsored conference with Vietnamese officials on draft *Law of Vietnam on Partnerships and Companies* (New York, Aug. 26-30, 1997)

Lecturer, World Bank/Central European University workshop on *Corporate Governance in Eastern Europe and Russia* (Budapest, Hungary, May 12-16, 1997)

Speaker, World Bank Conference on *Legal Reform and Economic Development* (Apr. 14, 1997)

1996:    *Corporate Law for Emerging Markets: The Case of Russia*, in **American Society of International Law, Proceedings of 90th Annual Meeting: Are International Institutions Doing Their Job?** 226-231 (1996)

Presentation of *Corporate Law and Residual Claimants*, Columbia Law School Conference on Employees and Corporate Governance (Nov. 22 & May 15, 1996)

Address on *The Path-Dependent Evolution of Corporate Law*, George Mason Law School Conference on Strong Managers, Weak Owners (May 4, 1996)

1995:    Bernard Black, *Legal Reform in Russia*, **Columbia Law School Report** 68 (Fall 1995) (short article for alumni magazine)

Presentations of *Corporate Law from Scratch*, World Bank Conference on Corporate Governance in Central Europe and Russia (Apr. 22, 1994; Sept 30, 1994; Dec. 16, 1994)

Address on *Investment Fund Law for Emerging Economies*, OECD Conference on Investment Funds in Ukraine (Paris, France, June 1-2, 1995)

1994:    *Comment: The Industrial Organization of Market-Making*, on Peter Reiss & Ingrid Werner, *Transacting Costs in Multiple Dealer Markets: Evidence from the London Stock Exchange*, in Andrew Lo, ed., **The Industrial Organization and Regulation of the Securities Industry** 171-174 (1995)

Address on *The Essentials of Corporate Governance in Privatizing Economies*, World Bank Conference on Creating Capital Markets in Central and Eastern Europe (Prague, Czech Republic, Nov. 17, 1994)

1993:    Presentations of *Hail Britannia?: Institutional Investor Behavior Under Limited Regulation*: Whittemore Conference on The International Capital Acquisition Process (May 21, 1993); Columbia Law School Conference on Relational Investing (May 6, 1993)

1992:    *Beyond Proxy Reform*, **Insights:    Corporate & Securities Law Advisor** 2 (March 1993) (editorial)

Participant, *Roundtable on Management Incentive Compensation and Shareholder Value*, **Continental Bank Journal of Applied Corporate Finance** 110-130 (Summer 1992)

Comment, *Event Studies in a World with Signaling and Partial Anticipation*, on Kleidon & Scott, *The Replacement of Corporate Chief Executive Officers and the Performance of the Board*, American Law & Economics Association (May 16, 1992)

1991:    Contributor to *Catch 22:    The Retired CEO as Company Director* (Institutional Shareholder Services Special Report, July 15, 1991)

Contributor to Roundtable discussion on *Institutional Investors and Corporate Governance*, published in **Directors and Boards** 9 (Spring 1991)

Presentation of *Agents Watching Agents*: Columbia Law School Conference on The Future of Corporate Governance (May 11, 1991)

Address on *Environmental Sanctions:    When Does Deterrence Become Overkill?*; Columbia Journal of Environmental Law Symposium on Crimes Against the Environment (Mar. 8, 1991)

Address on *Taking Long-Term Investing Seriously*; Institutional Shareholder Services Conference for the Proxy Professional (Feb. 22, 1991)

1990:    Conference presentation on *Hazardous Waste Cleanup Incentives in Corporate Acquisitions*; Columbia Business Law Review Symposium on Environmental Concerns in Business Transactions (Feb. 9, 1990)

1989:    Address on *The Long Term Profitability of Leveraged Buyouts*; Lowe Institute Conference on the Leveraging of Corporate America, Los Angeles (Apr. 11, 1989)

1988:    Presentation of *Is Corporate Law Trivial?*, Columbia Law School Conference on Contractual Freedom and Corporate Law (Dec. 9, 1988)

Address on *Shareholder Gains from Takeovers*, Rutgers Conference on Corporate Takeovers, Restructuring, and the Market for Corporate Control (May 24, 1988)

Address on *Regulatory Reform after the Market Crash:    The Case for Flow Restrictors*; USC-UCLA Conference on The Crash:  Causes and Cures? (Feb. 13, 1988)

## PERSONAL DATA

Born 1953 in Brooklyn, New York

Wife:  Katherine Litvak

| Children: | David (1979) | Samuel (1985) | Rebekah (1994) |
|---|---|---|---|
| | Benjamin (1980) | Sarah (1990) | Daniel (2005) |

0325

Exhibit B

**Professor Bernard Black**
School of Law and McCombs School of Business
University of Texas at Austin

**Deposition and Trial Testimony**
*as of March 2007*

**2006:**

AOL state securities litigation (Ohio and California cases) (expert reports and deposition for plaintiff)

> Testimony on various financial games played by AOL to inflate its financial results and the nature of its financial situation, compared to the results it disclosed.

> Contact Michael Dowd, Lerach Coughlin, miked@lerachlaw.com, 619-338-3838, or Ted Pintar, tedp@lerachlaw.com, 619-338-4529

In re Enron Securities Litigation (S.D. Tex. 2006) (expert reports and deposition for plaintiffs)

> Testimony on Enron's true financial results and the nature of its financial transactions, compared to the results it disclosed; and on Enron's solvency given those true results.

> Contact G. Paul Howes, Lerach Coughlin, paulh@lerachlaw.com, 713-571-0911, or Jamie Baskin, Baskin Law Group, jbaskin@baskin.com

Peregrine Litigation Trust v. KPMG (Cal. Superior Court) (expert declaration on behalf of intervenor John Moores)

> Declaration on adequacy of settlement amount for partial settlement of complex securities litigation with one defendant.

IPOC International Growth Fund Limited v. OAO "CT-Mobile (Arbitration, Stockholm Chamber of Commerce) (expert reports and hearing testimony for respondent)

> Testimony on Russian joint stock company law.

> Contact Nigel Rawding, Freshfields, nigel.rawding@freshfields.com

**2005:**

Norex Petroleum v. Chubb Insurance Co. (Queen's Bench, Alberta, Canada) (expert report and deposition for plaintiff)

> Report on Russian judicial corruption.

> Contact Gene Bodnar, MacLeod Dixon, gene.bodnar@macleoddixon.com, 403-267-8368.

Havens v. Pate (District Court for Harris County, Texas) (expert report, deposition, and trial testimony for plaintiff)

> Testimony on corporate governance custom and practice, director conduct, change-in-control benefits, and compliance with fiduciary duties in sale of a company (expert report and deposition for plaintiff)

1

*Contact*:  Tom Bilek, Hoeffner & Bilek, tbilek@hb-legal.com, 713-227-7720

Richard A. Williamson, Trustee v. AT&T Corp (Santa Clara County Superior Court, California) (expert report and deposition for defendant)

> Testimony on corporate governance custom and practice for relationship between controlling and controlled company

> *Contact*:  James Ducayet, Sidley & Austin, jducayet@sidley.com, 312-853-7621

American Savings Bank v. United States (Court of Federal Claims 2000) (expert reports and deposition for government)

> *Winstar* case, involving cost to savings and loan of replacing lost supervisory goodwill, as a component of regulatory capital.

## 2004:

Citizens Federal Savings and Loan Association (Indiana) v. United States (Court of Federal Claims 2004) (expert reports, depositions, and trial testimony for defendant)

> *Winstar* case, involving cost to savings and loan of replacing lost supervisory goodwill.

> *Contact:*   Richard   Evans,   U.S.   Department   of   Justice,   Washington   DC, richard.b.evans@usdoj.gov

## 2002:

NorthPoint Communications v. Verizon Inc. (San Francisco Superior Court 2002) (expert report and deposition for plaintiff)

> Case involving merger agreement termination, based on alleged material adverse change in seller's business; testimony on custom and practice in drafting merger agreements and material adverse change clauses.

> Contact Douglas Sullivan, Folger, Levin & Kahn, dsullivan@flk.com,  415-986-2800, or Sam Miller, Sidley &Austin, srmiller@sidley.com, 415-772-7447

Hewlett v. Hewlett-Packard Co. (Delaware Chancery Court 2002) (expert report and deposition for defendant)

> Proxy fight case; deposition on nature of merger integration and materiality of alleged deficiencies in disclosure of post-merger projections.

> Contact:  David Berger, Wilson Sonsini Goodrich & Rosasti, dberger@wsgr.com; 650-320-4901

Madden v. Deloitte & Touche (S.D. Cal. 2002) (expert report and deposition for defendant Prudential Securities)

> Case on concept of underwriter, and due diligence obligation under Securities Act § 11 of financial advisor to the buyer in a stock-for-stock merger.

> *Contact:*  Peter Root, Esq., Orrick Herrington & Sutcliffe, San Francisco, peroot@orrick.com

2

0327

**2001:**

Dura Pharmaceuticals v. CIBC World Markets (Cal. Superior Court, San Diego, 2001) (deposition for plaintiff/cross-defendant)

> Contract and takeover case: testimony on whether finder's fee agreement covers subsequent stock-for-stock merger and concept of equity investment by one company in another company.
>
> *Contact:* Michael Attanasio, Luce Forward Hamilton Scripps, 619-533-7394, mattanasio@luce.com

**2000:**

Danis v. USN Communications (N.D. Ill. 2000) (expert report and deposition for independent director defendants)

> Securities class action involving adequacy of disclosure in IPO prospectus, and whether the independent directors satisfied the requirements for the "due diligence" defense to liability under Securities Act § 11.
>
> *Contact:* Vince Connally, Mayer Brown & Platt, Chicago

Forge v. Cyrix Corp. (Ca. Superior Court, Santa Clara County, 2000) (deposition for plaintiff)

> Securities class action: involving adequacy of disclosure in proxy statement/prospectus for merger of National Semiconductor and Cyrix Corp.

**1999:**

Croucher v. MidCon Corp. Employee Stock Ownership Plan Administrative Committee (S.D. Texas, Houston Div. 1999) (expert report and deposition for plaintiff)

> Class action involving whether the amount paid to redeem preferred stock held by the MidCon ESOP complied with the terms of the preferred stock and whether the basis for valuing the preferred stock was adequately disclosed to the ESOP participants.
>
> *Contact:* Larry Veselka, Smyser Kaplan & Veselka, Houston TX, lveselka@skv.com

Werbowsky v. Collomb (Md. 1999) (deposition for defendant)

> Corporation law case: derivative lawsuit, involving whether outside directors acted reasonably and independently in negotiating and eventually approving a transaction between a foreign parent company and its majority owned, publicly traded U.S. subsidiary.
>
> *Contact:* Dick Favretto, Mayer Brown & Platt, Washington DC, 202-263-3000

Albert v Walter Fletcher, Inc. (Los Angeles Superior Court 1999) (deposition for plaintiff)

> Class action by members of trade association, involving whether the association's chief executive officer breached his fiduciary duty in buying the trade association, whether the investment bankers were negligent in preparing their fairness opinion, and whether the terms of the transaction were adequately disclosed to the association members in connection with their vote to approve the sale.

3

*Contact*: Harold Tomin, Fenigstein & Kaufman, Century City CA, 310-201-0777; Harold_Tomin@fenkauf.com

Risko v. Hollander (Alameda County CA 1999)  (deposition and trial testimony for plaintiff)

Contract and partnership case:  involving fiduciary duties of partners, and commercial reasonableness of claims by each side as to existence and content of oral agreement on profit sharing.

Fleischer v. Southern California Permanente Medical Group (Ca. Superior Ct. 1999) (deposition for defendant)

Case involving mandatory retirement of a physical from the Kaiser medical group, and whether he was an employee or a partner in Permanente Medical Group

**1998:**

Mentor Graphics Corp. v. Quickturn Design Systems, Inc. 1998 WL 839079 (Delaware Chancery Court, 1998) (expert report, deposition and trial testimony for defendant)

Expert report and testimony for defendant in Chancery Court, and consulting advice for appeal to Supreme Court, on whether Quickturn's takeover defenses were coercive or preclusive of potential bidder success, and on the Quickturn's statutory power to adopt a "no hand" poison pill defense.

*Contact:*  David Berger and Jamie DiBoise, Wilson Sonsini Goodrich & Rosati.  Berger is at dberger@wsgr.com; 650-320-4901

United States Surgical Corp. v. Richard Auhll (Delaware Chancery Court, 1998) (expert report and deposition for defendant)

Expert reports for defendant Circon Corp., as to reasonableness of continued resistance by Circon's board to hostile tender offer by U.S. Surgical.

*Contact:*  David Berger and Jamie DiBoise, Wilson Sonsini Goodrich & Rosati.  Berger is at dberger@wsgr.com; 650-320-4901

United States v. Jeffrey Szur (S.D.N.Y. 1998) (trial testimony for government)

Testimony in penny stock criminal fraud case, including nature of penny stocks, bid-asked spreads, and the mechanics of short-selling

Virgin Islands Seaplane Shuttle, Inc. v. Bear, Stearns & Co. (D.V.I. 1998) (expert report and deposition for plaintiff)

Expert report for plaintiff regarding reasonableness of Bear Stearns' actions, including due diligence, in seeking financing for a client, where Bear Stearns referred Virgin Islands Seaplane Shuttle to a financing source who had previously been convicted for securities fraud.

**1996:**

Krumme v. West-Point Pepperell, 1996 WL 2004 (S.D.N.Y. 1996) (trial testimony for defendant)

4

0329

Employment contract case involving interpretation of a change-of-control clause in an employment contract between Mr. Krumme and West-Point Pepperell

**1994:**

Alberti v. Trupin (S.D.N.Y. 1994) (trial testimony for plaintiff)

Securities class action involving adequacy of disclosure of ownership, conflicts of interest, and other terms of real estate limited partnerships, including whether counsel for the general partner ignored red flags indicating false or misleading disclosure.

