The McGraw-Hill Companies

# STANDARD &POOR'S

Peggy Hwan Hebard, CFA, CPA
Director
Ratings Services

55 Water Street
New York, NY 10041-0003
212-438-2319 Tel
212-438-7873 Fax
peggy_hebard@standardandpoors.com

March 29, 2007

Mr. Chandler Bigelow
Vice President & Treasurer
Tribune Co.
435 North Michigan Avenue
Chicago, Illinois 60611

Dear Mr. Bigelow:

Thank you for requesting Standard & Poor's Rating Evaluation Service (RES) to provide you with feedback on the ratings impact for Tribune Co. given the scenario pertaining to a leveraged buyout (LBO) sponsored by Zell LLC (Zell) and a newly formed Tribune employee stock ownership plan (ESOP). Standard & Poor's has reviewed the specific scenario that you provided. The following is a summary analysis reflecting our Rating Evaluation committee response.

### Existing Ratings

| | |
|---|---|
| Corporate credit rating | BB+/Watch Neg/-- |
| Senior unsecured debt | BB+/Watch Neg |
| Subordinated debt | BB-/Watch Neg |
| Commercial paper | B/Watch Neg |

### Scenario Presented

Zell and the ESOP will take Tribune private through a 2-step transaction that will add about $8.4 billion of incremental debt to the company's capital structure.

The first step includes:

- Zell purchases newly issued common stock and an exchangeable note for $225 million in cash;
- The ESOP is created, which purchases $250 million of newly issued common stock in exchange for a $250 million note to Tribune;
- Tribune puts in place $8.125 billion in senior secured credit facilities consisting of a $750 million revolving credit facility, $7.015 billion term loan B and $260 million delayed draw term loan B. In addition, there is an incremental facility of up to $2.13 billion that would be used to complete the second phase of the transaction; and
- The company uses the $7.015 billion term loan B and $225 million in cash from Zell to repurchase 128.5 million shares of Tribune common stock through a tender offer at $33 per share, or about 53% of the outstanding shares for approximately $4.2 billion, and to refinance the outstanding bank debt and commercial paper of about $2.8 billion. Zell and the ESOP do not participate in the tender offer.

*Private and Confidential*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    ML-TRIB-0431970

Following Tribune shareholders' and other approvals, including that of the Federal Communications Commission, the second step includes:

- Tribune raises about $4.2 billion of debt, consisting of the $2.13 billion incremental term loan B and $2.1 billion of new senior unsecured notes;
- Zell exchanges its Tribune common stock and exchangeable note valued at $225 million for a $185 million convertible subordinated note and a warrant valued at $40 million. The convertible note and warrant gives Zell the option to purchase newly issued shares that would account for 38% of Tribune's then outstanding common stock at a price of $350 million in cash plus the value of the note; and
- Tribune repurchases the remaining public shares for a total of $4.2 billion, and the merger is completed.

### Rating Conclusion

| | |
|---|---|
| Corporate credit rating | B/Stable/-- |
| Existing senior unsecured debt* | CCC+ (Recovery rating: 5) |
| Existing subordinated debt | CCC+ |
| Commercial paper | Not Rated** |
| | |
| New senior secured debt | B (Recovery rating: 2) |
| New subordinated debt | CCC+ |

*Upon issuance of the new senior secured credit facilities, this senior unsecured debt will become secured by the same collateral as the credit facilities.

**All outstanding borrowings will be repaid and the rating will be withdrawn.

### Rationale

#### Corporate Credit Rating

The current 'BB+/Watch Neg/B' corporate credit rating reflects Tribune's significant debt levels and its announcement in September 2006 that the company would be considering various alternatives for "creating additional value for shareholders." In May 2006, Tribune announced plans for a leveraged recapitalization with the repurchase of up to 75 million common shares, or about 25% of the common stock outstanding. In response, Standard & Poor's lowered its ratings on the company, including its long-term corporate credit rating to 'BBB-' from 'A-', and assigned a negative outlook. Tribune bought back about 23% of its shares for approximately $2.3 billion. The company's financial profile was weak for the ratings, but Standard & Poor's had expected that Tribune would focus on debt reduction following the completion of the repurchases. This was no longer the case with the September announcement.

