

July 13, 2007

Dear Shareholder:

We cordially invite you to attend a special meeting of shareholders of Tribune Company, which we will hold on August 21, 2007, at 9:00 a.m., Central Time, at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois. At the special meeting, we will ask you to consider and vote on a proposal to adopt the Agreement and Plan of Merger (the "Merger Agreement"), dated as of April 1, 2007, by and among Tribune Company (the "Company"), GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee (the "Trustee") of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and, for limited purposes, EGI-TRB, L.L.C. (the "Zell Entity"), a Delaware limited liability company wholly owned by a trust established for the benefit of Samuel Zell ("Zell" or "Mr. Zell") and his family.

The Merger Agreement contemplates the merger of Merger Sub into the Company (the "Merger"), with the Company surviving and becoming wholly owned by the ESOP. The Merger is part of a series of transactions under which the ESOP and the Zell Entity have invested and will invest in the Company. If we complete the Merger, the Company will become a privately held company wholly owned by the ESOP, with the Zell Entity as an investor in the Company through a subordinated promissory note and a warrant to acquire common stock. In the Merger, all shares of the Company's common stock ("Company Common Stock"), other than shares held by the ESOP and shares held by shareholders who validly exercise appraisal rights, will be converted into the right to receive $34.00 per share in cash. If the Merger does not close by January 1, 2008, this amount will be increased at an annualized rate of 8% from January 1, 2008 to the closing. Adoption of the Merger Agreement and approval of the Merger requires the affirmative vote of holders representing a majority of the shares of Company Common Stock outstanding and entitled to vote at the special meeting. **Your board of directors recommends that you vote <u>FOR</u> adoption of the Merger Agreement and approval of the Merger.**

The accompanying notice of special meeting and proxy statement provide you with a summary of the Merger Agreement and the Merger, conditions and other factors relating to the Merger, and additional important information. **Please read these materials carefully.**

The board has fixed the close of business on July 12, 2007, as the record date for the purpose of determining shareholders entitled to receive notice of and to vote at the special meeting or any adjournment, postponement or continuation of the meeting. The board knows of no other matters that will be presented for consideration at the special meeting. If any other matters properly come before the special meeting, the persons named in the enclosed form of proxy or their substitutes will vote in accordance with their best judgment on such matters.

**YOUR VOTE IS VERY IMPORTANT. Whether or not you plan to attend the special meeting in person, please sign and return the enclosed proxy in the envelope provided.** You may also submit your proxy by either visiting the website or calling the toll-free number shown on your proxy card. If you attend the special meeting and desire to vote in person, you may do so even though you have previously sent a proxy. Because adoption of the Merger Agreement and approval of the Merger requires approval by the holders of a majority of the outstanding shares of Company Common Stock, your failure to vote will have the same effect as a vote against the Merger. If you hold your shares through a broker, your broker will be unable to vote your shares without your instructions. You should instruct your broker how to vote your shares, following the procedures provided by your broker.

We thank you for your support.

Sincerely,

Dennis J. FitzSimons
*Chairman, President and Chief Executive Officer*

**Neither the Securities and Exchange Commission nor any state securities regulatory agency has approved or disapproved the Merger, passed upon the merits or fairness of the Merger or passed upon the adequacy or accuracy of the disclosure in this document. Any representation to the contrary is a criminal offense.**

This proxy statement is dated July 13, 2007, and is first being mailed to shareholders on or about July 17, 2007.

W/1233431v1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0523126

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0523127**

TRIBUNE

## NOTICE OF SPECIAL MEETING OF SHAREHOLDERS
## TO BE HELD ON AUGUST 21, 2007

We will hold a special meeting of shareholders of Tribune Company ("Tribune" or the "Company") on August 21, 2007, at 9:00 a.m., Central Time, at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois, for the following purposes:

1. to consider and vote on a proposal to adopt the Merger Agreement and approve the Merger;

2. to approve the adjournment of the meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes at the time of the meeting to adopt the Merger Agreement and approve the Merger; and

3. to act on any other business that may properly come before the meeting.

Only holders of record of Company Common Stock at the close of business on July 12, 2007, the record date for the special meeting, are entitled to notice of and to vote at the meeting. We cordially invite all shareholders of record to attend the special meeting in person. We will ask you to confirm your identity and stock ownership prior to entering the meeting. If you hold your shares through a broker, please bring a copy of a brokerage statement reflecting your stock ownership as of July 12, 2007. For at least ten days prior to the meeting, the Company will maintain, at its principal executive offices, a list of the names and addresses of shareholders eligible to vote at the meeting.

Your vote is important, regardless of the number of shares of Company Common Stock you own. The adoption of the Merger Agreement and approval of the Merger requires the affirmative vote of holders representing a majority of the outstanding shares of Company Common Stock entitled to vote thereon. The proposal to adjourn the meeting, if necessary or appropriate, to solicit additional proxies requires the affirmative vote of a majority of the votes cast on the matter by the holders of shares of Company Common Stock present and entitled to vote. Even if you plan to attend the special meeting in person, we encourage you to complete, sign, date and return the enclosed proxy card to ensure that your shares will be represented at the special meeting.

You may also vote your shares by proxy using a toll-free telephone number or the Internet. We have provided instructions on the proxy card for using these convenient services. If you sign, date and return your proxy card without indicating how you wish to vote, we will vote your proxy in favor of the adoption of the Merger Agreement and the proposal to adjourn the special meeting, if necessary or appropriate, to solicit additional proxies. If you fail to return your proxy card and do not vote at the meeting, we will not be able to count your shares for purposes of determining whether a quorum is present at the special meeting and your failure to vote will have the same effect as a vote against adoption of the Merger Agreement.

If you are a shareholder of record, voting in person at the special meeting will revoke any proxy that you previously submitted. If you hold your shares through a bank, broker or other custodian, you must obtain a legal proxy from such custodian in order to vote in person at the special meeting.

If you do not vote in favor of adoption of the Merger Agreement, you will have the right to seek appraisal of the fair value of your shares if we complete the Merger, but only if you submit a written demand for appraisal to the Company before the vote is taken on the Merger Agreement and otherwise strictly comply with all requirements of Delaware law, which we summarize in the accompanying proxy statement.

By order of the board of directors,

Crane H. Kenney
*Senior Vice President,*
*General Counsel and Secretary*

Dated: July 13, 2007

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523128

## IMPORTANT

**PLEASE VOTE.**   YOU MAY VOTE BY:

- SIGNING AND RETURNING THE ACCOMPANYING PROXY CARD

OR

- SUBMITTING YOUR PROXY BY TELEPHONE OR BY INTERNET (see the proxy card for instructions)

OR

- VOTING IN PERSON AT THE MEETING (if you are a shareholder of record or hold a legal proxy from the shareholder of record)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523129

## TABLE OF CONTENTS

| | Page |
|---|---|
| SUMMARY TERM SHEET | 1 |
| QUESTIONS AND ANSWERS ABOUT THE MERGER AND THE SPECIAL MEETING | 8 |
| INTRODUCTION | 16 |
| SPECIAL FACTORS | 16 |
|   Background of the Merger | 16 |
|   Reasons for and Fairness of the Merger; Recommendations of the Special Committee and the Board | 28 |
|   Reports of the Special Committee's Financial Advisor | 32 |
|   Reports of the Company's Financial Advisors | 32 |
|   Opinion of the Special Committee's Financial Advisor | 34 |
|   Opinion of the Company's Financial Advisor | 43 |
|   Opinion of Valuation Research Corporation | 47 |
|   Purposes and Reasons of the ESOP and Merger Sub | 50 |
|   Purposes and Reasons of the Zell Investors | 50 |
|   Position of the ESOP and Merger Sub as to Fairness | 51 |
|   Position of the Zell Investors as to Fairness | 52 |
|   Certain Effects of the Merger | 54 |
|   Plans for the Company after the Merger and the Other Leveraged ESOP Transactions | 56 |
|   Conduct of the Company's Business if the Merger is Not Completed | 57 |
|   Financing | 57 |
|   Interest of Directors and Executive Officers | 60 |
|   Fees and Expenses | 66 |
|   Appraisal Rights | 67 |
|   United States Federal Income Tax Consequences | 67 |
|   Litigation | 69 |
|   Regulatory Approvals | 71 |
|   Accounting Treatment of the Merger | 72 |
| IDENTITY AND BACKGROUND OF FILING PERSONS | 73 |
|   The Company | 73 |
|   The ESOP and Merger Sub | 75 |
|   The Zell Investors | 76 |
| THE SPECIAL MEETING | 79 |
|   Time, Place and Purpose of the Special Meeting | 79 |
|   Record Date and Quorum | 79 |
|   Required Vote | 79 |
|   Proxies; Revocation | 80 |
|   Adjournments and Postponements | 81 |
|   Solicitation of Proxies | 81 |
| THE MERGER AGREEMENT | 82 |
|   Effective Time; Structure | 82 |
|   Treatment of Company Common Stock | 82 |
|   Treatment of ESOP and Merger Sub-Owned Shares | 82 |
|   Treatment of Preferred Stock | 82 |

i

|  | Page |
|---|---|
| Treatment of Merger Sub Common Stock | 83 |
| Representations and Warranties | 83 |
| Conduct of Business Pending the Merger | 85 |
| No Solicitation of Transactions | 87 |
| Shareholders Meeting | 89 |
| Stock Options and Other Stock-Based Awards; Employee Benefits | 90 |
| Indemnification and Insurance | 90 |
| Agreement to Take Further Action and to Use All Reasonable Best Efforts | 91 |
| Financing Commitments; Company Cooperation | 91 |
| The Tender Offer | 92 |
| Eagle Exchange | 92 |
| Other Covenants and Agreements | 92 |
| Conditions to the Merger | 92 |
| Termination | 93 |
| Amendment and Waiver | 94 |
| OTHER TRANSACTION AGREEMENTS | 95 |
| Zell Entity Purchase Agreement | 95 |
| ESOP Purchase Agreement | 97 |
| Investor Rights Agreement | 98 |
| Voting Agreement | 98 |
| Zell Entity/ESOP Registration Rights Agreement | 99 |
| Chandler Trusts Registration Rights Agreement | 99 |
| ESOP Plan Documents | 100 |
| Amendment of Shareholder Rights Plan | 101 |
| APPRAISAL RIGHTS | 101 |
| INFORMATION ABOUT THE COMPANY | 104 |
| About Tribune Company | 104 |
| Selected Financial Data | 106 |
| Market Price of Company Common Stock | 119 |
| Security Ownership of Certain Beneficial Owners and Management | 119 |
| FINANCIAL PROJECTIONS | 124 |
| MULTIPLE SHAREHOLDERS SHARING ONE ADDRESS | 129 |
| SUBMISSION OF SHAREHOLDER PROPOSALS | 129 |
| OTHER MATTERS | 129 |
| PROVISIONS FOR UNAFFILIATED SHAREHOLDERS | 130 |
| CAUTIONARY NOTE ON FORWARD-LOOKING STATEMENTS | 130 |
| WHERE YOU CAN FIND MORE INFORMATION | 132 |
| ANNEXES | |
| Annex A    Agreement and Plan of Merger | A-1 |
| Annex B    Opinion of Morgan Stanley & Co. Incorporated | B-1 |
| Annex C    Opinion of Merrill Lynch, Pierce, Fenner & Smith Incorporated | C-1 |
| Annex D    Section 262 of the Delaware General Corporation Law | D-1 |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523131

## SUMMARY TERM SHEET

We are providing this summary term sheet for your convenience. We refer to the Company at times as "we," "our" or "us." This summary term sheet highlights the material information in this proxy statement, but you should realize that it does not describe all of the details of the Merger and related transactions to the same extent described in this proxy statement. We recommend that you read the entire proxy statement because it contains details of the Merger and other important information. We have included references to the pages of this proxy statement where you will find a more complete discussion where helpful.

### The Parties to the Merger

*Tribune Company.* The Company is a media and entertainment company, operating primarily in the United States, that conducts its operations through two business segments: publishing and broadcasting and entertainment. In publishing, the Company's leading daily newspapers include the *Los Angeles Times*, *Chicago Tribune*, *Newsday* (Long Island, NY), *The Sun* (Baltimore), *South Florida Sun-Sentinel*, *Orlando Sentinel* and *Hartford Courant*. The Company's broadcasting group operates 23 television stations, Superstation WGN on national cable, Chicago's WGN-AM and the Chicago Cubs baseball team. Popular news and information websites complement the Company's print and broadcast properties and extend its nationwide audience. These segments reflect the manner in which the Company sells its products to the marketplace, manages its operations and makes business decisions. The Company's media operations are principally in major metropolitan areas of the United States and compete against all types of media on both a local and national basis. The Company was founded in 1847 and incorporated in Illinois in 1861. As a result of a corporate restructuring in 1968, the Company became a holding company incorporated in Delaware. The principal executive offices of the Company are located at 435 North Michigan Avenue, Chicago, Illinois 60611 and its telephone number is (312) 222-9100. The Company is publicly traded on the New York Stock Exchange (the "NYSE") under the symbol "TRB."

*Tribune Employee Stock Ownership Plan.* The ESOP was newly formed by the Company on April 1, 2007, with an effective date of January 1, 2007, to enable eligible employees to acquire stock ownership interests in the Company by investing primarily in the Company's common stock. The ESOP is intended to be a qualified employee benefit plan under section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and an employee stock ownership plan within the meaning of section 4975(e)(7) of the Code. The ESOP is intended to invest primarily in the common stock of the Company, and is specifically permitted to invest up to 100% of its assets in the common stock of the Company. As of the record date, July 12, 2007, the ESOP owns 8,928,571 shares of Company Common Stock. The address of the Tribune Employee Stock Ownership Plan is c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523; telephone (630) 572-5130.

The trustee of the ESOP is GreatBanc Trust Company, a Delaware corporation with its principal executive offices at 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523, and its telephone number is (630) 572-5130. Incorporated in 1989, GreatBanc Trust Company provides trust, investment and wealth management services to individuals as well as a range of institutional services to corporations, foundations, endowments and not-for-profit organizations. GreatBanc Trust Company is an independent ERISA trustee with a specialization in employee stock ownership plans. Together with its two affiliates, Salem Trust Company and Pennant Management, Inc., GreatBanc Trust Company supervises client assets from its headquarters in Oak Brook, Illinois and offices in New York, Chicago, Milwaukee and several locations in Florida.

*Tesop Corporation.* Tesop Corporation is a Delaware corporation wholly owned by the ESOP with its principal executive offices at c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 800, Oak

1

Brook, Illinois 60523. Merger Sub's telephone number is (630) 572-5130. Merger Sub was formed solely for purposes of entering into and consummating the Leveraged ESOP Transactions. Merger Sub has not conducted any activities to date other than activities incidental to its formation and in connection with the Leveraged ESOP Transactions.

*EGI-TRB, L.L.C.* EGI-TRB, L.L.C. (the "Zell Entity") is a Delaware limited liability company wholly owned by Sam Investment Trust, a trust established for the benefit of Zell and his family. Its address is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606; telephone number (312) 454-0100. The Zell Entity was formed solely for purposes of entering into and consummating the Leveraged ESOP Transactions. As of the record date, July 12, 2007, the Zell Entity owns 1,470,588 shares of Company Common Stock. The Zell Entity has not conducted any activities to date other than activities incidental to its formation and in connection with the Leveraged ESOP Transactions. See "Identity and Background of Filing Persons" beginning on page 73.

## The Proposal

We are asking you to consider and vote on a proposal to adopt the Merger Agreement and thereby approve the Merger. We have attached a copy of the Merger Agreement to this proxy statement as Annex A. The Merger is part of a series of transactions, which we refer to as the Leveraged ESOP Transactions, under which the ESOP and the Zell Entity have invested and will invest in the Company. In the Merger, all shares of Company Common Stock, other than shares held by the ESOP and shares held by shareholders who validly exercise appraisal rights, will be converted into the right to receive $34.00 per share in cash. If the Merger does not close by January 1, 2008, this amount will be increased at an annualized rate of 8% from January 1, 2008 to the closing. We refer to the per share amount paid in the Merger as the "Merger Consideration." See "The Special Meeting" beginning on page 79.

## Date, Time and Location of the Special Meeting

We will hold the special meeting at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois, on August 21, 2007, starting at 9:00 a.m., Central Time. See "Time, Place and Purpose of the Special Meeting" beginning on page 79.

## Record Date

Each holder of record of shares of Company Common Stock entitled to vote will have the right to one vote for each such share held. Only holders of record at the close of business on July 12, 2007, the record date for the special meeting, are entitled to notice of and to vote at the special meeting. See "Record Date and Quorum" beginning on page 79.

## Required Vote

In order for us to complete the Merger, shareholders representing at least a majority of shares of Company Common Stock outstanding and entitled to vote thereon at the close of business on the record date must vote "**FOR**" adoption of the Merger Agreement and approval of the Merger. A failure to vote your shares of Company Common Stock, an abstention or a broker non-vote will have the same effect as a vote against the proposal to adopt the Merger Agreement and approve the Merger. In addition, the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies requires the affirmative vote of a majority of the votes cast by our shareholders on the proposal. For the purpose of such adjournment proposal, if a holder of shares of Company Common Stock fails to cast a vote, in person or by authorizing a proxy, such failure will not

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523133

have any effect on the outcome of the proposal. Abstentions and broker non-votes are not considered votes cast and therefore will have no effect on the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies. See "Required Vote" beginning on page 79.

**When the Merger Will be Completed**

We anticipate completing the Merger by the end of 2007, subject to adoption of the Merger Agreement by the Company's shareholders and satisfaction of the other closing conditions set forth in the Merger Agreement. See "The Merger Agreement—Effective Time; Structure" beginning on page 82.

**Effects of the Merger**

If the Company's shareholders adopt the Merger Agreement and we satisfy the other conditions to closing, Merger Sub will merge into the Company, with the Company being the surviving corporation in the Merger (the "Surviving Corporation") and becoming wholly owned by the ESOP. Following completion of the Merger, the Company Common Stock will no longer be publicly traded and shareholders other than the ESOP will cease to have any ownership interest in the Company and will not participate in any future earnings and growth of the Company. Immediately following the consummation of the Merger, the Zell Entity will purchase from the Company a subordinated promissory note and a warrant to acquire common stock. Immediately upon completion of the Leveraged ESOP Transactions, the ESOP will own approximately 52% of the fully diluted equity of the Company, and the Zell Entity will own a warrant to purchase approximately 40% of the fully diluted equity of the Company, in each case after giving effect to the grant of share equivalent awards expected to be made to certain members of management and other key employees. See "Certain Effects of the Merger" beginning on page 54.

**Recommendation of the Company's Board of Directors**

The Company's board of directors (the "Board") recommends that you vote **FOR** adoption of the Merger Agreement and approval of the Merger. See "Reasons for and Fairness of the Merger; Recommendations of the Special Committee and the Board" beginning on page 28.

On September 21, 2006, the Board formed a special committee (the "Special Committee"), consisting of all of the members of the Board other than the Chief Executive Officer and the three directors nominated by Chandler Trust No. 1 and Chandler Trust No. 2 (the "Chandler Trusts"), to oversee a formal process of exploring strategic alternatives. The Special Committee was created to ensure oversight of the process free of any potential conflicts of interest.

On April 1, 2007, the Board, based on the recommendation of the Special Committee, determined that the Merger Agreement is advisable, fair to and in the best interests of the Company and its unaffiliated shareholders, and approved the Merger Agreement and the transactions contemplated thereby. Representatives of the Chandler Trusts on the Board abstained from voting as directors, and Mr. Zell was not a member of the Board at the time the Board made these determinations, recommendations and approvals.

For the factors considered by the Board in reaching its decision to approve the Merger Agreement and approve the Merger, see "Special Factors—Reasons for and Fairness of the Merger; Recommendations of the Special Committee and the Board." See also "Special Factors—Interest of Directors and Executive Officers" beginning on page 60.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523134

**Opinion of the Special Committee's Financial Advisor**

In connection with the Merger, the Special Committee received a written opinion, dated April 1, 2007, from Morgan Stanley & Co. Incorporated ("Morgan Stanley"), the Special Committee's financial advisor, as to the fairness, from a financial point of view and as of the date of the opinion, of the Merger Consideration to be received by the unaffiliated holders of Company Common Stock. Morgan Stanley also provided this opinion to the Board. We have attached the full text of Morgan Stanley's written opinion to this proxy statement as Annex B. We encourage you to read this opinion carefully in its entirety for a description of the assumptions made, procedures followed, matters considered and limitations on the review undertaken. Morgan Stanley addressed its opinion to the Special Committee and the Board in connection with their evaluation of the Merger Consideration from a financial point of view, and its opinion does not address any other aspects or implications of the Merger, and does not constitute a recommendation to any shareholder as to how such shareholder should vote or act on any matters relating to the Merger. See "Special Factors—Opinion of the Special Committee's Financial Advisor" beginning on page 34 and Annex B.

**Opinion of the Company's Financial Advisor**

In connection with the Merger, the Board received a written opinion, dated April 1, 2007, from Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), the Company's financial advisor, as to the fairness, from a financial point of view and as of the date of the opinion, of the Merger Consideration to be received by unaffiliated holders of Company Common Stock. We have attached the full text of Merrill Lynch's written opinion to this proxy statement as Annex C. We encourage you to read this opinion carefully in its entirety for a description of the assumptions made, procedures followed, matters considered and limitations on the review undertaken. Merrill Lynch addressed its opinion to the Board in connection with its evaluation of the Merger Consideration from a financial point of view, and its opinion does not address any other aspects or implications of the Merger, and does not constitute a recommendation to any shareholder as to how such shareholder should vote or act on any matters relating to the Merger. See "Special Factors—Opinion of the Company's Financial Advisor" beginning on page 43 and Annex C.

**Opinion of Valuation Research Corporation**

In connection with the Tender Offer, the Board received written opinions, dated May 9, 2007 and May 24, 2007, from Valuation Research Corporation ("VRC") as to the solvency and capital adequacy of the Company after giving effect to the Step One Transactions, as of those dates. VRC's opinion is directed to the Board, addresses only the matters set forth therein, and does not constitute a recommendation to any shareholder of the Company as to how such shareholder should vote or act on any matters relating to the Merger. The Company also expects that VRC will provide a solvency opinion in connection with the Merger. The Company's receipt of a satisfactory solvency opinion giving effect to the Merger and related transactions is a condition to consummation of the Merger. See "Special Factors—Opinion of Valuation Research Corporation" beginning on page 47.

**Financing**

The Company has entered into a commitment letter with certain lenders with respect to a $2.105 billion incremental term loan facility and a $2.1 billion senior unsecured bridge facility. The Company may issue $2.1 billion senior notes or senior subordinated notes in lieu of drawing under the senior bridge facility or to refinance the senior bridge facility at a later date. The proceeds from these borrowings or issuances will in all cases be used by the Company, among other ways, in connection

4

with the payment of the Merger Consideration pursuant to the terms of the Merger Agreement. See "Special Factors—Financing" beginning on page 57.

## No-Solicitation Provision of the Merger Agreement

The Company has agreed not to take certain actions that would encourage an alternative proposal to the Merger. However, the parties to the Merger Agreement have agreed that, under certain circumstances, the Company may respond to an unsolicited alternative proposal. The Company has also agreed not to withdraw or modify the approval by the Special Committee or the Board of the Merger or the Merger Agreement, or propose publicly to do so, or to approve or propose publicly to approve any alternative proposal, except, under certain circumstances, if the Board determines that failure to take the foregoing actions would be inconsistent with the exercise of its fiduciary duties. See "The Merger Agreement—No Solicitation of Transactions" beginning on page 87.

## Conditions to the Merger

The obligations of the parties to complete the Merger are subject to the satisfaction or waiver of certain conditions, including shareholder and regulatory approval, receipt of financing and receipt of a satisfactory solvency opinion. See "The Merger Agreement—Conditions to the Merger" beginning on page 92.

## Termination of the Merger Agreement

The Merger Agreement may be terminated by mutual agreement of the Company and the ESOP (but only with the prior written consent of the Zell Entity). In addition, the Merger Agreement may be terminated, under certain circumstances, if the Merger has not occurred by May 31, 2008, if any final and non-appealable injunction or order permanently prohibits the consummation of the Merger, or if shareholder approval has not been obtained at the shareholders meeting.

In addition, the Merger Agreement may be terminated by the Company, under certain circumstances: (1) if the ESOP breaches or fails to perform its representations, warranties, covenants or other agreements contained in the Merger Agreement, which breach or failure to perform would result in a failure of a mutual condition or a condition to the Company's obligation to consummate the Merger to be satisfied and cannot be cured by May 31, 2008; (2) in order to accept a Superior Proposal; or (3) if the Zell Entity Purchase Agreement is terminated in accordance with its terms prior to the consummation of the Merger.

The Merger Agreement may be terminated by the ESOP, under certain circumstances: (1) if the Company breaches or fails to perform its representations, warranties, covenants or other agreements contained in the Merger Agreement, which breach or failure to perform would result in a failure of a mutual condition or a condition to the ESOP's obligation to consummate the Merger to be satisfied and cannot be cured by May 31, 2008; or (2) with the prior written consent of the Zell Entity, if prior to approval of the Company's shareholders the Board has failed to make the required recommendation in the proxy statement or has effected a change of recommendation in a manner adverse to the ESOP. See "The Merger Agreement—Termination" beginning on page 93.

If the Merger Agreement is terminated under certain specified circumstances, the Company may be required to pay the Zell Entity a fee of $25 million, including in the event of termination due to (1) certain breaches by the Company, (2) a change in recommendation by the Board or the Special Committee, (3) a determination by the Board or the Special Committee to accept a Superior Proposal or (4) shareholder disapproval under certain circumstances if the Company then enters into an alternative transaction meeting certain criteria within a year after termination. In addition, under

5

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

certain specified circumstances the Zell Entity may be required to pay the Company a fee of $25 million, including in the event of termination due to (1) certain breaches by the Zell Entity or (2) failure to obtain the financing for the transactions unless the failure is due to a breach by the Company or the ESOP. See "Other Transaction Agreements—Zell Entity Purchase Agreement" beginning on page 95.

**Treatment of Stock Options**

The Merger Agreement provides that all holders of the Company's stock options will receive an amount in cash equal to the excess of the Merger Consideration over the applicable per share exercise price for each stock option (whether vested or unvested) held, less applicable withholding tax. See "The Merger Agreement—Stock Options and Other Stock-Based Awards; Employee Benefits" beginning on page 90.

**Treatment of Restricted Stock Shares and Stock-Based Awards**

The Merger Agreement provides that all holders of the Company's restricted stock shares and stock-based awards will receive the Merger Consideration in cash for each share (whether vested or unvested) held, less applicable withholding tax. See "The Merger Agreement—Stock Options and Other Stock-Based Awards; Employee Benefits" beginning on page 90.

**Interests of the Company's Directors and Executive Officers in the Merger**

In considering the recommendation of the Board, you should be aware that our directors and executive officers may have interests in the Merger that are different from, or in addition to, your interests as a shareholder, and that may present actual or potential conflicts of interest. See "Special Factors—Interest of Directors and Executive Officers" beginning on page 60.

**Material United States Federal Income Tax Consequences**

If you are a U.S. holder (as defined below) of shares of Company Common Stock, the Merger will be a taxable transaction to you. For U.S. federal income tax purposes, your receipt of cash in exchange for your shares of Company Common Stock generally will cause you to recognize a gain or loss measured by the difference, if any, between the cash you receive in the Merger and your adjusted tax basis in your shares of Company Common Stock. **You should consult your own tax advisor for a full understanding of how the Merger will affect your taxes.** See "Special Factors—United States Federal Income Tax Consequences" beginning on page 67.

**Regulatory Approvals**

The parties have filed applications with the Federal Communications Commission ("FCC") for consent to the transfer of control of the Company from its public shareholders to the ESOP, the Zell Entity and Zell. The parties have also requested that the FCC waive its rule prohibiting the common ownership of daily English language newspapers and broadcast stations in the five markets where the Company owns such combinations. The parties have also requested a "failing station waiver" to permit the continued common ownership of the Company's two television stations in Hartford, Connecticut, as well as a "satellite waiver" to permit the continued common ownership and operation of WTTK, Kokomo, Indiana, as a satellite station of WTTV, Indianapolis, Indiana. See "Special Factors—Regulatory Approvals" beginning on page 71.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523137

**Rights of Appraisal**

Delaware law provides you with appraisal rights in the Merger. This means that, if you fully comply with the procedures for perfecting appraisal rights, Delaware law entitles you to have the fair value of your shares of common stock determined by the Delaware Court of Chancery and to receive payment based on that valuation in lieu of the Merger Consideration. The ultimate amount you receive in an appraisal proceeding may be more or less than, or the same as, the amount you would have received under the Merger Agreement. To exercise your appraisal rights, you must deliver a written demand for appraisal to the Company before the vote on the Merger Agreement at the special meeting and you must not vote in favor of the adoption of the Merger Agreement. Your failure to follow strictly the procedures specified under Delaware law will result in the loss of your appraisal rights. We have attached a copy of Section 262 of the General Corporation Law of the State of Delaware ("DGCL"), which sets forth the requirement for exercising appraisal rights, to this proxy statement as Annex D. We encourage you to consult your legal advisor if you intend to seek appraisal rights. See "Special Factors—Appraisal Rights" beginning on page 67 and Annex D).

7

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0523138**

## QUESTIONS AND ANSWERS ABOUT THE MERGER AND THE SPECIAL MEETING

The following questions and answers address briefly some questions you may have regarding the Merger and the special meeting. These questions and answers may not address all questions that may be important to you as a shareholder of the Company. Please refer to the more detailed information contained elsewhere in this proxy statement, the annexes to this proxy statement and the documents that we refer to or incorporate by reference in this proxy statement.

### What am I being asked to vote on?

We are asking you to vote on adoption of the Merger Agreement entered into by and among the Company, the ESOP, Merger Sub and, for limited purposes, the Zell Entity, and thereby to approve the Merger.

### What is the purpose of the Merger?

The purpose of the Merger is to make the Company a private company, wholly owned by the ESOP, with the Zell Entity as an investor in the Company through a subordinated note and a warrant to acquire common stock. The Merger is one step in the Leveraged ESOP Transactions. In the Merger, all shares of Company Common Stock, other than shares held by the ESOP and shares held by shareholders who validly exercise appraisal rights, will be converted into the right to receive $34.00 per share in cash. If the Merger does not close by January 1, 2008, this amount will be increased at an annualized rate of 8% from January 1, 2008 to the closing.

### What are the Leveraged ESOP Transactions?

What we refer to as the "Leveraged ESOP Transactions" consist of a series of transactions that include the Merger, as well as the following:

- The ESOP has purchased 8,928,571 shares of Company Common Stock from the Company at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP or distributions paid on the shares of Company Common Stock held by the ESOP. See "Other Transaction Agreements—ESOP Purchase Agreement."

