## THE SPECIAL MEETING

### Time, Place and Purpose of the Special Meeting

We are furnishing this proxy statement to our shareholders as part of the solicitation of proxies by our Board for use at the special meeting to be held at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois, on August 21, 2007, at 9:00 a.m. Central Time, or at any adjournment or postponement thereof. The purpose of the special meeting is for our shareholders to consider and vote upon the adoption of the Merger Agreement and thereby approve the Merger. If our shareholders fail to adopt the Merger Agreement, the Merger will not occur. A copy of the Merger Agreement is attached to this proxy statement as Annex A. This proxy statement and the enclosed form of proxy are first being mailed to our shareholders on or about July 17, 2007.

### Record Date and Quorum

The holders of record of Company Common Stock as of the close of business on July 12, 2007, the record date for the special meeting, are entitled to receive notice of and to vote at the special meeting. On the record date, 127,330,754 shares of Company Common Stock were outstanding (excluding shares held by our subsidiaries).

A quorum is necessary to hold and transact business at the special meeting. The presence in person or by proxy of holders representing a majority of the votes entitled to be cast at the special meeting will constitute a quorum for the transaction of business at the special meeting. Any shares of Company Common Stock held in treasury by the Company or by any of our subsidiaries will not be counted for purposes of determining a quorum. Once a share is represented at the special meeting, it will be counted for the purpose of determining a quorum at the special meeting and any adjournment of the special meeting. However, if a new record date is set for the adjourned special meeting, then a new quorum will have to be established.

### Required Vote

Adoption of the Merger Agreement and approval of the Merger requires the affirmative vote of the holders of a majority of shares of Company Common Stock outstanding on the record date and entitled to vote thereon. Each shareholder entitled to vote will have the right to one vote for each such share of Company Common Stock held. A failure to vote, an abstention or a broker non-vote will have the same effect as a vote against the proposal to adopt the Merger Agreement and approve the Merger. In addition, the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies requires the affirmative vote of a majority of the votes cast by our shareholders on the proposal. For the purpose of such adjournment proposal, if a holder of shares of Company Common Stock fails to cast a vote, in person or by authorizing a proxy, such failure will not have any effect on the outcome of the proposal. Abstentions and broker non-votes are not considered votes cast and therefore will have no effect on the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies.

As of the record date, there are 127,330,754 shares of Company Common Stock outstanding (excluding shares held by our subsidiaries), and the directors and executive officers of the Company beneficially owned (excluding options, restricted stock units and other stock-based awards), in the aggregate, approximately 706,033 shares of Company Common Stock, or approximately 0.6% of the outstanding shares of Company Common Stock. The amount of shares shown as beneficially owned by our directors and executive officers does not include the approximately 1.2% of the outstanding shares of Company Common Stock held by the Zell Entity.

Each of our directors and current executive officers has indicated to us that they currently intend to vote all of their shares of Company Common Stock "**FOR**" the adoption of the Merger Agreement and approval of the Merger and "**FOR**" any adjournment of the special meeting, if necessary or appropriate to solicit additional proxies, although none of such persons have entered into agreements obligating them to do so. The Zell Entity, which is owned by a trust established for the benefit of Zell

79

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523210

(who became a director of the Company effective May 9, 2007) and his family, has entered into an agreement to vote all of the shares of Company Common Stock that it beneficially owns in favor of the adoption of the Merger Agreement and approval of the transactions contemplated thereby, including the Merger. See "Other Transaction Agreements—Zell Entity Purchase Agreement."

As of the record date, July 12, 2007, the ESOP holds and is entitled to vote approximately 7% of the outstanding shares. The ESOP intends to vote all its shares of Company Common Stock in favor of the adoption of the Merger Agreement and approval of the Merger.

**Proxies; Revocation**

If you are a shareholder of record and submit a proxy by telephone or the Internet or by returning a signed proxy card by mail, we will vote your shares at the special meeting as you indicate on your proxy card or by such other method. If you sign your proxy card but no voting instructions are indicated, we will vote your shares of Company Common Stock "**FOR**" the adoption of the Merger Agreement and approval of the Merger and "**FOR**" any adjournment of the special meeting, if necessary or appropriate to solicit additional proxies.

If your shares are held in "street name" by your broker, bank or other nominee, you should instruct your broker, bank or other nominee how to vote your shares using the instructions provided by your broker, bank or other nominee. If you have not received such voting instructions or require further information regarding such voting instructions, contact your broker, bank or other nominee for directions on how to vote your shares. Under the rules of the NYSE, brokers who hold shares in "street name" for customers may not exercise their voting discretion with respect to the approval of non-routine matters such as the Merger proposal and thus, absent specific instructions from the beneficial owner of your shares, your broker is not empowered to vote such shares with respect to the adoption of the Merger Agreement. Shares of Company Common Stock held by persons attending the special meeting but not voting, or shares for which the Company has received proxies with respect to which holders have abstained from voting, will be considered abstentions. Abstentions and properly executed broker non-votes, if any, will be treated as shares that are present and entitled to vote at the special meeting for purposes of determining whether a quorum exists but will have the same effect as a vote "against" adoption of the Merger Agreement because adoption of the Merger Agreement requires the affirmative vote of a majority of the shares of Company Common Stock outstanding and entitled to vote. For the purpose of any adjournment proposal, if a holder of shares of Company Common Stock fails to cast a vote, in person or by authorizing a proxy, such failure will not have any effect on the outcome of the proposal.

If you are a participant in any of the Tribune Company 401(k) Savings and Profit Sharing Plan, the Tribune Company Defined Contribution Retirement Plan, or the Times Mirror Savings Plus Plan (collectively, the "Retirement Plans") or if you are a participant in the Tribune Company Employee Stock Purchase Plan (the "Stock Purchase Plan"), you will receive a voting instruction card with respect to those shares of Company Common Stock subject to the plan which will provide the trustee of the plans, with instructions on how to vote those shares. You must submit your voting instructions for your shares to the trustee by the close of business on August 17, 2007 to allow the trustee time to receive your voting instructions and to vote on behalf of the plan. If you hold shares of Company Common Stock outside of these plans, you will receive a separate proxy or voting instruction card for those shares. In order to have all of your shares counted at the meeting, you must complete and submit all cards that you receive.

You may revoke your proxy at any time before the vote is taken at the special meeting. To revoke your proxy, you must advise our Corporate Secretary in writing, at Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611, Attention: Corporate Secretary, submit a proxy by telephone, the Internet or mail dated after the date of the proxy you wish to revoke or attend the special meeting and vote your shares in person. Attendance at the special meeting will not by itself constitute revocation of a proxy.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523211

Please note that if you have instructed your broker, bank or other nominee to vote your shares, the options for revoking your proxy described in the paragraph above do not apply and instead you must follow the directions provided by your broker, bank or other nominee to change these instructions.

The Company does not expect that any matter other than the adoption of the Merger Agreement and approval of the Merger (and the approval of the adjournment of the meeting, if necessary or appropriate, to solicit additional proxies) will be brought before the special meeting. If, however, any such other matter is properly presented at the special meeting or any adjournment or postponement of the special meeting, the persons appointed as proxies will have discretionary authority to vote the shares represented by duly executed proxies in accordance with their discretion and judgment.

Shareholders of record and many shareholders who hold their shares through a broker, bank or other nominee will have the option to submit their proxies or voting instructions via the Internet or by telephone. There are separate arrangements for using the Internet and telephone to submit your proxy depending on whether you are a shareholder of record or your shares are held in "street name" by your broker, bank or other nominee. If your shares are held in "street name," you should check the voting instruction card provided by your broker, bank or other nominee to see which options are available and the procedures to be followed.

In addition to submitting the enclosed proxy card by mail, the Company's shareholders of record may submit their proxies:

- via the Internet by visiting the website established for that purpose indicated on the enclosed proxy card; or
- by telephone by calling the number indicated on the enclosed proxy card and following the recorded instructions.

**Adjournments and Postponements**

The special meeting may be adjourned or postponed for the purpose of soliciting additional proxies, if necessary. Any adjournment may be made without notice (if the adjournment is not for more than 30 days) by an announcement made at the special meeting of the time, date and place of the adjourned meeting. In the event that there is present, in person or by proxy, holders representing sufficient shares of Company Common Stock to secure the vote of the shareholders of the Company necessary to adopt the Merger Agreement and approve the Merger, the Company does not anticipate that we will adjourn or postpone the meeting. Any signed proxies received by the Company in which no voting instructions are provided on such matter will be voted in favor of an adjournment in these circumstances. Any adjournment or postponement of the special meeting for the purpose of soliciting additional proxies will allow the Company's shareholders who have already sent in their proxies to revoke them at any time prior to their use at the special meeting as adjourned or postponed.

**Solicitation of Proxies**

The Company will pay the cost of this proxy solicitation. In addition to soliciting proxies by mail, directors, officers and employees of the Company may solicit proxies personally and by telephone, facsimile or other electronic means of communication. These persons will not receive additional or special compensation for such solicitation services.

The Company will, upon request, reimburse brokers, banks and other nominees for their expenses in sending proxy materials to their customers who are beneficial owners and obtaining their voting instructions. The Company has retained Innisfree M&A Incorporated, a proxy solicitation firm, to assist it in the solicitation of proxies for the special meeting. The Company will pay Innisfree M&A Incorporated a customary fee for these services, plus reimbursement of out-of-pocket expenses. See "Special Factors—Fees and Expenses."

The ESOP and the Zell Entity, directly or through one or more affiliates or representatives, may, at their own cost, also make additional solicitations by mail, telephone, facsimile or other contact in connection with the Merger.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0523212**

## THE MERGER AGREEMENT

The following is a summary of certain material provisions of the Merger Agreement, a copy of which is attached as Annex A to this proxy statement and which we incorporate by reference herein. This summary does not purport to be complete and may not contain all of the information about the Merger Agreement that is important to you. We encourage you to read carefully the Merger Agreement in its entirety, as the rights and obligations of the parties are governed by the express terms of the Merger Agreement and not by this summary or any other information contained in this proxy statement.

The description of the Merger Agreement in this proxy statement has been included to provide you with information regarding its terms. The Merger Agreement contains representations and warranties made by and to the Company, the ESOP and Merger Sub as of specific dates. The statements embodied in those representations and warranties were made for purposes of that contract among the parties and are subject to qualifications and limitations agreed by the parties in connection with negotiating the terms of that contract.

*Effective Time; Structure.* At the "Effective Time" of the Merger, Merger Sub will merge with and into the Company with the Company surviving the Merger (the "Surviving Corporation") and becoming a wholly owned subsidiary of the ESOP. The Effective Time will occur at the time that the Company files a certificate of merger with the Secretary of State of the State of Delaware on the closing date of the Merger (or such later time as Merger Sub and the Company may agree and as provided in the certificate of merger). The closing date will occur no later than the third business day after satisfaction or waiver of the conditions to the Merger (other than those conditions that are to be satisfied at the closing) set forth in the Merger Agreement (or such other date as the ESOP and the Company may agree), as described below under "The Merger Agreement—Conditions to the Merger."

*Treatment of Company Common Stock.* In the Merger, each share of Company Common Stock, other than shares owned by the ESOP or Merger Sub immediately prior to the Effective Time or for which appraisal rights have been properly exercised, will be converted into and represent the right to receive $34.00 in cash, plus, if the Merger does not close by January 1, 2008, the Additional Share Consideration (as defined below), if any (the "Merger Consideration"). The "Additional Share Consideration" means the amount per share, if any, equal to (1) $34.00, multiplied by (2) 8%, multiplied by (3) the quotient obtained by dividing the number of days elapsed from January 1, 2008 to and including the Closing Date by 365. All shares of Company Common Stock that have been converted into the right to receive the Merger Consideration will be automatically cancelled and cease to exist, and the holders of certificates which, immediately prior to the Effective Time, represented such shares, will cease to have any rights with respect to such shares other than the right to receive the Merger Consideration.

*Treatment of ESOP and Merger Sub-Owned Shares.* In the Merger, each share of Company Common Stock owned, directly or indirectly, by the ESOP or Merger Sub immediately prior to the Effective Time or held by the Company immediately prior to the Effective Time will be cancelled and retired and no consideration will be delivered in exchange for such cancellation and retirement.

*Treatment of Preferred Stock.* As of May 31, 2007, there were approximately 60,671,319 shares of Company Common Stock and approximately 137,643 shares of Series D-1 Preferred Stock of the Company held by the Eagle Entities (as defined below). All of the common equity interests in the Eagle Entities are held by the Company. The Merger Agreement contemplates that, immediately prior to the Merger, the shares of Series D-1 Preferred Stock and the shares of Company Common Stock held by the Eagle Entities will be exchanged for a new Series E Preferred Stock of the Company, as described below under "The Merger Agreement—Eagle Exchange." Each share of Series E Preferred

82

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0523213**

Stock outstanding at the time of the Merger will remain outstanding following the Merger and will be entitled to appraisal rights.

*Treatment of Merger Sub Common Stock.*   All the issued and outstanding shares of common stock of Merger Sub will be converted into, in the aggregate, 56,521,739 shares of common stock of the Surviving Corporation.

*Representations and Warranties.*   The Merger Agreement contains representations and warranties made by the Company to the ESOP and Merger Sub, and representations and warranties made by the ESOP and Merger Sub to the Company. These representations and warranties are subject to important limitations and qualifications agreed to by the parties in connection with negotiating the terms of the Merger Agreement. In particular, the representations that the Company made are qualified by filings that the Company made with the SEC after December 25, 2005 and prior to the date of the Merger Agreement (other than risk factor and similar cautionary disclosure contained in such filings), as well as by a confidential disclosure schedule that the Company delivered to the ESOP and Merger Sub concurrently with the signing of the Merger Agreement. In addition, certain representations and warranties were made as of a specified date, may be subject to contractual standards of materiality different from those generally applicable to public disclosures to shareholders, or may have been used for the purpose of allocating risk among the parties rather than establishing matters of fact. For the foregoing reasons, you should not rely on the representations and warranties contained in the Merger Agreement as statements of factual information. The Company's material representations and warranties relate to:

- the Company's, its subsidiaries' and certain joint ventures' proper organization, good standing and qualification to do business;

- the Company's capitalization, including the number of outstanding shares of Company Common Stock and preferred stock, stock options and other equity-based interests;

- the Company's corporate power and authority to enter into the Merger Agreement and to consummate the transactions contemplated by the Merger Agreement;

- the absence of violations of or conflicts with the Company's and its subsidiaries' and certain joint ventures' governing documents, applicable law or certain agreements as a result of entering into the Merger Agreement and consummating the Merger and the other transactions contemplated by the Merger Agreement;

- the timeliness and compliance with SEC requirements of the Company's SEC filings since December 25, 2005, including the accuracy and compliance with GAAP and SEC requirements of the financial statements contained therein;

- the adequacy of the Company's disclosure controls and procedures and internal controls over financial reporting;

- the absence of undisclosed liabilities;

- permits and compliance with applicable legal requirements, including licenses issued by the FCC;

- environmental matters;

- matters relating to employee benefit plans;

- the absence of certain changes since December 31, 2006 and the absence of certain changes since the date of the Merger Agreement;

- legal proceedings and investigations;

83

TRB0523214

- accuracy and compliance with applicable securities law of filings made by the Company with the SEC in connection with the Merger Agreement;

- amendment of the Rights Agreement;

- tax matters;

- employment and labor matters affecting the Company or its subsidiaries;

- intellectual property and real property;

- the receipt by the Board of an opinion from Morgan Stanley and Merrill Lynch as to the fairness, from a financial point of view, of the Merger Consideration to be received by the holders of shares of Company Common Stock (other than certain affiliated entities);

- the required vote of the Company's shareholders in connection with the required adoption of the Merger Agreement and approval of the Merger;

- material contracts and performance of obligations thereunder;

- absence of undisclosed brokers' fees;

- insurance;

- absence of affiliate transactions;

- indebtedness; and

- cable and satellite matters.

Many of the Company's representations and warranties are qualified by a "Company Material Adverse Effect" standard. For the purposes of the Merger Agreement, "Company Material Adverse Effect" means any facts, circumstances, events or changes that are materially adverse to the business, assets, financial condition, results of operations on an ongoing basis or continuing operations of the Company and its subsidiaries, taken as a whole, or that have a material adverse effect on the ability of the Company to perform its obligations under the Merger Agreement, or to consummate the Merger and the other transactions to be consummated by the Company.

However, a Company Material Adverse Effect will not include facts, circumstances, events or changes resulting from:

- changes in general economic or political conditions or the securities, credit or financial markets in general;

- general changes or developments in the industries in which the Company and its subsidiaries operate, including general changes in law or regulation across such industries;

- the announcement of the Merger Agreement or the pendency or consummation of the Merger;

- compliance with the terms of, or the taking of any action required by, the Merger Agreement or consented to by the Zell Entity and the ESOP;

- any acts of terrorism or war;

- the identity of the Zell Entity or the ESOP or any of their affiliates as participants in the transactions contemplated by the Merger Agreement or other agreements described in the Merger Agreement; or

- changes in United States generally accepted accounting principles ("GAAP") or the interpretation of GAAP by the Financial Accounting Standards Board, the Accounting Principles Board, the American Institute of Certified Public Accountants and similar organizations.

84

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523215

The exceptions described in the first two bullet points above will apply except to the extent such facts, circumstances, events, changes or developments have a disproportionate impact on the Company and its subsidiaries, taken as a whole, relative to other companies in the industries or in the geographic markets in which the Company conducts its businesses after taking into account the size of the Company relative to such other companies.

The parties also have agreed that any decline in the stock price of the Company Common Stock or any failure to meet internal or published projections, forecasts or revenue or earning predictions for any period will not, in and of itself, constitute a Company Material Adverse Effect, but the underlying causes of such decline or failure will be considered to the extent applicable in determining whether there is a Company Material Adverse Effect.

The Merger Agreement also contains various representations and warranties made by the ESOP and Merger Sub that are subject, in some cases, to specified exceptions and qualifications. The material representations and warranties relate to:

- organization, valid existence and good standing;

- corporate or other power and authority to enter into the Merger Agreement and to consummate the transactions contemplated by the Merger Agreement;

- enforceability of the Merger Agreement as against the ESOP and Merger Sub;

- required consents and approvals of governmental entities in connection with the consummation of the Merger and the other transactions contemplated by the Merger Agreement;

- the absence of any violation of or conflict with their governing documents, applicable law or certain agreements as a result of entering into the Merger Agreement and consummating the Merger and the other transactions contemplated by the Merger Agreement;

- governmental investigations and litigation;

- accuracy and compliance with applicable securities law of the information supplied by the ESOP and Merger Sub for inclusion in the filings made with the SEC in connection with the Tender Offer, the Merger and the other transactions contemplated by the Merger Agreement;

- capitalization of Merger Sub;

- lack of ownership of Company Common Stock; and

- absence of undisclosed broker's fees.

Many of the ESOP and Merger Sub's representations and warranties are qualified by an "ESOP Material Adverse Effect" standard. For the purposes of the Merger Agreement, "ESOP Material Adverse Effect" means an effect that prevents or materially delays or materially impairs the ability of the ESOP or Merger Sub to consummate the Merger and the transactions contemplated by the Merger Agreement.

The representations and warranties of each of the parties to the Merger Agreement will expire upon the Effective Time.

*Conduct of Business Pending the Merger.*   Under the Merger Agreement, the Company has agreed that, subject to certain exceptions, from and after the date of the Merger Agreement and prior to the Effective Time or the date, if any, on which the Merger Agreement is earlier terminated:

- the Company and its subsidiaries will conduct their business in the ordinary course of business in a manner consistent with past practice; and

85

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

- the Company and its subsidiaries will use their reasonable best efforts to preserve substantially intact the Company's business and to keep available the services of the key present officers, employees and consultants.

The Company has also agreed that during the same time period, subject to certain exceptions contained in the Merger Agreement and except as otherwise contemplated by the Merger Agreement, the Company will not (unless the ESOP gives its prior written consent):

- authorize or pay any dividend or distribution on any shares of capital stock or other equity securities (other than dividends and distributions made on a pro rata basis by subsidiaries and except that the Company may continue to pay dividends on its preferred stock);

- split, combine or reclassify its capital stock or other equity securities, or issue or authorize or propose to issue any other securities in respect of its capital stock or other equity securities, except for any such transaction by a wholly owned subsidiary that remains a wholly owned subsidiary after consummation of such transaction and except as contemplated by the Eagle Exchange;

- increase the compensation or other benefits provided to the Company's employees, directors, consultants, contractors or service providers except in the ordinary course of business consistent with past practice; pay any pension, service or retirement benefits not required by any existing plan or agreement; enter into or amend any compensation or benefit plan, collective bargaining agreement or welfare benefit plan, other than employment, severance or retention agreements entered into in the ordinary course of business consistent with past practice between the Company (or one of its subsidiaries) and any consultant, independent contractor, service provider or employee who is not an executive officer; or accelerate the vesting of, or the lapsing of restrictions with respect to, any stock-based compensation, or otherwise accelerate any rights or benefits or make determinations that would result in a material increase in liabilities under any Company benefit plan;

- change financial accounting policies or procedures or any of its methods of reporting income, deductions or other material items for financial accounting purposes, except as required by GAAP or applicable law;

- amend any provision of its certificate of incorporation or by-laws or similar applicable charter documents;

- issue, sell, pledge, dispose of or encumber, or authorize any of the foregoing in respect of shares of capital stock or other ownership interests in the Company or any Subsidiaries, other than certain permitted issuances of shares;

- except among the Company and its wholly owned subsidiaries or among the Company's wholly owned subsidiaries, purchase, redeem or otherwise acquire any shares of capital stock or other equity securities or any rights, warrants or options to acquire any such equity securities;

- incur, assume, guarantee, prepay or otherwise become liable for any indebtedness for borrowed money except for (1) indebtedness incurred to replace any existing indebtedness on certain terms; (2) guarantees by the Company of indebtedness of subsidiaries; (3) indebtedness necessary to effect the exercise of the purchase option for the properties owned by TMCT, LLC and leased to the Company and its subsidiaries; (4) indebtedness in an amount not to exceed $100 million in aggregate principal amount outstanding at one time incurred under the existing credit agreements or as an advance under the revolving credit facility included in the new credit agreements; (5) indebtedness for borrowed money among the Company and its wholly owned subsidiaries or among the Company's wholly owned subsidiaries; (6) indebtedness as required to

86

consummate the Tender Offer; and (7) unsecured indebtedness not to exceed $100 million in aggregate principal amount outstanding at any time;

- sell, lease, license, transfer, exchange or swap, mortgage or otherwise encumber or otherwise dispose of any material portion of its properties or assets, except sales of inventory in the ordinary course and pursuant to existing agreements;

- modify, amend, terminate or waive any rights under certain material contracts in any material respect in a manner that is adverse to the Company;

- enter into certain material contracts;

- make, change or revoke any material tax election; file any amended tax return or settle or compromise any liability for taxes;

- acquire, including by merger, consolidation or acquisition, any corporation or business organization or any division, or any material amount of assets with a purchase price of $120 million in the aggregate, provided that without the consent of the ESOP, the Company will not acquire or make any investment in any entity that holds any license, authorization or approval issued by the FCC;

- adopt a plan of restructuring, recapitalization or other reorganization;

- settle any claim, action or proceeding, except those involving only the payment of monetary damages not in excess of $20 million individually and $75 million in the aggregate;

- make capital expenditures other than in accordance with the Company's budget consistent with past practice and other expenditures necessary in response to emergencies such as natural disasters or acts of terrorism;

- enter into any agreement, arrangement or understanding between the Company (or any subsidiary) and any affiliate that would be required to be disclosed under Item 404 of Regulation S-K;

- take any action reasonably likely to prevent or cause a material delay in the satisfaction of certain conditions contained in the Merger Agreement or the consummation of the Merger; or

- agree, or permit any of its subsidiaries, to take any of the foregoing actions.

In addition, the Company has agreed that between the date of the Merger Agreement and the Effective Time, it shall not, and shall not permit any of its subsidiaries or affiliates to, enter into or consummate any agreements or arrangements for an acquisition of any ownership interest attributable to the ESOP or any of its affiliates under the FCC rules in any radio or television broadcast licensee, or the publisher of any English language daily newspaper of general circulation, if ownership of such interest would reasonably be expected to result in any delay in obtaining, or the failure to obtain, an FCC order granting the consents or approvals required under the Communications Act of 1934 (the "FCC Order") or require the FCC to issue additional waivers prior to granting the FCC Order.

*No Solicitation of Transactions.*   During the period beginning on the date of the Merger Agreement and continuing until the Effective Time or the earlier termination of the Merger Agreement, the Company has agreed not to, and to cause its representatives not to:

- solicit, initiate, knowingly encourage or facilitate any inquiries with respect to, or the making, submission or announcement of, any Alternative Proposal (as defined below);

- participate in any negotiations regarding an Alternative Proposal, or furnish any non-public information regarding an Alternative Proposal or access to its properties, books, records or

87

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523218

personnel in connection with the Alternative Proposal, to any person that has made or is considering making an Alternative Proposal;

- engage in discussions regarding an Alternative Proposal with any person that has made or is considering making an Alternative Proposal;

- approve, endorse or recommend any Alternative Proposal;

- enter into any letter of intent, agreement in principle or any agreement providing for any Alternative Proposal;

- cooperate with, or assist or participate in, or knowingly facilitate or encourage any effort or attempt by any person with respect to, or that would reasonably be expected to result in, an Alternative Proposal; or

- exempt any person from state takeover restrictions or similar laws, or otherwise cause such restrictions not to apply.

In addition, the Company has agreed to, and to cause each of its subsidiaries to, and to direct each of its and its subsidiaries' representatives to, immediately cease any discussions or negotiations with any parties that may be ongoing with respect to any Alternative Proposal. However, the Company, the Zell Entity and the ESOP have agreed that the provisions of any standstill agreement entered into between the Company and any third party will not be deemed to prohibit the third party from submitting competing proposals to the Special Committee or the Board.

"Alternative Proposal" means any bona fide proposal or offer from any person or group of persons, prior to the receipt of Company shareholder adoption of the Merger Agreement and approval of the Merger (other than a proposal or offer by the ESOP, Merger Sub or the Zell Entity and other than the Tender Offer), for:

- a merger, reorganization, share exchange, consolidation, business combination, recapitalization, dissolution, liquidation or similar transaction involving the Company;

- the direct or indirect acquisition by any person of assets representing 20% or more of the assets, revenues or earnings of the Company and its subsidiaries;

- the direct or indirect acquisition by any person of 20% or more of the outstanding shares; or

- any tender offer or exchange offer that if consummated would result in any person beneficially owning 20% or more of the shares.

The parties have agreed, however, that the Company may take the following actions, at any time from the date of the Merger Agreement and continuing until the earlier of the receipt of Company shareholder adoption of the Merger Agreement and the termination of the Merger Agreement, in response to a bona fide written and unsolicited Alternative Proposal that constitutes a Superior Proposal (as defined below) or that the Special Committee or the Board determines in good faith could reasonably be expected to result in a Superior Proposal, if the Special Committee or the Board determines in good faith, after consultation with outside legal counsel, that the failure to take such actions would be inconsistent with the directors' exercise of their fiduciary duties:

- furnish non-public information to the third party making the Alternative Proposal (if the Company receives an executed confidentiality agreement having confidentiality provisions substantially similar to the provisions of the confidentiality agreement between the Company and EGI);

- engage in discussions with the third party with respect to the Alternative Proposal; and

88

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523219

- approve, recommend and enter into an agreement with respect to the Alternative Proposal in connection with the termination of the Merger Agreement in accordance with its terms.

The ESOP will be entitled to receive an executed copy of the confidentiality agreement referred to above and the Company will substantially simultaneously provide or make available to the ESOP any written material non-public information that is provided to the third party making the Alternative Proposal that was not previously provided to the ESOP.

The Company has also agreed that neither the Board nor any committee thereof will:

- withdraw or modify, or propose publicly to withdraw or modify in a manner adverse to the ESOP, the approval or recommendation by the Special Committee or the Board of the Merger or the Merger Agreement or other transactions contemplated by the Merger Agreement, including the Tender Offer (the "Recommendation");

- approve, adopt or recommend, or propose publicly to approve, adopt or recommend, any Alternative Proposal;

- recommend that shareholders tender their shares in any tender offer or exchange offer (other than the Tender Offer); or

- exempt any person from state takeover or similar restrictions.

Any of the foregoing actions constitute a "Change of Recommendation" under the Merger Agreement. However, if the Board or the Special Committee determines in good faith, after consultation with outside legal counsel and financial advisors, that failure to effect a Change of Recommendation would be inconsistent with the Board's or the Special Committee's exercise of its fiduciary duties, the Board or the Special Committee may make a Change of Recommendation.

The Company is required to promptly (within 48 hours) advise the ESOP of any Alternative Proposal or any inquiry that would reasonably be expected to lead to any Alternative Proposal, any request of non-public information relating to the Company or its subsidiaries or any inquiry for discussion or negotiation regarding an Alternative Proposal, including the identity of the person making any Alternative Proposal and the material terms of any such Alternative Proposal or inquiry. The Company must keep the ESOP reasonably informed on a current basis of the status of any Alternative Proposal or inquiry, and must promptly (within 48 hours) notify the ESOP if it determines to begin providing information or engaging in discussions concerning an Alternative Proposal.

"Superior Proposal" means any Alternative Proposal on terms that the Board or the Special Committee determines in good faith, after consultation with the Company's or the Special Committee's outside legal counsel and financial advisors, and considering such factors as the Board or the Special Committee considers to be appropriate, is more favorable to the Company and its shareholders than the transactions contemplated by the Merger Agreement. For purposes of the definition of "Superior Proposal," the references to "20%" in the definition of Alternative Proposal are deemed to be references to "50%."

*Shareholders Meeting.* The Company must, as promptly as reasonably practicable following the mailing of the proxy statement, call and hold a meeting of the Company's shareholders for the purpose of obtaining the shareholders' adoption of the Merger Agreement and approval of the Merger. The Company is required to use all reasonable best efforts to solicit shareholder proxies in favor of the approval of the Merger Agreement and the transactions contemplated by the Merger Agreement, subject to the other terms of the Merger Agreement. Unless the Merger Agreement has been terminated prior to the Company's meeting of shareholders, the Company is required to submit the Merger Agreement to a vote of shareholders even if the Board or the Special Committee has approved, endorsed or recommended an Alternative Proposal or has made a Change of Recommendation.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523220

*Stock Options and Other Stock-Based Awards; Employee Benefits.* Under the terms of the Merger Agreement, at the Effective Time, each outstanding Company stock option that remains outstanding immediately prior to the Effective Time, whether vested or unvested, will become fully vested and the holder of the stock option will receive a cash payment equal to the product of (1) the number of shares subject to the option as of the Effective Time, multiplied by (2) the excess, if any, of the Merger Consideration over the exercise price per share of Company Common Stock subject to such option, less applicable tax withholding.

Under the terms of the Merger Agreement, at the Effective Time, each right of any kind to receive shares of Company Common Stock or benefits measured in whole or in part by the value of shares of Company Common Stock granted under Company stock or benefit plans, other than restricted shares, whether vested or unvested, that is outstanding immediately prior to the Effective Time will become fully vested and cease to represent a right or award with respect to shares of Company Common Stock and the holder of such right will receive a cash payment, less applicable withholding taxes, of the Merger Consideration for each share underlying such stock-based award. In addition, under the terms of the Merger Agreement, immediately prior to the Effective Time, each share of restricted Company Common Stock shall vest in full and be converted into the right to receive the Merger Consideration, less any applicable withholding taxes.

