# TRIBUNE

## BOARD OF DIRECTORS MEETING
## December 12, 2006

**Master Copy**

**Confidential**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only



BOARD OF DIRECTORS DEC. 12, 2006

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Crane H. Kenney
Senior Vice President/General Counsel
& Secretary
312/222-2491

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
fax: 312/222-4206
e-mail: ckenney@tribune.com

December 5, 2006

Jeffrey Chandler
Dennis J. FitzSimons
Roger Goodan
Enrique Hernandez, Jr.
Betsy D. Holden
Robert S. Morrison

William A. Osborn
J. Christopher Reyes
William Stinehart, Jr.
Dudley S. Taft
Miles D. White

Enclosed is a notebook for use at the committee meetings and the Board of Directors meeting to be held on Monday and Tuesday, December 11-12, 2006.

The schedule for Monday and Tuesday is as follows:

| Date | Meeting | Location | Time |
|------|---------|----------|------|
| Mon., Dec. 11 | Audit Committee | Patterson Room | 5:00 p.m. |
| Mon., Dec. 11 | Board of Directors Dinner | McCormick Room | 6:30 p.m. |
| Tues., Dec. 12 | Nom. & Gov. Committee | Lakeview Room | 7:30 a.m. |
| Tues., Dec. 12 | Comp. & Org. Committee | Lakeview Room | 8:30 a.m. |
| Tues., Dec. 12 | Board of Directors Meeting | Patterson Room | 9:30 a.m. |
| Tues., Dec. 12 | Special Committee | Patterson Room | 12:00 p.m. |

On Tuesday morning, transportation will be provided from the Peninsula Hotel to Tribune Tower at 7:15 a.m. and 8:15 a.m. from the Superior Street entrance and a continental breakfast will be available at the committee and Board meetings. Airport transportation will be available at the conclusion of the meeting.

Please contact me if you have any questions in this regard. I look forward to seeing you.

Sincerely,

CHK/bap

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Dennis J. FitzSimons
Chairman, President and
Chief Executive Officer
312/222-3373

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Suite 2300
Chicago, Illinois 60611-4066
fax: 312/222-3203
e-mail: dfitzsimons@tribune.com

*Via Federal Express*

December 5, 2006

Jeffrey Chandler                    William A. Osborn
Roger Goodan                        J. Christopher Reyes
Enrique Hernandez, Jr.              William Stinehart, Jr.
Betsy D. Holden                     Dudley S. Taft
Robert S. Morrison                  Miles D. White

Enclosed is the Board book for our December meeting.

Additionally, here is a brief overview of general business conditions and recent company developments.

<u>Publishing and Interactive</u>

Current business conditions – The ad environment remains challenging with continued softness in national advertising and lower spending in print real estate and help wanted classified advertising. Cash expenses are expected to decrease 5%, or $39 million, and will help to offset the revenue softness. Operating cash flow, before special charges, will be up slightly for the fourth quarter.

Offshore outsourcing – We are making good progress on outsourcing inbound circulation customer service calls to a third-party vendor (APAC) with operations in Manila, Philippines. The project is on target, and we will have our eight largest newspapers migrated by year-end with the remainder operational in the first quarter of 2007. We are also pursuing other outsourcing initiatives in the ad building, technology help desk and advertising billing / collections areas.

Common advertising system - The CCI AdDesk Sales project has reached several critical milestones in recent months. Baltimore, Orlando and Chicago have implemented the classified ad order entry system in their classified call centers, and they have migrated all ad placements to the new system. Orlando and Chicago have also launched the e-commerce system, which allows private party customers to place and purchase ads online. The remaining newspapers will launch the classified system through mid-2007.

Common circulation system – Earlier this year, we standardized circulation business rules and began implementing one common centralized circulation system (Discus). In November, the *Daily Press* became the first newspaper to implement the new system. The remaining properties will either upgrade or convert to the common version of Discus by the end of 2007.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433799

Page 2

Los Angeles update – Jim O'Shea, the former managing editor of the *Chicago Tribune*, is three weeks into his role as editor of the *Los Angeles Times*. Both Jim and David Hiller, the *Times'* new Publisher, are off to a solid start, leading essential change to strengthen the *Times'* position serving Southern California. The *Los Angeles Times* is also celebrating the 125th anniversary of its founding this week.

Interactive – Tribune Interactive's fourth quarter revenues are projected to increase 28% over 2005. Interactive's websites, including 15 news sites, 23 television sites and 8 entertainment and shopping resource sites, drew a total of over 14 million unique visitors during October.

CareerBuilder – Fourth quarter market revenues are expected to grow by 27% over last year. CareerBuilder continues to be the leading online recruitment site in North America with the most job seeker traffic and revenue. CareerBuilder drew over 23 million unique visitors in October compared to Monster at almost 11 million and HotJobs at 16 million.

Broadcasting/Entertainment

Current business conditions – Advertising revenues for our television group were up 2% in October and up 7% in November due to strong political spending. December is currently pacing down 8%. Telecoms, movies and education continue to be the key category drivers for fourth quarter. Automotive is currently pacing flat for the quarter, while retail, our number two television ad category, continues to pace negative.

November ratings – Results from the recent November sweeps period are good, particularly in New York, Los Angeles and Chicago. Most of our CW affiliates are posting solid share increases for prime time in the key 18-49 demographic. In addition, late news ratings have benefited from the improved CW lead-ins. Initial advertiser reactions to our new programming (*Two and a Half Men / Family Guy*) that will premier in September '07 have been excellent.

**********

I look forward to seeing you at our dinner on Monday, December 11. David Hiller will join us to brief us on progress at the *Los Angeles Times*. If you have questions prior to the meeting, please feel free to call me.

Sincerely,

Dennis FitzSimons

Enclosure

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433800

**TRIBUNE COMPANY**
**BOARD OF DIRECTORS MEETING**
**TUESDAY, DECEMBER 12, 2006 (9:30 A.M.)**
**PATTERSON BOARD ROOM, 24TH FLOOR**
**TRIBUNE TOWER**

<u>AGENDA</u>

<u>Tab No.</u>

Executive session

Approve minutes of October 18, 2006 Board of Directors meeting        1

Approve 2007 Annual Meeting date        2

Company performance:

- Projected operating results and stock performance report        3

- 2007 operating plan

Development update        4

Southern Connecticut Newspapers        5

Audit Committee report

Nominating & Governance Committee report

- Board and committee performance evaluations        6

Compensation & Organization Committee report

- Revised Committee Charter        7

Executive session

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB-UR-0433801**

1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRIBUNE COMPANY**
**BOARD OF DIRECTORS MEETING**
**OCTOBER 18, 2006**

The Tribune Company Board of Directors met at 12:00 p.m. on Wednesday, October 18, 2006, at Tribune Tower, Chicago, Illinois, pursuant to notice. The meeting was attended by Jeffrey Chandler, Dennis J. FitzSimons, Roger Goodan, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, William Stinehart, Jr. and Miles D. White.

Portions of the meeting were attended by Donald C. Grenesko, Crane H. Kenney, Timothy J. Landon, Thomas D. Leach, Luis E. Lewin, Ruthellyn Musil, John E. Reardon and Scott C. Smith. Tom Cole of Sidley Austin LLP, Chip Mulaney of Skadden, Arps, Slate, Meagher & Flom LLP, Michael Costa of Merrill Lynch, Christina Mohr of Citigroup and Tom Whayne and Paul Taubman of Morgan Stanley also participated in portions of the meeting.

Mr. FitzSimons acted as chairman of the meeting and Mr. Kenney acted as secretary.

Mr. FitzSimons called the meeting to order at 12:00 p.m.

**EXECUTIVE SESSION**

The directors met in executive session at the beginning of the meeting. Messrs. Grenesko, Kenney, Leach, Cole, Mulaney, Whayne, Taubman and Costa and Ms. Mohr were present when the meeting was called to order.

Mr. Costa reviewed the status of the strategic review process and following discussion, a motion was made, seconded and approved to adopt the following resolutions:

> WHEREAS, the Company is in the process of evaluating various potential strategic transactions; and

> WHEREAS, the Board of Directors (the "Board") of the Company deems it advisable to establish a committee of the Board to oversee the process of seeking, reviewing and evaluating any proposed strategic transaction involving the Company (a "Potential Transaction");

> NOW, THEREFORE, BE IT:

> RESOLVED, that, pursuant to Section 141(c) of the Delaware General Corporation Law and Section 3.9.5 of the Company's By-Laws, as amended, a special committee of the Board (the "Special Committee") be, and it hereby is, created for the purpose of (i) overseeing the process of seeking, reviewing and evaluating Potential Transactions and (ii) if the Special Committee deems it appropriate, making a recommendation to the

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Board whether the terms of any Potential Transaction are in the best interests of stockholders of the Company and should be approved, if applicable, by the Board and/or by such stockholders;

FURTHER RESOLVED, that Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, Dudley S. Taft and Miles D. White be, and they hereby are, appointed to serve as members of the Special Committee, with William A. Osborn, the Company's lead independent director, to act as Chairman of the Special Committee;

FURTHER RESOLVED, that, the approval of these resolutions by the CT Directors (as defined in the Company's By-Laws, as amended), constitutes the agreement by the CT Directors to the composition of the Special Committee contemplated by Section 8.5 of the Company's By-Laws, as amended;

FURTHER RESOLVED, that the Special Committee be, and it hereby is, authorized to retain, at the Company's expense, legal counsel, financial advisors and such other advisors as the Special Committee shall deem necessary, appropriate or advisable, and to execute engagement letters and such other agreements on behalf of the Company in connection with the foregoing in such form as the Special Committee shall approve;

FURTHER RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and directed to, and to cause the Company's counsel, advisors and consultants to, inform the Special Committee and its counsel, advisors and consultants of any and all information requested by the Special Committee, its counsel, advisors and consultants;

FURTHER RESOLVED, that the Special Committee be, and it hereby is, authorized (i) to take, or cause to be taken, any and all action it deems necessary, appropriate or advisable in connection with the exercise of its authority pursuant to these resolutions and (ii) to direct the officers of the Company, or any of them, in the name and on behalf of the Company, to negotiate, execute and deliver in the name and on behalf of the Company, and to cause the performance of, any agreements or other documents and take any and all actions as the Special Committee may deem necessary, appropriate or advisable in connection with the foregoing;

FURTHER RESOLVED, that the Special Committee be, and it hereby is, authorized to adopt such procedures concerning its operation as it deems necessary, appropriate or advisable;

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

FURTHER RESOLVED, that the Special Committee shall make such reports to the Board with respect to its activities at such times and in such manner as it considers appropriate;

FURTHER RESOLVED, that, to the fullest extent permitted by applicable law, the deliberations and records of the Special Committee shall be confidential and, without limiting the generality of the foregoing, all statutory and common law privileges shall be available with respect to legal advice rendered to, and documents prepared by counsel to assist, the Special Committee in its deliberations;

FURTHER RESOLVED, that each member of the Special Committee shall be entitled to be indemnified by the Company to the fullest extent permitted by applicable law and the Company's Amended and Restated Certificate of Incorporation (such right to indemnification to include the advancement of expenses and the right to bring suit to enforce such rights to indemnifications and advancement of expenses, all as provided in the Company's Amended and Restated Certificate of Incorporation); and

FURTHER RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and directed to take or cause to be taken all such further actions, to execute and deliver or cause to be executed and delivered all such further documents and agreements in the name and on behalf of the Company, and to incur all such fees and expenses as in their judgment shall be necessary, appropriate or advisable in order to carry out filly the intent and purposes of the foregoing resolutions.

At the conclusion of the executive session Mr. Costa and Ms. Mohr departed the meeting. Messrs. Landon, Lewin, Reardon and Smith and Ms. Musil joined the meeting.

## APPROVAL OF MINUTES

A motion was made, seconded and approved to adopt the minutes of the July 19 and September 21, 2006 Board of Directors meetings.

## COMMON STOCK AND PREFERRED STOCK DIVIDENDS

A motion was made, seconded and approved to adopt the following resolutions:

RESOLVED, that there is hereby declared a dividend of $.18 per share on the common stock of the Company payable on December 14, 2006 to stockholders of record at the close of business on November 30, 2006; and

FURTHER RESOLVED, that there is hereby declared a dividend of $8.6375 per share on the Series D-1 Convertible Preferred Stock of the Company payable on December 14, 2006 to stockholders of record at the start of business on December 14, 2006.

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## THIRD QUARTER OPERATING RESULTS AND PROJECTIONS

Mr. Grenesko reviewed the third quarter operating results of each of the Company's lines of business and commented on factors impacting the results. Mr. Grenesko next reviewed the performance of the Company's stock and market factors affecting the stock. Mr. Grenesko also reviewed operating performance trends for the Company compared to its industry peers. Mr. Grenesko then answered questions from the Board.

## WEB WIDTH REDUCTION CAPITAL REQUEST

Mr. Smith presented management's request for approval for a $24.5 million capital investment to reduce printing press web widths at seven Tribune Publishing newspaper business units. Following discussion, a motion was made, seconded and approved to adopt the following resolutions:

> RESOLVED, that the Board of Directors of the Company hereby authorizes the Company (or any affiliate thereof) to invest up to $24.5 million to reduce printing press web widths at certain of the Tribune Publishing Company newspaper business units;

> FURTHER RESOLVED, that the Chairman, President and Chief Executive Officer, any Senior Vice President or any Vice President of the Company or the President, any Senior Vice President or any Vice President of Tribune Publishing Company be, and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to make all such arrangements, to do and perform all such acts and things, to execute and deliver all such agreements, certificates, instruments and documents, to make all governmental, regulatory or other filings, to pay all such amounts, to purchase all such machinery and equipment, and to take all such actions as they may deem advisable or necessary in connection with the foregoing resolution and in order to fully effectuate the purposes of the foregoing resolution; and

> FURTHER RESOLVED, that all actions previously taken by or on behalf of the Company (or any affiliate thereof) in connection with the matters set forth in these resolutions be, and hereby are, ratified, confirmed and approved in all respects.

## DEVELOPMENT UPDATE

Mr. Leach discussed a written report submitted to the Board prior to the meeting regarding the status of other current development activities. A discussion followed Mr. Leach's presentation.

## INTERACTIVE STRATEGIC REVIEW

Mr. Landon discussed a written report submitted to the Board prior to the meeting regarding the status of current online initiatives. A discussion followed Mr. Landon's presentation.

