New York Stock Exchange (NYSE) rules require all listed companies to adopt and disclose a code of business conduct applicable to directors, officers and employees. Any waiver of the code for executive officers and directors may be made only by the board of directors or a designated board committee and must be promptly disclosed to the shareholders. The rules also provide a list of the most important topics to be covered by the code of business conduct. The Company's current Code of Business Conduct is in full compliance with the NYSE rules. Copies of the Code and compliance statements are attached to this report.

In August, the Code of Business Conduct was provided to all business units for distribution to the Company's 23,000 employees. Employees at all locations, union and non-union, are now receiving the Code, with one exception. *At the Baltimore Sun, due to restrictive labor contracts,* the Company has had to negotiate the right to implement the Code with each of the Sun's six labor unions. To date, the Code is distributed to all of the Sun's non-union employees and 94% of its unionized employees. The balance of unionized employees will be receiving the Code as each of their contracts come up for renegotiation.

For the second year, the annual Code of Business Conduct certification process was completed on-line using a web-based tool hosted by an outside vendor, LRN. In addition, Tribune partnered with LRN to develop an online training class geared towards ethics and our Code of Business Conduct. *This class, which takes about 30-45 minutes to complete, provides employees* with an ethical decision-making model and ends with a quiz that each employee must pass before signing the annual compliance statement. All 13,000 employees that sign the annual code compliance statement were required to take this class before completing an on-line certification statement affirming their understanding of and compliance with the Code and disclose any possible exceptions. These employees were selected based upon a risk analysis and generally include all managers and above, as well as those who handle confidential information such as finance, sales, purchasing and information technology personnel or employees who have any level of approval authority. Internal Audit reviewed on-line summaries of which employees signed compliance statements and disclosed possible exceptions. Internal Audit and the Legal Department then reviewed compliance statements that disclosed relationships or circumstances that might be considered a violation of the Code or a conflict of interest.

About 1,000 employees made some type of disclosure in their compliance statements, which is consistent with prior years. The vast majority of these consisted of minor issues such as the receipt of small gifts, second part-time jobs, relatives that work for competitors or advertisers, etc. After review by corporate, only 30 of these disclosures were significant enough to warrant further investigation. For the remaining items, appropriate actions were taken and the identified conflicts or exceptions were not material individually or taken as a whole. The coverage of employees asked to sign compliance statements this year is satisfactory and was applied consistently across the Company. Code violations or conflicts of interest were handled promptly and consistently, and there are no unresolved issues.

During the year, Internal Audit will follow up on disclosed instances of potential or possible conflicts of interest to ensure that adequate internal controls have been implemented by the appropriate business units. For example, if an employee has a financial interest in an outside entity that conducts business with a business unit, that business unit is responsible for

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433883

implementing adequate internal controls to ensure that all such transactions are approved independently by a business unit manager.

The Code of Business Conduct also requires that the Audit Committee review a summary of political contributions made by the Company since last year's corporate compliance report. The Code requires all contributions to be expressly permitted by law, recommended by the Vice President, Washington Affairs, and authorized by the Company's President and Chief Executive Officer. Our review indicated that the Company made only one political contribution during the past 12 months. In August 2006, the Cubs made a $1,500 contribution to the campaign fund of a local alderman. This payment was in compliance with the Code's requirements for political contributions.

A Code of Ethics for the CEO and Senior Financial Officers was adopted by the Board at its meeting in May 2003. This code is required by the Sarbanes-Oxley Act and applies to Dennis FitzSimons (chief executive officer), Don Grenesko (chief financial officer) and Mark Mallory (controller). No changes in existing laws or the NYSE listing standards have occurred since May 2003 that would necessitate any revisions to the Code of Ethics. Tribune Company's CEO, CFO and Controller are in full compliance with all provisions of the document. A copy of the Code is attached to this report.

We believe the Company's existing compliance and ethics programs are adequate and functioning well. The Company has established appropriate standards and procedures and has communicated them to employees. The Company's training, monitoring and reporting systems are designed to identify potential problems early and reduce the risk of non-compliance. Internal resources from internal audit, finance, legal and human resources departments are used as well as outside consultants. Identified potential risks and exposures are being addressed appropriately. In addition, the internal audit department annually reviews the compliance assessments for accuracy and adequacy.

## CONCLUSION

While not every risk can be identified and avoided, management understands the importance of risk management and practices it throughout the Company. Tribune's management believes that its existing structure, organization, business practices, policies, and procedures address the critical components of good enterprise risk management. Critical strategic, operations, reporting and compliance risks are continuously addressed in the day-to-day management of the Company.

GWA/TGC
12/05/06

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433884



**TRIBUNE COMPANY**
**INSURANCE COVERAGE SUMMARY**
**For Fiscal 2006**
**(Dollars in Millions)**

**EXHIBIT I**

| | Coverage Terms | | | 2006 Expense | | |
|---|---|---|---|---|---|---|
| | Limit | Deductible | Primary Underwriters | Premium | Self-Insured | Total |
| **Liability:** | | | | | | |
| Auto, general and umbrella | $173 | $1.0 | Zurich, St. Paul, Chubb, AWAC, Ace, XL | $2.8 | $3.1 | $5.9 |
| Workers' compensation | Statutory | 1.0 | Zurich | 1.7 | 12.0 | 13.7 |
| Medial liability (libel/slander) | 136 | 1.0 | Chubb | 0.5 | - | 0.5 |
| Aviation/Helicopter use | 270 | - | Global Aerospace | 0.1 | - | 0.1 |
| Cubs (1) | 420 | | | 2.4 | - | 2.4 |
| **Property/Business Interruption (2)** | 4,000 | 2.5 | FM Global | 5.7 | - | 5.7 |
| **Other:** | | | | | | |
| Directors & officers (3) | 200 | - | Chubb, AIG, Ace, Zurich, Great Amer. | 3.1 | - | 3.1 |
| Fiduciary (ERISA) (4) | 50 | - | AIG, Chubb, Axis, HCC, St. Paul | 0.6 | - | 0.6 |
| Pollution | 100 | 0.5 | Indian Harbor/XL Capital | 0.1 | - | 0.1 |
| Fidelity (Crime) and all other | 20 | 0.3 | Chubb, AIG | 0.7 | - | 0.7 |
| Broker and claim admin fees | | | | 1.3 | - | 1.3 |
| **Total Expense** | | | | $19.0 | $15.1 | $34.1 |

(1) This coverage is negotiated and placed by Major League Baseball and
    paid by the Cubs. Cost shown is for MLB portion, paid by the Cubs.
(2) Deductible is principally the greater of $2.5 million or 2% of the covered
    property value per location.
(3) No deductible for officers and directors, the Company portion has a
    $25 million deductible.
(4) No deductible for employees, the Company portion has a
    $5 million deductible.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433885

**TRIBUNE COMPANY**
SUMMARY OF MAJOR FINANCIAL RISKS                    Exhibit II

| RISK AREA | POTENTIAL RISK | TRIBUNE RISK ASSESSMENT | MANAGEMENT RESPONSIBILITY |
|---|---|---|---|
| (1) Liquidity | • Failure to meet payment obligations to creditors or suppliers | • Operating cash flow of $1.3 billion and about $650 million of free cash flow annually.<br>• $750 million of unused revolving bank credit facility assures ready access to available funds. | Don Grenesko<br>Chandler Bigelow |
| (2) Changes in interest rates | • Increase in interest expense | • Continuous evaluation of variable and fixed rate debt mix. Prudent mix is maintained.<br>• 55% of total debt is pegged to variable interest rates.<br>• A one percentage point increase in variable interest rates would increase the Company's annual interest expense by approximately $30 million, or $18 million after-tax, which is equal to about 3% of the Company's annual free cash flow. | Chandler Bigelow |
| (3) Acceleration of debt repayments | • Certain events trigger immediate repayment of debt | • The Company's bank credit facilities, including the term loan, bridge loan and revolving credit facility, include two financial covenants which require: (i) the maintenance of a leverage test (debt-to-operating cash flow ratio) below 5.5x as of December 2006 and 2007, 5.0x as of December 2008 and 2009, 4.5x as of December 2010 and 4.0x thereafter and (ii) the maintenance of an interest coverage test (operating cash flow-to-interest expense) of at least 2.5x.<br>• The Company is in compliance with both financial covenants described above.<br>• None of the Company's other debt instruments contain material financial covenants. | Chandler Bigelow<br>Mark Mallory |
| (4) Derivative usage | • Losses from investment in, or changes in value of, derivative instruments | • Derivatives and hedges are only used to reduce the variability of expenses or asset values or monetize assets in tax efficient transactions.<br>• Only derivative securities outstanding are the PHONES and one interest rate swap. Ownership of 16 million Time Warner shares hedges the PHONES securities. Mark to market adjustments are recorded quarterly for these derivatives. | Chandler Bigelow |
| (5) Unfavorable income tax judgments or rulings | • Unrecorded liabilities<br>• Unexpected cash needs impacting liquidity | • Income tax exposures are summarized and reviewed with PWC each quarter. Estimated tax reserves are maintained on tha balance sheet. | Don Grenesko<br>Mark Mallory<br>Pat Shanahan |
| (6) Casualty losses or liability claims | • Loss of facilities or revenue<br>• Losses from auto, general liability, workers comp., libel/slander or aviation claims | • Ongoing evaluation of insurance coverage mitigates risk in this area. Adequate insurance coverage is maintained for replacement cost of facilities, business interruption and all liability areas including directors and officers liability coverage. | Jerry Agema<br>Jack Rodden<br>Ken Mescher |
| (7) Off-balance sheet and other financing arrangements | • Unrecorded liabilities | • No off-balance sheet financing transactions.<br>• All leases over $10 million must be approved by the Board, similar to capital expenditures.<br>• Borrowings are controlled centrally and capital expenditures are monitored by Corporate/Group staffs<br>• Capital structure and financing needs are reviewed with the Board. | Don Grenesko<br>Chandler Bigelow<br>Mark Mallory |
| (8) Special purpose entities | • Possible consolidation of entities impacting financial flexibility | • No special purpose entities. | Don Grenesko<br>Crane Kenney<br>Mark Mallory |
| (9) Loan guarantees or commitments for future financing to equity investees | • Unexpected cash needs impacting liquidity | • No loan guarantees.<br>• No material commitments for future funding of equity investees. | Don Grenesko<br>Chandler Bigelow<br>Crane Kenney |

11




**TRIBUNE COMPANY**
**CORPORATE COMPLIANCE SUMMARY**

**GENERAL CORPORATE LAWS & REGULATIONS**

| AREA | APPLICABLE LAWS AND REGULATIONS | POTENTIAL EXPOSURE | EXISTING COMPLIANCE SYSTEM | | MANAGEMENT RESPONSIBILITY |
|---|---|---|---|---|---|
| | | | INTERNAL | EXTERNAL | |
| Antitrust | • Sherman Act <br> • Clayton Act <br> • Robinson-Patman Act <br> • Hart-Scott-Rodino Antitrust Improvements Act (HSR) | • Fines <br> • Forced divestiture of business lines <br> • Unwinding of consummated transactions <br> • Disallowance of proposed acquisitions/joint ventures <br> • Criminal sanctions | • Corporate Law Department review of all acquisitions and significant transactions <br> • HSR notices for sizable acquisitions <br> • Written policies via the intranet and legal publications <br> • Seminars as required | • Consultation on key matters with Sidley Austin LLP and Patton Boggs LLP | Crane Kenney |
| Federal Communications Commission | • Federal Communications Act <br> • Telecommunications Act of 1996 <br> • FCC regulations <br> • Various state laws | • Loss of broadcast license <br> • Fines <br> • Letters of admonition <br> • Sanction at time of license renewal <br> • Non-renewal of license <br> • Litigation | • Corporate Law Department review of broadcasting procedures and practices, including one-on-one meetings <br> • Spot checks during station visits <br> • Meetings, seminars and conference calls with station management <br> • Written handbooks and memos | • Annual review and consultation on key matters with Sidley Austin LLP's Washington, D.C. office | Chuck Sennet |
| 'Federal Trade Commission | • Consumer Products Safety Act <br> • Can-Spam Act of 2003 <br> • Telephone Consumer Protection Act <br> • Telemarketing Sales Rule <br> • Various states' DNC laws | • Small exposure as CPSA applies only to Tribune Interactive <br> • Product recalls <br> • Fines | • Seminars as required <br> • Formal Do Not Call policies <br> • Can-Spam awareness training | • Consultation on key matters with Sidley Austin LLP | Crane Kenney/ Vince Casanova/ Dan Hess |
| Securities Laws/ SEC/NYSE | • Securities Acts <br> • Insider Trader Enforcement Act <br> • Regulation FD (Fair Disclosure) <br> • NYSE Listing Standards <br> • Sarbanes-Oxley Act of 2002 | • Fines <br> • Criminal and civil sanctions <br> • Comments on any violations in the proxy statement <br> • Financial restatements and public disclosure of violations | • Centralized filing procedures for Section 16(a) reports <br> • General Counsel clearance of trading in Tribune or affiliated company stock for senior executives <br> • Corporate Law Department coordination with Investor Relations regarding shareholder/analyst communications, and with Human Resources regarding stock related program provisions, practices and communications <br> • Corporate oversight of compliance with NYSE and Sarbanes-Oxley rules and regulations | • Consultation on key matters, including all public securities filings and corporate governance matters, with Sidley Austin LLP and Wachtell, Lipton, Rosen & Katz | Crane Kenney/ Don Grenesko / Ruthellyn Musil |

December 2006

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433887



**TRIBUNE COMPANY**
**CORPORATE COMPLIANCE SUMMARY**

### GENERAL CORPORATE LAWS & REGULATIONS (continued)

| AREA | APPLICABLE LAWS AND REGULATIONS | POTENTIAL EXPOSURE | EXISTING COMPLIANCE SYSTEM | | MANAGEMENT RESPONSIBILITY |
|---|---|---|---|---|---|
| | | | INTERNAL | EXTERNAL | |
| Ethics | • No specific law - business ethics | • Misappropriation of Company assets<br>• Shareholder lawsuits | • Annual Code of Business Conduct compliance review<br>• Annual Code of Ethics signed by Corporate CEO, CFO and Controller<br>• Editorial Code of Ethics<br>• Ethics training | • PricewaterhouseCoopers (PwC) review of officer compliance statements | Jerry Agema/<br>Gerry Kern /<br>Thomas Caputo |
| Newspaper Circulation | • Audit Bureau of Circulation Regulations | • Circulation adjustments<br>• Censure by ABC<br>• Advertiser litigation/rebates | • Standard group-wide reports and procedures regarding circulation practices<br>• Established rotation of business unit internal audit reviews<br>• Quarterly compliance questionnaire includes circulation specific questions and is signed by the VP/Circulation at business units<br>• Finance staffs at business unit review key circulation statistics<br>• Business unit CFOs and finance staff receive pertinent circulation training | • ABC annual audit at all daily newspapers | Scott Smith/<br>Vince Casanova |

