# TRIBUNE

## BOARD OF DIRECTORS MEETING
## May 9, 2007

**Master Copy**

**Confidential**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Crane H. Kenney
Senior Vice President/General Counsel
& Secretary
312/222-2491

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
fax: 312/222-4206
e-mail: ckenney@tribune.com

# TRIBUNE

May 2, 2007

| | |
|---|---|
| Jeffrey Chandler | William A. Osborn |
| Dennis J. FitzSimons | J. Christopher Reyes |
| Roger Goodan | William Stinehart, Jr. |
| Enrique Hernandez, Jr. | Dudley S. Taft |
| Betsy D. Holden | Miles D. White |
| Robert S. Morrison | Samuel Zell |

Enclosed is a notebook containing information that will be discussed at the Board of Directors and Audit Committee meetings to be held on Wednesday, May 9, 2007. The Board and Audit Committee meetings will take place on the 24th floor of Tribune Tower. The Annual Shareholders Meeting will be held in Campbell Hall on the 7th floor of Tribune Tower, and will begin at 11:00 a.m. We will review plans for the Annual Meeting at the conclusion of the Board meeting. Please note the cancellation of the Board dinner originally scheduled for Tuesday, May 8.

For those of you participating in the Board meeting via teleconference, please use the following dial-in information:

| | |
|---|---|
| Dial-in Numbers: | 888-232-0362 |
| | 805-240-9472 (international access only) |
| Participant Code: | 117264 |

For those of you participating in the Audit Committee meeting via teleconference, please use the following dial-in information:

| | |
|---|---|
| Dial-in Numbers: | 877-214-0402 |
| | 601-352-8646 (international access only) |
| Participant Code: | 951084 |

The schedule for Wednesday is as follows:

| Date | Meeting/Event | Location | Time |
|---|---|---|---|
| Wed., May 9 | Audit Committee | McCormick Room | 7:30 a.m. |
| Wed., May 9 | Board of Directors Meeting | Patterson Room | 9:00 a.m. |
| Wed., May 9 | Shareholders Meeting | Campbell Hall | 11:00 a.m. |
| Wed., May 9 | Board Luncheon | McCormick Room | 12:00 p.m. |

A continental breakfast will be available at the Board and Committee meetings and there will be an informal buffet luncheon immediately following the Annual Meeting. The luncheon will be held in the McCormick Room on the 24th floor of Tribune Tower. Transportation to the airport will be available at the conclusion of lunch.

I look forward to seeing you, and please contact me if you have any questions.

Sincerely,

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533510

Dennis J. FitzSimons
Chairman, President and
Chief Executive Officer
312/222-3373

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
fax: 312/222-3203
e-mail: dfitzsimons@tribune.com

*Via Federal Express*

May 2, 2007

| | |
|---|---|
| Jeffrey Chandler | J. Christopher Reyes |
| Roger Goodan | William Stinehart, Jr. |
| Enrique Hernandez, Jr. | Dudley S. Taft |
| Betsy D. Holden | Miles D. White |
| Robert S. Morrison | Samuel Zell |
| William A. Osborn | |

Enclosed is the Board book for our May meeting.

Additionally, here is a brief overview of general business conditions and recent company developments.

<u>Publishing and Interactive</u>

Current business conditions—The newspaper industry is going through a very difficult first half. Difficult comparisons to record real estate spending last year (especially in Florida) and continued weakness in automotive spending caused first quarter ad revenues to be down 6%. The second quarter will also be difficult.

We have a number of initiatives in progress to improve the picture:

TMN Retail – We are in the process of forming a new national retail sales organization for our top 15 retail accounts, which spent a total of about $240 million with us in 2006. This new sales organization will establish a central point of contact using a specialized team that will optimize our sales efforts and customer service by more closely matching the centralized decision making processes of these clients. In turn, local sales teams will be reorganized to focus more on local clients and territories where they have the most opportunity to impact ad revenue results.

Offshore outsourcing – Outsourcing of our circulation customer service call centers was completed for the last of our nine daily newspapers during the first quarter. By the end of the first quarter, call center metrics had stabilized, and the outsourced centers are now providing better customer service than our employee-operated call centers. The current focus is on continuing to improve call quality and upsell capabilities. Savings for 2007 are expected to be $7.7 million.

Outsourcing our IT help desk operation to IBM Daksh in India is underway. The transition of calls to IBM will begin in June and be completed by the end of August. IBM has hired and is currently training 52 help desk agents and supervisors. Annual savings are expected to be $1.5 million.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0533511

Page 2

We are currently negotiating an outsourcing agreement with Hewlett Packard (HP) regarding our advertising billing, credit and collections functions. Currently, about 240 FTEs perform these functions. Under the proposed arrangement, 150 positions would be eliminated at the newspapers with certain functions centralized in Chicago, and HP doing a good portion of the back office work out of Costa Rica. Transition could start in the third quarter with full-year savings eventually growing to $8 million.

On the interactive front, first quarter revenues increased 17% over the same period last year. Non-classified revenue was up 34% and classified revenue was up 14% in the first quarter. Tribune Interactive's websites, including 15 news sites, 23 television sites and 8 entertainment and shopping resource sites, drew almost 15 million average monthly unique visitors during the first quarter.

CareerBuilder's first quarter revenues grew by 20% over the same period last year. CareerBuilder continues to be the leading online recruitment site in North America with the most job seeker traffic and revenue. CareerBuilder drew almost 21 million average monthly unique visitors in the first quarter, compared to Monster's nearly 12 million and HotJobs' nearly 18 million.

Regarding labor matters, *The Baltimore Sun's* current four-year contract with the Newspaper Guild, covering 489 employees, will expire in June. Management has been planning for these negotiations for months with formal talks expected to start in early May. Based on past experience, we expect the negotiations to be contentious.

In Los Angeles, we are awaiting a final decision from the National Labor Relations Board regarding their approval of the January vote of our 280 pressroom employees to unionize. We expect the NLRB will certify the election and that we will begin negotiations with the union shortly after that.

<u>Broadcasting/Entertainment</u>

Current business conditions – First quarter ad revenue for our television group was down 1%. Six of our top ten ad categories were flat or up, led by telecom and entertainment. Automotive, retail and movies, however, were down a combined 7%. Most of our television markets reported lower revenues in the first quarter, with New York, Los Angeles and Chicago down an average of 5%. KTLA and WGN-TV both gained market share.

April pacing finished down 3% and May is pacing down 12%. Advertising demand is currently strong in the national network marketplace but seems to be weak across all media in individual markets. Some good news is that several of our stations have recently completed sales to clients that buy time on an annual basis. Rates for our new sitcoms that will launch in September were negotiated, and results so far have been excellent with unit rates up in the 30-50% range.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Page 3

The CW Network – The performance of The CW Network's prime time programming continues to be good for our station group, particularly in New York, Los Angeles and Dallas.  Advertiser response remains positive, and CW prime time rates are up in the mid-single digits for the group. The CW will announce its fall programming at its advertising upfront in New York on May 17. The network is investing more in program development this year, which should lead to further improved performance in the fall.

**********

I look forward to seeing you at our meeting on May 9.   If you have questions prior to the meeting, please feel free to call me.

Sincerely,

Dennis FitzSimons

Enclosure

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
# HIGHLIGHTS OF OPERATIONS
Report to the Board of Directors

First Quarter, 2007

CONFIDENTIAL

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0533514

# TRIBUNE COMPANY

## HIGHLIGHTS OF OPERATIONS
### Report to the Board of Directors
### First Quarter, 2007

## EXECUTIVE SUMMARY

Results of Operations Excluding Special Items,
Non-Operating Items and Discontinued Operations
First Quarter 2007 Highlights ............................................. 1
Consolidated Income Statements ........................................ 2
Consolidated Summary of Operating Cash Flow ................ 3
Consolidated Summary of Equity Income/(Loss) .............. 4

## PUBLISHING

First Quarter 2007 Highlights ............................................. 5
Summary of Operating Revenues ....................................... 6
Summary of Operating Cash Flow ...................................... 7
Summary of Advertising Revenues and Volume ................ 8
Summary of Circulation Revenue and Daily Circulation ... 10
Summary of Sunday Circulation ......................................... 11
Selected Operating Statistics ............................................. 12

## BROADCASTING & ENTERTAINMENT

First Quarter 2007 Highlights ............................................. 13
Summary of Operations ...................................................... 14
Television Group Summaries
Summary of Operating Revenues ....................................... 15
Summary of Operating Cash Flow ...................................... 16
Radio and Entertainment/Other
Summary of Operating Cash Flow ...................................... 17

## OTHER INFORMATION

Capital Expenditures
Overview ............................................................................. 18
Summary of Active Projects Over $10 Million ................. 19
Selected Balance Sheet Data .............................................. 20
Consolidated Income Statements Including Special Items,
Non-Operating Items and Discontinued Operations ......... 21

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0533515

EXECUTIVE SUMMARY

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533516

# TRIBUNE COMPANY
## FIRST QUARTER 2007 HIGHLIGHTS
### Excluding Special Items, Non-Operating Items and Discontinued Operations (1)

The sales of the Company's Southern Connecticut newspapers (*The Advocate* and *Greenwich Time*) and the New York edition of *Hoy* were announced in the first quarter of 2007. The sale of WATL-TV in Atlanta was completed in August 2006. The sales of WLVI-TV in Boston and WCWN-TV in Albany were completed in December 2006. These businesses are reported as discontinued operations and are therefore excluded throughout this report.

