1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In Re:                          ) Chapter 11

     TRIBUNE COMPANY, et al.,    ) Case No.

                Debtors.    ) 08-13141 (KJC)


CONFIDENTIAL PURSUANT TO

CONFIDENTIALITY AGREEMENT



       The confidential deposition of

BEN A. BUETTELL, called for examination, taken

pursuant to the Federal Rules of Civil Procedure of

the United States District Courts pertaining to the

taking of depositions, taken before SUSAN K. TODAY,

C.S.R. No. 84-2212, a Notary Public within and for

the County of DuPage, State of Illinois, and a

Certified Shorthand Reporter of said state, at

Suite 3800, One South Dearborn Street, Chicago,

Illinois, on December 2, 2009, commencing at

10:05 a.m.

CONFIDENTIAL

2

1    PRESENT:

2         ZUCKERMAN SPAEDER, LLP,

3         (1800 M Street, NW, Suite 1000,

4         Washington, D.C.  20036-5802,

5         202-778-1800), by:

6    MR. ANDREW N. GOLDFARB,

7              -and-

8    CHADBOURNE & PARKE, LLP,

9    (30 Rockefeller Plaza,

10   New York, New York  10112,

11   212-408-5100), by:

12   MR. MARC D. ASHLEY,

13        appeared on behalf of the Committee

14        of Unsecured Creditors;

15   KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP,

16   (1633 Broadway,

17   New York, New York  10019-6799,

18   212-506-1700), by:

19   MS. CHRISTINE A. MONTENEGRO,

20        appeared on behalf of New York

21        Law Debentures;

22

23

24

Ben A. Buettell                                      December 2, 2009

CONFIDENTIAL

3

```
 1    PRESENT:  (Continued)
 2            O'MELVENY & MYERS, LLP,
 3            7 Times Square,
 4            New York, New York  10010,
 5            212-326-4303), by:
 6            MR. ZACK GROSS,
 7                 appeared on behalf of
 8                 Bank of America;
 9            HENNIGAN BENNETT & DORMAN, LLP,
10            (865 South Figueroa Street, Suite 2900,
11            Los Angeles, California  90017,
12            213-694-1152), by:
13            MR. DAVID M. ROSS,
14                 appeared on behalf of the
15                 Credit Agreement Lenders;
16            KAYE SCHOLER, LLC,
17            (3 First National Plaza, Suite 4100,
18            70 West Madison Street,
19            Chicago, Illinois  60602-4231,
20            312-583-2433), by:
21            MR. ROBERT M. SPALDING,
22                 appeared on behalf of Merrill Lynch;
23
24
```

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

4

1    PRESENT:  (Continued)

2         DAVIS POLK & WARDWELL, LLP,

3         (450 Lexington Avenue,

4         New York, New York  10017,

5         212-450-4508), by:

6         MS. SHARON KATZ,

7              appeared on behalf of J.P. Morgan Chase;

8         SIDLEY AUSTIN, LLP,

9         (One South Dearborn,

10        Chicago, Illinois  60603,

11        312-853-7621), by:

12        MR. JAMES W. DUCAYET,

13             appeared on behalf of Tribune Company;

14        ABELSON HERRON, LLP,

15        (333 South Grand Avenue, Suite 1550,

16        Los Angeles, California  90071,

17        213-402-1900), by:

18        MR. VINCENT H. HERRON,

19             appeared on behalf of the Deponent.

20

21

22

23    REPORTED BY:  SUSAN K. TODAY, C.S.R., R.P.R.

24             License No. 84-2212.

Ben A. Buettell                                        December 2, 2009
CONFIDENTIAL

5

```
 1              (WHEREUPON, a certain document was
 2              marked Buettell Deposition Exhibit
 3              No. 1, for identification, as of
 4              12-02-2009.)
 5              (WHEREUPON, the witness was duly
 6              sworn.)
 7                   BEN A. BUETTELL,
 8   called as a witness herein, having been first duly
 9   sworn, was examined and testified as follows:
10                   EXAMINATION
11   BY MR. GOLDFARB:
12       Q.    Good morning, Mr. Buettell.  My name is
13   Andrew Goldfarb.  I'm with the firm of Zuckerman
14   Spaeder, and we are special counsel to the
15   Committee of Unsecured Creditors of the Tribune
16   Company.
17              Before we turn to you, just a couple of
18   housekeeping matters.  I guess what I would like is
19   for counsel present just to state their name and
20   affiliation for the record, please, and to
21   acknowledge that they have agreed to abide by the
22   terms of the confidentiality agreement which was
23   previously circulated as if they were a committee
24   participant and they have executed Exhibit A.
```

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

6

1          So if we could -- I guess we can start

2     down at the end.  Mr. Gross.

3          MR. GROSS:  Sure.  Zack Gross from O'Melveny &

4     Myers.  I have signed the agreement indicating that

5     we will abide by the confidentiality agreement and

6     representing Bank of America.

7          MS. MONTENEGRO:  Christine Montenegro with

8     Kasowitz, Benson, Torres & Friedman.  I have signed

9     the Exhibit A and we will abide by the agreement.

10         MR. ASHLEY:  Marc Ashley from Chadbourne &

11    Parke for the Committee of Unsecured Creditors.  We

12    have previously signed the agreement.

13         MR. HERRON:  I'm Vince Herron on behalf of the

14    deponent.

15         MR. DUCAYET:  Jim Ducayet from Sidley Austin

16    LLP on behalf of the Debtor.  And I have signed the

17    acknowledgment.

18         MS. KATZ:  Sharon Katz, Davis Polk & Wardwell,

19    on behalf J.P. Morgan Chase.  I have signed the --

20    acknowledged the agreement and would also just like

21    to note for the record that we have not received

22    any of the documents that I understand were

23    produced by Houlihan in this matter.  And in light

24    of that and for other reasons we reserve all of our

Ben A. Buettell                                           December 2, 2009
CONFIDENTIAL

7

1    rights to ask questions after we have received the

2    documents and have had an opportunity to review

3    them and reserve any other rights.

4          MR. SPALDING:  Robert Spalding from Kaye

5    Scholer on behalf of Merrill Lynch.  We've signed

6    the acknowledgment.

7          MR. ROSS:  David Ross from Hennigan Bennett &

8    Dorman on behalf of the Credit Agreement Lenders,

9    and those include the parties identified in the

10   Notice of Appearance and Request for Notice and

11   Service of Papers dated November 20th, 2009.

12            I have signed the confidentiality

13   agreement, and I join in Ms. Katz' objection

14   regarding the Houlihan papers.

15         MR. GOLDFARB:  I have previously marked the

16   notice of oral examination as Buettell Exhibit 1.

17            And let's mark as Buettell Exhibit 2,

18   please, collectively the Exhibit As that have been

19   executed by present counsel.

20                     (WHEREUPON, a certain document was

21                      marked Buettell Deposition Exhibit

22                      No. 2, for identification, as of

23                      12-02-2009.)

24

Ben A. Buettell                                                                December 2, 2009

CONFIDENTIAL

8

1    BY MR. GOLDFARB:

2        Q.    Mr. Buettell, again, could you please

3    state and spell your name for the record and give

4    your home address?

5        A.    Ben A. Buettell, B-u-e-t-t-e-l-l.  Home

6    address is 2516 Prairie Avenue, Unit 305, Evanston,

7    Illinois, 60201.

8        Q.    Mr. Buettell, have you been deposed

9    before?

10       A.    Yes.

11       Q.    You may be familiar with the procedures.

12   I will just review them quickly so that we

13   understand the ground rules and the deposition can

14   proceed as smoothly as possible today.

15           I will ask you questions and you will

16   provide answers.  The court reporter obviously can

17   only take down verbal responses.  So I ask that

18   when you respond that you do so with words as

19   opposed to facial gestures or body movements.

20           Do you understand that?

21       A.    Yes.

22       Q.    I will try not to interrupt you as you

23   are providing an answer.  I ask that you not

24   interrupt me so that the transcript can read as

Ben A. Buettell                          December 2, 2009
CONFIDENTIAL

9

1    cleanly as possible.

2            Is that acceptable to you?

3       A.    Yes.

4       Q.    Your counsel may object to questions.

5    There may be objections from other parties that are

6    present.  Unless instructed by your counsel not to

7    answer a question, those objections are just

8    preserving objections for the record by the parties

9    present, and so I ask that you answer those

10   questions unless instructed otherwise by counsel.

11           Is that clear?

12      A.    Yes.

13      Q.    And, of course, if you want to confer

14   with your counsel, we will certainly accommodate

15   that.  I just ask if a question is pending that you

16   finish your answer to the question and then we will

17   obviously accommodate your request to consult with

18   counsel.

19           Is that acceptable?

20      A.    Yes.

21      Q.    Sir, just as a little bit of brief

22   background, can you give me your educational

23   background starting with college, university?

24      A.    I graduated with a Bachelor of Arts in

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

                                                              10

1    economics from Northwestern University in June of

2    1984.  I subsequently went to work for a commercial

3    lending organization and also started part-time at

4    graduate school at Kellogg, Northwestern University

5    at Kellogg School, in the spring of 1986 and then

6    ultimately went back full-time in the fall of 1987

7    and graduated with at the time a Master of

8    Management in Finance and Management Policy in June

9    of 1988.

10        Q.    From?

11        A.    From Northwestern.  From Kellogg.

12        Q.    And then did you continue working for

13   the lending agency that you had been working for?

14        A.    I worked for the bank, which was

15   Boulevard Bank, a middle-market lending

16   organization in Chicago.  I worked there from July

17   of 1984 through August of 1987 and then after

18   business school started my career at Houlihan Lokey

19   and have been there ever since.

20        Q.    Did you do any of the sort of work that

21   you have done at Houlihan Lokey at the prior job?

22        A.    No.

23        Q.    Tell me again when you started at

24   Houlihan.

Ben A. Buettell                                          December 2, 2009

CONFIDENTIAL

11

1          A.     I started at Houlihan August 15, 1988.

2          Q.     What were you doing at the outset of

3     your time at Houlihan?

4          A.     I started out as an associate working on

5     a variety of engagements, primarily at the time

6     working on corporate valuation engagements, ESOP

7     valuation engagements, fairness opinion

8     engagements, solvency opinion engagements.

9     Generally valuation engagements.

10         Q.     When you started at Houlihan, this was a

11    new area of focus for you?

12         A.     Yes.

13         Q.     And you have been working in that same

14    basic area since?

15         A.     Well, I over the years did those kinds

16    of engagements.  Also did a lot of mergers and

17    acquisition work, primarily helping companies

18    sell -- helping people sell their businesses.  Did

19    some buy side advisory corporate recapitalization

20    type engagements.  Very little in the restructuring

21    arena at the time but over the years doing

22    transactional type of opinions and other related

23    corporate valuations along with the M&A work that I

24    discussed.

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

                                                        12

1        Q.    Then just sort of trace me time-wise, if

2    you would, please, through your different positions

3    at Houlihan leading up to the present.

4        A.    Was an associate, I guess, for -- I

5    don't have the exact dates but an associate for two

6    to three years.  Became a vice president.

7    Continued to work on those types of engagements but

8    started to manage those engagements and manage

9    other staff, both associates and financial

10   analysts.  Did that for a few years.

11            Became a senior vice president

12   effectively doing the same thing in terms of

13   managing engagements but also responsible for

14   generating business activity and client activity.

15            Eventually became a director for a few

16   years after that and ultimately became a managing

17   director in I guess it was December 1999 and have

18   been a managing director ever since.

19        Q.    As a managing director, are there

20   currently people to whom you report?

21        A.    Yeah.  I guess as a managing director

22   you always have got to report to somebody above

23   you.

24            I basically report to Jack Berka, who is

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

13

1    the senior managing director who runs what we call

2    our Financial Advisory Services practice, of which

3    I'm a part of.

4         Q.    Is Houlihan Lokey primarily centered in

5    Chicago?

6         A.    Well, the company is headquartered in

7    Los Angeles.  We have 14 offices around the U.S.

8    and the world.  So Chicago would be one of our

9    offices where we conduct our services.

10        Q.    How many people are in the Chicago

11   office?

12        A.    I don't have the exact number now, but I

13   would say maybe 75 people total in Chicago.

14        Q.    And do you have a management role in the

15   Chicago office?

16        A.    Yes.  I manage the Financial Advisory

17   Services group in Chicago.  Also help manage kind

18   of the office activities with a couple of my other

19   colleagues from our other business groups and help

20   manage overall the Financial Advisory Services

21   practice on a global basis.

22        Q.    How many people are in the financial

23   services activities group in Chicago?

24        A.    We now have 17 professionals and a

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

                                                              14

1    couple of assistants.

2          Q.    Other than Jack Berka are there other

3    senior managing directors to whom you report?

4          A.    Not directly, no.

5          Q.    Turning now to Houlihan's involvement

6    with the Tribune, when to your knowledge did

7    Houlihan first -- or prior to the kind of mid-2006

8    going into 2007 period, had Houlihan worked with

9    the Tribune previously?

10         MR. HERRON:  Are you asking about anybody in

11   the entire company?

12   BY MR. GOLDFARB:

13         Q.    If you know.  That will be my first

14   question.

15         A.    I do not know specifically what

16   engagements would have occurred between Houlihan

17   and the Tribune prior to -- well, I did work on --

18   we worked on the ESOP -- well, it wasn't an ESOP

19   transaction.  I'm trying to recollect now.

20               There was work done on the Times Mire

21   merger back in the early 2000s and I had worked on

22   that particular engagement.  I think it was a

23   fairness opinion.

24         Q.    Do you recall if Houlihan was retained

CONFIDENTIAL

15

1   by the Tribune for that?

2          A.     No.   I think we were retained by a

3   trustee for one of the plans is my recollection.

4          Q.     And after that early 2000s valuation

5   work was there -- again, prior to this mid to late

6   2006 period, was there additional work that you

7   know of that Houlihan did with the Tribune?

8          A.     Not to my knowledge.   There may have

9   been a few other valuations done perhaps for

10  certain interactive subsidiaries, interactive

11  Internet-based subsidiaries, but I don't recall the

12  specifics.

13         Q.     Okay.   Do you recall that Houlihan

14  assisted with one of the businesses called Topix

15  that was partially owned by the Tribune?

16         A.     Yeah.   I did not have knowledge at the

17  time, but I only know that there was some analysis

18  done based on the documents that we produced for

19  this deposition.

20         Q.     Okay.

21         A.     I had no direct involvement.

22         Q.     And do you know whether prior to this

23  period that Houlihan Lokey had done any work with

24  any of the entities affiliated with Sam Zell?

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

16

1          A.     I don't have direct knowledge.

2          Q.     And in connection with any of the banks

3    that were some of the major lenders to the Tribune

4    in connection with the Zell LBO in 2007, had

5    Houlihan worked with -- I mean, I can name J.P.

6    Morgan, Merrill Lynch, Citi, previously?

7          A.     I would say it's possible that we worked

8    on certain corporate valuations that those banks

9    may have been a party to in terms of lending, but I

10   don't have specific recollections of being retained

11   by any of those banks to do work on their behalf

12   for anything.  But I don't have full knowledge of

13   that based on a firm-wide basis.

14         Q.     And then moving to the mid-2006 period,

15   there was as has previously been indicated some

16   involvement with valuation of subsidiaries of

17   Tribune.  And you were not personally involved in

18   that; is that right?

19         A.     That's correct.

20         Q.     When is the first time to your knowledge

21   Houlihan became involved with the Tribune's

22   consideration of a restructuring transaction or

23   recapitalization merger, some transaction of some

24   form in the 2006 time period?

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

                                                              17

1        A.     I don't remember specific dates.  I just

2   remember reading about what was a potential

3   transaction going on with Tribune.  And I think at

4   one point in maybe late 2006 I remember us reaching

5   out to folks at Tribune saying if there is a role

6   for us to provide any work we would be interested

7   in doing that.  And I think that was done primarily

8   through my colleague, Paul Much at the time, and we

9   sent information to some of the special committee

10  members as a way to try to create an opportunity

11  for ourselves, whatever that was going to be

12  because nothing had been decided in terms of the

13  type of the transaction at that point.

14       Q.     Were you personally involved in the

15  contacts with the Tribune in that outreach?

16       A.     Yeah.  I think I e-mailed information at

17  Paul Much's instruction to Mr. Osborn, who was one

18  of the special committee members that Paul knew.

19       Q.     Do you know who were the other special

20  committee members who Paul Much reached out to?

21       A.     The other one would have been -- well, I

22  don't know if we reached out directly, but the

23  other one would have been Miles White who we also

24  knew.  Those were the only two we reached out to

Ben A. Buettell                                December 2, 2009

CONFIDENTIAL

18

1    based on my recollection.

2         Q.    And when you say that we knew Miles

3    White and Mr. Osborn, is that from prior

4    professional association?

5         A.    Paul knew them through other school

6    affiliations.  I think namely -- I think it was

7    Culver Military Academy.  But I don't recall if

8    both of them -- that's where he knew both of them

9    or through some activities involving Culver

10   Military Academy that he had interactions with them

11   and perhaps through other general business

12   contacts, networking.

13        Q.    And were there any calls or face-to-face

14   meetings that you were involved with in that

15   outreach process in late 2006?

16        A.    No face-to-face meetings.  And I think I

17   called Mr. Osborn but only spoke with his assistant

18   and she instructed me the best way to get our

19   qualifications to him.  The gatekeeper.

20        Q.    Was there any other outreach that you

21   were involved in in that 2006 period?

22        A.    No.

23        Q.    Do you know whether anyone else at

24   Houlihan was also making outreach to the Tribune?

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

19

1        A.     I don't know that anybody else was.

2        Q.     And do you know whether you or anyone

3    else at Houlihan was making outreach to any of the

4    other parties that potentially would be involved in

5    a transaction?

6        A.     Not at that time.  Because the only

7    thing we knew is that Tribune was -- they had

8    formed a special committee to explore transactional

9    alternatives.  So that was the party that we

10   reached out to because no other parties, buyers, or

11   anything else had really surfaced at that point.

12       Q.     And in that time period what, if

13   anything, came of those outreach efforts?

14       A.     Well, nothing specifically came of it.

15   I think we provided the information.  I can't

16   remember if Mr. Osborn sent an e-mail or through

17   his assistant said that they already had

18   representation and, you know, they would keep our

19   information, kind of that kind of thing.  But no

20   other -- nothing else came of it.  So we were on

21   the sidelines at that point.

22       Q.     At that time did they identify who was

23   representing them in the capacity that you had made

24   outreach for?

CONFIDENTIAL

20

1        A.    I don't recall if Mr. Osborn

2    specifically identified them, but I think it

3    ultimately was part of some press release or

4    announcement I think I had seen that they had

5    retained financial advisors.

6        Q.    And then after that fall 2006 period,

7    this outreach effort, when was the next time that

8    you know of that anybody at Houlihan had contact

9    with parties that would potentially be involved in

10   the Tribune transaction?

11       A.    I believe Andy Stull, one of my

12   colleagues in our Atlanta office, had been

13   contacted by some of the attorneys in early

14   February about a potential engagement, which I

15   think ultimately led to one of the Tribune folks

16   reaching out to Andy for initial discussions.

17       Q.    What position does Andy Stull have at

18   Houlihan Lokey?

19       A.    He is a managing director.

20       Q.    In the Atlanta office?

21       A.    In the Atlanta office.  He works on

22   transaction opinions, which is the product line

23   that I head, fairness and solvency opinions.  So he

24   works on those types of transactions with me.

CONFIDENTIAL

1          Q.     Do you know who the counsel was who

2    contacted him?

3          A.     I can't recall.  I think there is a

4    reference somewhere in one of the documents we

5    produced, but I can't remember the names.

6          Q.     Did you hear about this contact from

7    Mr. Stull?

8          A.     Yeah.  He contacted me I think by e-mail

9    and by phone call about the potential opportunity,

10   which would be typical.  When people get inquiries,

11   they usually reach out to me and that starts the

12   process of vetting those opportunities.

13         Q.     How did he describe the opportunity to

14   you?

15         A.     He said there was a potential solvency

16   opinion opportunity involved in the Tribune and

17   that we needed to call the guy back and have

18   dialogue with the particular contact to gain a

19   better understanding of what the opportunity was.

20         Q.     When you initially heard from Mr. Stull,

21   did you have any understanding of what the nature

22   of the transaction was or the structure or anything

23   about it?

24         A.     Not specifics.  But I know that there

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

22

1    was news reports, you know, over time talking about

2    the different possible strategic alternatives for

3    the company.  And I think it was generally

4    described to us at that time as what was known as

5    the self -- excuse me -- was known as, quote, a

6    self-help deal.

7         Q.    And what does that mean, at least to

8    you?

9         A.    At that time I think there was

10   discussion about trying to create better financial

11   return for shareholders.  So they were talking

12   about doing a special dividend where they would

13   further leverage the company up, pay out that

14   dividend, and then do other corporate spinoff or

15   reorganization transactions to extract, you know,

16   the highest value for the stock held by

17   shareholders.

18        Q.    And did you have an understanding about

19   whether this was being -- what the impetus was for

20   the exploration by the Trib?

21        A.    Well, I think generally speaking when

22   you engage in those types of transactions, special

23   dividend transactions, further leverage on the

24   company, you know, oftentimes people will request

Ben A. Buettell                                      December 2, 2009
CONFIDENTIAL

23

1    what's generically known as a solvency opinion.

2    And that was my understanding of the request coming

3    from Chandler Bigelow.

4        Q.    My question may have been a bad one so

5    I'll ask.  What I was going to was when you first

6    heard about the potential opportunity from

7    Mr. Stull, did you have any understanding of what

8    was driving the Tribune to explore a self-help

9    transaction or some other transaction?

10       A.    My understanding was, is there were

11   certain large shareholder groups who were unhappy

12   with the -- they were unhappy with where the stock

13   price was trading and wanted to try to find ways to

14   extract a higher value, the Chandler trusts and,

15   you know, other large shareholders.

16       Q.    Was this information that you had gotten

17   from public reports or that you got from Mr. Stull?

18       A.    That would have been from public -- that

19   would have been from reports in the press on, you

20   know, what kind of transactions they were

21   exploring.

22       Q.    And you said earlier that the way that

23   the process often works is that if there is a

24   solvency opportunity, as in this case Mr. Stull

Ben A. Buettell                                                December 2, 2009

CONFIDENTIAL

24

1    contacted you and then the process gets rolling.

2    Is that --

3          A.    Yeah.   What is known as the process gets

4    rolling, yes.

5          Q.    And then when this opportunity -- when

6    such an opportunity or request comes in to

7    Houlihan, can you just sort of walk through what

8    that rolling process entails?

9          A.    Yeah.   I mean, typically we like to have

10   dialogue with the prospect who is seeking the

11   service ultimately trying to gain as much

12   understanding as we can about the impetus for the

13   transaction, the structure of the transaction, the

14   financial parameters surrounding the company, an

15   understanding of maybe what the value of the

16   company is.   In this case it was publicly traded,

17   so you could come up with an implied value by just

18   using public information.

19              So we have dialogue and we ultimately

20   have whoever got the call be part of a group of

21   people who will put together what we call our

22   capital adequacy pricing sheets.   And that is the

23   document that we use, perhaps supplemented by other

24   information, to have internal dialogue or e-mail

Ben A. Buettell                                     December 2, 2009

CONFIDENTIAL

                                                              25

1    discussion about our desire to propose on the

2    engagement.

3         Q.     And is it accurate to say that the

4    capital adequacy pricing sheet is sort of the --

5    kind of the core summary that you base your

6    internal initial deliberations upon?

7         A.     That would be one of the -- yeah.  That

8    would be the core written document, if you will.

9         Q.     And who is involved in the discussion

10   around the capital adequacy pricing sheet

11   information and whether to proceed?

12        A.     There would be a group of senior

13   professionals, either people titled as senior

14   managing directors or managing directors who are

15   part of a group that would be provided that

16   information in addition to whoever the, you know,

17   deal team was that was putting that information

18   together.

19             And we would also have our industry

20   folks weigh in because of their knowledge of the

21   particular industry.  And that information would be

22   e-mailed out to people for discussion.

