1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In Re:                          ) Chapter 11

    TRIBUNE COMPANY, et al.,   ) Case No.

                Debtors.     ) 08-13141 (KJC)


CONFIDENTIAL PURSUANT TO

CONFIDENTIALITY AGREEMENT


      The confidential deposition of
ELYSE S. BLUTH, called for examination, taken
pursuant to the Federal Rules of Civil Procedure of
the United States District Courts pertaining to the
taking of depositions, taken before SUSAN K. TODAY,
C.S.R. No. 84-2212, a Notary Public within and for
the County of DuPage, State of Illinois, and a
Certified Shorthand Reporter of said state, at
Suite 3500, 35 West Wacker Street, Chicago,
Illinois, on December 17, 2009, commencing at
9:33 a.m.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

2

1    PRESENT:

2            ZUCKERMAN SPAEDER, LLP,

3            (1800 M Street, NW, Suite 1000,

4            Washington, D.C.  20036-5802,

5            202-778-1800), by:

6            MR. ANDREW N. GOLDFARB,

7                 -and-

8            CHADBOURNE & PARKE, LLP,

9            (30 Rockefeller Plaza,

10           New York, New York  10112,

11           212-408-5100), by:

12           MR. MARC D. ASHLEY,

13           MS. ELIZABETH M. MILLER,

14                appeared on behalf of the Committee

15                of Unsecured Creditors;

16           KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP,

17           (1633 Broadway,

18           New York, New York  10019-6799,

19           212-506-1700), by:

20           MR. SHERON KORPUS,

21                appeared on behalf of New York

22                Law Debentures;

23

24

CONFIDENTIAL

3

```
 1    PRESENT:  (Continued)
 2          O'MELVENY & MYERS, LLP,
 3          7 Times Square,
 4          New York, New York  10010,
 5          212-326-4303), by:
 6          MR. ZACK GROSS,
 7              appeared on behalf of
 8              Bank of America;
 9          HENNIGAN BENNETT & DORMAN, LLP,
10          (865 South Figueroa Street, Suite 2900,
11          Los Angeles, California  90017,
12          213-694-1152), by:
13          MR. JAMES O. JOHNSTON,
14          MR. JAMES W. BERGMAN,
15              appeared on behalf of the
16              Credit Agreement Lenders;
17          KAYE SCHOLER, LLC,
18          (3 First National Plaza, Suite 4100,
19          70 West Madison Street,
20          Chicago, Illinois  60602-4231,
21          312-583-2433), by:
22          MR. ROBERT M. SPALDING,
23              appeared on behalf of Merrill Lynch;
24
```

CONFIDENTIAL

4

1    PRESENT:  (Continued)

2          DAVIS POLK & WARDWELL, LLP,

3          (450 Lexington Avenue,

4          New York, New York  10017,

5          212-450-4462), by:

6          MR. LYNN EARL BUSATH,

7               appeared on behalf of JPMorgan Chase;

8          SIDLEY AUSTIN, LLP,

9          (One South Dearborn,

10         Chicago, Illinois  60603,

11         312-853-7621), by:

12         MR. JAMES W. DUCAYET,

13              -and-

14         SIDLEY AUSTIN, LLP,

15         (1501 K Street, N.W.,

16         Washington, D.C., 20005,

17         202-736-8000), by:

18         MR. DAVID M. MILES,

19              appeared on behalf of Tribune Company;

20

21

22

23

24

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

5

1    PRESENT: (Continued)

2          WINSTON & STRAWN, LLP,

3          (35 West Wacker Drive,

4          Chicago, Illinois  60602,

5          312-558-7332), by:

6          MR. DANE A. DROBNY,

7               appeared on behalf of Duff & Phelps and

8               the Deponent.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    REPORTED BY:  SUSAN K. TODAY, C.S.R., R.P.R.

24               License No. 84-2212.

CONFIDENTIAL

6

1          MR. GOLDFARB:  We are on the record.

2              Please swear the witness.

3                  (WHEREUPON, the witness was duly

4              sworn.)

5                  ELYSE S. BLUTH,

6     called as a witness herein, having been first duly

7     sworn, was examined and testified as follows:

8                  EXAMINATION

9     BY MR. GOLDFARB:

10         Q.    Ms. Bluth, my name is Andrew Goldfarb.

11    I'm with the firm of Zuckerman Spaeder, and we

12    represent the special -- we are the special counsel

13    to the Committee of Unsecured Creditors in the

14    Tribune bankruptcy.

15             Would you please state your name for the

16    record?

17         A.    Elyse Bluth.

18         MR. GOLDFARB:  I don't know if counsel have

19    checked in with the reporter.  Why don't we just go

20    around.

21             And I will just state for the record

22    consistent with prior examinations under Rule 2004

23    that the parties are agreeing to abide by the

24    confidentiality agreement that either has been or

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

7

1    is about to be memorialized in what has been

2    referred to as the document depository order to be

3    entered by the Bankruptcy Court.

4           So why don't we just go around and state

5    your name and affiliation for the record, please.

6       MR. DROBNY:   This is Dane Drobny on behalf of

7    Duff & Phelps and the witness.

8           What is the confidentiality arrangement

9    that -- Duff & Phelps is a third party, and I

10   assume Ms. Bluth's testimony and this transcript

11   are going to be treated as confidential and not

12   used for purposes outside the litigation.  Is that

13   fair?

14      MR. GOLDFARB:   Yes.  Well, there is a

15   particular confidentiality agreement in place for

16   Duff & Phelps that permits for the designation of

17   documents and for the use of documents for purposes

18   in connection with the case.

19          The individual confidentiality

20   agreements have -- I don't know if you would say

21   superceded but have been supplemented by an

22   arrangement reached among the parties to share

23   documents and sort maintain the confidentiality of

24   all materials so that more parties than just the

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

8

1   producing party and the receiving party can have

2   access to those documents for purposes of the LBO

3   investigation or potential settlement discussions

4   and so forth.

5        MR. DROBNY:  Okay.  I guess my assumption is

6   that her transcript is going to be treated as

7   confidential and not used for purposes outside the

8   litigation and the purposes you described.  But we

9   can deal with those issues after the dep.

10       MR. GOLDFARB:  Yes.

11       MR. JOHNSTON:  My name is Jim Johnston from

12   the firm of Hennigan Bennett & Dorman.  We are

13   representing the group of Credit Agreement Lenders.

14       MR. BERGMAN:  Jim Bergman, Hennigan Bennett &

15   Dorman.

16       MR. BUSATH:  Lynn Busath, Davis Polk &

17   Wardwell, representing JPMorgan and Chase Bank.

18       MR. GROSS:  Zack Gross of O'Melveny & Myers

19   representing Bank of America.

20       MR. DUCAYET:  Jim Ducayet from Sidley & Austin

21   representing the debtors.

22       MR. MILES:  David Miles, Sidley & Austin.

23       MR. SPALDING:  Robert Spalding from Kaye

24   Scholer on behalf of Merrill Lynch.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

9

1          MR. KORPUS:   Sheron Korpus of Kasowitz, Benson

2     for Law Debenture.

3          MS. MILLER:   Elizabeth Miller of Chadbourne &

4     Parke.

5          MR. ASHLEY:   Marc Ashley of Chadbourne & Park

6     for the Creditors Committee.

7     BY MR. GOLDFARB:

8          Q.    Again, good morning.  And have you been

9     deposed previously, Ms. Bluth?

10         A.    Not in this matter.

11         Q.    In your career in any capacity you have

12    been deposed?

13         A.    Yes.

14         Q.    I am just going to outline some basic

15    rules for the deposition so that it goes smoothly

16    and Ms. Today can accurately capture the exchanges

17    that occur today.

18         MR. JOHNSTON:   Mr. Goldberg, I am sorry to

19    interrupt.  Can we put on the record the

20    stipulations we had agreed to with respect to

21    objections as well?

22         MR. GOLDFARB:   Yes, I will do that as well.

23         MR. JOHNSTON:   Thank you.

24

CONFIDENTIAL

10

1    BY MR. GOLDFARB:

2         Q.    I will ask questions, you will answer

3    them.  If you don't understand a question that I

4    put to you, please let me know and I will rephrase

5    and try to put it in a way that you do understand

6    and can answer.

7              Is that acceptable to you?

8         A.    Yes.

9         Q.    The court reporter can only take down

10   verbal responses, so I ask that you respond with

11   yeses, nos, and whatever other verbal responses you

12   have, not shrugs, uh-huhs or uhm-uhms, so that your

13   testimony is accurately transcribed.

14             Is that acceptable?

15        A.    Sure.

16        Q.    We will accommodate any requests for a

17   break that you have, if you want to confer with

18   your counsel.  My only request is if there is a

19   question pending, that you complete your answer and

20   then request to speak to your counsel and we will

21   certainly accommodate that.

22             And if you need breaks for any personal

23   reasons, please let us know and we'll accommodate

24   you as well.  Is that okay?

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                            11

1        A.    Yep.

2        MR. GOLDFARB:  Okay.  Mr. Johnston asked --

3    and I will do so -- that the convention and the

4    process we'll follow today is that all objections

5    except as to form are preserved.  And an objection

6    by one counsel constitutes an objection for all so

7    that not all counsel need to raise the same

8    objection.

9             Any others?

10       MR. JOHNSTON:  No.  That was it.  Thank you.

11       MR. DROBNY:  Just for the record, I am going

12   to object when I feel appropriate.  I understand

13   you guys have your stipulations.  I don't want to

14   interfere with that.

15            But in any event go ahead.

16       MR. GOLDFARB:  Understood.

17   BY MR. GOLDFARB:

18       Q.    And per counsel's statement, he may make

19   objections to questions posed, and unless he

20   directs you not to answer, those are preserving

21   objections for the record; you should still answer

22   the question.

23            Okay?

24       A.    Okay.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                        12

1        Q.     You mentioned that you had been deposed

2    before.  Can you describe briefly the nature of the

3    matter or matters in which you have been deposed

4    previously?

5        A.     There have been several.  I have been

6    deposed in connection with Department of Labor

7    matters.  I have been deposed in connection with

8    several other disputes.  I can't go into detail

9    because I don't recollect them.

10       Q.     How many times in the past would you

11   estimate that you have been deposed?

12       A.     Approximately half a dozen.

13       Q.     Have any of those occurred during your

14   time at Duff & Phelps?

15       A.     All of them occurred during my time at

16   Duff & Phelps.

17       Q.     How long have you been at Duff & Phelps?

18       A.     25 years.

19       Q.     And in any of those cases were you

20   deposed as an expert?  Have you served as an expert

21   in litigation?

22       A.     I have.

23       Q.     And in any of those cases were the

24   depositions pursuant to your role as an expert?

CONFIDENTIAL

13

1        A.    I am not sure I understand the question.

2        Q.    In some cases you may be deposed as a

3   fact witness as you are today.  In other instances

4   you may be deposed because you have been designated

5   as an expert by a party that has retained you.

6              And my question is whether or not any of

7   the depositions you have given have been in your

8   capacity as a retained expert.

9        A.    Yes.

10       Q.    How many of those half dozen

11  depositions?

12       A.    One or two.

13       Q.    And when you have been retained as an

14  expert, can you describe generally the subject

15  matter of the expertise for which you were

16  retained?

17       A.    I don't recollect the details.

18  Generally ESOP matters.

19       Q.    And in those two instances who were the

20  parties who had retained you to serve as an expert?

21       A.    I don't remember.

22       Q.    When is the last time you were deposed?

23       A.    Within the last two years I think.

24       Q.    And what was the nature of the subject

Elyse S. Bluth                                December 17, 2009
CONFIDENTIAL

14

1    matter of that --

2         A.    A Department of Labor investigation.

3         Q.    Can you describe further?  Is that an

4    investigation with respect to a client of yours or

5    were you hired by the Department of Labor as a

6    consultant?

7         A.    It was an investigation into a

8    transaction I was involved in.

9         Q.    Are you able to disclose which

10   transaction that was?

11        MR. DROBNY:  I will tell you what.  I don't

12   know why -- I am going to object and caution the

13   witness not to disclose any matters that are

14   protected by confidentiality agreements that Duff

15   may have with its clients.  I don't know that this

16   investigation by the DOL was confidential.

17              So I will caution you to abide by those

18   confidentiality obligations as you understand them.

19   BY THE WITNESS:

20        A.    I don't know what -- I don't recall what

21   the confidentiality provisions were.  That said,

22   the matter was dismissed.

23   BY MR. GOLDFARB:

24        Q.    Do you know whether the investigation

Elyse S. Bluth                                December 17, 2009
CONFIDENTIAL

                                                              15

1    was governed by confidentiality?

2         A.     I don't recollect.

3         Q.     All right.  Stepping back from that, you

4    said you have been at Duff for about 25 years?

5         A.     Yes.

6         Q.     Can you just give a brief background --

7    why don't we do it this way, make it a little more

8    efficient.

9              Let's mark this, please, as Bluth No. 1.

10                  (WHEREUPON, a certain document was

11                  marked Bluth Deposition Exhibit

12                  No. 1, for identification, as of

13                  12-17-2009.)

14   BY MR. GOLDFARB:

15        Q.     And, Ms. Bluth, I ask you to look over

16   this and tell me if you can what this is.

17        A.      These are materials that describe

18   Duff & Phelps' experience and some of my

19   experience.

20        Q.     The cover page -- this is a document for

21   the record bearing Bates number MS 30250.  And is

22   this a printout from the Duff website?

23        A.     Since I haven't looked at the Duff &

24   Phelps website in a while, I think it looks

CONFIDENTIAL

16

1   approximately like something that used to be on

2   there.

3        Q.    And looking at it, I assume you don't

4   see anything that's particularly highly

5   confidential in the document; is that correct?

6        A.    Correct.

7        Q.    And looking at this, does this

8   accurately describe your professional credentials?

9        A.    Generally.  It's a little out of date.

10       Q.    Okay.  Is there anything in particular

11   that is missing from here that is material that you

12   would add to fill this in so that it is current?

13       A.    I am on the board of directors of the

14   ESOP Association.

15       Q.    What is the ESOP Association?

16       A.    It's a trade association for ESOP

17   companies.

18       Q.    Have you focused on ESOPs -- for the

19   record, what does ESOP stand for?

20       A.    Employee stock ownership plan.

21       Q.    And just describe briefly what an ESOP

22   is, please.

23       A.    An ESOP is an ERISA plan that's

24   permitted to hold employers' securities.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

17

1          Q.      And most broadly, how are ESOPs used?

2          A.      To pay pension benefits to company

3     employees and ESOP participants.

4          Q.      During your entire time at Duff & Phelps

5     have you focused on ESOPs?

6          A.      No.  I did a variety of corporate

7     finance and other valuation activities.

8          Q.      If you could, just briefly sort of walk

9     through the arc of your -- the activity that you

10    have and responsibilities that you have had at

11    Duff.

12         A.      I joined Duff & Phelps as an associate

13    out of business school.  I did valuations for all

14    sorts of purposes, including tax and other

15    corporate finance.  I have done a variety of

16    transaction opinions, worked for boards of

17    directors, started focusing on ESOPs in the late

18    '80s, early '90s, and spent a lot of time doing

19    work related to employer stock in pension plans,

20    whether they were ESOPs or other pension plans, and

21    concentrated more on that in the last 15 years.

22         Q.      And is your work now exclusively ESOP

23    related?

24         A.      No.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

18

1        Q.      What else besides ESOPs do you continue

2    to do?

3        A.      I do work for other ERISA plans that own

4    hard-to-value assets and employer securities.     I

5    also do work for -- valuation and opinion work for

6    other non-ERISA matters.

7        Q.      Have you ever done work on solvency

8    opinions?

9        A.      In 1988 I was the associate on one

10   solvency opinion.

11       Q.      And that's the extent of your formal

12   solvency experience --

13       A.      Yes.

14       Q.      -- ESOPs?

15              Turning back to Bluth Exhibit 1, the

16   second page lists a number of different entities

17   and describes -- appears to describe the work that

18   Duff & Phelps did for those entities.

19              Is that a fair characterization of that

20   second page?

21       A.      Yes.

22       Q.      Is this all work that you personally

23   have been involved in for the clients listed on

24   this page?

CONFIDENTIAL

                                                            19

1            A.    No.

2            Q.    This describes more generally Duff's --

3      as a firm Duff's experience; is that right?

4            A.    Yes.

5            Q.    And the following four pages list public

6      company ESOP clients.  Do you see that?

7            A.    Yes.

8            Q.    And does this describe the public

9      company ESOP plans with which you personally have

10     worked?

11           A.    No.

12           Q.    What does it describe?

13           A.    It's a list of clients that Duff &

14     Phelps did work for that were public companies, did

15     ESOP work for.

16           Q.    Just looking at the second page again,

17     can you please identify any of the engagements --

18     or which of these engagements for Duff you

19     personally were involved in?

20           A.    Cargill, Glatfelter Insurance,

21     Lifehouse.  That's it.

22           Q.    Okay.

23           A.    I would like to clarify that.

24           Q.    Please.

CONFIDENTIAL

20

1          A.     I may have reviewed other people's work

2     on the others but I did not -- I was not intimately

3     involved.

4          Q.     And --

5          A.     Excuse me.  Susquehanna Pflatzgraff

6     also.

7          Q.     Which one did you say?

8          A.     It's difficult to read, which is why I

9     missed it.  Susquehanna Pflatzgraff at the bottom.

10         Q.     I see it.  Thank you.

11                And if you could just -- I don't want to

12    identify every, but if you just could run through

13    the public company ESOP clients and identify what

14    you would consider to be the major engagements that

15    you personally worked on.

16         A.     Because this list goes back probably 20

17    years I am not sure I am going to remember them

18    all.

19         Q.     Okay.  I'll take your answers as you

20    give it just for -- as I say, just the major -- the

21    major ones that you personally have been involved

22    in.

23         A.     I will identify ones that I recollect

24    being involved with.  Whether major or not, I can't

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                              21

1    let you know.

2         Q.    Okay.

3         A.    A.P. Green, Allied Group, Cabot,

4    Conrail, Commercial Intertech, CPC, Dayton Hudson,

5    Delta Air Lines -- not the original transaction but

6    some later work -- Dow Chemical, Duquesne Light,

7    EDO, Federal-Mogul, some later work for General Re,

8    Griffin, Guidant, HON, Inland Steel, Johnson

9    Controls, Marion Merrell Dow, Michigan National,

10   Monsanto, Nalco Chemical, Pentair, Sara Lee, Tandy,

11   Dow Chemical again, Procter & Gamble, Ryland, done

12   some later work for St. Paul and Travelers,

13   Tribune, some later work for Volvo North America,

14   WorldCorp.

15            I may have been involved in some of the

16   others.  I just don't recollect.

17        Q.    Thank you.  And you mentioned that you

18   have been involved in -- some of the work you have

19   been involved in has involved valuations, correct?

20        A.    Yes.

21        Q.    What is a valuation?

22        MR. DROBNY:  I am going to object to the

23   extent that she is not an opinion witness; she is a

24   fact witness.  For foundation purposes I will allow

CONFIDENTIAL

22

1   some of these questions but I hope you are not

2   going to get into too many questions that call for

3   expert testimony.

4           So with that said, you can answer.

5   BY THE WITNESS:

6       A.    A valuation is an opinion of what you

7   think a stock or a company is worth, or a security.

8   BY MR. GOLDFARB:

9       Q.    And in general why have you or as a part

10  of Duff been asked to give valuations for clients?

11      A.    Could you be more specific?

12      Q.    I am asking sort of a general question,

13  which is a general sense of the circumstances in

14  which you have been asked to give valuations.

15      MR. DROBNY:  Object to foundation.

16  BY THE WITNESS:

17      A.    You need to be more specific.  I

18  apologize.

19  BY MR. GOLDFARB:

20      Q.    Okay.  You say that a valuation is an

21  opinion of what you think stock or a company is

22  worth at a particular point in time.  Is that fair?

23      A.    Yes.

24      Q.    Okay.  And I am asking generally the

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

23

1    circumstances in which you are asked to provide

2    valuation opinions or analyses.

3         MR. DROBNY:   Object; foundation.

4    BY THE WITNESS:

5         A.    Are you asking about Duff & Phelps?

6    BY MR. GOLDFARB:

7         Q.    I am asking about you personally.

8         A.    Okay.  I have been asked to provide

9    valuations when there has been a need for a

10   valuation.  Are you asking the circumstances --

11        Q.    Yes.

12        A.    -- that there is a need for a valuation?

13        Q.    Yes.

14        A.    In companies that have ESOPs employees

15   need to have -- need to know what the shares that

16   have been allocated to their accounts are worth.

17   So the law provides for a valuation at least once a

18   year so that an employee can see what their account

19   is worth and that terminated employees can be

20   cashed out.

21             In other circumstances there may be a

22   need in a transaction setting to receive an opinion

23   as to whether the price that's being paid for a

24   security or an asset is fair and reasonable.

Elyse S. Bluth                                December 17, 2009
CONFIDENTIAL

                                                          24

1              There are other reporting requirements

2      relating to ERISA plans, and there are other

3      transaction requirements related to all sorts of

4      circumstances, shareholders selling, plans selling,

5      plans going public, plans restructuring.  It's

6      numerous circumstances.

7          Q.    I want to focus on the work that Duff

8      did for the Chicago Tribune or the Tribune Company.

9      When did Duff first get involved with the Tribune

10     Company?

11         MR. JOHNSTON:  Objection to form.

12         MR. DROBNY:  And foundation.

13     BY THE WITNESS:

14         A.    The first time I did work for the

15     Tribune Company was when the first ESOP was put in.

16     I believe it was in 1989.

17     BY MR. GOLDFARB:

18         Q.    And what was the nature of your work at

19     that time?

20         A.    Duff & Phelps represented the fiduciary

21     to the trustee -- the fiduciary, I think it was

22     trustee of the Tribune Company's ESOP when it

23     purchased shares in Tribune.

24         Q.    And what was the name of the trustee?

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

25

1          A.     I don't remember.

2          Q.     And to your knowledge, had Duff done

3    work for the Tribune prior to 1989 when you first

4    got involved?

5          A.     I don't remember.

6          Q.     Describe the nature of your involvement

7    with Tribune from 1989 to the 2000 -- to, say,

8    January 1, 2007 in general.

9          MR. DROBNY:  Object to form.

10   BY THE WITNESS:

11         A.     I don't remember if there were any other

12   engagements in between those two periods.

13   BY MR. GOLDFARB:

14         Q.     So your involvement was that single time

15   in 1989; it was not ongoing between '89 and 2007?

16         A.     To my recollection, there were no other

17   assignments in the interim.

18         Q.     Do you remember what you did in 1989?

19         A.     We issued an adequate consideration

20   opinion to the trustee of the Tribune ESOP when it

21   purchased stock in Tribune.

22         Q.     And then to your recollection was there

23   any work that Duff & Phelps did for the Tribune

24   Company between that 1989 project and January 1st,

CONFIDENTIAL

26

1    2007?

2        A.    To my recollection -- I don't recollect

3    any.

4        Q.    And I am not talking about you just

5    personally.  I am talking about Duff in general for

6    this question.

7        A.    Duff & Phelps currently has about 1200

8    employees.  I don't know if someone else did work.

9        Q.    Then in 2007 did there come a time when

10   Duff again had communications with the Tribune

11   Company about doing some work for the Tribune?

12       A.    Yes.

13       Q.    How did that come about?

14       A.    I don't know.

15       Q.    Do you know who the point of contact was

16   at Duff when that contact began in 2007?

17       A.    I think I just answered that.  I don't

18   know how it first came about so I don't know who

19   the individual was who was contacted.

20       Q.    What was the first involvement with this

21   communication in 2007 that you were personally

22   involved in?

23       A.    I received a call from our CEO.

24       Q.    Who was the CEO?

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

27

1          A.      Noah Gottdiener.

2          Q.      And what did he tell you on that call?

3          A.      He told me that he had received a call

4    from Equity Group and they had an ESOP transaction

5    they wanted to talk about.

6          Q.      Is Equity Group an entity affiliated

7    with Sam Zell?

8          A.      To my knowledge, yes.

9          Q.      Did you have that understanding at the

10   time when you received the call from your CEO?

11         A.      Yes.

12         Q.      Had Duff worked for Equity Group prior

13   to the time of this call?

14         A.      Not to my knowledge.

15         Q.      What happened after you received --

16   well, what did you do after you received the call

17   from the CEO about possible ESOP work with the

18   Equity Group?

19         A.      I don't remember if I called or if they

20   called me, but I had a conversation with someone at

21   Equity Group.

22         Q.      Do you know who that was?

23         A.      I think it was Nils Larson.

24         Q.      And at this time do you know whether

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

28

1    there was anyone else at Duff who was in

2    communication with anyone else at the Equity Group?

3         A.    Not to my knowledge.

4         Q.    And do you recall when approximately in

5    2007 you had the call with Mr. Larson?

6         A.    Early February.

7         Q.    What was the substance of that

8    conversation?

9         A.    Equity Group was looking at an ESOP, and

10   since they didn't have ESOP expertise they wanted

11   to talk about it.

12        Q.    Do you know why Duff and you in

13   particular were contacted for that possible

14   engagement?

15        A.    My understanding is that Noah Gottdiener

16   knows Sam Zell and Duff & Phelps is well known in

17   the ESOP community to have ESOP expertise and I am

18   head of the ESOP and ERISA group so the connection

19   was made.

20        Q.    I probably should have asked you this at

21   the outset, but what is your current position at

22   Duff?

23        A.    I am the managing director and I am the

24   service line leader for the ESOP and ERISA

Elyse S. Bluth                                      December 17, 2009
CONFIDENTIAL

29

1    practice.

2          Q.    What does that mean, the service line

3    leader?

4          A.    I am in charge of all the ESOP and ERISA

5    assignments that come through Duff & Phelps.

6          Q.    How many people work under you?

7          A.    Three.

8          Q.    Three directly?

9          A.    Yes.

10         Q.    Who are those people?

11         A.    John Miscione, John O'Brien, Ginny

12   Saolnier.

13         Q.    And did you hold the same position in

14   February 2007 when you had the conversation with

15   Mr. Larson?

16         A.    Yes.

17         Q.    Did Mr. Larson provide any further

18   information about what Equity Group might look to

19   Duff & Phelps to do for it in connection with the

20   contemplated ESOP transaction?

21         A.    I don't remember the substance of the

22   call.

23         Q.    What happened after the call, or what

24   did you do after the call?

CONFIDENTIAL

30

1       A.      Since I was home with the flu, I went to

2   bed.

3       Q.      And after you convalesced?

4       A.      Do you mean that day?  The next day?

5       Q.      What did you do next in follow-up to

6   your call with Mr. Larson?

7       A.      Nothing.

8       Q.      Why?

9       A.      There was nothing to do.

10      Q.      How did you leave things with Mr. Larson

11  at the conclusion of the call that you had until

12  early February?

13      A.      That perhaps we would talk again.

14      Q.      And did you?

15      A.      Yes.

16      Q.      When did you talk again?

17      A.      My recollection is it was a few days

18  later on a Sunday.

19      Q.      And did you call Mr. Larson or did

20  Mr. Larson call you?

21      A.      I don't remember.  I may have returned a

22  message and so called him or he called me on the

23  cell.

24      Q.      What was that call about?

Elyse S. Bluth                                        December 17, 2009
CONFIDENTIAL

31

1          A.    In that call he revealed to me who the

2    company was.

3          Q.    And who was the company that he revealed

4    to you?

5          A.    Tribune Company.

6          Q.    What else did you discuss on that call?

7          A.    I don't remember.

8          Q.    On that call was there any discussion of

9    further work by Duff in connection with the

10   contemplated ESOP transaction?

11         A.    I don't remember having any discussion

12   about that, no.

13         Q.    On either of these first two calls did

14   he describe to you what the nature of the potential

15   transaction was?

16         A.    I don't remember.

17         Q.    Would you also place the second call

18   with Mr. Larson in early February?

19         A.    Yes.

20         Q.    And what happened after that call with

21   Mr. Larson?

22         A.    Well, it was Sunday afternoon.  Could

23   you be more specific?

24         Q.    Yes.  In connection with your possible

Elyse S. Bluth                                      December 17, 2009
CONFIDENTIAL

32

1    involvement with either Equity Group or the Tribune

2    Company in connection with a potential ESOP

3    transaction what happened after that Sunday call

4    with Mr. Larson?

5         A.    Not much.

6         Q.    Okay.  Did there come a time when Duff

7    was formally engaged by some party to do ESOP work

8    in connection with the contemplated transaction?

9         A.    Yes.

10         Q.    When did that occur?

11         A.    I don't remember the exact date, but it

12    was probably a few weeks after -- couple weeks

13    after these calls.

14         MR. GOLDFARB:  Let's mark this, please, as

15    Bluth No. 2.

16                   (WHEREUPON, a certain document was

17                   marked Bluth Deposition Exhibit

18                   No. 2, for identification, as of

19                   12-17-2009.)

20    BY MR. GOLDFARB:

21         Q.    Ms. Bluth, I'd ask that you take a look

22    at this and I'll ask you some questions about it.

23              And while you are doing so, I will note

24    for the record this is a multi-page document with

CONFIDENTIAL

33

1    the first Bates number D&P TR108564.

2              Have you had a chance to review it

3    briefly?

4         A.    Briefly reviewed, yes.

5         Q.    Is this a document you recognize?

6         A.    Yes.

7         Q.    What is this document?

8         A.    This is an engagement letter for a

9    solvency opinion.

10        Q.    And it was sent from Duff & Phelps to

11   the board of directors of the Tribune Company; is

12   that right?

13        A.    That's what it says.

14        Q.    And it's dated February 13th; is that

15   right?

16        A.    Yes.

17        Q.    2007.

18              Were you aware at the time that this

19   engagement was entered into between Duff and the

20   Tribune Company?

21        A.    Was I aware on February 13th, 2007?

22        Q.    Yes.

23        A.    I don't know.

24        Q.    If you turn to the document bearing

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

34

1    Bates number ending in 108568, who signed that

2    letter for Duff & Phelps?

3         A.    Bob Bartell.

4         Q.    And it indicates that Mr. Bartell is a

5    managing director at Duff & Phelps, right?

6         A.    Yes.

7         Q.    Do you know Mr. Bartell?

8         A.    I do.

9         Q.    Do you work with Mr. Bartell?

10        A.    Yes.

11        Q.    When to your recollection did you first

12   learn that Mr. Bartell had entered an engagement

13   with the Tribune Company to provide a solvency

14   opinion in connection with the transaction

15   described in this engagement letter?

16        MR. DROBNY:   Object; foundation.

17   BY THE WITNESS:

18        A.    Could you clarify the question, please?

19   BY MR. GOLDFARB:

20        Q.    Yes.  You indicated that -- please

21   clarify if I misstate what you said.  I believe

22   that you testified is that as of February 13th you

23   were not sure whether or not you were aware that

24   Duff had entered this engagement with the Tribune

CONFIDENTIAL

35

1    Company.

2              And now I am asking, when is the first

3    time that you recall being aware that Mr. Bartell

4    had entered this engagement to provide a solvency

5    opinion?

6         MR. JOHNSTON:  Object to the form of the

7    question.

8         MR. DROBNY:  Object; form and foundation.

9    BY THE WITNESS:

10        A.    After I learned that the company Equity

11   Group was looking at was Tribune Company, we ran

12   conflict -- didn't need to run conflict checks.  I

13   talked about it in the office and learned that we

14   were working on a solvency opinion.

15             This may have been before this letter

16   was signed.

17   BY MR. GOLDFARB:

18        Q.    What in your mind is the connection

19   between the conflicts process that was run at

20   Duff & Phelps and your awareness of this

21   engagement?

22        MR. DROBNY:  Object; asked and answered.

23             Go ahead.

24   BY THE WITNESS:

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                          36

1        A.    Once I was aware that we were already

2   doing work related to Tribune Company potential

3   transactions, I was concerned about doing any other

4   work related to Tribune Company transactions.

5   BY MR. GOLDFARB:

6        Q.    And by "other work," are you referring

7   to work for the Equity Group?

8        A.    I was never contacted to do work for

9   Equity Group directly.

10       Q.    Then what concern are you referring to

11  when you say you were concerned about doing other

12  work in connection with the Tribune?

13       A.    I was concerned about potentially doing

14  any ESOP-related work related to Tribune.

15       Q.    Okay.  Did you at some point then have

16  further contact with Mr. Larson regarding this

17  concern that you had?

18       A.    No.

19       Q.    And what, if any, further contact beyond

20  those two conversations do you recall having with

21  Mr. Larson about doing potential ESOP work for the

22  Equity Group in connection with this contemplated

23  transaction?

24       A.    I was never asked to do work for Equity

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

37

1    Group in connection with this transaction.

2         Q.    Okay.   After those two conversations did

3    you have any further contact with Mr. Larson?

4         A.    Yes.

5         Q.    In what capacity, in what context?

6         A.    When we were engaged to do ESOP-related

7    work or ESOP work related to Tribune, I had several

8    conversations with Mr. Larson.

9         Q.    But at that point you were engaged not

10   by Equity Group but by another party involved in

11   the transaction; is that right?

12        A.    Yes.

13        Q.    If you look at Bluth Exhibit 2, please,

14   and -- first, reviewing this engagement letter and

15   the transaction described therein, do you recognize

16   the form of the transaction that's described?

17        MR. JOHNSTON:   Objection to the form of the

18   question.

19   BY THE WITNESS:

20        A.    Would you please be more specific?

21   BY MR. GOLDFARB:

22        Q.    Yes.   The first paragraph refers to

23   opinions that Duff & Phelps might render as to the

24   solvency and capitalization in connection with

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

38

1    first a special distribution and then a spinoff of

2    the company's broadcasting unit.

3               Do you see that?

4        A.    Would you please point me to where it

5    talks about the special broadcasting unit?

6        MR. DROBNY:  First paragraph.

7    BY THE WITNESS:

8        A.    I found it.  Sorry.  I was looking at

9    the second paragraph.

10               Yes.

11   BY MR. GOLDFARB:

12       Q.    And I think my first question was do you

13   recognize the form of that transaction as one that

14   was at this point in time contemplated by the

15   Tribune.

16       MR. DROBNY:  Object to foundation.

17   BY THE WITNESS:

18       A.    At some point in time I became aware

19   that the Tribune was thinking about several

20   different transactions.  I don't remember specifics

21   of any of them.

22   BY MR. GOLDFARB:

23       Q.    Did you ever hear the phrase "self-help

24   plan" used in connection with any of the potential

CONFIDENTIAL

39

1    transactions contemplated by the Tribune in the

2    spring of 2007?

3         A.    I don't remember.

4         Q.    Looking at the third page of this

5    document, Bates number 108566, if you could, in the

6    middle of the page there is a definition given of

7    fair valuation.  Do you see that?

8         A.    Yes.

9         Q.    If you could just read that to yourself

10   and I'll have a question about it.

11            You have read it?

12        A.    Uh-huh.  Yes.

13        Q.    In your experience does this definition

14   as presented in this February 13th letter represent

15   a commonly used definition of fair valuation?

16      MR. JOHNSTON:  Objection to form.  Objection;

17   foundation.

18      MR. DROBNY:  Same objections; form and

19   foundation.

20   BY THE WITNESS:

21        A.    I don't typically use the terms "fair

22   valuation."

23   BY MR. GOLDFARB:

24        Q.    Is the term "fair valuation" in your

CONFIDENTIAL

40

1   experience a commonly used term either in the

2   valuation world or in the solvency world?

3        MR. JOHNSTON:  Objection to form.  Foundation

4   also.

5        MR. DROBNY:  Object to foundation.

6   BY THE WITNESS:

7        A.    I am not involved in the solvency world,

8   so I don't know what's acceptable or a standard in

9   the solvency world.

10            In most of the valuation activities that

11  I am involved in the term "fair valuation" is not

12  used.

13  BY MR. GOLDFARB:

14       Q.    Are you familiar with the term "fair

15  market value"?

16       A.    Yes.

17       Q.    Is that a term that you use?

18       A.    Yes.

19       Q.    Does the definition here termed "fair

20  valuation" in this February 13th letter reflect a

21  common definition of fair market value?

22       MR. JOHNSTON:  Objection to form.

23       MR. DROBNY:  Objection to foundation.  She is

24  not an expert witness.  I don't know why you are

Elyse S. Bluth                              December 17, 2009
CONFIDENTIAL

                                                                41

1    not asking her about what she did on the

2    transaction and in the transaction as opposed to

3    definitions of fair market value in the valuation

4    world.

5            But it's your deposition.  But again,

6    she is here as a percipient witness.

7    BY MR. GOLDFARB:

8        Q.    You can answer.

9        A.    Some parts of it are the same that I

10   would use and others are not.

11       Q.    Did you discuss the solvency engagement

12   as reflected in this February 13th letter with

13   Mr. Bartell at any point in time?

14       A.    I don't remember.

15       Q.    Do you know whether or not Duff & Phelps

16   issued the solvency opinion as contemplated in this

17   February 13th engagement letter?

18       A.    Duff & Phelps did not.

19       Q.    How do you know that?

20       A.    I am aware of it because I was involved

21   in the ultimate ESOP transaction.

22       MR. GOLDFARB:  Please mark this as No. 3.

23

24

Elyse S. Bluth                                                    December 17, 2009

CONFIDENTIAL

                                                                            42

1                          (WHEREUPON, a certain document was

2                          marked Bluth Deposition Exhibit

3                          No. 3, for identification, as of

4                          12-17-2009.)

5     BY MR. GOLDFARB:

6          Q.    Ms. Bluth, I will ask you to take a look

7     at this.  And while you are doing so I will note

8     for the record this is a multi-page document

9     beginning with Bates D&P TR041550.

10               Have you had a chance to look at it?

11         A.    Yes.

12         Q.    Can you identify this document, please?

13         A.    This is an engagement letter between

14    Duff & Phelps and Tribune related to exploring a

15    possible ESOP transaction.

16         Q.    And it's dated February 26, 2007; is

17    that right?

18         A.    Yes.

19         Q.    And if you look at Page 6 of the

20    document, Bates ending in 41555, the letter was

21    signed by you; is that right?

22         A.    Yes.

23         Q.    How did this engagement come about?

24         A.    I was asked by Tribune to put together

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

43

1    an engagement letter regarding helping them

2    understand whether or not a transaction that was

3    proposed was feasible.

4         Q.    And who contacted you from the Tribune?

5         A.    Could you be more specific in that

6    question?

7         Q.    You said you were asked by the Tribune

8    to put together an engagement letter, and I am

9    asking who asked you to do that.

10        A.    Don Grenesko.

11        Q.    Who is Mr. Gren --

12        A.    Excuse me.  It may have been Crane

13   Kenney.  I don't recall.

14        Q.    Who is Mr. Grenesko?

15        A.    At the time he was chief financial

16   officer of Tribune.

17        Q.    And who is Mr. Kenney?

18        A.    At the time he was general counsel of

19   Tribune.

20        Q.    How did you first come into contact with

21   either Mr. Kenney or Mr. Grenesko?

22        A.    I was asked to attend a meeting that the

23   team doing the solvency opinion was having on

24   diligence for the solvency opinion.  And that's

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

44

1    when I first met numerous Tribune members of

2    management.   I had met a couple of them in other

3    capacities in the past but did not know any of them

4    well.

5         Q.    "In other capacities," do you mean

6    completely unrelated to Duff & Phelps and your work

7    on this transaction?

8         A.    Yes.

9         Q.    Who asked you to attend the meeting that

10   the solvency team was doing with the Tribune with

11   respect to its due diligence?

12        A.    Bob Bartell.

13        Q.    And did that meeting predate this

14   February 26th engagement letter?

15        A.    I don't remember.

16        Q.    And what was your understanding of your

17   role at the meeting that you were asked to attend?

18        A.    I was not part of the entire meeting.   I

19   only joined for lunch.   My role was to help Tribune

20   understand the transaction that had been proposed

21   by Equity Group that involved an ESOP.

22        Q.    So at that point did you have an

23   understanding of what that transaction was and the

24   structure of the transaction?

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

45

1          A.    I had a general understanding that

2     Equity Group was proposing to use an ESOP to assist

3     it in buying Tribune.

4          Q.    How had you come to that understanding?

5          A.    I don't remember.

6          Q.    At the time you went to the -- that you

7     were asked to attend the meeting to explain or

8     to -- strike the question.

9                At the time you were asked to attend the

10    meeting, had you received any documents or

11    materials about the contemplated ESOP transaction?

12         A.    To my recollection, there were no

13    materials related to the contemplated ESOP

14    transaction when I attended the meeting.

15         Q.    So did you have any recollection whether

16    you learned about it from someone at EGI or from

17    the Tribune or from another source?

18         A.    I think I have already answered that

19    Nils Larson at Equity Group told me that they were

20    contemplating a transaction with an ESOP for

21    Tribune.

22         Q.    Right.  And I think you had said that

23    you didn't recall that you had any substantive

24    discussion about it.  Now I am just trying to

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

46

1   explore how you came to that understanding of the

2   structure such that you were able to participate in

3   the meeting that you attended.

4        A.    To my recollection, there was no

5   substantive discussion of any specific structure at

6   this point.

7        Q.    Okay.  I think it was your testimony --

8   and please correct if I am misunderstanding -- that

9   you testified it was your role at this meeting to

10  help the Trib understand the ESOP transaction that

11  EGI was considering for the Tribune.

12       MR. JOHNSTON:  Objection to form of the

13  question.

14  BY MR. GOLDFARB:

15       Q.    Does that accurately state your

16  testimony?

17       MR. DROBNY:  Object to the extent it

18  mischaracterizes it.

19            But go ahead.

20  BY THE WITNESS:

21       A.    You are assuming a level of precision

22  that didn't exist.  These were general discussions

23  on how an ESOP could be used to help purchase a

24  company.

CONFIDENTIAL

47

1    BY MR. GOLDFARB:

2         Q.    To your recollection, who was at the

3    lunch meeting that you attended?

4         A.    To my recollection, I was there, Bob

5    Bartell was there from Duff & Phelps, Chris Janssen

6    from Duff & Phelps.  There may have been -- in

7    fact, I am sure there were other Duff & Phelps

8    people, but I don't recall who else was there.

9              From Tribune, Crane Kenney was there,

10   Don Grenesko, Scott Smith, Chandler Bigelow.

11             There may have been other people but I

12   don't recall who.

13        Q.    And were there any representatives from

14   Equity Group to your recollection?

15        A.    There were no representatives of Equity

16   Group.

17        Q.    And am I right that after -- it was

18   after this meeting that you were asked to put

19   together the engagement letter that is Bluth

20   Exhibit 3?

21        A.    Yes.

22        Q.    In the first paragraph of the letter it

23   indicates that it was an agreement in which Duff &

24   Phelps was retained as an independent financial

CONFIDENTIAL

48

1    advisor to advise a committee formed to explore the

2    possible adoption of an employee stock ownership

3    plan by Tribune Company and to provide advice as to

4    the financial feasibility of the ESOP's

5    participation with Equity Group Investments in a

6    purchase of all or substantially all of the

7    company's shares.

8              Do you see that?

9         A.    I do.

10        Q.    The next sentence states, "If the

11   committee acting in a fiduciary capacity for the

12   yet-to-be-formed ESOP chooses to pursue the ESOP

13   transaction, it is expected that this engagement

14   will automatically transfer from representing the

15   committee to representing the ESOP trustee or

16   fiduciary unless such trustee or fiduciary requires

17   a new engagement letter."

18             Can you explain what that passage means?

19        A.    This engagement was on behalf of a

20   potential buyer of stock.  If the transaction

21   occurred -- and there was no certainty that the

22   transaction would occur -- it was likely that an

23   independent fiduciary or trustee would be retained

24   to represent the ESOP and at that point we would be

Elyse S. Bluth                                      December 17, 2009
CONFIDENTIAL

49

1    retained by that new party.

2         Q.    Is this transfer of representation

3    something that occurs commonly in your experience

4    in transactions?

5         A.    It's not uncommon to be retained by a

6    company that is thinking about an ESOP by a

7    fiduciary committee or a committee formed to be on

8    the buyer's side and then later be retained by an

9    institutional trustee or fiduciary and to have that

10   engagement move -- the engagement typically doesn't

11   move.  It typically gets terminated and then you

12   get retained by a third party.  It's not at all

13   uncommon.

14        Q.    And then at this point in time was it

15   contemplated upon the -- if the representation were

16   to transfer the type of activity that Duff would

17   perform for the fiduciary to the ESOP?

18        MR. JOHNSTON:  Objection; form.

19   BY THE WITNESS:

20        A.    I don't understand your question.

21   BY MR. GOLDFARB:

22        Q.    I will strike it.

23              I am just trying to -- what I am trying

24   to get at is, if the transaction were to go forward

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

50

1    at this point in time on February 26 when the

2    engagement was entered, did you have an

3    understanding of what Duff would be retained to do

4    for the ESOP trustee should the engagement transfer

5    to them?

6          A.     I had an understanding of what Duff &

7    Phelps' role would be if an ESOP transaction was

8    pursued and we were retained by a third party

9    trustee or fiduciary.

10         Q.     And what was your understanding of what

11   that role would be?

12         A.     I understood that we would be asked to

13   assist in negotiating a transaction and issuing

14   opinions that the trustee or fiduciary might need

15   on the transaction.

16         Q.     And what are the sorts of opinions that

17   the trustee or fiduciary might need?

18         MR. JOHNSTON:   Objection to form of the

19   question.

20         MR. DROBNY:   I will object to form as well;

21   calls for speculation.

22   BY THE WITNESS:

23         A.     In ESOP transactions there are certain

24   standard opinions that are typically issued.   The

CONFIDENTIAL

51

1    opinions relate to financial fairness, adequate

2    consideration of both the terms of the ESOP loan

3    and the price paid for the shares of stock

4    purchased by the ESOP.  It was my understanding

5    that as in any ESOP transaction these would be the

6    opinions that would be requested.

7    BY MR. GOLDFARB:

8         Q.    In the second paragraph of the letter it

9    refers to the engagement by the company's board

10   pursuant to the February 13th letter that we looked

11   at earlier.  Do you see that?

12        A.    Yes.

13        Q.    Why was that included in this engagement

14   letter?

15        A.    Disclosure.

16        Q.    Disclosure of what to whom?

17        A.    We thought it appropriate that everyone

18   be aware that we had two engagements going on.

19        Q.    And was it contemplated at that time

20   that the solvency engagement would also transfer to

21   the ESOP trustee or fiduciary?

22        MR. JOHNSTON:  Objection to form.

23   BY THE WITNESS:

24        A.    Not to my recollection.

Elyse S. Bluth                                           December 17, 2009
CONFIDENTIAL

                                                                    52

1    BY MR. GOLDFARB:

2         Q.    And what was your understanding of who

3    the solvency opinion would be provided to?

4         MR. DROBNY:  Object; foundation.

5    BY THE WITNESS:

6         A.    My very general understanding was that,

7    as is typical in solvency opinions, it would be

8    provided to the board of directors of the company.

9    BY MR. GOLDFARB:

10        Q.    And then looking to the second page,

11   paragraph No. 2 of the document --

12        MR. DROBNY:  Are you about finished with this

13   document?

14             Do you need a break?

15        THE WITNESS:  Depends on how long you are

16   going to spend on the document.

17        MR. GOLDFARB:  We can take a break.  Let's go

18   off the record.

19                  (WHEREUPON, a recess was had

20                   from 10:48 a.m. to 10:56 a.m.)

21   BY MR. GOLDFARB:

22        Q.    Before we went off the record, you

23   indicated that the purpose of including information

24   about the February 13th solvency -- or the solvency

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

53

1   engagement reflected in the February 13th letter

2   was disclosure.

3            Do you recall that testimony a few

4   moments ago?

5       A.   Yes.

6       Q.   How, if at all, did your interest in

7   disclosure relate to your earlier testimony where

8   you had some concerns once you learned about the

9   solvency engagement about doing additional

10  ESOP-related work in connection with the Tribune?

11      A.   I think you are overstating it.  The

12  idea was just to make sure for the record that

13  everyone was aware that we had -- we had multiple

14  engagements going.  We wanted to make sure we

15  didn't have any conflicts among those engagements

16  and therefore be sure to lay it out both verbally

17  in discussions and in writing.

18      Q.   You had indicated earlier upon learning

19  of the February 13th engagement it raised a concern

20  in your mind about doing other work related to the

21  Tribune.  And so now I am just trying to understand

22  a little bit more about what the concern was and

23  how, if at all, you addressed it.

24      MR. JOHNSTON:  Objection to the form of the

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

54

1    question.

2          MR. DUCAYET:   Asked and answered.

3          MR. DROBNY:   Same objection to form.   And I

4    think she answered the question already.

5                But go ahead.

6    BY THE WITNESS:

7          A.    Generally we try to make sure we don't

8    have any conflicts among engagements.

9    BY MR. GOLDFARB:

10         Q.    And so was your contact with the

11   representative from EGI in early 2007, did that

12   flag for you a concern that if he asked you to do

13   ESOP-related work for EGI that would present a

14   conflict in light of the February 13th engagement

15   to do solvency work?

16         A.    No.   I have already said that no one

17   from EGI ever asked Duff & Phelps to do any work

18   related to this transaction or any other ESOP

19   transaction.

20         Q.    I know.   I think that was in embedded in

21   my question.

22         A.    Yeah.

23         Q.    But you testified earlier that when you

24   learned of the February 13th engagement that it in

Elyse S. Bluth                                          December 17, 2009
CONFIDENTIAL

55

1   your mind raised a concern about conflicts.  And I

2   am just trying to understand what that concern was

3   and what, if anything, you did about it.

4        MR. JOHNSTON:  Objection; misstates the prior

5   testimony.

6        MR. DROBNY:  It does misstate her testimony.

7   She didn't say it raised a concern about conflicts.

8            But go ahead and answer the question if

9   you understand it.

10  BY THE WITNESS:

11       A.    Because I was never asked to do work for

12  Equity Group, I was never concerned about a

13  conflict with Equity Group.

14           My concerns were only that if we were

15  ultimately engaged to represent an ESOP fiduciary

16  in a purchase of shares was there a conflict with

17  also providing a solvency opinion to a board of

18  directors in the same transaction.

19  BY MR. GOLDFARB:

20       Q.    I am just trying to understand what gave

21  rise to the concern as at that point there was

22  no -- to your testimony there was no contemplated

23  ESOP work for the Tribune.

24       MR. DROBNY:  Is there a question?

CONFIDENTIAL

56

1    BY THE WITNESS:

2         A.    I don't understand your question.

3    BY MR. GOLDFARB:

4         Q.    Okay.  I will withdraw it.

5              At this point in time, on February 26th

6    when you entered this engagement, was there any

7    concern at Duff & Phelps or in your mind personally

8    about a conflict of doing the ESOP-related work and

9    the solvency-related work?

10        MR. JOHNSTON:  Objection to the form.

11        MR. DROBNY:  Same objection.

12   BY THE WITNESS:

13        A.    We had been doing ESOP -- we had been

14   doing -- excuse me.  Let me correct that.  We had

15   been doing solvency-related analysis in

16   contemplation of a potential solvency opinion

17   before the February 13th letter was signed.

18             When I was contacted or discussed any

19   potential engage -- any potential ESOP transaction

20   for Tribune, it was unclear as to who we would be

21   working for.  There was the potential that we would

22   be advising Tribune on any potential ESOP

23   transaction.

24

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

57

1    BY MR. GOLDFARB:

2         Q.     This is as of the February 13th letter?

3         A.     This was as of discussions with Tribune.

4    The February 13th -- letters take a long time to

5    get signed.  And we had been doing work -- to my

6    recollection, we had been doing work prior to this

7    letter being signed.

8         Q.     Okay.  And when you say "this letter,"

9    you are referring to the February 13th letter?

10        A.     I am.

11        Q.     Okay.  So were you aware that Duff &

12   Phelps was doing solvency-related analyses for the

13   Tribune prior to February 13th?

14        A.     I don't remember when I learned that

15   Duff & Phelps was doing solvency-related work for

16   Tribune.

17        Q.     Okay.  When did you learn that

18   solvency-related analyses were going on before the

19   February 13th letter?

20        MR. JOHNSTON:  Objection to the form of the

21   question.

22   BY THE WITNESS:

23        A.     I think I just said that I don't

24   remember when exactly the date that I learned that

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

58

1    solvency analyses were being performed for Tribune.

2    BY MR. GOLDFARB:

3         Q.    And do you remember how you learned,

4    from whom you learned that such work was going on?

5         A.    I remember very generally how I learned.

6    I don't remember the specifics.

7         Q.    Okay.  Generally how did you learn?

8         A.    When I learned that the contemplated

9    Equity Group transaction was Tribune, I

10   investigated as to whether or not Duff & Phelps was

11   doing work related to Tribune and discovered that

12   we were doing solvency-related work for Tribune.

13        Q.    Was this after the Sunday call with

14   Mr. Larson?

15        A.    Yes.

16        Q.    And how did you conduct your

17   investigation or how did you come to learn that

18   Duff was doing the work?

19        A.    I don't remember exactly.  I think I was

20   talking to people involved in the work.

21        Q.    Would that include Mr. Bartell?

22        A.    Could have been.

23        Q.    Do you recall anyone specifically you

24   spoke to about the work?

Elyse S. Bluth                              December 17, 2009

CONFIDENTIAL

59

1        A.    The only one who I recall speaking to

2   specifically -- I don't remember who the first

3   person was I spoke to.   I do recall talking to

4   Chris Janssen about it.

5        Q.    And what position does Mr. Janssen have?

6        A.    He is currently head of the transaction

7   opinions group.   I don't remember when he took on

8   that role.

9        Q.    And does transaction opinions include

10  solvency opinions?

11       A.    Yes.

12       Q.    Does it include valuation opinions?

13       A.    Yes.

14       Q.    Is Mr. Janssen senior to you in the

15  organizational chart of Duff & Phelps?

16       A.    At the time we were peers.   Unclear now.

17       Q.    What do you remember learning from

18  Mr. Janssen about what Duff & Phelps was doing for

19  the Tribune?

20       A.    I have already said that I don't

21  remember who I first learned about the solvency

22  engagement from.   So I don't remember who I learned

23  which piece of information from.   So if you want to

24  rephrase the question.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                              60

1        Q.    Is your answer to my question that you

2   don't know?

3        A.    If you could repeat your question.

4        Q.    My question was, do you remember what

5   you learned from Mr. Janssen about the work that

6   Duff was doing for the Tribune?

7        A.    I don't remember specifically what I

8   learned from Mr. Janssen.

9        Q.    Looking at the February 26th letter

10  before you, on Page 3, Bates ending in 1552, would

11  you agree that this paragraph generally describes

12  what Duff & Phelps agreed to provide to the Tribune

13  as far as the contents of a written opinion and

14  supporting analyses?

15       MR. DROBNY:  Object to the extent it

16  mischaracterizes the document.

17            But you can go ahead and answer.

18  BY THE WITNESS:

19       A.    No.

20  BY MR. GOLDFARB:

21       Q.    Okay.  What does this paragraph

22  describe?

23       A.    It describes what Duff & Phelps would

24  provide to an ESOP trustee or fiduciary.

CONFIDENTIAL

61

1        Q.     Fair enough.  And the Sub (i) -- well,

2    it begins, "Duff & Phelps agrees to provide a

3    written opinion (opinion) and supporting analysis

4    to the ESOP trustee or fiduciary as to whether (i)

5    the consideration to be paid for the shares and the

6    company's common stock in the ESOP transaction is

7    not greater than fair market value (as such term is

8    used in determining adequate consideration under

9    Section 3(18) of the Employee Income Retirement

10   Security Act of 1974 as amended."

11            Can you just describe, please, what that

12   means?

13       MR. JOHNSTON:  Objection to the form of the

14   question.

15   BY THE WITNESS:

16       A.     It means what it says, which is that the

17   opinion is that the consideration to be paid for

18   the stock is not greater than fair market value.

19   There are definitions that are used in ESOP

20   opinions to comply with regulations.  And the rest

21   of it is intended.  It's a standard opinion that's

22   required -- requested in ESOP transaction.

23   BY MR. GOLDFARB:

24       Q.     And do you know how fair market value is

Elyse S. Bluth                                          December 17, 2009
CONFIDENTIAL

62

1    defined in the ERISA Act, in the provision of the

2    ERISA Act?

3         A.    I don't remember the exact words.

4         Q.    In general what do you use the term to

5    mean in this paragraph?

6         A.    Use the term to mean willing buyer,

7    willing seller, arm's length transaction, under no

8    compulsion to act.

9         Q.    And then skipping a couple to (iv), the

10   opinion to the trustee or fiduciary would discuss

11   whether the terms -- and I'm quoting now -- "the

12   terms and conditions of the ESOP transaction are

13   fair and reasonable to the ESOP from a financial

14   point of view."

15            What do you mean by "fair and reasonable

16   from a financial point of view" in that clause?

17        A.    Because there are all sorts of terms,

18   outs, conditions of transactions, the financial

19   ones are typically reviewed and opinions are issued

20   that they are what it says, fair and reasonable.

21        Q.    And then -- sorry.  One further

22   question.  When you say "fair and reasonable," fair

23   and reasonable as compared to -- is it in

24   comparison to anything, or compared to what?

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

63

1        A.    Could be absolute, could be relative to

2   other transactions.  Depends on the situation.

3        Q.    Was there a particular meaning intended

4   in this clause?

5        A.    No.

6        Q.    Was the characterization of fair and

7   reasonable something that is typically in your

8   experience in this engagement left up to Duff &

9   Phelps to define?

10      MR. JOHNSTON:  Object to the form of the

11  question.

12  BY THE WITNESS:

13       A.    Although Duff & Phelps has to believe

14  that -- that terms and conditions are fair and

15  reasonable, often we are asked by our clients to

16  consider certain elements in a fairness opinion.

17  BY MR. GOLDFARB:

18       Q.    Did that happen in this instance?

19      MR. DUCAYET:  Object to the form.

20  BY THE WITNESS:

21       A.    Maybe you could be a little more precise

22  in the question.

23  BY MR. GOLDFARB:

24       Q.    Sure.  You indicated earlier that the

Elyse S. Bluth                          December 17, 2009
CONFIDENTIAL

64

1    determination of fair and reasonable could be

2    absolute or it could be in comparison to other

3    transactions and so forth.  And also you just

4    indicated that sometimes clients have specific

5    requests for how you go about making that

6    determination.

7            And I am asking if the Tribune made such

8    a request in this instance, that Duff & Phelps take

9    a particular approach toward rendering its opinion

10   as to the fair and reasonableness of the terms and

11   conditions of the ESOP transaction.

12       MR. JOHNSTON:  Objection; mischaracterizes the

13   testimony.

14       MR. DROBNY:  Object to foundation.

15   BY THE WITNESS:

16       A.    There's a whole lot in that question

17   which doesn't make sense to me.  In large part we

18   never -- to my recollection, we never discussed any

19   of our analysis with Tribune at all under this

20   engagement letter.  We were not requested by

21   Tribune to provide any information to them related

22   to any opinions for an ESOP transaction.

23            As I am sure you are well aware, we were

24   ultimately engaged by an independent fiduciary and

CONFIDENTIAL

65

1  we rendered our opinions to the independent

2  fiduciary.  So any discussion of what would be

3  considered and what made sense to consider under

4  the fairness opinion was with the fiduciary who was

5  ultimately retained.

6  BY MR. GOLDFARB:

7      Q.    And by that fiduciary you are referring

8  to GreatBanc; is that right?

9      A.    GreatBanc Trust Company, yes.

10     Q.    Did this engagement eventually transfer

11 as contemplated in this engagement letter?  Did it

12 eventually transfer to GreatBanc?

13     A.    No.

14     Q.    Was it superceded by a subsequent

15 engagement letter?

16     A.    Yes.

17     Q.    The last sentence of this paragraph

18 states that Duff & Phelps also agrees to provide an

19 opinion as to the various pieces referred to above

20 in the paragraph at closing of the ESOP

21 transaction.  And that's referred to as the

22 bring-down opinion.  Do you see that?

23     A.    I do.

24     Q.    Can you describe what a bring-down

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

66

1    opinion is as contemplated here?

2         A.    Often in ESOP transactions there is a

3    period of time between signing and closing.

4    Because ESOP transactions have to be fair as of the

5    day of closing, there is a need for an opinion as

6    of the day of closing.

7              A trustee also will not sign documents

8    unless it is confident that it can receive its

9    opinions.  Typically we issue opinions prior to or

10   in conjunction with a fiduciary signing up a

11   transaction.

12             If there is any significant time period

13   between signing and closing, there may be a need --

14   there sometimes is a need for a second opinion that

15   the transaction continues to be fair or is fair at

16   the time of closing.

17        MR. GOLDFARB:  Let's mark this as Bluth 4,

18   please.

19                  (WHEREUPON, a certain document was

20                  marked Bluth Deposition Exhibit

21                  No. 4, for identification, as of

22                  12-17-2009.)

23   BY MR. GOLDFARB:

24        Q.    Ms. Bluth, I ask you to take a look at

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

67

1    this.  And while you are doing so I will note for
2    the record this is a multi-page document with first
3    Bates D&P TR041541.
4            Have you had a chance to look at it,
5    Ms. Bluth?
6        A.    Briefly, yes.
7        Q.    Can you describe what this document is,
8    please?
9        A.    This is an engagement letter between
10   Duff & Phelps and GreatBanc Trust Company related
11   to being independent financial advisor to GreatBanc
12   Trust Company in connection with a potential
13   purchase of shares by a Tribune ESOP in a going
14   private transaction.
15       Q.    If you look at -- it's dated March 8th,
16   2007; is that right?
17       A.    Yes.
18       Q.    And if you look at Bates ending in
19   41546, is that your signature for Duff & Phelps?
20       A.    Yes.
21       Q.    What happened between February 26th,
22   2007, and March 8th, 2007, that resulted in the
23   issuance of this engagement letter?
24       A.    Tribune retained GreatBanc Trust as

CONFIDENTIAL

68

1    trustee of a potential ESOP.

2        Q.    Were you involved at all in the process

3    that led to the retention of GreatBanc?

4        A.    I was.

5        MR. JOHNSTON:  Objection to form.

6    BY MR. GOLDFARB:

7        Q.    How so?

8        A.    Tribune asked me to provide them names

9    of potential institutions that might serve as the

10   trustee of an ESOP.

11       Q.    Is GreatBanc one of the names that you

12   provided?

13       A.    Yes.

14       Q.    What, if any, relationship did you have

15   with GreatBanc prior to your identifying them as a

16   potential trustee to the Tribune in late February

17   or early March?

18       MR. DROBNY:  Object to form.

19   BY THE WITNESS:

20       A.    First of all, I don't remember when I

21   identified GreatBanc as a potential fiduciary.

22            Secondly, I worked with GreatBanc many

23   times over a long period of time on many different

24   transactions or ESOP valuations.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

69

1  BY MR. GOLDFARB:

2       Q.    Do you recall whether your

3  identification of GreatBanc as a potential trustee

4  occurred before or after the February 26th

5  engagement letter?

6       A.    I don't remember.

7       Q.    What function does this March 8th letter

8  serve vis-à-vis the February 26th letter?

9       MR. JOHNSTON:  Object to form.

10      MR. DROBNY:  Same objection.

11 BY MR. GOLDFARB:

12      Q.    I'll withdraw that.  It was a bad

13 question.

14            Does this March 8th letter supersede the

15 February 26th letter?

16      A.    Yes.

17      Q.    In the second paragraph it refers again

18 to the solvency work pursuant to the February 13th

19 engagement letter.  Do you see that?

20      A.    Yes.

21      Q.    During this time were you kept abreast

22 of what, if any, work the solvency engagement team

23 was doing pursuant to that engagement?

24      MR. DUCAYET:  Object to the form.

CONFIDENTIAL

70

1    BY THE WITNESS:

2         A.    Very generally.  I knew that we were

3    aware of the transactions and we were working on

4    solvency opinions related to potential transactions

5    Tribune was contemplating.

6    BY MR. GOLDFARB:

7         Q.    You had testified earlier about the

8    meeting during which the solvency team was doing

9    its due diligence in connection with its solvency

10   work.

11         Do you recall that?

12         A.    Yes.

13         Q.    Subsequent to that did you have further

14   involvement or were you -- did you participate in

15   any of the solvency-related work that was being

16   done by Mr. Bartell and his team?

17         A.    No.

18         Q.    Except for that -- you are saying except

19   for the one meeting that you were invited to where

20   you appeared for lunch to explain the potential

21   transaction; is that right?

22         A.    Are you asking about me personally?

23         Q.    Yes.

24         A.    I personally had no involvement in any

Elyse S. Bluth                                          December 17, 2009

CONFIDENTIAL

71

1    of the solvency work that was done for the board of

2    Tribune.

3         Q.    Okay.   Were there other people at Duff &

4    Phelps working with you on the Tribune engagement?

5         A.    Numerous people.

6         Q.    How many would you estimate were part of

7    that group?

8         A.    The number of people involved in doing

9    analysis and contributing to all the Tribune

10   engagements was somewhere in the 10 to 15 range.

11        Q.    Who were the -- if there were --

12   principal colleagues with whom you worked?  Can you

13   identify who they were who were assisting on this

14   work?

15        MR. DROBNY:   Exhibit 4, the GreatBanc --

16        MR. GOLDFARB:   The ESOP work, yes.

17   BY THE WITNESS:

18        A.    The principal -- there was some basic

19   valuation work that was done that could have been

20   used either for the solvency work or the ESOP work.

21   The individuals working on the valuation piece of

22   this worked on both assignments.   The principal

23   individual that I worked with on the ESOP

24   assignment was Dan Christoffel.

CONFIDENTIAL

72

1    BY MR. GOLDFARB:

2         Q.    Anyone else who you would consider a

3    principally involved colleague in this work?

4         A.    As I said before, there were 10 to 15

5    people involved in one variety or another.  But you

6    asked for the principal person and I have given you

7    the principal person's name.

8         Q.    Was Mr. Christoffel involved in the

9    basic valuation work that was used by both the

10   solvency and the ESOP teams?

11        A.    He may have been peripherally involved.

12   I don't think he was directly involved.

13        Q.    And who was the person who was

14   principally in charge of that basic valuation work?

15        A.    I don't remember.

16        Q.    Do you remember anybody who was involved

17   in doing that basic valuation work?

18        A.    Scott Bednas, Sam Pollack, Phil

19   Rosengren, and many others.

20        Q.    Were you personally involved in the

21   valuation work as well?

22        A.    Since it was the -- it was part of the

23   opinion, I clearly saw, was aware of it, but I

24   wasn't directing the day-to-day work.

CONFIDENTIAL

73

1       Q.      And who was directing the day-to-day

2   work?

3       A.      One of the people who I just mentioned.

4   I don't recall who.  Or there could have been

5   others.  I don't remember.

6       Q.      And during this period of time how

7   frequently would you estimate you had contact, if

8   at all, with Mr. Bartell about the solvency work

9   that he was overseeing?

10      A.      Since I wasn't involved in the solvency

11  work, I didn't talk about it very much to anyone.

12  I would see Bob Bartell in the hall or the office

13  all the time.  Whether or not we talked about the

14  solvency work, I don't recall.

15      Q.      Did all the people working on any

16  Tribune matters, be it solvency, valuation, ESOP

17  work, ever meet together as a group to discuss what

18  Duff & Phelps was doing for the Tribune?

19      A.      Not to my recollection.

20              There is an exception to that, which

21  would have been during the review process.

22      Q.      And what do you mean by "the review

23  process"?

24      A.      Before opinions are issued they go

CONFIDENTIAL

1   through a formal review process.  And so at that

2   time most of the participants that contributed to

3   the work on the assignment would be gathered in one

4   place, in one conference room, and participate in

5   the project review.

6        Q.     And how is that review conducted?

7        A.     In person and telephonically.

8        Q.     Are the reviewers people who are Duff &

9   Phelps personnel?

10        A.     Yes.

11        Q.     Is it a formal committee structure that

12   exists?

13        A.     Yes.

14        Q.     Can you describe it a little bit and who

15   participates in it?

16        A.     There is a formal transaction opinions

17   review committee.  The ESOP fairness opinion

18   ultimately went through that review process.  I

19   don't remember how many people comprise the

20   committee or comprised it when this project was

21   reviewed in 2007.

22             Our general counsel is on the committee,

23   as are other senior members of management.

24        Q.     Are you on the committee?

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

75

1      A.      I am not.

2      Q.      Is Mr. Bartell on the committee?  Strike

3  the question.

4              At the time in this period, in spring of

5  2007, was Mr. Bartell on the committee?

6      A.      I don't remember.

7      Q.      Roughly how many people are on the

8  committee?

9      A.      Somewhere in the five to eight range,

10  something like that.

11      Q.      And for this Tribune engagement, did

12  the -- strike the question.

13              Did the review committee review all the

14  different pieces of the -- all the different pieces

15  and analyses that Duff created for the Tribune

16  Company or GreatBanc in connection with this

17  engagement?

18      MR. JOHNSTON:  Objection to the form of the

19  question.

20      MR. DROBNY:  I object to form and foundation

21  as well.

22  BY THE WITNESS:

23      A.      Technical review that occurs before the

24  formal review by the committee.  In the technical

CONFIDENTIAL

1    review details are gone over and addressed.  The

2    review committee occurs after the technical review.

3         Q.    Do the same people who conduct the

4    technical review of the solvency-related work also

5    conduct the technical review of the ESOP analyses?

6         MR. DROBNY:  Object to foundation.

7    BY THE WITNESS:

8         A.    Are you talking about generally at

9    Duff & Phelps or are you talking about this

10   engagement?

11   BY MR. GOLDFARB:

12        Q.    I am talking about this engagement.

13        A.    Duff & Phelps never issued a solvency

14   opinion and so there was never a review of a

15   solvency opinion.

16        Q.    I don't think my question referred to a

17   solvency opinion.  I think it just referred to the

18   solvency work that was being done.  Let me strike

19   the question.

20             Was any solvency analysis ever put to

21   the Duff & Phelps review committee?

22        A.    I don't know.

23        Q.    Was any valuation analysis ever put

24   before the review committee?

CONFIDENTIAL

77

1          A.     The ESOP opinion was reviewed by the

2     committee and part of the opinion is a valuation

3     analysis.  So yes, it was.

4          Q.     And was the valuation piece of the ESOP

5     opinion and the ESOP -- specific parts of the ESOP

6     opinion, were both of those subjected to technical

7     review in this case?

8          A.     Yes.

9          Q.     Was that done by the same group of

10    people?

11         A.     No.

12         Q.     How was the technical review for those

13    two pieces of the ESOP analysis performed in this

14    case?

15         MR. JOHNSTON:  Objection; foundation.

16    BY THE WITNESS:

17         A.     What two pieces are you referring to?

18    BY MR. GOLDFARB:

19         Q.     You said that as part of the ESOP there

20    were ESOP specific parts of the ESOP analysis and

21    there were valuation aspects to the ESOP analysis.

22              Is that a fair characterization of your

23    testimony?

24         A.     No, it's not.

CONFIDENTIAL

78

1      Q.    Then please explain how the technical

2   review of what was ultimately contained in the ESOP

3   opinion occurred here.

4      A.    The analysis that was prepared for the

5   ESOP opinion was presented to individuals who spent

6   time looking at those analyses, reviewing those

7   analyses, make sure they understood those analyses,

8   make sure that they understood those analyses were

9   correct.

10     Q.    And am I correct that those

11  individuals -- some of them did the valuation --

12  looked at the valuation pieces of the ESOP opinion

13  and others looked at ESOP -- that were particular

14  to the ESOP issues that comprised the ESOP opinion?

15     A.    No.  That's incorrect.

16     Q.    The same individuals reviewed the entire

17  opinion?

18     A.    Yes.

19     Q.    Looking back at the March 8th engagement

20  letter, the second paragraph refers again to the

21  solvency and capitalization engagement.

22           Do you see that in the second paragraph?

23     A.    Yes.

24     Q.    And then it says, "Notwithstanding the

CONFIDENTIAL

1   foregoing, all parties intend that in the event a

2   solvency opinion is required in connection with the

3   transaction contemplated herein, Duff & Phelps will

4   be engaged to render the solvency opinion directly

5   to the trustee and the board will be given the

6   right to rely on such opinion and the letter dated

7   February 13th, 2007, will be of no further effect."

8          Can you explain what that means?

9       A.    Because we were working for a buyer of

10  stock in a transaction, there was concern that we

11  couldn't be issuing other opinions, whatever they

12  were, to anyone representing a seller of stock.

13  And so the thought was that if there is a need for

14  a solvency opinion by the trustee, then the trustee

15  would receive that opinion; and if the board needed

16  it or required it or asked for it, that the

17  trustee -- that the board would be given the right

18  to rely on the opinion.

19      Q.    Which board is referred to in the

20  passage that we're discussing that I read into the

21  record?

22      A.    It does appear that there is no

23  definition in this letter, but I think the intent

24  was that it was the board of directors of Tribune.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

80

1      Q.    And were you involved in the crafting of

2   this paragraph?

3      A.    Yes, I was.

4      Q.    Did you consult with Mr. Bartell or

5   others at Duff & Phelps about the permissible scope

6   of reliance on any solvency opinion should one

7   issue as reflected in this paragraph?

8      MR. DROBNY:  I will caution you to the extent

9   that you consulted -- I don't know if you did, but

10  to the extent you consulted with legal counsel on

11  that issue, I advise you not to disclose that

12  consultation.

13           If you talked to Bartell about it, you

14  can go ahead and talk about it.

15  BY THE WITNESS:

16     A.    I don't remember who I spoke to about

17  it.

18  BY MR. GOLDFARB:

19     Q.    Did you speak to anybody at the Tribune

20  about it?

21     A.    I am sure I spoke to many people about

22  it, but I don't remember specifically who I spoke

23  to.

24     Q.    Who at the Tribune do you recall

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

81

1   speaking to at any time about the solvency work

2   that Duff was doing?

3        A.    I'm going to repeat myself here.   I

4   think I said several times I wasn't involved in the

5   solvency opinion work.   So any discussions I had

6   about the solvency opinion or the solvency

7   engagement were cursory at best and were related to

8   the ESOP assignment.

9             That said, generally I would have

10  brought up the solvency engagement in the sense of

11  this letter with Don Grenesko or Crane Kenney.

12       Q.    At this point in time on March 8th --

13  strike the question.

14            Did you initiate communication with the

15  Tribune about whether or not they would be able to

16  rely on the solvency opinion if issued?

17       A.    I don't think so.   I don't remember

18  doing that, no.

19       Q.    Did they initiate communications with

20  you about whether the Tribune board could rely on a

21  solvency opinion if issued?

22       A.    I don't remember having conversations.

23       Q.    Do you have any recollection about how

24  this passage that we have been discussing came to

CONFIDENTIAL

82

1    be included in the engagement letter?

2         MR. DROBNY:   She testified to that.   Asked and

3    answered.

4    BY THE WITNESS:

5         A.    My general recollection is that it was

6    requested by GreatBanc Trust and their counsel.

7    BY MR. GOLDFARB:

8         Q.    Do you recall either Mr. Grenesko or

9    Mr. Kenney expressing an interest in having the

10   Tribune board be able to rely on a solvency opinion

11   if issued?

12        MR. DROBNY:   Objection; asked and answered.

13   BY THE WITNESS:

14        A.    I have already said that I don't

15   remember having any conversations in any depth at

16   all about this issue with anyone at Tribune.

17   BY MR. GOLDFARB:

18        Q.    I understand that you have testified

19   that you didn't have any conversation in any depth.

20   I am asking, to the conversations that you did have

21   with Mr. Grenesko and Mr. Kenney, what the

22   substance of those conversations were about this

23   subject.

24        A.    Other than putting the language in and

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

83

1   receiving comments and giving comments back and

2   forth, I don't remember having any conversations

3   about the solvency opinion with anyone at Tribune.

4        Q.    In your experience was the inclusion of

5   language allowing both the trustee and the board to

6   rely on a solvency opinion one that you had seen

7   before?

8        MR. DROBNY:  Object; form and foundation.

9   BY THE WITNESS:

10       A.    Because of the issue I have already

11  described, that a financial advisor cannot

12  represent both the board of a seller and a buyer,

13  every once in a while Duff & Phelps is asked to

14  issue a solvency opinion to a fiduciary and every

15  once in a while a board asks if they can rely on

16  it.  And I think every once in a while we say it's

17  okay.

18            It doesn't happen every day, but it's

19  not, you know, so unusual that I could say this is

20  the only time it happened.  It has happened before

21  and it will probably happen again.

22  BY MR. GOLDFARB:

23       Q.    And please explain why in your

24  experience or why the arrangement as reflected in

CONFIDENTIAL

84

1   here is -- why you characterize it as unusual.

2          A.     I did not characterize it as unusual.  I

3   have said that it has happened before and it

4   happens once in a while.

5          MR. DROBNY:  She said it's not unusual.

6   BY MR. GOLDFARB:

7          Q.     Just looking at your testimony, your

8   testimony was that every once in a while a board

9   asks if it can rely on a solvency opinion issued

10  for a trustee and every once in a while you say

11  yes.

12             Do you recall that testimony?

13         A.     Yes.

14         Q.     Did you consider the board's -- was

15  there ever a request made in this case by the board

16  that it be able to rely on the solvency opinion if

17  issued?

18         A.     I would like to clarify the prior answer

19  that I gave.

20         Q.     Please do.

21         A.     It's not an everyday circumstance where

22  a fiduciary asks for a solvency opinion in any

23  event, and it doesn't happen every day that in an

24  ESOP transaction a solvency opinion is requested

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                              85

1    either.  So the Venn diagram of the two happens

2    once in a while but not often.

3              I am not sure that I personally have

4    ever been involved in that situation.  I think

5    Duff & Phelps has been involved in that situation.

6              Given that clarification, could you

7    repeat the question you just asked?

8        MR. GOLDFARB:  Can you read back what my last

9    question is?

10                   (WHEREUPON, the record was read

11                    by the reporter as requested.)

12       MR. DROBNY:  Object; foundation.

13   BY THE WITNESS:

14       A.    I think there was a thought that the

15   board would have the right to rely on a solvency

16   opinion if issued and that's why it's in this

17   engagement letter.

18   BY MR. GOLDFARB:

19       Q.    Right.  And I don't mean to beat this.

20   Did you have any further recollection about at

21   whose initiative or how it came to be in this

22   situation -- in these circumstances that if the

23   solvency opinion were requested and Duff & Phelps

24   were retained to provide it to the trustee that the

Elyse S. Bluth                                December 17, 2009

CONFIDENTIAL

86

1    board would also be given the right to rely upon

2    it?

3         MR. DROBNY:  Objection; asked and answered.

4    BY THE WITNESS:

5         A.    To repeat what I said before, my

6    recollection is that GreatBanc Trust and its

7    counsel asked for the language to be crafted this

8    way.

9    BY MR. GOLDFARB:

10        Q.    This engagement letter is directed to

11   Marilyn Marchetti.  Do you see that?

12        A.    Yes.  Her name is pronounced Marchetti.

13        Q.    Marchetti.  Thank you.  Who is

14   Ms. Marchetti?

15        A.    Ms. Marchetti is an employee of

16   GreatBanc Trust Company.  I don't know her exact

17   title.

18        Q.    And who at GreatBanc -- strike the

19   question.

20             Did you have a principal contact at

21   GreatBanc during the course of your work pursuant

22   to this series of engagements?

23        A.    Yes.

24        Q.    Who was that person?

CONFIDENTIAL

87

1        A.      Marilyn Marchetti.

2        Q.      Was there any other person at GreatBanc

3    with whom you had substantial contact?

4        A.      There were several people at GreatBanc

5    that I had contact with.  I can't tell you if one

6    was more substantial than the other.

7        Q.      Who were the principal people with whom

8    you had any contact at GreatBanc?

9        A.      I have over the years done a fair amount

10   of work with GreatBanc.  I don't remember the

11   circumstance, who the individuals that I had any

12   kind of substantial discussions were at GreatBanc.

13       Q.      How about even limited discussion?

14       A.      Is your question about the engagement or

15   about the work that was done pursuant to the

16   engagement?

17       Q.      I am just trying to understand who at

18   GreatBanc you had contact with during the course of

19   February to beyond in connection with your ESOP

20   work with the Tribune.

21       A.      I had contact with Julie Williams,

22   Danielle Montesano, Vaughan Gordy, Karen Bonn,

23   Steve Hartman, and everyone else who was on their

24   committee.  I can't tell you all the names.

CONFIDENTIAL

88

1       Q.    Are the individuals who you've just

2    identified, they are on a committee at GreatBanc?

3       A.    At least some of them are.  I don't know

4    if all of them are.

5       Q.    What's the committee that you are

6    referring to?

7       A.    I don't know the name of the committee.

8    Generally it's the committee that reviews their

9    fiduciary engagements, their transactional

10   engagements.

11      Q.    Were there any other staff people

12   besides Ms. Marchetti who you had any regular or

13   substantial contact with during this period of

14   time?

15      A.    Julie Williams and Danielle Montesano

16   were involved in day-to-day matters also if that's

17   your question.

18      Q.    And do you know generally what

19   Ms. Marchetti's function is at GreatBanc, if not

20   her position?

21      A.    She acts as a fiduciary -- or acts on

22   behalf of GreatBanc as a fiduciary in ESOP

23   transactions and for ESOPs of private companies and

24   public companies.

CONFIDENTIAL

89

1      Q.      Looking at Page 4 of the March 8th

2   engagement letter, Paragraph 6 states that, "The

3   company agrees to pay Duff & Phelps' professional

4   fees for this engagement of $1 million," and then

5   it goes on to describe how that is broken down.

6              Do you see that?

7      A.      I do.

8      Q.      Was the fee, this $1 million fee for

9   this engagement, a large one for Duff & Phelps in

10  comparison to its other ESOP-related work?

11     MR. JOHNSTON:  Objection to the form.

12     MR. DROBNY:  I will object to form and

13  foundation.

14             To the extent you have any idea how to

15  answer that, you can go ahead.

16  BY THE WITNESS:

17     A.      Yes, it was a large fee for the ESOP

18  practice of Duff & Phelps.  It's also a large

19  transaction.

20  BY MR. GOLDFARB:

21     Q.      Is it among the largest fees that Duff &

22  Phelps has charged for an engagement like this?

23     MR. DROBNY:  Objection; foundation and form.

24

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

90

1   BY THE WITNESS:

2       A.    This is the only engagement like this

3   that occurred, so I don't know how to answer that

4   question.

5   BY MR. GOLDFARB:

6       Q.    Are there engagements in which Duff &

7   Phelps has charged a higher fee?

8       A.    I don't recall.  We have had fees in the

9   million-dollar range before.  This was -- and I

10  don't remember if we had one over a million or 900

11  but in that kind of range we had fees before.  But

12  it is a large fee for the ESOP practice.

13      Q.    What about for you personally in terms

14  of your engagements?

15      A.    Sure.  I mean, if it's a large fee for

16  Duff & Phelps, it's going to be a large fee for me

17  personally, of course.

18      Q.    Do you know if it was the largest fee

19  that Duff & Phelps had ever charged for an

20  engagement?

21      MR. DROBNY:  You just asked that.

22      MR. GOLDFARB:  No, I didn't.

23      MR. DROBNY:  Yeah, you did.

24          You can answer it again.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

91

1   BY THE WITNESS:

2        A.    It is not the largest fee that Duff &

3   Phelps has ever charged for an engagement.

4   BY MR. GOLDFARB:

5        Q.    Sub (v) of that paragraph refers to --

6   that the payment would include "$200,000 upon

7   delivery of the bring-down opinion or completion of

8   analysis if a decision is made not to issue the

9   bring-down opinion after Duff & Phelps has

10  substantially completed its analysis related to

11  issuing the bring-down opinion."

12            Do you see that?

13       A.    Yes.

14       Q.    What does that mean?

15       A.    In circumstances where a bring-down

16  opinion is needed, the concept is that we are paid

17  whether or not we ultimately issue the opinion if

18  the work for the opinion has been done.

19       Q.    And what are the circumstances -- in

20  this engagement was a bring-down opinion ever

21  issued?

22       A.    No.

23       Q.    Why not?

24       A.    It wasn't necessary.

CONFIDENTIAL

92

1          Q.     Why not?

2          A.     There was no time in between signing and

3     closing.

4          Q.     What do you mean when you say "signing

5     and closing"?  What do you mean by "signing" and

6     what do you mean by "closing"?

7          A.     As I described earlier, the need for a

8     bring-down opinion arises when there is a

9     substantial amount of time in between the ESOP

10    signing documents and closing of the ESOP

11    transaction.

12               In this circumstance there was no time

13    in between signing ESOP documents and closing of

14    the ESOP transaction.

15         Q.     When did that all occur?

16         A.     April 1st, 2007.

17         Q.     At the time this was written, this

18    engagement letter, March 8th, what was your

19    understanding of the circumstances that reflect the

20    issuance -- the potential issuance of a bring-down

21    opinion?

22         MR. DROBNY:  Objection; form.

23    BY THE WITNESS:

24         A.     At the time this letter was issued,

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

93

1    there was the potential that there would be time

2    between signing and closing, and so the engagement

3    letter contemplates the possibility that a

4    bring-down opinion would be necessary.

5    BY MR. GOLDFARB:

6         Q.     If you look at the last page -- I'm

7    sorry -- the Bates number ending in 41546, the

8    letter was agreed to and accepted by Ms. Marchetti

9    on behalf of GreatBanc and Mr. Grenesko on behalf

10   of the Tribune Company.

11              Do you see that?

12        A.     I do.

13        Q.     Why was Mr. Grenesko party to the

14   transaction -- party to this engagement letter?

15        A.     There are parts of the letter that the

16   company is involved in and so the company has to

17   agree to the letter.

18        Q.     What was your understanding of the

19   company's responsibilities with respect to this

20   engagement?

21        A.     As it says in Paragraph 1, the -- in

22   Paragraph 2, this is superseding another letter.

23   So that's disclosure.

24              In Paragraph 2 the company is agreeing

CONFIDENTIAL

94

1    to supply information and warranting and

2    representing that the information that's supplied

3    is reasonable and other aspects.

4              In Paragraph 4 the company -- we're

5    disclosing to the company -- the company is

6    agreeing that we can use their name in

7    advertisements.

8              In Paragraph 5 there is discussion that

9    the company can reference this opinion in public

10   filings or anything given to a governmental entity.

11             In Paragraph 6 the company is agreeing

12   to pay our fees.

13             In Paragraph 7 there is discussion of

14   how the agreement gets terminated.

15             In Paragraph 8 there is discussion about

16   successors and assigns.

17             In Paragraph 9 the company extends the

18   indemnification agreement that was already entered

19   into in connection with the prior engagement.

20             Paragraph 10 deals with any other

21   services that are required.

22             And then the attachment of the

23   indemnification and contribution agreement was the

24   company's responsibility from the prior engagement

CONFIDENTIAL

1    and is also attached.

2         Q.    Who did you consider to be the client

3    for purposes of this engagement as reflected in the

4    March 8th letter?

5         A.    GreatBanc Trust Company is our client --

6    was our client.  This is standard -- the form of

7    this engagement, the sense of the engagement is

8    standard in any ESOP transaction.

9         Q.    I suggest I try to cover one more

10   document and then take a break.

11              Are you doing okay?

12        A.    I'm fine.

13        MR. DROBNY:  Okay with me.

14        MR. GOLDFARB:  I apologize for the break.

15              Let's mark this, please, as No. 5.

16                  (WHEREUPON, a certain document was

17                   marked Bluth Deposition Exhibit

18                   No. 5, for identification, as of

19                   12-17-2009.)

20   BY MR. GOLDFARB:

21        Q.    Ms. Bluth, take a look at this, please.

22   And for the record, this is a four-page document

23   bearing Bates number, first page, GBTRIB 00008205.

24        MR. DROBNY:  Is there a question?

Elyse S. Bluth                                      December 17, 2009

CONFIDENTIAL

96

1        MR. GOLDFARB:  No.  I am giving the witness a

2    chance to look at the document.

3    BY THE WITNESS:

4        A.    Do you want me to read the document?

5    BY MR. GOLDFARB:

6        Q.    I want you to satisfy yourself that you

7    are familiar with it.  I can point you to

8    particular things in the document and ask you

9    questions about it, yes.

10       A.    I have never seen this document before

11   to my knowledge, to my recollection.  So should I

12   read it?

13       Q.    Why don't I ask you some general

14   questions and then we'll proceed from there.

15       A.    Okay.

16       Q.    You see this document appears to be

17   handwritten notes --

18       A.    Yes.

19       Q.    -- by someone?

20             Do you recognize the handwriting?

21       A.    No.

22       Q.    Do you see the reference to March 19 and

23   Tower on the top of the first page?

24       A.    Yes.

CONFIDENTIAL

97

1        Q.     Do you know what the term "Tower" refers

2    to?

3        A.     Yes.

4        Q.     What does it refer to?

5        A.     Tower was the working name used for

6    Tribune.

7        Q.     Looking over this document would it

8    appear to be notes that someone took of a meeting?

9        MR. DROBNY:   Objection; foundation.

10   BY THE WITNESS:

11       A.     It appears to be notes -- could be notes

12   of a phone call.  I don't know.

13   BY MR. GOLDFARB:

14       Q.     Do you recall having a phone call or

15   meeting in March of 2007 about the Tower

16   transaction with people at GreatBanc and people at

17   Duff & Phelps?

18       A.     My estimate is that I had hundreds of

19   phone calls and meetings on this matter.

20       Q.     Do you see on the top right of the

21   document it refers to -- there are some names

22   listed?

23       A.     Yes.

24       Q.     Can you read those names?

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                              98

1          A.    Elyse Bluth, Chris Janssen, Henry
2    Snyder, Charlie Smith.
3          Q.    You've referred earlier to Mr. Janssen,
4    correct?
5          A.    Yes.
6          Q.    Who is Mr. Snyder?
7          A.    An attorney at K&L Gates.
8          Q.    K&L Gates is a law firm?
9          A.    Yes.
10         Q.    Did they represent a party to this
11   transaction?
12         A.    K&L Gates represented GreatBanc.
13         Q.    And who was the last name listed among
14   those four at the top of the page?
15         A.    Charlie Smith.
16         Q.    Do you know Mr. Smith?
17         A.    I do.
18         Q.    Who is Mr. Smith?
19         A.    Mr. Smith is an attorney at K&L Gates.
20         Q.    Were Mr. Snyder, Mr. Smith -- did you
21   have numerous conversations in March of 2007 to
22   your recollection that involved Mr. Snyder and
23   Mr. Smith?
24         A.    Yes.

Elyse S. Bluth                                        December 17, 2009
CONFIDENTIAL

99

1          Q.     On the left-hand side you see that there

2     are what appear to be initials down the left-hand

3     side?

4          A.     Yes.

5          Q.     The third one is MM.  Do you see that?

6          A.     I do.

7          Q.     Would you take that to refer to

8     Ms. Marchetti?

9          MR. DROBNY:  Objection; calls for speculation,

10    lack of foundation.

11    BY THE WITNESS:

12         A.     It's a guess.

13         MR. DROBNY:  It could be Mickey Mouse.

14         MR. GOLDFARB:  It could be Mickey Mouse, you

15    are right, counsel.

16    BY MR. GOLDFARB:

17         Q.     Do you recall a meeting in March of 2007

18    involving at least Mr. Janssen, Mr. Snyder and

19    Mr. Smith at which there were discussions about

20    solvency?

21         MR. JOHNSTON:  Object to the form.

22         MR. DROBNY:  Object to form and foundation as

23    well.

24    BY THE WITNESS:

CONFIDENTIAL

1      A.    I don't remember any meetings with the

2   fiduciary aside from final presentations -- even

3   final presentations that Chris Janssen was involved

4   in.  So I don't remember.

5   BY MR. GOLDFARB:

6      Q.    Okay.  If you turn the page to the

7   second page, please, in the middle of the page

8   would you agree with me that the text, the

9   handwritten text, there says "Solvency - issues on

10  opinions"?

11     A.    I read the language the same way you do.

12     Q.    Okay.  Would you read the next line as I

13  do, which is "Board wonders if they need someone

14  else"?

15     A.    Yes.

16     Q.    Do you remember participating in a

17  meeting in March 2007 involving at least

18  Mr. Janssen, Mr. Snyder and Mr. Smith at which the

19  issue was raised about solvency and the entity that

20  might provide the board with a solvency opinion?

21     MR. DUCAYET:  Object to the form.

22     MR. DROBNY:  Same objection.

23  BY THE WITNESS:

24     A.    I remember this issue being generally

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

101

1    discussed.  I don't remember any specific meetings

2    or phone calls about it.

3    BY MR. GOLDFARB:

4        Q.    Was it a topic of frequent discussion to

5    your recollection?

6        MR. JOHNSTON:  Objection to form.

7    BY THE WITNESS:

8        A.    It's a topic that came up more than

9    once.  I don't know if that qualifies as frequent.

10   BY MR. GOLDFARB:

11       Q.    And what do you recall the discussion on

12   this topic being at any point in time?

13       A.    I recall the discussion being whether or

14   not it made sense for the company to have its own

15   separate advisor than Duff & Phelps who was at this

16   point advising the fiduciary to the ESOP.

17       Q.    Did you express a view on that?

18       A.    I don't remember.

19       Q.    Do you remember anyone during any

20   discussions expressing a view that the board should

21   have a party other than Duff & Phelps issue a

22   solvency opinion?

23       MR. JOHNSTON:  Objection as to form.

24   BY THE WITNESS:

CONFIDENTIAL

1        A.      There were many transactions being

2   contemplated.   The ESOP was not the only

3   transaction that was being contemplated.   And so

4   when you are referring to a solvency opinion, if

5   Duff & Phelps was not involved -- if the ESOP

6   transaction was put to bed, then Duff & Phelps

7   would be available to potentially issue a solvency

8   opinion to the board.

9            There were many, many things being

10  discussed at that point in time.

11  BY MR. GOLDFARB:

12       Q.      In the March 8th engagement letter that

13  we looked at earlier it indicated that the board

14  would be able to -- if a solvency opinion were

15  issued to the trustee, the board would be able to

16  rely on it.

17           Do you recall that part of the

18  engagement letter?

19       A.      Yes, of course.

20       Q.      Your testimony just suggested that it

21  was only -- sort of a different scenario as I

22  heard, which is if the ESOP transaction was put to

23  bed, then Duff would be available to issue an

24  opinion to the board.   What did you mean by that?

Elyse S. Bluth                                December 17, 2009

CONFIDENTIAL

                                                        103

1        A.     If the decision was made for the company

2    not to pursue -- that the company would not pursue

3    the ESOP transaction and the ESOP engagement

4    terminated, then Duff & Phelps would be available

5    to issue a solvency opinion to the board,

6    particularly since Duff & Phelps was already up to

7    speed on all of the financials of the company and

8    what was being contemplated.

9        Q.     Would you agree with me that a few lines

10   down is a statement handwritten there that says,

11   "The ESOP trustee will need its own solvency"?

12       A.     That is what it says.

13       Q.     Do you recall discussions during this

14   period in March of 2007 about the ESOP trustee

15   needing its own solvency opinion?

16       A.     Yes.

17       Q.     Do you recall having that discussion

18   with Mr. Janssen, Mr. Snyder and Mr. Smith?

19       A.     I remember having the discussions.  I

20   don't remember who they were with specifically.

21       Q.     What do you recall about those

22   discussions?

23       A.     I recall discussions that the ESOP

24   trustee might require a solvency opinion.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

1       Q.    Do you recall any point in time where a

2    view was expressed that the ESOP trustee needed to

3    have its own solvency opinion?

4       A.    A solvency opinion is not a standard

5    opinion to an ESOP fiduciary and so I am not sure

6    what you mean by need.

7       Q.    And why do you say a solvency opinion is

8    not a standard opinion issued to an ESOP fiduciary?

9       A.    ESOP fiduciaries request opinions and

10   they don't always request solvency opinions.  I

11   think I said before they rarely request solvency

12   opinions.

13      Q.    Do you recall if at any point in time

14   the ESOP trustee in this case did request a

15   solvency opinion?

16      A.    I remember discussions of a solvency

17   opinion with the ESOP trustee.

18      Q.    And do you remember the ESOP trustee

19   expressing the view that it needed a solvency

20   opinion?

21      A.    I remember the ESOP trustee wanted some

22   assurance that the company would be viable

23   post-transaction.  The form of the opinion was

24   under discussion.

Elyse S. Bluth                                  December 17, 2009
CONFIDENTIAL

1        Q.      What do you mean by "viable"?

2        A.      The ESOP trustee wanted some assurance

3   that given the company's outlook, the company's

4   projections, and the amount of debt that the

5   company was incurring that someone was looking at

6   the financials and seeing whether or not they

7   thought the company could handle the amount of debt

8   that it was incurring.

9        Q.      How do you understand this issue of

10  viability to differ from a solvency opinion?

11       MR. DROBNY:  Object foundation.

12       MR. DUCAYET:  Object to form.

13  BY THE WITNESS:

14       A.      I am not in the solvency practice.  I

15  don't do solvency opinions.  And I can't speak to

16  the technical opinions and details of what a

17  solvency opinion contains.

18            That said, my general understanding was

19  that the technical words and opinions in a solvency

20  opinion did not have particular meaning to an ESOP

21  fiduciary.

22            So the question was much more of, gee,

23  do we think this company will survive with the

24  heavy debt load versus any concepts of certain

CONFIDENTIAL

1   solvency tests or -- the technical parts of a

2   solvency opinion.

3   BY MR. GOLDFARB:

4        Q.    Did you have any understanding of why

5   the components or technical aspects of a solvency

6   opinion as you referred to don't have particular

7   meaning to an ESOP fiduciary?

8        A.    Very generally I do.  But again, it's a

9   very general, broad understanding, not a detailed

10  understanding.

11       Q.    What is that understanding?

12       A.    The concepts -- my general understanding

13  was that the concepts of fraudulent conveyance had

14  no meaning for an ESOP fiduciary, or that no one

15  was sure whether they had any meaning for an ESOP

16  fiduciary.

17       Q.    Explain, if you would, what the

18  connection is between fraudulent conveyance and a

19  solvency opinion.

20       A.    Now you are asking for the technical

21  parts that I should not be speaking to since I am

22  not in the solvency practice.

23       Q.    Do you recall participating in meetings

24  or discussions where those issues were raised and

Elyse S. Bluth                                              December 17, 2009

CONFIDENTIAL

107

1   discussed?

2        A.    Yes, I recall participating in those

3   conversations.

4        Q.    And who in your recollection were the

5   people who were the ones knowledgeable about the

6   issues who were discussing them and the degree of

7   applicability to this particular entity?

8        MR. JOHNSTON:  Objection to form.

9   BY THE WITNESS:

10       A.    The fiduciary, fiduciary counsel, and

11  people at Duff & Phelps.

12  BY MR. GOLDFARB:

13       Q.    Who at Duff & Phelps?

14       A.    My general recollection is that Bob

15  Bartell participated in those conversations.  I

16  don't remember if Chris Janssen did.

17       Q.    Looking at the document before you,

18  Ms. Bluth, would you agree with me that the next

19  entry on the notes says, "There is no case law to

20  support considering tax savings of the ESOP in

21  solvency"?

22       A.    I see that.

23       Q.    Would you agree with me that --

24       A.    That's what the words say, yeah.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

108

1        Q.    Do you recall being part of discussions

2    where this issue was a topic?

3        A.    Yes.

4        Q.    What do you recall about those

5    discussions?

6        A.    I recall many discussions as to whether

7    or not the tax savings made sense to consider in

8    the context of a solvency opinion.

9        Q.    And why was that an issue in connection

10   with this ESOP transaction?

11       MR. JOHNSTON:  Objection to form and

12   foundation.

13       MR. DROBNY:  Object to foundation.

14   BY THE WITNESS:

15       A.    If the ESOP -- at the time if the ESOP

16   transaction closed, those tax savings made a

17   difference to the company's ability to service its

18   debt.  And so the question was whether or not the

19   tax savings should be considered in a variety of

20   different analyses.

21   BY MR. GOLDFARB:

22       Q.    And I will take a step back to establish

23   a foundation.  What are the tax savings that you

24   are referring to?

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                          109

1          MR. JOHNSTON:   Objection as to form.

2    BY THE WITNESS:

3          A.    I don't know which tax savings were

4    being described at the time these notes were taken.

5    I can only speak to generally the tax savings that

6    arose out of the ultimate ESOP transaction.

7    BY MR. GOLDFARB:

8          Q.    And in general am I correct that the tax

9    code gives -- or ERISA gives favorable tax

10   treatment to ESOP structures in certain

11   circumstances?

12         MR. JOHNSTON:   Objection to form.

13         MR. DROBNY:   Object to form and foundation.

14   BY THE WITNESS:

15         A.    Contributions to ESOPs are

16   tax-deductible, as are contributions to any ERISA

17   pension plan within the limits prescribed by the

18   IRS.  So there are tax benefits to that.

19              There are tax benefits in private

20   companies when shareholders sell to an ESOP.  There

21   are also tax benefits when a company -- well, when

22   you put an ESOP into a Subchapter S company,

23   because a Subchapter S is a flow-through tax

24   entity, an ESOP doesn't have to pay tax on its

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

110

1    portion of the earnings of the Subchapter S company

2    and, therefore, the ESOP can maintain the cash if

3    tax distributions are made to other shareholders.

4               In instances where an ESOP owns 100

5    percent of a Subchapter S company, it's not

6    necessary to make those tax distributions since the

7    ESOP doesn't have to pay taxes and the company can

8    maintain that cash.

9    BY MR. GOLDFARB:

10        Q.    Are those last two aspects that you

11   identified; i.e., a Subchapter S election and 100

12   percent ownership by the ESOP of -- excuse me --

13   100 percent owner of the S corp by the ESOP, were

14   those relevant considerations in connection with

15   the Tribune ESOP transaction?

16        MR. DUCAYET:  Object to form and foundation.

17        MR. DROBNY:  Object to form.

18   BY THE WITNESS:

19        A.    Relevant to what?

20   BY MR. GOLDFARB:

21        Q.    Relevant to any aspect of the

22   transaction.

23        A.    The transaction was structured to be tax

24   efficient.  So certainly the structure whereby the

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

111

1    ESOP owned 100 percent of the company and there was

2    no need for tax distributions mattered.  So yes, it

3    was relevant.

4         Q.    So going back to the discussions that

5    you recall about whether tax savings of the ESOP

6    could be considered for solvency purposes, can you

7    now clarify or to your recollection what tax

8    savings were relevant to that issue?

9         MR. JOHNSTON:  Objection to the form of the

10   question.

11        MR. DROBNY:  Object to form and foundation.

12   BY THE WITNESS:

13        A.    We were all well aware that the company

14   was planning to elect to be a Subchapter S

15   corporation, and at some point in the structuring

16   of the transaction the ESOP was intended -- or the

17   transaction was structured so that the ESOP would

18   own 100 percent of the company and the tax

19   distributions would not need to be made.

20            And we were all well aware that the cash

21   savings from not paying federal income taxes and

22   most state taxes would be available to use in other

23   ways, either reinvesting in the company or in

24   repaying debt.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

112

1           So it was relevant to all sorts of parts

2    of our analysis.

3    BY MR. GOLDFARB:

4        Q.     Including solvency?

5        MR. DROBNY:  Objection; lack of foundation.

6    BY THE WITNESS:

7        A.     I have said about ten times that I was

8    not involved in the solvency aspect, so I can't

9    speak directly to what was involved in solvency.

10   We also did not issue a solvency opinion.

11          So my -- whether or not I think -- it's

12   not -- I am not an appropriate person to answer

13   that kind of a question.

14   BY MR. GOLDFARB:

15       Q.     Okay.  I am not asking your opinion of

16   it.  I am asking as to whether you recall whether

17   the discussions as to the importance of the tax

18   savings also included the importance of the tax

19   savings in the context of solvency.

20       MR. JOHNSTON:  Same objection.

21       MR. DROBNY:  Objection; asked and answered.

22   BY THE WITNESS:

23       A.     The conversations revolved around the

24   importance of the tax savings to the company's

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

113

1  ability to service its debt.  It was not

2  necessarily related to the word solvency.

3  BY MR. GOLDFARB:

4       Q.    If you look at the last page of this,

5  the last line of this, would you agree that the

6  handwritten notes say "Solvency opinion to the

7  board cannot factor in ESOP tax benefits"?

8       A.    That is what the words say.

9       Q.    Do you recall being part of a discussion

10  where someone expressed the view that a solvency

11  opinion to the board could not factor in the ESOP

12  tax benefits?

13       A.    My recollection is that it was -- what

14  was discussed was whether or not it could be

15  factored in.  I don't recall ever coming to a

16  conclusion on it.

17       Q.    When you say "ever coming to a

18  conclusion," do you mean in the context of a

19  particular discussion or in the context of the

20  broader engagement as a whole?

21       MR. JOHNSTON:  Objection to the form.

22       MR. DROBNY:  Object to form.

23  BY THE WITNESS:

24       A.    My recollection of the discussions as to

CONFIDENTIAL

114

1    whether or not tax savings related to the Sub S

2    structure could be considered in a solvency opinion

3    to the board were never -- my recollection is that

4    those -- it was never definitive to that issue,

5    that it was an open question.

6         MR. GOLDFARB:  Let's go off the record,

7    please.

8                    (WHEREUPON, at 12:36 p.m. the

9                    deposition was recessed until

10                   1:25 p.m., this date.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

115

1            IN THE UNITED STATES BANKRUPTCY COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4    In Re:                        ) Chapter 11

5          TRIBUNE COMPANY, et al.,    ) Case No.

6                    Debtors.      ) 08-13141 (KJC)

7

8

9              CONFIDENTIAL PURSUANT TO

10             CONFIDENTIALITY AGREEMENT

11

12                 DECEMBER 17, 2009

13                    1:25 p.m.

14

15          The confidential deposition of

16   ELYSE S. BLUTH resumed pursuant to recess at Suite

17   3500, 35 West Wacker Street, Chicago, Illinois.

18

19

20

21

22

23

24

CONFIDENTIAL

                                                          116

1    PRESENT:

2            ZUCKERMAN SPAEDER, LLP,

3            (1800 M Street, NW, Suite 1000,

4            Washington, D.C.  20036-5802,

5            202-778-1800), by:

6            MR. ANDREW N. GOLDFARB,

7                -and-

8            CHADBOURNE & PARKE, LLP,

9            (30 Rockefeller Plaza,

10           New York, New York  10112,

11           212-408-5100), by:

12           MR. MARC D. ASHLEY,

13           MS. ELIZABETH M. MILLER,

14               appeared on behalf of the Committee

15               of Unsecured Creditors;

16           KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP,

17           (1633 Broadway,

18           New York, New York  10019-6799,

19           212-506-1700), by:

20           MR. SHERON KORPUS,

21               appeared on behalf of New York

22               Law Debentures;

23

24

CONFIDENTIAL

117

1    PRESENT:  (Continued)

2          O'MELVENY & MYERS, LLP,

3          7 Times Square,

4          New York, New York  10010,

5          212-326-4303), by:

6          MR. ZACK GROSS,

7               appeared on behalf of

8               Bank of America;

9          HENNIGAN BENNETT & DORMAN, LLP,

10         (865 South Figueroa Street, Suite 2900,

11         Los Angeles, California  90017,

12         213-694-1152), by:

13         MR. JAMES O. JOHNSTON,

14         MR. JAMES W. BERGMAN,

15              appeared on behalf of the

16              Credit Agreement Lenders;

17         KAYE SCHOLER, LLC,

18         (3 First National Plaza, Suite 4100,

19         70 West Madison Street,

20         Chicago, Illinois  60602-4231,

21         312-583-2433), by:

22         MR. ROBERT M. SPALDING,

23              appeared on behalf of Merrill Lynch;

24

Elyse S. Bluth                                        December 17, 2009
CONFIDENTIAL

                                                              118

1    PRESENT:  (Continued)

2          DAVIS POLK & WARDWELL, LLP,

3          (450 Lexington Avenue,

4          New York, New York  10017,

5          212-450-4462), by:

6          MR. LYNN EARL BUSATH,

7               appeared on behalf of JPMorgan Chase;

8          SIDLEY AUSTIN, LLP,

9          (One South Dearborn,

10         Chicago, Illinois  60603,

11         312-853-7621), by:

12         MR. JAMES W. DUCAYET,

13              -and-

14         SIDLEY AUSTIN, LLP,

15         (1501 K Street, N.W.,

16         Washington, D.C., 20005,

17         202-736-8000), by:

18         MR. DAVID M. MILES,

19              appeared on behalf of Tribune Company;

20

21

22

23

24

CONFIDENTIAL

119

1    PRESENT: (Continued)

2          WINSTON & STRAWN, LLP,

3          (35 West Wacker Drive,

4          Chicago, Illinois  60602,

5          312-558-7332), by:

6          MR. DANE A. DROBNY,

7              appeared on behalf of the Deponent.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    REPORTED BY:  SUSAN K. TODAY, C.S.R., R.P.R.

24              License No. 84-2212.

CONFIDENTIAL

120

1          MR. GOLDFARB:  Back on the record.

2                    ELYSE S. BLUTH,

3     called as a witness herein, having been previously

4     duly sworn and having testified, was examined and

5     testified further as follows:

6                    EXAMINATION (Resumed)

7     BY MR. GOLDFARB:

8          Q.    Ms. Bluth, did you ever advise GreatBanc

9     as to what opinions it needed in connection with

10    the ESOP transaction?

11         A.    No.

12         Q.    Did anybody at Duff & Phelps provide

13    that advice to your knowledge?

14         A.    No.  The opinions are usually the

15    subject of discussions of a fiduciary with its

16    counsel.  They request them of the financial

17    advisor, but the nature of the opinions is usually

18    discussed with counsel.

19         Q.    With you say the "nature of the

20    opinions," what do you mean by that?

21         A.    The types of opinions required

22         Q.    That was nothing that the trustee ever

23    asked you about?

24         MR. DROBNY:  Objection; asked and answered.

Elyse S. Bluth                                        December 17, 2009
CONFIDENTIAL

121

1    BY THE WITNESS:

2         A.    If you are asking me whether the trustee

3    asked me which opinions it should receive from

4    Duff & Phelps, the answer is no.

5    BY MR. GOLDFARB:

6         Q.    Okay.  That was my question.

7         A.    Okay.

8         Q.    Were you ever present during discussions

9    when the trustee counsel advised the trustee as to

10   the opinions it should request from Duff & Phelps

11   in connection with this engagement -- excuse me --

12   in connection with the transaction?

13        A.    The opinions that the trustee was

14   requesting of Duff & Phelps are outlined in the

15   engagement letter, and I was certainly present

16   during discussions of what would go into our

17   engagement letter.

18        Q.    Okay.  And at some point you testified

19   earlier that Duff & Phelps ultimately did not

20   render a formal solvency opinion to the ESOP

21   trustee, correct?

22        A.    Yes.

23        Q.    In earlier iterations of the engagement

24   letter which we have looked at today such a

Elyse S. Bluth                                      December 17, 2009

CONFIDENTIAL

122

1   solvency opinion was contemplated, right?

2        A.    I would characterize it differently.

3   Such an opinion was considered.

4        Q.    Okay.  And do you know the basis for the

5   ultimate decision not to have Duff & Phelps issue a

6   solvency opinion in connection with the

7   transaction?

8        A.    Earlier today I testified that we

9   weren't sure whether or not the technical aspects

10  to a solvency opinion had any meaning to the

11  trustee.  As a result, we asked the trustee what it

12  really wanted and what it needed and tried to give

13  them what they were asking for, which was some

14  sense that we had tested the company's financials

15  and we had taken a look at whether or not we

16  thought the company could meet its obligations on

17  the day given the projections, et cetera.

18       Q.    Was there a change in perspective over

19  time from the earlier engagement letter and

20  discussions that did contemplate a possible

21  solvency opinion?

22       MR. JOHNSTON:  Objection to the form of the

23  question.

24       MR. DROBNY:  Mischaracterizes her testimony.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

123

1    BY THE WITNESS:

2         A.    It's not unusual for the opinions that

3    are issued to be different than the opinions that

4    are outlined in an engagement letter as people's

5    thinking develops and as a transaction develops.

6    BY MR. GOLDFARB:

7         Q.    And did that occur here?

8         A.    Yes, very clearly it occurred here.  We

9    didn't issue a solvency opinion; we didn't issue a

10   bring-down opinion.

11        Q.    Do you know who made the determination

12   that the technical requirements of a formal

13   solvency opinion were not what the trustee was

14   looking for in this case from Duff & Phelps?

15        A.    I am not sure any such determination was

16   made.  We provided what ultimately the trustee

17   requested.

18        Q.    And so is it your understanding that

19   someone at the trustee made a decision not to

20   request a solvency analysis or is your

21   understanding of the ultimate form of -- the

22   determination as to what ultimate form the opinions

23   would take different?

24        MR. JOHNSTON:  Objection to the form of the

Elyse S. Bluth                                December 17, 2009

CONFIDENTIAL

124

1    question.

2         MR. DROBNY:   Same objection to the form.

3    BY THE WITNESS:

4         A.    Could you restate that question, please?

5    BY MR. GOLDFARB:

6         Q.    Sure.   What is your understanding of who

7    made the decision as to what form the ultimate

8    opinions -- not the content but the form that the

9    ultimate opinions that Duff & Phelps would render

10   for the trustee would take?

11        MR. DROBNY:   Objection; foundation.

12   BY THE WITNESS:

13        A.    As with any opinion that I have been

14   involved in that's issued by Duff & Phelps, the

15   words in the opinion are discussed, described among

16   all the parties that are involved.   So who made the

17   decisions about what words I can't testify today.

18   And that includes the ESOP opinions.

19             We draft opinions.   We share them with

20   the other side.   There are comments back and forth.

21   And ultimately something -- an opinion that is

22   satisfactory to all parties is issued.   If it's not

23   satisfactory to any of the parties, then the

24   opinion doesn't get issued.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                              125

1        MR. GOLDFARB:  Let's please mark this as Bluth

2    No. 6.

3                        (WHEREUPON, a certain document was

4                        marked Bluth Deposition Exhibit

5                        No. 6, for identification, as of

6                        12-17-2009.)

7    BY MR. GOLDFARB:

8        Q.    Bluth No. 6 is a document bearing Bates

9    number D&P TR105502.

10            Ms. Bluth, do you recognize this

11    document?

12        A.    It appears to be a printout of an

13    e-mail.

14        Q.    And you see that it was sent from

15    wmerten@mwe.com.  Do you see that?

16        A.    Yes.

17        Q.    Who does that refer to?

18        A.    Bill Merten at McDermott Will & Emery.

19        Q.    Who is Mr. Merten?  What relationship

20    did he have to you that he was sending you an

21    e-mail?

22        A.    Bill Merten was representing Tribune.

23        Q.    And the e-mail states to you and Marilyn

24    Marchetti of GreatBanc -- do you see that?

CONFIDENTIAL

126

1      A.     Yes.

2      Q.     -- that "Crane Kenney would like to have

3   a call with the two of you at 1:30 Central to hear

4   what you plan on saying tomorrow at 5:45 Central to

5   the special committee.  Will you please let me know

6   about your availability as soon as possible?"

7           Do you know what meeting of the special

8   committee Mr. Merten is referring to?

9      A.     I don't remember.

10     Q.     During this period in March 2007 do you

11  recall making a presentation or communicating with

12  the special committee of the Tribune?

13     A.     I don't recall any special -- no, I

14  don't recall any conversations or meetings with the

15  special committee of the Tribune.

16     Q.     Just to confirm, when you see the word

17  "special committee" in the context of this e-mail,

18  do you interpret it also to refer to the special

19  committee of the Tribune board?

20     MR. DROBNY:  Objection; foundation.

21  BY THE WITNESS:

22     A.     I am assuming that there was a special

23  committee of the board.  I don't recall whether or

24  not there was a special committee of the board and

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

127

1    I don't remember having conversations with them.

2    BY MR. GOLDFARB:

3        Q.    Do you recall at any point in time being

4    scheduled to make a presentation or have some

5    communication with the board -- excuse me -- with

6    the special committee?

7        A.    On the closing of the transaction I

8    attended a board meeting with Marilyn Marchetti and

9    I believe her counsel.  It was on the night of the

10   closing, April 1st or April 2nd.  I don't recall

11   which.  I don't know -- I don't remember whether or

12   not the people in the room were the special

13   committee or whether it was the full board.

14            That's the only direct recollection I

15   have of meetings that involved any -- of meetings

16   that were of the board of Tribune or any part of

17   the board of Tribune.

18       Q.    Did you make any presentations to

19   individuals at the Tribune whether or not you knew

20   they were affiliated with a special committee

21   during the period of March 2007?

22       A.    I had numerous conversations with many

23   people at Tribune.  I don't know that you would

24   characterize any of them as presentations.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

128

1        Q.    What communications, if any, did you

2    have with Mr. Merten during this period of time?

3        A.    I spoke to him five times a day every

4    day.  Of course that's an exaggeration or a casual

5    way of saying that I spoke to him many, many times.

6        Q.    And why in general were you having such

7    frequent conversations with Mr. Merten?

8        A.    We were in the middle of a transaction

9    and we were trying to figure out how to get a

10   transaction completed and if it was going to get

11   completed.  There were conversations involved

12   getting information, there were conversations about

13   the structure of the deal, there were conversations

14   about timing, there were conversations about

15   setting up other conversations.  There were many

16   conversations.

17       Q.    Did you have conversations with people

18   at the Tribune where you gave them updates on the

19   progress of Duff & Phelps' work on the ESOP

20   analyses?

21       A.    No.

22            Let me clarify that.  It may be that

23   someone at Tribune at one point asked me, "When are

24   you meeting with GreatBanc; are you meeting with

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                              129

1    GreatBanc," in which case I would have answered I

2    am meeting with GreatBanc at such-and-such a time;

3    we'll get back to you after that meeting and let

4    you know the progress, or someone at GreatBanc

5    would.

6              But our engagement was with GreatBanc,

7    and I had no authority nor would I have ever

8    thought to respond to Tribune on any of the work

9    that we were doing for GreatBanc.

10        Q.    So then what were the nature of your

11   frequent conversations with people at the Tribune

12   during this period?  What was the general substance

13   of those communications?

14        A.    As in any conversation -- excuse me --

15   as in any transaction in which you are buying stock

16   from a company, there are numerous issues that come

17   up that would need follow-up and so phone calls

18   would be placed in order to follow up.

19              For example, had Citigroup presented a

20   new model, could we get a copy of the new model, or

21   is this number correct, or could you explain XYZ

22   about your financial statements, could you explain

23   something about your projections.  There were

24   numerous conversations like that.  Do you really

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

130

1    own this percentage of Food Network or is it a

2    different percentage?  Could you describe what the

3    status is of the Microsoft investment in Food

4    Network -- in CareerBuilder.

5              Many, many questions would come up and

6    therefore calls would be made to Trib.

7         Q.    And these are calls you would make

8    personally?

9         A.    Often.  Not always.

10        Q.    Was there a particular person with whom

11   you had primary contact at the Tribune for these

12   types of substantive inquiries?

13        A.    Most of my calls were either to Don

14   Grenesko, Chandler Bigelow, Dan Kazan.

15        Q.    What position did Mr. Bigelow hold?

16        A.    At the time he was treasurer.

17        Q.    And Mr. Kazan?

18        A.    I don't know his title.

19        Q.    Do you know what general area of the

20   company he worked or for what he was responsible?

21        A.    He was in the finance area.

22        MR. GOLDFARB:  Let's mark -- we will mark it

23   as two separate documents.  Bluth 7 is this one.

24

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

                                                            131

1              (WHEREUPON, a certain document was

2              marked Bluth Deposition Exhibit

3              No. 7, for identification, as of

4              12-17-2009.)

5          MR. GOLDFARB:  And here's No. 8.

6              (WHEREUPON, a certain document was

7              marked Bluth Deposition Exhibit

8              No. 8, for identification, as of

9              12-17-2009.)

10         MR. GOLDFARB:  Counsel, I'll represent for the

11     record that this document indicates it has two

12     attachments.  One of them is an ESOP model and one

13     of them was a rating agency presentation.  The

14     model was a very, very long printout document and I

15     didn't intend to ask any questions about it.  I

16     gave you the first page of it.

17         MR. DROBNY:  Okay.

18         MR. GOLDFARB:  And then the other document was

19     the other -- as you see, it was about 110 pages.

20     And then the rating agency presentation was the

21     second attachment to this e-mail.

22         MR. DROBNY:  Okay.

23         MR. DUCAYET:  Are you marking this as a

24     separate exhibit?

CONFIDENTIAL

132

1          MR. GOLDFARB:  7 is the e-mail.  8 is the

2     rating agency presentation.

3     BY MR. GOLDFARB:

4          Q.    Bluth Exhibit 7 is a document bearing

5     Bates number D&P TR105330 and Bluth 8 bears Bates

6     number D&P TR105440.

7               Have you had a chance to look at these

8     documents?

9          A.    I see what the document is.

10         Q.    Looking first at Bluth No. 7, can you

11    tell me what that document is, please?

12         A.    This is an e-mail from Chandler Bigelow

13    at Tribune to me.

14         Q.    And dated March 23rd, 2007; is that

15    right?

16         A.    Yes.

17         Q.    The text of the e-mail states, "Elyse,

18    attached is the rating agency presentation and our

19    latest financial model.  Also, as I mentioned to

20    Bob earlier, I confirmed that Bob's group can speak

21    with GreatBanc.  Please let me know if you have any

22    questions.  Many thanks.  Chandler."

23              Looking at Bluth Exhibit 8, do you

24    recognize that as the rating agency presentation

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

133

1    referred to in the e-mail?

2         A.    I think you just told me that this was

3    the attachment on this e-mail, otherwise I wouldn't

4    know if it was exactly the attachment that was on

5    the e-mail.

6         Q.    Do you recall this e-mail from

7    Mr. Bigelow?

8         A.    Not particularly, no.

9         Q.    Do you recall reviewing at any point in

10   time the rating agency presentation?

11        A.    I remember reviewing rating agency

12   presentations, yes.

13        Q.    What was the importance of the

14   presentation to the work that you were doing?

15        A.    All information regarding Tribune and

16   the proposed ESOP transaction was important and so

17   a rating agency presentation was one of the pieces

18   of information we received.

19        Q.    Was there particular information in this

20   rating agency presentation that was of relevance

21   to -- of particular relevance to what you were

22   doing?

23        A.    Without reviewing it in detail I can't

24   tell you whether there was anything in here that we

Elyse S. Bluth                              December 17, 2009
CONFIDENTIAL

134

1   didn't already know.

2        Q.    What was the general process by which

3   you obtained information from the Tribune?

4        A.    We received information both in hard

5   copy and via e-mail.

6        Q.    Was that pursuant to requests that you

7   made to the Tribune for information?

8        A.    Sometimes.

9        Q.    Did they send things to you without you

10  having requested them?

11       A.    Sometimes.

12       Q.    What type of information would they send

13  to you without your having requested it?

14       A.    Examples might include updated financing

15  models, updated projections, preliminary financial

16  statements.  Since they knew that we were working

17  contemporaneously with their work, they wanted to

18  provide us the most updated information as possible

19  and wouldn't necessarily wait until we requested

20  such information.

21       Q.    The second sentence of the e-mail says,

22  "As I mentioned to Bob earlier, I confirmed that

23  Bob's group can speak with GreatBanc."

24            Do you know the meaning of that

Elyse S. Bluth                                          December 17, 2009
CONFIDENTIAL

135

1    sentence?

2          MR. DROBNY:   Object to foundation.

3    BY THE WITNESS:

4          A.     My assumption is that he is referring to

5    Bob Bartell and that he is confirming that Bob

6    Bartell and those who were working with Bob Bartell

7    on solvency analyses could speak with GreatBanc.

8    BY MR. GOLDFARB:

9          Q.     Was there an issue that arose at any

10   point in time that suggested otherwise?

11         MR. JOHNSTON:   Objection to the form of the

12   question.

13         MR. DROBNY:   Same objection.

14   BY THE WITNESS:

15         A.     When we were originally retained

16   pursuant to the engagement letter related to the

17   solvency opinion there were confidentiality

18   restrictions in that.

19              When we were later retained in

20   connection with the ESOP engagement there were

21   confidentiality provisions also.

22              There was never an intent that both of

23   those engagements should go to final conclusion.

24   We were either going to be responsible to the

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

136

1    trustee or be responsible to the board, and we

2    wanted to make sure that everyone was aware and

3    that any information that was on one assignment was

4    available to be used for the other assignment.

5              So we were confirming with Tribune and I

6    believe we had written confirmation of sharing of

7    information that any information that had been

8    provided, for example, prior to our engagement on

9    the ESOP side to the solvency people, that we could

10   use that in the ESOP engagement.

11             And in addition, just to be clear, we

12   wanted to make sure that anyone who had worked on

13   the solvency engagement was available to talk to

14   GreatBanc.

15   BY MR. GOLDFARB:

16        Q.    To talk to GreatBanc about what?

17        MR. JOHNSTON:  Objection to the form of the

18   question.

19   BY MR. GOLDFARB:

20        Q.    If you know.

21        A.    Tribune.

22        Q.    And what particular aspect of the

23   Tribune engagement?

24        A.    Any aspect of the Tribune engagement.

Elyse S. Bluth                                          December 17, 2009
CONFIDENTIAL

137

1      Q.      So is it your understanding that by this

2   e-mail Mr. Bigelow was reaffirming the ability of

3   the solvency team to communicate with GreatBanc?

4      A.      You can't split individuals in half.

5   Some of these people were working on both

6   engagements.  I said before the people working on

7   the valuation -- there were people working on

8   valuation aspects.  Valuation aspects were being

9   used for both engagements.

10          And so we wanted -- we must have asked

11   Chandler -- and I don't recall specifically being

12   part of that conversation, but we must have asked

13   Chandler that it was all right to have people

14   working on both and that the people who had

15   worked on -- even people who had worked solely on

16   one part of the engagement were available to speak

17   to GreatBanc.  And he affirmed that there were no

18   confidentiality issues here.

19      Q.      You indicated a minute ago that there

20   was never an intent that both of the engagements

21   would go to a final conclusion and that in the end

22   you would issue opinions either on behalf of the

23   trustee or on behalf of the Tribune.

24          Does that accurately state your

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

138

1   testimony?

2        A.    Yes.

3        Q.    Can you explain that a little further

4   about how that arrangement was set up and what the

5   thinking was?

6        A.    I think you've seen in the engagement

7   letters how the arrangement was set up.  The

8   thinking was that because there were competing bids

9   for Tribune and there were competing transactions

10  that were being reviewed, the ESOP was only one of

11  several transactions that was being considered and

12  there was no certainty that the ESOP transaction

13  was going to be the one that was pursued and chosen

14  and ultimately closed.

15            In the event that the Tribune chose to

16  do a different transaction, the group reviewing

17  other transactions on behalf of the special

18  committee and the board was available to issue a

19  solvency opinion to the special committee of the

20  board.

21            In the event, however, that the ESOP

22  transaction was the one selected by Tribune, that

23  group was not available to do that.

24        Q.    "That group" meaning which group?

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

139

1          A.      Those opinions would not be issued; the

2     solvency opinion to the board would not be issued.

3          MR. GOLDFARB:  Let's mark this as No. 9.

4                    (WHEREUPON, a certain document was

5                    marked Bluth Deposition Exhibit

6                    No. 9, for identification, as of

7                    12-17-2009.)

8     BY MR. GOLDFARB:

9          Q.      This is a two-page document beginning

10    with Bates D&P TR114472.

11              Have you had a chance to look at this?

12         A.      Yes.

13         Q.      Can you identify it, please?

14         A.      This is a memo I wrote to the review

15    committee that was going to review the materials in

16    preparation of our issuing our opinion relative to

17    the ESOP transaction.

18         Q.      And are the recipients of this e-mail

19    the members of the review committee?

20         A.      Not all of them, no.

21         Q.      Who were the members of the review

22    committee who are among those that received this

23    e-mail?

24         A.      I don't recall who specifically was on

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                              140

1    the committee and who not.

2         Q.   Who among here do you know was not on

3    the committee?

4         A.   I know that Dan Christoffel, Scott

5    Bednas, Phil Rosengren, Sam Pollack were not on the

6    committee.  I don't think David Light or Dick May

7    was on the committee.  The others I don't know.  I

8    don't remember.

9         Q.   Who was Mr. Light?

10        A.   David Light was at that time an employee

11   of Duff & Phelps.

12        Q.   Why did you send this to him?

13        MR. DROBNY:  Objection; foundation.

14   BY THE WITNESS:

15        A.   I don't remember specifically.  The

16   likelihood is that he was doing some work on the --

17   doing some analysis.

18   BY MR. GOLDFARB:

19        Q.   Do you know what the focus of his work

20   was at Duff, what type of analysis he was doing for

21   this transaction?

22        A.   I would like to step back and point out

23   that this e-mail was not from me.  It was from my

24   assistant.  You previously characterized that I

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

141

1    sent the e-mail.  I did not.

2         Q.    I don't know whether I characterized it

3    that way or not.

4         MR. DROBNY:  You did.  You asked her why you

5    sent it to David Light.

6    BY MR. GOLDFARB:

7         Q.    Did you direct your assistant to send

8    this memo titled -- strike the question.

9              If you turn the page to Bates ending in

10   4473, what is this document?  What is this page?

11        A.    I believe I previously indicated that

12   it's a memo from me to the committee that was

13   reviewing materials related to our opinion to the

14   ESOP trustee related to the Tribune ESOP

15   transaction.

16        Q.    And did you direct your assistant to

17   send the memo to the particular individuals?

18        A.    I don't remember.

19        Q.    Do you think that your assistant would

20   have had a list of the appropriate people to send

21   the e-mail to?

22        A.    I had a very good assistant.  She may

23   have well known how to do it without me telling her

24   how to do it and who to send it to.

CONFIDENTIAL

1       Q.     So do you think that she sent this

2   e-mail to the right people?

3       MR. JOHNSTON:   Objection to the form of the

4   question.

5       MR. DROBNY:   Objection.

6   BY THE WITNESS:

7       A.     I don't remember who the right people

8   were.  So I think at the time the people who needed

9   to get the memo got it.  Whether other extra people

10  got it I don't remember.

11  BY MR. GOLDFARB:

12      Q.     Are there any particular people on this

13  list who you know were members of the review

14  committee at the time?

15      A.     If I remember correctly, Ed Forman was a

16  member of the review committee, Steve Burt was a

17  member of the review committee.  I think I remember

18  that Dave Turf was a member of the review

19  committee.  I don't remember -- Chris Janssen, Bob

20  Bartell, Jeff Schiedemeyer, one or more of them are

21  likely to have been members of the review

22  committee.  I don't remember who specifically.

23  They're rotating positions.

24      Q.     Did you thereafter send materials to the

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

143

1    D&P Tower ESOP review committee?

2         A.    I don't remember whether I sent

3    materials or whether Allyn Woghin sent materials or

4    whether other members of my team distributed

5    materials to members of the committee.

6         Q.    If Ms. Woghin distributed them, would

7    she have done it at your direction?

8         A.    Highly likely.

9         MR. GOLDFARB:  Let's mark this as Bluth 10 and

10   11.

11                    (WHEREUPON, certain documents were

12                    marked Bluth Deposition Exhibit

13                    Nos. 10 and 11, for identification,

14                    as of 12-17-2009.)

15   BY MR. GOLDFARB:

16        Q.    For the record, Bluth 10 is a one-page

17   document bearing Bates number D&P TR 114420 and

18   Bluth 11 is a multi-page document bearing Bates

19   number D&P TR114421.

20             Ms. Bluth, let me know when you have had

21   a chance to look at that, please.

22        A.    I have looked at them.

23        Q.    Can you identify the two documents for

24   the record, please?

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                        144

1        A.    The Document 10 is a copy of an e-mail

2   sent to a number of people from my assistant, and

3   the Document 11 is a draft of a valuation analysis

4   that we did.

5        Q.    And the e-mail is dated March 27th; is

6   that right?

7        A.    Yes; that's correct.

8        Q.    And it was indicated it was sent on your

9   behalf?

10       A.    Yes; that's correct.

11       Q.    The e-mail states, "I have attached the

12  valuation section of our report" and that indicates

13  that additional analysis and other report sections

14  would come out.

15            Do you recognize Bluth Exhibit 11?

16       A.    It appears to be a draft of our

17  valuation analysis related to the Tribune.

18       Q.    Who prepared this document?

19       A.    Members of the Duff & Phelps staff.

20       Q.    Did you review it before it was

21  circulated?

22       A.    At some point I reviewed it.  I don't

23  remember -- or I reviewed a draft of it, yes.

24       Q.    This is itself labeled a draft, right?

Elyse S. Bluth                                December 17, 2009

CONFIDENTIAL

145

1       A.      Yes.

2       Q.      Was a final version of this ever issued?

3       A.      Of this document?

4       Q.      Yes.

5       A.      I don't recall.

6       Q.      Do you know who was primarily

7  responsible for preparing this document?

8       A.      I don't remember.

9       Q.      Was there a group of people who had

10  primary responsibility for preparing it?

11      A.      I have referred several times to 10 to

12  15 people who were involved.  Of those 10 to 15,

13  maybe 5 or 8 had primary responsibility for putting

14  together these materials.  I don't remember who

15  specifically put together this document.

16      Q.      Did you talk to anybody about this

17  particular document before it was circulated to the

18  Duff & Phelps review committee?

19      A.      Did I talk to anybody about this

20  particular document?  Could you be more specific?

21      Q.      Can you answer that question?

22      A.      Yes.

23      MR. DROBNY:  She is asking you to clarify it.

24

CONFIDENTIAL

146

1    BY THE WITNESS:

2          A.    Please.

3          MR. GOLDFARB:  Can you restate my question,

4    please?

5                        (WHEREUPON, the record was read

6                        by the reporter as requested.)

7    BY MR. GOLDFARB:

8          Q.    Are you able to answer that question?

9          A.    I don't remember any specific

10   conversations I had regarding this document.  I am

11   sure I talked to numerous people at numerous times

12   about the document.

13         Q.    Were there meetings that Duff & Phelps

14   had internally to discuss the valuation analysis

15   that is reflected in this document?

16         A.    If by meeting you are referring to

17   people walking into other people's office or

18   informal gatherings or sitting around a conference

19   room table working things out, yes, we had many

20   discussions about the analyses that are embedded in

21   this document.

22         Q.    Did you participate in those?

23         A.    I am sure I participated in some of

24   them, although I was not primarily responsible for

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

147

1    the valuation analysis.

2         Q.    Who was primarily responsible for that?

3         A.    I don't remember.

4         MR. DROBNY:   Objection; asked and answered.

5    BY MR. GOLDFARB:

6         Q.    Am I correct that the valuation analysis

7    was something that was available for use by both

8    the solvency team and the ESOP team?

9         A.    Yes.

10        Q.    Can you describe generally what this

11   document contains?

12        A.    Section 1 is a brief description of

13   valuation methodologies.  Section 2 is a discounted

14   cash flow and valuation multiples and other

15   analyses about the valuation of the publishing

16   segment of Tribune.

17             Section 3 is a similar financial

18   analysis, discounted cash flow, selected public

19   company, M&A analysis on the broadcasting and

20   entertainment segment of Tribune.

21             Section 4 is a review of some of the

22   values in the other assets that aren't incorporated

23   in the broadcasting and entertainment and

24   publishing segments of Tribune.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

148

1          And Section 5 sums everything up.

2      Q.    What is the general purpose of the

3  sections?   What is the various analyses that you

4  have just referred to designed to do on the whole?

5      A.    Our goal was to -- these analyses were

6  an attempt to calculate the value of Tribune, the

7  total enterprise value of Tribune.

8      Q.    Why was that important to your ESOP

9  work?

10     MR. JOHNSTON:   Objection to the form of the

11  question.

12  BY THE WITNESS:

13     A.    We were buying -- I was representing an

14  ESOP that -- ESOP fiduciary who was deciding

15  whether or not to buy stock in a company, and so

16  the price that the ESOP would pay was important and

17  it was part of the opinions that Duff & Phelps was

18  engaged to render.

19  BY MR. GOLDFARB:

20     Q.    If you look at Page 5 of the document,

21  the heading is "Valuation Analysis - Publishing,

22  Discounted Cash Flow Analysis."   Do you see that?

23     A.    I do.

24     Q.    What is a discounted cash flow analysis?

CONFIDENTIAL

149

1      A.    A discounted cash flow analysis is an

2  analysis in which the financial performance of the

3  company is projected over a period of time,

4  reinvestment in the company is estimated, and the

5  expected free cash flow or extra cash that's not

6  needed for operations but that is available to be

7  paid to any providers of capital to the company

8  remains.  And so that's the free cash flow in every

9  single year.

10            And discounting it to today's value is

11  one way of coming up with the value of that portion

12  of the business or the value of the business if a

13  discounted cash flow is being performed on the

14  entire business.

15      Q.    It indicates that "To determine the

16  value of publishing we conducted a ten-year DCF

17  analysis based on management's five-year forecast."

18            Do you see that?

19      A.    I do.

20      Q.    How did Duff & Phelps go about

21  conducting a ten-year DCF analysis based on the

22  five-year forecast?

23      MR. JOHNSTON:  Objection; foundation.

24  BY THE WITNESS:

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

1        A.      Typically -- first of all, I don't

2   remember exactly what was done here.  Typically we

3   receive five years of material from companies, and

4   we often extrapolate beyond the five years that we

5   receive in order to work out any unusual items that

6   may occur during those five years.  So we

7   extrapolate.

8               Often we talk to management about what

9   would happen at the end of that five years.

10  BY MR. GOLDFARB:

11       Q.      Who was primarily responsible for

12  performing the DCF analysis?

13       A.      I don't remember.

14       Q.      Who at Duff & Phelps would know who

15  conducted that analysis?

16       A.      I think anyone you asked would have to

17  go back into the spread sheets and see if we could

18  identify who worked on it.  I don't know if anyone

19  recollects who exactly worked on any one of the

20  parts of the analysis.  They were very much

21  intertwined.

22       Q.      Do you know if any of the individuals

23  you mentioned earlier, Mr. Bednas, Mr. Christoffel,

24  Mr. Rosengren, Mr. Pollack, were they closer to the

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

151

1  valuation work than you such that they might have a

2  better recollection as to who was performing this

3  work?

4       A.    The individuals who you mentioned all

5  worked on pieces of the analysis and may have

6  worked on pulling it together.  We'd have to do

7  some investigation to figure out who worked on any

8  one part of it.

9            That being said, all of our analyses are

10  very much team efforts and there's a lot of input

11  by many individuals in any one analysis.  These are

12  not analyses that occur behind closed doors that no

13  one ever looks at or discusses at great length.

14       Q.    If you were to ask one person at Duff &

15  Phelps who conducted this work, who would you ask

16  to find that out?

17       MR. DROBNY:  Objection; asked and answered.

18  BY THE WITNESS:

19       A.    I would ask many people.  I would ask

20  Bob Bartell if he remembered, I would ask Chris

21  Janssen if he remembered.  I would look at the

22  computer files myself.  I would see if we have any

23  notes in the record.

24

CONFIDENTIAL

1    BY MR. GOLDFARB:

2         Q.     Anyone else?

3         A.     Nope.

4         Q.     On the following page, Page 6, the

5    second dash down indicates that, "Revenue

6    projections for 2007 to 2012 are based on

7    management forecasts.  Thereafter, revenue growth

8    is projected to decline steadily to a sustainable

9    long-term growth rate of .7 percent."

10              Do you see that?

11        A.     I do.

12        Q.     How did Duff & Phelps determine the

13   sustainable long-term growth rate of .7 percent

14   beyond the management forecasts?

15        MR. JOHNSTON:  Objection; foundation.

16        MR. DROBNY:  Objection.

17   BY THE WITNESS:

18        A.     I don't remember.

19   BY MR. GOLDFARB:

20        Q.     Who at Duff & Phelps would know that?

21        A.     I don't know.

22        Q.     Again, who would you ask at Duff &

23   Phelps to find out that information?

24        A.     You could ask the people I mentioned

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

153

1    before.  I don't know that anyone is going to

2    remember almost three years later how we determined

3    one part of this analysis.

4        Q.    Did you ever have discussions with

5    people at Duff & Phelps about how the sustainable

6    long-term growth rate of .7 percent was developed?

7        A.    I don't remember.

8        Q.    Looking at the next page, at the bottom

9    of the next page it indicates that the terminal

10   growth rate was projected at .75 percent past the

11   projection period.  How was that figure determined

12   by Duff & Phelps?

13       MR. JOHNSTON:  Objection; foundation.

14       MR. DROBNY:  Same objection.

15              Where are you in the document?

16       MR. GOLDFARB:  Bottom of Page 7.

17       THE WITNESS:  May I pull out a calculator?

18       MR. DROBNY:  If you need it to answer the

19   question.

20       THE WITNESS:  I do.

21              I'm sorry.  Could you repeat the

22   question?

23   BY MR. GOLDFARB:

24       Q.    My question is, what is the source of

CONFIDENTIAL

154

1    the terminal growth rate of .75 used in this

2    document as the terminal growth rate past the

3    projection period?

4         A.    Oh, I don't remember if there was a

5    specific source.  I don't know.

6         Q.    You pulled out a calculator for a

7    moment.  Can I ask what you were using the

8    calculator for?

9         A.    I was curious as to what the growth was

10   in these years, whether there was a typo or whether

11   it was approximately accurate.  I didn't see that

12   it's .7 percent from 2016 to 2015 on revenue.

13        Q.    Did you find a typo?

14        A.    No.  I found that it was accurate.

15        Q.    What was the calculation that you used

16   the calculator for?

17        A.    I was looking at the growth from 2016 to

18   2015.

19        Q.    If you look at Page 14 of the document,

20   please.  This page includes a table that purports

21   to summarize financial performance and implied

22   valuation multiples for the selected public

23   companies, Tribune, and Publishing.

24              Do you see that --

Elyse S. Bluth                                            December 17, 2009
CONFIDENTIAL

                                                                    155

1          A.      I do.

2          Q.      -- above the table?

3                  What are implied valuation multiples?

4          MR. JOHNSTON:  Objection; foundation.

5    BY THE WITNESS:

6          A.      The right-hand section of the report --

7    of the table lists valuation multiples accorded by

8    the public markets for each of the companies

9    listed.  So on the right-hand, for example, it says

10   EV over LTM EBITDA.  That's enterprise value over

11   latest 12 months EBITDA.  The next column over is

12   enterprise value divided by 2007 projected EBITDA.

13   The next column over is enterprise value divided by

14   2008 projected EBITDA.  And the last column is

15   enterprise value to revenue.

16                 These are all multiples that are

17   typically used -- very commonly used by investors

18   to review the pricing of public companies.

19   BY MR. GOLDFARB:

20         Q.      What is their significance to a

21   valuation analysis?

22         A.      Valuation multiples generally are

23   benchmarks that are used to place values on private

24   companies, for example, or segments of public

Elyse S. Bluth                                December 17, 2009

CONFIDENTIAL

156

1    companies or other publicly traded -- public or

2    private companies that need to be valued.

3            Q.    In the row second from the bottom of

4    this table are the numbers for the Tribune Company.

5    Do you see that?

6            A.    I do.

7            Q.    The third column over is enterprise

8    value.  Do you see that?

9            A.    Yes.

10           Q.    And the figure there appears to be

11   $10.372 billion.  Would you agree with that?

12           A.    Yes.

13           Q.    How did Duff & Phelps calculate that

14   number?

15           MR. JOHNSTON:   Objection; foundation.

16   BY THE WITNESS:

17           A.    I don't have the specific calculations

18   for this number.  There are supporting documents to

19   these that would show exactly the calculation.  I

20   can only say generally how that number is

21   calculated.

22   BY MR. GOLDFARB:

23           Q.    Generally how is the number calculated?

24           A.    Number of shares outstanding for a

CONFIDENTIAL

157

1   publicly traded company times the price per share

2   plus debt minus cash.

3          Sometimes there are adjustments to that

4   number for preferred stock, for minority interest,

5   for working capital swings that may be seasonal,

6   for non-operating assets for one-time items.

7          But typically in the very big picture

8   it's the market value of the company's stock plus

9   debt.

10      MR. GOLDFARB:  Can we go off the record?

11              (WHEREUPON, a recess was had

12               from 2:23 p.m. to 2:31 p.m.)

13  BY MR. GOLDFARB:

14      Q.    Turning back to this same exhibit,

15  Ms. Bluth, that we have been talking about, do you

16  know who was responsible for selecting the

17  comparable companies and the comparable

18  transactions to use for purposes of valuation of

19  the publishing group?

20      MR. DROBNY:  Object to foundation.

21  BY THE WITNESS:

22      A.    I don't think any one person had

23  ultimate responsibility for it.  I think it was a

24  group effort.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

158

1   BY MR. GOLDFARB:

2        Q.    What's the general process by which the

3   companies would be identified for purposes of this

4   analysis?

5        MR. JOHNSTON:   Object to foundation.

6   BY THE WITNESS:

7        A.    A typical Duff & Phelps process is once

8   the industry and the details of a company are

9   known, you search through various databases to find

10  companies that you believe are similar enough to

11  the subject company that their valuation metrics

12  can be used to benchmark the subject company

13  against.

14  BY MR. GOLDFARB:

15       Q.    Were you involved at all in that process

16  with respect to this valuation analysis?

17       A.    I don't remember being involved in the

18  process, no.

19       Q.    Do you recall reviewing this aspect of

20  the analysis with anybody at Duff & Phelps?

21       A.    I remember looking at it, I remember

22  knowing it was done, I remember being involved in

23  it and using the data if that is what you mean by

24  review.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

159

1        Q.    Who at Duff & Phelps is ultimately

2    responsible for this document?

3        MR. JOHNSTON:   Object to the form of the

4    question.

5    BY THE WITNESS:

6        A.    I think there was responsibility in many

7    camps for the valuation analyses.   It was

8    originally done for the solvency review, for the

9    solvency opinion work, and then it was also used in

10   the ESOP analysis.   And that's one of the reasons

11   that I don't remember who did it because I wasn't

12   involved during the time it was begun.

13       Q.    How did it come to be that you were the

14   person who circulated it to the review committee?

15       A.    Because the analysis was being used in

16   the ESOP opinion and the ESOP opinion is what was

17   being used, I was the one who sent out the

18   documents.

19       Q.    Did you ever make a presentation of the

20   information contained herein outside of Duff &

21   Phelps?

22       A.    I was part of presentations to

23   GreatBanc.   I don't remember if I was the one

24   presenting the valuation part of the analysis.   I

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

160

1    may well not have been.  I just don't remember.

2         Q.    Looking at Page 21 of this analysis,

3    what is reflected on this page?

4         A.    This page relates to selecting multiples

5    to place on publishing's EBITDA in order to value

6    the publishing segment of Tribune.

7         Q.    And in the box in the middle of the

8    table it says that the selected multiple range was

9    for both 2006 estimated EBITDA and 2007 projected

10   EBITDA 8.5 to 9.5 times EBITDA.

11             Do you see that?

12        A.    I do.

13        Q.    Do you know the basis for the selection

14   of those multiple ranges?

15        A.    I think the basis is laid out on the

16   prior pages and the benchmarks are shown.

17        Q.    Was the selected range ultimately an

18   exercise of some judgment or does the 8.5 to 9.5

19   translate directly from figures that I could find

20   elsewhere?

21        MR. DROBNY:  Object to form.

22   BY THE WITNESS:

23        A.    The 8-1/2 to 9-1/2 times are not

24   mathematical calculations that you'll see anywhere,

CONFIDENTIAL

1    so they do include judgment.  Understanding what we

2    knew of Tribune and what we knew of the public

3    companies and the M&A transactions, we developed a

4    range of 8-1/2 to 9-1/2 times EBITDA.

5    BY MR. GOLDFARB:

6         Q.    Who is "we"?

7         A.    Duff & Phelps.

8         Q.    And who at Duff & Phelps?

9         A.    The team generally works together to do

10   it.

11        Q.    Was there a meeting at which the

12   ultimate selected multiple range was decided at

13   which you were present?

14        A.    I don't remember.  Certainly there were

15   discussions.  Whether you would characterize them

16   as formal meetings I don't know.

17        Q.    Did you ever express a view as to

18   whether this selected multiple range was a correct

19   one?

20        A.    Let me put it this way:  I would have

21   expressed a view if I had not had confidence in the

22   selected range.  I don't remember whether I

23   affirmatively selected the range or was involved in

24   the selection of the range.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

162

1      Q.    And what did you do to have confidence

2    that the selected range was appropriate?

3      MR. JOHNSTON:  Object to the form of the

4    question.

5    BY THE WITNESS:

6      A.    There was a lot of work done, a lot of

7    analysis done on Tribune and understanding what

8    Tribune's business was, what its prospects were,

9    what we thought it could achieve, what it had

10   historically achieved, what was representative in

11   terms of profitability, where it was going, how it

12   was getting there.  So there was a lot of diligence

13   and work done on that.

14           As far as benchmarking the numbers, if

15   you look at Page 14, you see some of the guts of

16   the analysis, although by no means the entire

17   analysis.

18           Under the column that says EV to LTM

19   EBITDA, if you look down the column, Belo was at 8

20   times, Dow Jones at 12.9, and just reading down,

21   9.9, 7.6, 7.7, 8.6, 8.9.  I don't remember why

22   McClatchy is not material.  I don't know if they're

23   write-offs.

24           Media General at 8.3, New York Times at

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

163

1    8, Washington Post at 10.2.

2              So those -- with a mean of 9 and a

3    median at 8-1/2 times EBITDA.  So those provided a

4    basis for a range at where publicly traded

5    newspaper companies were trading as of the date of

6    this analysis, which was March I think it's 23rd

7    but I can't see on the copy.

8    BY MR. GOLDFARB:

9        Q.    Is this the analysis that you went

10   through at the time to give yourself confidence

11   that this selected multiple range was appropriate?

12       MR. DROBNY:  Objection; asked and answered.

13   BY THE WITNESS:

14       A.    This is a small part of the analysis

15   that was done.

16             So is this the analysis?  Not

17   completely, no.  There's many, many, many more

18   pages of analysis and work that was part of this.

19   BY MR. GOLDFARB:

20       Q.    My question is, what did you do to give

21   yourself confidence that -- you indicated that you

22   satisfied yourself that these were correct, and I

23   am asking what you did to satisfy yourself that

24   these were the appropriate ranges.

CONFIDENTIAL

1       MR. DROBNY:  Object as asked and answered.

2            But go ahead.

3   BY THE WITNESS:

4       A.    First of all, I think I said before that

5   I don't recall exactly what I did.  What I

6   typically do is review a lot of the analyses, not

7   only one table of which is here, to satisfy myself

8   that something is correct.

9            So if you are asking -- if your question

10  is did I look at this table only, no, that's not

11  accurate.

12  BY MR. GOLDFARB:

13      Q.    That wasn't my question.

14      A.    Okay.

15      Q.    My question was, what did you do?

16      A.    Okay.

17      MR. DROBNY:  She answered it.  She said she

18  doesn't remember what she did in this particular

19  situation but here's what she normally does.

20  BY MR. GOLDFARB:

21      Q.    Do you recall how much time you spent

22  reviewing this presentation before you submitted it

23  to the review committee?

24      A.    No, I do not.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

165

1        Q.      Do you have any estimate?

2        A.      Perhaps it would be helpful to say that

3    from the time I started working on this until the

4    time the deal closed, I don't think I left the

5    office before 10:00 to midnight, including

6    weekends, with maybe three days exception for two

7    months.  And so during that time period we were

8    working nonstop on all aspects of this analysis.

9            I am sure that I reviewed lots of

10   material related to this valuation, including these

11   tables among other tables.  I also know at some

12   point I read financial statements for some of these

13   companies and I instructed others working on the

14   analyses to read financial statements, read news

15   releases, read presentations that have been posted

16   on all these public companies, as well as reviewing

17   all of the information on Tribune.

18            So I hesitate to characterize what I did

19   as a short period of time, a long period of time.

20   We spent, you know, frankly quite a bit of time on

21   the analysis and I can't separate in my mind how

22   much was spent on any one portion of the analysis.

23       Q.      Looking back at Page 7 for a moment of

24   this, please, I asked a question earlier about the

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

166

1     terminal growth rate.  Do you recall my asking that

2     question?

3          A.     I do.

4          Q.     For the record, can you explain what a

5     terminal growth rate is, please?

6          A.     A discounted cash flow is a projection

7     of the company from now until forever

8     theoretically.  However, you can only put so much

9     on a piece of paper.  And so we have ten years on a

10    piece of paper, and a terminal growth rate is

11    intended to characterize what you think the

12    long-term rate of growth of free cash flow is

13    beyond the ten-year projection period.

14         Q.     And is it your understanding that the

15    .75 percent listed there was Duff & Phelps' best

16    estimate of what the growth rate would continue

17    beyond the projection period to perpetuity?

18         A.     The growth rate of free cash flow, yes.

19         Q.     What was that based on?

20         A.     I don't remember.  Typically we base

21    this on looking at the public companies and looking

22    at industry research as well as our discussions

23    with management.

24         Q.     And would that also include the

CONFIDENTIAL

1    performance of the company -- well, the projected

2    performance of the company as well as the

3    historical performance of the company?

4         A.    Of course.

5         Q.    Looking at Page 25 of the document,

6    please.  This is the valuation analysis portion for

7    broadcasting and entertainment.  Do you see that?

8         A.    I do.

9         Q.    That also identifies a terminal growth

10   rate to be projected at .75 percent past the

11   projection period.  Do you see that?

12        A.    I do.

13        Q.    Were you involved at all in the

14   determination of the projected terminal growth rate

15   as represented here?

16        A.    I don't remember.

17        Q.    And would the same analysis that you

18   just identified for the publishing terminal growth

19   rate apply equally to the broadcasting and

20   entertainment in terms of how Duff & Phelps would

21   determine an appropriate projected terminal growth

22   rate?

23        MR. BUSATH:  Object as to form.

24

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

168

1    BY THE WITNESS:

2         A.    Yes.

3    BY MR. GOLDFARB:

4         Q.    Turning to Page 40 of the document,

5    please.  What is depicted on this page, please?

6         A.    Page 40 contains a list of other

7    investments that Tribune had that were not part of

8    the publishing or broadcasting and entertainment

9    segment and estimates of values of those interests

10   and Tribune's portion of those companies.

11        Q.    The valuation of the final four --

12   excuse me.  Strike the question.

13              The middle three other investments, the

14   Cubs, the tax benefit from the sale of Recycler,

15   and the Comcast SportsNet, would you agree with me

16   that the figures here reflect the after-tax benefit

17   to Tribune?

18        A.    That's what it says.

19        Q.    At the top is CareerBuilder in which it

20   indicates here that Tribune Company had a 42.5

21   percent equity investment pretax.

22        A.    Yes.

23        Q.    Does the valuation to Tribune reflected

24   in the low and high columns to the right for

Elyse S. Bluth                                          December 17, 2009
CONFIDENTIAL

169

1    CareerBuilder, do those reflect pretax numbers?

2         A.    They do.

3         Q.    Why was the value of CareerBuilder

4    calculated using pretax numbers?

5         MR. JOHNSTON:  Objection; foundation.

6         MR. DROBNY:  Same objection.

7    BY THE WITNESS:

8         A.    The valuation of CareerBuilder was not

9    calculated using pretax numbers.  The valuation of

10   CareerBuilder was calculated using after-tax cash

11   flows and after-tax earnings.

12            What's shown here is the value of

13   CareerBuilder to Tribune since there was no intent

14   to sell the companies -- or sell their interest in

15   the companies and therefore no tax would be

16   incurred.

17   BY MR. GOLDFARB:

18        Q.    Thank you for the correction.  My

19   question about the valuation of CareerBuilder was

20   imprecise, but you clarified that.  And I

21   appreciate that.

22            In terms of the Television Food Network,

23   Tribune it's indicated here had a 31.3 percent

24   equity investment.  Do you see that?

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

170

1        A.    I do.

2        Q.    And that valuation -- the value to the

3    Tribune is also indicated to be calculated on a

4    pretax basis; is that accurate?

5        A.    Yes.

6        Q.    And why is that?

7        MR. JOHNSTON:  Objection; foundation.

8    BY THE WITNESS:

9        A.    Just like buildings Tribune owned or,

10   like, other assets Tribune had, since it had no

11   intent at this point to sell that asset, there was

12   no reason to take into account after-tax proceeds.

13   We were looking at the value to Tribune of its

14   holding in Food Network.

15   BY MR. GOLDFARB:

16       Q.    Are you familiar with the term "minority

17   discounts"?

18       A.    I am.

19       Q.    Or "minority ownership discount."

20            What does that refer to?

21       A.    A minority ownership is less than a

22   controlling interest in a company; and if one is

23   pegging or benchmarking multiples to the sale of a

24   company, then in order to get into a minority level

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

171

1    some people take discounts.

2              So for example, if a company is worth a

3    hundred in the hands of a current owner and yet

4    some other potential owner would pay more, for sake

5    of example 120, then that would be considered

6    control value.  They would be paying a 20-percent

7    premium or -- because I can't do the math in my --

8    whatever that would be in terms of a discount 100

9    over 120.

10             So the difference between a control

11   value and a value in the hands of the current owner

12   is either a controlled premium or, the other way

13   around, is a minority discount.

14       Q.    For CareerBuilder, for example, is it

15   correct that Tribune Company owned a minority share

16   of CareerBuilder?

17       A.    Yes.  Tribune owned less than 50

18   percent, which is technically a minority.  My

19   recollection is that no one owned more than 50

20   percent.  So no one had control at CareerBuilder.

21       Q.    Do you know whether Duff applied a

22   minority ownership discount to its valuation to the

23   Tribune of CareerBuilder?

24       A.    Of course not.  Since we did not value

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

172

1   it on a control basis, there would be no need to

2   value on a minority discount.

3        Q.    Explain to me why not.

4        A.    Since we were valuing the company in the

5   hands of the current owners, it is already a

6   minority interest and you wouldn't take a discount

7   from that.  In other words, we were not valuing

8   this company as though it was in the hands of

9   another buyer who would pay a premium.  We were

10  valuing it in the hands of its current owners.

11       Q.    When you are talking about valuing the

12  company, are you talking about the enterprise value

13  conclusion for CareerBuilder or are you talking

14  about the value to the Tribune of its 42-percent

15  investment in CareerBuilder?

16       A.    Both.

17       Q.    What about with respect to the Food

18  Network; did Duff consider a minority ownership

19  discount in evaluating the value of Tribune's

20  investment in the Food Network?

21       MR. JOHNSTON:  Objection; foundation.

22  BY THE WITNESS:

23       A.    The answer is similar, although the

24  ownership is different.  Tribune approximately

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

173

1    owned 31 percent of TV Food and its partner owned

2    the balance.  I think it was Scripps at the time.

3    So there was a majority owner.

4              That being said, we valued the company

5    on the economics as it exists.  So Tribune had its

6    proportional amount of the economics.  Again, it

7    was not valued the hands of another third-party

8    holder; it was valued as it existed.  So there was

9    no reason to take the discount because we didn't

10   put a premium on it.

11        Q.    What about for the other investments,

12   the interactive investments listed at the bottom

13   that were also -- was consideration given to

14   whether a minority ownership discount was

15   appropriate for any of those?

16        A.    It's all the same logic.  Because we

17   valued each of these entities on the economics that

18   existed at the time, not on the economics of

19   another owner that might pay a premium to get

20   synergies, there is no reason to take a discount.

21        Q.    Are you familiar with the term

22   "marketability discount"?

23        A.    I am.

24        Q.    What does that refer to?

Elyse S. Bluth                                  December 17, 2009

CONFIDENTIAL

174

1      A.      Marketability discount is typically used

2  in a private company where there isn't already a

3  market for its shares.

4      Q.      Were any of the entities listed here a

5  private company?

6      A.      Although these pieces were owned by

7  public companies -- I think for the most part owned

8  by public companies, none of them was public in its

9  own right.

10          So if you want to think of a subsidiary

11  of a public company as a private company, then yes,

12  they were private companies.

13      Q.      Were any of these traded publicly?

14      A.      No, none of them were traded publicly.

15      Q.      Did Duff consider whether a

16  marketability discount was appropriate in valuing

17  these other investments?

18      A.      Since they were part of a public

19  company, we did not, no.

20      Q.      I thought it was your testimony that the

21  Television Food Network was a general

22  partnership -- excuse me.  That wasn't your

23  testimony.

24          Was the Television Food Network a

CONFIDENTIAL

175

1    general partnership?

2        A.    That was my understanding, yes.

3        Q.    So the Food Network was not a publicly

4    held company, correct?

5        MR. DROBNY:   Objection; asked and answered.

6    BY THE WITNESS:

7        A.    TV Food was owned by two parties,

8    approximately 30 percent by Tribune and the balance

9    of it by Scripps.  So TV Food stock was not

10   publicly traded, no.

11   BY MR. GOLDFARB:

12       Q.    So in doing -- well, then maybe you can

13   explain how Duff went about valuing the Food

14   Network and whether or not its status as a private

15   company affected its valuation.

16       MR. JOHNSTON:   Objection; foundation.

17       MR. DROBNY:   Same objection.

18   BY THE WITNESS:

19       A.    We valued TV Food -- my recollection is

20   we valued TV Food based on multiples.  We may have

21   done discounted cash flow.  I don't remember.

22            All of those would reflect its minority

23   status as we discussed previously.

24            The fact that this piece wasn't readily

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

176

1    marketable on exchanges is no different than saying

2    any one of the TV stations wasn't readily

3    marketable on an exchange, any one of the

4    newspapers wasn't readily marketable on an

5    exchange.

6              And so if you were to take a discount

7    for lack of marketability on each and every unit of

8    Tribune, it wouldn't make sense.  And we viewed

9    these pieces similarly to that.

10   BY MR. GOLDFARB:

11        Q.    Turning to Page 42 of this document, the

12   last page, what's depicted on this page?

13        A.    This page is a table that adds up all

14   the pieces that were previously valued.

15        Q.    And what was the range of enterprise --

16   the total enterprise value for operations that

17   Duff & Phelps calculated?

18        A.    10.6 billion to 11.8 on this table.

19              Recognize that I don't know that this

20   was our final work.  This is a draft dated March

21   29th, or approximately March 29th.

22        Q.    And including the other investments,

23   what was the total enterprise value range

24   calculated?

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

177

1        A.    10.55 billion to 4.14 billion.

2        MR. GOLDFARB:  Mark this as 12, please.

3               (WHEREUPON, a certain document was

4               marked Bluth Deposition Exhibit

5               No. 12, for identification, as of

6               12-17-2009.)

7        MR. GOLDFARB:  And let's mark this as 13.

8               (WHEREUPON, a certain document was

9               marked Bluth Deposition Exhibit

10              No. 13, for identification, as of

11              12-17-2009.)

12   BY MR. GOLDFARB:

13        Q.    I have passed out two documents, 12 and

14   13.  12 is a one-page document bearing Bates number

15   114379.  And the second document is a document

16   bearing Bates GBTRIB 00064622.  Is that right?

17        A.    Yes.

18        Q.    Ms. Bluth, are you able to identify

19   Bluth Exhibit 12, please?

20        A.    This appears to be an e-mail from my

21   assistant at the time, Allyn Woghin, to a group of

22   people with an attachment of an ESOP trustee

23   report.

24        Q.    And what is reflected in -- or what is

CONFIDENTIAL

178

1  Bluth Exhibit 13, if you can identify it?

2       A.    It's a draft of the ESOP analysis that

3  was done.

4       MR. GOLDFARB:   Counsel, I'll represent that

5  there is a document, the attachment to this e-mail,

6  that bears Bates number 114380 and it is identical.

7  I just have another copy but it is identical to the

8  document that has been marked as Bluth Exhibit 13.

9       MR. DROBNY:   Okay.

10  BY THE WITNESS:

11      A.    So excuse me.   This is the document that

12  you are saying is identical to the document that

13  was --

14  BY MR. GOLDFARB:

15      Q.    That was attached.

16      MR. DROBNY:   That's what he's representing.

17  BY MR. GOLDFARB:

18      Q.    That's what I am representing.

19      A.    Okay.

20      Q.    How does this document that's titled

21  "ESOP Analysis, Preliminary Draft, March 28," how

22  does that fit in with the document we just looked

23  at, the draft valuation analysis?

24      A.    The valuation analysis was used as a

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

179

1    basis for this analysis.

2         Q.    What is this purpose of this ESOP

3    analysis draft?

4         A.    This is an analysis of the transaction,

5    not of the company.

6         Q.    Let me direct your attention to Page 9,

7    please, Bates ending 64630.  Can you describe

8    generally what is reflected on this page?

9         A.    This is a sources and uses table for the

10   transaction.  I am hesitating because I don't

11   remember and can't tell whether it's part of the

12   transaction or both the first and the second step

13   of the transaction.

14        Q.    And the numbers that are reflected on

15   here, directing in particular to the sources

16   column, do you know what the source was for those

17   sources, the source of information for Duff?

18        A.    It's requesting where we received our

19   information about the financing of the transaction?

20        Q.    Yes.  My question is, what is, if you

21   know, the source of the numbers contained on this

22   page?

23        A.    We received information from Tribune as

24   to where they expected the cash to come from.

CONFIDENTIAL

                                                           180

1        Q.    Is this the form of the draft that was

2   discussed with the Duff & Phelps review committee?

3        A.    Oh, I don't remember.

4        Q.    If we look back at the cover e-mail,

5   does that indicate that this is the document that

6   was sent to the Duff & Phelps review committee?

7        MR. DROBNY:  You indicated that.

8   BY THE WITNESS:

9        A.    You represented this is the document

10  that was in this e-mail.  This e-mail went to the

11  review committee.  So according to your

12  information, it is the document that was sent to

13  the review committee.

14  BY MR. GOLDFARB:

15       Q.    I'm sorry.  I obviously can't testify.

16  I represented that this is the document that was

17  attached to the e-mail.  My question is, is this

18  the document that was the subject of the Duff

19  review committee?

20       A.    This or a document very like this would

21  have been one of the documents that the review

22  committee received.

23       Q.    And how did the review committee conduct

24  its business?  Was there, for example, a

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

181

1   presentation made to the review committee about the

2   transaction or the materials it had received?

3        A.    There was a discussion that lasted

4   several hours about all the materials that were

5   received.

6        Q.    What is the end product of the review

7   committee's work?

8        MR. DROBNY:  Objection; foundation.

9   BY THE WITNESS:

10       A.    A review committee typically decides

11  whether or not Duff & Phelps is able to issue an

12  opinion.  And in this case there was discussion as

13  to the parts of the transaction and discussion as

14  to the risks of the transaction, discussion as to

15  the benefits of the transaction, discussion as to

16  the structure of the transaction, the value,

17  et cetera, and then the review committee would give

18  go/no go.  I don't know if that go/no go happened

19  during that call or not.

20  BY MR. GOLDFARB:

21       Q.    You said that the risks of the

22  transaction were discussed.  What do you recall

23  about the discussion of the risks of the

24  transaction?

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

182

1        A.    It's a high leverage transaction.  There

2    was discussion as to the amount of leverage that

3    the company was going to take on.  There was

4    discussion as to the nature of our opinions.  There

5    was discussion as to what our work was, what work

6    we had done to support our opinions.  There was

7    discussion as to the structure of the ESOP

8    transaction and whether it would withstand

9    regulatory scrutiny.  There was discussion as to

10   whether or not we could issue all the parts of the

11   ESOP opinions.

12            I mean, these are all standard kinds of

13   discussions that occur at any review committee.

14        Q.    And they did occur at the review

15   committee that occurred in late March 2007?

16        A.    Absolutely.

17        Q.    One of the risks that you identified was

18   that this was a highly leveraged transaction and

19   there was discussion about that.

20        A.    Yes.

21        Q.    What was the risk that was identified in

22   connection with the degree of leverage in this

23   transaction?

24        MR. DROBNY:  I will just caution you, Elyse,

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

183

1    that I know Ed Forman, the company's the general

2    counsel, is on the review committee at this

3    meeting.  And to the extent that -- I don't want

4    you to reveal any communications he may have made

5    in rendering legal advice during the course of the

6    review committee meeting.

7    BY THE WITNESS:

8         A.    The questions occurred as one would

9    expect them to occur; can the company afford this

10   level of debt.

11   BY MR. GOLDFARB:

12        Q.    Do you recall who raised that question?

13        A.    I think it was a general discussion.

14        Q.    Do you recall who participated in that

15   general discussion?

16        A.    Not specifically, no.

17        Q.    How about generally?

18        A.    Any member of the review committee could

19   have discussed -- could have said something.  I

20   don't remember who.

21        Q.    Did you participate in the discussion

22   about the risk given the leverage of the proposed

23   transaction.

24        A.    I don't remember.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

184

1        Q.    Do you remember if there was -- was

2    there any conclusion or decision reached on the

3    part of the committee about this aspect of the

4    risk?

5        MR. DUCAYET:   Object to the form of the

6    question.

7    BY THE WITNESS:

8        A.    There was a general feeling that it was

9    a highly leveraged transaction and a risky

10   transaction.  Beyond that I am not sure what

11   conclusion you're referring to.

12   BY MR. GOLDFARB:

13       Q.    I was just asking whether there was a

14   decision -- whether there was a decision or a

15   conclusion reached about whether the level of, for

16   example, level of risk or the amount of leverage

17   was an acceptable amount of risk in connection with

18   the transaction or otherwise.

19       MR. JOHNSTON:   Objection to the form of the

20   question.

21   BY THE WITNESS:

22       A.    I don't even know how to answer that

23   question.  I have already indicated that the risks

24   were discussed, the analysis was gone through in

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

1    detail.   I think everyone involved understood that

2    the leverage was very high assuming that the

3    transaction was going to go forward, which was a

4    big assumption at this point in time.

5           But the analysis led us to believe that

6    we could issue the opinions that we ultimately

7    issued.

8    BY MR. GOLDFARB:

9        Q.    What is the significance in terms of

10   risk that was discussed in terms of the leverage

11   being high?  What's the risk that you associate

12   with the high degree of leverage?

13       A.    Bankruptcy risk.

14       Q.    Do you recall whether the risk of

15   bankruptcy was specifically raised in connection

16   with the Duff & Phelps review committee?

17       A.    I don't remember whether that word was

18   used, but the implication of high leverage is that

19   the company will not survive its debt load.  And

20   certainly the risk levels and high debt load were

21   discussed.

22       Q.    Do you recall whether anybody at the

23   committee expressed the view that the risks from

24   the degree of leverage were sufficiently great that

CONFIDENTIAL

1    they feared that the transaction would result in a

2    bankruptcy?

3        A.    I don't remember anyone ever discussing

4    that, no.

5        Q.    Another risk that you identified that

6    was discussed was a risk with respect to Duff &

7    Phelps' opinions.  What did you mean by that?

8        A.    We were being asked to issue a viability

9    opinion to the fiduciary.  So we had to have -- we

10   had to review the analysis behind those opinions as

11   to whether or not the company -- it looked like the

12   company could meet its debt load.

13       Q.    When you're referring to risk, were you

14   referring to risk to Duff & Phelps?

15       A.    Certainly that's part of what a review

16   committee looks at but also risk of -- the

17   financial risk inherent in the projections.  If one

18   didn't think that the company could meet its debt

19   service requirements, then one would not issue the

20   viability opinion.

21       Q.    Do you recall anybody at the review

22   committee expressing the view that the risk to

23   Duff & Phelps opining on any aspect of this

24   transaction was too great to the firm?

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

187

1          MR. DROBNY:   I am going to instruct you not to

2     answer that question based on the fact the general

3     counsel was there and to the extent that somebody

4     in the review committee was or was not asking about

5     the risks to the company of the general counsel is

6     inherently privileged.   So I instruct you not to

7     answer.

8     BY MR. GOLDFARB:

9          Q.     Are you going to follow your counsel's

10    advice?

11         A.     Absolutely.

12         Q.     Another element of the risk you

13    identified was as to whether or not Duff & Phelps

14    could issue all parts of its ESOP opinions.

15              What did you mean by that?

16         A.     There are several different elements to

17    the opinions.   There are several different

18    financial aspects that we're issuing opinions on,

19    and so we had to go over each part of it.

20         Q.     Were there particular parts of the ESOP

21    opinions that -- components of the ESOP opinions

22    that raised particular concerns at the review

23    committee?

24         A.     Not to my recollection, no.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

188

1          MR. GOLDFARB:  Let's mark this as 14, please.

2                    (WHEREUPON, certain documents were

3                    marked Bluth Deposition Exhibit

4                    Nos. 14 and 15, for identification,

5                    as of 12-17-2009.)

6    BY MR. GOLDFARB:

7          Q.    Bluth Exhibit 14 is a one-page document

8    bearing Bates number D&P TR114323, and 15 is a

9    multi-page document bearing Bates D&P TR114324.

10                   Ms. Bluth, can you identify Bluth

11   Exhibit 14 for the record?

12         A.    This is a copy of an e-mail sent by Bob

13   Bartell to a group of people at Duff & Phelps.  The

14   e-mail reads, "Attached is the preliminary solvency

15   analysis for this afternoon's discussion.  Bob

16   Bartell."

17                   And below it is an e-mail that was sent

18   by my assistant, Allyn Woghin, to others.

19         Q.    Do you understand this to be

20   Mr. Bartell's transmission of the preliminary

21   solvency analysis to the Duff & Phelps review

22   committee?

23         A.    Yes.

24         Q.    And you received this e-mail, correct?

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

1          A.     Yes.

2          Q.     And you received the underlying document

3     as well?

4          A.     Yes.

5          Q.     Do you recall reviewing it?

6          A.     Not specifically, no.

7          Q.     Did you ever review this document before

8     it was sent to the review team?

9          A.     I don't recall.

10         Q.     Do you recall discussing it with anyone

11    before you sent it to the review team?

12         A.     I didn't send it to the review team.

13         Q.     Excuse me.  Before this was distributed

14    to the review team.

15         A.     I don't recall.

16         Q.     Did you participate in discussions about

17    this preliminary solvency analysis at the review

18    team meeting or conference call?

19         A.     I was in the meeting and participated in

20    the meeting.  And to the extent there was

21    discussion on this analysis, I was part of that

22    discussion.

23         Q.     Do you recall participating in it?

24         A.     I don't recall.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

190

1      Q.    Do you recall discussion of whether this
2   draft analysis reached a conclusion as to Tribune's
3   solvency in connection with the proposed Zell ESOP
4   transaction?
5      MR. DROBNY:  Again, Elyse, I will caution you
6   not to reveal advice that Mr. Forman may have given
7   during review committee, legal advice or legal
8   questions that were directed at him and which
9   sought legal advice.
10          But to the extent you have a
11  recollection of what was discussed and you can do
12  that without revealing those comments, go ahead.
13     MR. DUCAYET:  Object; form.
14  BY THE WITNESS:
15     A.    I have a general recollection of the
16  analysis being discussed.  My recollection is also
17  that at this point we were not issuing a solvency
18  opinion.  So discussions, although they were
19  loosely termed solvency, they were more intended to
20  be viability for the ESOP trustee.
21  BY MR. GOLDFARB:
22     Q.    So whatever the terminology, the content
23  of Mr. Bartell's analysis that he transmitted was
24  the subject of discussion at the committee?

Elyse S. Bluth                                December 17, 2009
CONFIDENTIAL

191

1      A.    Yes.

2      Q.    Did the committee express any conclusion

3  about as to whether Duff could issue the analysis

4  contained herein?

5      MR. DUCAYET:  Object to the form of the

6  question.

7  BY THE WITNESS:

8      A.    My recollection is that this analysis

9  was transmitted and shared -- or some form of this

10  analysis was transmitted and shared with GreatBanc.

11  And so it came out of committee, which ultimately

12  means that the committee said it was all right to

13  share it with our client.

14  BY MR. GOLDFARB:

15      Q.    Looking at Page 4 of this document, what

16  is reflected on this page?

17      A.    This is a table that sums the values of

18  parts of Tribune to get to a total enterprise

19  value.

20      Q.    Do you recognize this to be essentially,

21  if not identically, the same table that is

22  reflected at the end of the valuation analysis we

23  reviewed earlier?

24      A.    Without looking I can't tell you if it's

CONFIDENTIAL

1    exactly the same, but it's big picture the same.

2         Q.    And do you recognize the values

3    contained on the page to be approximately those

4    reflected in the earlier valuation?

5         A.    Why don't I check them.

6         Q.    You can look back at Page 40 of the

7    valuation analysis.

8         A.    Yes, these are the same numbers.

9         Q.    And then on the next page, Page 5, what

10   is reflected on this page?

11        A.    This page is a table that adds in a

12   range the enterprise value conclusion to the

13   present value of tax benefits that were assumed to

14   be achieved plus present value of other cost

15   savings, plus cash, subtracting debt and contingent

16   liabilities to get to a net asset value.

17        Q.    The enterprise value is -- the first

18   line is the one reflected on the prior page; is

19   that right, the values reflected on the prior page?

20        A.    Yes.

21        Q.    PV of tax benefits, what does that refer

22   to, if you know?

23        A.    My understanding is that's the present

24   value of the savings that were expected to be

Elyse S. Bluth                                        December 17, 2009
CONFIDENTIAL

193

1    achieved by the company not paying taxes because of

2    its structure for ten years.

3              It may have included -- I don't remember

4    where other tax savings, such as contributions to

5    the ESOP, might be included.  I don't remember

6    which piece of it.  But the big picture, the big

7    dollars would be the present value of the federal

8    taxes that were not -- and many state taxes that

9    were not expected to be paid.

10        Q.    Were you involved in the computation of

11   the present value of the tax benefits associated

12   with the ESOP structure?

13        A.    I didn't calculate them if that's your

14   question, but I was aware they were calculated and

15   I was part of the team.  So I was involved in the

16   analysis, yes.

17        Q.    Was this analysis located primarily on

18   the solvency team side or the ESOP team side, if

19   you know?

20        A.    I don't remember.

21        Q.    Do you know whether it was one of those

22   handled by the valuation team?

23        A.    I think you are mischaracterizing it.

24   People were working on different parts of the

Elyse S. Bluth                              December 17, 2009

CONFIDENTIAL

194

1   analysis.  It's not as though they were on separate

2   floors or in separate offices or there were walls

3   in between them.

4          In fact, most of the people were on two

5   floors and walking up and down all the time and

6   talking to each other.

7      Q.    Do you know who at Duff & Phelps was

8   primarily responsible for this line item in the

9   balance sheet test conclusions?

10     MR. DROBNY:  Objection; foundation.

11  BY THE WITNESS:

12     A.    I think several people could have done

13  this calculation.  I don't know who specifically

14  did the calculation that shows up in this table.

15  BY MR. GOLDFARB:

16     Q.    Who are the people who you would

17  identify?

18     A.    I am pretty sure that Dan Christoffel on

19  the ESOP side did a calculation like this.  Whether

20  this is his number or not I can't tell you.

21          I am pretty sure Sam Pollack on the

22  valuation or solvency side did some of this.  Phil

23  Rosengren may have done this calculation.  Several

24  people could have done it separately and I don't

Elyse S. Bluth                                      December 17, 2009
CONFIDENTIAL

195

1   know which one fit into this table.

2       Q.    Did Mr. Bartell or anyone else involved

3   in the preparation of this document confer with you

4   about any specific information that's contained

5   herein?

6       A.    I don't remember.

7       MR. JOHNSTON:  Object to form of the question.

8   BY THE WITNESS:

9       A.    Bob Bartell and I talked all the time

10  about this transaction.  Whether he asked me

11  specifics about this table or anything in this

12  document, I don't recall.

13      MR. DROBNY:  We have been going about another

14  hour.

15                  (WHEREUPON, a recess was had

16                   from 3:30 p.m. to 3:39 p.m.)

17                  (WHEREUPON, Mr. Marc Ashley exited

18                   the deposition proceedings.)

19  BY MR. GOLDFARB:

20      Q.    I have one more question, please, about

21  the last exhibit we were looking at, Bluth Exhibit

22  15, if you'd turn back to Page 5.

23              The second bullet on the left

24  indicates -- states, "The present value of tax

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

196

1    benefits reflects the next ten years of tax

2    benefits, discounted at 12 percent (the equity cost

3    of capital for Tribune Company).  The present value

4    of other cost savings reflects the elimination of

5    certain management costs, public company costs, and

6    401(k) contributions.  These costs have also been

7    discounted at a rate of 12 percent per annum."

8              What is the equity cost of capital

9    referred to?

10        MR. JOHNSTON:  Objection to form and

11   foundation.

12   BY THE WITNESS:

13        A.    Equity cost of capital is the rate of

14   return that one would expect on equity of the

15   company.

16   BY MR. GOLDFARB:

17        Q.    And why, if you know, did Duff use the

18   equity cost of capital for Tribune as the discount

19   figure to calculate the present value of the tax

20   benefits?

21        A.    Taxes are paid after other costs of

22   capital.  So typically like interest.  Interest is

23   a return to debt holders.  And so typically one

24   uses a weighted average cost of capital for cash

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

197

1    flows that are before interest and an equity cost

2    of capital for cash flows after interest.

3         Q.    And that's what's reflected here in the

4    statement in the document?

5         A.    I am presuming so, yeah.

6         Q.    Were you involved at all in the

7    determination of the discount rate to use in

8    establishing the present value of the tax benefits?

9         A.    I don't remember.

10        Q.    Okay.  You can put that one aside.

11             Let's mark this as 16, please.

12                  (WHEREUPON, a certain document was

13                  marked Bluth Deposition Exhibit

14                  No. 16, for identification, as of

15                  12-17-2009.)

16   BY MR. GOLDFARB:

17        Q.    Ms. Bluth, please take a look at this

18   document.  This is a document bearing Bates No.

19   GBTRIB 00008112.

20             Are you able to identify this document?

21        A.    The title says "GreatBanc Trust Company

22   ESOP Committee Meeting Minutes."

23        Q.    Is this a document you have seen before?

24        A.    I saw it the other day when I was

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

1    preparing for this deposition.

2         MR. DROBNY:  Other than you preparing for your

3    deposition.

4    BY THE WITNESS:

5         A.    No.  Not to my recollection, no.

6    BY MR. GOLDFARB:

7         Q.    Do you recall attending a GreatBanc

8    Trust Company ESOP committee meeting on March 29th,

9    2007?

10        A.    I do.

11        Q.    What do you recall about that meeting?

12        A.    I recall we discussed the ESOP

13   transaction in great depth.

14        Q.    And were there parts of the discussion

15   for which you were primarily responsible?

16        A.    Yes.

17        Q.    Which were those?

18        A.    The description analysis of the ESOP

19   transaction.

20        Q.    What were the components of that

21   discussion?

22        MR. JOHNSTON:  Object to form.

23   BY THE WITNESS:

24        A.    I described the ESOP transaction as it

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

199

1   was contemplated at that point in time.  I

2   described our analysis of the ESOP transaction.  We

3   discussed whether or not Duff & Phelps could issue

4   the ESOP opinions.  I was available to answer

5   questions of GreatBanc regarding the ESOP

6   transaction.

7   BY MR. GOLDFARB:

8        Q.    Was there discussion of the valuation

9   analysis that Duff & Phelps had done in connection

10  with its work?

11       A.    Yes, absolutely.

12       Q.    Was that something for which you made

13  the presentation?

14       A.    I don't remember if I was the one making

15  the presentation.  I think not but I don't remember

16  specifically.

17       Q.    Do you recall roughly how long the

18  meeting lasted?

19       A.    It was several hours from my

20  recollection.

21       Q.    If you could turn to page -- if you look

22  at Page 1, if you just look over the first

23  paragraph please, does the list of attendees accord

24  with your recollection of who was present at the

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

200

1    meeting?

2         A.    Yes.

3         Q.    And why was the GreatBanc -- why was

4    this ESOP committee meeting held on March 29th?

5    Was there a particular reason for why a meeting was

6    held at this time?

7         MR. DROBNY:  Object; foundation.

8    BY THE WITNESS:

9         A.    If the transaction was going forward, it

10   was expected to close within a few days of March

11   29th.  And so this was the point where we were far

12   enough along in our analysis and close enough to

13   closing that it made sense to take it to the entire

14   GreatBanc committee.

15   BY MR. GOLDFARB:

16        Q.    And what, if any, questions were -- was

17   the committee discussing -- strike that question.

18   It's a terrible question.

19        Did the committee meet to reach a

20   decision or conclusion about anything to your

21   knowledge?

22        A.    The committee met -- my understanding of

23   the committee meeting was to discuss, understand

24   the transaction, and come to preliminary

CONFIDENTIAL

201

1    conclusions subject to any final discussions or

2    changes in the transaction.

3         Q.    And did Duff & Phelps provide materials

4    in connection with this meeting?

5         A.    Yes.

6         Q.    Do you recall what materials Duff

7    provided to the committee?

8         A.    We provided a written valuation

9    analysis, we provided a written ESOP analysis, and

10   I believe we also provided a version of a

11   solvency-like analysis.

12        Q.    Turning to Page 5, please, the first

13   full paragraph starts by saying, "Ms. Bluth noted

14   that while the proposed transaction does not

15   represent a significant premium to market, the lack

16   of a premium may be the result of the lengthy

17   auction process and the general availability of

18   information in the market concerning the auction

19   process."

20             Do you recall telling the committee that

21   the proposed transaction did not represent a

22   significant premium to market?

23        A.    I recall discussing with the committee

24   that the stock price of -- that we're talking about

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

202

1    in the proposed transaction was not significantly

2    different from the stock price the company was

3    trading at on the New York Stock Exchange or in the

4    markets generally.  And, therefore, there was no

5    big premium to what -- the price that was being

6    paid; on the other hand, that that was due to the

7    fact that the stock had already gone up because of

8    all the rumored transactions.

9         Q.    If you look at the bottom of Page 6,

10   please, it states that -- the last paragraph says,

11   "Duff & Phelps (D&P) then reviewed the implied

12   enterprise value based on the price of the proposed

13   transaction."

14             Do you see that?

15        A.    Yes.

16        Q.    What is implied enterprise value?

17        A.    Stock price of the transaction

18   multiplied by shares outstanding in the company

19   plus debt minus cash.  And I had talked before

20   about some other adjustments that could affect

21   enterprise value.

22        Q.    For purposes of the valuation of the

23   Tribune, what was the purpose of calculating an

24   implied enterprise value for the transaction?

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

203

1          A.     To see the price that was being paid for

2     the company.

3          Q.     When you say "price," do you mean total

4     price or share price?

5          A.     Total price.

6          Q.     And what relevance does that have to the

7     work that you were doing for the Tribune?

8          A.     I wasn't doing --

9          Q.     Excuse me.  For the agreement.

10         A.     In order to assess fairness we had to

11    see that whether or not the price being paid for

12    the company was fair.  And enterprise value is a

13    measure of the price of the company, the value of

14    the company.

15         Q.     How does that number compare to a fair

16    market value calculation, if at all?

17         MR. DUCAYET:  Objection to the form of the

18    question.

19         MR. DROBNY:  Form and foundation.

20    BY THE WITNESS:

21         A.     If your question is how does enterprise

22    value relate to fair market value of the

23    enterprise, it's the same thing.

24

Elyse S. Bluth                                         December 17, 2009

CONFIDENTIAL

204

1    BY MR. GOLDFARB:

2         Q.    Is the definition of fair market value

3    the same as the calculation that you described for

4    implied enterprise value?

5         A.    I have lost track of which piece of this

6    we are talking about.  So if you could be more

7    specific.

8         Q.    I think it was just your testimony that

9    fair market value and implied enterprise value are

10   the same number.

11        A.    That's not what I said.  I said fair

12   market value is a concept that you have to attach

13   an asset to.  So fair market value of what?  Fair

14   market value of stock?  Fair market of your house?

15   Fair market value of enterprise?  Fair market value

16   of 31 percent of the Food Network.

17             So when we're using enterprise value

18   generally, that's intended to be fair market value

19   of the enterprise.

20             Implied enterprise value is the value

21   that is implied by the transaction.  Then the

22   question is, does that value fall within a range of

23   where we think the fair market value of the

24   enterprise is.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

205

1          And I think from these notes it said it

2     was.

3          Q.    Is the calculation of an implied

4     enterprise value, is that part of a valuation

5     analysis or some other piece of the ESOP work that

6     Duff & Phelps was doing --

7          MR. JOHNSTON:  Objection to the form.

8     BY MR. GOLDFARB:

9          Q.    -- in connection with this transaction?

10         MR. JOHNSTON:  Objection to foundation.

11         MR. DROBNY:  Object to form.

12    BY THE WITNESS:

13         A.    The valuation analysis was part of the

14    ESOP analysis.  So I am not sure I understand your

15    question.

16    BY MR. GOLDFARB:

17         Q.    Well, in the valuation analysis that we

18    looked at, that valuation analysis did not include

19    discussion of implied enterprise value.

20         A.    That's right.

21         Q.    And so I am asking you to identify what

22    part of the -- if it wasn't part of the valuation

23    analysis what piece of the engagement the implied

24    enterprise value was relevant to.

Elyse S. Bluth                                          December 17, 2009

CONFIDENTIAL

206

1        A.    Let me answer this by analogy.   If

2   someone looks at your house and says, "Gee, I think

3   it's worth between 250 and $300,000," and then you

4   get an offer for 295, they'll say, "Gee, that's

5   within the range of fair market value."

6             In this case we said looking objectively

7   we think the enterprise is between X and Y -- and I

8   don't have these numbers with me -- and then we

9   looked at the transaction that was proposed and

10  said, "Did it fall within the range?"

11       Q.    At the top of Page 9 -- I'm sorry.

12  Let's back up to the middle of Page 8, please.

13            It indicates that Mr. Bartell led a

14  discussion of D&P's financing analysis.   Do you see

15  that?

16       A.    Yes.

17       Q.    The second paragraph.

18            What was the financing analysis that

19  Mr. Bartell discussed?

20       MR. DROBNY:   Foundation.

21  BY THE WITNESS:

22       A.    My general recollection is it was an

23  analysis of what was proposed to finance the

24  transactions behind the ESOP.

CONFIDENTIAL

1    BY MR. GOLDFARB:

2         Q.    Was that a separate analysis from the --

3    if you go down two paragraphs, it indicates,

4    "Mr. Bartell then led the committee through D&P's

5    financial analysis with regard to the solvency of

6    the company."

7         A.    I think it's virtually the same

8    analysis.

9         Q.    Okay.  At the top of Page 9 it indicates

10   in response to a question from the committee about

11   whether he was aware of any LBOs with the level of

12   leverage in the proposed transaction Mr. Bartell

13   responded that the proposed transaction had a

14   debt-to-equity ratio in excess of 95 percent while

15   traditional LBOs possessed debt-to-equity ratios of

16   70 to 80 percent.

17             Do you see that?

18        A.    I do.

19        Q.    Do you recall the discussion of this

20   issue at the GreatBanc meeting?

21        A.    Not specifically, no.

22        Q.    Do you recall any discussion generally

23   of the amount of leverage involved in the proposed

24   transaction?

CONFIDENTIAL

208

1          A.     Yes.

2          Q.     And do you recall how the GreatBanc

3     committee members responded to Mr. Bartell's

4     description of the level of leverage in this

5     transaction as compared to typical LBOs?

6          A.     I think they were very concerned that it

7     was a lot of debt.

8          Q.     And how, if you remember, did that

9     manifest itself at the meeting?

10         A.     There was a lot of discussion about it.

11         Q.     And did you participate in that

12    discussion?

13         A.     Probably.  I don't recall specifics.

14         Q.     Did you have a view that you expressed

15    to the committee about the risk associated with the

16    degree of leverage in this transaction?

17         A.     Sure.  I expressed, as I expressed here,

18    that it was a lot of debt.

19         Q.     Anything else?

20         A.     Not to my recollection.  Not specifics.

21         Q.     Did you provide any assessment to the

22    committee of the implications of the level of debt

23    to be assumed in connection with this transaction?

24         MR. DROBNY:  Object; form.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

209

1    BY THE WITNESS:

2        A.    If by implications you mean that it made

3    the company riskier, sure, that was discussed at

4    the meeting.

5    BY MR. GOLDFARB:

6        Q.    Did anybody provide any advice to the

7    company as to how to address the level of risk

8    reflected in the transaction?

9        MR. JOHNSTON:  Objection to the form of the

10   question.

11       MR. DROBNY:  Object to form.

12   BY THE WITNESS:

13       A.    If by company you are referring to

14   GreatBanc -- first, I just want to make sure we're

15   clear that this was a discussion with GreatBanc and

16   not Tribune.

17            Secondly, this was a discussion of

18   what the transaction would look like if it went

19   forward.  This was not a discussion that was to

20   provide any other kind of advice to GreatBanc.

21            To my recollection, we weren't asked

22   about what other transactions were possible.  We

23   were facing one -- we were looking at one specific

24   transaction.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

210

1    BY MR. GOLDFARB:

2         Q.    The end of the paragraph says,

3    "Mr. Bartell then noted that traditional LBOs do

4    not possess the cash flow enhancements provided by

5    the proposed ESOP structure."

6              Do you recall him making -- or

7    discussing that issue with the committee?

8         A.    I don't recall the specifics, but I know

9    this was discussed at the meeting.

10        Q.    And what are the cash flow

11   enhancements -- if you recall, what were the cash

12   flow enhancements to which Mr. Bartell was

13   referring during this discussion?

14        A.    The most significant cash flow

15   enhancement was the company was not going to be

16   paying taxes post-transaction.  Excuse me.

17             The company was not going to be paying

18   federal income and most state taxes after elected

19   Sub S post-transaction.

20        Q.    Was there any discussion at the meeting

21   of the risks that the structure of the transaction

22   would in fact not yield the tax benefits?

23        MR. JOHNSTON:  Objection to the form of the

24   question.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

211

1    BY THE WITNESS:

2        A.    There may have been discussion about the

3    amount of tax benefits, but since the company

4    wasn't going to pay taxes, I think the discussion

5    was -- it was largely a moot point.

6    BY MR. GOLDFARB:

7        Q.    Was there any discussion about whether

8    in fact the ESOP S corp proposed structure was

9    itself risky such that there was a possibility that

10   the structure itself would not be allowed and

11   therefore -- would not be allowed to yield the tax

12   benefits?

13       A.    There was discussion over the course of

14   this transaction -- and I don't recall whether it

15   happened at this meeting -- as to whether this

16   structure would be available long term.  So there

17   was discussion, for example, of what happens if

18   ESOPs and S corps are no longer allowed or if the

19   UBIT exemption goes away and if ESOPs have to pay

20   taxes like other S corp shareholders and what would

21   happen in that event.

22            So whether or not that happened in this

23   discussion or not I don't recall, but I know there

24   was discussion over the course of the transaction

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

212

1    between GreatBanc and us, and I know that similar

2    discussions occurred at a corporate level at

3    Tribune.

4    BY MR. GOLDFARB:

5         Q.     Did you refer to UBIT?

6         A.     Unrelated business income tax.

7         Q.     And how does that figure in here?

8         A.     That's the provision by which an ESOP

9    doesn't have to pay taxes on its allocation of

10   income by an S corp.

11        Q.     The third paragraph on that page

12   indicates that "D&P stated that as a preliminary

13   matter, in its opinion, on a post-transaction

14   basis, taking into account the S corporation tax

15   shield, the fair saleable value of the company's

16   assets is greater than its liabilities."

17               Do you see that?

18        A.     I do.

19        Q.     And then Mr. Bartell -- going down a

20   paragraph, in the middle of that paragraph it says,

21   "Mr. Bartell also cautioned the committee that D&P

22   is able to issue its financing opinion because of

23   the anticipated benefits of the S corporation tax

24   shield.  If those tax benefits are not considered,

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

213

1    D&P would be unable to render its opinion.  A

2    discussion followed."

3              Do you see that?

4         A.    Yes, I do.

5         Q.    Do you recall Mr. Bartell informing the

6    committee that Duff & Phelps' financing opinion

7    depended on the realization of the anticipated

8    benefits of the S corp tax shield?

9         A.    I think I said several times I don't

10   really remember the specifics of this meeting, but

11   I am fairly confident that this was discussed at

12   the meeting.

13        Q.    Do you recall whether any of the

14   committee members expressed concern about the

15   reliance of Mr. Bartell on the solvency conclusion

16   on the realization of the tax benefits?

17        MR. DUCAYET:  Object.

18        MR. JOHNSTON:  Objection; form of question.

19        MR. DROBNY:  Object to form.

20        MR. DUCAYET:  Mischaracterizes her testimony.

21   BY THE WITNESS:

22        A.    Duff & Phelps did not issue a solvency

23   opinion.  We weren't giving opinions as to the

24   solvency of the company to the trustee.  We were

CONFIDENTIAL

214

1    giving them an understanding and opinions that we

2    felt the company could pay its debts considering

3    what it would look like as an ESOP company, as an

4    ESOP-owned S corp.

5              For that purpose, the tax benefits were

6    material.  This transaction was highly unlikely to

7    go forward without the company electing Sub S and

8    receiving the tax benefits.

9              So from an ESOP fiduciary standpoint,

10   from the trustee's standpoint, the only way it was

11   going forward was if it had those tax benefits, and

12   so it made sense to include them in our analysis.

13   BY MR. GOLDFARB:

14       Q.    At what point, if you remember, did it

15   become clear that Duff was not doing a formal

16   solvency opinion in connection with this

17   transaction?

18       MR. DUCAYET:  Object to the form of the

19   question.

20       MR. DROBNY:  Form and foundation.

21   BY THE WITNESS:

22       A.    I don't remember exactly when it was.

23   It was, you know, in the weeks or days leading up

24   to the closing.

Elyse S. Bluth                                          December 17, 2009
CONFIDENTIAL

215

1    BY MR. GOLDFARB:

2        Q.    Do you know why Mr. Bartell provided an

3    analysis of the -- a financial analysis with regard

4    to the solvency of the company at this meeting if

5    Duff wasn't providing a solvency opinion?

6        MR. JOHNSTON:  Object to the form of the

7    question.

8        MR. DROBNY:  Object; asked and answered.

9            Go ahead.

10   BY THE WITNESS:

11       A.    There was always the possibility that

12   the ESOP transaction was not going forward and that

13   the company would pursue one of the other

14   transactions that it was considering.

15           In that event, Duff & Phelps might be

16   resigning the ESOP side and serving the special

17   committee of the board to issue a solvency opinion.

18   And therefore, the work was going on side by side.

19           So for this purpose since that work was

20   already under way, that's what was used as a format

21   for discussing the viability opinion with the

22   trustee.

23   BY MR. GOLDFARB:

24       Q.    Had there been a formal determination or

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

216

1    decision at some point, if you know, that Duff

2    would not issue a solvency opinion in connection

3    with the ESOP transaction if that one went forward?

4         MR. JOHNSTON:  Object to the form of the

5    question.

6         MR. DROBNY:  Asked and answered this morning.

7              But go ahead.

8    BY THE WITNESS:

9         A.    A solvency opinion to whom?

10   BY MR. GOLDFARB:

11        Q.    To anybody.

12        A.    Well, we've already said that we

13   wouldn't be issuing -- if the ESOP transaction went

14   forward we would not be issuing a solvency opinion

15   to the board.  So let's take that off the table.

16             Then the next question is would we be

17   issuing a solvency opinion to the fiduciary.  And

18   we've already discussed the fact that we weren't

19   sure that there was any meaning to a formal

20   solvency opinion or the series of opinions that

21   would characterize it as a solvency opinion to a

22   fiduciary.

23             And what the fiduciary was really

24   interested in was whether we thought the company

CONFIDENTIAL

217

1   was viable long term.  So that's ultimately the

2   opinion that was issued.

3           I don't know that it ever got to the

4   point of a formal decision because I think that it

5   was taken off the table before it got there.

6       Q.    Was there any decision or resolution or

7   conclusions articulated by the committee at this

8   meeting as to its reaction to the presentation made

9   by Duff?

10      MR. JOHNSTON:  Object to the form of the

11  question.

12  BY THE WITNESS:

13      A.    The GreatBanc committee accepted our

14  analysis, asked lots of questions, asked us to go

15  back and do more work and to keep them informed.

16  BY MR. GOLDFARB:

17      Q.    What in particular was the additional

18  work that you were asked to do?

19      A.    I don't remember the specifics, but I do

20  remember that there were questions that had to be

21  answered, so we went back to provide more analysis.

22          In addition, the transaction was not

23  fully negotiated and so there were other elements

24  that had yet to be resolved.  And so we had to

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

218

1    provide analysis as to transaction elements that

2    hadn't been decided on yet.

3         Q.    Subsequent to that meeting was part of

4    Duff's engagement with GreatBanc revised, if you

5    know?

6         A.    No.

7         Q.    Do you know whether subsequent to that

8    March 29th meeting with the GreatBanc committee one

9    of the engagement letters of Duff with respect to

10   the ESOP transaction was revised?

11        A.    Not to my recollection.  I think the

12   ESOP engagement was signed ahead of that meeting.

13        Q.    Do you know whether or not the viability

14   part of the engagement was -- strike that --

15   whether there was a revised engagement letter

16   addressing the viability part of the work that Duff

17   was doing for GreatBanc?

18        A.    I don't remember any revisions to the

19   engagement letter related to the viability opinion.

20   I do recall, though, that we realized the

21   engagement letter hadn't been signed at the last

22   minute, although we had done virtually all the work

23   for that engagement, and so it ended up being

24   signed at the last minute.

CONFIDENTIAL

219

1           Unfortunately, that is not unusual in

2    the height of a transaction.

3        Q.    When you are referring to the letter

4    being signed in the last minute, which engagement

5    letter are you referring to?

6        A.    The engagement letter related to the

7    viability opinion.

8        MR. GOLDFARB:  Let's mark this as 17, please.

9                  (WHEREUPON, a certain document was

10                 marked Bluth Deposition Exhibit

11                 No. 17, for identification, as of

12                 12-17-2009.)

13   BY MR. GOLDFARB:

14       Q.    This is a document bearing Bates number

15   D&P underscore TR000005

16           Ms. Bluth, is this a document you have

17   seen before?

18       A.    Yes, it is.

19       Q.    What is it?

20       A.    This is the engagement letter related to

21   what we have been characterizing as the viability

22   opinion.

23       Q.    When did you first see this letter?

24       A.    I don't remember.

Elyse S. Bluth                                          December 17, 2009

CONFIDENTIAL

                                                                 220

1          Q.    There seems to have been some

2     highlighting on there that got copied in.  I don't

3     know where it came from.  But do you recognize this

4     to be a revised engagement letter relating to the

5     viability analysis done for the GreatBanc Trust

6     Company?

7          MR. DROBNY:  Object to form.

8     BY THE WITNESS:

9          A.    I know this is the letter that

10    ultimately was entered into in connection with the

11    viability opinion.  I was not part of the

12    preparation of this letter and so I don't know what

13    revisions, if any, there were from the time it was

14    first drafted to the time it was ultimately signed.

15    BY MR. GOLDFARB:

16         Q.    I'm sorry.  Just to clarify, did you say

17    you only saw this letter after it was executed?

18         A.    No.  I believe I saw it during the time

19    that it was -- before it was executed.

20         Q.    And were you consulted at all in

21    connection with the contents of this letter?

22         A.    I don't remember.

23         Q.    If you look at Page -- I'll say Bates

24    ending in 000010, it was signed by Mr. Bartell and

CONFIDENTIAL

221

1     Mr. Janssen for Duff & Phelps.  Do you see that?

2          A.    Yes.

3          Q.    Do you recall discussing this engagement

4     letter with them at all?

5          A.    I am sure I did at some point.  I don't

6     recall any specifics.

7          Q.    If you turn to Page 2 of the document,

8     you see that under the heading "Nature and Scope of

9     Engagement" it refers to -- it says, "Specifically,

10    subject to the assumptions and qualifications set

11    forth in the opinion and the bring-down opinion, we

12    will determine whether following the closing and

13    after taking into consideration the savings to be

14    realized by the company as a result of the ESOP

15    transaction (including, without limitation, the

16    savings resulting from the elimination of the

17    company's 401(k) cash contributions and public

18    company cost reductions and the tax savings

19    resulting from the company's contemplated 2008 S

20    election) (such savings contemplated as of the date

21    hereof being the 'anticipated savings')."

22              Do you see that?

23         A.    I do.

24         Q.    So then the company would determine two

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

222

1    things.  First, whether the fair market value of

2    the company's assets will exceed the value of its

3    liabilities, including all contingent and other

4    liabilities.  Do you see that?

5         A.    I don't see the company determining

6    anything, but I see the words "The fair market

7    value of the company's assets will exceed the value

8    of its liabilities," yes.

9         Q.    Right.  And that would be Duff making

10   that determination, correct --

11        A.    Yes.

12        Q.    -- under this engagement letter?

13             Can you read to yourself the definition

14   of fair market value on that page, which is

15   underneath -- which is the third paragraph from the

16   top?

17        A.    Okay.

18        Q.    Is that a common definition of fair

19   market value in your experience?

20        MR. DUCAYET:  Object to the form of the

21   question.

22        MR. DROBNY:  Object; foundation.

23   BY THE WITNESS:

24        A.    The discussion of anticipated savings is

CONFIDENTIAL

223

1   clearly intended only for this transaction.

2   BY MR. GOLDFARB:

3       Q.    And the definition indicates that, "Fair

4   market value means, with respect to the company's

5   assets, the price as of the date of our opinion or

6   bring-down opinion, as applicable, at which such

7   assets would change hands between a willing buyer

8   and a willing seller, neither being under any

9   compulsion to buy or to sell, and both having

10  reasonable knowledge of relevant facts."

11          Do you see that?

12      A.    I do.

13      Q.    Does that roughly correspond to the

14  definition of fair market value that you

15  articulated earlier when we were talking about your

16  understanding of the definition and how it is

17  defined in the ERISA provision that you saw

18  earlier?

19      MR. DUCAYET:   Objection.   It misstates the

20  prior testimony.

21      MR. DROBNY:   Object to form.

22  BY THE WITNESS:

23      A.    This is roughly the definition of fair

24  market value that I use in ERISA opinions.   I don't

CONFIDENTIAL

224

1    think it's ever articulated anywhere in ERISA as to

2    what the definition of fair market value is.

3    BY MR. GOLDFARB:

4        Q.    Do you know why the latter part of the

5    definition concerning the realization of the

6    anticipated savings was added to this definition?

7        A.    Since I have only just noticed this in

8    this reading, I don't think I should speculate and

9    guess as to why it was added.

10       Q.    I am asking if you were aware at the

11   time.

12       A.    I don't remember it at all.

13       Q.    Is this a definition of fair market

14   value; i.e., one that accounts for the realization

15   of ESOP-related tax savings, is that one that you

16   have encountered or used in other engagements in

17   which you have been involved?

18       MR. JOHNSTON:   Objection to the form of the

19   question.

20       MR. DROBNY:   I object.   It mischaracterizes

21   her testimony and what she did.

22   BY THE WITNESS:

23       A.    No.   I typically would not put in -- in

24   a fairness opinion to an ESOP trustee upon buying

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

225

1   shares, I typically would not put in the tax

2   savings that were expected to be realized by the

3   transaction in assessing the fairness of the price

4   paid.

5   BY MR. GOLDFARB:

6         Q.    The portion of that document that I

7   referred to also referred to a bring-down opinion

8   toward the top of that page.  No bring-down opinion

9   was ever issued; is that correct?

10        A.    As I previously testified, there was

11  never a need for a bring-down opinion.  In fact,

12  that shows you that this letter was likely around

13  for a long time intending to be signed and wasn't

14  signed because at the time this was signed we knew

15  there would be no bring-down opinion.

16        Q.    You are saying as of March 31st, 2007,

17  you knew there would be none?

18        A.    We knew there would be no need for one,

19  yes.

20        Q.    I think my prior questions concerned the

21  need for a bring-down opinion in an engagement

22  letter that referred to the ESOP analysis that was

23  being conducted.  This refers to the viability

24  analysis.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

226

1          Is it your recollection that the

2    bring-down opinion would concern both the viability

3    issues reflected in this engagement letter as well

4    as the ESOP fairness issues reflected in the other

5    engagement letter?

6          A.    Bring-down opinions to fiduciaries only

7    relate to actions fiduciaries can take.  Once the

8    fiduciary purchased the stock and agreed to other

9    aspects of this transaction, there was no need for

10   them to do anything else.  So there was no need for

11   a bring-down opinion in any aspect of the

12   transaction.

13          MR. GOLDFARB:  Let's mark this, please, as 18.

14                 (WHEREUPON, a certain document was

15                 marked Bluth Deposition Exhibit

16                 No. 18, for identification, as of

17                 12-17-2009.)

18   BY MR. GOLDFARB:

19          Q.    While you are looking at this, please,

20   Ms. Bluth, this is a document bearing Bates number

21   GBTRIB 00002076.

22                 Can you identify this document for the

23   record, please?

24          A.    If you will answer a question first.

CONFIDENTIAL

227

1  Where did this document come from?

2      Q.    I will tell you that it was produced

3  from the files of GreatBanc.

4      A.    Okay.  And I apologize for asking, but

5  there has been a lot of confusion about what the

6  last draft of our analysis was.  And so I wanted to

7  just make sure that this wasn't something else.

8          I believe this is the last set of

9  analyses that related to the ESOP transaction that

10  were distributed to GreatBanc.

11     Q.    And it's marked "Preliminary Draft"; is

12  that right?

13     A.    Yes.

14     Q.    To your knowledge, was there ever a

15  final version that was circulated to GreatBanc that

16  was not labeled draft?

17     A.    I do not think there was.  I believe

18  this is the draft -- the last draft that they got

19  before they signed the agreement that resulted in

20  them buying all of the stock in Tribune.

21         We later intended to and unfortunately

22  never did clean it up and send something

23  post-signing with all the final terms in it.  And

24  that's why there has been a lot of confusion as to

Elyse S. Bluth                                December 17, 2009

CONFIDENTIAL

228

1   what the last draft was -- or the last version.

2        Q.    But to your recollection, April 1st is

3   the -- this April 1st draft is the latest one you

4   are aware of?

5        A.    Was April 1st a Sunday?

6        Q.    I believe so.  It was either Saturday or

7   Sunday.

8        A.    The last version went out last Saturday

9   night.  It was reviewed with GreatBanc -- or

10  delivered early Sunday morning and was reviewed

11  with GreatBanc Sunday morning.  If that's April

12  1st, then --

13       Q.    April 1st was a Sunday, 2007.

14       A.    Then yes, this is the last version.

15       Q.    I just want to direct your attention

16  quickly to a couple things, please.

17             If we can look at Page 23 -- before we

18  look at this, were you involved in the development

19  of this last circulated draft?

20       A.    Yes.

21       Q.    Did you review it before it was sent to

22  GreatBanc?

23       A.    Yes.

24       Q.    Were you personally involved in the

Elyse S. Bluth                                          December 17, 2009
CONFIDENTIAL

229

1    preparation of the document?

2         A.     Yes.

3         Q.     Did you personally draft the material

4    that's contained in here?

5         A.     Some of it probably.

6         Q.     Is that different from the earlier ESOP

7    analysis draft that we looked at from March 27th or

8    28th?

9         A.     I was involved in the drafting of that

10   one also.

11        Q.     Looking at Page 23, what is presented on

12   this page, please?

13        A.     These are calculations that result in a

14   per-share range of fair market value for Tribune

15   common stock.

16        Q.     The major difference between the two

17   computations as far as I can tell is the

18   differential value assigned to the PHONES debt.

19   And I ask that you just look to see whether you

20   concur.

21        A.     I think that's right.  There was also

22   some differences in the number of in-the-money

23   options that resulted from that.

24        Q.     Yes.  For the record, what was the

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

230

1    PHONES debt?

2         A.    The PHONES debt was debt that was issued

3    secured by Time Warner stock, and it could be -- I

4    don't remember all the details, but it could be

5    exchanged for Time Warner stock.  I believe the

6    dividends on Time Warner stock were used to repay

7    principal.  And there were other aspects to it.  I

8    think it was issued in the late '90s.

9         Q.    What was the significance for this

10   presentation of presenting the price-per-share

11   computation reflecting the book value of the PHONES

12   on the left as opposed to the fair market value of

13   the PHONES debt on the right?

14        MR. JOHNSTON:  Objection to the form of the

15   question.

16   BY THE WITNESS:

17        A.    There was a lot of discussion as to

18   whether or not PHONES should be included at their

19   trading price or at their book value.  And so we

20   presented it both ways.

21   BY MR. GOLDFARB:

22        Q.    Did you have a view as to which

23   treatment was more appropriate?

24        A.    Yes.  I thought it was more appropriate

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

231

1    to have PHONES at fair market value.

2         Q.    And what was the basis for your view?

3         A.    The best estimate of the value of the

4    security is what someone else will pay for it and

5    that was its trading price on the exchange.

6              I'm sorry.  I don't know if it was on

7    the exchange, but that was its market price, what

8    investors were paying for it.

9         Q.    If you recall, what was the basis for

10   treating PHONES at face value?

11        A.    Just another measure of value.  That's

12   what it was on the company's balance sheet for.

13   That may be net of the Time Warner stock.  I don't

14   recall.

15        Q.    Looking at Page 24, please.  What's

16   depicted on this page?

17        A.    This is a calculation of the implied

18   enterprise value using the transaction price that

19   had been proposed of $34 a share.

20        Q.    And the total implied enterprise value

21   under the calculation shown here is $13.613

22   billion; is that right?

23        A.    Yes.

24        Q.    Using that implied enterprise -- strike

CONFIDENTIAL

232

1   the question.

2              On Page 25, what is reflected on this

3   page?

4       A.    This is an estimate of post-transaction

5   value.  So after the ESOP transaction would be

6   completed what the equity value would be worth.

7       Q.    And when you say when the transaction

8   would be completed, what do you mean by that?

9       A.    When the company was private.

10      Q.    And looking at the debt, the three debt

11  figures there, would you agree that those roughly

12  add up to $13.9 billion?

13      A.    Unless you want me to take out my

14  calculator, I will take your word for it.

15      Q.    Again, as I say, roughly.

16             And what do those three components of

17  debt comprise in total?

18      A.    I think you just told me.

19      Q.    What does pre-transaction debt,

20  repurchase debt and merger debt reflect?  What were

21  those?

22      A.    I think the first was the expected debt

23  at the time of closing of the transaction before

24  new debt was incurred.  I think the second is the

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

233

1    debt that would be incurred for the repurchase of

2    shares in the spring of 2007.  And then the merger

3    debt was the final amount of debt when the

4    remaining shares were repurchased whenever it was

5    closed.

6         Q.    And the Sub 1 down at the bottom where

7    it says, "Plus net present value of benefit

8    replacement and cost savings" -- do you see that?

9         A.    I do.

10        Q.    That's a figure of $322 million?

11        A.    Yes.

12        Q.    Does that relate to the benefits from

13   the ESOP structure?

14        A.    I believe -- my recollection is that

15   that relates to the cash savings that the company

16   was going to earn by not paying $60 million of cash

17   in 401(k) benefits and the cost savings of not

18   being public.

19        Q.    Why is that number -- well, why wouldn't

20   that number, the 322 million, be expected to be

21   reflected in the $34 share price that was used to

22   calculate the enterprise value?

23        MR. JOHNSTON:  Objection to the form of the

24   question.

Elyse S. Bluth                                          December 17, 2009
CONFIDENTIAL

234

1        MR. DROBNY:   Object to form.

2   BY THE WITNESS:

3        A.    If you are saying that the share price

4   of $34 was higher because the company expected to

5   save $60 million in cash a year from 401(k) savings

6   and $20 million from not being public, then, you

7   know, maybe.  I mean, we thought that the company

8   was worth 34 without that savings and so we show it

9   here adding.

10            This analysis is done for advice to the

11  trustee.  No decisions are made on it.  ESOP

12  fiduciaries are always curious as to what the value

13  of the company is after they buy it.  And so this

14  was sort of a "by the way" this is what it might

15  look like.  It wasn't definitive.  It didn't lead

16  to any conclusions that I recall.

17  BY MR. GOLDFARB:

18       Q.    In your understanding did the $34 per

19  share price reflect the income tax savings that

20  would result from the particular structure of the

21  Tribune post-transaction?

22       MR. DUCAYET:   Objection.

23       MR. JOHNSTON:   Objection to the form of the

24  question.

Elyse S. Bluth                                          December 17, 2009

CONFIDENTIAL

235

1    BY THE WITNESS:

2         A.     There is no analysis here that would

3    suggest that, no.  We thought the $34 a share was

4    supported without the Sub S benefits.

5    BY MR. GOLDFARB:

6         Q.     And by "Sub S benefits," you are

7    referring also to the ESOP benefits?

8         A.     There are numerous different ESOP

9    benefits.  So if you could be more specific as to

10   which benefit you are talking about, I would

11   appreciate it.

12        Q.     Well, it was in a prior document that we

13   indicated -- it was estimated there was an

14   estimated approximately $900 million net present

15   value of tax savings associated with the ESOP S

16   corp structure.  Do you recall that?

17        A.     Yes.

18        Q.     And that resulted from -- that was

19   attributed to the savings from not having to pay

20   income taxes, correct?

21        A.     Yes.

22        Q.     And I guess my question is, are those

23   savings reflected in the $34 a share when you are

24   calculating the implied enterprise value?

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                              236

1        A.      No, they are not.

2        Q.      Is there a reason in this -- on Page 25

3   why the income tax savings from the S corp

4   structure are not considered in this computation?

5        A.      The starting point here is implied

6   enterprise value and that was based on the

7   transaction price.

8               So if your question is did the $34 paid

9   for the stock consider the future tax savings,

10  since the company had alternatives that were around

11  the same price that didn't have that tax savings, I

12  would have to say no, I don't think that they were

13  included in the $34 a share price.

14              Going down the numbers in the column, we

15  did not add into this calculation the 900 or so

16  million dollars because we didn't think it was

17  appropriate to include the present value of the

18  future tax savings from being an S corp into the

19  equity value of the company post-transaction.

20       Q.      Why would -- I am just trying to

21  understand the distinction between that tax benefit

22  to, for example, the benefit replacement cost

23  savings that is included on here.

24       A.      The presumption is that the cash flows

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

237

1    and the cash flows we used for the discounted cash

2    flow analyses and the EBITDA that we used as a

3    basis for applying multiples included $80 million

4    of costs that were going away.

5              So to make the math easy, let's assume

6    that number was 100.  A multiple of 8 times 100 is

7    $800 million.  That value had already been

8    subtracted out in this 13.6 -- in enterprise value

9    because we were using multiples that were after

10   that.  However, this was non-cash.  So we were

11   adding it back in to correct the prior cash flows

12   out of the company that were presumed in the other

13   analyses.

14        Q.   Are you saying that the total implied

15   enterprise value here is one that is based on --

16   what are you referring to when you are referring to

17   multiples?

18        A.   The 13.6 million as we saw before is

19   based on the price that was paid in the transaction

20   of $34 a share.

21             We also -- I think you also saw that our

22   financial analysis, which included a discounted

23   cash flow and valuation multiple, also supported a

24   $13.6 million value.  It was within a range.

CONFIDENTIAL

238

1           And on the prior page you can see the

2     range, 12.6 to 14.2 million.

3          Q.    Just so the record is clear --

4          A.    On Page 26.  Excuse me.  It's the next

5     page.

6           Those calculations -- those implied

7     enterprises of 12.6 to 14.2 were determined through

8     the valuation analyses that we discussed earlier

9     today.

10           So for example, in a discounted cash

11    flow analysis we assumed $80 million would leave

12    the company every year, 60 million for a 401(k)

13    match in cash and 20 million to pay public company

14    costs.

15           So the 13.6 falls within that range.

16    The assumption is the 13.6 is supportable without

17    that cash flow savings.  We then have to correct

18    the fact that that expense is going away, so we add

19    it back.  After tax, 322.

20          Q.    I didn't understand all of that answer,

21    but if you could just -- so if you just clarify

22    your prior answer to explain if and where the tax

23    savings -- the ESOP tax savings from not having to

24    pay income tax are reflected here or why they

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

239

1   didn't need to be.  I just didn't understand your

2   answer.

3        A.    The 900 million ESOP Sub S savings is

4   not included here anywhere.

5        Q.    Again, so that I am clear on your

6   testimony, what are you saying is the distinction

7   between the income tax savings that's not reflected

8   here and why the net present value of the benefit

9   replacement cost savings is?

10       A.    Do you understand that we are talking

11  about two different things?  We are not talking

12  about the same aspect of the transaction.  It's not

13  the same cash flow.

14            I am just trying to understand the

15  confusion.

16       Q.    Yes.  I know.  I understand that.

17       A.    Okay.  So the 13.6 represents willing

18  buyer, willing seller, anyone buying the company.

19  And we are saying that $34 a share represents

20  anyone who might buy the company.  It happens to be

21  this transaction but it could be anyone.  It fell

22  within the range of where we felt the transaction

23  should be priced.

24            Then we said in this instance the ESOP

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

240

1    of -- the allocation of shares in a leveraged ESOP

2    will be providing the benefits to employees.  And

3    so the expense that's running through the income

4    statement is non-cash.  And so we are adding back

5    the cash.  So that's the distinction here.  So we

6    are adding back the cash and the $20 million public

7    cost savings.

8              So we're adding back the present value

9    of what we think the savings are in this

10   transaction here.

11             Anyone using an ESOP Sub S structure,

12   non-Sub S structure, you would have a 20-percent

13   ESOP in a company with other shareholders and

14   achieve that same savings.

15             The Sub S savings, however, can only be

16   achieved with the kind of structure here and cannot

17   be achieved by anyone else who owns stock in this

18   transaction.  The ESOP cannot sell its stock to

19   anyone else who could achieve that same tax

20   savings.  And therefore, given the construct of

21   willing buyer, willing seller, the standard is not

22   to include the Sub S tax savings in a valuation of

23   a 100-percent ESOP-owned Sub S company

24        Q.    Turning to Page 26, please.  Am I

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                            241

1    correct that this page is an expansion of the prior

2    page to include also the valuation range that Duff

3    had previously calculated through its valuation

4    analysis?

5          A.    Yes.

6          Q.    What was the purpose of adding that

7    valuation range to the implied transaction pricing?

8          A.    As we saw by looking at the page before,

9    it's hard to compare and flip and back and forth,

10   so we put them all next to each other.

11         Q.    And if you look at the low end --

12   looking at the low end of the range, in the darkly

13   shaded area at the bottom, if you take the account

14   of debt and the other figures, the EGI-TRB

15   investment, the cash flows, and then adding in the

16   net present value of the benefit replacement cost

17   savings and the net present value of the tax

18   savings from the ESOP loan principal, the number

19   there, am I correct that that's reflecting a

20   negative $322 million total adjusted equity value?

21         A.    Yes.

22         Q.    What, if any, significance does a

23   negative total adjusted equity value have?

24         MR. DROBNY:    Object to form.

CONFIDENTIAL

242

1   BY THE WITNESS:

2       A.    It shows that if the company was worth

3   12.6 on the implied enterprise value, less the

4   debt, plus the investment, plus the after-tax --

5   although the company was not going to be the

6   taxpayer -- the after-tax benefits, the number was

7   negative, was less than zero.

8             On the other hand, on the high end, the

9   number was well more than the transaction price

10  implied.  It's a range.

11  BY MR. GOLDFARB:

12      Q.    And do you recall any discussion within

13  Duff about the figures presented on this page, in

14  particular the result of a negative total adjusted

15  equity value at the low end of the range given the

16  understanding of the figures as presented here?

17      MR. JOHNSTON:  Objection to the form of the

18  question.

19  BY THE WITNESS:

20      A.    I think it was discussed at length.

21  BY MR. GOLDFARB:

22      Q.    And what do you recall about the

23  discussions?  Strike that question.

24            Do you recall who you discussed these

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

243

1   figures with?

2        A.    Not specifically, no.

3        Q.    How about generally?

4        A.    With many members of the team that were

5   working on this.

6        Q.    Was there anyone in particular who was

7   focused on this aspect of the calculation; i.e.,

8   the implied transaction value and the tables

9   depicted on this Page 26?

10       A.    The associate or the vice president who

11  was working on it with me, Dan Christoffel, was

12  involved in the calculations.  I think he probably

13  did the table.

14             But everyone was equally concerned about

15  a negative number.  We were also pretty excited

16  about the prospect of a higher number.

17       Q.    This is a document that you presented to

18  GreatBanc; is that right?

19       A.    Yes.

20       Q.    Do you recall whether they had any

21  reaction to this page in particular or questions

22  about it?

23       A.    I think there was a lot of discussion

24  about it and similar kind of discussions.

CONFIDENTIAL

                                                        244

1        Q.    Looking at the footnote on that page --

2   strike that question.

3             Do you know whether GreatBanc took any

4   action in response to the discussions that grew out

5   of this slide?

6        MR. JOHNSTON:   Objection to the form of the

7   question.

8   BY THE WITNESS:

9        A.    Aside from discussion?

10  BY MR. GOLDFARB:

11       Q.    Yes.

12       A.    I am not sure what action you are

13  suggesting they could have taken.  This was the day

14  of signing of the transaction.  I suppose their

15  choice was either go forward or not go forward.

16       Q.    Was there any discussion to your

17  recollection about whether at that point in time

18  they should or should not go forward?

19       A.    At every meeting we were at there was

20  discussion as to whether or not it made sense to go

21  forward.

22       Q.    And do you recall any specific

23  discussion about whether the negative total

24  adjusted equity value reflected in this scenario

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

245

1    prompted specific discussion or concern on the part

2    of GreatBanc on whether to proceed?

3         A.    Sure there was discussion as to the

4    negative number.  Of course there was.

5         Q.    And were you present during those

6    discussions?

7         A.    Yes.

8         Q.    How, if you know, did GreatBanc resolve

9    its concern about the negative number reflected in

10   here in reaching an ultimate decision to proceed

11   with the transaction?

12        MR. JOHNSTON:  Objection to the form of the

13   question.

14        MR. DROBNY:  Same objection; form.

15   BY THE WITNESS:

16        A.    Apart from discussion and requests for

17   additional analyses, the history tells that they

18   chose to go forward with the transaction.  And so I

19   think that was the ultimate resolution.

20   BY MR. GOLDFARB:

21        Q.    You said they requested that Duff

22   conduct additional analyses?

23        A.    Throughout this process they requested

24   that Duff & Phelps prepare additional analyses.  We

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

246

1    were all the time talking to GreatBanc.  So I don't

2    remember specifically about this one number at this

3    time whether there was specific analyses, but there

4    were constant discussions.

5            In fact, I think that Marilyn Marchetti

6    and Julie Williams spent the whole day sitting in

7    our office -- or much of the day sitting in our

8    offices with us going back and forth.

9        Q.    You indicated earlier that you

10   participated in the April 1st Tribune board

11   committee meeting.

12       MR. JOHNSTON:  Objection; mischaracterizes the

13   testimony.

14       MR. DROBNY:  Same objection.

15   BY MR. GOLDFARB:

16       Q.    Does that mischaracterize your

17   testimony?

18       A.    A little bit.  We were asked to attend

19   the board meeting that the company had the

20   evening -- that Sunday evening, April 1st.  We were

21   in there for maybe 10 or 15 minutes and then left.

22       Q.    Did you speak during the board meeting?

23       A.    I don't remember if I spoke during the

24   board meeting.  I know I spoke when we were walking

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

247

1    out shaking hands, et cetera.

2         Q.    You attended that meeting with

3    Ms. Marchetti; is that right?

4         A.    Yes.  And Charlie Smith was also there.

5    I don't remember if Henry Snyder was in there.  I

6    don't remember if they were in the board room with

7    us.  I know that they were at Trib Tower with us.

8         Q.    What briefly was the purpose of your

9    attending the meeting?

10        MR. DROBNY:  Object; foundation.

11   BY THE WITNESS:

12        A.    My general understanding was that the

13   board wanted to make sure that GreatBanc had

14   fulfilled all their fiduciary duties in looking at

15   this transaction.  And so they asked GreatBanc to

16   please discuss what they had done so that the board

17   could be assured.  The board was concerned that it

18   had fiduciary duty to the ESOP also and they wanted

19   to make sure that the trustee that had been picked

20   was following the right fiduciary procedures and

21   doing all of the things they were supposed to do.

22        MR. GOLDFARB:  Let's go off the record,

23   please.

24

Elyse S. Bluth                                        December 17, 2009
CONFIDENTIAL

                                                                    248

1                    (WHEREUPON, a recess was had

2                      from 5:01 p.m. to 5:10 p.m.)

3    BY MR. GOLDFARB:

4         Q.    Ms. Bluth, did Duff & Phelps issue an

5    opinion related to the fairness of the transaction

6    to the ESOP on April 1st, 2007?

7         A.    Yes.

8         Q.    Were you involved in the preparation of

9    that opinion letter?

10        A.    Yes.

11        Q.    Did you draft it personally?

12        A.    I did.

13        MR. GOLDFARB:  Let's mark this as 19.

14                   (WHEREUPON, a certain document was

15                    marked Bluth Deposition Exhibit

16                    No. 19, for identification, as of

17                    12-17-2009.)

18   BY MR. GOLDFARB:

19        Q.    This is a document bearing Bates number

20   GBTRIB 00019200.

21              Ms. Bluth, are you able to identify this

22   document?

23        A.    It looks like a series of e-mails and

24   the last one is mine.

CONFIDENTIAL

249

1          Q.     By "the last one," do you mean the first

2     e-mail, the most recent in time?

3          A.     Yes.

4          Q.     And that's at the top of the first page?

5          A.     Yes.

6          Q.     And this is an April 16th e-mail to

7     Bernadette Doran and Marilyn Marchetti, cc'd to

8     Danielle Montesano, James Staruck, Julie Williams;

9     is that right?

10         A.     That's right.

11         Q.     Who is Bernadette Doran?

12         A.     She was someone at Tribune.  I don't

13    remember.  Or related to Tribune.  I don't remember

14    who she was.

15         Q.     And your e-mail -- the subject of the

16    e-mail is concerning a final draft of Tribune press

17    release.  And you wrote, "My comments are attached.

18    Duff & Phelps would prefer the terms of our

19    opinions not be public per our engagement letter."

20               Do you see that?

21         A.     Yes.

22               Let me correct.  Bernadette Doran may

23    not be related to Tribune.  I don't know who she

24    is.  She may have been retained by GreatBanc.  I

Elyse S. Bluth                                December 17, 2009
CONFIDENTIAL

250

1    just don't know or remember.

2         Q.    Before you answer, then let me ask, you

3    see in the immediate prior e-mail to yours

4    she has an e-mail address

5    bdoran@industrialstrengthsoul.com?

6         A.    Yes.

7         Q.    Does that refresh your recollection as

8    to who she was?

9         A.    No.  That makes me think that she wasn't

10   part of Tribune.  That's why I thought maybe I was

11   incorrect before.

12        Q.    Do you know what Industrial Strength

13   Soul is?

14        A.    No.

15        Q.    Turning back to your e-mail, it says --

16   you wrote "Duff & Phelps would prefer the terms of

17   our opinions not be public per our engagement

18   letter."  Do you see that?

19        A.    Yes.

20        Q.    Why did Duff prefer that the terms of

21   its opinions not be public?

22        MR. JOHNSTON:  Objection; foundation.

23   BY THE WITNESS:

24        A.    I don't remember what was said in the

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

251

1    press release.  I don't remember what we changed.

2    Typically the details of opinions are not public.

3    And so this would be sort of standard form.

4    BY MR. GOLDFARB:

5         Q.    Was there anything in particular about

6    this engagement that prompted you to indicate that

7    Duff & Phelps preferred the terms of the opinions

8    for this engagement not be public?

9         A.    Not to my recollection, no.

10        MR. GOLDFARB:  Ms. Bluth, I am going to yield.

11   Thank you for your time.  I am going to yield the

12   hot seat to counsel.

13        MR. KORPUS:  I think the hot sheet is actually

14   over there.

15        MR. JOHNSTON:  Counsel, I also have questions,

16   very few.  Five minutes or less.

17        MR. KORPUS:  Give me a five-minute warning

18   then.

19        MR. JOHNSTON:  I'm not the timekeeper.

20        MR. DROBNY:  I'll give you a five-minute

21   warning.

22        MR. KORPUS:  Thank you.

23

24

Elyse S. Bluth                                    December 17, 2009
                          CONFIDENTIAL

                                                              252
1                          EXAMINATION

2     BY MR. KORPUS:

3          Q.    My name is Sheron Korpus.  I'm with

4     Kasowitz Benson, and I represent Law Debenture.

5                Can we go back to Bluth 5, please, in

6     the pile before you, the handwritten notes?  And

7     the first sentence on the first page reads "Friday

8     call from Don Grenesko that deal may have life."

9     And then a couple of lines further down it says,

10    "Why ESOP deal is back."

11               Do you see those two lines?

12         A.    I do.

13         Q.    Do you recall that at some point prior

14    to this March 19 call you were told that the deal

15    was off and to stop working on the deal?

16         A.    Yes.

17         Q.    And either at that time or sometime

18    after were you told why the deal was off and why

19    you should stop working on the deal?

20         A.    I probably was.  I don't recall today

21    why.

22         Q.    So sitting here today you have no

23    recollection as to any reason given by whoever

24    called you to tell you that the deal was off, any

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

253

1    reason given as to why the deal was off at that

2    time?

3         MR. DROBNY:   Objection; asked and answered.

4    BY THE WITNESS:

5         A.    You have made a presumption in your

6    question that I think is inaccurate.  I don't

7    remember getting -- particularly getting called

8    being told the deal was off.  I remember either an

9    e-mail or a voice mail message over a weekend that

10   I picked up on a Sunday night and then just found

11   out that everything was put on hold or off.  And I

12   don't remember much more about why or why it came

13   back.

14   BY MR. KORPUS:

15        Q.    Okay.  And my question was a little

16   different.  I wasn't asking for at that time you

17   were told why the deal was off.  I am asking

18   whether at any time sitting here today do you

19   recall ever learning why the deal was off?

20        A.    I recall that the deal was off.  I don't

21   recall why the deal was off.  I may have known at

22   the time.

23        Q.    In any event then, you were told the

24   deal may have life and you had this phone call

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

254

1    that's referred to here.

2              And you were asked about the subject of

3    the tax savings and the discussion in this document

4    about whether or not it was appropriate to include

5    the tax savings as part of the solvency opinion.

6              Do you remember that testimony?

7         A.    I don't remember testimony about that.

8    Would you please point me to where it is in the

9    document?

10        Q.    Sure.  You can look on the bottom of the

11   second page, "ESOP trustee - can we consider tax

12   benefits."  Going on to the third page, the

13   question states, "No case law exists on how to

14   treat the ESOP tax benefits for purposes of

15   solvency opinion."  And there is some more

16   discussion there.

17             And then on the very last entry it says,

18   "Solvency opinion to the board, cannot factor in

19   ESOP tax benefits."

20             Do you see those entries?

21        A.    Where is the solvency opinion?

22        Q.    That's the very last line.

23        A.    On the second page?

24        Q.    No.  Of the document.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

1      A.    Oh, at the very last line of the

2   document.

3            I see that.

4      Q.    And I think in response to questions you

5   said that there were views raised about whether or

6   not you could include the tax savings.  And my

7   question to you is, do you remember who expressed

8   what views?  Do you remember whether -- what views

9   were expressed by members of Tribune that may have

10  been known to call or the trustee or the trustee's

11  counsel?  Can you attribute any of the views that

12  were expressed at that meeting?

13     A.    I think these were notes from a call

14  that Tribune was not involved in.

15     Q.    Okay.

16     A.    So these notes seem to me to be a call

17  among Duff & Phelps, GreatBanc, and GreatBanc's

18  counsel.

19            It may have been discussed on that call

20  the kinds of issues that you are talking about,

21  whether or not a solvency opinion to a board can

22  include ESOP tax benefits or cannot include tax

23  benefits.

24            I think throughout the discussions that

CONFIDENTIAL

256

1    Duff & Phelps had with GreatBanc and GreatBanc's

2    counsel this was an open question, and I think I

3    have testified to that already.

4         Q.    Right.  And my question is, do you

5    recall -- I understand it was an open question and

6    there were views presented both ways, but do you

7    recall any particular individual that raised views

8    saying that the solvency opinion either can factor

9    in tax benefits or cannot factor in tax benefits?

10        A.    I remember discussions among people at

11   Duff & Phelps where there were no definitive

12   answers.  We didn't know.

13        Q.    Okay.  You don't recall anyone

14   expressing a strong opinion one way or another

15   sitting here today, either Duff & Phelps or the

16   trustee?

17        A.    At Duff & Phelps I remember many, many

18   discussions as to whether or not they could be

19   considered.  There were opinions every which way.

20   I don't think there was any firm resolution.

21        Q.    Do you remember what the trustee's

22   position was?

23        A.    The trustee was asking the questions of

24   us.  The trustee to my recollection did not have an

CONFIDENTIAL

257

1    opinion regarding a solvency opinion.

2         Q.    Do you recall what the trustee's

3    counsel's opinion was?

4         A.    No, I don't.

5         Q.    If you'd pull out Bluth Exhibit 16, the

6    board meetings from the March 29, 2007 -- the

7    minutes for the March 29, 2007, minutes.  Do you

8    have that?

9         A.    I do.

10        Q.    I know you were asked at length about

11   this document.  I wanted to just focus on one

12   paragraph that you weren't asked about.

13             At the bottom of Page 9, "The committee

14   then discussed the differing viewpoints of the

15   board of directors of the company and the committee

16   regarding solvency."

17             Do you remember learning either at that

18   meeting or before or after that there were

19   differing viewpoints of the board of directors of

20   the company and the committee regarding solvency?

21        MR. DUCAYET:  Object to the form of the

22   question.

23   BY THE WITNESS:

24        A.    My understanding is that this refers to

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

258

1    the kind of discussion that I mentioned before,

2    that there are different meanings to a solvency

3    analysis to different parties and whether or not

4    the committee had a need for a formal solvency

5    opinion.

6    BY MR. KORPUS:

7         Q.    So your understanding is that the

8    statement here about differing viewpoints of the

9    board of directors of the company and the committee

10   regarding solvency goes to differing viewpoints as

11   to whether or not a solvency opinion is required?

12        A.    Yes.

13        Q.    And what's the basis for that

14   understanding?

15        A.    The discussions that were had at Duff &

16   Phelps, the discussions that were had with the

17   trustee.

18        Q.    So sitting here today, you recall that

19   the discussion on March 29th, 2007, which is

20   reflected on these minutes related to that issue

21   and not any concern by the board of directors about

22   whether or not the company would be solvent

23   following this transaction?

24        A.    I was not privileged to any board of

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

259

1    directors discussions about the solvency or their

2    thoughts about solvency of the company, so I can't

3    come close to commenting on that part of your

4    question.

5            My recollections are generally of the

6    entire transaction.  As I have indicated a few

7    times, I don't remember any -- it's all one to me.

8    Sitting here today, I don't remember any specific

9    conversations at any specific meeting with minor

10   exceptions to that.

11           So I don't remember this conversation in

12   particular.  I just remember the general impression

13   throughout the process.

14       Q.    If you look at the top of Page 9 -- and

15   I know that you were asked about that; I just

16   wanted to remind you.  There was a discussion about

17   the proposed transaction having a 95-percent

18   debt-to-equity ratio.  And I know you were asked

19   about that.

20           And then if you turn to Page 12, at the

21   top of Page 12, it states "Michael Welgat noted

22   that given the extent of leverage, management would

23   be forced to operate in an environment where there

24   would be no capital to adapt to the market and that

Elyse S. Bluth                                          December 17, 2009

CONFIDENTIAL

260

1    no acquisitions would be possible and, accordingly,

2    the ability to take advantage of opportunities

3    would be limited."

4              Do you see that?

5         A.    I do.

6         Q.    Given those conditions that the company

7    would be operating under, was there any discussion

8    whether in its valuation Duff & Phelps should use a

9    company-specific risk premium to the cost of equity

10   and the calculation of the discount rate?

11        MR. JOHNSTON:  Objection to the form of the

12   question.

13   BY THE WITNESS:

14        A.    There was not and that would be

15   inappropriate.  Instead, one would analyze the cash

16   flows.  The risk of the equity doesn't change; the

17   risk of the weighted average cost of capital

18   doesn't change.  What you would do is adjust the

19   cash flows.

20   BY MR. KORPUS:

21        Q.    And did you adjust the cash flows at

22   all?

23        A.    The cash flows were already adjusted.

24   We were looking at projections that already

Elyse S. Bluth                                December 17, 2009
CONFIDENTIAL

261

1    incorporated lower working capital -- I'm sorry --

2    lower capital spending or other limits on spending

3    as a result of higher debt levels.

4         Q.    So in your opinion it would not have

5    been appropriate to include the company-specific

6    risk premiums based on the risks that I have

7    outlined?

8         A.    That's correct.

9         Q.    We are going to look at this at kind of

10   the same time.  If you could pull out Exhibits 8,

11   11 and 16.

12             16 you already have.  Just 8 and 11.

13             8 is the credit rating presentation and

14   11 is the valuation analysis as of March 29th.

15             Got them?

16        A.    I do.

17        Q.    Turning first to Bluth 8, the credit

18   rating -- the rating agency presentation and

19   looking at Page 23 of that document, do you see

20   that the total operating cash flow historically for

21   Tribune was in decline between '04, '05 and '06?

22   Do you see that entry?

23        A.    Yes.

24        Q.    And then turning to Bluth 11 and looking

CONFIDENTIAL

262

1    at Page 9 first of all and looking at the

2    projections for the publishing business, do you see

3    that there was also a projection of cash flow

4    declining somewhat after 2010, 2011, et cetera?  I

5    mean, there is a little bit of -- a little spike,

6    but the overall trend is a decline in free cash

7    flow in the projection for the publishing business.

8    Do you see that?

9         A.    I do.

10        Q.    And then if you turn to Page 27 of the

11   document --

12        MR. DROBNY:  Page 27 of what document?

13        MR. KORPUS:  27 of the same document we are

14   looking at, Exhibit 11.

15        MR. DROBNY:  Thank you.

16   BY MR. KORPUS:

17        Q.    For the broadcasting and entertainment

18   division you see a similar decline in trend in free

19   cash flow in the other years.

20        A.    Pretty flat.

21        Q.    Pretty flat but -- okay.  Flat.  Okay.

22              Given the historical decline in revenues

23   and the declining trend for the publishing free

24   cash flow and the decline or flat, I guess,

CONFIDENTIAL

263

1    broadcasting and entertainment revenues -- let me

2    start over because I screwed up the question.

3              Given the historical cash flow decline

4    and the other trends that I just showed you, was

5    the consideration within Duff & Phelps of including

6    a company-specific risk premium to the cost of

7    equity in the calculation of the discount rate?

8         A.    I have been at Duff & Phelps for more

9    than 25 years.  In the transaction opinions

10   investment banking group it has been highly unusual

11   to ever use a company-specific stock premium.  I

12   think we generally don't believe that's an

13   appropriate way to do an analysis.

14        Q.    So the answer to my question --

15        A.    The answer is no.

16        Q.    There was no discussion?

17        A.    Not to my knowledge.

18        Q.    Staying on Bluth 11 --

19        MR. DROBNY:  Switching to?

20        MR. KORPUS:  No.

21        MR. DROBNY:  I believe we were on 16.

22              Got it.  Thanks.

23   BY MR. KORPUS:

24        Q.    You recall that Duff & Phelps used a

CONFIDENTIAL

264

1    terminal growth rate of .75 percent for both the

2    publishing and the broadcasting businesses?

3         A.    Yes.

4         Q.    Given the free cash flow that are

5    projected to shrink for the publishing business,

6    what is the rationale to use a positive growth rate

7    in the other years?

8         A.    You know, I don't remember exactly the

9    specifics here and why the decisions were made.  I

10   generally think that it probably had to do with

11   just assuming some small inflationary growth, or

12   less than inflationary growth.  I don't remember

13   the specifics at all.

14        Q.    Is it normal in your experience to have

15   declining projections and then assume a positive

16   growth rate in the out years?

17        A.    Since it's not normal to have declining

18   projections, period, I don't know that there is any

19   sort of resulting assumption afterwards, any normal

20   assumption afterwards.

21        Q.    Sitting here today, can you recall any

22   other instance in any other of the many valuations

23   you worked on where you had a decline in

24   projections and then used a positive growth rate in

CONFIDENTIAL

265

1    the outer years?

2        MR. DROBNY:    Objection; foundation.

3    BY THE WITNESS:

4        A.    I don't remember.

5    BY MR. KORPUS:

6        Q.    If you turn to -- we are still going to

7    stay on Bluth 11.  We are going to talk a little

8    about the multiples.  And turn to Page 16.  And I

9    know you were asked about this page by

10   Mr. Goldfarb.  I am trying very hard not to repeat

11   what has been done already in the time allowed.

12            You testified that you took the median

13   multiple in coming up with the multiple.

14            And my question to you is, given that if

15   you look at EBITDA growth and revenue growth,

16   Tribune is near the bottom of the list of

17   comparables.  Was there any consideration given to

18   using something other than the median?

19       MR. JOHNSTON:  Objection; misstates the prior

20   testimony.

21   BY THE WITNESS:

22       A.    First of all, I don't believe I

23   testified that we used a median.  I think we chose

24   a multiple.  It may happen to have been the media.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

266

1    I think the multiple -- so I don't recall ever

2    testifying that we used the median.  We typically

3    don't use medians.  We typically look at the pluses

4    and minuses of the company that we're reviewing and

5    decide what the multiple would be.

6              So if it happened to be the median,

7    that's happenstance.

8              We certainly considered all aspects of

9    Tribune in choosing the multiples that we did.  You

10   will recognize that if the newspaper industry was

11   in decline and Tribune was in decline, then all

12   these companies are valued with similar problems.

13             The other thing I know we considered

14   heavily was locations of the company's newspapers,

15   the markets it was in, the markets it was serving,

16   and differentiated from some of its peers who might

17   have been in smaller DMAs or other markets that

18   were not as large as Tribune's.

19             So there were a variety of things that

20   went into the analysis and the choice of multiples.

21   It was not solely based on numbers that you see

22   reported on the page.

23   BY MR. KORPUS:

24        Q.    But you do not recall any specific

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

267

1    discussion -- do you recall any specific discussion

2    about Tribune Company being at the bottom of the

3    peer group for EBITDA growth and revenue growth and

4    how that affects the multiple that you would use

5    for your analysis?

6          A.    I don't recall any discussion.  I am

7    sure there was discussion.  There always is.

8          Q.    How did Duff & Phelps pick the multiple

9    range to value publishing?

10         A.    I think I have said several times that I

11   wasn't involved with the day-to-day part of the

12   valuation analysis, so I can't answer that question

13   directly.

14         Q.    Who would I ask the question to get an

15   answer?

16         A.    I don't recall who specifically was

17   involved in choosing the multiple, so I can't give

18   you a name.  It could have been any of a half dozen

19   people at Duff & Phelps, although we were all aware

20   of it.

21         Q.    Were you supervising somebody who was

22   doing it?

23         A.    We were working together as a team.  So

24   it was a joint effort; it wasn't one person who was

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

268

1    choosing.

2        Q.    So is it a fact that you once knew how

3    you picked the multiple range to value publishing

4    and now you don't remember or you never knew?

5        A.    Oh, no.  I was certainly well aware of

6    how the valuations were chosen at the time that

7    they were chosen.  I was part of the discussions.

8    I don't know -- I did not have primary

9    responsibility for it.

10        Q.    I wasn't trying to be facetious.  I was

11    just trying to figure out if it's something that

12    you didn't work on or you just don't remember

13    today.

14            It sounds like it's the latter.

15        A.    Correct.

16        Q.    Can you pull out Bluth 13, please, and

17    turn to Page 9, which is the page we looked at

18    before showing the uses and sources.

19            Do you have that?

20        A.    I do.

21        Q.    Are you familiar with what's referred to

22    sometimes as the Zell note?

23        A.    Yes.

24        Q.    I know that the Zell note is not shown

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

269

1    on this document.  Is there is a reason for that,

2    do you recall?

3         A.    I think we didn't know the amount of the

4    Zell note at that point, and that's why it says

5    across it needs to be updated to reflect final

6    equity investment and subordinated notes.

7         Q.    Is there an updated version of this

8    document?  Would it be the actual one document we

9    looked at?

10        A.    That would be, I think, as close as it

11   got at the end.

12        Q.    So that's Bluth 18 for the record.

13              Is the Zell note shown on Page 8, I

14   guess it is, of this document?

15        A.    There were two Zell notes.  There was

16   the first note that was put in and then he cashed

17   out, swapped it for another note.  And this may be

18   showing net of the two.  I don't recall how we did

19   it.

20        Q.    So was that a guess or do you recall

21   that's what happened?

22        A.    I believe that's what happened, but I

23   would have to check back in the calculations to

24   confirm that.

CONFIDENTIAL

1      Q.    Okay.  But sitting here today you agree

2   with me that this document, Bluth Exhibit 18 at

3   Page 8, does not show the Zell note?

4      A.    I do not agree with you.  This is a

5   sources and uses of cash.  And under sources it

6   says EGI-TRIB, LCC incremental investment of $90

7   million.

8          And I am sitting here thinking that

9   that's the incremental investment that happened at

10  the close because Zell had already put money into

11  the company.

12     Q.    Do you recall ever stating that the

13  company would be valued on a C corp basis?

14     A.    Yes.

15     Q.    Could you explain to me what you meant

16  by that?

17     A.    That we would value the company as

18  ongoing as though it were a taxpayer.

19     Q.    And in your opinion that's the right way

20  of doing it?

21     A.    Yes, it is.

22     MR. BUSATH:  Object as to form.

23     MR. KORPUS:  Too late.

24          Can I have this marked?

Elyse S. Bluth                                    December 17, 2009
                        CONFIDENTIAL

                                                              271

1                    (WHEREUPON, a certain document was

2                    marked Bluth Deposition Exhibit

3                    No. 20, for identification, as of

4                    12-17-2009.)

5     BY MR. KORPUS:

6          Q.    I have marked as Exhibit 20 an e-mail

7     dated February 5, 2008, which has an attached

8     schedule.

9          MR. SPALDING:  Can you read the Bates numbers?

10         MR. KORPUS:  Sure.  GBTRIB 00033535 through

11    37.

12    BY MR. KORPUS:

13         Q.    Do you recall this document?

14         A.    Not specifically, no.

15         Q.    This is a document that -- the attached

16    document looks like a document that you sent out,

17    right?

18         MR. DROBNY:  What do you mean, the attached

19    document?

20         MR. KORPUS:  The attached spread sheet.

21    BY THE WITNESS:

22         A.    It looks like something that could have

23    been produced by Duff & Phelps.

24    BY MR. KORPUS:

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

272

1      Q.     Right.  Because there is an e-mail at

2  the bottom that says, "A little different

3  presentation.  Let me know if you have any

4  questions."

5           And then the top e-mail says, "Attached

6  is a table I asked Elyse and team to prepare that

7  outlines the changes in components of the valuation

8  conclusion from April 2007 to December 31."

9           Do you see that?

10     A.     Yes.

11     Q.     So is it fair to presume that the

12  attached spread sheet is something that you sent

13  out?

14     A.     Was this the attachment?

15     Q.     Yes.

16     A.     Yes.

17     Q.     And what was the purpose of this

18  analysis, do you recall?

19     A.     We were retained after the transaction

20  closed to do a valuation as of December 31st, 2007,

21  of the stock of Tribune that was owned by the ESOP.

22           I think GreatBanc wanted more

23  information as to why the value had changed so

24  much.  And so this was prepared to show where the

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

273

1    changes came from.

2         Q.    Was GreatBanc concerned about the change

3    in value in between the April transaction and

4    December 31st, 2007?

5         MR. DROBNY:  Object to form.

6    BY THE WITNESS:

7         A.    Yes.

8    BY MR. KORPUS:

9         Q.    And they expressed that concern to you?

10        A.    They asked the question and that's why

11   we prepared the table.

12        Q.    Did the change in value raise any

13   questions in your mind about the accuracy of the

14   projections that were given to you as part of the

15   April transaction?

16        A.    We had projections as of the April

17   transaction or prior to the April transaction that

18   we based our opinions on.  Management represented

19   that they were the best they could provide at the

20   time of the transaction.

21             In my experience companies never meet

22   exactly the projections.  If they do, they are

23   managing to the projections.  Companies always

24   exceed or underperform.

CONFIDENTIAL

274

1          And so it was not a surprise that they

2    weren't exactly on projections.  I don't remember

3    how they performed vis-a-vis projections.  However,

4    it was a surprise that the value had declined, the

5    amount that we saw.

6          Q.    What diligence did you do in the

7    projections that were provided to you in February,

8    March of '07?

9          A.    Many members of Duff & Phelps as a team

10   met with Tribune management and talked about them

11   quite extensively.  We ran all sorts of sensitivity

12   analyses.  We did industry research on the industry

13   and the prospects.  We looked at analysts' reports

14   of -- related to Tribune and other newspaper,

15   publishing and broadcasting entities and asked lots

16   of questions of management of Tribune that we tried

17   to incorporate.

18          We also, as you are probably aware, got

19   them -- asked them and they agreed to represent a

20   warrant that these were as accurate as they

21   could -- the best representation of what they

22   thought their future would look like.

23          Q.    You mentioned analysts' reports.

24          MR. DROBNY:  Hold on one second.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                              275

1          We have been going -- when we went back

2    on the record, counsel represented that the

3    deposition at that point had gone 6 hours and 20

4    minutes.  We went back on the record at 5:08.  It's

5    now 5:43, which means we've gone 35 minutes more,

6    which would bring us to about 6 hours and 55

7    minutes.

8          So I'm telling you that it's about a

9    five-minute warning, although I'm not going to cut

10   you off.

11        MR. KORPUS:  I understand.  I appreciate it.

12   Let me just prioritize.

13        MR. DROBNY:  Sure.

14   BY MR. KORPUS:

15        Q.   Let me just finish the line I was on.

16             You mentioned market analysts.  Do you

17   recall that management projections in the March

18   time frame were higher than the market analysts'?

19        MR. JOHNSTON:  Objection to form of the

20   question.

21   BY MR. KORPUS:

22        Q.   Do you recall that giving you any

23   concern?

24        A.   I don't remember the specifics.

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

276

1      Q.    Do you remember a Lehman report that

2   came out in March of '07 that was negative on the

3   company?

4      A.    I do remember a Lehman report that was

5   negative on the company.  I don't remember whether

6   that Lehman report contained any projections on how

7   those compared to the management projection.

8      Q.    Do you recall whether you were concerned

9   by the Lehman report?

10     A.    I recall I was concerned by the Lehman

11  report.

12     Q.    Do you recall what you did about your

13  concern?

14     A.    I remember spending time, I remember

15  talking to management, and I remember discussing it

16  internally and looking at our analysis and seeing

17  whether or not we thought there was anything else

18  that should be done.

19          I don't recall whether we took specific

20  action.

21     MR. KORPUS:  I have one last document to mark.

22  And I know what it looks like; the document is

23  thick.  But I really have a question on just one

24  page of it.

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                              277

 1                    (WHEREUPON, a certain document was

 2                    marked Bluth Deposition Exhibit

 3                    No. 21, for identification, as of

 4                    12-17-2009.)

 5   BY MR. KORPUS:

 6        Q.    Do you recall that Duff & Phelps did

 7   another valuation analysis as of December 31, 2007?

 8        A.    Yes.

 9        Q.    And if you look at the projected growth

10   rates for revenue in EBITDA -- and let me refer you

11   to Page 8846.

12        A.    Could you repeat that page, please?

13        Q.    Yes.  The suffix is 8846.

14        MR. DROBNY:  41 of the document.

15        THE WITNESS:  41?  Okay.

16   BY MR. KORPUS:

17        Q.    Page 41 of the presentation.  It shows a

18   growth rate of over 2 percent for revenue.

19        MR. DROBNY:  She's still not there.

20   BY THE WITNESS:

21        A.    Okay.  41.  Yes.

22   BY MR. KORPUS:

23        Q.    Ten-year CAGR for revenue base case, 2.1

24   percent.  Do you see that?

CONFIDENTIAL

                                                           278

1          A.     I do.

2          Q.     And if you flip -- this is for the

3     publishing business.

4                 And if you flip forward to broadcasting,

5     it shows 2.6 percent on Page 59.

6          A.     It says that.

7          Q.     And if you look at EBITDA -- it's back

8     on Page 41 -- it shows a growth rate of 2.2 percent

9     for publishing and 3.3 percent for broadcasting for

10    the base case.

11         A.     Okay.

12         Q.     My question to you is, these growth

13    rates are higher than the projected growth rates in

14    the projections you used in March of '07 if you

15    recall.

16                And what happened in between March of

17    2007 that in your opinion justified the increased

18    growth rates?

19         MR. JOHNSTON:   Objection; foundation.

20    BY THE WITNESS:

21         A.     Are the dollar amounts higher than what

22    was projected in March?

23    BY MR. KORPUS:

24         Q.     I don't know.  I am focusing on the

CONFIDENTIAL

1    growth.

2        A.    Growth is a result.  The dollar amounts

3    are the important piece.  So I can't answer your

4    question without knowing whether or not the dollar

5    amounts were different than shown.

6            For example, a company could go to zero,

7    have no EBITDA, and the next -- let's say a company

8    has 100 of EBITDA.  It goes to zero and then goes

9    back to 100.  It's got an infinite growth rate.  It

10   doesn't mean anything.  It just means they had a

11   bad year in between.

12       Q.    So just focusing on the growth rates

13   alone, the fact that the growth rates may be higher

14   than the numbers in March of '07, that on its own

15   would not give you any concern?

16       A.    It may or may not.  Without looking into

17   it and doing analysis, I can't tell you whether or

18   not that's an issue.

19       Q.    Did you do anything different in testing

20   the reasonableness of the projections in December

21   of '07 than you did in March of '07?

22       MR. JOHNSTON:  Objection; foundation.

23   BY MR. KORPUS:

24       Q.    Do you understand my question?

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

280

1       A.      In the big picture we did the same

2    things.  I mean, we asked different questions, we

3    looked at different data, we may have looked at

4    different analysts' reports.  I know we looked at

5    CAGN data for example in somewhat more depth in the

6    January analysis.

7             But in the very big picture, no, I don't

8    think we did anything different.

9       Q.      You said you looked at the CAGN data in

10   more depth in December as opposed to March?

11      A.      That's my recollection.

12      Q.      Why?

13      A.      Because we had it and we had the time to

14   receive it and to get it and to review it.

15      MR. KORPUS:  I have no further questions.

16   Thank you.

17                     EXAMINATION

18   BY MR. JOHNSTON:

19      Q.      Okay.  Ms. Bluth, I am Jim Johnston

20   again from the firm of Hennigan Bennett & Dorman.

21   I'm representing a group of creditors who hold some

22   of the debt that was issued in connection with the

23   ESOP transaction involving Trib.

24             Very briefly, I wanted to follow up on

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

281

1    one of the questions that Mr. Korpus asked you

2    about.  And everything I'm going to ask you about

3    relates to Exhibit 18 if you can pull that out,

4    which is the Tribune Company ESOP analysis

5    preliminary draft dated April 1, 2007.

6             First, Mr. Korpus asked you to take a

7    look at Page 8 of this presentation in the context

8    of determining the Sam Zell subordinated note.  And

9    you had noted the $90 million EGI-TRB incremental

10   investment.

11            I wanted to have you turn back two pages

12   to Page 6, which is also a sources and uses chart

13   and direct your attention to the Zell investment

14   line under "Sources."

15            Do you see that?

16       A.    I do.

17       Q.    Does that refresh your recollection as

18   to the difference between Pages 6 and 8?

19       A.    Yes.  I believe this is the first stage

20   of the transaction where it was expected that about

21   125 million shares would be purchased and debt

22   incurred and Sam Zell or EGI put in 225 million,

23   although that number may have changed when the

24   transaction actually happened.

CONFIDENTIAL

282

1          And then at the closing of the second

2   stage that note was being -- that investment was

3   being cashed out and then he was putting in 315

4   million, and that's the difference of 90 million

5   that shows up on Page 8.

6       Q.    That would be the incremental

7   investment?

8       A.    That's right.

9       Q.    Okay.  Thank you.

10          Mr. Goldfarb spent some time with you on

11   this document on Pages 25 and 26.  And if I could

12   direct your attention to Page 25 in particular.

13          And the discussion was about the total

14   implied enterprise value and then how you get down

15   to a total adjusted equity value.

16          Just so I understand these numbers,

17   where you have total implied enterprise value and

18   then you have less three items, one is pre-trans

19   debt -- I assume that's pre-transaction debt --

20   then you have repurchase debt and then you have

21   merger debt.

22          What is repurchase debt?

23       A.    It was always contemplated that because

24   it was going to take a long time to close the

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

283

1    transaction the company would repurchase shares

2    early in the interim to get money to shareholders

3    as quickly as they could.  And that was what the

4    repurchase debt -- they had to borrow money to do a

5    redemption of shares for public shareholders.

6         Q.    So that would be new debt the company is

7    taking on?

8         A.    Yes.

9         Q.    And what's the merger debt?

10        A.    The merger debt related to the debt that

11   was going to be incurred to buy out the remaining

12   shares.

13        Q.    If the company used the proceeds or some

14   of the proceeds of the repurchase debt to pay off

15   the pre-transaction debt, would it not be the case

16   then that the adjusted equity value as reflected

17   here would go up?

18        MR. GOLDFARB:  Objection; form, foundation.

19   BY THE WITNESS:

20        A.    My assumption here is that this is a

21   marginal amount of debt, that it wasn't new debt

22   that was being used to refinance existing debt.  If

23   so, then it would be double counting of the debt.

24

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

284

1   BY MR. JOHNSTON:

2       Q.   Right.  And so I am speaking -- strictly

3   hypothetically speaking, just so I understand the

4   math, if some of the repurchased debt was used to

5   redeem some of the pre-transaction debt as

6   reflected here, then it would be double-counting,

7   would it not, to include the full level of

8   pre-transaction debt as well as the full level of

9   repurchase debt?

10      MR. GOLDFARB:  Objection; form, foundation,

11  calls for speculation.

12  BY MR. JOHNSTON:

13      Q.   Do you understand the question?

14      MR. GOLDFARB:  Same objection.

15  BY THE WITNESS:

16      A.   I understand the question.  I don't know

17  if these numbers are appropriate for that type

18  of --

19  BY MR. JOHNSTON:

20      Q.   Understood.  Understood.  Thank you.

21           These were materials -- and I mean still

22  referring to Exhibit 18.  These were materials that

23  were presented to GreatBanc or a committee of

24  GreatBanc that was considering the ESOP

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

285

1    transaction; is that correct?

2        A.    Yes.

3        Q.    If I could direct your attention to Page

4    36.  If you can take a look at this and describe to

5    me what this reflects.

6        A.    I just wanted to check.

7              This is an attempt to estimate what the

8    tax savings were going to be over time to the

9    company by virtue of not paying federal and most

10   states' income tax.

11       Q.    So this obviously then was part of the

12   information that was available to GreatBanc in its

13   consideration of the transaction?

14       A.    Yes.

15   MR. JOHNSTON:  I have nothing else.

16   MR. DROBNY:  Thanks everybody.

17             We'll reserve signature.

18                 (Time Noted:  5:57 p.m.)

19             FURTHER DEPONENT SAITH NAUGHT.

20

21

22

23

24

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

286

1              IN THE UNITED STATES BANKRUPTCY COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4    In Re:                        ) Chapter 11

5         TRIBUNE COMPANY, et al.,  ) Case No.

6                    Debtors.       ) 08-13141 (KJC)

7

8

9              I hereby certify that I have read the

10   foregoing transcript of my deposition given at the

11   time and place aforesaid, consisting of Pages 1 to

12   286, inclusive, and I do again subscribe and make

13   oath that the same is a true, correct and complete

14   transcript of my deposition so given as aforesaid,

15   and includes changes, if any, so made by me.

16

17

18                              ELYSE S. BLUTH

19

20

21   SUBSCRIBED AND SWORN TO before me this      day

22   of                  , A.D. 20   .

23

24          Notary Public

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

287

1    STATE OF ILLINOIS )

2                      )  SS:

3    COUNTY OF DU PAGE )

4              I, SUSAN K. TODAY, C.S.R. No. 84-2212, a

5    Notary Public within and for the County of DuPage,

6    State of Illinois, and a Certified Shorthand

7    Reporter of said state, do hereby certify:

8              That previous to the commencement of the

9    examination of the witness, the witness was duly

10   sworn to testify the whole truth concerning the

11   matters herein;

12             That the foregoing deposition transcript

13   was reported stenographically by me, was thereafter

14   reduced to typewriting under my personal direction

15   and constitutes a true record of the testimony

16   given and the proceedings had;

17             That the said deposition was taken

18   before me at the time and place specified;

19             That the reading and signing by the

20   witness of the deposition transcript was agreed

21   upon as stated herein;

22             That I am not a relative or employee or

23   attorney or counsel, nor a relative or employee of

24   such attorney or counsel for any of the parties

CONFIDENTIAL

288

1    hereto, nor interested directly or indirectly in

2    the outcome of this action.

3                IN WITNESS WHEREOF, I do hereunto set my

4    hand of office at Chicago, Illinois, this 23rd day

5    of December, 2009.

6

7

8

9                SUSAN K. TODAY, C.S.R. No. 84-2212.

10                Notary Public, DuPage County, Illinois.

11                My commission expires April 18, 2012.

12

13

14

15

16

17

18

19

20

21

22

23

24

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

289

```
1                     I N D E X

2    ELYSE S. BLUTH                EXAMINATION

3         By Mr. Goldfarb              6

4         By Mr. Korpus              252

5         By Mr. Johnston            280

6

7                  E X H I B I T S

8    BLUTH DEPOSITION EXHIBIT        MARKED FOR ID

9         No. 1................................ 15

10        No. 2................................ 32

11        No. 3................................ 42

12        No. 4................................ 66

13        No. 5................................ 95

14        No. 6................................125

15        No. 7................................131

16        No. 8................................131

17        No. 9................................139

18        Nos. 10 and 11.....................143

19        No. 12.............................177

20        No. 13.............................177

21        Nos. 14 and 15.....................188

22        No. 16.............................197

23        No. 17.............................219

24        No. 18.............................226
```

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

290

1                     I N D E X  (Continued)

2                       E X H I B I T S

3     BLUTH DEPOSITION EXHIBIT          MARKED FOR ID

4           No. 19............................248

5           No. 20............................271

6           No. 21............................277

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CONFIDENTIAL

291

1                    DEPOSITION ERRATA SHEET

2

3    RE:                Esquire Deposition Solutions

4    File No. 48833

5    IN RE: TRIBUNE COMPANY, et al.

6

7    Deponent: ELYSE S. BLUTH

8    Deposition Date: December 17, 2009

9    To the Reporter:

10   I have read the entire transcript of my Deposition taken

11   in the captioned matter or the same has been read to me.

12   I request that the following changes be entered upon the

13   record for the reasons indicated.  I have signed my name to

14   the Errata Sheet and the appropriate Certificate and

15   authorize you to attach both to the original transcript.

16

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

                                                              292

1   Deposition of ELYSE S. BLUTH

2

3   Page No._____Line No._____Change to:_____

4   _____

5   Reason for change:_____

6   Page No._____Line No._____Change to:_____

7   _____

8   Reason for change:_____

9   Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21

22

23  SIGNATURE:_____DATE:_____

24                   ELYSE S. BLUTH

Elyse S. Bluth                    December 17, 2009
                    CONFIDENTIAL

1

| **A** | | | |
|---|---|---|---|
| **abide** | **accurate** | **adding** | 209:6,20 |
| 6:23 14:17 | 154:11,14 | 234:9 237:11 | 234:10 |
| **ability** | 164:11 | 240:4,6,8 | **advise** |
| 108:17 113:1 | 170:4 | 241:6,15 | 48:1 80:11 |
| 137:2 260:2 | 274:20 | **addition** | 120:8 |
| **able** | **accurately** | 136:11 | **advised** |
| 14:9 46:2 | 9:16 10:13 | 217:22 | 121:9 |
| 81:15 82:10 | 16:8 46:15 | **additional** | **advising** |
| 84:16 | 137:24 | 53:9 144:13 | 56:22 101:16 |
| 102:14,15 | **achieve** | 217:17 | **advisor** |
| 146:8 | 162:9 240:14 | 245:17,22 | 48:1 67:11 |
| 177:18 | 240:19 | 245:24 | 83:11 |
| 181:11 | **achieved** | **address** | 101:15 |
| 197:20 | 162:10 | 209:7 250:4 | 120:17 |
| 212:22 | 192:14 | **addressed** | **affect** |
| 248:21 | 193:1 | 53:23 76:1 | 202:20 |
| **abreast** | 240:16,17 | **addressing** | **affiliated** |
| 69:21 | **acquisitions** | 218:16 | 27:6 127:20 |
| **absolute** | 260:1 | **adds** | **affiliation** |
| 63:1 64:2 | **act** | 176:13 | 7:5 |
| **absolutely** | 61:10 62:1,2 | 192:11 | **affirmati...** |
| 182:16 | 62:8 | **adequate** | 161:23 |
| 187:11 | **acting** | 25:19 51:1 | **affirmed** |
| 199:11 | 48:11 | 61:8 | 137:17 |
| **acceptable** | **action** | **adjust** | **afford** |
| 10:7,14 40:8 | 244:4,12 | 260:18,21 | 183:9 |
| 184:17 | 276:20 | **adjusted** | **aforesaid** |
| **accepted** | 288:2 | 241:20,23 | 286:11,14 |
| 93:8 217:13 | **actions** | 242:14 | **afternoon** |
| **access** | 226:7 | 244:24 | 31:22 |
| 8:2 | **activities** | 260:23 | **afternoons** |
| **accommodate** | 17:7 40:10 | 282:15 | 188:15 |
| 10:16,21,23 | **activity** | 283:16 | **aftertax** |
| **accord** | 17:9 49:16 | **adjustments** | 168:16 |
| 199:23 | **acts** | 157:3 202:20 | 169:10,11 |
| **accorded** | 88:21,21 | **adoption** | 170:12 |
| 155:7 | **actual** | 48:2 | 242:4,6 |
| **account** | 269:8 | **advantage** | **agency** |
| 23:18 170:12 | **adapt** | 260:2 | 131:13,20 |
| 212:14 | 259:24 | **advertise...** | 132:2,18,24 |
| 241:13 | **add** | 94:7 | 133:10,11 |
| **accounts** | 16:12 232:12 | **advice** | 133:17,20 |
| 23:16 224:14 | 236:15 | 48:3 120:13 | 261:18 |
| **accuracy** | 238:18 | 183:5 | **ago** |
| 273:13 | **added** | 187:10 | 53:4 137:19 |
| | 224:6,9 | 190:6,7,9 | **agree** |

| |
|---|
| 60:11 93:17 |
| 100:8 103:9 |
| 107:18,23 |
| 113:5 |
| 156:11 |
| 168:15 |
| 232:11 |
| 270:1,4 |
| **agreed** |
| 9:20 60:12 |
| 93:8 226:8 |
| 274:19 |
| 287:20 |
| **agreeing** |
| 6:23 93:24 |
| 94:6,11 |
| **agreement** |
| 1:10 3:16 |
| 6:24 7:15 |
| 8:13 47:23 |
| 94:14,18,23 |
| 115:10 |
| 117:16 |
| 203:9 |
| 227:19 |
| **agreements** |
| 7:20 14:14 |
| **agrees** |
| 61:2 65:18 |
| 89:3 |
| **ahead** |
| 11:15 35:23 |
| 46:19 54:5 |
| 55:8 60:17 |
| 80:14 89:15 |
| 164:2 |
| 190:12 |
| 215:9 216:7 |
| 218:12 |
| **air** |
| 21:5 |
| **al** |
| 1:5 115:5 |
| 286:5 291:5 |
| **allied** |
| 21:3 |
| **allocated** |

Elyse S. Bluth                                December 17, 2009
CONFIDENTIAL

2

```
       23:16              159:7 164:6        188:15,21         angeles              222:24
allocation               165:14             189:17,21         3:11 117:11          224:6
212:9 240:1              227:9 237:2         190:2,16,23       annum             anybody
allow                    237:13              191:3,8,10        196:7             72:16 80:19
21:24                    238:8               191:22            answer               120:12
allowed                  245:17,22           192:7             10:2,6,19            145:16,19
211:10,11,18             245:24              193:16,17         11:20,21             158:20
265:11                   246:3               194:1             22:4 41:8            185:22
allowing                 274:12              198:18            55:8 60:1            186:21
83:5                  analysis               199:2,9          60:17 84:18           209:6
allyn                    56:15 61:3          200:12            89:15 90:3           216:11
143:3 177:21             64:19 71:9          201:9,9,11        90:24             apart
188:18                   76:20,23            205:5,13,14       112:12               245:16
alternatives             77:3,13,20         205:17,18         121:4             apologize
236:10                   77:21 78:4          205:23            145:21            22:18 95:14
amended                  91:8,10             206:14,18         146:8                227:4
61:10                    112:2               206:23            153:18            appear
america                  123:20              207:2,5,8         172:23            79:22 97:8
3:8 8:19                 140:17,20           214:12            184:22               99:2
21:13 117:8             144:3,13,17          215:3,3           187:2,7          appeared
amount                   146:14              217:14,21         199:4 206:1       2:14,21 3:7
87:9 92:9                147:1,6,18          218:1 220:5       226:24               3:15,23 4:7
105:4,7                  147:19              225:22,24         238:20,22            4:19 5:7
173:6 182:2              148:21,22          227:6 229:7        239:2 250:2          70:20
184:16,17                148:24              234:10            263:14,15            116:14,21
207:23                   149:1,2,17          235:2             267:12,15            117:7,15,23
211:3 233:3              149:21              237:22            279:3                118:7,19
269:3 274:5              150:12,15           238:11         answered               119:7
283:21                   150:20              241:4 258:3       26:17 35:22      appears
amounts                  151:5,11            261:14            45:18 54:2        18:17 96:16
278:21 279:2             153:3               263:13            54:4 82:3            97:11
279:5                    155:21              266:20            82:12 86:3           125:12
analogy                  158:4,16,20         267:5,12          112:21              144:16
206:1                    159:10,15           272:18            120:24              156:10
analyses                 159:24              276:16            129:1 147:4          177:20
23:2 57:12               160:2 162:7         277:7             151:17         applicabi...
57:18 58:1               162:16,17           279:17            163:12              107:7
60:14 75:15              163:6,9,14         280:6 281:4        164:1,17        applicable
76:5 78:6,7              163:16,18        analysts             175:5 215:8          223:6
78:7,8                   165:8,21,22         274:13,23         216:6           applied
108:20                   167:6,17            275:16,18         217:21              171:21
128:20                   178:2,21,23         280:4             253:3           apply
135:7                    178:24           analyze           answers               167:19
146:20                   179:1,3,4           260:15            20:19 256:12     applying
147:15                   184:24           andrew           anticipated            237:3
148:3,5                  185:5               2:6 6:10          212:23 213:7     appreciate
151:9,12                 186:10              116:6            221:21               169:21
```

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

235:11
275:11
**approach**
64:9
**appropriate**
11:12 51:17
112:12
141:20
162:2
163:11,24
167:21
173:15
174:16
230:23,24
236:17
254:4 261:5
263:13
284:17
291:14
**approxima...**
12:12 16:1
28:4 154:11
172:24
175:8
176:21
192:3
235:14
**april**
92:16 127:10
127:10
228:2,3,5
228:11,13
246:10,20
248:6 249:6
272:8 273:3
273:15,16
273:17
281:5
288:11
**arc**
17:9
**area**
130:19,21
241:13
**arent**
147:22
**arises**

92:8
**arms**
62:7
**arose**
109:6 135:9
**arrangement**
7:8,22 83:24
138:4,7
**articulated**
217:7 223:15
224:1
**ashley**
2:12 9:5,5
116:12
195:17
**aside**
100:2 197:10
244:9
**asked**
11:2 22:10
22:14 23:1
23:8 28:20
35:22 36:24
42:24 43:7
43:9,22
44:9,17
45:7,9
47:18 50:12
54:2,12,17
55:11 63:15
68:8 72:6
79:16 82:2
82:12 83:13
85:7 86:3,7
90:21
112:21
120:23,24
121:3
122:11
128:23
137:10,12
141:4 147:4
150:16
151:17
163:12
164:1
165:24

175:5 186:8
195:10
209:21
215:8 216:6
217:14,14
217:18
246:18
247:15
253:3 254:2
257:10,12
259:15,18
265:9 272:6
273:10
274:15,19
280:2 281:1
281:6
**asking**
22:12,24
23:5,7,10
35:2 41:1
43:9 64:7
70:22 82:20
106:20
112:15,16
121:2
122:13
145:23
163:23
164:9 166:1
184:13
187:4
205:21
224:10
227:4
253:16,17
256:23
**asks**
83:15 84:9
84:22
**aspect**
110:21 112:8
136:22,24
158:19
184:3
186:23
226:11
239:12

243:7
**aspects**
77:21 94:3
106:5
110:10
122:9 137:8
137:8 165:8
187:18
226:9 230:7
266:8
**assess**
203:10
**assessing**
225:3
**assessment**
208:21
**asset**
23:24 170:11
192:16
204:13
**assets**
18:4 147:22
157:6
170:10
212:16
222:2,7
223:5,7
**assigned**
229:18
**assignment**
71:24 74:3
81:8 136:3
136:4
**assignments**
25:17 29:5
71:22
**assigns**
94:16
**assist**
45:2 50:13
**assistant**
140:24 141:7
141:16,19
141:22
144:2
177:21
188:18

**assisting**
71:13
**associate**
17:12 18:9
185:11
243:10
**associated**
193:11
208:15
235:15
**association**
16:14,15,16
**assume**
7:10 16:3
237:5
264:15
282:19
**assumed**
192:13
208:23
238:11
**assuming**
46:21 126:22
185:2
264:11
**assumption**
8:5 135:4
185:4
238:16
264:19,20
283:20
**assumptions**
221:10
**assurance**
104:22 105:2
**assured**
247:17
**attach**
204:12
291:15
**attached**
95:1 132:18
144:11
178:15
180:17
188:14
249:17

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

4

271:7,15,18
271:20
272:5,12
**attachment**
94:22 131:21
133:3,4
177:22
178:5
272:14
**attachments**
131:12
**attempt**
148:6 285:7
**attend**
43:22 44:9
44:17 45:7
45:9 246:18
**attended**
45:14 46:3
47:3 127:8
247:2
**attendees**
199:23
**attending**
198:7 247:9
**attention**
179:6 228:15
281:13
282:12
285:3
**attorney**
98:7,19
287:23,24
**attribute**
255:11
**attributed**
235:19
**auction**
201:17,18
**austin**
4:8,14 8:20
8:22 118:8
118:14
**authority**
129:7
**authorize**

291:15
**automatic...**
48:14
**availability**
126:6 201:17
**available**
102:7,23
103:4
111:22
136:4,13
137:16
138:18,23
147:7 149:6
199:4
211:16
285:12
**avenue**
4:3 118:3
**average**
196:24
260:17
**aware**
33:18,21
34:23 35:3
36:1 38:18
41:20 51:18
53:13 57:11
64:23 70:3
72:23
111:13,20
136:2
193:14
207:11
224:10
228:4
267:19
268:5
274:18
**awareness**
35:20

——— B ———
**back**
15:3 18:15
20:16 78:19
83:1 85:8
108:22

111:4 120:1
124:20
129:3
140:22
150:17
157:14
165:23
180:4 192:6
195:22
206:12
217:15,21
237:11
238:19
240:4,6,8
241:9 246:8
250:15
252:5,10
253:13
269:23
275:1,4
278:7 279:9
281:11
**background**
15:6
**bad**
69:12 279:11
**balance**
173:2 175:8
194:9
231:12
**bank**
3:8 8:17,19
117:8
**banking**
263:10
**bankruptcy**
1:1 6:14 7:3
115:1
185:13,15
186:2 286:1
**bartell**
34:3,4,7,9
34:12 35:3
41:13 44:12
47:5 58:21
70:16 73:8
73:12 75:2

75:5 80:4
80:13
107:15
135:5,6,6
142:20
151:20
188:13,16
195:2,9
206:13,19
207:4,12
210:3,12
212:19,21
213:5,15
215:2
220:24
**bartells**
188:20
190:23
208:3
**base**
166:20
277:23
278:10
**based**
149:17,21
152:6
166:19
175:20
187:2
202:12
236:6
237:15,19
261:6
266:21
273:18
**basic**
9:14 71:18
72:9,14,17
**basis**
122:4 160:13
160:15
163:4 170:4
172:1 179:1
212:14
231:2,9
237:3
258:13

270:13
**bates**
15:21 33:1
34:1 39:5
42:9,20
60:10 67:3
67:18 93:7
95:23 125:8
132:5,5
139:10
141:9
143:17,18
177:14,16
178:6 179:7
188:8,9
197:18
219:14
220:23
226:20
248:19
271:9
**bdoran**
250:5
**bearing**
15:21 33:24
95:23 125:8
132:4
143:17,18
177:14,16
188:8,9
197:18
219:14
226:20
248:19
**bears**
132:5 178:6
**beat**
85:19
**bed**
30:2 102:6
102:23
**bednas**
72:18 140:5
150:23
**began**
26:16
**beginning**

Elyse S. Bluth                                              December 17, 2009

CONFIDENTIAL

5

        42:9 139:9
**begins**
61:2
**begun**
159:12
**behalf**
2:14,21 3:7
  3:15,23 4:7
  4:19 5:7
  7:6 8:24
  48:19 88:22
  93:9,9
  116:14,21
  117:7,15,23
  118:7,19
  119:7
  137:22,23
  138:17
  144:9
**believe**
24:16 34:21
  63:13 127:9
  136:6
  141:11
  158:10
  185:5
  201:10
  220:18
  227:8,17
  228:6 230:5
  233:14
  263:12,21
  265:22
  269:22
  281:19
**belo**
162:19
**benchmark**
158:12
**benchmarking**
162:14
  170:23
**benchmarks**
155:23
  160:16
**benefit**
168:14,16

  233:7
  235:10
  236:21,22
  239:8
  241:16
**benefits**
17:2 109:18
  109:19,21
  113:7,12
  181:15
  192:13,21
  193:11
  196:1,2,20
  197:8
  210:22
  211:3,12
  212:23,24
  213:8,16
  214:5,8,11
  233:12,17
  235:4,6,7,9
  240:2 242:6
  254:12,14
  254:19
  255:22,23
  256:9,9
**bennett**
3:9 8:12,14
  117:9
  280:20
**benson**
2:16 9:1
  116:16
  252:4
**bergman**
3:14 8:14,14
  117:14
**bernadette**
249:7,11,22
**best**
81:7 166:15
  231:3
  273:19
  274:21
**better**
151:2
**beyond**

  36:19 87:19
  150:4
  152:14
  166:13,17
  184:10
**bids**
138:8
**big**
157:7 185:4
  192:1 193:6
  193:6 202:5
  280:1,7
**bigelow**
47:10 130:14
  130:15
  132:12
  133:7 137:2
**bill**
125:18,22
**billion**
156:11
  176:18
  177:1,1
  231:22
  232:12
**bit**
53:22 74:14
  165:20
  246:18
  262:5
**bluth**
1:14 6:5,10
  6:17 9:9
  15:9,11,15
  18:15 32:15
  32:17,21
  37:13 42:2
  42:6 47:19
  66:17,20,24
  67:5 95:17
  95:21 98:1
  107:18
  115:16
  120:2,8
  125:1,4,8
  125:10
  130:23

  131:2,7
  132:4,5,10
  132:23
  139:5 143:9
  143:12,16
  143:18,20
  144:15
  157:15
  177:4,9,18
  177:19
  178:1,8
  188:3,7,10
  188:10
  195:21
  197:13,17
  201:13
  219:10,16
  226:15,20
  248:4,15,21
  251:10
  252:5 257:5
  261:17,24
  263:18
  265:7
  268:16
  269:12
  270:2 271:2
  277:2
  280:19
  286:18
  289:2,8
  290:3 291:7
  292:1,24
**bluths**
7:10
**board**
16:13 33:11
  51:9 52:8
  55:17 71:1
  79:5,15,17
  79:19,24
  81:20 82:10
  83:5,12,15
  84:8,15
  85:15 86:1
  100:13,20
  101:20

  102:8,13,15
  102:24
  103:5 113:7
  113:11
  114:3
  126:19,23
  126:24
  127:5,8,13
  127:16,17
  136:1
  138:18,20
  139:2
  215:17
  216:15
  246:10,19
  246:22,24
  247:6,13,16
  247:17
  254:18
  255:21
  257:6,15,19
  258:9,21,24
**boards**
17:16 84:14
**bob**
34:3 44:12
  47:4 73:12
  107:14
  132:20
  134:22
  135:5,5,6
  142:19
  151:20
  188:12,15
  195:9
**bobs**
132:20
  134:23
**bonn**
87:22
**book**
230:11,19
**borrow**
283:4
**bottom**
20:9 153:8
  153:16

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

156:3
173:12
202:9 233:6
241:13
254:10
257:13
265:16
267:2 272:2
**box**
160:7
**break**
10:17 52:14
52:17 95:10
95:14
**breaks**
10:22
**brief**
15:6 147:11
**briefly**
12:2 16:21
17:8 33:3,4
67:6 247:8
280:24
**bring**
275:6
**bringdown**
65:22,24
91:7,9,11
91:15,20
92:8,20
93:4 123:10
221:11
223:6 225:7
225:8,11,15
225:21
226:2,6,11
**broad**
106:9
**broadcasting**
38:2,5
147:19,23
167:7,19
168:8
262:17
263:1 264:2
274:15
278:4,9

**broader**
113:20
**broadly**
17:1
**broadway**
2:17 116:17
**broken**
89:5
**brought**
81:10
**buildings**
170:9
**bullet**
195:23
**burt**
142:16
**busath**
4:6 8:16,16
118:6
167:23
270:22
**business**
17:13 149:12
149:12,14
162:8
180:24
212:6 262:2
262:7 264:5
278:3
**businesses**
264:2
**buy**
148:15 223:9
234:13
239:20
283:11
**buyer**
48:20 62:6
79:9 83:12
172:9 223:7
239:18
240:21
**buyers**
49:8
**buying**
45:3 129:15

148:13
224:24
227:20
239:18

_____
**C**
**cabot**
21:3
**cagn**
280:5,9
**cagr**
277:23
**calculate**
148:6 156:13
193:13
196:19
233:22
**calculated**
156:21,23
169:4,9,10
170:3
176:17,24
193:14
241:3
**calculating**
202:23
235:24
**calculation**
154:15
156:19
194:13,14
194:19,23
203:16
204:3 205:3
231:17,21
236:15
243:7
260:10
263:7
**calculations**
156:17
160:24
229:13
238:6
243:12
269:23
**calculator**

153:17 154:6
154:8,16
232:14
**california**
3:11 117:11
**call**
22:2 26:23
27:2,3,10
27:13,16
28:5 29:22
29:23,24
30:6,11,19
30:20,24
31:1,6,8,17
31:20 32:3
58:13 97:12
97:14 126:3
181:19
189:18
252:8,14
253:24
255:10,13
255:16,19
**called**
1:14 6:6
27:19,20
30:22,22
120:3
252:24
253:7
**calls**
31:13 32:13
50:21 97:19
99:9 101:2
129:17
130:6,7,13
284:11
**camps**
159:7
**cant**
12:8 20:24
87:5,24
105:15
112:8
124:17
133:23
137:4 163:7

165:21
171:7
179:11
180:15
191:24
194:20
259:2
267:12,17
279:3,17
**capacities**
44:3,5
**capacity**
9:11 13:8
37:5 48:11
**capital**
149:7 157:5
196:3,8,13
196:18,22
196:24
197:2
259:24
260:17
261:1,2
**capitaliz...**
37:24 78:21
**captioned**
291:11
**capture**
9:16
**career**
9:11
**careerbui...**
130:4 168:19
169:1,3,8
169:10,13
169:19
171:14,16
171:20,23
172:13,15
**cargill**
19:20
**case**
1:5 7:18
77:7,14
84:15
104:14
107:19

115:5
123:14
129:1
181:12
206:6
254:13
277:23
278:10
283:15
286:5
**cases**
12:19,23
13:2
**cash**
110:2,8
111:20
147:14,18
148:22,24
149:1,5,5,8
149:13
157:2 166:6
166:12,18
169:10
175:21
179:24
192:15
196:24
197:2
202:19
210:4,10,11
210:14
221:17
233:15,16
234:5
236:24
237:1,1,11
237:23
238:10,13
238:17
239:13
240:5,6
241:15
260:15,19
260:21,23
261:20
262:3,6,19
262:24

263:3 264:4
270:5
**cashed**
23:20 269:16
282:3
**casual**
128:4
**caution**
14:12,17
80:8 182:24
190:5
**cautioned**
212:21
**ccd**
249:7
**cell**
30:23
**central**
126:3,4
**ceo**
26:23,24
27:10,17
**certain**
15:10 32:16
42:1 50:23
63:16 66:19
95:16
105:24
109:10
125:3 131:1
131:6 139:4
143:11
177:3,8
188:2 196:5
197:12
219:9
226:14
248:14
271:1 277:1
**certainly**
10:21 110:24
121:15
161:14
185:20
186:15
266:8 268:5
**certainty**

48:21 138:12
**certificate**
291:14
**certified**
1:20 287:6
**certify**
286:9 287:7
**cetera**
122:17
181:17
247:1 262:4
**chadbourne**
2:8 9:3,5
116:8
**chance**
33:2 42:10
67:4 96:2
132:7
139:11
143:21
**chandler**
47:10 130:14
132:12,22
137:11,13
**change**
122:18 223:7
260:16,18
273:2,12
291:17,19
291:20,22
292:3,5,6,8
292:9,11,12
292:14,15
292:17,18
292:20
**changed**
251:1 272:23
281:23
**changes**
201:2 272:7
273:1
286:15
291:12
**chapter**
1:4 115:4
286:4
**character...**

18:19 63:6
77:22
**characterize**
84:1,2 122:2
127:24
161:15
165:18
166:11
216:21
**character...**
140:24 141:2
**character...**
219:21
**charge**
29:4 72:14
**charged**
89:22 90:7
90:19 91:3
**charlie**
98:2,15
247:4
**chart**
59:15 281:12
**chase**
4:7 8:17
118:7
**check**
192:5 269:23
285:6
**checked**
6:19
**checks**
35:12
**chemical**
21:6,10,11
**chicago**
1:21 3:20
4:10 5:4
24:8 115:17
117:20
118:10
119:4 288:4
**chief**
43:15
**choice**
244:15

266:20
**chooses**
48:12
**choosing**
266:9 267:17
268:1
**chose**
138:15
245:18
265:23
**chosen**
138:13 268:6
268:7
**chris**
47:5 59:4
98:1 100:3
107:16
142:19
151:20
**christoffel**
71:24 72:8
140:4
150:23
194:18
243:11
**circulated**
144:21
145:17
159:14
227:15
228:19
**circumstance**
84:21 87:11
92:12
**circumsta...**
22:13 23:1
23:10,21
24:4,6
85:22 91:15
91:19 92:19
109:11
**citigroup**
129:19
**civil**
1:15
**clarifica...**
85:6

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

8

| | | | | |
|---|---|---|---|---|
| **clarified** | 92:3,5,6,10 | 259:3 | 185:16,23 | 28:17 |
| 169:20 | 92:13 93:2 | **comments** | 186:16,22 | **companies** |
| **clarify** | 127:7,10 | 83:1,1 | 187:4,23 | 16:17 19:14 |
| 19:23 34:18 | 200:13 | 124:20 | 188:22 | 23:14 88:23 |
| 34:21 84:18 | 214:24 | 190:12 | 190:7,24 | 88:24 |
| 111:7 | 221:12 | 249:17 | 191:2,11,12 | 109:20 |
| 128:22 | 232:23 | **commercial** | 197:22 | 150:3 |
| 145:23 | 282:1 | 21:4 | 198:8 200:4 | 154:23 |
| 220:16 | **code** | **commission** | 200:14,17 | 155:8,18,24 |
| 238:21 | 109:9 | 288:11 | 200:19,22 | 156:1,2 |
| **clause** | **colleague** | **committee** | 200:23 | 157:17 |
| 62:16 63:4 | 72:3 | 2:14 6:13 | 201:7,20,23 | 158:3,10 |
| **clean** | **colleagues** | 9:6 48:1,11 | 207:4,10 | 161:3 163:5 |
| 227:22 | 71:12 | 48:15 49:7 | 208:3,15,22 | 165:13,16 |
| **clear** | **column** | 49:7 74:11 | 210:7 | 166:21 |
| 136:11 | 155:11,13,14 | 74:17,20,22 | 212:21 | 168:10 |
| 209:15 | 156:7 | 74:24 75:2 | 213:6,14 | 169:14,15 |
| 214:15 | 162:18,19 | 75:5,8,13 | 215:17 | 174:7,8,12 |
| 238:3 239:5 | 179:16 | 75:24 76:2 | 217:7,13 | 266:12 |
| **clearly** | 236:14 | 76:21,24 | 218:8 | 273:21,23 |
| 72:23 123:8 | **columns** | 77:2 87:24 | 246:11 | **company** |
| 223:1 | 168:24 | 88:2,5,7,8 | 257:13,15 | 1:5 4:19 |
| **client** | **com** | 116:14 | 257:20 | 17:2 19:6,9 |
| 14:4 95:2,5 | 125:15 250:5 | 126:5,8,12 | 258:4,9 | 20:13 22:7 |
| 95:6 191:13 | **comcast** | 126:15,17 | 284:23 | 22:21 24:8 |
| **clients** | 168:15 | 126:19,23 | **committees** | 24:10,15 |
| 14:15 18:23 | **come** | 126:24 | 181:7 | 25:24 26:11 |
| 19:6,13 | 26:9,13 29:5 | 127:6,13,20 | **common** | 31:2,3,5 |
| 20:13 22:10 | 32:6 42:23 | 138:18,19 | 40:21 61:6 | 32:2 33:11 |
| 63:15 64:4 | 43:20 45:4 | 139:15,19 | 222:18 | 33:20 34:13 |
| **close** | 58:17 | 139:22 | 229:15 | 35:1,10,11 |
| 200:10,12 | 129:16 | 140:1,3,6,7 | **commonly** | 36:2,4 |
| 259:3 | 130:5 | 141:12 | 39:15 40:1 | 46:24 48:3 |
| 269:10 | 144:14 | 142:14,16 | 49:3 155:17 | 49:6 52:8 |
| 270:10 | 159:13 | 142:17,19 | **communicate** | 65:9 67:10 |
| 282:24 | 179:24 | 142:22 | 137:3 | 67:12 75:16 |
| **closed** | 200:24 | 143:1,5 | **communica...** | 86:16 89:3 |
| 108:16 | 227:1 259:3 | 145:18 | 126:11 | 93:10,16,16 |
| 138:14 | **coming** | 159:14 | **communica...** | 93:24 94:4 |
| 151:12 | 113:15,17 | 164:23 | 26:21 28:2 | 94:5,5,9,11 |
| 165:4 233:5 | 149:11 | 180:2,6,11 | 81:14 127:5 | 94:17 95:5 |
| 272:20 | 265:13 | 180:13,19 | **communica...** | 101:14 |
| **closer** | **commencement** | 180:22,23 | 26:10 81:19 | 103:1,2,7 |
| 150:24 | 287:8 | 181:1,10,17 | 128:1 | 104:22 |
| **closing** | **commencing** | 182:13,15 | 129:13 | 105:5,7,23 |
| 65:20 66:3,5 | 1:22 | 183:2,6,18 | 183:4 | 109:21,22 |
| 66:6,13,16 | **commenting** | 184:3 | **community** | 110:1,5,7 |

Elyse S. Bluth                                December 17, 2009

CONFIDENTIAL

9

| | | | | |
|---|---|---|---|---|
| 111:1,13,18 | 234:4,7,13 | 208:5 276:7 | 53:19,22 | 63:14 64:11 |
| 111:23 | 236:10,19 | **comparison** | 54:12 55:1 | 260:6 |
| 115:5 | 237:12 | 62:24 64:2 | 55:2,7,21 | **conduct** |
| 118:19 | 238:12,13 | 89:10 | 56:7 79:10 | 58:16 76:3,5 |
| 122:16 | 239:18,20 | **competing** | 213:14 | 180:23 |
| 129:16 | 240:13,23 | 138:8,9 | 226:2 245:1 | 245:22 |
| 130:20 | 242:2,5 | **complete** | 245:9 | **conducted** |
| 147:19 | 246:19 | 10:19 286:13 | 258:21 | 74:6 149:16 |
| 148:15 | 257:15,20 | **completed** | 273:9 | 150:15 |
| 149:3,4,7 | 258:9,22 | 91:10 128:10 | 275:23 | 151:15 |
| 156:4 157:1 | 259:2 260:6 | 128:11 | 276:13 | 225:23 |
| 158:8,11,12 | 266:4 267:2 | 232:6,8 | 279:15 | **conducting** |
| 166:7 167:1 | 270:11,13 | **completely** | **concerned** | 149:21 |
| 167:2,3 | 270:17 | 44:6 163:17 | 36:3,11,13 | **confer** |
| 168:20 | 276:3,5 | **completion** | 55:12 208:6 | 10:17 195:3 |
| 170:22,24 | 279:6,7 | 91:7 | 225:20 | **conference** |
| 171:2,15 | 281:4 283:1 | **comply** | 243:14 | 74:4 146:18 |
| 172:4,8,12 | 283:6,13 | 61:20 | 247:17 | 189:18 |
| 173:4 174:2 | 285:9 286:5 | **components** | 273:2 276:8 | **confidence** |
| 174:5,11,11 | 291:5 | 106:5 187:21 | 276:10 | 161:21 162:1 |
| 174:19 | **companys** | 198:20 | **concerning** | 163:10,21 |
| 175:4,15 | 24:22 38:2 | 232:16 | 201:18 224:5 | **confident** |
| 179:5 182:3 | 48:7 51:9 | 272:7 | 249:16 | 66:8 213:11 |
| 183:9 | 61:6 93:19 | **comprise** | 287:10 | **confidential** |
| 185:19 | 94:24 105:3 | 74:19 232:17 | **concerns** | 1:9,13 7:11 |
| 186:11,12 | 105:3 | **comprised** | 53:8 55:14 | 8:7 14:16 |
| 186:18 | 108:17 | 74:20 78:14 | 187:22 | 16:5 115:9 |
| 187:5 193:1 | 112:24 | **compulsion** | **conclusion** | 115:15 |
| 196:3,5,15 | 122:14 | 62:8 223:9 | 30:11 113:16 | **confident...** |
| 197:21 | 157:8 183:1 | **computation** | 113:18 | 1:10 6:24 |
| 198:8 202:2 | 212:15 | 193:10 | 135:23 | 7:8,15,19 |
| 202:18 | 221:17,19 | 230:11 | 137:21 | 7:23 14:14 |
| 203:2,12,13 | 222:2,7 | 236:4 | 172:13 | 14:18,21 |
| 203:14 | 223:4 | **computations** | 184:2,11,15 | 15:1 115:10 |
| 207:6 209:3 | 231:12 | 229:17 | 190:2 191:2 | 135:17,21 |
| 209:7,13 | 266:14 | **computer** | 192:12 | 137:18 |
| 210:15,17 | **companysp...** | 151:22 | 200:20 | **confirm** |
| 211:3 | 260:9 261:5 | **concentrated** | 213:15 | 126:16 |
| 213:24 | 263:6,11 | 17:21 | 272:8 | 269:24 |
| 214:2,3,7 | **comparable** | **concept** | **conclusions** | **confirmation** |
| 215:4,13 | 157:17,17 | 91:16 204:12 | 194:9 201:1 | 136:6 |
| 216:24 | **comparables** | **concepts** | 217:7 | **confirmed** |
| 220:6 | 265:17 | 105:24 | 234:16 | 132:20 |
| 221:14,18 | **compare** | 106:12,13 | **concur** | 134:22 |
| 221:24 | 203:15 241:9 | **concern** | 229:20 | **confirming** |
| 222:5 232:9 | **compared** | 36:10,17 | **conditions** | 135:5 136:5 |
| 233:15 | 62:23,24 | | 62:12,18 | **conflict** |

Elyse S. Bluth                              December 17, 2009

CONFIDENTIAL

35:12,12
54:14 55:13
55:16 56:8
**conflicts**
35:19 53:15
54:8 55:1,7
**confusion**
227:5,24
239:15
**conjunction**
66:10
**connection**
7:18 12:6,7
28:18 29:19
31:9,24
32:2,8
34:14 35:18
36:12,22
37:1,24
38:24 53:10
67:12 70:9
75:16 79:2
87:19 94:19
106:18
108:9
110:14
120:9
121:11,12
122:6
135:20
182:22
184:17
185:15
190:3 199:9
201:4 205:9
208:23
214:16
216:2
220:10,21
280:22
**conrail**
21:4
**consider**
20:14 63:16
65:3 72:2
84:14 95:2
108:7

172:18
174:15
236:9
254:11
**considera...**
25:19 51:2
61:5,8,17
173:13
221:13
263:5
265:17
285:13
**considera...**
110:14
**considered**
65:3 108:19
111:6 114:2
122:3
138:11
171:5
212:24
236:4
256:19
266:8,13
**considering**
46:11 107:20
214:2
215:14
284:24
**consistent**
6:22
**consisting**
286:11
**constant**
246:4
**constitutes**
11:6 287:15
**construct**
240:20
**consult**
80:4
**consultant**
14:6
**consultation**
80:12
**consulted**
80:9,10

220:20
**contact**
26:15,16
36:16,19
37:3 43:20
54:10 73:7
86:20 87:3
87:5,8,18
87:21 88:13
130:11
**contacted**
26:19 28:13
36:8 43:4
56:18
**contained**
78:2 159:20
179:21
191:4 192:3
195:4 229:4
276:6
**contains**
105:17
147:11
168:6
**contemplate**
122:20
**contemplated**
29:20 31:10
32:8 36:22
38:14 39:1
41:16 45:11
45:13 49:15
51:19 55:22
58:8 65:11
66:1 79:3
102:2,3
103:8 122:1
199:1
221:19,20
282:23
**contemplates**
93:3
**contempla...**
45:20 70:5
**contempla...**
56:16
**contempor...**

134:17
**content**
124:8 190:22
**contents**
60:13 220:21
**context**
37:5 108:8
112:19
113:18,19
126:17
281:7
**contingent**
192:15 222:3
**continue**
18:1 166:16
**continued**
3:1 4:1 5:1
117:1 118:1
119:1 290:1
**continues**
66:15
**contributed**
74:2
**contributing**
71:9
**contribution**
94:23
**contribut...**
109:15,16
193:4 196:6
221:17
**control**
171:6,10,20
172:1
**controlled**
171:12
**controlling**
170:22
**controls**
21:9
**convalesced**
30:3
**convention**
11:3
**conversation**
27:20 28:8

29:14 82:19
129:14
137:12
259:11
**conversat...**
36:20 37:2,8
81:22 82:15
82:20,22
83:2 98:21
107:3,15
112:23
126:14
127:1,22
128:7,11,12
128:13,14
128:15,16
128:17
129:11,24
146:10
259:9
**conveyance**
106:13,18
**copied**
220:2
**copy**
129:20 134:5
144:1 163:7
178:7
188:12
**corp**
110:13 211:8
211:20
212:10
213:8 214:4
235:16
236:3,18
270:13
**corporate**
17:6,15
212:2
**corporation**
111:15
212:14,23
**corps**
211:18
**correct**
16:5,6 21:19

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

46:8 56:14
78:9,10
98:4 109:8
121:21
129:21
144:7,10
147:6
161:18
163:22
164:8
171:15
175:4
188:24
222:10
225:9
235:20
237:11
238:17
241:1,19
249:22
261:8
268:15
285:1
286:13
**correction**
169:18
**correctly**
142:15
**correspond**
223:13
**cost**
192:14 196:2
196:4,8,13
196:18,24
197:1
221:18
233:8,17
236:22
239:9 240:7
241:16
260:9,17
263:6
**costs**
196:5,5,6,21
237:4
238:14
**couldnt**

79:11
**counsel**
6:12,18
10:18,20
11:6,7
43:18 74:22
80:10 82:6
86:7 99:15
107:10
120:16,18
121:9 127:9
131:10
178:4 183:2
187:3,5
251:12,15
255:11,18
256:2 275:2
287:23,24
**counsels**
11:18 187:9
257:3
**counting**
283:23
**county**
1:19 287:3,5
288:10
**couple**
32:12 44:2
62:9 228:16
252:9
**course**
86:21 87:18
90:17
102:19
128:4 167:4
171:24
183:5
211:13,24
245:4
**court**
1:1 7:3 10:9
115:1 286:1
**courts**
1:16
**cover**
15:20 95:9
180:4

**cpc**
21:4
**crafted**
86:7
**crafting**
80:1
**crane**
43:14 47:9
81:11 126:2
**created**
75:15
**credentials**
16:8
**credit**
3:16 8:13
117:16
261:13,17
**creditors**
2:15 6:13
9:6 116:15
280:21
**cubs**
168:14
**curious**
154:9 234:12
**current**
16:12 28:21
171:3,11
172:5,10
**currently**
26:7 59:6
**cursory**
81:7
**cut**
275:9

---

**D**

**dan**
71:24 130:14
140:4
194:18
243:11
**dane**
5:6 7:6
119:6
**danielle**

87:22 88:15
249:8
**darkly**
241:12
**dash**
152:5
**data**
158:23 280:3
280:5,9
**databases**
158:9
**date**
16:9 32:11
57:24
114:10
163:5
221:20
223:5 291:8
292:23
**dated**
33:14 42:16
67:15 79:6
132:14
144:5
176:20
271:7 281:5
**dave**
142:18
**david**
4:18 8:22
118:18
140:6,10
141:5
**davis**
4:2 8:16
118:2
**day**
30:4,4 66:5
66:6 83:18
84:23
122:17
128:3,4
197:24
244:13
246:6,7
286:21
288:4

**days**
30:17 165:6
200:10
214:23
**daytoday**
72:24 73:1
88:16
267:11
**dayton**
21:4
**dcf**
149:16,21
150:12
**deal**
8:9 128:13
165:4 252:8
252:10,14
252:15,18
252:19,24
253:1,8,17
253:19,20
253:21,24
**deals**
94:20
**dearborn**
4:9 118:9
**debenture**
9:2 252:4
**debentures**
2:22 116:22
**debt**
105:4,7,24
108:18
111:24
113:1 157:2
157:9
183:10
185:19,20
186:12,18
192:15
196:23
202:19
208:7,18,22
229:18
230:1,2,2
230:13
232:10,10

Elyse S. Bluth                                      December 17, 2009
CONFIDENTIAL

12

232:17,19
232:20,20
232:22,24
233:1,3,3
241:14
242:4 261:3
280:22
281:21
282:19,19
282:20,21
282:22
283:4,6,9
283:10,10
283:14,15
283:21,21
283:22,23
284:4,5,8,9
**debtors**
1:6 8:21
115:6 286:6
**debts**
214:2
**debttoequity**
207:14,15
259:18
**december**
1:22 115:12
272:8,20
273:4 277:7
279:20
280:10
288:5 291:8
**decide**
266:5
**decided**
161:12 218:2
**decides**
181:10
**deciding**
148:14
**decision**
91:8 103:1
122:5
123:19
124:7 184:2
184:14,14
200:20

216:1 217:4
217:6
245:10
**decisions**
124:17
234:11
264:9
**decline**
152:8 261:21
262:6,18,22
262:24
263:3
264:23
266:11,11
**declined**
274:4
**declining**
262:4,23
264:15,17
**define**
63:9
**defined**
62:1 223:17
**definition**
39:6,13,15
40:19,21
79:23 204:2
222:13,18
223:3,14,16
223:23
224:2,5,6
224:13
**definitions**
41:3 61:19
**definitive**
114:4 234:15
256:11
**degree**
107:6 182:22
185:12,24
208:16
**delaware**
1:2 115:2
286:2
**delivered**
228:10
**delivery**

91:7
**delta**
21:5
**dep**
8:9
**department**
12:6 14:2,5
**depended**
213:7
**depends**
52:15 63:2
**depicted**
168:5 176:12
231:16
243:9
**deponent**
5:8 119:7
285:19
291:7
**deposed**
9:9,12 12:1
12:3,6,7,11
12:20 13:2
13:4,22
**deposition**
1:13 9:15
15:11 32:17
41:5 42:2
66:20 95:17
114:9
115:15
125:4 131:2
131:7 139:5
143:12
177:4,9
188:3
195:18
197:13
198:1,3
219:10
226:15
248:15
271:2 275:3
277:2
286:10,14
287:12,17
287:20

289:8 290:3
291:1,3,8
291:10
292:1
**depositions**
1:17 12:24
13:7,11
**depository**
7:2
**depth**
82:15,19
198:13
280:5,10
**describe**
12:2 13:14
14:3 15:17
16:8,21
18:17 19:8
19:12 25:6
31:14 60:22
61:11 65:24
67:7 74:14
89:5 130:2
147:10
179:7 285:4
**described**
8:8 34:15
37:15,16
83:11 92:7
109:4
124:15
198:24
199:2 204:3
**describes**
18:17 19:2
60:11,23
**description**
147:12
198:18
208:4
**designated**
13:4
**designation**
7:16
**designed**
148:4
**detail**

12:8 133:23
185:1
**detailed**
106:9
**details**
13:17 76:1
105:16
158:8 230:4
251:2
**determina...**
64:1,6
123:11,15
123:22
167:14
197:7
215:24
222:10
**determine**
149:15
152:12
167:21
221:12,24
**determined**
153:2,11
238:7
**determining**
61:8 222:5
281:8
**developed**
153:6 161:3
**development**
228:18
**develops**
123:5,5
**diagram**
85:1
**dick**
140:6
**didnt**
28:10 35:12
45:23 46:22
53:15 55:7
73:11 82:19
90:22 123:9
123:9
131:15
134:1

Elyse S. Bluth                                December 17, 2009
                      CONFIDENTIAL

154:11
173:9
186:18
189:12
193:13
234:15
236:11,16
238:20
239:1,1
256:12
268:12
269:3
**differ**
105:10
**difference**
108:17
171:10
229:16
281:18
282:4
**differences**
229:22
**different**
18:16 38:20
68:23 75:14
75:14
102:21
108:20
123:3,23
130:2
138:16
172:24
176:1
187:16,17
193:24
202:2 229:6
235:8
239:11
253:16
258:2,3
272:2 279:5
279:19
280:2,3,4,8
**differential**
229:18
**different...**
266:16

**differently**
122:2
**differing**
257:14,19
258:8,10
**difficult**
20:8
**diligence**
43:24 44:11
70:9 162:12
274:6
**direct**
127:14 141:7
141:16
179:6
228:15
281:13
282:12
285:3
**directed**
86:10 190:8
**directing**
72:24 73:1
179:15
**direction**
143:7 287:14
**directly**
29:8 36:9
72:12 79:4
112:9
160:19
267:13
288:1
**director**
28:23 34:5
**directors**
16:13 17:17
33:11 52:8
55:18 79:24
257:15,19
258:9,21
259:1
**directs**
11:20
**disclose**
14:9,13
80:11

**disclosing**
94:5
**disclosure**
51:15,16
53:2,7
93:23
**discount**
170:19 171:8
171:13,22
172:2,6,19
173:9,14,20
173:22
174:1,16
176:6
196:18
197:7
260:10
263:7
**discounted**
147:13,18
148:22,24
149:1,13
166:6
175:21
196:2,7
237:1,22
238:10
**discounting**
149:10
**discounts**
170:17 171:1
**discovered**
58:11
**discuss**
31:6 41:11
62:10 73:17
146:14
200:23
247:16
**discussed**
56:18 64:18
101:1
102:10
107:1
113:14
120:18
124:15

175:23
180:2
181:22
183:19
184:24
185:10,21
186:6
190:11,16
198:12
199:3
206:19
209:3 210:9
213:11
216:18
238:8
242:20,24
255:19
257:14
**discusses**
151:13
**discussing**
79:20 81:24
107:6 186:3
189:10
200:17
201:23
210:7
215:21
221:3
276:15
**discussion**
31:8,11
45:24 46:5
65:2 87:13
94:8,13,15
101:4,11,13
103:17
104:24
113:9,19
181:3,12,13
181:14,15
181:23
182:2,4,5,7
182:9,19
183:13,15
183:21
188:15

189:21,22
190:1,24
198:14,21
199:8
205:19
206:14
207:19,22
208:10,12
209:15,17
209:19
210:13,20
211:2,4,7
211:13,17
211:23,24
213:2
222:24
230:17
242:12
243:23
244:9,16,20
244:23
245:1,3,16
254:3,16
258:1,19
259:16
260:7
263:16
267:1,1,6,7
282:13
**discussions**
8:3 46:22
53:17 57:3
81:5 87:12
99:19
101:20
103:13,19
103:22,23
104:16
106:24
108:1,5,6
111:4
112:17
113:24
120:15
121:8,16
122:20
146:20

Elyse S. Bluth                                December 17, 2009
CONFIDENTIAL

14

| | | | | |
|---|---|---|---|---|
| 153:4 | 39:5 42:1,8 | 226:22 | 36:3,11,13 | 25:1,5,11 |
| 161:15 | 42:12,20 | 227:1 229:1 | 36:21 42:7 | 26:2,8,14 |
| 166:22 | 52:11,13,16 | 235:12 | 43:23 44:10 | 26:17,18 |
| 182:13 | 60:16 66:19 | 243:17 | 53:9,20 | 27:19 29:21 |
| 189:16 | 67:2,7 | 248:14,19 | 56:8,13,14 | 30:21 31:7 |
| 190:18 | 95:10,16,22 | 248:22 | 56:15 57:5 | 31:11,16 |
| 201:1 212:2 | 96:2,4,8,10 | 254:3,9,24 | 57:6,12,15 | 32:11 33:23 |
| 242:23 | 96:16 97:7 | 255:2 | 58:11,12,18 | 38:20 39:3 |
| 243:24 | 97:21 | 257:11 | 59:18 60:6 | 39:21 40:8 |
| 244:4 245:6 | 107:17 | 261:19 | 67:1 69:23 | 40:24 41:14 |
| 246:4 | 125:3,8,11 | 262:11,12 | 70:8 71:8 | 43:13 44:15 |
| 255:24 | 131:1,6,11 | 262:13 | 72:17 73:18 | 45:5 47:8 |
| 256:10,18 | 131:14,18 | 269:1,8,8 | 81:2,18 | 47:12 49:20 |
| 258:15,16 | 132:4,9,11 | 269:14 | 95:11 129:9 | 54:7 56:2 |
| 259:1 268:7 | 139:4,9 | 270:2 271:1 | 133:14,22 | 57:14,23 |
| **dismissed** | 141:10 | 271:13,15 | 140:16,17 | 58:6,19 |
| 14:22 | 143:17,18 | 271:16,16 | 140:20 | 59:2,7,20 |
| **disputes** | 144:1,3,18 | 271:19 | 175:12 | 59:22 60:2 |
| 12:8 | 145:3,7,15 | 276:21,22 | 203:7,8 | 60:7 62:3 |
| **distinction** | 145:17,20 | 277:1,14 | 205:6 | 68:20 69:6 |
| 236:21 239:6 | 146:10,12 | 282:11 | 214:15 | 72:12,15 |
| 240:5 | 146:15,21 | **documents** | 218:17 | 73:4,5,14 |
| **distributed** | 147:11 | 7:17,17,23 | 247:21 | 74:19 75:6 |
| 143:4,6 | 148:20 | 8:2 45:10 | 267:22 | 76:16,22 |
| 189:13 | 153:15 | 66:7 92:10 | 270:20 | 80:9,16,22 |
| 227:10 | 154:2,19 | 92:13 | 279:17 | 81:17,17,22 |
| **distribution** | 159:2 167:5 | 130:23 | **dol** | 82:14 83:2 |
| 38:1 | 168:4 | 132:8 | 14:16 | 85:19 86:16 |
| **distribut...** | 176:11 | 143:11,23 | **dollar** | 87:10 88:3 |
| 110:3,6 | 177:3,8,14 | 156:18 | 278:21 279:2 | 88:7 90:3,8 |
| 111:2,19 | 177:15,15 | 159:18 | 279:4 | 90:10 96:13 |
| **district** | 178:5,8,11 | 177:13 | **dollars** | 97:12 100:1 |
| 1:2,16 115:2 | 178:12,20 | 180:21 | 193:7 236:16 | 100:4 101:1 |
| 286:2 | 178:22 | 188:2 | **don** | 101:9,18 |
| **divided** | 180:5,9,12 | **doesnt** | 43:10 47:10 | 103:20 |
| 155:12,13 | 180:16,18 | 49:10 64:17 | 81:11 | 104:10 |
| **dividends** | 180:20 | 83:18 84:23 | 130:13 | 105:15 |
| 230:6 | 188:7,9 | 109:24 | 252:8 | 106:6 |
| **division** | 189:2,7 | 110:7 | **dont** | 107:16 |
| 262:18 | 191:15 | 124:24 | 6:18,19 7:4 | 109:3 |
| **dmas** | 195:3,12 | 164:18 | 7:20 10:3 | 113:15 |
| 266:17 | 197:4,12,18 | 212:9 | 11:13 12:9 | 126:9,13,14 |
| **document** | 197:18,20 | 260:16,18 | 13:17,21 | 126:23 |
| 7:2 15:10,20 | 197:23 | 279:10 | 14:11,15,20 | 127:1,10,11 |
| 16:5 32:16 | 219:9,14,16 | **doing** | 14:20 15:2 | 127:11,23 |
| 32:24 33:5 | 221:7 225:6 | 17:18 26:11 | 15:7 16:3 | 130:18 |
| 33:7,24 | 226:14,20 | 32:23 36:2 | 20:11 21:16 | 137:11 |

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

15

| | | | | |
|---|---|---|---|---|
| 139:24 | 217:3,19 | **dow** | 85:12 86:3 | 214:20 |
| 140:6,7,8 | 218:18 | 21:6,9,11 | 89:12,23 | 215:8 216:6 |
| 140:15 | 219:24 | 162:20 | 90:21,23 | 220:7 |
| 141:2,18 | 220:2,12,22 | **dozen** | 92:22 95:13 | 222:22 |
| 142:7,10,19 | 221:5 222:5 | 12:12 13:10 | 95:24 97:9 | 223:21 |
| 142:22 | 223:24 | 267:18 | 99:9,13,22 | 224:20 |
| 143:2 | 224:8,12 | **draft** | 100:22 | 234:1 |
| 144:22 | 230:4 231:6 | 124:19 144:3 | 105:11 | 241:24 |
| 145:5,8,14 | 231:13 | 144:16,23 | 108:13 | 245:14 |
| 146:9 147:3 | 236:12 | 144:24 | 109:13 | 246:14 |
| 150:1,13,18 | 246:1,23 | 176:20 | 110:17 | 247:10 |
| 152:18,21 | 247:5,6 | 178:2,21,23 | 111:11 | 251:20 |
| 153:1,7 | 249:12,13 | 179:3 180:1 | 112:5,21 | 253:3 |
| 154:4,5 | 249:23 | 190:2 227:6 | 113:22 | 262:12,15 |
| 156:17 | 250:1,24 | 227:11,16 | 119:6 | 263:19,21 |
| 157:22 | 251:1 | 227:18,18 | 120:24 | 265:2 |
| 158:17 | 252:20 | 228:1,3,19 | 122:24 | 271:18 |
| 159:11,23 | 253:6,12,20 | 229:3,7 | 124:2,11 | 273:5 |
| 160:1 | 254:7 | 248:11 | 126:20 | 274:24 |
| 161:14,16 | 256:13,20 | 249:16 | 131:17,22 | 275:13 |
| 161:22 | 257:4 259:7 | 281:5 | 135:2,13 | 277:14,19 |
| 162:21,22 | 259:8,11 | **drafted** | 140:13 | 285:16 |
| 164:5 165:4 | 263:12 | 220:14 | 141:4 142:5 | **du** |
| 166:20 | 264:8,12,18 | **drafting** | 145:23 | 287:3 |
| 167:16 | 265:4,22 | 229:9 | 147:4 | **ducayet** |
| 175:21 | 266:1,3 | **drive** | 151:17 | 4:12 8:20,20 |
| 176:19 | 267:6,16 | 5:3 119:3 | 152:16 | 54:2 63:19 |
| 179:10 | 268:4,8,12 | **drobny** | 153:14,18 | 69:24 |
| 180:3 | 269:18 | 5:6 7:6,6 | 157:20 | 100:21 |
| 181:18 | 274:2 | 8:5 11:11 | 160:21 | 105:12 |
| 183:3,20,24 | 275:24 | 14:11 21:22 | 163:12 | 110:16 |
| 184:22 | 276:5,19 | 22:15 23:3 | 164:1,17 | 118:12 |
| 185:17 | 278:24 | 24:12 25:9 | 169:6 175:5 | 131:23 |
| 186:3 189:9 | 280:7 | 34:16 35:8 | 175:17 | 184:5 |
| 189:15,24 | 284:16 | 35:22 38:6 | 178:9,16 | 190:13 |
| 192:5 193:3 | **doors** | 38:16 39:18 | 180:7 181:8 | 191:5 |
| 193:5,20 | 151:12 | 40:5,23 | 182:24 | 203:17 |
| 194:13,24 | **doran** | 46:17 50:20 | 187:1 190:5 | 213:17,20 |
| 195:6,12 | 249:7,11,22 | 52:4,12 | 194:10 | 214:18 |
| 197:9 | **dorman** | 54:3 55:6 | 195:13 | 222:20 |
| 199:14,15 | 3:9 8:12,15 | 55:24 56:11 | 198:2 200:7 | 223:19 |
| 206:8 | 117:9 | 60:15 64:14 | 203:19 | 234:22 |
| 208:13 | 280:20 | 68:18 69:10 | 205:11 | 257:21 |
| 210:8 | **double** | 71:15 75:20 | 206:20 | **due** |
| 211:14,23 | 283:23 | 76:6 80:8 | 208:24 | 44:11 70:9 |
| 213:9 | **doublecou...** | 82:2,12 | 209:11 | 202:6 |
| 214:22 | 284:6 | 83:8 84:5 | 213:19 | **duff** |

Elyse S. Bluth                                December 17, 2009
CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 5:7 7:7,9 | 107:11,13 | 218:9,16 | 165:24 | **egi** |
| 7:16 12:14 | 120:12 | 221:1 222:9 | 191:23 | 45:16 46:11 |
| 12:16,17 | 121:4,10,14 | 241:2 | 192:4 | 54:11,13,17 |
| 14:14 15:4 | 121:19 | 242:13 | 223:15,18 | 281:22 |
| 15:18,22,23 | 122:5 | 245:21,24 | 229:6 238:8 | **egitrb** |
| 17:4,11,12 | 123:14 | 248:4 | 246:9 | 241:14 281:9 |
| 18:18 19:13 | 124:9,14 | 249:18 | **early** | **egitrib** |
| 19:18 22:10 | 128:19 | 250:16,20 | 17:18 28:6 | 270:6 |
| 23:5 24:7,9 | 140:11,20 | 251:7 | 30:12 31:18 | **eight** |
| 24:20 25:2 | 144:19 | 255:17 | 54:11 68:17 | 75:9 |
| 25:23 26:5 | 145:18 | 256:1,11,15 | 228:10 | **either** |
| 26:7,10,16 | 146:13 | 256:17 | 283:2 | 6:24 31:13 |
| 27:12 28:1 | 148:17 | 258:15 | **earn** | 32:1 40:1 |
| 28:12,16,22 | 149:20 | 260:8 263:5 | 233:16 | 43:21 71:20 |
| 29:5,19 | 150:14 | 263:8,24 | **earnings** | 82:8 85:1 |
| 31:9 32:6 | 151:14 | 267:8,19 | 110:1 169:11 | 111:23 |
| 33:10,19 | 152:12,20 | 271:23 | **easy** | 130:13 |
| 34:2,5,24 | 152:22 | 274:9 277:6 | 237:5 | 135:24 |
| 35:20 37:23 | 153:5,12 | **duffs** | **ebitda** | 137:22 |
| 41:15,18 | 156:13 | 19:2,3 218:4 | 155:10,11,12 | 171:12 |
| 42:14 44:6 | 158:7,20 | **duly** | 155:14 | 228:6 |
| 47:5,6,7,23 | 159:1,20 | 6:3,6 120:4 | 160:5,9,10 | 244:15 |
| 49:16 50:3 | 161:7,8 | 287:9 | 160:10 | 252:17 |
| 50:6 54:17 | 166:15 | **dupage** | 161:4 | 253:8 256:8 |
| 56:7 57:11 | 167:20 | 1:19 287:5 | 162:19 | 256:15 |
| 57:15 58:10 | 171:21 | 288:10 | 163:3 237:2 | 257:17 |
| 58:18 59:15 | 172:18 | **duquesne** | 265:15 | **elect** |
| 59:18 60:6 | 174:15 | 21:6 | 267:3 | 111:14 |
| 60:12,23 | 175:13 | **duties** | 277:10 | **elected** |
| 61:2 63:8 | 176:17 | 247:14 | 278:7 279:7 | 210:18 |
| 63:13 64:8 | 179:17 | **duty** | 279:8 | **electing** |
| 65:18 67:10 | 180:2,6,18 | 247:18 | **economics** | 214:7 |
| 67:19 71:3 | 181:11 | | 173:5,6,17 | **election** |
| 73:18 74:8 | 185:16 | ⎯⎯⎯ **E** ⎯⎯⎯ | 173:18 | 110:11 |
| 75:15 76:9 | 186:6,14,23 | **earl** | **ed** | 221:20 |
| 76:13,21 | 187:13 | 4:6 118:6 | 142:15 183:1 | **element** |
| 79:3 80:5 | 188:13,21 | **earlier** | **edo** | 187:12 |
| 81:2 83:13 | 191:3 194:7 | 51:11 53:7 | 21:7 | **elements** |
| 85:5,23 | 196:17 | 53:18 54:23 | **effect** | 63:16 187:16 |
| 89:3,9,18 | 199:3,9 | 63:24 70:7 | 79:7 | 217:23 |
| 89:21 90:6 | 201:3,6 | 92:7 98:3 | **efficient** | 218:1 |
| 90:16,19 | 202:11 | 102:13 | 15:8 110:24 | **elimination** |
| 91:2,9 | 205:6 213:6 | 121:19,23 | **effort** | 196:4 221:16 |
| 97:17 | 213:22 | 122:8,19 | 157:24 | **elizabeth** |
| 101:15,21 | 214:15 | 132:20 | 267:24 | 2:13 9:3 |
| 102:5,6,23 | 215:5,15 | 134:22 | **efforts** | 116:13 |
| 103:4,6 | 216:1 217:9 | 150:23 | 151:10 | **elyse** |

Elyse S. Bluth                                    December 17, 2009
                        CONFIDENTIAL

1:14 6:5,17
98:1 115:16
120:2
132:17
182:24
190:5 272:6
286:18
289:2 291:7
292:1,24
**email**
125:13,21,23
126:17
131:21
132:1,12,17
133:1,3,5,6
134:5,21
137:2
139:18,23
140:23
141:1,21
142:2 144:1
144:5,11
177:20
178:5 180:4
180:10,10
180:17
188:12,14
188:17,24
249:2,6,15
249:16
250:3,4,15
253:9 271:6
272:1,5
**emails**
248:23
**embedded**
54:20 146:20
**emery**
125:18
**employee**
16:20 23:18
48:2 61:9
86:15
140:10
287:22,23
**employees**
17:3 23:14

23:19 26:8
240:2
**employer**
17:19 18:4
**employers**
16:24
**encountered**
224:16
**ended**
218:23
**engage**
56:19
**engaged**
32:7 37:6,9
55:15 64:24
79:4 148:18
**engagement**
28:14 33:8
33:19 34:12
34:15,24
35:4,21
37:14 41:11
41:17 42:13
42:23 43:1
43:8 44:14
47:19 48:13
48:17,19
49:10,10
50:2,4 51:9
51:13,20
53:1,9,19
54:14,24
56:6 59:22
63:8 64:20
65:10,11,15
67:9,23
69:5,19,22
69:23 71:4
75:11,17
76:10,12
78:19,21
81:7,10
82:1 85:17
86:10 87:14
87:16 89:2
89:4,9,22
90:2,20

91:3,20
92:18 93:2
93:14,20
94:19,24
95:3,7,7
102:12,18
103:3
113:20
121:11,15
121:17,23
122:19
123:4 129:6
135:16,20
136:8,10,13
136:23,24
137:16
138:6
205:23
218:4,9,12
218:14,15
218:19,21
218:23
219:4,6,20
220:4 221:3
221:9
222:12
225:21
226:3,5
249:19
250:17
251:6,8
**engagements**
19:17,18
20:14 25:12
51:18 53:14
53:15 54:8
71:10 86:22
88:9,10
90:6,14
135:23
137:6,9,20
224:16
**enhancement**
210:15
**enhancements**
210:4,11,12
**entered**

7:3 33:19
34:12,24
35:4 50:2
56:6 94:18
220:10
291:12
**enterprise**
148:7 155:10
155:12,13
155:15
156:7
172:12
176:15,16
176:23
191:18
192:12,17
202:12,16
202:21,24
203:12,21
203:23
204:4,9,15
204:17,19
204:20,24
205:4,19,24
206:7
231:18,20
231:24
233:22
235:24
236:6 237:8
237:15
242:3
282:14,17
**enterprises**
238:7
**entertain...**
147:20,23
167:7,20
168:8
262:17
263:1
**entire**
17:4 44:18
78:16
149:14
162:16
200:13

259:6
291:10
**entities**
18:16,18
173:17
174:4
274:15
**entity**
27:6 94:10
100:19
107:7
109:24
**entries**
254:20
**entry**
107:19
254:17
261:22
**environment**
259:23
**equally**
167:19
243:14
**equity**
27:4,6,12,18
27:21 28:2
28:9 29:18
32:1 35:10
36:7,9,22
36:24 37:10
44:21 45:2
45:19 47:14
47:15 48:5
55:12,13
58:9 168:21
169:24
196:2,8,13
196:14,18
197:1 232:6
236:19
241:20,23
242:15
244:24
260:9,16
263:7 269:6
282:15
283:16

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

283:16
**erisa**
16:23 18:3
24:2 28:18
28:24 29:4
62:1,2
109:9,16
223:17,24
224:1
**errata**
291:1,14
**esop**
13:18 16:14
16:15,16,19
16:21,23
17:3,22
19:6,9,15
20:13 24:15
24:22 25:20
27:4,17
28:9,10,17
28:17,18,24
29:4,20
31:10 32:2
32:7 36:21
37:7 41:21
42:15 44:21
45:2,11,13
45:20 46:10
46:23 48:12
48:12,15,24
49:6,17
50:4,7,23
51:2,4,5,21
54:18 55:15
55:23 56:13
56:19,22
60:24 61:4
61:6,19,22
62:12,13
64:11,22
65:20 66:2
66:4 67:13
68:1,10,24
71:16,20,23
72:10 73:16
74:17 76:5

77:1,4,5,5
77:13,19,20
77:20,21
78:2,5,12
78:13,14,14
81:8 84:24
87:19 88:22
89:17 90:12
92:9,10,13
92:14 95:8
101:16
102:2,5,22
103:3,3,11
103:14,23
104:2,5,8,9
104:14,17
104:18,21
105:2,20
106:7,14,15
107:20
108:10,15
108:15
109:6,10,20
109:22,24
110:2,4,7
110:12,13
110:15
111:1,5,16
111:17
113:7,11
120:10
121:20
124:18
128:19
131:12
133:16
135:20
136:9,10
138:10,12
138:21
139:17
141:14,14
143:1 147:8
148:8,14,14
148:16
159:10,16
159:16

177:22
178:2,21
179:2 182:7
182:11
187:14,20
187:21
190:3,20
193:5,12,18
194:19
197:22
198:8,12,18
198:24
199:2,4,5
200:4 201:9
205:5,14
206:24
210:5 211:8
212:8 214:3
214:9
215:12,16
216:3,13
218:10,12
221:14
224:24
225:22
226:4 227:9
229:6 232:5
233:13
234:11
235:7,8,15
238:23
239:3,24
240:1,11,13
240:18
241:18
247:18
248:6
252:10
254:11,14
254:19
255:22
272:21
280:23
281:4
284:24
**esopowned**
214:4 240:23

**esoprelated**
36:14 37:6
53:10 54:13
56:8 89:10
224:15
**esops**
16:18 17:1,5
17:17,20
18:1,14
23:14 48:4
88:23
109:15
211:18,19
**esquire**
291:3
**essentially**
191:20
**establish**
108:22
**establishing**
197:8
**estimate**
12:11 71:6
73:7 97:18
165:1
166:16
231:3 232:4
285:7
**estimated**
149:4 160:9
235:13,14
**estimates**
168:9
**et**
1:5 115:5
122:17
181:17
247:1 262:4
286:5 291:5
**ev**
155:10
162:18
**evaluating**
172:19
**evening**
246:20,20
**event**

11:15 79:1
84:23
138:15,21
211:21
215:15
253:23
**eventually**
65:10,12
**everybody**
285:16
**everyday**
84:21
**exact**
32:11 62:3
86:16
**exactly**
57:24 58:19
133:4 150:2
150:19
156:19
164:5 192:1
214:22
264:8
273:22
274:2
**exaggeration**
128:4
**examination**
1:14 6:8
120:6 252:1
280:17
287:9 289:2
**examinations**
6:22
**examined**
6:7 120:4
**example**
129:19 136:8
155:9,24
171:2,5,14
180:24
184:16
211:17
236:22
238:10
279:6 280:5
**examples**

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 134:14 | 95:17 125:4 | 233:20 | 208:14,17 | **factor** |
| **exceed** | 131:2,7,24 | 234:4 | 208:17 | 113:7,11 |
| 222:2,7 | 132:4,23 | 281:20 | 213:14 | 254:18 |
| 273:24 | 139:5 | **expense** | 255:7,9,12 | 256:8,9 |
| **exception** | 143:12 | 238:18 240:3 | 273:9 | **factored** |
| 73:20 165:6 | 144:15 | **experience** | **expressing** | 113:15 |
| **exceptions** | 157:14 | 15:18,19 | 82:9 101:20 | **facts** |
| 259:10 | 177:4,9,19 | 18:12 19:3 | 104:19 | 223:10 |
| **excess** | 178:1,8 | 39:13 40:1 | 186:22 | **fair** |
| 207:14 | 188:3,7,11 | 49:3 63:8 | 256:14 | 7:13 18:19 |
| **exchange** | 195:21,21 | 83:4,24 | **extends** | 22:22 23:24 |
| 176:3,5 | 197:13 | 222:19 | 94:17 | 39:7,15,21 |
| 202:3 231:5 | 219:10 | 264:14 | **extensively** | 39:24 40:11 |
| 231:7 | 226:15 | 273:21 | 274:11 | 40:14,19,21 |
| **exchanged** | 248:15 | **expert** | **extent** | 41:3 61:1,7 |
| 230:5 | 257:5 | 12:20,20,24 | 18:11 21:23 | 61:18,24 |
| **exchanges** | 262:14 | 13:5,8,14 | 46:17 60:15 | 62:13,15,20 |
| 9:16 176:1 | 270:2 271:2 | 13:20 22:3 | 80:8,10 | 62:22,22 |
| **excited** | 271:6 277:2 | 40:24 | 89:14 183:3 | 63:6,14 |
| 243:15 | 281:3 | **expertise** | 187:3 | 64:1,10 |
| **exclusively** | 284:22 | 13:15 28:10 | 189:20 | 66:4,15,15 |
| 17:22 | 289:8 290:3 | 28:17 | 190:10 | 77:22 87:9 |
| **excuse** | **exhibits** | **expires** | 259:22 | 203:12,15 |
| 20:5 43:12 | 261:10 | 288:11 | **extra** | 203:22 |
| 56:14 | **exist** | **explain** | 142:9 149:5 | 204:2,9,11 |
| 110:12 | 46:22 | 45:7 48:18 | **extrapolate** | 204:13,13 |
| 121:11 | **existed** | 70:20 78:1 | 150:4,7 | 204:14,15 |
| 127:5 | 173:8,18 | 79:8 83:23 | | 204:15,18 |
| 129:14 | **existing** | 106:17 | _____ | 204:23 |
| 168:12 | 283:22 | 129:21,22 | **F** | 206:5 |
| 174:22 | **exists** | 138:3 166:4 | **face** | 212:15 |
| 178:11 | 74:12 173:5 | 172:3 | 231:10 | 222:1,6,14 |
| 189:13 | 254:13 | 175:13 | **facetious** | 222:18 |
| 203:9 | **exited** | 238:22 | 268:10 | 223:3,14,23 |
| 210:16 | 195:17 | 270:15 | **facing** | 224:2,13 |
| 238:4 | **expansion** | **explore** | 209:23 | 229:14 |
| **executed** | 241:1 | 46:1 48:1 | **fact** | 230:12 |
| 220:17,19 | **expect** | **exploring** | 13:3 21:24 | 231:1 |
| **exemption** | 183:9 196:14 | 42:14 | 47:7 175:24 | 272:11 |
| 211:19 | **expected** | **express** | 187:2 194:4 | **fairly** |
| **exercise** | 48:13 149:5 | 101:17 | 202:7 | 213:11 |
| 160:18 | 179:24 | 161:17 | 210:22 | **fairness** |
| **exhibit** | 192:24 | 191:2 | 211:8 | 51:1 63:16 |
| 15:11 18:15 | 193:9 | **expressed** | 216:18 | 65:4 74:17 |
| 32:17 37:13 | 200:10 | 104:2 113:10 | 225:11 | 203:10 |
| 42:2 47:20 | 225:2 | 161:21 | 238:18 | 224:24 |
| 66:20 71:15 | 232:22 | 185:23 | 246:5 268:2 | 225:3 226:4 |
| | | | 279:13 | |

Elyse S. Bluth                    December 17, 2009

CONFIDENTIAL

248:5
fall
204:22
206:10
falls
238:15
familiar
40:14 96:7
170:16
173:21
268:21
far
60:13 162:14
200:11
229:17
favorable
109:9
feared
186:1
feasibility
48:4
feasible
43:3
february
28:6 29:14
30:12 31:18
33:14,21
34:22 39:14
40:20 41:12
41:17 42:16
44:14 50:1
51:10 52:24
53:1,19
54:14,24
56:5,17
57:2,4,9,13
57:19 60:9
67:21 68:16
69:4,8,15
69:18 79:7
87:19 271:7
274:7
federal
1:15 111:21
193:7
210:18
285:9

federalmogul
21:7
fee
89:8,8,17
90:7,12,15
90:16,18
91:2
feel
11:12
feeling
184:8
fees
89:4,21 90:8
90:11 94:12
fell
239:21
felt
214:2 239:22
fiduciaries
104:9 226:6
226:7
234:12
fiduciary
24:20,21
48:11,16,16
48:23 49:7
49:9,17
50:9,14,17
51:21 55:15
60:24 61:4
62:10 64:24
65:2,4,7
66:10 68:21
83:14 84:22
88:9,21,22
100:2
101:16
104:5,8
105:21
106:7,14,16
107:10,10
120:15
148:14
186:9 214:9
216:17,22
216:23
226:8

247:14,18
247:20
figueroa
3:10 117:10
figure
128:9 151:7
153:11
156:10
196:19
212:7
233:10
268:11
figures
160:19
168:16
232:11
241:14
242:13,16
243:1
file
291:4
files
151:22 227:3
filings
94:10
fill
16:12
final
100:2,3
135:23
137:21
145:2
168:11
176:20
201:1
227:15,23
233:3
249:16
269:5
finance
17:7,15
130:21
206:23
financial
43:15 47:24
48:4 51:1
62:13,16,18

67:11 83:11
120:16
129:22
132:19
134:15
147:17
149:2
154:21
165:12,14
186:17
187:18
207:5 215:3
237:22
financials
103:7 105:6
122:14
financing
134:14
179:19
206:14,18
212:22
213:6
find
151:16
152:23
154:13
158:9
160:19
fine
95:12
finish
275:15
finished
52:12
firm
6:11 8:12
19:3 98:8
186:24
256:20
280:20
first
3:18 6:6
24:9,14,15
25:3 26:18
26:20 31:13
33:1 34:11
35:2 37:14

37:22 38:1
38:6,12
43:20 44:1
47:22 59:2
59:21 67:2
68:20 95:23
96:23
117:18
131:16
132:10
150:1 164:4
179:12
192:17
199:22
201:12
209:14
219:23
220:14
222:1
226:24
232:22
249:1,4
252:7,7
261:17
262:1
265:22
269:16
281:6,19
fit
178:22 195:1
five
75:9 128:3
150:3,4,6,9
251:16
fiveminute
251:17,20
275:9
fiveyear
149:17,22
flag
54:12
flat
262:20,21,21
262:24
flip
241:9 278:2
278:4

**floors**
194:2,5
**flow**
147:14,18
148:22,24
149:1,5,8
149:13
166:6,12,18
175:21
210:4,10,12
210:14
237:2,23
238:11,17
239:13
261:20
262:3,7,19
262:24
263:3 264:4
**flows**
169:11 197:1
197:2
236:24
237:1,11
241:15
260:16,19
260:21,23
**flowthrough**
109:23
**flu**
30:1
**focus**
24:7 140:19
257:11
**focused**
16:18 17:5
243:7
**focusing**
17:17 278:24
279:12
**follow**
11:4 129:18
187:9
280:24
**followed**
213:2
**following**
19:5 152:4

221:12
247:20
258:23
291:12
**follows**
6:7 120:5
**followup**
30:5 129:17
**food**
130:1,3
169:22
170:14
172:17,20
173:1
174:21,24
175:3,7,9
175:13,19
175:20
204:16
**footnote**
244:1
**forced**
259:23
**forecast**
149:17,22
**forecasts**
152:7,14
**foregoing**
79:1 286:10
287:12
**forever**
166:7
**form**
11:5 24:11
25:9 35:6,8
37:16,17
38:13 39:16
39:18 40:3
40:22 46:12
49:18 50:18
50:20 51:22
53:24 54:3
56:10 57:20
61:13 63:10
63:19 68:5
68:18 69:9
69:24 75:18

75:20 83:8
89:11,12,23
92:22 95:6
99:21,22
100:21
101:6,23
104:23
105:12
107:8
108:11
109:1,12,13
110:16,17
111:9,11
113:21,22
122:22
123:21,22
123:24
124:2,7,8
135:11
136:17
142:3
148:10
159:3
160:21
162:3
167:23
180:1 184:5
184:19
190:13
191:5,9
195:7
196:10
198:22
203:17,19
205:7,11
208:24
209:9,11
210:23
213:18,19
214:18,20
215:6 216:4
217:10
220:7
222:20
223:21
224:18
230:14

233:23
234:1,23
241:24
242:17
244:6
245:12,14
251:3
257:21
260:11
270:22
273:5
275:19
283:18
284:10
**formal**
18:11 74:1
74:11,16
75:24
121:20
123:12
161:16
214:15
215:24
216:19
217:4 258:4
**formally**
32:7
**forman**
142:15 183:1
190:6
**format**
215:20
**formed**
48:1 49:7
**forth**
8:4 64:3
83:2 124:20
221:11
241:9 246:8
**forward**
49:24 185:3
200:9
209:19
214:7,11
215:12
216:3,14
244:15,15

244:18,21
245:18
278:4
**found**
38:8 154:14
253:10
**foundation**
21:24 22:15
23:3 24:12
34:16 35:8
38:16 39:17
39:19 40:3
40:5,23
52:4 64:14
75:20 76:6
77:15 83:8
85:12 89:13
89:23 97:9
99:10,22
105:11
108:12,13
108:23
109:13
110:16
111:11
112:5
124:11
126:20
135:2
140:13
149:23
152:15
153:13
155:4
156:15
157:20
158:5 169:5
170:7
172:21
175:16
181:8
194:10
196:11
200:7
203:19
205:10
206:20

Elyse S. Bluth                                                 December 17, 2009

CONFIDENTIAL

214:20
222:22
247:10
250:22
265:2
278:19
279:22
283:18
284:10
**four**
19:5 98:14
168:11
**fourpage**
95:22
**frame**
275:18
**frankly**
165:20
**fraudulent**
106:13,18
**free**
149:5,8
166:12,18
262:6,18,23
264:4
**frequent**
101:4,9
128:7
129:11
**frequently**
73:7
**friday**
252:7
**friedman**
2:16 116:16
**fulfilled**
247:14
**full**
127:13
201:13
284:7,8
**fully**
217:23
**function**
69:7 88:19
**further**

14:3 29:17
31:9 36:16
36:19 37:3
62:21 70:13
79:7 85:20
120:5 138:3
252:9
280:15
285:19
**future**
236:9,18
274:22

————— G —————
**gamble**
21:11
**gates**
98:7,8,12,19
**gathered**
74:3
**gatherings**
146:18
**gbtrib**
95:23 177:16
197:19
226:21
248:20
271:10
**gee**
105:22 206:2
206:4
**general**
21:7 22:9,12
22:13 25:8
26:5 43:18
45:1 46:22
52:6 62:4
74:22 82:5
96:13
105:18
106:9,12
107:14
109:8 128:6
129:12
130:19
134:2 148:2
158:2

162:24
174:21
175:1 183:1
183:13,15
184:8 187:2
187:5
190:15
201:17
206:22
247:12
259:12
**generally**
13:14,18
16:9 19:2
22:24 54:7
58:5,7
60:11 70:2
76:8 81:9
88:8,18
100:24
106:8 109:5
147:10
155:22
156:20,23
161:9 179:8
183:17
202:4
204:18
207:22
243:3 259:5
263:12
264:10
**getting**
128:12
162:12
253:7,7
**ginny**
29:11
**give**
15:6 20:20
22:10,14
122:12
163:10,20
181:17
251:17,20
267:17
279:15

**given**
13:7 39:6
72:6 79:5
79:17 85:6
86:1 94:10
105:3
122:17
173:13
183:22
190:6
240:20
242:15
252:23
253:1
259:22
260:6
262:22
263:3 264:4
265:14,17
273:14
286:10,14
287:16
**gives**
109:9,9
**giving**
83:1 96:1
213:23
214:1
275:22
**glatfelter**
19:20
**go**
6:19 7:4
11:15 12:8
35:23 46:19
49:24 52:17
54:5 55:8
60:17 64:5
73:24 80:14
89:15 114:6
121:16
135:23
137:21
149:20
150:17
157:10
164:2

181:18,18
181:18,18
185:3
187:19
190:12
207:3 214:7
215:9 216:7
217:14
244:15,15
244:18,20
245:18
247:22
252:5 279:6
283:17
**goal**
148:5
**goes**
9:15 20:16
89:5 211:19
258:10
279:8,8
**going**
7:11 8:6
9:14 11:11
14:12 20:17
21:22 22:2
24:5 51:18
52:16 53:14
57:18 58:4
67:13 81:3
90:16 111:4
128:10
135:24
138:13
139:15
153:1
162:11
182:3 185:3
187:1,9
195:13
200:9
210:15,17
211:4
212:19
214:11
215:12,18
233:16

Elyse S. Bluth                                December 17, 2009
CONFIDENTIAL

23

| | | | | |
|---|---|---|---|---|
| 236:14 | 86:9 89:20 | 175:11 | **good** | 209:20 |
| 237:4 | 90:5,22 | 176:10 | 9:8 141:22 | 212:1 |
| 238:18 | 91:4 93:5 | 177:2,7,12 | **gordy** | 217:13 |
| 242:5 246:8 | 95:14,20 | 178:4,14,17 | 87:22 | 218:4,8,17 |
| 251:10,11 | 96:1,5 | 180:14 | **gottdiener** | 220:5 227:3 |
| 254:12 | 97:13 99:14 | 181:20 | 27:1 28:15 | 227:10,15 |
| 261:9 265:6 | 99:16 100:5 | 183:11 | **governed** | 228:9,11,22 |
| 265:7 275:1 | 101:3,10 | 184:12 | 15:1 | 243:18 |
| 275:9 281:2 | 102:11 | 185:8 187:8 | **governmental** | 244:3 245:2 |
| 282:24 | 106:3 | 188:1,6 | 94:10 | 245:8 246:1 |
| 283:11 | 107:12 | 190:21 | **great** | 247:13,15 |
| 285:8 | 108:21 | 191:14 | 151:13 | 249:24 |
| **goldberg** | 109:7 110:9 | 194:15 | 185:24 | 255:17 |
| 9:18 | 110:20 | 195:19 | 186:24 | 256:1 |
| **goldfarb** | 112:3,14 | 196:16 | 198:13 | 272:22 |
| 2:6 6:1,9,10 | 113:3 114:6 | 197:16 | **greatbanc** | 273:2 |
| 6:18 7:14 | 116:6 120:1 | 198:6 199:7 | 65:8,9,12 | 284:23,24 |
| 8:10 9:7,22 | 120:7 121:5 | 200:15 | 67:10,11,24 | 285:12 |
| 10:1 11:2 | 123:6 124:5 | 204:1 205:8 | 68:3,11,15 | **greatbancs** |
| 11:16,17 | 125:1,7 | 205:16 | 68:21,22 | 255:17 256:1 |
| 14:23 15:14 | 127:2 | 207:1 209:5 | 69:3 71:15 | **greater** |
| 22:8,19 | 130:22 | 210:1 211:6 | 75:16 82:6 | 61:7,18 |
| 23:6 24:17 | 131:5,10,18 | 212:4 | 86:6,16,18 | 212:16 |
| 25:13 32:14 | 132:1,3 | 214:13 | 86:21 87:2 | **green** |
| 32:20 34:19 | 135:8 | 215:1,23 | 87:4,8,10 | 21:3 |
| 35:17 36:5 | 136:15,19 | 216:10 | 87:12,18 | **gren** |
| 37:21 38:11 | 139:3,8 | 217:16 | 88:2,19,22 | 43:11 |
| 38:22 39:23 | 140:18 | 219:8,13 | 93:9 95:5 | **grenesko** |
| 40:13 41:7 | 141:6 | 220:15 | 97:16 98:12 | 43:10,14,21 |
| 41:22 42:5 | 142:11 | 223:2 224:3 | 120:8 | 47:10 81:11 |
| 46:14 47:1 | 143:9,15 | 225:5 | 125:24 | 82:8,21 |
| 49:21 51:7 | 146:3,7 | 226:13,18 | 128:24 | 93:9,13 |
| 52:1,9,17 | 147:5 | 230:21 | 129:1,2,4,6 | 130:14 |
| 52:21 54:9 | 148:19 | 234:17 | 129:9 | 252:8 |
| 55:19 56:3 | 150:10 | 235:5 | 132:21 | **grew** |
| 57:1 58:2 | 152:1,19 | 242:11,21 | 134:23 | 244:4 |
| 60:20 61:23 | 153:16,23 | 244:10 | 135:7 | **griffin** |
| 63:17,23 | 155:19 | 245:20 | 136:14,16 | 21:8 |
| 65:6 66:17 | 156:22 | 246:15 | 137:3,17 | **gross** |
| 66:23 68:6 | 157:10,13 | 247:22 | 159:23 | 3:6 8:18,18 |
| 69:1,11 | 158:1,14 | 248:3,13,18 | 191:10 | 117:6 |
| 70:6 71:16 | 161:5 163:8 | 251:4,10 | 197:21 | **group** |
| 72:1 76:11 | 163:19 | 265:10 | 198:7 199:5 | 8:13 21:3 |
| 77:18 80:18 | 164:12,20 | 282:10 | 200:3,14 | 27:4,6,12 |
| 82:7,17 | 168:3 | 283:18 | 207:20 | 27:18,21 |
| 83:22 84:6 | 169:17 | 284:10,14 | 208:2 | 28:2,9,18 |
| 85:8,18 | 170:15 | 289:3 | 209:14,15 | 29:18 32:1 |

Elyse S. Bluth                                December 17, 2009

CONFIDENTIAL

35:11 36:7
36:9,22
37:1,10
44:21 45:2
45:19 47:14
47:16 48:5
55:12,13
58:9 59:7
71:7 73:17
77:9 132:20
134:23
138:16,23
138:24,24
145:9
157:19,24
177:21
188:13
263:10
267:3
280:21
growth
152:7,9,13
153:6,10
154:1,2,9
154:17
166:1,5,10
166:12,16
166:18
167:9,14,18
167:21
264:1,6,11
264:12,16
264:24
265:15,15
267:3,3
277:9,18
278:8,12,13
278:18
279:1,2,9
279:12,13
guess
8:5 99:12
224:9
235:22
262:24
269:14,20
guidant

21:8
guts
162:15
guys
11:13
_____

H
_____
hadnt
218:2,21
half
12:12 13:10
137:4
267:18
hall
73:12
hand
202:6 242:8
288:4
handle
105:7
handled
193:22
hands
171:3,11
172:5,8,10
173:7 223:7
247:1
handwriting
96:20
handwritten
96:17 100:9
103:10
113:6 252:6
happen
63:18 83:18
83:21 84:23
150:9
211:21
265:24
happened
27:15 29:23
31:20 32:3
67:21 83:20
83:20 84:3
181:18
211:15,22
266:6

21:8
guts
269:21,22
270:9
278:16
281:24
happens
84:4 85:1
211:17
239:20
happenstance
266:7
hard
134:4 241:9
265:10
hardtovalue
18:4
hartman
87:23
havent
15:23
head
28:18 59:6
heading
148:21 221:8
hear
38:23 126:3
heard
102:22
heavily
266:14
heavy
105:24
height
219:2
held
175:4 200:4
200:6
help
44:19 46:10
46:23
helpful
165:2
helping
43:1
hennigan
3:9 8:12,14
117:9

280:20
henry
98:1 247:5
hereof
221:21
heres
131:5 164:19
hereto
288:1
hereunto
288:3
hes
178:16
hesitate
165:18
hesitating
179:10
high
168:24 182:1
185:2,11,12
185:18,20
242:8
higher
90:7 234:4
243:16
261:3
275:18
278:13,21
279:13
highlighting
220:2
highly
16:4 143:8
182:18
184:9 214:6
263:10
hired
14:5
historical
167:3 262:22
263:3
historically
162:10
261:20
history
245:17

hold
16:24 29:13
130:15
253:11
274:24
280:21
holder
173:8
holders
196:23
holding
170:14
home
30:1
hon
21:8
hope
22:1
hot
251:12,13
hour
195:14
hours
181:4 199:19
275:3,6
house
204:14 206:2
hudson
21:4
hundred
171:3
hundreds
97:18
hypotheti...
284:3
_____

I
_____
id
32:21 289:8
290:3
idea
53:12 89:14
identical
178:6,7,12
identically
191:21

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

25

| | | | | |
|---|---|---|---|---|
| identific... | 251:20 | 112:17,18,24 | 83:4 | 163:21 |
| 15:12 32:18 | illinois | 133:13 | inclusive | 169:23 |
| 42:3 66:21 | 1:19,22 3:20 | important | 286:12 | 170:3 180:7 |
| 69:3 95:18 | 4:10 5:4 | 133:16 148:8 | income | 184:23 |
| 125:5 131:3 | 115:17 | 148:16 | 61:9 111:21 | 235:13 |
| 131:8 139:6 | 117:20 | 279:3 | 210:18 | 246:9 259:6 |
| 143:13 | 118:10 | imprecise | 212:6,10 | 291:13 |
| 177:5,10 | 119:4 287:1 | 169:20 | 234:19 | indicates |
| 188:4 | 287:6 288:4 | impression | 235:20 | 34:4 47:23 |
| 197:14 | 288:10 | 259:12 | 236:3 | 131:11 |
| 219:11 | im | inaccurate | 238:24 | 144:12 |
| 226:16 | 6:11 62:11 | 253:6 | 239:7 240:3 | 149:15 |
| 248:16 | 81:3 93:6 | inappropr... | 285:10 | 152:5 153:9 |
| 271:3 277:3 | 95:12 | 260:15 | incorporate | 168:20 |
| identified | 153:21 | include | 274:17 | 195:24 |
| 68:21 88:2 | 180:15 | 58:21 59:9 | incorporated | 206:13 |
| 110:11 | 206:11 | 59:12 91:6 | 147:22 261:1 | 207:3,9 |
| 158:3 | 220:16 | 134:14 | incorrect | 212:12 |
| 167:18 | 231:6 | 161:1 | 78:15 250:11 | 223:3 |
| 182:17,21 | 251:19 | 166:24 | increased | indirectly |
| 186:5 | 252:3 261:1 | 205:18 | 278:17 | 288:1 |
| 187:13 | 275:8,9 | 214:12 | incremental | individual |
| identifies | 280:21 | 236:17 | 270:6,9 | 7:19 26:19 |
| 167:9 | 281:2 | 240:22 | 281:9 282:6 | 71:23 256:7 |
| identify | immediate | 241:2 254:4 | incurred | individuals |
| 19:17 20:12 | 250:3 | 255:6,22,22 | 169:16 | 71:21 78:5 |
| 20:13,23 | implication | 261:5 284:7 | 232:24 | 78:11,16 |
| 42:12 71:13 | 185:18 | included | 233:1 | 87:11 88:1 |
| 139:13 | implications | 51:13 82:1 | 281:22 | 127:19 |
| 143:23 | 208:22 209:2 | 112:18 | 283:11 | 137:4 |
| 150:18 | implied | 193:3,5 | incurring | 141:17 |
| 177:18 | 154:21 155:3 | 230:18 | 105:5,8 | 150:22 |
| 178:1 | 202:11,16 | 236:13,23 | indemnifi... | 151:4,11 |
| 188:10 | 202:24 | 237:3,22 | 94:18,23 | industrial |
| 194:17 | 204:4,9,20 | 239:4 | independent | 250:12 |
| 197:20 | 204:21 | includes | 47:24 48:23 | industria... |
| 205:21 | 205:3,19,23 | 124:18 | 64:24 65:1 | 250:5 |
| 226:22 | 231:17,20 | 154:20 | 67:11 | industry |
| 248:21 | 231:24 | 286:15 | indicate | 158:8 166:22 |
| identifying | 235:24 | including | 180:5 251:6 | 266:10 |
| 68:15 | 236:5 | 17:14 52:23 | indicated | 274:12,12 |
| ill | 237:14 | 112:4 165:5 | 34:20 52:23 | infinite |
| 20:19 32:22 | 238:6 241:7 | 165:10 | 53:18 63:24 | 279:9 |
| 39:10 69:12 | 242:3,10 | 176:22 | 64:4 102:13 | inflationary |
| 131:10 | 243:8 | 221:15 | 137:19 | 264:11,12 |
| 178:4 | 282:14,17 | 222:3 263:5 | 141:11 | informal |
| 220:23 | importance | inclusion | 144:8 | 146:18 |

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

information
29:18 52:23
  59:23 64:21
  94:1,2
  128:12
  133:15,18
  133:19
  134:3,4,7
  134:12,18
  134:20
  136:3,7,7
  152:23
  159:20
  165:17
  179:17,19
  179:23
  180:12
  195:4
  201:18
  272:23
  285:12
informed
217:15
informing
213:5
inherent
186:17
inherently
187:6
initials
99:2
initiate
81:14,19
initiative
85:21
inland
21:8
input
151:10
inquiries
130:12
instance
  63:18 64:8
  239:24
  264:22
instances
  13:3,19

  110:4
instituti...
49:9
institutions
68:9
instruct
187:1,6
instructed
165:13
insurance
19:20
intend
79:1 131:15
intended
61:21 63:3
  111:16
  166:11
  190:19
  204:18
  223:1
  227:21
intending
225:13
intent
79:23 135:22
  137:20
  169:13
  170:11
interactive
173:12
interest
53:6 82:9
  157:4
  169:14
  170:22
  172:6
  196:22,22
  197:1,2
interested
216:24 288:1
interests
168:9
interfere
11:14
interim
25:17 283:2

internally
146:14
  276:16
interpret
126:18
interrupt
9:19
intertech
21:4
intertwined
150:21
inthemoney
229:22
intimately
20:2
investigated
58:10
investiga...
8:3 14:2,4,7
  14:16,24
  58:17 151:7
investment
130:3 168:21
  169:24
  172:15,20
  241:15
  242:4
  263:10
  269:6 270:6
  270:9
  281:10,13
  282:2,7
investments
48:5 168:7
  168:13
  173:11,12
  174:17
  176:22
investors
155:17 231:8
invited
70:19
involved
14:8 18:23
  19:19 20:3
  20:21,24
  21:15,18,19

21:19 24:9
  25:4 26:22
  37:10 40:7
  40:11 41:20
  44:21 58:20
  68:2 71:8
  72:3,5,8,11
  72:12,16,20
  73:10 80:1
  81:4 85:4,5
  88:16 93:16
  98:22 100:3
  102:5 112:8
  112:9
  124:14,16
  127:15
  128:11
  145:12
  158:15,17
  158:22
  159:12
  161:23
  167:13
  185:1
  193:10,15
  195:2 197:6
  207:23
  224:17
  228:18,24
  229:9
  243:12
  248:8
  255:14
  267:11,17
involvement
25:6,14
  26:20 32:1
  70:14,24
involving
99:18 100:17
  280:23
irs
109:18
isnt
174:2
issuance
67:23 92:20

92:20
issue
66:9 80:7,11
  82:16 83:10
  83:14 91:8
  91:17
  100:19,24
  101:21
  102:7,23
  103:5 105:9
  108:2,9
  111:8
  112:10
  114:4 122:5
  123:9,9
  135:9
  137:22
  138:18
  181:11
  182:10
  185:6 186:8
  186:19
  187:14
  191:3 199:3
  207:20
  210:7
  212:22
  213:22
  215:17
  216:2 248:4
  258:20
  279:18
issued
25:19 41:16
  50:24 62:19
  73:24 76:13
  81:16,21
  82:11 84:9
  84:17 85:16
  91:21 92:24
  102:15
  104:8 123:3
  124:14,22
  124:24
  139:1,2
  145:2 185:7
  217:2 225:9

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

27

```
   230:2,8          25:8,24          162:3 169:5     justified        14:12,15,20
   280:22           280:6            170:7           278:17           14:24 21:1
issues              jeff             172:21                           23:15 26:8
   8:9 78:14        142:20           175:16          _____     26:14,15,18
   100:9            jim              184:19                K           26:18 27:22
   106:24           8:11,14,20       195:7           karen            27:24 28:12
   107:6            280:19           196:10          87:22            33:23 34:7
   129:16           john             198:22          kasowitz         40:8,24
   137:18           29:11,11         205:7,10        2:16 9:1         41:15,19
   226:3,4          johnson          209:9           116:16           44:3 54:20
   255:20           21:8             210:23          252:4            60:2 61:24
issuing             johnston         213:18          kaye             76:22 80:9
   50:13 79:11      3:13 8:11,11     215:6 216:4     3:17 8:23        83:19 86:16
   91:11            9:18,23          217:10          117:17           88:3,7,18
   139:16           11:2,10          224:18          kazan            90:3,18
   187:18           24:11 35:6       230:14          130:14,17        97:1,12
   190:17           37:17 39:16      233:23          keep             98:16 101:9
   216:13,14        40:3,22          234:23          217:15           109:3 122:4
   216:17           46:12 49:18      242:17          kenney           123:11
item                50:18 51:22      244:6           43:13,17,21      126:5,7
   194:8            53:24 55:4       245:12          47:9 81:11       127:11,23
items               56:10 57:20      246:12          82:9,21         129:4
   150:5 157:6      61:13 63:10      250:22          126:2            130:18,19
   282:18           64:12 68:5       251:15,19       kept             132:21
iterations          69:9 75:18       260:11          69:21            133:4 134:1
   121:23           77:15 89:11      265:19          kind             134:24
iv                  99:21 101:6      275:19          87:12 90:11      136:20
   62:9             101:23           278:19          112:13           140:2,4,7
                    107:8            279:22          209:20           140:19
   _____     108:11           280:18,19       240:16           141:2
         J          109:1,12         284:1,12,19     243:24           142:13
james               111:9            285:15          258:1 261:9      143:20
   3:13,14 4:12     112:20           289:5           kinds            145:6
   117:13,14        113:21           joined          182:12           150:14,18
   118:12           117:13           17:12 44:19     255:20           150:22
   249:8            122:22           joint           kjc              152:20,21
janssen             123:24           267:24          1:6 115:6        153:1 154:5
   47:5 59:4,5      135:11           jones           286:6            157:16
   59:14,18         136:17           162:20          knew             160:13
   60:5,8 98:1      142:3            jpmorgan         70:2 127:19      161:16
   98:3 99:18       148:10           4:7 8:17         134:16           162:22
   100:3,18         149:23           118:7           161:2,2          165:11,20
   103:18           152:15           judgment        225:14,17        171:21
   107:16           153:13           160:18 161:1    225:18           176:19
   142:19           155:4            julie           268:2,4          179:16,21
   151:21           156:15           87:21 88:15     know             181:18
   221:1            158:5 159:3      246:6 249:8      6:18 7:20        183:1
january                                              10:4,23
```

184:22
192:22
193:19,21
194:7,13
195:1
196:17
210:8
211:23
212:1
214:23
215:2 216:1
217:3 218:5
218:7,13
220:3,9,12
224:4 231:6
234:7
239:16
244:3 245:8
246:24
247:7
249:23
250:1,12
256:12
257:10
259:15,18
264:8,18
265:9
266:13
268:8,24
269:3 272:3
276:22
278:24
280:4
284:16
**knowing**
158:22 279:4
**knowledge**
25:2 27:8,14
28:3 96:11
120:13
200:21
223:10
227:14
263:17
**knowledge...**
107:5
**known**

28:16 141:23
158:9
253:21
255:10
**knows**
28:16
**korpus**
2:20 9:1,1
116:20
251:13,17
251:22
252:2,3
253:14
258:6
260:20
262:13,16
263:20,23
265:5
266:23
270:23
271:5,10,12
271:20,24
273:8
275:11,14
275:21
276:21
277:5,16,22
278:23
279:23
280:15
281:1,6
289:4

———— **L** ————

**labeled**
144:24
227:16
**labor**
12:6 14:2,5
**lack**
99:10 112:5
176:7
201:15
**laid**
160:15
**language**
82:24 83:5

86:7 100:11
**large**
64:17 89:9
89:17,18
90:12,15,16
266:18
**largely**
211:5
**largest**
89:21 90:18
91:2
**larson**
27:23 28:5
29:15,17
30:6,10,19
30:20 31:18
31:21 32:4
36:16,21
37:3,8
45:19 58:14
**lasted**
181:3 199:18
**late**
17:17 68:16
182:15
230:8
270:23
**latest**
132:19
155:11
228:3
**law**
2:22 9:2
23:17 98:8
107:19
116:22
252:4
254:13
**lay**
53:16
**lbo**
8:2
**lbos**
207:11,15
208:5 210:3
**lcc**
270:6

**lead**
234:15
**leader**
28:24 29:3
**leading**
214:23
**learn**
34:12 57:17
58:7,17
**learned**
35:10,13
45:16 53:8
54:24 57:14
57:24 58:3
58:4,5,8
59:21,22
60:5,8
**learning**
53:18 59:17
253:19
257:17
**leave**
30:10 238:11
**led**
68:3 185:5
206:13
207:4
**lee**
21:10
**left**
63:8 165:4
195:23
230:12
246:21
**lefthand**
99:1,2
**legal**
80:10 183:5
190:7,7,9
**lehman**
276:1,4,6,9
276:10
**lenders**
3:16 8:13
117:16
**length**

62:7 151:13
242:20
257:10
**lengthy**
201:16
**letter**
33:8 34:2,15
35:15 37:14
39:14 40:20
41:12,17
42:13,20
43:1,8
44:14 47:19
47:22 48:17
51:8,10,14
53:1 56:17
57:2,7,8,9
57:19 60:9
64:20 65:11
65:15 67:9
67:23 69:5
69:7,8,14
69:15,19
78:20 79:6
79:23 81:11
82:1 85:17
86:10 89:2
92:18,24
93:3,8,14
93:15,17,22
95:4 102:12
102:18
121:15,17
121:24
122:19
123:4
135:16
218:15,19
218:21
219:3,5,6
219:20,23
220:4,9,12
220:17,21
221:4
222:12
225:12,22
226:3,5

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

248:9
249:19
250:18
**letters**
57:4 138:7
218:9
**level**
46:21 170:24
183:10
184:15,16
207:11
208:4,22
209:7 212:2
284:7,8
**levels**
185:20 261:3
**leverage**
182:1,2,22
183:22
184:16
185:2,10,12
185:18,24
207:12,23
208:4,16
259:22
**leveraged**
182:18 184:9
240:1
**lexington**
4:3 118:3
**liabilities**
192:16
212:16
222:3,4,8
**license**
5:24 119:24
**life**
252:8 253:24
**lifehouse**
19:21
**light**
21:6 54:14
140:6,9,10
141:5
**likelihood**
140:16
**limitation**

221:15
**limited**
87:13 260:3
**limits**
109:17 261:2
**line**
28:24 29:2
100:12
113:5
192:18
194:8
254:22
255:1
275:15
281:14
291:17,20
292:3,6,9
292:12,15
292:18
**lines**
21:5 103:9
252:9,11
**list**
19:5,13
20:16
141:20
142:13
168:6
199:23
265:16
**listed**
18:23 97:22
98:13 155:9
166:15
173:12
174:4
**lists**
18:16 155:7
**litigation**
7:12 8:8
12:21
**little**
15:7 16:9
53:22 63:21
74:14 138:3
246:18
253:15

262:5,5
265:7 272:2
**llc**
3:17 117:17
**llp**
2:2,8,16 3:2
3:9 4:2,8
4:14 5:2
116:2,8,16
117:2,9
118:2,8,14
119:2
**load**
105:24
185:19,20
186:12
**loan**
51:2 241:18
**located**
193:17
**locations**
266:14
**logic**
173:16
**long**
12:17 52:15
57:4 68:23
131:14
165:19
199:17
211:16
217:1
225:13
282:24
**longer**
211:18
**longterm**
152:9,13
153:6
166:12
**look**
15:15 29:18
32:21 37:13
42:6,10,19
66:24 67:4
67:15,18
93:6 95:21

96:2 113:4
122:15
132:7
139:11
143:21
148:20
151:21
154:19
162:15,19
164:10
180:4 192:6
197:17
199:21,22
202:9
209:18
214:3
220:23
228:17,18
229:19
234:15
241:11
254:10
259:14
261:9
265:15
266:3
274:22
277:9 278:7
281:7 285:4
**looked**
15:23 51:10
78:12,13
102:13
121:24
143:22
178:22
186:11
205:18
206:9 229:7
268:17
269:9
274:13
280:3,3,4,9
**looking**
16:3,7 19:16
28:9 35:11
38:8 39:4

52:10 60:9
78:6,19
84:7 89:1
97:7 105:5
107:17
123:14
132:10,23
153:8
154:17
158:21
160:2
165:23
166:21,21
167:5
170:13
191:15,24
195:21
206:6
209:23
226:19
229:11
231:15
232:10
241:8,12
244:1
247:14
260:24
261:19,24
262:1,14
276:16
279:16
**looks**
15:24 151:13
186:16
206:2
248:23
271:16,22
276:22
**loosely**
190:19
**los**
3:11 117:11
**lost**
204:5
**lot**
17:18 64:16
151:10

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 162:6,6,12 | 150:8 152:7 | 274:8 | 178:8 188:3 | 16:11 150:3 |
| 164:6 208:7 | 152:14 | 275:17 | 197:13 | 162:22 |
| 208:10,18 | 166:23 | 276:2 | 219:10 | 165:10 |
| 227:5,24 | 196:5 | 278:14,16 | 226:15 | 214:6 229:3 |
| 230:17 | 259:22 | 278:22 | 227:11 | **materials** |
| 243:23 | 273:18 | 279:14,21 | 248:15 | 7:24 15:17 |
| **lots** | 274:10,16 | 280:10 | 270:24 | 45:11,13 |
| 165:9 217:14 | 275:17 | **marchetti** | 271:2,6 | 139:15 |
| 274:15 | 276:7,15 | 86:11,12,13 | 277:2 289:8 | 141:13 |
| **low** | **managements** | 86:14,15 | 290:3 | 142:24 |
| 168:24 | 149:17 | 87:1 88:12 | **market** | 143:3,3,5 |
| 241:11,12 | **managing** | 93:8 99:8 | 40:15,21 | 145:14 |
| 242:15 | 28:23 34:5 | 125:24 | 41:3 61:7 | 181:2,4 |
| **lower** | 273:23 | 127:8 246:5 | 61:18,24 | 201:3,6 |
| 261:1,2 | **manifest** | 247:3 249:7 | 157:8 174:3 | 284:21,22 |
| **ltm** | 208:9 | **marchettis** | 201:15,18 | **math** |
| 155:10 | **marc** | 88:19 | 201:22 | 171:7 237:5 |
| 162:18 | 2:12 9:5 | **marginal** | 203:16,22 | 284:4 |
| **lunch** | 116:12 | 283:21 | 204:2,9,12 | **mathematical** |
| 44:19 47:3 | 195:17 | **marilyn** | 204:13,14 | 160:24 |
| 70:20 | **march** | 86:11 87:1 | 204:14,15 | **matter** |
| **lynch** | 67:15,22 | 125:23 | 204:15,18 | 9:10 12:3 |
| 3:23 8:24 | 68:17 69:7 | 127:8 246:5 | 204:23 | 13:15 14:1 |
| 117:23 | 69:14 78:19 | 249:7 | 206:5 222:1 | 14:22 97:19 |
| **lynn** | 81:12 89:1 | **marion** | 222:6,14,19 | 212:13 |
| 4:6 8:16 | 92:18 95:4 | 21:9 | 223:4,14,24 | 291:11 |
| 118:6 | 96:22 97:15 | **mark** | 224:2,13 | **mattered** |
| | 98:21 99:17 | 15:9 32:14 | 229:14 | 111:2 |
| **M** | 100:17 | 41:22 66:17 | 230:12 | **matters** |
| **madison** | 102:12 | 95:15 125:1 | 231:1,7 | 12:3,7 13:18 |
| 3:19 117:19 | 103:14 | 130:22,22 | 259:24 | 14:13 18:6 |
| **mail** | 126:10 | 139:3 143:9 | 275:16,18 | 73:16 88:16 |
| 253:9 | 127:21 | 177:2,7 | **marketabi...** | 287:11 |
| **maintain** | 132:14 | 188:1 | 173:22 174:1 | **mcclatchy** |
| 7:23 110:2,8 | 144:5 163:6 | 197:11 | 174:16 | 162:22 |
| **major** | 176:20,21 | 219:8 | 176:7 | **mcdermott** |
| 20:14,20,21 | 178:21 | 226:13 | **marketable** | 125:18 |
| 20:24 | 182:15 | 248:13 | 176:1,3,4 | **mean** |
| 229:16 | 198:8 200:4 | 276:21 | **markets** | 29:2 30:4 |
| **majority** | 200:10 | **marked** | 155:8 202:4 | 44:5 62:5,6 |
| 173:3 | 218:8 | 15:11 32:17 | 266:15,15 | 62:15 73:22 |
| **making** | 225:16 | 42:2 66:20 | 266:17 | 85:19 90:15 |
| 64:5 126:11 | 229:7 | 95:17 125:4 | **marking** | 91:14 92:4 |
| 199:14 | 252:14 | 131:2,7 | 131:23 | 92:5,6 |
| 210:6 222:9 | 257:6,7 | 139:5 | **match** | 102:24 |
| **management** | 258:19 | 143:12 | 238:13 | 104:6 105:1 |
| 44:2 74:23 | 261:14 | 177:4,9 | **material** | 113:18 |

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

```
120:20
158:23
163:2
182:12
186:7
187:15
203:3 209:2
232:8 234:7
249:1 262:5
271:18
279:10
280:2
284:21
meaning
63:3 105:20
  106:7,14,15
  122:10
  134:24
  138:24
  216:19
meanings
258:2
means
48:18 61:12
  61:16 79:8
  162:16
  191:12
  223:4 275:5
  279:10
meant
270:15
measure
203:13
  231:11
media
162:24
  265:24
median
163:3 265:12
  265:18,23
  266:2,6
medians
266:3
meet
73:17 122:16
  186:12,18
  200:19
```

```
273:21
meeting
43:22 44:9
  44:13,17,18
  45:7,10,14
  46:3,9 47:3
  47:18 70:8
  70:19 97:8
  97:15 99:17
  100:17
  126:7 127:8
  128:24,24
  129:2,3
  146:16
  161:11
  183:3,6
  189:18,19
  189:20
  197:22
  198:8,11
  199:18
  200:1,4,5
  200:23
  201:4
  207:20
  208:9 209:4
  210:9,20
  211:15
  213:10,12
  215:4 217:8
  218:3,8,12
  244:19
  246:11,19
  246:22,24
  247:2,9
  255:12
  257:18
  259:9
meetings
97:19 100:1
  101:1
  106:23
  126:14
  127:15,15
  146:13
  161:16
  257:6
```

```
member
142:16,17,18
  183:18
members
44:1 74:23
  139:19,21
  142:13,21
  143:4,5
  144:19
  208:3
  213:14
  243:4 255:9
  274:9
memo
139:14 141:8
  141:12,17
  142:9
memorialized
7:1
mentioned
12:1 21:17
  73:3 132:19
  134:22
  150:23
  151:4
  152:24
  258:1
  274:23
  275:16
merger
232:20 233:2
  282:21
  283:9,10
merrell
21:9
merrill
3:23 8:24
  117:23
merten
125:18,19,22
  126:8 128:2
  128:7
message
30:22 253:9
met
44:1,2
  200:22
```

```
274:10
methodolo...
147:13
metrics
158:11
michael
259:21
michigan
21:9
mickey
99:13,14
microsoft
130:3
middle
39:6 100:7
  128:8 160:7
  168:13
  206:12
  212:20
midnight
165:5
miles
4:18 8:22,22
  118:18
miller
2:13 9:3,3
  116:13
million
89:4,8 90:10
  233:10,16
  233:20
  234:5,6
  235:14
  236:16
  237:3,7,18
  237:24
  238:2,11,12
  238:13
  239:3 240:6
  241:20
  270:7 281:9
  281:21,22
  282:4,4
milliondo...
90:9
mind
35:18 53:20
```

```
55:1 56:7
165:21
  273:13
mine
248:24
minor
259:9
minority
157:4 170:16
  170:19,21
  170:24
  171:13,15
  171:18,22
  172:2,6,18
  173:14
  175:22
minus
157:2 202:19
minuses
266:4
minute
137:19
  218:22,24
  219:4
minutes
197:22
  246:21
  251:16
  257:7,7
  258:20
  275:4,5,7
mischarac...
246:16
mischarac...
46:18 60:16
  64:12
  122:24
  213:20
  224:20
  246:12
mischarac...
193:23
miscione
29:11
missed
20:9
missing
```

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

16:11
misstate
34:21 55:6
misstates
55:4 223:19
265:19
misunders...
46:8
mm
99:5
model
129:20,20
131:12,14
132:19
models
134:15
moment
154:7 165:23
moments
53:4
money
270:10 283:2
283:4
monsanto
21:10
montesano
87:22 88:15
249:8
months
155:11 165:7
moot
211:5
morning
9:8 216:6
228:10,11
mouse
99:13,14
move
49:10,11
multipage
32:24 42:8
67:2 143:18
188:9
multiple
53:13 160:8
160:14

161:12,18
163:11
237:6,23
265:13,13
265:24
266:1,5
267:4,8,17
268:3
multiples
147:14
154:22
155:3,7,16
155:22
160:4
170:23
175:20
237:3,9,17
265:8 266:9
266:20
multiplied
202:18
mwe
125:15
myers
3:2 8:18
117:2

———————
N
nalco
21:10
name
6:10,15 7:5
8:11 24:24
72:7 86:12
88:7 94:6
97:5 98:13
252:3
267:18
291:13
names
68:8,11
87:24 97:21
97:24
national
3:18 21:9
117:18
nature

12:2 13:24
24:18 25:6
31:14
120:17,19
129:10
182:4 221:8
naught
285:19
near
265:16
necessarily
113:2 134:19
necessary
91:24 93:4
110:6
need
10:22 11:7
22:17 23:9
23:12,15,15
23:22 35:12
50:14,17
52:14 66:5
66:13,14
79:13 92:7
100:13
103:11
104:6 111:2
111:19
129:17
153:18
156:2 172:1
225:11,18
225:21
226:9,10
239:1 258:4
needed
79:15 91:16
104:2,19
120:9
122:12
142:8 149:6
needing
103:15
needs
269:5
negative
241:20,23

242:7,14
243:15
244:23
245:4,9
276:2,5
negotiated
217:23
negotiating
50:13
neither
223:8
net
192:16
231:13
233:7
235:14
239:8
241:16,17
269:18
network
130:1,4
169:22
170:14
172:18,20
174:21,24
175:3,14
204:16
never
36:8,24
55:11,12
64:18,18
76:13,14
96:10 114:3
114:4
135:22
137:20
225:11
227:22
268:4
273:21
new
2:10,10,18
2:18,21 3:4
3:4 4:4,4
48:17 49:1
116:10,10
116:18,18

116:21
117:4,4
118:4,4
129:20,20
162:24
202:3
232:24
283:6,21
news
165:14
newspaper
163:5 266:10
274:14
newspapers
176:4 266:14
night
127:9 228:9
253:10
nils
27:23 45:19
noah
27:1 28:15
noncash
237:10 240:4
nonerisa
18:6
nonoperating
157:6
nonstop
165:8
nonsub
240:12
nope
152:3
normal
264:14,17,19
normally
164:19
north
21:13
nos
10:11 143:13
188:4
289:18,21
notary
1:18 286:24

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

33

287:5
288:10
**note**
32:23 42:7
67:1 268:22
268:24
269:4,13,16
269:17
270:3 281:8
282:2
**noted**
201:13 210:3
259:21
281:9
285:18
**notes**
96:17 97:8
97:11,11
107:19
109:4 113:6
151:23
205:1 252:6
255:13,16
269:6,15
**noticed**
224:7
**notwithst...**
78:24
**number**
15:21 18:16
33:1 34:1
39:5 71:8
93:7 95:23
125:9
129:21
132:5,6
143:17,19
144:2
156:14,18
156:20,23
156:24
157:4
177:14
178:6 188:8
194:20
203:15
204:10

219:14
226:20
229:22
233:19,20
237:6
241:18
242:6,9
243:15,16
245:4,9
246:2
248:19
281:23
**numbers**
156:4 162:14
169:1,4,9
179:14,21
192:8 206:8
236:14
266:21
271:9
279:14
282:16
284:17
**numerous**
24:6 44:1
71:5 98:21
127:22
129:16,24
146:11,11
235:8
**nw**
2:3 116:3

_____
O
_____

**oath**
286:13
**object**
11:12 14:12
21:22 22:15
23:3 25:9
34:16 35:6
35:8,22
38:16 40:5
46:17 50:20
52:4 60:15
63:10,19
64:14 68:18

69:9,24
75:20 76:6
83:8 85:12
89:12 99:21
99:22
100:21
105:11,12
108:13
109:13
110:16,17
111:11
113:22
135:2
157:20
158:5 159:3
160:21
162:3 164:1
167:23
184:5
190:13
191:5 195:7
198:22
200:7
205:11
208:24
209:11
213:17,19
214:18
215:6,8
216:4
217:10
220:7
222:20,22
223:21
224:20
234:1
241:24
247:10
257:21
270:22
273:5
**objection**
11:5,6,8
24:11 37:17
39:16,16
40:3,22,23
46:12 49:18

50:18 51:22
53:24 54:3
55:4 56:10
56:11 57:20
61:13 64:12
68:5 69:10
75:18 77:15
82:12 86:3
89:11,23
92:22 97:9
99:9 100:22
101:6,23
107:8
108:11
109:1,12
111:9 112:5
112:20,21
113:21
120:24
122:22
123:24
124:2,11
126:20
135:11,13
136:17
140:13
142:3,5
147:4
148:10
149:23
151:17
152:15,16
153:13,14
155:4
156:15
163:12
169:5,6
170:7
172:21
175:5,16,17
181:8
184:19
194:10
196:10
203:17
205:7,10
209:9

210:23
213:18
223:19
224:18
230:14
233:23
234:22,23
242:17
244:6
245:12,14
246:12,14
250:22
253:3
260:11
265:2,19
275:19
278:19
279:22
283:18
284:10,14
**objections**
9:21 11:4,19
11:21 39:18
**objectively**
206:6
**obligations**
14:18 122:16
**obrien**
29:11
**obtained**
134:3
**obviously**
180:15
285:11
**occur**
9:17 32:10
48:22 92:15
123:7 150:6
151:12
182:13,14
183:9
**occurred**
12:13,15
48:21 69:4
78:3 90:3
123:8
182:15

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

34

```
    183:8 212:2      262:21,21       52:3 55:17      138:19          105:15,16
occurs               270:1           56:16 60:13     139:2,16        105:19
49:3 75:23           277:15,21       61:3,3,17       141:13          120:9,14,17
    76:2             278:11          61:21 62:10     159:9,16,16     120:20,21
offer                280:19          63:16 64:9      181:12          121:3,10,13
206:4                282:9           65:4,19,22      186:9,20        123:2,3,22
office           omelveny            66:1,5,14       190:18          124:8,9,18
35:13 73:12      3:2 8:18            72:23 74:17     212:13,22       124:19
    146:17           117:2           76:14,15,17     213:1,6,23      137:22
    165:5 246:7  once                77:1,2,5,6      214:16          139:1
    288:4        23:17 36:1          78:3,5,12       215:5,17,21     148:17
officer              53:8 83:13      78:14,17        216:2,9,14      182:4,6,11
43:16                83:15,16        79:2,4,6,14     216:17,20       185:6 186:7
offices              84:4,8,10       79:15,18        216:21          186:10
194:2 246:8          85:2 101:9      80:6 81:5,6     217:2           187:14,17
oh                   158:7 226:7     81:16,21        218:19          187:18,21
154:4 180:3          268:2           82:10 83:3      219:7,22        187:21
    255:1 268:5  onepage             83:6,14         220:11          199:4
okay             143:16              84:9,16,22      221:11,11       213:23
8:5 10:24            177:14          84:24 85:16     223:5,6         214:1
    11:2,23,24       188:7           85:23 91:7      224:24          216:20
    16:10 19:22  ones                91:9,11,16      225:7,8,11      223:24
    20:19 21:2   20:21,23            91:17,18,20     225:15,21       226:6
    22:20,24         62:19 107:5     92:8,21         226:2,11        249:19
    23:8 32:6    onetime             93:4 94:9       248:5,9         250:17,21
    36:15 37:2   157:6               100:20          254:5,15,18     251:2,7
    46:7 56:4    ongoing             101:22          254:21          256:19
    57:8,11,17   25:15 270:18        102:4,8,14      255:21          263:9
    58:7 60:21   open                102:24          256:8,14        273:18
    71:3 83:17   114:5 256:2         103:5,15,24     257:1,1,3    opportuni...
    95:11,13         256:5           104:3,4,5,7     258:5,11       260:2
    96:15 100:6  operate             104:8,15,17     261:4         opposed
    100:12       259:23              104:20,23       270:19        41:2 230:12
    112:15       operating           105:10,17       278:17           280:10
    121:6,7,18   260:7 261:20        105:20       opinions         options
    122:4        operations          106:2,6,19    17:16 18:8      229:23
    131:17,22    149:6 176:16        108:8            23:2 37:23    order
    164:14,16    opining             112:10,15        50:14,16,24   7:2 129:18
    178:9,19     186:23              113:6,11         51:1,6 52:7      150:5 160:5
    197:10       opinion             114:2            59:7,9,10        170:24
    207:9        18:5,10             121:20           59:12 61:20      203:10
    222:17           21:23 22:6      122:1,3,6        62:19 64:22   organizat...
    227:4            22:21 23:22     122:10,21        65:1 66:9,9   59:15
    239:17           25:20 33:9      123:9,10,13      70:4 73:24    original
    253:15           34:14 35:5      124:13,15        74:16 79:11   21:5 291:15
    255:15           35:14 41:16     124:21,24        100:10        originally
    256:13           43:23,24        135:17           104:9,10,12   135:15 159:8
```

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

outcome
288:2
outer
265:1
outline
9:14
outlined
121:14 123:4
261:7
outlines
272:7
outlook
105:3
outs
62:18
outset
28:21
outside
7:12 8:7
159:20
outstanding
156:24
202:18
overall
262:6
overseeing
73:9
overstating
53:11
owned
111:1 170:9
171:15,17
171:19
173:1,1
174:6,7
175:7
272:21
owner
110:13 171:3
171:4,11
173:3,19
owners
172:5,10
ownership
16:20 48:2
110:12

170:19,21
171:22
172:18,24
173:14
owns
110:4 240:17
_____
P
_____
page
15:20 18:16
18:20,24
19:16 39:4
39:6 42:19
52:10 60:10
89:1 93:6
95:23 96:23
98:14 100:6
100:7,7
113:4
131:16
141:9,10
148:20
152:4,4
153:8,9,16
154:19,20
160:2,3,4
162:15
165:23
167:5 168:4
168:5,6
176:11,12
176:12,13
179:6,8,22
191:15,16
192:3,6,9,9
192:10,11
192:18,19
195:22
199:21,22
201:12
202:9
206:11,12
207:9
212:11
220:23
221:7
222:14

225:8
228:17
229:11,12
231:15,16
232:2,3
236:2 238:1
238:4,5
240:24
241:1,2,8
242:13
243:9,21
244:1 249:4
252:7
254:11,12
254:23
257:13
259:14,20
259:21
261:19
262:1,10,12
265:8,9
266:22
268:17,17
269:13
270:3
276:24
277:11,12
277:17
278:5,8
281:7,12
282:5,12
285:3 287:3
291:17,20
292:3,6,9
292:12,15
292:18
pages
19:5 131:19
160:16
163:18
281:11,18
282:11
286:11
paid
23:23 51:3
61:5,17
91:16 149:7

193:9
196:21
202:6 203:1
203:11
225:4 236:8
237:19
paper
166:9,10
paragraph
37:22 38:6,9
47:22 51:8
52:11 60:11
60:21 62:5
65:17,20
69:17 78:20
78:22 80:2
80:7 89:2
91:5 93:21
93:22,24
94:4,8,11
94:13,15,17
94:20
199:23
201:13
202:10
206:17
210:2
212:11,20
212:20
222:15
257:12
paragraphs
207:3
park
9:5
parke
2:8 9:4
116:8
part
22:9 44:18
64:17 71:6
72:22 77:2
77:19
102:17
108:1 113:9
127:16
137:12,16

148:17
151:8 153:3
159:22,24
163:14,18
168:7 174:7
174:18
179:11
184:3
186:15
187:19
189:21
193:15
205:4,13,22
205:22
218:3,14,16
220:11
224:4 245:1
250:10
254:5 259:3
267:11
268:7
273:14
285:11
participants
17:3 74:2
participate
46:2 70:14
74:4 146:22
183:21
189:16
208:11
participated
107:15
146:23
183:14
189:19
246:10
participates
74:15
participa...
100:16
106:23
107:2
189:23
participa...
48:5
particular

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

36

| | | | | |
|---|---|---|---|---|
| 7:15 16:10 | 191:18 | **pending** | 152:9,13 | 25:12 |
| 22:22 28:13 | 193:24 | 10:19 | 153:6,10 | **peripherally** |
| 63:3 64:9 | 198:14 | **pension** | 154:12 | 72:11 |
| 78:13 96:8 | **party** | 17:2,19,20 | 166:15 | **permissible** |
| 105:20 | 7:9 8:1,1 | 109:17 | 167:10 | 80:5 |
| 106:6 107:7 | 13:5 32:7 | **pentair** | 168:21 | **permits** |
| 113:19 | 37:10 49:1 | 21:10 | 169:23 | 7:16 |
| 130:10 | 49:12 50:8 | **people** | 171:18,20 | **permitted** |
| 133:19,21 | 93:13,14 | 29:6,10 47:8 | 173:1 175:8 | 16:24 |
| 136:22 | 98:10 | 47:11 58:20 | 196:2,7 | **perpetuity** |
| 141:17 | 101:21 | 71:3,5,8 | 204:16 | 166:17 |
| 142:12 | **passage** | 72:5 73:3 | 207:14,16 | **pershare** |
| 145:17,20 | 48:18 79:20 | 73:15 74:8 | 264:1 | 229:14 |
| 164:18 | 81:24 | 74:19 75:7 | 277:18,24 | **person** |
| 179:15 | **passed** | 76:3 77:10 | 278:5,8,9 | 59:3 72:6,13 |
| 187:20,22 | 177:13 | 80:21 87:4 | **percentage** | 74:7 86:24 |
| 200:5 | **paul** | 87:7 88:11 | 130:1,2 | 87:2 112:12 |
| 217:17 | 21:12 | 97:16,16 | **percipient** | 130:10 |
| 234:20 | **pay** | 107:5,11 | 41:6 | 151:14 |
| 242:14 | 17:2 89:3 | 127:12,23 | **perform** | 157:22 |
| 243:6,21 | 94:12 | 128:17 | 49:17 | 159:14 |
| 251:5 256:7 | 109:24 | 129:11 | **performance** | 267:24 |
| 259:12 | 110:7 | 136:9 137:5 | 149:2 154:21 | **personal** |
| 282:12 | 148:16 | 137:6,7,13 | 167:1,2,3 | 10:22 287:14 |
| **particularly** | 171:4 172:9 | 137:14,15 | **performed** | **personally** |
| 16:4 103:6 | 173:19 | 141:20 | 58:1 77:13 | 18:22 19:9 |
| 133:8 253:7 | 211:4,19 | 142:2,7,8,9 | 149:13 | 19:19 20:15 |
| **parties** | 212:9 214:2 | 142:12 | 274:3 | 20:21 23:7 |
| 6:23 7:22,24 | 231:4 | 144:2 145:9 | **performing** | 26:5,21 |
| 13:20 79:1 | 235:19 | 145:12 | 150:12 151:2 | 56:7 70:22 |
| 124:16,22 | 238:13,24 | 146:11,17 | **period** | 70:24 72:20 |
| 124:23 | 283:14 | 151:19 | 66:3,12 | 85:3 90:13 |
| 175:7 258:3 | **paying** | 152:24 | 68:23 73:6 | 90:17 130:8 |
| 287:24 | 111:21 171:6 | 153:5 171:1 | 75:4 88:13 | 228:24 |
| **partner** | 193:1 | 177:22 | 103:14 | 229:3 |
| 173:1 | 210:16,17 | 188:13 | 126:10 | 248:11 |
| **partnership** | 231:8 | 193:24 | 127:21 | **personnel** |
| 174:22 175:1 | 233:16 | 194:4,12,16 | 128:2 | 74:9 |
| **parts** | 285:9 | 194:24 | 129:12 | **persons** |
| 41:9 77:5,20 | **payment** | 256:10 | 149:3 | 72:7 |
| 93:15 106:1 | 91:6 | 267:19 | 153:11 | **perspective** |
| 106:21 | **peer** | **peoples** | 154:3 165:7 | 122:18 |
| 112:1 | 267:3 | 20:1 123:4 | 165:19,19 | **pertaining** |
| 150:20 | **peers** | 146:17 | 166:13,17 | 1:16 |
| 181:13 | 59:16 266:16 | **percent** | 167:11 | **pflatzgraff** |
| 182:10 | **pegging** | 110:5,12,13 | 264:18 | 20:5,9 |
| 187:14,20 | 170:23 | 111:1,18 | **periods** | |

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

**phelps**
5:7 7:7,9,16
12:14,16,17
15:18,24
17:4,12
18:18 19:14
23:5 24:20
25:23 26:7
28:16 29:5
29:19 33:10
34:2,5
35:20 37:23
41:15,18
42:14 44:6
47:5,6,7,24
50:7 54:17
56:7 57:12
57:15 58:10
59:15,18
60:12,23
61:2 63:9
63:13 64:8
65:18 67:10
67:19 71:4
73:18 74:9
76:9,13,21
79:3 80:5
83:13 85:5
85:23 89:3
89:9,18,22
90:7,16,19
91:3,9
97:17
101:15,21
102:5,6
103:4,6
107:11,13
120:12
121:4,10,14
121:19
122:5
123:14
124:9,14
128:19
140:11
144:19
145:18

146:13
148:17
149:20
150:14
151:15
152:12,20
152:23
153:5,12
156:13
158:7,20
159:1,21
161:7,8
166:15
167:20
176:17
180:2,6
181:11
185:16
186:7,14,23
187:13
188:13,21
194:7 199:3
199:9 201:3
202:11
205:6 213:6
213:22
215:15
221:1
245:24
248:4
249:18
250:16
251:7
255:17
256:1,11,15
256:17
258:16
260:8 263:5
263:8,24
267:8,19
271:23
274:9 277:6
**phil**
72:18 140:5
194:22
**phone**
97:12,14,19

101:2
129:17
253:24
**phones**
229:18 230:1
230:2,11,13
230:18
231:1,10
**phrase**
38:23
**pick**
267:8
**picked**
247:19
253:10
268:3
**picture**
157:7 192:1
193:6 280:1
280:7
**piece**
59:23 71:21
77:4 166:9
166:10
175:24
193:6 204:5
205:5,23
279:3
**pieces**
65:19 75:14
75:14 77:13
77:17 78:12
133:17
151:5 174:6
176:9,14
**pile**
252:6
**place**
7:15 31:17
74:4 155:23
160:5
286:11
287:18
**placed**
129:18
**plan**
16:20,23

38:24 48:3
109:17
126:4
**planning**
111:14
**plans**
17:19,20
18:3 19:9
24:2,4,5,5
**plaza**
2:9 3:18
116:9
117:18
**please**
6:2,15 7:5
10:4,23
15:9 16:22
19:17,24
32:14 34:18
34:20 37:13
37:20 38:4
41:22 42:12
46:8 61:11
66:18 67:8
78:1 83:23
84:20 95:15
95:21 100:7
114:7 124:4
125:1 126:5
132:11,21
139:13
143:21,24
146:2,4
154:20
165:24
166:5 167:6
168:5,5
177:2,19
179:7 188:1
195:20
197:11,17
199:23
201:12
202:10
206:12
219:8
226:13,19

226:23
228:16
229:12
231:15
240:24
247:16,23
252:5 254:8
268:16
277:12
**plus**
157:2,8
192:14,15
202:19
233:7 242:4
242:4
**pluses**
266:3
**point**
22:22 26:15
36:15 37:9
38:4,14,18
41:13 44:22
46:6 48:24
49:14 50:1
55:21 56:5
62:14,16
81:12 96:7
101:12,16
102:10
104:1,13
111:15
121:18
127:3
128:23
133:9
135:10
140:22
144:22
165:12
170:11
185:4
190:17
199:1
200:11
211:5
214:14
216:1 217:4

Elyse S. Bluth                    December 17, 2009
CONFIDENTIAL

221:5 236:5
244:17
252:13
254:8 269:4
275:3
**polk**
4:2 8:16
118:2
**pollack**
72:18 140:5
150:24
194:21
**portion**
110:1 149:11
165:22
167:6
168:10
225:6
**posed**
11:19
**position**
28:21 29:13
59:5 88:20
130:15
256:22
**positions**
142:23
**positive**
264:6,15,24
**possess**
210:4
**possessed**
207:15
**possibility**
93:3 211:9
215:11
**possible**
27:17 28:13
31:24 42:15
48:2 122:20
126:6
134:18
209:22
260:1
**post**
163:1
**posted**

165:15
**postsigning**
227:23
**posttrans...**
104:23
210:16,19
212:13
232:4
234:21
236:19
**potential**
8:3 31:14
32:2 36:2
36:21 38:24
48:20 56:16
56:19,19,21
56:22 67:12
68:1,9,16
68:21 69:3
70:4,20
92:20 93:1
171:4
**potentially**
36:13 102:7
**practice**
29:1 89:18
90:12
105:14
106:22
**precise**
63:21
**precision**
46:21
**predate**
44:13
**prefer**
249:18
250:16,20
**preferred**
157:4 251:7
**preliminary**
134:15
178:21
188:14,20
189:17
200:24
212:12

227:11
281:5
**premium**
171:7,12
172:9
173:10,19
201:15,16
201:22
202:5 260:9
263:6,11
**premiums**
261:6
**preparation**
139:16 195:3
220:12
229:1 248:8
**prepare**
245:24 272:6
**prepared**
78:4 144:18
272:24
273:11
**preparing**
145:7,10
198:1,2
**prescribed**
109:17
**present**
2:1 3:1 4:1
5:1 54:13
116:1 117:1
118:1 119:1
121:8,15
161:13
192:13,14
192:23
193:7,11
195:24
196:3,19
197:8
199:24
233:7
235:14
236:17
239:8 240:8
241:16,17
245:5

**presentation**
126:11 127:4
131:13,20
132:2,18,24
133:10,14
133:17,20
159:19
164:22
181:1
199:13,15
217:8
230:10
261:13,18
272:3
277:17
281:7
**presentat...**
100:2,3
127:18,24
133:12
159:22
165:15
**presented**
39:14 78:5
129:19
229:11
230:20
242:13,16
243:17
256:6
284:23
**presenting**
159:24
230:10
**preserved**
11:5
**preserving**
11:20
**president**
243:10
**press**
249:16 251:1
**presume**
272:11
**presumed**
237:12
**presuming**

197:5
**presumption**
236:24 253:5
**pretax**
168:21 169:1
169:4,9
170:4
**pretrans**
282:18
**pretransa...**
232:19
282:19
283:15
284:5,8
**pretty**
194:18,21
243:15
262:20,21
**previous**
287:8
**previously**
9:9 12:4
120:3
140:24
141:11
175:23
176:14
225:10
241:3
**price**
23:23 51:3
148:16
157:1
201:24
202:2,5,12
202:17
203:1,3,4,4
203:5,11,13
223:5 225:3
230:19
231:5,7,18
233:21
234:3,19
236:7,11,13
237:19
242:9
**priced**

Elyse S. Bluth                                   December 17, 2009
CONFIDENTIAL

```
 239:23              private            227:2 271:23    245:1 251:6    201:10
pricepers...        67:14 88:23        producing       pronounced     210:4 215:2
230:10              109:19             8:1             86:12          274:7
pricing             155:23             product         proportional   providers
155:18 241:7        156:2 174:2        181:6           173:6          149:7
primarily           174:5,11,12        professional    proposed       provides
145:6 146:24        175:14             16:8 89:3       43:3 44:20     23:17
147:2               232:9              profitabi...    133:16         providing
150:11              privileged         162:11          183:22         55:17 215:5
193:17              187:6 258:24       progress        190:3          240:2
194:8               probably           128:19 129:4    201:14,21      provision
198:15              20:16 28:20        project         202:1,12       62:1 212:8
primary             32:12 83:21        25:24 74:5      206:9,23       223:17
130:11              208:13             74:20           207:12,13      provisions
145:10,13           229:5              projected       207:23         14:21 135:21
268:8               243:12             149:3 152:8     210:5 211:8    ps
principal           252:20             153:10          231:19         206:14 207:4
71:12,18,22         264:10             155:12,14       259:17         public
72:6,7              274:18             160:9 167:1     proposing       1:18 19:5,8
86:20 87:7          problems           167:10,14       45:2           19:14 20:13
230:7               266:12             167:21          prospect       24:5 88:24
241:18              procedure          264:5 277:9     243:16         94:9 147:18
principally         1:15               278:13,22       prospects      154:22
72:3,14             procedures         projection      162:8 274:13   155:8,18,24
printout            247:20             153:11 154:3    protected      156:1 161:2
15:22 125:12        proceed            166:6,13,17     14:14          165:16
131:14              96:14 245:2        167:11          provide        166:21
prior               245:10             262:3,7         23:1,8 29:17   174:7,8,8
6:22 25:3           proceedings        276:7           34:13 35:4     174:11,18
27:12 55:4          195:18             projections     48:3 60:12     196:5
57:6,13             287:16             105:4 122:17    60:24 61:2     221:17
66:9 68:15          proceeds           129:23          64:21 65:18    233:18
84:18 94:19         170:12             134:15          68:8 85:24     234:6
94:24 136:8         283:13,14          152:6           100:20         238:13
160:16              process            186:17          120:12         240:6
192:18,19           11:4 35:19         260:24          134:18         249:19
223:20              68:2 73:21         262:2           201:3          250:17,21
225:20              73:23 74:1         264:15,18       208:21         251:2,8
235:12              74:18 134:2        264:24          209:6,20       283:5
237:11              158:2,7,15         273:14,16       217:21         286:24
238:1,22            158:18             273:22,23       218:1          287:5
241:1 250:3         201:17,19          274:2,3,7       273:19         288:10
252:13              245:23             275:17          provided       publicly
265:19              259:13             276:6           52:3,8 68:12   156:1 157:1
273:17              procter            278:14          123:16         163:4
prioritize          21:11              279:20          136:8 163:3    174:13,14
275:12              produced           prompted        201:7,8,9      175:3,10
```

CONFIDENTIAL

40

| | | | | |
|---|---|---|---|---|
| **publishing** | 157:18 | 101:9 | 179:20 | **questions** |
| 147:15,24 | 158:3 | **question** | 180:17 | 10:2 11:19 |
| 148:21 | 202:22 | 10:3,19 | 183:12 | 22:1,2 |
| 149:16 | 254:14 | 11:22 13:1 | 184:6,20,23 | 32:22 96:9 |
| 154:23 | **pursuant** | 13:6 22:12 | 187:2 191:6 | 96:14 130:5 |
| 157:19 | 1:9,15 12:24 | 26:6 34:18 | 193:14 | 131:15 |
| 160:6 | 51:10 69:18 | 35:7 37:18 | 195:7,20 | 132:22 |
| 167:18 | 69:23 86:21 | 38:12 39:10 | 200:17,18 | 183:8 190:8 |
| 168:8 262:2 | 87:15 115:9 | 43:6 45:8 | 203:18,21 | 199:5 |
| 262:7,23 | 115:16 | 46:13 49:20 | 204:22 | 200:16 |
| 264:2,5 | 134:6 | 50:19 54:1 | 205:15 | 217:14,20 |
| 267:9 268:3 | 135:16 | 54:4,21 | 207:10 | 225:20 |
| 274:15 | **pursue** | 55:8,24 | 209:10 | 243:21 |
| 278:3,9 | 48:12 103:2 | 56:2 57:21 | 210:24 | 251:15 |
| **publishings** | 103:2 | 59:24 60:1 | 213:18 | 255:4 |
| 160:5 | 215:13 | 60:3,4 | 214:19 | 256:23 |
| **pull** | **pursued** | 61:14 62:22 | 215:7 216:5 | 272:4 |
| 153:17 257:5 | 50:8 138:13 | 63:11,22 | 216:16 | 273:13 |
| 261:10 | **put** | 64:16 69:13 | 217:11 | 274:16 |
| 268:16 | 9:19 10:4,5 | 75:3,12,19 | 222:21 | 280:2,15 |
| 281:3 | 24:15 42:24 | 76:16,19 | 224:19 | 281:1 |
| **pulled** | 43:8 47:18 | 81:13 85:7 | 226:24 | **quickly** |
| 154:6 | 76:20,23 | 85:9 86:19 | 230:15 | 228:16 283:3 |
| **pulling** | 102:6,22 | 87:14 88:17 | 232:1 | **quite** |
| 151:6 | 109:22 | 90:4 95:24 | 233:24 | 165:20 |
| **purchase** | 145:15 | 105:22 | 234:24 | 274:11 |
| 46:23 48:6 | 161:20 | 108:18 | 235:22 | **quoting** |
| 55:16 67:13 | 166:8 | 111:10 | 236:8 | 62:11 |
| **purchased** | 173:10 | 112:13 | 242:18,23 | |
| 24:23 25:21 | 197:10 | 114:5 121:6 | 244:2,7 | _____ |
| 51:4 226:8 | 224:23 | 122:23 | 245:13 | **R** |
| 281:21 | 225:1 | 124:1,4 | 253:6,15 | _____ |
| **purports** | 241:10 | 135:12 | 254:13 | **raise** |
| 154:20 | 253:11 | 136:18 | 255:7 256:2 | 11:7 273:12 |
| **purpose** | 269:16 | 141:8 142:4 | 256:4,5 | **raised** |
| 52:23 148:2 | 270:10 | 145:21 | 257:22 | 53:19 55:1,7 |
| 179:2 | 281:22 | 146:3,8 | 259:4 | 100:19 |
| 202:23 | **putting** | 148:11 | 260:12 | 106:24 |
| 214:5 | 82:24 145:13 | 153:19,22 | 263:2,14 | 183:12 |
| 215:19 | 282:3 | 153:24 | 265:14 | 185:15 |
| 241:6 247:8 | **pv** | 159:4 162:4 | 267:12,14 | 187:22 |
| 272:17 | 192:21 | 163:20 | 273:10 | 255:5 256:7 |
| **purposes** | | 164:9,13,15 | 275:20 | **ran** |
| 7:12,17 8:2 | _____ | 165:24 | 276:23 | 35:11 274:11 |
| 8:7,8 17:14 | **Q** | 166:2 | 278:12 | **range** |
| 21:24 95:3 | _____ | 168:12 | 279:4,24 | 71:10 75:9 |
| 111:6 | **qualifica...** | 169:19 | 284:13,16 | 90:9,11 |
| | 221:10 | | | 160:8,17 |
| | **qualifies** | | | 161:4,12,18 |

Elyse S. Bluth                                December 17, 2009
CONFIDENTIAL

41

| | | | | |
|---|---|---|---|---|
| 161:22,23 | 261:18 | **really** | 111:5 | 266:1,24 |
| 161:24 | **ratio** | 122:12 | 112:16 | 267:1,6,16 |
| 162:2 163:4 | 207:14 | 129:24 | 113:9,15 | 269:2,18,20 |
| 163:11 | 259:18 | 213:10 | 126:11,13 | 270:12 |
| 176:15,23 | **rationale** | 216:23 | 126:14,23 | 271:13 |
| 192:12 | 264:6 | 276:23 | 127:3,10 | 272:18 |
| 204:22 | **ratios** | **reason** | 133:6,9 | 275:17,22 |
| 206:5,10 | 207:15 | 170:12 173:9 | 137:11 | 276:8,10,12 |
| 229:14 | **reach** | 173:20 | 139:24 | 276:19 |
| 237:24 | 200:19 | 200:5 236:2 | 145:5 | 277:6 |
| 238:2,15 | **reached** | 252:23 | 158:19 | 278:15 |
| 239:22 | 7:22 184:2 | 253:1 269:1 | 164:5,21 | **receive** |
| 241:2,7,12 | 184:15 | 291:19,22 | 166:1 | 23:22 66:8 |
| 242:10,15 | 190:2 | 292:5,8,11 | 181:22 | 79:15 121:3 |
| 267:9 268:3 | **reaching** | 292:14,17 | 183:12,14 | 150:3,5 |
| **ranges** | 245:10 | 292:20 | 185:14,22 | 280:14 |
| 160:14 | **reaction** | **reasonable** | 186:21 | **received** |
| 163:24 | 217:8 243:21 | 23:24 62:13 | 189:5,9,10 | 26:23 27:3 |
| **rarely** | **read** | 62:15,20,22 | 189:15,23 | 27:10,15,16 |
| 104:11 | 20:8 39:9,11 | 62:23 63:7 | 189:24 | 45:10 |
| **rate** | 79:20 85:8 | 63:15 64:1 | 190:1 | 133:18 |
| 152:9,13 | 85:10 96:4 | 94:3 223:10 | 195:12 | 134:4 |
| 153:6,10 | 96:12 97:24 | **reasonabl...** | 198:7,11,12 | 139:22 |
| 154:1,2 | 100:11,12 | 64:10 279:20 | 199:17 | 179:18,23 |
| 166:1,5,10 | 146:5 | **reasons** | 201:6,20,23 | 180:22 |
| 166:12,16 | 165:12,14 | 10:23 159:10 | 207:19,22 | 181:2,5 |
| 166:18 | 165:14,15 | 291:13 | 208:2,13 | 188:24 |
| 167:10,14 | 222:13 | **recall** | 210:6,8,11 | 189:2 |
| 167:19,22 | 271:9 286:9 | 14:20 28:4 | 211:14,23 | **receiving** |
| 196:7,13 | 291:10,11 | 35:3 36:20 | 213:5,13 | 8:1 83:1 |
| 197:7 | **readily** | 43:13 45:23 | 218:20 | 214:8 |
| 260:10 | 175:24 176:2 | 47:8,12 | 221:3,6 | **recess** |
| 263:7 264:1 | 176:4 | 53:3 58:23 | 231:9,14 | 52:19 115:16 |
| 264:6,16,24 | **reading** | 59:1,3 69:2 | 234:16 | 157:11 |
| 277:18 | 162:20 224:8 | 70:11 73:4 | 235:16 | 195:15 |
| 278:8 279:9 | 287:19 | 73:14 80:24 | 242:12,22 | 248:1 |
| **rates** | **reads** | 82:8 84:12 | 242:24 | **recessed** |
| 277:10 | 188:14 252:7 | 90:8 97:14 | 243:20 | 114:9 |
| 278:13,13 | **reaffirming** | 99:17 | 244:22 | **recipients** |
| 278:18 | 137:2 | 101:11,13 | 252:13,20 | 139:18 |
| 279:12,13 | **realization** | 102:17 | 253:19,20 | **recognize** |
| **rating** | 213:7,16 | 103:13,17 | 253:21 | 33:5 37:15 |
| 131:13,20 | 224:5,14 | 103:21,23 | 256:5,7,13 | 38:13 96:20 |
| 132:2,18,24 | **realized** | 104:1,13 | 257:2 | 125:10 |
| 133:10,11 | 218:20 | 106:23 | 258:18 | 132:24 |
| 133:17,20 | 221:14 | 107:2 108:1 | 263:24 | 144:15 |
| 261:13,18 | 225:2 | 108:4,6 | 264:21 | 176:19 |

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

42

191:20
192:2 220:3
266:10
**recollect**
12:9 13:17
15:2 20:23
21:16 26:2
**recollection**
25:16,22
26:2 30:17
34:11 45:12
45:15 46:4
47:2,4,14
51:24 57:6
64:18 73:19
81:23 82:5
85:20 86:6
96:11 98:22
101:5 107:4
107:14
111:7
113:13,24
114:3
127:14
151:2
171:19
175:19
187:24
190:11,15
190:16
191:8 198:5
199:20,24
206:22
208:20
209:21
218:11
226:1 228:2
233:14
244:17
250:7 251:9
252:23
256:24
280:11
281:17
**recollect...**
259:5
**recollects**

150:19
**record**
6:1,16,21
7:5 9:19
11:11,21
15:21 16:19
32:24 42:8
52:18,22
53:12 67:2
79:21 85:10
95:22 114:6
120:1
131:11
143:16,24
146:5
151:23
157:10
166:4
188:11
226:23
229:24
238:3
247:22
269:12
275:2,4
287:15
291:13
**recycler**
168:14
**redeem**
284:5
**redemption**
283:5
**reduced**
287:14
**reductions**
221:18
**refer**
97:4 99:7
125:17
126:18
170:20
173:24
192:21
212:5
277:10
**reference**

94:9 96:22
**referred**
7:2 65:19,21
76:16,17
79:19 98:3
106:6 133:1
145:11
148:4 196:9
225:7,7,22
254:1
268:21
**referring**
36:6,10 57:9
65:7 77:17
88:6 102:4
108:24
126:8 135:4
146:16
184:11
186:13,14
209:13
210:13
219:3,5
235:7
237:16,16
284:22
**refers**
37:22 51:9
69:17 78:20
91:5 97:1
97:21 221:9
225:23
257:24
**refinance**
283:22
**reflect**
40:20 92:19
168:16
169:1
175:22
232:20
234:19
269:5
**reflected**
41:12 53:1
80:7 83:24
95:3 146:15

160:3
168:23
177:24
179:8,14
191:16,22
192:4,10,18
192:19
197:3 209:8
226:3,4
232:2
233:21
235:23
238:24
239:7
244:24
245:9
258:20
283:16
284:6
**reflecting**
230:11
241:19
**reflects**
196:1,4
285:5
**refresh**
250:7 281:17
**regard**
207:5 215:3
**regarding**
36:16 43:1
133:15
146:10
199:5 257:1
257:16,20
258:10
**regular**
88:12
**regulations**
61:20
**regulatory**
182:9
**reinvesting**
111:23
**reinvestment**
149:4
**relate**

51:1 53:7
203:22
226:7
233:12
**related**
17:19,23
24:3 36:2,4
36:14 37:7
42:14 45:13
53:20 54:18
58:11 64:21
67:10 70:4
81:7 91:10
113:2 114:1
135:16
141:13,14
144:17
165:10
218:19
219:6,20
227:9 248:5
249:13,23
258:20
274:14
283:10
**relates**
160:4 233:15
281:3
**relating**
24:2 220:4
**relationship**
68:14 125:19
**relative**
63:1 139:16
287:22,23
**release**
249:17 251:1
**releases**
165:15
**relevance**
133:20,21
203:6
**relevant**
110:14,19,21
111:3,8
112:1
205:24

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

223:10
**reliance**
80:6 213:15
**rely**
79:6,18
81:16,20
82:10 83:6
83:15 84:9
84:16 85:15
86:1 102:16
**remaining**
233:4 283:11
**remains**
149:8
**remember**
13:21 20:17
25:1,5,11
25:18 27:19
29:21 30:21
31:7,11,16
32:11 38:20
39:3 41:14
44:15 45:5
57:14,24
58:3,5,6,19
59:2,7,17
59:21,22
60:4,7 62:3
68:20 69:6
72:15,16
73:5 74:19
75:6 80:16
80:22 81:17
81:22 82:15
83:2 87:10
90:10 100:1
100:4,16,24
101:1,18,19
103:19,20
104:16,18
104:21
107:16
126:9 127:1
127:11
133:11
140:8,15
141:18

142:7,10,15
142:17,19
142:22
143:2
144:23
145:8,14
146:9 147:3
150:2,13
152:18
153:2,7
154:4
158:17,21
158:21,22
159:11,23
160:1
161:14,22
162:21
164:18
166:20
167:16
175:21
179:11
180:3
183:20,24
184:1
185:17
186:3 193:3
193:5,20
195:6 197:9
199:14,15
208:8
213:10
214:14,22
217:19,20
218:18
219:24
220:22
224:12
230:4 246:2
246:23
247:5,6
249:13,13
250:1,24
251:1 253:7
253:8,12
254:6,7
255:7,8

256:10,17
256:21
257:17
259:7,8,11
259:12
264:8,12
265:4 268:4
268:12
274:2
275:24
276:1,4,5
276:14,14
276:15
**remembered**
151:20,21
**remind**
259:16
**render**
37:23 79:4
121:20
124:9
148:18
213:1
**rendered**
65:1
**rendering**
64:9 183:5
**repay**
230:6
**repaying**
111:24
**repeat**
60:3 81:3
85:7 86:5
153:21
265:10
277:12
**rephrase**
10:4 59:24
**replacement**
233:8 236:22
239:9
241:16
**report**
144:12,13
155:6
177:23

276:1,4,6,9
276:11
**reported**
5:23 119:23
266:22
287:13
**reporter**
1:20 6:19
10:9 85:11
146:6 287:7
291:9
**reporting**
24:1
**reports**
274:13,23
280:4
**represent**
6:12 39:14
48:24 55:15
83:12 98:10
131:10
178:4
201:15,21
252:4
274:19
**represent...**
49:2,15
274:21
**represent...**
54:11 162:10
**represent...**
47:13,15
**represented**
24:20 98:12
167:15
180:9,16
273:18
275:2
**representing**
8:13,17,19
8:21 48:14
48:15 79:12
94:2 125:22
148:13
178:16,18
280:21
**represents**

239:17,19
**repurchase**
232:20 233:1
282:20,22
283:1,4,14
284:9
**repurchased**
233:4 284:4
**request**
10:18,20
64:8 84:15
104:9,10,11
104:14
120:16
121:10
123:20
291:12
**requested**
51:6 61:22
64:20 82:6
84:24 85:11
85:23
123:17
134:10,13
134:19
146:6
245:21,23
**requesting**
121:14
179:18
**requests**
10:16 64:5
134:6
245:16
**require**
103:24
**required**
61:22 79:2
79:16 94:21
120:21
258:11
**requirements**
24:1,3
123:12
186:19
**requires**
48:16

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| **research** | **rest** | 31:1,3 | 188:21 | 85:19 86:1 |
| 166:22 | 61:20 | **revealing** | 189:7,8,11 | 97:20 99:15 |
| 274:12 | **restate** | 190:12 | 189:12,14 | 122:1 |
| **reserve** | 124:4 146:3 | **revenue** | 189:17 | 132:15 |
| 285:17 | **restrictions** | 152:5,7 | 190:7 | 137:13 |
| **resigning** | 135:18 | 154:12 | 228:21 | 142:2,7 |
| 215:16 | **restructu...** | 155:15 | 280:14 | 144:6,24 |
| **resolution** | 24:5 | 265:15 | **reviewed** | 168:24 |
| 217:6 245:19 | **result** | 267:3 | 20:1 33:4 | 174:9 |
| 256:20 | 122:11 186:1 | 277:10,18 | 62:19 74:21 | 177:16 |
| **resolve** | 201:16 | 277:23 | 77:1 78:16 | 191:12 |
| 245:8 | 221:14 | **revenues** | 138:10 | 192:19 |
| **resolved** | 229:13 | 262:22 263:1 | 144:22,23 | 205:20 |
| 217:24 | 234:20 | **review** | 165:9 | 222:9 |
| **respect** | 242:14 | 33:2 73:21 | 191:23 | 227:12 |
| 9:20 14:4 | 261:3 279:2 | 73:22 74:1 | 202:11 | 229:21 |
| 44:11 93:19 | **resulted** | 74:5,6,17 | 228:9,10 | 230:13 |
| 158:16 | 67:22 227:19 | 74:18 75:13 | **reviewers** | 231:22 |
| 172:17 | 229:23 | 75:13,23,24 | 74:8 | 243:18 |
| 186:6 218:9 | 235:18 | 76:1,2,2,4 | **reviewing** | 247:3,20 |
| 223:4 | **resulting** | 76:5,14,21 | 37:14 78:6 | 249:9,10 |
| **respond** | 221:16,19 | 76:24 77:7 | 133:9,11,23 | 256:4 |
| 10:10 129:8 | 264:19 | 77:12 78:2 | 138:16 | 270:19 |
| **responded** | **resumed** | 139:14,15 | 141:13 | 271:17 |
| 207:13 208:3 | 115:16 120:6 | 139:19,21 | 158:19 | 272:1 282:8 |
| **response** | **retained** | 142:13,16 | 164:22 | 284:2 |
| 207:10 244:4 | 13:5,8,13,16 | 142:17,18 | 165:16 | **righthand** |
| 255:4 | 13:20 47:24 | 142:21 | 189:5 266:4 | 155:6,9 |
| **responses** | 48:23 49:1 | 143:1 | **reviews** | **rise** |
| 10:10,11 | 49:5,8,12 | 144:20 | 88:8 | 55:21 |
| **responsib...** | 50:3,8 65:5 | 145:18 | **revised** | **risk** |
| 17:10 93:19 | 67:24 85:24 | 147:21 | 218:4,10,15 | 182:21 |
| **responsib...** | 135:15,19 | 155:18 | 220:4 | 183:22 |
| 94:24 145:10 | 249:24 | 158:24 | **revisions** | 184:4,16,17 |
| 145:13 | 272:19 | 159:8,14 | 218:18 | 185:10,11 |
| 157:23 | **retention** | 164:6,23 | 220:13 | 185:13,14 |
| 159:6 268:9 | 68:3 | 180:2,6,11 | **revolved** | 185:20 |
| **responsible** | **retirement** | 180:13,19 | 112:23 | 186:5,6,13 |
| 130:20 | 61:9 | 180:21,23 | **right** | 186:14,16 |
| 135:24 | **return** | 181:1,6,10 | 15:3 19:3 | 186:17,22 |
| 136:1 145:7 | 196:14,23 | 181:17 | 33:12,15 | 187:12 |
| 146:24 | **returned** | 182:13,14 | 34:5 37:11 | 208:15 |
| 147:2 | 30:21 | 183:2,6,18 | 42:17,21 | 209:7 260:9 |
| 150:11 | **reveal** | 185:16 | 45:22 47:17 | 260:16,17 |
| 157:16 | 183:4 190:6 | 186:10,15 | 65:8 67:16 | 261:6 263:6 |
| 159:2 194:8 | **revealed** | 186:21 | 70:21 79:6 | **riskier** |
| 198:15 | | 187:4,22 | 79:17 85:15 | 209:3 |

Elyse S. Bluth                                December 17, 2009
CONFIDENTIAL

**risks**
181:14,21,23
182:17
184:23
185:23
187:5
210:21
261:6
**risky**
184:9 211:9
**robert**
3:22 8:23
117:22
**rockefeller**
2:9 116:9
**role**
12:24 44:17
44:19 46:9
50:7,11
59:8
**room**
74:4 127:12
146:19
247:6
**rosengren**
72:19 140:5
150:24
194:23
**rotating**
142:23
**roughly**
75:7 199:17
223:13,23
232:11,15
**row**
156:3
**rule**
6:22
**rules**
1:15 9:15
**rumored**
202:8
**run**
20:12 35:12
35:19
**running**

240:3
**ryland**
21:11

_____
**S**
_____
**saith**
285:19
**sake**
171:4
**sale**
168:14
170:23
**saleable**
212:15
**sam**
27:7 28:16
72:18 140:5
194:21
281:8,22
**saolnier**
29:12
**sara**
21:10
**satisfactory**
124:22,23
**satisfied**
163:22
**satisfy**
96:6 163:23
164:7
**saturday**
228:6,8
**save**
234:5
**savings**
107:20 108:7
108:16,19
108:23
109:3,5
111:5,8,21
112:18,19
112:24
114:1
192:15,24
193:4 196:4
221:13,16
221:18,20

221:21
222:24
224:6,15
225:2 233:8
233:15,17
234:5,8,19
235:15,19
235:23
236:3,9,11
236:18,23
238:17,23
238:23
239:3,7,9
240:7,9,14
240:15,20
240:22
241:17,18
254:3,5
255:6 285:8
**saw**
72:23 197:24
220:17,18
223:17
237:18,21
241:8 274:5
**saying**
70:18 126:4
128:5 176:1
178:12
201:13
225:16
234:3
237:14
239:6,19
256:8
**says**
33:13 61:16
62:20 78:24
93:21 100:9
103:10,12
107:19
134:21
155:9 160:8
162:18
168:18
197:21
202:10

206:2 210:2
212:20
221:9 233:7
250:15
252:9
254:17
269:4 270:6
272:2,5
278:6
**scenario**
102:21
244:24
**schedule**
271:8
**scheduled**
127:4
**schiedemeyer**
142:20
**scholer**
3:17 8:24
117:17
**school**
17:13
**scope**
80:5 221:8
**scott**
47:10 72:18
140:4
**screwed**
263:2
**scripps**
173:2 175:9
**scrutiny**
182:9
**search**
158:9
**seasonal**
157:5
**seat**
251:12
**second**
18:16,20
19:16 31:17
38:9 51:8
52:10 66:14
69:17 78:20

78:22 100:7
131:21
134:21
152:5 156:3
177:15
179:12
195:23
206:17
232:24
254:11,23
274:24
282:1
**secondly**
68:22 209:17
**section**
61:9 144:12
147:12,13
147:17,21
148:1 155:6
**sections**
144:13 148:3
**secured**
230:3
**securities**
16:24 18:4
**security**
22:7 23:24
61:10 231:4
**see**
16:4 19:6
20:10 23:18
38:3 39:7
48:8 51:11
65:22 69:19
73:12 78:22
86:11 89:6
91:12 93:11
96:16,22
97:20 99:1
99:5 107:22
125:14,15
125:24
126:16
131:19
132:9
148:22
149:18

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 150:17 | 138:22 | 200:13 | 215:16 | **sharing** |
| 151:22 | 147:18 | 214:12 | 266:15 | 136:6 |
| 152:10 | 154:22 | 244:20 | **set** | **sheet** |
| 154:11,24 | 160:8,17 | **sensitivity** | 138:4,7 | 194:9 231:12 |
| 156:5,8 | 161:12,18 | 274:11 | 221:10 | 251:13 |
| 160:11,24 | 161:22,23 | **sent** | 227:8 288:3 | 271:20 |
| 162:15 | 162:2 | 33:10 125:14 | **setting** | 272:12 |
| 163:7 167:7 | 163:11 | 141:1,5 | 23:22 128:15 | 291:1,14 |
| 167:11 | **selecting** | 142:1 143:2 | **settlement** | **sheets** |
| 169:24 | 157:16 160:4 | 143:3 144:2 | 8:3 | 150:17 |
| 202:14 | **selection** | 144:8 | **shaded** | **sheron** |
| 203:1,11 | 160:13 | 159:17 | 241:13 | 2:20 9:1 |
| 206:14 | 161:24 | 180:6,12 | **shaking** | 116:20 |
| 207:17 | **selfhelp** | 188:12,17 | 247:1 | 252:3 |
| 212:17 | 38:23 | 189:8,11 | **share** | **shes** |
| 213:3 | **sell** | 228:21 | 7:22 124:19 | 277:19 |
| 219:23 | 109:20 | 271:16 | 157:1 | **shield** |
| 221:1,8,22 | 169:14,14 | 272:12 | 171:15 | 212:15,24 |
| 222:4,5,6 | 170:11 | **sentence** | 191:13 | 213:8 |
| 223:11 | 223:9 | 48:10 65:17 | 203:4 | **short** |
| 229:19 | 240:18 | 134:21 | 231:19 | 165:19 |
| 233:8 238:1 | **seller** | 135:1 252:7 | 233:21 | **shorthand** |
| 249:20 | 62:7 79:12 | **separate** | 234:3,19 | 1:20 287:6 |
| 250:3,18 | 83:12 223:8 | 101:15 | 235:3,23 | **show** |
| 252:11 | 239:18 | 130:23 | 236:13 | 156:19 234:8 |
| 254:20 | 240:21 | 131:24 | 237:20 | 270:3 |
| 255:3 260:4 | **selling** | 165:21 | 239:19 | 272:24 |
| 261:19,22 | 24:4,4 | 194:1,2 | **shared** | **showed** |
| 262:2,8,18 | **send** | 207:2 | 191:9,10 | 263:4 |
| 266:21 | 134:9,12 | **separately** | **shareholders** | **showing** |
| 272:9 | 140:12 | 194:24 | 24:4 109:20 | 268:18 |
| 277:24 | 141:7,17,20 | **series** | 110:3 | 269:18 |
| 281:15 | 141:24 | 86:22 216:20 | 211:20 | **shown** |
| **seeing** | 142:24 | 248:23 | 240:13 | 160:16 |
| 105:6 276:16 | 189:12 | **serve** | 283:2,5 | 169:12 |
| **seen** | 227:22 | 13:20 68:9 | **shares** | 231:21 |
| 83:6 96:10 | **sending** | 69:8 | 23:15 24:23 | 268:24 |
| 138:6 | 125:20 | **served** | 48:7 51:3 | 269:13 |
| 197:23 | **senior** | 12:20 | 55:16 61:5 | 279:5 |
| 219:17 | 59:14 74:23 | **service** | 67:13 | **shows** |
| **segment** | **sense** | 28:24 29:2 | 156:24 | 194:14 |
| 147:16,20 | 22:13 64:17 | 108:17 | 174:3 | 225:12 |
| 160:6 168:9 | 65:3 81:10 | 113:1 | 202:18 | 242:2 |
| **segments** | 95:7 101:14 | 186:19 | 225:1 233:2 | 277:17 |
| 147:24 | 108:7 | **services** | 233:4 240:1 | 278:5,8 |
| 155:24 | 122:14 | 94:21 | 281:21 | 282:5 |
| **selected** | 176:8 | **serving** | 283:1,5,12 | **shrink** |

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

47

| | | | | |
|---|---|---|---|---|
| 264:5 | 287:19 | 98:2,6,20,22 | 104:10,11 | **solvencyr...** |
| **shrugs** | **similar** | 99:18 | 104:15,16 | 56:9,15 |
| 10:12 | 147:17 | 100:18 | 104:19 | 57:12,15,18 |
| **side** | 158:10 | 103:18 | 105:10,14 | 58:12 70:15 |
| 49:8 99:1,3 | 172:23 | 247:5 | 105:15,17 | 76:4 |
| 124:20 | 212:1 | **solely** | 105:19 | **solvent** |
| 136:9 | 243:24 | 137:15 | 106:1,2,5 | 258:22 |
| 193:18,18 | 262:18 | 266:21 | 106:19,22 | **somebody** |
| 194:19,22 | 266:12 | **solutions** | 107:21 | 187:3 267:21 |
| 215:16,18 | **similarly** | 291:3 | 108:8 111:6 | **somewhat** |
| 215:18 | 176:9 | **solvency** | 112:4,8,9 | 262:4 280:5 |
| **sidley** | **single** | 18:7,10,12 | 112:10,19 | **soon** |
| 4:8,14 8:20 | 25:14 149:9 | 33:9 34:13 | 113:2,6,10 | 126:6 |
| 8:22 118:8 | **sitting** | 35:4,14 | 114:2 | **sorry** |
| 118:14 | 146:18 246:6 | 37:24 40:2 | 121:20 | 9:18 38:8 |
| **sign** | 246:7 | 40:7,9 | 122:1,6,10 | 62:21 93:7 |
| 66:7 | 252:22 | 41:11,16 | 122:21 | 153:21 |
| **signature** | 253:18 | 43:23,24 | 123:9,13,20 | 180:15 |
| 67:19 285:17 | 256:15 | 44:10 51:20 | 135:7,17 | 206:11 |
| 292:23 | 258:18 | 52:3,7,24 | 136:9,13 | 220:16 |
| **signed** | 259:8 | 52:24 53:9 | 137:3 | 231:6 261:1 |
| 34:1 35:16 | 264:21 | 54:15 55:17 | 138:19 | **sort** |
| 42:21 56:17 | 270:1,8 | 56:16 58:1 | 139:2 147:8 | 7:23 17:8 |
| 57:5,7 | **situation** | 59:10,21 | 159:8,9 | 22:12 |
| 218:12,21 | 63:2 85:4,5 | 69:18,22 | 188:14,21 | 102:21 |
| 218:24 | 85:22 | 70:4,8,9 | 189:17 | 234:14 |
| 219:4 | 164:19 | 71:1,20 | 190:3,17,19 | 251:3 |
| 220:14,24 | **skipping** | 72:10 73:8 | 193:18 | 264:19 |
| 225:13,14 | 62:9 | 73:10,14,16 | 194:22 | **sorts** |
| 225:14 | **slide** | 76:13,15,17 | 207:5 | 17:14 24:3 |
| 227:19 | 244:5 | 76:18,20 | 213:15,22 | 50:16 62:17 |
| 291:13 | **small** | 78:21 79:2 | 213:24 | 112:1 |
| **significance** | 163:14 | 79:4,14 | 214:16 | 274:11 |
| 155:20 185:9 | 264:11 | 80:6 81:1,5 | 215:4,5,17 | **sought** |
| 230:9 | **smaller** | 81:6,6,10 | 216:2,9,14 | 190:9 |
| 241:22 | 266:17 | 81:16,21 | 216:17,20 | **soul** |
| **significant** | **smith** | 82:10 83:3 | 216:21 | 250:13 |
| 66:12 201:15 | 47:10 98:2 | 83:6,14 | 254:5,15,18 | **sounds** |
| 201:22 | 98:15,16,18 | 84:9,16,22 | 254:21 | 268:14 |
| 210:14 | 98:19,20,23 | 84:24 85:15 | 255:21 | **source** |
| **significa...** | 99:19 | 85:23 99:20 | 256:8 257:1 | 45:17 153:24 |
| 202:1 | 100:18 | 100:9,19,20 | 257:16,20 | 154:5 |
| **signing** | 103:18 | 101:22 | 258:2,4,10 | 179:16,17 |
| 66:3,10,13 | 247:4 | 102:4,7,14 | 258:11 | 179:21 |
| 92:2,4,5,10 | **smoothly** | 103:5,11,15 | 259:1,2 | **sources** |
| 92:13 93:2 | 9:15 | 103:24 | **solvencylike** | 179:9,15,17 |
| 244:14 | **snyder** | 104:3,4,7 | 201:11 | 268:18 |

270:5,5
281:12,14
**south**
3:10 4:9
117:10
118:9
**spaeder**
2:2 6:11
116:2
**spalding**
3:22 8:23,23
117:22
271:9
**speak**
10:20 80:19
105:15
109:5 112:9
132:20
134:23
135:7
137:16
246:22
**speaking**
59:1 81:1
106:21
284:2,3
**special**
6:12,12 38:1
38:5 126:5
126:7,12,13
126:15,17
126:18,22
126:24
127:6,12,20
138:17,19
215:16
**specific**
22:11,17
31:23 37:20
43:5 46:5
64:4 77:5
77:20 101:1
145:20
146:9 154:5
156:17
195:4 204:7
209:23

235:9
244:22
245:1 246:3
259:8,9
266:24
267:1
276:19
**specifically**
58:23 59:2
60:7 80:22
103:20
137:11
139:24
140:15
142:22
145:15
183:16
185:15
189:6
194:13
199:16
207:21
221:9 243:2
246:2
267:16
271:14
**specifics**
38:20 58:6
195:11
208:13,20
210:8
213:10
217:19
221:6 264:9
264:13
275:24
**specified**
287:18
**speculate**
224:8
**speculation**
50:21 99:9
284:11
**speed**
103:7
**spend**
52:16

**spending**
261:2,2
276:14
**spent**
17:18 78:5
164:21
165:20,22
246:6
282:10
**spike**
262:5
**spinoff**
38:1
**split**
137:4
**spoke**
58:24 59:3
80:16,21,22
128:3,5
246:23,24
**sportsnet**
168:15
**spread**
150:17
271:20
272:12
**spring**
39:2 75:4
233:2
**square**
3:3 117:3
**ss**
287:2
**st**
21:12
**staff**
88:11 144:19
**stage**
281:19 282:2
**stand**
16:19
**standard**
40:8 50:24
61:21 95:6
95:8 104:4
104:8

182:12
240:21
251:3
**standpoint**
214:9,10
**start**
263:2
**started**
17:17 165:3
**starting**
236:5
**starts**
201:13
**staruck**
249:8
**state**
1:19,20 6:15
6:21 7:4
46:15
111:22
137:24
193:8
210:18
287:1,6,7
**stated**
212:12
287:21
**statement**
11:18 103:10
197:4 240:4
258:8
**statements**
129:22
134:16
165:12,14
**states**
1:1,16 48:10
65:18 89:2
115:1
125:23
132:17
144:11
195:24
202:10
254:13
259:21
285:10

286:1
**stating**
270:12
**stations**
176:2
**status**
130:3 175:14
175:23
**stay**
265:7
**staying**
263:18
**steadily**
152:8
**steel**
21:8
**stenograp...**
287:13
**step**
108:22
140:22
179:12
**stepping**
15:3
**steve**
87:23 142:16
**stipulations**
9:20 11:13
**stock**
16:20 17:19
22:7,21
25:21 48:2
48:20 51:3
61:6,18
79:10,12
129:15
148:15
157:4,8
175:9
201:24
202:2,3,7
202:17
204:14
226:8
227:20
229:15
230:3,5,6

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

49

231:13
236:9
240:17,18
263:11
272:21
stop
252:15,19
strawn
5:2 119:2
street
1:21 2:3
3:10,19
4:15 115:17
116:3
117:10,19
118:15
strength
250:12
strictly
284:2
strike
45:8 49:22
75:2,12
76:18 81:13
86:18 141:8
168:12
200:17
218:14
231:24
242:23
244:2
strong
256:14
structure
44:24 46:2,5
74:11
110:24
114:2
128:13
181:16
182:7 193:2
193:12
210:5,21
211:8,10,16
233:13
234:20
235:16

236:4
240:11,12
240:16
structured
110:23
111:17
structures
109:10
structuring
111:15
sub
61:1 91:5
114:1
210:19
214:7 233:6
235:4,6
239:3
240:11,15
240:22,23
subchapter
109:22,23
110:1,5,11
111:14
subject
13:14,24
82:23
120:15
158:11,12
180:18
190:24
201:1
221:10
249:15
254:2
subjected
77:6
submitted
164:22
subordinated
269:6 281:8
subscribe
286:12
subscribed
286:21
subsequent
65:14 70:13
218:3,7

subsidiary
174:10
substance
28:7 29:21
82:22
129:12
substantial
87:3,6,12
88:13 92:9
substanti...
48:6 91:10
substantive
45:23 46:5
130:12
subtracted
237:8
subtracting
192:15
successors
94:16
suchandsuch
129:2
sufficiently
185:24
suffix
277:13
suggest
95:9 235:3
suggested
102:20
135:10
suggesting
244:13
suite
1:21 2:3
3:10,18
115:16
116:3
117:10,18
summarize
154:21
sums
148:1 191:17
sunday
30:18 31:22
32:3 58:13

228:5,7,10
228:11,13
246:20
253:10
superceded
7:21 65:14
supersede
69:14
superseding
93:22
supervising
267:21
supplemented
7:21
supplied
94:2
supply
94:1
support
107:20 182:6
supportable
238:16
supported
235:4 237:23
supporting
60:14 61:3
156:18
suppose
244:14
supposed
247:21
sure
10:15 13:1
20:17 34:23
47:7 53:12
53:14,16
54:7 63:24
64:23 78:7
78:8 80:21
85:3 90:15
104:5
106:15
122:9
123:15
124:6 136:2
136:12
146:11,23

165:9
184:10
194:18,21
205:14
208:17
209:3,14
216:19
221:5 227:7
244:12
245:3
247:13,19
254:10
267:7
271:10
275:13
surprise
274:1,4
survive
105:23
185:19
susan
1:17 5:23
119:23
287:4 288:9
susquehanna
20:5,9
sustainable
152:8,13
153:5
swapped
269:17
swear
6:2
swings
157:5
switching
263:19
sworn
6:4,7 120:4
286:21
287:10
synergies
173:20

T

table
146:19

Elyse S. Bluth                              December 17, 2009

CONFIDENTIAL

154:20
155:2,7
156:4 160:8
164:7,10
176:13,18
179:9
191:17,21
192:11
194:14
195:1,11
216:15
217:5
243:13
272:6
273:11
**tables**
165:11,11
243:8
**take**
10:9 20:19
32:21 42:6
52:17 57:4
64:8 66:24
95:10,21
99:7 108:22
123:23
124:10
170:12
171:1 172:6
173:9,20
176:6 182:3
197:17
200:13
216:15
226:7
232:13,14
241:13
260:2 281:6
282:24
285:4
**taken**
1:14,17
109:4
122:15
217:5
244:13
287:17

291:10
**talk**
27:5 28:11
30:13,16
73:11 80:14
136:13,16
145:16,19
150:8 265:7
**talked**
35:13 73:13
80:13
146:11
195:9
202:19
274:10
**talking**
26:4,5 58:20
59:3 76:8,9
76:12
157:15
172:11,12
172:13
194:6
201:24
204:6
223:15
235:10
239:10,11
246:1
255:20
276:15
**talks**
38:5
**tandy**
21:10
**tax**
17:14 107:20
108:7,16,19
108:23
109:3,5,8,9
109:18,19
109:21,23
109:24
110:3,6,23
111:2,5,7
111:18
112:17,18

112:24
113:7,12
114:1
168:14
169:15
192:13,21
193:4,11
195:24
196:1,19
197:8
210:22
211:3,11
212:6,14,23
212:24
213:8,16
214:5,8,11
221:18
224:15
225:1
234:19
235:15
236:3,9,11
236:18,21
238:19,22
238:23,24
239:7
240:19,22
241:17
254:3,5,11
254:14,19
255:6,22,22
256:9,9
285:8,10
**taxdeduct...**
109:16
**taxes**
110:7 111:21
111:22
193:1,8,8
196:21
210:16,18
211:4,20
212:9
235:20
**taxpayer**
242:6 270:18
**team**

43:23 44:10
69:22 70:8
70:16 137:3
143:4 147:8
147:8
151:10
161:9 189:8
189:11,12
189:14,18
193:15,18
193:18,22
243:4
267:23
272:6 274:9
**teams**
72:10
**technical**
75:23,24
76:2,4,5
77:6,12
78:1 105:16
105:19
106:1,5,20
122:9
123:12
**technically**
171:18
**telephoni...**
74:7
**television**
169:22
174:21,24
**tell**
14:11 15:16
27:2 87:5
87:24
132:11
133:24
179:11
191:24
194:20
227:2
229:17
252:24
279:17
**telling**
141:23

201:20
275:8
**tells**
245:17
**ten**
112:7 166:9
193:2 196:1
**tenyear**
149:16,21
166:13
277:23
**term**
39:24 40:1
40:11,14,17
61:7 62:4,6
97:1 170:16
173:21
211:16
217:1
**termed**
40:19 190:19
**terminal**
153:9 154:1
154:2 166:1
166:5,10
167:9,14,18
167:21
264:1
**terminated**
23:19 49:11
94:14 103:4
**terminology**
190:22
**terms**
39:21 51:2
62:11,12,17
63:14 64:10
90:13
162:11
167:20
169:22
171:8 185:9
185:10
227:23
249:18
250:16,20
251:7

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

51

```
terrible          106:1             227:24            13:23 15:24      232:24
200:18            text              228:11            22:7,21          236:12,16
test              100:8,9           229:4,21          24:21 26:17      237:21
194:9             132:17            231:11            27:23 38:12      240:9
tested            thank             233:10            45:18,22         242:20
122:14            9:23 11:10        239:7 240:3       46:7 53:11       243:12,23
testified         20:10 21:17       240:5             54:4,20          245:19
6:7 34:22         86:13             241:19            57:23 58:19      246:5 250:9
46:9 54:23        169:18            249:4,10          72:12 76:16      251:13
70:7 82:2         251:11,22         250:10            76:17 79:23      253:6 255:4
82:18 120:4       262:15            254:1,22          81:4,17          255:13,24
120:5             280:16            261:8             83:16 85:4       256:2,20
121:18            282:9             263:12            85:14            263:12
122:8             284:20            266:7 269:4       104:11           264:10
225:10            thanks            269:12,21         105:23           265:23
256:3             132:22            269:22            112:11           266:1
265:12,23         263:22            270:9,19          133:2 138:6      267:10
testify           285:16            273:10            140:6            269:3,10
124:17            thats             279:18            141:19           272:22
180:15            16:4,23           280:11            142:1,8,17       280:8
287:10            18:11 19:21       282:4,8,19        150:16           thinking
testifying        23:23 33:13       theoretic...      157:22,23        38:19 49:6
266:2             37:16 43:24       166:8             159:6            123:5 138:5
testimony         61:21 65:21       theres            160:15           138:8 270:8
7:10 10:13        78:15 85:16       64:16 151:10      163:6 164:4      third
22:3 46:7         88:16 93:23       163:17            165:4            7:9 39:4
46:16 53:3        94:2 107:24       theyll            166:11           49:12 50:8
53:7 55:5,6       124:14            206:4             173:2 174:7      99:5 156:7
55:22 64:13       127:14            theyre            174:10           212:11
77:23 84:7        128:4 144:7       142:23            183:13           222:15
84:8,12           144:10            162:22            185:1            254:12
102:20            149:5,8           thick             186:18           thirdparty
122:24            155:10            276:23            193:23           173:7
138:1             159:10            thing             194:12           thought
174:20,23         164:10            203:23            199:15           51:17 79:13
204:8             168:18            266:13            204:8,23         85:14 105:7
213:20            178:16,18         things            205:1 206:2      122:16
223:20            178:20            30:10 96:8        206:7 207:7      129:8 162:9
224:21            186:15            102:9 134:9       208:6 211:4      174:20
239:6             192:23            146:19            213:9 217:4      216:24
246:13,17         193:13            222:1             218:11           230:24
254:6,7           195:4 197:3       228:16            224:1,8          234:7 235:3
265:20            204:11,18         239:11            225:20           250:10
287:15            205:20            247:21            227:17           274:22
testing           206:4 212:8       266:19            229:21           276:17
279:19            215:20            280:2             230:8            thoughts
tests             217:1             think             232:18,22        259:2
```

Elyse S. Bluth                                December 17, 2009
CONFIDENTIAL

52

three
29:7,8 153:2
  165:6
  168:13
  232:10,16
  282:18
time
  12:14,15
  13:22 17:4
  17:18 22:22
  24:14,19
  25:14 26:9
  27:10,13,24
  32:6 33:18
  35:3 38:14
  38:18 41:13
  43:15,18
  45:6,9
  49:14 50:1
  51:19 56:5
  57:4 59:16
  66:3,12,16
  68:23 69:21
  73:6,13
  74:2 75:4
  78:6 81:1
  81:12 83:20
  88:14 92:2
  92:9,12,17
  92:24 93:1
  101:12
  102:10
  104:1,13
  108:15
  109:4
  122:19
  127:3 128:2
  129:2
  130:16
  133:10
  135:10
  140:10
  142:8,14
  149:3
  159:12
  163:10
  164:21

165:3,4,7
165:19,19
165:20
173:2,18
177:21
185:4 194:5
195:9 199:1
200:6
220:13,14
220:18
224:11
225:13,14
230:3,5,6
231:13
232:23
244:17
246:1,3
249:2
251:11
252:17
253:2,16,18
253:22
261:10
265:11
268:6
273:20
275:18
276:14
280:13
282:10,24
285:8,18
286:11
287:18
timekeeper
251:19
times
3:3 12:10
68:23 81:4
112:7 117:3
128:3,5
145:11
146:11
157:1
160:10,23
161:4
162:20,24
163:3 213:9

237:6 259:7
267:10
timing
128:14
title
86:17 130:18
197:21
titled
141:8 178:20
today
1:17 5:23
9:16,17
11:4 13:3
119:23
121:24
122:8
124:17
238:9
252:20,22
253:18
256:15
258:18
259:8
264:21
268:13
270:1 287:4
288:9
todays
149:10
told
27:3 45:19
133:2
232:18
252:14,18
253:8,17,23
tomorrow
126:4
top
96:23 97:20
98:14
168:19
206:11
207:9
222:16
225:8 249:4
259:14,21
272:5

topic
101:4,8,12
  108:2
torres
2:16 116:16
total
148:7 176:16
  176:23
  191:18
  203:3,5
  231:20
  232:17
  237:14
  241:20,23
  242:14
  244:23
  261:20
  282:13,15
  282:17
tower
96:23 97:1,5
  97:15 143:1
  247:7
tr
143:17
tr000005
219:15
tr041541
67:3
tr041550
42:9
tr105330
132:5
tr105440
132:6
tr105502
125:9
tr108564
33:1
tr114323
188:8
tr114324
188:9
tr114421
143:19
tr114472

139:10
track
204:5
trade
16:16
traded
156:1 157:1
  163:4
  174:13,14
  175:10
trading
163:5 202:3
  230:19
  231:5
traditional
207:15 210:3
transaction
14:8,10
  17:16 21:5
  23:22 24:3
  27:4 29:20
  31:10,15
  32:3,8
  34:14 36:23
  37:1,11,15
  37:16 38:13
  41:2,2,21
  42:15 43:2
  44:7,20,23
  44:24 45:11
  45:14,20
  46:10 48:13
  48:20,22
  49:24 50:7
  50:13,15
  51:5 54:18
  54:19 55:18
  56:19,23
  58:9 59:6,9
  61:6,22
  62:7,12
  64:11,22
  65:21 66:11
  66:15 67:14
  70:21 74:16
  79:3,10
  84:24 89:19

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

92:11,14
93:14 95:8
97:16 98:11
102:3,6,22
103:3
108:10,16
109:6
110:15,22
110:23
111:16,17
120:10
121:12
122:7 123:5
127:7 128:8
128:10
129:15
133:16
138:12,16
138:22
139:17
140:21
141:15
179:4,10,12
179:13,19
181:2,13,14
181:15,16
181:22,24
182:1,8,18
182:23
183:23
184:9,10,18
185:3 186:1
186:24
190:4
195:10
198:13,19
198:24
199:2,6
200:9,24
201:2,14,21
202:1,13,17
202:24
204:21
205:9 206:9
207:12,13
207:24
208:5,16,23

209:8,18,24
210:21
211:14,24
214:6,17
215:12
216:3,13
217:22
218:1,10
219:2
221:15
223:1 225:3
226:9,12
227:9
231:18
232:5,7,23
236:7
237:19
239:12,21
239:22
240:10,18
241:7 242:9
243:8
244:14
245:11,18
247:15
248:5
258:23
259:6,17
263:9
272:19
273:3,15,17
273:17,20
280:23
281:20,24
283:1 285:1
285:13
**transacti...**
88:9
**transactions**
36:3,4 38:20
39:1 49:4
50:23 62:18
63:2 64:3
66:2,4
68:24 70:3
70:4 88:23
102:1 138:9

138:11,17
157:18
161:3 202:8
206:24
209:22
215:14
**transcribed**
10:13
**transcript**
7:10 8:6
286:10,14
287:12,20
291:10,15
**transfer**
48:14 49:2
49:16 50:4
51:20 65:10
65:12
**translate**
160:19
**transmission**
188:20
**transmitted**
190:23 191:9
191:10
**travelers**
21:12
**treasurer**
130:16
**treat**
254:14
**treated**
7:11 8:6
**treating**
231:10
**treatment**
109:10
230:23
**trend**
262:6,18,23
**trends**
263:4
**trib**
46:10 130:6
247:7
280:23

**tribune**
1:5 4:19
6:14 21:13
24:8,8,9,15
24:22,23
25:3,7,20
25:21,23
26:10,11
31:5 32:1
33:11,20
34:13,24
35:11 36:2
36:4,12,14
37:7 38:15
38:19 39:1
42:14,24
43:4,7,16
43:19 44:1
44:10,19
45:3,17,21
46:11 47:9
48:3 53:10
53:21 55:23
56:20,22
57:3,13,16
58:1,9,11
58:12 59:19
60:6,12
64:7,19,21
67:13,24
68:8,16
70:5 71:2,4
71:9 73:16
73:18 75:11
75:15 79:24
80:19,24
81:15,20
82:10,16
83:3 87:20
93:10 97:6
110:15
115:5
118:19
125:22
126:12,15
126:19
127:16,17

127:19,23
128:18,23
129:8,11
130:11
132:13
133:15
134:3,7
136:5,21,23
136:24
137:23
138:9,15,22
141:14
144:17
147:16,20
147:24
148:6,7
154:23
156:4 160:6
161:2 162:7
165:17
168:7,17,20
168:23
169:13,23
170:3,9,10
170:13
171:15,17
171:23
172:14,24
173:5 175:8
176:8
179:23
191:18
196:3,18
202:23
203:7
209:16
212:3
227:20
229:14
234:21
246:10
249:12,13
249:16,23
250:10
255:9,14
261:21
265:16

Elyse S. Bluth                                December 17, 2009

CONFIDENTIAL

54

266:9,11
267:2
272:21
274:10,14
274:16
281:4 286:5
291:5
**tribunes**
162:8 168:10
172:19
190:2
266:18
**tried**
122:12
274:16
**true**
286:13
287:15
**trust**
65:9 67:10
67:12,24
82:6 86:6
86:16 95:5
197:21
198:8 220:5
**trustee**
24:21,22,24
25:20 48:15
48:16,23
49:9 50:4,9
50:14,17
51:21 60:24
61:4 62:10
66:7 68:1
68:10,16
69:3 79:5
79:14,14,17
83:5 84:10
85:24
102:15
103:11,14
103:24
104:2,14,17
104:18,21
105:2
120:22
121:2,9,9

121:13,21
122:11,11
123:13,16
123:19
124:10
136:1
137:23
141:14
177:22
190:20
213:24
215:22
224:24
234:11
247:19
254:11
255:10
256:16,23
256:24
258:17
**trustees**
214:10
255:10
256:21
257:2
**truth**
287:10
**try**
10:5 54:7
95:9
**trying**
45:24 49:23
49:23 53:21
55:2,20
87:17 128:9
236:20
239:14
265:10
268:10,11
**turf**
142:18
**turn**
33:24 100:6
141:9
195:22
199:21
221:7

259:20
262:10
265:6,8
268:17
281:11
**turning**
18:15 157:14
168:4
176:11
201:12
240:24
250:15
261:17,24
**tv**
173:1 175:7
175:9,19,20
176:2
**two**
13:12,19,23
25:12 31:13
36:20 37:2
51:18 77:13
77:17 85:1
110:10
126:3
130:23
131:11
143:23
165:6 175:7
177:13
194:4 207:3
221:24
229:16
239:11
252:11
269:15,18
281:11
**twopage**
139:9
**type**
49:16 134:12
140:20
284:17
**types**
120:21
130:12
**typewriting**

287:14
**typical**
52:7 158:7
208:5
**typically**
39:21 49:10
49:11 50:24
62:19 63:7
66:9 150:1
150:2
155:17
157:7 164:6
166:20
174:1
181:10
196:22,23
224:23
225:1 251:2
266:2,3
**typo**
154:10,13

___ **U** ___

**ubit**
211:19 212:5
**uhhuh**
39:12
**uhhuhs**
10:12
**uhmuhms**
10:12
**ultimate**
41:21 109:6
122:5
123:21,22
124:7,9
157:23
161:12
245:10,19
**ultimately**
55:15 64:24
65:5 74:18
78:2 91:17
121:19
123:16
124:21
138:14

159:1
160:17
185:6
191:11
217:1
220:10,14
**unable**
213:1
**unclear**
56:20 59:16
**uncommon**
49:5,13
**underlying**
189:2
**underneath**
222:15
**underperform**
273:24
**underscore**
219:15
**understand**
10:3,5 11:12
13:1 14:18
43:2 44:20
46:10 49:20
53:21 55:2
55:9,20
56:2 82:18
87:17 105:9
188:19
200:23
205:14
236:21
238:20
239:1,10,14
239:16
256:5
275:11
279:24
282:16
284:3,13,16
**understan...**
27:9 28:15
44:16,23
45:1,4 46:1
50:3,6,10
51:4 52:2,6

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

92:19 93:18
105:18
106:4,9,10
106:11,12
123:18,21
124:6 137:1
161:1 162:7
166:14
175:2
192:23
200:22
214:1
223:16
234:18
242:16
247:12
257:24
258:7,14
**understood**
11:16 50:12
78:7,8
185:1
284:20,20
**unfortuna...**
219:1 227:21
**unit**
38:2,5 176:7
**united**
1:1,16 115:1
286:1
**unrelated**
44:6 212:6
**unsecured**
2:15 6:13
116:15
**unusual**
83:19 84:1,2
84:5 123:2
150:5 219:1
263:10
**updated**
134:14,15,18
269:5,7
**updates**
128:18
**use**
7:17 39:21

40:17 41:10
45:2 62:4,6
94:6 111:22
136:10
147:7
157:18
196:17
197:7
223:24
260:8
263:11
264:6 266:3
267:4
**uses**
179:9 196:24
268:18
270:5
281:12
**usually**
120:14,17

_____
**v**
_____
**valuation**
17:7 18:5
21:21 22:6
22:20 23:2
23:10,12,17
39:7,15,22
39:24 40:2
40:10,11,20
41:3 59:12
71:19,21
72:9,14,17
72:21 73:16
76:23 77:2
77:4,21
78:11,12
137:7,8,8
144:3,12,17
146:14
147:1,6,13
147:14,15
148:21
151:1
154:22
155:3,7,21
155:22

157:18
158:11,16
159:7,24
165:10
167:6
168:11,23
169:8,9,19
170:2
171:22
175:15
178:23,24
191:22
192:4,7
193:22
194:22
199:8 201:8
202:22
205:4,13,17
205:18,22
237:23
238:8
240:22
241:2,3,7
260:8
261:14
267:12
272:7,20
277:7
**valuations**
17:13 21:19
22:10,14
23:9 68:24
264:22
268:6
**value**
40:15,21
41:3 61:7
61:18,24
148:6,7
149:10,11
149:12,16
155:10,12
155:13,15
156:8 157:8
160:5 169:3
169:12
170:2,13

171:6,11,11
171:24
172:2,12,14
172:19
176:16,23
181:16
191:19
192:12,13
192:14,16
192:17,24
193:7,11
195:24
196:3,19
197:8
202:12,16
202:21,24
203:12,13
203:16,22
203:22
204:2,4,9,9
204:12,13
204:14,15
204:15,17
204:18,20
204:20,22
204:23
205:4,19,24
206:5
212:15
222:1,2,7,7
222:14,19
223:4,14,24
224:2,14
229:14,18
230:11,12
230:19
231:1,3,10
231:11,18
231:20
232:5,6
233:7,22
234:12
235:15,24
236:6,17,19
237:7,8,15
237:24
239:8 240:8

241:16,17
241:20,23
242:3,15
243:8
244:24
267:9 268:3
270:17
272:23
273:3,12
274:4
282:14,15
282:17
283:16
**valued**
156:2 173:4
173:7,8,17
175:19,20
176:14
266:12
270:13
**values**
147:22
155:23
168:9
191:17
192:2,19
**valuing**
172:4,7,10
172:11
174:16
175:13
**variety**
17:6,15 72:5
108:19
266:19
**various**
65:19 148:3
158:9
**vaughan**
87:22
**venn**
85:1
**verbal**
10:10,11
**verbally**
53:16
**version**

Elyse S. Bluth                                    December 17, 2009
CONFIDENTIAL

145:2
201:10
227:15
228:1,8,14
269:7
**versus**
105:24
**viability**
105:10 186:8
186:20
190:20
215:21
218:13,16
218:19
219:7,21
220:5,11
225:23
226:2
**viable**
104:22 105:1
217:1
**vice**
243:10
**view**
62:14,16
101:17,20
104:2,19
113:10
161:17,21
185:23
186:22
208:14
230:22
231:2
**viewed**
176:8
**viewpoints**
257:14,19
258:8,10
**views**
255:5,8,8,11
256:6,7
**virtually**
207:7 218:22
**virtue**
285:9
**visavis**

274:3
**visàvis**
69:8
**voice**
253:9
**volvo**
21:13

——————
W
——————
**wacker**
1:21 5:3
115:17
119:3
**wait**
134:19
**walk**
17:8
**walking**
146:17 194:5
246:24
**walls**
194:2
**want**
10:17 11:13
20:11 24:7
59:23 96:4
96:6 174:10
183:3
209:14
228:15
232:13
**wanted**
27:5 28:10
53:14
104:21
105:2
122:12
134:17
136:2,12
137:10
227:6
247:13,18
257:11
259:16
272:22
280:24
281:11

285:6
**wardwell**
4:2 8:17
118:2
**warner**
230:3,5,6
231:13
**warning**
251:17,21
275:9
**warrant**
274:2
**warranting**
94:1
**washington**
2:4 4:16
116:4
118:16
163:1
**wasnt**
72:24 73:10
81:4 91:24
159:11
164:13
174:22
175:24
176:2,4
203:8
205:22
211:4 215:5
225:13
227:7
234:15
250:9
253:16
267:11,24
268:10
283:21
**way**
10:5 15:7
86:8 100:11
128:5 141:3
149:11
161:20
171:12
214:10
215:20

234:14
256:14,19
263:13
270:19
**ways**
111:23
230:20
256:6
**website**
15:22,24
**wed**
151:6
**weekend**
253:9
**weekends**
165:6
**weeks**
32:12,12
214:23
**weighted**
196:24
260:17
**welgat**
259:21
**went**
30:1 45:6
52:22 74:18
163:9
175:13
180:10
209:18
216:3,13
217:21
228:8
266:20
275:1,4
**west**
1:21 3:19
5:3 115:17
117:19
119:3
**weve**
216:12,18
275:5
**whats**
40:8 88:5
158:2

169:12
176:12
185:11
197:3
231:15
258:13
268:21
283:9
**whereof**
288:3
**williams**
87:21 88:15
246:6 249:8
**willing**
62:6,7 223:7
223:8
239:17,18
240:21,21
**winston**
5:2 119:2
**withdraw**
56:4 69:12
**withstand**
182:8
**witness**
6:2,3,6 7:7
13:3 14:13
14:19 21:23
21:24 22:5
22:16 23:4
24:13 25:10
34:17 35:9
35:24 37:19
38:7,17
39:20 40:6
40:24 41:6
46:20 49:19
50:22 51:23
52:5,15
54:6 55:10
56:1,12
57:22 60:18
61:15 63:12
63:20 64:15
68:19 70:1
71:17 75:22
76:7 77:16

82:13 83:9
85:13 86:4
89:16 90:1
91:1 92:23
96:1,3
97:10 99:11
99:24
100:23
101:7,24
105:13
107:9
108:14
109:2,14
110:18
111:12
112:6,22
113:23
120:3 121:1
123:1 124:3
124:12
126:21
135:3,14
140:14
142:6 146:1
148:12
149:24
151:18
152:17
153:17,20
155:5
156:16
157:21
158:6 159:5
160:22
162:5
163:13
164:3 168:1
169:7 170:8
172:22
175:6,18
178:10
180:8 181:9
183:7 184:7
184:21
190:14
191:7
194:11

195:8
196:12
198:4,23
200:8
203:20
205:12
206:21
209:1,12
211:1
213:21
214:21
215:10
216:8
217:12
220:8
222:23
223:22
224:22
230:16
234:2 235:1
242:1,19
244:8
245:15
247:11
250:23
253:4
257:23
260:13
265:3,21
271:21
273:6
277:15,20
278:20
283:19
284:15
287:9,9,20
288:3
**wmerten**
125:15
**woghin**
143:3,6
177:21
188:18
**wonders**
100:13
**word**
113:2 126:16

185:17
232:14
**words**
62:3 105:19
107:24
113:8
124:15,17
172:7 222:6
**work**
17:19,22
18:3,5,5,7
18:17,22
19:14,15
20:1 21:6,7
21:12,13,18
24:7,14,18
25:3,23
26:8,11
27:17 29:6
31:9 32:7
34:9 36:2,4
36:6,7,8,12
36:14,21,24
37:7,7 44:6
53:10,20
54:13,15,17
55:11,23
56:8,9 57:5
57:6,15
58:4,11,12
58:18,20,24
60:5 69:18
69:22 70:10
70:15 71:1
71:14,16,19
71:20,20
72:3,9,14
72:17,21,24
73:2,8,11
73:14,17
74:3 76:4
76:18 81:1
81:5 86:21
87:10,15,20
89:10 91:18
128:19
129:8

133:14
134:17
140:16,19
148:9 150:5
151:1,3,15
159:9 162:6
162:13
163:18
176:20
181:7 182:5
182:5
199:10
203:7 205:5
215:18,19
217:15,18
218:16,22
268:12
**worked**
17:16 19:10
20:15 27:12
68:22 71:12
71:22,23
130:20
136:12
137:15,15
150:18,19
151:5,6,7
264:23
**working**
35:14 56:21
70:3 71:4
71:21 73:15
79:9 97:5
134:16
135:6 137:5
137:6,7,14
146:19
157:5 165:3
165:8,13
193:24
243:5,11
252:15,19
261:1
267:23
**works**
161:9
**world**

40:2,2,7,9
41:4
**worldcorp**
21:14
**worth**
22:7,22
23:16,19
171:2 206:3
232:6 234:8
242:2
**wouldnt**
133:3 134:19
172:6 176:8
216:13
233:19
**writeoffs**
162:23
**writing**
53:17
**written**
60:13 61:3
92:17 136:6
201:8,9
**wrote**
139:14
249:17
250:16

---
**X**
---
**xyz**
129:21

---
**Y**
---
**yeah**
54:22 90:23
107:24
197:5
**year**
23:18 149:9
234:5
238:12
279:11
**years**
12:18 13:23
15:4 17:21
20:17 87:9
150:3,4,6,9

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

58

| | | | | |
|---|---|---|---|---|
| 153:2 | 268:22,24 | 1:6 115:6 | **100percent** | 139:7 |
| 154:10 | 269:4,13,15 | 286:6 | 240:23 | 143:14 |
| 166:9 193:2 | 270:3,10 | | **10112** | 177:6,11 |
| 196:1 | 281:8,13,22 | ——— **1** ——— | 2:10 116:10 | 188:5 |
| 262:19 | **zero** | **1** | **108566** | 197:15 |
| 263:9 264:7 | 242:7 279:6 | 15:9,12 | 39:5 | 219:12 |
| 264:16 | 279:8 | 18:15 25:8 | **108568** | 226:17 |
| 265:1 | **zuckerman** | 89:4,8 | 34:1 | 248:17 |
| **yep** | 2:2 6:11 | 93:21 | **11** | 271:4 277:4 |
| 11:1 | 116:2 | 114:10 | 1:4 115:4 | **125** |
| **yeses** | | 115:13 | 143:10,13 | 281:21 |
| 10:11 | ——— **0** ——— | 126:3 | 143:18 | 289:14 |
| **yettobefo...** | **00** | 147:12 | 144:3,15 | **13** |
| 48:12 | 165:5 | 199:22 | 176:18 | 177:7,10,14 |
| **yield** | **000** | 233:6 | 261:11,12 | 178:1,8 |
| 210:22 | 91:6 206:3 | 277:23 | 261:14,24 | 231:21 |
| 211:11 | **000010** | 281:5 | 262:14 | 232:12 |
| 251:10,11 | 220:24 | 286:11 | 263:18 | 237:8,18,24 |
| **york** | **00002076** | 289:9 | 265:7 286:4 | 238:15,16 |
| 2:10,10,18 | 226:21 | **10** | 289:18 | 239:17 |
| 2:18,21 3:4 | **00008112** | 52:20,20 | **110** | 268:16 |
| 3:4 4:4,4 | 197:19 | 71:10 72:4 | 131:19 | 289:20 |
| 116:10,10 | **00008205** | 94:20 143:9 | **114379** | **131** |
| 116:18,18 | 95:23 | 143:13,16 | 177:15 | 289:15,16 |
| 116:21 | **00019200** | 144:1 | **114380** | **139** |
| 117:4,4 | 248:20 | 145:11,12 | 178:6 | 289:17 |
| 118:4,4 | **00033535** | 156:11 | **114420** | **13th** |
| 162:24 | 271:10 | 163:1 165:5 | 143:17 | 33:14,21 |
| 202:3 | **00064622** | 176:18 | **12** | 34:22 39:14 |
| **youd** | 177:16 | 177:1 | 114:8 155:11 | 40:20 41:12 |
| 195:22 257:5 | **01** | 246:21 | 162:20 | 41:17 51:10 |
| **youll** | 248:2 | 248:2 | 177:2,5,13 | 52:24 53:1 |
| 160:24 | **04** | 289:18 | 177:14,19 | 53:19 54:14 |
| **youre** | 261:21 | **100** | 196:2,7 | 54:24 56:17 |
| 184:11 | **05** | 110:4,11,13 | 238:2,7 | 57:2,4,9,13 |
| 186:13 | 261:21 | 111:1,18 | 242:3 | 57:19 69:18 |
| **youve** | **06** | 171:8 237:6 | 259:20,21 | 79:7 |
| 88:1 98:3 | 261:21 | 237:6 279:8 | 289:19 | **14** |
| 138:6 | **07** | 279:9 | **120** | 154:19 |
| | 274:8 276:2 | **1000** | 171:5,9 | 162:15 |
| ——— **z** ——— | 278:14 | 2:3 116:3 | **1200** | 177:1 188:1 |
| **zack** | 279:14,21 | **10010** | 26:7 | 188:4,7,11 |
| 3:6 8:18 | 279:21 | 3:4 117:4 | **12172009** | 238:2,7 |
| 117:6 | **08** | **10017** | 15:13 32:19 | 289:21 |
| **zell** | 275:4 | 4:4 118:4 | 42:4 66:22 | **143** |
| 27:7 28:16 | **0813141** | **100196799** | 95:19 125:6 | 289:18 |
| 190:3 | | 2:18 116:18 | 131:4,9 | **15** |

Elyse S. Bluth                                        December 17, 2009

CONFIDENTIAL

17:21 71:10
72:4 145:12
145:12
188:4,8
195:22
246:21
289:9,21
**1501**
4:15 118:15
**1552**
60:10
**16**
197:11,14
257:5
261:11,12
263:21
265:8
289:22
**1633**
2:17 116:17
**16th**
249:6
**17**
1:22 115:12
219:8,11
289:23
291:8
**177**
289:19,20
**18**
61:9 226:13
226:16
269:12
270:2 281:3
284:22
288:11
289:24
**1800**
2:3 116:3
**188**
289:21
**19**
96:22 248:13
248:16
252:14
290:4
**197**

289:22
**1974**
61:10
**1988**
18:9
**1989**
24:16 25:3,7
25:15,18,24
**1st**
25:24 92:16
127:10
228:2,3,5
228:12,13
246:10,20
248:6

––––––––––––
**2**

**2**
32:15,18
37:13 52:11
93:22,24
147:13
157:12,12
160:23,23
161:4,4
163:1,3
221:7 238:2
238:7
277:18,23
278:5,8,8
289:10
**20**
20:16 234:6
238:13
240:6 271:3
271:6 275:3
286:22
290:5
**200**
91:6
**2000**
25:7
**20005**
4:16 118:16
**200365802**
2:4 116:4
**2004**

6:22
**2006**
160:9
**2007**
25:8,15 26:1
26:9,16,21
28:5 29:14
33:17,21
39:2 42:16
54:11 67:16
67:22,22
74:21 75:5
79:7 92:16
97:15 98:21
99:17
100:17
103:14
126:10
127:21
132:14
152:16
155:12
160:9
182:15
198:9
225:16
228:13
233:2 248:6
257:6,7
258:19
272:8,20
273:4 277:7
278:17
281:5
**2008**
155:14
221:19
271:7
**2009**
1:22 115:12
288:5 291:8
**2010**
262:4
**2011**
262:4
**2012**
152:6 288:11

**2015**
154:12,18
**2016**
154:12,17
**2027368000**
4:17 118:17
**2027781800**
2:5 116:5
**20percent**
171:6 240:12
**21**
160:2 277:3
290:6
**2123264303**
3:5 117:5
**2124085100**
2:11 116:11
**2124504462**
4:5 118:5
**2125061700**
2:19 116:19
**2136941152**
3:12 117:12
**219**
289:23
**225**
281:22
**226**
289:24
**23**
157:12
228:17
229:11
261:19
**23rd**
132:14 163:6
288:4
**24**
231:15
**248**
290:4
**25**
12:18 15:4
114:10
115:13
167:5 232:2

236:2 263:9
282:11,12
**250**
206:3
**252**
289:4
**26**
42:16 50:1
238:4
240:24
243:9
282:11
**26th**
44:14 56:5
60:9 67:21
69:4,8,15
**27**
262:10,12,13
**271**
290:5
**277**
290:6
**27th**
144:5 229:7
**28**
178:21
**280**
289:5
**286**
286:12
**28th**
229:8
**29**
257:6,7
**2900**
3:10 117:10
**295**
206:4
**29th**
176:21,21
198:8 200:4
200:11
218:8
258:19
261:14
**2nd**

Elyse S. Bluth                                    December 17, 2009

CONFIDENTIAL

127:10

**3**
**3**
3:18 41:22
  42:3 47:20
  60:10 61:9
  117:18
  147:17
  162:24
  169:23
  195:16,16
  278:9,9
  289:11
**30**
  2:9 116:9
  126:3 175:8
  195:16
**300**
  206:3
**30250**
  15:21
**31**
  157:12
  169:23
  173:1
  204:16
  272:8 277:7
**3125587332**
  5:5 119:5
**3125832433**
  3:21 117:21
**3128537621**
  4:11 118:11
**315**
  282:3
**31st**
  225:16
  272:20
  273:4
**32**
  289:10
**322**
  233:10,20
  238:19
  241:20
**33**

1:23
**34**
  231:19
  233:21
  234:4,8,18
  235:3,23
  236:8,13
  237:20
  239:19
**35**
1:21 5:3
  115:17
  119:3 275:5
**3500**
1:21 115:17
**36**
114:8 285:4
**37**
  271:11
**372**
  156:11
**39**
  195:16

**4**
**4**
66:17,21
  71:15 89:1
  94:4 147:21
  177:1
  191:15
  289:12
**40**
168:4,6
  192:6
**401**
196:6 221:17
  233:17
  234:5
  238:12
**41**
277:14,15,17
  277:21
  278:8
**4100**
3:18 117:18
**41546**

67:19 93:7
**41555**
  42:20
**42**
168:20
  176:11
  289:11
**42percent**
172:14
**43**
  275:5
**4473**
141:10
**45**
126:4
**450**
4:3 118:3
**48**
52:20
**48833**
291:4

**5**
**5**
94:8 95:15
  95:18 126:4
  145:13
  148:1,20
  160:10,10
  160:18,18
  168:20
  192:9
  195:22
  201:12
  248:2,2
  252:5 271:7
  275:4,5
  285:18
  289:13
**50**
171:17,19
**55**
177:1 275:6
**56**
52:20
**57**
  285:18

**59**
  278:5

**6**
**6**
42:19 89:2
  94:11 125:2
  125:5,8
  152:4
  162:21,21
  176:18
  202:9 237:8
  237:18,24
  238:2,7,15
  238:16
  239:17
  242:3 275:3
  275:6 278:5
  281:12,18
  289:3,14
**60**
233:16 234:5
  238:12
**60602**
5:4 119:4
**606024231**
3:20 117:20
**60603**
4:10 118:10
**613**
231:21
**64630**
179:7
**66**
289:12

**7**
**7**
3:3 94:13
  117:3
  130:23
  131:3 132:1
  132:4,10
  152:9,13
  153:6,16
  154:12
  162:21,21

162:21
  165:23
  289:15
**70**
3:19 117:19
  207:16
**75**
153:10 154:1
  166:15
  167:10
  264:1

**8**
**8**
94:15 131:5
  131:8 132:1
  132:5,23
  145:13
  160:10,18
  162:19,21
  162:21,24
  163:1
  176:18
  206:12
  237:6
  261:10,12
  261:13,17
  269:13
  270:3 281:7
  281:18
  282:5
  289:16
**80**
207:16 237:3
  238:11
**800**
237:7
**80s**
17:18
**81**
160:23 161:4
  163:3
**842212**
1:18 5:24
  119:24
  287:4 288:9
**865**

```
 3:10 117:10
8846
277:11,13
89
25:15
8th
67:15,22
 69:7,14
 78:19 81:12
 89:1 92:18
 95:4 102:12
```

```
            9
9
1:23 94:17
 139:3,6
 160:10,18
 162:20,21
 162:21,21
 163:2 179:6
 206:11
 207:9
 232:12
 257:13
 259:14
 262:1
 268:17
 289:17
90
270:6 281:9
 282:4
900
90:10 235:14
 236:15
 239:3
90017
 3:11 117:11
90s
17:18 230:8
91
160:23 161:4
95
207:14
 289:13
95percent
259:17
```