Page 1

1

2  IN THE UNITED STATES BANKRUPTCY COURT

3  FOR THE DISTRICT OF DELAWARE

4  ------------------------)

5  In re:                  Chapter 11

6  Tribune Company, et al.,  Case No.

7             Debtors.     08-13141 (KJC)

8  ------------------------) (Jointly

9                            Administered)

10

11

12

13

14          CONFIDENTIAL DEPOSITION OF

15               BRYAN BROWNING

16            New York, New York

17            December 4, 2009

18

19

20

21

22

23

24  Reported by:

    Linda Salzman

25  JOB NO. 26237

1

2

3                      December 4, 2009

4                      9:30 a.m.

5

6            Confidential Deposition of BRYAN

7    BROWNING, the witness herein, held at the

8    offices of Chadbourne & Parke, LLP, 30

9    Rockefeller Plaza, New York, New York,

10   pursuant to Notice, before Linda Salzman,

11   a Notary Public of the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    A P P E A R A N C E S:

3

4

5        ZUCKERMAN SPAEDER, LLP

6        Attorneys for The Unsecured Creditors

7        Committee

8             1800 M Street, N.W.

9             Washington, DC 20086-5802

10    BY:    JAMES SOTTILE, ESQ.

11             ANDREW GOLDFARB, ESQ.

12

13

14        CHADBOURNE & PARKE, LLP

15        Attorneys for Committee of Unsecured

16        Creditors

17             30 Rockefeller Plaza

18             New York, New York 10112

19    BY:    MARC D. ASHLEY, ESQ.

20             ELIZABETH MILLER, ESQ.

21

22

23

24

25

Page 4

1

2   A P P E A R A N C E S: (Continued)

3

4

5       WINSTON & STRAWN, LLP

6       Attorneys for Valuation Research

7       Corporation and the Witness

8            200 Park Avenue

9            New York, New York 10166-4193

10  BY:    DAVID NEIER, ESQ.

11           ROBERT BOUDREAU, ESQ.

12

13

14      HENNIGAN BENNETT & DORMAN, LLP

15      Attorneys for Various Credit Agreement

16      Lenders

17           865 S. Figueroa Street

18           Suite 2900

19           Los Angeles, CA 90017

20  BY:    JAMES O. JOHNSTON, ESQ.

21           JAMES BERGMAN, ESQ.

22

23

24

25

Page 5

1

2   A P P E A R A N C E S: (Continued)

3

4

5       LAZARD FRERES & CO., LLC

6       Attorneys for Tribune Company

7            190 S. Lasalle

8            31st Floor

9            Chicago, Illinois 60603

10   BY:   SUNEEL MANDAVA, ESQ.

11            RAY STURM, ESQ.

12

13

14       KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP

15       Attorneys for Law Debenture of New York

16            1633 Broadway

17            New York, New York 10009

18   BY:   ANDREW GLENN, ESQ.

19            CHRISTINE A. MONTENEGRO, ESQ.

20

21

22

23

24

25

1

2    A P P E A R A N C E S: (Continued)

3

4

5        SIDLEY AUSTIN, LLP

6        Attorneys for Tribune

7            1501 K Street, N.W.

8            Washington, DC 20005

9        BY:   JAMES BENDERNAGEL, JR., ESQ.

10           DAVID M. MILES, ESQ.

11

12

13       DAVIS POLK & WARDWELL, LLP

14       Attorneys for JPMorgan Chase

15           450 Lexington Avenue

16           New York, New York 10017

17       BY:   LYNN EARL BUSATH, ESQ.

18           DANIEL LOSS, ESQ.

19

20

21       KAYE SCHOLER , LLP

22       Attorneys for Merrill Lynch

23           425 Park Avenue

24           New York, New York 10022-3598

25       BY:   JOSEPH M. DRAYTON, ESQ.

1

2    A P P E A R A N C E S: (Continued)

3

4

5        O'MELVENY & MYERS, LLP

6        Attorneys for Bank of America

7            7 Times Square

8            New York, New York 10036

9        BY:   STEVEN ROSENSTEIN, ESQ.

10

11

12        PAUL WEISS RIFKIND

13        WHARTON & GARRISON, LLP

14        Attorneys for CitiGroup

15            1285 Avenue of the Americas

16            New York, New York 10019

17        BY:   STUART McPHAIL, ESQ.

18

19

20

21

22

23

24

25

1

2          IT IS HEREBY STIPULATED AND AGREED,

3    by and between the attorneys for the

4    respective parties herein, that filing

5    and sealing be and the same are hereby

6    waived.

7          IT IS FURTHER STIPULATED AND AGREED

8    that all objections, except as to the

9    form of the question, shall be reserved

10   to the time of the trial.

11         IT IS FURTHER STIPULATED AND AGREED

12   that the within deposition may be sworn

13   to and signed before any officer

14   authorized to administer an oath, with

15   the same force and effect as if signed

16   and sworn to before the Court.

17

18

19

20

21

22

23

24

25

1

2    B R Y A N   B R O W N I N G,

3        called as a witness, having been duly

4        sworn by a Notary Public, was examined

5        and testified as follows:

6    EXAMINATION BY

7    MR. SOTTILE:

8        Q.   Would you please state your full

9    name, sir?

10       A.   It's Bryan, B-R-Y-A-N, H, Browning,

11   B-R-O-W-N-I-N-G.

12       Q.   Mr. Browning, my name is James

13   Sottile.  I'm a lawyer with the firm of

14   Zuckerman Spaeder, which is special

15   litigation counsel for the Committee of

16   Unsecured Creditors in the Tribune bankruptcy

17   case.

18            We're here today for an oral

19   examination of you to be conducted under

20   Bankruptcy Rule 2004.  The examination

21   consists of questions that I or other lawyers

22   will put to you, your answers, objections and

23   commentary that may come along the way.

24            I would ask that if you don't

25   understand a question that I or anyone else

1        B. Browning - Confidential

2    puts to you, let us know and we will do our

3    best to try to rephrase it so that you will

4    understand it and be able to respond.

5            MR. SOTTILE:  I want to -- before

6        we turn to questioning, I want to recite

7        a couple of agreements and stipulations

8        among counsel concerning the conduct of

9        this deposition.

10           As an initial matter, all parties

11       that are represented in the room agreed

12       at the deposition of Mr. Rucker

13       yesterday that they either had a

14       confidentiality agreement of their own

15       with Valuation Research concerning the

16       documents that have been produced by

17       Valuation Research or had signed onto

18       the confidentiality agreement between

19       the Committee of Unsecured Creditors and

20       VRC.

21           In addition, yesterday and today

22       some documents were used that were

23       produced by the Tribune, and in some

24       cases those documents have not been

25       marked as confidential because they came

1          B. Browning - Confidential

2          from a data room or such designations

3          were not present.

4               All such documents the parties will

5          agree will be treated as confidential.

6               With respect to objections, the

7          parties have stipulated as follows:

8               First, that all objections except

9          as to the form of the question are

10          preserved and need not be asserted

11          during the course of this deposition.

12               And second, that any objections

13          stated by one party will be deemed to be

14          joined in by all other parties.  And

15          absent objection, I will assume that

16          those understandings and stipulations

17          are satisfactory to all parties.

18               MR. NEIER:  I think everybody was

19          here yesterday except for Mr. Johnston,

20          and I don't recognize you, sir.

21               MR. GOLDFARB:  Andrew Goldfarb also

22          from the Zuckerman firm.

23     BY MR. SOTTILE:

24          Q.   Mr. Browning, can you take a look

25     at the document that's marked as Rucker

1          B. Browning - Confidential

2   Exhibit 1?  It should be on top of the pile

3   in front of you.  I would like you to turn to

4   the page that's stamped in the lower right

5   with numbers ending 19408.  It's about five

6   or six pages in from the beginning and has

7   your name at the top.

8          Mr. Browning, can you identify this

9   page and the two pages that follow it?

10      A.   Yes.

11      Q.   What is it?

12      A.   I believe it's a marketing piece

13   for, that gives a resume, if you will, or CV

14   for my education experience.

15      Q.   Is this resume accurate, or is

16   there anything that you would change, add or

17   subtract in it?

18      A.   It's relatively accurate, but

19   probably changes that would be made, but it's

20   a little bit old, so...

21      Q.   Is there anything material that you

22   would change other than reflecting more

23   recent experiences?

24      A.   I don't think so.

25      Q.   It recites that your position with

1          B. Browning - Confidential

2    Valuation Research Corporation is senior

3    vice-president and professional services

4    manager.

5              Is that your current position with

6    the company?

7         A.    It is not.  I'm managing director.

8         Q.    And did that involve any change in

9    responsibilities for your position as senior

10   vice-president and professional services

11   manager?

12        A.    Generally, no.

13        Q.    Is it correct, Mr. Browning, that

14   part of your work at Valuation Research has

15   involved working on opinions concerning the

16   solvency of companies?

17        A.    Yes.

18        Q.    Can you describe for me in general

19   terms what portion of your work would be

20   devoted to solvency opinions as opposed to

21   other kinds of engagements?

22        A.    That really depends on the year and

23   the time of year.

24        Q.    Can you give me any estimate over a

25   period of time?

1      B. Browning - Confidential

2      A.    I would say maybe 30 percent, 40

3  percent on average.

4      Q.    One engagement you worked on while

5  at Valuation Research concerning solvency was

6  for the Tribune Company; is that correct?

7      A.    Yes.

8      Q.    As of the time you began work on

9  that engagement, can you give me an estimate

10  of how many solvency opinions you had worked

11  on?

12      A.    I was probably involved in 4 or 500

13  by that time.

14      Q.    Had any of those prior experiences

15  with solvency opinions involved a company of

16  the size of Tribune, or transactions the size

17  of those contemplated by the Tribune?

18      A.    I don't think so.

19      Q.    Can you give me some indication of

20  what the next largest solvency opinion you

21  would have worked on was in comparison to the

22  Tribune?

23      A.    I think there was some of our

24  original ones that I worked on were, there

25  was a fairly significant one multiple billion

1      B. Browning - Confidential

2    dollar transaction, but I can't tell you that

3    for sure.  It was back in 1987, and I was an

4    analyst on the -- '87, '88 timeframe.

5         Q.    That would have been the largest

6    before the Tribune engagement?

7         A.    I believe so.

8         Q.    Had you ever worked on a solvency

9    opinion involving tax savings associated with

10   an employee stock ownership plan before you

11   worked on the Tribune engagement?

12        A.    Can you repeat that, I'm sorry.

13        Q.    Prior to the time you did your work

14   for the Tribune, had you ever worked on a

15   solvency opinion for a company that included

16   consideration of tax savings associated with

17   an employee stock ownership plan?

18        A.    I don't believe so.

19        Q.    Mr. Browning, could you take a look

20   at the document that has been marked as

21   Rucker Exhibit 2.

22            Are you able to identify this

23   document, sir?

24        A.    I have to pull some glasses here, I

25   think.

1        B. Browning - Confidential

2            It looks like an e-mail from one of

3    our employees.

4        Q.    Is it correct that there is more

5    than one e-mail included in this document?

6        A.    Yeah, there's a chain of e-mails, I

7    believe.

8        Q.    Were you copied on at least part of

9    this chain of e-mails?

10       A.    It looks like it.

11       Q.    The chain of e-mails appears to

12   start, if you look at the second page of the

13   exhibit, with one from a gentleman named

14   Chandler Bigelow to Bill Hughes and Peter

15   Morrison that is dated March 29th.

16            Do you see that?

17       A.    Yes.

18       Q.    Who is Mr. Morrison?

19       A.    Mr. Morrison is a senior

20   professional in our real estate practice.

21       Q.    Is he someone who had done work for

22   the Tribune prior to this time?

23       A.    I believe so.

24       Q.    Am I reading the e-mail chain

25   correctly, that it was -- Mr. Bigelow's

1          B. Browning - Confidential

2    e-mail was forwarded to you by Mr. Morrison,

3    is that what happened here?

4          A.   Could be.

5          Q.   Is the way in which you first

6    learned about a potential engagement for the

7    Tribune from Mr. Morrison, is that how you

8    learned about it?

9          A.   Yes, I believe so.

10         Q.   On the first page of Rucker Exhibit

11   2, the second e-mail from the top appears to

12   be from a Mr. Greg Barber to Chad Rucker,

13   Stuart Gruskin and yourself dated March 29th,

14   time 11:11 p.m.

15              Do you see the e-mail I'm referring

16   to?

17         A.   Yes.

18         Q.   Do you recall receiving this

19   e-mail?

20         A.   I don't recall specifically, but I

21   suspect that I did.

22         Q.   Is Mr. Barber someone who works

23   with you?

24         A.   Mr. Barber did work with me.

25         Q.   At this time he did?

1      B. Browning - Confidential

2      A.   At this time.

3      Q.   He's no longer with Valuation

4   Research?

5      A.   That is correct.

6      Q.   The second sentence of Mr. Barber's

7   e-mail reads, "This may be just acceptable

8   risk levels, but we will need to be

9   compensated."

10          Do you have an understanding of

11   what Mr. Barber was referring to when he was

12   talking about "just acceptable risk levels"?

13      A.   I'm not certain what he would be

14   saying there specifically, but I would assume

15   he's talking about the work that has to be

16   done relating to the opinion.

17      Q.   And what understanding did you have

18   about the risk levels associated with the

19   Tribune engagement as of this time when you

20   were just learning about it?

21      A.   The problem is right at this point

22   in time we were learning about it, so I don't

23   know if I really understood the risk levels.

24      Q.   Were you aware that the

25   transactions contemplated by the Tribune

1        B. Browning - Confidential

2   involved a high degree of leverage?

3        A.   Yes.

4        Q.   Would that create a risk level in

5   connection with Valuation Research's solvency

6   analysis as a general proposition?

7        A.   Well, there is a lot of factors

8   that go into when we refer to risk.  It can

9   be the -- just the complexity of the

10  transaction, the size of the transaction, the

11  leverage of the transaction, a number of

12  things.

13       Q.   Are there any other important

14  factors that VRC considers in assessing the

15  risk of an engagement to render a solvency

16  opinion?

17            You mentioned complexity, size and

18  leverage.

19       A.   I can't think of anything

20  specifically.  It all gets down to the amount

21  of work that has to be done.

22       Q.   What is the risk to VRC that arises

23  from these factors; complexity, size,

24  leverage and others that may be applicable?

25       A.   I would say the biggest risk is

1          B. Browning - Confidential

2     that we're not paid for the service that

3     we've provided.

4          Q.    I'm not sure that I understand, so

5     let me try to follow-up.

6               Are you saying that the biggest

7     risk to VRC is they would have to do more

8     work than was paid for?

9          A.    I don't think I said the biggest

10    risk.  I said a risk that a -- our projects

11    are based upon the timeframe that we take to

12    get a project done.  And so we want to make

13    sure that we knew this was going to be a

14    complex project, and we wanted to make sure

15    that we were compensated for the hours that

16    we put into the project.

17         Q.    You wanted to make sure that you

18    priced it right in light of the anticipated

19    work?

20         A.    That's correct.

21         Q.    Does a high degree of leverage in a

22    transaction that's being analyzed by VRC

23    indicate to you that there's a greater risk

24    than otherwise that VRC's solvency opinion

25    would later be challenged?

1      B. Browning - Confidential

2      A.   Certainly there would be -- the

3  higher the amount of leverage, the greater

4  chances of a challenge would be there.

5  That's just a matter of fact.

6      Q.   Is it also correct that the greater

7  the degree of leverage the greater the risk

8  that Valuation Research's solvency opinion

9  might be incorrect as of the time it was

10 rendered?

11     A.   The reason why we price it the way

12 we do, we want to make sure that we put the

13 time in to make sure it is correct.

14     Q.   That's because there's a greater

15 risk that it might be incorrect if there's a

16 greater degree of leverage?

17     A.   I don't think I know how to answer

18 that.

19     Q.   Fair enough.

20          MR. SOTTILE:  Let's mark this

21     document as Browning Exhibit 1, please.

22          (Browning Exhibit 1, E-mail, marked

23     for identification, as of this date.)

24     Q.   Mr. Browning, can you take a look

25 at the documents we've marked as Browning

1          B. Browning - Confidential

2    Exhibit 1 and identify it, if you are able to

3    do so?

4          A.    Yes.

5          Q.    What is it, sir?  Are you able to

6    identify this document, Mr. Browning?

7          A.    Not specifically, but it was an

8    e-mail that looks like the last one I sent of

9    a chain of e-mails.

10         Q.    By "the last one," which e-mail are

11   you referring to, sir?  There's several pages

12   here.

13         A.    I'm assuming it goes from the first

14   page would be the last e-mail sent, so that

15   would be me to a Mr. Neil Kelly.

16         Q.    Who is Mr. Kelly?

17         A.    Mr. Kelly is the chairman of

18   Valuation Research.

19         Q.    Is it correct that the way this

20   e-mail chain is laid out, what you sent to

21   Mr. Kelly would include all of the e-mails

22   that appear in Browning Exhibit 1?

23         A.    I would assume so.

24         Q.    Can you turn to the second page of

25   Browning Exhibit 1?

1    B. Browning - Confidential

2         And actually, also look at the last

3    line of the first page, which I think is part

4    of the e-mail that appears at the top of the

5    second page.

6         My question is:  Are you able to

7    identify the e-mail that starts on the last

8    line of the first page of Browning 1 and

9    carries over to the second page?

10        A.   Yes, I think so.

11        Q.   What is it, sir?

12        A.   It's an e-mail from -- that I think

13   I forwarded to Mark Brattebo and Neil Kelly.

14        Q.   I'm sorry.  I think I mean the

15   e-mail that carries over from the bottom of 1

16   to the top of 2?

17             MR. NEIER:  He's got it right.  It

18        is a forwarded e-mail.  He's forwarding

19        an e-mail from --

20             MR. SOTTILE:  I see what you're

21        saying.

22        Q.   So to be clear, if we start at the

23   bottom of page 1 of Browning Exhibit 1, you

24   are forwarding an e-mail to Mr. Brattebo and

25   Mr. Kelly; is that right?

1       B. Browning - Confidential

2       A.   Yes.

3       Q.   And the e-mail that you're

4   forwarding is the one, the text of which

5   appears at the top of page 2 of Browning

6   Exhibit 1?

7       A.   Yes.

8       Q.   And what was Mr. Brattebo's

9   position at this time?

10      A.   He is -- he was the executive

11  managing director for the eastern United

12  States.

13      Q.   Did you report to him?

14      A.   I did.

15      Q.   Directly or through some other

16  person?

17      A.   Directly.

18      Q.   Can we look at the e-mail that you

19  were forwarding to Mr. Brattebo and

20  Mr. Kelly.  That's an e-mail from you to

21  Mr. Hughes dated March 29th at 8:44 p.m.?

22          MR. NEIER:  Objection to form.

23      Q.   Is that right?

24      A.   Can you ask it again, I'm sorry.

25      Q.   Sure.

1      B. Browning - Confidential

2          Is the e-mail that you were

3   forwarding to Mr. Brattebo and Mr. Kelly an

4   e-mail from you to Mr. Bill Hughes that

5   recites that it was sent on Thursday, March

6   29, 2007 at 8:44 p.m.?

7      A.   That's what it looks like, yes.

8      Q.   What was Mr. Hughes's position at

9   this time?

10     A.   He was the executive managing

11  director for the rest of the United States.

12     Q.   So you did not report to him?

13     A.   Not at that time.

14     Q.   In the third sentence of the e-mail

15  from you to Mr. Hughes that reads, "Highly

16  unusual (because of S. Corp. AESOP tax

17  benefits) and highly leveraged."

18          What did you mean by "highly

19  leveraged" in this context?

20     A.   I meant they're borrowing a lot of

21  money to do the transaction.

22     Q.   In relation to the size of the

23  equity?

24     A.   Just in relation to the overall

25  transaction.

1      B. Browning - Confidential

2      Q.   And the transaction was highly

3  unusual because you had not previously worked

4  on one involving S. Corp. AESOP tax benefits?

5      A.   From a solvency standpoint, you're

6  asking?

7      Q.   Yes, sir.

8      A.   Yes.

9      Q.   The following sentence indicates,

10  "I have contacted the opinion committee," and

11  then goes on.

12           What was the opinion committee?

13      A.   The opinion committee is a

14  committee that looks at every, all of our

15  opinions to assist in pricing the opinions,

16  reviewing the opinions, and giving advice

17  toward opinions.

18      Q.   Is it correct that as of this time,

19  the Valuation Research opinion committee had

20  to review and agree on the acceptance of an

21  engagement to give a solvency opinion?

22      A.   I'm not sure I could say that.  I

23  would say that it certainly gave its input.

24      Q.   Is it correct that before -- at

25  this time, March 2007, before VRC took on a

1        B. Browning - Confidential

2   solvency opinion engagement, the individuals

3   involved had to consult with the opinion

4   committee?

5        A.   I would say generally yes.

6        Q.   Who was on the opinion committee at

7   this time; do you know?

8        A.   I think it was Stuart Gruskin, Greg

9   Barber, myself, Chad Rucker and there may

10  have been -- and possibly Mark Brattebo.

11       Q.   Do you recall any of the

12  discussions or considerations of the opinion

13  committee in relation to whether or not to

14  accept the engagement to render solvency

15  opinions for the Tribune?

16       A.   Not specifically.

17       Q.   Do you have a general recollection

18  of issues that were discussed?

19       A.   Sure.  I'm sure pricing was

20  discussed.  I'm sure the size of the

21  transaction was discussed.  Timing of the

22  transaction was discussed.  Those type of

23  general inputs which we would do in any of

24  our meeting relative to the opinion

25  committee.

1          B. Browning - Confidential

2          Q.    Do you have any more specific

3    recollection about discussions by the opinion

4    committee about whether to take the Tribune

5    solvency engagement?

6          A.    Well, at some point we decided to

7    take the opinion, so I don't know when that

8    would have been.

9          Q.    But you don't have any more

10   specific memory about what was said by

11   members of the opinion committee, what they

12   talked about?

13         A.    I don't specifically.

14         Q.    You mentioned the one thing the

15   opinion committee would look at at this time

16   would be pricing of an engagement; is that

17   right?

18         A.    Yes.

19         Q.    Is it correct, at least in the

20   initial engagement, the price was set at $1.5

21   million?

22         A.    I believe that's right.

23         Q.    How does that compare to other

24   solvency engagements which you've been

25   involved in with Valuation Research as of

1          B. Browning - Confidential

2    that time?

3          A.    I believe that was the highest fee.

4          Q.    What was the next highest you can

5    recall?

6          A.    Probably over a million dollars.

7          Q.    Can you tell me what the factors

8    were that led to the price for the Tribune

9    solvency opinions being the highest you'd

10   ever seen while at Valuation Research?

11         A.    I think the things that I just

12   referred to, the size of the transaction, the

13   complexity of the engagement, timing of the

14   engagement.

15         Q.    The degree of leverage?

16         A.    Leverage was certainly a factor.

17         Q.    In the course of evaluating whether

18   or not to accept the engagement to give

19   solvency opinions to the Tribune, did you

20   personally consider the likelihood that you

21   would be able to give a positive solvency

22   opinion after finishing your analysis?

23         A.    I'm not sure I understand the

24   question.

25         Q.    Sure.

1       B. Browning - Confidential

2           In deciding to take on the Tribune

3   engagement, did you think about how likely it

4   was at the end of the day you would be able

5   to give them a positive solvency opinion?

6       A.   I would say generally when we look

7   at pricing an opinion we consider those

8   factors.

9       Q.   Is it correct that at least your

10  own practice would be that you would not want

11  to take on an engagement to render a solvency

12  opinion unless you thought at the end of the

13  day you would be able to give a positive

14  opinion?

15      A.   I would say generally that's the

16  case.  Certainly doesn't always happen, but

17  that's certainly generally the case.

18      Q.   Have there been occasions in the

19  course of your work on solvency opinions when

20  you accepted the engagement but were

21  ultimately unable to give a positive solvency

22  opinion?

23      A.   Yes, I believe so.

24      Q.   How many times?

25      A.   I can't tell you that.

1        B. Browning - Confidential

2        Q.    Any estimate?

3        A.    I would probably say half dozen,

4    something like that.

5        Q.    Out of 4 or 500?

6        A.    I may be off on that number.  I

7    don't know.

8        Q.    But that's the best estimate you

9    can give right now?

10       A.    Yes.  The reason is we qualify the

11   opinions before we would take those on.

12       Q.    I'm not sure I understand the last

13   response.

14       A.    We look at the analysis before we

15   look at a high level, the analysis.

16       Q.    So before you take on an

17   engagement, you look at the analysis at a

18   high level to see whether or not you will be

19   able to give a positive solvency opinion; is

20   that right?

21       A.    Generally.

22       Q.    And you followed that practice with

23   respect to the Tribune engagement?

24       A.    I believe so.

25       Q.    Do you remember any specific

1        B. Browning - Confidential

2   discussion on that issue before Valuation

3   Research decided to take on the Tribune

4   engagement?

5        A.   I do not.

6             MR. SOTTILE:   Let's mark this as

7        Browning Exhibit 2, please.

8             (Browning Exhibit 2, Engagement

9        letter, marked for identification, as of

10       this date.)

11       Q.   Mr. Browning, are you able to

12   identify the document that we marked as

13   Browning Exhibit 2?

14       A.   Yes, I believe so.

15       Q.   What is it, sir?

16       A.   I believe it's either a copy of our

17   engagement letter or the final engagement

18   letter.

19       Q.   Can you take a look at the first

20   page of the document and see if you can

21   identify that, the page before the one you're

22   currently looking at, sir?

23             What's the first page?

24       A.   It looks like an e-mail to Chandler

25   Bigelow from Bill Hughes.

1        B. Browning - Confidential

2        Q.    Is the attachment to your

3    understanding a draft of the engagement

4    letter?

5        A.    I don't know.

6        Q.    Do you know who prepared the

7    engagement letter that appears in Browning

8    Exhibit 2, or the draft, if that's what it

9    is?

10        A.    I believe Bill Hughes.

11        Q.    Did you have any involvement in the

12    preparation of this document?

13        A.    I did.

14        Q.    What was your involvement?

15        A.    I either wrote some text or

16    reviewed the engagement letter or some

17    portion of it.

18        Q.    You reviewed this and were involved

19    in the drafting; is that right?

