Page 1

1

2    IN THE UNITED STATES BANKRUPTCY COURT

3    FOR THE DISTRICT OF DELAWARE

4    ------------------------)

5    In re:                  Chapter 11

6    TRIBUNE COMPANY, et al.,  Case No.

7             Debtors.     08-13141 (KJC)

8    ------------------------) (Jointly

9                              Administered)

10

11

12

13

14         CONFIDENTIAL DEPOSITION OF

15            MOSE RUCKER III

16          New York, New York

17          December 3, 2009

18

19

20

21

22

23

24    Reported by:

     Linda Salzman

25    JOB NO. 26236

1

2

3                    December 3, 2009

4                    9:30 a.m.

5

6           Confidential Deposition of MOSE

7    RUCKER III, the witness herein, held at

8    the offices of Chadbourne & Parke, LLP,

9    30 Rockefeller Plaza, New York, New York,

10   pursuant to Notice, before Linda Salzman,

11   a Notary Public of the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2   A P P E A R A N C E S:

3

4

5      ZUCKERMAN SPAEDER, LLP

6      Attorneys for The Unsecured Creditors

7      Committee

8           1800 M Street, N.W.

9           Washington, DC 20036-5802

10     BY:   JAMES SOTTILE, ESQ.

11

12

13

14     CHADBOURNE & PARKE, LLP

15     Attorneys for Committee of Unsecured

16     Creditors

17          30 Rockefeller Plaza

18          New York, New York 10112

19     BY:   MARC D. ASHLEY, ESQ.

20

21

22

23

24

25

1

2    A P P E A R A N C E S: (Continued)

3

4

5    WINSTON & STRAWN, LLP

6    Attorneys for Valuation Research

7    Corporation and the Witness

8         200 Park Avenue

9         New York, New York 10166-4193

10   BY:   DAVID NEIER, ESQ.

11         ROBERT BOUDREAU, ESQ.

12

13

14   HENNIGAN BENNETT & DORMAN, LLP

15   Attorneys for Various Credit Agreement

16   Lenders

17        245 Park Avenue

18        Suite 3900

19        New York, New York 10167

20   BY:   BRENT TRUITT, ESQ.

21        JAMES BERGMAN, ESQ.

22

23

24

25

Page 5

1
2    A P P E A R A N C E S: (Continued)
3
4
5        LAZARD FRERES & CO., LLC
6        Attorneys for Tribune Company
7            190 S. Lasalle
8            31st Floor
9            Chicago, Illinois 60603
10   BY:    SUNEEL MANDAVA, ESQ.
11           RAY STURM, ESQ.
12
13
14       KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP
15       Attorneys for Law Debenture of New York
16           1633 Broadway
17           New York, New York 10019
18   BY:    ANDREW GLENN, ESQ.
19           CHRISTINE A. MONTENEGRO, ESQ.
20
21
22
23
24
25

1

2   A P P E A R A N C E S: (Continued)

3

4

5       SIDLEY AUSTIN, LLP

6       Attorneys for Tribune

7             1501 K Street, N.W.

8             Washington, DC 20005

9       BY:   JAMES BENDERNAGEL, JR., ESQ.

10            DAVID M. MILES, ESQ.

11

12      DAVIS POLK & WARDWELL, LLP

13      Attorneys for JPMorgan Chase

14            450 Lexington Avenue

15            New York, New York 10017

16      BY:   LYNN EARL BUSATH, ESQ.

17            DANIEL LOSS, ESQ.

18

19

20      KAYE SCHOLER , LLP

21      Attorneys for Merrill Lynch

22            425 Park Avenue

23            New York, New York 10022-3598

24      BY:   JOSEPH M. DRAYTON, ESQ.

25

1

2    A P P E A R A N C E S: (Continued)

3

4

5        O'MELVENY & MYERS, LLP

6        Attorneys for Bank of America

7             7 Times Square

8             New York, New York 10036

9        BY:   STEVEN ROSENSTEIN, ESQ.

10

11

12       PAUL WEISS RIFKIND

13       WHARTON & GARRISON, LLP

14       Attorneys for CitiGroup

15            1285 Avenue of the Americas

16            New York, New York 10019

17       BY:   STUART McPHAIL, ESQ.

18

19

20

21

22

23

24

25

Page 8

1

2          IT IS HEREBY STIPULATED AND AGREED,

3     by and between the attorneys for the

4     respective parties herein, that filing

5     and sealing be and the same are hereby

6     waived.

7          IT IS FURTHER STIPULATED AND AGREED

8     that all objections, except as to the

9     form of the question, shall be reserved

10    to the time of the trial.

11         IT IS FURTHER STIPULATED AND AGREED

12    that the within deposition may be sworn

13    to and signed before any officer

14    authorized to administer an oath, with

15    the same force and effect as if signed

16    and sworn to before the Court.

17

18

19

20

21

22

23

24

25

1          M. Rucker - Confidential

2    M O S E   R U C K E R,

3        called as a witness, having been duly

4        sworn by a Notary Public, was examined

5        and testified as follows:

6    EXAMINATION BY

7    MR. SOTTILE:

8        Q.    Could you please state your full

9    name, sir?

10        A.    Mose Rucker III.

11        Q.    Are you commonly referred to as

12    Chad Rucker?

13        A.    Yes.

14        Q.    Mr. Rucker, my name is James

15    Sottile.  I'm a lawyer with the firm of

16    Zuckerman Spaeder, counsel to the Unsecured

17    Creditors Committee in the Tribune Company

18    bankruptcy proceedings.

19          We are here today for an oral

20    examination of you pursuant to Bankruptcy

21    Rule 2004.  The examination will consist of a

22    number of questions that I will put to you

23    and your responses, objections by other

24    parties, and other parties may have follow-up

25    questions once I conclude my examination.

1        M. Rucker - Confidential

2        If at any time during the

3   proceedings you don't understand a question

4   that I or anyone else put to you, I would ask

5   that you let us know so that we can try to

6   rephrase the question so that you will

7   understand it and be able to respond

8   appropriately.

9        MR. SOTTILE:  We have a couple of

10       preliminary matters I want to address

11       before we turn to the questioning.  The

12       first of which is I would like each

13       party present in the room to identify

14       themselves and the party they represent.

15       And while doing so, if one person

16       on behalf of each represented party

17       could confirm they have either signed

18       onto the confidentiality agreement

19       between the Unsecured Creditors

20       Committee and Valuation Research Capital

21       or have an independent confidentiality

22       agreement with VRC, I would be grateful,

23       and then we will state some stipulations

24       after we've introduced the parties.

25       MR. ASHLEY:  Marc Ashley of

1      M. Rucker - Confidential

2    Chadbourne & Parke for the Committee of

3    Unsecured Creditors.  We have previously

4    signed the agreement on behalf of the

5    committee.

6         MR. BUSATH:  Lynn Busath, David

7    Polk & Wardwell on behalf of JPMorgan

8    Chase.

9         Also Daniel Loss is with me here

10   today.

11        We do have a confidentiality

12   agreement.  I just want to note our own

13   objection to proceeding at this time,

14   and there are documents that have been

15   produced to some of the parties and not

16   all of the parties.  We reserve our

17   rights to ask additional questions at

18   another time.

19        MR. DRAYTON:  Joseph Drayton, Kaye

20   Scholer, LLP.  We represent Merrill

21   Lynch in this matter.  We signed on to

22   an independent confidentiality agreement

23   with Valuation Research Corporation.

24        I expect Madeline Primoff from my

25   office to attend a small portion of this

1      M. Rucker - Confidential

2    deposition.

3          MR. GLENN:   Andrew Glenn and

4    Christine Montenegro, Kasowitz, Benson,

5    Torres & Friedman on behalf of Law

6    Debenture.

7          We, too, have a confidentiality

8    agreement with VRC.

9          MR. ROSENSTEIN:   Steven Rosenstein,

10   O'Melveny & Myers, for Bank of America,

11   and we have signed the agreement today.

12         MR. TRUITT:   Brent Truitt, with Jim

13   Bergman, on behalf of various credit

14   agreement lenders, and we have our own

15   independent confidentiality agreement

16   with VRC.

17         MR. MILES:   David Miles and Jim

18   Bendernagel with Sidley Austin for the

19   debtor.   I will let Jim address the

20   confidentiality issue.

21         MR. BENDERNAGEL:   Also with us are

22   two members from Lazard, Suneel Mandava

23   and Ray Sturm.

24         I have signed the confidentiality

25   agreement that was turned out today, but

1     M. Rucker - Confidential

2     I believe we have our own

3     confidentiality, so we are double

4     protected in that regard.

5          MR. NEIER:  David Neier and Robert

6     Boudreau for the witness, Chad Rucker of

7     VRC.

8          We don't need a confidentiality

9     agreement.  We have given everybody

10    their own version.

11         MR. SOTTILE:  Excellent, thank you.

12         Before we went on the record -- I'm

13    sorry.

14         MR. McPHAIL:  Stuart McPhail, Paul

15    Weiss, Rifkind, Wharton & Garrison.  I

16    represent Citigroup and we signed onto

17    the confidentiality.

18         MR. SOTTILE:  Before we went on the

19    record, the parties agreed to two

20    stipulations concerning the conduct of

21    the deposition which I will recite, and

22    absent objection, we will assume they

23    are agreeable to all parties.

24         First, the parties have stipulated

25    that any objections to questions or to

1      M. Rucker - Confidential

2      the examination as a whole, other than

3      objections as to the form of questions,

4      are preserved and therefore do not need

5      to be asserted in the course of this

6      deposition.

7           Second, the parties have stipulated

8      that an objection by any one party will

9      be taken as joined in by all other

10     parties to the extent they later wish to

11     rely on that objection.

12          MR. BENDERNAGEL:  Can we go off the

13     record?

14          (Whereupon, an off-the-record

15     discussion was held.)

16          MR. SOTTILE:  Hearing no objection,

17     I understand that the stipulations that

18     I have recited on the record are

19     satisfactory to all parties.

20          We had a discussion off the record

21     concerning a particular confidential

22     document produced by the debtors.  We

23     will address the issues concerning that

24     document as and when it is introduced in

25     the course of the deposition.

1      M. Rucker - Confidential

2         I would like to mark this document

3      as Rucker Exhibit 1.

4         (Rucker Exhibit 1, Documents,

5      marked for identification, as of this

6      date.)

7         MR. SOTTILE:  The document is a

8      composite exhibit, the first page of

9      which is stamped VRC 0025639.  And the

10     last page of which is stamped VRC

11     0019421.

12        It consists of a number of

13     documents concerning individuals at VRC

14     that were involved in the Tribune

15     Company matter and some biographical

16     material concerning those witnesses.

17        Included within the exhibit are

18     some materials printed off the Valuation

19     Research Corporation website that also

20     contained biographical information

21     concerning individuals at Valuation

22     Research.

23        Does everyone have a copy of Rucker

24     Exhibit 1 in front of them now?  I take

25     it that we do.

1      M. Rucker - Confidential

2  BY MR. SOTTILE:

3      Q.   Mr. Rucker, can you take a look at

4  the first page of Rucker Exhibit 1, which is

5  in front of you, and tell us if you can what

6  this is, just the first page?

7      A.   This was a break-out of the

8  original responsibilities for the different

9  team members that would be analyzing the

10  Tribune solvency opinion.

11     Q.   When you say "original," what do

12  you mean by that?

13     A.   That means when we initially

14  received the assignment, we broke up into

15  teams to analyze the document.  And by

16  original, I mean throughout the process there

17  may have been other people that might have

18  joined in to work on the assignment or take

19  some small role, but initially or originally,

20  this was the team.

21     Q.   It's headed VRC.  We've used that

22  acronym already.

23          That stands for Valuation Research

24  Corporation; is that correct?

25     A.   Yes.

1          M. Rucker - Confidential

2       Q.   I note that your name appears in

3    several places on this first page.

4            Can you tell me what the

5    significance of your name appearing in those

6    places is?

7       A.   That means that I will be involved

8    in some aspect of doing, of taking on that

9    role.

10      Q.   Okay.

11      A.   Or reviewing that particular

12   segment of the business.

13      Q.   And the work, the projects rather,

14   that your name appears next to, includes

15   something called solvency letter development;

16   is that right?

17      A.   Yes.

18      Q.   Can you describe for me in general

19   what that phrase refers to?

20      A.   That means writing the solvency

21   opinion letter.

22      Q.   Actually writing the document

23   itself that express an opinion on solvency?

24      A.   The actual solvency opinion letter.

25      Q.   I also see Mr. Bryan Browning's

1        M. Rucker - Confidential

2   name in a number of places on this page.

3            Who is Mr. Browning?

4        A.   Bryan is a senior vice-president at

5   the company, and was the engagement manager

6   for the project.

7        Q.   And what does it mean to be the

8   engagement manager for a project at VRC?

9        A.   That really means that he

10  coordinates all of the different parties and

11  is ultimately responsible for getting the

12  assignment done.

13       Q.   So you reported to Mr. Browning

14  with respect to the Tribune Company project;

15  is that right?

16       A.   Yes.

17       Q.   Did others on the team report to

18  you?

19       A.   Yes.

20       Q.   Who reported to you, just looking

21  at the names on this first page of Rucker

22  Exhibit 1?

23       A.   Leo Mednick, Shakespeare James,

24  Chase Edge.

25            But in addition to reporting to me,

1       M. Rucker - Confidential

2   they also reported, you know, to others,

3   whomever were involved in this, that reported

4   directly to me.

5       Q.   Can you briefly describe the roles

6   each of them took in the engagement; that is,

7   Mr. Mednick, Mr. James and Mr. Edge?

8       A.   It's very difficult for me to

9   remember each and every role, but I would say

10  in general that Leo Mednick, Shakespeare

11  James and Chase Edge were involved in helping

12  to put together the financial model for the

13  company.  They were involved in looking at

14  pulling together industry information,

15  research information, and also in developing

16  which comparable companies were going to be

17  used, which comparable transactions were

18  going to be used, so generally putting

19  together the initial drafts of the

20  presentation.

21      Q.   Which would then be reviewed by you

22  and Mr. Browning; is that right?

23      A.   Yes, that would be reviewed.

24      Q.   Mr. Rucker, could you turn to the

25  page in Rucker Exhibit 1 that is stamped in

1          M. Rucker - Confidential

2     the lower right-hand corner VRC 0019425, and

3     it's headed at the top Chad Rucker?

4          A.    Please repeat that again.

5          Q.    Sure.

6               It's the page that's headed with

7     your name Chad Rucker at the top.  The last

8     five digits of the number in the right-hand

9     corner are 19425.

10               MR. NEIER:  Mine is not stamped,

11          just so you know.

12               MR. SOTTILE:  I think you're not

13          looking at the same page.

14               MR. NEIER:  Oh, I see.

15          Q.   Mr. Rucker, please take a moment to

16     review this page and then I'm going to ask

17     you whether you can tell us what it is.

18          A.    Looks like a summary of my resume.

19          Q.    Is this summary accurate and

20     complete, so far as you can tell from

21     reviewing it?

22          A.    For the most part it is complete,

23     except for major clients served.  That may be

24     dated.

25          Q.    Is there anything else in here

1          M. Rucker - Confidential

2     that's dated or should be changed to reflect

3     your current experience?

4          A.    My position is now managing

5     director.

6          Q.    At Valuation Research Corporation?

7          A.    Yes.

8          Q.    Anything else?

9          A.    Professional experience, there were

10    some internships in between that are not

11    included in there.

12         Q.    Understood.

13         A.    In general.

14               Okay, that's it.

15         Q.    This describes your position with

16    Valuation Research as being senior

17    vice-president.

18               Is that the position you held in

19    2007 while working on the Tribune Company

20    engagement that you've spoken some about?

21         A.    I think at the time I might have

22    been a vice-president.  I'm not sure.

23         Q.    When did you become a senior

24    vice-president with the company; do you

25    recall?

1          M. Rucker - Confidential

2          A.   It may have been 2007, 2008.   I

3     just don't recall exactly.

4          Q.   When did you become a managing

5     director?

6          A.   I think they made those changes in

7     probably July, August of this year.

8          Q.   And does that indicate an increase

9     in your level of responsibility at the

10    company becoming a managing director as

11    opposed to senior vice-president?

12         A.   No.   Technically I think they're

13    the same.

14         Q.   What's the significance of the

15    change in title, if any?

16         A.   Nothing.

17         Q.   Not even more money?

18         A.   No.

19         Q.   At the top of the page in Rucker

20    Exhibit 1, we're looking at VRC 19425 under

21    the heading, "Professional position," the

22    second sentence recites that, "Mr. Rucker

23    specializes in solvency and fairness

24    opinions."

25              Is that correct, and does it remain

1          M. Rucker - Confidential

2     true today, that you specialize in solvency

3     and fairness opinions?

4          A.    Yes.

5          Q.    Can you give us some estimate of

6     how many engagements you've worked on in the

7     course of your professional career that have

8     involved giving a solvency opinion?

9          A.    I don't know exactly the number.  I

10    would give a range from 15 to 30.

11         Q.    How many of those would come after

12    your work for the Tribune, just an estimate?

13         A.    Five to seven.

14         Q.    Is it fair to say that the Tribune

15    Company solvency analysis involved a much

16    larger company and larger transactions than

17    other solvency opinions that you worked on

18    during the course of your career?

19         A.    Repeat that question again, please,

20    sir.

21         Q.    In any of the work you've done on

22    solvency opinions in the course of your

23    career, has the company involved been of a

24    similar size as the Tribune Company?

25         A.    Generally solvency opinions have

1          M. Rucker - Confidential

2     been smaller, but I have worked on solvency

3     opinions of all different sizes.

4          Q.    Have you ever worked on one for a

5     company the size of the Tribune?

6          A.    Yes.

7          Q.    Which one are you thinking of, or

8     more than one, if there is more than one?

9          A.    That's confidential information.

10         Q.    It's not become public?

11         A.    No.

12         Q.    We are, I think, operating under a

13    confidentiality agreement, and subject to

14    your counsel's views, I would repeat the

15    question and ask whether or not the witness

16    can respond.

17         MR. NEIER:  I don't know if a

18         solvency opinion is something from

19         another client that he may be allowed to

20         testify.  He may be contractually

21         obligated to protect the

22         confidentiality.

23         The engagement for Tribune has a

24         confidentiality provision in it, and

25         it's likely that the confidentiality

1       M. Rucker - Confidential

2       provision is similar in the engagement

3       that Mr. Rucker is talking about, so I

4       don't know if he's allowed to talk about

5       it.

6       Q.   Let me try to get at it in a

7    different way.

8            Is it one solvency opinion which

9    you've been involved in that involved a

10   company that was similar in size as the

11   Tribune or more than one?

12       A.   One that was bigger than the

13   Tribune.

14       Q.   Was the work done before or after

15   the work you did for the Tribune?

16       A.   After.

17       Q.   Can you give me some comparison

18   between the work you'd done prior to the

19   Tribune engagement in terms of size of

20   companies and the size of the Tribune?

21           MR. NEIER:  Objection to the form.

22           You can answer if you understand.

23       A.   Repeat that question again, please.

24       Q.   Sure.

25           I think you indicated, Mr. Rucker,

1          M. Rucker - Confidential

2    that most of the solvency opinions you worked

3    on have involved companies smaller than the

4    Tribune; is that correct?

5          A.   Yes.

6          Q.   And that the only one you worked on

7    for a company that was larger than the

8    Tribune came after your work on the Tribune;

9    is that right?

10         A.   Yes.

11         Q.   When you say the other companies

12   that you've given solvency opinions were

13   smaller than the Tribune, how much smaller?

14   Give me some sense of what you're talking

15   about.

16         A.   I think in general I've worked on

17   solvency opinions that have ranged from 50

18   million to $8 billion enterprise dollar

19   transactions in general, and that's a range.

20         Q.   That range would be the same before

21   the Tribune engagement as afterwards?

22         A.   After the Tribune, that range would

23   increase to larger transactions.

24         Q.   But that range would be correct for

25   before the Tribune?

M. Rucker - Confidential

1    A.    In general.  I'm guessing, but in

general.  I'm not certain, but in general.

Q.    Are you able to identify the

engagement that involved an $8 billion

transaction prior to the work for the

Tribune, or is that subject to

confidentiality?

A.    I was given a range.  Generally I

don't know.  That was a guess.  I just don't

know.  Or I don't recall.

Q.    Mr. Rucker, we have been proceeding

as if we all know what a solvency opinion is.

Can you describe what a solvency

opinion is from your professional experience?

A.    Solvency opinion is an opinion by a

third party, and it's that third-party's

opinion whether or not a company is solvent

immediately after giving effect to a

particular transaction.

Q.    Have you ever been engaged by a

company in the course of your professional

career and asked to give a solvency opinion

that you or the company you were working for

concluded could not be given?

1          M. Rucker - Confidential

2     A.    Yes.

3     Q.    Can you describe the circumstances

4  without infringing on any confidentiality

5  that may apply?

6     A.    No.

7     Q.    How many occasions has this

8  occurred on?

9     A.    To the best of my recollection,

10  where we have actually been engaged, it's

11  one.

12     Q.    This is a situation where you were

13  engaged to give a solvency opinion and

14  concluded that you could not render an

15  opinion that the company involved was

16  solvent; is that right?

17     A.    Repeat that question again, please.

18     Q.    Is this a circumstance where you

19  concluded that you could not opine that the

20  company involved was solvent after being

21  engaged?

22     A.    Yes.

23     Q.    Do you know whether or not the

24  company involved later obtained a solvency

25  opinion from another firm?

1          M. Rucker - Confidential

2      A.    No.

3      Q.    You don't know, or you know that it

4    didn't happen?

5      A.    I don't know.

6      Q.    Mr. Rucker, to the extent you know,

7    can you describe for us how it is that VRC

8    came to be retained by the Tribune Company in

9    2007 to render certain solvency opinions?

10     A.    To the best of my recollection -- I

11   don't know all of the details, but to the

12   best of my recollection a gentleman who works

13   in our Milwaukee office named Peter Morrison,

14   who is a real estate appraiser who had done

15   work for the Tribune in the past, received a

16   call from Chandler Bigelow asking if we would

17   provide the interest in providing a solvency

18   opinion for the transaction.

19          That was generally how the

20   discussion began, and Peter took and turned

21   over those conversations to Bill Hughes in

22   our Chicago office.

23     Q.    Who is Mr. Bigelow?

24     A.    Chandler is currently the chief

25   financial officer of the Tribune corporation.

1       M. Rucker - Confidential

2       Q.   What position did he hold in 2007

3   at the time VRC was engaged, if you know?

4       A.   I think Chandler may have been the

5   controller or treasurer.  I'm not certain.

6       Q.   You mentioned a Mr. Bill Hughes

7   from VRC.

8            What was his position at the time

9   that VRC was engaged by the Tribune?

10      A.   He is the co-CEO of VRC.

11      Q.   And that's the position he held at

12  the time that VRC was engaged by the Tribune?

13      A.   Yes.

14      Q.   And to the extent you know, where

15  did things go for Mr. Hughes in terms of

16  considering and ultimately taking on the

17  engagement?

18      A.   Without knowing all the details in

19  general, Bill brought the potential

20  transaction to a group, or the solvency

21  committee, to discuss whether or not we were

22  interested in being retained to provide the

23  opinion.

24      Q.   What is the function of the

25  solvency committee at VRC?

1      M. Rucker - Confidential

2      A.   At the time the solvency opinion

3  committee was in its nascent stages or so,

4  and really the task of the solvency opinion

5  committee is to, number 1, approve whether or

6  not we will accept to be engaged to provide a

7  solvency opinion.

8      And number 2, their role is also to

9  review and ultimately approve whether or not

10  the solvency opinion can be issued.

11     Q.   Who were the members of that

12  committee at the time that the Tribune

13  engagement was being considered by VRC, if

14  you know?

15     A.   I think at the time, and this was

16  in the beginning stages, the committee

17  consisted of me, Bryan Browning, Greg Barber,

18  and I think for this particular situation it

19  may have been supplemented.  I'm not sure.

20  Some additional parties in the beginning.

21     Q.   The committee consisting of you,

22  Mr. Browning and Mr. Barber had to pass on

23  whether or not VRC would take on the

24  engagement from the Tribune to give a

25  solvency opinion or opinions; is that right?

1        M. Rucker - Confidential

2   You had to approve it?

3        A.    Yes.

4        Q.    Can you describe the process by

5   which that committee considered whether or

6   not to take on the engagement?

7        A.    I don't recall all of the details,

8   but I can describe in general --

9        Q.    Please.

10       A.    -- what happens.

11       Q.    Please do.

12       A.    In general, we will get preliminary

13   financial information from the company.  We

14   will review that information.  We will also

15   look at data, market data that's out there,

16   and generally get a sense of whether or not

17   we feel comfortable being engaged to provide

18   a solvency opinion.

19       Q.    And what is it that you consider on

20   this committee in order to become

21   comfortable?  What do you have to conclude,

22   that you believe you can give a positive

23   solvency opinion?

24       A.    That's one factor.

25             Another factor is how much leverage

1      M. Rucker - Confidential

2  the company will have.  Does the initial

3  model from the management team, does that

4  initial model show that the company will be

5  able to service its debts.  So those are some

6  of the factors.  Maybe not all the factors,

7  but those are some high level factors that we

8  look at.

9      Q.   Are there other high level factors

10  that VRC considered in 2007 in deciding

11  whether or not it would take on an engagement

12  to render a solvency opinion?

13      A.   Market conditions, I think, were

14  also things that we would take into account,

15  but I'm quite sure there are a number of

16  factors that are considered.  I just can't

17  recall all of them.

18      Q.   Can you explain what you mean by

19  "market conditions" in this context?

20      A.   The general condition of the

21  capital markets.

22      Q.   Whether it's easy to borrow, hard

23  to borrow, is that what you're talking about?

24      A.   Those are things that we definitely

25  consider a general condition.

1        M. Rucker - Confidential

2        Q.    You mentioned leverage is something

3    that VRC takes into account.

4            What's the role of leverage in

5    deciding whether or not to take on an

6    engagement to render a solvency opinion?

7        A.    Part of the test of a solvency

8    opinion is whether the assets exceed the

9    liabilities of the company.

10           So in looking at the leverage, you

11   want to get an initial sense of whether or

12   not the amount of the company's liability,

13   whether it's on a preliminary basis, based

14   upon the facts you have in front of you in

15   accepting an opinion, whether or not those

16   liabilities exceed the value of the company's

17   assets.

18       Q.    Not entirely sure I understand the

19   response.

20           Isn't it correct that a company

21   could be very highly leveraged but

22   nonetheless have assets that exceed

23   liabilities?

24       A.    Yes.

25       Q.    So does leverage involve some

1          M. Rucker - Confidential

2     different consideration in deciding whether

3     or not to give a solvency opinion than simply

4     whether assets exceed liabilities?

5          A.    I don't understand the question.

6     Repeat that again, please.

7          Q.    Let me try it a different way.

8               I think that you've testified that

9     VRC, in deciding whether or not to take on a

10    solvency engagement, considers how leveraged

11    the transaction at issue is; is that right?

12         A.    Yes.

13         Q.    Is it correct that if a transaction

14    is perceived as highly leveraged, VRC would

15    conclude that the risk associated with the

16    engagement is higher than it would be if the

17    transaction involved a lower degree of

18    leverage?

19         A.    I think that question is different

20    from the question you asked before.

21         Q.    It is.

22         A.    Okay.  Repeat it one more time,

23    please.

24         Q.    You're challenging my ability to

25    recall now.

1          M. Rucker - Confidential

2          Is it correct that if VRC perceives

3    an engagement involving a high degree of

4    leverage, that's a situation where the

5    solvency risk is higher than for a

6    transaction with a lower degree of leverage?

7          A.   I think the risk of giving an

8    incorrect answer is certainly higher if there

9    is a substantial amount of leverage.

10         Q.   The risk of giving an incorrect

11   opinion on solvency is higher in that

12   situation?

13         A.   Yes.

14         Q.   Is the presence of that risk the

15   reason that leverage is one of the

16   considerations the opinion committee uses in

17   deciding whether or not to take on an

18   engagement to write a solvency opinion?

19         A.   Yes.

20         Q.   Was the Tribune Company highly

21   leveraged in following the transactions that

22   you were being asked to examine?

23         A.   There are two steps to it.  And

24   yes, it was a highly leveraged transaction.

25         Q.   What significance did that have, in

1          M. Rucker - Confidential

2    VRC's consideration, whether or not to take

3    on the assignment?

4          A.   Could you be more specific with

5    that question, please?

6          Q.   Sure.

7               You've told us that the Tribune was

8    going to be highly leveraged as a result of

9    the transactions you were being asked to look

10   at.

11              What did that mean to you as a

12   member of the opinion committee in deciding

13   whether or not you were going to take on the

14   assignment?

15         A.   As part of the assignment, one

16   factor, as part of the assignment, is that we

17   were going to have to do a lot more due

18   diligence, a lot more work in making sure we

19   get to the right answer.

20         Q.   That's because, as you said before,

21   with a highly leveraged company, the risk of

22   giving an incorrect solvency opinion is

23   higher, right?

24         A.   Yes.

25              MR. SOTTILE:  Let's mark this

1        M. Rucker - Confidential

2     document as Rucker Exhibit 2, please.

3           (Rucker Exhibit 2, E-mails, marked

4     for identification, as of this date.)

5     Q.   Mr. Rucker, I'm putting in front of

6   you a document that we marked as Rucker

7   Exhibit 2.  It bears the numbering in the

8   lower right-hand corner VRC 0177894 and 895.

9           Can you take a look at this

10  document and tell us what it is, if you can?

11    A.   It's a series of e-mails between

12  Stuart Gruskin, Greg Barber, Bryan Browning,

13  Chandler Bigelow, Peter Morrison, Bryan

14  Browning and myself concerning the Tribune

15  solvency opinion.

16    Q.   On the first page, sort of in the

17  middle of the page, there appears to be an

18  e-mail in the chain from you, sent Thursday,

19  March 29, 2007 at 3:53 p.m. to Mr. Stuart

20  Gruskin and Mr. Greg Barber titled, "VRC

21  contacts."

22          Do you see where I'm referring to?

23    A.   Can I correct something that I said

24  earlier about the members of the committee?

25    Q.   Certainly.

1          M. Rucker - Confidential

2          A.    Looking at this e-mail, Stuart

3     Gruskin may have also been on the committee

4     at the time.  I'm not certain.

5          Q.    You're anticipating my question.

6               Is this an e-mail that you sent in

7     your role as a member of the opinion

8     committee at VRC, is that what this is?

9          A.    Yes.

10         Q.    And I think you told us that

11    Mr. Barber was at this time a member of the

12    opinion committee; is that right?

13         A.    Yes.

14         Q.    What was his position at this time,

15    which is March 29, 2007?

16         A.    He was a senior vice-president of

17    the firm.

18         Q.    Just above the e-mail we looked at

19    a moment ago appears to be an e-mail from

20    Mr. Barber, also dated Thursday, March 29,

21    2007 at 11:11 p.m. to you Mr. Gruskin and

22    Mr. Browning.

23               Could you read it out loud, please,

24    the text of the e-mail?

25         A.    "O-Team.  Looks quite large.  11 to

1      M. Rucker - Confidential

2  15 billion.  Quite leveraged.  8 to 9 times

3  EBITDA with good, stable, but deteriorating

4  businesses.  This may be just acceptable risk

5  levels, but we will need to be compensated.

6  My fee estimate would be 600 to 700,000,

7  absent any reduced timing or competitive

8  considerations.  Greg."

9      Q.   Does the term O-Team mean the

10  solvency opinion committee that you've

11  described, or something else?

12      A.   I don't know what it means.

13      Q.   Were all of these people, to your

14  recollection, members of the VRC opinion

15  committee at the time?

16      A.   To the best of my recollection,

17  yes.

18      Q.   Mr. Barber notes that the

19  transaction looks quite large, 11 to 15

20  billion.

21          What was the significance of that

22  for the opinion committee, if any?

23      A.   At the time it might have been the

24  largest transaction that we ever worked on.

25  I'm not certain.

¹     M. Rucker - Confidential

²     Q.   The e-mail goes on to say that it

³ looks quite leveraged, and that's significant

⁴ for the reasons you've described earlier

⁵ about leverage; is that right?

⁶     A.   Yes.

⁷     Q.   There's a reference to EBITDA,

⁸ that's earnings before interest, taxes,

⁹ depreciation and amortization; is that right?

¹⁰     A.   In general, yes.

¹¹     Q.   Mr. Barber goes on to note that

¹² they are good, stable but deteriorating

¹³ businesses.

¹⁴          He's referring to the Tribune here

¹⁵ as throughout the e-mail?

