Condensed Transcript

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

TRIBUNE COMPANY,
et al.,

          Debtors.
~~~~~~~~~~~~~~~~~~

Chapter 11
Case No:
08-13141(KJC)
(Jointly Administered)

**CONFIDENTIAL DEPOSITION OF**

**RAJESH KAPADIA**

January 22, 2010
9:30 a.m.

30 Rockefeller Plaza
New York, New York

Joan Warnock



Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

**1**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
-----------------------------------X
In re:

TRIBUNE COMPANY,          Chapter 11
et al.,                   Case No:
                          08-13141(KJC)
                          (Jointly Administered)
          Debtors.
-----------------------------------X

CONFIDENTIAL
DEPOSITION OF RAJESH KAPADIA
New York, New York
Friday, January 22, 2010

Reported by:
JOAN WARNOCK
JOB NO. 306439

**2**

1
2
3           January 22, 2010
4           9:30 a.m.
5
6       CONFIDENTIAL - Deposition of RAJESH
7   KAPADIA, held at the offices of
8   Chadbourne & Parke, LLP, 30 Rockefeller
9   Plaza, New York, New York, pursuant to
10  Notice, before Joan Warnock, a Notary
11  Public of the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1
2   A P P E A R A N C E S :
3
4   ZUCKERMAN SPAEDER, LLP
5   Attorneys for Official Committee of
6   Unsecured Creditors
7       1800 M Street, NW, Suite 1000
8       Washington, D.C.  20036-5802
9   BY:  ANDREW N. GOLDFARB, ESQ.
10
11  DAVIS POLK & WARDWELL
12  Attorneys for JPMorgan and the Witness
13      450 Lexington Avenue
14      New York, New York  10017
15  BY:  DENNIS E. GLAZER, ESQ.
16       SHARON KATZ, ESQ.
17       LYNN EARL BUSATH, ESQ.
18
19  HENNINGTON BENNETT & DORMAN LLP
20  Attorneys for Credit Agreement Lenders
21      865 South Figueroa Street
22      Suite 2900
23      Los Angeles, California  90017
24  BY:  JAMES O. JOHNSTON, ESQ.
25

**4**

1
2   A P P E A R A N C E S :  (Cont'd.)
3
4   SIDLEY AUSTIN, LLP
5   Attorneys for the Debtors
6       1501 K Street, N.W.
7       Washington, D.C.  20005
8   BY:  DAVID M. MILES, ESQ.
9
10  PAUL, WEISS, RIFKIND, WHARTON &
11  GARRISON, LLP
12  Attorneys for Citigroup Global
13  Markets, Inc.
14      1285 Avenue of the Americas
15      New York, New York  10019
16  BY:  STUART McPHAIL, ESQ.
17
18  O'MELVENY & MYERS, LLP
19  Attorneys for Bank of America
20      Times Square Tower
21      7 Times Square
22      New York, New York  10036
23  BY:  ZACK GROSS, ESQ.
24
25


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

| 5 | 7 |
|---|---|
| 1 | 1    Confidential - R. Kapadia |
| 2    A P P E A R A N C E S: (Cont'd.) | 2    R A J E S H   K A P A D I A, called as |
| 3 | 3    a witness, having been duly sworn |
| 4    BROWN RUDNICK | 4    by a Notary Public, was examined |
| 5    Attorneys for Wilmington Trust | 5    and testified as follows: |
| 6        One Financial Center | 6        COURT REPORTER:  Please state your |
| 7        Boston, Massachusetts  02111 | 7    name and address for the record. |
| 8    BY:  KATE S. BROMBERG, ESQ. | 8        THE WITNESS:  Rajesh Kapadia, |
| 9 | 9    36 Andrea Lane, Scarsdale, New York |
| 10    KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP | 10    10583. |
| 11    Attorneys for Law Debenture | 11    EXAMINATION BY |
| 12        1633 Broadway | 12    MR. GOLDFARB: |
| 13        New York, New York  10019-6799 | 13        Q.  Good morning, Mr. Kapadia.  My name |
| 14    BY:  SHERON KORPUS, ESQ. | 14    is Andrew Goldfarb.  I'm from the law firm of |
| 15        CHRISTINE ALVAREZ, ESQ. | 15    Zuckerman Spaeder, and we are Special Counsel |
| 16 | 16    to the Committee of Unsecured Creditors in |
| 17    KAYE SCHOLER LLP | 17    the Tribune bankruptcy matter.  Good morning. |
| 18    Attorneys for Merrill Lynch | 18    I will be taking your deposition today. |
| 19        425 Park Avenue | 19        MR. GOLDFARB:  Before we get going, |
| 20        New York, New York  10022-3598 | 20    just a couple of housekeeping things. |
| 21    BY:  JENNIFER R. MOORE, ESQ. | 21    If counsel would go around the room and |
| 22 | 22    identify themselves for the record, |
| 23 | 23    please. |
| 24 | 24        MR. GLAZER:  My name is Dennis |
| 25 | 25    Glazer from Davis Polk & Wardwell, and I |

| 6 | 8 |
|---|---|
| 1 | 1    Confidential - R. Kapadia |
| 2    A P P E A R A N C E S: (Cont'd.) | 2    represent JPMorgan and the witness. |
| 3 | 3        MS. KATZ:  Sharon Katz, Davis |
| 4    CHADBOURNE & PARKE, LLP | 4    Polk & Wardwell, JPMorgan and the |
| 5    Attorneys for Creditors' Committee | 5    witness. |
| 6        30 Rockefeller Plaza | 6        MR. BUSATH:  Lynn Busath, also |
| 7        New York, New York  10112 | 7    Davis Polk & Wardwell. |
| 8    BY:  MARC D. ASHLEY, ESQ. | 8        MR. CHANEN:  Lawrence Chanen from |
| 9        ALEXANDRA K. NELLOS, ESQ. | 9    JPMorgan Legal for JPMorgan and the |
| 10 | 10    witness. |
| 11    ALSO PRESENT: | 11        MS. MOORE:  Jennifer Moore with |
| 12        LAWRENCE N. CHANEN, JPMORGAN LEGAL DEPT. | 12    Kaye Scholer representing Merrill Lynch. |
| 13 | 13        MR. MILES:  David Miles from Sidley |
| 14 | 14    representing the Debtors. |
| 15 | 15        MR. McPHAIL:  Stuart McPhail from |
| 16 | 16    Paul Weiss representing Citigroup Global |
| 17 | 17    Markets. |
| 18 | 18        MR. JOHNSTON:  Jim Johnston, |
| 19 | 19    Hennigan Bennett & Dorman, on behalf of |
| 20 | 20    a group of Credit Agreement Lenders. |
| 21 | 21        MR. GROSS:  Zack Gross from |
| 22 | 22    O'Melveny & Myers representing Bank of |
| 23 | 23    America. |
| 24 | 24        MR. KORPUS:  Sheron Korpus, |
| 25 | 25    Kasowitz, Benson, Torres & Friedman, for |



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

**9**

1     Confidential - R. Kapadia
2   Law Debenture, and I expect Christine
3   Alvarez to join me at some point.
4     MR. ASHLEY:  Marc Ashley for
5   Chadbourne & Parke representing the
6   Creditors Committee.
7     MR. GOLDFARB:  And I can represent
8   on the record that all parties here
9   today have signed on to the appropriate
10  confidentiality agreements that have
11  been entered in the case.  And just in
12  terms of ground rules to make the day
13  run smoothly, an objection for one will
14  serve as an objection for all parties,
15  and all objections except as to form are
16  preserved.
17    MR. GLAZER:  And also,
18  Mr. Goldfarb, similar to the instruction
19  I gave Mr. Kowalczuk, I've told
20  Mr. Kapadia that if you ask him if he's
21  seen a document, that he is not to
22  answer with regard to having seen it
23  only during the course of his
24  preparation for his deposition, that
25  he's to answer with regard to whether

**11**

1     Confidential - R. Kapadia
2   write down words, I ask that you respond to
3   my questions with yes's, no's, and other
4   verbal responses as opposed to guttural
5   noises, bodily gestures, and other things of
6   that sort.  Is that okay?
7     A.  Understood.
8     Q.  If I ask a question that you do not
9   understand, please ask me to clarify it.  If
10  you don't ask that I clarify a question, I'll
11  assume that you understood it and that your
12  response is intended to be responsive to the
13  question asked.  And if you need a break to
14  confer with your counsel, I will certainly
15  give you that opportunity.  I ask if a
16  question is pending and you're able to answer
17  the question, unless you feel you're
18  implicating or entering an area of privilege,
19  that you answer the question before
20  conferring with your counsel.  Okay?
21    A.  Understood.
22    Q.  And if you need a break for
23  personal reasons, we'll try to take a break
24  every hour or so, every hour and 15 minutes
25  just to stretch our legs, but if you need a

**10**

1     Confidential - R. Kapadia
2   he's seen it before the preparation
3   sessions began, so that we'll have a
4   clean record on that as well.
5     MR. GOLDFARB:  Okay.  And if we
6   need to revisit that when we get there,
7   we can.
8     MR. GLAZER:  Absolutely.
9     Q.  Mr. Kapadia, have you had your
10  deposition taken ever before?
11    A.  No.
12    Q.  I will give you some basic ground
13  rules so that we end up with hopefully a
14  clean transcript and the day runs smoothly.
15    A.  Sure.
16    Q.  I'll be asking questions.  You'll
17  be answering them.  So that the court
18  reporter is able to record my questions and
19  your testimony, I ask that you not interrupt
20  my questions even if you think you know the
21  question being asked, and I'll endeavor not
22  to interrupt your responses.  Is that
23  acceptable to you?
24    A.  Sure.
25    Q.  Because the court reporter can only

**12**

1     Confidential - R. Kapadia
2   break more frequently, just let me know.
3     A.  Okay.
4     Q.  Mr. Kapadia, what is your
5   educational background beginning with
6   university?
7     A.  I did an engineering undergrad and
8   then an MBA.
9     Q.  And where did you study
10  engineering?
11    A.  University of London.
12    Q.  And when did you graduate?
13    A.  I graduated in 1988.
14    Q.  And where did you obtain your MBA?
15    A.  University of Chicago.
16    Q.  And when did you obtain that?
17    A.  '94.
18    Q.  Were you a full-time student while
19  you were studying for your MBA?
20    A.  I was.
21    Q.  What did you do between your
22  graduation from university and enrolling in
23  business school?
24    A.  I worked at a bank in the UK.
25    Q.  What was the name of that bank?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

### 13

1      Confidential - R. Kapadia
2      A.   Abbey National.
3      Q.   And how long did you work there?
4      A.   Three and a half, four years.
5      Q.   Did your time at Abbey National
6  span the entire period between college and
7  business school?
8      A.   Pretty much, yes.
9      Q.   Did you have any other employment
10 during that period?
11     A.   None that I recall.
12     Q.   And then after business school what
13 did you do?
14     A.   After business school I joined
15 Chemical Bank, which is the predecessor to
16 the firm that I'm working for.
17     Q.   And the firm you're working for now
18 is?
19     A.   JPMorgan Securities.
20     Q.   How long were you at Chemical?
21     MR. GLAZER:  Well, Chemical was a
22     predecessor.  There was a series of
23     mergers.
24     MR. GOLDFARB:  Yes.
25     Q.   When did you start at Chemical?

---

### 14

1      Confidential - R. Kapadia
2      A.   After graduation in '94.  So
3  summer, late summer, early fall '94.
4      Q.   And have you worked for Chemical
5  and then its successor entities continuously
6  since then?
7      A.   I have.
8      Q.   What is your current position?
9      A.   I work in the Leveraged Finance,
10 Syndicated and Leveraged Finance group at
11 JPMorgan.
12     Q.   What does the Syndicated and
13 Leveraged Finance group do at JPMorgan?
14     A.   It helps clients, issuer clients,
15 borrowers raise debt capital in the loan
16 market and bond markets.
17     Q.   And how does the Syndicated and
18 Leveraged Finance -- do you ever refer to it
19 as SLF?
20     A.   From time to time, yes.
21     Q.   If I use the short form, you'll
22 know what I mean.  Yes?
23     A.   Yes.
24     Q.   How does Syndicated and Leveraged
25 Finance help clients raise debt capital?

---

### 15

1      Confidential - R. Kapadia
2      A.   We work with our clients to
3  identify their financing needs, to identify
4  their acquisition needs, and help develop a
5  structure and set of terms that we believe
6  will appeal to the issuer, will appeal to
7  potential investors.
8      Q.   And what does syndicated and
9  leveraged finance mean?  What is syndicated
10 finance, most broadly?
11     MR. GLAZER:  Objection to form.
12     A.   Yeah, I'm not sure I fully
13 understand the question.
14     Q.   Okay.  What is a syndication?
15     A.   So a syndication, as I understand
16 it, is selling a credit facility, selling a
17 loan to a group of other lenders, be they
18 banks, institutional investors, you know,
19 third-party lenders.
20     MR. GOLDFARB:  And just for the
21     record, we've had someone else enter the
22     deposition.  Can you just identify
23     yourself for the record, please.
24     MS. BROMBERG:  Kate Bromberg with
25     Brown Rudnick.

---

### 16

1      Confidential - R. Kapadia
2      MR. GOLDFARB:  Okay.  Good morning.
3      Q.   How long have you been in the
4  Syndicated and Leveraged Finance department
5  at JPMorgan?
6      A.   About thirteen years.
7      Q.   Did the group exist before you
8  joined it?
9      A.   Yes.
10     Q.   How long have you been a managing
11 director?
12     A.   As I recall, approximately five
13 years.
14     Q.   And before that?
15     A.   Before that I was a vice president
16 in the group.
17     Q.   And within Syndicated and Leveraged
18 Finance, do you have a particular area of
19 expertise, either subject matter or
20 otherwise?  Any subspecialty?
21     A.   Sure.  So we do align ourselves by
22 industry verticals, and I am focused on the
23 TMT, Telecom, Media, Technology, space.
24     Q.   How many people are in the TMT
25 group at Syndicated and Leveraged Finance?

---



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

17

1        Confidential - R. Kapadia
2        A.   How many people today is your
3    question?
4        Q.   Sure.
5        A.   I would estimate maybe 20.
6        Q.   And is there someone who is the
7    head of the TMT group within Syndicated and
8    Leveraged Finance?
9        A.   Yes.
10       Q.   Who is that?
11       A.   Jessica Kearns.
12       Q.   And does Ms. Kearns report to
13   somebody within the Syndicated Leveraged
14   Finance structure?
15       A.   Yes.
16       Q.   Who does Ms. Kearns report to?
17       A.   She reports to Jim Casey and Andy
18   O'Brien.
19       Q.   Who is the head of Syndicated
20   Leveraged Finance?
21       A.   Jim Casey and Andy O'Brien are the
22   co-heads.
23       Q.   And do you report to Ms. Kearns?
24       A.   Yes.
25       Q.   Do you have colleagues who report

18

1        Confidential - R. Kapadia
2    to you?
3        A.   No.
4        Q.   You don't supervise anybody?
5        A.   In the context of deals, yes.
6        Q.   So it's a case by case circumstance
7    as to who you might be working with and
8    supervising in a particular transaction?
9        A.   Yes.
10       Q.   Have you in your time at JPMorgan
11   or any of its predecessor entities done any
12   work involving the Tribune Company?
13       A.   I have.
14       Q.   When did you first become involved
15   with the Tribune Company in any respect?
16       A.   As I recall, in early 2007.
17       Q.   That, to your recollection, is the
18   first time that you had any contact with
19   matters involving Tribune?
20       A.   As I recall, yes.
21       Q.   And how did the Tribune Company
22   come to your attention in early 2007?
23       A.   So as I recall, I was informed by a
24   colleague about Sam and his firm interested
25   in making a bid on Tribune, and that's when I

19

1        Confidential - R. Kapadia
2    first got involved in that.
3        Q.   And by Sam are you referring to Sam
4    Zell?
5        A.   Yes.
6        Q.   And by his firm are you referring
7    to the EGI firm?
8        A.   Yes.
9        Q.   And who is the colleague who
10   informed you that Sam Zell was interested in
11   exploring a bid for Tribune Company?
12       A.   I don't recall at this point.
13       Q.   Had you ever worked with Sam Zell
14   or EGI previously?
15       A.   I don't believe so.
16       Q.   Do you know whether any of your
17   colleagues at JPMorgan had as JPMorgan
18   employees?
19       A.   I'm not sure I understand your
20   question.
21       Q.   Do you know whether JPMorgan had
22   ever done any work for Sam Zell or EGI before
23   this early February 2007 period that you
24   learned of it?
25       A.   So just so that I understand your

20

1        Confidential - R. Kapadia
2    question, is your question did I know then
3    whether we had worked with Sam Zell and EGI?
4        Q.   Yes, that's my question.
5        A.   I don't recall if I knew then that
6    we had worked with Sam.
7        Q.   Did there come a time later when
8    you did learn that JPMorgan's work with Zell,
9    EGI had predated the February 2007 period?
10       A.   Is your question -- I'm not sure --
11       Q.   My question now is did you come to
12   learn later that, in fact, there had been a
13   relationship with Zell that predated
14   February '07?
15       A.   I believe so, yes.
16       Q.   And what did you learn had been the
17   nature of that relationship?
18       A.   As I recall, we've done some other
19   work and business with Sam.
20       Q.   Is there a particular group or
21   individual who has been the primary contact
22   or relationship person with Mr. Zell and his
23   company?
24       MR. GLAZER:  You're talking about
25   at any point in time?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

**21**

1        Confidential - R. Kapadia
2            MR. GOLDFARB:  Yes.
3        A.   I don't know with regard to at any
4    point in time, but during the time that I was
5    involved in the Tribune transaction, the
6    primary banker was Brit Bartter.
7        Q.   And what is Brit Bartter's position
8    at JPMorgan?
9            MR. GLAZER:  Back in 2007?
10       Q.   In 2007, if you know.
11       A.   As I recall, he's vice chairman
12   within our Investment Banking group.
13       Q.   And just so I understand the
14   structure a little bit, can you just describe
15   where within the JPMorgan organization
16   Syndicated Leveraged Finance sits?  Does
17   Syndicated Leveraged Finance sit -- is it in
18   a broader group or arm of JPMorgan?
19       A.   Where it sits today is your
20   question?
21       Q.   Yes.
22       A.   It's part of our Investment Banking
23   group.
24       Q.   Was that the case in the 2007, 2008
25   period?

---

**22**

1        Confidential - R. Kapadia
2        A.   I don't believe so.
3        Q.   Was it part of another group during
4    that period of time?
5        A.   As I recall, at that time the group
6    was part of a Global Debt and Capital Markets
7    business at that time.
8        Q.   Was the function of Syndicated
9    Leveraged Finance any different in 2007, 2008
10   when it was under Global Debt compared to its
11   current position under the Investment Banking
12   arm of JPMorgan?
13       A.   I understand your question.  It's a
14   very broad question.  We do a lot of -- you
15   know, the substance of what we do is the
16   same.
17       Q.   Okay.
18       A.   Yeah.
19       Q.   That was my question.  And what
20   about you personally, has the nature of what
21   you do changed from the 2007 period to today?
22       A.   Not really.
23       Q.   And if you can, can you describe
24   generally within Syndicated Leveraged Finance
25   what your personal responsibilities and

---

**23**

1        Confidential - R. Kapadia
2    functions are, what you do in your job?
3        A.   So I think as I described a couple
4    of minutes ago, the Syndicated Leveraged
5    Finance group helps our clients, issuer
6    clients, raise debt capital, and that's, you
7    know -- I'm a part of that group, and that's
8    what I help our issuer clients within our TMT
9    group, Telecom, Media, Technology group,
10   raise debt capital.  So work with the clients
11   with their financing needs and help them
12   raise that capital.
13       Q.   And I'm just trying to get a sense
14   of what your particular duties are.  And
15   without being exclusive, just by way of
16   example, are you someone who works primarily
17   with the client in terms of identifying the
18   client's needs and devising a plan of action,
19   or are you on the phone talking to potential
20   syndicate lenders?  Kind of where in this
21   broad function that you've identified do your
22   responsibilities fall?
23       A.   It's primarily with the clients,
24   but it's not exclusively with the clients.
25   From time to time you interact with investors

---

**24**

1        Confidential - R. Kapadia
2    or syndicate members from time to time.
3        Q.   And this is you personally as well?
4        A.   Yes.
5        Q.   When you learned that the EGI group
6    was contemplating a bid for the Tribune
7    Company, when your colleague told you about
8    that, what did he or she tell you?
9        A.   I don't recall the specifics.  That
10   being said, it's I think as I described a few
11   minutes ago, that Sam Zell and EGI were
12   interested in making a bid for Tribune and
13   there was a financing opportunity for us to
14   take a look at.
15       Q.   At that point in time did you
16   understand how Sam Zell proposed to structure
17   his bid for Tribune?
18       A.   At what time?
19       Q.   When you first learned of the
20   possibility in early 2007.
21       A.   I don't recall.
22       Q.   What happened after you were
23   informed that this possibility for the Zell,
24   EGI work existed?
25           MR. GLAZER:  Objection to the form.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

## 25

1      Confidential - R. Kapadia
2      A.  Can you repeat your question,
3   please.
4      Q.  Sure.  I'll withdraw it and ask
5   what did you do after you learned that this
6   possible transaction was out there?
7      A.  As I recall, we had a call with EGI
8   at some point in the days that followed that
9   first call.
10      Q.  Do you recall who at EGI you spoke
11   with?
12      A.  I believe it was Nils Larson.
13   There may have been others.
14      Q.  And you said "we" had a call with
15   EGI.  Who else participated in that call, to
16   your recollection?
17      A.  As I recall, Brit Bartter was on
18   that call.
19      Q.  Do you know why Mr. Bartter got you
20   involved in this transaction?
21      A.  I don't.
22      Q.  Had you worked with Mr. Bartter on
23   other transactions in the past?
24      A.  I may have.  I don't recall.
25      Q.  Am I right you testified you don't

## 26

1      Confidential - R. Kapadia
2   recall which colleague originally told you
3   that Mr. Zell was contemplating a bid for
4   Tribune?  Is that right?
5      MR. GLAZER:  That's what he said,
6   yes.
7      A.  That's right.
8      Q.  When you first learned about it,
9   did you know who Sam Zell was?
10      A.  Is your question did I know him
11   personally?
12      Q.  No.  My question is, did you know
13   who he was or what he did or anything about
14   him?
15      A.  By reputation, yes.
16      Q.  And can you recall whether anyone
17   other than Mr. Bartter was on the call, on
18   this first call with Mr. Larson and maybe
19   others?
20      A.  There may have been others.  I
21   don't recall if there were others.
22      Q.  And what do you recall was said on
23   that phone conference with Mr. Larson and
24   Mr. Bartter?
25      A.  I don't have, you know, a specific

## 27

1      Confidential - R. Kapadia
2   recollection of that.  We talked.  All I
3   recall is we talked a bit about what EGI was
4   thinking about the deal and their interest in
5   Tribune.  But, you know, I don't recall the
6   specifics.
7      Q.  Were you aware at that point in
8   time whether there were other possible
9   bidders for the Tribune Company?
10      A.  There may have been.  I wasn't -- I
11   don't recall.
12      Q.  At any point in time did you come
13   to learn that there were other bidders, other
14   potential bidders for the Tribune Company?
15      A.  When you say at any point in time,
16   I'm not sure I understand that.
17      Q.  Well, you said in this initial
18   call, in this initial period when you learned
19   about the potential Zell bid and had this
20   call with Mr. Larson, you weren't aware at
21   that time whether there were any other
22   potential bidders for the Tribune.  Is that
23   accurate?
24      A.  Yes.
25      Q.  At any point in time later did you

## 28

1      Confidential - R. Kapadia
2   come to learn that there were other potential
3   bidders?
4      A.  As I recall, there was either -- I
5   think there was one other bidder or bidder
6   group from the West Coast that was either
7   rumored to or may have submitted a bid.
8      Q.  Do you know the identity of who
9   those people were?
10      A.  I don't recall right now.
11      Q.  Have you ever heard of Ron Burkle
12   and Eli Broad?
13      A.  Yes.
14      Q.  Does that refresh your
15   recollection?
16      A.  That refreshes my recollection,
17   yes.
18      Q.  Other than the Burkle Broad group,
19   do you recall at any point hearing about
20   other potential bidders for the Tribune?
