**Condensed Transcript**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

TRIBUNE COMPANY,
et al.,

          Debtors.
~~~~~~~~~~~~~~~~~~

Chapter 11
Case No:
08-13141(KJC)
(Jointly Administered)

### CONFIDENTIAL DEPOSITION OF

### JOHN KOWALCZUK

January 22, 2010
9:30 a.m.

30 Rockefeller Plaza
New York, New York

Joan Warnock



Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington DC 20036
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

John Kowalczuk

January 20, 2010

CONFIDENTIAL

**1**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
- - - - - - - - - - - - - - - - - - - - - - - - - -X
In re:

TRIBUNE COMPANY,          Chapter 11
et al.,                   Case No:
                          08-13141(KJC)
                          (Jointly Administered)
          Debtors.
- - - - - - - - - - - - - - - - - - - - - - - - - -X


CONFIDENTIAL
DEPOSITION OF JOHN KOWALCZUK
New York, New York
Wednesday, January 20, 2010




Reported by:
JOAN WARNOCK

**2**

1
2
3            January 22, 2010
4              9:30 a.m.
5
6        CONFIDENTIAL - Deposition of JOHN
7    KOWALCZUK, held at the offices of
8    Chadbourne & Parke, LLP, 30 Rockefeller
9    Plaza, New York, New York, pursuant to
10   Notice, before Joan Warnock, a Notary
11   Public of the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1
2    A P P E A R A N C E S :
3
4    ZUCKERMAN SPAEDER, LLP
5    Attorneys for Official Committee of
6    Unsecured Creditors
7        1800 M Street, NW, Suite 1000
8        Washington, D.C.  20036-5802
9    BY:  ANDREW N. GOLDFARB, ESQ.
10
11   DAVIS POLK & WARDWELL
12   Attorneys for JPMorgan and the Witness
13       450 Lexington Avenue
14       New York, New York  10017
15   BY:  DENNIS E. GLAZER, ESQ.
16       LYNN EARL BUSATH, ESQ.
17
18   HENNINGTON BENNETT & DORMAN LLP
19   Attorneys for Credit Agreement Lenders
20       865 South Figueroa Street
21       Suite 2900
22       Los Angeles, California  90017
23   BY:  JAMES O. JOHNSTON, ESQ.
24
25

**4**

1
2    A P P E A R A N C E S :  (Cont'd.)
3
4    SIDLEY AUSTIN, LLP
5    Attorneys for the Debtors
6        1501 K Street, N.W.
7        Washington, D.C.  20005
8    BY:  DAVID M. MILES, ESQ.
9
10   PAUL, WEISS, RIFKIND, WHARTON &
11   GARRISON, LLP
12   Attorneys for Citigroup Global
13   Markets, Inc.
14       1285 Avenue of the Americas
15       New York, New York  10019
16   BY:  STUART McPHAIL, ESQ.
17
18   O'MELVENY & MYERS, LLP
19   Attorneys for Bank of America
20       Times Square Tower
21       7 Times Square
22       New York, New York  10036
23   BY:  ZACK GROSS, ESQ.
24
25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

John Kowalczuk                                    January 20, 2010

CONFIDENTIAL

| 5 |
|---|

1
2    A P P E A R A N C E S:  (Cont'd.)
3
4    BROWN RUDNICK
5    Attorneys for Wilmington Trust
6        One Financial Center
7        Boston, Massachusetts  02111
8    BY:  KATE BROMBERG, ESQ.
9
10   KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP
11   Attorneys for Law Debenture
12       1633 Broadway
13       New York, New York  10019-6799
14   BY:  SHERON KORPUS, ESQ.
15
16   KAYE SCHOLER LLP
17   Attorneys for Merrill Lynch
18       425 Park Avenue
19       New York, New York  10022-3598
20   BY:  JENNIFER R. MOORE, ESQ.
21
22
23
24
25

| 7 |
|---|

1        Confidential - J. Kowalczuk
2    J O H N  K O W A L C Z U K,  called as
3    a witness, having been duly sworn
4    by a Notary Public, was examined
5    and testified as follows:
6        COURT REPORTER:  Please state your
7    name and address for the record.
8        THE WITNESS:  John Kowalczuk,
9    226 Nelson Road, Scarsdale, New York
10   10583.
11       MR. GOLDFARB:  And if we could just
12   have counsel introduce themselves on the
13   record.  My name is Andrew Goldfarb.
14   I'm with the Zuckerman Spaeder firm, and
15   we are Special Counsel to the Unsecured
16   Creditors Committee.
17       MR. GLAZER:  I am Dennis Glazer
18   from Davis Polk & Wardwell, counsel for
19   JPMorgan and the witness.
20       MR. BUSATH:  Lynn Busath, also from
21   Davis Polk & Wardwell.
22       MR. CHANEN:  Lawrence Chanen from
23   the JPMorgan Legal Department for
24   JPMorgan and the witness.
25       MR. JOHNSTON:  Jim Johnston,

| 6 |
|---|

1
2    A P P E A R A N C E S:  (Cont'd.)
3
4    CHADBOURNE & PARKE, LLP
5    Attorneys for Creditors' Committee
6        30 Rockefeller Plaza
7        New York, New York  10112
8    BY:  MARC D. ASHLEY, ESQ.
9
10   ALSO PRESENT:
11       LAWRENCE N. CHANEN, JPMORGAN LEGAL DEPT.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| 8 |
|---|

1        Confidential - J. Kowalczuk
2    Hennigan Bennett & Dorman, on behalf of
3    a group of credit agreement lenders.
4        MR. MILES:  David Miles from Sidley
5    on behalf of the debtors.
6        MS. VARELLA:  Amanda Varella from
7    Brown Rudnick on behalf of Wilmington
8    Trust.
9        MR. KORPUS:  Sheron Korpus from
10   Kasowitz Benson Torres & Friedman for
11   Law Debenture.
12       MR. DRAYTON:  Joseph Drayton from
13   Kaye Scholer, LLP, on behalf of Merrill
14   Lynch.
15       MR. ASHLEY:  Marc Ashley from
16   Chadbourne & Parke for the Creditors
17   Committee.
18       MR. McPHAIL:  Stuart McPhail from
19   Paul Weiss on behalf of Citigroup Global
20   Markets, Inc.
21   EXAMINATION BY
22   MR. GOLDFARB:
23       Q.  Good morning, Mr. Kowalczuk.  Is
24   that how you pronounce your name?
25       A.  That's right.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

9

1    Confidential - J. Kowalczuk
2    Q.  I'll do my best to do that
3    correctly.
4        MR. GOLDFARB:  Before we start,
5    I'll just note that the counsel present
6    have acknowledged that they are signed
7    up under the appropriate confidentiality
8    agreements that have been entered, I
9    guess including the document depository
10   agreement.  And just in terms of how
11   we'll proceed, an objection by one
12   counsel will stand as an objection for
13   all, and all objections except as to
14   form are preserved.
15       Are you in agreement, counsel?
16       MR. GLAZER:  Yes.  In addition, I
17   will up front designate this deposition
18   testimony as confidential under the
19   agreements so that there is no confusion
20   about that, and if anybody wants to
21   de-designate, we'll have a discussion
22   about it at the appropriate time.
23   Q.  Mr. Kowalczuk, good morning.  Have
24   you ever had your deposition taken before?
25   A.  Once before.

10

1    Confidential - J. Kowalczuk
2    Q.  How long ago was that?
3    A.  It's probably -- well, between 5
4    and 10 years ago.
5    Q.  And was it in connection with your
6    professional work?
7    A.  Yes.
8    Q.  At JPMorgan?
9    A.  Yes.
10   Q.  I'll just give you some basic
11   ground rules for the deposition so it runs as
12   smoothly as possible today and so that we end
13   up with a transcript that is most useful to
14   the parties.
15       I'll be asking questions.  You'll
16   be answering them.  Your counsel may object.
17   And unless he objects on grounds and then
18   instructs you not to answer on grounds of
19   privilege, he or other counsel present may
20   make objections to preserve their objections
21   for the record, you will nevertheless answer
22   the question unless instructed to the
23   contrary by your counsel.  Do you understand?
24   A.  Um-hmm.  Yes.
25   Q.  You have just picked up on another

11

1    Confidential - J. Kowalczuk
2    important instruction, which is that the
3    court reporter can only take down verbal
4    responses.  So I ask that you respond with
5    yes's and no's as opposed to non-verbal or
6    other guttural responses.  Do you understand
7    that?
8    A.  Yes.
9    Q.  If you don't understand a question
10   that I ask, please tell me so, and I will
11   rephrase it and attempt to clear up any
12   misunderstanding.  If you respond to the
13   question, I'll assume that you understood the
14   question being asked.  Do you understand
15   that?
16   A.  Yes.
17   Q.  And if you want to confer with your
18   counsel, we'll certainly allow you to do so.
19   I ask if a question is pending, that you
20   answer the question before conferring with
21   counsel.
22       MR. GLAZER:  And I've given him an
23   exception to that, and that exception is
24   if he's concerned that it involves a
25   privileged communication, he should not

12

1    Confidential - J. Kowalczuk
2    answer it first.  We should discuss it
3    first.
4        MR. GOLDFARB:  I take that.
5    Q.  And, of course, if for personal
6    reasons if you want a break, we'll take a
7    break every probably hour or so just to
8    stretch our legs and so forth, but if you
9    need a break intermittently for any reason,
10   just let me know, and after the question has
11   been answered, we'll accommodate you.  Is
12   that acceptable to you?
13   A.  Yes.
14   Q.  Mr. Kowalczuk, just please describe
15   your educational background beginning with
16   university.
17   A.  I have a bachelor's from George
18   Washington University and an MBA from NYU.
19   Q.  What year did you receive your MBA?
20   A.  In the '84, '85 time frame.
21   Q.  And did you spend any time working
22   between your undergraduate education and
23   graduate school?
24   A.  I'm sorry.  Say it again.
25   Q.  Did you go straight from college to



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

### 13

1    Confidential - J. Kowalczuk
2  graduate school?
3    A.  No.  No.
4    Q.  When did you graduate from college?
5    A.  Oh.  In '79.
6    Q.  What did you do for the five years
7  between graduating from college and getting
8  your MBA?
9    A.  I was working at JPMorgan.
10    Q.  Have you worked at JPMorgan since
11  your graduation from college in 1979?
12    A.  No.  There was a short break.
13    Q.  Just trace generally the time
14  frames when you were at JPMorgan and then
15  when the break occurred and when you
16  returned.  I'll strike the question.
17    MR. GLAZER:  I think he was
18  referring to a break between college and
19  starting at JPMorgan.
20    A.  Yes, yes, yes.
21    Q.  Oh, I thought there was a
22  professional break.
23    A.  No, no.
24    Q.  Okay.  When you graduated from
25  college, what did you do?

### 14

1    Confidential - J. Kowalczuk
2    A.  I worked in Washington, D.C., for
3  the council -- President's Council on Wage
4  and Price Stability until whatever the year
5  -- the year Reagan was inaugurated, I think
6  that would be 1981, until around the
7  beginning part of the 1981.
8    Q.  And after then what did you do in
9  1981?
10    A.  Then I traveled for about six,
11  nine months.
12    Q.  And then?
13    A.  Then I started at JPMorgan in
14  November of 1981.
15    Q.  And have you been there
16  continuously since?
17    A.  Yes.
18    Q.  So it's going on 29 years?
19    A.  Yes.
20    MR. GLAZER:  Good of you to point
21  that out.
22    MR. GOLDFARB:  Off the record.
23    (Discussion off the record.)
24    Q.  And what is your current position
25  at JPMorgan?

### 15

1    Confidential - J. Kowalczuk
2    A.  An executive director.
3    Q.  And are you in a particular area or
4  department of JPMorgan?
5    A.  Yes.
6    Q.  What is the area or department that
7  you are an executive director in?
8    A.  In Credit Risk Management.
9    Q.  How long have you been in one
10  position or another in the Credit Risk
11  Management department?
12    A.  It's been called different things,
13  but it's since 2001.
14    Q.  When you say it's been called
15  different things, you're referring to the
16  Credit Risk Management division?
17    A.  Yes.
18    Q.  And what other names has Credit
19  Risk Management been referred to as?
20    A.  Corporate banking I think is what
21  it was called when I first joined.
22    Q.  And what is the function or service
23  provided by the Credit Risk Management or
24  corporate banking, under whatever name you
25  prefer, department at JPMorgan?

### 16

1    Confidential - J. Kowalczuk
2    A.  Well, it might commonly be
3  known as the credit department, so we sort of
4  look out for the credit exposure for
5  JPMorgan.
6    Q.  When you say that you look out for
7  the credit exposure, does Credit Risk
8  Management, does it have sort of an
9  inward-looking function as opposed to working
10  externally with clients in terms of making or
11  overseeing lending activity?
12    MR. GLAZER:  Objection to form.
13    A.  There is two functions.  One is to
14  monitor the credit of borrowers or
15  counterparties where we have exposure, and
16  the second is to work on transactions.
17    Q.  What types of transactions?
18    A.  Lending transactions, derivative
19  transactions.  We get involved where lines
20  are requested.
21    Q.  And by "lines" you mean lines of
22  credit?
23    A.  Lines of credit, yeah.
24    Q.  And are you personally involved in
25  both of those functions that you described,

Toll Free: 800.441.3376
Facsimile: 202.296.8652



ESQUIRE
an Alexander Gallo Company

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

**17**

1   Confidential - J. Kowalczuk
2   monitoring the credit of borrowers and
3   transactions?
4       A.  Yes.
5       Q.  And as an executive director in
6   Credit Risk Management, first of all, how
7   long have you held the position of executive
8   director?
9       A.  I need to take a second on this.  I
10  think since 2008.
11      Q.  And in your current position do you
12  report directly to anybody?
13      A.  Yes.
14      Q.  First, who is the person to whom
15  you report currently?
16      A.  Christian Walsh.
17      Q.  And what is Mr. Walsh's position?
18      A.  He's a managing director.
19      Q.  And what is the highest level
20  position in the Credit Risk Management
21  department?
22      A.  The highest level title is managing
23  director.
24      Q.  Is Mr. Walsh the sole managing
25  director in the department?

---

**18**

1   Confidential - J. Kowalczuk
2       A.  No.
3       Q.  Then who I guess within the
4   JPMorgan structure oversees the Credit Risk
5   Management department?
6       A.  I guess that would be --
7       MR. GLAZER:  If you're not sure,
8   just say so.
9       THE WITNESS:  Yeah.
10      A.  No, I think that's Steve
11  Eichenberger.
12      Q.  And do you know Mr. Eichenberger's
13  title?
14      A.  He's a managing director.
15      Q.  So there is a level of managing
16  directors that sit above Mr. Walsh, and other
17  managing directors who are at the top, who
18  are themselves at the top of the Credit Risk
19  Management department?
20      A.  I'm sorry.  Say that again.
21      Q.  I'm just trying to understand,
22  obviously, the organizational structure a
23  little bit.  And so Mr. Walsh reports to
24  Mr. Eichenberger, who is himself a managing
25  director?

---

**19**

1   Confidential - J. Kowalczuk
2       A.  No.  No.  Chris Walsh reports to
3   Tim Storms.
4       Q.  Tim Storms.  Okay.  And what is
5   Mr. Storms' position?
6       A.  He's a managing director.
7       Q.  And who does Mr. Storms report to?
8       A.  To Steve Eichenberger.
9       Q.  And what is his position?
10      A.  I'm sorry.
11      Q.  What is his position?
12      A.  I'm sorry.  His, Steve
13  Eichenberger's?
14      Q.  Yes.
15      A.  Managing director.
16      Q.  Who does Mr. Eichenberger report
17  to?
18      A.  He reports to Brian Sankey.
19      Q.  And does Mr. Sankey report to
20  anybody?
21      A.  John Hogan.
22      MR. GLAZER:  Let me save you the
23  trouble.  They're all managing
24  directors.
25      Q.  And does Mr. Hogan report to

---

**20**

1   Confidential - J. Kowalczuk
2   someone?
3       A.  Yes.
4       Q.  Who does he report to?
5       A.  I'm not sure, but I think it's
6   either -- I think it's either Jess Staley or
7   Steve Black.
8       Q.  What was the first name, please?
9       A.  Jess Staley.
10      MR. GLAZER:  Jess Staley,
11  S-t-a-l-e-y.
12      Q.  Also a managing director?
13      A.  Yes, I believe so.
14      Q.  And do those people report to
15  anybody?
16      A.  Jamie Dimon.
17      Q.  And what is his title?
18      A.  I don't know.  I'm sorry.  I do
19  know.  I believe he's the CEO.
20      Q.  And you said you've been an
21  executive director since 2008.  What was your
22  position before that?
23      A.  I was a vice president.
24      Q.  For what period of time were you a
25  vice president?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

John Kowalczuk                                        January 20, 2010,

CONFIDENTIAL

---

21

1      Confidential - J. Kowalczuk
2      A.   Oh.  Well, I've been a vice
3  president since sometime around 1986, '87,
4  maybe '85.
5      Q.   And do you supervise people in your
6  position?
7      A.   I do.
8      Q.   Approximately how many people do
9  you supervise?
10     A.   Six.  Yes.  Six.
11     Q.   And when you just gave that answer,
12 were you referring to your current role as
13 executive director or when you were a vice
14 president?
15     A.   My current role.
16     Q.   Did it change?  Were you
17 supervising people also when you were a
18 vice president prior to 2008?
19     A.   Yes.  Yes.  For the last year.  For
20 the last year as a vice president I was
21 supervising people.
22     Q.   And you said for the last year.  Is
23 that approximately the 2007, 2008 period?  Is
24 that correct?  Strike the question.
25     A.   Yeah.

---

22

1      Confidential - J. Kowalczuk
2      Q.   Just to make it easier, during the
3  period of time that we're going to be talking
4  about most today, which is really the March
5  to December 2007 period, during that period
6  were you supervising people?
7      A.   Well, that's why I was hesitating.
8  I think so, for a portion of that time.
9      Q.   And during that --
10     A.   Yeah.  Okay.
11     Q.   And can you recall how many people
12 you were supervising during that period of
13 time?
14     A.   I can't.
15     Q.   Who are the people who you recall,
16 if you can't recall numbers, are there names
17 or positions that you can recall supervising
18 during that period of time?
19     A.   I just need to take a second to
20 recreate this in my head a little bit.
21     Q.   Mr. Kowalczuk, I'll withdraw the
22 question.
23     A.   Yeah, okay.  Sorry.
24     Q.   And if it occurs to you during the
25 course of the day --

---

23

1      Confidential - J. Kowalczuk
2      A.   Okay.
3      Q.   -- then I would appreciate your
4  providing me the names of those people, but
5  we don't need to take so much time on it now.
6          And now focusing on your time
7  during this 2007 period from March -- let's
8  say all of 2007, you were vice president
9  during that entire time?
10     A.   Yes.
11     Q.   And in your work as a vice
12 president in Credit Risk Management, has
13 there been an area, an industry or area of
14 particular focus of yours?
15     A.   Yes.  Yes.
16     Q.   What is that area?
17     A.   Technology, Media and
18 Telecommunications.
19     Q.   And is that a defined group within
20 Credit Risk Management?
21     A.   Yes.
22     Q.   How many people work in that group?
23     A.   About thirteen, give or take.
24     Q.   In 2007 who was the head of that
25 group?

---

24

1      Confidential - J. Kowalczuk
2      A.   Chris Walsh.  Sorry.  Yeah, I think
3  it was Chris Walsh.
4      Q.   And who is currently the head of
5  Technology, Media and Telecommunications?
6      A.   Chris Walsh.
7      Q.   When did you first become involved
8  in working in a potential transaction
9  involving the Chicago -- or the Tribune
10 Company in 2007?
11     A.   I don't remember exactly, but I
12 think it was in the February 2007 time frame.
13     Q.   At that time was this the first
14 time that you had worked on a matter
15 involving the Tribune Company?
16     A.   Yes.
17     Q.   Are you aware of whether JPMorgan
18 had previously had the Tribune Company as a
19 client --
20     A.   Yes.
21     Q.   -- in any respect?
22     A.   Yes.  Yes, I'm aware, and yes, it
23 was a client.
24     Q.   To your knowledge, what was the
25 nature of the services that JPMorgan had

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

25

1      Confidential - J. Kowalczuk
2   provided the Tribune prior to, say, February
3   2007?
4      A.  I know that we were a lender in
5   their syndicated revolver.  And beyond that,
6   I don't know.
7      Q.  And just so the record is clear,
8   what is a syndicated revolver?
9      A.  Oh.  A revolving credit facility is
10  -- your question was what is a syndicated
11  revolver?
12     Q.  Yes.
13     A.  Yes.  It's a revolving credit
14  facility or like a line of credit that can be
15  borrowed and repaid and then reborrowed, and
16  the obligation to lend is shared by a number
17  of different banks or lenders in a syndicate.
18     Q.  And what division of JPMorgan, to
19  your knowledge, was responsible for providing
20  those services as a lender in the syndicated
21  revolver?
22     A.  Sorry.  Just repeat the question.
23     Q.  What area of JPMorgan was doing
24  that work, if you know?
25     A.  No, I know.  It would be the

---

26

1      Confidential - J. Kowalczuk
2   Syndicated Leveraged Finance group, and then
3   someone from Credit Risk Management would
4   have worked on it as well.
5      Q.  But you say you yourself personally
6   were not involved in that work?
7      A.  Yes.
8      Q.  Is that right?
9      A.  That's correct.
10     Q.  And how did you come to be involved
11  in the potential transaction involving the
12  Tribune Company in the period that you
13  identified, the February 2007 period?
14     A.  How did I become -- how did I
15  become involved?
16     Q.  Yes.
17     A.  I'm just not sure what you mean by
18  that.
19         MR. GLAZER:  Ask him to rephrase
20  it.
21     A.  Yeah, could you just rephrase it.
22     Q.  At some point were you approached
23  about becoming involved in doing some work in
24  connection with a potential transaction --
25     A.  Yes.

---

27

1      Confidential - J. Kowalczuk
2      Q.  -- involving the Tribune Company?
3      A.  Yes.
4      Q.  Who approached you?
5      A.  It was probably Chris Walsh.
6      Q.  What did he tell you about it?
7      A.  I don't remember what he said
8   specifically at the time.
9      Q.  Generally?
10     A.  Generally, I understood there was
11  -- that Tribune had been in a sale process
12  for some time and that there was a team
13  working on some aspect of that.  Yeah.
14     Q.  When Mr. Walsh approached you, was
15  this the first that you were aware that the
16  Tribune had been involved in a sale process?
17     A.  No.  No.
18     Q.  How did you know that?
19     A.  Well, I was aware of teams that had
20  been formed to work on it.
21     Q.  And that's teams within JPMorgan?
22     A.  Yes.
23     Q.  What are those teams that you're
24  referring to?
25     A.  Maybe rephrase that.

---

28

1      Confidential - J. Kowalczuk
2      Q.  Sure.  Who, to your knowledge, was
3   working on it as part of the teams at the
4   time?
5      A.  Oh, that I can't recall.
6      Q.  What about departments that were
7   working on it?
8      A.  Well, a team would typically have
9   someone from Credit Risk Management,
10  Syndicated Leveraged Finance, and Client
11  Coverage.
12     Q.  What is the Client Coverage
13  department?  What does that department do?
14     A.  They're the main relationship
15  contact for the clients.
16     Q.  And in connection with the Tribune
17  Company transaction, do you know who that
18  was?
19     A.  Who that was on --
20     Q.  On the JPMorgan side.
21     A.  But on the team that I was on or --
22  I'm sorry.  Yes.  Go ahead.
23     Q.  Let me just clarify the question.
24  You said that at the time when Mr. Walsh
25  approached you, you were already aware that

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

**29**

```
 1        Confidential - J. Kowalczuk
 2   teams at JPMorgan were working with the
 3   Tribune, and your testimony was that you
 4   don't know the individuals, but it would
 5   typically involve someone from Credit Risk
 6   Management, Syndicated Leveraged Finance, and
 7   Client Coverage.  And I'm now asking if you
 8   recall who in Client Coverage was the
 9   relationship contact for the Tribune matter.
10        A.  Yeah.  I think it was Peter Cohen.
11        Q.  And do you recall who the
12   Syndicated Leveraged Finance person was
13   working as part of a team for the Tribune?
14        A.  Well, there would have been -- if
15   there were multiple teams, there would have
16   been multiple people.
17        Q.  Do you remember the names of any of
18   the Syndicated Leveraged Finance people who
19   were involved in that early work?
20        A.  No.
21        Q.  What about Credit Risk Management?
22        A.  I believe that Chris Walsh was on
23   the team, and I believe that Tracy Ewing was
24   on the team.  Beyond that, I don't know.
