| J.P. MORGAN | MERRILL LYNCH | CITIGROUP | BANC OF AMERICA |
|---|---|---|---|
| SECURITIES INC. | CAPITAL | GLOBAL MARKETS | SECURITIES LLC |
| JPMORGAN CHASE | CORPORATION | INC. | BANK OF |
| BANK, N.A. | 4 World Financial | 388 Greenwich Street | AMERICA, N.A. |
| 270 Park Avenue | Center | New York, NY 10013 | 9 West 57th Street |
| New York, NY 10017 | New York, NY 10080 | | New York, NY 10019 |

April 5, 2007

Tribune Company
435 North Michigan Avenue, 6th Floor
Chicago, Illinois 60611

Attention: Don Grenesko
Senior Vice President, Finance and Administration

### Re: Project Tower — Amended and Restated First Step Commitment Letter

Ladies and Gentlemen:

Tribune Company ("you" or "Tribune") has advised J.P. Morgan Securities Inc. ("JPMorgan"), JPMorgan Chase Bank, N.A. ("JPMCB"), Merrill Lynch Capital Corporation ("Merrill Lynch"), Citigroup Global Markets Inc. ("CGMI") on behalf of Citigroup (as defined below), Bank of America, N.A. ("Bank of America") and Banc of America Securities LLC ("BAS") that (i) you have entered into an agreement and plan of merger dated as of the date hereof (the "Acquisition Agreement") with a new employee stock ownership plan sponsored by you (the "ESOP") that will be a "qualified plan" and an "employee stock ownership plan" under the Internal Revenue Code of 1986, as amended (the "Code") for the benefit of employees of Tribune and its subsidiaries (the administrator of the ESOP will be a fiduciary that is qualified under the Code) and an entity formed by the ESOP, pursuant to which such entity will be merged (the "Acquisition") with and into Tribune, with Tribune continuing as the surviving corporation, (ii) subsequent to entering into the Acquisition Agreement and prior to consummating the Acquisition, you intend to repurchase certain shares of your common stock (the "Stock Repurchase") and/or pay a special one time dividend on the shares of your common stock that are not repurchased in the Stock Repurchase (the "Dividend") and refinance certain of your existing indebtedness (the "Refinancing"), (iii) concurrently with the execution and delivery of the Acquisition Agreement, you intend to enter into a securities purchase agreement (the "Securities Purchase Agreement") with EGI-TRB, L.L.C., a newly formed single member limited liability company ("Holdco") owned by Samuel Zell ("Zell") pursuant to which Holdco will invest (the "Zell Investment"), which investment will be personally guaranteed by Zell, in Tribune $250.0 million in cash in exchange for $50.0 million of Tribune common equity (at a price of $34.00 per share) and an unsecured subordinated exchangeable promissory note in the principal amount of $200.0 million due upon the earlier to occur of the consummation of the Acquisition and the termination

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

of the Acquisition Agreement in accordance with its terms (the "Zell Note"), (iv) concurrently with the execution and delivery of the Acquisition Agreement, Tribune will form the ESOP, (v) concurrently with or as soon as practicable following the execution of the Acquisition Agreement, the ESOP will purchase $250.0 million of Tribune common equity (at a price not in excess of fair market value for purposes of Section 3(18) of ERISA) in exchange for a $250.0 million aggregate principal amount 30-year note (at a reasonable rate of interest and otherwise on arm's length terms that are generally fair and reasonable to the ESOP from a financial point of view) (such note, the "ESOP Note" and such investment, the "ESOP Investment") and (vi) the sources and uses of the funds necessary to consummate the Stock Repurchase, the Dividend, the Refinancing and the other transactions contemplated hereby (other than the Second Step Transactions (as defined below)) are set forth on Annex I to this Amended and Restated Commitment Letter. For purposes of this Amended and Restated Commitment Letter, "Citigroup" means CGMI, Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as may be appropriate to consummate the transactions contemplated herein. This letter amends, restates and supersedes in its entirety the Project Tower – First Step Commitment Letter among JPMorgan, JPMCB, Merrill Lynch, and Citigroup dated April 1, 2007 and such Commitment Letter shall be of no further force or effect.

In addition, you have advised JPMCB, Merrill Lynch, Citigroup and Bank of America (collectively, the "Initial Lenders") that in connection with the Stock Repurchase, the Dividend and the Refinancing, Tribune will enter into senior secured credit facilities in the amount of up to $8.028 billion described in Exhibit A hereto (the "Senior Secured Credit Facilities").

The Stock Repurchase and/or the Dividend, the Refinancing, the Zell Investment, the formation of the ESOP, the execution and delivery of the Acquisition Agreement, the ESOP Investment and the execution and delivery of the Senior Secured Credit Facilities and the other transactions contemplated hereby and thereby (other than the consummation of the Acquisition and the financings and other transactions directly related thereto (collectively, the "Second Step Transactions") and contemplated by that certain "Project Tower – Amended and Restated Second Step Commitment Letter" dated the date hereof among Tribune, the Initial Lenders and the Lead Arrangers (the "Second Step Commitment Letter")) are referred to as the "First Step Transactions".

You have requested that the Initial Lenders commit to provide the Senior Secured Credit Facilities to finance the aggregate amount of the Stock Repurchase, the Dividend and the Refinancing and to pay certain related fees and expenses.

Accordingly, subject to the terms and conditions set forth below, the Initial Lenders hereby agree with you as follows:

1. Commitment; Engagement. (a) Each of JPMCB and Merrill Lynch hereby commits, severally and not jointly, to provide to Tribune 30% of each of the Senior Secured Credit Facilities, (b) Citigroup hereby commits, severally and not jointly, to provide to Tribune 25% of each of the Senior Secured Credit Facilities and (c) Bank of America hereby commits, severally and not jointly, to provide to Tribune 15% of each of the Senior Secured Credit Facilities, in each case, upon the terms and subject to the conditions set forth or referred to herein, in

-2-

the confidential Amended and Restated First Step Fee Letter (the "First Step Fee Letter") dated the date hereof and delivered to you and in the Senior Secured Credit Facilities Summary of Terms and Conditions attached hereto (and incorporated by reference herein) as Exhibit A (the "Term Sheet"). The commitments of the Initial Lenders hereunder are subject to the negotiation, execution and delivery of definitive documents governing the Senior Secured Credit Facilities (together, the "Credit Documents") reflecting substantially the terms and conditions set forth herein and in the Term Sheet and the First Step Fee Letter and otherwise in a customary form.

2.      Syndication. The Initial Lenders reserve the right and intend, prior to or after the execution of the Credit Documents and in consultation with you, to syndicate all or a portion of their respective commitments with respect to the Senior Secured Credit Facilities to one or more financial institutions (together with the Initial Lenders, the "Lenders"). Upon the issuance by any additional Lender of its commitment with respect to any of the Senior Secured Credit Facilities, the Initial Lenders' commitments with respect to such Senior Secured Credit Facilities shall be reduced in the aggregate by an equal amount (and on a pro rata basis as among the Initial Lenders). Notwithstanding any such reduction in commitments, the Initial Lenders shall remain committed to fund amounts assigned in the event additional Lenders fail to fund. The commitments of the Initial Lenders hereunder are several and not joint, and are subject to (a) JPMorgan, Merrill Lynch, Citigroup and BAS (or one or more of their respective affiliates) acting as joint lead arrangers and bookrunners (the "Lead Arrangers") of, (b) JPMCB acting as sole and exclusive administrative agent (the "Administrative Agent") for, (c) Merrill Lynch acting as sole and exclusive syndication agent for and (d) Citigroup and Bank of America acting as co-documentation agents for the Senior Secured Credit Facilities. It is further agreed that in connection with any offering or marketing materials relating to the Senior Secured Credit Facilities, JPMorgan will appear "on the left" and the names of the other Lead Arrangers will appear in such order as they appear in the caption of this letter. The Lead Arrangers (or one or more of their respective affiliates) will manage all aspects of the syndication in consultation with you, including decisions as to the selection of potential Lenders to be approached and when they will be approached, when their commitments will be accepted, which Lenders will participate and the final allocations of the commitments among the Lenders (which are likely not to be pro rata across facilities among Lenders). The Lead Arrangers will exclusively perform, in consultation with you, all functions and exercise all authority as customarily performed and exercised in such capacities, including selecting one law firm as counsel for the Lead Arrangers and the Initial Lenders and negotiating the Credit Documents. Any agent or arranger titles (including co-agents) awarded to other Lenders with respect to the Senior Secured Credit Facilities are subject to the prior approval of Tribune and the Lead Arrangers (such approval not to be unreasonably withheld or delayed) and shall not entail any role with respect to the matters referred to in this paragraph without the prior consent of the Lead Arrangers (such consent not to be unreasonably withheld or delayed). You agree that, without the consent of the Initial Lenders, Tribune shall not pay to any Lender any compensation outside the terms contained herein and in the First Step Fee Letter in order to obtain its commitment to participate in any of the Senior Secured Credit Facilities.

