J.P. MORGAN
SECURITIES INC.
JPMORGAN CHASE
BANK, N.A.
270 Park Avenue
New York, NY  10017

MERRILL LYNCH
CAPITAL
CORPORATION
4 World Financial
Center
New York, NY  10080

CITIGROUP
GLOBAL MARKETS
INC.
388 Greenwich Street
New York, NY  10013

BANC OF AMERICA
SECURITIES LLC
BANC OF AMERICA
BRIDGE LLC
BANK OF
AMERICA, N.A.
9 West 57th Street
New York, NY 10019

April 5, 2007

Tribune Company
435 North Michigan Avenue, 6th Floor
Chicago, Illinois  60611

Attention:    Don Grenesko
              Senior Vice President, Finance and Administration

## Re:    Project Tower — Amended and Restated Second Step Commitment Letter

Ladies and Gentlemen:

Tribune Company ("you" or "Tribune") has advised J.P. Morgan Securities Inc. ("JPMorgan"), JPMorgan Chase Bank, N.A. ("JPMCB"), Merrill Lynch Capital Corporation ("Merrill Lynch"), Citigroup Global Markets Inc. ("CGMI") on behalf of Citigroup (as defined below), Bank of America, N.A. ("Bank of America"), Banc of America Bridge LLC ("Banc of America Bridge") and Banc of America Securities LLC ("BAS") that (i) you have entered into an agreement and plan of merger dated as of the date hereof (the "Acquisition Agreement") with a new employee stock ownership plan sponsored by Tribune (the "ESOP") that will be a "qualified plan" and an "employee stock ownership plan" under the Internal Revenue Code of 1986, as amended (the "Code") for the benefit of employees of Tribune and its subsidiaries (the administrator of the ESOP will be a fiduciary that is qualified under the Code) and an entity formed by the ESOP, pursuant to which such entity ("Merger Sub") will be merged (the "Acquisition") with and into Tribune with Tribune continuing as the surviving corporation, (ii) concurrently with the execution and delivery of the Acquisition Agreement, you intend to enter into a securities purchase agreement with EGI-TRB, L.L.C., a newly formed single member limited liability company ("Holdco") owned by Samuel Zell ("Zell"), pursuant to which Holdco will invest, which investment will be personally guaranteed by Zell, in Tribune $250.0 million in cash in exchange for $50.0 million of common equity (at a price of $34.00 per share) and an unsecured subordinated exchangeable promissory note in the principal amount of $200.0 million due upon the earlier to occur of the consummation of the Acquisition and the termination of the Acquisition Agreement in accordance with its terms (the "Zell Note"), (iii) concurrently with the execution and delivery of the Acquisition Agreement, Tribune will form the ESOP, (iv) concurrently with

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

or as soon as practicable following the execution of the Acquisition Agreement, the ESOP will purchase $250.0 million of Tribune common equity (at a price not in excess of fair market value for purposes of Section 3(18) of ERISA) in exchange for a $250.0 million aggregate principal amount 30 year note (at a reasonable rate of interest and otherwise on arms' length terms that are generally fair and reasonable to the ESOP from a financial point of view) (such note, the "ESOP Note" and such investment, the "ESOP Investment"), (v) immediately upon consummation of the Acquisition, the ESOP will own 100% of the equity of Tribune, (vi) immediately following the consummation of the Acquisition, Holdco will use the cash proceeds it receives from the Acquisition plus an additional $65.0 million (the "Incremental Zell Investment") to purchase: (a) an 11 year $225.0 million initial principal amount pay-in-kind subordinated note (the "Zell Sub Note") and (b) a 15 year warrant (the "Warrant") to purchase the number of shares of the common stock of Tribune (on a fully diluted basis) set forth in the Warrant at the exercise price provided for in the Warrant (such purchase, the "Holdco Purchase"), (vii) Tribune intends to enter into that certain "Project Tower – Amended and Restated First Step Commitment Letter" dated the date hereof among Tribune, the Initial Lenders and the Lead Arrangers (the "First Step Commitment Letter" and the Transactions contemplated thereby the "First Step Transactions") and consummate the First Step Transactions prior to the consummation of the Acquisition, and (viii) the sources and uses of the funds necessary to consummate the Acquisition and the other transactions contemplated hereby are set forth on Annex I to this Amended and Restated Commitment Letter. For purposes of this Amended and Restated Commitment Letter, "Citigroup" means CGMI, Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as may be appropriate to consummate the transactions contemplated herein. This letter amends, restates and supersedes in its entirety the Project Tower – Second Step Commitment Letter among JPMorgan, JPMCB, Merrill Lynch, and Citigroup dated April 1, 2007 and such Commitment Letter shall be of no further force or effect.

In addition, you have advised JPMCB, Merrill Lynch, Citigroup, Bank of America and Banc of America Bridge (collectively, the "Initial Lenders") that in connection with the Acquisition, Tribune will (i) borrow up to $2,105 million of new term loans described in Exhibit A hereto (the "Incremental Facility") as incremental term loans provided for under the senior secured credit facilities to be entered into by Tribune as part of the First Step Transactions (the "Senior Secured Credit Facilities" and together with the Incremental Facility, the "Bank Facilities") and (ii) either (a) borrow up to $2,100 million in senior unsecured loans from one or more lenders under the senior unsecured bridge facility described in Exhibit B hereto (the "Senior Bridge Facility" and together with the Incremental Facility, the "Second Step Facilities") or (b) issue $2,100 million in aggregate principal amount of senior unsecured notes (the "Senior Notes") in a public offering or in a Rule 144A or other private placement.

The Acquisition, the incurrence of the incremental term loans under the Incremental Facility, the execution and delivery of the Senior Bridge Facility or the issuance of the Senior Notes, the Holdco Purchase (including the issuance of the Warrant and the Zell Sub Note) and the other transactions contemplated hereby and thereby (other than the First Step Transactions) are referred to as the "Second Step Transactions".

You have requested that the Initial Lenders commit to provide the Second Step Facilities to finance the Acquisition and to pay certain related fees and expenses.

-2-

Accordingly, subject to the terms and conditions set forth below, the Initial Lenders hereby agree with you as follows:

1.    Commitment; Engagement.  (a) Each of JPMCB and Merrill Lynch hereby commits, severally and not jointly, to provide to Tribune 30% of each of the Second Step Facilities, (b) Citigroup hereby commits, severally and not jointly, to provide to Tribune 25% of each of the Second Step Facilities, (c) Bank of America hereby commits, severally and not jointly, to provide to Tribune 15% of the Incremental Facility and (d) Banc of America Bridge hereby commits, severally and not jointly, to provide to Tribune 15% of the Senior Bridge Facility, in each case, upon the terms and subject to the conditions set forth or referred to herein, in the confidential Amended and Restated Second Step Fee Letter (the "Second Step Fee Letter") dated the date hereof and delivered to you, in the Incremental Facility Summary of Terms and Conditions attached hereto (and incorporated by reference herein) as Exhibit A (the "Incremental Term Sheet") and in the Bridge Facility Summary of Terms and Conditions attached hereto (and incorporated by reference herein) as Exhibit B (the "Bridge Term Sheet" and together with the Incremental Term Sheet, the "Term Sheets").  The commitments of the Initial Lenders hereunder with respect to the Incremental Facility are subject to the negotiation, execution and delivery of an incremental term loan amendments to the Credit Documents (as defined in the First Step Commitment Letter) and appropriate ancillary documentation necessary to include the Incremental Facility in the Senior Secured Credit Facilities (the "Incremental Amendments") reflecting substantially the terms and conditions set forth herein and in the Term Sheets and the Second Step Fee Letter and otherwise mutually agreed upon.  The commitments of the Initial Lenders hereunder with respect to the Bridge Facility are subject to the negotiation, execution and delivery of definitive documents governing the Senior Bridge Facility (the "Bridge Documents" and together with the Incremental Amendments, the "Operative Documents") reflecting substantially the terms and conditions set forth herein and in the Term Sheets and the Second Step Fee Letter and otherwise in a customary form.  Notwithstanding anything in this Amended and Restated Commitment Letter, the Term Sheets, the Second Step Fee Letter, the Operative Documents or any other letter agreement or other undertaking concerning the financing of the Second Step Transactions to the contrary, (i) the only representations relating to Tribune, its subsidiaries and their businesses the making of which shall be a condition to availability of the Second Step Facilities on the Second Step Closing Date shall be (A) such of the representations made by Tribune in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that Merger Sub has the right to terminate its obligations under the Acquisition Agreement as a result of a breach of such representations in the Acquisition Agreement and (B) the representations and warranties of Tribune set forth in the Credit Agreement and the Operative Documents relating to corporate status, power and authority, due authorization, execution and delivery and enforceability of the Operative Documents, Federal Reserve margin regulations and the Investment Company Act (the representations in clauses (A) and (B) together the "Specified Representations") and (ii) the terms of the Operative Documentation shall be in a form such that they do not impair availability of the Second Step Facilities on the Second Step Closing Date if the conditions set forth herein and in the Term Sheets are satisfied.

