## Position of the Zell Investors as to Fairness

The rules of the SEC may require the Zell Investors to express their belief as to the fairness of the Leveraged ESOP Transactions, including the Tender Offer and the Merger, to the Company's shareholders who are not affiliated with the Zell Investors. The view of the Zell Investors as to the fairness of the Leveraged ESOP Transactions, including the Tender Offer and the Merger, should not be construed as a recommendation to any shareholder as to how such shareholder should vote on the proposal to adopt the Merger Agreement and approve the Merger.

The Zell Investors negotiated the terms of a transaction that would be most favorable to the Zell Investors, and not to shareholders of the Company and, accordingly, they did not negotiate the Merger Agreement and other agreements relating to the Leveraged ESOP Transactions with the goal of obtaining terms that were fair to the Company's unaffiliated shareholders. The Zell Investors did not participate in the deliberations of the Board or the Special Committee regarding, or receive advice from the Company's or the Special Committee's legal or financial advisors as to, the substantive and procedural fairness of the Leveraged ESOP Transactions, including the Tender Offer and the Merger, nor did the Zell Investors undertake any independent evaluation of the fairness of the Leveraged ESOP Transactions, including the Tender Offer and the Merger, to the Company's unaffiliated shareholders, engage a financial advisor for such purposes, or receive any report, opinion or appraisal from any financial advisor for such purposes. The Zell Investors believe, however, that the proposed Leveraged ESOP Transactions, including the Tender Offer and the Merger, are fair to the Company's unaffiliated shareholders based on the following factors:

- the consideration offered in the Tender Offer and the Merger of $34.00 per share represents a premium of approximately 5.9% to the closing price of Company Common Stock on March 30, 2007, the last trading day before the proposal was made public, approximately 12.5% to the average closing price of Company Common Stock for the 30 calendar day period ending on March 30, 2007 and approximately 9.5% to the average closing price for the 52 weeks ended March 30, 2007;

- the $34.00 per share consideration offered in the Tender Offer and the Merger and other terms and conditions of the Merger Agreement resulted from extensive arm's-length negotiations among the Special Committee and its advisors, the ESOP and its advisors, and the Zell Entity and its advisors;

- the Tender Offer provided and the Merger will provide consideration to the shareholders entirely in cash, which provides certainty of value;

- the fact that the Company had publicly disclosed numerous times its willingness to consider strategic alternatives, including a merger or a recapitalization;

- the Merger is conditioned upon the approval of the holders of a majority of the outstanding shares; the Zell Investors assume that the Company's shareholders are capable of evaluating the fairness of the Merger and further assume that an informed decision by holders of a majority of outstanding shares provides meaningful procedural protections for the Company's shareholders;

- the Special Committee consists solely of directors who are not officers or significant shareholders of the Company, or affiliated with the ESOP or its affiliates, or the Zell Investors or their affiliates;

- the Special Committee determined that the Merger Agreement, the Tender Offer and the Merger are fair to the unaffiliated shareholders of the Company and in the best interests of such shareholders;

54

D&P_TR099717

- the Board determined, based on the recommendation of the Special Committee, that the Merger Agreement, the Tender Offer and the Merger are fair to the unaffiliated shareholders of the Company and in the best interests of such shareholders;

- the Special Committee and the Board received the advice of financial and legal advisors, each of which has extensive experience in going private transactions; the Special Committee retained and received financial advice from Morgan Stanley, and the Board retained and received financial advice from Citi and Merrill Lynch, which included receipt of the fairness opinions referred to above under "Special Factors—Opinion of the Special Committee's Financial Advisor" and "Special Factors—Opinion of the Company's Financial Advisor;" the Company and the Board retained and received legal advice from Wachtell, Lipton, Rosen & Katz, from Sidley Austin LLP and, for ESOP matters, from McDermott Will & Emery; and the Special Committee retained and received legal advice from Skadden, Arps, Slate, Meagher & Flom LLP;

- the fact that the Zell Investors did not participate in the deliberative process of, or the conclusions reached by, the Special Committee or the negotiating positions of the Special Committee;

- the fact that appraisal rights under Delaware law are available to holders of shares of Company Common Stock who do not vote in favor of the Merger and comply with all of the required procedures under Delaware law, which provides shareholders who dispute the fairness of the Merger Consideration with an opportunity to have a court determine the fair value of their shares, which may be more than, less than, or the same as the amount such shareholders would have received under the Merger Agreement; and

- the fact that the Merger Agreement allows the Board or the Special Committee to withdraw or change its recommendation of the Merger Agreement, and to terminate the Merger Agreement and to accept a Superior Proposal (as described below under "The Merger Agreement"), subject to a payment by the Company to the Zell Entity of a $25 million termination fee.

The Zell Investors did not consider liquidation value of the Company as a relevant methodology because they considered the Company to be a viable, going concern. Further, the Zell Investors did not consider net book value, which is an accounting concept, as a factor because they believed that net book value is not a material indicator of the value of the Company as a going concern but rather is indicative of historical costs. The foregoing discussion of the information and factors known by the Zell Investors in connection with the fairness of the Tender Offer and the Merger is not intended to be exhaustive and the Zell Investors assigned no relative weights to the individual factors.

As described below under "Other Transaction Agreements—Zell Entity Purchase Agreement," pursuant to the Zell Entity Purchase Agreement, until the earlier of (1) the date of consummation of the Merger and (2) the date on which the Merger Agreement is terminated, the Zell Entity has agreed to vote all of the shares of Company Common Stock that it beneficially owns in favor of the adoption of the Merger Agreement and approval of the transactions contemplated thereby, including the Merger.

**Certain Effects of the Merger**

If the conditions to the Merger are met and the Merger closes, the Company will become wholly owned by the ESOP and all remaining shares of Company Common Stock, other than shares held by the ESOP and shares held by shareholders who validly exercise any appraisal rights that may be available under Delaware law, will be converted into the right to receive $34.00 per share in cash. If the Merger does not close by January 1, 2008, shareholders will receive an additional 8% annualized "ticking fee," calculated from January 1, 2008 through the date of closing of the Merger. In the Merger, the Zell Entity will receive this Merger Consideration for the shares of Company Common Stock it owns and, to the extent not already repaid or converted, the Company will repay the

Confidential

D&P_TR099718

exchangeable promissory note held by the Zell Entity immediately prior to the Merger. In the Merger, Zell will receive the Merger Consideration for the shares of Company Common Stock that he owns. In the Merger, all of the shares of Company Common Stock held by the ESOP will be cancelled and the shares of Merger Sub (all of which are owned by the ESOP) will convert into an aggregate of 56,521,739 shares of common stock of the Company (all of which will be held by the ESOP).

In addition, in the Merger, each outstanding Company stock option, each share of restricted Company Common Stock and each right of any kind to receive shares of Company Common Stock or benefits measured in whole or in part by the value of shares of Company Common Stock granted under Company stock or benefit plans will become fully vested and cashed out as described below under "The Merger Agreement—Stock Options and Other Stock-Based Awards; Employee Benefits."

Immediately following the consummation of the Merger, the Zell Entity will purchase from the Company, for an aggregate purchase price of $315 million, a $225 million subordinated promissory note and the Warrant. The Warrant will entitle the Zell Entity to purchase 43,478,261 shares of Company Common Stock (subject to adjustment), which will represent approximately 40.3% of the economic equity interest in the Company immediately following the Merger (on a fully diluted basis, including after giving effect to share equivalents under a management equity incentive plan). The Warrant will have an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first ten years of the Warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment).

As of the record date for the special meeting, the ESOP owned [●]% of the outstanding shares of Company Common Stock, the Zell Entity owned [●]% of the outstanding shares of Company Common Stock (which does not include the 5,882,353 shares of Company Common Stock underlying the exchangeable promissory note held by the Zell Entity) and Zell owned less than [●]% of the outstanding shares of Company Common Stock. Immediately upon completion of the Leveraged ESOP Transactions, the ESOP will own approximately 52.3% of the fully diluted equity of the Company, and the Zell Entity will own a Warrant to purchase approximately 40.3% of the fully diluted equity of the Company, in each case (1) after giving effect to the grant of share equivalent awards expected to be made to certain members of management and other key employees as described below under "Special Factors—Interest of Directors and Executive Officers—Proposed Tribune Management Equity Incentive Plan" but (2) without giving effect to the issuance of shares of new Series E Preferred Stock of the Company to the Eagle Entities as described below under "The Merger Agreement—Eagle Exchange." As shareholders and Warrant holders, as the case may be, the ESOP and the Zell Entity do not and will not have any direct interest in or ability to access the Company's net book value or net income. In addition, as described below under "Special Factors—Financing," the Credit Agreement (as defined below) provides that a condition to the consummation of the Merger will be the execution by the Zell Entity of an agreement, guaranteed by Zell, providing that the Zell Entity will invest up to an additional $100 million in Company Common Stock or subordinated debt of the Company in certain circumstances. The Company's net book value was $4,304 million as of April 1, 2007. The Company's net income for the fiscal year ended December 31, 2006 was $594.0 million, and its net loss for the three months ended April 1, 2007 was $23.3 million.

The Merger will also have the following additional effects:

*Participation in Future Growth.* If the Merger is completed, you will not have the opportunity to participate in the future earnings, profits and growth of the Company and will not have the right to vote on corporate matters relating to the Company. Similarly, you will not face the risk of a decline in the value of the Company after the completion of the Merger.

*Effect on the Market for Shares of Company Common Stock.* If the Merger is completed, the number of shares of Company Common Stock that might otherwise trade publicly will be reduced to zero and the number of holders of shares of Company Common Stock will be reduced to one.

Confidential

D&P_TR099719

*Delisting of the Shares of Company Common Stock on the NYSE.* The shares of Company Common Stock are currently listed on the NYSE. The Company intends to have the shares delisted as soon as possible after completion of the Merger.

*Deregistration of the Shares of Company Common Stock under the Exchange Act.* The shares of Company Common Stock are currently registered under the Exchange Act. Registration may be terminated by the Company upon application to the SEC if the outstanding shares are not listed on a national securities exchange and if there are fewer than 300 holders of record of shares. Termination of the registration of the shares under the Exchange Act would substantially reduce the information required to be furnished by the Company to its shareholders and would make certain provisions of the Exchange Act no longer applicable to the Company. These include the short-swing profit recovery provisions of Section 16(b) and the requirement to furnish proxy statements in connection with shareholders' meetings pursuant to Section 14(a) and the related requirement to furnish an annual report to shareholders. The Company intends to apply for termination of registration of the Company's shares as soon as possible after completion of the Merger. However, even if the registration of the shares of Company Common Stock under the Exchange Act is terminated, the Company has debt securities the offer of which was registered under the Securities Act of 1933, and certain of which are listed on the NYSE, and, so long as those securities remain outstanding, the Company will continue to have reporting obligations under the Exchange Act.

*Margin Regulations.* Shares of Company Common Stock are currently "margin securities" under the regulations of the Board of Governors of the Federal Reserve System which means that, among other things, brokers may extend credit on the collateral of the shares for purposes of buying, carrying or trading in securities. Depending upon factors such as the number of record holders of the shares and the number and market value of publicly held shares, following the purchase of shares pursuant to the Merger the shares of Company Common Stock might no longer constitute "margin securities" for purposes of the Federal Reserve Board's margin regulations and therefore could no longer be used as collateral for credit extended by brokers. In addition, if the registration of the shares of Company Common Stock under the Exchange Act were terminated, the shares would no longer constitute "margin securities."

## Plans for the Company after the Merger and the Other Leveraged ESOP Transactions

After the Merger and the other Leveraged ESOP Transactions, the Zell Investors and the ESOP anticipate that the Company's operations will be conducted substantially as they are currently being conducted, and that the Company will retain its core operating assets. With the exception of the proposed sale of the Chicago Cubs and the Company's interest in Comcast SportsNet Chicago, the Zell Investors and the ESOP have no present plans or proposals that relate to or would result in an extraordinary corporate transaction involving the Company's corporate structure, business or management, such as a merger, reorganization, liquidation, relocation of any material operations or sale or transfer of a material amount of assets. However, in conjunction with management, the Zell Investors and the ESOP will continue to evaluate the Company's entire asset portfolio, business and operations from time to time, and may propose or develop plans and proposals which they consider to be in the best interests of the Company and its equityholders, including the disposition or acquisition of material assets, alliances, joint ventures and other forms of cooperation with third parties or other extraordinary transactions. In particular, to the extent the Zell Investors and the ESOP believe greater value can be realized through dispositions, the Zell Investors and the ESOP may encourage the Company to pursue appropriate disposition transactions, as with the proposed sale of the Chicago Cubs and the Company's interest in Comcast SportsNet Chicago. After completion of the Leveraged ESOP Transactions, the Zell Investors and the ESOP intend to retain their interests in the Company, and have no current plans to retire or otherwise dispose of such interests.

Confidential

D&P_TR099720

After completion of the Merger and the other Leveraged ESOP Transactions, the board of directors of the Company will consist of nine directors. Pursuant to the post-closing bylaws of the Company and the Investor Rights Agreement (described below under "Other Transaction Agreements—Investor Rights Agreement"), the directors will be comprised of the following: two directors shall be designated by the Zell Entity, five directors shall be independent directors, one director shall be the Company's chief executive officer and one director shall be without qualification. In addition, pursuant to the Zell Entity Purchase Agreement (described below under "The Securities Purchase Agreements—Zell Entity Purchase Agreement"), Mr. Zell will be elected to serve as Chairman of the Board effective as of the date of the Zell Entity's purchase of the Warrant and the $225 million subordinated promissory note immediately after the Merger.

After the effective time of the Merger, the officers of the Company immediately prior to the effective time of the Merger will remain the officers of the Company, in each case until the earlier of their resignation or removal.

### Conduct of the Company's Business if the Merger is Not Completed

In the event that the Merger Agreement is not adopted by the Company's shareholders or if the Merger is not completed for any other reason, the Company's shareholders will not receive any payment for their shares of Company Common Stock under the Merger Agreement. Instead, the Company will remain a public company, its common stock will continue to be listed and traded on the NYSE, and the Company's shareholders will continue to be subject to risks and opportunities as owners of Company Common Stock. If the Merger is not completed, there can be no assurance as to the effect of these risks and opportunities on the future value of your Company Common Stock, including the risk that the market price of the Company Common Stock may decline to the extent that the current market price of the stock reflects a market assumption that the Merger will be completed.

The Company has agreed to grant the Zell Entity and the ESOP registration rights, in the event the Merger does not close, with respect to the shares of Company Common Stock that the Zell Entity and the ESOP purchased from the Company in their initial investments. However, the Zell Entity will not be able to exercise its registration rights prior to April 23, 2010 and, in the event the Merger does not close, will be prohibited from selling or assigning its Company Common Stock, exchangeable promissory note or underlying shares acquired upon exchange until April 23, 2010, other than to certain permitted transferees. In addition, the ESOP will not be able to exercise its registration rights prior to April 1, 2008. See "Other Transaction Agreements—Zell Entity/ESOP Registration Rights Agreement."

From time to time, the Board will evaluate and review the business operations of the Company, and, among other things, take such steps as are deemed appropriate and continue to seek to maximize shareholder value. If the Merger Agreement is not adopted by our shareholders or if the Merger is not consummated for any other reason, there can be no assurance that the business, prospects or results of operations of the Company will not be adversely impacted.

### Financing

On May 17, 2007, the Company entered into a Credit Agreement (the "Credit Agreement") by and among the Company, as borrower, the lenders party thereto, JPMorgan Chase Bank, N.A. ("JPMCB"), as administrative agent, Merrill Lynch Capital Corporation ("Merrill Lynch"), as syndication agent, Citicorp North America, Inc., Bank of America, N.A. ("Bank of America") and Barclays Bank plc ("Barclays Bank"), as co-documentation agents, and J.P. Morgan Securities Inc. ("JPMorgan"), Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. ("CGMI") and Banc of America Securities LLC ("BAS"), as joint lead arrangers and joint bookrunners, which Credit Agreement contains the negotiated terms and conditions originally

Confidential

D&P_TR099721

contemplated in the commitment letter entered into by the Company on April 1, 2007, as amended and restated on April 5, 2007 (the "First Step Commitment Letter"), with respect to new $8.028 billion senior secured credit facilities (the "First Step Credit Facilities"). The proceeds of the Credit Agreement are intended to be used by the Company, among other ways, in connection with the consummation of the Tender Offer, to refinance certain existing indebtedness of the Company and for general corporate purposes. The First Step Credit Facilities consist of (a) a $1.50 billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Revolving Credit Facility will include a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million.

The Company entered into an additional commitment letter on April 1, 2007, which was amended and restated on April 5, 2007 (as amended and restated, the "Second Step Commitment Letter" and together with the First Step Commitment Letter, the "Commitment Letters"), with JPMorgan, JPMCB, Merrill Lynch, CGMI, on behalf of certain of its affiliates, Bank of America, Banc of America Bridge LLC and BAS with respect to a $2.105 billion incremental term loan facility which will be included in the First Step Credit Facilities (the "Incremental Facility") and a $2.1 billion senior unsecured bridge facility (the "Senior Bridge Facility," together with the Incremental Facility, the "Second Step Credit Facilities" and, together with the First Step Credit Facilities, the "Credit Facilities"). The Company may issue $2.1 billion senior notes or senior subordinated notes (the "New Notes") in lieu of drawing under the Senior Bridge Facility or to refinance the Senior Bridge Facility at a later date. The proceeds from the borrowings or issuances contemplated by the Second Step Commitment Letter will in all cases be used by the Company, among other ways, in connection with the payment of the Merger Consideration pursuant to the terms of the Merger Agreement. The Credit Agreement permits the Company to borrow under the Incremental Facility, upon the satisfaction of certain conditions contained in the Credit Agreement and the Second Step Commitment Letter, including the consummation of the Merger on or before May 31, 2008.

The Credit Agreement provides that prior to the closing of the Second Step Credit Facilities, the Tranche X Facility (a two-year term facility) will bear interest per annum at a variable rate equal to, at the Company's election, either the applicable base rate plus a margin of 150 basis points or LIBOR plus a margin of 250 basis points. On and after the closing of the Second Step Credit Facilities, the margins applicable to the Tranche X Facility will increase to 175 basis points and 275 basis points, respectively. On the closing date of the Credit Agreement, the Tranche B Facility (a seven-year term facility), the Delayed Draw Facility (a seven-year term facility) and the Revolving Credit Facility (a six-year revolving facility) will bear interest per annum at a variable rate equal to, at the Company's election, either the applicable base rate plus a margin of 200 basis points or LIBOR plus a margin of 300 basis points. Undrawn amounts under the Delayed Draw Facility will accrue a commitment fee at a per annum rate of 75 basis points and undrawn amounts under the Revolving Credit Facility will accrue a commitment fee at a per annum rate of 50 basis points.

With respect to the Revolving Credit Facility only, the margin applicable to base rate advances, the margin applicable to LIBOR advances and the commitment fee applicable to undrawn amounts of the Revolving Credit Facility are subject to decreases after the closing date of the Credit Agreement based on a leverage-based grid. Also, the interest rate applicable to the Tranche X Facility, the Tranche B Facility, the Delayed Draw Facility and the Revolving Credit Facility is subject to a 25 basis point reduction if the Merger is not consummated and the Company's corporate credit ratings are at a specified level.

The Tranche X Facility must be repaid in an aggregate principal amount of $750 million on the date which is 18 months after the initial draw under the Credit Agreement or, if such date is not a business day, the first business day thereafter, which amount may be adjusted to reflect optional

Confidential

D&P_TR099722

prepayments or other mandatory prepayments (described below) applied thereto; the remaining outstanding amount of the Tranche X Facility must be repaid on the date which is two years after the initial draw under the Credit Agreement or, if such date is not a business day, the first business day thereafter if not repaid sooner. The Tranche B Facility and the Incremental Facility, if any, will amortize at a rate of 1.0% per annum (payable quarterly) prior to maturity, on which date the remaining principal amount will be payable in full. The Delayed Draw Facility will automatically become part of the Tranche B Facility when made and will amortize based upon the Tranche B Facility amortization schedule. Prior to the first anniversary of the closing date of the Credit Agreement, optional prepayments on the Tranche X Facility and the Tranche B Facility with the proceeds of a substantially concurrent issuance of loans under any senior secured credit facilities pursuant to the Credit Agreement must be accompanied by a prepayment fee equal to 1.00% of the aggregate amount of such prepayments if the interest rate spread applicable to such new loans is less than the interest rate applicable to the Tranche X Facility or the Tranche B Facility. Except as described in the immediately preceding sentence, the Tranche X Facility, the Tranche B Facility, the Incremental Facility, if any, the Delayed Draw Facility and the Revolving Credit Facility will be prepayable at any time prior to maturity without penalty, and the unutilized portion of the commitments under the Revolving Credit Facility or the Delayed Draw Facility may be reduced at the option of the Company without penalty.

Loans under the Tranche X Facility, the Tranche B Facility, the Incremental Facility, if any, the Delayed Draw Facility and the Revolving Loan Facility will be required to be repaid with the following proceeds, subject to certain exceptions and exclusions set forth in the Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for borrowed money by the Company or any subsidiary (other than debt permitted to be incurred under the negative covenants contained in the Credit Agreement (with certain exclusions)), (b) certain specified percentages of excess cash flow proceeds based on a leveraged-based grid ranging from 50% to 0%, (c) once the aggregate amount of net cash proceeds from all asset sales, share issuances by the Company's subsidiaries and casualty events exceeds $50 million, 100% of such net cash proceeds unless the Company reinvests the proceeds pursuant to the terms of the Credit Agreement, and (d) 100% of net cash proceeds from certain dispositions.

