compared to 2004. Circulation distribution expense declined 1%, or $5 million, primarily due to lower payments to outside contractors as a result of circulation volume declines.

Selling, general and administrative expenses ("SG&A") expenses were up 2%, or $22 million, in 2006. Compensation expense increased 5%, or $34 million, in 2006. Compensation expense in 2006 included $32 million of stock-based compensation, a $20 million charge for severance and other payments associated with the new union contracts at Newsday and a $9 million severance charge for the elimination of approximately 400 positions at publishing. Compensation expense in 2005 included a $45 million severance charge for the elimination of approximately 900 positions and a pension curtailment gain of $18 million. Promotion expense decreased 4%, or $4 million, due to the Company's efforts to reduce costs in 2006. SG&A expense in 2006 also included a $7 million gain on real property sales in Publishing and a $7 million gain related to the sale of the corporate airplane.

SG&A expenses were down 6%, or $98 million, in 2005. Compensation expense decreased 1%, or $5 million, in 2005. Compensation expense in 2005 included a $45 million severance charge for the elimination of approximately 900 positions and a pension curtailment gain of $18 million, while 2004 compensation expense included a $41 million severance charge for the elimination of about 600 positions in publishing. Circulation expense decreased 6%, or $7 million, in 2005. Other SG&A expenses declined $81 million in 2005. Other SG&A expenses in 2004 included a charge of $90 million related to the settlement with advertisers regarding misstated circulation at *Newsday* and *Hoy*, New York.

The decrease in depreciation and amortization of intangible assets in 2006 and the increase in 2005 is primarily due to $16 million of accelerated depreciation in 2005 related to the shutdown of the *Los Angeles Times* San Fernando Valley printing facility.

Equity income totaled $81 million in 2006, an increase of $40 million from 2005. The increase primarily reflects improvements at TV Food Network, CareerBuilder and Classified Ventures and the absence of losses from the WB Network. In addition, equity income for 2006 includes the Company's $6 million share of a one-time favorable income tax adjustment.

The Company spent $222 million for capital expenditures during 2006 and $206 million in 2005. Major capital projects that were in process during 2006 included the expansion of preprint inserting operations and color press capacities and the implementation of new standard advertising, editorial and circulation systems. Capital spending for the expansion of preprint inserting capacity in Chicago and Orlando totaled $20 million in 2006. The new inserts in Orlando began production in 2006. As of Dec. 31, 2006, the installation of additional equipment and systems at Chicago was in progress. The Chicago expansion is scheduled to be completed by mid-2007 with additional capital spending of approximately $22 million in 2007.

## Public projections

In connection with the due diligence review of the Company by the ESOP, the Zell Entity, and other interested parties, the Company provided to the ESOP and the Zell Entity and to other interested parties certain financial projections. These financial projections were also provided to the Tribune Board and the Special Committee and their respective financial and legal advisors. The Company is disclosing a subset of these projections to give public shareholders and investors access to certain information deemed material by the Board and Special Committee for purposes of considering and evaluating the leveraged ESOP transactions. A summary of these financial projections is set forth below.

The material assumptions made by Tribune management in developing the projections are as follows:

90

JPM_00052552

**Publishing**

- Revenue decline of 1% in 2007 due to a challenging advertising environment

- Print advertising revenue decline of 3% in 2007 which will be partially offset by Interactive revenue growth

- Modest improvement in 2008-2011 revenues as compared to 2007 due to annual Interactive revenue growth of 16% and improvements in classified

- Circulation revenue declines of 4% annually in years 2007-2011 from modest volume declines and continued selective discounting

- Expense decline of 1% in 2007 due to more favorable newsprint prices and other cost reductions

- Continued focus on cost reductions beyond 2007

- Growth in equity income from CareerBuilder and Classified Ventures

- Declining capital expenditures due to the completion of ongoing systems projects by early 2009

