## PRIVILEGED & CONFIDENTIAL

## *Memorandum*

| | |
|---|---|
| **To:** | James C. Dowdle<br>John W. Madigan |
| **From:** | Advisors to the Advisory Committees of the Boards of Directors of the Robert R. McCormick Tribune Foundation and Cantigny Foundation |
| **Date:** | April 25, 2007 |
| **Subject:** | To-do List for the Robert R. McCormick Tribune Foundation and Cantigny Foundation |

Below is a listing of the items that the advisors to the Advisory Committees of the Boards of Directors of the Robert R. McCormick Tribune Foundation and Cantigny Foundation should follow up on during the course of the closing of the Sam Zell/Tribune transaction.

**A.**   **Official Actions of the Advisory Committees of the Boards of Directors of the Robert R. McCormick Tribune Foundation and Cantigny Foundation and the Boards of Directors of the Robert R. McCormick Tribune Foundation [and Cantigny Foundation]**

A1.   Attached hereto as **Exhibit A** are the minutes from the Advisory Committee to the Robert R. McCormick Tribune Foundation meeting on February 23rd, as prepared by Quarles & Brady and Katten Muchin Rosenman LLP, which should be approved by the members of the Advisory Committee to the Robert R. McCormick Tribune Foundation **[and Cantigny Foundation]** at the May 23rd Board meeting.

A2.   Attached hereto as **Exhibit B** are the minutes from the Board of Directors of the Robert R. McCormick Tribune Foundation **[and Cantigny Foundation]** meeting[s] on February 23rd, as prepared by Quarles & Brady and Katten Muchin Rosenman LLP, which followed the Advisory Committee meeting[s] on that morning. These minutes should be presented for approval at the next regular meeting of the Board of Directors of the Robert R. McCormick Tribune Foundation **[and Cantigny Foundation]** at the May 23rd Board meeting.

A3.   Attached hereto as **Exhibit C** is a report of the Advisory Committee of the Board of Directors of the Robert R. McCormick Tribune Foundation and the Cantigny Foundation for the next meeting of the Board of Directors of the Foundation generally describing their activities during the course of negotiation of the Tribune transaction, particularly after the February 23rd board meeting as well as a

brief explanation of the proposed Zell/Tribune transaction and what it means for the Foundations' shares in the Tribune.

**B.**  **Items remaining for the Advisory Committees of the Boards of Directors of the Robert R. McCormick Tribune Foundation and the Cantigny Foundation in connection with the Zell/Tribune transaction**

B1.  The Advisory Committees will need to make a recommendation to the Boards of Directors of the Robert R. McCormick Tribune Foundation and the Cantigny Foundation regarding how it believes each Foundation should act with respect to: (i) whether the Foundation should sell Tribune shares in the open market prior to the tender offer or the closing of the merger (or take some other action such as entering into derivative transactions with respect to its shares in the Tribune), (ii) the expected tender for shares of the Tribune at $34 per share and (iii) the shareholder vote on the merger with and into the ESOP entity where the Foundation's shares would be cashed out at $34 per share.  The Advisory Committee to the Cantigny Foundation should pay particular attention to the Cantigny Foundation's tax status, and determine if any different conclusion needs to be reached with the Cantigny Foundation.  The Advisory Committee should review the memorandum with respect to the Cantigny Foundation's tax situation that was prepared by Quarles & Brady and is attached as **Exhibit D**.

B2.  The Advisory Committees will need to monitor the progress of the Zell/Tribune transaction, as well as be prepared to respond to any communications directed at the McCormick Tribune Foundation and the Cantigny Foundation with respect to any topping offer or request for voting or other agreements from either of Zell or Tribune (or others).  In addition, the Advisory Committees should be monitoring the progress of the various closing conditions of the Zell/Tribune transaction, particularly the FCC closing condition and the financing closing conditions, as well as ensuring the Foundations comply with any required securities law filings.

B3.  The advisors to the Advisory Committees should discuss with the Advisory Committees the advice, support and/or opinions they may need and/or want from their financial and legal advisors to help them make the foregoing determinations.  In addition, the Advisory Committees need to determine for how much longer should the advisors continue collecting and analyzing the press clippings on the Tribune transaction and the Foundations' relationship with Tribune.

**C.**  **Decisions that the Boards of Directors of the Robert R. McCormick Tribune Foundation and Cantigny Foundation will need to make in connection with the Zell/Tribune transaction**

C1.  The Boards of Directors of the Robert R. McCormick Tribune Foundation and Cantigny Foundation will need to make a determination of each Foundations' proper investment strategy for the proceeds of both the initial tender of Tribune shares and the final cash out in connection with the merger with and into the ESOP entity.  The Boards should consider whether a different investment strategy

FOUN0000172

is appropriate for the time between the Tribune tender, but prior to the final merger between Tribune and the ESOP entity.

