During the course of this review, the Advisory Committee and the Advisors participated in an all-day due diligence meeting and subsequent due diligence meetings with Company management, and the Advisors, on behalf of the Advisory Committee, engaged in numerous discussions with counsel to the Company and its investment bankers, special counsel and investment bankers for the Special Committee, representatives of the Chandler Trusts, and representatives of multiple third parties.

Subsequent to the Board meeting held on February 23rd, where the Advisory Committee was informed that the Company was pursuing a transaction with Samuel Zell ("Mr. Zell"), the Advisory Committee was asked to continue to negotiate with the Company and the Chandler Trusts in connection with a transaction where the Foundation would purchase a portion of the Chandler Trusts' shares in the Company, following a tender offer by the Company for the purchase of Company shares (the "Self-Help Alternative"). The Advisory Committee and its Advisors continued to pursue the Self-Help Alternative. Since the purchase of the Chandler Trusts' shares would occur after a Company tender offer, where the Foundation would be selling shares to the Company, this proposed transaction would potentially incur Section 16 liability for the Foundation, and therefore the Advisory Committee and the Advisors expended significant time and effort to solve this issue, including the hiring of a Section 16 legal expert, as well as conducting additional negotiations and discussion with the Chandler Trusts. The Advisory Committee was able to solve the Section 16 issue, and after solving this issue, the only significant remaining open issue related to the payment by the Company of the Foundation's expenses incurred in connection with its work on the various proposed transactions.

Current Transaction

The Company subsequently approved a series of transactions (collectively known as the "Leveraged ESOP Transactions") (i) with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), (ii) a limited liability company ("Zell LLC") wholly owned by Sam Investment Trust established for the benefit of Samuel Zell and his family, and (iii) Mr. Zell. The Leveraged ESOP Transactions include the following series of transactions:

(1)      The Zell LLC agreed to invest $250 million in the Company in exchange for (i) approximately 1.5 million shares of the Company's common stock ("Company Stock") at $34.00 per share, and (ii) an unsecured subordinated exchangeable promissory note of the Company in the amount of $200.0 million which would be required to be repaid prior to the Merger (as defined below). The promissory note would be exchangeable at the Company's option or automatically under certain circumstances into approximately 5.9 million shares of Company Stock. Mr. Zell would be appointed, effective upon closing the investment in the Company by the Zell LLC, as a member of the Tribune Board. If the purchase agreement for the investment by the Zell LLC is terminated under certain specified circumstances, including by reason of the Tribune Board's determination of a superior proposal, the Company will be obligated to pay Zell LLC a termination fee of $25 million.

(2)      The Company has agreed to reimburse Zell LLC for up to $2.5 million of unreimbursed expenses following consummation of the investment by Zell LLC and up

3

to an additional $2.5 million of unreimbursed expenses following consummation of the second investment by Zell LLC described in clause (6) below.

(3)    The ESOP purchased on April 1, 2007 approximately 8.9 million shares of Company Stock from the Company at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note in favor of the Company in the principal amount of $250 million to be repaid by the ESOP over the thirty (30) year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of the Company Stock held by the ESOP.

(4)    The Company has agreed to launch a tender offer to repurchase approximately 126 million shares of Company Stock that are currently outstanding at a price of $34.00 per share (the "Tender"). The Tender would not be contingent on any minimum number of shares of Company Stock being tendered. The Chandler Trusts have agreed to cause Jeffrey Chandler, Roger Goodan and William Stinehart, Jr., each of whom are currently serving on the Tribune Board as representatives of the Chandler Trusts, to resign as directors of the Company, effective upon the Company's acceptance of their shares of Company Stock for purchase in the Tender.

