**From:**          Sarah Brown
**Sent:**          Saturday, February 17, 2007 09:02 AM
**To:**            jmadigan@tribune.com; jdowdle@tribune.com; lmarsico@mccormicktribune.org;
                   obrien@advisoryresearch.com; Greenthal@blackstone.com; dugan@blackstone.com;
                   fields@blackstone.com; bueker@blackstone.com; madnani@blackstone.com;
                   tawil@blackstone.com; janofsky@blackstone.com; AHays@aol.com;
                   jahays@mccormicktribune.org; Wander, Herbert S.; Koeneman, Keith R.; Olson, Emily C.;
                   kdanyluk@quarles.com; tchomicz@quarles.com; jrodgers@quarles.com; jvail@quarles.com;
                   jmasterson@quarles.com
**CC:**            Harlan Teller; Jim Sloan
**Subject:**       Tribune Co. media coverage: 2/17/07


Below please find recent media coverage related to the McCormick Tribune Foundation.


Thanks,


Sarah Brown

312.861.4713


Of Taxes, Newspapers And Family
By Joe Nocera
17 February 2007
The New York Times

A little more than a year ago, representatives of the Chandler family approached the management of
the Tribune Company, hoping to solve a little tax problem. Years before, when the family still owned
Times-Mirror, it had set up two partnerships with the company that allowed the family to diversify
its holdings without having to actually sell any Times-Mirror stock -- thus avoiding a big tax bill.
When the family sold Times-Mirror to Tribune in 2000, for $8 billion, a price that now seems be rich
beyond belief, the Tribune Company inherited the partnerships.

The family needed to restructure the partnerships, but it wanted to do so in a way that left Tribune
holding any tax liabilities that might ensue. That is, if the Internal Revenue Service ruled that
the partnerships owed taxes after all, Tribune would pay them instead of the Chandlers. The
potential tax hit was estimated at $40 million to $60 million.

Not surprisingly, Tribune said no. And who could blame the company? As part of the purchase of
Times-Mirror, the company had agreed to take on an earlier potential tax liability -- which had
turned out disastrously. The I.R.S. wound up ruling against a highly controversial tax move
Times-Mirror had made in 1998, and Tribune, after a bitter court fight, had to pay the government $1
billion. (That case is still being appealed.) Tribune's management believed that the Chandlers,
owners of 20 percent of Tribune's stock and holders of three board seats, were putting their own
interests ahead of the interests of other shareholders.

In early 2006, with negotiations over the partnerships going nowhere, a family representative sent a
letter to Tribune that said, in effect, that if the negotiations weren't settled satisfactorily, the
family would try to put the company in play.

Scroll ahead now to February 2007. Over these last months, Tribune Company has most certainly been in play. During the fall and winter, after much public agitation by the family, the Tribune board conducted a ''strategic review.'' Potential buyers were invited to kick the tires. The company put itself on the auction block.

But the auction has turned out to be an embarrassment for its instigators, the Chandlers. The timing could not have been worse. With newspaper stocks in decline and the prospects of newspaper companies uncertain at best, there wasn't a single serious bid for the entire company. Most private equity firms, which are gobbling up everything in sight, weren't interested. Neither were other newspaper companies. They all saw what had happened to McClatchy after it bought Knight Ridder last year: its stock has swooned, and that deal is now viewed as a disaster. Instead, the small handful of bidders -- including the Chandlers -- made various offers that did not include a premium to shareholders, and included financial maneuvers like spinning off the company's television stations into a separate company, or adding on piles of debt. Tribune viewed all of these bids as unacceptable.

All concerned would probably have been better off standing pat and waiting for a more opportune moment. But companies that find themselves in play don't have that luxury. They have to do something or the stock will collapse. And it now appears likely that, sometime in the next six weeks, Tribune will announce its own restructuring plan, including a spinoff of the broadcast properties, a big one-time dividend to shareholders, and lots more debt. The company will hold on to its declining newspapers, and some other properties, like the Chicago Cubs.

Will this cure what ails Tribune? Unlikely. As a JPMorgan analyst, Frederick Searby, notes: ''Financial engineering can only get you so far. That won't eliminate the problems.'' Mainly, it will give shareholders a one-time cash payout.

And all because the Chandlers were trying to duck some potential taxes? Well, that's one way of looking at it.