Doss v. Leiva (Fla. 1994) (trial testimony for defendant/cross-plaintiff)

Fiduciary duty case involving duty of Mr. Doss, as lawyer/financial advisor to the Leivas, where Mr. Doss structured a transaction that gave him control of Miami Free Zone, formerly owned by the Leivas, without cash payment for the shares he received.

**Special Master**

Served as special master to Judge Shira Scheindlin in Union Carbide Corp. v. Montell N.V., 27 F. Supp. 2d 414 (S.D.N.Y. 1998)

Antitrust case involving chemicals joint venture between Union Carbide and Montedison.

**International Arbitrations**

IPOC International Growth Fund Ltd. v. OAO "CT-Mobile" (Stockholm Chamber of Commerce, 2006) (expert report and testimony for respondent)

Report and testimony on application of Russian company law to a shareholder agreement; arbitrators' decision largely adopts my analysis.

Contact Nigel Rawding, Freshfields Bruckhaus Derringer, nigel.rawding@freshfields.com

**Expert Reports (without testimony):**

Norex Petroleum v. Access Industries (S.D.N.Y. 2003) (expert report for plaintiff)

Report discusses Russian judicial corruption, and supports plaintiff's claim that the U.S. courts are an appropriate forum for case involving a hostile takeover of a Russian company.

Contact Bruce Marks, Marks & Sokolow, 215-569-8901, bmarks@mslaw.cc

Surface Transportation Board, Ex Parte No582 (Sub-No. 1) (major rail mergers) (expert report 2000 for Canadian National Railway)

In re Boeing Securities Litigation (W.D. Wash. 1999) (expert report for defendant)

0330

Securities class action involving whether Boeing adequately disclosed its production difficulties during 1998, and whether any disclosure failures would have affected how McDonnell shareholders voted on the then-pending Boeing-McDonnell merger.

ONBANCorp v. Holtzman (N.D.N.Y. 1996) (expert report for defendant)

Case involving compliance with the proxy rules, and what actions constitute a "solicitation" under the proxy rules.

Alumax Inc. v. Commissioner of Internal Revenue (U.S. Tax Court 1994) (expert report for government)

Case involving governance structure of joint venture, and the effect of that structure on whether Alumax could be consolidated for tax purpose with one of the joint venturers.

Seagram Corp. v. Commissioner of Internal Revenue (U.S. Tax Court 1993) (expert report for government)

Case involving integration of front-end tender offer with back-end merger, as part of the acquisition of Conoco by DuPont.

Syms v. Syms (N.Y. Supreme Court 1991) (expert report for defendant)

Case involving fairness of a recapitalization Syms Corp.

1                                       **PROOF OF SERVICE**

2 STATE OF CALIFORNIA          )
                             ) ss

3 COUNTY OF LOS ANGELES  )

4            I am employed in the County of Los Angeles, State of California.  I am over the age

5 of 18 years and not a party to the within action.  My business address is 555 West Fifth Street, Suite

6 4000, Los Angeles, California 90013-1010.

7            On May 21, 2007 I served the foregoing document described as **MEMORANDUM**

8 **OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR**

9 **PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS OF WILLIAM A.**

10 **OSBORN, MICHAEL COSTA, DONALD C. GRENESKO, AND BERNARD BLACK** on all

11 interested parties in this action as follows:

12      Randall J. Baron                           Dean J. Kitchens
     randyb@lerachlaw.com                 dkitchens@gibsondunn.com

13      Steven J. Oddo                             Melissa Epstein
     steveo@lerachlaw.com                  mepstein@gibsondunn.com

14      Lerach Coughlin Stoia Geller Rudman &       Gibson, Dunn & Crutcher LLP
     Robins LLP                                333 South Grand Avenue

15      655 West Broadway, Suite 1900           Los Angeles, CA  90071-3197
     San Diego, CA  92101

16

17 ☒    (VIA FEDERAL EXPRESS) I served the foregoing document(s) by Federal Express for
overnight delivery.  I placed true copies of the document(s) in a sealed envelope addressed to each

18 interested party as shown above.  I placed each such envelope, with Federal Express fees thereon
fully prepaid, for collection and delivery at Sidley Austin LLP, Los Angeles, California.  I am

19 readily familiar with Sidley Austin LLP's practice for collection and delivery of express carrier
package for delivery with Federal Express.  Under that practice, the Federal Express package(s)

20 would be delivered to an authorized courier or dealer authorized by Federal Express to receive
document(s) on that same day in the ordinary course of business.

21 ☒    (VIA E-MAIL OR ELECTRONIC TRANSMISSION)  Based on a court order or an
agreement of the parties to accept service by e-mail or electronic transmission, I caused the

22 document(s) to be sent to the person(s) at the e-mail address(es) listed above.  I did not receive,
within a reasonable time after the transmission, any electronic message or other indication that the

23 transmission was unsuccessful.

24            I declare under penalty of perjury under the laws of the State of California that the

25 above is true and correct.

26            Executed on May 21, 2007, at Los Angeles, California.

27

28                                  Camie P. Crosby

PROOF OF SERVICE

**PROOF OF SERVICE**

STATE OF CALIFORNIA       )
                      ) ss

COUNTY OF LOS ANGELES   )

        I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 555 West Fifth Street, Suite 4000, Los Angeles, California 90013-1010.

        On May 21, 2007 I served the foregoing document described as **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING DECLARATIONS OF WILLIAM A. OSBORN, MICHAEL COSTA, DONALD C. GRENESKO, AND BERNARD BLACK** on all interested parties in this action as follows:

Randall J. Baron
randyb@lerachlaw.com
Steven J. Oddo
steveo@lerachlaw.com
Lerach Coughlin Stoia Geller Rudman &
Robins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Dean J. Kitchens
dkitchens@gibsondunn.com
Melissa Epstein
mepstein@gibsondunn.com
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197

☒   (VIA FEDERAL EXPRESS) I served the foregoing document(s) by Federal Express for overnight delivery. I placed true copies of the document(s) in a sealed envelope addressed to each interested party as shown above. I placed each such envelope, with Federal Express fees thereon fully prepaid, for collection and delivery at Sidley Austin LLP, Los Angeles, California. I am readily familiar with Sidley Austin LLP's practice for collection and delivery of express carrier package for delivery with Federal Express. Under that practice, the Federal Express package(s) would be delivered to an authorized courier or dealer authorized by Federal Express to receive document(s) on that same day in the ordinary course of business.

☒   (VIA E-MAIL OR ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent to the person(s) at the e-mail address(es) listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

        I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

        Executed on May 21, 2007, at Los Angeles, California.

_____
Camie P. Crosby

PROOF OF SERVICE

LA1 921883v.1

**DECLARATION OF
JENNIFER A. LANDAU**

1  Michael C. Kelley (SBN 90062)
   Jennifer Altfeld Landau (SBN 153780)
2  Anne Mayer Turk (SBN 200011)
   SIDLEY AUSTIN LLP
3  555 West Fifth Street, Suite 4000
   Los Angeles, California 90013-1010
4  Telephone: (213) 896-6000
   Facsimile: (213) 896-6600
5
   Attorneys For Defendants
6  Dennis J. FitzSimons, Enrique
   Hernandez, Jr., Betsey D. Holden,
7  Robert S. Morrison, William A.
   Osborn, J. Christopher Reyes,
8  Dudley S. Taft, Miles D. White
   and Tribune Company
9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                  FOR THE COUNTY OF LOS ANGELES

12  FRANK GARAMELLA, Derivatively On     )   Case No. BC 362110
    Behalf of TRIBUNE COMPANY,           )
13                                       )
                                         )
14          Plaintiff,                   )
                                         )   **DECLARATION OF JENNIFER ALTFELD**
15      vs.                              )   **LANDAU IN SUPPORT OF DEFENDANTS'**
                                         )   **OPPOSITION TO PLAINTIFF'S MOTION**
16  DENNIS J. FITZSIMONS, et al.,        )   **FOR A PRELIMINARY INJUNCTION**
                                         )
17          Defendants,                  )   Date:  May 22, 2007
                                         )   Time:  9:00 a.m.
18      and                              )   Place: 324
                                         )
19                                       )
    TRIBUNE COMPANY, a Delaware          )
20  corporation,                         )
                                         )
21          Nominal Defendant.           )
                                         )
22                                       )
                                         )
23  _____)

24

25  **FILED CONDITIONALLY UNDER SEAL PURSUANT TO C.R.C. 2.551 AND ¶14 OF THE**
                      **STIPULATED PROTECTIVE ORDER**
26

27

28

---

**DECLARATION OF JENNIFER ALTFELD LANDAU IN SUPPORT OF DEFENDANTS' OPPOSITION TO**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

1

## DECLARATION OF JENNIFER ALTFELD LANDAU

2

I, Jennifer Altfeld Landau, declare and state as follows:

3       1.      I am an attorney licensed to practice law in the state of California, and I am a

4   partner in the law firm of Sidley Austin LLP, counsel of record for defendants Dennis J. FitzSimons,

5   Enrique Hernandez, Jr., Betsey D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher

6   Reyes, Dudley S. Taft, Miles D. White, and nominal defendant Tribune Company in this litigation.  I

7   have personal knowledge of the matters stated herein, and, if called upon to testify, could and would

8   testify competently thereto.

9       2.      Attached hereto are true and correct copies of the following exhibits:

10      Exhibit A:      Relevant Excerpts from the Deposition Transcript of Dennis J.
                        FitzSimons
11

12      Exhibit B:      February 13, 2007 Special Committee Meeting Minutes

13      Exhibit C:      Relevant Excerpts from the Deposition Transcript of Michael
                        R. Costa

14      Exhibit D:      March 23, 2007 letter from Broad and Burkle to Tribune Board

15      Exhibit E:      Michael Oneal, *Zell Plan Calls for ESOP at Tribune*, Chicago
                        Tribune, February 24, 2007
16

17      Exhibit F:      February 24, 2007 Special Committee Meeting Minutes

18      Exhibit G:      March 30, 2007 letter from Osborn to Broad and Burkle

19      Exhibit H:      November 8, 2006 letter from Tribune Company to Equity
                        Office Investments, L.L.C.

20      Exhibit I:      Relevant Excerpts from the Deposition Transcript of Thomas
                        Whayne
21

22      Exhibit J:      March 29, 2007 letter from Broad and Burkle to Tribune Board

23      Exhibit K:      Relevant Excerpts from the Deposition Transcript of William
                        A. Osborn

24      Exhibit L:      Relevant Excerpts from the Deposition Transcript of Frank
                        Garamella

25

26

27

28

---

**DECLARATION OF JENNIFER ALTFELD LANDAU IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

1    Exhibit M:    Buy Order and Excerpt of Summary of Holdings of Plaintiff

2    I declare under penalty of perjury under the laws of the State of California that the

3    foregoing is true and correct.

4    Executed in Los Angeles, California on May 21, 2007.

5

6    _____
     Jennifer Altfeld Landau

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF JENNIFER RATNER**

LA1 930739v.1

Exhibit A

Highly Confidential **CERTIFIED COPY**    Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

FRANK GARAMELLA, Derivatively)   No. BC362110
on Behalf of TRIBUNE COMPANY,)
            Plaintiff,      )
  vs.                       ) HIGHLY CONFIDENTIAL
DENNIS J. FITZSIMONS, et al.,)UNDER THE PROTECTIVE
            Defendants,     )      ORDER
  -and-                     )
TRIBUNE COMPANY, a Delaware )
corporation,                )
        Nominal Defendant.  )


   The videotaped highly confidential discovery
deposition of DENNIS J. FITZSIMONS, taken in the
above-entitled cause, before DERALYN GORDON,
a notary public of Cook County, Illinois, on the
14th day of May, 2007, at One South Dearborn
Street, Chicago, Illinois, beginning at
approximately 11:15 a.m., pursuant to Notice.


REPORTED BY:  DERALYN GORDON, CSR, RPR, CRR
LICENSE NO:  084-003957

Highly Confidential

1  modifications to the proposal since the last

2  meeting.

3       Had you had any direct contact with either

4  the representatives of the Chandler Trusts and/or

5  Mr. Broad and Burkle?                          03:18PM

6    A.   I had not had any direct contact with the

7  Chandler Trusts representatives.

8       At some point during this time, I did have

9  dinner with Mr. Broad and Mr. Burkle.

10   Q.   Okay.  Here in Chicago or in Los Angeles?   03:18PM

11   A.   Here in Chicago.

12   Q.   And what was the topic of conversation?

13   A.   Pretty much about they wanted to get

14  to know me a little bit, express to me that they

15  would like me to stay on to run the Company, how   03:18PM

16  they would interact with Management, how they saw

17  their roles, and just to indicate their continued

18  interest in seeing their proposal through to

19  fruition.

20   Q.   What did you take from that meeting?        03:19PM

21   A.   Just what I said.  It was a very pleasant

22  dinner and two very impressive, successful people.

23   Q.   When approximately did that take place, do

24  you recall?

25   A.   I can't offhand.  It certainly would be on   03:19PM

Exhibit B

CONFIDENTIAL

To be disclosed only to
Members of the Special Committee

TRIBUNE COMPANY

SPECIAL COMMITTEE OF THE

BOARD OF DIRECTORS MEETING

FEBRUARY 13, 2007

Pursuant to notice, a meeting of the Special Committee (the "Committee") of the Board of Directors of Tribune Company (the "Company") was held at 9:45 A.M. on February 13, 2007, at the offices of the Company. All of the members of the Committee were in attendance: William A. Osborn, Chairman, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, J. Christopher Reyes, Dudley S. Taft and Miles D. White. Also in attendance were Dennis J. FitzSimons, Scott Smith, Donald C. Grenesko, Thomas D. Leach and Crane H. Kenney of the Company, Charles W. Mulaney, Jr. of Skadden, Arps, Slate, Meagher & Flom LLP, Todd Kaplan of Merrill Lynch & Co., Christina Mohr of Citigroup, Paul Taubman and Thomas Whayne of Morgan Stanley, and Steven A. Rosenblum of Wachtell, Lipton, Rosen & Katz.