The 'B/Stable/--' corporate credit rating conclusion for the scenario is based on the operating assumptions and financial projections that you provided. These include:

- Successful implementation of the previously announced plan to reduce annual operating costs by $200 million by 2008;

*Private and Confidential*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    ML-TRIB-0431971

- A further reduction in annual operating costs of $80 million, consisting of the elimination of the annual contribution to the 401(k) plan of $60 million and public cost and other savings of $20 million;
- Financing structure as previously discussed;
- Financial covenants of a maximum total guaranteed debt leverage ratio starting at 9.0x in 2007, 9.0x in 2008, 8.75x in 2009, 8.5x in 2010, and 8.25x in 2011 and a minimum interest coverage ratio starting at 1.1x in 2007, 1.15x in 2008, 1.2x in 2009, and 1.25x in 2010 and thereafter.
- Debt reduction of about $600 million from the sale of the Chicago Cubs baseball team and Comcast SportsNet investment shortly after the closing of the LBO;
- Conversion of Tribune to an S-Corporation in 2008 from a C-Corporation; and
- Excess cash flow is used for debt repayment.

In addition, Standard & Poor's assumes that there are no meaningful changes in Tribune's senior management, operating strategies and post-LBO financial policies.

The corporate credit rating assessment reflects the substantially greater pro forma debt levels, resulting in sharply weaker credit measures and free operating cash flow generation. Both the company's newspaper and broadcasting operations are facing very challenging revenue climates and competitive market conditions. These factors are offset in part by Tribune's satisfactory business profile, as exhibited by the leading and diversified mix of newspaper and broadcasting properties. In addition, required debt amortization will be modest and financial flexibility will be provided by an undrawn revolving credit facility. Pro forma debt to EBITDA for the year ended December 2007 is projected at 8.9x and EBITDA to interest coverage at 1.6x. These measures are adjusted for Standard & Poor's' operating leases and PHONES methodologies. The outlook is stable. Further downside ratings pressure could exist if cash flow does not stabilize as a result of prolonged revenue weakness, which would meaningfully reduce or eliminate the availability under the planned revolving credit facility as the company's financial metrics gets close to or does not comply with the debt covenants.

**Recovery Analysis / Issue Ratings**

The planned senior secured credit facilities totaling about $10.2 billion would be rated 'B', the same as the corporate credit rating, with recovery ratings of '2', indicating prospects for a substantial recovery (80%-100%) of principal in the event of a payment default. The planned $2.1 billion of senior unsecured notes would be rated 'CCC+'. The ratings on the existing senior unsecured debt would be lowered to 'CCC+'. These debt issues will become secured once the secured credit facilities are put into place, and Standard & Poor's would assign recovery ratings of '5', indicating prospects for a negligible recovery (0%-25%) of principal in the event of a payment default. The rating on the outstanding subordinated debt (PHONES) would be lowered to 'CCC+'. These issue ratings are based on preliminary terms and conditions, as more fully discussed below. Proceeds from the new credit facilities and senior unsecured debt, combined with the $225 million in cash from Zell, would be used to repurchase the outstanding public shares of Tribune and repay existing bank debt and commercial paper borrowings. The $260 million delayed draw term loan B would be available to help repay maturing medium-term notes in 2008.

*Private and Confidential*

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**                                    ML-TRIB-0431972

Table 1
Tribune Co. – Credit Profile
Corporate credit rating    B/Stable/–

| Facility/Issue | Issue rating | Recovery rating | Expected recovery (%) | Term (years) | Repayment |
|---|---|---|---|---|---|
| $750 million revolving credit facility | B | 2 | 80-100% | 6 | Bullet |
| $7,015 million term loan B | B | 2 | 80-100% | 7 | 1% annually, balance at maturity |
| $260 million delayed draw term loan B | B | 2 | 80-100% | 7 | 1% annually, balance at maturity |
| $2,130 million incremental term loan B | B | 2 | 80-100% | 7 | 1% annually, balance at maturity |
| Existing senior unsecured debt that will become secured | CCC+ | 5 | 0-25% | various | |

A summary of the terms and conditions of the credit facilities is provided in Table 3. Important considerations include:

- The collateral for the credit facilities will consist of the pledge of the stock of Tribune's subsidiaries, which is a weaker claim to the full value of the company than a direct lien on the assets of the subsidiaries, which own the majority of the consolidated assets. This collateral will be shared on a pro rata basis with Tribune's existing senior unsecured debt, which will become secured, and is expected to total about $1.5 billion pro forma for the refinancing as outlined in Table 1;
- The credit facilities will benefit from an upstream guarantee from the subsidiaries, which will provide the holders of this debt with a direct claim against the subsidiaries that is structurally superior to the pledge of the subsidiary stock as collateral. As such, our analysis considers the credit facilities to have a higher priority claim to the value of the company than the secured notes if Tribune were to default. However, because the subsidiary guarantees will be unsecured, the credit facilities will rank pari passu with any other unsecured claims at the subsidiary level;
- Step 2 of the transaction contemplates raising an additional $2.1 billion by issuing new senior unsecured notes or through a new senior interim term loan. Such debt is expected to benefit from subsidiary guarantees, but these guarantees are expected to be senior subordinated guarantees and thus junior to the guarantees of the credit facilities; and
- The existing senior unsecured debt and subordinated debt (PHONES) will not benefit from a guarantee of the subsidiaries.

Table 2
Tribune Co. – Simulated Default/Valuation Variables
Corporate credit rating    B/Stable/–

| –Simulation default– | | –Valuation– | | –Results– | |
|---|---|---|---|---|---|
| Years to default | 3 (the end of fiscal 2009) | Emergence capital structure (debt/equity) | 70%/30% | Unadjusted value | $9,743 million |
| LIBOR rise | 150 bps | Cost of equity | 15.0% | Priority claims | $582 million |
| Margin increase | 150 bps | Effective tax | 20.0% | Adjusted value | $9,011 million |
| Default first-lien debt | $9,270 million | After-tax cost of debt | 8.3% | | |
| Default EBITDA (FY2009) | $1,141 million | Weighted avg cost of capital | 10.4% | Estimated principal recovery of first-lien facilities | 80%-100% |
| Revenue growth rate | PF 2007 -8.5%, 2008 -1.4%, 2009 -2.7% | Equivalent EBITDA multiple | 7.9x | | |
| EBITDA margin | PF 2007 25.9%, 2008 25.2%, 2009 23.9% | Unlevered free cash flow normalized after default | $1,011 million | | |
| Maintenance capex | $90 million | | | | |

### Simulated default scenario

Pro forma for Tribune's LBO, the company will have a highly leveraged capital structure with 2007 debt to EBITDA (adjusted for operating leases and the PHONES) of 8.9x. This will weaken the Tribune's debt service coverage ratios and cash generating capability, although its liquidity will benefit from substantial borrowing capacity on its revolving facility. Operationally, the company's results will remain reliant on the health of the publishing and broadcast advertising revenue climate, which is sensitive to economic cycles and is in the midst of a secular shift.

Given these risks, our default scenario contemplates that the sector downturn is more prolonged and pronounced than the company's expectations and other recent downturns. In our scenario, default was

*Private and Confidential*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    ML-TRIB-0431973

driven by a continued decline in advertising and circulation revenues, coupled with volatility in broadcast and entertainment revenues, as these are the key drivers to the company's revenue and EBITDA. More specifically, our analysis assumed the following:

- Publishing advertising revenues decline 7% in 2007, 4% in 2008, and 4% in 2009;
- Circulation revenues decrease 5% in 2007, 5% in 2008, and 5% in 2009;
- Broadcast and entertainment revenues fall 16% in 2007, increase 3% in 2008 driven by increased political advertising, and decline in 3% in 2009;
- Step 2 of the transaction is completed by the end of 2007 and includes borrowing the $2.13 billion incremental term loan B and $2.1 billion in senior unsecured debt as previously outlined;
- The Chicago Cubs and Comcast SportsNet divestitures are completed by the end of 2007, with the net proceeds of $600 million used to repay a portion of the credit facilities;
- The $260 million delayed draw term loan is drawn in 2008 and used to repay the maturing $263 million of medium-term notes;
- Capital expenditures total $100 million in 2007, $90 million in 2008, and $90 million in 2009;
- LIBOR rises by 150 basis points;
- Credit facilities' interest rates increase by 150 basis points to reflect the higher risk resulting from the borrowers simulated credit deterioration; and
- A fully drawn revolving credit facility at the time of default.