- The Zell Entity has made an initial investment of $250 million in the Company in exchange for (1) 1,470,588 shares of the Company Common Stock at a price of $34.00 per share and (2) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million, which the Company must repay immediately prior to the Merger. The promissory note is exchangeable at the Company's option, or automatically upon termination of the Merger Agreement, into an aggregate of 5,882,353 shares of Company Common Stock, subject to antidilution adjustments. The shares of Company Common Stock, the exchangeable promissory note and any underlying shares acquired upon exchange that are held by the Zell Entity are subject to certain transfer restrictions until April 23, 2010. In connection with the Zell Entity's investment, on May 9, 2007, Mr. Zell was appointed as a member of the Board. See "Other Transaction Agreements—Zell Entity Purchase Agreement."

- The Company commenced, on April 25, 2007, a tender offer to purchase up to 126,000,000 shares of Company Common Stock at a price of $34.00 per share in cash (the "Tender Offer"). Approximately 218,132,000 shares were tendered in the Tender Offer, which expired at 5:00 p.m. New York City time, on May 24, 2007. Because more than 126,000,000 shares were tendered in the Tender Offer, proration of tendered shares, except for "odd lots" (lots held by owners of less than 100 shares), was required.

8

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523139

- The Company, the ESOP, Merger Sub and, for limited purposes, the Zell Entity entered into the Merger Agreement providing for the Merger, on the terms and subject to the conditions set forth in the Merger Agreement. See "The Merger Agreement."

- In the Merger, the Zell Entity will receive cash for the shares of Company Common Stock it owns and, immediately prior to the Merger, the Company will repay the exchangeable promissory note held by the Zell Entity. Following consummation of the Merger, the Zell Entity will purchase from the Company, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant (the "Warrant"). The Warrant will entitle the Zell Entity to purchase 43,478,261 shares of Company Common Stock (subject to adjustment), which will represent approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to share equivalents under a management equity incentive plan). The Warrant will have an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the Warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). See "Other Transaction Agreements—Zell Entity Purchase Agreement."

- The Company has agreed to grant the Zell Entity and the ESOP registration rights, in the event the Merger does not close, with respect to the shares of Company Common Stock that the Zell Entity and the ESOP purchased from the Company in their initial investments. However, the Zell Entity will not be able to exercise its registration rights prior to April 23, 2010 and, in the event the Merger does not close, will be prohibited from selling or assigning its Company Common Stock, exchangeable promissory note or underlying shares acquired upon exchange until April 23, 2010, other than to certain permitted transferees. In addition, the ESOP will not be able to exercise its registration rights prior to April 1, 2008. The Company has also agreed to grant the Chandler Trusts registration rights. See "Other Transaction Agreements—Zell Entity/ESOP Registration Rights Agreement" and "Other Transaction Agreements—Chandler Trusts Registration Rights Agreement."

- The Company has secured financing commitments from and executed a Credit Agreement with certain lenders to provide the Company with the ability to borrow the amounts required for purposes of financing the Leveraged ESOP Transactions, to refinance certain indebtedness of the Company, including indebtedness under its existing credit facilities, and for working capital and general corporate purposes of the Company. See "Special Factors—Financing."

- The Chandler Trusts tendered into the Tender Offer all shares held by them as of the expiration of the Tender Offer.

- Effective no later than January 1st following the date the Merger is consummated, the Company intends to elect to be treated as an S corporation under Subchapter S of the Code and to elect for each of its domestic eligible subsidiaries (other than (a) immaterial subsidiaries and (b) any other subsidiaries for which the Company reasonably determines the failure to be treated as a qualified subchapter S subsidiary for U.S. federal income tax purposes would not result in material adverse tax consequences to the Company) to be treated as qualified subchapter S subsidiaries for U.S. federal income tax purposes. Subject to certain limitations (such as the built-in gains tax applicable for ten years to gains accrued prior to the election), once the Company so elects, it will not be subject to federal income tax. Instead, the Company's income will be required to be reported by its shareholders. The ESOP will generally not be taxed on the share of income that is passed through to it.

In addition, after the 2007 baseball season, the Company intends to dispose of an interest in the Chicago Cubs and the Company's 25 percent stake in Comcast SportsNet Chicago. The Company currently expects to use proceeds from such disposition to pay down Company debt.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523140

**Who will own the Company following the Merger?**

Immediately upon completion of the Merger, the Company will be wholly owned by the ESOP. The Zell Entity will be an investor in the Company through a subordinated promissory note and a warrant to acquire common stock, which will entitle the Zell Entity to purchase, at a future date, approximately 40% of the economic equity interest in the Company.

**Why is the Company engaging in the Merger and the other Leveraged ESOP Transactions?**

After a rigorous and thorough strategic review process during which the Special Committee considered a number of strategic alternatives, the Special Committee and the Board determined that the Merger and the other Leveraged ESOP Transactions were in the best interests of the Company and its shareholders. The Special Committee and the Board considered a number of factors in determining to recommend the Merger and the other Leveraged ESOP Transactions. These included:

- the fact that the value offered in the Leveraged ESOP Transactions was as high as any proposal received from any third party, and the consideration offered in the Merger of $34.00 per share reflects a premium of approximately 5.9% to the closing price of Company Common Stock on March 30, 2007, the last trading day before the proposal was made public, and approximately 12.5% to the average closing price of Company Common Stock for the 30 calendar day period ending on March 30, 2007;

- the business, operations, properties and assets, financial condition, business strategy and prospects of the Company (as well as the risks involved in achieving those prospects);

- the fact that the Company had explored a variety of strategic alternatives over an extended period of time and the Special Committee's view that the Leveraged ESOP Transactions, including the Merger, were in the best interests of the Company and its unaffiliated shareholders compared to the alternatives considered;

- the fact that the transactions were structured to permit the Tender Offer as a means of purchasing a significant portion of the Company Common Stock on an accelerated timetable, and the increased consideration to be paid in the Merger, in the form of the 8% annualized "ticking fee," in the event the Merger does not close by January 1, 2008;

- the other terms of the Merger Agreement, including the fact that the Merger Agreement does not preclude unsolicited offers from other parties, subject to specified conditions, and permits the Company to terminate the Merger Agreement prior to shareholder approval to accept a superior proposal, subject to payment by the Company of a $25 million termination fee;

- the availability of financing commitments for the Merger and other steps in the Leveraged ESOP Transactions;

- the analysis and written opinion of Morgan Stanley to the effect that, as of April 1, 2007, and based upon the factors and subject to the assumptions set forth in its written opinion, the Merger Consideration to be received by the holders of Company Common Stock (other than certain affiliated entities) was fair from a financial point of view to such shareholders; and

- the analysis and written opinion of Merrill Lynch to the effect that, as of April 1, 2007, and based upon the factors and subject to the assumptions set forth in its written opinion, the Merger Consideration to be received by the holders of Company Common Stock (other than certain affiliated entities) was fair from a financial point of view to such shareholders.

For additional factors and more details with respect to the factors considered by the Special Committee and the Board, see "Special Factors—Background of the Merger" and "Special Factors—Reasons for and Fairness of the Merger; Recommendations of the Special Committee and the Board."

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523141

**Is this part of a going-private transaction?**

Yes. In the Merger, all the remaining shares of Company Common Stock, other than shares held by the ESOP and shares held by shareholders who validly exercise appraisal rights, will be converted into the right to receive cash. As a result, following the Merger, the Company will cease to be a public company.

**What does it mean to cease to be a public company?**

Immediately upon completion of the Merger, the Company will be wholly owned by the ESOP, which will result in the Company being delisted from the NYSE and will permit the Company to deregister the shares under the Securities Exchange Act of 1934 (the "Exchange Act"). However, the Company has debt securities that are registered under the Securities Act of 1933, certain of which are listed on the NYSE and, so long as those debt securities remain outstanding, the Company will continue to have reporting obligations under the Exchange Act.

**Has the Company or the Board adopted a position on the Merger?**

Yes. The Board, based on the recommendation of the Special Committee, has determined that the Merger Agreement, including the Merger, is advisable, fair to and in the best interests of the Company and the Company's unaffiliated shareholders, and recommends that shareholders vote their shares in favor of the Merger Agreement and the Merger. Representatives of the Chandler Trusts abstained from voting as directors, and Mr. Zell was not a member of the Board at the time the Board made these determinations, recommendations and approvals. See "Special Factors—Reasons for and Fairness of the Merger; Recommendations of the Special Committee and the Board."

**How will the Company pay the Merger Consideration?**

We anticipate that we will pay for the Merger Consideration from borrowings under the Second Step Credit Facilities (as defined below). At this time, the Company does not have any alternative financing arrangements or plans in the event these sources do not provide the funds necessary to pay the Merger Consideration. See "Special Factors—Financing."

**When and where is the special meeting?**

We will hold the special meeting of shareholders of the Company on August 21, 2007, at 9:00 a.m., Central Time, at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois. See "The Special Meeting."

**May I attend the special meeting?**

All Company shareholders of record as of the close of business on July 12, 2007, the record date for the special meeting, or their duly appointed proxies, may attend the special meeting. In order to be admitted to the special meeting, we will require a form of personal identification, as well as proof of ownership of Company Common Stock.

If you hold your shares of Company Common Stock in the name of a bank, broker or other holder of record, and you plan to attend the special meeting, you must present proof of your ownership of Company Common Stock, such as a bank or brokerage account statement or other proof of ownership, in order to be admitted to the special meeting.

Please note that if you hold your shares of Company Common Stock in the name of a bank, broker or other holder of record, and plan to vote at the special meeting, you must also present at the special meeting a proxy issued to you by the holder of record of your shares.

11

No cameras, recording equipment, electronic devices, large bags, briefcases or packages will be permitted in the special meeting.

**Who can vote at the special meeting?**

You can vote at the special meeting if you owned shares of Company Common Stock at the close of business on July 12, 2007, the record date for shareholders entitled to vote at the special meeting. As of the close of business on that day, 127,330,754 shares of Company Common Stock were outstanding (excluding shares held by our subsidiaries). See "The Special Meeting."

**What constitutes a quorum?**

The special meeting will only be held if a quorum is present. The presence, in person or by proxy, of shareholders having a majority of the votes entitled to be cast at the meeting will constitute a quorum to conduct business. Abstentions and broker non-votes are counted as present for establishing a quorum. A broker non-vote occurs when a broker cannot vote on a matter because the broker has not received instructions from the beneficial owner and lacks discretionary voting authority with respect to that matter, in circumstances where the broker votes a client's shares on some but not all of the proposals presented at the meeting.

**How do I vote?**

Shareholders of record can vote in person, or by proxy on the Internet, by telephone or by mail. To submit a proxy by mail, complete, sign and date the enclosed proxy card and return it in the enclosed postage-paid envelope. To submit a proxy by telephone or on the Internet, follow the instructions on the proxy card. We will vote your shares as you indicate. Unless you give other instructions on your proxy card, the persons named as proxy holders on the proxy card will vote your shares in accordance with the Board's recommendations.

You have the right to revoke your proxy at any time before the meeting by:

• delivering a written notice of revocation to Tribune's corporate secretary;

• voting in person by ballot at the meeting;

• returning a later-dated proxy card; or

• submitting a new proxy by telephone or on the Internet.

If you hold shares through a broker, your broker will instruct you as to how your shares may be voted by proxy, including whether telephonic or Internet voting options are available, and as to how your proxy may be revoked. If you would like to vote in person at the meeting, you must obtain a proxy from your broker and bring it to the meeting.

**How do I vote my shares in Tribune's employee benefit plans?**

If you are a participant in the Tribune Company 401(k) Savings and Profit Sharing Plan, the Tribune Company Defined Contribution Retirement Plan, or the Times Mirror Savings Plus Plan (collectively, the "Retirement Plans") or in the Tribune Company Employee Stock Purchase Plan (the "Stock Purchase Plan"), you are entitled to instruct the appropriate plan trustee or nominee how to vote the shares held in an account for you under these plans. Plan participants may give instructions to the appropriate plan trustee or nominee by mail, by telephone or on the Internet by following the procedures described on the proxy card.

Any participant may revoke or modify such instructions prior to 5:00 p.m., Central Time, on August 17, 2007 by delivering written notice to the trustee or nominee. The trustee or nominee will vote shares under Tribune's employee benefit plans in accordance with instructions that it receives by

12

the close of business on August 17, 2007. Shares held in any of the Retirement Plans for which no instructions are received by the close of business on August 17, 2007 will be voted in the same proportion as the shares in each plan for which instructions are received. Shares held in the Employee Stock Purchase Plan for which no instructions are received by the close of business on August 17, 2007 will not be voted.

**How many shares are held by Tribune's employee benefit plans?**

Computershare Trust Company, Inc. is the nominee of the Tribune Company Employee Stock Purchase Plan. The Northern Trust Company is the trustee of each of the Retirement Plans. As of the record date, July 12, 2007, the following shares are held in these plans:

| | |
|---|---:|
| Tribune Company Employee Stock Purchase Plan | 2,078,829 shares |
| Tribune Company 401(k) Savings and Profit Sharing Plan | 8,513,927 shares |
| Times Mirror Savings Plus Plan | 256,218 shares |
| All other Tribune defined contribution plans | 1,125,282 shares |

**How are votes counted?**

The inspector of election appointed for the special meeting will count the votes, and will separately count "For" and "Against" votes, abstentions and broker non-votes. A "broker non-vote" occurs when a nominee holding shares for a beneficial owner does not receive instructions from the beneficial owner with regard to the proposed Merger, in circumstances where the broker is authorized to vote the client's shares on some but not all of the proposals presented at the meeting and lacks discretionary voting authority with respect to that matter. Because adoption of the Merger Agreement and approval of the Merger requires the affirmative vote of holders representing a majority of the shares of Company Common Stock outstanding and entitled to vote thereon, the failure to vote, broker non-votes and abstentions will have the same effect as voting "Against" adoption of the Merger Agreement.

**How many votes are required to approve the Merger Agreement?**

Adoption of the Merger Agreement and approval of the Merger requires the affirmative vote of holders representing a majority of outstanding shares of Company Common Stock entitled to vote thereon as of the close of business on July 12, 2007, the record date for shareholders entitled to vote at the special meeting. As of the close of business on the record date, there are 127,330,754 shares of Company Common Stock outstanding and entitled to vote on the Merger Agreement and the Merger.

**How many votes are required to approve an adjournment of the special meeting?**

Approval of any adjournments of the special meeting to solicit additional proxies requires the affirmative vote of a majority of the votes cast by our shareholders, in person or by proxy, on the proposal. For the purpose of this proposal, if you fail to cast a vote on this proposal, in person or by proxy, such failure will not have any effect on the outcome of this proposal. Abstentions and broker non-votes are not considered votes cast and therefore will have no effect on the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies.

**How do the Company's directors and executive officers intend to vote?**

To the best of our knowledge, all of our directors and executive officers intend to vote their shares of Company Common Stock in favor of the adoption of the Merger Agreement and approval of the Merger, although such persons have not entered into agreements obligating them to do so. The Zell Entity, which is owned by a trust established for the benefit of Zell (who became a director of the Company effective May 9, 2007) and his family, has entered into an agreement to vote all of the shares

13

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523144

of Company Common Stock that it beneficially owns in favor of the adoption of the Merger Agreement and approval of the Merger. As of the record date, the directors and executive officers of the Company (in the aggregate) hold and are entitled to vote Company Common Stock representing approximately 0.6% of the outstanding shares (which amount does not include the approximately 1.2% of the outstanding shares held by the Zell Entity). See "Other Transaction Agreements—Zell Entity Purchase Agreement."

**How does the ESOP intend to vote?**

The ESOP currently holds and is entitled to vote 8,928,571 shares of Company Common Stock, representing approximately 7% of the outstanding shares. The ESOP intends to vote all its shares of Company Common Stock in favor of the adoption of the Merger Agreement and approval of the Merger.

**How many votes do I have?**

You have one vote for each share of Company Common Stock you own as of the record date. If you are a participant in one of the Retirement Plans or in the Stock Purchase Plan, you can direct one vote for each share allocated to your account under these plans.

**If my shares are held in "street name" by my broker, will my broker vote my shares for me?**

Your broker will vote your shares only if you provide instructions to your broker on how to vote. You should instruct your broker to vote your shares by following the directions provided to you by your broker. See "The Special Meeting."

**What if I fail to instruct my broker?**

Without instructions, your broker will not vote any of your shares held in "street name." Broker non-votes, if any, will be counted for the purpose of determining the presence or absence of a quorum, but will not be deemed votes cast and will have the same effect as a vote "Against" the Merger proposal.

**Will my shares held in "street name" or another form of record ownership be combined for voting purposes with shares I hold of record?**

No. Because any shares you may hold in "street name" will be deemed to be held by a different shareholder than any shares you hold of record, any shares so held will not be combined for voting purposes with shares you hold of record. Similarly, if you own shares in various registered forms, such as jointly with your spouse, as trustee of a trust or as custodian for a minor, you will receive, and will need to sign and return, a separate proxy card for those shares because they are held in a different form of record ownership. Shares held by a corporation or business entity must be voted by an authorized officer of the entity.

**When should I send in my stock certificates?**

After the completion of the Merger, you will receive a letter of transmittal to complete and return to Computershare Trust Company, N.A., the paying agent. In order to receive the Merger Consideration as soon as reasonably practicable following the completion of the Merger, you must send the paying agent your validly completed letter of transmittal together with your Company stock certificates as instructed in the separate mailing. **You should not send your stock certificates now.**

**I do not know where my stock certificate is—how will I get my cash?**

The materials we will send you after completion of the Merger will include the procedures that you must follow if you cannot locate your stock certificate. This will include an affidavit that you will

14

need to sign attesting to the loss of your certificate. We may also require that you provide a bond to the Company in order to cover any potential loss.

**What should I do now?**

Mail your completed proxy card in the enclosed return envelope. You may also submit your proxy by visiting the website or by calling the toll-free number shown on your proxy card.

**What happens if I sell my shares before the special meeting?**

If you transfer your shares of Company Common Stock after the record date but before the special meeting, you will, unless special arrangements are made, retain your right to vote at the special meeting but will transfer the right to receive the Merger Consideration to the person to whom you transfer your shares.

**Can I change my vote after I have mailed in my proxy card?**

Yes. You can change your vote at any time before we vote your proxy at the special meeting. You can do so in any of the following ways: first, you can send a written notice stating that you would like to revoke your proxy to the Corporate Secretary of the Company at the address given below; second, you can request a new proxy card, complete it and send it to the Corporate Secretary of the Company at: 435 North Michigan Avenue, Chicago, Illinois 60611 or complete a new proxy by visiting the website or by calling the toll-free number shown on your proxy card; and third, you can attend the special meeting and vote in person. You should send any written notice or request for a new proxy card to the attention of Corporate Secretary, Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611. Submitting your proxy via the Internet, by telephone or by mailing in your proxy card will not prevent you from voting in person at the special meeting. See "The Special Meeting."

**What if I have further questions?**

If you have additional questions about the Merger or if you would like additional copies of this proxy statement or a new proxy card, you may call our proxy solicitor, Innisfree M&A Incorporated, toll-free at (877) 825-8621 or contact our Corporate Secretary, Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523146

## INTRODUCTION

We are providing you with this proxy statement and the accompanying form of proxy in connection with the solicitation of proxies by our Board for use at a special meeting of our shareholders to be held on August 21, 2007, at 9:00 a.m., Central Time, at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois.

At the special meeting, we will ask you to vote on adoption of the Merger Agreement and thereby approve the Merger. The Merger is part of a series of transactions, which we refer to as the Leveraged ESOP Transactions, under which the ESOP and the Zell Entity have invested and will invest in the Company. If we complete the Merger, the Company will become a privately held company wholly owned by the ESOP, and our shareholders will have the right to receive the Merger Consideration for each share of Company Common Stock.

**Our Board, based on the recommendation of the Special Committee, has determined that the Merger Agreement and the Merger are advisable, fair to and in the best interests of the Company and the Company's unaffiliated shareholders and recommends that shareholders vote "FOR" adoption of the Merger Agreement and approval of the Merger. Representatives of the Chandler Trusts abstained from voting as directors, and Mr. Zell was not a member of the Board at the time the Board made these determinations, recommendations and approvals. See "Special Factors—Reasons for and Fairness of the Merger; Recommendations of the Special Committee and the Board."**

## SPECIAL FACTORS

### Background of the Merger

The Company periodically conducts strategic reviews of its businesses internally and with the Board as a means of evaluating the Company's strategic direction and alternatives.

As early as February 2005, the Company and Merrill Lynch, the Company's outside financial advisor, reviewed with the Board certain factors affecting the Company's Broadcasting & Entertainment Group (the "B&E Group") and discussed on a preliminary basis the range of financial and strategic options available with respect to that business. While the Company had preliminary discussions with certain third parties with respect to the B&E Group, the Company determined not to proceed further with any such discussions pending an upcoming strategic review with the Board.

In October 2005, the Company held a two-day strategic review with the Board and Merrill Lynch. These sessions included a full review of the media business environment, strategic opportunities and capital planning. Among the strategic alternatives reviewed, the Board dedicated substantial time to exploring the possible sale or other separation of the B&E Group and the impact that such a transaction might have on shareholder value. The Board asked the Company's management and Merrill Lynch to continue their evaluation of such a transaction and other strategic alternatives.

At a Board meeting in December 2005, the Board explored further the possibility of a separation of the B&E Group, as well as other strategic alternatives, with management and Merrill Lynch. Potential value creation alternatives that were reviewed included a variety of structures for separating the B&E Group, a possible strategic combination with another media company and the acquisition of the Company by financial buyers through a leveraged buy-out. The Board also considered an increase in the Company's stock repurchase authority.

With respect to the separation of the B&E Group, the Board focused on a tax-free spin-off as having substantial tax and other advantages compared to a taxable sale of the B&E Group. The Board also considered the need to restructure two limited liability companies, TMCT, LLC and TMCT II, LLC (the "TMCT LLCs"), co-owned by the Company and the Chandler Trusts, in connection with a spin-off of the B&E Group or certain other transactions. The restructuring of the TMCT LLCs required the mutual consent of the Company and the Chandler Trusts. The Board

16

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0523147

directed management to prepare for a possible spin-off of the B&E Group and to pursue the necessary restructuring of the first TMCT LLC, as well as to continue to explore the possible sale of the B&E Group. The Board also increased the Company's stock repurchase authority.

In mid-December 2005 and early 2006, representatives of the Company met with representatives of a private equity firm, at the firm's request, to understand outside views of the potential value to shareholders of possible private equity transactions. The Company's management and Merrill Lynch also continued to evaluate the possible spin-off of the B&E Group. In January 2006, representatives of the Company met with representatives of the Chandler Trusts to discuss the Company's strategic alternatives and the impact of those alternatives on the TMCT LLCs. The Chandler Trusts representatives expressed their desire to combine any strategic alternative pursued by the Company with the restructuring of the TMCT LLCs. The Chandler Trusts representatives suggested that such a restructuring could occur in the third quarter of 2006.

In early February 2006, prior to a February 2006 Board meeting, the Chandler Trusts sent a letter to the Board reiterating their desire to restructure the TMCT LLCs and proposing that the TMCT LLCs be restructured prior to a spin-off of the B&E Group. The letter suggested that the restructuring of the first TMCT LLC should be completed by the end of May and the second in September, with a spin-off of the B&E Group promptly thereafter. The letter also stated that in the absence of satisfactory progress on these suggestions, the Chandler Trusts would begin exploring with other shareholders and possible acquirors the possibility of a "fundamental transaction" involving the Company.

At the February 2006 Board meeting, the Company's management and Merrill Lynch reviewed the Company's progress toward a spin-off of the B&E Group. Management and the Board, including the directors nominated by the Chandler Trusts, discussed the impediments posed by the TMCT LLCs to a spin-off transaction and the Chandler Trusts' proposed resolution through a restructuring of the TMCT LLCs. Management also reviewed its discussions with third parties with respect to a possible sale, spin-off or merger of the B&E Group. In addition, management reviewed its meetings with the private equity firm and its assessment of the range of private equity opportunities that might be available to the Company, and sought the Board's permission to have further discussions to explore a private equity transaction. After reviewing these alternatives, the Board determined that the potential spin-off of the B&E Group was more promising than the other alternatives reviewed. Accordingly, the Board directed management and Merrill Lynch to continue preparing for a possible spin-off of the B&E Group and to continue working toward a resolution of the TMCT LLCs. In light of the focus on a possible spin-off and resolution of the TMCT LLCs, the Board directed management not to have further discussions with the private equity firm.

At a special meeting of the Board in late March 2006, management reviewed the Chandler Trusts' proposal for restructuring the first TMCT LLC through a distribution to the Company of the Company's interest, the Company's evaluation of that proposal as well as tax and accounting issues, and the work being performed by consultants to appraise certain assets held by that TMCT LLC. Management also reviewed the continued work on the separation of the B&E Group and the potential spin-off, and noted that it would be necessary to restructure not only the first TMCT LLC but also TMCT II, LLC in connection with a spin-off. In late April 2006, the Chandler Trusts sent a letter to the Board stating that they remained committed to a May 31 deadline for restructuring the first TMCT LLC, and urging that the Company announce a plan to spin off the B&E Group at the same time, with a target for completion of the spin-off in September following a restructuring of the second TMCT LLC. The letter also stated that the Chandler Trusts had received "feelers" from a variety of parties and that the Company was considered vulnerable to a transaction initiated by outside parties.

In early May 2006, the Board reviewed with management and Merrill Lynch the status of the negotiations with respect to the first TMCT LLC, and progress toward a spin-off of the B&E Group. Citi was also invited to this Board meeting to make a presentation regarding a recapitalization and

17

other alternatives. Management and the financial advisors reviewed with the Board various recapitalization alternatives available to the Company, either alone or in combination with a spin-off or other separation of the B&E Group, as a means of returning capital to shareholders in the near term. Merrill Lynch and Citigroup Global Markets Inc. ("Citi") reviewed the impact of a leveraged recapitalization and other considerations that would accompany such a transaction. Management discussed potential cost-savings measures and divestitures that could be used to reduce debt following a leveraged recapitalization. The directors nominated by the Chandler Trusts expressed a lack of support for a leveraged recapitalization, but the rest of the Board determined that further work should be done on the leveraged recapitalization alternatives and should be presented to the Board at the end of the month. The Board also directed management to continue working toward a resolution of the TMCT LLCs and the possible spin-off of the B&E Group.

At a meeting on May 26, 2006, the Board reviewed with the Company's management, Merrill Lynch and Citi a potential leveraged recapitalization transaction that would involve the repurchase of up to 75 million shares of Company Common Stock. Merrill Lynch and Citi reviewed the benefits of the transaction and the impact on the Company of such a repurchase. Following these reviews, the Board authorized the leveraged recapitalization transaction in the form of a repurchase of up to 75 million shares of Company Common Stock at prices not to exceed $32.50 per share. The three directors nominated by the Chandler Trusts voted against the transaction. On May 30, 2006, the Company announced the leveraged recapitalization transaction using a modified "dutch auction" tender offer. The Company also identified a performance improvement plan with targets of $200 million in annual cost savings and $500 million in asset sale proceeds.

On June 13, 2006, the Chandler Trusts sent a letter to the Board, and filed the letter publicly, stating that the Chandler Trusts did not intend to tender any shares into the tender offer. The letter said that the Chandler Trusts believed that the process that led to the offer was "hasty and ill-informed" and that the offer failed to address the business issues facing the Company. The letter urged the Company to restructure the TMCT LLCs and to spin off the B&E Group, and suggested the possibility of a financial sponsor for the spin-off. The letter expressed the view that the Company should also promptly explore other strategic alternatives, including a possible leveraged buyout. In addition, the letter called on the Board to appoint a committee of independent directors, with independent financial advisors and legal counsel, to oversee a review of the issues facing the Company and to take action to enhance shareholder value. The letter concluded that, if timely action were not taken, the Chandler Trusts intended to engage with other shareholders and parties to pursue changes in the Company's management and other transactions to enhance value.

On June 27, 2006, the Company announced that it had repurchased 55 million shares for a price of $32.50 through the tender offer and a separate purchase agreement with the McCormick Tribune Foundation and the Cantigny Foundation (the "Foundations"), two of the Company's major shareholders, at the same price. As a result of these repurchases and the Chandler Trusts' decision not to tender any shares, the Chandler Trusts became the Company's largest shareholders, increasing their percentage ownership in the Company to approximately 15% of the Company's outstanding shares.

On July 19, 2006, management and the Board reviewed the results of the recapitalization plan with Merrill Lynch and Citi and the Board continued its discussion of other strategic alternatives. The Board requested that each of Merrill Lynch and Citi separately analyze the strategic alternatives available to the Company given the existing operating conditions and to provide their recommendations to the Board at a special meeting scheduled for September 21, 2006. The Board also directed management to renew its efforts to resolve the TMCT LLC issues with the Chandler Trusts.

Between July 19 and September 21, 2006, representatives of the Company re-engaged with representatives of the Chandler Trusts with respect to the restructuring of the first TMCT LLC and, in September, also engaged in discussions with respect to TMCT II, LLC, including negotiating valuations with respect to the assets of the TMCT LLCs and the timing and terms of a redemption of the

18

Company's interests in the TMCT LLCs. Representatives of the Chandler Trusts reiterated their view that the Company should undertake a public process to review the Company's strategic alternatives. During this same period, Merrill Lynch and Citi each conducted a review of strategic alternatives available with respect to the Company's businesses and the Company as a whole.

At its meeting on September 21, 2006, the Board reviewed with management and Merrill Lynch the progress of negotiations on the restructuring of the TMCT LLCs, and reviewed with Merrill Lynch and Citi their analyses of strategic alternatives. The Board reviewed with management and Merrill Lynch the proposed terms of a distribution to the Company of the Company's interests in the TMCT LLCs, including the valuations that had been negotiated with respect to the assets held by the TMCT LLCs, and the proposed distribution to the Company of all of the Company's preferred stock and 80% of the Company Common Stock held by the TMCT LLCs. The Board approved the redemption on the terms presented.

The range of strategic alternatives reviewed with the Board at the September 21, 2006 meeting included continuing to operate without further restructurings, continuing to pursue a separation of the B&E Group, alternatives with respect to the publishing business, and seeking proposals from third parties for the acquisition of the entire Company. Following this review, the Board created the Special Committee, consisting of all of the members of the Board other than the Chief Executive Officer and the three directors nominated by the Chandler Trusts, to oversee a formal process of exploring strategic alternatives. The Special Committee was created to ensure oversight of the process free of any potential conflicts of interest. As part of this process, the Board authorized the Company to seek third-party proposals for the acquisition of the Company.