The parties have agreed that the Surviving Corporation will honor all Company benefit plans and compensation arrangements in accordance with their terms. The Surviving Corporation will provide each current and former employee, other than employees covered by collective bargaining agreements whose employment terminates during the one-year period following the Effective Time with severance benefits at levels in accordance with the terms of the Company's severance plans and policies in effect immediately prior to the Effective Time. The Surviving Corporation will fulfill the Company's obligations under the Company's Transitional Compensation Plan, without any amendment that is adverse to any beneficiary of such plan.

For all purposes under any new employee benefit plans of the Surviving Corporation providing benefits to employees of the Company after the Effective Time, each employee will be credited with his or her years of service with the Company under the employee benefit plans of the Surviving Corporation to the same extent that he or she was entitled to credit for service under the Company's similar benefit plans prior to the Effective Time. Each employee will be immediately eligible to participate in the Surviving Corporation's new employee benefit plans that replace a similar or comparable old benefit plan under which the employee participated. In addition, for new plans of the Surviving Corporation, preexisting condition exclusions and similar requirements will be waived to the extent they were waived under the Company's old plans, and eligible expenses incurred by an employee during the portion of the year prior to consummation of the Merger will be credited for deductible, coinsurance and maximum out-of-pocket expenses for that year under the Surviving Corporation's benefit plans.

*Indemnification and Insurance.* For a period of six years from the Effective Time, the Surviving Corporation will maintain in effect director, officer and employee exculpation, indemnification and advancement of expenses provisions no less favorable than those of the Company's and any of its subsidiaries' certificates of incorporation and by-laws as in effect immediately prior to the Effective Time or in any indemnification agreements of the Company or its subsidiaries with any of their respective directors, officers or employees as in effect immediately prior to the Effective Time, and will not amend, repeal or otherwise modify any such provisions in any manner that would adversely affect the rights thereunder of any individuals who at the Effective Time were current or former directors, officers or employees of the Company or any of its subsidiaries.

The parties have also agreed that the Surviving Corporation will, to the fullest extent permitted under applicable law, indemnify and hold harmless each current and former director, officer or

90

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523221

employee of the Company or any of its subsidiaries and each person who served as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise at the request of the Company (each, an "Indemnified Party") against any costs or expenses, judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened action, arising out of, relating to or in connection with any action or omission occurring or alleged to have occurred whether before or after the Effective Time (including acts or omissions in connection with such persons serving as an officer, director or other fiduciary in any entity if such service was at the request or for the benefit of the Company).

The parties have further agreed that for a period of six years from the Effective Time, the Surviving Corporation will maintain in effect the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Company and its subsidiaries with respect to matters arising on or before the Effective Time, subject to a maximum annual insurance premium of 200% of the last annual premium paid by the Company prior to the date of the Merger Agreement in respect of such coverage (the "Maximum Premium"). At the Company's option, after consultation with the ESOP, the Company may purchase, prior to the Effective Time, a six-year prepaid "tail" policy (at an aggregate cost not exceeding the Maximum Premium times six) on terms and conditions providing substantially equivalent benefits as the current policies of directors' and officers' liability insurance and fiduciary liability insurance. If the Company obtains such a prepaid tail policy, the Surviving Corporation will maintain the policy in full force and effect for its full term.

The Surviving Corporation will also pay all reasonable expenses, including reasonable attorneys' fees that may be incurred by any Indemnified Party in enforcing the foregoing obligations.

*Agreement to Take Further Action and to Use All Reasonable Best Efforts.*  Each of the Company, the ESOP and Merger Sub has agreed to use its reasonable best efforts to do all things necessary, proper or advisable under applicable laws to consummate and make effective the Merger and the other transactions contemplated by the Merger Agreement, including to obtain necessary consents or waivers from third parties, to defend any lawsuit challenging the Merger Agreement or the consummation of the Merger or the other transactions contemplated by the Merger Agreement, and to execute and deliver any additional documents necessary to complete the Merger and the other transactions contemplated by the Merger Agreement. However, in no event are the ESOP, Merger Sub or the Company or any of its subsidiaries required to pay prior to the Effective Time any fee or other consideration to any third party for any consent or approval required for the consummation of the transactions contemplated by the Merger Agreement under any contract or agreement.

The Company and the ESOP have agreed to use reasonable best efforts to cooperate with each other in making any required filings with any governmental entity, and have agreed to take such further action as reasonably may be necessary to resolve objections, if any, as the FCC, the Federal Trade Commission, the Antitrust Division of the United States Department of Justice, state antitrust authorities or competition authorities of another nation, or any other person may assert under regulatory law so as to enable the closing of the Merger to occur as soon as reasonably possible.

*Financing Commitments; Company Cooperation.*  The Company has agreed to use its reasonable best efforts to arrange the debt financing in connection with the Merger, the Tender Offer and the other transactions contemplated by the Merger Agreement on the terms described in the debt commitment letters delivered in connection with the signing of the Merger Agreement. If any of this debt financing becomes unlikely to occur in the manner or from the sources described in the debt commitment letters, the Company will promptly notify the ESOP and use its reasonable best efforts to obtain alternative debt financing.

91

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only
TRB0523222

The ESOP has agreed to cooperate with the Company in obtaining the financing, including:

- participating in a reasonable number of meetings on reasonable advance notice;

- providing information reasonably required to be included in the preparation of offering memoranda, private placement memoranda, prospectuses and similar documents; and

- cooperating and assisting in the preparation, negotiation, execution and closing of any underwriting or placement agreements, indentures, credit agreements, pledge and security documents or other definitive financing documents.

*The Tender Offer.* The Company agreed in the Merger Agreement to commence the Tender Offer. The Tender Offer was commenced on April 25, 2007, and expired on May 24, 2007. Approximately 218,132,000 shares were tendered in the Tender Offer. Because more than 126,000,000 shares were tendered in the Tender Offer, proration of tendered shares, except for "odd lots" (lots held by owners of less than 100 shares), was required.

*Eagle Exchange.* The Merger Agreement also provides that, if any shares of Company Common Stock or shares of Series D-1 Preferred Stock are owned or held by Eagle New Media Investments, LLC or Eagle Publishing Investments, LLC (the "Eagle Entities") less than 20 business days prior to the closing of the Merger, the Company will, and will cause the Eagle Entities to, (1) enter into an exchange agreement providing for the Eagle Entities to exchange all shares of Company Common Stock and Series D-1 Preferred Stock held by the Eagle Entities for shares of newly designated and issued Series E Preferred Stock of the Company (the "Exchange") and (2) consummate the Exchange prior to the closing of the Merger.

*Other Covenants and Agreements.* The Merger Agreement contains additional agreements among the Company, the ESOP and Merger Sub relating to:

- specified divestitures by the Company, and the process by which such divestitures are conducted;

- compliance with requirements of the FCC and notification of any inquiry by the FCC relating to each radio broadcast and television station owned and operated by the Company or its subsidiaries;

- providing the ESOP reasonable access during normal business hours to the Company's officers, employees, properties, contracts, commitments, books and records;

- taking actions necessary to exempt the transactions contemplated by the Merger Agreement from the effect of any takeover statutes; and

- the issuance of press releases or other public statements relating to the Merger Agreement or the transactions contemplated by the Merger Agreement.

*Conditions to the Merger.* The obligations of the parties to complete the Merger are subject to the satisfaction or waiver of the following mutual conditions:

- the Company shareholder approval must be obtained;

- no restraining order, injunction or other order by any court that prohibits consummation of the Merger shall have been entered and shall continue to be in effect;

- any applicable waiting period under the HSR Act shall have expired or been earlier terminated and the FCC Order shall have been obtained;

- certain specified consents and approvals shall have been received;

- the Exchange shall have been consummated, if applicable;

92

- the conditions precedent to the consummation of the purchase of the Subordinated Note and the Warrant (as described below under "Other Transaction Agreements—Zell Entity Purchase Agreement") shall have been satisfied or waived;

- the Company has obtained the debt financing on the terms set forth in the debt commitment letters, or alternative financing on substantially similar terms;

- the representations and warranties of the other party are true and correct both when made and as of the closing date (except to the extent made as of an earlier date, in which case as of such date), except where the failure of such representations and warranties to be so true and correct would not have, individually or in the aggregate, an ESOP Material Adverse Effect or a Company Material Adverse Effect, as the case may be; and

- the other party has in all material respects performed all obligations and complied with all covenants required by the Merger Agreement prior to the Effective Time.

In addition, the Company's obligation to effect the Merger is further subject to the fulfillment of the following conditions:

- the FCC Order does not impose any condition on the ESOP, the Company or any subsidiary that, individually or in combination with one or more conditions, would reasonably be expected to have a material adverse effect on the business, assets, financial condition, results of operations on an ongoing basis or continuing operations of the broadcasting business of the Company and its subsidiaries, taken as a whole;

- the ESOP has delivered to the Company a certificate, dated the Effective Time, certifying to the effect that the conditions related to the representations and warranties and performance in all material respects by the ESOP and Merger Sub of their obligations and covenants required by the Merger Agreement have been satisfied; and

- the Company has obtained an opinion from Valuation Research Corporation or another nationally recognized firm, in form and substance reasonably satisfactory to the Company, as to the solvency of the Company, after giving effect to the transactions contemplated by the Merger Agreement.

In addition, the ESOP's and Merger Sub's obligation to effect the Merger is further subject to the fulfillment of the condition that the Company has delivered to the ESOP a certificate, dated the Effective Time, certifying to the effect that the conditions related to the representations and warranties and performance in all material respects by the Company of its obligations and covenants required by the Merger Agreement have been satisfied.

*Termination.*    The Merger Agreement may be terminated by either the ESOP or the Company, if:

- the Company and the ESOP agree to do so;

- the Effective Time shall not have occurred by May 31, 2008, except that this right will not be available to a party if the failure to fulfill any of such party's obligations under the Merger Agreement is the proximate cause of the failure to complete the Merger on or prior to such date;

- any final and non-appealable injunction or order permanently restrains, enjoins or prohibits the consummation of the Merger, except that the party seeking to terminate the Merger Agreement must have used its reasonable best efforts to remove such injunction or order; or

- the Company shareholders meeting shall have concluded and the Company shareholder approval was not obtained.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523224

The Merger Agreement may be terminated by the Company:

- if the Company is not in material breach of any of its representations, warranties or covenants and if the ESOP breaches or fails to perform in any material respect any of its representations, warranties, covenants or other agreements contained in the Merger Agreement, which breach or failure to perform (1) would result in a failure of a mutual condition or a condition to the Company's obligation to consummate the Merger to be satisfied and (2) cannot be cured by May 31, 2008; and the Company has provided the ESOP 30 days' written notice of its intention to terminate;

- in order to accept a Superior Proposal if, prior to the Company shareholder approval, (1) the Company has provided written notice to the ESOP advising that it has received a Superior Proposal; (2) at least three business days following receipt of such notice, the Board or the Special Committee has determined that, taking into account any revised proposal made by the ESOP, the Superior Proposal remains a Superior Proposal; (3) the Company has not breached its no-solicitation obligations; (4) the Board concurrently approves and the Company concurrently enters into a definitive agreement for such Superior Proposal; and (5) the Company has given the ESOP 48 hours' written notice of its intention to terminate the Merger Agreement; or

- if the consummation of the purchase of shares of Company Common Stock and the Exchangeable Note pursuant to the Zell Entity Purchase Agreement (as described below under "Other Transaction Agreements—Zell Entity Purchase Agreement") has not occurred on or before August 17, 2007, or if the Zell Entity Purchase Agreement is terminated in accordance with its terms prior to the Effective Time. The purchase of shares and the Exchangeable Note was consummated on April 23, 2007.

The Merger Agreement may be terminated by the ESOP:

- if the ESOP is not in material breach of any of its representations, warranties or covenants and if the Company breaches or fails to perform in any material respect any of its representations, warranties, covenants or other agreements contained in the Merger Agreement, which breach or failure to perform (1) would result in a failure of a mutual condition or a condition to the ESOP's obligation to consummate the Merger to be satisfied and (2) cannot be cured by May 31, 2008; and the ESOP has provided the Company 30 days' written notice of its intention to terminate; or

- if prior to the Company shareholder approval, the Board has failed to make the Recommendation in the proxy statement or has effected a Change of Recommendation in a manner adverse to the ESOP.

If the Merger Agreement is terminated, the Merger will not occur. See "Special Factors—Conduct of the Company's Business if the Merger is Not Completed."

*Amendment and Waiver.* The Merger Agreement may be amended by a written agreement signed by the Company, the ESOP and Merger Sub at any time prior to the Effective Time. However, neither the ESOP nor Merger Sub may, without the prior written consent of the Zell Entity, either (1) waive or amend any provision of the Merger Agreement (including, without limitation, any closing condition), including by the exercise of any consent rights, or (2) agree to, or exercise any right to, terminate the Merger Agreement as described under the first bullet point or the last bullet point under the subheading "The Merger Agreement—Termination" above. In addition, no amendment that requires further approval of the Company's shareholders will be made without obtaining that approval.

94

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523225

## OTHER TRANSACTION AGREEMENTS

**Zell Entity Purchase Agreement**

On April 1, 2007, the Company concurrently with its entry into the Merger Agreement entered into a Securities Purchase Agreement (the "Zell Entity Purchase Agreement") with the Zell Entity and Zell. Pursuant to the terms of the Zell Entity Purchase Agreement, the Company agreed to sell to the Zell Entity (1) 1,470,588 newly issued shares of Company Common Stock for a purchase price of $50 million, and (2) an unsecured subordinated exchangeable promissory note in the principal amount of $200 million, which is exchangeable at the option of the Company, or automatically under certain circumstances, into 5,882,353 shares of Company Common Stock (the "Exchangeable Note"), for a purchase price of $200 million (the "Step One Purchase Transaction"). The parties closed the Step One Purchase Transaction on April 23, 2007. In the Merger, the Zell Entity will receive the Merger Consideration for its shares of Company Common Stock and, immediately prior to the Merger, the Company will repay the Exchangeable Note.

The Zell Entity Purchase Agreement also provides that, immediately following the consummation of the Merger, the Zell Entity will purchase from the Company for an aggregate purchase price of $315 million, (1) an unsecured subordinated promissory note in the principal amount of $225 million (the "Subordinated Note") and (2) a 15-year warrant (the "Warrant") to purchase 43,478,261 shares of Company Common Stock (subject to adjustment), which will represent approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to the grant of share equivalent awards expected to be made under the management equity incentive plan as described above under "Special Factors—Interest of Directors and Executive Officers") (the "Step Two Purchase Transaction" and, together with the Step One Purchase Transaction, the "Purchase Transactions"). The Warrant will have an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first ten years of the Warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment).

Many of the representations, warranties and covenants made by the Company in the Merger Agreement are incorporated by reference and made by the Company to the Zell Entity and Zell in the Zell Entity Purchase Agreement, including among others, the covenants described above under "The Merger Agreement—No Solicitation of Transactions" with respect to solicitation or negotiation of competing proposals. Pursuant to the Zell Entity Purchase Agreement, Mr. Zell has been appointed to the Board, effective May 9, 2007, and the Company has agreed that Mr. Zell will be elected to serve as Chairman of the Board, effective as of the date of the consummation of the Step Two Purchase Transaction. The Company also reimbursed the Zell Entity for $2.5 million of expenses following consummation of the Step One Purchase Transaction and agreed to reimburse the Zell Entity for up to an additional $2.5 million of unreimbursed expenses following consummation of the Step Two Purchase Transaction. The Step Two Purchase Transaction is subject to various closing conditions, including consummation of the Merger.

The Zell Entity Purchase Agreement provides that, from April 1, 2007 until the third anniversary of the closing of the Step One Purchase Transaction, the Zell Entity will not transfer the Exchangeable Note, any shares purchased in the Step One Purchase Transaction, or any shares received in exchange for the Exchangeable Note other than pursuant to the Zell Entity Purchase Agreement or the Merger Agreement, except that, after the first to occur of the termination of the Zell Entity Purchase Agreement, the termination of the Merger Agreement or the consummation of the Merger, the Zell Entity may make transfers to certain of its affiliates who agree to be bound by the provisions of the Zell Entity Purchase Agreement.

The Zell Entity Purchase Agreement also provides that the Company will not amend, waive, or otherwise modify any provision of, or any of the rights and obligations under, the Merger Agreement,

95

and that the Company will not amend, waive obligations under, or otherwise modify or terminate the exchange agreement providing for the Exchange or the ESOP Purchase Agreement.

The Zell Entity Purchase Agreement grants certain termination rights to the parties. The Zell Entity Purchase Agreement may be terminated by the Company or the Zell Entity:

- by mutual consent;

- upon termination of the Merger Agreement;

- if the Step One Purchase Transaction has not been consummated on or prior to August 17, 2007 (the Step One Purchase Transaction was consummated on April 23, 2007); or

- if an injunction or other similar proceeding prohibiting the consummation of the Merger or the transactions contemplated by the Zell Entity Purchase Agreement has become final and non-appealable.

The Zell Entity Purchase Agreement may be terminated by the Zell Entity if:

- the Merger has not been consummated on or prior to May 31, 2008 (provided that the Zell Entity shall not have breached in any material respect its obligations in any manner that shall have proximately caused such failure to consummate the Merger);

- prior to obtaining the requisite shareholder approval, the Board fails to recommend the adoption of the Merger Agreement by the Company's shareholders in the Company's proxy statement or changes its recommendation to the Company's shareholders in a manner adverse to the Zell Entity;

- the Company fails to obtain the requisite shareholder approval of the Merger Agreement at the meeting of the Company's shareholders; or

- the Board or the Special Committee determines to accept a Superior Proposal.

The Zell Entity Purchase Agreement also gives the Zell Entity and the Company the right to terminate the Zell Entity Purchase Agreement if the other party has breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements in the Zell Entity Purchase Agreement, which breach or failure to perform (1) would result in a failure of any of the other party's conditions to complete the Step One Purchase Transaction (which transaction was completed on April 23, 2007) or (2) (a) would result in a failure of any of the other party's conditions to complete the Step Two Purchase Transaction and (b) cannot be cured by May 31, 2008; provided that the party seeking termination shall have given the other party at least 30 days' notice of its intent to terminate and the basis for the termination.

The Zell Entity Purchase Agreement provides that if the Zell Entity Purchase Agreement is terminated under certain specified circumstances, the Company may be required to pay the Zell Entity a termination fee of $25 million, including in the event of termination due to (1) certain breaches by the Company, (2) a change in recommendation by the Board or the Special Committee, (3) a determination by the Board or the Special Committee to accept a Superior Proposal or (4) shareholder disapproval under certain circumstances if the Company then enters into an alternative transaction meeting certain criteria within a year after termination.

In addition, under certain specified circumstances the Zell Entity may be required to pay the Company a termination fee of $25 million, including in the event of termination due to (1) certain breaches by the Zell Entity or (2) failure to obtain the financing for the transactions unless the failure is due to a breach by the Company or the ESOP.

Pursuant to the terms of the Zell Entity Purchase Agreement, until the earlier of (1) the date of consummation of the Merger and (2) the date on which the Merger Agreement is terminated, the Zell

96

Entity has agreed to vote all of the shares of Company Common Stock that it beneficially owns in favor of adoption of the Merger Agreement and approval of the transactions contemplated thereby, including the Merger.

The Zell Entity Purchase Agreement also provides that Mr. Zell will provide a guarantee of payment to the Company of the obligations of the Zell Entity under the Zell Entity Purchase Agreement.

The Exchangeable Note accrues interest on the unpaid principal amount at the rate of 4.81% per annum, which may be paid in additional notes. The Exchangeable Note is subordinated to the senior obligations of the Company. The Exchangeable Note is exchangeable at any time, at the option of the Company, and will automatically be exchanged upon any termination of the Merger Agreement, into an aggregate of 5,882,353 shares of Company Common Stock, subject to antidilution adjustments. In the event of such an exchange, the Company will pay cash to the Zell Entity in an amount equal to 40% of the interest on the Exchangeable Note that has accrued or has been paid in additional notes, and the remaining 60% will be considered to be additional exchange price for the shares of Company Common Stock issued on the exchange. The Exchangeable Note matures on the date of the closing of the Merger and the Company is required to pay the outstanding principal amount of the Exchangeable Note together with all accrued and unpaid interest thereon, immediately prior to the consummation of the Merger. It is also prepayable at the Company's option in cash.

The Subordinated Note will be an unsecured subordinated promissory note in the principal amount of $225 million and will bear interest at the "Long-Term Applicable Federal Rate" on the date of issuance. The Warrant is exercisable for a period of 15 years from the date of issuance and provides for the aggregate issuance of 43,478,261 shares of Company Common Stock. The Warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the Warrant, for a maximum aggregate exercise price of $600 million. The number of shares and the exercise price are subject to adjustment in certain circumstances.

The foregoing descriptions of the Zell Entity Purchase Agreement, the Exchangeable Note, the Subordinated Note and the Warrant are qualified in their entirety by reference to the complete terms and conditions of the Zell Entity Purchase Agreement and the forms of the Exchangeable Note, the Subordinated Note and the Warrant, which are attached as Exhibits (d)(4), (d)(5), (d)(6) and (d)(7) to the Schedule 13E-3, respectively, and incorporated herein by reference.

**ESOP Purchase Agreement**

On April 1, 2007, the Company, concurrently with its entry into the Merger Agreement, entered into an ESOP Purchase Agreement (the "ESOP Purchase Agreement" and, together with the Zell Entity Purchase Agreement, the "Purchase Agreements") with the Trustee (on behalf of the ESOP). Pursuant to the terms of the ESOP Purchase Agreement, on April 1, 2007, the Company sold 8,928,571 shares of Company Common Stock to the ESOP at a price of $28.00 per share. Pursuant to the ESOP Purchase Agreement the Trustee agreed not to tender shares in the Tender Offer. The ESOP paid for this purchase with a promissory note of the ESOP executed by the Trustee in favor of the Company in the principal amount of $250 million (the "ESOP Note") to be repaid by the ESOP over the 30-year life of the loan through the ESOP's use of annual contributions from the Company to the ESOP or distributions paid on the shares of Company Common Stock held by the ESOP.

On April 1, 2007, the Company and the Trustee (on behalf of the ESOP) entered into an ESOP Loan Agreement (the "ESOP Loan Agreement"). The ESOP Loan Agreement documents an extension of credit of $250 million from the Company to the ESOP, as evidenced by the ESOP Note, which was made to permit the ESOP to purchase the shares of Company Common Stock pursuant to the ESOP Purchase Agreement. The ESOP Note contemplates payment by the ESOP to the Company in 30 annual installments with an annual interest rate of approximately 5%. The Trustee (on behalf of the

97

TRB0523228

ESOP) also entered into a pledge agreement (the "ESOP Pledge Agreement") with the Company whereby the ESOP agreed to pledge the shares of Company Common Stock acquired by the ESOP from the Company as collateral for the Company's extension of credit to the ESOP.

The foregoing descriptions of the ESOP Purchase Agreement, the ESOP Loan Agreement, the ESOP Note and the ESOP Pledge Agreement are qualified in their entirety by reference to the complete terms and conditions of the ESOP Purchase Agreement, the ESOP Loan Agreement, the ESOP Note and the ESOP Pledge Agreement, which are attached as Exhibits (d)(8), (d)(9), (d)(10) and (d)(11) to the Schedule 13E-3, respectively, and incorporated herein by reference.

**Investor Rights Agreement**

On April 1, 2007, the Company entered into an Investor Rights Agreement (the "Investor Rights Agreement") with the Zell Entity and the Trustee (on behalf of the ESOP). Each shareholder who is a party to the Investor Rights Agreement has agreed to vote its shares following the Merger such that (1) the initial directors on the Board following the Merger will serve until the third annual election following the consummation of the Merger, (2) there will be two directors designated by the Zell Entity and (3) there will be one director who shall be the chief executive officer of the Company. The Board will comprise nine members. The Investor Rights Agreement also contains provisions governing the transfer of the shares of Company Common Stock held by the Zell Entity and the ESOP, preemptive rights granted to the Zell Entity and the ESOP by the Company, and specified actions requiring the approval of a majority of the entire Board, including a majority of the independent directors and one designee of the Zell Entity. The parties to the Investor Rights Agreement also have agreed to take all actions necessary to enable the Company to make an election to be treated as a subchapter-S corporation under the Internal Revenue Code, following the consummation of the Merger, and to maintain an election for subchapter-S corporation status. The Investor Rights Agreement is not effective with respect to the Company until the closing of the Merger. The foregoing description of the Investor Rights Agreement is qualified in its entirety by reference to the complete terms and conditions of the Investor Rights Agreement, which is attached as Exhibit (d)(12) to the Schedule 13E-3, and incorporated herein by reference.

**Voting Agreement**

On April 1, 2007, the Company entered into a Voting Agreement (the "Voting Agreement") with the Chandler Trusts, pursuant to which the Chandler Trusts committed to vote all of the shares of Company Common Stock that they beneficially own on the record date in favor of the Merger Agreement, whether or not recommended by the Board, and against any competing transaction, against any other agreement or action that is intended or would reasonably be expected to prevent, impede, or, in any material respect, interfere with, delay, postpone or discourage the transactions contemplated by the Merger Agreement, and against any action, agreement, transaction or proposal that would result in a breach of any representation, warranty, covenant, agreement or other obligation of the Company in the Merger Agreement or any of the Purchase Agreements. As of June 7, 2007, the Chandler Trusts no longer own any shares of Company Common Stock.

The Chandler Trusts also agreed to certain restrictions, subject to certain exceptions, on their ability to (1) solicit inquiries with respect to a competing transaction, (2) participate in discussions or negotiations with, or furnish nonpublic information to, any person with respect to a competing transaction or (3) approve, endorse or recommend a competing transaction or enter into any letter of intent or agreement with respect to a competing transaction.

The foregoing description of the Voting Agreement is qualified in its entirety by reference to the complete terms and conditions of the Voting Agreement, which is attached as Exhibit (d)(13) to the Schedule 13E-3, and incorporated herein by reference.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523229

**Zell Entity/ESOP Registration Rights Agreement**

On April 1, 2007, the Company entered into a registration rights agreement (the "Zell Entity/ ESOP Registration Rights Agreement") with the Zell Entity and the Trustee (on behalf of the ESOP), pursuant to which the Company granted to the Zell Entity and the ESOP certain demand and piggyback registration rights for the registration and sale of shares of Company Common Stock held by the Zell Entity or the ESOP, respectively, in the event that the Merger Agreement is terminated without consummation of the Merger. The registration rights granted pursuant to the Zell Entity/ESOP Registration Rights Agreement will not become effective in the case of the ESOP until the first anniversary of the date on which the ESOP purchased the shares of Company Common Stock from the Company pursuant to the ESOP Purchase Agreement. The registration rights applicable to the Zell Entity will not become effective until the third anniversary of the date on which the Zell Entity purchased shares of Company Common Stock and the Exchangeable Note from the Company pursuant to the Zell Entity Purchase Agreement. In addition, the Zell Entity will be prohibited from selling or assigning the Company Common Stock, Exchangeable Note and underlying shares acquired upon exchange until such third anniversary other than to certain permitted transferees. The Zell Entity/ESOP Registration Rights Agreement will terminate upon consummation of the Merger.

The foregoing description of the Zell Entity/ESOP Registration Rights Agreement is qualified in its entirety by reference to the complete terms and conditions of the Registration Rights Agreement, which is attached as Exhibit (d)(2) to the Schedule 13E-3, and incorporated herein by reference.

**Chandler Trusts Registration Rights Agreement**

On April 1, 2007, the Company entered into a registration rights agreement with the Chandler Trusts (the "Chandler Trusts Registration Rights Agreement") pursuant to which the Company granted to the Chandler Trusts certain shelf registration rights for the registration and sale of shares of Company Common Stock that the Chandler Trusts currently own. Concurrently with the commencement of the Tender Offer, the Company filed a shelf registration for the sale of such shares. The Chandler Trusts have agreed that they will not sell or offer to sell shares or otherwise act as a distribution participant (as defined in Regulation M under the Exchange Act) pursuant to the shelf registration prior to consummation or termination of the Tender Offer, unless counsel for the Company and the Chandler Trusts reasonably agree that such actions would not cause the Tender Offer or purchases pursuant to the Tender Offer to violate Regulation M under the Exchange Act. On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman Sachs and the Company, pursuant to which the Chandler Trusts agreed to sell an aggregate of 20,351,954 shares of Company Common Stock, the remainder of the shares owned by them following the Tender Offer, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to a shelf registration statement that the Company filed with the Securities and Exchange Commission and that became effective on April 25, 2007. Following the closing of this transaction on June 7, 2007, the Chandler Trusts no longer own any shares of Company Common Stock.

In the Chandler Trusts Registration Rights Agreement, the Chandler Trusts agreed that they would tender into the Tender Offer all shares held by them at the expiration of the Tender Offer, so long as the Tender Offer was at a cash price equal to at least $34.00 per share. The Chandler Trusts also agreed in the Chandler Trusts Registration Rights Agreement to cause Jeffrey Chandler, Roger Goodan and William Stinehart, Jr., each of whom were serving on the Board as representatives of the Chandler Trusts, to resign as directors of the Company, effective upon the purchase of shares of Company Common Stock in the Tender Offer or, if earlier, upon the Article VIII Termination Date (as defined in Section 8.1 of the Company's by-laws). The resignations became effective on June 4, 2007.

The foregoing description of the Chandler Trusts Registration Rights Agreement is qualified in its entirety by reference to the complete terms and conditions of the Chandler Trusts Registration Rights

99

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523230

Agreement, which is attached as Exhibit (d)(3) to the Schedule 13E-3, and incorporated herein by reference.

**ESOP Plan Documents**

In connection with the Leveraged ESOP Transactions, the Board adopted the ESOP on April 1, 2007, effective as of January 1, 2007. The ESOP is intended to be qualified under Sections 401(a), 409 and 4975 of the Internal Revenue Code, and the trust portion thereof (the "ESOP Trust") is intended to be tax-exempt under Section 501(a) of the Internal Revenue Code. According to the terms of the ESOP, an employee is eligible to participate as of the first pay period after he or she has completed a year of service (including pre-effective date service) and attained age 21, with certain exclusions. Participating subsidiaries of the Company may make contributions for any year in such amounts as the Company may determine in its sole discretion, subject to the terms of the ESOP Loan Agreement, which provides that contributions will be made to the ESOP and distributions will be made on the shares of Company Common Stock held by the ESOP in an aggregate amount that is sufficient to enable the Trustee to pay principal and interest on the ESOP Note when due.

As of each December 31, stock will be allocated under the ESOP to the accounts of eligible employees who either (1) have completed 1,000 hours during the year and are employed on the last day of the year or (2) have retired, died or become disabled during the year. Allocations will be pro rata based on each employee's relative compensation, including base salary, wages and commissions, but excluding bonus and overtime. Participants will vest 20% per year between years 2-6 and pre-effective date service will be counted. Participants who have reached age 55 and completed 10 years of plan participation can elect to "diversify" a portion of their account by having their stock account converted to cash and reinvesting such amounts in other investment alternatives available in the retirement plan; pre-effective date service will not count for this purpose.

Participants' accounts will be distributed as follows: (1) upon retirement (age 65), death or disability, accounts will be distributed in the year following the year of termination of employment; or (2) upon termination of employment for other reasons, accounts will be distributed in the year that is the later of (A) 2018 or (B) six years after the year in which termination of employment occurs, but no later than the year following the year in which the participant attains age 65. The stock will be distributed in a lump sum and the participant or the ESOP will sell it back to the Company at the then fair market value, with payment by the Company to the participants in installments over five years with interest pursuant to the terms of an adequately secured promissory note. The first payment will be at the time of distribution.