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Messrs. Landon, Leach, Lewin, Reardon and Smith and Ms. Musil departed the meeting.

## AUDIT COMMITTEE REPORT

Mr. Osborn reported on the business discussed at the Audit Committee meeting held earlier in the day.

Mr. Osborn reported that the Committee reviewed third quarter financial results and a draft of the press release to be issued the following morning.

The Committee also reviewed the status of the internal controls certification project. Mr. Osborn noted that the overall results of this year's review have been good. To date, no material weaknesses requiring disclosure have been identified and the two significant deficiencies reported to the Committee in February have been resolved.

Mr. Osborn next reported that the Committee reviewed the internal audit status report. Mr. Osborn noted that, in light of recent media attention and SEC scrutiny regarding option backdating, the Committee requested that Internal Audit conduct a review of the Company's stock option practices. The review found no issues with the Company's stock option practices.

Mr. Osborn reported on an investigation being conducted by Internal Audit and Tribune's legal department into certain fraudulent schemes perpetrated by the former director of finance and other former employees of the Los Angeles Times' Recycler subsidiary. Mr. Osborn also reported on the status of management's strategic alternatives review for Recycler.

The Committee next reviewed with management a report summarizing the accounting policies relating to Tribune's interactive businesses. The Committee requested the report as part of its ongoing effort to better understand the Company's significant accounting policies.

The Committee also discussed the results of the annual audit of executive expense reports and travel logs for the Company jet. The Committee determined that the executives complied with the Company's travel and entertainment policies and usage of the Company plane was appropriate and adequately documented.

Mr. Osborn then reported that the Committee reviewed (i) the Company's procedures for handling complaints relating to accounting, internal controls or auditing matters and (ii) the Company's policies regarding hiring current of former employees of its independent accountants. The Committee determined the Company's practices and policies in these two areas were satisfactory.

5

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## COMPENSATION & ORGANIZATION COMMITTEE REPORT

Mr. Morrison reported on the business discussed at the Compensation & Organization Committee meeting held earlier in the day.

Mr. Morrison reported that the Committee discussed several management recommendations regarding compensation and benefits matters that could be implemented in the event of a change in control transaction. Mr. Morrison noted that the Committee approved all of management's recommendations (except for the proposed amendments to the director deferred compensation plans, which the Committee reserved the right to reconsider). Mr. Morrison then indicated that the Committee recommended that the Board approve the proposed amendments to certain of the employee deferred compensation plans. Following discussion, a motion was made, seconded and approved to adopt the following resolutions:

> RESOLVED, that the following unfunded, non-qualified compensation plans be amended to provide that all accrued amounts under the plans be paid to plan participants upon a Change in Control and to adopt the Internal Revenue Code Section 409A definition of Change in Control: (i) the Tribune Company Bonus Deferral Plan; (ii) the Tribune Company Supplemental Defined Contribution Plan; and (iii) the Tribune Company Supplemental Retirement Plan;

> FURTHER RESOLVED, that the Tribune Company Employee Benefits Committee be, and hereby is, authorized (with full power of delegation), in the name and on behalf of the Board of Directors (or any committee thereof) to take all steps necessary to effect the foregoing resolutions, including preparing, executing, delivering and filing the amendments and such other documents as may be required by law or as may be deemed necessary or proper in connection with the matters set forth in these resolutions.

A discussion followed Mr. Morrison's report. Mr. Grenesko and Mr. Kenney departed the meeting.

## ADJOURNMENT

There being no further business to come before the Board, the meeting was adjourned at 2:05 p.m.

_____
Secretary

6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433808

**2**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTION

### (2007 Annual Meeting date)

RESOLVED, that the 2007 Annual Meeting of Stockholders of the Company shall be held at 11:00 a.m. on Wednesday, May 9, 2007 at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois and that the close of business on March 14, 2007 is hereby fixed as the record date for the determination of stockholders of the Company entitled to notice of, and to vote at said meeting.

CHK/bap
12/5/06

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**3**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433811

# TRIBUNE COMPANY
## STOCK PERFORMANCE REPORT
### *as of December 4, 2006*



### Total Returns
(price change plus dividends)

| | YTD | Annual 3 year | 5 year |
|---|---|---|---|
| **S&P 500** | **14.9%** | **11.8%** | **6.4%** |
| **Tribune** | **9.1%** | **-11.4%** | **-0.7%** |
| **Benchmark** | **-1.3%** | **-6.5%** | **1.8%** |

## STOCK PERFORMANCE

Year-to-date, TRB's total return including dividends is 9% with the stock at approximately $32. Since our September announcement regarding exploration of strategic alternatives, the stock has remained in the $31-$33 range. Despite a recent rally in the newspaper sector, our Benchmark (p. 3) is down about 1% year-to-date, including Gannett (+1.2%), Washington Post (-3.6%), New York Times (-4.9%), Belo (-11.7%) and McClatchy (-26.0%).

## VALUATION

Since our last report, multiples have increased somewhat. At $32, Tribune is trading at 9.2x enterprise value/2006 operating cash flow, slightly ahead of the average for the newspaper group of 8.9x.

| EV/EBITDA Multiples | |
|---|---|
| | December |
| Tribune | 9.2x |
| Cable | 10.0x |
| Entertainment | 10.3x |
| Newspapers | 8.9x |
| Radio | 10.8x |
| Television | 9.7x |

*Source: CSFB*
*Based on 2006 est. EBITDA.*

## TRADING ACTIVITY

Tribune's average daily volume year-to-date is about 2 million shares, more than double the daily volume from the same period in 2005.

Short interest remains in the range of 17 million shares (7% of shares outstanding), consistent with third quarter activity and in-line with the broader market. As we saw in October, short interest in our peer companies ranges from 13% (Dow Jones) and 11% (New York Times) on the high end to 1% (Scripps and Washington Post) on the low end.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## ANALYST/INSTITUIONAL ACTIVTY

We are not presenting at this year's Media Week conferences in New York. Analysts expect a cautionary tone from the newspaper publishers given the challenging ad environment, and say downward 2007 earnings estimate revisions are likely. Key topics will be ad rate increases, newsprint pricing and growth in online businesses. Most of our peer companies will be presenting on Wednesday, December 6.

According to second quarter 13F filings released in mid-November, T. Rowe Price (6.8%), Ariel Capital (6.2%), and Gamco/Mario Gabelli (1.3%) increased their TRB holdings. Nelson Peltz/Trian Partners reported holdings of 2.8 million shares (1.2%). Davidson Kempner has reduced its stake to about 1 million shares and is no longer one of TRB's "Top 15."

### TOP 15 INSTITUTIONAL SHAREHOLDERS

|   |   | Shares Held | % | Style |
|---|---|---|---|---|
| 1. | T. Rowe Price Associates | 17.1M | 6.8% | Active |
| 2. | Ariel Capital Management | 15.5 | 6.2 | Active |
| 3. | Barclays Global Investors | 6.6 | 2.6 | Index/Quant |
| 4. | Morgan Stanley Investment Management | 6.5 | 2.6 | Active |
| 5. | The Vanguard Group | 5.4 | 2.2 | Index |
| 6. | LSV Asset Management | 5.0 | 2.0 | Quant |
| 7. | State Street Global Advisors | 4.8 | 1.9 | Index |
| 8. | Northern Trust Investments | 4.1 | 1.7 | Index |
| 9. | Fidelity Management & Research | 3.7 | 1.5 | Active |
| 10. | Lord Abbett | 3.6 | 1.4 | Active |
| 11. | Gabelli Asset Management Co. | 3.3 | 1.3 | Active |
| 12. | Nelson Peltz/Trian Partners | 2.8 | 1.2 | Activist |
| 13. | Dimensional Fund Advisors | 2.6 | 1.0 | Active |
| 14. | MacKay Shields | 2.5 | 1.0 | Active |
| 15. | Deutsche Asset Management Americas | 2.4 | 1.0 | Active |

| TRIBUNE OWNERSHIP | |
|---|---|
| Employees (estimated) | 10% |
| McCormick Tribune | 13% |
| Chandler Trusts | 20% |
| Institutional/Retail | 57% |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433813

# TRIBUNE COMPANY
## BENCHMARK COMPANY TOTAL RETURNS
### Through December 4, 2006

| | YTD | | 1-Year | | 3-Year | | 5-Year |
|---|---|---|---|---|---|---|---|
| Sinclair | 14.5% | Sinclair | 8.3% | Scripps | 3.0% | Scripps | 10.0% |
| Hearst-Argyle | 9.3% | Hearst-Argyle | 8.1% | Hearst-Argyle | 1.7% | Washington Post | 8.1% |
| **Tribune** | **9.1%** | Dow Jones | 6.2% | Sinclair | -2.0% | Sinclair | 6.4% |
| Dow Jones | 5.9% | Scripps | 5.5% | Washington Post | -2.2% | Hearst-Argyle | 4.6% |
| Scripps | 3.3% | **Tribune** | **5.2%** | Dow Jones | -6.9% | Belo | 2.3% |
| Gannett | 1.2% | Gannett | 1.1% | Gannett | -10.7% | McClatchy | 0.0% |
| Washington Post | -3.6% | Washington Post | 0.7% | **Tribune** | **-11.4%** | **Tribune** | **-0.7%** |
| New York Times | -4.9% | New York Times | -7.1% | Belo | -11.7% | Gannett | -1.2% |
| Belo | -11.7% | Belo | -12.8% | McClatchy | -12.4% | Dow Jones | -3.9% |
| McClatchy | -26.0% | McClatchy | -28.3% | New York Times | -17.2% | New York Times | -10.1% |
| | | | | | | | |
| *Benchmark* | *-1.3%* | *Benchmark* | *-2.0%* | *Benchmark* | *-6.5%* | *Benchmark* | *1.8%* |
| | | | | | | | |
| S&P 500 | 14.9% | | 13.5% | | 11.8% | | 6.4% |
| S&P Pub | 14.7% | | 12.9% | | -0.1% | | 4.7% |

The "Annual" heading spans the 1-Year, 3-Year, and 5-Year columns.

## BENCHMARK COMPONENTS

| | Business | Enterprise Value ($B) |
|---|---|---|
| Gannett* | N, B | $ 17.9 |
| **Tribune*** | **N, B** | **12.2** |
| Scripps | N, B | 9.1 |
| Washington Post | N, B | 6.7 |
| McClatchy | N | 5.4 |
| New York Times* | N, B | 4.9 |
| Dow Jones* | N, B | 3.7 |
| Belo | N, B | 3.1 |
| Hearst-Argyle | B | 3.0 |
| Sinclair | B | 2.1 |

(N) Newspapers, (B) Broadcasting

*Included in the S&P 500 Publishing Index.*

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433814

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB-UR-0433815**

# TRIBUNE COMPANY
## DEVELOPMENT UPDATE

This report summarizes the status of current development activities.

## PUBLISHING AND INTERACTIVE

### CareerBuilder

As discussed in the past, one of CareerBuilder's most important business arrangements is its distribution agreement with Microsoft's MSN that runs through December 2008. CareerBuilder continues to have discussions with Microsoft about extending that arrangement through 2013 and obtaining a similar distribution deal for areas outside of the U.S. As part of those discussions, Microsoft has expressed an interest in acquiring an equity stake in CareerBuilder. Under the right terms, we believe it would be beneficial to have Microsoft as an equity partner. Negotiations are ongoing and we will update you on our progress at the Board meeting.

As you are aware, several weeks ago Yahoo's HotJobs announced a strategic alliance with a group of newspaper companies that includes Belo, Cox, Hearst, Journal Register, Lee, Media News and Scripps. Most of these same newspaper companies expressed an initial preference to affiliate with CareerBuilder. However, it became clear that an agreement could not be reached on affiliation terms. While we will continue to monitor the competitive situation closely, we do not believe these newspaper affiliations will have a negative impact on CareerBuilder's position in the online recruitment market.

### New Interactive Joint Ventures

Tribune, Gannett and McClatchy continue to evaluate ways to more effectively use our combined Internet assets. Our discussions have focused on creating an online advertising network and launching new national content channels. The ad network would include each of our companies' newspaper.com websites and, hopefully, the sites of other newspaper groups, and would establish a standard online advertising platform across a large segment of the newspaper industry. The new content channels would likely cover areas such as entertainment, travel and parenting.

As previously discussed, the frequency and pace of these conversations has accelerated over the last three months as we work towards finalizing the details for the launch of an ad network in the first quarter of 2007 and a national entertainment site later in 2007. Tribune, Gannett and McClatchy are also continuing discussions with Yahoo, Google and Microsoft regarding possible alliances or business relationships with our ad network and new content channels. Having one of these major Internet companies as a partner could aid our efforts, as each potential partner has a sophisticated technology platform that could run our network and each could provide strong distribution for our national content channels.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433816

Importantly, the recent HotJobs announcement has not impacted Yahoo's interest in continuing discussions with Tribune, Gannett and McClatchy regarding an ad network and distribution arrangement for other content channels. It has also increased Microsoft's interest in discussing areas of strategic alignment beyond the existing CareerBuilder relationship. We will have additional meetings with Yahoo, Microsoft and Google before the end of the year. Also, several of the newspaper groups included in the HotJobs announcement continue to express interest in aligning with us on the ad network.

## Hoy

We have signed a non-binding letter of intent to sell the assets of *Hoy* New York to ImpreMedia LLC for $7.5 million in cash. ImpreMedia publishes Spanish language newspapers in six markets, including daily newspapers *El Diario La Prensa* in New York and *La Opinion* in Los Angeles, and weekly newspaper *La Raza* in Chicago. *Hoy* New York is projected to lose $3 million in cash flow in 2006. Its circulation misstatements and subsequent revenue decline has damaged its competitive position in New York and significant combined sales with *Hoy* in Los Angeles and Chicago have not materialized. Our Hoy group registered an $8 million cash flow loss in 2006. We will look to break even in 2007.

## The View Newspapers

The Baltimore Sun is in the process of acquiring the assets of *The View* newspapers for $1 million. *The View,* which consists of two weekly and two monthly publications, has a free, controlled circulation of approximately 30,000 and covers Howard County, Maryland. We expect *The View* to generate approximately $235,000 of operating cash flow on revenues of $1.5 million in 2007. *The View* will be operated by Patuxent Publishing, the Sun's niche publication subsidiary.