### ENVIRONMENTAL , SAFETY & HEALTH, PROPERTIES AND RISK MANAGEMENT LAWS AND REGULATIONS

| AREA | APPLICABLE LAWS AND REGULATIONS | POTENTIAL EXPOSURE | INTERNAL | EXTERNAL | MANAGEMENT RESPONSIBILITY |
|---|---|---|---|---|---|
| Environmental | • Federal Environmental Protection laws<br>  - Hazardous Waste (RCRA)<br>  - Superfund (CERCLA)<br>  - Air Emissions/Permitting (CAA)<br>  - Spills, Releases & Discharges<br>    (CWA, SARA, EPCRA, POTW) | • Regulatory citations and penalties<br>• Participation in site remediation activities or contribution to Superfund cleanup for historic waste disposal<br>• Third party litigation for property damage and health<br>• Adverse publicity originating from an environmental mishap | • Corporate oversight and risk assessment<br>• Established network of responsible business unit representatives<br>• Written procedures and communication where exposure is identified<br>• Due diligence reviews on all acquired properties with appropriate follow-up<br>• Electronic deadline management program<br>• Regular conference calls, information updates and site visits | • Consultation on key matters with Tribune Law Department and external legal counsel<br>• Consultation with environmental engineers and remediation experts | Business Units Coordinated by Mark Anderson |
| Safety and Health | • Employee safety & health laws:<br>  - Occupational Safety and Health Act regulations (OSHA)<br>  - Department of Transportation regulations<br>  - Americans with Disabilities Act | • Regulatory citations and penalties.<br>• Worker's compensation costs<br>• Third party litigation stemming from product liability actions<br>• Adverse publicity originating from a serious incident | • Established network of responsible business unit representatives<br>• Written procedures and communication where exposure is identified<br>• Regular conference calls | • Consultation on key matters with Tribune Labor & Employee Relations Department, and external legal counsel<br>• Consultation with workplace safety and health experts, industrial hygienist and management advisors | Mark Thomas/<br>Mark Anderson/<br>Myna Ramirez/<br>Business Units |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB-UR-0433888**






**TRIBUNE COMPANY**
**CORPORATE COMPLIANCE SUMMARY**

**ENVIRONMENTAL, SAFETY & HEALTH, PROPERTIES AND RISK MANAGEMENT LAWS AND REGULATIONS (continued)**

| AREA | APPLICABLE LAWS AND REGULATIONS | POTENTIAL EXPOSURE | EXISTING COMPLIANCE SYSTEM | | MANAGEMENT RESPONSIBILITY |
|---|---|---|---|---|---|
| | | | INTERNAL | EXTERNAL | |
| Risk Management | • State insurance laws and regulations<br> - Workers' Compensation<br> - Auto Liability<br> - General Liability<br>• Payment Card Industry (PCI) security standards | • Employee and third party litigation on work related injuries, auto liability or public/general liability hazards<br>• State/regulatory penalties<br>• Workers' Compensation Commission oversight<br>• Industry specific fines for non-compliance (credit cards)<br>• Public disclosure requirements for any security breach of data covered by privacy laws | • Corporate oversight of insurance programs and risk management function<br>• Established network of business unit contacts for insurance issues, claim investigations and litigation support<br>• Periodic claim review meetings with Corporate Law Department<br>• Participation of Corporate HR in serious complex claims<br>• Annual PCI-required network scans and surveys | • Consultation on key matters with insurance brokers Aon and Marsh<br>• National service agreement with Gallagher Bassett to administer Tribune claims<br>• National service agreement with Cynergistics to complete network scans | Jack Rodden/<br>Cara Leeman/<br>Jerry Agema/<br>Michele DeCesare |
| Building Codes (Tribune Tower) | • Local building codes and fire safety regulations<br>• Commission of Chicago Landmarks regulations | • Penalties and fines<br>• Licenses and permits not renewed<br>• Remediation costs | • Written procedures and communication where exposure is identified<br>• Ongoing inspections<br>• Tracking system for permits, inspections, licenses<br>• Review meetings<br>• Ongoing training<br>• Documented and approved fire sprinkler implementation plan | • Licensed contractors<br>• Ongoing inspections<br>• Consultation on structural engineering matters with Wiss, Janey, Elstner Associates | Mary Jo Mandula |

**FINANCIAL LAWS AND REGULATIONS**

| | | | | | |
|---|---|---|---|---|---|
| Income Taxes - Federal, State, Local and International | • Internal Revenue Code<br>• Treasury regulations<br>• State and local laws and regulations<br>• International tax laws & treaties | • Additional tax liabilities<br>• Penalties, interest and fines<br>• Criminal and civil sanctions | • Corporate oversight and risk assessment<br>• Centralized preparation and review of all income tax returns<br>• Established network of responsible business representatives<br>• Hiring of technically competent tax staff and maintaining that competence through a regular program of continuing education<br>• Consultation with business units on sales and use taxes | • Consultation on key matters with PwC, KPMG and legal counsel including Mayer Brown Rowe & Maw, Horwood Marcus & Berk, Sidley Austin LLP | Pat Shanahan/<br>Mark Mallory |

December 2006

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433889

TRIBUNE COMPANY
CORPORATE COMPLIANCE SUMMARY

**FINANCIAL LAWS AND REGULATIONS (continued)**

| AREA | APPLICABLE LAWS AND REGULATIONS | POTENTIAL EXPOSURE | EXISTING COMPLIANCE SYSTEM | | MANAGEMENT RESPONSIBILITY |
|---|---|---|---|---|---|
| | | | INTERNAL | EXTERNAL | |
| Financial Policies and Procedures | • Generally accepted accounting principles (GAAP)<br>• Securities and Exchange Commission (SEC) rules and regulations<br>• Sarbanes-Oxley Act of 2002<br>  - including Section 404 covering internal controls over financial reporting | • Penalties and fines<br>• Financial restatements<br>• SEC sanctions<br>• Shareholder litigation<br>• Criminal sanctions | • Centralized preparation of all consolidated financial statements<br>• Company-wide financial policies<br>• Quarterly compliance questionnaires, signed by controller, CFO and CEO, and schedules completed by all business units<br>• Disclosure Committee and Audit Committee review of annual 10-Ks and quarterly 10-Qs, earnings press releases, significant accounting and internal control issues, and audit plan<br>• Regular discussions with group and business unit personnel about financial information<br>• Centralized project team and steering committee managing Section 404 Internal Controls Certification project<br>• Internal audits/compliance reviews<br>  - including work necessary to be in compliance with Section 404<br>• Anti-fraud program<br>• Due diligence reviews on all acquired companies with appropriate follow-up<br>• Hiring of technically competent financial staff and maintaining that competence through a regular program of continuing education | • PwC integrated financial and internal control audits, including reviews of 10-Ks and 10-Qs<br>• Consultation on key matters, including special filings, with PwC, Sidley Austin LLP and Wachtell, Lipton, Rosen & Katz<br>• Audit Committee reviews of earnings press releases and 10-Q/10-K filings | Mark Mallory/<br>Brian Litman |
| Escheatment | • State laws governing uncashed checks and other unclaimed property that must be remitted to the states after specified time periods | • Penalties and fines<br>• Interest on amounts owed | • Established network of responsible business unit representatives<br>• Comprehensive survey for all acquired companies with appropriate follow-up<br>• Written policies and procedures | • Assistance from Kimberly Unclaimed Property Services (KUPS) with due diligence, processing and filing of escheatable items | Mark Mallory/<br>Jennifer Uson |
| Treasury | • Statutory requirements | • Penalties and fines<br>• Interest on amounts owed | • Daily cash, debt and interest expense projections<br>• $750 million revolving credit facility<br>• Board approval for capital expenditures and leases over $10 million | • Consultation on key matters with relationship banks | Chandler Bigelow |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433890




**TRIBUNE COMPANY**
**CORPORATE COMPLIANCE SUMMARY**

**LABOR LAWS AND REGULATIONS**

| AREA | APPLICABLE LAWS AND REGULATIONS | POTENTIAL EXPOSURE | EXISTING COMPLIANCE SYSTEM | | MANAGEMENT RESPONSIBILITY |
|---|---|---|---|---|---|
| | | | INTERNAL | EXTERNAL | |
| Employee Benefits | • Employee Retirement Income Security Act (ERISA)<br>• Internal Revenue Code<br>• Department of Labor Regulations<br>• Social Security Act<br>• Consolidated Omnibus Budget Reconciliation Act (COBRA)<br>• Health Insurance Portability and Accountability Act (HIPAA)<br>• Federal and state privacy laws<br>• Sarbanes-Oxley Act of 2002 | • Penalties and fines<br>• Disqualification of benefit plans<br>• Disallowance of tax deductions<br>• Criminal and civil sanctions<br>• Imputed income to employees if a plan is disqualified | • Centralized benefits administration<br>• Employee Benefits Committee review of all significant matters<br>• Written procedures<br>• Ongoing reviews and reconciliations of trust and plan accounts<br>• Monthly reconciliation of pension plan activity<br>• Daily reconciliation of 401(k) activity | • Consultation on key matters with McDermott Will & Emery, and Hewitt Associates<br>• PwC limited review of plan financial statements and preparation of IRS information returns (Form 5500)<br>• Periodic audits of vendors by outside firms such as Hewitt | Luis Lewin/<br>Mark Harris/<br>Jim King/<br>Chandler Bigelow |
| Employee Relations/ Employment Law | • Drug Free Workplace Act<br>• Employee Polygraph Protection Act<br>• Age Discrimination in Employment Act<br>• Americans with Disabilities Act<br>• Family Medical Leave Act<br>• Immigration Reform and Control Act<br>• Title VII (EEOC)<br>• Worker Adjustment and Retraining Notification Act<br>• Executive Order 11246 (obligations of federal contractors)<br>• 42 United States Code Sections 1981 and 1983(local civil and human rights ordinance)<br>• The Fair Credit Reporting Act<br>• The Rehabilitation Act<br>• Uniformed Services Employment and Reemployment Act<br>• Federal Bankruptcy Act<br>• State Unfair Competition Statutes<br>• State Laws relating to personnel records<br>• Civil Rights Acts of 1866 and 1991<br>• State and Municipal Human Rights Acts<br>• CA law AB1825 - harassment training | • Liquidated damages<br>• Punitive damages<br>• Additional pay<br>• Penalties and fines<br>• Attorney fees<br>• Federal contract debarment<br>• Compensatory damages<br>• Orders to reinstate employment | • Corporate oversight and coordination by the Labor & Employee Relations Department and Human Resource Service Center<br>• Established network of responsible, trained business unit representatives<br>• Written policies and procedures<br>• Ongoing training efforts<br>• Periodic employment/HR audits | • Consultation on key matters with Seyfarth Shaw, and other selected outside legal counsel | Luis Lewin/<br>Jim Osick/<br>Howard Weinstein |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433891



**TRIBUNE COMPANY**
**CORPORATE COMPLIANCE SUMMARY**

**LABOR LAWS AND REGULATIONS (continued)**

| AREA | APPLICABLE LAWS AND REGULATIONS | POTENTIAL EXPOSURE | EXISTING COMPLIANCE SYSTEM | | MANAGEMENT RESPONSIBILITY |
|---|---|---|---|---|---|
| | | | INTERNAL | EXTERNAL | |
| Labor Relations | • National Labor Relations Act<br>• State Labor Relations Statutes | • Cease and desist orders<br>• Bargaining orders<br>• Orders to reinstate<br>• Back pay | • Corporate oversight and coordination<br>• Established network of responsible, trained business unit representatives<br>• Targeted training as required | • Consultation on key matters with Seyfarth Shaw, and other selected outside legal counsel | Luis Lewin/<br>Jim Osick/<br>Howard Weinstein |
| Wage & Hour Laws | • Fair Labor Standards Act<br>• Equal Pay Act<br>• State wage & hour statutes | • Retroactive benefits awards<br>• Back contributions<br>• Reclassification of independent contractors as employees<br>• Payroll tax rate adjustments based on experience<br>• Liquidated damages<br>• Penalties and fines | • Corporate oversight and coordination by Labor & Employee Relations Department<br>• Established network of responsible, trained business unit representatives | • Consultation on key matters with Seyfarth Shaw, and other selected outside legal counsel | Luis Lewin/<br>Jim Osick/<br>Howard Weinstein |

December 2006

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433892

# TRIBUNE COMPANY

## CODE OF BUSINESS CONDUCT

### TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | COMPLIANCE WITH LAWS AND COMPANY POLICIES | 1 |
| III. | AUTHORIZED TRANSACTIONS AND ACCURATE ACCOUNTING | 1 |
| IV. | IMPROPER PAYMENTS | 2 |
| V. | COMPETITION AND FAIR DEALING | 2 |
| VI. | CONFLICTS OF INTEREST | 2 |
| VII. | CORPORATE OPPORTUNITIES | 3 |
| VIII. | CONFIDENTIALITY | 4 |
| IX. | PROTECTION AND PROPER USE OF COMPANY ASSETS | 4 |
| X. | POLITICAL CONTRIBUTIONS | 4 |
| XI. | SECURITIES LAWS | 4 |
| XII. | FINANCIAL REPORTING | 6 |
| XIII. | OPERATIONS REPORTING | 6 |
| XIV. | WAIVERS OF THE CODE OF BUSINESS CONDUCT | 6 |
| XV. | REPORTING ANY ILLEGAL OR UNETHICAL BEHAVIOR | 6 |
| XVI. | COMPLIANCE PROCEDURES | 6 |
| XVII. | REVIEW AND AMENDMENT | 7 |

July 2006

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## I.    INTRODUCTION

Integrity is one of the fundamental values to which Tribune Company (and, together with its subsidiaries, the "Company") is committed in carrying out its mission. Truth, objectivity, and independence are the foundation of our business. They are the standards that every employee, officer and director should meet in all business conduct.