**First Quarter Diluted EPS**

| | 2006 | 2007 |
|---|---|---|
| $.50 | | |
| $.40 | $.38 | |
| $.30 | | $.28 |
| $.20 | | |
| $.10 | | |
| $.00 | | |

| | First Qtr. 2007 | Change from 2006 $ | Change from 2006 % |
|---|---|---|---|
| **COMPARISONS TO 2006** | | | |
| **Diluted EPS:** | $.28 | -$.10 | -26% |
| ◆ A decline in net income, primarily due to lower operating profit and higher interest expense, was partially offset by lower average shares outstanding. | | | |
| **Operating Profit:** | | | |
| Publishing | $141 M | -$46 M | -25% |
| ◆ Lower operating profit was primarily the result of a $54 million decline in revenues (advertising - $47M, circulation -$9M and other +$3M) and higher TMC postage expense ($5M), partially offset by lower newsprint and ink ($9M) and compensation ($4M) expenses. | | | |
| **Broadcasting & Entertainment** | $61 | -$6 | -9% |
| ◆ A decline in operating profit was due to lower revenues ($1M) and higher expenses ($5M). | | | |
| Corporate Expenses | -$19 | +$1 | +5% |
| **Total Operating Profit** | **$183 M** | **-$52 M** | **-22%** |
| **Equity Income** | $13 M | +$6 M | +94% |
| ◆ Increased equity income was primarily due to improved results at TV Food Network ($5M) and CareerBuilder ($3M), partially offset by lower TMCT equity income ($2M). The Company's investment in the TMCT I and II Portfolios was reduced from 20% to 5% in September 2006. | | | |
| **Interest Expense** | $83 M | +$34 M | +71% |
| ◆ Higher interest expense was primarily due to additional debt to finance the share repurchases in 2006 as well as higher interest rates. | | | |

1

(1) See page 21 for a consolidated income statement including special items, non-operating items and discontinued operations.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## TRIBUNE COMPANY
## CONSOLIDATED INCOME STATEMENTS
### Excluding Special Items, Non-Operating Items and Discontinued Operations (A)
### (In Millions, Except Per Share Amounts)

FIRST QUARTER

| | 2007 Actual | 2007 Plan | 2006 Actual | % Variance From Plan | % Variance From 2006 |
|---|---|---|---|---|---|
| **Operating revenues** | | | | | |
| Publishing | $ 931.5 | $ 953.7 | $ 985.3 | (2) % | (5) % |
| Broadcasting & entertainment | 283.0 | 285.3 | 284.1 | (1) | - |
| Total | $ 1,214.5 | $ 1,238.9 | $ 1,269.4 | (2) | (4) |
| **Operating expenses** | | | | | |
| Publishing | $ 790.9 | $ 805.0 | $ 798.3 | (2) | (1) |
| Broadcasting & entertainment | 221.6 | 230.4 | 216.7 | (4) | 2 |
| Corporate expenses | 19.4 | 20.1 | 20.4 | (3) | (5) |
| Total | $ 1,031.9 | $ 1,055.5 | $ 1,035.3 | (2) | - |
| **Operating profit** | | | | | |
| Publishing | $ 140.6 | $ 148.6 | $ 187.1 | (5) | (25) |
| Broadcasting & entertainment | 61.4 | 54.9 | 67.5 | 12 | (9) |
| Corporate expenses | (19.4) | (20.1) | (20.4) | 3 | 5 |
| Total | $ 182.6 | $ 183.4 | $ 234.2 | - | (22) |
| Equity income | 12.7 | 7.3 | 6.5 | 73 | 94 |
| Interest and dividend income | 3.2 | 3.0 | 2.2 | 6 | 45 |
| Interest expense | (83.2) | (83.9) | (48.8) | 1 | (71) |
| Income before income taxes | 115.2 | 109.8 | 194.1 | 5 | (41) |
| Income taxes | (46.2) | (42.0) | (76.5) | (10) | 40 |
| Net Income | $ 69.0 | $ 67.8 | $ 117.6 | 2 | (41) |
| Diluted earnings per share | $ 0.28 | $ 0.28 | $ 0.38 | - | (26) |
| Weighted average diluted shares outstanding (B) | 242.1 | 241.5 | 306.0 | - | (21) |

(A) The sales of the Southern Connecticut newspapers ("SCNI") and the New York edition of Hoy ("Hoy, New York") were announced in the first quarter of 2007. The sale of WATL-TV in Atlanta was completed in August 2006. The sales of WLVI-TV in Boston and WCWN-TV in Albany were completed in December 2006. For both years, operating results for these businesses are excluded herein and reported as discontinued operations. See page 21 for a consolidated income statement including special items, non-operating items and discontinued operations.

(B) Diluted average shares outstanding declined versus 2006 due to the repurchase of approximately 66 million shares in the second half of 2006.

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533518

**TRIBUNE COMPANY**
**CONSOLIDATED SUMMARY OF OPERATING CASH FLOW**
**Excluding Special Items, Non-Operating Items and Discontinued Operations**
**(In Millions)**

| | FIRST QUARTER | | | % Variance From | |
| | 2007 Actual | 2007 Plan | 2006 Actual | Plan | 2006 |
|---|---|---|---|---|---|
| **Operating cash flow** | | | | | |
| Publishing | $ 184.7 | $ 195.4 | $ 229.2 | (6) % | (19) % |
| Broadcasting & entertainment | 74.1 | 67.8 | 79.5 | 9 | (7) |
| Corporate expenses | (19.2) | (19.7) | (20.0) | 3 | 4 |
| Total | $ 239.6 | $ 243.5 | $ 288.7 | (2) | (17) |

**FIRST QUARTER COMPARISONS TO 2006**

- First quarter operating cash flow was down 17% at $240M compared to $289M in 2006. Publishing decreased 19% and broadcasting and entertainment fell 7%.
- On a consolidated basis, first quarter operating cash flow margin was 19.7%, down from 22.7% in 2006.



**First Quarter Operating Cash Flow**

| | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| | $323 | $304 | $289 | $240 |
| Operating Cash Flow Margin | 24.9% | 23.7% | 22.7% | 19.7% |

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533519

**TRIBUNE COMPANY**
**CONSOLIDATED SUMMARY OF EQUITY INCOME/(LOSS) (A)**
(In Millions)

|  | FIRST QUARTER | | | % Variance From | |
|  | 2007 Actual | 2007 Plan | 2006 Actual | Plan | 2006 |
|---|---|---|---|---|---|
| **Equity Income/(Loss)** | | | | | |
| Publishing | | | | | |
| CareerBuilder (42.5%) | $ (7.3) | $ (8.8) | $ (10.1) | 17 % | 27 |
| Classified Ventures (28%) | 0.6 | 0.7 | 0.2 | NM | 275 |
| ShopLocal (42.5%) | (1.5) | (2.5) | (1.7) | 40 | 12 |
| BrassRing, Inc. (27%) (B) | - | - | 0.3 | - | (100) |
| Other | (0.2) | (0.9) | 0.6 | 83 | NM |
| Sub-total | (8.4) | (13.0) | (10.8) | 35 | 22 |
| | | | | | |
| Broadcasting & Entertainment | | | | | |
| TV Food Network (31%) | 17.2 | 16.3 | 11.8 | 6 | 46 |
| Comcast SportsNet Chicago (25%) | 3.6 | 3.5 | 3.4 | 2 | 4 |
| Other | 0.4 | 0.4 | 0.6 | - | (30) |
| Sub-total | 21.2 | 20.2 | 15.9 | 5 | 34 |
| | | | | | |
| Corporate | (0.2) | - | 1.5 | NM | (111) |
| | | | | | |
| **Total Equity Income** | $ 12.7 | $ 7.3 | $ 6.5 | 73 | 94 |

(A) The Company uses the equity method to account for its investments in 20-50% owned companies and for certain partnership interests.
    Under the equity method, Tribune records its share of each company's net income or loss.
(B) Tribune's investment in BrassRing was sold in November 2006.

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533520

PUBLISHING

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# PUBLISHING
## FIRST QUARTER 2007 HIGHLIGHTS
## Excluding Special Items, Non-Operating Items and Discontinued Operations

### COMPARISONS TO 2006

**Revenues:**

◆ Advertising revenues declined $47M (6%) compared to last year. Retail revenues were down $2M (1%); national fell $4M (2%); and classified was down $42M (14%).

◆ Circulation revenues were down $9M (7%), due to volume declines, mostly in single copy, and selective price discounting in order to stabilize individually paid copies.

**Expenses:**

◆ Newsprint and ink expenses decreased $9M (8%) compared to the prior year as a result of a 1% decrease in price, and a 6% decline in consumption.

◆ Compensation expense was down $4M (1%) primarily due to a 3% (600 full time equivalent positions) reduction in staffing.

◆ Other cash expenses grew $4M (1%) mainly due to higher TMC postage and outside services expenses.

**Operating Cash Flow:**

◆ Operating cash flow decreased $45M (19%) due to lower revenues.

◆ Operating cash flow margin was 19.8%, compared to 23.3% in 2006.





5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## PUBLISHING
## SUMMARY OF OPERATING REVENUES
### Excluding Discontinued Operations
(Dollars in Millions)

| Operating revenues | FIRST QUARTER 2007 Actual | FIRST QUARTER 2006 Actual | % Change |
|---|---|---|---|
| Los Angeles | $ 261.8 | $ 273.8 | (4) % |
| Chicago | 200.9 | 208.4 | (4) |
| Newsday | 121.7 | 128.9 | (6) |
| South Florida | 95.0 | 109.6 | (13) |
| Orlando | 64.2 | 73.6 | (13) |
| Baltimore | 69.1 | 73.7 | (6) |
| Hartford | 46.8 | 48.9 | (4) |
| Allentown | 24.8 | 25.0 | (1) |
| Newport News | 18.8 | 19.2 | (2) |
| Tribune Media Services | 27.5 | 26.0 | 6 |
| Other | 0.9 | (1.9) | NM |
| Total | $ 931.5 | $ 985.3 | (5) |

**First Quarter 2007 Revenues**



National 19%
Classified 28%
Circulation 15%
Other 7%
Retail 31%

### FIRST QUARTER COMPARISONS TO 2006

**Overall:** Operating revenues decreased $54M (5%), mainly due to lower advertising and circulation revenues.

**Los Angeles:** Advertising revenues declined $9M (4%). Retail was down $2M (3%) from weakness in department stores, furniture/home furnishings and electronics, partially offset by gains from the ADVO preprint distribution agreement. National was up $2M (3%) mainly due to higher movies, partially offset by lower auto. Classified decreased $9M (12%), due to declines in all categories. Circulation revenue was down $4M (8%), due to lower single copy volume, increased discounting and converting Recycler to a free publication in May 2006.