23        Q.     When you say "industry folks," describe

24   who those people are and what --

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

26

1        A.     At the time it was a gentleman by the

2     name of Jon Richmond.  J-o-n Richmond,

3     R-i-c-h-m-o-n-d.  Susan Casey, who had -- Jon had

4     particular experience in the media entertainment

5     area.  Susan Casey was also part of that group.

6     C-a-s-e-y.  She had particular knowledge of

7     newspaper -- the newspaper industry and publishing

8     industry.  And Brian Marler would have been another

9     person who was part of that industry group and also

10    part of our FAS group who had knowledge of media

11    and entertainment assets.

12             So we would ask them to provide any

13    insights or analytics so that we have, again, a

14    full appreciation for the opportunity given that I

15    am not an expert in that sector.

16       Q.     And then is there -- this is all leading

17    up to a decision as to whether or not Houlihan is

18    going to bid for the work, yes?

19       A.     Correct.

20       Q.     The materials that were produced make

21    reference to a capital adequacy pricing committee.

22    What is that?

23       A.     The pricing committee are the folks that

24    I mentioned, the senior managing directors and

CONFIDENTIAL

27

1    managing directors, that would span people from

2    FAS, people from corporate finance, our corporate

3    finance group, people from our financial

4    restructuring group.  And those members would

5    comprise that pricing committee.

6         Q.    Is that a standing committee?

7         A.    It's a standing committee.

8         Q.    Who, if you remember, were the members

9    of the committee in this period, February of '07?

10        A.    In February folks that would have

11   participated in the dialogue, Jack Berka, Scott

12   Beiser, B-e-i-s-e-r.  Berka is B-e-r-k-a.

13            The industry folks that I mentioned

14   previously were not part of the standing committee

15   but would have deliberated on this initial call or

16   these initial discussions.  And I can't tell you

17   specifically who else was in on any discussions

18   but --

19        Q.    Are you a standing --

20        A.    Yeah.  I'm a standing committee member.

21        Q.    Do you have to have a last name of B to

22   be on the standing committee?

23        A.    That helps.

24        Q.    Anybody else who you can think of?

CONFIDENTIAL

1      A.     In February I can't recall -- I can't

2    recall if there were other people.

3      Q.     What was Mr. Beiser's role on the

4    committee?

5      A.     He is in our Financial Advisory Services

6    practice, but he's our co-CEO and one of the people

7    that I think would have more influence, and we like

8    him to weigh in on things when we are having these

9    discussions on larger high-profile transactions.

10     Q.     So now going back, you said earlier that

11   you -- you had the conversation with Mr. Stull and

12   what came out of that was that you needed to go

13   back to his contact and find out more information,

14   yes?

15     A.     Correct.

16     Q.     And did that occur?

17     A.     Yeah.  I think there's some e-mail

18   printouts in the documents, but we had -- I

19   remember Andy called me because I remember I was in

20   Milwaukee and we had a phone call with Mr. Bigelow

21   I think it was on that Thursday, the early part of

22   February, whatever the date was, February 8th or

23   something like that.

24          We had a call, discussed it.  He was

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

29

1    interested in getting our feedback on a desire to

2    propose as soon as possible.  And so we had that

3    call and then had, you know, gathered our

4    information and were working on Friday, but we told

5    him that we wouldn't be able to give him a fee

6    quote until Monday at the earliest because we like

7    to spend some time understanding what was a pretty

8    complex transaction at that time.

9         Q.    You said that once you are dealing with

10   a prospect you like to have dialogue and to get an

11   understanding as to the impetus and the structure

12   and parameters and value of the company.

13             Did you do that in this February period?

14        A.    Yes.

15        Q.    Who were you having the contact -- was

16   it Mr. Bigelow who provided you that information?

17        A.    He provided us the information on the

18   Thursday call in terms of telling us verbally what

19   was being proposed; i.e., the self-help deal.

20             But I think -- I don't recall getting

21   any specific information from him at that time.  We

22   used all publicly available information.

23             I'm not saying that he didn't maybe

24   provide some information that might not have been

Ben A. Buettell                                           December 2, 2009

CONFIDENTIAL

30

1    publicly available in terms of the potential

2    structure of the deal, but we didn't receive any

3    documents from him to my knowledge at that time.

4         Q.    And at that time am I correct the

5    proposal; i.e., which would follow from your having

6    contact with Mr. Bigelow, would be to be retained

7    by the Tribune itself as part of this transaction,

8    or was it another potential party to this self-help

9    transaction?

10        A.    My understanding, we would have been

11   retained by the Tribune to provide a solvency

12   opinion to the board of directors.  I don't know

13   whether that also included the special committee

14   because I don't recall the specific discussion in

15   that regard.

16        Q.    Do you recall roughly how long the

17   conference call with Mr. Bigelow was on that

18   Thursday?

19        A.    15, 20 minutes, maybe a half hour.

20        Q.    And is he the one who was part of the

21   process described, what you referred to as sort of

22   the impetus for the deal?

23        A.    Yes.

24        Q.    And what the structure was going to be?

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

31

1          A.     Yes.

2          Q.     And what about in terms of the

3     parameters of the engagement?

4          A.     You have to be more specific about what

5     you mean by parameters.

6          Q.     Well, that was the term you used earlier

7     in describing when you are doing the dialogue

8     probably just to get a better understanding of what

9     you are going to be doing.

10         A.     Yeah, I think that's how I would use the

11    phrase parameters.

12         Q.     And the value of the company, is that

13    information that you would gather on your own?

14         A.     We gathered that on our own, yes.  We

15    would have talked about -- we would have asked

16    specifics about the financial structure of the

17    deal; namely debt, to understand kind of the

18    leverage that's going to be employed.  We would

19    have talked about the timing of when they needed

20    our work.  You know, due diligence, who would we be

21    meeting with, those types of things, which would be

22    standard for any engagement that we would field

23    from an inquiry standpoint.

24         Q.     And it may just be the way that you

CONFIDENTIAL

1   phrased your answer, but do you recall actually

2   discussing those matters with Mr. Bigelow on that

3   call; i.e. -- let's take it first the questions

4   about the leverage that would be incurred.

5        A.   We would have had discussions about

6   that, yeah.

7        Q.   Do you remember what he told you?

8        A.   I think at the time he told us about the

9   leverage employed in connection with the special

10  dividend.

11       Q.   Do you remember what the amount of debt

12  was?

13       A.   I don't remember the exact amount but it

14  would have been our estimate or whatever

15  information we would have gathered based on public

16  information.  And his dialogue would have been

17  included in our pricing information as best to our

18  knowledge.

19       Q.   And what did Mr. Bigelow tell you about

20  the timing of when he would like to have a solvency

21  opinion if you were to proceed with the engagement?

22       A.   I don't recall the specific timing in

23  that February discussion.  My only recollection

24  was, is I think there was a sense of urgency

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

33

1   because he was hoping to hear back from us on

2   Friday, the day after, about whether we were

3   interested in pursuing this, and we told him we

4   needed more time.  But I don't recall specifics

5   about when they were going to need the delivery of

6   the opinion.

7        Q.    Is there sort of a rough amount of time

8   that development of a solvency opinion at Houlihan

9   Lokey ordinarily takes, understanding that deals

10  differ in complexity and size and so forth?  But is

11  there sort of a minimum or rough, you know,

12  estimate that you tend to give clients to do an

13  opinion to your standards?

14       A.    You know, each case has its own set of

15  facts and circumstances as you said.  You know, we

16  would always like to have more time, but we were

17  always sensitive to if somebody said, "Hey, we need

18  something turned out quickly," we didn't want to

19  say we weren't capable of doing that.

20            There was nothing from a procedures

21  standpoint that said we need a minimum amount of

22  time, but in this particular case I would have said

23  we would like two to three weeks to get our arms

24  around this because there was a lot to digest.

CONFIDENTIAL

34

1          And we are always sensitive about people

2    calling us last minute to do work because I think

3    it's a difficult fact pattern if somebody says we

4    need a solvency opinion and can you do it in two or

5    three days.

6          Q.    From this first call that you had with

7    Mr. Bigelow do you know whether you had the two or

8    three weeks or was he looking for something in a

9    shorter time period?

10         A.    I don't recall specifics, but I think he

11   was looking for something in a shorter time period.

12   That was my sense.  I don't recall him telling us

13   specifically a date or a number of days in that

14   particular discussion.

15         Q.    After the call with Bigelow what did

16   Houlihan do to continue its consideration of the

17   deal?

18         A.    I think Andy worked with some of his

19   colleagues in Atlanta to gather information to

20   provide in that form of that pricing sheet or any

21   other additional information so that we could have

22   a proper dialogue, whatever that was going to

23   entail, over the weekend so that we could get back

24   to Chandler on Monday.

Ben A. Buettell                                        December 2, 2009

CONFIDENTIAL

35

1      Q.    And was a capital adequacy pricing

2    information sheet created in the February time

3    period?

4      A.    Yes.

5      Q.    Do you know who created it?

6      A.    I think it would have been a combination

7    of Andy Stull and I think Tom Perchelli, a V.P.

8    down in our Atlanta office.  He might have been an

9    associate at the time.  I don't recall.

10           And maybe some other folks.  I think

11   there was one other gentleman who helped out, an

12   analyst.

13     Q.    Do the sheets tend to go through review

14   by various levels of people, including yourself,

15   before they are finalized for a discussion by the

16   committee?

17     A.    No set policy but the senior person

18   would ultimately have to review it before sending

19   it out.  Oftentimes people send it to me to review

20   it.  Since I was directly involved in it, chances

21   are I took a look at it, but I don't recall.

22     Q.    Was there a -- let me ask this first.

23   There is also some reference in the documents to a

24   solvency committee.  Is that a separate committee

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

36

1    from the capital adequacy pricing committee?

2        A.    Yeah.  Yes.

3        Q.    What is the solvency committee?

4        A.    That would be a standing committee of

5    people who would ultimately review any analytics in

6    connection with an engagement, which is a smaller

7    subset of the pricing committee folks that I

8    mentioned earlier.

9        Q.    Just so I understand clearly, is the

10   pricing committee so named because it's charged

11   with figuring out what Houlihan Lokey's fee should

12   be if it bids for an engagement?

13       A.    Yeah.  They provide input, but

14   ultimately I and a few of the other folks who are

15   focused on the product line would have in theory

16   ultimate say-so about how to price.  But we need to

17   get some consensus from the various pricing

18   committee folks.  So that pricing committee is a

19   subset of people across our three main product

20   lines.

21            But the solvency review committee, which

22   I think you were referring to, is primarily

23   Financial Advisory Services senior members not

24   involved in the deal who would ultimately sit and

CONFIDENTIAL

37

1    review the analytics at an appropriate time.

2         Q.    I see.  Does the pricing committee

3    consider the substance of the transaction?  I am

4    trying to figure out what role it plays, if any, in

5    Houlihan's substantive consideration of its view as

6    to in the case of a solvency the solvency of an

7    entity or --

8         A.    Well, it considers all of the

9    information that's presented.  It considers, you

10   know, who the parties are.  It considers the

11   transaction structure.  It considers the timing of

12   when we're requested.  It considers, you know, the

13   risks associated with any solvency opinion.

14              But I want to be clear.  It's not that

15   the committee or the work that's presented to that

16   committee can -- there is not a decision about, you

17   know -- there is not all the analytics obviously

18   that would be in connection with actually doing the

19   engagement.  But as I said earlier, we like to

20   spend as much time as we can understanding up front

21   what the issues are.

22              And I think that's in contrast perhaps

23   to other competitors of ours who may not look at it

24   quite the same way we do.

CONFIDENTIAL

38

1          And the other consideration -- a large

2     consideration and was a growing concern at that

3     time given the nature of the credit markets and the

4     kinds of transactions out there is our

5     restructuring practice and the fact that there is a

6     unique dynamic in our firm between the solvency

7     opinion product line and the restructuring group

8     activities.

9          Q.    When you say that the Houlihan process

10    contrasts with others who do some -- who also issue

11    solvency opinions and so forth, what do you mean by

12    that?

13         A.    Well, the particular issue to this

14    particular engagement, I think earlier I said

15    Chandler wanted a quick response and we wanted more

16    time.  My understanding when we talked to him on

17    Monday to give him our fee quote, he had already

18    made a decision at that time because Duff & Phelps

19    had decided that they were going to do this, they

20    were ready to go.  I don't know what questions or

21    conversations they had, but they were ready to go

22    and at a fee level that was my understanding less

23    than ours.  And he had already made his decision.

24              So we were a little more deliberate in

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

                                                           39

1    our approach.

2         Q.    In this instance in that couple days --

3    maybe it was over the weekend -- was there actually

4    a meeting or a conference call of the capital

5    adequacy pricing committee?

6         A.    I can't recall a specific conversation,

7    but we would have had conversations, the telephone

8    conference call.  I don't remember which day it was

9    or if there was more than one, but I know we would

10   have had conversations.

11        Q.    And at that point was the solvency

12   committee involved in the process at all or is it

13   preliminary to their involvement?

14        A.    Solvency pricing committee folks would

15   have been involved, whoever could have participated

16   in the call, and the industry folks I mentioned

17   earlier.

18        MR. GOLDFARB:  Let me mark this as Buettell

19   No. 3.

20                    (WHEREUPON, a certain document was

21                     marked Buettell Deposition Exhibit

22                     No. 3, for identification, as of

23                     12-02-2009.)

24        MR. GOLDFARB:  Counsel, I don't have copies

Ben A. Buettell                                        December 2, 2009
CONFIDENTIAL

40

1    for everybody because I couldn't schlep them out

2    here.  If you want to share, I have a couple extra

3    so you can follow along.

4    BY MR. GOLDFARB:

5        Q.    This is a several-page document.  Just

6    for the record, it was produced to us in this

7    format, although looking at the font between the

8    first page and the remaining pages, there may be a

9    disconnect in the e-mail chain.  And so I kept the

10   document as it was produced to us, but I think

11   looking at it it appears that Bates number 000248

12   is not part of the rest of the chain.  It has a

13   different subject line and a different type font,

14   typeface.

15       MR. DUCAYET:  Could you just for the record

16   indicate the Bates range?

17       MR. GOLDFARB:  Sure.  The Bates range of this

18   document is HLHZ-Tribune 000248 to 252.

19   BY MR. GOLDFARB:

20       Q.    And, Mr. Buettell, I don't know if I

21   mentioned it.  If you need a break or just want to

22   stretch your legs, we can -- we will take breaks

23   periodically.

24       A.    That's fine.

CONFIDENTIAL

41

1        Q.    But if you are ready for one, let me

2    know.

3        A.    No.  I just didn't want to litter.

4        Q.    Mr. Buettell, just take a look at the

5    document.  I am going to kind of go backward a

6    little bit and start from the earliest-most e-mail

7    in the string and proceed forward.

8              Have you had a chance to look at it?

9        A.    Yes.

10       Q.    Looking at Bates 000251, that's an

11   e-mail from Mr. Stull to Mr. Much cc'ing you, yes?

12       A.    Yes.

13       Q.    Do you recall this e-mail?

14       A.    I do since we produced the documents,

15   yes.

16       Q.    Do you recall receiving it at the time?

17       A.    Many e-mails ago.

18       Q.    And does this sort of generally reflect

19   the testimony that you just gave in terms of the

20   Duff & Phelps involvement and also Houlihan's -- as

21   Mr. Stull writes in his e-mail, that Houlihan was

22   more cautious about agreeing to work within a

23   compressed time frame?

24            MR. HERRON:  The question is compound.  Are

Ben A. Buettell                                            December 2, 2009
CONFIDENTIAL

42

1    you asking him if this e-mail reflects his

2    testimony?

3        MR. GOLDFARB:  I am asking if the e-mail is

4    consistent with the testimony he gave.

5        MR. HERRON:  The document will speak for

6    itself.

7        MS. KATZ:  I object to the form.

8            Can we have some agreement that an

9    objection by one counts for all so that people

10   don't have to object?

11       MR. GOLDFARB:  Yes.

12   BY THE WITNESS:

13       A.    Yeah, I think generally speaking this

14   document -- or this e-mail from Andy's perspective

15   summarized some of what I said earlier.

16   BY MR. GOLDFARB:

17       Q.    And you shared that view as well?  Well,

18   did you share that view as well?

19       MR. HERRON:  At the time?

20       MR. GOLDFARB:  At the time.

21   BY THE WITNESS:

22       A.    At the time did I share the views that

23   were outlined in this e-mail?

24

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

43

1    BY MR. GOLDFARB:

2         Q.    Yes.

3         A.    Yes.

4         Q.    Turning to the prior page now, 250,

5    referring to the e-mail from Paul Much dated

6    February 14th.

7         A.    Yes.

8         Q.    Just looking at the third paragraph of

9    that e-mail, there is reference to you, Ben

10   Buettell, our managing director in Chicago,

11   providing the background, detailing the experience

12   in the media, newspaper and sports industries.

13              Do you see that?

14        A.    Yes.

15        Q.    I just want to confirm that that refers

16   to your not face-to-face meetings but just the

17   providing of information back in the fall of '06;

18   is that right?

19        A.    That's correct.

20        Q.    And then there is reference in the next

21   sentence to familiarity with the Tribune from prior

22   work in connection with WGN superstation

23   litigation.

24        A.    Yes.

CONFIDENTIAL

44

1    Q.    Do you see that?

2    A.    Yes.

3    Q.    Do you know what that was referring to?

4    A.    Well, it was a litigation matter that

5    candidly I didn't remember, but Paul Much had

6    worked on that litigation.  And I don't recall the

7    specifics, but it was involving I think WGN and

8    Tribune, whatever they referred to as the

9    superstation litigation.

10    Q.    And that's not anything that you were

11    personally involved in?

12    A.    No.  I think it was provided strictly

13    for kind of credibility purposes and past

14    relationship.

15    Q.    And now looking at the first paragraph

16    which is -- and this e-mail was sent to Mr. Osborn

17    and Miles White, yes?

18    A.    Yes.

19    Q.    Did they provide a response to either

20    Mr. Much or you or anyone else at Houlihan in

21    response to this e-mail?

22    A.    Yeah.  I think the response is right

23    above.

24    Q.    And this is February 14th.  And at this

Ben A. Buettell                                December 2, 2009

CONFIDENTIAL

                                                              45

1     point do you recall whether Duff & Phelps had been

2     retained?

3          MR. HERRON:   Calls for speculation.

4     BY THE WITNESS:

5          A.    Yeah.   I don't have specific knowledge

6     of whether they were retained at that point

7     verbally or otherwise.

8     BY MR. GOLDFARB:

9          Q.    After this mid-February period did

10    Houlihan Lokey in the rest -- for the rest of

11    February, was there further involvement or contact

12    with the Tribune about the possible involvement of

13    Houlihan providing a solvency opinion or other

14    involvement in connection with a Tribune

15    transaction?

16         A.    No.   I think we provided this -- or

17    there was this e-mail exchange.   I don't recall if

18    it was also in February, but I know there is other

19    e-mail in response to this e-mail we sent to

20    Mr. Osborn and Mr. White because Andy informed

21    Chandler that we were sending the e-mail or sent

22    the e-mail because we knew it might be -- he might

23    not like the fact that we were trying to still

24    insert ourselves into the equation.

Ben A. Buettell                                            December 2, 2009

CONFIDENTIAL

46

1           And I don't remember the exact time

2     frame.  I know the document exists because it's in

3     the documents we produced.

4           But we weren't actively pursuing

5     anything at this point.  I wasn't and I don't

6     recall anybody else other than in relation to this

7     e-mail chain.

8        Q.     And was that because of concerns that

9     Houlihan had with the transaction?

10        A.     No.  I think the e-mail said that they

11     had decided to hire Duff.  We tried -- I don't want

12     to say it was an end-around -- we tried to go to

13     people that were higher up.  I think I referenced

14     the special committee dynamics, so I think

15     Mr. Osborn's response was not for us to follow up

16     on.

17           But after that the only thing I do

18     recall is that at some point -- I don't recall

19     when -- but Chandler wasn't happy about the e-mail.

20     Then I think he subsequently called Andy or Andy

21     called him to try to smooth it over and there was a

22     discussion about, you know, just sit tight because

23     there may be some things changing and there may be

24     another opportunity or role for Houlihan Lokey down

Ben A. Buettell                                     December 2, 2009
CONFIDENTIAL

47

1    the road or in the near term, whatever.

2         Q.    And again, just to kind of wrap up this

3    February time period, other than the conversation

4    on that Thursday to get information from Chandler

5    and then Houlihan did some work over the weekend,

6    did Houlihan have contact or seek information from

7    anybody else at the Tribune in connection with the

8    deal?

9         MR. HERRON:  Calls for speculation.

10             He just wants to know what you know.

11   BY THE WITNESS:

12        A.    Not to my knowledge.

13   BY MR. GOLDFARB:

14        Q.    And at that point in time did Houlihan

15   reach the point of actually doing any analytics of

16   its own in connection with the transaction as it

17   was structured and as it was described to you in

18   February?

19        MR. DUCAYET:  Objection to the form of the

20   question.

21   BY THE WITNESS:

22        A.    I did not and not to my knowledge.  We

23   had gotten our answer, and at this point we weren't

24   expecting to get involved in any potential

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

48

1   analytics involving what was called the self-help

2   deal.

3   BY MR. GOLDFARB:

4        Q.    And then after that February period when

5   was the next time to your recollection that

6   Houlihan had any contact with the Tribune or

7   another party in connection with a Tribune

8   transaction?

9        A.    Well, I don't have specific

10  recollection, but the e-mail that is stamped 248

11  talks about this potential new transaction

12  structure, which is referred to as the ESOP.

13              I can't remember who the, quote, trustee

14  was that contacted me, but there was obviously --

15  there was either a no-name discussion about a

16  potential deal that we might be able to get

17  involved with from an ESOP perspective and that's

18  why my name was given to Matt Renaud, somebody that

19  we had done work with in the past.

20       Q.    Where does Mr. Renaud work?

21       A.    I think he is at Jenner & Block.  I

22  always get it confused.  It's either Jenner or -- I

23  think it's Jenner.  Or it's Winston & Strawn.  But

24  I always get confused.

CONFIDENTIAL

49

1      Q.    For the record, can you describe what

2    you mean by a no-name discussion?

3      A.    I don't recall that the trustee said

4    there may be a potential Tribune ESOP.  I think

5    when he called me it was prior to me seeing this

6    article about what I referred to as the Sam Zell

7    deal.

8          So I can't recall if I figured out that

9    it was this or whether they just talked about a

10   large ESOP opportunity.  I don't recall.

11     Q.    And did you follow up on this contact to

12   do anything?

13     A.    No.  I think the person was informing me

14   that my name was thrown into the hat for whatever

15   might come down the pike, but I didn't pursue

16   anything at that point because I didn't know any of

17   the specifics.

18     Q.    Then after this February 24th e-mail

19   that you referred to when was the next time that

20   you were aware of Houlihan Lokey's -- any contacts

21   with Houlihan Lokey in connection with working on a

22   Tribune transaction?

23     A.    My involvement or awareness would have

24   been in late March.

CONFIDENTIAL

50

1      Q.    And what was the contact or

2   communication that triggered it?

3      A.    I can't recall if it was Andy Stull

4   calling me back saying now we have an opportunity

5   with a potential new deal, the ESOP, and either at

6   roughly the same time a call I also got from a

7   colleague, Brad Pickard, who had been contacted by

8   Sam Zell.  It was all kind of happening at the same

9   time, late March.

10      Q.    And what position -- is Brad Pickard a

11   colleague of yours at Houlihan?

12      A.    He was a colleague at that time.  He was

13   one of our private equity coverage guys in Chicago.

14      MR. GOLDFARB:  Okay.  Let's go off the record,

15   please.

16                  (WHEREUPON, a recess was had

17                   from 11:09 a.m. to 11:20 a.m.)

18      MR. GOLDFARB:  I may have neglected to say

19   this at the outset, the agreement with counsel for

20   the witness.

21              The transcript as a whole is going to be

22   marked confidential, and so we'll also be subject

23   to the terms of the confidentiality agreement.