20        A.    I believe so.

21        Q.    And this document, at least

22    according to the e-mail on the first page,

23    was sent to Mr. Bigelow at the Tribune on

24    April 2, 2007; is that right?

25        A.    That's what it looks like.

1      B. Browning - Confidential

2      Q.    Who is Mr. Bigelow?

3      A.    I believe Mr. Bigelow was the

4  treasurer of Tribune at that point in time.

5      Q.    Was he the principal person at

6  Tribune that you and other members of your

7  team dealt with?

8      A.    Chandler was a significant contact,

9  but there were others we dealt with.

10     Q.    Turn to the page in the engagement

11 letter that is included in Browning Exhibit 2

12 that's numbered 3 and has in the lower

13 right-hand corner the numbers 59204.

14         I would ask you to review the

15 definition of fair value that appears here

16 and then I have a couple of questions about

17 it.

18     A.    Are you referring to the solvency

19 cost and definitions there?

20     Q.    No, there's a definition of fair

21 value.

22     A.    Yes.

23     Q.    If you can just read that

24 paragraph, I have some questions.

25     A.    Yes.

1        B. Browning - Confidential

2            "The reasonably equivalent

3    value" --

4        Q.    You don't need to read it out loud,

5    Mr. Browning.  I just invite you to review it

6    before I ask questions.

7        A.    Okay.

8        Q.    Does this definition of fair value

9    differ from the definition of fair value that

10   you would typically use in connection with an

11   engagement to give a solvency opinion?

12       A.    It does.

13       Q.    In what way?

14       A.    Primarily relative to the S. Corp.

15   or equivalent type of structure, S. Corp.

16   AESOP, I'm sorry.

17       Q.    Other than with respect to the

18   engagement for the Tribune, have you ever

19   worked on a solvency opinion that contained

20   that modification to the definition of fair

21   value?

22       A.    I do not believe so.

23       Q.    Was that modification to the

24   definition of fair value something that was

25   suggested by the Tribune?

1          B. Browning - Confidential

2          A.    I can't remember who suggested it,

3     to tell you the truth.

4          Q.    Do you recall any discussion about

5     the subject of a modified definition of fair

6     value for the Tribune engagement to include

7     this reference to the AESOP S. Corp. tax --

8     AESOP S. Corporation structure?

9          A.    I recall discussion, yes.

10         Q.    With whom?

11         A.    Discussion with the Tribune,

12    discussion internally.

13         Q.    And what do you recall about

14    discussions with the Tribune on that subject?

15         A.    The discussions were regarding the

16    transaction itself, how it was structured

17    including an S. Corp. AESOP, and because of

18    that specific structure, we included it in

19    the definition.

20         Q.    But you're not sure whether or not

21    it was included in the definition at the

22    suggestion of the Tribune or that that's an

23    idea that emanated with VRC; is that right?

24         A.    I'm not certain.

25         Q.    Is it correct that, at least as

1          B. Browning - Confidential

2    reflected here, the definition of fair value

3    would mean that the willing buyer and willing

4    seller referred to would both have legal

5    structures, similar to that contemplated by

6    the Tribune, that is, an S. Corporation owned

7    entirely by an AESOP?

8          A.    I don't think that's what it means.

9          Q.    Please explain what it does mean

10   then.

11         A.    It means it's specific to the

12   structure that's anticipated in the solvency

13   opinion.

14         Q.    Is it correct that under this

15   definition of fair value the willing buyer is

16   assumed to be one that has a legal structure

17   similar to the structure contemplated by the

18   Tribune in the transactions?

19         A.    The willing buyer?

20         Q.    Yes.

21         A.    Yes, it is assumed that.

22         Q.    Can you turn to the previous page,

23   that's the page numbered two of the

24   engagement letter included in the exhibit.

25              And just read to yourself the first

1      B. Browning - Confidential

2   paragraph under the heading Introduction and

3   Purpose.

4      A.   First paragraph?

5      Q.   Yes, sir.

6      A.   Okay.

7      Q.   Is it correct that VRC understood,

8   as of the time of this document, April 2,

9   2007 that the Tribune wanted two separate

10  opinions on solvency?

11     A.   Yes.

12     Q.   And one of those is referred to

13  here as a the step 1 opinion and the other as

14  the step 2 opinion?

15     A.   Yes.

16     Q.   And when was it, at least as of

17  this time, that VRC understood the Tribune

18  wanted those two opinions delivered?

19     A.   I believe it says in here May 31,

20  2007 for the first one and December 31, 2007

21  for the second one.

22     Q.   Then I want to turn to the last

23  sentence of the paragraph I asked you to

24  read, that sentence reads, "The S. Corp.

25  election and the Cubs/Comcast sale are

1      B. Browning - Confidential

2    expected to take place in early 2008 and the

3    benefits will be incorporated into the

4    opinions."

5              What does the Cubs/Comcast sale

6    refer to here?

7         A.   The sale by the Tribune of the

8    Chicago Cubs, and I think it's Sports Net

9    Chicago or Comcast Sports Net, whatever it

10   was called, their interest in that.

11        Q.   What is meant by saying that the

12   benefits of those sales will be incorporated

13   into the opinions?

14        A.   I believe the benefits are the

15   financial benefits, the cash flow benefits.

16        Q.   Is it correct to say that, at least

17   as of this time VRC contemplated that, both

18   the step 1 and step 2 opinion would include

19   and incorporate the financial benefits of the

20   sale of the Cubs and of Comcast Sports Net?

21        A.   Yes.

22        Q.   Although those sales were at this

23   time expected to take place in early 2008?

24        A.   Yes.

25        Q.   And that's after VRC contemplated

1         B. Browning - Confidential

2    giving both the step 1 and step 2 opinions?

3         A.   Correct.

4              MR. SOTTILE:  Off the record.

5              (Whereupon, an off-the-record

6         discussion was held.)

7              MR. SOTTILE:  Mark this document as

8         Browning Exhibit 3.

9              (Browning Exhibit 3, Engagement

10        letter draft, marked for identification,

11        as of this date.)

12        Q.   While the document is being passed

13   around, Mr. Browning, can you please review

14   it and then I'm going to ask you whether or

15   not you can identify it in a moment.

16             Mr. Browning, are you able to

17   identify the document that we've marked as

18   Browning Exhibit 3?

19        A.   Yes.

20        Q.   What is it, sir?

21        A.   I believe it's a draft, a marked-up

22   draft of our engagement letter.

23        Q.   Does that indicate to you that the

24   engagement letter included in Browning

25   Exhibit 2 was a draft?

1      B. Browning - Confidential

2      A.   Yes.

3      Q.   And the engagement letter included

4  in Browning Exhibit 3 is a markup of a draft

5  engagement letter; is that right?

6      A.   Yes.

7      Q.   And who did the markup come from?

8      A.   Looks like it came from Chandler

9  Bigelow.

10     Q.   At the Tribune?

11     A.   Yes.

12     Q.   And the markup was sent to you on

13  or about April 5, 2007; is that right?

14     A.   Yes.

15     Q.   Could you turn to the third page of

16  the exhibit which is -- has in the lower

17  right-hand corner a number ending with 75240.

18          Are you on that page, sir?

19     A.   I believe so.

20     Q.   I want to look at the first

21  paragraph under the heading Introduction and

22  Purpose, which we also looked at in an

23  earlier draft.

24          Can you look at the last sentence

25  of that paragraph which reads, "The benefits

1      B. Browning - Confidential

2   from the S. Corp. election and the

3   Cubs/Comcast sale will be incorporated into

4   the step 2 opinion."

5           Do you see that?

6      A.    Yes.

7      Q.    Is that a change from the previous

8   draft, which I believe and invite you to

9   confirm indicated that the benefits from the

10  S. Corp. election and the Cubs/Comcast sale

11  will be incorporated into both opinions?

12     A.    Looks like a change.

13     Q.    Do you have any recollection of how

14  that change came about or why?

15     A.    I think the change refers primarily

16  to the S. Corp. election, because the

17  election would happen after the step 1

18  opinion was given.

19     Q.    Would it also happen, to your

20  understanding, after the step 2 opinion was

21  given?

22     A.    I'm sorry?

23     Q.    Isn't it correct that the S. Corp.

24  election would also happen after the step 2

25  opinion was given?

1          B. Browning - Confidential

2          A.    That may or may not have been the

3     case.  I'm not certain.  In anticipation of

4     the S. Corp. election.

5          Q.    To be clear, the step 2 opinion, to

6     your understanding, at least as of this time,

7     would incorporate the benefits from the S.

8     Corp. election which would be anticipated to

9     follow the step 2 opinion?

10         A.    I'm not certain what you're asking.

11              MR. SOTTILE:  Why don't we read it

12         back?  Don't read it back.

13         Q.    Is it correct, at least as of this

14    time, April 5, 2007, VRC contemplated that

15    the step 2 opinion would incorporate the

16    benefits from the S. Corp. election because

17    that election was anticipated to follow

18    shortly after the step 2 opinion was given?

19         A.    The step 2 -- I will say the step 2

20    opinion incorporated the S. Corp. election

21    benefits, yes.

22         Q.    Do you know why it is that between

23    Browning Exhibit 2 and Browning Exhibit 3 the

24    engagement letter was changed such that the

25    benefits of the Cubs/Comcast sale would be

1      B. Browning - Confidential

2  incorporated only in the step 2 opinion and

3  not in the step 1 opinion?

4      A.    I don't think that's a correct

5  representation.  The benefits were included

6  in both opinions.  I think that refers to the

7  anticipated sale.  The actual proceeds were

8  anticipated by the time the step 2

9  transaction took place.  But in both

10  opinions, the financial benefits were

11  considered.

12      Q.    Would you turn to the fourth page

13  of Browning Exhibit 3, which has a number

14  75241 in the lower right?

15      A.    Uh-huh.

16      Q.    Are you at that page, sir?

17      A.    Yes.

18      Q.    The second bolded phrase here is

19  Fair Value.

20          Do you see that?

21      A.    Yes.

22      Q.    And there appears to be some text

23  that was added to a draft that follows, which

24  reads, "And present fair saleable value."

25          Do you see that?

1          B. Browning - Confidential

2          A.    Yes.

3          Q.    What's the difference between fair

4     value and present fair saleable value, to

5     your understanding?

6          A.    They're generally considered the

7     same.

8          Q.    In VRC's opinions ultimately given

9     to the Tribune, did VRC do any different

10    analysis for present fair saleable value than

11    the analysis it did for fair value?

12         A.    I don't believe so.

13         Q.    Mr. Browning, can you take a look

14    at the document marked Rucker Exhibit 3,

15    which should be on top of the pile in front

16    of you, and I would ask you to review the

17    parts of the document that start on the

18    second page and identify it, if you can?

19              MR. NEIER:  "The second page,"

20         meaning the first page of the letter?

21              MR. SOTTILE:  Yes.

22         A.    What did you ask me to do with it?

23         Q.    Just identify it, if you are able

24    to do so.

25         A.    I believe it's the signed

1      B. Browning - Confidential

2  engagement letter.

3      Q.   This is the final signed engagement

4  letter between VRC and the Tribune in

5  connection with the solvency opinions the

6  Tribune asked VRC to provide?

7      A.   It certainly is a signed one.  I'm

8  hoping it's a final.

9      Q.   Could you turn to pages 3 and 4 of

10  the letter, and take a look at the

11  definitions of fair value and present fair

12  saleable value that appear here, and I have a

13  couple of questions about those definitions.

14          Is it correct that both of those

15  definitions are modified from the typical

16  form of definitions of those terms that you

17  would use in rendering solvency opinions?

18          MR. BENDERNAGEL:  Object to the

19      form of the question.  No foundation.

20      A.   Yes, they are generally different.

21      Q.   And describe the ways in which they

22  are different from the form of these

23  definitions that you would generally use in

24  rendering solvency opinions?

25      A.   They assume an S. Corp. AESOP

1      B. Browning - Confidential

2  structure.

3      Q.   Is it correct then, Mr. Browning,

4  that VRC was engaged by the Tribune, only to

5  offer opinions on fair value and present fair

6  saleable value, assuming that the willing

7  buyer referred to in those definitions would

8  be an S. Corporation owned entirely by an

9  AESOP or another structure resulting in

10  equivalent favorable federal income tax

11  treatment?

12      A.   I'm not sure I got the whole

13  question.

14          MR. SOTTILE:   Read it back, please.

15          (Whereupon, the requested portion

16      was read back by the court reporter.)

17      A.   The answer is I think no to that

18  question.   We were asked to provide a

19  solvency opinion specific to the transaction

20  contemplated.

21      Q.   By "specific to the transaction

22  contemplated," you mean a structure in which

23  the Tribune would be owned by an S.

24  Corporation owned by -- well, in which the

25  subject entity would be an S. Corporation

1       B. Browning - Confidential

2    owned entirely by an AESOP receiving

3    favorable federal income tax treatment?

4       A.   Or a similar structure.

5       Q.   Is it correct, Mr. Browning, that

6    VRC was not asked by the Tribune to opine on

7    the solvency of the Tribune Company if it

8    were to be acquired by an entity that did not

9    receive such favorable federal income tax

10   treatment?

11      A.   Is it true that we were not asked

12   to do that?

13      Q.   That's the question.

14      A.   Our opinion was relative -- the

15   solvency opinion was relative to this

16   specific transaction or transactions.

17      Q.   So is it correct that VRC

18   ultimately offered no opinions to the Tribune

19   on whether or not it would be solvent if it

20   were to be acquired by an entity that did not

21   receive the favorable federal income tax

22   treatment described in the definitions of

23   fair value and present fair saleable value in

24   this document?

25           MR. BENDERNAGEL:  Object to the

1        B. Browning - Confidential

2        form of the question.

3        A.    Yes, that's fair, we did not.

4        Q.    Turn to page 6 of the engagement

5    letter that's included in Rucker Exhibit 3.

6              Do you have that page, sir?

7        A.    I believe so.

8        Q.    Actually, let me start on the

9    bottom of page 5.

10              There is a sentence that begins at

11    the bottom of page 5 that reads, "VRC will,

12    however, advise after discussion with

13    management with respect thereto, and based on

14    its inquiries and its experience in reviewing

15    such liabilities whether anything has come to

16    VRC's attention in the course of its

17    engagement which has led it to believe that

18    any such financial forecasts and projections

19    are unreasonable or that any such information

20    or data is inaccurate in any material

21    respect, or whether VRC has reason to believe

22    that it was unreasonable for VRC to utilize

23    and rely upon such financial forecasts,

24    projections, information and data or that

25    there has been any material adverse change

1        B. Browning - Confidential

2   with respect to the company."

3             Did there ever come a time, to your

4   recollection, where VRC did advise the

5   Tribune that any such matters had come to its

6   attention of the type described in the

7   portion I just read?

8        A.   Did VRC advise?  I would say VRC

9   discussed with the Tribune on numerous

10  occasions relative to their projections,

11  relative to their financial performance.

12       Q.   Did it ever come to VRC's

13  attention, in the course of its work, that

14  financial forecasts and projections provided

15  by the Tribune were unreasonable or

16  inaccurate?

17       A.   No.

18       Q.   Did it ever come to VRC's

19  attention, during the course of its

20  engagement, that VRC believed it to be

21  unreasonable to rely on Tribune's financial

22  forecasts, projections, information or data?

23       A.   The projections changed all the

24  time, so relative to our opinions, no.  But

25  relative to the projections, they did change

1      B. Browning - Confidential

2    all the time.

3      Q.   Mr. Browning, can you take a look

4    at the document that was marked as Rucker

5    Exhibit 5, and it should be in the pile of

6    exhibits in front of you.

7         I first ask whether you're able to

8    identify this document?

9      A.   Looks like a marked-up draft of our

10   solvency letter.

11     Q.   By "solvency letter," do you mean a

12   solvency opinion letter?

13     A.   Yes.

14     Q.   And the markup was being sent to

15   you by Mr. Mark Hianik on or about April 22,

16   2007; is that right?

17     A.   Yes.

18     Q.   And who was Mr. Hianik?

19     A.   I believe he was general counsel at

20   Tribune.

21     Q.   Would you take a look at numbered

22   page two of the draft letter, and in

23   particular, at what appear to be some boxes

24   of deleted text on the right-hand side, I'm

25   looking at the boxes that are second and

1          B. Browning - Confidential

2    third from the top, and just read them to

3    yourself and I have a couple of questions.

4          A.    Are you asking me to read the

5    deleted?

6          Q.    Read the deleted, please, the

7    second and third boxes.

8          A.    Okay.

9          Q.    Do you have any understanding as to

10   why it was Mr. Hianik was deleting the text

11   here that refers to the step 2 opinion?

12         A.    Yes, I believe it was, because this

13   was -- this opinion letter related to only

14   the step 1 opinion.

15         Q.    Was it a mistake on VRC's part that

16   it had included in the initial draft language

17   relating to the step 2 opinion?

18         A.    It wasn't a mistake.  It was just

19   clarification.

20         Q.    What was clarification?

21         A.    We had -- I think in the step 1 we

22   had addressed both step 1 and step 2 as

23   information.  And they just wanted to make

24   sure that there was clarity as to the fact

25   that there was no AESOP S. Corp. tax savings

1        B. Browning - Confidential

2   associated with the step 1 opinion.

3        Q.   When you say that the draft opinion

4   letter addressed information about both step

5   1 and step 2, are you referring to the second

6   and third paragraphs on the first page of the

7   letter?

8        A.   I am.

9        Q.   And I think you testified, and

10  correct me if I've got this wrong, that they

11  wanted to make sure that the tax savings were

12  not considered in the step 1 opinion; is that

13  right?

14       A.   When I say "they," we all wanted to

15  make sure that it was clear as to the

16  assumptions used for the step 1 opinion.

17       Q.   So "we all" would be what group of

18  people, both the VRC team and the Tribune

19  people you were working with?

20       A.   And their advisors.

21       Q.   Do you recall some specific

22  discussion on this subject that we need to

23  make clear, that the step 1 opinion doesn't

24  include the AESOP tax savings?

25       A.   Not specific discussion, but I'm

1      B. Browning - Confidential

2   sure discussion was taking place.

3           MR. SOTTILE:  Why don't we take a

4        five-minute break.  Off the record.

5           (Whereupon, an off-the-record

6        discussion was held.)

7   BY MR. SOTTILE:

8      Q.   Mr. Browning, can you turn back to

9   Browning Exhibit 2 for a moment, that's the

10  April 2, 2007 e-mail from Mr. Hughes to

11  Mr. Bigelow attaching a solvency engagement

12  letter?

13     A.   Uh-huh.

14     Q.   Do you have that in front of you,

15  sir?

16     A.   Yes.

17     Q.   If I'm recalling your testimony

18  correctly, the first time you heard about

19  this potential engagement was on March 29th;

20  is that right?

21     A.   I don't think I ever said what day

22  I heard.  I think I heard it from Peter

23  Morrison, is what I think I said.

24     Q.   I think that we looked at an e-mail

25  chain that dealt with the issue?

1          B. Browning - Confidential

2               MR. NEIER:   Browning 1.

3          Q.   Which is Browning Exhibit 1.

4               Can you take a look at that and see

5     if that refreshes your recollection as to

6     when you first heard about this potential

7     engagement for the Tribune?

8          A.   Okay.

9          Q.   Does that help you remember when

10    you first heard about the engagement?

11         A.   Yes, it does help.

12         Q.   When was it?

13         A.   I think it was right around that

14    March 29th -- 28th, 29th timeframe.

15         Q.   Sometime in the evening of March

16    29th, if you look at the times on the

17    e-mails; is that right?

18         A.   Are you suggesting this is the

19    first time I heard about it?

20         Q.   I'm asking you whether it is.

21         A.   I don't know.

22         Q.   If you look at Mr. Bigelow's e-mail

23    to Mr. Hughes and Mr. Morrison, which is the

24    last e-mail in the chain included in Browning

25    Exhibit 1, does that help you place in time

1          B. Browning - Confidential

2    when the Tribune first approached VRC about

3    rendering solvency opinions?

4          A.    The last e-mail?

5          Q.    The last e-mail in the chain, which

6    appears at the top of page 3.

7          A.    March 29th?

8          Q.    Right.

9                MR. BENDERNAGEL:   Just to be clear,

10         most people would consider that the

11         first e-mail in the chain.

12               MR. SOTTILE:   Fair enough.

13         Q.    Does that indicate to you that VRC

14   was first approached about giving solvency

15   opinions on Thursday, March 29th?

16         A.    It certainly could be the case.

17         Q.    Browning Exhibit 2 shows a solvency

18   engagement letter going out on Monday, April

19   2nd, correct?

20         A.    Yes.

21         Q.    Is it fair to conclude that the

22   consideration by VRC on whether or not to

23   take on the engagement for the Tribune took

24   place between Thursday, March 29th and

25   Monday, April 2nd?

1          B. Browning - Confidential

2          A.   I think that's fair.

3          Q.   Do you have any recollection of the

4     work that was done over that time period by

5     VRC to decide whether or not to take on the

6     engagement beyond your testimony about the

7     work of the opinion committee?

8          A.   I don't recall specifically.

9          Q.   Do you recall working through the

10    weekend on this matter?

11         A.   I don't recall specifically.

12         Q.   Do you know what documents VRC had

13    available in this time period as it was

14    considering whether to take on the

15    engagement?

16         A.   I don't.

17         Q.   Do you have any recollection of

18    reviewing documents relating to the Tribune

19    in connection with the decision whether to

20    take on the engagement?

21         A.   Not specifically.

22         Q.   Do you have some general

23    recollection of looking at Tribune documents

24    in that time period?

25         A.   I suspect I did, but I don't know

1        B. Browning - Confidential

2   what they were.

3        Q.   Do you have any sense of how much

4   time you personally put in during this March

5   29th to April 2nd time period in connection

6   with deciding whether or not to take on the

7   Tribune engagement?

8        A.   I don't specifically remember.

9        Q.   10 hours, 20 hours, any sense at

10  all?

11       A.   Certainly could have.  I don't

12  know.

13       Q.   Can you take a look at the document

14  we marked as Rucker Exhibit 4.  It should be

15  in this stack here in front of you.

16            Do you have Rucker Exhibit 4 in

17  front of you, sir?

18       A.   I do.

19       Q.   Can you tell us what it is?

20       A.   I believe it's a preliminary

21  analysis or a draft analysis of the Tribune

22  solvency.

23       Q.   And this preliminary analysis was

24  being sent by Mr. Rucker to a number of

25  people at Valuation Research, including

1      B. Browning - Confidential

2    yourself, on April 24, 2007?

3      A.    Yes.

4      Q.    Do you recall reviewing this

5    analysis in or about that time?

6      A.    I am sure I did.

7      Q.    Can you turn to page numbered 3 of

8    the analysis, which has in the lower

9    right-hand corner a number ending with 48044?

10     A.    Okay.

11     Q.    It's headed, "Consolidated

12   valuation summary."

13          Do you have that page in front of

14   you, sir?

15     A.    I do.

16     Q.    Is it correct that this page

17   summarizes valuation of the Tribune, both in

18   connection with step 1 and step 2 of the

19   transactions you analyzed?

20     A.    Yes.

21     Q.    I understood from your prior

22   testimony that VRC did not anticipate

23   rendering an opinion with respect to step 2

24   until later in the year; is that right?

25     A.    That's correct.

1    B. Browning - Confidential

2    Q.   Why is it that you were, at this

3    time, in April 2007, analyzing the solvency

4    of the Tribune on the assumption that step 2

5    closed on a pro forma basis?

6    A.   There are a couple of reasons.

7         One, first of all, this was the

8    first draft, and I suspect it was my analyst

9    putting it all together and looking at what

10   they know.

11        If you -- I think this is an

12   incomplete draft, but -- so that would be

13   one.

14        Second thing is we wanted to make

15   sure that in rendering the first opinion,

16   that there weren't any red flags for the

17   second opinion.

18   Q.   Why did that matter to you?

19   A.   Well, we just didn't want to go

20   down a road that would complicate the whole

21   transaction.

22   Q.   Complicate it in what way?

23   A.   I don't know in what way, but it

24   would make it very complicated if we render

25   an opinion for first step and then can't

1      B. Browning - Confidential

2  render it in the second step.

3      Q.   And it's because you wanted to be

4  comfortable that VRC would be able to render

5  a positive solvency opinion in step 2, that

6  in April you were looking at the question of

7  solvency of the Tribune after step 2?

8      A.   I don't know if I would say

9  comfortable.  I would say it was part of our

10  due diligence in conducting our analysis.

11      Q.   What effect, if any, would it have

12  had on your work on the step 1 solvency

13  finance if you had concluded in April of 2007

14  that the Tribune would be insolvent after

15  step 2?

16      A.   I don't know if it had any -- I

17  don't know if it would have had any at all,

18  any change to it.  I just wanted to make

19  sure, I wanted to see where we were at that

20  point.  We wanted to see where we were, I

21  would say.

22      Q.   VRC wanted to see, based on the

23  information available in April, if it looked

24  like the Tribune would be insolvent after

25  step 2?

1        B. Browning - Confidential

2        A.    Insolvent?

3        Q.    Insolvent after step 2, you wanted

4    to see that?

5        A.    Repeat the question.

6             MR. NEIER:   Objection to form.

7        Q.    Is it correct that in April 2007

8    VRC wanted to see whether, based on the

9    information available at that time, you

10   anticipated that the Tribune would be solvent

11   following the consummation of step 2?

12       A.    I think that's a fair statement.

13       Q.    Did VRC come to a view in the

14   April, May 2007 timeframe as to whether,

15   based on the information then available, it

16   believed that the Tribune would be solvent

17   following step 2?

18       A.    I don't think we ever came to a

19   formal view of that.  I think we came to a

20   level that, what I said earlier, red flags, I

21   don't think we saw any red flags at that

22   point.

23       Q.    What would have been a red flag in

24   this context?

25       A.    I don't know.  I'm just saying that

1       B. Browning - Confidential

2  there was enough cushion in the analyses to

3  say that there wasn't a red flag.

4       Q.    And if your analysis in April 2007

5  had indicated the Tribune would be insolvent

6  after step 2, that would have been a red

7  flag?

8       A.    I would think that would be a red

9  flag, yes.

10      Q.    Would it also have been a red flag

11  if the equity cushion was very low after step

12  2 based on the information available to VRC

13  at that time?

14           MR. JOHNSTON:   Objection to form.

15      A.    I don't know what you mean, "low."

16      Q.    What do you mean by a low equity

17  cushion?