¹⁶     A.   Yes.

¹⁷     Q.   Did you have an understanding of

¹⁸ what he meant by "deteriorating businesses"?

¹⁹     A.   He's referring to the fact that the

²⁰ publishing business was declining.

²¹     Q.   It goes on to say in the second

²² sentence of the e-mail, "This may be just

²³ acceptable risk levels, but we will need to

²⁴ be compensated."

²⁵          What did you understand Mr. Barber

1        M. Rucker - Confidential

2    to mean by that?

3        A.    I don't know exactly what Greg was

4    meaning by this, but I think what he probably

5    meant was, as I said earlier, the risk of

6    giving an incorrect answer, the risk -- with

7    this amount of leverage, the need to do more

8    intense work or more work on the solvency

9    opinion.

10       Q.    He may have been referring to the

11   fact, as you mentioned earlier, a highly

12   leveraged transaction is one where there's a

13   greater risk of giving an incorrect opinion?

14       A.    Yes.

15       Q.    And when he said in the sentence,

16   "This may be just acceptable risk levels,"

17   did you understand Mr. Barber to be saying it

18   might be just barely acceptable risk levels

19   for the engagement to be taken on by --

20            MR. NEIER:    Objection to form.

21            You can answer.

22       A.    I don't know exactly what he meant

23   by that.

24       Q.    What did you think he meant?

25       A.    To be honest with you, I just don't

1      M. Rucker - Confidential

2  recall from the time I saw the e-mail.  I

3  just don't recall.

4      Q.    Mr. Barber goes on to say, "We will

5  need to be compensated."

6          Did you understand from that that

7  Mr. Barber was suggesting the fee should be

8  higher because the risk was higher?

9      A.    The way I understood it, it was

10  going to be a lot more work, that we were

11  going to need to charge more than we

12  typically charge for the solvency.

13      Q.    You didn't think he meant it's high

14  risk, therefore we need a high fee?

15      A.    Repeat that question again, please.

16      Q.    Did you understand Mr. Barber to be

17  saying, at least in part, this is a high risk

18  transaction and therefore we need a higher

19  fee?

20      A.    He may have.  I just don't know

21  exactly, recall exactly what he meant at the

22  time as part of his e-mail.  I don't know

23  exactly.  I don't recall exactly what he

24  meant.

25          I think in general it was a lot

1        M. Rucker - Confidential

2    more work, large transaction that we need to

3    be compensated for.

4        Q.   And a higher risk transaction?

5        A.   It was certainly a higher leveraged

6    transaction.

7        Q.   And therefore higher risk, right?

8        A.   Any time there's more leverage,

9    there is an increased risk of giving an

10   incorrect opinion.

11       Q.   Mr. Barber goes on to say that the

12   fee would be 600 to $700,000, correct?

13       A.   Yes.

14       Q.   Do you know what the actual fee was

15   that was ultimately charged to the Tribune

16   for this work?

17       A.   Initially, it was 1.5 million.

18       Q.   Do you know why it is that the fee

19   ended up being more than double Mr. Barber's

20   estimate?

21       A.   I think there were several factors.

22            One, size of the transaction.  Two,

23   the amount of the leverage, the amount of the

24   work.  And I would assume that in general we

25   concluded that his fee estimate was too low.

1        M. Rucker - Confidential

2        Q.    Of course, Mr. Barber and you knew,

3    as of the time of his e-mail here, that it

4    was a highly leveraged transaction already,

5    correct?

6        A.    Yes.

7        Q.    So you assume that VRC concluded

8    that more work would be required than Mr.

9    Barber had anticipated and that led to the

10   higher fee?

11       A.    That was a factor.

12       Q.    Were there other factors you can

13   recall that led to the higher fee?

14       A.    To the best of my recollection, we

15   all did a conference call and everyone kind

16   of hashed out what their thought process was

17   on the fee.  And in general, we ended up with

18   a fee that was higher than this one.

19            There were some people that had fee

20   estimates that were higher and some people

21   that were lower.

22       Q.    When you say we had a conference

23   call, what group of people are you referring

24   to?

25       A.    I can't recall every one that was

1      M. Rucker - Confidential

2   on the call.  But I would assume it was the

3   committee members.  There may have been Bill

4   Hughes on the call.  It may have been Mark

5   Brattebo on the call.  I just don't recall

6   everyone.  And Stuart Gruskin on the call.  I

7   just can't recall everyone that was on the

8   call.

9      Q.   What was Mr. Brattebo's position

10  with VRC at the time, March 2007?

11     A.   He's the co-CEO.

12     Q.   And was then?

13     A.   Yes.

14     Q.   Mr. Rucker, did the opinion

15  committee, which you described, conclude, at

16  least preliminarily, that VRC would be able

17  to give a positive solvency opinion to the

18  Tribune before taking on the engagement?

19     A.   I think that we looked at the

20  information that we were presented, and

21  thought that there was a probability that it

22  would be solvent.

23     Q.   And you thought you, that is the

24  opinion committee, thought there was a

25  probability that the Tribune would be solvent

1          M. Rucker - Confidential

2     after both steps of the transactions that you

3     were being asked to look at by the Tribune?

4          A.   I can't recall if on the initial

5     information that we received stuck on both

6     step 1 and step 2.  I just can't recall.

7              I would guess that we looked at

8     both.  That we received information on both

9     steps, but I'm not certain.

10         Q.   If you did get information on both,

11    the opinion committee would have considered,

12    before taking on the engagement, whether or

13    not you thought you could give a positive

14    opinion on both steps?

15         A.   Generally, that's what we would

16    look at, the entire transaction in general.

17         Q.   By "the entire transaction," what

18    do you mean in reference to the Tribune?

19         A.   There were two steps to this

20    transaction.  There was an initial step.  I

21    don't recall exactly the terms of the initial

22    step, but it was a -- it involved purchasing

23    some shares and the initial setup of the

24    AESOP structure.

25              If I can look at some of my files

1      M. Rucker - Confidential

2  and the opinion letter, that would be give me

3  a better indication of what those terms were.

4      There was a subsequent step 2 where

5  an AESOP S. Corp. was fully put in place with

6  some additional leverage, and that

7  transaction occurred in December 2007.  I

8  don't remember all of the details on those,

9  but it was a two-step process to consummating

10  the acquisition transaction.

11      Q.   And the acquisition transaction was

12  what again?

13      A.   The acquisition of Tribune by the

14  AESOP S. Corporation.

15      Q.   Can you just explain what an AESOP

16  and S. Corporation are?

17      A.   An S. Corporation is a special

18  corporation set up under the Internal Revenue

19  Service Code which allows you to pass through

20  tax benefits so you become a pass-through tax

21  entity.

22      An AESOP corporation is an employee

23  stock-owned company.  I don't know what the P

24  stands for.  And essentially, with an AESOP

25  S. Corporation, it becomes a non-taxpaying

1       M. Rucker - Confidential

2  entity, for the most part, for federal income

3  tax purposes and for operating income tax

4  purposes.

5       Q.   So the acquisition transaction that

6  you understood the Tribune was engaging VRC

7  to look at was this two-step process that led

8  to an AESOP owning the Tribune?

9       A.   Yes.

10       Q.   Was it your understanding at the

11  time VRC was considering the engagement that

12  the Tribune intended to go through both steps

13  and complete being acquired by the AESOP?

14       A.   It was my understanding that that

15  was the ultimate goal, was the two-step

16  process.

17            MR. SOTTILE:  Let's go off the

18       record.

19            (Recess taken.)

20       Q.   Mr. Rucker, the VRC ultimately

21  decided to accept the engagement from the

22  Tribune, correct?

23       A.   Yes.

24       Q.   And commenced work on the solvency

25  analysis during April 2007; is that right?

1          M. Rucker - Confidential

2       A.   I think that's generally correct.

3       Q.   And as VRC began its work, were you

4  considering the question of whether the

5  Tribune would be solvent after both steps of

6  the transaction; that is, after the step 1

7  and step 2 parts of the acquisition

8  transaction you've described?

9       A.   Initially, yes.

10      Q.   And did that change at some point?

11      A.   Yes.

12      Q.   How did it change?

13      A.   I think when we were looking at the

14  step 1 and step 2 transaction combined, I

15  think that we produced a preliminary report

16  to the Tribune Corporation, and if I'm not

17  mistaken, I think one of the attorneys there,

18  Mark Hianik, said that for our initial

19  opinion, we were to only deliver the initial

20  opinion assuming the consummation of step 1,

21  because there was risk that step 2 may not

22  occur.

23      Q.   Mr. Hianik was an attorney working

24  for the Tribune?

25      A.   Yes.

1          M. Rucker - Confidential

2          Q.    Did he describe to you what the

3     risk was that step 2 might not occur?

4          MR. NEIER:   Objection to form.

5          A.    No, he didn't.  But that we should

6     simply look at step 1, when we delivered our

7     first opinion, we should deliver our first

8     opinion for step 1 and for the subsequent

9     opinion we would deliver it with step 2.

10         Q.    Was that a change in the engagement

11    from VRC's perspective?

12         A.    To be honest with you, I don't

13    think it was necessarily a change, because

14    even internally, even though we delivered the

15    opinion for step 1, we initially also looked

16    at step 2.

17              It just made sense, because you

18    were going down a path and realized where

19    ultimately the company was going to go to

20    also look at step 2 when we were looking at

21    step 1 initially.

22         Q.    Is it correct that you understood

23    it initially that the Tribune wanted to get

24    opinions concerning the solvency of the

25    company, after both step 1 and step 2 and --

1        M. Rucker - Confidential

2        A.    Repeat this question again.

3        Q.    Is it correct it was your initial

4    understanding of the engagement that the

5    Tribune wanted solvency opinions that

6    addressed the position of the company after

7    both the step 1 transactions you have

8    described and the step 2 transactions you

9    described?

10           MR. BENDERNAGEL:  I object to that

11        question as vague.

12        A.    I think initially -- I think

13    ultimately that's what we concluded, and that

14    was the way we proceeded.  We provided a

15    solvency opinion for step 1 and we provided a

16    solvency opinion for step 2 immediately after

17    and given effect to each of those

18    transactions.

19        Q.    Were you working on both of those

20    opinions to begin with in April 2007?

21        A.    No.  Initially in April 2007, we

22    were just working on the step 1, the opinion

23    for the step 1 transaction.  And when we

24    looked at step 1, we also subsequently looked

25    at step 2 next to step 1.

1          M. Rucker - Confidential

2      Q.   Is it then your testimony that VRC

3  was not looking, not working on a step 2

4  opinion in April 2007?

5      A.   When we performed our analysis, we

6  were performing our analysis for step 1, but

7  we also, when we did our analysis, we also

8  looked at step 2, what would be the pro forma

9  impact when step 2 occurred.

10         I don't completely understand your

11 question, I'm sorry.

12     Q.   That's fine.  Let me follow-up.

13         Did you understand in April 2007,

14 before this communication from Mr. Hianik,

15 that the Tribune wanted to get, in the May

16 2000 timeframe, separate opinions addressing

17 both step 1 and step two of the transaction?

18     A.   When we were engaged, we always

19 knew we were going to be doing two separate

20 opinions; a step 1 opinion and a step 2

21 opinion.

22     Q.   When you were first engaged, did

23 you think the Tribune wanted both opinions up

24 front in May 2007?

25     A.   No.

1          M. Rucker - Confidential

2      Q.    When did you think you were going

3  to be asked to give the step 2 opinion?

4      A.    When the step 2 transaction

5  occurred.

6      Q.    But you nonetheless did some

7  analysis of solvency following the step 2

8  transactions in April 2007, correct?

9      A.    Repeat that again, please.

10     Q.    VRC, in fact, however, did some

11  analysis of the solvency of the Tribune

12  following step 2 in the April 2000 timeframe?

13          MR. NEIER:   I'm going to object to

14      the form.   I think you can get there --

15          MR. SOTTILE:   I will try it again.

16     Q.    Mr. Rucker, is it correct that in

17  April 2007, VRC did some analysis concerning

18  the solvency of the Tribune after the step 2

19  transactions?

20          MR. BENDERNAGEL:   Object as vague.

21     A.    That question is not clear.

22     Q.    I'm not doing well.

23          MR. NEIER:   I think the word

24      "after" is very confusing.

25     Q.    Is it correct that in April 2007

1          M. Rucker - Confidential

2     VRC did some analysis of the solvency of the

3     Tribune, assuming on a pro forma basis that

4     the step 2 transactions were completed?

5          A.   Yes.

6          Q.   Why were you doing that if you

7     didn't anticipate giving a step 2 opinion

8     until much later in 2007?

9          A.   We felt it was prudent to renew

10    ultimately that the company was looking to

11    have a two-step process.  It was prudent at

12    the time to look on a pro forma basis to see

13    what the company would look like ultimately.

14         Q.   Why did you think it was prudent to

15    do that work in April 2007?

16         A.   We were going down a path, or the

17    company was going down a path where it was

18    going to consummate two transactions, and it

19    was reasonable to look at -- if we had the

20    information, it was reasonable to look at

21    step 1, what were the impacts of step 1, and

22    if we also had the information about what

23    potentially the pro forma impacts might be

24    for step 2, it was prudent to look at that.

25              And the company had provided us

1    M. Rucker - Confidential

2  information where we could look at both.

3    Q.   Was it prudent to look at the

4  effects of the step 2 transactions on a pro

5  forma basis because VRC wanted to see whether

6  or not the company would be solvent, assuming

7  the step 2 transactions proceeded?

8    A.   Yes.

9    MR. SOTTILE:  Let's mark this

10  document as Rucker 3.

11    (Rucker Exhibit 3, Tribune Company

12    solvency engagement letter, marked for

13    identification, as of this date.)

14    Q.   Mr. Rucker, we're putting in front

15  of you a document titled on the first page,

16  "Tribune Company solvency engagement letter,

17  April 11, 2007."

18    And if you take a moment and review

19  the document in general, my first question is

20  going to be whether or not can you identify

21  it.

22    MR. BENDERNAGEL:  Off the record.

23    (Whereupon, an off-the-record

24    discussion was held.)

25    MR. SOTTILE:  Off the record we had

<sup>1</sup>      M. Rucker - Confidential

<sup>2</sup>      a discussion about the source of Rucker

<sup>3</sup>      Exhibit 3, and we agreed that while

<sup>4</sup>      there is no confidentiality designation

<sup>5</sup>      on the document, it should be designated

<sup>6</sup>      it is confidential and for purposes

<sup>7</sup>      regarding confidentiality, it is.

<sup>8</sup>      Q.   Mr. Rucker, are you able to

<sup>9</sup>   identify this document, Rucker Exhibit 3?

<sup>10</sup>      A.   I just don't recognize the cover,

<sup>11</sup>   but I do recognize the contents inside.

<sup>12</sup>      Q.   Setting aside the cover, what is

<sup>13</sup>   this document?

<sup>14</sup>      A.   Looks like an executed copy of our

<sup>15</sup>   engagement letter and an executed copy of our

<sup>16</sup>   indemnification agreement.

<sup>17</sup>      Q.   And the engagement letter here is

<sup>18</sup>   the formal agreement between VRC and the

<sup>19</sup>   Tribune with respect to the solvency analysis

<sup>20</sup>   and opinions that VRC was to provide; is that

<sup>21</sup>   right?

<sup>22</sup>      A.   That's what it looks like, yes.

<sup>23</sup>      Q.   Were you involved in the drafting

<sup>24</sup>   of this document?

<sup>25</sup>      A.   I gave some comments on the letter,

1          M. Rucker - Confidential

2    but I didn't technically draft this

3    engagement letter.

4          Q.    But you saw it and commented on it

5    before it became a final document?

6          A.    I provided some comments on some

7    aspects of it.

8          Q.    Can you turn to the numbered page 2

9    of the engagement letter, which is the third

10   page of the exhibit?

11             And I'm -- in the paragraph that's

12   under the heading Introduction and Purpose,

13   the first paragraph under that heading, the

14   second-to-last sentence, that sentence reads,

15   "The S. Corp. election is expected to occur

16   at the beginning of 2008 but may not occur

17   until the beginning of 2009 if the merger

18   does not close before the end of 2007 and the

19   Cubs/Comcast sale may occur before or after

20   the closing of the merger."

21             And then the last sentence of the

22   paragraph reads, "The benefits from the S.

23   Corp. election and the Cubs/Comcast sale will

24   be incorporated into the step 2 opinion."

25             Do you see where I've just been

1        M. Rucker - Confidential

2    reading, Mr. Rucker?

3        A.   Yes.

4        Q.   Is it correct that, at least at the

5    time of this engagement letter, VRC had been

6    engaged to render the step 2 opinion on

7    solvency?

8        A.   Repeat your question again, sir.

9        Q.   Is it correct that as of the date

10   of this engagement letter, VRC had been

11   engaged by the Tribune to render the step 2

12   opinion when the time came?

13       A.   Yes, we were going to give a step 1

14   and step 2 opinion.

15       Q.   Is it correct in rendering the step

16   2 opinion VRC was going to assume that the

17   sale of the Cubs and Comcast would have

18   occurred?

19       A.   I just can't recall.  I think for

20   the Cubs.  I can't recall about the Comcast

21   piece.

22       Q.   You think for the Cubs what?

23       A.   That it was going to assume a sell

24   of the Cubs, but I'm not certain about, I

25   just can't recall about Comcast.

1           M. Rucker - Confidential

2           Q.    Would you understand the last

3    sentence of the paragraph we've just been

4    reading talks about the benefits from the S.

5    Corp. election and the Cubs/Comcast sale

6    being incorporated in step 2 opinion to say

7    that, at least at this time, VRC contemplated

8    that in rendering a step 2 opinion, it would

9    include the benefits of selling both the Cubs

10   and Comcast Sports Net?

11          A.    From this language it appears that

12   way, but I'm not certain.

13          Q.    From your memory, you remember that

14   you were going to include the Cubs in

15   rendering the step 2 opinion but you're not

16   sure about Comcast; is that right?

17          A.    I'm not certain.  I don't recall

18   completely.

19          Q.    Is it correct that, at least as

20   it's written here, VRC was going to consider

21   the benefits of the Cubs/Comcast sale in

22   rendering its step 2 opinion, even though

23   that sale might not occur until after step 2

24   was completed?

25          A.    This letter says it may occur

1        M. Rucker - Confidential

2    before or after.

3        Q.   What may occur before or after?

4        A.   The Cubs/Comcast sale.

5        Q.   Under this engagement letter, if

6    the Cubs/Comcast sale occurred after the

7    merger, VRC was still going to take into

8    account in rendering its step 2 volume

9    opinion, correct?

10       A.   On a pro forma basis.  That's what

11   it appears would be the requirement by this

12   letter.

13       Q.   Is that a requirement that emanates

14   from the Tribune, or is that something that

15   VRC wanted included in the engagement letter?

16       A.   I just don't recall.  I did not --

17   I gave comments on the letter, but I was not

18   actively involved in drafting this engagement

19   letter.

20       Q.   Mr. Rucker, you mentioned earlier

21   that there was a greater risk of a solvency

22   opinion being incorrect for a highly

23   leveraged transaction.

24          Do you recall that testimony?

25       A.   Yes.

1          M. Rucker - Confidential

2          Q.    What do you mean by "a solvency

3    opinion being incorrect"?

4          A.    There may be less cushion.

5          Q.    Explain what you mean by a

6    "cushion."

7          A.    There may be a smaller amount of

8    cushion, cushion with a covenants compared to

9    what's required in your debt documents, the

10   covenants you have to abide by.

11          There may be less cushion with the

12   equity component, so that increases the risk

13   of being incorrect.  You have a smaller

14   amount of cushion.

15          Q.    Let me make sure I understand.

16          For higher leveraged transactions,

17   there may be less cushion in between the

18   required loan covenants and the company's

19   anticipated performance.

20          Is that one thing you're talking

21   about?

22          A.    There may be less cushion between

23   the forecasted covenant, the forecasted

24   results from the company as far as what they

25   anticipate the covenant coverage or debt

¹          M. Rucker - Confidential

² ratios may be and what's required with the

³ debt documents, so the credit agreements.

⁴          There may also be less equity

⁵ cushion, which means less equity in the

⁶ transaction.  So you have less cushion.  You

⁷ have less cushion as compared to what's

⁸ required by the covenants.  Those types of

⁹ things.

¹⁰     Q.   By "less equity," you mean the

¹¹ amount by which the assets exceed liabilities

¹² would be less in a highly leveraged

¹³ transaction?

¹⁴     A.   Yes, there could be, yes.

¹⁵     Q.   And because there may be less

¹⁶ cushion, as you've described it with a highly

¹⁷ leveraged transaction, there is more risk

¹⁸ that the solvency opinion would be incorrect;

¹⁹ is that right?

²⁰     A.   There's more risk that you may give

²¹ an incorrect opinion, yes.

²²     Q.   And a solvency opinion would be

²³ incorrect if, for example, VRC opined the

²⁴ company was solvent, but in fact it turned

²⁵ out it wasn't?

1      M. Rucker - Confidential

2      A.   No.

3      Q.   Then what would make an opinion

4  rendered by VRC incorrect?

5      A.   Repeat your earlier question again.

6          MR. NEIER:  I think he means the

7      one he responded "no" to.

8          MR. SOTTILE:  Why don't we read it

9      back?

10          (Whereupon, the requested portion

11      was read back by the court reporter.)

12      A.   It's the piece where you said

13  "turned out."  That appears that you're

14  asking the question looking back in the

15  rearview mirror.  That's the piece that

16  causes me concern about that.

17          You look at the facts that you have

18  at the time, using your best judgment, your

19  best reason, based upon all the facts that

20  you've gathered, based upon management's

21  forecast and you make a determination.  You

22  do testing around information that's been

23  given by management.

24          And at the time you render your

25  opinion, your opinion is for a specific time.

1        M. Rucker - Confidential

2   It's not -- your opinion is not looking back

3   in the rearview mirror two years later.

4        Q.   What do you mean by an incorrect

5   solvency opinion?

6        A.   An incorrect solvency opinion is

7   if, at the time you give the opinion, in fact

8   the company is insolvent at the time you give

9   the opinion and you've rendered it solvent.

10       Q.   If a company is highly leveraged,

11  the risk of giving an incorrect solvency

12  opinion, as you've just described, is higher?

13       A.   Yes, it requires more work to make

14  sure you give the correct answer.

15       Q.   I understand.

16       MR. SOTTILE:  Let's mark this

17       document as Rucker Exhibit 4, please.

18       (Rucker Exhibit 4, E-mail dated

19       4/24/07, marked for identification, as

20       of this date.)

21       Q.   Mr. Rucker, we've put in front of

22  you a document marked as Rucker Exhibit 4.

23  The first page of that appears to be an

24  e-mail from you to a number of people at

25  Valuation Research dated April 24, 2007.  The

1        M. Rucker - Confidential

2  exhibit begins with the number in the lower

3  right-hand corner VRC 0048041.

4        Can you take a look at this

5  document, and if you're able to identify it

6  for us?

7        MR. NEIER:  The e-mail or the

8     document attached to the e-mail?

9        MR. SOTTILE:  Both.

10     A.   Looks like a preliminary draft for

11  some of our work for the solvency opinion.

12     Q.   And what's the first page of the

13  exhibit?

14     A.   It's an e-mail from me that was

15  sent out to members of the solvency opinion

16  team.

17     Q.   Is that the solvency opinion team

18  for the Tribune engagement in particular, or

19  is this some broader team of people?

20     A.   Looks like it's a solvency opinion

21  team and also some of the members of the

22  solvency opinion committee.

23     Q.   Why was it you were sending a

24  preliminary draft to this group of people at

25  this time?

1          M. Rucker - Confidential

2      A.    I just can't recall.

3      Q.    Did you want them to review it and

4   give you comments on it?

5      A.    Generally that would be why it's

6   sent out, to get comments on it.

7      Q.    What was your role in the

8   preparation of the preliminary solvency

9   analysis that begins on the second page of

10  the exhibit?

11     A.    My primary role was working with

12  our senior analysts and junior analysts to

13  pull together the financial models for the

14  analysis and some of the preliminary

15  valuation work.  We're dealing with some of

16  the preliminary valuation work for the

17  analysis.

18     Q.    Did you play a role in actually

19  drafting the presentation that appears here

20  in Rucker Exhibit 4?

21     A.    I'm quite sure I did.

22     Q.    Turn to numbered page 3 of the

23  presentation, which is the fourth page of the

24  exhibit stamp 48044 in the lower right.

25          Do you have that page in front of

1          M. Rucker - Confidential

2     you, sir?

3          A.   Yes.

4          Q.   Can you tell us what this page is

5     supposed to be telling us?

6          A.   This is a preliminary valuation

7     summary where we determine the company's

8     enterprise value and the company's equity

9     value.  We look at the company's debt level.

10    It's called valuation summary page.

11         Q.   That's because it summarizes a much

12    more complex set of valuations that are

13    reflected later on in this document?

14         A.   Yes.

15         Q.   There are two headings that appear

16    on the top of the columns the numbers here.

17    One is called Valuation Summary Step Number

18    1, and the second is called Valuation Summary

19    Step Number 2.

20              Can you tell us what those are?

21         A.   One, Valuation Summary Step 1 is

22    the valuation assuming the consummation of

23    step 1.

24              Valuation Summary Step 2 is

25    assuming the pro forma consummation of step 2

1        M. Rucker - Confidential

2   of the transaction.

3        Q.   Does this page reflect, at least in

4   part, the work that VRC was doing in April

5   2007, analyzing on a pro forma basis the

6   solvency position of the Tribune following

7   the step 2 transactions?

8        A.   Repeat that again, please.

9        Q.   Sure.

10       Does this page reflect some of the

11  work that you described earlier that VRC was

12  doing in April 2007 to analyze the solvency

13  opinion of the Tribune following step 2 on a

14  pro forma basis, assuming step 2 occurred?

15       A.   Yes, for part of the work, yes.

16       Q.   For both valuation summary step 1

17  and valuation summary step 2, there appear to

18  be four different valuation methods that are

19  being described here.

20       Can you identify what those are and

21  briefly describe each?

22       A.   Those are sum of the parts

23  valuation method.  And with the sum of the

24  parts valuation methodology, you value the

25  publishing division and the broadcasting

1          M. Rucker - Confidential

2    division separately.  Make adjustments for

3    corporate expenses and come up with a

4    valuation of the company by adding those two

5    separate valuations together.

6          The comparable company's approach

7    or valuation method values the company on a

8    consolidated basis looking at current market

9    multiples that are observed in the market.

10          The comparable transactions method

11   is where you look at multiples of

12   transactions that have occurred in the

13   industry and making adjustments.  You try to

14   determine an estimate of the value of the

15   company using M and A transactions that have

16   occurred.

17          The discounted cash flow approach

18   is an approach where you look at the free

19   cash flow of the company and discount that

20   free cash flow back in an appropriate rate

21   and then use a terminal value or terminal

22   growth rate to determine the overall

23   discounted or net present value of the

24   company.

25          Q.   All of those are methods of coming

¹        M. Rucker - Confidential

²    up with an enterprise value for a company,

³    correct?

⁴        A.   Yes.

⁵        Q.   And as reflected on this page of

⁶    Rucker Exhibit 4, VRC was analyzing the

⁷    enterprise value of the company using each of

⁸    these methods and then blending them together

⁹    to arrive at an average operating enterprise

¹⁰   value?

¹¹       A.   Yes.

¹²       Q.   I note that the discounted cash

¹³   flow method is weighted at 40 percent in

¹⁴   determining average operating enterprise

¹⁵   value.

¹⁶            Do you see that?

¹⁷       A.   Yes.

¹⁸       Q.   Why is it the discounted cash flow

¹⁹   was weighted more heavily than the other

²⁰   three valuation methods described on this

²¹   page?

²²       A.   I can't recall exactly why that was

²³   done.  It was an initial report that was put

²⁴   together by our analysts, but I would assume

²⁵   that it was weighted more heavily in an

1      M. Rucker - Confidential

2  effort to be conservative.  That's what I'm

3  assuming initially.

4      Q.   Why would weighting discounted cash

5  flow be more conservative?

6      A.   I think in this particular

7  instance, the only reason this was more

8  conservative was because it was a lower

9  value.

10     Q.   So discounted cash flow is not

11 generally a more conservative valuation

12 method?

13     A.   It depends on the projections of

14 the forecast that you were given by the

15 company, so I can't say as a general rule.

16 It depends.

17     Q.   It might or might not be a more

18 conservative method than the others for

19 determining an enterprise value?

20     A.   If you're looking at a why in

21 different situations, yes.  It may or may not

22 be.

23     Q.   Is there any other reason you're

24 aware of why discounted cash flow was

25 weighted more heavily than the other methods,

1          M. Rucker - Confidential

2   at least in this presentation as reflected on

3   page 4 of Rucker 4?

4          A.   That is the only reason why I can

5   see it would be weighted more.

6          Q.   You reviewed this before you sent

7   it out to the distribution list of the e-mail

8   of the first page of the exhibit, correct?

9          A.   I would probably say yes, I did

10   look at it before then.

11          Q.   Do you recall any discussion with

12   the analysts who were working on this as to

13   why discounted cash flow was weighted more

14   heavily than the other methods?

15          A.   I don't recall any specific

16   conversation.

17          Q.   And other solvency analyses that

18   you worked on in the course of your

19   professional career, have you ever weighted

20   discounted cash flow more heavily in

21   determining an average operating enterprise

22   value?

23          A.   Generally, in solvency opinions we

24   do not weight one method over, higher than

25   the other.  We generally look for a range of

1      M. Rucker - Confidential

2   methodologies to come up with a range of

3   values.  We weight them equally and look at

4   them equally.

5           And in this particular instance,

6   that was occurring and I do recall this, is

7   that this was -- Bryan had recently been

8   brought in to head the team in New York, and

9   there were some changes that were going on at

10  the time where more, what I would call

11  traditional valuations that were used for

12  appraisal-type purposes were being tried with

13  some of our solvency opinion work and those

14  were things like weightings and those types

15  of things.

16          So generally in the past we have

17  not weighted solvency opinions valuation

18  methodologies separately.  We generally

19  treated them equally.

20          But this was a new approach that

21  was being tried, much because Bryan was a

22  fairly new person on the team.  He was a

23  senior person on the team, and suggested that

24  we start incorporating some of the more

25  traditional, quote-unquote, equity-type

1          M. Rucker - Confidential

2     valuation methodologies to the solvency

3     opinion.

4          Q.   Bryan is Mr. Browning?

5          A.   Yes.

6          Q.   And he's the one who suggested that

7     in this instance you try weighting discounted

8     cash flow more heavily than the other

9     methods?

10         A.   I don't know if in this particular

11    instance if he suggested it to the Tribune

12    piece.  In general, when he came on board,

13    that was one of the things that he wanted to

14    try with our new, you know, as he came into,

15    as a new head of the team.  He wanted to try

16    some different things.

17         Q.   I think you said in your answer

18    that weighting discounted cash flow more

19    heavily would be a more traditional method of

20    valuation.

21              Did I hear you right?

22         A.   No.  I said a more -- when you're

23    using more a traditional kind of

24    appraisal-type approach, when you're

25    valuating maybe a common equity for tax

1       M. Rucker - Confidential

2   purposes, where you have to get to one

3   particular number, you may do weighting.

4       But in solvency opinions, you look

5   at a range of values, so it makes it

6   unnecessary do the weightings.

7       Q.   I'm not sure that I understand why

8   looking at a range of values makes it

9   unnecessary to consider different weights for

10  different valuation methods.

11      Could you explain?

12      A.   I will give you an example.  If

13  you're doing a valuation for income tax

14  purposes, the IRS doesn't want you to come up

15  with a range of values.  They want you to

16  come up with a particular value for computing

17  your income tax.

18      A lot of the work we do is what I

19  would call more valuation work toward that's,

20  geared toward that.  Here you're looking at a

21  range of values when you're doing a solvency

22  opinion.  So it may be inappropriate to do

23  the weighting.  It may be more appropriate to

24  look at them as an indication of value and to

25  thereby look at a range of values as opposed

1          M. Rucker - Confidential

2     to one particular value where you would do

3     the weighting.

4          Q.   I'm not sure I understand, so let

5     me try again.

6               Isn't it correct that if you

7     weighted discounted cash flow more heavily

8     than the other methods that's reflected on

9     this page, you would still end up with a

10    range of values for an insolvency analysis?

11         A.   In this approach, you still ended

12    up with a range of values, yes, using this

13    methodology.

14         Q.   So why is it that you think that

15    there's, that it may be inappropriate to

16    overweight discounted cash flow in this

17    instance?