21      A.  No.
22      Q.  Mr. Kapadia, when you first got
23   involved through Mr. Bartter in this, what
24   was your job?  What did you do once you
25   learned that the Zell group was considering a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

29

1      Confidential - R. Kapadia
2  bid for Tribune Company?
3        MR. GLAZER:  Objection to form.
4      A.  I'm not sure I understand the
5  question what did I do.
6      Q.  Well, maybe stepping back from this
7  transaction, I'm just trying to understand
8  generally when you learn that there is a
9  possibility of a transaction where JPMorgan
10  may have a client and you're involved, you
11  learn that there is a possible transaction
12  out there, what do you do, what is the next
13  step?
14      A.  So it's case by case, but generally
15  we seek to assess the situation, diligence
16  the company and the structure and the
17  situation, and then see if we can formulate a
18  solution or a financing associated with that.
19      Q.  Did that occur in this case with
20  Zell, EGI in early 2007?
21      A.  As I recall, yes.
22      Q.  JPMorgan performed diligence on the
23  Tribune Company; is that right?
24      A.  Can you repeat your question.
25      Q.  Yes.  I'm asking whether JPMorgan

30

1      Confidential - R. Kapadia
2  performed due diligence on the Tribune
3  Company?
4      A.  As I recall, we did.
5      Q.  And does that occur in the
6  Syndicated Leveraged Finance department?
7      A.  The diligence is -- okay, and it's
8  case by case, would typically involve the
9  Syndicated Leveraged Finance department, the
10  Credit department, as well as the Investment
11  Banking Coverage department.
12      Q.  And do you recall whether personnel
13  from each of these groups contributed to the
14  diligence of the Tribune Company in this
15  instance?
16      A.  They may have.  I don't have, you
17  know, recollection of specifically.
18      Q.  Do you recall any of the
19  individuals who did that work?
20      A.  Not specifically, no.
21      Q.  Did you personally do any of that
22  work, or is that work that is done by people
23  more junior to you?
24      A.  As I recall, I was part of some
25  discussion around some of that diligence.

31

1      Confidential - R. Kapadia
2      Q.  And who did you have those
3  discussions with, to your recollection?
4      A.  I believe with Nils Larson at EGI.
5      Q.  And what were you talking to
6  Mr. Larson about in terms of conducting the
7  diligence?
8      A.  I don't recall the specifics.  As I
9  described a few minutes ago, it was to
10  understand their, you know, their plan to buy
11  Tribune.
12      Q.  And what did he tell you about it?
13      A.  I don't recall the specifics.
14      Q.  Do you recall anything generally
15  about what he told you the plan was?
16      A.  So generally, around, you know, the
17  structure that they were contemplating, the
18  capital structure that they were
19  contemplating putting in.
20      Q.  And what do you recall about the
21  structure that Zell, EGI was contemplating?
22      A.  The S-Corp. ESOP structure.
23      Q.  And what did you understand that to
24  mean?
25      A.  Understand that to mean when?

32

1      Confidential - R. Kapadia
2      Q.  At the time when he explained it to
3  you, what did you understand that structure
4  to be?
5      A.  I don't recall what I understood
6  when he explained it to me.  We went through
7  it in more detail obviously in the weeks,
8  months leading or subsequent to it.  I don't
9  recall what I understood at that time.
10      Q.  Did you have any background in
11  S-Corp. ESOP structures before this?
12      A.  I don't believe so.
13      Q.  Did you personally do any other
14  external diligence in connection with the
15  Tribune?  And just to be clear, when I'm
16  talking about Tribune, I'm talking about the
17  transaction as a whole, so it could also
18  include EGI or other parties.
19      A.  I believe we did.
20      Q.  Did you personally?
21      A.  Yes.
22      Q.  What did you do?
23      A.  It's the discussion, as I recall,
24  with Nils Larson from EGI.
25      Q.  And I'm asking now other than your



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

## 33

1    Confidential - R. Kapadia
2  conversation -- was it multiple conversations
3  with Mr. Larson?
4    A.   There may have been multiple
5  conversations, yes.
6    Q.   And other than those conversations
7  with Mr. Larson, did you personally do any
8  additional diligence?
9    A.   I may have.  I don't recall at this
10  point.
11    Q.   And did colleagues of yours also
12  undertake due diligence related to this
13  transaction?
14    A.   They may have.  I don't have
15  specific recollection of that.
16    Q.   Was there anybody within JPMorgan
17  tasked internally with compiling information,
18  gathering reports or compiling reports about
19  the Tribune Company and other entities that
20  would be party to a transaction?
21    A.   There may have been.  I don't
22  recall if we did that.
23    Q.   Is that something that would
24  typically happen at JPMorgan in connection
25  with a transaction?

## 34

1    Confidential - R. Kapadia
2    A.   It's really case by case.
3    Q.   When you spoke to Mr. Bartter and
4  your early contacts with Mr. Larson, did you
5  understand this to be a significant potential
6  transaction for JPMorgan?
7    MR. GLAZER:  Objection to form.
8    A.   Can you repeat your question,
9  please.
10    Q.   Yes.  During these early contacts
11  with Mr. Bartter or conversations with
12  Mr. Larson when you were learning about the
13  potential transaction, did you consider it to
14  be a potentially significant one for
15  JPMorgan?
16    MR. GLAZER:  Same objection.
17    A.   Yeah, what do you mean by
18  significant?
19    Q.   Was it a big deal?
20    A.   Potentially.
21    Q.   Was it potentially a big deal in
22  terms of the amount of money contemplated
23  that would be involved in a bid for the
24  Tribune Company?
25    A.   Potentially, yeah.

## 35

1    Confidential - R. Kapadia
2    Q.   And did you have an understanding
3  from these early conversations the range of
4  numbers or lendings that would be involved in
5  a transaction of this size?
6    MR. GLAZER:  Objection to form.
7    A.   I don't recall -- if you're asking
8  me at that point in time, I don't recall
9  that.  Obviously since then, but not at that
10  time.
11    Q.   Did you have any sense as to
12  whether it was going to be on the larger
13  scale of transactions that you personally had
14  worked on in your time at JPMorgan?
15    A.   It was on the larger scale, yes.
16    Q.   And as the transaction developed
17  and came to be, did it turn out to be one of
18  the larger transactions that you have worked
19  on at JPMorgan?
20    A.   What time period are you referring
21  to?
22    Q.   Ever.
23    A.   Can you repeat your question,
24  please.
25    Q.   Yes.  I'm just trying to get a

## 36

1    Confidential - R. Kapadia
2  sense from your perspective among the
3  transactions you've worked on in your career
4  where this fell in terms of its magnitude and
5  significance.
6    MR. GLAZER:  Objection to form.
7    A.   You know, I've been in this
8  business for thirteen years, so I've done a
9  range of transactions of all sizes, and this
10  was a larger transaction, but I've done
11  transactions that are even bigger.
12    Q.   So the answer is that it's at least
13  among the larger transactions you've been
14  involved with?
15    A.   It's among the larger transactions,
16  yes.
17    Q.   And as you were going through the
18  transaction, who did you consider to be your
19  client?
20    A.   I don't recall who I would have
21  considered to be my client at that time.
22    Q.   And what time are you referring to
23  when you say "that time"?
24    A.   When, as I understood your
25  question, as we were doing the transaction, I



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

**37**

1    Confidential - R. Kapadia
2  don't recall who during that time I thought
3  as our client or as my client.
4    Q.   And just so that the record is
5  clear on the time frame, at any point in the
6  transaction during 2007 did you have an
7  entity in this transaction that you
8  identified as your client?
9    A.   So if it's -- I would say that we
10 really had -- I would have viewed both Sam
11 Zell and EGI as one client and Tribune as
12 another client.
13   Q.   And did you consider them both to
14 be clients of JPMorgan during this period of
15 time?
16   A.   Yes.
17   Q.   Are you aware of whether JPMorgan
18 was involved in assisting other potential
19 bidders for the Tribune Company during this
20 period of time, any point in 2007?
21   A.   We may have been.  I'm not aware of
22 -- I don't recall.
23   Q.   Would it be an unusual situation
24 for JPMorgan to be helping multiple potential
25 bidders for one target company

---

**38**

1    Confidential - R. Kapadia
2  simultaneously?
3        MR. GLAZER:  Objection to form.  If
4  you know.
5    A.   You're asking a very broad
6  question.  We do, we describe it, have
7  multiple trees helping multiple potential
8  bidders on a specific asset or specific
9  target.
10   Q.   And when that happens, have you
11 been in that situation personally where there
12 are maybe multiple branches coming off the
13 tree, maybe the metaphor is not working, but
14 were there multiple teams at JPMorgan working
15 with multiple bidders on a potential single
16 transaction, have you personally been
17 involved in those circumstances?
18   A.   Yes.
19   Q.   And when that happens, are you
20 typically aware of whether there are other
21 people at JPMorgan working on potential bids
22 other than the one that you personally are
23 working on?
24   A.   Not typically.  Not typically.
25   Q.   So in this instance, as in other

---

**39**

1    Confidential - R. Kapadia
2  instances, it sounds like, there may have
3  been other people within JPMorgan working on
4  a potential bid and you just didn't know
5  about them.  Is that a fair characterization?
6    A.   That's fair.
7    Q.   After this initial due diligence
8  period where you spoke to Mr. Larson, did the
9  work with the Zell, EGI group in connection
10 with a potential transaction continue beyond
11 the February 2007 period?
12   A.   I believe so, yes.
13   Q.   The other main task that you
14 identified in addition to doing diligence in
15 response to a potential transaction was to
16 work with the client to begin to formulate a
17 solution.  Do you recall that testimony?  Do
18 you recall saying that earlier?
19   A.   Can you repeat that, please.
20   Q.   Yes.  You had identified earlier
21 that when there's a potential transaction,
22 JPMorgan undertakes due diligence and also
23 begins to work with the client to identify
24 the client's needs and formulate a solution.
25 Is that fair to say?

---

**40**

1    Confidential - R. Kapadia
2    A.   Yes.
3    Q.   I'm now asking about this second,
4  to work with the client to identify his needs
5  and formulate a solution.  Were you involved
6  in that?  Did that go on in this instance?
7    A.   As I recall, yes.
8    Q.   Were you involved in that?
9    A.   As I recall, yes.
10   Q.   Did you do this alone or did you do
11 this with colleagues?
12   A.   I believe with colleagues.
13   Q.   Who are the people who you worked
14 with in this -- would you characterize this
15 as a little bit more of a strategic function
16 as opposed to the due diligence work?
17   A.   When you say strategic function --
18   Q.   I'm just trying to identify a
19 shorthand way to refer to this second
20 function, identifying the client's needs and
21 formulating a solution.
22   A.   Sure.  It's not a strategic
23 function.  It is all -- it's all targeted to
24 the financing and understanding, you know,
25 what the client is looking for and what may

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

Rajesh Kapadia                                      January 22, 2010

CONFIDENTIAL

---

41

1      Confidential - R. Kapadia
2  be feasible from a market standpoint.
3      Q.   And who did you work with among
4  your colleagues to do this?
5      A.   So as I recall, we had a couple of
6  people from our Investment Banking group,
7  some of my colleagues in Leveraged Finance,
8  and some folks from our Credit department.
9      Q.   After this initial period in
10  February 2007 when you did your initial work,
11  to your recollection, what happened
12  thereafter to the potential Zell bid?  Did it
13  go forward?
14      A.   It did go forward, yes.
15      Q.   And did it go forward immediately
16  following your initial involvement in
17  February 2007?
18      A.   No.
19      Q.   Do you recall why it didn't?
20      A.   As I recall, there were some twists
21  and turns in the deal and some changes in the
22  approach that Sam and the special committee
23  of the board of Tribune had, you know,
24  eventually negotiated.
25      Q.   And what are you referring to when

---

42

1      Confidential - R. Kapadia
2  you say twists and turns?
3      A.   Twists and turns.  As I recall, the
4  original proposal that EGI was contemplating
5  was executing the transaction in one step,
6  and it ultimately ended up being two steps,
7  with a recap followed by the Step 2.
8      Q.   And when you refer to a recap, what
9  do you mean by that?
10      A.   I'm referring to the shareholder
11  distributions that was accompanied with the
12  Step 1 of the financing.
13      Q.   And then you referred to a Step 2.
14  What occurred in Step 2?
15      A.   As I recall, there were a series of
16  conditions associated with the closing of
17  Step 2, regulatory conditions, I believe
18  there were some shareholder approvals, and
19  maybe there were some other conditions as
20  well that all had to be satisfied prior to
21  the closing of Step 2.
22      Q.   And what was Step 2?
23      A.   Step 2 was the eventual go private
24  of Tribune.
25      Q.   And do you recall how that was

---

43

1      Confidential - R. Kapadia
2  structured to occur?
3      A.   As I recall, it was buying out the
4  shares of the public float in Tribune at a 33
5  or $34 price.
6      Q.   And when you say float, are you
7  referring to the remaining publicly owned
8  shares?
9      A.   Yes.
10      MR. GOLDFARB:  Let's mark this as
11  Kapadia 1, please.
12      (Exhibit Kapadia 1, Document Bates
13  stamped JPM 00341511, marked for
14  identification, as of this date.)
15      Q.   Mr. Kapadia, madam court reporter
16  has put before you a document that has been
17  marked as Kapadia Exhibit 1.  If you can take
18  a look at it and identify it.
19      While you're looking at it, I'll
20  note for the record it's a document bearing
21  Bates number JPM 00341511.
22      Can you identify this document,
23  sir?
24      A.   It's an email from Yang Chen to me
25  and a couple of others.

---

44

1      Confidential - R. Kapadia
2      Q.   Who is Yang Chen?
3      A.   She was a colleague of mine.
4      Q.   Is she in Syndicated Leveraged
5  Finance?
6      A.   Yes.
7      Q.   Is she still at JPMorgan?
8      A.   Yes.
9      Q.   Do you know her title?
10      A.   She is a vice president.
11      Q.   Did she work with you on the
12  Tribune transaction?
13      A.   Yes.
14      Q.   And the document is dated
15  March 8th, 2007; is that right?
16      A.   Yes.
17      Q.   And there is also a reference to a
18  Natalia Klykova.  Do you see that?
19      A.   Um-hmm.
20      Q.   Do you know Ms. Klykova?
21      A.   I do.
22      Q.   Is she still with JPMorgan?
23      A.   Yes.
24      Q.   And what department is she in, if
25  you know?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

**45**

1      Confidential - R. Kapadia
2      A.   She's also in Syndicated and
3   Leveraged Finance.
4      Q.   And what about Mr. or Ms. Rabbani?
5      A.   Yes.  So Aized Rabbani.  What was
6   your question?
7      Q.   Is it Mr. or Ms. Rabbani?
8      A.   It's a Mr.
9      Q.   So is Mr. Rabbani also in
10   Syndicated Leveraged Finance?
11      A.   He was at that point.  Yes, he was
12   at that point.
13      Q.   Has he moved within JPMorgan, or do
14   you know if he's left JPMorgan?
15      A.   He's within a different group
16   within JPMorgan now.
17      Q.   And what about Joachim Sonne?  I
18   don't know how to pronounce it.
19      A.   Joachim Sonne.
20      Q.   And is he also in Syndicated
21   Leveraged Finance?
22      A.   No.
23      Q.   Where is Mr. Sonne?
24      A.   He is in the TMT, Technology,
25   Media, Telecom, Investment Banking group.

---

**46**

1      Confidential - R. Kapadia
2      Q.   And the subject line is "Project
3   Tower Internal Call."  Do you see that?
4      A.   I do.
5      Q.   Do you recall Project Tower
6   referred to the potential bid by Zell, EGI
7   for the Tribune?
8      A.   I recall vaguely that we had called
9   it Project Tower.
10      Q.   And the email begins, "Raj/Natasha,
11   I just wanted to give you a quick update on
12   our meeting with Henry this afternoon."
13      Do you know what the reference to
14   Henry is?  Do you know who the reference is?
15      MR. GLAZER:  Objection to form.
16      A.   So while I can't say for sure who
17   Yang is referring to as who Henry is, but I
18   believe the Henry she is referring to is
19   Henry Higby.
20      Q.   Do you know where Mr. Higby works
21   or worked at this time at JPMorgan?
22      A.   At that time he worked in our
23   ratings advisory group.
24      Q.   What does that group do?
25      A.   That group works with clients and

---

**47**

1      Confidential - R. Kapadia
2   with JPMorgan on, you know, ratings matters,
3   ratings advice, and preparing for the rating
4   agencies.
5      Q.   And by ratings what do you mean?
6   Just most generally, when you say ratings and
7   rating agencies, what are you referring to?
8      A.   I'm referring to credit ratings by
9   Moody's and S&P.
10      Q.   And why, if you recall, was
11   Ms. Chen meeting with Mr. Higby about Project
12   Tower?
13      MR. GLAZER:  If you know.
14      Q.   If you know.
15      A.   I don't recall specifically why she
16   would be meeting with Henry Higby.  That
17   being said, this is something we -- these
18   kinds of discussions are discussions that we
19   typically engage in with regard to a new
20   financing.
21      Q.   Was there someone at JPMorgan who
22   you would consider to have been the lead
23   person or the head of Project Tower?
24      A.   I don't believe so.
25      Q.   Would there be anyone who would

---

**48**

1      Confidential - R. Kapadia
2   have directed Yang Chen to meet with Henry
3   Higby about the Project Tower transaction?
4      MR. GLAZER:  Objection to form.
5      A.   Maybe.  I don't recall.
6      Q.   The second sentence says, "We
7   walked through the Step 2 transaction,
8   obviously recognizing Step 2 being the
9   difficult part."
10      MR. GLAZER:  I don't think you read
11   that correctly.
12      MR. GOLDFARB:  I'll strike that and
13   read it again.
14      Q.   "We walked through the two-step
15   transaction, obviously recognizing Step 2
16   being the difficult part."  Do you see that?
17      A.   I do.
18      Q.   Do you know what Yang Chen means by
19   that, meant by that sentence?
20      MR. GLAZER:  Objection.  You
21   shouldn't speculate on what she means.
22      A.   Yeah, I don't know what she had in
23   mind.
24      Q.   Did you ever talk to your
25   colleagues about the structure of the

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

**49**

1      Confidential - R. Kapadia
2    transaction at any point in time?
3      A.  That's a very broad question.
4      Q.  It is meant broadly.
5      A.  Okay.  So yes.  Yes, I did.
6      Q.  Did you talk to your colleagues
7    about both steps of the contemplated
8    transaction at different points in time?
9      A.  I'm sure I did.
10     Q.  And did you and your colleagues
11   engage in any assessment or evaluation of the
12   transaction in the context of working on it
13   and discussing the different pieces of the
14   transaction?
15     MR. GLAZER:  Objection to form.
16     A.  I'm not sure I understand your
17   question.  Could you repeat that, please.
18     Q.  Yes.  You've testified that you
19   discussed the structure of the transaction
20   with your colleagues, and now I'm asking
21   whether as part of that discussion you
22   engaged in any sort of evaluation or
23   assessment of the transaction.
24     MR. GLAZER:  Objection to form.
25     A.  I discussed the transaction with my

---

**50**

1      Confidential - R. Kapadia
2    colleagues as part of, you know, the work
3    that we did on the deal and as part of what
4    we described, the diligence and the
5    structuring associated with the deal.
6      Q.  Along the way did you identify any
7    challenges facing JPMorgan in connection with
8    the transaction?
9      MR. GLAZER:  Objection to form.
10     A.  What do you mean by challenges?
11     Q.  Well, were there things about the
12   transaction that you considered to be more
13   risky, more complex, more difficult?
14     MR. GLAZER:  Objection to form.
15     A.  As I recall, this was on the bigger
16   side of financings, and so that was one, as I
17   recall, one item we -- one item that we were,
18   you know, focused on addressing.
19     Q.  And when you say focused on the
20   bigger side of financing, it was on the
21   bigger side of financings --
22     A.  Bigger size.
23     Q.  Bigger size.  Okay.
24     A.  Yes.
25     Q.  Thank you.  What significance did

---

**51**

1      Confidential - R. Kapadia
2    that have in terms of your assessment or
3    evaluation of the transaction?
4      MR. GLAZER:  Objection to form.
5      A.  Yeah, I think that's -- I'm not
6    sure that I understand that question.
7      Q.  Okay.  I'll strike it.  Did you
8    ever talk to Mr. Higby personally about the
9    Tribune transaction?
10     A.  I may have.  I don't recall.
11     Q.  Would you typically interact with
12   Mr. Higby or someone else in the ratings
13   advisory group in connection with a
14   transaction of this size?
15     A.  It's case by case.  I have from
16   time to time.  I don't recall if I did this
17   time.
18     Q.  Yang Chen writes in the email that
19   Mr. Higby's initial reaction was that
20   headline leverage is high compared to public
21   valuations of newspaper companies.  What does
22   that mean, headline leverage is high, if you
23   know?
24     A.  I don't know what Yang or Henry
25   might have been referring to there.

---

**52**

1      Confidential - R. Kapadia
2      Q.  Are you familiar with the term
3    "headline leverage"?
4      A.  I've seen it been used.
5      Q.  And what do you interpret it to
6    mean?
7      MR. GLAZER:  Objection to form.
8      A.  You know, I've seen it in a bunch
9    of different contexts, so I'm not sure I can
10   address that question in terms of what I
11   interpret it to mean.
12     Q.  The second enumerated point in the
13   email states, "Presentation of equity check
14   is tricky."  Do you see that?
15     A.  I do.
16     Q.  Are you familiar with the term
17   "equity check"?
18     A.  I've seen it being used.
19     Q.  Have you used it yourself?
20     A.  I'm sure I have.
21     Q.  What do you mean by that term when
22   you use it?
23     A.  Again, case by case, it's the
24   amount of equity in the capital structure.
25     Q.  Do you know what Yang Chen meant

---



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

53

1      Confidential - R. Kapadia
2  when she wrote to you that Mr. Higby reported
3  that the presentation of equity check was
4  tricky?
5        MR. GLAZER:  Objection to form.
6      A.  Don't recall.  Don't know.
7      Q.  Do you recall ever speaking to
8  Ms. Chen about this, about her conversation
9  with Mr. Higby?
10     A.  I may have.  I don't recall.
11     Q.  Did Yang Chen have a perspective on
12 the Project Tower transaction from your
13 interactions with her?
14       MR. GLAZER:  Objection to form.
15     A.  If she had a perspective, I don't
16 recall it.
17     Q.  She also reported to you that
18 "Agency will most likely put a deep discount
19 on the $825 million ESOP contribution (maybe
20 give $400 million), which makes the equity
21 check very slim."  Do you see that?
22     A.  I do.
23     Q.  Do you have an understanding of
24 what she meant by a very slim equity check?
25     A.  I can't comment on what she meant.

---

54

1      Confidential - R. Kapadia
2      Q.  Is that a phrase or term of general
3  usage in your experience?
4      A.  What phrase are you referring to?
5      Q.  That the agency would put a deep
6  discount on the ESOP contribution making the
7  equity check very slim?
8      A.  I may have seen it from time to
9  time, but it's not -- it's not something that
10 I've seen commonly.
11     Q.  And as you sit here today, do you
12 have any ability to interpret those words at
13 all as to what you expect Yang Chen was
14 talking about in the context of Project
15 Tower?
16       MR. GLAZER:  Objection to form.
17     A.  I don't know what she was talking
18 about then.
19     Q.  In general, if someone referred to
20 an equity check being slim, would you know
21 what someone was telling you if they told you
22 that?
23     A.  I would, yes.
24     Q.  And what would it mean?
25     A.  So it would mean that the equity as

---

55

1      Confidential - R. Kapadia
2  a percentage of the capitalization of the
3  business is slim.
4      Q.  And in this context what does slim
5  mean?
6      A.  I don't know.
7      Q.  In general, and agree or disagree,
8  would you interpret it to mean that the
9  assets and total equity in a company exceeds
10 the amount of debt by a slim margin?
11       MR. GLAZER:  Objection to form.
12     A.  I don't understand your question.
13     Q.  I'm just trying to understand when
14 you use the term "slim," I'm just trying to
15 understand what you mean by it.