25        Q.  When you say that there were
```

**30**

```
 1        Confidential - J. Kowalczuk
 2   multiple -- you're using that there were
 3   multiple teams, do you know what the
 4   different teams were doing?
 5        A.  No.
 6        Q.  How did you know -- sorry.  I
 7   didn't mean to interrupt you.
 8        A.  Well, go ahead.  It's all right.
 9        Q.  How did you know that there was
10   more than one team working on the potential
11   matter?
12        A.  I don't know, I mean, but,
13   generally -- the question that you asked
14   before, I mean when I say there were multiple
15   teams, they were working for different
16   interested parties as buyers, in other words,
17   right.
18        Q.  So do you know who the different
19   teams represented?
20        A.  No.
21        Q.  Who the clients were?
22        A.  No.
23        Q.  In this circumstance, if, as you
24   say, there were multiple teams representing
25   different potential bidders or purchasers, is
```

**31**

```
 1        Confidential - J. Kowalczuk
 2   that accurate?
 3        A.  Yes.
 4        Q.  Were they silo'd from one another,
 5   i.e., so that there was not communication
 6   among the different teams?
 7        A.  Yes.
 8        Q.  And how was that set out?
 9        A.  What do you mean?
10        Q.  How were the teams, the teams and
11   the information that they possessed kept
12   apart?
13        MR. GLAZER:  You're asking how
14   structurally or technically that's done
15   internally?
16        MR. GOLDFARB:  Yes.
17        Q.  Well, structurally how is it done
18   internally?
19        A.  Well, people just don't talk to
20   each other on different teams.  I mean beyond
21   that, I'm not sure.
22        Q.  Is it a written policy, is there an
23   email or a policy that exists that identifies
24   who the people are on the various teams to
25   maintain the separation?
```

**32**

```
 1        Confidential - J. Kowalczuk
 2        A.  I mean I think that there's a
 3   policy that if you're working on an
 4   acquisition where there is potential multiple
 5   bidders, you just don't talk to anybody about
 6   it other than people on your team.
 7        Q.  How do you know who is on your
 8   team?
 9        A.  Well, you're told who is on your
10   team, right, and -- you're told who is on
11   your team, so you just talk to those people.
12        MR. GLAZER:  And everybody else is
13   not.
14        Q.  When you were asked to do work by
15   Mr. Walsh, was it on behalf of a particular
16   bidder?
17        A.  Yes.
18        Q.  And who was that?
19        A.  That was Sam Zell, or EGI.
20        Q.  What is EGI?
21        A.  I think that's Sam Zell's company.
22        Q.  And did you join a team that
23   already existed that was assisting Mr. Zell?
24        A.  Yes.
25        Q.  And I will use probably Zell and
```



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

33

1      Confidential - J. Kowalczuk
2  EGI interchangeably, but when I use Zell or
3  EGI, I mean it to mean the same thing, unless
4  I refer to Mr. Zell personally.  Is that
5  okay?
6      A.  Okay.
7      Q.  Who else was on the Zell team at
8  JPMorgan?
9      A.  Well, Raj Kapadia, Tony Grimminck,
10 I believe.  Joachim S-o-n-n-e.  I still don't
11 know how to pronounce it right.  And I
12 believe Peter Cohen was on the team as well.
13     Q.  And Mr. Kapadia, what department is
14 he in or was he in at the time?
15     A.  Syndicated Leveraged Finance.
16     Q.  And Mr. Grimminck?
17     A.  Client Coverage.
18     Q.  And Mr. Sonne?
19     A.  Sonne.  Client Coverage.
20     Q.  And you said Mr. Cohen was also in
21 Client Coverage; is that right?
22     A.  Yes.  And then there were two
23 analysts.  Well, there was an analyst in
24 Client Coverage.  Her name was I think
25 Gretchen Tonnesen.  And I don't know when

34

1      Confidential - J. Kowalczuk
2  these people got involved.
3      Q.  Anyone else that you can remember?
4      A.  Not at that point in time.
5      Q.  And what did Mr. Walsh tell you
6  about the transaction, or I guess the
7  potential transaction with Mr. Zell?
8      A.  Nothing that I can remember other
9  than what I said generally.
10     Q.  And what did he ask you to do?
11     A.  Work on that team.
12     Q.  So did you thereafter begin to work
13 on that team?
14     A.  Yes.
15     MR. GLAZER:  Or else it would have
16 been a very short deposition.
17     MR. GOLDFARB:  We're done.
18     Q.  What were you asked to do?  When
19 you say you worked on the team, when you say
20 you began to work on the team, what did you
21 do?
22     A.  Well, I think at first very little.
23 And I think there was a -- I think I became
24 sort of aware of the transaction, and then
25 not much happened for a while, and then after

35

1      Confidential - J. Kowalczuk
2  that it was to sort of to work on the credit
3  approval and credit approval package.
4      Q.  What is the credit approval
5  package?
6      A.  Just because I want to make sure
7  there was, uhh -- okay.  And I don't remember
8  beyond that.
9      Q.  Who asked you to work on the credit
10 approval package?
11     A.  That's just part of what we do.
12     Q.  When you joined the Zell team, was
13 there somebody who was a designated head of
14 that team?
15     A.  Not really.
16     Q.  What is the credit approval
17 package?  What does that mean?
18     A.  Well, it documents the transaction
19 and it's a background for the credit
20 approval.
21     Q.  And when you say credit approval,
22 what are you referring to?  What does that
23 mean?
24     A.  I mean I guess I'm not sure if it
25 would be called -- I mean it's the credit

36

1      Confidential - J. Kowalczuk
2  package.
3      Q.  I'm just trying to understand what
4  the credit package is.
5      A.  Yeah.  So go ahead.  Ask me the
6  question you asked me.  I forget what it was.
7      Q.  My question was, what does credit
8  approval mean?
9      A.  What does credit approval mean?
10     Q.  Right.
11     A.  Well, in order for JPMorgan to go
12 forward in a transaction where we're taking
13 exposure, it has to have the approval of a
14 credit officer.
15     Q.  How did you learn about the
16 substance of the transaction, of at that time
17 the proposed transaction?
18     A.  I'm sorry.  Going back to a prior
19 question, I forgot -- I forgot -- when you
20 said who was on that team, Jeff Sell was on
21 the team as well.
22     Q.  And what position or what
23 department is Mr. Sell from?
24     A.  He was the head of special credits.
25 He was a managing director.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

### 37

Confidential - J. Kowalczuk

1
2      Q.   And how did you learn about the
3  substance of the transaction in order to work
4  on the credit approval package?
5      A.   I probably spoke -- I think I spoke
6  to Raj Kapadia.
7      Q.   Was it in a single conversation or
8  a series of conversations?
9      A.   Oh, I don't remember.
10      Q.   Can you describe generally how the
11  team functioned as a process matter in terms
12  of working with Mr. Zell?  How did you
13  communicate?  Did you meet regularly?  Just
14  sort of describe how the team worked.
15      A.   Well, in terms of how it
16  communicated with Mr. Zell?
17      Q.   No, no.  Internally.
18      A.   Internally.
19      Q.   Internally to JPMorgan.
20      A.   I'm just not sure I understand what
21  you're getting at.
22      Q.   I'm trying to get just a general
23  sense of how the team did its work.  If you
24  can explain a little bit about how the team
25  functioned, you know, as I say, the manner in

### 38

1      Confidential - J. Kowalczuk
2  which it communicated, did you have regular
3  meetings, how did you go about doing the work
4  for Mr. Zell?
5      A.   I'm not going to say we had regular
6  meetings.  I mean the leveraged finance guys
7  or the syndicated leveraged finance guys,
8  they worked on certain aspects of it.  I
9  worked on, you know, sort of the credit
10  aspect of it.
11      Q.   How did Syndicated Leveraged
12  Finance, how did those people communicate --
13  did they communicate with credit management?
14      A.   Credit Risk Management?
15      Q.   Credit Risk Management.
16      A.   Yes.
17      Q.   How would that occur?
18      A.   By phone or email.  There may have
19  been meetings.
20      Q.   You said there weren't regular
21  meetings.  Did the team meet as a whole to
22  discuss the Zell project ever?
23      A.   Yes.  Well, ever ever?  Like at any
24  time in 2007?
25      Q.   Well, I'm trying to get a sense of

### 39

1      Confidential - J. Kowalczuk
2  the frequency with which you got together and
3  communicated.
4      A.   Because we seem to be talking about
5  the early stage of the project.
6      Q.   Yes.
7      A.   And I don't remember -- I don't
8  remember getting together for meetings.  I
9  don't remember meetings at that stage.
10      Q.   And I asked you how you
11  communicated with people who were on the team
12  from Syndicated Leveraged Finance, and you, I
13  think, said mostly phone and email; is that
14  right?
15      A.   Yes.
16      Q.   Is that also the case for the
17  Client Coverage members of the team?  Is that
18  how you communicated with them as well?
19      A.   Generally, yes, or in person, but
20  not necessarily as a whole team together.
21  That may have happened.  There may have been
22  meetings with the whole team.  I just don't
23  remember.
24      Q.   Were the individuals on the Zell
25  team physically located in proximity to one

### 40

1      Confidential - J. Kowalczuk
2  another?  I mean are you in the same
3  building, all in New York?  Where were these
4  people located?
5      A.   The Syndicated Leveraged Finance
6  people were one floor away from me.  And the
7  coverage people were across the street.
8      Q.   So you indicated that you spoke to
9  Mr. Kapadia to learn a little bit about the
10  details of the project?
11      A.   To the best I can remember, yeah.
12      Q.   What did he tell you, to the best
13  of your recollection?
14      A.   I don't remember.
15      Q.   Do you remember in general?
16      A.   No.  Well, I remember in general
17  that it was, you know, that we were working
18  with the Sam Zell team, and it was a go
19  private transaction.
20      Q.   And what do you mean by go private
21  transaction?
22      A.   That the company was not going to
23  be public following the transaction.
24      Q.   And did you come to an
25  understanding of how that was to be

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

John Kowalczuk

January 20, 2010

CONFIDENTIAL

---

### 41

1    Confidential - J. Kowalczuk
2  accomplished?
3      A.  I did.
4      Q.  How did you acquire that
5  information?
6      A.  By talking to members of the team,
7  I guess, and reading materials.
8      Q.  What reading materials do you
9  recall seeing about the transaction?
10     A.  I don't remember.
11     Q.  At what point in time, to the best
12 of your recollection, did you become familiar
13 with the structure of the go private
14 transaction as it was proposed?
15     A.  You know, I don't remember.  I
16 don't remember.
17     Q.  Can you describe your understanding
18 of what the process was, of what that
19 transaction structure was?
20     A.  Well, I remember that it was --
21     MR. GLAZER:  Please note my
22 objection to the form of the question.
23     A.  I'm sorry.  Could you repeat the
24 question.
25     Q.  Yes.  What was your understanding

### 42

1    Confidential - J. Kowalczuk
2  of how the transaction was structured, the go
3  private transaction was structured?
4      MR. GLAZER:  Same objection.
5      A.  That it was -- that there was two
6  steps and that we would be lending at both
7  steps or stages.
8      Q.  What was your understanding of what
9  would happen in each of the steps?
10     A.  Oh, I don't remember.  I mean what
11 was my understanding then?
12     Q.  Yes.
13     A.  I mean I don't remember.
14     (Kowalczuk Exhibit 1, Notice of
15 Oral Examination Pursuant to Bankruptcy
16 Rule 2004, marked for identification, as
17 of this date.)
18     MR. GOLDFARB:  Counsel, I didn't
19 give you a copy, but I did previously
20 mark prior to the deposition the notice
21 as Exhibit 1.
22     MR. GLAZER:  Anything you can
23 premark I like.
24     MR. GOLDFARB:  I did premark.  I
25 just didn't timely distribute.  And

### 43

1    Confidential - J. Kowalczuk
2  we'll follow the convention and mark
3  these as Kowalczuk 1.
4      Let's mark this as Kowalczuk 2,
5  please.
6      (Kowalczuk Exhibit 2, Document
7  Bates stamped JPM 00218132, marked for
8  identification, as of this date.)
9      Q.  Mr. Kowalczuk, if you could take a
10 look at that.  And while you're doing so,
11 I'll note for the record this is a one-page
12 document bearing Bates JPM 00218132.
13     MR. GLAZER:  And you're referring
14 to Exhibit 2?
15     MR. GOLDFARB:  I'm referring to
16 Exhibit 2.
17     A.  Okay.
18     Q.  Have you had a chance to look at
19 it?
20     A.  Yes.
21     Q.  What is this document?
22     A.  Oh, I'm sorry.  I only read the top
23 part.
24     Q.  You can please read both.
25     A.  Okay.  Okay.

### 44

1    Confidential - J. Kowalczuk
2      Q.  What is this document, sir?
3      A.  It's an email from me to Natasha
4  and Robert Anastasio.
5      Q.  And looking at the bottom email
6  first, that's an email to Natasha Klykova; is
7  that right?
8      A.  Yes.
9      Q.  Who is Ms. Klykova?
10     A.  She worked in Syndicated Leveraged
11 Finance.
12     Q.  And that's dated March 27th, 2007,
13 with the subject line "Jeff Sell Just Called
14 Me."  Do you see that?
15     A.  Yes.
16     Q.  The first line of the bottom email
17 says, "I left you a v-mail, but the short
18 version is that he is concerned that we're
19 unsecured by the opcos."  Do you see that?
20     A.  Yes.
21     MR. GLAZER:  That's not exactly
22 what it says, but you've straightened
23 out what appears to be a typo.
24     MR. GOLDFARB:  Thank you.  I did
25 indeed.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

## 45

1    Confidential - J. Kowalczuk
2    Q.   What does that mean?
3    A.   What does what mean?
4    Q.   The portion of the sentence that
5    says "he," presumably referring to Mr. Sell;
6    is that right?
7    A.   Yes.  I believe so, yes.
8    Q.   "Is concerned that we are unsecured
9    by the opcos."
10    MR. GLAZER:  If you have an
11    understanding as you sit here today
12    about what she meant.
13    THE WITNESS:  Sure.
14    A.   At some point the transaction --
15    the structure changed so that instead of
16    being secured by the publishing companies,
17    the publishing assets or operating companies,
18    we were going to be secured by an
19    intercompany note held by a company above
20    them.
21    Q.   And --
22    A.   Oh.  But your question was what
23    does it mean is he concerned.  And that was
24    not as good a position for the lenders as the
25    structure before that, which was -- which

## 46

1    Confidential - J. Kowalczuk
2    didn't include the intercompany note.
3    Q.   Can you describe what the structure
4    of the transaction was, the original
5    structure of the transaction was, and then I
6    will ask you about what your understanding
7    was of the modified structure that you've
8    just referred to.
9    MR. JOHNSTON:  Objection to form.
10    Q.   But my first question, just to be
11    clear, is if you could please describe the
12    structure of the transaction as it was
13    originally contemplated.
14    MR. GLAZER:  Objection to form.
15    Other than as he's already described.
16    A.   Yes.  So I think the answer to your
17    question can I describe it is no.  But I do
18    know that there was a specific aspect to the
19    transaction which was to be secured by the --
20    I think it was the stock of both the
21    broadcasting operating companies -- I don't
22    remember if it was stock or assets of the
23    broadcasting assets or companies and the
24    publishing stock or assets opcos.  And so
25    this was a change from that.

## 47

1    Confidential - J. Kowalczuk
2    Q.   And this is just taking a step
3    back.  Am I correct that the Tribune Company
4    at that time had two main divisions, a
5    publishing division and a broadcasting and
6    entertainment division?
7    A.   I know that they were in those two
8    different lines of business.
9    Q.   And do you recall having a
10    conversation or conversations with Mr. Sell
11    about his concern that JPMorgan was unsecured
12    by the opcos under the revised scenario that
13    you described?
14    A.   Yes.  I remember talking to Jeff
15    about it.
16    Q.   Do you remember whether you called
17    him or he called you?
18    A.   I don't, no.
19    Q.   Do you recall how you came to learn
20    about this revised collateral structure?  Do
21    you know what I mean when I refer to a
22    collateral structure?
23    A.   Yeah, I think I know what you're
24    referring to.  Yeah.  I think I learned about
25    it from Natasha.

## 48

1    Confidential - J. Kowalczuk
2    Q.   And did she explain to you why the
3    structure, the collateral structure was
4    revised?
5    A.   I don't remember if she explained
6    why.
7    Q.   Did you come to an understanding at
8    some point of why the collateral structure
9    was revised?
10    A.   Yes.
11    Q.   What was that understanding?
12    A.   To the best that I can remember, it
13    had to do with the fact that under the prior
14    structure, the company was going to have to
15    produce financial -- financials, I think
16    audited financials for the publishing
17    operating companies.  There was a problem
18    with that.  I don't remember exactly why that
19    was an issue.  So this was -- this revised
20    structure was put in place to deal with that
21    issue.
22    Q.   And when you wrote in this email
23    that Mr. Sell was concerned that we are
24    unsecured by the opcos, and by opcos, are you
25    referring to operating companies?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

49

1      Confidential - J. Kowalczuk
2      A.  Yes.
3      Q.  And that's referring to certain
4  subsidiaries of the Tribune Company?
5      A.  Yes.  Yes.
6      Q.  Explain what your understanding was
7  as to why Mr. Sell was concerned that
8  JPMorgan was unsecured by the opcos in the
9  revised collateral structure.
10     MR. GLAZER:  Objection to form.  If
11  you know what his concerns were.
12     A.  I'm sorry.  Can you repeat the
13  question.
14     Q.  Yes.  Well, strike that prior
15  question.  Did Mr. Sell tell you what his
16  concerns were that JPMorgan was unsecured by
17  the opcos?
18     A.  Yes.  I believe he did.
19     Q.  And why was he concerned?
20     MR. GLAZER:  Objection to form.
21  You may answer.
22     A.  Well, I think the issue he had was
23  that the -- there was less collateral under
24  this structure because we were secured by the
25  intercompany note, not the operating

50

1      Confidential - J. Kowalczuk
2  companies.
3      Q.  And what is the significance to
4  JPMorgan of having less collateral under the
5  revised structure?
6      A.  Beyond saying more collateral, you
7  always want more collateral.  More collateral
8  is better than less collateral.
9      Q.  Why?
10     A.  Because it's supporting -- it's
11  more support for your loan.
12     Q.  And I'm just trying to understand
13  your testimony.  Did you understand
14  Mr. Sell's concern to be that if there were a
15  default or other event that made it difficult
16  or impossible for JPMorgan to recover its
17  money via the note, that JPMorgan wanted to
18  have more recourse to other assets of the
19  Tribune Company to recover its investment?
20     MR. JOHNSTON:  Objection to form.
21     MR. GLAZER:  Objection to form.
22     A.  That was a long question.  Should
23  we ask her to read it back?
24     MR. GLAZER:  Nice try for a
25  litigator.

51

1      Confidential - J. Kowalczuk
2      MR. GOLDFARB:  Can you read back
3  the question.
4      (Record read.)
5      MR. GOLDFARB:  Let's go off the
6  record.
7      (Discussion off the record.)
8      (Recess taken from 10:34 a.m. to
9  10:48 a.m.)
10     Q.  Mr. Kowalczuk, I just want to go
11  back for a second to understand a little bit
12  about the structure.  When you said a little
13  bit earlier that there were multiple teams in
14  the early stages that were working for
15  different potential bidders in connection
16  with the Tribune, do you recall that
17  testimony?
18     A.  Yes.
19     Q.  Did there come a point in time
20  where you did learn who the other potential
21  bidders were that JPMorgan had been working
22  on?
23     A.  Only -- yes.  Yes.
24     Q.  And how many other bidders did you
25  come to learn there?

52

1      Confidential - J. Kowalczuk
2      A.  I only remember one.
3      Q.  And who was that?
4      A.  It was these guys from L.A., Burkle
5  or something, Burkle something.
6      Q.  And Broad?
7      A.  That sounds familiar.
8      Q.  But Ron Burkle is one of the names
9  that you remember?
10     A.  Yeah.  I think that's right, yeah.
11     Q.  And do you remember any others,
12  whether or not you remember specifically who
13  the bidder was, whether there was more than
14  two JPMorgan teams working on potential bids
15  for the Tribune?
16     A.  I assumed there were other -- I
17  assume there were other teams, because of the
18  fact that we went to Jeff Sell.
19     Q.  What about going to Jeff Sell, why
20  is that significant?
21     A.  Because the other -- because Jeff
22  Sell was the head of special credits.  He
23  wouldn't be the person you would normally go
24  to.  It wasn't his primary job to approve new
25  transactions.  We would only go to him if the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

53

1    Confidential - J. Kowalczuk
2  other credit approvers would have been
3  conflicted on other teams.
4      Q.  And when you say credit approvers,
5  who are the normal credit approvers who would
6  be sort of it sounds like the first people to
7  go to before you went to Mr. Sell?
8      MR. GLAZER:  Objection to form.
9      A.  You want the list of names of
10  people who would have or might have had the
11  authority to approve this?
12      Q.  Yes.
13      A.  Well, I don't remember how big or,
14  you know, what the levels were.  I mean Tim
15  Storms would have been probably somebody, and
16  then depending on the size of the deal, Chris
17  Walsh could have -- might have been able to
18  do it, and then there were two or three
19  others at Chris's level who might have been
20  able to do it, depending on the size of the
21  financing that was required.
22      Q.  And Mr. Sell was at a level where
23  he could approve a credit engagement of the
24  size involved that was required for the
25  Tribune transaction; is that right?

---

54

1    Confidential - J. Kowalczuk
2      A.  Yes.
3      Q.  Returning to Kowalczuk Exhibit 2,
4  do you recall whether in your conversations
5  with Mr. Sell he indicated what, if any,
6  additional changes should be made to the
7  collateral structure to resolve the concerns
8  that he expressed?
9      A.  Just repeat that.  I want to make
10  sure I got it.
11      (Record read.)
12      A.  No, I don't.  No.
13      Q.  And then looking at the top email
14  in this Exhibit 2 string, that's an email
15  from you to Ms. Klykova, Mr. Anastasio, and
16  copied to Mr. Kapadia; is that right?
17      A.  Yes.
18      Q.  And the subject of that is "Project
19  Tower Approval"?
20      A.  Yes.
21      Q.  What does that refer to?
22      A.  Well, Project Tower was the code
23  name for the team we were on, the Sam Zell
24  transaction.  And the approval is the
25  approval of it, the credit approval of it.

---

55

1    Confidential - J. Kowalczuk
2      Q.  In the first line you wrote, "Is
3  there anything from the docs calls last night
4  that we ought to run by Jeff Sell."  Do you
5  see that?
6      A.  Yes.
7      Q.  What were the docs calls referred
8  to in this email?
9      A.  I believe it would have been a call
10  to talk about the commitment papers, which
11  would be the commitment letter and the term
12  sheet and maybe some others.  I don't know.
13      Q.  And am I right that when you're
14  referring to the commitment letters and term
15  sheets, those outline and provide the basic
16  terms under which and the amounts that
17  JPMorgan committed to lend in connection with
18  the transaction?
19      MR. GLAZER:  Objection to form.
20      A.  Generally that's what those papers
21  do, yes.
22      Q.  Anything else?
23      A.  Not that I can remember.  I would
24  just say I mean when we talk about a docs
25  call, we could be talking about the credit

---

56

1    Confidential - J. Kowalczuk
2  agreement discussion or we could be talking
3  about the commitment papers.  I'm guessing,
4  based on the date of this, that we weren't
5  talking about the credit agreement yet, that
6  it would have come later, and that it would
7  have been about the commitment papers.
8      Q.  And the next sentence says, "It
9  seems like our conditionality and credit
10  terms are remaining largely as had been
11  presented it to him."  And the "it" I think
12  is just a typo.
13      What did you mean when you referred
14  to "our conditionality and credit terms"?
15      A.  Well, the credit terms would be
16  just the basic terms, basic structure of the
17  deal.  And conditionality would be conditions
18  that would have to be met to close a
19  transaction.
20      Q.  Was the Zell project a significant
21  one for you in terms of the size of the
22  potential transaction and the sort of
23  considered significance of the transaction at
24  JPMorgan?
25      MR. GLAZER:  Objection to form.

---



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

John Kowalczuk
January 20, 2010

CONFIDENTIAL

---

57

1      Confidential - J. Kowalczuk
2      A.  I would say that it was -- it was a
3  large deal, you know, it was a large,
4  relatively large deal, yeah.
5      Q.  And what do you mean by large?
6      A.  The amount of the financing.
7      Q.  And did you have an impression one
8  way or the other about whether it was a
9  significant deal to JPMorgan not just in
10  terms of its size, but also in terms of its
11  significance to JPMorgan as a firm in terms
12  of the client it was dealing with and
13  reputationally and any other sort of
14  non-monetary respect?