You understand that the Lead Arrangers intend to commence the syndication of the Senior Secured Credit Facilities promptly, and you agree actively to assist them in achieving a timely syndication that is mutually satisfactory to the Lead Arrangers and Tribune. The syndication efforts will be accomplished by a variety of means, including direct contact during the

-3-

syndication between senior management, advisors and affiliates of Tribune on the one hand and the proposed Lenders on the other hand, and Tribune hosting, with the Lead Arrangers, at least one meeting with prospective Lenders at such times and places as the Lead Arrangers may reasonably request.  You agree, upon the reasonable request of the Lead Arrangers, to use commercially reasonable efforts to (a) provide, and cause your subsidiaries and advisors to provide to the Lead Arrangers all information relating to Tribune and its subsidiaries reasonably deemed necessary by them, as and when such information becomes available, including, without limitation, upon request from the Lead Arrangers copies of Tribune's internal management reports prepared in the ordinary course of business consistent with past practices for each fiscal month after the most recent fiscal quarter (including year end) for which financial statements have been received by the Lead Arrangers as described in Paragraph 1 of Annex II hereto, to successfully complete the primary syndication of the Senior Secured Credit Facilities, including the Information and Projections (including updated projections) contemplated hereby, (b) assist, and cause your subsidiaries and advisors to assist, the Lead Arrangers in the preparation of a Confidential Information Memorandum to be completed not later than 20 business days prior to the Closing Date (as defined in Exhibit A) and other reasonably necessary marketing materials (the contents of which, except to the extent relating to either Lead Arranger or its affiliates, you shall be solely responsible for) to be used in connection with the primary syndication of the Senior Secured Credit Facilities and (c) obtain, at your expense, corporate family ratings and a monitored public rating of the Senior Secured Credit Facilities from each of Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's, a division of the McGraw Hill Companies ("S&P").  You also agree to use your commercially reasonable efforts to ensure that the syndication efforts of the Lead Arrangers benefit materially from your (and your subsidiaries') existing lending relationships.  You further agree to afford the Lead Arrangers and their affiliates a period of not less than 20 business days prior to the Closing Date to syndicate the Senior Secured Credit Facilities.

Without limiting your obligation to assist with the syndication efforts as set forth above, it is understood and agreed that completion of such syndication is not a condition to the Initial Lenders' commitments hereunder.

3.    Fees.  As consideration for the commitments of the Initial Lenders hereunder and the agreement of the Lead Arrangers to arrange, manage, structure and syndicate the Senior Secured Credit Facilities, you agree to pay to them when due the fees as set forth in the First Step Fee Letter.

4.    Conditions.  The Initial Lenders' commitments hereunder are subject to the conditions set forth in Annex II to this Amended and Restated Commitment Letter and are also subject to:

(a)    the preparation, execution and delivery of mutually satisfactory definitive documentation with respect to the Senior Secured Credit Facilities (including a credit agreement and guarantees) incorporating the terms outlined in this Amended and Restated Commitment Letter and in the Term Sheet and otherwise in a customary form;

(b)    the Initial Lenders and their respective affiliates shall be satisfied that, after the date hereof and until the successful syndication of the Senior Secured Credit Facilities has been completed (as determined by them) or, if earlier, the Closing Date, none

-4-

of Tribune, any of its subsidiaries, the ESOP, Holdco or any of its affiliates or subsidiaries shall have offered, placed, arranged or issued, or engaged in discussions concerning the offering, placement, arrangement or issuance of, any debt facility or debt security (including any renewal or refinancing of and increase of commitments under existing facilities or securities), or participated in the taking of such actions by another person where Tribune or one of its affiliates is intended to assume the obligations of such other person shortly after they are incurred, prior to or during the primary syndication of the Senior Secured Credit Facilities, without the prior written consent of the Lead Arrangers, other than the Senior Secured Credit Facilities, any issuance of indebtedness as part of the Second Step Transactions and any amendments to extend the maturity of the Tribune's existing 364-day bridge credit agreement facility; and

(c)       (i) from December 31, 2006 through the date hereof, except as otherwise contemplated, required or permitted by the Acquisition Agreement, the Tower Purchase Agreement (as defined in the Acquisition Agreement) or the ESOP Purchase Agreement (as defined in the Acquisition Agreement) there has not been any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect (as defined (and all component definitions thereof are defined) in the Acquisition Agreement as in effect on the date hereof) and (ii) since the date hereof, there has not been any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

5.       Information and Investigations. You hereby represent and warrant that (a) all information and data (excluding the Projections and information of a general economic or industry-specific nature) that have been or will be made available by you or any of your representatives or advisors to the Initial Lenders, the Lead Arrangers or any Lender (whether prior to or on or after the date hereof) in connection with the First Step Transactions, taken as a whole (the "Information"), is and will be complete and correct in all material respects and does not and will not, taken as a whole, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made, and (b) all financial projections concerning Tribune and its subsidiaries, the ESOP and the transactions contemplated hereby (the "Projections") that have been made or will be prepared by or on behalf of you or any of your representatives or advisors and that have been or will be made available to the Initial Lenders, the Lead Arrangers or any Lender in connection with the transactions contemplated hereby (including the Second Step Transactions) have been or in the case of projections made after the date hereof, will be, prepared in good faith based upon assumptions that you reasonably believe to have been reasonable at the time made (it being understood that any such projections are subject to significant uncertainties and contingencies, many of which are beyond your control, and that no assurance can be given that such projections will be realized and that actual results may differ from such projections and such differences may be material). You agree to use commercially reasonable efforts to supplement the Information and the Projections from time to time until the Closing Date and, if requested by the Lead Arrangers, for a reasonable period thereafter not to exceed 45 days necessary to complete the successful syndication of the Senior Secured Credit Facilities so that the representation and warranty in the preceding sentence remains correct in all material respects. In syndicating the Senior Secured Credit Facilities the Lead Arrangers will be

-5-

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

entitled to use and rely primarily on the Information and the Projections without responsibility for independent check or verification thereof.

You hereby acknowledge that (a) the Lead Arrangers will make available Information and Projections to the proposed syndicate of Lenders on a confidential basis through posting on IntraLinks or another similar electronic system and (b) certain of the proposed Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to Tribune, its affiliates or any securities thereof ("Material Non-Public Information")) (each, a "Public Lender"). You hereby agree that (a) you will use commercially reasonable efforts to identify that portion of the Information and Projections that may be distributed to the Public Lenders and include a reasonably detailed term sheet in such Information and that all of the foregoing that is to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC"; (b) by marking materials "PUBLIC," you shall be deemed to have authorized the Lead Arrangers and the proposed Lenders to treat such materials as not containing any Material Non-Public Information, it being understood that certain of such materials may be subject to the confidentiality requirements of the definitive credit documentation; (c) all materials marked "PUBLIC" are permitted to be made available by electronic means designated for "Public Lenders;" and (d) the Lead Arrangers shall be entitled to treat any materials that are not marked "PUBLIC" as being suitable only for posting by confidential electronic means not designated for "Public Lenders." You also acknowledge that Public Lenders employed by one or more of the Lead Arrangers or their respective affiliates, consisting of publishing debt analysts, may participate in any meetings or telephone conference calls held pursuant to Section 2 hereof; *provided* that such analysts shall not publish any information obtained from such meetings or calls until the syndication of the Senior Secured Credit Facilities has been completed upon the making of allocations by the Lead Arrangers and the Lead Arrangers freeing the Senior Secured Credit Facilities to trade.

6.      Indemnification. You agree to indemnify and hold harmless each Initial Lender, each Lead Arranger, each other Lender and their respective affiliates, and each such person's respective officers, directors, employees, agents and controlling persons (each Initial Lender, each Lead Arranger and each such other person being an "Indemnified Party") from and against any and all losses, claims, damages, costs, expenses and liabilities, joint or several, to which any Indemnified Party may become subject under any applicable law, or otherwise related to or arising out of or in connection with this Amended and Restated Commitment Letter, the First Step Fee Letter, the Term Sheet, the Senior Secured Credit Facilities, the loans thereunder and the use of proceeds therefrom, any of the First Step Transactions or any related transaction and the performance by any Indemnified Party of the services contemplated hereby, and will reimburse each Indemnified Party for any and all reasonable and documented expenses (including reasonable and documented counsel fees and expenses) as they are incurred in connection with the investigation of or preparation for or defense of any pending or threatened claim or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party and whether or not such claim, action or proceeding is initiated or brought by or on behalf of you or any of your subsidiaries and whether or not any of the First Step Transactions is consummated or this Amended and Restated Commitment Letter is terminated, except to the extent (i) determined by a final judgment of a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct or (ii) arising from a material breach of the obligations of such Indemnified Party under this Amended and Restated Commit-

-6-

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

ment Letter. No party hereto nor any of its affiliates or subsidiaries shall be liable to any other party hereto or any of its subsidiaries or affiliates on any theory of liability for any special, indirect, consequential, punitive or exemplary damages in connection in any way with this Amended and Restated Commitment Letter, the First Step Fee Letter, the Term Sheet, the Senior Secured Credit Facilities, the loans thereunder and the use of proceeds therefrom, any of the First Step Transactions or any related transaction or the performance by any party hereto or any of its subsidiaries, or affiliates, its obligations hereunder or under the Senior Secured Credit Facilities. Notwithstanding any other provision of this Amended and Restated Commitment Letter, no Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, except to the extent determined by a final judgment of a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct.

You agree that, without the prior written consent of the Lead Arrangers (not to be unreasonably withheld), neither you nor any of your affiliates or subsidiaries will settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification has been or could be sought under the indemnification provisions hereof (whether or not any other Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent (i) includes an unconditional written release in form and substance reasonably satisfactory to the Lead Arrangers of each Indemnified Party from all liability arising out of such claim, action or proceeding and (ii) does not include any statement as to or an admission of fault, culpability or failure to act by or on behalf of any Indemnified Party.

7.    Expenses.  You agree to reimburse the Initial Lenders and their affiliates for their reasonable, documented, out-of-pocket expenses promptly following their request made from time to time (including, without limitation, all reasonable due diligence investigation expenses, fees of consultants engaged with your consent (not to be unreasonably withheld), syndication expenses (including printing, distribution, and bank meetings), travel expenses, duplication fees and expenses, search fees, filing and recording fees and the reasonable, documented fees, disbursements and other charges of Cahill Gordon & Reindel LLP as counsel to the Initial Lenders, and any sales, use or similar taxes (and any additions to such taxes) related to any of the foregoing) incurred in connection with the negotiation, preparation, execution and delivery, waiver or modification, collection and enforcement of this Amended and Restated Commitment Letter, the Term Sheet, the First Step Fee Letter and the Credit Documents and the security arrangements in connection therewith, and whether or not such fees and expenses are incurred before or after the date hereof or any loan documentation is entered into or the First Step Transactions are consummated or any extensions of credit are made under the Senior Secured Credit Facilities or this Amended and Restated Commitment Letter is terminated or expires; provided that such payment or reimbursement obligation with respect to legal counsel shall include only the reasonable fees and expenses of Cahill Gordon & Reindel LLP.