2.    Syndication.  The Initial Lenders reserve the right and intend, prior to or after the execution of the Operative Documents and in consultation with you, to syndicate all or a portion of their respective commitments with respect to the Second Step Facilities to one or more financial institutions (together with the Initial Lenders, the "Lenders").  Upon the issuance by

-3-

any additional Lender of its commitment with respect to any of the Second Step Facilities, the Initial Lenders' commitments with respect to such Second Step Facilities shall be reduced in the aggregate by an equal amount (and on a pro rata basis as among the Initial Lenders). Notwithstanding any such reduction in commitments, the Initial Lenders shall remain committed to fund amounts assigned in the event additional Lenders fail to fund. The commitments of the Initial Lenders hereunder are several and not joint, and are subject to (a) JPMorgan, Merrill Lynch, Citigroup and BAS (or one or more of their respective affiliates) and acting as joint lead arrangers and bookrunners (the "Lead Arrangers") of, (b) Merrill Lynch acting as sole and exclusive administrative agent (the "Administrative Agent") for, (c) JPMCB acting as sole and exclusive syndication agent for, and (d) Citigroup and Banc of America Bridge acting as co-documentation agents for the Senior Bridge Facility. It is further agreed that in connection with any offering or marketing materials relating to the Incremental Facility, JPMorgan will appear "on the left", in connection with any offering or marketing materials relating to the Senior Bridge Facility, Merrill Lynch will appear "on the left", and in each case the names of the other Lead Arrangers will appear in such order as they appear in the caption of this letter. The Lead Arrangers (or one or more of their respective affiliates) will manage all aspects of the syndication in consultation with you, including decisions as to the selection of potential Lenders to be approached and when they will be approached, when their commitments will be accepted, which Lenders will participate and the final allocations of the commitments among the Lenders (which are likely not to be pro rata across facilities among Lenders). The Lead Arrangers will exclusively perform, in consultation with you, all functions and exercise all authority as customarily performed and exercised in such capacities, including selecting one law firm as counsel for the Lead Arrangers and the Initial Lenders and negotiating the Operative Documents. Any agent or arranger titles (including co-agents) awarded to other Lenders with respect to the Facilities are subject to the prior approval of Tribune and the Lead Arrangers (such approval not to be unreasonably withheld or delayed) and shall not entail any role with respect to the matters referred to in this paragraph without the prior consent of the Lead Arrangers (such consent not to be unreasonably withheld or delayed). You agree that, without the consent of the Initial Lenders, Tribune shall not pay to any Lender any compensation outside the terms contained herein and in the Second Step Fee Letter in order to obtain its commitment to participate in any of the Second Step Facilities.

You understand that the Lead Arrangers intend to commence the syndication of the Second Step Facilities promptly, and you agree actively to assist them, and to use commercially reasonable efforts to cause Tribune to assist them, in achieving a timely syndication that is mutually satisfactory to the Lead Arrangers and Tribune. The syndication efforts will be accomplished by a variety of means, including direct contact during the syndication between senior management, advisors and affiliates of Tribune on the one hand and the proposed Lenders on the other hand, and Tribune hosting, with the Lead Arrangers, at least one meeting with prospective Lenders at such times and places as the Lead Arrangers may reasonably request. You agree, upon the reasonable request of the Lead Arrangers, to use commercially reasonable efforts to (a) provide, and cause your subsidiaries and advisors to provide to the Lead Arrangers all information relating to you and your subsidiaries reasonably deemed necessary by them as and when such information becomes available, including without limitation, upon request from the Lead Arrangers copies of Tribune's internal management reports prepared in the ordinary course of business consistent with past practices for each fiscal month after the most recent fiscal quarter (including year end) for which financial statements were received by the Lenders as described in Paragraph 1 of Annex II hereto and ended 30 days before the Second Step Closing Date, to suc-

-4-

cessfully complete the primary syndication of the Second Step Facilities, including the Information and Projections (including updated projections) contemplated hereby, (b) assist, and cause your subsidiaries and advisors to assist, the Lead Arrangers in the preparation of a Confidential Information Memorandum to be completed not later than 20 business days prior to the Second Step Closing Date (as defined in Exhibit A) and other reasonably necessary marketing materials (the contents of which, except to the extent relating to either Lead Arranger or its affiliates, you shall be solely responsible for) to be used in connection with the primary syndication of the Second Step Facilities and (c) obtain, at your expense, corporate family ratings and a monitored public rating of each of the Second Step Facilities from each of Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's, a division of the McGraw Hill Companies ("S&P") (which in the case of the Bank Facilities, may be a re-assignment of an existing rating). You also agree to use your commercially reasonable efforts to ensure that the syndication efforts of the Lead Arrangers benefit materially from your (and your subsidiaries') existing lending relationships. You further agree to afford the Lead Arrangers and their affiliates a period of not less than 20 business days prior to the Second Step Closing Date to syndicate the Second Step Facilities.

Without limiting your obligation to assist with the syndication efforts as set forth above, it is understood and agreed that completion of such syndication is not a condition to the Initial Lenders' commitments hereunder.

3.    Fees.  As consideration for the commitments of the Initial Lenders hereunder and the agreement of the Lead Arrangers to arrange, manage, structure and syndicate the Second Step Facilities, you agree to pay to them when due the fees as set forth in the Second Step Fee Letter.

4.    Conditions.  The Initial Lenders' commitments hereunder are subject to the conditions set forth in Annex II to this Amended and Restated Commitment Letter and are also subject to:

(a)    the preparation, execution and delivery of mutually satisfactory definitive documentation with respect to the Second Step Facilities (including Incremental Amendments and a bridge credit agreement and related guarantees) incorporating the terms outlined in this Amended and Restated Commitment Letter and in the Term Sheets and otherwise in a customary form;

(b)    the Initial Lenders and their respective affiliates shall be satisfied that, after the date hereof and until the successful syndication of the Second Step Facilities, or, if earlier, the Second Step Closing Date, none of Tribune, Holdco, any of their respective subsidiaries or the ESOP shall have offered, placed, arranged or issued, or engaged in discussions concerning the offering, placement, arrangement or issuance of, any debt facility or debt security (including any renewal or refinancing of and increase of commitments under existing facilities or securities) prior to or during the primary syndication of the Second Step Facilities, without the prior written consent of the Lead Arrangers, other than the Second Step Facilities, the Zell Note, the Zell Sub Note and any Senior Notes offered, issued or sold in connection with or as a part of the First Step Transactions or the Second Step Transactions; and

-5-

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

(c) (i) from December 31, 2006 through the date hereof, except as otherwise contemplated, required or permitted by the Acquisition Agreement, the Tower Purchase Agreement (as defined in the Acquisition Agreement) or the ESOP Purchase Agreement (as defined in the Acquisition Agreement) there has not been any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect (as defined (and all component definitions thereof are defined) in the Acquisition Agreement as in effect on the date hereof) and (ii) since the date hereof, there has not been any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

5.    Information and Investigations. You hereby represent and warrant that (a) all information and data (excluding the Projections and information of a general economic or in-dustry-specific nature) that have been or will be made available by you or any of your represen-tatives or advisors to the Initial Lenders, the Lead Arrangers or any Lender (whether prior to or on or after the date hereof) in connection with the Second Step Transactions, taken as a whole (the "Information"), is and will be complete and correct in all material respects and does not and will not, taken as a whole, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements contained therein not materially mislead-ing in light of the circumstances under which such statements are made, and (b) all financial pro-jections concerning Tribune and its subsidiaries and the transactions contemplated hereby (the "Projections") that have been made or will be prepared by or on behalf of you or any of your rep-resentatives or advisors and that have been or will be made available to the Initial Lenders, the Lead Arrangers or any Lender in connection with the transactions contemplated hereby have been or in the case of projections made after the date hereof, will be, prepared in good faith based upon assumptions that you reasonably believe to have been reasonable at the time made (it being understood that any such projections are subject to significant uncertainties and contingen-cies, many of which are beyond your control, and that no assurance can be given that such pro-jections will be realized and that actual results may differ from such projections and such differ-ences may be material). You agree to use commercially reasonable efforts to supplement the In-formation and the Projections from time to time until the Second Step Closing Date and, if re-quested by the Lead Arrangers, for a reasonable period thereafter (not to exceed 45 days) necessary to complete the successful syndication of the Second Step Facilities so that the representation and warranty in the preceding sentence remains correct in all material respects. In syndicating the Sec-ond Step Facilities the Lead Arrangers will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent check or verification thereof.