The Tranche X Facility, the Tranche B Facility, the Delayed Draw Facility, the Incremental Facility, if any, and the Revolving Loan Facility will be guaranteed by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the capital stock of certain specified subsidiaries of the Company. Certain outstanding senior notes of the Company (the "Existing Notes") will be secured on an equal and ratable basis with the First Step Credit Facilities and the Incremental Facility, if any, as required by the terms of the indentures governing such Existing Notes.

The Credit Agreement contains representations and warranties, affirmative and negative covenants and events of default, in each case subject to customary and negotiated exceptions and limitations, as applicable. In addition, the Credit Agreement includes three financial covenants with which the Company must comply, including a maximum total guaranteed leverage ratio, a minimum interest coverage ratio and limitations on capital expenditures. The Credit Agreement also provides that a condition to the consummation of the Merger will be the execution by the Zell Entity of an agreement, guaranteed by Zell, providing that the Zell Entity will invest up to an additional $100 million in Company Common Stock or subordinated debt of the Company in certain circumstances.

There is a possibility that the Company will not be able to borrow funds under the Credit Facilities if any of the conditions in the Second Step Commitment Letter, the Credit Agreement or the other documents evidencing the Credit Facilities are not met. The Company currently has no alternative financing arrangements in place if the proceeds of the Credit Facilities are not available to it.

We anticipate that we will pay for the Merger Consideration from borrowings under the Second Step Credit Facilities. While we have obtained a financing commitment pursuant to the Second Step

Confidential

D&P_TR099723

Commitment Letter, it is contingent on the satisfaction of various conditions as described therein. Accordingly, as discussed in "The Merger Agreement—Conditions to the Merger," in addition to the other conditions described in this proxy statement, the Merger is subject to our receipt of debt financing on the terms set forth in the Commitment Letters or alternative financing on substantially similar terms. The Company does not currently plan to have alternative financing plans in place prior to the Effective Time.

The preceding summary of the material terms of the Credit Agreement and the Second Step Commitment Letter is qualified in its entirety by the terms of the actual Credit Agreement and the Second Step Commitment Letter, which are included as Exhibits (b)(3) and (b)(1)(B) to the Schedule 13E-3, respectively. The summary may not contain all of the information about the Credit Agreement and the Second Step Commitment Letter that is important to you. We encourage you to read them carefully and in their entirety.

## Interest of Directors and Executive Officers

Certain members of the Board and the Company's management have interests in the Merger and the other Leveraged ESOP Transactions that are different from, or in addition to, the interests of the Company's unaffiliated shareholders. The Board was aware of such interests and considered them, among other matters, when determining to approve the Leveraged ESOP Transactions. These interests are described below.

### *Compensation Awards*

In connection with the Board's review of strategic alternatives for the Company beginning in September 2006, the Compensation Committee of the Board authorized the creation of a transaction bonus pool to motivate management to seek a transaction that would provide the maximum return to the Company's shareholders despite the risks such transaction would pose to management's continued employment. In connection with the approval of the Leveraged ESOP Transactions, on April 1, 2007, the Board approved certain cash compensation awards and a share equivalent plan for members of management and other key employees of the Company conditioned upon the consummation of the Merger. The Company's principal executive officer, Dennis J. FitzSimons, and the Company's principal financial officer, Donald C. Grenesko, along with Scott C. Smith, President, Tribune Publishing Company, Luis E. Lewin, Senior Vice President Human Resources, and John E. Reardon, President, Tribune Broadcasting Company (who are the three most highly compensated executive officers other than Messrs. FitzSimons and Grenesko), will participate in certain of the awards as more fully described below.

### *Cash Transaction Bonus Pool*

On April 1, 2007, the Board approved a cash transaction bonus pool in an aggregate amount of $6,500,000 for 32 individuals. Subsequently, management increased the number of recipients to 39 and reduced the bonus pool to $5,150,000. This cash bonus pool will be used in lieu of approximately 285,000 restricted stock units that were authorized for issuance. Payment of these cash bonuses is conditioned upon the consummation of the Merger and will be payable to a select group of management and other key employees who are playing a critical role in overseeing the completion of the Leveraged ESOP Transactions (not including the Company's Chairman, President and Chief Executive Officer, Mr. FitzSimons, and the President of Tribune Publishing Company, Mr. Smith, who each voluntarily elected not to participate in this cash bonus pool). We currently contemplate that the named executive officers in the Company's annual proxy statement ("NEOs"), other than Messrs. FitzSimons and Smith, will be allocated amounts from this cash bonus pool as follows: Donald C. Grenesko: $400,000; John E. Reardon: $200,000; and Luis E. Lewin: $50,000.

Confidential

D&P_TR099724

*Proposed Tribune Management Equity Incentive Plan*

The Merger Agreement contemplates the establishment of a new Tribune Company Management Equity Incentive Plan (the "Plan") to be effective following the consummation of the Merger. The Plan will be administered by the Compensation and Organization Committee of the Board (the "Plan Committee") and the Plan Committee will select who will receive awards and the terms of the awards. The Plan contemplates two tranches of share equivalent awards to be granted to certain members of management and other key employees. The first tranche of awards ("Tranche One Awards") will include share equivalents with an economic value equal to 5% of the outstanding Company Common Stock (calculated after giving effect to the Warrant and subject to typical anti-dilution adjustments) and will be awarded to eligible members of Company management (including the NEOs) and other key employees. A portion of the Tranche One Awards will be granted upon the consummation of the Merger, and the remaining portion will be granted in future years. Tranche One Awards will vest ratably over a three-year period beginning on the date of grant unless the Plan Committee determines that another vesting schedule is preferable and, subject to a redeferral election by individual plan participants, will be payable in cash on the fifth anniversary of the grant date.

Following the grant of Tranche One Awards, the Plan contemplates that the unvested portion of any Tranche One Awards will become fully vested upon a change in control of the Company or termination of employment due to death, disability or retirement from the Company. Upon a change in control of the Company or a Plan participant's termination of employment due to death or disability, the entire Tranche One Award will be payable as soon as practicable following such event. Upon a Plan participant's termination of employment for any other reason, the participant will be entitled to retain the then vested portion of any Tranche One Award, with payment to be made on the fifth anniversary of the grant date. The unvested portion of any Tranche One Award upon such termination will be cancelled.

The second tranche of awards ("Tranche Two Awards") will include share equivalents with an economic value equal to 3% of the outstanding Company Common Stock (calculated after giving effect to the Warrant and subject to typical anti-dilution adjustments) to be awarded upon consummation of the Merger to a select group of management and other key employees. The Plan contemplates that 50% of Tranche Two Awards will be fully vested upon grant and the remaining fifty percent of Tranche Two Awards will vest on the one year anniversary of the grant date. The Plan also contemplates that the unvested portion of any Tranche Two Awards will become fully vested upon a change in control of the Company, involuntary termination of employment or termination of employment due to death, disability or retirement from the Company. Upon a change in control of the Company or a Plan participant's involuntary termination of employment or termination of employment due to death or disability, the entire Tranche Two Award will be payable in cash as soon as practicable following such event. In all other instances and subject to a redeferral election by individual plan participants, one-third of the Tranche Two Awards will be payable in cash on each of the fourth, sixth and eighth anniversaries of the grant date. Tranche Two Awards will be accompanied by a gross-up for the payment of excise taxes, if any, by the participants receiving Tranche Two Awards.

*Transitional Compensation Plan*

Each of the Company's NEOs is eligible for benefits under a Transitional Compensation Plan, which provides for payments and other benefits if the NEO is terminated under circumstances specified in the Transitional Compensation Plan within three years following a change in control of the Company. Consummation of the Merger would constitute a change in control of the Company.

Under the Transitional Compensation Plan, each NEO would be eligible for benefits upon termination of employment within 36 months following completion of the Merger. A participant would be eligible for benefits for termination prior to the Merger if the termination was at the request of any

Confidential

D&P_TR099725

third party participating in or causing the Merger or otherwise in anticipation of the Merger. Transitional Compensation Plan benefits will only be available if the participant's termination of employment was not:

- on account of his death;

- on account of a physical or mental condition that would entitle him to long-term disability benefits under the Tribune Company Long-Term Disability Plan;

- for conduct involving dishonesty or willful misconduct which, in either case, is detrimental in a significant way to the Company's business; or

- on account of the employee's voluntary resignation.

For purposes of the NEOs covered under the Transitional Compensation Plan, a resignation would not be considered to be "voluntary": (a) if the resignation by Mr. FitzSimons or Mr. Grenesko occurs during the 30-day period immediately following the first anniversary of the completion of the Merger; or (b) if the resignation occurs after a successor refuses to assume and agree to perform Tribune's obligations under the Transitional Compensation Plan; or (c) if, subsequent to the completion of the Merger and prior to such resignation, there has been a reduction in the nature or scope of the participant's authority or duties, a reduction in the participant's compensation or benefits, or a change in the city in which he is required to perform his duties.

Upon a termination under the circumstances outlined above, NEOs would be entitled to a lump sum payment equal to three times the sum of (1) the highest annual rate of the executive's base salary in effect within three years of the date of the participant's termination, plus (2) 200% of the participant's target bonus payable for the year in which the change in control occurs. The Transitional Compensation Plan would also provide outplacement benefits in an amount up to 25% of a participant's base salary and continuation of medical, life insurance and disability benefits for up to three years. In addition, the Transitional Compensation Plan provides that each NEO is entitled to a "gross-up" payment to make the executive whole for any federal excise tax imposed on change in control or severance payments or benefits received by the NEO.

Assuming the Merger is completed on December 31, 2007 and that thereafter each NEO experiences a qualifying termination for purposes of the Transitional Compensation Plan on that date, the estimated cost of the cash and in-kind severance benefits with respect to the NEOs would be as follows: Mr. FitzSimons, $10,657,500; Mr. Grenesko, $4,576,447; Mr. Smith, $4,794,460; Mr. Lewin, $2,532,550; and Mr. Reardon, $3,872,893. The estimated aggregate cost of the cash and in kind severance benefits that would be payable to all other executive officers based upon the foregoing scenario would be $9,785,994.

In addition, as described above, participants in the Transitional Compensation Plan are entitled to certain tax gross-up payments. Assuming the Merger is completed on December 31, 2007 and that thereafter each NEO experiences a qualifying termination for purposes of the Transitional Compensation Plan on that date, the estimated tax gross-up payments to the NEOs would be as follows: Mr. FitzSimons, $3,999,225, Mr. Grenesko, $1,793,016, Mr. Smith, $1,609,862, Mr. Lewin, $955,791 and Mr. Reardon, $1,767,063. The estimated tax gross-up payments that would be payable to all other executive officers based upon the foregoing scenario would be $3,725,596.

### Stock Options, Restricted Stock and Other Equity-Based Awards

As of the effective time of the Merger:

- Each outstanding Company stock option that remains outstanding immediately prior to the Effective Time, whether vested or unvested, will become fully vested and the holder of the stock option will receive a cash payment, less applicable withholding taxes, equal to the product of

63

(1) the number of shares subject to the option as of the Effective Time, multiplied by (2) the excess, if any, of the Merger Consideration over the exercise price per share of Company Common Stock subject to such option, less applicable tax withholding.

- Each share of restricted Company Common Stock will vest in full and be converted into the right to receive the Merger Consideration, less any applicable withholding taxes.

- Each other right of any kind to receive Company Common Stock or benefits measured in whole or in part by the value of a number of shares of Company Common Stock will vest and become free of any forfeiture or holding restrictions or performance, or other conditions, and will entitle the holder thereof to receive an amount in cash based on the Merger Consideration.

We estimate the amounts that will be payable to each NEO in settlement of stock options, restricted stock and other equity-based awards as follows: Mr. FitzSimons, $6,869,559; Mr. Grenesko, $2,699,026; Mr. Smith, $2,665,784; Mr. Lewin, $1,300,699; and Mr. Reardon, $2,005,265. We estimate the aggregate amount that will be payable to all directors and executive officers in settlement of stock options, restricted stock and other equity-based awards to be $7,750,595.

### Indemnification of Directors and Officers; Directors' and Officers' Insurance

In addition, as described below under "The Merger Agreement—Indemnification and Insurance," the Merger Agreement provides that, for a period of six years after completion of the Merger, the Company will maintain in effect director, officer and employee exculpation, indemnification and advancement of expenses provisions no less favorable than those of the Company's and any of its subsidiaries' certificates of incorporation and by-laws as in effect immediately prior to the Merger or in any indemnification agreements of the Company or its subsidiaries with any of their directors, officers or employees as in effect immediately prior to the Merger. The Merger Agreement also provides that the Company will, to the fullest extent permitted under applicable law, indemnify and hold harmless each current and former director, officer or employee of the Company or any of its subsidiaries and each person who served as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise at the request of the Company against any costs or expenses, judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened action, arising out of, relating to or in connection with any action or omission occurring or alleged to have occurred whether before or after completion of the Merger. Following the Merger, the Company will maintain in effect the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Company and its subsidiaries with respect to matters arising on or before the Effective Time, subject to a maximum annual insurance premium of 200% of the last annual premium paid by the Company prior to the date of the Merger Agreement in respect of such coverage. At the Company's option, after consultation with the ESOP, the Company may purchase, prior to the Effective Time, a six-year prepaid "tail" policy (at an aggregate cost not exceeding the maximum premium multiplied by six) on terms and conditions providing substantially equivalent benefits as the current policies of directors' and officers' liability insurance and fiduciary liability insurance.

### Related Party Transactions and Agreements

*Chandler Trusts.* Three members of the Board, Jeffrey Chandler, Roger Goodan and William Stinehart, Jr., are trustees of the Chandler Trusts. Mr. Chandler and Mr. Goodan are also beneficiaries of these trusts. The Chandler Trusts were the principal shareholders of The Times Mirror Company prior to the merger of Times Mirror into the Company on June 12, 2000. In connection with the merger in 2000, the Chandler Trusts exchanged their Times Mirror common stock for 36,304,135 shares of Company Common Stock and the Company amended its by-laws to grant the Chandler Trusts the right to nominate three directors, one for each of the Board's three classes. As long as the Chandler Trusts have these rights, neither the Board nor any Board committee may nominate any person in

64

opposition to the three Chandler Trust nominees. Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. were the Chandler Trusts' initial nominees and became directors of the Company following the Merger. Mr. Chandler and Mr. Goodan are cousins.

As described above in "Other Transaction Agreements—Chandler Trusts Registration Rights Agreement," pursuant to such agreement, the Chandler Trusts have tendered into the Tender Offer all shares held by them at the expiration of the Tender Offer, and have agreed to cause Messrs. Chandler, Goodman and Stinehart, each of whom were serving on the Board as a representative of the Chandler Trusts, to resign as directors of the Company. The resignations are expected to become effective in early June.

In 1997, the Chandler Trusts and Times Mirror entered into a transaction which, through the formation of TMCT, LLC ("TMCT"), enabled Times Mirror to retire for accounting purposes a substantial block of Times Mirror stock. Times Mirror and its affiliates contributed to TMCT real property used in Times Mirror's business operations and cash and the Chandler Trusts contributed Times Mirror stock. Times Mirror leased back the real property under long-term leases. Upon completion of the merger of Times Mirror into the Company, the Company assumed these leases and the Times Mirror stock held by the limited liability company was converted into Company Common Stock. In 2006, $20,300,792 of lease payments and $4,005,936 in dividends received on the Company Common Stock held by TMCT were allocated to the Chandler Trusts.

In 1999, the Chandler Trusts and Times Mirror formed TMCT II, LLC ("TMCT II") and entered into a similar transaction that again enabled Times Mirror to retire for accounting purposes a substantial block of stock. Times Mirror's contribution to TMCT II consisted of cash and securities. The Chandler Trusts again contributed Times Mirror stock that was converted into Company Common Stock upon completion of the merger of Times Mirror into the Company. In 2006, $7,440,746 in dividends received on the Company Common Stock held by TMCT II were allocated to the Chandler Trusts.

On September 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT and TMCT II. Under the terms of the agreements, the Company received on September 22, 2006, a total of 38.9 million shares of Company Common Stock and all 1.1 million shares of the Company's preferred stock held collectively by TMCT and TMCT II. Following the distributions by TMCT and TMCT II, the Company's interests in each of TMCT and TMCT II were reduced to approximately five percent. The agreements also provided for certain put and call options, which are exercisable at fair market value beginning in September 2007, relating to the Company's remaining ownership interests in TMCT and TMCT II.

In addition, on September 22, 2006, the Company and TMCT amended the lease agreement for the eight properties the Company leases from TMCT. Under the terms of the amended lease, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company was also granted an option to acquire the leased properties from February 8, 2008 to three months prior to the expiration of the amended lease at the higher of fair market value or $195 million. In addition, the amendment extended the properties' current fixed rental rate through August 7, 2021.

On October 20, 2006, the remaining 12.4 million shares of Company Common Stock held by TMCT and TMCT II were distributed to the Company and the Chandler Trusts in accordance with their respective ownership interests. The Company received 0.6 million shares and the Chandler Trusts received 11.8 million shares. Until October 20, 2007, the trustees of the Chandler Trusts have agreed to vote the 11.8 million shares in the same proportion as all other shares are voted on any matter requiring a shareholder vote, including the proposals to be voted on at the 2007 annual meeting. Information pertaining to the Company's investments in TMCT and TMCT II is provided in Note 7 to the consolidated financial statements included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006.

Confidential

D&P_TR099728

*The Zell Entity.*   The Zell Entity is wholly owned by Sam Investment Trust, a trust established for the benefit of Mr. Zell and his family. As more fully described below and elsewhere herein, the Zell Entity is party to certain of the agreements entered into in connection with the Leveraged ESOP Transactions and has an interest in the Leveraged ESOP Transactions.

Immediately prior to the Merger, the Company will repay the exchangeable promissory note held by the Zell Entity. In the Merger, the Zell Entity will receive cash equal to the Merger Consideration for the shares of Company Common Stock it owns. Following consummation of the Merger, the Zell Entity will purchase from the Company, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant (the "Warrant"). The Warrant will entitle the Zell Entity to purchase 43,478,261 shares of Company Common Stock (subject to adjustment), which will represent approximately 40.3% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to share equivalents under a management equity incentive plan). The Warrant will have an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the Warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). See "Other Transaction Agreements—Zell Entity Purchase Agreement."

In addition, the Company has granted the Zell Entity registration rights, in the event the Merger does not close, with respect to the shares of Company Common Stock that the Zell Entity purchased from the Company in its initial investment. However, the Zell Entity will not be able to exercise its registration rights prior to April 23, 2010 and, in the event the Merger does not close, will be prohibited from selling or assigning its Company Common Stock, exchangeable promissory note or underlying shares acquired upon exchange until April 23, 2010, other than to certain permitted transferees. See "Other Transaction Agreements—Zell Entity/ESOP Registration Rights Agreement."

Pursuant to the Zell Entity Purchase Agreement, Mr. Zell has been appointed to the Board effective May 9, 2007, and the Company has agreed that Mr. Zell will be elected to serve as Chairman of the Board effective as of the date of the consummation of the Step Two Purchase Transaction. The Company also reimbursed the Zell Entity for $2.5 million of expenses following consummation of the Step One Purchase Transaction and agreed to reimburse the Zell Entity for up to an additional $2.5 million of unreimbursed expenses following consummation of the Step Two Purchase Transaction.

Pursuant to the Credit Agreement, a condition to the consummation of the Merger will be the execution by the Zell Entity of an agreement, guaranteed by Zell, providing that the Zell Entity will invest up to an additional $100 million in Company Common Stock or subordinated debt of the Company in certain circumstances.

*The ESOP and the Trustee.*   Pursuant to the terms of the ESOP Purchase Agreement, on April 1, 2007, the Company sold 8,928,571 shares of Company Common Stock to the ESOP at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP executed by the Trustee in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through the ESOP's use of annual contributions from the Company to the ESOP or distributions paid on the shares of Company Common Stock held by the ESOP. On the same date, the Company and the Trustee, on behalf of the ESOP, entered into the ESOP Loan Agreement, which documents the extension of credit from the Company to the ESOP evidenced by the ESOP Note. The ESOP Note contemplates payment by the ESOP to the Company in 30 annual installments with an annual interest rate of approximately 5%. The Trustee, on behalf of the ESOP, also entered into the ESOP Pledge Agreement with the Company whereby the ESOP has agreed to pledge the shares of Company Common Stock acquired by the ESOP from the Company as collateral for the Company's extension of credit to the ESOP.

In addition, the Company has granted the ESOP registration rights, in the event the Merger does not close, with respect to the shares of Company Common Stock that the ESOP purchased from the Company in its initial investment. However, the ESOP will not be able to exercise its registration rights

66

prior to April 1, 2008. See "Other Transaction Agreements—Zell Entity/ESOP Registration Rights Agreement."

**Fees and Expenses**

As set forth under "Special Factors—Background of the Merger," the Company retained Merrill Lynch and Citi to act as the Company's co-financial advisors and the Special Committee retained Morgan Stanley to act as its financial advisor. In addition, affiliates of Merrill Lynch and Citi will provide a portion of the financing for the Tender Offer and the Merger, subject to specified conditions. The fees payable to Morgan Stanley for its advisory services and to Merrill Lynch for its advisory and financing services are described under "Special Factors—Opinion of the Special Committee's Financial Advisor" and "Special Factors—Opinion of the Company's Financial Advisor," respectively. Total advisory and financing fees payable to Citi (before syndication costs, capital allocation costs and financing credits) aggregate approximately $68.9 million, of which approximately $35.8 million are contingent on the Merger closing and approximately $33.1 million relate to financing the Tender Offer.