**Broadcasting**

- Advertising sales growth of nearly 2% annually in years 2006-2011

- Base television spot market growth of 1% annually

- Expected improvements in political spending

- An expected increase in revenue share to 14.3% in 2011 from a projected 13.3% in 2006

- Improved ratings for The CW network as compared to The WB network and continued ratings momentum of FOX network programming

- Increase in revenue share due to debuts of new syndicated programming in fall 2007

- Continued growth of WGN Superstation distribution (volume and rate) and renewal of carriage agreements

- Increase in annual operating expenses of approximately 1.6%

- Continued growth of the TV Food Network

91

JPM_00052553

## Summary consolidated income statement ($ millions)

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | '06-'10 4Y CAGR | '07-'11 4Y CAGR | '06-'11 5Y CAGR |
|---|---|---|---|---|---|---|---|---|---|
| **Operating Revenues** | | | | | | | | | |
| Publishing | 4,025 | 3,984 | 4,007 | 4,036 | 4,063 | 4,093 | 0.2 % | 0.7 % | 0.3 % |
| Broadcasting & Entertainment | 1,408 | 1,401 | 1,480 | 1,487 | 1,531 | 1,537 | 2.1 % | 2.3 % | 1.8 % |
| Total Revenues | 5,433 | 5,385 | 5,487 | 5,523 | 5,594 | 5,630 | 0.7 % | 1.1 % | 0.7 % |
| | | | | | | | | | |
| **Operating Cash Expenses[1]** | | | | | | | | | |
| Publishing | 3,094 | 3,069 | 3,077 | 3,089 | 3,104 | 3,123 | 0.1 % | 0.4 % | 0.2 % |
| Broadcasting & Entertainment | 970 | 985 | 1,012 | 1,003 | 1,030 | 1,048 | 1.5 % | 1.6 % | 1.6 % |
| Corporate | 61 | 61 | 65 | 66 | 69 | 71 | 3.0 % | 3.8 % | 3.0 % |
| Total Operating Cash Expenses | 4,125 | 4,115 | 4,149 | 4,158 | 4,203 | 4,242 | 0.5 % | 0.8 % | 0.6 % |
| | | | | | | | | | |
| **Operating Cash Flow [1]** | | | | | | | | | |
| Publishing | 931 | 915 | 935 | 947 | 959 | 970 | 0.7 % | 1.5 % | 0.8 % |
| Broadcasting & Entertainment | 437 | 416 | 468 | 484 | 501 | 490 | 3.5 % | 4.2 % | 2.3 % |
| Corporate | (61 ) | (61 ) | (65 ) | (66 ) | (69 ) | (71 ) | 3.0 % | 3.8 % | 3.0 % |
| Total Operating Cash Flow | 1,308 | 1,270 | 1,339 | 1,364 | 1,391 | 1,389 | 1.6 % | 2.3 % | 1.2 % |
| | | | | | | | | | |
| Equity Income | 75 | 67 | 95 | 129 | 159 | 191 | 20.7 % | 29.9 % | 20.6 % |
| Adjusted Operating Cash Flow | 1,383 | 1,337 | 1,434 | 1,493 | 1,550 | 1,580 | 2.9 % | 4.3 % | 2.7 % |
| | | | | | | | | | |
| **Capital Expenditures** | | | | | | | | | |
| Publishing | 173 | 165 | 140 | 100 | 100 | 100 | | | |
| Broadcasting & Entertainment | 42 | 28 | 28 | 27 | 27 | 27 | | | |
| Corporate | 6 | 7 | 7 | 3 | 3 | 3 | | | |
| Total Capital Expenditures | 222 | 200 | 175 | 130 | 130 | 130 | | | |
| | | | | | | | | | |
| Investments | 222 | 100 | 275[3] | 100 | 100 | 100 | | | |
| Total Capital Usage | 444 | 300 | 450 | 230 | 230 | 230 | | | |
| | | | | | | | Cumulative FCF ('07-'11) | | |
| Pre-tax free cash flow | $939 | $1,037 | $983 | $1,264 | $1,320 | $1,350 | $5,954 | | |

Note: Excludes non-operating items, discontinued operations (Atlanta, Albany and Boston) and the following special items: approximately $20 million of severance and other payments associated with new union contracts at Newsday, $9 million of severance expense, a $4 million charge for the disposition of a press, $7 million of gains from property sales and a $7 million gain from the sale of the corporate airplane.