C2.    The Boards of Directors of the Robert R. McCormick Tribune Foundation and the Cantigny Foundation will also need to make a determination of what the relationship between the Foundations and Tribune will be after the consummation of the transactions when the Foundations no longer own any stock in Tribune. The Boards should pay particular attention to the makeup of the Foundations' Boards of Directors and any changes to the programs of the Foundations, particularly the Communities Program of McCormick Tribune Foundation.

FOUN0000173

**EXHIBIT A**

**Minutes of Advisory Committee Meeting**
**February 23, 2007**

FOUN0000174

*ATTORNEY-CLIENT COMMUNICATION*

## MINUTES OF A MEETING
## OF THE ADVISORY COMMITTEE OF THE
## BOARD OF DIRECTORS OF THE
## ROBERT R. McCORMICK TRIBUNE FOUNDATION

### February 23, 2007

A meeting of the advisory committee (the "**Committee**") of the Board of Directors (the "**Board**") of the Robert R. McCormick Tribune Foundation (the "**Foundation**") was held at 7:30 a.m. Central Time on Friday, February 23, 2007 in Chicago, Illinois at the Foundation's offices. An agenda is attached.

Present at the meeting were James C. Dowdle and John W. Madigan both of whom were independent directors ("**Independent Directors**") appointed by the Board to serve on the Committee. Also present were Jill Greenthal, Kate Bueker, Sean Madnani and Miriam Tawail pf The Blackstone Group ("**Blackstone**"), Herbert S. Wander, Eric Smith, Keith R. Koeneman and Emily C. Olson of Katten Muchin Rosenman LLP ("**Katten**"), Thomas E. Chomicz and Janice E. Rodgers of Quarles & Brady LLP ("**Quarles & Brady**") and Brien O'Brien of Advisory Research, Inc. ("**Advisory Research**"). Mr. Chomicz acted as secretary of the meeting.

**Report to the Advisory Committee**

*Preliminary Remarks*

The Committee began by recognizing the work it had accomplished prior to this meeting. First, the Committee met in person a number of times in connection with (i) conducting business, financial and legal due diligence, (ii) exploring with executives of Tribune Company ("**Company**") alternative plans and structures as well as reviewing financial and business projections and (iii) reviewing and analyzing the foregoing with its financial and legal advisors. Second, through its public relations colleagues (Andy Hays, independent consultant, and Harlan Teller of Financial Dynamics), the Committee monitored the press coverage and the Committee's responses thereto. Third, the Committee was kept current by counsel relating to contacts with the Office of the Attorney General of Illinois. Fourth, the Committee acknowledged that it was kept current by daily scheduled telephone conference calls each afternoon (including a number of weekend calls) with its financial and legal advisors (sometimes, there would be more than one call a day and on a few occasions, a scheduled call would be skipped). Finally, the Committee's advisors had previously supplied the Committee with numerous written legal, due diligence and financial memoranda.

*Overview of Structure*

Mr. Wander and Ms. Greenthal reviewed the currently proposed transaction structure ("**Proposed Transaction**"), which had four primary components: (i) the Company would proceed with a leveraged recapitalization involving a $20.00 per share special dividend to its stockholders funded through approximately $5.1 billion of incremental indebtedness, (ii) the

Foundation would use approximately half the amount received from the Company dividend to purchase 25 million Company shares owned by the Chandler Trusts, (iii) the Foundation would exchange a portion of its Company stock (the "**Exchange**") from voting common to nonvoting preferred stock (with such nonvoting preferred being convertible to voting common at any time, and which would be substantially economically identical to the voting common stock), to the extent the Foundation deems necessary or advisable to ensure avoidance of penalty excise taxes under the Internal Revenue Code of 1986, as amended (the "**Code**"), and (d) subject to market conditions and exchange listing requirements, the Company would split the publishing and broadcasting portions into two distinct corporate entities. Mr. Wander then briefly described the legal documents that would need to be executed by the Foundation:

1. *Stock Purchase Agreement between the Foundation and the Chandler Trusts* (the "**Purchase Agreement**"), pursuant to which the Foundation would agree to purchase 25 million shares Common Stock owned by the Chandler Trusts at a price to be determined based on future trading levels, subject to a collar of $31.00 to $29.00 per share. Mr. Wander noted that the consummation of purchase of the shares under the Purchase Agreement would be subject to a series of conditions, including the payment of the $20 per share cash dividend by the Company, the resignation by the Chandler Trusts' nominated directors from the Company's Board of Directors and a stand-still agreement by the Chandler Trusts.

2. *Exchange Agreement between the Foundation and the Company,* (the "**Exchange Agreement**"), pursuant to which the Foundation would have the right to transfer shares of Company common stock in exchange for shares of Company convertible preferred stock. Mr. Wander noted that it was anticipated that prior to the ex-dividend date for the $20 per share cash divided to be paid by the Company, the Foundation would exchange shares of its Company common stock for shares of Company convertible preferred stock, and that the Foundation would have the continuing right to exchange common stock for non-voting preferred stock at any time and from time to time.