(5)    The Company has entered into an Agreement and Plan of Merger with GreatBanc Trust Company as Trustee of the ESOP, the Zell LLC and a separate corporation wholly owned by the ESOP, pursuant to which such separate corporation would be merged with and into the Company ("Merger"). Following such Merger, the Company will continue as a surviving corporation wholly owned by the ESOP. In connection with the Merger, all of the outstanding shares of Company Stock other than those held by the ESOP will receive consideration of $34.00 per share. If the Merger does not close by January 1, 2008 shareholders will receive an additional 8% annualized "ticking fee" calculated from January 1, 2008 to the date of closing of the Merger. The Company may participate in discussions and negotiations with, and furnish non-public information to, a party that has made a competing proposal, if the Special Committee determines in good faith that such proposal could reasonably be expected to result in a transaction or transactions that are more favorable to the Company and its shareholders that the Merger. The Merger agreement is subject to various closing conditions, including approval of the Merger by holders of a majority of the outstanding shares of Company Stock, receipt of necessary consents and approvals of the FCC and Major League Baseball, receipt of financing commitments and receipt of a solvency opinion. The Merger agreement also gives the Company or the ESOP the right to terminate the Merger transaction if stockholder approval is not obtained or if the Merger does not close by May 31, 2008. The Company also has the right to terminate the Merger agreement in the event that the closing of Zell LLC's initial investment described in clause (1) is not consummated on or prior to August 17, 2007.

(6)    In the Merger Zell LLC will receive cash for the shares of Company Stock it owns. Immediately prior to the Merger, the Company will repay the exchangeable promissory note held by Zell LLC. Following the consummation of the Merger, Zell LLC has agreed that it will purchase from the Company a $225.0 million

4

FOUN0000194

subordinated promissory note and a 15-year warrant for $90.0 million. The warrant will entitle Zell LLC to purchase approximately 43.4 million shares of Company Stock which will represent approximately 40% of the economic equity interest in the Company following the Merger. The warrant will have an initial aggregate exercise price of $500 million increasing by $10 million per year for the first ten (10) years of the warrant, for a maximum aggregate exercise price of $600 million.

(7)     The Company has agreed to grant Zell LLC and the ESOP registration rights with respect to the shares of Company Stock that the Zell LLC and ESOP purchased from the Company.

(8)     In connection with the approval of the Leveraged ESOP Transactions, the Tribune Board approved certain cash compensation awards and a phantom equity plan for members of management and other key employees conditioned upon consummation of the Merger. The cash transaction bonus pool will be in the aggregate of $6.5 million for 38 individuals. Mr. Scott C. Smith will be entitled to participate in the bonus pool. Mr. FitzSimons has voluntarily elected not to participate in this pool. The phantom equity pool will provide two tranches of phantom stock awards to be granted to certain members of management. The first tranche will include shares of phantom stock with an economic value equal to 5% of the outstanding shares of Company Stock and will be awarded upon consummation of the Merger. The second tranche of awards will include shares with an economic value equal to 3% of the outstanding Company Stock to be awarded upon consummation of the Merger.

The Company has secured financing commitments from certain lenders to provide the Company with the ability to borrow the amounts required to finance the Leveraged ESOP Transactions.

The Company's largest shareholder, the Chandler Trusts, entered into a voting agreement whereby the Chandler Trusts have committed to vote all of their shares of Company Stock in favor of the approval and adoption of the Merger and the Leveraged ESOP Transactions.

As a result of the Tender, the Foundation would receive approximately $556.3 million for 16.4 million shares of Company Stock (assuming that the participation of shareholders in response to the Tender is 80% and that the Company accepts in the Tender on a proportionate basis). Following the consummation of the Tender, the Foundation will have cash and investments of approximately $852 million and its Tribune equity with a value of $396 million, increasing further diversification of the Foundation's portfolio.

Blackstone has analyzed the Leveraged ESOP Transactions and submitted to the Advisory Committee a written report and fairness opinion to the effect that the tender price is fair to the Foundation from a financial point of view. In Blackstone's fairness opinion and the report that accompanied it, Blackstone does note the following important positive factors in relationship to the Tender:

5

1.   The Foundation's participation in the Tender will increase diversification of the overall investment portfolio of the Foundation with a reduction of the percentage of the portfolio that is represented by the stock of the Company;

[2.   **The Leveraged ESOP Transactions would create a more stable operating environment for the Company going forward; and**

3.   **The Leveraged ESOP Transactions would resolve divisions with the Chandler Trusts, whose ownership would be meaningfully reduced and whose presence on the Tribune Board would be eliminated.]**

The Advisory Committee considers the foregoing factors identified by Blackstone to be important in consideration of the Tender, including but not limited to the fact that participation in the Tender would increase the overall liquidity of the Foundation's investment portfolio which would provide the Foundation with additional flexibility in its investment opportunities to enable the Foundation to be in a better position to carry out its on-going charitable activity.