If you have only a glancing knowledge of the newspaper industry, it's natural to lump the Chandlers in with the other great newspaper families -- the Sulzbergers of New York, the Grahams of Washington, the Bancrofts of Dow Jones, and so on. But this would be a mistake. In the modern age, there has really been only one Chandler -- Otis, who ran The Los Angeles Times for 20 years and made it great -- who viewed newspapering as a kind of public trust, the way those other families do.

Otis Chandler died last year, but long before then, other branches of the family had retaken control of Times-Mirror. Famously, they brought in Mark Willes from General Mills to run the company in the 1990s, and when he didn't work out, they sold it out from under him to Tribune. Mr. Willes apparently didn't even know Times-Mirror was up for sale until the deed was done.

Although eight family members sit on the board of the family trusts, Jeffrey Chandler, Otis's 64-year-old cousin, appears to be the lead family member. He is one of the three family representatives on the Tribune board. The Chandlers are legendary for not giving interviews, but Jeffrey Chandler once complained bitterly to Forbes that The Los Angeles Times had become too liberal.

The Chandlers are legendary for several other things. The first is that they may be the most tax-averse family in the country. ''I think The Los Angeles Times is a great paper and all,'' said the Lehman Brothers tax expert Robert Willens, ''but their greatest talent was tax avoidance.'' Tribune's $1 billion tax hit, for instance, came after Times-Mirror tried to make a sale of a subsidiary appear to be a tax-free corporate reorganization. The second is that they view newspapers as just another business -- albeit the business they happen to be stuck with.

None of 170 or so family members work for the family business, so the Chandlers' advisers know that their job is to extract the maximum amount of money they can from the assets they control. This has become an ever more pressing goal in recent years because the family trusts will expire after the last member of the current older generation dies, and the money will be disbursed to the heirs. That is likely to happen in the next 10 to 15 years.

Thus did the Chandlers rather unsentimentally sell Times-Mirror. And thus, as Tribune has struggled in the last few years, with the stock dropping some 40 percent, have the Chandlers become increasingly unwilling to sit back and wait it out. The tax issue may have been the trigger, but the feeling among the Chandlers and their advisers was that Tribune management was costing them money -- and that was unacceptable.

Tribune, meanwhile, had its own struggles. Its strategy has been a kind of Grand Unified Theory of the media business: if it owns lots of media properties in big markets -- a TV station, the major newspaper, a radio station, Internet properties, tabloid giveaways, you name it -- it will have something to satisfy all advertisers. But that strategy has not had much success; indeed major metropolitan newspapers like The Los Angeles Times have been among the hardest hit in circulation and advertising declines.

So Tribune's management has turned to a strategy of relentless cost-cutting to maintain its profitability. This has outraged many of the journalists at its newspapers and led, for instance, to the recent departure of the Los Angeles Times editor Dean Baquet (who is returning to The New York Times in March as Washington bureau chief). But it does mean that Tribune has remained a profitable newspaper chain with very healthy cash flow -- just the kind of cash flow you'd think a private equity buyout firm might lust after.

Yet even before the Chandlers began publicly rattling the cages, it should have been clear that the Tribune Company wasn't going to get much interest from private equity firms. The Knight Ridder sale had taken place just a few months before; it not only drew surprisingly little interest, but when the company was finally sold, the price was lower than newspaper chains have historically sold for.

What's more, precisely because Tribune's managers have been so focused on cost-cutting, they really haven't left much low-hanging fruit for private buyers to pick at. ''We have now had two referendums on the newspaper business,'' said Mr. Searby, the JPMorgan analyst, meaning Knight Ridder and now Tribune. In both cases, he added, the marketplace has given the industry a thumbs down. The Chandlers, by pressing their case when they did, not only didn't get the sale they wanted, but they also helped reinforce the notion that the industry in which they hold their major asset is in irreversible decline. Nice going.

That's why you have to wonder what in the world the Chandlers were thinking when then started this brouhaha. Maybe they really thought they could sell the whole company. Maybe they thought if they agitated loudly enough, something good would come of it. Maybe they thought they could reclaim the newspapers, and then sell them off one by one. If they actually have some end-game in mind, they've kept it to themselves--except to make it plain that they are looking out for themselves. Indeed, their own proposal was terribly lopsided in their favor.

''The Chandlers ultimately look very self-serving,'' said Mr. Searby. For its part, Tribune management now views its largest shareholder as a bully, looking to gain advantage at the company's expense.

Of course, there is one other possibility: maybe they really were just ticked off about the tax situation. As it turns out, the partnership dispute wound up being settled in September, quickly and quietly, in a manner that satisfied both sides. Tribune agreed to accept the tax liability, but the Chandlers paid the company to do so. It was much ado about very little, and proof that the company didn't need to be put in play to get it settled.