Mr. Osborn asked the investment bankers to address the manner of implementing the proposed recapitalization. Mr. Kaplan summarized the variety of considerations and factors that had led the investment bankers as a group to the recommendation that the recapitalization be effected as a dividend. Among the factors considered were the value of the residual equity following the cash payment, the greater simplicity of a $20 per share dividend which required no investment decision by stockholders, issues involved in setting a tender offer price, and potential uncertainties as to the stockholder profile of the Company if the Company tendered for approximately 60% of the outstanding shares. Ms. Mohr noted that the McCormick Foundation was having discussions about purchasing some of the Chandler shares following the return of capital in a recapitalization. She related the Foundation's belief as to the benefits going forward if the percent of outstanding shares held by the Chandler Trusts were substantially reduced in terms of promoting a more stable environment for the publishing and broadcasting companies. Questions and a discussion followed.

**REDACTED**

TRIB 000053
HIGHLY CONFIDENTIAL

After extended discussion, Mr. Osborn then summarized the sense of the Committee based on the presentations and discussions over the past several months and the Committee members' knowledge of the Company from service as directors of the Company:  the Chandler Trusts and Broad/Yucaipa proposals in their present forms were not attractive compared with the benefits of the recapitalization consisting of a dividend of $20 per share and subsequent spin-off of broadcasting.  He indicated that it was the sense of the Committee that its advisors should continue discussions on the Zell proposal and seek from Carlyle its highest and best offer for the broadcasting assets of the Company.  Concurrent with this, Mr. Osborn indicated that management and the Company's legal and financial advisors would finalize the financing, timetable and other matters in connection with announcing and undertaking the proposed recapitalization and restructuring that would be considered at a meeting of the Committee to be held on Saturday, February 24, 2007, at 7:30 A.M., to be followed by a meeting of the Board of Directors immediately thereafter.

There being no further business, the meeting was adjourned.

**TRIB 000054**
**HIGHLY CONFIDENTIAL**

Exhibit C

HIGHLY CONFIDENTIAL

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

FRANK GARAMELLA, Derivatively on Behalf )
of TRIBUNE COMPANY,                      )
                                         )
                 Plaintiff,              )
                                         )
            vs.                          ) Case No. BC362110
                                         )
DENNIS J. FITZSIMONS, et al.,            )
                                         )
                 Defendants,             )
                                         )
            -and-                        )
                                         )
TRIBUNE COMPANY, a Delaware corporation,)
                                         )
                 Nominal Defendant.      )

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF MICHAEL R. COSTA

New York, New York

Thursday, May 17, 2007

REPORTED BY:  BARBARA R. ZELTMAN

              Professional Shorthand Reporter

HIGHLY CONFIDENTIAL

Page 36

| | | |
|---|---|---|
| 14:52:07 | 1 | similar to the one presented by Mr. Zell? |
| 14:52:09 | 2 | A    Not to my knowledge. |
| 14:52:15 | 3 | Q    Was there any discussion about |
| 14:52:16 | 4 | whether that would be a good idea between |
| 14:52:19 | 5 | the Special Committee and Merrill Lynch? |
| 14:52:30 | 6 | A    There was a discussion around |
| 14:52:32 | 7 | the tailored and unique nature of the |
| 14:52:38 | 8 | Zell proposal and some discussion around |
| 14:52:40 | 9 | whether there might be other investors |
| 14:52:44 | 10 | who could duplicate that proposal. |
| 14:52:51 | 11 | Q    And as a result of that |
| 14:52:53 | 12 | discussion, was it decided that other |
| 14:52:57 | 13 | investors should be approached or should |
| 14:52:59 | 14 | not be approached with the similar |
| 14:53:02 | 15 | proposal? |
| 14:53:03 | 16 | A    At that time, there was a fair |
| 14:53:06 | 17 | amount of uncertainty as to whether an |
| 14:53:09 | 18 | S Corp. proposal could be fully |
| 14:53:12 | 19 | developed, so therefore the committee |
| 14:53:18 | 20 | determined to see if the S Corp. |
| 14:53:21 | 21 | proposal, regardless of the investor, |
| 14:53:25 | 22 | could be developed before thinking about |
| 14:53:26 | 23 | other investors. |
| 14:53:30 | 24 | Q    Was there a discussion about |
| 14:53:32 | 25 | once that occurred that the Special |

EASTWOOD-STEIN
Deposition Management (800) 514-2714

52f75ad3-cd67-4e93-bd5c-a888299dfc23
0008

HIGHLY CONFIDENTIAL

Page 46

| | | |
|---|---|---|
| 15:04:50 | 1 | MS. WINDLE:  Object to form. |
| 15:04:50 | 2 | A     No. |
| 15:04:54 | 3 | Q     Well, assuming the financing |
| 15:04:56 | 4 | condition was met and assuming and |
| 15:04:59 | 5 | because of the fact that the rating |
| 15:05:00 | 6 | agencies were company property that they |
| 15:05:02 | 7 | could utilize in their bid, then would -- |
| 15:05:09 | 8 | the structural issues were the only ones |
| 15:05:12 | 9 | that were really the outstanding issues; |
| 15:05:15 | 10 | is that correct? |
| 15:05:15 | 11 | A     Not in my judgement. |
| 15:05:16 | 12 | Q     What else do you think was |
| 15:05:18 | 13 | outstanding? |
| 15:05:20 | 14 | A     There remained on the order of |
| 15:05:21 | 15 | 800 pages of documents that needed to be |
| 15:05:24 | 16 | negotiated between Tribune, Broad and |
| 15:05:28 | 17 | Burkle and the ESOP which had not been |
| 15:05:31 | 18 | negotiated yet, among other things. |
| 15:05:39 | 19 | Q     And how long did it take you to |
| 15:05:41 | 20 | negotiate those similar issues with |
| 15:05:43 | 21 | Mr. Zell? |
| 15:05:45 | 22 | MS. WINDLE:  Object to the |
| 15:05:46 | 23 | "review." |
| 15:05:48 | 24 | A     As I mentioned earlier, from |
| 15:05:50 | 25 | the time we received the first Zell |

HIGHLY CONFIDENTIAL

Page 47

| | | |
|---|---|---|
| 15:05:53 | 1 | S Corp. proposal to the time there was a |
| 15:05:56 | 2 | definitive transaction the Board could |
| 15:06:00 | 3 | approve, that took approximately 60 days |
| 15:06:03 | 4 | or two months. |
| 15:06:26 | 5 | Q    Let's go back to the March 29th |
| 15:06:28 | 6 | letter. |
| 15:06:45 | 7 | Were the terms that are laid out |
| 15:06:48 | 8 | in this letter, were they ever discussed |
| 15:06:49 | 9 | with the Board? |
| 15:06:50 | 10 | A    Yes. |
| 15:06:52 | 11 | Q    Were you the one that presented |
| 15:06:54 | 12 | those terms to the Board? |
| 15:06:59 | 13 | A    I don't recall.  I recall that |
| 15:07:01 | 14 | the letter -- this letter was forwarded |
| 15:07:04 | 15 | to the Board. |
| 15:07:07 | 16 | Q    Was the letter discussed in a |
| 15:07:08 | 17 | meeting with the Board? |
| 15:07:09 | 18 | A    Yes. |
| 15:07:12 | 19 | Q    What was told to the Board |
| 15:07:13 | 20 | about the terms in this letter? |
| 15:07:23 | 21 | A    I think Merrill Lynch |
| 15:07:24 | 22 | summarized the terms of the letter and |
| 15:07:37 | 23 | its view as to the amount of open issues |
| 15:07:44 | 24 | and the further negotiation documentation |
| 15:07:47 | 25 | that we would be required to make this a |

HIGHLY CONFIDENTIAL

Page 58

| | | |
|---|---|---|
| 15:21:33 | 1 | the second part of the transaction did |
| 15:21:35 | 2 | not close. |
| 15:21:41 | 3 | Q    Was there a position taken by |
| 15:21:44 | 4 | Mr. Broad and Burkle on that issue? |
| 15:21:47 | 5 | A    I believe their representatives |
| 15:21:49 | 6 | expressed or summarized financial terms |
| 15:21:53 | 7 | of the security with respect to the |
| 15:21:59 | 8 | initial $250 million investment. |
| 15:22:09 | 9 | Q    So their position was with |
| 15:22:11 | 10 | respect to the initial $250,000 |
| 15:22:17 | 11 | investment that they would be granted |
| 15:22:19 | 12 | registration rights or what was their |
| 15:22:21 | 13 | position? |
| 15:22:22 | 14 | A    I don't recall.  They |
| 15:22:22 | 15 | summarized certain aspects of that |
| 15:22:24 | 16 | security that I can't recall today. |
| 15:22:27 | 17 | Q    What else was discussed? |
| 15:22:30 | 18 | A    In a second conversation with |
| 15:22:33 | 19 | either UBS or Broad and Burkle |
| 15:22:35 | 20 | representatives, they requested the Zell |
| 15:22:40 | 21 | documentation. |
| 15:22:42 | 22 | Q    What was your response? |
| 15:22:44 | 23 | A    Our response was what it had |
| 15:22:48 | 24 | been the previous day; that we were not |
| 15:22:52 | 25 | in a position of shopping other bidders' |

EASTWOOD-STEIN
Deposition Management (800) 514-2714

HIGHLY CONFIDENTIAL

Page 59

| | | |
|---|---|---|
| 15:22:52 | 1 | terms or documents and that they should |
| 15:22:55 | 2 | proceed with the merger agreement that |
| 15:22:57 | 3 | they had been supplied with in the fall. |
| 15:23:03 | 4 | Q    Did they ask for specific |
| 15:23:05 | 5 | documents or did they just say "the |
| 15:23:10 | 6 | documentation"? |
| 15:23:12 | 7 | A    My recollection is they just |
| 15:23:13 | 8 | referred to the documentation in |
| 15:23:14 | 9 | connection with the transaction. |
| 15:23:17 | 10 | Q    Did you make any attempt to |
| 15:23:18 | 11 | ascertain exactly what documents they |
| 15:23:21 | 12 | might be looking for? |
| 15:23:31 | 13 | A    I don't recall. |
| 15:23:33 | 14 | Q    Did you ever at any point tell |
| 15:23:34 | 15 | them what specific documents they would |
| 15:23:37 | 16 | need to submit? |
| 15:23:39 | 17 | MS. WINDLE:  Other than what |
| 15:23:40 | 18 | he's already testified to. |
| 15:23:45 | 19 | A    We had discussions around the |
| 15:23:48 | 20 | other documents that would be involved in |
| 15:23:50 | 21 | an S Corp. transaction. |
| 15:23:52 | 22 | Q    What did you tell them? |
| 15:23:55 | 23 | A    Not sure we told them anything |
| 15:23:56 | 24 | specifically. |
| 15:23:58 | 25 | Q    So they are asking for |

HIGHLY CONFIDENTIAL

Page 90

| | | |
|---|---|---|
| 16:12:12 | 1 | Q    And what's the conclusions of |
| 16:12:13 | 2 | that analysis? |
| 16:12:15 | 3 | A    Well, we have discussed with |
| 16:12:20 | 4 | the company the likely impact on the |
| 16:12:25 | 5 | current share price once the current |
| 16:12:31 | 6 | self-tender is consummated. |
| 16:12:33 | 7 | Q    And what was your conclusions |
| 16:12:36 | 8 | on the share price? |
| 16:12:37 | 9 | A    The conclusions and advice that |
| 16:12:40 | 10 | the company has been -- that the market |
| 16:12:45 | 11 | continues to reflect the fact that in all |
| 16:12:47 | 12 | likelihood that the merger would be |
| 16:12:50 | 13 | consummated and that post the tender the |
| 16:12:53 | 14 | stock would trade as other merger stocks |
| 16:12:56 | 15 | do at what I would call a slight |
| 16:12:58 | 16 | arbitrage discount to the $34 offer. |
| 16:13:03 | 17 | Q    What would happen to the |
| 16:13:03 | 18 | company's stock price if FCC approval was |
| 16:13:07 | 19 | not obtained and a merger was not |
| 16:13:10 | 20 | consummated? |
| 16:13:11 | 21 | A    I have not analyzed or |
| 16:13:14 | 22 | speculated on that. |
| 16:13:17 | 23 | Q    As you are sitting here today, |
| 16:13:17 | 24 | do you have a view on what would happen |
| 16:13:20 | 25 | to the stock price? |

EASTWOOD-STEIN
Deposition Management (800) 514-2714

52f75ad3-cd67-4e93-bd5c-a888299dfc23
0013

HIGHLY CONFIDENTIAL

Page 97

| | | |
|---|---|---|
| 16:20:06 | 1 | specifically in the context of the offer |
| 16:20:07 | 2 | or the proposal made by Mr. Zell? |
| 16:20:09 | 3 | A    Not that I recall. |
| 16:21:14 | 4 | MR. WISSBROECKER:  Merrill |
| 16:21:14 | 5 | Exhibit 6.  Show the witness an |
| 16:21:18 | 6 | e-mail from Mr. Costa to Kenney |
| 16:21:20 | 7 | Crane, Bates stamped TRIB-014023 |
| 16:21:25 | 8 | dated February 10, 2007. |
| 16:22:08 | 9 | (Merrill Exhibit 6, E-mail dated |
| 16:22:09 | 10 | February 10, 2007, TRIB-014023, was |
| 16:22:09 | 11 | marked for Identification.) |
| 16:22:30 | 12 | Q    Are you done reading the text |
| 16:22:31 | 13 | of this e-mail? |
| 16:22:36 | 14 | A    I did.  I read it. |
| 16:22:37 | 15 | Q    Can you read it for the record? |
| 16:22:40 | 16 | A    Sure. |
| 16:22:42 | 17 | It's an e-mail from myself to |
| 16:22:45 | 18 | Crane Kenney.  It says, "Crane, here is the |
| 16:22:47 | 19 | thought.  Why don't we announce self-tender |
| 16:22:51 | 20 | at 33 or more for 145 million shares. |
| 16:22:55 | 21 | Foundation and Chandlers decide what they |
| 16:22:58 | 22 | want to do on their own.  Chandlers can't |
| 16:23:01 | 23 | afford not to tender given their views on |
| 16:23:05 | 24 | value.  They tender, they are off the |
| 16:23:13 | 25 | Board." |