The impact of these assumptions on Tribune's consolidated revenue and EBITDA and other modeling assumptions are highlighted above in Table 2. Under our scenario, the company is expected to default in 2009 when its cash flow and revolving credit capacity are unable to cover its interest expense, capital expenditures, and working capital needs.

### Valuation

Standard & Poor's believes that Tribune would reorganize if it experienced a payment default given its strong competitive positions in the newspaper publishing and broadcasting industries. To value the company, we assumed a perpetual free cash flow growth rate of 0%, reflecting the mature nature of the newspaper business and rising competition from alternative media. These discounted cash flow assumptions produce an enterprise value of approximately $9.7 billion, which is equivalent to an EBITDA multiple of 7.9x. This is below Tribune's purchase multiple of about 10x.

### Results

Our analysis yields an enterprise value of about $9.7 billion, or about $9.0 billion after accounting for priority claims of about 7% for administrative expenses and other priority claims such as capitalized lease obligations. This value is sufficient to provide a recovery in the high 90% area to the lenders of the credit facilities, before considering the potential for other unsecured claims against the subsidiaries. Other potential unsecured subsidiary claims could include deficiency claims for rejected operating leases, pension or union employee contracts, or terminated broadcasting rights. Even with the potential for such claims, we still feel that the value of the company is sufficient to provide the credit facilities' lenders with an 80%-100% recovery of principal in our simulated default scenario and thus the '2' recovery rating. Given this recovery level and that the existing senior unsecured debt would be structurally subordinated to the senior secured credit facilities, the existing senior unsecured debt would be expected to have negligible recovery (0%-25%) of principal and therefore the '5' recovery rating.

*Private and Confidential*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ML-TRIB-0431974

Table 3
Tribune Co. – Transaction Summary

| | |
|---|---|
| | $10.155 billion senior secured bank facility |
| Borrower(s) | Tribune Company |
| Guarantor(s) | All domestic subsidiaries of the borrower |
| Structure | $750 million 6 year revolving credit facility; $7.015 billion initial 7 year term loan B; $260 million 7 year delayed draw term loan B; $2.13 billion 7 year term loan B. The revolving facility will not amortize and will be due in full at maturity, and the term loans will amortize in equal quarterly installments at a rate of 1% annually with the balance due at maturity. |
| Security package | Stock of subsidiaries |
| Financial covenants | Total guaranteed maximum debt to EBITDA of 9.0x for 2007, 9.0x for 2008, 8.75x in 2009, 8.5x in 2010, and 8.25x in 2011. Total EBITDA coverage of interest expense of 1.1x for 2007 and 1.15x for 2008, 1.2x for 2009, 1.25x for 2010 and thereafter. |

*This evaluation is both preliminary and confidential. It is preliminary in that it is based on hypothetical information recently presented to us. You understand that Standard & Poor's will not review, modify or surveil this evaluation. Subsequent information or changes to the information previously provided could result in final conclusions that differ from the preliminary proposed conclusions. Please note the conclusions provided herein are based on assumptions you and your team have provided to us. To the extent that these assumptions change, the rating implications could also change. You understand and agree that we are not financial advisors to you and that in performing the RES, Standard & Poor's is providing indicative rating opinions on the scenarios presented; it is not endorsing or advocating any particular course of action. Nothing in this report is intended to create, or should be construed as creating, a fiduciary relationship between you and us and recipients of the indicative rating. We have not consented to and will not consent to being named an "expert" under applicable securities laws. Standard & Poor's indicative rating is not a "market" rating, nor is it a recommendation to buy, hold or sell any financial obligation of an issuer.*

*<u>Confidential Dissemination of the Evaluation.</u> This Evaluation is issued by Standard & Poor's on a confidential basis. The Client is permitted to disseminate the Evaluation for internal use and to interested third parties on a confidential basis but only in accordance with applicable law and only if a copy of this final Evaluation report is provided in its entirety to all recipients without any changes. If the Evaluation subsequently becomes public through disclosure by the Client or a third party other than Standard & Poor's, Standard & Poor's reserves the right to publicly comment on the Evaluation and/or publish the final Evaluation report.*

Should you have any questions, please do not hesitate to contact me.

Sincerely,

*[signature]*

Peggy Hwan Hebard, CFA, CPA
Director

*Private and Confidential*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ML-TRIB-0431975