Following the September 21, 2006 meeting, the Company publicly announced the creation of the Special Committee to oversee the process of evaluating strategic alternatives for the Company. The Company stated that it expected the process to conclude by the end of 2006. The Company also publicly announced the restructuring of the TMCT LLCs. As a result of the restructuring, the Chandler Trusts' percentage ownership in the Company increased further. The Special Committee subsequently engaged Morgan Stanley as its financial advisor, as well as separate legal counsel. In addition, the Company formally engaged Citi to act as co-advisor with Merrill Lynch for purposes of the process. Thereafter, the Special Committee directed Merrill Lynch and Citi to begin contacting a wide range of private equity firms and potential strategic buyers to invite them to indicate their interest in an acquisition of the Company, and the Company entered into confidentiality agreements and began sharing information about the Company with interested parties. Over the next several weeks, these parties began receiving information and conducting due diligence with respect to the Company for purposes of determining whether to submit a preliminary bid for the acquisition of the Company. Merrill Lynch and Citi requested preliminary bids from interested parties by October 27, 2006.

On October 18, 2006, the Special Committee reviewed with the Company's advisors and management and with the Special Committee's financial and legal advisors the status of the strategic review process and considerations relating to the financing that Merrill Lynch and Citi proposed to make available to interested parties. The Special Committee also reviewed with its financial advisor considerations relating to the benefits and risks of exploring the possible sale of parts of the Company concurrently with the possible sale of the whole Company.

On October 31, 2006, the Special Committee reviewed the process to date with the Company's financial advisors and management, and with the Special Committee's financial and legal advisors. As of October 31, 2006, a total of 17 confidentiality agreements were signed with private equity firms and potential strategic bidders (by the end of the process, 31 confidentiality agreements were signed with potential bidders). Five parties or groups had submitted preliminary indications of interest, with indications of price ranging from $30 to $34 per share. One other group stated that it expected to submit an indication of interest shortly and another group requested an extension. The Special Committee also reviewed with the Company's management and advisors the possibility of asset sales as

19

an enhancement to the process, as well as the possibility of a further leveraged recapitalization of the Company. The Special Committee directed management and the Company's financial advisors to continue the process of seeking a buyer for the entire Company and to explore the sale of all of the B&E Group, the sale of the major market assets of the B&E Group and the sale of the Company's largest newspaper. Thereafter, six parties or groups continued in the process and conducted further due diligence, including data room access and management presentations.

On November 8, 2006, Zell's Equity Group Investments, L.L.C. ("EGI") signed a confidentiality agreement with the Company.

On November 17, 2006, the Special Committee reviewed with the Company's financial advisors the status of the process and the parties who remained interested in a potential acquisition of the Company. The financial advisors also reported on parties that had expressed interest in discrete assets of the Company, as well as parties that had initially expressed some interest but had dropped out, including Zell. In addition, the Company's financial advisors reported that the Chandler Trusts desired to enter the bidding process with a possible transaction involving the spin-off of the B&E Group and the Chandler Trusts' acquisition of the remaining Company following the spin-off. The Company's financial advisors also reported on the buyout of Clear Channel Communications that had just been announced, and the implications of that transaction for the Company's process, including the timing of when the Company should request final bids and potential regulatory issues that the buyers in the Clear Channel transaction would have with respect to a subsequent acquisition of the Company. The Special Committee requested further consideration and analysis of these issues.

On November 27, 2006, the Special Committee received an update from the financial advisors and the Company's management. The advisors reported that one party had dropped out of the process due, in part, to the party's involvement in the Clear Channel transaction, and that the status of another party was uncertain. In light of these uncertainties and a strong desire expressed by the remaining participants in the process for adequate time to prepare and submit a definitive proposal, the Company's financial advisors recommended that final bids not be requested until January 12, 2007. The Special Committee approved this timetable and, the next day, the Company issued a press release stating that the process was being extended and the Company expected a final recommendation in the first quarter of 2007.

On December 12, 2006, the Special Committee received a further update on the process from the Company's financial advisors and the Company's management. Five parties or groups continued to show interest in making a bid for the Company. In addition, other parties had shown interest in parts of the Company, including the Chandler Trusts, who were continuing to conduct due diligence and to work on their proposal for a spin-off of the B&E Group followed by an acquisition of the remaining Company. The Special Committee also reviewed with the advisors possible alternative approaches in the event that there was not a satisfactory bid for the whole Company. These included selling the Company in two or more pieces, a spin-off of the B&E Group or other restructuring, and a further leveraged recapitalization. The Special Committee directed the Company's financial advisors to request final bids from the remaining interested parties by January 12, 2007.

Following the December 12 Special Committee meeting, Merrill Lynch and Citi sent letters to the remaining interested parties to request final bids by January 12, 2007, and sent a form of merger agreement to these parties with a request that the parties provide markups of a form of merger agreement by January 3, 2007. Merrill Lynch and Citi also invited the Chandler Trusts to formalize their proposal, and the Company's counsel subsequently sent counsel for the Chandler Trusts a form of spin-off agreement with respect to the spin-off of the B&E Group as well as the form of merger agreement. In early January 2007, counsel for the Chandler Trusts sent counsel for the Company a markup of the form of merger agreement and spin-off agreement. One other potential bidder sent an issues list reflecting issues with the form of merger agreement. Another potential bidder determined

20

that it was interested only in acquiring the B&E Group, and the Company's counsel sent that bidder a form of stock purchase agreement with respect to that potential transaction.

On January 12, 2007, the Special Committee reviewed with the Company's financial advisors and the Company's management the status of the bidding process. Several parties had determined that they would not be submitting final proposals, while two bidders were still pursuing bids for the whole Company. In addition, one bidder was pursuing a bid for the B&E Group, and the Chandler Trusts were continuing to pursue their proposal for a spin-off of the B&E Group followed by an acquisition by the Chandler Trusts of the remaining Company. The Special Committee also reviewed with the Company's financial advisors and separately with Morgan Stanley the various strategic alternatives available to the Company, including a sale of the whole Company, a leveraged recapitalization of the Company, the sale of the B&E Group, a spin-off of the B&E Group and a split-off of the Company's publishing business.

On January 20, 2007, the Special Committee met to review the proposals that had been submitted to the Company pursuant to its process. One of the bidders that was still pursuing a bid as of January 12, 2007 had dropped out of the process. The remaining proposals consisted of: (1) a proposal from a third-party group for a transaction pursuant to which the Company would pay a $27 per share dividend to its shareholders, the third-party group would invest $500 million in new equity and warrants, and shareholders would retain an equity interest in the Company that the third-party group asserted, based on its assumptions of the discounted present value of the future expected trading values of the recapitalized equity, would be valued at $7 per share or more; (2) a third-party proposal to acquire the B&E Group, including the Cubs, for cash in a taxable transaction for a purchase price of approximately $4.8 billion; and (3) the Chandler Trusts' proposal to spin off the B&E Group and acquire the remaining Company, with shareholders receiving $19.30 per share in cash and equity in the B&E Group, in a transaction that the Chandler Trusts asserted, based on their valuation of the B&E Group equity, to be worth $31.70 per share. In addition, the Special Committee reviewed a letter submitted by the Foundations, expressing the Foundations' preference that the Company continue as a public company with its current structure unless a transaction for the whole Company at a substantial premium with minimal closing risk could be obtained.

The Special Committee reviewed with the Company's advisors the terms of each of the proposals submitted, including the financial advisors' valuations of such proposals. In the case of the first and third proposals, the financial advisors' valuations were lower than the valuations asserted by the third-party group and the Chandler Trusts, respectively. In addition, the advisors reviewed the conditionality and tax consequences to the Company and to shareholders of the proposals. Representatives of the third-party group making the first proposal and representatives of the Chandler Trusts both made presentations at the meeting with respect to their proposals. The Special Committee also met separately with its financial and legal advisors to review the proposals. Following these reviews, the Special Committee determined that none of the proposals was satisfactory, and directed the Company's financial advisors to seek improvements in the proposals. The Special Committee also directed the Company's financial advisors to analyze alternatives that the Company could implement on its own. In addition, the Special Committee directed the Company to permit discussions between the Chandler Trusts and the Foundations to determine whether the Foundations could assist in developing an improved proposal. Following the Special Committee meeting, the Company issued a press release saying that its strategic review was continuing and that a decision was expected by the end of the first quarter.

The Special Committee received an update on the process on January 27, 2007. The Company's financial advisors again reviewed the three proposals that had been submitted, including minor revisions to the proposals designed to make them more attractive. In the case of the first proposal, the third-party group agreed to reduce the amount of warrants that it would acquire, limiting its ownership in the Company following the $27 dividend to 40%. In the case of the bid to acquire the B&E Group, the third party slightly increased the price it was willing to offer. In the case of the Chandler Trusts'

21

proposal, the Chandler Trusts suggested the possibility of additional leverage at the B&E Group to permit an increased cash payment of $24.55 per share, reducing the equity value of the B&E Group to be spun off to shareholders under their proposal.

The Special Committee reviewed with the Company's advisors their valuations of these proposals, which again were lower than the valuations asserted by the third parties in the case of the first and third proposals, as well as their assessment of conditionality and execution risk. Management and the Company's advisors also reviewed a possible leveraged recapitalization of the Company and spin-off of the B&E Group, under which the Company would pay a special dividend of $20 per share in cash prior to the spin-off. The Special Committee reviewed the valuations of the leveraged recapitalization and spin-off plan compared to the third-party proposals with the Company's financial advisors and then separately with the Special Committee's financial advisor. The Special Committee directed the Company's management and financial advisors to continue to seek improvements in the proposals while developing further details with respect to the leveraged recapitalization and spin-off plan.

On February 2, 2007, the Special Committee received a letter from the Foundations expressing their preference for the recapitalization and spin-off plan compared to the other alternatives available to the Company. The Foundations also stated that, in connection with a recapitalization and spin-off plan, the Foundations would be willing to consider increasing their ownership in the Company, including by purchasing shares of Company Common Stock from the Chandler Trusts.

The Special Committee received an update on February 3, 2007. Morgan Stanley compared the two remaining third-party proposals to a leveraged recapitalization of the Company that contemplated a cash dividend of $20 per share. In addition, Morgan Stanley noted that EGI had submitted a proposal the previous day for a transaction in which EGI and a Company ESOP would acquire the Company at a price of $30 per share. Following these reviews, the Special Committee directed management and the Company's financial advisors to present a full comparison of the possible alternatives and recommendations to the Special Committee and the Board at their meetings scheduled for February 12 and 13, 2007.

The Special Committee met on February 12, 2007 to review presentations and recommendations with respect to the alternatives available to the Company. The review included presentations by the Company's management and by the advisors with respect to a proposed recapitalization and spin-off plan, contemplating a dividend of $20 per share and a subsequent spin-off of the B&E Group. Management and the Company's advisors also reported that the Chandler Trusts and the Foundations had been negotiating with respect to the purchase of shares of Company Common Stock by the Foundations from the Chandler Trusts in the context of the recapitalization and spin-off plan. The Company's management recommended proceeding with this plan. Management also reviewed certain revisions to the Company's financial outlook based on preliminary operating results in January 2007. In particular, management revised downward the outlook for the Company's publishing business, and this revised outlook was shared with the parties that had submitted proposals.

The Special Committee also reviewed the status of the other proposals that had been submitted. The third-party proposal that had originally contemplated a cash dividend of $27 per share had been verbally revised to reduce the cash dividend to $23 per share, but to add a contingent value right tied to any recovery from the Company's appeal of certain tax litigation. That third party stated that if the Company were interested in the revised proposal, the third party would submit the proposal in writing if so requested by the Board. The Chandler Trusts' proposal contemplated a cash payment of $18 per share upon completion of audited financial statements for the B&E Group, with an additional cash payment of $6 per share upon the spin-off of the B&E Group. The EGI proposal was revised to provide for an acquisition by EGI and a Company ESOP of the entire Company at $33 per share.

Following these reviews and presentations, the Special Committee determined to recommend to the Board that the Company proceed with the recapitalization and spin-off plan and that the Company not continue to pursue the Chandler Trusts' proposal or the other third-party proposals. The Special

22

Committee did, however, direct management and the Company's advisors to continue to develop the EGI proposal to determine its feasibility. The Special Committee, following consultation with its financial advisors and the Company's financial advisors, did not believe that the Chandler Trusts' proposal or the other third-party proposals offered as much value as the recapitalization and spin-off plan or the EGI proposal. The following day, the Board authorized the Company to move forward towards completion of the recapitalization and spin-off plan. Following the Board meeting, the Company issued a press release stating once again that the Special Committee's process was continuing and that the Board expected to make a decision before the end of the first quarter.

Following these meetings, the Company's management and advisors worked to complete the required documentation with respect to the recapitalization and spin-off plan, including the negotiation of registration rights agreements with the Chandler Trusts and the Foundations. In addition, the Chandler Trusts and the Foundations negotiated with respect to the terms and pricing of a purchase of shares of Company Common Stock by the Foundations from the Chandler Trusts in connection with the recapitalization and spin-off plan.

At the same time, the Company's management and financial advisors sought to develop further details with respect to the potential ESOP transaction proposed by Zell and EGI. The Company engaged counsel to advise it on ESOP matters, and engaged GreatBanc Trust Company as the Trustee in connection with the possible ESOP transaction. The Trustee engaged Duff & Phelps as its financial advisor and engaged K&L Gates as its legal counsel. Duff & Phelps had previously conducted due diligence with respect to the Company in connection with a possible engagement to provide a solvency opinion to the Company, but this possible engagement was rescinded after Duff & Phelps was engaged by the Trustee.

On February 19, 2007, EGI submitted a term sheet to the Company with respect to proposed terms for the ESOP transaction. The term sheet contemplated a merger in which the Company's shareholders would receive $33 per share in cash, with a new LLC formed by EGI investing $225 million, a newly formed ESOP investing $825 million and the Company incurring debt for the remaining cash payments to shareholders. Following the merger, the Company would elect to become an S-corporation for federal income tax purposes, with the result that the Company would not pay corporate level federal income taxes. The EGI LLC would initially hold approximately 21.4% of the Company Common Stock following the merger and would acquire 20-year warrants to purchase an additional 20%. The term sheet also contemplated a management incentive plan with respect to the economic equivalent of 5% of the Company Common Stock. After preliminary conversations with the Company's management and financial advisors, EGI submitted a revised term sheet on February 22, 2007, which included a description of the terms of proposed financing for the transaction.

On February 24, 2007, the Special Committee reviewed with the Company's management and advisors the status of the proposed recapitalization and spin-off plan, as well as an update with respect to EGI's proposed ESOP transaction. For a description of the financial advisors' presentations at this meeting and subsequent meetings, see "Special Factors—Reports of the Special Committee's Financial Advisor" and "Special Factors—Reports of the Company's Financial Advisors" below, as well as the financial advisors' presentation materials, which are attached as exhibits to the Schedule 13E-3 filed with the Securities and Exchange Commission (the "SEC") in connection with this proxy statement (the "Schedule 13E-3").

The advisors also described the steps involved in the proposed ESOP transaction and the anticipated timetable. They noted that EGI's proposal contemplated voting agreements from the Chandler Trusts and the Foundations. Following these reviews, the Special Committee also consulted separately with its financial and legal advisors. The Special Committee then directed the Company's management and financial advisors to solicit the views of the Chandler Trusts and the Foundations with respect to the EGI proposal, and to continue to pursue the proposal with a view to improving the economic terms and certainty. On February 25, 2007, the Company's advisors had separate discussions

23

with representatives of the Chandler Trusts and representatives of the Foundations with respect to the EGI proposal.

Over the course of the next week, the Company's management and advisors had discussions with representatives of EGI and the ESOP with respect to the proposed ESOP transaction. On March 1, 2007, EGI's counsel provided the Company's counsel with a markup of the form of merger agreement. On March 2, EGI's counsel and the Company's counsel discussed the markup, particularly with respect to conditions to the merger and termination fees in the event the merger did not close. Also on March 1, the Foundations sent a letter to the Special Committee expressing concerns about the timing and execution risk of the proposed ESOP transaction, and suggesting that the Company pursue the recapitalization and spin-off plan. On March 2, the Chandler Trusts sent a letter to the Special Committee also indicating concern about the timing and execution risk of the proposed ESOP transaction, and indicating a willingness to continue to work with the Company to complete the recapitalization and spin-off plan. On March 3, the Company's counsel provided a revised draft of the merger agreement, and counsel for the parties had further discussions with respect to the draft on March 4.

Also on March 4, 2007, EGI provided the Company with a revised term sheet, reflecting improvements to the proposed economic terms of the transaction. In particular, the revised term sheet contemplated that the Company would effect a first step tender offer at $33 per share in cash, as a means of providing a portion of the cash consideration to the Company's shareholders more quickly and with greater certainty. The revised term sheet also contemplated that shareholders would receive an 8% "ticking fee" on the merger consideration running from six months following execution of the merger agreement until closing of the merger, and that the Company would be permitted to pay regular quarterly cash dividends until the merger closed.

During the week of March 5, 2007, representatives of the Company continued to have discussions with representatives of EGI and the ESOP with respect to the potential transaction. In the course of these discussions, EGI indicated that it would be willing to make an investment of $250 million in the Company as soon as possible following execution of the merger agreement and before the closing of the merger, in order to create more certainty with respect to the transaction. The parties also discussed a similar investment by the ESOP concurrently with executing the merger agreement. On March 6, EGI provided a revised term sheet reflecting this change of structure and other improved economic terms. The revised term sheet contemplated that EGI would purchase $250 million of Company Common Stock at $33 per share as soon as practicable following execution of the merger agreement, and that the ESOP would purchase $250 million of Company Common Stock at market prices concurrently with executing the merger agreement. The revised term sheet also contemplated that shareholders would receive a 5% "ticking fee" on the merger consideration running from the date of execution of the merger agreement until closing, but that the Company would not pay dividends on the Company Common Stock between signing and closing. The revised term sheet also contemplated that EGI's initial investment would be cashed out in the merger, but that EGI would then immediately purchase a $185 million subordinated note and pay an additional $40 million to acquire a 20-year warrant to acquire 38% of the Company Common Stock for an aggregate exercise price of $351 million.

On March 7, 2007, EGI's counsel provided the Company with a revised draft of a merger agreement reflecting the revised structure of the proposed transaction. The revised merger agreement contemplated that the Company would merge with an entity owned by the ESOP, with the ESOP initially owning 100% of the Company Common Stock following the merger. EGI's counsel also provided the Company with drafts of a warrant agreement setting forth the terms of EGI's proposed warrant, and a voting agreement under which the Chandler Trusts and the Foundations would vote for the ESOP transaction. On March 8, the Company's ESOP counsel circulated drafts of an ESOP purchase agreement, loan agreement, pledge agreement and note. During March 8 and 9, counsel for the parties exchanged comments on various agreements, including comments from the ESOP's counsel on the draft merger agreement, and EGI's counsel provided drafts of the Zell Entity securities

24

purchase agreement, the subordinated note, the warrant, the investor rights agreement and the registration rights agreement and the charter and by-laws for the Company following the merger.

On March 10, 2007, the Company informed EGI that the Company was reconsidering its level of comfort with the proposed ESOP transaction, including the levels of leverage contemplated by that transaction, and was also reconsidering the possible recapitalization and spin-off plan at reduced levels of leverage. Over the course of the following week, representatives of the Company discussed with representatives of the Chandler Trusts and the Foundations the possibility of pursuing the recapitalization and spin-off plan with a dividend of $15 per share rather than $20 per share. The Foundations and the Chandler Trusts engaged in discussions with respect to restructuring their agreement on the purchase of shares by the Foundations from the Chandler Trusts in the context of a reduced dividend. The Company's advisors and the Special Committee's financial and legal advisors also had discussions with respect to the advisability of pursuing a revised recapitalization and spin-off plan versus re-engaging on the proposed ESOP transaction. As a result of these discussions, the Special Committee scheduled a meeting for March 21, 2007 to consider the status of the two potential transactions.

At the March 21, 2007 Special Committee meeting, the Company's management and advisors provided a full review of the proposed terms of the potential ESOP transaction with a first-step cash payment to shareholders equivalent to $17.50 per share, and compared it to a recapitalization and spin-off transaction with a $17.50 per share cash dividend. The Company's advisors stated that the ESOP transaction involved substantially more debt, but as a result of the tax advantages of the S-corporation structure, as well as the elimination of the Company's 401(k) cash contributions after creation of the ESOP and other cost savings, the cash flow available for debt repayment would be approximately equivalent in the two alternatives. The Company's advisors noted, however, that they expected that the credit rating agencies would rate the Company's debt in the proposed recapitalization transaction one level higher than they would rate the Company's debt in the proposed ESOP transaction. The Company's financial advisors also provided a comparative valuation of the two alternatives.

The Special Committee also heard presentations from the Trustee and its financial advisor about their qualifications and the process they were following with respect to determining the fairness of the transaction to the ESOP. Management reported on the Company's financial performance to date in 2007, and the Company's legal advisors reported on the legal terms of the alternative transactions. The Company's advisors also reviewed the financing arrangements contemplated by each transaction. The Special Committee consulted separately with its financial and legal advisors with respect to the two potential transactions. Following these reviews, the Special Committee directed the Company's management and advisors to present two fully developed alternatives to the Special Committee at a meeting on March 30, 2007 for a final determination.

Between March 21 and March 30, 2007, representatives of the Company, EGI and the ESOP, including the Special Committee's financial and legal advisors, negotiated the terms of the various agreements relating to the potential ESOP transaction. In addition, representatives of the Company and EGI negotiated with representatives of the Chandler Trusts with respect to the proposed voting agreement and registration rights agreement. The Foundations declined to negotiate with respect to a voting agreement. The Company sought to increase the certainty with respect to the transaction, to limit any breakup fees the Company would have to pay, and to require a breakup fee from EGI in the event financing was not obtained for any reason other than a breach by the Company or the ESOP. The Company also required that its obligation to complete the merger would be conditioned on the receipt of a satisfactory solvency opinion, among other conditions.

As a result of negotiations with the Company and the ESOP, the initial investment by the Zell Entity was restructured so that the Zell Entity would purchase $50 million in Company Common Stock and $200 million in a subordinated exchangeable note that would be exchangeable into Company

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Common Stock at the Company's election, or automatically if the Merger Agreement was terminated. The parties also negotiated the terms of proposed financing, with the goal of increasing the certainty that the financing would be available, and agreed that receipt of financing would be a condition to the merger.

The Company continued to seek improvements in the economic terms of the transaction, including an increase in the price to be paid to the Company's shareholders and an increase in the investment to be made by EGI. The Company and the Trustee also negotiated the terms of the ESOP's investment, including with respect to the price to be paid by the ESOP for the shares of Company Common Stock to be purchased by the ESOP. In addition, the Board received two letters from one of the third-party groups that had previously made a revised proposal with respect to a transaction with the Company. In the first letter, the third-party group sought access to further information and, thereafter, additional information was provided to them. In the second letter, the third-party group expressed its interest in participating with a $500 million equity investment in an ESOP transaction in which the Company's shareholders would receive $34 per share. This second letter was not accompanied by any further documents or financing commitments. Thereafter, the Company's financial advisors had further discussions with the financial advisors to the third-party group in order to obtain further details about the proposal.

Prior to the meeting of the Special Committee on March 30, EGI slightly revised its proposal to increase the stated per share consideration in the merger to $33.50, but with the "ticking fee" start date moved to January 1, 2008.

On March 30, the Special Committee and the Board met for a full review of the alternative transactions. The Special Committee received presentations and reviewed in detail the terms of the proposed ESOP transaction and the terms of the proposed recapitalization and spin-off, including the terms of the draft agreements with respect to each alternative, the terms of proposed financing for each alternative, the transaction steps and timing of each alternative, regulatory approvals and tax treatment for each alternative, and the process undertaken by the Trustee and its advisors in connection with the proposed ESOP transaction. The Company's financial advisors also reviewed the relative valuations of the two alternatives. The Board and Special Committee also reviewed the letters received as described above and the discussions between the third-party group submitting such letters and the financial and legal advisors of the Company and the Special Committee.

Following these reviews, the Special Committee met separately with its advisors to review the alternatives. Based on its review, and after consultation with its advisors, the Special Committee determined that the proposed ESOP transaction was a more attractive transaction than the proposed recapitalization and spin-off. In particular, the Special Committee noted that the proposed price for the ESOP transaction was at the high end of the valuation ranges presented for the recapitalization and spin-off transaction. See "Special Factors—Reports of the Special Committee's Financial Advisor" and "Special Factors—Reports of the Company's Financial Advisors." In addition, the Special Committee believed that the execution risk of the recapitalization and spin-off transaction was higher, given that the valuation ranges presented depended on the ability of the Company to meet the projections that the advisors had used in developing these valuation ranges. The Special Committee directed the Company and its advisors to continue to seek improvement of the economic terms of the proposed ESOP transaction. The Special Committee noted that the proposal from the third-party group required additional work and documentation and directed the Company and its advisors to continue discussions with the third-party group. Based on these recommendations, the Board directed the Company's management and financial advisors, and the Special Committee's financial and legal advisors, to seek to complete negotiation of the proposed ESOP transaction and present the completed proposal to the Board at a meeting on Sunday morning, April 1, and concurrently to continue discussions with the third-party group.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523157

The representatives of the Company, the ESOP, EGI and the Chandler Trusts then continued negotiation of the agreements with respect to the ESOP transaction. In the course of these negotiations, EGI agreed to increase the price to be paid to the Company's shareholders from $33.50 to $34 per share, with an 8% "ticking fee" running from January 1, 2008 to the closing of the merger if the merger did not close by January 1, 2008. EGI agreed that its initial $250 million investment in the Company would be based on a $34 per share price, and that its investment would increase to $315 million in connection with the merger, consisting of a $225 million subordinated note and a $90 million purchase price for the warrant. EGI also agreed to a breakup fee of $25 million to be paid by the Company if it accepted a superior proposal and agreed to pay a $25 million breakup fee if financing was not obtained for any reason other than breach by the Company or the ESOP. The Company and the ESOP agreed to a $28 per share purchase price for the ESOP's purchase of shares of Company Common Stock. The Chandler Trusts agreed to the voting agreement and, in connection with the registration rights agreement, agreed to tender their shares of Company Common Stock in the Offer, and to cause the directors nominated by the Chandler Trusts to resign upon the closing of the Offer (or under certain other circumstances).

On Sunday morning, April 1, the Special Committee received a report on the status of the proposed ESOP transaction and additional discussions over the last few days with the third-party group that submitted the letters described above. The Company's management and advisors reported that all major open issues with respect to the proposed ESOP transaction had been resolved, with the exception of the exercise price of the warrant. Given the increase in price under the proposed ESOP transaction to $34 per share, the same price proposed in the third-party group's letter, and the fact that the third-party group's proposal was subject to additional work and documentation, the Special Committee believed that the proposed ESOP transaction should continue to be pursued subject to resolution of the remaining open issue. The Special Committee agreed to reconvene that evening to permit the parties to resolve this open issue.

During the course of the day, the Company, the ESOP and EGI reached agreement that the exercise price of the warrant would increase by $10 million per year for the first 10 years of the warrant, to a maximum of $600 million, and that the term of the warrant would be reduced from 20 years to 15 years. The Special Committee and the Board reconvened on Sunday evening, April 1, and the Company's management and advisors reported on the resolution of all open issues. The Company's legal counsel reviewed all the agreements and actions to be approved in connection with the proposed ESOP transactions. In a separate meeting of the Special Committee, Morgan Stanley rendered its oral opinion to the Special Committee, subsequently confirmed in writing as of the same date, to the effect that, as of April 1, 2007, and based upon the factors and subject to the assumptions set forth in its written opinion, the Merger Consideration to be received by the holders of Company Common Stock (other than certain affiliated entities) was fair from a financial point of view to such shareholders. See "Special Factors—Opinion of the Special Committee's Financial Advisor." The Trustee provided information to the Special Committee regarding the Trustee's role in the negotiation of the transactions. The Special Committee recommended that the Board approve the Leveraged ESOP Transactions. At the full meeting of the Board, Merrill Lynch gave its oral opinion, subsequently confirmed in writing as of the same date, as to the fairness of the Merger Consideration from a financial point of view (see "Special Factors—Opinion of the Company's Financial Advisor" below), and Morgan Stanley delivered to the full Board the opinion it had previously given to the Special Committee. The Board then approved the Leveraged ESOP Transactions and the related documents. Representatives of the Chandler Trusts on the Board abstained from voting as directors; Dudley Taft was not present at the meeting and did not vote. Following the Board meeting, the approved agreements were executed and the transaction was publicly announced on April 2, 2007.

On Wednesday, April 25, 2007, the Company commenced the Tender Offer. On May 9, 2007, the Company received an opinion from VRC as to the solvency of the Company after giving effect to the Step One Transactions. See "Special Factors—Opinion of Valuation Research Corporation."

27

On May 17, 2007, the Company entered into a credit agreement, as borrower, with several lenders, with respect to an $8.028 billion senior secured credit facility, the proceeds of which are intended to be used by the Company, among other ways, to make payments in connection with the Tender Offer and to refinance certain existing indebtedness.

The Tender Offer expired at 5:00 p.m. New York City time, on May 24, 2007. On May 31, 2007, the Company announced that approximately 218,132,000 shares were tendered in the Tender Offer. The shares tendered in the Tender Offer represented approximately 90% of shares outstanding, and, after proration, the shares that the Company repurchased represented approximately 52% of shares outstanding.

On June 4, 2007, Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. resigned as members of the Board. Messrs. Chandler, Goodan and Stinehart served on the Board as representatives of the Chandler Trusts, which agreed to cause the resignations of Messrs. Chandler, Goodan and Stinehart effective upon the consummation of the Tender Offer.

On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman, Sachs & Co. ("Goldman Sachs") and the Company, pursuant to which the Chandler Trusts agreed to sell an aggregate of 20,351,954 shares of Company Common Stock, the remainder of the shares owned by them following the Tender Offer, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to a shelf registration statement that the Company filed with the Securities and Exchange Commission and that became effective on April 25, 2007. Following the closing of this transaction on June 7, 2007, the Chandler Trusts no longer own any shares of Company Common Stock.