The Tribune Company Employee Benefits Committee will administer the ESOP. Stock in the ESOP will be voted as follows: (1) while the stock is publicly traded, voting will be passed through to participants on all matters and the Trustee will vote undirected and unallocated shares in its discretion; (2) during any period the stock is not publicly traded, the Trustee will vote the shares in its discretion, provided that if the vote relates to certain events specified by law (merger, consolidation, recapitalization, reclassification, liquidation, dissolution or sale of substantially all assets in a trade or business), participants will have the right to direct the vote of the shares allocated to their account and the Trustee will vote all unallocated and undirected shares; and (3) the Trustee will determine how to respond to tender offers, but has agreed under the terms of the ESOP Purchase Agreement not to tender, in connection with the Tender Offer commenced by the Company on April 25, 2007, the shares of Company Common Stock that it purchased from the Company.

The foregoing description of the ESOP and the ESOP Trust is qualified in its entirety by reference to the complete terms and conditions of the ESOP and the ESOP Trust, which are attached as Exhibits (d)(14) and (d)(15) to the Schedule 13E-3, respectively, and incorporated herein by reference.

100

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523231

**Amendment of Shareholder Rights Plan**

In connection with the Leveraged ESOP Transactions, the Company has entered into Amendment No. 3, dated as of April 1, 2007, to the Rights Agreement. The amendment provides that no person shall be deemed to be an Acquiring Person (as defined in the Rights Agreement), and therefore the rights under the Rights Agreement will not be triggered solely by virtue of the execution, delivery or performance of any of the Merger Agreement, the Zell Entity Purchase Agreement, the ESOP Purchase Agreement, the Investor Rights Agreement, the Voting Agreement, the Zell Entity/ESOP Registration Rights Agreement, the Chandler Trusts Registration Rights Agreement and the other agreements entered into in connection with the Leveraged ESOP Transactions. The foregoing description of Amendment No. 3 to the Rights Agreement is qualified in its entirety by reference to the complete terms and conditions of Amendment No. 3 to the Rights Agreement, which is attached as Exhibit (d)(19) to the Schedule 13E-3, and incorporated herein by reference.

## APPRAISAL RIGHTS

*The discussion of the provisions set forth below is not a complete summary regarding your appraisal rights under Delaware law and is qualified in its entirety by reference to the text of the relevant provisions of Delaware law, which are attached to this proxy statement as Annex D. Shareholders intending to exercise appraisal rights should carefully review Annex D. Failure to follow any of the statutory procedures precisely may result in a termination or waiver of these rights.*

If the Merger is consummated, dissenting shareholders who follow the procedures specified in Section 262 of the DGCL within the appropriate time periods will be entitled to have their shares appraised by a court and to receive the "fair value" of such shares in cash as determined by the Delaware Court of Chancery in lieu of the consideration that such shareholder would otherwise be entitled to receive pursuant to the Merger Agreement.

The following is a brief summary of Section 262, which sets forth the procedures for dissenting from the Merger and demanding statutory appraisal rights. Failure to follow the procedures set forth in Section 262 precisely could result in the loss of appraisal rights. This proxy statement constitutes notice to our shareholders concerning the availability of appraisal rights under Section 262. A shareholder of record wishing to assert appraisal rights must hold the shares of stock on the date of making a demand for appraisal rights with respect to such shares and must continuously hold such shares through the effective time of the Merger.

Shareholders who desire to exercise their appraisal rights must satisfy all of the conditions of Section 262. A written demand for appraisal of shares must be filed with us before the special meeting. Shareholders electing to exercise their appraisal rights must also not vote "FOR" the Merger. Any proxy or vote against the Merger will not constitute a demand for appraisal within the meaning of Section 262.

A demand for appraisal must be executed by or for the shareholder of record, fully and correctly, as such shareholder's name appears on the share certificate. If the shares are owned of record in a fiduciary capacity, such as by a trustee, guardian or custodian, the demand must be executed by or for the fiduciary. If the shares are owned of record by or for more than one person, as in a joint tenancy or tenancy in common, the demand must be executed by or for all joint owners. An authorized agent, including an agent for two or more joint owners, may execute the demand for appraisal for a shareholder of record; however, the agent must identify the record owner or owners and expressly disclose the fact that, in exercising the demand, he is acting as agent for the record owner or owners. A person having a beneficial interest in shares held of record in the name of another person, such as a broker or nominee, must act promptly to cause the record holder to follow the steps summarized below and in a timely manner to perfect whatever appraisal rights the beneficial owner may have.

101

A shareholder who elects to exercise appraisal rights should mail or deliver the required written demand to us at our address at 435 North Michigan Avenue, Chicago, Illinois 60611, Attention: Corporate Secretary. The written demand for appraisal should specify the shareholder's name, and that the shareholder is demanding appraisal of his, her or its shares. Within ten days after the effective time of the Merger, we must provide notice of the effective time of the Merger to all of our shareholders who have complied with Section 262 and have not voted for the Merger.

Within 120 days after the effective time of the Merger, any shareholder who has satisfied the requirements of Section 262 will be entitled, upon written request, to receive from the Company a statement listing the aggregate number of shares not voted in favor of the Merger and with respect to which demands for appraisal have been received and the aggregate number of holders of such shares. The Company, as the surviving corporation in the Merger, must mail such written statement to the shareholder no later than the later of 10 days after the shareholder's request is received by us or 10 days after the latest date for delivery of a demand for appraisal under Section 262.

Within 120 days after the effective time of the Merger, either we or any shareholder who has complied with the required conditions of Section 262 and who is otherwise entitled to appraisal rights may file a petition in the Delaware Court of Chancery demanding a determination of the fair value of the shares owned by shareholders entitled to appraisal rights. We have no present intention to file such a petition if demand for appraisal is made.

Upon the filing of any petition by a shareholder in accordance with Section 262, service of a copy must be made upon us. We must, within 20 days after service, file in the office of the Register in Chancery in which the petition was filed, a duly verified list containing the names and addresses of all shareholders who have demanded payment for their shares and with whom we have not reached agreements as to the value of their shares. If we file a petition, the petition must be accompanied by the verified list. The Register in Chancery, if so ordered by the court, will give notice of the time and place fixed for the hearing of such petition by registered or certified mail to us and to the shareholders shown on the list at the addresses therein stated, and notice will also be given by publishing a notice at least one week before the day of the hearing in a newspaper of general circulation published in the City of Wilmington, Delaware, or such publication as the court deems advisable. The forms of the notices by mail and by publication must be approved by the court, and we will bear the costs for such notices. The Delaware Court of Chancery may require the shareholders who have demanded an appraisal for their shares (and who hold stock represented by certificates) to submit their stock certificates to the Register in Chancery for notation of the pendency of the appraisal proceedings and the Delaware Court of Chancery may dismiss the proceedings as to any shareholder that fails to comply with such direction.

If a petition for an appraisal is filed in a timely fashion, after a hearing on the petition, the court will determine which shareholders are entitled to appraisal rights and will appraise the shares owned by these shareholders, determining the fair value of such shares, exclusive of any element of value arising from the accomplishment or expectation of the Merger, together with a fair rate of interest to be paid, if any, upon the amount determined to be the fair value. In determining "fair value", the Delaware Court is required to take into account all relevant factors. In *Weinberger v. UOP, Inc.* the Delaware Supreme Court discussed the factors that could be considered in determining fair value in an appraisal proceeding, stating that "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court" should be considered and that "[f]air price obviously requires consideration of all relevant factors involving the value of a company." The Delaware Supreme Court has stated that in making this determination of fair value the court must consider market value, asset value, dividends, earnings prospects, the nature of the enterprise and any other facts which could be ascertained as of the date of the merger which throw any light on future prospects of the merged corporation. Section 262 provides that fair value is to be "exclusive of any element of value arising from the accomplishment or expectation of the merger." In

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523233

*Cede & Co. v. Technicolor Inc.*, the Delaware Supreme Court stated that such exclusion is a "narrow exclusion [that] does not encompass known elements of value," but which rather applies only to the speculative elements of value arising from such accomplishment or expectation. In *Weinberger*, the Delaware Supreme Court construed Section 262 to mean that "elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered."

Shareholders considering seeking appraisal of their shares should note that the fair value of their shares determined under Section 262 could be more, the same or less than the consideration they would receive pursuant to the Merger Agreement if they did not seek appraisal of their shares. The costs of the appraisal proceeding may be determined by the court and taxed against the parties as the court deems equitable under the circumstances. Upon application of a dissenting shareholder, the court may order that all or a portion of the expenses incurred by any dissenting shareholder in connection with the appraisal proceeding, including reasonable attorneys' fees and the fees and expenses of experts, be charged pro rata against the value of all shares entitled to appraisal. In the absence of a determination or assessment, each party bears his, her or its own expenses. The exchange of shares for cash pursuant to the exercise of appraisal rights generally will be a taxable transaction for United States federal income tax purposes and possibly state, local and foreign income tax purposes as well. See "Special Factors—United States Federal Income Tax Consequences" on page 67.

Any shareholder who has duly demanded appraisal in compliance with Section 262 will not, after the effective time of the Merger, be entitled to vote for any purpose the shares subject to demand or to receive payment of dividends or other distributions on such shares, except for dividends or distributions payable to shareholders of record at a date prior to the effective time of the Merger.

At any time within 60 days after the effective time of the Merger, any shareholder will have the right to withdraw his, her or its demand for appraisal and to accept the terms offered in the Merger Agreement. After this period, a shareholder may withdraw his, her or its demand for appraisal and receive payment for his, her or its shares as provided in the Merger Agreement only with our consent. If no petition for appraisal is filed with the court within 120 days after the effective time of the Merger, shareholders' rights to appraisal (if available) will cease. Inasmuch as we have no obligation to file such a petition, any shareholder who desires a petition to be filed is advised to file it on a timely basis. No petition timely filed in the court demanding appraisal may be dismissed as to any shareholder without the approval of the court, which approval may be conditioned upon such terms as the court deems just.

Failure by any shareholder to comply fully with the procedures of Section 262 of the DGCL (as reproduced in Annex D to this proxy statement) may result in termination of such shareholder's appraisal rights. In view of the complexity of Section 262, shareholders who may wish to dissent from the Merger and pursue appraisal rights should consult their legal advisors.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523234

## INFORMATION ABOUT THE COMPANY

**About Tribune Company**

The Company is a media and entertainment company, operating primarily in the United States, that conducts our operations through two business segments: publishing, and broadcasting and entertainment. In publishing, our leading daily newspapers include the *Los Angeles Times*, *Chicago Tribune*, *Newsday* (Long Island, NY), *The Sun* (Baltimore), *South Florida Sun-Sentinel*, *Orlando Sentinel* and *Hartford Courant*. Our broadcasting group operates 23 television stations, Superstation WGN on national cable, Chicago's WGN-AM and the Chicago Cubs baseball team. Popular news and information websites complement our print and broadcast properties and extend our nationwide audience. These segments reflect the manner in which we sell our products to the marketplace, manage our operations and make business decisions. Our media operations are principally in major metropolitan areas of the United States and compete against all types of media on both a local and national basis. We were founded in 1847 and incorporated in Illinois in 1861. As a result of a corporate restructuring in 1968, we became a holding company incorporated in Delaware.

*Prior Public Offerings.* The Company has for several years maintained active debt shelf registration statements for its medium-term note program and other financing needs. A $1 billion shelf registration statement was declared effective in February 2006. In July 2006, a new shelf registration statement was filed and declared effective, replacing the shelf registration statement declared effective in February 2006. The new shelf registration statement does not have a designated amount, but the Board has authorized the issuance and sale of up to $3 billion of debt securities, inclusive of the $1 billion that was registered pursuant to the February 2006 registration statement.

*Company Common Stock Repurchases.* Except for repurchases of shares of Company Common Stock in the Tender Offer, the Company has not repurchased shares in 2007. The Company's repurchases of shares of Company Common Stock totaled 71 million shares for $2.3 billion in 2006 and 12 million shares for $440 million in 2005. On May 30, 2006, the Company initiated a modified "Dutch Auction" tender offer to repurchase up to 53 million shares of Company Common Stock at a price per share not greater than $32.50 and not less than $28.00. That tender offer closed on June 26, 2006, and the Company acquired 45 million shares of Company Common Stock on July 5, 2006 at a price of $32.50 per share before transaction costs. The Company also acquired 10 million shares of Company Common Stock from the Foundations on July 12, 2006 at a price of $32.50 per share before transaction costs. The Foundations are affiliated non-profit organizations, which together held 13.6% of the Company's outstanding shares when that tender offer was launched. In connection with that tender offer, the Board also authorized the repurchase of an additional 12 million shares of Company Common Stock commencing on the eleventh business day following the completion of the tender offer. In the third quarter of 2006, the Company repurchased an additional 11.1 million shares under that authorization at a weighted average cost of $29.94 per share. In addition, the Company repurchased and retired 4.6 million shares of Company Common Stock in the first quarter of 2006.

The following table summarizes the Company's 2006 repurchases (in thousands):

|  | Shares | Cost |
|---|---|---|
| Repurchases in first quarter | 4,604 | $  137,746 |
| May 2006 tender offer repurchases | 45,027 | 1,468,270 |
| Repurchases from the Robert R. McCormick Tribune Foundation and Cantigny Foundation | 10,000 | 325,300 |
| Repurchases subsequent to the May 2006 tender offer | 11,053 | 330,952 |
| Total Company Common Stock repurchases | 70,684 | $2,262,268 |

104

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523235

### Significant Events

*TMCT Transactions.* As a result of the Company's acquisition of Times Mirror in 2000, the Company holds investment interests in TMCT and TMCT II. TMCT and TMCT II were formed in 1997 and 1999, respectively, as a result of transactions involving agreements between Times Mirror and its largest shareholders, the Chandler Trusts. Additional information pertaining to the Company's investments in TMCT and TMCT II is provided in Note 7 to the consolidated financial statements in Item 8 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006. See "Special Factors—Interest of Directors and Officers—Related Party Transactions and Agreements."

*Sales of WATL-TV, Atlanta, WCWN-TV, Albany and WLVI-TV, Boston.* On June 5, 2006, the Company announced the sale of WATL-TV, Atlanta to Gannett Co., Inc. ("Gannett") for $180 million. The sale closed on August 7, 2006. On June 19, 2006, the Company announced the sale of WCWN-TV, Albany to Freedom Communications, Inc. for $17 million. The sale closed on December 6, 2006. On September 14, 2006, the Company announced the sale of WLVI-TV, Boston, to Sunbeam Television Corp. for $113.7 million. The sale closed on December 19, 2006.

*Acquisition of Additional Equity in CareerBuilder, ShopLocal and Topix.* In August 2006, the Company completed its acquisition of additional equity interests in each of CareerBuilder, LLC, ShopLocal, LLC (formerly CrossMedia Services, Inc.) and Topix, LLC for an aggregate purchase price of $155 million. The negotiated equity purchases followed the exercise of call options by the Company and Gannett on Knight-Ridder, Inc.'s equity ownership in the three online businesses after The McClatchy Company's announcement of its proposed acquisition of Knight-Ridder, Inc. As a result of this transaction, the Company and Gannett each increased their respective ownership of CareerBuilder, LLC and ShopLocal, LLC to 42.5% with The McClatchy Company retaining a 15% interest in both entities. Additionally, each of the Company's and Gannett's interest in Topix, LLC increased to 31.9%. As a result of subsequent funding, the current ownership of Topix, LLC is approximately 33.7% for both the Company and Gannett, 11.9% for The McClatchy Company and 20.7% for management of Topix, LLC.

*Network Affiliations.* On January 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 16 of its television stations that were at that time affiliated with the former WB Network (including those in New York, Los Angeles and Chicago) with a new broadcast network, the CW Network. The new network was launched in September 2006 by Warner Bros. Entertainment and CBS. The new network airs a portion of the programming previously carried on the WB Network and the UPN Network, as well as new programming. The WB Network has shut down. The Company did not incur any costs related to the shutdown of the WB Network.

In the second quarter of 2006, the Company announced that its other three former WB Network affiliates (Philadelphia, Atlanta and Seattle) would become affiliates of the new broadcast network, MyNetworkTV, which was launched in September 2006 by the FOX Television Stations Network Inc. and Twentieth Century Television. The new network airs primarily primetime dramas. The Company subsequently sold its Atlanta station in August 2006 and its Albany and Boston stations in December 2006.

### Recent Developments

On February 12, 2007, the Company announced an agreement to sell the New York edition of *Hoy* ("*Hoy*, New York") to ImpreMedia, LLC. The sale of *Hoy*, New York closed on May 15, 2007. On March 6, 2007, the Company announced an agreement to sell Southern Connecticut Newspapers Inc. ("SCNI") to Gannett for $73 million. This agreement was terminated following an arbitrator's ruling that the Company could not sell SCNI unless Gannett assumed an existing collective bargaining contract as a condition of the sale, which Gannett declined to do. The Company simultaneously

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523236

announced that it would immediately begin the process of soliciting offers for the SCNI newspapers with the intention of completing a sale as soon as possible. In the first quarter of 2007, the Company recorded an after-tax loss of $33 million to write down the SCNI net assets to estimated fair value, less costs to sell.

On June 1, 2007, the Company announced that an offer of settlement is pending in its appeal of a 2005 Tax Court decision disallowing the tax-free reorganizations of Matthew Bender and Mosby, former subsidiaries of Times Mirror. Under the proposed settlement, the Company will receive refunds of approximately $350 million in federal and state income taxes and interest resulting from payments previously made for both transactions. After consideration of income taxes on the interest and state income tax refunds, the net cash proceeds would be approximately $290 million. Tribune acquired Times Mirror in June 2000 and inherited the preexisting tax dispute at that time.

**Selected Financial Data**

*Historical Financial Information.*   We incorporate by reference the financial statements and notes thereto set forth in Item 8 of our Annual Report on Form 10-K for the fiscal year ended December 31, 2006. In addition, we incorporate by reference the financial information included in Item 1 of our Quarterly Report on Form 10-Q for the quarter ended April 1, 2007. You should refer to "Where You Can Find More Information" for instructions on how you can obtain copies of our SEC filings, including filings that contain our financial statements.

*Summary Historical Consolidated Financial Data.*   Set forth below is certain selected historical consolidated financial data. The financial data has been derived from, and should be read in conjunction with, our audited consolidated financial statements and the related notes filed as part of our Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and the unaudited condensed consolidated financial statements and the related notes filed as part of our Quarterly Report on Form 10-Q for the quarter ended April 1, 2007. More comprehensive financial information is included in such reports, including management's discussion and analysis of financial condition and results of operations, and other documents filed by the Company with the SEC, and the following summary is qualified in its entirety by reference to such reports and other documents and all of the financial information and notes contained in those documents. See "Where You Can Find More Information." Financial data for the quarterly periods ended April 1, 2007 and March 26, 2006, and the selected ratios for the quarterly periods ended April 1, 2007 and March 26, 2006 are unaudited and, in the opinion of our management, include all adjustments necessary for a fair presentation of the data. The results of operations for the interim periods are not necessarily indicative of the results to be expected for the entire year.

106

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523237

## TRIBUNE COMPANY AND SUBSIDIARIES
## SUMMARY HISTORICAL CONSOLIDATED FINANCIAL DATA
### (In thousands of dollars, except per share data)

| | Three Months Ended | | Fiscal Years Ended | | | | |
|---|---|---|---|---|---|---|---|
| | April 1, 2007 | March 26, 2006 | Dec. 31, 2006 | Dec. 25, 2005 | Dec. 26, 2004 | Dec. 28, 2003 | Dec. 29, 2002 |
| | (unaudited) | (unaudited) | | | | | |
| **Operating Revenues** | | | | | | | |
| Publishing . . . . . . . . . . . . . . . . $ | 931,494 $ | 985,319 $ | 4,045,598 $ | 4,046,907 $ | 4,075,618 $ | 3,983,292 $ | 3,889,904 |
| Broadcasting and entertainment . . . . . | 283,008 | 284,102 | 1,425,146 | 1,414,433 | 1,501,581 | 1,457,496 | 1,344,799 |
| Total operating revenues . . . . . . . . $ | 1,214,502 $ | 1,269,421 $ | 5,470,744 $ | 5,461,340 $ | 5,577,199 $ | 5,440,788 $ | 5,234,703 |
| **Operating Profit** | | | | | | | |
| Publishing . . . . . . . . . . . . . . . . . $ | 139,721 $ | 169,813 $ | 742,822 $ | 755,871 $ | 730,874 $ | 878,388 $ | 844,115 |
| Broadcasting and entertainment . . . . . | 61,382 | 67,451 | 391,533 | 416,891 | 513,289 | 491,733 | 437,008 |
| Corporate expenses . . . . . . . . . . . | (19,641) | (20,363) | (55,712) | (49,413) | (52,218) | (53,351) | (45,770) |
| Restructuring charges(1) . . . . . . . . . | — | — | — | — | — | — | (27,253) |
| Total operating profit . . . . . . . . . | 181,462 | 216,901 | 1,078,643 | 1,123,349 | 1,191,945 | 1,316,770 | 1,208,100 |
| Net income (loss) on equity investments . | 12,684 | 6,548 | 80,773 | 41,209 | 17,931 | 5,590 | (40,875) |
| Interest and dividend income . . . . . . . | 3,154 | 2,180 | 14,145 | 7,539 | 3,053 | 6,048 | 8,818 |
| Interest expense . . . . . . . . . . . . . . | (83,249) | (48,772) | (273,902) | (155,191) | (153,118) | (198,123) | (213,309) |
| Non-operating items . . . . . . . . . . . . | (83,715) | (13,697) | 102,969 | 69,861 | (145,044) | 241,247 | (63,211) |
| **Income from Continuing Operations Before Income Taxes and Cumulative Effect of Changes in Accounting Principle** . . . . . . . . . . . . . . . . . . . . | 30,336 | 163,160 | 1,002,628 | 1,086,767 | 914,767 | 1,371,532 | 899,523 |
| Income taxes . . . . . . . . . . . . . . . . . | (19,257) | (64,004) | (345,431) | (566,175) | (357,707) | (506,222) | (315,069) |
| **Income from Continuing Operations Before Cumulative Effect of Changes in Accounting Principle** . . . . . . . . . . | 11,079 | 99,156 | 657,197 | 520,592 | 557,060 | 865,310 | 584,454 |
| Income (Loss) from Discontinued Operations, net of tax(2) . . . . . . . . | (34,374) | 3,608 | (63,202) | 14,097 | 16,264 | 26,069 | 24,125 |
| Cumulative effect of changes in accounting principle, net of tax(3) . . . | — | — | — | — | (17,788) | — | (165,587) |
| **Net Income (Loss)(4)** . . . . . . . . . . . . . $ | (23,295) $ | 102,764 $ | 593,995 $ | 534,689 $ | 555,536 $ | 891,379 $ | 442,992 |
| **Share Information** | | | | | | | |
| Basic earnings (loss) per share | | | | | | | |
| Continuing operations before cumulative effect of changes in accounting principle . . . . . . . . . . . $ | 0.05 $ | 0.32 $ | 2.39 $ | 1.64 $ | 1.70 $ | 2.70 $ | 1.85 |
| Discontinued operations . . . . . . . . . | (0.14) | 0.01 | (0.23) | 0.05 | 0.05 | 0.08 | 0.08 |
| Cumulative effect of changes in accounting principle . . . . . . . . . . . | — | — | — | — | (.05) | — | (0.55) |
| Net income (loss) . . . . . . . . . . . . . . $ | (0.10) $ | 0.33 $ | 2.16 $ | 1.68 $ | 1.70 $ | 2.78 $ | 1.38 |
| Diluted earnings (loss) per share | | | | | | | |
| Continuing operations before cumulative effect of changes in accounting principle . . . . . . . . . . . $ | 0.05 $ | 0.32 $ | 2.37 $ | 1.62 $ | 1.68 $ | 2.53 $ | 1.72 |
| Discontinued operations . . . . . . . . . | (0.14) | 0.01 | (0.23) | 0.04 | 0.05 | 0.08 | 0.07 |
| Cumulative effect of changes in accounting principle . . . . . . . . . . . | — | — | — | — | (0.05) | — | (0.50) |
| Net income (loss) . . . . . . . . . . . . . . $ | (.10) $ | 0.33 $ | 2.14 $ | 1.67 $ | 1.67 $ | 2.61 $ | 1.30 |
| Common dividends per share . . . . . . . $ | 0.18 $ | 0.18 $ | 0.72 $ | 0.72 $ | 0.48 $ | 0.44 $ | 0.44 |
| Weighted average common shares outstanding (000's) . . . . . . . . . . . . . | 239,959 | 304,219 | 272,672 | 312,880 | 322,420 | 311,295 | 301,932 |

107

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523238

| | Three Months Ended | | Fiscal Years Ended | | | | |
|---|---|---|---|---|---|---|---|
| | April 1, 2007 | March 26, 2006 | Dec. 31, 2006 | Dec. 25, 2005 | Dec. 26, 2004 | Dec. 28, 2003 | Dec. 29, 2002 |
| | (unaudited) | (unaudited) | | | | | |
| **Financial Ratios** | | | | | | | |
| Operating profit margin . . . . . . . . . . . | 14.9% | 17.1% | 19.7% | 20.6% | 21.4% | 24.2% | 23.1% |
| Debt to capital including PHONES(5) . . | 44% | 27% | 44% | 26% | 22% | 22% | 29% |
| Debt to capital excluding PHONES(5) . . | 41% | 23% | 41% | 23% | 18% | 18% | 26% |
| **Financial Position and Other Data** | | | | | | | |
| Total assets . . . . . . . . . . . . . . . . . . . | $13,183,924 | $14,378,818 | $13,400,772 | $14,546,242 | $14,155,432 | $14,280,152 | $13,974,048 |
| Long-term debt including PHONES . . . | 3,608,570 | 2,962,146 | 3,576,211 | 2,959,262 | 2,317,933 | 2,381,617 | 3,260,795 |
| Long-term debt excluding PHONES . . . | 2,996,490 | 2,450,866 | 3,003,251 | 2,449,561 | 1,733,053 | 1,846,337 | 2,737,355 |
| Shareholders' equity . . . . . . . . . . . . . | 4,304,420 | 6,662,283 | 4,319,616 | 6,725,551 | 6,836,844 | 7,028,124 | 6,119,235 |
| Capital expenditures . . . . . . . . . . . . . | 21,369 | 21,852 | 221,907 | 205,945 | 217,348 | 193,535 | 186,737 |

(1) During the second quarter of 2001, the Company announced a voluntary employee retirement program. The Company implemented this program as well as various other cost reduction initiatives throughout the remainder of 2001 and the first quarter of 2002. The restructuring charges related to these programs decreased 2002 full year net income by $17 million and diluted EPS by $.05.

(2) Includes results from operations of *Hoy*, New York and SCNI for the first quarters of 2007 and 2006 and the expected loss on sale of SCNI in the first quarter of 2007. The results of operations for fiscal years 2002 through 2006 for *Hoy*, New York and SCNI have been reclassified as discontinued operations. Also includes income from operations and net loss on sales of WATL-TV, Atlanta, WCWN-TV, Albany, and WLVI-TV, Boston for fiscal year 2006. The results of operations for fiscal years 2002 through 2005 for these businesses are reported as discontinued operations. See Note 3 to the consolidated financial statements included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and Note 3 to the condensed consolidated financial statements included in our Quarterly Report on Form 10-Q for the quarterly period ended April 1, 2007 for additional information pertaining to discontinued operations.

(3) The cumulative effect of adopting a new accounting pronouncement for the valuation of certain intangible assets decreased net income by $18 million in 2004. The cumulative effect of adopting a new accounting pronouncement for goodwill and other intangible assets decreased net income by $166 million in 2002.

(4) See Note 8 to the condensed consolidated financial statements included in our Quarterly Report on Form 10-Q for the quarterly period ended April 1, 2007 for information pertaining to non-operating items recorded in the first quarters of 2007 and 2006. See Note 2 to the consolidated financial statements included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2006 for information pertaining to non-operating items recorded in 2006, 2005 and 2004. Fiscal year 2003 included the following after-tax non-operating items: gain on changes in fair values of derivatives and related investments of $52 million, gain on sales of subsidiaries and investments of $90 million, loss on investment write-downs of $6 million, gain on insurance recoveries of $14 million, an other non-operating loss of $2 million and a favorable income tax settlement adjustment of $25 million, totaling a gain of $173 million, or $.52 per diluted share. Fiscal year 2002 included the following after-tax non-operating items: loss on changes in fair values of derivatives and related investments of $98 million, gain on sales of subsidiaries and investments of $65 million, loss on investment write-downs of $11 million, other non-operating gain of $6 million and a favorable income tax settlement adjustment of $29 million, totaling a loss of $9 million, or $.02 per diluted share.

(5) Capital comprises total debt, non-current deferred income taxes and shareholders' equity.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523239

| | Three Months Ended | | Fiscal Years Ended | | | | |
|---|---|---|---|---|---|---|---|
| | April 1, 2007 | March 26, 2006 | Dec. 31, 2006 | Dec. 25, 2005 | Dec. 26, 2004 | Dec. 28, 2003 | Dec. 29, 2002 |
| | (unaudited) | (unaudited) | | | | | |
| **Selected Ratio:** | | | | | | | |
| Ratio of earnings to fixed charges | 1.7x | 4.0x | 4.3x | 7.1x | 6.2x | 7.2x | 4.9x |

| | April 1, 2007 (unaudited) | December 31, 2006 |
|---|---|---|
| | (Dollars in thousands, except per share amounts) | |
| **Financial Position:** | | |
| Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $13,183,924 | $13,400,772 |
| Current liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,454,709 | 2,546,714 |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,608,570 | 3,576,211 |
| Other non-current liabilities . . . . . . . . . . . . . . . . . . . . | 2,816,225 | 2,958,231 |
| Shareholders' equity . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,304,420 | 4,319,616 |
| Book value per common share . . . . . . . . . . . . . . . . . . | $    17.89 | $    18.06 |

*Summary Unaudited Pro Forma Consolidated Financial Data—2006*

The following unaudited pro forma condensed consolidated financial statements present the Company's pro forma consolidated financial position at December 31, 2006 and its pro forma consolidated results of operations for the year then ended. These unaudited pro forma consolidated financial statements are derived from our historical consolidated financial statements and give effect to the repurchase of shares of Company Common Stock pursuant to the Tender Offer and the related refinancings of certain indebtedness of the Company, as if such repurchase and refinancings had occurred at the beginning of fiscal year 2006 for purposes of the pro forma condensed consolidated statement of income and as if such repurchase and refinancings had occurred at the end of fiscal year 2006 for purposes of the pro forma condensed consolidated balance sheet. In addition, these unaudited pro forma condensed consolidated financial statements give effect to the Step One Purchase Transaction and the ESOP Purchase Agreement as if they had been consummated at the beginning of fiscal year 2006 for purposes of the pro forma condensed consolidated statement of income and as if such agreements had been consummated at the end of fiscal year 2006 for purposes of the pro forma condensed consolidated balance sheet.