## BrassRing

The sale of BrassRing to Kenexa Corporation for $115 million in cash closed on November 13. Tribune owned 27% of BrassRing and our total proceeds from the transaction, after fees and management equity payouts, are approximately $28 million before taxes ($22 million after taxes).

## BROADCASTING

## WCWN-Albany and WLVI-Boston

We closed on our sale of WCWN-Albany to Freedom Communications for $17 million on December 5. Also, we have received approval from the Federal Communications Commission for our sale of WLVI-Boston to Sunbeam Television Corp. for $113.7 million. We expect to close that transaction on December 19.

TL/DGK
12/5/06

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433817

5

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB-UR-0433818**

# TRIBUNE COMPANY
## SALE OF SOUTHERN CONNECTICUT NEWSPAPERS, INC.

## RECOMMENDATION

Management requests authority to sell Southern Connecticut Newspapers, Inc. (SCNI) for at least $70 million. As reported in October, we initiated discussions to sell SCNI with several parties and Gannett has emerged as the highest bidder. We believe an agreement with Gannett may be reached prior to our February board meeting.

The contemplated transaction with Gannett will exclude SCNI's real estate. The real estate consists of an office building and print facility in Stamford and an office building in Greenwich. We expect to sell the real estate in one or more separate transactions for at least $20 million.

## BACKGROUND

Tribune acquired SCNI as part of the Times Mirror acquisition in 2000. *The Advocate* and the *Greenwich Time* serve the Southern Connecticut cities of Stamford and Greenwich, respectively. This affluent Fairfield County market is adjacent to New York's Westchester County, where Gannett publishes the leading local paper, *The Journal News*. *The Advocate* and the *Greenwich Time* combined have daily and Sunday circulation of less than 40,000, making them by far Tribune's smallest daily newspapers.

In October 2005, the Board approved the sale of SCNI for $85 million. However, we did not reach an agreement to sell the company at that time. In light of our decision in May 2006 to divest non-core assets, we revisited the sale of SCNI.

## STRATEGIC RATIONALE

Despite the attractive demographics of Fairfield County, we believe SCNI has limited prospects for growth. SCNI lacks operating scale and its cash flow margin is last among our daily newspapers. SCNI's revenue has declined approximately 0.4% annually since 2001, compared to an

| SCNI Financials ($ in millions) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | '01 | '02 | '03 | '04 | '05 | '06E | CAGR |
| Revenues | $38.5 | $37.6 | $38.6 | $39.7 | $39.3 | $37.7 | -0.4% |
| Cash Flow | 6.0 | 7.0 | 6.5 | 7.0 | 7.5 | 6.6 | 1.9% |
| Cash Flow Margin | 15.6% | 18.6% | 16.8% | 17.6% | 19.0% | 17.5% | |
| Capital Expenditures | $1.1 | $0.7 | $2.9 | $0.8 | $1.0 | $0.8 | |

Note: 2006 included on a 52 week basis; excluding stock-based compensation

annual revenue growth rate of just under 1% for our entire newspaper group over that same period of time. Revenue declines have accelerated in 2006, down 4%, due to softness in auto and real estate classifieds. We do not expect SCNI's revenue outlook to significantly improve in the near term. Similarly, prospects for operating cash flow growth are limited. Operating cash flow has grown just under 2% annually since 2001, primarily due to aggressive cost

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

management. Further cost reductions will be difficult due to the inherent cost structure of operating a stand-alone local daily newspaper in a competitive, high-cost suburban market. Accordingly, we project operating cash flow growth will be roughly flat over the next 3-5 years. SCNI's return on invested capital is projected to be approximately 4% for 2006.

We believe the combination of SCNI with an adjacent daily newspaper operation can generate better cash flow growth primarily through cost synergies. The largest cost savings would come from combining plant operations, with additional savings from the elimination of redundant back-office, distribution and editorial functions. Unfortunately, SCNI is located too far from *Newsday* and the *Hartford Courant* for us to receive those benefits of scale.



## TRANSACTION STATUS

Gannett has made an offer to buy the assets of SCNI (excluding the real estate) for $73 million in cash, an 11.1x multiple of SCNI's projected 2006 cash flow. Gannett's offer does not include the purchase of SCNI's real estate because they would combine most of SCNI's operations with those of *The Journal News*. We believe we can maximize our proceeds from this transaction by selling the real estate separately, subject to a short-term lease to Gannett. We expect to sell the real estate for $20-25 million in total.

A $93 million sale (including the real estate) would generate after-tax proceeds of approximately $57 million, or a 9x after-tax cash flow multiple. The sale transactions will have minimal impact on our ongoing EPS, but will result in a $20 million loss on sale (net of a $7 million gain on the real estate) for book accounting purposes. The difference between the after-tax proceeds and the accounting loss is related to goodwill and intangibles recorded for book purposes when we acquired Times Mirror.

A transaction with Gannett is subject to their completion of due diligence, negotiation of definitive agreements and Hart-Scott-Rodino clearance, and would likely close late in the first quarter of 2007.

TDL
12/5/06

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433820

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTIONS

### (Sale of Southern Connecticut Newspapers, Inc.)

RESOLVED, that the Board of Directors of the Company hereby approves the sale by the Company (or any affiliate thereof) of Southern Connecticut Newspapers, Inc. ("SCNI") for not less than $70 million (exclusive of the real property owned by SCNI) (collectively, the "Transaction");

FURTHER RESOLVED, that the Chairman, President and Chief Executive Officer, any Senior Vice President or any Vice President of the Company, the President, Senior Vice President or any Vice President of Tribune Publishing Company or the President, Senior Vice President or any Vice President of SCNI (the "Authorized Officers"), be and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to negotiate, document and execute agreements and instruments evidencing the Transaction as such Authorized Officer executing the same may approve, such approval to be conclusively evidenced by such officer's execution thereof;

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to make all such arrangements, to do and perform all such acts and things, to execute and deliver all such agreements, certificates, instruments and documents, to make all governmental, regulatory or other filings (including, without limitation, filings pursuant to the Hart-Scott-Rodino Antitrust Improvements Act), to pay all such amounts, and to take all such actions as they may deem advisable or necessary in connection with the matters set forth in these resolutions and in order to fully effectuate the purposes of these resolutions; and

FURTHER RESOLVED, that all actions previously taken by or on behalf of the Company (or any affiliate thereof) in connection with the matters set forth in these resolutions be, and hereby are, ratified, confirmed and approved in all respects.

DPE
12/5/06

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433821

6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433822

# TRIBUNE COMPANY
## BOARD AND COMMITTEE PERFORMANCE REVIEWS

As required by the Company's Governance Guidelines, each year the Board reviews its performance and that of the Board's committees. Self evaluation questionnaires were circulated at the May 2 Board meeting and completed questionnaires were returned to the Company's corporate secretary.

At the July meetings, the Nominating & Governance Committee deferred review of the Board and Nominating & Governance Committee responses. The Compensation & Organization Committee conducted its performance evaluation and reported the results of its review to the Board in July.

The following report provides a consolidated review of the responses of each of the Company's directors regarding Board performance. The Nominating & Governance Committee will discuss both the Board performance evaluations and the Nominating & Governance Committee performance evaluations at its meeting and report the results of its reviews to the full Board.

MWH
12/5/06

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# TRIBUNE COMPANY

## 2006 Board of Directors Self Evaluation Questionnaire

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improvement* (✓) | Comments |
|---|---|---|---|---|
| **A. Board Meeting Mechanics** | | | | |
| 1. Length of meetings | 5 | 5 | 1 | •Meetings flex and lengthen as needed to ensure sufficient coverage of key issues.<br>•Considering what the Company has been going through and the decisions recently.<br>•Need to allow more time to convey major issues and strategic discussions. |
| 2. Number of meetings | 5 | 6 | | •A lot has been going on so it is understandable. |
| 3. Agenda setting (process and content) | 6 | 5 | | •Content has been better this year with more time spent on key strategic issues.  Should spend time on key metrics, growth plans, major cost reductions, portfolio options this next year. |
| 4. Between meeting communications; sufficiency of information flow | 7 | 4 | | •Dennis does a good job with e-mails and phone calls keeping the Board informed between meetings.<br>•Dennis keeps us up-to-date and always returns calls quickly.<br>•Sometimes unscheduled meetings are less well prepared for. |
| 5. Timeliness and sufficiency of pre-meeting materials | 8 | 3 | | •No problem. |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improvement* (✓) | Comments |
|---|---|---|---|---|
| **B. Meeting Content/Conduct** | | | | |
| 1. Balance between strategy and operations | 4 | 6 | 1 | •Has improved with more time spent on strategy this year.<br>•More focus on our strategy. Also, time spent on cost cuts and improving operations.<br>•Too focused on reporting operations.<br>•Heavier on operations than strategy. |
| 2. Quality of Management presentations | 4 | 7 | | •Sometimes do not cover key contingencies or answer some key questions to make a decision.<br>•In general, very good.<br>•Pretty detailed. Often repetitive with info provided in book which is very detailed.<br>•Sometimes too packaged and not balanced.<br>•Getting better. |
| 3. Amount of detail in presentations | 5 | 6 | | •A lot. |
| 4. Coverage of corporate governance issues | 5 | 6 | | •Very good on standard corporate governance. Chandler Trust situation makes some issues more challenging. |
| 5. Time allotted for discussion | 4 | 6 | 1 | •We have a lot of discussions.<br>•Need more time to focus on strategy.<br>•Keep working on this. |
| 6. Climate for open discussion | 4 | 5 | 2 | •Dennis sets a good tone and encourages open discussion. Different agendas of some Board members at times makes open discussion difficult.<br>•Very open, but tension because of Chandler representatives.<br>•Management expects rubber stamp. |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433825



| Item | Very Good (✓) | Satisfactory (✓) | Needs Improvement* (✓) | Comments |
|---|---|---|---|---|
| B. Meeting Content/Conduct (Continued) | | | | |
| 7.  Topics covered (breadth and depth) | 3 | 7 | | |
| 8.  Quality of Committee reports to Board | 6 | 5 | | •Excellent Committee reports. <br> •Sometimes too packaged but definitely getting better. |
| 9.  Candid and constructive Executive Sessions | 8 | 2 | 1 | •Very open, candid, but some tension with Chandler Directors. <br> •Should structure Executive Sessions allowing more time.  Too rushed. |

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433826



| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve-ment* (✓) | Comments |
|---|---|---|---|---|
| **G.   Board Organization/Operation** | | | | |
| 1.   Size of Board | 4 | 7 | | ●Currently one short with the loss of Kathryn Turner.<br>●Need more independent directors but now is not the time.<br>●Could use one more. |
| 2.   Committee structure and makeup | 4 | 6 | | ●Much better. |
| 3.   Exposure and access to Management | 6 | 5 | | ●No problem. |
| 4.   Exposure and access to external advisors and other adequate resources | 8 | 3 | | ●Utilization of BCG, Merrill Lynch and Sidley Austin has been very helpful this year.<br>●Open access. |
| 5.   Board composition (experience, expertise, mix of skills, diversity, etc.) | 6 | 3 | 2 | ●Should look to add another woman and/or person of color as seats become available.  Diversity can be enhanced.<br>●Excellent board – very candid between the 8 non Chandlers – work well together – stockholder comes first.<br>●Need more <u>racial</u> diversity. |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433827

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improvement* (✓) | Comments |
|---|---|---|---|---|
| **C.** **Board Organization/Operation (Continued)** | | | | |
| 6.    Meaningful dialogue between Directors and Management | 6 | 4 | | •Management out of sync with some Board members.  Don't appreciate Board's real concerns. |
| 7.    Director independence | 6 | 3 | 1 | •At times, Chandler Trust Board members are conflicted representing the Trust and all shareholders. <br>•Chandler directors are not independent. <br>•Directors are independent but some members question independence of Chicago directors. |
| 8.    Concern for integrity and ethical values | 9 | 2 | | |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433828

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve-ment* (✓) | Comments |
|---|---|---|---|---|
| **ID    Board Practices** | | | | |
| 1.    Director selection and nomination | 3 | 6 | 1 | • Not been through it yet.<br>• Not much participation from Board members other than Nom. & Gov. Committee members. |
| 2.    Committee selection | 2 | 8 | | • Can't comment. |
| 3.    Director orientation and continuing education | 2 | 7 | 2 | • Some other boards do more in the way of continuing education.<br>• Last directors to join were thrown into turbulent waters without adequate preparation. |
| 4.    Board evaluation process | 3 | 7 | | |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433829

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve-ment* (✓) | Comments |
|---|---|---|---|---|
| **E.   Board Performance** | | | | |
| 1.   Understanding our business/industry | 3 | 8 | | • Could still do a better job on likely scenarios of future state based on evolving technology and competitive set.<br>• We spend a lot of time on the industry, both publishing and broadcasting. |
| 2.   Keeping current with issues affecting the Company (internal and external) | 7 | 4 | | • Well communicated. |
| 3.   Understanding our strategy | 3 | 7 | 1 | • Need continued work on strategy and consensus.<br>• Quickly evolving environment means directors need to keep up with news/changes.<br>• Need continuing discussion. |
| 4.   Involvement in long-term strategic planning process | 4 | 7 | | • Significant time investment this year in this area. |
| 5.   Understanding our processes for monitoring business risks | 3 | 7 | 1 | |

7

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433830

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve- ment* (✓) | Comments |
|---|---|---|---|---|
| **Board Performance (Continued)** | | | | |
| 6.  Understanding our annual operating plan process | 4 | 7 | | |
| 7.  Monitoring financial and other indicators of performance | 5 | 6 | | •Still opportunity to focus more on key metrics that will drive performance.<br>•Need to better understand circulation and viewer trends rather than static reports. |
| 8.  Monitoring major capital and other projects | 6 | 4 | 1 | |
| 9.  Assessment and understanding of the Company's competitive position | 5 | 6 | | •Hard to do in changing industry even for experts. |
| 10.  Sharing insights and experiences | 4 | 6 | 1 | •Would like to hear more from other directors. |
| 11.  Effective oversight of management | 3 | 8 | | |