The Code of Business Conduct is intended to help ensure compliance with the highest legal and ethical standards. It is the responsibility of every employee, officer and director of the Company to understand and adhere to the Code. Adherence to the Code is in no way intended to abridge the First Amendment rights of Tribune or its employees, discourage appropriate participation in community life or prohibit reasonable outside work.

Any employee who knowingly violates any provision of this Code will be subject to disciplinary action, including reprimand, suspension and/or termination. It is also the responsibility of every officer and manager of the Company to ensure that employees reporting to them understand and comply with the Code. *Employees who have questions concerning the Code or become aware of a possible violation of the Code should promptly contact their supervisor or Company legal counsel, or should follow the guidelines described in Article XIV of this Code.*

## II.    COMPLIANCE WITH LAWS AND COMPANY POLICIES

It is Company policy to comply with all laws and government regulations applicable to our business. With respect to the Company's business practices, the Company is committed to cooperating with government inquiries and takes seriously any investigation or review. Notwithstanding this commitment, the Company reserves the right to protect the newsgathering and editorial process from inappropriate intrusion. Employees should consult their supervisor or Company legal counsel about instances where there is doubt or ambiguity concerning legal requirements or appropriate practices. Employees should also consult with Company legal counsel regarding any request for information, other than in the ordinary course of business, from any government official or agency before any information is furnished and before there is any agreement or understanding to furnish such information.

Additionally, employees are required to understand and comply with all applicable Company policies including, but not limited to, anti-harassment, equal employment opportunity, safe and secure workplace, substance abuse, employee confidential information and credit card information. Employees may only include their eligible dependents in coverage under the Company's health and welfare benefit plans.

## III.    AUTHORIZED TRANSACTIONS AND ACCURATE ACCOUNTING

Expenditures of Company funds and use of Company property should be made only as properly authorized. The Company requires accurate and complete accounting in compliance with accepted accounting rules and controls. All expenditures and payments should be properly recorded and documented. Employees who suspect financial or accounting irregularities or fraud should report it immediately to their supervisor or Company legal counsel.

## IV.   IMPROPER PAYMENTS

The Company does not permit or condone any illegal or improper payments, transfers or receipts. Employees should not offer, give, solicit or accept any money or anything else of value for the purpose of obtaining or bestowing business or preferential treatment. (This rule does not prohibit authorized and appropriate business entertainment and gifts. See Section V, below.)

No outside consultant, attorney, accountant, contractor, vendor, or agent of any kind should be used in any manner that would be contrary to this prohibition against illegal or improper payments. Fees, commissions and expenses that are paid to such outside agents should be based upon proper billings and reasonable standards for services rendered. As a general rule, payments should be for services or activities of such nature as to qualify for income tax deductibility.

## V.    COMPETITION AND FAIR DEALING

We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices.   Each employee, officer and director should endeavor to deal fairly with the Company's customers, suppliers, competitors and employees. With respect to our competitors, none should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other intentional unfair-dealing practice.

Employees should not provide or accept, from any person or entity doing business with the Company, discounts, business entertainment and/or gifts that exceed reasonable business standards. Employees should never solicit such discounts, entertainment or gifts. No cash or cash equivalents, such as gift certificates, should be accepted.

All funds expended for business entertainment and gifts must be fully and accurately documented and reflected in the books and records of the Company.

## VI.   CONFLICTS OF INTEREST

It is Company policy that employees should avoid any personal or business relationships, dealings or investments that might create a personal interest that conflicts with the best interests of the Company. A conflict situation can arise when an employee, officer or director takes actions or has interests that may make it difficult to perform his or her Company work objectively and effectively. It is not possible to foresee or define with precision every situation that may constitute a conflict of interest. Conflicts may be actual, potential and even matters of perception. In addition, conflicts may occur in, but are not limited to, situations where an employee, officer or director, or a closely-related family member:[1]

---

[1]     Closely-related family members generally include an employee's, officer's or director's spouse (or other significant relationship), children, parents, brothers and sisters, and any person dependent on the employee for support.

Revised July 2006

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**                                                    TRB-UR-0433895

1. Has a significant financial interest[2] in, or obligation to, a competitor, supplier, or customer of the Company.

2. Is employed, part-time or otherwise, by a competitor, supplier or customer of the Company (in the case of a family member, as a supervisor or manager), or sells products to Company employees or recruits Company employees to sell or distribute products.

3. Serves on the board of directors of, or acts as a consultant or advisor to, a competitor, supplier or customer of the Company (other than at the request of the Company).

4. Transacts business with the Company, including buying from or selling to the Company any goods or services (other than transactions in the ordinary course of the Company's businesses, e.g., newspaper subscriptions).

5. Uses equipment, computer software and services, materials, supplies, content (including outtakes), data and other information or business relationships obtained in the course of employment with the Company to advance personal interests.

6. Has a personal business interest that is similar or related to work the employee, the Company, or any of its business units performs or produces.

7. Receives improper personal benefits as a result of his or her position in the Company.

8. Receives a loan or loan guarantee from the Company.

Failure to disclose an actual or potential conflict of interest is a violation of the Code. Conflicts of interest may not always be clear-cut, so if you have a question, you should consult with higher levels of management or Company legal counsel. Any employee, officer or director who becomes aware of a conflict or potential conflict should bring it to the attention of a supervisor, manager or other appropriate personnel or consult the procedures described in Section XIV of this Code.

VII.    CORPORATE OPPORTUNITIES

Employees, officers and directors are prohibited from taking for themselves personally opportunities that are discovered through the use of corporate property, information or position without the consent of the Board of Directors. No employee may use corporate property, information, or position for improper personal gain, and no employee may compete with the Company directly or indirectly. Employees, officers and directors owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

---

[2]    An interest amounting to less than one percent of any class of securities listed on any of the national securities exchanges or regularly traded over-the-counter will not be regarded as a "significant" financial interest in the absence of unusual circumstances.

Revised July 2006

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433896

## VIII.  CONFIDENTIALITY

Employees, officers and directors must maintain the confidentiality of confidential information entrusted to them by the Company or its customers, except when disclosure is authorized by Company legal counsel or required by laws or regulations.  Confidential information includes all non-public information that might be of use to competitors, or harmful to the Company or its customers, if disclosed.  It also includes information that employees, suppliers and customers have entrusted to us.  The obligation to preserve confidential information continues even after employment ends.

## IX.    PROTECTION AND PROPER USE OF COMPANY ASSETS

All employees, officers and directors should endeavor to protect the Company's assets and ensure their efficient use.  Theft, carelessness and waste have a direct impact on the Company's profitability.  Any suspected incident of fraud or theft should be immediately reported for investigation.  Company equipment should not be used for non-Company business, though incidental personal use may be permitted.

The obligation of employees to protect the Company's assets includes its proprietary information.  Proprietary information includes intellectual property such as trade secrets, patents, trademarks and copyrights, as well as business, marketing and service plans, engineering and manufacturing ideas, designs, databases, records, salary information and any unpublished financial data and reports.  Unauthorized use or distribution of this information would violate Company policy.  It could also be illegal and result in civil or even criminal penalties.

## X.     POLITICAL CONTRIBUTIONS

No Company funds or assets may be contributed to any political candidate or political party, unless such contribution is expressly permitted by law, recommended by the Vice President, Washington Affairs, and authorized by the Company's President and Chief Executive Officer.  Any such payments shall be reported to the Audit Committee annually.  This prohibition relates only to the use of Company funds or assets.  It is not intended to discourage employees from making personal contributions to political candidates or parties of their choice.  (Other Company policies relating to editorial independence restrict personal contributions in some circumstances.)  Employees shall not be reimbursed by the Company in any way for personal contributions.

## XI.    SECURITIES LAWS

Insider Trading Is Prohibited.  Under the federal securities laws and this policy, directors, officers and other employees of the Company are prohibited from buying or selling Tribune Company securities while they are in possession of **material inside information** concerning the Company.  "Inside information" is any information that has not been publicly disclosed.  "Material information" is any information that would be of significance to an investor in deciding whether to buy, sell or hold a security or if it would have a substantial effect on the market price of a security if it were

Revised July 2006

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433897

disclosed. These prohibitions apply not only to the employee but also to the employee's spouse, children, relatives who share the individual's residence and certain trusts, partnerships or other entities controlled by the individual.

The Prohibition Also Applies To Other Companies' Securities. The insider trading prohibition also applies to securities of other companies. Employees who learn material inside information about other companies through their work at the Company are prohibited from trading securities of that company while they are in possession of material inside information about that company. This situation could arise in many contexts, including in regard to information employees may learn during the course of the preparation or release of news reports, and information employees may learn about existing or potential customers, suppliers, acquisition targets or business partners of the Company.

Inside Information Should Not Be Provided To Others. It is also a violation of the federal securities laws and this policy to provide other people (friends, financial advisors, business associates, etc.) with any material inside information. This is known as "tipping" and it can result in liability to the employee as well as the other person, even if the employee did not receive monetary profit from the other person's illegal trading. Accordingly, all employees should exercise extreme care when they are in possession of material inside information to ensure that such information is not disclosed, either on purpose or by accident, to any other person other than those to whom the information is essential for Company-related business, and even in that situation, the employee should make it known that such information has not been publicly disclosed.

Penalties For Violations Can Be Severe. In addition to being required to disgorge any profit from a securities trade made in violation of the insider trading prohibition, an individual is subject to a civil penalty of up to three times the profit gained or loss avoided and criminal penalties not exceeding $5,000,000 and/or imprisonment for 20 years. In addition, a "controlling person" (directors, officers, possibly supervisors and the Company itself) could be subject to a civil penalty equal to the greater of $1,000,000 or three times the profit gained or loss avoided by the violator.

Examples of Material Inside Information. Some examples of information about a company that might be material are:

- A proposed acquisition or divestiture.
- A stock split or a change in the dividend rate.
- A significant expansion or curtailment of operations.
- A significant change in revenues or earnings from those from a prior period or from those publicly projected.
- A significant product development or significant information regarding a product.
- The institution of a stock repurchase program.
- Extraordinary management or business developments.

If this type of information is known to an employee and has not been publicly disclosed by the company to which it relates, that employee is prohibited from trading in the securities of that company or encouraging others to trade in those securities.

Revised July 2006

5

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433898

Employees are urged to contact their manager or supervisor if they have any questions regarding these rules. These standards related to the securities laws and the insider trading prohibition are not intended to prevent our journalists from reporting previously undisclosed information as part of their news reporting duties.

## XII.  FINANCIAL REPORTING

All employees involved in the Company's financial reporting process are responsible for ensuring that financial information is reported fully, accurately and in accordance with Company policies. Employees involved in the Company's reporting obligations as a publicly traded company are responsible for ensuring full, fair, accurate, timely and understandable disclosure in reports and documents filed or submitted to the Securities and Exchange Commission and in other public communications. Employees who suspect financial reporting irregularities or fraud should report it immediately to their supervisor or Company legal counsel.

## XIII.  OPERATIONS REPORTING

Employees involved in the Company's reporting regarding operations, including circulation reporting, are responsible for ensuring full, accurate and timely disclosure, adherence to the Company's policies and compliance with the rules set forth by third party reporting agencies, such as the Audit Bureau of Circulations. Employees who suspect any irregularities or fraud in connection with operations reporting matters should report it immediately to their supervisor or Company legal counsel.

## XIV.  WAIVERS OF THE CODE OF BUSINESS CONDUCT

Any waiver of this Code for executive officers or directors may be made only by the Board or a Board committee and will be promptly disclosed as required by law or stock exchange regulation.

## XV.  REPORTING ANY ILLEGAL OR UNETHICAL BEHAVIOR

Employees should talk to supervisors, managers or other appropriate personnel about observed illegal or unethical behavior and when in doubt about the best course of action in a particular situation. It is the policy of the Company not to allow retaliation for reports of misconduct by others made in good faith by employees. Employees are expected to cooperate in internal investigations of misconduct.

## XVI.  COMPLIANCE PROCEDURES

We must all work to ensure prompt and consistent action against violations of this Code. However, in some situations it is difficult to know right from wrong. Since we cannot anticipate every situation that will arise, it is important that we have a way to approach a new question or problem. These are the steps to keep in mind:

Revised July 2006

6

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

- <u>Make sure you have all the facts</u>. In order to reach the right solutions, we must be as fully informed as possible.

- <u>Ask yourself: What specifically am I being asked to do? Does it seem unethical or improper</u>? This will enable you to focus on the specific question you are faced with, and the alternatives you have. Use your judgment and common sense; if something seems unethical or improper, it probably is.

- <u>Clarify your responsibility and role</u>. In most situations, there is shared responsibility. Are your colleagues informed? It may help to get others involved and discuss the problem.

- <u>Discuss the problem with your supervisor</u>. This is the basic guidance for all situations. In many cases, your supervisor will be more knowledgeable about the question, and will appreciate being brought into the decision-making process. Remember that it is your supervisor's responsibility to help solve problems.

- <u>Seek help from Company resources</u>. In the rare case where it may not be appropriate to discuss an issue with your supervisor, or where you do not feel comfortable approaching your supervisor with your question, discuss it locally with your office manager or your Human Resources manager. If you prefer to write, address your concerns to: Vice President/Corporate Compliance & Risk Management and/or General Counsel, Tribune Company, 435 North Michigan Avenue, 6th Floor, Chicago, Illinois 60611. Alternatively, you can submit your question or issue via a confidential hotline by dialing 1-800-216-1772.

- <u>You may report ethical violations in confidence and without fear of retaliation</u>. If your situation requires that your identity be kept secret, your anonymity will be protected. The Company does not permit retaliation of any kind against employees for good faith reports of ethical violations.

- <u>Always ask first, act later</u>: If you are unsure of what to do in any situation, seek guidance <u>before you act.</u>

## XVII.  REVIEW AND AMENDMENT

Management shall periodically review and reassess the adequacy of this Code and recommend changes to the Board for approval. The Board reserves the right to amend this Code from time to time as it determines to be desirable or appropriate.