**Chicago:** Advertising revenues decreased $6M (4%). Retail grew $3M (5%) due to improved apparel/fashion, electronics and specialty merchandise. National declined $5M (11%), mainly due to lower auto and technology. Classified decreased $4M (9%), primarily due to weakness in real estate and recruitment. Circulation revenue was down $2M (5%), due to continued selective home delivery discounting and lower single copy.

**Newsday:** Advertising revenues fell $6M (6%). Retail decreased $4M (9%), due to softness in department stores and other retail, partially offset by higher health care. National was up 2%. Classified decreased $2M (6%), primarily due to lower auto and real estate. Circulation revenue was down $1M (5%).

**South Florida:** Advertising revenues were down $14M (15%). Retail improved $1M (3%). National declined $1M (4%). Classified was down $15M (31%), due to declines in all categories with the largest in real estate. Circulation revenue was 6% lower.

**Orlando:** Advertising revenues were down $8M (14%). Retail improved $1M (4%). National was up 1%. Classified was down $9M (29%), due to declines in all categories. Circulation revenue was $1M (11%) lower.

6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533523

# PUBLISHING
## SUMMARY OF OPERATING CASH FLOW
### Excluding Special Items, Non-Operating Items and Discontinued Operations
(Dollars in Millions)

| | FIRST QUARTER | | |
|---|---|---|---|
| | 2007 Actual | 2006 Actual | % Change |
| **Operating cash flow** | | | |
| Los Angeles | $ 49.0 | $ 56.5 | (13) % |
| Chicago | 44.2 | 51.4 | (14) |
| Newsday | 19.0 | 20.9 | (9) |
| South Florida | 28.7 | 42.4 | (32) |
| Orlando | 14.2 | 23.2 | (39) |
| Baltimore | 10.3 | 14.9 | (31) |
| Hartford | 9.0 | 9.6 | (6) |
| Allentown | 5.6 | 5.8 | (3) |
| Newport News | 4.8 | 5.1 | (6) |
| Tribune Media Services | 5.9 | 5.3 | 11 |
| Other | (6.1) | (6.0) | 2 |
| Total | $ 184.7 | $ 229.2 | (19) |

| | | | Absolute Change |
|---|---|---|---|
| **Operating cash flow margin** | | | |
| Los Angeles | 18.7 % | 20.6 % | (1.9) pts. |
| Chicago | 22.0 | 24.7 | (2.7) |
| Newsday | 15.6 | 16.2 | (0.6) |
| South Florida | 30.2 | 38.7 | (8.5) |
| Orlando | 22.2 | 31.6 | (9.4) |
| Baltimore | 14.9 | 20.2 | (5.3) |
| Hartford | 19.3 | 19.6 | (0.3) |
| Allentown | 22.7 | 23.3 | (0.6) |
| Newport News | 25.5 | 26.8 | (1.3) |
| Tribune Media Services | 21.3 | 20.3 | 1.0 |
| Total | 19.8 | 23.3 | (3.5) |

### FIRST QUARTER COMPARISONS TO 2006

**Los Angeles:** Operating cash flow was down $7M (13%), due to lower revenues ($12M), partially offset by reduced newsprint and ink ($4M).

**Chicago:** Operating cash flow fell $7M (14%), mainly due to lower advertising revenues ($6M).

**Newsday:** Operating cash flow declined $2M (9%) due to a decline in revenues ($7M), partially offset by lower expenses for compensation ($2M), circulation ($1M) and newsprint and ink ($1M).

**South Florida:** Operating cash flow was down $14M (32%), mainly due to lower revenues ($15M), partially offset by reduced newsprint and ink expense ($2M).

**Orlando:** Operating cash flow was down $9M (39%), mainly due to lower ad revenues ($9M).

**Baltimore:** Operating cash flow declined $5M (31%) due to lower revenues ($5M).

7

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0533524

## PUBLISHING
## SUMMARY OF ADVERTISING REVENUES AND VOLUME
### Excluding Discontinued Operations
#### (Dollars in Millions)

| Advertising Revenues | FIRST QUARTER 2007 Actual | 2006 Actual | % Change |
|---|---|---|---|
| **Retail** | | | |
| Los Angeles | $ 73.2 | $ 75.5 | (3) % |
| Chicago | 71.4 | 68.3 | 5 |
| Newsday | 41.3 | 45.5 | (9) |
| South Florida | 32.5 | 31.7 | 3 |
| Orlando | 20.4 | 19.7 | 4 |
| Baltimore | 24.3 | 24.6 | (1) |
| Hartford | 14.9 | 15.6 | (4) |
| Other | 14.2 | 13.2 | 7 |
| Total | $ 292.3 | $ 294.1 | (1) |
| **National** | | | |
| Los Angeles | $ 75.3 | $ 73.1 | 3 |
| Chicago | 38.9 | 43.6 | (11) |
| Newsday | 20.2 | 19.9 | 2 |
| South Florida | 14.4 | 15.0 | (4) |
| Orlando | 9.6 | 9.5 | 1 |
| Baltimore | 8.8 | 9.5 | (8) |
| Hartford | 6.6 | 6.8 | (4) |
| Other | 4.1 | 4.4 | (7) |
| Total | $ 177.8 | $ 181.8 | (2) |

### FIRST QUARTER COMPARISONS TO 2006

◆ Retail revenues were down $2M (1%) mainly due to lower department stores, furniture/home furnishings and electronics, partially offset by higher home improvement stores. Los Angeles is continuing to be negatively impacted by the Federated/Rob May merger.

◆ Preprint revenues, which are primarily included in retail, improved $3M (2%) led by gains in Los Angeles related to the ADVO preprint distribution agreement, which began in August 2006.

◆ National revenues declined $4M (2%), mainly due to lower auto and technology, partially offset by higher movies and telecom/wireless.

**Preprint Revenues**

| | First Quarter | | |
|---|---|---|---|
| | 2007 | 2006 | % Change |
| Los Angeles | $ 41.5 | $ 36.0 | 15 % |
| Chicago | 44.7 | 46.1 | (3) |
| Newsday | 17.3 | 19.1 | (9) |
| Total Group | $ 155.5 | $ 152.8 | 2 |

8

**PUBLISHING**
**SUMMARY OF ADVERTISING REVENUES AND VOLUME**
Excluding Discontinued Operations
(Dollars in Millions)

### Classified Advertising Revenues First Quarter 2007



- Help Wanted 32%
- Real Estate 32%
- Automotive 23%
- Other 13%

| | FIRST QUARTER | | |
| --- | --- | --- | --- |
| | 2007 Actual | 2006 Actual | % Change |
| **Classified** | | | |
| Los Angeles | $ 67.0 | $ 76.3 | (12) % |
| Chicago | 47.7 | 52.2 | (9) |
| Newsday | 38.0 | 40.3 | (6) |
| South Florida | 32.2 | 46.9 | (31) |
| Orlando | 22.5 | 31.6 | (29) |
| Baltimore | 21.2 | 24.7 | (14) |
| Hartford | 14.2 | 15.1 | (6) |
| Other | 18.0 | 15.4 | 17 |
| Total | $ 260.7 | $ 302.4 | (14) |
| **Total Advertising** | | | |
| Los Angeles | $ 215.5 | $ 224.9 | (4) |
| Chicago | 158.0 | 164.0 | (4) |
| Newsday | 99.6 | 105.7 | (6) |
| South Florida | 79.1 | 93.6 | (15) |
| Orlando | 52.5 | 60.8 | (14) |
| Baltimore | 54.3 | 58.8 | (8) |
| Hartford | 35.7 | 37.5 | (5) |
| Other | 36.2 | 33.0 | 10 |
| Total | $ 730.8 | $ 778.3 | (6) |
| **Advertising Volume (000's)** | | | |
| Inches | | | |
| Full Run | 3,973 | 4,418 | (10) |
| Part Run | 4,735 | 4,960 | (5) |
| Total | 8,708 | 9,378 | (7) |
| Preprint Pieces | 3,484,658 | 3,328,527 | 5 |

### FIRST QUARTER COMPARISONS TO 2006

- Classified revenues were down $42M (14%), due to lower real estate ($14M), recruitment ($13M), and auto ($11M).

- Preprint pieces were up 5%, mainly due to improvements in Los Angeles (16%) and Orlando (7%), partially offset by declines in Chicago (1%) and South Florida (3%).