24

Ben A. Buettell                                   December 2, 2009
CONFIDENTIAL

51

1    BY MR. GOLDFARB:

2         Q.    Before we proceed to the late March 2007

3    period, there is an e-mail around March 20th that

4    refers in the same e-mail both to Tribune and to

5    TravelPort.

6              Do you know what TravelPort refers to?

7    Do you know whether Houlihan was involved --

8         MS. KATZ:  I'm sorry.  Did the witness answer?

9    I just didn't hear.

10        THE WITNESS:  No.

11        MR. GOLDFARB:  No.  I have a running question.

12        MS. KATZ:  I see.

13        MR. GOLDFARB:  A long and running question.

14        THE WITNESS:  I was following instructions.

15        MR. GOLDFARB:  I will strike the question.

16   BY MR. GOLDFARB:

17        Q.    There is a reference in an e-mail to

18   TravelPort.  Do you know to what that refers?

19        A.    I don't recall the specifics other than

20   what I read in the e-mail.

21        Q.    Is it unrelated to the Tribune?

22        A.    I believe it's unrelated to the Tribune.

23   Separate opportunity.

24        Q.    Okay.  Turning back to the late March

Ben A. Buettell                                          December 2, 2009
CONFIDENTIAL

                                                              52

1    period, you thought that Mr. Stull may have been

2    contacted and also that your colleague,

3    Mr. Pickard --

4         A.      Pickard.

5         Q.      -- Pickard had been contacted by Sam

6    Zell.

7         A.      Yeah.  I think Andy was contacted first

8    about this potential new opportunity.

9         Q.      Do you know on whose behalf Houlihan

10   would be engaged through -- let me strike the

11   question.

12              Do you know who contacted Mr. Stull?

13        A.      I believe it was Chandler Bigelow again.

14        Q.      What was your understanding of who in

15   Mr. Bigelow's contact with Mr. Stull would be

16   retaining Houlihan?

17        A.      My understanding at the time is that,

18   again, the Tribune was going to be looking for a

19   solvency opinion in connection with this new,

20   quote, ESOP, unquote, transaction.  I don't know if

21   there was other dialogue about whether it was

22   Tribune or whether the trustee was looking for some

23   analysis, but my understanding was it was the

24   Tribune.

Ben A. Buettell                                December 2, 2009

CONFIDENTIAL

53

1        Q.     And in Mr. Zell's contact with

2    Mr. Pickard was Mr. Zell reaching out to him with

3    an eye to Houlihan being retained by Mr. Zell?

4        MS. KATZ:  Objection to form.

5    BY THE WITNESS:

6        A.     That was not my understanding.

7    BY MR. GOLDFARB:

8        Q.     What was your understanding of the

9    substance of the contact with Mr. Zell?

10       A.     Well, first of all, I am going to say I

11   don't remember the sequence again, but I remember

12   that when Brad contacted me and said Mr. Zell had

13   called him to talk about this potential ESOP deal

14   and our involvement, I don't recall if it was at

15   that time we had decided not to get involved, but I

16   told Brad, you know, we're dealing with the

17   Tribune.  That's the seller and Mr. Zell is the

18   counterparty.  So whatever he is saying to me, Ben

19   Buettell, is kind of irrelevant.  We shouldn't be

20   talking to him because that's not who we were

21   talking to in late March, which is easier said than

22   done, to just say we are not going to talk to him.

23            I mean, we needed to be careful because

24   there were lots of different parties that were

CONFIDENTIAL

54

1    involved and we were dealing with Tribune at that

2    time.

3         Q.    Did you have a conversation with

4    Mr. Pickard about how you had to deal with Mr. Zell

5    as a -- with Houlihan as a firm?

6         A.    You mean about other dealings we had

7    with Mr. Zell?

8         Q.    No, no, no.  In terms of how you had to

9    respond to him in respect to his outreach.

10        A.    I think we discussed that -- my

11   discussion with Brad -- I don't know what he

12   specifically said to Mr. Zell, but I told Brad that

13   we should be not talking to him about any of our

14   involvement at that particular juncture.

15        MR. GOLDFARB:  Let's mark this as Buettell

16   Exhibit 4.

17                    (WHEREUPON, a certain document was

18                    marked Buettell Deposition Exhibit

19                    No. 4, for identification, as of

20                    12-02-2009.)

21   BY MR. GOLDFARB:

22        Q.    Mr. Buettell, while you are looking at

23   this I'll note for the record this is a two-page

24   document bearing Bates No. HLHZ-Tribune 000243 to

CONFIDENTIAL

55

1   244.

2              Just let me know when you have had a

3   chance to look at it.

4       A.    I am finished.

5       Q.    Looking at the earlier e-mail first, the

6   second in the string, this is a March 26th, 2007,

7   e-mail from Mr. Stull to you, Mr. Much, and Sandy

8   Purcell, yes?

9       A.    Yes.

10      Q.    Who is Mr. or Ms. Purcell?

11      A.    Sandy is a -- he is a male.  He is a

12  managing director who was in Chicago -- in the

13  Chicago office, was a colleague of mine, and was

14  also one of our ESOP experts.  So that's why he was

15  getting involved.

16             He would have also been on the pricing

17  committee prior but he was getting more involved.

18      Q.    On the capital adequacy pricing or the

19  solvency pricing?

20      A.    He would have been on both committees

21  but was now getting more involved because it was an

22  ESOP deal.  I don't know whether he participated in

23  the previous deliberations, but he would have seen

24  the information.

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

56

1          Q.     Okay.  At that time do you remember who
2     the members were of the solvency -- standing
3     members of the solvency pricing committee?
4          A.     Yeah.  I gave you some of those names
5     before and there are other names.
6          Q.     Since it was a subset, can you just run
7     through who the people were?
8          A.     The solvency review committee or the
9     solvency committee that reviews analyses would have
10     been people in the Financial Advisory Services
11     practice.  And as I said earlier, the pricing
12     committee would have had people also from corporate
13     finance -- the corporate finance group I think
14     there were a few and people from the financial
15     restructuring group.
16               So Sandy was a FAS -- he was in the FAS
17     group, so he would have been on both pricing
18     committee and solvency review committee.
19          Q.     And are you on both?
20          A.     Yes.
21          Q.     Is Mr. Berka on both?
22          A.     Yes.
23          Q.     So who else is on both?
24          A.     Scott Beiser.

CONFIDENTIAL

1     MS. KATZ:  I think you said is.  You mean back

2  then at that time?

3     MR. GOLDFARB:  Yes, at that time.  Thank you.

4  BY THE WITNESS:

5     A.    At that time.  Scott Beiser, who I

6  mentioned earlier; Kevin Collins; Richard DeRose;

7  Terrence Tchen, T-c-h-e-n; Chris Croft; Glenn

8  Daniel -- two "n's" on Glenn, no "s" on Daniel.

9          That's the best of my recollection

10  because there's no way I can go back and look at it

11  at this time.

12  BY MR. GOLDFARB:

13     Q.    But just from these names it's at least

14  nine, ten people?

15     A.    That were people that were selected to

16  do a review which would consist of three people not

17  involved with the deal.  So yeah.  And then the

18  pricing committee would have had probably another

19  seven or eight names, financial restructuring

20  people, and maybe one or two corporate finance

21  people.

22     Q.    And how do these committees work in

23  terms of their decision-making?

24     A.    Sometimes very difficultily.  I mean,

CONFIDENTIAL

1    everybody gets the information.  And if we have a

2    call or there is e-mail deliberation -- well, one

3    of the rules we had in place was depending on the

4    amount of leverage on a given deal, the people who

5    were presenting the deal had to offer up a

6    telephone call so that we could discuss the matters

7    further.

8              And we deliberated and there were

9    decisions made, you know, with either consensus on

10   some basis, no one particular party or no one

11   particular group of people necessarily driving.  We

12   would have the deliberations and we would make our

13   best educated decision about how we wanted to

14   proceed and at what fee level.

15        Q.   So going back to this -- the top e-mail

16   that you sent on March 26th to sending the group

17   back, you indicated that "We need to get updated

18   pricing sheets together."

19              Do you see that?

20        A.   Yes.

21        Q.   Is that a reference to the capital

22   adequacy information sheet?

23        A.   Correct.

24        Q.   "And have a call as JIW spoke to Berka."

CONFIDENTIAL

59

1   Who is JIW?

2        A.     Jeff Werbalowsky, W-e-r-b-a-l-o-w-s-k-y,

3   I think.

4        Q.     And what position did Mr. Werbalowsky

5   hold at that time?

6        A.     He was and is co-CEO and he was also

7   head of our restructuring practices -- one of the

8   heads of our restructuring practice.

9        Q.     And from your e-mail -- your e-mail says

10  Mr. Werbalowsky "spoke to Berka and me last week

11  and is concerned about us quoting in the solvency

12  market given inherent risks."

13       A.     Uh-huh.

14       Q.     What does that refer to?

15       A.     Well, during the time frame there were

16  transactions being announced -- not just this

17  Tribune transaction.  This is broader discussion

18  that we were having internally about the market is

19  getting overheated, high leverage multiples of

20  EBITDA structured type transactions.  And we were

21  having dialogue about whether it was time for us

22  to, for lack of a better word, maybe sit on the

23  sidelines in certain transactions.

24              And that was a discussion that we were

Ben A. Buettell                                        December 2, 2009
CONFIDENTIAL

                                                             60

1    having with a smaller subset of the pricing

2    committee folks at that time.

3         Q.    And can you explain a little bit more

4    specifically what you meant by inherent risks in

5    that e-mail?

6         A.    Well, with higher leverage

7    transactions -- and although we don't forecast the

8    future, I think because of our expertise both in

9    solvency opinions and financial restructurings and

10   some of the things we had seen in the marketplace,

11   we thought that the risk profile for deals as the

12   economic expansion continued, or maybe waned as the

13   case may be in that time frame, there were concerns

14   because we viewed our solvency product line to be

15   among the most risky product lines we have because

16   of the nature of the opinion and the tail that's

17   associated with how the opinion might be attacked

18   subsequent to a transaction for a period of years.

19              And it goes back to the restructuring

20   discussion I had earlier, which is that that

21   restructuring practice is large for us and that may

22   alter our calculus and our decisions about which

23   transactions to get involved with because it may

24   impact our ability to get involved if and when

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

61

1    something happens down the road.

2          Q.    Was Mr. Werbalowsky involved in the

3    internal deliberations within Houlihan about

4    Tribune?

5          A.    I don't recall him being specifically

6    involved in the February discussions.  He would

7    have seen -- he would have been -- he would have

8    received e-mails, would have seen e-mail traffic.

9    Whether he read them or not, I don't know.  I don't

10   recall him specifically being involved then, but I

11   do recall him being specifically involved in the

12   late March deliberations.

13         Q.    And do you recall whether --

14         A.    Can I just clarify one thing?

15         Q.    Sure.

16         A.    Paul Much was also on both committees.

17   He was one of our primary reviewer people at the

18   time.  I kind of -- it's a long story about why I

19   might have forgotten his name and that association

20   but that's for off the record.  But he was on the

21   committee, one of our primary people.

22         Q.    And do you know whether -- well, did you

23   share Mr. Werbalowsky's concerns about quoting in

24   the solvency markets in this period of time?

CONFIDENTIAL

62

1          MR. HERRON:   Share with whom?

2          MR. GOLDFARB:   No.  Did he share the same

3     concerns as Mr. Werbalowsky.

4     BY THE WITNESS:

5          A.    Yes.

6     BY MR. GOLDFARB:

7          Q.    Mr. Berka?

8          A.    Yes.

9          Q.    Were there other people involved in this

10    broader discussion within Houlihan about the level

11    of your involvement in the solvency market at this

12    time?

13         A.    It would have included Scott Beiser and

14    Irwin Gold and Andrew Miller.  Those are the people

15    I recall, the senior people having this kind of

16    broader discussion, ongoing discussion.

17         Q.    And just quickly, where were Mr. Miller

18    and Mr. Gold in the organization?

19         A.    Mr. Miller and Mr. Gold were board

20    members, senior managing directors in the

21    restructuring group.  Irwin Gold was the co-head of

22    the group with Jeff Werbalowsky.  And Andrew was

23    kind of third in the chain of command.

24         Q.    And at that time was it your

Ben A. Buettell                                      December 2, 2009
CONFIDENTIAL

63

1    understanding that there was more than one

2    potential Tribune transaction under consideration?

3         A.    My recollection was the ESOP opportunity

4    was one of the possibilities.  I don't know if that

5    meant that they had killed the self-help deal.  And

6    there were obviously other reports of other

7    potential transactions out there involving other

8    third-party buyers that I read in the news reports.

9         Q.    Do you remember who the third -- other

10   potential third-party buyers were?

11        A.    There was the Ron Burkle deal I think

12   with Eli Broad, and I can't remember who the other

13   party was or whether the Chandler trust had offered

14   up some potential transaction.  Those were the few

15   I remember.

16        MR. GOLDFARB:  Let's mark this as No. 5.

17             (WHEREUPON, a certain document was

18             marked Buettell Deposition Exhibit

19             No. 5, for identification, as of

20             12-02-2009.)

21   BY MR. GOLDFARB:

22        Q.    I assume you recognize this document,

23   sir?

24        A.    Yes, I do.

Ben A. Buettell                                       December 2, 2009
CONFIDENTIAL

64

1        Q.    This is a three-page document bearing

2    Bates number HLHZ-Tribune 000140 to 142.

3             And is this the common format that

4    Houlihan used for the capital adequacy engagement

5    information sheet?

6        MR. HERRON:  Putting aside the redactions?

7    BY THE WITNESS:

8        A.    Putting aside the redactions, yes.

9        MR. GOLDFARB:  I guess I will note for the

10   record that on Page 1 and Page -- the top

11   two-thirds of Page 1 is redacted and the bottom

12   half of Page 3 is also redacted.

13   BY MR. GOLDFARB:

14       Q.    Do you know who prepared this for

15   Houlihan?

16       A.    It would have been Andy Stull and his

17   team, the same team that prepared the February one.

18       Q.    And just so the record is clear, sir,

19   can you generally describe since it's the first

20   portion of the top of the -- the first portion of

21   this sheet what is generally -- what type of

22   information is generally contained in the redacted

23   portion?

24       MR. HERRON:  Just generally?

Ben A. Buettell                                          December 2, 2009
CONFIDENTIAL

                                                                    65

1          MR. GOLDFARB:  Just generally.

2     BY THE WITNESS:

3          A.     My brain is not so specific anymore.

4               It would have been a series of kind of

5     check-the-box type information about, you know,

6     client information, who contacted us, what type of

7     transaction it was, whether there was I think a

8     possibility for public disclosure, other

9     particulars that helped people easily understand

10    what kind of transaction we were dealing with,

11    which was then supplemented by some of the text you

12    see.

13              And the last page of the redactions, I

14    don't recall specifically but I think they were

15    kind of other considerations and things that would

16    have been potentially relevant.  But I don't recall

17    what was put down here.

18    BY MR. GOLDFARB:

19         Q.     Did you review this at the time?

20         A.     I don't recall if I reviewed it.  I was

21    out of town.  I was in a better place than

22    Milwaukee.  But I was out of town I think when this

23    was being discussed.  So I might have reviewed it

24    online.  Would have reviewed it online.  I had my

CONFIDENTIAL

66

1    laptop.

2         Q.    Did the circulation of this information

3    sheet and other activity within Houlihan lead

4    eventually to a meeting of the capital adequacy

5    pricing committee?

6         A.    Teleconference for those who were

7    available, yes.

8         Q.    Do you remember when that occurred in

9    relation to -- well, this is dated March 28th -- in

10   relation to the circulation of this document?

11        A.    No, other than if I looked at a calendar

12   on my BlackBerry I could probably tell you.

13        Q.    And the information that's on the bottom

14   of Page 1, is this information that was -- that you

15   yourself personally were aware of at the time in

16   terms of the basic numbers and structure of the

17   ESOP LBO that was proposed?

18        A.    This was the information that I was

19   aware of, and I -- my assumption is that Andy Stull

20   got this information from Chandler at that time

21   telling us what the current -- what the transaction

22   structure was as of that date, what was currently

23   being contemplated.

24        Q.    And how did you learn the information?

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

67

1        A.     Again, I can't recall which day of the

2    week this was, but I think at that point in time or

3    shortly before we had entered into a

4    confidentiality agreement to get whatever

5    information we could get.  And whether I saw it at

6    that time or some date subsequent to this time, the

7    information that was in here I think was coming

8    from what's referred to as the rating agency

9    presentation.

10            I don't know whether I saw that prior to

11   this or afterwards because I would have to look at

12   other information.

13        MR. GOLDFARB:  Just to maybe help orient you,

14   let's mark this as Buettell 6.  This is the

15   confidentiality agreement.

16                  (WHEREUPON, a certain document was

17                  marked Buettell Deposition Exhibit

18                  No. 6, for identification, as of

19                  12-02-2009.)

20   BY MR. GOLDFARB:

21        Q.     Mr. Buettell, this is dated March 26,

22   which I think is consistent with your prior

23   testimony that before the circulation of the

24   information sheet you had entered into a

CONFIDENTIAL

68

1    confidential agreement.

2              Is that still consistent with your

3    recollection seeing the document now?

4         A.    Yes.

5         Q.    And then it's your understanding that

6    you began to receive information from the Tribune;

7    is that right?  Not you personally.  Houlihan did?

8         A.    Yeah.

9         MR. HERRON:  Misstates the testimony.

10   BY THE WITNESS:

11        A.    I recall the main document that we got

12   was the rating agency presentation which outlined

13   the deal and the proposed capital structure, which

14   was a document that they had provided us under this

15   confidentiality agreement.

16   BY MR. GOLDFARB:

17        Q.    Did you review that personally?

18        A.    I remember seeing it, but I can't say

19   that I saw it between the 26th of March and the

20   28th.  I may have seen it after the fact.  But

21   that's the best of my recollection.

22        MR. GOLDFARB:  Let's mark this as Buettell 7,

23   please.

24

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

69

1                    (WHEREUPON, a certain document was

2                    marked Buettell Deposition Exhibit

3                    No. 7, for identification, as of

4                    12-02-2009.)

5          MR. GOLDFARB:   And this is also a two-page

6    document with Bates number HLHZ-Tribune 000147.

7    BY MR. GOLDFARB:

8          Q.    Mr. Buettell, let me know when you have

9    had a chance to look at it.

10         A.    Yes, I have looked at it.

11         Q.    Looking at the bottom e-mail first, sir,

12   it's an e-mail from Andrew Stull on Wednesday,

13   March 28th, to a number of people including

14   yourself, yes?

15         A.    Yes.

16         Q.    And this provides a description of

17   the -- well, strike that.

18               What does Mr. Stull's e-mail describe?

19         A.    It provides an overview of the ESOP --

20   the potential ESOP transaction and some of the

21   financial parameters around that and also

22   continues -- well, it continues and then it

23   describes what we have been referring to as the

24   self-help plan and some of the financial parameters

CONFIDENTIAL

                                                                    70

1    around that and then talks about their desire to

2    hire us in whatever path they pursue because they

3    were -- based on this e-mail and some other e-mails

4    that I just saw they were going to have a meeting

5    to try to figure out which way they were going to

6    go with the deal.

7         Q.    Who is the "they"?

8         A.    Well, my understanding was the special

9    committee was either going to be meeting later on

10   that week and then I would have assumed the board

11   would have met as well.  So call it the board of

12   directors and those who were charged with making a

13   decision about how to proceed.  That's what they

14   were going to do a few days after this, my

15   understanding.

16        MS. KATZ:  Move to strike as speculation.

17   BY MR. GOLDFARB:

18        Q.    Just so the record is clear, when you

19   are talking about the committee and the special

20   committee, you are talking about at the Tribune,

21   correct?

22        A.    Tribune.

23        Q.    Nothing internal to Houlihan Lokey?

24        A.    Right.  Tribune special committee or

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

71

1    board of directors.

2         Q.    Do you know who the members were of the

3    special committee of the Tribune?

4         A.    I only recall the two.  I think Miles

5    White and Bill Osborn, but I don't recall other

6    folks.

7         Q.    And then turning to the top e-mail,

8    that's one that you sent to Andy Stull also on

9    March 28th.  And it says, "Just on my laptop now

10   but have a committee review to do.  Just looking at

11   your e-mail, seems like this may be tough.  Can I

12   call you in about an hour from now?"

13             Do you see that?

14        A.    Yes.

15        Q.    What did you mean by "just looking at

16   your e-mail, seems like this may be tough"?

17        A.    Well, based on the preliminary

18   information that was in the engagement -- what was

19   referred to as the engagement information sheet or

20   the pricing sheet as we have been talking about

21   dated March 28th, '07, when I read the information

22   and looked at some of the numbers, particularly on

23   Bates -- whatever you call the stamp -- 142, I

24   thought it might be tough because if in fact these

CONFIDENTIAL

72

1    numbers were correct -- and we weren't saying the

2    numbers were correct; this was preliminary

3    information that we put together -- it seemed like

4    there may be -- seemed like that was a lot of

5    leverage on this particular transaction structure,

6    on the post-transaction column, if you will.

7         Q.    And when you say "this may be tough,"

8    what are you referring to?  May be tough for whom?

9    Let me strike that question.

10              When you say "this may be tough," just

11   describe what the "this" is and what the "tough" is

12   and for whom you are speaking?

13        A.    In my e-mail "this" would have referred

14   to the proposed transaction -- the proposed ESOP

15   transaction.  That's what the "this" means.  And

16   the "tough" would have referred to the fact that

17   this was a highly leveraged transaction and on the

18   surface it may have been tough -- if we were asked

19   to say, hey, do we think we can deliver a solvency

20   opinion, it may have been hard for us to say yes

21   based on this preliminary information we had.

22        Q.    And you say at the beginning of that

23   sentence "Just looking at your e-mail."  What in

24   particular is the financial information in the

CONFIDENTIAL

73

1    Stull e-mail that prompted your statement?

2         A.     In its simplest form, if you turn to the

3    stamp 142, we have a line item that's referred to

4    as "Enterprise Value," "Post-Transaction."  It's

5    12.3 billion or 12,300 million -- 12.3 billion and

6    it says "Face Value of Debt," 13.3 billion.

7              So without any other information and

8    whether that enterprise value was in fact even

9    correct, because there may have been other value

10   from other assets that we were unaware of at that

11   time, if you just look at that, that to me shows --

12   well, those two numbers and EBITDA, earnings before

13   interest, taxes, depreciation and amortization, of

14   1.469 billion, if I did math in my head which was,

15   I think, done on the sheet, you are looking at

16   total debt -- total leverage to EBITDA of about

17   nine times or a little more than that.

18             But you have face value of debt being

19   greater than the enterprise value, at least as

20   calculated by us in this sheet, and that seems a

21   little challenging -- that seemed a little

22   challenging from my perspective at that time.

23        Q.     And just to be clear, I think you

24   answered the question substantively.  I just want

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

74

1    the record to be clear that my question went to the

2    information that's in the Stull e-mail.

3              And if you could just confirm that the

4    same information that you picked off of Bates 142

5    is also reflected in the Stull e-mail on 147.

6        A.    Yes.  If you look at Paragraph 2 --

7    well, sorry -- Paragraph 3, there is the third line

8    on the right-hand side says, "9.1 times pro forma

9    leverage - total debt of 13.3 billion" and then in

10   Paragraph 2, the last line where Tribune was

11   currently trading at $31.14 implied a 12.3 billion

12   enterprise value.

13             Now, that's not to say that if the

14   transaction, which I think was at this time -- I

15   think the offer price was in the $33 range, it

16   would have implied a higher enterprise value than

17   12.3 billion.  But those numbers generally reflect

18   what's on Page 142.

19             And I would also say there obviously

20   would have been other considerations regarding

21   value, but we didn't have that particular

22   information other than this discussion about

23   this -- what is referred to as the dollar sign, 1B

24   PV of ESOP tax benefits.  That means $1 billion

Ben A. Buettell                                                December 2, 2009
CONFIDENTIAL

75

1    present value of ESOP tax benefits, which would not

2    have been reflected in the $12.3 billion enterprise

3    value.

4         Q.    And again, just so the record is clear,

5    what are you saying, that the -- how the 1 billion

6    in the ESOP tax benefits factored into this broad

7    level information in your assessment?

8         A.    Well, for purposes of this document, the

9    $1 billion present value of ESOP tax benefits was

10   not part of the enterprise value calculation that

11   we did.  And one of the things we would have

12   discussed is whether that should be something that

13   is also included in enterprise value.  But that

14   was, I think, a discussion item, not laid out any

15   more than what you see in the document here.