18      A.    I don't mean anything by it.   I'm

19  not asking the question.   Low is relative.

20      Q.    If VRC had concluded in April 2007

21  that the equity cushion for the Tribune

22  following consummation of step 2 was low in

23  relation to the size of the Tribune and the

24  leverage undertaken, would that have been a

25  red flag, as you have used that term?

1      B. Browning - Confidential

2           MR. JOHNSTON:  Objection to form.

3      A.   We didn't come to that conclusion,

4  so I can't tell you.  That would be

5  speculating.

6      Q.   Is it correct, Mr. Browning, that

7  one thing VRC was looking for in

8  preliminarily evaluating the Tribune after

9  step 2, it was the level of equity cushion

10 following step 2?

11     A.   I'm not sure --

12          MR. NEIER:  I think you have to

13     restate that one.

14     Q.   In looking at the solvency position

15 of the Tribune after step 2 in the April 2007

16 time period, was one thing VRC was looking at

17 what the equity cushion would be following

18 step 2?

19     A.   Was one thing?

20     Q.   Yeah.

21     A.   Sure, yes.

22     Q.   Why is that something that you

23 wanted to look at?

24     A.   Because it's a test of solvency.

25     Q.   And explain what you mean, an

1          B. Browning - Confidential

2     equity cushion.

3          A.    Assets, the fair saleable value or

4     the present fair saleable value of the assets

5     minus the liabilities.

6          Q.    And the cushion is the difference

7     between those two figures?

8          A.    As you call it, the cushion, yes.

9          Q.    Is that a word you're familiar

10    with?

11         A.    It is.

12         Q.    Is it a concern in a solvency

13    analysis if the analysis indicates that

14    assets do exceed liabilities but by a very

15    small margin and therefore there is a small

16    equity cushion?

17         A.    I guess so, yes.

18         Q.    Why would that be a concern?

19         A.    You want to make sure the assets

20    exceed the liabilities.  But it's not the

21    only concern -- it's not the only factor.

22         Q.    As a general proposition, in

23    connection with solvency opinions that you

24    worked on, if you were to conclude that the

25    assets of the company you're looking at

1      B. Browning - Confidential

2    exceed the liabilities by one dollar, is that

3    enough for you to say yup, it's solvent?

4        A.   I would have to look at it.  I

5    can't say here whether one dollar because

6    there is a lot of factors that go in.  It

7    depends on the liabilities and how they're

8    structured and when they come due, and a lot

9    of things go into that opinion.

10       Q.   Are you saying that you could

11   imagine circumstances where you might find

12   solvency after concluding that the assets

13   exceeds liabilities by one dollar?

14       A.   I don't think I've ever seen it,

15   but I'm not saying it wouldn't happen.

16       Q.   Have you ever seen situations in

17   your work on solvency opinions where you

18   concluded that assets exceeded liabilities,

19   but the margin by which assets exceeded

20   liabilities was so small you were not

21   comfortable rendering an opinion that the

22   company was solvent?

23       A.   I would say that that is probably

24   the case.

25       Q.   So there's some minimum level of

1      B. Browning - Confidential

2   cushion that you would be looking for in a

3   solvency analysis before you would be

4   comfortable rendering a positive solvency

5   opinion?

6           MR. JOHNSTON:  Objection to form.

7      A.   It goes more to than just cushion.

8   There is a lot of factors, so I would have to

9   look at all of the factors because there's

10   more than one test.

11      Q.   Understood.

12           Still on page 3 of the preliminary

13   solvency analysis included in Rucker Exhibit

14   4, there's a line on the left-hand side, I

15   think it's the sixth line down, that reads,

16   "Tax savings."

17           Do you see it?

18      A.   Uh-huh.

19      Q.   What do the tax savings refer to

20   here?

21      A.   I'm not certain, but I'm assuming

22   they relate to tax savings associated with

23   the PHONES liability and tax savings

24   associated with the S. Corp. AESOP structure.

25      Q.   Would you agree with me that the

1        B. Browning - Confidential

2   figures shown for tax savings on this page

3   are the same for the step 1 valuation summary

4   as for the step 2 valuation summary?

5        A.    They are.

6        Q.    Does that indicate to you that the

7   step 1 valuation summary was calculating tax

8   savings on the assumption of an S. Corp.

9   AESOP structure?

10       A.    At this point in time, that

11  probably was the case.  This was the first

12  draft I received.  I think so.

13       Q.    Was that incorrect in your view?

14       A.    Given that the fact that the AESOP

15  S. Corp. structure wasn't to come into play

16  until after step 1, it was the improper

17  assumption.

18       Q.    Mr. Browning, still on the same

19  page, at the top of the page, the first four

20  lines appear to be different valuation

21  methodologies; is that correct?

22       A.    Yes.

23       Q.    And are these four valuation

24  methodologies ones that were used by VRC in

25  the solvency analysis for the Tribune?

1          B. Browning - Confidential

2          A.    They were.

3          Q.    Is it correct that they were, for

4    purposes of this document, weighted together

5    on the basis of certain probabilities

6    reflected on this page?

7          A.    That's what it looks like.

8          Q.    What's the weighting that was given

9    to the discounted cash flow valuation method?

10         A.    40 percent.

11         Q.    The others are 20 percent each; is

12   that right?

13         A.    Yes.

14         Q.    Do you know why it was that the

15   discounted cash flow was weighted 40 percent

16   in this draft?

17         A.    I don't know why.  I suspect one of

18   our analysts felt that was the proper

19   weighting.

20         Q.    Do you have any recollection as to

21   why the analyst had that view?

22         A.    No.

23         Q.    Did you have a view at this time as

24   to whether or not discounted cash flow should

25   be weighted more heavily than the other

1      B. Browning - Confidential

2  valuation methods?

3      A.    I may have.   I don't recall.

4      Q.    In the course of your work on

5  solvency opinions, have you ever weighted one

6  valuation method more heavily than others?

7      A.    Have I ever?

8      Q.    Ever?

9      A.    I probably have.

10      Q.    Can you give me some general sense

11  of the circumstances where you might weigh

12  one valuation method more heavily than

13  others?

14      A.    Well, if you've -- generally

15  speaking, if you have more confidence in one

16  approach than the other, you may weight it

17  heavier.

18      Q.    Are there other reasons why you

19  might weight one approach more heavily than

20  others that you can think of?

21      A.    I don't know.

22      Q.    One reason would be if the analyst

23  concluded that he or she had more confidence

24  in one valuation method as compared to

25  others?

1      B. Browning - Confidential

2      A.    Certainly could be the case.

3      Q.    And is it correct that in some of

4  the work you've done on solvency opinions

5  you've weighted one method more heavily than

6  others where you had more confidence in that

7  method?

8      A.    I don't know.  That could be the

9  case.

10     Q.    Did you ever form a view that, in

11 the course of the work for the Tribune, that

12 it was appropriate to weight discounted cash

13 flow more heavily than other valuation

14 methods?

15     A.    I don't recall having that opinion.

16     Q.    One way or the other, you don't

17 remember whether you formed that view?

18     A.    I may have.  I don't recall.

19     Q.    Mr. Browning, is it correct that

20 you were the overall engagement manager for

21 the Tribune?

22     A.    Yes.

23     Q.    Were there particular parts of the

24 work that you personally were more involved

25 in than others?

B. Browning - Confidential

A.   Well, I oversaw the entire
engagement, so I was involved in pretty much
all of the parts from one level to another.

Q.   Were there any parts that you were
more involved in than others, or you had a
general involvement in everything?

A.   I had a general involvement in
everything.  I think maybe -- so I would
attend all the meetings typically and
conference calls, that type of thing.

Q.   Can you describe your involvement
in the work on determining the value of the
Tribune's equity investments?

A.   I reviewed all of the work that our
analysts worked on.  As I said earlier, I was
involved in the conference calls, discussions
with the individuals who were responsible for
those equity investments and reviewed all the
work.

Q.   You recall that some of the equity
investments of the Tribune were minority
interests in privately held companies?

A.   Yes.

Q.   Did that fact play any part in

1          B. Browning - Confidential

2    VRC's valuation of the equity investments?

3          A.   Yes.

4          Q.   Describe how.

5          A.   It was a consideration we took into

6    account.

7          Q.   Did it change VRC's views on the

8    value of equity investments that some of them

9    were minority interests in privately held

10   companies?

11         A.   We changed the value.  We

12   established the value, but we didn't change

13   the value.

14         Q.   Are you familiar with the phrase

15   "minority discount"?

16         A.   Yes.

17         Q.   What does that mean in the context

18   of a valuation of a company?

19         A.   Relative to having control of an

20   entity, minority value is worth less,

21   generally speaking.

22         Q.   Are you familiar with a phrase

23   "marketability discount" in connection with

24   valuations?

25         A.   I am.

1          B. Browning - Confidential

2      Q.    What does that mean?

3      A.    It means that a non-marketable or

4  illiquid investment is worth less than one

5  that is liquid and marketable.

6      Q.    Is that a discount that would

7  generally be applied to privately held

8  companies?

9      A.    Depends.

10      Q.    Setting aside the Tribune, are you

11  aware of any circumstances in your work on

12  solvency opinions that have involved a

13  minority interest in a privately held company

14  where no marketability discount was applied?

15      A.    I may have.  I don't know.

16      Q.    Can you think of any?

17      A.    No.

18      Q.    Is it correct that in valuing the

19  Tribune's minority interests in privately

20  held companies, VRC did not apply any

21  minority discount or marketability discount

22  in the way you use those terms?

23      A.    You mean apply discrete minority

24  discount?

25      Q.    Yes.

1        B. Browning - Confidential

2        A.    No, not a discrete one.

3        Q.    Are you suggesting that those

4   discounts were applied in some non-discrete

5   way?

6        A.    I would say that, yes, I would say

7   that's the case.

8        Q.    Can you describe how that was done

9   by VRC in connection with its analysis of the

10  Tribune's investments in equities where it

11  had a minority position in a privately held

12  company?

13       A.    It depended on the equity

14  investment, but the approaches we used

15  implicitly, some of the approaches we used

16  implicitly would consider those factors.

17       Q.    What approaches are you thinking

18  of?

19       A.    Things like market comparable

20  analyses and maybe calls on investment --

21  calls to investors, that type of thing, where

22  we drew information from minority interest

23  transactions.

24       Q.    Can you explain what you mean,

25  "market comparable analysis" in this context?

1        B. Browning - Confidential

2        A.   We looked at comparable companies

3    and what they were trading at, the trading

4    prices to get an indication of value.

5        Q.   How is it that a market comparable

6    analysis includes in it some consideration of

7    a minority discount if, in fact, it does?

8        A.   Well, they're minority transactions

9    and so they're individual shareholder

10   transactions at a price that they're willing

11   to pay multiplied by the number of shares

12   outstanding.

13       Q.   Does the availability of a market

14   comparable analysis in your judgment make it

15   unnecessary to apply a minority discount to

16   valuation of a minority interest in a

17   privately held company?

18       A.   It may or may not.

19       Q.   And what circumstance would it mean

20   that you still had to apply a minority

21   discount?

22       A.   Well, if there was a feeling that

23   the comparable company analysis stated the

24   value on a controlling interest and we're

25   talking about a minority interest, then there

1        B. Browning - Confidential

2   may be an additional need for a discount.

3        Q.   You also mentioned calls to

4   investors as an indication of value that

5   might include within it some minority or

6   marketability discount; is that right?

7        A.   Yes.

8        Q.   Can you explain what you meant by

9   that?

10       A.   What I mean by that is minority

11  transactions of a sort.

12       Q.   Can you explain further?

13       A.   Transactions among the investors

14  where they were required to put additional

15  investment in and gave us indications of

16  value.

17       Q.   That would include, for example, a

18  situation where a privately held company

19  makes calls on its shareholders for

20  additional equity capital?

21       A.   Maybe not -- well, general

22  partnership, or an LLC, or something like

23  that.

24       Q.   And the values embedded in those

25  calls would, in your judgment, to some extent

1        B. Browning - Confidential

2   reflect a minority discount?

3        A.    It could, yes.

4        Q.    Could, but not always?

5        A.    Well, depends on the facts and

6   circumstances.

7        Q.    Was the Food Network one of the

8   equity investments that the Tribune and VRC

9   analyzed in the course of its work?

10       A.    It was.

11       Q.    That was a privately held company?

12       A.    I believe it was a general

13   partnership.

14       Q.    The Tribune had a minority interest

15   in the Food Network?

16       A.    It did.

17       Q.    Is it correct that VRC applied no

18   explicit minority or marketability discount

19   in valuing the Tribune's minority interest in

20   the Food Network?

21           MR. JOHNSTON:   Objection to form.

22       A.    When I say explicit, I mean there

23   was not a number like 15 percent or something

24   like that applied to it after we came up with

25   an indication of value, so there was no

1        B. Browning - Confidential

2    explicit that way.

3        Q.    With specific reference to the Food

4    Network, did VRC, in some non-explicit way,

5    consider in its valuation the fact that the

6    Tribune had a minority interest in a

7    privately held business, a general

8    partnership?

9        A.    VRC valued the Food Network --

10   VRC's value for the Food Network is a value

11   that VRC believes that was appropriate for

12   its 30 percent, yes.

13       Q.    How, if at all, did VRC consider in

14   its valuation the fact that it was a minority

15   interest in a private business?

16       A.    It looked at -- first of all,

17   Valuation Research, or we believed there

18   really wasn't need for a significant discount

19   or any discount at all because of significant

20   cash flows to the shareholders, which

21   basically takes away any minority

22   consideration and the fact that they had

23   seats on the board, and I believe there were

24   other factors, but a number of factors.

25       Q.    You identified two factors.  One is

1      B. Browning - Confidential

2   that there was significant cash flow going to

3   the equity holders in the Food Network,

4   correct?

5      A.   Yes.

6      Q.   And the second is that the Tribune

7   had representation on the board of directors;

8   is that right?

9      A.   I believe so.

10      Q.   And do those two factors standing

11   on their own in your judgment mean that no

12   minority discount needed to be taken?

13      A.   I'm not saying just those factors.

14   Other factors, talking to management, how the

15   entity was being operated, and whatever other

16   factors there may have been at the time.

17      Q.   Are there any others you can think

18   of?

19      A.   No, not specifically.

20      Q.   Do you remember anything that

21   management said to VRC that supported the

22   view that no explicit minority discount

23   needed to be taken with respect to the Food

24   Network?

25      A.   That question was never raised.  I

1        B. Browning - Confidential

2   mean, it wasn't raised -- that question was

3   not raised specifically that I know of.  Much

4   discussion was taken regarding how marketable

5   Tribune's interest in the Food Network was.

6   And also how many parties would be interested

7   in that interest.

8        Q.    Much discussion with Tribune

9   management, is that who you were talking to

10  on that subject?

11       A.    No, I think actually the people at

12  Food Network.

13       Q.    VRC was talking to people at the

14  Food Network on the subject of potential

15  purchasers for the Tribune's interest; is

16  that right?

17       A.    No.  Just in general discussions

18  with the Tribune management and

19  representatives for the Food Network.

20       Q.    What did VRC learn in those

21  discussions about the Tribune's ability to

22  sell its minority interest in the Food

23  Network?

24       A.    I don't think there was a

25  discussion relative to them selling it.

1          B. Browning - Confidential

2     There was discussion to what it was worth.

3          Q.   I thought, and correct me if I'm

4     wrong, that you indicated there was some

5     discussion about the number of potential

6     purchasers.

7              Am I remembering that right?

8          A.   If I said it that way, I will say

9     interest in other parties in the Tribune's 30

10    percent ownership.

11         Q.   What do you recall learning on that

12    subject?

13         A.   30 plus.

14         Q.   What do you recall learning on that

15    subject?

16         A.   That there was a lot of interest.

17         Q.   What, if anything, did that tell

18    you about whether a minority discount was

19    appropriate?

20         A.   The value that we came up with was

21    reasonable and reflected what their 30

22    percent interest was worth.

23         Q.   Are you saying that you learned in

24    these discussions that there was a lot of

25    interest in buying the Tribune's share in the

1      B. Browning - Confidential

2  Food Network at the value VRC came up with?

3      A.   I don't think we ever said anything

4  about buying or selling.  We said there was a

5  lot of interest by potential other parties in

6  Tribune's ownership interest in the Food

7  Network.

8          I don't want to mischaracterize my

9  testimony.  My testimony is we talked about a

10  lot of things in those meetings.  And those

11  certainly would have been some of the

12  discussions.

13      Q.   I'm little confused, so let me try

14  to follow-up.

15          I think you testified that you

16  learned in these discussions with Tribune

17  management and representatives of the Food

18  Network that there were a number of persons

19  interested in the Tribune's position in the

20  Food Network; is that right?

21      A.   That there would be a general

22  interest in their 30 percent, plus or minus

23  whatever that is.

24      Q.   And that general interest would be

25  in buying the 30 percent?

1      B. Browning - Confidential

2      A.   Well, most likely, but I don't

3  think we specifically said who are the

4  buyers.  We may have.  I don't recall.

5      Q.   So you remember discussions to the

6  effect that there would be a number of people

7  interested in acquiring it but no specific

8  discussion of particular purchasers?

9      A.   We may have.  I don't recall.

10     Q.   Am I understanding your testimony

11  correctly the fact that people were

12  interested in the Tribune's stake in the Food

13  Network supports VRC's conclusion that no

14  minority discount was needed?

15          MR. NEIER:  Objection to form.

16     A.   That's not what I said.  I think I

17  said there is a number of factors that go

18  into Valuation Research's estimate of value

19  for the Food Network, of the Food Network's

20  interest owned by Tribune.

21     Q.   One of them is that people were

22  interested in that stake?

23     A.   Certainly.

24     Q.   Do you recall what Tribune

25  management valued that stake at?

1    B. Browning - Confidential

2    A.   I don't.

3         MR. SOTTILE:  Let's mark this as

4    Browning 4.

5         (Browning Exhibit 4, Memorandum

6    response, marked for identification, as

7    of this date.)

8    Q.   Are you able to identify the

9    document we marked as Browning Exhibit 4,

10   sir?

11   A.   I am.

12   Q.   What is it?

13   A.   It's a memorandum response to

14   questions from lenders.

15   Q.   Were you involved in drafting this

16   document?

17   A.   I believe I reviewed this document.

18   Q.   You reviewed it before it was sent

19   out to the lenders?

20   A.   I would assume so.

21   Q.   It's dated December 7, 2007.

22        Do you see that?

23   A.   Yes.

24        MR. BENDERNAGEL:  We have a problem

25   with this document right now.  You've

1      B. Browning - Confidential

2      used the Tribune's copy of the document

3      that's marked as attorneys' eyes only.

4      I don't think anything in the deposition

5      so far has been anything other than that

6      attorneys' eyes only.  How did VRC mark

7      its copies of this draft?

8           MR. NEIER:  It marked this document

9      as confidential, I believe.  Did not

10     mark it as highly confidential.

11          MR. BENDERNAGEL:  We will withdraw

12     that highly confidential designation so

13     that people beyond the attorneys can

14     look at it.

15          MR. SOTTILE:  Thank you.

16     Q.   Can you turn to page 7 of Browning

17   Exhibit 4?  The numbered item 10A, which

18   reads, "Considering the company has minority

19   ownership in many of its equity investments,

20   how is the marketability of these equity

21   investments been considered."

22          Could you review the two paragraphs

23   that follow in answer to that question?

24     A.   Okay.

25     Q.   Does the second paragraph under 10A

1        B. Browning - Confidential

2    accurately set forth the reasons why VRC did

3    not apply minority or marketability

4    discounts?

5        A.    Those are certainly some of them.

6        Q.    Are there others?

7        A.    I think there are others.

8        Q.    Is there a reason why you didn't

9    include the others here?

10        A.    Probably because I didn't write the

11    complete document.

12        Q.    But you reviewed and approved it

13    before it went out to lenders, correct?

14        A.    I did.

15        Q.    If you had thought there was

16    something wrong in it, you would have

17    presumably commented on that in your review;

18    is that right?

19        MR. BENDERNAGEL:  Objection to form

20    of the question.

21        A.    I don't know that these are wrong.

22    I don't know that they're complete.

23        Q.    What would you add to this in order

24    to make it complete?

25        A.    Consideration of cash flow to the

1          B. Browning - Confidential

2   minority shareholders.   Indications of

3   minority value are already implied by the

4   data that we looked at.   Things like that.

5          Q.   Anything else?

6          A.   No.

7          Q.   Is there a reason why those items

8   were not mentioned here?

9          A.   I don't know why.

10         Q.   Can we turn back to Browning

11  Exhibit 3 for a moment, sir?   That's the

12  preliminary valuation summary.   I'm sorry, I

13  misspoke.   Rucker Exhibit 4 is what I wanted

14  him to -- sorry about that.

15              I would like to turn to numbered

16  page 10.   That's headed, "Equity investment

17  valuation summary."

18              Do you see that?

19         A.   Yes.

20         Q.   Can you tell me what this page

21  represents?

22         A.   I believe it was a summary schedule

23  of the various equity investments that

24  Tribune owned.

25         Q.   It includes TD Food Network, which

1          B. Browning - Confidential

2      we have been discussing, correct?

3          A.   Yes.

4          Q.   If I'm reading this correctly, at

5      least at this stage, the ownership or

6      adjusted range mid value for the TD Food

7      Network was 1,189,000,000; is that right?

8               MR. BENDERNAGEL:  Objection.

9          A.   It shows 1 billion-189, yes.

10              MR. BENDERNAGEL:  Just so it's

11          clear on the record, you're talking

12          about the adjusted share, not the

13          valuation range?

14              MR. SOTTILE:  Yes.

15         A.   And that's mid range of the value.

16         Q.   And that figure would not include

17     any explicit minority or marketability

18     discount, correct?

19         A.   I don't believe so.

20         Q.   Do you know how that compares to

21     the valuation that the Tribune put on TD's

22     Food Network as of this time?

23         A.   I do not.

24         Q.   Would it be significant to VRC's

25     analysis at this time if it were the case

1        B. Browning - Confidential

2    that the Tribune was valuing Food Network at

3    $850 million until April 2007?

4            MR. NEIER:  Objection to form.

5        Significant to what?

6        Q.    To your determination of the value

7    of the Tribune's interest in the Food

8    Network?

9        A.    I would say that I would have to

10   look at that.  I don't know.  I don't know

11   what form they were coming up with and what

12   assumptions they were using to come up with

13   850 million.

14       Q.    Do you have any recollection as to

15   how the Tribune's valuation of its interest

16   in TD Food Network compared with VRC's

17   valuation of that interest?

18       A.    No.

19       Q.    Could you turn to page 20 in this

20   document, sir?  This page is headed, "Base

21   case/sensitivity case comparison."

22            Do you have any understanding what

23   the sensitivity case being referred to is?

24       A.    I'm assuming it's the sensitivity

25   -- it's referred to as a downside case

1          B. Browning - Confidential

2    relative to a base case.

3          Q.    Explain for me, if you would, what

4    a base case is and what a downside case is in

5    connection with a solvency analysis.

6          A.    Generally?

7          Q.    Yes, sir.

8          A.    Generally, a base case is the most

9    expected case that management believes its

10   future performance will achieve.

11         Q.    And what's a downside case as a

12   general matter?

13         A.    It's to stress that most expected

14   case for numerous unexpected possibilities.

15         Q.    So a downside case would assume

16   worst financial performance for a company

17   than a base case?

18         A.    I would say that's generally, yes.

19         Q.    And what use, if any, did VRC make

20   of a downside case in its solvency analysis

21   for the Tribune?

22         A.    What use?

23         Q.    Did you use a downside case in your

24   analysis?

25         A.    Yes.

1          B. Browning - Confidential

2      Q.    What did you do with it?

3      A.    We reviewed it, we incorporated it

4  into our solvency analysis and we looked to

5  see what the impact it would have on all of

6  the factors associated with a solvency

7  opinion.

8      Q.    Did you look to see what effect the

9  downside case would have on the balance sheet

10 test for solvency?

11     A.    Did we look to see if the

12 sensitivity case --

13     Q.    What effect the downside case would

14 have on the balance sheet test for solvency

15 of the Tribune?

16     A.    We did not.

17     Q.    Why not?

18     A.    Because that's a different -- the

19 pure definition of value is present fair

20 saleable and fair saleable value.  It is not

21 liquidation value.

22     Q.    And do you understand a downside

23 case to be measuring liquidation value?

24     A.    It could be, but it's not fair

25 saleable value.

1        B. Browning - Confidential

2        Q.    Why is it a downside case, in your

3    judgment, doesn't represent fair saleable

4    value?

5        A.    Because fair saleable value is

6    looked at from a standpoint of the expected

7    cash flows and discounted at an appropriate

8    rate to come up with an indication of value.

9        Q.    Does fair saleable value, as you

10   understand the term, include some

11   consideration of the possibility that the

12   base case for a financial performance will

13   turn out to be incorrect and too high?

14       A.    The discount rate incorporates

15   those possibilities.

16       Q.    And because the discount rate

17   incorporates some measure of the risk that

18   the actual financial performance will be

19   worse than the base case, VRC doesn't use a

20   downside case for the determination of fair

21   saleable value?

22            MR. NEIER:  Objection to form.

23       A.    I believe the way we value the fair

24   saleable value was appropriate the way we

25   looked at it with the four approaches.

1        B. Browning - Confidential

2        Q.    And you believed that in analyzing

3    the solvency of the Tribune, it was

4    unnecessary to apply the downside case to the

5    four valuation methods that were used by VRC?

6              MR. NEIER:   Objection to form.

7        A.    That's correct.

8        Q.    You believed it was unnecessary

9    because the discount rate served the function

10   of accounting for the risk that financial

11   performance would not turn out as projected?

12       A.    That's certainly a factor.

13       Q.    Is there another factor?

14       A.    Not that I can think of right now.

15       Q.    Mr. Browning, could you take Rucker

16   Exhibit 7 from the pile that's in front of

17   you?  Can you review it and identify it for

18   us, if you are able to do so?

19       A.    Yes, I believe it's a presentation

20   of our analysis of our solvency opinion.

21       Q.    Are you able to determine when this

22   document was prepared from anything on the

23   exhibit?

24       A.    Was sent out on May 4th, so it

25   would have been probably pretty much

1          B. Browning - Confidential

2     completed by that point in time.

3          Q.   Can you turn to page 9 of the

4     solvency analysis first?  Just describe

5     generally what's represented on this page.