18              MR. DRAYTON:   Object.

19         A.   The way we have traditionally done

20    our solvency opinions work in the past and

21    the way that we do it now, we look at each

22    indication of value and we treat each

23    indication of value equally.

24              And I would say in general the

25    industry as a whole looks at each indication

1      M. Rucker - Confidential

2  of value equally.

3      Q.   Have you ever been involved working

4  on a solvency opinion where one method of

5  value in the company was weighted more

6  heavily than the others, setting aside the

7  Tribune?

8      A.   There may have been one instance

9  where -- there may have been, for some

10  reason, I think there may have been one

11  instance where, for a company that didn't

12  have any debt and was about to liquidate,

13  where you might have looked at a DCF

14  valuation.

15       For some reason, I think I came

16  across one of those opportunities, and in

17  that instance, you didn't weight the DCF at

18  all because you didn't have any DCF.

19      Q.   Is that the only example you can

20  think of where one would weight the valuation

21  methods differently where you have actually

22  been involved in rendering a solvency

23  opinion?

24      A.   I think that's to the best of my

25  recollection.  As I said, generally each

1        M. Rucker - Confidential

2   indication of value is treated equally

3   generally.

4        Q.   Why is that?

5        A.   As I said before, you're looking at

6   a range of values.  Each indication of value

7   gives you an indication of values and we look

8   at that as a range of values for solvency

9   opinions.

10       Q.   Is it your view that each of the

11  methods is equally reliable in determining a

12  range of values for a company?

13       A.   As a general answer, yes, but it

14  depends upon the type of information, the

15  facts and circumstances that you're doing the

16  valuation.

17       Q.   There may be circumstances where

18  one method is not as reliable as the others

19  for determining the value of a company?

20       A.   There may be certain circumstances.

21       Q.   And have you ever encountered such

22  a situation where you looked at it and

23  concluded one of these methods just isn't as

24  reliable as the others, for whatever reason?

25       A.   I just gave you an example earlier.

M. Rucker - Confidential

Q.   Any others, or is that it?

A.   To the best of my recollection, there may have been others.  I just can't recall.

Q.   I have a couple of questions about some of the entries on page 4 of Rucker Exhibit 4, which we have been looking at here.

MR. NEIER:  You mean the page numbered 3 still?

MR. SOTTILE:  It's the page numbered 3.  It's the fourth page of the exhibit.  Thank you.

Q.   On the left-hand side, the set of numbers that are headed Valuation Summary Step Number 1, the sixth line down on the left-hand side reads, "Tax savings."

Do you see that?

A.   Yes.

Q.   Can you tell me what that represents?

A.   I think we took this number from the Tribune model and it represented the savings from the AESOP S. Corp. structure.

1         M. Rucker - Confidential

2    And I think those numbers came directly from

3    some numbers that we had gotten from the

4    Tribune at the time, from one of their

5    models, if I'm not mistaken.

6         Q.   Can you explain to me how it is

7    that the AESOP structure would lead to these

8    tax savings, to your understanding?

9         A.   As an AESOP S. Corporation, you do

10   not pay any income taxes and if you're

11   valuing the company using companies that are

12   taxpayers and you value that and you have

13   additional or incremental value from those

14   tax savings, we believe it's appropriate to

15   add those tax savings to the overall value to

16   come up with an aggregate value of the

17   company.

18        Q.   Have you ever been involved in a

19   solvency analysis other than the Tribune that

20   involved a company that would not be paying

21   federal income tax if the transaction is

22   contemplated by the solvency analysis were

23   completed?

24        A.   I can't recall, but I'm quite sure

25   I looked at different transactions where

1          M. Rucker - Confidential

2     there may have been some NOLs.  I have never

3     done a transaction with an AESOP S. Corp. for

4     a solvency opinion, but I'm quite sure

5     there's been other transactions where we've

6     had to look at NOL benefits for the

7     transaction with respect to solvency.

8          Q.    NOL, you mean net operating loss?

9          A.    Yes.

10         Q.    Which would operate to reduce the

11    tax burden on a company?

12         A.    Yes.

13         Q.    And the calculations of tax savings

14    that are reflected on the page stamped 48044

15    in Rucker Exhibit 4, you believe these were

16    given to VRC by the Tribune?

17         A.    I think in that instance we -- to

18    the best of my recollection, I think we used

19    estimates that were given by -- that were

20    taken off the Tribune's financial model, to

21    the best of my recollection.  I'm not

22    certain.

23         Q.    The next line down after tax

24    savings is headed, "Equity investments."

25              Can you describe what that is?

1      M. Rucker - Confidential

2      A.    Tribune had a number of companies

3  that had investments in it and owned pieces

4  of.  We valued those investments separately

5  and added those values to determine the

6  adjusted enterprise value of the company.

7      Q.    These are businesses where the

8  Tribune owns a minority interest in a

9  company?

10     A.    I don't know.  I think in some

11 instances they may have been minority

12 interests.  In other situations there may

13 have been 100 percent or controlled interest,

14 so it varied.

15     Q.    You believe that some of the equity

16 investments that are reflected here may be

17 companies that are 100 percent owned by the

18 Tribune?

19     A.    They may have been.  I don't know

20 for sure if in the equity investment line for

21 this one -- we would have to look at the

22 documents.  It may have been the Cubs out of

23 here.  I just don't know for sure.  There may

24 have been some businesses that are owned 100

25 percent.  I just don't recall.

1          M. Rucker - Confidential

2          There may be a schedule in here

3   which lists what the equity investments are

4   and the amounts that are owed somewhere in

5   this document, I would assume.

6      Q.    Still on the left-hand side of the

7   same page of Rucker Exhibit 4 under the

8   heading, "Adjusted enterprise value," there's

9   a subheading for debt.

10          Do you see that?

11     A.    Yes.

12     Q.    What is the debt figure represented

13  in this line?

14     A.    To the best of my recollection, I

15  think it's just the sum of the company's

16  outstanding indebtedness for borrowed money,

17  to the best of my recollection.

18     Q.    Does it include the debt that was

19  contemplated to be assumed as part of the

20  step 1 transactions you've described?

21     A.    Looks like it does include that.

22     Q.    And the next line down is,

23  "Identified contingent liabilities."

24          What do those numbers represent?

25     A.    We asked the company to provide us

1          M. Rucker - Confidential

2   with a list of certain liabilities that may

3   not be on the company's balance sheet or may

4   not be fully reserved on the company's

5   balance sheet or potential contingent

6   liabilities.  And this 90.3 represents

7   management's estimate of those identified

8   contingent liabilities.

9          MR. SOTTILE:  Let's go off the

10         record and take a break.

11         (Recess taken.)

12     Q.   Mr. Rucker, we're still working

13   with Rucker Exhibit 4, the page that's

14   stamped 48044, and I would like to move from

15   the left-hand side of the page, which we have

16   been focusing on, to the right-hand side

17   headed, "Valuation Summary Step Number 2."

18         Are you with me?

19     A.   Yes.

20     Q.   I want to make sure that I

21   understand how the calculations work here.

22   If we start at the top, there appear to be

23   the same four valuation methodologies you

24   described earlier, correct?

25     A.   Yes.

1         M. Rucker - Confidential

2         Q.    And those are weighted together

3    using the weightings set forth in this table

4    to arrive at the average operating enterprise

5    value; is that right?

6         A.    Yes.

7         Q.    And I note that there is a range

8    for all of these numbers; low, mid and high.

9              What are the variables that change

10   the numbers and produce that range?

11        A.    When you're determining the

12   valuation of the company using the different

13   methodologies, you apply a range of valuation

14   metrics to a particular number and it ends up

15   giving you a range of values.

16        Q.    Would the variables that explain

17   the difference between the low, mid and high

18   valuations include the discount rate used for

19   discounted cash flow, for example?

20        A.    Yes.  In the discounted cash flow

21   valuation methodology, yes.

22        Q.    For comparable companies and

23   comparable transactions, would the variables

24   that would produce the low, mid and high

25   range include, for example, the multiples of

1      M. Rucker - Confidential

2  EBITDA that are used for those analyses?

3      A.   For the low and the high, yes.   The

4  mid -- if I'm not mistaken, I think the mid

5  is just the midpoint between those two

6  numbers, is the average between those two

7  numbers, if I'm not mistaken.

8      Q.   Is that true for all of the

9  valuation methods, the mid is just the middle

10  point between the low and the high and

11  doesn't have any independent set of variables

12  associated with it?

13      A.   To the best of my recollection,

14  yes, but I would have to do the calculation

15  and see.

16      Q.   Can't say that I did it.

17      And following the average operating

18  enterprise value for which there are low, mid

19  and high numbers, we see the same two lines

20  we looked at before, tax savings and equity

21  investments.

22      Are those figures added to the

23  average operating enterprise value to arrive

24  at the adjusted enterprise value that's shown

25  in the middle of this table?

1          M. Rucker - Confidential

2          A.    In this analysis, yes.

3          Q.    And then the next step in the

4    presentation here is to add cash, subtract

5    debt and subtract identified contingent

6    liabilities; is that right?

7          A.    Yes.

8          Q.    And the end result of those

9    calculations is the equity value of the

10   company as determined by these methods?

11         A.    Yes.

12         Q.    What is the equity value shown on

13   the right-hand side table on this page in the

14   low, mid and high range?

15         A.    4,857,000,000.

16         Q.    I'm on the right-hand side.

17         A.    I'm sorry.  643,100,000, it looks

18   like.  2,044,400,000.  3,445,800,000.  I'm

19   sorry.  Okay.

20         Q.    Below the equity value line, there

21   is a line that reads, "Percentage of

22   enterprise value."

23              Do you see where I'm reading?

24         A.    Yes.

25         Q.    What do those percentage figures

1        M. Rucker - Confidential

2   represent?

3        A.   That represents, if I'm not

4   mistaken here, it either represents the

5   equity value divided by the adjusted

6   enterprise value or the equity value divided

7   by the average operating enterprise value.  I

8   just don't know here exactly which one it

9   was, but I'm assuming that it's of the

10  adjusted enterprise value.

11       Q.   And is this a measure of the

12  cushion which you described earlier as

13  applied to the excess of assets over

14  liabilities?

15       A.   Yes.  It's one measure of that.

16       Q.   Is there a particular percentage of

17  enterprise value cushion that VRC looks for

18  in order to be comfortable with its solvency

19  opinions?

20       A.   No.  It's dependent upon the facts

21  and circumstances of each individual company.

22       Q.   I note here that at the low end of

23  the range, the percentage of enterprise value

24  cushion on the right-hand side table is 4.5

25  percent.

1       M. Rucker - Confidential

2           Do you see that?

3       A.    Yes.

4       Q.    What significance would that

5   cushion figure have for you in looking at the

6   solvency of the Tribune on a pro forma basis

7   assuming a step 2 transaction closed?

8       A.    Repeat that question again, please.

9       Q.    Sure.

10          Looking at the 4.5 percent of

11  enterprise value figure shown on the

12  right-hand table for the low end of the

13  valuation summary range, is that 4.5 percent

14  low, high or something else in your

15  experience in working on solvency opinions?

16      A.    It just depends upon the facts and

17  circumstances.

18      Q.    How about the facts and

19  circumstances of this case, is that low, high

20  or something else?

21      A.    What it represents is it represents

22  the assets exceeds the amount of the

23  liabilities.  But if it's low or high, it

24  just depends upon the facts and circumstances

25  of the company.

1        M. Rucker - Confidential

2            In this particular instance, there

3    are other factors that you need to take into

4    account other than just the 4.5 percent of

5    cushion.

6            One of the things that we took into

7    consideration, the committee and the team

8    was, even given this cushion amount, certain

9    things, like a new management team being

10   brought in, Sam Zell being brought in,

11   cost-cutting initiatives, were they going to

12   be turning around the business, was the

13   business going to be operated with.

14           So whether this was low or high,

15   this was something we didn't look at in a

16   complete vacuum.  It was a factor that we

17   took into consideration.

18           So it was a joint decision by the

19   team, and based upon what the team and the

20   solvency committee saw, even though this was

21   an interim analysis, at this point we still

22   concluded that the company was solvent.

23       Q.   Recognizing there are lots of other

24   factors that go into a solvency analysis, is

25   a 4.5 percent equity cushion low for a highly

1      M. Rucker - Confidential

2  leveraged company like the Tribune?

3      A.   It depends upon the facts and

4  circumstances.  In some instances, I've seen

5  cushions where cushions may have been that

6  type, but you have to look, and it depends on

7  the facts and circumstances of the company.

8      Q.   What is your judgment given the

9  facts and circumstances of the Tribune as to

10  whether that's a low equity cushion?

11      A.   Based upon our initial analysis

12  here, we still believe that the company was

13  solvent based upon the consummation of step

14  2, that it maintained adequate capital and

15  that the company was solvent.

16      Q.   How would you characterize a 4.5

17  percent equity cushion for the Tribune?

18          MR. NEIER:   Objection to form.

19      Q.   Good, bad, indifferent?

20      A.   It's a factor that just has to be

21  considered.

22      Q.   Is it fair to say that the lower

23  the cushion on equity value that is indicated

24  by a solvency analysis the higher the risk,

25  that the solvency opinion would be incorrect,

1          M. Rucker - Confidential

2    as you use that term?

3          A.   Can you read that back?

4               (Whereupon, the requested portion

5          was read back by the court reporter.)

6          A.   Yes, there is an increased risk of

7    giving an incorrect opinion when the cushion

8    is lower.

9          Q.   Mr. Rucker, is it correct that at

10   least in this preliminary analysis, the

11   valuation summary for step 2 produces a

12   positive equity value on the low end of the

13   range only by including tax savings?

14         A.   We didn't look at it without the

15   tax savings.  So I don't know if it was -- we

16   didn't look at it without the tax savings, so

17   we only looked at this and we thought it was

18   improper to look at this transaction, given

19   that it was a tax-driven transaction, to look

20   at it without the tax savings, so we did not

21   look at it without the tax savings, so I

22   don't know the answer to that.

23         Q.   Can we agree that the 980.6 million

24   of tax savings shown here exceeds the 643.1

25   million of equity value shown at the low end

1          M. Rucker - Confidential

2     of the range in the valuation summary step

3     number 2?

4          A.   If you're asking me if 980.6 is

5     greater than 643, the answer is yes.

6          Q.   Is it correct, Mr. Rucker, that the

7     comparable companies' method and comparable

8     transactions method as applied to the Tribune

9     looked at companies that were subject to

10    federal income tax?

11         A.   Generally I would say yes, that

12    these were taxpaying entities.

13         Q.   Is it correct the Tribune was the

14    only entity included in the analysis of

15    comparable companies in transactions that you

16    assume would be exempt from federal income

17    tax as a result of these transactions?

18              MR. BENDERNAGEL:  Object to the

19         form of the question.

20         A.   No.

21         Q.   Tell me what was incorrect about

22    the statement.

23         A.   Tribune wasn't included in our

24    company's comparable companies' analysis.

25         Q.   I understand.  Fair enough.

1      M. Rucker - Confidential

2          Is it correct that the tax savings

3   that were contemplated by the line items

4   shown on this page of Rucker Exhibit 4 could

5   be achieved only if the Tribune was owned by

6   an AESOP which was exempt from federal income

7   tax?

8      A.   I don't know if that was the only

9   way that it could be -- if those tax savings

10  would be generated, but this is the way we

11  looked at it, based upon the facts that we

12  were given by the company, that it was going

13  to be an AESOP S. Corporation.

14     Q.   Did you consider what the value of

15  the Tribune would be if it was acquired by

16  the AESOP contemplated by these transactions

17  but then later sold to a company subject to

18  federal income tax?

19     A.   No.

20     Q.   Is it correct that in that

21  situation these tax savings would no longer

22  be available?

23     A.   I'm not certain.  We looked at it

24  as an AESOP S. Corporation.  We realized

25  there were other people that were looking at

1        M. Rucker - Confidential

2   acquiring the Tribune using a similar AESOP

3   S. Corporation structure.

4              There are other companies out there

5   that have been acquired using an AESOP

6   structure, smaller companies, so that's the

7   way we looked at it because that was the

8   essential of the heart of the transaction,

9   was the AESOP S. Corporation.

10       Q.   For purposes of VRC's solvency

11  analysis, did you assume that the Tribune

12  would be owned by an AESOP in perpetuity

13  forever?

14              MR. BENDERNAGEL:  Object to the

15       form of the question.

16       A.   In computing our tax savings, we

17  assumed that the tax savings, that that

18  structure was a perpetual structure.

19       Q.   But if the structure changed, you

20  understood, didn't you, that the tax savings

21  might no longer be available?

22       A.   We looked at it based upon the tax

23  savings being there for perpetual basis.

24       Q.   So in forming your opinion on

25  solvency, did you not consider the

1        M. Rucker - Confidential

2    possibility that the Tribune would be subject

3    to federal income tax at some point in the

4    future following the acquisition by the

5    AESOP?

6            MR. BENDERNAGEL:  Object to the

7        form of the question.

8    A.    For the step 2?

9    Q.    Yes.

10        Did you consider the possibility,

11   in making your solvency analysis, that after

12   being acquired by the AESOP, the Tribune

13   would no longer be able to take advantage of

14   the tax savings because, for example, it

15   would be sold to a third party subject to

16   tax?

17   A.    One thing is being missed here, is

18   that after -- we were informed that after a

19   10-year period, that there were certain

20   additional benefits to avoiding capital gains

21   tax that would be able to be achieved by the

22   AESOP S. Corporation also.

23        So taking that into consideration,

24   after that 10-year period, assets could be

25   potentially sold 100 percent tax free to the

1          M. Rucker - Confidential

2    AESOP.  Those were other things that we took

3    into consideration when we decided to use a

4    perpetual basis for the tax savings.

5          So it was likely, or there were

6    conversations that after that 10-year period

7    under the Internal Revenue Service Code, that

8    assets would be able to be sold on a tax-free

9    basis to the AESOP, which adds substantial

10   value, and we felt it was incorrect to not

11   take into account that increased value.

12        Q.   In doing the solvency analysis,

13   assuming the step 2 transactions closed, did

14   VRC ever consider the possibility that the

15   Tribune would be sold to a third party that

16   would be subject to federal income tax at

17   some point in the future?

18        A.   No.  To the best of my

19   recollection, we did not.  And we were not

20   asked to look at it that way by the company.

21        Q.   Does the fact that the company

22   didn't ask VRC to do that mean that you

23   wouldn't consider doing it?

24        A.   We were retained by the company to

25   look at the transaction based upon the AESOP

1        M. Rucker - Confidential

2   S. Corporation tax structure.  Our engagement

3   letter says that we're going to look at it

4   that way, and that's the way we looked at it.

5        We did not assume it would be sold

6   to a taxpaying entity or third-party

7   taxpaying entity.

8        Q.   And you did not make that

9   assumption because the Tribune told you they

10  wanted you to assume an AESOP structure in

11  perpetuity?

12       A.   No, the Tribune did not tell us

13  that.  We were engaged to look at it by using

14  an AESOP S. Corp. structure.  So I guess in

15  one way we were told with an engagement

16  letter, but that's the way we were asked to

17  look at it.

18       Q.   Mr. Rucker, still in Rucker Exhibit

19  4, can you turn to the pages that numbered 20

20  and stamped 48061?

21       You have it in front of you, sir?

22       A.   Yes.

23       Q.   This page is headed, "Base

24  case/sensitivity case comparison."

25       What is the sensitivity case that's

1          M. Rucker - Confidential

2    being referred to?

3          A.   I think here is that this

4    sensitivity case, Tribune provided us with

5    two cases, if I'm not mistaken.  They

6    provided us with a base case and a downside

7    sensitivity case, and I think that's

8    comparing the results of those two.

9          Q.   You believe that the sensitivity

10   case here is the downside case that was

11   provided to VRC by the Tribune?

12         A.   Yes, that's what I think it is.

13   I'm not certain.  Because I see one title

14   says, "Base case/sensitivity case comparison"

15   and I see sensitivity case/Tribune

16   sensitivity case comparison, so I'm not

17   certain.

18         Q.   I was actually going to ask you to

19   turn to the next page, page 21, stamped

20   48062, and as you point out, this page is

21   headed, "Sensitivity case/Tribune sensitivity

22   case comparison."

23              Reviewing this, does that change

24   your view about what the sensitivity case

25   referred to on the previous page is?

1          M. Rucker - Confidential

2      A.   I'm not certain.  What I do know is

3 that when we did our analysis, Tribune

4 provided us with a base case and a

5 sensitivity case.

6          VRC tested those using a base case

7 that we tested and also a sensitivity case

8 that we developed and tested around, so I'm

9 not certain exactly with this particular one

10 what sensitivity case that's referring to.

11 I'm just not certain.

12      Q.   But you recall that VRC developed

13 its own sensitivity case in the April, May

14 2007 timeframe?

15      A.   I'm not certain in the April, May

16 2007 timeframe if we did that, but during the

17 solvency opinion analysis, we did.

18      Q.   You can't tell from this page

19 whether or not the sensitivity case referred

20 to here is a VRC sensitivity case, and I'm

21 looking at the page numbered 21, which I note

22 also references a Tribune sensitivity case?

23      A.   I just cannot tell from this.  I'm

24 just not certain.

25      Q.   Mr. Rucker, in doing solvency

1        M. Rucker - Confidential

2   analysis work for the Tribune, did VRC ever

3   apply any of the sensitivity cases that it

4   used to the measures of value that we've been

5   talking about on the page numbered 4 from

6   this exhibit, page numbered 3 from this

7   exhibit, sum of the parties, comparable

8   companies, discounted cash flow?

9        A.   No, it wasn't appropriate to apply

10  those to those.

11       Q.   Why is that?

12       A.   You end up with a range of values

13  -- typically the way you do a solvency

14  opinion, you end up with a range of values

15  based upon the company's base case, and that

16  range of values has a low and mid and that

17  gives you sensitivity around it for the

18  valuation components.

19            And then with the sensitivity

20  analysis, the sensitivity analysis typically

21  is done to look at the company's ability to

22  be able to repay its indebtedness and service

23  the debt on the company and making sure the

24  company has adequate of capital.

25            That's what you use a sensitivity

1        M. Rucker - Confidential

2   analysis for.  It's inappropriate, we

3   believe, to use those cases that you test

4   around to value the company.  You implicitly

5   have a range of values based upon your

6   valuation methodology.  You make adjustments

7   to your multiples.  You make adjustments to

8   your discount rate, and to make additional

9   adjustments using your sensitivity cases we

10  do not feel is appropriate.

11       Q.   So in valuing a business on the

12  discounted cash flow method, for example, VRC

13  believes it is inappropriate to apply a

14  sensitivity case and see what the value of

15  the company would be using the discounted

16  cash flow model and the sensitivity case?

17       A.   You have sensitivity adjustments in

18  your DCF analysis.  You have sensitivity

19  adjustments in the discount rate that you use

20  which reflects the risk of attaining those

21  cash flows.  You have sensitivity analysis

22  around the exit multiples.

23           If your question is do we set up a

24  base case and value the company using that,

25  no.  We make adjustments to our discounted

1        M. Rucker - Confidential

2   cash flow discount rates and our discounted

3   cash flow multiples and that's the

4   sensitivity adjustment around the DCF

5   analysis.

6        Q.   One thing that sensitivity cases

7   commonly vary would be the projected revenue

8   and the projected EBITDA of a company; isn't

9   that right?

10        A.   Yes.

11        Q.   Those factors are important in

12   determining a value of a company based on

13   discounted cash flow comparable companies or

14   comparable transactions, correct?

15        A.   Repeat that question again, please.

16        Q.   Sure.

17             If you want to value a company

18   using the discounted cash flow method, it's

19   important for you to know what the most

20   reliable measure of earnings and revenues is,

21   right?

22        A.   Yes.

23        Q.   And one thing sensitivity cases do

24   is look at the effects on solvency analysis

25   if you change the revenues and earnings,

1        M. Rucker - Confidential

2   right?

3            MR. BENDERNAGEL:   Object to the

4        form of the question.

5        A.    You make the adjustments to your

6   multiples.  You make the adjustments to your

7   discounts rates.  That reflects the risks of

8   attaining those revenues in EBITDA numbers.

9        Q.    And it is VRC's practice, as I

10  understand your testimony, never to use a

11  sensitivity case in connection with the four

12  valuation methods that we described, except

13  to the extent that varying discount rates and

14  multiples constitutes a sensitivity?

15       A.    We -- in our opinions, we do not do

16  valuations based upon that.  We have our

17  models set up so that for our base case, we

18  value based upon our base case analysis.

19            The assumptions and forecast is

20  provided by management.  The management -- we

21  have to rely upon the projections and things

22  that are provided by management, but we do

23  not determine a separate valuation that we

24  use in our actual opinion analysis based upon

25  our sensitivity of cases.  We do not use

1       M. Rucker - Confidential

2  those valuations in our actual conclusions.

3       Q.   Turn back to the page numbered 3 in

4  Rucker Exhibit 4.  Again, I'm looking at the

5  right-hand side of the page under the

6  heading, "Valuation summary step number 2."

7  We looked at this before, Mr. Rucker, and

8  noted that at the low end of the valuation

9  range, the equity value was 643.1 million.

10      You remember that?

11      A.   Yes.

12      Q.   What would it mean for your

13 solvency analysis if the low number here was

14 negative but the mid and high numbers were

15 positive?

16      A.   I think if the number was negative,

17 of course we didn't look at it that way.  But

18 if the number was negative it would indicate

19 that assets exceed -- liabilities exceed

20 assets.  We did not -- our results did not

21 produce that kind of number.

22      Q.   If they had produced that kind of

23 number at the low end of the valuation range

24 after you completed all your analysis, would

25 you have concluded that the Tribune was

1        M. Rucker - Confidential

2    insolvent?

3        A.   I don't know.  That would have been

4    a question that would have had to have been

5    raised by the solvency opinion committee.  I

6    can't say what the committee would have done.

7        Q.   Have you ever seen a situation

8    where a company had liabilities exceeding

9    assets at the low end of the valuation range

10   but not at the high end?

11       A.   I think I have, yes.  But I'm not

12   certain.  I think I have.

13       Q.   And the situation you're thinking

14   of, did that lead you to conclude that the

15   company was solvent or insolvent?

16       A.   I think in that instance we might

17   have concluded the company was insolvent.

18   I'm not certain.

19        MR. SOTTILE:  I would like to mark

20        this document as Rucker Exhibit 5,

21        please.

22        (Rucker Exhibit 5, Solvency opinion

23        letter draft, marked for identification,

24        as of this date.)

25        MR. SOTTILE:  Rucker Exhibit 5 is a

1      M. Rucker - Confidential

2    document produced by the Tribune that is

3    designated as professional eyes only,

4    highly confidential.

5        I understand from conversations

6    with Mr. Bendernagel that the Tribune is

7    prepared to treat this document as being

8    designated as confidential within the

9    means of the confidentiality agreements.

10       Am I understanding that correctly?

11       MR. BENDERNAGEL:  That's correct,

12    and so long as the people in the room

13    would be agreeable to abide by the

14    confidentiality considerations that are

15    governed in this deposition with respect

16    to this document, I don't have a problem

17    with you moving forward with this

18    document as a confidential document.

19       MR. SOTTILE:  I understand that

20    everyone does so agree and ask that if

21    anyone does not, they speak now or

22    forever hold their peace.

23        You're in silence.  I think we can

24    agree that everyone signs on to

25    confidentiality for this document.

M. Rucker - Confidential

1

2    Q.   Mr. Rucker, can you take a look at

3  the document we marked as Rucker 5 and tell

4  us whether this is something you've seen

5  before?

6    A.   I can't recall whether or not I've

7  seen this particular document, but I have

8  seen some versions of this document.  I don't

9  know if it was this particular document or

10  not.

11    Q.   What is this document, to your

12  understanding?

13    A.   Looks like a draft of a solvency

14  opinion letter.

15    Q.   You're talking about the part of

16  the exhibit that starts with the second page?

17    A.   Yes.

18    Q.   Were you involved in the drafting

19  of the solvency opinion for the Tribune?

20    A.   Yes.  The solvency opinion letter,

21  yes, I was involved in that.

22    Q.   And the document that appears

23  starting on the second page of Rucker Exhibit

24  5, you understand to be a draft of VRC's

25  ultimate solvency opinion?

1        M. Rucker - Confidential

2        A.    That looks like it's a draft of

3    that.

4        Q.    You're just not sure whether or not

5    you have seen this particular draft; is that

6    right?

7        A.    I'm not certain.  I have seen some

8    version of this letter.  I just don't know if

9    I've seen this particular version.  I'm not

10    addressed in the e-mail.

11            MR. SOTTILE:  Let's mark this

12        document as Rucker 6.

13            (Rucker Exhibit 6, E-mails, marked

14        for identification, as of this date.)

15        Q.    Mr. Rucker, can you take a look at

16    what we marked as Rucker Exhibit 6 and tell

17    us whether or not you can identify it?

18        A.    Yes.

19        Q.    What is it?

20        A.    A series of e-mails between Bryan

21    Browning and me and our attorney David Neier.

22            MR. NEIER:  Obviously this document

23        contains or embedded in this document is

24        a privileged communication, but I have

25        no objection to you proceeding with the

1    M. Rucker - Confidential

2    examination, provided you agree this

3    does not constitute a waiver of any

4    other attorney-client privileged

5    communications.

6        If you won't agree, them I'm going

7    to say that it's an inadvertent

8    production and I'm going to ask you to

9    return the document.

10       MR. SOTTILE:  You're happy with my

11   questioning the witness on all of this

12   document without interposing privilege

13   objections so long as I will agree that

14   by doing so, I'm not working any broader

15   privilege waiver?

16       MR. NEIER:  That's correct.

17       MR. GLENN:  It's also clear from

18   our perspective that we're not waiving

19   any rights --

20       MR. NEIER:  Well, then we'll just

21   take the document back.

22       MR. GLENN:  Neither side should be

23   waiving any rights by proceeding in the

24   manner that Mr. Neier proposes.  I don't

25   understand why that's problematic at

M. Rucker - Confidential

1    all.

2          MR. NEIER:  I'm asking that the

3    document be redacted to remove the

4    privilege communication before you

5    proceed, because Mr. Glenn will not

6    agree that this doesn't constitute a

7    broader waive of attorney-client

8    privilege.

9          MR. GLENN:  That's not what I'm

10   saying.  What I'm saying is that I agree

11   that by proceeding you're not waiving

12   the right to say that that portion of

13   the document is privileged.  That

14   doesn't mean that it is privileged,

15   though.  So it may or may not be

16   privileged.

17         We're assuming for purposes of

18   proceeding today that it is privileged

19   and the witness will not be questioned

20   about it.  That doesn't mean that we're

21   waiving the right to argue that it

22   should have been designated privileged

23   from the outside.

24         MR. NEIER:  That's not what we

1        M. Rucker - Confidential

2     agreed to.

3             MR. SOTTILE:  Off the record.

4             (Whereupon, an off-the-record

5     discussion was held.)

6             MR. SOTTILE:  We had a discussion

7     off the record about the scope of an

8     agreement concerning a broader privilege

9     waiver, and let me attempt to state what

10    I think the parties have agreed to.

11            We will agree that by permitting

12    questioning concerning Rucker Exhibit 6,

13    VRC is not waiving its claim to

14    privilege as to other documents or

15    information, or that there is any kind

16    of subject matter waiver purely as a

17    result of permitting the questioning

18    today.

19            MR. NEIER:  That's correct.

20            MR. SOTTILE:  Thank you.

21    Q.   Mr. Rucker, does reviewing this

22    chain of e-mails allow you to determine

23    whether or not you saw the draft solvency

24    opinion that is contained in Rucker Exhibit

25    5?

1          M. Rucker - Confidential

2     A.   I'm not certain if it was forwarded

3  to me or not.

4     Q.   May I suggest that you compare the

5  last chain of the e-mails on Rucker Exhibit 6

6  with the e-mail that is the first page of

7  Rucker 5 and see if that helps.

8          MR. NEIER:  I will just point out

9     that the Rucker Exhibit 6 refers to

10    something sent on Saturday, April 21st,

11    and Rucker Exhibit 5 refers to something

12    sent on Sunday, April 22nd.

13         So Rucker Exhibit 5 is after this

14    e-mail chain, as far as I can tell.

15         MR. SOTTILE:  It actually depends

16    on the time zones.  It's not entirely

17    clear.

18         MR. NEIER:  Okay.

19    Q.   If this helps you tell whether

20 you've seen it, tell us, and if not, tell us

21 that.

22    A.   I'm not certain.  I'm just not

23 certain.  From the time codes, I just can't

24 say for certain if I saw it or not.