16     A.  When I think of slim, I view it on
17 a case by case basis depending on the
18 transaction, the marketplace we're in, the
19 structure of the deal.  So there's no blanket
20 answer on slim means one thing.  It is case
21 by case.
22     Q.  The third point is that --
23       MR. GLAZER:  Andrew, before we get
24 too much further, we've been going about
25 an hour and fifteen --

---

56

1      Confidential - R. Kapadia
2        MR. GOLDFARB:  Yeah, I was just
3  going to finish this document, another
4  couple of questions.  Are you okay to go
5  --
6        THE WITNESS:  That's fine.
7        MR. GOLDFARB:  Let's go off.
8        (Recess taken from 10:45 a.m. to
9  11:02 a.m.)
10     Q.  Mr. Kapadia, did you understand
11 when you were working on the Tribune deal
12 that the Tribune Company essentially had two
13 large divisions under the parent holding
14 company?
15     A.  Yes.
16     Q.  And did you understand one of them
17 to be what was referred to as a publishing
18 arm and the other referred to as the
19 broadcasting and entertainment arm?
20     A.  Yes.
21     Q.  And did you have an understanding
22 as to the relative size or contribution of
23 those two different arms to the Tribune's
24 revenues and earnings in 2007?
25     A.  I don't recall.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

57

1        Confidential - R. Kapadia
2        Q.  Do you know whether one was larger
3    than the other?
4        A.  I recall that, yes.
5        Q.  Which one, to your recollection,
6    was larger?
7        A.  I don't recall that.
8        Q.  Do you remember having an
9    understanding of the general state of the
10   newspaper industry in 2007?
11       MR. GLAZER:  Objection to form.
12       A.  Can you repeat your question.
13       (Record read.)
14       A.  I don't recall specifically.  There
15   were some, as I vaguely recall, there were a
16   couple of sectors within newspaper
17   advertising that were -- either a couple of
18   sectors or couple of geographies that were
19   experiencing some sort of challenges, but I
20   don't recall the specifics at this point.
21       Q.  And how did you come to familiarize
22   yourself with the information that underlies
23   the prior answer about your understanding of
24   the state of the newspaper industry in 2007?
25       A.  I don't recall specifically.  We

58

1        Confidential - R. Kapadia
2    typically, as I described earlier, do
3    diligence around the business, around the
4    situation.  And that includes, you know,
5    understanding the landscape that that company
6    operates in.
7        Q.  And how did you personally come to
8    that understanding?
9        A.  I don't recall.
10       Q.  Is there a typical way in which,
11   when you become involved in a transaction,
12   you learn about maybe the company and the
13   industry in which it operates that are
14   involved in the potential transaction?
15       A.  So case by case.  That being said,
16   it's looking at and reviewing the company's
17   filings if it's a public company or other
18   reports, analyst research reports.
19       Q.  And these are things you -- I'm
20   sorry if you weren't finished with your
21   answer.
22       A.  No.  I think...
23       Q.  Okay.  And are these public filings
24   and research reports things that you review
25   personally?

59

1        Confidential - R. Kapadia
2        A.  Case by case.
3        Q.  What about in the Tribune Company,
4    do you remember reviewing industry analyst
5    reports and Tribune filings yourself?
6        A.  I may have.  I don't recall.  I may
7    have.
8        Q.  What other types of material would
9    you review, if any, in order to familiarize
10   yourself with a target company in the
11   industry in which it operates?
12       A.  If I understand your question
13   correctly, if you're asking about what we
14   typically do on a transaction, in addition to
15   what I described, we, depending on the
16   transaction, we would also review as part of
17   that diligence the plan, the projections, you
18   know, for the company, for the transaction.
19       Q.  And did you personally in
20   connection with the Tribune Company review
21   management projections?
22       A.  I believe I did, yes.
23       Q.  Do you know at what point in time
24   you reviewed those projections?
25       A.  I don't recall.

60

1        Confidential - R. Kapadia
2        Q.  Do you recall how you came to have
3    them?
4        MR. GLAZER:  Objection to form.
5        A.  I don't recall.  As I recall, we
6    were sent a set of projections and the plan
7    by EGI, maybe by Tribune, I don't recall, but
8    we were sent a set of projections.
9        Q.  Did you personally have direct
10   contact with people at the Tribune?
11       A.  In what time frame are you --
12       Q.  At any time frame in connection
13   with the Tribune transaction.
14       A.  Yes.
15       Q.  What about in this due diligence
16   early period that you've been talking about
17   where you began to formulate a plan?
18       A.  I'm sure I did.  I don't recall the
19   specifics, but I'm sure I did.
20       Q.  Who at the Tribune did you yourself
21   have contact with?
22       A.  At what point in time are you --
23       Q.  Again, in this February, March 2007
24   period.
25       A.  As I recall, there may have been



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

61

1     Confidential - R. Kapadia
2   others as well, but as I recall, it was
3   Chandler Bigelow at the company, maybe his
4   colleagues as well.
5       Q.   Anyone else who you recall by name?
6       A.   We may have had some conversations
7   with Don Grenesko.
8       Q.   Anyone else that you can recall?
9       A.   No.
10      Q.   And was there anyone else at
11  JPMorgan who was having communications with
12  people at the Tribune Company during this
13  time period, February, March 2007?
14      A.   There probably were. I was not
15  party to those conversations, but there
16  probably were.
17      Q.   Was there a lead contact at
18  JPMorgan for the Tribune, someone who had a
19  relationship with the Tribune, the primary
20  relationship with the Tribune Company?
21      A.   Sure. So Peter Cohen was really
22  the client executive for Tribune.
23      Q.   And you referred to client
24  executive. Was there a client executive for
25  Zell, EGI also?

---

62

1     Confidential - R. Kapadia
2       A.   Brit Bartter, as we talked about
3   earlier.
4       Q.   And during this period of time in
5   this February, March 2007 period, who were
6   the colleagues with whom you worked most
7   closely and actively on the Tribune matter?
8       A.   As I recall, we went through some
9   of these names earlier, as I recall, with
10  Yang Chen, Aized Rabbani, Natasha Klykova,
11  Joachim Sonne, Peter Cohen, Brit Bartter,
12  John Kowalczuk, and Jeff Sell.
13      Q.   And during this period of time were
14  you working with other potential -- people
15  external to JPMorgan at other banks who were
16  also potential lenders in a Tribune
17  transaction?
18      MR. GLAZER:  Still in February,
19  March; right?
20      MR. GOLDFARB:  Yes.
21      A.   Yes.
22      Q.   Who were the people outside of
23  JPMorgan who fall into that category?
24      A.   As I recall, it was Merrill Lynch
25  and Citigroup.

---

63

1     Confidential - R. Kapadia
2       Q.   And were there particular
3   individuals at Merrill Lynch and Citigroup
4   who were the primary contacts to JPMorgan
5   during this time period?
6       A.   When you say JPMorgan, what do you
7   mean by primary contacts to JPMorgan?
8       Q.   Well, if JPMorgan was working with
9   Merrill Lynch and Citigroup, are there
10  individuals at those companies who were the
11  lead contact essentially for Merrill and Citi
12  in its dealings with JPMorgan?
13      MR. GLAZER:  On the Tribune
14  financing.
15      MR. GOLDFARB:  Yes.
16      A.   So I can't comment on the
17  discussions that Brit Bartter or Peter Cohen
18  may have had with their counterparts at those
19  two firms, but the people I had most
20  interaction with that I recall are Todd
21  Kaplan at Merrill Lynch and Julie Persily at
22  Citigroup.
23      Q.   And how, if you know, did they come
24  to be involved in the planning and run-up to
25  the LBO transaction?

---

64

1     Confidential - R. Kapadia
2       A.   As I recall, they were advising
3   Tribune on the sale process.
4       Q.   And other than Merrill and Citi in
5   this February, March time period, are there
6   any other institutions that were involved in
7   the discussion planning, to your
8   recollection?
9       A.   So as I recall, Bank of America was
10  part of the syndicate, syndicate of lenders,
11  but, as I recall, they were brought in later
12  on in the process. I don't know when. They
13  were brought on later on in the process.
14      Q.   And is there a particular contact
15  at Bank of America who you worked with?
16      A.   As I recall, Bill Bowen.
17      MR. GOLDFARB:  Let's mark this,
18  please, as Kapadia 2.
19      (Exhibit Kapadia 2, Document Bates
20  stamped JPM 00235896, marked for
21  identification, as of this date.)
22      Q.   Mr. Kapadia, while you're looking
23  at the document, I'll note for the record
24  it's a one-page email bearing Bates number
25  JPM 00235896.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

Rajesh Kapadia                                      January 22, 2010

CONFIDENTIAL

---

**65**

1       Confidential - R. Kapadia
2           What is this document, sir?
3       A.  It's an email from Peter Cohen.
4       Q.  And it's to Mr. Bartter, Jennifer
5   Nason at JPMorgan.  Do you see that?
6       A.  I do.
7       Q.  Who is Ms. Nason?  What position
8   does she hold at JPMorgan?
9       A.  At that time?
10      Q.  At that time, yes.
11      A.  She is -- she was the head of the
12  Telecom, Media, Technology Investment Banking
13  practice.
14      Q.  And the subject is "Jamie."  Do you
15  see that?
16      A.  I do.
17      Q.  Do you know what that is referring
18  to?
19      A.  No.
20      Q.  In the first line Mr. Cohen writes,
21  "Spoke to Jamie this afternoon."  Do you see
22  that?
23      A.  I do.
24      Q.  And it says, "He spoke to
25  Fitzsimmons yesterday," ending in exclamation

---

**66**

1       Confidential - R. Kapadia
2   point.  Do you see that?
3       A.  I do.
4       Q.  Do you know what the reference to
5   Fitzsimmons refers to?
6       MR. GLAZER:  Objection to form.
7       A.  I can't say what Peter was
8   referring to when he says Fitzsimmons.  I
9   believe the CEO at the time was Dennis
10  Fitzsimmons.  So the Tribune CEO at that time
11  was Dennis Fitzsimmons, so maybe that is what
12  he's referring to.
13      Q.  And with the next sentence saying,
14  "Dennis said we're doing a good job," and it
15  goes on from there.  Does that bolster your
16  recollection that -- or the likelihood that
17  Mr. Cohen is referring to Dennis Fitzsimmons,
18  then the CEO of the Tribune Company?
19      MR. GLAZER:  Objection to form.
20      A.  He may be, but.
21      Q.  And who was the CEO of JPMorgan at
22  this time?
23      A.  Jamie Dimon.
24      Q.  Was he involved at all in the
25  Tribune transaction at JPMorgan?

---

**67**

1       Confidential - R. Kapadia
2       A.  I wouldn't say he was involved in
3   the transaction.  He knew Sam Zell from
4   Jamie's time in Chicago or other places.  And
5   I believe, you know, he had a couple of
6   conversations with Sam.
7       Q.  Do you know whether Jamie Dimon
8   ever spoke to Dennis Fitzsimmons?
9       A.  He may have.  I don't know.
10      Q.  Do you interpret Mr. Cohen to be
11  telling you that in this email?
12      MR. GLAZER:  Objection to form.
13      A.  You could interpret that, but I was
14  not party to those discussions, so.
15      Q.  As a recipient of the email, and as
16  you sit here today, do you interpret
17  Mr. Cohen to have been telling you that Jamie
18  Dimon spoke to Dennis Fitzsimmons?
19      MR. GLAZER:  Same objection.  I
20      don't know that that's his role to sit
21      here and interpret.  You're entitled to
22      his recollection, but to have him read
23      an email that you and I can read and
24      interpret is not really his role or a
25      good use of anybody's time.

---

**68**

1       Confidential - R. Kapadia
2       Q.  You can answer.
3       A.  I think I say what I said a moment
4   ago.  You could interpret it that way.  I was
5   not party to those discussions.  I don't
6   recall this email.  You could obviously
7   interpret it that way.
8       Q.  Did you ever have conversations
9   with Peter Cohen about contacts that were
10  going on between JPMorgan and the Tribune
11  Company?
12      A.  Contacts that were going?
13      MR. GLAZER:  Read it back for the
14      witness, please.
15      (Record read.)
16      A.  I'm sure I did.
17      Q.  Did those conversations ever
18  involve Jamie Dimon being part of those
19  communications?
20      A.  They may have.  I don't recall
21  that.
22      Q.  Sitting here today, do you recall
23  Jamie Dimon ever having any contact with
24  anybody at the Tribune Company in connection
25  with this transaction?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

69

1    Confidential - R. Kapadia
2        MR. GLAZER:  Well, other than as
3    he's already testified.
4        A.  He may have.  I don't recall.
5        Q.  The second sentence indicates that
6    -- this is Mr. Cohen reporting that "He,"
7    referring to Jamie, "will call Dennis
8    tomorrow again to emphasize using us to
9    minimize execution risk and confirm role."
10   Do you see that?
11       A.  I do.
12       Q.  Do you know what Mr. Cohen meant by
13   minimize execution risk?
14       A.  I don't.
15       Q.  Sitting here today, are you able to
16   interpret --
17       MR. GLAZER:  Objection to the form.
18       Q.  -- this phrase, "minimize execution
19   role"?
20       MR. GLAZER:  Objection to form.
21       A.  Can you repeat your question again,
22   please.
23       Q.  Yes.  Sitting here today, are you
24   able to elucidate what Mr. Cohen may have
25   meant by using JPMorgan to minimize execution

70

1    Confidential - R. Kapadia
2    risk?
3        MR. GLAZER:  Same objection.
4        A.  So while I can't comment on what he
5    may have meant, we do, you know, we do have a
6    leading leveraged finance platform and take
7    pride in that and our ability to execute
8    transactions for our clients.  So this is
9    pure speculation, but that is maybe what he
10   was referring to.
11       Q.  You mentioned that Mr. Dimon knew
12   Sam Zell from Chicago.  Do you know whether
13   Mr. Dimon knew any of the management at the
14   Tribune Company?
15       A.  He may have.  I don't know.
16       Q.  How do you know that Mr. Dimon knew
17   Sam Zell from his time in Chicago?
18       A.  Yeah.  So I believe what I had said
19   a minute ago was that I think that he knows
20   him from Chicago or other places.  I don't
21   know for sure whether he knows him from
22   Chicago.  Jamie Dimon was in Chicago for a
23   couple of years, so maybe that's how they got
24   to know each other.  I don't know.
25       Q.  So just so I understand your

71

1    Confidential - R. Kapadia
2    testimony, is your testimony that you don't
3    know how Jamie Dimon knew Sam Zell?
4        A.  That is correct.
5        Q.  And then the last line says,
6    "Apparently Cubs sale role still 'formally'
7    up for grabs" -- "'formally'" is in quotes --
8    "so we'll try to position for that, too.  Low
9    prob I think."  Do you see that?
10       A.  I do.
11       Q.  Do you know what Mr. Cohen was
12   referring to in that when he referred to the
13   Cubs sale role?
14       A.  So while I can't obviously comment
15   on what he was referring to, I can speculate
16   that it's regarding the Cubs baseball team
17   and the sale side role associated with that,
18   sell side M&A role associated with that.
19       Q.  And what do you mean by sale side
20   M&A role?
21       A.  As I recall, whether it was EGI or
22   Tribune, I don't recall which one, but they
23   were contemplating selling the Cubs, and they
24   needed an adviser to help them sell the Cubs.
25       Q.  And when you say either EGI or the

72

1    Confidential - R. Kapadia
2    Tribune was contemplating selling the Cubs,
3    do you know at this point in time in March of
4    2007 who owned the Cubs?
5        A.  Tribune.
6        Q.  So when you say that you're not
7    sure whether it was Zell or the Tribune that
8    was looking to sell the Cubs, what do you
9    mean by that?
10       A.  So while Tribune owned the Cubs at
11   that point in time, I don't recall if Tribune
12   had already made a decision to sell the Cubs
13   or the decision to sell the Cubs was a
14   function of the transaction that Zell was
15   contemplating.  I don't know where that
16   decision was made, but I do recall the
17   decision to sell the Cubs was made by
18   someone.
19       Q.  Do you know whether or not JPMorgan
20   ultimately was retained to occupy the M&A
21   adviser role in connection with the sale of
22   the Cubs?
23       A.  As I recall, we did.
24       Q.  And earlier you had testified that
25   looking at the entire 2007 period, you


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

73

1        Confidential - R. Kapadia
2    considered both Zell EGI and the Tribune to
3    be JPMorgan clients during that period of
4    time.  Do you recall that testimony?
5        A.   I do.
6        Q.   Setting aside the sale of the Cubs,
7    in connection with the LBO transaction, did
8    you consider both EGI and the Tribune
9    to be JPMorgan clients?
10        A.   Let me be sure I understand your
11    question.  You're asking in connection with
12    the LBO was Zell, EGI and Tribune both our
13    clients?
14        Q.   Yes.
15        A.   Yes.
16        Q.   It sounds like in the February
17    period, the early February period we're
18    talking about, is it fair to say that you
19    considered initially Zell, EGI to be your
20    client?
21        A.   We may have.  I don't recall it.
22    We don't -- yeah, I don't recall that.
23        Q.   Is there a point in time that you
24    recall at which you recognized or understood
25    or believed the Tribune to be a JPMorgan

---

74

1        Confidential - R. Kapadia
2    client?
3        A.   In connection with the LBO is your
4    question?
5        Q.   Yes, sir.
6        A.   So while I don't recall
7    specifically, the distinction that you're
8    trying to draw is not a distinction that I
9    make typically.  And I don't recall what we
10    did on Tribune, but that's not a distinction
11    that I would typically make.
12        Q.   And just please clarify for the
13    record what you mean when you're saying the
14    distinction.
15        A.   The distinction between EGI being a
16    client and Tribune.  They're two different
17    clients, but it's -- they're two different
18    clients, but at the same time we don't, you
19    know, we view that, I view it as really one
20    client.
21        Q.   Does JPMorgan typically execute
22    engagement letters with clients?
23        A.   Case by case.
24        Q.   And there's no typical practice?
25        A.   It depends what the transaction is

---

75

1        Confidential - R. Kapadia
2    that's been contemplated.
3        Q.   Do you know if in connection with
4    the Zell, EGI, Tribune transaction JPMorgan
5    had engagement letters with either or both of
6    the parties?
7        A.   So we had commitment papers with
8    respect to the financing.  As I recall, I
9    don't know if this was ever executed.  As I
10    recall, there was a discussion around putting
11    an engagement letter together as well.  I
12    don't know if that ever got executed.
13        Q.   And when you referred to the
14    commitment letters just now, are you
15    referring to the commitment letters that were
16    originally signed on April 1st that outline
17    the structure of the lendings to the Tribune?
18        A.   I don't recall when they were
19    signed, but the commitment letters, they
20    probably are that same date.  They're
21    referring to the committed financing in
22    connection with Step 1 and Step 2.
23        Q.   And were you involved in the
24    preparation of those letters?
25        A.   Yes.

---

76

1        Confidential - R. Kapadia
2        Q.   Were you a drafter of them?
3        A.   No.
4        Q.   Do you know who drafted them?
5        A.   I believe it was outside counsel.
6        Q.   What was your role?
7        A.   Role with regard to what?
8        Q.   The preparation of the commitment
9    letters.
10        A.   Outside counsel had prepared them.
11    I reviewed, provided comments, as I typically
12    would.
13        MR. GOLDFARB:  Let's mark this as
14    Kapadia Number 3, please.
15        (Exhibit Kapadia 3, Document Bates
16    stamped JPM 00247488, marked for
17    identification, as of this date.)
18        Q.   This is a one-page document bearing
19    Bates number JPM 00247488.  And just before I
20    ask you about this document, sir, you made a
21    reference that you recalled discussions about
22    engagement letters being prepared and weren't
23    sure whether engagement letters were ever
24    actually executed.  Do you recall that?
25        A.   I do.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

77

1    Confidential - R. Kapadia
2    Q.  What do you recall about the
3  discussions concerning the preparation of
4  engagement letters?
5    A.  So as I recall, at the time the
6  deal was announced, at that time we were
7  awarded the status by EGI, by Sam Zell as an
8  adviser to EGI, Sam Zell at the time the deal
9  was announced.  And in connection with that,
10  I believe our, you know, firm policy or
11  normal practice is to negotiate, execute an
12  engagement letter in connection with that.
13    Q.  And who at JPMorgan would have been
14  the person to prepare or sign an engagement
15  letter for JPMorgan with a person or entity
16  like Zell, EGI?
17    MR. GLAZER:  Objection to form.
18    A.  I don't know.  I'm not typically
19  involved in that, so I don't know.
20    Q.  Do you recall ultimately whether
21  engagement letters were executed with Zell,
22  EGI?
23    A.  I don't recall.
24    Q.  Looking now at Kapadia Exhibit 3,
25  sir, do you recognize this to be a string of

78

1    Confidential - R. Kapadia
2  emails, a string of two?
3    A.  I do.
4    Q.  I want to focus your attention,
5  please, on the bottom email, which is the one
6  earlier in time from Brit Bartter to Bill
7  Pate dated March 22nd, 2007.  Do you see
8  that?
9    A.  I do.
10    Q.  Do you know who Mr. Pate is?
11    MR. GLAZER:  That's the 4:33 email?
12    THE WITNESS:  Yes.
13    MR. GOLDFARB:  Yes.
14    A.  I do.
15    Q.  Who is Mr. Pate?
16    A.  I don't know what his role is
17  today, but at that time he was part of EGI.
18    Q.  Did you also work with him in
19  connection with the Tribune transaction?
20    A.  As I recall, I had some
21  conversations with him, but not really.
22    Q.  And you're cc'd on Mr. Bartter's
23  email.  Do you see that?
24    A.  I do.
25    Q.  Mr. Bartter wrote, "Bill, I don't

79

1    Confidential - R. Kapadia
2  know where the 'noise' is originating from re
3  'Zell's deal needing more equity' as
4  mentioned in several press stories today, but
5  that theme prompted Jamie Dimon to call me
6  today and offer again that JPM would be
7  interested in contributing some junior
8  capital if it is needed and there is a way to
9  do it without impairing the S-Corp.
10  election."  Do you see that?
11    A.  I do.
12    Q.  First of all, do you remember this
13  email, sir?
14    A.  I don't.
15    Q.  Do you recall generally learning at
16  some point in time prior to April 1st, 2007,
17  that Jamie Dimon was interested in
18  potentially having JPMorgan contribute junior
19  capital to increase the amount of equity in
20  the Zell deal?
21    THE WITNESS:  Can I ask you to
22  repeat the question again, please.
23    (Record read.)
24    A.  I don't have a specific
25  recollection of that.  I do vaguely remember

80

1    Confidential - R. Kapadia
2  looking into that question and concluding
3  that it was not, you know, it was not
4  feasible or practical to do that.
5    Q.  Do you remember whether part of the
6  interest that prompted you to look into that
7  was Mr. Dimon's interest in exploring the
8  question?
9    A.  It may have been.  I don't recall
10  that right now, but it may well have been.
11    Q.  Did you correspond by email
12  typically frequently with Mr. Bartter or only
13  in connection with this transaction?
14    MR. GLAZER:  Objection to form.
15    A.  I'm not sure I understand your
16  question.
17    Q.  Well, would you typically read an
18  email that you received from Mr. Bartter?
19    A.  Yes.
20    Q.  Is he senior to you at JPMorgan?
21  Was he at this time?
22    A.  Yes.
23    Q.  And if he referred in an email to
24  Jamie Dimon exploring JPMorgan contributing
25  junior capital, is that something that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

81

1  Confidential - R. Kapadia
2  typically you would pay attention to --
3        MR. GLAZER:  Objection to form.
4     Q.  -- in your role?
5        MR. GLAZER:  Objection to form.
6     A.  I understand the question you're
7  asking.  It's, you know, everything we do,
8  everything I do is equally important, so I'm
9  not sure I make a distinction between one
10  email versus the other.
11     Q.  In your experience, Jamie Dimon,
12  does he typically involve himself in
13  transactions on which you have worked?
14     A.  Yes.  From time to time he gets --
15  if he knows the client or the client knows
16  him, you know, he would be involved in it in
17  some way.
18     Q.  And in your experience, in your own
19  personal transactions, has he been involved,
20  has he typically weighed in or have you
21  learned about his interest in other
22  transactions that you've been involved in?