15      MR. GLAZER:  Objection to form.
16      A.  Non-monetary.  No.  No.
17      Q.  At the time in this late March
18  period, did you acquire an understanding of
19  the general state of the Tribune's
20  performance and business at that time?
21      MR. JOHNSTON:  Objection to form.
22      THE WITNESS:  Just -- sorry.  Could
23  you read it back.
24      (Record read.)
25      A.  Yes.  In around that time period,

---

58

1      Confidential - J. Kowalczuk
2  yeah.
3      Q.  Did you have a view as to how the
4  company was doing?
5      A.  I believe I had a view.
6      Q.  What was that view?
7      A.  I don't recall specifically what
8  the view was.
9      Q.  Do you recall generally?
10      A.  Yeah.  I mean I think generally
11  that at least some parts of their business
12  were down.
13      Q.  What parts of the business do you
14  recall were down?
15      A.  I believe at the time I was aware
16  that publishing was down.  I don't remember
17  about broadcasting.
18      Q.  And when you say down, what do you
19  mean by that?
20      A.  Well, generally, it would refer to
21  you know, revenue and EBITDA.
22      Q.  And EBITDA stands for?
23      A.  Earnings before interest, taxes,
24  and depreciation amortization.
25      Q.  And did you have a view as to the

---

59

1      Confidential - J. Kowalczuk
2  significance of the declining nature of the
3  at least publishing division?
4      MR. GLAZER:  Objection to form.
5      A.  I believe I had a -- I'm sorry.
6      Q.  Well, strike the question.  Did you
7  consider the downturn or the downward trend
8  in the publishing division of the Tribune to
9  be a significant one?
10      MR. GLAZER:  Objection to form.
11      A.  I don't know if I considered it
12  significant.  I mean I considered it.  I mean
13  I was aware of it.
14      (Kowalczuk Exhibit 3, Document
15      Bates stamped JPM 00239371, marked for
16      identification, as of this date.)
17      Q.  Please take a look at that,
18  Mr. Kowalczuk.  Exhibit 3 is a document
19  bearing Bates number JPM 00239371.
20      Have you had a chance to look at
21  it?
22      A.  Yes.
23      Q.  What is this document?
24      A.  Well, it's an email from Gretchen
25  Tonnesen to me, which is forwarding an email

---

60

1      Confidential - J. Kowalczuk
2  from Yang Chen to a bunch of people
3  describing the ratings that Tribune had
4  received.
5      Q.  And this is dated March 28th, 2007;
6  correct?
7      A.  Yes.
8      Q.  And the subject of the email is
9  "Project Tower Ratings."  What ratings is
10  this email referring to?
11      A.  By the form, it appears to be the
12  Moody's and S&P ratings.
13      Q.  And just more generally, what are
14  the ratings?  Not what are these particular
15  ratings.  What does it mean, what is the
16  rating, the Moody's or the S&P rating to
17  which this email refers?
18      A.  You mean what is -- are you asking
19  what does a credit rating mean --
20      Q.  Yes.
21      A.  -- or what is specifically --
22      Q.  No.  I'm asking what a credit
23  rating means.
24      A.  Yeah, okay.  A credit rating,
25  generally speaking, is a letter -- for the

---



Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

## 61

1 Confidential - J. Kowalczuk
2 public ratings, S&P, Moody's, it's a letter
3 that's meant to indicate an assessment of
4 creditworthiness or risk associated with an
5 issuer or an issue.
6     Q.   And you mentioned Moody's and
7 Standard & Poor's as two organizations that
8 issue such credit ratings; is that right?
9     A.   Yes.
10     Q.   Why did the company receive ratings
11 at this point in time from these entities?
12         MR. GLAZER:  If you know.
13     Q.   If you know.
14     A.   Well, I don't remember
15 specifically.  I mean I think -- let's see.
16 We were going to be issuing -- I don't know
17 if they were going to issue bonds or bank
18 debt, but at some point, and I think we -- so
19 they would have gotten ratings in
20 anticipation of that generally.  You know, I
21 couldn't say specifically why it happened
22 right here and now, you know.
23     Q.   Well, let's take the Moody's.  Do
24 Standard & Poor and Moody's each have their
25 own respective scales of ratings?

## 62

1 Confidential - J. Kowalczuk
2     A.   Yes.
3     Q.   And just most generally for let's
4 take Moody's first, what would be the top of
5 the scale, the highest rating for --
6     A.   Could we take S&P instead.  I don't
7 know these off the top -- oh, actually, I
8 think Moody's, the top of Moody's I think is
9 A -- triple A, I suspect, right.
10     Q.   And then there's a declining scale
11 with various number of letter designations
12 and pluses and minuses affixed to those
13 ratings.  Is that accurate?
14     A.   Yes.
15     Q.   And what is the bottom of the
16 scale, if you know?
17     A.   I don't know.  I think it's D, if
18 I'm not mistaken.  For S&P or Moody's I think
19 it's D, but I don't know for sure.
20     Q.   And looking specifically here at
21 the ratings here, the corporate rating refers
22 to B2 stable/B negative outlook?
23     A.   Yes.
24     Q.   What does that mean?
25     A.   You mean like what is the

## 63

1 Confidential - J. Kowalczuk
2 definition of a B2 rating?  What is the
3 description that goes along with a B --
4     Q.   Yes.
5     A.   I couldn't tell you.
6     Q.   Do you have any sense of where
7 along the rating scale a B2/B rating falls?
8     A.   Yes.
9     Q.   And where along the scale does that
10 fall?
11     A.   Well, it goes triple A, double A,
12 single A, generically speaking, between the
13 two agencies, triple A, double A, single A,
14 triple B, double B, and then single B, and
15 then you go into the triple Cs.
16     Q.   So when you learned that the
17 corporate rating had been given as B2
18 stable/B negative outlook, did you consider
19 that a positive or negative?  Did you have a
20 reaction whether that was good news or bad
21 news?
22     A.   Oh, I don't remember.
23     Q.   Had the team expected any
24 particular rating prior to learning what the
25 actual rating was?

## 64

1 Confidential - J. Kowalczuk
2     A.   I don't know.  I don't remember.  I
3 don't know.
4     Q.   And it talks about new bank getting
5 a B1/B rating.  Do you see that?
6     A.   Yes.
7     Q.   What does new bank refer to?
8     A.   I think it was referring to the new
9 term loans.  That's my guess is that it's
10 referring to the new term loans that were
11 going to be issued in connection with this
12 transaction, but I'm not sure.
13     Q.   And did you have any reaction
14 qualitatively about the rating that the new
15 bank debt received from the credit agency?
16     A.   Do I or did I?
17     Q.   Did you.
18     A.   Oh, I don't remember.  I don't
19 remember.
20     Q.   And what about the new bond got a
21 rating of CAAA1/CCC+.  Do you see that?
22     A.   Yes.
23     Q.   And what does new bond refer to?
24         MR. GLAZER:  Objection.  I'm not
25 sure you read that correctly.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

**65**

1      Confidential - J. Kowalczuk
2      Q. I'll restate. The new bond got a
3 rating of Caa1/CCC+. What does new bond
4 refer to?
5      A. You know, I'm not sure, because I
6 don't remember the tranches of the
7 transaction. I assume it would have been
8 some debt issued in connection with this
9 transaction, but I don't remember what.
10      Q. And do you remember whether you had
11 a reaction qualitatively to the rating
12 received for the new bond --
13      A. I don't.
14      Q. -- debt?
15      A. I don't. I mean looking at this
16 now, lots of LBOs were done at that time, and
17 they were sort of typically in this rating
18 range, I think. You know, the corporate
19 rating of single Bs was not uncommon at all.
20      Q. What was the significance of the
21 credit ratings, if any, that the debt
22 associated with the transaction received for
23 your work in connection with the transaction?
24      A. Well, we assigned our own rating,
25 and we do that sort of independently, but we

---

**66**

1      Confidential - J. Kowalczuk
2 will often sort of look at the public
3 ratings, you know. And if we're far off the
4 public ratings, we would want to sort of
5 think about, if we would -- you know, we
6 would sort of think about it as a sort of a
7 check, right.
8      Q. Did the receipt of these ratings
9 impact your work at all?
10      A. I don't remember.
11      Q. Do you remember whether it impacted
12 JPMorgan's perception of the proposed Zell
13 transaction?
14      MR. JOHNSTON: Objection to form.
15      THE WITNESS: Did you say
16 something?
17      MR. GLAZER: You can answer.
18      A. No. I don't remember.
19      MR. GOLDFARB: Let's mark Kowalczuk
20 Exhibit 4, please.
21      (Kowalczuk Exhibit 4, Document
22 Bates stamped JPM 00260070 through
23 260074, marked for identification, as of
24 this date.)
25      Q. Kowalczuk Number 4 is a multi-page

---

**67**

1      Confidential - J. Kowalczuk
2 document with first Bates 00260070. Do you
3 recognize this document?
4      A. Not really.
5      Q. What do you mean by that?
6      MR. GLAZER: All not reallys are to
7 be taken as no's.
8      A. It looks like something I might
9 have looked at, you know, in preparation for
10 today, but I can't say for sure.
11      MR. GLAZER: Actually, I'm going to
12 instruct the witness that if you ask him
13 if he's seen a document before, to not
14 include any occasion when counsel showed
15 it to him in preparation, that your
16 question should be asking about whether
17 he saw it before he was involved in
18 preparing for today's deposition so that
19 we don't muck up the transcript as to
20 his recollection of having seen
21 documents before.
22      In addition, any document that we
23 selected to show him as part of his
24 preparation, our selection process we
25 believe is work product. So I would

---

**68**

1      Confidential - J. Kowalczuk
2 like to have the witness understand that
3 if he's asked if he's seen a document
4 before, the answer to the question
5 should be other than in preparation for
6 your deposition.
7      MR. GOLDFARB: I don't know if I
8 agree with you, but I mean I can ask him
9 a yes or no question and he can respond
10 whether or not he's seen a document
11 before.
12      MR. GLAZER: Well, with that
13 instruction, he can respond.
14      A. I don't remember the question.
15      MR. GLAZER: He asked if you had
16 seen it before. And my instruction is
17 you should exclude any occasion related
18 to your preparation, that the question
19 is have you seen it before your
20 preparation.
21      A. Yeah, I don't recall seeing it
22 prior to preparation.
23      Q. Looking at the last email in the
24 chain on the second page, this is an email
25 from Gretchen Tonnesen to you on March 29th?

---



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

## 69

1    Confidential - J. Kowalczuk
2        MR. GLAZER: Just so it's clear,
3    there are three March 29th's. I think
4    you're referring to the 2:50 a.m. entry,
5    which is the first in time?
6        MR. GOLDFARB: Yes.
7        THE WITNESS: Yes.
8        MR. GLAZER: The last on the page.
9    Q.   And in that Ms. Tonnesen wrote,
10   "John, please find attached another downside
11   case for the stand-alone Step 1 transaction."
12   Do you see that?
13   A.   Yes.
14   Q.   And then the middle email in this
15   string is an email from you also dated
16   March 29th at 8:53 in the morning responding
17   to Ms. Tonnesen. And you wrote to her, "We
18   need to run the Step 2 case with the revised
19   downside assumptions as well."
20       Do you see that in that first
21   sentence?
22   A.   Oh. Yes.
23   Q.   And then the next line is, "Natasha
24   and Raj, Jeff Sell has asked for a run
25   showing just Step 1 assuming Step 2 never got

## 70

1    Confidential - J. Kowalczuk
2    done and a downside. The downside in the
3    materials we got was too light, i.e.,
4    negative one percent to negative two percent,
5    so we revised per the assumptions below."
6        Do you see that?
7    A.   I do.
8    Q.   Do you recall instructing
9    Ms. Tonnesen to run the Step 2 case with the
10   revised downside assumptions that are
11   reflected in her third email, the third email
12   in the string?
13   A.   No. I remember talking to her
14   about running revised -- running downside
15   cases. I don't remember this one
16   specifically.
17   Q.   And in your email you seem to be
18   addressing Natasha and Raj. Do you see that?
19   A.   Yes.
20   Q.   Do you interpret that to mean that
21   you also copied Ms. Klykova and Raj Kapadia
22   on this email?
23   A.   I'm sorry. Say that again.
24   Q.   I'm asking whether you would agree
25   with me that the reference to Natasha and Raj

## 71

1    Confidential - J. Kowalczuk
2    in the email suggests that you also copied
3    them on your response to Ms. Tonnesen?
4    A.   Yes. That's what I would think.
5    Q.   And then when you wrote, "The
6    downside in the materials we got was too
7    light," what do you mean by that?
8    A.   I think I would have meant -- at
9    the time I would have meant that it wasn't
10   sort of down enough.
11   Q.   Am I right that a downside case
12   refers to -- well, what is a downside case?
13   A.   A downside case is a projection
14   where you sort of -- where you make a
15   reasonable assumption as to, you know, things
16   working out in a reasonable stress scenario.
17   Q.   And was it a determination that you
18   yourself made that the downside in the
19   materials that you got was too light?
20   A.   Oh, I don't remember. I don't
21   remember.
22       MR. GLAZER: If you don't
23   remember --
24       THE WITNESS: Yeah.
25   Q.   And do you remember why you wrote,

## 72

1    Confidential - J. Kowalczuk
2    you indicated that the downside was too
3    light?
4    A.   Do I remember why I wrote that the
5    downside was too light. No. No.
6    Q.   Was there anything about the
7    Tribune's current operating performance at
8    that time that suggested to you that you
9    needed to introduce more negative stressing
10   assumptions into the model that JPMorgan was
11   using?
12   A.   Yeah, I believe the results up to
13   that point were -- may have been more
14   negative, but I don't really remember
15   specifically.
16   Q.   And more negative in what respect?
17   A.   See, I don't know, because this is
18   saying one to two percent. I'm not sure if
19   it's referring to cash flow or revenue or
20   EBITDA. So I don't know.
21   Q.   Well, if you look at the second
22   run, Bates number ending in 0073.
23   A.   Yes.
24   Q.   The one labeled "TRB Downside Case"
25   --



Toll Free: 800.441.3376
Facsimile: 202.296.8652

ESQUIRE
an Alexander Gallo Company

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

John Kowalczuk

CONFIDENTIAL

---

73

1        Confidential - J. Kowalczuk
2        A.   Yes.
3        Q.   -- "Capital Structure 1."  Do you
4    see that?
5        A.   Yes.
6        Q.   If you look at the percentage
7    revenue growth projections under the
8    financial summary block?
9        A.   Yes.
10       Q.   Do you see that?
11       A.   Yes.
12       Q.   The range is from negative two to
13   negative one percent?
14       A.   Yes.
15       Q.   And then in the JPM downside case,
16   which is 260072?
17       A.   Yes.
18       Q.   The revenue growth range goes from
19   negative 8 to 1.1 percent.
20       A.   Yes.
21       Q.   Do you see that?
22       A.   Yes.
23       Q.   Does that suggest to you that the
24   negative one to negative two percent
25   referred to in your email refers to the

---

74

1        Confidential - J. Kowalczuk
2    revenue growth projections?
3        MR. GLAZER:  Objection to form.
4    You should ask about his recollection,
5    not what it suggests to him as you run
6    through documents.
7        Give him your recollection if you
8    have any on the subject.
9        A.   Yeah.  I mean I don't remember
10   exactly what I was saying, what we were
11   talking about here.  It does seem like the
12   one to two percent is revenue.  And that
13   would -- so yeah.
14       Q.   Looking also at the third email
15   that talks about the projection for revenue
16   growth used in the JPM downside case, does
17   that aid your recollection or refresh your
18   recollection at all with respect to whether
19   or not the negative one percent to
20   two percent that you referred to, in fact,
21   related to the revenue growth percentage?
22       A.   Yeah.  Yes.  It appears to be
23   revenue growth.
24       Q.   And do you recall looking at the
25   JPM downside case run that is reflected on

---

75

1        Confidential - J. Kowalczuk
2    260072?
3        A.   Not specifically, no.
4        MR. GOLDFARB:  Let's mark as
5    Number 5, please.
6        (Kowalczuk Exhibit 5, Document
7    Bates stamped JPM 00496537 through
8    496539, marked for identification, as of
9    this date.)
10       Q.   Kowalczuk 5 bears first Bates
11   number JPM 00496537.
12       Have you had a chance to look at
13   this?
14       A.   I'm not quite through it.  Okay.
15       Q.   What is this document?
16       A.   This looks like an email from
17   Joachim to a lot of people describing the
18   Zell Tribune transaction.
19       Q.   And it's dated April 2nd, 2007; is
20   that right?
21       A.   Yes.
22       Q.   The bolded paragraph at the bottom
23   states, "JPMorgan acted as exclusive
24   financial adviser to Sam Zell and will serve
25   as joint book runner on each tranche of the

---

76

1        Confidential - J. Kowalczuk
2    debt financing for this transaction."
3        Do you see that?
4        A.   Yes.
5        Q.   And if you look at the following
6    page, there's a list that identifies the
7    members of the JPMorgan team.  Do you see
8    that?
9        A.   Yes.
10       Q.   Can you tell me which of the
11   members of the team were acting as financial
12   advisers to Zell?
13       A.   I could not tell you that.
14       Q.   Was the financial adviser role one
15   distinct, to your recollection, distinct from
16   the team that you were working on?
17       A.   Sorry.  Repeat the question again.
18       Q.   Sure.
19       A.   Was it distinct from the team that
20   I was working on?
21       Q.   Yes.  Was there a group of people
22   working as financial advisers that were
23   distinct from the group that you considered
24   yourself to be on?
25       A.   Let me -- I'll answer it this way.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

### 77

1      Confidential - J. Kowalczuk
2  I'm not aware of any of the work that the --
3  any work, financial advisory work that was
4  done or might have been done by JPMorgan in
5  connection with this transaction.
6      MR. GLAZER:  That was just not your
7  area?
8      THE WITNESS:  Yeah.
9      A.  So I think the answer to your
10 question was no.  Well, it must have been
11 distinct, but I'm not aware of it.  I'm not
12 aware of that work.
13     Q.  At any point in time did you become
14 aware that there were people at JPMorgan who
15 had acted as financial advisers to Zell in
16 connection with the transaction?
17     A.  I don't remember.  I don't remember
18 that being the case.
19     Q.  To your understanding, was the
20 JPMorgan team as reflected here, were the
21 people here part of the team that you've
22 testified about today that you have referred
23 to as the Zell team?
24     A.  I'm sorry.  Say that again.
25     (Record read.)

### 78

1      Confidential - J. Kowalczuk
2      MR. GLAZER:  Objection to form.
3      A.  It's just confusing the way --
4  maybe you can just put it a different way.
5      Q.  You testified earlier about a Zell
6  team.
7      A.  Yes.
8      Q.  Are the members listed here the
9  people who you considered to be members of
10 your Zell team?
11     A.  Some of them listed here are what I
12 considered part the Project Tower sort of
13 Zell team, yeah.
14     Q.  Are there people who are outside of
15 that Project Tower team listed here?
16     A.  Yes.
17     Q.  Who are those people?
18     A.  Well, to my knowledge -- well,
19 there's a lot of senior people here who
20 weren't on, you know, weren't really on the
21 team, sort of the active team that worked on
22 this, that worked on the financing that I'm
23 aware of.  I mean the people that were sort
24 of on the active team that I worked on were,
25 you know, Peter Cohen, Joachim, Tony,

### 79

1      Confidential - J. Kowalczuk
2  Gretchen, Raj, Natasha, Yang.  I don't
3  remember Mark and Tesia specifically, but --
4  and then Jeff and me and Robert Anastasio,
5  Jeff Sell and me and Robert Anastasio.  You
6  know, someone like Andy O'Brien, who is the
7  head of capital markets, was someone that
8  they would have -- that someone in the
9  leveraged finance would have talked to about
10 this transaction, maybe gotten approval to go
11 forward with it, but he wasn't like -- he
12 wasn't sort of on the active team, if you
13 understand what I mean.
14     Q.  Looking at the senior management,
15 the first person listed is Jamie Dimon, CEO?
16     A.  Yes.
17     Q.  What did you understand his role to
18 be in connection with this transaction?
19     A.  I didn't understand him to have a
20 role on this transaction.  He may have met
21 with Sam at some point, but beyond that, I
22 don't know.
23     Q.  What about Jimmy Lee?
24     A.  I think it's the same thing.  I
25 think he may have met with Sam at some point,

### 80

1      Confidential - J. Kowalczuk
2  but I don't know.  I don't know of him having
3  a role.
4      Q.  In your experience, is it common
5  for JPMorgan to put out an announcement such
6  as this when a deal is executed?
7      A.  Not uncommon.
8      Q.  In other deals you had worked on,
9  had announcements such as this in this
10 general form been issued?
11     A.  Yeah.  Sometimes yes, sometimes no.
12     Q.  And in your experience, was it
13 typical for Jamie Dimon to be listed as part
14 of a team for a transaction in an
15 announcement like this?
16     A.  No.  Uhh, just say it again.  Is
17 it -- was it -- sorry.
18     (Record read.)
19     A.  In my experience, no.
20     Q.  And what about Jimmy Lee?
21     A.  Sometimes he shows up on these
22 things or these sorts of things.  I couldn't
23 say what is typical or not.
24     Q.  And Brit Bartter, what was his
25 role, if you know?



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

## 81

1    Confidential - J. Kowalczuk
2       A.  He was the -- he was the
3    relationship officer, I believe, for Sam Zell
4    slash EGI.
5       Q.  What do you mean by a relationship
6    officer?
7       A.  Like the coverage guy.
8       Q.  A person who had a primary client
9    relationship, a primary relationship with a
10   client?
11      A.  Yes.  Yes.
12      Q.  Doug Braunstein, what was his role
13   in this transaction, if you know?
14      A.  I don't know.
15      Q.  And what about Chris Linneman?
16      A.  Well, I don't know, but Chris I
17   think at the time to do the -- to go forward
18   with a transaction, I think Chris's approval
19   might have been required.
20      Q.  Before this came out, before
21   April 2nd, were you aware that either
22   Mr. Dimon or Jimmy Lee were involved in the
23   Zell project?
24      A.  I don't remember.
25      Q.  And in the last paragraph just

## 82

1    Confidential - J. Kowalczuk
2    before the team list it says, "The press
3    release and a detailed case study are
4    attached."  Do you see that?
5       A.  Yes.
6       Q.  What does a detailed case study
7    mean at JPMorgan in this context?
8       A.  Usually it's a page or a couple of
9    pages that kind of describe or summarize the
10   transaction.
11      MR. GOLDFARB:  Let's mark this as
12   Number 6, please.
13      (Kowalczuk Exhibit 6, Document
14   Bates stamped JPM 00218145 through
15   218147, marked for identification, as of
16   this date.)
17      MR. GOLDFARB:  While Mr. Kowalczuk
18   is looking at this, this is a document
19   starting with Bates number JPM 00218145.
20      Q.  Have you had a chance to look at
21   it?
22      A.  Yes.
23      Q.  I want to focus your attention on
24   the bottom of the first page.  Strike that.
25   Let's look at the last email, and I'll ask a

## 83

1    Confidential - J. Kowalczuk
2    question about it.
3       MR. GLAZER:  The last on the page
4    is the first in time.
5       Q.  The last on the page is the first
6    in time.  It's dated April 2nd, 2007, at
7    1:45 p.m.  Do you see that?
8       A.  Yes.
9       Q.  And it's an email from Mr. Kotronis
10   to Mr. Guterman and cc'ing others asking for
11   information that is required before we move a
12   deal to a mandate.  Do you see that?
13      A.  Yes.
14      Q.  What does that mean?
15      A.  I think what this is is they have a
16   pipeline that tracks projects, and I think
17   once we are sort of signed up or mandated to
18   go forward, I think they move it in the
19   system from just sort of a project that
20   people are working on to a mandated deal.  I
21   think that's what this is.  It's not really
22   -- it's a leveraged finance kind of
23   administrative thing, so.
24      Q.  And it's requesting a number of
25   bulleted points of information; right?

## 84

1    Confidential - J. Kowalczuk
2       A.  Right.
3       Q.  And then looking to the bottom of
4    the first page, which is the second most
5    recent email, the one from Mr. Guterman to
6    Mr. Kotronis and cc'ing you, among others?
7       A.  Yes.
8       MR. GLAZER:  That's the 2:06 email?
9       MR. GOLDFARB:  The 2:06 email, yes.
10      Q.  It's asking you for certain
11   information.  Do you see that?  It asks that
12   you provide Thanos with the hold amounts,
13   obligor ratings, and facility ratings.  Do
14   you see that?
15      A.  I do.
16      Q.  And then at the bottom of the email
17   it says, "JPM is joint book runner."
18      A.  Yes.
19      Q.  Do you see that?
20      A.  Yes.
21      Q.  What is that role?  What does that
22   mean?