8.    Confidentiality.  This Amended and Restated Commitment Letter, the Term Sheet, the contents of any of the foregoing and the Initial Lenders' and/or their affiliates' activities pursuant hereto or thereto are confidential and shall not be disclosed by or on behalf of you or any of your subsidiaries to any person without the prior written consent of the Initial

-7-

Lenders, except that you may (i) disclose this Amended and Restated Commitment Letter, the First Step Fee Letter and the Term Sheet to Holdco and your and Holdco's respective officers, directors, employees and advisors, and then only in connection with the First Step Transactions and on a confidential need-to-know basis, (ii) file a copy of any portion of this Amended and Restated Commitment Letter (but not the First Step Fee Letter) and the Term Sheet in any public record in which it is required by law to be filed and (iii) make any other disclosure as you are required to make by applicable law or compulsory legal process (based on the advice of legal counsel); provided, however, that in the event of any such compulsory legal process you agree, to the extent permitted by applicable law, to give the Lead Arrangers prompt notice thereof and to cooperate, at the Lead Arrangers' expense, with the Initial Lenders in securing a protective order in the event of compulsory disclosure. The foregoing restrictions shall cease to apply with respect to this Amended and Restated Commitment Letter, the Term Sheet and the contents thereof once this Amended and Restated Commitment Letter has been accepted by you. You agree that you will use commercially reasonable efforts to permit the Initial Lenders to review and approve any reference to any of the Initial Lenders or any of their affiliates in connection with the Senior Secured Credit Facilities or the transactions contemplated hereby contained in any press release or similar public disclosure prior to public release. Subject to the terms of the next succeeding paragraph, you agree that the Initial Lenders and their affiliates may share information concerning you and your subsidiaries and affiliates among themselves solely in connection with the performance of their services hereunder and the evaluation and consummation of financings and First Step Transactions contemplated hereby. You also acknowledge that the Initial Lenders or their affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to parties whose interests may conflict with yours. The Initial Lenders agree that they will not furnish confidential information obtained from you to any of their other customers and that they will treat confidential information relating to you and your affiliates with the same degree of care as they treat their own confidential information. The Initial Lenders further advise you that they and their affiliates will not make available to you confidential information that they have obtained or may obtain from any other customer.

Each Lead Arranger agrees to maintain the confidentiality of the Confidential Information (as defined below), except that Confidential Information may be disclosed (a) to its and its affiliates' partners, directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and agree to keep such Confidential Information confidential), (b) to the extent requested or required by any state, Federal or foreign authority or examiner regulating such Lead Arranger, (c) to the extent required by applicable law, rule or regulation or by any subpoena or similar legal process, (d) in connection with any litigation or legal proceeding relating to this Amended and Restated Commitment Letter or the First Step Fee Letter or any other documentation in connection therewith or the enforcement of rights hereunder or thereunder or to which such Lead Arranger or any of its affiliates may be a party, (e) to any prospective Lender (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and agree to keep such Confidential Information confidential), (f) with the consent of Tribune, (g) to any rating agency when required by such rating agency, (h) for purposes of establishing a "due diligence defense" or (i) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this paragraph or (ii) becomes available to such Lead Arranger on a nonconfidential basis from a source other than Tribune or

-8-

any of its subsidiaries, officers, directors, employees or advisors. For the purposes of this paragraph, "Confidential Information" means all information received from Tribune or any of its subsidiaries, officers, directors, employees or advisors relating to Tribune or its businesses, other than any such information that is available to the Lead Arrangers on a nonconfidential basis prior to disclosure by Tribune. Any person required to maintain the confidentiality of Confidential Information as provided in this paragraph shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such Confidential Information as such person would accord to its own confidential information.

9.    Termination.  The Initial Lenders' commitments hereunder shall terminate in their entirety on the earliest to occur of (A) August 17, 2007 if the Credit Documents are not executed and delivered by Tribune and the Lenders on or prior to such date, (B) the date of execution and delivery of the Credit Documents by Tribune and the Lenders and (C) if earlier than (B), the date of termination of the Acquisition Agreement. Notwithstanding the foregoing, the provisions of Sections 6, 7, 8, 10 and 11 hereof shall survive any termination pursuant to this Section 9 (it being understood that the reimbursement and indemnification provisions contained herein shall be superseded by the reimbursement and indemnifications provisions contained in the Credit Documents when such Credit Documents become effective).

10.    Assignment; No Fiduciary; Etc.  This Amended and Restated Commitment Letter and the commitments of the Initial Lenders hereunder shall not be assignable by any party hereto (other than by the Initial Lenders to their respective affiliates) without the prior written consent of the other parties hereto, and any attempted assignment shall be void and of no effect; provided, however, that nothing contained in this Section 10 shall prohibit the Initial Lenders (in their sole discretion) from (i) performing any of their duties hereunder through any of their affiliates, and you will owe any related duties (including those set forth in Section 2 above) to any such affiliate, and (ii) granting (in consultation with you) participations in, or selling (in consultation with you) assignments of all or a portion of, the commitments or the loans under the Senior Secured Credit Facilities pursuant to arrangements satisfactory to the Initial Lenders (provided that, in the case of clauses (i) and (ii) above, the Initial Lenders shall be and remain primarily liable for the full and prompt performance of their duties and obligations hereunder). This Amended and Restated Commitment Letter is solely for the benefit of the parties hereto and does not confer any benefits upon, or create any rights in favor of, any other person.

In connection with all aspects of each transaction contemplated by this Amended and Restated Commitment Letter, you acknowledge and agree, and acknowledge your subsidiaries' understanding, that (i) each transaction contemplated by this Amended and Restated Commitment Letter is an arm's-length commercial transaction, between Tribune, on the one hand, and each of the Initial Lenders and the Lead Arrangers, on the other hand, (ii) in connection with each such transaction and the process leading thereto each of the Initial Lenders and Lead Arrangers will act solely as a principal and not as agent (except as otherwise provided herein) nor as fiduciary of Tribune or its respective stockholders, affiliates, creditors, employees or any other party, (iii) none of the Initial Lenders and the Lead Arrangers will assume an advisory or fiduciary responsibility in favor of Tribune or any of its affiliates with respect to any of the transactions contemplated hereby or the process leading thereto (irrespective of whether any Initial Lender or Lead Arranger has advised or is currently advising Tribune on other matters) and none

-9-

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

of the Initial Lenders and Lead Arrangers will have any obligation to Tribune or any of its affiliates with respect to the transactions contemplated in this Amended and Restated Commitment Letter except the obligations expressly set forth herein or as otherwise expressly agreed to in writing, (iv) the Initial Lenders and Lead Arrangers may be engaged in a broad range of transactions that involve interests that differ from those of Tribune and its affiliates, and (v) none of the Initial Lenders and Lead Arrangers has provided nor will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby and Tribune has consulted and will consult its own legal, accounting, regulatory, and tax advisors to the extent they deem appropriate. You hereby waive and release, to the fullest extent permitted by law, any claims that you may have against the Initial Lenders and Lead Arrangers with respect to any breach or alleged breach of fiduciary duty in respect of any of the transactions contemplated by this Amended and Restated Commitment Letter.

      11.    Governing Law; Waiver of Jury Trial. This Amended and Restated Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York. Each of the parties hereto waives all right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of any of the First Step Transactions or the other transactions contemplated hereby, or the performance by the Initial lenders, the Lead Arrangers or any of their respective affiliates of the services contemplated hereby.

      12.    Amendments; Counterparts; etc. No amendment or waiver of any provision hereof or of the Term Sheet shall be effective unless in writing and signed by the parties hereto and then only in the specific instance and for the specific purpose for which given. This Amended and Restated Commitment Letter, the Term Sheet and the First Step Fee Letter are the only agreements between the parties hereto with respect to the matters contemplated hereby and thereby and set forth the entire understanding of the parties with respect thereto. This Amended and Restated Commitment Letter may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart by telecopier shall be effective as delivery of a manually executed counterpart.

      13.    Patriot Act. The Initial Lenders hereby notify you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Patriot Act"), the Lenders may be required to obtain, verify and record information that identifies Tribune, which information includes the name, address and tax identification number and other information regarding it that will allow such Lender to identify it in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to the Lenders.

      14.    Public Announcements; Notices. The Initial Lenders and Lead Arrangers may, subject to your prior consent (not to be unreasonably withheld, delayed or conditioned) at their expense, publicly announce as they may choose the capacities in which they or their affiliates have acted hereunder. Any notice given pursuant hereto shall be mailed or hand delivered in writing, if to (i) you, at your address set forth on page one hereof, (ii) JPMorgan and JPMCB, at 270 Park Avenue, New York, NY 10017, Attention: Rajesh Kapadia; (iii) Merrill Lynch, at 4

-10-

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112637

World Financial Center, New York, New York 10080, Attention: David Tuvlin; (iv) CGMI, at 390 Greenwich Street, New York, NY 10013, Attention: Robert Chen; (v) Bank of America and BAS, at 9 West 57th Street, New York, New York 10019, Attention: William Pegler; and (vi) in the case of the foregoing clause (i), with a copy to Sidley Austin LLP, 1 South Dearborn Street, Chicago, Illinois 60603, Attention: Robert Lewis; and (vii) in the case of the foregoing clauses (ii), (iii), (iv) or (v), with a copy to Cahill Gordon & Reindel LLP, 80 Pine Street, New York, NY 10005, Attention: Jonathan A. Schaffzin.