You hereby acknowledge that (a) the Lead Arrangers will make available Infor-mation and Projections to the proposed syndicate of Lenders on a confidential basis through posting on IntraLinks or another similar electronic system and (b) certain of the proposed Lend-ers may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to Tribune and its affiliates or any securities thereof ("Material Non-Public Information")) (each, a "Public Lender"). You hereby agree that (a) you will use com-mercially reasonable efforts to identify that portion of the Information and Projections that may be distributed to the Public Lenders and include a reasonably detailed term sheet in such Infor-mation and that all of the foregoing that is to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC"; (b) by marking materials "PUBLIC," you shall be

-6-

deemed to have authorized the Lead Arrangers and the proposed Lenders to treat such materials as not containing any Material Non-Public Information, it being understood that certain of such materials may be subject to the confidentiality requirements of the definitive credit documentation; (c) all materials marked "PUBLIC" are permitted to be made available by electronic means designated for "Public Lenders;" and (d) the Lead Arrangers shall be entitled to treat any materials that are not marked "PUBLIC" as being suitable only for posting by confidential electronic means not designated for "Public Lenders." You also acknowledge that Public Lenders employed by one or more of the Lead Arrangers or their respective affiliates, consisting of publishing debt analysts, may participate in any meetings or telephone conference calls held pursuant to Section 2 hereof; *provided* that such analysts shall not publish any information obtained from such meetings or calls until the syndication of the Second Step Facilities has been completed upon the making of allocations by the Lead Arrangers and the Lead Arrangers freeing the Second Step Facilities to trade.

6.     Indemnification.   You agree to indemnify and hold harmless each Initial Lender, each Lead Arranger, each other Lender and their respective affiliates, and each such person's respective officers, directors, employees, agents and controlling persons (each Initial Lender, each Lead Arranger and each such other person being an "Indemnified Party") from and against any and all losses, claims, damages, costs, expenses and liabilities, joint or several, to which any Indemnified Party may become subject under any applicable law, or otherwise related to or arising out of or in connection with this Amended and Restated Commitment Letter, the Second Step Fee Letter, the Term Sheets, the Second Step Facilities, the loans thereunder and the use of proceeds therefrom, any of the Second Step Transactions or any related transaction and the performance by any Indemnified Party of the services contemplated hereby, and will reimburse each Indemnified Party for any and all reasonable and documented expenses (including reasonable and documented counsel fees and expenses) as they are incurred in connection with the investigation of or preparation for or defense of any pending or threatened claim or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party and whether or not such claim, action or proceeding is initiated or brought by or on behalf of you or any of your subsidiaries and whether or not any of the Second Step Transactions are consummated or this Amended and Restated Commitment Letter is terminated, except to the extent (i) determined by a final judgment of a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct or (ii) arising from a material breach of the obligations of such Indemnified Party under this Amended and Restated Commitment Letter. No party hereto nor any of its affiliates or subsidiaries shall be liable to any other party hereto or any of its subsidiaries or affiliates on any theory of liability for any special, indirect, consequential, punitive or exemplary damages in connection in any way with this Amended and Restated Commitment Letter, the Second Step Fee Letter, the Term Sheets, the Second Step Facilities, the loans thereunder and the use of proceeds therefrom, any of the Second Step Transactions or any related transaction or the performance by any party hereto or any of its subsidiaries, or affiliates, its obligations hereunder or under the Second Step Facilities. Notwithstanding any other provision of this Amended and Restated Commitment Letter, no Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, except to the extent determined by a final judgment of a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct.

-7-

You agree that, without the prior written consent of the Lead Arrangers (not to be unreasonably withheld), neither you nor any of your affiliates or subsidiaries will settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification has been or could be sought under the indemnification provisions hereof (whether or not any other Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent (i) includes an unconditional written release in form and substance reasonably satisfactory to the Lead Arrangers of each Indemnified Party from all liability arising out of such claim, action or proceeding and (ii) does not include any statement as to or an admission of fault, culpability or failure to act by or on behalf of any Indemnified Party.

7.    Expenses.  You agree to reimburse the Initial Lenders and their affiliates for their reasonable, documented, out-of-pocket expenses promptly following their request made from time to time (including, without limitation, all reasonable due diligence investigation expenses, fees of consultants engaged with your consent (not to be unreasonably withheld), syndication expenses (including printing, distribution, and bank meetings), travel expenses, duplication fees and expenses, search fees, filing and recording fees and the reasonable, documented fees, disbursements and other charges of Cahill Gordon & Reindel LLP as counsel to the Initial Lenders, and any sales, use or similar taxes (and any additions to such taxes) related to any of the foregoing) incurred in connection with the negotiation, preparation, execution and delivery, waiver or modification, collection and enforcement of this Amended and Restated Commitment Letter, the Term Sheets, the Second Step Fee Letter and the Operative Documents and whether or not such fees and expenses are incurred before or after the date hereof or any loan documentation is entered into or the Second Step Transactions are consummated or any extensions of credit are made under the Facilities or this Amended and Restated Commitment Letter is terminated or expires; provided that such payment or reimbursement obligation with respect to legal counsel shall include only the reasonable fees and expenses of Cahill Gordon & Reindel LLP.

8.    Confidentiality.  This Amended and Restated Commitment Letter, the Term Sheets, the contents of any of the foregoing and the Initial Lenders' and/or their affiliates' activities pursuant hereto or thereto are confidential and shall not be disclosed by or on behalf of you or any of your subsidiaries to any person without the prior written consent of the Initial Lenders, except that you may (i) disclose this Amended and Restated Commitment Letter, the Second Step Fee Letter and the Term Sheets to your officers, directors, employees and advisors, and then only in connection with the Second Step Transactions and on a confidential need-to-know basis, (ii) file a copy of any portion of this Amended and Restated Commitment Letter (but not the Second Step Fee Letter) and the Term Sheets in any public record in which it is required by law to be filed and (iii) make any other disclosure as you are required to make by applicable law or compulsory legal process (based on the advice of legal counsel); provided, however, that in the event of any such compulsory legal process you agree, to the extent permitted by applicable law, to give the Lead Arrangers prompt notice thereof and to cooperate, at the Lead Arrangers' expense, with the Initial Lenders in securing a protective order in the event of compulsory disclosure.  The foregoing restrictions shall cease to apply with respect to this Amended and Restated Commitment Letter, the Term Sheets and the contents thereof once this Amended and Restated Commitment Letter has been accepted by you.  You agree that you will use commercially reasonable efforts to permit the Initial Lenders to review and approve any reference to any of the Initial Lenders or any of their affiliates in connection with the Second Step Facilities or the

-8-

transactions contemplated hereby contained in any press release or similar public disclosure prior to public release. Subject to the terms of the next succeeding paragraph, you agree that the Initial Lenders and their affiliates may share information concerning you and your subsidiaries and affiliates among themselves solely in connection with the performance of their services hereunder and the evaluation and consummation of financings and Transactions contemplated hereby. You also acknowledge that the Initial Lenders or their affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to parties whose interests may conflict with yours. The Initial Lenders agree that they will not furnish confidential information obtained from you to any of their other customers and that they will treat confidential information relating to you and your affiliates with the same degree of care as they treat their own confidential information. The Initial Lenders further advise you that they and their affiliates will not make available to you confidential information that they have obtained or may obtain from any other customer.

Each Lead Arranger agrees to maintain the confidentiality of the Confidential Information (as defined below), except that Confidential Information may be disclosed (a) to its and its affiliates' partners, directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and agree to keep such Confidential Information confidential), (b) to the extent requested or required by any state, Federal or foreign authority or examiner regulating such Lead Arranger, (c) to the extent required by applicable law, rule or regulation or by any subpoena or similar legal process, (d) in connection with any litigation or legal proceeding relating to this Amended and Restated Commitment Letter or the Second Step Fee Letter or any other documentation in connection therewith or the enforcement of rights hereunder or thereunder or to which such Lead Arranger or any of its affiliates may be a party, (e) to any prospective Lender (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and agree to keep such Confidential Information confidential), (f) with the consent of Tribune, (g) to any rating agency when required by such rating agency, (h) for purposes of establishing a "due diligence defense" or (i) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this paragraph or (ii) becomes available to such Lead Arranger on a nonconfidential basis from a source other than you or any of your subsidiaries, officers, directors, employees or advisors. For the purposes of this paragraph, "Confidential Information" means all information received from you or any of your subsidiaries, officers, directors, employees or advisors relating to you, or your businesses, other than any such information that is available to the Lead Arrangers on a nonconfidential basis prior to disclosure by you. Any person required to maintain the confidentiality of Confidential Information as provided in this paragraph shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such Confidential Information as such person would accord to its own confidential information.