In addition, JPMorgan and Bank of America and their affiliates have also undertaken to provide financing for the Merger subject to the terms and conditions of the Credit Facilities Commitment Letter described in "Special Factors—Financing," and will receive customary fees in connection therewith.

Merrill Lynch, Citi, JPMorgan and Bank of America were retained to act as the Co-Dealer Managers in connection with the Tender Offer, for which they will receive reasonable and customary compensation. We also have agreed to reimburse the Co-Dealer Managers for reasonable out-of-pocket expenses incurred in connection with the Tender Offer, including reasonable fees and expenses of counsel, and to indemnify the Co-Dealer Managers against certain liabilities in connection with the Tender Offer, including certain liabilities under the federal securities laws. The Co-Dealer Managers and their affiliates have provided, and may in the future provide, various investment banking and other services to us for which future services we would expect they would receive customary compensation from us. In the ordinary course of business, including in their trading and brokerage operations and in a fiduciary capacity, the Co-Dealer Managers and their affiliates may hold positions, both long and short, for their own accounts and for those of their customers, in our securities.

We have retained Innisfree M&A Incorporated to act as proxy solicitor. The proxy solicitor will receive reasonable and customary compensation for its services, will be reimbursed by us for reasonable out-of-pocket expenses and will be indemnified against certain liabilities, including certain liabilities under the federal securities laws.

Whether or not the Merger is completed, in general, all fees and expenses incurred in connection with the Merger will be paid by the party incurring those fees and expenses, except for the reimbursements described below and for the termination fee potentially payable as described under

Confidential

"Other Transaction Agreements—Zell Entity Purchase Agreement." Fees and expenses incurred or to be incurred by the Company in connection with the Merger are estimated at this time to be as follows:

| Description | Amount |
|---|---|
| | (In thousands) |
| Legal | $ [●] |
| Financial Advisors | $ [●] |
| Accounting | $ [●] |
| Printing and Mailing | $ [●] |
| SEC Filing Fees | $ [●] |
| Paying Agent | $ [●] |
| Proxy Solicitation and Information Agent | $ [●] |
| Reimbursement of Zell Entity Fees and Expenses[1] | $ [●] |
| Reimbursement of ESOP Fees and Expenses[2] | $ [●] |
| Miscellaneous | $ [●] |
| Total | $ [●] |

(1) Pursuant to the Zell Entity Purchase Agreement, the Company reimbursed the Zell Entity for $2.5 million of legal and other advisory fees and expenses upon consummation of the Step One Purchase Transaction and agreed to reimburse the Zell Entity for up to an additional $2.5 million of unreimbursed expenses following consummation of the Step Two Purchase Transaction.

(2) Pursuant to the ESOP Purchase Agreement, the Company has agreed to pay the reasonable expenses of the ESOP and the ESOP trustee, including legal and financial advisory fees, incurred in connection with the Leveraged ESOP Transactions.

These expenses will not reduce the Merger Consideration to be received by the Company's shareholders.

**Appraisal Rights**

Delaware law provides shareholders with appraisal rights in the Merger. This means that if you fully comply with the procedures for perfecting appraisal rights provided for under Delaware law, Delaware law entitles you to have the fair value of your shares determined by the Delaware Court of Chancery and to receive payment based on that valuation in lieu of the Merger Consideration. The ultimate amount you receive in an appraisal proceeding may be more or less than, or the same as, the amount you would have received under the Merger Agreement. To exercise your appraisal rights, you must deliver a written demand for appraisal to the Company before the vote on the Merger Agreement at the special meeting and you must not vote in favor of the adoption of the Merger Agreement. Your failure to strictly follow the procedures specified under Delaware law will result in the loss of your appraisal rights. A copy of Section 262 of the DGCL is attached to this proxy statement as Annex D. We encourage you to consult your legal advisor if you intend to seek appraisal. See "Appraisal Rights" on page 102.

**United States Federal Income Tax Consequences**

If the Merger is consummated, sales of shares into cash pursuant to the Merger will be taxable transactions for United States federal income tax purposes. The following is a discussion of the material United States federal income tax consequences of the Merger to U.S. holders (as defined below) whose shares of Company Common Stock are converted into the right to receive cash in the Merger. The discussion is based upon the Internal Revenue Code, Treasury regulations, Internal Revenue Service published rulings and judicial and administrative decisions in effect as of the date of this proxy statement, all of which are subject to change (possibly with retroactive effect) and to

68

D&P_TR099731

differing interpretations. The following discussion does not purport to consider all aspects of U.S. federal income taxation that might be relevant to our shareholders. This discussion applies only to shareholders who, on the date on which the Merger is completed, hold shares of Company Common Stock as a capital asset within the meaning of section 1221 of the Internal Revenue Code. The following discussion does not address taxpayers subject to special treatment under U.S. federal income tax laws, such as insurance companies, financial institutions, dealers in securities or currencies, traders of securities that elect the mark-to-market method of accounting for their securities, persons that have a functional currency other than the U.S. dollar, tax-exempt organizations, mutual funds, real estate investment trusts, S corporations or other pass-through entities (or investors in an S corporation or other pass-through entity) and taxpayers subject to the alternative minimum tax. In addition, the following discussion may not apply to shareholders who acquired their shares of Company Common Stock upon the exercise of employee stock options or otherwise as compensation for services or through a tax-qualified retirement plan or who hold their shares as part of a hedge, straddle, conversion transaction or other integrated transaction. The following discussion does not address the U.S. federal income tax consequences of the Merger to the ESOP, Merger Sub or the Zell Entity.

If Company Common Stock is held through a partnership, the U.S. federal income tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. It is recommended that partnerships that are holders of Company Common Stock and partners in such partnerships consult their own tax advisors regarding the tax consequences to them of the Merger.

This discussion also does not address potential alternative minimum tax, foreign, state, local and other tax consequences of the Merger. All shareholders should consult their own tax advisors regarding the U.S. federal income tax consequences, as well as the foreign, state and local tax consequences of the disposition of their shares in the Merger.

For purposes of this summary, a "U.S. holder" is a beneficial owner of Company Common Stock shares that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation) created or organized in or under the laws of the United States, any state of the United States or the District of Columbia;

- an estate the income of which is subject to U.S. federal income tax regardless of its source;

- a trust if (1) a U.S. court is able to exercise primary supervision over the trust's administration and one or more U.S. persons are authorized to control all substantial decisions of the trust; or (2) it was in existence on August 20, 1996 and has a valid election in place to be treated as a domestic trust for U.S. federal income tax purposes; or

- otherwise is subject to U.S. federal income taxation on a net income basis.

Except with respect to the backup withholding discussion below, this discussion is confined to the tax consequences to a shareholder that is a U.S. holder for U.S. federal income tax purposes.

For U.S. federal income tax purposes, the disposition of Company Common Stock pursuant to the Merger generally will be treated as a sale of Company Common Stock for cash by each of our shareholders. Accordingly, in general, the U.S. federal income tax consequences to a shareholder receiving cash in the Merger will be as follows:

- The shareholder will recognize a capital gain or loss for U.S. federal income tax purposes upon the disposition of the shareholder's shares of Company Common Stock pursuant to the Merger.

- The amount of capital gain or loss recognized by each shareholder will be measured by the difference, if any, between the amount of cash received by the shareholder in the Merger (other than, in the case of a dissenting shareholder, amounts, if any, which are deemed to be interest for U.S. federal income tax purposes, which amounts will be taxed as ordinary income) and the

Confidential

D&P_TR099732

shareholder's adjusted tax basis in the shares of Company Common Stock surrendered in the Merger. Gain or loss will be determined separately for each block of shares (i.e., shares acquired at the same cost in a single transaction) surrendered for cash in the Merger.

- The capital gain or loss, if any, will be long-term with respect to shares of Company Common Stock that have a holding period for tax purposes in excess of one year at the effective time of the Merger. Long-term capital gains of individuals are eligible for reduced rates of taxation. There are limitations on the deductibility of capital losses. A dissenting shareholder may be required to recognize any gain or loss in the year the Merger closes, irrespective of whether the dissenting shareholder actually receives payment in that year.

Cash payments made pursuant to the Merger will be reported to our shareholders and the Internal Revenue Service to the extent required by the Internal Revenue Code and applicable Treasury regulations. Non-corporate shareholders may be subject to back-up withholding at a rate of 28% on any cash payments they receive. Shareholders who are U.S. holders generally will not be subject to backup withholding if they: (1) furnish a correct taxpayer identification number and certify that they are not subject to backup withholding on the substitute Form W-9 included in the election form/letter of transmittal they are to receive or (2) are otherwise exempt from backup withholding. Shareholders who are not U.S. holders should complete and sign a Form W-8BEN (or other applicable tax form) and return it to the paying agent in order to provide the information and certification necessary to avoid backup withholding tax or otherwise establish an exemption from backup withholding tax. Certain of our shareholders will be asked to provide additional tax information in the letter of transmittal for the shares of Company Common Stock.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules generally will be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is timely furnished to the Internal Revenue Service.

**The foregoing is a general discussion of certain material U.S. federal income tax consequences. We recommend that you consult your own tax advisor to determine the particular tax consequences to you (including the application and effect of any foreign, state or local income and other tax laws) of the receipt of cash in exchange for shares of Company Common Stock pursuant to the Merger.**

## Litigation

On September 19, 2006, a Company shareholder filed a complaint in the United States District Court for the Northern District of Illinois against the Company's directors, with the exception of Messrs. Chandler, Goodan and Stinehart, and the Company as a nominal defendant, alleging direct and derivative claims on behalf of a purported class of Company shareholders for breach of fiduciary duty in connection with the Company's May 2006 share repurchase program and the manner in which the Board was handling its exploration of strategic alternatives. After the judge in that case issued a memorandum questioning whether plaintiff had satisfied the requirements for diversity jurisdiction in order to maintain the case in federal court, plaintiff moved to dismiss the case voluntarily without prejudice. The district court dismissed the case on September 27, 2006.

Approximately seven weeks later, on November 17, 2006, the same plaintiff filed a complaint captioned *Garamella v. FitzSimons, et al.*, No. BC362110, in the Superior Court of California, Los Angeles County, alleging substantially identical direct and derivative claims on behalf of a purported class of Company shareholders against all Company directors, including Messrs. Chandler, Goodan and Stinehart, and the Company as a nominal defendant. After the Company announced the Leveraged ESOP Transactions on April 2, 2007, and before any responsive pleading was due, plaintiff amended the California complaint to include claims alleging that the Company's directors breached their fiduciary duties to shareholders in connection with the negotiation of the Leveraged ESOP Transactions and execution of the related documents. Specifically, plaintiff claims that the directors' desire to entrench themselves on the Company's Board caused them to breach their fiduciary duties by undertaking the May 2006 share repurchase program which caused the Company to take on additional

Confidential

D&P_TR099733

debt and, according to plaintiff, become less attractive to potential bidders. Plaintiff further alleges that the directors' entrenchment motives caused them to breach their fiduciary duties by rejecting certain strategic alternatives for the Company, such as a sale of individual Company assets or a tax-free spin-off, and by keeping in place certain of the Company's corporate governance mechanisms such as the shareholder rights plan and the staggered structure of the Board. With respect to the Merger Agreement and the auction process that preceded it, plaintiff claims that the directors breached their fiduciary duties by setting a bid deadline of March 31, 2007 and thereby "cutting short" the bidding process, by structuring the transaction to include an up-front tender offer which plaintiff characterizes as "coercive," and by structuring the transaction so that "insider shareholders" such as the Chandler Trusts and McCormick Tribune Foundation obtain additional unique benefits from the transaction that are not available to other shareholders. Among other things, the California complaint seeks to enjoin the impending Tender Offer and the consummation of the Merger. Defendants filed motions to dismiss the California complaint on April 20, 2007. On May 4, 2007, the court denied defendants' motions to dismiss. On May 18, 2007, plaintiff filed a motion for a preliminary injunction seeking to enjoin the Company from completing the Tender Offer until the Company (1) takes steps to maximize shareholder value, (2) removes the allegedly coercive aspects of the Tender Offer and (3) discloses all material information about the Tender Offer to shareholders. On May 22, 2007, the court denied plaintiff's motion for a preliminary injunction. The foregoing description is qualified in its entirety by reference to Exhibit (a)(5)(A) to the Schedule 13E-3, which is incorporated herein by reference.

On April 5, 2007, a Company shareholder filed a complaint captioned *Simpson v. Tribune Co., et al.*, No. 07CH9519, in the Chancery Division of the Circuit Court of Cook County, Illinois, against the Company and each of the Company's directors. The *Simpson* complaint alleges that the Company's directors breached their fiduciary duties in negotiating and executing the Merger Agreement which unfairly favors the Company's management and major insider shareholders at the expense of the Company's public shareholders. The foregoing description is qualified in its entirety by reference to Exhibit (a)(5)(B) to the Schedule 13E-3, which is incorporated herein by reference.

These actions will be defended vigorously.

The Company received a letter dated April 9, 2007, (1) stating that it was written on behalf of two hedge funds purporting to hold approximately 37% of the Company's 8,000,000 PHONES[SM] Exchangeable Subordinated Debentures due 2029 (the "PHONES"), (2) purporting to give a "notice of default" that the Company has violated the "maintenance of properties" covenant in the indenture under which the PHONES were issued (the "PHONES Indenture") and (3) informing the Company that failure to remedy such purported violation within 60 days of notice will result in an "event of default" under the PHONES Indenture (which could, if properly declared, result in an acceleration of principal and interest payable with respect to the PHONES). On April 27, 2007, the Company received a letter from the law firm purporting to represent the two hedge funds stating that the law firm also purported to represent a third hedge fund, which, together with the first two hedge funds, purported to hold 55% of the Company's PHONES and reiterating the claims set forth in the April 9, 2007 letter.

The particular covenant in question, Section 10.05 of the PHONES Indenture, requires the Company to "cause all properties used or useful in the conduct of its business or the business of any Subsidiary to be maintained and kept in good condition, repair and working order (normal wear and tear excepted) and supplied with all necessary equipment. . . all as in the judgment of the Company may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times. . . ." Section 10.05 of the PHONES Indenture expressly provides that the covenant does not "prevent the Company from discontinuing the operation and maintenance of any such properties, or disposing of any of them, if such discontinuance or disposal is, in the judgment of the Company or of the Subsidiary concerned, desirable in the conduct of its business or the business of any Subsidiary and not disadvantageous in any material respect to the Holders [of the PHONES]." The letters suggest that the Company's recent sales of three television stations, announced intention to sell the Chicago Cubs baseball team and recent and proposed issuances of debt and return of capital to shareholders violated or will violate this maintenance of properties covenant.

Confidential

D&P_TR099734

The Company believes that the hedge funds' claims are without merit and that the Company remains in full compliance with Section 10.05 of the PHONES Indenture. On May 2, 2007, the Company sent a letter to the law firm purporting to represent the hedge funds rejecting their purported "notice of default" as defective and invalid because the Company was not in default of Section 10.05, the entities the law firm purported to represent were not "Holders" as defined in the PHONES Indenture, and because the law firm had provided no evidence that it was an agent duly appointed in writing as contemplated by Section 1.04 of the PHONES Indenture. The law firm sent a letter to the Company on May 8, 2007 responding to the Company's May 2, 2007 letter, reiterating its claim that the Company was in default of Section 10.05 and stating that it had properly noticed a default pursuant to Section 5.01(4) of the Indenture. The Company further responded by letter dated May 18, 2007 reaffirming its rejection of the purported "notice of default" and reiterating its position that the Company was not in default of Section 10.05 and that the entities the law firm purported to represent were not entitled to provide a notice of default under Section 5.01(4) of the PHONES Indenture. The Company will enforce and defend vigorously its rights under the PHONES Indenture.

**Regulatory Approvals**

In connection with the Leveraged ESOP Transactions, the parties to the Merger Agreement and the Zell Entity Purchase Agreement have filed applications with the FCC for consent to the transfer of control of the Company from its public shareholders to the ESOP, the Zell Entity and Zell. The parties have also requested that the FCC waive its rule prohibiting the common ownership of daily English language newspapers and broadcast stations (the "cross-ownership rule") in the five markets where the Company owns such combinations. The applications will also require that the FCC address the Company's pending license renewal applications. The FCC can address the pending license renewal applications by taking action on the renewal applications themselves in connection with the transfer application or, alternatively by accepting the transferee's willingness to be bound by the FCC's subsequent action on the pending license renewal applications following the completion of the current FCC rulemaking process. The parties have also requested a "failing station waiver" to permit the continued common ownership of the Company's two television stations in Hartford, Connecticut, as well as a "satellite waiver" to permit the continued common ownership and operation of WTTK, Kokomo, Indiana, as a satellite station of WTTV, Indianapolis, Indiana.

The Company is currently permitted to own its five cross-ownerships as follows:

- In New York, the Company acquired *Newsday*, *Greenwich Time* and *The Advocate* after the grant of its last renewal application for WPIX(TV), and is permitted to own each of them until the FCC acts on the next renewal application for WPIX(TV), which is currently pending, under the FCC's applicable policy, known as the "note 25 exception."

- In Chicago, the Company's common ownership of WGN-TV, WGN(AM), and the *Chicago Tribune* was grandfathered when the FCC adopted its cross-ownership rule in 1975.

- In Los Angeles, the Company owns both the *Los Angeles Times* and KTLA under the note 25 exception. An application for renewal of KTLA's license is pending before the FCC.

- In Miami-Ft. Lauderdale, in 1998 the Company was granted a waiver to permit it to own WSFL-TV and the *South Florida Sun-Sentinel* until six months after the FCC completes its still-pending rulemaking proceeding addressing the cross-ownership rule.

- In Hartford, the Company was granted a permanent waiver of the rules to permit it to own both WTIC-TV and WTXX(TV) because it had shown WTXX to be a "failing station." The Company is permitted to own both WTIC and the *Hartford Courant* under the note 25 exception, and it is permitted to own both WTXX and the *Hartford Courant* under a waiver permitting such common ownership until after the FCC acts on WTXX's currently pending renewal application.

Confidential

D&P_TR099735

The Company has filed renewal applications for all twenty-four of its television stations and for WGN(AM) during the recently concluded renewal cycle. Renewal applications have been granted for WGN(AM), for WSFL-TV, Miami, Florida, and for five other television stations. The renewal applications for the other eighteen television stations remain pending before the FCC. The pending renewal applications for the New York, Los Angeles and Hartford stations each contain a request for permanent waiver of the cross-ownership rule or, in the alternative, a waiver pending the outcome of the rulemaking. Those requests were opposed in New York, Los Angeles and Hartford.

None of the newspaper-broadcast cross-ownership waivers can be transferred under a transfer of control application. New waivers will be required in each of the five markets, including Chicago, which was otherwise grandfathered. Because there is a rulemaking proceeding pending in which, on remand from the United States Court of Appeals for the Third Circuit, the FCC is reviewing its ownership rules, including the cross-ownership rule, and because in that proceeding the FCC has previously adopted a rule which would have permitted each of the cross-ownerships, the parties have requested waivers of the cross-ownership rule pending the outcome of that rulemaking proceeding. In connection with this pending rulemaking, we anticipate that certain parties may file petitions to deny or other objections with the FCC which will oppose the grant of cross-ownership waivers to us in connection with our transfer of control application. The FCC may also grant a cross-ownership waiver that could require us to come into compliance with the cross-ownership rule within a specified time period, which might require us to divest either our newspaper or broadcast assets in one or more of the five cross-ownership markets.

The FCC also generally will not act on a transfer of control application for a broadcast station when a license renewal application is pending for such station. While the FCC could accelerate the processing of the pending renewal applications and act upon them at the same time it acts on the transfer of control applications, in the event that it does not elect to do so, there is a possibility that these renewal applications could remain pending until after the FCC completes its current rulemaking process.

The "failing station waiver" permitting the common ownership of the two television stations in Hartford does not transfer. In order to obtain a new "failing station waiver," the parties are required to show that WTXX is in financial distress, that it has poor viewership ratings, that it cannot be sold to an out of market buyer, and that the grant of the waiver would be in the public interest. The "satellite waiver" in the Indianapolis market, permitting the common ownership of WTTK and WTTV, similarly cannot be transferred but must be requested again by the parties. The Company has previously made the necessary showing to obtain the "satellite waiver" when it acquired these stations and currently believes that the parties have made the necessary showing to obtain a new "satellite waiver."

We cannot assure that any such approvals or other actions will be obtained, or will be obtained without substantial cost or conditions, or that the failure to obtain the approvals or other actions might not result in adverse consequences to our business and financial condition. The obligation of the parties to the Merger Agreement to close the Merger is subject to certain conditions relating to regulatory approvals. See "The Merger Agreement—Conditions to the Merger."

The Merger is not subject to the filing and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder (the "HSR Act").

**Accounting Treatment of the Merger**

We expect that, for financial reporting purposes, the Merger may be accounted for as a leveraged recapitalization, pursuant to which the historical basis of the Company's assets and liabilities will be preserved following the Merger. However, it is possible that the Merger could be accounted for as a purchase, pursuant to which, following the Merger, the Company's assets and liabilities would be reflected at their fair market value as of the date of the Merger.