[1] Includes non-cash stock-based compensation and non-cash pension expense.

[2] Excludes fiscal year 2006's additional week. A 53rd week occurs every six years as the Company's fiscal years end on the last Sunday of the year.

[3] Includes $175 million in 2008 for the purchase of TMCT real estate

92

Confidential

JPM_00052554

## 10. Appendix

### Summaries of principal transaction documents

**Merger agreement and related agreements**

| | |
|---|---|
| Structure | ■ The Company, the ESOP, and a merger subsidiary of the ESOP are parties to the merger agreement.  EGI-TRB, an LLC wholly owned by a trust established for the benefit of Sam Zell and his family, will also have the benefit, through the securities purchase agreement described below, of certain closing conditions and termination rights, as well as certain representations, warranties and covenants (including interim operating covenants and no solicitation covenants) |
| | ■ All common stock, except stock owned by the ESOP and any dissenting shares, is cashed out at $34 per share.  In the event the Merger does not close on or prior to December 31, 2007, each share of common stock will also be entitled to an 8% per annum ticking fee from January 1, 2008 through the closing date of the merger. |
| Regulatory commitment | ■ Reasonable best efforts standard.  No obligation to close if FCC order contains conditions that would have a material adverse effect on the broadcasting business |
| Closing conditions | ■ Customary mutual conditions including: Shareholder approval, no injunction, regulatory approvals and receipt of specified consents.  Additional mutual conditions include |
| | ⚌ Receipt of financing |
| | ⚌ Consummation of the recapitalization of common stock held by the Eagles subsidiaries |
| | ⚌ Conditions to consummation of the purchase of the subordinated note and the Warrant in the securities purchase agreement have been satisfied or waived |
| | ■ ESOP has customary closing conditions, including the material accuracy of the Company's representations and warranties and performance of covenants. |
| | ■ Company has customary closing conditions, including the material accuracy of the ESOP's representations and warranties and performance of covenants.    Additional Company conditions include |
| | ⚌ FCC consent must not impose any condition on the Company that would have a material adverse effect on the broadcasting business |
| | ⚌ Receipt of solvency opinion |
| | ■ ESOP may not waive any of its conditions to closing without the prior written consent of EGI-TRB (the Zell Entity) |
| Drop dead date | ■ May 31, 2008 |
| Termination rights | Customary termination rights, including |
| | Mutual written consent |
| | If merger not closed by the drop dead date |
| | Non-appealable injunction or court order prohibiting transaction |
| | Failure to obtain shareholder approval |
| | By either party, if other party breaches merger agreement and cannot be cured by the drop dead date |
| | By the Company, to accept a better deal |
| | By the ESOP, if the Board fails to make appropriate recommendation to shareholders or changes its recommendation |