3. *Registration Rights Agreement between the Foundation and the Issuer,* (the "**Registration Rights Agreement**"), pursuant to which: (i) the Foundation would be permitted to demand up to three registrations of its Company stock, subject to certain conditions, (ii) the Foundation would be granted the right to allow Foundation-owned Company common stock to be sold in conjunction with an offering of new public shares by the Company (also known as a "piggyback right"), and (iii) in the event that a spin-off would be consummated by the Company, the rights described in (i) and (ii) above would also be extended to the spun-off public entity.

4. *Letter Agreement from the Company to the Foundation, regarding the voting rights of certain shares purchased from Chandler Trusts* (the "**TMCT Letter Agreement**"), under which the Company would notify the Foundation that, upon consummation of the transactions contemplated by the Purchase Agreement, to the extent that any of Company common stock purchased by the Foundation under the Purchase Agreement was subject to Section 4.6(b) of the Distribution Agreement, dated September 21, 2006, by and among TMCT, LLC, the Company and the Chandler Trusts or the Distribution Agreement, dated September 21, 2006, by and among TMCT II, LLC, the Company, and

FOUN0000176

the Chandler Trusts, the provisions in Sections 4.6(b) relating to the voting of such shares would not apply with respect to the Foundation or to any subsequent transferee of the Foundation (other than the Chandler Trusts).

5.   *Letter Agreement from the Company to the Foundation, regarding the Board seats* (the **"Board Letter Agreement"**), under which the Company would provide the Foundation with the right to designate an individual for nomination or appointment to the Board of the Company, and in the event that a spin-off is consummated, the board of the spun-off company. Mr. Wander noted that, for many weeks, the Company had resisted this request by the Foundation for Board representation, but had finally agreed to it.

6.   *Letter from the Special Committee of the Tribune Board,* pursuant to which the Special Committee of the Tribune Board indicating that an agreement for the purchase of the Chandler Trusts shares by the Foundation would be a material factor in the Special Committee's decision of whether to recommend the proposed restructuring and recapitalization to the full Tribune Board.

*Latest Developments*

Ms. Greenthal then noted that the Independent Directors and its advisors had worked extremely hard since the formation of the Committee, as described above. She also noted that the Committee had reviewed numerous possible transactions involving the Company and the Foundation and had analyzed the financial, investment, tax and legal issues of each. She expressed the view that the Independent Directors were fully informed on all of the latest developments, but asked if there were any questions at this time. Mr. Madigan asked Ms. Greenthal to confirm that the Chandler Trusts had not changed their negotiating position and that they continued to expect a pre-dividend price that was market-based and subject to a collar of $31.00 to $29.00 per share. Ms. Greenthal confirmed that was correct. As there were no further questions, Mr. Wander expressed the view that the Independent Directors had met their fiduciary duties of: (i) staying fully informed, (ii) maintaining their independence and (iii) negotiating at arms' length on behalf of the Foundation.

*Timing*

Ms. Greenthal communicated to the Committee that, subject to any delays that might occur, the Proposed Transaction was expected to close prior to the end of the second quarter of 2007, and that the subsequent spin-off of the Company's broadcasting assets might occur as early as early in the forth quarter of 2007.

*Open Issues*

The discussion then turned to open issues. Ms. Greenthal noted for the Committee the following open items: (i) whether the Company would amend its "poison pill" to permit the Foundation to sell or otherwise transfer shares without triggering the poison pill, (ii) whether the Company would reimburse the Foundation for its expenses related to the Proposed Transaction, (iii) the exact number of shares of Company common stock to be exchanged under the Exchange Agreement, (iv) payment of the Hart Scott Rodino filing fee and (v) certain minor points with

respect to the Registration Rights Agreement. With respect to the third point (iii), Mr. Chomicz indicated that Quarles & Brady would make the calculation, consistent with the requirements of the Code, and communicate it to the Committee.

**Fairness Presentation**

Blackstone then made a presentation (the "**Blackstone Presentation**") which focused on its opinion as to the fairness, from a financial point of view, of the value of the consideration to be paid by the Foundation for the 25 million Company common shares to be purchased from the Chandler Trusts as part of the Proposed Transaction. A draft of the Blackstone Presentation had been previously circulated to the Independent Directors and their advisors in preparation for the Committee meeting.  Ms. Greenthal also informed the Committee that the Blackstone Opinion Committee had reviewed the presentation in detail and approved the fairness opinion.  The Blackstone Presentation, each page of which Ms. Greenthal and Ms. Bueker presented to and reviewed with the Independent Directors, contained seven primary sections: (i) introduction, (ii) overview of the foundations, (iii) overview of Tribune Company, (iv) transaction summary, (v) valuation analysis, (vi) pro forma impact of the transaction and (vii) form of the fairness opinion letter. In her introduction, Ms. Greenthal noted that the Proposed Transaction would have a number of important results for the Foundation, including the following: (i) the Foundation would receive net cash proceeds of $285 - $335 million, increasing its portfolio diversification (*i.e.*, the portion of its portfolio in Company stock would fall to approximately 50% from 75%), (ii) the purchase of stock from the Chandler Trusts and the exit of their representatives from the Company Board of Directors would create a more stable operating environment for the Company and (iii) the Foundation would become the largest stockholder of the Company and would be granted one seat on the Company's Board of Directors.  The Committee discussed these points at length and asked many questions of Blackstone, Katten and Quarles & Brady. After the discussion had concluded, Ms. Bueker made a detailed presentation of Blackstone's valuation analyses, which included: (i) discounted cash flow analysis, (ii) sum-of-the-parts analysis, (iii) publicly-traded comparable companies analysis and (iv) precedent transactions analysis. In addition to describing these analyses, Ms. Bueker explained the impact that various "scenario analyses" would have on the Proposed Transaction and the potential value of the Company's stock price. The Committee asked numerous questions of Blackstone and discussed the valuation analyses at length. After the Independent Directors' questions had been satisfactorily answered, Ms. Greenthal communicated that Blackstone had concluded that the Proposed Transaction was fair to the Foundation.