Advisory Research has provided its opinion that submission of the shares in the Tender would be a prudent investment transaction in the context of the Foundation's overall investment portfolio.

Accordingly, the Advisory Committee has concluded that participation in the Tender at the $34.00 per share price is in the best interests of the Foundation and recommends that the Board of Directors authorize the Foundation to tender the maximum number of shares permitted under the terms of the Tender.

Respectfully submitted,

James C. Dowdle

John W. Madigan

6

FOUN0000196

**EXHIBIT D**


**Quarles & Brady Memorandum**
**Cantigny Foundation -- Tax Analysis of tender of Tribune Company Shares**
**as part of the Zell/ESOP Transaction**

FOUN0000197

Memorandum



April 26, 2007

**To:**    James C. Dowdle
           John W. Madigan

**From:**  Thomas E. Chomicz
           Janice E. Rodgers

**cc:**    Herbert S. Wander
           Jill Greenthal
           Brien O'Brien

**Re:**    Cantigny Foundation - Tax analysis of tender of Tribune Company shares as
           part of the Zell/ESOP transaction

The purpose of this memorandum is to alert you to the potential that Cantigny may pay a 2% excise tax on the $64.7 million distribution to be received from Tribune Company as part of the tender of Tribune shares in the first phase of the Zell/ESOP transaction. The potential excise tax would be approximately $1.3 million. This memorandum sets forth the scenarios under which the excise tax may occur and identifies possible alternatives to avoid the tax.

<u>Dual Support Test</u>

Cantigny is a tax-exempt organization under Internal Revenue Code ("Code") Section 501(c)(3) and is a public charity as described in Code Section 509(a)(2). To maintain its public charity status and to avoid being subject to strict private foundation rules, Cantigny must meet a dual support test. First, at least one-third of Cantigny's total support must come from a combination of public contributions, grants (from sources such as the McCormick Tribune Foundation) and revenues from activities related to its tax-exempt purpose (such as greens fees and parking fees). Second, and more significant for purposes of this analysis, Cantigny's investment income, excluding capital gains, may not exceed one-third of its total support. If Cantigny fails either part of the mechanical dual support test, it will automatically lose its public charity status in 2007.

Cantigny's support test is calculated on its annual Form 990. The test is typically applied by calculating Cantigny's sources of support during the prior four-year period. If, however, Cantigny receives a large "deemed" dividend from Tribune Company in 2007, that income would be considered a material change in its sources of support and the

QBCHI\520700.2

test would be calculated based on the current year combined with the prior four years. This five-year period would then be 2003-2007.

Consequences of a Large Dividend

If the distribution of $64.7 million received by Cantigny pursuant to the tender is considered to be a dividend paid to Cantigny, this additional investment income would cause Cantigny to fail the one-third investment income limitation over the five-year period. A dividend of approximately $64.7 million would increase Cantigny's investment income to more than 50% of total support over the period (far in excess of the one-third limitation) and would result in the termination of Cantigny's public charity status in 2007. The 2% tax on $64.7 million would be approximately $1.3 million.

As previously advised, Cantigny could regain its public charity status by filing a notice to the IRS prior to January 1, 2008. Cantigny would most likely be considered to be a public charity under Section 509(a)(2) for all the years subsequent to 2007 (beginning January 1, 2008). We can provide a detailed analysis if you wish.

We note that the issue of the additional excise tax of $1.3 million arises only if the $64.7 million tender distribution is considered to be dividend income. If the distribution is considered to be a return of capital or a capital gain, the distribution would not be included in investment income for purposes of the one-third test, and Cantigny would retain its public charity status and would not have to pay a tax on the gain. Thus, the potential for the $1.3 million excise tax arises only if the distribution from the stock tender is considered to be a dividend.