But of course it is also true that instead of making a public stink over Tribune's falling stock price, the Chandlers could have just sold their stock, and put their money in other, faster-growing ventures more to their liking. Oh right, I forgot. That would mean they'd have to pay capital gains taxes.

We can't have that now, can we?


The Week Ahead -- Our Take On Coming Events: Tribune moves closer to a corporate rewrite
By Sarah Ellison
17 February 2007
The Wall Street Journal

As the auction for Tribune Co. limps to a close, it is becoming clear that newspaper publishers can't sell their way out of their current woes.

Tribune's board of directors is scheduled to meet late this coming week, and while it is uncertain they will emerge from the meeting with an announcement, company management and advisers are casting aside outside offers and working on what is being billed as a "self-help" plan.

That is another way of saying that nobody came to Tribune's rescue.

Typically, if a company avoids a takeover, employees and management breathe a sigh of relief and go back to business as usual. But if this auction ends as many expect, Tribune will have to self-inflict the kinds of harsh changes that normally come from an outside buyer. That will mean even steeper cost cutting and asset sales.

That is partly because Tribune, along with many other newspaper players, waited too long to take the dramatic action that now is being thrust upon them. Tribune was forced into the auction process by its largest shareholder, the Chandler family, which pushed for action just as panic was building about the industry's prospects. The irony is that the Chandlers were too late. They are angling to remove themselves from the newspaper business they should have gotten out of years ago, when they

sold Times Mirror Co. to Tribune in 2000. Today, the options are much more limited.

John Rogers, chairman and chief executive of Ariel Capital Management, one of Tribune's biggest holders, says the market's fear of newspaper companies is a result of "group think."

"We may be looking back on things in the long term and say that this was the bottom of the cycle," he says. By that rationale, it is a good time to buy into the industry. But timing the comeback of the industry is a risky bet, and one that few investors are willing to take.

Under the current plan, at least Tribune's fate is all in the Chicago family. Sam Zell, a Windy City real-estate mogul, and the Chandlers are still circling Tribune, though any chance of either party making a successful offer is unlikely. Tribune isn't comfortable with either proposal being proffered, and neither party seems willing to increase the terms.

Under the structure being considered, the company would spin off its television stations and pay out a dividend to its shareholders. Then, one possibility is that the McCormick Tribune Foundation -- Tribune's second-largest shareholder behind the Chandler family -- would help buy out part of the Chandlers' stake in the company.

That would solve two problems for Tribune. It would reduce the Chandlers' influence -- possibly booting them off the board -- and increase control for the management-friendly foundation, which is controlled by two former Tribune executives. The three other foundation board members are current Tribune executives who have recused themselves from decision making while the sale process is under way.

The foundation is adamant that it acts independently from the company. But in the past 50 years, the foundation has had only 20 directors, all of whom have been current or former Tribune officials. Foundation offices sit just floors away from Tribune management in Chicago's Tribune Tower.

It is hard to see how buying up more newspaper stock is good for the McCormick Tribune Foundation. If most shareholders are trying to get out of the newspaper business, why wouldn't the McCormick Tribune Foundation want the same?


Top Tribune execs given stock; CEO FitzSimons leads way with $4.1 million
By Michael Oneal
17 February 2007
Chicago Tribune

In the midst of a tumultuous search for ways to boost the company's stock price, Tribune Co.'s board this week gave top management a large incentive to stick around.

At a regular board meeting Tuesday, directors awarded 10 top executives restricted stock worth $12.4 million, according to government filings.

The biggest grant went to Chairman and Chief Executive Dennis FitzSimons, who received 135,000 restricted shares worth $4.1 million at Tuesday's close of $30.40 apiece.

The stock grants, which vest in one-third increments over three years with no performance hurdles, mark a sharp increase from the amount of restricted stock granted a year ago. FitzSimons' grant of 135,000 shares, for instance, was more than twice the 60,000 shares he received last year, despite a 4 percent drop in the company's operating cash flow and flat stock performance during 2006.

The grants don't tell the whole compensation story at Tribune. The board has been cutting executive bonuses in recent years, reflecting sluggish performance, and this year's proxy statement, due in late March, could include more cuts. Moreover, Tribune's board has stopped granting stock options and has increased its restricted stock grants to make up the difference.

Restricted stock units are grants of full-value stock, priced when they vest. Options are the right to buy stock at a preset "strike price."