52f75ad3-cd67-4e93-bd5c-a888299dfc23

0014

HIGHLY CONFIDENTIAL

Page 98

| | | |
|---|---|---|
| 16:23:13 | 1 | Q    Is this the first time -- in |
| 16:23:13 | 2 | this e-mail is this the first time that |
| 16:23:15 | 3 | you raised the suggestion? |
| 16:23:17 | 4 | A    No. |
| 16:23:19 | 5 | Q    When had this been discussed |
| 16:23:22 | 6 | before? |
| 16:23:22 | 7 | A    Well, again, in connection with |
| 16:23:25 | 8 | looking at various strategic alternatives |
| 16:23:28 | 9 | in September of '06, it was well-known |
| 16:23:31 | 10 | that if the Chandlers sold X-number of |
| 16:23:34 | 11 | shares, that over time they would lose |
| 16:23:36 | 12 | their Board seats. |
| 16:23:41 | 13 | Q    What specific strategic |
| 16:23:42 | 14 | alternative was this discussed in the |
| 16:23:45 | 15 | context of? |
| 16:23:47 | 16 | A    This particular e-mail was in |
| 16:23:48 | 17 | the context of a self-help plan that |
| 16:23:54 | 18 | Tribune was considering. |
| 16:23:57 | 19 | Q    Was this the leverage |
| 16:23:58 | 20 | recapitalization plan the Board was |
| 16:24:00 | 21 | considering, January through March? |
| 16:24:03 | 22 | A    Yes. |
| 16:24:05 | 23 | Q    Was it noted at any time that |
| 16:24:09 | 24 | this same benefit would be associated |
| 16:24:12 | 25 | with the Zell transaction? |

EASTWOOD-STEIN
Deposition Management (800) 514-2714

HIGHLY CONFIDENTIAL

Page 99

| | | |
|---|---|---|
| 16:24:16 | 1 | A      Not that I recall. |
| 16:24:24 | 2 | Q      Did Mr. Zell or his advisors |
| 16:24:27 | 3 | ever express that to you, that that might |
| 16:24:29 | 4 | be a benefit of a structure that they |
| 16:24:32 | 5 | proposed? |
| 16:24:36 | 6 | A      Not that I recall. |
| 16:24:51 | 7 | Q      Did you ever discuss with |
| 16:24:52 | 8 | company management the possibility that |
| 16:24:56 | 9 | if the transaction was not consummated, |
| 16:24:59 | 10 | then it would be possible for the company |
| 16:25:02 | 11 | to pursue the spinoff, part of the |
| 16:25:06 | 12 | leverage recapitalization, self-help |
| 16:25:08 | 13 | plan? |
| 16:25:09 | 14 | A      Sorry?  Which transaction was |
| 16:25:12 | 15 | it consummated? |
| 16:25:14 | 16 | Q      Sorry.  The Zell transaction. |
| 16:25:15 | 17 | A      Could you repeat or restate the |
| 16:25:16 | 18 | question. |
| 16:25:17 | 19 | Q      Sure. |
| 16:25:17 | 20 | In discussing the Zell |
| 16:25:18 | 21 | transaction with company management, did |
| 16:25:21 | 22 | you ever discuss the possibility that if |
| 16:25:25 | 23 | the merger is not consummated, that the |
| 16:25:28 | 24 | company that can then go ahead and do the |
| 16:25:31 | 25 | spinoff transaction, part of the self-help |

52f75ad3-cd67-4e93-bd5c-a888299dfc23
0016

HIGHLY CONFIDENTIAL

Page 129

| | | |
|---|---|---|
| 17:30:22 | 1 | questions for you. |
| 17:30:22 | 2 | A    Sure. |
| 17:30:26 | 3 | Q    Mr. Wissbroecker asked you some |
| 17:30:27 | 4 | questions about whether there were |
| 17:30:30 | 5 | communications between Merrill and |
| 17:30:33 | 6 | representatives for Broad and Burkle |
| 17:30:35 | 7 | between the time in early February after |
| 17:30:40 | 8 | the Broad and Burkle offer was revised |
| 17:30:44 | 9 | and the time when the letter was first |
| 17:30:46 | 10 | received in March, March 25th.  And I |
| 17:30:51 | 11 | believe your testimony was that they were |
| 17:30:55 | 12 | no such communications during that time |
| 17:30:57 | 13 | period; is that correct? |
| 17:30:58 | 14 | A    That's correct. |
| 17:30:59 | 15 | Q    Why were there not |
| 17:31:00 | 16 | communications during that time period? |
| 17:31:02 | 17 | A    We had advised Broad and Burkle |
| 17:31:03 | 18 | that their proposal, revised proposal was |
| 17:31:09 | 19 | not -- was economically inferior to our |
| 17:31:14 | 20 | other alternatives that Tribune was |
| 17:31:16 | 21 | pursuing and therefore there was no basis |
| 17:31:19 | 22 | on which to have continued discussions. |
| 17:31:26 | 23 | MR. DUCAYET:  I have nothing |
| 17:31:27 | 24 | further. |
| 17:31:29 | 25 | MR. WISSBROECKER:  Redirect. |

52f75ad3-cd67-4e93-bd5c-a888299dfc23
0017

Exhibit D

March 23, 2007

Board of Directors
Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
Attention: Mr. Dennis FitzSimons

Gentlemen & Ladies:

As you know we have previously proposed a $13 billion recapitalization transaction which would have offered Tribune shareholders immediate value in excess of $34.00 a share. Since the time the Board decided not to pursue our proposal, we have been following the reports in the press concerning possible alternative transactions, including an ESOP transaction which the Company apparently has developed with its advisors. According to the press reports Tribune has been discussing its ESOP proposal with Sam Zell, a prominent investor residing in the Chicago area. It is now being reported that Mr. Zell is pursuing an ESOP transaction valued at $33.00 a share. Yucaipa has considered similar ESOP transactions in the past and is familiar with the general structure of these proposals and the benefits they may provide.

What we don't understand is why Tribune would develop such a proposal and then limit its discussions to a single proposed investor. It has been reported to us that your advisors, Merrill Lynch and Citigroup, have shopped our bid to other private equity firms. How can the Board now be certain that another investor would not be willing to pursue a transaction using this ESOP structure at a higher price? We would be more than willing to review the terms of the Company's ESOP proposal and promptly advise the Board whether we believe we could deliver a higher value to Tribune shareholders than is currently on the table. Given the amount of time and expense that we have invested in developing an attractive proposal for Tribune shareholders, we simply do not understand why we have not been contacted about our interest in pursuing the ESOP transaction currently being developed. Our prior efforts should more than qualify us as serious bidders. In fact, after the Board decided to halt discussions with us, we received information that suggested that some critical information affecting Tribune's value was not made available to us as we were developing our original proposal.

If the Company has spent its own resources to hire specialized advisors to develop a transaction structure that one investor finds attractive, there is good reason to believe that others would as well. We clearly have demonstrated our strong belief in the value of the Company's assets and have tried to follow the process you established. Why has that process now been abandoned?

If you feel that our evaluation of the new proposal would be in the best interest of your shareholders, I would encourage you to contact either Pete Adamson at The Broad Investment Company at (310) 954-5038 or Ira Tochner at The Yucaipa Companies at (310) 228-2898. We look forward to hearing from you.

LA\1703137.1

TRIB 012050
HIGHLY CONFIDENTIAL

Exhibit D

0018

Sincerely,

_____
Eli Broad
The Broad Investment Company, Inc.

_____
Ronald W. Burkle
The Yucaipa Companies, LLC

TRIB 012051
HIGHLY CONFIDENTIAL

0019

Exhibit E

**Exhibit F**

CONFIDENTIAL

To be disclosed only to
Members of the Special Committee

TRIBUNE COMPANY

SPECIAL COMMITTEE OF THE

BOARD OF DIRECTORS MEETING

FEBRUARY 24, 2007

Pursuant to notice, a telephonic meeting of the Special Committee (the "Committee") of Tribune Company (the "Company") was held at 7:30 A.M. on February 24, 2007. All of the members of the Committee were in attendance: William A. Osborn, Chairman, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, J. Christopher Reyes, Dudley S. Taft and Miles D. White. Also in attendance were Messrs. Dennis J. FitzSimons, Donald C. Grenesko, Crane H. Kenney and Thomas D. Leach of the Company; Mr. Charles W. Mulaney, Jr. of Skadden, Arps, Slate, Meagher & Flom LLP; Mr. Thomas A. Cole of Sidley Austin LLP; Mr. Steven A. Rosenblum of Wachtell, Lipton, Rosen & Katz; Mr. William W. Merten of McDermott, Will & Emery, LLP; Mr. Michael Costa of Merrill Lynch & Co.; Ms. Christina Mohr of Citigroup; and Messrs. Paul Taubman and Thomas Whayne of Morgan Stanley.

Mr. Osborn called the meeting to order. The Committee then reviewed and approved minutes for the meetings of the Committee held on February 3, 12 and 13, copies of which had been previously distributed to the members of the Committee.

At the request of Mr. Osborn, Mr. Costa reviewed developments in the Company's process of considering strategic alternatives. Referring to materials previously distributed to the members of the Committee, Mr. Costa updated the Committee on the status of the potential recapitalization transaction consisting of a special dividend and subsequent spin-off of broadcasting. Mr. Costa reported that significant progress had been made on the documentation and other steps necessary to implement the potential recapitalization, including with respect to the financing commitments and the agreements relating to the purchase by the McCormick Tribune Foundation of common stock of the Company held by the Chandler Trusts. Mr. Costa then reported on developments relating to the proposal from Mr. Zell to acquire the Company using an ESOP structure. Mr. Costa reported on the terms of a revised proposal from Mr. Zell and the significant amount of work being undertaken by Mr. Zell and his advisors and GreatBank Trust Company, the potential ESOP trustee, and its advisors with respect to Mr. Zell's proposal, including with respect to FCC and financing matters. Questions and a discussion followed.

TRIB 002640
HIGHLY CONFIDENTIAL

Continuing to refer to materials previously distributed to members of the Committee, Mr. Costa and Ms. Mohr then compared the potential recapitalization transaction with Mr. Zell's ESOP proposal, including with respect to the amount of debt required to be incurred by the Company, the timing of consummation of each potential transaction, the risks to a successful consummation of each transaction and the relative value to the Company's stockholders offered by each transaction. Questions and a full discussion ensued.

Mr. Kenney then introduced Mr. Merten of McDermott, Will & Emery. Mr. Kenney explained that the Company had retained McDermott Will, as ESOP counsel, to assist the Company in connection with the exploration of Mr. Zell's proposal.

REDACTED

Mr. Fitzsimons then reported on management's views with respect to the potential recapitalization transaction and Mr. Zell's proposal. Mr. Fitzsimons concurred that the documentation and other steps necessary to implement the recapitalization transaction, should the Committee and the Board of Directors determine to do so, were nearing completion. Mr. Fitzsimons also reported that management believed that, in light of the progress made to date on Mr. Zell's proposal, it would be advisable to devote additional time and resources to explore and further develop the proposal. Mr. Fitzsimons and Mr. Kenney then reported that a critical next step in continuing to explore Mr. Zell's proposal was the retention of an ESOP trustee. Mr. Kenney directed the members of the Committee to a copy of GreatBank's draft engagement letter, which had been previously distributed to the members of the Committee. Questions and a discussion followed.

Mr. Osborn then excused representatives of the Company, Merrill Lynch, Citigroup, Sidley Austin, Wachtell Lipton and McDermott Will.

The Committee and its advisors then discussed at length the relative advantages and disadvantages of Mr. Zell's proposal and the potential recapitalization transaction consisting of a special dividend and subsequent spin-off of broadcasting. Messrs. Taubman and Whayne compared the value of Mr. Zell's proposal to the value of the potential recapitalization transaction under various scenarios.

REDACTED

The Committee and its

TRIB 002641
HIGHLY CONFIDENTIAL

advisors also discussed the requirement in Mr. Zell's proposal that the Chandler Trusts and the McCormick Tribune Foundation both support the transaction by entering into voting agreements.

Following such discussion, it was the sense to the Committee that action with respect to the potential recapitalization transaction should be deferred pending the further exploration of Mr. Zell's proposal and an understanding of the willingness of the Chandler Trusts and the Foundation to support Mr. Zell's proposal.

Following further discussion, the meeting was adjourned.

**TRIB 002642**
**HIGHLY CONFIDENTIAL**

Exhibit G

**Tribune Company**
**435 North Michigan Avenue**
**Chicago, Illinois 60611**

March 30, 2007

Mr. Eli Broad
Broad Investment Company
10900 Wilshire Boulevard, Suite 1200
Los Angles, CA 90024

Mr. Ronald W. Burkle
The Yucaipa Companies LLC
9130 W. Sunset Blvd.
Los Angles, CA 90069

Dear Messrs. Broad and Burkle:

Following receipt of your letter of March 23, 2007, our representatives contacted you and provided all the information that you requested. Prior to receiving your letter, we had not been contacted by you or your representatives for over three weeks, even though our advisors have always been ready, willing and able to respond to your inquiries or information requests.

Your letter's assertion that "the Tribune Board decided to halt discussions" with you is not accurate. You decided to halt discussions with us over a month ago. Prior to your doing so, we treated your proposal seriously, responded promptly to all your inquires, gave you access to management and company data, and, on January 20, 2007, afforded you and your advisors the opportunity to present your proposal in person to the Special Committee of the Board of Directors for a full and comprehensive discussion.

Since your letter states that you are knowledgeable about ESOP transactions, you have been free for months to formulate a proposal involving an ESOP and to present it to us. You, not we, bear responsibility for the fact that you did not do so in the past.