### Reasons for and Fairness of the Merger; Recommendations of the Special Committee and the Board

The Board, based in part on the recommendation of the Special Committee, has (1) determined that the Merger Agreement, including the Merger and the other transactions contemplated by the Merger Agreement, is fair to, advisable and in the best interests of the Company and its unaffiliated shareholders, (2) approved the Merger Agreement and the Merger, and (3) determined to recommend that the Company's shareholders vote in favor of adoption of the Merger Agreement. Representatives of the Chandler Trusts on the Board abstained from voting as directors, and Mr. Zell was not a member of the Board at the time the Board made these determinations, recommendations and approvals. **Accordingly, the Board recommends that you vote "FOR" adoption of the Merger Agreement and approval of the Merger.**

*The Special Committee.*    In reaching its determination to recommend the Leveraged ESOP Transactions, including the Merger Agreement, the Merger and the other transactions contemplated by the Merger Agreement, the Special Committee, in consultation with its legal and financial advisors, and the Company's management and legal and financial advisors, considered the following material factors and benefits of the Leveraged ESOP Transactions, each of which the Special Committee believed supported its recommendation:

- recent and historical market prices for the shares of Company Common Stock and the fact that the value offered in the Leveraged ESOP Transactions was as high as any proposal received from any third party, and the consideration offered in the Merger of $34.00 per share represented a premium of approximately 5.9% to the closing price of Company Common Stock on March 30, 2007, the last trading day before the proposal was made public, approximately 12.5% to the average closing price of Company Common Stock for the 30 calendar day period ending on March 30, 2007 and approximately 9.5% to the average closing price for the 52 weeks ended March 30, 2007;

- the business, operations, properties and assets, financial condition (as described under "Information About the Company—Selected Financial Data"), business strategy and prospects

28

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523159

(including as described under "Financial Projections") of the Company (as well as the risks involved in achieving those prospects), the nature of the industry in which the Company competes, industry trends and economic and market conditions, both on a historical and on a prospective basis, including in particular:

- the weakened demand for advertising in the newspaper industry;

- the proliferation of media sources and the increased competition with these sources;

- declines and potential declines in newspaper circulation and broadcasting audience as consumers migrate to other media alternatives;

- possible volatility in newsprint prices and cost of broadcast programming rights; and

- the uncertain status of the FCC's cross-ownership rules and other regulatory requirements;

- the fact that the Company had explored a variety of strategic alternatives over an extended period of time, the thoroughness of the process for exploring and reviewing these alternatives, and the Special Committee's view that the Leveraged ESOP Transactions were in the best interests of the Company and its unaffiliated shareholders compared to the alternatives considered;

- the Special Committee's belief that the values potentially offered by the recapitalization and spin-off plan were subject to a number of risks and uncertainties, and that there was no certainty as to the achievability of those values;

- the arm's-length negotiation of the transactions and related agreements, including the economic improvements to the transactions resulting from those negotiations;

- the fact that the transactions were structured to permit the Tender Offer as a means of purchasing a significant portion of the Company Common Stock on an accelerated timetable and without the requirement of satisfying the regulatory requirements necessary for the Merger, and the increased consideration to be paid in the Merger, in the form of the 8% annualized "ticking fee," in the event the Merger does not close by January 1, 2008;

- the fact that the Zell Entity would be making an initial investment of $250 million in the Company, which investment was not conditional on the closing of the Merger;

- the conditions to the Merger Agreement, which the Special Committee viewed as providing a reasonable level of assurance that the Merger could be completed;

- the other terms of the Merger Agreement, including the fact that the Merger Agreement does not preclude unsolicited offers from other parties, subject to specified conditions, and permits the Company to terminate the Merger Agreement to accept a superior proposal through the date of meeting of the Company's shareholders to consider the Merger, subject to payment by the Company of a $25 million termination fee;

- the availability of financing commitments for the Tender Offer and the Merger, and the agreement by Zell and the Zell Entity to pay a $25 million termination fee to the Company if financing is not obtained for any reason other than a breach by the Company or the ESOP;

- the favorable tax treatment available to the Company following the Merger upon its election to become an S corporation for federal income tax purposes, the proposed elimination of the Company's 401(k) cash contributions following creation of the ESOP, and the ability to support increased levels of borrowing by the Company as a result of this favorable tax treatment and these savings in order to permit the acquisition of all the shares at $34.00 per share;

- the analysis and written opinion of Morgan Stanley to the effect that, as of April 1, 2007, and based upon the factors and subject to the assumptions set forth in its written opinion, the

29

Merger Consideration to be received by the holders of Company Common Stock (other than certain affiliated entities) was fair from a financial point of view to such shareholders, as more fully described below under "Special Factors—Opinion of the Special Committee's Financial Advisor";

- the analysis and written opinion of Merrill Lynch to the effect that, as of April 1, 2007, and based upon the factors and subject to the assumptions set forth in its written opinion, the Merger Consideration to be received by the holders of Company Common Stock (other than certain affiliated entities) was fair from a financial point of view to such shareholders, as more fully described below under "Special Factors—Opinion of the Company's Financial Advisor";

- the prices paid by the Company in other purchases of Company Common Stock and the fact that the consideration offered in the Merger of $34.00 per share exceeded the highest price paid per share for purchases of Company Common Stock by the Company during 2006, including the $32.50 per share that the Company paid to purchase shares of Company Common Stock in the June 2006 modified "dutch auction" tender offer; and

- the fact that a vote of shareholders on the Merger is required under Delaware law, and that shareholders who do not tender their shares into the Tender Offer and who do not vote in favor of the Merger will have the right to dissent from the Merger and to demand appraisal of the fair value of their shares under Delaware law.

The Special Committee also took into consideration a variety of risks and other potentially negative factors concerning the Leveraged ESOP Transactions, including the following:

- the risk that the conditions to the Merger will not be met, including the conditions requiring receipt of FCC approval, the receipt of financing and receipt of a solvency opinion, and the potential adverse impact on the Company if the Merger does not close, including the diversion of management and employee attention, potential employee attrition and the effect on business and customer relationships;

- the fact that the Company's shareholders who tender their shares into the Tender Offer (or whose shares will be converted into cash in the Merger) will not participate in any future earnings or growth of the Company and will not benefit from any appreciation in the value of the Company or from any increased consideration available in connection with a superior proposal accepted by the Company should such a proposal be presented after the consummation of the Tender Offer;

- the Merger Agreement's limitations on the Company's ability to solicit other offers;

- the fact that the all-cash consideration in the transactions will be taxable to the Company's shareholders that are U.S. persons for U.S. federal income tax purposes; and

- the fact that the Zell Entity is a newly formed limited liability company with essentially no assets and, accordingly, that the Company's remedy in connection with a breach of the Merger Agreement by the Zell Entity, even a breach that is deliberate or willful, may be limited to a $25 million termination fee.

In considering various analyses related to the "going concern value" of the Company, the Special Committee relied on the analyses undertaken by Morgan Stanley and Merrill Lynch described below under "Special Factors—Opinion of the Special Committee's Financial Advisor" and "Special Factors—Opinion of the Company's Financial Advisor." In relying on such analyses, the Special Committee adopted (for purposes of this discussion) such analyses. The members of the Special Committee did not consider the liquidation value of the Company because they considered the Company to be a viable, going concern and therefore did not consider liquidation value to be a relevant methodology. Merrill Lynch's analysis referred to above did, however, include an analysis of implied per-share valuations of the Company on an after-tax basis assuming the sale of the B&E Group followed by a sale of the

30

Company's publishing business. Further, the members of the Special Committee did not consider net book value, which is an accounting concept, as a factor because they believed that net book value is not a material indicator of the value of the Company as a going concern but rather is indicative of historical costs.

The foregoing discussion summarizes the material factors considered by the Special Committee in its consideration of the Leveraged ESOP Transactions, including the Merger. After considering these factors, the Special Committee concluded that the positive factors relating to the Merger Agreement and the other Leveraged ESOP Transactions substantially outweighed the potential negative factors. In view of the wide variety of factors considered by the Special Committee, and the complexity of these matters, the Special Committee did not find it practicable to quantify or otherwise assign relative weights to the foregoing factors. In addition, individual members of the Special Committee may have assigned different weights to various factors. The Special Committee approved and recommended the Leveraged ESOP Transactions, including the Merger Agreement, based upon the totality of the information presented to and considered by it.

*The Board.*    In reaching its determination to approve the Leveraged ESOP Transactions, including the Merger Agreement, the Merger and the other transactions contemplated by the Merger Agreement, the Board, in consultation with its legal and financial advisors and the Company's management, considered all of the factors considered by the Special Committee, as described above, as well as the following:

- the recommendation of the Special Committee in favor of the Leveraged ESOP Transactions as described above;

- the fact that the Special Committee consists solely of independent directors who are not officers or nominees of the Chandler Trusts or affiliated with the ESOP, the Zell Entity or Zell or their affiliates, and that the members of the Special Committee will not personally benefit from the completion of the Leveraged ESOP Transactions in a manner different from the Company's unaffiliated shareholders; and

- the fact that the Special Committee retained separate legal and financial advisors, who participated in negotiations with respect to the Leveraged ESOP Transactions and advised the Special Committee as to the Leveraged ESOP Transactions and the alternatives.

In considering various analyses related to the "going concern value" of the Company, the Board relied on the analyses undertaken by Morgan Stanley and Merrill Lynch described below under "Special Factors—Opinion of the Special Committee's Financial Advisor" and "Special Factors—Opinion of the Company's Financial Advisor." In relying on such analyses, the Board adopted (for purposes of this discussion) such analyses. The Board did not consider the liquidation value of the Company because it considered the Company to be a viable, going concern and therefore did not consider liquidation value to be a relevant methodology. Merrill Lynch's analysis referred to above did, however, include an analysis of implied per-share valuations of the Company on an after-tax basis assuming the sale of the B&E Group followed by a sale of the Company's publishing business. Further, the members of the Board did not consider net book value, which is an accounting concept, as a factor because they believed that net book value is not a material indicator of the value of the Company as a going concern but rather is indicative of historical costs.

The foregoing discussion summarizes the material factors considered by the Board in its determination to approve the Leveraged ESOP Transactions, including the Merger Agreement. In view of the wide variety of factors considered by the Board, and the complexity of these matters, the Board did not find it practicable to quantify or otherwise assign relative weights to the foregoing factors. In addition, individual members of the Board may have assigned different weights to various factors. The Board approved and recommends the Leveraged ESOP Transactions, including the Merger Agreement, based upon the totality of the information presented to and considered by it.

31

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523162

Representatives of the Chandler Trusts on the Board abstained from voting on the Leveraged ESOP Transactions and make no recommendation with respect thereto. Mr. Zell was not a member of the Board at the time the Board made these determinations, recommendations and approvals.

**Reports of the Special Committee's Financial Advisor**

During the course of its engagement, the Special Committee's financial advisor, Morgan Stanley, made various presentations to the Special Committee regarding the strategic alternatives available to the Company. Below is a summary of the presentations that Morgan Stanley gave analyzing EGI's various proposals for an ESOP transaction compared to a recapitalization transaction involving a $17.50 per share special dividend and the spin-off of the B&E Group.

On March 21, 2007, Morgan Stanley made a presentation to the Special Committee. The presentation included analysis of the economic value of EGI's proposed ESOP transaction at $33 per share with a "ticking fee" of 5% running from the signing of the Merger Agreement through the closing date of the Merger. Morgan Stanley commented that the economic value of the EGI proposal to the Company's shareholders depended upon assumptions as to the time to close and the appropriate cost of equity and stated that its current estimate of the value of the EGI proposal ranged from $30.94 to $32.54. Morgan Stanley then provided estimated valuation ranges for the recapitalization and spin-off plan ranging from $23.67 to $35.55 using EBITDA multiples of 7.5x-8.0x for the Company's publishing business and 9.0x-11.0x for the B&E Group. Morgan Stanley also reviewed recent trading metrics for comparable companies.

At the March 30, 2007 Special Committee meeting, Morgan Stanley reviewed the Company's recent financial performance, including comparisons of the Company's year-to-date performance against management's plan for 2007 and against the Company's performance for the comparable period in 2006. Morgan Stanley commented that the Company's year-to-date performance was on track with management's plan and that management's presentation to the ratings agencies in connection with the financing for the ESOP transaction was based on management's plan. Morgan Stanley also reviewed estimates by research analysts of the Company's future financial performance, which had been consistent since January 2007, and trading metrics for comparable companies.

In a presentation delivered later at the March 30, 2007 Special Committee meeting, Morgan Stanley compared the proposal for a revised ESOP transaction with per-share consideration of $33.50 per share with an 8% "ticking fee" beginning nine months after the signing of the Merger Agreement through the closing date of the Merger, with the recapitalization and spin-off plan. The valuations for the ESOP transaction ranged from $31.05 to $32.33, depending on whether a $17.50 cash distribution was received up-front, and assuming a cost of equity of 10% and time to close of 12 months. The valuations for the recapitalization and spin-off plan ranged from $21.18 to $34.55 per share, using EBITDA multiples of 7.5x-8.0x for the Company's publishing business and 9.0x-11.0x for the B&E Group. Morgan Stanley also presented a summary of the financial and comparative analyses it performed in connection with its fairness opinion, including historical share price analysis, Wall Street equity research analyst price targets, comparable company analysis, precedent transactions analysis, discounted cash flow analysis and recapitalization alternative. See "Special Factors—Opinion of the Special Committee's Financial Advisor."

**Reports of the Company's Financial Advisors**

On February 12, 2007, the Company's financial advisors, Merrill Lynch and Citi, made a presentation to the Special Committee that included an update on the EGI proposal to reflect that EGI had proposed to increase its price for an acquisition of the entire Company from $30 per share to $33 per share.

On February 24, 2007, Merrill Lynch and Citi provided an update to the Special Committee on the EGI proposal. The financial advisors compared the cash received in EGI's proposed ESOP transaction

32

at $33 per share with estimated valuation ranges for a $20 per share dividend recapitalization and spin-off of the B&E Group plan. The valuations for the recapitalization and spin-off plan ranged from $27.09 to $34.81 per share primarily based on EBITDA multiples using 7.25x-8.75x operating cash flow to value the Company's publishing business and 8.5x-10.0x operating cash flow to value the B&E Group. The financial advisors commented that the EGI proposal provided $13 per share more in cash than the recapitalization and spin-off plan and the cash received in the transaction represented a 22% premium to the low end and a 5% discount to the high end of the recapitalization plan valuation. The financial advisors also compared the Company's projected free cash flow position with respect to both the EGI proposal and the recapitalization and spin-off plan. Although the Company's interest expense was estimated to be higher in connection with the EGI proposal, the elimination of income taxes made the transactions similar from a free cash flow perspective. The financial advisors also summarized for the Special Committee various precedent large leveraged employee stock ownership plan buyout transactions that were consummated during the past 25 years.

On March 21, 2007, Merrill Lynch and Citi provided a full review for the Special Committee of the proposed terms of the potential ESOP transaction with a first-step cash payment to shareholders equivalent to $17.50 per share, and compared it to a recapitalization and spin-off transaction with a $17.50 per share cash dividend. The valuations for the recapitalization and spin-off plan ranged from $27.21 to $34.94 per share primarily based on EBITDA multiples using 7.25x-8.75x operating cash flow to value the Company's publishing business and 8.5x-10.0x operating cash flow to value the B&E Group. The financial advisors commented that the cash received in the ESOP transaction represented a 24% premium to the low end and a 4% discount to the high end of the recapitalization plan valuation. The financial advisors also compared the Company's projected free cash flow position with respect to both the ESOP transaction and the recapitalization and spin-off plan. Although the Company's interest expense was estimated to be higher in connection with the ESOP transaction, the reduction of income taxes, the tax advantages of the S-corporation structure, the elimination of the Company's 401(k) cash contributions after creation of the ESOP and other cash cost savings made the transactions appear to be similar from a free cash flow perspective. The financial advisors commented that the rating agencies were expected to rate the ESOP transaction one notch lower than the recapitalization and spin-off plan. The financial advisors also reviewed for the Special Committee the proposed terms of the two-step financing contemplated by the ESOP transaction.

On March 30, 2007, Merrill Lynch and Citi provided a full review of the alternative transactions at a meeting of the Special Committee. The presentation included an update on the ESOP proposal to reflect that EGI had agreed to increase the per-share consideration in the Merger to $33.50 per share with an 8% "ticking fee" running from January 1, 2008 to the closing of the Merger if the Merger did not close by January 1, 2008. The financial advisors also updated the Special Committee regarding two letters received from one of the third-party groups that had previously made a revised proposal with respect to an ESOP transaction involving the Company. The third-party group expressed its interest in participating with a $500 million equity investment in an ESOP transaction in which the Company's shareholders would receive $34 per share. The financial advisors reviewed in detail the terms of the proposed ESOP transaction and the terms of the proposed recapitalization and spin-off, including the terms of proposed financing for each alternative and the transaction steps and timing of each alternative. The financial advisors also reviewed the relative valuations of the two alternatives. The valuations for the recapitalization and spin-off plan ranged from $27.31 to $35.05 per share primarily based on EBITDA multiples using 7.25x-8.75x operating cash flow to value the Company's publishing business and 8.5x-10.0x operating cash flow to value the B&E Group and a $17.50 per share distribution to shareholders. The financial advisors commented that the cash received in the ESOP transaction represented a 21% premium to the low end and a 5% discount to the high end of the recapitalization plan valuation. Merrill Lynch also presented a summary of the financial and comparative analyses it performed in connection with its fairness opinion, including a comparable public companies analysis, an after-tax sum-of-the-parts analysis and a discounted cash flow analysis.

33

See "Special Factors—Opinion of the Special Committee's Financial Advisor" and "Special Factors—Opinion of the Company's Financial Advisor."

**Opinion of the Special Committee's Financial Advisor**

The Special Committee retained Morgan Stanley to provide it with financial advisory services and a financial opinion to the Special Committee in connection with the Merger. The Special Committee selected Morgan Stanley to act as its financial advisor based on Morgan Stanley's qualifications, expertise, reputation and knowledge of the business of the Company. At the special meeting of the Board on April 1, 2007, Morgan Stanley rendered its oral opinion, subsequently confirmed in writing as of the same date, that, based upon and subject to the assumptions, qualifications and limitations set forth therein, the consideration to be received by the unaffiliated holders of shares of Company Common Stock pursuant to the Merger Agreement was fair from a financial point of view to such holders.

**The full text of Morgan Stanley's written opinion, dated April 1, 2007, which sets forth the assumptions made, procedures followed, matters considered and qualifications and limitations of the reviews undertaken in rendering its opinion, is attached as Annex B hereto. The summary of Morgan Stanley's opinion set forth in this proxy statement is qualified in its entirety by reference to the full text of the opinion. Shareholders should read this opinion carefully and in its entirety. Morgan Stanley's opinion is directed to the Special Committee and the Board, addresses only the fairness from a financial point of view of the consideration to be received by unaffiliated holders of Company Common Stock pursuant to the Merger Agreement and does not address any other aspect of the Merger. Morgan Stanley's opinion does not constitute a recommendation to any shareholder of the Company as to how such shareholder should vote with respect to the Merger.**

In connection with rendering its opinion, Morgan Stanley, among other things:

- reviewed certain publicly available financial statements and other information of the Company;

- reviewed certain internal financial statements and other financial and operating data concerning the Company prepared by the Company's management;

- analyzed certain financial projections prepared by the Company's management;

- discussed the past and current operations and financial condition and the prospects of the Company with senior executives of the Company;

- reviewed the reported prices and trading activity for shares of Company Common Stock;

- compared the financial performance of the Company and the prices and trading activity of shares of Company Common Stock with that of certain other comparable publicly traded companies and their securities;

- reviewed the financial terms, to the extent publicly available, of certain comparable acquisition transactions;

- participated in discussions and negotiations among representatives of the Special Committee, the Company, the ESOP, the Zell Entity and their financial and legal advisors;

- reviewed drafts, each dated April 1, 2007, of the Merger Agreement, the debt financing commitments provided to the Company by certain lending institutions, the securities purchase agreement, the ESOP purchase agreement, the voting agreement and certain other related documents; and

- performed such other analyses and considered such other factors as it deemed appropriate.

In arriving at its opinion, Morgan Stanley assumed and relied upon, without independent verification, the accuracy and completeness of the information reviewed by it for the purposes of its

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523165

opinion. With respect to the financial projections, Morgan Stanley assumed that they were reasonably prepared on bases reflecting the best currently available estimates and judgments of the future financial performance of the Company. In addition, Morgan Stanley assumed that the Merger will be consummated in accordance with the terms set forth in the Merger Agreement without any waiver, amendment or delay of any terms or conditions including that the Leveraged ESOP Transactions will be consummated in accordance with their terms. Morgan Stanley is not a legal, regulatory or tax advisor. Morgan Stanley is a financial advisor only and relied upon, without independent verification, the assessments of the Company and its legal, regulatory and tax advisors with respect to such matters.

The Morgan Stanley opinion does not address the fairness of any consideration to be received by the ESOP, the Zell Entity or certain other affiliated shareholders in connection with the Leveraged ESOP Transactions, the relative fairness of any portion of the Merger Consideration to holders of any series of common or preferred stock of the Company, the relative merits of the Merger as compared to alternative transactions or strategies that might have been available to the Company or the underlying business decision of the Company to enter into the Merger Agreement. Morgan Stanley did not make any independent valuation or appraisal of the assets or liabilities of the Company, nor was it furnished with any such valuations or appraisals. Morgan Stanley's opinion was necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to Morgan Stanley as of, April 1, 2007. Events occurring after April 1, 2007 may have affected Morgan Stanley's opinion and the assumptions used in preparing it, and Morgan Stanley did not assume any obligation to update, revise or reaffirm its opinion.

In preparing certain of its analyses, Morgan Stanley incorporated four specific scenarios with respect to the projected future financial performance of the Company. The scenario referred to as the "Research Case" refers to projections derived from publicly available Wall Street equity research estimates. The "Management Plan" is based on projections provided by the Company's management team in its operating plan in February 2007, with minor adjustments. "Downside Case A" reflects projections developed by the Company's management team assuming a 2.0% decline in publishing revenue per year and flat operating cash flow for the Company's broadcasting segment. "Downside Case B" reflects projections developed by the Company's management team assuming a 3.0% decline in publishing revenue per year and a 1.0% per year decline in the operating cash flow of the Company's broadcasting segment. Morgan Stanley noted that each of the projections described in this paragraph are based on numerous variables and assumptions that are inherently uncertain and may be beyond the control of management, including, without limitation, factors related to general economic and competitive conditions and prevailing interest rates. Accordingly, actual results could vary significantly from those set forth in such projections.

The following is a summary of the material financial analyses performed by Morgan Stanley in connection with its oral opinion of April 1, 2007 and the preparation of its written opinion of April 1, 2007. Some of these summaries include information in tabular format. In order to understand fully the financial analyses used by Morgan Stanley, the tables must be read together with the text of each summary. The tables alone do not constitute a complete description of the analyses.

*Historical Share Price Analysis.* To provide background information and perspective with respect to the relative historical share prices of the Company, Morgan Stanley performed a historical share price analysis.

Morgan Stanley assumed that the per share Merger Consideration of $34.00 received by each unaffiliated holder of Company Common Stock consisted of an upfront $17.50 cash distribution received in connection with the Tender Offer and a subsequent $16.50 cash distribution received upon consummation of the Merger. Morgan Stanley noted that if the Merger does not close by January 1, 2008, holders of Company Common Stock will be entitled to receive the Additional Share Consideration, if any. The "Additional Share Consideration" means the amount per share, if any, equal to (1) $34.00 multiplied by (2) 8% multiplied by (3) the quotient obtained by dividing the number of

35

days elapsed from and excluding January 1, 2008 to and including the Closing Date by 365. Morgan Stanley also noted that the economic value of the Merger Consideration to the Company's shareholders is a function of the assumed cost of equity and the length of time between the signing of the Merger Agreement and the closing of the Merger. Morgan Stanley discounted to present value the distribution of $16.50 per share received upon consummation of the Merger and the Additional Share Consideration, if any, at an assumed cost of equity of 10.0%. The discount rate used by Morgan Stanley was the midpoint between 8.0% and 12.0%, the estimated range of the Company's cost of equity as estimated by Morgan Stanley. Morgan Stanley did not discount the upfront distribution of $17.50 per share to present value in connection with its analysis. Based on the foregoing assumptions, the present value of the Merger Consideration was $33.23 if the Merger closed six months after the Merger Agreement was signed, or "Perspective 1," and $32.80 if the Merger closed twelve months after the signing of the Merger Agreement, or "Perspective 2."

Morgan Stanley reviewed the stock price performance of the Company during various periods ending on March 28, 2007 and compared them to the base Merger Consideration and the present value of the Merger Consideration received under Perspective 1 and Perspective 2.

| | Price of the Company Common Stock | Base Merger Consideration ($34.00), Implied Premium | Present Value of Merger Consideration in Perspective 1 ($33.23), Implied Premium | Present Value of Merger Consideration in Perspective 2 ($32.80), Implied Premium |
|---|---|---|---|---|
| **Recent Company Common Stock Prices** | | | | |
| March 28, 2007(1) . . . . . . . . . . . . . . . . | $31.13 | 9.2% | 6.8% | 5.4% |
| March 20, 2007(1) . . . . . . . . . . . . . . . . | $28.81 | 18.0% | 15.3% | 13.8% |
| 52-Week Low . . . . . . . . . . . . . . . . . . . . | $27.09 | 25.5% | 22.7% | 21.1% |
| 52-Week High . . . . . . . . . . . . . . . . . . . | $34.28 | (0.8)% | (3.1)% | (4.3)% |
| **Average Price Perspectives(2)** | | | | |
| 1-Year . . . . . . . . . . . . . . . . . . . . . . . . | $30.72 | 10.7% | 8.2% | 6.8% |
| 2-Year . . . . . . . . . . . . . . . . . . . . . . . . | $32.45 | 4.8% | 2.4% | 1.1% |
| 3-Year . . . . . . . . . . . . . . . . . . . . . . . . | $36.14 | (5.9)% | (8.0)% | (9.2)% |

(1) Based on closing prices as of March 28 and March 20, 2007, respectively.

(2) Based on the average of the closing prices for each day of the applicable year(s).

*Tribune Wall Street Equity Research Analyst Price Targets.*    Morgan Stanley reviewed publicly available published 12-month price target estimates for the Company's Common Stock from Wall Street equity research analysts.

Morgan Stanley observed that the analysts' 12-month price targets ranged from $19.00 to $34.00 per share of Company Common Stock, with a median target price of $31.00 per share of Company Common Stock. Morgan Stanley also discounted to present value the Wall Street analysts' 12-month price targets for one year at a cost of equity of 11.0%. The Company's cost of equity was estimated by Morgan Stanley using the capital-asset pricing model methodology. The discounted Wall Street analysts' price targets yielded an implied valuation range of $17.12 to $30.63 per share of Company Common Stock, with a median discounted price target of $27.93 per share of Company Common Stock.

The public market trading price targets published by Wall Street equity research analysts do not necessarily reflect current market trading prices for shares of Company Common Stock, and these estimates are subject to uncertainties, including the future financial performance of the Company and future financial market conditions.

*Comparable Company Analysis.*    Morgan Stanley reviewed and analyzed certain financial data of, and calculated selected public market trading metrics for, the Company and for public companies with

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523167

businesses that Morgan Stanley deemed to be similar to those of the Company. The following companies were reviewed in connection with this analysis:

*Diversified Publishing Companies*

- Belo Corp.
- Gannett Co., Inc.
- Media General, Inc.

*Pure Publishing Companies*

- Journal Register Company
- Lee Enterprises, Incorporated
- The New York Times Company
- The McClatchy Company

*Broadcasting Companies*

- Hearst-Argyle Television, Inc.
- LIN TV Corp.
- Gray Television, Inc.
- Sinclair Broadcast Group, Inc.

Morgan Stanley calculated the aggregate value (defined as equity value plus total book value of debt less cash, cash equivalents and the assumed value of unconsolidated assets) as of March 28, 2007 divided by estimated 2007 and 2008 earnings before interest, taxes, depreciation and amortization, or EBITDA, for comparable diversified publishing, pure publishing and broadcasting companies and for the Company. The estimates of 2007 and 2008 EBITDA for comparable diversified publishing, pure publishing and broadcasting companies were based on publicly available Wall Street equity research estimates as of March 28, 2007. The 2007 and 2008 EBITDA estimates for the Company were based on both the Research Case and the Management Plan.

A summary of the reference range of market trading multiples (which reflected Morgan Stanley's qualitative assessments of the market trading multiples for the Company and the comparable diversified

37

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

publishing, pure publishing and broadcasting companies) that Morgan Stanley derived is set forth below:

|  | Aggregate Value to: | |
| --- | --- | --- |
|  | 2007E EBITDA | 2008E EBITDA |
| **Tribune** | | |
| Research Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8.4x | 8.2x |
| Management Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8.4x | 8.0x |
| **Diversified Publishing Companies** | | |
| Belo Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8.7x | 7.6x |
| Gannett Co., Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8.0x | 7.9x |
| Media General, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7.8x | 6.9x |
| **Pure Publishing Companies** | | |
| Journal Register Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8.7x | 8.9x |
| Lee Enterprises, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8.6x | 8.6x |
| The New York Times Company . . . . . . . . . . . . . . . . . . . . . . . . | 8.4x | 8.2x |
| McClatchy Newspapers, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . | 7.1x | 7.1x |
| **Broadcasting Companies** | | |
| Hearst-Argyle Television Inc. . . . . . . . . . . . . . . . . . . . . . . . . . | 14.1x | 11.8x |
| LIN TV Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13.2x | 10.0x |
| Gray Television, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12.6x | 10.1x |
| Sinclair Broadcast Group, Inc. . . . . . . . . . . . . . . . . . . . . . . . . | 11.6x | 10.9x |

Based on the analysis of the relevant metrics for the Company under the Research Case and Management Plan and for each of the comparable companies, Morgan Stanley selected a reference range of EBITDA multiples of 8.0x to 8.5x for the Company and applied this range of multiples to the 2007 estimated EBITDA (excluding estimated cash flow from the Chicago Cubs) provided by the Company's management in the Management Plan. Morgan Stanley then calculated the Company's implied equity value by subtracting the value of the Company's net debt (approximately $5.1 billion as of December 31, 2006) and adding the value of the Company's unconsolidated assets ($2.2 billion). Based upon and subject to the foregoing, Morgan Stanley calculated an implied valuation range for Company Common Stock of $29.17 to $31.74 per share. Morgan Stanley also selected a reference range of EBITDA multiples of 7.5x to 8.0x for the Company's publishing segment and EBITDA multiples of 9.0x to 11.0x for the broadcasting segment. These ranges of multiples were applied to the 2007 estimated EBITDA for the publishing segment and the broadcasting segment (excluding estimated cash flow from the Chicago Cubs) contained in the Management Plan. Morgan Stanley then calculated the Company's implied equity value by subtracting the value of the Company's net debt (approximately $5.1 billion as of December 31, 2006) and adding the value of the Company's unconsolidated assets ($2.2 billion). Based upon and subject to the foregoing, Morgan Stanley calculated an implied valuation range for Company Common Stock of $28.97 to $33.89 per share.

In addition, Morgan Stanley calculated the equity market value divided by the estimated 2007 and 2008 net income for both the Company and the comparable companies. The estimates of 2007 and 2008 earnings for comparable diversified publishing, pure publishing and broadcasting companies were based on publicly available Wall Street equity research estimates as of March 28, 2007. The 2007 and 2008 earnings estimates for the Company were based on both the Research Case and the Management Plan.

Based on the analysis of the relevant metrics for the Company under the Research Case and Management Plan and for each of the comparable companies, Morgan Stanley selected a reference range of earnings per share, or EPS, multiples of 12.0x to 14.0x and applied this range of multiples to the 2007 estimated EPS provided by the Company's management in the Management Plan. Based upon

38

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0523169

and subject to the foregoing, Morgan Stanley calculated an implied valuation range for Company Common Stock of $24.00 to $28.00 per share.