The unaudited pro forma condensed consolidated financial statements include adjustments directly attributable to the Tender Offer and related refinancings that are expected to have a continuing impact on the Company. The unaudited pro forma condensed consolidated financial statements do not give effect to the consummation of the Merger, the repayment of the Exchangeable Note held by the Zell Entity or the issuance of the $225 million Subordinated Note or the 15-year Warrant to the Zell Entity in the Step Two Purchase Transaction because the proposed Merger Consideration is all cash and, if the Merger is completed, shareholders other than the ESOP will cease to have any ownership interest in the Company. The pro forma adjustments are described in the accompanying notes to the unaudited pro forma condensed consolidated financial statements. We believe the assumptions used, and pro forma adjustments derived from such assumptions, are reasonable based upon currently available information. However, such adjustments are subject to change based on finalization of the Tender Offer and related refinancings.

These unaudited pro forma condensed consolidated financial statements should be read in conjunction with our audited consolidated financial statements and the related notes filed as part of our Annual Report on Form 10-K for the fiscal year ended December 31, 2006 which is incorporated herein by reference. These unaudited pro forma condensed consolidated financial statements are not necessarily indicative of either our financial position or the results of operations that actually would have been attained had the repurchase of shares of Company Common Stock and related refinancings

109

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

pursuant to the Tender Offer, and consummation of the Step One Purchase Transaction and the ESOP Purchase Agreement had been completed at the dates indicated, or that will be achieved in the future. These unaudited pro forma condensed consolidated financial statements have been included herein for informational and comparative purposes only. Our future results are subject to prevailing economic and industry specific conditions and financial, business and other known and unknown risks and uncertainties, certain of which are beyond our control. These factors include, without limitation, those described in this proxy statement under "Cautionary Note on Forward-Looking Statements."

### Pro Forma Condensed Consolidated Statement of Income (Unaudited)

| | Year Ended December 31, 2006 | | |
|---|---|---|---|
| | Historical | Pro Forma Adjustments | Pro Forma |
| | (In thousands, except per share data) | | |
| **Operating Revenues** | $5,470,744 | $     — | $5,470,744 |
| **Operating Expenses:** | | | |
| Cost of sales (exclusive of items shown below) | 2,715,353 | — | 2,715,353 |
| Selling, general and administrative | 1,451,539 | — | 1,451,539 |
| Depreciation | 205,446 | — | 205,446 |
| Amortization of intangible assets | 19,763 | — | 19,763 |
| Total operating expenses | 4,392,101 | — | 4,392,101 |
| **Operating Profit** | 1,078,643 | — | 1,078,643 |
| Net income on equity investments | 80,773 | — | 80,773 |
| Interest and dividend income | 14,145 | — | 14,145 |
| Interest expense | (273,902) | (514,573)(a) | (788,475) |
| Gain on change in fair values of derivatives and related investments | 11,088 | — | 11,088 |
| Gain on TMCT transactions | 59,596 | — | 59,596 |
| Gain on sales of investments, net | 36,732 | — | 36,732 |
| Other non-operating loss, net | (4,447) | — | (4,447) |
| **Income From Continuing Operations Before Income Taxes** | 1,002,628 | (514,573) | 488,055 |
| Income taxes | (345,431) | 192,965 (b) | (152,466) |
| **Income From Continuing Operations** | $  657,197 | $(321,608) | $  335,589 |
| **Earnings Per Share From Continuing Operations:** | | | |
| Basic | $      2.39 | | $      2.22 |
| Diluted | $      2.37 | | $      2.15 |
| **Weighted-average Common Shares Outstanding:** | | | |
| Basic | 272,672 | (124,529)(c) | 148,143 |
| Diluted | 274,411 | (118,647)(c) | 155,764 |
| Book value per common share | $     18.06 | | $      0.59 |
| Ratio of earnings to fixed charges | 4.3 | | 1.6 |

See "Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements."

110

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523241

## Pro Forma Condensed Consolidated Balance Sheet (Unaudited)

| | As of December 31, 2006 | | |
| | Historical | Pro Forma Adjustments | Pro Forma |
|---|---|---|---|
| | (In thousands of dollars) | | |
| **Assets** | | | |
| **Current Assets:** | | | |
| Cash and cash equivalents | $    174,686 | $        — | $    174,686 |
| Accounts receivable, net | 765,871 | — | 765,871 |
| Inventories | 40,962 | — | 40,962 |
| Broadcast rights | 271,995 | — | 271,995 |
| Deferred income taxes | 74,450 | — | 74,450 |
| Prepaid expenses and other | 49,466 | — | 49,466 |
| Total current assets | 1,377,430 | — | 1,377,430 |
| **Properties:** | | | |
| Property, plant and equipment | 3,592,477 | — | 3,592,477 |
| Accumulated depreciation | (1,907,365) | — | (1,907,365) |
| Net properties | 1,685,112 | — | 1,685,112 |
| **Other Assets:** | | | |
| Broadcast rights | 295,186 | — | 295,186 |
| Goodwill | 5,837,208 | — | 5,837,208 |
| Other intangible assets, net | 2,846,057 | — | 2,846,057 |
| Time Warner stock related to PHONES debt | 348,480 | — | 348,480 |
| Other investments | 564,750 | — | 564,750 |
| Prepaid pension costs | 293,455 | — | 293,455 |
| Assets held for sale | 9,172 | — | 9,172 |
| Other | 143,922 | 112,857 (d) | 256,779 |
| Total other assets | 10,338,230 | 112,857 | 10,451,087 |
| Total assets | $13,400,772 | $    112,857 | $13,513,629 |
| **Liabilities and Shareholders' Equity** | | | |
| **Current Liabilities:** | | | |
| Borrowings under bridge credit facility | $ 1,310,000 | $(1,310,000)(e) | $        — |
| Other debt due within one year | 119,007 | (97,019)(e) | 21,988 |
| Contracts payable for broadcast rights | 317,945 | — | 317,945 |
| Deferred income | 108,607 | — | 108,607 |
| Accounts payable, accrued expenses and other current liabilities | 691,155 | (7,929)(d) | 683,226 |
| Total current liabilities | 2,546,714 | (1,414,948) | 1,131,766 |
| **Long-Term Debt:** | | | |
| PHONES debt related to Time Warner stock | 572,960 | — | 572,960 |
| Other long-term debt (less portions due within one year) | 3,003,251 | 5,779,219 (e) | 8,782,470 |
| Total long-term debt | 3,576,211 | 5,779,219 | 9,355,430 |
| **Other Non-Current Liabilities:** | | | |
| Deferred income taxes | 1,974,672 | — | 1,974,672 |
| Contracts payable for broadcast rights | 425,927 | — | 425,927 |
| Compensation and other obligations | 557,632 | — | 557,632 |
| Total other non-current liabilities | 2,958,231 | — | 2,958,231 |
| **Shareholders' Equity:** | | | |
| Common stock and additional paid-in capital | 6,837,029 | (1,784,235)(g) | 5,052,794 |
| Retained earnings | 3,138,313 | (13,214)(d) | 566,846 |
| | | (54,288)(f) | |
| | | (2,503,965)(g) | |
| Treasury common stock (at cost) | (5,288,341) | 354,288 (f) | (4,934,053) |
| Unearned ESOP shares | — | (250,000)(f) | (250,000) |
| Accumulated other comprehensive income (loss) | (367,385) | — | (367,385) |
| Total shareholders' equity | 4,319,616 | (4,251,414) | 68,202 |
| Total liabilities and shareholders' equity | $13,400,772 | $    112,857 | $13,513,629 |

See "Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements."

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only
TRB0523242

### Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements

On April 1, 2007, our Board, based on the recommendation of the Special Committee, approved the Company's entry into the Leveraged ESOP Transactions. In connection with the Leveraged ESOP Transactions, the Company agreed to launch the Tender Offer to repurchase up to 126,000,000 shares of Company Common Stock that are currently outstanding at a price of $34.00 per share. On April 1, 2007, the Company also entered into the Zell Entity Purchase Agreement and the ESOP Purchase Agreement. The terms of these agreements included the following:

- Pursuant to the ESOP Purchase Agreement, on April 1, 2007, the ESOP purchased from the Company 8,928,571 shares of Company Common Stock at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of Company Common Stock held by the ESOP.

- Pursuant to the Zell Entity Purchase Agreement, on April 23, 2007, the Zell Entity made an initial investment of $250 million in the Company in exchange for (1) 1,470,588 shares of Company Common Stock at $34.00 per share and (2) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million. The promissory note is exchangeable at the Company's option, or automatically upon termination of the Merger Agreement, into an aggregate of 5,882,353 shares of Company Common Stock, subject to antidilution adjustments.

To finance the Tender Offer and to refinance indebtedness under its existing credit facilities, the Company secured financing commitments from certain lenders, the definitive terms of which are set forth in the Credit Agreement.

The unaudited pro forma condensed consolidated statement of income does not reflect material non-recurring charges, which we anticipate will affect income from continuing operations within 12 months following the Tender Offer and related refinancings. The most significant of these charges are costs related to the extinguishment of the Company's existing term facility and bridge credit facility. We currently estimate that the income statement charges related to the extinguishment will be approximately $9 million after-tax. The unaudited pro forma condensed consolidated balance sheet reflects the impact of these non-recurring charges.

The pro forma adjustments for the Tender Offer and related refinancings, and the Purchase Agreements are described below.

(a) The pro forma interest expense adjustment assumes the issuance of approximately $7.1 billion of new variable rate debt to finance the Tender Offer and to refinance the Company's existing term facility, existing bridge credit facility, and outstanding commercial paper. On July 2, 2007, the Company entered into a Swap Agreement to hedge its variable rate interest exposure on a notional amount of $2.5 billion of debt. A rate of 7.86%, based on LIBOR (at July 10, 2007) plus a spread of 2.5%, has been used to compute pro forma interest expense on $1.5 billion of the new borrowings, a rate of 8.36%, based on LIBOR (at July 10, 2007) plus a spread of 3.0%, has been used to compute pro forma interest expense on $3.1 billion of the new borrowings and a rate of 8.31%, based on the average interest rate under the Swap Agreement plus a spread of 3.0%, has been used to compute pro forma interest expense on the remaining $2.5 billion of the new borrowings. The pro forma interest expense adjustment is net of the historical interest expense on the Company's term facility, bridge credit facility and commercial paper that were assumed to be refinanced and includes the amortization of estimated debt issuance costs of $134 million using an average life of approximately six years as well as undrawn commitment fees on a $263 million variable rate credit facility. A

112

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523243

one-eighth percentage point change in the assumed interest rate on the new borrowings would increase or decrease pro forma interest expense by approximately $9 million.

In addition, the pro forma interest expense adjustment also includes interest on the $200 million subordinated exchangeable promissory note assumed to be issued in connection with the Zell Entity Purchase Agreement. A rate of 4.81%, based on the rate specified in the Zell Entity Purchase Agreement, has been used to compute interest expense on the promissory note.

The following table summarizes the pro forma interest expense adjustment.

**Pro forma interest expense adjustment ($ in millions)**

| | |
|---|---:|
| New variable rate debt | $584 |
| $200 million promissory note | 10 |
| Amortization of debt issuance costs | 22 |
| Commitment fees | 2 |
| Less: existing term facility | (54) |
| Less: existing bridge credit facility | (44) |
| Less: existing commercial paper | (5) |
| Interest expense adjustment | $515 |

(b)  Reflects the income tax effect of the pro forma interest expense adjustment utilizing the applicable statutory tax rate for the year ended December 31, 2006.

(c)  The pro forma adjustment to basic weighted-average common shares outstanding reflects the repurchase of 126,000,000 shares of Company Common Stock and the issuance of 1,470,588 shares of Company Common Stock as of the beginning of fiscal year 2006 in connection with the Zell Entity Purchase Agreement. The pro forma adjustment to diluted weighted-average common shares outstanding also reflects the assumed conversion of the $200 million subordinated exchangeable promissory note into 5,882,353 shares of Company Common Stock as of the beginning of fiscal year 2006.

(d)  Reflects $134 million of debt issuance costs in connection with the new borrowings and the write-off of $21 million of debt issuance costs ($13 million after-tax) as a result of the extinguishment of the term facility and bridge credit facility.

(e)  To record the issuance of the new borrowings and the refinancing of the existing term facility, existing bridge credit facility and $97 million of the Company's outstanding commercial paper.

(f)  To record the issuance of shares of Company Common Stock to the ESOP and Zell Entity in connection with the Purchase Agreements. The shares were assumed to have been issued from our existing treasury common stock at the average value of $34.07 per share.

(g)  To record the repurchase and subsequent retirement of 126,000,000 shares of Company Common Stock at $34.00 per share in connection with the Tender Offer, including $4.2 million of related transaction costs.

*Summary Unaudited Pro Forma Consolidated Financial Data—First Quarter 2007*

The following unaudited pro forma condensed consolidated financial statements present the Company's pro forma consolidated financial position at April 1, 2007 and its pro forma consolidated results of operations for the quarter then ended. These unaudited pro forma consolidated financial statements are derived from our historical unaudited condensed consolidated financial statements and give effect to the repurchase of shares of Company Common Stock pursuant to the Tender Offer and the related refinancings of certain indebtedness of the Company, as if such repurchase and refinancings had occurred at the beginning of fiscal year 2006 for purposes of the pro forma condensed consolidated statement of operations and as if such repurchase and refinancings had occurred at the end of the first

113

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523244

fiscal quarter of 2007 for purposes of the pro forma condensed consolidated balance sheet. In addition, these unaudited pro forma condensed consolidated financial statements give effect to the Step One Purchase Transaction as if such transaction had been consummated at the beginning of fiscal year 2006 for purposes of the pro forma condensed consolidated statement of operations and as if such transaction had been consummated at the end of the first fiscal quarter of 2007 for purposes of the pro forma condensed consolidated balance sheet.

The unaudited pro forma condensed consolidated financial statements include adjustments directly attributable to the Tender Offer and related refinancings that are expected to have a continuing impact on the Company. The unaudited pro forma condensed consolidated financial statements do not give effect to the consummation of the Merger, the repayment of the Exchangeable Note held by the Zell Entity or the issuance of the $225 million Subordinated Note or the 15-year Warrant to the Zell Entity in the Step Two Purchase Transaction because the proposed Merger Consideration is all cash and, if the Merger is completed, shareholders other than the ESOP will cease to have any ownership interest in the Company. The pro forma adjustments are described in the accompanying notes to the unaudited pro forma condensed consolidated financial statements. We believe the assumptions used, and pro forma adjustments derived from such assumptions, are reasonable based upon currently available information. However, such adjustments are subject to change based on finalization of the Tender Offer and related refinancings.

These unaudited pro forma condensed consolidated financial statements should be read in conjunction with our audited consolidated financial statements and the related notes filed as part of our Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and our unaudited condensed consolidated financial statements and the related notes filed as part of our Quarterly Report on Form 10-Q for the quarterly period ended April 1, 2007, which are incorporated herein by reference. These unaudited pro forma condensed consolidated financial statements are not necessarily indicative of either our financial position or the results of operations that actually would have been attained had the repurchase of shares of Company Common Stock and related refinancings pursuant to the Tender Offer, and consummation of the Step One Purchase Transaction, been completed at the dates indicated, or that will be achieved in the future. These unaudited pro forma condensed consolidated financial statements have been included herein for informational and comparative purposes only. Our future results are subject to prevailing economic and industry specific conditions and financial, business and other known and unknown risks and uncertainties, certain of which are beyond our control. These factors include, without limitation, those described in this proxy statement under "Cautionary Note on Forward-Looking Statements."

114

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523245

**Pro Forma Condensed Consolidated Statement of Operations (Unaudited)**

| | First Quarter Ended April 1, 2007 | | |
| --- | --- | --- | --- |
| | Historical | Pro Forma Adjustments | Pro Forma |
| | (In thousands, except per share data) | | |
| **Operating Revenues** | $1,214,502 | $    — | $1,214,502 |
| **Operating Expenses:** | | | |
| Cost of sales (exclusive of items shown below) | 617,032 | — | 617,032 |
| Selling, general and administrative | 358,976 | — | 358,976 |
| Depreciation | 52,025 | — | 52,025 |
| Amortization of intangible assets | 5,007 | — | 5,007 |
| Total operating expenses | 1,033,040 | — | 1,033,040 |
| **Operating Profit** | 181,462 | — | 181,462 |
| Net income on equity investments | 12,684 | — | 12,684 |
| Interest and dividend income | 3,154 | — | 3,154 |
| Interest expense | (83,249) | (107,416)(a) | (190,665) |
| Loss on change in fair values of derivatives and related investments | (69,780) | — | (69,780) |
| Gain on sales of investments, net | 73 | — | 73 |
| Other non-operating loss, net | (14,008) | — | (14,008) |
| **Income (Loss) from Continuing Operations Before Income Taxes** | 30,336 | (107,416) | (77,080) |
| Income taxes | (19,257) | 40,281 (b) | 21,024 |
| **Income (Loss) from Continuing Operations** | $   11,079 | $ (67,135) | $  (56,056) |
| **Earnings (Loss) Per Share from Continuing Operations:** | | | |
| Basic | $     0.05 | | $    (0.49) |
| Diluted | $     0.05 | | $    (0.49) |
| **Weighted-average Common Shares Outstanding:** | | | |
| Basic | 239,959 | (124,529)(c) | 115,430 |
| Diluted | 242,052 | (126,622)(c) | 115,430 |
| Book value per common share | $   17.89 | | $     0.48 |
| Ratio of earnings to fixed charges | 1.7 | | 0.8 |

See "Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements."

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523246

**Pro Forma Condensed Consolidated Balance Sheet (Unaudited)**

| | Historical | Pro Forma Adjustments | Pro Forma |
|---|---|---|---|
| | | As of April 1, 2007 | |
| | | (In thousands of dollars) | |
| **Assets** | | | |
| **Current Assets:** | | | |
| Cash and cash equivalents | $ 182,109 | $ — | $ 182,109 |
| Accounts receivable, net | 676,973 | — | 676,973 |
| Inventories | 50,146 | — | 50,146 |
| Broadcast rights | 243,061 | — | 243,061 |
| Deferred income taxes | 79,374 | — | 79,374 |
| Assets held for sale | 4,535 | — | 4,535 |
| Prepaid expenses and other | 69,588 | — | 69,588 |
| Total current assets | 1,305,786 | — | 1,305,786 |
| **Properties:** | | | |
| Property, plant and equipment | 3,586,372 | — | 3,586,372 |
| Accumulated depreciation | (1,940,230) | — | (1,940,230) |
| Net properties | 1,646,142 | — | 1,646,142 |
| **Other Assets:** | | | |
| Broadcast rights | 250,984 | — | 250,984 |
| Goodwill | 5,780,251 | — | 5,780,251 |
| Other intangible assets, net | 2,807,545 | — | 2,807,545 |
| Time Warner stock related to PHONES debt | 315,520 | — | 315,520 |
| Other investments | 536,526 | — | 536,526 |
| Prepaid pension costs | 307,207 | — | 307,207 |
| Assets held for sale | 84,681 | — | 84,681 |
| Other | 149,282 | 117,368 (d) | 266,650 |
| Total other assets | 10,231,996 | 117,368 | 10,349,364 |
| Total assets | $13,183,924 | $ 117,368 | $13,301,292 |
| **Liabilities and Shareholders' Equity** | | | |
| **Current Liabilities:** | | | |
| Borrowings under bridge credit facility | $ 1,325,000 | $(1,325,000)(c) | $ — |
| Other debt due within one year | 22,664 | — | 22,664 |
| Contracts payable for broadcast rights | 290,927 | — | 290,927 |
| Deferred income | 205,837 | — | 205,837 |
| Accounts payable, accrued expenses and other current liabilities | 610,281 | (6,237)(d) | 604,044 |
| Total current liabilities | 2,454,709 | (1,331,237) | 1,123,472 |
| **Long-Term Debt:** | | | |
| PHONES debt related to Time Warner stock | 612,080 | — | 612,080 |
| Other long-term debt (less portions due within one year) | 2,996,490 | 5,697,200 (e) | 8,693,690 |
| Total long-term debt | 3,608,570 | 5,697,200 | 9,305,770 |
| **Other Non-Current Liabilities:** | | | |
| Deferred income taxes | 1,897,399 | — | 1,897,399 |
| Contracts payable for broadcast rights | 377,785 | — | 377,785 |
| Compensation and other obligations | 541,041 | — | 541,041 |
| Total other non-current liabilities | 2,816,225 | — | 2,816,225 |
| **Shareholders' Equity:** | | | |
| Common stock and additional paid-in capital | 6,870,377 | (1,793,879)(g) | 5,076,498 |
| Retained earnings | 3,016,452 | (10,395)(d) | 511,634 |
| | | (101)(f) | |
| | | (2,494,321)(g) | |
| Treasury common stock (at cost) | (4,972,072) | 50,101 (f) | (4,921,971) |
| Unearned ESOP shares | (250,000) | — | (250,000) |
| Accumulated other comprehensive income (loss) | (360,337) | — | (360,337) |
| Total shareholders' equity | 4,304,420 | (4,248,595) | 55,825 |
| Total liabilities and shareholders' equity | $13,183,924 | $ 117,368 | $13,301,292 |

See "Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements."

116

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523247

**Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements**

On April 1, 2007, our Board, based on the recommendation of the Special Committee, approved the Company's entry into the Leveraged ESOP Transactions. In connection with the Leveraged ESOP Transactions, the Company agreed to launch the Tender Offer to repurchase up to 126,000,000 shares of Company Common Stock that are currently outstanding at a price of $34.00 per share. On April 1, 2007, the Company also entered into the Zell Entity Purchase Agreement and the ESOP Purchase Agreement. The terms of these agreements included the following:

- Pursuant to the ESOP Purchase Agreement, on April 1, 2007, the ESOP purchased from the Company 8,928,571 shares of Company Common Stock at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of Company Common Stock held by the ESOP.

- Pursuant to the Zell Entity Purchase Agreement, on April 23, 2007, the Zell Entity made an initial investment of $250 million in the Company in exchange for (1) 1,470,588 shares of Company Common Stock at $34.00 per share and (2) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million. The promissory note is exchangeable at the Company's option, or automatically upon termination of the Merger Agreement, into an aggregate of 5,882,353 shares of Company Common Stock, subject to antidilution adjustments.

To finance the Tender Offer and to refinance indebtedness under its existing credit facilities, the Company secured financing commitments from certain lenders, the definitive terms of which are set forth in the Credit Agreement.

The unaudited pro forma condensed consolidated statement of operations does not reflect material non-recurring charges, which we anticipate will affect income from continuing operations within 12 months following the Tender Offer and related refinancings. The most significant of these charges are costs related to the extinguishment of the Company's existing term facility and bridge credit facility. We currently estimate that the income statement charges related to the extinguishment will be approximately $9 million after-tax. The unaudited pro forma condensed consolidated balance sheet reflects the impact of these non-recurring charges.

The pro forma adjustments for the Tender Offer and related refinancings, and the Step One Purchase Transaction are described below.

(a) The pro forma interest expense adjustment assumes the issuance of approximately $7.0 billion of new variable rate debt to finance the Tender Offer and to refinance the Company's existing term facility and bridge credit facility. On July 2, 2007, the Company entered into a Swap Agreement to hedge its variable rate interest exposure on a notional amount of $2.5 billion of debt. A rate of 7.86%, based on LIBOR (at July 10, 2007) plus a spread of 2.5%, has been used to compute pro forma interest expense on $1.5 billion of the new borrowings, a rate of 8.36%, based on LIBOR (at July 10, 2007) plus a spread of 3.0%, has been used to compute pro forma interest expense on $3.0 billion of the new borrowings and a rate of 8.31%, based on the average interest rate under the Swap Agreement plus a spread of 3.0%, has been used to compute pro forma interest expense on the remaining $2.5 billion of the new borrowings. The pro forma interest expense adjustment is net of the historical interest expense on the Company's term facility and bridge credit facility that were assumed to be refinanced and includes the amortization of estimated debt issuance costs of $134 million using an average life of approximately six years as well as undrawn commitment fees on a $263 million variable

117

Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements (Continued)

rate credit facility. A one-eighth percentage point change in the assumed interest rate on the new borrowings would increase or decrease pro forma interest expense by approximately $9 million.

In addition, the pro forma interest expense adjustment also includes interest on the $200 million subordinated exchangeable promissory note issued in connection with the Zell Entity Purchase Agreement. A rate of 4.81%, based on the rate specified in the Zell Entity Purchase Agreement, has been used to compute interest expense on the promissory note.

The following table summarizes the pro forma interest expense adjustment.

**Pro forma interest expense adjustment ($ in millions)**

| | |
|---|---:|
| New variable rate debt | $144 |
| $200 million promissory note | 2 |
| Amortization of debt issuance costs | 6 |
| Commitment fees | 1 |
| Less: existing term facility | (25) |
| Less: existing bridge credit facility | (21) |
| Interest expense adjustment | $107 |

(b) Reflects the income tax effect of the pro forma interest expense adjustment utilizing the applicable statutory tax rate for the quarter ended April 1, 2007.

(c) The pro forma adjustment to basic weighted-average common shares outstanding reflects the repurchase of 126,000,000 shares of Company Common Stock and the issuance of 1,470,588 shares of Company Common Stock as of the beginning of fiscal year 2006 in connection with the Zell Entity Purchase Agreement. The pro forma adjustment to diluted weighted-average common shares outstanding also includes 2,093,000 shares to eliminate the adjustment for the Company's stock-based awards included in the historical diluted weighted-average common shares outstanding because their effects would be antidilutive on a pro forma basis. The conversion of the $200 million subordinated exchangeable promissory note was not assumed because the effect would be antidilutive on a pro forma basis.

(d) Reflects $134 million of debt issuance costs in connection with the new borrowings and the write-off of $17 million of debt issuance costs ($10 million after-tax) as a result of the extinguishment of the term facility and bridge credit facility.

(e) To record the issuance of the new borrowings and the refinancing of the existing term facility and existing bridge credit facility.

(f) To record the issuance of shares of Company Common Stock to the Zell Entity in connection with the Step One Purchase Transaction. The shares were assumed to have been issued from our existing treasury common stock at the average value of $34.07 per share.

(g) To record the repurchase and subsequent retirement of 126,000,000 of Company Common Stock at $34.00 per share in connection with the Tender Offer, including $4.2 million of related transaction costs.

118

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523249

**Market Price of Company Common Stock**

The shares are traded on the NYSE under the symbol "TRB." The following table sets forth, for each of the periods indicated, the high and low sales prices per share as reported by the NYSE based on published financial sources.

| | High | Low |
|---|---|---|
| **Year Ending December 30, 2007:** | | |
| First Quarter | $ 32.30 | $ 28.59 |
| Second Quarter | $ 33.30 | $ 28.95 |
| Third Quarter (through July 12, 2007) | $ 30.90 | $ 29.47 |
| **Year Ended December 31, 2006:** | | |
| First Quarter | $ 31.84 | $ 27.79 |
| Second Quarter | $ 32.94 | $ 27.09 |
| Third Quarter | $ 34.28 | $ 28.66 |
| Fourth Quarter | $ 33.99 | $ 30.74 |
| **Year Ended December 25, 2005:** | | |
| First Quarter | $ 42.37 | $ 38.59 |
| Second Quarter | $ 40.14 | $ 35.02 |
| Third Quarter | $ 39.56 | $ 34.53 |
| Fourth Quarter | $ 36.15 | $ 30.05 |

On March 30, 2007, the last full trading day prior to the public announcement of the execution of the Merger Agreement, the last reported sales price of the shares reported by the NYSE was $32.11 per share. On July 12, 2007, the most recent practicable date before the printing of this proxy statement, the closing price of Company Common Stock was $29.98. **We recommend that shareholders obtain a current market price for the shares before deciding how to vote their shares.**

Quarterly cash dividends declared on Company Common Stock were $0.18 per share for each quarter during 2006 and 2005. Total cash dividends declared on Company Common Stock by the Company were $195 million for 2006 and $225 million for 2005. The Company announced in February 2007 that its first quarter 2007 cash dividend would be $0.18 per share. Under the Merger Agreement, we are not permitted to pay further dividends on the shares pending completion of the Merger.

**Security Ownership of Certain Beneficial Owners and Management**

As of July 1, 2007, there were 127,319,714 shares of Company Common Stock issued and outstanding, excluding 60,671,319 shares of Company Common Stock held by our subsidiaries.

As of July 1, 2007, our directors and executive officers as a group (18 persons) beneficially owned an aggregate of approximately 5,914,846 shares, representing approximately 4.5% of the total number of outstanding shares. As of the record date, July 12, 2007, the directors and executive officers as a group hold and are entitled to vote Company Common Stock representing approximately 0.6% of the outstanding shares (which amount does not include the approximately 1.2% of the outstanding shares held by the Zell Entity).

To the best of the Company's knowledge, all of the Company's directors and executive officers intend to vote all shares that they are entitled to vote in favor of the adoption of the Merger Agreement and approval of the Merger, although such persons have not entered into agreements obligating them to do so.

The Zell Entity has entered into an agreement to vote all of the shares of Company Common Stock that it beneficially owns in favor of the adoption of the Merger Agreement and approval of the transactions contemplated thereby, including the Merger. See "Other Transaction Agreements—Zell

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523250

Entity Purchase Agreement." As of the record date, the ESOP holds and is entitled to vote 8,928,571 of Company Common Stock, representing approximately 7% of the outstanding shares. The ESOP intends to vote all its shares of Company Common Stock in favor of the adoption of the Merger Agreement and approval of the Merger.

As of July 1, 2007, the aggregate number and percentage of shares of Company Common Stock that were beneficially owned by our current directors, current executive officers and each person who owns (to our knowledge) 5% or more of our outstanding shares, were as appears in the following table. Unless otherwise indicated, the address of each person listed is c/o Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership(1)(2) | Percentage of Shares |
|---|---|---|
| **5% Shareholders:** | | |
| Robert R. McCormick Tribune Foundation and Cantigny Foundation(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 435 North Michigan Avenue, Room 770 Chicago, IL 60611 | 13,229,051 | 10.39% |
| Tribune Employee Stock Ownership Plan . . . . . . . . . . . . . . . . . c/o GreatBanc Trust Company 1301 West 22nd Street, Suite 800 Oak Brook, Illinois 60523 | 8,928,571 | 7.01% |
| Michael A. Roth and Brian J. Stark(4) . . . . . . . . . . . . . . . . . . . 3600 South Lake Drive St. Francis, WI 53235 | 7,759,992 | 6.09% |
| **Directors and Executive Officers:** | | |
| Dennis J. FitzSimons(5)(6) | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 214,333 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . | 1,561,556 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,775,889 | 1.38% |
| Donald C. Grenesko | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 110,966 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . | 630,956 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 741,922 | * |
| Enrique Hernandez, Jr. | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,801 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . | 15,200 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28,001 | * |
| Betsy D. Holden | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,305 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . | 7,200 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,505 | * |
| Crane H. Kenney | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21,905 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . | 485,063 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 506,968 | * |
| Timothy J. Landon | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19,446 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . | 367,015 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 386,461 | * |

120

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership(1)(2) | Percentage of Shares |
|---|---|---|
| Thomas D. Leach(6) | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21,459 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . . | 242,408 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 263,867 | * |
| Luis E. Lewin | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,089 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . . | 392,310 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 402,399 | * |
| R. Mark Mallory | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 46,060 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . . | 207,245 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 253,305 | * |
| Robert S. Morrison | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13,119 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . . | 11,200 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24,319 | * |
| Ruthellyn Musil | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31,637 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . . | 349,379 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 381,016 | * |
| William A. Osborn | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,021 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . . | 11,200 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,221 | * |
| John E. Reardon(6) | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27,015 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . . | 323,487 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 350,502 | * |
| J. Christopher Reyes | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,170 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . . | 0 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,170 | * |
| Scott C. Smith(5)(6) | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 95,729 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . . | 577,394 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 673,123 | * |
| Dudley S. Taft(7) | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 44,000 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . . | 27,200 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 71,200 | * |
| Miles D. White | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8,698 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . . | 0 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8,698 | * |
| Samuel Zell(8) | | |
| Amount of shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,278 | |
| Options exercisable within 60 days . . . . . . . . . . . . . . . . . . . . | 0 | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,278 | * |

---

\*     Less than 1% of the issued and outstanding Company Common Stock.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**
TRB0523252

(1) "Beneficial ownership" generally means any person who, directly or indirectly, has or shares voting or investment power with respect to a security or has the right to acquire such power within 60 days.