8

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433831

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve-ment* (✓) | Comments |
|---|---|---|---|---|
| **Board Performance – Continued** | | | | |
| 12.   Engaging in constructive dialogue | 5 | 6 | | |
| 13.   Attendance at meetings | 7 | 4 | | |
| 14.   CEO evaluation process | 8 | 3 | | |
| 15.   CEO and senior management succession planning | 4 | 6 | 1 | •Need to do a better job on CEO succession.<br>•Really missing at this point. |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433832



| Item | Yes (✓) | No (✓) | Comments |
|---|---|---|---|
| **1F   Strategic Planning Process** | | | |
| 1.   Is the strategic plan review of appropriate duration? | 9 | 2 | •Need more time with the Company and industry in such transformation.<br>•When off-site.<br>•Probably need longer view.<br>•Move to longer duration meeting.  At Kohler was constructive. |
| 2.   Does the written strategic plan document facilitate discussion? | 11 | | •It was helpful to have BCG perspective this year.<br>•At this point in the industry situation, both are important. |
| 3.   Is it helpful to include a general business overview in the written report or should the report focus solely on strategic plan progress and environmental changes? | 10 | | •General business overview is always helpful.<br>•Strategic plan and environment.<br>•Include business overview. |
| 4.   Is it helpful to include business operators in the discussion? | 8 | 1 | •Focus on most senior operators.<br>•Only to talk about general business overview. |

10

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433833

| Item | Yes (✓) | No (✓) | Comments |
|---|---|---|---|
| **B    Strategic Planning Process (Continued)** | | | |
| 5.    Is the executive session useful? | 11 | | |
| 6.    Do you have any suggestions to improve the strategic planning process? | 5 | 4 | •Still need a better overview of key emerging technologies, emerging competitors, future scenarios, some rule changing options.  What is next generation beyond internet?  Other partnerships we should be pursuing?  What skills/capabilities will we need in the future?  Key metrics to track progress.<br>•Maybe have a retreat session prior to completion of plan to allow for more input.<br>•Need to keep looking for prescriptions and solutions, not descriptions and projections.  We'll all keep working at it.<br>•Continue with new longer duration format.<br>•The planning process is fine.  It's the execution that needs to be worked on.<br>•Additional strategy discussions during regular Board meetings/dinners other than October off-site.<br>•More time for discussion. |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433834

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve-ment* (✓) | Comments |
|---|---|---|---|---|
| **G.  Overall Collective Performance of Board** | | | | |
| 1.  Overall, I feel the performance of the Board is: | 6 | 5 | | • Overall performance of the Board is good in a very challenging situation.  Need to resolve Chandler Trust issues for Board to be effective going forward.  Board members leaking for their own interest has eroded trust.<br>• We spend a huge amount of time dealing with the Chandler issue.  It certainly complicates Board meetings.  I think we have an excellent Board though that really focuses on the issues. |

**H.   Additional Comments/Suggestions:**

12

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433835

**7**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433836

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTION

### (Approval of Revised Compensation & Organization Committee Charter)

RESOLVED, that the revised Compensation & Organization Committee Charter, substantially in the form presented at this meeting, is hereby adopted and approved.

MWH
12/05/06

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## COMPENSATION & ORGANIZATION COMMITTEE CHARTER
### (As in effect on ~~October 19, 2005~~December 12, 2006)

### Purpose

The Compensation & Organization Committee is appointed by the Board of Directors to: (a) discharge the Board's responsibilities relating to compensation of the directors and officers of the Company and its subsidiaries; (b) assist the Board of Directors with management development and succession planning; and (c) perform other related tasks, as may be requested from time to time by the Board of Directors.

### Committee Membership

The Compensation & Organization Committee shall consist of no fewer than three members. The members of the Committee shall meet the independence requirements of the New York Stock Exchange. The members of the Committee, including a chairperson, shall be appointed and replaced by the Board of Directors based on recommendations of the Nominating & Governance Committee.

### Committee Authority and Responsibilities

1.  The Committee shall annually review and approve corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and either as a committee or together with the other independent directors (as directed by the Board), determine and approve the CEO's compensation level based on this evaluation.

2.  The Committee shall annually review and approve for the CEO and the senior executive officers of the Company, (i) the annual base salary level, (ii) the annual incentive opportunity level, (iii) the long-term incentive opportunity level, (iv) employment agreements, severance arrangements, and change in control agreements/provisions, in each case, when and if appropriate, and (v) any special or supplemental benefits.

3.  The Committee shall fix and determine awards to employees of stock, stock options, stock appreciation rights, restricted stock, restricted stock units or other forms of equity compensation pursuant to any of the Company's employee stock option or ~~stock-related~~ equity compensation plans now or from time to time hereafter in effect and exercise such other power and authority as may be permitted or required under such plans.

4.  The Committee shall annually consult with the CEO and make recommendations with respect to non-CEO executive officer compensation, and incentive compensation and equity-based plans that are subject to Board approval.

5. The Committee: (i) shall, from time to time, make recommendations to the Board with respect to those equity compensation plans that are subject to shareholder approval and (ii) may, from time to time, make recommendations to the Board with respect to those equity compensation plans that are not subject to shareholder approval or any other incentive compensation, deferred compensation, retirement or welfare benefit plans.

~~The Committee shall review and, in its discretion, either (i) approve or disapprove or (ii) recommend to the Board for approval or disapproval, those equity compensation plans that are not subject to shareholder approval.~~

6. The Committee shall periodically review and make recommendations to the Board with respect to the compensation of outside directors.

7. The Committee shall periodically review and make recommendations to the Board with respect to stock ownership guidelines applicable to Company employees and outside directors.

8. The Committee shall (i) review and discuss with management the Compensation Discussion and Analysis required to be included in the Company's annual report on Form 10-K and annual proxy statement filed with the Securities and Exchange Commission and (ii) ensure that it is sufficiently satisfied with the disclosure in order to be in a position to recommend to the Board that the Compensation Disclosure and Analysis be included in the annual report and proxy statement. ~~produce a report on executive officer compensation as required by the Securities and Exchange Commission (SEC) to be included in the Company's annual proxy statement or annual report on Form 10-K filed with the SEC.~~

9. The Committee shall participate in the annual management development and succession planning process and shall make recommendations to the Board, concerning management development and succession planning matters.

10. The Committee shall have the sole authority to retain and terminate any compensation consultant used to assist in the evaluation of director, CEO or other senior executive compensation and shall have sole authority to approve the consultant's fees and other retention terms.  Compensation consultants used to evaluate compensation of non-executive employees shall remain at the discretion of management.

11. The Committee shall have the authority to obtain advice and assistance from internal or external legal, accounting or other advisors.

12. The Committee may form and delegate authority to subcommittees when appropriate.

13. The Committee shall make regular reports to the Board.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433839

14. The Committee shall review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval.  The Committee shall annually review its own performance.

15. The Committee shall carry out such other duties as may be delegated to it from time to time by the Board.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433840



AUDIT COMMITTEE

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433841

**TRIBUNE COMPANY**
**AUDIT COMMITTEE MEETING**
**MONDAY, DECEMBER 11, 2006 (5:00 P.M.)**
**PATTERSON ROOM**
**24th FLOOR, TRIBUNE TOWER**

**AGENDA**

|  | Tab No. |
|---|---|
| Approve Minutes of October 18, 2006 Audit Committee Meeting | 1 |
| Audit Committee Responsibility Summary | 2 |
| Preliminary Update on Impairment Review of Intangible Assets | 3 |
| PHONES Tax Issue Update | 4 |
| 2006 Internal Controls Certification Update | 5 |
| Internal Audit Status Report | 6 |
| Business Continuity Planning Update | 7 |
| Enterprise Risk Management | 8 |

- Overview
- Code of Business Conduct
- Code of Ethics for CEO and Senior Financial Officers
- Summary of Compliance and Ethics Program
- Review of Major Financial Risk Exposures

|  |  |
|---|---|
| Reassessment of Audit Committee Charter | 9 |

Private Sessions

**PARTICIPANTS**

*Audit Committee*
Betsy D. Holden
William A. Osborn, Chair
J. Christopher Reyes
Dudley S. Taft

*Other Board Members*
Jeffrey Chandler
Roger Goodan

*PricewaterhouseCoopers LLP*
Jay Henderson          Chicago Office Managing Partner
Kevin Maguire          Engagement Partner

*Management*
Jerry Agema            Vice President, Corporate Compliance and Risk Management
Tom Caputo             Vice President, Auditing
Dennis FitzSimons      Chairman, President and Chief Executive Officer
Don Grenesko           Sr. Vice President, Finance & Administration
Mark Mallory           Vice President and Controller

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433843

**TRIBUNE COMPANY**
**AUDIT COMMITTEE MEETING**
**OCTOBER 18, 2006**

The Audit Committee met on Wednesday, October 18, 2006 at 10:45 a.m. The meeting was held at Tribune Tower, Chicago, Illinois, pursuant to notice. The meeting was attended by Betsy Holden, William Osborn and J. Christopher Reyes of the Audit Committee; Roger Goodan of the board of directors; Kevin Maguire and Stephanie Potter of PricewaterhouseCoopers (PwC); and Gerald Agema, Harry Amsden, Thomas Caputo, Mark Mallory and Scott Smith of Tribune Company. Donald Grenesko of Tribune Company attended a portion of the meeting.

Mr. Osborn acted as Chairman of the meeting and Mr. Caputo as Secretary.

The following business was discussed at the meeting:

1.  The Committee approved the minutes of the May 2 and July 11, 2006 Audit Committee meetings.

2.  Mr. Mallory gave a brief overview of the Company's third quarter 2006 operating results and commented on changes in diluted EPS, including the net gain on the TMCT transactions. He indicated that a more complete review of operating results would be presented to the full board later that day by Mr. Grenesko. Mr. Mallory also briefly reviewed a draft of the Company's third quarter earnings press release, indicating that it is similar in content and presentation to those from previous quarters.

    Mr. Maguire then discussed PricewaterhouseCoopers' report on their review of the Company's third quarter results. Mr. Maguire noted that they were substantially complete with their review and that there were no disagreements with management and no proposed adjustments.

    Messrs. Mallory and Maguire answered questions from the members of the Committee during the presentation.

3.  Messrs. Mallory and Agema reviewed the status of the internal controls certification process. Mr. Mallory discussed the approach being taken for 2006 and the impact of the process improvements that have been made to-date. He indicated that the Company has engaged Deloitte and Touche to assist in streamlining the more complex areas of the certification process. Mr. Mallory then stated that the overall results of this year's review have been good to-date and that audits have yielded relatively few control deficiencies. He then indicated that management and Internal Audit have not identified any significant deficiencies, which would need to be reported to the Audit Committee, or material weaknesses, which must be disclosed publicly.

    Mr. Agema then provided an update on the two significant deficiencies identified during the 2005 certification process. He noted that the item related to Newsday's change management controls was resolved in the first quarter, and that new controls were recently implemented at the major daily newspapers to address the preprint billing item. Mr. Agema also noted that

recent audits by Internal Audit and PwC verified that Newsday has stabilized its control environment. He then stated that the only significant area of concern to-date relates to information system controls at the Baltimore Sun. He indicated, however, that management is focused on resolving most of the deficiencies noted in Baltimore by the end of the year. Mr. Agema stated that management and PwC will continue to provide regular updates to the Committee until the process is completed.

Messrs. Agema, Caputo, Maguire and Mallory answered questions from the members of the Committee during the presentation.

4. Mr. Caputo then gave an internal audit status report. He reviewed a summary of audits performed during May through September 2006 which provided an overall assessment of the results. He noted that during the past six months, most of Internal Audit's time has been devoted to audits related to the internal controls certification project. Mr. Caputo then indicated that at the request of the Committee, Internal Audit also reviewed the Company's stock option practices. He stated that Internal Audit's procedures covered options granted during the past 10 years and that their review found no issues with the Company's stock option practices.

Messrs. Agema, Caputo and Mallory answered questions from members of the Committee during the presentation.

5. Messrs. Caputo and Amsden then reviewed control issues and financial performance at Recycler, a subsidiary of the Los Angeles Times. Mr. Caputo indicated that the Company was investigating a possible fraud committed by the former director of finance at Recycler. He stated that the results of the investigation to-date suggest that the former employee crafted several fraud schemes that involved collusion with former Recycler employees, relatives, and acquaintances outside the company in order to circumvent controls and misappropriate approximately $150,000 of Company funds. Mr. Caputo stated that Tribune's legal department has engaged Deloitte and Touche to determine the extent of the fraud and to prepare a package of evidence to aid the Los Angeles District Attorney in the prosecution process.

Mr. Amsden then reviewed strategic alternatives being considered for this business as revenues have declined steadily from $45 million in 1999 to $28 million this year, and an operating loss of $4.1 million is currently projected for 2006. He indicated that management plans to complete this strategic review by the end of this year.

Messrs. Agema, Amsden, Caputo, Mallory and Smith answered questions from members of the Committee during the presentation.

6. Mr. Amsden provided an overview of the Company's accounting policies related to Tribune's interactive businesses. He indicated that the Committee had requested this as part of its ongoing effort to learn more about the Company's significant accounting policies. Mr. Amsden discussed revenue recognition, affiliate agreements, and web-site development and maintenance costs. He indicated that the Company's policies are all in accordance with generally accepted accounting principles.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433845

Messrs. Agema, Caputo and Mallory answered questions from members of the Committee during the presentation.

At this point, Mr. Grenesko joined the meeting.

7. Mr. Caputo discussed the results of the annual audit of executive expense reports and the use of the Company jet. He noted that the review indicated records were in order, applicable policies were followed and no significant problems or violations were identified.

   Messrs. Caputo and Maguire answered questions from members of the Committee during the presentation.

8. Mr. Caputo discussed the Company's procedures for handling complaints related to accounting, internal controls or auditing matters. He indicated that the procedures had not changed since last year and were adequate, and that no changes were proposed. After discussion, the Committee approved the Company's existing procedures for handling complaints for the next 12 months.

9. Mr. Caputo also reviewed the Company's policies regarding hiring current or former employees of its independent accountants. He indicated the procedures had not changed and that during the past year, the corporate office had not hired any former PwC employees and that the business units had not hired any former PwC employees as an officer. After discussion, the Committee approved the Company's existing hiring policies regarding former PwC employees for the next 12 months.

10. At this point, all Company employees left the meeting, and the Committee met privately with the PwC representatives. Mr. Maguire and Ms. Potter then left the meeting, and the Committee met privately with Messrs. Agema and Caputo.

There being no further business to come before the Committee, the meeting was adjourned at 11:35 a.m.