Revised July 2006

7

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## TRIBUNE COMPANY
## STATEMENT OF COMPLIANCE WITH THE CODE OF BUSINESS CONDUCT
### (For Those Employees Required to Sign Quarterly Questionnaires)

I have received and read the Company's Code of Business Conduct, and I agree to comply with its provisions. I also affirm that my answers to the following questions are true and correct to the best of my knowledge. I understand that any intentional omission or misrepresentation of information on this form may result in disciplinary action, including termination. I further understand that, as an executor of the Company's Quarterly Questionnaires: (i) the Company will rely upon the accuracy and completeness of my Quarterly Questionnaires and (ii) I will have possession of confidential information that may preclude me from trading in the Company's securities at various times. I understand and agree that if a Quarterly Questionnaire is incomplete or inaccurate in any material respect, or if I engage in any act of fraud, insider trading or other securities law violation, the Company may (i) suspend or terminate my employment, (ii) suspend or cancel all of my outstanding stock options, both vested and non-vested and (iii) require me to forfeit to the Company any (A) cash bonus compensation and (B) shares received on the exercise of any Company stock options, in each case retroactive to the date of the inaccuracy or violation.

**If the answer to any question is yes, describe below or on an attached sheet. Even if you have disclosed an incidence in prior years, you must disclose it again, if still applicable.**

1.  Have you violated any provision of the Code? If yes, please describe.

    Yes [ ]          No [ ]

2.  Are you aware of any actual or possible conflict of interest (as described in Section VI of the Code) involving you or a closely-related family member? If yes, please describe (e.g., if you serve on the board of directors, or have a significant personal interest in a competitor, supplier, advertiser or customer, describe fully the interest and any transactions between such entity and the Company of which you are aware).

    Yes [ ]          No [ ]

3.  During the last twelve months, were you employed by, or did you act as an independent contractor, representative or agent for an entity other than the Company? (Exclude activities prior to beginning employment with the Company.) If yes, describe your responsibility for the other entity.

    Yes [ ]          No [ ]

4.  During the last twelve months, did you accept any single business gift, purchase discount or other benefit with a value in excess of one hundred dollars? If yes, describe the gift, discount or other benefit and provide the estimated value.

    Yes [ ]          No [ ]

5.  During the past five years, have you been convicted or pleaded guilty in a criminal proceeding (excluding minor traffic violations)? If yes, please describe.

    Yes [ ]          No [ ]

---

Name (Print or Type) _____        Signature _____

Position / Department _____        Date _____

Supervisor _____        Phone number _____

---

FOR OFFICE USE ONLY:

___ Conflict    ___ Possible Conflict    ____ No Conflict (Check One)

_____ Department Head's Initials    _____ H.R. Initials    _____ C.E.O.'s Initials

Resolution/Action:  (e.g. if a possible conflict, describe management's procedure to ensure arms length dealings.)

Revised 6/04

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433901

## TRIBUNE COMPANY

### STATEMENT OF COMPLIANCE WITH THE CODE OF BUSINESS CONDUCT

I have received and read the Company's Code of Business Conduct, and I agree to comply with its provisions.  I also affirm that my answers to the following questions are true and correct to the best of my knowledge.  I understand that any intentional omission or misrepresentation of information on this form may result in disciplinary action, including termination.

**If the answer to any question is yes, describe below or on an attached sheet.  Even if you have disclosed an incidence in prior years, you must disclose it again, if still applicable.**

1.   Have you violated any provision of the Code?  If yes, please describe.

     Yes [  ]          No [  ]

2.   Are you aware of any actual or possible *conflict of interest* (as described in Section VI of the Code) involving you or a closely-related family member?  If yes, please describe (e.g., if you serve on the board of directors, or have a significant personal interest in a competitor, supplier, advertiser or customer, describe fully the interest and any transactions between such entity and the Company of which you are aware).

     Yes [  ]          No [  ]

3.   During the last twelve months, were you employed by, or did you act as an independent contractor, representative or agent for an entity other than the Company?  (Exclude activities prior to beginning employment with the Company.)  If yes, describe your responsibility for the other entity.

     Yes [  ]          No [  ]

4.   During the last twelve months, did you accept any single business gift, purchase discount or other benefit with a value in excess of one hundred dollars?  If yes, describe the gift, discount or other benefit and provide the estimated value.

     Yes [  ]          No [  ]

5.   During the past five years, have you been convicted or pleaded guilty in a criminal proceeding (excluding minor traffic violations)?  If yes, please describe.

     Yes [  ]          No [  ]

---

Name (Print or Type) _____     Signature _____

Position / Department _____     Date _____

Supervisor _____     Phone number _____

---

FOR OFFICE USE ONLY:

___ Conflict     ___ Possible Conflict     ____ No Conflict (Check One)

_____ Department Head's Initials     _____ H.R. Initials     _____ C.E.O.'s Initials

*Resolution/Action:  (e.g. if a possible conflict, describe management's procedure to ensure arms length dealings.)*

Revised  6/04

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## CODE OF ETHICS FOR CEO AND SENIOR FINANCIAL OFFICERS
### Adopted and effective as of May 6, 2003

All of the employees of Tribune Company (the "Company") are bound by the provisions set forth in the Company's Code of Business Conduct relating to ethical conduct, conflicts of interest and compliance with law. In addition, Tribune's Chief Executive Officer ("CEO"), Senior Vice President, Finance and Administration ("CFO") and Vice President and Controller ("Controller"), are subject to the following additional policies:

1. The CEO, CFO and Controller are responsible for full, fair, accurate, timely and understandable disclosure in the periodic reports filed by the Company with the SEC and in other public communications. Accordingly, it is the responsibility of the CEO, CFO and Controller promptly to bring to the attention of the Disclosure Committee any material information that affects the disclosures made by the Company in its public filings.

2. The CEO, CFO and Controller shall promptly bring to the attention of the Disclosure Committee, the Audit Committee and the Company's auditors any information concerning (a) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

3. The CEO, CFO and Controller shall promptly bring to the attention of the General Counsel and the Audit Committee any information concerning (a) any violation of this Code, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls and (b) evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

4. The Board of Directors shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of this Code by the CEO, CFO or Controller. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to this Code. In determining what action is appropriate in a particular case, the Board of Directors or such designee shall take into account all relevant information, including the nature and severity of the violation, whether the violation was a single occurrence or a repeated occurrence, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the violation as to the proper course of action and whether or not the individual in question had committed other violations in the past.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Any waiver of this Code for the CEO, CFO or Controller may be made only by the Board or a Board committee and will be promptly disclosed as required by law or stock exchange regulation.

Management shall periodically review and reassess the adequacy of this Code and recommend changes to the Board for approval. The Board reserves the right to amend this Code from time to time as it determines to be desirable or appropriate. Any amendment of this Code will be promptly disclosed as required by law or stock exchange regulation.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433904

9

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433905

## TRIBUNE COMPANY
## REASSESSMENT OF AUDIT COMMITTEE CHARTER

New York Stock Exchange (NYSE) rules require audit committees to have a written charter describing the committee's purpose, mission, duties, responsibilities, relationships with the independent accountants and the internal audit function, and access to outside consultants. A copy of the current charter that was approved by the full board at its February 2006 meeting is attached as Exhibit I.

The Audit Committee's charter, in accordance with existing NYSE and SEC regulations, requires the Committee to review and reassess the adequacy of its charter annually. The current charter is in compliance with existing rules and no new rules have been issued since February 2005 that would necessitate any revisions. As such, management recommends that the Committee make no changes to its current charter. If the Committee agrees that no changes are necessary, the current charter will be included in the Company's 2007 proxy statement early next year.

TGC
12/01/06

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB-UR-0433906**

Exhibit I

# TRIBUNE COMPANY
## AUDIT COMMITTEE OF THE BOARD OF DIRECTORS
## OPERATING CHARTER
### (As approved by the Board of Directors on February 14, 2006)

## PURPOSE

The Audit Committee is appointed by the Board of Directors to assist the Board in monitoring (a) the integrity of the Company's financial statements, (b) the independent accountants' qualifications and independence, (c) the performance of the Company's internal audit function and independent accountants, and (d) the Company's compliance and ethics program.

## COMMITTEE MEMBERSHIP

The Committee shall consist of no fewer than three members. The members of the Committee shall meet the independence and experience requirements of the New York Stock Exchange, Section 10A(m)(3) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules and regulations of the Securities and Exchange Commission (the "Commission"). At least one member of the Audit Committee shall be an audit committee financial expert as defined by the Commission and as determined by the Board of Directors. The members and chairperson of the Committee shall be appointed and replaced by the Board of Directors.

## MEETINGS

The Committee shall meet as often as it determines, but not less frequently than quarterly. The Committee shall meet periodically with management, the internal auditors and the independent accountants in separate executive sessions. The Committee may request any officer or employee of the Company or the Company's outside counsel or independent accountants to attend a meeting of the Committee or to meet with any members of, or consultants to, the Committee.

## COMMITTEE AUTHORITY AND RESPONSIBILITIES

The Committee shall have the sole authority to appoint or replace the independent accountants (subject to shareholder ratification). The Committee shall be directly responsible for the compensation and oversight of the work of the independent accountants (including resolution of disagreements between management and the independent accountants regarding financial reporting) for the purpose of preparing or issuing an audit report or related work. The independent accountants shall report directly to the Committee.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433907

Exhibit I

# TRIBUNE COMPANY
## AUDIT COMMITTEE OF THE BOARD OF DIRECTORS
## OPERATING CHARTER
### (As approved by the Board of Directors on February 14, 2006)

The Committee shall pre-approve all auditing services and permitted non-auditing services (including the fees and terms thereof) to be performed for the Company by the independent accountants, subject to the de minimus exceptions for non-audit services described in Section 10A(i)(1)(B) of the Exchange Act which are approved by the Committee prior to the completion of the audit.

The Committee may form and delegate authority to subcommittees consisting of one or more members when appropriate, including the authority to grant preapprovals of audit and permitted non-audit services, provided that decisions of such subcommittees to grant preapprovals shall be presented to the full Committee at its next scheduled meeting.

The Committee shall have the authority, to the extent it deems necessary or appropriate, to retain independent legal, accounting or other advisors.   The Company shall provide for appropriate funding, as determined by the Committee, for payment of compensation to the independent accountants for the purpose of rendering or issuing an audit report and to any advisors employed by the Committee.

The Committee shall make regular reports to the Board of Directors. The Committee shall review and reassess the adequacy of this Charter annually and shall submit any proposed substantive changes to the Board of Directors for approval.  The Committee shall annually review its own performance.

The Committee shall prepare the report required by the rules of the Commission to be included in the Company's annual proxy statement.

The Committee, to the extent it deems necessary or appropriate, shall:

### Financial Statement and Disclosure Matters

1.    Meet to review and discuss with management and the Company's independent accountants the annual audited financial statements, including the Company's specific disclosures made in management's discussion and analysis, and recommend to the Board of Directors whether the audited financial statements should be included in the Company's Form 10-K.

2.    Review and discuss with management and the Company's independent accountants the annual reports on internal controls over financial reporting that will be included in the Company's Form 10-K in accordance with Section 404 of the Sarbanes-Oxley Act.  Review and discuss any significant deficiencies or material weaknesses in the Company's internal controls over financial reporting that are disclosed to the Committee by management or the independent accountants, and the steps being taken to resolve them.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433908

Exhibit I

# TRIBUNE COMPANY
## AUDIT COMMITTEE OF THE BOARD OF DIRECTORS
## OPERATING CHARTER
### (As approved by the Board of Directors on February 14, 2006)

3.  Meet to review and discuss with management and the independent accountants the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the Company's specific disclosures made in management's discussion and analysis and the results of the independent accountants' reviews of the quarterly financial statements.

4.  Discuss with management and the independent accountants significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles.

5.  Review and discuss reports from the independent auditors on:

    (a)  All critical accounting principles and practices to be used.

    (b)  All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent accountants.

    (c)  Other material written communications between the independent accountants and management.

6.  Discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally, consisting of discussing the types of information to be disclosed and the types of presentations to be made.

7.  Discuss with management and the independent accountants the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements.

8.  Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

9.  Discuss with the independent accountants the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433909

Exhibit I

## TRIBUNE COMPANY
### AUDIT COMMITTEE OF THE BOARD OF DIRECTORS
### OPERATING CHARTER
#### (As approved by the Board of Directors on February 14, 2006)

10.  Review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls over financial reporting or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

### *Oversight of the Company's Relationship with the Independent Accountants*

11.  Review and evaluate the lead partner of the independent accountants' team.

12.  Obtain and review a report from the independent accountants at least annually regarding (a) the independent accountants' internal quality-control procedures, (b) any material issues raised by the most recent internal quality-control review, or publicly disclosed findings resulting from reviews of public oversight bodies or investigations by governmental authorities within the preceding five years respecting one or more independent audits carried out by the firm, (c) any steps taken to deal with any such issues or findings, and (d) all relationships between the independent accountants and the Company. Evaluate the qualifications, performance and independence of the independent accountants, including considering whether the accountants' quality controls are adequate and the provision of permitted non-audit services is compatible with maintaining the accountants' independence, and taking into account the opinions of management and internal auditors. The Committee shall present its conclusions with respect to the independent accountants to the Board of Directors.

13.  Ensure the rotation of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit as required by law.

14.  Set policies for the Company's hiring of employees or former employees of the independent accountants who participated in any capacity in the audit of the Company.

15.  Meet with the independent accountants prior to the audit to discuss the planning and staffing of the audit.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433910

Exhibit I

# TRIBUNE COMPANY
## AUDIT COMMITTEE OF THE BOARD OF DIRECTORS
## OPERATING CHARTER
### (As approved by the Board of Directors on February 14, 2006)

### Oversight of the Company's Internal Audit Function

16. Review the appointment and replacement of the senior internal auditing executive.

17. Review the significant issues raised in reports to management prepared by the internal auditing department and management's responses.

18. Discuss with the independent accountants and management the internal audit department responsibilities, budget and staffing and any recommended changes in the planned scope of the internal audit function.

### Compliance and Ethics Program Oversight Responsibilities

19. Obtain from the independent accountants assurance that Section 10A(b) of the Exchange Act regarding illegal acts has not been implicated.

20. Obtain reports from management, the Company's senior internal auditing executive and the Company's vice president of corporate compliance and risk management that the Company has an effective compliance and ethics program that is in conformity with applicable legal requirements and the Company's Code of Business Conduct, including the provisions related to insider trading and conflicts of interest. Advise the Board of Directors with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and ethics and with the Company's Code of Business Conduct.