9

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533526

## PUBLISHING
## SUMMARY OF CIRCULATION REVENUE AND DAILY CIRCULATION
### Excluding Discontinued Operations
### (Dollars in Millions)

| | FIRST QUARTER | | |
|---|---|---|---|
| | 2007 Actual | 2006 Actual | % Change |
| **Circulation Revenue** | | | |
| Los Angeles | $ 39.9 | $ 43.5 | (8) % |
| Chicago | 28.0 | 29.5 | (5) |
| Newsday | 19.9 | 20.8 | (5) |
| South Florida | 8.6 | 9.1 | (6) |
| Orlando | 8.6 | 9.7 | (11) |
| Baltimore | 11.2 | 12.0 | (7) |
| Hartford | 9.8 | 10.0 | (2) |
| Other (A) | 9.0 | 9.7 | (8) |
| Total | $ 134.9 | $ 144.3 | (7) |
| **Daily (Mon–Fri) Circulation** | | | |
| **Individually Paid Copies (000's) (B)** | | | |
| Los Angeles | 836 | 813 | 3 |
| Chicago | 544 | 538 | 1 |
| Newsday | 378 | 394 | (4) |
| South Florida | 236 | 240 | (2) |
| Orlando | 218 | 217 | - |
| Baltimore | 225 | 231 | (3) |
| Hartford | 167 | 176 | (5) |
| Other (A) | 185 | 189 | (4) |
| Total | 2,789 | 2,798 | - |
| **ABC Copies (000's) (C)** | | | |
| Los Angeles | 867 | 859 | 1 |
| Chicago | 562 | 567 | (1) |
| Newsday | 393 | 418 | (6) |
| South Florida | 242 | 264 | (8) |
| Orlando | 235 | 234 | - |
| Baltimore | 230 | 236 | (3) |
| Hartford | 172 | 181 | (5) |
| Other (A) | 191 | 199 | (4) |
| Total | 2,893 | 2,958 | (2) |

**FIRST QUARTER COMPARISONS TO 2006**

Overall: Circulation revenues decreased $9M (7%), mainly due to volume declines and continued selective discounting to stabilize individually paid circulation.

Los Angeles: Circulation revenue decreased $4M (8%), due to lower single copy volume, increased discounting and converting Recycler to a free publication in May 2006.

Chicago: Circulation revenue was down $2M (5%), due to continued selective home delivery discounting and lower single copy volume.

Newsday: Circulation revenue declined $1M (5%) due to lower home delivery and single copy volumes.

South Florida: Circulation revenue decreased $1M (6%) due to continued selective home delivery discounting and lower volume.

Orlando: Circulation revenue was down $1M (11%) as a new subscriber acquisition program with higher discount rates was initiated.

Baltimore: Circulation revenue fell $1M (7%) due to continued discounting.

(A) Other includes Allentown and Newport News.
(B) Individually Paid includes home delivery and single copy circulation.
(C) ABC copies include home delivery, single copy and other paid categories, such as hotel and education copies.

10

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533527

**PUBLISHING**
**SUMMARY OF SUNDAY CIRCULATION**
**Excluding Discontinued Operations**

**FIRST QUARTER COMPARISONS TO 2006**

- ◆ Total ABC circulation trends are lower than those for individually paid copies as the company continues to reduce "other paid" circulation.

| | FIRST QUARTER | | |
| --- | --- | --- | --- |
| | 2007 Actual | 2006 Actual | % Change |
| **Sunday Circulation** | | | |
| **Individually Paid Copies (000's) (A)** | | | |
| Los Angeles | 1,157 | 1,199 | (4) |
| Chicago | 904 | 907 | - |
| Newsday | 452 | 472 | (4) |
| South Florida | 331 | 336 | (1) |
| Orlando | 335 | 339 | (1) |
| Baltimore | 369 | 385 | (4) |
| Hartford | 247 | 262 | (6) |
| Other (B) | 252 | 257 | (2) |
| Total | 4,047 | 4,157 | (3) |
| | | | |
| **ABC Copies (000's) (C)** | | | |
| Los Angeles | 1,170 | 1,217 | (4) % |
| Chicago | 931 | 954 | (2) |
| Newsday | 456 | 477 | (4) |
| South Florida | 332 | 349 | (5) |
| Orlando | 343 | 345 | (1) |
| Baltimore | 376 | 400 | (6) |
| Hartford | 252 | 267 | (6) |
| Other (B) | 254 | 261 | (2) |
| Total | 4,114 | 4,270 | (4) |

(A) Individually Paid includes home delivery and single copy circulation.
(B) Other includes Allentown and Newport News.
(C) ABC copies include home delivery, single copy and other paid categories, such as hotel and education copies.

11

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0533528

## PUBLISHING
## SELECTED OPERATING STATISTICS
### Excluding Discontinued Operations
### (Dollars in Millions, Except Per Ton Amounts)

| | FIRST QUARTER | | |
| | 2007<br>Actual | 2006<br>Actual | %<br>Change |
|---|---|---|---|
| Operating expenses | | | |
| Newsprint & ink expense | $ 114.6 | $ 123.9 | (8) % |
| Compensation expense | 329.6 | 333.5 | (1) |
| Other cash expenses | 302.6 | 298.6 | 1 |
| Depreciation and amortization | 44.0 | 42.1 | 5 |
| Total | $ 790.9 | $ 798.3 | (1) |
| Newsprint tons consumed | 163,307 | 173,981 | (6) |
| Average newsprint cost per ton | $ 610 | $ 617 | (1) |
| Full time equivalents | 16,871 | 17,448 | (3) |

### FIRST QUARTER COMPARISONS TO 2006

♦ Newsprint expense was down $9M (8%) compared to 2006 as a result of a 6% decline in consumption and a 1% decrease in average prices.

♦ Compensation expense decreased $4M (1%), primarily due to a 3% decrease in full-time equivalent employees and lower pension/retirement benefit expenses.

♦ Full time equivalents declined by about 600 due to the impact of staff reductions across the group.

**Average Regular Newsprint Cost Per Ton**



12

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533529

BROADCASTING & ENTERTAINMENT

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533530

# BROADCASTING AND ENTERTAINMENT
## FIRST QUARTER 2007 HIGHLIGHTS
### Excluding Special Items and Discontinued Operations

## COMPARISONS TO 2006

**Revenues:**

- Television revenues were down $1M (1%). Station revenues in New York, Los Angeles and Chicago all showed improvement for the quarter. For the station group, softness in the auto, retail and movie categories were partially offset by gains in the telecom, entertainment/recreation and packaged goods categories.

- Tribune Entertainment revenues were down 5% due to lower studio revenues.

- Chicago Cubs revenues increased $2M (39%) mainly due to MLB shared revenue adjustments and timing of exhibition and spring training games.

- WGN Radio revenues were down $2M (20%) primarily due to the discontinued sponsorship of the Flower and Garden show.

**Expenses:**

- Television cash operating expenses were up $4M (2%) primarily due to higher compensation expense, partially offset by a decrease in broadcast rights expense.

- Radio and entertainment expenses were up $1M (2%) due to higher player costs at the Cubs, partially offset by the absence of Flower and Garden sponsorship costs at WGN Radio.

**Operating Cash Flow:**

- Total broadcasting and entertainment operating cash flow was down $5M (7%).

- Total broadcasting and entertainment operating cash flow margins were 26.2% in 2007, down from 28.0% in 2006.

13





TRB0533531

## BROADCASTING & ENTERTAINMENT
### SUMMARY OF OPERATIONS
### Excluding Discontinued Operations
### (Dollars in Millions)



First Quarter 2007
Cash Expenses by Type
(excluding Cubs)

- Compensation 35%
- Other 16%
- Broadcast Rights 49%

| | FIRST QUARTER | | |
| --- | --- | --- | --- |
| | 2007 Actual | 2006 Actual | % Change |
| **Operating revenues** | | | |
| Television | $ 264.4 | $ 265.8 | (1) % |
| Radio/Entertainment | 18.6 | 18.3 | 1 |
| Total | $ 283.0 | $ 284.1 | - |
| **Operating expenses** | | | |
| Television | $ 197.5 | $ 193.1 | 2 |
| Radio/Entertainment | 24.1 | 23.6 | 2 |
| Total | $ 221.6 | $ 216.7 | 2 |
| **Operating cash flow** | | | |
| Television | $ 78.0 | $ 83.5 | (6) |
| Radio/Entertainment | (3.9) | (4.0) | - |
| Total | $ 74.1 | $ 79.5 | (7) |
| **Operating profit (loss)** | | | |
| Television | $ 66.9 | $ 72.7 | (8) |
| Radio/Entertainment | (5.5) | (5.2) | (6) |
| Total | $ 61.4 | $ 67.5 | (9) |
| **Cash expenses - excluding Cubs** | | | |
| Programming | $ 95.1 | $ 98.3 | (3) % |
| Compensation | 67.6 | 64.9 | 4 |
| Other | 32.4 | 30.8 | 5 |
| Total | $ 195.1 | $ 193.9 | 1 |

14

## TELEVISION
## SUMMARY OF OPERATING REVENUES
### Excluding Discontinued Operations
#### (Dollars in Millions)

**First Quarter 2007 Operating Revenues**



Pie chart: Other TV Stations 47%, NY/LA/CHI 40%, Cable 13%

|  | 2007 Actual | 2006 Actual | % Change |
|---|---|---|---|
|  | | | % |
| **Operating revenues** | | | |
| **NY/LA/Chicago** | | | |
| New York | $ 40.8 | $ 40.7 | - |
| Los Angeles | 37.0 | 36.6 | 1 |
| Chicago | 27.3 | 27.1 | 1 |
| Sub-total | 105.0 | 104.3 | 1 |
| | | | |
| Other Stations | | | |
| Philadelphia | 10.4 | 11.0 | (5) |
| Dallas | 12.8 | 12.6 | 2 |
| Washington | 8.4 | 9.4 | (10) |
| Houston | 8.7 | 8.7 | - |
| Seattle | 14.7 | 14.0 | 5 |
| Miami | 9.3 | 9.9 | (6) |
| Denver | 6.1 | 7.0 | (14) |
| Sacramento | 9.8 | 10.1 | (3) |
| St. Louis | 5.1 | 5.4 | (5) |
| Portland | 3.3 | 3.3 | (1) |
| Indianapolis | 10.3 | 11.0 | (6) |
| San Diego | 4.6 | 4.8 | (4) |
| Hartford | 9.1 | 8.5 | 6 |
| Grand Rapids | 4.0 | 4.3 | (8) |
| Harrisburg | 3.1 | 3.2 | (1) |
| New Orleans | 4.1 | 2.8 | 44 |
| Sub-total | 123.9 | 126.1 | (2) |
| | | | |
| Cable | | | |
| Chicago Cable | 24.2 | 25.2 | (4) |
| WGN Cable Distribution | 10.5 | 9.3 | 13 |
| Sub-total | 34.7 | 34.5 | 1 |
| | | | |
| Total | $ 264.4 | $ 265.8 | (1) |