16        Q.    Did you eventually -- did Houlihan's

17   involvement at this time reach a point where you

18   did have that discussion?

19        A.    We would have had discussions about the

20   specifics of the ESOP structure and whether those

21   tax benefits would have been -- should have been or

22   could have been included in value.

23        Q.    And did Houlihan reach a conclusion

24   about its view on that?

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

76

1        A.    I don't think there was a definitive

2   conclusion, but given the structure and what was

3   being proposed and under the particulars of an

4   S corp 100-percent ESOP, you could have varying

5   opinions about whether that tax benefit should be

6   factored into our analysis for purposes of

7   solvency.

8        Q.    And did the group looking at this ESOP

9   transaction reach a consensus conclusion about how

10  Houlihan would treat the ESOP tax savings?

11        MS. KATZ:  I think it's asked and answered.

12        MR. HERRON:  It's asked and answered.

13  BY MR. GOLDFARB:

14        Q.    You can answer.

15        A.    I think I answered that, if you want to

16  repeat my previous answer to the previous question.

17        Q.    I think your answer was there could be

18  varying opinions.  And I am asking you if there was

19  an outcome to that and, if so, what it was.

20        MS. KATZ:  Objection.

21        MR. DUCAYET:  Objection; mischaracterizes his

22  testimony.

23  BY THE WITNESS:

24        A.    I don't recall a specific outcome saying

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

77

1    that we would unequivocally not include tax

2    benefits.   There was lots of discussion about not

3    only whether Houlihan as a firm might come to that

4    conclusion but there was discussion about whether

5    the IRS or the Department of Labor might also have

6    a view because this was a time frame when this

7    notion of 100-percent S corp ESOPs and not paying

8    any taxes, that whole -- it was a broader

9    discussion that was going on not only in the

10   context of this transaction.

11          So I don't recall anything definitely

12   about a Houlihan decision or a Houlihan position,

13   nor do I think we ever put anything like that on

14   the record because, again, I think there were

15   circumstances where each deal has case-by-case

16   facts and circumstances that may allow us to

17   conclude something in one deal but not necessarily

18   in another.

19   BY MR. GOLDFARB:

20        Q.    And referring to your top e-mail, when

21   you say "this seems like this may be tough," is

22   that a comment that applied to both proposed

23   transaction structures or just to the Zell ESOP

24   structure?

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

78

1        A.    I think that it applied -- well, I don't

2   "think."  From my viewpoint the self-help deal was

3   a different deal that had less leverage when it was

4   originally presented to us.  And it's referenced

5   here as such.

6              And I think the "this may be tough" in

7   this e-mail -- the reason that I said "this may be

8   tough" in this e-mail is because we went from

9   proposing on a self-help deal with less leverage

10  and being prepared to at least get involved, not

11  saying that we would get to the conclusion that it

12  was solvent, that now we were being asked to be

13  hired on either deal.

14             So I naturally am looking at kind of the

15  tougher deal, which was in my mind the ESOP deal

16  just by the very nature of the leverage if nothing

17  else.  And also I guess I would say some more

18  complexity given the nature of the ESOP deal.

19       Q.    When you say that, what do you mean by

20  complexity?

21       A.    Just some of the structure regarding

22  Zell's investment, how the ESOP would invest, the

23  warrants.  You know, this really was -- without

24  getting into all the mechanics, if you get to the

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

79

1    end, if the ESOP did their investment and Zell did

2    his investment and then they subsequently tendered

3    for a certain number of shares up to, you know,

4    whatever it was, 50 percent or something in the

5    first -- what was referred to as the first step,

6    when you get to the end, you basically have the

7    ESOP -- you have Zell owning what we would refer to

8    as synthetic equity because he wasn't really buying

9    the equity.

10            And there was a lot of discussion at

11   that time, as I mentioned earlier, about how far

12   you could go with somebody who didn't put hard

13   equity dollars in and how much ownership they could

14   have given that the ESOP as an S corp could only

15   have one shareholder, that being the ESOP.

16            So that was also part of our discussion.

17   And there weren't clear guidelines at that time

18   about how far you could go in terms of that

19   ownership position.

20            So those were some of the complexities

21   that I'm referring to when I say the ESOP.

22       Q.    What happened after this initial

23   exchange where you said "this might be tough"?  Did

24   you have conversations with your colleagues about

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

80

1    the transaction and what you were being asked to

2    do?

3         A.    We discussed basically what was in the

4    pricing sheets and, you know, what's talked about

5    in these e-mails.  That was discussed.

6              I now see that March 28th was a

7    Wednesday, and we either had conversations right

8    after this e-mail, which is why I said I would call

9    in an hour, and I know we had some further

10   discussions on Thursday morning because I was

11   trying to go skiing and I was on a ski lift trying

12   to deal with this monster conference call on a very

13   sensitive matter.

14             I would rather have been skiing just for

15   the record.  I thought I would put that in there.

16        Q.    Sounds like you were skiing.

17        A.    I hadn't gotten even to the first run.

18   I was on the lift.  I can remember it.

19        Q.    Who was on the call?

20        A.    On the Wednesday night call -- well,

21   just so I can implicate my other partners, Jack

22   Berka was with me on the ski trip, Kevin Collins,

23   one of the committee members was with me on the ski

24   trip.  It was his house.  Very nice by the way.

CONFIDENTIAL

1          Sandy Purcell also happened to be on the

2    ski trip.  And we would have had Scott Beiser and

3    Jeff Werbalowsky on by telephone.  I don't recall

4    if Irwin Gold was on.  And probably would have had

5    Terrence Tchen on and maybe Chris Croft.

6          So we had what was the senior -- total

7    at the highest levels involvement of our firm on

8    the call.

9          Q.    And what was the purpose of the call?

10         A.    To decide whether we were going to

11   propose on this new opportunity.

12         Q.    Was a decision made on that call?

13         A.    I don't think a formal decision was made

14   on the Wednesday call.  But I think at that point

15   because we were being asked to potentially do

16   either of these, the ESOP deal gave us some

17   concern.  And Werbalowsky and others, we were

18   leaning towards saying we were not going to bid on

19   this new opportunity.  That was our thinking.

20         I mean, you know, it was not determined

21   at that point whether we were going to say no

22   thanks; no -- you know -- how we were going to say

23   no is really what the issue was that still needed

24   to be resolved because saying no is not easy.

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

82

1        Q.    But as of that Wednesday night call, had

2   the group determined that Houlihan was going to say

3   no as to bidding on both aspects of the -- both

4   forms of the transaction?

5        A.    No final determination was made on

6   Wednesday.  The final determination was made on

7   Thursday morning.  So I could go skiing.

8        Q.    Was that same group involved?

9        A.    I don't know if everybody was on the

10  call.  I know that Scott Beiser was on.  I don't

11  recall if Werbalowsky was on.  I think he was out

12  of pocket.  So we had kind of the group.  We were

13  having conversations with the folks who were on the

14  ski trip and then we had Beiser on the call -- on a

15  call and then Andy Stull and the team on that

16  Thursday morning.

17       Q.    And what was the decision made on

18  Thursday?

19       A.    Based on the information that we had

20  received to date in our preliminary review of the

21  information, we decided that we would just take a

22  pass.

23       Q.    Do you know whether anyone from Houlihan

24  had conversations with Mr. Bigelow or anyone else

Ben A. Buettell                                        December 2, 2009
CONFIDENTIAL

                                                              83

1    at the Tribune after the Wednesday night call?

2        A.    I don't recall -- well, I don't recall

3    specifically if Andy Stull had any conversations

4    Wednesday night or prior to the Thursday morning

5    call.  It would have been mid-morning Chicago time.

6    It would have been later morning because Andy was

7    in Atlanta.

8            So I don't recall if any conversations

9    were had or whether he had -- I don't recall.  We

10   might have said, "Hey, you might want to call

11   Chandler, let him know this is brewing but we may

12   be taking a pass."  But I don't recall if he did

13   that or not.  I only know that we made the decision

14   Thursday morning and that's when Andy Stull had

15   called Chandler.

16                    (WHEREUPON, a certain document was

17                     marked Buettell Deposition Exhibit

18                     No. 8, for identification, as of

19                     12-02-2009.)

20   BY MR. GOLDFARB:

21       Q.    This is a one-page document bearing

22   Bates number HLHZ-Tribune 000145.

23            And this goes back to the afternoon of

24   the 28th.  This is an e-mail from Andrew Stull to a

CONFIDENTIAL

84

1    bunch of people, including yourself cc'd, and the

2    recipients are some of the people you mentioned

3    earlier, the investment people, Mr. Richmond, Susan

4    Casey, Brian Marler and Timothy Shoup.  I don't

5    think you mentioned Mr. Shoup earlier.

6         A.    No.  He was an analyst in that media and

7    entertainment group.

8         Q.    Mr. Stull addresses the four of them and

9    thanks them for the analysis they sent earlier

10   today.

11             Do you know what analysis is referred to

12   in that e-mail?

13        A.    I don't recall specifically the

14   analysis.  I don't recall the specifics.

15        Q.    Do you recall whether you received the

16   same information that Mr. Stull received?  Let me

17   strike that last question.

18             Do you recall receiving an e-mail from

19   any one of the addressees, Mr. Richmond, Casey,

20   Marler or Shoup, on Wednesday, the 28th?

21        A.    I don't recall getting an e-mail from

22   them about what you referred to as the analysis.

23        Q.    Okay.  And then Mr. Stull -- strike

24   that.  Do you know what these people had been asked

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

85

1    to do in this time period in connection with the

2    Houlihan consideration of the Tribune matter?

3         A.    I don't know specifically what Andy

4    asked them to do.

5         Q.    So they were working at his direction,

6    not at yours at that point?

7         A.    Yeah.  I think I mentioned in an earlier

8    e-mail we need to get our media folks involved.  So

9    ultimately we wanted to get, again, the best

10   insight into anything they knew about the deal or

11   about how we might look at this relative to other

12   public companies in the sector, et cetera.

13   Transactions, other things.

14              So I think that's the kind of

15   information they were preparing for Andy.

16        Q.    Then the e-mail also asks -- refers

17   to a 10:00 a.m. eastern call tomorrow; i.e.,

18   referring to Thursday, the 29th, and asked that

19   these folks be able to provide their views on the

20   company.

21              Did they participate in the Thursday

22   call that you testified about a few minutes ago?

23        A.    I don't recall if all of them were on

24   the phone.  But if they were available, any one

Ben A. Buettell                                        December 2, 2009

CONFIDENTIAL

86

1   of -- well, it would -- it could have been Jon,

2   Susan or Brian that would have participated in the

3   call, but I don't recall specifically if they were

4   actually on the call.

5        Q.   Do you recall whether or not there was a

6   presentation or any analysis presented by any of

7   these people on the call on Thursday as part of the

8   conference call?

9        A.   They might have provided some verbal

10  insights.  But again, I was not in an area where I

11  would have had access to the laptop or seen any of

12  that document.

13       Q.   Right.  What I am actually asking about,

14  on the call on Thursday, whether or not they

15  were -- they made verbal contributions to the

16  meeting.

17       A.   I don't recall if they did or not.

18                 (WHEREUPON, a certain document was

19                 marked Buettell Deposition Exhibit

20                 No. 9, for identification, as of

21                 12-02-2009.)

22  BY MR. GOLDFARB:

23       Q.   This is a one-page document bearing

24  Bates No. 000070.  That's a one-page document.

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

87

1          Have you had a chance to look at this,

2    sir?

3        A.    Yes.

4        Q.    What is it?

5        A.    It's an e-mail from Andy Stull to

6    myself, Sandy Purcell and Jack Berka regarding

7    referencing his conversation that he had with

8    Chandler regarding our Thursday morning conference

9    call.

10       Q.    And what did you interpret when

11   Mr. Stull said, "I spoke to Chandler at Tribune and

12   answered various questions he had regarding our

13   perspective"?  What did you interpret "our

14   perspective" to mean?

15       MR. DUCAYET:  Object to the form of the

16   question.

17   BY THE WITNESS:

18       A.    I wasn't on the call so I can't tell you

19   specifically what Andy said other than I think what

20   I said earlier, which is we were going to take a

21   pass on quoting on this.

22          And I do recall us saying the ESOP deal

23   seems challenging to us.  And I think the way we

24   left it, which is I think what's summarized here,

CONFIDENTIAL

88

1    that in the event that that ESOP deal doesn't go

2    forward and they are back to the self-help deal,

3    that might be something that we are able to help

4    them with.

5              So I can't tell you what the specifics

6    of the call were.

7    BY MR. GOLDFARB:

8         Q.    And then he says, "Interestingly, he did

9    say that Duff was prepared to provide a solvency

10   opinion for the ESOP trustee."

11             And my only question is, was that of any

12   special interest to you that Duff was willing to do

13   that?  I was just wondering if you had a

14   perspective that Duff's opining on solvency for the

15   ESOP trustee was similarly interesting.

16        MS. KATZ:  Object to the form.

17        MR. HERRON:  The question is compound.

18   BY THE WITNESS:

19        A.    I thought it was interesting.

20   BY MR. GOLDFARB:

21        Q.    Why?

22        A.    That he said that Duff said they were

23   prepared to provide a solvency opinion for the ESOP

24   trustee.

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

89

1        Q.     Now I am really confused.

2               Did you think it was interesting that

3     Duff was prepared to provide a solvency opinion for

4     the ESOP trustee?

5        MS. KATZ:  Object to the form.

6     BY THE WITNESS:

7        A.     Here's what I am going to say:  My

8     understanding at the time, although Duff was

9     originally asked to get involved with solvency

10    opinions for the company back in that February time

11    frame, they obviously had switched roles and got

12    involved with the ESOP trustee.

13              My understanding at that time was that

14    Duff was being asked to provide a fairness opinion

15    on behalf of the ESOP trustee.

16              The solvency opinion was new to me so

17    that was interesting.

18              My next comment about what was

19    interesting -- and this is -- I'll be clear; this

20    is speculation on my part.  But I thought it was

21    interesting that he said that they were prepared to

22    provide a solvency opinion.  And at the time I

23    remember thinking, well, is he trying to get us to

24    get involved with the transaction because somebody

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

90

1    else is saying it's okay, not having any knowledge

2    of whether they had done a solvency opinion, any of

3    the analysis they had done.  And I thought that was

4    interesting.

5              So the fact that they were being

6    asked to give a solvency opinion or that the

7    trustee had asked them, I thought it was

8    interesting and that he was saying that since they

9    were giving one I thought he was implying maybe we

10   should be okay to go forward and give whatever

11   analysis we were going to give.  That's what I

12   thought was interesting.

13        MS. KATZ:  Move to strike; speculation.

14   BY MR. GOLDFARB:

15        Q.    In that last sentence where you referred

16   to "he," are you referring to Mr. Bigelow?

17        A.    Mr. Bigelow.

18        MR. GOLDFARB:  Let's mark this No. 10.

19                  (WHEREUPON, a certain document was

20                  marked Buettell Deposition Exhibit

21                  No. 10, for identification, as of

22                  12-02-2009.)

23   BY MR. GOLDFARB:

24        Q.    This, again, is a one-page document

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

91

1    bearing -- ending in Bates number 000071.

2            And, Mr. Buettell, have you had a chance

3    to look at it?

4        A.    Yes.

5        Q.    What is this, sir?

6        A.    This is another e-mail from Andy Stull

7    to Sandy Purcell, myself, and Jack Berka regarding

8    the previously discussed Brad Pickard involvement

9    with the potential parties to the Tribune ESOP

10   deal.

11       Q.    The second sentence in the e-mail says,

12   "Sam was upset that HL was holding up his deal and

13   asked Brad for an explanation."

14            Do you see that?

15       A.    Uh-huh.  Yes.

16       Q.    What did you interpret that to mean?

17       A.    Well, initially I guess I was surprised

18   that Sam Zell was calling Brad Pickard, that he

19   somehow knew this information which was happening

20   realtime.

21            But from this e-mail somehow Zell either

22   found out that we said we were taking a pass, which

23   I find we weren't holding up his deal; we were just

24   not participating in the deal.

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

                                                          92

1           So that's why I'm laughing, because I

2    remember reading this.  And as I said earlier, I

3    didn't think it was appropriate for Brad to be

4    having conversations with Sam Zell because he was

5    not the party, one, who had contacted us and, two,

6    even though he was involved in the deal I was

7    concerned about confidentiality reasons for

8    disclosing anything to the guy who was the

9    counter-party.

10          Q.    And the next sentence says, "I

11   walked Brad through the deal and our internal

12   process."  What did you take the internal process

13   to mean?

14          A.    Just all of the discussion regarding the

15   pricing committee memo and the dialogue that we had

16   been having at the highest levels of the firm

17   during this time period and all the, you know,

18   previous discussions we had had because Brad

19   wouldn't have known about any of that.

20          Q.    Well, do you know when the Zell LBO deal

21   was announced?

22          MR. HERRON:   Publicly?

23          MR. GOLDFARB:   Publicly.

24

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

                                                              93

1    BY THE WITNESS:

2         A.    I don't -- well, I don't recall a

3    specific date.  I think there was reference earlier

4    to the possibility of a Zell-backed ESOP deal,

5    which was I think in that late February time frame

6    when I mentioned it in my e-mail.

7              But when the actual deal deal was

8    announced, I don't recall.

9    BY MR. GOLDFARB:

10        Q.    And was there discussion within the firm

11   about whether or not -- was there continued

12   discussion even after the announcement of the deal

13   as to whether or not if that one fell through

14   Houlihan would be willing to consider getting

15   involved on a self-help transaction?

16        A.    I don't recall having any particular

17   discussion or that there was any ongoing dialogue

18   with anybody, Chandler or anybody else from the

19   Tribune, in any time frame after the Zell deal was

20   announced.

21        Q.    And did there come a time when you

22   found out that someone -- that a firm had

23   issued a solvency opinion in connection with the

24   Zell LBO?

CONFIDENTIAL

1        A.    I don't recall the specific date that I

2   found out that Valuation Research had done a

3   solvency opinion.

4              I don't think we would have known

5   anything until publicly available -- until

6   documents became publicly available and we happened

7   to see it.

8        Q.    At some point did you receive the VRC

9   solvency opinions?

10       A.    From publicly available sources?  Yes.

11       MS. KATZ:  I'm sorry.  Did you say opinions?

12       MR. HERRON:  You mean more than one opinion?

13       MR. GOLDFARB:  Yes, I did say opinions.

14  BY THE WITNESS:

15       A.    It should be just opinion I think.

16  BY MR. GOLDFARB:

17       Q.    For what time frame?  Which opinion are

18  you referring to?

19       A.    That would have been what was referred

20  to as the Step 1 opinion.

21       Q.    Do you recall when you saw the Step 1

22  opinion?

23       A.    Not the specific date but I think it was

24  sometime in the September time frame.  I wasn't

CONFIDENTIAL

1    really tracking all the deal specifics on public

2    disclosure and all that stuff.

3          MR. GOLDFARB:  Let's go off the record.

4                    (WHEREUPON, at 12:30 p.m. the

5                    deposition was recessed until

6                    1:00 p.m., this date.)

CONFIDENTIAL

96

1              IN THE UNITED STATES BANKRUPTCY COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4     In Re:                          ) Chapter 11

5          TRIBUNE COMPANY, et al.,   ) Case No.

6                     Debtors.        ) 08-13141 (KJC)

7

8

9              CONFIDENTIAL PURSUANT TO

10             CONFIDENTIALITY AGREEMENT

11

12                DECEMBER 2, 2009

13                   1:01 p.m.

14

15          The confidential deposition of

16    BEN A. BUETTELL resumed pursuant to recess at Suite

17    3800, One South Dearborn Street, Chicago, Illinois.

18

19

20

21

22

23

24

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

97

1    PRESENT:

2         ZUCKERMAN SPAEDER, LLP,

3         (1800 M Street, NW, Suite 1000,

4         Washington, D.C.  20036-5802,

5         202-778-1800), by:

6      MR. ANDREW N. GOLDFARB,

7              -and-

8      CHADBOURNE & PARKE, LLP,

9      (30 Rockefeller Plaza,

10     New York, New York  10112,

11     212-408-5100), by:

12     MR. MARC D. ASHLEY,

13          appeared on behalf of the Committee

14          of Unsecured Creditors;

15     KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP,

16     (1633 Broadway,

17     New York, New York  10019-6799,

18     212-506-1700), by:

19     MS. CHRISTINE A. MONTENEGRO,

20          appeared on behalf of New York

21          Law Debentures;

22

23

24

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

                                                          98

1   PRESENT:   (Continued)

2          O'MELVENY & MYERS, LLP,

3          7 Times Square,

4          New York, New York  10010,

5          212-326-4303), by:

6          MR. ZACK GROSS,

7               appeared on behalf of

8               Bank of America;

9          HENNIGAN BENNETT & DORMAN, LLP,

10         (865 South Figueroa Street, Suite 2900,

11         Los Angeles, California  90017,

12         213-694-1152), by:

13         MR. DAVID M. ROSS,

14              appeared on behalf of the

15              Credit Agreement Lenders;

16         KAYE SCHOLER, LLC,

17         (3 First National Plaza, Suite 4100,

18         70 West Madison Street,

19         Chicago, Illinois  60602-4231,

20         312-583-2433), by:

21         MR. ROBERT M. SPALDING,

22              appeared on behalf of Merrill Lynch;

23

24

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

99

1    PRESENT:  (Continued)

2          DAVIS POLK & WARDWELL, LLP,

3          (450 Lexington Avenue,

4          New York, New York  10017,

5          212-450-4508), by:

6          MS. SHARON KATZ,

7               appeared on behalf of J.P. Morgan Chase;

8          SIDLEY AUSTIN, LLP,

9          (One South Dearborn,

10         Chicago, Illinois  60603,

11         312-853-7621), by:

12         MR. JAMES W. DUCAYET,

13              appeared on behalf of Tribune Company;

14         ABELSON HERRON, LLP,

15         (333 South Grand Avenue, Suite 1550,

16         Los Angeles, California  90071,

17         213-402-1900), by:

18         MR. VINCENT H. HERRON,

19              appeared on behalf of the Deponent.

20

21

22

23    REPORTED BY:  SUSAN K. TODAY, C.S.R., R.P.R.

24               License No. 84-2212.

Ben A. Buettell                                              December 2, 2009
CONFIDENTIAL

                                                                    100

1                        BEN A. BUETTELL,

2      called as a witness herein, having been previously

3      duly sworn and having testified, was examined and

4      testified further as follows:

5                        EXAMINATION (Resumed)

6      BY MR. GOLDFARB:

7           Q.    We are back on the record.  And I just

8      have a couple last questions about this earlier

9      March period.

10               First, at the time that Houlihan was

11     considering whether or not to submit a proposal to

12     the Tribune to provide solvency opinions, are you

13     aware as to whether or not any of the other

14     entities that were also potentially going to opine

15     on the transaction, whether they had additional or

16     more information than Houlihan had?

17          MR. HERRON:  Calls for speculation.

18          MS. KATZ:  Objection to form.

19          MR. DUCAYET:  Calls for speculation, lack of

20     foundation.

21     BY THE WITNESS:

22          A.    I'm not aware.

23     BY MR. GOLDFARB:

24          Q.    You described earlier with respect to

Ben A. Buettell                                                December 2, 2009
CONFIDENTIAL

101

1    information that was in the information sheet as

2    well as in the Stull e-mail some of the highlight

3    financial information that led you to say in the

4    e-mail that this might be tough.

5             Do you recall that testimony?

6        A.    Yes.

7        Q.    My question is, in the deliberation that

8    Houlihan underwent on the Wednesday call that you

9    described earlier, on the Thursday call again that

10   you described, was there other particular financial

11   information that other people identified as

12   underlying their views that ultimately led Houlihan

13   to take a pass on the ESOP?

14       MR. HERRON:  You mean information other than

15   was in the e-mail and the information pricing

16   sheet?

17       MR. GOLDFARB:  Yes.

18   BY THE WITNESS:

19       A.    I am not aware.  If they pulled other

20   information, it would have been publicly available

21   information.  But I am not aware they had any other

22   information or did any other research on their own

23   relating to the deal and their views.