6          A.   I believe it's a summary of the

7     approaches to value to get to the operating

8     enterprise, plus other investments and tax

9     savings, less -- and cash and then less debt

10    and contingent liability to see what the

11    equity value was in the step 1 transaction.

12         Q.   On the left-hand side of the page,

13    in the upper left-hand corner, there appears

14    the heading, "Valuation method (weighting)."

15         Do you see that?

16         A.   Yes.

17         Q.   Can you tell us what weighting was

18    given at this time to the four different

19    methodologies?

20         A.   Yes, they look like they changed a

21    little bit; 40 percent for the discounted

22    cash flow, 25 percent for comparable

23    companies, 10 percent for transactions and 25

24    percent for some of the individual assets.

25         Q.   Do you have any recollection or

1          B. Browning - Confidential

2     understanding as to why these weightings were

3     chosen as of this time?

4          A.   I don't.

5          Q.   How about the comparable

6     transactions weighting in particular, do you

7     have any understanding as to why in this

8     analysis those would be underweighted at 10

9     percent?

10         A.   I don't.

11         Q.   This is a document that was sent in

12    draft form to Mr. Chandler Bigelow at the

13    Tribune, correct, if you look at the first

14    page?

15         A.   Yes.

16         Q.   You reviewed it and approved it

17    before it went out; is that right?

18         A.   I believe so.

19         Q.   Does that mean that you were

20    comfortable at this stage of the analysis

21    with the weightings reflected on page 9?

22         A.   I wasn't uncomfortable.

23         Q.   Does seeing this jog any

24    recollection of discussions within VRC about

25    the weightings to be given for the four

1      B. Browning - Confidential

2 valuation methods?

3      A.   At this point in time, you're

4 referring to?

5      Q.   Yes.

6      A.   No.  This was a long process, so

7 there were lots of discussions.

8      Q.   Do you recall any discussion about

9 whether you should apply different weightings

10 to the valuation methods as opposed to

11 weighing them the same?

12      A.   Honestly, I don't remember, if I

13 said to weight them some way and weight them

14 differently another time.  I could have done

15 that.

16      Q.   But you don't recall one way or the

17 other?

18      A.   I don't.

19      Q.   Can you take a look at Rucker

20 Exhibit 8, sir, and identify it, if you are

21 able to do so?

22      A.   Yes.

23      Q.   What is it?

24      A.   I think it's our final solvency

25 analysis for the step 1 transaction.

1          B. Browning - Confidential

2          Q.    This document was sent by you to

3     Mr. Bigelow on May 8, 2007?

4          A.    That's what it looks like, yes.

5          Q.    Can you turn to page 10 of the

6     analysis?  This is a revised version of the

7     similar page we were just looking at in

8     Rucker Exhibit 7; is that right?

9          A.    That's what it looks like.

10         Q.    I note that on this page there are

11    no different weightings given to the

12    valuation methods.

13             Do you see that?

14         A.    I do.

15         Q.    Does seeing that help you recall at

16    all any discussions about the different

17    weightings of these valuation methods?

18         A.    Yes.

19         Q.    Please share.

20         A.    Well, you asked me up to that point

21    in time.  And up until that point in time, I

22    don't recall.

23             Subsequent to that May, whatever,

24    whatever period that was, our opinion

25    committee met and they suggested we take the

1      B. Browning - Confidential

2  weightings out.

3      Q.   So sometime between May 4th, the

4  date of Rucker Exhibit 7, and May 8th the

5  date of Rucker Exhibit 8, the opinion

6  committee met and suggested that the

7  different weightings for valuation methods be

8  taken out of the analysis; is that right?

9      A.   The opinion committee met many

10  times between that point, but yes.

11      Q.   Would the membership of the opinion

12  committee at that time be the same as what

13  you described earlier?

14      A.   I think we added several people,

15  one or two, because Chad and I were

16  conflicted, so I think we added several

17  people.

18      Q.   Does the fact that you were

19  conflicted meant that you didn't participate

20  in the deliberations of the committee?

21      A.   No, I was there, but I didn't -- I

22  wasn't part of the review portion.

23      Q.   Do you recall who it was that was

24  added to the committee because you and

25  Mr. Rucker were conflicted?

1     B. Browning - Confidential

2     A.   Yes, I believe Steve Schuetz was

3  added and Neil Kelly may have been added.  I

4  don't recall everyone, but I believe those

5  two were.

6     Q.   Do you recall a discussion with the

7  opinion committee about the weightings of the

8  valuation methods at this time?

9     A.   I do.

10    Q.   What do you remember about the

11 discussion?

12    A.   That this isn't an appraisal from

13 the standpoint of where you -- you weight an

14 indication and that's the point indication.

15 It's really a range of values that you are

16 looking at, so it's better to look at that

17 range without putting any kind of constraints

18 on or -- if you will.

19    Q.   Was that view news to you, was that

20 something you never heard before?

21    A.   I don't know if it was news to me

22 or not.  I think -- I would say no, it wasn't

23 news to me.

24    Q.   You'd heard people express that

25 view in the past?

1      B. Browning - Confidential

2      A.    Sure.

3      Q.    And although you heard that view

4  expressed in the past, you were nonetheless

5  not uncomfortable sending a draft analysis to

6  Mr. Bigelow that had different weightings,

7  correct?

8            MR. NEIER:   Objection to form.

9      A.    I wasn't uncomfortable.   It was a

10  long process.   We were looking at a lot of

11  things.

12     Q.    Do you recall anything else about

13  the discussion with the opinion committee on

14  weightings for the valuation methods?

15     A.    No, I don't.

16     Q.    As of this time in May 2007, can

17  you explain the effect of the opinion

18  committee's views on a solvency analysis?

19  Were you required to follow their views or

20  did you have to take them into account but

21  could take a different path?

22     A.    That's a good question.   I

23  respected the opinion committee's views and I

24  generally took them into account.

25     Q.    Were you required to do so?

1      B. Browning - Confidential

2      A.   I don't know if I would say

3  "required."  I don't know if I would lose my

4  job, if you're asking me that if I didn't

5  listen to them, but I listened to them.

6      Q.   Are there circumstances where you

7  disagreed with the opinion committee and

8  proceeded on your own judgment as a general

9  matter?

10     A.   None that I can recall.

11     Q.   Take a look at the document that

12 was marked as Rucker Exhibit 9, sir.  It

13 should be on the top of this pile.  Take your

14 time to review it and then tell us what it

15 is, if you are able to.

16     A.   Looks like our opinion letter for

17 the step 1 transaction.

18     Q.   Did you play a part in drafting

19 this document?

20     A.   I believe I did.

21     Q.   What was your role?

22     A.   I either added to or reviewed the

23 letter.

24     Q.   Do you recall any specific changes

25 or additions you made to the letter?

1      B. Browning - Confidential

2      A.   No.

3      Q.   Can you turn to the second page of

4  the letter?  Towards the bottom of the page,

5  there are a couple of sentences that read,

6  "In rendering the opinion, VRC conducted such

7  reviews, analyses and inquiries, reasonably

8  deemed necessary or appropriate under the

9  circumstances.  Among other things VRC has,"

10  and then there is a long bulleted list of

11  things that VRC had done.

12          Do you see that?

13      A.   Yes.

14      Q.   The third bulleted item down from

15  the text I just read reads, "Reviewed

16  internal interim financial statements for the

17  period ended March 31, 2007."

18          Do you see that?

19      A.   Yes.

20      Q.   I will represent to you that I do

21  not see in this list any reference to

22  internal interim financial statements for any

23  later period.

24          Would that indicate to you that as

25  of this time VRC had not seen any later

1       B. Browning - Confidential

2    internal interim financial statements?

3       A.    I think we had April 5th, the 8-K,

4    which would have been after this March 31st,

5    but I think it would have been probably the

6    same period.

7       Q.    Same financial data?

8       A.    Yeah, because I don't think there

9    was financial data available beyond that we

10   know of.

11      Q.    If there had been such later

12   financial data available as of May 9th, is it

13   correct that it would have been listed here?

14      A.    I believe so.

15      Q.    Take a look at Rucker Exhibit 11, a

16   couple down in the pile in front of you.

17          What is this document, sir?

18      A.    It is a -- I believe it's a signed

19   solvency opinion as of May 24th.

20      Q.    Does the phrase "bring down

21   opinion" have any meaning for you?

22      A.    Yes.

23      Q.    What is that?

24      A.    It's an opinion that is given

25   oftentimes at the consummation of a

1          B. Browning - Confidential

2     transaction.

3          Q.   And what is it bringing down?

4          A.   It's taking any opinions that have

5     been made previously to that date, basically

6     bringing it to that date.

7          Q.   Is this a bring down opinion

8     bringing down the May 9th opinion, which is

9     Rucker 9, to May 24th?

10         A.   I believe it is.

11         Q.   Mr. Browning, can you turn to page

12    2 of Rucker Exhibit 11?  At the bottom of the

13    page, I think you will see some text that is

14    similar to what we just looked at in Rucker

15    9 --

16         A.   Yes.

17         Q.   -- describing the reviews, analyses

18    and inquiries done by VRC.

19              Do you see that, sir?

20         A.   Views -- I'm sorry?

21         Q.   Reviews, analyses and inquiries?

22         A.   Yes.

23         Q.   This is parallel to the section we

24    just looked at for the May 9th opinion?

25         A.   Yes.

1      B. Browning - Confidential

2      Q.   There's a similar long list of

3  things that VRC had done; is that right?

4      A.   Yes.

5      Q.   If you turn to numbered page two of

6  opinion -- well, actually, there are two

7  numbered pages 2.  It's the third page of the

8  exhibit stamped VRC 0175885.

9      A.   Okay.

10     Q.   The fifth bullet down from the top

11 reads, "Reviewed internal interim financial

12 statements for the period ended April 1,

13 2007."

14          Do you see that?

15     A.   Yes.

16     Q.   I will represent to you that there

17 is no reference in this document to any later

18 internal interim financial statements except

19 for the 8-K, which presumably relates to the

20 same period?

21          MR. NEIER:  Objection to form.

22     Misstates the document.  We went through

23     this yesterday.

24          MR. SOTTILE:  Off the record.

25          (Whereupon, an off-the-record

1       B. Browning - Confidential

2       discussion was held.)

3       Q.   There is a reference in the page

4  we're looking at to review company memorandum

5  dated May 11, 2007 titled Financing Update.

6           Do you see that?

7       A.   Yes.

8       Q.   Do you know what that was?

9       A.   I suspect it was a document that

10  Tribune provided to us that gave us where

11  they were with their financing, and probably

12  some operating data as well.

13       Q.   Do you know whether or not any

14  operating data was included?

15       A.   I don't.

16       Q.   Would your understanding of the

17  financing being referenced here being debt

18  financing in connection with the step 1

19  transactions?

20       A.   I think it was debt and equity.

21       Q.   Is there some reason why you think

22  operating information may have been included

23  with this financing update?

24       A.   Not specifically, but it could have

25  been.

B. Browning - Confidential

2      Q.    You don't recall it being included,

3  but it's possible; is that right?

4      A.    It's possible.

5      Q.    As you sit here today, do you know

6  whether or not, as of the time of this

7  opinion, VRC had seen any financial

8  information for the Tribune covering periods

9  after April 1, 2007?

10      A.    As I sit here today?

11      Q.    That's the question.

12      A.    No, I don't.

13      Q.    If the --

14      A.    You're talking about for this

15  specific opinion?

16      Q.    For this opinion, yes, sir.

17          If VRC had seen such financial data

18  for the Tribune as of the time of this

19  opinion, would you expect it to be identified

20  in this opinion?

21          MR. BENDERNAGEL:   Object to the

22      form of the question.

23      A.    If we had seen it, I would expect

24  it to be in there.

25      Q.    Mr. Browning, I'm going to ask if

1         B. Browning - Confidential

2    -- we will go off the record so you can do

3    this -- if you can review all the bullet

4    points here and tell me whether or not any of

5    them suggest to you that VRC, as of this

6    time, had any kind of financial statements

7    for the Tribune for periods after April 1,

8    2007, with the exception of the updated

9    financing memo, which we already discussed.

10        MR. SOTTILE:  Let's go off the

11        record.

12        (Whereupon, an off-the-record

13        discussion was held.)

14        Q.   Mr. Browning, have you now had an

15    opportunity to review those portions of

16    Rucker Exhibit 11 that identify things that

17    VRC had done in connection with rendering its

18    solvency opinion?

19        A.   I reviewed?

20        Q.   Have you reviewed it?

21        A.   You said had done, but had reviewed

22    are you asking me?  You said things that VRC

23    had done.

24        Q.   VRC had reviewed.

25        A.   Yes.

1          B. Browning - Confidential

2          Q.    So you looked at all of the

3     bulleted items that start on the bottom of

4     page 2 and continue on through the page

5     numbered 4, which is VRC 0175887?

6          A.    Yes.

7          Q.    Do any of those items indicate to

8     you that as of this date VRC had seen

9     financial statements or reports on operations

10    of the Tribune for periods after April 1,

11    2007?

12         A.    I think the answer is no, but the

13    only other one that could possibly be was in

14    the discussions with management regarding

15    historical and future operations.

16         Q.    And which bullet are you referring

17    to in particular?

18         A.    "Held discussion and multiple

19    meetings with certain members of the

20    company's management team with respect to

21    past, present and future operations and

22    financial conditions of the company, among

23    other subjects."

24         Q.    That's the second to the last of

25    these bullets?

1        B.  Browning - Confidential

2        A.    Yes.

3        Q.    And it's possible that included a

4   discussion of financial performance after

5   April 1, 2007, but you don't know?

6        A.    That's correct.

7        Q.    Is there anything else in these

8   bullets that indicate to you that as of May

9   24, 2007 VRC had reviewed information

10  concerning the financial performance of the

11  Tribune for periods after April 1, 2007, and

12  I will exclude from the question the

13  financing update?

14       A.    No.

15            MR. SOTTILE:  Let's mark this

16       document as Browning Exhibit 5, please.

17            (Browning Exhibit 5, E-mails,

18       marked for identification, as of this

19       date.)

20       Q.    Are you able to identify the

21  document we marked as Browning Exhibit 5,

22  sir?

23       A.    It's a series of e-mails between

24  myself and Chad Rucker.

25       Q.    These e-mails were sent, according

1          B. Browning - Confidential

2    to the dates indicated, on May 16 and 17,

3    2007, correct?

4          A.   Yes, that's what it looks like.

5          Q.   Starting with the first e-mail in

6    the chain, which is the last in the text,

7    that appears to be an e-mail from Mr. Rucker

8    to you dated May 16th.

9              Do you see that?

10         A.   Yes.

11         Q.   And in the text of the e-mail in

12   the second sentence, Mr. Rucker says, "We

13   have included two summaries; one for step 1

14   and the other for step 2."

15             Do you see that?

16         A.   Yes.

17         Q.   Do you know what he's talking

18   about?

19         A.   I'm assuming he's talking about

20   solvency opinion summaries for both steps.

21         Q.   Do you recall that such summaries

22   were being worked on in this timeframe, mid

23   May 2007?

24             MR. JOHNSTON:  Objection to

25        questioning the witness on a document

1      B. Browning - Confidential

2      that should have an attachment to it

3      that's not included.

4          MR. SOTTILE:  I'm about to put the

5      document in front of him.

6          MR. JOHNSTON:  Okay.

7          MR. SOTTILE:  Let's just cut to the

8      chase.

9      Q.   Can you pull out Rucker Exhibit 13

10  and Rucker Exhibit 14?

11          Mr. Browning, what I would like to

12  ask you to do is tell us, if you are able to

13  do so, whether Rucker Exhibit 13 and Rucker

14  Exhibit 14 are the summaries referred to in

15  Mr. Rucker's May 16th e-mail to you?

16      A.   I would assume so, given the dates.

17      Q.   Do you know why it is that as of

18  this time, May 16, 2007, VRC was working on a

19  step 2 solvency opinion analysis?

20      A.   Because we were engaged to conduct

21  both steps.  We generally completed our step

22  1 analysis, and I suspect that -- I would

23  think that the step 1 they sent me is in

24  regard to the bring down at that point.  I

25  don't know.

1          B. Browning - Confidential

2          Q.    Setting aside the step 1 opinion

3    for the moment, is it your testimony that VRC

4    was working on a step 2 solvency opinion

5    analysis in mid May 2007 because it had been

6    engaged to ultimately give that opinion later

7    in the year?

8          A.    Yes.

9          Q.    Let's turn to Rucker Exhibit 14 in

10   particular, which is headed, "Step 2 solvency

11   opinion analysis," dated May 17, 2007.

12          Can you turn to numbered page 4 of

13   this document, sir?

14          A.    Okay.

15          Q.    And this is a page summarizing the

16   results of the valuation capital adequacy

17   test described in the document; is that

18   right?

19          A.    Yes.

20          Q.    There is a line on the left-hand

21   side that reads, "NPV of AESOP tax savings."

22          Do you see where I'm reading?

23          A.    Yes.

24          Q.    What does that line represent, sir?

25          A.    That represents the potential tax

1          B. Browning - Confidential

2    savings that the company would achieve by

3    having the S. Corp. AESOP structure.

4          Q.   I note that those values are the

5    same in the low, mid and high cases.

6               Do you see that?

7          A.   I do.

8          Q.   Do you know why that's so?

9          A.   I suspect that they took a point

10   value and put it in for each indication.

11         Q.   Do you believe that's an

12   appropriate way to consider the NPV of the

13   AESOP tax savings in the low, mid and high

14   valuations?

15         A.   I believe we changed that.

16         Q.   So you believe this was

17   inappropriate?

18         A.   It was a preliminary draft.

19         Q.   And it was inappropriate because

20   you changed it?

21         A.   I wouldn't say inappropriate.  It

22   was either the opinion committee suggested

23   it, or I suggested it, or someone suggested

24   it.

25         Q.   And ultimately when the step 2

1        B. Browning - Confidential

2    opinion was given, the tax savings were

3    different in the low, mid and high cases,

4    correct?

5        A.   I believe that is correct.

6        Q.   Do you recall why it is the change

7    was made?

8        A.   I think -- I'm speculating, but I

9    think we use a sensitivity analysis and we

10   look at a high-low using different discount

11   rates.  And -- different discount rates, and

12   that's probably the changes in the value.

13       Q.   Can you take a look at the document

14   that was marked as Rucker Exhibit 15, sir?

15   And please identify it for us, if you're able

16   to do so.

17       A.   Looks like a draft of the step 2

18   analysis sent from Leo Mednik to Chandler

19   Bigelow.

20       Q.   You're not copied on this e-mail.

21            Were you aware that this draft was

22   going to Mr. Bigelow?

23       A.   I'm just wondering if I was on

24   vacation or not.  I think that's probably

25   what it was.

1        B. Browning - Confidential

2        Q.    Were you aware in June 2007 that

3    VRC was sending Mr. Bigelow a draft of the

4    step 2 solvency analysis?

5        A.    I probably was.

6        Q.    Do you know why it was being sent

7    to him at that time?

8        A.    To get his input, I suspect.

9        Q.    Do you recall any discussion with

10   Mr. Bigelow or any written communication back

11   from him concerning the preliminary step 2

12   solvency analysis?

13       A.    Nothing in particular.  I don't

14   recall.

15       Q.    The step 2 solvency opinion was

16   also given in December 2007; is that right?

17       A.    Yes.  Again given, did you say?

18       Q.    Was given.

19       A.    Was given, yes.

20       Q.    Although it was six months away, a

21   draft of the solvency analysis was

22   nonetheless being sent to Mr. Bigelow for

23   comment in June?

24            MR. BENDERNAGEL:  Object to the

25       form of the question.

1      B. Browning - Confidential

2      A.    It looks like it, yes.

3      Q.    Do you have any further

4  understanding as to why you were sending it

5  to him six months in advance of when the

6  opinion was anticipated to be rendered?

7           MR. BENDERNAGEL:  Objection to the

8       form of the question.

9           MR. NEIER:  Objection.

10      A.    I will just say big picture.  It

11  was a long process.  We started from the

12  beginning.  We looked at both transactions.

13  We focused on the step 1 transaction, and as

14  soon as we completed that point where we were

15  comfortable, we focused on the step 2

16  transaction.

17           MR. SOTTILE:  Why don't we break

18       for lunch.

19           (Whereupon, a luncheon recess was

20       taken at 12:24 p.m.)

21

22                  *    *    *

23

24

25

Page 119

1         B. Browning - Confidential

2     A F T E R N O O N    S E S S I O N

3             (Time noted:  1:10 p.m.)

4

5  B R Y A N    B R O W N I N G,

6     resumed and testified as follows:

7             MR. SOTTILE:  I would like to mark

8     this document as Browning Exhibit 6.

9             (Browning Exhibit 6, Document,

10    marked for identification, as of this

11    date.)

12 EXAMINATION BY (Cont'd.)

13 MR. SOTTILE:

14    Q.   Mr. Browning, are you able to

15 identify what we've marked as Browning

16 Exhibit 6?

17            MR. BENDERNAGEL:  Is this a single

18    document or multiple?

19            MR. SOTTILE:  It came in this way.

20    I believe the documents included are

21    attachments to the e-mail.

22            MR. BENDERNAGEL:  There's gaps.

23            MR. NEIER:  Yes, there is a lot of

24    gaps.

25            MR. SOTTILE:  Oh, in the numbering,

1       B. Browning - Confidential

2       I see what you mean.  The only document

3       in this.

4            MR. NEIER:  I can assure you it's

5       not a single document.

6       Q.    There's only one document in here

7  that I want to address your attention to,

8  which I believe is complete.  That's the

9  document that is stamped VRC 0034756 to 758.

10  It purports to be a memo to file from Leo

11  Mednik dated October 29, 2007.  That's the

12  only document within this exhibit that I'm

13  going to ask you questions about.

14       A.    Okay.

15       Q.    Have you had an opportunity to

16  review that document, sir?

17       A.    You're asking me today did I have a

18  chance to review it?

19       Q.    Yes.

20       A.    No, I haven't had a chance to

21  review it.

22       Q.    Do you know what it is?

23       A.    Yes.

24       Q.    What is it?

25       A.    It's a memo from Leo to the file.

1        B. Browning - Confidential

2        Q.    Leo is one of the analysts working

3    on the Tribune engagement?

4        A.    Yes.

5        Q.    And he reported to you?

6        A.    Yes.

7        Q.    Did you see this memorandum at or

8    about the date it a bears, late October 2007?

9        A.    I'm not certain if I did or didn't.

10        Q.    Did you see memoranda like this

11    prepared by Mr. Mednik in the October 2007

12    timeframe?

13        A.    Yes, memorandum like this.  I told

14    all my analysts to put their assumptions to

15    the file, so it was a general kind of

16    procedure.

17        Q.    But you're not sure whether or not

18    you saw this particular memorandum?

19        A.    I'm not.

20        Q.    Can you turn to the page of that

21    memorandum that's stamped VRC 0034758?  And

22    read to yourself the subsection that's

23    titled, "f VRC analysis," and then I have a

24    couple of questions for you.

25              MR. NEIER:  Small f.

1           B. Browning - Confidential

2      A.    Okay.

3      Q.    First of all, you understand the

4  subject of this memo is the broadcasting

5  revenue assumptions made in the Tribune base

6  case; is that right?

7           If it's helpful, the first page of

8  the memorandum, the subject line may help

9  you?

10     A.    Okay.

11     Q.    Is that what you understand from

12  looking at this, that the memo is about?

13     A.    I guess so, yeah.

14     Q.    In the section f VRC analysis, the

15  sub little i, first sentence reads, "VRC

16  believes that a revenue growth rate of 7.9

17  percent is overestimated."

18           Do you see that?

19     A.    Yes.

20           MR. NEIER:  There are two VRC

21      analyses on this page.

22           MR. SOTTILE:  At the top, the one

23      with sub f.

24     A.    Yes, I do see that.

25     Q.    The revenue growth rate of 7.9

1           B. Browning - Confidential

2    percent reflected here comes from the Tribune

3    base case as of this time; is that right?

4           A.    I don't know.  It could be.

5           Q.    Can you tell from context whether

6    that's what it is?

7           A.    Yes, I think it is from the base

8    case at that point in time.

9           Q.    Do you recall any discussion with

10   Mr. Mednik or others about the Tribune base

11   case revenue growth rate for broadcasting

12   revenue being overestimated?

13              MR. BENDERNAGEL:  For 2008.  You

14          didn't qualify it as 2008.  That's the

15          objection to the question.

16              MR. SOTTILE:  I'm happy to accept

17          the change.

18          A.    And what is the change?

19          Q.    Do you recall any discussions in

20   the October/November 2007 timeframe about

21   whether or not the Tribune base case estimate

22   of revenue growth of 7.9 percent in 2008 was

23   overestimated?

24              MR. NEIER:  Objection to form.  I

25          think what you're asking him is whether

1        B. Browning - Confidential

2        the projected revenue for 2008 fiscal

3        year 2008 estimated as of October 29,

4        2007 was overestimated, right?

5             MR. SOTTILE:  I will accept that

6        question.

7        A.   I suspect we did have conversations

8    in that regard.

9        Q.   Do you remember that?

10       A.   We had conversations -- it was a

11   long process.  We had conversations about

12   every case they had.

13       Q.   You think you may have discussed

14   this with Mr. Mednik but you don't have a

15   specific recollection?

16       A.   That's correct.

17       Q.   At the end of this subsection, f

18   VRC analysis, there appears a sentence,

19   "Therefore, VRC believes an appropriate

20   growth rate is 5.8 percent."

21             Do you see that?

22       A.   Yes, I see that, okay.

23       Q.   Does that spark any recollection of

24   discussions on this subject of an appropriate

25   growth rate for projected growth rate for

1      B. Browning - Confidential

2  broadcasting revenue?

3      A.   It really, you know, again, I will

4  just have to answer we probably did talk

5  about it, but specific discussions I don't

6  recall.  Oftentimes we would get on the phone

7  with Tribune management and discuss -- if we

8  had a concern, we discussed that concern with

9  them.

10     Q.   Would you expect this issue, that

11 is, a difference between what Mr. Mednik

12 believed was an appropriate growth rate and

13 what was reflected apparently in the Tribune

14 base case as of this time, to be something

15 you would have raised with Tribune

16 management?

17     A.   Certainly.  I believe we would

18 have.

19     Q.   But you don't recall specifically

20 whether you did or not?