25    Q.   I understand, Mr. Rucker.

1          M. Rucker - Confidential

2          Mr. Rucker, I want to direct your

3     attention to an e-mail towards the middle of

4     the first page of Rucker Exhibit 6.  Appears

5     to be an e-mail from you to Mr. Neier, copy

6     to Bryan Browning, dated Sunday, April 22nd,

7     time 10:31.

8          Do you see the e-mail that I'm

9     referring to?

10     A.    Yes.

11     Q.    Would you review the text of that

12     e-mail and tell me whether or not the

13     documents being referred to in the e-mail is

14     the draft solvency opinion that appears in

15     Rucker Exhibit 5, if you're able to do so?

16     A.    I'm not certain.  I'm assuming if

17     this were the document, there would be an

18     attachment somewhere to the e-mail.  I'm just

19     not certain.

20     Q.    Sticking with the same e-mail, the

21     third sentence of the e-mail reads, "One

22     major issue is the deletion of step 2."

23          You see where I'm reading?

24     A.    Yes.

25     Q.    Do you recall that at some point

1        M. Rucker - Confidential

2   step 2 was deleted from a draft solvency

3   opinion prepared by VRC?

4        A.   I do recall step 2 being removed

5   from one of our analyses.

6        Q.   But you don't recall whether or not

7   step 2 was actually a solvency opinion and

8   then removed from a draft solvency opinion?

9        A.   It may have been in a draft

10  solvency opinion.

11        Q.   Turn back to Rucker Exhibit 5.

12  Look at the third page of the exhibit, which

13  is the second page of the draft solvency

14  opinion stamped TRB 0129237.

15            Are you with me?

16        A.   Yes.

17        Q.   Do you see on the right-hand side

18  of the page that there's an indication that

19  some text has been deleted?

20        A.   Yes.

21        Q.   Would you agree with me the text

22  being deleted in the second and third boxes

23  relates to a step 2 opinion?

24        A.   It refers to a step 2 opinion.

25        Q.   Does that help you to recall that

¹     M. Rucker - Confidential

²    there was a draft solvency opinion from which

³    references to step 2 were deleted?

⁴        A.    Actually, I think these definitions

⁵    were taken directly from the engagement

⁶    letter, so I would imagine, if you compared

⁷    fair value and present fair saleable value,

⁸    the definitions, I would imagine that they

⁹    were tied directly to the engagement letter.

¹⁰        So it does not tell me that we did

¹¹    a solvency opinion for step 2 at the same

¹²    time we did a value opinion for step 1.

¹³        Q.    I'm not sure I understand part of

¹⁴    your testimony.

¹⁵        You reference the definitions of

¹⁶    fair value and present fair saleable value

¹⁷    that appears in Rucker Exhibit 5, correct?

¹⁸        A.    Yes.

¹⁹        Q.    And I think that you suggested that

²⁰    those definitions may be the same as the

²¹    definitions that appear in the engagement

²²    letter; is that right?

²³        A.    Typically, when we do a first draft

²⁴    of an opinion letter, we will copy text

²⁵    directly from the opinion letter.

1        M. Rucker - Confidential

2            In this instance, when we define

3    fair value and present fair saleable value,

4    we may have just copied the text directly

5    from the engagement letter as is when we did

6    those definitions.  I'm not certain.

7        Q.   We have the engagement letter, so

8    why don't I ask you to compare the

9    definitions and see if your supposition is,

10   in fact, the case.

11           Rucker Exhibit 3 is the engagement

12   letter you previously identified.

13       A.   For those particular two deletions,

14   it looks like they're the same from the

15   engagement letter.

16       Q.   To be clear, the definitions of

17   fair value and present fair saleable value

18   from Rucker Exhibit 3, the engagement letter,

19   appear to be the same as the definitions of

20   those terms in Rucker Exhibit 5 prior to the

21   deletions of text that are indicated in

22   Rucker Exhibit 5; is that correct?

23       A.   They appear to be the same, yes.

24       Q.   Let's turn back to Rucker Exhibit

25   6.

1        M. Rucker - Confidential

2            Still looking at the same e-mail

3    from you to Mr. Neier, while I take it you're

4    uncertain exactly what solvency opinion is

5    being referenced here, is it fair to say this

6    e-mail concerns a draft of the VRC solvency

7    opinion?

8        A.    Yes, I think we provided a draft to

9    the company that may have had step 1 and step

10   2.  The analysis, not the opinion, but the

11   analysis for step 1 and step 2.  I'm not

12   certain about a draft of the opinion letter.

13       Q.    Does this e-mail, from your reading

14   of it, concern a solvency opinion in draft

15   form for the Tribune prepared by VRC?

16       A.    Yes.

17       Q.    When the third sentence of the

18   e-mail refers to the deletion of step 2 being

19   a major issue, is it referring to the

20   deletion of step 2 from a draft solvency

21   opinion?

22       A.    Refer to me which line again, sir?

23       Q.    It's the first line of the April

24   22nd e-mail from you to Mr. Neier, third

25   sentence?

1          M. Rucker - Confidential

2      A.   The sentence that reads, "All the

3  projections and analyses"?

4      Q.   No, the one that reads, "One major

5  issue is the deletion of step 2."

6      A.   Yes.

7      Q.   Is the deletion of step 2 being

8  referenced there a deletion of step 2 from a

9  draft solvency opinion prepared by VRC for

10  the Tribune?

11      A.   I don't know if it's a draft

12  solvency opinion.  But I'm certain that it

13  includes a draft solvency analysis.  I'm not

14  certain about a draft solvency opinion.

15      Q.   You're certain there was a solvency

16  analysis that included step 2, which was

17  later deleted, correct?

18          MR. BENDERNAGEL:  Object to the

19      form of the question as vague.

20      Q.   Is it correct, Mr. Rucker, that you

21  recall a solvency analysis prepared by VRC

22  that included an analysis of the solvency of

23  the company, assuming step 2 closed on a pro

24  forma basis which was later deleted from

25  VRC's solvency analysis?

1      M. Rucker - Confidential

2      A.   Yes.

3           MR. BENDERNAGEL:   Object to the

4      form.

5           MR. TRUITT:   Objection to form.

6      A.   From a draft, yes, I think there

7 was a series of e-mails that show that, if

8 I'm not mistaken.

9      Q.   That show what?

10      A.   That we assume step 1 occurring

11 without step 2 subsequently closing.

12      Q.   I think I'm still having trouble,

13 Mr. Rucker, understanding what you were

14 talking about in the e-mail from Rucker

15 Exhibit 6, that's from you to Mr. Neier, when

16 you said that one major issue is the deletion

17 of step 2.

18           What were you talking about there?

19      A.   I cannot recall exactly what I mean

20 here, but I'm assuming here that we're

21 talking about, we did not -- we assumed only

22 the closing of step 1 and not the pro forma

23 closing of step 2.   That's what I'm assuming.

24 That's what it appears the e-mail is saying.

25      Q.   I'm not sure that I understood,

1          M. Rucker - Confidential

2     Mr. Rucker.  It appears the e-mail is saying

3     what?

4          A.    It appears that we looked at --

5     that we were not assuming on a pro forma

6     basis the consummation of step 2.  That we

7     assumed the consummation of step 1 --

8          Q.    Yes.

9          A.    -- and not the pro forma

10    consummation of step 2.

11         Q.    For purposes of a solvency opinion,

12    an analysis or both?

13              MR. BENDERNAGEL:  Object to the

14         form of the question.

15         A.    I just don't know.  I'm quite sure

16    if we look at more documents, documents will

17    maybe refresh my memory, but I just don't

18    recall.

19         Q.    Let me make one effort in that

20    regard.

21              Mr. Rucker, if you look at Rucker

22    Exhibit 5, the third page, we looked at some

23    deleted text on the right-hand side.

24              MR. NEIER:  He means page 2.

25         Q.    Page 2, stamped TRB 129237.

1            M. Rucker - Confidential

2       A.    Yes.

3       Q.    And we looked previously at some

4    deleted text referencing a step 2 opinion.

5            Do you see that deleted text?

6       A.    In boxes 2 and 3?

7       Q.    I think it's actually in 2, 3 and

8    4, on the right-hand side of this page.

9            Do you see that in each of those

10   boxes there are deletions of references to

11   the step 2 opinion?

12      A.    Yes.

13      Q.    Does looking at that refresh your

14   recollection about what you were talking

15   about in your April 22nd e-mail in Rucker

16   Exhibit 6 in referencing the deletion of step

17   2?

18      A.    Repeat your question, please.

19      Q.    Does reviewing the deleted text

20   from Rucker Exhibit 5 relating to the step 2

21   opinion refresh your recollection as to what

22   you were referring to in your April 22nd

23   e-mail to Mr. Neier when you referred to the

24   deletion of step 2?

25      A.    No, no.  Not to my knowledge it

1          M. Rucker - Confidential

2     doesn't.

3          Q.   Do you believe when you referred to

4     the deletion of step 2 in your April 22nd

5     e-mail, were you talking about the deleted

6     text shown in Rucker Exhibit 5 that refers to

7     the step 2 opinion?

8          A.   No.

9          Q.   You don't think so or you don't

10    know?

11         A.   Is your question what I'm

12    referencing to David, is it directly related

13    to those?

14         Q.   That's the question.

15         A.   It may have been a factor, but I'm

16    not certain that was the only issue. I just

17    don't recall.

18         Q.   So your e-mail to Mr. Neier

19    referencing the deletion of step 2 may be

20    referring, at least in part, to the deletion

21    of references to the step 2 opinion in Rucker

22    Exhibit 5; is that right?

23         A.   It may be, but I'm not 100 percent

24    certain.

25         Q.   Mr. Rucker, is it correct that

1       M. Rucker - Confidential

2    setting aside these documents, you have an

3    independent recollection of a solvency

4    analysis prepared by VRC for the Tribune in

5    draft form that included an analysis of the

6    effects of step 2 on a pro forma basis that

7    was deleted at the request of the Tribune?

8       A.   There was a draft analysis which

9    showed the consummation of step 2 on a pro

10   forma basis, yes.

11      Q.   And Mr. Hianik told you to delete

12   it; is that right?

13      A.   To the best of my recollection,

14   Mark contacted me via e-mail or via phone and

15   said that for step 1 we should only look at

16   the consummation of step 1.  That's to the

17   best of my recollection.

18      Q.   Understood.

19         Back to Rucker Exhibit 6, the same

20   e-mail from you to Mr. Neier, the fourth

21   sentence of that April 22nd e-mail reads,

22   "All of projections and analysis assume

23   consummation of step 2."

24         Is that accurate as of the date of

25   this e-mail that all of VRC's projections and

1        M. Rucker - Confidential

2   analysis assume consummation of step 2?

3        A.    I'm assuming that all of the

4   projections of forecast that were provided by

5   the company, their financial models, assumed

6   a consummation of a step 2.

7        Q.    And VRC made the same assumption,

8   at least as of this time?

9        A.    Initially, yes.

10       Q.    That changed at some point?

11       A.    At some point.

12       Q.    That's the change that came about

13  as a result of the communication from

14  Mr. Hianik?

15       A.    Yes.

16       Q.    The following sentence, still on

17  Rucker Exhibit 6, reads, "Plus a key

18  assumption in our analysis is AESOP tax

19  savings."

20            Goes on to say, "It provides about

21  1 billion in NPV value."

22            Do you see what I just read,

23  Mr. Rucker?

24       A.    Yes, sir.

25       Q.    What were you referring to here?

1        M. Rucker - Confidential

2        A.    The tax savings from the AESOP

3    S. Corporation structure.

4        Q.    They were a key assumption for your

5    solvency analysis; is that right?

6        A.    It was a factor that we took into

7    consideration when we were retained to do the

8    solvency opinion.

9        Q.    It was a key assumption as you

10   describe it in this e-mail?

11       A.    Yes.

12       Q.    Did the deletion of step 2 cause

13   you any concern about that key assumption?

14            MR. BENDERNAGEL:   Object to the

15        form of the question.

16       A.    Can you repeat the question?

17            (Whereupon, the requested portion

18        was read back by the court reporter.)

19       A.    I think in general the deletion of

20   the AESOP S. Corporation structure made me

21   concerned about how we would handle that as

22   far as our analysis and our valuation and

23   what was the appropriate way to handle that.

24       Q.    And that's because the AESOP tax

25   structure provided about a billion dollars in

1        M. Rucker - Confidential

2    NPV value, at least as of this time, April

3    22nd?

4        A.   At that time, yes, from our initial

5    analysis.

6        Q.   If you take those tax savings out,

7    you were removing about a billion dollars in

8    NPV value, contributing to the equity value

9    of the Tribune as calculated at this time?

10        A.   I'm not certain that the net effect

11    was a billion dollars, but it did require

12    some adjustment to the valuation.

13        Q.   Your e-mail recites that the tax

14    savings provides about one billion NPV value.

15        Do you believe it is incorrect?

16        MR. NEIER:   Object to the form.

17    That's not what he said.

18        A.   I said I'm not sure the net effect

19    was that amount.

20        Q.   Is the NPV value referred to in

21    your e-mail on a net effect basis?

22        A.   No, it doesn't refer to a net

23    effect basis.

24        Q.   Help me understand why the net

25    effect of removing tax savings might be

1          M. Rucker - Confidential

2    different than simply the gross amount of tax

3    savings?

4          A.    You have other tax advantage

5    structures in Tribune's capital structure

6    which have an impact if you -- you know, once

7    it becomes an AESOP S. Corporation.

8          That's why I said I don't know what

9    the net effect was.  I think at this

10   particular time we weren't sure what all of

11   those impacts were.

12         Q.    Thank you, Mr. Rucker.  That helps.

13         Let me turn to the last sentence in

14   this April 22nd e-mail from you to Mr. Neier,

15   which reads, "Please also note that we

16   carefully negotiated the engagement letter

17   and our analysis conforms with the engagement

18   letter, not the revisions."

19         What is it that the revisions

20   referred to here changed from the analysis

21   that you all were doing based on the

22   engagement letter?

23         A.    I'm just not certain.  I mean, I

24   would need to sit down and read the entire

25   engagement letter.

1          M. Rucker - Confidential

2          Q.    Is it correct that the engagement

3     letter, which we looked at earlier,

4     contemplated VRC giving both step 1 and step

5     2 opinions?

6               MR. BENDERNAGEL:  Object to the

7          form of the question.  It's deliberately

8          misleading.

9               MR. SOTTILE:  I think that's what

10         it says.

11              MR. BENDERNAGEL:  That's not what

12         it says.

13         Q.    Let's go back to the engagement

14    letter, Rucker Exhibit 3.  Turn to the page

15    numbered 2 under the heading Introduction and

16    Purpose in the first paragraph.

17         A.    Can I read the entire letter?

18         Q.    Yes, but if we're going to do that,

19    I prefer to do that over a break because it

20    will take you a while to read the entire

21    letter.

22              MR. NEIER:  How about if you listen

23         to his question, and if you think you

24         can answer his question based on what

25         he's directing you to, then proceed.  If

M. Rucker - Confidential

1      you think you need to read the entire

2      letter, just let us know and we will

3      take a break and you will read the

4      letter.

5          THE WITNESS:  Okay.

6      Q.    I would invite you, Mr. Rucker, to

7  read the first paragraph under the heading

8  Introduction and Purpose on numbered page 2

9  of the engagement letter.

10         And once you do that, my question

11 is going to be whether or not, pursuant to

12 the engagement letter, the Tribune had

13 retained VRC to provide both a step 1

14 opinion, and upon the closing of step 2

15 transactions, a step 2 opinion?

16         MR. NEIER:  I will object to the

17     form of that question.  You read the

18     first paragraph and see what you can do

19     about his question.

20         MR. BENDERNAGEL:  Just so it's

21     complete, you mind also reading the

22     second full paragraph on page 7 which

23     also addresses the same subject matter.

24         MR. SOTTILE:  Off the record.

1        M. Rucker - Confidential

2            (Whereupon, an off-the-record

3        discussion was held.)

4            THE WITNESS:  Okay.

5            MR. NEIER:  He's read those two

6        paragraphs.

7        Q.    Mr. Rucker, is it your

8    understanding, based on the two paragraphs of

9    the engagement letter to which your attention

10   has been directed, that VRC was engaged to

11   render both a step 1 opinion and step 2

12   opinion by the Tribune?

13       A.    Yes.

14       Q.    Take a look at Rucker Exhibit 6

15   again in that same e-mail.

16            Are you back at Rucker Exhibit 6,

17   your April 22nd e-mail to Mr. Neier?

18       A.    Yes.

19       Q.    Does reviewing the engagement

20   letter refresh your recollection as to what

21   you meant in the last sentence of the e-mail

22   when you said, "Our analysis conforms with

23   the engagement letter, not the revisions"?

24       A.    Repeat your question.

25       Q.    Sure.

1      M. Rucker - Confidential

2          Does reviewing the two paragraphs

3   of the engagement letter to which we directed

4   your attention refresh your memory about what

5   you meant in your April 22nd e-mail when you

6   said at the end of the last sentence, "Our

7   analysis conforms with the engagement letter,

8   not the revisions"?

9      A.   What I'm referring to in this

10  e-mail is in our step 1 analysis should we

11  consider the pro forma step 2 transaction or

12  should we consider not the pro forma step 2

13  transaction.  That's what I'm referring to

14  here.

15     Q.   Is it correct that you understood

16  the engagement letter to say that VRC should

17  consider a pro forma effect of the step 2

18  transactions?

19     A.   I'm not certain of that.  I'm not

20  certain of that.

21     Q.   Then do you know what you meant

22  when you said, "Our analysis conforms with

23  the engagement letter, not the revisions"?

24     A.   I'm just not certain.  I'm just not

25  certain.  If, you know, I'm not certain if

1          M. Rucker - Confidential

2    the engagement letter said we should consider

3    the pro forma step 2 transaction or if I made

4    an assumption that the engagement letter said

5    that.  I'm just not certain.

6          MR. SOTTILE:  It's about the lunch

7       hour.  Why don't we take a break.

8          (Whereupon, a luncheon recess was

9       taken at 12:40 p.m.)

10

11                  *    *    *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       M. Rucker - Confidential

2     A F T E R N O O N   S E S S I O N

3           (Time noted:  1:24 p.m.)

4

5   M O S E   R U C K E R,

6     resumed and testified as follows:

7           MR. SOTTILE:  I would like to mark

8     this document as Rucker Exhibit 7.

9           (Rucker Exhibit 7, Step 1 solvency

10     opinion draft, marked for

11     identification, as of this date.)

12   EXAMINATION BY (Cont'd.)

13   MR. SOTTILE:

14     Q.   Mr. Rucker, we've put in front of

15   you a document marked as Rucker Exhibit 7.  I

16   would be grateful if you could review the

17   document and tell us whether or not this is

18   something you can identify?

19     A.   Yes.

20     Q.   What is it?

21     A.   It's a draft of a step 1 solvency

22   opinion.

23     Q.   It's a draft of the opinion or the

24   analysis?

25     A.   Analysis.

1           M. Rucker - Confidential

2           Q.    Were you involved in the

3      preparation of this draft?

4           A.    Yes.

5           Q.    What was the nature of your

6      involvement?

7           A.    The same as before.

8           Q.    The first page of the exhibit

9      appears to be an e-mail from Mr. Mednik to

10     Mr. Bigelow; is that correct?

11          A.    Yes.

12          Q.    Mr. Mednik reported to you and

13     worked on this engagement?

14          A.    Yes.

15          Q.    Can you turn to the page that's

16     number 9 in the analysis.  It's stamped VRC

17     51407.

18          A.    Yes.

19          Q.    On the left-hand side of this page

20     there are a number of figures under the

21     heading Valuation Summary.

22              Do you see that?

23          A.    Yes.

24          Q.    And on the upper left-hand corner

25     there's a heading Valuation Method Weighting.

1          M. Rucker - Confidential

2          Do you see what I'm looking at?

3      A.   Yes.

4      Q.   What are the weightings being used

5  in the different valuation methods for this

6  draft?

7      A.   25 percent for comparable

8  companies, 10 percent for comparable

9  transactions, 25 percent for some of the

10  individual assets, 40 percent for discounted

11  cash flow.

12      Q.   Do you have any recollection as to

13  why these weightings were chosen at this

14  stage of the analysis?

15      A.   To the best of my recollection, no.

16  Best of my knowledge, no, I can't say why

17  they were chosen.

18      Q.   This is, however, a document you

19  reviewed in the ordinary course of your work

20  before it went to Mr. Bigelow?

21      A.   Yes.

22      Q.   And you had the opportunity to

23  comment on it and revise it?

24      A.   Yes.

25      Q.   We looked at an earlier draft that

1          M. Rucker - Confidential

2    also had a weighting of 40 percent for

3    discounted cash flow.  This one also has

4    different weighting for comparable

5    transactions of 10 percent.

6          Do you see that?

7      A.   Yes.

8      Q.   Do you have any understanding as to

9    why this comparable transactions was weighted

10   at 10 percent at this stage of the analysis?

11     A.   No.

12     Q.   Do you have any understanding

13   generally as to why comparable transactions

14   might be underweighted in relation to other

15   valuation methods for purposes of solvency

16   analysis?

17          MR. NEIER:  You're saying any

18      solvency analysis?

19     Q.   Any solvency analysis.  Not

20   particularly the Tribune.

21          Why would you underweight

22   comparable transactions if you would?

23     A.   I don't think you should

24   underweight comparable transactions unless

25   they're clearly not applicable.

1          M. Rucker - Confidential

2          Q.    What do you mean by "clearly not

3     applicable"?

4          A.    You may not have any comparable

5     transactions.

6          Q.    Or you might believe that the

7     comparable transactions you have are not very

8     comparable, correct?

9               MR. NEIER:   I think you said the

10              same thing as he did.

11         A.    That's what I was thinking.

12         Q.    I think what you said is you might

13    have no comparables at all.

14         A.    If the comparable transactions are

15    not comparable, you don't have comparable

16    transactions.

17         Q.    Fair enough.  I think you're right.

18    I said the same thing.

19              The valuations reflected on this

20    page, page numbered 9, in Rucker Exhibit 7,

21    the debt levels that are put here, are these

22    the debt levels, assuming the closing of step

23    1, but not taking into account any debt that

24    might be assumed in step 2 of the acquisition

25    transaction?

1          M. Rucker - Confidential

2          A.    It appears that way, yes.

3          Q.    To your knowledge, did VRC ever

4    give consideration to whether in a step 1

5    solvency analysis it should include some

6    consideration of the cost to close the

7    acquisition transaction in step 2?

8          A.    Repeat that question again, sir.

9          Q.    Sure.

10         Did VRC, in performing its step 1

11   solvency analysis, ever consider whether or

12   not the cost of closing the second step of

13   the acquisition transaction should be

14   reflected in that step 1 solvency analysis?

15         A.    To the best of my knowledge, no,

16   but I'm not 100 percent certain because I'm

17   not certain if in some of the different

18   valuation methods if those things might have

19   been reflected in the model, so I'm not 100

20   percent certain whether or not they were

21   included or not, so I'm not certain.

22         Q.    Still on the same page of Rucker 7,

23   we have again the line item identified

24   contingent liabilities that we discussed

25   before with respect to an earlier draft.

1          M. Rucker - Confidential

2          Did VRC do any independent inquiry

3    into whether or not the liabilities,

4    contingent liabilities identified by the

5    company, were the only ones that should be

6    considered in a solvency analysis?

7          A.    We rely upon management to provide

8    us with the identified contingent

9    liabilities.  Management also provides us a

10   representation letter with respect to the

11   amount of the identified contingent

12   liabilities, and if I'm not mistaken, our

13   engagement letter typically says that we will

14   not -- we will only represent identified

15   contingent liabilities that have been

16   provided to us by the company.

17         Q.    So in the case of the Tribune

18   solvency analysis, VRC did not try to look

19   behind the contingent liabilities identified

20   by management and see if there were any

21   others that should be considered, but instead

22   took a representation from management?

23         A.    We have to rely upon representation

24   from management.

25         Q.    In the course of the solvency

1        M. Rucker - Confidential

2   analysis in general, if VRC identifies a

3   contingent liability that management hasn't

4   identified to it, what would you do?

5        A.   You would ask management about it.

6        Q.   Did that happen with respect to the

7   Tribune transaction?  Were there any

8   instances where VRC identified what it

9   thought was contingent liability that should

10  be considered that had not been identified by

11  management?

12       A.   In this transaction we relied upon

13  management and management's representations.

14       Q.   I understand you relied upon it,

15  but did you in fact find ones that management

16  hadn't identified you to?

17       A.   To the best of my knowledge,

18  nothing came to our attention.

19       Q.   And if it had, you would have

20  raised it with the Tribune?

21       A.   Yes.

22       Q.   Could you turn to the page numbered

23  32 in Rucker Exhibit 7, please?  It's headed,

24  "Discounted cash flow method."

25            Are you on that page, Mr. Rucker?

1          M. Rucker - Confidential

2     A.   Yes.

3     Q.   Can you describe what this page is

4  intended to reflect?

5     A.   It's intended to reflect our

6  valuation using the DCF valuation method.

7     Q.   In the box at the bottom of the

8  page, at the left there's a heading,

9  "Discount rate."

10         Do you see that?

11     A.   Yes.

12     Q.   What are the discount rates shown

13  here used for in the analysis?

14     A.   The discount rates are used to

15  discount back to the net present value each

16  distinct cash flow.  And also our terminal

17  value.

18     Q.   And explain what a terminal value

19  is in a solvency analysis?

20     A.   In this particular instance, the

21  terminal value represents adjusted EBITDA

22  times a multiple to figure out what the

23  company may be worth, or give an estimate of

24  what the terminal value of the company may be

25  at the end of your discrete periods of cash

1          M. Rucker - Confidential

2    flow.

3          Q.   So a discounted cash flow method

4    valuation would start with a discrete period

5    of cash flow for which you have year-by-year

6    projections?

7          A.   Yes.

8          Q.   And then at the end of that period

9    of projections, VRC would calculate a

10   terminal value intended to represent the

11   value of cash flows from that point on into

12   the future?

13         A.   Or the value of the enterprise at

14   that point in the future.

15         Q.   How were the discount rates

16   reflected here reflected for the discounted

17   cash flow method, and to be clear, they are

18   stated here as 7.5 percent, 8 percent and 8.5

19   percent?

20         A.   I don't know exactly how these

21   particular numbers were calculated.  I can

22   explain to you in general how you determine

23   a --

24         Q.   Please.

25         A.   -- discount rate.

1         M. Rucker - Confidential

2         Q.    Please do.

3         A.    In general, you look at a series of

4    comparable companies to determine a weighted

5    average cost of capital for a particular

6    company.

7              So you look at comparable

8    companies.  You use a weighted average cost

9    to determine a weighted average cost of

10   capital for a company or industry, and that's

11   how you determine the discount rate.  You may

12   make adjustments up or down for specific

13   items for a particular company, but that's in

14   general how you determine the discounted cash

15   flow -- discount rate.

16        Q.    In general, would you look at the

17   average weighted cost of capital for

18   comparable companies?

19        A.    You develop a weighted average cost

20   of capital.  It's called a WACC, W-A-C-C.

21        Q.    You have no specific recollection

22   of how these discount rates reflected on page

23   32 of Rucker Exhibit 7 were chosen; is that

24   right?

25        A.    No, without looking at the WACC

1        M. Rucker - Confidential

2   table, I don't know the specifics.

3        Q.    In determining the discount rate

4   for valuing the Tribune on a discounted cash

5   flow method, did VRC look at the Tribune's

6   actual cost of debt on a pro forma basis,

7   assuming completion of both steps of the

8   transaction?

9        A.    When you're doing a discounted cash

10  flow approach, it's not appropriate to look

11  at a particular company's capital structure.

12  You look at an industry capital structure

13  when you're doing a DCF.  It's not

14  appropriate to look at a particular company's

15  capital structure.

16       Q.    It's never appropriate to look at

17  the company whose cash flow you're valuing

18  cost of capital in determining the discount

19  rate?

20       A.    When you're looking on an unlevered

21  basis, it's not appropriate.  Here we were

22  looking at it on an unlevered basis.

23       Q.    Why is it that it's not appropriate

24  when you're looking at it on an unlevered

25  basis?

M. Rucker - Confidential

1    A.   If you see on page 32, you do not

2    consider leverage here.  You have adjusted

3    EBITDA, but you do not have any deduction at

4    all for interest expense or anything like

5    that, so it's an unlevered cash flow.

6    Q.   You discount that unlevered cash

7    flow based on an industry weighted cost of

8    capital, not on the Tribune's actual

9    anticipated cost of capital?

10    A.   When you're doing it on an

11    unlevered basis, yes.

12    MR. SOTTILE:   Let's mark this as

13    Rucker Exhibit 8, please.

14    (Rucker Exhibit 8, Solvency opinion

15    analysis, marked for identification, as

16    of this date.)

17    Q.   Mr. Rucker, as with previous

18    exhibits, I would be grateful if you can

19    review Rucker Exhibit 8 and identify it for

20    us if you are able to do so.

21    A.   Looks like a solvency opinion

22    analysis that was sent out to Chandler

23    Bigelow from Bryan Browning.

24    Q.   Did you see this at the time it was

1       M. Rucker - Confidential

2  sent to Mr. Bigelow?

3       A.   I'm quite certain that I did.  I'm

4  cc'd on it, so I'm quite certain that I did.

5       Q.   Did you play the same role on the

6  drafting of this that you did in previous

7  drafts of the solvency opinion analysis for

8  the Tribune?

9       A.   Yes.

10       Q.   Do you understand this document to

11  be the final solvency presentation prepared

12  for the Tribune by VRC with respect to step

13  1?

14       A.   I'm not certain if this is the

15  final one, but it may be the final one.

16       Q.   Can you turn to the page numbered

17  10 in Rucker Exhibit 8, which is stamped VRC

18  60928?

19       A.   Yes.

20       Q.   This, again, is a summary of

21  valuation on capital adequacy tests performed

22  by VRC on the Tribune; is that right?

23       A.   Yes.

24       Q.   There are no weightings indicated

25  for the different valuation methods here in

1          M. Rucker - Confidential

2     contrast to the draft we just looked at,

3     which was Rucker Exhibit 7.

4          Do you see that?

5     A.    Yes.

6     Q.    Would you assume from that that

7     these are weighted equally?

8     A.    Yes.

9     Q.    And do you have any recollection as

10    to how it is between the time of Rucker

11    Exhibit 7 and the time of Rucker Exhibit 8

12    the weightings changed so that they became 25

13    percent for each valuation method as opposed

14    to, in the previous draft, 40 percent for

15    DCF, 10 percent for comparable transactions?

16    A.    Yes.  When we went to our internal

17    committee to review the draft analysis, our

18    internal committee concluded that it was not

19    appropriate to use weightings in a solvency

20    opinion analysis.

21    Q.    And you were one of the members of

22    that committee, correct?

23    A.    Not in this instance, because Bryan

24    Browning and I were conflicted on this.  The

25    committee composition consisted of Greg

1          M. Rucker - Confidential

2     Barber, it consisted of Steve Schuetz, Mark

3     Brattebo, and I cannot recall if Stuart

4     Gruskin was involved in reviewing it or not.

5          Q.   Mr. Rucker, you believe that

6     between the time of Rucker Exhibit 7 and the

7     time of Rucker Exhibit 8, the solvency

8     analysis for step 1 was presented to the

9     opinion committee; is that right?

10         A.   I'm certain it was.

11         Q.   You believe it was the opinion

12    committee that advised that the weightings

13    for each valuation method should be equal as

14    opposed to the way they were presented in

15    Rucker Exhibit 7?

16         A.   Yes.

17         Q.   Do you recall that happening or are

18    you inferring that happening from the change

19    in the documents?

20         A.   I remember the conversations in

21    general.

22         Q.   What do you recall being said on

23    the subject of the weightings of the

24    different valuation methods in the meeting of

25    the opinion committee?

1          M. Rucker - Confidential

2          A.   The opinion committee felt that

3   given -- that an approach of using the

4   weightings was more a traditional

5   appraisal-type of valuation process that we

6   talked about earlier as opposed to the way

7   that you should use indications of value in a

8   solvency opinion and asked us to remove those

9   weightings.  They did not think it was

10  appropriate.

11         Q.   Is it correct that you and

12  Mr. Browning, in presenting the solvency

13  analysis to the opinion committee, believed

14  that it was appropriate to use different

15  weightings for the different valuation

16  methods?

17         A.   No.

18         Q.   Then why did you present it that

19  way?

20         A.   As I indicated earlier, we were

21  bringing through some new valuation

22  approaches with Bryan coming in and was

23  trying new things that we had not

24  traditionally done with solvency opinions as

25  far as the weightings.