23     A.  His interest in other transactions.
24  Can you repeat that question again, please.
25     Q.  I'll withdraw that question.  I'm

---

82

1  Confidential - R. Kapadia
2  just trying to understand, sir, whether or
3  not it's unusual in your experience for Jamie
4  Dimon to become involved in transactions in
5  the way that he did in the Tribune
6  transaction, to your recollection.
7        MR. GLAZER:  Objection to form.
8     A.  You're asking a very broad
9  question, but let me make some comments.  So
10  in my experience, Jamie Dimon from time to
11  time does get involved in certain
12  transactions.  And in my experience, that
13  involvement is not the, how can I best
14  characterize it, the day to day involvement.
15  It's occasional interface with Brit Bartter
16  or the client.
17     Q.  What, if anything, else do you
18  recall about Mr. Dimon's involvement in this
19  transaction?
20     A.  I believe, as I recall, he had a
21  couple of conversations with Sam, maybe with
22  others.  I was not party to any of those.
23  And as I recall, I was not party to the
24  debrief of any of those conversations.
25     Q.  And was this a transaction that you

---

83

1  Confidential - R. Kapadia
2  understood within JPMorgan that you or others
3  should keep Mr. Dimon abreast of developments
4  and the status of the transaction?
5     A.  It goes, in the way I think about
6  it, it goes hand in hand with the comment I
7  made a few moments ago, that, as I recall,
8  Jamie knew Sam Zell, and if there's that
9  connection, wherever that connection came
10  about, you know, we would keep Jamie apprised
11  of developments.
12        MR. GOLDFARB:  Let's mark this as
13  Kapadia 4.
14        (Exhibit Kapadia 4, Document Bates
15  stamped JPM 00234471 through 234472,
16  marked for identification, as of this
17  date.)
18     Q.  Have you had a chance to look at
19  this document, sir?
20     A.  I have.
21     Q.  And do you recognize Kapadia
22  Exhibit 4 to also be a string of emails?
23     A.  I do.
24     Q.  And starting at the third email,
25  which is the sole one on the second page, the

---

84

1  Confidential - R. Kapadia
2  earliest in time dated March 30th, 2007, at
3  10:16 p.m., that's an email from you; is that
4  right?
5     A.  Looks like it.
6     Q.  And it looks like you're scheduling
7  two calls for Saturday, sounds like a good
8  Saturday, first among the underwriters and
9  then with the clients.  Do you see that?
10     A.  I do.
11     Q.  My first question is, when you
12  referred to the scheduled call with the
13  underwriters, who or what entities are you
14  referring to, if you recall?
15     A.  I believe that this would be
16  referring to the three other banks, Merrill,
17  Citi, and BoA.
18     Q.  And by BoA, you mean Bank of
19  America?
20     A.  Bank of America, yes.
21     Q.  And the second call was scheduled
22  to be with the clients.  Do you know what
23  you're referring to there?
24     A.  I don't recall.  It would be
25  speculating, but I assume it would be

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

85

1         Confidential - R. Kapadia
2    referring to EGI and Tribune.
3         Q.   And the bottom part of the email
4    says, "Special committee came back, wants
5    Zell to increase bid by 50 cents
6    ($125 million) and change date when ticking
7    fee to shareholders kicks in to September '07
8    from Jan. '08 (which adds $75 million), for a
9    total of $200 million.  Call us to discuss
10   whether we can do more debt."
11        The special committee, what was
12   that?
13        A.   I would assume, I don't recall what
14   I had in mind then, but I would assume it was
15   the special committee of the board of
16   Tribune.
17        Q.   And what was your understanding of
18   their role in connection with the LBO
19   transaction?
20        A.   As I recall, they were evaluating
21   the strategic alternatives for the company.
22        Q.   And did JPMorgan have direct
23   contact with members of the special
24   committee?
25        A.   If they did, I don't know.  I don't

---

86

1         Confidential - R. Kapadia
2    recall.
3         Q.   The last sentence says, "Call us to
4    discuss whether we can do more debt."  What
5    did you mean by that?
6         A.   Again, I don't know what I would
7    have meant at that time.  I can speculate
8    that it's in connection with the 200 million
9    increase in purchase price.
10        Q.   And moving to the middle email,
11   Joachim Sonne wrote to you and said, "If not,
12   I am sure Jamie will help with equity," with
13   a smiley emoticon.  Do you see that?
14        A.   I do.
15        Q.   What did you interpret Joachim to
16   mean by his email?
17        A.   You're asking for my recollection
18   at that time, so I don't know.  We can review
19   this string of emails and, you know, talk
20   about putting in equity, but I don't recall
21   at that time, what I thought at that time.
22        Q.   Sitting here today, do you
23   understand just generally from your work on
24   the Tribune matter what Mr. Sonne was talking
25   about when suggesting in his email that Jamie

---

87

1         Confidential - R. Kapadia
2    will help with equity?
3         MR. GLAZER:  If you can do so
4    without speculating.
5         A.   I don't.
6         Q.   Did you ever have any contact with
7    Jamie Dimon in connection with the Tribune
8    LBO transaction yourself?
9         A.   As I recall, I had one meeting with
10   him.
11        Q.   When did that occur?
12        A.   I don't recall.
13        Q.   Do you remember the subject matter
14   of your meeting, the meeting you were at with
15   Jamie Dimon?
16        A.   I don't recall.
17        Q.   Aside from meetings with him, were
18   you ever on conference calls or have email
19   exchanges with Mr. Dimon in connection with
20   the Tribune LBO?
21        A.   I may have.  I don't think so.  I
22   may have.
23        Q.   And then in the second to top email
24   you respond to Mr. Sonne and say, "We cannot
25   put in equity given S-Corp., etc."  What did

---

88

1         Confidential - R. Kapadia
2    you mean by that?
3         A.   As I recall, the S-Corp. status had
4    some conditions associated with the ownership
5    of that S-Corp., and JPMorgan or its
6    affiliates putting in equity would not be
7    consistent with that S-Corp. status.
8         Q.   Do you know what the consequences
9    of JPMorgan putting in equity would be to the
10   S-Corp. structure?  Did you understand at
11   that time?
12        MR. GLAZER:  Objection to form.
13        A.   I don't know the consequences.  I
14   think I described that the way the S-Corp.
15   rules worked or work, a corporation, as I
16   recall, could not be an equity holder in an
17   S-Corp.
18        q.   But do you recall why?  Do you
19   recall the implications of that being the
20   case?
21        A.   I don't recall the implications of
22   that, no.
23        Q.   And then the top email is Sonne
24   replying again to you it looks like late on
25   Friday or late on Saturday stating, "I know,

---



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

89

1      Confidential - R. Kapadia
2  but Jamie will want to find a way to play,"
3  again with a smiling emoticon.
4      Do you recall this exchange with
5  Mr. Sonne?
6      A.  I don't.
7      Q.  Do you understand at the time the
8  substance of what Mr. Sonne was communicating
9  to you about Jamie Dimon's interest in the
10  Tribune transaction?
11      A.  The question is do I recall what I
12  thought the substance of this was at that
13  time?
14      Q.  Yes.
15      A.  I don't.
16      Q.  And what about sitting here today,
17  do you have a recollection of the substance
18  of the email?
19      A.  I have a vague recollection.  I
20  think we've talked about a bit of this, that
21  Jamie had a question with regard to do we put
22  equity into the capital structure, we
23  diligenced that, and we concluded that it's
24  not consistent with the S-Corp. setup.
25      MR. GOLDFARB:  Can we go off the

90

1  record for a second.
2      (Discussion off the record.)
3      MR. GOLDFARB:  Let's mark this as
4  Kapadia 5.
5      (Exhibit Kapadia 5, Document Bates
6  stamped JPM 00206979 through 206981,
7  marked for identification, as of this
8  date.)
9      Q.  This Kapadia Exhibit 5 bears Bates
10  numbers JPM 00206979.  Sir, let me know when
11  you've had a chance to look at the document.
12      A.  Sure.  Okay.
13      Q.  Do you remember receiving this
14  string of emails?
15      A.  I don't recall.
16      Q.  Do you see that the top one at the
17  top of the first page is an email from you to
18  Mr. Bartter dated March 30th, 2007, at
19  10:49 p.m.?
20      A.  Yes.
21      Q.  And your email to Mr. Bartter says,
22  "The email chain here starts with Jimmy, who
23  seems to have received call from Sam this
24  evening."  Do you see that?

91

1      Confidential - R. Kapadia
2      A.  I do.
3      Q.  Who is Jimmy?
4      A.  I would assume he's referring to
5  Jimmy Lee.
6      Q.  Who is Jimmy Lee?
7      A.  He is a vice chairman within the
8  investment banking group at JPMorgan.
9      Q.  And what role did he have in the
10  Tribune LBO transaction?
11      A.  He knew Sam and, as I recall, had
12  conversations with Sam from time to time.
13      Q.  Do you know what the substance of
14  his conversations with Mr. Zell were?
15      A.  I don't recall from that time, but
16  reading this email, it appears -- it would
17  appear that Sam wanted our thoughts on how to
18  finance the increase in purchase price.
19      Q.  And the last email is an email from
20  Mr. Lee to Jamie Dimon at 6:26 on the 30th.
21  Do you see that?
22      A.  I do.
23      Q.  Do you recall Mr. Dimon being
24  involved in those discussions of how JPMorgan
25  could assist Zell in financing the

92

1      Confidential - R. Kapadia
2  transaction?
3      A.  I don't recall.
4      Q.  Did you have direct contact with
5  Mr. Lee in connection with the Tribune LBO?
6      A.  As I recall, I may have spoken to
7  him once or twice and may have emailed him a
8  couple of times.
9      Q.  And what do you recall about the
10  substance of your conversations with him,
11  your phone call?
12      A.  I don't recall.
13      Q.  In general you don't recall?
14      A.  Well, the one I recall is at the
15  time we were syndicating the Step 1 term
16  loans, there was a lender meeting that Jimmy
17  Lee was to attend.  And as I recall, I had a
18  discussion with Jimmy Lee to prep him, if you
19  will, for that lender meeting.
20      Q.  Was there anyone at JPMorgan more
21  knowledgeable about the terms of the lendings
22  involved in the Tribune LBO than you?
23      MR. GLAZER:  Objection to form.
24      A.  I don't understand that question.
25  It's too broad, so.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

93

1    Confidential - R. Kapadia
2        Q.  Well, I guess my question is why
3    were you the one who was asked to prep Jimmy
4    Lee for the meeting that he was scheduled to
5    attend?
6        MR. GLAZER:  If you know.
7        A.  I don't recall.
8        Q.  In your recollection, who at
9    JPMorgan had lead responsibility for
10   understanding the structure and details about
11   the JPMorgan financings related to the LBO?
12       MR. GLAZER:  Objection.
13       A.  I would like you to repeat that
14   question for me, please.
15       MR. GOLDFARB:  Would you read it
16   back, please.
17       (Record read.)
18       A.  I'm not sure we conduct our
19   business and think of it as an individual who
20   has lead responsibility.  People in our
21   Credit organization, people in our Coverage
22   group interfacing with the client, me and my
23   colleagues in Leveraged Finance are all part
24   and parcel of that.  So I'm not sure there's
25   lead responsibility for that.

94

1    Confidential - R. Kapadia
2        Q.  Referring to the financing
3    commitment letters that you testified about
4    earlier, who else among your colleagues, to
5    your knowledge, was involved in the
6    preparation of those commitment letters?
7        A.  Sure.  So I think as I described
8    earlier, the preparation of that was done by
9    outside counsel, but in terms of reviewing
10   and commenting on them, as I recall, besides
11   myself, I had some of my colleagues,
12   including, I believe, Yang Chen and John
13   Kowalczuk.  There may have been others, but.
14       Q.  And then looking at the second to
15   last email, which is another email from
16   Mr. Lee to Mr. Dimon on March 30th in which
17   Mr. Lee says that he had heard again from Sam
18   Zell looking for ways to finance the bump,
19   and by that you interpret the bump to refer
20   to an increase in the size of the
21   transaction?
22       A.  That would be a reasonable
23   conclusion, yes.
24       Q.  And that Mr. Lee told Sam Zell that
25   he might hear from you, "you" referring to

95

1    Confidential - R. Kapadia
2    Jamie Dimon.  Do you see that?
3        A.  I do.
4        Q.  Do you know whether Mr. Dimon
5    called Sam Zell on March 30th to talk about
6    the transaction?
7        A.  He may have.  I don't know.
8        Q.  The email on the top of the string
9    on the second page of the document, which is
10   from Mr. Lee to Mr. O'Brien and Patricia
11   Deans, cc'ing Jamie Dimon.  Do you see that?
12       A.  I do.
13       Q.  In which Mr. Lee in the second
14   sentence said, "Let's be as helpful as we
15   can."  Do you see that?
16       A.  I do.
17       Q.  What did Mr. Lee mean by that?
18       MR. GLAZER:  Objection.
19       A.  I don't know.
20       Q.  Did you ever ask anybody?
21       A.  No.  If I did, I don't recall.
22       Q.  Do you recall on March 30th, 2007,
23   exploring ways to finance the increased cost
24   of the Zell LBO?
25       A.  I vaguely recall that we looked

96

1    Confidential - R. Kapadia
2    into financing that increase.  I don't really
3    recall much of the particulars of that.
4        Q.  If you look at the second email,
5    it's an email from you at 9:36 on the 30th.
6    Does that refresh your recollection at all
7    about what you did after you received the
8    email from Mr. O'Brien about putting more
9    money into the Zell LBO deal?
10       A.  Sure.  So I read it and I see my
11   email.  Don't recall the broader substance of
12   that than what is in here.
13       MR. GOLDFARB:  Off the record.
14       (Discussion off the record.)
15       (Exhibit Kapadia 6, Document Bates
16   stamped JPM 00227775, marked for
17   identification, as of this date.)
18       Q.  This is a one-page document bearing
19   Bates number JPM 00227775.  Mr. Kapadia,
20   there is no substantive subject line to these
21   emails, but do you also recognize this as a
22   string of emails you had with Patricia Deans
23   on the 30th of 2007?
24       A.  I see that.
25       Q.  Did I ask you what position



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

97

1       Confidential - R. Kapadia
2   Ms. Deans held at this time at JPMorgan?
3       A.  You have not.
4       Q.  I ask you that now, sir.
5       A.  So Patricia Deans or Trish Deans
6   was managing director in our Loan Capital
7   Markets group within Leveraged Finance.
8       Q.  And in the third email in the
9   string Ms. Deans asked you if you thought we
10  could put another hundred of debt on Trib.
11  Do you see that?
12      A.  I do.
13      Q.  What did you interpret that to
14  mean?
15      A.  I don't recall the specifics.  That
16  being said, I believe this is in -- this is
17  all related to the discussion we were having
18  a few minutes ago about financing the
19  200 million increase in the purchase price,
20  some debt, some equity.
21      Q.  And the reference to a hundred you
22  take to be a hundred million dollars; is that
23  right?
24      A.  That's a fair assumption.
25      Q.  And then your response to Ms. Deans

98

1       Confidential - R. Kapadia
2   was, "I think we're on the edge, so we'll
3   need to go to the agencies on this."
4       What did you mean by "I think we're
5   on the edge"?
6       A.  Again, I don't recall what I would
7   have meant back at that date.  That being
8   said, reading my email, I think it's
9   referring to the outlook from the agencies.
10  Or the view from the agencies, I should say.
11      Q.  And by "the agencies" you're
12  referring to ratings agencies?
13      A.  Yes.
14      Q.  And by rating agencies do you mean
15  organizations like Standard & Poor and
16  Moody's that rate --
17      A.  Those two.
18      Q.  -- that rate the creditworthiness
19  of various financial instruments?
20      A.  Those two firms, yes.
21      Q.  And what does it mean to be on the
22  edge?
23      A.  I don't know what it means.
24      Q.  As the author of the email, do you
25  know what you would have meant by saying --

99

1       Confidential - R. Kapadia
2   is that a phrase you've ever used before?
3       A.  I'm sure I've used it.  As I
4   described, before we make a decision around
5   increasing the debt, we wanted to be sure
6   that the agencies did not do something to the
7   ratings, credit rating agencies did not do
8   something to the ratings, and we did not want
9   the hundred million of debt to result in
10  something happening with the rating agencies.
11      Q.  And just perhaps by way of
12  background, when you say that you wanted to
13  be sure that the agencies did not do
14  something to the ratings, what do you mean by
15  that?
16      A.  Like, if they downgraded the
17  ratings or, you know, changed the outlook
18  or...
19      Q.  What would be the significance of
20  that if they did downgrade the ratings?
21      A.  So I can address that question kind
22  of a bit more broadly and more generally than
23  the specifics here, but I think you'll get
24  the picture.  The significance of the
25  agencies downgrading the ratings in isolation

100

1       Confidential - R. Kapadia
2   is just one thing.  But I think in the
3   context of the terms that we would have
4   negotiated in any deal with regard to cap
5   rates, flex, etc., if that is set, and then
6   there's a change in ratings, you know, we
7   would want to be in a position to revisit the
8   terms that we have committed our capital to
9   underwrite that deal.  So that's, you know,
10  ultimately the significance of this, as I
11  recall.
12      Q.  And, in general, in the
13  circumstances that you described, if rating
14  agencies lowered the rating, is it so that it
15  would potentially alter the terms, the
16  negotiated terms of a lending transaction to
17  JPMorgan's disadvantage?
18      A.  I wouldn't characterize that as
19  disadvantage.  It increases your cost of
20  capital.  If you're triple A rated, you're
21  not going to pay the same cost of capital as
22  if you're triple B or double B or single B.
23  So it's a cost of capital, fundamentally it's
24  a cost of capital issue.
25      Q.  And in the scales you just



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

101

1    Confidential - R. Kapadia
2    identified, the B ratings are lower ratings
3    of the rating agencies.  Is that fair to say?
4        MR. GLAZER:  Objection to form.
5        A.  They have a lot of other lower
6    ratings, but.
7        Q.  But in your answer you meant to be
8    going down --
9        A.  That's right.
10       Q.  -- down in scale of
11   creditworthiness?
12       A.  Yes.
13       Q.  Is that fair to say?
14       A.  Yes.
15       MR. GOLDFARB:  Let's go off the
16   record.
17       (Discussion off the record.)
18       (Lunch recess taken from 12:23 p.m.
19   to 1:13 p.m.)
20       AFTERNOON SESSION
21   EXAMINATION (Cont'd.)
22   BY MR. GOLDFARB:
23       Q.  Good afternoon, Mr. Kapadia.  We're
24   back on the record?
25       A.  Good afternoon.

---

103

1    Confidential - R. Kapadia
2    the deal, what are you referring to?  What do
3    you mean by that?
4        A.  What I'm referring to is the way
5    the credit support from the operations of
6    Tribune, the broadcasting and the publishing
7    operations of Tribune, how those operations
8    will provide credit support with respect to
9    the LBO debt.
10       Q.  And the collateral structure as
11   discussed in this string, was that the
12   structure that was in place from the outset
13   of the contemplated LBO transaction, to your
14   knowledge?
15       A.  When you say from the outset, are
16   you referring to from the time that the
17   transaction closed?
18       Q.  No.  I mean from the time that the
19   transaction was first developed.
20       A.  Developed.  As I recall, we had
21   originally started down the path of getting
22   the broadcasting and the publishing asset
23   collateral support directly, and one of these
24   emails refers to it, but there was some
25   reporting -- SEC reporting requirements that

---

102

1    Confidential - R. Kapadia
2        MR. GOLDFARB:  Can we please mark
3    this as Number 7.
4        (Kapadia Exhibit 7, Document
5    bearing Bates number JPM 00311216
6    through 311220, marked for
7    identification, as of this date.)
8        Q.  And while you're looking at that,
9    this is a document bearing Bates number JPM
10   00311216.
11       A.  Okay.
12       Q.  Do you recognize this document,
13   sir?
14       A.  I recognize it.  I don't recall it,
15   but I recognize it.
16       Q.  What distinction are you drawing?
17       A.  I mean I see it's a chain of
18   emails.  I don't recall it from back in '07.
19       Q.  Can you describe generally what the
20   substance of this email string relates to?
21       A.  As I read the emails, it's about
22   the ratings outcome and updating the rating
23   agencies on the structure of -- the
24   collateral structure of the deal.
25       Q.  And by the collateral structure of

---

104

1    Confidential - R. Kapadia
2    the company would be faced with as a result
3    of what we had originally been thinking of.
4    And as a result, we formulated this revised
5    structure.
6        Q.  Were you involved in the
7    development and creation of this revised
8    structure?
9        MR. GLAZER:  Involved in the sense
10   of being a decision maker?  Is that what
11   you're asking?  "Involved" is very
12   broad.
13       MR. GOLDFARB:  You can object.  If
14   the witness --
15       MR. GLAZER:  I object.
16       MR. GOLDFARB:  -- needs
17   clarification, he can request it.
18       A.  Can you repeat your question,
19   please.
20       Q.  Yes.  Were you involved at all in
21   the creation or development of this
22   alternative collateral structure?
23       MR. GLAZER:  Same objection.
24       Q.  That's discussed in this email
25   string?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

## 105

1     Confidential - R. Kapadia
2     A.  I'm sure I was involved in the
3  discussions around it.  I do not recall if I
4  was involved in the creation of it, as you
5  describe it.
6     Q.  Do you know who created it?
7     A.  I don't recall.
8     Q.  Was it someone at JPMorgan?
9     A.  It may have been.  I don't recall.
10    Q.  The top email on the first page is
11 an email from you to Chandler Bigelow.  And
12 Mr. Bigelow is at the Tribune Company; is
13 that right?
14    A.  Yes.
15    Q.  And it's copied to David Eldersveld
16 also at the Tribune.  Do you know what
17 position Mr. Eldersveld held?
18    A.  As I recall, he worked with
19 Chandler.  I don't recall his specific
20 position, but he worked with Chandler.
21    Q.  And the other recipients were Julie
22 Persily?
23    A.  Persily.
24    Q.  At Citigroup, who you mentioned
25 earlier.  Michael O'Grady at Merrill Lynch;

## 106

1     Confidential - R. Kapadia
2  is that right?
3     A.  Yes.
4     Q.  And Todd Kaplan at Merrill Lynch?
5     A.  Yes.
6     Q.  And then Mark Guterman at JPMorgan
7  Chase?
8     A.  Yes.
9     Q.  What position did Mr. Guterman have
10 at JPMorgan Chase at the time?
11    A.  He worked in the Leveraged Finance
12 group at the time.
13    Q.  And did he work with you on the
14 Tribune matter?
15    A.  Yes.
16    Q.  And also Yang Chen was a recipient.
17 Yes?
18    A.  Yes.
19    Q.  And you write, "Chandler, please
20 see attached schematic that we put together."
21 Do you see that?
22    A.  I do.
23    Q.  And then the attachment is at the
24 last page on Bates ending in 1220.  Is that
25 the schematic to which you're referring in

## 107

1     Confidential - R. Kapadia
2  your email?
3     A.  It probably is.  Obviously I don't
4  recall from that time, but it probably is.
5     Q.  And would you agree with me, sir,
6  that the top email indicates that someone at
7  JPMorgan put this chart together, put this
8  schematic together?
9     MR. GLAZER:  Objection.
10    A.  Could you repeat your question
11 please.
12    MR. GOLDFARB:  Could you read it
13    back, please.
14    (Record read.)
15    MR. GLAZER:  Objection.  You can
16    draw your own conclusions.  You should
17    get this witness's recollection, not his
18    reading of emails that he doesn't
19    recall.
20    A.  It's possible.  It's, you know,
21 likely that someone at JPMorgan put this
22 together.  Obviously I can't confirm that.
23    Q.  What benefit, sir, did you
24 understand this proposed financing structure
25 to provide to JPMorgan?

## 108

1     Confidential - R. Kapadia
2     MR. GLAZER:  Objection.
3     A.  I don't understand your question.
4     Q.  As the deal was consummated, did it
5  include a collateral structure that was
6  similar to the one reflected on this diagram?
7     A.  As I recall, yes.
8     Q.  And did JPMorgan agree to lend for
9  purposes of the LBO with this collateral
10 structure in place?
11    A.  Yes.
12    Q.  And my question is, why did JPM
13 agree to this collateral structure?
14    MR. GLAZER:  Objection to form.
15    A.  So as I described a few minutes
16 ago, and this is the case with a lot of other
17 issuers with regard to SEC reporting
18 requirements for public companies or
19 companies that have securities out there, and
20 if the company -- the company would have been
21 burdened with a lot of additional subsidiary
22 reporting requirements, and this was a way to
23 address that concern that they had.