23      A.  I'm sorry.  It takes a minute
24   because it's a commonly used term that I've
25   never thought about the definition of.  Well,



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

85

1      Confidential - J. Kowalczuk
2  the joint part means we're sharing the book
3  runner role with another institution.  And
4  the book runner role is -- I guess you could
5  just say it's the institution that's leading
6  the transaction.
7      Q.   The beginning of the next sentence
8  says, "We believe we are lead left on the
9  bank facility."  Do you see that?
10     A.   Yes.
11     Q.   What does lead left refer to?
12     A.   It would refer to the placement of
13 the institution on things like marketing
14 materials that are distributed to the
15 prospective investors, and which institution
16 goes on the left is sort of the lead, sort of
17 the lead of the leads.
18     Q.   So am I correct lead left is sort
19 of the primary or principal lender on a
20 facility that has more than one lender?
21     MR. GLAZER:  Objection to form.
22     A.   Sorry.
23     (Record read.)
24     A.   It's a little more complicated than
25 that.  Lead left definitely defines who gets

86

1      Confidential - J. Kowalczuk
2  lead left credit in lead tables.  And then
3  functionally, it often means the institution
4  that's lead left is sort of really leading in
5  a functional way all the aspects of the
6  transaction.  But it might also mean that
7  there is actual joint work being done.  So
8  the most significant aspect of left or the
9  one you know is always the case is that
10 that's who is going to get the lead left sort
11 of credit on the lead tables.  The joint book
12 runner status, lead left might not
13 necessarily mean that that's the institution
14 that's really doing -- the only institution
15 that's doing the work on sort of leading the
16 transaction.  So the joint might have a
17 significant role.  It depends.
18     Q.   And then the top email is one from
19 you to Mr. Guterman copying others, and the
20 first line says, "I just spoke to Jeff Sell,
21 and he said 100 million would be our hold on
22 the RC, zero on the term loans."  Do you see
23 that?
24     A.   Yes.
25     Q.   What does that mean when you were

87

1      Confidential - J. Kowalczuk
2  recounting Mr. Sells saying that 100 million
3  would be our hold on the RC?
4      A.   I'm sorry.  Did you say what does
5  it mean?
6      Q.   Yes.  What does it mean?
7      A.   Well, in a transaction like this in
8  an underwriting there is the amount you
9  underwrite, which is the exposure you have
10 initially until it's sort of distributed to
11 the syndicate, and then there is what
12 JPMorgan keeps in a sense that is not
13 distributed.  And so in this transaction we
14 were going to distribute the entire term
15 loan, which is typical, and then we would
16 keep a hundred million dollars of the
17 revolving credit facility.
18     Q.   When you say it was typical to
19 retain zero on the term loan, why was that
20 typical?
21     A.   We just -- I can't say why it's
22 typical, but just we don't -- JPMorgan is not
23 a Term Loan B investor.
24     Q.   Is it true that a hundred million
25 dollar hold on the revolver would be a

88

1      Confidential - J. Kowalczuk
2  reduction from the initial commitment that
3  JPM agreed to underwrite?
4      A.   The initial commitment to the
5  revolver?
6      Q.   Yes.
7      A.   Yeah.  Yeah.  Yeah.
8      Q.   Does that also, correspondingly,
9  reduce JPM's exposure or risk in connection
10 with that revolver?
11     MR. GLAZER:  Objection to form.
12     A.   I'll put it this way.  If you're
13 holding less, you have less risk, yes.
14     Q.   And by going to zero on the term
15 loans, does that mean that JPMorgan, if it
16 was successful in reducing its hold to zero
17 on the term loans, would have no risk in
18 connection with the term loans?
19     A.   In connection with the term loans,
20 yes.
21     Q.   Do you recall what JPMorgan's
22 commitment was on the term loans initially?
23     A.   I don't, no.
24     Q.   What about on the revolver?
25     A.   I perhaps shouldn't guess, but I



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

John Kowalczuk                                    January 20, 2010

(HIGHLY) CONFIDENTIAL

89

1    Confidential - J. Kowalczuk
2  seem to recall we had a third, and I do
3  remember that the revolver was 750, so I
4  could be wrong about this, but it might have
5  been 250.
6    Q.   And then the next line says, "I
7  also believe the we're selling at least
8  49 percent of the bridge." I assume it says
9  I also believe that we're selling at least
10  49 percent of the bridge.  What does the
11  bridge refer to?
12    A.   I think there was going to be
13  high-yield bonds, I think, as part of this
14  transaction.  And so the bridge would have
15  been the bridge loan in anticipation of those
16  bonds being sold.
17      (The following portion has been
18      deemed Financial Institution Highly
19      Confidential and continues in highly
20      confidential portion of transcript.)
21
22
23
24
25

90

2    Q.   And then the last line says, "We
3  didn't discuss the rating, but I think this
4  will be a 6/6+."
5      What does that refer to, a rating
6  of 6/6+?
7    A.   When I talked earlier about that
8  JPMorgan does our own internal credit grades,
9  so that's our -- that was going to be our --
10  that was what I was saying was the internal
11  -- I thought would be the internal credit
12  grade.  It was in that range.
13    Q.   And is that a high grade or a low
14  grade rating?
15    A.   It's similar to a single B or
16  single B plus risk rating -- credit rating.
17    MR. GLAZER:  I'm going to designate
18    the last two questions and answers as
19    Financial Institution Highly
20    Confidential, because it relates to
21    internal JPMorgan ratings as well as
22    this document Exhibit 6.
23    MR. GOLDFARB:  And, counsel, you
24    can do a continuing to the extent I'm
25    asking about these things.

91

2    MR. GLAZER:  Thank you.  So let's
3    make it continuing until we take it off.
4    MR. GOLDFARB:  Okay.
5    Q.   What is the range of the JPMorgan
6  rating scale?
7    A.   I think it actually starts at one
8  and goes to I believe ten.
9    MR. GLAZER:  Can we go off the
10    record for a second, please.
11    MR. GOLDFARB:  Sure.
12    (Discussion off the record.)
13    MR. GOLDFARB:  Let's mark this as
14    Kowalczuk Exhibit 7.
15    (Kowalczuk Exhibit 7, Document
16    Bates stamped JPM 00148109 through
17    148155, marked for identification, as of
18    this date.)
19    Q.   And this is a lengthy document
20  bearing Bates 00148109.  And why don't I
21  suggest this, Mr. Kowalczuk, which is I'm not
22  going to ask you about all parts of this,
23  because it doesn't make sense for you to
24  review it in its entirety.  Of course, if you
25  need to review it in order to answer my

92

2  questions, please let me know.  But I would
3  propose that I kind of point you to an area,
4  give you time to review it to your
5  satisfaction, and ask you questions about it.
6    A.   Okay.
7    Q.   Rather than taking time to review
8  the entire document.  Is that okay with you?
9    A.   Sure.
10    Q.   Looking just at the cover page, is
11  this a form of document you have seen before?
12    A.   It actually doesn't look familiar.
13  It does not look familiar.
14    Q.   And just for the record, this page
15  is titled "Credit Approval and Review Summary
16  Interim Proposal:  Tribune Company." And it
17  indicates the report was run on 27 April
18  2007.  And just up from the bottom is an
19  approval history.  Do you see that?
20    A.   Yes.
21    Q.   Indicating listing Jeffrey Sell and
22  yourself as the two people listed there.  Do
23  you see that?
24    A.   Yes.
25    Q.   There are references to authority



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

### 93

2  level in the fourth column of that section.
3  Do you see that?
4      A.  Yes.
5      Q.  Mr. Sell has a C6 authority level.
6  What does that mean?
7      A.  It means he can approve
8  transactions of a certain size.  There's a
9  grid mand a C2 can approve transactions of a
10 certain size.  A C4 can approve transactions
11 of a larger size.  And a C6 can approve
12 transactions of a larger size.
13     Q.  Again, just so I understand, what
14 is that scale?  Is C6 the highest, or are
15 there approval levels above C6?
16     A.  I think C6 might be the highest,
17 but I'm not sure.
18     Q.  And you're listed as having a B2
19 rating.  Do you see that?
20     A.  Yes.
21         MR. GLAZER:  Objection.  That's a
22 B2 authority level.  It's not a rating.
23 He's very highly rated.
24         THE WITNESS:  Exactly.
25     Q.  You're an A in my book, sir.  B2

### 94

2  authority level, do you see that?
3      A.  Yes.
4      Q.  What authority level does that
5  represent?
6      A.  So a B level authority could not
7  approve term exposure, which is -- B level --
8  a B level authority could approve very short
9  term like operating and settlement exposure
10 but not anything longer term than that, and
11 so -- but two signatures are required on any
12 approval, so I'm sort of the second signer
13 here.
14     Q.  Turning to page -- well, it's about
15 the fifth or sixth page of the document, the
16 one ending in Bates 116.
17     A.  Yes.
18     Q.  Do you see that?
19         MR. GOLDFARB:  And, counsel, we may
20 need to sort it out a little bit, but is
21 this part of the transcript one that
22 need be designated financial information
23 under --
24         MR. GLAZER:  Yes.  We'll designate
25 the questions and answers for this

### 95

2  document as well.
3      Q.  Is this a form of document that you
4  recognize?
5      A.  Yes.
6      Q.  What is this document?
7      A.  This is the approval form for the
8  high-yield bridge.
9      Q.  And the tranche summarization
10 indicates that its senior notes of a size
11 2100.00.  Do you see that?
12     A.  Yes.
13     Q.  And do you take that to mean
14 $2.1 billion?
15     A.  Yes.
16     Q.  And the signatures at the bottom,
17 is that Mr. Kapadia's signature?  Do you
18 recognize that as Mr. Kapadia's signature?
19     A.  I don't, but I have no reason to
20 believe it's not.
21     Q.  And either Mr. Linneman or
22 J. Casey?
23     A.  Um-hmm.
24     Q.  Who is Mr. Casey?
25     A.  He was the head of the high-yield

### 96

2  desk.  I can't give you a more precise title
3  than that.
4      Q.  And is that your signature as the
5  client credit manager?
6      A.  Yes.
7      Q.  And do you recognize that as
8  Mr. Sell's signature under the credit
9  executive?
10     A.  I don't recognize it, but.
11     Q.  Now, turning to the next page,
12 Bates ending in 117, is this a form of
13 document that you recognize?
14     A.  Yes.
15     Q.  And what is this page?
16     A.  This is the approval form for the
17 tranches of the transaction that were not
18 high yield.  I guess it's the, you know, the
19 senior or senior secured tranches.
20     Q.  And that indicates the facilities
21 and pricing section.  Do you see that?
22     A.  Yes.
23     Q.  That third block down, it lists the
24 total bank deal amount in millions as 8,028,
25 so a little over $8 billion.  Is that right?



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

## 97

2  Can you read that?

3      A.  Yes.

4      Q.  And underneath that is the JPM

5  commitment amount of about 2.4 billion?

6      A.  Yes.

7      Q.  With a JPM target hold of a hundred

8  million?

9      A.  Yeah.

10      Q.  Is that the hundred million dollars

11  referred to in your earlier email that

12  JPMorgan sought to hold a hundred million

13  dollars on the revolver?

14      A.  Yes.

15      Q.  Underneath there it indicates that

16  there are a couple of phrases with questions.

17  The first one is "Highly Confident."  Do you

18  see that?

19      A.  Yes.

20      Q.  What does that mean?  What does

21  that refer to?

22      A.  In an underwriting, the capital

23  markets team will either say that they are

24  highly confident that they will be able to

25  sell the entire amount that's being

## 98

2  underwritten or that they're not.  And here

3  they're saying that there is a highly -- they

4  were highly confident that they would be able

5  to sell the -- sell what we were underwriting

6  down to our target hold level.

7      Q.  Do you know who prepared this form?

8      A.  Oh.  Well, I don't know, but it

9  says "Prepared by Mark Guterman" at the very

10  top.

11      Q.  Well, that helps, then, doesn't it.

12      MR. GLAZER:  Maybe yes, maybe no.

13      A.  I mean typically it would have been

14  prepared by the SLF analyst.

15      Q.  And do you know who in this

16  instance would be the person who would make

17  the judgment as to whether or not JPMorgan

18  was highly confident that it would be able to

19  sell down its commitment to its target hold

20  level?

21      A.  It would either be Chris Linneman

22  or Jim Casey or someone who worked for them.

23  I don't know.

24      Q.  In the third bar from the bottom,

25  it lists "Other Considerations."  Well,

## 99

2  "Exposure" is on the left, and then "Other

3  Considerations."  Do you see that?

4      A.  Yes.

5      Q.  The first box under "Other

6  Considerations" states, "Is this a heightened

7  risk transaction?"  Do you see that?

8      A.  Yes.

9      Q.  What is meant by a heightened risk

10  transaction at JPMorgan in this context?

11      A.  Yeah, I'm not sure, but I think

12  that -- I think there is or was a regulatory

13  designation of certain transactions that were

14  designated as heightened risk, but I -- and I

15  think there was a specific definition that

16  went along with it.  I think that's what this

17  might be, but I'm not sure.

18      Q.  Do you know who at JPMorgan would

19  be making the assessment or determination

20  about whether a transaction or this

21  transaction was a heightened risk

22  transaction?

23      A.  I don't know.

24      Q.  And then, again, there are a number

25  of signatures in the SLF approval block, and

## 100

2  then that is your signature, the first

3  signature under the credit approval?

4      A.  Yes.

5      Q.  And then there are proposed risk

6  ratings on the right next to the signatures.

7  Do you see that?

8      A.  Yes.

9      Q.  And the left-most column there

10  refers to the facility type, and then next to

11  it is a default grade.  Do you see that?

12      A.  I'm sorry.  The right-most column

13  refers to facility grade.

14      Q.  I'm sorry.

15      A.  Oh, facility type.  Yes.  Yes.

16      Q.  Just describing the transaction.

17  And then the second column is default grade?

18      A.  Yes.

19      Q.  What does default grade refer to?

20      A.  That's the -- it's the risk grade

21  or the credit -- it's similar to the credit

22  rating and is meant to -- I forget how I

23  defined credit rating earlier, but it's meant

24  to capture and reflect the risk of -- the

25  risk associated with a borrower, risk being



# ESQUIRE

an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

101

2  sort of risk of default.
3       Q.  Is the default grade scale at
4  JPMorgan the same as you described earlier
5  for the ratings scale that you described in
6  connection with the exhibit we looked at
7  earlier?
8       A.  Yeah.  I forget the exhibit, but
9  it's the same thing.  Default grade -- I
10  forget what we called...
11       Q.  Kowalczuk Exhibit 6 just refers to
12  -- the email said -- it didn't identify the
13  particular rating used.
14       A.  Yeah.
15       Q.  It just used the number.
16       A.  Yes.  So we commonly refer to that
17  as risk grade, but it's also known as obligor
18  grade or default grade.
19       Q.  And what is the difference between
20  default grade and facility grade?
21       A.  The facility grade is in a sense
22  calculated or defined by the default grade
23  and the LGD.
24       Q.  What is the LGD?
25       A.  Okay.  LGD is loss given default.

---

102

2       Q.  What does that mean?
3       A.  So it assumes -- it's an estimate
4  of what the loss would be if there is a
5  default in percentage terms.
6       Q.  And there are the three facility
7  types listed in this box, each is listed at
8  30.  Do you see that?
9       A.  Yes.
10       Q.  Who made that determination?
11       A.  It would have been some combination
12  of Jeff Sell and me.
13       Q.  Is that considered a high LGD,
14  30 percent?
15       MR. GLAZER:  Objection to form.
16       A.  No.  No.
17       Q.  Is it considered a low LGD?
18       MR. GLAZER:  Same objection.
19       A.  No.  No.
20       Q.  In signing this form, did you have
21  any concerns about JPMorgan's participation
22  in this transaction and the facilities
23  described here?
24       MR. GLAZER:  Objection to form.
25       MR. JOHNSTON:  Objection to form.

---

103

2       A.  Did you say did I have concerns?
3       Q.  Um-hmm.
4       A.  I don't recall having concerns.
5  This was a big deal, and there was, you know,
6  it was -- there was risk involved, but, you
7  know, that's kind of the business we're in,
8  so.
9       Q.  In your own experience, did you
10  consider this -- sort of I guess where on the
11  scale of riskiness did you personally sort of
12  assess this transaction as compared to others
13  that you had worked on at JPMorgan?
14       MR. GLAZER:  Objection to form.
15       MR. JOHNSTON:  Objection to form.
16       A.  Well, I mean it's sort of reflected
17  in the risk grade, and we were doing a lot of
18  deals at the time that were sort of six
19  rated.  LBOs were sort of typically in that
20  range.  And this was larger.  It was sort of
21  a large deal.
22       Q.  And then the next page is Bates
23  ending in 118.  Do you see that?
24       A.  Yes.
25       Q.  And do you recognize that

---

104

2  essentially to be the same form approval
3  document but for another loan connected to
4  this transaction?
5       A.  Yes.  Yes.
6       Q.  And the signature at the bottom,
7  you also signed this one?
8       A.  Yes.
9       Q.  And looking at the next page
10  beginning with Bates 00148119, do you see
11  that?
12       A.  Yes.
13       Q.  What is this document?
14       A.  This is -- at the time we talked
15  about the credit package or the credit memo.
16  It was sort of split into -- at this time
17  sort of split into two different parts, one
18  kind of describing the transaction and the
19  other more describing the borrower and the
20  industry and its place in the industry and
21  things like that.  So this is part of that
22  credit package that we talked about earlier.
23       Q.  And who does this go to at
24  JPMorgan?
25       A.  Who does it go to.  It doesn't -- I

---



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

### 105

2  mean it would have gone to Jeff Sell, I mean
3  but not anybody other than that really.
4      Q.  And who prepared it?
5      A.  It also would go to sort of the
6  mid-office for processing, because this looks
7  like a mid-office document you got here or
8  like a back-office document, so.
9      Q.  And who prepared it?
10     A.  Most of the work is done by an
11 analyst that we had Jana Choi and me.  But
12 Jana would have done most of the work on it.
13     Q.  Was Ms. Choi an analyst in your
14 Credit Risk Management?
15     A.  Yes.
16     Q.  And was she also in the particular
17 sub-group, what is TMT?
18     A.  TMT, yes.  Yeah.
19        MR. GOLDFARB:  Let's go off the
20     record, please.
21        (Discussion off the record.)
22        (Lunch recess taken from 12:24 p.m.
23     to 1:15 p.m.)
24        AFTERNOON SESSION
25 EXAMINATION (Cont'd.)

### 106

2  BY MR. GOLDFARB:
3      Q.  Good afternoon, Mr. Kowalczuk.
4  Turning back to Kowalczuk Exhibit 7, we were
5  looking at the cover page of the transaction
6  of the document labeled "Transaction
7  Proposal."  Are you back there with me?
8      A.  Yes.
9      Q.  And it's dated April 5th, 2007; is
10 that right?
11     A.  Yes.
12     Q.  And you mentioned before the break
13 that Ms. Choi helped prepare the document;
14 correct?
15     A.  She did the primary -- most of the
16 work in preparation for this document.
17     Q.  Who else actually worked on
18 preparing this document?
19     A.  Well, there are pieces pulled in
20 from the coverage team and from leveraged
21 finance.
22     Q.  Did you participate in the creation
23 of this document?
24     A.  Yes.
25     Q.  Does a document like this undergo a

### 107

2  final review before submission for approval?
3      A.  Well, I would read it before I sign
4  it or we call it final and before we give it
5  to Jeff as the final copy.
6      Q.  And are you saying that you were
7  the final reviewer before it was distributed
8  to Mr. Sell?
9      A.  Yes.  That's right.
10     Q.  So if you turn the page, there is
11 information about the client information and
12 team?  Do you see that?
13        MR. GLAZER:  That's on 48120?
14        MR. GOLDFARB:  48120, yes.
15     A.  Yes.
16     Q.  And under Client Credit Management,
17 you and Ms. Choi are listed.  Yes?
18     A.  Yes.
19     Q.  Were you supervising her at this
20 point in time?
21     A.  She reported to me.
22     Q.  And the department is listed as
23 Client Credit Management?  Yes?  Your
24 department?
25     A.  Yes.  Yes.  I think I said earlier

### 108

2  there were a couple of names, there was
3  Corporate Banking, and then I forgot about
4  Client Credit Management.  And now it's
5  Credit Risk Management.  So it's the same.
6      Q.  And at this point in time who was
7  the client for which you were preparing this
8  material?
9        MR. GLAZER:  Objection to form.
10     A.  Do you mean who was the internal
11 client, like who internally are we preparing
12 this for?
13     Q.  Well, your department was the
14 Client Credit Management department.  Who did
15 you understand JPMorgan was working for in
16 connection with this transaction?
17     A.  Yeah, I don't --
18        MR. GLAZER:  If you recall.
19     A.  Yeah, I mean I don't recall sort of
20 thinking it was -- who the client was, I mean
21 whether I was thinking it was Tribune or
22 Zell, I mean I don't think I had that
23 distinction in my mind.
24     Q.  Do you know who at this point was
25 paying JPMorgan's fees in connection with



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

109

2  this work?
3      A.  No.  No.
4      Q.  Do you know who was the person that
5  would know that, if you know?
6      A.  I think someone in SLF would know
7  that.
8      Q.  Prior to this report, working with
9  Ms. Choi for this report, had you worked with
10  her previously?
11      A.  Yes.
12      Q.  In what capacity?
13      A.  I don't remember specifically what
14  we worked on together, but we do annual
15  reviews of our clients, of our borrowers, and
16  I know that she -- I reviewed some of her
17  annual reviews.
18      Q.  Were there other analysts in Client
19  Credit Management who worked on this
20  transaction proposal?
21      A.  No, I don't think so.
22      Q.  How did she come to be the one
23  enlisted to prepare it, if you know?
24      A.  I think she was not on another
25  team, and I think she was the person who

110

2  covered Tribune previously, but I'm not sure
3  about that.  It's just a vague recollection.
4      Q.  Did you yourself enlist her to help
5  with the project?
6      A.  I don't remember.
7      Q.  And just sort of describe, if you
8  can, how the document was created.  Did you
9  meet with Ms. Choi?  Did you have an ongoing
10  conversation or emails as it was prepared?
11  What was sort of the working, generally, the
12  working structure or format?
13      A.  She would have -- could you just
14  read that back to me.
15      (Record read.)
16      A.  She would have done some work on
17  it.  She would have pulled in some
18  information from other groups.  I would have
19  reviewed drafts and made comments or changes
20  to those drafts or talked to her about those
21  drafts.
22      Q.  Did this document, to your
23  knowledge, go through multiple iterations?
24      A.  Yes.
25      Q.  And did you review intermediate

111

2  drafts as they were prepared?
3      MR. GLAZER:  Objection to form.
4      A.  Yes.  I reviewed many drafts.
5      Q.  And what did you do with those
6  drafts when you reviewed them?
7      A.  I would make comments or talk to
8  her about them and then she would make
9  revisions.
10      Q.  And would your comments be
11  delivered orally, or would you make
12  handwritten notations or some other approach
13  to providing the comments to Ms. Choi?
14      MR. GLAZER:  Objection to form.
15      A.  Probably both.
16      Q.  Did you ever have conversations
17  with Ms. Choi about whether either of you had
18  concerns about the degree of leverage or the
19  structure of the transaction that was
20  proposed?
21      A.  I don't remember.
22      Q.  Do you remember having
23  conversations with anybody at JPMorgan where
24  the concerns about the structure of the Zell
25  transaction were discussed?

112

2      A.  No.  No.
3      Q.  You did, I believe, testify earlier
4  that you had at least one conversation with
5  Jeff Sell where he expressed concern about
6  the structure of collateral that was proposed
7  for the Zell transaction in late March.  Do
8  you recall that?
9      MR. GLAZER:  Objection.
10      MR. JOHNSTON:  Objection.
11  Misstates the testimony.
12      (Record read.)
13      A.  I remember talking to Jeff about
14  the structure.  I remember generally talking
15  to Jeff about the structure and that change
16  to the structure.
17      Q.  And did you talk to anybody else
18  about the structure of the transaction?
19      A.  I talked to Natasha about it, too.
20      Q.  And what aspect of the transaction
21  structure do you recall talking to
22  Ms. Klykova about?
23      A.  Well, I remember talking to her
24  about that change, that aspect of it, the
25  change from secured by the publishing assets



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

John Kowalczuk                                    January 20, 2010

(HIGHLY) CONFIDENTIAL

---

### 113

2    or stock to the intercompany note.