(Signature Page Follows)

-11-

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112638

Please confirm that the foregoing correctly sets forth our agreement of the terms hereof and the First Step Fee Letter by signing and returning to the Initial Lenders the duplicate copy of this letter and the First Step Fee Letter enclosed herewith. Unless the Initial Lenders receive your executed duplicate copies hereof and thereof by 5:00 p.m., New York City time, on April 5, 2007, the commitments of the Initial Lenders hereunder will expire at such time.

We are pleased to have this opportunity and we look forward to working with you on this transaction.

Very truly yours,

MERRILL LYNCH CAPITAL CORPORATION

By: _____ Stephen D Pan _____
Name: Stephen Pan
Title: Vice President

CITIGROUP GLOBAL MARKETS INC.

By: _____
Name:
Title:

J.P. MORGAN SECURITIES INC.

By: _____
Name:
Title:

JPMORGAN CHASE BANK, N.A.

By: _____
Name:
Title:

[Step One Commitment Letter]

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

Please confirm that the foregoing correctly sets forth our agreement of the terms hereof and the First Step Fee Letter by signing and returning to the Initial Lenders the duplicate copy of this letter and the First Step Fee Letter enclosed herewith. Unless the Initial Lenders receive your executed duplicate copies hereof and thereof by 5:00 p.m., New York City time, on April 5, 2007, the commitments of the Initial Lenders hereunder will expire at such time.

We are pleased to have this opportunity and we look forward to working with you on this transaction.

Very truly yours,

MERRILL LYNCH CAPITAL CORPORATION

By: _____
    Name:
    Title:

CITIGROUP GLOBAL MARKETS INC.

By: _____
    Name:  Robert H. Chen
    Title:  Director

J.P. MORGAN SECURITIES INC.

By: _____
    Name:
    Title:

JPMORGAN CHASE BANK, N.A.

By: _____
    Name:
    Title:

[Step One Commitment Letter]

Professionals' Eyes Only                                                                                    TRB0112640
Highly Confidential - Attorneys' Eyes Only

Please confirm that the foregoing correctly sets forth our agreement of the terms hereof and the First Step Fee Letter by signing and returning to the Initial Lenders the duplicate copy of this letter and the First Step Fee Letter enclosed herewith. Unless the Initial Lenders receive your executed duplicate copies hereof and thereof by 5:00 p.m., New York City time, on April 5, 2007, the commitments of the Initial Lenders hereunder will expire at such time.

We are pleased to have this opportunity and we look forward to working with you on this transaction.

Very truly yours,

MERRILL LYNCH CAPITAL CORPORATION

By: _____
    Name:
    Title:

CITIGROUP GLOBAL MARKETS INC.

By: _____
    Name:
    Title:

J.P. MORGAN SECURITIES INC.

By: _____
    Name:    Robert Anastasio
    Title:   Vice President

JPMORGAN CHASE BANK, N.A.

By: _____
    Name:
    Title:   Robert Anastasio
             Vice President

[Step One Commitment Letter]

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112641

BANK OF AMERICA, N.A.

By: _____
Name: DANIEL R . PETRIK
Title: SENIOR VICE PRESIDENT

BANC OF AMERICA SECURITIES LLC

By: _____
　　Name:
　　Title:

[Step One Commitment Letter]

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112642

BANK OF AMERICA, N.A.

By: _____
    Name:
    Title:

BANC OF AMERICA SECURITIES LLC

By: _____
    Name: James G. Rone
    Title: Managing Director

[Step One Commitment Letter]

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112643

Accepted and agreed to as of
the date first above written:

TRIBUNE COMPANY,

By:

Name:  Donald C. Grenesko
Title:   Senior Vice President, Finance and Administration

Acknowledged:

EGI-TRB, L.L.C.

By:

Name:
Title:

[First Step Commitment Letter]

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112644

Accepted and agreed to as of
the date first above written:

TRIBUNE COMPANY

By:
Name:   Dennis J. FitzSimons
Title:   Chairman, President and
         Chief Executive Officer

EGI-TRB, L.L.C.

By:
Name:   Philip G. Tinkler
Title:   Vice President

Signature Page to the First Step Commitment Letter

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112645

**Annex I**

## Estimated Sources and Uses of Funds
### (in $ millions)

| Sources | | Uses | |
|---|---|---|---|
| Zell Investment | $   250.0 | | |
| Revolving Facility[1] | 0 | Stock Repurchase/Dividend | $4,288.0 |
| Tranche B Term Loan | 7,015.0 | Repayment of Existing Debt | 2,825.0 |
| Delayed Draw Term Loan[2] | 0 | Estimated fees and expenses | 152.0 |
| Rollover Debt and PHONES[3] | 2,421.0 | Rollover Debt and PHONES[3] | 2,421.0 |
| Total Sources | $9,686.0 | Total Uses | $9,686.0 |

---

[1]   $750,000,000 of commitments on the Closing Date; $0 drawn on the Closing Date.

[2]      $263,000,000 of commitments on the Closing Date; $0 drawn on the Closing Date.

[3]   Includes approximately $1,521.0 million of outstanding notes and $900.0 million of PHONES.

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

**Annex II**

**Project Tower**
**Summary of Additional Conditions Precedent**

Except as otherwise set forth below, the initial borrowing under each of the Senior Secured Credit Facilities shall be subject to the contemporaneous or prior satisfaction of the following additional conditions:

1.    The Lenders shall have received unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of Tribune for each fiscal quarter ended after December 31, 2006 and ended on or before 30 days before the Closing Date.

2.    The Lenders shall have received two pro forma consolidated balance sheets of Tribune as of the fiscal quarter (including the fourth quarter) most recently ended prior to the Closing Date, the first after giving effect to the First Step Transactions and the second after giving effect to both the First Step Transactions and the Second Step Transactions. The Lead Arrangers shall have received two sets of reasonably detailed pro forma consolidated financial projections prepared by or on behalf of Tribune for Tribune and its consolidated entities for the five-fiscal year period after the Closing Date, the first after giving effect to the First Step Transactions and the second after giving effect to both the First Step Transactions and the Second Step Transactions.

3.    The Refinancing shall have occurred and the Lead Arrangers shall have received evidence thereof reasonably satisfactory to the Lead Arrangers and a "pay-off" letter or letters or other documentation reasonably satisfactory to the Lead Arrangers with respect to existing indebtedness being repaid in connection therewith (it being understood that Tribune's existing letters of credit shall be permitted to remain outstanding).

4.    All accrued fees and expenses (including the reasonable fees and expenses of counsel to the Lead Arrangers) of the Lead Arrangers in connection with the Credit Documents shall have been paid; provided that such fees and expenses shall have been invoiced at least two business days prior to the Closing Date.

5.    The Lenders shall have a valid lien on and security interest in the collateral referred to in Exhibit A under "Collateral", which lien shall be a first priority perfected lien, subject only to the equal and ratable lien in favor of holders of Existing Notes and customary non-consensual permitted liens, upon the making of all filings, recordations and searches necessary in connection therewith and the payment of all recording fees and taxes in connection therewith. All such action as shall be necessary to secure the Existing Notes (as defined in Exhibit A) equally and ratably with the Lenders shall have been taken.

6.    Delivery of reasonably satisfactory legal opinions, including customary opinions of counsel to the ESOP (to the extent requested by the Lead Arrangers) and of Tribune's counsel; absence of prepayment events under other material debt instruments; no creation

of liens on Collateral (as defined in Exhibit A) under other debt instruments (other than the Existing Notes) or other agreements and no creation of material liens on assets not constituting Collateral, in each case as a result of the First Step Transactions; customary closing certificates including evidence of authority, charter documents and officers' incumbency certificates; to the extent requested by the Lead Arrangers, delivery of the opinion of the ESOP trustee's financial advisor; to the extent requested by the Lead Arrangers, delivery of a customary certificate of the ESOP trustee; and compliance with applicable laws and regulations (including but not limited to ERISA, margin regulations and environmental laws) except for violations that, individually or in the aggregate, could not reasonably be expected to result in a material adverse effect.

       7.      The Acquisition Agreement shall have been executed and delivered and no provision thereof shall have been waived, amended, supplemented or otherwise modified and no action by Tribune prohibited by the Acquisition Agreement shall have been consented to, in each case in a manner material and adverse to the Lenders without the consent of the Lead Arrangers.

       8.      The Zell Investment shall have been made and Tribune shall have received cash proceeds therefrom in an aggregate amount equal to at least $250.0 million. The ESOP Investment shall have been made and Tribune shall have received the ESOP Note. Neither Holdco nor the ESOP shall have participated in the Stock Repurchase.

       9.      The Lead Arrangers shall be reasonably satisfied that (i) there shall not have been any changes or waivers to the terms and conditions of the documentation regarding the establishment of the ESOP (including the provisions of the ESOP relating to redemptions and distributions) compared to the execution versions of such documentation dated the date hereof that are material and adverse to Lenders and (ii) the ESOP shall not have entered into any transactions (a) constituting a "prohibited transaction" as defined in the Code, (b) that violate fiduciary standards imposed by Section 404(a) of ERISA or (c) adversely affect the qualified status of the ESOP under Sections 401(a) or 4975(e)(7) of the Code.