9.    Termination. The Initial Lenders' commitments hereunder shall terminate in their entirety on the earliest to occur of (A) May 31, 2008 if the Operative Documents are not executed and delivered by Tribune and the Lenders on or prior to such date, (B) the date of execution and delivery of the Operative Documents by Tribune and the Lenders, (C) if earlier than (B), the date of termination of the Acquisition Agreement and (D) August 17, 2007 if the Credit Agreement has not been executed and delivered by Tribune and the lenders thereunder on or

-9-

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112677

prior to such date. Notwithstanding the foregoing, the provisions of Sections 6, 7, 8, 10 and 11 hereof shall survive any termination pursuant to this Section 9 (it being understood that the reimbursement and indemnification provisions contained herein shall be superseded by the reimbursement and indemnifications provisions contained in the Credit Agreement or the Bridge Documentation when the applicable Operative Documents become effective).

      10.    Assignment; No Fiduciary; Etc.  This Amended and Restated Commitment Letter and the commitments of the Initial Lenders hereunder shall not be assignable by any party hereto (other than by the Initial Lenders to their respective affiliates) without the prior written consent of the other parties hereto, and any attempted assignment shall be void and of no effect; provided, however, that nothing contained in this Section 10 shall prohibit the Initial Lenders (in their sole discretion) from (i) performing any of their duties hereunder through any of their affiliates, and you will owe any related duties (including those set forth in Section 2 above) to any such affiliate, and (ii) granting (in consultation with you) participations in, or selling (in consultation with you) assignments of all or a portion of, the commitments or the loans under the Second Step Facilities pursuant to arrangements satisfactory to the Initial Lenders (provided that, in the case of clause (i) or (ii) above, the Initial Lenders shall be and remain primarily liable for the full and prompt performance of their duties and obligations hereunder).  This Amended and Restated Commitment Letter is solely for the benefit of the parties hereto and does not confer any benefits upon, or create any rights in favor of, any other person.

      In connection with all aspects of each transaction contemplated by this Amended and Restated Commitment Letter, you acknowledge and agree, and acknowledge your subsidiaries' understanding, that (i) each transaction contemplated by this Amended and Restated Commitment Letter is an arm's-length commercial transaction, between Tribune, on the one hand, and each of the Initial Lenders and the Lead Arrangers, on the other hand, (ii) in connection with each such transaction and the process leading thereto each of the Initial Lenders and Lead Arrangers will act solely as a principal and not as agent (except as otherwise provided herein) nor as fiduciary of Tribune, or its stockholders, affiliates, creditors, employees or any other party, (iii) none of the Initial Lenders and the Lead Arrangers will assume an advisory or fiduciary responsibility in favor of Tribune or any of its affiliates with respect to any of the transactions contemplated hereby or the process leading thereto (irrespective of whether any Initial Lender or Lead Arranger has advised or is currently advising Tribune on other matters) and none of the Initial Lenders and Lead Arrangers will have any obligation to Tribune or any of its affiliates with respect to the transactions contemplated in this Amended and Restated Commitment Letter except the obligations expressly set forth herein or as otherwise expressly agreed to in writing, (iv) the Initial Lenders and Lead Arrangers may be engaged in a broad range of transactions that involve interests that differ from those of Tribune and its affiliates, and (v) none of the Initial Lenders and Lead Arrangers has provided nor will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby and Tribune has consulted and will consult its own legal, accounting, regulatory, and tax advisors to the extent it deems appropriate.  You hereby waive and release, to the fullest extent permitted by law, any claims that you may have against the Initial Lenders and Lead Arrangers with respect to any breach or alleged breach of fiduciary duty in respect of any of the transactions contemplated by this Amended and Restated Commitment Letter.

-10-

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

11.  Governing Law; Waiver of Jury Trial. This Amended and Restated Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York. Each of the parties hereto waives all right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of any of the Transactions or the other transactions contemplated hereby, or the performance by the Initial lenders, the Lead Arrangers or any of their respective affiliates of the services contemplated hereby.

12.  Amendments; Counterparts; etc. No amendment or waiver of any provision hereof or of the Term Sheets shall be effective unless in writing and signed by the parties hereto and then only in the specific instance and for the specific purpose for which given. This Amended and Restated Commitment Letter, the Term Sheets and the Second Step Fee Letter are the only agreements between the parties hereto with respect to the matters contemplated hereby and thereby and set forth the entire understanding of the parties with respect thereto. This Amended and Restated Commitment Letter may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart by telecopier shall be effective as delivery of a manually executed counterpart.

13.  Patriot Act. The Initial Lenders hereby notify you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Patriot Act"), the Lenders may be required to obtain, verify and record information that identifies Tribune, which information includes the name, address and tax identification number and other information regarding it that will allow such Lender to identify it in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to the Lenders.

14.  Public Announcements; Notices. The Initial Lenders and Lead Arrangers may, subject to your prior consent (not to be unreasonably withheld, delayed or conditioned) at their expense, publicly announce as they may choose the capacities in which they or their affiliates have acted hereunder. Any notice given pursuant hereto shall be mailed or hand delivered in writing, if to (i) you, at your address set forth on page one hereof; (ii) JPMorgan and JPMCB, at 270 Park Avenue, New York, NY 10017, Attention: Rajesh Kapadia; (iii) Merrill Lynch, at 4 World Financial Center, New York, New York 10080, Attention: David Tuvlin; (iv) CGMI, at 390 Greenwich Street, New York, NY 10013, Attention: Robert Chen; (v) Bank of America, Banc of America Bridge and BAS, at 9 West 57th Street, New York, New York 10019, Attention: William Pegler; (vi) in the case of the foregoing clause (i), with a copy to Sidley Austin LLP, 1 South Dearborn Street, Chicago, Illinois 60603, Attention: Robert Lewis; and (vii) in the case of the foregoing clauses (ii), (iii), (iv) or (v), with a copy to Cahill Gordon & Reindel LLP, 80 Pine Street, New York, NY 10005, Attention: Jonathan A. Schaffzin.

(Signature Page Follows)

-11-

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

Please confirm that the foregoing correctly sets forth our agreement of the terms hereof and the Second Step Fee Letter by signing and returning to the Initial Lenders the duplicate copy of this letter and the Second Step Fee Letter enclosed herewith. Unless the Initial Lenders receive your executed duplicate copies hereof and thereof by 5:00 p.m., New York City time, on April **5**, 2007, the commitments of the Initial Lenders hereunder will expire at such time.

We are pleased to have this opportunity and we look forward to working with you on this transaction.

Very truly yours,

MERRILL LYNCH CAPITAL CORPORATION

By: _____
      Name: Stephen Paras
      Title: Vice President

CITIGROUP GLOBAL MARKETS INC.

By: _____
      Name:
      Title:

J.P. MORGAN SECURITIES INC.

By: _____
      Name:
      Title:

JPMORGAN CHASE BANK, N.A.

By: _____
      Name:
      Title:

[Step Two Commitment Letter]

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

Please confirm that the foregoing correctly sets forth our agreement of the terms hereof and the Second Step Fee Letter by signing and returning to the Initial Lenders the duplicate copy of this letter and the Second Step Fee Letter enclosed herewith. Unless the Initial Lenders receive your executed duplicate copies hereof and thereof by 5:00 p.m., New York City time, on April 5, 2007, the commitments of the Initial Lenders hereunder will expire at such time.

We are pleased to have this opportunity and we look forward to working with you on this transaction.

Very truly yours,

MERRILL LYNCH CAPITAL CORPORATION

By: _____

Name:
Title:

CITIGROUP GLOBAL MARKETS INC.

By: _____

Name:  Robert H. Chen
Title:  Director

J.P. MORGAN SECURITIES INC.

By: _____

Name:
Title:

JPMORGAN CHASE BANK, N.A.

By: _____

Name:
Title:

[Step Two Commitment Letter]

Professionals' Eyes Only                                                    TRB0112681
Highly Confidential - Attorneys' Eyes Only

Please confirm that the foregoing correctly sets forth our agreement of the terms hereof and the Second Step Fee Letter by signing and returning to the Initial Lenders the duplicate copy of this letter and the Second Step Fee Letter enclosed herewith. Unless the Initial Lenders receive your executed duplicate copies hereof and thereof by 5:00 p.m., New York City time, on April $\underline{5}$, 2007, the commitments of the Initial Lenders hereunder will expire at such time.

We are pleased to have this opportunity and we look forward to working with you on this transaction.