Confidential

D&P_TR099736

# IDENTITY AND BACKGROUND OF FILING PERSONS

## The Company

Tribune Company is a media and entertainment company, operating primarily in the United States, that conducts its operations through two business segments: publishing and broadcasting and entertainment. In publishing, the Company's leading daily newspapers include the *Los Angeles Times*, *Chicago Tribune*, *Newsday* (Long Island, NY), *The Sun* (Baltimore), *South Florida Sun-Sentinel*, *Orlando Sentinel* and *Hartford Courant*. The Company's broadcasting group operates 24 television stations, including Superstation WGN on national cable, and Chicago's WGN-AM and the Chicago Cubs baseball team. Popular news and information websites complement the Company's print and broadcast properties and extend its nationwide audience. These segments reflect the manner in which the Company sells its products to the marketplace, manages its operations and makes business decisions. The Company's media operations are principally in major metropolitan areas of the United States and compete against all types of media on both a local and national basis. The Company was founded in 1847 and incorporated in Illinois in 1861. As a result of a corporate restructuring in 1968, the Company became a holding company incorporated in Delaware. The principal executive offices of the Company are located at 435 North Michigan Avenue, Chicago, Illinois 60611 and its telephone number is (312) 222-9100. The Company is publicly traded on the New York Stock Exchange (the "NYSE") under the symbol "TRB."

The names of each of the members of the Company's Board and each of the Company's executive officers and their business experience and principal positions held during the past five years are set forth below. Except as set forth below, the business address and telephone number of each of the below directors or executive officers is c/o Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611; telephone number (312) 222-9100.

### Company Directors

*Jeffrey Chandler.*   President and Chief Executive Officer of Chandler Ranch Co., P.O. Box 1192, 6122 Paseo Delicias, Rancho Santa Fe, CA 92067, one of the largest growers of avocados in California, since 1984. Director since 2000.

*Dennis J. FitzSimons.*   Chairman (since January 2004), Chief Executive Officer (since January 2003), President (since July 2001), Chief Operating Officer (from July 2001 until December 2002) and Executive Vice President (from January 2000 until July 2001) of Tribune Company; President of Tribune Broadcasting Company, a subsidiary of Tribune Company, from May 1997 until January 2003. Director since 2000.

*Roger Goodan.*   Consultant to various global energy services firms, since December 2001; Vice President of Schlumberger Oilfield Services, a services and technology supplier to the international petroleum industry, from December 2000 until his retirement in December 2001; executive in operations, engineering and finance positions throughout Schlumberger from 1973 until December 2000. Director of Hydril Company. Director since 2000.

*Enrique Hernandez, Jr.*   Chairman and Chief Executive Officer of Inter-Con Security Systems, Inc., 210 South De Lacey Avenue, Pasadena, CA 91105, an international provider of high-end security and facility support services to government, utilities and industrial customers, since 1986; Co-founder and principal partner of Interspan Communications, a television broadcasting company serving Spanish-speaking audiences, since 1998. Director of McDonald's Corporation and Wells Fargo & Company. Director and Chairman of Nordstrom, Inc. Director since 2001.

*Betsy D. Holden.*   President-Global Marketing and Category Development of Kraft Foods Inc., a food business unit of Altria Group Inc., from January 2004 through June 2005; Co-Chief Executive

Confidential

D&P_TR099737

Officer of Kraft Foods Inc. from March 2001 until December 2003; President and Chief Executive Officer of Kraft Foods North America from May 2000 until December 2003. Director of Western Union Company. Director since 2002.

*Robert S. Morrison.*   Interim Chairman and Chief Executive Officer of 3M Company, a diversified technology company, from June 2005 until December 2005. Vice Chairman of PepsiCo, Inc., a processor of packaged foods and beverages, and Chairman of PepsiCo Beverages and Foods North America from August 2001 until his retirement in February 2003; Chairman, President and Chief Executive Officer of The Quaker Oats Company from October 1997 until its merger with PepsiCo in August 2001. Director of 3M Company, Aon Corporation and Illinois Tool Works, Inc. Director since 2001.

*William A. Osborn.*   Chairman and Chief Executive Officer of Northern Trust Corporation, 50 South LaSalle Street, Chicago, IL 60675, a multibank holding company, and its principal subsidiary, The Northern Trust Company, since October 1995. Director of Caterpillar Inc. and Northern Trust Corporation. Director since 2001.

*J. Christopher Reyes.*   Chairman of Reyes Holdings, LLC, 9500 West Bryn Mawr Avenue, Suite 700, Rosemont, IL 60018, a food and beverage distribution company, since 1997. Director of The Allstate Corporation and Wintrust Financial Corporation. Director since 2005.

*William Stinehart, Jr.*   Partner in the law firm of Gibson, Dunn & Crutcher LLP, 2029 Century Park East, Suite 4000, Los Angeles, CA 90067, from 1977 until his retirement in December 2004. Director since 2000.

*Dudley S. Taft.*   President and Director of Taft Broadcasting Company, 312 Walnut Street, Suite 3550, Cincinnati, OH 45202, an investor in media and entertainment companies, since 1987. Director of Duke Energy Corporation, Fifth Third Bancorp and UNIFI Mutual Holding Company. Director since 1996.

*Miles D. White.*   Chairman and Chief Executive Officer of Abbott Laboratories, 100 Abbott Park Road, Abbott Park, IL 60064, a broad-based medical products and pharmaceutical company, since 1999. Chairman of the Federal Reserve Bank of Chicago. Director of Abbott Laboratories and Motorola, Inc. Director since 2005.

*Samuel Zell.*   President and Chairman of Equity Group Investments, L.L.C., Two North Riverside Plaza, Suite 600, Chicago, IL 60606. Chairman of the Board of Anixter International Inc., Capital Trust, Inc., Equity Lifestyle Properties, Inc., Equity Residential and Covanta Holding Corporation. Chairman of the Board of Equity Office Properties Trust until its sale in February 2007. Director since May 2007.

### Company Executive Officers

*Dennis J. FitzSimons.*   Chairman (since January 2004), Chief Executive Officer (since January 2003) and President (since July 2001); Chief Operating Officer from July 2001 until December 2002; Executive Vice President from January 2000 until July 2001; President of Tribune Broadcasting Company* from May 1997 until January 2003.

*Donald C. Grenesko.*   Senior Vice President/Finance and Administration.

*Crane H. Kenney.*   Senior Vice President, General Counsel and Secretary.

*Timothy J. Landon.*   President of Tribune Interactive, Inc.* since March 2004; President of Tribune Classified* from June 2000 until March 2004.

Confidential

D&P_TR099738

*Thomas D. Leach.*   Senior Vice President/Development since February 2005; Vice President/ Development from February 2004 until February 2005; Vice President and Chief Financial Officer of Tribune Broadcasting Company* from March 2001 until January 2004.

*Luis E. Lewin.*   Senior Vice President/Human Resources.

*R. Mark Mallory.*   Vice President and Controller.

*Ruthellyn Musil.*   Senior Vice President/Corporate Relations since February 2004; Vice President/ Corporate Relations until February 2004.

*John E. Reardon.*   President of Tribune Broadcasting Company* since November 2005; Vice President of Tribune Broadcasting Company* from March 2004 until November 2005; Vice President and General Manager of KTLA-TV, Los Angeles* until March 2004.

*Scott C. Smith.*   President of Tribune Publishing Company* since January 2005 and Publisher of Chicago Tribune Company* since October 2006; Chief Operating Officer of Tribune Publishing Company* from November 2004 until January 2005; President of Chicago Tribune Company* until November 2004.

--------

\*    A subsidiary or a division of Tribune Company.

During the past five years, none of the persons described above or the Tribune Company has been (i) convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or (ii) party to any judicial or administrative proceeding (except for matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining the person from future violations of, or prohibiting activities subject to, federal or state securities laws or a finding of any violation of federal or state securities laws. Each person identified above is a United States citizen.

**The ESOP and Merger Sub**

The address of the Tribune Employee Stock Ownership Plan is c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523; telephone (630) 572-5130.

The ESOP was newly formed by the Company on April 1, 2007, with an effective date of January 1, 2007, to enable eligible employees to acquire stock ownership interests in the Company by investing primarily in the Company's common stock. The ESOP is intended to be a qualified employee benefit plan under section 401(a) of the Code and an employee stock ownership plan within the meaning of section 4975(e)(7) of the Code. The ESOP is intended to invest primarily in the common stock of the Company, and is specifically permitted to invest up to 100% of its assets in the common stock of the Company.

Tesop Corporation is a Delaware corporation wholly owned by the ESOP with its principal executive offices at c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523. Merger Sub's telephone number is (630) 572 5130. Merger Sub was formed solely for purposes of entering into and consummating the Leveraged ESOP Transactions. Merger Sub has not conducted any activities to date other than activities incidental to its formation and in connection with the Leveraged ESOP Transactions.

*The Trustee of the ESOP*

The ESOP has no board of directors or similar board of managers. The Trustee of the ESOP is GreatBanc Trust Company. GreatBanc Trust Company is a Delaware corporation with its principal executive offices at 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523 and its telephone number is (630) 572-5130. Incorporated in 1989, GreatBanc Trust Company provides trust, investment

Confidential

D&P_TR099739

and wealth management services to individuals as well as a range of institutional services to corporations, foundations, endowments and not-for-profit organizations. GreatBanc Trust Company is an independent ERISA trustee with a specialization in employee stock ownership plans. Together with its affiliates, Salem Trust Company and Pennant Management, Inc., GreatBanc Trust Company supervises client assets from its headquarters in Oak Brook, Illinois and offices in New York, Chicago, Milwaukee and several locations in Florida.

### Merger Sub Directors and Executive Officers

The names of each of the members of Merger Sub's board of directors and each of Merger Sub's executive officers and their business experience and principal positions held during the past five years are set forth below. The business address and telephone number of each of the below directors or executive officers is c/o GreatBanc Trust Company, 1301 West 22nd Street, Suite 800, Oak Brook, Illinois 60523; telephone number (630) 572-5130.

#### Merger Sub Director

*Michael Welgat.*   President and Chief Executive Officer of GreatBanc Trust Company since 1989; President of U.S. Fiduciary Services, Inc., the parent holding company of GreatBanc Trust Company and Executive Vice President of Pennant Management, Inc., a subsidiary of U.S. Fiduciary Services, Inc.

#### Merger Sub Executive Officers

*Marilyn Marchetti.*   President. Has been a Senior Vice President of GreatBanc Trust Company since 1999.

*Danielle Montesano.*   Secretary/Treasurer. Has been a Senior Vice President of GreatBanc Trust Company since 2005 and has been associated with GreatBanc Trust Company since 1999, including formerly as Chief Compliance Officer, Secretary and General Counsel.

During the past five years, none of the ESOP, the Trustee, Merger Sub or any of Merger Sub's directors or executive officers has been (i) convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or (ii) party to any judicial or administrative proceeding (except for matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining the person from future violations of, or prohibiting activities subject to, federal or state securities laws or a finding of any violation of federal or state securities laws. Each of Merger Sub's directors and executive officers is a United States citizen.

## The Zell Investors

The Zell Investors consist of Samuel Zell, the Zell Entity and Sam Investment Trust. Mr. Zell is the President of the Zell Entity and is also President and Chairman of Equity Group Investments, L.L.C. ("EGI"). Mr. Zell also serves as the Chairman of the Board of Anixter International Inc.; Capital Trust, Inc.; Equity Lifestyle Properties, Inc.; Equity Residential; and Covanta Holding Corporation. Mr. Zell has been a Director of Tribune Company since May 2007, and served as Chairman of the Board of Equity Office Properties Trust until its sale in February 2007. Mr. Zell's address is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606. His telephone number is (312) 454-0100.

The Zell Entity is a Delaware limited liability company wholly owned by Sam Investment Trust, a trust established for the benefit of Mr. Zell and his family. Its address is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606. The Zell Entity's telephone number is (312) 454-0100. The Zell Entity was formed solely for purposes of entering into and consummating the Leveraged ESOP

77

Transactions. The Zell Entity has not conducted any activities to date other than activities incidental to its formation and in connection with the Leveraged ESOP Transactions.

The Zell Entity's sole member is Sam Investment Trust ("SIT"), an Illinois trust established for the benefit of Mr. Zell and his family. The trustee of SIT is Chai Trust Company, LLC, an Illinois limited liability company ("Chai Trust"). The names of each of Chai Trust's officers and managing directors and their business experience and principal positions held during the past five years are set forth below. Except as set forth below, the business address and telephone number of Chai Trust and each of its officers and managing directors listed below is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606; telephone number (312) 454-0100.

EGI is a private corporate and real estate investment firm co-founded by Mr. Zell in 1968, and is owned by trusts established for the benefit of Mr. Zell and his family (but not SIT). Mr. Zell is the President and Chairman of EGI, which provides investment advisory services to Chai Trust. However, EGI does not have investment control over Chai Trust and the assets held by the trusts controlled by Chai Trust. As such, EGI has no ownership or beneficial interest in either the Zell Entity or SIT, is not a party to any of the agreements entered into in connection with the Leveraged ESOP Transactions, and has no beneficial interest therein.

### Zell Entity Executive Officers

The Zell Entity has no board of directors or similar board of managers. The names of each of the Zell Entity's executive officers and their business experience and principal positions held during the past five years are set forth below. The business address and telephone number of each of the below executive officers of the Zell Entity is Two North Riverside Plaza, Suite 600, Chicago, Illinois 60606; telephone number (312) 454-0100.

*Samuel Zell.* President. President and Chairman, EGI. Chairman of the Board of Anixter International Inc., Capital Trust, Inc., Equity Lifestyle Properties, Inc., Equity Residential and Covanta Holding Corporation. Director of Tribune Company since May 9, 2007. Chairman of the Board of Equity Office Properties Trust until its sale in February 2007.

*William C. Pate.* Vice President. Chief Investment Officer of EGI since March 2006, Managing Director of EGI from July 2000 until March 2006. Director of Hanover Compressor Company since January 2007. Director of Covanta Holding Corporation since 1999 and Chairman of the Board from October 2004 until September 2005. Director of Adams Respiratory Therapeutics, Inc. from 2000 until April 2007. Director of Home Products International, Inc. from December 2004 to January 2006.

*Philip G. Tinkler.* Vice President. Chief Financial Officer and Chief Operating Officer, EGI, Vice President—Accounting from December 2002 until March 2006. President and Chief Executive Officer, First Capital Financial, L.L.C., since March 2006; served in other capacities since 2001. Chief Financial Officer, Covanta Holding Corporation, from January 2003 until October 2004. Director of Home Products International, Inc. since January 2006.

### Chai Trust Executive Officers

*Donald J. Liebentritt.* President. Senior Advisor, EGI, since January 2006; President from 2000 until 2005. Chief Executive Officer and President, First Capital Financial, L.L.C., from December 2002 until March 2006. Director, Adams Respiratory Therapeutics, Inc. since February 2005. Director, Rewards Network Inc. since 2005. Director, Home Products International, Inc., from December 2004 until March 2007.

*Robert M. Levin.* Senior Trust Officer. Partner, Levin & Schreder, Ltd., 120 North LaSalle Street, Suite 3800, Chicago, Illinois 60602; (312) 332-6300.

Confidential

D&P_TR099741

*James Bunegar.* Vice President, Chief Financial Officer, Assistant Trust Officer and Treasurer. Vice President—Taxes, EGI.

### Chai Trust Managing Directors

*Donald J. Liebentritt.* Senior Advisor, EGI since January 2006; President from 2000 until 2005. Chief Executive Officer and President, First Capital Financial, L.L.C., from December 2002 until March 2006. Director, Adams Respiratory Therapeutics, Inc. since February 2005. Director, Rewards Network Inc. since 2005. Director, Home Products International, Inc., from December 2004 until March 2007.

*Robert M. Levin.* Partner, Levin & Schreder, Ltd., 120 North LaSalle Street, Suite 3800, Chicago, Illinois 60602; (312) 332-6300.

*Bert Cohen.* Private Investor, 5000-4A Estate Enighed, #65, St. John, VI 00830.

*Kellie Zell Harper.* Homemaker.

*Leah Zell Wanger.* Private Investor, 227 West Monroe Street, Chicago, Illinois 60603.

*JoAnn Zell Gillis.* Physician.

*Matthew Zell.* Managing Director, EGI. Director, Anixter International Inc. since 2001. Director of Desarrolladora Homex, S.A. de C.V. since 2004.

During the past five years, none of the Zell Investors nor, to any of the Zell Investors' knowledge, any of the Zell Entity's executive officers or any of Chai Trust's officers or managing directors has been (i) convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or (ii) party to any judicial or administrative proceeding (except for matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining the person from future violations of, or prohibiting activities subject to, federal or state securities laws or a finding of any violation of federal or state securities laws. Mr. Zell and each other executive officer of the Zell Entity and each officer or managing director of Chai Trust is a United States citizen.

Confidential

D&P_TR099742

# THE SPECIAL MEETING

## Time, Place and Purpose of the Special Meeting

We are furnishing this proxy statement to our shareholders as part of the solicitation of proxies by our Board for use at the special meeting to be held at [●], on [●], 2007, at [●] a.m. Central Time, or at any adjournment or postponement thereof. The purpose of the special meeting is for our shareholders to consider and vote upon the adoption of the Merger Agreement and thereby approve the Merger. If our shareholders fail to adopt the Merger Agreement, the Merger will not occur. A copy of the Merger Agreement is attached to this proxy statement as Annex A. This proxy statement and the enclosed form of proxy are first being mailed to our shareholders on or about [●].

## Record Date and Quorum

The holders of record of Company Common Stock as of the close of business on [●], the record date for the special meeting, are entitled to receive notice of and to vote at the special meeting. On the record date, [●] shares of Company Common Stock were outstanding.

A quorum is necessary to hold and transact business at the special meeting. The presence in person or by proxy of holders representing a majority of the votes entitled to be cast at the special meeting will constitute a quorum for the transaction of business at the special meeting. Any shares of Company Common Stock held in treasury by the Company or by any of our subsidiaries will not be counted for purposes of determining a quorum. Once a share is represented at the special meeting, it will be counted for the purpose of determining a quorum at the special meeting and any adjournment of the special meeting. However, if a new record date is set for the adjourned special meeting, then a new quorum will have to be established.

## Required Vote

Adoption of the Merger Agreement and approval of the Merger requires the affirmative vote of the holders of a majority of shares of Company Common Stock outstanding on the record date and entitled to vote thereon. Each shareholder entitled to vote will have the right to one vote for each such share of Company Common Stock held. A failure to vote, an abstention or a broker non-vote will have the same effect as a vote against the proposal to adopt the Merger Agreement and approve the Merger. In addition, the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies requires the affirmative vote of a majority of the votes cast by our shareholders on the proposal. For the purpose of such adjournment proposal, if a holder of shares of Company Common Stock fails to cast a vote, in person or by authorizing a proxy, such failure will not have any effect on the outcome of the proposal. Abstentions and broker non-votes are not considered votes cast and therefore will have no effect on the proposal to approve any adjournments of the special meeting for the purpose of soliciting additional proxies.

As of the record date, there were [●] shares of Company Common Stock outstanding (excluding shares held by our subsidiaries), and the directors and executive officers of the Company beneficially owned (excluding options, restricted stock units and other stock-based awards), in the aggregate, [●] shares of Company Common Stock, or approximately [●]% of the outstanding shares of Company Common Stock.

Each of our directors and current executive officers has indicated to us that they currently intend to vote all of their shares of Company Common Stock "**FOR**" the adoption of the Merger Agreement and approval of the Merger and "**FOR**" any adjournment of the special meeting, if necessary or appropriate to solicit additional proxies, although none of such persons have entered into agreements obligating them to do so. The Zell Entity, which is owned by a trust established for the benefit of Zell (who became a director of the Company effective May 9, 2007) and his family, has entered into an agreement to vote all of the shares of Company Common Stock that it beneficially owns in favor of the adoption of the Merger Agreement and approval of the transactions contemplated thereby, including the Merger. In addition, the Chandler Trusts have agreed to vote any shares held by them as of the

80

record date in favor of the Merger Agreement and the transactions contemplated thereby, including the Merger. See "Other Transaction Agreements—Zell Entity Purchase Agreement" and "Other Transaction Agreements—Voting Agreement." As of the record date, [●] [●], 2007, the directors and executive officers of the Company (in the aggregate) hold and are entitled to vote Company Common Stock representing approximately [●]% of the outstanding shares.

**Proxies; Revocation**

If you are a shareholder of record and submit a proxy by telephone or the Internet or by returning a signed proxy card by mail, we will vote your shares at the special meeting as you indicate on your proxy card or by such other method. If you sign your proxy card but no voting instructions are indicated, we will vote your shares of Company Common Stock "**FOR**" the adoption of the Merger Agreement and approval of the Merger and "**FOR**" any adjournment of the special meeting, if necessary or appropriate to solicit additional proxies.

If your shares are held in "street name" by your broker, bank or other nominee, you should instruct your broker, bank or other nominee how to vote your shares using the instructions provided by your broker, bank or other nominee. If you have not received such voting instructions or require further information regarding such voting instructions, contact your broker, bank or other nominee for directions on how to vote your shares. Under the rules of the NYSE, brokers who hold shares in "street name" for customers may not exercise their voting discretion with respect to the approval of non-routine matters such as the Merger proposal and thus, absent specific instructions from the beneficial owner of your shares, your broker is not empowered to vote such shares with respect to the adoption of the Merger Agreement. Shares of Company Common Stock held by persons attending the special meeting but not voting, or shares for which the Company has received proxies with respect to which holders have abstained from voting, will be considered abstentions. Abstentions and properly executed broker non-votes, if any, will be treated as shares that are present and entitled to vote at the special meeting for purposes of determining whether a quorum exists but will have the same effect as a vote "against" adoption of the Merger Agreement because adoption of the Merger Agreement requires the affirmative vote of a majority of the shares of Company Common Stock outstanding and entitled to vote. For the purpose of any adjournment proposal, if a holder of shares of Company Common Stock fails to cast a vote, in person or by authorizing a proxy, such failure will not have any effect on the outcome of the proposal.