93

Confidential

## Merger agreement and related agreements (cont'd)

| | |
|---|---|
| Non-solicitation | ■ No-shop provision, but Company may entertain alternative proposal if reasonably likely to lead to a better deal, and may terminate to take a better deal |
| Interim covenants | ■ Customary interim operating covenants, restricting the Company's ability between signing and closing to make acquisitions or dispositions, incur debt, pay quarterly dividends or take other material steps without the consent of the ESOP and Zell |
| Representations | ■ Customary Company representations and warranties, including with respect to: Organization, capital stock, corporate authority, reports and financial statements, internal controls, no undisclosed liabilities, compliance with law, environmental, employee benefits, absence of changes, litigation, proxy statement, rights plan, tax, labor, intellectual property, real property, fairness opinion, shareholder vote, material contracts, brokers, insurance, affiliate transactions, indebtedness and cable and satellite matters<br>■ Customary acquiror representations and warranties, including with respect to: Organization, authority, no violation, litigation, capitalization, lack of ownership of company common stock |
| Options; RSU's; employee matters | ■ At the effective time of the merger, options, whether vested or unvested, will be cashed out at the spread, if any, between exercise price and deal price<br>■ At the effective time of the merger, unvested restricted stock units will vest and be paid out at the deal price<br>■ Following the merger, limited employee benefit protections/covenants regarding: Severance, plan eligibility/participation and 2007 bonus and 401(k) contributions have been agreed to |
| Self-tender | ■ The merger agreement provides that the Company will commence the self tender offer as the first step of the transaction (tender commenced on April 25, 2007) |
| D&O indemnity and insurance | ■ Indemnification: Company to maintain, for six years, provisions relating to exculpation, indemnification and advancement of expenses no less favorable than currently in effect<br>■ Insurance: Company to maintain D&O liability and fiduciary liability insurance for six years or acquire a tail policy providing the same coverage |
| Voting agreement | ■ The Chandler Trusts have committed to vote all of their shares of company common stock in favor of the merger. |
| Eagles exchange | ■ Prior to the merger, the Eagle entities will exchange any Company common stock or Series D-1 preferred stock that they own for a new Series E preferred stock. The Series E preferred stock held by the Eagle entities will remain outstanding after the merger. |