Mr. O'Brien left the meeting due to a family emergency.

FOUN0000178

## Legal Analysis

*Due Diligence*

Mr. Wander then began describing to the Committee the work that Katten and the Committee's other advisors had performed with respect to due diligence. Mr. Wander noted that one of Katten's primary responsibilities was to assist the Committee in fulfilling its fiduciary obligations to the Foundation by providing legal due diligence on the Company. Mr. Wander also noted that, since December, the Foundation and its advisors had considered a wide variety of possible transactions and deal structures, and that the due diligence investigation had evolved to reflect the goals and objectives of the Proposed Transaction (*i.e.*, Katten had <u>not</u> analyzed the Company materials as though the Foundation would be acquiring the Company). Mr. Wander then summarized the due diligence investigation by noting that Katten had: (i) reviewed and analyzed material documents on the Company data site, of which the index itself spans 93 pages, (ii) attended the Company management presentations and (iii) participated in numerous telephone conversations and meetings with the Company management, advisors and counsel, as well as Foundation management, advisors and counsel. Mr. Wander also referred the Independent Directors to the lengthy, detailed due diligence memorandum previously delivered to the Committee, which summarized the *material* results of the legal due diligence investigation by Katten.

In describing the *scope* of its due diligence efforts, Mr. Wander communicated that Katten had divided the due diligence investigation matters into three tiers based on degree of importance to the Foundation: (i) areas of major investigation, (ii) areas of moderate investigation and (iii) areas of little to no investigation. According to Mr. Wander, Katten had dedicated significant efforts to investigating the following areas:

1.  Voting provisions in the Company's certificate and by-laws,

2.  Meetings of the Company Board of Directors,

3.  Company Disclosure Committee meetings,

4.  Company Employee Benefits Committee meetings,

5.  Company Rights Agreement (*i.e.*, the poison pill),

6.  Company's relationship with the Chandler Trusts, including TMCT and TMCT II,

7.  Contracts relating to the Tribune Publishing division,

8.  Potential change-of-control payments,

9.  Company partnerships, and

10. Joint ventures.

According to Mr. Wander, Katten had dedicated a moderate amount of resources to investigating the following areas:

1.   The Eagle LLCs,

2.   Tax issues, including the Matthew Bender litigation,

3.   Union issues,

4.   Debt and indentures,

5.   Litigation,

6.   Insurance,

7.   Other corporate issues,

8.   Other financial issues, and

9.   Other material agreements.

According to Mr. Wander, Katten had performed little to no due diligence investigation in any other areas, including:

1.   Tribune Broadcasting division,

2.   Real estate,

3.   Environmental,

4.   Business,

5.   Technical,

6.   Information technology,

7.   Employment law,

8.   Intellectual property, or

9.   Compliance issues.

Mr. Wander concluded by stating that, at that time, nothing had come to Katten's attention that would cause any significant legal exposure to the Foundation should the Foundation, the Chandler Trusts and the Company proceed with the Proposed Transaction.

*Filing and Disclosure Requirements*

The discussion then turned to filing and disclosure requirements associated with the Proposed Transaction. Mr. Wander noted that the Foundation would need to complete certain SEC filings, such as a Form 4 and a Form 13-D, as well as a Hart-Scott Rodino filing with the Federal Trade Commission in order to complete the transaction. Mr. Wander communicated that he believed that Katten and Quarles & Brady would be able complete these filings on behalf of the Foundation as soon as necessary.