Tax Analysis of the Distribution

If the $64.7 million distribution satisfies any one of the three tests found in Code Section 302, the distribution will not be treated as a dividend and the 2% excise tax would therefore not be an issue.

Complete Termination of Interest. If as a result of the Zell/ESOP plan Cantigny's entire investment in Tribune Company is terminated, the distribution on the tender of approximately 50% of Cantigny's Tribune shares would be considered a return of capital or a capital gain (and not a dividend). Thus, if both Phase 1 (tender) and Phase 2 (merger) of the Zell/ESOP transaction occur, the tender would be considered to be a capital gain transaction and there would be no 2% excise tax in 2007. The 2% excise tax may be incurred only if Phase 2 of the transaction (the merger) does not occur.

Disproportionate Redemption. The distribution on the tender would also qualify for capital gain treatment if Cantigny's percentage of ownership in Tribune Company after the tender is 80% or less of the percentage of ownership before the tender. Cantigny currently owns 1.3% of the outstanding shares of Tribune Company. If as a result of the tender the percentage of ownership is 1.04% or less (80% of 1.3%), then Cantigny would satisfy the disproportionate redemption test and the tender would be

FOUN0000199

treated as a capital gain even if the second part of the Zell/ESOP transaction is not consummated.

There is reason to be concerned, however, that the tender may not achieve a reduction in the percentage of ownership to less than 1.04%. If all shareholders of Tribune Company tender shares, then Cantigny would fail the substantially disproportionate test because Cantigny would own 1.3% of Tribune Company shares prior to the tender and 1.3% after the tender.

Cantigny could achieve a substantially disproportionate redemption only if some parties, such as the Index Funds, do not tender. There was a discussion that 20% of the shareholders may not tender and, if that occurs, Cantigny may be able to satisfy the substantially disproportionate test. Blackstone prepared an analysis assuming 20% of the shareholders would not tender. Under that analysis, however, Cantigny's share ownership percentage would decrease only from 1.3% to 1.1%. Under this analysis, Cantigny would <u>not</u> satisfy the substantially disproportionate test because it would not reach a percentage of ownership of 1.04% or less after the tender. In order for Cantigny to satisfy the test, a percentage in excess of 20% of the shareholders must not tender.

<u>Meaningful Reduction</u>. An additional alternative to achieve capital gain treatment is available for a meaningful reduction in the percentage of ownership. In publicly held companies a very small percentage reduction has been deemed by the Internal Revenue Service to be a meaningful reduction. Whether a percentage of ownership reduction of 0.2% (1.3% to 1.1%) would satisfy the meaningful reduction test would be determined by all of the facts and circumstances. The fact that the Phase 2 merger transaction was contemplated at the time of the tender but did not take place would be a helpful fact, but on the other hand, the close relationship of certain of the Cantigny Board members to Tribune Company management, would be a negative factor. The bottom line is that the "meaningful reduction" analysis is a gray area and there can be no assurances that, even if there is a percentage of ownership reduction of 0.2%, the reduction would be considered to be a meaningful reduction. This result could consequently leave Cantigny exposed to the potential for a $1.3 million tax.

## Avoidance of the 2% Excise Tax

Possible alternatives to avoid the potential for the distribution on tender to be considered as dividend income and thereby to avoid the $1.3 million excise tax are discussed below:

## Sale of Tribune Shares

Cantigny could sell its shares of Tribune Company on the market prior to the tender. Cantigny accordingly would not participate in the tender and thus would not have any dividend income. The market sale would instead generate a capital gain that would not be subject to tax. Whether to sell is an investment decision, as the sale price

FOUN0000200

would be less than the tender price of $34. The issue is whether the opportunity to invest the sale proceeds and avoid the $1.3 million excise tax outweighs the reduced price on the sale of the Tribune Company shares. There is also a potential that there could be another deal down the road for the acquisition of Tribune Company. The sale of Tribune Company shares prior to the tender would not allow for participation by Cantigny in any subsequent transaction.