Tribune has explained the switch by saying restricted stock allows for a similar level of compensation using fewer shares, which provides for less dilution to other shareholders.

But executive compensation expert Richard Harris, a principal at Hewitt Associates in Lincolnshire, said that's true only when the stock is rising. Options are worthless if the stock price stays below the strike price. Restricted stock has value whether the stock is rising or falling and consequently dilutes the other shareholders to some degree no matter what.

In 2005, for instance, FitzSimons received 200,000 options with a strike price of $40.59 a share.

But the stock has fallen since then, meaning those options haven't been worth exercising.

Meanwhile, FitzSimons received 60,000 restricted stock units last year. This week, he became vested in 20,000 of them, with a value of $608,000.

For this reason, Harris said, options encourage performance, while restricted stock makes a better retention tool. For a company in flux like Tribune, he added, that can be worth a lot if the board is intent on keeping management.

"They're not doing it to reward performance," he said. "They're doing it to retain executives."

A Tribune spokesman had no comment on the board's motivations. Chicago-based Tribune owns the Chicago Tribune, Los Angeles Times, WGN-Ch. 9 and other assets.


Chandlers' Interest in L.A. Times Now Strictly Business
By Frank Ahrens
17 February 2007
The Washington Post

Who are the Chandlers, the family seemingly intent on breaking up one of the industry's oldest and most venerated newspaper companies?

For more than a century, the family played a central role in the Los Angeles Times and the building of modern L.A. The Chandlers' patriarch, Gen. Harrison Gray Otis, took over the Times in 1884 and built Times Mirror, a vastly successful family-run newspaper chain. Today, the Chandlers are once again agents of change in the newspaper business -- this time as shareholders, rather than as editors and publishers.

Seven years after a merger with Tribune Co. made them the largest shareholders of the Chicago-based media empire, the Chandlers have watched the value of their stake in Tribune decline along with the newspaper industry's circulation and advertising revenue. They have forced the company onto the block and submitted their own bid to split it up and extract much of their investment.

Tribune, which has 11 newspapers and 25 broadcast stations, may spin off its television division, be forced to take on huge amounts of new debt, sell the company's beloved Chicago Cubs or make more cuts at its newspapers in the coming weeks. The Tribune board's decision on the Chandlers' plan could come as soon as next week, a source close to the company said.

Similar scenes are playing out at other large newspaper and TV companies. What most don't have, however, is a family shareholder as large, varied, powerful and provocative as the Chandlers.

Today's Chandlers are 170-some descendants of Otis and his son-in-law, Harry Chandler. Once a straight line of succession, father-to-son owners and publishers of the Times, the Chandlers are now a diverse collection of sons, daughters, cousins and in-laws that sprawls like the great city itself and who relate to each other about as well as Compton does to Beverly Hills.

They are the beneficiaries of two trusts set up by Harry Chandler during the Depression that now are worth at least $3 billion, half of which is tied up in flat-lined Tribune stock.

The last Chandler to run the Times left in 1980, turning the paper over to professional management and effectively ending most of the family's interest in journalism as anything other than an investment.

Twenty years later, the Chandlers sold Times Mirror, which included the L.A. Times and several other papers, to Tribune for $8 billion in stock. They got three seats on Tribune's board and came to own 20 percent of the company.

But the combined company's stock, which traded as high as $60 a share after the merger, has lost half of its value in the seven years since. That helped splinter the Chandlers, souring many of them on journalism as a source of income and amplifying their differences.

"Many members of this extended family live outside Southern California; most are not named Chandler," Harry B. Chandler, son of the legendary Otis Chandler, the last Chandler publisher of the L.A. Times, wrote in an op-ed article in the Times in November.

A photographer and one of only seven current family members to work at the paper, Harry Chandler lamented how Tribune's troubles affected the Times. After Tribune forced out the paper's editor and publisher in November, Chandler wrote: "My point is that a family of this size, largely personally disconnected from this newspaper, is unlikely to act in concert toward a solution for The Times.

What a shame that is."

Members of the Chandler family declined to speak publicly for this article. Tribune had no comment on the Chandlers.

The two family trusts, originally a Depression-era emergency fund for Harry and Marian Chandler's eight children, provide wealth and income for today's Chandlers, who receive dividend checks from their investments.