Your letter of March 23, 2007 contains a number of other statements that are not true. The facts are that the Company and its advisors did not "develop" an ESOP transaction and



TRIB 066805
HIGHLY CONFIDENTIAL

Exhibit G                                                                0026

"limit" discussions about it to Mr. Sam Zell. Our advisors did not "shop" your proposal to anyone and have always respected the confidentiality of the terms and conditions of third party proposals. If the Company is currently in discussions with Mr. Zell, these discussions are in response to the initiatives of Mr. Zell and are confidential, just as our discussions with you were and are confidential.

The Special Committee, its advisors and management have worked tirelessly for months with you and others in a fair and impartial way to develop and evaluate alternative proposals for the Company. After your decision not to pursue further discussions with us over a month ago, we are happy to respond to your renewed interest.

Sincerely,

William A. Osborn
Chairman, Special Committee
Board of Directors

TRIB 066806
HIGHLY CONFIDENTIAL

Exhibit H

PRIVATE AND CONFIDENTIAL

November 8, 2006

Equity Group Investments, L.L.C.
Two North Riverside Plaza, Suite 600
Chicago, Illinois 60606

Ladies and Gentlemen:

You have requested confidential, non-public information from Tribune Company (the "Company") in connection with your consideration of a possible negotiated business combination or other transaction between us and you (a "Transaction"). It is understood and agreed that this agreement creates no obligation to enter into any Transaction or any agreement relating to a Transaction. The Company is willing to furnish such information to you only for the purpose of evaluating such Transaction and pursuant to the terms of this letter agreement (this "Agreement"). You agree that such information and any other confidential, non-public information the Company or its Representatives (as hereinafter defined) furnish to you or your Representatives, including any technical, scientific, trade secret or other proprietary information of the Company or its affiliates with which you or your Representatives may come into contact in the course of your investigation, and whether oral, written or electronic ("Information"), together with any reports, analyses, compilations, memoranda, notes and any other written or electronic materials prepared by you or your Representatives which contain, reflect or are based upon such Information (collectively, the "Evaluation Material"), will be kept confidential, used only for the purpose of evaluating the Company and a Transaction and will not be used by you in any way detrimental to the Company or its affiliates; provided, however, that any of such Information may be disclosed (i) as required by applicable law or judicial process in accordance with the terms set forth below, and (ii) to your Representatives who reasonably require access to such Information for the purpose of evaluating the Company and a Transaction between us (it being understood that you will cause your Representatives to treat such Information in a confidential manner and in accordance with the terms hereof). You acknowledge and agree that the Company shall remain the exclusive owner of the Information and all patent, copyright, trade secret, trademark, domain name and other intellectual property rights therein. No license or conveyance of any such rights is granted to you or implied under this Agreement. For purposes of this Agreement, references herein to "you" and/or "your Representatives" shall include only your officers, directors, members, general partners, employees and counsel and, following your provision of prior written notice to the Company, your affiliates, consultants, investment bankers, financial advisors and potential sources of debt financing, and "Representatives" in respect of the Company, shall mean its officers, directors, employees, counsel, investment bankers, consultants and other representatives. For the avoidance of doubt, (i) without the prior written consent of the Company, no person who is a potential source of equity capital or equity financing shall be considered your Representative for any purpose hereunder; and (ii) no affiliate, consultant, investment banker, financial advisor or person who is a potential source of debt financing shall be considered your Representative for any purpose hereunder unless and until you shall have executed and delivered to the Company a prior written notice that (x) identifies any such person or firm to whom you intend to provide Information and (y) includes

CHI 3654689v.4

TRIB 048660
HIGHLY CONFIDENTIAL

Exhibit H                                                          0028

your express acknowledgment and agreement that any such person or firm shall be deemed to be your Representative hereunder.

        You agree that neither you, your affiliates, nor any Representatives of you or your affiliates will without the prior written consent of the Company, directly or indirectly, (i)(A) discuss with or offer to any other person an equity participation in a possible transaction or any other form of joint acquisition by you and such third person, or (B) enter into any agreement, arrangement or understanding with any other person (other than one of your Representatives) regarding a possible transaction involving the Company or any of its affiliates, or (ii) other than with your Representatives, disclose to or discuss with any other person, including without limitation, any investment bankers or potential sources of capital or financing, (a) the fact that discussions or negotiations are taking place concerning a possible Transaction, (b) any of the terms, conditions or other facts with respect to any such possible Transaction, including the status thereof, (c) any information that could enable such other person to identify the Company or any of its affiliates as a party to any discussions or negotiations with you, or (d) that you have received or produced any Evaluation Material (together with clauses a, b and c above, the "Confidential Information"). The Company agrees that neither the Company nor any of its Representatives will, without your prior written consent, directly or indirectly, disclose to or discuss with any other person, other than with its affiliates or Representatives, (a) the fact that discussions or negotiations are taking place concerning a possible Transaction between you and the Company, (b) any of the terms, conditions or other facts with respect to any such possible Transaction between you and the Company, including the status thereof, (c) any information that could enable such other person to identify you or any of your affiliates as a party to any discussions or negotiations with the Company regarding a Transaction or (d) that you have received or produced any Evaluation Material; provided that the Company may make such disclosure if required by law, court order or rules of any governmental regulatory body or stock exchange. You further agree that neither you, your affiliates, nor any Representatives of you or your affiliates will without the prior written consent of the Company, directly or indirectly, enter into any agreement, arrangement or understanding with any other person that has or would have the effect of requiring such person to provide you with financing or other potential sources of capital in connection with a possible transaction involving the Company and/or any of its affiliates whereby such financing source expressly agrees to not provide financing or other potential sources of capital to any other person (other than you and your affiliates) in connection with a possible transaction between such other person, on the one hand, and the Company and/or any of its affiliates, on the other hand. The term "person" as used in this Agreement shall be broadly interpreted to include, without limitation, the media and any corporation, company, group, partnership or individual. The term "affiliate" as used in this Agreement shall have the meaning ascribed to such term in Rule 12b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

        It is understood that all communications which would ordinarily be discussed with either the Company or its financial advisors regarding the possible transaction or requests for information will be submitted or directed only to Michael Costa of Merrill Lynch ((212) 449-8533; michael_costa@ml.com) or Christina Mohr of Citigroup ((212) 816-9247; christina.mohr@citigroup.com), unless otherwise agreed to in writing by the Company. You also agree, unless otherwise agreed to in writing by the Company, not to initiate or maintain contact (except for those contacts made in the ordinary course of business) with any officer,

2

TRIB 048661
HIGHLY CONFIDENTIAL

0029

director or employee or agent of the Company or its affiliates regarding its business, operations, prospects or finances, except for Crane Kenney, Senior Vice President and General Counsel ((312) 222-2491; ckenney@tribune.com), or Donald Grenesko, Senior Vice President/Finance and Administration ((312) 222-3766; dgrenesko@tribune.com), or otherwise with the express written permission of the Company, Michael Costa of Merrill Lynch or Christina Mohr of Citigroup. It is understood that Michael Costa of Merrill Lynch or Christina Mohr of Citigroup will arrange for appropriate contacts for due diligence purposes. It is further understood that delivery of written notice to Crane Kenney, Senior Vice President and General Counsel, or Donald Grenesko, Senior Vice President/Finance and Administration, shall constitute written notice to the Company for purposes of this Agreement.

In the event that you or any of your Representatives are required to disclose any Evaluation Material or any Confidential Information in connection with any judicial or administrative proceedings (by oral questions, interrogatories, requests for information or documents, subpoena, Civil Investigation Demand or other legal process), you will in advance of such disclosure provide the Company with prompt notice of such requirement(s). You also agree to provide the Company, in advance of any such disclosure, with a list of any Evaluation Material or Confidential Information you intend to disclose (and, if applicable, the text of the disclosure language itself) and to reasonably cooperate with the Company to the extent it may seek to limit such disclosure, including, if requested, taking all reasonable steps to resist or avoid any such judicial or administrative proceeding referred to above. If, in the absence of a protective order or the receipt of a waiver from the Company after a request in writing therefor is made by you (such request to be made as soon as reasonably practicable to allow the Company a reasonable amount of time to respond thereto), you or your Representatives are legally required to disclose Evaluation Material or Confidential Information to any tribunal or other applicable authority to avoid censure or penalty, you may disclose such information without liability hereunder; provided, however, that you agree that you will furnish only that portion of the Evaluation Material or Confidential Information which you are advised by counsel is legally required and use your reasonable efforts to obtain assurances that confidential treatment will be accorded to such Evaluation Material or Confidential Information.

In consideration for being furnished with the Evaluation Material you agree that for a period of twelve (12) months from the date of this Agreement, unless the Company's Board of Directors shall otherwise specifically request in writing in advance, you will not, and shall cause your Representatives and affiliates not to (and you and they will not assist or form a group within the meaning of Section 13(d)(3) of the Exchange Act, act in concert or participate with or encourage other persons to), directly or indirectly, (i) acquire or offer to acquire, seek, propose or agree to acquire, by means of a purchase, tender or exchange offer, business combination or in any other manner, beneficial ownership as defined in Rule 13d-3 under the Exchange Act, of any of the assets, businesses or securities of the Company or any affiliate thereof, including rights or options to acquire such ownership (including from any third party), other than up to two percent (2%) of the outstanding voting common stock of the Company, (ii) initiate, or induce or attempt to induce any other person, entity or group (as defined in Section 13(d)(3) of the Exchange Act) to initiate, any stockholder proposal or tender offer for any securities of the Company or any affiliate thereof, any change of control of the Company or any affiliate thereof or the convening of a stockholders' meeting of the Company or any affiliate thereof, (iii) seek or propose to influence, advise, change or control the management, Board of Directors, governing instruments

3

TRIB 048662
HIGHLY CONFIDENTIAL

0030

or policies or affairs of the Company or any of its affiliates, including, without limitation, by means of a solicitation of proxies (as such terms are defined in Rule 14a-1 of Regulation 14A promulgated pursuant to Section 14 of the Exchange Act, disregarding clause (iv) of Rule 14a-1(l)(2) and including any otherwise exempt solicitation pursuant to Rule 14a-2(b)), contacting any person relating to any of the matters set forth in this Agreement or seeking to influence, advise or direct the vote of any holder of voting securities of the Company or publicly making a request of the Company (or its directors, officers, employees or agents), directly or indirectly, to amend or waive this provision or any other provision of this paragraph or the second paragraph of this letter, or (iv) make any public disclosure, or take any action (including making any non-public communication to the Company) which could require the Company or any of its affiliates to make any public disclosure, with respect to any of the matters set forth in this Agreement.

Promptly, upon the request of the Company, you will (and you will cause your Representatives to) deliver to the Company or destroy all copies of the Evaluation Material, including any notes relating thereto, without retaining any copy thereof, including, to the extent practicable, expunging all such Evaluation Material from any computer, word processor or other device containing such information. If requested by the Company, an appropriate officer of yours will certify to the Company that all such material has been so delivered or destroyed in compliance herewith. Notwithstanding the delivery or destruction or the Evaluation Material required by this paragraph, any and all duties and obligations existing under this Agreement shall remain in full force and effect. Notwithstanding the foregoing, you or your Representatives may keep a copy of the Evaluation Material to the extent such is required by such person to comply with applicable law or regulation.

For a period of eighteen (18) months from the date hereof, you agree that you and your affiliates will not, directly or indirectly, (i) use any of the Evaluation Material to solicit any customers or suppliers of the Company's or any of its affiliates' businesses, or (ii) hire or solicit any officer or director of the Company or any of its affiliates, or any employee of the Company or any of its affiliates with whom you have had contact or who became known to you in connection with your consideration of a Transaction, except that you shall not be precluded from hiring (x) any such officer or employee that is no longer employed by the Company or any of its affiliates and who has not been employed by the Company or any of its affiliates for at least 30 days prior to such solicitation or hiring or (y) any employee of the Company who responds to a general advertisement or notice not specifically directed at employees of the Company.

The term "Evaluation Material" does not include Information that (i) was or becomes available to you on a non-confidential basis from a source other than the Company or its Representatives provided such other source is not known by you after reasonable inquiry to be bound by a confidentiality obligation to the Company, (ii) was or becomes generally available to the public (other than as a result of a breach by you or your Representatives of this letter agreement) or (iii) is already in your possession, provided that such Information is not known by you after reasonable inquiry to be subject to another confidentiality agreement or other obligation of secrecy to the Company.

You understand and agree that neither the Company nor any of its Representatives makes any representation or warranty, express or implied, on which you may rely as to the accuracy or completeness of the Evaluation Material for your purposes and that only those

4

TRIB 048663
HIGHLY CONFIDENTIAL

0031

representations and warranties made by us in writing in a subsequent definitive agreement related to a Transaction, if any, shall have any legal effect. You agree that other than as may be set forth in such definitive agreement neither the Company nor its Representatives shall have any liability whatsoever to you or any of your Representatives, including, without limitation, in contract, tort or under federal or state securities laws, relating to or resulting from the use of the Evaluation Material or any errors therein or omissions therefrom.

It is agreed that no failure or delay by the Company in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

You and the Company acknowledge that irreparable damage would occur if any of the provisions of this agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, you agree that the Company, and the Company agrees that you, without prejudice to any rights to judicial relief it may otherwise have, shall be entitled to seek equitable relief, including injunction, in the event of any breach of the provisions of this Agreement. You and the Company agree that it will not oppose the granting of such relief on the basis that the Company or you, as applicable, has an adequate remedy at law. You and the Company also agree that it will not seek and agree to waive any requirement for the securing or posting of a bond in connection with the Company's or your, as applicable, seeking or obtaining such relief.