No company utilized in the comparable company analysis is identical to the Company. In evaluating comparable diversified publishing, pure publishing and broadcasting companies and selecting the valuation multiples to apply, Morgan Stanley made qualitative judgments and assumptions with regard to industry performance, general business, economic, regulatory, market and financial conditions and other matters, many of which are beyond the control of the Company, such as the impact of competition on the businesses of the Company and the publishing and broadcasting industries generally, industry growth and the absence of any adverse material change in the financial condition and prospects of the Company or the industries or in the markets in general. Mathematical analysis (such as determining the average or median) is not in itself a meaningful method of using comparable company data.

*Precedent Transactions Analysis.*   Morgan Stanley reviewed and analyzed certain publicly available information, including the purchase price, and certain financial information of the target company, relating to selected private market precedent transactions involving other companies in the newspaper and television broadcasting industries and calculated certain valuation multiples implied by such information. Morgan Stanley chose transactions based on the similarity of the target companies to the Company. Morgan Stanley reviewed the last twelve months' EBITDA multiples, or LTM EBITDA, and analyzed historical multiples for the precedent transactions involving companies in the publishing industry. Morgan Stanley reviewed broadcast cash flow multiples, or BCF, and analyzed historical multiples for the precedent transactions in the broadcasting industry. The following acquisition transactions were reviewed in connection with this analysis:

*Newspaper Precedent Transactions*

- Star Tribune/Avista Capital Partners

- Philadelphia Inquirer and Philadelphia Daily News/Philadelphia Media Holdings, LLC

- The McClatchy Company/MediaNews Group, Inc. and Hearst Corporation

- Knight-Ridder, Inc./The McClatchy Company

*Television Broadcasting Precedent Transactions*

- The New York Times Company/Oak Hill Capital Partners

- Tribune Company/Sunbeam Television Corp.

- Tribune Company/Freedom Communications, Inc.

- Tribune Company/Gannett Co., Inc.

- Emmis Communications/Hearst-Argyle Television, Inc.

- NBC Universal/Media General, Inc.

Morgan Stanley then derived from the precedent transactions involving the newspaper industry a reference range of LTM EBITDA multiples of 7.0x to 9.0x, and from the precedent transactions involving television broadcasting companies a reference range of BCF multiples of 10.0x to 12.0x. These ranges of multiples were applied to the 2007 estimated EBITDA for the publishing and broadcasting segments (excluding estimated cash flow from the Chicago Cubs) provided by the Company's management in the Management Plan. Morgan Stanley then calculated the Company's implied equity value by subtracting the value of the Company's net debt (approximately $5.1 billion as of December 31, 2006) and adding the value of the Company's unconsolidated assets ($2.2 billion). Based

39

TRB0523170

upon and subject to the foregoing, Morgan Stanley calculated an implied valuation range for Company Common Stock of $28.76 to $39.03 per share.

Morgan Stanley further noted that the merger and acquisition transaction environment varies over time because of macroeconomic factors such as interest rate and equity market fluctuations and microeconomic factors such as industry results and growth expectations. Morgan Stanley noted that no company or transaction reviewed was identical to the Company or the Merger and that, accordingly, these analyses involve complex considerations and qualitative judgments concerning differences in financial and operating characteristics of the Company and each of the comparable companies, as well as other factors that would affect the acquisition values in the comparable transactions, including the size, regulatory and economic characteristics of the markets of each company and the competitive environment in which it operates. Mathematical analysis (such as determining the average or median) is not in itself a meaningful method of using comparable transaction data.

*Discounted Cash Flow Analysis.*    Morgan Stanley performed a five-year discounted cash flow analysis of the Company based upon each of the Management Plan, the Research Case, Downside Case A and Downside Case B.

Utilizing such projections, Morgan Stanley calculated the annual after-tax unlevered free cash flows for fiscal years 2007 through 2011. Morgan Stanley estimated a range of terminal values calculated in 2011 using a range of EBITDA multiples of 8.0x to 9.0x applied to the 2012 estimated EBITDA (excluding estimated cash flow from the Chicago Cubs). Morgan Stanley calculated the 2012 estimated EBITDA by multiplying the 2011 estimated EBITDA (excluding estimated cash flow from the Chicago Cubs) provided by the Company's management by the estimated 2011 percentage revenue growth contained in the Management Plan. Morgan Stanley then calculated the present value of the unlevered free cash flow streams and the estimated terminal value using a range of discount rates of 7.0% to 8.0%. The discount rate range was selected based on a weighted average cost of capital calculation which factored in research analysts' views on the Company's cost of capital and estimates provided by the capital-asset pricing model methodology. Morgan Stanley then calculated the Company's implied equity value by subtracting the value of the Company's net debt (approximately $5.1 billion as of December 31, 2006) and adding the value of the Company's unconsolidated assets ($2.2 billion). Based on the foregoing projections and assumptions, the discounted cash flow analysis yielded an implied valuation range of $28.25 to $33.96 per share utilizing the Management Plan, $28.75 to $34.45 per share utilizing the Research Case, $17.91 to $21.98 utilizing Downside Case A and $14.21 to $17.70 per share utilizing Downside Case B.

*Recapitalization Alternative.*    In conjunction with the foregoing valuation analyses, Morgan Stanley also evaluated a recapitalization scenario in which the Company would spin off its broadcasting segment to the Company's shareholders in the form of a newly created public company, or SpinCo, divest certain assets and use a leveraged debt capital structure to effect a return of capital to investors through a special cash dividend of $17.50.

In connection with its evaluation of a recapitalization, Morgan Stanley performed a discounted equity value analysis, which is designed to provide insight into the future price of a company's common equity as a function of the company's future EBITDA and future EBITDA multiples. The resulting value is subsequently discounted to arrive at a present value for the Company's stock price. Morgan Stanley assumed a $17.50 per-share return of capital to holders of Company Common Stock, implying pro-forma leverage of 6.8x consolidated adjusted LTM EBITDA. Morgan Stanley then calculated the post-recapitalization per-share value of Company Common Stock and the common stock of SpinCo utilizing the four operational cases described above: (i) the Management Plan, (ii) the Research Case, (iii) Downside Case A and (iv) Downside Case B. In each case, Morgan Stanley calculated the future stock price of both the Company and SpinCo at December 31, 2009 assuming a 2009 year-end forward EBITDA multiple of 7.5x to 8.0x for the Company and 9.0x to 11.0x for SpinCo. Morgan Stanley then discounted these future stock prices to present value at a cost of equity of 11.0%. The cost of equity

40

was estimated by Morgan Stanley using the capital-asset pricing model methodology. For each scenario, Morgan Stanley calculated the "Package Value" of the recapitalization alternative by adding the present value of the equity returns of the Company and SpinCo post-recapitalization to the total amount of capital returned to holders of Company Common Stock pursuant to the special cash dividend.

Based on the foregoing projections and assumptions, the discounted equity value analysis relating to a recapitalization implied the following Package Value ranges:

| | Implied Package Value Range; 7.5x Publishing Multiple | Implied Package Value Range; 8.0x Publishing Multiple |
|---|---|---|
| Management Plan . . . . . . . . . . . . . . . | $31.77-$34.55 | $33.13-$35.90 |
| Research Case . . . . . . . . . . . . . . . . . . | $31.37-$34.13 | $32.68-$35.44 |
| Downside Case A . . . . . . . . . . . . . . . . | $24.04-$26.24 | $25.08-$27.28 |
| Downside Case B . . . . . . . . . . . . . . . . | $21.18-$23.31 | $22.07-$24.20 |

In addition, Morgan Stanley reviewed the Package Values, assuming a 2009 year-end forward EBITDA multiple for the Company of 7.5x and for SpinCo of 9.0x, and compared such values with the base Merger Consideration and the present value of Merger Consideration received under Perspectives 1 and 2.

| | Package Value | Base Merger Consideration ($34.00); Implied Premium | Present Value of Merger Consideration in Perspective 1 ($33.23); Implied Premium | Present Value of Merger Consideration in Perspective 2 ($32.80); Implied Premium |
|---|---|---|---|---|
| Management Plan . . . . . . . | $31.77 | 7.0% | 4.6% | 3.2% |
| Research Case . . . . . . . . . | $31.37 | 8.4% | 5.9% | 4.6% |
| Downside Case A . . . . . . . | $24.04 | 41.4% | 38.2% | 36.4% |
| Downside Case B . . . . . . . | $21.18 | 60.5% | 56.9% | 54.9% |

*Other Factors.* In rendering its opinion, Morgan Stanley also reviewed and considered other factors, including:

- publicly available research analysts' estimates of the market value of the Company to a financial buyer that would effect a leveraged buyout of the Company. The research analysts' estimates ranged from $25 to $35, with a median of $34; and

- the mean and median premiums paid in public-to-private transactions with an aggregate value greater than $5 billion since 2004.

Morgan Stanley performed a variety of financial and comparative analyses for purposes of rendering its opinion. The preparation of a financial opinion is a complex process and is not susceptible to partial analysis or summary description. In arriving at its opinion, Morgan Stanley considered the results of all of its analyses as a whole and did not attribute any particular weight to any analysis or factor considered. Furthermore, Morgan Stanley believes that the summary provided and the analyses described above must be considered as a whole and that selecting any portion of the analyses, without considering all of them as a whole, would create an incomplete view of the process underlying Morgan Stanley's analyses and opinion. In addition, Morgan Stanley may have given various analyses and factors more or less weight than other analyses and factors, and may have deemed various assumptions more or less probable than other assumptions. As a result, the ranges of valuations resulting from any particular analysis or combination of analyses described above should not be taken to be the view of Morgan Stanley with respect to the actual value of Company Common Stock or the value of the successor company.

41

In performing its analyses, Morgan Stanley made numerous assumptions with respect to industry performance, general business, regulatory and economic conditions and other matters, many of which are beyond the control of Morgan Stanley or the Company. Any estimates contained in the analyses of Morgan Stanley are not necessarily indicative of future results or actual values, which may be significantly more or less favorable than those suggested by such estimates.

Morgan Stanley conducted the analyses described above solely as part of its analysis of the fairness from a financial point of view of the consideration to be received by unaffiliated holders of Company Common Stock pursuant to the Merger Agreement and in connection with the delivery of its opinion to the Special Committee and the Board. These analyses do not purport to be appraisals or to reflect the prices at which shares of Company Common Stock might actually trade.

The Merger Consideration was determined through arm's-length negotiations between the Company, the ESOP and the Zell Entity, was recommended by the Special Committee and was approved by the Board. Morgan Stanley provided advice to the Special Committee during these negotiations. Morgan Stanley did not, however, recommend any specific merger consideration to the Special Committee or that any specific merger consideration constituted the only appropriate merger consideration for the Merger.

The opinion of Morgan Stanley was one of the many factors taken into consideration by the Special Committee in making its determination to recommend the Merger Agreement and by the Board in making its determination to approve the Merger Agreement. Consequently, the analyses as described above should not be viewed as determinative of the opinion of the Special Committee or the Board with respect to the Merger Consideration or of whether the Special Committee would have been willing to recommend, or the Board would have been willing to agree to, different merger consideration. The foregoing summary does not purport to be a complete description of all of the analyses performed by Morgan Stanley.

Morgan Stanley is an internationally recognized investment banking and advisory firm. Morgan Stanley, as part of its investment banking business, is continuously engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and valuations for corporate, estate and other purposes. In the ordinary course of its trading, brokerage, investment management and financing activities, Morgan Stanley or its affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for its own account or the accounts of its customers, in debt or equity securities or senior loans of the Company or any other company or any currency or commodity that may be involved in the Merger.

Pursuant to an engagement letter, the Company has agreed to pay Morgan Stanley customary fees. A $2.5 million fee was payable at the beginning of the assignment, a $7.5 million fee became payable upon delivery of its opinion and the Special Committee has also agreed pursuant to the engagement letter to discuss with Morgan Stanley the payment of an additional discretionary fee payable at the sole discretion of the Special Committee. The terms of the engagement letter do not quantify the amount of the additional discretionary fee and the Special Committee has not yet determined whether to pay Morgan Stanley a discretionary fee or when such determination will be made. The Company has also agreed to reimburse Morgan Stanley for reasonable expenses incurred in performing its services. In addition, the Company has agreed to indemnify Morgan Stanley and its affiliates, their respective directors, officers, agents and employees and each person, if any, controlling Morgan Stanley or any of its affiliates against certain liabilities and expenses, including certain liabilities under the federal securities laws, related to or arising out of Morgan Stanley's engagement and any related transactions. In the past, Morgan Stanley and its affiliates have provided financial advisory and financing services for the Company and affiliates of the Zell Entity and have received fees for the rendering of these services. In addition, Morgan Stanley and its affiliates, directors or officers, including individuals working with

42

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

the Company in connection with the Merger, may have committed or may commit in the future to invest in investment funds managed by affiliates of the Zell Entity. Morgan Stanley may also seek to provide the Company, the ESOP, the Zell Entity or their affiliates services in the future and may receive fees in connection with such services. Morgan Stanley did not participate in the financing of the Leveraged ESOP Transactions or any of the alternative transactions considered by the Special Committee.

**Opinion of the Company's Financial Advisor**

The Board retained Merrill Lynch to act as its financial advisor in connection with the proposed Merger and to render an opinion as to whether the Merger Consideration to be received by the holders of shares of Company Common Stock pursuant to the Merger was fair, from a financial point of view, to the holders of shares of Company Common Stock, other than the ESOP and its affiliates and Zell and his affiliates.

On April 1, 2007, Merrill Lynch delivered its oral opinion, which opinion was subsequently confirmed in writing, to the Board to the effect that, as of such date and based upon the assumptions made, matters considered and limits of review set forth in its written opinion, the consideration of $34.00 per share in cash plus an annualized 8% "ticking fee" from January 1, 2008, up to and including the closing date of the Merger to be received by the holders of shares of Company Common Stock pursuant to the Merger is fair from a financial point of view to the holders of shares of Company Common Stock, other than the ESOP and its affiliates and Zell and his affiliates.

**The full text of the written opinion of Merrill Lynch, dated as of April 1, 2007, which sets forth the assumptions made, matters considered and limits on the scope of the review undertaken in connection with the opinion is attached as Annex C hereto. The summary of Merrill Lynch's opinion below is qualified by reference to the full text of the opinion, and we encourage you to read Merrill Lynch's opinion in its entirety. Merrill Lynch's opinion was intended for the use and benefit of the Board, does not address the merits of the underlying decision by the Company to engage in the Merger and does not constitute a recommendation to any holder of shares of Company Common Stock as to how such holder should vote on the Merger or any related matter.**

Merrill Lynch was not asked to address, nor does its opinion address, the fairness to, or any other consideration of, the holders of any class of securities, creditors or other constituencies of the Company, other than the holders of shares of Company Common Stock who receive the Merger Consideration (other than the ESOP and its affiliates and Zell and his affiliates).

In arriving at its opinion, Merrill Lynch:

- reviewed certain publicly available business and financial information relating to the Company that Merrill Lynch deemed to be relevant;

- reviewed certain information, including financial forecasts, relating to the business, earnings, cash flow, assets, liabilities and prospects of the Company furnished to Merrill Lynch by the Company;

- conducted discussions with members of senior management and representatives of the Company concerning the matters described in the first two bullet points above;

- reviewed the market prices and valuation multiples for shares of Company Common Stock prior to the Merger and compared them with those of certain publicly traded companies that Merrill Lynch deemed to be relevant;

- reviewed the results of operations of the Company and compared them with those of certain publicly traded companies that Merrill Lynch deemed to be relevant;

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0523174

- compared the proposed financial terms of the Merger with the financial terms of certain other transactions that Merrill Lynch deemed to be relevant;

- participated in certain discussions and negotiations among representatives of the Company, the ESOP and Zell, and their financial and legal advisors;

- reviewed a draft, dated as of April 1, 2007, of the Merger Agreement (it being understood that such draft was, in all material respects, in the form to be executed); and

- reviewed such other financial studies and analyses and took into account such other matters as Merrill Lynch deemed necessary, including its assessment of general economic, market and monetary conditions.

In preparing its opinion, Merrill Lynch assumed and relied upon the accuracy and completeness of all information supplied or otherwise made available to Merrill Lynch, discussed with or reviewed by or for Merrill Lynch, or publicly available, and Merrill Lynch did not assume any responsibility for independently verifying such information or undertaking an independent evaluation or appraisal of any of the assets or liabilities of the Company and was not furnished with any such evaluation or appraisal, nor did Merrill Lynch evaluate the solvency or fair value of the Company under any state or federal laws relating to bankruptcy, insolvency or similar matters. In addition, Merrill Lynch has not assumed any obligation to conduct any physical inspection of the properties or facilities of the Company. With respect to the financial forecast information furnished to or discussed with Merrill Lynch by the Company, Merrill Lynch assumed that they were reasonably prepared and reflected the best currently available estimates and judgment of the Company's management as to the expected future financial performance of the Company. Merrill Lynch also assumed that the final form of the Merger Agreement would be substantially similar to the last draft reviewed by it.

Merrill Lynch's opinion was necessarily based upon market, economic and other conditions as they existed and could be evaluated on, and on the information made available to Merrill Lynch as of, the date of its opinion. Merrill Lynch did not express an opinion on any aspects of any agreements to consummate the Merger or any other document referred to in the Merger Agreement to be entered into in connection with the transaction.

The following is a summary of the material financial and comparative analyses performed by Merrill Lynch that were presented to the Board in connection with its opinion. The following summary, however, does not purport to be a complete description of its presentations or the financial analyses performed by Merrill Lynch, nor does the order of the analyses described represent relative importance or weight given to those analyses by Merrill Lynch. The Company provided Merrill Lynch, and Merrill Lynch relied on as the basis for its analysis, a "Management Plan" and a "Sensitivity Plan." The Sensitivity Plan assumed a 2.0% decline in publishing revenues and declines in operating cash flow, and assumed no growth in broadcasting and entertainment operating cash flow.

Except as otherwise noted, the following quantitative information, to the extent that it is based on market data, is based on market data as it existed on or before March 26, 2007, and is not necessarily indicative of current market conditions.

### Review of 52-Week High and Low Market Prices for the Company Common Stock

Merrill Lynch observed the publicly available historical closing prices for shares of Company Common Stock, as reported by FactSet, and noted that over the 52-week period ended March 26, 2007, the low price was $27.09 per share and the high price was $34.28 per share.

44

TRB0523175

*Comparable Public Companies Analysis*

Using publicly available information, Merrill Lynch reviewed and analyzed certain financial information, ratios and public market multiples, where applicable, for the following publicly traded companies in the newspaper publishing and television broadcasting industries:

**Public Companies Reviewed**

*Newspaper Publishing*

- Gannett Co., Inc.
- Journal Communications, Inc.
- Journal Register Company
- Lee Enterprises, Incorporated
- The McClatchy Company
- Media General, Inc.
- The New York Times Company

*Television Broadcasting*

- Belo Corp.
- Gray Television, Inc.
- Hearst-Argyle Television, Inc.
- LIN TV Corp.
- Nexstar Broadcasting Group, Inc.
- Sinclair Broadcast Group, Inc.

As calculated based on a multiple of enterprise value to estimated 2007 EBITDA (earnings before interest, taxes, depreciation and amortization), the reference trading range for the Newspaper Publishing comparables in the aggregate was a minimum 2007 enterprise value to EBITDA multiple of 7.1x to a maximum of 9.4x, with a mean of 8.4x. As calculated based on a multiple of enterprise value to estimated 2007 EBITDA, the reference trading range for the Television Broadcasting comparables in the aggregate was a minimum 2007 enterprise value to EBITDA multiple of 8.6x to a maximum of 13.7x, with a mean of 11.8x. The multiples and ratios for the Company and each of the selected companies were calculated using their respective closing prices on March 26, 2007 and were based on the most recent publicly available information, Wall Street research and consensus estimates.

Based on the analysis of the relevant metrics for the Company under the Management Plan, Merrill Lynch selected a reference range of EBITDA multiples of 7.25x to 8.75x for the Company's publishing segment, and EBITDA multiples of 8.5x to 10.0x for the broadcasting and entertainment segment. These ranges of multiples were applied to the 2007 estimated EBITDA for the Company's publishing segment and the 2007 estimated EBITDA for the Company's broadcasting and entertainment segment (excluding cash flows from the Chicago Cubs baseball team) contained in the Management Plan. Merrill Lynch then calculated the Company's implied equity value by subtracting the value of the Company's net debt (approximately $5.1 billion as of December 31, 2006) and adding the value of the Company's unconsolidated assets (on an after-tax basis for Comcast SportsNet Chicago) and the after-tax value of the Chicago Cubs baseball team. Based upon and subject to the foregoing,

45

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523176

Merrill Lynch calculated an implied valuation range for Company Common Stock of $27.25 to $35.00 per share.

Although none of the selected companies is directly comparable to the Company, the companies included were selected by Merrill Lynch because they are publicly traded companies with operations that for purposes of analysis Merrill Lynch considered similar to certain operations of the Company. Accordingly, a complete analysis of the results of the following calculations cannot be limited to a quantitative review of such results and involves complex considerations and judgments concerning the differences in the financial and operating characteristics of the comparable companies and other factors that could affect the public share prices of the comparable companies, as well as the price of shares of Company Common Stock.

### Discounted Cash Flow Analysis

Merrill Lynch performed a discounted cash flow ("DCF") analysis on the Company, based on projections provided by the Company's management.

The DCF analysis was performed in order to evaluate the fully diluted equity value per share of Company Common Stock. Merrill Lynch calculated illustrative implied equity value per share by calculating (a) the sum of (i)(A) the illustrative present value indications of unlevered free cash flows for the Company for the years 2007 through 2011 using discount rates ranging from 8% to 9%, based on the estimated cost of capital of the Company, which included consideration of historical rates of return for publicly traded common stocks, risks inherent in the industry and specific risks associated with the continuing operations of the Company on a standalone basis, and (B) the present value of the illustrative terminal value using estimated 2011 EBITDA based on terminal EBITDA multiples ranging from 7.25x to 8.25x, and using discount rates ranging from 8% to 9%, and (C) the value of the Company's unconsolidated assets (on an after-tax basis for Comcast SportsNet Chicago) and the after-tax value of the Chicago Cubs baseball team less (ii) the Company's net debt of $5.1 billion as of December 31, 2006, divided by (b) total outstanding diluted shares of Company Common Stock.

The DCF analysis yielded an implied equity value per diluted share ranging from $26.50 to $33.00 based on the Management Plan and an implied equity value per diluted share of $17.50 to $22.75 based on the Sensitivity Case.

### After-Tax Sum-of-the-Parts Analysis

Merrill Lynch performed an illustrative after-tax sum-of-the-parts analysis on the Company using certain financial forecasts for the Company provided by the management of the Company. In the illustrative after-tax sum-of-the-parts analysis, Merrill Lynch calculated illustrative per-share value indications for the Company on an after-tax basis assuming the sale of Company's broadcasting and entertainment segment followed by a sale of the publishing segment.

In the illustrative after-tax sum-of-the-parts analysis, Merrill Lynch calculated illustrative implied equity value per share by calculating: (a)(i) the sum of (A) the illustrative after-tax present value indications of unlevered free cash flows for broadcasting and entertainment for the years 2007 through 2011 using discount rates ranging from 8% to 9%, based on the estimated cost of capital of the Company, which included consideration of historical rates of return for publicly traded common stocks, risks inherent in the industry and specific risks associated with the continuing operations of the Company on a standalone basis, and (B) the after-tax present value of the illustrative terminal value using estimated 2011 broadcasting EBITDA based on terminal EBITDA multiples ranging from 8.0x to 9.0x, and using discount rates ranging from 8% to 9%, and (C) the illustrative present value indications of unlevered free cash flows for the publishing segment for the years 2007 through 2011 using discount rates ranging from 8% to 9%, and (D) the present value of the illustrative terminal value using estimated 2011 publishing EBITDA based on terminal EBITDA multiples ranging from 7.0x to 8.0x,

46

and using discount rates ranging from 8% to 9%, and (E) the value of the Company's unconsolidated assets (on an after-tax basis for Comcast SportsNet Chicago and the TV Food Network) and the after-tax value of WGN-AM Radio and the Chicago Cubs baseball team less (ii) the Company's net debt of $5.1 billion as of December 31, 2006, divided by (b) total diluted shares outstanding of Company Common Stock.

This analysis resulted in a range of illustrative values per share of Company Common Stock of $26.00 to $31.00.

The summary set forth above describes the material analyses performed by Merrill Lynch but does not purport to be a complete description of the analyses performed by Merrill Lynch in arriving at its opinion. The preparation of a financial opinion is a complex process and is not necessarily susceptible to partial or summary description. Accordingly, Merrill Lynch believes that its analyses must be considered as a whole and that selecting portions of its analyses and the factors considered by Merrill Lynch, without considering all analyses and factors, could create an incomplete view of the process underlying the Merrill Lynch opinion. Merrill Lynch did not assign relative weights to any of its analyses in preparing its opinion. The matters considered by Merrill Lynch in its analyses were based on numerous macroeconomic, operating and financial assumptions with respect to industry performance, general business and economic conditions and other matters, many of which are beyond the Company's and Merrill Lynch's control, and involve the application of complex methodologies and educated judgments. In addition, no company utilized as a comparison in the analyses described above is identical to the Company.

Merrill Lynch is acting as financial advisor to the Company in connection with the Merger, and will assist the Company in arranging a portion of the financing for the Merger. Total advisory and financing fees payable to Merrill Lynch (before syndication costs, capital allocation costs and financing credits) aggregate approximately $70 million, of which approximately $37 million are contingent on the Merger closing and approximately $33 million relate to financing the Tender Offer. In addition, the Company has agreed to indemnify Merrill Lynch for certain liabilities arising out of its engagement. Merrill Lynch is a participant in the Company's credit facilities which will be refinanced in connection with the transaction and anticipates that it will be a participant in such refinancing. Merrill Lynch has, in the past, provided financial advisory and financing services to the Company and/or its affiliates and Zell and/or his affiliates and may continue to do so and has received, and may receive, fees for the rendering of such services. In addition, in the ordinary course of business, Merrill Lynch may actively trade shares of Company Common Stock and other securities of the Company for its own account and for the accounts of customers and, accordingly, may at any time hold a long or short position in such securities.

**Opinion of Valuation Research Corporation**

The Company has engaged VRC to conduct and provide solvency and capital adequacy analyses and solvency and capital adequacy opinions to the Company after giving effect to the Step One Transactions (as defined below), and subsequent solvency and capital adequacy analyses and solvency and capital adequacy opinions in connection with the Merger and related transactions. The Company selected VRC based on its qualifications, expertise and reputation in providing valuation and solvency opinions.

On May 9, 2007, VRC made a presentation to the Board and, on May 9, 2007 and on May 24, 2007, VRC provided the Board with written opinions stating that, as of such dates: (1) immediately before giving effect to the consummation of the Step One Transactions, each of the Fair Value and Present Fair Saleable Value of the aggregate assets (including goodwill) of Tribune exceeds its liabilities (including the Stated Liabilities and the Identified Contingent Liabilities) (the "Capital Reduction Test"); (2) immediately after and giving effect to the consummation of the Step One Common Stock

47

TRB0523178

Purchase, each of the Fair Value and Present Fair Saleable Value of the aggregate assets (including goodwill) of the Company will exceed its liabilities (including the Stated Liabilities, the Identified Contingent Liabilities and the New Financing), and such excess is in an amount that is not less than the capital of the Company (as determined pursuant to Section 154 of the Delaware General Corporation Law) (the "Valuation and Capital Adequacy Test"); (3) immediately after and giving effect to the consumation of the Step One Transactions, the Company will be able to pay its debts (including the Stated Liabilities, the Identified Contingent Liabilities and the New Financing) (each as defined below), as such debts mature or otherwise become absolute or due (the "Cash Flow Test"); and (4) immediately after and giving effect to the consummation of the Step One Transactions, the Company Does Not Have Unreasonably Small Capital (as defined below) (the "Capitalization Test").

The full text of VRC's written opinions, dated as of May 9, 2007 and May 24, 2007, which set forth the assumptions made, procedures followed, matters considered and qualifications and limitations of the reviews undertaken in rendering its opinions, are attached as Exhibits (c)(11) and (c)(13), respectively, to the Schedule 13E-3, and the written presentation materials provided by VRC to the Board on May 9, 2007 are attached as Exhibit (c)(12) to the Schedule 13E-3, and incorporated herein by reference. The summary below is qualified by reference to the full text of the opinions and the written presentation. We encourage you to read the full text of the opinions in their entirety. VRC's opinions are directed to the Board, address only the matters set forth therein and do not constitute a recommendation to any shareholder of the Company as to how such shareholder should vote or act on any matters relating to the Merger.

Furthermore, VRC's opinions do not represent an assurance, guarantee or warranty that the Company will not default on any of its debt obligations or other liabilities in either the Step One Transactions or Step Two Transactions (as defined below), nor do the opinions provide any assurance, guarantee or warranty that any covenants, financial or otherwise, associated with any financing will not be breached in the future.

In its presentation to the Board on May 9, 2007, VRC reviewed the Valuation and Capital Adequacy Test, the Cash Flow Test, the Capitalization Test and the Capital Reduction Test. In connection with the Valuation and Capital Adequacy Test, VRC estimated the Fair Value and Present Fair Saleable Value of the Company by using comparable companies, comparable transactions, sum of individual assets and discounted cash flow valuation methodologies. VRC estimated Fair Value and Present Fair Saleable Value ranges of approximately $13.9 billion to $16.4 billion for the Company's aggregate assets including goodwill, with a midpoint of $15.1 billion. For VRC's analysis, aggregate assets including goodwill is represented by enterprise value. VRC's corresponding estimates for the Company's equity value as a percent of enterprise value ranged from a low of 32.5 percent to a high of 42.8 percent, with a midpoint of 38.1 percent. With respect to the Cash Flow Test, VRC estimated net cash flow, after scheduled debt repayments, of $211.0 million, $175.0 million, $437.1 million, $67.1 million, $553.2 million, $611.2 million and $579.7 million in 2007 through 2013, respectively. It also reviewed sensitivity cash flow cases showing lower, but still positive, cash flows after scheduled debt repayments in all years from 2007 to 2013 except 2010. In the 2010 sensitivity cash flow case, VRC estimated that the Company would have to draw down approximately $82.6 million on its revolving credit facility. However, VRC believes that the Company maintains adequate liquidity in the 2010 sensitivity cash flow case by maintaining an estimated $174.7 million of cash and $667.4 million of availability under its $750 million revolving credit facility. With respect to the Capitalization Test, VRC discussed the post-transaction relative equity value of the Company, as well as various sensitivity tests it had conducted. It estimated a post-transaction equity value range of approximately $4.5 billion to $7.0 billion. With respect to the Capital Reduction Test, VRC estimates the Company's equity value as a percent of enterprise value ranged from a low of 69.4 percent to a high of 74.0 percent, with a midpoint of 71.9 percent.