(2) Includes shares of Company Common Stock beneficially owned by executive officers under the Tribune Company 401(k) Savings and Profit Sharing Plan. The executive officers have the right to direct the voting of shares allocated to their accounts. Totals for Ms. Musil and Messrs. FitzSimons, Grenesko, Lewin, Mallory and Smith do not include unvested restricted stock units held by them; however, each such individual has reached the minimum retirement age and the required years of service and, therefore, the restrictions on the unvested restricted stock units held by them lapse upon the executive's retirement. Ms. Musil holds 28,667 unvested restricted stock units and Messrs. FitzSimons, Grenesko, Lewin, Mallory and Smith hold 175,000, 71,417, 33,334, 21,934 and 70,000 unvested restricted stock units, respectively.

(3) The Robert R. McCormick Tribune Foundation owns 11,850,866 shares and the Cantigny Foundation owns 1,378,185 shares. The investment and voting power of each of the Robert R. McCormick Tribune Foundation and the Cantigny Foundation is vested in a board of five directors, consisting of Dennis J. FitzSimons, David D. Hiller, Scott C. Smith and two former Company officers. Mr. Hiller is the Publisher of the *Los Angeles Times*.

(4) Share ownership number based upon information contained in a Schedule 13G filed with the Securities and Exchange Commission on June 27, 2007. According to information provided by Messrs. Roth and Stark, the shares are held directly by Stark Master Fund Ltd. ("Stark Master") and Stark Global Opportunities Master Fund Ltd. ("Stark Global"). Messrs. Roth and Stark direct the management of Stark Offshore Management LLC ("Stark Offshore"), which acts as the investment manager and has sole power to direct the management of Stark Master. Messrs. Roth and Stark direct the management of Stark Global Opportunities Management LLC ("Stark Management"), which acts as the investment manager and has sole power to direct the management of Stark Global. As the Managing Members of Stark Offshore and Stark Management, Messrs. Roth and Stark possess voting and dispositive power over all of the shares. For purposes of the reporting requirements under the Exchange Act, Messrs. Roth and Stark may be deemed to be the beneficial owners of, but disclaim such beneficial ownership of, the shares.

(5) Does not include 11,850,866 shares owned by the Robert R. McCormick Tribune Foundation and 1,378,185 shares owned by the Cantigny Foundation (see (3) above).

(6) Includes shares held by family members or in family trusts, as follows: Mr. FitzSimons, 3,087 shares; Mr. Leach, 94 shares; Mr. Reardon, 75 shares; and Mr. Smith, 800 shares.

(7) Includes 30,113 shares held by Taft Broadcasting Company. Mr. Taft is the sole shareholder of Taft Broadcasting Company.

(8) Samuel Zell was elected to the Company's board of directors on May 9, 2007. The amount of shares indicated as beneficially owned by Mr. Zell consist of the 2,278 shares of Company Common Stock Mr. Zell received from the Company on May 9, 2007 as a director stock award. In addition, the Zell Entity is the beneficial owner of 1,470,588 shares of Company Common Stock and a promissory note made by the Company which is exchangeable into 5,882,352 shares of Company Common Stock (subject to certain adjustments), although such exchange is not in the control of the Zell Entity. SIT, the sole member of the Zell Entity, is an irrevocable trust established for the benefit of Mr. Zell and his family. Chai Trust, the trustee of SIT, has investment control with respect to SIT. Mr. Zell is not a managing director or officer of Chai Trust, and does not otherwise exercise investment control with respect to SIT or the Zell Entity. As such, the amount of shares indicated as beneficially owned by Mr. Zell does not include the securities of the Company beneficially owned by the Zell Entity.

122

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523253

*Other Agreements Involving the Company's Securities.* Except as otherwise described herein and for the outstanding stock options, stock awards and other restricted equity interests granted to our directors, executive officers and other employees pursuant to the Company's various equity benefits plans, which are described in Note 16 to the financial statements contained in our Annual Report on Form 10-K for the year ended December 31, 2006, which descriptions are incorporated herein by reference, neither the Company nor any affiliate nor, to the Company's knowledge, any of the Company's executive officers or directors, nor associate of the foregoing persons, is a party to any agreement, arrangement, understanding or relationship with the Company or any other person relating, directly or indirectly, to any of the Company's securities. For more information regarding the terms of our equity incentive plans and certain other agreements, we refer you to the entire text of the documents included as Exhibits (d)(20) through (d)(37) to the Schedule 13E-3, as the same may be amended from time to time, which are incorporated herein by reference.

*Recent Securities Transactions.* Except for the Leveraged ESOP Transactions or as otherwise described herein, based on our records and on information provided to us by our directors, executive officers, affiliates and subsidiaries, neither we nor any of our directors, executive officers, affiliates or subsidiaries have effected any transactions involving shares of our Company Common Stock during the 60 days prior to July 12, 2007, with the following exceptions:

- The following shares were purchased in the Tender Offer from the Chandler Trusts, the McCormick Tribune Foundation and Cantigny Foundation and each individual who was a director or executive officer at the expiration of the Tender Offer:

| Name | Shares Tendered and Accepted for Payment |
| --- | --- |
| The Chandler Trusts | 27,812,585 |
| Robert R. McCormick Tribune Foundation and Cantigny Foundation | 18,053,737 |
| Dennis J. FitzSimons | 266,963 |
| Roger Goodan | 7,575 |
| Donald C. Grenesko | 131,391 |
| Enrique Hernandez Jr. | 808 |
| Betsy D. Holden | 635 |
| Crane H. Kenney | 29,763 |
| Timothy J. Landon | 26,535 |
| Thomas D. Leach | 29,281 |
| Luis Lewin | 12,725 |
| R. Mark Mallory | 62,510 |
| Robert S. Morrison | 2,308 |
| Ruthellyn M. Musil | 33,754 |
| William A. Osborn | 8,216 |
| John E. Reardon | 36,822 |
| J. Christopher Reyes | 7,078 |
| Scott C. Smith | 129,542 |
| William Stinehart, Jr. | 4,041 |
| Dudley S. Taft | 56,938 |

- On May 21, 2007, R. Mark Mallory acquired 6,500 shares of Company Common Stock at a price of $31.16 per share upon the exercise of a stock option that was scheduled to expire on February 14, 2014, and used 6,248 shares of Company Common Stock at a price of $32.98 per share to pay the exercise price and income tax applicable to the option exercise.

- The Chandler Trusts sold 20,351,954 shares of Company Common Stock in a transaction that closed on June 7, 2007. See "Other Transaction Agreements—Chandler Trusts Registration Rights Agreement."

123

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523254

## FINANCIAL PROJECTIONS

The Company does not as a matter of course make public projections as to its future performance, earnings or other results, and is especially wary of making projections for earnings periods due to the unpredictability of the underlying assumptions and estimates. However, in connection with the due diligence review of the Company by the ESOP, the Zell Entity, the Chandler Trusts and other interested parties, the Company provided to the ESOP, the Zell Entity, the Chandler Trusts and to other interested parties certain non-public financial projections. The Company also provided these internal financial projections to the Board and the Special Committee and their respective financial and legal advisors. We have included below a summary of these projections to give our shareholders access to certain non-public information that was furnished to third parties and was considered by the financial advisors and by our Board and Special Committee for purposes of evaluating the Leveraged ESOP Transactions. These projections were prepared on a basis consistent with the accounting principles used in our historical financial statements.

We prepared the internal financial projections that are set forth below at the dates indicated for internal use and to assist the financial advisors to each of the Board and the Special Committee and other parties in their due diligence investigations of the Company, and not with a view toward public disclosure or toward compliance with GAAP, the published guidelines of the SEC regarding projections, or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. Neither the Company's independent auditors nor any other independent accountants have compiled, examined or performed any procedures with respect to the prospective financial information contained in the projections, nor have they expressed any opinion or given any form of assurance on the projections or their achievability. The independent auditors report incorporated by reference in this proxy statement relates to the Company's historical financial information. It does not extend to the prospective financial information and should not be read to do so.

We based these internal financial projections on numerous estimates, variables and assumptions that are inherently subject to economic and competitive uncertainties, all of which are difficult to predict and beyond the control of the Company's management and may not prove to have been, or may no longer be, accurate. Important factors that may affect actual results and result in the forecasted results not being achieved include, but are not limited to: changes in advertising demand, circulation levels and audience shares; regulatory and judicial rulings; availability and cost of broadcast rights; competition and other economic conditions; changes in newsprint prices; changes in the Company's credit ratings and interest rates; changes in accounting standards; adverse results from litigation, governmental investigations or tax-related proceedings or audits; the effect of labor strikes, lock-outs and negotiations; the effect of acquisitions, investments and divestitures; the effect of derivative transactions; the Company's reliance on third-party vendors for various services; the effect of the Leveraged ESOP Transactions, and other risks described in the Company's Annual Report on Form 10-K filed with the SEC for the fiscal year ended December 31, 2006 and in the Company's Quarterly Report on Form 10-Q for the quarter ended April 1, 2007.

Furthermore, we prepared the internal financial projections at the dates indicated below, and they do not necessarily reflect revised prospects for the Company's business, changes in general business or economic conditions, or any other transaction or event that has occurred or that may occur and that was not anticipated at the time the projections were prepared. Moreover, the projections are not necessarily indicative of future performance, which may be significantly more or less favorable than as contemplated by the projections and accordingly should not be regarded as a representation that they will be achieved. In addition, we prepared the projections prior to the Board's approval of the Leveraged ESOP Transactions and, accordingly, the projections do not reflect the effects of such transactions. Since the date of the projections, the Company has made publicly available the results of operations for the fiscal year ended December 31, 2006 and the fiscal quarter ended April 1, 2007.

124

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Shareholders should review the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and the Company's Quarterly Report on Form 10-Q for the quarter ended April 1, 2007 to obtain this information.

You should not regard the inclusion of the internal financial projections in this document as an indication that the Company or its affiliates, advisors or representatives considered or consider the projections to be predictive of actual future events, and the projections should not be relied upon as such. None of the Company or its affiliates, advisors, officers, directors or representatives can give you any assurance that actual results will not differ from the projections, and none of them undertakes any obligation to update or otherwise revise or reconcile the projections to reflect circumstances existing after the date such projections were generated or to reflect the occurrence of future events even in the event that any or all of the assumptions underlying the projections are shown to be in error. None of the Company, nor, to the knowledge of the Company, the ESOP, the Zell Entity or the Chandler Trusts intends to make publicly available any update or other revisions to the projections. None of the Company or its affiliates, advisors, officers, directors or representatives has made or makes any representation to any shareholder or other person regarding the ultimate performance of the Company compared to the information contained in the projections or that projected results will be achieved. The Company has made no representation to the ESOP, the Zell Entity or the Chandler Trusts in the Merger Agreement or otherwise, concerning the projections.

125

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0523256

## Company Projected Financial Information

### 2007 Management Projections

As described above, in February 2007 the Company provided the following financial projections ("2007 Management Projections") to the Company's Board and the Special Committee and their respective financial advisors as well as to the ESOP, the Zell Entity, the Chandler Trusts and to other interested parties.

### TRIBUNE COMPANY
### SUMMARY CONSOLIDATED FINANCIAL DATA(a)
#### ($ in millions)

| | 2006(d) | 2007 | 2008 | 2009 | 2010 | 2011 | '06-'10 4Y CAGR | '07-'11 4Y CAGR | '06-'11 5Y CAGR |
|---|---|---|---|---|---|---|---|---|---|
| **Operating Revenues** | | | | | | | | | |
| Publishing | $4,025 | $3,984 | $4,007 | $4,036 | $4,063 | $4,093 | 0.2% | 0.7% | 0.3% |
| Broadcasting & Entertainment | 1,408 | 1,401 | 1,480 | 1,487 | 1,531 | 1,537 | 2.1% | 2.3% | 1.8% |
| Total Revenues | 5,433 | 5,385 | 5,487 | 5,523 | 5,594 | 5,630 | 0.7% | 1.1% | 0.7% |
| **Operating Cash Expenses(b)** | | | | | | | | | |
| Publishing | 3,094 | 3,069 | 3,072 | 3,089 | 3,104 | 3,123 | 0.1% | 0.4% | 0.2% |
| Broadcasting & Entertainment | 970 | 985 | 1,012 | 1,003 | 1,030 | 1,048 | 1.5% | 1.6% | 1.6% |
| Corporate | 61 | 61 | 65 | 66 | 69 | 71 | 3.0% | 3.8% | 3.0% |
| Total Operating Cash Expenses | 4,125 | 4,115 | 4,149 | 4,158 | 4,203 | 4,242 | 0.5% | 0.8% | 0.6% |
| **Operating Cash Flow(c)** | | | | | | | | | |
| Publishing | 931 | 915 | 935 | 947 | 959 | 970 | 0.7% | 1.5% | 0.8% |
| Broadcasting & Entertainment | 437 | 416 | 468 | 484 | 501 | 490 | 3.5% | 4.2% | 2.3% |
| Corporate | (61) | (61) | (65) | (66) | (69) | (71) | 3.0% | 3.8% | 3.0% |
| Total Operating Cash Flow | 1,308 | 1,270 | 1,339 | 1,364 | 1,391 | 1,389 | 1.6% | 2.3% | 1.2% |
| **Equity Income** | 75 | 67 | 95 | 129 | 159 | 191 | 20.7% | 29.9% | 20.6% |
| **Adjusted Operating Cash Flow** | 1,383 | 1,337 | 1,434 | 1,493 | 1,550 | 1,580 | 2.9% | 4.3% | 2.7% |
| **Capital Expenditures** | | | | | | | | | |
| Publishing | 173 | 165 | 140 | 100 | 100 | 100 | | | |
| Broadcasting & Entertainment | 42 | 28 | 28 | 27 | 27 | 27 | | | |
| Corporate | 6 | 7 | 7 | 3 | 3 | 3 | | | |
| Total Capital Expenditures | 222 | 200 | 175 | 130 | 130 | 130 | | | |
| Investments | 222 | 100 | 275(e) | 100 | 100 | 100 | | | |
| Total Capital Usage | 444 | 300 | 450 | 230 | 230 | 230 | | | |
| | | | | | | | | Cumulative FCF ('07-'11) | |
| **Pre-tax Free Cash Flow** | $ 939 | $1,037 | $ 983 | $1,264 | $1,320 | $1,350 | | $5,954 | |

(a)  Excludes non-operating items and discontinued operations (Atlanta, Albany and Boston).

(b)  Includes non-cash stock-based compensation and non-cash pension expense.

(c)  Operating Cash Flow represents operating revenue less cash expenses, including non-cash stock-based compensation expense and non-cash pension expense. It should be noted that operating cash flow is not a measure of performance under GAAP and should not be considered as an alternative to operating income or net income as a measure of operating performance or cash flows as a measure of liquidity. Further, management's calculation of operating cash flows may differ from that used by others.

(d)  Excludes fiscal year 2006's additional week. A 53rd week occurs every six years as the Company's fiscal year ends on the last Sunday of the year. 2006 excludes the following special items: approximately $20 million of severance and other payments associated with new union contracts at Newsday, $9 million of other severance expense, a $4 million charge for the disposition of a press, $7 million of gains from property sales and a $7 million gain from the sale of the corporate airplane.

(e)  Includes $175 million in 2008 for the purchase of TMCT real estate.

126

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523257

The material assumptions made by the Company in developing the 2007 Management Projections were as follows:

*Publishing*

- Revenue decline of 1% in 2007 due to a challenging advertising environment;

- Print advertising revenue decline of 3% in 2007, which will be partially offset by Interactive revenue growth;

- Modest improvement in 2008-2011 revenues as compared to 2007 due to annual Interactive revenue growth of 16% and improvements in classified;

- Circulation revenue declines of 4% annually in years 2007-2011 from modest volume declines and continued selective discounting;

- Expense decline of 1% in 2007 due to more favorable newsprint prices and other cost reductions;

- Continued focus on cost reductions beyond 2007;

- Growth in equity income from CareerBuilder and Classified Ventures; and

- Declining capital expenditures due to the completion of ongoing systems projects by early 2009.

*Broadcasting and Entertainment*

- Advertising sales growth of nearly 2% annually in years 2006-2011;

- Base television spot market growth of 1% annually;

- Expected improvements in political spending;

- An expected increase in revenue share to 14.3% in 2011 from a projected 13.3% in 2006;

- Improved ratings for The CW network as compared to The WB network and continued ratings momentum of FOX network programming;

- Increase in revenue share due to debuts of new syndicated programming in fall 2007;

- Continued growth of WGN Superstation distribution (volume and rate) and renewal of carriage agreements;

- Increase in annual operating expenses of approximately 1.6%; and

- Continued growth of the TV Food Network.

The Company subsequently slightly refined the 2007 Management Projections discussed above. The material difference in the revised version of the projections was a decrease of approximately $75 million in capital expenditures and investments in 2007, resulting in an increase of the same amount in pre-tax free cash flow in 2007. These updated projections were shared with the Board, the Special Committee and their respective financial advisors, as well as with the Chandler Trusts and the Zell Entity.

The Board, the Special Committee and their respective financial advisors also considered certain downside sensitivity cases, two of which are described as "Downside Case A" and "Downside Case B" in "Special Factors—Opinion of the Special Committee's Financial Advisor." Downside Case A assumes a 2% annual decline in publishing revenues and no growth in broadcasting and entertainment operating cash flow, in each case, from 2007 through 2011. Downside Case B assumes a 3% annual decline in publishing revenues and a 1% annual decline in broadcasting and entertainment operating

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523258

cash flow, in each case, from 2007 through 2011. The downside sensitivity cases were not provided to the Zell Entity; however, they were provided to the ESOP and other interested parties. The Downside Case A and the Downside Case B developed by the Company are described in the April 1, 2007 Presentation to the Committee of Independent Directors of the Board of Directors of Tribune prepared by Morgan Stanley, which is included as Exhibit (c)(10) to the Schedule 13E-3 dated April 25, 2007.

### First Quarter 2007 Results

On May 9, 2007, the Company reported its 2007 first quarter results and furnished such results on a Quarterly Report on Form 10-Q. Consolidated operating cash flow for the first quarter of 2007 was 2% lower than planned results factored into the 2007 Management Projections, primarily due to lower publishing revenues, which were partially offset by lower expenses in both the publishing and broadcasting segments. Consolidated operating cash flow for the first quarter of 2007 was down approximately 12% from 2006. Excluding one-time items in 2007 and 2006, consolidated operating cash flow declined by approximately 17%. Shareholders should review the Company's Quarterly Report on Form 10-Q dated May 9, 2007 to obtain further information regarding the Company's first quarter results.

### Certain 2006 Management Projections

In October and December 2006, the Company prepared certain other non-public financial projections which, during the strategic review process, were provided or made available to the Board, the Special Committee, the Zell Entity and other interested parties and their respective legal and financial advisors (respectively, the "October 2006 Projections" and the "December 2006 Projections"). The October 2006 Projections and December 2006 Projections were fully superseded by the 2007 Management Projections described above.

The October 2006 Projections included projected financial information for the remainder of the 2006 fiscal year through the 2010 fiscal year and reflected (i) 2006 publishing operating revenues of $4,042 million, increasing at a five-year compound annual growth rate ("CAGR") of 2.1%, (ii) 2006 broadcasting and entertainment operating revenues of $1,390 million, increasing at a five-year CAGR of 1.7% and (iii) 2006 consolidated operating cash flow of $1,303 million, increasing at a five-year CAGR of 2.9%.

In December 2006, management reviewed the October 2006 Projections in light of the most recent operating results and revised the October 2006 Projections. As compared to the October 2006 Projections, the December 2006 Projections included projected financial information for the remainder of the 2006 fiscal year through the 2010 fiscal year and reflected (i) 2006 publishing operating revenues of $4,022 million, increasing at a five-year CAGR of 2.1%, (ii) 2006 broadcasting and entertainment operating revenues of $1,399 million, increasing at a five-year CAGR of 2.3% and (iii) 2006 consolidated operating cash flow of $1,307 million, increasing at a five-year CAGR of 3.4%.

In February 2007, in connection with the Company's preparation of its 2007 operating plan and in light of the 2006 year-end operating results and Period 1, 2007 operating results, management reviewed and revised the December 2006 Projections and prepared the 2007 Management Projections described above.

128

TRB0523259

## MULTIPLE SHAREHOLDERS SHARING ONE ADDRESS

In accordance with Rule 14a-3(e)(1) under the Exchange Act, we are sending only one copy of this proxy statement to shareholders who share the same last name and address unless they have notified us that they wish to continue receiving multiple copies. This practice, known as "householding," is designed to reduce duplicate mailings and save printing and postage costs as well as natural resources.

If you received a householded mailing this year and you would like to have additional copies mailed to you or you would like to opt out of this practice for future mailings, please submit your request (i) via e-mail to the Company's website at www.tribune.com, under the heading "Investor Relations"; (ii) in writing to Tribune Company, Attention: Corporate Relations Department, 435 North Michigan Avenue, Chicago, Illinois 60611; or (iii) telephonically to (312) 222-9100. You may also contact us if you received multiple copies of the proxy materials and would prefer to receive a single copy in the future.

## SUBMISSION OF SHAREHOLDER PROPOSALS

If the Merger is consummated, we will not have public shareholders and there will be no public participation in any future meeting of shareholders. However, if the Merger is not completed, we expect to hold a 2008 annual meeting of shareholders. In order to submit proposals for consideration at an annual meeting, shareholders must comply with the procedures set forth in the Company's by-laws and securities laws, rules and regulations. The Company's by-laws provide that in order for a shareholder to propose business for consideration at an annual meeting, notice of the proposal must be delivered to the Company not earlier than the close of business on the 120th day and not later than the close of business on the 90th day prior to the first anniversary of the preceding year's annual meeting. Accordingly, a shareholder proposal intended to be considered at the 2008 annual meeting must be received by the Company after the close of business on January 10, 2008 and prior to the close of business on February 11, 2008. However, under securities laws, if a shareholder desires to have the proposal included in the Company's proxy statement for the 2008 annual meeting, notice of the proposal must be delivered to the Company on or before December 10, 2007.

Shareholders may also nominate a candidate for election as a director. The Company's by-laws provide that notice of shareholder nominations for election of directors must be received by the Company not less than 90 days and not more than 120 days prior to the meeting at which directors are to be elected. As more fully described in the Company's by-laws, this notice must include the proposed nominee's name, age, business and residence addresses, and principal occupation, the number of shares of Company Common Stock he or she beneficially owns, and a signed consent of the proposed nominee to serve as a director of the Company if elected. The advance notice requirement affords the Board's Nominating & Governance Committee the opportunity to consider the qualifications of the proposed nominee and, to the extent deemed necessary or desirable by the Board, inform shareholders about these qualifications.

Proposals and director nominations should be directed to Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611, Attention: Corporate Secretary. Only proposals and director nominations that meet the requirements set forth in the Company's by-laws will be considered. The Company's by-laws and additional information regarding shareholder proposals and director nominations are available on our website at www.tribune.com.

## OTHER MATTERS

We currently know of no other business that will be presented for consideration at the special meeting. Nevertheless, the enclosed proxy confers discretionary authority to vote with respect to matters described in Rule 14a-4(c) under the Exchange Act, including matters that the Board does not know, a reasonable time before proxy solicitation, are to be presented at the meeting. If any of these matters are presented at the special meeting, then the proxy agents named in the enclosed proxy card will vote in accordance with their judgment.

129

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0523260

## PROVISIONS FOR UNAFFILIATED SHAREHOLDERS

No provision has been made to grant the Company's shareholders access to the corporate files of the Company or any other party to the Merger Agreement or to obtain counsel or appraisal services at the expense of the Company or other such party.

## CAUTIONARY NOTE ON FORWARD-LOOKING STATEMENTS

This proxy statement, including any documents incorporated by reference or deemed to be incorporated by reference, contains "forward-looking statements" that are subject to certain risks, trends and uncertainties that could cause actual results and achievements to differ materially from those expressed in the forward-looking statements. Such risks, trends and uncertainties are in some instances beyond the Company's control.

The words "believe," "expect," "anticipate," "estimate," "could," "should," "intend" and similar expressions generally identify forward-looking statements. These statements are not guarantees of performance. They are inherently subject to known and unknown risks, uncertainties and assumptions that could cause our future results and shareholder value to differ materially from those expressed in these statements. Our actual actions or results may differ materially from those expected or anticipated in the forward-looking statements. Factors that might cause such a difference include, but are not limited to, the following:

- the occurrence of any event, change or other circumstance that could give rise to the termination of the Merger Agreement;

- the outcome of any legal proceedings that have been or may be instituted against the Company and others relating to the Merger Agreement;

- our ability to obtain necessary consents or approvals from the FCC under the Communications Act of 1934;

- the inability to complete the Merger due to the failure to obtain shareholder approval or the failure to satisfy other conditions to consummation of the Merger;

- our ability to obtain the necessary financing for the Merger pursuant to the terms and conditions of the Second Step Credit Facilities;

- the effects of our increased debt subsequent to the Merger;

- the failure of the Merger to be completed for any other reason;

- the risk that the proposed transaction disrupts current plans and operations and or results in difficulties in employee retention;

- the effect of the announcement of the Merger on our client and customer relationships, operating results and business generally;

- the amount of the costs, fees, expenses and charges related to the Merger;

- the demand for our advertising being impacted by changes in economic conditions and fragmentation of the media landscape;

- the possible decline in our newspaper circulation and broadcasting audience share as consumers migrate to other media alternatives;

- changes in the regulatory landscape affecting our business operations and asset mix;

- the impact of the availability and cost of quality syndicated programming on our television ratings;

- the impact of events beyond our control;

130

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0523261

- unforeseen volatility in newsprint prices and cost of broadcast programming rights;

- the highly competitive nature of the media business or our ability to achieve operating and financial targets;

- our ability to attract and retain qualified management and personnel;

- potential claims and other liabilities that may be asserted against the Company;

- fluctuations in the market value of our Company Common Stock;

- the outcome of previously disclosed governmental investigations by the United States Attorney for the Eastern District of New York;

- delays in supply of our raw materials used in our operations;

- changes in our business strategy or development plans, including potential divestiture, exchange, reorganization or spin-off of certain of our publishing or interactive assets and some or all of our broadcasting and entertainment assets;

- our borrowing costs increasing due to increased debt;

- any further downgrade in the Company's credit ratings as a result of the Merger;

- changes in accounting standards;

- adverse effects of derivative transactions;

- adverse results from litigation or governmental investigations;

- additional tax liabilities;

- changes in interest rates;

- our reliance on third-party vendors for various services;

- labor strikes, lock-outs and protracted negotiations; and

- future acquisitions, investments and divestitures.

These risks and uncertainties include risks related to our businesses as well as the factors relating to the transactions discussed in this proxy statement. You should not place undue reliance on the forward-looking statements, which speak only as to the date of this proxy statement or the date of documents incorporated by reference.

In addition, please refer to our Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and our Quarterly Report on Form 10-Q for the quarter ended April 1, 2007, as filed with the SEC, which is incorporated by reference herein, for additional information on risks and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements or that may otherwise impact our company and business. See "Where You Can Find More Information" beginning on page 132. Any statement contained in this proxy statement or in a document incorporated herein by reference into this proxy statement shall be deemed to be modified or superseded to the extent such statement is modified or superseded in any subsequently filed document. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this proxy statement.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523262

## WHERE YOU CAN FIND MORE INFORMATION

We are subject to the informational filing requirements of the Exchange Act, and, accordingly, are obligated to file reports, statements and other information with the SEC relating to our business, financial condition and other matters. These reports, statements and other information can be inspected and copied at the public reference facilities maintained by the SEC at 100 F Street, N.E., Room 1580, Washington, DC 20549 and at the library of the NYSE at 20 Broad Street, New York, NY 10005. You may obtain copies of this material by mail, upon payment of the SEC's customary charges, from the Public Reference Section of the SEC at 100 F Street, N.E., Washington, DC 20549. The SEC also maintains a web site on the Internet at: http://www.sec.gov that contains reports, proxy and information statements and other information regarding registrants that file electronically with the SEC.

Because the Merger is a "going private" transaction, the Company, the ESOP, Merger Sub and the Zell Investors have filed with the SEC a Transaction Statement on Schedule 13E-3 with respect to the proposed Merger. The Schedule 13E-3, including any amendments and exhibits filed or incorporated by reference as a part of it, is available for inspection as set forth above. The Schedule 13E-3 will be amended to report promptly any material changes in the information set forth in the most recent Schedule 13E-3 filed with the SEC.

The rules of the SEC allow us to "incorporate by reference" information into this proxy statement, which means that we can disclose important information to you by referring you to another document filed separately with the SEC. This proxy statement incorporates by reference the documents listed below, including the financial statements and the notes related thereto contained in those documents that we previously filed with the SEC and any future filings made with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this proxy statement and before the special meeting. These documents contain important information about us.

| SEC Filing (File No. 1-8572) | Period or Date Filed |
|---|---|
| Annual Report on Form 10-K | Fiscal Year Ended December 31, 2006, filed February 26, 2007. |
| Definitive Proxy Statement on Schedule 14A for Tribune's 2007 Annual Meeting | April 6, 2007. |
| Quarterly Report on Form 10-Q | Fiscal Quarter Ended April 1, 2007, filed May 9, 2007. |
| Current Reports on Form 8-K | February 16, 2007; April 5, 2007; April 24, 2007; April 25, 2007; May 10, 2007; May 17, 2007; June 1, 2007; June 5, 2007 and June 29, 2007. |

Any statement contained in this proxy statement or in a document incorporated herein by reference into this proxy statement shall be deemed to be modified or superseded to the extent such statement is modified or superseded in any subsequently filed document. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this proxy statement.

You can obtain any of the documents incorporated by reference in this proxy statement from us or from the SEC's web site at the address described above. Documents incorporated by reference are available from us without charge, excluding any exhibits to those documents. You may request a copy of these filings by writing or telephoning us at: Tribune Company, Attention: Corporate Relations Department, 435 North Michigan Avenue, Chicago, Illinois 60611, Telephone: (800) 757-1694. Please be sure to include your complete name and address in your request. If you request any incorporated documents, we will mail them to you by first class mail, or another equally prompt means, within one business day after we receive your request. You can find additional information by visiting our website at www.tribune.com. Information contained on our website is not part of, and is not incorporated into, this proxy statement.