_____
Thomas Caputo

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433846

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## AUDIT COMMITTEE RESPONSIBILITY SUMMARY

Management has prepared the attached summary of Audit Committee responsibilities to aid in planning Audit Committee meetings and to ensure that all responsibilities specified in the Audit Committee charter are fulfilled each year. The summary specifies the expected timetable for discussing each area of responsibility. We have made no changes to the summary since the last Audit Committee meeting. All topics slated for discussion at this Audit Committee meeting are covered in the remaining sections of the meeting materials.

RMM
12/1/06

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRIBUNE COMPANY**
**AUDIT COMMITTEE RESPONSIBILITY SUMMARY**
**AND TIMETABLE**

| Responsibility | Charter Reference | Meetings | | | | Quarterly Calls | As Needed |
|---|---|---|---|---|---|---|---|
| | | Feb. | May | Oct. | Dec. | | |
| **General:** | | | | | | | |
| 1. Meet periodically and privately with the independent accountants and internal auditors. | * | X | X | X | X | | X |
| 2. Meet periodically and privately with management. | * | X | | | | | X |
| 3. Appoint (after reviewing estimated fees for services to be performed) or replace the independent accountants. | * | X | | | | | |
| 4. Resolve any disagreements between management and the independent accountants regarding financial reporting. | * | | | | | | X |
| 5. Pre-approve all services performed by the independent accountants (including the fees and terms). | * | | X | | | | X |
| 6. Make regular reports to the Board of Directors. | * | X | X | X | X | | |
| 7. Reassess the adequacy of the Audit Committee Charter annually. | * | | | | X | | |
| 8. Self-assess Audit Committee performance (performed each July in conjunction with the overall Board self-assessment). | * | | | | | | |
| 9. Approve the Audit Committee report required by the SEC to be included in Tribune's annual proxy statement. | * | X | | | | | |
| **Financial Statement and Disclosure Matters:** | | | | | | | |
| 10. Meet to review the annual financial statements and disclosures with management and the independent accountants. | 1 | X | | | | | |
| 11. Make a recommendation to the Board regarding inclusion of the financial statements in the Company's 10-K. | 1 | X | | | | | |
| 12. Review the annual Section 404 internal control reports with management and the independent accountants. | 2 | X | | | | | |

\* These items are included in the "Meetings" and "Committee Authority and Responsibilities" sections of the Audit Committee Charter.

**December 2006**

1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRIBUNE COMPANY**
**AUDIT COMMITTEE RESPONSIBILITY SUMMARY**
**AND TIMETABLE**

| Responsibility | Charter Reference | Meetings | | | | Quarterly Calls | As Needed |
|---|---|---|---|---|---|---|---|
| | | Feb. | May | Oct. | Dec. | | |
| 13. Review any significant deficiencies or material weaknesses in internal controls, and the steps being taken to resolve them, with management and the independent accountants. | 2 | X | | | | | X |
| 14. Meet to review the quarterly financial statements and disclosures with management and the independent accountants prior to each 10-Q filing. | 3 | | | X (3rd Qtr) | | X (1st and 2nd Qtrs) | |
| 15. Review the results of the independent accountants' quarterly reviews. | 3 | | | X (3rd Qtr) | | X (1st, 2nd & 4th Qtrs) | |
| 16. Review significant financial reporting issues and judgments related to the financial statements with management and the independent accountants. | 4 | X | X | X | X | X | |
| 17. Review reports from the independent accountants regarding material accounting and financial reporting issues. | 5 | X | | | | | X |
| 18. Discuss the quarterly earnings releases with management. | 6 | | | | | X | |
| 19. Discuss financial information and earnings guidance provided to analysts and rating agencies with management. | 6 | | | | | X | X |
| 20. Discuss the effect of regulatory and accounting initiatives and off-balance sheet structures with management and the independent accountants. | 7 | | | | | | X |
| 21. Discuss major financial risk exposures and related risk management policies with management. | 8 | | | | X | | X |
| 22. Discuss with the independent accountants matters related to the annual audit, including any difficulties encountered, scope restrictions, or significant management disagreements. | 9 | X | | | | | |
| 23. Review any disclosures made by the CEO or CFO during the certification process regarding internal control weaknesses and/or fraud. | 10 | X (4th Qtr) | | X (3rd Qtr) | | X (1st and 2nd Qtrs) | |

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRIBUNE COMPANY**
**AUDIT COMMITTEE RESPONSIBILITY SUMMARY**
**AND TIMETABLE**

| Responsibility | Charter Reference | Timetable | | | | Quarterly Calls | As Needed |
|---|---|---|---|---|---|---|---|
| | | Meetings | | | | | |
| | | Feb. | May | Oct. | Dec. | | |
| **Oversight of the Company's Relationship with the Independent Accountants:** | | | | | | | |
| 24. Evaluate the independent accountants' lead partner. | 11 | X | | | | | |
| 25. Review the independent accountants' quality control procedures and any material issues raised by recent internal or external reviews. | 12 | X | | | | | |
| 26. Evaluate the qualifications, performance, and independence of the independent accountants and present conclusions to the Board. | 12 | X | | | | | |
| 27. Ensure rotation of the independent accountants' partners as required by law. | 13 | | X | | | | |
| 28. Set and review policies for hiring current and former employees of the independent accountants. | 14 | | | X | | | |
| 29. Discuss the planning and staffing of the independent audit. | 15 | | X | | | | |
| **Oversight of the Company's Internal Audit Function:** | | | | | | | |
| 30. Review the appointment and replacement of the senior internal auditing executive. | 16 | | | | | | X |
| 31. Review significant issues and management's responses raised in internal audit reports. | 17 | X | X | X | X | | X |
| 32. Discuss the internal audit department's responsibilities and planned scope of activities, budget, and staffing with the independent accountants and management. | 18 | | X | | | | |
| **Compliance Oversight Responsibilities:** | | | | | | | |
| 33. Obtain assurance from the independent accountants that they did not become aware of any illegal acts during their audit. | 19 | X | | | | | |
| 34. Review reports from management, internal audit and the chief compliance officer regarding the Company's compliance and ethics program and its Code of Business Conduct. | 20 | | | | X | | |

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRIBUNE COMPANY**
**AUDIT COMMITTEE RESPONSIBILITY SUMMARY**
**AND TIMETABLE**

| Responsibility | Charter Reference | Meetings | | | | Quarterly Calls | As Needed |
|---|---|---|---|---|---|---|---|
| | | Feb. | May | Oct. | Dec. | | |
| 35. Advise the Board regarding the effectiveness of the Company's compliance and ethics program. | 20 | | | | X | | |
| 36. Review the procedures for handling complaints and employee concerns regarding accounting and auditing matters. | 21 | | | X | | | |
| 37. Review any significant complaints and employee concerns regarding accounting and auditing matters. | 21 | | | | | | X |
| 38. Discuss the results of the annual review of executive expense reports performed by the independent accountants and the internal auditors. | N/A | | | X | | | |
| 39. Discuss the Company's business continuity plans and the related reviews performed by the internal auditors. | N/A | | | | X | | |
| 40. Discuss with management and the independent accountants correspondence with regulators or governmental agencies regarding material accounting and financial reporting issues. | 22 | | | | | | X |
| 41. Discuss legal matters that may materially affect the Company's financial statements or compliance policies with the Company's General Counsel. | 23 | | | | | | X |

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433852

**3**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433853

## TRIBUNE COMPANY
## IMPAIRMENT REVIEW OF GOODWILL AND OTHER INTANGIBLE ASSETS
### PRELIMINARY UPDATE

This report provides a preliminary update on this year's impairment review of goodwill and other intangible assets. As discussed below, we do not anticipate there will be an impairment charge in this year's fourth quarter. We will present the final results of our review at the February 2007 Audit Committee meeting.

### BACKGROUND

Goodwill and other intangible assets totaled $8.7 billion and represented about 60% of the Company's total assets at the end of this year's third quarter. About 75% of the Company's intangible assets arose from the acquisitions in 2000 of Times Mirror and in 1997 of Renaissance Communications, which owned six television stations. When we acquire a company, we allocate the purchase price first to the tangible net assets, such as cash, accounts receivable, and fixed assets, and then to separately identifiable intangible assets, such as newspaper mastheads, FCC licenses, network affiliations, and customer lists. We base these allocations on estimated fair values, which we normally determine with the assistance of outside appraisal firms. We allocate any remaining purchase price to goodwill.

Under current accounting rules that first became effective in 2002, the Company no longer amortizes goodwill and other intangible assets that are considered to have indefinite lives, such as newspaper mastheads and FCC licenses. However, the Company must review these assets for impairment annually by comparing book values to fair values. We perform this review in the fourth quarter of each year.

The valuation of intangible assets requires assumptions and estimates of many critical factors, including revenue and market growth, operating cash flow, market multiples, and discount rates. These factors involve inherent uncertainties, and changes in any of them can have a significant impact on our fair value estimates.

Our annual impairment reviews have not resulted in any impairment charges, except in the fourth quarter of 2004, when the SEC and FASB issued new rules for valuing FCC licenses. This change in accounting resulted in a $29 million pretax charge related to the St. Louis, Portland, Indianapolis and Grand Rapids television stations. We reflected the charge as a cumulative effect of a change in accounting principle, net of tax, in our 2004 income statement. Without the change to the new method, we would not have had an impairment charge in 2004.

The following summary covers the impairment testing approach for each category of intangible assets that is not being amortized. This year's approach is similar to last year's, and we have reviewed it with PricewaterhouseCoopers.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## GOODWILL

Goodwill impairment testing is performed by first grouping similar business units into "reporting units," as defined by the rules. For example, all of our newspapers are currently considered to be one reporting unit and all of our TV stations are another reporting unit. The fair value of each of our reporting units is based upon operating cash flow multiples. Our preliminary analyses show that fair value exceeds book value for each of our reporting units, and no goodwill write-down is required.

## OTHER INTANGIBLE ASSETS

Impairment testing for other intangible assets with an indefinite life is different from the testing for goodwill. Each intangible asset at each business unit must be tested separately to determine if its fair value exceeds its book value. Intangible assets subject to an annual impairment test include newspaper mastheads and FCC licenses.

### Newspaper Mastheads

The mastheads acquired from Times Mirror have a book value of $1.6 billion. Their initial fair values were based on an independent appraisal performed by Ernst & Young, who calculated the estimated benefit of owning, rather than licensing the mastheads. If the Company did not own the mastheads, it would have to license them from another entity and make royalty payments. The present values of these theoretical future royalty payments represent the estimated fair values of the mastheads. We are in the process of finalizing the projected revenues, royalty rates and discount rate to be used in the calculations, and we do not anticipate there will be an impairment charge for any of our mastheads.

### FCC Licenses

A television station's most valuable asset is its FCC license. The fair value of a FCC license in a given market is determined by estimating the average value of a FCC license in that market. We use a financial model that was developed by Standard & Poors, an independent valuation firm. The model derives the likely cash flows from start up for a station that would ultimately achieve an average market share and profitability in a particular market. The estimated cash flows are then discounted at an interest rate approximating the average cost of capital of likely buyers of a FCC license. We are in the process of finalizing the market assumptions and discount rate for the 2006 FCC license valuations. At this point, we do not expect any write downs will be required.


RMM
12/1/06


2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433855

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## PHONES TAX ISSUE UPDATE

The Company is close to reaching a favorable settlement with the Internal Revenue Service related to interest expense deductions on the Company's PHONES debt securities. As we have discussed previously with the Audit Committee, this issue arose in connection with the examination of the Company's federal income tax returns for 2000 and 2001. This report provides background information on the issue, summarizes the proposed settlement, and discusses the related financial impacts.

## BACKGROUND INFORMATION

The PHONES were issued in 1999 for $1.3 billion, have a thirty-year term, and are indexed to the value of 16 million Time Warner common shares. Interest on the PHONES is paid quarterly at an annual rate of 2%. However, interest expense deductions for tax purposes are significantly higher than the cash interest payments, based on the IRS's "contingent debt" rule. This rule allows us to calculate interest expense deductions using the prevailing interest rate (8.125%) at the time of the PHONES issuance, instead of the 2% coupon rate. The interest deduction grows each year because interest is computed on the original principal value of the PHONES ($1.3 billion) plus the amount of unpaid interest that has been deducted each year. To illustrate this compounding, the interest deduction was $110 million in 2000 and grew to $152 million in 2005. The tax savings from this interest deduction was about $43 million in 2000 and $60 million in 2005 and has helped increase the Company's free cash flow each year. Because the tax savings from the noncash interest deductions must be repaid when the PHONES mature, they have been recorded on the balance sheet as a deferred tax liability, rather than in income.

The IRS audit team has proposed that the Company capitalize the interest on the PHONES as additional tax basis in the Company's 16 million shares of Time Warner common stock, rather than being allowed to currently deduct such interest. The effect of this treatment would be to increase the Company's tax liability by approximately $370 million for the period 2000 through 2006. If the IRS were to prevail, there would be no effect on the Company's reported income for any of these periods. The potential tax payments would be recorded as a reduction in the Company's deferred tax liability, and interest on the tax payments would be charged to our tax reserves. Since the issue arose, we have been conservatively accruing the interest that would be payable to the IRS if the PHONES interest deductions were disallowed. We have been including this interest in income tax expense in our income statement and have been adding it to our income tax reserves on our balance sheet.

In early 2005, the National Office of the IRS issued a Technical Advice Memorandum that supported the IRS audit team's proposed treatment. Shortly thereafter, the Company requested that the IRS administrative appeals office review the issue.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## PROPOSED SETTLEMENT / FINANCIAL IMPACT

Our discussions with the appeals office have been ongoing since December of last year. During recent discussions, the appeals officer has indicated a willingness to settle the issue without litigation. We believe the appeals officer may agree to allow the Company to retain about 70% of the PHONES interest deduction. A settlement will include interest on back taxes, but no penalties. Importantly, as part of the settlement, the Company and the IRS would enter into an agreement that would bind the IRS and the Company to the above tax treatment of the PHONES for the remaining 23-year life of the instrument.

A 70% PHONES settlement would result in an assessment of approximately $120 million for federal and state taxes and interest. However, this assessment would be offset by about $45 million of refunds unrelated to the PHONES. The IRS elected to defer payment of the refunds, which relate to 2000 and 2001, until the PHONES issue is resolved. Net of the refunds, the cash payment would be approximately $75 million. Other financial impacts of a 70% settlement would include:

- Free cash flow would be reduced by about $20 million a year because the Company's tax payments would increase as a result of the lower interest tax deduction. But after this reduction, the PHONES interest deduction will still add about $40 million to free cash flow in 2007 and grow each year thereafter.