21. Review procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting control or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

22. Discuss with management and the independent accountants any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies.

23. Discuss with the Company's General Counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433911

**Exhibit I**

**TRIBUNE COMPANY**
**AUDIT COMMITTEE OF THE BOARD OF DIRECTORS**
**OPERATING CHARTER**
**(As approved by the Board of Directors on February 14, 2006)**

## LIMITATION OF AUDIT COMMITTEE'S ROLE

While the Audit Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Audit Committee to plan or conduct audits or to determine that the Company's financial statements and disclosures are complete and accurate and are in accordance with generally accepted accounting principles and applicable rules and regulations.  These are the responsibilities of management and the independent accountants.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB-UR-0433912**

NOMINATING & GOVERNANCE
COMMITTEE

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# TRIBUNE COMPANY
## NOMINATING & GOVERNANCE COMMITTEE MEETING
### TUESDAY, DECEMBER 12, 2006 (7:30 A.M.)
### LAKEVIEW ROOM, 24TH FLOOR
### TRIBUNE TOWER

## AGENDA

|  | Tab No. |
|---|---|
| Approve minutes of July 19, 2006 meeting | 1 |
| Review shareholder proposals | 2 |
| Majority voting update | 3 |
| Board and committee performance reviews | 4 |
| Review director candidates | 5 |

Nominating & Governance Committee
Roger Goodan
Enrique Hernandez, Jr., Chairman
Robert S. Morrison
J. Christopher Reyes
William Stinehart, Jr.

Tribune Company
Dennis J. FitzSimons
Crane H. Kenney

Guest
Tom Cole, Sidley Austin LLP

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433915

**TRIBUNE COMPANY**
**NOMINATING & GOVERNANCE COMMITTEE MEETING**
**JULY 19, 2006**

The Nominating & Governance Committee met at 7:30 a.m. on Wednesday, July 19, 2006, at Tribune Tower, Chicago, Illinois, pursuant to notice. The meeting was attended by Roger Goodan, Enrique Hernandez, Jr., J. Christopher Reyes and William Stinehart, Jr. Robert S. Morrison participated in the meeting via telephone. William A. Osborn, Thomas A. Cole of Sidley Austin LLP and Andrew Bogen of Gibson, Dunn & Crutcher LLP also attended the meeting. Dennis J. FitzSimons and Crane H. Kenney attended a portion of the meeting.

Mr. Hernandez acted as Chairman of the meeting. Messrs. Bogen, Cole, FitzSimons, Kenney and Osborn were present as the meeting was called to order. The following business was discussed by the Committee:

1.  The minutes of the February 13, 2006 Nominating & Governance Committee meeting were approved.

2.  The Committee reviewed the size, structure and meeting frequency of the Board and Board committees in accordance with the Committee charter. The Committee agreed that no changes to the Board size, committee structure or meeting frequency needed to be made at this time. The Committee discussed service responsibilities of Mr. Reyes given his appointment to the Audit Committee in May 2006 and his ongoing service on the Compensation & Organization Committee and Nominating & Governance Committee. After discussion, it was agreed to recommend that Mr. Reyes be relieved of his Compensation & Organization Committee responsibilities.

3.  The Committee next reviewed the Board Governance Guidelines in accordance with the Committee charter and recommended no changes be made at this time.

4.  The Committee then reviewed a proposal the Company received from Evelyn Y. Davis calling for the elimination of the classified Board structure. The Committee directed management to oppose the proposal in the same manner as it did in connection with the 2006 annual shareholders meeting.

5.  The Committee next discussed recent developments on the issue of majority voting for directors and agreed to continue monitoring developments on this issue at future meetings.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

6.    The Committee conducted its annual review of the Committee charter and recommended no changes to the charter be made at this time.

7.    The Committee deferred discussion of the responses to the Board and Committee performance questionnaires distributed at the May Board meeting until its next meeting.

8.    The Committee next discussed the July 17, 2006 Chandler Trust letter and the obligations of all directors regarding confidentiality and use of Board material. Mr. Cole reviewed the fiduciary and other legal requirements regarding disclosure of Board deliberations and use of Board material. Mr. Bogen responded with his interpretation of those duties and his interpretation of the November 2000 Confidentiality Agreement between the Company and the Chandler Trusts. Mr. Bogen distinguished between the duties of directors and shareholders when in receipt of confidential information. The Committee discussed the interests of the Board in keeping Board deliberations and Board material confidential and whether the Chandler Trusts would agree to abide by those principles. After further discussion, the Committee requested Messrs. Cole and Bogen to attempt to distill to writing the legal requirements regarding the use of Board material and submit any areas of disagreement to an independent third law firm that the Committee would retain.

There being no further business to come before the Committee, the meeting was adjourned at 9:20 a.m.

_____

Enrique Hernandez, Jr.
Chairman

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**2**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433918

**EVELYN Y. DAVIS**
EDITOR
HIGHLIGHTS AND LOWLIGHTS
WATERGATE OFFICE BUILDING
2600 VIRGINIA AVE. N.W. SUITE 215
WASHINGTON. DC 20037

CERTIFIED RETURN
RECEIPT REQUESTED

(202) 737-7755 OR
(202) 338-8989

June 16, 2006

Dennis Fitsimons, CEO
TRIBUNE COS.
Chicago, Ill.

Dear Dennis:

Dear

This is a formal notice to the management of  Tribune                    that Mrs. Evelyn Y. Davis, who is the owner of  250      shares of common stock plans to introduce the following resolution at the forthcoming Annual Meeting of 20 07 . I ask that my name and address be printed in the proxy statement, together with the text of the resolution and reasons for its introduction. I also ask that the substance of the resolution be included in the notice of the meeting:

RESOLVED: "That the stockholders of  TRIBUNE COS.                   recommend that the Board of Directors take the necessary steps to reinstate the election of directors ANNUALLY, instead of the stagger system which was recently adopted."

REASONS: "Until recently, directors of              .        were elected annually by all shareholders."

"The great majority of New York Stock Exchange listed corporations elect all their directors each year."

"This insures that ALL directors will be more accountable to ALL shareholders each year and to a certain extent prevents the self-perpetuation of the Board."

"Many Companies in recent year have adopted MY resolution to end the stagger system including Starwood, Marriott, Host Marriott, Goldman Sa Lehman Bros, Morgan StanleyDow Jones, Carr America, Merck, BristolMye "If you AGREE, please mark your proxy FOR this resolution." Squibb, FederatedP&G and oth

Last year the owners of.....*shares, representing approximately46.8% shares voting, voted FOR this proposal.

"If you AGREE, please vote YOUR shares FOR this proposal.".

Mrs. Evelyn Y. Davis *Mrs Evl y Davis*

....*Please fill in correct figure

CC: SEC in D.C.

P.S. DAN: We do have differences of opinion but I CERTAINLY support YOU and management AGAINST   the ridiculous ideas of the Chandler Famil You are doing overall a GOOD job and I am 100% with you!!!! Should YOU wish to adopt this proposal please let me know. Please acknowledge receipt of this letter YOURSELF

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# INTERNATIONAL BROTHERHOOD OF TEAMSTERS



**JAMES P. HOFFA**
General President

25 Louisiana Avenue, NW
Washington, DC 20001

**C. THOMAS KEEGEL**
General Secretary-Treasurer

202.624.6800
www.teamster.org

November 2, 2006

**BY FAX: 312-222-4206**
**BY UPS NEXT DAY**

Mr. Crane H. Kenney
Corporate Secretary
The Tribune Company
435 North Michigan Avenue
Chicago, IL  60611

Dear Mr. Kenney:

I hereby submit the following resolution on behalf of the Teamsters General Fund, in accordance with SEC Rule 14a-8, to be presented at the Company's 2007 Annual Meeting.

The General Fund has owned 160 shares of The Tribune Company continuously for at least one year and intends to continue to own at least this amount through the date of the annual meeting.  Enclosed is relevant proof of ownership.

Any written communication should be sent to the above address via U.S. Postal Service, UPS, or DHL, as the Teamsters have a policy of accepting only Union delivery.  If you have any questions about this proposal, please direct them to Noa Oren of the Capital Strategies Department, at (202) 624-8990.

Sincerely,

*C. Thomas Keegel*

C. Thomas Keegel
General Secretary-Treasurer

CTK/lm
Enclosures

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433920

**RESOLVED:**    That stockholders of Tribune Company, ("Tribune" or "the Company") ask the Board of Directors to adopt a policy that the Board's chairman be an independent director who has not previously served as an executive officer of the Company.    The policy should be implemented so as not to violate any contractual obligation.    The policy should also specify (a) how to select a new independent chairman if a current chairman ceases to be independent during the time between annual meetings of shareholders; and, (b) that compliance with the policy is excused if no independent director is available and willing to serve as chairman.

**SUPPORTING STATEMENT:**    It is the responsibility of the Board of Directors to protect shareholders' long-term interests by providing independent oversight of management, including the Chief Executive Officer (CEO), in directing the corporation's business and affairs.  Mr. Dennis FitzSimons currently holds both the position of Chairman of the Board and CEO at Tribune.  We believe this arrangement compromises the ability of the Board to have true independent oversight of management at our Company.

Shareholders of Tribune require an independent leader to ensure that management acts strictly in the best interests of the Company.  Recently, under FitzSimons' leadership, the Tribune Company admitted to overstating circulation at certain publications instigating a class action lawsuit by advertisers, sanctions from the Audit Bureau of Circulation (ABC) and investigations from both the Securities and Exchange Commission (SEC) and New York State's Attorney General, Elliot Spitzer.

We believe that ensuring that the Chairman of the Board of our Company is independent, will enhance Board leadership at Tribune, and protect shareholders from future management actions that can potentially harm shareholders.  Other corporate governance experts support this type of reform.  As a Commission of The Conference Board stated in a 2003 report, "The ultimate responsibility for good corporate governance rests with the Board of Directors.  Only a strong, diligent and independent board of directors that understands the key issues, provides wise counsel, and asks management the tough questions, is capable of ensuring that the interests of shareowners as well as other constituencies are being properly served."

Though William Osborn serves as a lead director on the Tribune Board, his ability to provide independent leadership may be compromised by other related transactions between our Company and the Northern Trust Corporation where he serves as Chairman and CEO.  In 2005, Tribune and certain of its employee benefit

Teamsters' Tribune Company Proposal
November 2, 2006
Page 2

plans paid Northern Trust and its subsidiaries $710,449 for trust and custody services, cash management and related services, and bank credit facility fees. And effective January 1, 2006, Tribune retained the Northern Trust Company, the principal subsidiary of Northern Trust Corporation, as the trustee of each of Tribune's 401(k) savings plans.

With or without an independent lead director, however, we believe a Board is less able to provide independent oversight of the officers if the Chairman of that Board is also the CEO of the Company.

We, therefore, urge shareholders to vote **FOR** this important corporate governance reform.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**



# Amalgamated Bank
### America's Labor Bank

10/30/2006

Mr. Crane H. Kenney
Corporate Secretary
Tribune Company
435 North Michigan Ave
Chicago, I.L. 60611

**Re: Tribune Company**

Dear Mr. Kenney,

Amalgamated Bank is the record owner of 160 shares of common stock (the "Shares") of Tribune Company, beneficially owned by the International Brotherhood of Teamsters General Fund. The shares are held by Amalgamated Bank at the Depository Trust Company in our participant account # 2352. The International Brotherhood of Teamsters General Fund has held the shares continuously since 05/27/2005 and intends to hold the shares through the shareholders meeting.

If you have any questions or need anything further, please do not hesitate to call me at (212) 462-3749.

Very truly yours,

Niall J. Kenny
*Vice President*
**Amalgamated Bank**
11-15 Union Square
New York, NY 10003

NJK/nk

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**



**Legal Office**
P.O. Box 942707
Sacramento, CA  94229-2707
Telecommunications Device for the Deaf - (916) 795-3240
(916) 795-3675   FAX (916) 795-3659

**CalPERS**

November 17, 2006                                **OVERNIGHT MAIL**

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
Attn: Crane H. Kenney, Corporate Secretary

    Re:  Notice of Shareowner Proposal

Mr. Kenney:

The purpose of this letter is to submit our shareowner proposal for inclusion in the proxy materials in connection with the company's next annual meeting pursuant to SEC Rule 14a-8.[1]

Our submission of this proposal does not indicate that CalPERS is closed to further communication and negotiation.  Although we must file now, in order to comply with the timing requirements of Rule 14a-8, we remain open to the possibility of withdrawing this proposal if and when we become assured that our concerns with the company are addressed.

If you have any questions concerning this proposal, please contact me.

Very truly yours,

PETER H. MIXON
General Counsel

Enclosures

cc:    Dennis Johnson, Senior Portfolio Manager - CalPERS
      Dennis J. FitzSimons, Chairman, President & CEO – Tribune Company

---

[1]  CalPERS is the owner of approximately 940,000 shares of the company.  Acquisition of this stock has been ongoing and continuous for several years.  Specifically, CalPERS has owned shares with a market value in excess of $2,000 continuously for at least the preceding year.  (Documentary evidence of such ownership is enclosed.)  Furthermore, CalPERS intends to continue to own such a block of stock at least through the date of the annual shareholders' meeting.

**California Public Employees' Retirement System**
**www.calpers.ca.gov**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## SHAREOWNER PROPOSAL

RESOLVED, that the shareowners of the Tribune Company ("Company") urge the Company to take all steps necessary, in compliance with applicable law, to remove the supermajority requirements in its Certificate of Incorporation and by-laws, including but not limited to those supermajority requirements related to the approval of certain business combinations and changes of the by-laws.

## SUPPORTING STATEMENT

Is accountability by the Board of Directors important to you as a shareowner of the Company? As a trust fund with more than 1.4 million participants, and as the owner of approximately 940,000 shares of the Company's common stock, the California Public Employees' Retirement System (CalPERS) *thinks accountability is of paramount importance.* This is why we are sponsoring this proposal which, if passed, would make the Company more accountable to shareowners by removing supermajority requirements that, *among other things, make it very difficult to approve certain business* combinations or amend the company's bylaws.

As it currently stands, the affirmative vote of 80% of the outstanding shares of the Company are required for shareowners to amend the Company's by-laws and approve certain business combinations. When you consider abstentions and broker non-votes, such a supermajority vote can be almost impossible to obtain. For example, a proposal to declassify the board of directors filed at Goodyear Tire & Rubber Company failed to pass even though approximately 90% of votes cast were in favor of the proposal. While it is often

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

stated by corporations that the purpose of supermajority requirements is to provide corporations the ability to protect minority shareholders, supermajority requirements are most often used, in CalPERS' opinion, to block initiatives opposed by management and the board of directors but supported by most shareowners. The Goodyear Tire & Rubber Company vote is a perfect illustration.