15

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533533

# TELEVISION
## SUMMARY OF OPERATING CASH FLOW
### Excluding Discontinued Operations
(Dollars in Millions)

**FIRST QUARTER**

| Operating cash flow | 2007 Actual | 2006 Actual | % Change |
|---|---|---|---|
| NY/LA/Chicago | | | |
| New York | $ 13.2 | $ 13.0 | 2 % |
| Los Angeles | 8.4 | 9.1 | (8) |
| Chicago | 3.6 | 4.1 | (14) |
| Sub-total | 25.1 | 26.2 | (4) |
| | | | |
| Other Stations | | | |
| Philadelphia | 3.1 | 2.4 | 29 |
| Dallas | 4.6 | 4.9 | (7) |
| Washington | 3.2 | 3.6 | (11) |
| Houston | 2.5 | 2.9 | (16) |
| Seattle | 4.3 | 3.9 | 12 |
| Miami | 3.3 | 4.1 | (20) |
| Denver | - | 0.7 | (106) |
| Sacramento | 3.1 | 3.5 | (12) |
| St. Louis | 0.5 | 1.0 | (54) |
| Portland | 0.1 | 0.4 | (66) |
| Indianapolis | 2.1 | 2.3 | (9) |
| San Diego | - | 0.1 | (144) |
| Hartford | 2.1 | 1.8 | 18 |
| Grand Rapids | 1.1 | 1.4 | (25) |
| Harrisburg | 0.5 | 0.5 | (6) |
| New Orleans | 0.8 | (0.2) | NM |
| Sub-total | 31.1 | 33.2 | (6) |
| | | | |
| Cable Superstation | | | |
| Chicago Cable | 13.6 | 14.2 | (5) |
| WGN Cable Distribution | 8.7 | 7.8 | 11 |
| Sub-total | 22.2 | 22.0 | 1 |
| | | | |
| Corporate allocation | (0.3) | 2.0 | NM |
| | | | |
| Total | $ 78.0 | $ 83.5 | (6) |

## FIRST QUARTER COMPARISONS TO 2006

Overall:  Television operating cash flow decreased $5M (6%) due to modest declines at most stations. Revenues were $1M lower and cash expenses were $4M higher due to increased compensation, partially offset by lower broadcast rights.

**TV Operating Cash Flow Margins**

| | First Quarter | |
|---|---|---|
| | 2007 | 2006 |
| NY/LA/Chicago | 23.9% | 25.1% |
| All Other TV Stations (A) | 25.1% | 26.3% |
| Cable Superstation | 64.1% | 64.0% |
| Total Group | 29.5% | 31.4% |

16

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533534

## RADIO AND ENTERTAINMENT/OTHER
## SUMMARY OF OPERATING CASH FLOW
### (Dollars in Millions)

|  | FIRST QUARTER | | |
|---|---|---|---|
|  | 2007 Actual | 2006 Actual | % Change |
| **Operating cash flow** | | | |
| WGN Radio | $ 1.5 | $ 1.5 | (1) % |
| Tribune Entertainment | 1.6 | 0.6 | NM |
| Chicago Cubs | (6.6) | (5.6) | (18) |
| Other | (0.4) | (0.4) | (1) |
| Total | $ (3.9) | $ (3.9) | - |

### FIRST QUARTER COMPARISONS TO 2006

TEC:    Operating cash flow improved $1M mainly due to lower legal expenses, partially offset by a decline in studio revenues.

Cubs:    Operating cash flow declined $1M (18%) mainly due to higher player-related costs.

17

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533535

OTHER INFORMATION

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533536

# TRIBUNE COMPANY
## CAPITAL EXPENDITURES OVERVIEW
### At April 1, 2007

Total spending for the first quarter was $21M. Full year projected spending was reduced to $150M from the plan of $200M in response to the difficult operating environment. Capital spending is traditionally higher during the second half of the year and that trend is expected to continue in 2007.

Publishing projects to spend $115M in 2007. Major system projects for all newspaper markets that continue in 2007 are the common advertising systems project ($27M in 2007, $77M total), the common editorial system ($9M in 2007, $33M total) and the common circulation system ($5M in 2007, $22M total). Web width reductions at seven of the markets continue in 2007 ($10M in 2007, $25M total). In Chicago, the color press expansion project is nearing completion ($2M in 2007, $75M total) and the preprint project to increase targeting capabilities continues ($10M in 2007, $39M total). The remaining spending is for system and hardware replacements, refurbishing of production equipment and technology enhancements across the Publishing group.

Broadcasting is expected to spend $28M in 2007. Approximately $9M is planned spending for digital transmission and studio equipment projects, including $4M to continue the transition to high-definition news in the New York, Los Angeles and Chicago markets. The remaining planned spending includes news equipment and various smaller projects throughout the station group. The 2007 plan and projection do not include anticipated spending at New Orleans to replace assets damaged by Hurricane Katrina, as it will be fully funded by insurance proceeds.

Corporate plans to spend $7M in 2007. This includes structural repairs and improvements to Tribune Tower and various software and hardware upgrades at the technology and finance shared service centers.

| | Summary By Group | | |
| | 2007 | | 2006 |
| | Projection | Plan | Actual |
|---|---|---|---|
| Publishing | $115M | $165M | $173M |
| Broadcasting | 28 | 28 | 42 |
| Corporate | 7 | 7 | 6 |
| Total | $150M | $200M | $222M |

18

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533537

**TRIBUNE COMPANY**
**SUMMARY OF ACTIVE PROJECTS OVER $10 MILLION**
**At April 1, 2007**

| Status | Amount Spent To Date | Current Estimate at Completion | Approved Amount |
|---|---|---|---|
| | | (Millions) | |
| **Publishing** | | | |
| _Chicago_ | | | |
| **Color Press Expansion Project** - Add a color-printing tower and reconfigure each of the 10 presses in operation to increase color capacity from 16 to 32 pages. <br><br>• All ten reconfigured presses are in operation. Training, testing and phased implementation of full press capabilities continues into 2007. Final acceptance of all reconfigured presses and completion of the project are scheduled for the fourth quarter of 2007. | $ 70.0 | $ 75.0 | $ 75.0 |
| **Next Generation Preprint Project** - Replace existing inserting equipment with five new high-capacity inserters. New equipment will increase capacity and improve targeting capabilities. <br><br>• The first new inserter was installed during the first quarter of 2007. Next steps include start-up and acceptance testing for the installed inserter and initial roll-out of new zoning capabilities to key customers. | 18.7 | 39.4 | 39.4 |
| _Publishing Group_ | | | |
| **Advertising Systems Replacement Project** - Replace the classified advertising front-end and advertising billing systems at all Tribune Publishing newspaper markets. <br><br>• Full system installations for classified advertising have been completed in five markets. The remaining five markets will be completed by year-end 2007. Web order entry for classified advertising has also been launched in Orlando and Chicago. In-paper advertising, preprint and billing system implementations will follow the classified system launches by approximately one year. | 41.3 | 77.0 | 77.0 |
| **Common Editorial System Project** - Replace the current editorial systems at all Tribune Publishing newspaper markets with a standardized and centralized editorial front-end and pagination system. <br><br>• Chicago was the first market to launch the new system in the first quarter of 2007. Los Angeles, South Florida and Daily Press are scheduled to launch during the second quarter of 2007. System launches for the remaining markets are staggered over the second half of 2007 and into 2008. | 14.9 | 33.0 | 33.0 |
| **Common Circulation System Project** - Replace the circulation systems at all Tribune Publishing newspaper markets with a standardized and centralized circulation system. <br><br>• Hartford was the second market to launch the centralized circulation system in the first quarter of 2007. A revised project schedule is being reviewed and approved to ensure that a system interface problem is appropriately fixed prior to the system launches in the remaining markets | 13.5 | 22.0 | 22.0 |
| **Web Width Reduction Project** - Reduce the printing press widths at seven Tribune Publishing newspaper markets to reduce newsprint costs. <br><br>• Baltimore was the first market to complete their web width reduction in the fourth quarter of 2006. The remaining markets will convert to reduced web widths on a phased schedule throughout 2007 and 2008. | 3.1 | 24.6 | 24.6 |

19

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0533538

TRIBUNE COMPANY
SELECTED BALANCE SHEET DATA
(Dollars in Millions)

| | 4/1/2007 | 12/31/2006 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 182 | $ 175 |
| Total current assets | 1,306 | 1,377 |
| Intangible assets | 8,588 | 8,683 |
| Time Warner stock related to PHONES | 316 | 348 |
| Other investments | 536 | 565 |
| Prepaid pension costs | 307 | 293 |
| Properties and other | 2,131 | 2,135 |
| Total assets | $ 13,184 | $ 13,401 |
| | | |
| **Liabilities & shareholders' equity** | | |
| Borrowings under bridge credit facility | $ 1,325 | $ 1,310 |
| Other debt due within one year | 23 | 119 |
| Total current liabilities | 2,447 | 2,547 |
| PHONES debt related to Time Warner stock (A) | 612 | 573 |
| Other long-term debt | 2,996 | 3,003 |
| Deferred income taxes and other long-term liabilities | 2,817 | 2,958 |
| Shareholders' equity | 4,312 | 4,320 |
| Total liabilities and shareholders' equity | $ 13,184 | $ 13,401 |
| | | |
| Intangible assets as a percent of total assets | 65% | 65% |
| | | |
| Debt to Operating Cash Flow: | | |
| Excluding PHONES | 3.5x* | 3.3x |
| Including PHONES at book value ($612M) | 3.9x* | 3.8x |

(A)  Includes $468M and $465M of discounted debt and $144M and $108M of a call option at Apr. 1, 2007 and Dec. 31, 2006, respectively, which gives the holders of the PHONES the upside on Time Warner stock in excess of $78/share.