24

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

102

1    BY MR. GOLDFARB:

2         Q.    And did your colleagues look to other --

3    during that call did you discuss information other

4    than the comparison between the enterprise value

5    and the face value of the debt, for example, or the

6    debt ratios in connection with the deliberation as

7    to whether or not to proceed?

8         MR. HERRON:   Compound.

9         THE WITNESS:   You have to read that back to

10   me.

11                    (WHEREUPON, the record was read

12                     by the reporter as requested.)

13        MR. DUCAYET:   Objection; mischaracterizes his

14   testimony.

15   BY THE WITNESS:

16        A.    I don't recall the specifics, but we

17   would have talked about information in the memo,

18   other people's viewpoints, other market data.  I

19   mean -- but I don't recall specifically what else

20   might have been discussed.

21             We talked about the ESOP, tax benefits

22   and some of those things I mentioned previously,

23   but I don't recall anything else specifically that

24   was outside what was kind of contained in the

Ben A. Buettell                                     December 2, 2009
CONFIDENTIAL

103

1    materials that we summarized in the pricing sheet.

2    BY MR. GOLDFARB:

3         Q.    And do you recall any particular

4    participant in the Thursday call, for example,

5    expressing a view as to any particular piece of

6    financial information that swayed his or her view

7    as to the transaction?

8         MS. KATZ:   Object to form.

9    BY THE WITNESS:

10        A.    I don't recall any particular

11   information.  I think it was, again, the general

12   discussions we had and timing of providing any

13   analyses to these folks.

14   BY MR. GOLDFARB:

15        Q.    What do you mean by that?

16        A.    There was I think also a question of

17   timing, which I think we talked about earlier,

18   where that was also one of the considerations in

19   terms of when they were going to need analysis from

20   us and how quickly we would have to make a

21   decision.

22             And I think there was still compressed

23   timing -- the potential for compressed timing,

24   although I think there was discussion about we

Ben A. Buettell                                           December 2, 2009
CONFIDENTIAL

104

1    might have two to three weeks, but these guys were

2    talking about maybe announcing something earlier.

3             That was a concern from my standpoint

4    just because I don't think it's wise to announce

5    some deal and then get other facts and information

6    after the fact that puts us in a difficult spot,

7    whatever the analysis might be.

8        Q.    What do you mean by "a difficult spot"?

9        A.    Well, it would be like -- the analogy

10   would be somebody wants -- you know, a company

11   announces that the board has entered into a merger

12   agreement with XYZ Company and then they'll get a

13   fairness opinion after that.  That's really not how

14   it works.  That's not how I would go about it.

15            So I think timing was also part of the

16   discussion.

17       Q.    When you say a tight spot, are you

18   referring to vulnerability or the potential for

19   vulnerability of attack upon Houlihan Lokey?

20       A.    Yeah.  I think when it's tight timing, I

21   think it's a challenging fact pattern that if

22   somebody says, oh, you guys got retained on a

23   Monday and you delivered an opinion on a Wednesday,

24   no matter how good you are, no matter what industry

Ben A. Buettell                                          December 2, 2009

CONFIDENTIAL

105

1   expertise you have, no matter what, if something

2   goes wrong or it ever does become a source of

3   litigation, you can't -- I don't think you win when

4   you are being put on the witness stand.

5        Q.    And on that Thursday call where a

6   decision was made, was that a consensus decision?

7   Would you characterize that as a consensus

8   decision?

9        A.    I would.

10       Q.    Okay.  Moving beyond the March time

11   period, did there come a time later in 2007 when

12   Houlihan Lokey was contacted in connection with the

13   Tribune ESOP LBO?

14       A.    Not by Tribune to do anything regarding

15   any opinion or analysis in the context of the ESOP

16   LBO.

17       Q.    Was Houlihan Lokey contacted by another

18   party involved in the transaction?  Let me strike

19   that question.

20             Was Houlihan Lokey contacted by a lender

21   to the transaction?

22       A.    I was contacted -- well, a colleague of

23   mine was contacted by a woman from Citigroup in the

24   December time frame.

Ben A. Buettell                                      December 2, 2009
CONFIDENTIAL

106

1        Q.    Is that the next time when you

2   personally were involved or you personally had any

3   contact with the ESOP LBO?

4        A.    That was my direct personal involvement,

5   yeah.

6        Q.    Was there a time a couple months earlier

7   in September when Houlihan Lokey was contacted?

8        A.    My recollection was that an attorney had

9   contacted one of our colleagues not previously

10  involved in any of the deliberations, and I believe

11  that gentleman referred it to Jack Berka.  I think

12  that was in the September time frame.  But I don't

13  know the exact date.

14       Q.    And do you know who the attorney

15  represented?

16       A.    I don't recall at the time who they

17  represented.

18       Q.    Did you have any understanding of why

19  the attorney reached out to your colleague at

20  Houlihan Lokey?

21       A.    I mean, my only recollection was I don't

22  know if -- I don't recall whether it was specific

23  to any potential litigation that was out there at

24  that time or anything from a financing standpoint.

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

                                                        107

1    I don't recall the specifics because I was only

2    tangentially involved.

3         Q.    Did you at some later point in time

4    learn what the nature of the September contact had

5    been about?

6         A.    If I did, I don't recall when or the

7    specifics.

8         MR. GOLDFARB:  Let's mark this as 11.

9                    (WHEREUPON, a certain document was

10                   marked Buettell Deposition Exhibit

11                   No. 11, for identification, as of

12                   12-02-2009.)

13   BY MR. GOLDFARB:

14        Q.    And this is a two-page document bearing

15   Bates number ending in 001111.

16        A.    1112?  Oh.  The first page.

17        Q.    Yes.  The first page has Bates number

18   ending in 1111.

19        A.    Sorry.

20        Q.    That's all right.  Again, I am going to

21   walk back from the earliest.  Let me know when you

22   have had a chance --

23        A.    I am ready.

24        Q.    The final e-mail is dated Friday,

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

108

1    September 21st, and it's from Mr. Berka to yourself

2    and Mr. Stull.  And Mr. Berka says, "Just passed on

3    this."  What was he informing you of?

4         MR. HERRON:  Objection; calls for speculation.

5              Go ahead.

6    BY THE WITNESS:

7         A.    I think he was referencing -- he was

8    referencing contact I think that he had had

9    regarding some potential involvement with the

10   ongoing Tribune matter.

11   BY MR. GOLDFARB:

12        Q.    Do you recall anything more about what

13   the nature of that was?

14        A.    No.  And I am now recollecting why,

15   which you'll all -- I was traveling again.  And I

16   don't think Jack -- whatever involvement he had, I

17   wasn't directly involved.  And I think he either

18   left me a voice mail but I was out of the country,

19   and so his only question was -- or he was informing

20   me that he passed on whatever it was that had come

21   in.  I don't think I had much on the specifics.

22   And that he had asked -- either the attorney he was

23   referencing may have asked for other people who

24   might be able to assist them.

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

109

1          Q.    Okay.   Then looking at the top of the

2    page with Bates 1112 is your e-mail back also of

3    September 21st raising a name at a firm in Chicago.

4    And then you say "I forget his last name.   Runs the

5    solvency stuff.   If they are smart, they will pass,

6    too."

7               Do you see that?

8          A.    Yes.

9          Q.    With respect to the first part of that

10   in terms of running the solvency stuff, does that

11   refresh your recollection at all as to what the

12   substance of the request -- the substance of the

13   contact that Berka was referring to and then his

14   request to you for additional names?

15         A.    No.   I don't specifically recall what

16   angle the attorney was looking for other than there

17   was some kind of solvency analysis.   But I don't

18   know -- I don't recall the specifics of it.

19         Q.    And then the last sentence says, "If

20   they are smart, they will pass, too."   Do you have

21   any recollection as to what you were referring to

22   there?

23         A.    Yeah.   I think -- at this point my own

24   personal opinion was we had been contacted, we

CONFIDENTIAL

110

1    decided to sit on the sidelines.  That was our

2    decision.  And if somebody else wanted to get

3    involved, I thought if they took a look at this,

4    they might, too, decide to stay on the sidelines.

5    Not, again, because there was any conclusion being

6    drawn but that it just -- I think it was -- it

7    would be a challenging engagement.

8            And again, in this particular case I

9    don't know whether the attorney was asking for

10   solvency analysis to say it was solvent, insolvency

11   analysis to say it was insolvent.  I don't recall

12   the specifics because I don't even know who he was

13   representing at the time.

14           So I think, again, it was more we

15   decided to sit on the sidelines.  That was our

16   conclusion.  And if Stout wanted to take a look at

17   it, they could.  They could draw their own

18   conclusions.

19       Q.    When you just used the word "challenging

20   engagement," what do you mean by that?

21       A.    Well, I am going back to at the time --

22   well, not knowing what this particular request was,

23   I am just thinking about the ESOP LBO transaction

24   that we had been talking about.

Ben A. Buettell                                         December 2, 2009

CONFIDENTIAL

111

1          And I think during the course of the

2    summer there was some -- there were some issues

3    with changes -- pretty substantial changes in

4    credit markets, stock markets, and I think whatever

5    news reports were coming out on any kind of

6    quarterly basis or any kind of press releases from

7    Tribune regarding the fundamentals of their

8    business.  I think they were having some more

9    challenging times relative to maybe what they

10   thought the financial forecasts or the future was

11   for this business.

12          MR. GOLDFARB:  Let's mark this as 12.

13                    (WHEREUPON, a certain document was

14                    marked Buettell Deposition Exhibit

15                    No. 12, for identification, as of

16                    12-02-2009.)

17   BY MR. GOLDFARB:

18          Q.    This is a one-page document ending in

19   Bates 001115.

20          Mr. Buettell, this is not an e-mail that

21   you received.  It's an e-mail from Mr. Berka to

22   Robert Hotz.

23          A.    Hotz.

24          Q.    Hotz.  Who is Mr. Hotz?

Ben A. Buettell                                           December 2, 2009
CONFIDENTIAL

112

1      A.    He is one of our co-heads of corporate

2  finance, the corporate finance group.

3      Q.    And Mr. Berka refers to discussions with

4  the solvency committee.  Do you see that?

5      A.    Yes.

6      Q.    Do you recall in this time period being

7  part of solvency committee discussions regarding

8  the Tribune?

9      A.    I was not because I was out of the

10  country.

11      Q.    Who is -- the e-mail refers to

12  Christopher Crain.  Who is he?

13      A.    He is our in-house legal counsel, our

14  general counsel.

15      Q.    And then Mr. Berka writes, "I told

16  Jonathan Schaffein that we have a conflict and

17  cannot proceed."

18            Do you know who Mr. Schaffein is?

19      A.    I do not.

20      Q.    And do you know what the conflict is

21  that Mr. Berka referred to in that e-mail?

22      A.    My recollection is that Jack said we had

23  a conflict because we had had previous discussions

24  with the Tribune and were subject to

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

113

1    confidentiality agreements.  And I think he took

2    the position, perhaps based on conversations with

3    our in-house counsel, that it would be best just to

4    say that we have this conflict.  We had other

5    information.

6              Obviously Jack and/or Christopher or the

7    committee made some determination that this --

8         MR. HERRON:  If Chris Crain was involved, I

9    don't want you talking about it.  But you can say

10   what Jack told others.

11   BY THE WITNESS:

12        A.    I think what Jack told me is they made a

13   decision that because of the conflict -- because of

14   our previous involvement, which I will put in

15   quotes because we really never got formally

16   involved, he decided to just say we are conflicted

17   and that's when he asked for other names.

18        MR. GOLDFARB:  Let's mark this No. 13.

19                   (WHEREUPON, a certain document was

20                    marked Buettell Deposition Exhibit

21                    No. 13, for identification, as of

22                    12-02-2009.)

23   BY MR. GOLDFARB:

24        Q.    Buettell Exhibit No. 13 is a document

CONFIDENTIAL

114

1    with Bates number ending in -- the first page is

2    001127 and it goes to 1156.

3         MR. HERRON:  Counsel, can I have one minute to

4    talk to my client?

5         MR. GOLDFARB:  You may.  There is no question

6    pending.

7         MR. HERRON:  I just want to take 30 seconds.

8                    (WHEREUPON, discussion was had off

9                     the record between the witness and

10                    his counsel.)

11        MR. HERRON:  Thank you.

12   BY MR. GOLDFARB:

13        Q.    Just before this e-mail, looking back at

14   the last e-mail, No. 12, in terms of conflict,

15   Mr. Berka's e-mail referring to a conflict, do you

16   know whether Houlihan made a determination as to

17   whether a conflict actually existed or -- I will

18   ask that question.

19        MR. HERRON:  If Christopher Crain was involved

20   in making that decision, then it's privileged and

21   we wouldn't talk about it.

22   BY THE WITNESS:

23        A.    I don't know what the determination was.

24   All I know is Jack communicated to me that he told

Ben A. Buettell                                                    December 2, 2009

CONFIDENTIAL

115

1    this attorney that we had a conflict.

2    BY MR. GOLDFARB:

3         Q.    And then just turning back to Buettell

4    Exhibit 11, which is the one with Bates number

5    ending in 1111.  Do you see that?

6         A.    Yes.

7         Q.    It's a Stull e-mail -- the top e-mail is

8    a Stull e-mail to you and Mr. Berka saying,

9    "Thanks.  We made the right call again."

10              Do you see that?

11        A.    Uh-huh.

12        Q.    What did you interpret him to mean by

13   that?

14        A.    I don't know what he meant because,

15   again, I'm not certain I had the specific context

16   of why we were even called in this particular case.

17        Q.    Now turning to Buettell No. 13, what is

18   this document?

19        A.    This is the Valuation Research

20   Corporation solvency opinion dated May 24, 2007,

21   and a solvency opinion analysis dated May 9th,

22   which my understanding supports this opinion

23   letter, that was part of the public documentation

24   filed in connection with Step 1 or the tender offer

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

116

1    for certain shares in Tribune stock.

2         Q.    And the e-mail is from Steven Reynolds

3    sent to you, Mr. Berka, Mr. Stull, cc'd to -- is it

4    Kreg Jackson?

5         A.    Kreg, right.

6         Q.    What was his role at Houlihan?

7         A.    Kreg was also one of our senior ESOP

8    leaders and also was -- also worked on fairness and

9    solvency opinions with me in Chicago.  And he had

10   been involved in some of the deliberations back

11   from the springtime.

12        Q.    When you received this e-mail, was this

13   the first time that you had received -- you had

14   seen the VRC May 24th solvency opinion?

15        A.    That's my recollection, yes.

16        Q.    Do you know whether VRC issued another

17   solvency opinion in May of 2007?

18        A.    No, I don't.

19        Q.    Did you review this solvency letter when

20   you received it?

21        A.    I remember reading the -- I remember

22   reading the presentation.  I don't really recall

23   how much time I spent on the opinion letter itself.

24        Q.    Do you recall having any reaction to the

CONFIDENTIAL

117

1   presentation, the May 9th presentation that you

2   just referred to?

3        A.    It was hard to read.  That was my

4   initial reaction.

5        Q.    Just so the record is clear, the copy

6   that's before you is hard to read or it was hard to

7   read when you received it in September?

8        A.    Whatever copy I originally received was

9   hard to read, too.

10             I remember taking a look at it, and I

11  guess my main reaction to this was on the Bates

12  stamp 1150 -- well, this is one of the pages that

13  it's on but any of the references to adjusted

14  enterprise value -- where it was ranging from

15  approximately 13.9 billion to 16.4 billion.

16             I was interested in that range of

17  enterprise values.  And although it's unclear here,

18  my recollection was in the document -- and it may

19  be in one of these shaded areas -- I thought I had

20  seen some per-share prices, common equity -- the

21  per-share value, if you will, that was implied by

22  this analysis.

23             And I remember at the time, whether it

24  was this document -- it had to be because -- at

CONFIDENTIAL

118

1    least that's my recollection.  I remember seeing

2    ranges of value that were what I thought was

3    substantially higher than $34 a share, which I

4    thought was interesting given that this company had

5    been shopped and that the purchase price for this

6    deal was basically $34 a share.

7            So if you took our -- I don't want to

8    compare what our numbers were in our pricing memo,

9    but if that was in my mind at the time and you look

10   at these numbers, there may have been asset value

11   there, but I thought it was curious that that asset

12   value was in the medium and high cases

13   substantially higher than what I thought would have

14   been a reasonable enterprise value.

15           That was the main -- that was my main

16   reaction to this.

17           And the rest of it in terms of the cash

18   flow tests and stuff, I never had any -- I never

19   really had any direct information to kind of anchor

20   to and say, "Oh, that's interesting because that

21   might differ from what I originally had," because

22   we didn't have anything other than the rating

23   agency presentation.  So I was really just kind of

24   interested in the value.

CONFIDENTIAL

119

1        MR. ROSS:  Move to strike as improper opinion

2    testimony, lack of foundation, and speculation.

3    BY MR. GOLDFARB:

4        Q.    Do you recall any other reactions upon

5    reviewing the May 9th analysis?

6        A.    I guess my other reaction that I recall

7    was that I was -- I had seen on Bates stamp 1155

8    how the enterprise value was built up, the ranges I

9    was referring to before.  So I saw equity

10   investments and then the net present value of

11   PHONES tax savings.  I remember seeing these tax

12   savings and thinking there's not any -- there is no

13   reference in here to any potential ESOP tax savings

14   or anything else.

15            And so I don't know.  I am not saying I

16   would have expected to see anything.  I just was

17   curious that I didn't -- that there was no

18   discussion of that.

19       MR. ROSS:  I would make the same objection to

20   strike the testimony.  It's improper opinion, based

21   on speculation, lack of foundation.

22            And I didn't get it in before he

23   answered, but I also object to the question on the

24   same grounds.

Ben A. Buettell                                              December 2, 2009
CONFIDENTIAL

                                                                    120

1    BY MR. GOLDFARB:

2         Q.    So the record is clear, you made

3    reference on Page 1155 to NPV of PHONES tax

4    savings.  Do you know what PHONES refer to?

5         A.    It was a security, but I didn't spend --

6    it was a security structure that was part of, I

7    think, their existing capital structure and certain

8    tax savings, but I don't know the specifics of it.

9         Q.    Do you recall discussing the VRC opinion

10   letter with anybody?

11        A.    Kreg Jackson and I probably would have

12   discussed it or said this is interesting or -- but

13   I don't recall specifics.

14        Q.    Do you recall discussing it with anybody

15   else other than Mr. Jackson?

16        A.    Sandy Purcell and I might have made

17   reference to it, too, although he is not on this

18   list.  I might have mentioned that I had received

19   this.

20        Q.    And the questions I just asked went to

21   the opinion letter.  I'll ask the same question now

22   with respect to the May 9th analysis that's at the

23   back, that starts on 1135.  You may have just

24   conflated both in your answer.  My question was

CONFIDENTIAL

121

1    about the opinion letter.  Now I am asking about --

2        A.    I'm sorry.  I think I answered the

3    question about the analysis thinking that that's

4    what we were -- maybe you didn't ask that but

5    that's where I went to.  I was talking about the

6    analysis first.

7             I don't really recall reading the

8    specifics of the opinion letter.  But the reason

9    that the opinion letter wouldn't be as interesting

10   to me is because there's no numbers in there, which

11   is typically standard for a solvency opinion.

12       Q.    You can set that aside.

13             You referred earlier -- well, a

14   fundamental question.  Do you recall any other

15   involvement you had or -- first that you had in the

16   September period with respect to the ongoing

17   Tribune LBO?

18       A.    No.

19       Q.    And what about Houlihan; do you have any

20   knowledge of anyone else at Houlihan that was

21   involved?

22       A.    I have no knowledge of anybody else's

23   involvement.

24       Q.    And you referred earlier to a contact in

CONFIDENTIAL

122

1    early to mid-December 2007.  Do you recall that

2    testimony?

3         A.    Yes.

4         MR. GOLDFARB:  Let's mark this as No. 14,

5    please.

6                        (WHEREUPON, a certain document was

7                         marked Buettell Deposition Exhibit

8                         No. 14, for identification, as of

9                         12-02-2009.)

10   BY MR. GOLDFARB:

11        Q.    Buettell Exhibit 14 is a one-page

12   document ending in Bates 001164.

13              Have you had a chance to look at it?

14        A.    Yes.

15        Q.    What is this document?

16        A.    This is an e-mail to Jeff Werbalowsky

17   and Jack Berka regarding a conversation I had with

18   the previously mentioned woman from Citigroup.

19        Q.    And this is an e-mail that you sent,

20   yes?

21        A.    Yes.

22        Q.    And the first line says that "Siegret

23   got a call from Karen Kirchen, North American

24   general counsel at Citigroup."

Ben A. Buettell                                          December 2, 2009

CONFIDENTIAL

                                                              123

1              Do you see that?

2         A.    Yes.

3         Q.    Say again who Mr. Siegret is.

4         A.    Eric Siegret is one of our senior

5    financial restructuring managing directors.

6         Q.    Is your e-mail reporting on the

7    conversation as you heard it from Mr. Siegret or a

8    conversation you had directly with Ms. Kirchen?

9         A.    I think I had gotten an e-mail from Eric

10   Siegert that day.  He said he had been contacted by

11   Karen Kirchen regarding this Tribune matter, and he

12   had either forwarded it to me or called me to allow

13   me to follow up directly with Karen.  I believe it

14   was earlier on the day of December 12th.  And then

15   I had a conversation with her sometime in the late

16   afternoon and then would have subsequently typed

17   out this e-mail.

18        Q.    Before you spoke to Ms. Kirchen had

19   Mr. Siegert told you anything of substance about

20   his conversation with Ms. Kirchen?

21        A.    No, because he wouldn't have -- he would

22   have said not for me to -- I'll just get -- guys

23   have been trained to just say "call that guy who is

24   heading up the practice and let him deal with it."

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

                                                        124

1    So he just flipped it to me.

2          Q.     And then just tell me about your first

3    conversation with Ms. Kirchen.

4          A.     I called her and she had told me that

5    they were in the final stages of getting ready to

6    close on the Tribune deal, the financing on the

7    Tribune deal, and they were having some discussions

8    I think either internally at Citigroup and as well

9    with the bank group.

10           My understanding was, is they wanted the

11   entire bank group to agree to move forward to close

12   the transaction.  And I think there was some

13   discussion about is that the direction that we

14   should all be going; i.e., the banks closing on the

15   deal, or maybe they had some discussion about

16   whether they thought they shouldn't close because

17   of whatever issues they were discussing.

18           So she was calling to ask about us

19   potentially helping Citigroup with some analytics

20   regarding solvency.

21         Q.     And did she sort of describe the

22   substance of the analytics that she was calling

23   about?

24         A.     She didn't call to say -- she didn't

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

125

1  call and say, "We're looking for a solvency

2  opinion."  She didn't call to say, "We're looking

3  for an insolvency opinion."  She called to say,

4  "We're trying to assess solvency as of this point

5  in time" based on whatever conversation they were

6  having.

7           And I tried to find out specifically

8  what they were looking for from us because, again,

9  time was of the essence.  And we talked about

10 analytics versus a formal opinion and those types

11 of issues because that was something that I thought

12 was going to be problematic from my perspective if

13 we were asked to deliver some kind of opinion in --

14 at the time, which was I think less than a week

15 before this thing was supposed to close.

16      Q.    A couple up follow-up questions.  When

17 you say time was of the essence, what you just

18 referred to, was that deadline one that she

19 informed you about in terms of when you had that

20 initial call?

21      A.    Yes.

22      Q.    Did she inform you on that call that it

23 was expected that -- that the plan was for the LBO

24 to close in a week?

Ben A. Buettell                                           December 2, 2009
CONFIDENTIAL

                                                              126

1      A.    Yeah.  I don't remember the exact date,

2  but I seem to recall December 20th or something

3  thereabouts.

4      Q.    And then in terms of what she was asking

5  Houlihan Lokey to consider doing, you just

6  juxtaposed analytics and a formal opinion.  What do

7  you mean by analytics?

8      A.    That we might provide some preliminary

9  analyses based on whatever information was out

10  there publicly available, whether they were going

11  to give us information.

12          Again, I don't recall any specifics, but

13  that we might have done some financial analyses

14  effectively -- it depended on what kind of

15  information we were going to get.  And we might

16  have done some of that analyses and provided them

17  with some kind of preliminary verbal conclusions

18  but not issue a formal opinion letter concluding

19  whatever it is we might have concluded.  But

20  nothing had been discussed in that regard.