21     A.   Not specific to these numbers.

22     Q.   Okay, thank you.  That's all I have

23 on that exhibit.

24          MR. SOTTILE:  Can you mark this

25     page as Browning Exhibit 7.

1       B. Browning - Confidential

2           (Browning Exhibit 7, Handwritten

3       page, marked for identification, as of

4       this date.)

5       Q.   The document that I have marked as

6   Browning Exhibit 7 is the last page of the

7   document I'm passing around you, so the

8   exhibit is solely the last page of what you

9   are getting copies of.

10          MR. BENDERNAGEL:  What does that

11      mean?  Does that mean you're marking the

12      whole document?

13          MR. SOTTILE:  It means I'm marking

14      only the last page, but I'm not ripping

15      that off of what's been handed around.

16          MR. NEIER:  But I'm ripping it off.

17          MR. BENDERNAGEL:  What's the court

18      reporter marking?

19          MR. SOTTILE:  Just the last page.

20      That's the exhibit.

21      Q.   Are you able to identify Browning

22   Exhibit 7, sir?

23      A.   It's my writing.

24      Q.   This is your handwriting?

25      A.   Fortunately or unfortunately.

1          B. Browning - Confidential

2          Q.    Could you read it out loud for us?

3          A.    "The real estate incremental value

4     has been excluded from our analyses for

5     solvency to be conservative but could

6     potentially add 100 to $300 million to asset

7     values, or 1 to 3 percent increase."

8          Q.    When are the notes dated?

9          A.    Looks like November 21, 2007.

10         Q.    Are these notes to yourself or

11    notes of a discussion?

12         A.    I would have to see what the rest

13    of that document is.

14         Q.    I don't know whether it will help

15    you, but you're welcome to it.

16              MR. SOTTILE:  Off the record.

17              (Whereupon, an off-the-record

18         discussion was held.)

19         Q.    Let's mark as Browning Exhibit 8 a

20    three-page document stamped VRC 0025824

21    through 826.

22              (Browning Exhibit 8, Four-page

23         document, marked for identification, as

24         of this date.)

25              MR. BENDERNAGEL:  Why is 7 being

Page 128

1      B. Browning - Confidential

2    cut up?

3         MR. SOTTILE:  Because there's a

4    long gap in Bates numbers.

5         Off the record.

6         (Whereupon, an off-the-record

7    discussion was held.)

8         MR. SOTTILE:  We're going to

9    substitute as Browning Exhibit 8 a

10    document that has the following Bates

11    numbers; VRC 0025824, 825, 826 and 827.

12         MR. NEIER:  I'm confused.

13         MR. SOTTILE:  We're changing 8 to

14    add a fourth page which may go with it,

15    because Jim's point was that the fourth

16    page may be part of what I originally

17    marked as Browning 8.  That's the actual

18    exhibit.

19         THE WITNESS:  I have four pages.

20         MR. NEIER:  I have six.  I had from

21    24 to 27.

22         MR. SOTTILE:  After that interlude,

23    let's be clear that Browning Exhibit 8

24    consists of four pages, and it's stamped

25    VRC 25824 through 827.

1          B. Browning - Confidential

2              MR. NEIER:  We already have that.

3     Q.   Mr. Browning, can you identify the

4 document we marked as Browning Exhibit 8?

5     A.   Yes.  I believe they are notes from

6 a conference call we had with Chandler and

7 other probably Tribune management members.

8     Q.   And you were a participant in that

9 telephone call?

10     A.   Yes.

11     Q.   Is the handwriting that appears on

12 this document yours?

13     A.   Yes.

14     Q.   Does seeing Browning Exhibit 8 help

15 you in determining the context of Browning

16 Exhibit 7 and whether it's notes to yourself

17 or notes of a discussion?

18     A.   It's notes of a discussion that I

19 took during that call.

20     Q.   During the same call, as to which

21 you have notes in Browning Exhibit 8?

22     A.   I believe so.

23     Q.   So you believe now that the notes

24 in Browning Exhibit 7 are notes of a call in

25 which you participated with Mr. Bigelow on

1     B. Browning - Confidential

2 November 21, 2007?

3     A.   Correct.

4     Q.   And the statements that appear in

5 Browning Exhibit 7 concerning real estate

6 incremental value, are those notes of

7 something that Mr. Bigelow said, you said or

8 some other person said?

9     A.   I'm assuming that Mr. Bigelow said

10 or some other person from Tribune.

11     Q.   You believe that what's recorded in

12 Browning Exhibit 7 is a statement by either

13 Mr. Bigelow or someone else at the Tribune?

14     A.   It's my interpretation of that,

15 yes.

16     Q.   It's your notes of what Mr. Bigelow

17 or some other Tribune person said?

18     A.   Yes.

19     Q.   And what is the real estate

20 incremental value being referred to here, to

21 your understanding?

22     A.   I'm assuming it's some of the real

23 estate on the previous page.

24     Q.   Which previous page are you

25 referring to here?

1     B. Browning - Confidential

2          MR. NEIER:  The witness is

3     referring to Browning Exhibit 8.

4     A.   Exhibit 8.  The last page of

5     Exhibit 8.

6     Q.   Which is numbered what?

7          MR. NEIER:  Ending 27.

8     A.   827.

9     Q.   What is it you're referring to on

10    that page concerning real estate incremental

11    value?

12    A.   There's different pieces of real

13    estate; Tribune Tower, Times Mirror property

14    in Los Angeles, and there was a Baltimore

15    property.  I'm assuming that's what it was.

16    Q.   You're assuming that the real

17    estate identified on the last page of

18    Browning 8 is the same real estate being

19    referred to in Browning 7?

20    A.   Yes.

21    Q.   Could you read out loud your notes

22    on the last page of Browning Exhibit 8?

23          MR. BENDERNAGEL:  Didn't we just do

24    that?

25          MR. SOTTILE:  Most of it.

B. Browning - Confidential

Q.    You don't need to repeat the
description of the three properties that you
identified, but there's some text at the top
and the bottom.

Could you read that?

A.    "Other questions, real estate.
Additional value of real estate has not been
factored in."

Q.    What is the additional value of
real estate being referred to there?

A.    These properties.

Q.    It's value that's additional to
what?

A.    To what was in their analysis.

Q.    To what was in the Tribune's --

A.    Projections and information that
they provided.

Q.    These are properties that the
Tribune believed were valued properly at
levels above what they had previously
provided to you?

A.    No, that's not.

Q.    Then I misunderstood.  Could you
explain?

1      B. Browning - Confidential

2      A.   We didn't include any values for

3    these properties in our analysis to that

4    point.

5      Q.   Why not?  Why had they not

6    previously been included?

7      A.   I think there's a couple of

8    reasons.  One was there was some speculation

9    as to how they were going to handle these

10   properties, what they were going to do with

11   them, so that was probably the biggest

12   reason.

13     Q.   What was the uncertainty between,

14   what were the possibilities?

15     A.   For example, take the Tribune

16   Tower.  Obviously the company was using the

17   Tribune Tower for its corporate offices.

18   There were decisions trying to be made what

19   to do with that and so nothing had been

20   formulated and therefore no value had been

21   placed on it.

22     Q.   Did that change as a result of

23   these discussions with Mr. Bigelow and others

24   at the Tribune?

25          MR. BENDERNAGEL:  Object to the

1       B. Browning - Confidential

2       form of the question.

3       A.    At this point in time?

4       Q.    After this point in time?

5       A.    At this point in time, we were

6    investigating to see if there were reasonable

7    -- if there were certain properties that

8    should be included or shouldn't be included,

9    what was speculative and what was more

10   concrete.  And that's what we were looking

11   at.

12      Q.    Did you ultimately conclude that

13   some real estate should be included in the

14   solvency analysis that had not previously

15   been included?

16      A.    I believe that as the projections

17   evolved, I believe that Tribune included a

18   couple of the properties in their analysis.

19      Q.    And once Tribune did so you, VRC,

20   included them in your solvency analysis?

21      A.    I believe that's correct.

22      Q.    Did VRC make an independent

23   judgment about whether it was appropriate to

24   include that real estate in its solvency

25   analysis, or were you relying upon Tribune?

1       B. Browning - Confidential

2       A.   Are you asking did we do an

3   independent appraisal, or what are you

4   asking?

5       Q.   As I understand it, following

6   November 21, 2007, your testimony is that the

7   Tribune modified their projections to include

8   some of the real estate; is that right?

9       A.   I believe so, yes.

10       Q.   And after that, I understand your

11   testimony to be that VRC followed suit and

12   included consideration of the same real

13   estate in its solvency analysis; is that

14   right?

15       A.   I'm not sure if it's the same real

16   estate.  I know we included real estate in

17   our analysis, but whether it was exactly the

18   same, I don't know.

19       Q.   What was the basis on which VRC

20   included in its analysis certain real estate

21   that had not been included prior to November

22   21, 2007?

23       A.   I believe it was schedules from

24   Tribune.

25       Q.   Was there any other basis on which

1        B. Browning - Confidential

2    VRC decided it should include such real

3    estate in the solvency analysis other than

4    receiving schedules from the Tribune?

5        A.   No, I don't believe so.

6             MR. NEIER:  If I can now ask we

7        identify the person who's now in the far

8        corner.

9             MS. MILLER:  Elizabeth Miller from

10       Chadbourne.

11            MR. SOTTILE:  Let's mark this as

12       Browning Exhibit 9.

13            (Browning Exhibit 9, E-mail, marked

14       for identification, as of this date.)

15       Q.   Mr. Browning, are you able to

16   identify the document that we have marked as

17   Browning Exhibit 9?

18       A.   Yes, I believe so.

19       Q.   What is it, sir?

20       A.   It is an e-mail that I forwarded to

21   Chad Rucker from Chandler Bigelow.

22       Q.   What's the date on the e-mail from

23   Mr. Bigelow to you?

24       A.   Sunday, May 13th.

25       Q.   2007?

1        B. Browning - Confidential

2        A.    2007.

3        Q.    Can you describe the attachments to

4   the e-mail?

5        A.    Yes.   It looks like revised terms

6   of, or it's a financing update, and also it

7   looks like probably a press release by

8   Tribune for a certain period, period four, it

9   looks like.

10       Q.    Which is April of 2007?

11       A.    April 2007.

12       Q.    Can you look at the last page of

13   the exhibit and identify that for us, if you

14   are able to do so?

15       A.    It looks like it's called a summary

16   of revenues and newspaper advertising volume

17   as of period 4, ended April 29, 2007,

18   unaudited.

19       Q.    Could you turn back to the document

20   we had marked as Rucker Exhibit 11, which is

21   the May 24, 2007 solvency opinion.

22       A.    Okay.

23       Q.    And I direct you to the third page

24   of that exhibit, which is stamped 175885 in

25   the lower right-hand corner.   It is numbered

1    B. Browning - Confidential

2    2.  It's the second page numbered 2.

3         Do you have that one?  It's the one

4    that ends 885?

5        A.  Yes.

6        Q.  About the seventh bullet down here

7    references a company memorandum dated May 11,

8    2007 titled Financing Update.

9         Do you see that?

10       A.  Yes, I do.  Yes, I see it.

11       Q.  Are you able to determine from

12   reviewing the document that we marked as

13   Browning 9 whether that reference is a

14   reference to part or all of the attachments

15   to the e-mail that's the first page of

16   Browning 9?

17       A.  Yes, I believe it would be in

18   reference to those attachments.

19       Q.  Do you believe it to be a reference

20   to all of the attachments or only the page

21   that's headed Financing Update?

22       A.  I believe it would be all.

23       Q.  Thank you.

24       MR. SOTTILE:  Let's mark this

25   document as Browning Exhibit 10.

1      B. Browning - Confidential

2          (Browning Exhibit 10, E-mail,

3      marked for identification, as of this

4      date.)

5      Q.   Mr. Browning, are you able to

6  identify the document we've marked as

7  Browning Exhibit 10?

8      A.   Yes, I think it's an e-mail that I

9  forwarded to Leo Mednik.

10     Q.   And the e-mail that's forwarded is

11 an e-mail from Mr. Brattebo to you dated

12 November 27, 2007?

13     A.   It's to Biff, but yes, that is me.

14     Q.   Biff is your nickname?

15     A.   It's not something I chose, but

16 yes.

17     Q.   Could you just read to yourself the

18 e-mail from Mr. Brattebo because I have

19 several questions about it.

20     A.   Okay.

21     Q.   First of all, numbered item 3 in

22 the e-mail from Mr. Brattebo reads, "I don't

23 think the same tax savings value should be

24 the same under all the scenarios."

25          Do you know what Mr. Brattebo was

1          B. Browning - Confidential

2     referring to here?

3          A.    I think it's referring to what you

4     talked about previously, where we had all

5     three -- between the high, low and medium

6     indication, we used the same indication

7     value.

8          Q.    For the tax savings?

9          A.    That's correct.

10         Q.    And you understood Mr. Brattebo to

11    be saying he didn't think that was the right

12    way to handle it?

13         A.    That's what he's saying here, yes.

14         Q.    Was a change in the treatment of

15    tax savings in the low, mid and high cases

16    after this e-mail was received by you?

17         A.    I believe it was.

18         Q.    Item numbered 4 in the e-mail from

19    Mr. Brattebo starts with a question, "How

20    does 'cushion' compare to other leveraged

21    deals in 2007?"

22              By "cushion" here, do you

23    understand Mr. Brattebo to be referring to

24    the equity cushion that we talked about

25    earlier today?

1          B. Browning - Confidential

2          A.    Yes.

3          Q.    Were you able to answer

4    Mr. Brattebo's question?

5          A.    I believe we looked into it as a

6    result of his question.

7          Q.    What did you find?

8          A.    I don't recall.

9          Q.    You don't have any recollection of

10   how the cushion in the Tribune transaction

11   compared to other leveraged deals in 2007?

12         A.    No.

13         Q.    Mr. Brattebo goes on in the

14   following sentence to say, "If below average

15   (and it likely is) what factors compensate

16   for this (clearly taxes for one)."

17               Was it your view that the equity

18   cushion in the Tribune transaction was below

19   average compared to other leveraged deals at

20   the time?

21         A.    I think that's his statement, but I

22   couldn't say.  I can't speculate whether it

23   was or wasn't, to tell you the truth.

24         Q.    Do you recall investigating that

25   issue, though?

1       B. Browning - Confidential

2       A.    One of my staff probably did.

3       Q.    You just don't remember what the

4  results of that inquiry were?

5       A.    No.

6       Q.    Numbered paragraph 6 from

7  Mr. Brattebo's e-mail, the first sentence of

8  that reads, "My standard line with solvency

9  tests is that the greatest risk is associated

10 with the second test, i.e. the ability to

11 repay debt as it matures."

12       Second sentence goes on to say,

13 "Here my initial opinion is more concerned

14 with test number 1, especially with the low

15 discount rate."

16       What did you understand

17 Mr. Brattebo to be referring to when he

18 mentioned test number 1?

19       A.    I'm assuming he means the tests

20 that shown where assets minus liabilities, or

21 the balance sheet test.

22       Q.    That's the same thing, the balance

23 sheet test is the measure of assets against

24 liabilities?

25       A.    Yes.

1          B. Browning - Confidential

2          Q.    Do you understand what Mr. Brattebo

3    is referring to when he describes the

4    discount rate being low for test number 1?

5          A.    I'm assuming he thinks it's low.

6          Q.    Did you think so at this time?

7          A.    No.

8          Q.    Was any change made to the discount

9    rate for test number 1, the balance sheet

10   test, after you received Mr. Brattebo's

11   e-mail?

12         A.    Could have been.  I don't know.

13         Q.    But as of the time you received

14   this e-mail, you did not agree with Mr.

15   Brattebo that the discount rate was low for

16   the balance sheet test?

17         A.    I don't know if I would say agree

18   or disagree.  I would say that the discount

19   rate that we did use at the time was tested

20   by a number of different means, so that's how

21   we came up with it.

22         Q.    Did you believe as of November 27th

23   that the discount rate was low?

24         A.    I think I said no to that.

25         Q.    The last sentence of this numbered

1      B. Browning - Confidential

2  paragraph 6 reads, "The cost of debt is L

3  plus 150 to 300 for many companies.  Could

4  equity cost be greater than 9 percent."

5          What did you understand the

6  reference "L plus 150 to 300" to mean?

7      A.    Probably LIBOR plus 150 basis

8  points to 300 basis points most likely.

9      Q.    Can you explain what LIBOR is?

10     A.    It's a lending rate.

11     Q.    That's a common index used for cost

12  of debt?

13     A.    Yes.

14     Q.    What did you understand

15  Mr. Brattebo to be saying to you in this

16  sentence?

17     A.    I think it all gets back to the

18  previous question about what the cost of

19  capital was, the discount rate.

20     Q.    Can you explain what you understood

21  his question to be as it was expressed here

22  in this final sentence of paragraph six?

23     A.    I think the question is could

24  equity cost be greater than 9 percent.  He's

25  asking a question.

1      B. Browning - Confidential

2      Q.    Does that lead you to believe that

3   at the time the discount rate being used was

4   9 percent?

5      A.    No, not necessarily, but it could

6   be.

7      Q.    And do you understand Mr. Brattebo

8   to be suggesting that if the cost of debt is

9   in the range suggested here, the equity cost

10  might be greater than 9 percent?

11     A.    I think he's asking the question.

12     Q.    Did you answer the question?

13     A.    Yes.

14     Q.    What was the answer?

15     A.    To each of these questions.

16     Q.    What was the answer to this one?

17     A.    I don't remember.

18     Q.    Was there an e-mail that went back

19  to Mr. Brattebo from you or one of your team

20  responding to this document?

21     A.    I think -- I don't recall, but I

22  think it was done through another opinion

23  committee meeting.

24     Q.    Do you recall any writing that

25  reflects the answers given to Mr. Brattebo's

1       B. Browning - Confidential

2   questions?

3       A.   Any writing?

4       Q.   Any writing?

5       A.   No, I don't recall.

6       Q.   Can you look at numbered paragraph

7   8 from Mr. Brattebo's e-mail.  That reads,

8   "Risk of using residual mult in DCF for

9   publishing close to that used in comparable

10  and transaction approaches.  Yet in

11  broadcasting, we are using a residual

12  multiple well below that used in comparable

13  and transaction approaches."

14          What did you understand

15  Mr. Brattebo to be saying here?

16      A.   He's saying we're undervaluing the

17  broadcasting valuation.

18      Q.   Because the multiple being used

19  should be higher?

20      A.   It was lower than what the

21  comparable transaction is and multiples were.

22      Q.   By residual multiple, what did you

23  understand him to mean?

24      A.   I think he means terminal multiple

25  for the value beyond a certain period.

1          B. Browning - Confidential

2          Q.    That's multiple used to estimate

3     the value of cash flows after a given period

4     of time on into perpetuity?

5          A.    It's the present value.  It's meant

6     to determine the present value of those cash

7     flows beyond a given period.

8          Q.    Was there a change made to the

9     residual or terminal multiple for

10    broadcasting following Mr. Brattebo's e-mail?

11         A.    I'll say I think there was.

12         Q.    And it was increased?

13         A.    I think it did.

14         Q.    Could you go back to Browning

15    Exhibit 9 for a moment, sir?

16              MR. NEIER:  Browning, right?

17              MR. SOTTILE:  Yes.

18         A.    Okay.

19         Q.    Mr. Browning, the last page of

20    Browning Exhibit 9, which we looked at

21    earlier, appears to be a summary of revenues

22    and newspaper advertising volume for the

23    Tribune for the period ending April 29, 2007.

24              Do you see that?

25              MR. BENDERNAGEL:  Object to the

1        B. Browning - Confidential

2        form of the question.  There's two

3        columns on that page.

4        A.    I see the schedule.

5        Q.    And it includes both period 4,

6   referencing the period ending April 29, 2007,

7   the four weeks ending April 29, 2007 and the

8   year-to-date period ending April 29, 2007; is

9   that right?

10        A.    Yes, I believe so.  Four weeks and

11  year to date.

12        Q.    Do you know whether or not the

13  period for information shown on this page was

14  reflected in any solvency analysis done by

15  VRC between the date of Mr. Bigelow's e-mail

16  to you, May 13th, and the date of VRC, May

17  24th solvency opinion?

18        A.    I would say that because this is

19  revenue, I would say it would have been

20  considered.

21        Q.    Do you know that to be the case, or

22  you're assuming that because you would

23  generally consider financial information

24  given to you?

25        A.    I'd almost say yes to both for that

1        B. Browning - Confidential

2    question, because yeah, I think generally

3    information is given to us but because if it

4    was given to us, we would have looked at it.

5        Q.   Do you know whether or not this

6    information caused VRC to change its solvency

7    analysis from what it had been prior to the

8    date you received this e-mail?

9            MR. BENDERNAGEL:  Object to the

10           question as vague.

11           MR. SOTTILE:  Let me restate the

12           question.

13       Q.   Do you know whether or not the

14   information reflected on the last page of

15   Browning Exhibit 9 led VRC to make any

16   changes in its solvency analysis supporting

17   its step 1 solvency opinion?

18       A.   I don't know specifically, no.

19       Q.   Just to close out this line,

20   Mr. Browning, you answered you don't know

21   specifically.

22           Does that suggest that you have

23   some general view that this information

24   caused VRC to change its solvency analysis?

25       A.   No, I just can't recall.

1      B. Browning - Confidential

2          MR. SOTTILE:  Let's mark this

3      document as Browning Exhibit 11.

4          (Browning Exhibit 11, Note, marked

5      for identification, as of this date.)

6      Q.   Mr. Browning are you able to

7  identify what we marked as Browning 11?

8      A.   Yes.

9      Q.   What is it?

10     A.   I believe it's a note that I wrote

11  relative to our committee meetings as of

12  12/1/2007.

13     Q.   Which committee are you referring

14  to?

15     A.   Our opinion committee.

16     Q.   Is this a reference to a meeting of

17  the opinion committee where there was

18  discussion about Tribune?

19     A.   Yes.

20     Q.   Is this your handwriting?

21     A.   Yes.

22     Q.   Could you read it out loud for us?

23     A.   "Meet again to address outstanding

24  issues with committee.  Significant time was

25  spent on the assumption of refinancing.  The

1        B. Browning - Confidential

2   committee asked for more data to look at and

3   consider potential asset sales."

4        Q.   What was the assumption of

5   refinancing referred to here?

6        A.   I think what that relates to is we

7   made an assumption that they could refinance.

8   We had indications that they could refinance.

9   And they wanted us to test that a little bit

10  more.

11       Q.   Why is it that the committee wanted

12  further testing on that assumption, to your

13  understanding?

14       A.   Just to be certain it was a

15  reasonable assumption.

16       Q.   Is that assumption important to the

17  VRC solvency analysis?

18       A.   It's important to any solvency

19  analysis that we do.

20       Q.   So it was important for the

21  Tribune?

22       A.   Sure.

23       Q.   What was done following the meeting

24  of the committee to further look into the

25  assumption of refinancing?

B. Browning - Confidential

1    A.    I think we looked at covenant

2    analysis.  We looked at what kind of interest

3    rate coverage the company would have at the

4    time of refinancing.  What the debt was

5    relative to profitability, et cetera.

6         Also talked to Tribune management

7    regarding refinancing.  And I believe they

8    talked to their advisors regarding

9    refinancing.

10   Q.    Who would the advisors have been?

11   A.    I think it was Morgan Stanley.

12   Q.    What did you learn as a result of

13   these inquiries?

14   A.    That the refinancing assumptions

15   were reasonable.

16        MR. SOTTILE:  Let's mark this as

17        Browning 12.

18        (Browning Exhibit 12, Notes, marked

19        for identification, as of this date.)

20   Q.    What is Browning Exhibit 12, sir?

21   A.    It looks like my notes from a call

22   we had with Tribune management regarding

23   financing.

24   Q.    Is this at least one of the

1    B. Browning - Confidential

2  conversations about the assumption of

3  refinancing that you just testified about?

4    A.   I suspect it is.  It is a day

5  later.

6    Q.   It's a day later than the opinion

7  committee meeting you were just talking

8  about?

9    A.   Yes.

10    Q.   Would you read the last sentence on

11  the second page, it's numbered five, out

12  loud?

13    A.   "Management will provide a letter

14  of representation that the refinancing is a

15  reasonable assumption."

16    Q.   Did management ultimately provide

17  such a letter of representation?

18    A.   Yes.

19    Q.   And VRC relied upon that letter of

20  representation in giving its solvency

21  opinion?

22    A.   Yes.

23    Q.   Did VRC form any view independent

24  of management's representation about the

25  assumption of refinancing?

1      B. Browning - Confidential

2      A.   As I said, we looked at covenant

3  analysis and other types of financial

4  modeling analyses to test the refinancing

5  assumption.

6      Q.   And based on your analysis, did VRC

7  form an independent view about whether the

8  assumption of refinancing was reasonable?

9      A.   We relied upon management's

10 representations, but we tested those just as

11 we would any representation.

12     Q.   And your view is the testing

13 supported the representation made by

14 management?

15     A.   Yes.

16         MR. SOTTILE:  Let's mark this as

17     Browning Exhibit 13.

18         (Browning Exhibit 13, Notes, marked

19     for identification, as of this date.)

20     Q.   Can you tell us what Browning

21 Exhibit 13 is?

22     A.   I think it's my notes from this

23 specific meeting, the specific call with

24 Tribune management.

25     Q.   Is this a different call from the

1       B. Browning - Confidential

2    one as to which you have notes in Browning

3    Exhibit 12?  They're both dated the same day.

4       A.   My speculation would be that I

5    rewrote my notes so that I could read them.

6       Q.   You think these may be notes of the

7    same telephone call?

8       A.   I do.

9       Q.   Can you turn to the second page of

10   Browning Exhibit 13?  I'm not going to make

11   you read all of it, but if you could describe

12   for me the substance of these notes on this

13   page, I would be grateful.

14      A.   I'm sorry, page 2?

15      Q.   Page 2 of Browning Exhibit 13.

16      A.   I think this relates to the Zell

17   warrants and basically when and if he would

18   exercise, what impact would that have on the

19   company.

20      Q.   Could you just explain briefly what

21   warrants Mr. Zell held or his entities held?

22      A.   Yeah.  He had -- he held warrants

23   associated with the investment that he made

24   in the transaction.

25      Q.   And those warrants entitled him to

1          B. Browning - Confidential

2   acquire in certain circumstances 40 percent

3   of the equity of the Tribune?