1          M. Rucker - Confidential

2          Q.    I understand that you were using a

3     new approach or trying out a new approach.

4          A.    Uh-huh.

5          Q.    Isn't it true, though, that by

6     presenting it to the opinion committee using

7     different weightings you and Mr. Browning

8     were expressing the view that those different

9     weightings were appropriate to use?

10         A.    No, it's not necessary that I

11    agreed on particular weightings, or Bryan

12    agreed on particular weightings.

13         Q.    Then help me understand why the two

14    of you would present to VRC's opinion

15    committee a solvency analysis that used

16    valuation weightings you didn't agree with?

17         A.    It's a draft of an analysis.  It's

18    a draft that we're going to be waiting to get

19    that comment and commentary from our internal

20    committee.  So you put forth an initial case

21    to get back commentary and thought on that.

22         Q.    And the initial case you and

23    Mr. Browning presented used different

24    weightings?

25         A.    Yes.

1          M. Rucker - Confidential

2          Q.    For different valuation methods?

3          A.    Yes.

4          Q.    Can you turn to the page numbered

5    17, which is VRC 60935, still in Rucker

6    Exhibit 8.

7          Do you have it in front of you?

8    It's the page headed, "Sensitivity test

9    assumptions"?

10          A.    Yes.

11          Q.    Is this a sensitivity test

12   developed by VRC or by the Tribune?

13          A.    I'm not certain, but I think it's

14   the sensitivity case developed by the

15   Tribune.

16          Q.    That's the downside case you

17   referred to earlier?

18          A.    The Tribune downside sensitivity

19   case, if I'm not mistaken.

20          MR. SOTTILE:  Let's mark this as

21          Rucker Exhibit 9, please.

22          (Rucker Exhibit 9, Final solvency

23          opinion letter, marked for

24          identification, as of this date.)

25          Q.    Mr. Rucker, please take a look at

1        M. Rucker - Confidential

2   Rucker Exhibit 9 and identify it for us if

3   you can.

4        A.    Looks like our solvency opinion,

5   final solvency opinion letter for step 1 that

6   was filed with the SEC.

7        Q.    Did you play a part in the drafting

8   of this solvency letter?

9        A.    Yes.

10       Q.    Were you the initial drafter or did

11  someone else draft it and you edited it?

12       A.    I don't recall.

13       Q.    Mr. Rucker, can you turn to the

14  page numbered 2 of 10 in the upper right-hand

15  corner.  Towards the bottom of the page,

16  there's a phrase that reads, "In rendering

17  the opinion, VRC conducted such reviews,

18  analyses and inquiries reasonably deemed

19  necessary or appropriate under the

20  circumstances.  Among other things, VRC has,"

21  and then there's a long bullet list of items

22  that follows.

23            Do you see where I've been reading?

24       A.    Yes, sir.

25       Q.    There are references here, just

1      M. Rucker - Confidential

2   below the text I read, to a review of certain

3   financial materials of the Tribune by VRC in

4   the first four bullet points on the bottom of

5   page 2.

6           Do you see that?

7      A.   Yes.

8      Q.   These appear to reflect a review of

9   financial statements for periods ending no

10  later than March 31, 2007; is that correct,

11  or perhaps April 1, 2007?

12     A.   No.

13     Q.   What was I missing?

14     A.   April 5, 2007.

15     Q.   You're referring to the Form 8-K

16  filed on April 5, 2007?

17     A.   For the first four bullets?

18     Q.   Yes.

19     A.   Yes.

20     Q.   Do you know whether or not that 8-K

21  included any financial information going past

22  April 1st?

23     A.   I don't know.  I don't recall.

24     Q.   To your recollection, at the time

25  this solvency opinion was issued, had VRC

1        M. Rucker - Confidential

2   reviewed any financial statements of the

3   company, whether interim, internal or

4   otherwise, covering periods after April 5,

5   2007?

6        A.   I just don't recall.  I don't know.

7        Q.   I will represent to you none are

8   listed here.

9        A.   Uh-huh.

10       Q.   Assuming that my representation is

11  correct, does that mean that VRC did not

12  review any Tribune financial information

13  after April 5, 2007 in rendering this

14  solvency opinion?

15       A.   I'm not sure, because there could

16  have been some interim financials in the

17  company's model.  I'm just not certain.  I

18  don't know.

19       Q.   You're referring to the model

20  that's referenced in the fifth bullet point

21  at the bottom of page 2?

22       A.   If that was the latest model that

23  we had at the time.

24       Q.   Is it correct if you had a later

25  model from the company at the time this

1           M. Rucker - Confidential

2    opinion was issued it would have been

3    referenced here?

4        A.    In these first four bullets or

5    somewhere in the document?

6        Q.    Somewhere in the document.

7        A.    I would imagine it would have been,

8    but I'm not certain.

9        Q.    I note that the third bullet point

10    at the bottom of page 2 says, "Reviewed

11    internal interim financial statements for the

12    period ended March 31, 2007."

13           Do you see that?

14        A.    Yes.

15        Q.    I see no reference anywhere in the

16    document to reviewing any later interim

17    financial statements.

18           If VRC had done so in rendering its

19    opinion, would it have reflected such interim

20    financials in this opinion letter?

21        A.    I'm not certain if we reviewed

22    financial information after that date or not,

23    and it was not reflected in here.  I'm just

24    not certain.

25        Q.    What I'm trying to get at is:  Does

1          M. Rucker - Confidential

2     the fact that I'm representing to you that no

3     such interim financials are listed in this

4     document mean that VRC didn't see them as of

5     the time this opinion was issued?

6          A.    No, we could have looked at them

7     but forgot to reference them in the document.

8     I'm just not certain.  I don't know.

9          Q.    Is it correct that it was VRC's

10    intent in identifying things that it did to

11    identify all important documents it had

12    reviewed?

13         A.    We tried to be comprehensive, but

14    given the sheer volume of stuff that was

15    going back and forth and the number of people

16    that were involved, we're not certain that we

17    captured everything.

18         Q.    You would have tried to capture all

19    important documents but you might have missed

20    one?

21         A.    There's a possibility that we could

22    have missed documents that we reviewed that

23    you weren't listed on here.

24         Q.    Would you agree with me that in

25    rendering a solvency opinion it's important

1          M. Rucker - Confidential

2    to have access to the most current financial

3    information concerning the company you're

4    opining about?

5          A.    It's important to have both current

6    and projected financial information.

7          Q.    And you want to have as current a

8    financial opinion as possible at the time of

9    rendering a solvency opinion; don't you?

10         A.    Particularly for the balance sheet

11   test, you want to have either an up-to-date

12   balance sheet or an up-to-date number on what

13   the pro forma balance sheet will look like.

14         But you also have representation

15   letters from the company that the company

16   represents to you and you have to assume that

17   the information that you have is the best

18   current information.

19         Q.    Independent of the representations,

20   it's VRC's practice to make an effort to get

21   the most current financial information

22   available in rendering a solvency opinion;

23   isn't that so?

24         A.    We use the most current information

25   that we have that's made available to us.

1          M. Rucker - Confidential

2          Q.   Does the term "brown book" have any

3     meaning to you in connection with the Tribune

4     and financial statements?

5          A.   Yes.

6          Q.   What is it?

7          A.   It's an internal document that

8     lists tons of financial information about the

9     Tribune on all different types of levels.

10         Q.   And to your understanding, as of

11    April, May 2007, were such documents prepared

12    on a monthly basis by the Tribune?

13         A.   At the time, I just don't know, to

14    be honest with you.

15         Q.   You recall seeing examples of brown

16    books at some point in time during your work,

17    you're just not sure whether you saw them in

18    this timeframe; is that right?

19         A.   Yes.

20         Q.   And you're not sure whether or not

21    they were issued on a monthly basis or some

22    other period of time?

23         A.   I just don't recall at this time

24    when they issued them.

25         Q.   As you sit here today, do you know

1          M. Rucker - Confidential

2    how the company's April 2007 revenues and

3    EBITDA compared to the projections that you,

4    VRC were using, in connection with your

5    solvency opinion?

6          A.    I just don't recall.

7              MR. SOTTILE:   Let's mark this

8          document as Rucker Exhibit 10.

9              (Rucker Exhibit 10, Management

10         representation letters, marked for

11         identification, as of this date.)

12         Q.    Mr. Rucker, can you take a look at

13   Rucker Exhibit 10 and identify it for us if

14   you are able to do so.

15              I note it does not bear a

16   confidential designation but assume it came

17   from the Tribune data room and therefore that

18   it should be designated as confidential and

19   treated as such.

20         A.    Could you repeat the question,

21   please?

22         Q.    I'm just asking whether you can

23   identify it, Mr. Rucker.

24              MR. BENDERNAGEL:   Why don't we

25         treat it as confidential for the moment,

1          M. Rucker - Confidential

2      but I'm not sure these were made as part

3      of the tender offer package.  I'm just

4      not sure if these documents were posted

5      at the SEC and the like.

6          MR. SOTTILE:  I'm happy to agree to

7      treat the document as confidential

8      pending on checking whether or not it

9      became public.

10          MR. BENDERNAGEL:  Why don't we do

11      that.  Thank you.

12      Q.   Can you tell us what it is,

13  Mr. Rucker?

14      A.   Management representation letters

15  for the step 1 opinion.

16      Q.   I think you made reference at some

17  point, Mr. Rucker, to representations from

18  management in connection with VRC solvency

19  opinion about changes in the financial

20  condition of the company.

21          Do you recall that?

22      A.   No.

23      Q.   Let's try it a different way.

24          What's your understanding of the

25  representation reflected on the first page of

1       M. Rucker - Confidential

2   Rucker Exhibit 10?  What is the company

3   representing to VRC here?

4       A.    That as of April 1st balance sheet

5   2007 these are no material adverse changes.

6       Q.    From when to when?

7       A.    Between April 1st, 2007 and May 9,

8   2007.

9       Q.    And no material adverse changes in

10  what?

11      A.    Maybe it's best if I read it to

12  you.

13      Q.    That's fine.

14      A.    "The undersigned, in his capacity

15  as a responsible officer of Tribune,

16  represents to VRC that there have not been

17  any material adverse changes in the assets or

18  liabilities of Tribune between April 1st,

19  2007, the most recent draft balance sheet

20  furnished to VRC, and the date hereof, that

21  may materially affect without limitation

22  Tribune's business operations or condition,

23  financial or otherwise, except as listed

24  below.  If no material adverse changes have

25  occurred, please state none.  Please provide

1          M. Rucker - Confidential

2     an additional attachment if required."

3          Q.    Is it correct that none was

4     inserted in the description of material

5     adverse changes on this document?

6          A.    Yes.

7          Q.    Did you understand that to mean

8     that the Tribune was representing to VRC that

9     there had been no material adverse changes in

10    the assets or liabilities of the Tribune

11    between April 1, 2007 and May 9, 2007 subject

12    to the limitations in the material you just

13    read?

14         A.    Yes, that was the representation

15    that we were provided.

16         Q.    I want you to assume for a moment

17    that, in fact, the April financial statements

18    showed a material decline in revenues and

19    EBITDA from previous periods.

20              Would you understand that to be a

21    matter within the scope of this

22    representation that should have been

23    disclosed by the Tribune?

24         A.    Any material adverse changes should

25    have been disclosed.

1        M. Rucker - Confidential

2        Q.    Including material adverse changes

3    in revenue and EBITDA?

4        A.    Material adverse changes in the

5    operations or conditions of the company's

6    business.

7        Q.    Which would include revenues and

8    EBITDA; is that correct, to your

9    understanding?

10       A.    Any material adverse changes.

11            MR. BENDERNAGEL:  That's his

12       understanding as opposed to --

13            MR. SOTTILE:  That's the question,

14       is that his understanding.

15       A.    My understanding is that any

16   material adverse changes would have been

17   disclosed, either there or in the

18   representation related to financial forecast.

19       Q.    This representation letter in the

20   section you just read indicates that the most

21   recent draft balance sheet furnished to VRC

22   was dated as of April 1, 2007.

23            Do you recall that?

24       A.    Yes, sir.

25       Q.    Does that indicate to you that as

1          M. Rucker - Confidential

2     of May 9, 2007, VRC had not seen any later

3     interim financials for the Tribune?

4          A.   For our solvency opinion analysis,

5     we relied upon the April 1st, 2007 balance

6     sheet.  I cannot recall whether or not we saw

7     any others, but from what I see here, we

8     relied upon the April 1st, 2007 balance

9     sheet.

10         Q.   Can we agree that this

11    representation letter says that that's the

12    most recent one that has been furnished to

13    VRC from the Tribune?

14         A.   Yes.

15         Q.   Thank you.

16         MR. SOTTILE:  Let's mark this as

17    Rucker Exhibit 11.

18         (Rucker Exhibit 11, May 24th

19    solvency opinion, marked for

20    identification, as of this date.)

21         Q.   Mr. Rucker, as usual, please take a

22    look at the document we marked as Rucker

23    Exhibit 11 and identify it for us if you are

24    able to do so.

25         A.   Looks like a May 24th solvency

1      M. Rucker - Confidential

2  opinion.

3      Q.   And did you work on this in the

4  same manner that you worked on the May 9,

5  2007 solvency opinion for the Tribune?

6      A.   I would assume, yes.

7      Q.   Could you turn to the second page

8  of the exhibit, at the bottom of the page

9  there's -- at the very bottom it reads, "In

10  rendering the opinion, VRC conducted such

11  reviews, analyses and inquiries reasonably

12  deemed necessary or appropriate under the

13  circumstances.  Among other things, VRC has,"

14  and then there continues a similar long

15  bulleted list of items that VRC has done.

16          Do you see where I've been

17  referring to in the exhibit, sir?

18      A.   Yes.

19      Q.   If you turn to the page, the third

20  page of the exhibit which is actually also

21  numbered page 2, at the top, take a look at

22  the second, third, fourth, fifth and sixth

23  bullet items and tell me, if you can, what

24  the most recent financials of the Tribune

25  that are described here are.

1           M. Rucker - Confidential

2       A.    Looks like reviewed a company

3   memorandum dated May 11th titled, "Financing

4   update."

5       Q.    And do you understand from reading

6   this that that document included any

7   financial statements for the Tribune?

8       A.    I don't recall.  I don't recall

9   what was in that document, but that's the

10  latest date, May 11th.

11      Q.    Understood.

12          Do you see the bullet point that

13  reads, "Reviewed internal interim financial

14  statements for the period ended April 1,

15  2007"?

16      A.    Yes.

17      Q.    You saw the same note in the May

18  9th opinion, correct?

19      A.    Repeat that question again, sir.

20      Q.    We saw the same note about

21  reviewing internal and interim financial

22  statements for the period ended April 1, 2007

23  in both the May 9th and May 24th opinions;

24  isn't that correct?

25      A.    No.

1       M. Rucker - Confidential

2       Q.    How does it differ?

3       A.    I'm comparing the two.  It says,

4  "Reviewed internal interim financial

5  statements for the period ended March 31,

6  2007."

7       Q.    That's what the May 9th one says?

8       A.    That's what I see here.

9       Q.    Yes, I am sorry.  You're quite

10  right.  This one says, "Financial statements

11  for the period ended April 1, 2007"?

12      A.    Yes.

13      Q.    Would you understand those to be

14  references to the same internal interim

15  financial statements, even though the dates

16  are one day different?

17      A.    I don't recall.  I just don't know.

18      Q.    Mr. Rucker, I will represent to you

19  that in Rucker Exhibit 11, the latest interim

20  financial statements that are identified here

21  are the ones for the period ended April 1,

22  2007.

23           Assuming that that representation

24  is correct, would you conclude from that that

25  VRC did not review any later internal interim

1        M. Rucker - Confidential

2    financial statements for the Tribune before

3    rendering its May 24, 2007 solvency opinion?

4          MR. NEIER:  Objection to form.

5      A.   I just don't know.  I just can't

6    recall.

7      Q.   Is it fair to say that internal

8    interim financial statements for the Tribune

9    for periods ending after April 1, 2007 would

10   have been important documents for VRC to

11   review in the course of rendering its

12   solvency opinion if they were available?

13     A.   If they were material.

14     Q.   What do you mean by "material" in

15   this context?

16     A.   If they were material.  Oftentimes

17   you will do a solvency opinion where there's

18   a gap between the last financial statements

19   that you have, and when you issue the final

20   opinion, but sometimes if they're not

21   material of pieces and the company represents

22   to you about the financial forecasts and no

23   material adverse change, you often will still

24   deliver the opinion because you're relying

25   upon management's representation that the

1          M. Rucker - Confidential

2   forecast that they had provided, that the

3   financial statements that they provided,

4   represent an accurate view of the company.

5          Q.   And that's a representation like

6   the first page of Rucker Exhibit 10 that we

7   looked at earlier that you're referring to?

8          A.   Like all of the representation

9   letters combined.

10          Q.   All the ones that are included in

11   Rucker Exhibit 10?

12          A.   Yes.

13              MR. SOTTILE:  Off the record.

14              (Whereupon, an off-the-record

15          discussion was held.)

16              MR. SOTTILE:  Let's mark this

17          document as Rucker Exhibit 12.

18              (Rucker Exhibit 12, E-mail

19          exchange, marked for identification, as

20          of this date.)

21          Q.   Mr. Rucker, please review Exhibit

22   12 and tell us whether or not you can

23   identify it?

24          A.   Looks like we're, or I'm conversing

25   with Bryan Browning, or asking Chandler

1       M. Rucker - Confidential

2   Bigelow about the status of an updated model.

3       Q.   You're conversing by means of an

4   e-mail exchange; is that right?

5       A.   Yes.

6       Q.   And the e-mail exchange is

7   occurring on May 15, 2007; is that right?

8       A.   May 14th and May 15th.

9       Q.   I see, yes.

10          What is the model that's being

11  referred to in this e-mail exchange?

12      A.   The Tribune model financial model.

13  Excel model that they provided to us that

14  provides us with both historical and

15  forecasted projections.

16      Q.   Does this indicate that you were

17  receiving an updated or revised version of

18  the model around May 14th or 15th of 2007?

19      A.   The e-mail says we received this

20  this morning, so I'm assuming yes.

21      Q.   Do you recall getting an updated or

22  revised version of the model in this

23  timeframe?

24      A.   No.  We received several updated

25  models throughout the forecast, throughout

1          M. Rucker - Confidential

2     the period, so I can't recall any particular

3     date.

4          Q.   Can you look at the second e-mail

5     from the top on the first page of Rucker

6     Exhibit 12, appears to be from you to

7     Mr. Browning on May 15th at 1:19.

8               Could you read that out loud, sir?

9          A.   Repeat it, please, sir.

10         Q.   Could you just please read out loud

11    the e-mail?

12         A.   From Chad Rucker to Bryan Browning

13    sent Tuesday, May 15th, 13:19:25, 2007.

14              Is this the correct e-mail, sir,

15    that you want me to read?

16         Q.   Yes.

17         A.   "Subject re: Status of model.  We

18    received it this morning and are going

19    through it.  On the surface, the debt is

20    essentially the same.  But projected EBITDA

21    is lower.  I am trying to determine the

22    source of the lower EBITDA numbers.  Part of

23    it is that they have also projected lower

24    revenues.  I don't think it will have an

25    impact on step 1, but we have to see how

1        M. Rucker - Confidential

2   close it is on step 2.  We should be fine

3   still for step 1.  I will provide you with an

4   update once we are complete.  Regards, Chad

5   Rucker."

6        Q.   Am I understanding this correctly

7   that the model you just received this morning

8   had lower EBITDA numbers than the previous

9   model you were working with?

10       A.   From the context of this e-mail, it

11  appears so.

12       Q.   And also lower revenues?

13       A.   From the context of this e-mail, it

14  seems so.

15       Q.   The sentence that follows the

16  references to the lower EBITDA numbers and

17  lower revenues reads, "I don't think it will

18  have an impact on step 1 but we have to see

19  how close it is on step 2."

20            MR. NEIER:  To be clear, it refers

21       to projected lower revenues.

22            MR. SOTTILE:  Sorry.  Quite right.

23       Q.   Can you explain what you meant by

24  the sentence that reads, "I don't think it

25  will have an impact on step 1, but we have to

1        M. Rucker - Confidential

2   see how close it is to step 2"?

3        A.   Referring to how much cushion we

4   have, in step 1, we had more cushion.   In

5   step 2, we had less cushion, so what kind of

6   impact will that have on the cushion.

7        Q.   So lower EBITDA and projected lower

8   revenues you didn't think would have a

9   material impact on step 1, given its cushion,

10  correct?

11       A.   I would assume based upon the

12  context of this e-mail, yes.

13       Q.   But you wanted to see how close the

14  cushion would be on step 2 given the new

15  model; is that right?

16       A.   Yes, from the text of this e-mail

17  it appears, yes.

18       Q.   Would this indicate to you that as

19  of May 15th, VRC was analyzing solvency, both

20  after step 1 and on a pro forma basis after

21  step 2?

22       A.   Internally, yes, it appears from

23  this e-mail, yes.

24            MR. SOTTILE:  Let's mark this as

25       Rucker 13.

1        M. Rucker - Confidential

2          (Rucker Exhibit 13, Solvency

3     analysis, marked for identification, as

4     of this date.)

5          MR. SOTTILE:  Rucker Exhibit 13

6     does not have any numbering or

7     confidentiality designations.

8     Consistent with our previous practice,

9     we will treat this document as

10    confidential.

11         MR. BENDERNAGEL:  Do you know where

12    this came from?

13         MR. SOTTILE:  I don't.

14    A.    It appears it may be attached to an

15    e-mail.  Can I get the cover e-mail for that?

16    Q.    If I had it, you could.  I will

17    look for it, Mr. Rucker.  I do not have it

18    immediately available.

19         Mr. Rucker, can you review this

20    document and tell us what it is, if you are

21    able to do so?

22         MR. NEIER:  I want to explain that

23    sometimes the analyses are for an event

24    in the future.  They're drafted with a

25    date that is the date of the

1      M. Rucker - Confidential

2      presentation, so the cover e-mails do

3      help.

4           MR. SOTTILE:  I understand the

5      point that the date shown on the

6      presentation is not necessarily the date

7      something was prepared.  I will try to

8      explore that to the extent we can.

9           MR. NEIER:  We've seen that in the

10     prior exhibits.  That's why I'm

11     mentioning it.

12          MR. SOTTILE:  You're quite right.

13     I just don't have an e-mail immediately

14     available to go with this that would

15     help us.

16     Q.   Can you tell us what this is,

17 Mr. Rucker, if you are able to do so.

18     A.   It appears to be a solvency

19 analysis.

20     Q.   Of the Tribune prepared by VRC,

21 correct?

22     A.   Yes, it appears that.

23     Q.   It's dated on the first page May

24 17, 2007, correct?

25     A.   That's the date on the first page,

1        M. Rucker - Confidential

2    but I'm not certain that's the date of this.

3    We do not have the e-mail or attachment for

4    this.

5        Q.   If it's not the date that it was

6    prepared, what would be the significance of

7    that date, to your understanding?

8        A.   Sometimes you're doing it as a

9    draft for a future date and you may just have

10   that date on the cover as part of your

11   interim process.  To the best of my

12   recollection, we did not do a final opinion

13   on May 17th, to the best of my recollection.

14   I don't know where this document came from.

15       Q.   Is this a step 1 solvency analysis,

16   step 2 or some combination thereof?

17       A.   With a summary look at some of the

18   facts here, it looks like it's a step 1

19   analysis.

20       Q.   What are you looking at that tells

21   you that?

22       A.   Just some of the line items.

23   They're different from the step 2 analysis.

24            MR. NEIER:  The witness is

25       referring to page 10 of Rucker Exhibit

1         M. Rucker - Confidential

2         13.

3         Q.    Is that correct, you were looking

4    at page 10?

5         A.    Yes, sir.

6         Q.    And one of the things here that

7    would indicate to you that this is a step 1

8    analysis would be the amount of the debt

9    that's shown on this page; is that right?

10        A.    That's one item, but also the NPV

11   of PHONES tax savings is another indicator of

12   that step 1 transaction.

13        Q.    Why does that indicate to you that

14   this is a step 1 solvency analysis?

15        A.    Because the NPV of the PHONES tax

16   savings, they're not a factor and not

17   considered in the step 2 analysis.

18        Q.    Why is that?

19        A.    Because in the step 2 analysis, you

20   have the AESOP S. Corp. and the entity is no

21   longer a taxpaying entity.  The PHONES have

22   certain tax advantages here that are being

23   taken into consideration if it's a taxpaying

24   entity.

25        Q.    Can you just briefly explain what

1          M. Rucker - Confidential

2     the PHONES are and why they're tax savings

3     associated with them?

4          A.    Off the top of my head, truthfully,

5     no.  If you can provide me with the

6     prospectus from the PHONES, I will be happy

7     to read through some of the description for

8     you.

9               MR. NEIER:  PHONES is all caps,

10          P-H-O-N-E-S.

11          A.    I will describe it in general, but

12     I'm not going to have all of the terms.  We

13     really need to get the prospectus for the

14     PHONES.  It's a derivative security that was

15     issued by the Tribune to monetize part of the

16     value of some Time Warner stock that it

17     owned.

18               There's a series of derivative

19     components within this security where the

20     interest rate is fairly low, 2 percent

21     interest rate with an obligation to pay debt

22     in 2029, or to exchange the Time Warner

23     stock.

24               So basically they have an option of

25     which one of those two.  The holder of the

1        M. Rucker - Confidential

2   security has an option, of which one of those

3   two securities it would like to receive.

4        Q.   Do you have a general understanding

5   as to how the PHONES would lead to tax

6   savings, at least in step 1 of the

7   transaction?

8        A.   He would really need to get the

9   prospectus, but in general this is a very

10  high level, it's not specific.

11            For income tax purposes, for the

12  PHONES, you're able to deduct a higher

13  interest rate than you were actually paying

14  out in cash taxes, which leads to, for income

15  tax calculations, which leads to tax savings.

16  It's very high level, though.

17       Q.   Understood.   Thank you.

18            Can you turn back to Rucker Exhibit

19  8 just for a moment and keep out 12, which is

20  the May 9th, solvency analysis dated May 9th,

21  although the cover is May 8th.

22            Do you have Rucker Exhibit 8?

23       A.   Yes, sir.

24       Q.   And you also have the document we

25  were just looking at, Rucker Exhibit 13.

1          M. Rucker - Confidential

2          Do you have any understanding of

3     the relationship, if any, between these two

4     analyses?  Is May 17th a later draft?  Is

5     Rucker 13 a later draft of the solvency

6     analysis reflected in Rucker 8?

7          A.   Without the cover e-mail or exactly

8     where it came from I don't know for sure, but

9     if I just look at the dates, I would assume

10    that one is later than the other.

11         Q.   Going solely by the dates on the

12    covers of the two documents?

13         A.   That's all I have with no attached

14    e-mail or anything like that, sir.

15         Q.   Understood.  If you open page 10 of

16    both Exhibits 8 and 13, I think you will see

17    that the discounted cash flow valuation in

18    Rucker Exhibit 13 is materially lower than

19    Rucker Exhibit 8.

20         For example, in Rucker Exhibit 8,

21    at the low end of the range, the discounted

22    cash flow given -- valuation given is

23    9,830,000,000.

24         Whereas, in Rucker Exhibit 13, the

25    comparable low end valuation for discounted

1       M. Rucker - Confidential

2   cash flow is 9,245,000,000.

3       Do you see the two figures that I

4   am referring to?

5       A.   Yes.

6       Q.   Does looking at those two figures

7   suggest anything to you about the

8   relationship between these documents?

9       A.   No.

10      Q.   Do you recall the exhibit we looked

11  at dated with some May 15th e-mails that

12  refer to an updated model with lower

13  revenues, lower projected revenues and lower

14  EBITDA?

15      A.   What was the date of that e-mail?

16      Q.   May 15th, and I believe that that

17  is Rucker 12?

18      A.   Yes.

19      Q.   If you look at that e-mail chain

20  with the reference to a version of the model

21  with lower EBITDA and lower projected

22  revenue, does that suggest to you that the

23  difference between Rucker 8 and Rucker 13

24  discounted cash flow valuations is as a

25  result of a model you received on May 15th?

1          M. Rucker - Confidential

2              MR. BENDERNAGEL:  Object.  Calls

3      for speculation.

4      A.    I just don't recall.  I don't know.

5      Q.    In Rucker Exhibit 13, can you turn

6  to the page numbered 24?

7      A.    Which exhibit, sir?

8      Q.    13, the one dated May 17th.

9              This page is headed, "Base case

10  comparison," and then there are references in

11  it to a current base case and an original

12  base case.

13              Do you see those references,

14  Mr. Rucker?

15      A.    Yes, sir.

16      Q.    Do you have any understanding of

17  what those are referring to, the current base

18  case and the original base case?

19      A.    I just can't recall off the top of

20  my head seeing this.  I just can't recall

21  exactly what it's referring to.

22      Q.    Would you understand a base case to

23  be something coming from the Tribune and its

24  AESOP model?

25              MR. NEIER:  Objection to form.

1          M. Rucker - Confidential

2          A.   It could be, but I'm not certain,

3    just from the document.

4               MR. SOTTILE:   Let's mark this

5          document as Rucker 14.

6               (Rucker Exhibit 14, E-mail, marked

7          for identification, as of this date.)

8          Q.   Mr. Rucker, are you able to

9    identify Rucker Exhibit 14?

10         A.   Do you have the attached e-mail for

11   the front cover of this, sir?

12         Q.   I don't.  This is the way in which

13   I got the document.  I'm going to mark in a

14   minute, I have a second related document.

15   Let me just put it in front of you so you've

16   got both of them.

17              MR. SOTTILE:  Mark this Rucker 15.

18              (Rucker Exhibit 15, Solvency

19         analysis, marked for identification, as

20         of this date.)

21         Q.   Mr. Rucker, we put in front of you

22   two documents, Rucker Exhibit 14 and Exhibit

23   15, which appear to contain copies of the

24   same underlying solvency analysis, although I

25   have not compared them line by line.

1          M. Rucker - Confidential

2          Are you able from looking at these

3    two documents to identify them --

4          MR. NEIER:  You're saying Rucker 14

5       and Rucker 15 are the same document?

6          MR. SOTTILE:  Rucker 15 includes a

7       cover e-mail.

8          MR. NEIER:  I would just point out

9       that the cover sheets are different.

10      Rucker 14 says step 2 solvency opinion

11      analysis, and Rucker 15 says step 2

12      preliminary solvency opinion analysis.

13         MR. SOTTILE:  You're quite right.

14      Q.   Mr. Rucker, if you could take a

15   look at both documents, and if you're able to

16   do so, identify them for us.

17      A.   On the surface it looks like that

18   these are internal analyses, but we're also

19   looking at step 2, but it doesn't look like a

20   final opinion.  It looks like an internal

21   analysis to me.

22      Q.   Rucker 15, is it correct it appears

23   to have gone to Mr. Bigelow at the Tribune?

24      A.   Yes, sir.

25      Q.   Your counsel has pointed out that

1      M. Rucker - Confidential

2  the titles of the documents differ a little

3  bit, though both refer to a step 2 solvency

4  opinion.

5          Do you have any understanding

6  whether or not these are different drafts of

7  the same document?

8      A.   Without a complete and thorough

9  review, I looked just to spot-check some of

10  the numbers.  They appear to be the same

11  numbers.

12      Q.   I did the same and the numbers

13  appear to track.  And from that, what do you

14  conclude?

15      A.   I concluded they are preliminary

16  analyses that we're looking at step 2.  And

17  one had the word title Preliminary on it and

18  the other did not.

19      Q.   Looking at these two documents, are

20  you able to determine when the analysis

21  reflected in these two documents were done?

22          Both are dated May 17, 2007.  The

23  second has an e-mail to Mr. Bigelow dated

24  June 13, 2007.  Those are the only dates I

25  see.

1       M. Rucker - Confidential

2       A.   I cannot tell when it's done.  I

3  just think it's odd that it's dated May 17th

4  and sent June 13th.  That's all.

5       Q.   You don't have any understanding of

6  the significance, if any, of the date May 17,

7  2007 for a solvency analysis?

8       A.   A lot of times the cover date did

9  not mean anything.  It might have been just a

10  date we were referencing for some reason or

11  not, but there was no particular significance

12  to my recollection of a May 17th date, to the

13  best of my knowledge.

14       Q.   Okay.  Let's stick with Rucker

15  Exhibit 14 for a moment.  I would like to

16  turn to the page numbered 4, stamped 48776.

17       Do you have that in front of you?

18       A.   Yes, sir, I do.

19       Q.   Tell us what this page represents.

20       A.   Represents our valuation summary.

21       Q.   Similar to valuation summaries we

22  looked at in other solvency analyses?