24    Q.  So if you recall, was the amount
25 and degree of collateral secured by JPMorgan



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

### 109

Confidential - R. Kapadia

1 through this structure the same as, less
2 than, greater than that as originally
3 contemplated in the deal, i.e., the stock and
4 all the operating subs?
5     A.  As I vaguely recall, we looked into
6 it and diligenced it, and, as I recall, we
7 came to the conclusion that it required
8 substantively the same collateral as we would
9 otherwise have received, as I recall.
10    Q.  And as you recall, sir, under the
11 structure, on the broadcasting side what was
12 the collateral on which JPMorgan receives
13 security?
14    A.  Can you repeat your question,
15 please.
16    Q.  Yes.  On the broadcasting side,
17 what was the collateral given to JPMorgan in
18 connection with this financing structure?
19    A.  I don't recall at this point in
20 time, but this chart I think summarizes it.
21 It's the stock of the broadcasting holding
22 company as well as guarantee from the
23 operating subsidiaries.
24    Q.  And what about on the publishing

### 110

Confidential - R. Kapadia

1 side, what was the collateral, if you recall,
2 that JPMorgan got as a result of this
3 structure?
4     A.  I think as this chart summarizes,
5 it's the stock of Tribune Finance, LLC, as
6 well -- well, not as well, but stock of
7 Tribune Finance, LLC, and I believe that
8 included the pledge of the intercompany note
9 between Tribune Finance, LLC, and the
10 publishing assets.
11    Q.  Do you recall whether there were
12 any assets other than that intercompany note
13 in Tribune Finance, LLC?
14    A.  I don't recall.
15    Q.  Do you recall, sir, whether the
16 collateral structure provided JPMorgan
17 structural priority over existing Tribune
18 debt in connection with the LBO?
19    A.  When you say structural priority,
20 could you elaborate on that.
21    Q.  Yes.  In the event of a bankruptcy
22 or default, the priority of repayment would
23 be superior for JPMorgan as a result of a
24 collateral structure as compared to existing

### 111

Confidential - R. Kapadia

1 -- preexisting debt of the company?
2     MR. JOHNSTON:  Object to the form
3 of the question.
4     A.  So the terms of the LBO debt, the
5 new bank and bond debt as part of Step 1 and
6 then as part of Step 2, was structured, as I
7 recall, with the benefit of some additional
8 credit support that the preexisting debt did
9 not enjoy all of that credit support benefit.
10 But as I recall, consistent with the way we
11 look at this, this was done within the --
12 obviously within the confines of the terms of
13 that preexisting debt and what the
14 preexisting debt would or would not allow
15 with respect to incurrence of additional
16 debt.
17    Q.  And by credit support, what do you
18 mean by that?  Is that another term for
19 collateral?
20    A.  Collateral, yes.
21    Q.  And in the case of the new bank
22 debt, am I correct that it was secured by
23 both a pledge of stock in the broadcasting
24 and finance companies as well as by

### 112

Confidential - R. Kapadia

1 guarantees given by certain of the Tribune
2 operating companies?
3     A.  I believe that's accurate.  I think
4 that's what this chart is summarizing.
5     Q.  Do you know whether the guarantees,
6 setting aside the stock pledges for a moment,
7 whether the guarantees themselves provided
8 structural seniority for the new LBO-related
9 debt?
10    MR. JOHNSTON:  Object to the form.
11    MR. GLAZER:  Objection.
12    A.  So your question is did the
13 guarantees provide structural seniority to
14 the new debt relative to the preexisting
15 debt.
16    Q.  Yes, sir.
17    A.  So I don't recall that.  I do
18 recall, as I described a minute ago, that we
19 -- and that may be.  I don't recall whether
20 we had the structural benefit of the
21 guarantees.  But as I described a minute ago,
22 we had structured the new debt taking into
23 account the terms of the preexisting debt.
24    Q.  And you used that phrase a minute



# ESQUIRE

an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

### 113

1     Confidential - R. Kapadia
2 ago, and I'm just not sure I understand what
3 you mean when you say you structured the new
4 debt taking into account the terms of the
5 preexisting debt. I just don't understand
6 what you mean by that.
7     A. Sure. So the preexisting debt, as
8 I recall, for this deal, and there's other
9 transactions of similar type, was issued
10 whenever the preexisting debt was issued upon
11 terms and conditions and ability to incur
12 additional debt, ability to provide that new
13 debt with structural or other seniority. And
14 so with respect to the Tribune LBO debt, we
15 had structured the new debt, both the bank
16 and the bonds, again, to fit within the
17 confines of the terms of the preexisting
18 debt.
19     Q. Was obtaining structural seniority
20 to the preexisting debt important to JPMorgan
21 in its decision as to whether to proceed with
22 this financing?
23     MR. GLAZER: Objection to form.
24     A. So I don't recall that. But that
25 being said, we -- that's not the way I think

### 114

1     Confidential - R. Kapadia
2 about it when I think about, you know, a new
3 financing.
4     Q. At the time did you have a view as
5 to whether or not JPMorgan would have
6 undertaken the financing absent structural
7 seniority?
8     A. At the time?
9     Q. Yes.
10     A. We may have had that view. I don't
11 recall. Back to my comment a moment ago,
12 ultimately it comes down to the trade-offs
13 and the cost of capital. So from my
14 perspective, there is various different ways
15 to structure a financing. It's, you know,
16 what is the cost of capital impact relative
17 to the different options that might be
18 available to the company.
19     Q. At the time when you were
20 structuring the lendings, do you recall
21 having discussions or communications of any
22 form within JPMorgan about what would happen
23 and considering what would happen in the
24 event of a default or a bankruptcy by the
25 Tribune post lending?

### 115

1     Confidential - R. Kapadia
2     A. Can you repeat your question,
3 please.
4     Q. Yes. Do you recall having any
5 communications with colleagues within
6 JPMorgan prior to the decision to enter the
7 loan commitments about what would happen to
8 the JPMorgan lendings in the event of a
9 Tribune default or bankruptcy?
10     A. I don't recall that.
11     Q. Do you remember having discussions
12 with any of your colleagues about how
13 JPMorgan would fare in a Tribune default or
14 bankruptcy as compared to other preexisting
15 creditors of the Tribune Company in
16 connection with the structuring of the LBO
17 financings?
18     A. That may be. I don't recall that.
19 That's not something that I would typically
20 be involved in. It would typically be our
21 Credit organization.
22     Q. And who within the Credit
23 organization, to your recollection, was most
24 involved in the Tribune financings?
25     A. So it was John Kowalczuk and Jeff

### 116

1     Confidential - R. Kapadia
2 Sell. There may be others, but those are the
3 two names I recall.
4     Q. And do you understand the string of
5 emails to be communications among various
6 lending parties and Mr. Bigelow about how to
7 describe the collateral structure to the
8 rating agencies?
9     A. That's what I think these emails
10 refer to.
11     Q. And I guess it's the third email
12 down, it goes from the bottom of the first
13 page to the top of the second, is an email
14 from you to Mr. Bigelow, Ms. Persily, and
15 others. Do you see that one?
16     A. I do.
17     Q. That's the one on March 30th at
18 11:27 --
19     A. Um-hmm.
20     Q. -- in which you tell Mr. Bigelow
21 that you think he should reach out to both
22 agencies today and update them, more as an
23 FYI, about the structure of the deal with the
24 collateral package on the publishing side and
25 on the broadcasting side, describing the

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

117

1    Confidential - R. Kapadia
2  reason for the structure, as Julie points out
3  in her email, as well as the guarantees the
4  new loan and bond investors gets is an
5  important part of the discussion, the banks
6  can offer to be on the line, however, it is
7  probably best done as a one-on-one
8  conversation.  Do you see that?
9    A.  I do.
10    Q.  Do you recall advising Mr. Bigelow
11  that his communication with the rating
12  agencies about the collateral package was
13  best done as a one-on-one conversation?
14    A.  I don't recall that.  I read it,
15  but I don't recall that.
16    Q.  You say you don't recall giving
17  that advice?
18    A.  I'm sure I wrote this email, but
19  prior to reading this email, I would not have
20  recalled having had that recommendation.
21    Q.  Sitting here today as you read this
22  string of emails and that email, does it
23  refresh your recollection at all about why
24  you suggested to Mr. Bigelow that it be done
25  as a one-on-one conversation with the rating

118

1    Confidential - R. Kapadia
2  agencies?
3    A.  No.
4    Q.  Do you recall having any discussion
5  in connection with this proposed collateral
6  structure about the impact that it might have
7  if there were bankruptcy subsequent to the
8  LBO lendings by the Tribune?
9    MR. JOHNSTON:  Object to the form.
10    A.  So can you repeat your question,
11  please.
12    (Record read.)
13    Q.  And just to clarify the question,
14  by the Tribune is not the LBO lendings, but I
15  was referring to the bankruptcy.
16    A.  Understood.
17    Q.  Thank you.
18    A.  Understood.  I don't recall that.
19    MR. GOLDFARB:  Can we put before
20  the witness, please, Kowalczuk Exhibit 7
21  from yesterday.
22    MR. GLAZER:  I think you mean from
23  Wednesday.
24    MR. GOLDFARB:  I do mean from
25  Wednesday.  Thank you.

119

1    Confidential - R. Kapadia
2    MR. GLAZER:  Okay.  He has it.
3    A.  Exhibit 7.
4    Q.  And, sir, I would ask you, I think,
5  just to look at the first -- I'm really going
6  to ask you more high level questions about
7  the document.
8    A.  Sure.
9    Q.  So if you want to focus first on
10  the first six or seven pages going through to
11  this cover page.
12    A.  Okay.
13    Q.  Just familiarize yourself.  If you
14  do feel the need to look at the substance to
15  respond to any question, let me know, and
16  I'll of course give you the opportunity to
17  review it to your satisfaction, but I have
18  some general questions first.
19    A.  Okay.
20    Q.  Sir, looking at the top page, is
21  this a form of document that you recognize?
22    A.  I don't.  You're referring to this
23  page, right?
24    Q.  Yes.  The first page labeled
25  "Credit Approval and Review Summary Interim

120

1    Confidential - R. Kapadia
2  Proposal: Tribune Company."
3    MR. GLAZER:  It's 148109.
4    A.  I don't.
5    Q.  Turning to the document bearing
6  Bates ending in 8116.
7    A.  Um-hmm.
8    Q.  Is that a form of document you
9  recognize, sir?
10    A.  The form I do, yes.
11    Q.  What is the form of document?
12    A.  It's an approval form with respect
13  to the bond bridge commitment.
14    Q.  And I had asked you generally about
15  the form, but do you recognize this to be the
16  form that actually was filled out for the
17  bridge loan in connection with the Tribune
18  LBO?
19    A.  Well, this form -- what I said was
20  this form we would fill out -- at that time
21  this form we would fill out in connection
22  with any bond bridge commitments.
23    Q.  I see.  Okay.  And now looking
24  specifically, is this such a document that
25  was prepared for approval to enter into the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

121

1     Confidential - R. Kapadia
2  commitment to lend on the Tribune bridge?
3     A.  I believe so, yes.
4     Q.  And is that your signature at the
5  top of the SLF approval block?
6     A.  I believe so, yes.
7     Q.  And next to your name it says,
8  "Originator, MD."  What does that stand for?
9     A.  I know what the MD stands for.  You
10 know, I think the originator -- I don't know
11 what that term stands for.  We're the
12 interface for the client, so I think that's
13 maybe the history.  I'm speculating, though.
14    Q.  And MD stands for managing
15 director; is that right?
16    A.  Yes.
17    Q.  And then just looking at the next
18 page, is that a similar approval form for
19 different credit facilities?
20    A.  So this form -- yes.  This form is
21 a form that we would typically have for
22 committed senior credit facilities.
23    Q.  And, again, is that your signature
24 under the SLF approval block next to the term
25 "SLF Senior Transactor"?

---

122

1     Confidential - R. Kapadia
2     A.  I believe so.
3     Q.  And it's dated April 5th, 2007; is
4  that right?
5     A.  Yes.
6     Q.  Sir, do you recall executing these
7  approval forms?
8     A.  I don't recall.  I'm sure I did,
9  but I don't recall that.
10    Q.  And, sir, just so we're talking
11 about the full package, looking at the
12 document ending in 8118, do you see that as a
13 third approval form for yet another one of
14 the Tribune LBO credit facilities?
15    A.  I do.
16    Q.  Do you recall that part of the
17 package of credit facilities was what was
18 referred to as an incremental facility?
19    A.  I do.
20    Q.  Do you recognize the approval form,
21 this approval form to refer to the term loan
22 that was the incremental facility for the
23 Tribune LBO?
24    A.  I believe so.
25    Q.  And, again, sir, that, again, is

---

123

1     Confidential - R. Kapadia
2  your signature toward the bottom of the page?
3     A.  I believe so, yes.
4     Q.  Do you have any reason to doubt
5  it's your signature?
6     A.  No, there is no reason to doubt,
7  but.
8     Q.  What information did you review in
9  order to be able to sign these approvals?
10    A.  You know, I think it's -- it's not
11 -- I don't recall specifically for this deal,
12 but typically, it may be different in the
13 Credit organization, but it's not -- I think
14 what your question is getting to is what is
15 the information that we review to get to
16 this.  It's, you know a series of
17 information.  It's not any one, you know,
18 piece of paper, one document, or one
19 discussion or one conversation.  It's a
20 series of diligence, series of discussions,
21 series of information.
22    Q.  When you were provided with these
23 forms to sign, were you also provided with a
24 set of materials relating to the proposed
25 facilities for you to review?

---

124

1     Confidential - R. Kapadia
2     A.  Not that I recall.  Again, it may
3  be different in the credit organization, but
4  not that I recall from a syndicated leveraged
5  standpoint.
6     Q.  If you look at the next page ending
7  in Bates 8119, is this a form of document you
8  recognize?
9     A.  A form I recognize, yes.
10    Q.  What is it?
11    A.  I believe it's -- the form I
12 believe is the credit approval memo, if you
13 will.
14    Q.  And is this a document that was
15 provided to you before or in connection with
16 your approval of the credit facilities?
17    A.  It may have been.  I don't recall
18 that.
19    Q.  Do you recall reviewing a
20 transaction proposal document in connection
21 with the Tribune credit facilities?
22    A.  I may have, but I don't recall
23 that.
24    Q.  Would you have had any hand in
25 preparing the material contained in a

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

125

1      Confidential - R. Kapadia
2    transaction proposal?
3          MR. GLAZER: Objection to form.
4      A.   I may have. As I said, I don't
5    recall.
6      Q.   Among the people that signed the
7    same approval forms that you signed was Jeff
8    Sell. Do you see that?
9      A.   Yes, I see that.
10     Q.   And Mr. Sell is also listed on the
11   first page of the transaction proposal
12   document. Do you see that?
13     A.   I do.
14     Q.   Did you ever talk to Mr. Sell about
15   the LBO lendings to which JPMorgan Chase
16   committed itself in connection with the LBO?
17     A.   Yes.
18     Q.   What do you recall talking to
19   Mr. Sell about?
20     A.   I don't recall the specifics. As
21   we were working on the transaction from
22   February through commitment, I believe I had,
23   you know, a number of discussions with Jeff
24   Sell but don't recall the specifics on that.
25     Q.   Do you know whether Mr. Sell -- and

126

1      Confidential - R. Kapadia
2    Mr. Sell was senior to Mr. Kowalczuk in the
3    approval, credit approval hierarchy at
4    JPMorgan; is that right?
5      A.   That's right.
6      Q.   Do you recall Mr. Sell expressing
7    any concerns about the structure of the
8    financing to which JPMorgan committed itself?
9      A.   I recall some of those discussions.
10   I don't recall the specifics. That's, you
11   know, that's what Jeff Sell as a credit
12   officer, that's his role.
13     Q.   Yes. And in general, what do you
14   recall about those discussions?
15     A.   I don't have specific recollection
16   other than, you know, working with him and
17   John Kowalczuk and the team on the diligence
18   and getting, you know, getting to a point
19   where we were ready to approve the deal.
20     Q.   Sir, if you can just flip through,
21   I just am curious as to whether you recall
22   whether the Syndicated Leveraged Finance
23   group had a hand in preparing any of the
24   information contained in here.
25     A.   Whether I recall that?

127

1      Confidential - R. Kapadia
2      Q.   Yes.
3      A.   So would you like us to do a page
4    flip?
5      Q.   Yes, please.
6      A.   So it's possible that SLF and my
7    colleagues within SLF had some role in some
8    of these materials. I don't recall.
9      Q.   Is there material that SLF
10   personnel prepared and provided to you
11   specifically in connection with your work on
12   the LBO?
13     A.   I'm sure they did. I don't recall
14   what that was, but I'm sure they did.
15     Q.   And what type of materials would
16   your SLF colleagues provide to you?
17         MR. GLAZER: Objection to form.
18     A.   I don't get that question.
19     Q.   Well, your testimony was you're
20   sure that SLF colleagues provided you with
21   information in connection with the LBO
22   transaction, and I'm now asking what types of
23   materials they gave you so that you could do
24   your job.
25     A.   Yeah. So, you know, it could be,

128

1      Confidential - R. Kapadia
2    you know, copies of the lender presentation,
3    the information memorandum, and other
4    documents.
5      Q.   Did JPMorgan have a hand in
6    preparing the lender presentation?
7      A.   We helped the company prepare that.
8      Q.   And are you familiar that in April
9    of 2007 there was also a presentation made to
10   rating agencies in connection with the
11   Tribune LBO?
12     A.   I recall there was a presentation
13   to the rating agencies. I don't recall the
14   date.
15     Q.   And did JPMorgan help in the
16   preparation of that document as well?
17     A.   I recall we provided our input in
18   that as well.
19     Q.   And for something like the lender
20   presentation or the rating agency
21   presentation, were you personally involved in
22   reviewing drafts of that and approving its
23   contents from the JPMorgan perspective?
24     A.   I probably was. I don't recall
25   specifically, but I probably was.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

129

1    Confidential - R. Kapadia
2    Q.  Who else do you recall at JPMorgan
3    being involved in the preparation of the
4    lenders presentation or the rating agency
5    presentation?
6    A.  I don't recall specifically, but I
7    think it's some of the individuals that we
8    talked about previously within the Leveraged
9    Finance group as well as within the TMT
10   Investment Banking group.
11   Q.  Anyone in particular you could
12   identify by name?
13   A.  Let me get those names.  So it's my
14   colleagues Yang Chen, Mark Guterman, Peter
15   Cohen, Joachim Sonne.  Maybe others.
16   Q.  Did JPMorgan, to your recollection,
17   hope to use its participation as a lead
18   lender in connection with the LBO to expand
19   the range of services that JPMorgan provided
20   to the Tribune Company?
21   MR. GLAZER:  Can I hear that
22   question again.
23   (Record read.)
24   THE WITNESS:  Can you repeat that
25   question for me one more time.

130

1    Confidential - R. Kapadia
2    (Record read.)
3    A.  We're hopeful to be able to do
4    that, yes.
5    Q.  And is that typically the case, in
6    your experience, where JPMorgan, after it is
7    able to establish a relationship with a
8    client, looks to expand that relationship and
9    develop it further?
10   MR. GLAZER:  We'll stipulate to
11   that.
12   A.  We are in the relationship banking
13   business.  That's what we're in.
14   Q.  Just to be clear, as a result of
15   the services that it provides, JPMorgan
16   charges the clients for those services and it
17   earns fees for performing those services; is
18   that right?
19   MR. GLAZER:  Objection to form.
20   A.  It's a very broad question.  That's
21   the hope that we provide some services.  We
22   provide value add and we get compensated for
23   it.  It doesn't always happen.
24   Q.  It doesn't always happen that you
25   get paid, or it doesn't always happen that

131

1    Confidential - R. Kapadia
2    you charge for your services?
3    A.  It's case by case.
4    Q.  I don't understand what you mean by
5    that.
6    A.  So there may be occasions when we
7    perform a service, the cost to us, the value
8    add to the client may be minimal.  And it's
9    part of the relationship banking franchise
10   that we have.  There may be instances where,
11   you know -- so those are kinds of instances
12   where maybe there is no compensation
13   associated with it.
14   MR. GOLDFARB:  Let's mark this as
15   Number 8, please.
16   (Kapadia Exhibit 8, Document Bates
17   stamped JPM 00232401, marked for
18   identification, as of this date.)
19   Q.  And while you're looking at this
20   one-page document, sir, I will note for the
21   record that it bears Bates number JPM
22   00232401.
23   A.  Okay.
24   Q.  Do you recognize this document?
25   A.  Yes.  Well, it's a series of

132

1    Confidential - R. Kapadia
2    emails.
3    Q.  Do you recall the document?
4    A.  No.
5    Q.  Focusing on the lower email, which
6    is one that you wrote to a number of people.
7    Do you see that?
8    A.  I do.
9    Q.  And you indicate at the bottom in
10   the first paragraph that JPMorgan gross fees
11   went from $74 million to $66 million based on
12   a reallocation of the lending split.
13   MR. GLAZER:  Objection to form.
14   Q.  Is that correct?
15   A.  I did not hear your question.
16   Q.  The last sentence of that first
17   paragraph of your email, is it fair to say
18   that it indicates that JPMorgan's fees, gross
19   fees, declined from $74 million to
20   $66 million based on an anticipated recut of
21   the lending allocation among the lead
22   lenders?
23   A.  That's a reasonable conclusion from
24   that, yes.
25   Q.  And then the next sentence says,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

133

Confidential - R. Kapadia

1
2  "Our coverage bankers are focused on using
3  this as an opportunity to push for some
4  sell-side business coming out of Tribune
5  post closing.  We will be putting this under
6  the SLF Cross-Marketing Effort."  Do you see
7  that?
8      A.  I do.
9      Q.  What did you mean by the first
10 sentence in that paragraph that I just read?
11     A.  And your question is what I recall
12 that I meant at the time I wrote this email?
13     Q.  Yes.
14     A.  So I don't recall specifically.  I
15 believe, and we talked about this before
16 lunch, that there was a decision made by
17 someone to sell the Cubs asset, and maybe
18 that is what this was referring to.  But,
19 again, that's, you know, speculation.
20     Q.  What are JPMorgan's coverage
21 bankers?  What does that phrase refer to?
22     A.  It would typically be people that
23 -- the bankers who are the client executives.
24     Q.  And what did you mean when you said
25 "We will be putting this under the SLF

---

134

Confidential - R. Kapadia

1
2  Cross-Marketing Effort"?  And I'll just note
3  that "Cross-Marketing" and "Effort" are each
4  initial capped.
5      A.  You know, I believe as you had
6  asked a question a couple of moments ago
7  about using one opportunity to do other
8  business with a client, that's what this is
9  ultimately referring to.
10     Q.  And would you expect that the
11 sell-side business coming out of the Tribune
12 post closing if it came to fruition would be
13 business that JPMorgan would charge and earn
14 fees on?
15         MR. GLAZER:  If you recall what you
16 were thinking in 2007.
17     A.  I'm not in the M&A group, so I
18 would not know.  We would typically charge
19 for it, but I wouldn't know what is
20 contemplated on that.
21     Q.  And did you ever talk to the
22 coverage bankers about their interest in
23 pushing for sell-side business coming out of
24 the Tribune after the LBO closed?
25     A.  I may have.  I don't recall that.

---

135

Confidential - R. Kapadia

1
2      Q.  But does your email here suggest to
3  you that you did?  Does that refresh your
4  recollection at all?
5          MR. GLAZER:  Objection to the form.
6      A.  I don't think this email suggests
7  that I talked to the bankers about, you know,
8  about that.
9      Q.  Then do you have any idea, sir,
10 what would have been the basis for you
11 writing that our coverage bankers are focused
12 on using this as an opportunity to push for
13 sell-side business?
14     A.  Understood.  But as I understood
15 your question, I thought you were asking
16 whether I had the discussions with the
17 coverage bankers about the cross-marketing.
18 I may have.  I don't recall that.  As I read
19 this, it's the coverage bankers describing to
20 me as opposed to me describing to them other
21 business that they may be, you know, looking
22 to do.