3        Q.    And what, if anything, do you
4    recall her saying about it?
5        A.    I don't. I just remember the
6    general conversation.
7        Q.    If you could turn to Page 8 of the
8    Power Point, which is Bates ending in 8127.
9        A.    Okay.
10        Q.    And this is labeled "Step 1
11    Projections." Do you see that?
12        A.    Yes.
13        Q.    Do you know where these projections
14    came from?
15        A.    I don't remember.
16        Q.    Stepping back from this document,
17    do you remember generally receiving
18    projections of Tribune Company performance in
19    the course of your work in 2007 on this
20    project?
21        A.    Yes. Yes.
22        Q.    Where did you get projections from,
23    if you recall, from any source?
24        A.    From the company. I mean I
25    remember we got a management case. I don't

---

### 114

2    remember if this is that management case.
3        Q.    And looking at the next page. Oh,
4    I'm sorry. I'm going backwards in time. I
5    meant Page 7, please.
6        A.    Yes.
7        Q.    The Step 1 Sources and Uses page.
8    Do you see that?
9        A.    Yes.
10        Q.    In the Sources column the fourth
11    line down refers to "Roll existing debt." Do
12    you see that?
13        A.    Yes.
14        Q.    Do you know what that is referring
15    to?
16        A.    I believe that there was existing
17    debt that was going to stay in place,
18    existing debt of Tribune that was going to
19    stay in place, and I believe that's what that
20    is.
21        Q.    And the 1521 refers to
22    $1.521 billion; is that right?
23        A.    I don't remember the amount.
24        Q.    Was this transaction proposal
25    prepared to account for the entire going

---

### 115

2    private transaction?
3        MR. GLAZER:  Objection to form.
4        A.    What do you mean by the entire?
5        Q.    Well, you referred earlier that
6    your understanding was that the transaction
7    was to proceed in two steps.
8        MR. GLAZER:  Objection to form.
9        Q.    Do you recall that testimony?
10        A.    I remember talking about, yeah, two
11    steps or two stages, yes.
12        Q.    And does this transaction proposal
13    seek approval for lending in connection with
14    both steps of the going private transaction?
15        A.    I believe it does.
16        Q.    And at any point, to your
17    knowledge, did JPMorgan seek approval for a
18    transaction for the first step of the
19    transaction independently?
20        MR. GLAZER:  Objection to form.
21        A.    We did analysis of the first step
22    sort of a stand-alone and, you know, as part
23    of this, I think as part of this analysis, so
24    -- and as well as analysis as to what it
25    would look like, what the company would look

---

### 116

2    after Step 2 as well.
3        Q.    And my question was, did at any
4    point JPMorgan submit for credit approval as
5    part of a credit approval package a
6    transaction proposal that looked only at the
7    first step of the proposed going private
8    transaction?
9        A.    No. No.
10        Q.    So looking at that same Page 7, the
11    Step 1 Sources and Uses page, you see the
12    second line down refers to a new Term Loan B.
13    Do you see that?
14        A.    Yes.
15        Q.    And what does that refer to?
16        A.    Well, it would refer to Term Loan B
17    that was being raised in connection with this
18    deal.
19        Q.    You indicated earlier, I think it
20    was, as you said, that JPMorgan is not a Term
21    Loan B lender. Do you recall testimony to
22    that effect?
23        A.    I think I said that we're not a --
24    yeah, I think I said -- I think I said we're
25    not a Term Loan B investor.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

John Kowalczuk                                    January 20, 2010

(HIGHLY) CONFIDENTIAL

---

117

2     Q.  Investor.  Okay.
3     A.  Right.
4     Q.  Term Loan B, were you using that as
5  a term of art?  What did you mean by that?
6       MR. GLAZER:  Objection to form.
7     A.  I don't want to give everybody a
8  really long answer to this question, but
9  several years ago the market, what was
10  traditionally a bank lending -- the investors
11  in bank loans became broader to include other
12  types of investors other than just banks.
13  And they were structured as term loans, and
14  they were referred to as Term Loan B's, and
15  so -- and now that market is sort of
16  dominated by non-bank investors.  And so now
17  I forget your question because it was -- so I
18  don't know if I've answered it.
19       MR. GLAZER:  I think you did.
20       THE WITNESS:  Okay.
21     Q.  But in short, you were referring to
22  Term Loan B as a term of art?  Yes?
23     A.  I don't know what you mean by a
24  term of art.  There is a sort of a security
25  in a sense, right, called -- commonly called

---

118

2  Term Loan B's that are term loans that people
3  invest in.  It's a generic reference.
4     Q.  And then looking at the Step 2
5  Summary of Terms beginning on Page 14 of the
6  document, Bates 8133.
7     A.  Yes.
8     Q.  That refers to an incremental
9  credit facility.  Do you see that?  Just in
10  that black line.
11     A.  Oh.  Yes.
12     Q.  Do you recall what the incremental
13  credit facility was in connection with this
14  transaction?
15     A.  I don't.
16     Q.  And then looking at Page 17, which
17  is Bates 8136.
18     A.  Yes.
19     Q.  It refers to exposure.  The title
20  of the slide is "Exposure Summary and
21  Strategy."  Do you see that?
22     A.  Yes.
23     Q.  What does that refer to?
24     A.  I have to take a second to look.
25     Q.  Please do.  I didn't mean to rush

---

119

2  you.  Please take a moment to look at it.
3     A.  Okay.  So could you repeat the
4  question.
5     Q.  Yes.  What does exposure summary
6  and strategy refer to?
7     A.  It's the -- well, it describes the
8  existing exposure prior to this transaction.
9  It shows our exposure following Step 1 and
10  exposure following Step 2 and how that
11  exposure would increase or decrease over
12  time.
13     Q.  And am I reading this slide
14  correctly that initially as of April 1, '07,
15  the total transaction JPM share was
16  $3.67 billion?  Am I reading that slide
17  correctly?
18       MR. GLAZER:  Objection to form.
19     A.  I'm sorry.  Just say that again.
20     Q.  As of 4/1/07, the total JPM share
21  for the total transaction was $3.67 billion?
22       MR. GLAZER:  Objection to form.
23     A.  That looks -- that looks right.
24     Q.  And post Step 2 closing, the far
25  column on the right, JPM's plan was to have a

---

120

2  total transaction exposure of $457 million
3  after a Step 2 closing?
4       MR. GLAZER:  Objection to form.
5     A.  That was the plan or the outlook,
6  not including the existing exposure.
7     Q.  And turning to page 19, take a
8  moment to look at it.
9     A.  Okay.  I took a moment, but go
10  ahead and we'll see if I need to take more
11  moments.
12     Q.  Sure.  The top line refers to
13  Family Threshold.  See that?
14     A.  Yes.
15     Q.  What does that mean at JPMorgan?
16     A.  There are thresholds that we have
17  that say you don't want to have -- to sort of
18  guard against exposure concentrations with
19  single clients.  There's thresholds sort of
20  for acceptable exposure levels for a single
21  client, and it's based on risk grade.  And I
22  guess at the time the net threshold for
23  Tribune based on its rating was 125.  So it's
24  referring to that threshold for Tribune at
25  that current rating.

---



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

121

2      Q.  And by 125, is that a rating or is
3  that a dollar figure?
4      A.  No.  That's millions of dollars,
5  $125 million.
6      Q.  The fourth line down on the left
7  has a phrase that says "Family Over
8  Threshold," colon.
9      A.  Yes.
10      Q.  With a "Y" meaning yes?
11      A.  Yes.
12      Q.  And what does that mean?
13      A.  It means that the exposure, and I'm
14  not sure what that -- how that 442 is
15  calculated, we would probably have to go back
16  to a prior page, but the exposure was over
17  the threshold for that borrower.
18      Q.  And what is the significance, if
19  any, of that?
20      A.  Well, it triggered -- at the time I
21  think if a borrower was over threshold or
22  exposure was over threshold for a borrower, I
23  think at the time there were periodic
24  meetings where Client Coverage had to discuss
25  the over-threshold names with senior

122

2  management.
3      Q.  With what purpose?  Why would those
4  discussions occur?
5      A.  To make them aware of the plan to
6  reduce exposure to below or at the threshold
7  amount or to get comfortable that, you know,
8  we would stay there for whatever period of
9  time we felt we needed to stay there.
10      Q.  And did Tribune remain over
11  threshold after April 5th, 2007?
12      A.  Yes.  Yes.
13      Q.  At some point thereafter did the
14  Tribune come within its threshold at
15  JPMorgan, if you recall?
16      A.  I don't think so.
17      Q.  Do you know whether the meetings
18  that you described for an over-threshold
19  client occurred in connection with the
20  Tribune itself?
21      A.  Oh, I don't know.  Just to be
22  clear, there was one meeting and all sort of
23  -- all of the threshold names would be
24  discussed at that meeting, and I don't know
25  if Tribune was discussed or not.  And I'm

123

2  sorry, just to be clear, the timing, I'm not
3  sure if those meetings are still being held,
4  and I'm not sure if they were even being held
5  at the time, at this point in time.  At some
6  point there were -- these over-threshold
7  meetings were taking place, and I'm just not
8  sure if it ran up through this period of time
9  or not.
10      Q.  And it indicates at the bottom,
11  "When JPM is sold down to its approved hold
12  levels, we expect our exposure will consist
13  of a hundred million dollars of revolver
14  credit exposure plus $68.5 million of
15  internal guidance lines and DRE, with
16  expected rating of six minus," in brackets,
17  "we expect exposure will be over threshold
18  and likely to remain so at least initially."
19  Do you see that?
20      A.  Yes.
21      Q.  Who wrote that, if you know?
22      A.  Well, it was -- it would have been
23  Jana and/or me, Jana with input from me, Jana
24  Choi.
25      Q.  And whose responsibility was it to

124

2  make this comparison or analysis in order to
3  make this statement?
4      A.  It was part of the credit package,
5  which is prepared by Jana and me, to figure
6  out if a borrower was over or under
7  threshold.
8      Q.  Looking at the next slide, slide
9  20, just take a look at that and let me know
10  when you've finished looking it over.
11      A.  Okay.  Again, I might need more
12  moments, but go ahead.
13      Q.  Sure.  What does this slide
14  describe generally?
15      A.  It's the revenue and profitability
16  of the Tribune relationship.
17      Q.  And am I correct that it describes
18  various departments or services within
19  JPMorgan that were working with the Tribune
20  Company?
21      A.  Yeah.  Yeah.
22      Q.  The fourth one down refers to T&SS.
23      A.  Yes.
24      Q.  What does that refer to?
25      A.  I'll get this wrong for sure, but



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

### 125

2  it's -- I think it's --
3         MR. GLAZER:  Hopefully it won't
4  sound like a strip club.
5         THE WITNESS:  That's on the record.
6    A.   Trade and Securities Services.
7         MR. BUSATH:  Treasury.
8         THE WITNESS:  Treasury.  Thank you.
9    A.   Treasury and Security Services, I
10  think.
11   Q.   And IMPB, the next one down?
12   A.   I think that's Investment
13  Management and Private Banking.
14   Q.   And in the relationship commentary
15  it says, "Tribune is a Core client for the
16  TMT team in North America."  Do you see that?
17   A.   I do.
18   Q.   Now, "Core" is capitalized.  Is
19  that a term of art?
20   A.   It refers to a specific category of
21  client, yes, I think if that's what you mean
22  by term of art.  It's a proper noun.  Right.
23   Q.   And what are the qualifications to
24  be a Core client?
25   A.   I don't know.  It's sort of a

### 126

2  coverage designation.
3    Q.   By coverage designation, what do
4  you mean by coverage designation?
5    A.   I'm sorry.  The coverage group, the
6  TMT coverage group.
7    Q.   And is it meant to convey a level
8  of particular importance to JPMorgan?
9    A.   I don't think importance is the
10  right word.  It's hard for me to answer that.
11  It's really hard for me to answer that
12  question.
13   Q.   Did you have any at the time
14  understanding of what made Tribune a Core
15  client for the TMT team?
16   A.   No.  This is information -- that it
17  was a core client is something we would have
18  gotten from the coverage team.
19   Q.   Does its status as a Core client or
20  its inclusion in this document have
21  significance or convey or is it intended to
22  convey anything to the reader about the
23  information?
24   A.   I'm sorry.  About?
25   Q.   About the information.

### 127

2         MR. GLAZER:  Objection to form.
3    A.   It is informational.  Beyond it
4  describing the relationship, I couldn't say
5  any more than that.
6    Q.   Did you have any understanding from
7  your work on this matter whether JPMorgan
8  hoped to use its relationship with the
9  Tribune as a lender in this transaction to
10  develop and broaden its relationship with the
11  Tribune in other service areas within
12  JPMorgan?
13         MR. GLAZER:  Objection.
14   A.   I don't recall.  I don't recall
15  that being the case.
16   Q.   Did you ever have conversations or
17  discussions with people about whether
18  JPMorgan's role in this transaction presented
19  an opportunity to expand its relationship
20  with Tribune into other areas?
21   A.   I don't recall having conversations
22  like that.
23   Q.   How about with respect to Mr. Zell?
24   A.   That I don't remember.  In other
25  words, I think you were asking to expand this

### 128

2  transaction, would it help us expand our
3  relationship with Mr. Zell?  That's what you
4  were asking?
5    Q.   Yes.
6    A.   Yeah.  I don't remember anything
7  like that.
8    Q.   Looking at Page 22.  And just take
9  a look at it quickly.  It may be difficult in
10  black and white to figure out which line is
11  which, but take a look and I'll ask you
12  questions.
13   A.   Okay.
14   Q.   Do you recall looking at
15  information like this in the course of your
16  work on the Tribune matter about the Tribune
17  stock performance?
18   A.   I don't, actually.
19   Q.   Do you have any recollection of how
20  the Tribune was doing relative to the rest of
21  the newspaper industry?
22   A.   At this point in time?
23   Q.   Yes.
24   A.   I think we looked at it, how it was
25  doing relative to the industry.  I do think



Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

### 129

2    we looked at it, but I don't recall
3    specifically.
4        Q.   And do you recall generally what
5    JPMorgan found in looking at how the Tribune
6    was performing relative to its competitors?
7        A.   I don't.
8        Q.   If you could look at Page 24,
9    please.
10           MR. GLAZER:  There are quite a few
11       words that are unreadable on this page.
12           MR. GOLDFARB:  That is true.  I
13       think it actually is readable if you
14       look at it.  I may have another copy of
15       it that we can come across if the
16       witness is having trouble.
17           MR. GLAZER:  Well, ask your
18       questions and we'll see if it's a
19       problem.
20           MR. GOLDFARB:  Sure.
21       Q.   Have you had a chance to look at
22    it?
23       A.   Oh.  Yeah.  Okay.
24       Q.   This refers to Facilities/LGD
25    Analysis.  Do you see that?

### 130

2        A.   Yes.
3        Q.   And that LGD refers to loss given
4    default, as you testified earlier?
5        A.   Yes.
6        Q.   What is depicted on this slide?
7        A.   Well, it's the basic structure of
8    the transaction.
9        Q.   Is this something that your group
10    put together, if you recall?
11       A.   I don't recall.
12       Q.   The text below the box on the right
13    says, "TF LLC lends," bracket, "3.0 billion
14    to publishing operating subs in the form of
15    junior subordinated debt."  Do you see that?
16       A.   Yes.
17       Q.   Do you know what TF LLC refers to?
18       A.   I think it refers to Trib Finance
19    LLC, which I think is the box above it.
20       Q.   And what was that entity, if you
21    recall?
22       A.   I believe that was the holding
23    company that was put in place that held the
24    intercompany note that we talked about
25    earlier.

### 131

2        Q.   In the sentence that I just read,
3    there is an asterisk next to the bracketed
4    3.0 billion figure.  Do you see that?
5        A.   I do, yes.
6        Q.   And the asterisk down below states
7    -- the footnote referring to that asterisk
8    below says, "The intercompany note is
9    required to be at least three billion
10    dollars, but based on considerations
11    regarding the solvency opinions, it could be
12    up to $4.2 billion."  Do you see that?
13       A.   I do.
14       Q.   What does that mean?
15       A.   It means at the time we didn't know
16    the size of the intercompany note, but we, I
17    guess I understood it that it could be as big
18    as 4.2 billion or as small as 3.0, three
19    billion, but it wouldn't be any less than
20    three billion.
21       Q.   And what is meant by the phrase
22    "based on considerations regarding the
23    solvency opinions"?
24       A.   I just remember -- I don't remember
25    how I came to understand that.  All I

### 132

2    remember is that the size of it was based on
3    the -- had something to do with the question
4    of solvency.
5            MR. GLAZER:  Don't speculate.  Tell
6        him what you recall.
7        A.   Yeah.  Well, I do recall that it
8    had something to do with solvency at the
9    time.
10       Q.   Looking at the next page, Page 25,
11    just take a look at those two bullets,
12    please.
13       A.   Okay.
14       Q.   Thank you.
15       A.   Okay.
16       Q.   What is, generally, the information
17    that's generally being communicated on this
18    slide?
19       A.   The seniority of the bank debt
20    either through collateral or guarantees.
21       Q.   And seniority of the bank debt, is
22    that compared to other debt?  What seniority
23    is to what?
24       A.   Yeah, compared to other debt, yes.
25       Q.   And what is the other debt that the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

133

2  bank debt would be senior to?
3      A.  Well, the new bonds, the existing
4  Tribune debt, and the phone debt, the phones.
5      Q.  And do you recall what the phones,
6  just for the record, what the phones debt
7  was?
8      A.  Vaguely, yes.  It was some -- it
9  had some connection with Time Warner stock,
10  some Time Warner stock, I believe.
11      Q.  Was this structural seniority
12  important to JPMorgan in its consideration of
13  whether to approve this lending?
14      A.  The position of the bank debt or
15  the position of the debt we hold in the
16  capital structure is always important.  It's
17  always an important consideration in a credit
18  decision.
19      Q.  Is it the main consideration?
20      A.  Well, I can't say.  I mean it's an
21  important consideration.
22      Q.  What are the other important
23  considerations?
24      A.  Well, the -- what are the other
25  important considerations in what?

134

2      Q.  I think it was just your testimony
3  that the --
4      MR. GOLDFARB:  Well, can you read
5  back his prior answer, please.
6      (The following record was read:)
7      "ANSWER:  The position of the bank
8  debt or the position of the debt that we
9  hold in the capital structure is always
10  important.  It's always an important
11  consideration in a credit decision."
12      Q.  And are there other basic
13  considerations that you would consider more
14  important to JPMorgan?
15      MR. GLAZER:  Objection to form.
16      A.  I mean there are other
17  considerations that are important in making a
18  credit decision.
19      Q.  Was there any discussion of
20  JPMorgan doing the transaction without such a
21  structural seniority in place in this
22  transaction?
23      MR. JOHNSTON:  Object to form.
24      A.  No.  I don't think so.  I mean this
25  was the structure, I think, that was sort of

135

2  in place when I got involved basically except
3  for this change I think shortly after I got
4  involved, I think it was shortly after I got
5  involved, with the collateral, you know, the
6  intercompany note instead of the collateral
7  of the publishing.  So the answer, I think,
8  to your question is no.
9      Q.  Looking at Page 27, and take a look
10  at it, and my question will be what is being
11  depicted on this slide?
12      A.  Sure.  I need to take a second.
13  Okay.  It's a comparison of the debt to the
14  collateral.
15      THE WITNESS:  Can I take a second?
16      MR. GOLDFARB:  Sure.
17      (Witness conferred with counsel.)
18      A.  Okay.  Sorry.
19      Q.  And when you say a comparison of
20  the debt to the collateral, you mean the debt
21  taken on by the lenders in the transaction;
22  correct?
23      A.  I think it -- I believe it appears
24  to be the senior secured debt.
25      Q.  What is the conclusion, if there is

136

2  one, shown on this slide?
3      A.  Yeah.  Well, this slide shows that
4  we thought there might be a collateral
5  deficit, that there was less collateral than
6  -- that the senior secured lenders were
7  under-collateralized.  But this is not the
8  final version of this document.  It doesn't
9  appear to be.  Because I do remember that
10  there was -- we weren't sure at this point if
11  the unconsolidated subs were included in our
12  collateral, and then we subsequently learned
13  that it was, and this slide got revised and
14  the deficit -- in the final version there was
15  no deficit.  I think it was footnoted or
16  something.  But at this point we thought
17  there would be a -- there might be a
18  collateral deficit.  Which is interesting.
19      Q.  Why do you say it's interesting?
20      A.  Well, no, it's not the final
21  version of the document, so I'm concerned
22  about what we've been looking at.
23      Q.  Well, do you recall whether there
24  was a credit approval package submitted at
25  more than one point in time?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

**137**

2    A.  I think there's only one that is
3  actually signed, so.
4    Q.  But if we go back to the first few
5  pages that we looked at earlier, it indicates
6  it looks like Mr. Kapadia -- if you look at
7  48116.
8    A.  Yes.
9    Q.  The very beginning.
10    A.  Yes.
11    Q.  Am I right that it looks like
12  Mr. Kapadia signed it on April 5th, you
13  signed it on April 6th, Mr. Sell signed it on
14  April 6th?
15    A.  Yeah.  But there's a version of
16  this document where this cover page is
17  signed, actually.
18        MR. GLAZER:  And you're pointing to
19  what page?  Identify the cover page.
20    A.  Yeah.  It's 119.
21    Q.  And you just referred to 119.  Does
22  it say on that page "See attached SLF
23  approval sheet for signature"?
24    A.  It does.
25    Q.  Do you recall whether there were

---

**138**

2  credit approval packages submitted and
3  executed at different points in time in
4  connection with this transaction?
5    A.  I don't.  No.
6    Q.  If you could turn, please, to
7  Page 30 of this document, Bates ending in
8  8149.
9    A.  Yes.
10    Q.  Let me know when you've had a
11  chance to look at it.
12    A.  Okay.
13    Q.  What is depicted on this line?
14    A.  It's a -- well, it's the LGD
15  analysis or the analysis that we did to
16  determine the loss given default, the LGD.
17    Q.  And what is shown on this page?
18    A.  It's different segments of the
19  Tribune Company summed in a sum of the parts
20  analysis compared against the senior secured
21  debt.
22    Q.  And the subtitle of this slide is
23  "DCF Valuation Versus Bank Debt."  Do you see
24  that?
25    A.  Yes.

---

**139**

2    Q.  And what does DCF stand for?
3    A.  Discounted cash flow.
4    Q.  And so at the bottom of the chart,
5  the build-up of those rectangles refers to
6  DCF valuation plus investments.  Do you see
7  that?
8    A.  Yes.
9    Q.  What does DCF valuation mean?
10    A.  It's a discounted cash flow, a
11  value based on the discounted cash flow,
12  projected discounted -- projected cash flow
13  discounted to present, like this DCF.  So,
14  I'm sorry, did you ask -- you asked me what
15  the DCF valuation means?
16    Q.  Yes.
17    A.  It's a valuation based on the
18  discounted cash flow of future cash flow.
19    Q.  A valuation of what?
20    A.  Well, in this case it's only pieces
21  of this were done on a DCF basis.  So I think
22  it's the broadcasting, entertainment, the
23  other publishing, and the newspapers on this
24  page were done based on a DCF valuation.
25    Q.  Are the different components, the

---

**140**

2  three different components you just
3  identified components of the Tribune Company?
4    A.  Yes.
5    Q.  So the DCF valuation was a
6  discounted cash flow valuation of the Tribune
7  Company; is that right?
8    A.  It was a piece of the Tribune
9  Company.
10    Q.  And then some investments,
11  investment values were added to the Tribune
12  components?
13    A.  Yes.
14    Q.  And you referred to a sum of the
15  parts value?
16    A.  Yes.
17    Q.  Is that the bar depicted by "SOTP
18  Firm Value"?
19    A.  Yes.
20    Q.  And I think, as you indicated
21  earlier, next to that is a bar labeled "Bank
22  Debt"?
23    A.  Yes.
24    Q.  And that identifies four credit
25  facilities as comprising the bank debt; is

---



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

141

2   that right?
3       A.  It appears to, yeah.
4       Q.  And there is the dotted line
5   rectangle above the black bar of bank debt
6   that says, "Cushion, $3.449 billion,
7   25 percent."  Do you see that?
8       A.  Yes.
9       Q.  What does that refer to?
10      A.  The excess of value, so to speak,
11  above the senior secured debt.
12      Q.  And this senior secured debt is the
13  senior secured debt that encompasses both
14  steps of the going private transaction; is
15  that right?
16      A.  I don't recall.
17      Q.  Well, if we look back at the
18  Sources and Uses page -- that's not the right
19  page.  Well, do you see under the Step 1
20  Sources and Uses page at Bates 8126, it's
21  Page 7 of the document?
22      A.  Yes.
23      Q.  And we might need to toggle back
24  and forth for a second, but the bank debt
25  identified of 10.133, do you see it's

---

143

2           THE WITNESS:  Does.
3           MR. GOLDFARB:  And the delayed draw
4   Term Loan B on Page 7 has in paren
5   $263 million.