-2-

TRB0112648

**CONFIDENTIAL**                                                                                      **EXHIBIT A**

## SENIOR SECURED CREDIT FACILITIES

### SUMMARY OF TERMS AND CONDITIONS[1]

| | |
|---|---|
| Borrower: | Tribune Company, a Delaware corporation ("Tribune"). |
| Joint Lead Arrangers: | J.P. Morgan Securities Inc., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, an affiliate of Citigroup Global Markets Inc. and Banc of America Securities LLC (the "Lead Arrangers"). |
| Agents: | JPMorgan Chase Bank, N.A., as sole and exclusive Administrative Agent (in such capacity, the "Administrative Agent"), Merrill Lynch Capital Corporation, as sole and exclusive syndication agent, and an affiliate of Citigroup Global Markets Inc. and Bank of America, N.A. as co-documentation agents. |
| Lenders: | JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation (or one of its affiliates), an affiliate of Citigroup Global Markets Inc., Bank of America, N.A. and a syndicate of financial institutions (the "Senior Secured Lenders") arranged by the Lead Arrangers in consultation with Tribune. |
| Senior Secured Credit Facilities: | Senior credit facilities (the "Senior Secured Credit Facilities") in an aggregate principal amount of up to $8.028 billion, such Senior Secured Credit Facilities comprising: |

        (A)    Term Loan Facilities. A Senior Tranche B Term Loan facility in an aggregate principal amount of up to $7,015.0 million (the "Tranche B Facility") and a Delayed Draw Senior Tranche B Term Loan facility in an aggregate principal amount of $263.0 million (the "Delayed Draw Facility" and together with the Tranche B Facility, the "Term Loan Facilities"). Loans under the Term Loan Facilities are herein referred to as "Term Loans". Loans under the Delayed Draw Facility are herein referred to as "Delayed Draw Term Loans".

---

[1]    Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the attached Amended and Restated Commitment Letter (the "Amended and Restated Commitment Letter").

TRB0112649

Once made, Term Loans made under the Delayed Draw Facility shall be Tranche B Term Loans and incorporated into and treated as part of the Tranche B Facility for all purposes under the Credit Documentation.

(B)  Revolving Facility.  A revolving credit facility in an aggregate principal amount of $750.0 million (the "Revolving Facility").  Loans under the Revolving Facility are herein referred to as "Revolving Loans"; the Term Loans and the Revolving Loans are herein referred to collectively as "Loans".  The Revolving Facility will include a letter of credit subfacility in an amount up to $250,000,000 and a swing line subfacility in an amount up to $100,000,000.

First Step Transactions:                As described in the Amended and Restated Commitment Letter.

Availability/Purpose:          (A)  Term Loan Facilities.  Term Loans (other than Delayed Draw Term Loans) will be available to finance a portion of the Stock Repurchase, the Dividend and the Refinancing and to pay related fees and expenses, subject to the terms and conditions set forth in the Credit Documents, on the date of the consummation of the Stock Repurchase, the Dividend and the Refinancing in one draw (the "Closing Date").  Term Loans repaid or prepaid may not be reborrowed.

Delayed Draw Term Loans will be available in one or more drawings in each case solely to refinance a portion of Tribune's outstanding $263.0 million aggregate principal amount of medium term notes as and when they become due during 2008.

(B)  Revolving Facility.  The Revolving Facility will be available for working capital and general corporate purposes, including, without limitation, acquisitions, on a fully revolving basis, subject to the terms and conditions set forth in the Credit Documents, in the form of revolving loans, swing line loans and letters of credit on and after the Closing Date until the Revolver Maturity Date.

Incremental Facility:          Tribune shall be entitled, solely in connection with the Acquisition and subject to satisfaction of the Acquisition Conditions (as defined below), to incur additional term loans (the "Incremental Facility") under a new term loan facility to be included in the Senior Secured Credit Facilities in an aggregate principal amount of up to $2,105,000,000, to be used to finance the Acquisition; *provided* that (i) no event of default or default exists or would exist after giving effect thereto, (ii) the Specified Representations (as defined in the Second Step Commitment Letter) shall be true and correct, (iii) the maturity date of the Incremental Facil-

A-2

ity shall be the Tranche B Maturity Date, (iv) the average life to maturity of the Incremental Facility shall be the same as the remaining average life to maturity of the Tranche B Term Loans, (v) all reasonable and documented fees and expenses owing in respect of such increase to the Administrative Agent and the Senior Secured Lenders shall have been paid, (vi) the other terms and documentation in respect thereof, to the extent not consistent with the Tranche B Facility shall otherwise be reasonably satisfactory to the Administrative Agent (except as permitted by clause (vii) below) and (vii) in the event that the Applicable Margins for the Incremental Facility are greater than the Applicable Margins for the Tranche B Facility made on the Closing Date by more than 25 basis points, then the Applicable Margins for the existing Tranche B Facility shall be increased to equal the Applicable Margins for the Incremental Facility minus 25 basis points; *provided* that in determining the Applicable Margin applicable to the existing Tranche B Facility and the Incremental Facility, (x) original issue discount ("<u>OID</u>") or upfront fees (which shall be deemed to constitute like amounts of OID) payable by Tribune to the Lenders of the existing Tranche B Facility or the Incremental Facility in the primary syndication thereof shall be included (with OID being equated to interest based on an assumed four-year life to maturity) and (y) customary arrangement or commitment fees payable to the Lead Arrangers (or its affiliates) in connection with the Tranche B Facility or to one or more arrangers (or their affiliates) of the Incremental Facility shall be excluded. It is understood that the Second Step Commitment Letter represents a commitment to provide the Incremental Facility, subject to the terms and conditions of the Second Step Commitment Letter. The Credit Documentation shall be amended to give effect to the Incremental Facility by documentation executed by the Lender or Lenders making the commitments with respect to the Incremental Facility, the Administrative Agent and Tribune, and without the consent of any other Lender.

Documentation:

The documentation for the Senior Secured Credit Facilities (collectively, the "<u>Credit Documents</u>") will include, among others, a credit agreement (the "<u>Credit Agreement</u>").

Guarantors:

Each of Tribune's direct and indirect U.S. subsidiaries (other than any U.S. subsidiary that is a direct or indirect subsidiary of a non-U.S. subsidiary and de minimis subsidiaries to be agreed) existing on the Closing Date or thereafter created or acquired shall unconditionally guarantee, on a joint and several and senior basis, all obligations of Tribune under the Senior Secured Credit Facilities and (to the extent relating to the Loans) under each interest rate protection agreement entered into with a person that is a Senior Secured Lender or an affiliate of a Senior Secured Lender at the time such agreement is entered into. Each guarantor of any of the Senior Secured Credit Facilities is herein re-

A-3

ferred to as a "<u>Guarantor</u>" and its guarantee is referred to herein as a "<u>Guarantee</u>"; Tribune and the Guarantors are herein referred to as the "<u>Credit Parties</u>".

Collateral:

The Senior Secured Credit Facilities, the Guarantees, and (to the extent relating to the Loans) the obligations of the Credit Parties under each interest rate protection agreement entered into with a person that is a Senior Secured Lender or any affiliate of a Senior Secured Lender at the time such agreement is entered into will be secured by a perfected lien on, and pledge of, all of the capital stock of Tribune Finance LLC and Tribune Broadcasting Holdco LLC, together with any proceeds of the foregoing (collectively, the "<u>Collateral</u>").

All such security interests will be created pursuant to documentation reasonably satisfactory in all respects to the Administrative Agent, and on the Closing Date, such security interests shall have become perfected (or arrangements for the perfection thereof reasonably satisfactory to the Administrative Agent shall have been made) and the Administrative Agent shall have received reasonably satisfactory evidence as to the enforceability and priority (relative to all creditors other than holders of the Existing Notes) thereof.

Termination of Commitments:

The commitments in respect of the Senior Secured Credit Facilities (including pursuant to the Amended and Restated Commitment Letter) will terminate in their entirety on August 17, 2007 if the initial funding under the Senior Secured Credit Facilities does not occur on or prior to such date. If the Closing Date occurs, any unused commitments in respect of the Delayed Draw Facility will terminate in their entirety on the latest stated termination date of any series of Tribune's medium term notes due 2008, as in effect on the date hereof.

Final Maturity:

(A)    <u>Tranche B Facility</u>. The Tranche B Facility (including any Delayed Draw Term Loans) will mature on the seventh anniversary of the Closing Date (the "<u>Tranche B Maturity Date</u>").

(B)    <u>Revolving Facility</u>. The Revolving Facility will mature on the sixth anniversary of the Closing Date (the "<u>Revolver Maturity Date</u>").

Amortization Schedule:

The Tranche B Facility will amortize at a rate of 1.0% per annum (payable quarterly) prior to the Tranche B Maturity Date, on which date the remaining principal amount shall be payable in full. Delayed Draw Term Loans automatically become part of the Tranche B Facility when made and will amortize based upon the Tranche B Facility amortization schedule.

A-4

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

| | |
|---|---|
| Letters of Credit: | Letters of credit under the Revolving Facility ("Letters of Credit") will be issued by a Senior Secured Lender to be agreed by the Lead Arrangers and Tribune (in such capacity, the "L/C Lender"). The issuance of all Letters of Credit shall be subject to the customary procedures of the L/C Lender. |
| Letter of Credit Fees: | Letter of Credit fees will be payable for the account of the Revolving Facility Lenders on the daily average undrawn face amount of each Letter of Credit at a rate per annum equal to the applicable margin for Revolving Loans that are LIBOR rate loans in effect at such time, which fees shall be paid quarterly in arrears. In addition, an issuing fee on the face amount of each Letter of Credit in an amount agreed upon between the L/C Lender and Tribune shall be payable to the L/C Lender for its own account. |
| Interest Rates and Fees: | Interest rates and fees in connection with the Senior Secured Credit Facilities will be as specified on Annex I attached hereto. |
| Default Rate: | At all times during a payment default, interest on the overdue amount shall accrue at a rate per annum equal to 2% in excess of the applicable interest rate (including applicable margin). |
| Mandatory Prepayments/ Reductions in Commitments: | Subject to the next paragraph, Loans under the Term Loan Facilities shall be prepaid with, and commitments under the Revolving Facility shall be reduced by, an amount equal to (a) 100% of the net cash proceeds of the issuance or incurrence after the Closing Date of funded debt (other than the Senior Secured Credit Facilities and certain permitted debt, including debt incurred in connection with the Second Step Transactions) or of any sale and lease-back by Tribune or any of its subsidiaries (subject to baskets and exceptions to be agreed upon), (b) 50% of Excess Cash Flow (to be defined) and subject to leverage based step-down to be agreed, (c) 100% of the net cash proceeds from all non-ordinary course asset sales or other dispositions of property by Tribune and its subsidiaries (including insurance and condemnation proceeds in excess of an amount to be agreed), subject to customary exceptions, which shall include carve-outs for ordinary course dispositions, like-kind exchanges and asset swaps, limited thresholds and reinvestment rights if reinvested or committed to be reinvested within 12 months of such sale and actually reinvested within 18 months of such sale; *provided* that to the extent any Junior Capital (as defined below) is outstanding as a result of a Special Contribution (as defined below), then up to 50% of the net cash proceeds constituting Special Proceeds may be applied to repurchase such Junior Capital in accordance with the terms of the Credit Agreement and (d) net cash proceeds from any Special Contribution. |

A-5

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

"Special Proceeds" means any net cash proceeds received from and related tax savings associated with all sales of Designated Assets (as defined below) in excess of $600.0 million in the aggregate.