Very truly yours,

MERRILL LYNCH CAPITAL CORPORATION

By: _____
       Name:
       Title:

CITIGROUP GLOBAL MARKETS INC.

By: _____
       Name:
       Title:

J.P. MORGAN SECURITIES INC.

By: _____
       Name:       Robert Anastasio
       Title:      Vice President

JPMORGAN CHASE BANK, N.A.

By: _____
       Name:       Robert Anastasio
       Title:      Vice President

[Step Two Commitment Letter]

BANK OF AMERICA, N.A.

By: _____
Name: DANIEL R. PETRIK
Title: SENIOR VICE PRESIDENT

BANC OF AMERICA BRIDGE LLC

By: _____
Name:
Title:

BANC OF AMERICA SECURITIES LLC

By: _____
Name:
Title:

[Step Two Commitment Letter]

Professionals' Eyes Only                                                        TRB0112683
Highly Confidential - Attorneys' Eyes Only

BANK OF AMERICA, N.A.

By: _____
    Name:
    Title:

BANC OF AMERICA BRIDGE LLC

By: _____
    Name: James G. Rose
    Title: Managing Director

BANC OF AMERICA SECURITIES LLC

By: _____
    Name: James G. Rose
    Title: Managing Director

[Step Two Commitment Letter]

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112684

Accepted and agreed to as of
the date first written above:

TRIBUNE COMPANY

By:

Name:   Donald C. Grenesko
Title:   Senior Vice President, Finance and Administration

Acknowledged:

EGI-TRB, L.L.C.

By:
Name:
Title:

[Second Step Commitment Letter]

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

Accepted and agreed to as of
the date first above written:

TRIBUNE COMPANY

By: _____

Name: Dennis J. FitzSimons

Title: Chairman, President and
Chief Executive Officer

EGI-TRB, L.L.C.

By: _____

Name: Philip G. Tinkler

Title: Vice President

Signature Page to the Second Step Commitment Letter

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

## Estimated Sources and Uses of Funds
### (in $ millions)

| Sources | | Uses | |
|---|---|---|---|
| Options proceeds[1] | $ 215.0 | | |
| Incremental Zell Investment | 65.0 | | |
| Revolving Facility[2] | 0 | | |
| Incremental Term Loan | 2,105.0 | Acquisition consideration[3] | $4,261.0 |
| Senior Notes/Senior Bridge Facility | 2,100.0 | Estimated fees and expenses[4] | 224.0 |
| Rollover Debt and PHONES[5] | 9,106.0 | Rollover Debt and PHONES[5] | 9,106.0 |
| Total Sources | $13,591.0 | Total Uses | $13,591.0 |

---

[1]     Includes $15.0 million of tax benefits in 2007.

[2]     $750,000,000 of commitments on the Second Step Closing Date; $0 drawn on the Second Step Closing Date.

[3]     Includes repayment of the Zell Note to the extent Tribune has not elected to convert it into common equity in accordance with its terms.

[4]     Includes approximately $104.0 million of cash distributions resulting from the change of control.

[5]     Includes approximately $1,521.0 million of outstanding notes, the $7,015 million Tranche B Facility and $900.0 million of PHONES.

TRB0112687

**Annex II**

**Project Tower**
**Summary of Additional Conditions Precedent**

Except as otherwise set forth below, the initial borrowing under each of the Second Step Facilities shall be subject to the contemporaneous or prior satisfaction of the following additional conditions:

1.      The Lenders shall have received audited consolidated balance sheets of Tribune for the most recent fiscal year ended on or before 75 days before the Second Step Closing Date and related statements of income, stockholders' equity and cash flows of Tribune and unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of Tribune for each fiscal quarter ended after the date of the audited financial statements provided above and ended on or before 30 days before the Second Step Closing Date.

2.      The Lenders shall have received a pro forma consolidated balance sheet of Tribune as of the fiscal quarter (including the fourth quarter) most recently ended prior to the Second Step Closing Date, after giving effect to the Second Step Transactions.  The Lead Arrangers shall have received reasonably detailed pro forma consolidated financial projections prepared by or on behalf of Tribune for Tribune and its consolidated entities for the five-fiscal year period after the Second Step Closing Date.

3.      All accrued fees and expenses (including the reasonable fees and expenses of counsel to the Lead Arrangers) of the Lead Arrangers in connection with the Operative Documents shall have been paid; provided that such fees and expenses shall have been invoiced at least two business days prior to the Second Step Closing Date.

4.      As a condition to the Incremental Facility, the Lenders thereunder shall have a valid lien on and security interest in the collateral referred to in Exhibit A under "Collateral" that is equivalent to the lien in favor of the other Lenders under the Tranche B Facility.

5.      As a condition to the Senior Bridge Facility, the Lead Arrangers shall have received, not later than 20 business days prior to the Second Step Closing Date and at the Second Step Closing Date, a complete printed preliminary prospectus or preliminary offering memorandum or preliminary private placement memorandum suitable for use in a customary "high-yield road show" relating to the Senior Notes, which will include (unless and to the extent that you and the Lead Arrangers otherwise agree) all financial statements and other data to be included therein (including all audited financial statements, all unaudited financial statements (which shall have been reviewed by the independent accountants for Tribune as provided in Statement on Auditing Standards No. 100) and all appropriate pro forma financial statements prepared in accordance with, or reconciled to, U.S. GAAP and prepared in accordance with Regulation S-X under the Securities Act), and all other data (including selected financial data) that the Securities and Exchange Commission would require in a registered offering of the Senior Notes or that would be necessary for the Lead Arrangers to receive customary "comfort" (including "negative assur-

TRB0112688

ance" comfort) from independent accountants in connection with the offering of the Senior Notes. Upon delivery of such prospectus, offering memorandum or private placement memorandum you will, and will use commercially reasonable efforts to cause Tribune's senior management personnel to participate in, a customary road show for the sale of the Senior Notes.

6. Delivery of reasonably satisfactory legal opinions, including customary opinions of counsel to the ESOP (to the extent requested by the Lead Arrangers) and of Tribune's counsel; absence of prepayment events under other material debt instruments; no creation of liens on Collateral (as defined in Exhibit A) under other debt instruments or other agreements and no creation of material liens on assets not constituting Collateral, in each case as a result of the transactions contemplated hereby; customary closing certificates, including evidence of authority, charter documents and officers' incumbency certificates; to the extent requested by the Lead Arrangers, delivery of the opinion of the ESOP trustee's financial advisor; and to the extent requested by the Lead Arrangers, delivery of a customary certificate of the ESOP trustee.

7. The Acquisition shall have been consummated in accordance with the terms and conditions of the Acquisition Agreement and no provision thereof shall have been waived, amended, supplemented or otherwise modified and no action by Tribune prohibited by the Acquisition Agreement shall have been consented to, in each case in a manner material and adverse to the Lenders without the consent of the Lead Arrangers.

8. Each of the First Step Transactions shall have been consummated and the Credit Agreement (as defined in the First Step Commitment Letter) shall have been executed and delivered shall be in full force and effect and there shall not have been any amendments, modifications or waivers thereto subsequent to the execution and delivery thereof that are adverse to the Lenders under the Incremental Facility in any material respect.

9. As a condition to the Incremental Facility, no default or event of default shall result from the making of term loans thereunder.

10. Zell and Holdco shall have entered an equity commitment agreement or subscription agreement whereby Zell (either directly or through Holdco) will agree to invest up to $100.0 million (less the Investment Reduction Amount (as defined in the First Step Commitment Letter)) on the later to occur of March 25, 2008 and the Second Step Closing Date, in Junior Capital (as defined in the First Step Commitment Letter) of Tribune if Tribune has not made the election to be treated as an S Corporation under the Code (the "S. Corp Election") on or prior to March 15, 2008, such agreement to be in form and substance reasonably satisfactory to the Lead Arrangers and granting third-party enforcement rights in favor of the Administrative Agent on behalf of the Lenders (the "Zell Investment Agreement").

11. The ratio of total outstanding indebtedness of Tribune that is guaranteed by any of its subsidiaries and outstanding indebtedness of any of the Guarantors (on a consolidated basis) to trailing four quarter EBITDA (as defined in Annex II to this Exhibit A) shall not exceed 9.00:1.00 when measured on a pro forma basis as of the last day of the fiscal quarter ending immediately prior to the date of the Acquisition (giving effect to the Second Step Transactions and other customary and appropriate pro forma adjustment events, including any acquisi-

-2-

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only
TRB0112689

tions or dispositions after the beginning of the relevant determination period but prior to or simultaneous with the consummation of the Acquisition).