If you are a participant in any of the Tribune Company 401(k) Savings and Profit Sharing Plan, the Tribune Company Defined Contribution Retirement Plan, or the Times Mirror Savings Plus Plan (collectively, the "Retirement Plans") or if you are a participant in the Tribune Company Employee Stock Purchase Plan (the "Stock Purchase Plan"), you will receive a voting instruction card with respect to those shares of Company Common Stock subject to the plan which will provide the trustee of the plans, with instructions on how to vote those shares. You must submit your voting instructions for your shares to the trustee by the close of business on [●] to allow the trustee time to receive your voting instructions and to vote on behalf of the plan. If you hold shares of Company Common Stock outside of these plans, you will receive a separate proxy or voting instruction card for those shares. In order to have all of your shares counted at the meeting, you must complete and submit all cards that you receive.

You may revoke your proxy at any time before the vote is taken at the special meeting. To revoke your proxy, you must advise our Corporate Secretary in writing, at Tribune Company, 435 North Michigan Avenue, Chicago, Illinois 60611, Attention: Corporate Secretary, submit a proxy by telephone, the Internet or mail dated after the date of the proxy you wish to revoke or attend the special meeting and vote your shares in person. Attendance at the special meeting will not by itself constitute revocation of a proxy.

Please note that if you have instructed your broker, bank or other nominee to vote your shares, the options for revoking your proxy described in the paragraph above do not apply and instead you

Confidential

D&P_TR099744

must follow the directions provided by your broker, bank or other nominee to change these instructions.

The Company does not expect that any matter other than the adoption of the Merger Agreement and approval of the Merger (and the approval of the adjournment of the meeting, if necessary or appropriate, to solicit additional proxies) will be brought before the special meeting. If, however, any such other matter is properly presented at the special meeting or any adjournment or postponement of the special meeting, the persons appointed as proxies will have discretionary authority to vote the shares represented by duly executed proxies in accordance with their discretion and judgment.

Shareholders of record and many shareholders who hold their shares through a broker, bank or other nominee will have the option to submit their proxies or voting instructions via the Internet or by telephone. There are separate arrangements for using the Internet and telephone to submit your proxy depending on whether you are a shareholder of record or your shares are held in "street name" by your broker, bank or other nominee. If your shares are held in "street name," you should check the voting instruction card provided by your broker, bank or other nominee to see which options are available and the procedures to be followed.

In addition to submitting the enclosed proxy card by mail, the Company's shareholders of record may submit their proxies:

- via the Internet by visiting the website established for that purpose indicated on the enclosed proxy card; or

- by telephone by calling the number indicated on the enclosed proxy card and following the recorded instructions.

**Adjournments and Postponements**

The special meeting may be adjourned or postponed for the purpose of soliciting additional proxies, if necessary. Any adjournment may be made without notice (if the adjournment is not for more than thirty days) by an announcement made at the special meeting of the time, date and place of the adjourned meeting. In the event that there is present, in person or by proxy, holders representing sufficient shares of Company Common Stock to secure the vote of the shareholders of the Company necessary to adopt the Merger Agreement and approve the Merger, the Company does not anticipate that we will adjourn or postpone the meeting. Any signed proxies received by the Company in which no voting instructions are provided on such matter will be voted in favor of an adjournment in these circumstances. Any adjournment or postponement of the special meeting for the purpose of soliciting additional proxies will allow the Company's shareholders who have already sent in their proxies to revoke them at any time prior to their use at the special meeting as adjourned or postponed.

**Solicitation of Proxies**

The Company will pay the cost of this proxy solicitation. In addition to soliciting proxies by mail, directors, officers and employees of the Company may solicit proxies personally and by telephone, facsimile or other electronic means of communication. These persons will not receive additional or special compensation for such solicitation services.

The Company will, upon request, reimburse brokers, banks and other nominees for their expenses in sending proxy materials to their customers who are beneficial owners and obtaining their voting instructions. The Company has retained Innisfree M&A Incorporated, a proxy solicitation firm, to assist it in the solicitation of proxies for the special meeting. The Company will pay Innisfree M&A Incorporated a customary fee for these services, plus reimbursement of out-of-pocket expenses. See "Special Factors—Fees and Expenses."

The ESOP and the Zell Entity, directly or through one or more affiliates or representatives, may, at their own cost, also make additional solicitations by mail, telephone, facsimile or other contact in connection with the Merger.

82

# THE MERGER AGREEMENT

The following is a summary of certain material provisions of the Merger Agreement, a copy of which is attached as Annex A to this proxy statement and which we incorporate by reference herein. This summary does not purport to be complete and may not contain all of the information about the Merger Agreement that is important to you. We encourage you to read carefully the Merger Agreement in its entirety, as the rights and obligations of the parties are governed by the express terms of the Merger Agreement and not by this summary or any other information contained in this proxy statement.

The description of the Merger Agreement in this proxy statement has been included to provide you with information regarding its terms. The Merger Agreement contains representations and warranties made by and to the Company, the ESOP and Merger Sub as of specific dates. The statements embodied in those representations and warranties were made for purposes of that contract among the parties and are subject to qualifications and limitations agreed by the parties in connection with negotiating the terms of that contract.

*Effective Time; Structure.* At the "Effective Time" of the Merger, Merger Sub will merge with and into the Company with the Company surviving the Merger (the "Surviving Corporation") and becoming a wholly owned subsidiary of the ESOP. The Effective Time will occur at the time that the Company files a certificate of merger with the Secretary of State of the State of Delaware on the closing date of the Merger (or such later time as Merger Sub and the Company may agree and as provided in the certificate of merger). The closing date will occur no later than the third business day after satisfaction or waiver of the conditions to the Merger (other than those conditions that are to be satisfied at the closing) set forth in the Merger Agreement (or such other date as the ESOP and the Company may agree), as described below under "The Merger Agreement—Conditions to the Merger."

*Treatment of Company Common Stock.* In the Merger, each share of Company Common Stock, other than shares owned by the ESOP or Merger Sub immediately prior to the Effective Time or for which appraisal rights have been properly exercised, will be converted into and represent the right to receive $34.00 in cash, plus, if the Merger does not close by January 1, 2008, the Additional Share Consideration (as defined below), if any (the "Merger Consideration"). The "Additional Share Consideration" means the amount per share, if any, equal to (1) $34.00, multiplied by (2) 8%, multiplied by (3) the quotient obtained by dividing the number of days elapsed from January 1, 2008 to and including the Closing Date by 365. All shares of Company Common Stock that have been converted into the right to receive the Merger Consideration will be automatically cancelled and cease to exist, and the holders of certificates which, immediately prior to the Effective Time, represented such shares, will cease to have any rights with respect to such shares other than the right to receive the Merger Consideration.

*Treatment of ESOP and Merger Sub-Owned Shares.* In the Merger, each share of Company Common Stock owned, directly or indirectly, by the ESOP or Merger Sub immediately prior to the Effective Time or held by the Company immediately prior to the Effective Time will be cancelled and retired and no consideration will be delivered in exchange for such cancellation and retirement.

*Treatment of Preferred Stock.* As of May 31, 2007, there were approximately 60,671,319 shares of Company Common Stock and approximately 137,643 shares of Series D-1 Preferred Stock of the Company held by the Eagle Entities (as defined below). All of the common equity interests in the Eagle Entities are held by the Company. The Merger Agreement contemplates that, immediately prior to the Merger, the shares of Series D-1 Preferred Stock and the shares of Company Common Stock held by the Eagle Entities will be exchanged for a new Series E Preferred Stock of the Company, as described below under "The Merger Agreement—Eagle Exchange." Each share of Series E Preferred

83

Stock outstanding at the time of the Merger will remain outstanding following the Merger and will be entitled to appraisal rights.

*Treatment of Merger Sub Common Stock.* All the issued and outstanding shares of common stock of Merger Sub will be converted into, in the aggregate, 56,521,739 shares of common stock of the Surviving Corporation.

*Representations and Warranties.* The Merger Agreement contains representations and warranties made by the Company to the ESOP and Merger Sub, and representations and warranties made by the ESOP and Merger Sub to the Company. These representations and warranties are subject to important limitations and qualifications agreed to by the parties in connection with negotiating the terms of the Merger Agreement. In particular, the representations that the Company made are qualified by filings that the Company made with the SEC after December 25, 2005 and prior to the date of the Merger Agreement (other than risk factor and similar cautionary disclosure contained in such filings), as well as by a confidential disclosure schedule that the Company delivered to the ESOP and Merger Sub concurrently with the signing of the Merger Agreement. In addition, certain representations and warranties were made as of a specified date, may be subject to contractual standards of materiality different from those generally applicable to public disclosures to shareholders, or may have been used for the purpose of allocating risk among the parties rather than establishing matters of fact. For the foregoing reasons, you should not rely on the representations and warranties contained in the Merger Agreement as statements of factual information. The Company's material representations and warranties relate to:

- the Company's, its subsidiaries' and certain joint ventures' proper organization, good standing and qualification to do business;

- the Company's capitalization, including the number of outstanding shares of Company Common Stock and preferred stock, stock options and other equity-based interests;

- the Company's corporate power and authority to enter into the Merger Agreement and to consummate the transactions contemplated by the Merger Agreement;

- the absence of violations of or conflicts with the Company's and its subsidiaries' and certain joint ventures' governing documents, applicable law or certain agreements as a result of entering into the Merger Agreement and consummating the Merger and the other transactions contemplated by the Merger Agreement;

- the timeliness and compliance with SEC requirements of the Company's SEC filings since December 25, 2005, including the accuracy and compliance with GAAP and SEC requirements of the financial statements contained therein;

- the adequacy of the Company's disclosure controls and procedures and internal controls over financial reporting;

- the absence of undisclosed liabilities;

- permits and compliance with applicable legal requirements, including licenses issued by the FCC;

- environmental matters;

- matters relating to employee benefit plans;

- the absence of certain changes since December 31, 2006 and the absence of certain changes since the date of the Merger Agreement;

- legal proceedings and investigations;

84

D&P_TR099747

- accuracy and compliance with applicable securities law of filings made by the Company with the SEC in connection with the Merger Agreement;

- amendment of the Rights Agreement;

- tax matters;

- employment and labor matters affecting the Company or its subsidiaries;

- intellectual property and real property;

- the receipt by the Board of an opinion from Morgan Stanley and Merrill Lynch as to the fairness, from a financial point of view, of the Merger Consideration to be received by the holders of shares of Company Common Stock (other than certain affiliated entities);

- the required vote of the Company's shareholders in connection with the required adoption of the Merger Agreement and approval of the Merger;

- material contracts and performance of obligations thereunder;

- absence of undisclosed brokers' fees;

- insurance;

- absence of affiliate transactions;

- indebtedness; and

- cable and satellite matters.

Many of the Company's representations and warranties are qualified by a "Company Material Adverse Effect" standard. For the purposes of the Merger Agreement, "Company Material Adverse Effect" means any facts, circumstances, events or changes that are materially adverse to the business, assets, financial condition, results of operations on an ongoing basis or continuing operations of the Company and its subsidiaries, taken as a whole, or that have a material adverse effect on the ability of the Company to perform its obligations under the Merger Agreement, or to consummate the Merger and the other transactions to be consummated by the Company.

However, a Company Material Adverse Effect will not include facts, circumstances, events or changes resulting from:

- changes in general economic or political conditions or the securities, credit or financial markets in general;

- general changes or developments in the industries in which the Company and its subsidiaries operate, including general changes in law or regulation across such industries;

- the announcement of the Merger Agreement or the pendency or consummation of the Merger;

- compliance with the terms of, or the taking of any action required by, the Merger Agreement or consented to by the Zell Entity and the ESOP;

- any acts of terrorism or war;

- the identity of the Zell Entity or the ESOP or any of their affiliates as participants in the transactions contemplated by the Merger Agreement or other agreements described in the Merger Agreement; or

- changes in United Stated generally accepted accounting principles ("GAAP") or the interpretation of GAAP by the Financial Accounting Standards Board, the Accounting Principles Board, the American Institute of Certified Public Accountants and similar organizations.

Confidential

D&P_TR099748

The exceptions described in the first two bullet points above will apply except to the extent such facts, circumstances, events, changes or developments have a disproportionate impact on the Company and its subsidiaries, taken as a whole, relative to other companies in the industries or in the geographic markets in which the Company conducts its businesses after taking into account the size of the Company relative to such other companies.

The parties also have agreed that any decline in the stock price of the Company Common Stock or any failure to meet internal or published projections, forecasts or revenue or earning predictions for any period will not, in and of itself, constitute a Company Material Adverse Effect, but the underlying causes of such decline or failure will be considered to the extent applicable in determining whether there is a Company Material Adverse Effect.

The Merger Agreement also contains various representations and warranties made by the ESOP and Merger Sub that are subject, in some cases, to specified exceptions and qualifications. The material representations and warranties relate to:

- organization, valid existence and good standing;

- corporate or other power and authority to enter into the Merger Agreement and to consummate the transactions contemplated by the Merger Agreement;

- enforceability of the Merger Agreement as against the ESOP and Merger Sub;

- required consents and approvals of governmental entities in connection with the consummation of the Merger and the other transactions contemplated by the Merger Agreement;

- the absence of any violation of or conflict with their governing documents, applicable law or certain agreements as a result of entering into the Merger Agreement and consummating the Merger and the other transactions contemplated by the Merger Agreement;

- governmental investigations and litigation;

- accuracy and compliance with applicable securities law of the information supplied by the ESOP and Merger Sub for inclusion in the filings made with the SEC in connection with the Tender Offer, the Merger and the other transactions contemplated by the Merger Agreement;

- capitalization of Merger Sub;

- lack of ownership of Company Common Stock; and

- absence of undisclosed broker's fees.

Many of the ESOP and Merger Sub's representations and warranties are qualified by an "ESOP Material Adverse Effect" standard. For the purposes of the Merger Agreement, "ESOP Material Adverse Effect" means an effect that prevents or materially delays or materially impairs the ability of the ESOP or Merger Sub to consummate the Merger and the transactions contemplated by the Merger Agreement.

The representations and warranties of each of the parties to the Merger Agreement will expire upon the Effective Time.

*Conduct of Business Pending the Merger.*  Under the Merger Agreement, the Company has agreed that, subject to certain exceptions, from and after the date of the Merger Agreement and prior to the Effective Time or the date, if any, on which the Merger Agreement is earlier terminated:

- the Company and its subsidiaries will conduct their business in the ordinary course of business in a manner consistent with past practice; and

Confidential

D&P_TR099749

- the Company and its subsidiaries will use their reasonable best efforts to preserve substantially intact the Company's business and to keep available the services of the key present officers, employees and consultants.

The Company has also agreed that during the same time period, subject to certain exceptions contained in the Merger Agreement and except as otherwise contemplated by the Merger Agreement, the Company will not (unless the ESOP gives its prior written consent):

- authorize or pay any dividend or distribution on any shares of capital stock or other equity securities (other than dividends and distributions made on a pro rata basis by subsidiaries and except that the Company may continue to pay dividends on its preferred stock);

- split, combine or reclassify its capital stock or other equity securities, or issue or authorize or propose to issue any other securities in respect of its capital stock or other equity securities, except for any such transaction by a wholly owned subsidiary that remains a wholly owned subsidiary after consummation of such transaction and except as contemplated by the Eagle Exchange;

- increase the compensation or other benefits provided to the Company's employees, directors, consultants, contractors or service providers except in the ordinary course of business consistent with past practice; pay any pension, service or retirement benefits not required by any existing plan or agreement; enter into or amend any compensation or benefit plan, collective bargaining agreement or welfare benefit plan, other than employment, severance or retention agreements entered into in the ordinary course of business consistent with past practice between the Company (or one of its subsidiaries) and any consultant, independent contractor, service provider or employee who is not an executive officer; or accelerate the vesting of, or the lapsing of restrictions with respect to, any stock-based compensation, or otherwise accelerate any rights or benefits or make determinations that would result in a material increase in liabilities under any Company benefit plan;

- change financial accounting policies or procedures or any of its methods of reporting income, deductions or other material items for financial accounting purposes, except as required by GAAP or applicable law;

- amend any provision of its certificate of incorporation or by-laws or similar applicable charter documents;

- issue, sell, pledge, dispose of or encumber, or authorize any of the foregoing in respect of shares of capital stock or other ownership interests in the Company or any Subsidiaries, other than certain permitted issuances of shares;

- except among the Company and its wholly owned subsidiaries or among the Company's wholly owned subsidiaries, purchase, redeem or otherwise acquire any shares of capital stock or other equity securities or any rights, warrants or options to acquire any such equity securities;

- incur, assume, guarantee, prepay or otherwise become liable for any indebtedness for borrowed money except for (1) indebtedness incurred to replace any existing indebtedness on certain terms; (2) guarantees by the Company of indebtedness of subsidiaries; (3) indebtedness necessary to effect the exercise of the purchase option for the properties owned by TMCT, LLC and leased to the Company and its subsidiaries; (4) indebtedness in an amount not to exceed $100 million in aggregate principal amount outstanding at one time incurred under the existing credit agreements or as an advance under the revolving credit facility included in the new credit agreements; (5) indebtedness for borrowed money among the Company and its wholly owned subsidiaries or among the Company's wholly owned subsidiaries; (6) indebtedness as required to

87

consummate the Tender Offer; and (7) unsecured indebtedness not to exceed $100 million in aggregate principal amount outstanding at any time;

- sell, lease, license, transfer, exchange or swap, mortgage or otherwise encumber or otherwise dispose of any material portion of its properties or assets, except sales of inventory in the ordinary course and pursuant to existing agreements;

- modify, amend, terminate or waive any rights under certain material contracts in any material respect in a manner that is adverse to the Company;

- enter into certain material contracts;

- make, change or revoke any material tax election; file any amended tax return or settle or compromise any liability for taxes;

- acquire, including by merger, consolidation or acquisition, any corporation or business organization or any division, or any material amount of assets with a purchase price of $120 million in the aggregate, provided that without the consent of the ESOP, the Company will not acquire or make any investment in any entity that holds any license, authorization or approval issued by the FCC;

- adopt a plan of restructuring, recapitalization or other reorganization;

- settle any claim, action or proceeding, except those involving only the payment of monetary damages not in excess of $20 million individually and $75 million in the aggregate;

- make capital expenditures other than in accordance with the Company's budget consistent with past practice and other expenditures necessary in response to emergencies such as natural disasters or acts of terrorism;

- enter into any agreement, arrangement or understanding between the Company (or any subsidiary) and any affiliate that would be required to be disclosed under Item 404 of Regulation S-K;

- take any action reasonably likely to prevent or cause a material delay in the satisfaction of certain conditions contained in the Merger Agreement or the consummation of the Merger; or

- agree, or permit any of its subsidiaries, to take any of the foregoing actions.

In addition, the Company has agreed that between the date of the Merger Agreement and the Effective Time, it shall not, and shall not permit any of its subsidiaries or affiliates to, enter into or consummate any agreements or arrangements for an acquisition of any ownership interest attributable to the ESOP or any of its affiliates under the FCC rules in any radio or television broadcast licensee, or the publisher of any English language daily newspaper of general circulation, if ownership of such interest would reasonably be expected to result in any delay in obtaining, or the failure to obtain, an FCC order granting the consents or approvals required under the Communications Act of 1934 (the "FCC Order") or require the FCC to issue additional waivers prior to granting the FCC Order.

*No Solicitation of Transactions.* During the period beginning on the date of the Merger Agreement and continuing until the Effective Time or the earlier termination of the Merger Agreement, the Company has agreed not to, and to cause its representatives not to:

- solicit, initiate, knowingly encourage or facilitate any inquiries with respect to, or the making, submission or announcement of, any Alternative Proposal (as defined below);

- participate in any negotiations regarding an Alternative Proposal, or furnish any non-public information regarding an Alternative Proposal or access to its properties, books, records or

88

D&P_TR099751

personnel in connection with the Alternative Proposal, to any person that has made or is considering making an Alternative Proposal;

- engage in discussions regarding an Alternative Proposal with any person that has made or is considering making an Alternative Proposal;

- approve, endorse or recommend any Alternative Proposal;

- enter into any letter of intent, agreement in principle or any agreement providing for any Alternative Proposal;

- cooperate with, or assist or participate in, or knowingly facilitate or encourage any effort or attempt by any person with respect to, or that would reasonably be expected to result in, an Alternative Proposal; or

- exempt any person from state takeover restrictions or similar laws, or otherwise cause such restrictions not to apply.

In addition, the Company has agreed to, and to cause each of its subsidiaries to, and to direct each of its and its subsidiaries' representatives to, immediately cease any discussions or negotiations with any parties that may be ongoing with respect to any Alternative Proposal. However, the Company, the Zell Entity and the ESOP have agreed that the provisions of any standstill agreement entered into between the Company and any third party will not be deemed to prohibit the third party from submitting competing proposals to the Special Committee or the Board.

"Alternative Proposal" means any bona fide proposal or offer from any person or group of persons, prior to the receipt of Company shareholder adoption of the Merger Agreement and approval of the Merger (other than a proposal or offer by the ESOP, Merger Sub or the Zell Entity and other than the Tender Offer), for:

- a merger, reorganization, share exchange, consolidation, business combination, recapitalization, dissolution, liquidation or similar transaction involving the Company;

- the direct or indirect acquisition by any person of assets representing 20% or more of the assets, revenues or earnings of the Company and its subsidiaries;

- the direct or indirect acquisition by any person of 20% or more of the outstanding shares; or

- any tender offer or exchange offer that if consummated would result in any person beneficially owning 20% or more of the shares.