94

JPM_00052556

## Securities purchase agreement and related agreements

| | |
|---|---|
| **Structure and basic terms** | ■ Entered into concurrently with the execution and delivery of the merger agreement, between the Company and EGI-TRB LLC and Sam Zell, individually, as guarantor. |
| | ■ Structured with two closings |
| | ☆ **First closing:** On April 23, 2007, EGI-TRB purchased from the Company $50 million of common stock at $34 per share and an exchangeable note for $200 million, which is exchangeable at the option of the Company, or automatically upon termination of the merger agreement, into common stock at $14 per share. This transaction was consummated on April 23, 2007. Zell will be appointed to the Company's board no later than May 9, 2007. |
| | ☆ **Second closing:** In the merger, EGI-TRB will receive the merger consideration for its shares of common stock and immediately prior to the consummation of the merger, the Company will repay the exchangeable note to the extent it is still outstanding. Immediately following the consummation of the merger; the Zell entity will purchase a $225 million subordinated note and a 15-year warrant (described below) for $90 million. |
| **Representations and warranties** | ■ Generally mirror the representations and warranties found in the Merger Agreement. |
| **Covenants** | ■ Generally mirror the covenants in the merger agreement, including covenants binding Zell to use reasonable efforts to consummate the transactions. |
| | ☆ No transfer of the common stock or the exchangeable note pending the merger or during the three year period from the date of purchase in the event the merger does not close |
| | ☆ Zell agrees to vote in favor of the merger, to revoke any prior proxies and not enter into inconsistent agreements |
| **Guarantee** | ■ Zell, in his personal capacity, has agreed to guarantee the obligations of EGI-TRB LLC. |
| **Conditions to the first closing which occurred on April 23, 2007** | ■ No injunction |
| | ■ No termination of the merger agreement |
| | ■ Receipt of all required regulatory and third-party consents and approvals; early termination of the HSR waiting period granted on April 20, 2007. |
| | ■ Compliance with representations, warranties and covenants, and delivery of officers' certificates certifying compliance |
| | ■ Authorization of shares for listing on the NYSE (satisfied) |
| **Conditions to second closing** | ■ No injunction |
| | ■ Consummation of the merger |
| | ■ Zell elected as chairman, if he is willing and able to serve in such capacity, as of the second closing |
| **Termination rights** | ■ Mutual written consent |
| | ■ Unappealable injunction or court order |
| | ■ Upon termination of the merger agreement in accordance with its terms |
| | ■ By either party, if other party breaches the securities purchase agreement and cannot cure by the drop dead date of the merger agreement |
| | ■ By EGI-TRB if the merger has not occurred by May 31, 2008 (unless the failure to close has been caused by EGI-TRB) |
| | ■ By EGI-TRB, if prior to obtaining the shareholder vote, the Tribune board fails to make appropriate recommendation to shareholders or changes its recommendation |
| | ■ By EGI-TRB, if the requisite shareholder approval is not obtained at the shareholder meeting |
| | ■ By EGI-TRB, if the Company decides to accept a better deal |
| ==Break-up fees== | ■ Company may be required to pay a ==$25 million termination fee== in event of termination due to (i) certain breaches by the Company, (ii) a change in recommendation, (iii) accepting a better deal or (iv) shareholders do not approve deal under certain circumstances and then Company enters into an alternative transaction within one year |
| | ■ EGI-TRB may be required to pay $25 million termination fee in event of termination due to (i) certain breaches by EGI-TRB or (ii) failure to obtain the financing (unless such failure is due to a breach by the Company or the ESOP) |
| **Expenses** | ■ Company has agreed to reimburse EGI-TRB/Zell for up to $2.5 million of expenses following consummation of the first closing and up to an additional $2.5 million of expenses following the second closing |
| **Exchangeable note, subordinated note, and warrant** | ■ **Exchangeable subordinated note:** Exchangeable subordinated note bears interest at rate of 4.81% and is subordinated to all other debt. Immediately prior to the closing of the merger, the Company shall repay the outstanding amount of the note. If the merger does not close, the exchangeable subordinated note will be exchanged into Tribune common stock at $34 per share |
| | ■ **Subordinated note:** Subordinated note will bear interest at the "long-term applicable federal rate" and is payable in cash if not prohibited by any applicable subordination agreement or in additional principal amount (i.e., "pay-in-kind"). The subordinated note will be subordinated to the Step 1 Financings and the Step 2 Financings and will mature 11 years from the date of issuance |
| | ■ **Warrant:** Warrant will give EGI-TRB the right to purchase 43,478,261 million shares of the Company, which will represent approximately 43% of the common stock of the Company, or 40% on a fully diluted basis taking into account an 8% management equity incentive pool. The Warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the Warrant. The Warrant will be fully vested and exercisable at the time of grant, will have a term of 15 years, will be subject to restrictions on transfer, and will include customary anti-dilution adjustments |

95

Confidential

JPM_00052557

## ESOP purchase and related agreements

| | |
|---|---|
| ESOP purchase agreement | ■ The ESOP has purchased shares of Company common stock for $250 million at a price of $28 per share |
| | ■ The $250 million purchase price was paid with the ESOP's promissory note under the ESOP loan agreement |
| | ■ The Company has agreed to a covenant to maintain its and the ESOP's existence and to make sufficient contributions to the ESOP (taken together with dividends) to allow the ESOP to repay its stock acquisition indebtedness. This covenant will terminate if the ESOP is terminated or if the Company is sold |
| | ■ The Company will pay the ESOP's transaction expenses |
| | ■ Following the merger, the Company will at all times ensure that the ESOP owns at least 51% of both the value and the voting power of the Company's total equity, on a fully-diluted basis, subject to certain exceptions |
| ESOP loan agreement, ESOP note and ESOP pledge agreement | ■ The ESOP note bears interest at the rate of 5.01% per annum. The loan will be repaid in 30 equal annual installments of $15,342,301, with a balloon payment of $62,500,000 due in 2037 |
| | ■ The shares of Company stock acquired for the $250 million note are pledged as collateral for the loan. A portion of these shares will be released from the pledge annually in accordance with a formula based on the proportion of the loan that has been repaid |

96