*Legal Standards and Opinions*

Mr. Chomicz then reviewed for the Committee the substance of Quarles & Brady's draft legal opinion to the Foundation with respect to the Proposed Transaction, focusing on two issues: (i) whether the Foundation would be in compliance with applicable standards for prudent investment decisions by the directors of the Foundation under Illinois state law if the Directors approved the Proposed Transaction in the manner expected, and (ii) whether the Proposed Transaction would jeopardize the Foundation's tax-exempt status or cause the Foundation to incur certain penalty excise taxes under the Internal Revenue Code. With respect to the first issue, Mr. Chomicz communicated that Quarles & Brady had determined that the Foundation's directors would have satisfied their duties of care under Illinois law by considering all of the relevant circumstances prior to deciding whether to enter into the agreements which would affect the Proposed Transaction. With respect to the second issue, Mr. Chomicz communicated that Quarles & Brady had determined that the Purchase will not jeopardize the Foundation's tax-exempt status under Code Section 501(a) as an organization described in Code Section 501(c)(3) or cause the Foundation or its foundation managers to incur any excise tax under Code Sections 4941, 4944 or 4958, and that, assuming the Foundation limits its ownership of voting stock in the Company as planned, the Foundation will not incur any excise tax under Code Section 4943 by virtue of its ownership of stock of the Company.

**Approval of the Proposed Transaction**

The Committee further discussed the Proposed Transaction, approved it unanimously and decided to recommend that the Board of the Foundation also approve the Proposed Transaction.

There being no further business to come before the Committee, the meeting was adjourned at 9:50 a.m.


_____
Thomas E. Chomicz, Acting Secretary

Approved:

_____
James C. Dowdle, Advisory Committee Member


_____
John W. Madigan, Advisory Committee Member

**MEETING OF THE ADVISORY COMMITTEE
OF THE
ROBERT R. McCORMICK TRIBUNE FOUNDATION**

**AGENDA**

Meeting to be held at Foundation's office:
435 N. Michigan - Suite 770
Chicago, IL

February 23, 2007

7:30 a.m.

| | | |
|---|---|---|
| 1. | Report to the Advisory Committee | Blackstone<br>Quarles & Brady<br>Katten |
| | Overview of Structure<br>Latest Developments<br>Timing<br>Open Issues<br>Questions and Answers | |
| 2. | Fairness Presentation | Blackstone |
| 3. | Legal Analysis | Quarles & Brady<br>Katten |
| | Due Diligence<br>Filing and Disclosure requirements<br>Legal Standards and Opinions | |
| 4. | Committee Consideration and Determination | Independent Directors |
| 5. | Executive Session | Independent Directors |

**EXHIBIT B**

**Minutes of the Board Meeting**
**February 23, 2007**

FOUN0000183

Katten Draft 4-24-07

*ATTORNEY-CLIENT COMMUNICATION*

## MINUTES OF A MEETING
## OF THE BOARD OF DIRECTORS OF THE
## ROBERT R. McCORMICK TRIBUNE FOUNDATION

### February 23, 2007

A meeting of the Board of Directors (the "**Board**") of the Robert R. McCormick Tribune Foundation (the "**Foundation**") was held at 10:00 a.m. Central Time on Friday, February 23, 2007 in Chicago, Illinois at the Foundation's offices. An agenda is attached.

Present at the meeting were James C. Dowdle, Dennis FitzSimons, David Hiller, John Madigan and Scott Smith, constituting the entire Board. Also present by invitation were Jill Greenthal and Kate Bueker of The Blackstone Group ("**Blackstone**"), Herbert S. Wander of Katten Muchin Rosenman LLP ("**Katten**") and Thomas E. Chomicz of Quarles & Brady LLP ("**Quarles & Brady**"). Mr. FitzSimons chaired the meeting and Mr. Chomicz acted as secretary of the meeting.

### Report of the Advisory Committee to the Board

*History and Background of the Proposed Transaction*

John W. Madigan and James C. Dowdle, each of whom were independent Board directors ("**Independent Directors**") appointed by the Board to serve on the advisory committee of the Board, which was formed to oversee the Foundation's role in any possible transaction involving Tribune Company ("**Company**"). The Committee began by explaining to the Board the work it had accomplished prior to this meeting. First, the Committee indicated that they had met in person a number of times in connection with (i) conducting business, financial and legal due diligence, (ii) exploring with executives of the Company, alternative plans and structures as well as reviewing financial and business projections and (iii) reviewing and analyzing the foregoing with its financial and legal advisors. Second, through its investor relations colleagues (Andy Hays, independent consultant and Harlan Teller of Financial Dynamics), the Committee monitored the press coverage and the Committee's responses thereto. Third, the Committee was kept current by counsel relating to contacts with the Office of the Attorney General of Illinois. Fourth, the Committee acknowledged that it was kept current by daily scheduled telephone conference calls each afternoon (including a number of weekend calls) with its financial and legal advisors (sometimes, there would be more than one call a day and on a few occasions, a scheduled call would be skipped). Finally, the Committee's advisors had previously supplied the Committee with numerous written legal, due diligence and financial memoranda.

The Independent Directors indicated that they had monitored each of the proposals that were officially submitted to the Company's Special Committee through the publicly available documentation, as well as through conversations with both the Company's Special Committee and members of the Company's management. The Committee learned through these conversations that in addition to the official bids for the Company, the Company was also

1

considering a proposal from Sam Zell involving an ESOP, however the Committee had previously been told that the completion of the Proposed Transaction (as described below) was the most likely outcome, and the Committee felt that they should focus on completing the negotiations of the Proposed Transaction in order to maximize the value of the Foundation's investment in the Company.