Sale of Tribune Company Shares to McCormick Tribune Foundation

If the Tribune Company shares were sold to McCormick Tribune Foundation ("MTF") prior to the tender, Cantigny would achieve capital gain treatment on the sale, retain public charity status, and avoid the $1.3 million excise tax. The sale could be in exchange for a note. Subsequently, MTF would tender Tribune Company shares for cash and a portion of such proceeds would be used to pay the note to Cantigny.

Since MTF is acquiring the Tribune Company shares with a note the debt financed income provisions would apply. If MTF has a gain on the subsequent sale of the Tribune Company shares, the gain would be subject to income tax at 34%. If MTF purchases at 34 and sells at 34, no gain would be recognized and no income tax to be paid.

McCormick Tribune Foundation Contract to Purchase Untendered Shares

MTF could contract with Cantigny prior to the tender to purchase the untendered shares so that if Phase 2 (merger) of the Zell/ESOP transaction does not occur, MTF would purchase Cantigny's remaining Tribune Company shares. Under this alternative, there would be a complete termination of Cantigny's investment in Tribune Company which would qualify for capital gain treatment. MTF could use part of its proceeds received in the tender to purchase the remaining balance of Cantigny's Tribune Company shares not acquired by Tribune Company as part of the tender. This alternative would avoid the need for a note and thus the possible imposition of an income tax on any gains by the subsequent sale of Tribune Company shares acquired by MTF from Cantigny.

Assignment of Tender Rights

MTF could assign a portion of its rights to tender Tribune shares to Cantigny so that Cantigny would be able to sell its entire investment in Tribune Company pursuant to the tender offer. Cantigny owns 3.3 million Tribune Company shares. Cantigny would be able to tender approximately 50% of its Tribune shares or 1.65 million. Cantigny would obtain from MTF the right to tender an additional 1.65 million so that all of the Tribune shares owned by Cantigny would be sold pursuant to the tender and thus constitute a complete termination of interest and qualify as capital gain. The assignment of additional tender rights from MTF to Cantigny would require the approval of Tribune Company.

Grant of Tribune Shares to MTF by Cantigny

Another alternative is for Cantigny simply to grant its Tribune Company shares to McCormick as part of Cantigny's charitable program and in recognition of the contributions and grants that have been received in the past from MTF. MTF would continue going forward to fund operating costs, and capital improvements and other expenditures, on behalf of Cantigny. We would need to confirm that such a grant would be permitted under Cantigny's governing documents.

Grant by McCormick Tribune Foundation to Cantigny

MTF could pay an extraordinary grant to Cantigny in 2007, thereby increasing Cantigny's level of total support so that, even if the tender distribution is treated as a dividend, the total investment income would be less than one-third of total support. The amount of the grant from MTF to Cantigny would have to be at least $120.0 million to maintain the investment income below one-third of total support. Such a grant could be used in part to fund various capital improvements recommended by management of Cantigny.

Tax Impact on McCormick Tribune Foundation

The purchase of additional shares by MTF could potentially have some impact on whether MTF itself could satisfy either the disproportionate redemption test or the meaningful redemption test. Thus there is some risk that the proceeds from the tender made by MTF would also be taxable as a dividend subject to the 2% excise tax. If the proceeds of the tender are considered dividend income, the additional investment income would cause total support to increase and the Foundation's charitable support would only be approximately 20% of total support as opposed to the required one-third.

You may recall that the MTF, however, has an alternative of seeking status as a public charity under a facts and circumstances test. We are of the view that MTF should be able to satisfy the facts and circumstances test to the satisfaction of the IRS and thus avoid the 2% excise tax on any dividend received.

Potential 16(b) Liability

Any transaction between Cantigny and MTF involving the purchase and sale of Tribune shares would need to be reviewed to determine whether MTF would be subject to short profits liability under 16(b).

Conclusion

The above is an analysis of the potential for dividend income to be recognized by Cantigny as part of the tender and the associated tax cost of $1.3 million. The purpose of this memorandum is to advise you of the potential risk of the $1.3 million excise tax

QBCHI\520700.2

FOUN0000202

and allow you to consider whether any of the alternatives are worthwhile undertakings to avoid the tax.

T.E.C.
J.E.R.

QBCHI\520700.2

FOUN0000203