"The only way the family could get its money was by the payment of dividends, and if the business wasn't performing, they weren't going to get a lot of dividends," said David Laventhol, a former publisher of the L.A. Times and former president of Times Mirror. "They couldn't just go up to the treasurer of the company and say, 'Write me a check for a million dollars.' "

The Chandler trusts are controlled by a board that has little interaction with family beneficiaries, many of whom receive only a yearly audit report with their dividend checks, according to a source familiar with family business who spoke on condition of anonymity because of continuing dealings with the Chandlers. Despite their combined wealth of at least $3 billion, no single member or small group has the resources to mount a buyout for Tribune, even combined with other investors.

The Chandlers are among three bidders for Tribune. Their offer would spin off Tribune's broadcast unit into a new business and take the newspapers private with equity backing that would pay the Chandlers for about half of their investment in the company. The Tribune board will either accept one of the bids or restructure the company on its own. Tribune says the decision will be made by the end of March.

The four key players connected to the family trusts are Warren "Spud" Williamson, a Chandler cousin and director of the trusts; William Stinehart Jr., a Los Angeles lawyer and member of the Tribune board; Thomas Unterman, the family's longtime financial adviser; and Jeffrey Chandler, a Chandler cousin and Tribune director.

Williamson is a philanthropist, horse enthusiast and political conservative who has given millions of dollars to such Southern California institutions as the Los Angeles Philharmonic. He sits on the five-person L.A. Times board that also includes three Tribune appointees. The board approves the choice of publisher.

The Chandlers' chief legal representative to Tribune is Stinehart, the longtime family lawyer and retired partner with Gibson, Dunn & Crutcher in Los Angeles. Stinehart forbade his high school from showing a L.A. Times reporter his 1961 yearbook featuring him, the paper wrote last year.

Unterman, who is not related to the Chandlers, is the family's top lieutenant and a former Tribune director. Managing partner of private-equity firm Rustic Canyon Partners, he is described by some as having a casual mien that belies a fierce business acumen. Unterman was the primary architect of such Times Mirror deals as the sale of its cable assets to Cox Enterprises for $2.3 billion in 1994 and its merger with Tribune in 2000.

In addition to newspapering, much of the Chandler trusts' wealth came from real estate. For most of the past century, for example, the family owned a California ranch one-third the size of Rhode Island. In 1936, the Chandlers struck oil on the property. The family's push to bring water to Los Angeles is fictionalized in the 1974 movie "Chinatown."


Tribune sues Fox News over use of RedEye name
By Paul Merrion
16 February 2007
Crain's Chicago Business Online

Chicago Tribune Co. is suing the Fox News Network for trademark infringement after it dubbed its new late-night cable entertainment talk show "Red Eye."

In its February 14 complaint, Tribune says its five-year-old daily RedEye tabloid edition and the Fox show "contain nearly identical content" and "viewers are quite likely to assume that Fox and the RedEye products owned by Tribune are collaborating, thereby causing confusion."

But the Tribune's request for a temporary restraining order was converted to a motion for a preliminary injunction and set for hearing on February 26.

The company also seeks unspecified damages, including any profits from using the name.

Tribune's suit noted that it has a "RedEye" segment on its own CLTV cable television program as well

as a RedEye website, which could also be confused with a Fox News Red Eye website and a blog by host Greg Gutfeld, a former editor of men's magazines.

The suit says Tribune has spent almost $4 million promoting the 150,000-circulation RedEye edition.

Tribune has two federal trademark registrations for the RedEye mark for newspapers, and has trademark applications pending on the name for television and internet services, the suit says.

Fox News "admitted that it did not conduct a trademark search," according to the suit, and "ignored" Tribune's demand to not use the name. The suit says the Fox News "Red Eye" show first aired on Feb. 6, 2007.

A Tribune spokesman declined to comment. A Fox News representative was not immediately available for comment.


Tribune Sees Red Over Fox News 'Red Eye' Show
16 February 2007
Editor & Publisher Online

CHICAGO Tribune Co., publisher of the Chicago commuter and youth daily tabloid RedEye says Fox News Network is infringing on its trademark with a talk show called "Red Eye."

The lawsuit, filed Feb. 14 and first reported Friday by Crain's Chicago Business, says the entertainment-oriented cable-TV show covers the same content as RedEye.

Tribune notes that it already airs a television show called "RedEye" on its CLTV channel in Chicago. The newspaper also produces content for a RedEye Web site, Tribune said, which could lead to more consumer confusion because the Fox News program also has a "Red Eye" Web site and a blog.

Tribune's suit says the Chicago media giant owns a federal trademark on the RedEye name for newspapers, and has applications pending for television and the Web.

A hearing was set for Feb. 26.