It is further understood and agreed that unless and until the execution and delivery of a definitive agreement with respect to a Transaction, neither the Company nor you intends to be, nor shall either of us be, under any legal obligation of any kind whatsoever with respect to such Transaction or otherwise, by virtue of any written or oral expressions by our respective Representatives with respect to such Transaction, except for the matters specifically agreed to in this Agreement. You further acknowledge and agree that (i) the Company shall have no obligation to authorize or pursue with you or any other party any transaction referred to in the first paragraph of this Agreement, (ii) you understand that the Company has not, as of the date hereof, authorized any such transaction and (iii) the Company reserves the right, in its sole and absolute discretion, to reject all proposals and to terminate discussions and negotiations with you at any time. These provisions may only be modified or waived by a separate writing signed by the Company and you expressly so modifying or waiving these provisions.

You hereby confirm that you are aware and that your Representatives have been advised that the United States securities laws generally prohibit any person who has material non-public information about a company from purchasing or selling securities of such company on the basis of such information or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person may purchase or sell such securities.

You hereby confirm that you and your Representatives will take any reasonable action necessary or appropriate to prevent the use of any information about the Company in a way which might violate any antitrust or other applicable law.

5

TRIB 048664
HIGHLY CONFIDENTIAL

0032

If at any time you cease to consider a Transaction, you agree promptly to notify us of such decision in writing.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware. In case of any dispute related to this Agreement, you and the Company agree (i) to submit to personal jurisdiction in and that exclusive jurisdiction and venue shall lie in the United States District Court for the Northern District of Illinois and the Circuit Court of the State of Illinois for the County of Cook and (ii) that notice may be served upon you and the Company at the address set forth on the first page of this Agreement. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

It is understood and agreed that if any provision contained in this Agreement or the application thereof to you, the Company, or any other person or circumstance shall be invalid, illegal or unenforceable in any respect under any applicable law as determined by a court of competent jurisdiction, the validity, legality and enforceability of the remaining provisions contained in this Agreement, or the application of such provision to such persons or circumstances other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby. In the case of any such invalidity, illegality or unenforceability, the parties hereto shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to affect the original intent of the parties.

This Agreement shall benefit and bind successors and assigns of you and of the Company. Any assignment of this Agreement by you without prior written consent of the Company shall be void.

This Agreement (i) constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, (ii) may be amended or modified only in a written instrument executed by the parties hereto and (iii) shall, except as otherwise specifically set forth herein, cease to be effective two years after the date hereof; provided, that the confidentiality provisions contained herein shall continue to apply so long as you retain any Evaluation Material in accordance with the last sentence of the first full paragraph on page 4.

[Remainder of Page Intentionally Left Blank]

6

TRIB 048665
HIGHLY CONFIDENTIAL

0033

If you are in agreement with the foregoing, please so indicate by signing and returning one copy of this Agreement, whereupon this Agreement will constitute our agreement with respect to the subject matter hereof.

Very truly yours,

TRIBUNE COMPANY

By: _____
Name: Crane H. Kenney
Title: SVP/ General Counsel

CONFIRMED AND AGREED TO:

EQUITY GROUP INVESTMENTS, L.L.C.

By: _____
Name: Philip G. Tinkler
Title: Chief Operating Officer

7

TRIB 048666
HIGHLY CONFIDENTIAL

0034

Exhibit I

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

FRANK GARAMELLA, Derivatively on Behalf )
of TRIBUNE COMPANY, )
                                        )
              Plaintiff, )
                                        )
          vs.                           )  Case No. BC362110
                                        )
DENNIS J. FITZSIMONS, et al., )
                                        )
              Defendants, )
                                        )
          -and- )
                                        )
TRIBUNE COMPANY, a Delaware corporation,)
                                        )
              Nominal Defendant. )
                                        )

DEPOSITION OF THOMAS WHAYNE

New York, New York

Thursday, May 17, 2007

REPORTED BY:  BARBARA R. ZELTMAN

            Professional Shorthand Reporter

EASTWOOD-STEIN
Deposition Management (800) 514-2714

**Exhibit I**

fe31aa54-5c3f-4795-bd0c-7a1b7098768a

0035

Page 22

| Time | Line | |
|---|---|---|
| 08:41:38 | 1 | Q    Was there any discussion -- did |
| 08:41:40 | 2 | you ever have any discussion with anyone |
| 08:41:41 | 3 | about structuring the transaction as a |
| 08:41:44 | 4 | one-step Tender Offer? |
| 08:41:48 | 5 | MR. WEINSTEIN:  Objection. |
| 08:41:51 | 6 | A    The initial proposal involved a |
| 08:41:56 | 7 | one-step merger. |
| 08:42:08 | 8 | Q    Why was it decided not to |
| 08:42:09 | 9 | structure the transaction as a one-step |
| 08:42:12 | 10 | merger? |
| 08:42:12 | 11 | MR. WEINSTEIN:  Objection. |
| 08:42:15 | 12 | A    It was -- I think it was viewed |
| 08:42:18 | 13 | as attractive to shareholders as well as |
| 08:42:22 | 14 | to the Special Committee to have a |
| 08:42:25 | 15 | distribution as quickly as possible, so |
| 08:42:29 | 16 | it was our request that we structure it |
| 08:42:33 | 17 | that way. |
| 08:42:34 | 18 | Q    Who requested that the merger |
| 08:42:36 | 19 | be structured that way or the |
| 08:42:38 | 20 | transaction? |
| 08:42:39 | 21 | A    Well, there was a request from |
| 08:42:42 | 22 | a number of the shareholders that a |
| 08:42:45 | 23 | distribution be provided to shareholders |
| 08:42:49 | 24 | as quickly as possible and the Special |
| 08:42:54 | 25 | Committee as well as the company |

Page 23

| | | |
|---|---|---|
| 08:43:02 | 1 | requested that the Zell party consider a |
| 08:43:10 | 2 | first step Tender Offer to provide a |
| 08:43:14 | 3 | significant distribution to shareholders |
| 08:43:17 | 4 | as soon as possible. |
| 08:43:19 | 5 | Q    What shareholders made that |
| 08:43:20 | 6 | request? |
| 08:43:23 | 7 | A    Well, there were a number of |
| 08:43:24 | 8 | shareholders.  Certainly the Chandlers |
| 08:43:29 | 9 | were one, Foundation, I believe Ariel and |
| 08:43:35 | 10 | I believe there are others but I don't |
| 08:43:37 | 11 | know all of them. |
| 08:43:40 | 12 | I think there was a fairly broad |
| 08:43:41 | 13 | expectation or desire on the part of |
| 08:43:43 | 14 | shareholders to have a return of capital as |
| 08:43:45 | 15 | quickly as possible. |
| 08:43:51 | 16 | Q    Were those requests made or |
| 08:43:54 | 17 | directed through the Special Committee? |
| 08:43:56 | 18 | Were they made through you or through |
| 08:43:59 | 19 | some other set of advisors? |
| 08:44:02 | 20 | MR. WEINSTEIN:  Objection. |
| 08:44:05 | 21 | A    I believe they came in through |
| 08:44:06 | 22 | a number of channels, be it the company's |
| 08:44:09 | 23 | advisors, there may have been |
| 08:44:11 | 24 | communication with the Board, but it |
| 08:44:12 | 25 | was -- and to company management. |

Page 34

| | | |
|---|---|---|
| 08:57:20 | 1 | MR. WEINSTEIN: Objection. |
| 08:57:20 | 2 | A    In the January time frame, we |
| 08:57:22 | 3 | were more in the mode of reviewing a |
| 08:57:24 | 4 | proposal that they had made to -- in |
| 08:57:29 | 5 | addition to other proposals that the |
| 08:57:35 | 6 | Chandlers had made to specifically take |
| 08:57:37 | 7 | the publishing business private. |
| 08:57:39 | 8 | And so the form of a distribution |
| 08:57:42 | 9 | was not really part of the discussion at |
| 08:57:45 | 10 | that point in time.  It was not really |
| 08:57:46 | 11 | something that became part of the |
| 08:57:48 | 12 | discussion until later. |
| 08:57:56 | 13 | Q    Did you ever discuss with the |
| 08:57:57 | 14 | Board whether or not the cash |
| 08:57:58 | 15 | distribution would enable the company to |
| 08:58:00 | 16 | get the Chandlers off the Board and out |
| 08:58:02 | 17 | of the picture quickly? |
| 08:58:05 | 18 | MR. WEINSTEIN: Objection. |
| 08:58:13 | 19 | A    In the February/March time |
| 08:58:15 | 20 | frame, one of the benefits of the |
| 08:58:18 | 21 | recapitalization alternative was that |
| 08:58:24 | 22 | potential structure. |
| 08:58:31 | 23 | Q    When you say "potential |
| 08:58:32 | 24 | structure," what are you referring to? |
| 08:58:33 | 25 | A    That potentially the Chandlers |

Page 35

| | | |
|---|---|---|
| 08:58:38 | 1 | would be willing to step off the Board. |
| 08:59:00 | 2 | Q    Was that same issue discussed |
| 08:59:02 | 3 | with respect to the Zell transaction? |
| 08:59:05 | 4 | MR. WEINSTEIN:  Objection. |
| 08:59:09 | 5 | A    I don't think it was germane -- |
| 08:59:12 | 6 | as germane to the Zell transaction.  I |
| 08:59:21 | 7 | mean, it was certainly something that was |
| 08:59:22 | 8 | important to the Zell group, but as being |
| 08:59:27 | 9 | a benefit other than the key benefits of |
| 08:59:30 | 10 | value, certainty and a similar upfront |
| 08:59:34 | 11 | distribution, it just wasn't a |
| 08:59:38 | 12 | significant part of the discussion. |
| 08:59:46 | 13 | Q    One of the benefits of the |
| 08:59:47 | 14 | recapitalization, the upfront and cash |
| 08:59:51 | 15 | distribution, would be the fact that the |
| 08:59:52 | 16 | Chandlers would be willing to step off |
| 08:59:54 | 17 | the Board at that point; is that correct? |
| 08:59:56 | 18 | MR. WEINSTEIN:  Objection. |
| 09:00:00 | 19 | A    As was being discussed under |
| 09:00:02 | 20 | the recapitalization, that was certainly |
| 09:00:06 | 21 | a benefit that they were willing to |
| 09:00:07 | 22 | consider stepping off the Board if we |
| 09:00:11 | 23 | pursued the recapitalization. |
| 09:00:15 | 24 | But whether it was dispositive as |
| 09:00:17 | 25 | to whether or not we would have pursued the |

Page 113

| | | |
|---|---|---|
| 11:00:51 | 1 | A     I'll answer the best I can. |
| 11:00:53 | 2 | As far as I know, Broad and |
| 11:00:57 | 3 | Burkle had access to the same data room |
| 11:01:00 | 4 | that the Zell group had access to at the |
| 11:01:02 | 5 | time that the Zell group came forward with |
| 11:01:04 | 6 | the S Corp. ESOP structure, so I don't know |
| 11:01:09 | 7 | what additional information that the Zell |
| 11:01:12 | 8 | group needed that wasn't in the data room |
| 11:01:14 | 9 | that ultimately got them to a fully baked |
| 11:01:18 | 10 | proposal that we ultimately a proved on |
| 11:01:20 | 11 | April 1. |
| 11:01:21 | 12 | But in order to come up with a |
| 11:01:22 | 13 | proposal, I think that they had equal |
| 11:01:29 | 14 | access to information in that |
| 11:01:31 | 15 | January/February time frame. |
| 11:01:36 | 16 | Q     This document I just gave you, |
| 11:01:37 | 17 | the cover is an e-mail. |
| 11:01:42 | 18 | Look at the one from Michael |
| 11:01:45 | 19 | Costa to various people including yourself. |
| 11:01:49 | 20 | It says -- referring to the |
| 11:01:53 | 21 | attached letter:  You should decide how to |
| 11:01:55 | 22 | proceed.  They withdrew that $34 offer and |
| 11:02:02 | 23 | lowered the $27 cash component.  Be happy |
| 11:02:08 | 24 | to get on the phone with them and walk them |
| 11:02:11 | 25 | through the basic outline and see if they |

| | | |
|---|---|---|
| 11:24:30 | 1 | take every proposal seriously and to |
| 11:24:33 | 2 | negotiate with somebody in good faith, to |
| 11:24:35 | 3 | help them get their proposal in position so |
| 11:24:37 | 4 | that it can be reviewed by the Board, which |
| 11:24:40 | 5 | we actively tried to do with Broad and |
| 11:24:42 | 6 | Burkle. |
| 11:24:43 | 7 | But I was opposed to actually |
| 11:24:44 | 8 | sending across the documents, which is what |
| 11:24:47 | 9 | these guys were trying to get us to do. |
| 11:24:50 | 10 | Q    Did is the company take the |
| 11:24:51 | 11 | position there was a confidentiality |
| 11:24:53 | 12 | order in place that would prevent them |
| 11:24:56 | 13 | from doing so, from giving the documents? |
| 11:24:59 | 14 | MR. WEINSTEIN:  Objection. |
| 11:24:59 | 15 | A    I don't know whether they took |
| 11:25:01 | 16 | a position on that.at all.  I don't even |
| 11:25:04 | 17 | get to that point.  I just view that if |
| 11:25:06 | 18 | somebody else has negotiated something |
| 11:25:08 | 19 | with you, especially something as highly |
| 11:25:12 | 20 | engineered as this, that it is unethical |
| 11:25:15 | 21 | as a process manager to send somebody |
| 11:25:18 | 22 | else's documents to somebody else. |
| 11:25:20 | 23 | It's unethical and it's also |
| 11:25:23 | 24 | incredibly risky because if we do it, it's |
| 11:25:25 | 25 | bad faith and the party that negotiated it |

| | | |
|---|---|---|
| 11:25:26 | 1 | would view it as bad faith and they might |
| 11:25:28 | 2 | walk away. |
| 11:25:28 | 3 | Q    Have you ever been involved in |
| 11:25:29 | 4 | a merger and acquisition transaction |
| 11:25:31 | 5 | where an executed contract or a |
| 11:25:35 | 6 | negotiated contract has been provided to |
| 11:25:37 | 7 | another party to allow them to make |
| 11:25:39 | 8 | alterations to it to use it to facilitate |
| 11:25:44 | 9 | their own bid? |
| 11:25:46 | 10 | MR. WEINSTEIN:  Objection. |
| 11:25:49 | 11 | A    I've never been involved in |
| 11:25:51 | 12 | anything quite like this one that's |
| 11:25:53 | 13 | highly engineered.  In most transactions |
| 11:25:57 | 14 | you are sending all bidders one draft |
| 11:25:59 | 15 | contract and you are asking them to make |
| 11:26:02 | 16 | comments to that contract and you are |
| 11:26:03 | 17 | negotiating with different parties around |
| 11:26:05 | 18 | their comments and obviously using |
| 11:26:07 | 19 | whatever you have been able to negotiate |
| 11:26:08 | 20 | with somebody else as a way of trying to |
| 11:26:10 | 21 | get something better. |
| 11:26:11 | 22 | But have I sent across somebody |
| 11:26:13 | 23 | else's document with comments to somebody |
| 11:26:15 | 24 | else?  No. |
| 11:26:16 | 25 | Q    You've never sent a merger |

Exhibit J

March 29, 2007

Board of Directors
Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
Attention: Mr. Dennis FitzSimons

Gentlemen and Ladies:

As you know, we have spent considerable time and resources, and have completed our due diligence. Previously we made an offer that was valued at $34 per share in which we were to invest $500 million and receive warrants for 40% of the Company.