48

TRB0523179

In rendering its opinions, VRC estimated the Fair Value and Present Fair Saleable Value of the aggregate assets of the Company on a consolidated basis immediately after and giving effect to the consummation of the following transactions: (1) the purchase by the Zell Entity of newly issued Company Common Stock for an aggregate purchase price of $50 million in cash and an exchangeable note for a purchase price of $200 million in cash, (2) the ESOP Purchase Agreement, (3) the borrowing by the Company of debt of approximately $7.0 billion under the First Step Credit Facilities, (4) the Tender Offer, (5) the refinancing of existing debt of approximately $2.4 billion in accordance with the First Step Credit Facilities, (6) the roll-over of certain existing debt of approximately $2.4 billion and (7) the payment of financing and other transaction fees of approximately $152 million (collectively, the "Step One Transactions"). For purposes of VRC's opinions, the following terms have the meanings set forth below:

(1) "Fair Value" means the amount at which the aggregate or total assets of the Company would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, neither being under any compulsion to act.

(2) "Present Fair Saleable Value" means with respect to the assets of the Company, the amount that may be realized if such aggregate assets are sold with reasonable promptness.

(3) "Does Not Have Unreasonably Small Capital" means, with respect to the Company, that the Company does not lack sufficient capital for the businesses in which it is engaged, and will be engaged, as management has indicated such businesses are now conducted and are proposed to be conducted.

(4) "Stated Liabilities" means, the recorded liabilities of the subject entity as presented on the most recent balance sheet provided to VRC, which excludes the New Financing (as defined below).

(5) "Step Two Transactions" means: (i) the borrowing by the Company of additional debt of approximately $4.2 billion; (ii) the repayment by the Company of the exchangeable note acquired by the Zell Entity under the Zell Entity Purchase Agreement; (iii) the closing of the Merger; (iv) the purchase by the Zell Entity from the Company of a subordinated note for $225 million and the purchase by the Zell Entity of the Warrant; (v) the roll-over of certain existing debt of approximately $9.1 billion; (vi) the payment of cash distributions triggered by a change of control of approximately $104 million; (vii) the payment of financing and other transaction fees of approximately $120 million; (viii) the election of an S-Corporation status following the Merger; and (ix) the disposition of an interest in the Chicago Cubs and in Comcast SportsNet Chicago.

(6) "New Financing" means the indebtedness incurred, assumed or guaranteed by the Company in connection with the Step One Transactions.

(7) "Identified Contingent Liabilities" means the reasonably estimated contingent liabilities that may result from threatened or pending litigation, asserted claims and assessments, environmental conditions, guaranties, indemnities, contract obligations, uninsured risks, purchase obligations, taxes and other contingent liabilities as identified and explained to VRC by the Company in terms of their nature, expected timing and estimated dollar amount by responsible officers of the Company.

VRC's opinions were based on, among other things, its solvency and capital adequacy analyses following a review of certain of the Company's public filings, discussions with management, review of industry data and review of information provided by the Company, including the forecasts reflected in VRC's written presentation which is attached as Exhibit (c)(12) to the Schedule 13E-3.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523180

In rendering its opinions, VRC assumed and relied upon the accuracy and completeness of all information, data and other material (including certain financial forecasts) furnished or otherwise made available to it by the Company, discussed with or reviewed by VRC with the Company, or publicly available, and VRC did not assume any responsibility for independently verifying such information, data or materials. Nothing came to the attention of VRC to lead it to believe that it was unreasonable for VRC to utilize and rely upon such financial forecasts, information and data.

VRC's opinions were based on, among other things, the assumptions that: (1) the Company will be able to refinance debts when they mature and that it will not make acquisitions or dispositions other than those assumed during the forecast period based on the financial forecasts provided to VRC; and (2) that the Step One Transactions will be consummated in accordance with the terms and conditions of the ESOP Transaction Model dated April 2007, term sheets or Step One Transactions agreements provided to VRC and that the Company is in compliance in all material respects with any and all applicable laws, rules or regulations of any and all legal or regulatory authorities.

The Company also expects that VRC will provide a solvency opinion in connection with the Merger. The Company's receipt of a satisfactory solvency opinion giving effect to the Merger and related transactions is a condition to consummation of the Merger. See "The Merger Agreement—Conditions to the Merger." The Company will pay VRC fees of $1.5 million for services rendered in connection with delivering these opinions plus expenses.

In 2006, VRC provided real estate appraisal services to the Company in connection with the restructuring of the TMCT LLCs, for which it was paid customary fees.

## Purposes and Reasons of the ESOP and Merger Sub

For the ESOP and Merger Sub, the primary purpose for the Merger is to benefit from any future earnings and growth of the Company after shares of the Company cease to be publicly traded. The transaction structure will have the effect of the Company becoming a privately held company wholly owned by the ESOP.

## Purposes and Reasons of the Zell Investors

For Samuel Zell, the Zell Entity and Sam Investment Trust (which are collectively referred to as the "Zell Investors"), the purpose of the Leveraged ESOP Transactions, including the Merger, is to allow the Zell Entity to benefit from increases in value of the Company through the Zell Entity's ownership of the Warrant and to allow the Zell Entity to earn an interest return on the $225 million subordinated promissory note. The Zell Investors believe that the Company's future business prospects can be improved through the active participation of Mr. Zell in the strategic direction and operations of the Company and through the Company's experienced management team.

The Zell Investors believe that it is best for the Company to operate as a privately held entity. As a privately held entity, the Company will have the flexibility to focus on continuing improvements to its business without the constraints, distractions and expenses associated with publicly held companies, especially in light of the fundamental changes occurring in publishing and in the media industry generally. In addition, as an entity whose common stock is not publicly traded, the Company will be able to more easily make strategic decisions that may negatively affect short-term financial performance but that may, in the long run, increase the value of the Company because it is often difficult for a public company to make decisions that could negatively affect it in the short term when the result of those decisions is often a reduction in the per-share price of the publicly traded equity securities of such company. As a result of the Company Common Stock being privately held, the Company will also enjoy certain additional efficiencies, such as a reduction of the time devoted by its management and certain other employees to compliance with certain SEC reporting requirements.

50

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

In addition, the Zell Investors expect that the Company will derive significant cost and tax savings from the favorable tax treatment available to the Company following the Leveraged ESOP Transactions upon the Company's election to become an S-corporation for federal income tax purposes and the proposed elimination of the Company's 401(k) cash contributions following the creation of the ESOP.

The Zell Investors' expectations are based upon publicly available information regarding the Company, their due diligence, investigation or knowledge of the Company, and the experience of the Zell Investors and their affiliates in investing in or managing companies generally. While the Zell Investors believe that there will be significant opportunities associated with the Zell Entity's investment in the Company, and that the value of its Warrant could become considerably greater than the original cost thereof, they realize that there also are substantial and significant risks that such opportunities may never be fully realized.

**Position of the ESOP and Merger Sub as to Fairness**

The rules of the SEC require the ESOP and Merger Sub to express their belief as to the fairness of the Leveraged ESOP Transactions, including the Tender Offer and the Merger, to the Company's shareholders who are not affiliated with the ESOP. The view of the ESOP and Merger Sub as to the fairness of the Leveraged ESOP Transactions, including the Tender Offer and the Merger, should not be construed as a recommendation to any shareholder as to how such shareholder should vote on the proposal to adopt the Merger Agreement and approve the Merger.

The Trustee for the ESOP negotiated the terms of a transaction that would be most favorable to the ESOP and Merger Sub, and not to shareholders of the Company and, accordingly, it did not negotiate the Merger Agreement and other agreements relating to the Leveraged ESOP Transactions with the goal of obtaining terms that were fair to the Company's unaffiliated shareholders. The ESOP and Merger Sub did not participate in the deliberations of the Board or the Special Committee regarding, or receive advice from the Company's or the Special Committee's legal or financial advisors as to, the substantive and procedural fairness of the Leveraged ESOP Transactions, including the Tender Offer and the Merger, nor did the ESOP or Merger Sub undertake any independent evaluation of the fairness of the Leveraged ESOP Transactions, including the Tender Offer and the Merger, to the Company's unaffiliated shareholders, or engage a financial advisor for such purposes. The ESOP and Merger Sub believe, however, that the Leveraged ESOP Transactions, including the Tender Offer and the Merger, are fair to the Company's unaffiliated shareholders based on the following factors:

- the consideration offered in the Tender Offer and the Merger of $34.00 per share represents a premium of approximately 5.9% to the closing price of Company Common Stock on March 30, 2007, the last trading day before the proposal was made public, and approximately 12.5% to the average closing price of Company Common Stock for the 30 calendar day period ending on March 30, 2007 and approximately 9.5% to the average closing price for the 52 weeks ended March 30, 2007;

- the $34.00 per share consideration offered in the Tender Offer and the Merger and other terms and conditions of the Merger Agreement resulted from extensive arm's-length negotiations among the Special Committee and its advisors, the ESOP and its advisors, and the Zell Entity and its advisors;

- the Merger is conditioned upon the approval of the holders of a majority of the outstanding shares; the ESOP and Merger Sub assume that the Company's shareholders are capable of evaluating the fairness of the Merger Consideration and further assumes that an informed decision by holders of a majority of outstanding shares provides meaningful procedural protections for the Company's shareholders;

51

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

- the Special Committee consists solely of directors who are not officers or significant shareholders of the Company, or affiliated with the ESOP or its affiliates, or the Zell Entity or its affiliates;

- the Special Committee determined that the Merger Agreement, the Tender Offer and the Merger are fair to the unaffiliated shareholders of the Company and in the best interests of such shareholders;

- the Board determined, based on the recommendation of the Special Committee, that the Merger Agreement, the Tender Offer and the Merger are fair to the unaffiliated shareholders of the Company and in the best interests of such shareholders;

- the Tender Offer provided, and the Merger will provide, consideration to the shareholders entirely in cash, which provides certainty of value;

- the Special Committee and the Board received the advice of financial and legal advisors, each of which has extensive experience in going-private transactions; the Special Committee retained and received financial advice from Morgan Stanley, and the Board retained and received financial advice from Citi and Merrill Lynch, which included receipt of the fairness opinions referred to above under "Special Factors—Opinion of the Special Committee's Financial Advisor" and "Special Factors—Opinion of the Company's Financial Advisor;" the Company and the Board retained and received legal advice from Wachtell, Lipton, Rosen & Katz, from Sidley Austin LLP and, for ESOP matters, from McDermott Will & Emery; and the Special Committee retained and received legal advice from Skadden, Arps, Slate, Meagher & Flom LLP;

- the fact that the ESOP and Merger Sub did not participate in the deliberative process of, or the conclusions reached by, the Special Committee or the negotiating positions of the Special Committee;

- the fact that appraisal rights under Delaware law are available to holders of shares of Company Common Stock who do not vote in favor of the Merger and comply with all of the required procedures under Delaware law, which provides shareholders who dispute the fairness of the Merger Consideration with an opportunity to have a court determine the fair value of their shares, which may be more than, less than, or the same as the amount such shareholders would have received under the Merger Agreement; and

- the fact that the Merger Agreement allows the Board or the Special Committee to withdraw or change its recommendation of the Merger Agreement, and to terminate the Merger Agreement and to accept a Superior Proposal (as described below under "The Merger Agreement"), subject to a payment by the Company to the Zell Entity of a $25 million termination fee.

The ESOP and Merger Sub did not consider the liquidation value or net book value of the Company. The foregoing discussion of the information and factors known by the ESOP and Merger Sub in connection with the fairness of the Tender Offer and the Merger is not intended to be exhaustive and the ESOP and Merger Sub assigned no relative weights to the individual factors.

**Position of the Zell Investors as to Fairness**

The rules of the SEC may require the Zell Investors to express their belief as to the fairness of the Leveraged ESOP Transactions, including the Tender Offer and the Merger, to the Company's shareholders who are not affiliated with the Zell Investors. The view of the Zell Investors as to the fairness of the Leveraged ESOP Transactions, including the Tender Offer and the Merger, should not be construed as a recommendation to any shareholder as to how such shareholder should vote on the proposal to adopt the Merger Agreement and approve the Merger.

52

The Zell Investors negotiated the terms of a transaction that would be most favorable to the Zell Investors, and not to shareholders of the Company and, accordingly, they did not negotiate the Merger Agreement and other agreements relating to the Leveraged ESOP Transactions with the goal of obtaining terms that were fair to the Company's unaffiliated shareholders. The Zell Investors did not participate in the deliberations of the Board or the Special Committee regarding, or receive advice from the Company's or the Special Committee's legal or financial advisors as to, the substantive and procedural fairness of the Leveraged ESOP Transactions, including the Tender Offer and the Merger, nor did the Zell Investors undertake any independent evaluation of the fairness of the Leveraged ESOP Transactions, including the Tender Offer and the Merger, to the Company's unaffiliated shareholders, engage a financial advisor for such purposes, or receive any report, opinion or appraisal from any financial advisor for such purposes. The Zell Investors believe, however, that the proposed Leveraged ESOP Transactions, including the Tender Offer and the Merger, are fair to the Company's unaffiliated shareholders based on the following factors:

- the consideration offered in the Tender Offer and the Merger of $34.00 per share represents a premium of approximately 5.9% to the closing price of Company Common Stock on March 30, 2007, the last trading day before the proposal was made public, approximately 12.5% to the average closing price of Company Common Stock for the 30 calendar day period ending on March 30, 2007 and approximately 9.5% to the average closing price for the 52 weeks ended March 30, 2007;

- the $34.00 per share consideration offered in the Tender Offer and the Merger and other terms and conditions of the Merger Agreement resulted from extensive arm's-length negotiations among the Special Committee and its advisors, the ESOP and its advisors, and the Zell Entity and its advisors;

- the Tender Offer provided and the Merger will provide consideration to the shareholders entirely in cash, which provides certainty of value;

- the fact that the Company had publicly disclosed numerous times its willingness to consider strategic alternatives, including a merger or a recapitalization;

- the Merger is conditioned upon the approval of the holders of a majority of the outstanding shares; the Zell Investors assume that the Company's shareholders are capable of evaluating the fairness of the Merger and further assume that an informed decision by holders of a majority of outstanding shares provides meaningful procedural protections for the Company's shareholders;

- the Special Committee consists solely of directors who are not officers or significant shareholders of the Company, or affiliated with the ESOP or its affiliates, or the Zell Investors or their affiliates;

- the Special Committee determined that the Merger Agreement, the Tender Offer and the Merger are fair to the unaffiliated shareholders of the Company and in the best interests of such shareholders;

- the Board determined, based on the recommendation of the Special Committee, that the Merger Agreement, the Tender Offer and the Merger are fair to the unaffiliated shareholders of the Company and in the best interests of such shareholders;

- the Special Committee and the Board received the advice of financial and legal advisors, each of which has extensive experience in going-private transactions; the Special Committee retained and received financial advice from Morgan Stanley, and the Board retained and received financial advice from Citi and Merrill Lynch, which included receipt of the fairness opinions referred to above under "Special Factors—Opinion of the Special Committee's Financial Advisor" and "Special Factors—Opinion of the Company's Financial Advisor"; the Company and the Board

53

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

retained and received legal advice from Wachtell, Lipton, Rosen & Katz, from Sidley Austin LLP and, for ESOP matters, from McDermott Will & Emery; and the Special Committee retained and received legal advice from Skadden, Arps, Slate, Meagher & Flom LLP;

- the fact that the Zell Investors did not participate in the deliberative process of, or the conclusions reached by, the Special Committee or the negotiating positions of the Special Committee;

- the fact that appraisal rights under Delaware law are available to holders of shares of Company Common Stock who do not vote in favor of the Merger and comply with all of the required procedures under Delaware law, which provides shareholders who dispute the fairness of the Merger Consideration with an opportunity to have a court determine the fair value of their shares, which may be more than, less than, or the same as the amount such shareholders would have received under the Merger Agreement; and

- the fact that the Merger Agreement allows the Board or the Special Committee to withdraw or change its recommendation of the Merger Agreement, and to terminate the Merger Agreement and to accept a Superior Proposal (as described below under "The Merger Agreement"), subject to a payment by the Company to the Zell Entity of a $25 million termination fee.

The Zell Investors did not consider liquidation value of the Company as a relevant methodology because they considered the Company to be a viable, going concern. Further, the Zell Investors did not consider net book value, which is an accounting concept, as a factor because they believed that net book value is not a material indicator of the value of the Company as a going concern but rather is indicative of historical costs. The foregoing discussion of the information and factors known by the Zell Investors in connection with the fairness of the Tender Offer and the Merger is not intended to be exhaustive and the Zell Investors assigned no relative weights to the individual factors.

As described below under "Other Transaction Agreements—Zell Entity Purchase Agreement," pursuant to the Zell Entity Purchase Agreement, until the earlier of (1) the date of consummation of the Merger and (2) the date on which the Merger Agreement is terminated, the Zell Entity has agreed to vote all of the shares of Company Common Stock that it beneficially owns in favor of the adoption of the Merger Agreement and approval of the transactions contemplated thereby, including the Merger.

**Certain Effects of the Merger**

If the conditions to the Merger are met and the Merger closes, the Company will become wholly owned by the ESOP and all remaining shares of Company Common Stock, other than shares held by the ESOP and shares held by shareholders who validly exercise any appraisal rights that may be available under Delaware law, will be converted into the right to receive $34.00 per share in cash. If the Merger does not close by January 1, 2008, shareholders will receive an additional 8% annualized "ticking fee," calculated from January 1, 2008 through the date of closing of the Merger. In the Merger, the Zell Entity will receive this Merger Consideration for the shares of Company Common Stock it owns and, to the extent not already repaid or converted, the Company will repay the exchangeable promissory note held by the Zell Entity immediately prior to the Merger. In the Merger, Zell will receive the Merger Consideration for the shares of Company Common Stock that he owns. In the Merger, all of the shares of Company Common Stock held by the ESOP will be cancelled and the shares of Merger Sub (all of which are owned by the ESOP) will convert into an aggregate of 56,521,739 shares of common stock of the Company (all of which will be held by the ESOP).

In addition, in the Merger, each outstanding Company stock option, each share of restricted Company Common Stock and each right of any kind to receive shares of Company Common Stock or benefits measured in whole or in part by the value of shares of Company Common Stock granted

54

under Company stock or benefit plans will become fully vested and cashed out as described below under "The Merger Agreement—Stock Options and Other Stock-Based Awards; Employee Benefits."

Immediately following the consummation of the Merger, the Zell Entity will purchase from the Company, for an aggregate purchase price of $315 million, a $225 million subordinated promissory note and the Warrant. The Warrant will entitle the Zell Entity to purchase 43,478,261 shares of Company Common Stock (subject to adjustment), which will represent approximately 40% of the economic equity interest in the Company immediately following the Merger (on a fully diluted basis, including after giving effect to share equivalents under a management equity incentive plan). The Warrant will have an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first ten years of the Warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment).

As of the record date for the special meeting, the ESOP owns approximately 7% of the outstanding shares of Company Common Stock, the Zell Entity owns approximately 1.2% of the outstanding shares of Company Common Stock (which does not include the 5,882,353 shares of Company Common Stock underlying the exchangeable promissory note held by the Zell Entity) and Zell owns less than 1% of the outstanding shares of Company Common Stock. Immediately upon completion of the Leveraged ESOP Transactions, the ESOP will own approximately 52% of the fully diluted equity of the Company, and the Zell Entity will own a Warrant to purchase approximately 40% of the fully diluted equity of the Company, in each case (1) after giving effect to the grant of share equivalent awards expected to be made to certain members of management and other key employees as described below under "Special Factors—Interest of Directors and Executive Officers—Proposed Tribune Management Equity Incentive Plan" but (2) without giving effect to the issuance of shares of new Series E Preferred Stock of the Company to the Eagle Entities as described below under "The Merger Agreement—Eagle Exchange." As shareholders and Warrant holders, as the case may be, the ESOP and the Zell Entity do not and will not have any direct interest in or ability to access the Company's net book value or net income. In addition, as described below under "Special Factors—Financing," the Credit Agreement (as defined below) provides that a condition to the consummation of the Merger will be the execution by the Zell Entity of an agreement, guaranteed by Zell, providing that the Zell Entity will invest up to an additional $100 million in Company Common Stock or subordinated debt of the Company in certain circumstances. The Company's net book value was $4,304 million as of April 1, 2007. The Company's net income for the fiscal year ended December 31, 2006 was $594.0 million, and its net loss for the three months ended April 1, 2007 was $23.3 million.

The Merger will also have the following additional effects:

*Participation in Future Growth.* If the Merger is completed, you will not have the opportunity to participate in the future earnings, profits and growth of the Company and will not have the right to vote on corporate matters relating to the Company. Similarly, you will not face the risk of a decline in the value of the Company after the completion of the Merger.

*Effect on the Market for Shares of Company Common Stock.* If the Merger is completed, the number of shares of Company Common Stock that might otherwise trade publicly will be reduced to zero and the number of holders of shares of Company Common Stock will be reduced to one.

*Delisting of the Shares of Company Common Stock on the NYSE.* The shares of Company Common Stock are currently listed on the NYSE. The Company intends to have the shares delisted as soon as possible after completion of the Merger.

*Deregistration of the Shares of Company Common Stock under the Exchange Act.* The shares of Company Common Stock are currently registered under the Exchange Act. Registration may be terminated by the Company upon application to the SEC if the outstanding shares are not listed on a national securities exchange and if there are fewer than 300 holders of record of shares. Termination of the registration of the shares under the Exchange Act would substantially reduce the information

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523186

required to be furnished by the Company to its shareholders and would make certain provisions of the Exchange Act no longer applicable to the Company. These include the short-swing profit recovery provisions of Section 16(b) and the requirement to furnish proxy statements in connection with shareholders' meetings pursuant to Section 14(a) and the related requirement to furnish an annual report to shareholders. The Company intends to apply for termination of registration of the Company's shares as soon as possible after completion of the Merger. However, even if the registration of the shares of Company Common Stock under the Exchange Act is terminated, the Company has debt securities the offer of which was registered under the Securities Act of 1933, and certain of which are listed on the NYSE, and, so long as those securities remain outstanding, the Company will continue to have reporting obligations under the Exchange Act.

*Margin Regulations.*   Shares of Company Common Stock are currently "margin securities" under the regulations of the Board of Governors of the Federal Reserve System, which means that, among other things, brokers may extend credit on the collateral of the shares for purposes of buying, carrying or trading in securities. Depending upon factors such as the number of record holders of the shares and the number and market value of publicly held shares, following the purchase of shares pursuant to the Merger the shares of Company Common Stock might no longer constitute "margin securities" for purposes of the Federal Reserve Board's margin regulations and therefore could no longer be used as collateral for credit extended by brokers. In addition, if the registration of the shares of Company Common Stock under the Exchange Act were terminated, the shares would no longer constitute "margin securities."

## Plans for the Company after the Merger and the Other Leveraged ESOP Transactions

After the Merger and the other Leveraged ESOP Transactions, the Zell Investors and the ESOP anticipate that the Company's operations will be conducted substantially as they are currently being conducted, and that the Company will retain its core operating assets. With the exception of the proposed disposition of an interest in the Chicago Cubs and the Company's interest in Comcast SportsNet Chicago, the Zell Investors and the ESOP have no present plans or proposals that relate to or would result in an extraordinary corporate transaction involving the Company's corporate structure, business or management, such as a merger, reorganization, liquidation, relocation of any material operations or sale or transfer of a material amount of assets. However, in conjunction with management, the Zell Investors and the ESOP will continue to evaluate the Company's entire asset portfolio, business and operations from time to time, and may propose or develop plans and proposals which they consider to be in the best interests of the Company and its equityholders, including the disposition or acquisition of material assets, alliances, joint ventures and other forms of cooperation with third parties or other extraordinary transactions. In particular, to the extent the Zell Investors and the ESOP believe greater value can be realized through dispositions, the Zell Investors and the ESOP may encourage the Company to pursue appropriate disposition transactions, as with the proposed disposition of an interest in the Chicago Cubs and the Company's interest in Comcast SportsNet Chicago. After completion of the Leveraged ESOP Transactions, the Zell Investors and the ESOP intend to retain their interests in the Company and have no current plans to retire or otherwise dispose of such interests.

After completion of the Merger and the other Leveraged ESOP Transactions, the board of directors of the Company will consist of nine directors. Pursuant to the post-closing bylaws of the Company and the Investor Rights Agreement (described below under "Other Transaction Agreements—Investor Rights Agreement"), the directors will be comprised of the following: two directors shall be designated by the Zell Entity, five directors shall be independent directors, one director shall be the Company's chief executive officer and one director shall be without qualification. In addition, pursuant to the Zell Entity Purchase Agreement (described below under "The Securities Purchase Agreements—Zell Entity Purchase Agreement"), Mr. Zell will be elected to serve as

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Chairman of the Board effective as of the date of the Zell Entity's purchase of the Warrant and the $225 million subordinated promissory note immediately after the Merger.

After the effective time of the Merger, the officers of the Company immediately prior to the effective time of the Merger will remain the officers of the Company, in each case until the earlier of their resignation or removal.

### Conduct of the Company's Business if the Merger is Not Completed

In the event that the Merger Agreement is not adopted by the Company's shareholders or if the Merger is not completed for any other reason, the Company's shareholders will not receive any payment for their shares of Company Common Stock under the Merger Agreement. Instead, the Company will remain a public company, its common stock will continue to be listed and traded on the NYSE, and the Company's shareholders will continue to be subject to risks and opportunities as owners of Company Common Stock. If the Merger is not completed, there can be no assurance as to the effect of these risks and opportunities on the future value of your Company Common Stock, including the risk that the market price of the Company Common Stock may decline to the extent that the current market price of the stock reflects a market assumption that the Merger will be completed.

The Company has agreed to grant the Zell Entity and the ESOP registration rights, in the event the Merger does not close, with respect to the shares of Company Common Stock that the Zell Entity and the ESOP purchased from the Company in their initial investments. However, the Zell Entity will not be able to exercise its registration rights prior to April 23, 2010, and in the event the Merger does not close, will be prohibited from selling or assigning its Company Common Stock, exchangeable promissory note or underlying shares acquired upon exchange until April 23, 2010, other than to certain permitted transferees. In addition, the ESOP will not be able to exercise its registration rights prior to April 1, 2008. See "Other Transaction Agreements—Zell Entity/ESOP Registration Rights Agreement."

From time to time, the Board will evaluate and review the business operations of the Company, and, among other things, take such steps as are deemed appropriate and continue to seek to maximize shareholder value. If the Merger Agreement is not adopted by our shareholders or if the Merger is not consummated for any other reason, there can be no assurance that the business, prospects or results of operations of the Company will not be adversely impacted.

### Financing

On May 17, 2007, the Company entered into a Credit Agreement (the "New Credit Agreement") by and among the Company, as borrower, the lenders party thereto, JPMorgan Chase Bank, N.A. ("JPMCB"), as administrative agent, Merrill Lynch Capital Corporation ("Merrill Lynch"), as syndication agent, Citicorp North America, Inc., Bank of America, N.A. ("Bank of America") and Barclays Bank plc ("Barclays Bank"), as co-documentation agents, and J.P. Morgan Securities Inc. ("JPMorgan"), Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. ("CGMI") and Banc of America Securities LLC ("BAS"), as joint lead arrangers and joint bookrunners, and on June 4, 2007, the Company entered into an amendment (the "Amendment") to the New Credit Agreement (the New Credit Agreement, as so amended, the "Credit Agreement"). The Credit Agreement contains the negotiated terms and conditions originally contemplated in the commitment letter entered into by the Company on April 1, 2007, as amended and restated on April 5, 2007 (the "First Step Commitment Letter"), with respect to new $8.028 billion senior secured credit facilities (the "First Step Credit Facilities"). The proceeds of the Credit Agreement are to be used by the Company, among other ways, in connection with the consummation of the Tender Offer, to refinance certain existing indebtedness of the Company and for general corporate purposes. The First Step Credit Facilities consist of (a) a $1.50 billion Senior Tranche X Term Loan Facility (the "Tranche

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523188

X Facility"), (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million.

The Company entered into an additional commitment letter on April 1, 2007, which was amended and restated on April 5, 2007 (as amended and restated, the "Second Step Commitment Letter" and together with the First Step Commitment Letter, the "Commitment Letters"), with JPMorgan, JPMCB, Merrill Lynch, CGMI, on behalf of certain of its affiliates, Bank of America, Banc of America Bridge LLC and BAS with respect to a $2.105 billion incremental term loan facility which will be included in the First Step Credit Facilities (the "Incremental Facility") and a $2.1 billion senior unsecured bridge facility (the "Senior Bridge Facility," together with the Incremental Facility, the "Second Step Credit Facilities" and, together with the First Step Credit Facilities, the "Credit Facilities"). The Company may issue $2.1 billion senior notes or senior subordinated notes (the "New Notes") in lieu of drawing under the Senior Bridge Facility or to refinance the Senior Bridge Facility at a later date. The proceeds from the borrowings or issuances contemplated by the Second Step Commitment Letter will in all cases be used by the Company, among other ways, in connection with the payment of the Merger Consideration pursuant to the terms of the Merger Agreement. The Credit Agreement permits the Company to borrow under the Incremental Facility, upon the satisfaction of certain conditions contained in the Credit Agreement and the Second Step Commitment Letter, including the consummation of the Merger on or before May 31, 2008.

The Credit Agreement provides that prior to the closing of the Second Step Credit Facilities, the Tranche X Facility (a two-year term facility) bears interest per annum at a variable rate equal to, at the Company's election, either the applicable base rate plus a margin of 150 basis points or LIBOR plus a margin of 250 basis points. On and after the closing of the Second Step Credit Facilities, the margins applicable to the Tranche X Facility will increase to 175 basis points and 275 basis points, respectively. As of the closing date of the Credit Agreement, the Tranche B Facility (a seven-year term facility), the Delayed Draw Facility (a seven-year term facility) and the Revolving Credit Facility (a six-year revolving facility) bear interest per annum at a variable rate equal to, at the Company's election, either the applicable base rate plus a margin of 200 basis points or LIBOR plus a margin of 300 basis points. Undrawn amounts under the Delayed Draw Facility will accrue a commitment fee at a per annum rate of 75 basis points and undrawn amounts under the Revolving Credit Facility accrue a commitment fee at a per annum rate of 50 basis points.

With respect to the Revolving Credit Facility only, the margin applicable to base rate advances, the margin applicable to LIBOR advances and the commitment fee applicable to undrawn amounts of the Revolving Credit Facility are subject to decreases based on a leverage-based grid. Also, the interest rate applicable to the Tranche X Facility, the Tranche B Facility, the Delayed Draw Facility and the Revolving Credit Facility is subject to a 25 basis point reduction if the Merger is not consummated and the Company's corporate credit ratings are at a specified level.