Tribune Company

July 13, 2007

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523263

**Annex A**

AGREEMENT AND PLAN OF MERGER

by and among

GREATBANC TRUST COMPANY,
solely as trustee of the
TRIBUNE EMPLOYEE STOCK OWNERSHIP TRUST
which forms a part of the
TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN,

TESOP CORPORATION,

TRIBUNE COMPANY

and

EGI-TRB, L.L.C.
(solely for the limited purposes of Section 8.12 hereof)

Dated as of April 1, 2007

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0523264

(This page has been left blank intentionally.)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**Table of Contents**

| | | Page |
|---|---|---|
| ARTICLE I | THE MERGER | A-2 |
| Section 1.1 | The Merger | A-2 |
| Section 1.2 | Closing | A-2 |
| Section 1.3 | Effective Time | A-2 |
| Section 1.4 | Effects of the Merger | A-2 |
| Section 1.5 | Certificate of Incorporation and By-laws of the Surviving Corporation | A-2 |
| Section 1.6 | Directors | A-3 |
| Section 1.7 | Officers | A-3 |
| ARTICLE II | CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES | A-3 |
| Section 2.1 | Effect on Capital Stock | A-3 |
| Section 2.2 | Exchange of Certificates | A-4 |
| ARTICLE III | REPRESENTATIONS AND WARRANTIES OF THE COMPANY | A-6 |
| Section 3.1 | Qualification, Organization, Subsidiaries, etc. | A-6 |
| Section 3.2 | Capital Stock | A-7 |
| Section 3.3 | Corporate Authority Relative to This Agreement; No Violation | A-9 |
| Section 3.4 | Reports and Financial Statements | A-11 |
| Section 3.5 | Internal Controls and Procedures | A-11 |
| Section 3.6 | No Undisclosed Liabilities | A-12 |
| Section 3.7 | Compliance with Law; Permits | A-12 |
| Section 3.8 | Environmental Laws and Regulations | A-14 |
| Section 3.9 | Employee Benefit Plans | A-14 |
| Section 3.10 | Absence of Certain Changes or Events | A-16 |
| Section 3.11 | Investigations; Litigation | A-16 |
| Section 3.12 | Proxy Statement; Other Information | A-16 |
| Section 3.13 | Rights Plan | A-17 |
| Section 3.14 | Tax Matters | A-17 |
| Section 3.15 | Labor Matters | A-18 |
| Section 3.16 | Intellectual Property | A-18 |
| Section 3.17 | Real Property | A-19 |
| Section 3.18 | Opinion of Financial Advisor | A-19 |
| Section 3.19 | Required Vote of the Company Shareholders | A-19 |
| Section 3.20 | Material Contracts | A-19 |
| Section 3.21 | Finders or Brokers | A-20 |
| Section 3.22 | Insurance | A-20 |
| Section 3.23 | Affiliate Transactions | A-20 |
| Section 3.24 | Indebtedness | A-20 |
| Section 3.25 | Cable and Satellite Matters | A-20 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF THE ESOP AND MERGER SUB | A-20 |
| Section 4.1 | Qualification, Organization; Subsidiaries, etc. | A-20 |
| Section 4.2 | Authority Relative to This Agreement; No Violation | A-21 |
| Section 4.3 | Investigations; Litigation | A-21 |
| Section 4.4 | Proxy Statement; Other Information | A-22 |
| Section 4.5 | Capitalization of Merger Sub | A-22 |
| Section 4.6 | Lack of Ownership of Company Common Stock | A-22 |
| Section 4.7 | Finders or Brokers | A-22 |

A-ii

|  |  | Page |
|---|---|---|
| Section 4.8 | No Additional Representations | A-22 |
| ARTICLE V | COVENANTS AND AGREEMENTS | A-23 |
| Section 5.1 | Conduct of Business by the Company | A-23 |
| Section 5.2 | Investigation | A-26 |
| Section 5.3 | No Solicitation | A-27 |
| Section 5.4 | Proxy Statement; Company Meeting | A-30 |
| Section 5.5 | Stock Options and Other Stock-Based Awards; Employee Matters | A-31 |
| Section 5.6 | Reasonable Best Efforts | A-33 |
| Section 5.7 | Takeover Statute | A-36 |
| Section 5.8 | Public Announcements | A-36 |
| Section 5.9 | Indemnification and Insurance | A-36 |
| Section 5.10 | Control of Operations | A-37 |
| Section 5.11 | Financing | A-37 |
| Section 5.12 | Specified Divestitures | A-39 |
| Section 5.13 | FCC Matters | A-39 |
| Section 5.14 | Company Offer | A-39 |
| Section 5.15 | Eagles Exchange | A-40 |
| ARTICLE VI | CONDITIONS TO THE MERGER | A-40 |
| Section 6.1 | Conditions to Each Party's Obligation to Effect the Merger | A-40 |
| Section 6.2 | Conditions to Obligation of the Company to Effect the Merger | A-41 |
| Section 6.3 | Conditions to Obligations of the ESOP and Merger Sub to Effect the Merger | A-41 |
| Section 6.4 | Frustration of Closing Conditions | A-42 |
| ARTICLE VII | TERMINATION | A-42 |
| Section 7.1 | Termination or Abandonment | A-42 |
| ARTICLE VIII | MISCELLANEOUS | A-43 |
| Section 8.1 | No Survival of Representations and Warranties | A-43 |
| Section 8.2 | Expenses | A-43 |
| Section 8.3 | Counterparts; Effectiveness | A-43 |
| Section 8.4 | Governing Law | A-44 |
| Section 8.5 | Jurisdiction; Enforcement | A-44 |
| Section 8.6 | WAIVER OF JURY TRIAL | A-44 |
| Section 8.7 | Notices | A-44 |
| Section 8.8 | Assignment; Binding Effect | A-46 |
| Section 8.9 | Severability | A-46 |
| Section 8.10 | Entire Agreement; Third-Party Beneficiaries | A-46 |
| Section 8.11 | Amendments; Waivers | A-46 |
| Section 8.12 | Tribune Acquisition Rights | A-47 |
| Section 8.13 | Headings | A-47 |
| Section 8.14 | Interpretation | A-47 |
| Section 8.15 | No Recourse | A-47 |
| Section 8.16 | Definitions | A-47 |

**EXHIBITS**

Exhibit A — Certificate of Incorporation
Exhibit B — By-Laws
Exhibit C — Exchange Agreement

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523267

AGREEMENT AND PLAN OF MERGER, dated as of April 1, 2007 (the "*Agreement*"), among GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee (the "*ESOP Fiduciary*") of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "*ESOP*"), Tesop Corporation, a Delaware corporation all of the common stock of which is owned by the ESOP ("*Merger Sub*"), Tribune Company, a Delaware corporation (the "*Company*"), and EGI-TRB, L.L.C., a Delaware limited liability company ("*Tribune Acquisition*") (solely for the limited purposes of Section 8.12 hereof).

## W I T N E S S E T H:

WHEREAS, the parties intend that Merger Sub be merged with and into the Company (the "*Merger*"), with the Company surviving the Merger.

WHEREAS, concurrently herewith, the Company, Tribune Acquisition and Samuel Zell have entered into a Securities Purchase Agreement (the "*Tribune Purchase Agreement*") pursuant to which Tribune Acquisition has, on the terms and subject to the conditions set forth in the Tribune Purchase Agreement, agreed to purchase (a) 1,470,588 shares of Company Common Stock (as defined below) and an unsecured $200,000,000 subordinated exchangeable note (the "*Subordinated Exchangeable Note*") prior to consummation of the Merger and (b) an unsecured $225,000,000 subordinated promissory note (the "*Subordinated Note*") and a warrant (the "*Warrant*") to purchase 43,478,261 shares of common stock of the Surviving Corporation (as defined below) immediately following consummation of the Merger.

WHEREAS, concurrently herewith, the ESOP Fiduciary, on behalf of the ESOP, and the Company have entered into an Equity Purchase Agreement (the "*ESOP Purchase Agreement*") pursuant to which the ESOP has, on the terms and subject to the conditions set forth in the ESOP Purchase Agreement, agreed to purchase 8,928,571 shares of Company Common Stock prior to consummation of the Merger.

WHEREAS, concurrently herewith, the Company has entered into a Voting Agreement with Chandler Trust No. 1 and Chandler Trust No. 2, pursuant to which Chandler Trust No. 1 and Chandler Trust No. 2 have agreed, among other things, to vote in favor of this Agreement and the Merger.

WHEREAS, concurrently herewith, the Company, Tribune Acquisition and the ESOP Fiduciary, on behalf of the ESOP, have entered into an Investor Rights Agreement (the "*Investor Rights Agreement*") pursuant to which the parties thereto will have certain rights and obligations as the Surviving Corporation and the stockholders of the Surviving Corporation, as applicable.

WHEREAS, the Board of Directors of the Company, acting upon the recommendation of a special committee of independent directors of the Company (the "*Special Committee*"), has (a) determined that it is in the best interests of the Company and its shareholders, and declared it advisable, to enter into this Agreement, (b) approved the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, including the Merger, and (c) resolved to recommend to its shareholders approval and adoption of this Agreement.

WHEREAS, the ESOP Fiduciary, on behalf of the ESOP, and the board of directors of Merger Sub have approved this Agreement and declared it advisable for the ESOP and Merger Sub, respectively, to enter into this Agreement.

WHEREAS, the ESOP, Merger Sub and the Company desire to make certain representations, warranties, covenants and agreements specified herein in connection with this Agreement.

A-1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, the ESOP, Merger Sub and the Company agree as follows:

## ARTICLE I
## THE MERGER

Section 1.1 *The Merger.* On the terms and subject to the conditions set forth in this Agreement, and in accordance with the General Corporation Law of the State of Delaware (the "*DGCL*"), at the Effective Time (as hereinafter defined), Merger Sub will merge with and into the Company, the separate corporate existence of Merger Sub will cease and the Company will continue its corporate existence under Delaware law as the surviving corporation in the Merger (the "*Surviving Corporation*").

Section 1.2 *Closing.* The closing of the Merger (the "*Closing*") shall take place at the offices of Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York at 10:00 a.m., local time, on a date to be specified by the parties (the "*Closing Date*") which shall be no later than the third business day after the satisfaction or waiver (to the extent permitted by applicable Law (as hereinafter defined)) of the conditions set forth in Article VI (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place, date and time as the Company and the ESOP may agree in writing.

Section 1.3 *Effective Time.* Subject to the provisions of this Agreement, at the Closing, the Company will cause a certificate of merger in a form reasonably satisfactory to the ESOP and Tribune Acquisition (the "*Certificate of Merger*") to be executed, acknowledged and filed with the Secretary of State of the State of Delaware in accordance with Section 251 of the DGCL. The Merger will become effective at such time as the Certificate of Merger has been duly filed with the Secretary of State of the State of Delaware or at such later date or time as may be agreed by the Company and Merger Sub in writing and specified in the Certificate of Merger in accordance with the DGCL (the effective time of the Merger being hereinafter referred to as the "*Effective Time*").

Section 1.4 *Effects of the Merger.* The Merger shall have the effects set forth in this Agreement and the applicable provisions of the DGCL. Without limiting the generality of the foregoing, and subject thereto, from and after the Effective Time, all property, rights, privileges, immunities, powers, franchises, licenses and authority of the Company and Merger Sub shall vest in the Surviving Corporation, and all debts, liabilities, obligations, restrictions and duties of each of the Company and Merger Sub shall become the debts, liabilities, obligations, restrictions and duties of the Surviving Corporation. At and after the Effective Time, the officers and directors of the Surviving Corporation shall be authorized to execute and deliver, in the name and on behalf of the Company, its Subsidiaries or Merger Sub, any deeds, bills of sale, assignments or assurances and to take and do, in the name and on behalf of the Company, its Subsidiaries or Merger Sub, any other actions and things to vest, perfect or confirm of record or otherwise in the Surviving Corporation any and all right, title and interest in, to and under any of the rights, properties or assets of the Company, its Subsidiaries and Merger Sub.

Section 1.5 *Certificate of Incorporation and By-laws of the Surviving Corporation.* Subject to Section 5.9, at the Effective Time, (a) the Certificate of Incorporation of the Surviving Corporation shall be amended to read in its entirety as the Certificate of Incorporation of Merger Sub read immediately prior to the Effective Time, in the form attached hereto as *Exhibit A*, except that the name of the Surviving Corporation shall be Tribune Company and the provision in the Certificate of Incorporation of Merger Sub naming its incorporator shall be omitted, and (b) the bylaws of the Surviving Corporation shall be amended so as to read in their entirety as the bylaws of Merger Sub as in effect immediately prior to the Effective Time, in the form attached hereto as *Exhibit B*, with such changes as may be necessary to comply with any applicable Law or the rules and regulations of any

A-2

TRB0523269

national securities exchange, in each case, until thereafter amended in accordance with applicable Law, except the references to Merger Sub's name shall be replaced by references to Tribune Company.

Section 1.6    *Directors.*    Subject to applicable Law, the directors of Merger Sub as of the Effective Time shall be the initial directors of the Surviving Corporation and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal.

Section 1.7    *Officers.*    The officers of the Company as of the Effective Time shall be the initial officers of the Surviving Corporation and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal.

## ARTICLE II
## CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES

Section 2.1    *Effect on Capital Stock.*    At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Merger Sub or the holders of any securities of the Company or Merger Sub:

(a)    *Conversion of Company Common Stock.*    Each share of Common Stock, par value $.01 per share, of the Company outstanding immediately prior to the Effective Time (such shares, collectively, "*Company Common Stock,*" and each, a "*Share*"), other than (i) Shares to be cancelled pursuant to Section 2.1(b) and (ii) Dissenting Shares (as hereinafter defined), shall be converted automatically into and shall thereafter represent the right to receive Thirty-four Dollars ($34.00) in cash plus the Additional Per Share Consideration (the "*Merger Consideration*"). The "*Additional Per Share Consideration*" shall mean an amount per share, if any, rounded to the nearest whole cent, equal to (1) Thirty-four Dollars ($34) *multiplied by* (2) eight percent (8%) *multiplied by* (3) the Annualized Portion (as hereinafter defined). The "*Annualized Portion*" shall mean the quotient obtained by dividing (x) the number of days actually elapsed from and excluding January 1, 2008 to and including the Closing Date by (y) 365. All Shares that have been converted into the right to receive the Merger Consideration as provided in this Section 2.1 shall be automatically cancelled and shall cease to exist, and the holders of certificates which immediately prior to the Effective Time represented such Shares shall cease to have any rights with respect to such Shares other than the right to receive the Merger Consideration.

(b)    *ESOP and Merger Sub-Owned Shares.*    Each Share that is owned, directly or indirectly, by the ESOP or Merger Sub immediately prior to the Effective Time or held by the Company immediately prior to the Effective Time (in each case, other than any such Shares held on behalf of third parties) (the "*Cancelled Shares*") shall be cancelled and retired and shall cease to exist, and no consideration shall be delivered in exchange for such cancellation and retirement.

(c)    *Treatment of Company Preferred Stock.*    Each share of Series E Preferred Stock of the Company that is owned immediately prior to the Effective Time by an Eagle Entity, which shares constitute all the outstanding shares of Series E Preferred Stock, shall remain outstanding following the Merger in accordance with their terms.

(d)    *Conversion of Merger Sub Common Stock.*    All the shares of common stock, par value $.01 per share, of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become, in the aggregate, 56,521,739 validly issued, fully paid and nonassessable shares of common stock, par value $.01 per share, of the Surviving Corporation with the same rights, powers and privileges as the shares so converted and, together with the shares of Series E Preferred Stock referred to above in Section 2.1(c), shall constitute the only outstanding shares of capital stock of the Surviving Corporation. From and after the Effective Time, all certificates representing the common stock of Merger Sub shall be deemed for all purposes to represent the number of shares of common

A-3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523270

stock of the Surviving Corporation into which they were converted in accordance with the immediately preceding sentence.

(c) *Dissenters' Rights.*    Notwithstanding any provision of this Agreement to the contrary, if required by the DGCL (but only to the extent required thereby), Shares that are issued and outstanding immediately prior to the Effective Time (other than Cancelled Shares) and that are held by holders of such Shares who have not voted in favor of the adoption of this Agreement or consented thereto in writing and who have properly exercised appraisal rights with respect thereto in accordance with, and who have complied with, Section 262 of the DGCL (the *"Dissenting Shares"*) will not be converted into the right to receive the Merger Consideration, and holders of such Dissenting Shares will be entitled to receive payment of the fair value of such Dissenting Shares in accordance with the provisions of such Section 262 unless and until any such holder fails to perfect or effectively waives, withdraws or loses its rights to appraisal and payment under the DGCL. If, after the Effective Time, any such holder fails to perfect or effectively waives, withdraws or loses such right, such Shares shall not be deemed Dissenting Shares and will thereupon be treated as if they had been converted into and have become exchangeable for, at the Effective Time, the right to receive the Merger Consideration, without any interest thereon, and the Surviving Corporation shall remain liable for payment of the Merger Consideration for such Shares. At the Effective Time, any holder of Dissenting Shares shall cease to have any rights with respect thereto, except the rights provided in Section 262 of the DGCL and as provided in the previous sentence. Any portion of the Merger Consideration made available to the Paying Agent pursuant to Section 2.2 to pay for Dissenting Shares for which appraisal rights have been perfected shall be paid to the Surviving Corporation upon demand. The Company will give the ESOP (i) prompt notice of any demands received by the Company for appraisals of Shares, withdrawals of such demands, and any other instruments served pursuant to the DGCL and received by the Company that relate to any such demand for dissenters' rights and (ii) the opportunity to participate in and direct all negotiations and proceedings with respect to such notices and demands. The Company shall not, except with the prior written consent of the ESOP, make any payment with respect to any demands for appraisal or settle or offer to settle any such demands.

(f) *Adjustments.*    If at any time during the period between the date of this Agreement and the Effective Time, any change in the outstanding shares of capital stock of the Company shall occur as a result of any reclassification, recapitalization, stock split (including a reverse stock split) or combination, exchange or readjustment of shares, or any stock dividend or stock distribution is declared with a record date during such period, the Merger Consideration shall be equitably adjusted to reflect such change.

Section 2.2    *Exchange of Certificates.*

(a) *Paying Agent.*    At or prior to the Effective Time, the Company shall deposit, or shall cause to be deposited, with a U.S. bank or trust company to act as a paying agent hereunder pursuant to an agreement customary in form and substance (the *"Paying Agent"*), in trust for the benefit of holders of the Shares, the Company Stock Options (as hereinafter defined) and the Company Stock-Based Awards (as hereinafter defined), cash in U.S. dollars sufficient to pay (i) the aggregate Merger Consideration in exchange for all of the Shares outstanding immediately prior to the Effective Time (other than the Cancelled Shares), payable upon due surrender of the certificates that immediately prior to the Effective Time represented Shares (*"Certificates"*) (or effective affidavits of loss in lieu thereof) or non-certificated Shares represented by book-entry (*"Book-Entry Shares"*) pursuant to the provisions of this Article II and (ii) the Option and Stock-Based Consideration (as hereinafter defined) payable pursuant to Section 5.5 (such cash referred to in subsections (a)(i) and (a)(ii) being hereinafter referred to as the *"Exchange Fund"*).

A-4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

(b)  *Payment Procedures.*

(i) As soon as reasonably practicable after the Effective Time and in any event not later than the second business day following the Effective Time, the Paying Agent shall mail (x) to each holder of record of Shares whose Shares were converted into the Merger Consideration pursuant to Section 2.1, (A) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to Certificates shall pass, only upon delivery of Certificates (or effective affidavits of loss in lieu thereof) or Book-Entry Shares to the Paying Agent and shall be in such form and have such other provisions as the ESOP and the Company may mutually agree), and (B) instructions for use in effecting the surrender of Certificates (or effective affidavits of loss in lieu thereof) or Book-Entry Shares in exchange for the Merger Consideration and (y) upon surrender of such documents as may reasonably be required by the Paying Agent, to each holder of a Company Stock Option or a Company Stock-Based Award, a check in an amount, if any, due and payable to such holder pursuant to Section 5.5 hereof in respect of such Company Stock Option or Company Stock-Based Award.

(ii) Upon surrender of Certificates (or effective affidavits of loss in lieu thereof) or Book-Entry Shares to the Paying Agent together with such letter of transmittal, duly completed and validly executed in accordance with the instructions thereto, and such other documents as may reasonably be required by the Paying Agent, the holder of such Certificates or Book-Entry Shares shall be entitled to receive in exchange therefor a check in an amount equal to the product of (x) the number of Shares represented by such holder's properly surrendered Certificates (or effective affidavits of loss in lieu thereof) or Book-Entry Shares multiplied by (y) the Merger Consideration. No interest will be paid or accrued on any amount payable upon due surrender of Certificates or Book-Entry Shares. In the event of a transfer of ownership of Shares that is not registered in the transfer records of the Company, a check for any cash to be paid upon due surrender of the Certificate may be paid to such a transferee if the Certificate formerly representing such Shares is presented to the Paying Agent, accompanied by all documents required to evidence and effect such transfer and to evidence that any applicable stock transfer Taxes (as hereinafter defined) have been paid or are not applicable.

(iii) The Paying Agent or the Surviving Corporation shall be entitled to deduct and withhold from the consideration otherwise payable under this Agreement to any holder of Shares or holder of Company Stock Options or Company Stock-Based Awards, such amounts as are required to be withheld or deducted under the Internal Revenue Code of 1986 (the *"Code"*) or any provision of applicable Federal, state, local or foreign Tax Law with respect to the making of such payment. To the extent that amounts are so withheld or deducted and paid over to the applicable Governmental Entity (as hereinafter defined), such withheld or deducted amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the Shares or holder of the Company Stock Options or Company Stock-Based Awards, in respect of which such deduction and withholding were made.

(c)  *Closing of Transfer Books.*  At the Effective Time, the stock transfer books of the Company shall be closed, and there shall be no further registration of transfers on the stock transfer books of the Surviving Corporation of the Shares that were outstanding immediately prior to the Effective Time. If, after the Effective Time, Certificates are presented to the Surviving Corporation for transfer, they shall be cancelled and exchanged for a check in the proper amount pursuant to this Article II.

(d)  *Termination of Exchange Fund.*  Any portion of the Exchange Fund (including the proceeds of any investments thereof) that remains undistributed to the former holders of Shares for one year after the Effective Time shall be delivered to the Surviving Corporation upon demand, and any former holders of Shares who have not surrendered their Shares in accordance with Section 2.2 shall thereafter look only to the Surviving Corporation as general unsecured creditors of the Surviving Corporation for

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only
TRB0523272

payment of their claim for the Merger Consideration, without any interest thereon, upon due surrender of their Shares.

(e)  *No Liability.*  Notwithstanding anything herein to the contrary, none of the Company, the ESOP, Merger Sub, the Surviving Corporation, the Paying Agent or any other person shall be liable to any former holder of Shares for any amount properly delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.

(f)  *Investment of Exchange Fund.*  The Paying Agent shall invest all cash included in the Exchange Fund as reasonably directed by the Company; *provided, however,* that any investment of such cash shall be limited to direct short-term obligations of, or short-term obligations fully guaranteed as to principal and interest by, the U.S. government, or commercial paper obligations receiving the highest rating from either Moody's Investor Services, Inc. or Standard & Poor's Corporation, a division of The McGraw Hill Companies, or in certificates of deposit, bank repurchase agreements or banker's acceptances of commercial banks with capital exceeding $1 billion (based on the most recent financial statements of such bank that are then publicly available), or a combination thereof. Any interest and other income resulting from such investments shall be paid to the Surviving Corporation pursuant to Section 2.2(d).

(g)  *Lost Certificates.*  In the case of any Certificate that has been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such Certificate to be lost, stolen or destroyed and, if required by the Surviving Corporation, the posting by such person of a bond in customary amount as indemnity against any claim that may be made against it with respect to such Certificate, the Paying Agent will issue in exchange for such lost, stolen or destroyed Certificate a check in the amount of the number of Shares represented by such lost, stolen or destroyed Certificate multiplied by the Merger Consideration.

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as disclosed in the Company SEC Documents (as hereinafter defined) filed prior to the date hereof, other than risk factor and similar cautionary disclosure contained in the Company SEC Documents under the headings "Risk Factors" or "Forward-Looking Statements" or under any other similar heading, or as disclosed in the disclosure schedule delivered by the Company to the ESOP immediately prior to the execution of this Agreement (the "*Company Disclosure Schedule*"), the Company represents and warrants to the ESOP and Merger Sub as follows:

Section 3.1  *Qualification, Organization, Subsidiaries, etc.*  Each of the Company and its Subsidiaries and, to the knowledge of the Company, each Company Joint Venture is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease, hold and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing, holding or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, validly existing, qualified or in good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. As used in this Agreement, "*Company Joint Venture*" means CareerBuilder, LLC, ShopLocal, LLC, Topix LLC, Television Food Network, G.P., Comcast SportsNet Chicago, LLC, Eagle New Media Investments, LLC ("*Eagle New Media*"), and Eagle Publishing Investments, LLC ("*Eagle Publishing*" and together with Eagle New Media, the "*Eagle Entities*"). As used in this Agreement, any reference to any facts, circumstances, events or changes having a "*Company Material Adverse Effect*" means any facts, circumstances, events or changes that are materially adverse to the business, assets, financial condition, results of operations on an ongoing basis

A-6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

or continuing operations of the Company and its Subsidiaries, taken as a whole, or that have a material adverse effect on the ability of the Company to perform its obligations under this Agreement, or to consummate the Merger and the other transactions to be performed or consummated by the Company; *provided, however* that "Company Material Adverse Effect" shall not include facts, circumstances, events or changes resulting from (a) changes in general economic or political conditions or the securities, credit or financial markets in general, (b) general changes or developments in the industries in which the Company and its Subsidiaries operate, including general changes in law or regulation across such industries, (c) the announcement of this Agreement or the pendency or consummation of the Merger, (d) compliance with the terms of, or the taking of any action required by, this Agreement or consented to by Tribune Acquisition and the ESOP, (e) any acts of terrorism or war (other than any of the foregoing that causes any damage or destruction to or renders unusable any facility or property of the Company or any of its Subsidiaries), (f) the identity of Tribune Acquisition or the ESOP or any of their affiliates as participants in the transactions contemplated by this Agreement or the other agreements described in the recitals hereof or (g) changes in GAAP or the interpretation thereof by the Financial Accounting Standards Board, the Accounting Principles Board, the American Institute of Certified Public Accountants and other similar organizations generally considered authoritative with respect to the interpretation of GAAP, except, in the case of the foregoing clauses (a) and (b), to the extent such facts, circumstances, events, changes or developments referred to therein have a disproportionate impact on the Company and its Subsidiaries, taken as a whole, relative to other companies in the industries or in the geographic markets in which the Company conducts its businesses after taking into account the size of the Company relative to such other companies. For the avoidance of doubt, the parties agree that any decline in the stock price of the Company Common Stock on the New York Stock Exchange or any failure to meet internal or published projections, forecasts or revenue or earning predictions for any period shall not, in and of itself, constitute a Company Material Adverse Effect, but the underlying causes of such decline or failure shall be considered to the extent applicable (and subject to the proviso set forth in the immediately preceding sentence) in determining whether there is a Company Material Adverse Effect. The Company has made available to the ESOP prior to the date of this Agreement a true and complete copy of the Company's amended and restated certificate of incorporation and by-laws and the charter and comparable organizational documents of each Company Joint Venture, each as amended through the date hereof. The amended and restated certificate of incorporation and by-laws of the Company are in full force and effect, and the certificate of incorporation and by-laws or similar organizational documents of each Subsidiary of the Company and, to the knowledge of the Company, each Company Joint Venture are in full force and effect. Neither the Company nor any Subsidiary nor, to the knowledge of the Company, any Company Joint Venture is in material violation of any provision of its certificate of incorporation or by-laws or similar organizational documents.

Section 3.2    *Capital Stock.*

(a)  The authorized capital stock of the Company consists of 1,400,000,000 shares of Company Common Stock and 12,000,000 shares of preferred stock, without par value ("*Company Preferred Stock*"), of which 6,000,000 shares are designated as Series A Junior Participating Preferred Stock and 380,972 shares are designated as Series D-1 Preferred Stock (the "*Series D-1 Preferred Stock*"). At the close of business on March 14, 2007, (i) 388,098,408 shares of Company Common Stock were issued and outstanding (including 18,000 Restricted Shares), (ii) 87,035,996 shares of Company Common Stock were held in treasury, (iii) 60,671,319 shares of Company Common Stock were held by the Eagle Entities, (iv) 32,853,240 shares of Company Common Stock were reserved for issuance under the employee and director stock plans of the Company or of the former Times Mirror Company (the "*Company Stock Plans*") and (v) 137,643 shares of Series D-1 Preferred Stock were issued and outstanding and held by the Eagle Entities. All outstanding shares of Company Common Stock and Company Preferred Stock, and all shares of Company Common Stock reserved for issuance as noted in clause (iv), when issued in accordance with the respective terms thereof, are or will be duly authorized,

A-7

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

validly issued, fully paid and non-assessable and free of pre-emptive rights and all Liens. As of immediately prior to the Effective Time, there will be (i) no shares of Series D-1 Preferred Stock issued and outstanding and (ii) issued and outstanding shares of Series E Preferred Stock, all of which will be held by the Eagle Entities, as contemplated by that certain Exchange Agreement by and among the Company, Eagle New Media and Eagle Publishing (the "*Exchange Agreement*"). Such Series E Preferred Stock, when issued in accordance with the terms of the Exchange Agreement, will be fully authorized, validly issued, fully paid and non-assessable and free of pre-emptive rights and all Liens.

(b)  Section 3.2(b) of the Company Disclosure Schedule sets forth as of March 14, 2007, a complete and correct list of all outstanding Company Stock-Based Awards, Restricted Shares, Company Stock Options and each right of any kind, contingent or accrued, to receive shares of Company Common Stock or benefits measured in whole or in part by the value of a number of shares of Company Common Stock granted under the Company Stock Plans, Company Benefit Plans or otherwise (including restricted stock units, phantom units, deferred stock units and dividend equivalents), the number of shares of Company Common Stock issuable thereunder or with respect thereto and the exercise price (if any) and the Company has granted no other such awards since March 14, 2007 and prior to the date hereof. Each grant of a Company Stock Option was duly authorized no later than the date on which the grant of such Company Stock Option was by its terms to be effective by all necessary corporate action, including any required shareholder approval by the necessary number of votes or written consents, and each such grant was made in all material respects in accordance with the terms of the applicable compensation plan or arrangement of the Company, the Exchange Act, and all other applicable Laws and regulatory rules or requirements, including the rules of the New York Stock Exchange. The per share exercise price of each Company Stock Option was equal to the fair market value (as such term is defined in the applicable Company Stock Plan) of a share of Company Common Stock on the applicable grant date. The Company has not knowingly granted, and there is no and has been no Company policy or intentional practice to grant, Company Stock Options prior to, or otherwise intentionally coordinate the grant of Company Stock Options with, the release or other public announcement of material information regarding the Company or its Subsidiaries or their financial results or prospects. No outstanding Company Stock Option is intended to qualify as an "incentive stock option" under Section 422 of the Code.

(c)  All outstanding shares of capital stock of, or other equity interests in, each Subsidiary of the Company are duly authorized, validly issued, fully paid and non-assessable, were not issued in violation of any preemptive or similar rights, purchase option, call or right of first refusal or similar rights, and are owned by the Company or by a wholly owned Subsidiary of the Company, free and clear of all Liens. To the knowledge of the Company, all of the outstanding ownership interests in each of the Company Joint Ventures are duly authorized, validly issued, fully paid and nonassessable, and were not issued in violation of any preemptive or similar rights, purchase option, call or right of first refusal or similar rights. All the outstanding shares of capital stock of, or other equity interests in, each Company Joint Venture that are owned by the Company or a wholly owned Subsidiary of the Company, are owned free and clear of all Liens.