- We would reduce our income tax reserves by about $30 million. As mentioned previously, we have been conservatively accruing interest each year assuming the PHONES interest deductions would be disallowed. We have been including this interest in our income tax expense and adding it to our tax reserves each year.

- Our income tax expense would decrease by about $16 million each year because we would no longer need to record additional tax reserves for this issue. However, after-tax interest expense would increase about $3 million each year due to the additional debt incurred to finance the settlement payment. On a net basis, income would increase annually by about $13 million, or five cents per share.

We hope to reach final agreement with the appeals officer sometime this month and fund the net payment of $75 million by year-end. IRS procedures require the Joint Committee on Taxation to also approve the final agreement. The Joint Committee often takes several months to complete its review, but rarely disallows an appeals officer's negotiated settlement.

PMS/RMM
12/4/06

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433859

# TRIBUNE COMPANY
## 2006 INTERNAL CONTROLS CERTIFICATION UPDATE

Internal Audit has completed audits at 21 of the 23 locations included in this year's certification process. PricewaterhouseCoopers (PwC) has made 11 of their 15 visits. The remaining reviews are expected to be completed by mid-January. Internal Audit has also begun follow-up audit work at previously audited locations to allow management to attest to the adequacy of controls as of year-end. *PwC will shortly begin their follow-up audit work as well for the purpose of their year-end opinion.* (See Exhibit I on page 4 for the status of all audit work).

As issues have been identified, the business units have developed action plans to resolve each issue. The action plans specify the corrective action required, the person(s) responsible, and the timetable. Internal Audit, the Director of Controls and Compliance and the Internal Control steering committee receive regular reports from the business units to monitor the status of their action plans.

## CURRENT STATUS

The overall results to date continue to be good, as testing has yielded relatively few control deficiencies at most business units. Similar to last year, the types of deficiencies identified have predominantly been instances where a required control was not performed or where insufficient documentation was retained to evidence that the control was performed properly. These types of exceptions were expected given past experience and the manual nature of many of the Company's controls. By year-end, only a small number of miscellaneous control deficiencies are expected to be open. Overall, the key internal controls over financial reporting appear to be adequate and functioning as intended and the documentation prepared by the Company accurately reflects the manual and automated controls in place.

---

**Results To Date:**
- No material weaknesses
- Minimal number of deficiencies at most locations
- Stabilized control environment at Newsday
- Vast majority of previously identified issues in Baltimore's IT area have already been addressed and tested
- No common issues have emerged across business units
- Small number of miscellaneous control deficiencies expected to be open at year-end

---

**Update on 2005 Significant Deficiencies**

Internal Audit has been monitoring the remediation of the two significant deficiencies identified during the 2005 certification process. As noted during the October meeting, the deficiency regarding change management controls over the advertising revenue system at Newsday has been properly remediated and tested.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

The other deficiency pertained to verifying that insertion and distribution of preprints at the major daily newspapers occurs prior to billing. The newspapers have implemented the required new controls in this area, and Internal Audit and PwC have confirmed that the design of these controls properly addresses the related risks. These new controls have been tested at the Chicago Tribune, Los Angeles Times and Sun-Sentinel. Testing is expected to be completed at the other major daily newspapers prior to year-end when Internal Audit and PwC perform their respective follow-up audit procedures. At this point, management believes that this issue has been properly remediated.

**Baltimore**

As discussed at the October meeting, 15 deficiencies in the IT general controls area were identified at the Baltimore Sun. Even though management does not believe that the potential financial impact related to these deficiencies is material, additional training and monitoring in the IT area has been instituted. Baltimore management has already resolved 11 of these deficiencies. Also, earlier this month, Internal Audit re-visited Baltimore and validated that the remediated controls are operating properly. The four remaining open deficiencies are expected to be closed by year-end.

**Other Results**

Management, Internal Audit and PwC have recently begun to aggregate open deficiencies across the significant business units. At this point, no common issues or significant concerns have been identified. Also, as mentioned above, only a small number of control deficiencies are expected to remain open at year-end. These open items were identified late in the process and not enough instances of the controls exist to properly test that they are operating effectively.

Regarding PwC's current fee estimate, management has asked PwC to provide updates on costs and time incurred so that fees can be tracked against the estimate provided at the May meeting. To date, PwC's fees for the integrated audits are tracking above plan by $40,000. This is due to unplanned work related to the debt registration statement filed in July 2006 and associated comfort letter procedures. PwC has also incurred $130,000 in additional unplanned fees related to the TMCT transactions. The Committee will need to approve this $170,000 of unplanned work at its December meeting. A revised PwC fee summary is included in Exhibit II on page 5.

**NEXT STEPS**

Internal Audit and the steering committee will continue to have frequent conference calls with the significant business units to help ensure open items are being properly closed. Follow-up audit work at these locations by PwC and Internal Audit will be finalized during January as will testing of the Company's year-end financial reporting process. The final aggregation and evaluation of any open deficiencies will be performed afterwards. We are confident that we will not have any material weaknesses and at this point, management is not anticipating any

2



significant deficiencies for the 2006 certification process. We will update the Committee on these items and review our final assessments at the February meeting.

The Securities and Exchange Commission (SEC) continues to evaluate complaints from the business community that the certification process is overly burdensome and expensive. In December, the SEC is expected to release preliminary guidance which will provide direction on how management can better leverage existing internal control processes and procedures and focus testing on the parts of their business that present the biggest potential financial risk. As mentioned at the October meeting, management began a project earlier this year to reduce the time-consuming tests of routine, transactional processing controls, increase focus on higher risk areas, and place more reliance on company level controls (like anti-fraud programs, reviews of operating results, etc.). These efforts are all in-line with the expected guidance from the SEC.

RMM/TGC
12/5/2006

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433862

**Exhibit I**

**TRIBUNE COMPANY**
**2006 INTERNAL CONTROLS CERTIFICATION PROJECT**
**KEY BUSINESS UNIT STATUS AS OF 12/5/06**

| Key Business Units | PRIMARY AUDIT WORK | | FOLLOW-UP AUDIT WORK (1) | |
| --- | --- | --- | --- | --- |
| | IA | PwC | IA | PwC |
| **Publishing:** | | | | |
| LA Times | May 15 - June 3 & Sept 18 - Sept 22 | Oct 2 - Oct 20 | Dec - Jan '07 | Dec - Jan '07 |
| Chicago Tribune | Sept 18 - Sept 30 | Oct 30 - Nov 17 | Dec - Jan '07 | N/A |
| Newsday | Apr 10 - Apr 21 & Aug 14 - Aug 25 | Sep 4 - Sep 22 | Dec - Jan '07 | Dec - Jan '07 |
| Fort Lauderdale | June 12 - June 23 | Oct 30 - Nov 17 | Dec - Jan '07 | N/A |
| Baltimore | July 17 - Aug 25 | Sep 11 - Sep 22 | Dec - Jan '07 | Dec - Jan '07 |
| Orlando | Dec 4 - Dec 15 | (2) | N/A | N/A |
| Tribune Media Services | Sept 25 - Oct 6 | Oct 16 - Oct 20 | N/A | N/A |
| Group Office | June 26 - July 7 | (2) | Dec - Jan '07 | Dec - Jan '07 |
| Customer Accounting | June 12 - June 23 | Aug 21 - Aug 25 | Dec - Jan '07 | Dec - Jan '07 |
| Tribune Interactive | Aug 14 - Aug 25 | (2) | N/A | N/A |
| Hartford | Oct 16 - Oct 20 | (2) | N/A | N/A |
| Star Community Publishing | Oct 2 - Nov 10 | N/A | N/A | N/A |
| Hoy | Oct 2 - Oct 27 | N/A | N/A | N/A |
| Recycler | Jan 2 '07 - Feb 2 '07 | N/A | N/A | N/A |
| **Broadcasting & Entertainment:** | | | | |
| New York TV | July 17 - July 28 | Dec 11 - Dec 20 | Dec - Jan '07 | N/A |
| Los Angeles TV | July 17 - July 28 | Dec 4 - Dec 8 | Dec - Jan '07 | N/A |
| Chicago TV | May 8 - May 19 | Nov 27 - Dec 6 | Dec - Jan '07 | N/A |
| Chicago Cubs | Aug 28 - Sept 1 | Dec 11 - Dec 15 | Dec - Jan '07 | N/A |
| Group Office | June 5 - June 23 | (2) | Dec - Jan '07 | N/A |
| WGN-Cable | Sept 11 - Sept 22 | Dec 7 - Dec 15 | Dec - Jan '07 | N/A |
| **Corporate:** | | | | |
| Corporate Office | June 12 - June 30 & Sept 11 - Sept 22 | Aug 7 - Aug 18 & Oct 2 - Oct 20 | Dec - Jan '07 | Dec - Jan '07 |
| Finance Service Center | May 15 - May 26 | Aug 21 - Aug 25 | Dec - Jan '07 | Dec - Jan '07 |
| PeopleSoft Support Group | June 12 - June 30 | Aug 14 - Aug 18 | Dec - Jan '07 | N/A |

(1) Updates of the reviews that were completed earlier in the year will be performed to allow us to attest to the adequacy of controls as of year-end. These follow-up reviews are generally performed from Chicago.

(2) PwC will only be reviewing company level controls at these locations. These reviews will take place throughout December and will be performed from Chicago.

*Note: Shaded areas indicate completed work.*



**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB-UR-0433863**

Exhibit II

## TRIBUNE COMPANY
## UPDATED PwC FEE SUMMARY
## DECEMBER 2005

| | 2006 Estimates | | 2005 |
| --- | --- | --- | --- |
| | December | May | Actual |
| **Audit Services:** | | | |
| Integrated financial statement audit (1) | $2,140,000 | $2,100,000 | $1,958,000 |
| Out-of-pocket expenses | 165,000 | 200,000 | 195,000 |
| TMCT Transactions | 130,000 | - | - |
| Total audit services | 2,435,000 | 2,300,000 | 2,153,000 |
| **Audit Related Services:** | | | |
| Employee benefit plan audits (2) | 424,500 | 400,000 | 370,000 |
| Audits of the TMCT LLC's | 70,000 | 70,000 | 65,500 |
| Audit of the Chicago Cubs | 50,000 | 50,000 | 47,000 |
| Broadcasting Project (3) | 1,200,000 | 1,200,000 | 174,000 |
| Other | - | - | 30,000 |
| Total audit related services | 1,744,500 | 1,720,000 | 686,500 |
| **Tax Services** | 10,000 | 10,000 | - |
| **Other services** | 162,200 | 176,000 | 164,300 |
| **Total Services** | $4,351,700 | $4,206,000 | $3,003,800 |

(1) The December 2006 fee includes $40,000 of billings which were not included in the May 2006 fee estimate and relate to the debt registration statement filed in July 2006 and associated comfort letter procedures.

(2) The increase from May is largely attributable to costs associated with the audit of an additional benefit plan.

(3) The 2006 estimated fee amount includes $1 million of actual costs incurred and billed to date. The project is not complete and has been put on hold per management's instruction.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433864

**6**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433865

## TRIBUNE COMPANY
## INTERNAL AUDIT STATUS REPORT

Internal Audit regularly provides reports to the Audit Committee summarizing the results of recent audits.  Significant issues that we report to the Committee typically include:

- Identified and/or unresolved significant deficiencies or material weaknesses in internal controls over financial reporting
- Significant weaknesses in other control areas that could jeopardize material systems, operations or processes
- Significant financial statement adjustments ($500,000 or greater)
- Any fraud committed by an employee with considerable responsibility for internal controls, or a sizeable fraud committed by any level of employee ($25,000 or greater)
- Material circulation adjustments (2% of total circulation or greater)

Since our last report in October, Internal Audit has focused its efforts in three areas:  integrated audits of financial statements and internal controls over financial reporting, reviews of business continuity plans and analytical reviews.  Internal Audit continued to provide assistance to Newsday and to the internal controls certification streamlining project and continued its participation in the investigation of frauds at Recycler (a subsidiary of Los Angeles Times) and amNew York.  Internal Audit also reviewed corporate compliance procedures and Code of Business Conduct responses as noted in the Enterprise Risk Management Report under Tab 8.

The results from the audits performed since the last meeting are summarized below and in Exhibit I on page 4.  Results from the fraud investigations are also included.  No significant financial adjustments or material weaknesses in internal controls were identified.  In addition, no senior-level financial positions are currently open across the company.

## INTEGRATED AUDITS (audits of financial statements and internal controls over financial reporting)

The majority of integrated audits performed during the past two months focused on the business units needed to support management's internal controls certification for 2006.  These reviews included Hoy, Star Community Publishing (a subsidiary of Newsday) and the Hartford Courant. Results from these audits were covered in the Internal Controls Certification Update under Tab 5.  The remaining two audits required for management's certification process will be completed by mid-January.

Other integrated audits were performed at less significant business units pursuant to our annual audit plan.  These included CLTV and the Hartford television stations.  No significant issues were noted.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## BUSINESS CONTINUITY PLAN REVIEWS

Internal Audit performed testing of the business continuity plans for Tribune Tower, Chicago Tribune, Orlando Sentinel, Baltimore Sun, KTLA-TV (Los Angeles) and WSFL-TV (Miami). These reviews included an evaluation of whether the plan is current, conforms to Tribune's recommended format and guidelines, identifies critical business processes, and describes clear procedures for recovery. We also examined the test results and the restoration of backups, ensured that personnel knew their responsibilities and reviewed the effectiveness of communication methods. No significant issues were noted during these reviews. Remaining reviews at the Los Angeles Times and Tribune Interactive are expected to be performed during the first quarter.

## ANALYTICAL REVIEWS

In accordance with the audit plan, analytical reviews are being performed remotely from Chicago for any business unit that did not receive an integrated audit during 2006. Eleven reviews have been completed and twenty-five reviews are in various stages of completion at this time. No significant items or adjustments have been noted to date.