CalPERS believes that corporate governance procedures and practices, and the level of accountability they impose, are closely related to financial performance. CalPERS also believes that shareholders are willing to pay a premium for shares of corporations that have excellent corporate governance, as illustrated by a recent study by McKinsey & Co. If the Company were to remove its supermajority requirements, it would be a strong statement that this Company is committed to good corporate governance and its long-term financial performance.

We urge your support FOR this proposal.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only



**STATE STREET.**
*Serving Institutional Investors Worldwide™*

State Street California, Inc.
Institutional Investor Services
1001 Marina Village Parkway, 3rd Floor
Alameda, CA 94501

Telephone: (510) 521-7111
Facsimile: (510) 337-5791

November 17, 2006

To Whom It May Concern:

State Street Bank & Trust Company, as custodian for the California Public Employees' Retirement System, declares the following under penalty of perjury:

1) State Street Bank and Trust Company performs master custodial services for the California State Public Employees' Retirement System.

2) As of the date of this declaration and continuously for at least the immediately preceding eighteen months, California Public Employees' Retirement System is and has been the beneficial owner of shares of Tribune Company, having a market value in excess of $1,000,000.00.

3) Such shares beneficially owned by the California Public Employees' Retirement System are custodied by State Street Corporation through the electronic book-entry services of the Depository Trust Company (DTC). State Street is a participant (Participant Number 0997) of DTC and shares registered under participant 0997 in the street name of Surfboard & Co. are beneficially owned by the California Public Employees' Retirement System.

Signed this 17th day of November, 2006 at Sacramento, California.

STATE STREET CORPORATION
As custodian for the California Public Employees'
Retirement System.

By: _____

Title:  Client Service Officer

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

November 22, 2006

Mr. Crane H. Kenney
Senior Vice President, General Counsel and Secretary
Tribune Company
435 North Michigan Ave.
Chicago, IL 60611

Dear Mr. Kenney:

Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "Trusts") hereby submit the enclosed shareholder proposal (the "Proposal") for inclusion in the proxy statement of Tribune Company (the "Company") to be circulated to the Company's shareholders in conjunction with the next annual meeting of shareholders. The Proposal is submitted under Rule 14a-8 (Proposals of Security Holders) of the U.S. Securities and Exchange Commission's proxy rules. We understand that a proposal similar to the Proposal was previously submitted by Ms. Evelyn Y. Davis on June 16, 2006, and we do not know the current status of Ms. Davis' proposal or her intentions. If Ms. Davis' proposal is included in the Company's proxy statement the Proposal enclosed herewith may be omitted.

The Trusts are the record holders of an aggregate of 48,126,341 shares of the Company's common stock, 36,304,135 shares of which have been held continuously by the Trusts for more than a year. The Trusts intend to hold these shares through the date of the Company's next annual meeting of shareholders. The shares held by the Trusts are covered by the Schedule 13D filed by the Trustees of the Trusts on June 21, 2000, as amended by Amendment No. 1 filed on June 13, 2006 and Amendment No. 2 filed on September 27, 2006. The Trusts have no material interest in the Proposal. The address of the Trusts, as it appears on the Company's books, is 350 West Colorado Blvd., Suite 230, Pasadena, California 91105.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

If you have any questions or wish to discuss the Proposal, please contact me at (310) 552-8557. Copies of any correspondence should be forwarded to me at Gibson, Dunn & Crutcher LLP, 2029 Century Park East, Los Angeles, CA 90067 with a copy to Andrew Bogen, Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, CA 90071.

Sincerely,

William Stinehart, Jr.

Enclosure

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433929

## ANNUAL DIRECTOR ELECTION PROPOSAL

**Resolved,** that the shareholders of Tribune Company (the "Company") urge the board of directors to take the necessary steps, in compliance with state law, excluding those steps that must be taken by shareholders, to eliminate the classification of the Company's board of directors and to require that all directors stand for election annually. The declassification should be completed in a manner that does not affect the unexpired terms of previously elected directors.

**Supporting Statement:**   We believe the election of directors is the most powerful way shareholders influence the Company's strategic options. Our Company's Board of Directors is divided into three classes, with approximately one-third of all directors elected annually to three-year terms. In our opinion, this director classification system, which results in only a portion of the Board being elected annually, is not in the best interests of our Company and its shareholders. We believe shareholders should have the opportunity to vote on the performance of the entire Board each year and we don't believe destaggering the board will destabilize the Company or affect the continuity of director service.

The classification of the Company's board is effected in its certificate of incorporation, and amendment of the charter provision classifying the board requires approval of a majority of the Company's outstanding shares. There was strong shareholder support for this proposal last year, with more than 46% voting in favor of declassifying our Company's board.

We believe investors increasingly favor requiring annual elections for all directors. The Council of Institutional Investors, the California Public Employees' Retirement System, and Institutional Shareholder Services have supported this reform. According to the Investor Responsibility Research Center, a majority of shareholders at 74 companies voted in favor of annual director elections in 2005, and a record 44 companies proposed to repeal their classified board structure last year.

In our view, the election of directors is the primary avenue for shareholders to influence corporate governance policies and to hold management accountable for implementing those policies. Eliminating this classification system would require each director to stand for election annually and would give shareholders an opportunity to register their views on the performance of the board collectively and each director individually.

We urge shareholders to vote for this proposal.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**3**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433931

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB-UR-0433932**

**TRIBUNE COMPANY**
**NOMINATING & GOVERNANCE COMMITTEE**
**BOARD AND COMMITTEE PERFORMANCE REVIEWS**

As required by the Company's Governance Guidelines, each year the Board reviews its performance and that of the Board's committees. Self evaluation questionnaires were circulated at the May 2 Board meeting and completed questionnaires were returned to the Company's corporate secretary.

At the July meeting, the Committee deferred review of the Board and Committee questionnaire responses to this meeting. The following reports provide a consolidated review of the responses of each of the Board members regarding Board performance and the Committee members regarding Committee performance. The Committee will review the responses at the meeting and report the results of its reviews to the full Board.

MWH
12/5/06

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# TRIBUNE COMPANY

## 2006 Board of Directors Self Evaluation Questionnaire

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improvement* (✓) | Comments |
|---|---|---|---|---|
| **A** | **Board Meeting Mechanics** | | | |
| 1.  Length of meetings | 5 | 5 | 1 | •Meetings flex and lengthen as needed to ensure sufficient coverage of key issues.<br>•Considering what the Company has been going through and the decisions recently.<br>•Need to allow more time to convey major issues and strategic discussions. |
| 2.  Number of meetings | 5 | 6 | | •A lot has been going on so it is understandable. |
| 3.  Agenda setting (process and content) | 6 | 5 | | •Content has been better this year with more time spent on key strategic issues.  Should spend time on key metrics, growth plans, major cost reductions, portfolio options this next year. |
| 4.  Between meeting communications; sufficiency of information flow | 7 | 4 | | •Dennis does a good job with e-mails and phone calls keeping the Board informed between meetings.<br>•Dennis keeps us up-to-date and always returns calls quickly.<br>•Sometimes unscheduled meetings are less well prepared for. |
| 5.  Timeliness and sufficiency of pre-meeting materials | 8 | 3 | | •No problem. |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improvement* (✓) | Comments |
|---|---|---|---|---|
| **B. Meeting Content/Conduct** | | | | |
| 1. Balance between strategy and operations | 4 | 6 | 1 | •Has improved with more time spent on strategy this year.<br>•More focus on our strategy. Also, time spent on cost cuts and improving operations.<br>•Too focused on reporting operations.<br>•Heavier on operations than strategy. |
| 2. Quality of Management presentations | 4 | 7 | | •Sometimes do not cover key contingencies or answer some key questions to make a decision.<br>•In general, very good.<br>•Pretty detailed. Often repetitive with info provided in book which is <u>very</u> detailed.<br>•Sometimes too packaged and not balanced.<br>•Getting better. |
| 3. Amount of detail in presentations | 5 | 6 | | •A lot. |
| 4. Coverage of corporate governance issues | 5 | 6 | | •Very good on standard corporate governance. Chandler Trust situation makes some issues more challenging. |
| 5. Time allotted for discussion | 4 | 6 | 1 | •We have a lot of discussions.<br>•Need more time to focus on strategy.<br>•Keep working on this. |
| 6. Climate for open discussion | 4 | 5 | 2 | •Dennis sets a good tone and encourages open discussion. Different agendas of some Board members at times makes open discussion difficult.<br>•Very open, but tension because of Chandler representatives.<br>•Management expects rubber stamp. |

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433935

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improvement* (✓) | Comments |
|------|------|------|------|------|
| **B. Meeting Content/Conduct (Continued)** | | | | |
| 7. Topics covered (breadth and depth) | 3 | 7 | | |
| 8. Quality of Committee reports to Board | 6 | 5 | | • Excellent Committee reports.<br>• Sometimes too packaged but definitely getting better. |
| 9. Candid and constructive Executive Sessions | 8 | 2 | 1 | • Very open, candid, but some tension with Chandler Directors.<br>• Should structure Executive Sessions allowing more time. Too rushed. |

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433936



| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve-ment* (✓) | Comments |
|---|---|---|---|---|
| **C. Board Organization/Operation** | | | | |
| 1. Size of Board | 4 | 7 | | •Currently one short with the loss of Kathryn Turner.<br>•Need more independent directors but now is not the time.<br>•Could use one more. |
| 2. Committee structure and makeup | 4 | 6 | | •Much better. |
| 3. Exposure and access to Management | 6 | 5 | | •No problem. |
| 4. Exposure and access to external advisors and other adequate resources | 8 | 3 | | •Utilization of BCG, Merrill Lynch and Sidley Austin has been very helpful this year.<br>•Open access. |
| 5. Board composition (experience, expertise, mix of skills, diversity, etc.) | 6 | 3 | 2 | •Should look to add another woman and/or person of color as seats become available.  Diversity can be enhanced.<br>•Excellent board – very candid between the 8 non Chandlers – work well together – stockholder comes first.<br>•Need more <u>racial</u> diversity. |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433937



| Item | Very Good (✓) | Satisfactory (✓) | Needs Improvement* (✓) | Comments |
|---|---|---|---|---|
| **C.  Board Organization/Operation (Continued)** | | | | |
| 6.   Meaningful dialogue between Directors and Management | 6 | 4 | | •Management out of sync with some Board members.  Don't appreciate Board's real concerns. |
| 7.   Director independence | 6 | 3 | 1 | •At times, Chandler Trust Board members are conflicted representing the Trust and all shareholders.<br>•Chandler directors are not independent.<br>•Directors are independent but some members question independence of Chicago directors. |
| 8.   Concern for integrity and ethical values | 9 | 2 | | |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433938

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve-ment* (✓) | Comments |
|---|---|---|---|---|
| **1) Board Practices** | | | | |
| 1.  Director selection and nomination | 3 | 6 | 1 | •Not been through it yet.<br>•Not much participation from Board members other than Nom. & Gov. Committee members. |
| 2.  Committee selection | 2 | 8 | | •Can't comment. |
| 3.  Director orientation and continuing education | 2 | 7 | 2 | •Some other boards do more in the way of continuing education.<br>•Last directors to join were thrown into turbulent waters without adequate preparation. |
| 4.  Board evaluation process | 3 | 7 | | |

6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433939

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve-ment* (✓) | Comments |
|---|---|---|---|---|
| **F.  Board Performance** | | | | |
| 1.   Understanding our business/industry | 3 | 8 | | •Could still do a better job on likely scenarios of future state based on evolving technology and competitive set.<br>•We spend a lot of time on the industry, both publishing and broadcasting. |
| 2.   Keeping current with issues affecting the Company (internal and external) | 7 | 4 | | •Well communicated. |
| 3.   Understanding our strategy | 3 | 7 | 1 | •Need continued work on strategy and consensus.<br>•Quickly evolving environment means directors need to keep up with news/changes.<br>•Need continuing discussion. |
| 4.   Involvement in long-term strategic planning process | 4 | 7 | | •Significant time investment this year in this area. |
| 5.   Understanding our processes for monitoring business risks | 3 | 7 | 1 | |

7

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433940

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve- ment* (✓) | Comments |
|---|---|---|---|---|
| **I.   Board Performance (Continued)** | | | | |
| 6.   Understanding our annual operating plan process | 4 | 7 | | |
| 7.   Monitoring financial and other indicators of performance | 5 | 6 | | •Still opportunity to focus more on key metrics that will drive performance. <br>•Need to better understand circulation and viewer trends rather than static reports. |
| 8.   Monitoring major capital and other projects | 6 | 4 | 1 | |
| 9.   Assessment and understanding of the Company's competitive position | 5 | 6 | | •Hard to do in changing industry even for experts. |
| 10.   Sharing insights and experiences | 4 | 6 | 1 | •Would like to hear more from other directors. |
| 11.   Effective oversight of management | 3 | 8 | | |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433941

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improvement* (✓) | Comments |
|---|---|---|---|---|
| **Board Performance (Continued)** | | | | |
| 12. Engaging in constructive dialogue | 5 | 6 | | |
| 13. Attendance at meetings | 7 | 4 | | |
| 14. CEO evaluation process | 8 | 3 | | |
| 15. CEO and senior management succession planning | 4 | 6 | 1 | •Need to do a better job on CEO succession.<br>•Really missing at this point. |

9

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433942

| Item | Yes (✓) | No (✓) | Comments |
|---|---|---|---|
| **Strategic Planning Process** | | | |
| 1. Is the strategic plan review of appropriate duration? | 9 | 2 | •Need more time with the Company and industry in such transformation. <br>•When off-site. <br>•Probably need longer view. <br>•Move to longer duration meeting.  At Kohler was constructive. |
| 2. Does the written strategic plan document facilitate discussion? | 11 | | •It was helpful to have BCG perspective this year. <br>•At this point in the industry situation, both are important. |
| 3. Is it helpful to include a general business overview in the written report or should the report focus solely on strategic plan progress and environmental changes? | 10 | | •General business overview is always helpful. <br>•Strategic plan and environment. <br>•Include business overview. |
| 4. Is it helpful to include business operators in the discussion? | 8 | 1 | •Focus on most senior operators. <br>•Only to talk about general business overview. |