*Debt to Operating Cash Flow as of 4/1/2007 is calculated using 2007 projected operating cash flow.

20

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533539

**TRIBUNE COMPANY**
**CONSOLIDATED INCOME STATEMENTS INCLUDING**
**SPECIAL ITEMS, NON-OPERATING ITEMS AND DISCONTINUED OPERATIONS**
(Dollars in Millions, Except Per Share Data)

| | FIRST QUARTER, 2007 | | FIRST QUARTER, 2006 | |
| --- | --- | --- | --- | --- |
| | Amount | Diluted EPS | Amount | Diluted EPS |
| **Net Income from Continuing Operations, before Special Items and Non-Operating Items** | $69.0 | $.28 | $117.6 | $.38 |
| Severance | (1.1) | - | - | - |
| Newsday union related charges | - | - | (19.2) | (.04) |
| Gain on sales of properties | - | - | 1.9 | - |
| **Total Special Items before taxes** | (1.1) | - | (17.3) | (.04) |
| Loss on Change in Fair Value of 16M Time Warner Shares, net of PHONES | (69.8) | (.18) | (10.3) | (.02) |
| Net loss on investments | - | - | (3.4) | - |
| Strategic review fees | (6.8) | (.03) | - | - |
| Other, net | 0.6 | - | 0.1 | - |
| **Total Non-Operating Items before taxes** | (76.0) | (.20) | (13.6) | (.02) |
| Income Taxes on Special Items and Non-Operating Items | 27.0 | - | 12.5 | - |
| **Net Income from Continuing Operations** | 18.8 | .08 | 99.2 | .32 |
| Income (Loss) from Discontinued Operations, net of tax (A) | (34.4) | (.14) | 3.6 | .01 |
| **Net Income (Loss)** | ($15.6) | ($.06) | $102.8 | $.33 |

(A) Includes SCNI and Hoy, New York in 2007 and 2006 and the Atlanta, Albany and Boston television stations in 2006.

21

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533540

**TRIBUNE COMPANY**
**BOARD OF DIRECTORS MEETING**
**WEDNESDAY, MAY 9, 2007 (9:00 A.M.)**
**PATTERSON BOARD ROOM, 24th FLOOR**
**TRIBUNE TOWER**

### AGENDA

|                                                          | Tab No. |
|----------------------------------------------------------|---------|
| Executive session                                        |         |
| • Director election                                      | 1       |
| Approve minutes of February 13 and April 1, 2007 meetings | 2       |
| Preferred stock dividend                                 | 3       |
| Election of officers                                     | 4       |
| Committee appointments                                   | 5       |
| First quarter operating results                          |         |
| Stock performance report                                 | 6       |
| Development update                                       | 7       |
| Transaction update                                       |         |
| • Solvency presentation                                  |         |
| • Delaware counsel opinion                               |         |
| Review of Annual Meeting                                 |         |
| • CalPERS governance proposals                           | 8       |
| Audit Committee report                                   |         |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTIONS

### (Election of Director)

RESOLVED, that the size of this Board of Directors be, and hereby is, increased from 11 to 12 members; and

FURTHER RESOLVED, that in order to fill the newly created directorship created by the above resolution, Samuel Zell is hereby elected as a member of this Board of Directors, effective May 9, 2007, to serve in the class of directors with terms expiring at the 2010 annual meeting of the shareholders of the Company and until his successor shall be elected and qualified or his earlier resignation or removal.

DPE
5/2/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only



**Biography of Samuel Zell**

A native Chicagoan, Samuel Zell is a graduate of the University of Michigan and the University of Michigan Law School. Mr. Zell began his career in real estate while an undergraduate at the University by managing apartment buildings throughout southeast Michigan. He continued his interests in real estate, and subsequently, non-real estate investments, with the founding of Equity Group Investments, L.L.C. (formerly known as Equity Financial and Management Company), an entrepreneurial investment firm based in Chicago where he currently serves as President and Chairman.

Mr. Zell maintains substantial interests in and serves as Chairman of the Board of various publicly traded companies which include Anixter International (AXE), a value-added provider of integrated networking and cabling solutions that support business information and network infrastructure requirements; Equity Lifestyle Properties, Inc. (ELS), an equity real estate investment trust which owns and operates manufactured home communities in 26 states; Equity Residential (EQR), the largest apartment real estate investment trust in the United States; Capital Trust (CT), a specialized real estate finance company; and Covanta Holding Corp. (CVA), a multinational owner and operator of modern waste to energy facilities. Mr. Zell also served as Chairman of the Board of Equity Office Properties Trust (EOP), a real estate investment trust which held the largest office portfolio of any publicly traded, full-service office company in the United States. EOP was sold to Blackstone in February 2007. Mr. Zell is also Chairman of Equity International, a privately-held, leading investor in real estate-related businesses outside of the United States.

Mr. Zell served a two-year term as Chairman of the National Association of Real Estate Investment Trusts (NAREIT) from 1998-2000. He serves on the JPMorgan National Advisory Board, the Eurohypo International Advisory Board, the President's Advisory Board at the University of Michigan, the Visitor's Committee at the University of Michigan Law School, and with the combined efforts of the University of Michigan Business School, established the Zell/Lurie Entrepreneurial Center. Mr. Zell's continual assistance to Michigan's MBA program has also enhanced the Business School's Polish Studies Program. He was appointed a DeRoy Visiting Professor in Honors at the College of Literature, Science and the Arts at the University of Michigan. He is a long standing supporter of the University of Pennsylvania Wharton Real Estate Center and has endowed the Samuel Zell/Robert Lurie Real Estate Center at Wharton. Mr. Zell has also endowed the Northwestern University Center for Risk Management.

Mr. Zell is an avid skier, racquetball player and enjoys riding motorcycles. He is a frequent contributor of articles to various publications and is often heard as keynote speaker throughout the United States and Europe.

SZ 2-27-07 update SZ BIO

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0533544

**2**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533545

**TRIBUNE COMPANY**
**BOARD OF DIRECTORS MEETING**
**APRIL 1, 2007**

The Tribune Company Board of Directors met at 10:20 p.m. Central time on Sunday, April 1, 2007, by conference telephone, pursuant to notice. The following directors participated in the meeting: Jeffrey Chandler, Dennis J. FitzSimons, Roger Goodan, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, William Stinehart, Jr. and Miles D. White. Dudley S. Taft was unable to participate in the meeting.

The following Company officers and advisors also participated in the meeting: Donald C. Grenesko, Crane H. Kenney, Thomas D. Leach, Tom Cole of Sidley Austin LLP, Steve Rosenblum of Wachtell Lipton Rosen & Katz, Charles Mulaney of Skadden, Arps, Slate, Meagher & Flom LLP, Michael Costa of Merrill Lynch, Christina Mohr of Citigroup, Paul Taubman and Tom Whayne of Morgan Stanley, William W. Merten of McDermott Will & Emery, Elyse Bluth of Duff & Phelps, LLC, Marilyn Marchetti of GreatBanc Trust Company and Charles R. Smith of K&L Gates.

Mr. FitzSimons acted as chairman of the meeting and Mr. Kenney acted as secretary.

Mr. FitzSimons called the meeting to order at 10:20 p.m. Central time.

## LEVERAGED ESOP TRANSACTION

Mr. FitzSimons reported that the Compensation & Organization Committee and the Special Committee had just concluded separate telephonic meetings regarding the proposed leveraged ESOP transaction with Samuel Zell and the newly-created Tribune Employee Stock Ownership Plan (the "Proposed Transaction") and that the Special Committee was now in a position to recommend the Proposed Transaction to the full Board of Directors for approval.

Mr. Rosenblum then provided the Board with an overview of the Proposed Transaction structure and transaction documents, drafts of which were previously provided to the Directors for their review. Mr. Rosenblum noted

Redacted

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Mr. Costa then provided an updated financial overview of the Proposed Transaction, comparing it to the proposed leveraged recapitalization/Broadcasting & Entertainment spin-off transaction that the Board had previously reviewed. He also reviewed the letters submitted by another third-party group expressing that group's interest in participating in an ESOP buyout at a price of $34 per share, the same price as contemplated by the Proposed Transaction. Following discussion of these matters, Mr. Costa delivered Merrill Lynch's fairness opinion supporting the Proposed Transaction.

Mr. Whayne next discussed the comparative financial analysis of the Proposed Transaction and the proposed leveraged recapitalization/spin-off transaction, as well as the letters submitted by the third-party group, that his firm provided to the Special Committee. Mr. Whayne then advised the Board that Morgan Stanley had delivered a fairness opinion supporting the Proposed Transaction to the Special Committee and Mr. Whayne provided the same fairness opinion to the full Board.

Ms. Marchetti then reported on the ESOP Trustee's due diligence review and provided an overview of the ESOP-related components of the Proposed Transaction. Ms. Marchetti reported that (i) the ESOP Trustee had received an opinion from its financial advisor, Duff & Phelps, LLC, that the terms of the Proposed Transaction are fair and reasonable from a financial point of view, (ii) the Proposed Transaction had been approved by the ESOP Trustee's ESOP transaction review committee and (iii) the ESOP Trustee was prepared to proceed with document execution.