21      Q.    Then the e-mail -- well, the e-mail says

22  "rather than type out the facts."  Do you see that?

23      A.    Uh-huh.

24      Q.    What are the facts that you are

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

127

1    referring to?

2         A.    I think what I just described, which was

3    bank groups trying to figure out should they go

4    forward.

5              I remember her talking about the fact

6    that they were addressing their own -- I don't want

7    to call it conflict but their own internal

8    conflicts in the sense that Citigroup was an

9    advisor on the deal, they were also a lender on the

10   deal.  They were two different parties there.  The

11   investment bankers were kind of in the background.

12   The lending group was trying to do their own

13   independent analysis irrespective of what the

14   bankers had done, irrespective of fees or anything

15   like that because that was a conflict issue I think

16   that they were grappling with and then the

17   discussion about the agent bank who I can't

18   remember wanting everybody to basically I think, as

19   I understood it, for the record say we are going to

20   close on this deal because this was the time frame

21   when there were some other deals that had had

22   issues with closing and financing commitments and

23   things like that.

24              So that was my interpretation of some of

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

128

1    the facts that I wanted to discuss, and it was

2    easier to discuss it rather than put it all in an

3    e-mail.

4         MS. KATZ:   I object to the answer and move to

5    strike.   A lot of that sounded like speculation.

6    BY MR. GOLDFARB:

7         Q.    When you say that there had been issues

8    with other deals closing in your last answer, are

9    you referring to deals involving the Tribune or

10   just --

11        A.    Other deals unrelated to the Tribune.

12        Q.    And then your e-mail says, I suppose

13   talking to Mr. Berka, "Jack, this has become more

14   complicated than the last time we talked in

15   September when I believe that an attorney from

16   Cahill called you about a media deal."

17             What did you mean by "this has become

18   more complicated" than in September?

19        A.    Well, it's one thing to be asked to get

20   involved in the front end of a deal.   In my view

21   it's a whole 'nother layer of challenges to be

22   involved in a deal where everybody thinks a deal is

23   going to close in a week and all of a sudden we

24   might come in and do analyses and don't know what's

Ben A. Buettell                                          December 2, 2009
CONFIDENTIAL

129

1    going to ultimately happen.

2            In my view, there was really no upside

3    for us to get involved no matter what the analysis

4    would show.

5        Q.    And then the next sentence says, "The

6    good news is that we would not be hired to deliver

7    a solvency opinion; but if we end up where I think

8    we all know we would end up with our analysis, we

9    may be the ones to kill the deal so to speak and

10   not certain we want to get involved in that mess."

11           What did you mean by "if we end up where

12   I think we all know we would end up with our

13   analysis"?

14       A.    The meaning of that phrase from my

15   perspective was we had a transaction that was

16   highly leveraged early on.  We had what I

17   considered some pretty large market changes in

18   terms of equity values for companies during the

19   summer and fall of 2007.  That also impacted --

20   that was the first of the credit market seizing up

21   back in that time frame.

22           And that if -- regardless of what any

23   analytics would have showed in the March, April,

24   May time frame, my opinion was if you took those

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

130

1    facts into consideration and you look at some of

2    the reported information on Tribune in terms of

3    their own fundamental financial performance, it

4    might have made the analysis that much more

5    difficult in terms of coming to a conclusion of

6    solvency.  That was my opinion at that time.

7         MR. ROSS:  Move to strike the answer as

8    improper opinion, lacking foundation, and

9    speculation.

10   BY MR. GOLDFARB:

11        Q.    And what did you mean by saying "we may

12   be the ones to kill the deal so to speak"?

13        A.    Well, depending on specifically what was

14   going to be asked of us, which at this time nothing

15   specifically was being asked of us, but if somebody

16   said we would like to hire you to tell us whether

17   you think this company based on whatever

18   information we would have or be given was either

19   solvent or not solvent, the possibility of

20   concluding it not being solvent could potentially

21   kill the deal or cause lots of problems.  And

22   that's what I was referring to.

23        Q.    And just to be clear, based on the

24   information you had at the time and whatever

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

131

1    information you may have gotten from Ms. Kirchen,

2    was it your assessment that Houlihan would have a

3    hard time finding the Tribune solvent as of

4    December 2007?

5              MR. DUCAYET:  Objection.

6              MS. KATZ:  Objection to form.

7              MR. ROSS:  Could you read the question back?

8              MR. GOLDFARB:  Can you read it back?

9                         (WHEREUPON, the record was read

10                         by the reporter as requested.)

11             MR. ROSS:  Object to the question as calling

12    for speculation, lack of foundation, calling for

13    improper opinion.

14    BY THE WITNESS:

15             A.    She didn't give me any financial

16    information.  And since I hadn't done any formal

17    analysis going all the way back to February, nor

18    had I in March, nor did I in September, nor did I

19    while I was laying at home sick talking to her that

20    night, because I do remember that, too, and I

21    hadn't been tracking anything, I wouldn't have been

22    able to make any determination of whether the

23    company was solvent or insolvent.  Nor would I have

24    said that to her even if I had a particular

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

132

1    opinion.

2    BY MR. GOLDFARB:

3         Q.    Sorry.   Maybe I misunderstood your prior

4    answer.   What was the basis for your statement "if

5    we end up where I think we all know we would end up

6    with our analysis"?

7         MR. HERRON:   Asked and answered.

8    BY THE WITNESS:

9         A.    I thought you were talking about, quote,

10   kill the deal before.   So I don't know if there was

11   a particular question on the phrase "where we would

12   end up with our analysis."

13   BY MR. GOLDFARB:

14        Q.    Okay.   I guess now I will ask.   What did

15   you mean when you wrote "if we end up where I think

16   we all know we would end up with our analysis,"

17   what did you mean by that?

18        A.    Okay.   I think I did answer it before --

19        MR. ROSS:   Asked and answered.

20   BY THE WITNESS:

21        A.    -- which was the -- basically trying to

22   provide the continuum from the first time we got

23   asked to get involved to the December time frame

24   and all the things I talked about in terms of the

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

133

1    credit markets, the equity markets, et cetera,

2    again not having drawn any particular conclusions

3    about solvency or insolvency at any point in time.

4              But given some of the market changes, it

5    would make in my mind any analysis done in the

6    spring of 2007 to December 2007, it might make the

7    analysis more difficult.

8        MR. ROSS:  Move to strike as speculation and

9    lack of foundation.

10   BY MR. GOLDFARB:

11       Q.    If you could, just describe what

12   Houlihan would have had to go through in order to

13   reach an opinion.  What's the -- I take it your

14   last answer, which is that Houlihan hadn't gone

15   through its usual process, and now I am asking what

16   are the steps that Houlihan would have had to take

17   before it would reach that?

18       MR. ROSS:  Objection; vague.

19       MR. HERRON:  I think it's an incomplete

20   hypothetical, too.

21   BY MR. GOLDFARB:

22       Q.    Let me strike the question.

23              Taking a step back and taking your prior

24   answer, now I am asking you to sort of describe the

CONFIDENTIAL

134

1    process that Houlihan would go through when engaged

2    to render a solvency opinion.

3          MR. ROSS:  Do you mean in general?

4          MR. GOLDFARB:  In general.

5    BY THE WITNESS:

6          A.    In general?

7    BY MR. GOLDFARB:

8          Q.    Yes.

9          MR. HERRON:  Same objection.

10   BY THE WITNESS:

11         A.    Generally speaking, if we were retained

12   to do a solvency opinion, we would typically send

13   out a due diligence request list or ask for access

14   to a data room that would have existed in

15   connection with the transaction.  We would have had

16   to review financial documents, legal documents,

17   board minutes, board presentations, everything that

18   would have started in this -- well, in general in

19   an M&A process we would have wanted to see all the

20   documents that were part of that process.  So in

21   this particular case it could have gone all the way

22   back from September 2006 through December 2007.

23              And then after reviewing documents,

24   doing some financial analysis of our own, we would

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

135

1   have asked for access to senior and operating

2   management to conduct due diligence and ask

3   questions about the history of the business, the

4   recent financial performance, the near-term

5   performance, the forecasted performance.

6           We would have had to take a look at

7   whatever projections were provided to the bank

8   groups for purposes of them extending credit, and

9   we would have taken those and run what we call a

10  base case scenario with that set of projections.

11          We would have had to run sensitivity

12  analyses on those projections.  We would have had

13  to have discussions about identified contingent

14  liabilities, the whole process in general, what

15  kind of indications they receive from other

16  potential bidders, the deliberation process.

17          I mean, that's just a short list of

18  broad categories.  And we would have to do that

19  all.

20          Once we get that information synthesized

21  in an analysis, then we have to go before our

22  review committee, which we talked about earlier,

23  and they would have to review the entire analyses

24  and get comfortable and sign off that in fact we

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

136

1    could deliver whatever was being asked of us in

2    delivering a solvency opinion or some solvency

3    analytics.

4            And then, you know, provide those

5    answers either verbally or in presentation form and

6    ultimately deliver an opinion at the close of the

7    transaction.

8            That's a generic, very high level

9    overview, even though it was a long answer.

10   BY MR. GOLDFARB:

11       Q.    Subsequent to this e-mail that we have

12   been discussing, Buettell Exhibit 14, did you have

13   conversations with your colleagues about what to do

14   in response to the outreach from Citigroup?

15       A.    I think I had conversations with only

16   Jack and Jeff.  No other colleagues.

17       Q.    What do you recall about your

18   conversations with -- we'll start with Jeff?

19       A.    Well, it would have been together.  It

20   was a conference call.

21       Q.    Then both of them.

22       A.    I think I would have had the discussion

23   of the things that I outlined with you about the

24   conversation I had with Karen.  And, you know, I

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

                                                              137

1    think we determined that if we were asked to get

2    involved, we would say that we were not in a

3    position to do that, one.  I think, again, we still

4    had in our minds confidentiality agreement issues

5    with Tribune.  Two, we had timing issues.  We

6    wouldn't have been able to do half of the things

7    that we would have wanted to in a normal solvency

8    setting because you wouldn't have had access to

9    management or anything.  It would have been done

10   more in a litigation mode, if you will.

11          But we were never asked to ultimately --

12   I mean, we decided we would stay on the sidelines,

13   but we never were asked to do anything in

14   connection with this potential inquiry.

15        Q.    And did either Mr. Werbalowsky or

16   Mr. Berka express views about whether Houlihan

17   should look and consider the outreach from

18   Citigroup and consider getting involved?

19        A.    I think they were in agreement that it

20   was an extremely challenging position that we would

21   be asked to get involved with given some of the

22   dynamics I just discussed.

23        Q.    Was there -- let's do this.  Let's mark

24   this as 15.

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

138

1                    (WHEREUPON, a certain document was

2                    marked Buettell Deposition Exhibit

3                    No. 15, for identification, as of

4                    12-02-2009.)

5          MR. GOLDFARB:  Could we go off the record for

6     a second?

7                    (WHEREUPON, a recess was had

8                    from 2:00 p.m. to 2:10 p.m.)

9     BY MR. GOLDFARB:

10         Q.    Back on the record.

11               And you have had a chance to look at

12    Buettell Exhibit 15?

13         A.    Yes.

14         Q.    And tracing from the last e-mail which

15    begins on Page 1190, that's an e-mail late on

16    December 12th from you to Ms. Kirchen.  And you

17    refer to a brief call with a few of your senior

18    partners.

19         A.    Yes.

20         Q.    What does that refer to?

21         A.    That would refer to the conversation

22    that I had with Jack Berka and Jeff Werbalowsky.

23         Q.    Did you testify -- if you did, just

24    answer the question again, please.  Was any

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

139

1  decision reached on that call with your partners

2  about whether Houlihan would get involved in

3  response to the Citi outreach?

4       A.   I think based on the information --

5  based on the information that I had discussed with

6  them, we thought it would be difficult for us to

7  get involved and was still a little unclear about

8  what was being asked of us.

9       Q.   And you posed questions in your e-mail

10 to Ms. Kirchen.  First, "What happens if we all

11 conclude that the company is not solvent; what does

12 the bank group do between now and December 20th?

13 Are all of the terms and pricing set on the loan?

14 Do you have any sense about what the other three

15 banks have been discussing with the Tribune?"

16           And then you ask her if she was

17 available to talk.

18           Did you speak to Ms. Kirchen about these

19 questions?

20      A.   I did not.

21      Q.   You did not on this date or ever?

22      A.   I don't think I had -- I don't recall

23 having any more telephone conversations with her

24 after the one that I had on the Wednesday

Ben A. Buettell                                              December 2, 2009
CONFIDENTIAL

                                                                    140

1    afternoon.

2         Q.    Did she ever respond verbally to your

3    questions here, by e-mail, or otherwise?

4         A.    No verbal response to those particular

5    questions I asked.  And to the best of my

6    knowledge, whatever is in these e-mails was the

7    rest of the response I had with her.

8         Q.    And then I guess after you sent that

9    e-mail to Ms. Kirchen she sent another one saying

10   she was talking to her business management and

11   would call soon.  Do you see that?

12        A.    Yes.

13        Q.    Do you recall whether she did in fact

14   call you?

15        A.    She did not call me back.

16        Q.    And then the immediate prior e-mail is

17   another e-mail from you to Ms. Kirchen on December

18   13th stating the "General consensus from our side

19   is that it will be tough for us to get involved.

20   Short time frame with limited info and we don't

21   really feel like there is much upside from us from

22   a reputational standpoint given the things we

23   discussed last night."

24              Do you see that?

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

141

1        A.    Yes.

2        Q.    What did you mean in the last part of

3   that where you say "given the things we discussed

4   last night"?

5        MR. HERRON:  Asked and answered.

6   BY THE WITNESS:

7        A.    I recall the one conversation where she

8   had talked to me about what the potential request

9   was going to be.  I do not recall having another

10  conversation with her that night.  So it may have

11  been referring to any of the issues that I was

12  discussing with her in that, that this would be

13  potentially difficult for us, you know, raising

14  just my own opinion about what issues might come

15  about and why it might be a challenge for us to get

16  involved at that late stage of the game.

17            Then I would have talked to Jack and

18  Jeff.  And I don't think I had talked to her again

19  the rest of that night because I had sent her the

20  e-mail late.  And I don't think we talked because I

21  would have been not able to.  I was not feeling

22  well.

23            So I think the reference is to the only

24  conversation I had with her, which are just some of

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

142

1    my initial observations.

2    BY MR. GOLDFARB:

3        Q.    Do you remember roughly how long that

4    call was with Ms. Kirchen, the call that you do

5    remember?

6        A.    It wouldn't have been more than 10 or 15

7    minutes.  It was extremely hard for me to even

8    talk.

9        Q.    And then on the first page, in the

10   middle of the page --

11       A.    Yes.

12       Q.    -- is an e-mail -- well, I'm sorry.

13   Just so the record is a little bit clearer, then at

14   the bottom of 1189 going over to 1190 there is an

15   e-mail from Ms. Kirchen to you indicating she was

16   still talking to her senior management, she

17   understood the difficulty for your firm, and she

18   "will revert ASAP on whether we have a concrete

19   proposal" -- "we" meaning Citi -- "would like you

20   to consider."

21            And then in the middle -- with that

22   background, now turning to the middle of Page 1,

23   Ms. Kirchen writes on December 13th to you that the

24   "banks may buy a little more time."

CONFIDENTIAL

143

1          Do you see that?

2      A.    Yes.

3      MS. KATZ:  I am just going to object to the

4  form of the question.

5      MR. ROSS:  Object.  You mischaracterized the

6  document.

7  BY MR. GOLDFARB:

8      Q.    What did you understand that to mean,

9  that the banks may buy a little more time?

10      MR. HERRON:  Calls for speculation.

11  BY THE WITNESS:

12      A.    My opinion was that they might decide

13  not to close on the December 20th date.  But I

14  never had any conversations with her about that.

15  That's just what we wrote.

16      MR. ROSS:  Move to strike the response to the

17  extent it's speculation.  I think the first part

18  was and the second part might be as well.

19  BY MR. GOLDFARB:

20      Q.    And then she says, "I will reach out to

21  you tomorrow to discuss."  And to your

22  recollection, did you ever have a further

23  conversation with Ms. Kirchen?

24      A.    Did not have any further conversations

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

                                                              144

1    with her.

2          MR. GOLDFARB:   Let's mark this as 16, please.

3                    (WHEREUPON, a certain document was

4                    marked Buettell Deposition Exhibit

5                    No. 16, for identification, as of

6                    12-02-2009.)

7    BY MR. GOLDFARB:

8          Q.    This is a one-page e-mail ending in

9    Bates number 001196.

10               Have you had a chance to look at it?

11         A.    Yes.

12         Q.    It's an e-mail from Mr. Beiser to you

13   cc'd to Mr. Berka on December 12th.  Do you see

14   that?

15         A.    Yeah.

16         Q.    And Mr. Beiser says in the third and

17   fourth sentences, "My view is rather clear.  If we

18   only get a week to do shooter work, we will always

19   be at a disadvantage from the other side who has

20   lived with this deal for a long time."

21               Do you see that?

22         A.    Yes.

23         Q.    What do you interpret shooter work to

24   mean, or what did you interpret shooter work to

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

145

1    mean?

2        MR. ROSS:   Calls for speculation.

3    BY THE WITNESS:

4        A.    I don't know what he meant by shooter

5    work.

6    BY MR. GOLDFARB:

7        Q.    Did you ask him?

8        A.    No.

9        Q.    And Mr. Beiser goes on to say, "So we

10    are forever on the defensive making chump change in

11    a hostile fact pattern; even worse we are on the

12    outside (not even on the company info side) and

13    thus this smells like divorce work where we may be

14    on the correct answer side but we are not playing

15    with a fair deck of info and time versus the other

16    side."

17            Do you see that?

18        A.    Yes.

19        Q.    What did you interpret divorce work --

20    his reference to divorce work to refer to?

21        MR. HERRON:   Calls for speculation.

22        MR. GOLDFARB:   I'm asking what he interpreted.

23        MR. HERRON:   But you are asking him to

24    interpret an e-mail somebody else wrote.

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

146

1    BY THE WITNESS:

2         A.    I think his text speaks for itself.   I

3    think what he is saying -- well, my interpretation

4    of divorce work, which is not something we do

5    typically, we don't get involved in those types of

6    litigation cases because that's not how we choose

7    to make our money.   It's a no-win situation.

8              And I think that's what he is saying if

9    you read that in the context of the rest of that

10   sentence that you just read.

11   BY MR. GOLDFARB:

12        Q.    By divorce work, just so the record is

13   clear, you don't interpret that to mean literally

14   marital divorce, right?

15        A.    Yeah, that's what he does mean.   That's

16   what I think he means, divorce work in a marital

17   sense.

18        Q.    Okay.

19        A.    Don't know if I threw you for a loop.

20        Q.    Did you speak to him about his use of

21   the phrase or the analogy divorce work?

22        A.    I don't think I spoke to him about this

23   e-mail and I don't even recall that we had any

24   other calls because I might have just decided I was

CONFIDENTIAL

147

1    not feeling well.  So he provided this information

2    late, but I would have -- I did not talk to him

3    about it this day.

4         Q.    After this conversation on December 12th

5    with Ms. Kirchen and then these follow-up e-mails,

6    what, if any, interaction did Houlihan have

7    following that series of interactions with the LBO

8    transaction with respect to any party?

9         A.    None to my knowledge.

10        MR. HERRON:  Calls for speculation.

11   BY MR. GOLDFARB:

12        Q.    And you personally had no additional

13   direct involvement; is that right?

14        A.    No.  I will just say the only thing

15   that -- the only other involvement I had was when I

16   tried to follow up after the first of the year with

17   Ms. Kirchen.  I don't even know if she was still at

18   Citigroup.  Her phone was disconnected.  I never

19   knew what happened to her.

20        Q.    By "first of the year," you mean January

21   2008?

22        A.    Yes.

23        Q.    What was the purpose of trying to get

24   back in touch with her in January 2008?

CONFIDENTIAL

148

1        A.      Just kind of follow-up.  But obviously

2   at that point I already, I guess, had my answer

3   because the deal had closed.

4                    (WHEREUPON, a certain document was

5                    marked Buettell Deposition Exhibit

6                    No. 17, for identification, as of

7                    12-02-2009.)

8   BY MR. GOLDFARB:

9        Q.      This is a one-page document ending in

10  Bates number 001174.

11                  Have you had a chance to look at it?

12       A.      Yes.

13       Q.      The bottom e-mail is from Steven

14  Reynolds to you and Kreg Jackson on December 19th

15  with a text, "According to this" -- there is an

16  attached document -- "it sounds like they got the

17  second stage solvency opinion."

18                  Do you see that?

19       A.      Yes.

20       Q.      Then you responded also on December 19th

21  to Mr. Werbalowsky, Mr. Berka, Mr. Beiser,

22  Mr. Purcell, yes?

23       A.      Yes.

24       Q.      And the first paragraph of your e-mail

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

149

1    says, "Imagine that, getting a solvency opinion

2    despite the changes with the company and the credit

3    markets.  Hope they put in language about selling

4    the Cubs and Wrigley Field for billions in April to

5    pay down debt."

6         A.    Yes.

7         Q.    What did you mean by the line "Imagine

8    that, getting a solvency opinion despite the

9    changes with the company and credit markets"?

10        MR. ROSS:  Objection.  It calls for

11   speculation and improper opinion.

12        MR. GOLDFARB:  Calls for speculation by the

13   person who wrote it?  Okay.

14   BY THE WITNESS:

15        A.    I think it has been asked and answered.

16   But again, not having done a formal analysis, only

17   having outside public information other than the

18   ratings document back in the spring, if I look at

19   any of the preliminary information from our pricing

20   sheets and I look at where things were from a

21   market standpoint in December, I think getting a

22   second solvency opinion might have been more

23   challenging.

24

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

150

1    BY MR. GOLDFARB:

2         Q.    And referring to the second line, "Hope

3    they put in language about selling the Cubs and

4    Wrigley Field for billions in April to pay down the

5    debt," what did you mean by that?

6         A.    If you look back into the rating agency

7    document, one of the things they talked about at

8    the time frame of this deal closing, the Cubs would

9    have been sold either pretty close to concluding

10   this transaction or shortly thereafter.

11        And in order to have debt pay down, my

12   commentary was just that, hopefully either whatever

13   language would have been in an opinion -- which I

14   have never seen -- that they were going to have

15   some debt come due and if they had gotten proceeds

16   and paid down the debt, that might have been

17   something that they could have referenced in their

18   opinion as a caveat.  That was the essence of that

19   statement.

20        MR. ROSS:  Move to strike the last answer as

21   speculation and improper opinion testimony and lack

22   of foundation.

23   BY MR. GOLDFARB:

24        Q.    And you refer to selling the Cubs and

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

151

1    Wrigley Field for billions in April.  Did you have

2    any information as to what the estimated market

3    value was at the time of the Cubs and Wrigley

4    Field?

5         A.    I think there were press reports that

6    talked about 600 million.  We had also -- you know,

7    we had done a lot of sports work over the years.

8    Paul Much and I had done some.  So there was

9    obviously lots of discussion about the sale of the

10   Cubs during that time frame.  But the only number I

11   remember publicly was 600 million.

12            We might have done some other internal

13   work on our own with our own views but no other

14   numbers other than that.

15        Q.    And upon learning of the -- getting this

16   information from Mr. Reynolds, aside from this

17   e-mail, did you have conversations with colleagues

18   internally at Houlihan about the LBO and the

19   reported closure in the December 19, December 20

20   period?

21        A.    No.  This talked about getting the

22   solvency opinion and the question was was the deal

23   still going to close because I don't think as of

24   the 19th it had closed yet.

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

152

1    Q.    Right.  But my question is, did you have

2    discussions with your colleagues about it?

3    A.    No.

4    Q.    And then the top e-mail obviously is

5    from Mr. Purcell back to the group copied below.

6    And he says, "No regrets on losing this one."

7          And what did you interpret Mr. Purcell's

8    e-mail to you to mean?

9    MS. KATZ:  Object to the form.

10    MR. ROSS:  Objection; calls for speculation,

11    lacks foundation.