4        A.   I believe that's correct.

5        Q.   There appears to be -- these notes

6   appear to reflect some discussion about

7   whether Mr. Zell might exercise that warrant

8   early.

9            Do you see that?

10       A.   Yes.

11       Q.   What is meant by "early" here?

12       A.   Before -- I think the warrants had

13  a 15-year period, time period before they

14  expired.

15           And the question was what would

16  happen if he exercised early?

17       Q.   That is before the end of the

18  15-year period?

19       A.   15 years.

20       Q.   And the 15-year period expired in

21  2022?

22       A.   Yes, I believe that's right.

23  Something like that.

24       Q.   This is a subject that was being

25  discussed between you and Tribune management

1        B. Browning - Confidential

2   as reflected in these notes on December 2,

3   2007?

4        A.   Yes.

5        Q.   And why was this a matter of

6   concern to you in connection with the

7   solvency analysis being done by VRC?

8        A.   I'm speculating, but I'm thinking

9   it has to do with the AESOP tax savings.

10        Q.   And what's the connection between

11   the two?

12        A.   If he exercises earlier, the tax

13   savings wouldn't be as great.

14        Q.   Why is that?

15        A.   Because only -- as long as there is

16   a 100 percent AESOP structure, AESOP-owned

17   company, they would receive all of the tax

18   benefits.  And if Sam Zell owns 40 percent,

19   they would get 60 percent of the benefits.

20        Q.   What you were told by Tribune

21   management on the subject of whether or not

22   Mr. Zell might exercise his warrants early,

23   as you described it?

24        A.   Well, I can read it here and try to

25   speculate, but one is that he wouldn't do so

1        B. Browning - Confidential

2   because he would want the upside potential

3   before he exercises and why exercise early if

4   you've got that option.

5        Q.   What's the upside potential you're

6   referring to?

7        A.   15 years from now there's

8   potentially a lot more value than there is in

9   year 2 or year 3 or year 4, so that's one

10  reason he wouldn't.

11            Second point is there is no

12  contractual agreement -- something like he

13  may try to get dollars from the company.  I

14  think that was -- that was my point.  As the

15  chairman, he may try to receive it before

16  that.  Something like that.

17       Q.   Does this reflect some discussion

18  to the effect that as chairman of the Tribune

19  Mr. Zell might attempt to get dollars from

20  the company?

21       A.   Not necessarily yes to that

22  question, but my answer is I'm asking the

23  question because I wanted to see if he would

24  exercise early.  And then their response was

25  his fiduciary responsibility would not allow

1        B. Browning - Confidential

2   him to.

3        Q.   So you were told by Tribune

4   management one reason Mr. Zell would not

5   exercise the warrants early would be because

6   while he would not be able to get dollars out

7   of the company to pay any tax liability

8   resulting from his early exercise of the

9   warrants?

10        MR. NEIER:  Objection to form.

11        A.   I don't know, I'm speculating.  I

12   don't know if -- I'm assuming it would have

13   been for the taxes associated with it.

14        And you have to realize the reason

15   I'm asking this question is because if that

16   was the case, obviously the tax savings

17   wouldn't be as great.  And the company I

18   think goes on in here and says Tribune will

19   never pay the taxes for Sam Zell.

20        Q.   Was it your understanding at this

21   time, December 2007, that as a matter of the

22   terms of his warrants, Mr. Zell's entities

23   could have exercised them at any time from

24   2008 forward?

25        A.   Yes, because that's why we had this

1       B. Browning - Confidential

2   conversation.

3       Q.   If Mr. Zell's entities had

4   exercised the warrants early -- earlier than

5   2022, then the company would have lost 40

6   percent of the benefits of the tax savings

7   for whatever period he exercised the

8   warrants?

9       A.   Yeah, I believe that's why we had

10  this conversation.

11      Q.   And Tribune management told you in

12  substance that Mr. Zell wouldn't do it

13  because he would want to wait and see what

14  the upside potential was over time and

15  because he would not be able to get dollars

16  out from the company to pay any tax liability

17  that might result from exercising the

18  warrants?

19          MR. NEIER:  Objection to form.

20          MR. BENDERNAGEL:  Objection to

21      form.

22      A.   I think there are two questions

23  there, and they're two separate issues.

24      Q.   If you can address them in

25  seriatim, that would be great.

1      B. Browning - Confidential

2      A.   The first issue from our concern

3  was would he exercise early and the company

4  said he would not.   There is no incentive for

5  him to do so.

6           And secondly, when he does

7  exercise, whether it's two years out or 15

8  years out or seven years out, will the

9  company be responsible for those taxes.   And

10  the answer was no.

11           So from the standpoint, though, it

12  still -- there is no taxes to the company,

13  even when he does exercise, but from the

14  whole shareholder base they wouldn't have the

15  tax benefits that they had before he

16  exercised, so it was a concern of ours and we

17  wanted to make sure we discussed it.

18      Q.   And it was a concern of VRC's

19  because tax savings were an important part of

20  the solvency analysis, correct?

21      A.   Yes.

22      Q.   Mr. Browning, did VRC consider

23  before issuing its December 20, 2007 solvency

24  opinion the possibility that Mr. Zell would

25  exercise his warrant early as a part of the

1          B. Browning - Confidential

2    sale of the Tribune to a third party?

3          A.    No.

4          Q.    It's not something you ever thought

5    about?

6          A.    I don't think so.

7          Q.    And not something that Tribune

8    management ever told you was a possibility?

9          A.    I don't believe so.

10         Q.    Would that have affected your

11   analysis of the potential tax savings if that

12   were a real possibility?

13         A.    I would say if they sold it to

14   another third party, they would only do so if

15   it made economic sense and then probably it

16   wouldn't matter.

17         Q.    I'm not sure I understand the

18   answer.

19              Could you explain?

20         A.    First of all, the answer is no, we

21   didn't ever consider it.

22         Q.    Did VRC consider any part of its

23   analysis leading up to the December 20, 2007

24   solvency opinion the possibility that the

25   Tribune would be sold to a third party

1            B. Browning - Confidential

2    subject to federal income tax, irrespective

3    of any warrant exercised by Mr. Zell?

4            A.   Can you repeat that, please?

5                 (Whereupon, the requested portion

6            was read back by the court reporter.)

7            A.   Are you referring other than the

8    AESOP that they were selling to?

9            Q.   Yes.

10           A.   No.

11           Q.   Did you understand that to be a

12   possibility that at some time from 2008

13   forward the Tribune might be sold to a third

14   party subject to federal income tax?

15           A.   I would say that we didn't consider

16   it.  Did I consider it to be a possibility?

17   There's probably a possibility there

18   somewhere, but we did not consider it.

19           Q.   You, VRC, did not consider that

20   possibility as part of your solvency

21   analysis, correct?

22           A.   That is correct.  It wouldn't make

23   sense in my opinion to do so.

24           Q.   Why is that?

25           A.   Because we're opining on a specific

1        B. Browning - Confidential

2    transaction, not something after the

3    transaction.

4        Q.   You were opining on a specific

5    transaction and your opinion assumed, among

6    other things, tax savings going out many

7    years into the future; isn't that right?

8        A.   Yes.

9        Q.   Did you consider the possibility

10   that aside from a warrant exercised by Mr.

11   Zell, the tax savings you were including in

12   your analysis would not, in fact, continue

13   indefinitely into the future for whatever

14   reason?

15       A.   I believe our analysis included,

16   though, the tax savings into perpetuity.

17       Q.   Did you consider the possibility

18   that might not happen, that the tax savings

19   might not continue into perpetuity for

20   whatever reason?

21       A.   Sure.  Our discount rate takes that

22   into account because you're not taking the

23   absolute tax dollars at a risk free rate.

24   You're taking it at a discounted rate.

25       Q.   It's your testimony that the

1      B. Browning - Confidential

2  discount rate used by VRC for the tax savings

3  was intended in part to reflect the risk that

4  the tax savings would not materialize over

5  time?

6      A.   I guess my testimony is that

7  there's a risk that the tax savings wouldn't

8  be achieved as they're forecasted.

9      Q.   And you believe that that risk is

10 factored into the discount rate that was used

11 for the tax savings?

12     A.   Yes.

13     Q.   Did the discount rate also factor

14 in, in your judgment, the possibility that

15 the tax savings would cease entirely at some

16 point in the future?

17     A.   Certainly could take that into

18 account.  Could be one of the factors.

19     Q.   Was that a possibility you

20 considered in selecting the discount rate?

21     A.   Not discretely, but it's embedded

22 in that discount rate.

23     Q.   Is it correct, Mr. Browning, that

24 VRC, for purposes of its final solvency

25 opinion, assumed that the tax savings would

Page 166

1      B. Browning - Confidential

2  continue into perpetuity, although from 2022

3  forward you assume that only 60 percent of

4  the tax savings would accrue to the benefit

5  of the company?

6      A.    I believe that's correct.

7      Q.    Is it correct that the discount

8  rate used for the tax savings was based on

9  that assumption?

10     A.    Well, I think the discount rate was

11 just meant to be a rate that measures the

12 probability of achieving cash flows, tax

13 savings cash flows, so in that sense, yes.

14     Q.    Did you do some analysis of the

15 probability of achieving the full tax savings

16 into perpetuity that you are assuming?

17         MR. BENDERNAGEL:  Object to form.

18     A.    We made that assumption.

19     Q.    You made what assumption?

20     A.    That they would remain into

21 perpetuity.

22         MR. SOTTILE:  Why don't we take a

23         five-minute break.

24         (Recess taken.)

25     Q.    Mr. Browning, can you take a look

1        B. Browning - Confidential

2    at the document that's been marked as Rucker

3    Exhibit 16?  It's the stack in front of you,

4    the one on top there.  Take a look and

5    identify it for us, if you can.

6        A.    Looks like a preliminary solvency

7    analysis for step 2.

8        Q.    Is this something that you saw in

9    November 2007?

10        A.    I would think so.

11        Q.    If you look at the second page of

12    the exhibit, the table of contents, there are

13    references to a VRC base case, a VRC downside

14    case and VRC recession case?

15        A.    Uh-huh.

16        Q.    And then if you look at the text of

17    the document later, there are various slides

18    relating to each of those VRC cases.

19        Can you explain to me what the VRC

20    base case was that's referred to here?

21        A.    It's probably one that was done

22    independent of Tribune's projections or

23    incorporated Tribune's projections with

24    modifications.  I don't know.

25        Q.    If you turn to the slides marked

1         B. Browning - Confidential

2    35, 36 and 37, that might help you identify

3    what the VRC base case is that's referred to

4    here.

5         A.    Okay.

6         Q.    Does that help you identify what

7    the VRC base case is?

8         A.    It helps me read what the

9    assumptions were.

10        Q.    On page 35, the first sentence

11   starts off saying, "VRC developed an

12   independent base case."

13            You see where I've read?

14        A.    Yes.

15        Q.    Why is it that VRC would develop an

16   independent base case for the Tribune's

17   publishing and broadcasting and entertainment

18   divisions?

19        A.    I think it was because we took the

20   project very seriously.  We looked at base

21   cases and we looked at downside.  We wanted

22   to stress management's cases, so it was

23   considering a lot of factors, so we did our

24   own independent case.  This is for an

25   internal, our internal analysis.

1      B. Browning - Confidential

2      Q.   Do you know whether or not any of

3  this internal analysis to the extent it

4  concerns VRC cases was shared with the

5  Tribune?

6      A.   I'm not sure.

7      Q.   You don't know whether or not the

8  Tribune ever saw the portions of this

9  document, for example, that concern a VRC

10  base case, a VRC downside case and VRC

11  recession case?

12      A.   I'm not certain.  It could have.

13      Q.   But you don't know one way or the

14  other?

15      A.   No.

16      Q.   Would it have been normal practice

17  for VRC to share its own cases with a client

18  like the Tribune for which it was doing a

19  solvency analysis?

20      A.   It probably could have been.  It's

21  case specific, but sometimes we would have.

22  Sometimes we wouldn't have.

23      Q.   What role did the VRC cases that

24  are reflected in this document, the VRC base

25  case, downside case and recession case play

1      B. Browning - Confidential

2   in the solvency analysis?

3      A.   Well, it was part of our

4   sensitivity testing, so as I said previously,

5   when you asked me about cushion, are there

6   other considerations, there are.  We look at

7   the cushion that the company has from the

8   test.

9           We refer to the first tests.  We

10   also look at sensitivity as another metric to

11   test the viability of the forecast, so that's

12   what they were used for.

13      Q.   These cases were being used to test

14   what would happen to your solvency analysis

15   if the company's performance were projected

16   to be different from the base case provided

17   by the Tribune?

18      A.   That's correct, generally.

19      Q.   Does VRC's final solvency opinion

20   rendered on December 20, 2007 with respect to

21   step 2 rely on any of VRC's own cases for the

22   advice given?

23      A.   No.  Let me be clear on that.

24   Rely, no.  But we, as part of our due

25   diligence, yes.

1       B. Browning - Confidential

2       Q.   The financial cases that VRC

3   ultimately relied on in its December 20, 2007

4   opinion were ones provided by the Tribune; is

5   that right?

6       A.   That's correct.

7       Q.   Take a look at Rucker Exhibit 17,

8   which should be the next one in the pile in

9   front of you, sir.

10           MR. NEIER:   That would be a

11       miracle.

12       Q.   Can you turn to -- first take a

13   look and tell us whether or not you can

14   identify this document.

15       A.   Yes, I believe it's a draft

16   presentation to the board of directors

17   regarding the step 2 solvency opinion.

18       Q.   Can you turn to page 5, which is

19   headed Key Assumptions?

20       A.   Yes.

21       Q.   There are four bullet points here.

22   The third reads, "VRC relied upon achieving

23   S. Corp. AESOP tax savings for Tribune which

24   are determined using the base case forecast."

25           You see what I've read?

1      B. Browning - Confidential

2      A.   Yes.

3      Q.   Is that correct that VRC did in

4  fact rely on achieving S. Corp. AESOP tax

5  savings determined using the base case

6  forecast?

7      A.   Yes.

8      Q.   Turn to page 8 of this exhibit,

9  sir.  This page is headed, "Comparison of

10 consolidated valuations."

11         Can you describe what this page is

12 intended to show?

13     A.   Yes, I believe it's just -- it's

14 trying to show the differences between the

15 indications from the step 1 valuation versus

16 the step 2 valuation and the differences.

17     Q.   One of those changes concerns the

18 value for equity investments and other

19 assets; is that correct?

20     A.   One of the changes?

21     Q.   One of the changes in value between

22 the two summaries relates to equity

23 investments and other assets?

24     A.   Yes.

25     Q.   They increased from the step 1

1          B. Browning - Confidential

2    summary to this draft summary by some $626

3    million; is that right?

4          A.    That's what it looks like.

5    Actually, I should look at it closer.

6                MR. NEIER:   626 million.

7          A.    Yeah, 626 million.

8          Q.    There are two footnotes next to the

9    equity investments and other assets line,

10   which appear below the table numbers 2 and 3.

11               I want to focus on number 3, which

12   reads, "Includes after-tax value of certain

13   real estate that can either be sold or

14   capitalized into value"?

15         A.    Yes.

16         Q.    Do you understand that to be a

17   reference to the real estate that you had

18   been discussing with Tribune management in

19   late November 2007 as reflected in some

20   handwritten notes that we reviewed earlier?

21         A.    Yes, it included some of that.

22         Q.    Is there some other kind of real

23   estate, some other real estate that's

24   included here that wasn't part of your late

25   November discussions with Tribune management?

1          B. Browning - Confidential

2          A.    No.   I think it captured that real

3    estate, but it didn't capture all of it.

4    Just part of it.

5          Q.    I see.  So part of the real estate

6    that led to an increase in equity investments

7    and other assets as of the date of this draft

8    summary is some of the real estate you were

9    talking to Tribune management about in late

10   November?

11         A.    Yes.

12         Q.    And that real estate had not been

13   reflected in the step 1 valuation; is that

14   right?

15         A.    I believe that's correct.

16         Q.    Can you take a look at the document

17   that was marked as Rucker Exhibit 18?   It

18   should be in front of you.

19         Are you able to identify this

20   document, sir?

21         A.    Yes.

22         Q.    What is it?

23         A.    I believe it's an internal review

24   document for the step 2 solvency opinion.

25         Q.    Is this something that you saw at

1        B. Browning - Confidential

2    the time, December 15, 2007?

3        A.    I believe so.

4        Q.    You're shown as being copied on the

5    e-mail, it's the first page?

6        A.    Yes.

7        Q.    Can you turn to page 3 of the

8    analysis the page numbered 3?

9        A.    Yes.

10        Q.    This page is headed, "Consolidated

11    valuation summary comparison."

12            Is this page summarizing

13    differences between the December 4th

14    valuation summary and what's titled here, a

15    December 18th valuation summary?

16        A.    Yes.

17        Q.    One of the line items showing

18    changes is the NPV of S. Corp.--AESOP tax

19    savings.

20            Do you see that?

21        A.    Yes.

22        Q.    And those tax savings are shown as

23    decreasing by some $1,148,000,000, correct?

24        A.    Yes.

25        Q.    Footnote 3 indicates, which appears

1        B. Browning - Confidential

2   next to that line item indicates as follows,

3   "Value has been adjusted based on internal

4   discussions and consideration of suggestions

5   made by lenders."

6        Do you have any recollection of the

7   internal discussions or the suggestions made

8   by lenders that led to this change in the tax

9   savings?

10       A.   I do.

11       Q.   Could you tell us what you recall?

12       A.   We had received some questions from

13  lenders regarding a number of things, and one

14  of them was regarding the cost of capital

15  used to discount the tax savings to present

16  value.  And so based upon that question, we

17  had an internal discussion and made a

18  decision to increase the discount rate.

19       Q.   And what was it increased to?

20       A.   I believe it was somewhere like 16

21  was the midpoint or something like that.

22       Q.   And how was 16 percent chosen as an

23  appropriate discount rate?

24       A.   It was based on the Tribune's

25  specific cost of capital considering the

Page 177

1        B. Browning - Confidential

2    leverage.

3        Q.   What had the discount rate for the

4    tax savings previously been based on?

5        A.   I think it was more of an industry

6    capital structure as opposed to Tribune's

7    actual capital structure.

8        Q.   Why is it that you concluded after

9    these questions from lenders and the internal

10   discussions that it was more appropriate to

11   use a cost of capital specific to the

12   Tribune?

13       A.   I think they made a very good

14   point.  The point was you're looking at a

15   specific -- this is my internal statement.

16   But we were looking at the special

17   transaction that the Tribune was

18   anticipating.

19            At that point you should consider

20   the specific capital structure for that

21   asset, and therefore we decided to make that

22   change.  It was an appropriate change.

23       Q.   That's because the tax savings were

24   specific to the Tribune and not to the

25   industry generally?

1      B. Browning - Confidential

2      A.    That's correct.

3      Q.    Can you turn back to Browning

4  Exhibit 4, Mr. Browning?  That's the December

5  7th response to questions from lenders.

6      A.    Yes.

7      Q.    Is the question from lenders that

8  you just referred to reflected in this

9  document?

10     A.    Maybe.  I think it is.

11     Q.    Can you take a look and identify it

12  for us, if you can?

13          MR. NEIER:  Can I help him out?

14          MR. SOTTILE:   Sure.

15     A.    I don't see anything specific to

16  the discount freight, if that's what you were

17  asking.

18     Q.    That's what I was asking.

19     A.    I don't see it.

20     Q.    But it is still your recollection

21  that the question about the appropriate

22  discount rate for tax savings came from the

23  lenders?

24     A.    I believe so.

25     Q.    Did you have any direct discussions

1      B. Browning - Confidential

2   with the lenders in this time period about

3   the solvency analysis?

4      A.   No.

5      Q.   Did you have direct discussions

6   with the lenders at any point during the

7   course of your solvency work?

8      A.   We may have, but I don't recall of

9   any.

10      MR. NEIER:  Let's go off the record

11   for a second.

12      MR. SOTTILE:  Off the record.

13      (Whereupon, an off-the-record

14   discussion was held.)

15      Q.   Can you turn to page 5 in Browning

16   Exhibit 4?

17      A.   Okay.

18      Q.   At the top of page 5, question 6A

19   asks, "What is the discount rate (WACC)

20   used?"

21      And the first sentence of the

22   answer is, "VRC used weighted average cost of

23   capital ('WACC') discount rates between 6.5

24   percent and 8.5 percent in its discounted

25   cash flow DCF valuation analyses."

B. Browning - Confidential

1    How is it that VRC chose that range

2    of discount rates?

3    A.   Is your question regarding the

4    PHONES here?

5    Q.   No.

6    A.   I didn't know.  We looked at

7    industry capital structures for similar type

8    based on the industries that the Tribune was

9    engaged and it was based upon those industry

10   capital structures and then current market

11   rates.

12   Q.   Then current market interest rates?

13   A.   Interest and equity return rates.

14   Q.   And is it correct that in

15   determining the discount rates for the

16   discounted cash flow analysis VRC did not

17   look at the Tribune's own individual cost of

18   capital?

19   A.   For the --

20   Q.   DCF analysis?

21   A.   That is correct.

22   Q.   Would you turn to page 8 of

23   Browning Exhibit 4?

24   A.   Yes.

1      B. Browning - Confidential

2      Q.   Question number 12 on this page,

3   there are actually three questions, "What is

4   considered the acceptable range of excess

5   capital in the capitalization test, what is

6   considered to be the acceptable range of

7   equity cushion, is book value of equity

8   considered in the analysis."

9           Did VRC, at any time in its

10   solvency analysis work for the Tribune,

11   determine what an acceptable range of equity

12   cushion was?

13      A.   Well, the conclusions reached VRC

14   determined was acceptable.

15      Q.   Let me follow-up.  VRC concluded

16   that the actual cushions that resulted from

17   its analysis were acceptable, correct?

18      A.   Yes.

19      Q.   Did VRC ever consider what level of

20   cushion would not be acceptable for purposes

21   of its solvency analysis?

22      A.   No.

23      Q.   So Valuation Research looked at the

24   equity cushion, it determined and said that

25   was acceptable and didn't go on to ask when

1          B. Browning - Confidential

2     would the equity cushion become so low as to

3     become unacceptable?

4          A.    I would have to say no to that

5     comment.  We looked at a lot of things, not

6     just the equity cushion to come up with that

7     conclusion, and I think some of those are

8     spelled out in this response.

9          Q.    Mr. Browning, could you take a look

10    at Rucker Exhibit 20?  It should be in this

11    stack of exhibits.

12             What is Rucker Exhibit 20?

13         A.    It looks to me like a -- I don't

14    know if this is a final, but it looks like

15    it's a presentation to the board of directors

16    of Tribune regarding the step 2 solvency

17    opinion.

18         Q.    Can you turn to page 5 of the

19    document headed Key Assumptions?

20         A.    Yes.

21         Q.    Is it correct that this outlines

22    four key assumptions made by VRC in

23    connection with its solvency analysis in

24    December 2007?

25         A.    Yes.

1        B. Browning - Confidential

2        Q.    If any of these assumptions were

3    incorrect, would that change VRC's solvency

4    opinion?

5        A.    Well, it would likely change it,

6    but I don't know what that -- but I don't

7    have an opinion on that.

8        Q.    But for purposes of VRC's solvency

9    opinion, you assumed that all of these were

10   correct, right?

11       A.    Yes.

12       Q.    And you don't know what the effect

13   would be if one of them turned out to be

14   incorrect, but it would likely change VRC's

15   opinion?

16       A.    That is correct.

17       Q.    Can you turn to page 7 of this

18   document, sir?

19       A.    I'm there.

20       Q.    I'm looking at the valuation

21   summary on the left-hand side of the page,

22   and this gives low, mid and high valuations

23   or equity values for the company, among other

24   things, do you see the equity value line?

25       A.    Yes.

1      B. Browning - Confidential

2      Q.   At the low end of the range here,

3  the equity value is shown as being 931.6

4  million; is that correct?

5      A.   Yes.

6      Q.   Is that an acceptable level of

7  equity cushion?

8      A.   Yes.

9      Q.   But you don't have a view on how

10  much lower an equity cushion would be

11  unacceptable?

12     A.   No.

13     Q.   You would know it when you saw it?

14  I will withdraw the question.

15         Take a look at the document marked

16  as Rucker Exhibit 22, sir.

17     A.   Okay.

18     Q.   What is this document?

19     A.   I assuming that's our -- let me

20  take a look.  I'm assuming that's our final

21  step 2 solvency opinion.

22     Q.   This solvency opinion is based on

23  the solvency analysis that appears in Rucker

24  Exhibit 20; is that right?

25     A.   Can you ask the question again?

1        B. Browning - Confidential

2        Q.   Is it correct that this solvency

3    opinion, Rucker Exhibit 22, is based on the

4    analysis that is reflected in Rucker Exhibit

5    20?

6        A.   I assume so.

7        Q.   Did you play a part in drafting

8    Rucker Exhibit 22?

9        A.   I'm sure I did.

10        Q.   Can you describe the nature of your

11    involvement in the drafting?

12        A.   It was either reviewing it or

13    adding text to it.

14            MR. SOTTILE:  Off the record.

15            (Whereupon, an off-the-record

16        discussion was held.)

17            MR. SOTTILE:  Thank you,

18        Mr. Browning.  I don't have any further

19        questions at this time.

20            THE WITNESS:  Thank you.

21            MR. GLENN:  We will have some

22        questions.  Let's break for three to

23        five minutes.

24            (Recess taken.)

25    EXAMINATION BY

1      B. Browning - Confidential

2   MR. GLENN:

3      Q.   You're ready to proceed, Mr.

4   Browning?

5      A.   Sure.

6      Q.   I'm Andrew Glenn from Kasowitz,

7   Benson, Torres & Friedman, LLP representing

8   Law Debenture, one of the debenture trustees.

9           Have you ever been involved with a

10  solvency opinion or any other work on behalf

11  of an entity related to or affiliated with

12  Samuel Zell other than Tribune?

13     A.   Have we ever done work for an

14  entity --

15     Q.   Yes.

16     A.   I think subsequent to -- subsequent

17  from the Tribune, I think we've done some

18  work for some of Zell's entities, yes.

19     Q.   On how many occasions?

20     A.   I don't know.  Two or three.

21     Q.   How recently were those

22  engagements?