23       A.   Yes.

24       Q.   There appears on the eighth line

25  down, on the left-hand side, a line which

1          M. Rucker - Confidential

2     we've seen several times before, NPV AESOP

3     tax savings.

4          Do you see that?

5     A.   Yes, sir.

6     Q.   In this case?

7          MR. NEIER:   Objection to form to

8          the last question.

9          Go ahead.

10    Q.   The AESOP tax savings that are

11    shown on this line are the same in the low,

12    mid and high valuation cases, correct?

13    A.   Yes.

14    Q.   Why is that?

15    A.   I cannot recall.

16    Q.   Would you agree with me that the

17    NPV of AESOP tax savings should differ in the

18    low, mid and high cases?

19    A.   No.

20    Q.   It's your view it should be the

21    same as reflected on page 4 of this document?

22    A.   In our analysis here seems like we

23    made a judgment that the AESOP tax savings

24    should be the same in both the low, mid and

25    high cases.

1        M. Rucker - Confidential

2        Q.    Does that mean that you would

3    understand this to reflect a judgment that

4    the discount rate applied to the tax savings

5    should be the same in the low, mid and high

6    cases?

7             MR. NEIER:   Objection to form.

8        A.    No.

9        Q.    If the discount rate were different

10   for the tax savings in the low, mid and high

11   cases, wouldn't we have different tax savings

12   in those cases?

13       A.    I would assume if the discount rate

14   changed, the amount of the tax savings would

15   also change.

16       Q.    Since the tax savings are the same

17   in all three cases here, can we conclude that

18   the discount rate was the same for the tax

19   savings in each of the three cases?

20       A.    I would assume that the variables

21   that were looked at was the same.

22       Q.    One of those variables would be the

23   discount rate; is that right?

24       A.    Yes.

25       Q.    And do you believe that is an

1        M. Rucker - Confidential

2   appropriate way of valuing the tax savings to

3   assume that all variables remain the same

4   with respect to those tax savings in the low,

5   mid and high cases?

6        A.   I think the team concluded that

7   based upon this analysis, that it was

8   appropriate to use the same variables or the

9   company's base case forecast, maybe with some

10  changes, to determine the AESOP tax savings.

11       Q.   I take it you don't have a specific

12  recollection on this subject; is that right?

13       A.   I just don't remember the details,

14  to be honest with you.

15       Q.   But you're assuming from the fact

16  that the number for tax savings is the same

17  in all three cases, that the team made a

18  judgment that that was the right way to value

19  the tax savings?

20       A.   In this draft, yes.

21       Q.   Mr. Rucker, do you know why it is

22  that Mr. Mednik was sending Rucker Exhibit 15

23  to Mr. Bigelow in June 2007?

24       A.   I'm assuming that I asked him to

25  send it to him.

1          M. Rucker - Confidential

2      Q.   Is this something that Mr. Bigelow

3   asked for, to your recollection?

4      A.   I don't recall.

5      Q.   Was Mr. Bigelow aware in April or

6   May 2007, to your knowledge, that VRC was

7   working on a solvency analysis, assuming the

8   step 2 transactions closed on a pro forma

9   basis?

10          MR. NEIER:  Objection to form.  The

11       e-mail is dated June 13th.

12          MR. SOTTILE:  I understand that.

13      A.   Repeat the question again, please,

14   sir.

15      Q.   Is it correct that in the April,

16   May 2007 time period, VRC was doing some

17   analysis of the solvency of the Tribune

18   assuming that the step 2 transactions closed

19   on a pro forma basis?

20      A.   Yes.

21      Q.   Did you or anyone else from VRC, to

22   your knowledge, tell Mr. Bigelow or anyone at

23   the Tribune that you were doing so in the

24   April, May 2007 time period when you were

25   doing the work?

1        M. Rucker - Confidential

2          MR. TRUITT:  Objection to form.

3      A.   I don't know, but I'm assuming from

4  those e-mails that we sent earlier that

5  Chandler would have received one of those

6  e-mails which had one of those versions in

7  there, I'm assuming.

8      Q.   Which document are we referring to,

9  Mr. Rucker?

10      A.   I don't know.  I think we can go

11  back and look at some of the previous ones

12  where we have a step 2 analysis and see if

13  Chandler was on an e-mail there.  That might

14  be the best way to answer that question.

15      Q.   I think if you look at -- I believe

16  you may be thinking of the document that was

17  marked as Rucker Exhibit 4, but if that's the

18  document you're thinking of, Mr. Bigelow does

19  not appear to be copied on it.

20      A.   Sir, I don't know the answer to

21  that.  I don't know if he received a copy or

22  not of the previous work.

23      Q.   Do you know whether Mr. Bigelow was

24  aware in the April, May 2007 timeframe that

25  VRC was doing some analysis of the solvency

1        M. Rucker - Confidential

2    of the Tribune on the assumption step 2

3    closed on a pro forma basis?

4           MR. TRUITT:  Objection to form.

5        A.   I don't know.  It's been two years.

6    I don't know for sure.

7        Q.   Mr. Rucker, did there come a time

8    when VRC was asked to go ahead and prepare a

9    step 2 solvency opinion and to do the

10   analysis necessary to render such an opinion?

11       A.   There was a point where we started

12   the process of looking at step 2.

13       Q.   When was that?

14       A.   You mean without step 1?

15       Q.   No.  We've looked at the step 1

16   solvency opinion dated May 9th and May 24th.

17          Do you recall those documents?

18       A.   Yes, sir.

19       Q.   Ultimately, another solvency

20   opinion was offered that related to step 2 on

21   a pro forma basis.

22          Do you recall that opinion

23   ultimately being rendered by VRC?

24       A.   Yes.

25       Q.   When was it that VRC started work

1        M. Rucker - Confidential

2   on the analysis that led to that opinion?

3        A.   I think we have always been looking

4   at step 2 from the beginning in some kind of

5   fashion, or looking at that from the

6   beginning.

7        Q.   From the beginning of the

8   engagement?

9        A.   Yes, we always were considering

10  step 2 always.

11       Q.   Did there come a time when

12  Mr. Bigelow or someone else at the Tribune

13  came to VRC and said now we want a formal

14  step 2 solvency opinion?

15       A.   I don't recall.

16       MR. SOTTILE:  Let's mark this

17       document as Rucker Exhibit 16.

18       (Rucker Exhibit 16, E-mail, marked

19       for identification, as of this date.)

20       A.   Sir, do you have the attached

21  e-mail that goes with the cover of this?

22       Q.   I don't.

23       MR. SOTTILE:  Off the record.

24       (Whereupon, an off-the-record

25       discussion was held.)

1        M. Rucker - Confidential

2        Q.   Mr. Rucker, are you able to

3    identify what we marked as Rucker Exhibit 16?

4        A.   No.

5        Q.   Is this a document you've seen

6    before?

7        A.   No.

8        Q.   Can you determine by looking at it

9    who in VRC would have worked on this

10    document?

11        A.   There are markings on this

12    document, there's writings in this document

13    that's not my handwriting, so I don't know

14    whose document it is.

15        Q.   You don't recognize the

16    handwriting?

17        A.   Not mine.

18        Q.   I understood.  Do you know whose it

19    is?

20        A.   No.

21        Q.   Setting aside the handwriting, have

22    you seen this document before?

23        A.   The PowerPoint version of the

24    document, yes, I have seen this document

25    before.

1        M. Rucker - Confidential

2        Q.    By PowerPoint version, what are you

3   referring to?

4        A.    The actual document without any of

5   the edits or anything like that, I have seen

6   this document before.

7        Q.    So you have seen this document, but

8   without the handwritten notes that are

9   reflected in Exhibit 16; is that right?

10       A.    Yes, because I don't know whose

11  notes they were or where they came from.

12       Q.    Understood.

13            Can you turn to page numbered 4 in

14  Exhibit 16, please?  Mr. Rucker, this is a

15  valuation summary for the Tribune; is that

16  correct?

17       A.    Yes.

18       Q.    I note that if we look on the

19  left-hand side at the NPV of S. Corp. tax

20  savings line, that the amount of the savings

21  is the same in all three cases; low, mid and

22  high.

23            Do you see that?

24       A.    Yes.

25       Q.    Would you understand that to be the

1        M. Rucker - Confidential

2   same for the same reasons that you identified

3   when we looked at an earlier exhibit where

4   the S. Corp. tax savings were the same in all

5   three cases?

6        MR. BENDERNAGEL:  Objection to

7   form.

8        A.   Repeat your question again, sir.

9        Q.   Why is it that the numbers are the

10  same in all three cases, to your

11  understanding?

12       A.   Throughout this process we were

13  constantly getting information, getting

14  input.  The team was constantly looking at

15  this, and I'm assuming that the team assumed

16  that the best way to value the tax savings

17  was to use a constant variable.

18       Q.   Or at least the team assumed that

19  as of the time this document was prepared,

20  correct?

21       A.   Yes.

22       Q.   Do you have any recollection of

23  discussions about that assumption that the

24  tax should be the same in all three cases?

25       A.   I just don't recall the

1          M. Rucker - Confidential

2     conversations about using the same tax

3     savings number.

4          Q.   Can you turn to the page numbered

5     21 in this document, please?

6          A.   Okay.

7          Q.   Do you have in front of you the

8     page that's headed, "Consolidated discounted

9     cash flow method"?

10         A.   Yes, sir.

11         Q.   There are discount rates given in

12    the table towards the bottom of this page

13    ranging from 7 percent to 8 percent.

14              Do you see that?

15         A.   Yes, sir.

16         Q.   Your understanding of the selection

17    of these discount rates would be similar to

18    what you described earlier in looking at an

19    earlier iteration of the solvency analysis;

20    is that right?

21         A.   For an unlevered cash flow, yes,

22    based upon the company's -- the comparable

23    company's cost of capital.  We looked at it

24    and developed a WACC analysis for that.

25         Q.   Can you turn to slide 23, please?

1         M. Rucker - Confidential

2    This is headed, "Net present value of S.

3    Corp. tax savings."

4              Are you on that page, sir?

5         A.   Yes, sir.

6         Q.   Do you understand this page to be

7    reflecting the analysis, at least as of this

8    time of the value of the S. Corp. tax

9    savings?

10        A.   Yes, sir.

11        Q.   At this point in time, were the tax

12   savings being calculated into perpetuity?

13        A.   It appears that way.

14        Q.   There is a box in the lower

15   right-hand corner of this slide headed, "PV

16   of tax savings summary."

17             Do you see that?

18        A.   Yes, sir.

19        Q.   There's a projected period value

20   given there of $480 million.

21             Do you see where I just read?

22        A.   Yes, sir.

23        Q.   Is that the projected value of the

24   tax savings through the year 2017?

25        A.   It appears that way, yes, sir.

1          M. Rucker - Confidential

2          Q.    The next line down from the

3    projected period value is headed, "Terminal

4    value," and the figure given is

5    1,213,000,000.

6               Do you see that?

7          A.    Yes, sir.

8          Q.    Does that, to your understanding,

9    represent the value of the tax savings from

10   2017 into perpetuity?

11         A.    Yes, sir.

12         Q.    If you look at the left-hand box in

13   the bottom of this page that's headed,

14   "Terminal value calculation," there's a

15   reference to a discount rate of 9 percent.

16              Do you see that?

17         A.    Yes, sir.

18         Q.    Do you understand that to be the

19   discount rate used in this analysis for

20   calculating the value of S. Corp. tax

21   savings?

22         A.    Yes, sir.

23         Q.    Do you know how it was selected?

24         A.    To the best of my recollection, I

25   think here that the discount rate that was

1        M. Rucker - Confidential

2   selected was the equity component of the WACC

3   analysis.

4        Q.   Can you explain what you mean, "the

5   equity component of the WACC analysis"?

6        A.   When you compute a WACC, you have

7   both a debt component and an equity

8   component.  The equity component is computed

9   using the capital asset appreciation model,

10  or cap M model.  That cap M model uses a beta

11  which is derived from comparable companies,

12  the risk free interest rate and premium.  And

13  that the 9 percent here, to the best of my

14  recollection, represents the equity component

15  from using the cap M model.

16       Q.   Mr. Rucker, why is that, in your

17  judgment, the appropriate basis for the

18  discount rate for valuing S. Corp. tax

19  savings?

20       A.   Just keep in mind we were

21  constantly getting information throughout

22  this process.  And the discount or the

23  discount rate that I spoke to before was

24  using an unlevered cash flow, assuming no

25  debt in the capital structure.

1        M. Rucker - Confidential

2            Obviously taxes take into account

3    interest expense.  And so interest expenses

4    after a -- this calculation or the taxes is

5    not on a levered basis.  I'm saying it's not

6    on an unlevered basis.  It's on a levered

7    basis.

8            In order to do the calculation of

9    the taxes using this approach, to the best of

10   my recollection, I think that we concluded

11   that the appropriate rate to use was the

12   equity component of that WACC analysis

13   because it was not an unlevered revenue or

14   stream.  It was a levered stream.

15       Q.   What are the risks that are

16   included in the equity portion of a weighted

17   average cost of capital?  What risks are

18   embedded in that?

19       A.   You have a beta, which is the

20   correlation between a particular company and

21   the market returns.  You have a risk free

22   rate.  You have a, which is typically a

23   government security or risk free security,

24   and you have a market premium, that's

25   typically determined by looking at studies.

M. Rucker - Confidential

And there may be some adjustments.
Sometimes there may be adjustments for small
company stock premiums or may be adjustments
for other types of items in computing their
equity component.

Q.   Is it fair to say that an equity
component of a weighted average cost of
capital is intended, among other things, to
reflect the risk that cash flows may not
materialize as projected?

A.   I think that's embedded in the cap
M model with beta or otherwise everything
wouldn't materialize as given you would just
rely upon the risk free rate.

Q.   The beta component of the equity
cost of the equity component of the weighted
average cost of capital, is that, in your
judgment, an appropriate measure of risk to
use in discounting cash flows from S. Corp.
tax savings?

A.   Repeat that again, please, sir.

Q.   It wasn't very artful, so let me
try it a different way.

I think you've testified that one

1        M. Rucker - Confidential

2    component of the equity piece of the weighted

3    average cost of capital is a measure through

4    beta of the risk, that cash flows won't, in

5    fact, follow projections; is that right?

6        A.   I said I think it's embedded in the

7    beta and in the risk premium.

8        Q.   Is the risk that S. Corp. tax

9    savings won't come in as projected the same

10   as the risk that projected revenues won't

11   come in as projected?

12       A.   I don't know.

13       Q.   What is the risk to the extent you

14   understood it in 2007 that the Tribune

15   wouldn't, in fact, realize the S. Corp. tax

16   savings into perpetuity that you were

17   assuming?

18       A.   Repeat that question again, sir.

19       Q.   As I understand it, you assume, for

20   purposes of your solvency analysis, that the

21   Tribune would, in fact, realize the S. Corp.

22   tax savings into perpetuity; is that right?

23       A.   Yes.

24       Q.   And you did that because that was

25   set forth in the terms of your engagement

1          M. Rucker - Confidential

2    letter?

3          A.    I don't recall if the perpetuity

4    component of the tax savings was in our

5    engagement letter.

6          Q.    But that's, in fact, what you

7    assumed?

8          A.    Yes.

9          Q.    That S. Corp. tax savings would go

10   into perpetuity?

11         A.    And we also received, we made a

12   calculation of the NPV of the tax savings,

13   and we also, in our analysis for the step 2

14   opinion, we also received a representation

15   letter from the company that they thought

16   that this -- that our tax savings were

17   reasonable.

18         We based these tax savings upon

19   financial forecasts that were provided to us

20   by the company, and tax calculations that

21   were provided to us by the company with some

22   extrapolations on that and we relied upon

23   those representations.

24         Q.    I understand that VRC assumed that

25   S. Corp. tax savings would continue into

1        M. Rucker - Confidential

2   perpetuity and that the company so

3   represented to VRC.

4        Did you or anyone else at VRC, to

5   your knowledge, become aware that there was a

6   risk that the S. Corp. tax savings would not,

7   in fact, continue into perpetuity?

8        A.    I think we were all aware that if

9   the company at the point of the 10-year

10  anniversary, that there was substantial

11  embedded tax benefits from being able to sell

12  assets in a tax free manner or avoid capital

13  gains.

14        And we felt that the best way to

15  capture those embedded benefits was to look

16  at it on a perpetuity basis.  There were

17  definitely -- we had discussions with the

18  company that there were some definite

19  benefits to being able to get to the 10-year

20  anniversary and being able to sell some

21  substantial assets, some of which had some

22  very low tax bases without incurring capital

23  gain taxes.

24        Q.   Can you turn to page 35 in Rucker

25  Exhibit 16?

1        M. Rucker - Confidential

2      A.    Yes.

3      Q.    This page is headed, "VRC base case

4   assumptions."

5            Do you see that?

6      A.    Yes.

7      Q.    Is this talking about a base case

8   for the Tribune's financial performance

9   developed by VRC independent of the Tribune?

10     A.    Testing that was done principally

11  for the company's ability to be able to repay

12  indebtedness and whether the company would

13  have reasonable capital, so VRC base case

14  developed specifically for those functions

15  when we were doing testing around the

16  company's base case.

17     Q.    The VRC base case differed from the

18  company's base case?

19     A.    Yes.

20     Q.    Is it correct that the VRC base

21  case assumed lower revenues in EBITDA that

22  the Tribune base case did?

23     A.    We would have to look through the

24  document.  I just can't recall the details.

25     Q.    Understand.  Turn to slide 53, if

1        M. Rucker - Confidential

2   you would, in Rucker 16.

3        A.   Okay, sir.

4        Q.   This page is headed, "VRC downside

5   case assumptions."

6             Do you see that?

7        A.   Yes, sir.

8        Q.   And this would be a downside case

9   for the Tribune's financial performance

10  developed by VRC that is different from the

11  Tribune's downside case?

12       A.   Testing, yes, sir.  But in general,

13  I think our downside cases were, had lower

14  revenue and EBITDA numbers.  In general, I

15  think our downside and VRC base case compared

16  to the company's, but I would need to compare

17  them case by case to be for sure.

18       Q.   What was the purpose for VRC to

19  develop its own base case and downside case,

20  why were you doing that?

21       A.   We always test management's

22  forecast for developed -- we always develop

23  sensitivity tests for financial forecasts

24  that management gives us to test around.  We

25  assume management's forecast is correct, but

Page 210

M. Rucker - Confidential

1    we also do testing around results that are

2    given to management by us.

3         Q.   What's the purpose of the testing

4    if VRC is assuming that management's forecast

5    is correct?

6         A.   To see if what our downside stress

7    test, to see if the company is still solvent,

8    given our downside stress test with respect

9    to the ability to be able to repay

10   indebtedness and unreasonably small capital.

11        Q.   What would you conclude if, on

12   VRC's downside case, for a company that it

13   was analyzing solvency of, it could not

14   satisfy one or more of the solvency tests

15   while the company could satisfy those tests

16   under its own projections?

17        MR. BENDERNAGEL:  Object to the

18        form of the question.

19        MR. NEIER:  Are you asking as a

20        hypothetical in any situation?

21        MR. SOTTILE:  Yes.

22        MR. NEIER:  Okay.

23        A.   Generally, if our downside test for

24   the cash flow test, or the ability to be able

1          M. Rucker - Confidential

2    to repay indebtors is a small capital test,

3    generally, if it does not pass, but some of

4    our downside tests, we will look at that, and

5    generally if it does not pass our downside

6    testing, we may not say that the company is

7    solvent or be able to render an opinion that

8    the company is solvent.

9          Q.   So at least one purpose for running

10   a downside case for VRC is to see whether or

11   not you're comfortable giving a solvency

12   opinion, even given management's own base

13   case?

14         A.   Yes.

15         Q.   Would you turn to the page marked

16   numbered 63 in Rucker 16?

17         A.   Okay, sir.

18         Q.   It's headed, "VRC recession case

19   assumptions."

20              Do you see that?

21         A.   Yes, sir.

22         Q.   What was the VRC recession case

23   described here?

24         A.   We consider that here the basic

25   premise of our recession case was to consider

1           M. Rucker - Confidential

2    if the country went into a recession and

3    eventually came out of that recession, by

4    looking at some of the historical

5    information, what kind of impact would that

6    have on the company's results.

7           Q.   So this is another more severe

8    downside case?

9           A.   Yes.

10          Q.   That you used?

11          A.   Yes, I think it was more severe,

12   particularly in the recession.  I think the

13   earlier years were more severe in the

14   recession case.

15          Q.   Is it correct, Mr. Rucker, that VRC

16   did not use its own base case, its own

17   downside case, its own recession case to test

18   the -- to look at the balance sheet test for

19   the Tribune?

20          A.   No, it's not appropriate to use

21   those tests for those.

22          Q.   And because VRC thinks it's

23   inappropriate, you didn't use any of those

24   cases to analyze whether the company passed

25   the balance sheet test; is that right?

1          M. Rucker - Confidential

2          A.    In our conclusions, we did not

3    consider those.

4               MR. SOTTILE:   Mark this as Rucker

5          Exhibit 17.

6               (Rucker Exhibit 17, Solvency

7          opinion draft, marked for

8          identification, as of this date.)

9          Q.   Mr. Rucker, can you take a look at

10   what we marked as Rucker 17 and identify it,

11   if you're able to do so?

12         A.   Do you have a preliminary e-mail

13   attachment for this, sir?

14         Q.   I don't.

15              MR. NEIER:  This is another one of

16         those documents that isn't marked

17         confidential, so --

18              MR. SOTTILE:  Given our existing

19         practice, we will treat this document as

20         confidential.

21         A.    Looks like a preliminary solvency

22   opinion or a draft of a solvency opinion.

23              MR. BENDERNAGEL:  Do you know if

24         this came off of the company's data

25         room?

M. Rucker - Confidential

1          MR. ASHLEY:  I don't know for
2      certain, but I assume it does.
3      Q.   Can you turn to page 7 in Rucker
4  Exhibit 17?
5      A.   Yes, sir.
6      Q.   That is summary of valuation test
7  done at this time; is that right?
8      A.   Yes, sir.
9      Q.   On the left-hand side, there's a
10  line titled, "NPV of S. Corp.--AESOP tax
11  savings."
12          Do you see that?
13      A.   Yes, sir.
14      Q.   And there are different values
15  given in the low, mid and high cases.
16          Do you see that?
17      A.   Yes, sir.
18      Q.   Do you know why in this case
19  different values were given for the tax
20  savings, whereas in previous exhibits that we
21  looked at the AESOP tax savings were the same
22  in all three cases?
23      A.   I cannot recall, sir.  I just can't
24  recall.  I would assume that someone within

1        M. Rucker - Confidential

2   our team or so made a suggestion.  It was a

3   constant process of new information, new

4   comments, so I just can't recall.

5        Q.   Take a look at the following slide

6   that is slide 8 in Rucker Exhibit 17.  The

7   three columns here are headed, "Step 1

8   valuation summary," "Step 2 valuation

9   summary," and "Change increase/(decrease)."

10        Do you see those headings?

11        A.   Yes, sir.

12        Q.   What do you understand this chart

13   to be representing under those headings?

14   What is it supposed to tell the reader?

15        A.   The change in line items between

16   the step 2 analysis and the step 1 analysis.

17   Sort of a bridge between those two.

18        Q.   At least as reflected on this page,

19   the average operating enterprise value is

20   shown as going down by $1,962,000,000 from

21   the step 1 valuation summary to the step 2;

22   is that right?

23        A.   Yes, sir.

24        Q.   Equity investments and other assets

25   are shown as increasing by 626 million,

1          M. Rucker - Confidential

2    correct?

3          A.   Yes, sir.

4          Q.   There appear to be two footnotes

5    next to that line, equity investments and

6    other assets.

7               Do those indicate to you the

8    explanations for the increase in that line

9    item from step 1 to step 2?

10         A.   I think they probably indicate some

11   of the changes.  I'm not necessarily saying

12   that they indicate all of the changes, but it

13   appears they indicate some of the material

14   changes.

15         Q.   And the changes referenced in those

16   footnotes are Tribune's latest estimate of

17   the net proceeds from the sale of the Cubs

18   and Comcast and the aftertax value of certain

19   real estate that can either be sold or

20   capitalized into value; is that right?

21         A.   Yes, sir.

22         Q.   Do you know what the real estate

23   was that is being referred to here?

24         A.   I cannot recall off the top of my

25   head, but the Tribune provided us with a

1          M. Rucker - Confidential

2    schedule of potential assets that could be

3    either monetized, and we reflected that, so I

4    don't recall exactly what pieces of real

5    estate, but there were some schedules that

6    the Tribune had provided to us on real estate

7    values.

8          Q.   Those were real estate assets that

9    the Tribune owned at the time of the step 1

10   valuation summary as well; is that right?

11         A.   I'm not certain.  There may have

12   been some transactions that occurred in

13   between step 1 and step 2.

14              For some reason, I recollect that

15   there was a transaction with -- I just don't

16   recall.  There was some TMCT, something like

17   that, that I recall in some real estate

18   transaction there.  I don't recall the

19   details of that.  There could have been a

20   possibility there was a transaction in

21   between step 1 and step 2.

22         Q.   If the real estate referred to had

23   been owned, both at step 1 and step 2, would

24   it be appropriate to make an audit judgment

25   to the equity investments and other assets

M. Rucker - Confidential

line?

A.    In step 1?

Q.    Let's step back for a moment.  Part
of the reason that equity investments and
other assets increase, according to this page
from step 1 to step 2, is that the aftertax
value of certain real estate is included; is
that right?

A.    Yes, sir.

Q.    And would it be appropriate to
include that here, if the real estate had
been owned both in step 1 and in step 2?

A.    If you had not valued that real
estate in step 1 and you did that in step 2,
I would assume that's it's appropriate to
reflect it there and explain why there are
differences.

Q.    You don't have any specific
recollection of the real estate referred to
and whether or not it was owned in step 1 and
step 2?

A.    I'm not certain.  There are
schedules that have been provided that I'm
quite sure lists the real estate.

1       M. Rucker - Confidential

2           MR. SOTTILE:  Let's take five.

3           (Recess taken.)

4           MR. SOTTILE:  Let's mark this as

5       18.

6           (Rucker Exhibit 18, Internal review

7       document for step 2 solvency opinion

8       transaction, marked for identification,

9       as of this date.)

10      Q.   Mr. Rucker, can you take a look at

11  the document we marked as Rucker Exhibit 18

12  and identify it, if you are able to do so?

13      A.   Yes.

14      Q.   What is the document, sir?

15      A.   It's an internal analysis or

16  internal review document for the transaction,

17  step 2 solvency opinion transaction.

18      Q.   The first page is an e-mail from

19  you to Mr. Browning and others at VRC,

20  correct?

21      A.   Yes.

22      Q.   I note in the final sentence of the

23  e-mail it reads, "The most significant

24  changes are that the tax savings are

25  discounted at a much higher cost of capital

1          M. Rucker - Confidential

2     and the PHONES liability has been adjusted to

3     their current quoted value."

4          Why is it that the tax savings, at

5     least as of the time of this review, were

6     being discounted at a much higher cost of

7     capital?

8          A.   Well, throughout this entire

9     process we were constantly getting new

10    information, and one of the things that

11    happened in this process is we received a set

12    of questions or inquiry from banks

13    questioning some of the assumptions that we

14    have made, and we didn't put blinders on

15    throughout this process.

16          And I'm assuming with this

17    particular analysis here that one of the

18    questions related to the discount rate that

19    we were applying to the tax savings.

20          Q.   Do you recall that to be the case,

21    or is that an assumption you're making?

22          A.   There are two documents in here.  I

23    didn't see there were two separate documents.

24          Q.   You're right.  There is first a

25    document titled, "Internal review document,"

1          M. Rucker - Confidential

2    which starts on the second page of the

3    exhibit.  And then there is also, starting on

4    the page stamped VRC 0109238, a document

5    headed, "Tribune Company preliminary draft,

6    board of directors presentation."

7          I understand, Mr. Rucker, that your

8    testimony so far as concerned the first

9    document following the e-mail; is that

10   correct?

11        A.   I don't think both of these

12   documents were in the same e-mail.

13        Q.   If you look at the description of

14   the attachments in the e-mail, Mr. Rucker,

15   that may enable you to determine whether or

16   not these documents went together.

17        A.   It looks like two documents were in

18   the e-mail so I'm not certain, but it looks

19   like two documents were attached to the

20   e-mail.

21        Q.   Okay.

22        A.   But let's start back over.

23        Q.   Sure.

24             We were talking about the increased

25   discount rate for the tax savings, and I

1       M. Rucker - Confidential

2  think you testified that that may have been a

3  result of questions from lenders; is that

4  right?

5       A.   Yes.

6       Q.   Do you recall that to be the case,

7  or is that an assumption you're making?

8       A.   The lenders questioned sent out a

9  series of questions asking us about the

10 discount rate used in the NPV of the tax

11 savings, and that caused us to do additional

12 thinking if we were using the appropriate

13 discount rate.

14      Q.   And at least as of the time of the

15 e-mail, that's the first page of Rucker

16 Exhibit 18, you concluded that you weren't

17 using the appropriate discount rate in the

18 past; is that right?

19      A.   We concluded that as part of this

20 draft of the analysis, it was appropriate to

21 use a higher discount rate to determine the

22 value of the -- the NPV value of the tax

23 savings.

24      Q.   Why was it appropriate to use a

25 higher discount rate?

1          M. Rucker - Confidential

2          A.    You may recall earlier when I was

3    talking about using the capital asset pricing

4    model to determine the discount rate for

5    determining the value of the equity --

6    determining the value of the tax savings.

7          Q.    I recall the testimony.

8          A.    And we used an industry equity

9    discount rate at that point.

10         Q.    Yes.

11         A.    When the lenders provided us with

12   that question, it inspired us to question,

13   well, given Tribune's capital structure,

14   instead of using an industry equity rate,

15   should we perhaps have been using a higher

16   rate or a levered rate for the Tribune.

17         Q.    Okay.

18         A.    So instead of using the industry

19   capital structure in determining the amount

20   of the debt versus equity in our beta

21   calculation when we re-levered the beta, we

22   said maybe it's more appropriate to use

23   Tribune's debt to equity ratio and relever

24   the beta.

25         Q.    I may have misunderstood some

Filed

1      M. Rucker - Confidential

2   earlier testimony, Mr. Rucker.

3          Correct me if I've got this wrong,

4   but I thought you testified earlier that it

5   was inappropriate to look at the Tribune's

6   own situation in determining discount rates

7   and this one should instead look at averages

8   from the industry?

9          MR. NEIER:  Objection to form.

10      That was with respect to DCF.

11          MR. TRUITT:  Objection.

12      A.   You're wrong.

13      Q.   Please correct me.

14      A.   Remember one piece I talked about

15   levered cash flows, and another piece I

16   talked about unlevered cash flows.

17      Q.   I do recall.

18      A.   And I said with unlevered cash

19   flows it was inappropriate to look at

20   Tribune's capital structure.

21          With levered cash flows, or the

22   pretax income piece, we assumed it was more

23   appropriate to use Tribune's when relevering

24   the beta to use Tribune's capital structure,

25   and when we did that, we ended up with a rate

1          M. Rucker - Confidential

2   of about 16 percent on the equity component.

3          Q.    And you thought that was

4   appropriate to use for discounting the tax

5   savings but not for discounted cash flow

6   because one is levered and one is unlevered?

7          A.    Yes.

8          Q.    And that thought process began as a

9   result of questions from the lenders about

10  the discount rate; is that right?

11         A.    Yes.  Throughout this entire

12  process, we never put blinders on.

13  Throughout this entire process, we were

14  getting additional information and we were

15  considering the additional information that

16  we received.

17         Q.    Mr. Rucker, still in Rucker Exhibit

18  18, can you turn to the page that's numbered

19  3, actually the fourth page of the exhibit.

20             MR. NEIER:  The first slide?

21             MR. SOTTILE:  No.

22             MR. NEIER:  The first of the two

23      attachments?

24             MR. SOTTILE:  Yes.  The fourth page

25      of the exhibit.

1          M. Rucker - Confidential

2              MR. NEIER:  Thank you.

3              MR. SOTTILE:  Sorry.

4      Q.    It's the page stamped VRC 01009230.

5          Are you with me, Mr. Rucker?

6      A.    Yes, sir.

7      Q.    This is comparing changes from a,

8  what's captioned in the December 4th

9  valuation summary to a December 18th

10  valuation summary; is that right?

11      A.    Yes, sir.

12      Q.    And the second line under average

13  operating enterprise value refers to the NPV

14  of S. Corp. AESOP tax savings, correct?