23     Q.  So if I change my question to
24 conversations with the coverage bankers as
25 opposed to you talking to the coverage

---

136

Confidential - R. Kapadia

1
2  bankers, your answer would have been
3  different?
4      A.  You're trying to put a level
5  precision on something that I, you know,
6  don't recall.
7         (Kapadia Exhibit 9, Document Bates
8  stamped JPM 00255010, marked for
9  identification, as of this date.)
10     Q.  This Document Number 9 bears Bates
11 number JPM 00255010.
12         Have you had a chance to look at
13 this document, sir?
14     A.  I have.
15     Q.  Do you recognize it?
16     A.  It's an email exchange.
17     Q.  Do you recall receiving it in April
18 of 2007?
19     A.  I don't.
20     Q.  Do you see that you are among the
21 copies on an email from Mr. Daniel Chapman?
22     A.  I do.
23     Q.  Mr. Chapman, do you know what his
24 position was at JPMorgan Chase at this time?
25     A.  At that point in time Dan was on

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

137

1      Confidential - R. Kapadia
2   our loan sales desk.
3      Q.   And is it fair to say that he would
4   be one of the persons who was reaching out to
5   potential syndicate members to gauge their
6   interest in participating in the Tribune
7   financing syndicates?
8      A.   Yes.
9      Q.   And Mr. Chapman wrote that Rich
10  Kaye of BTM just called to decline.  Do you
11  see that?
12     A.   I do.
13     Q.   Do you know what BTM stands for?
14     A.   I would imagine or guess it was
15  Bank of Tokyo Mitsubishi.
16     Q.   And do you recall whether -- Bank
17  of Tokyo Mitsubishi you say?
18     A.   Um-hmm.
19     Q.   -- declined to participate in one
20  or more of the financing syndicates for the
21  Tribune LBO?
22     A.   Do I recall that the Bank of Tokyo
23  Mitsubishi declined?
24     Q.   Yes.
25     A.   I don't recall that.  I see it

138

1      Confidential - R. Kapadia
2   here, but I don't recall that.
3      Q.   Did you yourself have any, other
4   than the lead lenders, did you yourself have
5   any contact with potential syndicate members
6   that declined to participate in the Tribune
7   lendings?
8      A.   I vaguely recall talking to a
9   couple of the potential syndicate members.  I
10  don't recall where those conversations ended
11  up in terms of their participation or them
12  declining.
13     Q.   Did you receive regular reports
14  along the lines of Mr. Chapman's or otherwise
15  as to the progress in JPMorgan's efforts to
16  syndicate the Tribune financings?
17     A.   We had regular discussions.  I
18  wouldn't call them reports, but we had
19  regular discussions around the syndication of
20  the deal.
21     Q.   And did you get reports that banks,
22  such as reflected here, that certain banks
23  declined to participate in the syndication?
24     A.   Again, I can't say whether they
25  were reports or not, but yes, I recall there

139

1      Confidential - R. Kapadia
2   were some banks that declined to participate
3   in the deal.
4      Q.   And what was your general
5   understanding of the reasons why banks that
6   declined to participate in the syndicate did
7   so?
8      MR. GLAZER:  Objection to form.
9      A.   You're asking a very broad
10  question, but let me provide some context
11  hopefully that addresses what your question
12  is getting to.  And I would also start by
13  drawing a distinction between the banks as
14  opposed to the non-bank lenders.  And so many
15  of the banks that we had approached had
16  looked at the transaction.  Many of them
17  committed to the deal.  But some of them
18  declined, like as it appears BTM declined to
19  come into the deal.  Separate and apart from
20  that, we had a term loan syndicate.  But, you
21  know, consistent with my experience in doing
22  this for thirteen years, the traditional
23  banks' appetite to commit to revolving credit
24  facilities is, you know, very discrete and
25  generally pretty limited.

140

1      Confidential - R. Kapadia
2      MR. GOLDFARB:  Can you reread my
3   question, please, and the witness can
4   answer.
5      (Record read.)
6      A.   Sure.  So I think I provided some
7   of the context.  I think that the primary
8   reason that banks, again, making that
9   distinction, the banks in syndicate are
10  typically invited to commit to the revolver.
11  The revolver is an unfunded commitment, yet
12  the capital charges associated with that are
13  still pretty significant, and the returns
14  associated with that capital commitment,
15  especially since the revolver is undrawn, is
16  rarely commensurate with the capital
17  commitments.  And as a result, as we think
18  about it, the hit rate for revolver lenders
19  is typically very low.
20     MR. GOLDFARB:  Can you read my
21  question again.  Maybe the witness can
22  provide an answer to my question.
23     (Record read.)
24     MR. GLAZER:  He's answered your
25  question.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

141

1        Confidential - R. Kapadia
2        A.   I think I've answered your question
3    in a lot more detail.
4        Q.   Did you ever receive communications
5    or reports explaining why particular banks
6    declined to participate in the lending
7    syndicates?
8        MR. GLAZER:  For Tribune?
9        MR. GOLDFARB:  For Tribune, yes.
10       A.   I did.  I don't recall the
11   specifics.  There were, I think as I
12   described, I don't recall why one bank said
13   yes and the other bank said no and why the
14   third bank also said no and what the
15   different reasons were, but the common theme
16   that we've seen, as I recall, from Tribune as
17   well as all these other deals that I've been
18   part of and my colleagues have been part of
19   is what I described about the capital
20   commitment and returns associated with it.
21   There may be other reasons specific to each
22   bank.  I don't recall that.
23       Q.   In the email before you, Kapadia
24   Exhibit 9, it indicates that Bank of Tokyo
25   Mitsubishi cited high leverage and the

---

142

1        Confidential - R. Kapadia
2    projected growth in revenues was unrealistic.
3    Do you see that?
4        A.   I do.
5        Q.   Do you have any reason to doubt
6    that that's an inaccurate report of the
7    reasons why Bank of Tokyo Mitsubishi declined
8    to participate?
9        MR. GLAZER:  Objection to form.
10       A.   Yeah, I don't know how to answer
11   that question.  I didn't talk to BTM.  If
12   that's the way they're explaining it to Dan
13   Chapman and he's accurately reflecting that
14   discussion, you know, that's accurate.  But I
15   can't attest to whether that's the reasons
16   why BTM declined it.
17       Q.   Do you recall hearing that certain
18   banks declined to participate in the
19   syndicate because there were concerns about
20   the high leverage associated with the Tribune
21   LBO?
22       A.   Can you repeat your question.
23       MR. GOLDFARB:  Can you read it
24   back, please.
25       (Record read.)

---

143

1        Confidential - R. Kapadia
2        A.   I recall that that was a concern
3    for some lenders, among others.
4        Q.   And do you recall that among the
5    other reasons why certain banks declined to
6    participate or certain potential lenders
7    declined to participate in the syndicate was
8    that there were concerns about the
9    reasonableness of the projected growth in
10   revenues of the Tribune?
11       A.   I don't recall that.
12       Q.   Do you recall any discussion within
13   JPMorgan about whether the projected growth
14   in revenues at the Tribune in the management
15   projections provided to you was unrealistic?
16       A.   If we had those discussions within
17   the firm, I don't recall it.
18       Q.   Would Syndicated Leveraged Finance
19   typically be one of the departments that
20   would be involved in assessing the
21   reasonableness of revenue growth projections
22   by the company?
23       A.   It's case by case I would say.
24       Q.   Do you recall that the --
25       A.   Can I just pause there for one

---

144

1        Confidential - R. Kapadia
2    second.
3        Q.   Sure.
4        THE WITNESS:  Can I just --
5        MR. GLAZER:  Yeah, actually, it's
6    been about an hour and fifteen.  Why
7    don't we take a break.
8        MR. GOLDFARB:  Okay.  Let's go off
9    the record, please.
10       (Recess taken from 2:27 p.m. to
11   2:42 p.m.)
12       Q.   Before the break, Mr. Kapadia, I
13   had asked you a series of questions about
14   reasons, to your recollection, why potential
15   lenders chose not to participate in the
16   syndicate, and I think your answer generally
17   focused on why bank lenders, certain bank
18   lenders may have declined to participate in
19   the syndicate.  Do you recall that testimony?
20       A.   I do.
21       Q.   You drew a distinction between bank
22   lenders and non-bank lenders in your answer.
23       A.   I did.
24       Q.   And can you answer the question now
25   also with respect to the non-bank lenders in

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

145

1      Confidential - R. Kapadia
2  terms of your recollection as to why non-bank
3  lenders opted not to participate in the
4  syndicates?
5      A.  With respect to the Tribune
6  transaction.
7      Q.  Yes, sir.
8      A.  Yeah.  So the non-bank market or,
9  as we call it, the institutional term loan
10  market, the institutional investors are a
11  very big, very diverse number of
12  institutional investors.  Have been, as I
13  recall, back in 2007 and continue to this
14  days.  And like in any transaction, and as I
15  recall in Tribune, there were a subset of
16  those institutional investors who ultimately
17  did not come into the deal for, as I recall,
18  a variety of reasons.  And it could be, as I
19  recall, they didn't like the leverage, they
20  didn't like the industry or were already
21  exposed in other investments in that sector,
22  they didn't like the pricing or the yield, or
23  there may have been other reasons.
24      Q.  And do you recall receiving an
25  update in early May 2007 that was sent to

146

1      Confidential - R. Kapadia
2  Jamie Dimon updating him on the progress of
3  the JPMorgan efforts to syndicate the Tribune
4  facilities?
5      A.  We may have updated Jamie.  I don't
6  recall that.
7      (Kapadia Exhibit 10, Document Bates
8      stamped JPM 00340187 through 340189,
9      marked for identification, as of this
10      date.)
11      Q.  This is a document bearing Bates
12  number JPM 00340187.
13      A.  Okay.
14      Q.  Sir, do you recall receiving this
15  email or being copied on this string of
16  emails involving Mr. Cohen and Mr. O'Brien in
17  May of '07?
18      A.  I don't recall.  I see it, but I
19  don't recall it.
20      Q.  And just as a general matter, do
21  you understand Mr. Cohen in his bottom email
22  to be referring to Jamie Dimon in the subject
23  line?
24      A.  Probably.
25      Q.  Is there any other Jamie that you

147

1      Confidential - R. Kapadia
2  can conceive of that Mr. Cohen would be
3  referring to in this email?
4      A.  No.
5      Q.  And would you agree with me, sir,
6  that Mr. Cohen is forwarding to you and
7  Mr. O'Brien a draft of an email that he hoped
8  to or intended to send to Jamie Dimon?
9      A.  Yes.
10      Q.  Do you recall whether there were
11  multiple instances in which Mr. Cohen would
12  send emails of a type like this to Jamie
13  Dimon to update him on the progress of the
14  Tribune matter?
15      MR. GLAZER:  Objection to form.
16      A.  I don't recall.  And also, this
17  email is in draft form.  I don't see the
18  email he sent to Jamie.
19      Q.  And the middle email from
20  Mr. O'Brien back to Mr. Cohen copying you as
21  well states, "Looks okay.  Should mention low
22  equity check as issue."  Do you see that?
23      A.  I do.
24      Q.  Do you recall there being a concern
25  about low equity check in connection with the

148

1      Confidential - R. Kapadia
2  Tribune in May of '07?
3      A.  When you say concern, you're
4  referring to concern by investors?  Concern
5  by who?
6      Q.  Well, were you aware of concerns
7  either within or without JPMorgan about the
8  Tribune having a low level of equity in May
9  of '07?
10      MR. GLAZER:  Objection to form.
11      Q.  In connection with the LBO deal?
12      MR. GLAZER:  Same objection.
13      A.  So, first of all, I'm not sure --
14  as I recall, I wouldn't describe it as a
15  concern.  It was, as I recall, some
16  investors, in evaluating the deal, one of the
17  issues that they had put forth or one of the
18  issues that, as they were evaluating the
19  deal, was the low equity capitalization as
20  part of the deal.
21      Q.  And you did not interpret that as a
22  concern on the part of potential investors?
23      A.  See, I think that whether it's
24  JPMorgan or the other banks or these
25  prospective investors, they're ultimately in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

149

1          Confidential - R. Kapadia
2     the risk management business. And it's
3     ultimately a decision that the investor has
4     to make as to, you know, what's the
5     structure, what are the terms, what is the
6     risk associated with it, are they being
7     compensated adequately for that. So I don't
8     view it, maybe we're talking about the same
9     thing, but I don't view it as a concern.
10    Ultimately it is the investor making a
11    decision are they getting adequately
12    compensated for the transaction before them.
13         MR. GOLDFARB: Let's mark this as
14    Kapadia 11, please.
15         (Kapadia Exhibit 11, Document Bates
16    stamped JPM 00490132, marked for
17    identification, as of this date.)
18         MR. GLAZER: We have it.
19    Q.   You've had a chance to look at this
20    document, sir?
21    A.   I have.
22    Q.   And what is it?
23    A.   Appears to be an email from Peter
24    Cohen to Jamie Dimon and others.
25    Q.   Including yourself?

---

150

1          Confidential - R. Kapadia
2     A.   Yes.
3     Q.   Do you recall receiving it in May
4     of '07?
5     A.   No.
6     Q.   In conjunction with the last email
7     we saw, does this refresh at all your
8     recollection that Mr. Cohen sent in this time
9     period an update to Jamie Dimon on the
10    progress of the syndication efforts at
11    JPMorgan?
12    A.   It does not. I see he sent it, but
13    it does not recollect my recollection at that
14    time, from that time.
15    Q.   The subject of the email is
16    "Tribune," and the email begins, "Jamie, the
17    Tribune management team has asked me to make
18    sure that you are fully briefed on the
19    current status of the Tribune transaction."
20         Were you considered a member of the
21    Tribune management team?
22    A.   No. I don't think this is
23    referring to JPMorgan at all.
24    Q.   You interpret it to mean within the
25    Tribune Company. Is that how --

---

151

1          Confidential - R. Kapadia
2     A.   If you read the second sentence, I
3     think that's -- I don't know, but I don't
4     think that's referring to JPMorgan management
5     team.
6     Q.   And Mr. Cohen indicates in the
7     second sentence that Tribune management asked
8     that you, referring to Mr. Dimon, call Dennis
9     this weekend as this has been a difficult
10    execution and he values your counsel.
11         Do you know what Mr. Cohen meant by
12    difficult execution?
13         MR. GLAZER: Objection to form.
14    A.   So I don't know specifically what
15    Peter meant by difficult execution. I was
16    involved within Leveraged Finance with the
17    whole execution process. So I'm more
18    familiar with pieces of it, but I obviously
19    don't know what he meant by difficult
20    execution.
21    Q.   Stepping back from this email,
22    would you yourself characterize the
23    syndication of the Tribune Step 1 loans as a
24    difficult execution?
25    A.   No.

---

152

1          Confidential - R. Kapadia
2     Q.   Do you recall writing to Mr. Cohen
3     and expressing your disagreement with his
4     email either in draft form or in final form
5     as it went to Jamie Dimon?
6     A.   I don't believe so.
7     Q.   The second sentence of the second
8     paragraph says, "Since we launched two weeks
9     ago, the deal has struggled in the market."
10    Do you see that?
11    A.   Um-hmm.
12    Q.   Do you agree with that statement?
13    A.   So that statement I agree it. Yes.
14    That statement I agree with.
15    Q.   In what respect do you agree that
16    the deal struggled in the market in the two
17    weeks after syndication efforts were
18    launched?
19    A.   So at this point in time, as I
20    recall, in early May, as I recall, there were
21    a couple of considerations with regard to the
22    deal or the syndication of the deal and a
23    couple of considerations with regard to the
24    marketplace, the market backdrop. We had
25    started to see some what I describe as cracks

---



Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Rajesh Kapadia                                    January 22, 2010

CONFIDENTIAL

---

**153**

1    Confidential - R. Kapadia
2  in the market, in the broader credit market,
3  broader markets beyond that, especially given
4  how quickly the run-up had been in 2006 and
5  the first part of 2007, tiny credit spreads,
6  improving cost of capital, etc., for issuers.
7  So there was a crack or a pause in that, so
8  we had seen some of that as kind of the
9  backdrop.
10    Specifically with respect to
11 Tribune and the execution of the Tribune
12 financing, you know, the deal had some
13 struggles in the marketplace, and
14 fundamentally, as I recall, at that time in
15 May '07 the eight billion term loan was the
16 largest institutional term loan ever
17 syndicated.  Since then there have been a
18 couple others in connection with other
19 go private transactions, but at that time it
20 was the largest institutional term loan.  And
21 notwithstanding a generally strong market,
22 eight billion dollars was a lot of money to
23 raise, which we ultimately did from, I
24 forget, but over a hundred institutional
25 lenders in the loan market.

---

**154**

1    Confidential - R. Kapadia
2    Q.  And do you agree with Mr. Cohen's
3  statement in the email that "Investor
4  concerns included total leverage (8.9 times
5  EBITDA), low equity check from Sam,
6  continuing deterioration of newspaper
7  industry fundamentals, price and overhang
8  from the expected second step of the
9  transaction which will occur later this
10 year"?
11    A.  So, as I recall, some of these were
12 issues that investors -- or some investors
13 had raised.
14    Q.  And do you recall these being among
15 the recurring issues raised by investors?
16    A.  I'm not sure I can say among the
17 recurring issues raised by the investors.
18 You know, I guess if I can just take a step
19 back and put one more piece of context around
20 this.  In any deal the institutional loan
21 market is comprised of probably in excess of
22 200 investors.  So in any deal that we would
23 launch in the marketplace, invariably there
24 is a subset, whether it's a hundred investors
25 or 50 investors, that for various reasons

---

**155**

1    Confidential - R. Kapadia
2  choose not to participate in the deal, as I
3  described a few moments ago, concerns about
4  issues, issues or concerns that they may have
5  about various things.  And from a syndication
6  standpoint, we hear that feedback and, you
7  know, focus on the investors that, you know,
8  are working towards being part of the deal.
9    Q.  Do you remember whether in
10 connection with this email or otherwise
11 enlisting senior executives at JPMorgan to
12 reach out to the Tribune or reach out to the
13 marketplace to aid the syndication?
14    A.  I don't recall that.
15    MR. GOLDFARB:  Can I ask you to
16 pull out Kowalczuk Exhibit 9, please,
17 which is the big May packet.
18    Q.  And, again, sir, if you want to
19 flip through this, I intend to ask some
20 general questions about it, but if I ask you
21 a particular question about a subject matter,
22 I'll of course give you the opportunity to
23 review it.
24    A.  Sure.
25    Q.  But at least initially I think my

---

**156**

1    Confidential - R. Kapadia
2  questions will be general enough that you
3  don't need to do a page by page perusal.
4    A.  Okay.
5    Q.  Kowalczuk Exhibit 9, looking at the
6  first four pages, sir, do you recognize the
7  form of those pages?
8    A.  These approval forms?
9    Q.  Yes.
10    A.  Yes.
11    Q.  And do you recognize the first
12 page, sir, to be an updated approval form
13 relating to the Tribune financings in the
14 spring of '07?
15    A.  It would appear to be, yes.
16    Q.  And, again, sir, in the SLF
17 approval block two-thirds down the page, is
18 that your signature?
19    A.  It appears to be, yes.
20    Q.  Do you recall, Mr. Kapadia, that in
21 May of '07 the Tribune credit package was
22 resubmitted for approval within JPMorgan?
23    A.  I don't recall that.
24    Q.  Do you recall receiving updated
25 credit package materials in May of '07

---



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

## 157

1    Confidential - R. Kapadia
2  relating to the Tribune lendings?
3      A.  I may have.  I don't recall that.
4      Q.  Looking at the document ending in
5  Bates number 9460, do you recognize this
6  document?
7      A.  I recognize the form of it, but not
8  the document.
9      Q.  Do you recall reviewing the Tribune
10 Company approval update addendum after it was
11 prepared?
12     A.  I don't.  It's not something I
13 would typically review.  I may have, but I
14 don't recall.
15     Q.  Can you recall, sir, any of the
16 information that you reviewed to satisfy
17 yourself sufficiently to execute the approval
18 form that's the first page of this document?
19     A.  So I believe you're asking me a
20 question specific to this transaction.
21     Q.  Yes.
22     A.  I don't recall that.  Typically,
23 however, I would review just what is
24 contained on this page before I execute it.
25     Q.  And in reviewing a page like

---

## 158

1    Confidential - R. Kapadia
2  this --
3      MR. GLAZER:  Just to be clear, the
4    witness is referring to Page 169456.
5      MR. GOLDFARB:  Thank you.
6      Q.  Is there particular information on
7  this page that is of particular significance
8  to you in your review of a page like this in
9  deciding whether to sign it?
10     A.  No.  I think it's whether it
11 accurately depicts the transaction before I
12 would sign it.
13     Q.  And what is the information that
14 you would look at on a page like this or on
15 this particular page that would provide you
16 the information as to whether it's accurate
17 or not?
18     MR. GLAZER:  Objection to form.
19     A.  I'm not sure I follow your
20 question, but it's the information that's
21 here, what the ratings are, what the size of
22 the facilities are, what the pricing is, who
23 the deal team is, what the expected fees are,
24 what our exposure is, who is signing it,
25 those are the things that are relevant for

---

## 159

1    Confidential - R. Kapadia
2  this form.  And I would typically check that
3  that's all represented or described
4  accurately.
5      Q.  And how would you know whether or
6  not the information is accurate or not?
7      A.  Again, case by case.  I think some,
8  for instance, with respect to the reference
9  to the Term Loan X at a billion five, we put
10 in place that tranche of Term Loan X, so it
11 was -- there was no need to refer back to any
12 other -- you know, some of the information is
13 clear and is obvious.  Some other
14 information, you know.
15     Q.  And I'm just trying to understand
16 is that, for example, the information you
17 just cited, the 1.5 billion Term Loan X, you
18 knew that was accurate just because you were
19 familiar with the transaction; is that right?
20     A.  Yes.
21     Q.  And what about the proposed risk
22 ratings at the bottom, is that information
23 that you knew before looking at this approval
24 to offer sheet?
25     A.  So you're talking about the box on

---

## 160

1    Confidential - R. Kapadia
2  the bottom right, the proposed risk ratings.
3      Q.  Yes.
4      A.  Yes.  So this is our internal risk
5  rating that we assign to -- I believe to
6  every deal regardless of ratings, external
7  ratings.  And this is really within the
8  purview of the Credit department within John
9  Kowalczuk and Jeff Sell's world, group.
10     Q.  So by saying that, are you saying
11 that when you would look at a form like this,
12 you would assume that's right, but this is
13 information that you would not yourself check
14 to see if it, in fact, reflects JPMorgan's
15 proposed risk ratings?
16     A.  That is correct.  Typically the
17 Credit department would sign this form first
18 before the Syndicated Leveraged Finance group
19 would sign this, typically.  So if they
20 signed it, they've obviously reviewed and
21 agreed with the proposed risk ratings before
22 they signed it.
23     Q.  And in this instance, from looking
24 at it, it looks like Mr. Jacobson from
25 Syndicated Leveraged Finance signed it about

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

161

1        Confidential - R. Kapadia
2    five days before Mr. Kowalczuk and Mr. Sell.
3    Do you see that?
4        A.   I see he signed it.  I can't see
5    the date.
6        Q.   What do you read the date next to
7    Mr. Jacobson's name to say?
8        A.   5 slash 2 something 07.  I don't
9    know what that something looks like.  It
10   could be a 4.  It could be...
11       MR. GLAZER:  Their eyes will figure
12   it out.
13       Q.   Did you complete your answer?
14       A.   I don't know what it says.  After
15   the 2 I don't know what it says.  It could be
16   a 4.  It could be a 9.
17       Q.   Other than the information that
18   you've identified, is there any other
19   information on this page that is significant
20   to you in deciding whether or not to sign the
21   approval form?
22       A.   Other than the information I've
23   already described, no.
24       Q.   Sir, if I could direct your
25   attention to Page 40 of -- actually, as

---

162

1        Confidential - R. Kapadia
2    produced, there are two Power Points attached
3    to this document, so there might be two 40's,
4    but the one that I'm asking you about is the
5    one that ends in Bates 9505.  And it's
6    entitled Appendix 6.
7        MR. GLAZER:  9506 perhaps?
8        A.   Appendix 6, Relative Ranking?
9        Q.   Yes.  You're right.  I stand
10   corrected.