6           MR. GLAZER:  I'm not sure where you
7   get 263 from Page 7.  That's the
8   problem.
9           MR. GOLDFARB:  See where it says
10  "New Delayed Draw Term Loan B,
11  $263 million"?
12          MR. GLAZER:  It does not say that
13  on Page 7 is the point.  We're toggling
14  back and forth.
15          MR. GOLDFARB:  I'm sorry.  Can we
16  just go off the record for a second.
17          (Discussion off the record.)
18      Q.  So, again, we're just looking at
19  the components of the bank debt as identified
20  in the black bar on Page 30.
21      A.  Yes.
22      Q.  And I think you've agreed with me
23  that the Term Loan B, the revolver, and the
24  delayed draw are shown in that bar as three
25  of the components?

---

142

2   comprised of $7.015 billion for the Term
3   Loan B?
4       A.  Yes.
5       Q.  The $750 million of the revolver?
6       A.  Yes.
7       Q.  And the $263 million delayed draw
8   Term Loan B?
9       A.  Yes.  You're talking about --
10  sorry.  You're on Page 30 now?
11      Q.  Yes.  I'm looking at the components
12  of that bar.
13      A.  Right.
14          MR. CHANEN:  Sorry.  Where are you
15  reading from, please?
16          MR. GOLDFARB:  Well, we're looking
17  back and forth between Page 30, which
18  has the bar of senior debt, and the
19  components of that, which are listed, in
20  part, in the Step 1 Sources and Uses
21  page.
22          MR. GLAZER:  Although the numbers
23  don't match.  7015 does.
24          MR. GOLDFARB:  Does not?
25          MR. GLAZER:  Does.

---

144

2       A.  Yes.
3       Q.  And then if you look at the Step 2
4   Sources and Uses.
5           MR. GLAZER:  Page 12?
6           MR. GOLDFARB:  Page 12, yes.  Thank
7   you, counsel.
8       Q.  It shows the incremental facility
9   of $2.105 billion?
10      A.  Yes.
11      Q.  Do you see that?
12      A.  Yes.
13      Q.  So that's what comprises the
14  $10.133 million of bank debt?
15      A.  Yes.
16      Q.  Do you agree?
17      A.  Yes.
18      Q.  And would you also agree that that
19  sum does not reflect the total of debt
20  incurred by the Tribune Company in connection
21  with the transaction?
22          THE WITNESS:  Can you repeat it,
23  please.
24          (Record read.)
25      A.  I agree it doesn't, it doesn't

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

145

2  reflect the total debt.
3      Q.  Because the Tribune had some
4  existing debt; is that right?
5      A.  Yes.
6      Q.  The phones debt?
7      A.  Yes.
8      Q.  And the existing bond debt?
9      A.  Yes.
10     Q.  And it also in connection with the
11  transaction incurred an obligation to repay a
12  bridge loan; is that right?
13     A.  That I don't recall.  It also
14  didn't -- it also did not incur the actual --
15  the revolver as debt at the time, right.
16  That was going to be undrawn.
17     Q.  Right.  Summarize again for me, if
18  you would, what is depicted in these last two
19  bars, what is it showing?
20     A.  A sum of the parts valuation versus
21  the senior secured debt for the purpose of
22  the LGD analysis.
23     Q.  And how did you use this
24  information in arriving at a conclusion about
25  what the LGD percentage should be?

146

2      A.  How did we use the -- well, I think
3  it showed that the senior secured debt was
4  fully covered by a sum of the parts, by a sum
5  of the parts valuation.
6      Q.  And what impact would that have on
7  the LGD number?
8      A.  It would -- it would, I guess, lead
9  us to use a standard loss given default
10  percentage for secured transactions.
11         MR. KORPUS:  Can you repeat his
12  last answer, please.
13         (Record read.)
14     Q.  When you say "standard," is
15  30 percent a standard loss given default
16  number?
17     A.  There are -- there is sort of a
18  range, and I'm going from memory because
19  things have shifted over time, but there is a
20  range of loss given defaults percentages for
21  secured deals, and there's sort of a range
22  for unsecured deals.  And so I think we
23  arrived at 25 or 30 percent here, and that
24  was sort of in the range for a secured deal.
25     Q.  And was that judgment one that you

147

2  ultimately recommended, or did someone else
3  make that ultimate determination as to what
4  the LGD should be?
5      A.  It would have been some combination
6  of Jeff Sell and me.  I'm not sure if I
7  recommended and he had -- it would have been
8  between Jeff Sell and me.
9      Q.  Do you recall discussing it with
10  him?
11     A.  I don't.
12         MR. GLAZER:  Are we done with 7?
13         MR. GOLDFARB:  We are for now.
14  Maybe forever.
15         MR. GLAZER:  With that, I would
16  like to designate the testimony that's
17  gone on from the last point we noted
18  until now as Financial Institution
19  Highly Confidential and this document of
20  Exhibit 7 as well.
21         We've been going about an hour and
22  fifteen.  You want to take a short
23  break?
24         MR. GOLDFARB:  Sure.  Let's go off
25  the record, please.

148

2         (Recess taken from 2:48 p.m. to
3  2:42 p.m.)
4         (Record read.)
5      Q.  Just before we went off the record,
6  sir, I think you testified that you didn't
7  recall whether or not in connection with the
8  transaction the Tribune Company incurred or
9  entered into a bridge facility in connection
10  with Step 2 of the transaction?
11     A.  Oh.
12     Q.  Do you recall that testimony?
13     A.  I recall saying that, but I thought
14  you were -- I thought you were saying it was
15  a repayment -- when we looked at that
16  exposure page, there was I think an old
17  bridge facility that I saw in there, and I
18  thought you were talking about repaying that
19  bridge.  So maybe -- I don't know if you want
20  to go back to that question, because I think
21  I may have misunderstood you.
22     Q.  Yes.  Well, if we could just go
23  back to Kowalczuk 7 again, Page 30.
24         Mr. Kowalczuk, in connection with
25  the questioning I asked a series of questions



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

John Kowalczuk                                              January 20, 2010

(HIGHLY) CONFIDENTIAL

---

### 149

2   about other debt that the Tribune had or
3   incurred in connection with the transaction.
4   Do you recall questions in connection with
5   this slide?
6       A.   Yes.
7       Q.   And one of the questions I asked
8   was whether the Tribune also incurred a
9   $1.6 billion bridge loan in connection with
10   the transaction.
11       A.   Okay.
12       Q.   Do you recall that?
13       A.   I don't remember the amount, but I
14   do remember there was a bridge loan in
15   connection with this transaction, yes.
16       Q.   Does it refresh your recollection
17   at all, if you look at Sources and Uses on
18   Step 2 on Page 12 of this document, this
19   refers to -- let me know when you're there,
20   sir.
21       A.   I'm here. Yes. Sorry.
22       Q.   New senior notes, $2.1 billion?
23       A.   Yes.
24       Q.   And if we look at Page 15 of this
25   document, it refers in the summary of the

### 150

2   terms for Step 2, it includes a senior
3   unsecured bridge facility of $2.105 billion?
4       A.   2105. That's confusing.
5       Q.   Sir, I'll withdraw the pending
6   question, and there may be a way to
7   straighten it out, because I think I see the
8   confusion. There may be a slight error in
9   the document itself.
10       A.   Okay.
11       Q.   If you look at Page 17, which has
12   an Exposure Summary and Strategy?
13       A.   Yes.
14       Q.   That refers in April of 2007 to a
15   Step 2 incremental of 2.105 billion and a
16   bridge of 2.1 billion?
17       MR. GLAZER:   Step 2 or Step 1?
18   Step 2. Okay.
19       A.   Incremental of 2105 and a bridge of
20   2100.
21       Q.   Yes.
22       A.   Yes.
23       Q.   Does this refresh your recollection
24   as to the incurrence of the bridge obligation
25   that the Tribune had in addition to the bank

### 151

2   debt listed at Page 30 in the bar?
3       A.   Yes. Yes, although I thought you
4   said before it was $1.6 billion bridge.
5       Q.   Do you have any recollection as to
6   whether it was later in the fall the bridge,
7   the size of the bridge facility was reduced
8   from $2.1 billion to $1.6 billion?
9       A.   I remember there was an adjustment
10   to the size of some of the tranches, yes.
11       Q.   In addition to the other additional
12   debt incurred by the Tribune, do you also
13   recall that there was about a 200,
14   $225 million note given to Sam Zell in
15   connection with Step 2 of the transaction?
16       A.   I remember there was a Zell note,
17   yes, in connection with the transaction.
18       Q.   Did you ever have discussions with
19   any of your colleagues about the implications
20   for JPMorgan if the Tribune were to default
21   on its loans or to petition for bankruptcy?
22       THE WITNESS:   Sorry. Can you read
23   that back.
24       (Record read.)
25       A.   I don't remember.

### 152

2       Q.   Do you recall ever discussing
3   whether or not the Tribune was solvent or
4   would be solvent as a result of the going
5   private LBO transaction?
6       A.   I do remember discussions about
7   that.
8       Q.   With whom did you have such
9   discussions, if you recall?
10       A.   I think various members of the deal
11   team.
12       Q.   Who in particular do you remember
13   having discussions with?
14       A.   But, sorry, I don't think we had
15   discussions -- I mean I think I may have
16   answered the question incorrectly. I
17   remember having discussions about whether
18   there would be -- not whether they would be
19   insolvent or insolvent, but whether there
20   would be a solvency opinion or not, whether
21   they would be able to get a solvency opinion
22   or not.
23       Q.   And did you have a view as to
24   whether or not they would obtain a solvency
25   opinion?

---



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

(HIGHLY) CONFIDENTIAL

---

153

2      A.  I didn't.
3      Q.  Who do you recall having the
4   discussions with?
5      A.  I don't remember specific
6   discussions or who I would have -- with whom
7   I would have had them.
8      Q.  Did you ever have discussions with
9   any of your colleagues about whether in the
10  event of a default or bankruptcy other
11  creditors of the Tribune Company would be
12  covered as JPMorgan was?
13     A.  Covered, you mean --
14        MR. GLAZER:  Objection.  Just let
15     him ask his questions.  If you don't
16     understand it, he'll rephrase it.
17     A.  Yeah.  Maybe you need to rephrase
18  it.
19     Q.  Did you ever discuss with your
20  colleagues the impact of a Tribune bankruptcy
21  on creditors other than JPMorgan?
22     A.  I don't remember.  I don't remember
23  having conversations about that.
24     Q.  Was that ever a concern that you or
25  your colleagues expressed, to your

---

154

2   recollection?
3      A.  A concern?
4      Q.  About what would happen to other
5   creditors in the event of a Tribune
6   bankruptcy?
7        THE WITNESS:  Just read the
8     question back.
9        (Record read.)
10     A.  I don't remember.
11        (Kowalczuk Exhibit 8, Document
12     Bates stamped JPM 00422643 through
13     422652, marked for identification, as of
14     this date.)
15     Q.  I'm just going to be asking you
16  about the first two pages.
17     A.  Okay.
18     Q.  Have you had a chance to look at
19  it?
20     A.  Yes.
21     Q.  Is this an email you've seen
22  before?
23     A.  Not prior to, you know,
24  preparation.
25     Q.  What is it?

---

155

2      A.  It looks like email from Jana Choi
3   to Goh Siew Tan.
4      Q.  Do you know who Goh Siew Tan is?
5      A.  Yes.
6      Q.  And forgive me, I don't know
7   whether it's a he or she.
8      A.  It's a he.
9      Q.  Does he work at JPMorgan?
10     A.  Yes, he does.
11     Q.  Does Ms. Choi still work at
12  JPMorgan?
13     A.  No.
14     Q.  Do you know when she left?
15     A.  It'll just take me a second.  I
16  think she left in June, July of '08.
17     Q.  Do you know where she went?
18     A.  I believe she went back home.
19     Q.  Where was home, if you know?
20     A.  Korea.
21        MR. GLAZER:  South.
22     A.  Yeah, I think South Korea.
23     Q.  One hopes.
24     A.  Yes.
25     Q.  Do you know why she left?

---

156

2      A.  Yeah.  Yeah.
3      Q.  Why did she leave?
4      A.  Well, she was not asked to stay on
5   as -- the analysts come in for three years.
6   The analysts in Credit or Credit Risk
7   Management come in for three years, and
8   they're either asked to stay as an associate
9   or they're not, and she was not asked to
10  stay.
11     Q.  The first sentence of the second
12  paragraph states, "There was a WSJ article
13  today that talked about how TRB should be
14  very, very careful in executing any deals or
15  doing anything from now on as the company has
16  no room for mistake no more."  Do you see
17  that?
18     A.  I do.
19     Q.  I assume you would agree that WSJ
20  refers to Wall Street Journal?
21     A.  Yes.
22     Q.  Do you recall a Wall Street Journal
23  article in this time period discussing the
24  Tribune and its margin for, umm --
25        MR. GLAZER:  Mistakes no more.

---



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

157

2    Q.  Mistake no more?

3    A.  I don't, other than sort of, again,

4    prep, I did not remember that article.

5    Q.  Aside from the article, do you

6    remember that specific article, do you

7    remember discussions either in the press or

8    among industry analysts evaluating the

9    Tribune in the wake of the execution of the

10   LBO agreement in April, early April 2007?

11   A.  I remember there was a Lehman

12   research report that was negative, but I

13   don't remember -- I don't remember the time

14   period.  It may have been later.

15   Q.  Did you agree as of April 2005

16   yourself that the Tribune had a slim margin

17   for error in terms of the amount of debt it

18   could take on in the wake -- or additional

19   debt it could take on given the LBO

20   transaction?

21   MR. GLAZER:  Objection to form.

22   A.  I thought that there was -- I

23   thought there was, you know, significant

24   amount of leverage on the company, not

25   unusual for LBOs at that time, but I mean it

158

2    was a lot of leverage.

3    Q.  In your experience, was the

4    leverage that the Tribune LBO involved

5    greater than that of comparable transactions

6    going on at the time?

7    MR. GLAZER:  Objection to form.

8    A.  You know, I couldn't say.

9    Q.  Do you remember discussion either

10   in the mainstream press, financial press, or

11   among industry analysts speculating that the

12   company had incurred so much debt that its

13   assets wouldn't cover the debt in the case of

14   a bankruptcy?

15   A.  No, I don't remember that.

16   Q.  Did you follow the financial press,

17   mainstream press, and trade press in

18   connection with your work at JPMorgan?

19   A.  Well, I read the Wall Street

20   Journal every day.  I think back then I read

21   the Wall Street Journal every day, yeah.

22   Q.  The third sentence of that

23   paragraph says, "Well, that is actually

24   basically what we (JK and me and rest of the

25   group) are saying, too, but we're doing this

159

2    because it's enough to cover our bank debt."

3    Do you see that?

4    A.  I do see it.

5    Q.  Did you have discussions with

6    Ms. Choi that JPMorgan was engaging in the

7    transaction because, regardless of what

8    happened, Tribune would be able to cover the

9    bank debt?

10   A.  I don't remember.

11   Q.  Do you remember having any

12   discussions in connection with the Tribune

13   transaction where people expressed that

14   JPMorgan's primary concern was that it be

15   able to recover its lendings in connection

16   with any bankruptcy?

17   A.  No.  No.

18   Q.  Did you ever have any discussion

19   with anybody about the fees that JPMorgan was

20   earning in connection with the transaction?

21   A.  I'm sure I must have.

22   Q.  Do you know what amount of fees

23   JPMorgan was earning in connection with the

24   transaction?

25   A.  I believe -- yes.  Well, I believe

160

2    it was sort of in the $60 million range.  But

3    I don't know if that was gross or sort of net

4    net of, you know, what had to get paid out to

5    the syndicate.  I don't know what the --

6    actually, at this point I remember that

7    number, but that's all I remember.

8    Q.  And the last line indicates, the

9    last sentence says, "See graph below (total

10   debt, btw, is 14.639 billion)."

11   A.  Yes.

12   Q.  Do you see that?

13   A.  Yes.

14   Q.  Do you take "btw" to mean by the

15   way?

16   A.  I do, yeah.

17   Q.  And if you turn to the next page.

18   A.  Yes.

19   Q.  What is the graph on this page

20   showing?

21   A.  This looks like the LGD analysis.

22   I can't say if it's identical, because I

23   think it's probably an earlier version, but

24   that we talked about earlier.

25   Q.  Mr. Kowalczuk, do you think that in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

## 161

2   the parenthetical in the second line of that
3   paragraph, that you're the JK referred to in
4   the parenthetical?
5           MR. GLAZER:  Don't speculate, but.
6       A.  Yeah.  I think it's probably me.
7           MR. GLAZER:  Those are his
8   initials.
9       Q.  Do you know whether there was
10  anybody else with the initials JK who was
11  working on the Tribune deal?
12      A.  I don't know.
13      Q.  And the last line refers to the
14  debt at $14.639 billion?
15      A.  Yes.
16      Q.  What do you interpret that total
17  debt figure to be referring to, total debt of
18  what?
19      A.  What do I think this debt of
20  14.6 billion is referring to?
21      Q.  Yes.
22          MR. GLAZER:  If you know.
23      A.  Yeah, I don't know.
24      Q.  Do you know why Ms. Choi was not
25  asked to continue as an analyst after her

## 162

2   three-year period?
3       A.  Generally, yeah.
4       Q.  And what was that reason, to the
5   extent you know?
6       A.  She --
7           MR. GLAZER:  Don't be shy.
8       A.  No.  Jana I think struggled while
9   she was an analyst.  She was very productive,
10  but she always sort of had -- she always had
11  difficulty in sort of the quantity versus --
12  the quality versus quantity aspect of her
13  job, so she was -- she could produce annual
14  reviews very quickly, but they were not of
15  such good quality, you know, such good
16  quality.  And I think that was kind of --
17  that was one issue.  And I think she was
18  somewhat on the kind of shy side, and I think
19  to become an associate, usually we look for
20  people who are like more dynamic and
21  outgoing.  I think those are probably two of
22  the reasons.  That's probably not like the
23  complete list.
24      Q.  Do you have any reason to doubt the
25  accuracy of the material that was submitted

## 163

2   in connection with the credit approval
3   packages for the Tribune transaction?
4       A.  You mean...
5           (Record read.)
6           MR. JOHNSTON:  Objection to the
7   form of the question.
8           MR. GLAZER:  Yes.
9       A.  Jana submitted materials to me,
10  and, you know, with any analyst there is
11  always mistakes.  They have to -- it has to
12  get redone or worked.  And I can't say that I
13  caught every mistake.  I don't have any
14  reason specifically to doubt, but, you know,
15  there may be errors in the materials we
16  worked on.  You know, I don't always catch
17  everything.
18      Q.  And so, for example, in the
19  transaction proposal memo that we looked at,
20  I think it's Number 7, earlier, who is the
21  individual ultimately responsible for the
22  contents of that document?
23      A.  It's probably me, because I sign
24  off on it.
25      Q.  Have you had any further contact

## 164

2   with Ms. Choi since she left JPMorgan?
3       A.  Yes.  Yes.
4       Q.  How recently?
5       A.  Oh, you know, I think more than a
6   year ago.
7       Q.  Do you know what she's doing in
8   Korea, South Korea?
9       A.  I don't.  I don't.
10      Q.  Did you continue after the
11  submission of the credit package in early
12  April of '07, did you continue to work on the
13  Tribune matter?
14      A.  Yes.
15      Q.  What did you do after that initial
16  credit package was submitted?
17      A.  Well, as I described earlier, there
18  was sort of two functions.  One is to work on
19  transactions.  One is to sort of monitor the
20  credit.  And so I think there were some
21  activities leading up to Step 2, but also,
22  you know, I was sort of monitoring their
23  performance following the close of Step 1.
24      Q.  And do you recall receiving
25  information about the Tribune's financial



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

### 165

2  performance in April of 2007?
3      A.   In April 2007.
4      Q.   Excuse me.  I'll strike the
5  question.  Do you recall receiving
6  information about Tribune's performance for
7  the period April 2007?
8      A.   Not specifically, no.
9      Q.   Generally do you remember receiving
10  such information?
11      A.   I remember receiving periodic
12  updates.  What time period are we in now?
13      Q.   I'm asking now whether you recall
14  receiving information about the Tribune's
15  April 2007 performance.
16      A.   Okay.  So not specifically.  I
17  don't remember specifically about getting
18  something about April.
19      Q.   But do you recall tracking,
20  generally, Tribune's performance after April,
21  after early April 2007?
22      A.   I remember after the closing I
23  think we were getting monthly updates, but
24  after April I just don't remember, you know,
25  for April and May, because I think this deal

### 166

2  closed in late May, if I'm not mistaken.  So
3  I don't remember getting sort of periodic
4  updates during that period.  I just don't
5  remember.
6      Q.   Do you remember generally how the
7  Tribune was doing during the period following
8  the close of the transaction in early -- or
9  after the early April 2007 period?
10      A.   Sorry.  Following the close of
11  Step 1 or --
12      Q.   Well, following April 1st, 2007.
13      A.   No.  I remember following the
14  closing sort of how they were doing, but I
15  don't remember sort of, you know -- it sounds
16  like you're talking about the April, May time
17  frame.
18      Q.   I am now, yes.
19      A.   Yeah, and I don't remember
20  specifically how they were doing in that
21  period.
22      Q.   How about generally?
23      A.   No, not even generally.
24      Q.   Do you remember making any analyses
25  about how they were doing compared to the

### 167

2  projected performance that they had provided
3  to JPMorgan earlier in 2007?
4      A.   In that same period?
5      Q.   Yes.
6      A.   I don't.
7      Q.   At what period do you remember
8  tracking how the Tribune was doing relative
9  to its projected performance?
10      A.   I remember in July we got
11  information and in July comparing it.
12      Q.   Why do you remember doing that in
13  July?
14          MR. GLAZER:  Objection to form.
15      A.   Because we, a group of us, went to
16  Chicago in July, and I can sort of picture a
17  slide deck that they prepared for us talking
18  about the performance.
19      Q.   And what do you recall about the
20  nature of the performance, how they were
21  doing?
22      A.   That it was worse than they had
23  originally projected, than the prior
24  projection they had given to us.
25      Q.   And what was your reaction to that

### 168

2  information in July 2007?
3      A.   I don't remember.
4      Q.   How about institutionally, did
5  JPMorgan react institutionally to the receipt
6  of the news?
7          MR. JOHNSTON:  Objection to form.
8      Q.   Of the performance?
9      A.   I can't speak to the institution.
10  I do actually remember that we considered
11  lowering their risk grade upon sort of the
12  July information, I don't know what period
13  you're referring to, but we considered
14  lowering the risk grade at that point.
15      Q.   And what impact would lowering the
16  risk grade have?
17      A.   Well, there would be a capital
18  impact associated with that.
19      Q.   What does that mean?
20      A.   I had a feeling you were going to
21  ask me that.  Well, JPMorgan has to set
22  capital, I mean, aside against the loans it
23  holds or the exposure it has, and the amount
24  of capital is based on the risk grade.  So
25  the lower the risk grade, the more capital



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

### 169

2  they have to set aside.  So if we were going
3  to lower the risk grade, it would have meant
4  slightly more capital.  Or more capital.  I'm
5  not sure if it's slightly or not.
6      Q.  When you say there were
7  requirements for how much capital had to be
8  set aside, were those requirements that were
9  set internally to JPMorgan, or were those
10 external regulatory requirements, if you
11 know?
12     A.  Well, I think there are regulatory
13 requirements.  I think there's also sort of
14 internal -- the bank sets aside capital as
15 well, but I'm not sure how those two things
16 work or interact.
17     MR. GLAZER:  Before we move on, I
18 don't think I ever ended the designation
19 of this as Financial Institution Highly
20 Confidential, which I will do now.
21     MR. GOLDFARB:  And maybe, counsel,
22 we can go back and figure out what point
23 in time --
24     MR. GLAZER:  When we came back from
25 the break and we resumed talking about

### 170

2      Exhibit 7, that's when we started, so
3      from the break until now will be
4      designated, and we'll talk about
5      de-designation if that's desirable.
6          (Continued in Confidential portion
7      of transcript.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### 171

1      Confidential - J. Kowalczuk
2          (Kowalczuk Exhibit 9, Document
3      Bates stamped JPM 00169456 through
4      169600, marked for identification, as of
5      this date.)