Mandatory prepayments will be applied first to the Tranche B Facility (*provided* that Tribune may elect to apply such prepayment to the next four occurring installments of the Tranche B Facility occurring immediately after the date of such prepayment) and then to reduce outstanding Loans and commitments under the Revolving Facility.

Notwithstanding the foregoing, to the extent that (i) a mandatory prepayment of the type described in clause (c) above would be required to be made with net cash proceeds received by foreign subsidiaries of Tribune; (ii) Tribune requires a dividend or distribution of such net cash proceeds from such foreign subsidiaries in order to make such prepayment and (iii) such dividend or distribution would result in a material adverse tax consequence to Tribune, then no such prepayment shall be required until such time as either such dividend or distribution is no longer required to make such prepayment or such dividend or distribution would no longer have a material adverse tax consequence to Tribune.

Revolving Loans will be prepaid within one business day to the extent that the aggregate amount of credit extensions under the Revolving Facility exceeds the commitments in effect under the Revolving Facility.

Voluntary Prepayments/
Reductions in Commitments:

(A)    Term Loan Facilities.  Term Loans may be prepaid at any time in whole or in part at the option of Tribune, in a minimum principal amount and in multiples to be agreed upon, without premium or penalty (except, in the case of LIBOR borrowings, breakage costs related to prepayments not made on the last day of the relevant interest period).  Voluntary prepayments will be applied as determined by Tribune.

The unutilized portion of the commitments under the Delayed Draw Facility may be reduced at the option of Tribune, in a minimum principal amount and in multiples to be agreed upon, without premium or penalty.

(B)    Revolving Facility.  The unutilized portion of the commitments under the Revolving Facility may be reduced (and loans thereunder may be repaid at any time) at the option of Tribune, in a minimum principal amount and in multiples to be agreed upon, without premium or penalty (except, in the case of LIBOR borrowings, breakage

A-6

TRB0112654

costs related to prepayments not made on the last day of the relevant interest period).

Conditions to Effectiveness
and to Loans on Closing Date:

The effectiveness of the credit agreement and the making of the initial Loans under the Senior Secured Credit Facilities (other than the Delayed Draw Facility) shall be subject to the conditions precedent specified herein and in the Amended and Restated Commitment Letter (all such conditions to be satisfied in a manner satisfactory to the Lead Arrangers and the Senior Secured Lenders or the Required Lenders (as the case may be) (as defined below under "Required Lenders") or waived).

1.  The absence of any event that has had or could reasonably be expected to have a material adverse effect on (a) the rights and remedies of the Senior Secured Lenders under any Credit Document or (b) the ability of Tribune to perform its obligations under any Credit Document.

2.  Certification (which may refer to and rely in part upon any solvency opinion referred to below) as to the solvency of Borrower and its subsidiaries, taken as a whole, from the chief financial officer of Borrower and, if any, a copy of the solvency opinion delivered in connection with the First Step Transactions (which opinion may be addressed to Tribune but shall be certified by Tribune to the Lenders to be a true and correct copy of the opinion delivered to it).

3.  Receipt of all governmental and third party approvals or consents necessary in connection with the Senior Secured Credit Facilities.

4.  Tribune shall have formed Tribune Finance LLC as a direct wholly-owned subsidiary and in connection with the First Step Transactions, (a) Tribune will contribute no less than $3,000.0 million to Tribune Finance LLC, (b) Tribune Finance LLC will lend the full amount contributed to it in the aggregate to the Guarantors (as defined in Exhibit A) that are part of its publishing segment in the form of junior subordinated notes and on terms reasonably satisfactory to the Lead Arrangers and (c) such subsidiaries in the publishing segment shall directly or indirectly dividend or otherwise distribute the aggregate amount of such loaned funds to Tribune. Tribune shall have formed a new limited liability company ("Tribune Broadcasting Holdco LLC") as a direct wholly-owned subsidiary and in connection with the First Step Transactions, Tribune will contribute 100% of its equity interests in Tribune Broadcasting Company to Tribune Broadcasting Holdco LLC.

A-7

TRB0112655

Conditions to All
Extensions of Credit:

Each extension of credit under the Senior Secured Credit Facilities (other than certain mandatory borrowings and the Incremental Facility, but including Delayed Draw Term Loans) will be subject to the (i) absence of any Default or Event of Default, and (ii) continued accuracy of all representations and warranties in all material respects (to the extent not qualified by materiality standards).

Representations and Warranties:

The Credit Documents shall contain the following customary representations and warranties and such other representations and warranties usual and customary for facilities and transactions of this type as shall be mutually agreed upon and substantially similar to Tribune's existing credit agreement (subject to customary and reasonable exceptions and materiality qualifications):

1.    Corporate status, power and authority.

2.    Execution, delivery, and performance of the Credit Documents do not violate law or other material debt agreements.

3.    No government or regulatory approvals required, other than approvals in effect.

4.    Due authorization, execution and delivery of the Credit Documents; legality, validity, binding effect and enforceability of the Credit Documents.

5.    Ownership of subsidiaries.

6.    Accuracy of financial statements and other information; accuracy and completeness of disclosure; absence of undisclosed liabilities.

7.    (a) Prior to the earlier to occur of the Second Step Closing Date and the termination of the Acquisition Agreement in accordance with its terms, no Company Material Adverse Effect (as defined (and all component definitions thereof) are defined) in the Acquisition Agreement has occurred and (b) after the Second Step Closing Date, no event or condition has occurred or become known that has had or could reasonably be expected to have a material adverse effect on the business, operations or financial condition of Tribune and its subsidiaries taken as a whole (after giving effect to the First Step Transactions and Second Step Transactions) since December 31, 2006 (clause (a) prior to the Second Step Closing Date and clause (b) after the Second Step Closing Date, a "Material Adverse Change").

A-8

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

8.   Solvency of Tribune and its subsidiaries, taken as a
     whole.

9.   No action, suit, investigation, litigation or proceeding
     pending or threatened in any court or before any arbitra-
     tor or governmental authority that could reasonably be
     expected to result in a Material Adverse Change; no con-
     flict with applicable law or regulatory authority.

10.  Payment of taxes.

11.  Insurance.

12.  Labor matters.

13.  Use of proceeds.

14.  Compliance with margin regulations.

15.  Inapplicability of the Investment Company Act.

16.  Compliance with applicable laws and regulations, in-
     cluding ERISA, Patriot Act and other counter-terrorism
     laws and all applicable environmental laws and regula-
     tions.

17.  Ownership of properties and necessary rights to intellec-
     tual property.

Affirmative Covenants:            The Credit Documents shall contain the following customary
                                  affirmative covenants and such other affirmative covenants usual
                                  and customary for facilities and transactions of this type as shall
                                  be mutually agreed upon (subject to customary and reasonable
                                  exceptions and materiality qualifications):

1.   Delivery of independently audited annual consolidated
     financial statements and certified unaudited quarterly
     (including fourth quarter) consolidated financial state-
     ments.

2.   Notice of reports to shareholders, notices of defaults,
     litigation and any Material Adverse Change, and other
     information customarily supplied in facilities similar to
     the Senior Secured Credit Facilities.

3.   Maintenance of books and records; annual meetings,
     visitation and inspection rights and access to books and
     records.

4.   Preservation of corporate existence; conduct of business.

A-9

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

5.      Material compliance with laws (including ERISA and applicable environmental laws).

6.      Environmental matters.

7.      Payment of taxes.

8.      Maintenance of properties and insurance.

9.      Use of proceeds.

10.     Further assurances.

11.     Provision of additional collateral and guarantees.

12.     Interest rate hedging arrangements mutually satisfactory to the Lead Arrangers and Tribune with respect to a notional amount of indebtedness not in excess of 50% of the Term Loans.

13.     Tribune Finance LLC transactions.

14.     Subsequent to the consummation of the Acquisition, election and, once granted, maintenance of S Corporation treatment under the Code.

15.     Subsequent to the consummation of the Acquisition, Tribune shall eliminate contributions made by Tribune and its subsidiaries to the Tribune Company 401(k) Savings and Profit Sharing Plan.

Negative Covenants:     The Credit Documents shall contain the following customary negative covenants and such other negative covenants usual and customary for facilities and transactions of this type as shall be mutually agreed upon (subject to customary and reasonable exceptions and materiality qualifications):

1.      Limitation on indebtedness (including, without limitation, guarantees and other contingent obligations), subject to carve-outs to be agreed, including carve-outs (a) for up to $4,250.0 million in the aggregate of senior or senior subordinated notes (on terms and conditions reasonably satisfactory to the Administrative Agent) and/or Incremental Facility in connection with the consummation of and as part of the Second Step Transactions and (b) the Zell Note and the Zell Sub Note (as defined in the Second Step Commitment Letter).

2.      Limitation on liens, subject to carve-outs (a) for equally and ratably securing the Existing Notes, (b) to mortgage any real property purchased from TMCT I that is cur-

A-10

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

rently leased by Tribune and (c) for second priority liens
in favor of the Senior Notes (as defined in the Second
Step Commitment Letter).