12.    The Lead Arrangers shall be reasonably satisfied that subsequent to the consummation of the First Step Transactions, there shall not have been any changes to the terms and conditions of the documentation regarding the establishment of the ESOP (including the provisions of the ESOP relating to redemptions and distributions) that are material and adverse to Lenders.  The Lead Arrangers shall be reasonably satisfied that subsequent to the consummation of the First Step Transactions, the ESOP shall not have entered into any transactions (a) constituting a "prohibited transaction" as defined in the Code, (b) that violate fiduciary standards imposed by Section 404(a) of ERISA or (c) adversely affect the qualified status of the ESOP under Sections 401(a) or 4975(e)(7) of the Code.

13.    The Holdco Purchase shall be consummated substantially concurrent with the consummation of the Acquisition.

-3-

**CONFIDENTIAL**                                                                  **EXHIBIT A**

## INCREMENTAL CREDIT FACILITY

### SUMMARY OF TERMS AND CONDITIONS[1]

| | |
|---|---|
| Borrower: | Tribune Company, a Delaware corporation ("Tribune"). |
| Joint Lead Arrangers: | J.P. Morgan Securities Inc., Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, an affiliate of Citigroup Global Markets Inc. and Banc of America Securities LLC (the "Lead Arrangers"). |
| Lenders: | JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation (or one of its affiliates), an affiliate of Citigroup Global Markets Inc., Bank of America, N.A. and a syndicate of financial institutions (the "Incremental Lenders") arranged by the Lead Arrangers in consultation with Tribune. |
| Incremental Facility: | A $2,105.0 million incremental term loan facility that will be issued under the Credit Agreement |
| Transactions: | As described in the Amended and Restated Commitment Letter. |
| Availability/Purpose: | Incremental term loans will be available to finance the Acquisition and related transactions on the date of the consummation of the Acquisition in one draw (the "Second Step Closing Date"). |
| Documentation: | The Incremental Facility will be the "Incremental Facility" provided for under the Credit Agreement and will be incorporated into and governed by the Credit Documents (as defined in the First Step Commitment Letter).  As a result, except as expressly provided herein or as the context otherwise requires, all terms, conditions and provisions of the Credit Documents that apply to the Tranche B Facility (as defined in the First Step Commitment Letter) will apply to the Incremental Facility (including, without limitation, default interest, mandatory prepayments/reduction in commitments, voluntary prepayments/reduction in commitments, representations and warranties, affirmative covenants, negative covenants, financial covenants, events of default, yield protection and increased costs, assignments and participations, required |

---

[1]   Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the attached Amended and Restated Commitment Letter (the "Amended and Restated Commitment Letter").

|  | lenders, expenses and indemnification, governing law and waiver of jury trial). |
|---|---|
| Guarantors: | Identical to the Tranche B Facility. Each guarantor of any of the Bank Facilities is herein referred to as a "Guarantor" and its guarantee is referred to herein as a "Guarantee"; Tribune and the Guarantors are herein referred to as the "Credit Parties". The Guarantors will unconditionally guarantee, on a joint and several and senior basis, all obligations of Tribune under the Incremental Facility. |
| Collateral: | Identical to the Tranche B Facility. |
| Termination of Commitments: | The commitments in respect of the Incremental Facility (including pursuant to the Amended and Restated Commitment Letter) will terminate in their entirety on May 31, 2008 if the initial funding under the Incremental Facility does not occur on or prior to such date. |
| Final Maturity: | Identical to the Tranche B Facility. |
| Amortization Schedule: | Identical to the Tranche B Facility |
| Interest Rates and Fees: | Tribune will be entitled to make borrowings based on the ABR plus the Applicable Margin or LIBOR plus the Applicable Margin. The "Applicable Margin" for the Incremental Facility shall be (A) 2.50% per annum for LIBOR Loans and (B) 1.50% per annum for ABR Loans. |
| Conditions to Effectiveness and to Loans on Second Step Closing Date: | The effectiveness of the Incremental Facility and the making of incremental term loans thereunder shall be subject to the conditions precedent to the Incremental Facility set forth in the Credit Agreement and: |

1.    The absence of any event that has had or could reasonably be expected to have a material adverse effect on (a) the rights and remedies of the Incremental Lenders under any Credit Document or (b) the ability of Tribune to perform its obligations under any Credit Document.

2.    Certification (which may refer to and rely in part upon any solvency opinion referred to below) as to the solvency of Borrower and its subsidiaries, taken as a whole, from the chief financial officer of Borrower and, if any, a copy of the solvency opinion delivered in connection with the Second Step Transactions (which opinion may be addressed to Tribune but shall be certified by Tribune to the Lenders to be a true and correct copy of the opinion delivered to it).

A-1-2

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

3.    Receipt of all governmental and third party approvals or consents necessary for the incurrence of incremental term loans under the Incremental Facility.

Special Counsel for Lead
Arrangers:

Cahill Gordon & Reindel LLP.

A-1-3

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112693

**CONFIDENTIAL**                                                     **EXHIBIT B**

## SENIOR UNSECURED BRIDGE FACILITY

### SUMMARY OF TERMS AND CONDITIONS[2]

| | |
|---|---|
| Borrower: | Tribune Company, a Delaware corporation ("Tribune"). |
| Joint Lead Arrangers: | Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, JPMorgan Securities Inc., an affiliate of Citigroup Global Markets Inc. and Banc of America Securities LLC (the "Lead Arrangers"). |
| Agents: | Merrill Lynch Capital Corporation, as sole and exclusive administrative agent (in such capacity, the "Administrative Agent"), JPMorgan Chase Bank, N.A., as sole and exclusive syndication agent, and an affiliate of Citigroup Global Markets Inc. and Banc of America Bridge as co-documentation agents. |
| Bridge Lenders: | Merrill Lynch Capital Corporation (or one of its affiliates), an affiliate of Citigroup Global Markets Inc., JPMCB, Banc of America Bridge (together, the "Initial Bridge Lenders"), and a syndicate of financial institutions (the "Bridge Lenders") arranged by the Lead Arrangers in consultation with you. |
| Initial Senior Unsecured Loans: | The Bridge Lenders will make loans (the "Initial Senior Loans") to Tribune on the Second Step Closing Date in an aggregate principal amount not to exceed $2,100.0 million. |
| Purpose and Availability of Initial Senior Loans: | The proceeds of the Initial Senior Loans and the Incremental Facility will be used solely as set forth in the Sources and Uses of Funds. The Bridge Lenders will make the Initial Senior Loans simultaneously with (a) the consummation of the Acquisition and (b) the funding under the Incremental Facility. Amounts borrowed under the Senior Unsecured Facility and repaid or prepaid may not be reborrowed. |

---

[2]    Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the attached Amended and Restated Commitment Letter.

B-1

Professionals' Eyes Only                                                     TRB0112694
Highly Confidential - Attorneys' Eyes Only

Initial Maturity Date and
Exchange of the Initial Senior Loans:

The Initial Senior Loans will mature on the first anniversary (the "Initial Maturity Date") of the Second Step Closing Date; *provided, however*, that subject to "Conditions to Extension" below, the maturity of the Initial Senior Loans will be automatically extended on the Initial Maturity Date until the eighth anniversary of the Second Step Closing Date (the "Extended Maturity Date" and, such extended maturity loans, the "Extended Senior Term Loans"). At any time on or after the Initial Maturity Date at the option of the applicable holder, Extended Senior Term Loans may be exchanged in whole or in part for senior unsecured exchange notes (the "Senior Exchange Securities") having an equal principal amount; *provided* that Tribune shall not be obligated to issue Senior Exchange Securities until it has received requests therefor in respect of Initial Senior Loans or Extended Senior Term Loans having an aggregate principal amount of at least $100.0 million (an "Exchange Request"). The Extended Senior Term Loans will be governed by the provisions of the Bridge Documents and will have the same material terms as the Initial Senior Loans except as set forth in this exhibit. When issued, the Senior Exchange Securities will be governed by an indenture to be entered into between Tribune and a trustee that is reasonably acceptable to Tribune and the Lead Arrangers, that shall have the same material terms as the Initial Senior Loans except as set forth in this exhibit.

Conditions to Extension:

Extension of the maturity of the Initial Senior Loans is subject to neither Tribune nor any significant subsidiary thereof that is a guarantor of the Initial Senior Loans being subject to a bankruptcy or other insolvency proceedings.

Availability of the Senior
Exchange Securities:

The Senior Exchange Securities will be available only in exchange for the Initial Senior Loans and Extended Senior Term Loans. The principal amount of any Senior Exchange Security will equal 100% of the aggregate principal amount (including any accrued interest not required to be paid in cash) of the Initial Senior Loan for which it is exchanged. Tribune will issue Senior Exchange Securities under an indenture which complies with the Trust Indenture Act of 1939, as amended.