The parties have agreed, however, that the Company may take the following actions, at any time from the date of the Merger Agreement and continuing until the earlier of the receipt of Company shareholder adoption of the Merger Agreement and the termination of the Merger Agreement, in response to a bona fide written and unsolicited Alternative Proposal that constitutes a Superior Proposal (as defined below) or that the Special Committee or the Board determines in good faith could reasonably be expected to result in a Superior Proposal, if the Special Committee or the Board determines in good faith, after consultation with outside legal counsel, that the failure to take such actions would be inconsistent with the directors' exercise of their fiduciary duties:

- furnish non-public information to the third party making the Alternative Proposal (if the Company receives an executed confidentiality agreement having confidentiality provisions substantially similar to the provisions of the confidentiality agreement between the Company and EGI);

- engage in discussions with the third party with respect to the Alternative Proposal; and

89

D&P_TR099752

- approve, recommend and enter into an agreement with respect to the Alternative Proposal in connection with the termination of the Merger Agreement in accordance with its terms.

The ESOP will be entitled to receive an executed copy of the confidentiality agreement referred to above and the Company will substantially simultaneously provide or make available to the ESOP any written material non-public information that is provided to the third party making the Alternative Proposal that was not previously provided to the ESOP.

The Company has also agreed that neither the Board nor any committee thereof will:

- withdraw or modify, or propose publicly to withdraw or modify in a manner adverse to the ESOP, the approval or recommendation by the Special Committee or the Board of the Merger or the Merger Agreement or other transactions contemplated by the Merger Agreement, including the Tender Offer (the "Recommendation");

- approve, adopt or recommend, or propose publicly to approve, adopt or recommend, any Alternative Proposal;

- recommend that shareholders tender their shares in any tender offer or exchange offer (other than the Tender Offer); or

- exempt any person from state takeover or similar restrictions.

Any of the foregoing actions constitute a "Change of Recommendation" under the Merger Agreement. However, if the Board or the Special Committee determines in good faith, after consultation with outside legal counsel and financial advisors, that failure to effect a Change of Recommendation would be inconsistent with the Board's or the Special Committee's exercise of its fiduciary duties, the Board or the Special Committee may make a Change of Recommendation.

The Company is required to promptly (within 48 hours) advise the ESOP of any Alternative Proposal or any inquiry that would reasonably be expected to lead to any Alternative Proposal, any request of non-public information relating to the Company or its subsidiaries or any inquiry for discussion or negotiation regarding an Alternative Proposal, including the identity of the person making any Alternative Proposal and the material terms of any such Alternative Proposal or inquiry. The Company must keep the ESOP reasonably informed on a current basis of the status of any Alternative Proposal or inquiry, and must promptly (within 48 hours) notify the ESOP if it determines to begin providing information or engaging in discussions concerning an Alternative Proposal.

"Superior Proposal" means any Alternative Proposal on terms that the Board or the Special Committee determines in good faith, after consultation with the Company's or the Special Committee's outside legal counsel and financial advisors, and considering such factors as the Board or the Special Committee considers to be appropriate, is more favorable to the Company and its shareholders than the transactions contemplated by the Merger Agreement. For purposes of the definition of "Superior Proposal," the references to "20%" in the definition of Alternative Proposal are deemed to be references to "50%."

*Shareholders Meeting.* The Company must, as promptly as reasonably practicable following the mailing of the proxy statement, call and hold a meeting of the Company's shareholders for the purpose of obtaining the shareholders' adoption of the Merger Agreement and approval of the Merger. The Company is required to use all reasonable best efforts to solicit shareholder proxies in favor of the approval of the Merger Agreement and the transactions contemplated by the Merger Agreement, subject to the other terms of the Merger Agreement. Unless the Merger Agreement has been terminated prior to the Company's meeting of shareholders, the Company is required to submit the Merger Agreement to a vote of shareholders even if the Board or the Special Committee has approved, endorsed or recommended an Alternative Proposal or has made a Change of Recommendation.

Confidential

D&P_TR099753

*Stock Options and Other Stock-Based Awards; Employee Benefits.* Under the terms of the Merger Agreement, at the Effective Time, each outstanding Company stock option that remains outstanding immediately prior to the Effective Time, whether vested or unvested, will become fully vested and the holder of the stock option will receive a cash payment equal to the product of (1) the number of shares subject to the option as of the Effective Time, multiplied by (2) the excess, if any, of the Merger Consideration over the exercise price per share of Company Common Stock subject to such option, less applicable tax withholding.

Under the terms of the Merger Agreement, at the Effective Time, each right of any kind to receive shares of Company Common Stock or benefits measured in whole or in part by the value of shares of Company Common Stock granted under Company stock or benefit plans, other than restricted shares, whether vested or unvested, that is outstanding immediately prior to the Effective Time will become fully vested and cease to represent a right or award with respect to shares of Company Common Stock and the holder of such right will receive a cash payment, less applicable withholding taxes, of the Merger Consideration for each share underlying such stock-based award. In addition, under the terms of the Merger Agreement, immediately prior to the Effective Time, each share of restricted Company Common Stock shall vest in full and be converted into the right to receive the Merger Consideration, less any applicable withholding taxes.

The parties have agreed that the Surviving Corporation will honor all Company benefit plans and compensation arrangements in accordance with their terms. The Surviving Corporation will provide each current and former employee, other than employees covered by collective bargaining agreements whose employment terminates during the one-year period following the Effective Time with severance benefits at levels in accordance with the terms of the Company's severance plans and policies in effect immediately prior to the Effective Time. The Surviving Corporation will fulfill the Company's obligations under the Company's Transitional Compensation Plan, without any amendment that is adverse to any beneficiary of such plan.

For all purposes under any new employee benefit plans of the Surviving Corporation providing benefits to employees of the Company after the Effective Time, each employee will be credited with his or her years of service with the Company under the employee benefit plans of the Surviving Corporation to the same extent that he or she was entitled to credit for service under the Company's similar benefit plans prior to the Effective Time. Each employee will be immediately eligible to participate in the Surviving Corporation's new employee benefit plans that replace a similar or comparable old benefit plan under which the employee participated. In addition, for new plans of the Surviving Corporation, preexisting condition exclusions and similar requirements will be waived to the extent they were waived under the Company's old plans, and eligible expenses incurred by an employee during the portion of the year prior to consummation of the Merger will be credited for deductible, coinsurance and maximum out-of-pocket expenses for that year under the Surviving Corporation's benefit plans.

*Indemnification and Insurance.* For a period of six years from the Effective Time, the Surviving Corporation will maintain in effect director, officer and employee exculpation, indemnification and advancement of expenses provisions no less favorable than those of the Company's and any of its subsidiaries' certificates of incorporation and by-laws as in effect immediately prior to the Effective Time or in any indemnification agreements of the Company or its subsidiaries with any of their respective directors, officers or employees as in effect immediately prior to the Effective Time, and will not amend, repeal or otherwise modify any such provisions in any manner that would adversely affect the rights thereunder of any individuals who at the Effective Time were current or former directors, officers or employees of the Company or any of its subsidiaries.

The parties have also agreed that the Surviving Corporation will, to the fullest extent permitted under applicable law, indemnify and hold harmless each current and former director, officer or

Confidential

D&P_TR099754

employee of the Company or any of its subsidiaries and each person who served as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise at the request of the Company (each, an "Indemnified Party") against any costs or expenses, judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened action, arising out of, relating to or in connection with any action or omission occurring or alleged to have occurred whether before or after the Effective Time (including acts or omissions in connection with such persons serving as an officer, director or other fiduciary in any entity if such service was at the request or for the benefit of the Company).

The parties have further agreed that for a period of six years from the Effective Time, the Surviving Corporation will maintain in effect the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Company and its subsidiaries with respect to matters arising on or before the Effective Time, subject to a maximum annual insurance premium of 200% of the last annual premium paid by the Company prior to the date of the Merger Agreement in respect of such coverage (the "Maximum Premium"). At the Company's option, after consultation with the ESOP, the Company may purchase, prior to the Effective Time, a six-year prepaid "tail" policy (at an aggregate cost not exceeding the Maximum Premium times six) on terms and conditions providing substantially equivalent benefits as the current policies of directors' and officers' liability insurance and fiduciary liability insurance. If the Company obtains such a prepaid tail policy, the Surviving Corporation will maintain the policy in full force and effect for its full term.

The Surviving Corporation will also pay all reasonable expenses, including reasonable attorneys' fees that may be incurred by any Indemnified Party in enforcing the foregoing obligations.

*Agreement to Take Further Action and to Use All Reasonable Best Efforts.* Each of the Company, the ESOP and Merger Sub has agreed to use its reasonable best efforts to do all things necessary, proper or advisable under applicable laws to consummate and make effective the Merger and the other transactions contemplated by the Merger Agreement, including to obtain necessary consents or waivers from third parties, to defend any lawsuit challenging the Merger Agreement or the consummation of the Merger or the other transactions contemplated by the Merger Agreement, and to execute and deliver any additional documents necessary to complete the Merger and the other transactions contemplated by the Merger Agreement. However, in no event are the ESOP, Merger Sub or the Company or any of its subsidiaries required to pay prior to the Effective Time any fee or other consideration to any third party for any consent or approval required for the consummation of the transactions contemplated by the Merger Agreement under any contract or agreement.

The Company and the ESOP have agreed to use reasonable best efforts to cooperate with each other in making any required filings with any governmental entity, and have agreed to take such further action as reasonably may be necessary to resolve objections, if any, as the FCC, the Federal Trade Commission, the Antitrust Division of the United States Department of Justice, state antitrust authorities or competition authorities of another nation, or any other person may assert under regulatory law so as to enable the closing of the Merger to occur as soon as reasonably possible.

*Financing Commitments; Company Cooperation.* The Company has agreed to use its reasonable best efforts to arrange the debt financing in connection with the Merger, the Tender Offer and the other transactions contemplated by the Merger Agreement on the terms described in the debt commitment letters delivered in connection with the signing of the Merger Agreement. If any of this debt financing becomes unlikely to occur in the manner or from the sources described in the debt commitment letters, the Company will promptly notify the ESOP and use its reasonable best efforts to obtain alternative debt financing.

Confidential

The ESOP has agreed to cooperate with the Company in obtaining the financing, including:

- participating in a reasonable number of meetings on reasonable advance notice;

- providing information reasonably required to be included in the preparation of offering memoranda, private placement memoranda, prospectuses and similar documents; and

- cooperating and assisting in the preparation, negotiation, execution and closing of any underwriting or placement agreements, indentures, credit agreements, pledge and security documents or other definitive financing documents.

*The Tender Offer.*  The Company agreed in the Merger Agreement to commence the Tender Offer. The Tender Offer was commenced on April 25, 2007, and expired on May 24, 2007. Approximately 218,132,000 shares were tendered in the Tender Offer. Because more than 126,000,000 shares were tendered in the Tender Offer, proration of tendered shares, except for "odd lots" (lots held by owners of less than 100 shares), was required.

*Eagle Exchange.*  The Merger Agreement also provides that, if any shares of Company Common Stock or shares of Series D-1 Preferred Stock are owned or held by Eagle New Media Investments, LLC or Eagle Publishing Investments, LLC (the "Eagle Entities") less than 20 business days prior to the closing of the Merger, the Company will, and will cause the Eagle Entities to, (1) enter into an exchange agreement providing for the Eagle Entities to exchange all shares of Company Common Stock and Series D-1 Preferred Stock held by the Eagle Entities for shares of newly designated and issued Series E Preferred Stock of the Company (the "Exchange") and (2) consummate the Exchange prior to the closing of the Merger.

*Other Covenants and Agreements.*  The Merger Agreement contains additional agreements among the Company, the ESOP and Merger Sub relating to:

- specified divestitures by the Company, and the process by which such divestitures are conducted;

- compliance with requirements of the FCC and notification of any inquiry by the FCC relating to each radio broadcast and television station owned and operated by the Company or its subsidiaries;

- providing the ESOP reasonable access during normal business hours to the Company's officers, employees, properties, contracts, commitments, books and records;

- taking actions necessary to exempt the transactions contemplated by the Merger Agreement from the effect of any takeover statutes; and

- the issuance of press releases or other public statements relating to the Merger Agreement or the transactions contemplated by the Merger Agreement.

*Conditions to the Merger.*  The obligations of the parties to complete the Merger are subject to the satisfaction or waiver of the following mutual conditions:

- the Company shareholder approval must be obtained;

- no restraining order, injunction or other order by any court that prohibits consummation of the Merger shall have been entered and shall continue to be in effect;

- any applicable waiting period under the HSR Act shall have expired or been earlier terminated and the FCC Order shall have been obtained;

- certain specified consents and approvals shall have been received;

- the Exchange shall have been consummated, if applicable;

93

- the conditions precedent to the consummation of the purchase of the Subordinated Note and the Warrant (as described below, under "Other Transaction Agreements—Zell Entity Purchase Agreement") shall have been satisfied or waived;

- the Company has obtained the debt financing on the terms set forth in the debt commitment letters, or alternative financing on substantially similar terms;

- the representations and warranties of the other party are true and correct both when made and as of the closing date (except to the extent made as of an earlier date, in which case as of such date), except where the failure of such representations and warranties to be so true and correct would not have, individually or in the aggregate, an ESOP Material Adverse Effect or a Company Material Adverse Effect, as the case may be; and

- the other party has in all material respects performed all obligations and complied with all covenants required by the Merger Agreement prior to the Effective Time.

In addition, the Company's obligation to effect the Merger is further subject to the fulfillment of the following conditions:

- the FCC Order does not impose any condition on the ESOP, the Company or any subsidiary that, individually or in combination with one or more conditions, would reasonably be expected to have a material adverse effect on the business, assets, financial condition, results of operations on an ongoing basis or continuing operations of the broadcasting business of the Company and its subsidiaries, taken as a whole;

- the ESOP has delivered to the Company a certificate, dated the Effective Time, certifying to the effect that the conditions related to the representations and warranties and performance in all material respects by the ESOP and Merger Sub of their obligations and covenants required by the Merger Agreement have been satisfied; and

- the Company has obtained an opinion from Valuation Research Corporation or another nationally recognized firm, in form and substance reasonably satisfactory to the Company, as to the solvency of the Company, after giving effect to the transactions contemplated by the Merger Agreement.

In addition, the ESOP's and Merger Sub's obligation to effect the Merger is further subject to the fulfillment of the condition that the Company has delivered to the ESOP a certificate, dated the Effective Time, certifying to the effect that the conditions related to the representations and warranties and performance in all material respects by the Company of its obligations and covenants required by the Merger Agreement have been satisfied.

*Termination.* The Merger Agreement may be terminated by either the ESOP or the Company, if:

- the Company and the ESOP agree to do so;

- the Effective Time shall not have occurred by May 31, 2008, except that this right will not be available to a party if the failure to fulfill any of such party's obligations under the Merger Agreement is the proximate cause of the failure to complete the Merger on or prior to such date;

- any final and non-appealable injunction or order permanently restrains, enjoins or prohibits the consummation of the Merger, except that the party seeking to terminate the Merger Agreement must have used its reasonable best efforts to remove such injunction or order; or

- the Company shareholders meeting shall have concluded and the Company shareholder approval was not obtained.

94

D&P_TR099757

The Merger Agreement may be terminated by the Company:

- if the Company is not in material breach of any of its representations, warranties or covenants and if the ESOP breaches or fails to perform in any material respect any of its representations, warranties, covenants or other agreements contained in the Merger Agreement, which breach or failure to perform (1) would result in a failure of a mutual condition or a condition to the Company's obligation to consummate the Merger to be satisfied and (2) cannot be cured by May 31, 2008; and the Company has provided the ESOP 30 days' written notice of its intention to terminate;

- in order to accept a Superior Proposal if, prior to the Company shareholder approval, (1) the Company has provided written notice to the ESOP advising that it has received a Superior Proposal; (2) at least three business days following receipt of such notice, the Board or the Special Committee has determined that, taking into account any revised proposal made by the ESOP, the Superior Proposal remains a Superior Proposal; (3) the Company has not breached its no-solicitation obligations; (4) the Board concurrently approves and the Company concurrently enters into a definitive agreement for such Superior Proposal; and (5) the Company has given the ESOP 48 hours' written notice of its intention to terminate the Merger Agreement; or

- if the consummation of the purchase of shares of Company Common Stock and the Exchangeable Note pursuant to the Zell Entity Purchase Agreement (as described below under "Other Transaction Agreements—Zell Entity Purchase Agreement") has not occurred on or before August 17, 2007, or if the Zell Entity Purchase Agreement is terminated in accordance with its terms prior to the Effective Time. The purchase of shares and the Exchangeable Note was consummated on April 23, 2007.

The Merger Agreement may be terminated by the ESOP:

- if the ESOP is not in material breach of any of its representations, warranties or covenants and if the Company breaches or fails to perform in any material respect any of its representations, warranties, covenants or other agreements contained in the Merger Agreement, which breach or failure to perform (1) would result in a failure of a mutual condition or a condition to the ESOP's obligation to consummate the Merger to be satisfied and (2) cannot be cured by May 31, 2008; and the ESOP has provided the Company 30 days' written notice of its intention to terminate; or

- if prior to the Company shareholder approval, the Board has failed to make the Recommendation in the proxy statement or has effected a Change of Recommendation in a manner adverse to the ESOP.

If the Merger Agreement is terminated, the Merger will not occur. See "Special Factors—Conduct of the Company's Business if the Merger is Not Completed."

*Amendment and Waiver.*   The Merger Agreement may be amended by a written agreement signed by the Company, the ESOP and Merger Sub at any time prior to the Effective Time. However, neither the ESOP nor Merger Sub may, without the prior written consent of the Zell Entity, either (1) waive or amend any provision of the Merger Agreement (including, without limitation, any closing condition), including by the exercise of any consent rights, or (2) agree to, or exercise any right to, terminate the Merger Agreement as described under the first bullet point or the last bullet point under the subheading "The Merger Agreement—Termination" above. In addition, no amendment that requires further approval of the Company's shareholders will be made without obtaining that approval.

Confidential

## OTHER TRANSACTION AGREEMENTS

### Zell Entity Purchase Agreement

On April 1, 2007, the Company concurrently with its entry into the Merger Agreement entered into a Securities Purchase Agreement (the "Zell Entity Purchase Agreement") with the Zell Entity and Zell. Pursuant to the terms of the Zell Entity Purchase Agreement, the Company agreed to sell to the Zell Entity (1) 1,470,588 newly issued shares of Company Common Stock for a purchase price of $50 million, and (2) an unsecured subordinated exchangeable promissory note in the principal amount of $200 million, which is exchangeable at the option of the Company, or automatically under certain circumstances, into 5,882,353 shares of Company Common Stock (the "Exchangeable Note"), for a purchase price of $200 million (the "Step One Purchase Transaction"). The parties closed the Step One Purchase Transaction on April 23, 2007. In the Merger, the Zell Entity will receive the Merger Consideration for its shares of Company Common Stock and, immediately prior to the Merger, the Company will repay the Exchangeable Note.

The Zell Entity Purchase Agreement also provides that, immediately following the consummation of the Merger, the Zell Entity will purchase from the Company for an aggregate purchase price of $315 million, (1) an unsecured subordinated promissory note in the principal amount of $225 million (the "Subordinated Note") and (2) a 15-year warrant (the "Warrant") to purchase 43,478,261 shares of Company Common Stock (subject to adjustment), which will represent approximately 40.3% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to the grant of share equivalent awards expected to be made under the management equity incentive plan as described above under "Special Factors—Interest of Directors and Executive Officers") (the "Step Two Purchase Transaction" and, together with the Step One Purchase Transaction, the "Purchase Transactions"). The Warrant will have an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first ten years of the Warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment).

Many of the representations, warranties and covenants made by the Company in the Merger Agreement are incorporated by reference and made by the Company to the Zell Entity and Zell in the Zell Entity Purchase Agreement, including among others, the covenants described above under "The Merger Agreement—No Solicitation of Transactions" with respect to solicitation or negotiation of competing proposals. Pursuant to the Zell Entity Purchase Agreement, Mr. Zell has been appointed to the Board effective May 9, 2007, and the Company has agreed that Mr. Zell will be elected to serve as Chairman of the Board effective as of the date of the consummation of the Step Two Purchase Transaction. The Company also reimbursed the Zell Entity for $2.5 million of expenses following consummation of the Step One Purchase Transaction and agreed to reimburse the Zell Entity for up to an additional $2.5 million of unreimbursed expenses following consummation of the Step Two Purchase Transaction. The Step Two Purchase Transaction is subject to various closing conditions, including consummation of the Merger.

The Zell Entity Purchase Agreement provides that, from April 1, 2007 until the third anniversary of the closing of the Step One Purchase Transaction, the Zell Entity will not transfer the Exchangeable Note, any shares purchased in the Step One Purchase Transaction, or any shares received in exchange for the Exchangeable Note other than pursuant to the Zell Entity Purchase Agreement or the Merger Agreement, except that, after the first to occur of the termination of the Zell Entity Purchase Agreement, the termination of the Merger Agreement or the consummation of the Merger, the Zell Entity may make transfers to certain of its affiliates who agree to be bound by the provisions of the Zell Entity Purchase Agreement.

The Zell Entity Purchase Agreement also provides that the Company will not amend, waive, or otherwise modify any provision of, or any of the rights and obligations under, the Merger Agreement,

Confidential

D&P_TR099759

and that the Company will not amend, waive obligations under, or otherwise modify or terminate the exchange agreement providing for the Exchange or the ESOP Purchase Agreement.