*Due Diligence*

Mr. Madigan then began describing to the Committee the work that Katten and the Committee's other advisors had performed with respect to due diligence of the Company. Mr. Madigan noted that, since December, the Foundation and its advisors had considered a wide variety of possible transactions and deal structures, and that the due diligence investigation had evolved to reflect the goals and objectives of the Proposed Transaction (*i.e.*, the Committee and its advisors had not analyzed the Company materials as though the Foundation would be acquiring the Company). Mr. Madigan then summarized the due diligence investigation by noting that Katten had: (i) reviewed and analyzed material documents on the Company data site, of which the index itself spans for 93 pages, (ii) attended the Company management presentations and (iii) participated in numerous telephone conversations and meetings with the Company management, advisors and counsel, as well as Foundation management, advisors and counsel. Mr. Madigan also indicated that Katten had provides the Committee a lengthy, detailed due diligence memorandum previously delivered to the Committee, which summarized the *material* results of the legal due diligence investigation by Katten.

Mr. Madigan concluded by stating that, at this time, nothing has come to Katten's attention that would cause any significant legal exposure to the Foundation should the Foundation, the Chandler Trusts and the Company proceed with the Proposed Transaction.

*Negotiations with the Various Parties*

Mr. Madigan then briefly detailed the Advisory Committee's negotiations with the various parties, including the following:

1.  A proposal from the Chandler Trusts for a split-off of the Company's broadcast-related assets ("**Tribune Broadcasting**"), whereby the Foundation and other Company shareholders would receive shares of Tribune Broadcasting and a cash distribution in exchange for their shares of the Company, and the Chandler Trusts, along with other investors, would retain ownership of the remaining publishing assets of the Company ("**Tribune Publishing**"), as well as a similar alternative, but with the positions of the Foundation and the Chandler Trusts' reversed.

2.  The Broad and Burkle ("**B&B**") proposal, whereby B&B would make a cash infusion of $500.0 million into the Company in exchange for a 34% equity share in the Company, the Company would take on significant debt, and there would be a $27 dividend distribution received by all shareholders of the Company.

3.  A proposal by The Carlyle Group to purchase Tribune Broadcasting.

FOUN0000185

4.   Inquiries from various media companies, including Hearst, Gannett and News Corp., as to various proposed transactions, and from numerous other third parties interested in one or more potential transactions with the Company and/or the Foundation.

5.   Various "self-help" alternatives, including but not limited to the Proposed Transaction.

The discussion then turned to open issues. The Committee noted the following open items with respect to the Proposed Transaction: (i) whether the Company will amend its "poison pill" to permit the Foundation to sell or otherwise transfer shares without triggering the poison pill, (ii) whether the Company will reimburse the Foundation for its expenses related to the Proposed Transaction, (iii) the exact number of shares of Company common stock to be exchanged under the Exchange Agreement, (iv) payment of the Hart Scott Rodino filing fee and (v) certain minor points with respect to the Registration Rights Agreement. With respect to the third point (iii), Mr. Chomicz indicated that Quarles & Brady would make the calculation, consistent with the requirements of the Code, and communicate it to the Committee.

*Proposed Transaction*

Mr. Madigan and Mr. Dowdle explained the currently proposed transaction structure ("**Proposed Transaction**"), which had four primary components: (i) the Company would proceed with a leveraged recapitalization involving a $20.00 per share special dividend to its stockholders funded through approximately $5.1 billion of incremental indebtedness, (ii) the Foundation would use approximately half the amount received from the Company dividend to purchase 25 million Company shares owned by the Chandler Trusts, (iii) the Foundation would exchange a portion of its Company stock (the "**Exchange**") from voting common to nonvoting preferred stock (with such nonvoting preferred being convertible to voting common at any time, and which would be substantially economically identical to the voting common stock), to the extent the Foundation deems necessary or advisable to ensure avoidance of penalty excise taxes under the Internal Revenue Code of 1986, as amended (the "**Code**") and (d) subject to market conditions and exchange listing requirements, the Company would split the publishing and broadcasting portions into two distinct corporate entities. Mr. Madigan then briefly described the legal documents that would need to be executed by the Foundation:

1.   *Stock Purchase Agreement between the Foundation and the Chandler Trusts* (the "**Purchase Agreement**"), pursuant to which the Foundation would agree to purchase 25 million shares Common Stock owned by the Chandler Trusts at a price to be determined based on future trading levels, subject to a collar of $31.00 to $29.00 per share. Mr. Wander noted that the consummation of purchase of the shares under the Purchase Agreement would be subject to a series of conditions, including the payment of the $20 per share cash dividend by the Company, the resignation by the Chandler Trusts' nominated directors from the Company's Board of Directors and a stand-still agreement by the Chandler Trusts.