We have reviewed the ESOP recapitalization of the Company and have concluded that our $34 per share, $500 million investment and 40% warrant offer will work within the Company's ESOP recapitalization plan.

As we understand it, the transaction has two primary components: (1) an initial self-tender and ESOP formation; and (2) following the receipt of regulatory approvals, a second step merger and S-Corporation election.

With regard to financing, we understand that financing is readily available to the Company and the ESOP.

We have endeavored to collect all of the work product the Company and its advisors have produced. We have received some of it.

Please consider this letter as our willingness to enter a definitive contract offering shareholders $34 per share, our making a $500 million investment and receiving warrants for 40% of the Company.

As we have indicated in the past, it is our intention to have present management be responsible for Company operations.

We look forward to receiving a draft of a definitive agreement so we can proceed. If you have any questions, please feel free to call Pete Adamson on 310/954-5038 at The Broad Investment Company, or Ira Tochner on 310/228-2898 at The Yucaipa Companies. We look forward to hearing from you.

Sincerely,

Eli Broad
The Broad Investment Company, Inc.

Ronald W. Burkle
The Yucaipa Companies, LLC

EXHIBIT
Osborn- 8
5-16-07 (DS)

TRIB 006184
HIGHLY CONFIDENTIAL

Exhibit J

0043

HIGHLY CONFIDENTIAL

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

FRANK GARAMELLA, Derivatively) No. BC362110

on Behalf of TRIBUNE COMPANY,)

         Plaintiff,     )

  vs.           ) HIGHLY CONFIDENTIAL

DENNIS J. FITZSIMONS, et al.,)UNDER THE PROTECTIVE

      Defendants,   )    ORDER

  -and-         )

TRIBUNE COMPANY, a Delaware )

corporation,        )

    Nominal Defendant.  )

                 )


The videotaped highly confidential discovery

deposition of WILLIAM A. OSBORN, taken in the

above-entitled cause, before DERALYN GORDON,

a notary public of Cook County, Illinois, on the

16th day of May, 2007, at One South Dearborn

Street, Chicago, Illinois, beginning at

approximately 9:40 a.m., pursuant to Notice.


REPORTED BY:  DERALYN GORDON, CSR, RPR, CRR

LICENSE NO:  084-003957

HIGHLY CONFIDENTIAL

Page 78

1  any sort of instruction to its advisors to let

2  Mr. Broad or Mr. Burkle know what type of time

3  constraints the Special Committee was working

4  under?

5      A.   Well, the time frame that we were working   12:07PM

6  under was actually by that point quite public.

7  There was a -- we had given out a press release

8  earlier that by the end of March, we would make a

9  decision.  If you read any of the papers, this was

10  out in the press.                                    12:08PM

11      So I'm not -- I can't speak as to whether

12  or not they were told the specific time frame,

13  but the fact that all of these letters were

14  coming in conjunction with that tells me that

15  they knew.                                           12:08PM

16      Q.   Okay.  Did you, in fact, make a decision

17  by the end of the quarter?

18      A.   We made a decision by the 1st of April,

19  which was that weekend.

20      Q.   Okay.  When did the Company's quarter end?   12:08PM

21      A.   Well, the Company has a -- they go on

22  so many weeks in a year, so it's not exactly a

23  calendar year.  So I'm not certain.

24      I think they're -- they actually ended on

25  the 1st of April because -- as opposed to the 31st   12:09PM

EASTWOOD-STEIN
Deposition Management (800) 514-2714

HIGHLY CONFIDENTIAL

Page 79

1   was their quarter end.

2      Q.   Okay.   What are you basing that on, that

3   understanding on?

4      A.   What am I basing it on?   Well, I'm

5   actually basing it on the fact that because          12:09PM

6   Morgan Stanley had to give an opinion, and the

7   opinion was on the 31st of April, and we had to --

8           MR. GRAHAM:   Do you mean 31st of April?

9           THE WITNESS:   Excuse me, the 1st of April.

10  And we had to put that expense into the first        12:09PM

11  quarter told me that that was a first quarter

12  expense.   So it was a -- you know, there's a day

13  difference.   The way they handle the calendar,

14  that's how it works.

15  BY MR. ODDO:                                          12:10PM

16     Q.   Do you have any recollection of whether

17  or not the Company's advisors or the Special

18  Committee advisors made any progress with Broad

19  and Burkle or their advisors on execution of a

20  definitive agreement?                                 12:10PM

21          MR. GRAHAM:   That weekend you're talking

22  about?

23          MR. ODDO:   Yes.

24     A.   No.   The input we had from our advisors

25  was similar to what the letters -- there were not    12:11PM

HIGHLY CONFIDENTIAL

Page 80

1    complete documents, they had not picked an ESOP

2    trustee, it was viewed based on the input we had

3    from our legal advisors and our financial advisors

4    is while there was a number put out there, there

5    was a lot of work to be done to be able to get          12:11PM

6    that transaction really documented and closed.

7    BY MR. ODDO:

8        Q.   Okay.  Do you know whether or not Broad

9    and Burkle were informed of what they needed to do

10   in order to get their proposal into acceptable         12:11PM

11   form?

12       A.   Well, I don't know the details of how --

13   what they were informed about, but they -- these

14   are businessmen that have been down this path many

15   times before.                                          12:12PM

16       Q.   Okay.  You're not aware of what your

17   advisors may or may not have told them about any

18   deficiencies in -- purported deficiencies in their

19   proposal?

20       A.   Not the specifics, no.                        12:12PM

21       MR. ODDO:  Let's mark as Exhibit No. 11 a

22   document that's Bates stamped TRIB2923.

23                   (Osborn Deposition Exhibit No. 11

24                   marked for identification.)

25                                                          12:13PM

HIGHLY CONFIDENTIAL

Page 105

1   their response as an indication that they probably

2   would not support it unless there was some sort of

3   upfront consideration?

4       A.   To be fair we didn't -- we had the letters

5   for both McCormick Tribune and the Chandlers that      01:24PM

6   really had very little to do with how we

7   eventually structured the deal.  They were not the

8   drivers to what we were trying to do.

9           We wanted ourselves to get more money

10  upfront, we felt that was an important issue.  So     01:24PM

11  we were -- some of their issues that they may

12  raise we were already trying to do because we

13  wanted to get a higher portion of certainty in

14  terms of payment for the shareholders.

15      Q.   Was it important for the Special Committee   01:25PM

16  to have their support in favor of whatever

17  transaction the Special Committee ultimately would

18  recommend?

19      A.   Well, they were major shareholders,

20  clearly we needed to listen to them, but our job      01:25PM

21  was not to pay attention to their demands but to

22  think of the broader shareholder base.

23          And the only issue that we were concerned

24  with of support was Zell wanted to make certain

25  that the Chandlers were supportive so he would       01:25PM

HIGHLY CONFIDENTIAL

Page 138

1    and we were trying to get those returned that

2    would be marked up so we could proceed.

3         Q.    Is it fair to say that as of the end of

4    March of 2007 the Company had never received a

5    markup of any of its documents that it had                02:19PM

6    provided to Broad and Burkle?

7         A.    Yes.

8         Q.    And that was the markups that you were

9    referring to that were being sought in late March?

10        A.    Yes.                                            02:20PM

11        Q.    At the very beginning of your deposition,

12   Mr. Osborn, you were asked about your expectations

13   in terms of whether or not you would or would not

14   stay on the Board of Tribune following the merger

15   that is the subject of the merger agreement; do             02:20PM

16   you recall being asked about that?

17        A.    Yes.

18        Q.    Now, as I recall, you referred to a

19   conversation that you had with Mr. FitzSimons

20   about that at one point in time, and I'll come             02:20PM

21   back to that.

22             Prior to the time that the merger

23   agreement was signed with EGI and the ESOP,

24   was there any discussion by you or by the

25   Special Committee to your knowledge regarding             02:20PM

HIGHLY CONFIDENTIAL

Page 139

1    whether any of you would stay on the board of

2    the new company?

3        A.    No.

4        Q.    Were any offers made in that regard by

5    either Zell or EGI?                                02:21PM

6        A.    No.

7        Q.    Any promises made?

8        A.    No.

9        Q.    Now, you indicated you had a conversation

10   with Mr. FitzSimons at some time subsequent to the   02:21PM

11   time that the merger agreement was signed where he

12   asked about whether that would be something that

13   you'd be interested in; do you recall that?

14       A.    Yes.

15       Q.    Okay.  Did Mr. FitzSimons say whether that   02:21PM

16   was something that he was personally interested in

17   or whether he was making that inquiry on behalf of

18   Mr. Zell and EGI?

19       A.    It was only from his standpoint.

20       Q.    His personal standpoint?                 02:21PM

21       A.    Yes.  He was not asking me on behalf of

22   Sam Zell.

23       Q.    Okay.  Now, just following up on that,

24   just to be clear, no one's made an offer to be on

25   the new board; is that correct?                   02:22PM

117d421a-d82d-4548-9639-ba599031d1a0

0049a

HIGHLY CONFIDENTIAL

Page 140

1      A.   No.

2      Q.   Do you have any preference as to whether

3  or not you would or would not serve on the new

4  board?

5      A.   Yes, I have a preference.                    02:22PM

6      Q.   What's your preference?

7      A.   I would not serve on the board.

8      Q.   And, by the way, is that a topic that

9  you've discussed in recent weeks with other board

10  members as to whether or not they would like to      02:22PM

11  serve on the new board or not if asked to do so?

12      A.   We happened to have a discussion in

13  executive session at our last board meeting.

14      Q.   And is it fair to say that none of the

15  current Board members who served on the Special      02:22PM

16  Committee has expressed any interest in serving on

17  the new board?

18      A.   That's correct.

19           THE VIDEOGRAPHER:  Two minutes.

20  BY MR. GRAHAM:                                        02:22PM

21      Q.   Mr. Osborn, you indicated previously in

22  response to questions from Mr. Oddo that Northern

23  Trust does some business with the Tribune; is that

24  correct?

25      A.   Yes.                                         02:23PM

117d421a-d82d-4548-9639-ba599031d1a0

0049b

Exhibit L

HIGHLY CONFIDENTIAL

CERTIFIED
COPY

HIGHLY
CONFIDENTIA

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              FOR THE COUNTY OF LOS ANGELES

3

4    FRANK GARAMELLA,          )
     Derivatively On Behalf )
5    of TRIBUNE COMPANY,      )
                              )
6              Plaintiff,     )
                              )
7          VS.                )  Case No. BC 362110
                              )
8    DENNIS J. FITZSIMONS,    )
     ENRIQUE HERNANDEZ, JR.,  )
9    BETSEY D. HOLDEN,        )
     ROBERT S. MORRISON,      )
10   WILLIAM A. OSBORN,       )
     J. CHRISTOPHER REYES,    )
11   DUDLEY S. TAFT,          )
     MILES D. WHITE, JEFFREY  )
12   CHANDLER, ROGER GOODAN,  )
     WILLIAM STINEHART, JR.,  )
13   and DOES 1-25,           )
     inclusive,               )
14                            )
          Defendants,         )
15                            )
          and                 )
16                            )
     TRIBUNE COMPANY, a       )
17   Delaware corporation,    )
                              )
18        Nominal Defendant.  )
     _____)
19

20              HIGHLY CONFIDENTIAL

21         DEPOSITION OF FRANK GARAMELLA
                   TAKEN ON
22          THURSDAY, MAY 17, 2007

23

24   Reported by:  SHANDA LEVINE, CSR No. 10094
                        and
25            LESLI KELIGIAN, CSR No. 6006

1

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 11:37:43 | 1 | THE REPORTER:  He does what? |
| 11:37:44 | 2 | THE WITNESS:  He performs hedging and |
| 11:37:49 | 3 | another way of saying short selling to a degree |
| 11:37:49 | 4 | so -- |
| 11:37:49 | 5 | THE REPORTER:  You're saying "short"? |
| 11:37:49 | 6 | THE WITNESS:  Short.  S-h-o-r-t.  I |
| 11:37:56 | 7 | apologize. |
| 11:37:56 | 8 | I generally do -- I generally invest a lot |
| 11:37:59 | 9 | of this on my own. |
| 11:38:00 | 10 | BY MS. LANDAU: |
| 11:38:00 | 11 | Q.  Okay.  How do you choose the stocks that -- |
| 11:38:02 | 12 | you invest in? |
| 11:38:03 | 13 | A.  You might hear something on the street, you |
| 11:38:08 | 14 | might talk to somebody, a friend or an acquaintance |
| 11:38:11 | 15 | and they might say this company looks like they're |
| 11:38:13 | 16 | doing well, or that company looks like they're doing |
| 11:38:15 | 17 | well. |
| 11:38:16 | 18 | I don't make as much of a science of it |
| 11:38:18 | 19 | as -- as -- as a lot of other people do.  I have |
| 11:38:22 | 20 | always done a lot better concentrating on my core |
| 11:38:25 | 21 | business, which is insurance and employee benefits, |
| 11:38:27 | 22 | and -- and that's why I have someone in Chicago now |
| 11:38:31 | 23 | handling more serious amounts of money than my |
| 11:38:34 | 24 | Stifel holdings, by far.  This is just kind of -- |
| 11:38:37 | 25 | almost a hobby to a degree, just in general buying |

90

0051

HIGHLY CONFIDENTIAL

11:38:41  1    the various stocks.  Somewhat educated, but --

11:38:51  2         Q.  Now, with respect to Tribune, Exhibit 2

11:38:54  3    reflects that you bought the Tribune on December 30

11:38:51  4    of 2003 and that the settlement date was January 5

11:38:56  5    of 2004.