The Tranche X Facility must be repaid in an aggregate principal amount of $750 million on the date that is 18 months after the initial draw under the Credit Agreement or, if such date is not a business day, the first business day thereafter, which amount may be adjusted to reflect optional prepayments or other mandatory prepayments (described below) applied thereto; the remaining outstanding amount of the Tranche X Facility must be repaid on the date that is two years after the initial draw under the Credit Agreement or, if such date is not a business day, the first business day thereafter if not repaid sooner. The Tranche B Facility amortizes, and the Incremental Facility, if any, will amortize, at a rate of 1.0% per annum (payable quarterly) prior to maturity, on which date the remaining principal amount will be payable in full. The Delayed Draw Facility will automatically become part of the Tranche B Facility when made and will amortize based upon the Tranche B Facility

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523189

amortization schedule. Prior to the first anniversary of the closing date of the Credit Agreement, optional prepayments on the Tranche X Facility and the Tranche B Facility with the proceeds of a substantially concurrent issuance of loans under any senior secured credit facilities pursuant to the Credit Agreement must be accompanied by a prepayment fee equal to 1.00% of the aggregate amount of such prepayments if the interest rate spread applicable to such new loans is less than the interest rate applicable to the Tranche X Facility or the Tranche B Facility. Except as described in the immediately preceding sentence, the Tranche X Facility, the Tranche B Facility, the Incremental Facility, if any, the Delayed Draw Facility and the Revolving Credit Facility are or will be, as applicable, prepayable at any time prior to maturity without penalty, and the unutilized portion of the commitments under the Revolving Credit Facility or the Delayed Draw Facility may be reduced at the option of the Company without penalty.

Loans under the Tranche X Facility, the Tranche B Facility, the Incremental Facility, if any, the Delayed Draw Facility and the Revolving Loan Facility are or will be, as applicable, required to be repaid with the following proceeds, subject to certain exceptions and exclusions set forth in the Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for borrowed money by the Company or any subsidiary (other than debt permitted to be incurred under the negative covenants contained in the Credit Agreement (with certain exclusions)), (b) certain specified percentages of excess cash flow proceeds based on a leveraged-based grid ranging from 50% to 0%, (c) once the aggregate amount of net cash proceeds from all asset sales, share issuances by the Company's subsidiaries and casualty events exceeds $50 million, 100% of such net cash proceeds unless the Company reinvests the proceeds pursuant to the terms of the Credit Agreement and (d) 100% of net cash proceeds from certain dispositions.

The Tranche X Facility, the Tranche B Facility, the Delayed Draw Facility, the Incremental Facility, if any, and the Revolving Loan Facility are or will be, as applicable, guaranteed by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the capital stock of certain specified subsidiaries of the Company. Certain outstanding senior notes of the Company (the "Existing Notes") are secured on an equal and ratable basis with the First Step Credit Facilities and the Incremental Facility, if any, as required by the terms of the indentures governing such Existing Notes.

The Credit Agreement contains representations and warranties, affirmative and negative covenants and events of default, in each case subject to customary and negotiated exceptions and limitations, as applicable. In addition, the Credit Agreement includes three financial covenants with which the Company must comply, including a maximum total guaranteed leverage ratio, a minimum interest coverage ratio and limitations on capital expenditures. The Credit Agreement also provides that a condition to the consummation of the Merger will be the execution by the Zell Entity of an agreement, guaranteed by Zell, providing that the Zell Entity will invest up to an additional $100 million in Company Common Stock or subordinated debt of the Company in certain circumstances.

Under the terms of the Credit Agreement, the Company is required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money. On July 2, 2007, the Company entered into an ISDA Master Agreement, a Schedule to the 1992 ISDA Master Agreement and, on July 3, 2007, three Rate Swap Confirmations related thereto (collectively, the "Swap Agreement") with Barclays Bank plc, which Swap Agreement provides for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to $750 million in notional amount.

There is a possibility that the Company will not be able to borrow funds under the Second Step Credit Facilities if any of the applicable conditions in the Second Step Commitment Letter, the Credit Agreement or the other documents evidencing the Credit Facilities are not met. The Company

59

TRB0523190

currently has no alternative financing arrangements in place if the proceeds of the Second Step Credit Facilities are not available to it.

We anticipate that we will pay for the Merger Consideration from borrowings under the Second Step Credit Facilities. While we have obtained a financing commitment pursuant to the Second Step Commitment Letter, it is contingent on the satisfaction of various conditions as described therein. Accordingly, as discussed in "The Merger Agreement—Conditions to the Merger," in addition to the other conditions described in this proxy statement, the Merger is subject to our receipt of debt financing on the terms set forth in the Second Step Commitment Letter or alternative financing on substantially similar terms. The Company does not currently plan to have alternative financing plans in place prior to the Effective Time.

The preceding summary of the material terms of the Credit Agreement and the Second Step Commitment Letter is qualified in its entirety by the terms of the actual New Credit Agreement, the Amendment and the Second Step Commitment Letter, which are included as Exhibits (b)(3), (b)(4) and (b)(1)(B) to the Schedule 13E-3, respectively. The summary may not contain all of the information about the Credit Agreement and the Second Step Commitment Letter that is important to you. We encourage you to read them carefully and in their entirety.

**Interest of Directors and Executive Officers**

Certain members of the Board and the Company's management have interests in the Merger and the other Leveraged ESOP Transactions that are different from, or in addition to, the interests of the Company's unaffiliated shareholders. The Board was aware of such interests and considered them, among other matters, when determining to approve the Leveraged ESOP Transactions. These interests are described below.

### *Compensation Awards*

In connection with the Board's review of strategic alternatives for the Company beginning in September 2006, the Compensation Committee of the Board authorized the creation of a transaction bonus pool to motivate management to seek a transaction that would provide the maximum return to the Company's shareholders despite the risks such transaction would pose to management's continued employment. In connection with the approval of the Leveraged ESOP Transactions, on April 1, 2007, the Board approved certain cash compensation awards and a share equivalent plan for members of management and other key employees of the Company conditioned upon the consummation of the Merger. The Company's principal executive officer, Dennis J. FitzSimons, and the Company's principal financial officer, Donald C. Grenesko, along with Scott C. Smith, President, Tribune Publishing Company, Luis E. Lewin, Senior Vice President Human Resources, and John E. Reardon, President, Tribune Broadcasting Company (who are the three most highly compensated executive officers other than Messrs. FitzSimons and Grenesko), will participate in certain of the awards as more fully described below.

### *Cash Transaction Bonus Pool*

On April 1, 2007, the Board approved a cash transaction bonus pool in an aggregate amount of $6,500,000 for 32 individuals. Subsequently, management increased the number of recipients to 40 and reduced the bonus pool to $5,400,000. This cash bonus pool will be used in lieu of approximately 285,000 restricted stock units that were authorized for issuance. Payment of these cash bonuses is conditioned upon the consummation of the Merger and will be payable to a select group of management and other key employees who are playing a critical role in overseeing the completion of the Leveraged ESOP Transactions (not including the Company's Chairman, President and Chief Executive Officer, Mr. FitzSimons, and the President of Tribune Publishing Company, Mr. Smith, who

60

TRB0523191

each voluntarily elected not to participate in this cash bonus pool). We currently contemplate that the named executive officers in the Company's annual proxy statement ("NEOs"), other than Messrs. FitzSimons and Smith, will be allocated amounts from this cash bonus pool as follows: Donald C. Grenesko: $400,000; John E. Reardon: $200,000; and Luis E. Lewin: $50,000.

### Proposed Tribune Management Equity Incentive Plan

The Merger Agreement contemplates the establishment of a new Tribune Company Management Equity Incentive Plan (the "Plan") to be effective following the consummation of the Merger. The Plan will be administered by the Compensation Committee of the Board (the "Plan Committee") and the Plan Committee will select who will receive awards and the terms of the awards. The Plan contemplates two tranches of share equivalent awards to be granted to certain members of management and other key employees. The first tranche of awards ("Tranche One Awards") will include share equivalents with an economic value equal to 5% of the outstanding Company Common Stock (calculated after giving effect to the Warrant and subject to typical anti-dilution adjustments) and will be awarded to eligible members of Company management (including the NEOs) and other key employees. A portion of the Tranche One Awards will be granted upon the consummation of the Merger, and the remaining portion will be granted in future years. Tranche One Awards will vest ratably over a three-year period beginning on the date of grant unless the Plan Committee determines that another vesting schedule is preferable and, subject to a redeferral election by individual plan participants, will be payable in cash on the fifth anniversary of the grant date.

Following the grant of Tranche One Awards, the Plan contemplates that the unvested portion of any Tranche One Awards will become fully vested upon a change in control of the Company or termination of employment due to death, disability or retirement from the Company. Upon a change in control of the Company or a Plan participant's termination of employment due to death or disability, the entire Tranche One Award will be payable as soon as practicable following such event. Upon a Plan participant's termination of employment for any other reason, the participant will be entitled to retain the then-vested portion of any Tranche One Award, with payment to be made on the fifth anniversary of the grant date. The unvested portion of any Tranche One Award upon such termination will be cancelled.

The second tranche of awards ("Tranche Two Awards") will include share equivalents with an economic value equal to 3% of the outstanding Company Common Stock (calculated after giving effect to the Warrant and subject to typical anti-dilution adjustments) to be awarded upon consummation of the Merger to a select group of management and other key employees. The Plan contemplates that 50% of Tranche Two Awards will be fully vested upon grant and the remaining 50% of Tranche Two Awards will vest on the one year anniversary of the grant date. The Plan also contemplates that the unvested portion of any Tranche Two Awards will become fully vested upon a change in control of the Company, involuntary termination of employment or termination of employment due to death, disability or retirement from the Company. Upon a change in control of the Company or a Plan participant's involuntary termination of employment or termination of employment due to death or disability, the entire Tranche Two Award will be payable in cash as soon as practicable following such event. In all other instances and subject to a redeferral election by individual plan participants, one-third of the Tranche Two Awards will be payable in cash on each of the fourth, sixth and eighth anniversaries of the grant date. Tranche Two Awards will be accompanied by a gross-up for the payment of excise taxes, if any, by the participants receiving Tranche Two Awards.

### Transitional Compensation Plan

Each of the Company's NEOs is eligible for benefits under a Transitional Compensation Plan, which provides for payments and other benefits if the NEO is terminated under circumstances specified

61

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

in the Transitional Compensation Plan within three years following a change in control of the Company. Consummation of the Merger would constitute a change in control of the Company.

Under the Transitional Compensation Plan, each NEO would be eligible for benefits upon termination of employment within 36 months following completion of the Merger. A participant would be eligible for benefits for termination prior to the Merger if the termination was at the request of any third party participating in or causing the Merger or otherwise in anticipation of the Merger. Transitional Compensation Plan benefits will only be available if the participant's termination of employment was not:

- on account of his death;

- on account of a physical or mental condition that would entitle him to long-term disability benefits under the Tribune Company Long-Term Disability Plan;

- for conduct involving dishonesty or willful misconduct which, in either case, is detrimental in a significant way to the Company's business; or

- on account of the employee's voluntary resignation.

For purposes of the NEOs covered under the Transitional Compensation Plan, a resignation would not be considered to be "voluntary": (a) if the resignation by Mr. FitzSimons or Mr. Grenesko occurs during the 30-day period immediately following the first anniversary of the completion of the Merger; or (b) if the resignation occurs after a successor refuses to assume and agree to perform Tribune's obligations under the Transitional Compensation Plan; or (c) if, subsequent to the completion of the Merger and prior to such resignation, there has been a reduction in the nature or scope of the participant's authority or duties, a reduction in the participant's compensation or benefits, or a change in the city in which he is required to perform his duties.

Upon a termination under the circumstances outlined above, NEOs would be entitled to a lump sum payment equal to three times the sum of (1) the highest annual rate of the executive's base salary in effect within three years of the date of the participant's termination, plus (2) 200% of the participant's target bonus payable for the year in which the change in control occurs. The Transitional Compensation Plan would also provide outplacement benefits in an amount up to 25% of a participant's base salary and continuation of medical, life insurance and disability benefits for up to three years. In addition, the Transitional Compensation Plan provides that each NEO is entitled to a "gross-up" payment to make the executive whole for any federal excise tax imposed on change in control or severance payments or benefits received by the NEO.

Assuming the Merger is completed on December 31, 2007 and that thereafter each NEO experiences a qualifying termination for purposes of the Transitional Compensation Plan on that date, the estimated cost of the cash and in-kind severance benefits with respect to the NEOs would be as follows: Mr. FitzSimons, $10,657,500; Mr. Grenesko, $4,576,447; Mr. Smith, $4,794,460; Mr. Lewin, $2,532,550; and Mr. Reardon, $3,872,893. The estimated aggregate cost of the cash and in-kind severance benefits that would be payable to all other executive officers based upon the foregoing scenario would be $9,785,994.

In addition, as described above, participants in the Transitional Compensation Plan are entitled to certain tax gross-up payments. Assuming the Merger is completed on December 31, 2007 and that thereafter each NEO experiences a qualifying termination for purposes of the Transitional Compensation Plan on that date, the estimated tax gross-up payments to the NEOs would be as follows: Mr. FitzSimons, $3,999,225, Mr. Grenesko, $1,793,016, Mr. Smith, $1,609,862, Mr. Lewin, $955,791 and Mr. Reardon, $1,767,063. The estimated tax gross-up payments that would be payable to all other executive officers based upon the foregoing scenario would be $3,725,596.

62

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523193

### Stock Options, Restricted Stock and Other Equity-Based Awards

As of the effective time of the Merger:

- Each outstanding Company stock option that remains outstanding immediately prior to the Effective Time, whether vested or unvested, will become fully vested, and the holder of the stock option will receive a cash payment, less applicable withholding taxes, equal to the product of (1) the number of shares subject to the option as of the Effective Time, multiplied by (2) the excess, if any, of the Merger Consideration over the exercise price per share of Company Common Stock subject to such option, less applicable tax withholding.

- Each share of restricted Company Common Stock will vest in full and be converted into the right to receive the Merger Consideration, less any applicable withholding taxes.

- Each other right of any kind to receive Company Common Stock or benefits measured in whole or in part by the value of a number of shares of Company Common Stock will vest and become free of any forfeiture or holding restrictions or performance, or other conditions, and will entitle the holder thereof to receive an amount in cash based on the Merger Consideration.

We estimate the amounts that will be payable to each NEO in settlement of stock options, restricted stock and other equity-based awards as follows: Mr. FitzSimons, $6,869,559; Mr. Grenesko, $2,699,026; Mr. Smith, $2,665,784; Mr. Lewin, $1,300,699; and Mr. Reardon, $2,005,265. We estimate the aggregate amount that will be payable to all directors and executive officers in settlement of stock options, restricted stock and other equity-based awards to be $7,750,595.

### Indemnification of Directors and Officers; Directors' and Officers' Insurance

In addition, as described below under "The Merger Agreement—Indemnification and Insurance," the Merger Agreement provides that, for a period of six years after completion of the Merger, the Company will maintain in effect director, officer and employee exculpation, indemnification and advancement of expenses provisions no less favorable than those of the Company's and any of its subsidiaries' certificates of incorporation and by-laws as in effect immediately prior to the Merger or in any indemnification agreements of the Company or its subsidiaries with any of their directors, officers or employees as in effect immediately prior to the Merger. The Merger Agreement also provides that the Company will, to the fullest extent permitted under applicable law, indemnify and hold harmless each current and former director, officer or employee of the Company or any of its subsidiaries and each person who served as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise at the request of the Company against any costs or expenses, judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened action, arising out of, relating to or in connection with any action or omission occurring or alleged to have occurred whether before or after completion of the Merger. Following the Merger, the Company will maintain in effect the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Company and its subsidiaries with respect to matters arising on or before the Effective Time, subject to a maximum annual insurance premium of 200% of the last annual premium paid by the Company prior to the date of the Merger Agreement in respect of such coverage. At the Company's option, after consultation with the ESOP, the Company may purchase, prior to the Effective Time, a six-year prepaid "tail" policy (at an aggregate cost not exceeding the maximum premium multiplied by six) on terms and conditions providing substantially equivalent benefits as the current policies of directors' and officers' liability insurance and fiduciary liability insurance.

### Related Party Transactions and Agreements

*Chandler Trusts.* Jeffrey Chandler, Roger Goodan and William Stinehart, Jr., formerly members of our Board, are trustees of the Chandler Trusts. Mr. Chandler and Mr. Goodan are also beneficiaries of

63

TRB0523194

these trusts. The Chandler Trusts were the principal shareholders of The Times Mirror Company ("Times Mirror") prior to the merger of Times Mirror into the Company on June 12, 2000. In connection with the merger in 2000, the Chandler Trusts exchanged their Times Mirror common stock for 36,304,135 shares of Company Common Stock and the Company amended its by-laws to grant the Chandler Trusts the right to nominate three directors, one for each of the Board's three classes. Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. were the Chandler Trusts' initial nominees and became directors of the Company following the merger. Mr. Chandler and Mr. Goodan are cousins.

As described below in "Other Transaction Agreements—Chandler Trusts Registration Rights Agreement," pursuant to such agreement, the Chandler Trusts tendered into the Tender Offer all shares held by them at the expiration of the Tender Offer, and caused Messrs. Chandler, Goodman and Stinehart, each of whom were serving on the Board as a representative of the Chandler Trusts, to resign as directors of the Company, effective June 4, 2007. On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman Sachs and the Company, pursuant to which the Chandler Trusts agreed to sell an aggregate of 20,351,954 shares of Company Common Stock, the remainder of the shares owned by them following the Tender Offer, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to a shelf registration statement that the Company filed with the Securities and Exchange Commission and that became effective on April 25, 2007. Following the closing of this transaction on June 7, 2007, the Chandler Trusts no longer own any shares of Company Common Stock.

In 1997, the Chandler Trusts and Times Mirror entered into a transaction which, through the formation of TMCT, LLC ("TMCT"), enabled Times Mirror to retire for accounting purposes a substantial block of Times Mirror stock. Times Mirror and its affiliates contributed to TMCT real property used in Times Mirror's business operations and cash and the Chandler Trusts contributed Times Mirror stock. Times Mirror leased back the real property under long-term leases. Upon completion of the merger of Times Mirror into the Company, the Company assumed these leases, and the Times Mirror stock held by the limited liability company was converted into Company Common Stock. In 2006, $20,300,792 of lease payments and $4,005,936 in dividends received on the Company Common Stock held by TMCT were allocated to the Chandler Trusts.

In 1999, the Chandler Trusts and Times Mirror formed TMCT II, LLC ("TMCT II") and entered into a similar transaction that again enabled Times Mirror to retire for accounting purposes a substantial block of stock. Times Mirror's contribution to TMCT II consisted of cash and securities. The Chandler Trusts again contributed Times Mirror stock that was converted into Company Common Stock upon completion of the merger of Times Mirror into the Company. In 2006, $7,440,746 in dividends received on the Company Common Stock held by TMCT II were allocated to the Chandler Trusts.

On September 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. Under the terms of the agreements, the Company received on September 22, 2006, a total of 38.9 million shares of Company Common Stock and all 1.1 million shares of the Company's preferred stock held collectively by TMCT and TMCT II. Following the distributions by TMCT and TMCT II, the Company's interests in each of TMCT and TMCT II were reduced to approximately five percent. The agreements also provided for certain put and call options, which are exercisable at fair market value beginning in September 2007, relating to the Company's remaining ownership interests in TMCT and TMCT II.

In addition, on September 22, 2006, the Company and TMCT amended the lease agreement for the eight properties the Company leases from TMCT. Under the terms of the amended lease, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company was also granted an option to acquire the leased properties from February 8, 2008 to three months prior to the expiration of the amended lease at the higher of fair market value or $195 million. In addition, the amendment extended the properties' current fixed rental rate through August 7, 2021.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523195

On October 20, 2006, the remaining 12.4 million shares of Company Common Stock held by TMCT and TMCT II were distributed to the Company and the Chandler Trusts in accordance with their respective ownership interests. The Company received 0.6 million shares and the Chandler Trusts received 11.8 million shares. Until October 20, 2007, the trustees of the Chandler Trusts have agreed to vote the 11.8 million shares in the same proportion as all other shares are voted on any matter requiring a shareholder vote, including the proposals to be voted on at the 2007 annual meeting. Information pertaining to the Company's investments in TMCT and TMCT II is provided in Note 7 to the consolidated financial statements included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006.

*The Zell Entity.*  The Zell Entity is wholly owned by Sam Investment Trust, a trust established for the benefit of Mr. Zell and his family. As more fully described below and elsewhere herein, the Zell Entity is party to certain of the agreements entered into in connection with the Leveraged ESOP Transactions and has an interest in the Leveraged ESOP Transactions.

Immediately prior to the Merger, the Company will repay the exchangeable promissory note held by the Zell Entity. In the Merger, the Zell Entity will receive cash equal to the Merger Consideration for the shares of Company Common Stock it owns. Following consummation of the Merger, the Zell Entity will purchase from the Company, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant (the "Warrant"). The Warrant will entitle the Zell Entity to purchase 43,478,261 shares of Company Common Stock (subject to adjustment), which will represent approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to share equivalents under a management equity incentive plan). The Warrant will have an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the Warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). See "Other Transaction Agreements—Zell Entity Purchase Agreement."

In addition, the Company has granted the Zell Entity registration rights, in the event the Merger does not close, with respect to the shares of Company Common Stock that the Zell Entity purchased from the Company in its initial investment. However, the Zell Entity will not be able to exercise its registration rights prior to April 23, 2010 and, in the event the Merger does not close, will be prohibited from selling or assigning its Company Common Stock, exchangeable promissory note or underlying shares acquired upon exchange until April 23, 2010, other than to certain permitted transferees. See "Other Transaction Agreements—Zell Entity/ESOP Registration Rights Agreement."

Pursuant to the Zell Entity Purchase Agreement, Mr. Zell has been appointed to the Board, effective May 9, 2007, and the Company has agreed that Mr. Zell will be elected to serve as Chairman of the Board, effective as of the date of the consummation of the Step Two Purchase Transaction. The Company also reimbursed the Zell Entity for $2.5 million of expenses following consummation of the Step One Purchase Transaction and agreed to reimburse the Zell Entity for up to an additional $2.5 million of unreimbursed expenses following consummation of the Step Two Purchase Transaction.

Pursuant to the Credit Agreement, a condition to the consummation of the Merger will be the execution by the Zell Entity of an agreement, guaranteed by Zell, providing that the Zell Entity will invest up to an additional $100 million in Company Common Stock or subordinated debt of the Company in certain circumstances.

*The ESOP and the Trustee.*  Pursuant to the terms of the ESOP Purchase Agreement, on April 1, 2007, the Company sold 8,928,571 shares of Company Common Stock to the ESOP at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP executed by the Trustee in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through the ESOP's use of annual contributions from the Company to the ESOP or distributions paid on the shares of Company Common Stock held by the ESOP. On the same date, the Company and the Trustee, on behalf of the ESOP, entered into the ESOP Loan

65

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Agreement, which documents the extension of credit from the Company to the ESOP evidenced by the ESOP Note. The ESOP Note contemplates payment by the ESOP to the Company in 30 annual installments with an annual interest rate of approximately 5%. The Trustee, on behalf of the ESOP, also entered into the ESOP Pledge Agreement with the Company whereby the ESOP has agreed to pledge the shares of Company Common Stock acquired by the ESOP from the Company as collateral for the Company's extension of credit to the ESOP.

In addition, the Company has granted the ESOP registration rights, in the event the Merger does not close, with respect to the shares of Company Common Stock that the ESOP purchased from the Company in its initial investment. However, the ESOP will not be able to exercise its registration rights prior to April 1, 2008. See "Other Transaction Agreements—Zell Entity/ESOP Registration Rights Agreement."

The ESOP intends to vote all its shares of Company Common Stock in favor of the adoption of the Merger Agreement and approval of the Merger.

**Fees and Expenses**

As set forth under "Special Factors—Background of the Merger," the Company retained Merrill Lynch and Citi to act as the Company's co-financial advisors and the Special Committee retained Morgan Stanley to act as its financial advisor. In addition, affiliates of Merrill Lynch and Citi will provide a portion of the financing for the Tender Offer and the Merger, subject to specified conditions. The fees payable to Morgan Stanley for its advisory services and to Merrill Lynch for its advisory and financing services are described under "Special Factors—Opinion of the Special Committee's Financial Advisor" and "Special Factors—Opinion of the Company's Financial Advisor," respectively. Total advisory and financing fees payable to Citi (before syndication costs, capital allocation costs and financing credits) aggregate approximately $68.9 million, of which approximately $35.8 million are contingent on the Merger closing and approximately $33.1 million relate to financing the Tender Offer.

In addition, JPMorgan and Bank of America and their affiliates have also undertaken to provide financing for the Merger, subject to the terms and conditions of the Second Step Commitment Letter described in "Special Factors—Financing," and will receive customary fees in connection therewith.

Merrill Lynch, Citi, JPMorgan and Bank of America were retained to act as the Co-Dealer Managers in connection with the Tender Offer, for which they will receive reasonable and customary compensation. We also have agreed to reimburse the Co-Dealer Managers for reasonable out-of-pocket expenses incurred in connection with the Tender Offer, including reasonable fees and expenses of counsel, and to indemnify the Co-Dealer Managers against certain liabilities in connection with the Tender Offer, including certain liabilities under the federal securities laws. The Co-Dealer Managers and their affiliates have provided, and may in the future provide, various investment banking and other services to us, for which future services we would expect they would receive customary compensation from us. In the ordinary course of business, including in their trading and brokerage operations and in a fiduciary capacity, the Co-Dealer Managers and their affiliates may hold positions, both long and short, for their own accounts and for those of their customers, in our securities.

We have retained Innisfree M&A Incorporated to act as proxy solicitor. The proxy solicitor will receive reasonable and customary compensation for its services, will be reimbursed by us for reasonable out-of-pocket expenses and will be indemnified against certain liabilities, including certain liabilities under the federal securities laws.

Whether or not the Merger is completed, in general, all fees and expenses incurred in connection with the Merger will be paid by the party incurring those fees and expenses, except for the reimbursements described below and for the termination fee potentially payable as described under "Other Transaction Agreements—Zell Entity Purchase Agreement." Fees and expenses incurred or to

66

be incurred by the Company in connection with the Leveraged ESOP Transactions are estimated at this time to be as follows:

| Description | | Amount |
|---|---|---|
| | | (In thousands) |
| Legal | $ | 14,000 |
| Financial Advisors | $ | 32,000 |
| Debt Issuance Costs | $ | 230,000 |
| Accounting | $ | 460 |
| Printing | $ | 550 |
| SEC Filing Fees | $ | 310 |
| Proxy Solicitation, Information Agent, Paying Agent and Mailing | $ | 525 |
| Reimbursement of Zell Entity Fees and Expenses[1] | $ | 5,000 |
| Reimbursement of ESOP Fees and Expenses[2] | $ | 3,500 |
| Miscellaneous | $ | 825 |
| Total | $ | 287,170 |

(1) Pursuant to the Zell Entity Purchase Agreement, the Company reimbursed the Zell Entity for $2.5 million of legal and other advisory fees and expenses upon consummation of the Step One Purchase Transaction and agreed to reimburse the Zell Entity for up to an additional $2.5 million of unreimbursed expenses following consummation of the Step Two Purchase Transaction.

(2) Pursuant to the ESOP Purchase Agreement, the Company has agreed to pay the reasonable expenses of the ESOP and the ESOP trustee, including legal and financial advisory fees, incurred in connection with the Leveraged ESOP Transactions.

These expenses will not reduce the Merger Consideration to be received by the Company's shareholders.

**Appraisal Rights**

Delaware law provides shareholders with appraisal rights in the Merger. This means that if you fully comply with the procedures for perfecting appraisal rights provided for under Delaware law, Delaware law entitles you to have the fair value of your shares determined by the Delaware Court of Chancery and to receive payment based on that valuation in lieu of the Merger Consideration. The ultimate amount you receive in an appraisal proceeding may be more or less than, or the same as, the amount you would have received under the Merger Agreement. To exercise your appraisal rights, you must deliver a written demand for appraisal to the Company before the vote on the Merger Agreement at the special meeting and you must not vote in favor of the adoption of the Merger Agreement. Your failure to strictly follow the procedures specified under Delaware law will result in the loss of your appraisal rights. A copy of Section 262 of the DGCL is attached to this proxy statement as Annex D. We encourage you to consult your legal advisor if you intend to seek appraisal. See "Appraisal Rights" on page 101.

**United States Federal Income Tax Consequences**

If the Merger is consummated, sales of shares into cash pursuant to the Merger will be taxable transactions for United States federal income tax purposes. The following is a discussion of the material United States federal income tax consequences of the Merger to U.S. holders (as defined below) whose shares of Company Common Stock are converted into the right to receive cash in the Merger. The discussion is based upon the Internal Revenue Code, Treasury regulations, Internal Revenue Service published rulings and judicial and administrative decisions in effect as of the date of this proxy statement, all of which are subject to change (possibly with retroactive effect) and to differing interpretations. The following discussion does not purport to consider all aspects of U.S. federal income taxation that might be relevant to our shareholders. This discussion applies only to

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523198

shareholders who, on the date on which the Merger is completed, hold shares of Company Common Stock as a capital asset within the meaning of section 1221 of the Internal Revenue Code. The following discussion does not address taxpayers subject to special treatment under U.S. federal income tax laws, such as insurance companies, financial institutions, dealers in securities or currencies, traders of securities that elect the mark-to-market method of accounting for their securities, persons that have a functional currency other than the U.S. dollar, tax-exempt organizations, mutual funds, real estate investment trusts, S corporations or other pass-through entities (or investors in an S corporation or other pass-through entity) and taxpayers subject to the alternative minimum tax. In addition, the following discussion may not apply to shareholders who acquired their shares of Company Common Stock upon the exercise of employee stock options or otherwise as compensation for services or through a tax-qualified retirement plan or who hold their shares as part of a hedge, straddle, conversion transaction or other integrated transaction. The following discussion does not address the U.S. federal income tax consequences of the Merger to the ESOP, Merger Sub or the Zell Entity.

If Company Common Stock is held through a partnership, the U.S. federal income tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. It is recommended that partnerships that are holders of Company Common Stock and partners in such partnerships consult their own tax advisors regarding the tax consequences to them of the Merger.

This discussion also does not address potential alternative minimum tax, foreign, state, local and other tax consequences of the Merger. All shareholders should consult their own tax advisors regarding the U.S. federal income tax consequences, as well as the foreign, state and local tax consequences of the disposition of their shares in the Merger.

For purposes of this summary, a "U.S. holder" is a beneficial owner of Company Common Stock shares that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation) created or organized in or under the laws of the United States, any state of the United States or the District of Columbia;

- an estate the income of which is subject to U.S. federal income tax regardless of its source;

- a trust if (1) a U.S. court is able to exercise primary supervision over the trust's administration and one or more U.S. persons are authorized to control all substantial decisions of the trust; or (2) it was in existence on August 20, 1996 and has a valid election in place to be treated as a domestic trust for U.S. federal income tax purposes; or

- otherwise is subject to U.S. federal income taxation on a net income basis.

Except with respect to the backup withholding discussion below, this discussion is confined to the tax consequences to a shareholder that is a U.S. holder for U.S. federal income tax purposes.