(d)  Except as set forth in subsection (a) above, as of the date hereof, (i) the Company does not have any shares of its capital stock or other voting securities issued or outstanding other than shares of Company Common Stock that have become outstanding after March 14, 2007, which were reserved for issuance as of March 14, 2007 as set forth in subsection (a) above with respect to awards outstanding as of such date under Company Stock Plans, and (ii) there are no outstanding subscriptions, options, warrants, calls, convertible or exchangeable securities, or other similar rights, undertakings, agreements or commitments of any kind to which the Company or any of the Company's Subsidiaries is a party obligating the Company or any of the Company's Subsidiaries to (A) issue, transfer or sell, or cause to be issued, transferred or sold, any shares of capital stock or other equity interests of the Company or any Subsidiary of the Company or securities convertible into or exchangeable for such shares or equity

A-8

interests, (B) issue, grant, extend or enter into any such subscription, option, warrant, call, convertible securities or other similar right, undertaking, agreement or arrangement, (C) repurchase, redeem or otherwise acquire any such shares of capital stock or other equity interests, (D) provide a material amount of funds to, or make any material investment (in the form of a loan, capital contribution or otherwise) in, any Subsidiary or Company Joint Venture or (E) give any person the right to receive any economic benefit or right similar to or derived from the economic benefits and rights occurring to holders of Company Common Stock. Except for the issuance of shares of Company Common Stock that were reserved for issuance as set forth in subsection (a) above, and except for regular quarterly cash dividends, from March 9, 2007 to the date hereof, the Company has not declared or paid any dividend or distribution in respect of the Company Common Stock, and has not issued, sold, repurchased, redeemed or otherwise acquired any Company Common Stock, and its Board of Directors has not authorized any of the foregoing.

(e)  Except for awards to acquire or receive shares of Company Common Stock under a Company Stock Plan, neither the Company nor any of its Subsidiaries has outstanding bonds, debentures, notes or other obligations, the holders of which have the right to vote (or which are convertible into or exercisable for securities having the right to vote) with the shareholders of the Company on any matter.

(f)  There are no voting trusts or other agreements or understandings to which the Company or any of its Subsidiaries is a party with respect to the voting of the capital stock or other equity interest of the Company or any of its Subsidiaries.

Section 3.3  *Corporate Authority Relative to This Agreement; No Violation.*

(a)  The Company has all requisite corporate power and authority to enter into this Agreement and, subject to receipt of the Company Shareholder Approval (as hereinafter defined) in the case of the Merger, to consummate the Merger and the other transactions contemplated hereby. The Board of Directors of the Company, acting upon the recommendation of the Special Committee, at a duly held meeting has (i) determined that it is fair to and in the best interests of the Company and its shareholders, and declared it advisable, to enter into this Agreement, (ii) approved the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, including the Merger, and (iii) resolved to recommend that the shareholders of the Company approve the adoption of this Agreement (the "*Recommendation*") and directed that this Agreement and the Merger be submitted for consideration of the shareholders of the Company at the Company Meeting (as hereinafter defined). Assuming the accuracy of the representations and warranties of the ESOP and Merger Sub set forth in Section 4.9, (i) the determinations, approvals and resolutions by the Board of Directors of the Company are sufficient to render inapplicable to the ESOP and Merger Sub and this Agreement, the Merger and the other transactions contemplated hereby the restrictions on "business combinations" contained in Section 203 of the DGCL and (ii) to the knowledge of the Company, no other "fair price," "moratorium," "control share acquisition," "business combination" or other similar antitakeover statute or regulation enacted under state or Federal laws in the United States applicable to the Company is applicable to the ESOP and Merger Sub and this Agreement, the Merger or the other transactions contemplated hereby. Except for the Company Shareholder Approval and the filing of the Certificate of Merger with the Secretary of State of the State of Delaware, no other corporate proceedings on the part of the Company are necessary to authorize this Agreement or the consummation of the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Company and, assuming this Agreement constitutes the legal, valid and binding agreement of the ESOP and Merger Sub, constitutes the legal, valid and binding agreement of the Company, enforceable against the Company in accordance with its terms.

(b)  The execution, delivery and performance by the Company of this Agreement and the consummation of the Merger and the other transactions contemplated by this Agreement by the Company do not and will not require any consent, approval, license, authorization, order or permit of,

A-9

action by, filing with or notification to any Federal, state, local or foreign governmental or regulatory agency, commission, court, body, entity or authority (each, a "*Governmental Entity*"), other than (i) the filing of the Certificate of Merger, (ii) compliance with the applicable requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "*HSR Act*"), (iii) compliance with the applicable requirements of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), including the filing of the Proxy Statement (as hereinafter defined) and the Schedule 13E-3 (as hereinafter defined), (iv) compliance with the rules and regulations of the New York Stock Exchange, (v) filings with the Federal Communications Commission (the "*FCC*"), the FCC Order (as hereinafter defined), and the state regulatory bodies (the "*State Commissions*") set forth on Section 3.3(b) of the Company Disclosure Schedule, (vi) compliance with any applicable foreign or state securities or blue sky laws, (vii) such of the foregoing as may be required in connection with the Financing, and (viii) the other consents and/or notices set forth on Section 3.3(b) of the Company Disclosure Schedule (collectively, clauses (i) through (viii), the "*Company Approvals*"), and other than any consent, approval, authorization, permit, action, filing or notification the failure of which to make or obtain would not reasonably be expected to, individually or in the aggregate, (A) have a Company Material Adverse Effect or (B) prevent or materially delay the consummation of the Merger. As used herein, "*FCC Order*" means one or more orders or decisions of the FCC (or its staff) which grant all consents or approvals required under the Communications Act of 1934, as amended (the "*Communications Act*") or the rules, regulations and published policies of the FCC promulgated thereunder (the "*FCC Rules*") for the transfer of control or assignment of all FCC licenses, permits or other authorizations held by the Company or any of its Subsidiaries to the ESOP, Merger Sub or an affiliate of the ESOP or Merger Sub and the consummation of the transactions contemplated by this Agreement, whether or not any (x) appeal or request for reconsideration or review of such order is pending, or whether the time for filing any such appeal or request for reconsideration or review, or any sua sponte action by the FCC with similar effect, has expired or (y) such order is subject to any condition or provision of law or regulation of the FCC (whether such law or regulation is now existing or is proposed in any proceeding pending at the time of receipt of the FCC Order). There is not pending or, to the knowledge of the Company, threatened by or before the FCC any proceeding, notice of violation, order of forfeiture, complaint or investigation against or relating to the Company, any of its Subsidiaries or a Company Station or, to the knowledge of the Company, any Company Joint Venture, nor, to the knowledge of the Company, is there any fact or circumstance related to the Company, any of its Subsidiaries, any Company Joint Venture or a Company Station, that would reasonably be expected to prevent the FCC from issuing the FCC Order.

(c)   The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the Merger and the other transactions contemplated hereby do not and will not (i) contravene or conflict with the organizational or governing documents of the Company, any of its Subsidiaries or any Company Joint Venture, (ii) assuming compliance with the matters referenced in Section 3.3(b) and the receipt of the Company Shareholder Approval, contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Company or any of its Subsidiaries or any of their respective properties or assets, (iii) assuming compliance with the matters referenced in Section 3.3(b), conflict with, contravene, result in any violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any material obligation or to the loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person (other than employees of the Company) under, any loan, guarantee of indebtedness or credit agreement, note, bond, mortgage, indenture, lease, agreement, contract, instrument, permit, concession, franchise, right or license to which the Company or any of the Company's Subsidiaries is a party or by which any of their respective properties or assets is bound, or (iv) result in the creation of any liens, claims, mortgages, encumbrances, pledges, security interests, equities or charges of any kind (each, a "*Lien*"), other than any such Lien (A) for Taxes or governmental assessments, charges or claims of

A-10

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523277

payment not yet due, being contested in good faith or for which adequate accruals or reserves have been established on the most recent consolidated balance sheet included in Company SEC Documents filed prior to the date hereof, (B) which is a carriers', warehousemen's, mechanics', materialmen's, repairmen's or other similar lien arising in the ordinary course of business, (C) which is disclosed on the most recent consolidated balance sheet of the Company or notes thereto or securing liabilities reflected on such balance sheet or (D) which was incurred in the ordinary course of business since the date of the most recent consolidated balance sheet of the Company (each of the foregoing, a *"Permitted Lien"*), upon any of the properties or assets of the Company or any of the Company's Subsidiaries, other than, in the case of clauses (ii) and (iii), any such items that would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.4    *Reports and Financial Statements.*

(a)   The Company has filed or furnished all forms, documents and reports required to be filed or furnished prior to the date hereof by it with the Securities and Exchange Commission (the *"SEC"*) since December 25, 2005 (the *"Company SEC Documents"*). As of their respective dates, or, if amended, as of the date of the last such amendment, the Company SEC Documents complied in all material respects with the requirements of the Securities Act of 1933, as amended (the *"Securities Act"*), and the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder, and none of the Company SEC Documents contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. None of the Subsidiaries of the Company is, or at any time since December 25, 2005 has been, required to file any form or report with the SEC.

(b)   The consolidated financial statements of the Company included in the Company SEC Documents (including all related notes and schedules, where applicable) fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries, as at the respective dates thereof, and the consolidated results of their operations and their consolidated cash flows for the respective periods then ended (subject, in the case of the unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein, including the notes thereto), in conformity with United States generally accepted accounting principles (*"GAAP"*) (except, in the case of the unaudited statements, as permitted by the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto), and comply as to form with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto. Since December 25, 2005, there has been no material change in the Company's accounting methods or principles that would be required to be disclosed in the Company's financial statements in accordance with GAAP, except as described in the notes to such Company financial statements.

(c)   To the knowledge of the Company, there is no applicable accounting rule, consensus or pronouncement that, as of the date of this Agreement, has been adopted by the SEC, the Financial Accounting Standards Board or the Emerging Issues Task Force that is not in effect as of the date of this Agreement but that, if implemented, could reasonably be expected to have a Company Material Adverse Effect.

Section 3.5    *Internal Controls and Procedures.*   The Company has established and maintains disclosure controls and procedures and internal control over financial reporting (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 under the Exchange Act) as required by Rule 13a-15 under the Exchange Act. The Company's disclosure controls and procedures are reasonably designed to ensure that all material information required to be disclosed by the Company in the reports that it files or furnishes under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC, and that all such material

A-11

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

information is accumulated and communicated to the Company's management as appropriate to allow timely decisions regarding required disclosure and to make the certifications required pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 (the "*Sarbanes-Oxley Act*"). The Company's management has completed an assessment of the effectiveness of the Company's internal control over financial reporting in compliance with the requirements of Section 404 of the Sarbanes-Oxley Act for the year ended December 31, 2006, and such assessment concluded that such controls were effective.

Section 3.6  *No Undisclosed Liabilities.*   Except (a) as reflected or reserved against in the Company's most recent consolidated balance sheet (or the notes thereto) included in the Company SEC Documents, (b) as expressly permitted or contemplated by this Agreement, (c) for liabilities and obligations incurred in the ordinary course of business since December 31, 2006 and (d) for liabilities or obligations which have been discharged or paid in full in the ordinary course of business, as of the date hereof, neither the Company nor any Subsidiary of the Company has any liabilities or obligations of any nature, whether or not accrued, absolute, contingent or otherwise, that would be required by GAAP to be reflected on a consolidated balance sheet of the Company and its Subsidiaries (or in the notes thereto), other than those that would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.7  *Compliance with Law; Permits.*

(a)  The Company, each of the Company's Subsidiaries, their relevant personnel and operations and, to the knowledge of the Company, each of the Company Joint Ventures are, and since December 31, 2006, have been, in compliance with and are not in default under or in violation of any applicable federal, state, local or foreign law, statute, ordinance, rule, regulation, judgment, order, injunction, decree or agency requirement of any Governmental Entity (collectively, "*Laws*" and each, a "*Law*"), except where such non-compliance, default or violation would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. Notwithstanding anything contained in this Section 3.7(a), no representation or warranty shall be deemed to be made in this Section 3.7(a) in respect of the matters referenced in Sections 3.4 or 3.5, or in respect of environmental, Tax, employee benefits or labor Law matters, each of which matters is addressed by other sections of this Agreement.

(b)  The Company, the Company's Subsidiaries and, to the knowledge of the Company, each of the Company Joint Ventures are in possession of and have in effect all franchises, grants, authorizations, licenses, permits (other than the Company FCC Licenses), easements, variances, exceptions, consents, certificates, approvals and orders of any Governmental Entity necessary for the Company and the Company's Subsidiaries to own, lease and operate their properties and assets or to carry on their businesses as they are now being conducted (the "*Company Permits*"), and no non-renewal, suspension, cancellation or materially adverse modification of any of the Company Permits is pending or, to the knowledge of the Company, threatened, except where the failure to have any of the Company Permits or the suspension, cancellation or materially adverse modification of any of the Company Permits would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, and there has occurred no violation of, default (with or without the lapse or time or the giving of notice, or both) under, or event giving to others any right of termination, amendment or cancellation of, with or without notice or lapse of time or both, any such Company Permit, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. All Company Permits are in full force and effect in accordance with their terms and, to the Company's knowledge, there is no event which would reasonably be expected to result in the revocation, cancellation, non-renewal or adverse modification of any such Company Permit, except where the failure to be in full force and effect, or where such revocation, cancellation, non-renewal or adverse modification, would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

A-12

(c)  Section 3.7(c) of the Company Disclosure Schedule sets forth (i) all main television and radio station licenses, permits, authorizations and approvals issued by the FCC to the Company or any of its Subsidiaries for the operation of the Company Stations ("*Company FCC Licenses*") and the legal name of the entity to which each such Company FCC License was issued and (ii) all time brokerage agreements and joint sales agreements between the Company or any of its Subsidiaries and any other broadcast licensee with respect to any broadcast television or radio station. The Company FCC Licenses are in full force and effect in accordance with their terms in all material respects and are not subject to any material conditions except for conditions applicable to television or radio broadcast licenses generally or as otherwise disclosed on the face of the Company FCC Licenses. The Company and its Subsidiaries have constructed and operated and currently are constructing and operating the Company Stations in material compliance with the terms of the Company FCC Licenses, the Communications Act, the FCC Rules and applicable requirements of the Federal Aviation Administration (the "*FAA*"). Without limiting the generality of the foregoing, the Company and its Subsidiaries have timely filed or made all applications, reports and other disclosures required by the FCC or FAA to be filed or made with respect to the Company Stations and have timely paid all FCC regulatory fees with respect to the Company Stations, except for such noncompliance, failure to file or failure to pay as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. The Company and its Subsidiaries hold all Company FCC Licenses necessary for the Company and its Subsidiaries to construct and operate the Company Stations as they are now being constructed and operated, and no suspension, cancellation or adverse modification of any of the Company FCC Licenses is pending or, to the knowledge of the Company, threatened, except where the failure to have any of the Company FCC Licenses or the non-renewal, suspension, cancellation or materially adverse modification of any of the Company FCC Licenses would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. There is not pending or, to the knowledge of the Company, threatened by or before the FCC any proceeding, notice of violation, order of forfeiture, complaint or investigation against or relating to the Company, any of its Subsidiaries, any Company Station or, to the knowledge of the Company, any Company Joint Venture, except for any such proceedings, notices, orders, complaints or investigations that would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. There is no order of forfeiture or notice of liability issued by the FCC with respect to the Company, any of its Subsidiaries, any Company Station or, to the knowledge of the Company, any Company Joint Venture that has not been satisfied. As used herein, "Company Station" shall mean each radio broadcast and television station currently owned and operated by the Company or any of its Subsidiaries, including full power radio and television broadcast stations and low power television and television translator stations.

(d)  The transmission towers and other transmission facilities of the Company Stations have been maintained in a manner consistent in all material respects with generally accepted standards of good engineering practice. To the knowledge of the Company, no Company Station causes interference in violation of the Communications Act or the FCC Rules to the transmission of any other broadcast station or communications facility.

(e)  Neither the Company nor any of its Subsidiaries has leased, licensed, assigned, conveyed or otherwise encumbered any portion of the digital spectrum of a Company Station or granted rights to any party to broadcast on any portion of the digital spectrum of a Company Station.

A-13

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523280

Section 3.8  *Environmental Laws and Regulations.*

(a) Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, (i) the Company and its Subsidiaries have conducted their respective businesses in compliance with all applicable Environmental Laws (as hereinafter defined), (ii) none of the properties owned, leased or operated by the Company or any of its Subsidiaries contains any Hazardous Substance (as hereinafter defined) as a result of any activity of the Company or any of its Subsidiaries in amounts exceeding the levels allowed or otherwise permitted by applicable Environmental Laws, (iii) since December 31, 2006, neither the Company nor any of its Subsidiaries has received any notices, demand letters or requests for information from any federal, state, local or foreign Governmental Entity indicating that the Company or any of its Subsidiaries may be in violation of, or liable under, any Environmental Law in connection with the ownership or operation of its businesses or any of their respective properties or assets, (iv) there have been no Releases or transportation of any Hazardous Substance at, onto, or from any properties presently or formerly owned, leased or operated by the Company or any of its Subsidiaries as a result of any activity of the Company or any of its Subsidiaries during the time such properties were owned, leased or operated by the Company or any of its Subsidiaries and (v) neither the Company, its Subsidiaries nor any of their respective properties are subject to any liabilities relating to any suit, settlement, court order, administrative order, regulatory requirement, judgment, notice of violation or written claim asserted or arising under any Environmental Law. It is agreed and understood that no representation or warranty is made in respect of environmental matters in any Section of this Agreement other than this Section 3.8.

(b) As used herein, *"Environmental Law"* means any Law relating to (x) the protection, preservation or restoration of human health or the environment (including air, water vapor, surface water, groundwater, drinking water supply, surface land, subsurface land, plant or animal life, or any other natural resource), (y) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, Release or disposal of Hazardous Substances, in each case as in effect at the date hereof, or (z) the protection of worker health or safety.

(c) As used herein, *"Hazardous Substance"* means any substance, element, compound, mixture, solution, and/or waste presently listed, defined, designated, identified, or classified as hazardous, toxic, radioactive, or dangerous, or otherwise regulated, under any Environmental Law. Hazardous Substance includes any substance, element, compound, mixture, solution and/or waste to which exposure is regulated by any Governmental Entity or any Environmental Law, including but not limited to any toxic waste, pollutant, contaminant, hazardous substance (including toxic mold), toxic substance, hazardous waste, special waste, industrial substance or petroleum or any derivative or byproduct thereof, radon, radioactive material, asbestos, or asbestos containing material, urea formaldehyde, foam insulation or polychlorinated biphenyls.

(d) As used herein, *"Release"* means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, storing, escaping, leaching, migrating, dumping, discarding, burying, abandoning or disposing into the environment of a Hazardous Substance, in each case, in violation of any Environmental Law or in a manner which has or may give rise to any liability under any Environmental Law.

Section 3.9  *Employee Benefit Plans.*

(a) Section 3.9(a) of the Company Disclosure Schedule lists all material Company Benefit Plans. *"Company Benefit Plans"* means all employee or director benefit plans, programs, policies, agreements or other arrangements, including any employee welfare plan within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended (*"ERISA"*), any employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not such plan is subject to ERISA), and any bonus, incentive, deferred compensation, vacation, stock purchase, stock option or

A-14

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

other equity-based plan or arrangement, severance, employment, change of control or fringe benefit plan, program or agreement (other than any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA and any other plan, program or arrangement maintained by an entity other than the Company or a Company Subsidiary pursuant to any collective bargaining agreements), in each case that are sponsored, maintained or contributed to by the Company or any of its Subsidiaries for the benefit of current or former employees, directors or consultants of the Company or its Subsidiaries.

(b)   Section 3.9(b) of the Company Disclosure Schedule lists all "multiemployer plans" (as defined in Regulation 4001.2 under ERISA) to which the Company or any ERISA Affiliate (as defined below) is obligated to contribute currently or has been obligated to contribute during the immediately preceding three years. The Company has made available to the ESOP all material written information which it has regarding potential withdrawal liability under such multiemployer plans, and, subject to, and in accordance with Section 5.2, the Company will use reasonable best efforts to assist the ESOP and Merger Sub in obtaining any additional, available material information regarding such multiemployer plans as the ESOP or Merger Sub shall reasonably request.

(c)   The Company has heretofore made available to the ESOP true and complete copies of each of the material Company Benefit Plans and material related documents, including (i) each writing constituting a part of such Company Benefit Plan, including all amendments thereto, (ii) the three most recent Annual Reports (Form 5500 Series) and accompanying schedules, if any, and (iii) the most recent determination letter from the Internal Revenue Services (the "*IRS*") (if applicable) for such Company Benefit Plan.

(d)   Except as would not have, individually or in the aggregate, a Company Material Adverse Effect: (i) each material Company Benefit Plan has been maintained and administered in compliance with its terms and with applicable Law, including ERISA and the Code to the extent applicable thereto, and in each case the regulations thereunder (ii) each of the Company Benefit Plans intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion issued by the IRS, and there are no existing circumstances or any events that have occurred that would reasonably be expected to adversely affect the qualified status of any such plan, (iii) with respect to each Company Benefit Plan that is subject to Title IV of ERISA, the present value of the accrued benefits under such Company Benefit Plan, based upon the actuarial assumptions used for funding purposes in the most recent actuarial report prepared for such Company Benefit Plan's actuary with respect to such Company Benefit Plan, did not, as of its latest valuation date, exceed the then current value of the assets of such Company Benefit Plan allocable to such accrued benefits, (iv) no Company Benefit Plan provides benefits, including death or medical benefits (whether or not insured), with respect to current or former employees or directors of the Company or its Subsidiaries beyond their retirement or other termination of service, other than (A) coverage mandated by applicable Law or (B) benefits under any "employee pension plan" (as such term is defined in Section 3(2) of ERISA), (v) no liability under Title IV of ERISA has been incurred by the Company, its Subsidiaries or any ERISA Affiliate of the Company that has not been satisfied in full (other than with respect to amounts not yet due), and, to the knowledge of the Company, no condition exists that presents a risk to the Company, its Subsidiaries or any ERISA Affiliate of the Company of incurring a liability thereunder, (vi) all contributions or other amounts payable by the Company or its Subsidiaries as of the date hereof with respect to each Company Benefit Plan in respect of current or prior plan years have been paid or accrued in accordance with GAAP, (vii) neither the Company nor its Subsidiaries has engaged in a transaction in connection with which the Company or its Subsidiaries reasonably could be subject to either a civil penalty assessed pursuant to Section 409 or 502(i) of ERISA or a material Tax imposed pursuant to Section 4975 or 4976 of the Code and (viii) there are no pending, threatened or anticipated claims (other than routine claims for benefits) by, on behalf of or against any of the Company Benefit Plans

A-15

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

or any trusts related thereto which could individually or in the aggregate reasonably be expected to result in any liability of the Company or any of its Subsidiaries. "*ERISA Affiliate*" means, with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes the first entity, trade or business, or that is a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

(e)  Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will, either alone or in combination with another event, (i) entitle any current or former employee, consultant, director or officer of the Company or any of its Subsidiaries to severance pay, unemployment compensation, forgiveness of indebtedness or any other payment, except as expressly provided in this Agreement or as required by applicable Law, (ii) result in any "excess parachute payment" (within the meaning of Section 280G of the Code), (iii) materially increase any benefits otherwise payable under any Company Benefit Plan, (iv) accelerate the time of payment or vesting, or increase the amount of compensation due any such employee, consultant, director or officer, except as expressly provided in this Agreement, (v) require the funding of any such benefits or (vi) limit the ability to amend or terminate any Company Benefit Plan or related trust.

Section 3.10  *Absence of Certain Changes or Events.*

(a)  From December 31, 2006 through the date of this Agreement, except as otherwise contemplated, required or permitted by this Agreement, the Tribune Purchase Agreement or the ESOP Purchase Agreement, (i) the businesses of the Company and its Subsidiaries have been conducted, in all material respects, in the ordinary course of business, and (ii) there has not been any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(b)  Since the date of this Agreement, there has not been any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.11  *Investigations; Litigation.*  As of the date hereof, (a) there is no investigation or review pending (or, to the knowledge of the Company, threatened) by any Governmental Entity with respect to the Company, any of the Company's Subsidiaries or, to the knowledge of the Company, any Company Joint Venture which would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, and (b) there are no actions, suits, inquiries, investigations, arbitrations, mediations or proceedings pending (or, to the knowledge of the Company, threatened) against or affecting the Company, any of its Subsidiaries, any of their respective properties or, to the knowledge of the Company, any Company Joint Venture at law or in equity (and, to the knowledge of the Company, there is no basis for any such action, suit, inquiry, investigation or proceeding) before, and there are no orders, judgments or decrees of, or before, any Governmental Entity, in each case which would have, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.12  *Proxy Statement; Other Information.*  The proxy statement (including the letter to shareholders, notice of meeting and form of proxy, and any amendments or supplements thereto, the "*Proxy Statement*") and the Rule 13E-3 Transaction Statement on Schedule 13E-3 (the "*Schedule 13E-3*") to be filed by the Company with the SEC in connection with seeking the adoption of this Agreement by the shareholders of the Company will not, at the time they are concurrently filed with the SEC, or, in the case of the Proxy Statement, at the time it is first mailed to the shareholders of the Company or at the time of the Company Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The Company will cause the Proxy Statement and the Schedule 13E-3 to comply as to form in all material

A-16

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523283

respects with the requirements of the Exchange Act and the rules and regulations thereunder applicable thereto as of the date of such filing. No representation is made by the Company with respect to statements made in the Proxy Statement or the Schedule 13E-3 based on information supplied by the ESOP, Merger Sub or any of their affiliates specifically for inclusion or incorporation by reference therein.

Section 3.13  *Rights Plan.* The Board of Directors of the Company has resolved to, and the Company promptly after the execution of this Agreement will, take all action necessary to render the rights to purchase shares of Series A Junior Participating Preferred Stock of the Company ("*Rights*"), issued pursuant to the terms of the Rights Agreement, dated as of December 12, 1997, as amended (the "*Rights Agreement*"), between the Company and Computershare Trust Company, N.A. (formerly First Chicago Trust Company of New York), as Rights Agent, inapplicable to the Merger and the execution and operation of this Agreement.

Section 3.14  *Tax Matters.*

(a)  Except in the case of clauses (i), (iv) or (v) as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, (i) the Company and each of its Subsidiaries have prepared and timely filed (taking into account any extension of time within which to file) all Tax Returns required to be filed by any of them and all such filed Tax Returns are complete and accurate, (ii) the Company and each of its Subsidiaries have paid all material Taxes that are required to be paid by any of them (whether or not shown on any Tax Return), except, in the case of clause (i) or clause (ii) hereof, with respect to matters contested in good faith or for which adequate reserves have been established in accordance with GAAP, (iii) the U.S. consolidated federal income Tax Returns of the Company have been examined by the IRS (or the period for assessment of the Taxes in respect of which such Tax Returns were required to be filed has expired), (iv) as of the date of this Agreement, there are not pending or, to the knowledge of the Company, threatened in writing, any audits, examinations, investigations or other proceedings in respect of Taxes or Tax matters owed or claimed to be owed by the Company or any of its Subsidiaries, (v) there are no Liens for Taxes on any of the assets of the Company or any of its Subsidiaries other than Permitted Liens, (vi) none of the Company or any of its Subsidiaries has been a "controlled corporation" or a "distributing corporation" in any distribution occurring during the two-year period ending on the date hereof that was purported or intended to be governed, in whole or in part, by Section 355(a) or 361 of the Code (or any similar provision of state, local or foreign Law) and (vii) neither the Company nor any of its Subsidiaries has ever entered into any "reportable transaction," as defined in Treasury Regulation Section 1.6011-4(b), required to be reported in a disclosure statement pursuant to Treasury Regulation Section 1.6011-4(a) (other than transactions for which Form 8866 was filed with the Company's Tax Returns).

(b)  None of the Company or any of its Subsidiaries will be required to include in a taxable period ending after the Effective Time taxable income attributable to income that accrued (for purposes of the financial statements of the Company included in the Company SEC Documents) in a prior taxable period (or portion of a taxable period) but was not recognized for tax purposes in any prior taxable period as a result of (i) the installment method of accounting, (ii) the completed contract method of accounting, (iii) the long-term contract method of accounting, (iv) the cash method of accounting or Section 481 of the Code or (v) any comparable provisions of state or local tax law, domestic or foreign, or for any other reason, other than any amounts that are specifically reflected in a reserve for taxes on the financial statements of the Company included in the Company SEC Documents.

(c)  As used in this Agreement, (i) "*Taxes*" means any and all (whether or not disputed) domestic or foreign, federal, state, local or other taxes of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any Governmental Entity, including taxes on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, unemployment, social security, workers'

A-17

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523284

compensation or net worth, and taxes in the nature of excise, withholding, ad valorem or value added, and including liability for the payment of any such amounts as a result of being either (A) a member of an affiliated, consolidated, combined, unitary or aggregate group or as a transferee or successor, or (B) a party to any tax sharing agreement or as a result of any express or implied obligation to indemnify any other person with respect to any such amounts, and (ii) "*Tax Return*" means any return, report or similar filing (including the attached schedules) required to be filed with respect to Taxes, including any information return, claim for refund, amended return or declaration of estimated Taxes.

Section 3.15  *Labor Matters.*  Except for matters in the case of clause (c) below which would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, as of the date hereof, (a) there are no strikes or lockouts with respect to any employees of the Company or any of its Subsidiaries ("*Employees*") that, individually or in the aggregate, would reasonably be expected to have a material adverse impact on the operations of, or result in material liability to, the Company and its Subsidiaries taken as a whole, (b) to the knowledge of the Company, there is no union organizing effort pending or threatened against the Company or any of its Subsidiaries that, individually or in the aggregate, would reasonably be expected to have a material adverse impact on the operations of, or result in material liability to, the Company and its Subsidiaries taken as a whole, (c) there is no unfair labor practice, labor dispute (other than routine individual grievances) or labor arbitration proceeding pending or, to the knowledge of the Company, threatened against the Company or any of its Subsidiaries that, individually or in the aggregate, would reasonably be expected to have a material adverse impact on the operations of, or result in material liability to, the Company and its Subsidiaries taken as a whole, (d) there is no slowdown, or work stoppage in effect or, to the knowledge of the Company, threatened with respect to Employees that, individually or in the aggregate, would reasonably be expected to have a material adverse impact on the operations of, or result in material liability to, the Company and its Subsidiaries taken as a whole, and (e) the Company and its Subsidiaries are in compliance with all applicable Laws respecting (i) employment and employment practices, (ii) terms and conditions of employment and wages and hours and (iii) unfair labor practices. Neither the Company nor any of its Subsidiaries has any material liabilities under the Worker Adjustment and Retraining Act of 1998 as a result of any action taken by the Company (other than at the written direction of the ESOP or as a result of any of the transactions contemplated hereby) that would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.16  *Intellectual Property.*  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, either the Company or a Subsidiary of the Company owns, or is licensed or otherwise possesses legally enforceable rights to use, free and clear of all material Liens, all domestic and foreign trademarks (including call signs), trade names, service marks, service names, assumed names, registered and unregistered copyrights and applications for same, domain names, patents and patent applications and registrations used in their respective businesses as currently conducted, including all rights associated therewith, whether registered or unregistered and however documented (collectively, the "*Intellectual Property*"). Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, since December 31, 2006, (a) there has not been any pending or, to the knowledge of the Company, threatened claims by any person alleging infringement, misappropriation or other unauthorized use of Intellectual Property by the Company or any of its Subsidiaries, or challenging any aspect of the validity, enforceability, ownership, authorship, inventorship or use of any of the Intellectual Property, (b) to the knowledge of the Company, the conduct of the business of the Company and its Subsidiaries has not infringed, misappropriated or otherwise made unauthorized use of any intellectual property rights of any person, and neither the Company nor any of its Subsidiaries has received an "invitation to license" or other communication from any third party asserting that the Company or any of its Subsidiaries is or will be obligated to take a license under any intellectual property owned by any third party in order to continue to conduct their respective businesses as they

A-18

are currently conducted, (c) neither the Company nor any of its Subsidiaries has made any claim of infringement, misappropriation or other unauthorized use by others of its rights to or in connection with the Intellectual Property of the Company or any of its Subsidiaries, (d) to the knowledge of the Company, no person has or is currently infringing, misappropriating or otherwise making unauthorized use of any Intellectual Property of the Company or any of its Subsidiaries and (e) the Company and its Subsidiaries have taken commercially reasonable actions in accordance with normal industry practice to protect, maintain and preserve the Intellectual Property.