## FRAUD INVESTIGATIONS

### amNew York

As discussed at the October meeting, a sales representative at amNew York, Danny Florence, had apparently been diverting cash and check payments that he had collected from several of his customers and was covering the theft with charges on credit cards belonging to other advertisers. Newsday engaged Ernst & Young (E&Y) to assist with the investigation and help prepare documentation to support prosecution of Mr. Florence. E&Y has completed their work and verified that no other sales representatives were involved. Since October, an additional $3,000 in charge-backs from the credit cards used in the fraud has been processed bringing the current total to $23,000. Newsday will continue to monitor chargeback activity but still believes the remaining exposure is less than $50,000.

Mr. Florence was terminated immediately and $10,000 of unpaid commissions and 401(k) balances were withheld. Representatives from Newsday and Tribune's legal department recently met with the Assistant Manhattan District Attorney who agreed to pursue prosecution of Mr. Florence. Additional controls over the authorization, documentation and use of credit card payments have been implemented to prevent this from occurring again. Also, various accounting procedures are being transferred over the next few months to Newsday's finance department to enhance segregation of duties and overall internal controls.

### Recycler

As discussed at the Committee's October meeting, Recycler's Director of Finance, Nish Mehta, voluntarily left the Company in August after only one year on the job. A few days later, the Los Angeles Times CFO, Bob Bellack, and the finance department, which had been questioning Mr.

2

TRB-UR-0433867

Mehta about the financial performance of Recycler, became aware of an unusual transaction involving two $10,000 payments. The payments, which were approved by Mr. Mehta, were to a former Recycler finance employee for consulting services never rendered. Further investigation of all of Mr. Mehta's activity suggests that he crafted several other fraud and kickback schemes, involving collusion with internal employees and relatives and acquaintances outside the company to circumvent controls and misappropriate approximately $150,000 of Company funds.

Tribune's legal department engaged Deloitte & Touche (D&T) to determine the extent of the fraud and to prepare a package of evidence to aid in the prosecution of Mr. Mehta. D&T has completed their investigation and did not identify any additional schemes or losses. Also, their work uncovered no evidence that the frauds involved any other current Recycler or Los Angeles Times employee. Recently, representatives from the Los Angeles Times and Tribune's legal department provided the documentation from the investigation to the Los Angeles Police Department (LAPD). LAPD will be recommending that the Los Angeles District Attorney proceed with prosecution of Mr. Mehta. Management believes the Company may be able to recover about $20 - $50,000 of the misappropriated funds from the outside parties that were involved. Management will also seek restitution directly from Mr. Mehta.

Since the frauds were uncovered, the Los Angeles Times has made several internal control modifications at Recycler and have moved various accounting functions to the Los Angeles Times' finance department. These are positive changes, but the primary cause of the fraud was Mr. Mehta's override of controls and collusion. Recycler's general manager was too trusting of Mr. Mehta and allowed him to participate in sales and marketing activities, which created a conflict of responsibilities and provided opportunities for him to collude with friends and relatives. Also, a number of current employees have been interviewed during this investigation that were not directly involved, but should have questioned Mr. Mehta's actions. These employees have been counseled and have received final warnings in their personnel files.

At the October meeting, Tribune Publishing management also discussed with the Committee strategic alternatives that are being considered for Recycler given the steady decline in its revenues and its current projected operating loss of $4.5 million for 2006. The alternatives range from changing the business model in order to achieve breakeven results, to selling the marketable pieces of the print business while retaining management control of Recycler.com through a licensing agreement. Management plans to complete this strategic review by the end of 2006. In the meantime, Recycler has changed its zoning strategy and decided to utilize the Los Angeles Times' distribution network. These changes were announced in October and will eliminate over 100 FTE's next year.

TGC
12/5/2006

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**Exhibit I**

**TRIBUNE COMPANY**
**SUMMARY OF AUDITS**
**OCTOBER - DECEMBER 2006**

| 2005 Revenues (millions) | Location | Integrated Audit | Analytical Review | Risk-Based Audit |
|---|---|---|---|---|
| | **Publishing:** | | | |
| | **Chicago Tribune Group:** | | | |
| $    761 | Chicago Tribune Company | | | Business Continuity Plan |
| 18 | Chicago Magazine | | | |
| 12 | Chicagoland Publishing Company  (apartment guides) | | | |
| | **Newsday Group:** | | | |
| 78 | Star Community Publishing  (weekly shoppers) | | | |
| | **Fort Lauderdale Group:** | | | |
| 21 | Gold Coast Publications, Inc.  (weekly shoppers) | | | |
| 18 | Forum Publishing Group (weekly/monthly newspapers) | | | |
| 258 | Baltimore Sun | | | Business Continuity Plan |
| 281 | Orlando Sentinel | | | Business Continuity Plan |
| 188 | Hartford Courant | | | |
| 34 | Hoy | | | |
| 11 | ChicagoLand Television News (CLTV) | | | |
| - | Tribune Media Net (national sales organization) | | | |
| | **Broadcasting & Entertainment:** | | | |
| | **Television** | | | |
| 153 | **Los Angeles** | | | Business Continuity Plan |
| 46 | **Philadelphia** | | | |
| 43 | **Miami** | | | Business Continuity Plan |
| 40 | **Sacramento** | | | |
| 37 | **Houston** | | | |
| 37 | **Hartford (2 stations)** | | | |
| 28 | **St. Louis** | | | |
| 19 | **Grand Rapids** | | | |
| | **Corporate:** | | | |
| - | **Corporate Office** | | | Business Continuity Plan |

**Audit Results Key:**

- Satisfactory
- Needs Improvement
- Unsatisfactory

*Note:*  Ratings of "Needs Improvement" and "Unsatisfactory" require communication to the Audit Committeee as well as a description of remediation efforts.

4



**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433869

**7**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433870

# TRIBUNE COMPANY
## BUSINESS CONTINUITY PLANNING UPDATE

Shortly after the attacks of September 11, 2001, management established uniform guidelines for the Company's business continuity planning process and required each business unit and corporate group to create written plans to address various disaster scenarios. All of these plans were implemented by year-end 2002. To keep the plans up-to-date, each business unit is required to:

1. Appoint an individual or group of individuals to be responsible for plan maintenance
2. Review and update the plan at least semi-annually
3. Obtain approval of the plan from the Publisher/CEO/GM annually
4. Perform periodic testing on key elements of the plan at least annually

The group offices have also issued guidelines to business units addressing plan maintenance, accessibility, education and awareness and, as needed, hold conference calls to share ideas, discuss updates, etc.

To monitor compliance, business continuity related questions that address each of the above requirements are included in the quarterly financial questionnaire that is completed and signed by each business unit and various corporate groups. Internal Audit also regularly reviews the responses to these questions and began a rotation of limited scope audits of business continuity plans at all business units. Initial audits have focused on Tribune Tower, Tribune Interactive and the newspapers and television stations in New York, Chicago and Los Angeles. The results from these audits have been satisfactory. Internal Audit noted that the key elements of the business continuity plans are in place and has also provided business unit management with some minor recommendations to enhance documentation, processes, and testing.

Additionally, in 2005 the corporate risk management department began holding bi-annual business continuity planning conferences with FM Global, our property insurance carrier. Representatives from Publishing, Broadcasting, Interactive and Internal Audit are invited to this event to learn and discuss advancements in loss prevention techniques and best practices regarding business continuity planning. The next conference will be scheduled in 2007.

The following are updates regarding business continuity plans for the business units and Tribune Tower.

## PUBLISHING

Under the current Publishing Group plans, the type of newspaper that could be published in the event of a major disruption depends on the magnitude and the timing of the disruption. Even in the most severe circumstances, business units will be able to publish a limited distribution "core" newspaper with little or no advertising. The Publishing Group is finalizing its update of the costs and resources required to establish fully redundant production and computer systems in the event of a catastrophic destruction of office and production facilities. The creation of full backup capabilities still does not appear to be cost-justified given the extremely low probability of a "complete destruction" occurrence.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Fortunately, no publishing business unit had to enact its business continuity plan during 2006. The Publishing Group has, however, been working on various initiatives. The Sun-Sentinel and Orlando Sentinel have incorporated into their plans specific "lessons learned" from Hurricanes Katrina and Wilma to improve preparedness in these situations. The improvements addressed unique employee issues such as the ability to locate all employees and provide them shelter, and production issues such as availability of water, gasoline and electricity. In addition, the Orlando Sentinel has taken a leadership role in the Florida Newspapers Business Continuity Group. This organization's goal is to allow the 18 major Florida newspapers to share production capabilities for any newspapers hit by a hurricane.

To prepare the newspapers for the potential impact of an Avian flu pandemic on business operations, sales and distribution, a draft plan was developed by the Orlando Sentinel earlier this year and reviewed by Tribune Publishing group management, Corporate Human Resources and Corporate Medical. Orlando's final plan is due out during the first quarter of 2007 and will be used as a template by all Tribune newspapers for their own plans.

Finally, to prepare for a Katrina-like disaster, the Publishing Group is trying to develop robust web publishing capabilities on every newspaper's websites and the ability to produce a user-friendly version of the hard-copy newspaper on the Internet. A detailed analysis of the resources required is currently underway. Final planning, development and implementation are scheduled for 2007.

## TRIBUNE INTERACTIVE

The main risk for Tribune Interactive (TI) is an outage at its main hub, or "hosting" site provided by AT&T. TI does have an alternate hosting location, but it provides considerably less capacity and functionality than the main site and is only good for outages of 5 hours or less. During that time, however, the alternate location is capable of hosting a slimmed-down version of our newspapers' websites that can easily be populated with breaking news stories. TI management acknowledges that the capital needed to establish a fully redundant alternate hosting location is currently cost-prohibitive, but given the growing importance of interactive operations, intends to revisit this issue in 2007.

TI's disaster scenarios include denial of service, unavailability of websites due to a communication outage, and loss of a major piece of computer software or hardware. TI management performs testing of their business continuity plan by section throughout the year and mandates that the business units test their plans as well. They also perform comprehensive, recurring communications tests during and after work hours to ensure that employees are reachable and know whom to contact.

As mentioned above, the newspapers would like to have the ability to produce a version of the hard-copy newspaper on the Internet. TI has the required technical infrastructure and will continue to work with Tribune Publishing in 2007 to achieve this goal.

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## BROADCASTING

The Broadcasting Group plans acknowledge that the incremental benefit of fully redundant back-up systems (such as back-up transmitter facilities for all stations) does not justify the cost. Instead, in the event of loss of the studio facility, each station has the capability to receive from a sister station a fully integrated program stream complete with spots and deliver it to the local market transmitter for distribution. This satellite feed is also available to cable systems and satellite providers to restore service to those homes. With this capability, a station can continue broadcasting to up to 85% of its market, even if it suffered a severe disruption at its studio or transmitter facility or both.

Like Publishing, none of the stations had to implement any portions of their business continuity plans during the year. As far as ongoing initiatives, the Seattle and Indianapolis stations expanded their capacity during 2006 and now have the ability to run four to five stations out of their respective locations. In fact, master control for the two New Orleans stations is now permanently run out of Indianapolis, and there is still capacity to run another station if needed. The Broadcasting Group has also been working to develop back-up systems for its digital signal. Due to restricted capital, they have been phasing in these capabilities, starting with the largest stations, and are working toward total digital redundancy by 2010. Lastly, the Broadcasting Group will review the Orlando Sentinel's Avian flu pandemic plan once it is finalized to see how it can be applied to the individual stations.

## TRIBUNE TOWER

The business continuity plan for Tribune Tower covers all of the Company's corporate departments. Some of the key elements of the plan include:

- Maintaining a crisis management team and a clearly defined notification process to inform key senior managers of major emergencies.
- Educating employees about emergency procedures through evacuation drills, educational pamphlets and informational e-mails.
- Sustaining emergency communications channels through a toll-free employee information number, Tribune's Internet and intranet websites, and emergency calling trees.
- Assessing key employee-related issues that could arise in an emergency (e.g., payroll/ benefits continuation, financial assistance, modifications to existing medical policies).
- Identifying alternate workspace in Chicago that could be used if the Tower was not accessible.

Like the plans at the business units, the Tribune Tower plan is updated every six months. Periodic tests are also performed by management to ensure that all information is accurate and that employees are aware of their responsibilities in case of an emergency.

Ongoing initiatives regarding the Tower plan involve broadening testing scenarios to address a "total destruction" situation and maintaining a high level of employee awareness of the plan's key aspects. Additionally, Tribune Tower's fire sprinkler plan was approved by the City of Chicago

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433873

last year.  Currently, approximately 40% of the building is equipped with sprinklers.  The remainder of the Tower will be fitted with automatic sprinklers over the next several years.

## OVERALL ASSESSMENT

Management believes that the business continuity plan designs are reasonable and practical.  As noted in this and previous reports, the capital required to provide fully redundant back-up systems that would cover any conceivable disaster significantly exceeds the perceived benefit.  The plans, however, are adequately designed to minimize the impact of various levels of disaster and stabilize critical functions until normal operations can resume.  The natural disasters of the past few years have been the true test of effectiveness of the Company's plans.

TGC
12/1/06

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433874

8

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433875

**TRIBUNE COMPANY**
**ENTERPRISE RISK MANAGEMENT**

## SUMMARY

This report covers the Company's approach to enterprise risk management. The report also includes more detailed discussion of the following areas which require Audit Committee review:

- Tribune's major financial risk exposures and the steps management has taken to monitor and control those exposures;
- Tribune's compliance and ethics program;
- Annual Code of Business conduct certification and compliance process;
- Code of Ethics for CEO and Senior Financial Officers.

## INTRODUCTION

Enterprise risk management is a comprehensive, systematic approach to the identification, assessment and control of risk on a company-wide basis. Risk is the possibility that an event will occur and adversely impact the achievement of company objectives. Risks and uncertainties affect every aspect of a business organization, and the ability to implement programs to mitigate and monitor the broad array of risks helps a company create and preserve shareholder value.

In an effort to improve the quality of financial reporting, enhance corporate governance, increase management accountability, improve the consistency of performance and avoid disruptive negative events, companies have implemented various types of enterprise risk management programs. These programs focus on a wide range of concerns from internal controls and regulatory compliance to the assessment and monitoring of the company's strategic and operating risks.

Some companies have implemented a centralized enterprise risk management structure, which monitors and assesses risks for the entire organization. Others, like Tribune, address enterprise risk management through various corporate, group and business unit management functions and programs in place throughout the organization. We believe that the identification, assessment, monitoring and control of risk are the responsibility of management at all levels throughout the Company.