10

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433943

| Item | Yes (✓) | No (✓) | Comments |
|---|---|---|---|
| **B. Strategic Planning Process (Continued)** | | | |
| 5.    Is the executive session useful? | 11 | | |
| 6.    Do you have any suggestions to improve the strategic planning process? | 5 | 4 | •Still need a better overview of key emerging technologies, emerging competitors, future scenarios, some rule changing options.  What is next generation beyond internet?  Other partnerships we should be pursuing?  What skills/capabilities will we need in the future?  Key metrics to track progress.<br>•Maybe have a retreat session prior to completion of plan to allow for more input.<br>•Need to keep looking for <u>prescriptions</u> and solutions, not <u>descriptions</u> and projections.  We'll all keep working at it.<br>•Continue with new longer duration format.<br>•The planning process is fine.  It's the execution that needs to be worked on.<br>•Additional strategy discussions during regular Board meetings/dinners other than October off-site.<br>•More time for discussion. |

11

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433944

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve-ment* (✓) | Comments |
|---|---|---|---|---|
| **G.    Overall Collective Performance of Board** | | | | |
| 1.    Overall, I feel the performance of the Board is: | 6 | 5 | | •Overall performance of the Board is good in a very challenging situation.  Need to resolve Chandler Trust issues for Board to be effective going forward.  Board members leaking for their own interest has eroded trust. <br> •We spend a huge amount of time dealing with the Chandler issue.  It certainly complicates Board meetings.  I think we have an excellent Board though that really focuses on the issues. |

**H.    Additional Comments/Suggestions:**

12

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433945

# TRIBUNE COMPANY

## 2006 Nominating & Governance Committee Self Evaluation Questionnaire

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve-ment* (✓) | Comments |
|---|---|---|---|---|
| Committee Organization and Membership | | | | |
| 1. Clarity of Committee's role (as it relates to: management, other committees, full Board) | 2 | 3 | | |
| 2. Size | 1 | 4 | | |
| 3. Composition (including independence) | 4 | 1 | | |
| 4. Effectiveness and leadership of Chairman | 4 | | | |
| 5. Level of member contribution | 4 | 1 | | |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433946

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improvement* (✓) | Comments |
|---|---|---|---|---|
| **B. Meeting** | | | | |
| 1. Frequency, length and schedule of meetings | 2 | 3 | | |
| 2. Timeliness and sufficiency of advance materials | 2 | 3 | | |
| 3. Between meeting communications; sufficiency of information flow | 1 | 4 | | • But we have not needed such in recent times. |
| 4. Quality of communication within Committee | 4 | 1 | | |
| 5. Ability to discuss and resolve key issues effectively | 5 | | | |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433947

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve-ment* (✓) | Comments |
|---|---|---|---|---|
| **Agenda Setting and Execution** | | | | |
| 1.    Process for development of agendas | 1 | 4 | | |
| 2.    Adequacy of support from internal or external resources | 3 | 2 | | |
| 3.    Sufficient Committee independence (from the CEO and management) | 3 | 2 | | |

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433948

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve- ment* (✓) | Comments |
|------|:---:|:---:|:---:|---|
| **D.  Other** | | | | |
| 1.  Quality of communication by the Committee with full Board and other committees | 4 | 1 | | |
| 2.  Quality of communication by the Committee with management | 3 | 2 | | |
| 3.  Quality of minutes and other records | 2 | 3 | | |
| 4.  Clarity and sufficiency of Committee Charter | 2 | 3 | | |

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433949

| Item | Very Good (✓) | Satisfactory (✓) | Needs Improve-ment* (✓) | Comments |
|---|---|---|---|---|
| **Committee Performance** | | | | |
| 1. Overall effectiveness of the Committee in discharging its responsibilities as outlined in the Committee Charter | 3 | 1 | | |

**F.   Additional Comments/Suggestions:**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433950

**5**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## LLOYD H. DEAN

Lloyd H. Dean is President and Chief Executive Officer of Catholic Healthcare West (CHW), a not-for-profit healthcare system, in San Francisco, California, since April 2000. Before joining CHW, Mr. Dean was Executive Vice President and Chief Operating Officer of Advocate Health Care, a faith-based integrated health care delivery system in Oak Brook, Illinois. Mr. Dean was also with The Upjohn Company where he held progressively responsible management positions, including National Vice President of Sales for the Upjohn Health Care Services Division. He was recognized with the W.E. Upjohn Award for management and operational excellence.

Mr. Dean currently serves on the board of Wells Fargo & Company (NYSE:WFC), a diversified financial services company. Mr. Dean also serves on the boards of numerous other organizations including Premier, Inc., the largest healthcare alliance in the United States, the California Healthcare Association, Mercy Housing California and the Catholic Health Association of the USA (Board and Executive Committees). He is also a member of McKesson's Advisory Board, the Healthcare Research and Development Institute, Governor Schwarzenegger's California Commission for Jobs and Economic Growth and San Francisco Committee on JOBS.

Mr. Dean received his bachelor's degree in communications and his master's degree in education from Western Michigan University and he is a graduate of Pennsylvania State University's executive management program. He also was an assistant professor in the School of Business at Western Michigan University and taught in the Kalamazoo public school system. Mr. Dean serves on the Board of Trustees for Elmhurst College and is Board Vice-Chairman of the Sisters of Charity of Leavenworth Health Services Corporation, a Midwestern Catholic health system.

Mr. Dean, 55, currently resides in San Francisco.

**Public Company Board Committees:**

| | |
|---|---|
| Wells Fargo | Audit and Examination |
| | Finance |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## COLEMAN H. PETERSON

Coleman H. Peterson is President and Chief Executive Officer of Hollis Enterprises, LLC, a human resources consulting firm, which he founded in 2004 following his retirement from Wal-Mart Stores, Incorporated. Mr. Peterson was an Executive Vice President of People at Wal-Mart Stores, Inc. from 1994 to 2004. At Wal-Mart, Peterson had the distinction of being Chief Human Resource Officer of the world's largest private workforce – 1.5 million associates worldwide. Peterson was responsible for the recruitment, retention and development of Wal-Mart's retail organization that continues its global growth in countries including Mexico, Canada, the U.K., Asia and South America. Mr. Peterson is also well respected for his efforts in strategic succession planning. Prior to joining Wal-Mart, Mr. Peterson spent 16 years with Venture Stores of St. Louis, with his last role being the Senior Vice President of Human Resources.

Mr. Peterson currently serves on the boards of The ServiceMaster Company (NYSE:SVM ), a national outsourcing services company, J. B. Hunt Transport Services, Inc. (NASDAQ:JBHT), a full truck-load transportation and logistics company, and Build-A-Bear Workshop, Inc. (NYSE:BBW), a novelty consumer products retailer.

Mr. Peterson is a member of the National Council of La Raza and a past recipient of the Society for Human Resource Management's highest recognition - The Award for Professional Excellence. He also sits on the Executive Committee of the NAACP, where he serves as Treasurer of the NAACP's Special Contribution Fund, and is the Vice-Chairman of the Board of Trustees of Northwest Arkansas Community College.

Mr. Peterson, age 57, was born in Birmingham, Alabama and grew up in Chicago. He attended Lane Tech High School on Chicago's northwest side, graduated from Loyola University of Chicago with a bachelor's degree in English Literature and a master's degree in Industrial Relations. He currently resides in Rogers, Arkansas with his wife and has two children.

**Public Company Board Committees:**

| | |
|---|---|
| Service Master | Compensation and Leadership Development (Chair)<br>Executive |
| J.B. Hunt | Executive Compensation (Chair) |
| Build-A-Bear | Compensation (Chair)<br>Governance |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRIBUNE COMPANY**
**BOARD OF DIRECTORS**
**RETIREMENT POLICY AND SCHEDULE**

A director who is not an officer of the Company is eligible to serve as a director until the annual meeting occurring after the director's 72nd birthday. A director who is an officer of the Company is eligible to serve as a director until either (i) the officer's resignation as an officer of the Company or (ii) the annual meeting next occurring after the officer's retirement (By-law §3.1).

| TERM EXPIRES 2007 | BIRTH DATE | AGE* | SERVED SINCE | RETIREMENT REQUIRED** | YEARS WILL HAVE SERVED |
|---|---|---|---|---|---|
| Chandler | 01/18/42 | 64 | 2000 | 2014 | 14 |
| Osborn | 10/14/47 | 58 | 2001 | 2020 | 19 |
| White | 03/10/55 | 51 | 2005 | 2027 | 22 |
| **TERM EXPIRES 2008** | | | | | |
| Goodan | 07/17/45 | 60 | 2000 | 2018 | 18 |
| Hernandez | 11/2/55 | 50 | 2001 | 2028 | 27 |
| Reyes | 12/29/53 | 52 | 2005 | 2026 | 21 |
| Taft | 04/24/40 | 65 | 1996 | 2012 | 16 |
| **TERM EXPIRES 2009** | | | | | |
| FitzSimons | 06/26/50 | 55 | 2000 | *** | *** |
| Holden | 10/19/55 | 50 | 2002 | 2028 | 26 |
| Morrison | 04/4/42 | 63 | 2001 | 2014 | 13 |
| Stinehart | 12/15/43 | 62 | 2000 | 2016 | 16 |

*Age as of mailing date of 2006 Proxy (March 24, 2006).
**Assumes Annual Meeting occurs in May.
***Retirement at Annual Meeting following retirement as officer of the Company.

CHK/bad
8/24/06

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## COMMITTEE APPOINTMENTS

### Audit Committee
Betsy Holden
William A. Osborn*
J. Christopher Reyes
Dudley S. Taft

#### Observers:
Jeffrey Chandler
Roger Goodan

### Executive Committee
Dennis J. FitzSimons*
Enrique Hernandez, Jr.
Robert S. Morrison
William A. Osborn
William Stinehart, Jr.

### Nominating & Governance Committee
Roger Goodan
Enrique Hernandez, Jr.*
Robert S. Morrison
J. Christopher Reyes
William Stinehart, Jr.

### Compensation & Organization Committee
Jeffrey Chandler
Enrique Hernandez, Jr.
Robert S. Morrison*
Miles D. White

*Chairman

CHK/bad
7/19/06

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433955

COMPENSATION & ORGANIZATION COMMITTEE

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433956

# TRIBUNE COMPANY
## COMPENSATION & ORGANIZATION COMMITTEE MEETING
### TUESDAY, DECEMBER 12, 2006 (8:30 A.M.)
### LAKEVIEW ROOM, 24TH FLOOR
### TRIBUNE TOWER

## AGENDA

|  | Tab No. |
|---|---|
| Approve minutes of October 18 and November 9, 2006 meetings | 1 |
| Proxy disclosure review | 2 |
| Committee charter review | 3 |
| Compensation review | 4 |
| Retired executive administrative support | 5 |

Compensation & Organization Committee
Jeffrey Chandler
Enrique Hernandez, Jr.
Robert S. Morrison, Chairman
Miles D. White

Tribune Company
Dennis J. FitzSimons
Donald C. Grenesko
Crane H. Kenney

Guests
Chip Mulaney, Skadden Arps
George Paulin, Frederic W. Cook & Co.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**TRIBUNE COMPANY**
**COMPENSATION & ORGANIZATION COMMITTEE MEETING**
**OCTOBER 18, 2006**

The Compensation & Organization Committee met at 10:45 a.m. on Wednesday, October 18, 2006 at Tribune Tower, Chicago, Illinois, pursuant to notice. The meeting was attended by Jeffrey Chandler, Enrique Hernandez, Jr., Robert S. Morrison and Miles D. White. Dennis J. FitzSimons, Donald C. Grenesko, Crane H. Kenney, Luis E. Lewin, Tom Cole of Sidley Austin LLP, Chip Mulaney of Skadden, Arps, Slate, Meagher & Flom LLP and George B. Paulin of Frederic W. Cook & Co., Inc. also participated in the meeting.

Mr. Morrison acted as Chairman of the meeting. Messrs. Cole, FitzSimons, Grenesko, Kenney, Lewin, Mulaney and Paulin were present as the meeting was called to order. The following business was discussed by the Committee:

1.    The minutes of the July 19, 2006 Compensation & Organization Committee meeting were approved as submitted.

2.    Mr. Grenesko led a discussion of a written report submitted to the Committee prior to the meeting regarding compensation and benefits matters that could be implemented in the event of a change in control transaction closing in 2007. The following recommendations were included in the report:

- 2006 MIP payouts will be determined based on the formulas approved at the February 2006 Committee meeting;
- normal salary reviews will be made in February 2007;
- the buyer will be obligated to make 2007 MIP payouts under the Incentive Compensation Plan at the higher of target or actual year-end results;
- the 2006 401(k) plan profit sharing allocation will be based on consolidated financial performance;
- the buyer will be obligated to continue the Company's 401(k) plans through the end of 2007;
- the grant of up to 2 million restricted share units in connection with a change in control transaction (with individual grant recommendations subject to Committee review and approval); and
- that certain unfunded deferred compensation and supplemental retirement plans be amended to provide for an automatic payout of accrued benefits upon a change in control and to adopt the Internal Revenue Code definition of "change in control."

The Committee noted that the recommendations were reviewed by George Paulin of Frederic W. Cook & Company, the Committee's compensation consultant, and representatives Merrill Lynch and Citigroup, the lead investment banks in the Company's strategic alternatives review, each of whom opined that all the recommendations are reasonable and consistent with general practice.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Following discussion, the Committee approved all of management's recommendations (except for the proposed amendments to the director deferred compensation plans, which the Committee reserved the right to reconsider) and agreed to recommend to the Board that it adopt the following resolutions in order to effect the compensation plan amendments:

RESOLVED, that the following unfunded, non-qualified compensation plans be amended to provide that all accrued amounts under the plans be paid to plan participants upon a Change in Control and to adopt the Internal Revenue Code Section 409A definition of Change in Control: (i) the Tribune Company Bonus Deferral Plan; (ii) the Tribune Company Supplemental Defined Contribution Plan; and (iii) the Tribune Company Supplemental Retirement Plan; and

FURTHER RESOLVED, that the Tribune Company Employee Benefits Committee be, and hereby is, authorized (with full power of delegation), in the name and on behalf of the Board of Directors (or any committee thereof) to take all steps necessary to effect the foregoing resolutions, including preparing, executing, delivering and filing the amendments and such other documents as may be required by law or as may be deemed necessary or proper in connection with the matters set forth in these resolutions.

There being no further business to come before the Committee, the meeting was adjourned at 12:00 p.m.