Following these presentations, Mr. Osborn, as Chair of the Special Committee, advised the Board that the Special Committee, following review with its independent legal and financial advisors, recommends the full Board approve the Proposed Transaction as presented at this meeting. Mr. Osborn and members of senior management then responded to questions from the Directors. During the course of this discussion, Mr. Stinehart advised the Board that he and Messrs. Chandler and Goodan would abstain from the Board vote on the Proposed Transaction, but that the Chandler Trusts would vote in favor of the merger at the special shareholders' meeting and would enter into a voting agreement with the Company evidencing this understanding.

Following discussion, Mr. Rosenblum reviewed the proposed resolutions that were before the Board. On motion duly made and seconded, the Board (with Messrs. Chandler, Goodan and Stinehart abstaining) then adopted the following recitals and resolutions:

**WHEREAS**, it is proposed that Tribune Company, a Delaware corporation (the "Company"), enter into certain agreements listed on Exhibit A hereto (collectively, as each may be amended, modified, waived or supplemented from time to time, the "Transaction Agreements"), which contemplate the entry into and the consummation of certain transactions and the rights and obligations of the Company with respect thereto (collectively, the "Transactions");

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**WHEREAS**, it is deemed to be in the best interests of the Company to recognize and reward the contribution by the Company's employees to its successful operation, and to provide an incentive for such employees to increase their productivity, by enabling them to acquire stock ownership interests in the Company and to share in the profits of the Company through a plan that will qualify as an "employee stock ownership plan" within the meaning of the Internal Revenue Code of 1986, as amended, and the Employee Retirement Income Security Act of 1974, as amended, to be known as the Tribune Employee Stock Ownership Plan (the "ESOP");

**WHEREAS**, it is proposed that the Company enter into an Agreement and Plan of Merger (the "Merger Agreement"), by and among the Company, GreatBanc Trust Company, as trustee (in such capacity, the "ESOP Fiduciary") and on behalf of the ESOP, and Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and, for the limited purposes set forth therein, EGI-TRB L.L.C., a Delaware corporation ("Tower Acquisition");

**WHEREAS**, the Merger Agreement provides for, among other things, Merger Sub to be merged with and into the Company (the "Merger"), with the Company surviving the Merger (the "Surviving Corporation"), whereby, among other things and subject to the terms and on the conditions stated in the Merger Agreement, each issued and outstanding share of common stock of the Company, par value $0.01 per share ("Common Stock"), other than shares held by the ESOP or with respect to which dissenters' rights are validly exercised and not withdrawn, will be converted into the right to receive $34.00 in cash per share of Common Stock, subject to increase to the extent set forth in the Merger Agreement;

**WHEREAS**, it is proposed that the Company enter into a Securities Purchase Agreement, by and among the Company, Tower Acquisition, and Mr. Samuel Zell (the "Guarantor") (the "Securities Purchase Agreement"), which provides for, among other things, and subject to the terms and on the conditions stated in the Securities Purchase Agreement, (i) prior to the consummation of the Merger (the "First Closing"), (a) Tower Acquisition to acquire, and the Company to sell, 1,470,588 newly issued shares of Common Stock for $34.00 per share (the "Purchased Shares") for an aggregate purchase price of $50,000,000; and (b) an unsecured subordinated exchangeable note, issued by the Company to Tower Acquisition with an aggregate principal amount of $200,000,000, subject to certain terms and conditions stated therein (the "Exchangeable Note") for an aggregate purchase price of $200,000,000; and (ii) immediately following the consummation of the Merger (the "Second Closing"), in exchange for the consideration set forth therein, (a) an unsecured subordinated promissory note, made by the Company to Tower Acquisition with an aggregate principal amount of $225,000,000, subject to certain terms and conditions stated therein (the "Subordinated Promissory Note"); and (b) a warrant to purchase 43,478,261 shares of common stock of the Surviving Corporation (the "Warrant Agreement");

**WHEREAS**, it is proposed that the Company enter into an ESOP Purchase Agreement, by and among the Company and the ESOP (the "ESOP Purchase Agreement"), which provides for, among other things and subject to the terms and on the conditions stated in the ESOP Purchase Agreement, the ESOP to purchase, and the Company to sell, 8,928,571 newly issued shares of Common Stock (the "ESOP Shares") for an aggregate purchase price of $250,000,000;

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0533548

**WHEREAS**, in connection with the ESOP Purchase Agreement, it is proposed that the Company enter into an ESOP Loan Agreement, by and between the Company and the ESOP (the "ESOP Loan Agreement"), which provides for, among other things, and subject to the terms and on the conditions stated in the ESOP Loan Agreement, including execution of a note (the "ESOP Note") and a pledge agreement (the "ESOP Pledge Agreement") in favor of the Company, the extension of credit by the Company to the ESOP Fiduciary to implement the terms of the ESOP Purchase Agreement and to enable the ESOP to purchase Common Stock pursuant thereto;

**WHEREAS**, in connection with the Merger Agreement, the Securities Purchase Agreement and the ESOP Purchase Agreement, it is proposed that the Company enter into an Investor Rights Agreement by and among the Company, Tower Acquisition and the ESOP (the "Investor Rights Agreement"), which provides for, among other things, the right of Tower Acquisition to designate individuals to the Board of Directors of the Company, as well as other matters in connection with the governance of the Company following the execution of said agreements and the consummation of the transactions contemplated thereby;

**WHEREAS**, in connection with the Merger Agreement, the Securities Purchase Agreement and the ESOP Purchase Agreement, it is proposed that the Company enter into a voting agreement with Chandler Trust No. 1 and Chandler Trust No. 2 (the "Voting Agreement"), whereby Chandler Trust No. 1 and Chandler Trust No. 2 each agrees to vote its respective shares of Common Stock in favor of the Merger, tender their respective shares into the Share Repurchase and take other actions designed to ensure approval of the Merger Agreement and the Merger;

**WHEREAS**, it is proposed that the Company enter into registration rights agreements with Tower Acquisition, the ESOP, Chandler Trust No. 1 and Chandler No. 2 (each agreement, a "Registration Rights Agreement"), whereby Tower Acquisition, the ESOP, Chandler Trust No. 1 and Chandler No. 2 are each provided with certain registration rights with respect to shares of Common Stock;

**WHEREAS**, it is proposed that, under the circumstances contemplated by the Merger Agreement, the Company enter into an Exchange Agreement with Eagle New Media Investments, LLC and Eagle Publishing Investments, LLC (collectively, the "Eagle Entities") (the "Exchange Agreement"), under which the Company will, immediately prior to the consummation of the Merger, issue shares of a new series of the Company's preferred stock, as contemplated by the Merger Agreement, to the Eagle Entities, in exchange for all of the shares of Common Stock and preferred stock currently held by the Eagle Entities;

**WHEREAS**, the Company and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent (the "Rights Agent"), have executed and entered into a Rights Agreement, dated as of December 12, 1997 (as amended, the "Rights Agreement");

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533549

**WHEREAS**, pursuant to Section 27 of the Rights Agreement, the Company and the Rights Agent may from time to time supplement or amend the Rights Agreement in accordance with the provisions thereof;

**WHEREAS**, it is proposed that the Board of Directors of the Company amend the Rights Agreement substantially in the form of Exhibit B hereto ("Amendment No. 3"), to clarify that the execution and performance of the Transaction Agreements do not result in any of the parties thereto being deemed to be an Acquiring Person (as defined in the Rights Agreement);

**WHEREAS**, it is proposed that the Company enter into a First Step Commitment Letter, by and among the Company, Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A. and/or Bank of America, N.A., Banc of America Bridge LLC and Banc of America Securities LLC (collectively, the "First Step Credit Facilities Agents") (including the Summary of Terms and Conditions appended thereto, the Fee Letter issued in connection therewith and the Engagement Letter issued in connection therewith, collectively, the "First Step Commitment"), which provides for, among other things, and subject to the terms and on the conditions stated in the First Step Commitment, the First Step Credit Facilities Agents to provide senior secured credit facilities for the Company in an aggregate principal amount of approximately $8.028 billion, consisting of a $7.015 billion seven-year term loan, a $263 million seven-year term loan and a $750 million six-year revolving line of credit (collectively, the "First Step Credit Facility"), for the uses and purposes described in the First Step Commitment;

**WHEREAS**, it is proposed that the Company enter into a Second Step Commitment Letter, by and among the Company, Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A. and/or Bank of America, N.A., Banc of America Bridge LLC and Banc of America Securities LLC (collectively, the "Second Step Credit Facilities Agents" and, together with the First Step Credit Facilities Agents, the "Credit Facilities Agents") (including the Summary of Terms and Conditions appended thereto, the Fee Letter issued in connection therewith and the Engagement Letter issued in connection therewith, collectively, the "Second Step Commitment" and, together with the First Step Commitment, the "Commitments"), which provides for, among other things, and subject to the terms and on the conditions stated in the Second Step Commitment, the Second Step Credit Facilities Agents to (i) provide an incremental term loan facility for the Company in an aggregate principal amount of approximately $2.105 billion (the "Incremental Facility" and, together with the First Step Credit Facility, the "Secured Facilities") and (ii) either provide a senior unsecured bridge facility for the Company or provide assistance in connection with the issuance of senior notes and/or senior unsecured notes by the Company, in either case in an aggregate principal amount of approximately $2.1 billion (together, the "Unsecured Facility" and the Unsecured Facility together with the Incremental Facility, the "Second Step Credit Facility" and the Second Step Credit Facility together with the First Step Credit Facility, the "Credit Facilities"), each for the uses and purposes described in the Second Step Commitment;