12    BY THE WITNESS:

13    A.    It says what it says.  Sandy felt like

14    he had no regrets on losing this one.

15    MR. GOLDFARB:  Let's go off the record for a

16    second.  I may be just about done.  Let me look

17    over my notes for a second.

18          (WHEREUPON, a recess was had

19          from 3:20 p.m. to 3:27 p.m.)

20    MR. GOLDFARB:  I don't have any more

21    questions.

22          EXAMINATION

23    BY MS. MONTENEGRO:

24    Q.    Good afternoon, Mr. Buettell.  Thanks

CONFIDENTIAL

153

1    for being patient and taking the time today to be

2    with us.

3              My name is Christine Montenegro and as I

4    mentioned to you off the record I represent

5    New York Law Debentures.

6              I just have some follow-up questions

7    based on the questioning of Mr. Goldfarb.

8              When were you first contacted by your

9    counsel to gather -- to be involved in this action?

10        MR. HERRON:  You just want to know the time?

11        MS. MONTENEGRO:  Yes.

12   BY THE WITNESS:

13        A.    I don't recall the specific date.  I

14   guess -- I thought it was sometime in the summer.

15   BY MS. MONTENEGRO:

16        Q.    Were you asked to gather documents at

17   any point in time?

18        A.    Yes.

19        Q.    When was that?

20        A.    Same time.

21        Q.    This summer?

22        A.    This summer.

23        Q.    What was your role with respect to

24   gathering documents?

CONFIDENTIAL

154

1        A.    They had asked me to -- well, they said

2    they were going to go through --

3        MR. HERRON:   When you say "they," is this

4    legal counsel?

5        THE WITNESS:   Our internal legal counsel.

6    This is primarily Jenna.

7        MR. HERRON:   Jenna is a paralegal so you can

8    talk about it.

9    BY THE WITNESS:

10        A.    I think initially -- I can't recall now.

11    I think initially when Jenna Radomile --

12    R-a-d-o-m-i-l-e.  J-e-n-n-a is the first name.

13              She I think contacted me.  I might have

14    had a subsequent call with Christopher Crain and

15    others, but I was asked to go through any files

16    that I had either online or hard copy and that they

17    were also going to be going through whatever

18    process they go through on e-mail productions.

19              Well, that was after it was determined

20    we were going to do this.  I think we had some

21    initial questions about whether we felt we had to

22    do anything.  But that was my recollection.

23    BY MS. MONTENEGRO:

24        Q.    Do you know whether anyone else was

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

155

1    asked to go through their files to gather

2    documents?

3         A.    I believe Jack Berka was and I believe

4    Andy Stull was.  I can't recall for certain whether

5    Kreg Jackson or Sandy Purcell would have been.  I

6    don't recall.

7         Q.    So you are not sure whether -- I guess

8    for the committee members in 2006 you don't know

9    whether requests were made for all those files for

10   the people involved in the committee review?

11        A.    I do not know specifically other than

12   the people I just mentioned.

13        Q.    Do you know whether Andrew Stull had

14   provided documents?

15        A.    My understanding is he did provide

16   documents.

17        Q.    And what about Jack Berka?

18        A.    My understanding is he did provide

19   documents.

20             Well, or he looked through files and

21   either if he had documents that weren't part of

22   either online or e-mail, he would have provided

23   them.

24        Q.    Are you aware of what your policy is as

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

156

1    far as retaining documents?

2         A.    Normally we have a retention policy for

3    engagements, but I don't consider this an

4    engagement, so there would be no policy for these

5    documents.

6         Q.    Okay.

7         A.    To my knowledge.

8         Q.    And do you know whether any searches

9    were run across the e-mails of the people that were

10   on the committee, the opinion and solvency

11   committee?

12        A.    I'm not aware of how the e-mail search

13   was conducted.

14        Q.    How long have you had a solvency

15   committee?

16        A.    I want to say formally going back to the

17   2004 time frame.

18        Q.    What about a pricing committee?

19        A.    Also back to that 2004 time frame.

20        Q.    What prompted your company to establish

21   committees?

22        MR. HERRON:  Calls for speculation.

23             To the extent you know.

24   BY MS. MONTENEGRO:

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

157

1       Q.    To the extent you know since you are a

2   member of the committee.

3       A.    As the firm had grown and we went to

4   more of a national model versus each office kind of

5   doing their own thing -- we reorganized in 2001,

6   2002 with the three groups that I talked about

7   earlier, FAS, corporate financing, and financial

8   restructuring.

9            And as we continued that growth, we had

10  discussions internally about bringing more

11  protocols to how we go about taking on business.

12  And that prompted us to do what we call these

13  capital adequacy procedures and how you go about

14  vetting opportunities for the firm.  And that was

15  the genesis for some of these review committees and

16  pricing committees.

17      Q.    And I guess you said there were

18  protocols that were created as far as what type of

19  information you would need in making a

20  determination on whether to take on an engagement?

21      A.    I think it was broader protocols about

22  how one is going to vet one of these opportunities.

23  So, you know, who you have to contact, what

24  procedures you have to go through --

CONFIDENTIAL

                                                        158

1          Q.     Okay.

2          A.     -- and the like.

3          Q.     When you were contacted for the Tribune

4    engagement, you talked about in February that there

5    was a capital adequacy engagement sheet.

6          A.     Yes.  Capital adequacy information sheet

7    I think is what it's referred to.  Capital adequacy

8    engagement information sheet.

9          Q.     And you said one was created in February

10   2007?

11         A.     Correct.

12         Q.     And you believe Andrew Stull was

13   involved with that?

14         A.     Correct.

15         Q.     Do you know whether any such engagement

16   sheet was produced to us in this action?

17         A.     Yeah.  I think it's -- I think that's

18   what the redacted --

19         MR. HERRON:  That's March.  February was

20   produced also.

21   BY THE WITNESS:

22         A.     February was produced, yeah.  February

23   and March.

24   BY MS. MONTENEGRO:

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

159

1          Q.     Then also one was created in March as

2     well?

3          A.     Yes.

4          Q.     And you mentioned the information that

5     would be on that type of sheet.  There wouldn't be

6     any information concerning advice of counsel; is

7     that correct?

8          A.     No, because we typically wouldn't be --

9     let me stop there.  Do you mean internal counsel,

10    our counsel?

11         Q.     Yes.

12         A.     There wouldn't -- there is not

13    information on there regarding internal counsel,

14    although they would receive the pricing sheets so

15    they're knowledgeable about what's going on and

16    could potentially participate in any of those

17    discussions.

18         Q.     Okay.  But their advice isn't reflected

19    in those --

20         A.     Correct.

21         Q.     -- actual capital adequacy sheets?

22         A.     Correct.

23         Q.     So it's just the information you are

24    taking as far as the intake procedure of a client

CONFIDENTIAL

160

1    taking on an engagement, correct?

2         A.    That's correct.  Gathering financial and

3    other information regarding the transaction.

4         Q.    In March 2007 you said that you

5    received -- or you said you had received the agency

6    presentation from Tribune; is that correct?

7         A.    Correct.

8         Q.    Was there any other information that was

9    received with respect to determining whether to

10   take on that engagement from Tribune?

11        A.    To my knowledge, the only document that

12   Houlihan Lokey ever got subject to that

13   confidentiality agreement was the rating agency

14   presentation.  To my knowledge.

15        Q.    Would someone else have greater

16   knowledge on that respect?

17        MR. HERRON:  Calls for speculation.

18   BY THE WITNESS:

19        A.    I don't know.  The only --

20   BY MS. MONTENEGRO:

21        Q.    Is there any reason why Andrew was

22   creating that capital adequacy sheet?

23        A.    Yes.

24        Q.    Would he have access to certain

Ben A. Buettell                                           December 2, 2009
CONFIDENTIAL

161

1    information that you don't have?

2         A.    It's highly unlikely.  He created it

3    because he was the one that had the initial call

4    and then worked with me on those pricing sheets.

5              And if he did have additional

6    information and it was still in his files or on his

7    system, I think he would have produced it.

8         Q.    Did you find the presentation -- did it

9    convey adequate information for you to make a

10   determination as far as intake of a client?

11        A.    It provided preliminary information in

12   addition to other public available information that

13   we would have gotten so that we could at least have

14   a dialogue about the prospects of getting involved

15   but would not be anywhere obviously all-inclusive

16   to any information to do what I would consider a

17   full analysis.

18        Q.    Was there any deficiency though in

19   information that you were provided to make that

20   initial determination whether to take on a client?

21        MR. DUCAYET:  Object to the form of the

22   question.

23        THE WITNESS:  Can you read that back to me?

24

CONFIDENTIAL

162

1                    (WHEREUPON, the record was read

2                    by the reporter as requested.)

3    BY MS. MONTENEGRO:

4         Q.    Strike that.  I'll reword it.

5               Was there any deficiency in information

6    that was provided to you from Tribune that made it

7    impossible to make a determination as to whether to

8    take them on as a client?

9         MR. ROSS:  Objection; vague, calls for

10   speculation.

11   BY THE WITNESS:

12        A.    I can't say whether there was deficiency

13   in the information we got or --

14   BY MS. MONTENEGRO:

15        Q.    Well, would you have asked for further

16   information if you felt you couldn't make a

17   decision?

18        MR. DUCAYET:  Object to the form of the

19   question.

20        MR. ROSS:  Same objection.

21   BY THE WITNESS:

22        A.    I think we felt we had enough

23   information at the time to have a general

24   understanding of the parameters regarding the

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

163

1    transactions.   The proposed transactions.

2    BY MS. MONTENEGRO:

3         Q.     Now, you had mentioned that you entered

4    into a confidentiality agreement with Tribune.   Is

5    that typical in your industry, to enter into a

6    confidentiality agreement?

7         A.     I would say that when we get involved in

8    any opportunities up front where there is a request

9    for information, I would typically offer up that we

10   are happy to sign a CA so that there is no question

11   about what would be considered confidential or not.

12   So it's usually offered up when I am involved.

13        Q.     And generally in this intake procedure

14   you don't have access to the data room at that

15   point, correct?

16        A.     That's correct.

17        Q.     So this transaction is not different

18   than other transactions as far as your internal

19   review of the information, correct?

20        MR. ROSS:   Could you repeat that?

21             (WHEREUPON, the record was read

22             by the reporter as requested.)

23        MR. HERRON:   The question is vague and an

24   incomplete hypothetical.

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

164

1    BY THE WITNESS:

2         A.    I think each prospect has its own unique

3    set of circumstances, information, et cetera.  We

4    try to ask for information that could help us put

5    proper data into the pricing sheet both

6    qualitatively and quantitatively for purposes of

7    deciding on whether to get involved.

8              I didn't view this particular engagement

9    to have anything more or less.  I don't like to use

10   the word "typical," but we followed what I

11   considered to be normal procedures for evaluating a

12   solvency opportunity.

13   BY MS. MONTENEGRO:

14        Q.    You had provided us with a March 26,

15   2007, capital adequacy sheet.

16        A.    Yes.

17        Q.    What exhibit is that?

18        A.    That's Exhibit 5.  That's the redacted

19   version.

20        Q.    I know it's heavily redacted.  Do you

21   recall what it looked like in the unredacted form?

22        MR. ROSS:  Asked and answered.

23   BY THE WITNESS:

24        A.    I think I answered it earlier.  There

CONFIDENTIAL

165

1    are certain kind of check-the-box information in

2    the first half.  And then I think there was -- I

3    don't recall what -- the third page in terms of

4    what information would be there.  I think it would

5    be other -- kind of other issues or other

6    considerations that might be of interest in

7    evaluating the opportunity.

8    BY MS. MONTENEGRO:

9         Q.    You don't know whether or not -- I guess

10   do you know for sure since you have seen the

11   unredacted version whether there was anything

12   showing that information was lacking from Tribune?

13        MR. HERRON:  The question is vague.

14   BY THE WITNESS:

15        A.    For purposes of us making the

16   determination, I think we felt we had sufficient

17   information.

18   BY MS. MONTENEGRO:

19        Q.    Okay.  And you had mentioned that there

20   was an issue about the ESOP tax saving and whether

21   it should be factored in into the enterprise value,

22   correct?

23        A.    Correct.

24        Q.    And you said that a definitive decision

CONFIDENTIAL

166

1    had not been made in the March 2007 time period?

2         A.    Yeah.   I don't think anything was

3    definitive.

4         Q.    When you decided to pass on the deal in

5    late March 2007, was a decision ever made with

6    respect to the ESOP tax saving issue?

7         MS. KATZ:   Asked and answered.

8         MR. DUCAYET:   Object.

9    BY MS. MONTENEGRO:

10        Q.    You can answer.

11        A.    I think we would have had to get engaged

12   and do more analysis and look at all the facts and

13   circumstances before we would make any

14   determination of the merit of those tax benefits.

15        Q.    Was anyone at that time doing any type

16   of review on the ESOP issues?

17        A.    Well, I had had plenty of ESOP

18   experience, so I knew what were the mechanics of

19   that.  Kreg Jackson and Sandy Purcell would have

20   also been taking a look at it.

21        Q.    And you mentioned that the other factors

22   that were involved in the decision to pass was

23   timing.  Was that one of them you said?

24        A.    Yes.

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

1        Q.    Were there any other issues?

2        MR. HERRON:  It has been asked and answered.

3   BY THE WITNESS:

4        A.    Yeah, I think I covered most of the

5   issues that would be generic to us assessing

6   whether to take on a solvency opinion or not.

7   BY MS. MONTENEGRO:

8        Q.    Were there any other factors that you

9   haven't listed today that come to mind?

10       A.    I don't want to say my answers were

11  exhaustive, but I think I covered the general

12  topics that were relevant.

13       Q.    And you had mentioned earlier the whole

14  procedures you go through for the solvency --

15  before you issue a solvency opinion.

16            How long does it take from I guess the

17  date when you are first engaged and you have access

18  to the data to when you actually issue an opinion?

19       MR. HERRON:  Calls for speculation.  It's an

20  incomplete hypothetical.

21       MR. DUCAYET:  Asked and answered.

22  BY THE WITNESS:

23       A.    There is nothing typical, but if a

24  client or a prospect were asking me "if we were to

CONFIDENTIAL

168

1    engage you, how long would it take," again, it's

2    going to be based on facts and circumstances.

3              But I think from the time that they say

4    "we are going to hire you; we are going to start

5    drafting a retainer agreement; we are going to

6    start getting you documents that you requested; we

7    are going to set up due diligence" and all the way

8    through the end where we either finish our analysis

9    and give them an opinion, which could be later than

10   when we're done with our analysis -- you know, we

11   have to bring it down -- I would typically say we

12   would like at least two to three weeks.

13             And in this particular case because of

14   the complexities that would have been kind of the

15   minimum time frame from my perspective.

16             There's no procedures, there is nothing

17   that codifies what we have to do.  That's just my

18   own viewpoint.

19        MR. ROSS:  Object and move to strike to the

20   extent that's speculation and lack of foundation.

21   BY MS. MONTENEGRO:

22        Q.   I guess given the complexity of the

23   transaction, what would have been a comfortable

24   time frame?

Ben A. Buettell                                          December 2, 2009
CONFIDENTIAL

169

1        MS. KATZ:  Calls for calculation.

2        MR. ROSS:  Objection.

3   BY MS. MONTENEGRO:

4        Q.    You can answer.

5        MR. ROSS:  And improper opinion.

6   BY MS. MONTENEGRO:

7        Q.    You can answer.

8        A.    I don't know that I have any particular

9   time frame in mind.  And, you know --

10       Q.    I assume it would be more than three

11  weeks since you said three weeks is cutting it

12  close.

13       MR. ROSS:  Objection.

14       MS. KATZ:  Object to form.

15  BY MS. MONTENEGRO:

16       Q.    You can answer.

17       A.    It depends because it may be that we are

18  going to do some preliminary analysis regarding

19  valuation regarding the projections.  But there are

20  times when the financing is not even in place so

21  you can't really give a full, complete opinion, nor

22  would you be able to deliver a written one, let

23  alone a verbal one.

24            So in this particular case, don't know

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

170

1   that -- we never got enough -- in enough to know

2   whether all those mechanics were in place for us to

3   even deliver an opinion in the time frame, whether

4   it was one week or three weeks or five weeks.  So

5   it's too hard to give you a specific answer.

6        Q.    Do you know whether it's industry

7   practice to have some type of committee review for

8   the intake procedure?

9        MR. HERRON:  Incomplete hypothetical, lack of

10  foundation, calls for speculation, and it may be

11  improper expert testimony.

12  BY MS. MONTENEGRO:

13       Q.    Go ahead; you can answer.

14       A.    I don't know what other firms do from a

15  solvency standpoint in terms of committee review.

16  I know what we do and I know what -- I know what we

17  do.  I can't tell you what other people do with

18  regard to solvency opinions.

19       Q.    So you don't know whether other solvency

20  firms are doing that as well, having a committee in

21  place?

22       MR. HERRON:  Asked and answered.  Same

23  objections.

24

Ben A. Buettell                                        December 2, 2009

CONFIDENTIAL

171

1    BY THE WITNESS:

2         A.    Don't know.

3    BY MS. MONTENEGRO:

4         Q.    For this type of deal that was being

5    proposed by Tribune, would you consider it prudent

6    to have some type of committee review?

7         MR. HERRON:   Same objections.

8    BY THE WITNESS:

9         A.    I'd sure want -- from my perspective I

10   would want to have -- I would want to have other

11   people looking at the analyses other than those

12   working on the deal.

13   BY MS. MONTENEGRO:

14        Q.    Exhibit 4.  You were shown this exhibit

15   earlier, Exhibit 4, and you were asked about --

16   when you mentioned that there was inherent risks in

17   the market, you had mentioned that the solvency

18   product line is a risky product line.

19             What did you mean by that?

20        MR. DUCAYET:   Objection; asked and answered.

21   BY THE WITNESS:

22        A.    Yeah, I think I answered it before.  But

23   in short, the nature of the solvency opinion is an

24   opinion as of a date, typically the closing of a

Ben A. Buettell                                     December 2, 2009

CONFIDENTIAL

172

1    transaction, but also incorporates financial

2    forecasts into the future.

3              And so I think there is potential for

4    more scrutiny or a company having issues where that

5    solvency opinion is going to be called into

6    question if somewhere down the road relating to the

7    transaction or not they have financial

8    difficulties.

9    BY MS. MONTENEGRO:

10       Q.    And when you are deciding whether to

11   take on a client, do you anticipate whether your

12   opinion could withstand attack?

13       MS. KATZ:  Objection; form.

14       MR. ROSS:  Objection; calls for speculation,

15   lack of foundation.

16       MR. HERRON:  Incomplete hypothetical.

17   BY MS. MONTENEGRO:

18       Q.    You can answer.

19       THE WITNESS:  Read it to me again.

20              (WHEREUPON, the record was read

21              by the reporter as requested.)

22   BY THE WITNESS:

23       A.    I would tell you that every analysis we

24   do we take the approach that it's potentially under

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

173

1   attack, whether it's solvency opinions or a

2   valuation for whatever reason.

3   BY MS. MONTENEGRO:

4       Q.    So you would take that approach with

5   your solvency opinion?

6       A.    We take that approach with everything we

7   do.

8       Q.    So when you are doing your internal

9   review and deciding whether to take on a client,

10  it's a pretty thorough internal review; I guess you

11  wouldn't want to be subject to attack down the

12  road; is that correct?

13      MS. KATZ:   Objection.

14      MR. ROSS:   Objection; vague, argumentative.

15  BY THE WITNESS:

16      A.    We do the review that I have outlined in

17  several answers today in terms of intake and

18  decision-making.  It's not a static process.  We

19  vet it like I say we do and the process is what it

20  is.  Whether it's thorough or whatever phrase you

21  use is not something I can judge.

22      MR. ROSS:   I'm sorry.  What was the last part

23  of the answer?

24      THE WITNESS:   "Not something I can judge."

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

174

1      Sorry.

2      BY MS. MONTENEGRO:

3          Q.    Is there any reason for you to believe

4      that your committee review is not thorough?

5          A.    I think our committee review follows

6      procedures that we think are appropriate to

7      evaluate opportunities recognizing that those

8      procedures or analyses or those information sheets

9      are by no way, shape, or form a formal analysis or

10     any kind of support for any opinion.

11         Q.    But the end goal in doing your -- one of

12     the goals is to make sure that your opinion isn't

13     subject to attack; is that correct?

14         MR. HERRON:  Asked and answered.

15     BY THE WITNESS:

16         A.    I think our procedures are in place to

17     manage the risks of the product line and the firm.

18     BY MS. MONTENEGRO:

19         Q.    Moving on to Exhibit I believe 13.  I

20     think you were focusing on page -- we were talking

21     about Bates HLHZ 1155.

22         A.    Yes.

23         Q.    You said one of the things you found

24     interesting was that the ESOP tax saving wasn't

CONFIDENTIAL

1    mentioned in this chart here?

2         A.    Well, I think I said -- and if I didn't,

3    I will be clear -- I don't see it explicitly

4    mentioned.  That doesn't mean it's not somewhere

5    reflected in these numbers.

6         Q.    Why would you have expected it to be

7    referenced in these numbers?

8         MR. ROSS:  Objection; calls for improper

9    opinion, calls for improper legal opinion, lack of

10   foundation, calls for speculation.

11        MR. DUCAYET:  And mischaracterizes his

12   testimony.

13   BY MS. MONTENEGRO:

14        Q.    Why would you have expected to see it in

15   this chart here?

16        MR. DUCAYET:  Mischaracterizes his testimony.

17   BY THE WITNESS:

18        A.    I don't know that I expected to see it.

19   I think what I said is that given the discussions

20   in the rating agency document about present value

21   of tax benefits, I was curious as to whether those

22   would be explicitly referenced anywhere in this

23   analysis.  I'm not saying it's supposed to be.  I'm

24   just saying I was curious to see if in fact it was.

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

176

1   BY MS. MONTENEGRO:

2       Q.     And you said this is in reference to

3   what you saw in the rating agency presentation is

4   what prompted you to be curious about not seeing it

5   in this presentation?

6       A.     That's correct.  There was sufficient

7   discussion about what I'd call the ESOP tax

8   benefits and the mechanics of the ESOP both from an

9   annual savings, certain contributions, and the

10  various calculations that would result from the

11  ESOP structure that may provide for tax savings.

12      Q.     When you talk about these various

13  discussions, you are talking about discussions with

14  Tribune outside of those documents?

15      A.     No.  Discussions that we had internally

16  based on the rating agency document.

17      Q.     Okay.  So when you were doing your

18  initial evaluation of whether to take Tribune on as

19  a client, one of the things you were focusing on

20  was the ESOP tax benefits at that stage when you

21  were issuing your opinion?

22      MS. KATZ:  Object to the form.

23      MR. ROSS:  Mischaracterizes his testimony,

24  lacks foundation.

Ben A. Buettell                                   December 2, 2009

CONFIDENTIAL

177

1    BY THE WITNESS:

2        A.    I think the ESOP tax benefits was one of

3    the things you would obviously have to consider

4    when you do the formal analysis on this particular

5    entity.

6    BY MS. MONTENEGRO:

7        Q.    But you are not making any distinction

8    between time period when you are taking in the

9    formal analysis of the ESOP tax saving?

10       A.    I think everything was presented on what

11   we call a present value basis.  So I personally

12   didn't spend a lot of time trying to verify that

13   number or see if that number made sense.  It was

14   more the concept of whether you would somehow

15   factor that into the overall value of the Tribune

16   in light of the proposed transaction.

17       Q.    And I guess you see that this is the

18   first opinion they are giving in May.  You are not

19   making a distinction in your mind between whether

20   it should go in a May opinion versus a later

21   opinion?

22       MR. ROSS:  Can you repeat the question,

23   please?