23     A.   I was involved in one probably six

24  months ago or eight months ago, but there

25  were other members of our firm involved in

1        B. Browning - Confidential

2    some other things.  I can't tell you when

3    those were.

4        Q.   Do you know the names of the

5    companies, the size of the transactions, what

6    was involved?

7        A.   I don't know any of them that the

8    other people were working on.  But I'm not

9    sure we're completely finished with the other

10   one, so I'm not sure I can actually divulge

11   that.

12       Q.   Is it a solvency opinion?

13       A.   No.

14       Q.   Fairness opinion?

15       A.   No.  It's a valuation.

16       Q.   Just so the record is clear, prior

17   to Tribune, are you aware of any circumstance

18   where Valuation Research performed work for

19   any entity affiliated with Mr. Zell?

20       A.   I don't believe so.

21       Q.   How about JP Morgan, do you

22   understand that JP Morgan was one of the

23   major banks involved with the financing of

24   this LBO?

25       A.   I understood that, yes.

1       B. Browning - Confidential

2       Q.    Prior to the time the Tribune

3  transaction closed, approximately how many

4  solvency opinions had Valuation Research

5  delivered for transactions in which JPMorgan

6  was lender?

7       A.    I have no idea.

8       Q.    More than 100?

9       A.    I have no idea.   Could be two.

10  Could be -- no idea.

11       Q.    Is there a database that you keep

12  at your company that would give us that

13  information?

14       A.    It may have some of that

15  information.   But it may not.

16       Q.    Did you check conflicts before you

17  took this engagement?

18       A.    I think so.   We normally do that

19  sort of normal procedure.

20       Q.    And what do you do to check

21  conflicts at Valuation Research?

22       A.    Oftentimes we will send out an

23  e-mail, but I don't know if we did do that,

24  to tell you the truth.   We may or may not

25  have.   I don't think we felt we had a

1       B. Browning - Confidential

2   conflict when we did the opinion.

3       Q.    How do you determine whether or not

4   you have a conflict?

5       A.    Again, we usually send out an

6   e-mail to our professionals to see if there

7   is any conflict.

8       Q.    And do you have a conflict only if

9   you've been engaged by another party to the

10  same transaction, or what is a conflict for a

11  firm such as Valuation Research?

12      A.    Well, it's facts and circumstances,

13  but it could be that you're just conflicted

14  on the transaction for some reason.  You may

15  have supplied values to a Zell organization

16  or -- which would have been part of this

17  transaction.  I don't know.  It's facts and

18  circumstances.

19      Q.    Apologies if you were asked this

20  earlier, I don't mean to cover old ground,

21  but I believe you were one of the first

22  people contacted in connection with this

23  potential engagement?

24      A.    I think I was probably second or

25  third.

1        B. Browning - Confidential

2        Q.   Did you have any direct

3   communication with Mr. Bigelow about

4   Valuation Research taking on this engagement?

5        A.   Yes, I believe I did.

6        Q.   On the phone?

7        A.   Yes.

8        Q.   And what did he tell you was the

9   business objective of your engagement?

10       A.   I believe he said that they would

11  most likely need a solvency opinion for the

12  transaction.

13       Q.   Did he tell you why they needed a

14  solvency opinion?

15       A.   I'm not certain if he did.  At some

16  point he probably did.

17       Q.   Did you have an understanding as to

18  why they needed a solvency opinion in this

19  case?

20       A.   I suspect it was -- it was to

21  protect the board, but it also could have

22  been a requisite in some of the credit

23  documents.  I don't know.

24       Q.   But you understood that the

25  business objective of getting a solvency

1          B. Browning - Confidential

2     opinion was to allow this LBO to close?

3               MR. JOHNSTON:  Objection to form.

4               MR. BENDERNAGEL:  Object to form.

5          A.   I'm not sure if that's true or not.

6          Q.   You don't know one way or another?

7          A.   I'm not sure.  It was before the

8     board to make a decision.

9          Q.   Is it your understanding that

10    Valuation Research's goal is to provide

11    clients with the guidance needed to achieve

12    their business objectives?

13         A.   Could you ask that again?

14              MR. GLENN:  Can you read it back?

15              (Whereupon, the requested portion

16         was read back by the court reporter.)

17         A.   I don't think that's an accurate

18    statement.  I think Valuation Research is an

19    objective independent valuation firm which

20    provides indications of value.

21         Q.   Are you in the habit of posting

22    information on your website that's not

23    accurate?

24         A.   I hope not.

25              MR. NEIER:  Objection to form.

1          B. Browning - Confidential

2          Q.    Do you understand that the language

3     I just gave you is on your website today?

4          A.    It could be.  It's a marketing

5     piece.

6          Q.    And do you understand that

7     Valuation Research provides solvency opinions

8     to protect boards and lenders from having a

9     transaction unravel in a future bankruptcy?

10         A.    It's to protect boards from that

11    potential occurrence.

12         Q.    I would like to talk to you about

13    the discount rate in the discounted cash flow

14    analysis prior to step 1.  Okay.

15              You recall that there was a

16    discounted cash flow analysis that Valuation

17    Research performed before step 1?

18         A.    That Valuation Research performed

19    before step 1?

20         Q.    Yes.

21         A.    Ask the question.

22         Q.    Did Valuation Research do a

23    discounted cash flow analysis for Tribune

24    before step 1?

25         A.    As part of step 1?

1      B. Browning - Confidential

2      Q.   Yes.

3      A.   Yes, of course.

4      Q.   And as I understand it, you derived

5  the discount rate for that analysis by

6  looking at comparable companies, right?

7      A.   Among other things, yes.

8      Q.   Are you familiar with the Pratt

9  treatise on valuation?

10     A.   The Pratt treatise.  I know Shannon

11 Pratt.

12     Q.   Are you aware that Mr. Pratt has

13 the preeminent book on valuation in the

14 industry?

15         MR. BENDERNAGEL:   Object to the

16     form of the question.

17     A.   I know he's written a lot.

18     Q.   Do you have a copy of that big

19 thick green book in your office that he

20 wrote?

21     A.   Several.

22     Q.   Are you familiar with the capital

23 asset pricing model for valuation?

24     A.   Yes.

25     Q.   And you use that in connection with

1          B. Browning - Confidential

2     the DCF, right?

3          A.   Yes.

4          Q.   Now, for that methodology, you take

5     the cost of debt, that's one of the inputs,

6     right?

7          A.   From the cap M?

8          Q.   Yes.

9          A.   No.

10         Q.   What do you do for cap M then?

11         A.   It's a cost of equity

12    determination.

13         Q.   That is correct.  Thank you for

14    correcting me.

15              The weighted average cost of

16    capital, you're familiar with that

17    methodology, right?

18         A.   I am.

19         Q.   And cap M is part of the weighted

20    average cost of capital methodology, right?

21         A.   The cap M is a determination of the

22    cost of equity that's used in the weighted

23    average cost of capital.

24         Q.   And I take it you did not use,

25    prior to step 1, Tribune's actual cost of

1          B. Browning - Confidential

2     debt to do your WACC, right?

3          A.   No, we did not.

4          Q.   Did you know prior to the closing

5     of step 1 what Tribune's actual cost of debt

6     was?

7          A.   Cost of debt?

8          Q.   Cost of debt?

9          A.   Or cost of capital?

10         Q.   Cost of debt.

11         A.   We may have.

12         Q.   But you did familiarize yourself

13    with the interest rates charged by the

14    lenders for Tribune prior to the closing of

15    step 1?

16         MR. BENDERNAGEL:  Object to the

17    form of the question as vague.

18         Q.   Did you?

19         A.   Did we know about the interest

20    rates?

21         Q.   Yes.

22         A.   Prior to?

23         Q.   Yes.

24         A.   Yes.

25         Q.   They were in the approximate range

1          B. Browning - Confidential

2    of LIBOR plus 200, right?

3          A.    Some were, yes.

4          Q.    And did you know what LIBOR was as

5    of May 2007?

6          A.    I'm sure we did.

7          Q.    If I told you it was approximately

8    5 percent, would that ring any bells and does

9    that sound accurate to you?

10         A.    It could.

11         Q.    Now, before step 1 closed, I

12   believe you used discount rates of 7.5 to 8.5

13   percent, right?

14         A.    That's correct.

15         Q.    And did you apply the cap M

16   methodology to determine Tribune's cost of

17   equity prior to step 1 closing?

18         A.    Yes.

19         Q.    What was that?

20         A.    I don't recall.

21         Q.    What was the approximate split of

22   debt and equity that you used to compute your

23   discount rate prior to the closing of step 1?

24         A.    I don't recall.

25         Q.    I would like to direct your

1        B. Browning - Confidential

2    attention to Rucker Exhibit Number 20,

3    please.  If you could turn to page 10 of that

4    document and look up when you're done.

5        A.    Page 10?

6        Q.    Page 10.

7        A.    Okay.

8        Q.    The third bullet point down at the

9    bottom of this page refers to a footnote 3.

10            Do you see that?

11       A.    Yes.

12       Q.    It says after that, "Adjusted due

13   to an increase in the discount rate to 16

14   percent from 10 percent."

15            Do you see that?

16       A.    Yes.

17       Q.    And the footnote to that is a

18   reference to the NPV of S. Corp.-AESOP tax

19   savings.

20            Do you see that?

21       A.    You mean that it's a footnote to a

22   line above?

23       Q.    Yes.

24       A.    Yes, I see that.

25       Q.    And for the tax savings, you

1       B. Browning - Confidential

2  applied only the cost of equity to determine

3  the appropriate discount rate for that,

4  right?

5       A.   I believe so.

6       Q.   And as we discussed earlier, the

7  cost of equity is one of the inputs to the

8  weighted average cost of capital, correct?

9       A.   The industry cost of capital.  The

10 industry cost of equity.

11      Q.   The industry cost of equity, okay.

12           So can you explain to me why the

13 industry cost of equity went from 10 percent

14 to 16 percent?

15           MR. NEIER:  Objection.

16 Mischaracterizes his testimony.

17           You may answer.

18           MR. GLENN:  I will back up then.

19      Q.   Why does it reference here that the

20 discount rate increased from 10 percent to 16

21 percent?

22      A.   Because we were looking at the

23 discount rate from an industry standpoint,

24 which if it was fair value asset specific to

25 the industry, then that would be appropriate.

B. Browning - Confidential

2          But here it's looking at a specific

3   transaction, and the equity -- and the tax

4   savings associated with that specific

5   transaction and therefore we should be

6   looking at the discount rate associated with

7   that transaction.  Specific to that

8   transaction.

9       Q.   Okay.

10      A.   And that's the 16 percent.

11      Q.   So your determination of the

12  specific discount rate for this transaction

13  was 16 percent?

14          MR. BENDERNAGEL:  Objection.

15          MR. NEIER:  Objection.

16  Mischaracterizes his testimony.

17      A.   That is not correct.

18      Q.   I'm not understanding you, and I

19  apologize for that, so can you explain to me

20  how you got to the 16 percent?

21          MR. NEIER:  We're talking about

22      discount rate applied to tax savings, so

23      ask your questions about that.

24          MR. GLENN:  I don't agree with your

25      characterization, so I will stand by my

1      B. Browning - Confidential

2      question.

3      Q.   What does that 16 percent

4  represent?

5           MR. BENDERNAGEL:  Objection.  Asked

6      and answered.

7      A.   The 16 percent represents a

8  discount rate associated with the S. Corp.

9  AESOP tax savings.

10     Q.   How did you derive to that 16

11  percent?

12     A.   By looking at the -- at Tribune's

13  actual capital structure relative -- I mean,

14  rather than the industry's capital structure.

15     Q.   When you say Tribune's actual

16  capital structure, can you explain to me what

17  you meant in that prior answer?

18     A.   Yes.  The proposed capital

19  structure associated with the transaction.

20     Q.   The actual debt and equity capital

21  structure at Tribune as of December 2007?

22          MR. NEIER:  No, what the witness

23      just said is as --

24          MR. GLENN:  Please don't testify

25      for the witness.

1      B. Browning - Confidential

2           MR. NEIER:  You're

3      mischaracterizing his testimony.

4           MR. GLENN:  Object to the form.

5           MR. NEIER:  Objection.

6           MR. GLENN:  Thank you, sir.

7      Q.    What capital structure are you

8  referring to?

9      A.    The proposed capital structure.

10     Q.    And what is that?  What is the

11 proposed capital structure?

12          MR. BENDERNAGEL:  Objection to

13     form.

14     A.    The leveraged capital structure.

15     Q.    How leveraged?

16     A.    You will have to help me out.

17     Q.    I'm trying to understand what's in

18 your document, sir, so I need your help.

19     A.    I don't have the actual calculation

20 in front of me.

21     Q.    Can you give me some narrative

22 guidance to that?  Is it the capital

23 structure assuming that step 2 closed?

24     A.    Yes, I think so.

25     Q.    Thank you.

1        B. Browning - Confidential

2            So is it your testimony, sir, that

3    the discount rate would have been higher in

4    your DCF had you used the actual capital

5    structure for Tribune than an industry

6    capital structure?

7            MR. BENDERNAGEL:  Object to the

8        question.

9    A.    Is it my testimony?

10   Q.    Yes.

11   A.    No.

12            MR. GLENN:  Can you read me back my

13        last question and make sure I didn't

14        misstate it?

15            (Whereupon, the requested portion

16        was read back by the court reporter.)

17   Q.    Why is that?

18            MR. NEIER:  He said no, it's not my

19        testimony.  Now you're saying why is

20        that?

21            MR. GLENN:  Yes.

22   A.    Why is it not my testimony, because

23   I didn't testify to that?

24   Q.    Is it your belief that the discount

25   rate would have been higher had you used

1          B. Browning - Confidential

2     Tribune's actual capital structure rather

3     than an industry capital structure?

4          MR. BENDERNAGEL:  Objection to

5        form.

6          MR. NEIER:  For the DCF.

7          MR. BUSATH:  Objection to form.

8     Q.   Let me back up.

9          Had you used 16 percent as the cost

10    of equity in your DCF, would that have

11    produced a higher discount rate than the one

12    that you actually used in your discounted

13    cash flow analysis?

14    A.   Of course.  But it would be

15    inappropriate to do so.

16    Q.   Can you point me to any scholarly

17    literature that allows a valuation expert to

18    use an industry capital structure as opposed

19    to a capital structure based on actual cost

20    of debt and the cost of equity of the

21    specific company you're valuing?

22    A.   You want me to point to a

23    literature right now?

24    Q.   Give me a name.

25    A.   I would say that it is not only --

1      B. Browning - Confidential

first of all, it's inappropriate to do it.

2

3           Secondly, if somebody is doing it,

4    they would be valuing it incorrectly.  Almost

5    every form of literature, financial

6    literature would say you look at the actual

7    industry cost of capital when you are

8    determining the fair value or the fair market

9    value or the present fair saleable value of

10   an asset.

11      Q.   Have you ever used, in your career,

12   discounted cash flow analysis by basing a

13   specific size premium for the cost of equity?

14           MR. JOHNSTON:   Objection to form.

15      A.   I'm not sure what you're asking.

16      Q.   Have you ever used a size premium

17   to compute the cost of equity for the company

18   you're valuing?

19      A.   Of course.

20      Q.   Did you do that in this case?

21      A.   I believe we have included an

22   equity risk premium which takes into account

23   some of that.

24      Q.   How did it take into account -- how

25   was that taken into account in this specific

1          B. Browning - Confidential

2     case?

3          A.    Because the equity risk premium is

4     based upon capitalization the size of a

5     company.

6          Q.    And how did you take that into

7     account as you used an industry capital

8     structure?

9          A.    First of all, I guess what I will

10    just -- when we're doing the valuations,

11    we're determining a business enterprise, what

12    anyone in the industry would pay for that

13    particular asset.  Therefore, it's

14    appropriate to use an industry cost of

15    capital.

16               Then you subtract off the actual

17    debt to get to equity.  Okay.

18               So to answer your question, which I

19    can't remember what it was -- please read it

20    back.

21               (Whereupon, the requested portion

22          was read back by the court reporter.)

23          A.    So we looked at the cost of capital

24    for that an industry structure.  We

25    considered the size of the transaction.  And

1      B. Browning - Confidential

2  based upon that, we came up with an equity

3  risk premium, if you will.

4      Q.    How does Tribune compare, or how

5  did Tribune compare to its industry peers as

6  you developed your discount rate?

7      A.    It depends on what you're looking

8  at, but in some ways it had higher margins.

9  In some ways it had lower growth rates.   In

10 some ways it differed.

11     Q.    Did you consider applying a

12 specific risk premium to the cost of equity

13 that you used?

14     A.    We did, and I don't know if we did

15 or not.

16     Q.    Do you have any specific work

17 papers that explain exactly how you got to

18 your discount rate in this case?

19     A.    I believe we've sent everything we

20 have.

21     Q.    So have you destroyed any documents

22 since you were hired in connection with

23 Tribune?

24     A.    We have not.

25     Q.    And you produced all the documents

1          B. Browning - Confidential

2     to your counsel in this case?

3          A.   Yes.

4          Q.   So if we don't have a document that

5     explains how you got to your discount rate,

6     then it doesn't exist?

7               MR. BENDERNAGEL:  Object to the

8          form.

9               MR. NEIER:  Object to the form.

10              MR. BENDERNAGEL:  It's

11         argumentative.

12         A.   I have no idea.

13              MR. NEIER:  There are documents all

14         over this table that explain the

15         discount rate.

16         Q.   The 10 percent you have in this

17    bullet point, sir, is that the cost of equity

18    that you actually used in your DCF?

19         A.   No.

20         Q.   What was the cost of equity that

21    you used in your DCF?

22         A.   They ranged depending upon the

23    entity.

24         Q.   Which entities?

25              MR. NEIER:  Did you want to

1        B. Browning - Confidential

2        supplement your answer?

3        A.    They ranged depending upon the

4    entity's value.

5        Q.    Which entity?

6        A.    Entities?

7        Q.    Yes.

8        A.    Broadcasting, publishing,

9    consolidated.

10       Q.    Okay.  So which equity rate did you

11   use for each of those segments?

12       A.    I don't recall.

13       Q.    Did they change between step 1 and

14   step 2?

15            MR. BENDERNAGEL:  Object to the

16       form of the question.

17       A.    I think they did.

18       Q.    Why did they change?

19       A.    Market rates change over time.

20            Also, we may have incorporated risk

21   adjustments that we didn't the first time.  I

22   don't know.  It's a number of factors.

23       Q.    I would like you to turn to

24   Browning Number 5, please.  If you turn to

25   page 5 --

1        B. Browning - Confidential

2            MR. NEIER:  Browning Number 5 is a

3        two-page e-mail.

4            MR. BENDERNAGEL:  Is this the

5        document you're looking for?

6            MR. GLENN:  Yes.

7            MR. BENDERNAGEL:  4.

8        Q.    Page 557.  These are questions that

9        were posed to Valuation Research by the

10       lenders; is that right?

11       A.    I believe so.

12       Q.    The first letter A says, "What is

13       the discount rate (WACC) used?"

14            Do you see that?

15       A.    Yes.

16       Q.    And then it goes on to say that you

17       used weighted average cost of capital

18       discount rates between 6.5 and 8.5 in your

19       DCF valuation analysis, right?

20       A.    Yes.

21       Q.    I would like you to take out Rucker

22       Number 7, please.  Then also if you would

23       take out Rucker Number 16.  For Rucker Number

24       7, if you could turn to page 32, which should

25       have the title Discounted Cash Flow Method.

1      B. Browning - Confidential

2           MR. NEIER:  7 and 16?

3           MR. GLENN:  Correct.

4      A.   Here it is.  Page what?

5      Q.   Page 32.

6           MR. NEIER:  One page is entitled,

7      "Publishing:  Discounted cash flow

8      method" and the other page is called,

9      "Discounted cash flow method."

10          MR. GLENN:  Just so the record is

11     clear, let's all get on the same page.

12     Rucker Number 7, page 32, Bates stamp on

13     the bottom right, last four numbers are

14     1430.

15     Q.   Do you have that in front of you,

16 sir?

17     A.   Yes.

18     Q.   Great.

19          Next one is Rucker 16, Publishing

20 Discounted Cash Flow Method, page 15, the

21 four Bates stamps on the bottom right are

22 1649.

23          For Rucker Number 7, this is your

24 DCF valuation for Tribune prior to step 1?

25          MR. BENDERNAGEL:  Object to the

1        B. Browning - Confidential

2        form of the question.

3        A.    I think it's publishing or one of

4    the cash flow -- discounted cash flow

5    indications.

6             Yes, you're right, I'm sorry.  Yes,

7    I believe that's right.

8        Q.    There is no qualification this is

9    segmented for any part of the business,

10   right?

11       A.    Correct.

12       Q.    And the discount ranges range from

13   7.5 to 8.5 percent, right?

14       A.    Yes, that is correct.

15       Q.    Going to the November 14th

16   document, Rucker 16, page 15, you've used 7.5

17   to 8.5 again for that segment, right?

18            MR. BENDERNAGEL:  Object to the

19       form of the question.

20       A.    On that page, yes, that's right.

21       Q.    And then moving forward, there's a

22   broadcasting segment which is on page VRC,

23   the last four numbers are 1654.  This is for

24   the broadcasting segment.  You used 6.5 to

25   7.5 percent, right?

1       B. Browning - Confidential

2       A.    Correct.

3       Q.    What specific factors led you to

4   reduce the proposed discount rate for

5   broadcasting prior to step 2 in your DCF?

6           MR. NEIER:  Objection to form.

7           MR. BENDERNAGEL:  Objection to

8       form.

9       A.    Reduce it from what?

10      Q.    You used 7.5 to 8.5 percent before

11  step 1?

12          MR. BENDERNAGEL:  Object to the

13      form of the question.  Misstates the

14      testimony.

15      A.    These are two different --

16      Q.    I understand they're different, but

17  I believe your testimony was before step 1 in

18  Rucker 7 you used the same discount rate for

19  all of your DCF methodology, correct?

20      A.    No, I don't think I said that at

21  all.  I said it depended upon the segment we

22  looked at, what the discount rate would be.

23      Q.    What segment does page 32 refer to?

24      A.    Consolidated operations.

25      Q.    So that's for all of the

1         B. Browning - Confidential

2    businesses, right?

3         A.   That's correct.

4         Q.   Did you do a consolidated one for

5    step 2?

6         A.   I believe it's in here.

7         Q.   Can you point me to that page?

8              MR. NEIER:   How about the next

9         page?

10             MR. GLENN:   Thank you.

11        Q.   So the consolidated, you went from

12   7 percent to 8 percent before step 2 on page

13   21?   1655 is the number in the lower

14   right-hand corner.

15        A.   7 to 8 percent.

16        Q.   That's actually lower than

17   Tribune's actual cost of debt; isn't it?

18        A.   I don't know.

19        Q.   You don't know what Tribune's cost

20   of debt was in December 2007?

21        A.   I'm not sure what it was on a

22   weighted basis, but I'm not sure I know how

23   to answer the question.

24        Q.   You don't know what Tribune's cost

25   of debt was as of December 2007 so you can't

1          B. Browning - Confidential

2     answer my question?

3          A.    Are you talking about pretax cost

4     of debt, after cost --

5          Q.    Pretax.

6          A.    It could be lower than that.

7          Q.    Have you ever valued a company

8     before where the WACC was lower than a

9     company's actual cost of debt?

10         A.    I'm not sure how to answer that

11    because you're mixing all kinds of financial

12    theories in that question which aren't

13    appropriate.  You're taking something that's

14    an enterprise here and trying to relate it to

15    a cost of debt to a specific company which

16    isn't what we're doing here.

17         Q.    I will stand by my question, sir.

18               Have you ever valued a company

19    before?

20               MR. NEIER:  I think the witness

21          basically said he can't answer your

22          question.  So standing by your question

23          doesn't help.  The witness is allowed to

24          say "I don't understand your question."

25         Q.    Have you ever valued a company

1        B. Browning - Confidential

2    before where you applied a weighted average

3    cost of capital that is less than that

4    company's actual cost of debt?

5            MR. NEIER:  Asked and answered.

6        A.   I can't answer it because it

7    doesn't make sense, because it's two

8    different assets what you're talking about.

9        Q.   I understand it's two different

10   assets.

11       A.   I don't think I can even answer it

12   because I don't think I ever compared it that

13   way.

14       Q.   Why did the consolidated discount

15   rate reference range, why was it less in

16   December of 2007 than in May of 2007?

17       A.   Most likely the cost of capital

18   went down for the industry.

19       Q.   Any other factors that you can

20   recall?

21       A.   No.

22       Q.   And by using a lower discount rate,

23   that had the effect of increasing the value

24   of the company in your DCF analysis, correct?

25       A.   Generally lower discount rates

1          B. Browning - Confidential

2    increase value than higher discount rates.

3          Q.   I will ask a couple of questions

4    before we mark that.

5               You recall that Career Builder was

6    one of the assets that was owned by Tribune?

7    Does that ring a bell?

8          A.   Yes.

9          Q.   Did you perform any valuation

10   analysis of Career Builder in the course of

11   your engagement?

12         A.   My analysts did, yes.

13         Q.   Did you review and approve their

14   valuations of Career Builder?

15         A.   I did.

16         Q.   Alpesh Patel is someone you worked

17   with at Valuation Research in December 2007?

18         A.   Yes.

19         Q.   Does that person still work for

20   you?

21         A.   He does.

22         Q.   This is an e-mail change between

23   you and Mr. Patel in the December 2007

24   timeframe?

25         A.   Yes, I believe so.  December 4th I

1          B. Browning - Confidential

2    think is where it starts.

3          Q.   On the first page it says, December

4    4th at 1:57 he says in an e-mail to you, does

5    he not, "My judgment for time is as accurate

6    as Career Builder's value period, ha ha."

7               Do you see that?

8          A.   I do.

9          Q.   And Mr. Patel was engaged in a

10   valuation of Career Builder at the time?

11         A.   He was.

12         Q.   And you responded to him directly

13   above that by saying, "Of course," right?

14         A.   Yes.

15         Q.   Why did you say that?

16         A.   Well, it's because Alpesh valued

17   Career Builder two times for the first

18   opinion and for the second opinion.  It's

19   value indication using the methodology we

20   described earlier came up with a certain

21   value for Career Builder.