15      A.    Repeat that again, please, sir.

16      Q.    Do you see the line that reads,

17  "NPV of S. Corp.-AESOP tax savings" on this

18  page?

19      A.    Yes, sir.

20      Q.    Is it correct that at least as of

21  the date of this analysis, given the 16

22  percent discount rate, the value of those tax

23  savings had decreased by some $1,148,000,000?

24      A.    Yes, sir.

25      Q.    Underneath the line relating to the

1        M. Rucker - Confidential

2   AESOP tax savings, there's a line that reads,

3   "Time Warner stock."

4        Do you see that?

5        A.   Yes, sir.

6        Q.   And there's a note for, and the

7   note reads, "Reflect the market value of the

8   16 million shares of Time Warner stock

9   associated with the PHONES."

10        Do you see from where I just read?

11        A.   Yes, sir.

12        Q.   Why is it that that figure for Time

13   Warner stock, that line is blank in the

14   December 4th valuation summary, and there's

15   $270 million in the December 18th valuation

16   summary?

17        A.   Because we changed the way that we

18   were looking at the Time Warner stock and the

19   embedded piece in the PHONES.  And what we

20   decided to do was to split the two and have

21   the Time Warner stock added above the

22   adjusted enterprise value, whereas before it

23   was being netted against the PHONES value.

24        Q.   So the value of Time Warner stock

25   in the December 4th valuation summary would

1          M. Rucker - Confidential

2    have been reflected in the debt column?

3          A.   Yes.

4          Q.   And in the December 18th valuation

5    summary, you've broken out the value of the

6    stock from the debt column and moved it above

7    and created a separate Time Warner stock

8    line; is that right?

9          A.   Yes.

10         Q.   Was there any actual change in

11   value associated with the PHONES as a result

12   of that change, or are you simply moving

13   value from one line to another?

14         A.   In that particular instance we're

15   moving value from one line to the other, but

16   I'm not sure what the difference in the

17   market value at the time of Time Warner stock

18   was between those two dates.

19         Q.   So there could have been a change

20   in the value of the PHONES if the market

21   value of the Time Warner stock changed in

22   this period?

23         A.   Potential.

24         Q.   But the change in presentation you

25   described, where the value of the stock was

1      M. Rucker - Confidential

2  broken out and reported separately, that

3  wouldn't result in any change of the net

4  value of the PHONES standing alone; is that

5  correct?

6          MR. BENDERNAGEL:  Object to the

7      form of the question.

8      A.   Well, the PHONES are traded, are

9  listed securities, so they would change

10  throughout the day.  The market value does.

11      Q.   I think I understand your point, so

12  let's move on.

13          Under the heading Adjusted

14  Enterprise Value on this page, the second

15  line under there reads Debt.

16          Do you see that?

17      A.   Yes, sir.

18      Q.   And if you read across, there is an

19  indication that the debt has decreased by

20  $602 million between December 4th and

21  December 18th?

22      A.   Yes, sir.

23      Q.   Note five, next to the word debt,

24  indicates, "PHONES liability has been

25  adjusted to market value."

<sup>1</sup>        M. Rucker - Confidential

<sup>2</sup>        Is that the entire explanation for

<sup>3</sup> the change in the debt figures between the

<sup>4</sup> December 4th and December 18th valuation

<sup>5</sup> summaries?

<sup>6</sup>    A.    That, along with the moving of the

<sup>7</sup> Time Warner stock up above the adjusted

<sup>8</sup> enterprise value line.

<sup>9</sup>        So initially we were using the face

<sup>10</sup> value of the PHONES.  And here we used the

<sup>11</sup> market value of the PHONES.

<sup>12</sup>    Q.   Why is it that you change from

<sup>13</sup> using the face value of the PHONES to using

<sup>14</sup> the market value of the PHONES liability?

<sup>15</sup>    A.    You recall that throughout this

<sup>16</sup> process we said we were constantly getting

<sup>17</sup> new information.  And one of the things that

<sup>18</sup> was raised is that given that the PHONES were

<sup>19</sup> very long-term liability with a very low

<sup>20</sup> interest rate, it may be the best indication

<sup>21</sup> of the amount of the liability for the

<sup>22</sup> PHONES, that maybe the best indication was

<sup>23</sup> not in this particular analysis, that maybe

<sup>24</sup> the best indication was not the method we

<sup>25</sup> were using before, but instead the market

1        M. Rucker - Confidential

2   value of the PHONES.

3        Q.   Who is it that suggested that to

4   VRC?

5        A.   We got -- I got questioned -- I got

6   a question from Chandler Bigelow about this

7   of whether or not we were handling the amount

8   of the liability of the PHONES, if we were

9   handling that correctly.

10       Q.   Did his question concern whether or

11  not the PHONES liability should be recorded

12  at face or market value?  Is that what he was

13  asking about?

14       A.   Yes.  He sent me an e-mail, or we

15  had a conversation -- one of the two, I don't

16  recall -- where there was an inquiry as to

17  whether we were looking at this liability

18  correctly.

19       Q.   Looking at this document, would

20  that suggest to you the conversation took

21  place in the first half of December of 2007?

22       A.   Looking at this document?

23       Q.   Yes.

24       A.   No.  You said the first half of

25  December?

1          M. Rucker - Confidential

2      Q.   Yes.  Between December 4th and

3  December 18th?

4      A.   Oh, it definitely occurred between

5  there, I would assume, yes.

6      Q.   Because that's the period in which

7  you made the change to how you valued the

8  PHONES liability?

9      A.   Yes.

10     Q.   The effect there was to reduce the

11 debt of the Tribune associated with the

12 PHONES; is that right?

13     A.   Yes.

14     Q.   I think you said the PHONES are

15 publicly traded instruments; is that right?

16     A.   Yes, it's a publicly traded

17 derivative-type instrument.

18     Q.   So you went and looked at some

19 market measure of value for the PHONES in

20 order to determine how much PHONES liability

21 should be reflected in the debt part of your

22 analysis?

23     A.   In this analysis, yes.  As I said,

24 we were constantly getting information.  We

25 did not put blinders on.  If someone raised a

1      M. Rucker - Confidential

2  question, we would take a look at it and see

3  if it was reasonable to treat something in a

4  particular way.

5      Q.   Is there any standard practice in

6  connection with valuations of publicly traded

7  debt instruments as to whether one should

8  look to the face value or the market value of

9  those instruments for purposes of solvency

10 analysis?

11     A.   You got to recall this is not

12 really a publicly traded debt instrument per

13 se.  It's a publicly traded derivative

14 instrument, so you have to look at it

15 differently.

16     Q.   Is it correct that the instrument

17 combines elements of debt and derivative?

18     A.   Yes.

19     Q.   If the instrument was a pure debt

20 instrument, would it be correct to say that

21 standard practice for solvency analyses would

22 be to look to the face value of the debt, not

23 the market value of the debt?

24          MR. BENDERNAGEL:  Object to form.

25     A.   Depends upon the debt instrument.

1          M. Rucker - Confidential

2          Q.   Have you ever worked on a solvency

3    analysis involving publicly traded debt

4    instruments where you valued the publicly

5    traded debt at the market value instead of

6    the face value?

7          A.   No.

8          Q.   Is it correct that in the other

9    solvency engagements that you worked on over

10   the years when valuing publicly traded debt

11   instruments you valued them at face value,

12   not market value?

13         A.   Yes.

14         Q.   Is the reason that you treated the

15   PHONES differently from the way you treated

16   publicly traded debt instruments and other

17   engagements that it had both a debt and a

18   derivative component to it?

19         A.   There were a couple of factors.

20         Q.   What are the others?

21         A.   The derivative factor.  The very

22   low interest rate.  And the length, or length

23   of maturity of this particular security.

24              Another factor is that when you

25   look at the way that the Tribune treated this

1          M. Rucker - Confidential

2     as a liability, it did not treat it as it

3     treats other pieces of debt.  It used what's

4     called FAS 133, which is from the accounting

5     standards board's way to record this as a

6     liability.

7          So even the company treated this

8     differently when it put it on its balance

9     sheet as compared to other pieces of debt.

10         Q.   Did the company, in the way it

11    treated the PHONES on its balance sheet,

12    value them based on their market value?

13         A.   There are two components to it and

14    we would have to go to the documents, if we

15    could pull up a K or Q for the Tribune, it

16    will explain how they value.

17         There's a derivative component and

18    a discounted debt component.  So there are

19    two components to that.

20         Q.   Do you recall how it's valued on

21    the financial statements of the Tribune, or

22    at least how it was valued in 2007 when you

23    were doing your solvency analysis?

24         A.   It was valued according to the

25    rules of FAS 133.

1        M. Rucker - Confidential

2        Q.   Can you explain in a general way

3    what that would be?

4        A.   We would have to pull up a K or a

5    Q, because it's a complicated method of

6    computing the amount of the liability under

7    FAS, and they explain a rationale around

8    that.

9        Q.   Had Mr. Bigelow raised the question

10   of how you were treating the PHONES liability

11   for purposes of the solvency analysis before

12   December 2007?

13       A.   I'm not sure, but to the best of my

14   recollection, I think he might have raised it

15   at one point.

16            Because for some reason I remember,

17   and I don't know if it was at the time we had

18   this conversation, he raised it that this was

19   not the way necessarily that the company

20   treated this liability.  It was not

21   necessarily the way that the rating agencies

22   looked at this liability.

23       Q.   You're not sure whether that's the

24   same discussion you testified about earlier

25   in December or in the early discussion?

1          M. Rucker - Confidential

2          A.    I'm just not 100 percent certain.

3     It's been a long time.

4          Q.    Can you turn to the following page

5     of Rucker Exhibit 18?  It's the page numbered

6     4 of the internal review document.  This page

7     is headed, "Net present value of S. Corp.

8     AESOP tax savings."

9               Are you with me on the page?

10         A.    Yes, sir.

11         Q.    There is a footnote 1 which follows

12    the text that reads, "Taxes saved on S.

13    Corp.-AESOP," and footnote 1 reads, "Tax

14    savings are based upon Tribune's base case

15    and the assumption that in 2022 Sam Zell

16    exercises his right to acquire a 40 percent

17    equity interest in the company.  Upon

18    exercise of this interest, the company will

19    receive 60 percent of the estimated tax

20    benefits as opposed to 100 percent before the

21    conversion."

22              Do you see where I have read, sir?

23         A.    Yes.

24         Q.    Can you explain to me a little bit

25    how, at least at the time of this analysis,

1      M. Rucker - Confidential

2  the company -- VRC was valuing the tax

3  benefits after 2022?

4      A.   We were still valuing the tax

5  benefits based upon the value to the entire

6  AESOP S. Corporation.

7          In our solvency opinion analysis,

8  we received a representation and management

9  told us that even though Sam Zell may

10  exercise his warrant to acquire 40 percent of

11  the common stock, that the company would

12  never pay his portion of income taxes.

13          So we received a representation

14  letter to that, so we valued that company

15  still based upon the same premise that we had

16  used before.

17          After receiving this rep letter and

18  the company telling us that they would not --

19  if Sam Zell had to pay some form of income

20  taxes it would not distribute cash to him to

21  pay those income taxes.

22      Q.   So for purposes of the final

23  solvency opinion in December 2007 and the

24  analysis on which it was based, VRC assumed

25  that even after 2022 the company would

1          M. Rucker - Confidential

2     receive 100 percent of the estimated tax

3     benefits associated with S. Corp. status,

4     correct?

5          A.    That's what we were told by the

6     company, and that's what we assumed, and

7     that's what the company represented to us.

8          Q.    Is it correct that as of the date

9     of this document, Rucker Exhibit 18, that's

10    not what you were assuming, you were assuming

11    that the company would only get 60 percent of

12    the tax benefits after 2022, and I'm

13    referring you in particular to footnote 1 on

14    page 4 of the internal review document we've

15    been looking at?

16         A.    I would have to go through the

17    calculations, but to the best of my

18    recollection, that's what we did.  I would

19    have to go through the calculations and see.

20         Q.    The best of your recollection, what

21    is what you did?

22         A.    To the best of my recollection, I

23    assume that we looked at the company -- that

24    we assumed the taxes on, that the company

25    received the entire benefit of those taxes,

1      M. Rucker - Confidential

2   but I'm not 100 percent certain of that.  I

3   would have to go back through the

4   calculations.

5      Q.   Would you agree with me that at

6   least footnote 1 on this page says that's not

7   the assumption that you were making at this

8   time?

9      A.   That's what it appears that we were

10  assuming at this time.  That's the way it

11  appears.

12     Q.   But your recollection is at the end

13  of the day when the solvency analysis was

14  finalized and the opinion was given, the

15  assumption was that the company would

16  continue to receive 100 percent of the tax

17  benefits, even after 2022?

18     A.   To the best of my recollection.  We

19  would have to look at the analysis to see.

20  I'm not certain.

21     Q.   Understood.

22     MR. SOTTILE:  Would you mark this

23  document as Rucker Exhibit 19.

24     (Rucker Exhibit 19, Draft, marked

25      for identification, as of this date.)

1           M. Rucker - Confidential

2       Q.   Mr. Rucker, could you review this

3   document and if you are able to do so,

4   identify it for us?

5       A.   Okay.

6       Q.   Are you able to identify the

7   document, sir?

8       A.   Looks like it's edits to a draft of

9   a response to questions from lenders.

10      Q.   This is a draft of the response to

11  questions from lenders that you referred to

12  earlier in your testimony?

13      A.   Yes.

14      Q.   The edits here come from

15  Mr. Bigelow; is that right?

16      A.   If this e-mail is correct, it looks

17  like it's an e-mail to me from Chandler

18  Bigelow, so I would assume that they have

19  come in from Chandler Bigelow.

20      Q.   Did VRC draft the responses to the

21  lenders' questions in the first instance and

22  then send them to Mr. Bigelow for review?

23      A.   Yes.

24      Q.   If you take a look at the third

25  page of the document, which is stamped VRC

1          M. Rucker - Confidential

2     7117 in the lower right, are you with me,

3     sir?

4          A.    Yes.

5          Q.    There's a question numbered 8, "How

6     are taxes treated in the analysis?  As the

7     company will not be a federal taxpayer as a

8     result of the S. Corp. election, does the

9     discounted cash flow analysis take this into

10    consideration, and if so, how?"

11          And the answer includes in the

12    third sentence a statement that -- sorry, the

13    fourth sentence, that, "VRC assumed that in

14    year 15 and beyond that the company would

15    receive 60 percent of the projected tax

16    savings after EGI, TRB, LLC ("Zell Group")

17    exercises its warrants to acquire 40 percent

18    of Tribune's equity interest."

19          Is it correct, at least as of the

20    time of these direct responses, VRC was

21    assuming that after the Zell Group exercised

22    the warrants, the company would only receive

23    60 percent of the total projected AESOP tax

24    savings?

25          A.    It appears based upon this that

1          M. Rucker - Confidential

2     that's what we did at this time.  I may have

3     been incorrect earlier, but this is what it

4     appears we were doing at this time.

5          Q.    Could you turn to the following

6     page, which is stamped VRC 7118?  Numbered

7     question 10 here reads, "Discuss the

8     following issues concerning the equity

9     investments.  A, considering the company has

10    minority ownership in many of its equity

11    investments, how has the marketability of

12    these equity investments been considered."

13            And there's an answer that follows

14    the A section.

15            Would you review that and then I

16    have a couple of questions for you?

17         A.    Yes.

18         Q.    The second paragraph of the answer

19    to 10A appears to give some reasons why VRC

20    did not apply minority or marketability

21    discounts to these equity investments.

22            Do you see that description of

23    reasons?

24         A.    Yes.

25         Q.    Were there other reasons why VRC

1      M. Rucker - Confidential

2   did not apply minority or marketability

3   discounts to valuing the equity investments

4   of the Tribune for purposes of its solvency

5   analysis?

6      A.   First of all, let me say I was not

7   as close to the equity investments part, so

8   my level of knowledge is not as much as with

9   the other parties.  I was not on that part of

10  the team.

11          The only thing I can say is that

12  for some of the valuation methodology that we

13  used for the equity investments, there were

14  embedded in those analyses our transactions

15  that may embed a marketability discount.

16          For example, if the valuation

17  methodology was based upon a financing round,

18  we would assume that that financing round has

19  some marketability discounts already embedded

20  in there, but in general, I think that many

21  of the valuation metrics that were used may

22  have some of those things already embedded in

23  them.

24          But I must say that with respect to

25  the equity investments, I was not that deeply

1      M. Rucker - Confidential

2  involved in reviewing the equity investment

3  valuations.

4      Q.   Were you aware while the solvency

5  analyses were going on, that VRC was not

6  applying minority or marketability discounts

7  for the equity investments?

8      A.   For the most part the equity

9  investments were handled by Alpresh and Bryan

10  Browning.  They really focused on the equity

11  investments.

12      Q.   I will address my questions to

13  Mr. Browning.

14          MR. SOTTILE:  Can you mark this as

15      Rucker 20?

16          (Rucker Exhibit 20, Final solvency

17      opinion analysis, marked for

18      identification, as of this date.)

19      Q.   Mr. Rucker, let me know when you've

20  had a chance to take a quick look at this and

21  tell us whether can you identify it.

22          I will note for the record this

23  document has no numbering or confidential

24  stamp, but we will treat it as confidential.

25      A.   Yes, I recognize this document.

1          M. Rucker - Confidential

2     Q.    What is it?

3     A.    It appears to be our final solvency

4  opinion analysis that was presented to the

5  board.

6     Q.    Can you turn to page 5 of the

7  document numbered page 5?  At the top of the

8  page, there's a bullet that indicates that,

9  "The standards of values used for the

10 solvency of the step 2 transactions include

11 fair value and present fair saleable value

12 and have been modified for this opinion."

13          Then it goes on to say, "The

14 modification assumes that the buyer would

15 have a structure similar to the structure

16 contemplated in the step 2 transactions (an

17 S. Corporation owned entirely by an AESOP)

18 which receives federal income tax deferrals

19 or another structure resulting in equivalent

20 favorable federal income tax treatment to

21 Tribune."

22          Is it correct that this assumption

23 was made because the Tribune asked VRC to

24 make it for purposes of this solvency

25 analysis?

1          M. Rucker - Confidential

2          MR. BENDERNAGEL:  Object to the

3      form of the question.

4      A.   We were engaged to provide the

5  analysis based upon this.

6      Q.   Based upon?

7      A.   The AESOP Corp. structure.

8      Q.   So did you not -- VRC did not opine

9  on the solvency of the company following step

10  2 transactions in the event that a buyer of

11  the Tribune would be subject to federal

12  income tax?

13      A.   No.

14          MR. NEIER:  Just so we don't get

15      the double negative, you mean correct?

16          THE WITNESS:  Correct.

17      Q.   The second bullet point on this

18  page reads, "VRC relied upon management's

19  base case and downside case projections for

20  its opinion."

21          We reviewed earlier a number of

22  sensitivity cases that VRC looked at for

23  purposes of its opinion.

24          Is it correct, based on this

25  statement, that VRC, in rendering its final

1          M. Rucker - Confidential

2     opinion, did not rely upon any of its own

3     sensitivity cases?

4          A.   We did test around management's

5     base case, management's downside case.  But

6     ultimately we relied upon management's

7     projections and representations to us.

8          Q.   Turn to page 7 of Rucker Exhibit

9     20.

10          Is this a summary of the final

11     results of solvency valuation tests done for

12     purposes of VRC's December 20, 2007 solvency

13     opinion?

14          A.   One of the tests.

15          Q.   The valuation test?

16          A.   Yes.

17          Q.   Can you turn to slide 10 in Rucker

18     Exhibit 20?  This is headed, "Valuation

19     comparison, December 4th and 20th board

20     presentations."

21          Are you at that page, sir?

22          A.   Yes, sir.

23          Q.   Next to the debt line there is a

24     footnote 4, and footnote 4 reads, "PHONES

25     liability has been adjusted to reflect the

1          M. Rucker - Confidential

2    discounted debt component (at book value) and

3    derivative component (at fair value)

4    presented on the company's balance sheet as

5    of September 30, 2007."

6          Can you explain what that

7    adjustment was?

8    A.    You may recall in our previous

9    discussion we had said we used market value.

10   Q.    Yes.

11   A.    And the market value, I can't

12   remember exactly what number that was.  Once

13   again, we were constantly, as we got

14   additional information, we were constantly

15   looking at our analysis.  And ultimately, we

16   concluded that the right way to look at the

17   PHONES, or the correct way to look at the

18   PHONES was the way the company did for FAS

19   133, which was to look at the liability based

20   upon what their accounting rules required

21   them to look at their liability as.

22          So ultimately we made a change

23   there from market value to what's required by

24   FAS 133.

25   Q.    Was the result of the change that

1          M. Rucker - Confidential

2     the debt component of the PHONES was recorded

3     at book value and the derivative component at

4     market value -- fair value, I'm sorry.

5          A.   Repeat that again, sir.

6          Q.   Was the result of this change that

7     the PHONES liability discounted debt

8     component was reflected in your analysis at

9     book value while the derivative component of

10    the PHONES liability was reflected in your

11    analysis at fair value?

12         A.   I'm sorry.  That question isn't

13    clear.

14         Q.   Does footnote 4, to your

15    understanding, accurately describe how the

16    PHONES liability was adjusted for purposes of

17    this solvency analysis?

18         A.   It's a summary of how it was done,

19    yes.  But the technical piece would be

20    referenced in the company's 10-K or 10-Q

21    under the description of how they handle the

22    PHONES liability.  It's just a summary of

23    that.

24         Q.   As a summary, it's correct?

25         A.   Yes.

1          M. Rucker - Confidential

2              MR. SOTTILE:  Let's mark this

3          document as Rucker 21.

4              (Rucker Exhibit 21, Representation

5          letters, marked for identification, as

6          of this date.)

7              MR. NEIER:  Once again, if we can

8          have an agreement that this is also

9          confidential?

10             MR. SOTTILE:  As with previous

11         documents that are not numbered or

12         stamped confidential, we will agree that

13         this document is to be treated as

14         confidential.

15         Q.  Mr. Rucker, can you review the

16    document we marked as Rucker 21 and identify

17    it for us, if you are able to do so?

18         A.  Yes, it's representation letters

19    that we received from management.

20         Q.  These are the representation

21    letters in connection with VRC's December 20,

22    2007 solvency opinion; is that right?

23         A.  Yes.

24         Q.  Can you turn to the third page from

25    the end of this exhibit?

1          M. Rucker - Confidential

2              Just to be clear, since there is no

3     obvious way to identify this, the one I'm

4     looking at has a second paragraph beginning,

5     "Based upon Tribune's current understanding

6     of the Delaware General Corporation Law."

7              Do you have that page in front of

8     you, sir?

9          A.   Yes, sir.

10         Q.   I think you made reference earlier

11    to a representation from the Tribune that it

12    was reasonable for VRC to assume that Tribune

13    would continue to benefit from 100 percent of

14    the forecasted AESOP tax savings, even if

15    Mr. Zell exercised his warrant?

16             MR. NEIER:   Objection to form.

17         Q.   Is this the representation letter

18    you were referring to?

19         A.   Repeat that question again, sir.

20         Q.   I think you made reference earlier,

21    Mr. Rucker, to a representation from the

22    Tribune concerning whether or not VRC could

23    assume that the company would continue to

24    receive 100 percent of the tax benefits from

25    the AESOP after 2022.

Page 253

1          M. Rucker - Confidential

2          Do you recall that testimony, sir?

3          MR. NEIER:  The witness said he may

4     have been incorrect when he said that as

5     well, later on.

6          MR. SOTTILE:  Okay.

7     Q.   Do you recall testifying on the

8  subject of a representation about whether VRC

9  could assume that 100 percent of the tax

10 savings stayed with the company after 2022?

11    A.   Yes, sir.

12    Q.   Is this the representation you were

13 thinking of?

14    A.   Yes, sir.

15         MR. SOTTILE:  Mark this 22.

16         (Rucker Exhibit 22, December 20,

17    2007 solvency opinion, marked for

18    identification, as of this date.)

19    Q.   Mr. Rucker, are you able to

20 identify the document we marked as Rucker 22?

21         MR. SOTTILE:  I'm sorry, Jim, this

22    is a Tribune document marked attorneys'

23    eyes only.

24         Are you willing to agree to treat

25    this as confidential for purposes of the

1        M. Rucker - Confidential

2      deposition?

3           MR. BENDERNAGEL:  Let me see it.

4           MR. SOTTILE:  It's the December 20,

5      2007 solvency opinion.

6           MR. BENDERNAGEL:  That's fine.

7           MR. SOTTILE:  Thank you.

8      Q.   Are you able to identify this

9  document, Mr. Rucker?

10     A.   Yes, sir.

11     Q.   What is it?

12     A.   It's our final solvency opinion

13 letter to the Tribune.

14     Q.   Is this solvency opinion based on

15 the solvency analysis that's reflected in

16 Rucker Exhibit 20?

17     A.   Yes, sir.  I think so.

18          MR. SOTTILE:  Off the record.

19          (Recess taken.)

20          MR. SOTTILE:  I have no further

21     questions for the witness at this time.

22 EXAMINATION BY

23 MR. GLENN:

24     Q.   Mr. Rucker, I'm Andrew Glenn.  I

25 represent Law Debenture, one of the indenture

1        M. Rucker - Confidential

2    trustees in this case.

3            If you can pull out what was marked

4    earlier as Rucker 11, which is the May 24,

5    2007 opinion.

6            Now, I would like to direct your

7    attention -- I would like you to turn to the

8    page Bates stamped 887 of that document.

9            Are you with me?

10   A.    Yes, sir.

11   Q.    The last paragraph on this page

12   says, "In rendering the opinion, VRC assumed

13   and relied upon, without independent

14   verification, the accuracy and completeness

15   of all information data and other material

16   (including without limitation the base

17   forecast model and the downside forecast

18   model) furnished or otherwise made available

19   by the company to VRC, discussed with or

20   reviewed by VRC with the company or publicly

21   available and VRC did not assume any

22   responsibility for independently verifying

23   such information data or other materials."

24           Do you see that?

25   A.    Yes.

1          M. Rucker - Confidential

2      Q.    And similar disclaimer follows that

3   with the rest of the paragraph.

4          Do you see that.

5      A.    Yes.

6      Q.    So what this paragraph means,

7   correct me if I'm wrong, is that you took the

8   company's financial projections and assumed

9   that they were the best available projection

10  of the company's financial performance,

11  right?

12     A.    Yes, and the company represented to

13  us that that was the case.

14     Q.    If that's not in fact the case, the

15  opinions contained in your letter could

16  change, right?

17         MR. BENDERNAGEL:   Object to the

18         form of the question.

19     A.    We rely upon management's forecast.

20  We rely upon management's representation that

21  this is the best available data and

22  accurately represents the company's --

23  financial condition of the company.

24     Q.    In the context of a solvency

25  opinion, what's the effect if those

1      M. Rucker - Confidential

2  representations are not true?

3      A.   I don't know if I understand

4  completely your question.

5      Q.   Well, you rely on those

6  representations.

7           That's your testimony, right?

8      A.   Yes.

9      Q.   What is the effect, as an example,

10  if the projections overstate financial

11  performance by 50 percent?

12           MR. DRAYTON:   Objection.

13      A.   What is the effect -- repeat that

14  again, please.

15      Q.   What effect, if any, would it have

16  if the company's financial projections

17  overstated revenues and EBITDA by as much as

18  50 percent?

19      A.   I don't know.  That causes me to

20  speculate.  What we do is we rely upon the

21  information given by the company.  The

22  company represents that, so that's requiring

23  me to speculate the impact.  All I know is we

24  rely upon what's provided by management.

25      Q.   Let's talk about the comparable

1        M. Rucker - Confidential

2   company analysis.  There are two components,

3   generally speaking, for comparable company

4   valuation analysis.  There's the multiple

5   that's one component.

6            Am I correct?

7       A.   Yes.

8       Q.   And you used a multiple of EBITDA

9   in your comparable company analysis, right?

10      A.   Yes.

11      Q.   The other component you used was

12  projected EBITDA, at least in one case,

13  right?

14      A.   Yes.

15      Q.   So the projected EBITDA was taken

16  from the company's projections upon which you

17  relied, right?

18      A.   We used the combination -- if I'm

19  not mistaken, we used some LTM data and some

20  projected data, if I'm not mistaken.

21      Q.   Let's focus on projected data.  We

22  can refer back to your exhibit if you want.

23  You used something called NFY in your

24  valuation analysis.

25           Do you recall that?

1          M. Rucker - Confidential

2     A.   Yes.

3     Q.   That's next fiscal year, correct?

4     A.   Yes.

5     Q.   That next fiscal year number is the

6  EBITDA projected by the company supplied to

7  you, correct?

8     A.   Yes.

9     Q.   And upon which you relied without

10 independent verification, correct?

11    A.   Yes, we rely upon what management

12 gives us.

13    Q.   So at least in that circumstance,

14 for that component of your valuation, if the

15 company had provided you with an EBITDA

16 projection that was 50 percent less than what

17 you used for your next physical fiscal year

18 analysis in the comparable company analysis,

19 that would reduce that number by 50 percent,

20 correct?

21         MR. NEIER:  I'm sorry, 50 percent

22    less?

23         MR. GLENN:  50 percent less.  It's

24    math.

25    Q.   It's math; isn't it, Mr. Rucker?

1          M. Rucker - Confidential

2      A.   Yes, it is.

3      Q.   But it would be 50 percent less in

4  that case?

5      A.   You're requiring me to speculate

6  here.  What we do is rely upon management's

7  forecast, management's representation.  So

8  you're requiring me to speculate on

9  hypothetical situations.

10     Q.   In the discounted cash flow

11 analysis you used the company's financial

12 projections, correct?

13     A.   Yes.

14     Q.   Again, those were adopted without

15 independent verification, right?

16     A.   Yes.

17     Q.   And you layered on top of those

18 projections a weighted average cost of

19 capital, or WACC, correct?

20     A.   Yes.

21     Q.   So if the company's projections

22 supplied to you indicated free cash flow of

23 50 percent less every year of your analysis,

24 that would produce a significantly lower

25 number than what is presented in your

1      M. Rucker - Confidential

2  valuation opinions, correct?

3      A.   Once again, you're asking me to

4  speculate here.  But that may or may not.

5  There are several different variables that

6  have to be taken into consideration.

7          If you're provided with lower

8  forecasted numbers, you may use a different

9  discount rate because there may be less risk

10  in attaining those numbers, but once again,

11  you're asking me to speculate on a

12  hypothetical situation.

13      Q.   But all things being equal, lower

14  free cash flow numbers will produce a lower

15  valuation than higher free cash flow

16  projections, right?

17      A.   Assuming everything else is the

18  same.

19      Q.   Okay.  Who gave you these

20  projections?

21      A.    We were provided these projections

22  by the company, by Chandler Bigelow, and

23  another person that was involved, a young

24  lady named Naomi Saks was involved in the

25  process.

1      M. Rucker - Confidential

2      Q.   Were you aware that this

3 transaction involved a sponsor led by an

4 entity controlled by Samuel Zell?

5      A.   Yes.

6      Q.   Did you have any communications

7 with the Zell entities during the course of

8 your engagement or any of their

9 representatives?

10      A.   Yes, with Sam Zell.

11      Q.   Describe your communications with

12 Mr. Zell.

13      A.   At board meetings.

14      Q.   Before the transaction closed --

15 before step 1 of the transaction?

16      A.   No, not before step 1, I don't

17 think.

18      Q.   Were you aware at any time before

19 step 1 that the Zell entities prepared

20 projections of their own?

21      A.   No.

22      Q.   Did you have any communications

23 with any of the lenders of the transaction

24 before step 1 closed?

25      A.   To the best of my recollection, no.

1              M. Rucker - Confidential

2         Q.    Has Valuation Research ever

3    undertaken any solvency opinions for any

4    transaction involving the Zell organizations

5    or any entities affiliated with Mr. Zell

6    before the Tribune transaction?

7         A.    To the best of my recollection, no.

8         Q.    I believe you testified earlier

9    that this was a tax driven -- let me start

10   from scratch.

11             I believe you testified earlier in

12   substance that this transaction was a

13   tax-driven transaction.

14             Do you recall that testimony?

15        A.    Yes.

16        Q.    And one of the components that

17   drove the tax consequences was that this was

18   to be an AESOP?

19        A.    AESOP S. Corporation.

20        Q.    AESOP S. Corporation, thank you.

21             As best as you understand as a

22   business person and not as a legal person,

23   what are the requirements for obtaining this

24   tax benefit by being an AESOP, what do you

25   have to do?

M. Rucker - Confidential

1    A.    I don't think I'm qualified to give

2  all the rules of what's required for an AESOP

3  structure.