11       A.   Okay.
12       MR. GLAZER:  Have it.
13       Q.   And, sir, I just want you to look,
14   for example, on that page at the discussion
15   of the different facilities listed on that
16   page, and then I'll ask you a question about
17   it.
18       A.   And the title is "Appendix 6,
19   Relative Ranking"; right?
20       Q.   Yes, sir.
21       A.   Okay.  Okay.
22       Q.   Just generally, sir, first looking
23   at these couple of pages, are these pages
24   that you've seen either as part of this
25   document or as a part of any other document

---

163

1        Confidential - R. Kapadia
2    previously?
3        A.   No.
4        Q.   Is the information contained on
5    here information that you have seen
6    previously?
7        A.   No.
8        Q.   If you look at the third column for
9    both of the facilities on that first Page 40
10   that I referred you to, the fourth squared
11   bullet in each of those boxes starts out with
12   the phrase "In the event of a bankruptcy or
13   liquidation of a guarantor."  Do you see
14   that?
15       A.   I see that.
16       Q.   Does looking at this information,
17   sir, refresh your recollection at all about
18   whether there were discussions within
19   JPMorgan in the spring of 2007 about the
20   implications for the credit facilities in the
21   event of a bankruptcy or liquidation of
22   Tribune entities?
23       A.   There may have been.  I don't
24   recall that.  And if there were, I don't
25   recall if I was part of those discussions.

---

164

1        Confidential - R. Kapadia
2        Q.   In your work generally, when you
3    are participating in JPMorgan's efforts to
4    structure a financing for a client, do you
5    ever participate in discussions about the
6    implications for the credit facilities, JPM's
7    credit facilities in the event of a
8    bankruptcy?
9        A.   Not typically.
10       MR. GOLDFARB:  Let's mark this as
11   12, please.
12       Q.   Actually, before we do this, do you
13   recall how the Tribune Company performed in
14   the first half of 2007?
15       A.   I don't recall that.
16       Q.   Do you have a general recollection
17   about whether its performance improved or
18   deteriorated, at a general level?
19       A.   I think at a general level there
20   was some, as I recall, I think we talked
21   about it this morning, some sectors or some
22   geographies within the publishing business
23   that were weaker.  I don't recall the
24   specifics.  But that's what I recall at this
25   point.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

165

1    Confidential - R. Kapadia
2    Q.   And when you refer to geographies,
3  sir, are you talking about particular areas
4  of the country --
5    A.   Yes.
6    Q.   -- or is that a term of art in your
7  business?
8    A.   No.  No.  Particular areas of the
9  country.  Florida, I believe.
10    Q.   And in particular, you also
11  referred to sectors within the publishing or
12  newspaper industry.  Are there particular
13  sectors that you recall where there were
14  challenges?
15    A.   So as I recall I think our
16  discussion this morning, I believe the auto
17  sector within the publishing sector was
18  weaker.
19    Q.   And what do you mean by auto sector
20  within the publishing sector?  I don't know
21  what that means.
22    MR. GLAZER:  Car advertising.
23    A.   Car advertising.
24    Q.   And do you recall in particular
25  whether there was discussion in the summer of

166

1    Confidential - R. Kapadia
2  2007 about the second quarter results of the
3  Tribune and its impact on the LBO financings?
4    A.   Can you repeat your question again,
5  please.
6    (Record read.)
7    A.   Don't recall specifically.
8    (Kapadia Exhibit 12, Document Bates
9    stamped JPM 00346336, marked for
10    identification, as of this date.)
11    Q.   It's a one-page document bearing
12  Bates number JPM 00346336.
13    A.   Okay.
14    Q.   Do you recognize this document,
15  sir?
16    A.   I see it as an email exchange.
17    Q.   And it's an email exchange at the
18  top from Mr. Tim Storms to John Kowalczuk and
19  others in July of 2007?
20    A.   I see that.
21    Q.   And the second email in the string
22  is an email from Mr. Kowalczuk to Mr. Sell
23  cc'ing others, including you.  Do you see
24  that?
25    A.   I see that.

167

1    Confidential - R. Kapadia
2    Q.   Do you recall receiving this email
3  from Mr. Kowalczuk in 2007?
4    A.   I don't.
5    Q.   And do you recall, sir, in July of
6  2007 receiving an update via teleconference
7  from the Tribune about its second quarter
8  earnings?
9    A.   As I recall, we had a couple of
10  discussions with Tribune around their
11  earnings.  I don't recall that specifically.
12  I recall that we had, you know, some
13  discussions with the company on their
14  earnings.
15    Q.   And do you recall having
16  discussions with the company about the
17  earnings before they released information
18  publicly?
19    A.   Not specifically.  I see it here,
20  but I don't recall that, you know, that
21  specifically.
22    Q.   In your work on the Tribune, was
23  there a typical practice whereby the Tribune
24  would have such a discussion with you about
25  its financial results prior to releasing them

168

1    Confidential - R. Kapadia
2  publicly?
3    A.   I was not involved with Tribune
4  prior to this whole transaction, so I can't
5  really comment on that in terms of whether
6  they discussed results with us prior to
7  public release.
8    Q.   Do you recall whether it happened
9  after the first quarter results for 2007?
10    A.   It may have.  I don't recall that.
11    Q.   And Mr. Kowalczuk wrote in the
12  third sentence, "Raj noted the problem with
13  the monthly numbers being negative in a
14  vacuum and suggested that if there were some
15  positive news the company could release, it
16  would be very helpful."  Do you see that?
17    A.   I see that.
18    Q.   Do you recall making such a
19  statement to the company concerning its
20  second quarter earnings?
21    A.   I don't recall it.
22    Q.   Do you recall ever making a
23  recommendation to the Tribune that releasing
24  positive news in connection with its earnings
25  would be helpful?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

169

1         Confidential - R. Kapadia
2         A.   I may have.  I don't recall that.
3    I don't recall that.
4         Q.   What would you have meant by that?
5              MR. GLAZER:  Objection to the form.
6         Q.   If you told the company that it
7    would be helpful to release positive news
8    along with negative news.
9              MR. GLAZER:  Objection to form.
10        A.   I don't know.  I don't recall what
11   I would have meant here.
12        Q.   In July of 2007 do you remember how
13   the syndication efforts of JPMorgan were
14   going?
15        A.   In July 2007?
16        Q.   Yes.
17        A.   As I recall, I believe we closed
18   the financing for Step 1 in May.  And,
19   therefore, we had, as I recall, fully
20   syndicated all the Step 1 financing at that
21   time.  So I'm not sure what you're referring
22   to about July syndication.
23        Q.   Was syndication still going on in
24   July of 2008?
25        A.   As I recall, I don't think so.

170

1         Confidential - R. Kapadia
2         Q.   I meant 2007.
3         A.   Yeah.  No.  I think we were done in
4    May of that year.
5         Q.   Do you recall at any point in 2007
6    contacting Mr. Kowalczuk to correct his
7    characterization of what you had said on a
8    call to the Tribune?
9         A.   With respect to this email?
10        Q.   Yes.
11        A.   I don't.
12        Q.   Do you have any reason to doubt
13   that Mr. Kowalczuk accurately reported your
14   statements, or, excuse me, accurately
15   summarized your statements on the call with
16   Tribune?
17             MR. GLAZER:  Objection.
18        A.   You're asking me to comment on
19   John's email citing some advice I would have
20   given the company.  I don't recall that, so
21   I'm not sure how I can address that question.
22        Q.   Well, in general, would you
23   consider Mr. Kowalczuk to be accurate in his
24   work?
25        A.   Yes.  He's a seasoned banker,

171

1         Confidential - R. Kapadia
2    seasoned credit officer.
3         Q.   And do you have any reason to
4    believe that he would report to Mr. Sell
5    inaccurately the contents of the call?
6              MR. GLAZER:  Objection.
7         A.   Can you repeat your question,
8    please.
9              (Record read.)
10        A.   I think, unless I'm missing your
11   question, I think I already addressed that in
12   the previous one that, you know, John is a
13   seasoned credit officer.  You're asking me to
14   comment on something that I don't have a
15   recollection of.
16        Q.   But, in general, your experience
17   with Mr. Kowalczuk is he's accurate in his
18   work?
19        A.   Absolutely.
20        (Kapadia Exhibit 13, Document Bates
21   stamped JPM 00335870, marked for
22   identification, as of this date.)
23        A.   Okay.
24        Q.   Mr. Kapadia, did there come a time
25   in 2007 when concerns about the solvency of

172

1         Confidential - R. Kapadia
2    the Tribune increased within JPMorgan?
3         A.   I wouldn't characterize it as
4    concerns.
5         Q.   Whether the Tribune was solvent or
6    not was not a concern of JPMorgan's?
7         A.   As I said, I wouldn't characterize
8    it as a concern.  It was something we were
9    focused on understanding, but it was not --
10   it was not a concern.
11        Q.   Did JPMorgan care whether the
12   Tribune was solvent or insolvent?
13             MR. GLAZER:  Objection to form.
14        A.   I don't understand that question.
15   What do you mean JPMorgan would care?
16        Q.   Well, your testimony was that you
17   wouldn't characterize the Tribune's solvency
18   or insolvency as a concern of JPMorgan's.
19   And so my question is what it is, whether
20   JPMorgan cared one way or the other whether
21   the Tribune was solvent or insolvent.
22             MR. GLAZER:  Objection to form.
23        A.   I think it's a very -- you're
24   asking a very broad question, JPMorgan.  I
25   was giving you my point of view that I would



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

173

1    Confidential - R. Kapadia
2    not characterize it as a concern.  It's
3    something we were focused on understanding,
4    you know, with regard to Tribune.
5        Q.  Why did you focus on understanding
6    it?
7        A.  As I recall, at that time at some
8    point in the summer there was, as I recall,
9    there were some equity research reports or
10   some other reports published by sell-side
11   analysts that covered Tribune talking about
12   Tribune.  And, as I recall, some of those
13   analysts had voiced questions around
14   Tribune's solvency.  And it was also at that
15   time, back to my comment earlier about some
16   of the cracks that we saw in the credit
17   markets in April and May, those cracks had
18   turned into something bigger.
19       MR. GLAZER:  Fissures.
20       THE WITNESS:  Fissures.  Exactly.
21   Thank you.
22       MR. GOLDFARB:  Object to counsel's
23   providing the witness with helpful
24   metaphor.
25       A.  Bigger cracks, why don't we say

174

1    Confidential - R. Kapadia
2    that.  So there was a market overlay.  It was
3    out in the public domain, if I can put it
4    that way, with regard to some of the equity
5    research analysts.  And as a result, you
6    know, we were focused on understanding
7    solvency.
8        Q.  Would you characterize the solvency
9    or insolvency of the Tribune as important to
10   JPMorgan in connection with its LBO
11   financing?
12       MR. GLAZER:  Objection to form.
13       THE WITNESS:  Can you repeat that
14   question, please.
15       (Record read.)
16       A.  Yes.
17       Q.  Why?
18       A.  You know, it's -- they're a client
19   of the firm.  We have a second step
20   transaction that may or may not occur,
21   depending on the conditions that I think we
22   talked about this morning.  And if the second
23   step transaction, all the conditions were met
24   with regard to regulator approvals and all
25   the other items we talked about this morning,

175

1    Confidential - R. Kapadia
2    I think it's in connection with that.
3        Q.  The document before you, Kapadia
4    Number 13, is an email from Mr. Daryl
5    Jacobson to you and to Yang Chen with the
6    subject "Solvency Question."  Do you see
7    that?
8        A.  I do.
9        Q.  I don't know if I've asked you
10   about Mr. Jacobson today.  Did he work in SLF
11   with you?
12       A.  At that time, yes.
13       Q.  And he asks a question about
14   solvency, and I may ask you a question about
15   that in a moment, but, more generally, were
16   you someone in SLF who was involved with
17   assessing the solvency of the Tribune in this
18   period of time?
19       A.  No.
20       Q.  Were there others within Syndicated
21   Leveraged Finance who were conducting
22   analyses of the Tribune solvency in this time
23   period?
24       A.  Not that I recall.
25       Q.  Do you recall receiving this email

176

1    Confidential - R. Kapadia
2    from Mr. Jacobson?
3        A.  I don't.  I see it, but I don't
4    recall it.
5        Q.  Did you have any communications in
6    one direction or another with the firm that
7    had been retained to evaluate Tribune's
8    solvency for the second step of the
9    go private transaction?
10       MR. GLAZER:  That's a yes or a no.
11       A.  And just so that I understand, when
12   you say "the firm," which firm are you
13   referring to?
14       Q.  VRC.
15       A.  And your question is did we have
16   any discussions with VRC?
17       MR. GLAZER:  He asked about you.
18       Q.  My question is you.
19       A.  Did I have.  Sorry.  No.
20       Q.  Did others at JPMorgan, to your
21   knowledge?
22       A.  As far as I'm aware, no.
23       Q.  Do you know whether others acting
24   on JPMorgan's behalf had contacts with VRC?
25       A.  To my knowledge, no.



Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

177

1       Confidential - R. Kapadia
2       Q.  Have you had a chance to look at
3   this email?
4       A.  Yes.
5       Q.  Do you understand the substance of
6   the question being posed by Mr. Jacobson?
7       A.  I do.
8       Q.  What was Mr. Jacobson asking about
9   in this email?
10      A.  I believe at this point in time, as
11  we were -- I believe at this point in time as
12  we were getting educated, if I can use that
13  term, educated around the solvency and the
14  different parts to solvency, different tests
15  associated with solvency, one of those tests
16  with regard to solvency is the company's
17  ability to refinance its debt as it comes
18  due.  And Daryl is addressing, you know, that
19  topic and the company's ability to refinance
20  its debt and still cover its interest burden.
21      Q.  Do you interpret that Mr. Jacobson
22  was asking you whether the debt burden from
23  the Tribune LBO commitments would make it
24  difficult to refinance its maturities?
25      MR. GLAZER:  Objection.

178

1       Confidential - R. Kapadia
2       A.  I don't recall what he was
3   interpreting it to be.
4       Q.  Had you worked on solvency
5   questions previously at JPMorgan in
6   connection with other clients?
7       A.  Solvency questions?
8       Q.  Yes.  I'm just interested in
9   whether or not you had prior experience with
10  issues of solvency and the various tests
11  associated with solvency opinions from your
12  prior work at JPMorgan.
13      A.  Very briefly previously, as I
14  recall.
15      Q.  And was this period of time in
16  September '07, was this the first time that
17  questions arose with respect to solvency in
18  your work for you in connection with this
19  transaction?
20      MR. GLAZER:  Objection to form.
21      A.  I think as I described, we looked
22  to really get educated and get smarter on
23  solvency.  I can't recall when during the
24  2007 period between Step 1 and Step 2 we
25  started that.  Generally, it's some point in

179

1       Confidential - R. Kapadia
2   the summer, or it may be a little bit later
3   on, but I don't recall when exactly we
4   started that.
5       Q.  Do you recall whether you had
6   discussions with anybody at JPMorgan relating
7   to the issue raised by Mr. Jacobson's email?
8       A.  I may have.  I don't recall that.
9       Q.  Are there particular people with
10  whom you recall discussing questions of
11  solvency relating to the Tribune in this
12  period?
13      A.  So as I recall, there were
14  discussions with some of my colleagues.
15  There were discussions with some of the other
16  three underwriting banks.  And then I think
17  this goes to the issue of privilege.  There
18  were subsequent discussions with outside
19  counsel as well.
20      Q.  And what prompted these
21  discussions, to your recollection?  Why did
22  JPMorgan begin to educate itself on Tribune's
23  solvency questions in this period of time?
24      MR. GLAZER:  Given what the witness
25  has said about discussions with outside

180

1       Confidential - R. Kapadia
2   counsel, I'm going to suggest we take a
3   few-minute break so I can cover with him
4   the ground rules of the privilege.
5       MR. GOLDFARB:  Well, can the
6   witness answer this question?
7       MR. GLAZER:  Not without my talking
8   to him.  That's the point.
9       MR. GOLDFARB:  Let's go off the
10  record for a second.
11      (Counsel conferred with witness.)
12      (Recess taken from 3:46 p.m. to
13  3:56 p.m.)
14      MR. GOLDFARB:  Do you have anything
15  to say, or should we just continue?  I
16  just wanted to register an objection.  I
17  think it's probably clear from the
18  record, but I just wanted to register an
19  objection that we went off the record
20  while a question was pending and had not
21  yet been answered.
22      MR. GLAZER:  May I hear the
23  question back before I respond.
24      (Record read.)
25      MR. GLAZER:  In discussions with



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

181

1  Confidential - R. Kapadia
2  the witness as well as other information
3  we know from our review of the matter,
4  we've determined that, in fact,
5  answering that question would involve
6  testifying about privileged material.
7  And, therefore, I'll instruct the
8  witness not to answer.
9      MR. KORPUS:  Can I just get some
10  clarification on that, because the
11  question counsel was asking was not the
12  contents of the discussion, but what
13  prompted the discussions.  And you're
14  saying that what prompted the
15  discussions between Mr. Kapadia and
16  other banks and Mr. Kapadia and
17  colleagues is privileged?
18     MR. GLAZER:  What I'm saying is to
19  answer that question would involve
20  revealing privileged information.
21     MR. GOLDFARB:  But, counsel, there
22  have to be underlying facts that are not
23  privileged that prompted or that I
24  believe would be responsive to the
25  question and that would not implicate

---

182

1  Confidential - R. Kapadia
2  the privilege.
3      MR. GLAZER:  I don't agree.
4      MR. GOLDFARB:  It's your position
5  that the facts that prompted are
6  themselves privileged facts?
7      MR. GLAZER:  I'm not saying you
8  can't ask other questions that may or
9  may not implicate privilege, but that
10  question does.
11     Q.  Are you going to follow counsel's
12  instruction.
13     A.  Yes.
14     MR. GOLDFARB:  Depending upon what
15  happens, we will reserve our right to
16  recall the witness to get at this
17  information and to get responses to
18  questions that we believe do not
19  implicate privileged information.
20     MR. GLAZER:  You have whatever
21  rights you have.  Let's keep going.
22     Q.  Mr. Kapadia, why did JPMorgan begin
23  to educate itself in the fall of 2007 on
24  solvency issues in connection with the
25  Tribune?

---

183

1  Confidential - R. Kapadia
2      MR. GLAZER:  That may involve the
3  same issues.  Can you answer that
4  without involving privileged
5  conversations?  And I would add other
6  than as you've already testified,
7  because I think you have testified to
8  that.
9      THE WITNESS:  Yeah, I think your
10  last comment is important.
11     A.  I have provided comments earlier
12  around solvency being in the public domain
13  arising from equity research reports in the
14  summer.
15     Q.  So is it your testimony that it was
16  these equity research reports that prompted
17  JPMorgan to begin to examine solvency
18  questions at the Tribune?
19     MR. GLAZER:  I'm going to have
20  another objection here, and that is that
21  he doesn't speak for all of JPMorgan.
22  He can only speak for himself.
23     MR. GOLDFARB:  All I can ask for is
24  the witness's --
25     MR. GLAZER:  Well, you could ask

---

184

1  Confidential - R. Kapadia
2  better questions, but you asked about
3  JPMorgan, and I'm going to object on the
4  grounds that he doesn't speak for all of
5  JPMorgan.
6      A.  Can you repeat your question,
7  please.
8      (Record read.)
9      A.  As I recall, yes.
10     Q.  Who are the colleagues with whom
11  you discussed solvency, the colleagues at
12  JPMorgan with whom you discussed solvency in
13  the summer of '07?
14     MR. GLAZER:  Just names.  No
15  subject matter, please.  Just names.
16     A.  I don't recall.  Well, I recall
17  that we had some discussions with in-house
18  counsel, Scott Campbell, I believe.
19     Q.  What is the name, please?
20     MR. GLAZER:  Scott Campbell.
21     A.  And then probably some of my other
22  colleagues that we've talked about before,
23  Yang Chen, Peter Cohen, Joachim Sonne.
24     Q.  Anyone else?
25     A.  There may be.  I don't recall.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

185

1      Confidential - R. Kapadia
2      Q.  Do you specifically recall
3  discussing solvency issues in the summer of
4  '07 with each of these people that you've
5  just identified, Mr. Campbell, Yang Chen,
6  Peter Cohen, Joachim Sonne?
7      A.  With Scott Campbell I do.  With the
8  others, I'm sure I may have had discussions
9  on it.  I don't recall the specifics or the
10 venues.
11     Q.  And do you recall, Mr. Kapadia,
12 which of your colleagues you spoke with first
13 about the issue?
14     A.  I don't recall that.
15     Q.  Do you remember in particular who,
16 the organization that published the equity
17 research reports that raised the questions?
18     A.  There may have been others.  The
19 one that I recall was Lehman.
20     Q.  And you also mentioned that you
21 discussed solvency issues with other
22 underwriting banks.  Do you recall that
23 testimony?
24     A.  Yes.
25     Q.  Who were the people at the other

---

186

1      Confidential - R. Kapadia
2  banks with whom you discussed solvency issues
3  in the summer of '07?
4      A.  I don't recall specifically.
5      Q.  Do you recall what institutions
6  these people came from that you had the
7  discussions with?
8      A.  Yes.  I think as I described
9  earlier, as I believe, it was the three other
10 underwriting banks, Merrill, Citi, and BoA,
11 Bank of America.
12     Q.  And do you recall, sir, who
13 initiated the discussions in which you
14 participated around solvency in the summer of
15 '07?
16     A.  I don't recall that.
17     MR. GOLDFARB:  Please mark this as
18 Kapadia 14.
19     (Kapadia Exhibit 14, Document Bates
20 stamped JPM 00280816 through 280821,
21 marked for identification, as of this
22 date.)
23     Q.  This document bears Bates number
24 JPM 00280816.  Just let me know when you've
25 had a chance to look at it.

---

187

1      Confidential - R. Kapadia
2      A.  Okay.
3      Q.  Mr. Kapadia, do you recognize this
4  document?
5      A.  It's an email from my colleague
6  Yang.
7      Q.  Do you recall receiving it in
8  September of 2007?
9      A.  I don't.
10     Q.  Do you recall generally that there
11 was a senior management meeting scheduled in
12 mid to late September 2007 to discuss the
13 Tribune?
14     MR. GLAZER:  Objection to form.
15     A.  Can you repeat your question,
16 please.
17     MR. GOLDFARB:  Could you read it
18 back, please.
19     (Record read.)
20     A.  There may have been.  I don't
21 recall that.  There may have been.
22     Q.  Who among those we've discussed who
23 have had any involvement in the Tribune
24 matter that we spoke about today, which of
25 those individuals would you consider to be of

---

188

1      Confidential - R. Kapadia
2  JPMorgan senior management?
3      A.  It could be either Jamie Dimon and
4  Jimmy Lee, who we talked about this morning.
5  It could also be the bankers who run the
6  leveraged finance business or ran it at that
7  time, Chris Linneman, Andy O'Brien, and Jim
8  Casey.
9      Q.  Do you recall a meeting occurring
10 in this time period with some or all of the
11 individuals you just identified to discuss
12 the Tribune?
13     A.  There may have been a meeting with
14 Jamie and Jimmy.  I don't recall that.  And
15 if there was, I don't recall being part of
16 that.  Chris Linneman, Andy O'Brien, and Jim
17 Casey are all on the same floor that I am in
18 our offices.  So there may have been more
19 regular discussions with them.  I don't
20 recall the specifics, obviously.
21     Q.  If you look at the attachment to
22 the document, three or four-page Power Point.
23 Do you see that?
24     A.  I do.
25     Q.  The cover page is dated

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

189

1    Confidential - R. Kapadia
2  September 20, 2007, and is titled "Internal
3  Discussion Materials." Do you see that?
4    A.  I do.
5    Q.  Do you recall being involved in the
6  preparation of internal discussion materials
7  for a senior management meeting to discuss
8  Tribune in this time period?
9    A.  I may have. And I may have
10  provided comments to whoever put this
11  together. I don't recall it specifically.
12    Q.  Who among your colleagues working
13  on the Tribune matter would have been able to
14  put together the information contained in
15  this Power Point presentation?
16    MR. GLAZER:  Objection to form.
17    A.  You know, I think I would be
18  speculating, but I'm happy to speculate if
19  you want me to.
20    MR. GLAZER:  I'm not happy to have
21  you speculate.