6      MR. GOLDFARB:  Mr. Kowalczuk and
7  counsel, if it's acceptable to you,
8  obviously I've put a long document
9  beginning with Bates number 00169456
10 before the witness.  It's Kowalczuk
11 Number 9.  I will give you the
12 opportunity to look at passages as I ask
13 you about them, if that's okay, so we
14 don't need to take the time.
15     MR. GLAZER:  Yes.
16     Q.  Just looking at the first page,
17 sir.
18     A.  Yes.
19     Q.  What is this page?
20     A.  This is what we call the SLF
21 approval sheet.
22     Q.  And is this similar in form to the
23 document we looked at earlier, Kowalczuk
24 Number 7?
25     A.  It is similar in form.  Yes, it's

### 172

1      Confidential - J. Kowalczuk
2  similar in form.
3      Q.  And in the top right corner the
4  date there is 5/24/2007.  Do you see that?
5      A.  Yes.
6      Q.  And among the facility types listed
7  there in the middle of the page, do you see
8  reference to a Term Loan X?
9      A.  Yes.
10     Q.  Do you recall how the Term Loan X
11 facility came to be?
12     A.  I remember that the initial
13 syndication went slowly and it was a change
14 that was made to the deal to add the Term
15 Loan X.
16     Q.  And what about Term Loan X was a
17 response to what you referred to as the slow
18 syndication of the first step loan?
19     A.  Do you mean how did Term Loan X
20 address --
21     Q.  Yes.
22     A.  Well, Term Loan X, if I remember
23 correctly, was an asset -- was structured to
24 be repaid first from asset sales.  And so I
25 think it was -- so it had sort of -- there



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

173

1    Confidential - J. Kowalczuk
2    was a benefit to the lender.  I think the
3    investors or lenders saw a benefit to that.
4        Q.   And looking at the sums of the
5    amounts of Term Loan B and Term Loan X, is it
6    right that Term Loan X was $1.5 billion that
7    was just simply carved out of the 7.015
8    original Term Loan B?
9        A.   I wouldn't attempt to make that
10   conclusion without a calculator or adding the
11   amounts, but -- should we do the math or?
12   Original Term Loan B was 7015, I believe.
13       MR. GLAZER:  Yes.
14       A.   Okay.  I believe you.  Sorry.  The
15   answer to the question is --
16       MR. GLAZER:  They add up.
17       A.   They add up.  It looks like the
18   Term Loan X was just taken out of the
19   original 7015 Term Loan B.
20       MR. GLAZER:  But you're not
21   testifying from memory.  You're
22   testifying from calculation.  Is that
23   right?
24       THE WITNESS:  That's true, yeah.
25       Q.   And seeing this doesn't refresh

174

1    Confidential - J. Kowalczuk
2    your recollection that that is, in fact, what
3    occurred?
4        A.   You know, not really.  I mean I
5    knew it came out of -- I knew that the
6    facilities got restructured, but I don't
7    remember sort of exactly how.
8        Q.   And if we look at Bates ending in
9    9466.
10       A.   That would be about ten pages in
11   then?
12       Q.   Yes.
13       A.   Yes.
14       Q.   What does this document indicate?
15       A.   I think this is the final
16   transaction package.
17       Q.   And it's dated May 29th, 2007; is
18   that right?
19       A.   Yes.
20       Q.   And this document contains your
21   signature on the first page in the approval
22   block; is that right?
23       A.   Yes.
24       Q.   And it also contains Mr. Sell's
25   signature?

175

1    Confidential - J. Kowalczuk
2        A.   I have no reason to believe that
3    that's not Jeff Sell's signature, yeah.
4        Q.   Now, if you look at Page 6.
5        MR. GLAZER:  The one titled
6    "Executive Summary"?
7        MR. GOLDFARB:  Yes.
8        A.   Yes.
9        Q.   I'll give you a chance, sir, why
10   don't you read the executive summary, the
11   overview of the transaction at Pages 5 and
12   going over to 6.
13       A.   Sorry.
14       Q.   So my question is actually going to
15   focus on bullet point four or paragraph four.
16       A.   Number four, "Merger"?
17       Q.   Yes.
18       A.   Okay.  That's what I'm reading now.
19   I read four.  I didn't read five.
20       Q.   If I ask you about it, I'll
21   certainly give you the time to look at it.
22       A.   Okay.
23       Q.   Who prepared this document?
24       A.   This page or this document?
25       Q.   The whole document.

176

1    Confidential - J. Kowalczuk
2        A.   Jana would have -- Jana would have
3    done most of the work in preparation of this
4    document.
5        Q.   Did you also contribute to the
6    preparation of this document?
7        A.   Yes.
8        Q.   And before it was submitted for
9    final approval and signature, did you review
10   it?
11       A.   I did.
12       Q.   Paragraph four, the first bullet
13   states, "Up to the time of shareholder
14   approval, Tribune's board of directors will
15   be entitled, subject to specified conditions,
16   to consider unsolicited alternative proposals
17   that may lead to a superior proposal.  In the
18   event such a superior proposal is selected,
19   the break-up fee to Zell would be
20   $25 million."  Do you see that?
21       A.   I do.
22       Q.   Do you recall whether JPMorgan
23   undertook an analysis as to the likelihood of
24   other bidders for the Tribune in this time
25   period?



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

177

1      Confidential - J. Kowalczuk
2      A.   I think the answer to that question
3  is no, but could you maybe just read it back
4  to me.
5      (Record read.)
6      A.   No.
7      Q.   Do you know whether at any point
8  JPMorgan made an assessment after April 1st
9  as to the likelihood of competing bids to the
10 Zell proposal?
11     A.   I don't remember that being done.
12     Q.   Do you remember having a view as to
13 whether or not it was likely or unlikely that
14 the Tribune would receive an alternative
15 proposal that may lead to a superior proposal
16 after April of 2007?
17     A.   I don't remember having a view
18 about that.
19     Q.   If you turn to Page 25 of this
20 document, it's Bates ending in 9491.
21     MR. GLAZER:  A version we can read.
22     THE WITNESS:  Yeah.
23     MR. GOLDFARB:  I knew there was one
24 somewhere.
25     Q.   Mr. Kowalczuk, I just want to pause

---

178

1      Confidential - J. Kowalczuk
2  in our consideration of this document to
3  introduce Kowalczuk Exhibit 10.
4      (Kowalczuk Exhibit 10, Two-page
5  document beginning with Bates number JPM
6  00345444, marked for identification, as
7  of this date.)
8      Q.   This is a two-page document
9  beginning with Bates number JPM 00345444.
10 Can you identify this document for the
11 record, Mr. Kowalczuk?
12     A.   This appears to be an email
13 exchange between, the last was between Robert
14 Anastasio and me responding to an email from
15 me to him, I guess, and then from him to me
16 and then from me to him.  Sorry.  Is that
17 enough of a description?
18     Q.   Okay.  We'll say it's a series of
19 emails.
20     A.   Okay.
21     Q.   Looking at the earliest in time,
22 which is the last document, the last email on
23 5445.
24     A.   Yes.
25     Q.   It's an email from you to

---

179

1      Confidential - J. Kowalczuk
2  Mr. Anastasio; correct?
3      A.   Yes.
4      Q.   Copying Mr. Kapadia and
5  Mr. Jacobson about the Trib intercompany
6  note.  Do you see that?
7      A.   Yes.
8      Q.   And it says, "When we were doing
9  the term sheet, there was uncertainty as to
10 the size of the intercompany note from
11 Finance Co. to the publishing sub.  The
12 minimum was 3.0, but they were going to make
13 it as big as possible up to 4.2 billion as
14 long as it didn't put the solvency opinion at
15 risk.  Do we know what/if the size was
16 settled on?  It's a significant element of
17 our collateral package, and the difference
18 between 3 and 4.2 is important."
19     And then it says, "Robert, if you
20 don't know, could you reply all so Raj or
21 Daryl can respond.  Thanks."  Do you see
22 that?
23     A.   Yes.
24     Q.   When you say "The minimum was 3.0
25 but they were going to make it as big as

---

180

1      Confidential - J. Kowalczuk
2  possible up to 4.2 billion," do you see that?
3      A.   Yes.
4      Q.   Who is the "they"?
5      A.   I don't recall.
6      Q.   Well, who was responsible, if you
7  recall, at setting the size of the
8  intercompany note?
9      A.   Oh, I don't recall.
10     Q.   Do you recall whether the creation
11 of this intercompany note decreased the
12 amount of collateral supporting the JPM
13 lending?
14     MR. JOHNSTON:  Objection to form.
15     MR. GLAZER:  Objection to the form.
16     A.   The intercompany note was less, I
17 think, as best I can remember, the amount of
18 the intercompany note was less than -- was
19 less collateral than we would have had had we
20 -- if we had gotten the publishing assets or,
21 you know, the stock of the publishing opcos.
22 I don't remember if we were looking at the
23 assets or the stock of the opcos, but I seem
24 to remember that the three billion was less
25 than what we thought that was worth.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

181

Confidential - J. Kowalczuk
1 Confidential - J. Kowalczuk
2    Q.  Why did JPM agree to take less
3 collateral?
4    A.  It goes back to the question you
5 asked earlier, the company wanted it
6 structured this way because of the difficulty
7 in producing financial statements for those
8 entities, and so we agreed to do that.
9    Q.  Do you know why JPMorgan agreed to
10 do that?
11    MR. GLAZER:  Other than as he's
12    already testified.
13    A.  Yeah, I mean not -- no.  But I
14 would say, you know, deals change, you know,
15 any deal sort of changes, terms change, the
16 borrower will make a request, you know,
17 things get tighter, things get looser.  You
18 know, those kinds of things happen.
19    Q.  And I asked who the "they" was in
20 referring to this email, and now do you know
21 why whoever the "they" is were going to make
22 it as big as possible up to $4.2 billion as
23 long as they didn't put the solvency opinion
24 at risk?
25    A.  I'm sorry.  What's the question?

---

182

1 Confidential - J. Kowalczuk
2    Q.  Why was it going to be made as big
3 as possible as long as it didn't put the
4 solvency opinion at risk?  If you know.
5    MR. GLAZER:  If you know.
6    A.  I don't know, but my understanding
7 at the time was for the benefit of the
8 lenders, it was going to be as big as
9 possible.  That's what I understood at the
10 time.  I think that's what I meant when I
11 said this, but I don't know beyond that.
12    Q.  How did the size of the
13 intercompany note impact the amount of
14 collateral available to JPMorgan?
15    MR. JOHNSTON:  Objection to the
16    form of the question.
17    A.  I think it's just what I said
18 before.  The size of the note, to the best I
19 can remember, that the size of the note was
20 going to be less than the value of the
21 collateral if we had just gotten the assets.
22    Q.  And am I right that if the
23 intercompany note was larger, the delta
24 between the collateral deficit would be
25 correspondingly smaller?

---

183

1 Confidential - J. Kowalczuk
2    A.  Just say that again.
3    Q.  Yes.  I want to make sure that I'm
4 understanding your testimony, so modify my
5 characterization if need be.  But am I right
6 that what you're saying is if the
7 intercompany note was larger, it would make
8 the collateral deficit smaller?
9    A.  Yes, if there had been a deficit,
10 but in the end there was no deficit.
11    Q.  And then Mr. Anastasio responded to
12 you that the size of the intercompany note
13 was three billion dollars.  Do you see that
14 at the top of 5445?
15    A.  I do.
16    Q.  And then you responded, "That's
17 unfortunate"?
18    A.  Yes.
19    Q.  What was unfortunate about that?
20    A.  It's sort of -- I think it's sort
21 of the same answer that I gave you earlier to
22 a question you asked about Jeff Sell.  I mean
23 more collateral is better than less
24 collateral.  So it was unfortunate that we
25 didn't get a bigger -- the bigger amount

---

184

1 Confidential - J. Kowalczuk
2 because that would be better.
3    Q.  And what function, if you know, did
4 the creation of the Tribune Finance holding
5 company serve in the structure?
6    MR. GLAZER:  Objection to form.
7    A.  My understanding is that was only
8 formed to hold the intercompany note.
9    MR. GLAZER:  Are we done with 9 as
10 well?
11    MR. GOLDFARB:  We are done with 10.
12 We're going to turn back to 9 now.
13    A.  Okay.
14    Q.  Look at Page 31 of this package,
15 sir.
16    A.  Okay.
17    Q.  Do you recognize this to be, at
18 least with respect to the bar chart on the
19 top, the same chart as that that was in
20 Kowalczuk Exhibit 7?
21    MR. GLAZER:  Same format anyway.
22    Q.  Same format.
23    MR. BUSATH:  And you're looking at
24 the page that ends in 497?
25    MR. GOLDFARB:  Yes, sir.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

185

1    Confidential - J. Kowalczuk
2       MR. BUSATH:  Because there are two
3    page 31's in this package, so I wanted
4    to make that clear.  Thank you.
5       A.   Sorry.  It's the one ending in 9497
6    you said?
7       Q.   Yes.
8       A.   Yes.  Sorry.
9       Q.   I'm trying to confirm initially
10   that you recognize this to be the same format
11   and a slide addressing the same basic issues
12   as the one that we looked at earlier at
13   Page 30 of Kowalczuk Number 7?
14      A.   Yes.
15      Q.   Why did JPMorgan, in looking at a
16   valuation for purposes of comparing it to the
17   bank debt, why did JPMorgan use a DCF
18   valuation?
19      A.   We normally -- sorry.  Just repeat
20   it, please.
21         (Record read.)
22      A.   Well, for the purpose of an LGD, an
23   LGD analysis, we often use, I think we
24   usually use DCF.  I think the regulators like
25   it.  I'm not a hundred percent sure about

186

1    Confidential - J. Kowalczuk
2    that, but I think the regulators prefer it.
3    And it's one of many valuation methods.  And
4    so here -- but here it was not exclusively a
5    DCF, because, again, there were pieces that
6    were not valued on a DCF basis.
7       Q.   And did JPMorgan make an assessment
8    as to which valuation approach to use in
9    connection with this facility LGD analysis?
10      A.   Well, not JPMorgan, it was me,
11   right, okay.
12      Q.   Okay.  Why did you choose DCF as
13   opposed to one of the other valuation
14   methods?
15      A.   So, again, normally in an LGD
16   analysis we normally use DCF.  And, again, I
17   think it's because -- I think it's because
18   the regulators like it because they
19   understand it.  It's sort of familiar to
20   them.  But I can't -- I would be speculating
21   to go beyond sort of that and why we use LGD
22   -- I mean, sorry, why we use DCFs in our LGD
23   analysis.  But, again, here it was a
24   combination of DCF plus some other things.
25      Q.   Is it JPMorgan policy to use a DCF

187

1    Confidential - J. Kowalczuk
2    valuation plus investments for an LGD
3    analysis or was that -- well, strike that.
4    You can answer that question.  Is it JPM
5    policy to do an LGD analysis this way?
6       A.   No.  I don't think there is any
7    policy written down.
8       Q.   Have you ever seen it done using
9    anything other than a DCF as a basic
10   valuation when comparing it to -- when
11   conducting an LGD analysis?
12         MR. JOHNSTON:  Objection to form.
13      A.   I'm sorry.
14         (Record read.)
15      A.   I can't recall one way or another.
16   I mean usually in an LGD analysis we will use
17   DCF, and we may reference -- often we
18   reference other valuation methods.
19      Q.   And did you in this one?
20      A.   I don't remember.  But, again, we
21   did DCF for pieces of it and then other
22   valuation methods for other pieces.
23      Q.   And when you say other valuation
24   methods for other pieces, what are you
25   referring to?

188

1    Confidential - J. Kowalczuk
2       A.   Well, like the Cubs, the other
3    equity investments, Cover Your Builder and
4    Food Network, I don't believe those values
5    that are listed here, I don't believe those
6    were done by DCF analysis.
7       Q.   And let me direct you, sir, to the
8    document bearing Bates number 169509 in this
9    same document.  It's several pages hence.
10      A.   Okay.
11      Q.   This entire package was produced as
12   one document to the committee, so this was
13   contained within it.  What is this document?
14      A.   So I just want to correct you.  You
15   said the committee.  There is no committee.
16         MR. GLAZER:  The committee is his
17   client.
18      Q.   My client.
19      A.   Oh, I'm sorry.  Okay.  Because
20   sometimes people talk about credit
21   committees.
22         MR. GLAZER:  We don't denigrate his
23   client.  If they want to call themselves
24   the committee or a group or a pack of
25   Indians, whatever it is, they're



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

189

1    Confidential - J. Kowalczuk
2    entitled to call themselves.
3        A.  I'm sorry.  Can you repeat that
4    question.
5        Q.  Yes.  What is this document?  Or
6    what is this page and the ensuing pages?
7        A.  Okay.  It's what I described before
8    when we talked about there used to be a
9    single document, and then, although there was
10    an annual review prepared for the client or
11    for a borrower, and then we separated some of
12    the transaction-specific parts of it into the
13    transaction document.  And so this is more
14    focused on the borrower and credit analysis
15    of the borrower and its position in the
16    industry and things like that.
17        Q.  And was this document prepared,
18    also consistent with the approval request
19    document, primarily by Ms. Choi?
20        A.  Yes.
21        Q.  And subject to your review and
22    final approval?
23        A.  Yes.
24        Q.  And is that your signature on that
25    page?

---

190

1    Confidential - J. Kowalczuk
2        A.  Yes, it is.
3        Q.  Sir, I want to direct your
4    attention, please, to Page 62 of this
5    document.  I guess we'll start with 63,
6    actually, please.  The copying is a little
7    confusing.
8        A.  Okay.
9        Q.  But Page 63.
10        A.  Yes.
11        Q.  And if you want to familiarize
12    yourself with what is on that page.
13        A.  Okay.
14        Q.  What is this page?
15        A.  This is a DCF valuation page.  It's
16    sort of a standard part of the credit
17    package.
18        Q.  And why is it included in the
19    credit package?
20        A.  Because I think, as I said, we
21    normally do a DCF of the -- a DCF as part of
22    the LGD analysis, although that was not --
23    that was not really the case here.  We did a
24    DCF on pieces, and then we did other pieces
25    in a different way.  And I think I should

---

191

1    Confidential - J. Kowalczuk
2    sort of explain the -- because we weren't --
3    normally we lend against the enterprise
4    value, right, of the total company.  Here we
5    didn't have -- part of our collateral was
6    this intercompany note, so we didn't really
7    have all the collateral, all the assets as
8    collateral, so we didn't -- we had to sort of
9    do the DCF -- sorry, we had to do the LGD
10    analysis different than what we might have
11    done otherwise.  So this DCF valuation is
12    sort of in the template because often we
13    would just do a DCF of the enterprise, but
14    that's not what we did here, because we had
15    this intercompany note, not all the assets of
16    the company.  Okay.
17        Q.  How did JPMorgan view the
18    guarantees that were given by certain of the
19    operating companies of the Tribune as it
20    related to the collateral package --
21        MR. JOHNSTON:  Objection to form.
22        Q.  -- received by JPMorgan in
23    connection with the transaction?
24        MR. GLAZER:  Objection.
25        A.  How did I view the guarantees?

---

192

1    Confidential - J. Kowalczuk
2        Q.  Yes.  How did you view the
3    guarantees?
4        A.  I think the guarantees put us ahead
5    of certain pieces of the debt, I think.
6        Q.  Did the guarantees provide JPMorgan
7    an additional level of comfort?
8        A.  Well, the guarantees, I would say
9    that I thought that the guarantees
10    strengthened the structure versus if they
11    hadn't been there.
12        Q.  And was there discussion within
13    JPMorgan about engaging in the transaction
14    without the guarantees?
15        A.  I don't remember.
16        Q.  Do you think JPMorgan would have
17    done the transaction without the guarantees?
18        MR. GLAZER:  Objection to form.
19        A.  I wouldn't -- I couldn't speculate
20    as to that.
21        Q.  Would you have recommended that
22    JPMorgan enter the transaction without the
23    guarantees?
24        MR. GLAZER:  Same objection.
25        A.  I would be speculating.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

CONFIDENTIAL

---

193

1    Confidential - J. Kowalczuk
2        Q.  Well, would you have signed this
3    document seeking approval for the lending if
4    the guarantees were not in there?
5        MR. GLAZER:  Same question.  Same
6    objection.
7        A.  I mean it would have been -- it
8    would have been a different deal.  You would have to
9    analyze that deal, and, you know, I would be
10   speculating.
11       Q.  Did you ever talk to Mr. Sell about
12   whether he would have approved the deal
13   without the existence of the guarantee?
14       A.  No, I don't think so.  I don't
15   remember ever talking to Jeff about that.
16       Q.  Looking at this slide 63, is this a
17   slide that was prepared, the information on
18   the slide and the analysis done by Client
19   Credit Management?
20       A.  In these documents there's often
21   pages provided by, you know, different
22   groups, and I couldn't say if Jana did this
23   or someone in TMT coverage would have done
24   it.
25       Q.  Is there a department that would

---

194

1    Confidential - J. Kowalczuk
2    ordinarily be the office or group that
3    performs valuation analyses?
4        A.  For the purpose of the credit
5    package and the LGD, often in a transaction,
6    the modeling is often done in TMT Coverage,
7    and then often it gets transferred to Client
8    Credit Management, and so -- and sometimes
9    it's done by SLF, but not that often.  So I
10   think your question -- I forget the question
11   now.  I get to these long-winded answers, and
12   then I forget the question.  Sorry.
13       (Record read.)
14       A.  So it could be Coverage or it could
15   be us, and at some point there is often a
16   transition where it goes from Coverage to us.
17       Q.  Do you recall what was done in this
18   case?
19       A.  I don't.  I know that Client
20   Coverage started the modeling.  I know at
21   some point it got transferred to Jana, but I
22   don't know who did it when that transfer
23   occurred.
24       MR. GLAZER:  Andrew, when you find
25   a convenient time, we should take a

---

195

1    Confidential - J. Kowalczuk
2    break.
3        MR. GOLDFARB:  We can go off the
4    record.
5        (Recess taken from 4:00 p.m. to
6    4:13 p.m.)
7        Q.  Mr. Kowalczuk, if I could direct
8    your attention back to Kowalczuk Exhibit 9 at
9    Page 63.
10       A.  Okay.
11       Q.  We were looking at this before the
12   break, and it indicates that this is a
13   discounted cash flow analysis, perpetuity
14   growth method.  Do you see that?
15       A.  Yes.
16       Q.  And the perpetuity growth method is
17   one way to approach a DCF valuation; is that
18   right?
19       A.  I'm sorry.  Is?
20       Q.  It is one way to approach a DCF
21   valuation?
22       A.  Yeah.  I think it's the only way
23   that I know.  There may be others, but.
24       Q.  And is this a method you're
25   familiar with?

---

196

1    Confidential - J. Kowalczuk
2        A.  Yeah.  Perpetuity growth method,
3    yes.
4        Q.  So if you look at the bottom half
5    of that slide, sir, you have the A, B, and C
6    blocks.  Do you see that?
7        A.  Yes.
8        Q.  And you add A and B together to get
9    the firm value, which is C?
10       A.  Yes.
11       Q.  The C block.  And am I correct,
12   sir, that it presents a range of values
13   depending upon the discount rate that's used
14   in the model and also the terminal growth
15   rate that is selected?
16       A.  Yes.
17       Q.  And then if you look at column D,
18   which is net debt?
19       A.  Yes.
20       Q.  At 2007 you have the figure of
21   $12.896 billion; is that right?
22       A.  Yes.
23       Q.  Now, the total equity value in the
24   E block there --
25       A.  Yes.

---



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

197

1    Confidential - J. Kowalczuk
2    Q.  -- appears to be a sum of the C and
3    D blocks.  Do you see that?
4    A.  Yes.
5    Q.  Is that an error?
6    A.  I believe it is.
7    Q.  The total equity value should be C
8    minus D; is that right?
9    A.  Normally I think that's the way it
10   would be done.
11   Q.  And, in fact, if you look just to
12   the left of the D column, there is what could
13   be a subtraction sign?
14   A.  It could be.
15       MR. GLAZER:  There's at least a
16   mark.
17   A.  There's at least a mark, yeah.
18       MR. BUSATH:  It's an equal sign.
19   Q.  If, as you testified, sir, you
20   would normally subtract D from the C total,
21   is it the case, based on this slide, that
22   there would be a negative total equity value
23   for the entire range of discount rates and
24   terminal growth values?
25   A.  Well, based on this slide, yes.

198

1    Confidential - J. Kowalczuk
2    But there is an obvious error on this slide,
3    and so I don't -- what I was saying before is
4    that we didn't use -- this is in a template
5    but we didn't really use this method in this
6    LGD analysis, so I didn't really focus on
7    this slide, and so I wouldn't draw any
8    conclusion from anything on this slide.  I
9    mean there's such an obvious error on here, I
10   mean I don't know if -- I'm not sure anything
11   in here is correct.  But to answer your
12   question, if you used just this slide, I
13   think the answer would be yes.