3.      Limitation on mergers and disposition of all or substan-
tially all assets, subject to a carve-out for the Acquisi-
tion; *provided* that (i) the Acquisition is consummated
on or prior to May 31, 2008 in accordance with the terms
and conditions of the Acquisition Agreement (without
waiver, amendment, supplement or other modification in
a manner material and adverse to the Lenders without
the consent of the Administrative Agent), (ii) Zell and
Holdco shall have entered into a Junior Capital (as de-
fined below) commitment agreement or subscription
agreement whereby Zell (either directly or through
Holdco) will agree to invest up to $100.0 million in Jun-
ior Capital of Tribune (less (x) the aggregate amount of
Junior Capital invested in Tribune (other than Junior
Capital invested as part of the Zell Investment or the
Holdco Purchase (as defined in the Second Step Com-
mitment Letter)), (y) the portion of any Special Proceeds
not required to be applied to prepay Tranche B Term
Loans and (z) cash recoveries from certain litigation and
other proceedings to be agreed, in the case of each of
clauses (x), (y) and (z) received after April 1, 2007 and
on or before the date such investment is required, such
amount, the "Investment Reduction Amount") on the
later to occur of March 25, 2008 and the Second Step
Closing Date if Tribune has not made the S Corp Elec-
tion (as defined in the Second Step Commitment Letter)
on or prior to March 15, 2008, such agreement to be in
form and substance reasonably satisfactory to the Ad-
ministrative Agent and granting third-party enforcement
rights in favor of the Administrative Agent on behalf of
the Lenders (the "Zell Investment Agreement"), (iii) the
Second Step Transactions shall have been consummated
prior to or substantially concurrent to the consummation
of the Acquisition, (iv) all Post Acquisition Financial
Covenants (as defined below) would be satisfied on a
pro forma basis as of the last day of the fiscal quarter
ending immediately prior to the date of the Acquisition
(giving effect to the Second Step Transactions and other
customary and appropriate pro forma adjustment events,
including any acquisitions or dispositions after the be-
ginning of the relevant determination period but prior to
or simultaneous with the consummation of the Acquisi-
tion) and (v) no default or event of default shall exist or
result therefrom (the conditions in clauses (i) through
(v), together the "Acquisition Conditions").

A-11

Professionals' Eyes Only                                                                                    TRB0112659
Highly Confidential - Attorneys' Eyes Only

4. Limitation on transactions with affiliates, subject to a carve-outs for (i) each of the First Step Transactions and Second Step Transactions (including, without limitation, Tribune's reimbursement of certain of Holdco's expenses pursuant to the Securities Purchase Agreement as in effect on the date hereof); *provided* that, in the case of the Second Step Transactions, the Acquisition Conditions have been satisfied or waived, (ii) the purchase, on an arms-length basis, of real property currently leased from TMCT I, (iii) transactions to be agreed in connection with refinancings at Eagle New Media Investments, LLC and Eagle Publishing Investments, LLC and (iv) exercise of put rights in connection with TMCT I and TMCT II.

5. Limitation on dividend and other payment restrictions affecting material subsidiaries.

6. Limitation on changes in business conducted.

7. Limitation on dividends, redemptions and repurchases with respect to capital stock (including Junior Capital), subject to carve outs for (a) the First Step Transactions and the Second Step Transactions; *provided* that the Acquisition Conditions have been satisfied or waived, (b) after the consummation of the Acquisition, up to an amount to be agreed in aggregate cash dividends to Holdco and the ESOP, (c) an amount to be agreed to satisfy Tribune common equity repurchase obligations pursuant to the various documents governing the ESOP; *provided* that such dividends, redemptions and repurchases may exceed the agreed upon amounts solely to extent necessary to comply with applicable law (any such required excess amounts the "Required Payments"), (d) repurchase or redemption of capital stock from employees pursuant to the Tribune Management Equity Incentive Plan and consistent in all material respects with the terms thereof previously provided to the Lead Arrangers, (e) repurchase or redemption of Junior Capital issued in connection with a Special Contribution solely with the portion of any Special Proceeds not required to be applied to prepay Tranche B Term Loans and cash recoveries from certain litigation and other proceedings to be agreed and (f) a general basket in an amount to be agreed; *provided* that the amount available under the general basket will be reduced by any Required Payments made.

8. Limitations on prepayments, redemptions and repurchases of indebtedness (other than (i) loans under the Senior Secured Credit Facilities, (ii) the Holdco Pur-

A-12

TRB0112660

chase (as defined in the Second Step Commitment Letter) in connection with and as part of the consummation of the Second Step Transactions and (iii) certain other indebtedness in an amount to be agreed).

9. Limitations on loans and investments (other than the ESOP Note and permitted acquisitions).

10. Limitation on capital expenditures, including a carve-out to purchase real property currently leased from TMCT I with levels to be agreed (subject to a carry-forward to be agreed).

11. Limitation on amendment of debt, ESOP structure, PHONES and other material agreements (including, without limitation, any Zell Investment Agreements and the agreements relating to the ESOP) in a manner adverse to Lenders in any material respect.

12. Prohibition on subsidiaries guaranteeing the Existing Notes.

13. Limitation on asset sales, subject to a carve out for the sale of (i) the assets constituting the business of the Chicago Cubs baseball team, (ii) the Credit Parties' investments in Comcast Sports Network, (iii) the assets constituting the business of the Southern Connecticut publishing business, (iv) other assets sales not to exceed 15% of Tribune's total assets per fiscal year (with such percentage being measured against the audited financial statements from the immediately prior year) and (v) other permitted dispositions to be agreed. As used herein, the "Designated Assets" means the assets described in clauses (i) and (ii) of this paragraph and certain other assets previously identified to the Lead Arrangers.

14. Limitation on activities of Tribune Finance LLC.

"Existing Notes" means Tribune's existing 6.35% senior notes due 2008, 5.5% senior notes due 2008, 5.67% senior notes due 2008, 4.875% senior notes due 2010, 7.25% senior debentures due 2013, 5.25% senior debentures due 2015, 7.5% senior debentures due 2023, 6.25% senior notes due 2026, 6.61% senior debentures due 2027 and 7.25% senior debentures due 2096.

Financial Covenants:                    The Credit Documentation for the Senior Secured Credit Facilities will contain the following financial covenants (mutually agreeable definitions to be set forth in the Credit Agreement):

1. Minimum ratio of trailing four quarter EBITDA to total interest expense for the same period (a) for the period

A-13

beginning on the Closing Date through December 30, 2007, greater than or equal to 1.75:1, and (b) thereafter, greater than or equal to 2.00:1; *provided* that subsequent to the consummation of the Second Step Transactions, the covenant levels set forth above shall be modified as follows: (a) for the period beginning on the Closing Date through December 30, 2007, greater than or equal to 1.1 to 1, (b) for the period beginning on December 31, 2007 through December 28, 2008, greater than or equal to 1.15:1, (c) for the period beginning on December 29, 2008 through December 27, 2009, greater than or equal to 1.20:1 and (d) thereafter, greater than or equal to 1.25:1.

2.  Maximum ratio of total indebtedness of Tribune that is guaranteed by any of its subsidiaries and indebtedness of any of the Guarantors (on a consolidated basis) to trailing four quarter EBITDA (as defined in Annex II to this Exhibit A) as of the last day of the most recently completed fiscal quarter (the "Total New Leverage Ratio") (a) for the period beginning on the Closing Date through December 30, 2007, less than or equal to 6.25:1, (b) for the period beginning on December 31, 2007 through December 28, 2008, less than or equal to 6.00:1, (c) for the period beginning on December 29, 2008 through December 27, 2009, less than or equal to 5.75:1, (d) for the period beginning on December 28, 2009 through December 26, 2010, less than or equal to 5.50:1 and (e) thereafter, less than or equal to 5.25:1; *provided* that (i) for each period described in clause (a) ending subsequent to consummation of the Second Step Transactions, the ratio in clause (a) shall be increased by 2.75:1 and (ii) for each period described in clauses (b), (c), (d) and (e), in each case ending subsequent to the consummation of the Second Step Transactions, the ratios in such clauses shall be increased by 3.00:1. The financial covenants, as adjusted upon consummation of the Second Step Transactions are referred to as the "Post Acquisition Financial Covenants".

The financial covenants contemplated above will be tested as of the last day of each fiscal quarter and will apply to Tribune and its subsidiaries on a consolidated basis.

Events of Default:

The Credit Documents shall contain the following customary defaults and such other defaults usual and customary for facilities and transactions of this type as shall be mutually agreed upon (which shall constitute "Events of Default") (subject to customary and reasonable exceptions, materiality qualifications and notice, cure and grace periods):

A-14

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

1.      Failure to pay, when due, any principal with respect to the Senior Secured Credit Facilities.

2.      Failure to pay any interest, fees or other amounts after a grace period of five business days.

3.      Any representation or warranty made or deemed made shall prove to have been incorrect in any material respect when made or deemed made.

4.      Breach or violation by any Credit Party of covenants or other provisions of the Credit Documents.

5.      Any event of default shall occur under any other indebtedness of Tribune or any material subsidiary having an aggregate outstanding principal amount in excess of $75,000,000.

6.      Judgments or decrees in excess of $75,000,000 individually or in the aggregate against Tribune or any material subsidiary that are not stayed, discharged, paid (including by insurance) or bonded within 60 days.

7.      Bankruptcy or insolvency events with respect to Tribune or any material subsidiary.

8.      Any Change of Control (to be defined and in any event, excluding the Second Step Transactions).

9.      Standard ERISA defaults.

10.     Any provision of any Credit Documents shall for any reason cease to be valid, binding and enforceable on Tribune.