Guarantee:

The obligations of Tribune in respect of the Initial Senior Loans and the Senior Exchange Securities will be unconditionally and irrevocably guaranteed on a senior subordinated

B-2

TRB0112695

basis (the "Subordinated Guarantees") by all of Tribune's subsidiaries that guarantee the Bank Facilities (each a "Subsidiary Guarantor") for so long as such subsidiaries guarantee the Bank Facilities. A Subordinated Guarantee shall be automatically released at the time any subsidiary's guarantee of the Bank Facilities is released thereunder in accordance with its terms. The Subordinated Guarantees are intended to eliminate structural subordination of the Senior Bridge Facility and, accordingly, will apply to all Subsidiary Guarantors.

Collateral:                          None.

Final Maturity Date:                 The Final Maturity Date of the Senior Exchange Securities and the Extended Senior Term Loans will be the eighth anniversary of the Second Step Closing Date.

Interest Rates and Fees:             As set forth on Annex I hereto and in the Fee Letter and Engagement Letter.

Ranking:                             The Initial Senior Loans, the Extended Senior Term Loans and the Senior Exchange Securities shall be pari passu for all purposes.

                                     Tribune's obligations under the Bank Facilities, the Initial Senior Loans, the Extended Senior Term Loans and the Senior Exchange Securities shall constitute senior debt. With respect to the Bank Facilities, the Subsidiary Guarantors' Subordinated Guarantees shall constitute senior subordinated debt pursuant to subordination provisions customary for high-yield securities. Any future senior debt of a Subsidiary Guarantor will be senior to its Subordinated Guarantee. Any future subordinated debt of a Subsidiary Guarantor will be either pari passu with or junior to such Subsidiary Guarantor's Subordinated Guarantee.

Mandatory Redemption:                Tribune will be required to prepay Initial Senior Loans and Extended Senior Term Loans and redeem the Senior Exchange Securities (or in the case of Fixed Rate Senior Exchange Securities (as defined below), offer to purchase such Fixed Rate Senior Exchange Securities) on a pro rata basis subject, in certain circumstances, to the non-call provisions of any Fixed Rate Exchange Security, at par plus accrued and unpaid interest (without penalty or premium) or, in the case of Fixed Rate Senior Exchange Securities, at par plus accrued and unpaid interest plus any applicable premiums), from the net cash proceeds (after deduction of, among other

B-3

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112696

things, mandatory repayments and permitted reinvestments under the Bank Facilities) from the incurrence of certain debt (to be agreed) by Tribune or any of its subsidiaries or the issuance of any equity by Tribune or any of its subsidiaries in each case after the Second Step Closing Date (other than with respect to Fixed Rate Senior Exchange Securities) or from all non-ordinary course asset sales by Tribune or any of its subsidiaries.

Notwithstanding the previous paragraph, the net cash proceeds from non-ordinary course asset sales will be applied first to the Bank Facilities and will otherwise be subject to the same exceptions and reinvestment rights permitted under the Bank Facilities.

Tribune will be required to offer to repurchase or repay all Initial Senior Loans, Extended Senior Term Loans and the Senior Exchange Securities at 100% (or 101% in the case of Fixed Rate Senior Exchange Securities) plus accrued and unpaid interest, upon the occurrence of a change of control.

Optional Prepayment:

The Initial Senior Loans and Extended Senior Term Loans may be prepaid and the Senior Exchange Securities may be redeemed (subject to non-call provisions relating to Fixed Rate Senior Exchange Securities), in whole or in part, at the option of Tribune, at any time upon 3 business days' prior notice, at par plus accrued and unpaid interest and without premium or penalty, subject in the case of Initial Senior Loans and Extended Senior Term Loans to reimbursement of the Bridge Lenders' actual redeployment costs in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant Interest Period.

Fixed Rate Senior Exchange Securities:

Each holder of Senior Exchange Securities (other than a party to the Amended and Restated Commitment Letter, in which case only in connection with a sale to a third party) shall have the right to fix the interest rate on such Senior Exchange Security (each such Senior Exchange Security being a "Fixed Rate Senior Exchange Security") at a rate not higher than the then applicable rate of interest.

Each Fixed Rate Senior Exchange Security will be non-callable for four years from the Second Step Closing Date (subject to customary equity clawback provisions) and will be callable thereafter at par plus accrued interest plus a premium equal to one-half the coupon in effect on the date of the fixing of the interest rate on such Fixed Rate Senior Ex-

B-4

TRB0112697

|                                | change Security, which premium shall decline ratably on each yearly anniversary of the Second Step Closing Date to zero one year before the maturity of the Senior Exchange Securities; *provided, however*, that any Fixed Rate Senior Exchange Securities will be callable prior to such 4th anniversary at a redemption price equal to par plus accrued interest plus a make whole premium calculated on the basis of a discount rate equal to the then Treasury Rate plus one-half of one percent (0.50%). |
|---|---|
| Representations and Warranties: | The documentation governing the Initial Senior Loans will have representations and warranties that are substantially similar to (but no more restrictive than) those provided in the Credit Agreement. |
| Conditions Precedent to Initial Senior Loans: | As specified in the Summary of Additional Conditions Precedent as described in <u>Annex II</u> to the Amended and Restated Commitment Letter (and subject to the limitations set forth in the Amended and Restated Commitment Letter). |
| Affirmative Covenants: | In the case of the Initial Senior Loans, affirmative covenants that are substantially similar to those provided in the Credit Agreement. |

In the case of the Senior Exchange Securities, usual and customary for facilities and transactions of this type (to be applicable to Tribune and its restricted subsidiaries), including the following and such other covenants as may be mutually agreed upon, and subject, in each case, to customary exceptions to be agreed and in no event more restrictive than similar provisions in the Credit Agreement:

    1. Performance of obligations.

    2. Delivery of reports filed with the Securities and Exchange Commission.

    3. Delivery of compliance certificates.

    4. Election and, once granted, maintenance of S Corporation treatment under the Code.

Following the Initial Maturity Date, all outstanding Senior Extended Term Loans will be automatically modified to bear affirmative covenants substantially similar to the af-

B-5

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

firmative covenants of the Senior Exchange Securities.

Negative Covenants:

In the case of the Initial Senior Loans, negative covenants that are substantially similar to those in the Credit Agreement.

In the case of the Senior Exchange Securities, incurrence based and usual and customary for facilities and transactions of this type (to be applicable to Tribune and its restricted subsidiaries), including the following and such other covenants as may be mutually agreed upon, and subject in each case to exceptions in no event more restrictive than those provided in the Credit Agreement (taken as a whole):

1. Limitations on debt.

2. Limitations on liens.

3. Limitations on mergers, consolidations, asset dispositions and sale/leaseback transactions.

4. Limitations on the issuance and sale of capital stock of restricted subsidiaries.

5. Limitations on restrictions on distributions from subsidiaries.

6. Limitations on transactions with affiliates.

7. Limitations on restricted payments.

8. Limitations on amendment of ESOP structure, PHONES and other material agreements (including, without limitation, any Zell Investment Agreements (as defined in the First Step Commitment Letter) and the agreements relating to the ESOP) in a manner adverse to holders in any material respect

9. Limitation on activities of Tribune Finance LLC.

Following the Initial Maturity Date, all outstanding Senior Extended Term Loans will be automatically modified to bear negative covenants substantially similar to the negative covenants of the Senior Exchange Securities.

Events of Default:

In the case of the Initial Senior Loans, events of default that are substantially similar to those provided in the Credit

B-6

Agreement.

In the case of the Senior Exchange Securities, usual and customary for facilities and transactions of this type and others to be reasonably specified by the Agent, including the following and such other events of default as may be mutually agreed upon, and subject, in each case, to exceptions that are no more restrictive than those provided in the Credit Agreement (taken as a whole):

> 1. Failure to pay, when due, any principal with respect to the Senior Exchange Securities.
>
> 2. Failure to pay interest, fees or other amounts after a period of five business days.
>
> 3. Any representation or warranty made or deemed made shall prove to have been incorrect in any material respect when made or deemed made
>
> 4. Breach or violation by any Credit Party of covenants or other provisions of the Senior Exchange Securities (or the related indenture) (with notice and cure periods as applicable).
>
> 5. Cross-acceleration to debt aggregating $75,000,000 or more.
>
> 6. Judgments or decrees in excess of $75,000,000 individually or in the aggregate against Tribune or any subsidiary that are not stayed, discharged, paid (including by insurance) or bonded within 60 days.
>
> 7. Bankruptcy or insolvency events with respect to Tribune or any material subsidiary.
>
> 8. Actual or Credit Party asserted invalidity of any Guarantee or any other Operative Document.