The Zell Entity Purchase Agreement grants certain termination rights to the parties. The Zell Entity Purchase Agreement may be terminated by the Company or the Zell Entity:

- by mutual consent;

- upon termination of the Merger Agreement;

- if the Step One Purchase Transaction has not been consummated on or prior to August 17, 2007 (the Step One Purchase Transaction was consummated on April 23, 2007); or

- if an injunction or other similar proceeding prohibiting the consummation of the Merger or the transactions contemplated by the Zell Entity Purchase Agreement has become final and non-appealable.

The Zell Entity Purchase Agreement may be terminated by the Zell Entity if:

- the Merger has not been consummated on or prior to May 31, 2008 (provided that the Zell Entity shall not have breached in any material respect its obligations in any manner that shall have proximately caused such failure to consummate the Merger);

- prior to obtaining the requisite shareholder approval, the Board fails to recommend the adoption of the Merger Agreement by the Company's shareholders in the Company's proxy statement or changes its recommendation to the Company's shareholders in a manner adverse to the Zell Entity;

- the Company fails to obtain the requisite shareholder approval of the Merger Agreement at the meeting of the Company's shareholders; or

- the Board or the Special Committee determines to accept a Superior Proposal.

The Zell Entity Purchase Agreement also gives the Zell Entity and the Company the right to terminate the Zell Entity Purchase Agreement if the other party has breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements in the Zell Entity Purchase Agreement, which breach or failure to perform (1) would result in a failure of any of the other party's conditions to complete the Step One Purchase Transaction (which transaction was completed on April 23, 2007) or (2) (a) would result in a failure of any of the other party's conditions to complete the Step Two Purchase Transaction and (b) cannot be cured by May 31, 2008; provided that the party seeking termination shall have given the other party at least 30 days' notice of its intent to terminate and the basis for the termination.

The Zell Entity Purchase Agreement provides that if the Zell Entity Purchase Agreement is terminated under certain specified circumstances, the Company may be required to pay the Zell Entity a termination fee of $25 million, including in the event of termination due to (1) certain breaches by the Company, (2) a change in recommendation by the Board or the Special Committee, (3) a determination by the Board or the Special Committee to accept a Superior Proposal or (4) shareholder disapproval under certain circumstances if the Company then enters into an alternative transaction meeting certain criteria within a year after termination.

In addition, under certain specified circumstances the Zell Entity may be required to pay the Company a termination fee of $25 million, including in the event of termination due to (1) certain breaches by the Zell Entity or (2) failure to obtain the financing for the transactions unless the failure is due to a breach by the Company or the ESOP.

Pursuant to the terms of the Zell Entity Purchase Agreement, until the earlier of (1) the date of consummation of the Merger and (2) the date on which the Merger Agreement is terminated, the Zell

Confidential

Entity has agreed to vote all of the shares of Company Common Stock that it beneficially owns in favor of adoption of the Merger Agreement and approval of the transactions contemplated thereby, including the Merger.

The Zell Entity Purchase Agreement also provides that Mr. Zell will provide a guarantee of payment to the Company of the obligations of the Zell Entity under the Zell Entity Purchase Agreement.

The Exchangeable Note accrues interest on the unpaid principal amount at the rate of 4.81% per annum, which may be paid in additional notes. The Exchangeable Note is subordinated to the senior obligations of the Company. The Exchangeable Note is exchangeable at any time, at the option of the Company, and will automatically be exchanged upon any termination of the Merger Agreement, into an aggregate of 5,882,353 shares of Company Common Stock, subject to antidilution adjustments. In the event of such an exchange, the Company will pay cash to the Zell Entity in an amount equal to 40% of the interest on the Exchangeable Note that has accrued or has been paid in additional notes, and the remaining 60% will be considered to be additional exchange price for the shares of Company Common Stock issued on the exchange. The Exchangeable Note matures on the date of the closing of the Merger and the Company is required to pay the outstanding principal amount of the Exchangeable Note together with all accrued and unpaid interest thereon, immediately prior to the consummation of the Merger. It is also prepayable at the Company's option in cash.

The Subordinated Note will be an unsecured subordinated promissory note in the principal amount of $225 million and will bear interest at the "Long-Term Applicable Federal Rate" on the date of issuance. The Warrant is exercisable for a period of 15 years from the date of issuance and provides for the aggregate issuance of 43,478,261 shares of Company Common Stock. The Warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the Warrant, for a maximum aggregate exercise price of $600 million. The number of shares and the exercise price are subject to adjustment in certain circumstances.

The foregoing descriptions of the Zell Entity Purchase Agreement, the Exchangeable Note, the Subordinated Note and the Warrant are qualified in their entirety by reference to the complete terms and conditions of the Zell Entity Purchase Agreement and the forms of the Exchangeable Note, the Subordinated Note and the Warrant, which are attached as Exhibits (d)(4), (d)(5), (d)(6) and (d)(7) to the Schedule 13E-3, respectively, and incorporated herein by reference.

**ESOP Purchase Agreement**

On April 1, 2007, the Company, concurrently with its entry into the Merger Agreement, entered into an ESOP Purchase Agreement (the "ESOP Purchase Agreement" and, together with the Zell Entity Purchase Agreement, the "Purchase Agreements") with the Trustee (on behalf of the ESOP). Pursuant to the terms of the ESOP Purchase Agreement, on April 1, 2007, the Company sold 8,928,571 shares of Company Common Stock to the ESOP at a price of $28.00 per share. Pursuant to the ESOP Purchase Agreement the Trustee agreed not to tender shares in the Tender Offer. The ESOP paid for this purchase with a promissory note of the ESOP executed by the Trustee in favor of the Company in the principal amount of $250 million (the "ESOP Note") to be repaid by the ESOP over the 30-year life of the loan through the ESOP's use of annual contributions from the Company to the ESOP or distributions paid on the shares of Company Common Stock held by the ESOP.

On April 1, 2007, the Company and the Trustee (on behalf of the ESOP) entered into an ESOP Loan Agreement (the "ESOP Loan Agreement"). The ESOP Loan Agreement documents an extension of credit of $250 million from the Company to the ESOP, as evidenced by the ESOP Note, which was made to permit the ESOP to purchase the shares of Company Common Stock pursuant to the ESOP Purchase Agreement. The ESOP Note contemplates payment by the ESOP to the Company in 30 annual installments with an annual interest rate of approximately 5%. The Trustee (on behalf of the

98

D&P_TR099761

ESOP) also entered into a pledge agreement (the "ESOP Pledge Agreement") with the Company whereby the ESOP agreed to pledge the shares of Company Common Stock acquired by the ESOP from the Company as collateral for the Company's extension of credit to the ESOP.

The foregoing descriptions of the ESOP Purchase Agreement, the ESOP Loan Agreement, the ESOP Note and the ESOP Pledge Agreement are qualified in their entirety by reference to the complete terms and conditions of the ESOP Purchase Agreement, the ESOP Loan Agreement, the ESOP Note and the ESOP Pledge Agreement, which are attached as Exhibits (d)(8), (d)(9), (d)(10) and (d)(11) to the Schedule 13E-3, respectively, and incorporated herein by reference.

**Investor Rights Agreement**

On April 1, 2007, the Company entered into an Investor Rights Agreement (the "Investor Rights Agreement") with the Zell Entity and the Trustee (on behalf of the ESOP). Each shareholder who is a party to the Investor Rights Agreement has agreed to vote its shares following the Merger such that (1) the initial directors on the Board following the Merger will serve until the third annual election following the consummation of the Merger, (2) there will be two directors designated by the Zell Entity and (3) there will be one director who shall be the chief executive officer of the Company. The Board will comprise nine members. The Investor Rights Agreement also contains provisions governing the transfer of the shares of Company Common Stock held by the Zell Entity and the ESOP, preemptive rights granted to the Zell Entity and the ESOP by the Company, and specified actions requiring the approval of a majority of the entire Board, including a majority of the independent directors and one designee of the Zell Entity. The parties to the Investor Rights Agreement also have agreed to take all actions necessary to enable the Company to make an election to be treated as a subchapter-S corporation under the Internal Revenue Code, following the consummation of the Merger, and to maintain an election for subchapter-S corporation status. The Investor Rights Agreement is not effective with respect to the Company until the closing of the Merger. The foregoing description of the Investor Rights Agreement is qualified in its entirety by reference to the complete terms and conditions of the Investor Rights Agreement, which is attached as Exhibit (d)(12) to the Schedule 13E-3, and incorporated herein by reference.

**Voting Agreement**

On April 1, 2007, the Company entered into a Voting Agreement (the "Voting Agreement") with the Chandler Trusts, pursuant to which the Chandler Trusts have committed to vote all of the shares of Company Common Stock that they beneficially own on the record date in favor of the Merger Agreement, whether or not recommended by the Board, and against any competing transaction, against any other agreement or action that is intended or would reasonably be expected to prevent, impede, or, in any material respect, interfere with, delay, postpone or discourage the transactions contemplated by the Merger Agreement, and against any action, agreement, transaction or proposal that would result in a breach of any representation, warranty, covenant, agreement or other obligation of the Company in the Merger Agreement or any of the Purchase Agreements.

The Chandler Trusts have also agreed to certain restrictions, subject to certain exceptions, on their ability to (1) solicit inquiries with respect to a competing transaction, (2) participate in discussions or negotiations with, or furnish nonpublic information to, any person with respect to a competing transaction or (3) approve, endorse or recommend a competing transaction or enter into any letter of intent or agreement with respect to a competing transaction.

The foregoing description of the Voting Agreement is qualified in its entirety by reference to the complete terms and conditions of the Voting Agreement, which is attached as Exhibit (d)(13) to the Schedule 13E-3, and incorporated herein by reference.

Confidential

**Zell Entity/ESOP Registration Rights Agreement**

On April 1, 2007, the Company entered into a registration rights agreement (the "Zell Entity/ ESOP Registration Rights Agreement") with the Zell Entity and the Trustee (on behalf of the ESOP), pursuant to which the Company granted to the Zell Entity and the ESOP certain demand and piggyback registration rights for the registration and sale of shares of Company Common Stock held by the Zell Entity or the ESOP, respectively, in the event that the Merger Agreement is terminated without consummation of the Merger. The registration rights granted pursuant to the Zell Entity/ESOP Registration Rights Agreement will not become effective in the case of the ESOP until the first anniversary of the date on which the ESOP purchased the shares of Company Common Stock from the Company pursuant to the ESOP Purchase Agreement. The registration rights applicable to the Zell Entity will not become effective until the third anniversary of the date on which the Zell Entity purchased shares of Company Common Stock and the Exchangeable Note from the Company pursuant to the Zell Entity Purchase Agreement. In addition, the Zell Entity will be prohibited from selling or assigning the Company Common Stock, Exchangeable Note and underlying shares acquired upon exchange until such third anniversary other than to certain permitted transferees. The Zell Entity/ESOP Registration Rights Agreement will terminate upon consummation of the Merger.

The foregoing description of the Zell Entity/ESOP Registration Rights Agreement is qualified in its entirety by reference to the complete terms and conditions of the Registration Rights Agreement, which is attached as Exhibit (d)(2) to the Schedule 13E-3, and incorporated herein by reference.

**Chandler Trusts Registration Rights Agreement**

On April 1, 2007, the Company entered into a registration rights agreement with the Chandler Trusts (the "Chandler Trusts Registration Rights Agreement") pursuant to which the Company granted to the Chandler Trusts certain shelf registration rights for the registration and sale of shares of Company Common Stock that the Chandler Trusts currently own. Concurrently with the commencement of the Tender Offer, the Company filed a shelf registration for the sale of such shares. The Chandler Trusts have agreed that they will not sell or offer to sell shares or otherwise act as a distribution participant (as defined in Regulation M under the Exchange Act) pursuant to the shelf registration prior to consummation or termination of the Tender Offer, unless counsel for the Company and the Chandler Trusts reasonably agree that such actions would not cause the Tender Offer or purchases pursuant to the Tender Offer to violate Regulation M under the Exchange Act. These shelf registration rights will terminate no later than November 22, 2007, and may terminate earlier under certain circumstances.

In the Chandler Trusts Registration Rights Agreement, the Chandler Trusts have agreed that they will tender into the Tender Offer all shares held by them at the expiration of the Tender Offer, so long as the Tender Offer is at a cash price equal to at least $34.00 per share. The Chandler Trusts have also agreed in the Chandler Trusts Registration Rights Agreement to cause Jeffrey Chandler, Roger Goodan and William Stinehart, Jr., each of whom were serving on the Board as representatives of the Chandler Trusts, to resign as directors of the Company, effective upon the purchase of shares of Company Common Stock in the Tender Offer or, if earlier, upon the Article VIII Termination Date (as defined in Section 8.1 of the Company's by-laws). The resignations are expected to become effective in early June.

The foregoing description of the Chandler Trusts Registration Rights Agreement is qualified in its entirety by reference to the complete terms and conditions of the Chandler Trusts Registration Rights Agreement, which is attached as Exhibit (d)(3) to the Schedule 13E-3, and incorporated herein by reference.

Confidential

D&P_TR099763

## ESOP Plan Documents

In connection with the Leveraged ESOP Transactions, the Board adopted the ESOP on April 1, 2007, effective as of January 1, 2007. The ESOP is intended to be qualified under Sections 401(a), 409 and 4975 of the Internal Revenue Code, and the trust portion thereof (the "ESOP Trust") is intended to be tax-exempt under Section 501(a) of the Internal Revenue Code. According to the terms of the ESOP, an employee is eligible to participate as of the first pay period after he or she has completed a year of service (including pre-effective date service) and attained age 21, with certain exclusions. Participating subsidiaries of the Company may make contributions for any year in such amounts as the Company may determine in its sole discretion, subject to the terms of the ESOP Loan Agreement, which provides that contributions will be made to the ESOP and distributions will be made on the shares of Company Common Stock held by the ESOP in an aggregate amount that is sufficient to enable the Trustee to pay principal and interest on the ESOP Note when due.

As of each December 31, stock will be allocated under the ESOP to the accounts of eligible employees who either (1) have completed 1,000 hours during the year and are employed on the last day of the year or (2) have retired, died or become disabled during the year. Allocations will be pro rata based on each employee's relative compensation, including base salary, wages and commissions, but excluding bonus and overtime. Participants will vest 20% per year between years 2-6 and pre-effective date service will be counted. Participants who have reached age 55 and completed 10 years of plan participation can elect to "diversify" a portion of their account by having their stock account converted to cash and reinvesting such amounts in other investment alternatives available in the retirement plan; pre-effective date service will not count for this purpose.

Participants' accounts will be distributed as follows: (1) upon retirement (age 65), death or disability, accounts will be distributed in the year following the year of termination of employment; or (2) upon termination of employment for other reasons, accounts will be distributed in the year that is the later of (A) 2018 or (B) six years after the year in which termination of employment occurs, but no later than the year following the year in which the participant attains age 65. The stock will be distributed in a lump sum and the participant or the ESOP will sell it back to the Company at the then fair market value, with payment by the Company to the participants in installments over five years with interest pursuant to the terms of an adequately secured promissory note. The first payment will be at the time of distribution.

The Tribune Company Employee Benefits Committee will administer the ESOP. Stock in the ESOP will be voted as follows: (1) while the stock is publicly traded, voting will be passed through to participants on all matters and the Trustee will vote undirected and unallocated shares in its discretion; (2) during any period the stock is not publicly traded, the Trustee will vote the shares in its discretion, provided that if the vote relates to certain events specified by law (merger, consolidation, recapitalization, reclassification, liquidation, dissolution or sale of substantially all assets in a trade or business), participants will have the right to direct the vote of the shares allocated to their account and the Trustee will vote all unallocated and undirected shares; and (3) the Trustee will determine how to respond to tender offers, but has agreed under the terms of the ESOP Purchase Agreement not to tender, in connection with the Tender Offer commenced by the Company on April 25, 2007, the shares of Company Common Stock that it purchased from the Company.

The foregoing description of the ESOP and the ESOP Trust is qualified in its entirety by reference to the complete terms and conditions of the ESOP and the ESOP Trust, which are attached as Exhibits (d)(14) and (d)(15) to the Schedule 13E-3, respectively, and incorporated herein by reference.

## Amendment of Shareholder Rights Plan

In connection with the Leveraged ESOP Transactions, the Company has entered into Amendment No. 3, dated as of April 1, 2007, to the Rights Agreement. The amendment provides that no person

Confidential

D&P_TR099764

shall be deemed to be an Acquiring Person (as defined in the Rights Agreement), and therefore the rights under the Rights Agreement will not be triggered solely by virtue of the execution, delivery or performance of any of the Merger Agreement, the Zell Entity Purchase Agreement, the ESOP Purchase Agreement, the Investor Rights Agreement, the Voting Agreement, the Zell Entity/ESOP Registration Rights Agreement, the Chandler Trusts Registration Rights Agreement and the other agreements entered into in connection with the Leveraged ESOP Transactions. The foregoing description of Amendment No. 3 to the Rights Agreement is qualified in its entirety by reference to the complete terms and conditions of Amendment No. 3 to the Rights Agreement, which is attached as Exhibit (d)(19) to the Schedule 13E-3, and incorporated herein by reference.

## APPRAISAL RIGHTS

*The discussion of the provisions set forth below is not a complete summary regarding your appraisal rights under Delaware law and is qualified in its entirety by reference to the text of the relevant provisions of Delaware law, which are attached to this proxy statement as Annex D. Shareholders intending to exercise appraisal rights should carefully review Annex D. Failure to follow any of the statutory procedures precisely may result in a termination or waiver of these rights.*

If the Merger is consummated, dissenting shareholders who follow the procedures specified in Section 262 of the DGCL within the appropriate time periods will be entitled to have their shares appraised by a court and to receive the "fair value" of such shares in cash as determined by the Delaware Court of Chancery in lieu of the consideration that such shareholder would otherwise be entitled to receive pursuant to the Merger Agreement.

The following is a brief summary of Section 262, which sets forth the procedures for dissenting from the Merger and demanding statutory appraisal rights. Failure to follow the procedures set forth in Section 262 precisely could result in the loss of appraisal rights. This proxy statement constitutes notice to our shareholders concerning the availability of appraisal rights under Section 262. A shareholder of record wishing to assert appraisal rights must hold the shares of stock on the date of making a demand for appraisal rights with respect to such shares and must continuously hold such shares through the effective time of the Merger.

Shareholders who desire to exercise their appraisal rights must satisfy all of the conditions of Section 262. A written demand for appraisal of shares must be filed with us before the special meeting. Shareholders electing to exercise their appraisal rights must also not vote "FOR" the Merger. Any proxy or vote against the Merger will not constitute a demand for appraisal within the meaning of Section 262.

A demand for appraisal must be executed by or for the shareholder of record, fully and correctly, as such shareholder's name appears on the share certificate. If the shares are owned of record in a fiduciary capacity, such as by a trustee, guardian or custodian, the demand must be executed by or for the fiduciary. If the shares are owned of record by or for more than one person, as in a joint tenancy or tenancy in common, the demand must be executed by or for all joint owners. An authorized agent, including an agent for two or more joint owners, may execute the demand for appraisal for a shareholder of record; however, the agent must identify the record owner or owners and expressly disclose the fact that, in exercising the demand, he is acting as agent for the record owner or owners. A person having a beneficial interest in shares held of record in the name of another person, such as a broker or nominee, must act promptly to cause the record holder to follow the steps summarized below and in a timely manner to perfect whatever appraisal rights the beneficial owner may have.

A shareholder who elects to exercise appraisal rights should mail or deliver the required written demand to us at our address at 435 North Michigan Avenue, Chicago, Illinois 60611, Attention: Corporate Secretary. The written demand for appraisal should specify the shareholder's name, and that the shareholder is demanding appraisal of his, her or its shares. Within ten days after the effective time

Confidential

D&P_TR099765

of the Merger, we must provide notice of the effective time of the Merger to all of our shareholders who have complied with Section 262 and have not voted for the Merger.

Within 120 days after the effective time of the Merger, any shareholder who has satisfied the requirements of Section 262 will be entitled, upon written request, to receive from the Company a statement listing the aggregate number of shares not voted in favor of the Merger and with respect to which demands for appraisal have been received and the aggregate number of holders of such shares. The Company, as the surviving corporation in the Merger, must mail such written statement to the shareholder no later than the later of 10 days after the shareholder's request is received by us or 10 days after the latest date for delivery of a demand for appraisal under Section 262.

Within 120 days after the effective time of the Merger, either we or any shareholder who has complied with the required conditions of Section 262 and who is otherwise entitled to appraisal rights may file a petition in the Delaware Court of Chancery demanding a determination of the fair value of the shares owned by shareholders entitled to appraisal rights. We have no present intention to file such a petition if demand for appraisal is made.

Upon the filing of any petition by a shareholder in accordance with Section 262, service of a copy must be made upon us. We must, within 20 days after service, file in the office of the Register in Chancery in which the petition was filed, a duly verified list containing the names and addresses of all shareholders who have demanded payment for their shares and with whom we have not reached agreements as to the value of their shares. If we file a petition, the petition must be accompanied by the verified list. The Register in Chancery, if so ordered by the court, will give notice of the time and place fixed for the hearing of such petition by registered or certified mail to us and to the shareholders shown on the list at the addresses therein stated, and notice will also be given by publishing a notice at least one week before the day of the hearing in a newspaper of general circulation published in the City of Wilmington, Delaware, or such publication as the court deems advisable. The forms of the notices by mail and by publication must be approved by the court, and we will bear the costs for such notices. The Delaware Court of Chancery may require the shareholders who have demanded an appraisal for their shares (and who hold stock represented by certificates) to submit their stock certificates to the Register in Chancery for notation of the pendency of the appraisal proceedings and the Delaware Court of Chancery may dismiss the proceedings as to any shareholder that fails to comply with such direction.