2.   *Exchange Agreement between the Foundation and the Company,* (the "**Exchange Agreement**"), pursuant to which the Foundation would have the right to transfer shares of Company common stock in exchange for shares of Company convertible preferred stock. Mr. Wander noted that it is anticipated that prior to the ex-dividend date for the

3

$20 per share cash divided to be paid by the Company, the Foundation would exchange shares of its Company common stock for shares of Company convertible preferred stock, and that the Foundation would have the continuing right to exchange common stock for non-voting preferred stock at any time and from time to time.

3.  *Registration Rights Agreement between the Foundation and the Issuer,* (the "**Registration Rights Agreement**"), pursuant to which: (i) the Foundation would be permitted to demand up to three registrations of its Company stock, subject to certain conditions, (ii) the Foundation would be granted the right to allow Foundation-owned Company common stock to be sold in conjunction with an offering of new public shares by the Company (also known as a "piggyback right"), and (iii) in the event that a spin-off would be consummated by the Company, the rights described in (i) and (ii) above would also be extended to the spun-off public entity.

4.  *Letter Agreement from the Company to the Foundation, regarding the voting rights of certain shares purchased from Chandler Trusts* (the "**TMCT Letter Agreement**"), under which the Company would notify the Foundation that, upon consummation of the transactions contemplated by the Purchase Agreement, to the extent that any of Company common stock purchased by the Foundation under the Purchase Agreement was subject to Section 4.6(b) of the Distribution Agreement, dated September 21, 2006, by and among TMCT, LLC, the Company and the Chandler Trusts or the Distribution Agreement, dated September 21, 2006, by and among TMCT II, LLC, the Company, and the Chandler Trusts, the provisions in Sections 4.6(b) relating to the voting of such shares would <u>not</u> apply with respect to the Foundation or to any subsequent transferee of the Foundation (other than the Chandler Trusts).

5.  *Letter Agreement from the Company to the Foundation, regarding the Board seats* (the "**Board Letter Agreement**"), under which the Company would provide the Foundation with the right to designate an individual for nomination or appointment to the Board of the Company, and in the event that a spin-off is consummated, the event of the spun-off company. Mr. Wander noted that, for many weeks, the Company had resisted this request by the Foundation for Board representation, but had finally agreed to it.

6.  *Letter from the Special Committee of the Tribune Board,* pursuant to which the Special Committee of the Company Board indicating that an agreement for the purchase of the Chandler Trusts shares by the Foundation would be a material factor in the Special Committee's decision of whether to recommend the proposed restructuring and recapitalization to the full Company Board.

*Recommendation of the Advisory Committee*

At this point, prior to the Independent Directors making their formal recommendation to the Board to approve the Proposed Transaction, Mr. FitzSimons indicated that the Company was not planning on approving the Proposed Transaction over the weekend. The Company had determined it was in its best interest to continue to pursue alternative transactions to the Proposed Transaction, particularly a proposed transaction structured around Sam Zell and an

4

ESOP. Mr. FitzSimons did indicate that the Company would like the Foundation to continue to finalize the documentation necessary for the Foundation to complete its part of the Proposed Transaction, and to specifically finalize documentation with the Chandler Trusts. In addition, the Committee was directed to meet with Andy Hayes and Harlan Teller of Financial Dynamics, the Foundation's public relations advisors, to plan the Foundation's public comments on the status of its investment in the Company and the Proposed Transactions.

There being no further business to come before the Committee, the meeting was adjourned at approximately 11:00 a.m.

_____
Thomas E. Chomicz, Secretary

Approved:

_____
Dennis FitzSimons, Chair

_____
James C. Dowdle

_____
David Hiller

_____
John W. Madigan

_____
Scott Smith

5

FOUN0000188

**Katten Draft 4-24-07**

## MEETING OF THE BOARD OF DIRECTORS
## OF THE
## ROBERT R. McCORMICK TRIBUNE FOUNDATION

### AGENDA

Meeting to be held at Foundation's office:
435 N. Michigan - Suite 770
Chicago, IL

February 23, 2007

10:00 a.m.

| | | |
|---|---|---|
| 1. | Report of the Advisory Committee to the Board | James Dowdle<br>John Madigan |
| | History and Background of the Proposed Transaction<br>Due Diligence Conducted<br>Negotiations with the Various Parties<br>Terms of the Proposed Transaction<br>Recommendation of the Advisory Committee | |
| 2. | Fairness Presentation | Blackstone |
| 3. | Legal Analysis | Quarles & Brady<br>Katten |
| | Due Diligence<br>Filing and Disclosure requirements<br>Legal Standards and Opinions | |
| 4. | Board Consideration and Determination | Board |
| 5. | Executive Session | |
| 6. | Public Disclosure | Andy Hayes<br>Harlan Teller |

60559349.3

FOUN0000189

**EXHIBIT C**

**Report of the Advisory Committee
of the Robert R. McCormick Tribune Foundation
May __, 2007**

FOUN0000190

CONFIDENTIAL COMMUNICATION

## ROBERT R. MCCORMICK TRIBUNE FOUNDATION

<u>Report of Advisory Committee to the Board of Directors</u>
May __, 2007

As you know, Tribune Company (the "Company") in September of 2006 formed an independent Special Committee (the "Special Committee") of its Board of Directors (the "Tribune Board") to explore strategic alternatives for preserving and creating additional shareholder value and thereafter to make recommendations to the Tribune Board with respect to one or more strategic alternatives.