11:38:57  6         Does that refresh your recollection as to

11:39:00  7    when you owned your Tribune stock?

11:39:01  8         A.  Uh-huh.

11:39:02  9         Q.  And why is it that you bought the Tribune

11:39:04  10   stock at the time that you did?

11:39:05  11        A.  Well, it was some time ago.

11:39:06  12        I probably -- it may have been something

11:39:10  13   that maybe my broker at the time said to me about

11:39:14  14   Tribune stock, it's possible.  You know, obviously

11:39:17  15   they made comments from time to time.  Sometimes I

11:39:20  16   act on their advice, sometimes I don't.  I may have

11:39:23  17   read an article somewhere.  It's usually a pretty

11:39:27  18   informal combination of all of those.

11:39:30  19        Q.  Mr. Garamella, part of this process is --

11:39:33  20   is -- deposition is geared to my getting your best

11:39:36  21   recollection.  I don't want you to speculate.

11:39:38  22        So do you have a recollection of why you

11:39:41  23   purchased stock in Tribune?

11:39:45  24        A.  Nothing other than I thought it was a -- a

11:39:51  25   good company, well-known name, and I thought that

91

0052

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 14:06:31 | 1 | MR. BARON:  Objection.  Assumes facts not |
| 14:06:32 | 2 | in evidence. |
| 14:06:32 | 3 | MS. LANDAU:  I think the record's clear. |
| 14:06:34 | 4 | Q.  Mr. Garamella, is there anything that you |
| 14:06:37 | 5 | content has been omitted from the document that's |
| 14:06:38 | 6 | been marked as Exhibit 6?  Any material information |
| 14:06:40 | 7 | that would have an impact on whether you decide to |
| 14:06:43 | 8 | tender your shares? |
| 14:06:44 | 9 | A.  I'm not at all familiar with this document. |
| 14:06:47 | 10 | I can't -- I can't comment other than that. |
| 14:06:53 | 11 | Q.  Okay.  Mr. Garamella, as a class rep, don't |
| 14:06:55 | 12 | you feel it's incumbent upon you to have actually |
| 14:06:59 | 13 | read the disclosures that have been provided to |
| 14:07:01 | 14 | shareholders in this case? |
| 14:07:02 | 15 | A.  Well, that's why I rely on counsel's |
| 14:07:05 | 16 | advice. |
| 14:07:05 | 17 | Q.  So you're relying solely on counsel?  You |
| 14:07:08 | 18 | don't feel that it's incumbent upon you to have read |
| 14:07:12 | 19 | the documents, the disclosure documents in the case? |
| 14:07:14 | 20 | A.  Not to have read every document in the |
| 14:07:16 | 21 | case, no. |
| 14:07:17 | 22 | Q.  Do you feel -- obviously Exhibit 6 is the |
| 14:07:20 | 23 | Schedule T.O. |
| 14:07:21 | 24 | You don't feel it's incumbent upon you to |
| 14:07:23 | 25 | have read the Schedule T.O.? |

175

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 14:07:27 | 1 | A.  That's correct. |
| 14:07:30 | 2 | MS. LANDAU:  Okay.  I'd like to mark as |
| 14:07:31 | 3 | Exhibit 7. |
| | 4 | (The document referred to was |
| | 5 | marked for identification by the |
| | 6 | C.S.R. as Exhibit 7 and attached to |
| | 7 | and made part of this deposition.) |
| | 8 | BY MS. LANDAU: |
| 14:08:00 | 9 | Q.  Mr. Garamella, why don't you just stack up |
| 14:08:02 | 10 | the other exhibits. |
| 14:08:03 | 11 | A.  I was going to put them in chronological |
| 14:08:06 | 12 | order.  I'll hurry along with that. |
| 14:08:11 | 13 | Q.  Mr. Garamella, Exhibit 7 is the offer to |
| 14:08:13 | 14 | purchase.  And I believe this was one of the |
| 14:08:15 | 15 | documents that you reviewed with Mr. Baron last |
| 14:08:17 | 16 | night. |
| 14:08:17 | 17 | Is that right? |
| 14:08:19 | 18 | A.  No, this is one of the documents that was |
| 14:08:20 | 19 | in the book. |
| 14:08:22 | 20 | Q.  Right. |
| 14:08:23 | 21 | A.  In the binder.  I didn't review this |
| 14:08:25 | 22 | document. |
| 14:08:27 | 23 | Q.  You said you reviewed the first three |
| 14:08:28 | 24 | pages, I believe? |
| 14:08:30 | 25 | A.  Let me see.  Oh, it's in a little different |

176

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 14:08:36 | 1 | format here.  I believe this is the same one, it was |
| 14:08:39 | 2 | just double-sided before. |
| 14:08:41 | 3 | Yeah, I think I probably did.  Yes. |
| 14:08:44 | 4 | Q.  Well, is that your recollection? |
| 14:08:45 | 5 | A.  Yes, it is. |
| 14:08:45 | 6 | Q.  Okay. |
| 14:08:47 | 7 | A.  It was just in a different format than it |
| 14:08:49 | 8 | was in the binder so -- |
| 14:08:50 | 9 | Q.  Again, this is the offer to purchase.  And |
| 14:08:52 | 10 | this is the document that contains disclosure to |
| 14:08:54 | 11 | shareholders. |
| 14:08:55 | 12 | You don't believe it's incumbent upon you |
| 14:08:57 | 13 | to have read the document? |
| 14:08:58 | 14 | A.  I don't -- I don't have the background |
| 14:09:00 | 15 | to -- to understand the 137 pages here in tiny |
| 14:09:06 | 16 | print.  This is way beyond my expertise. |
| 14:09:08 | 17 | Q.  So you're relying solely on what your |
| 14:09:10 | 18 | attorneys have told you with respect to this |
| 14:09:11 | 19 | document? |
| 14:09:12 | 20 | A.  Yes. |
| 14:09:12 | 21 | Q.  Okay.  Is there anything in this document, |
| 14:09:15 | 22 | to your knowledge, that's false or misleading? |
| 14:09:19 | 23 | MR. BARON:  And I'm going to object to the |
| 14:09:21 | 24 | extent that you have an independent view as opposed |
| 14:09:23 | 25 | to discussions you've had with counsel about that. |

177

0055

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 16:08:50 | 1 | How was the process deficient? |
| 16:08:54 | 2 | MR. BARON:  To the extent that -- to the |
| 16:08:56 | 3 | extent that you have an independent view, you may so |
| 16:08:58 | 4 | testify.  To the extent your view is based upon |
| 16:09:01 | 5 | conversations that you've had with counsel not in |
| 16:09:03 | 6 | the presence of your wife and not based on |
| 16:09:06 | 7 | information in the Complaint, it's attorney-client |
| 16:09:08 | 8 | privilege.  I advise you not to answer. |
| 16:09:11 | 9 | THE WITNESS:  I have no outside, |
| 16:09:12 | 10 | independent view. |
| 16:09:13 | 11 | BY MS. LANDAU: |
| 16:09:14 | 12 | Q    Other than what's set forth in the |
| 16:09:16 | 13 | Complaint?  You can testify as to what's set forth |
| 16:09:19 | 14 | in the Complaint, Mr. Garamella. |
| 16:09:25 | 15 | A    I believe in what's set forth in the |
| 16:09:28 | 16 | Complaint. |
| 16:09:29 | 17 | Q    What is set forth in the Complaint?  Tell |
| 16:09:31 | 18 | me without looking at the Complaint.  How is the |
| 16:09:33 | 19 | process deficient? |
| 16:09:37 | 20 | A    I really rely on counsel.  I don't have the |
| 16:09:39 | 21 | Complaint memorized.  But we've gone over several |
| 16:09:43 | 22 | features of that. |
| 16:09:44 | 23 | Q    Do you have even the most basic of |
| 16:09:46 | 24 | understandings with respect to what the Complaint |
| 16:09:48 | 25 | alleges? |

249

0056

HIGHLY CONFIDENTIAL

| 16:09:49 | 1 | A | Yes. |

16:09:49    1    A    Yes.

16:09:50    2    Q    Okay.  Tell me what the Complaint alleges.

16:09:53    3         MR. BARON:  Objection.  Asked and answered.

16:09:55    4         But go ahead.

16:09:58    5         THE WITNESS:  The Complaint alleges, among

16:10:00    6    other things, that there was not a free, open, and

16:10:03    7    tedious process of obtaining bids.

16:10:05    8    BY MS. LANDAU:

16:10:06    9    Q    Okay.  What else?

16:10:15   10    A    At this time, that's all I recall.

16:10:19   11    Q    What wasn't open about the process of

16:10:21   12    obtaining bids --

16:10:23   13         MR. BARON:  Again, based upon --

16:10:25   14    BY MS. LANDAU:

16:10:25   15    Q    -- according to the Complaint and your own

16:10:28   16    views, separate from what's been informed by

16:10:30   17    counsel?

16:10:31   18    A    I have no other outside views except for

16:10:33   19    what's been informed by counsel.

16:10:35   20    Q    What's in the Complaint?  In your view,

16:10:37   21    what made the process not open?

16:10:47   22    A    In a bidding process, there's giving and

16:10:49   23    taking, there's re-bids, it's over an extended

16:10:52   24    period of time, and that appears not to have

16:10:55   25    occurred as well as it could have.

250

Exhibit M

# Stifel Nicolaus
## Company Incorporated

# *Trade Confirmation*

Account Number:

Investment Executive:  JEFFREY PATTERSON

Phone:

Office:    **REDACTED**

808809 003 739 102 1/1 —— 739    000739

FRANK GARAMELLA AND
SALLY W GARAMELLA JTWROS

REDACTED

If applicable, please make checks
payable to Stifel Nicolaus & Co., Inc.
and remit to your branch office.

| Trade Date | Security Description | Symbol | Cusip/Sec No. | Qty Bought | Price |
|---|---|---|---|---|---|
| 12/30/2003 | TRIBUNE CO NEW 10/83 | TRB | 896047107 | 200 | $51.50000 |

| Principal: | $10,300.00 |
|---|---|
| Commission/Handling: | $166.60 |
| Net Amount: | $10,466.60 |

| Settlement Date | Account Type | Transaction Type |
|---|---|---|
| 01/05/2004 | CASH ACCOUNT | 06 (See reverse side) |

Special remarks for this transaction:

PREFERRED RATE APPLIED

**HIGHLY
CONFIDENTIAL**

**GARAMELLA 001**

**Exhibit M**

0058


# STIFEL
# NICOLAUS

FRANK GARAMELLA AND
SALLY W GARAMELLA JTWROS

April 1 -
April 30, 2007
Account Number:

Page 4 of

## ASSET DETAILS (continued)

| Equities | Symbol/ Bond Rating | Quantity | Current price | Average unit cost | Current value | Cost | Unrealized gain/(-)loss* | Anticipated annualized income | Current yield % |
|---|---|---|---|---|---|---|---|---|---|
| **REDACTED** | | | | | | | | | |
| TRIBUNE CO NEW 10/83 CUSIP: 896047107 | TRB | 200 | 32.8000 | 52.3330 | 6,560.00 | 10,466.60 | -3,906.60 | 144.00 | 2.20% |
| **REDACTED** | | | | | | | | | |

6500

**HIGHLY
CONFIDENTIAL**

**GARAMELLA 002**

# PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             )  ss
COUNTY OF LOS ANGELES        )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 555 West Fifth Street, Suite 4000, Los Angeles, California 90013-1010.

On May 21, 2007 I served the foregoing document described as **DECLARATION OF JENNIFER ALTFELD LANDAU IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** on all interested parties in this action as follows:

| | |
|---|---|
| Randall J. Baron | Dean J. Kitchens |
| randyb@lerachlaw.com | dkitchens@gibsondunn.com |
| Steven J. Oddo | Melissa Epstein |
| steveo@lerachlaw.com | mepstein@gibsondunn.com |
| Lerach Coughlin Stoia Geller Rudman & | Gibson, Dunn & Crutcher LLP |
| Robins LLP | 333 South Grand Avenue |
| 655 West Broadway, Suite 1900 | Los Angeles, CA  90071-3197 |
| San Diego, CA  92101 | |

☒    (VIA FEDERAL EXPRESS) I served the foregoing document(s) by Federal Express for overnight delivery. I placed true copies of the document(s) in a sealed envelope addressed to each interested party as shown above. I placed each such envelope, with Federal Express fees thereon fully prepaid, for collection and delivery at Sidley Austin LLP, Los Angeles, California. I am readily familiar with Sidley Austin LLP's practice for collection and delivery of express carrier package for delivery with Federal Express. Under that practice, the Federal Express package(s) would be delivered to an authorized courier or dealer authorized by Federal Express to receive document(s) on that same day in the ordinary course of business.

☒    (VIA E-MAIL OR ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent to the person(s) at the e-mail address(es) listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on May 21, 2007, at Los Angeles, California.

_____
Camie P. Crosby

PROOF OF SERVICE

LA1 921883v.1