For U.S. federal income tax purposes, the disposition of Company Common Stock pursuant to the Merger generally will be treated as a sale of Company Common Stock for cash by each of our shareholders. Accordingly, in general, the U.S. federal income tax consequences to a shareholder receiving cash in the Merger will be as follows:

- The shareholder will recognize a capital gain or loss for U.S. federal income tax purposes upon the disposition of the shareholder's shares of Company Common Stock pursuant to the Merger.

- The amount of capital gain or loss recognized by each shareholder will be measured by the difference, if any, between the amount of cash received by the shareholder in the Merger (other than, in the case of a dissenting shareholder, amounts, if any, which are deemed to be interest for U.S. federal income tax purposes, which amounts will be taxed as ordinary income) and the shareholder's adjusted tax basis in the shares of Company Common Stock surrendered in the Merger. Gain or loss will be determined separately for each block of shares (i.e., shares acquired at the same cost in a single transaction) surrendered for cash in the Merger.

68

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

- The capital gain or loss, if any, will be long-term with respect to shares of Company Common Stock that have a holding period for tax purposes in excess of one year at the effective time of the Merger. Long-term capital gains of individuals are eligible for reduced rates of taxation. There are limitations on the deductibility of capital losses. A dissenting shareholder may be required to recognize any gain or loss in the year the Merger closes, irrespective of whether the dissenting shareholder actually receives payment in that year.

Cash payments made pursuant to the Merger will be reported to our shareholders and the Internal Revenue Service to the extent required by the Internal Revenue Code and applicable Treasury regulations. Non-corporate shareholders may be subject to back-up withholding at a rate of 28% on any cash payments they receive. Shareholders who are U.S. holders generally will not be subject to backup withholding if they: (1) furnish a correct taxpayer identification number and certify that they are not subject to backup withholding on the substitute Form W-9 included in the election form/letter of transmittal they are to receive or (2) are otherwise exempt from backup withholding. Shareholders who are not U.S. holders should complete and sign a Form W-8BEN (or other applicable tax form) and return it to the paying agent in order to provide the information and certification necessary to avoid backup withholding tax or otherwise establish an exemption from backup withholding tax. Certain of our shareholders will be asked to provide additional tax information in the letter of transmittal for the shares of Company Common Stock.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules generally will be allowed as a refund or a credit against your U.S. federal income tax liability, provided the required information is timely furnished to the Internal Revenue Service.

**The foregoing is a general discussion of certain material U.S. federal income tax consequences. We recommend that you consult your own tax advisor to determine the particular tax consequences to you (including the application and effect of any foreign, state or local income and other tax laws) of the receipt of cash in exchange for shares of Company Common Stock pursuant to the Merger.**

### Litigation

On September 19, 2006, a Company shareholder filed a complaint in the United States District Court for the Northern District of Illinois against the Company's directors, with the exception of Messrs. Chandler, Goodan and Stinehart, and the Company as a nominal defendant, alleging direct and derivative claims on behalf of a purported class of Company shareholders for breach of fiduciary duty in connection with the Company's May 2006 share repurchase program and the manner in which the Board was handling its exploration of strategic alternatives. After the judge in that case issued a memorandum questioning whether plaintiff had satisfied the requirements for diversity jurisdiction in order to maintain the case in federal court, plaintiff moved to dismiss the case voluntarily without prejudice. The district court dismissed the case on September 27, 2006.

Approximately seven weeks later, on November 17, 2006, the same plaintiff filed a complaint captioned *Garamella v. FitzSimons, et al.*, No. BC362110, in the Superior Court of California, Los Angeles County, alleging substantially identical direct and derivative claims on behalf of a purported class of Company shareholders against all Company directors, including Messrs. Chandler, Goodan and Stinehart, and the Company as a nominal defendant. After the Company announced the Leveraged ESOP Transactions on April 2, 2007, and before any responsive pleading was due, plaintiff amended the California complaint to include claims alleging that the Company's directors breached their fiduciary duties to shareholders in connection with the negotiation of the Leveraged ESOP Transactions and execution of the related documents. Specifically, plaintiff claims that the directors' desire to entrench themselves on the Company's Board caused them to breach their fiduciary duties by undertaking the May 2006 share repurchase program which caused the Company to take on additional debt and, according to plaintiff, become less attractive to potential bidders. Plaintiff further alleges that the directors' entrenchment motives caused them to breach their fiduciary duties by rejecting certain strategic alternatives for the Company, such as a sale of individual Company assets or a tax-free spin-off, and by keeping in place certain of the Company's corporate governance mechanisms such as

69

the shareholder rights plan and the staggered structure of the Board. With respect to the Merger Agreement and the auction process that preceded it, plaintiff claims that the directors breached their fiduciary duties by setting a bid deadline of March 31, 2007 and thereby "cutting short" the bidding process, by structuring the transaction to include an up-front tender offer which plaintiff characterizes as "coercive," and by structuring the transaction so that "insider shareholders" such as the Chandler Trusts and McCormick Tribune Foundation obtain additional unique benefits from the transaction that are not available to other shareholders. Among other things, the California complaint seeks to enjoin the impending Tender Offer and the consummation of the Merger. Defendants filed motions to dismiss the California complaint on April 20, 2007. On May 4, 2007, the court denied defendants' motions to dismiss. On May 18, 2007, plaintiff filed a motion for a preliminary injunction seeking to enjoin the Company from completing the Tender Offer until the Company (1) takes steps to maximize shareholder value, (2) removes the allegedly coercive aspects of the Tender Offer and (3) discloses all material information about the Tender Offer to shareholders. On May 22, 2007, the court denied plaintiff's motion for a preliminary injunction. The foregoing description is qualified in its entirety by reference to Exhibit (a)(5)(A) to the Schedule 13E-3, which is incorporated herein by reference.

On April 5, 2007, a Company shareholder filed a complaint captioned *Simpson v. Tribune Co., et al.*, No. 07CH9519, in the Chancery Division of the Circuit Court of Cook County, Illinois, against the Company and each of the Company's directors. The *Simpson* complaint alleges that the Company's directors breached their fiduciary duties in negotiating and executing the Merger Agreement which unfairly favors the Company's management and major insider shareholders at the expense of the Company's public shareholders. The foregoing description is qualified in its entirety by reference to Exhibit (a)(5)(B) to the Schedule 13E-3, which is incorporated herein by reference.

These actions will be defended vigorously.

The Company received a letter dated April 9, 2007, (1) stating that it was written on behalf of two hedge funds purporting to hold approximately 37% of the Company's 8,000,000 PHONES[SM] Exchangeable Subordinated Debentures due 2029 (the "PHONES"), (2) purporting to give a "notice of default" that the Company has violated the "maintenance of properties" covenant in the indenture under which the PHONES were issued (the "PHONES Indenture") and (3) informing the Company that failure to remedy such purported violation within 60 days of notice will result in an "event of default" under the PHONES Indenture (which could, if properly declared, result in an acceleration of principal and interest payable with respect to the PHONES). On April 27, 2007, the Company received a letter from the law firm purporting to represent the two hedge funds stating that the law firm also purported to represent a third hedge fund, which, together with the first two hedge funds, purported to hold 55% of the Company's PHONES and reiterating the claims set forth in the April 9, 2007 letter.

The particular covenant in question, Section 10.05 of the PHONES Indenture, requires the Company to "cause all properties used or useful in the conduct of its business or the business of any Subsidiary to be maintained and kept in good condition, repair and working order (normal wear and tear excepted) and supplied with all necessary equipment. . . all as in the judgment of the Company may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times. . . ." Section 10.05 of the PHONES Indenture expressly provides that the covenant does not "prevent the Company from discontinuing the operation and maintenance of any such properties, or disposing of any of them, if such discontinuance or disposal is, in the judgment of the Company or of the Subsidiary concerned, desirable in the conduct of its business or the business of any Subsidiary and not disadvantageous in any material respect to the Holders [of the PHONES]." The letters suggest that the Company's recent sales of three television stations, announced intention to sell the Chicago Cubs baseball team and recent and proposed issuances of debt and return of capital to shareholders violated or will violate this maintenance of properties covenant.

The Company believes that the hedge funds' claims are without merit and that the Company remains in full compliance with Section 10.05 of the PHONES Indenture. On May 2, 2007, the Company sent a letter to the law firm purporting to represent the hedge funds rejecting their purported "notice of default" as defective and invalid because the Company was not in default of Section 10.05,

70

TRB0523201

the entities the law firm purported to represent were not "Holders" as defined in the PHONES Indenture, and because the law firm had provided no evidence that it was an agent duly appointed in writing as contemplated by Section 1.04 of the PHONES Indenture. The law firm sent a letter to the Company on May 8, 2007 responding to the Company's May 2, 2007 letter, reiterating its claim that the Company was in default of Section 10.05 and stating that it had properly noticed a default pursuant to Section 5.01(4) of the Indenture. The Company further responded by letter dated May 18, 2007 reaffirming its rejection of the purported "notice of default" and reiterating its position that the Company was not in default of Section 10.05 and that the entities the law firm purported to represent were not entitled to provide a notice of default under Section 5.01(4) of the PHONES Indenture. The Company will enforce and defend vigorously its rights under the PHONES Indenture.

On June 1, 2007, the Company announced that an offer of settlement is pending in its appeal of a 2005 Tax Court decision disallowing the tax-free reorganizations of Matthew Bender and Mosby, former subsidiaries of Times Mirror. Under the proposed settlement, the Company will receive refunds of approximately $350 million in federal and state income taxes and interest resulting from payments previously made for both transactions. After consideration of income taxes on the interest and state income tax refunds, the net cash proceeds would be approximately $290 million. Tribune acquired Times Mirror in June 2000 and inherited the preexisting tax dispute at that time.

**Regulatory Approvals**

In connection with the Leveraged ESOP Transactions, the parties to the Merger Agreement and the Zell Entity Purchase Agreement have filed applications with the FCC for consent to the transfer of control of the Company from its public shareholders to the ESOP, the Zell Entity and Zell. The parties have also requested that the FCC waive its rule prohibiting the common ownership of daily English language newspapers and broadcast stations (the "cross-ownership rule") in the five markets where the Company owns such combinations. The applications will also require that the FCC address the Company's pending license renewal applications. The FCC can address the pending license renewal applications by taking action on the renewal applications themselves in connection with the transfer application or, alternatively, by accepting the transferee's willingness to be bound by the FCC's subsequent action on the pending license renewal applications following the completion of the current FCC rulemaking process. The parties have also requested a "failing station waiver" to permit the continued common ownership of the Company's two television stations in Hartford, Connecticut, as well as a "satellite waiver" to permit the continued common ownership and operation of WTTK, Kokomo, Indiana, as a satellite station of WTTV, Indianapolis, Indiana.

The Company is currently permitted to own its five cross-ownerships as follows:

- In New York, the Company acquired *Newsday*, *Greenwich Time* and *The Advocate* after the grant of its last renewal application for WPIX(TV), and is permitted to own each of them until the FCC acts on the next renewal application for WPIX(TV), which is currently pending, under the FCC's applicable policy, known as the "note 25 exception."

- In Chicago, the Company's common ownership of WGN-TV, WGN(AM), and the *Chicago Tribune* was grandfathered when the FCC adopted its cross-ownership rule in 1975.

- In Los Angeles, the Company owns both the *Los Angeles Times* and KTLA under the note 25 exception. An application for renewal of KTLA's license is pending before the FCC.

- In Miami-Ft. Lauderdale, in 1998 the Company was granted a waiver to permit it to own WSFL-TV and the *South Florida Sun-Sentinel* until six months after the FCC completes its still-pending rulemaking proceeding addressing the cross-ownership rule.

- In Hartford, the Company was granted a permanent waiver of the rules to permit it to own both WTIC-TV and WTXX(TV) because it had shown WTXX to be a "failing station." The Company is permitted to own both WTIC and the *Hartford Courant* under the note 25 exception, and it is permitted to own both WTXX and the *Hartford Courant* under a waiver

71

permitting such common ownership until after the FCC acts on WTXX's currently pending renewal application.

The Company has filed renewal applications for all twenty-four of its television stations and for WGN(AM) during the recently concluded renewal cycle. Renewal applications have been granted for WGN(AM), for WSFL-TV, Miami, Florida, and for six other television stations. The renewal applications for the other eighteen television stations remain pending before the FCC. The pending renewal applications for the New York, Los Angeles and Hartford stations each contain a request for permanent waiver of the cross-ownership rule or, in the alternative, a waiver pending the outcome of the rulemaking. Those requests were opposed in New York, Los Angeles and Hartford.

None of the newspaper broadcast cross-ownership waivers can be transferred under a transfer of control application. New waivers will be required in each of the five markets, including Chicago, which were otherwise grandfathered. Because there is a rulemaking proceeding pending in which, on remand from the United States Court of Appeals for the Third Circuit, the FCC is reviewing its ownership rules, including the cross-ownership rule, and because in that proceeding the FCC has previously adopted a rule which would have permitted each of the cross-ownerships, the parties have requested waivers of the cross-ownership rule pending the outcome of that rulemaking proceeding. On June 11, 2007, the Office of Communication of the United Church of Christ and Media Alliance filed a Petition to Deny with the FCC which opposed the grant of the cross-ownership waivers to us in connection with our transfer of control applications. The International Brotherhood of Teamsters also filed comments on the applications, as did certain other parties. The Company and the proposed transferees opposed these objections and comments in pleadings filed on June 26, 2007. In acting on the applications, the FCC may also grant a cross-ownership waiver that could require us to come into compliance with the cross-ownership rule within a specified time period, which might require us to divest either our newspaper or broadcast assets in one or more of the five cross-ownership markets.

The FCC also generally will not act on a transfer of control application for a broadcast station when a license renewal application is pending for such station. While the FCC could accelerate the processing of the pending renewal applications and act upon them at the same time it acts on the transfer of control applications, in the event that it does not elect to do so, there is a possibility that these renewal applications could remain pending until after the FCC completes its current rulemaking process.

The "failing station waiver" permitting the common ownership of the two television stations in Hartford does not transfer. In order to obtain a new "failing station waiver," the parties are required to show that WTXX is in financial distress, that it has poor viewership ratings, that it cannot be sold to an out of market buyer, and that the grant of the waiver would be in the public interest. The "satellite waiver" in the Indianapolis market, permitting the common ownership of WTTK and WTTV, similarly cannot be transferred but must be requested again by the parties. The Company has previously made the necessary showing to obtain the "satellite waiver" when it acquired these stations and currently believes that the parties have made the necessary showing to obtain a new "satellite waiver."

We cannot assure that any such approvals or other actions will be obtained, or will be obtained without substantial cost or conditions, or that the failure to obtain the approvals or other actions might not result in adverse consequences to our business and financial condition. The obligation of the parties to the Merger Agreement to close the Merger is subject to certain conditions relating to regulatory approvals. See "The Merger Agreement—Conditions to the Merger."

The Merger is not subject to the filing and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder (the "HSR Act").

**Accounting Treatment of the Merger**

We expect that, for financial reporting purposes, the Merger will be accounted for as a leveraged recapitalization, pursuant to which the historical basis of the Company's assets and liabilities will be preserved following the Merger. However, it is possible that the Merger could be accounted for as a purchase, pursuant to which, following the Merger, the Company's assets and liabilities would be reflected at their fair market value as of the date of the Merger.

72

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## IDENTITY AND BACKGROUND OF FILING PERSONS

**The Company**

Tribune Company is a media and entertainment company, operating primarily in the United States, that conducts its operations through two business segments: publishing and broadcasting and entertainment. In publishing, the Company's leading daily newspapers include the *Los Angeles Times*, *Chicago Tribune*, *Newsday* (Long Island, NY), *The Sun* (Baltimore), *South Florida Sun-Sentinel*, *Orlando Sentinel* and *Hartford Courant*. The Company's broadcasting group operates 23 television stations, Superstation WGN on national cable, Chicago's WGN-AM and the Chicago Cubs baseball team. Popular news and information websites complement the Company's print and broadcast properties and extend its nationwide audience. These segments reflect the manner in which the Company sells its products to the marketplace, manages its operations and makes business decisions. The Company's media operations are principally in major metropolitan areas of the United States and compete against all types of media on both a local and national basis. The Company was founded in 1847 and incorporated in Illinois in 1861. As a result of a corporate restructuring in 1968, the Company became a holding company incorporated in Delaware. The principal executive offices of the Company are located at 435 North Michigan Avenue, Chicago, Illinois 60611 and its telephone number is (312) 222-9100. The Company is publicly traded on the New York Stock Exchange (the "NYSE") under the symbol "TRB."

The names of each of the members of the Company's Board and each of the Company's executive officers and their business experience and principal positions held during the past five years are set forth below. Except as set forth below, the business address and telephone number of each of the below directors or executive officers is c/o Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611; telephone number (312) 222-9100.

### Company Directors

*Dennis J. FitzSimons.*    Chairman (since January 2004), Chief Executive Officer (since January 2003), President (since July 2001), Chief Operating Officer (from July 2001 until December 2002) and Executive Vice President (from January 2000 until July 2001) of Tribune Company; President of Tribune Broadcasting Company, a subsidiary of Tribune Company, from May 1997 until January 2003. Director since 2000.

*Enrique Hernandez, Jr.*    Chairman and Chief Executive Officer of Inter-Con Security Systems, Inc., 210 South De Lacey Avenue, Pasadena, CA 91105, an international provider of high-end security and facility support services to government, utilities and industrial customers, since 1986; Co-founder and principal partner of Interspan Communications, a television broadcasting company serving Spanish-speaking audiences, since 1998. Director of McDonald's Corporation and Wells Fargo & Company. Director and Chairman of Nordstrom, Inc. Director since 2001.

*Betsy D. Holden.*    President–Global Marketing and Category Development of Kraft Foods Inc., a food business unit of Altria Group Inc., from January 2004 through June 2005; Co-Chief Executive Officer of Kraft Foods Inc. from March 2001 until December 2003; President and Chief Executive Officer of Kraft Foods North America from May 2000 until December 2003. Director of Western Union Company. Director since 2002.

*Robert S. Morrison.*    Interim Chairman and Chief Executive Officer of 3M Company, a diversified technology company, from June 2005 until December 2005. Vice Chairman of PepsiCo, Inc., a processor of packaged foods and beverages, and Chairman of PepsiCo Beverages and Foods North America from August 2001 until his retirement in February 2003; Chairman, President and Chief Executive Officer of The Quaker Oats Company from October 1997 until its merger with PepsiCo in

73

August 2001. Director of 3M Company, Aon Corporation and Illinois Tool Works, Inc. Director since 2001.

*William A. Osborn.*    Chairman and Chief Executive Officer of Northern Trust Corporation, 50 South LaSalle Street, Chicago, IL 60675, a multibank holding company, and its principal subsidiary, The Northern Trust Company, since October 1995. Director of Caterpillar Inc. and Northern Trust Corporation. Director since 2001.

*J. Christopher Reyes.*    Chairman of Reyes Holdings, LLC, 9500 West Bryn Mawr Avenue, Suite 700, Rosemont, IL 60018, a food and beverage distribution company, since 1997. Director of The Allstate Corporation and Wintrust Financial Corporation. Director since 2005. On June 25, 2007, Mr. Reyes provided the Company with written notice of his decision to resign as a director, for personal business considerations and commitments, following the July 18, 2007 meeting of the Board.

*Dudley S. Taft.*    President and Director of Taft Broadcasting Company, 312 Walnut Street, Suite 3550, Cincinnati, OH 45202, an investor in media and entertainment companies, since 1987. Director of Duke Energy Corporation, Fifth Third Bancorp and UNIFI Mutual Holding Company. Director since 1996.

*Miles D. White.*    Chairman and Chief Executive Officer of Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, a broad-based medical products and pharmaceutical company, since 1999. Chairman of the Federal Reserve Bank of Chicago. Director of Abbott Laboratories and Motorola, Inc. Director since 2005.

*Samuel Zell.*    President and Chairman of Equity Group Investments, L.L.C., Two North Riverside Plaza, Suite 600, Chicago, IL 60606. Chairman of the Board of Anixter International Inc., Capital Trust, Inc., Equity Lifestyle Properties, Inc., Equity Residential and Covanta Holding Corporation. Chairman of the Board of Equity Office Properties Trust until its sale in February 2007. Director since May 2007.

### Company Executive Officers

*Dennis J. FitzSimons.*    Chairman (since January 2004), Chief Executive Officer (since January 2003) and President (since July 2001); Chief Operating Officer from July 2001 until December 2002; Executive Vice President from January 2000 until July 2001; President of Tribune Broadcasting Company* from May 1997 until January 2003.

*Donald C. Grenesko.*    Senior Vice President/Finance and Administration.

*Crane H. Kenney.*    Senior Vice President, General Counsel and Secretary.

*Timothy J. Landon.*    President of Tribune Interactive, Inc.* since March 2004; President of Tribune Classified* from June 2000 until March 2004.

*Thomas D. Leach.*    Senior Vice President/Development since February 2005; Vice President/ Development from February 2004 until February 2005; Vice President and Chief Financial Officer of Tribune Broadcasting Company* from March 2001 until January 2004.

*Luis E. Lewin.*    Senior Vice President/Human Resources.

*R. Mark Mallory.*    Vice President and Controller.

*Ruthellyn Musil.*    Senior Vice President/Corporate Relations since February 2004; Vice President/ Corporate Relations until February 2004.

74

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

*John E. Reardon.*  President of Tribune Broadcasting Company* since November 2005; Vice President of Tribune Broadcasting Company* from March 2004 until November 2005; Vice President and General Manager of KTLA-TV, Los Angeles* until March 2004.

*Scott C. Smith.*  President of Tribune Publishing Company* since January 2005 and Publisher of Chicago Tribune Company* since October 2006; Chief Operating Officer of Tribune Publishing Company* from November 2004 until January 2005; President of Chicago Tribune Company* until November 2004.

---

\*    A subsidiary or a division of Tribune Company.

During the past five years, none of the persons described above or the Tribune Company has been (i) convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or (ii) party to any judicial or administrative proceeding (except for matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining the person from future violations of, or prohibiting activities subject to, federal or state securities laws or a finding of any violation of federal or state securities laws. Each person identified above is a United States citizen.

## The ESOP and Merger Sub

The address of the Tribune Employee Stock Ownership Plan is c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523; telephone (630) 572-5130.

The ESOP was newly formed by the Company on April 1, 2007, with an effective date of January 1, 2007, to enable eligible employees to acquire stock ownership interests in the Company by investing primarily in the Company's common stock. The ESOP is intended to be a qualified employee benefit plan under section 401(a) of the Code and an employee stock ownership plan within the meaning of section 4975(c)(7) of the Code. The ESOP is intended to invest primarily in the common stock of the Company, and is specifically permitted to invest up to 100% of its assets in the common stock of the Company.

Tesop Corporation is a Delaware corporation wholly owned by the ESOP with its principal executive offices at c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523. Merger Sub's telephone number is (630) 572-5130. Merger Sub was formed solely for purposes of entering into and consummating the Leveraged ESOP Transactions. Merger Sub has not conducted any activities to date other than activities incidental to its formation and in connection with the Leveraged ESOP Transactions.

### The Trustee of the ESOP

The ESOP has no board of directors or similar board of managers. The Trustee of the ESOP is GreatBanc Trust Company. GreatBanc Trust Company is a Delaware corporation with its principal executive offices at 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523, and its telephone number is (630) 572-5130. Incorporated in 1989, GreatBanc Trust Company provides trust, investment and wealth management services to individuals as well as a range of institutional services to corporations, foundations, endowments and not-for-profit organizations. GreatBanc Trust Company is an independent ERISA trustee with a specialization in employee stock ownership plans. Together with its affiliates, Salem Trust Company and Pennant Management, Inc., GreatBanc Trust Company supervises client assets from its headquarters in Oak Brook, Illinois and offices in New York, Chicago, Milwaukee and several locations in Florida.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0523206

*Merger Sub Directors and Executive Officers*

The names of each of the members of Merger Sub's board of directors and each of Merger Sub's executive officers and their business experience and principal positions held during the past five years are set forth below. The business address and telephone number of each of the below directors or executive officers is c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523; telephone number (630) 572-5130.

*Merger Sub Director*

*Michael Welgat.*   President and Chief Executive Officer of GreatBanc Trust Company since 1989; President of U.S. Fiduciary Services, Inc., the parent holding company of GreatBanc Trust Company and Executive Vice President of Pennant Management, Inc., a subsidiary of U.S. Fiduciary Services, Inc.

*Merger Sub Executive Officers*

*Marilyn Marchetti.*   President. Has been a Senior Vice President of GreatBanc Trust Company since 1999.

*Danielle Montesano.*   Secretary/Treasurer. Has been a Senior Vice President of GreatBanc Trust Company since 2005 and has been associated with GreatBanc Trust Company since 1999, including formerly as Chief Compliance Officer, Secretary and General Counsel.

During the past five years, none of the ESOP, the Trustee, Merger Sub or any of Merger Sub's directors or executive officers has been (i) convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or (ii) party to any judicial or administrative proceeding (except for matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining the person from future violations of, or prohibiting activities subject to, federal or state securities laws or a finding of any violation of federal or state securities laws. Each of Merger Sub's directors and executive officers is a United States citizen.

## The Zell Investors

The Zell Investors consist of Samuel Zell, the Zell Entity and Sam Investment Trust. Mr. Zell is the President of the Zell Entity and is also President and Chairman of Equity Group Investments, L.L.C. ("EGI"). Mr. Zell also serves as the Chairman of the Board of Anixter International Inc.; Capital Trust, Inc.; Equity Lifestyle Properties, Inc.; Equity Residential; and Covanta Holding Corporation. Mr. Zell has been a Director of Tribune Company since May 2007, and served as Chairman of the Board of Equity Office Properties Trust until its sale in February 2007. Mr. Zell's address is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606. His telephone number is (312) 454-0100.

The Zell Entity is a Delaware limited liability company wholly owned by Sam Investment Trust, a trust established for the benefit of Mr. Zell and his family. Its address is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606. The Zell Entity's telephone number is (312) 454-0100. The Zell Entity was formed solely for purposes of entering into and consummating the Leveraged ESOP Transactions. The Zell Entity has not conducted any activities to date other than activities incidental to its formation and in connection with the Leveraged ESOP Transactions.

The Zell Entity's sole member is Sam Investment Trust ("SIT"), an Illinois trust established for the benefit of Mr. Zell and his family. The trustee of SIT is Chai Trust Company, LLC, an Illinois limited liability company ("Chai Trust"). The names of each of Chai Trust's officers and managing directors and their business experience and principal positions held during the past five years are set forth below. Except as set forth below, the business address and telephone number of Chai Trust and each of its

76

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

officers and managing directors listed below is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606; telephone number (312) 454-0100.

EGI is a private corporate and real estate investment firm co-founded by Mr. Zell in 1968, and is owned by trusts established for the benefit of Mr. Zell and his family (but not SIT). Mr. Zell is the President and Chairman of EGI, which provides investment advisory services to Chai Trust. However, EGI does not have investment control over Chai Trust and the assets held by the trusts controlled by Chai Trust. As such, EGI has no ownership or beneficial interest in either the Zell Entity or SIT, is not a party to any of the agreements entered into in connection with the Leveraged ESOP Transactions, and has no beneficial interest therein.

### Zell Entity Executive Officers

The Zell Entity has no board of directors or similar board of managers. The names of each of the Zell Entity's executive officers and their business experience and principal positions held during the past five years are set forth below. The business address and telephone number of each of the below executive officers of the Zell Entity is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606; telephone number (312) 454-0100.

*Samuel Zell.* President. President and Chairman, EGI. Chairman of the Board of Anixter International Inc., Capital Trust, Inc., Equity Lifestyle Properties, Inc., Equity Residential and Covanta Holding Corporation. Director of Tribune Company since May 9, 2007. Chairman of the Board of Equity Office Properties Trust until its sale in February 2007.

*William C. Pate.* Vice President. Chief Investment Officer of EGI since March 2006, Managing Director of EGI from July 2000 until March 2006. Director of Hanover Compressor Company since January 2007. Director of Covanta Holding Corporation since 1999 and Chairman of the Board from October 2004 until September 2005. Director of Adams Respiratory Therapeutics, Inc. from 2000 until April 2007. Director of Home Products International, Inc. from December 2004 to January 2006.

*Philip G. Tinkler.* Vice President. Chief Financial Officer and Chief Operating Officer, EGI, Vice President—Accounting from December 2002 until March 2006. President and Chief Executive Officer, First Capital Financial, L.L.C., since March 2006; served in other capacities since 2001. Chief Financial Officer, Covanta Holding Corporation, from January 2003 until October 2004. Director of Home Products International, Inc. since January 2006.

### Chai Trust Executive Officers

*Donald J. Liebentritt.* President. Senior Advisor, EGI, since January 2006; President from 2000 until 2005. Chief Executive Officer and President, First Capital Financial, L.L.C., from December 2002 until March 2006. Director, Adams Respiratory Therapeutics, Inc. since February 2005. Director, Rewards Network Inc. since 2005. Director, Home Products International, Inc., from December 2004 until March 2007.

*Robert M. Levin.* Senior Trust Officer. Partner, Levin & Schreder, Ltd., 120 North LaSalle Street, Suite 3800, Chicago, Illinois 60602; (312) 332-6300.

*James Bunegar.* Vice President, Chief Financial Officer, Assistant Trust Officer and Treasurer. Vice President—Taxes, EGI.

### Chai Trust Managing Directors

*Donald J. Liebentritt.* Senior Advisor, EGI since January 2006; President from 2000 until 2005. Chief Executive Officer and President, First Capital Financial, L.L.C., from December 2002 until March 2006. Director, Adams Respiratory Therapeutics, Inc. since February 2005. Director, Rewards

77

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Network Inc. since 2005. Director, Home Products International, Inc., from December 2004 until March 2007.

*Robert M. Levin.*    Partner, Levin & Schreder, Ltd., 120 North LaSalle Street, Suite 3800, Chicago, Illinois 60602; (312) 332-6300.

*Bert Cohen.*    Private Investor, 5000-4A Estate Enighed, #65, St. John, VI 00830.

*Kellie Zell Harper.*    Homemaker.

*Leah Zell Wanger.*    Private Investor, 227 West Monroe Street, Chicago, Illinois 60603.

*JoAnn Zell Gillis.*    Physician.

*Matthew Zell.*    Managing Director, EGI. Director, Anixter International Inc. since 2001. Director of Desarrolladora Homex, S.A. de C.V. since 2004.

During the past five years, none of the Zell Investors nor, to any of the Zell Investors' knowledge, any of the Zell Entity's executive officers or any of Chai Trust's officers or managing directors has been (i) convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or (ii) party to any judicial or administrative proceeding (except for matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining the person from future violations of, or prohibiting activities subject to, federal or state securities laws or a finding of any violation of federal or state securities laws. Mr. Zell and each other executive officer of the Zell Entity and each officer or managing director of Chai Trust is a United States citizen.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523209