Section 3.17    *Real Property.*    Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, the Company or a Subsidiary of the Company owns and has good and valid title to all of its owned real property and has valid leasehold interests in all of its leased properties, free and clear of all Liens (except for Permitted Liens and all other title exceptions, defects, encumbrances and other matters, whether or not of record, which do not materially affect the continued use of the property for the purposes for which the property is currently being used by the Company or a Subsidiary of the Company as of the date hereof).

Section 3.18    *Opinion of Financial Advisor.*    The Board of Directors of the Company has received the opinion of each of Morgan Stanley & Co. Incorporated and Merrill Lynch & Co., Inc., dated the date of this Agreement, substantially to the effect that, as of such date, the Merger Consideration to be received by the holders of shares of Company Common Stock pursuant to the Merger is fair from a financial point of view to the holders of such shares (other than certain affiliated entities).

Section 3.19    *Required Vote of the Company Shareholders.*    Subject to the accuracy of the representations and warranties of the ESOP and Merger Sub in Section 4.9, the affirmative vote of the holders of outstanding shares of Company Common Stock representing at least a majority of all the votes entitled to be cast thereupon by holders of Company Common Stock is the only vote of holders of securities of the Company which is required to approve this Agreement and the Merger (the "*Company Shareholder Approval*").

Section 3.20    *Material Contracts.*

(a)    Except for this Agreement, the Tribune Purchase Agreement, the ESOP Purchase Agreement, the Company Benefit Plans or as filed with the SEC, as of the date hereof, neither the Company nor any of its Subsidiaries is a party to or bound by, nor are any of their properties or other assets bound by, any "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC) (all contracts of the type described in this Section 3.20(a) being referred to herein as "*Company Material Contracts*").

(b)    Neither the Company nor any Subsidiary of the Company is in breach of or default under (nor to the knowledge of the Company does there exist any condition which upon the passage of time or the giving of notice or both would cause such a violation of or default under) the terms of any Company Material Contract where such breach or default would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. To the knowledge of the Company, no other party to any Company Material Contract is in breach of or default under the terms of any Company Material Contract where such breach or default would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. Each Company Material Contract is a valid and binding obligation of the Company or the Subsidiary of the Company which is party thereto and, to the knowledge of the Company, of each other party thereto, and is in full force and effect, except that (i) such enforcement may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws, now or hereafter in effect, relating to creditors' rights generally and (ii) equitable remedies of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

A-19

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Section 3.21  *Finders or Brokers.*  Except for Morgan Stanley & Co. Incorporated, Merrill Lynch & Co., Inc. and Citigroup Global Markets Inc. (the "*Company Financial Advisors*"), neither the Company nor any of its Subsidiaries has employed any investment banker, broker or finder in connection with the transactions contemplated by this Agreement who might be entitled to any fee or any commission in connection with or upon consummation of the Merger. The Company has made available to the ESOP an accurate and complete summary of the fee arrangements with the Company Financial Advisors.

Section 3.22  *Insurance.*  The Company and its Subsidiaries own or hold policies of insurance, or are self-insured, in amounts providing reasonably adequate coverage against all risks customarily insured against by companies and subsidiaries in similar lines of business as the Company or its Subsidiaries, and in amounts sufficient to comply with all Company Material Contracts to which the Company or any of its Subsidiaries are parties or are otherwise bound.

Section 3.23  *Affiliate Transactions.*  As of the date hereof, there are no material transactions, agreements, arrangements or understandings between (i) the Company or any of its Subsidiaries, on the one hand, and (ii) any affiliate of the Company (other than any of its Subsidiaries), on the other hand, of the type that would be required to be disclosed under Item 404 of Regulation S-K promulgated by the SEC which have not been so disclosed prior to the date hereof.

Section 3.24  *Indebtedness.*  Section 3.24 of the Company Disclosure Schedule sets forth, as of April 1, 2007, all of the outstanding indebtedness for borrowed money of, and all the outstanding guarantees of indebtedness for borrowed money of any person by, and all reimbursement obligations (or guarantees thereof) with respect to letters of credit issued on behalf of, the Company and each of its Subsidiaries.

Section 3.25  *Cable and Satellite Matters.*  Section 3.25 of the Company Disclosure Schedule sets forth a list of the ten largest multichannel video programming distributors (including cable systems, SMATV, open video systems, MMDS, MDS, Broadband Radio Service and DBS systems, collectively, "*MVPDs*") that carry the analog and/or digital signals of the Company Stations. No MVPD listed on Section 3.25 of the Company Disclosure Schedule has declined or refused to carry a Company Station or disputed a Company Station's right to carriage pursuant to such Company Station's must-carry or retransmission consent election, as the case may be.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE ESOP AND MERGER SUB**

The ESOP and Merger Sub jointly and severally represent and warrant to the Company as follows:

Section 4.1  *Qualification, Organization, Subsidiaries, etc.*  Merger Sub is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease, hold and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing, holding or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, validly existing, qualified or in good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to prevent or materially delay or materially impair the ability of the ESOP or Merger Sub to consummate the Merger and the other transactions contemplated by this Agreement (an "*ESOP Material Adverse Effect*"). The ESOP has made available to the Company prior to the date of this Agreement a true and complete copy of the operating agreement of the ESOP and the certificate of incorporation and by-laws of Merger Sub, each as amended through the date hereof.

A-20

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Section 4.2  *Authority Relative to This Agreement; No Violation.*

(a)  The ESOP has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. Merger Sub has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the trustee of the ESOP, the Board of Directors of Merger Sub and by the ESOP, as the sole shareholder of Merger Sub, and, except for the filing of the Certificate of Merger with the Secretary of State of the State of Delaware, no other organizational proceedings on the part of the ESOP or corporate proceedings on the part of Merger Sub are necessary to authorize this Agreement or the consummation of the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the ESOP and Merger Sub and, assuming this Agreement constitutes the legal, valid and binding agreement of the Company, this Agreement constitutes the legal, valid and binding agreement of the ESOP and Merger Sub, enforceable against each of the ESOP and Merger Sub in accordance with its terms.

(b)  The execution, delivery and performance by the ESOP and Merger Sub of this Agreement and the consummation by the ESOP and Merger Sub and the other transactions contemplated by this Agreement by the ESOP and Merger Sub do not and will not require any consent, approval, license, authorization, order or permit of, action by, filing with or notification to any Governmental Entity, other than (i) the filing of the Certificate of Merger, (ii) compliance with the applicable requirements of the HSR Act, (iii) compliance with the applicable requirements of the Exchange Act, (iv) filings with and approvals from the FCC and the State Commissions as set forth on Section 3.3(b) of the Company Disclosure Schedule, (v) compliance with any applicable foreign or state competition, antitrust, securities or blue sky laws, (vi) filings under any applicable state takeover Law and (vii) such of the foregoing as may be required in connection with the Financing (collectively, clauses (i) through (vii), the "*ESOP Approvals*"), and other than any consent, approval, license, authorization, order, permit, action, filing or notification the failure of which to make or obtain would not, individually or in the aggregate, reasonably be expected to have an ESOP Material Adverse Effect.

(c)  The execution, delivery and performance by the ESOP and Merger Sub of this Agreement and the consummation by the ESOP and Merger Sub of the Merger and the other transactions contemplated hereby do not and will not (i) contravene or conflict with the organizational or governing documents of the ESOP or Merger Sub, (ii) assuming compliance with the matters referenced in Section 4.2(b), contravene or conflict with or result in violation of any provision of any Law binding upon or applicable to the ESOP or Merger Sub or any of their respective properties or assets, or (iii) result in any violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any material obligation or to the loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, any loan, guarantee of indebtedness or credit agreement, note, bond, mortgage, indenture, lease, agreement, contract, instrument, permit, concession, franchise, right or license to which the ESOP or Merger Sub is a party or by which any of their respective properties or assets is bound, or (iv) result in the creation of any Lien (other than Permitted Liens) upon any of the properties or assets of the ESOP or Merger Sub, other than, in the case of clause (ii) through (iv), any such items that would not, individually or in the aggregate, reasonably be expected to have an ESOP Material Adverse Effect.

Section 4.3  *Investigations; Litigation.*  There is no investigation or review pending (or, to the knowledge of the ESOP, threatened) by any Governmental Entity with respect to the ESOP or Merger Sub which could, individually or in the aggregate, reasonably be expected to have an ESOP Material Adverse Effect, and there are no actions, suits, inquiries, investigations or proceedings pending (or, to the ESOP's knowledge, threatened) against or affecting the ESOP or Merger Sub, or any of their respective properties at law or in equity (and to the ESOP's knowledge there is no basis for any such

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0523288

action, suit, inquiry, investigation, arbitration, mediation or proceeding) before, and there are no orders, judgments or decrees of, or before, any Governmental Entity, in each case which could, individually or in the aggregate, reasonably be expected to have an ESOP Material Adverse Effect.

Section 4.4    *Proxy Statement; Other Information.*    None of the information provided by the ESOP or Merger Sub to be included in the Proxy Statement, the Schedule TO or the Schedule 13E-3 will, at the time the Proxy Statement, the Schedule TO and the Schedule 13E-3 are concurrently filed with the SEC, or, in the case of the Proxy Statement, at the time the Proxy Statement is first mailed to the shareholders of the Company or at the time of the Company Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. No representation is made by the ESOP or Merger Sub with respect to statements made in the Proxy Statement, the Schedule TO or the Schedule 13E-3 based on information supplied by the Company, any of the Company's Subsidiaries or any of their respective affiliates.

Section 4.5    *Capitalization of Merger Sub.*    As of the date of this Agreement, the authorized capital stock of Merger Sub consists of 1000 shares of common stock, par value $.01 per share, 100 of which are validly issued and outstanding. All of the issued and outstanding capital stock of Merger Sub is, and at the Effective Time will be, owned by the ESOP. Merger Sub has outstanding no option, warrant, right, or any other agreement pursuant to which any person other than the ESOP may acquire any equity security of Merger Sub. Merger Sub has not conducted any business prior to the date hereof, other than business and operations related to the Merger and the transactions contemplated by this Agreement, and has no assets, liabilities or obligations of any nature other than those incident to its formation and pursuant to this Agreement and the Merger and the other transactions contemplated by this Agreement.

Section 4.6    *Lack of Ownership of Company Common Stock.*    Except as contemplated by the ESOP Purchase Agreement, neither the ESOP nor any of its Subsidiaries beneficially owns or, since December 31, 2006 has beneficially owned, directly or indirectly, any shares of Company Common Stock or other securities convertible into, exchangeable into or exercisable for shares of Company Common Stock.

Section 4.7    *Finders or Brokers.*    Except for Duff & Phelps, LLC, the ESOP has not employed any financial advisor, investment banker, broker or finder in connection with the transactions contemplated by this Agreement who is entitled to any fee or any commission in connection with or upon consummation of the Merger.

Section 4.8    *No Additional Representations.*

(a)    The ESOP acknowledges that it and its Representatives (as hereinafter defined) have received access to such books and records, facilities, equipment, contracts and other assets of the Company which it and its Representatives have desired or requested to review, and that it and its Representatives have had full opportunity to meet with the management of the Company and to discuss the business and assets of the Company.

(b)    The ESOP acknowledges that neither the Company nor any person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company furnished or made available to the ESOP and its Representatives except as expressly set forth in Article III, and neither the Company nor any other person shall be subject to any liability to the ESOP or any other person resulting from the Company's making available to the ESOP or the ESOP's use of such information, including the presentation materials delivered to the ESOP, as subsequently updated, supplemented or amended (the "*Information Memorandum*"), or any information, documents or material made available to the ESOP in the due diligence materials provided to the ESOP, including in the "data room," other management presentations (formal or

A-22

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

informal) or in any other form in connection with the transactions contemplated by this Agreement. Without limiting the foregoing, the Company makes no representation or warranty to the ESOP with respect to (i) the information set forth in the Information Memorandum or (ii) any financial projection or forecast relating to the Company or any of its Subsidiaries, whether or not included in the Information Memorandum or any management presentation.

## ARTICLE V
## COVENANTS AND AGREEMENTS

Section 5.1  *Conduct of Business by the Company.*

(a)  From and after the date hereof and prior to the Effective Time or the date, if any, on which this Agreement is earlier terminated pursuant to Section 7.1 (the "*Termination Date*"), and except (i) as may be required by applicable Law, (ii) as may be agreed in writing by the ESOP and Tribune Acquisition (which consent shall not be unreasonably withheld), (iii) as may be expressly required or permitted by this Agreement, the Tribune Purchase Agreement, the Financing Commitments, the New Credit Agreements or the ESOP Purchase Agreement, or (iv) as set forth in Section 5.1 of the Company Disclosure Schedule, the Company covenants and agrees that (A) the business of the Company and its Subsidiaries shall be conducted in, and such entities shall not take any action except in, the ordinary course of business and in a manner consistent with past practice and (B) the Company and its Subsidiaries shall use their reasonable best efforts to preserve substantially intact the Company's business, to keep available the services of those of their present officers, employees and consultants who are important to the operation of their business; *provided, however,* that no action by the Company or its Subsidiaries with respect to matters specifically addressed by any provision of Section 5.1(b) shall be deemed a breach of this sentence unless such action would constitute a breach of such other provision.

(b)  Subject to the exceptions contained in clauses (i) through (iv) of Section 5.1(a), the Company agrees, on behalf of itself and its Subsidiaries, that between the date hereof and the Effective Time, without the prior written consent of the ESOP, the Company:

(i)  shall not, and shall not permit any of its Subsidiaries that is not wholly owned to, authorize or pay any dividends on or make any distribution with respect to its outstanding shares of capital stock or other equity securities (whether in cash, assets, stock or other securities of the Company or its Subsidiaries), except (A) dividends and distributions paid or made on a pro rata basis by Subsidiaries and (B) that the Company may continue to pay dividends on the Company Preferred Stock in accordance with the terms thereof;

(ii)  shall not, and shall not permit any of its Subsidiaries to, split, combine or reclassify any of its capital stock or other equity securities or issue or authorize or propose the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or other equity securities, except (A) for any such transaction by a wholly owned Subsidiary of the Company which remains a wholly owned Subsidiary after consummation of such transaction and (B) as contemplated by the Exchange Agreement;

(iii)  except to the extent required by Law (including Section 409A of the Code) or by Contracts in existence as of the date hereof or by Company Benefit Plans, shall not and shall not permit any of its Subsidiaries to (A) increase in any manner the compensation or benefits of any of its employees, directors, consultants, independent contractors or service providers except in the ordinary course of business consistent with past practice (the ordinary course including, for this purpose, the employee salary, bonus and equity compensation review process and related adjustments substantially as conducted each year), (B) pay any pension, severance or retirement benefits not required by any existing plan or agreement to any such employees, directors,

A-23

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

consultants, independent contractors or service providers, (C) enter into, amend, alter (other than amendments that do not materially increase the cost to the Company or any of its Subsidiaries of maintaining the applicable compensation or benefit program, policy, arrangement or agreement), adopt, implement or otherwise commit itself to any compensation or benefit plan, program, policy, arrangement or agreement including any pension, retirement, profit-sharing, bonus, collective bargaining or other employee benefit or welfare benefit plan, policy, arrangement or agreement or employment or consulting agreement with or for the benefit of any employee, director, consultant, independent contractor or service provider, other than with respect to any employment, severance or retention agreement (or amendment with respect thereto) entered into in the ordinary course of business consistent with past practice between the Company or one of its Subsidiaries, on the one hand, and any consultant, independent contractor, service provider or employee of the Company or its Subsidiaries who is not an executive officer of the Company or its Subsidiaries, or
(D) accelerate the vesting of, or the lapsing of restrictions with respect to, any stock options or other stock-based compensation or otherwise accelerate any rights or benefits, or make any determinations that would result in a material increase in liabilities under any Company Benefit Plan;

(iv) shall not, and shall not permit any of its Subsidiaries to, change financial accounting policies, practices or procedures or any of its methods of reporting income, deductions or other material items for financial accounting purposes, except as required by GAAP, SEC rule or policy or applicable Law;

(v) shall not, and shall not permit any of its Subsidiaries to, adopt any amendments to its certificate of incorporation or by-laws or similar applicable organizational documents, except pursuant to the Certificate of Designation;

(vi) except for transactions among the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries, shall not, and shall not permit any of its Subsidiaries to, issue, sell, pledge, dispose of or encumber, or authorize the issuance, sale, pledge, disposition or encumbrance of, any shares of its capital stock or other ownership interest in the Company or any Subsidiaries or any securities convertible into or exchangeable for any such shares or ownership interest, or any rights, warrants or options to acquire or with respect to any such shares of capital stock, ownership interest or convertible or exchangeable securities or take any action to cause to be exercisable any otherwise unexercisable option under any existing stock option plan (except as otherwise expressly provided by the terms of this Agreement or the express terms of any unexercisable options outstanding on the date hereof), other than (A) issuances of shares of Company Common Stock in respect of any exercise of Company Stock Options and settlement of any Company Stock-Based Awards (each as hereinafter defined) outstanding on the date hereof or as may be granted after the date hereof as permitted under this Section 5.1(b), (B) issuances of up to 75,000 shares of Company Common Stock in the ordinary course of business pursuant to the Company Benefit Plans, (C) the sale of shares of Company Common Stock pursuant to the exercise of options to purchase Company Common Stock permitted under this Section 5.1(b) if necessary to effectuate an optionee direction upon exercise or for withholding of Taxes and
(D) issuances of shares of Company Common Stock and other Company securities pursuant to the Tribune Purchase Agreement and the ESOP Purchase Agreement;

(vii) except for transactions among the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries, shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, purchase, redeem or otherwise acquire any shares of its capital stock or other equity securities or any rights, warrants or options to acquire any such equity securities;

(viii) shall not, and shall not permit any of its Subsidiaries to, incur, assume, guarantee, prepay or otherwise become liable for any indebtedness for borrowed money (directly, contingently or

A-24

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0523291

otherwise), except for (A) any indebtedness for borrowed money among the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries, (B) indebtedness for borrowed money incurred to replace, renew, extend, refinance or refund any existing indebtedness for borrowed money (x) on materially no less favorable terms and so long as such indebtedness is voluntarily prepayable or redeemable without premium or penalty or (y) with borrowings under and pursuant to the (1) Amended and Restated Credit Agreement and the Amended and Restated Bridge Credit Agreement, each dated as of June 27, 2006, among the Company, the banks, financial institutions and other institutional lenders party thereto, and Citicorp North America, Inc., as administrative agent (together, the "*Existing Credit Agreements*") or the (2) definitive credit agreements (the "*New Credit Agreements*") to be entered into by the Company pursuant to the Financing Commitments, (C) guarantees by the Company of indebtedness for borrowed money of Subsidiaries of the Company, which indebtedness is incurred in compliance with this Section 5.1(b), (D) indebtedness for borrowed money in an amount necessary to effect the exercise of the purchase option for the properties currently owned by TMCT, LLC and leased to the Company and its Subsidiaries, (E) indebtedness for borrowed money in an amount not to exceed $100 million in aggregate principal amount outstanding at any time, incurred as (x) a "Revolving Credit Advance" or a "Swing Line Advance" and "Term Advances" under and pursuant to the Existing Credit Agreements or (y) as an advance under the revolving credit facility to be included in the New Credit Agreements; provided that any amount borrowed pursuant to this clause (E) shall reduce the amount of borrowings permitted under clause (G) below, (F) indebtedness for borrowed money as required to consummate the Offer, the Merger and the transactions contemplated hereby or by the New Credit Agreements and (G) other unsecured indebtedness for borrowed money not to exceed $100 million in aggregate principal amount outstanding at any time other than in accordance with clauses (A)-(F) above, so long as such indebtedness is voluntarily prepayable or redeemable (without premium or penalty) upon no more than three business days' notice; *provided* that any amount borrowed pursuant to this clause (G) shall reduce the amount of borrowings permitted under clause (E)(y) above;

(ix) except for transactions among the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries, shall not sell, lease, license, transfer, exchange or swap, mortgage or otherwise encumber (including securitizations), or subject to any Lien (other than Permitted Liens) or otherwise dispose of any material portion of its properties or assets, including the capital stock or equity securities of Subsidiaries, except (A) sales of inventory in the ordinary course of business, (B) pursuant to existing agreements in effect prior to the execution of this Agreement and (C) as set forth on Section 5.1(b) of the Company Disclosure Schedule;

(x) shall not, and shall not permit any of its Subsidiaries to, modify, amend, terminate or waive any rights under any Company Material Contract in any material respect in a manner which is adverse to the Company;

(xi) shall not, and shall not permit any of its Subsidiaries to, enter into any Company Material Contracts;

(xii) shall not, and shall not permit any of its Subsidiaries to, (A) make, change or revoke any material Tax election, (B) file any amended Tax Return, or (C) settle or compromise any liability for Taxes or surrender any claim for a refund of Taxes, other than in the case of clauses (B) and (C) hereof in respect of any Taxes that have been identified in the reserves for Taxes in the Company's GAAP financial statements;

A-25

TRB0523292

(xiii) shall not acquire, except in respect of any mergers, consolidations, business combinations among the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries, including by merger, consolidation or acquisition of stock or assets, any corporation, partnership, limited liability company, other business organization or any division thereof, or any material amount of assets in connection with acquisitions or investments with a purchase price of $120 million in the aggregate; *provided* that without the ESOP's consent (which consent may not be unreasonably withheld), the Company shall not acquire or make any investment (or agree to acquire or to make any investment) in any entity that holds, or has an attributable interest in, any license, authorization, permit or approval issued by the FCC;

(xiv) shall not adopt or enter into a plan of restructuring, recapitalization or other reorganization (other than as contemplated in this Agreement);

(xv) shall not settle or compromise any claim, suit, action, arbitration, or other proceeding, whether administrative, civil or criminal, in law or in equity, including in connection with the Matthew Bender and Mosby Tax litigation, except for claims that consist solely of monetary damages in an amount not to exceed $20 million individually and $75 million in the aggregate;

(xvi) shall not make any capital expenditures other than in accordance with the Company's budget consistent with past practice and other than expenditures necessary in response to emergencies such as natural disasters or acts of terrorism, in each case in accordance with past practice;

(xvii) shall not enter into any transaction, agreement, arrangement or understanding between (A) the Company or any Subsidiary, on the one hand, and (B) any affiliate of the Company (other than the Subsidiaries), on the other hand, of the type that would be required to be disclosed under Item 404 of Regulation S-K promulgated by the SEC;

(xviii) shall not knowingly take any action that would be reasonably likely to prevent or cause a material delay in the satisfaction of the conditions contained in Sections 6.1 and 6.3 or the consummation of the Merger; and

(xix) shall not, and shall not permit any of its Subsidiaries to, agree, in writing or otherwise, to take any of the foregoing actions.

(c) The Company (on behalf of itself and its Subsidiaries and affiliates) agrees that, between the date hereof and the Effective Time, they shall not, and shall not permit any of their respective Subsidiaries or affiliates to enter into or consummate any agreements or arrangements for an acquisition (via stock purchase, merger, consolidation, purchase of assets or otherwise) of any ownership interest attributable to the ESOP or any of its affiliates under the FCC Rules in any radio or television broadcast licensee, or the publisher of any English language daily newspaper of general circulation, if the ownership of such interest would reasonably be expected (A) to result in any delay in obtaining, or failure to obtain, the FCC Order or (B) to require the FCC to issue additional waivers of its ownership rules in prior to granting the FCC Order.

Section 5.2  *Investigation.*  The Company shall afford to the ESOP and its accountants, consultants, legal counsel, financial advisors, and agents and other representatives (collectively, "*Representatives*") reasonable access during normal business hours, throughout the period prior to the earlier of the Effective Time and the Termination Date, to its and its Subsidiaries' officers, employees, properties, contracts, commitments, books and records and any report, schedule or other document filed or received by it pursuant to the requirements of applicable Laws and shall furnish the ESOP with financial, operating and other data and information as the ESOP, through its respective officers, employees or other authorized Representatives, may from time to time reasonably request in writing. Notwithstanding the foregoing, the Company shall not be required to afford such access if it would unreasonably disrupt the operations of the Company or any of its Subsidiaries, would cause a violation

A-26

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

of any agreement to which the Company or any of its Subsidiaries is a party, would cause a material risk of a loss of privilege to the Company or any of its Subsidiaries or would constitute a violation of any applicable Law, nor shall the ESOP or any of its Representatives be permitted to perform any onsite procedure (including any onsite environmental study) with respect to any property of the Company or any of its Subsidiaries, except, with respect to any onsite procedure, with the Company's prior written consent (which consent shall not be unreasonably withheld, delayed or conditioned if such procedure is necessary for the Financing).

Section 5.3  *No Solicitation.*

(a)  Subject to Section 5.3(b)-(e), (i) the Company shall, and shall cause its Subsidiaries to, and shall direct its and their respective Representatives to, immediately cease any discussions or negotiations with any parties that may be ongoing with respect to any Alternative Proposal and (ii) during the period beginning on the date hereof and continuing until the Effective Time or, if earlier, the termination of this Agreement in accordance with Article VII, the Company agrees that neither it nor any Subsidiary of the Company shall, and that it shall direct its and their respective Representatives not to, directly or indirectly, (A) solicit, initiate or knowingly facilitate or encourage any inquiry with respect to, or the making, submission or announcement of, any Alternative Proposal (as hereinafter defined), (B) participate in any negotiations regarding an Alternative Proposal with, or furnish any nonpublic information regarding an Alternative Proposal or access to its properties, books, records or personnel in connection therewith to, any person that has made or, to the Company's knowledge, is considering making an Alternative Proposal, (C) engage in discussions regarding an Alternative Proposal with any person that has made or, to the Company's knowledge, is considering making an Alternative Proposal, except to notify such person as to the existence of the provisions of this Section 5.3, (D) approve, endorse or recommend any Alternative Proposal, (E) enter into any letter of intent or agreement in principle or any agreement providing for any Alternative Proposal (except for confidentiality agreements permitted under Section 5.3(b)), (F) otherwise cooperate with, or assist or participate in, or knowingly facilitate or encourage any effort or attempt by any person (other than the ESOP, Merger Sub, Tribune Acquisition or their Representatives) with respect to, or which would reasonably be expected to result in, an Alternative Proposal, or (G) exempt any person from the restrictions contained in any state takeover or similar laws, including Section 203 of the DGCL or otherwise cause such restrictions not to apply. The Company shall promptly inform its Representatives, and shall cause its Subsidiaries promptly to inform their respective Representatives, of the obligations under this Section 5.3(a). Without limiting the foregoing, it is understood that any action of any Subsidiary of the Company or Representative of the Company or any of its Subsidiaries that would be a violation if taken by the Company shall be deemed to be a breach of this Section 5.3 by the Company.

(b)  Notwithstanding the limitations set forth in Section 5.3(a), at any time from the date hereof and continuing until the earlier of the receipt of the Company Shareholder Approval and the Termination Date, if the Company receives a bona fide written Alternative Proposal that was not solicited after the execution and delivery hereof (i) which (A) constitutes a Superior Proposal or (B) the Special Committee or the Board of Directors of the Company determines in good faith could reasonably be expected to result in a Superior Proposal, and (ii) which the Special Committee or the Board of Directors of the Company determines in good faith, after consultation with the Special Committee's or the Company's outside legal counsel, that the failure of the Special Committee or the Board of Directors of the Company to take the actions set forth in clauses (x) and (y) below with respect to such Alternative Proposal would be inconsistent with the

A-27

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

directors' exercise of their fiduciary obligations to the Company's shareholders under applicable Law, then the Company may take the following actions:

(x) furnish nonpublic information to the third party (including its Representatives) making such Alternative Proposal (if, and only if, prior to so furnishing such information, the Company receives from the third party an executed agreement having provisions requiring such party to keep such information confidential that, subject to Section 5.3(d), are substantially similar to the comparable confidentiality provisions of that certain Confidentiality Agreement, dated as of November 8, 2006, by and between the Company and Equity Group Investments, L.L.C. (the "*Confidentiality Agreement*"), it being understood that such agreement with such third party need not have comparable standstill provisions), (y) engage in discussions or negotiations with the third party (including its Representatives) with respect to the Alternative Proposal, and (z) approve, recommend and enter into an agreement with the third party with respect to the Alternative Proposal and exempt such third party from the restrictions contained in any state takeover or similar laws, including Section 203 of the DGCL or otherwise cause such restrictions not to apply to such Alternative Proposal, in each case in connection with the termination of this Agreement pursuant to and in accordance with the terms of Section 7.1(g); *provided, however*, that (1) the ESOP shall be entitled to receive an executed copy of such confidentiality agreement prior to or substantially simultaneously with the Company furnishing information to the person making such Alternative Proposal or its Representatives and (2) the Company shall substantially simultaneously provide or make available to the ESOP any written material nonpublic information concerning the Company or any of its Subsidiaries that is provided to the person making such Alternative Proposal or its Representatives which was not previously provided or made available to the ESOP.

(c) Except as provided in the next sentence, neither the Special Committee nor the Board of Directors of the Company shall (i) withdraw or modify, or propose publicly to withdraw or modify in a manner adverse to the ESOP, the approval or recommendation by the Special Committee or the Board of Directors of the Company of the Merger or this Agreement or the other transactions or agreements contemplated by this Agreement (including the Offer), (ii) approve, adopt or recommend, or propose publicly to approve, adopt or recommend, any Alternative Proposal, (iii) recommend that shareholders of the Company tender their shares in connection with any tender offer or exchange offer (other than the Offer) or (iv) exempt any person from the restrictions contained in any state takeover or similar laws, including Section 203 of the DGCL (each of the foregoing, a "*Change of Recommendation*"). Notwithstanding the foregoing, but subject to Section 5.4(c), the Special Committee or the Board of Directors of the Company may, at any time, make a Change of Recommendation if the Special Committee or the Board of Directors of the Company has concluded in good faith, after consultation with the Company's or the Special Committee's outside legal counsel and financial advisors, that the failure of the Special Committee or the Board of Directors of the Company to effect a Change of Recommendation would be inconsistent with the directors' exercise of their fiduciary obligations to the Company's shareholders under applicable Law; *provided, however*, that no Change of Recommendation shall change the approval of the Special Committee or the Board of Directors of the Company for purposes of (A) causing any state takeover statute or other state law to be inapplicable to the transactions contemplated by this Agreement or (B) rendering the Rights issued pursuant to the Rights Agreement inapplicable to the Merger and the execution and operation of this Agreement.

(d) The Company promptly (and in any event within 48 hours) shall advise the ESOP orally and in writing of (i) any Alternative Proposal after the date hereof or indication or inquiry after the date hereof with respect to or that would reasonably be expected to lead to any Alternative Proposal, (ii) any request after the date hereof for nonpublic information relating to the Company or its Subsidiaries, other than requests for information not reasonably expected to be related to an Alternative Proposal, or (iii) any inquiry or request after the date hereof for discussion or

A-28

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only