The Company has a number of programs in place that encompass various aspects of enterprise risk management. The purpose of this report is to review these programs and identify the management processes and procedures in place to ensure that these programs continue to operate effectively.

## ENTERPRISE RISK MANAGEMENT FRAMEWORK

The enterprise risk management framework has four categories of objectives (1) Strategic – addressing risks to the high-level goals supporting the company's mission, (2) Operations – relating to effective and efficient use of a company's resources (3) Reporting – assuring

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

reliability and accuracy of financial reporting, and (4) Compliance – assuring that the company is in compliance with all applicable laws and regulations.

Across these four categories, there are several key components of enterprise risk management. First, the company's internal management environment must set the proper standards for ethics and integrity and have an organizational structure that supports the achievement of the company's goals and objectives. Second, processes must be in place to identify and assess significant risks. Management must also develop the appropriate responses to critical risks based on their risk tolerance and establish policies and procedures to ensure that the response is carried out. Third, management must continually monitor the risk management process and communicate the results through the management reporting structure and up to the Board of Directors.

Enterprise risk management can be expected to provide reasonable assurance regarding the achievement of objectives related to the reliability of reporting, and compliance with laws and regulations. Achievement of these objectives is within a company's control and depends on how well the company's related control activities are performed. However, the achievement of strategic and operating objectives is not always within a company's control. Enterprise risk management cannot prevent poor business judgments or decisions, or external events that can cause a company to fail to meet its goals in these areas. It does, however, increase the likelihood that management will make better decisions and can provide reasonable assurance that both management and the Board are aware of the extent to which a company is meeting its goals.

**STRATEGIC OBJECTIVES**

Tribune has key strategic elements supporting strong enterprise risk management. This begins with Tribune's mission statement: "Inform and entertain our customers in ways, places and times they want. Create value for consumers, advertisers and shareholders through the combination of outstanding content, convenience and connections". The Company has eight fundamental values that guide management actions: Citizenship, Customer Satisfaction, Diversity, Employee Involvement, Financial Strength, Innovation, Integrity and Teamwork. These values are listed on the back of employee ID cards. The Corporate Management Committee, consisting of the CEO, group presidents, and senior corporate vice presidents, guides the day-to-day operations of the organization.

The strategic planning process is an important aspect of enterprise risk management. Each year corporate, group and business unit management go through an extensive strategic planning process that culminates with the presentation of the strategic plan to the Board. It is through the development of the strategic plan that management identifies, evaluates and proposes responses to the various external risks facing the Company. These risks include the impact of competition, changing economic conditions and capital markets. It also addresses the impact of evolving technology, pending regulatory changes and changing customer habits. Through the strategic planning process, these external risks are evaluated, assessed and monitored. The risks are specifically addressed in the development of business unit, group and corporate strategies.

2

Other important strategic enterprise risk management components are: 1) "Introduction to Tribune Leadership" class designed for first level managers is held about six times per year on a regional basis (each class has approximately fifty participants); 2) "Tribune Leadership Development Program" designed for more senior managers is held two to three times per year (each class has approximately thirty five participants); and 3) the ongoing Succession Planning process. These ongoing programs ensure that the Company identifies and develops its future leaders to assure continuity of strong, ethical management. The evaluation and development process runs throughout the organization. A detailed review of management succession plans is presented to the Board each February.

For many years, the Company has used the internal audit department to recruit and develop financial professionals who have moved into leadership positions throughout the Company. There are currently more than 40 former Tribune internal auditors in key financial or operational leadership positions.

## OPERATING OBJECTIVES

The key operating element of enterprise risk management is the development of an annual Operating Plan. As part of this process, business unit, group and corporate management identify and assess the risks that could prevent the Company from achieving its performance targets for the coming year. This is a critical aspect of the planning process. Each year corporate, group and business unit management go through an extensive operating planning process that culminates with the presentation of the operating plan to the Board typically at its December meeting. When it is determined that risks to achieving the operating plan targets are significant, management develops contingency plans that detail actions to be taken, such as expense or capital spending reductions, if operating plan shortfalls are projected.

Tribune has strong and effective Business Continuity Plans for each business unit, group and corporate function. These plans are maintained to enable the company to minimize the impact and quickly recover from any disaster that might impede operations. The plans are regularly updated and tested, and worked very effectively during the hurricanes in New Orleans and Florida last year. Business unit management must sign quarterly representations that their plans are up to date and adequate. Internal Audit also performs audits of the business continuity plans at significant Company locations. An update on the Company's Business Continuity Plans is covered in the report under Tab 7.

The Company has an appropriate insurance program that provides coverage for all significant property and liability exposures. Property coverage includes both replacement costs of assets as well as compensation for losses due to business interruption. Insurance is an important risk management function in that the insurance program balances the cost and availability of coverage with the Company's ability to prevent or absorb losses. The Corporate insurance department working with our brokers-Aon and Marsh-continuously evaluates the adequacy and cost/benefits of the insurance coverage. Exhibit I on page 10 shows a summary of Tribune's insurance program. During the 2006 policy renewals, we revised coverages in consultation with our brokers and Tribune senior management as follows.

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

- Media (libel and slander) liability coverage was increased $50 million to $136 million while auto and general liability coverage was reduced $30 million to $173 million.
- Property coverage was changed by increasing the policy deductible to $2.5 million from $1 million and dropping the limited California earthquake coverage ($20 million) that had a very high premium per million of coverage.
- Directors and Officers, Pension Fiduciary and Fidelity (crime) coverages remained the same.

Many operating risks are regularly addressed through the management practices and procedures in place at our newspapers, television stations and other business units, as well as in the support provided by the groups, service centers, and corporate departments. A few examples are:

- The acquisition of newsprint for all of our newspapers is managed by the Publishing Group staff through the maintenance of long-term supply contracts. This process eliminates the risk of any of our newspapers not being able to obtain newsprint that meets our quality standards at competitive market prices.
- The acquisition of broadcast rights are managed by the Broadcasting Group staff to address the risk of our television stations not being able to obtain a continuous supply of quality programming at competitive market prices.
- The Finance Service Center and business units maintain appropriate customer credit standards and procedures to make sure the risk of extending credit to customers is properly balanced against the revenue generated by each customer.
- At the corporate level, the Legal Department provides a review of critical contracts that Company managers sign to avoid the risk of executing contracts with terms that may be adverse to Company interests.
- Key projects, such as systems implementations, are managed at the business unit level with appropriate oversight from group or corporate functions to ensure controls are standardized, properly implemented and operating as intended.

Key financial risks to the Company are typically identified and managed at the corporate level Exhibit II on page 11 shows the key financial risks faced by Tribune and the Company's programs to address those risks. The risks noted in this exhibit relate primarily to financing transactions involving debt, equity or investments. We believe that the Company's existing programs to monitor and control these risks are adequate and functioning well, and that the overall risks in these areas are low as Tribune is a conservative company, which typically does not enter into risky or unusual transactions.

These are just a few examples of management practices and procedures that address critical risks to the company's day-to-day operations. It is the responsibility of managers at all levels throughout the company to continue to focus attention on risks that can adversely impact the achievement of the operating objectives in their specific areas of responsibility.

### REPORTING OBJECTIVES

An important category of enterprise risk management is maintaining the accuracy and reliability of the company's financial reporting. This supports management's decision making and monitoring of the Company's activities and performance. Strong internal controls are an

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433879

important component of enterprise risk management. This begins with the integrated use of PeopleSoft Financial Systems throughout the Company for general ledger, payroll and other critical financial reporting and control purposes. Our television stations have common financial and operating systems. Publishing is in the process of implementing common advertising and circulation systems.

Tribune has an executive steering committee and a cross-functional management team in place to ensure the Company adequately complies with the internal control certification requirements of Section 404 of the Sarbanes-Oxley Act. The cross-functional team is led by the director of controls and compliance (a newly created position for 2006) and consists of several of finance and information technology personnel from Corporate, Internal Audit, the group offices and the business units. Quarterly assessments of any significant changes in internal controls are performed to ensure that controls are adequate and that no weaknesses or changes in internal control need to be reported publicly. The Company's goal is to have no significant deficiencies or material weaknesses in internal control. Periodic reports are provided to the Audit Committee and the report for this meeting is under Tab 5.

Business units and the groups prepare revised financial projections each period measured against the same period in the previous year. Monthly income statements also provide comparison to plan/projections and the previous year. This detailed monitoring helps to quickly identify risks to achieving revenue and operating profit targets.

Business units provide quarterly income statements and balance sheets that form the basis for the corporate consolidated financial statements. Each business unit provides a report explaining variances between actual and plan/projections and last year. Each business unit, including service centers and corporate, completes a comprehensive financial reporting quarterly questionnaire, which is certified by the business unit's CEO, CFO, CTO, and circulation vice president. These detailed questionnaires contain over 100 questions covering income statement, balance sheet, internal controls and related items. The questionnaires are sent to corporate financial reporting for review. Internal Audit also regularly reviews the questionnaires and verifies the representations during each audit. The quarterly questionnaire is an important part of the overall company-wide control process.

The Company has a Corporate Disclosure Committee consisting of all of the members of the Corporate Management Committee, plus the group CFO's, corporate controller, assistant controller, vice president of corporate compliance & risk management and audit vice president. The committee's responsibility is to assure that all of the financial information in the 10-Q's and 10-K is accurate and all necessary information is properly disclosed. The committee also reviews any significant internal control issues that may have surfaced during the quarter and verifies that corrective action has been taken. All members of the Disclosure Committee as well as other corporate financial officers and its chief technology officer must sign a quarterly certification attesting to the accuracy of all disclosures. This enables the CEO and CFO to certify to the accuracy of the 10-Q's and 10-K. Significant risk factors are disclosed in the 10-K and updates for significant changes in risk are disclosed on a quarterly basis in the 10-Q.

5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

The Audit Committee of the Board of Directors plays an important role in the reporting component of enterprise risk management. The Audit Committee assists the Board in monitoring the integrity of the company's financial statements, overseeing the Company's relationship with its independent accountants, monitoring the performance of the Company's internal audit function and its independent accountants, and monitoring the Company's compliance and ethics program. The Audit Committee also reviews quarterly earnings releases, the 10-Q and the 10-K before filing.

Compliance with reporting requirements of the ABC circulation rules is integral to reliable reporting of circulation statistics for each daily newspaper. The Company's circulation compliance programs are overseen by Tribune Publishing's Vice President of Circulation, and include standard policies and procedures, oversight by the business unit finance department, periodic internal audits of circulation data, annual audits by ABC, and the completion of a quarterly questionnaire by each business unit covering key circulation data.

## COMPLIANCE OBJECTIVES

Compliance is the final critical component of enterprise risk management. For a number of years, Tribune has employed a formal process for identifying the significant laws and regulations that affect the Company's business operations, determining the potential exposures in the event of non-compliance, and assessing the Company's existing compliance systems. Each key compliance area has a process owner, who is responsible for ensuring compliance with those laws or regulations. The vice president of corporate compliance & risk management oversees the Company's compliance and ethics program.

In November 2004, the amended U.S. Sentencing Commission Guidelines for Organizations were enacted. These guidelines require that a company's board of directors be responsible for the oversight of the compliance and ethics program and that the board should be knowledgeable about the content and operation of that program. In Tribune's case, and for many years, the Board has delegated that oversight authority to the Audit Committee. As a result of these amended guidelines, the oversight of the compliance program by the Audit Committee was added to the Audit Committee charter in December 2005 and approved by the Board at the February 2006 meeting. No changes are proposed this year to the Audit Committee charter which is in the report under Tab 9.

The vice president of corporate compliance and risk management reports at least annually on the status of the compliance and ethics program to the Audit Committee. The compliance report is included as part of this report. Attached to this report is a summary of the Company's key compliance areas, potential exposures/risk assessments, compliance systems and the members of management responsible for ensuring that those compliance systems are effective.

The Company also has a Confidential Ethics Line managed and staffed by a third party vendor. The toll-free number provides a confidential method for employees to report suspected illegal or unethical behavior or violations of Tribune's Code of Business Conduct. Calls are documented and reviewed by a team made up of representatives from the Law Department, Internal Audit and Human Resources. Complaints are sent to appropriate areas of the Company for investigation.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433881

Any significant accounting, internal control or auditing matters are reported to the Audit Committee.

Tribune developed a Supplier Code of Conduct in 2006 that is applicable to employees, temporary employees and independent contractors that work for our suppliers. The code is designed to require suppliers conduct their business dealings with Tribune in accordance with the code and in compliance with all laws applicable to their business, wherever conducted.

Tribune has a Code of Editorial Principles (updated in 2006) that covers journalists and other editorial employees of Tribune Publishing and Tribune Broadcasting. This code is designed to promote that:

- our name signifies integrity and courage in gathering and presenting the news;
- the news we deliver—as text, audio or video—is accurate and free of the influence of special interests, whether public or private, commercial or political, our own or that of our friends;
- we do not make news decisions in a self-interested manner, or needlessly damage or cause pain to those we cover;
- we respond to the needs and interests of our communities with journalism of high public purpose and broad individual appeal.

Tribune's Internal Audit Department plays a key role in the Company's enterprise risk management program. Internal Audit performs financial and operational audits throughout the Company. The internal audits determine if necessary internal controls are in place and functioning properly, monitor the accuracy of financial reporting systems and evaluate compliance with the Company's prescribed business practices and procedures. The additional effort to comply with the internal control requirements of the Sarbanes-Oxley Act has focused our attention in the technology area and resulted in improved controls. Internal Audit has a detailed reporting process that assures that any internal control deficiencies, inaccurate reporting, or non-compliance with Company policies or procedures are reported and corrected. Status reports summarizing the work of Internal Audit are presented at each Audit Committee meeting. This meeting's report is under Tab 6.

## CODE OF CONDUCT

The Company's Code of Business Conduct is a key element of its compliance and ethics program. The Company first adopted a Code of Business Conduct in 1988. The Company's current Code of Business Conduct was last reviewed with the Board at the July 2005 meeting. It was subsequently slightly amended and approved by the Company's Corporate Management Committee in October 2005. The purpose of the Code is to help maintain ethical business practices throughout the Company. The Code provides a clear statement of the kinds of conduct that violate Company policy and also provides clear guidance on how to respond when a violation is encountered. All officers and managers are responsible for communicating the Code to employees on an ongoing basis. Each business unit has the primary responsibility for monitoring compliance with the Code.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433882