_____

Robert S. Morrison
Chairman

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433960

**TRIBUNE COMPANY**
**COMPENSATION & ORGANIZATION COMMITTEE MEETING**
**NOVEMBER 9, 2006**

The Compensation & Organization Committee met on Thursday, November 9, 2006, at 9:00 A.M., Central Time, by teleconference. Robert S. Morrison, Jeffrey Chandler, Enrique Hernandez, Jr. and Miles D. White were in attendance. Also participating were Charles W. Mulaney, Jr., Skadden, Arps, Slate, Meagher & Flom LLP and George B. Paulin, Frederic W. Cook & Co., Inc.

Mr. Morrison acted as Chairman of the meeting. Messrs. Mulaney and Paulin were present as the meeting was called to order. The following business was discussed by the Committee:

1. Referencing materials previously distributed to the members of the Committee, Mr. Morrison outlined a proposal for providing cash awards to nine members of senior management depending upon the results obtained in the Company's consideration of strategic alternatives, including a possible sale of the Company. He outlined the amounts the five most senior executive officers would receive under existing agreements upon a change in control of the Company on the assumption that the individual's employment with the Company both did and did not continue following the change in control.

2. The Committee reviewed and discussed the Company's current and historical compensation practices as compared with the Company's peer group, as well as the anticipated value upon a change in control of previous awards of options and restricted stock for senior executives. The desirability of incentivizing senior management to maximize the value for stockholders in a sale of the Company or other strategic transaction was discussed and agreed upon. Individual award amounts at various change in control prices were outlined and discussed. There was a consensus among committee members that some form of an award program should be established. Messrs. Paulin and Chandler left the meeting at this point.

3. Discussion continued as to the appropriate amounts of awards at possible per share transaction values. Following further discussion and questions, the committee decided (i) not to take any formal action at this time, (ii) to continue to study the amounts of awards to be made at various outcomes and (iii) to instruct management to advise bidders that the Compensation Committee wanted to retain authority to make awards in the aggregate of up to $25,000,000 under a success award plan for senior management. The amounts and targets for such awards would be determined at a later date.

There being no further business to come before the Committee, the meeting was adjourned.

_____
Robert S. Morrison
Chairman

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**2**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433962

**3**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB-UR-0433963

## TRIBUNE COMPANY
## COMPENSATION & ORGANIZATION COMMITTEE
## COMMITTEE CHARTER REVIEW

The Compensation & Organization Committee Charter requires the Committee to review and reassess the adequacy of the charter annually and recommend any proposed changes to the Board for approval.

The current Committee charter, which was amended and restated last October as part of the Board committee restructuring, is based on a model compensation committee charter developed by Wachtell Lipton Rosen & Katz. Other than the SEC's new executive compensation disclosure rules, which will be in effect for the upcoming proxy season, there have been no significant developments affecting compensation committee governance practices since last October.

Attached as Annex A is a proposed revised Committee charter for review and recommendation to the full Board for approval. The proposed charter is marked to show the changes management recommends be made in light of the new executive compensation disclosure rules and a few other clean-up changes.


MWH
12/05/06

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## COMPENSATION & ORGANIZATION COMMITTEE CHARTER
### (As in effect on ~~October 19, 2005~~December 12, 2006)

### Purpose

The Compensation & Organization Committee is appointed by the Board of Directors to: (a) discharge the Board's responsibilities relating to compensation of the directors and officers of the Company and its subsidiaries; (b) assist the Board of Directors with management development and succession planning; and (c) perform other related tasks, as may be requested from time to time by the Board of Directors.

### Committee Membership

The Compensation & Organization Committee shall consist of no fewer than three members. The members of the Committee shall meet the independence requirements of the New York Stock Exchange.  The members of the Committee, including a chairperson, shall be appointed and replaced by the Board of Directors based on recommendations of the Nominating & Governance Committee.

### Committee Authority and Responsibilities

1.  The Committee shall annually review and approve corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and either as a committee or together with the other independent directors (as directed by the Board), determine and approve the CEO's compensation level based on this evaluation.

2.  <u>The Committee shall annually review and approve for the CEO and the senior executive officers of the Company, (i) the annual base salary level, (ii) the annual incentive opportunity level, (iii) the long-term incentive opportunity level, (iv) employment agreements, severance arrangements, and change in control agreements/provisions, in each case, when and if appropriate, and (v) any special or supplemental benefits.</u>

3.  The Committee shall fix and determine awards to employees of stock, stock options, stock appreciation rights, restricted stock<u>, restricted stock units</u> or other forms of equity compensation pursuant to any of the Company's employee stock option or ~~stock-related~~ <u>equity compensation</u> plans now or from time to time hereafter in effect and exercise such other power and authority as may be permitted or required under such plans.

4.  The Committee shall annually consult with the CEO and make recommendations with respect to non-CEO executive officer compensation, and incentive compensation and equity-based plans that are subject to Board approval.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

5.  The Committee: (i) shall, from time to time, make recommendations to the Board with respect to those equity compensation plans that are subject to shareholder approval and (ii) may, from time to time, make recommendations to the Board with respect to <u>those equity compensation plans that are not subject to shareholder approval or</u> any other incentive compensation, deferred compensation, retirement or welfare benefit plans.

~~The Committee shall review and, in its discretion, either (i) approve or disapprove or (ii) recommend to the Board for approval or disapproval, those equity compensation plans that are not subject to shareholder approval.~~

6.  The Committee shall periodically review and make recommendations to the Board with respect to the compensation of outside directors.

7.  The Committee shall periodically review and make recommendations to the Board with respect to stock ownership guidelines applicable to Company employees and outside directors.

8.  The Committee shall <u>(i) review and discuss with management the Compensation Discussion and Analysis required to be included in the Company's annual report on Form 10-K and annual proxy statement filed with the Securities and Exchange Commission and (ii) ensure that it is sufficiently satisfied with the disclosure in order to be in a position to recommend to the Board that the Compensation Disclosure and Analysis be included in the annual report and proxy statement.</u> ~~produce a report on executive officer compensation as required by the Securities and Exchange Commission (SEC) to be included in the Company's annual proxy statement or annual report on Form 10-K filed with the SEC.~~

9.  The Committee shall participate in the annual management development and succession planning process and shall make recommendations to the Board, concerning management development and succession planning matters.

10. The Committee shall have the sole authority to retain and terminate any compensation consultant used to assist in the evaluation of director, CEO or other senior executive compensation and shall have sole authority to approve the consultant's fees and other retention terms.  Compensation consultants used to evaluate compensation of non-executive employees shall remain at the discretion of management.

11. The Committee shall have the authority to obtain advice and assistance from internal or external legal, accounting or other advisors.

12. The Committee may form and delegate authority to subcommittees when appropriate.

13. The Committee shall make regular reports to the Board.

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433966

14.    The Committee shall review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval.  The Committee shall annually review its own performance.

15.    The Committee shall carry out such other duties as may be delegated to it from time to time by the Board.

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433967

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# TRIBUNE COMPANY
# COMPENSATION UPDATE

## INTRODUCTION

As part of the Compensation and Organization Committee's 2005 performance review, the Committee requested a preview each December of Management's compensation recommendations before final approval at the February Committee meeting. Given the Company's current consideration of strategic alternatives and the need to inform bidders of compensation expense and equity grant levels in 2007, the Committee approved certain compensation matters at its October meeting. This report is for informational purposes only and no Committee action is required at this time.

## 2006 MANAGEMENT INCENTIVE PLAN (MIP)

In accordance with past practice, this year's MIP payouts will be based upon the formulas and operating plan approved at the February 2006 Board and Committee meetings. As shown below, current projections estimate Publishing to achieve approximately 78% of target, Broadcasting 162%, and Corporate (based on consolidated results) 98% of target. As is customary, Management will present final year-end results and bonus recommendations at the February 2007 Committee meeting.

|  | | 2006 MIP Achievement | | |
|  | | Operating Cash Flow + Equity Income* | | |
| ($ in millions) | Projected | Min<br>40% | Target<br>100% | Max<br>200% |
| Publishing | $951 | $854 | $1,005 | $1,155 |
| Broadcasting | 523 | 405 | 476 | 548 |
| Corporate | (46) | | (50) | |
| **Consolidated** | **$1,418** | **$1,217** | **$1,431** | **$1,646** |

\* Actual results and target levels have been adjusted to exclude stock-based compensation and the Atlanta, Albany and Boston television stations which have been sold.

## 2006 401(k) PROFIT SHARING ALLOCATION

Tribune's on-going retirement plan is comprised entirely of contributions to the 401(k) plan. Contributions are made within IRS limitations to a "qualified plan" and for employees with salaries above $220,000, to a supplemental plan. Employees receive a 4% allocation with each paycheck and a year-end allocation ranging from 2 to 5% depending on the given year's consolidated financial results. Based on current projections, Management estimates the year-end

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

401(k) allocation to be 2.5% for a total 2006 contribution of 6.5%. This has been lowered from the original target of 7.5%. The allocation may vary somewhat depending on December results.

## 2007 SALARY INCREASES

Customary with past years, the Company expects to award general merit increases of approximately 3% for 2007. This will include differentiation between excellent and average performance. Merit increases will take effect following the February Committee meeting.

The Company also expects to continue with the recommendation adopted by the Committee in December 2005 to make market based adjustments to certain executive salaries. At the December 2005 Committee meeting, George Paulin of Frederick W. Cook & Company reported that Management compensation significantly lagged industry peers. Base salaries, bonus targets and payouts, and total cash compensation fell significantly below the median for peer companies. Historically, as a growth oriented company, this compensation gap was closed through the use of stock options. However, more recently, stock options have not delivered any long-term incentive value. As a result, the Committee approved market adjustments to 19 executive salaries to be implemented over a two to three year timeframe. Management will make specific recommendations at the February 2007 Committee meeting to adjust salaries similar to the increases made in 2006.

## EQUITY GRANTS

At its October meeting, the Committee agreed to make normal 2007 equity grants for competitive compensation and retention purposes. The Committee also agreed that the 2007 equity awards would be comprised entirely of restricted stock, rather than stock options. In February 2006, the Company began using a combination of restricted stock and stock options, as every stock option award since 1998 was underwater. The chart below illustrates the dramatic reduction in stock option expense, first in anticipation of the need to expense stock options and then as the Company shifted to the use of restricted stock in 2006.

| | Options Granted | Grant Price | Black-Scholes Value | Total Grant Expense * |
|---|---|---|---|---|
| **Equity Grant Summary** | | | | |
| **(000's except per share data)** | | | | |
| 2001 | 7,540 | $40.18 | $13.79 | $103,977 |
| 2002 | 7,220 | 40.50 | 13.59 | 98,120 |
| 2003 | 6,635 | 45.90 | 13.90 | 92,227 |
| 2004 | 4,052 | 52.05 | 15.48 | 62,725 |
| 2005 | 3,648 | 40.59 | 10.51 | 38,340 |
| 2006 | | | | |
| Options | 1,920 | 31.16 | $5.96 | 11,443 |
| Restricted | | | | |
| Annual | 1,004 | 31.16 | N/A | 31,285 |
| Supplemental | 495 | 31.16 | N/A | 15,424 |
| 2006 Total | 1,499 | | | $58,152 |
| 2007 P | | | | |
| Restricted | 2,000 | 32.00 P | N/A | $64,000 |

*Accounting expense is recognized over a 36-month vesting period for the 2006 and 2007 awards. Prior year awards have been fully expensed because of accelerated vesting.

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

In February 2006, approximately 1 million restricted shares were granted in lieu of stock options based on a 4 to1 conversation ratio. To address competitive compensation inequities and retention issues, the Committee also approved grants of an additional 495,000 shares to 88 employees. The CEO and the other four executives in the proxy statement did not receive the supplemental award, as management did not want to indicate any weakness in their commitment to the Company. In total, the February 2006 equity awards were below the peer group median (share awards as a percentage of shares outstanding).

In October, the Committee agreed that 2007 awards would total up to 2 million restricted share units, equivalent to the February 2006 restricted stock units and options (assuming a 4 to 1 conversion ratio). The current value of this award would be approximately $64 million or 0.8% of the Company's equity market capitalization. According to a November 2006 Frederic Cook report, equity awards at this level would be between the 50-75th percentile for large capitalization companies and between the 25-50th percentile for middle capitalization companies.

The Committee also agreed to accelerate the 2007 grant awards to the earlier of the transaction announcement date or the February 2007 meeting. At that time, Management will present specific equity recommendations for senior Management based upon performance, contribution to the transaction process and retention risk.

## IMPACT ON STRATEGIC REVIEW

In connection with the Company's strategic review, each of the foregoing salary, MIP, 401(k) and equity grant recommendations have been incorporated in the 2007 financial projections and draft transaction documents. It is possible that the interested parties may attempt to negotiate the terms of these compensation recommendations and Management will continue to update the Committee as negotiations commence.

IMFS
12/05/06

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**                                    **TRB-UR-0433971**

5

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRIBUNE COMPANY**
**COMPENSATION & ORGANIZATION COMMITTEE**
**RETIRED EXECUTIVE ADMINISTRATIVE SUPPORT**

For a number of years, retired Tribune senior executives who were also directors of the Company were provided with an office, an assistant and a parking space upon their retirement from Tribune employment for their lifetime. Historically, because all of these retired senior executives were also directors of the McCormick Tribune Foundation, the Foundation provided the office space and the Company provided the assistant and the parking space.

Sometime in the mid- to late-1990's, the Governance and Compensation Committee adopted a policy whereby the Company would provide an office, an assistant and a parking space for a retired Tribune officer who also served as a Tribune director for such person's lifetime. The policy, which was never formally documented, has covered arrangements for Stanton Cook, Charles Brumbach, James Dowdle and John Madigan. The policy would also cover Dennis FitzSimons upon his retirement.

Management now recommends that the Committee formally recognize and reconfirm the policy by adopting the proposed policy attached hereto as Annex A.

MWH
12/05/06

ANNEX A

# TRIBUNE COMPANY

## RETIRED EXECUTIVE ADMINISTRATIVE SUPPORT POLICY

This memorandum describes the Retired Executive Administrative Support Policy originally adopted by the Governance and Compensation Committee of the Tribune Company Board of Directors and ratified and confirmed by the Compensation & Organization Committee of the Tribune Company Board of Directors on December 12, 2006.

**Covered Executives**

Retired Tribune Company senior executives who also served as members of the Tribune Company Board of Directors.

**Benefits Provided; Term**

Each Covered Executive shall be provided with the following benefits at no cost to the Covered Executive for the Covered Executive's lifetime:

- office space in Tribune Tower;
- administrative assistant support (which can be on a shared basis); and
- use of a parking space.

MWH
12/05/06

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB-UR-0433974