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533550

**WHEREAS**, in connection with the Company's entry into the Credit Facilities and the issuance of the Securities (as defined under the heading "Capital Market Debt Issuances" below), it is proposed that the Company enter into interest rate management transactions constituting a rate swap, basis swap, forward rate transaction, interest rate option, cap transaction, floor transaction, collar transaction, forward transaction or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, linked to one or more interest rates with respect to notional amounts of indebtedness under the Credit Facilities and under the Securities determined from time to time by the officer or officers hereafter authorized to be necessary in connection with the Company's financial operations or performance (the "Interest Rate Hedging Transactions");

**WHEREAS**, it is proposed that as promptly as practicable following the execution of the Merger Agreement, the Company commence a self-tender offer to repurchase shares of Common Stock at $34.00 per share, net to the seller in cash (the "Share Repurchase");

**WHEREAS**, a Special Committee of the Board of Directors (the "Special Committee") has been formed consisting of members of the Board of Directors of the Company (the "Board") other than members of the Company's management and representatives of Chandler Trust No. 1 and Chandler Trust No. 2;

**WHEREAS**, the Special Committee has reviewed the terms of the Transaction Agreements and the Transactions with management and its outside legal and financial advisors, and has recommended that the Board approve the Transaction Agreements and the Transactions;

**WHEREAS**, at this meeting, the Board has received the opinion of its financial advisor, Merrill Lynch & Co., Inc., and the Special Committee's financial advisor, Morgan Stanley & Co. Incorporated, with respect to the Transactions, to the effect that the Transactions are fair, from a financial point of view, to the stockholders of the Company (who are not parties to the Transaction Agreements);

**WHEREAS**, at this meeting, the Board has reviewed the terms of the Transaction Agreements and the Transactions, and on the recommendation of the Special Committee and based on the presentations of the Company's outside legal and financial advisors at this and other meetings, and on such other factors as the Board deemed pertinent, determined that entry into the Transaction Agreements and the consummation of the Transactions is advisable, fair to and in the best interests of the Company and its stockholders; and

**WHEREAS**, the Board has determined to approve the Transaction Agreements and to authorize the proper officers of the Company to take all actions necessary and proper for the execution of the Transaction Agreements and the consummation of the Transactions.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533551

**NOW, THEREFORE, BE IT:**

<u>Establishment of ESOP and Appointment of Trustee</u>

**RESOLVED**, that the Board hereby establishes a plan designed to invest primarily in stock of the Corporation, which will qualify as an "employee stock ownership plan" within the meaning of Section 4975(e)(7) of the Internal Revenue Code of 1986, as amended and Section 407(d)(6) of the Employee Retirement Income Security Act of 1974, as amended;

**FURTHER RESOLVED**, that the form of employee stock ownership plan that has been presented to the Board, to be known as the "Tribune Employee Stock Ownership Plan," be and hereby is approved and adopted, effective as of January 1, 2007;

**FURTHER RESOLVED**, that the form of employee stock ownership trust that has been presented to the Board, to be known as the "Tribune Employee Stock Ownership Trust," be and hereby is approved and adopted, effective as of February 7, 2007;

**FURTHER RESOLVED**, that the appointment of GreatBanc Trust Company to serve as trustee of the Tribune Employee Stock Ownership Trust is hereby ratified;

**FURTHER RESOLVED**, that the Tribune Company Employee Benefits Committee is hereby appointed to serve as the Administrator under Section 1.4 of the Tribune Employee Stock Ownership Plan and under Section 2.2 of the Tribune Employee Stock Ownership Trust;

**FURTHER RESOLVED**, that the proper officers of the Corporation are authorized and directed to execute the agreement memorializing the Tribune Employee Stock Ownership Trust on behalf of the Company, to obtain an execution of such agreement by the ESOP Fiduciary and to execute a certification with respect to the adoption of the ESOP; and

**FURTHER RESOLVED**, that the proper officers of the Company are authorized and directed to work with counsel to submit to the Internal Revenue Service copies of the Plan and other documents ancillary thereto, with a request that the Internal Revenue Service issue a determination letter that the Plan is qualified under Code Section 401(a) and that it constitutes an employee stock ownership plan within the meaning of Code 4975(e)(7).

<u>Approval of the Transaction Agreements and the Transactions</u>

**FURTHER RESOLVED**, that having reviewed the terms of the Transaction Agreements and the Transactions, and on the recommendation of the Special Committee and based on the presentations of the Company's outside legal and financial advisors at this and other meetings, and on such other factors as the Board deemed pertinent, the Board determines that entry into the Transaction Agreements and the consummation of the Transactions is advisable, fair to and in the best interests of the Company and its stockholders;

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0533552

**FURTHER RESOLVED**, that the Board hereby approves the form of temporary certificate representing the ESOP Shares to be executed by the President of the Company and attested to by the Secretary or any Assistant Secretary of the Company;

**FURTHER RESOLVED**, that the Board hereby approves the issuance of the Purchased Shares to Tower Acquisition pursuant to the terms of the Securities Purchase Agreement, the issuance of shares of Common Stock to Tower Acquisition pursuant to the terms of the Exchangeable Note (the "Exchange Shares"), and the issuance of the ESOP Shares to the ESOP pursuant to the terms of the ESOP Purchase Agreement, and such shares will be validly issued, fully paid and nonassessable, when the certificates representing the Purchased Shares, Exchange Shares and ESOP Shares, respectively, have been duly executed, countersigned and registered and duly delivered to Tower Acquisition or the ESOP, as applicable, against payment of the agreed consideration therefor in accordance with the Securities Purchase Agreement, the Exchangeable Note and the ESOP Purchase Agreement, respectively;

**FURTHER RESOLVED**, that the Board hereby approves the execution and performance of the Transaction Agreements and the consummation of the Transactions, and intends that the foregoing approval and adoption render inapplicable to the execution of the Transaction Agreements and the Transactions contemplated thereby, including the Merger, all "fair price," "merger moratorium," "control share acquisition," or other antitakeover or similar statutes or regulations, including, without limitation, Section 203 of the Delaware General Corporation Law, that apply or purport to apply to such agreements or transactions, and hereby takes all action necessary to exempt such agreements and transactions therefrom;

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized for and on behalf of the Company to execute and deliver each of the Transaction Agreements in substantially the form presented to the Board at this meeting, with such changes as such officer executing the same may approve, the execution and delivery of each of the Transaction Agreements by such officer to be deemed conclusive evidence that the Board and the Company have approved and adopted, and do approve and adopt, each of the Transaction Agreements as executed; and

**FURTHER RESOLVED**, that the proper officers of the Company be, and each hereby is, authorized to file, execute, verify, acknowledge and deliver, for and on behalf of the Company, any and all notices, certificates, agreements, amendments, instruments and other documents and to perform or do or cause to be performed or done any and all such acts or things and to pay or cause to be paid all necessary fees and expenses, in each case in the name and on behalf of the Company, as they or any of them may deem necessary or advisable to enable, effectuate or carry out the provisions of each of the Transaction Agreements or the intentions and purposes of the foregoing resolutions in connection with the Transactions, the taking of any such action to be deemed conclusive evidence that the Board and the Company have authorized such action.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0533553

## Credit Facilities and Related Matters

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized for and on behalf of the Company to (i) execute for, in the name of and on behalf of the Company, and deliver to the Credit Facilities Agents, individually and/or as agents for themselves and the other lenders that may participate in the Credit Facilities, any and all instruments, documents and agreements deemed necessary or desirable by the Credit Facilities Agents in order to evidence the Credit Facilities properly in accordance with the requirements of the Commitments and the Credit Facilities contemplated thereby and any other requirements established by the Credit Facilities Agents or any of the other lenders, including without limitation promissory notes, loan or credit agreements, joinder agreements, indemnity agreements, pledge agreements, security agreements, guarantees, certificates, affidavits, applications, notices, financing statements or any other agreements or instruments evidencing the indebtedness of the Company for the monies so borrowed, with interest thereon, including renewals, extensions and/or amendments of said promissory notes, loan or credit agreements, joinder agreements, indemnity agreements, pledge agreements, security agreements, guarantees, certificates, affidavits, applications, notices, financing statements or any other agreements or instruments (individually and collectively, the "Credit Facilities Documents"), all in the form required by the Credit Facilities Agents and approved by the proper officers of the Company executing same, the execution of same by such officers to constitute conclusive evidence of the approval of same, (ii) enter into the Interest Rate Hedging Transactions on terms as, in the judgment of the officer or officers hereafter authorized, the Company may from time to time hereafter require, (iii) take from time to time any actions deemed necessary or desirable by the proper officers of the Company to establish the Credit Facilities and to evidence the Credit Facilities properly in accordance with the requirements of the Commitments and the Credit Facilities Documents contemplated thereby and any other requirements established by the Credit Facilities Agents and/or any of the other lenders, and to cause the Company to enter into and perform all of its obligations pursuant to the Credit Facilities Documents or otherwise in connection with the Credit Facilities and (iv) execute from time to time renewals, extensions and/or amendments of the Credit Facilities Documents;

**FURTHER RESOLVED**, that the proper officers, be and they are each hereby authorized, directed and empowered, in the name of the Company, to execute and deliver for the benefit of each counterparty to the Interest Rate Hedging Transactions ISDA master agreements, confirmations, schedules, joinder agreements, pledge agreements, security agreements, financing statements or other agreements or instruments evidencing the obligations of the Company under such Interest Rate Hedging Transactions, and each of said Authorized Officers are authorized to from time to time execute renewals, extensions and/or amendments of said ISDA master agreements, confirmations, schedules, joinder agreements, pledge agreements, security agreements, financing statements or other agreements or instruments;

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized for and on behalf of the Company to, as security for the indebtedness and other obligations of the Company to the Credit Facilities Agents, individually and/or as agents for

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0533554