24

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

178

1              (WHEREUPON, the record was read
2                  by the reporter as requested.)
3    BY THE WITNESS:
4         A.    Yeah, I made no determination about
5    whether it should be in one opinion versus the
6    other opinion.
7              And again, it might be in this opinion
8    or in this analysis.  I'm not making any
9    distinction.  And just to be clear, I have never
10   seen anything on what people have referred to as
11   the second opinion.
12   BY MS. MONTENEGRO:
13        Q.    Okay.  We had discussion when Citigroup
14   had approached you later on in December.  Do you
15   know why Citigroup had approached your firm?
16        MR. HERRON:  Asked and answered.
17   BY THE WITNESS:
18        A.    I think they were looking for someone
19   who may be able to help them assess solvency.
20   BY MS. MONTENEGRO:
21        Q.    Do you know why they went to your firm
22   versus another firm?
23        MS. KATZ:  Objection; calls for speculation.
24

Ben A. Buettell                                          December 2, 2009
CONFIDENTIAL

179

1    BY THE WITNESS:

2         A.    All I know is they contacted Eric

3    Siegret.  That's not to say they didn't contact

4    other people or who they contacted.  I'm pretty

5    certain they wouldn't be contacting Duff & Phelps

6    and Valuation Research.  I think that's pretty

7    clear.  Whether they talked to other people, I have

8    no knowledge of it.

9    BY MS. MONTENEGRO:

10        Q.    Did Citi have any -- do you know whether

11   they knew that your firm had previously been

12   contacted by Tribune?

13        MR. HERRON:  Calls for speculation.

14   BY THE WITNESS:

15        A.    I don't know.

16   BY MS. MONTENEGRO:

17        Q.    Did you ever tell Karen that that was an

18   issue?

19        A.    No.  I mean, I would not have discussed

20   our potential involvement from a confidentiality

21   standpoint.  Having said that, she asked, you know,

22   was I familiar with the deal and clearly I was

23   familiar with the deal.  But that would have been

24   from public company information I had.  I would not

CONFIDENTIAL

180

1   have specifically referenced anything in the rating

2   agency presentation.

3                And by that time that information would

4   have been known.  The tendered document was out, so

5   I wouldn't have breached any confidentiality anyway

6   but wouldn't have gotten into discussions about

7   potential involvement with any other parties.  And

8   what she knew I don't know.

9        Q.    But I guess since you never took them on

10  as a client in March, there was no conflict if you

11  wanted to do the work in December; is that correct?

12       MR. HERRON:  May call for a legal conclusion,

13  calls for speculation.

14  BY THE WITNESS:

15       A.    I never was the person determining

16  whether a conflict existed in any of those previous

17  discussions.  But I think with any calls we got, we

18  were always careful about what we were saying and

19  not saying for the very reason I'm sitting here

20  today.

21  BY MS. MONTENEGRO:

22       Q.    Okay.  But was there any type of

23  conflict review done to see whether or not you

24  could take on Citi as a prospective client for this

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

181

1    engagement?

2        MR. HERRON:   Same objections.   If you know of

3    any from legal counsel, of course don't reveal it.

4    If there was any.

5    BY THE WITNESS:

6        A.    I don't know.   I don't think we would

7    have ran formal conflicts procedures because I

8    think I was knowledgeable about what all the

9    potential contacts and conflicts were.

10           And whether any formally were run, I

11   don't know.   I did not ask them to be run in the

12   December time frame.   What was run before or

13   anybody else that might have asked them, I am not

14   aware of.

15   BY MS. MONTENEGRO:

16       Q.    But you specifically didn't ask for any

17   conflict checks?

18       A.    That's correct.

19       Q.    Is it correct that you didn't see that

20   there was some type of conflict?

21       MR. HERRON:   Misstates the testimony.

22   BY THE WITNESS:

23       A.    No.   I didn't say that.   I didn't ask

24   for a formal conflicts procedure check run per our

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

182

1    procedures from a firm standpoint.  I wasn't making

2    the determination on whether there was in fact

3    conflicts.

4    BY MS. MONTENEGRO:

5        Q.    Exhibit 16, if you could look at the

6    e-mail that you referred to earlier from Scott to

7    yourself.

8        A.    Beiser.

9        Q.    Scott Beiser to yourself.

10       A.    Yes.

11       Q.    You talked about the divorce work.  Do

12   you know what he meant by when he said "we may be

13   on the correct side" -- "correct answer side"?

14       MS. KATZ:   Objection; form, calls for

15   speculation.

16   BY THE WITNESS:

17       A.    I think the phrase is a little awkward,

18   "on the correct answer."  I'm not certain

19   specifically what he means by "on the correct

20   answer" because at the time I wasn't even certain

21   what the request was from Citigroup in terms of

22   what it is they were asking us to do because that

23   had still been undetermined.

24              So anything with respect to the phrase

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

183

1   that starts "thus this smells like divorce" would

2   be speculation on my part to interpret what I think

3   he meant if you read the whole rest of that

4   sentence.

5   BY MS. MONTENEGRO:

6        Q.    And he was a member of the committee,

7   correct?

8        A.    That's correct.

9        Q.    So he had equal access --

10       MR. ROSS:  Objection; vague.

11  BY MS. MONTENEGRO:

12       Q.    -- to information that you had as well,

13  correct?

14       MR. HERRON:  Calls for speculation.

15  BY THE WITNESS:

16       A.    He would have received all of the

17  e-mails that were e-mails to the formal committee

18  if in fact it's listed in the e-mail as solvency

19  committee.  I am not saying that he was tracking

20  all the e-mails that may have gone between members

21  of the committee.

22  BY MS. MONTENEGRO:

23       Q.    But he had access to the same --

24       A.    He would have had access to the pricing

CONFIDENTIAL

1    information sheets.

2        Q.    And been involved in the phone calls as

3    well?

4        A.    I can't say that he was on every single

5    phone call.  I'm certain I wasn't even on every

6    single phone call.

7        Q.    At that same time frame you sent Karen

8    an e-mail.  It was December 12th.  And one of the

9    questions you asked, "What happens if we all

10   conclude that the company is not solvent?"

11       A.    Yes.

12       Q.    And I know you said you weren't sure

13   whether you were going to be retained to give a

14   solvency opinion at that time but that was

15   something that the committee -- everyone is

16   thinking about, whether they would have to give a

17   solvency opinion.

18       MS. KATZ:  Objection to the form.

19            I'm sorry.  Was that a question?

20       MR. ROSS:  Was that a question?

21   BY MS. MONTENEGRO:

22       Q.    Was the issue of whether your company

23   would have to give a solvency opinion for

24   Citigroup, was that an issue you were contemplating

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

185

1   at that time?

2        A.    I think my line of questioning was what

3   if we did some analysis and we came to the

4   determination at that point in time -- what if we

5   thought that the company was insolvent or in the

6   zone of insolvency or was a close call, whatever

7   you want to say; what are the implications of that.

8   That was a critical question in my mind to try to

9   understand if we were to get involved what chain of

10  events that might cause.

11       Q.    Taking that, what is going on at that

12  time, and then if you look at what Scott is saying

13  here, the correct answer side, would you have a

14  sense of what he is referring to?

15       A.    No.

16       MS. KATZ:  Object to the form.

17       MR. ROSS:  Asked and answered.

18  BY THE WITNESS:

19       A.    She could have asked us to give a

20  solvency opinion and we might have said solvent.

21  She could have asked us to give in insolvency

22  opinion and we'd come up with an insolvency

23  opinion.  And both of those would be, quote,

24  correct answers potentially.

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

186

1          That was never -- in all the discussions

2     I had with Karen it was never clear what it is she

3     was specifically asking us for, which is what led

4     to some of the line of questioning that my partners

5     were asking me and, if nothing else, for them to

6     think about -- which I am sure they were thinking

7     about anyway.  I was not involved with any of their

8     internal discussions.

9     BY MS. MONTENEGRO:

10         Q.    And you never had a subsequent

11    conversation with Scott regarding what he meant by

12    this?

13         MR. HERRON:  Asked and answered.

14    BY THE WITNESS:

15         A.    No, I don't recall further

16    conversations.

17    BY MS. MONTENEGRO:

18         Q.    Exhibit 17.  This was shown to you

19    earlier.  You talked about the sale of the Cubs.

20              Why was that something that was on your

21    mind at that time?

22         MR. HERRON:  Asked and answered.

23    BY THE WITNESS:

24         A.    I answered it but I'll answer it again.

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

187

1    The Cubs were -- that was one of the clear things

2    was going to happen; they were going to sell the

3    Cubs.  And one of the things that I remember early

4    on them talking about, if they sell the Cubs, that

5    debt -- that cash from that sale would go to pay

6    down debt, which is something that they were going

7    to have to do and something I think they talked

8    about doing kind of immediately post-transaction to

9    bring the capital structure -- to bring the

10   leverage component of the capital structure down.

11          So that was -- that's in response to

12   what Tribune was telling everybody publicly at the

13   time.

14   BY MS. MONTENEGRO:

15       Q.    Was that ever a factor in your

16   consideration, the sale of the Cubs and what they

17   could sell it for, in your determining whether to

18   take on Tribune's engagement?

19       A.    Not back in the February, March -- not

20   in any time frame really because, again, we

21   wouldn't be speculating about a sale that hadn't

22   happened yet for a price that was unknown.

23       Q.    And you said you knew that it was valued

24   at about -- at that time they were talking about

Ben A. Buettell                                    December 2, 2009

CONFIDENTIAL

188

1    600 million?

2         MR. HERRON:  Misstates the testimony.

3    BY THE WITNESS:

4         A.    I think press reports talked about it at

5    600 million.  There were lots of different

6    viewpoints about value.  Houlihan, Paul Much and I,

7    had our own viewpoints.  Other people had other

8    viewpoints, but that's just one of the numbers I

9    recall.

10   BY MS. MONTENEGRO:

11        Q.    But you hadn't seen anything saying that

12   it was going to be sold for billions of dollars,

13   correct?

14        A.    No.

15        MS. MONTENEGRO:  I just have one document I

16   want to mark as an exhibit, 1178 through 1179.

17                    (WHEREUPON, a certain document was

18                    marked Buettell Deposition Exhibit

19                    No. 18, for identification, as of

20                    12-02-2009.)

21        MS. KATZ:  I just want to make a request,

22   especially if counsel plan to use documents at a

23   deposition when others have not even received

24   copies of the documents, that they at least bring

Ben A. Buettell                                December 2, 2009
CONFIDENTIAL

189

1    some copies so that the rest of us can at least see

2    the document while it's being used.

3    BY MS. MONTENEGRO:

4         Q.    Are you done reviewing?

5         A.    I am ready.

6         Q.    This e-mail refers to David Hilty.  Who

7    is that?

8         A.    He is one of our financial restructuring

9    folks in New York.

10        Q.    And he got a call from special counsel

11   being hired by Tribune, Zell, and the ESOP.  Do you

12   know what that was with respect to?

13        A.    No, not other than what was said here,

14   special litigation counsel.  I don't know what they

15   were referring to.

16        Q.    Do you know what was being asked of your

17   company at that time?

18        A.    I do not.  I do not.

19        Q.    Did you ever follow up with David Hilty

20   to find out what he was referring to?

21        A.    I don't recall having any particular

22   phone conversation with him.  I think the e-mail

23   chain speaks for itself.

24        Q.    Then you say, "We need to stay away from

CONFIDENTIAL

190

1    this side."  What did you mean by that?

2          A.    Candidly at this point I'm not certain

3    what side was what.  That's as honest as I could

4    be.  I don't recall what side I was referring to.

5    I really don't.

6                What I was basically saying is we just

7    don't need to be involved.  Didn't want to be

8    involved, period.  End of story.

9          Q.    If you can just look.  Are any of these

10   parties attorneys that are being referenced, the

11   "to" and "from"?

12         A.    No.  These are all -- those are all --

13   well, Jeff Werbalowsky is an attorney.  He has a

14   law degree, but he is our co-CEO.

15         Q.    But he is not acting in the capacity as

16   an attorney to your firm?

17         A.    No.

18         Q.    So all these communications are between

19   your colleagues?

20         A.    That's correct.

21         Q.    And you wouldn't know the nature of

22   these redactions, would you?

23         MR. HERRON:  I can tell what they are.  We

24   redacted them.

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

191

1    BY THE WITNESS:

2        A.    I don't know what -- because I never saw

3    the unredacted.

4        MR. HERRON:  It was a bunch of e-mails about a

5    friend of the firm and some personal information

6    but it had nothing to do about this deal.  And then

7    at some point somebody said, "Whatever happened on

8    the Tribune thing?"  So I gave you everything from

9    there.

10            The bottom stuff had nothing to do with

11   any party related to Tribune.

12       MS. MONTENEGRO:  So it wasn't withheld on the

13   basis of privilege?

14       MR. HERRON:  No.

15   BY MS. MONTENEGRO:

16       Q.    Earlier you had mentioned that at the

17   end of the review process for the solvency opinions

18   that there is a review committee that looks at the

19   opinion before it's issued.

20       A.    Correct.

21       Q.    Is that different than the solvency

22   committee and the pricing committee?

23       A.    Yeah.  As I said earlier, the pricing

24   committee is on the -- what you have been referring

CONFIDENTIAL

1    to as the intake side.  So whether we want to get

2    involved.

3              And then the smaller subset of people

4    are part of what's known as the solvency review

5    committee, or it might be called something else in

6    the e-mail system.  But it's a group of senior

7    Financial Advisory Services people who you have to

8    select three people to do a formal review of the

9    analyses and the opinion and the engagement being

10   presented by the deal team, people not involved

11   with the engagement.

12        Q.    So that's the same committee?  When you

13   are referring to the review committee looking at

14   the opinion, that's the committee that's actually

15   looking at the solvency?

16        A.    Yeah.  They would be looking at the

17   solvency analysis.  That's the review committee.

18        Q.    Do you know whether there are any other

19   documents that are generated in the intake process

20   of whether to take on a client other than the

21   capital adequacy sheet?

22        A.    There is no other formal -- there may be

23   other documents produced.  There may be other

24   analyses done in different situations.  But in some

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

193

1    way, shape, or form you have to have the pricing

2    committee sheet filled out and then you may

3    supplement it with other analyses.

4         Q.    Do you know whether there was any other

5    analyses done with respect to Tribune?

6         A.    Not to my knowledge.

7         Q.    Would anyone else know?

8         MR. HERRON:  Calls for speculation.

9    BY THE WITNESS:

10        A.    You would have to depose them, I guess.

11   I don't know.

12   BY MS. MONTENEGRO:

13        Q.    You said Andrew might have enlisted

14   other people in the industry side to do other work.

15   You mentioned that.  Andrew Stull.

16        A.    That information I think was presented

17   in these documents.

18        Q.    So you are not aware --

19        A.    Those e-mail communications are with our

20   industry experts.

21        Q.    But you are not aware of any other

22   documentation that might have been generated?

23        A.    Nope.

24        MS. MONTENEGRO:  I think that's all the

CONFIDENTIAL

194

1    questions I have.  Thank you.

2        MS. KATZ:  Just two minutes.

3                        EXAMINATION

4    BY MR. ROSS:

5        Q.    Mr. Buettell, good afternoon.  Thank you

6    for your patience.

7                My name is David Ross and I'm with the

8    firm Hennigan Bennett & Dorman.  I represent a

9    group of banks that are referred to as the Credit

10   Agreement Lenders.  And I have just a couple

11   questions for you.

12               Earlier in the deposition do you recall

13   describing at a high level sort of the general

14   steps involved in preparing a solvency opinion?

15       A.    Yes.

16       Q.    In preparing the capital adequacy sheet

17   that is marked as Exhibit 5 --

18       MR. HERRON:  Whatever.

19   BY MR. ROSS:

20       Q.    -- did Houlihan do all those tasks

21   associated with performing a valuation or a

22   solvency opinion?

23       A.    Absolutely not.

24       Q.    Is it a fair statement that a capital

CONFIDENTIAL

195

1   adequacy sheet is not a valuation?

2       MR. ASHLEY:  Objection to form.

3   BY THE WITNESS:

4       A.    That's a fair statement.

5   BY MR. ROSS:

6       Q.    Is it a fair statement to say that

7   Houlihan did not perform a valuation for Tribune?

8       A.    We did not perform a formal valuation in

9   the context of a solvency analysis; that's correct.

10      MR. ROSS:  Okay.  Thank you.  That's all I

11  have.

12                      EXAMINATION

13  BY MS. KATZ:

14      Q.    How do you do?  I'm Sharon Katz from

15  Davis Polk representing J.P. Morgan.

16          Very quickly, I want to just ask about

17  first Exhibit 9.  This is an e-mail from Mr. Stull

18  to you reporting on a discussion that he had with

19  Chandler Bigelow.

20          Did you ever speak to Mr. Bigelow

21  yourself regarding the substance of this e-mail?

22      A.    I don't believe I had -- I did not have

23  conversations with Chandler on the substance of

24  this e-mail.

Ben A. Buettell                                        December 2, 2009

CONFIDENTIAL

196

1      Q.    Do you have any direct knowledge as to

2    whether Duff & Phelps was prepared to provide a

3    solvency opinion on March 29, 2007?

4          MR. GOLDFARB:  Objection; calls for

5    speculation.

6    BY THE WITNESS:

7          A.    I did not have any direct knowledge that

8    they were providing any kind of solvency opinion in

9    connection with this deal.

10   BY MS. KATZ:

11         Q.    Do you have any knowledge as to what

12   work, if any, had been done by Duff & Phelps as of

13   March 29, 2000, the date of this e-mail?

14         MR. GOLDFARB:  Objection; calls for

15   speculation, lack of foundation.

16   BY THE WITNESS:

17         A.    My understanding is they were hired to

18   do an ESOP fairness opinion.  Whether they had done

19   one as of that date or any analytics related to

20   that, I have no direct knowledge.

21   BY MS. KATZ:

22         Q.    Do you have any direct knowledge what

23   information had been made available to them in

24   connection with any work that they were going to be

Ben A. Buettell                                December 2, 2009
CONFIDENTIAL

197

1    doing?

2         A.    I do not.

3         MR. GOLDFARB:  Objection to form.

4    BY THE WITNESS:

5         A.    I do not.

6    BY MS. KATZ:

7         Q.    With respect to Exhibit 10, this is

8    again from Mr. Stull to you and others.  Do you

9    have any -- regarding a discussion he had with

10   Mr. Zell.

11            Do you have any direct knowledge about

12   what anyone may have told Sam Zell regarding what

13   Houlihan Lokey had decided to do or not to do?

14        A.    I do not have direct knowledge of what

15   Brad Pickard told Sam Zell that's referenced in

16   this e-mail.

17        MS. KATZ:  Thank you.  I have no further

18   questions.

19        MR. GOLDFARB:  I think we are done.  Does

20   anyone else have any?

21        MR. ROSS:  Before we go off, can we put on the

22   record that the Zuckerman firm has agreed to

23   provide the Houlihan production associated with

24   this deposition, all the documents that were

CONFIDENTIAL

198

1    produced, including the marked exhibits, and will

2    be providing those promptly?

3        MR. HERRON:  To those parties that have signed

4    to be bound by the confidentiality agreement.

5        MR. ROSS:  Right.  Is that agreed?

6        MR. GOLDFARB:  Yes.

7        MR. HERRON:  Do you want to just have the

8    transcript sent to me and I will give it to him for

9    signature?

10        MR. GOLDFARB:  Yes.

11        MR. HERRON:  30 days after I receive it.

12            (Time Noted:  3:28 p.m.)

13            FURTHER DEPONENT SAITH NAUGHT.

14

15

16

17

18

19

20

21

22

23

24

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

                                                              199

1    STATE OF ILLINOIS )

2                      )  SS:

3    COUNTY OF DU PAGE )

4              I, SUSAN K. TODAY, C.S.R. No. 84-2212, a

5    Notary Public within and for the County of DuPage,

6    State of Illinois, and a Certified Shorthand

7    Reporter of said state, do hereby certify:

8              That previous to the commencement of the

9    examination of the witness, the witness was duly
     sworn to testify the whole truth concerning the
10   matters herein;
               That the foregoing deposition transcript
11   was reported stenographically by me, was thereafter
     reduced to typewriting under my personal direction
12   and constitutes a true record of the testimony
     given and the proceedings had;
13             That the said deposition was taken
     before me at the time and place specified;
14             That the reading and signing by the
     witness of the deposition transcript was agreed
15   upon as stated herein;
               That I am not a relative or employee or
16   attorney or counsel, nor a relative or employee of
     such attorney or counsel for any of the parties
17   hereto, nor interested directly or indirectly in
     the outcome of this action.
18             IN WITNESS WHEREOF, I do hereunto set my
     hand of office at Chicago, Illinois, this 4th day
19   of December, 2009.

20

21

22             SUSAN K. TODAY, C.S.R. No. 84-2212.

23             Notary Public, DuPage County, Illinois.

24             My commission expires April 18, 2012.

Ben A. Buettell                                                     December 2, 2009

CONFIDENTIAL

200

1                              CAPTION

2

3          The Deposition of BEN A. BUETTELL,

4     taken in the matter, on the date, and at the time and

5     place set out on the title page hereof.

6          It was requested that the deposition be taken

7     by the reporter and that same be reduced to

8     typewritten form.

9          It was agreed by and between counsel and the

10    parties that the Deponent will read and sign the

11    transcript of said deposition.

12

13

14

15

16

17

18

19

20

21

22

23

24

Ben A. Buettell                                    December 2, 2009
CONFIDENTIAL

201

```
 1                    CERTIFICATE
 2
 3    STATE OF                        :
 4    COUNTY/CITY OF                  :
 5              Before me, this day, personally appeared,
 6    BEN A. BUETTELL, who, being duly sworn, states that the
 7    foregoing transcript of his/her Deposition, taken in the
 8    matter, on the date, and at the time and place set out
 9    on the title page hereof, constitutes a true and accurate
10    transcript of said deposition.
11
12              _____
13                   BEN A. BUETTELL
14
15         SUBSCRIBED and SWORN to before me this
16    _____day of_____, 20___ in the
17    jurisdiction aforesaid.
18
19
20    _____   _____
21    My Commission Expires   Notary Public
22
23    *If no changes need to be made on the following two pages,
24    place a check here ____, and return only this signed page.
```

Ben A. Buettell                                        December 2, 2009

CONFIDENTIAL

                                                            202

1                    DEPOSITION ERRATA SHEET

2

3    RE:          Esquire Deposition Solutions

4    File No.   48833

5    Case Caption: In Re:

6    TRIBUNE COMPANY, et al.

7    Deponent:   BEN A. BUETTELL

8    Deposition Date:  December 2, 2009

9    To the Reporter:

10   I have read the entire transcript of my Deposition taken

11   in the captioned matter or the same has been read to me.

12   I request that the following changes be entered upon the

13   record for the reasons indicated.  I have signed my name to

14   the Errata Sheet and the appropriate Certificate and

15   authorize you to attach both to the original transcript.

16

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   Page No._____Line No._____Change to:_____

24   _____

CONFIDENTIAL

203

1   Deposition of BEN A. BUETTELL

2

3   Reason for change:_____

4   Page No._____Line No._____Change to:_____

5   _____

6   Reason for change:_____

7   Page No._____Line No._____Change to:_____

8   _____

9   Reason for change:_____

10  Page No._____Line No._____Change to:_____

11  _____

12  Reason for change:_____

13  Page No._____Line No._____Change to:_____

14  _____

15  Reason for change:_____

16  Page No._____Line No._____Change to:_____

17  _____

18  Reason for change:_____

19

20

21

22  SIGNATURE:_____DATE:_____

23              BEN A. BUETTELL

24

Ben A. Buettell                                           December 2, 2009

CONFIDENTIAL

204

1                          I N D E X

2    BEN A. BUETTELL                    EXAMINATION

3           By Mr. Goldfarb                  5

4           By Ms. Montenegro              152

5           By Mr. Ross                    194

6           By Ms. Katz                    195

7

8

9

10                       E X H I B I T S

11   BUETTELL DEPOSITION EXHIBIT        MARKED FOR ID

12          No. 1................................  5

13          No. 2................................  7

14          No. 3................................ 39

15          No. 4................................ 54

16          No. 5................................ 63

17          No. 6................................ 67

18          No. 7................................ 69

19          No. 8................................ 83

20          No. 9................................ 86

21          No. 10............................... 90

22          No. 11...............................107

23          No. 12...............................111

24          No. 13...............................113

Ben A. Buettell                                      December 2, 2009
CONFIDENTIAL

205

1              I N D E X   (Continued)

2                E X H I B I T S

3    BUETTELL DEPOSITION EXHIBIT          MARKED FOR ID

4          No. 14.............................122

5          No. 15.............................138

6          No. 16.............................144

7          No. 17.............................148

8          No. 18.............................188

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24