22              I don't remember what that was, but

23   he came up with a certain value and that was

24   the exact same value that Microsoft paid for

25   Career Builder.

1          B. Browning - Confidential

2          He was referencing that.  He hit it

3    right on, exactly to the point, so that was

4    his reference to the e-mail.  He was hitting

5    the spot and I said of course.

6          Q.   We only wish he was so right in

7    this case.

8               MR. NEIER:  But he was.

9               MR. GLENN:  No, he was not.

10              MR. NEIER:  He was exactly right,

11         because Career Builder sold it for what

12         he valued it at.

13         Q.   Did you review, either before step

14    1 or before step 2, the rating values of any

15    of Tribune's debt securities or bank debt?

16         A.   I think we did.

17         Q.   Before step 1, step 2 or both?

18         A.   Probably both.

19         Q.   Did you observe at any point in

20    time that there were, the debt was trading at

21    significant discounts to par?

22         A.   I don't know whether significant,

23    but it was trading at a discount to par.

24         Q.   What do you recall before step 1?

25         A.   I don't recall.

1    B. Browning - Confidential

2    Q.    What do you recall before step 2?

3    A.    I think I recall somewhere in the

4    '80s.

5    Q.    Did you take that into account in

6    your valuation?

7    A.    Yes.

8    Q.    How did you take that into account?

9    A.    We looked at it like we looked at a

10   lot of data points and we came up with a

11   valuation and that was certainly a

12   consideration.

13   Q.    Why was that a consideration?

14   A.    Because it was trading below par

15   and so the market was pricing it below par.

16   Q.    As a valuation expert, why is that

17   significant to you?

18   A.    Well, it may be significant, it may

19   not be.  There could be a lot of reasons for

20   that.

21         You have to remember what the

22   market was doing for a lot of debt securities

23   at that point in time.  A lot of debt

24   securities were trading below par and it

25   wasn't necessarily because of this -- just

1        B. Browning - Confidential

2   Tribune.   A lot of companies were trading

3   below par.

4        Q.   Were you aware that lenders

5   attempted to stop the closing of step 2?

6            MR. JOHNSTON:   Objection to form.

7        A.   Aware of them trying to stop it?

8        Q.   Yes.

9        A.   I'm aware that they sent us

10  questions they wanted us to address.

11       Q.   Putting aside those questions, did

12  you become aware, in words or in substance,

13  that there were lenders that did not want

14  step 2 to close?

15       A.   I may have heard that.

16       Q.   But you don't know, as you sit here

17  today?

18       A.   I do not know.

19           MR. GLENN:   Nothing further.

20  EXAMINATION BY

21  MR. BUSATH:

22       Q.   Good afternoon, Mr. Browning.   My

23  name is Lynn Busath.   I'm an attorney at

24  Davis Polk & Wardwell.   We represent JP

25  Morgan and Chase Bank.   I have just a few

1        B. Browning - Confidential

2   questions.

3            First of all, if I can refer you to

4   Rucker Exhibit 22.

5        A.   Okay.

6        Q.   This is a copy of the opinion

7   letter of VRC dated December 20 2007.  If I

8   can have you turn to page 6, there was a

9   number of bullets there.  The second to the

10  last one refers to the fact that VRC had

11  reviewed questions submitted by

12  representatives of a number of banks on

13  December 7th, December 11th and December

14  17th, 2007.

15           Does that indicate that, in fact,

16  there were multiple sets of questions from

17  the lenders?

18       A.   I believe that's true.

19       Q.   Today you were asked to look at one

20  set and see if there was a question that

21  related to the discount rate for the net

22  present value of the tax savings.

23           Do you recall that?

24       A.   Yes.

25       Q.   But you haven't looked at the other

1          B. Browning - Confidential

2     sets, right?

3          A.    Today?

4          Q.    Yes, today?

5          A.    Yes, that's right.

6          Q.    If I could ask you now to refer to

7     Rucker Exhibit 13.

8          A.    Okay.

9          Q.    This is a solvency analysis that

10    was done dated May 17, 2007.

11               Is that correct?

12         A.    Okay.  Yes.

13         Q.    You discussed this earlier.

14               Was this analysis part of what VRC

15    was relying on when it issued its opinion

16    letter, its bring down opinion letter dated

17    May 24, 2007?

18         A.    I'm not sure if it was the draft of

19    it or the final one, but it certainly would

20    have been part of the analysis toward that.

21         Q.    So it was part of what you looked

22    at in doing -- that much you're certain of at

23    the moment?

24         A.    Yes.

25         Q.    Can I ask you to look at Rucker

1          B. Browning - Confidential

2     Exhibit 17.  We're going to compare the two

3     here in a moment.

4          A.   Okay.

5          Q.   If we can turn first to Rucker

6     Exhibit 17 to page 8.

7          A.   Okay.

8          Q.   And this is a table again that we

9     looked at earlier in the deposition comparing

10    step 1 valuations to the step 2 valuations at

11    December 4th and the differences between

12    them; is that right?

13         A.   Yes.

14         Q.   I would like to compare those

15    numbers given to the valuations at step 1

16    with the valuations contained in the May 17th

17    analysis at Rucker Exhibit 13 on page 10.

18         A.   Okay.

19         Q.   Can you confirm for me that the

20    numbers set out in the December 4th

21    presentation for step 1 valuations are the

22    same as those contained in the May 17th

23    valuation or analysis at the midpoint range?

24              MR. NEIER:  You're asking -- for

25         the record, you're asking him to compare

1      B. Browning - Confidential

2      the numbers on page 8 in Rucker 17 with

3      the numbers on page 10 in Rucker 13?

4           MR. BUSATH:  Right, the midpoint

5      valuations on Rucker 13.

6      A.   Yes, they're the same number.

7      Q.   Does this refresh your recollection

8  as to whether this May 17th analysis was one

9  that VRC regarded as its final step 1

10  analysis?

11      A.   I believe so.

12      Q.   Do you know whether in doing this

13  analysis at May 17th whether VRC looked at --

14  whether that was based on updated information

15  received from Tribune just prior to May 17th?

16      A.   I'm assuming it was.  I'm assuming

17  we received that information, as I said

18  earlier today.

19      Q.   I refer you to Rucker Exhibit 12.

20      A.   Okay.

21      Q.   It's a series of e-mails on May

22  15th or beginning May 14th and following on

23  May 17th -- May 15th, rather, 2007.

24           Do you see that?

25      A.   Yes.

1      B. Browning - Confidential

2      Q.   In the first e-mail in sequence of

3  time, Chad Rucker is asking Chandler Bigelow,

4  "Just checking on the status of the model."

5           Do you know what "the model" refers

6  to?

7      A.   I'm assuming it's the company's

8  projections, their model for their

9  projections.

10     Q.   And then the second e-mail in time

11 you write to Chad Rucker, "How does the model

12 look?"

13          Do you see that?

14     A.   Yes.

15     Q.   You're referring to that same model

16 by Tribune of their financial projections?

17     A.   Yes.

18     Q.   And just above that on May 15th,

19 next e-mail in time, Mr. Rucker writes back

20 that he's received it this morning.  We are

21 going through it.

22          Do you see that?

23     A.   Yes.

24     Q.   Is it your understanding then that

25 that updated model at that time was used in

1        B. Browning - Confidential

2   preparing the analysis that's dated May 17th?

3        A.    Again, I'm assuming it was.

4        Q.    If we look at a couple of documents

5   to see if we can verify that for you.

6             You see in the next sentence in

7   that e-mail Mr. Rucker says, "On the surface

8   the debt is essentially the same, but

9   projected EBITDA is lower.  I am trying to

10  determine the source of the lower EBITDA

11  numbers.  Part of it is that they have also

12  projected lower revenues."

13            You see that?

14       A.    Yes.

15            MR. BUSATH:  Now, I would like to

16       mark a document which is going to be

17       Browning Exhibit 15.

18            (Browning Exhibit 15, Excel file

19       printout, marked for identification, as

20       of this date.)

21       Q.    This is a printout from an Excel

22  file, I should say portions of an Excel file

23  produced by VRC, and we want to make it clear

24  there's a path line at the bottom, part of

25  that indicates where it resides on our

1        B. Browning - Confidential

2    computer system, but the other part

3    identifies that this was VRC 186609.XLS.

4    It's a live Excel file.  The date on the

5    right is just the date we printed it.

6            Do you see that?

7    A.    Yes.

8    Q.    Then the worksheet indicates that I

9    printed off the cover, and then on the next

10   page printed off the worksheet called Model.

11           Do you see that?

12   A.    Yes.

13   Q.    Is this a Tribune model, the type

14   of model that Tribune prepared?

15   A.    Yes, it is.

16   Q.    This indicates it was last updated

17   May 14, 2007, 11:49 p.m.

18           Do you see that?

19   A.    Yes.

20           MR. BUSATH:  I want to compare that

21       with some numbers used in the May 15th

22       analysis by VRC.

23           So I would like to next mark, this

24       will be Browning 16, an excerpt from

25       another Excel file produced by VRC.

1          B. Browning - Confidential

2          It's called VRC 026842.

3                 (Browning Exhibit 16, Excel file

4          excerpt, marked for identification, as

5          of this date.)

6                 MR. BENDERNAGEL:  You can make this

7          confidential so we don't have to

8          designate this part of the transcript.

9          Q.    As I understand it, Mr. Browning,

10   what we marked as Browning 16 is a printout

11   of the worksheet related to the discounted

12   cash flow on a consolidated basis relating to

13   the May 17th analysis.  And that's set out in

14   a letter from Mr. Neier.  We can mark that,

15   too, if you would like, but I just wanted to

16   establish that foundation.

17                 Did, in fact -- Mr. Browning, did

18   VRC have underlying Excel sheets that

19   supported their analyses?

20          A.    Yes.

21          Q.    If I can have you compare the

22   revenue numbers presented on Exhibit 16 for

23   the years from 2008 to 2012 to the revenue

24   numbers set out in the Tribune model marked

25   as Exhibit 15 for those same years, can you

1      B. Browning - Confidential

2  confirm for me they are the same?

3      A.   Yes, with rounding.

4      Q.   Does that indicate to you then that

5  the revenue numbers used in the VRC analysis

6  came from that updated analysis from the

7  Tribune model?

8      A.   I believe so.

9      Q.   In the Tribune model, Exhibit 15,

10  there's a line item called OCF.

11          Do you see that?

12      A.   Yes.

13      Q.   Can you tell me what OCF stands

14  for?

15      A.   I believe that's operational cash

16  flow.

17      Q.   And is that another way of

18  indicating EBITDA?

19      A.   Yes.

20      Q.   Then on Exhibit 16, VRC discounted

21  cash flow analysis, there's an adjusted

22  EBITDA line.

23          Do you see that?

24      A.   Yes.

25      Q.   Could you compare again the

1       B. Browning - Confidential

2  adjusted EBITDA figures used by VRC from 2008

3  to 2012 with the OCF numbers for those

4  comparable years in the Tribune model and

5  confirm for me that in each instance VRC is

6  using an adjusted EBITDA that is $20 million

7  lower than the OCF in the Tribune model for

8  those years?

9       A.   Yes, I believe so.

10      Q.   Do you have an understanding as to

11 why VRC used an adjusted EBITDA that was $20

12 million lower than the OCF in the Tribune

13 model?

14      A.   I'm not certain, but it's probably

15 another expense that we believed to be

16 included.  I don't know the answer.

17      Q.   I did notice just above the OCF

18 line in the Tribune model there's a line item

19 for other expense reduction, and it happens

20 to be $20 million in each of those years.

21           Do you see that?

22      A.   Yes.

23      Q.   Is it likely that that item was not

24 credited by VRC in its analysis?

25      A.   Yes.

B. Browning - Confidential

1

2    Q.   Is that an indication that VRC

3  being more conservative than Tribune's

4  management's projections in VRC's analysis?

5    A.   Could be that, or there was just

6  discussion as to what that 20 million

7  represented and felt it was an operational

8  expense.  I don't know.  But yes.

9    Q.   Going back to Exhibit 16, there is

10  a calculation underneath that of the

11  enterprise cash flow.

12         Do you see that?

13    A.   Yes.

14    Q.   Can you tell me what that is

15  reporting to calculate there, what the

16  significance of enterprise cash flow is?

17    A.   Can you say the question again?

18    Q.   What's the significance of

19  enterprise cash flow in this analysis?

20    A.   It's to determine the value of the

21  enterprise.  It's used to capitalize into

22  value the enterprise.

23    Q.   During the course of your work, in

24  your review, did you look at the models at

25  this level of detail?

1          B. Browning - Confidential

2          A.    I didn't look at all of the models.

3    I looked at some of them, but not all of

4    them, I can't say that.  But I looked at the

5    -- we had a lot of people checking it and so

6    forth.

7          Q.    With respect to Exhibit 16, did you

8    look at VRC's underlying worksheet at this

9    level of detail?

10         A.    Yes.

11         Q.    Can you tell me, did you come to

12   understand at some point in time that this

13   calculation of the enterprise value was not

14   done correctly?

15         A.    Yes.

16         Q.    Could you explain what you came to

17   understand?

18         A.    The depreciation wasn't being

19   factored in correctly, so it wasn't being

20   deducted from the EBITDA line.  And so there

21   was an overstatement of taxes included in the

22   analysis.

23         Q.    And what was the effect of that

24   overstatement of analysis -- of taxes on your

25   valuation analysis?

1       B. Browning - Confidential

2       A.   It understated the value relative

3   to the discounted cash flow approach.

4       Q.   If the calculation had been done

5   mathematically correctly, the discounted cash

6   flow analysis would have indicated the higher

7   value?

8       A.   Yes.

9           MR. BUSATH:   Thank you,

10          Mr. Browning.   I have no further

11          questions at this time.

12  EXAMINATION BY

13  MR. JOHNSTON:

14      Q.   Good afternoon, Mr. Browning.   I'm

15  Jim Johnston of the firm of Hennigan Bennett

16  & Dorman, LLP.   I represent a group of

17  lenders who hold some of the credit agreement

18  debt that was issued in connection with the

19  leveraged AESOP transactions.

20          Very briefly this morning Mr.

21  Sottile asked you about the basis for the

22  change in the discount rate that was applied

23  to value the AESOP tax savings in connection

24  with the S. Corp. and the reason why that

25  changed in the course of your analysis from

1      B. Browning - Confidential

2   10 to 16 percent.

3          And you testified, I believe in

4   part, that the change was at least in part

5   reflected as a result of some questions that

6   were asked by the lenders.

7          And then Mr. Sottile showed you a

8   sheet of lender questions and you couldn't

9   find anywhere on there the question that was

10  asked.

11         And then a few minutes ago

12  Mr. Busath pointed you to another document

13  that said there were some other lender

14  questions.

15         I want to mark this as Browning 17

16  and see if this refreshes your recollection

17  or provides a basis -- let's mark this as 17.

18         (Browning Exhibit 17, Lenders'

19     questions, marked for identification, as

20     of this date.)

21     Q.   As it's going around, please take a

22  look at it and see if you can identify the

23  document.

24     A.   Yes, this is lenders' questions, I

25  believe.

1        B. Browning - Confidential

2        Q.    In particular, I direct your

3    attention to questions 1B and 1C and ask you

4    if those were the questions you were

5    referencing earlier that played into your

6    determination to adjust the discount rate for

7    the S. Corp. tax savings.

8        A.    I believe that was -- in going

9    through these questions, that was a question

10   that made us start thinking about that.

11       Q.    Thank you.

12            Mr. Glenn questioned you, among

13   other documents, on two of your solvency

14   opinion analyses, one was Rucker Exhibit 7, I

15   don't know if you can dig that out in front

16   of you, and the other was Rucker Exhibit 16.

17            MR. NEIER:  It may be challenging,

18       but we will give it a shot.

19       Q.    When you get those out, I will

20   direct you to a page on each.

21            On Rucker 7, Mr. Glenn asked you

22   some questions about page 32, which bears the

23   Bates stamp VRC 51430.  If you could turn to

24   that page.

25       A.    Okay.

¹       B. Browning - Confidential

²       Q.    Then on Rucker Exhibit 16, if you

³   could turn to page 21, which bears the Bates

⁴   stamp VRC 31655.

⁵       A.    Okay.

⁶       Q.    Mr. Glenn was asking you, among

⁷   other things, to compare the discount rate

⁸   used for the discounted cash flow method, and

⁹   he observed that the range of discount rates

¹⁰  on Rucker 7 ranged from 7.5 to 8.5 percent,

¹¹  whereas on Rucker 16 they ranged from 7

¹²  percent to 8 percent.

¹³          Do you recall that?

¹⁴      A.    Yes.

¹⁵      Q.    What is the date of the

¹⁶  presentation for Rucker 16?

¹⁷      A.    November 14th.

¹⁸      Q.    Is that your final analysis?

¹⁹      A.    No.

²⁰      Q.    If you could turn to Rucker 20?

²¹      A.    Okay.

²²      Q.    I believe you testified earlier

²³  that Rucker 20 represents VRC's final

²⁴  solvency analysis; is that correct?

²⁵      A.    I think so.

1          B. Browning - Confidential

2          Q.   If you can turn to page 9 of that,

3    in particular look at the second bullet

4    point?

5          A.   Okay.

6          Q.   And tell me if that refreshes your

7    recollection as to whether the discount rate

8    for consolidated operations actually changed

9    from your step 1 analysis?

10         A.   They're the same.

11              MR. JOHNSTON:  That was all I had.

12    Thank you.

13    EXAMINATION BY

14    MR. BENDERNAGEL:

15         Q.   Mr. Browning, my name is Jim

16    Bendernagel.  I am with Sidley Austin and I

17    represent the debtors in this proceeding.  If

18    you can find in that pile of material over

19    there Rucker 11, which is the May 24th

20    solvency opinion by VRC.

21         A.   Okay.

22         Q.   If you can turn over to the page

23    that has the Bates number ending in 5884,

24    first of the page 2.

25         A.   Okay.

1      B. Browning - Confidential

2      Q.    You recall there was a series of

3  questions by Mr. Sottile regarding the

4  various material that's listed on the next

5  couple of pages.

6          Do you recall that?

7      A.    Yes.

8      Q.    And at one point he asked you to go

9  through there and see if you can identify any

10  categories where there might be material

11  relating to post April 1st performance.

12          Do you recall that?

13      A.    Yes.

14      Q.    I believe at one point you

15  identified -- you identified a couple of

16  categories including on page 4, which ends

17  with 5887, the bullet second from the last

18  regarding discussions with management.

19          Do you see that?

20      A.    Yes.

21      Q.    If you go up a little further on

22  that page, there is a bullet that says,

23  "Reviewed the various other schedules and

24  work books from the data room."

25          Do you see that?

1          B. Browning - Confidential

2     A.    I'm trying to find it.  Yes.

3     Q.    Do you recall what the data room

4  was and what materials were in the data room?

5     A.    I can't tell you all of them.

6  There were a lot of materials.  It was a

7  virtual room where a lot of the transaction

8  documents were stored.

9     Q.    Do you know if there was financial

10  information in them?

11     A.    I'm sure there was financial

12  information.

13     Q.    Do you know if any of the data

14  postdated April 1st?

15     A.    I don't know if it was at this

16  point in time, but it was at some point in

17  time, I'm sure.

18     Q.    If you can take out Browning

19  Exhibit 7?  It's the one page of notes.

20          MR. NEIER:  Because it's one page

21     it's worse.

22          MR. BENDERNAGEL:  Take out 7 and 8.

23     Q.    You recall there was some

24  discussion about these two exhibits and

25  they're both dated 11/21, and they reflect

1         B. Browning - Confidential

2    your notes, correct?

3         A.   Correct.

4         Q.   And Browning 8 is notes of a

5    conversation that you had with the company

6    including Mr. Bigelow; is that correct?

7         A.   Yes.

8         Q.   And you suggested that 11/21 --

9    Exhibit Browning 7 was also notes relating to

10   a conversation with Mr. Bigelow; is that

11   correct?

12        A.   Yes.

13        Q.   Can you read the first sentence of

14   Browning 7 into the record?

15        A.   "The real estate incremental value

16   has been excluded from our analysis."

17        Q.   Is that the end of that sentence or

18   does it go on to say "our analysis for

19   solvency to be conservative"?

20        A.   I'm not sure.  I didn't have any

21   periods.  Oftentimes I rewrite them.

22        Q.   Are you suggesting that was

23   Mr. Bigelow's words or what you were doing in

24   your analysis?

25        A.   I would be speculating.  Could have

1      B. Browning - Confidential

2  been his comment.  It could have been my

3  comment.

4      Q.   Whose analysis are they commenting

5  on, VRC's or the Tribune's?

6      A.   Here we're talking about Tribune's

7  analysis.

8      Q.   Tribune was doing a solvency

9  analysis?

10      A.   No, I'm sorry.  It was our

11  analysis, but what I'm referring to, it was

12  excluded from their forecast, their

13  projections.

14      Q.   And so it was excluded from your

15  analysis as well, correct?

16      A.   At that point in time, yes.

17      Q.   So just so I have this clear,

18  because I think earlier you testified that

19  what you were reflecting here were

20  Mr. Bigelow's comments.

21           As I understand your testimony now,

22  this is -- you're not saying that that first

23  sentence is what Mr. Bigelow said; is it?

24      A.   I'm not saying that.  I would be

25  speculating to say that.

1      B. Browning - Confidential

2      Q.   But just so it's clear, at that

3   point in time you hadn't included this

4   certain real estate in your solvency analysis

5   so that it was conservative; is that correct?

6      A.   That's correct.  We had not.

7      Q.   If you could pull out what's been

8   marked as Browning 13, which is another set

9   of your notes.

10          This one is dated 12/2/2007.

11      A.   Okay.

12      Q.   And if you could turn to page two

13   of that document.  There is a series of

14   questions by Mr. Sottile regarding the

15   discussion on this page going over to the

16   next page regarding the situation with

17   Mr. Zell and his warrant and whether he would

18   exercise it.

19          Do you recall that?

20      A.   Yes.

21      Q.   And I think your testimony was that

22   you were addressing two different issues

23   here, one was the question of when he would

24   exercise the warrant and the other was

25   whether the company would pay his taxes.

1      B. Browning - Confidential

2          Is that a fair characterization?

3      A.    That is correct.

4      Q.    Just focusing on the first

5  question, as I understood your testimony, the

6  Tribune's explanation of why they thought he

7  would not exercise the option prematurely or

8  before 2022 was twofold; is that correct?

9      A.    If I said it that way, I may not

10 have meant it.

11     Q.    Looking at the notes there's a 1

12 and a 2.

13         Do you see that?

14     A.    Right.

15     Q.    As I understood the point with

16 respect to 1 is that it would not be in

17 Mr. Zell's economic interest to exercise the

18 option before 2022, correct?

19     A.    That's correct.

20     Q.    And as I understood number 2, the

21 point that the Tribune was trying to make is

22 that put aside what his economic interest

23 was, if he did it, he might have a fiduciary

24 duty problem; is that correct?

25     A.    That's correct.

1        B. Browning - Confidential

2        Q.    Thank you.

3              Just talking about the AESOP, as I

4    understand it, the subchapter S. Corporation

5    does not pay taxes, correct?

6        A.    That's right.  At the entity level.

7        Q.    At the entity level and this would

8    be true both before 2022 and after 2022,

9    correct?

10       A.    That's correct.

11       Q.    And so at the entity level, the

12   entity would have the benefit of the tax

13   savings even after 2022, correct?

14       A.    Yes.

15       Q.    But in your analysis, you only give

16   the entity the benefit of 60 percent of those

17   tax savings after 2022, correct?

18       A.    That's correct.

19       Q.    In your view, was that conservative

20   or aggressive?

21

22    (Continued on next page to include Jurat)

23

24

25

1      B. Browning - Confidential

2    A.    That was conservative.

3         MR. BENDERNAGEL:  I don't have

4    anything further.

5         MR. NEIER:  Anybody else?

6         (Time Noted:  4:35 p.m.)

7

8              _____

9              BRYAN BROWNING

10   Subscribed and sworn to before me

11   this ____ day of _____, 2009.

12   _____

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 246

1

2              C E R T I F I C A T E

3      STATE OF NEW YORK      )

4                             : ss.

5      COUNTY OF NEW YORK     )

6

7              I, Linda Salzman, a Notary Public

8      within and for the State of New York, do

9      hereby certify:

10             That BRYAN BROWNING, the witness

11     whose deposition is hereinbefore set

12     forth, was duly sworn by me and that such

13     deposition is a true record of the

14     testimony given by the witness.

15             I further certify that I am not

16     related to any of the parties to this

17     action by blood or marriage, and that I

18     am in no way interested in the outcome of

19     this matter.

20             IN WITNESS WHEREOF, I have hereunto

21     set my hand this 9th day of December,

22     2009.

23

24             _____

25                  Linda Salzman

1

2

3    --------------- I N D E X ------------------

4    WITNESS                 EXAMINATION BY      PAGE

5    BRYAN BROWNING     MR. SOTTILE           9

6                       MR. GLENN          186

7                       MR. BUSATH         220

8                       MR. JOHNSON        233

9                       MR. BENDERNAGEL    237

10

11   ---------------- EXHIBITS ------------------

12   BROWNING                           FOR ID.

13   Exhibit 1     E-mail              21

14   Exhibit 2     Engagement letter    32

15   Exhibit 3     Engagement letter draft  40

16   Exhibit 4     Memorandum response  85

17   Exhibit 5     E-mails             111

18   Exhibit 6     Document            119

19   Exhibit 7     Handwritten page    126

20   Exhibit 8     Four-page document  127

21   Exhibit 9     E-mail              136

22   Exhibit 10    E-mail              139

23   Exhibit 11    Note                150

24

25                        (Continued)

1

2        ------------- EXHIBITS (Cont'd) -------------

3        BROWNING                                    FOR ID.

4        Exhibit 12    Notes                        152

5        Exhibit 13    Notes                        154

6        Exhibit 14    (Inadvertently omitted)

7        Exhibit 15    Excel file printout     226

8        Exhibit 16    Excel file excerpt       228

9        Exhibit 17    Lenders' questions       234

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    ERRATA SHEET FOR THE TRANSCRIPT OF:

3    Case Name:  Tribune Company, et al.

4    Dep. Date:  December 4, 2009

5    Deponent:   BRYAN BROWNING

6    Pg. Ln.   Now Reads      Should Read   Reason

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18

19                  _____

20                  Signature of Deponent

21

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS    DAY OF          , 2009.

24   _____

25   (Notary Public)  MY COMMISSION EXPIRES:_____