4    Q.    But AESOP is an employee stock

5  ownership plan or something like that?

6    A.    Yes.

7    Q.    The AESOP has to own, as you

8  understand it, how much of the entity to

9  qualify for the tax treatment?

10         MR. BENDERNAGEL:   Object to the

11         question as vague.

12    A.    I don't know the answer to that.

13    Q.    But you did understand that to

14  qualify for that tax benefit there had to be

15  AESOP ownership of the Tribune Company?

16    A.    Yes.

17    Q.    Do you know if the Tribune Company

18  were IPO'd after step 1 and step 2 closed,

19  whether Tribune would still qualify for the

20  AESOP tax benefits?

21    A.    I don't know.

22    Q.    Do you know if 100 percent of the

23  equity in Tribune were sold, whether Tribune

24  would qualify for the tax benefits of an

1      M. Rucker - Confidential

2 AESOP?

3           MR. BENDERNAGEL:  Object to the

4      question as vague.

5      A.   I don't know.  It depends upon the

6 structure it was sold.

7      Q.   But you do know that if it

8 continued as the discounted cash flow

9 analysis contemplated, that it could

10 potentially be available for the tax benefits

11 of being an AESOP, right?

12     A.   Repeat that question again.

13     Q.   You do know your discounted cash

14 flow analysis contemplates continued AESOP

15 ownership, right?

16     A.   Yes.

17          MR. BENDERNAGEL:  Object to the

18     form.

19     Q.   You also performed a comparable

20 company analysis; didn't you?

21     A.   Yes.

22     Q.   And a comparable company analysis

23 examines the trading multiples of publicly

24 traded companies and applies them to

25 financial metrics of the subject company,

Page 266

M. Rucker - Confidential

1

2  correct?

3      A.   Yes.

4      Q.   But you don't know if Tribune were

5  listed as a public company like your comps,

6  whether that tax treatment would still be

7  available, do you, as an AESOP?

8      A.   I don't know the answer to that.

9      Q.   So the comparable company analysis

10  might not be applicable at all to Tribune?

11          MR. NEIER:   Objection to the form

12      A.   I think you're wrong.

13      Q.   Why am I wrong?

14      A.   The comparable company analysis is

15  one factor that can be used to value the

16  Tribune as an AESOP S. Corporation.

17      Q.   Why is that?

18      A.   Because we've made adjustments to

19  the valuation where we've added the tax

20  benefits to the Tribune.  So the AESOP S.

21  structure, using a comparable company's

22  analysis, is appropriate with adjustments

23  here.

24      Q.   But that tax benefit may or may not

25  evaporate if the company is traded on a

1        M. Rucker - Confidential

2    public exchange like the comparable

3    companies, correct?

4         MR. BENDERNAGEL:  Object to the

5         form of the question.

6    A.    We were given a set management

7    strategy for the way this transaction would

8    occur, and the way that management viewed the

9    way this transaction would occur is that the

10    company would be owned 100 percent by the

11    AESOP S. Corporation.

12        We felt that it was appropriate to

13    value it as an AESOP S. Corporation.  And the

14    way that we derive that value, one component

15    was the comparable company's analysis.  And I

16    would disagree with you where you say that

17    using the comparable company's approach in

18    valuing this company is incorrect.

19         MR. GLENN:  We're going to mark the

20         next one Rucker 23, bearing the Bates

21         stamp 134654-1618.

22         (Rucker Exhibit 23, Document,

23         marked for identification, as of this

24         date.)

25    Q.    Were you employed, Mr. Rucker, by

1          M. Rucker - Confidential

2   Valuation Research Corporation as of December

3   13, 2006?

4          A.   Yes.

5          Q.   And are you apprised from time to

6   time of the fees charged by Valuation

7   Research for various services that it

8   provides to its clients?

9          A.   Yes.

10         Q.   I would like to turn your attention

11  -- first of all, do you recognize this

12  document?

13         A.   No.

14         Q.   I would like to turn your

15  attention, please, to the page with the last

16  three numbers 659.

17         A.   The last three pages?

18         Q.   No, the last numbers at the Bates

19  stamp bearing the number 659.  It's about six

20  pages in.  It says, "Summary of

21  financial/operating presentation."

22         A.   Yes.

23         Q.   There are a number of engagements

24  where it says, "Large engagements 100,000 and

25  over, eleven months of 2006."  And that

1          M. Rucker - Confidential

2    continues, I think, two pages down to the

3    Bates number 661.

4          Do you see those?

5      A.   Yes.

6      Q.   Were you involved, very quickly, in

7    any of the transactions listed on these pages

8    here?

9      A.   Yes.

10     Q.   And you're familiar with the fees

11   charged in this -- for this particular

12   solvency opinion?

13     A.   Which solvency opinion?

14     Q.   Step 1 and step 2?

15     A.   Yes.

16     Q.   And I believe, and correct me if

17   I'm wrong, those were $750,000 each,

18   something like that?

19     A.   We didn't break them out.

20     Q.   What was the total amount that you

21   charged Tribune?

22     A.   The ultimate amount I think ended

23   up being 1.75 million or 1.8 million.

24     Q.   Correct me if I'm wrong, the

25   Tribune transaction was -- the fees charged

1          M. Rucker - Confidential

2     were larger than any of the transactions

3     listed on the pages we have identified,

4     correct?

5               MR. DRAYTON:  Objection.

6          A.    They appear that way, yes.

7          Q.    Are you aware in calendar year 2007

8     whether the Tribune transaction generated, or

9     transactions as a bundle generated more fees

10    than any other single transaction or series

11    of transactions that Valuation Research was

12    involved with?

13         A.    I'm not certain.

14         Q.    As you sit here today, you can't

15    think of one that you charged a higher amount

16    than Tribune in calendar year 2007?

17         A.    I'm not certain, but I think for

18    solvency fairness opinion, that that was the

19    largest transaction.

20         Q.    Am I correct that Valuation

21    Research sells solvency opinions, that's one

22    of the products that it markets to its

23    customers?

24               MR. NEIER:  Objection to form.

25         A.    It's a product we provide.  It's a

1        M. Rucker - Confidential

2   service we provide to clients.

3        Q.   Is a solvency opinion a service

4   that Valuation Research provides?

5        A.   Yes.

6        Q.   Do you on your website market

7   solvency opinions as one of the products and

8   services that you provide?

9             MR. NEIER:   Objection to form.

10            You can answer.

11       A.   I think so.

12       Q.   Do you sell insolvency opinions?

13       A.   To the best of my recollection, we

14   have performed, and this is way before my

15   time, I don't know anything about it, that we

16   have provided insolvency opinions in the

17   past.

18       Q.   What I'm asking is something

19   different than that.

20            Do you market to the world that you

21   sell insolvency opinions?

22            MR. NEIER:   Objection to form.

23       A.   We provide our opinion with respect

24   to the solvency of a company, so that's a

25   service we provide.

1        M. Rucker - Confidential

2        Q.    The question I'm asking is very

3    precise.   I would like you to answer it, if

4    you can.

5            Are you aware of any marketing

6    materials in which Valuation Research markets

7    something with the words precisely,

8    insolvency opinions?

9            MR. BENDERNAGEL:   Objection,

10       argumentative.

11           MR. NEIER:   Objection to form.

12       There is no such thing as an insolvency

13       opinion.

14       Q.    You can answer the question.

15           MR. GLENN:   And you can object to

16       the form and not testify.

17       Q.    Please answer.

18       A.    To the best of my recollection, no.

19       Q.    In fact, you are involved

20   personally in the sale and marketing of

21   solvency opinions, right?

22           MR. BENDERNAGEL:   Object to the

23       form of the question.   Argumentative.

24           MR. NEIER:   Objection to the form.

25       A.    I am part of the solvency opinion

1          M. Rucker - Confidential

2     team, yes.

3          Q.    And you market valuation -- strike

4     that.

5               You market Valuation Research as

6     one of the leading providers of solvency

7     opinions, correct?

8          A.    Yes.

9          Q.    And you do that because what you

10    want to market is protection to boards of --

11    you want to provide boards of directors with

12    additional protection from potential

13    fraudulent conveyance claims, right?

14         A.    Solvency premiums are a way to

15    provide protections of the board of directors

16    and show that they have been informed that a

17    transaction is solvent, so yes.

18         Q.    And you did that, that's what you

19    were striving to do in the case of the

20    solvency opinions for the Tribune Company,

21    correct?

22              MR. BENDERNAGEL:   Object to the

23         form of the question.

24         A.    With respect to the solvency

25    opinion for the Tribune Corporation, we were

1          M. Rucker - Confidential

2    retained to provide our opinion as to whether

3    or not the company was solvent and that's

4    what we did.

5              MR. GLENN:  Let's mark a document

6         bearing the Bates stamp VRC 182070

7         through 2087.  This is 24.

8              (Rucker Exhibit 24, E-mail, marked

9         for identification, as of this date.)

10        Q.    Do you recognize Exhibit 24, sir?

11        A.    Yes.

12        Q.    Yes, you do recognize the document?

13        A.    I don't recognize the document, but

14   I do recognize the e-mail.

15        Q.    This is an e-mail from you to

16   people from Cumulus Media, right?

17        A.    Yes.

18        Q.    And Cumulus Media is what?

19        A.    I think it's a radio station group.

20        Q.    In connection with this e-mail, are

21   you trying to market services for solvency

22   opinions for Cumulus Media?

23        A.    Yes.

24        Q.    And you were touting your

25   experience as providing a solvency opinion to

1          M. Rucker - Confidential

2     Tribune as part of one of your sales tools in

3     this e-mail, right?

4          A.   We were talking about providing

5     solvency opinions to companies in the media

6     space, yes.

7          Q.   And it says here, "I would welcome

8     an opportunity to speak with you further

9     about your pending transaction and how we may

10    be able to provide your board of directors an

11    additional level of protection from potential

12    fraudulent conveyance claims in the event

13    that the company may become insolvent in the

14    future."

15          Do you see that?

16          A.   Yes.

17          Q.   And you used that terminology, that

18    phrase, as a reason why Cumulus Media should

19    obtain solvency opinion from Valuation

20    Research, correct?

21          A.   It's a reason to consider why to

22    get a solvency opinion.

23          Q.   Correct me if I'm wrong, you're

24    offering the exact same service to Cumulus

25    Media that you provided to Tribune Company in

1          M. Rucker - Confidential

2     this case?

3          A.    We're offering to provide to do an

4     analysis of whether or not the company is

5     solvent, yes.

6          Q.    Thank you.

7               Next one is Exhibit 25.

8               (Rucker Exhibit 25, E-mail, marked

9          for identification, as of this date.)

10         Q.    Do you recognize Exhibit 25, sir?

11         A.    Yes, sir, I do.

12         Q.    Who is Greg Barber?

13         A.    He was a former senior

14    vice-president of the company.

15         Q.    He's no longer with the company?

16         A.    No.

17         Q.    This is during the period March 30,

18    2007 where you were being considered but had

19    not yet been hired for a solvency opinion for

20    Tribune Company?

21         A.    Yes.

22         Q.    It says here, "Loop me in when you

23    get a chance.  I would like to discuss HLHZ's

24    not wanting to bid.  Raises the risk by

25    itself."

1           M. Rucker - Confidential

2           Do you see that?

3      A.   Yes.

4      Q.   Do you know what he's referring to

5    there?

6      A.   Yes.

7      Q.   What is he referring to?

8      A.   He's referring that we had heard

9    that Houlihan Lokey had turned down or said

10   that they could not do the opinion.

11     Q.   Who did you hear that from?

12     A.   I think when we initially got the

13   call, we heard that from, I think maybe

14   Chandler Bigelow, if I'm not mistaken.

15     Q.   Were you told why they did not want

16   to bid?

17     A.   Something related to the tax.

18     Q.   And he says, "Raises the risk by

19   itself."

20          Do you see that?

21     A.   Yes.

22     Q.   Do you know what he meant by that?

23     A.   I think he meant raises the risk of

24   giving an incorrect opinion.

25     Q.   Is that a red flag that Valuation

1          M. Rucker - Confidential

2    Research considers before it decides to

3    proceed with a solvency opinion, that a

4    competing company has turned down the

5    opportunity to bid for the business?

6          A.    Of course it's something you

7    consider.   You take that into consideration.

8          Q.    Why do you take that into

9    consideration?

10         A.    You want to gather as many facts as

11   possible before you agree to take on an

12   opinion.

13         Q.    Are you aware of any circumstance

14   where Valuation Research has heard that a

15   competing firm has refused to bid and then

16   Valuation Research, too, has refused to bid

17   for solvency opinion work?

18         A.    I don't think the industry shares

19   that much information, so no.   I mean, I

20   don't think --

21         Q.    You're not aware of that

22   circumstance?

23         A.    I don't think people in the

24   industry speak to each other that much.

25         Q.    You're not aware of that?

1      M. Rucker - Confidential

2   A.   No.

3        MR. GLENN:  Mark this 26.

4        (Rucker Exhibit 26, Lehman Brothers

5   research report, marked for

6   identification, as of this date.)

7        MR. GLENN:  We've handed the

8   witness a document with the ML-Trib

9   Bates stamp.  I believe that's Merrill

10  Lynch, but I'm not sure.  It says

11  confidential, but I believe this is a

12  publically available report.  And I

13  believe that there was convention in

14  this case that everything was

15  confidential because it was done on an

16  expedited basis.

17       I have not reviewed the

18  confidentiality restrictions and whether

19  or not there's any issues with that, but

20  if you don't have any objection, I am

21  just going to proceed because I believe

22  that is a public document.

23       MR. DRAYTON:  I don't know if it's

24  public or not.

25       MR. NEIER:  It's not public.

1          M. Rucker - Confidential

2          MR. BENDERNAGEL:  You're not going

3     to get it at the newsstand.

4          Q.   Do you recognize this document,

5     sir?

6          A.   Yes.

7          Q.   What is it?

8          A.   It's a research report from Lehman

9     Brothers.

10          Q.   And was this document made

11     available to Valuation Research before it

12     rendered its opinion?

13          A.   Yes.

14          Q.   I would like you to turn to the

15     third page of the document, but it's

16     double-sided, at least my copy is.

17          MR. NEIER:  Last number is 87?

18          MR. GLENN:  Correct.

19          Q.   This is a discussion here of the

20     Zell proposal.

21          Do you see that?

22          A.   Yes.

23          Q.   And the Zell proposal is ultimately

24     the proposal that won the day for the Tribune

25     acquisition, correct?

1          M. Rucker - Confidential

2              MR. BENDERNAGEL:  Objection to form

3      of the question.

4      A.   Yes.

5      Q.   It says here the fourth paragraph

6  down --

7              MR. NEIER:  Four from the top?

8      Q.   Four after Zell proposal.

9          "We think putting this much debt on

10  Tribute's newspapers and TV stations is way

11  too risky and makes it very possible to put

12  the company into bankruptcy somewhere down

13  the road, especially if the economy slows,

14  with or without the added tax savings from

15  the AESOP financing."

16              Do you see that?

17      A.   Yes.

18      Q.   And Valuation Research typically

19  reviews analysts' reports before it renders

20  solvency opinions when available, correct?

21      A.   Yes.

22      Q.   I would like you to turn back to

23  your solvency opinion, Exhibit 11.  Page

24  175886, page 3.  About halfway down, there is

25  a bullet -- first of all, let me back up and

1       M. Rucker - Confidential

2    ask a foundation question.

3           This series of bullet points begins

4    on page 2 with the Bates stamp 175884.  And

5    it says on that page, page 2, "In rendering

6    the opinion, VRC conducted such reviews,

7    analyses and inquiries reasonably deemed

8    necessary or appropriate under the

9    circumstances.  Among other things, VRC has,"

10   and then it listed a series of things that

11   VRC has done or reviewed before it rendered

12   its solvency opinion.

13          Correct?

14      A.   Yes.

15      Q.   Going back to the page I identified

16   ending in 886, it says here, "Reviewed

17   current research reports prepared by Thompson

18   Financial and Morgan Stanley for the

19   company's broadcasting operations."

20          Do you see that?

21      A.   Yes.

22      Q.   The next page, or the next bullet

23   point, I should say, it says, "Reviewed

24   current research reports prepared by Wachovia

25   Capital, UBS, Bear Stearns, JPMorgan,

1          M. Rucker - Confidential

2     Deutsche Bank, Citigroup, Credit Suisse and

3     Morgan Stanley for the publishing

4     operations."

5               Do you see that?

6          A.   Yes.

7          Q.   We've looked at this and we can't

8     see any reference to the Lehman research

9     report.

10               Do you know why it was omitted from

11    the items that you listed as having reviewed?

12               MR. BENDERNAGEL:   Objection to the

13          form of the question.   Assumes that they

14          reviewed it.

15          A.   I would -- I don't know why it was

16    not included.   But I'm absolutely certain

17    that we reviewed this Lehman Brothers report.

18               And in fact, if you look at some of

19    our work, we referenced the -- the Huber

20    report, so I'm absolutely certain that we

21    reviewed this report.

22               And in addition, the company's

23    downside case was based upon, from what we

24    were instructed by the company, was based

25    upon the Huber report, so we absolutely

Page 284

1        M. Rucker - Confidential

2    reviewed this report.

3        Q.   Do you know if the rest of the

4    research reports here were positive, negative

5    or neutral on Tribune?

6        A.   I can't recall off the top of my

7    head.

8            MR. GLENN:  Nothing further.

9            MR. DRAYTON:  To the extent that

10           counsel for any party, we have a Rule

11           2004 deposition or any kind of

12           deposition in Chapter 11 cases, and you

13           know you're going to use a document

14           labeled confidential by Merrill Lynch, I

15           would like for counsel to just contact

16           counsel for Merrill Lynch to discuss the

17           document before bringing it up at a

18           deposition and using it.

19           MR. NEIER:  That's fine.  I will

20           tell you this is part of VRC's

21           production as well.

22           MR. GLENN:  I thought we had the

23           VRC version.  It wasn't intentional.

24           MR. DRAYTON:  I didn't think so,

25           but I just wanted to state that on the

1          M. Rucker - Confidential

2          record.

3     EXAMINATION BY

4     MR. TRUITT:

5          Q.   Good afternoon, or good evening,

6     Mr. Rucker.  My name is Brent Truitt.  I

7     represent various credit agreement lenders.

8     I have just a very few questions for you.  If

9     you would dig the bottom of your pile for

10    Exhibit 2.

11          Do you have that, Mr. Rucker?

12         A.   Yes, sir.

13         Q.   Do you recall testifying regarding

14    Exhibit 2?

15         A.   Yes, sir.

16         Q.   And that you were party to at least

17    some of the e-mails in this e-mail chain

18    that's represented by Exhibit 2?

19         A.   Yes, sir.

20         Q.   If you look back at the bottom or

21    the end of Exhibit 2, the first e-mail from

22    Chandler Bigelow to Bill Hughes and Peter

23    Morrison, do you see that?

24         A.   Yes, sir.

25         Q.   If you take a moment to just review

Page 286

1          M. Rucker - Confidential

2    the text of that e-mail, let me know when

3    you're finished.

4          A.    I am finished.

5          Q.    As far as you know, was this the

6    initial contact by Tribune to VRC regarding

7    providing solvency opinion?

8          A.    Whether the e-mail was the initial

9    contact?

10         Q.    Yes.

11               MR. NEIER:   It refers to voicemails

12         left earlier.   It's late in the day.   We

13         don't need to confuse everybody.

14         Q.    Is it your understanding that the

15   initial contact by Tribune to VRC regarding

16   providing solvency opinions was around the

17   time of this e-mail, March 29th?

18         A.    I'm assuming, but I wasn't party to

19   those conversations, so I'm assuming that

20   they were.

21         Q.    You're not aware of any earlier

22   conversations or e-mails regarding that?

23         A.    No.

24         Q.    And it appears that based on the

25   time stamp of the e-mail, that this was 2:50

1       M. Rucker - Confidential

2  p.m. on March 29th; is that correct?

3       A.   That's what the e-mail says.

4       Q.   Now, let's go to the beginning of

5  Exhibit 2, and that appears to be an e-mail

6  from Stuart Gruskin to Greg Barber, yourself

7  and Bryan Browning, correct?

8       A.   Yes, sir.

9       Q.   And the time stamp on that is the

10 following day, March 30th, at 8:35 a.m.,

11 correct?

12      A.   Yes, sir.

13      Q.   During this time period between the

14 first and last e-mails that we've just

15 discussed, did you have any understanding

16 that there would be a two-step transaction

17 requiring more than one opinion?

18      A.   I don't know if I knew anything at

19 that particular time, to be honest with you.

20 I just can't recall.

21      Q.   So are you aware of whether anyone

22 else in this e-mail chain had any knowledge

23 that there would be a two-step transaction or

24 a need for more than one opinion?

25      A.   I just can't recall.

1          M. Rucker - Confidential

2          Q.   If you look at the text at the top

3     of Exhibit 2, "I would say at least 750 and

4     maybe significantly more depending on levels,

5     and if they need, bring downs, et cetera."

6               Do you see that?

7          A.   Yes.

8          Q.   Do you have any understanding of

9     what "depending on levels" refers to?

10         A.   Yes, sir.

11         Q.   What is that?

12         A.   That means depending upon the

13    structure, if you have a Hold Co. or Op Co.

14    type structure, if you have to provide

15    opinions at different levels of the company's

16    organizational structure.

17         Q.   That would in part predict the fee

18    for the opinion?

19         A.   It's more work, so, yes.

20         Q.   Do you know what Mr. Gruskin meant

21    by "bring downs"?

22         A.   Typically a bring down means you've

23    given one initial opinion and then there may

24    be another opinion before closing.

25         Q.   Were there any bring downs in the

1          M. Rucker - Confidential

2    Tribune transaction?

3          A.   From the series of documents that I

4    saw today, it looks like that we gave

5    preliminary opinions and we may have given

6    opinions immediately before closing of

7    certain transactions, so it appears from the

8    documents I have seen today that we did give

9    some opinions before closing.

10              MR. TRUITT:  Nothing further.

11   EXAMINATION BY

12   MR. BENDERNAGEL:

13         Q.   Good afternoon, Mr. Rucker.  My

14   name is Jim Bendernagel.  I'm with Sidley and

15   I represent the debtors in the case.

16              I have a couple of questions on a

17   couple of the exhibits that were shown to

18   you.

19         A.   Yes, sir.

20         Q.   Do you have Exhibit 25 in front of

21   you?  It was the last exhibit that was shown

22   to you.

23              MR. NEIER:  Actually, he showed a

24         different exhibit that has similar

25         e-mails.

M. Rucker - Confidential

1

2    Q.    I'm sorry.  Do you have 25 in front

3    of you?

4    A.    Yes, sir.

5    Q.    The first e-mail on the top of the

6    page references some information that was

7    learned about Houlihan?

8    A.    Yes, sir.

9    Q.    What was your understanding of

10   where that information came from?

11   A.    My understanding was that that

12   information came from a conversation with

13   Chandler Bigelow.

14   Q.    It's your understanding the company

15   disclosed to VRC the situation with Houlihan;

16   is that correct?

17   A.    Yes.

18   Q.    I don't think I have anything else

19   on that document.

20         You have Exhibit 11 in front of

21   you, which is the May 24, 2007 opinion

22   letter?

23   A.    Yes, sir.

24   Q.    Some questions asked to you by

25   Mr. Glenn, on page 4 of the document, the

1          M. Rucker - Confidential

2    paragraph that runs from the bottom of that

3    page over to the top of page 5?

4          A.   Yes, sir.

5          Q.   Regarding the projections, do you

6    recall that, and your reliance on the

7    projections from the company?

8          A.   Yes, sir.

9          Q.   Did VRC conduct due diligence with

10   respect to the projections in connection with

11   step 1?

12         A.   You mean did we inquire with the

13   company about the projections?

14         Q.   Yes.

15         A.   Yes.

16         Q.   There's been a lot of questions

17   regarding the various bullet points that

18   start on page 2 and go over to page 4

19   regarding what you looked at.

20              If you could look at page 4, and

21   just read into the record the second to last

22   bullet point on that page, the one that

23   begins, "Held discussions"?

24         A.   "Held discussions and multiple

25   meetings with certain members of the

1        M. Rucker - Confidential

2   company's management team with respect to the

3   past, present and future operating and

4   financial conditions of the company, among

5   other subjects."

6        Q.   My recollection of your engagement

7   letter indicated that if in connection with

8   your due diligence you became aware of some

9   kind of problem with the projections and the

10  like, you would bring it to the company's

11  attention.

12            Is that a fair characterization?

13       A.   To the best of my recollection,

14  yes.

15       Q.   Do you recall in connection with

16  these various meetings coming to the

17  conclusion that there was a problem with the

18  projections that you needed to bring to the

19  company's attention?

20       A.   Nothing came to our attention where

21  we needed to bring that to the company's

22  attention.

23       Q.   If you could take a look at Exhibit

24  18, which was the an e-mail from you to a

25  bunch of VRC folks dated December 15th.

1          M. Rucker - Confidential

2      A.    Okay.

3      Q.    If you could just refresh your

4  recollection, you pointed out to when you

5  were being examined on this document, the

6  document consisted of two separate documents,

7  do you recall that, one dated at the front

8  December 15th, and then another that started,

9  further back in the pack, dated December

10  18th.

11          Do you recall that?

12      A.    Yes, sir.

13      Q.    Just focusing on the December 15th

14  document, which is what the questioning

15  focused on, and if you will turn to page 4 of

16  that document that has the Bates number

17  ending with 9231?

18      A.    Page 4?

19      Q.    Yes.  This chart relates to the

20  calculation of the net present value of the

21  S. Corp. AESOP tax savings; is that correct?

22      A.    Yes, sir.

23      Q.    There was a footnote that there was

24  some discussion with respect, and the

25  footnote reads, "Tax savings were based upon

1          M. Rucker - Confidential

2     Tribune's base case and the assumption that

3     in 2022 Sam Zell exercises his right to

4     acquire 40 percent equity interest in the

5     company.  Upon exercise of his interest, the

6     company will receive 60 percent of the

7     estimated tax benefits as opposed to 100

8     percent for the conversion."

9          Do you see that?

10    A.   Yes.

11    Q.   Based on your testimony, it's my

12    understanding that the numbers on this page

13    were computed based on that assumption.

14         Is that a fair characterization?

15    A.   I'm not 100 percent of exactly how

16    these numbers were calculated here.  I think

17    I made -- in previous testimony I think I may

18    have made a mistake in exactly how this was

19    calculated.

20         But it appears, based upon this

21    footnote, that for this particular analysis,

22    that we assumed some kind of split between

23    the tax savings.

24    Q.   After 2022?

25    A.   Yes.

1        M. Rucker - Confidential

2        Q.    And this page 4 is the backup for

3    the tax savings numbers that are set forth on

4    page 2 of this document, correct?

5        A.    Yes, sir, these numbers tie.

6        Q.    That's right.  So the line item NPV

7    of S. Corp. AESOP tax savings that has the

8    low valuation number of $815.8 million and

9    the high number of $936.1 million is derived

10   from the information on page 4 of this

11   document, correct?

12       A.    Yes, sir.

13       Q.    You have in front of you Exhibit

14   20, which is the December 20th board

15   presentation.

16       A.    Yes, sir.

17       Q.    If you turn to page 7 of this

18   document.  This is the valuation summary

19   sheet; is that correct?

20       A.    Yes, sir.

21       Q.    And if you look at the line item

22   entitled NPV of S. Corp., S. Corp. tax

23   savings, and you look at the numbers for

24   high, medium and low, those numbers are the

25   same numbers that you just looked at in the

1          M. Rucker - Confidential

2    December 15th analysis that's been marked as

3    Exhibit 18, correct?

4          A.   Yes, sir.

5          Q.   And that would suggest that,

6    however, the numbers in the final version of

7    December 20th were calculated in the same

8    manner as the numbers in the December 15th

9    calculation, correct?

10         A.   Yes, sir, it would suggest that.

11         Q.   If you take one last document and

12   then I will be done.  Go to -- I believe this

13   was Rucker 23, but it's the rep letters of

14   December 20, 2007.

15         MR. BUSATH:  It's Exhibit 21.

16         A.   Yes, sir.

17         Q.   You were asked to address the rep

18   on the third to the last page regarding the

19   treatment of Zell taxation.

20         Do you recall that?

21         A.   Yes, sir.

22         Q.   You were asked specifically to look

23   at the paragraph, the first portion of the

24   representation that begins with, "Based upon

25   the Tribune's current understanding."

1          M. Rucker - Confidential

2              Do you see that?

3      A.    Yes, sir.

4      Q.    And this representation is

5  addressing how the tax savings split would be

6  handled if, in fact, the exercise by Mr. Zell

7  occurred before 2022, correct?

8      A.    Yes, sir.

9      Q.    This doesn't relate to -- have any

10  bearing on how the taxes were going to be

11  handled after 2022, correct?

12      A.    If I read the text of this

13  representation letter, it appears this way.

14              (Continued on next page to include

15          signature and jurat.)

16

17

18

19

20

21

22

23

24

25

Page 298

1        M. Rucker - Confidential

2         MR. BENDERNAGEL:  I have no further

3     questions.  I appreciate your time.

4         (Time Noted:  5:32 p.m.)

5

6

7                    _____

8                    MOSE RUCKER III

9

10    Subscribed and sworn to before me

11    this ____ day of _____, 2009.

12

13    _____

14

15

16

17

18

19

20

21

22

23

24

25

1

2          C E R T I F I C A T E

3   STATE OF NEW YORK      )

4                          : ss.

5   COUNTY OF NEW YORK     )

6

7          I, Linda Salzman, a Notary Public

8      within and for the State of New York, do

9      hereby certify:

10          That MOSE RUCKER III, the witness

11     whose deposition is hereinbefore set

12     forth, was duly sworn by me and that such

13     deposition is a true record of the

14     testimony given by the witness.

15          I further certify that I am not

16     related to any of the parties to this

17     action by blood or marriage, and that I

18     am in no way interested in the outcome of

19     this matter.

20          IN WITNESS WHEREOF, I have hereunto

21     set my hand this 8th day of December,

22     2009.

23

24          _____

25                Linda Salzman

1

2   --------------- I N D E X ------------------

3   WITNESS                 EXAMINATION BY        PAGE

4   MOSE RUCKER III    MR. SOTTILE              9

5                      MR. GLENN             254

6                      MR. TRUITT            285

7                      MR. BENDERNAGEL       289

8

9   ---------------- EXHIBITS ------------------

10  RUCKER                             FOR ID.

11  Exhibit 1   Documents                15

12  Exhibit 2   E-mails                  38

13  Exhibit 3   Tribune Company solvency  56

14              engagement letter

15  Exhibit 4   E-mail dated 4/24/07     65

16  Exhibit 5   Solvency opinion letter  107

17              draft

18  Exhibit 6   E-mails                  110

19  Exhibit 7   Step 1 solvency opinion  135

20              draft

21  Exhibit 8   Solvency opinion analysis  147

22

23

24

25                      (Continued)

1

2      ------------- EXHIBITS (Cont'd) -------------

3      RUCKER                                FOR ID.

4      Exhibit 9   Final solvency opinion      153

5                  letter

6      Exhibit 10  Management representation    161

7                  letters

8      Exhibit 11  May 24th solvency opinion    166

9      Exhibit 12  E-mail exchange              171

10     Exhibit 13  Solvency analysis            176

11     Exhibit 14  E-mail                       185

12     Exhibit 15  Solvency analysis            185

13     Exhibit 16  E-mail                       195

14     Exhibit 17  Solvency opinion draft       213

15     Exhibit 18  Internal review document     219

16                 for step 2 solvency opinion

17                 transaction

18     Exhibit 19  Draft                        240

19     Exhibit 20  Final solvency opinion       245

20                 analysis

21     Exhibit 21  Representation letters        251

22     Exhibit 22  December 20, 2007 solvency    253

23                 opinion

24

25                             (Continued)

Page 302

1

2      ------------- EXHIBITS (Cont'd) -------------

3      RUCKER                              FOR ID.

4      Exhibit 23  Document                    267

5      Exhibit 24  E-mail                      274

6      Exhibit 25  E-mail                      276

7      Exhibit 26  Lehman Brothers research    279

8                  report

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    ERRATA SHEET FOR THE TRANSCRIPT OF:

3    Case Name:  Tribune Company, et al.

4    Dep. Date:  December 3, 2009

5    Deponent:   MOSE RUCKER III

6    Pg. Ln.   Now Reads      Should Read   Reason

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18

19                 _____

20                 Signature of Deponent

21

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS    DAY OF          , 2009.

24   _____

25   (Notary Public)  MY COMMISSION EXPIRES:_____