22    THE WITNESS:  Okay. Thank you.
23    Q.  Well, just looking at the first
24  page, the financial information contained
25  there, are there particular people who were

190

1    Confidential - R. Kapadia
2  typically tasked with compiling transaction
3  summary information for the Tribune?
4    A.  I mean not typically, but, you
5  know, my colleagues Yang Chen and Daryl
6  Jacobson, you know, would be some of the
7  folks who were involved in putting something
8  like this together.
9    Q.  And are discussion materials for a
10  senior management meeting on the Tribune in
11  this time period something that you believe
12  would have been reviewed by you prior to
13  circulation?
14    MR. GLAZER:  Objection to form.
15    A.  So it's a fair assumption, I don't
16  recall it, but it's a fair assumption,
17  though.
18    Q.  If you look back at the cover
19  email, sir, the email says, "Attached please
20  find three pages we plan to use in the
21  meeting with senior management tomorrow." Do
22  you see that?
23    A.  I see that.
24    Q.  And then in parens and italics it
25  says, "See attached file, Tribune Dimon pages

191

1    Confidential - R. Kapadia
2  V3.PPT." And do you take that to be the
3  document attached to the email?
4    MR. GLAZER:  Objection to form.
5    A.  It may be. I can't confirm it, but
6  it may be.
7    Q.  And below that it says, "Brit, here
8  are the materials on the second and third
9  pages. On the first page we lay out the cap
10  structure, ratings, trading levels, and JPM
11  commitments, reserves, etc." Do you see
12  that?
13    A.  I do.
14    Q.  And then there are a series of
15  bullets on that cover email?
16    A.  I see that.
17    Q.  Of dashed phrases?
18    A.  Um-hmm.
19    Q.  About the fourth bullet down
20  states, "Recent performance worse than what
21  company projected six months ago." Do you
22  see that?
23    A.  I see that.
24    Q.  Does that refresh your recollection
25  at all about whether you participated in

192

1    Confidential - R. Kapadia
2  discussions about the Tribune's performance
3  as compared to its -- as opposed to Tribune
4  management projections in 2007?
5    A.  Let me try to understand your
6  question.
7    THE WITNESS:  If you could repeat
8  that.
9    (Record read.)
10    A.  So participated in discussions?
11  Discussions with Tribune or with -- I'm not
12  sure I understand which discussions you're
13  referring to.
14    Q.  Well, I'll start with anybody.
15    A.  I probably did. I don't recall the
16  specifics, but I probably did.
17    Q.  What about within JPMorgan, do you
18  recall having discussions with your
19  colleagues about the Tribune's performance as
20  compared to its projected performance as
21  provided by Tribune management?
22    A.  I probably did. I don't recall
23  those discussions or who those discussions
24  were held with.
25    Q.  Do you recall that as a general



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

193

1    Confidential - R. Kapadia
2  matter, that the Tribune throughout 2007
3  performed worse than management had projected
4  that it would?
5       MR. GLAZER: Objection to form.
6       THE WITNESS: Could you repeat that
7    question, please.
8       (Record read.)
9    A.  That's a very broad question.  I
10  don't recall it that way.  I do recall, I
11  think we talked a bit about it earlier, the
12  challenges, softness in some sectors, the car
13  advertising auto sector and the Florida
14  markets.  I don't recall it in the way you've
15  asked the question around projections.
16   Q.  Do you recall engaging in any
17  discussions where you compared, for example,
18  either projected EBITDA levels or revenue of
19  the Tribune and how that compared to
20  management projections?
21   A.  We may have.  I don't recall that.
22  We may have.
23   Q.  Is that something that you would
24  have expected JPMorgan as an institution to
25  focus on as it was undertaking the LBO

194

1    Confidential - R. Kapadia
2  financings in 2007?
3       MR. GLAZER: Objection to form.
4    A.  Yeah, I think that's a very broad
5    question.
6    Q.  I'll strike it.  What about asking
7  the same question with respect to Syndicated
8  Leveraged Finance, not JPMorgan as an
9  institution.
10   A.  Can you reask your question with
11  that in mind.
12   Q.  Yes.  I'll strike the question.
13  Was the Tribune's actual performance as it
14  compared to the projected performance by
15  management important information to
16  Syndicated Leveraged Finance in 2007?
17       MR. GLAZER: Objection to form.
18   A.  I wouldn't characterize it as
19  important.  It may be important within our
20  credit organization, although, you know, it's
21  -- yeah, I wouldn't characterize it as
22  important.  It's relevant in terms of how
23  they're performing.
24   Q.  And then three bullets down from
25  the one I just referred you to, Mr. Kapadia,

195

1    Confidential - R. Kapadia
2  the Yang Chen email says, "Hiring independent
3  solvency firm."  Do you see that?
4    A.  I do.
5    Q.  And if you look at the discussion
6  points on the page ending in 0820, you'll see
7  it's essentially the same text as the email.
8  Would you agree with that?
9    A.  It appears to be, yes.
10   Q.  What did you understand that to
11  mean?
12       MR. GLAZER: Objection to the form
13    of your question.  He hasn't testified
14    to seeing this document, let alone
15    having an understanding about what
16    something meant.
17       MS. KATZ: Could you hold on for
18    one second, please.
19       MR. GOLDFARB: Sharon, do you want
20    me to wait before I ask the next
21    question?
22       MS. KATZ: Yes, please.
23       (Counsel conferred.)
24       MR. GLAZER: Thank you.
25   A.  So your question one more time,

196

1    Confidential - R. Kapadia
2  please.
3    Q.  I'll withdraw the pending question
4  and ask, do you recall that it was a
5  condition to completion of the going private
6  transaction that the Tribune obtain a
7  solvency opinion?
8       MR. GLAZER: Objection to form.
9    A.  As I recall, there was a condition
10  I believe in the merger agreement or in the
11  go private transaction that there was a
12  solvency opinion rendered with respect to the
13  closing.  At the time of the closing, I
14  should say.
15   Q.  And do you recall any consideration
16  or discussion at JPMorgan in 2007 about
17  retaining a separate solvency firm other than
18  the one retained by the Tribune to evaluate
19  the solvency of the Tribune?
20       MR. GLAZER: You can answer that
21    yes or no.
22   A.  Yes.
23   Q.  And without revealing the substance
24  of the communication, where did you learn --
25  if it derived from conversations with



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

197

1      Confidential - R. Kapadia
2  counsel, but what is the basis for your
3  knowledge of that?
4        MR. GLAZER:  I don't understand
5  your question.  Maybe you can put a
6  cleaner question to the witness.
7        MR. GOLDFARB:  I'd hope I could.
8  One can hope.
9    Q.   You testified that you recall
10  consideration or discussion at JPMorgan of
11  hiring an independent solvency firm, and my
12  question is where did you get that
13  information from?
14    A.   Where did I get the information
15  from about JPMorgan hiring?  I'm not sure I
16  --
17        MR. GLAZER:  Your question doesn't
18  follow on his answer.  He says he
19  recalls discussion.  That doesn't
20  suggest that he got information.  Your
21  question relates to getting information,
22  not having the discussion.
23    Q.   Did you personally participate in
24  such discussion or consideration for
25  JPMorgan?

198

1      Confidential - R. Kapadia
2        MR. GLAZER:  It's a yes or a no.
3    A.   Considerations with regard to
4  hiring another firm?
5    Q.   Yes.
6    A.   Yes.
7    Q.   And what do you recall of those
8  discussions?
9        MR. GLAZER:  Now we're into
10  privileged areas because they involved
11  --
12        THE WITNESS:  Yeah.
13        MR. GLAZER:  -- discussions with
14  counsel.  And the witness said we are
15  there.  The witness said we are in that
16  area.
17        MR. GOLDFARB:  What do you mean we
18  are?  I don't understand.
19        MR. GLAZER:  The privileged area.
20        MR. GOLDFARB:  Oh, I see.  I
21  understand.
22        THE WITNESS:  Yes.  That's all.
23        MR. GOLDFARB:  I didn't understand
24  the "we are."
25        THE WITNESS:  Yeah.

199

1      Confidential - R. Kapadia
2    Q.   And who, Mr. Kapadia, to your
3  recollection, was party to those discussions,
4  just the names of the people?
5    A.   Which discussions?
6    Q.   The discussions that you have
7  testified to about JPMorgan's consideration
8  of retaining an independent solvency firm.
9        MR. GLAZER:  I object to the
10  question, but you may answer.
11    A.   So who -- your question is who I
12  recall was involved in those discussions?
13    Q.   Yes.
14    A.   Discussions about retaining a firm
15  or discussions with the firm?
16        MR. GLAZER:  About retaining was
17  the question.
18    Q.   Retaining.
19    A.   Retaining the firm.  Okay.  I don't
20  recall specifically.  I recall, I believe,
21  that we had discussions with counsel and the
22  other four underwriting banks, and I'm sure
23  there were members from JPMorgan part of
24  that.  I don't recall who, you know, who
25  those individuals were.

200

1      Confidential - R. Kapadia
2    Q.   Do you recall any individuals from
3  any of the three sets of parties you
4  identified, counsel, the other banks, and
5  JPMorgan?
6    A.   So counsel, I believe it was --
7  outside counsel was Cahill, Jonathan
8  Schaffzin, and a couple of his colleagues.  I
9  don't know the other, you know, their names
10  or I don't recollect.  There were a couple of
11  discussions, so it's very vague as to who was
12  on the various calls.
13    Q.   I'll take the universe of people
14  who you recall being part of any of the
15  discussions.
16    A.   I think Todd Kaplan from Merrill,
17  Julie Persily from Citigroup.  I don't recall
18  who from B of A.  And there may be others on
19  those discussions.
20    Q.   In your experience at JPMorgan, was
21  it unusual for JPMorgan to consider hiring an
22  independent solvency firm in connection with
23  a transaction?
24        MR. GLAZER:  Objection to form.
25    A.   So, you know, I think it's -- from



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

201

1    Confidential - R. Kapadia
2    my experience, each deal and each situation
3    and each market requires its own customized
4    analysis, its own customized education,
5    diligence, call it what you will. We
6    recently completed a deal for an airline, and
7    there was a bunch of work associated with how
8    to get the security back. So each deal is
9    very specific with regard to what is needed.
10   And what is needed and what is relevant at
11   that time was to get an understanding of
12   solvency. So it may -- it may be unusual,
13   but it was, you know, whatever is required
14   for the deal and the situation and the
15   markets at that time.
16       Q.  In your experience at JPMorgan, had
17   it ever occurred, happened on another
18   transaction where JPMorgan hired a firm to
19   evaluate the solvency of the firm that you
20   were lending to?
21       MR. GLAZER:  Objection to the form.
22       A.  So two things. I don't know if we
23   did or did not. I don't know. I don't
24   recall. And just to be clear, it's not to
25   evaluate the solvency that we hired this firm

202

1    Confidential - R. Kapadia
2    for. It's to help us get educated on
3    solvency. There's a --
4        MR. GLAZER:  You should be careful
5    here also, because we're into privileged
6    areas again if you go further.
7        THE WITNESS:  Yes.
8        Q.  What was the name of the firm that
9    you hired?
10       MR. GLAZER:  Objection to form. Go
11   ahead.
12       A.  Murray Devine.
13       Q.  In answer to my prior question you
14   said you didn't recall whether on any other
15   transactions you've worked JPMorgan has hired
16   an independent firm to address solvency. Do
17   you recall responding to that?
18       MR. GLAZER:  Objection to form.
19       You may answer.
20       A.  I recall responding to that. As I
21   recall, the question was has JPMorgan
22   retained or done this work. As I now
23   understand your question, if you're asking on
24   deals that I have been involved in, if that's
25   your question, I don't believe we have. If

203

1    Confidential - R. Kapadia
2    the question was has JPMorgan in totality, we
3    may have. Don't know.
4        Q.  And just so the record is clear,
5    I'll ask the question then, and my question
6    was with respect to any of the transactions
7    that you've worked on during your time at
8    JPMorgan, to your knowledge, has JPMorgan
9    retained a firm to evaluate the solvency of a
10   company with which it was transacting.
11       A.  I don't believe so.
12       Q.  Were you involved at all in the
13   retention of Murray Devine?
14       MR. GLAZER:  Other than as he's
15   already testified?
16       MR. GOLDFARB:  I don't think I've
17   asked a question at all in terms of --
18       MR. GLAZER:  I disagree, but okay.
19   Other than as you testified, is there
20   anything more you have to add.
21       MR. GOLDFARB:  Let me strike the
22   question just so the transcript is
23   cleaner.
24       Q.  Were you personally involved in the
25   identification and retention of Murray Devine

204

1    Confidential - R. Kapadia
2    as the firm to work with JPMorgan on
3    solvency?
4        MR. GLAZER:  Objection to form.
5        A.  Can you repeat your question,
6    please.
7        (Record read.)
8        A.  Involved, yes.
9        Q.  Can you describe your involvement?
10       MR. GLAZER:  Other than discussions
11   you may have had that involved counsel's
12   participation.
13       A.  So as I recall, my involvement was
14   to, first of all, determine other solvency
15   firms obviously besides VRC that could help
16   us get educated on solvency, and then, as I
17   recall, work with counsel, I believe outside
18   counsel, to narrow the list of those
19   prospective firms and interview or discuss
20   with the short list and then determine, you
21   know, who is the most appropriate firm to get
22   us smarter and get us educated on solvency.
23       Q.  Did you do this in connection with
24   the other lead lenders?
25       A.  As I recall, I believe so, yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

205

1        Confidential - R. Kapadia
2        Q.   And when you say that Murray Devine
3   helped educate you on solvency, was their
4   role to educate you on solvency in the
5   context of the Tribune Company, or was it
6   more generally a seminar on solvency?
7        MR. GLAZER:  We're now into
8     privileged areas again, so I'm going to
9     instruct him not to answer.
10       Q.   Are you going to follow counsel's
11  instruction?
12       A.   I am going to follow counsel's
13  instructions.
14       MR. KORPUS:  Excuse me.  Are you
15    claiming privilege on the subject matter
16    of the discussion or just the subject
17    matter was a general --
18       MR. GLAZER:  You heard the
19    question, you heard the response.  The
20    answer is that's what I claim privilege
21    with regard to.
22       MR. KORPUS:  All right.
23       (Kapadia Exhibit 15, Document Bates
24    stamped JPM 00450240 through 450242,
25    marked for identification, as of this

206

1        Confidential - R. Kapadia
2     date.)
3        Q.   This is a document bearing Bates
4   JPM 00450240.  Do you recognize this
5   document, sir?
6        A.   It's an email exchange.
7        Q.   Do you recall the email exchange --
8        A.   No.
9        Q.   -- at the time it occurred in
10  September 2007?
11       A.   I don't.  I see it, but I don't
12  recall it.
13       Q.   Looking at the second or the bottom
14  email, the Jacobson email, that's an email
15  from Mr. Jacobson to you, Mr. Sell, Christian
16  Walsh, John Kowalczuk, and Robert Anastasio?
17       A.   Yes.
18       Q.   Cc'ing Yang Chen?
19       A.   Um-hmm.
20       Q.   And the subject is "Solvency
21  Opinion Firms."  Do you know why Mr. Jacobson
22  was providing the recipients of this email
23  with a list of solvency opinion firms?
24       A.   I don't recall.
25       Q.   And do you see that the date of

207

1        Confidential - R. Kapadia
2   Mr. Jacobson's email is September 21st, 2007?
3   Do you see that?
4        A.   I do, yes.
5        Q.   And that you forwarded that email
6   to Jonathan Schaffzin also on the 21st?
7        A.   I see that.
8        Q.   And am I right that that was the
9   day after this senior management meeting that
10  we've just referred to that included a Power
11  Point referring to the potential retention of
12  an independent solvency firm?
13       MR. GLAZER:  He didn't testify that
14    he knew about that meeting or attended
15    it or knew the date of it.  How can you
16    ask him to say this is the day after the
17    meeting that he just testified he didn't
18    know about.  I mean you just want to
19    testify or -- it's just your testimony.
20    That's all it is.  The witness did not
21    testify about the 20th.
22       MR. GOLDFARB:  Okay.  It may have
23    been inartfully phrased, counsel, but
24    I'm not testifying.  I'm just trying to
25    locate in time --

208

1        Confidential - R. Kapadia
2        MR. GLAZER:  I think the document
3     was dated the 20th.  He didn't testify
4     about the document or the meeting.  You
5     want to connect the dots, connect the
6     dots.  This witness can't do it for you.
7        MR. GOLDFARB:  I understand.  Let
8     me ask my questions, please.
9        Q.   Do you know, sir, why Mr. Jacobson
10  was circulating names of solvency opinion
11  firms?
12       A.   No, I don't know.
13       Q.   You just testified a moment ago
14  that you were involved in interviewing firms
15  and selecting a firm to assist JPMorgan to
16  educate JPMorgan on solvency issues in 2007?
17       A.   That's right.
18       Q.   Did Mr. Jacobson help you in that
19  effort?
20       A.   I believe so.  I don't recall
21  specifically, but I believe so.
22       Q.   Do you know who asked Mr. Jacobson
23  to do this?
24       A.   I don't recall.
25       Q.   Were you involved in an effort in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

Rajesh Kapadia
January 22, 2010
CONFIDENTIAL

---

209

1    Confidential - R. Kapadia
2  September of 2007 to solicit and identify --
3  to identify the names of potential solvency
4  firms to retain?
5      A.  I believe that's the question you
6  asked a few minutes ago, or is this a
7  different question?  I was involved --
8      MR. GLAZER:  It's the same.
9      A.  I was involved in, as I discussed,
10 with outside counsel and with the other three
11 firms getting a list and narrowing that down.
12 Is this a different question?
13     Q.  I was asking whether you personally
14 were involved in identifying and locating
15 potential firms to retain.
16     A.  Identifying potential firms.
17     MR. GLAZER:  Putting together the
18 bigger list you're asking about?
19     MR. GOLDFARB:  Yes.
20     Q.  I'm asking if you --
21     A.  Did I contribute to this list is
22 your question?
23     Q.  That's not my question.  My
24 question is -- I can have the court reporter
25 repeat my question.

---

210

1    Confidential - R. Kapadia
2    (Record read.)
3      A.  I may be missing something, but
4  substantively isn't it, you know, did I
5  contribute to the list of firms that could
6  help educate us on solvency, or is it a
7  different question?  I was involved in it.  I
8  don't recall if, you know, if any of these
9  names were names that I had experience with
10 or had dealt with before.  I don't recall
11 that.
12     Q.  Did you personally solicit from
13 colleagues or other sources names of
14 potential solvency firms?
15     A.  I may have.  I may have.  I don't
16 recall specifically, but I may have.
17     Q.  And do you recall providing
18 Mr. Jacobson or anyone else with names of
19 potential solvency firms?
20     A.  I may have.  As I said, I don't
21 recall that.
22     Q.  Do you know who else was involved
23 in the effort of identifying firms?
24     A.  I don't recall, although if you
25 read this email, assuming he's summarizing it

---

211

1    Confidential - R. Kapadia
2  accurately, I think you see a couple of
3  individuals who forwarded input into that.
4      Q.  And by that, Mr. Kapadia, you're
5  referring to Mr. Jacobson's listing of Jeff
6  Sell, Norma Corio, Joe Lilas, Henry Higby,
7  and Kevin Kelly?
8      A.  Yes.
9      Q.  And looking at the list of firms
10 bulleted in Mr. Jacobson's email, did you
11 personally speak with representatives from
12 each of these firms?
13     A.  I don't believe so.  I may have,
14 but I don't believe so.
15     Q.  Do you remember when Murray Devine
16 was retained?
17     A.  I don't recall specifically.  Based
18 on this email, I can say obviously it was
19 some point after September 21, but I don't
20 know when.
21     Q.  Do you recall how long the process
22 was of selecting a firm?
23     A.  I don't recall that.
24     Q.  Do you recall whether the
25 identification of firms, potential solvency

---

212

1    Confidential - R. Kapadia
2  firms, predated September 21st?
3      A.  It may have.  Don't know.  Don't
4  recall.
5      Q.  Do you recall anything, sir, that
6  prompted you to become involved in this part
7  of the project, i.e., the assessment and
8  retention of a solvency firm?
9      MR. GLAZER:  Other than as he's
10 already testified.
11     A.  I think I've already commented on
12 that.  The reason is we wanted to get
13 educated, get smarter on solvency.
14     Q.  I don't understand what you mean by
15 that, get educated or get smarter.  Can you
16 elucidate any further?
17     MR. GLAZER:  Without implicating
18 conversations that involved counsel.
19     THE WITNESS:  Yeah.
20     A.  I think as I recall, as I
21 understand it, the solvency analysis has
22 several elements to it, understanding how
23 those elements are prepared, how the
24 assumptions -- how they're prepared, how they
25 interrelate to each other.  I don't know.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

### 213

1    Confidential - R. Kapadia
2  It's getting educated around what does it
3  mean to provide a solvency opinion and what,
4  you know, was the analysis that went into it.
5      Q.  Did you provide Murray Devine with
6  any information specific to the Tribune
7  Company?
8      A.  I believe so.
9      Q.  Do you know what information was
10 provided to Murray Devine specific to the
11 Tribune Company?
12     A.  I can't comment on the specifics
13 because my recollection is vague.  I do
14 recall we had a meeting with the Tribune
15 management team to get an update on their
16 business, and Murray Devine was part of that
17 discussion, but I don't recall what else we
18 may have -- we may or may not have shared
19 with them.
20     Q.  And do you know who was responsible
21 for providing information to Murray Devine in
22 connection with this work?
23     A.  As I recall, it was Cahill.
24     Q.  And do you know whether Murray
25 Devine provided you with any work product or

### 214

1    Confidential - R. Kapadia
2  report resulting from its work?
3      MR. GLAZER:  That's a yes or a no.
4      A.  I don't believe they provided us
5  with a work product.
6      Q.  Do you think they provided someone
7  other than JPMorgan with work product?
8      A.  They may have.  I don't believe so,
9  but I don't know.
10     Q.  And other than the meeting with
11 Tribune management that you just referred to,
12 did you have other interactions with Murray
13 Devine where there was information particular
14 to the Tribune Company that was discussed?
15     A.  I believe there was.  But it's --
16 it involves privilege.
17     Q.  Can you estimate how many times you
18 met with representatives from Murray Devine?
19     A.  As I recall, met with them once.
20     Q.  And what about other non-in-person
21 communications?
22     A.  Right.  I don't recall
23 specifically.  It was, you know, a handful of
24 times.
25     Q.  And over what period of time did

### 215

1    Confidential - R. Kapadia
2  you understand Murray Devine to be working on
3  this matter?
4      A.  I don't recall specifically.  Based
5  on our previous discussion, it was obviously
6  at some point after September 20.  I don't
7  know when after September 20th.  Or 21st,
8  rather.  That's the date of that email.
9      Q.  Do you know whether Murray Devine
10 rendered an opinion as to the solvency or
11 insolvency of the Tribune?
12     A.  They did not.  Although that is a
13 question of privilege, but I guess I -- I'm
14 not a lawyer.
15     (Kapadia Exhibit 16, Document Bates
16 stamped JPM 00069986, marked for
17 identification, as of this date.)
18     A.  Okay.
19     Q.  What is this document, sir?
20     A.  I don't know what it is.  It's a
21 summary of -- appears to be a summary of the
22 deal.
23     Q.  Is this a form of document that you
24 recognize from your career at JPMorgan?
25     A.  No.

### 216

1    Confidential - R. Kapadia
2      Q.  You see this is an undated -- well,
3  it's a draft dated September, bracket, 2007.
4  It's marked "Draft," and there is no
5  particular date on it up in the right-hand
6  corner.
7      A.  Yes.  I see that.  I see that.
8  Yes.
9      Q.  And it's a document addressed to
10 Jamie Dimon and Jimmy Lee.  Do you see that?
11     A.  I see that.
12     Q.  And it's from a number of people in
13 Leveraged Finance, including you?
14     A.  I see that.
15     Q.  Do you recall being involved in the
16 preparation of this document?
17     A.  I don't recall that.  I may have,
18 but I don't know.
19     Q.  Do you have any recollection of
20 receiving a request for Leveraged Finance to
21 prepare a summary of the Tribune transaction
22 for Jamie Dimon and Jimmy Lee?
23     A.  I don't recall that.
24     Q.  In the left-hand column, the second
25 from the bottom section is titled "Summary of



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com