14       MR. GLAZER:  And the error you're
15   talking about is not the one --
16       MR. KORPUS:  Let the witness finish
17   the answer.
18       MR. GLAZER:  And the error you're
19   talking about is not the one
20   Mr. Goldfarb is talking about, is it?
21       THE WITNESS:  Yeah.  That is the
22   obvious error, yes.
23   Q.  For the record, sir, what is the
24   obvious error?
25   A.  That debt was added, not

199

1    Confidential - J. Kowalczuk
2    subtracted.
3    Q.  Other than that, do you have any
4    reason to doubt the accuracy of the figures
5    contained on this document, how they were
6    generated?
7    A.  The fact that it has such an
8    obvious error, and I don't think I would have
9    focused on this page because we didn't use
10   this analysis in the LGD calculation, you
11   know, in the LGD analysis, makes me feel like
12   I don't -- I just don't really trust this
13   page.
14   Q.  All right.  Well, if you turn the
15   page to 64.
16   A.  64.  Yes.
17   Q.  This is a discounted cash flow
18   analysis using the EBITDA multiple method.
19   Do you see that?  Just at the top, at the
20   black bar at the top.
21   A.  Yes.  Oh.  Okay.  Sorry.  Go ahead.
22   Q.  Is the EBITDA multiple method
23   another approach to performing a discounted
24   cash flow valuation?
25   A.  I guess it is.

200

1    Confidential - J. Kowalczuk
2    Q.  Is it one you're familiar with,
3    sir?
4    A.  No, not -- not really.
5    Q.  Do you know who prepared this
6    slide?
7    A.  No.  It's the same, same answer as
8    before.
9    Q.  And, sir, would you agree that,
10   similar to the last slide, the E block
11   erroneously adds rather than subtracts the
12   net debt to obtain a total equity value?
13   A.  Yes.
14   Q.  And would you also agree that if
15   the numbers depicted in blocks C and D are
16   accurate, subtracting D from C would yield a
17   negative total equity value for all but three
18   of the cells in the total equity value
19   section under E?
20   A.  Yes.  That appears to be the case.
21   Q.  Did anybody ever call this error to
22   your attention?  Well, strike the question.
23   Did anybody ever call the spread sheet error
24   to your attention?
25   A.  The spread sheet error.  This



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

John Kowalczuk                                              January 20, 2010

CONFIDENTIAL

---

201

1     Confidential - J. Kowalczuk
2  error --
3     Q.  The computational error.
4     A.  No.  Not prior to prep.
5     Q.  And do you recall any discussion at
6  the time that correcting for the
7  computational error would yield a negative
8  total equity value for the DCF valuation
9  under both of these methods?
10     A.  No.  No.  But, again, the same
11  comment applies.  No.  It's not a page I
12  would have focused on when we went through
13  this, because it's not really -- it's not
14  what we used in the LGD analysis.
15     Q.  But it's part of the package, part
16  of the credit approval package that was
17  prepared and sent to and signed by yourself
18  and Mr. Sell; right?
19     A.  Right.  Yeah.  And can I just, you
20  know --
21     MR. GLAZER:  I'll object to that
22  question.  Over my objection.
23     A.  I never focused on this EBITDA
24  multiple method and the perpetuity method.
25  So when you asked is that a way of doing it,

---

202

1     Confidential - J. Kowalczuk
2  the perpetuity method is, the way I
3  understand, is you take at a point in time
4  the terminal value sort of in perpetuity and
5  you discount that back.  And so I'm not
6  really sure about the difference between
7  these two methods.  And I guess I said that,
8  but I just wanted to say it again.
9     MR. GLAZER:  Mr. Goldfarb, I assume
10  it was just an oversight on your part,
11  but if you look back, you'll see that
12  Mr. Sell did not sign this particular
13  document.
14     MR. GOLDFARB:  It was an oversight.
15  I obviously stand corrected.
16     MR. GLAZER:  I just wanted to point
17  it out so you don't go galloping off in
18  the future thinking something is not so.
19     Q.  But just so the record is clear,
20  Mr. Sell approved the revised credit package
21  of May 2007, correct, as reflected on the
22  first page of this document?
23     A.  Well, I need to just take a look at
24  the first page of the document.  Yes.  He may
25  not have gotten this document, and I guess he

---

203

1     Confidential - J. Kowalczuk
2  probably didn't approve it, because this is
3  the piece of the credit package that sort of
4  takes -- serves the function of what's in the
5  annual review, and so he wouldn't normally
6  sign the annual review, so he probably
7  wouldn't have had to sign this.
8     Q.  And when you talk about the annual
9  review, just describe what that is.
10     A.  Oh.  We do an annual review of each
11  borrower, and at the time it was analysis
12  that was sort of similar to what you see in
13  here.
14     Q.  Was there any point in your
15  involvement on the Tribune matter when you
16  did become concerned about whether the
17  Tribune would remain solvent after the going
18  private transaction?
19     A.  No.  No.
20     Q.  And I'm not limiting my question
21  now to May of '07.  I'm asking throughout.
22     A.  Yeah.  No.  I understand.  I mean.
23     MR. GLAZER:  You understood his
24  question?
25     THE WITNESS:  Yes.

---

204

1     Confidential - J. Kowalczuk
2     A.  Was I aware that they would remain
3  solvent.  No.
4     Q.  Do you ever recall any discussion
5  about calling into question whether or not
6  the Tribune would be able to obtain a
7  solvency opinion in connection with Stage 2
8  of the going private transaction?
9     THE WITNESS:  I'm sorry.  Just read
10  that back, please.
11     (Record read.)
12     A.  Yes.  I think I said earlier that
13  there were discussions about whether they
14  would be able to obtain a solvency opinion.
15     MR. GOLDFARB:  Let's mark this as
16  11.
17     (Kowalczuk Exhibit 11, Document
18  Bates stamped JPM 00346445, marked for
19  identification, as of this date.)
20     Q.  This is a document bearing Bates
21  number JPM 00346445.
22     Have you had a chance to look at
23  it, sir?
24     A.  I have.
25     Q.  Kowalczuk Number 11 is a two-page

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

205

1    Confidential - J. Kowalczuk
2    document containing two emails.  The top
3    email is sent from Peter Thauer, T-h-a-u-e-r,
4    to you; is that right?
5        A.  Tower (phonetic).  It's pronounced
6    Tower (phonetic).
7        Q.  Thank you.
8        A.  I say Thauer when I want to annoy
9    him, but go ahead.  Sorry.
10       Q.  And it's dated July 25th, 2007;
11   correct?
12       A.  Yes.
13       Q.  And that's forwarding an earlier
14   email from a Mr. Villanova?
15       A.  Villanueva.
16       Q.  Villanueva.  This is a tough email
17   for me.  Also the same date.  And the
18   Villanueva email on the bottom was sent,
19   among others, to the TMT Industry Group.  Do
20   you see that?
21       A.  I do.
22       Q.  Did you receive that email
23   directly?  Do you know if you were part of
24   the TMT Industry Group?
25       A.  I don't know, but I would surmise

206

1    Confidential - J. Kowalczuk
2    from the fact that Peter got it, because he's
3    a colleague, he works with me, that I would
4    have gotten it as well, but I'm not sure.
5        Q.  And the Villanueva email concerns
6    the second quarter of 2000 Tribune results;
7    is that right?
8        A.  Second quarter of 2007.
9        Q.  Yes.
10       A.  Yes.
11       Q.  And were you tracking the Tribune's
12   performance in this period of time yourself,
13   in the November 2007 time period -- excuse
14   me, the July 2007 time period?
15       A.  Yes.
16       Q.  Mr. Villanueva stated at the end of
17   his email, after reciting certain information
18   about the Tribune's second quarter 2007
19   performance, "Further asset sales could
20   reduce leverage to nine times, which is too
21   high for this company with weakening
22   fundamentals."  Do you see that?
23       A.  I do.
24       Q.  Did you agree with that statement?
25       MR. GLAZER:  Back then.

207

1    Confidential - J. Kowalczuk
2        A.  Back then I don't remember if I
3    agreed or disagreed.
4        Q.  Did you at any point, sir, from the
5    beginning of your engagement through today,
6    do you recall having concerns about the
7    Tribune's ability to withstand the debt it
8    incurred in connection with the LBO
9    transaction?
10       MR. GLAZER:  Objection to form.
11       A.  I mean it was -- there was a lot of
12   leverage on this deal.  You know, it was a
13   risky transaction from the beginning, and as
14   the performance deteriorated, you know, the
15   riskiness increased, in a sense.
16       Q.  And did you ever come to the view
17   whether the leverage was too high for the
18   company given its deteriorating performance
19   in the 2007 time period?
20       A.  I don't -- I think those are sort
21   of Jose's words.  He's a public side guy.
22       MR. GLAZER:  He asked about you.
23       A.  Yeah.  So no.  The answer to the
24   question is no.
25       Q.  And just to be clear, I'm not

208

1    Confidential - J. Kowalczuk
2    asking whether you agree with his words, but
3    whether you agree with the substance of his
4    words, as you understand them.
5        A.  I don't recall.
6        Q.  And then the next sentence says,
7    "TRB is one of our key credit concerns even
8    if the second stage of the LBO does not goes
9    through."  Do you see that?
10       A.  Yes.
11       Q.  Did, to your recollection and
12   knowledge, JPMorgan consider the Tribune one
13   of the key credit concerns for JPMorgan even
14   if the second stage of the LBO didn't go
15   through?
16       MR. GLAZER:  Objection to form.
17       A.  Well, again, you said JPMorgan.  I
18   mean Jose was a public side credit analyst.
19   So I think that's what he says.  But I don't
20   think he speaks for all of JPMorgan.
21       Q.  And I'm asking about your
22   perspective as to the --
23       A.  Oh, I'm sorry.
24       Q.  As to the --
25       MR. GLAZER:  Actually, the question



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

### 209

1      Confidential - J. Kowalczuk
2      didn't ask, but if you want to, you
3      should.  I think you asked about
4      JPMorgan.
5          Q.  Yes.  My question was, to your
6      recollection, did JPMorgan consider the
7      Tribune one of its key credit concerns even
8      if the second stage of the LBO didn't go
9      through?
10         A.  Okay.  And so my perspective, you
11     know, in Client Credit Management, or
12     whatever we called it back then, was that it
13     was a risky transaction, there was a lot of
14     leverage, but that if Step 2 didn't go
15     through, I wasn't -- it wasn't a big concern
16     of mine.
17         Q.  What wasn't a big concern of yours?
18         A.  If Tribune -- if Step 2 didn't go
19     through.
20         Q.  The top email from Mr. Thauer --
21     did I say it right?
22         A.  Yes.
23         Q.  To you, it says, "Tribune Urgent
24     Confidential" is the subject line; right?
25         A.  Yes.

### 210

1      Confidential - J. Kowalczuk
2          Q.  And it says in the second line,
3      "Based on what I've seen publicly and heard
4      from Jana re performance versus plan, it
5      sounds pretty bad."  Do you see that?
6          A.  I do.
7          Q.  Did you have a perspective of how
8      the Tribune was performing in July 2007 as
9      compared to its management plan?
10         A.  Yeah.  Yes.  I mean it was worse.
11     Yes.
12         Q.  And did you agree with Mr. Thauer
13     that it was pretty bad, that the second
14     quarter numbers compared to the management
15     plan were pretty bad?
16         A.  I don't know if I would have used
17     those words.
18         Q.  What words would you have used to
19     describe the Tribune's performance versus its
20     plan through the second quarter of 2007?
21         A.  I mean I remember sort of thinking,
22     oh, this is materially worse than the plan we
23     looked at before we closed the deal.
24         Q.  And when you say materially worse,
25     what do you mean by that?

### 211

1      Confidential - J. Kowalczuk
2          A.  I don't remember how far the July
3      numbers were off plan.  I don't remember.
4          Q.  What, if anything, did learning of
5      the second quarter performance prompt you to
6      do in connection with your work relating to
7      this going private transaction?
8          A.  I think I said earlier I don't
9      remember exactly when, but I think, I think
10     it was at this point that we thought about
11     lowering the risk grade, but I'm not sure if
12     it was as a result of this or a month later,
13     but it was sort of around that time period.
14         (Kowalczuk Exhibit 12, Document
15         Bates stamped JPM 00346464 and 346465,
16         marked for identification, as of this
17         date.)
18         Q.  This is a document bearing Bates
19     number JPM 00346464.  Kowalczuk Exhibit 12 is
20     also again a string of emails.  The earliest
21     in time was a July 25th 11:14, a.m. one
22     seeking a temporary increase for the Tribune
23     Company in terms of their commercial card
24     facility of an additional five million
25     dollars until the end of the month?

### 212

1      Confidential - J. Kowalczuk
2          A.  Oh, sorry.  Yes.
3          Q.  Do you see that?
4          A.  Yes.
5          Q.  What was happening here?  What was
6      the credit card facility that you were being
7      asked to extend additional credit for?
8          A.  The commercial card facility,
9      they're credit cards issued to employees of
10     the company for purposes of purchasing --
11     like purchasing office supplies, things like
12     that, or travel and entertainment.  So there
13     is a credit exposure, because the charges
14     occur, and then they have to repay us for
15     those charges.
16         Q.  Is this an independent line of
17     service that JPMorgan was providing to the
18     Tribune separate and apart from the LBO work
19     that you were doing?
20         A.  Yeah.  Yeah.  I think this was a
21     preexisting product that we had with them.
22         Q.  And I've seen a number of documents
23     in the production that seem to indicate
24     almost on a monthly basis requests for an
25     end-of-month line increase.  Are you familiar



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

---

**213**

1    Confidential - J. Kowalczuk
2  that it was a recurring request at the end of
3  the month for such an increase?
4        MR. GLAZER: You mean the temporary
5  increase?
6        MR. GOLDFARB: Temporary increase,
7  yes.
8     A. Yes. Temporary increase, yes. I
9  remember that.
10    Q. And is the way that that worked is
11  there would be a temporary increase, and then
12  the credit limit would go back down to
13  whatever the cap was for the next month?
14    A. Yes. Basically, yeah.
15    Q. And do you know why the Tribune
16  wasn't able to stay within its credit limit
17  on a monthly basis?
18    A. Oh. No. No. But it's not
19  uncommon -- I mean usage of these cards
20  sometimes grows within a company, so it's not
21  that unusual for this to happen.
22    Q. And then you see on July 25th you
23  seem to have approved the temporary increase,
24  the five-million-dollar increase until year's
25  end. And then the second to the top email

**214**

1    Confidential - J. Kowalczuk
2  appears to be a request for a permanent
3  increase from 34 to $38 million with a
4  possibility of it going to 40. Do you see
5  that?
6        MR. GLAZER: You said year's end, I
7     thought you meant month end, as part of
8     your question.
9        MR. GOLDFARB: I stand corrected.
10  Yes.
11    A. Oh.
12    Q. Let me strike the question and
13  start again.
14    A. Okay. Thanks.
15    Q. Am I right that in the second to
16  the top email Stella Millas is asking whether
17  or not the credit card guidance line should
18  be expanded either from 34 to 38 or up to
19  $40 million?
20    A. Yes.
21    Q. Is that right?
22    A. Yes.
23    Q. And then your response was, also on
24  the 25th at the top, "Let's discuss tomorrow.
25  People are VERY" -- capital "VERY" --

**215**

1    Confidential - J. Kowalczuk
2  "sensitive to Trib exposure increases at this
3  point."
4        What was the basis for your
5  statement that people were very sensitive to
6  Trib exposure increases in July, the end of
7  July 2007?
8     A. We had a lot of exposure with Trib.
9  I don't remember if we got down all the way
10  to our target on Step 1, but we had Step 2
11  still to go, and, you know, we were committed
12  on -- you know, we had a commitment letter
13  from Step 2, so there was a lot of exposure.
14  And even our hold level, the hundred, would
15  -- I think, I think the threshold for a
16  six-rated credit was 75. So even our hold
17  level was above the threshold. So with that
18  plus the additional exposure for the
19  transaction, people were sensitive to take on
20  yet more exposure.
21    Q. And when you say people, who are
22  you referring to?
23    A. I think -- well, me. Jeff Sell
24  would have been sensitive to it, and I think
25  Tim Storms as well.

**216**

1    Confidential - J. Kowalczuk
2        MR. GOLDFARB: Let's mark this as
3     13.
4        (Kowalczuk Exhibit 13, Document
5     Bates stamped JPM 00347365, marked for
6     identification, as of this date.)
7     Q. This is a document bearing Bates
8  number JPM 00347365.
9        Have you had a chance to look at
10  it?
11    A. Yes.
12    Q. What is it?
13    A. This is an email to me from Daryl
14  Jacobson at SLF forwarding I guess what he
15  refers to as a recovery report from S&P,
16  which is a forward of a note that he got I
17  guess from Yang Chen.
18    Q. And what is a recovery report, if
19  you know?
20    A. I only know vaguely it's an
21  analysis that S&P does to estimate the
22  recovery, I think, on different tranches of
23  debt.
24    Q. Does it relate at all to recovery
25  in the event of bankruptcy, or is it



Toll Free: 800.441.3376
Facsimile: 202.296.8652

ESQUIRE
an Alexander Gallo Company

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

217

1     Confidential - J. Kowalczuk
2   otherwise?
3       A.  I don't know.
4       Q.  The Chen email on the bottom states
5   that it's providing some highlights, what the
6   email terms as highlights of the S&P recovery
7   report.  Do you see that?
8       A.  I do.
9       Q.  And the last dashed highlight in
10  the email states, "For the recovery analysis,
11  they assumed the Step 2 happens, cost of debt
12  increases by about 250 BPS than planned,
13  revenues decline 5.7 percent in 2007,
14  3.2 percent in 2008, and 3.7 percent in 2009,
15  and result in a contraction of EBITDA
16  margins, maintenance capex of $100 million.
17  With these assumptions, the company would
18  default toward the end of 2009."  Do you see
19  that?
20      A.  Yes.
21      Q.  Do you recall receiving this email
22  from Mr. Jacobson?
23      A.  I don't.
24      Q.  Do you recall discussing the S&P
25  recovery report with anybody in and around

218

1     Confidential - J. Kowalczuk
2   this time frame, August of 2007?
3       A.  I don't.
4       Q.  Do you have any knowledge of
5   whether anybody expressed concern that the
6   S&P recovery report indicated that with the
7   assumptions of deteriorating performance
8   contained therein, the Trib would default
9   towards the end of 2009?
10      A.  No.  I think the lead-in to your
11  question was do I remember having -- sorry.
12      (Record read.)
13      A.  No, I don't.
14      Q.  Do you know whether JPMorgan ever
15  undertook any analysis that showed the
16  company could be rendered insolvent as a
17  result of the LBO transaction?
18      MR. GLAZER:  It's a yes or a no.
19      (Record read.)
20      A.  No.  I don't think so.
21      Q.  Do you recall that one of the
22  conditions to completion of the LBO merger
23  transaction was that the Tribune obtain a
24  solvency opinion in connection with the
25  second step of the transaction?

219

1     Confidential - J. Kowalczuk
2       MR. GLAZER:  Objection to form.
3       A.  I do recall that there was a
4   condition that --
5       THE WITNESS:  Sorry.  Just read it
6   back.
7       (Record read.)
8       A.  Yes.  I don't remember who actually
9   got the opinion, but I remember there was a
10  solvency opinion had to be -- as a condition
11  for Step 2, that a solvency opinion had to be
12  delivered as a condition to Step 2.
13      Q.  Were you ever aware of
14  consideration within JPMorgan of retaining
15  its own firm to do an analysis and evaluation
16  of the Tribune's solvency in advance of
17  completion of Step 2 of the LBO transaction?
18      MR. GLAZER:  It's a yes or no.
19      THE WITNESS:  Just I have a
20  question for you.
21      MR. GLAZER:  Yes.  Let's take a
22  moment.
23      MR. GOLDFARB:  Okay.
24      (Witness conferred with counsel.)
25      (Record read.)

220

1     Confidential - J. Kowalczuk
2       A.  Yes.
3       Q.  How did you come to learn of JPM's
4   consideration of retaining its own solvency
5   firm?
6       A.  There were -- I just remember some
7   discussions about it, but I don't remember --
8   I don't remember anything specific.
9       Q.  Who do you recall discussions with?
10      A.  I don't remember.
11      Q.  What is the basis for your
12  recollection that such discussions or
13  consideration occurred?
14      A.  I just remember sort of generally.
15      Q.  Do you remember in the discussions
16  that you recall occurring why JPMorgan was
17  considering retaining an independent solvency
18  firm to do an analysis?
19      MR. GLAZER:  You can answer that
20  yes or no.
21      A.  Yes.  Yes.
22      Q.  And why, if you recall, was
23  JPMorgan considering retaining its own
24  solvency firm?
25      MR. GLAZER:  We've now entered the



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com

221

1    Confidential - J. Kowalczuk
2    area of privileged conversations, and
3    I'm going to instruct the witness not to
4    answer that.
5        Q.   Are you going to follow your
6    counsel's instruction?
7        A.   Yes.
8        MR. GLAZER:  I always tell
9    witnesses they either follow that
10   instruction or they sit here by
11   themselves.  That's their choice.
12       Q.   Now, Mr. Kowalczuk, I had asked you
13   earlier if you recalled having discussions
14   with anyone at any point about whether the
15   LBO transaction would render the Tribune
16   insolvent; is that correct?
17       A.   I remember that question, yes.
18       Q.   And you've now testified that you
19   also remember discussions about JPMorgan
20   considering retaining its own solvency firm
21   in advance of the closure of Step 2
22   transaction; is that right?
23       A.   Yes.
24       Q.   Do you need to modify your earlier
25   testimony at all with respect to

222

1    Confidential - J. Kowalczuk
2    conversations about the ability of the
3    Tribune to remain solvent after Step 2?
4        A.   I don't think so, because I think
5    when I answered that question, I think what I
6    said was we -- because I think I, in fact,
7    corrected myself, because I think what we
8    were thinking about was whether they would be
9    able to get a solvency opinion.  I think
10   that's what I remember the question in our
11   mind being, are they going to be able to get
12   a solvency opinion.  So I think that answer
13   is okay.  I think that's right.
14       MR. GLAZER:  When we review the
15   transcript, if he feels differently,
16   we'll let you know.
17       Q.   And independent of any discussions
18   that you had with counsel, did you yourself
19   come to a view about whether JPMorgan should
20   retain an independent solvency firm?
21       MR. GLAZER:  I'm not going to let
22   him answer that question, because it
23   relates to conversations with counsel.
24       MR. GOLDFARB:  Okay.
25       Q.   Are you going to follow your

223

1    Confidential - J. Kowalczuk
2    counsel's instruction?
3        A.   Yes.
4        Q.   Again?
5        MR. GLAZER:  Why don't we assume a
6    continuous yes.
7        Q.   Are you able to answer that
8    question independent of your counsel's
9    instruction not to reveal anything that would
10   reveal a privileged communication?
11       A.   I'm not sure I understand the
12   question.
13       Q.   I'm asking if you're able to answer
14   the question about your perspective as to
15   JPMorgan retaining an independent solvency
16   firm apart from the privileged communications
17   that your counsel has cautioned you about?
18       MR. GLAZER:  Having spoken to this
19   witness and others about the subject, it
20   cannot be answered, I've concluded that
21   it cannot be answered without imposing
22   on privileged conversations.  And,
23   therefore, I'll instruct him not to
24   answer.  The privilege doesn't belong to
25   this witness.  It belongs to JPMorgan.

224

1    Confidential - J. Kowalczuk
2        Q.   Do you know whether JPMorgan did
3    ultimately retain a firm to separately
4    analyze the solvency of the Tribune in 2007?
5        MR. GLAZER:  That's a yes or a no.
6    Yes or no.
7        A.   Do I know if they did, yes, I know
8    if we did or didn't.
9        Q.   And did JPMorgan, to your
10   knowledge, retain a firm to evaluate solvency
11   of the Tribune in 2007?
12       MR. GLAZER:  Yes or no.
13       A.   No.
14       (Kowalczuk Exhibit 14, Document
15   Bates stamped JPM 00070129, marked for
16   identification, as of this date.)
17       Q.   This is a document bearing first
18   Bates JPM 00070129.  Have you had a chance to
19   look at this?
20       A.   Should I look at both sides?
21       Q.   Yes.
22       A.   Okay.  Sorry.
23       Q.   Have you seen this document before,
24   Mr. Kowalczuk?
25       A.   It doesn't look familiar.



Toll Free: 800.441.3376
Facsimile: 202.296.8652

Suite 620
1020 19th Street, NW
Washington, DC 20036
www.esquiresolutions.com