11.     Any actual or Credit Party asserted invalidity of guarantees or any other Credit Document.

For purposes of determining compliance with the covenant described in clause 14 under "Affirmative Covenants" above, receipt by Tribune of a cash investment in an amount equal to $100.0 million (less the Investment Reduction Amount in the case of any first such investment) (which shall be in the form of Junior Capital that is otherwise on terms and conditions reasonably acceptable to the Administrative Agent) after the Second Step Closing Date and on or prior to the day that is 10 days after the last day in a calendar year when Tribune can validly make an S Corporation election for such tax year shall be deemed to cure any breach of such covenant (any such investment, a "Special Contribution"); *provided* that (a) all cash proceeds received from a Special Contribution shall be applied to reduce Tranche B

A-15

TRB0112663

Term Loans in accordance with "Mandatory Prepay-
ments/Reduction in Commitments" and (b) all Special Contribu-
tions shall be disregarded for purposes of determining any bas-
kets with respect to the covenants contained in the Credit
Agreement.

"Junior Capital" means (i) any common equity interests of Trib-
une that do not (a) provide for scheduled prepayments of divi-
dends in cash prior to the date that is one year after the Tranche
B Maturity Date or (b) become mandatorily redeemable pursuant
to a sinking fund obligation or otherwise prior to the date that is
one year after the Tranche B Maturity Date and (ii) indebtedness
of Tribune that (a) is unsecured and not guaranteed by any sub-
sidiary of Tribune, (b) is expressly subordinated to the prior
payment in full in cash of the obligations of Tribune under the
Senior Secured Credit Facilities on terms reasonably satisfactory
to the Administrative Agent (it being agreed that the subordina-
tion provisions of the Zell Note (taken together with the last sen-
tence of this paragraph) are satisfactory to the Administrative
Agent), (c) has a final maturity date that is not earlier than, and
provides for no scheduled payments of principal or mandatory
redemption obligations prior to, the date that is one year after the
Tranche B Maturity Date and (d) provides for payments of inter-
est solely in-kind until the date that is one year after the Tranche
B Maturity Date. Notwithstanding the foregoing, Junior Capital
may be voluntarily repurchased or repaid to the extent otherwise
permitted under the Credit Agreement.

Yield Protection and
Increased Costs:

Standard yield protection (including compliance with risk-based
capital guidelines, increased costs, payments free and clear of
withholding taxes and interest period breakage indemnities),
eurodollar illegality and similar provisions. Tribune's reim-
bursement obligations in respect of increased costs and changes
in circumstances shall be limited to amounts accruing not more
than 90 days prior to the invoice thereof (to be extended as nec-
essary to take into account any retroactive application of a
change in law giving rise to such reimbursement obligation).

Assignments and
Participations:

Each assignment (unless to another Senior Secured Lender or
its affiliates) shall be in a minimum amount and in an integral
multiple of $1 million with respect to the Term Loan Facility and
$5 million with respect to the Revolving Facility (unless Tribune
and the Administrative Agent otherwise consent or unless the as-
signing Senior Secured Lender's exposure is thereby reduced to
zero). Assignments (which may be non-pro rata among loans
and commitments) shall be permitted with Tribune's and the
Administrative Agent's consent (such consent not to be unrea-
sonably withheld, delayed or conditioned), except that no such
consent of Tribune need be obtained to effect an assignment (a)
of loans and/or commitments under the Term Loan Facilities, (b)
to any Senior Secured Lender (or its affiliates), (c) if any pay-

A-16

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

|  | ment or bankruptcy default has occurred and is continuing or (d) if determined by the Lead Arrangers, in consultation with Tribune, to be necessary to achieve a successful primary syndication. Participations shall be permitted without restriction. Voting rights of participants will be subject to customary limitations. |
|---|---|
| Required Lenders: | Senior Secured Lenders having a majority of the outstanding credit exposure (the "Required Lenders"), subject to amendments of certain provisions of the Credit Documents requiring the consent of Senior Secured Lenders having a greater share (or all) of the outstanding credit exposure or Senior Secured Lenders having a majority of the outstanding credit exposure with respect to a particular facility. Amendments prior to the completion of the primary syndication of the Senior Secured Credit Facilities (as determined by the Lead Arrangers) shall also require the consent of the Lead Arrangers. |
| Expenses and Indemnification: | All reasonable, documented and out-of-pocket expenses of the Lead Arrangers and the Administrative Agent (and the Senior Secured Lenders for enforcement costs and documentary taxes) associated with the preparation, execution and delivery of any waiver or modification (whether or not effective) of, and the enforcement of, any Credit Document (including the reasonable fees, disbursements and other charges of one law firm as counsel for the Lead Arrangers) are to be paid by Tribune. |
|  | Tribune will indemnify each of the Lead Arrangers, the Administrative Agent and the other Senior Secured Lenders and hold them harmless from and against all reasonable and documented costs, expenses (including reasonable and documented fees, disbursements and other charges of counsel) and liabilities arising out of or relating to any litigation or other proceeding (regardless of whether the Lead Arrangers, the Administrative Agent or any such other Senior Secured Lender is a party thereto) that relate to the First Step Transactions or any transactions related thereto, except to the extent determined by a final judgment of a court of competent jurisdiction to have arisen solely from such person's bad faith, gross negligence or willful misconduct. |
| Governing Law and Forum: | New York. |
| Waiver of Jury Trial: | All parties to the Credit Documents waive the right to trial by jury. |
| Special Counsel for Lead Arrangers: | Cahill Gordon & Reindel LLP. |

A-17

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only                                    TRB0112665

ANNEX I
to Exhibit A

Interest Rates and Fees:    Tribune will be entitled to make borrowings based on the ABR plus the Applicable Margin or LIBOR plus the Applicable Margin, which shall be (A) 2.50% per annum for LIBOR Loans and (B) 1.50% per annum for ABR Loans. If (i) the Acquisition Agreement is terminated prior to the consummation of the Acquisition and (ii) the corporate credit ratings for Tribune are B1 (no negative outlook) or better by Moody's and B+ (no negative outlook) or better by S&P, then the "Applicable Margin" for each of the Senior Secured Credit Facilities shall be reduced by 25 basis points. The Applicable Margin for the Revolving Facility will be subject to reduction in accordance with a leverage based grid to be agreed.

"ABR" means the higher of (i) the corporate base rate of interest announced by the Administrative Agent from time to time, changing effective on the date of announcement of said corporate base rate changes, and (ii) the Federal Funds Rate plus 0.50% per annum. The corporate base rate is not necessarily the lowest rate charged by the Administrative Agent to its customers.

"LIBOR" means the rate determined by the Administrative Agent to be available to the Senior Secured Lenders in the London interbank market for deposits in US Dollars in the amount of, and for a maturity corresponding to, the amount of the applicable LIBOR Loan, as adjusted for maximum statutory reserves.

Tribune may select interest periods of one, two, three or six months (or, to the extent approved by all of the Senior Secured Lenders, nine or twelve months) for LIBOR borrowings. Interest will be payable in arrears (i) in the case of ABR Loans, at the end of each quarter and (ii) in the case of LIBOR Loans, at the end of each interest period and, in the case of any interest period longer than three months, no less frequently than every three months. Interest on all borrowings shall be calculated on the basis of the actual number of days elapsed over (x) in the case of LIBOR Loans, a 360-day year, and (y) in the case of ABR Loans, a 365- or 366-day year, as the case may be.

B-1-1

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only                TRB0112666

Commitment fees accrue on the undrawn amount of the Revolving Facility and the Delayed Draw Facility, commencing on the date of the execution and delivery of the Credit Documents. The commitment fee in respect of the Revolving Facility will be 0.50% per annum and will be subject to reduction in accordance with a leverage based grid to be agreed. The commitment fee in respect of the unused Delayed Draw Facility will be 0.75% per annum.

All commitment fees will be payable in arrears at the end of each quarter and upon any termination of any commitment, in each case for the actual number of days elapsed over a 360-day year.

B-1-2

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112667

ANNEX II
to Exhibit A

"**Consolidated EBITDA**" means, for any period, and with respect to Tribune and its Subsidiaries, consolidated net income (or net loss) of Tribune and its Subsidiaries for such period, exclusive of, without duplication, (w) the income or loss resulting from extraordinary items for such period, and all losses or gains resulting from non-cash, non-operating items and one-time charges, (x) whether or not recurring, non-cash stock-based compensation expense (determined in accordance with GAAP for such period), (y) whether or not recurring, non-cash retirement expense, including such expense from ESOP, pension and cash-balance plans and (z) the income of any Person accounted for by Tribune or any of its Subsidiaries on the equity method for such period, but any such income so excluded may be included in such period or any later period to the extent of any cash dividends or distributions actually paid in the relevant period to Tribune or any Subsidiary of Tribune (excluding, in the case of clauses (w), (x) and (y), (i) any non-cash charge representing an accrual or a reserve for potential cash charges in any future period and (ii) the accrual of revenue or recording of receivables in the ordinary course of business), plus the sum of:

(a)    consolidated interest expense for such period (determined in accordance with GAAP for such period),

(b)    consolidated income tax expense for such period (determined in accordance with GAAP for such period),

(c)    depreciation expense for such period (determined in accordance with GAAP for such period),

(d)    amortization expense for such period (determined in accordance with GAAP for such period), and

(e)    costs and expenses directly incurred in connection with the First Step Transactions and the Second Step Transactions.

Other than for purposes of calculating Excess Cash Flow, Consolidated EBITDA shall be calculated on a pro forma basis in accordance with GAAP and Regulation S-X to give effect to the First Step Transactions and the Second Step Transactions (to the extent consummated), including any cost savings related thereto and any permitted acquisition and asset sales (other than any dispositions in the ordinary course of business) consummated at any time on or after the first day of the test period and prior to the date of determination as if the First Step Transactions, the Second Step Transactions and each such permitted acquisition had been effected on the first day of such period and as if each such asset sale had been consummated on the day prior to the first day of such period.

Notwithstanding anything to the contrary, modifications to be mutually agreed to the above definition will be made to properly reflect the impact of Tribune's election to be treated as an S Corporation under the Code and to add back ESOP compensation expense.

B-1-1

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112668