Following the Initial Maturity Date, all outstanding Senior Extended Term Loans will be automatically modified to bear events of default substantially similar to the events of default of the Senior Exchange Securities.

Registration Rights with
Respect to Senior Exchange Securities: Tribune will use its commercially reasonable efforts to cause to become effective as soon as practicable after receipt of

B-7

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112700

any first Exchange Request (such date the "Trigger Date"), a shelf registration statement with respect to the Senior Exchange Securities (a "Shelf Registration Statement") and/or a registration statement (an "Exchange Offer Registration Statement") whereby Tribune has offered registered notes having terms identical to the Senior Exchange Securities (the "Substitute Notes") in exchange for all outstanding Senior Exchange Securities (a "Registered Exchange Offer"). If a Shelf Registration Statement is filed, Tribune will use its commercially reasonable efforts to keep such registration statement effective and available (subject to customary exceptions) until it is no longer needed to permit unrestricted resales of Senior Exchange Securities (but in no event longer than two years from the Trigger Date).

If within 255 days from the Trigger Date,

(a)     a Shelf Registration Statement for the Exchange Securities has not been declared effective, or

(b)     Tribune has not effected the Registered Exchange Offer, or

(c)     the holders of Senior Exchange Securities have not received Substitute Notes through the Registered Exchange Offer which, in the opinion of counsel, would be freely saleable by such holders without registration or requirement for delivery of a current prospectus under the Securities Act (other than a prospectus delivery requirement imposed on a broker-dealer who is exchanging Senior Exchange Securities acquired for its own account as a result of market making or other trading activities) and Tribune has not made available a Shelf Registration Statement with respect to such Senior Exchange Securities (each such event referred to in clauses (a) through (c), a "Registration Default"),

then Tribune will pay liquidated damages to each holder of Senior Exchange Securities from and including the date on which any such Registration Default shall occur to but excluding the date on which all Registration Defaults have been cured, such liquidated damages accrue with respect to the first 90-day period immediately following the occurrence of the first Registration Default, at a rate equal to one-quarter of one percent (0.25%) per annum on the principal amount of Senior Exchange Securities held by such holder,

B-8

TRB0112701

and thereafter the rate of accrual of the liquidated damages will increase by an additional one-quarter of one percent (0.25%) per annum on the principal amount of Senior Exchange Securities with respect to each subsequent 90-day period until all Registration Defaults shall have been cured, up to a maximum rate of accrual of liquidated damages for all Registration Defaults of 1.00% per annum (such damages to be payable in the form of additional Initial Senior Loans or Senior Exchange Securities, as applicable, if the then interest rate thereon exceeds the applicable interest rate cap). Tribune will also pay such liquidated damages for any period of time (subject to customary exceptions) following the effectiveness of a Shelf Registration Statement that such Shelf Registration Statement is not available for resales thereunder.

Voting:

Amendments and waivers of the documentation for the Initial Senior Loans and the other definitive credit documentation related thereto will require the approval of Bridge Lenders holding at least a majority of the outstanding Initial Senior Loans and Senior Exchange Securities, except that the consent of each affected Bridge Lender and/or holder of a Senior Exchange Security will be required for, among other things (i) to reductions of principal and interest rates and fees, (ii) extensions of the Initial Maturity Date, (iii) additional restrictions on the right to exchange Initial Senior Loans for Senior Exchange Securities or any amendment of the rate of such exchange or (iv) any amendment to the Senior Exchange Securities that requires (or would, if any Senior Exchange Securities were outstanding, require) the approval of all holders of Senior Exchange Securities.

Assignment and Participation
of Loans:

The Bridge Lenders will have the right to assign loans and commitments to their affiliates and to other Bridge Lenders or to any Federal Reserve Bank without restriction, and to other financial institutions with the consent, not to be unreasonably withheld, of the Agent. Minimum aggregate assignment amounts (except to other Bridge Lenders) of $5,000,000 and increments of $1,000,000 in excess thereof; *provided* that, prior to the Initial Maturity Date, the consent of Tribune (not to be unreasonably withheld) shall be required with respect to any assignment that would result in any party to this Amended and Restated Commitment Letter holding less than 50.1% of the aggregate principal amount of the Initial Senior Loans of such party. The parties to the assignment (other than Tribune) shall pay to the Agent an

B-9

administrative fee of $3,500.

Each Bridge Lender will have the right to sell participations in its rights and obligations under the loan documents, subject to customary restrictions on the participants' voting rights (limited to significant matters such as changes in amount, rate and maturity).

Right to Transfer
Senior Exchange Securities:

The holders of the Senior Exchange Securities shall have the absolute and unconditional right to transfer such Senior Exchange Securities in compliance with applicable law to any third parties.

Yield Protection, Taxes
and Other Deductions:

The loan documents will contain yield protection provisions, customary for facilities of this nature, protecting the Bridge Lenders in the event of unavailability of funding, funding losses, reserve and capital adequacy requirements.

All payments to be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than income, franchise and similar taxes in the jurisdiction of the Bridge Lender's applicable lending office). The Bridge Lenders will use reasonable efforts to minimize to the extent possible any applicable taxes and Tribune will indemnify the Bridge Lenders and the Agent for such taxes paid by the Bridge Lenders or the Agent.

Expenses and Indemnification:

Customary provisions regarding expense reimbursement and indemnification by the Credit Parties.

Governing Law and Forum:

New York.

Counsel for the Lead Arrangers:

Cahill Gordon & Reindel LLP.

B-10

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRB0112703

ANNEX I
to Exhibit B

Senior Unsecured Facility
Interest Rates and Fees

Initial Senior Loans:

Before the Initial Maturity Date, the Initial Senior Loans will accrue interest at a rate per annum equal to, at Tribune's election, either (i) 3 month reserve-adjusted LIBOR plus a spread (the "LIBOR Spread," as defined below), or (ii) the ABR (as defined below) plus a spread (the "ABR Spread," as defined below).

The "LIBOR Spread" will initially be 450 basis points. If Tribune chooses to pay interest at the rate specified in clause (i), and the Initial Senior Loans are not repaid in whole within the three-month period following the Second Step Closing Date, the LIBOR Spread will increase by 50 basis points at the end of such three-month period and shall increase by an additional 50 basis points at the end of each three month period thereafter until, but excluding, the Initial Maturity Date.

The "ABR Spread" will initially be 350 basis points. If Tribune chooses to pay interest at the rate specified in clause (ii), and the Initial Senior Loans are not repaid in whole within the three-month period following the Second Step Closing Date, the ABR Spread will increase by 50 basis points at the end of such three-month period and shall increase by an additional 50 basis points at the end of each three-month period thereafter until, but excluding, the Initial Maturity Date.

"ABR" means the highest of (i) Citibank, N.A.'s base rate, (ii) the certificate of deposit rate plus 1/2 of 1%, and (iii) the Federal Funds Effective Rate plus 1/2 of 1%.

Notwithstanding the foregoing, the interest rate in effect at any time before the Initial Maturity Date shall not exceed the Senior Unsecured Bridge Cap. In no event shall the interest rate on the Initial Senior Loans exceed the highest rate permitted under applicable law.

Calculation of interest shall be on the basis of actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR loans, except where ABR is determined pursuant to clause (iii) of the definition thereof).

B-1-1

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

LIBOR will at all times include statutory reserves.

Interest will be payable in arrears (a) for Initial Senior Loans accruing interest at a rate based on LIBOR, at the end of each LIBOR period and on the Initial Maturity Date, (b) for Initial Senior Loans accruing interest at a rate based on the Alternate Base Rate, quarterly in arrears and on the Initial Maturity Date and (c) for Initial Senior Loans outstanding after the Initial Maturity Date, quarterly in arrears.

Extended Senior Term Loans and Senior Exchange Securities:

The Extended Senior Term Loans and Senior Exchange Securities will bear interest at a rate equal to the Initial Rate (as defined below) plus the Exchange Spread (as defined below). Notwithstanding the foregoing, the interest rate in effect at any time shall not exceed the Senior Unsecured Bridge Cap. In no event shall the interest rate on the Extended Senior Term Loans or Senior Exchange Securities exceed the highest rate permitted under applicable law.

"Exchange Spread" means 0 basis points during the 3 month period commencing on the Initial Maturity Date and shall increase by 50 basis points at the beginning of each subsequent 3 month period.

"Initial Rate" shall equal the interest rate borne by the Initial Senior Loans on the day immediately preceding the Initial Maturity Date plus 50 basis points.

Interest on the Senior Exchange Securities and Extended Senior Term Loans will be payable quarterly in arrears (or semiannually in arrears for Fixed Rate Senior Exchange Securities).

B-1-2