If a petition for an appraisal is filed in a timely fashion, after a hearing on the petition, the court will determine which shareholders are entitled to appraisal rights and will appraise the shares owned by these shareholders, determining the fair value of such shares, exclusive of any element of value arising from the accomplishment or expectation of the Merger, together with a fair rate of interest to be paid, if any, upon the amount determined to be the fair value. In determining "fair value", the Delaware Court is required to take into account all relevant factors. In *Weinberger v. UOP, Inc.* the Delaware Supreme Court discussed the factors that could be considered in determining fair value in an appraisal proceeding, stating that "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court" should be considered and that "[f]air price obviously requires consideration of all relevant factors involving the value of a company." The Delaware Supreme Court has stated that in making this determination of fair value the court must consider market value, asset value, dividends, earnings prospects, the nature of the enterprise and any other facts which could be ascertained as of the date of the merger which throw any light on future prospects of the merged corporation. Section 262 provides that fair value is to be "exclusive of any element of value arising from the accomplishment or expectation of the merger." In *Cede & Co. v. Technicolor Inc.*, the Delaware Supreme Court stated that such exclusion is a "narrow exclusion [that] does not encompass known elements of value," but which rather applies only to the speculative elements of value arising from such accomplishment or expectation. In *Weinberger*, the Delaware Supreme Court construed Section 262 to mean that "elements of future value, including the

103

nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered."

Shareholders considering seeking appraisal of their shares should note that the fair value of their shares determined under Section 262 could be more, the same or less than the consideration they would receive pursuant to the Merger Agreement if they did not seek appraisal of their shares. The costs of the appraisal proceeding may be determined by the court and taxed against the parties as the court deems equitable under the circumstances. Upon application of a dissenting shareholder, the court may order that all or a portion of the expenses incurred by any dissenting shareholder in connection with the appraisal proceeding, including reasonable attorneys' fees and the fees and expenses of experts, be charged pro rata against the value of all shares entitled to appraisal. In the absence of a determination or assessment, each party bears his, her or its own expenses. The exchange of shares for cash pursuant to the exercise of appraisal rights generally will be a taxable transaction for United States federal income tax purposes and possibly state, local and foreign income tax purposes as well. See "Special Factors—United States Federal Income Tax Consequences" on page 68.

Any shareholder who has duly demanded appraisal in compliance with Section 262 will not, after the effective time of the Merger, be entitled to vote for any purpose the shares subject to demand or to receive payment of dividends or other distributions on such shares, except for dividends or distributions payable to shareholders of record at a date prior to the effective time of the Merger.

At any time within 60 days after the effective time of the Merger, any shareholder will have the right to withdraw his, her or its demand for appraisal and to accept the terms offered in the Merger Agreement. After this period, a shareholder may withdraw his, her or its demand for appraisal and receive payment for his, her or its shares as provided in the Merger Agreement only with our consent. If no petition for appraisal is filed with the court within 120 days after the effective time of the Merger, shareholders' rights to appraisal (if available) will cease. Inasmuch as we have no obligation to file such a petition, any shareholder who desires a petition to be filed is advised to file it on a timely basis. No petition timely filed in the court demanding appraisal may be dismissed as to any shareholder without the approval of the court, which approval may be conditioned upon such terms as the court deems just.

Failure by any shareholder to comply fully with the procedures of Section 262 of the DGCL (as reproduced in Annex D to this proxy statement) may result in termination of such shareholder's appraisal rights. In view of the complexity of Section 262, shareholders who may wish to dissent from the Merger and pursue appraisal rights should consult their legal advisors.

Confidential

D&P_TR099767

# INFORMATION ABOUT THE COMPANY

## About Tribune Company

The Company is a media and entertainment company, operating primarily in the United States, that conducts our operations through two business segments: publishing, and broadcasting and entertainment. In publishing, our leading daily newspapers include the *Los Angeles Times*, *Chicago Tribune*, *Newsday* (Long Island, NY), *The Sun* (Baltimore), *South Florida Sun-Sentinel*, *Orlando Sentinel* and *Hartford Courant*. Our broadcasting group operates 24 television stations, including Superstation WGN on national cable, and Chicago's WGN-AM and the Chicago Cubs baseball team. Popular news and information websites complement our print and broadcast properties and extend our nationwide audience. These segments reflect the manner in which we sell our products to the marketplace, manage our operations and make business decisions. Our media operations are principally in major metropolitan areas of the United States and compete against all types of media on both a local and national basis. We were founded in 1847 and incorporated in Illinois in 1861. As a result of a corporate restructuring in 1968, we became a holding company incorporated in Delaware.

*Prior Public Offerings.* The Company has for several years maintained active debt shelf registration statements for its medium-term note program and other financing needs. A $1 billion shelf registration statement was declared effective in February 2006. In July 2006, a new shelf registration statement was filed and declared effective, replacing the shelf registration statement declared effective in February 2006. The new shelf registration statement does not have a designated amount, but the Board has authorized the issuance and sale of up to $3 billion of debt securities, inclusive of the $1 billion that was registered pursuant to the February 2006 registration statement.

*Company Common Stock Repurchases.* Except for repurchases of shares of Company Common Stock in the Tender Offer, the Company has not repurchased shares in 2007. The Company's repurchases of shares of Company Common Stock totaled 71 million shares for $2.3 billion in 2006 and 12 million shares for $440 million in 2005. On May 30, 2006, the Company initiated a modified "Dutch Auction" tender offer to repurchase up to 53 million shares of Company Common Stock at a price per share not greater than $32.50 and not less than $28.00. That tender offer closed on June 26, 2006, and the Company acquired 45 million shares of Company Common Stock on July 5, 2006 at a price of $32.50 per share before transaction costs. The Company also acquired 10 million shares of Company Common Stock from the Foundations on July 12, 2006 at a price of $32.50 per share before transaction costs. The Foundations are affiliated non-profit organizations, which together held 13.6% of the Company's outstanding shares when that tender offer was launched. In connection with that tender offer, the Board also authorized the repurchase of an additional 12 million shares of Company Common Stock commencing on the eleventh business day following the completion of the tender offer. In the third quarter of 2006, the Company repurchased an additional 11.1 million shares under that authorization at a weighted average cost of $29.94 per share. In addition, the Company repurchased and retired 4.6 million shares of Company Common Stock in the first quarter of 2006.

The following table summarizes the Company's 2006 repurchases (in thousands):

|  | Shares | Cost |
|---|---|---|
| Repurchases in first quarter | 4,604 | $ 137,746 |
| May 2006 tender offer repurchases | 45,027 | 1,468,270 |
| Repurchases from the Robert R. McCormick Tribune Foundation and Cantigny Foundation | 10,000 | 325,300 |
| Repurchases subsequent to the May 2006 tender offer | 11,053 | 330,952 |
| Total Company Common Stock repurchases | 70,684 | $2,262,268 |

Confidential

D&P_TR099768

### Significant Events

*TMCT Transactions.*   As a result of the Company's acquisition of Times Mirror in 2000, the Company holds investment interests in TMCT and TMCT II. TMCT and TMCT II were formed in 1997 and 1999, respectively, as a result of transactions involving agreements between Times Mirror and its largest shareholders, the Chandler Trusts. Additional information pertaining to the Company's investments in TMCT and TMCT II is provided in Note 7 to the consolidated financial statements in Item 8 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006. See "Special Factors—Interest of Directors and Officers—Related Party Transactions and Agreements."

*Sales of WATL-TV, Atlanta, WCWN-TV, Albany and WLVI-TV, Boston.*   On June 5, 2006, the Company announced the sale of WATL-TV, Atlanta to Gannett Co., Inc. ("Gannett") for $180 million. The sale closed on August 7, 2006. On June 19, 2006, the Company announced the sale of WCWN-TV, Albany to Freedom Communications, Inc. for $17 million. The sale closed on December 6, 2006. On September 14, 2006, the Company announced the sale of WLVI-TV, Boston, to Sunbeam Television Corp. for $113.7 million. The sale closed on December 19, 2006.

*Acquisition of Additional Equity in CareerBuilder, ShopLocal and Topix.*   In August 2006, the Company completed its acquisition of additional equity interests in each of CareerBuilder, LLC, ShopLocal, LLC (formerly CrossMedia Services, Inc.) and Topix, LLC for an aggregate purchase price of $155 million. The negotiated equity purchases followed the exercise of call options by the Company and Gannett on Knight-Ridder, Inc.'s equity ownership in the three online businesses after The McClatchy Company's announcement of its proposed acquisition of Knight-Ridder, Inc. As a result of this transaction, the Company and Gannett each increased their respective ownership of CareerBuilder, LLC and ShopLocal, LLC to 42.5% with The McClatchy Company retaining a 15% interest in both entities. Additionally, each of the Company's and Gannett's interest in Topix, LLC increased to 31.9%. As a result of subsequent funding, the current ownership of Topix, LLC is approximately 33.7% for both the Company and Gannett, 11.9% for The McClatchy Company and 20.7% for management of Topix, LLC.

*Network Affiliations.*   On January 24, 2006, the Company announced that it had reached a 10-year agreement to affiliate 16 of its television stations that were at that time affiliated with the former WB Network (including those in New York, Los Angeles and Chicago) with a new broadcast network, the CW Network. The new network was launched in September 2006 by Warner Bros. Entertainment and CBS. The new network airs a portion of the programming previously carried on the WB Network and the UPN Network, as well as new programming. The WB Network has shut down. The Company did not incur any costs related to the shutdown of the WB Network.

In the second quarter of 2006, the Company announced that its other three former WB Network affiliates (Philadelphia, Atlanta and Seattle) would become affiliates of the new broadcast network, MyNetworkTV, which was launched in September 2006 by the FOX Television Stations Network Inc. and Twentieth Century Television. The new network airs primarily primetime dramas. The Company subsequently sold its Atlanta station in August 2006 and its Albany and Boston stations in December 2006.

### Recent Developments

On February 12, 2007, the Company announced an agreement to sell the New York edition of *Hoy* ("*Hoy*, New York") to ImpreMedia, LLC. The sale of *Hoy*, New York closed on May 15, 2007. On March 6, 2007, the Company announced an agreement to sell Southern Connecticut Newspapers Inc. ("SCNI") to Gannett for $73 million. This agreement was terminated following an arbitrator's ruling that the Company could not sell SCNI unless Gannett assumed an existing collective bargaining contract as a condition of the sale, which Gannett declined to do. The Company simultaneously

Confidential

D&P_TR099769

announced that it would immediately begin the process of soliciting offers for the SCNI newspapers with the intention of completing a sale as soon as possible. In the first quarter of 2007, the Company recorded an after-tax loss of $33 million to write down the SCNI net assets to estimated fair value, less costs to sell.

## Selected Financial Data

*Historical Financial Information.*   We incorporate by reference the financial statements and notes thereto set forth in Item 8 of our Annual Report on Form 10-K for the fiscal year ended December 31, 2006. In addition, we incorporate by reference the financial information included in Item 1 of our Quarterly Report on Form 10-Q for the quarter ended April 1, 2007. You should refer to "Where You Can Find More Information" for instructions on how you can obtain copies of our SEC filings, including filings that contain our financial statements.

*Summary Historical Consolidated Financial Data.*   Set forth below is certain selected historical consolidated financial data. The financial data has been derived from, and should be read in conjunction with, our audited consolidated financial statements and the related notes filed as part of our Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and the unaudited condensed consolidated financial statements and the related notes filed as part of our Quarterly Report on Form 10-Q for the quarter ended April 1, 2007. More comprehensive financial information is included in such reports, including management's discussion and analysis of financial condition and results of operations, and other documents filed by the Company with the SEC, and the following summary is qualified in its entirety by reference to such reports and other documents and all of the financial information and notes contained in those documents. See "Where You Can Find More Information." Financial data for the quarterly periods ended April 1, 2007 and March 26, 2006, and the selected ratios for the quarterly periods ended April 1, 2007 and March 26, 2006 are unaudited and, in the opinion of our management, include all adjustments necessary for a fair presentation of the data. The results of operations for the interim periods are not necessarily indicative of the results to be expected for the entire year.

Confidential

D&P_TR099770

| | Three Months Ended | | Fiscal Years Ended | | | | |
|---|---|---|---|---|---|---|---|
| | April 1, 2007 | March 26, 2006 | Dec. 31, 2006 | Dec. 25, 2005 | Dec. 26, 2004 | Dec. 28, 2003 | Dec. 29, 2002 |
| | (unaudited) | (unaudited) | | | | | |
| **Operating Revenues** | | | | | | | |
| Publishing . . . . . . . . . . . . . . . . . | $ 931,494 | $ 985,319 | $ 4,045,598 | $ 4,046,907 | $ 4,075,618 | $ 3,983,292 | $ 3,889,904 |
| Broadcasting and entertainment . . . . . | 283,008 | 284,102 | 1,425,146 | 1,414,433 | 1,501,581 | 1,457,496 | 1,344,799 |
| Total operating revenues . . . . . . . . | $ 1,214,502 | $ 1,269,421 | $ 5,470,744 | $ 5,461,340 | $ 5,577,199 | $ 5,440,788 | $ 5,234,703 |
| **Operating Profit** | | | | | | | |
| Publishing . . . . . . . . . . . . . . . . . | $ 139,721 | $ 169,813 | $ 742,822 | $ 755,871 | $ 730,874 | $ 878,388 | $ 844,115 |
| Broadcasting and entertainment . . . . . | 61,382 | 67,451 | 391,533 | 416,891 | 513,289 | 491,733 | 437,008 |
| Corporate expenses . . . . . . . . . . . | (19,641) | (20,363) | (55,712) | (49,413) | (52,218) | (53,351) | (45,770) |
| Restructuring charges(1) . . . . . . . . . | — | — | — | — | — | — | (27,253) |
| Total operating profit . . . . . . . . . . . | 181,462 | 216,901 | 1,078,643 | 1,123,349 | 1,191,945 | 1,316,770 | 1,208,100 |
| Net income (loss) on equity investments . | 12,684 | 6,548 | 80,773 | 41,209 | 17,931 | 5,590 | (40,875) |
| Interest and dividend income . . . . . . . | 3,154 | 2,180 | 14,145 | 7,539 | 3,053 | 6,048 | 8,818 |
| Interest expense . . . . . . . . . . . . . . | (83,249) | (48,772) | (273,902) | (155,191) | (153,118) | (198,123) | (213,309) |
| Non-operating items . . . . . . . . . . . . | (83,715) | (13,697) | 102,969 | 69,861 | (145,044) | 241,247 | (63,211) |
| **Income from Continuing Operations Before Income Taxes and Cumulative Effect of Changes in Accounting Principle** . . . . . . . . . . . . . . . . . | 30,336 | 163,160 | 1,002,628 | 1,086,767 | 914,767 | 1,371,532 | 899,523 |
| Income taxes . . . . . . . . . . . . . . . . | (19,257) | (64,004) | (345,431) | (566,175) | (357,707) | (506,222) | (315,069) |
| **Income from Continuing Operations Before Cumulative Effect of Changes in Accounting Principle** . . . . . . . . . | 11,079 | 99,156 | 657,197 | 520,592 | 557,060 | 865,310 | 584,454 |
| Income (Loss) from Discontinued Operations, net of tax(2) . . . . . . . . . | (34,374) | 3,608 | (63,202) | 14,097 | 16,264 | 26,069 | 24,125 |
| Cumulative effect of changes in accounting principle, net of tax(3) . . . | — | — | — | — | (17,788) | — | (165,587) |
| **Net Income (Loss)(4)** . . . . . . . . . . . . | $ (23,295) | $ 102,764 | $ 593,995 | $ 534,689 | $ 555,536 | $ 891,379 | $ 442,992 |
| **Share Information** | | | | | | | |
| Basic earnings (loss) per share | | | | | | | |
| Continuing operations before cumulative effect of changes in accounting principle . . . . . . . . . . . | $ 0.05 | $ 0.32 | $ 2.39 | $ 1.64 | $ 1.70 | $ 2.70 | $ 1.85 |
| Discontinued operations . . . . . . . . . | (0.14) | 0.01 | (0.23) | 0.05 | 0.05 | 0.08 | 0.08 |
| Cumulative effect of changes in accounting principle . . . . . . . . . . . | — | — | — | — | (.05) | — | (0.55) |
| Net income (loss) . . . . . . . . . . . . . . | $ (0.10) | $ 0.33 | $ 2.16 | $ 1.68 | $ 1.70 | $ 2.78 | $ 1.38 |
| Diluted earnings (loss) per share | | | | | | | |
| Continuing operations before cumulative effect of changes in accounting principle . . . . . . . . . . . | $ 0.05 | $ 0.32 | $ 2.37 | $ 1.62 | $ 1.68 | $ 2.53 | $ 1.72 |
| Discontinued operations . . . . . . . . . | (0.14) | 0.01 | (0.23) | 0.04 | 0.05 | 0.08 | 0.07 |
| Cumulative effect of changes in accounting principle . . . . . . . . . . . | — | — | — | — | (0.05) | — | (0.50) |
| Net income (loss) . . . . . . . . . . . . . . | $ (.10) | $ 0.33 | $ 2.14 | $ 1.67 | $ 1.67 | $ 2.61 | $ 1.30 |
| Common dividends per share . . . . . . . . | $ 0.18 | $ 0.18 | $ 0.72 | $ 0.72 | $ 0.48 | $ 0.44 | $ 0.44 |
| Weighted average common shares outstanding (000's) . . . . . . . . . . . . . | 239,959 | 304,219 | 272,672 | 312,880 | 322,420 | 311,295 | 301,932 |

Confidential

D&P_TR099771

|  | Three Months Ended | | Fiscal Years Ended | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
|  | April 1, 2007 | March 26, 2006 | Dec. 31, 2006 | Dec. 25, 2005 | Dec. 26, 2004 | Dec. 28, 2003 | Dec. 29, 2002 |
|  | (unaudited) | (unaudited) | | | | | |
| **Financial Ratios** | | | | | | | |
| Operating profit margin . . . . . . . . . . . | 14.9% | 17.1% | 19.7% | 20.6% | 21.4% | 24.2% | 23.1% |
| Debt to capital including PHONES(5) . . | 44% | 27% | 44% | 26% | 22% | 22% | 29% |
| Debt to capital excluding PHONES(5) . . | 41% | 23% | 41% | 23% | 18% | 18% | 26% |
| **Financial Position and Other Data** | | | | | | | |
| Total assets . . . . . . . . . . . . . . . . . . | $13,183,924 | $14,378,818 | $13,400,772 | $14,546,242 | $14,155,432 | $14,280,152 | $13,974,048 |
| Long-term debt including PHONES . . . | 3,608,570 | 2,962,146 | 3,576,211 | 2,959,262 | 2,317,933 | 2,381,617 | 3,260,795 |
| Long-term debt excluding PHONES . . . | 2,996,490 | 2,450,866 | 3,003,251 | 2,449,561 | 1,733,053 | 1,846,337 | 2,737,355 |
| Shareholders' equity . . . . . . . . . . . . . | 4,304,420 | 6,662,283 | 4,319,616 | 6,725,551 | 6,836,844 | 7,028,124 | 6,119,235 |
| Capital expenditures . . . . . . . . . . . . . | 21,369 | 21,852 | 221,907 | 205,945 | 217,348 | 193,535 | 186,737 |

(1) During the second quarter of 2001, the Company announced a voluntary employee retirement program. The Company implemented this program as well as various other cost reduction initiatives throughout the remainder of 2001 and the first quarter of 2002. The restructuring charges related to these programs decreased 2002 full year net income by $17 million and diluted EPS by $.05.

(2) Includes results from operations of *Hoy*, New York and SCNI for the first quarters of 2007 and 2006 and the expected loss on sale of SCNI in the first quarter of 2007. The results of operations for fiscal years 2002 through 2006 for *Hoy*, New York and SCNI have been reclassified as discontinued operations. Also includes income from operations and net loss on sales of WATL-TV, Atlanta, WCWN-TV, Albany, and WLVI-TV, Boston for fiscal year 2006. The results of operations for fiscal years 2002 through 2005 for these businesses are reported as discontinued operations. See Note 3 to the consolidated financial statements included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and Note 3 to the condensed consolidated financial statements included in our Quarterly Report on Form 10-Q for the quarterly period ended April 1, 2007 for additional information pertaining to discontinued operations.

(3) The cumulative effect of adopting a new accounting pronouncement for the valuation of certain intangible assets decreased net income by $18 million in 2004. The cumulative effect of adopting a new accounting pronouncement for goodwill and other intangible assets decreased net income by $166 million in 2002.

(4) See Note 8 to the condensed consolidated financial statements included in our Quarterly Report on Form 10-Q for the quarterly period ended April 1, 2007 for information pertaining to non-operating items recorded in the first quarters of 2007 and 2006. See Note 2 to the consolidated financial statements included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2006 for information pertaining to non-operating items recorded in 2006, 2005 and 2004. Fiscal year 2003 included the following after-tax non-operating items; gain on changes in fair values of derivatives and related investments of $52 million, gain on sales of subsidiaries and investments of $90 million, loss on investment write-downs of $6 million, gain on insurance recoveries of $14 million, an other non-operating loss of $2 million and a favorable income tax settlement adjustment of $25 million, totaling a gain of $173 million, or $.52 per diluted share. Fiscal year 2002 included the following after-tax non-operating items; loss on changes in fair values of derivatives and related investments of $98 million, gain on sales of subsidiaries and investments of $65 million, loss on investment write-downs of $11 million, other non-operating gain of $6 million and a favorable income tax settlement adjustment of $29 million, totaling a loss of $9 million, or $.02 per diluted share.

(5) Capital comprises total debt, non-current deferred income taxes and shareholders' equity.

Confidential

D&P_TR099772