Pursuant to the resolutions adopted by the Board of Directors ("Board") of the Robert R. McCormick Tribune Foundation (the "Foundation") on December 14, 2006, the undersigned, James C. Dowdle and John W. Madigan, were appointed as an Advisory Committee to the Board as follows:

RESOLVED, that the Board appoint an Advisory Committee (the "Advisory Committee") to consist of Mr. John Madigan and Mr. James Dowdle and authorize it to undertake the following: (a) to analyze and evaluate courses of action that the Foundation should take with respect to the Shares in light of Tribune's strategic assessment; (b) to retain a financial advisor to provide advice to the Advisory Committee and the Board with respect to the Shares and possible actions that could be taken by the Foundation with respect to the Shares; (c) to recommend to the Board any actions that it determines should be taken with respect to the Shares; (d) to execute on behalf of the Foundation a non-disclosure agreement with Tribune to obtain access to confidential information of Tribune, and (e) to take such actions, make such filings including but not limited to an amendment to Schedule 13D originally filed with the Securities and Exchange Commission, to disclose the actions approved by this resolution, and issue such public announcements as it deems appropriate and necessary in connection with its activities.

FURTHER RESOLVED, that the directors and officers are hereby authorized and directed to execute and deliver, for and on behalf of the Foundation, the 13D amendment in such form and substance as has been approved by the Advisory Committee and to take such actions and execute such additional documents or instruments from time to time as they deem appropriate to accomplish the actions described in the foregoing resolution.

In furtherance of the foregoing appointment and authorization, the Advisory Committee has taken the following steps:

1.     The Advisory Committee, on behalf of the Foundation, retained The Blackstone Group L.P. ("Blackstone") as financial advisor as provided in the Board resolution.

2.     The Advisory Committee consulted with Blackstone, as well as Katten Muchin Rosenman LLP, Special Counsel to the Foundation ("Special Counsel"), Quarles & Brady LLP,

FOUN0000191

General Counsel to the Foundation ("General Counsel"), and Brien O'Brien of Advisory Research, investment advisor to the Foundation ("Advisory Research"; Special Counsel, Blackstone, General Counsel and Advisory Research collectively referred to herein as the "Advisors") in connection with the Advisory Committee's evaluation of possible actions available to the Foundation with respect to any financial restructuring alternatives considered by the Special Committee and the Company and related financial, investment, tax and legal issues. The Advisory Committee had numerous in-person meetings, as well as generally daily telephonic meetings, with the Advisors. It received numerous legal, informational and due diligence memoranda prepared by Special Counsel and General Counsel, as well as detailed financial analyses provided by Blackstone and Advisory Research regarding the Company, its business, prospects and existing and proposed capital structure and a number of restructuring alternatives. The Advisory Committee considered, analyzed and discussed these memoranda with the Advisors.

3.   The Advisory Committee reviewed with the Advisors the following alternatives and related information:

A.   A proposal from Chandler Trust No. 1 and Chandler Trust No. 2 (the "Chandler Trusts") for a split-off of the Company's broadcast-related assets ("Tribune Broadcasting") whereby the Foundation and other Company shareholders would receive shares of Tribune Broadcasting and a cash distribution in exchange for their shares of the Company, and the Chandler Trusts, along with other investors, would retain ownership of the remaining publishing assets of the Company ("Tribune Publishing"). The Chandler Trusts and the Chandler family are largely responsible for the Company's strategic review process.

B.   A similar alternative, but with the positions of the Foundation and the Chandler Trusts' reversed.

C.   The Broad and Burkle ("B&B") proposal, whereby B&B would make a cash infusion of $500.0 million into the Company in exchange for a 34% equity share in the Company, the Company would take on significant debt, and there would be a $27 dividend distribution received by all shareholders of the Company.

D.   A proposal by The Carlyle Group to purchase Tribune Broadcasting.

E.   Inquiries from various media companies, including Hearst, Gannett and News Corp., as to various proposed transactions, and from numerous other third parties interested in one or more potential transactions with the Company and/or the Foundation.

F.   Various "self-help" alternatives, including but not limited to the Company's incurrence of additional debt, the declaration of a special dividend, or a tender by the Company for the purchase of Company shares, along with or as part of a split-off of Tribune Broadcasting to all common shareholders of the Company.

G.   Discussions with the Company and the Chandler Trusts regarding the purchase by the Foundation of a portion of the shares of the Company owned by the Chandler Trusts.

FOUN0000192