

# FORM 10-Q

## TRIBUNE CO - TRBCQ

**Filed: May 08, 2008 (period: March 30, 2008)**

Quarterly report which provides a continuing view of a company's financial position

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514051

# Table of Contents

10-Q - FIRST QUARTER 2008 FORM 10-Q

## PART I.

## PART I.

| ITEM 1. | FINANCIAL STATEMENTS. |
| ITEM 2. | MANAGEMENT S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS. |
| ITEM 3. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK. |
| ITEM 4. | CONTROLS AND PROCEDURES. |

## PART II.

| ITEM 1. | LEGAL PROCEEDINGS. |
| ITEM 1A. | RISK FACTORS. |
| ITEM 6. | EXHIBITS. |
| SIGNATURE | |

EX-31.1 (SAMUEL ZELL - FORM 10-Q CERTIFICATION)

EX-31.2 (CHANDLER BIGELOW - FORM 10-Q CERTIFICATION)

EX-32.1 (SAMUEL ZELL - FORM 10-Q CERTIFICATION)

EX-32.2 (CHANDLER BIGELOW - FORM 10-Q CERTIFCATION)

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-Q

**QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE QUARTERLY PERIOD ENDED MARCH 30, 2008**

**Commission file number 1-8572**

## TRIBUNE COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **36-1880355** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |
| **435 North Michigan Avenue, Chicago, Illinois** | **60611** |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code:  (312) 222-9100

No Changes
(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes /✓/ No / /

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.  See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act (Check One):
Large accelerated filer / /    Accelerated filer / /    Non-accelerated filer /✓/    Smaller Reporting Company / /

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
  Yes / /  No /✓/

At May 8, 2008, there were 56,521,739 shares of the Company's Common Stock ($.01 par value per share) outstanding, all of which were held by the Tribune Employee Stock Ownership Plan.

Source: TRIBUNE CO, 10-Q, May 08, 2008

### TRIBUNE COMPANY
### INDEX TO 2008 FIRST QUARTER FORM 10-Q

**Item No.**                                                                                     **Page**

### PART I.  FINANCIAL INFORMATION

1.   Financial Statements (Unaudited)

| | |
|---|---|
| Condensed Consolidated Statements of Operations for the First Quarters Ended March 30, 2008 and April 1, 2007 | 1 |
| Condensed Consolidated Balance Sheets at March 30, 2008 and Dec. 30, 2007 | 2 |
| Condensed Consolidated Statements of Cash Flows for the First Quarters Ended March 30, 2008 and April 1, 2007 | 4 |
| Notes to Condensed Consolidated Financial Statements | |
| Note 1:  Basis of Preparation | 5 |
| Note 2:  Discontinued Operations and Assets Held for Sale | 6 |
| Note 3:  Income Taxes | 7 |
| Note 4:  Stock-Based Compensation | 8 |
| Note 5:  Employee Stock Ownership Plan | 9 |
| Note 6:  Pension and Other Postretirement Benefits | 10 |
| Note 7:  Non-Operating Items | 10 |
| Note 8:  Inventories | 11 |
| Note 9:  Goodwill and Other Intangible Assets | 12 |
| Note 10:   Debt | 13 |
| Note 11:   Fair Value of Financial Instruments | 19 |
| Note 12:   Comprehensive Income | 20 |
| Note 13:   Other Matters | 21 |
| Note 14:   Segment Information | 24 |

2.   Management's Discussion and Analysis of Financial Condition and Results of Operations                                 25

3.   Quantitative and Qualitative Disclosures About Market Risk                                 42

4.   Controls and Procedures                                 45

### PART II.  OTHER INFORMATION

1.   Legal Proceedings                                 46
1A.   Risk Factors                                 48
6.   Exhibits                                 48

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**                                 **TRB0514054**
**Highly Confidential -- Attorneys' Eyes Only**

PART I.  FINANCIAL INFORMATION

## ITEM 1.  FINANCIAL STATEMENTS.

**TRIBUNE COMPANY AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
(In thousands of dollars)
(Unaudited)

| | First Quarter Ended | |
| --- | --- | --- |
| | March 30, 2008 | April 1, 2007 |
| Operating Revenues | $ 1,114,648 | $ 1,209,379 |
| **Operating Expenses** | | |
| Cost of sales (exclusive of items shown below) | 599,657 | 614,751 |
| Selling, general and administrative | 315,006 | 355,881 |
| Depreciation | 51,648 | 51,823 |
| Amortization of intangible assets | 4,985 | 5,007 |
| Total operating expenses | 971,296 | 1,027,462 |
| **Operating Profit** | 143,352 | 181,917 |
| Net income on equity investments | 16,757 | 12,684 |
| Interest and dividend income | 3,931 | 3,154 |
| Interest expense | (263,275) | (83,249) |
| Gain (loss) on change in fair values of PHONES and related investment | 69,880 | (69,780) |
| Strategic transaction expenses | — | (14,473) |
| Other non-operating gain (loss), net | (859) | 538 |
| **Income (Loss) from Continuing Operations Before Income Taxes** | (30,214) | 30,791 |
| Income taxes (Note 3) | 1,854,224 | (19,441) |
| **Income from Continuing Operations** | 1,824,010 | 11,350 |
| **Loss from Discontinued Operations, net of tax** (Note 2) | (548) | (34,645) |
| **Net Income (Loss)** | $ 1,823,462 | $ (23,295) |

See Notes to Condensed Consolidated Financial Statements.

1

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRIBUNE COMPANY AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
(In thousands of dollars)
(Unaudited)

| | March 30, 2008 | Dec. 30, 2007 |
|---|---|---|
| **Assets** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 246,801 | $ 233,284 |
| Accounts receivable, net | 661,708 | 732,853 |
| Inventories | 44,284 | 40,675 |
| Broadcast rights | 261,762 | 287,045 |
| Deferred income taxes | 24,771 | — |
| Prepaid expenses and other | 109,230 | 91,166 |
| Total current assets | 1,348,556 | 1,385,023 |
| **Properties** | | |
| Property, plant and equipment | 3,573,327 | 3,564,436 |
| Accumulated depreciation | (2,034,597) | (1,998,741) |
| Net properties | 1,538,730 | 1,565,695 |
| **Other Assets** | | |
| Broadcast rights | 248,273 | 301,263 |
| Goodwill | 5,579,926 | 5,579,926 |
| Other intangible assets, net | 2,658,225 | 2,663,152 |
| Time Warner stock related to PHONES debt | 221,920 | 266,400 |
| Other investments | 460,619 | 508,205 |
| Prepaid pension costs | 488,425 | 514,429 |
| Assets held for sale | 10,432 | 33,780 |
| Other | 419,276 | 331,846 |
| Total other assets | 10,087,096 | 10,199,001 |
| Total assets | $ 12,974,382 | $ 13,149,719 |

See Notes to Condensed Consolidated Financial Statements.

2

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only                    TRB0514056

**TRIBUNE COMPANY AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
(In thousands of dollars)
(Unaudited)

| | March 30, 2008 | Dec. 30, 2007 |
|---|---|---|
| **Liabilities and Shareholders' Equity (Deficit)** | | |
| **Current Liabilities** | | |
| PHONES debt related to Time Warner stock (Note 10) | $ 210,824 | $ 253,080 |
| Other debt due within one year | 752,138 | 750,239 |
| Contracts payable for broadcast rights | 320,706 | 339,909 |
| Deferred income taxes | — | 100,324 |
| Deferred income | 260,307 | 121,239 |
| Accounts payable, accrued expenses and other current liabilities | 534,567 | 625,175 |
| Total current liabilities | 2,078,542 | 2,189,966 |
| **Long-Term Debt** | | |
| PHONES debt related to Time Warner stock (Note 10) | 93,816 | 343,960 |
| Other long-term debt (less portions due within one year) | 11,547,383 | 11,496,246 |
| Total long-term debt | 11,641,199 | 11,840,206 |
| **Other Non-Current Liabilities** | | |
| Deferred income taxes | 73,737 | 1,771,845 |
| Contracts payable for broadcast rights | 374,793 | 432,393 |
| Deferred compensation and benefits | 251,610 | 264,480 |
| Other obligations | 212,527 | 164,769 |
| Total other non-current liabilities | 912,667 | 2,633,487 |
| **Common Shares Held by ESOP, net of Unearned Compensation (Note 5)** | 10,688 | — |
| **Shareholders' Equity (Deficit)** | | |
| Stock purchase warrants | 255,000 | 255,000 |
| Retained earnings (deficit) | (1,554,069) | (3,474,311) |
| Accumulated other comprehensive income (loss) | (369,645) | (294,629) |
| Total shareholders' equity (deficit) | (1,668,714) | (3,513,940) |
| Total liabilities and shareholders' equity (deficit) | $ 12,974,382 | $ 13,149,719 |

See Notes to Condensed Consolidated Financial Statements.

3

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0514057

## TRIBUNE COMPANY AND SUBSIDIARIES
## CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
### (In thousands of dollars)
### (Unaudited)

| | First Quarter Ended | |
|---|---|---|
| | March 30, 2008 | April 1, 2007 |
| **Operating Activities** | | |
| Net income (loss) | $ 1,823,462 | $ (23,295) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | |
| Stock-based compensation related to equity-classified awards | — | 18,338 |
| ESOP compensation | 10,688 | — |
| Pension costs, net of contributions | 20,536 | (865) |
| Depreciation | 51,648 | 52,424 |
| Amortization of intangible assets | 4,982 | 5,020 |
| Net income on equity investments | (16,757) | (12,684) |
| Distributions from equity investments | 58,717 | 45,202 |
| Amortization of debt issuance costs | 18,448 | 4,219 |
| (Gain) loss on change in fair values of PHONES and related investment | (69,880) | 69,780 |
| Gain on sale of studio production lot | (82,587) | — |
| Loss on sales of discontinued operations | 516 | 19,442 |
| Subchapter S corporation election deferred income taxes adjustment (Note 3) | (1,859,358) | — |
| Changes in working capital items, excluding effects from acquisitions and dispositions: | | |
| Accounts receivable | 71,145 | 84,604 |
| Inventories, prepaid expenses and other current assets | (24,098) | (29,547) |
| Deferred income, accounts payable, accrued expenses and other current liabilities | (11,286) | (8,961) |
| Income taxes | 53,140 | (21,570) |
| Deferred compensation | (12,688) | (47,896) |
| Deferred income taxes, excluding subchapter S corporation election adjustment | (10,444) | (10,504) |
| Tax benefit on stock options exercised | — | 3,462 |
| Other, net | 25,139 | (11,971) |
| Net cash provided by operating activities | 51,323 | 135,198 |
| **Investing Activities** | | |
| Capital expenditures | (23,082) | (21,369) |
| Acquisitions and investments | (1,810) | (4,579) |
| Proceeds from sales of intangibles, investments and real estate | 131,001 | 10,400 |
| Investment in escrow fund related to real estate | (118,610) | — |
| Net cash used for investing activities | (12,501) | (15,548) |
| **Financing Activities** | | |
| Long-term borrowings | 25,327 | 25 |
| Borrowings under former bridge credit facility | — | 100,000 |
| Repayments under former bridge credit facility | — | (85,000) |
| Repayments of long-term debt | (50,632) | (6,280) |
| | — | (97,019) |

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0514058

| | | |
|---|---|---|
| Repayments of commercial paper, net | | |
| Sales of common stock to employees, net | — | 19,294 |
| Dividends | — | (43,247) |
| Net cash used for financing activities | (25,305) | (112,227) |
| **Net Increase in Cash and Cash Equivalents** | 13,517 | 7,423 |
| Cash and cash equivalents, beginning of year | 233,284 | 174,686 |
| Cash and cash equivalents, end of quarter | $ 246,801 | $ 182,109 |

See Notes to Condensed Consolidated Financial Statements.

4

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514059

**TRIBUNE COMPANY AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(Unaudited)

**NOTE 1: BASIS OF PREPARATION**

In the opinion of management, the accompanying unaudited condensed consolidated financial statements contain all adjustments necessary for a fair statement of the financial position of Tribune Company and its subsidiaries (the "Company" or "Tribune") as of March 30, 2008 and the results of their operations and cash flows for the first quarters ended March 30, 2008 and April 1, 2007. All adjustments reflected in the accompanying unaudited condensed consolidated financial statements are of a normal recurring nature. Results of operations for interim periods are not necessarily indicative of the results to be expected for the full year. Certain prior year amounts have been reclassified to conform to the 2008 presentation.

On April 1, 2007, the Company's board of directors (the "Board"), based on the recommendation of a special committee of the Board comprised entirely of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), EGI-TRB, L.L.C., a Delaware limited liability company wholly owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell. On Dec. 20, 2007, the Company completed the Leveraged ESOP Transactions which culminated in the cancellation of all issued and outstanding shares of the Company's common stock as of that date, other than shares held by the Company or the ESOP, and the Company becoming wholly owned by the ESOP. The Company has significant continuing public debt and has accounted for these transactions as a leveraged recapitalization and, accordingly, has maintained a historical cost presentation in its consolidated financial statements.

On Feb. 12, 2007, the Company announced an agreement to sell the New York edition of *Hoy*, the Company's Spanish-language daily newspaper ("*Hoy*, New York"). The Company completed the sale of *Hoy*, New York on May 15, 2007. In March 2007, the Company announced its intentions to sell its Southern Connecticut Newspapers—*The Advocate* (Stamford) and *Greenwich Time* (collectively "SCNI"). The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which was sold in a separate transaction that closed on April 22, 2008. During the third quarter of 2007, the Company began actively pursuing the sale of the stock of one of its subsidiaries, EZ Buy & EZ Sell Recycler Corporation ("Recycler"). The accompanying unaudited condensed consolidated financial statements reflect these businesses as discontinued operations for all periods presented. See Note 2 for further discussion.

As of March 30, 2008, the Company's significant accounting policies and estimates, which are detailed in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007, have not changed from Dec. 30, 2007, except for the adoption of Financial Accounting Standards Board ("FASB") Statement No. 157, "Fair Value Measurements" ("FAS No. 157") and FASB Statement No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("FAS No. 159"), both of which were adopted effective Dec. 31, 2007. The Company has elected to account for its PHONES debt utilizing the fair value option under FAS No. 159. The effects of this election were recorded as of Dec. 31, 2007, and included a $177 million decrease in PHONES debt related to Time Warner stock, a $62 million increase in deferred income tax liabilities, an $18 million decrease in other assets, and a $97 million increase in retained earnings. In accordance with FAS No. 159, the $97 million retained earnings increase was not included in the Company's unaudited condensed consolidated statement of operations for the quarter ended March 30, 2008. See Note 10 for additional information regarding the Company's adoption of FAS No. 159. The adoption of FAS No. 157 had no impact on the Company's consolidated financial statements. See Note 11 for additional disclosures related to the fair value of financial instruments included in the Company's unaudited condensed consolidated balance sheet at March 30, 2008.

5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0514060

**NOTE 2:  DISCONTINUED OPERATIONS AND ASSETS HELD FOR SALE**

**Publishing Discontinued Operations**—The Company announced an agreement to sell *Hoy*, New York on Feb. 12, 2007, and completed the sale on May 15, 2007.  In March 2007, the Company announced its intentions to sell SCNI.  The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which was sold in a separate transaction that closed on April 22, 2008 (see "Assets Held for Sale" section below).  In the first quarter of 2007, the Company recorded a pretax loss of $19 million ($33 million after taxes) to write down the net assets of SCNI to estimated fair value, less costs to sell.  In the first quarter of 2008, the Company recorded an additional $.5 million after-tax loss on the sale of SCNI.  During the third quarter of 2007, the Company began actively pursuing the sale of the stock of Recycler.  The sale of Recycler closed on Oct. 17, 2007.

These businesses were considered components of the Company's publishing segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company.  The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations.  Accordingly, the results of operations in 2007 for each of these businesses are reported as discontinued operations in the unaudited condensed consolidated statements of operations.

**Summarized Financial Information**—Selected financial information related to discontinued operations is summarized as follows (in thousands):

|                                                      | First Quarter | |
|------------------------------------------------------|-------------:|-------------:|
|                                                      | **2008** | **2007** |
| Operating revenues                                   | $        — | $     15,657 |
| Operating loss                                       | $      (63) | $     (2,460) |
| Loss on sales of discontinued operations             | (516)      | (19,442)     |
| Loss from discontinued operations before income taxes | (579)      | (21,902)     |
| Income taxes(1)                                      | 31         | (12,743)     |
| Loss from discontinued operations, net of tax        | $     (548) | $    (34,645) |

(1) Income taxes for the first quarter of 2007 included tax expense of $14 million related to the $19 million pretax loss on sale of SCNI.  The pretax loss included $54 million of allocated newspaper group goodwill, most of which is not deductible for income tax purposes.

**Assets Held for Sale**—During the third quarter of 2007, the Company commenced a process to sell the real estate and related assets of its studio production lot located in Hollywood, California. Accordingly, the $23 million carrying value of the land, building and equipment of the studio production lot was included in assets held for sale at Dec. 30, 2007.  The sale of the studio production lot closed on Jan. 30, 2008, and the Company received net proceeds of $122 million, of which $119 million was placed into an escrow fund immediately following the closing of the sale and is included in other non-current assets at March 30, 2008. Simultaneous with the closing of the sale, the Company entered into a five-year operating lease for a portion of the studio production lot utilized by the Company's KTLA-TV station. The sale resulted in a total pretax gain of $99 million.  The pretax gain related to the portion of the studio production lot currently utilized by the Company's KTLA-TV station was $16 million and represented more than a minor portion of the fair value of the studio production lot.  Accordingly, this gain was deferred and will be amortized as reduced rent expense over the five-year life of the related operating lease.  The remaining pretax gain of $83 million was recorded as a reduction to selling, general and administrative expenses in the first quarter of 2008.

As noted above, the Company sold the SCNI real estate in Stamford and Greenwich, Connecticut on April 22, 2008.  The $5 million carrying value of the real estate was included in assets held for sale at March 30, 2008

6

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514061

and Dec. 30, 2007. The Company received net proceeds of $29 million on the sale of the SCNI real estate, which proceeds were placed into an escrow fund immediately following the closing of the sale, and expects to record a pretax gain of $23 million in the second quarter of 2008. On April 28, 2008, the $29 million of net proceeds from the sale of the SCNI real estate, the $119 million of net proceeds from the sale of the studio production lot and available cash were utilized to purchase eight real properties that were previously leased from TMCT, LLC (see Note 13 for additional information pertaining to the Company's acquisition of the TMCT real properties). The purchase was structured as a like-kind exchange, which allowed the Company to defer income taxes on essentially all of the gains from these dispositions. In December 2006, the Company commenced a process to sell the land and building of one of its other facilities. The $5 million carrying value of the land and building approximates fair value less costs to sell and is also included in assets held for sale at March 30, 2008 and Dec. 30, 2007.

## NOTE 3: INCOME TAXES

**S Corporation Election**—On March 13, 2008, the Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. The Company also elected to treat essentially all of its subsidiaries as qualified subchapter S subsidiaries. Subject to certain limitations (such as the built-in capital gains tax applicable for ten years to gains accrued prior to the election), the Company is no longer subject to federal income tax. Instead, the Company's income will be required to be reported by its shareholders. The Company's ESOP, the Company's sole shareholder (see Note 5), will not be taxed on the share of income that is passed through to it because the ESOP is a qualified employee benefit plan. Although most states in which the Company operates recognize the S corporation status, some impose income taxes at a reduced rate.

As a result of the election and in accordance with FASB Statement No. 109, "Accounting for Income Taxes", the Company has eliminated approximately $1,859 million of net deferred income tax liabilities as of Dec. 31, 2007, and has recorded such adjustment as a reduction in the Company's provision for income tax expense in the first quarter of 2008. The Company will continue to report deferred income taxes relating to states that assess taxes on S corporations, subsidiaries which are not qualified subchapter S subsidiaries, and potential asset dispositions that the Company expects will be subject to the built-in gains tax.

**PHONES Interest**—In connection with the routine examination of the Company's federal income tax returns for 2000 through 2003, the Internal Revenue Service ("IRS") proposed that the Company capitalize the interest on the PHONES as additional tax basis in the Company's 16 million shares of Time Warner common stock, rather than allowing the Company to currently deduct such interest. The National Office of the IRS has issued a Technical Advice Memorandum that supports the proposed treatment. The Company disagrees with the IRS's position and requested that the IRS administrative appeals office review the issue. The effect of the treatment proposed by the IRS would be to increase the Company's tax liability by approximately $199 million for the period 2000 through 2003 and by approximately $277 million for the period 2004 through the first quarter of 2008.

During the fourth quarter of 2006, the Company reached an agreement with the IRS appeals office regarding the deductibility of the PHONES interest expense. The agreement will apply for the tax years 2000 through the 2029 maturity date of the PHONES. In December of 2006, under the terms of the agreement reached with the IRS appeals office, the Company paid approximately $81 million of tax plus interest for tax years 2000 through 2005. The tax payments were recorded as a reduction in the Company's deferred tax liability, and the interest was recorded as a reduction in the Company's income tax reserves. The agreement reached with the appeals office is being reviewed by the Joint Committee on Taxation. A decision from the Joint Committee on Taxation is expected by the end of the second quarter of 2008.

**Other**—Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

7

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**                                                                TRB0514062

In the first quarter of 2008, income tax expense applicable to continuing operations amounted to a net benefit of $1,854 million and was comprised of the favorable $1,859 million deferred income tax adjustment discussed above and a provision of $5 million. The provision was primarily for interest on uncertain tax positions. The effective tax rate on income from continuing operations was 63.1% in the first quarter of 2007. The effective tax rate for the 2007 first quarter was affected by certain non-operating items that were not deductible for tax purposes. See Note 7 for a summary of non-operating items. In the aggregate, non-operating items increased the effective tax rate in the first quarter of 2007 by 23.0 percentage points.

**NOTE 4:  STOCK-BASED COMPENSATION**

Stock-based compensation expense for the first quarters of 2008 and 2007 was as follows (in thousands):

| | First Quarter | |
| --- | --- | --- |
| | 2008 | 2007 |
| Management equity incentive plan Options(1) | $          7,994 | $           — |
| | — | 726 |
| Restricted stock units(1) | — | 16,951 |
| Employee stock purchase plan(2) | — | 586 |
| Total stock-based compensation expense | $          7,994 | $        18,263 |

(1) Pursuant to an Agreement and Plan of Merger ("the Merger Agreement") entered into by the Company on April 1, 2007 with Great Banc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust which forms a part of the ESOP, Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and the Zell Entity (solely for the limited purposes specified therein), which provided for Merger Sub to be merged with and into the Company, and following such merger, the Company to continue as the surviving corporation wholly owned by the ESOP (the "Merger"), on Dec. 20, 2007, the Company redeemed for cash all outstanding stock awards, each of which vested in full upon completion of the Merger, with positive intrinsic value relative to $34.00 per share. All remaining outstanding stock awards under the Tribune Company Incentive Plan (the "Incentive Plan") as of Dec. 20, 2007 that were not cash settled pursuant to the Merger Agreement were cancelled. The Company does not intend to grant any new equity awards under the Incentive Plan.

(2) The Company's employee stock purchase plan was discontinued as of Dec. 20, 2007, following the consummation of the Merger.

For the first quarter of 2007, total stock-based compensation expense excluded $44,000 of credits related to discontinued operations and $119,000 of capitalized costs.

On Dec. 20, 2007, the Board approved the Company's 2007 Management Equity Incentive Plan (the "MEIP"). The MEIP provides for phantom units (the "Units") that generally track the fair value of a share of the Company's common stock, as determined by the trustee of the Company's Employee Stock Ownership Plan (see Note 5). MEIP awards have been made to eligible members of the Company's management and other key employees at the discretion of the Board.

The Company accounts for the Units issued under the MEIP as liability-classified awards. As a result, the Company is required to adjust the MEIP liability to reflect the most recent estimate of the fair value of a share of the Company's common stock. The Company recorded $8.0 million of compensation expense in the first quarter of 2008 in connection with the MEIP, including $2.2 million of accelerated expense related to early termination payments made pursuant to the terms of the plan. The remaining $5.8 million of expense was based on the estimated fair value of the Company's common stock. The Company's liability under the MEIP is included in other non-current liabilities on the Company's unaudited condensed consolidated balance sheet and totaled $16 million at March 30, 2008 and Dec. 30, 2007. The estimated fair value per share of the Company's common stock did not change during the first quarter of 2008.

8

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514063

## NOTE 5:  EMPLOYEE STOCK OWNERSHIP PLAN

On April 1, 2007, the Company established the ESOP as a long-term employee benefit plan.  On that date, the ESOP purchased 8,928,571 shares of the Company's common stock. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP. Upon consummation of the Merger, the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock.

The ESOP provides for the allocation of the Company's common shares it holds on a noncontributory basis to eligible employees of the Company.  None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007.  Beginning in fiscal year 2008, as the ESOP repays the loan through its use of contributions from the Company, shares will be released and allocated to eligible employees in proportion to their eligible compensation.  The shares that are released for allocation on an annual basis will be in the same proportion that the current year's principal and interest payments bear in relation to the total remaining principal and interest payments to be paid over the life of the $250 million ESOP loan. The Company will recognize compensation expense based on the estimated fair value of the shares of the Company's common stock that are allocated in each annual period.  In the first quarter of 2008, the Company recognized $10.7 million of compensation expense related to the ESOP.

The Company's policy is to present unallocated shares held by the ESOP at book value, net of unearned compensation, and allocated shares, which include shares committed to be released, at fair value in the Company's consolidated balance sheet. Pursuant to the terms of the ESOP, participants who receive distributions of shares of the Company's common stock can require the Company to repurchase those shares within a specified time period following such distribution.  Accordingly, the shares of the Company's common stock held by the ESOP are classified outside of shareholders' equity (deficit), net of unearned compensation, in the Company's condensed consolidated balance sheets. The amounts at March 30, 2008 and Dec. 30, 2007 were as follows (in thousands):

|  | March 30, 2008 | Dec. 30, 2007 |
|---|---|---|
| Allocated ESOP shares (at fair value)(1) | $         10,688 | $              — |
| Unallocated ESOP shares (at book value) | 245,498 | 250,000 |
| Unearned compensation related to ESOP | (245,498) | (250,000) |
| Common shares held by ESOP, net of unearned compensation | $         10,688 | $              — |

(1)  Represents 1,017,891 shares committed to be released.

At March 30, 2008 and Dec. 30, 2007, the fair value of the unallocated shares held by the ESOP was approximately $583 million and $593 million, respectively.  In accordance with the terms of the ESOP, the fair value per share of the Company's common stock is determined as of each fiscal year end by the trustee of the ESOP.  The estimated fair value per share of the Company's common stock did not change during the first quarter of 2008.

9

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514064

## NOTE 6: PENSION AND OTHER POSTRETIREMENT BENEFITS

The components of net periodic benefit cost for Company-sponsored pension and other postretirement benefits plans for the first quarters of 2008 and 2007 were as follows (in thousands):

| | Pension Benefits First Quarter | | Other Postretirement Benefits First Quarter | |
| --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2008 | 2007 |
| Service cost | $ 6,046 | $ 570 | $ 307 | $ 323 |
| Interest cost | 21,938 | 21,675 | 1,888 | 1,872 |
| Expected return on plans' assets | (36,727) | (34,849) | — | — |
| Recognized actuarial loss | 6,385 | 12,832 | 44 | 4 |
| Amortization of prior service costs (credits) | 360 | 55 | (362) | (361) |
| Special termination benefits(1) | 24,153 | — | — | — |
| Net periodic benefit cost | $ 22,155 | $ 283 | $ 1,877 | $ 1,838 |

(1) One-time pension benefits related to position the elimination of approximately 600 positions.

For the year ending Dec. 28, 2008, the Company plans to contribute $6 million to certain of its union and non-qualified pension plans and $13 million to its other postretirement plans. For the first quarter ended March 30, 2008, the Company made $2 million of contributions to its union and non-qualified pension plans and $3 million of contributions to its other postretirement plans.

## NOTE 7: NON-OPERATING ITEMS

The first quarters of 2008 and 2007 included several non-operating items, summarized as follows (in thousands):

| | First Quarter 2008 | | First Quarter 2007 | |
| --- | --- | --- | --- | --- |
| | Pretax Gain (Loss) | After-tax Gain (Loss) | Pretax Gain (Loss) | After-tax Gain (Loss) |
| Gain (loss) on change in fair values of PHONES and related investment | $ 69,880 | $ 69,055 | $ (69,780) | $ (42,566) |
| Strategic transaction expenses | — | — | (14,473) | (13,771) |
| Other, net | (859) | (1,075) | 538 | (842) |
| Income tax adjustment | — | 1,859,358 | — | — |
| Total non-operating items | $ 69,021 | $ 1,927,338 | $ (83,715) | $ (57,179) |

In the first quarter of 2008, the $70 million non-cash pretax gain on change in fair values of PHONES and related investment resulted primarily from a $115 million decrease in the fair value of the Company's PHONES, partially offset by a $45 million decrease in the fair value of 16 million shares of Time Warner common stock. Effective Dec. 31, 2007, the Company has elected to account for its PHONES utilizing the fair value option under FAS No. 159. As a result of this election, the Company no longer measures just the changes in fair value of the derivative component of the PHONES, but instead measures the changes in fair value of the entire PHONES debt. See Note 10 for further information pertaining to the Company's adoption of FAS No. 159. The favorable income tax adjustment of $1,859 million in the first quarter of 2008 related to the Company's election to be treated as a subchapter S corporation, which resulted in the elimination of essentially all of the Company's net deferred tax liabilities. See Note 3 for further information pertaining to the Company's election to be treated as a subchapter S corporation.

10

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only                                                    TRB0514065

In the first quarter of 2007, the $70 million non-cash pretax loss on change in fair values of PHONES and related investment resulted primarily from a $36 million increase in the fair value of the derivative component of the Company's PHONES and a $33 million decrease in the fair value of 16 million shares of Time Warner common stock.  The strategic transaction expenses in the first quarter of 2007 related to the Company's strategic review and the Leveraged ESOP Transactions.

**NOTE 8:  INVENTORIES**

Inventories consisted of the following (in thousands):

| | March 30, 2008 | Dec. 30, 2007 |
|---|---|---|
| Newsprint | $    31,722 | $    28,664 |
| Supplies and other | 12,562 | 12,011 |
| Total inventories | $    44,284 | $    40,675 |

Newsprint inventories valued under the LIFO method were less than current cost by approximately $12 million at March 30, 2008 and $10 million at Dec. 30, 2007.

11

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514066

## NOTE 9:  GOODWILL AND OTHER INTANGIBLE ASSETS

Goodwill and other intangible assets consisted of the following (in thousands):

| | March 30, 2008 | | | Dec. 30, 2007 | | |
|---|---|---|---|---|---|---|
| | Gross Amount | Accumulated Amortization | Net Amount | Gross Amount | Accumulated Amortization | Net Amount |
| **Intangible assets subject to amortization** | | | | | | |
| Subscribers (useful life of 15 to 20 years) | $ 189,879 | $ (84,210) | $ 105,669 | $ 189,879 | $ (81,698) | $ 108,181 |
| Network affiliation agreements (useful life of 40 years)(1) | 278,034 | (31,293) | 246,741 | 278,034 | (29,552) | 248,482 |
| Other (useful life of 3 to 40 years) | 25,436 | (12,436) | 13,000 | 25,381 | (11,707) | 13,674 |
| Total | $ 493,349 | $ (127,939) | 365,410 | $ 493,294 | $ (122,957) | 370,337 |
| **Goodwill and other intangible assets not subject to amortization** | | | | | | |
| Goodwill | | | | | | |
| Publishing | | | 4,138,685 | | | 4,138,685 |
| Broadcasting and entertainment | | | 1,441,241 | | | 1,441,241 |
| Total goodwill | | | 5,579,926 | | | 5,579,926 |
| Newspaper mastheads | | | 1,412,937 | | | 1,412,937 |
| FCC licenses | | | 871,946 | | | 871,946 |
| Tradename | | | 7,932 | | | 7,932 |
| Total | | | 7,872,741 | | | 7,872,741 |
| Total goodwill and other intangible assets | | | $ 8,238,151 | | | $ 8,243,078 |

(1)  Network affiliation agreements, net of accumulated amortization, included $173 million related to FOX affiliations, $71 million related to CW affiliations and $3 million related to MyNetworkTV affiliations as of March 30, 2008.

On March 13, 2008, the Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year.  As a result, approximately $1,859 million of the Company's net deferred tax liabilities were eliminated and such adjustment was recorded as a reduction in the Company's provision for income tax expense in the first quarter of 2008 (see Note 3).  This adjustment resulted in an increase in the carrying values of the Company's reporting units.

As disclosed in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007, the Company performs its annual impairment review of goodwill and other intangible assets not subject to amortization in the fourth quarter of each year in accordance with FASB Statement No. 142, "Goodwill and Other Intangible Assets" ("FAS No. 142").  Under FAS No. 142, the impairment review of goodwill and other intangible assets not subject to amortization must be based on estimated fair values.  The valuation of intangible assets requires assumptions and estimates of many critical factors, including revenue and market growth, operating cash flows, market multiples, and discount rates.  The Company has experienced continued declines in its consolidated operating results during the first quarter of 2008, particularly in its publishing reporting unit. Adverse changes in expected operating results and/or unfavorable changes in other economic factors used to estimate fair values could result in a non-cash impairment charge in the future under FAS No. 142.

12

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0514067

**NOTE 10:  DEBT**

Debt consisted of the following (in thousands):

| | March 30, 2008 | Dec. 30, 2007 |
|---|---|---|
| Tranche B Facility due 2014, interest rate of 5.54% and 7.91%, respectively | $ 7,593,050 | $ 7,587,163 |
| Tranche X Facility due 2008-2009, interest rate of 7.40% and 7.99%, respectively | 1,400,000 | 1,400,000 |
| Bridge Facility due 2008, interest rate of 7.54% and 9.43%, respectively | 1,600,000 | 1,600,000 |
| Medium-term notes due 2008, weighted average interest rate of 5.6% in 2008 and 2007 | 237,585 | 262,585 |
| Property financing obligation, effective interest rate of 7.7%, expiring 2009 | 30,267 | 35,676 |
| 4.875% notes due 2010, net of unamortized discount of $372 and $410, respectively | 449,628 | 449,589 |
| 7.25% debentures due 2013, net of unamortized discount of $1,708 and $1,794, respectively | 80,375 | 80,289 |
| 5.25% notes due 2015, net of unamortized discount of $1,166 and $1,205, respectively | 328,835 | 328,795 |
| 7.5% debentures due 2023, net of unamortized discount of $3,673 and $3,732, respectively | 95,075 | 95,016 |
| 6.61% debentures due 2027, net of unamortized discount of $2,069 and $2,095, respectively | 82,891 | 82,864 |
| 7.25% debentures due 2096, net of unamortized discount of $17,879 and $17,926, respectively | 130,120 | 130,073 |
| Subordinated promissory notes due 2018, effective interest rate of 17%, net of unamortized discount of $165,063 and $165,000, respectively | 62,859 | 60,315 |
| Interest rate swaps | 193,872 | 119,029 |
| Other notes and obligations | 14,964 | 15,091 |
| Total debt excluding PHONES | 12,299,521 | 12,246,485 |
| 2% PHONES debt related to Time Warner stock, due 2029 | 304,640 | 597,040 |
| Total debt | $ 12,604,161 | $ 12,843,525 |

Debt was classified as follows in the unaudited condensed consolidated balance sheets (in thousands):

| | March 30, 2008 | Dec. 30, 2007 |
|---|---|---|
| Current Liabilities: | | |
| PHONES debt related to Time Warner stock | $ 210,824 | $ 253,080 |
| Other debt due within one year | 752,138 | 750,239 |
| Total current debt | 962,962 | 1,003,319 |
| Long-Term Debt: | | |
| PHONES debt related to Time Warner stock | 93,816 | 343,960 |
| Other long-term debt | 11,547,383 | 11,496,246 |
| Total long-term debt | 11,641,199 | 11,840,206 |
| Total Debt | $ 12,604,161 | $ 12,843,525 |

13

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514068

**New Credit Agreements**—On May 17, 2007, the Company entered into a $8.028 billion senior secured credit agreement, as amended on June 4, 2007 (collectively, the "Credit Agreement"). The Credit Agreement consists of the following facilities: (a) a $1.50 billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Credit Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility"). Accordingly, the aggregate amount of the facilities under the Credit Agreement equals $10.133 billion.

On June 4, 2007, proceeds from the Tranche X Facility and the Tranche B Facility were used by the Company in connection with the consummation of the Company's tender offer to repurchase 126 million shares of the Company's common stock that were then outstanding at a price of $34.00 per share in cash and to refinance the Company's former five-year credit agreement and former bridge credit agreement.

The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million. As of March 30, 2008, the Company had $65 million of letters of credit outstanding. Borrowings under the Revolving Credit Facility may be used for working capital and general corporate purposes.

On Dec. 20, 2007, the Company entered into (i) a $1.6 billion senior unsecured interim loan agreement (the "Interim Credit Agreement") and (ii) a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Credit Agreement (the Incremental Facility and Tranche B Facility are hereinafter referred to collectively as the Tranche B Facility). The Interim Credit Agreement contains a $1.6 billion twelve-month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by the Company, among other ways, in connection with the consummation of the Merger and for general corporate purposes.

Prior to the consummation of the Merger, the Tranche X Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 150 basis points or LIBOR plus a margin of 250 basis points. Pursuant to the terms of the Credit Agreement, following the closing of the Merger, the margins applicable to the Tranche X Facility increased to 175 basis points and 275 basis points, respectively.

The Tranche B Facility, Delayed Draw Facility and Revolving Credit Facility bear interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 200 basis points or LIBOR plus a margin of 300 basis points. All undrawn amounts under the Delayed Draw Facility and the Revolving Credit Facility accrue commitment fees at a per annum rate of 75 basis points and 50 basis points, respectively. With respect to the Revolving Credit Facility only, the margin applicable to base rate advances, the margin applicable to LIBOR advances and the commitment fee applicable to undrawn amounts are subject to decreases based on a leverage-based grid.

On June 29, 2007, the Company repaid $100 million of the $1.5 billion of borrowings under the Tranche X Facility. The remaining principal balance of the Tranche X Facility must be repaid in an aggregate amount of $650 million on Dec. 4, 2008, which amount may be adjusted to reflect additional prepayments or other mandatory prepayments (described below) applied thereto, and the remaining outstanding amount of the Tranche X Facility, if any, must be repaid on June 4, 2009.

The Tranche B Facility is a seven-year facility which matures on June 4, 2014 and also amortizes at a rate of 1.0% per annum (payable quarterly). The Revolving Facility is a six-year facility and matures on June 4, 2013. In February 2008, the Company refinanced $25 million of its medium-term notes with borrowings under the Delayed Draw Facility. The Delayed Draw Facility automatically becomes part of the Tranche B Facility as amounts are borrowed and amortizes based upon the Tranche B Facility amortization schedule. The Company

14

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0514069

intends to use the Delayed Draw Facility to refinance approximately $238 million of its remaining medium-term notes as they mature during 2008. Accordingly, the Company has classified its medium-term notes as long-term at March 30, 2008 and Dec. 30, 2007.

Prior to June 4, 2008, optional prepayments on the Tranche X Facility and the Tranche B Facility with the proceeds of a substantially concurrent issuance of loans under any senior secured credit facilities pursuant to the Credit Agreement must be accompanied by a prepayment fee equal to 1.0% of the aggregate amount of such prepayments if the interest rate spread applicable to such new loans is less than the interest rate applicable to the Tranche X Facility or the Tranche B Facility. Except as described in the immediately preceding sentence, borrowings under the Credit Agreement are prepayable at any time prior to maturity without penalty, and the unutilized portion of the commitments under the Revolving Credit Facility or the Delayed Draw Facility may be reduced at the option of the Company without penalty.

Upon execution of the Interim Credit Agreement, loans under the Bridge Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 350 basis points or LIBOR plus a margin of 450 basis points. On March 20, 2008, pursuant to the terms of the Interim Credit Agreement, such margins increased by 50 basis points per annum and will continue to increase by this amount each quarter, subject to specified caps, a portion of which interest may be payable through an interest payable-in-kind feature. Subject to certain prepayment restrictions contained in the Credit Agreement, the Bridge Facility is prepayable at any time prior to maturity without penalty, including in connection with the issuance of up to $1.6 billion of high-yield notes.

If any loans under the Bridge Facility remain outstanding on Dec. 20, 2008, the lenders thereunder will have the option, subject to the terms of the Interim Credit Agreement, at any time and from time to time to exchange such initial loans for senior exchange notes that the Company will issue under a senior indenture, and the maturity date of any initial loans that are not exchanged for senior exchange notes will, unless a bankruptcy event of default has occurred and is continuing on such date, automatically be extended to Dec. 20, 2015 (the "Final Interim Credit Agreement Maturity Date"). Accordingly, the Company has classified the borrowings under the Bridge Facility as long-term at March 30, 2008 and Dec. 30, 2007. The senior exchange notes will also mature on the Final Interim Credit Agreement Maturity Date. Holders of the senior exchange notes will have registration rights.

Loans under the Tranche X Facility, Tranche B Facility and Revolving Loan Facility are required to be repaid with the following proceeds, subject to certain exceptions and exclusions set forth in the Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for borrowed money by the Company or any subsidiary (other than debt permitted to be incurred under the negative covenants contained in the Credit Agreement (with certain exclusions)), (b) certain specified percentages of excess cash flow proceeds based on a leverage-based grid ranging from 50% to 0% and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Credit Agreement.

Loans under the Bridge Facility are required to be repaid with the following proceeds, in each case after the obligations under the Credit Agreement have been repaid, either as required by the Credit Agreement or repaid at the election of the Company, subject to certain exceptions and exclusions set forth in the Interim Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of certain debt for borrowed money by the Company or any subsidiary, (b) 100% of the net cash proceeds of any equity issuance consummated by the Company and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Interim Credit Agreement.

Borrowings under the Credit Agreement are guaranteed on a senior basis by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the equity interests of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two subsidiaries of the Company. The Company's other senior notes and

15

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514070

senior debentures are secured on an equal and ratable basis with the borrowings under the Credit Agreement as required by the terms of the indentures governing such notes and debentures. Borrowings under the Interim Credit Agreement are unsecured, but are guaranteed on a senior subordinated basis by certain of the Company's direct and indirect U.S. subsidiaries.

The Credit Agreement and the Interim Credit Agreement contain representations and warranties, affirmative and negative covenants, including restrictions on capital expenditures, and events of default, in each case subject to customary and negotiated exceptions and limitations, as applicable. If an event of default occurs, the lenders under the Credit Agreement and the Interim Credit Agreement will be entitled to take certain actions, including acceleration of all amounts due under the facilities.

Further, pursuant to the Credit Agreement, the Company is required to comply, on a quarterly basis, with a maximum total guaranteed leverage ratio and a minimum interest coverage ratio. For the twelve-month period ending March 30, 2008, the maximum permitted "Total Guaranteed Leverage Ratio" and the minimum permitted "Interest Coverage Ratio" (each as defined in the Credit Agreement) were 9.00 to 1.0 and 1.15 to 1.0, respectively. Both financial covenant ratios are measured on a rolling four-quarter basis and become more restrictive on an annual basis as set forth in the Credit Agreement. At March 30, 2008, the Company was in compliance with these financial covenants. The Company's ability to remain in compliance with these financial covenants will be impacted by a number of factors, including the Company's ability to continue to generate sufficient revenues and cash flows, changes in interest rates, the impact of future purchase, sale, joint venture or similar transactions involving the Company or its business units and the other risks and uncertainties set forth in Part I, Item 1A, "Risk Factors" in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007.

On March 13, 2008, the Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. The Credit Agreement and the Interim Credit Agreement contain affirmative covenants which required the Company to make such election and that the election be effective for fiscal year 2008. The Credit Agreement and Interim Credit Agreement further provide that if the Company fails to maintain the S corporation election for any year beginning with 2009, the Company will be required in each such year to obtain an investment in the Company in the form of common stock or subordinated debt in an amount of up to $100 million. There can be no assurance that the Company will be able to obtain such an investment and the failure to obtain such an investment in those circumstances could result in a default under the Credit Agreement and Interim Credit Agreement.

Under the terms of the Credit Agreement, the Company is required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money.  On July 2, 2007, the Company entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and, on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays Bank, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to $750 million in notional amount. The Swap Documents effectively converted a portion of the variable rate borrowings under the Tranche B Facility in the Credit Agreement to a weighted average fixed rate of 5.31% plus a margin of 300 basis points. The Company accounts for these interest rate swaps as cash flow hedges in accordance with FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("FAS No. 133").  Under FAS No. 133, a cash flow hedge is deemed to be highly effective if it is expected that changes in the cash flows of the hedged item are almost fully offset by changes in the cash flows of the hedging instrument. While there will be some ineffectiveness in the future, the cash flow hedges covered by the Swap Documents are deemed to be highly effective, and therefore gains and losses resulting from changes in the fair value of these hedges, other than changes resulting from hedge ineffectiveness, are recorded in other comprehensive income (loss), net of taxes.

16

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0514071

As of March 30, 2008, the Company had outstanding borrowings of $7.6 billion under the Tranche B Facility, $1.4 billion under the Tranche X Facility, and $1.6 billion under the Bridge Facility.  As of March 30, 2008, the applicable interest rate was 5.54% on the Tranche B Facility, 7.40% on the Tranche X Facility and 7.54% on the Bridge Facility.

**Interest Rate Swaps**—As noted above, the Company is party to three interest rate swaps covered under the Swap Documents. At March 30, 2008, the fair value of these swaps had declined since their inception date of July 3, 2007 by $160 million, which amount is included in long-term debt.  The Company determined that $1.7 million of this change resulted from hedge ineffectiveness.  The remaining $158.3 million change in fair value of these swaps is included, net of taxes, in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) at March 30, 2008. The Company is also party to an additional interest rate swap agreement related to the $100 million 7.5% debentures due in 2023 which effectively converts the fixed 7.5% rate to a variable rate based on LIBOR.

**Debt Due Within One Year**—Debt due within one year at March 30, 2008 included $650 million of borrowings under the Tranche X Facility, $78 million of borrowings under the Tranche B Facility, $211 million related to PHONES, and $23 million of property financing and other obligations. Debt due within one year at Dec. 30, 2007 included $650 million of borrowings under the Tranche X Facility, $76 million of borrowings under the Tranche B Facility, $253 million related to PHONES, and $24 million of property financing and other obligations.  The Company expects to fund interest and principal payments due in 2008 through a combination of cash flows from operations, available borrowings under the Revolving Credit Facility, and, if necessary, dispositions of assets or operations.  The Company's ability to make scheduled payments or prepayments on its debt and other financial obligations will depend on future financial and operating performance and the ability to dispose of assets on favorable terms.  There can be no assurances that the Company's businesses will generate sufficient cash flows from operations or that future borrowings under the Revolving Credit Facility will be available in an amount sufficient to satisfy debt maturities or to fund other liquidity needs or that any such asset dispositions can be completed.  The Company's financial and operating performance is subject to prevailing economic and industry conditions and to financial, business and other factors, some of which are beyond the control of the Company.

If the Company's cash flows and capital resources are insufficient to fund debt service obligations, the Company will likely face increased pressure to reduce or delay capital expenditures, dispose of assets or operations, further reduce the size of its workforce, seek additional capital or restructure or refinance its indebtedness. These actions could have a material adverse effect on the Company's business, financial condition and results of operations. In addition, the Company cannot assure the ability to take any of these actions, that these actions would be successful and permit the Company to meet scheduled debt service obligations or that these actions would be permitted under the terms of the Company's existing or future debt agreements, including the Credit Agreement and the Interim Credit Agreement.  For example, the Company may need to refinance all or a portion of its indebtedness on or before maturity. There can be no assurance that the Company will be able to refinance any of its indebtedness on commercially reasonable terms or at all.  In the absence of improved operating results and access to capital resources, the Company could face substantial liquidity problems and might be required to dispose of material assets or operations to meet its debt service and other obligations. The Credit Agreement and the Interim Credit Agreement restrict the Company's ability to dispose of assets and use the proceeds from the disposition.  The Company may not be able to consummate those dispositions or to obtain the proceeds realized.  Additionally, these proceeds may not be adequate to meet the debt service obligations then due.

If the Company cannot make scheduled payments or prepayments on its debt, the Company will be in default and, as a result, among other things, the Company's debt holders could declare all outstanding principal and interest to be due and payable and the Company could be forced into bankruptcy or liquidation or required to substantially restructure or alter business operations or debt obligations.

17

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0514072

**Exchangeable Subordinated Debentures due 2029 ("PHONES")**—In 1999, the Company issued 8 million PHONES for an aggregate principal amount of approximately $1.3 billion. The principal amount was equal to the value of 16 million shares of Time Warner common stock at the closing price of $78.50 per share on April 7, 1999. Quarterly interest payments are made to the PHONES holders at an annual rate of 2% of the initial principal. Effective Dec. 31, 2007, the Company has elected to account for the PHONES utilizing the fair value option under FAS No. 159. Prior to the adoption of FAS No. 159, the Company recorded both cash and non-cash interest expense on the discounted debt component of the PHONES. Following the adoption of FAS No. 159 for the PHONES, the Company records as interest expense only the cash interest paid on the PHONES. See below for further information pertaining to the Company's adoption of FAS No. 159.

The PHONES debenture agreement requires principal payments equal to any dividends declared on the 16 million shares of Time Warner common stock. A payment of $.125 per PHONES was made in the first quarter of 2008 for a Time Warner dividend declared in the fourth quarter of 2007, and a payment of $.125 per PHONES will be due in the second quarter of 2008 for a Time Warner dividend declared in the first quarter of 2008. The Company records the dividends it receives on its Time Warner common stock as dividend income and accounts for the related payments to the PHONES holders as principal reduction.

The Company may redeem the PHONES at any time for the higher of the principal value of the PHONES ($155.86 per PHONES at March 30, 2008) or the then market value of two shares of Time Warner common stock, subject to certain adjustments. At any time, holders of the PHONES may exchange a PHONES for an amount of cash equal to 95% (or 100% under certain circumstances) of the market value of two shares of Time Warner common stock. At March 30, 2008, the market value per PHONES was $38.08, and the market value of two shares of Time Warner common stock was $27.74. The amount PHONES holders could have received if they had elected to exchange their PHONES for cash on March 30, 2008 was $211 million, which is included in current liabilities at March 30, 2008.

Prior to the adoption of FAS No. 159, the Company accounted for the PHONES under the provisions of FAS No. 133. Under FAS No. 133, the PHONES consisted of a discounted debt component, which was presented at book value, and a derivative component, which was presented at fair value. Changes in the fair value of the derivative component of the PHONES were recorded in the statement of income. At Dec. 30, 2007, the Company performed a direct valuation of the derivative component of the PHONES utilizing the Black-Scholes option-pricing model. As noted above, effective Dec. 31, 2007, the Company has elected to account for the PHONES utilizing the fair value option under FAS No. 159. As a result of this election, the PHONES no longer consists of a discounted debt component, presented at book value, and a derivative component, presented at fair value, but instead is presented based on the fair value of the entire PHONES debt. The Company made this election as the fair value of the PHONES is readily determinable based on quoted market prices. Changes in the fair value of the PHONES are recorded in the statement of income.

The following table summarizes the impact of the adoption of FAS No. 159 for the PHONES on the Company's unaudited condensed consolidated balance sheet (in thousands):

| | Balances prior to adoption | Net gain/(loss) upon adoption | Balances after adoption |
|---|---|---|---|
| PHONES debt (current and long-term portions) | $ (597,040) | $ 177,040 | $ (420,000) |
| Unamortized debt issuance costs related to PHONES included in other non-current assets | 18,384 | (18,384) | |
| Pretax cumulative effect of adoption | | 158,656 | |
| Increase in deferred income tax liabilities | | (61,876) | |
| Cumulative effect of adoption (increase to retained earnings) | | $ 96,780 | |

18

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0514073

In accordance with FAS No. 159, the $97 million after-tax cumulative effect of adoption was recorded directly to retained earnings and was not included in the Company's unaudited condensed consolidated statement of operations for the quarter ended March 30, 2008.

The market value of the PHONES, which are traded on the New York Stock Exchange, was $305 million and $420 million at March 30, 2008 and Dec. 30, 2007, respectively.  The outstanding principal balance of the PHONES was $1,247 million and $1,248 million at March 30, 2008 and Dec. 30, 2007, respectively.

## NOTE 11: FAIR VALUE OF FINANCIAL INSTRUMENTS

As discussed in Note 1, the Company adopted FAS No. 157 effective Dec. 31, 2007.  FAS No. 157 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements.  In February 2008, the FASB issued Staff Position No. 157-2 ("FSP No. 157-2") which defers the effective date of FAS No. 157 for all nonfinancial assets and liabilities, except those items recognized or disclosed at fair value on an annual or more frequently recurring basis, until one year after the adoption of FAS No. 157.  The Company is currently evaluating the impact of FAS No. 157 on the assets and liabilities within the scope of FSP 157-2, the provisions of which will become effective beginning in the Company's first quarter of 2009.

In accordance with FAS No. 157, the Company has categorized its financial assets and liabilities into a three-level hierarchy as outlined below.

- **Level One** – Financial assets and liabilities whose values are based on unadjusted quoted prices for identical assets or liabilities in an active market.  Level One financial assets for the Company include its investment in Time Warner stock related to its PHONES debt and other investments in the securities of public companies that are classified as available for sale.  Level One financial liabilities for the Company include its PHONES debt related to Time Warner stock (see Note 10 for additional information pertaining to the fair value of the Company's PHONES debt).
- **Level Two** – Financial assets and liabilities whose values are based on quoted prices in markets where trading occurs infrequently or whose values are based on quoted prices of instruments with similar attributes in active markets.  Level Two financial assets and liabilities also include assets and liabilities whose values are derived from valuation models whose inputs are observable.  Level Two financial assets and liabilities for the Company include its interest rate swaps (see Note 10 for additional information on the Company's interest rate swaps).
- **Level Three** – Financial assets and liabilities whose values are based on valuation models or pricing techniques that utilize unobservable inputs that are significant to the overall fair value measurement.  The Company does not currently have any Level Three financial assets or liabilities.

19

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514074

The following table presents the financial assets and liabilities measured at fair value on a recurring basis on the Company's unaudited condensed consolidated balance sheet at March 30, 2008 (in thousands):

| | March 30, 2008 | |
| | Level 1 | Level 2 |
|---|---|---|
| **Financial Assets:** | | |
| Time Warner stock related to PHONES | $ 221,920 | $ — |
| Other investments in securities of public companies | 3,923 | — |
| Interest rate swaps | — | 38,658 |
| Total | $ 225,843 | $ 38,658 |
| | | |
| **Financial Liabilities:** | | |
| PHONES debt related to Time Warner stock | $ 304,640 | $ — |
| Interest rate swaps | — | 193,872 |
| Total | $ 304,640 | $ 193,872 |

## NOTE 12:  COMPREHENSIVE INCOME

Comprehensive income (loss) reflects all changes in the net assets of the Company during the period from transactions and other events and circumstances, except those resulting from stock issuances, stock repurchases and dividends. The Company's comprehensive income (loss) includes net income (loss) and other gains and losses.

The Company's comprehensive income (loss) was as follows (in thousands):

| | First Quarter | |
| | 2008 | 2007 |
|---|---|---|
| Net income (loss) | $ 1,823,462 | $ (23,295) |
| Change in unrecognized benefit cost loss, net of taxes | (11,565) | — |
| Adjustment for previously unrecognized benefit cost (gains) and losses included in net income, net of taxes | 6,351 | 7,642 |
| Unrealized loss on marketable securities, net of taxes | (1,369) | (611) |
| Unrecognized losses on cash flow hedging instruments: | | |
| Change in losses on cash flow hedging instruments, net of taxes | (68,455) | — |
| Adjustment for losses on cash flow hedging instruments included in net income, net of taxes | 28 | — |
| Unrecognized losses on cash flow hedging instruments, net of taxes | (68,427) | — |
| Change in foreign currency translation adjustments, net of taxes | (6) | 17 |
| Other comprehensive income (loss) | (75,016) | 7,048 |
| Comprehensive income (loss) | $ 1,748,446 | $ (16,247) |

20

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0514075

**NOTE 13:  OTHER MATTERS**

**Media Ownership Rules**—Various aspects of the Company's operations are subject to regulation by governmental authorities in the United States.  The Company's television and radio broadcasting operations are subject to Federal Communications Commission ("FCC") jurisdiction under the Communications Act of 1934, as amended. FCC rules, among other things, govern the term, renewal and transfer of radio and television broadcasting licenses, and limit the number of media interests in a local market that a single entity can own.  Federal law also regulates the rates charged for political advertising and the quantity of advertising within children's programs.

On Nov. 30, 2007, the FCC issued an order (the "Order") granting applications of the Company to transfer control of the Company from the shareholders to the ESOP.  In the Order, the FCC granted the Company temporary waivers of the newspaper/broadcast cross-ownership rule in Miami, Florida (WSFL-TV and the *South Florida Sun-Sentinel*); Hartford, Connecticut (WTXX-TV/WTIC-TV and the *Hartford Courant*); Los Angeles, California (KTLA-TV and the *Los Angeles Times*); and New York, New York (WPIX-TV and *Newsday*), for a six-month period beginning Jan. 1, 2008.  The six-month waiver could be automatically extended under two conditions: (1) if the Company appeals the Order, the waivers are extended for the longer of two years or six months after the conclusion of the litigation over the Order; or (2) if the FCC adopts a revised newspaper-broadcast cross-ownership rule prior to Jan. 1, 2008, the waivers are extended for a two-year period to allow the Company to come into compliance with any revised rule, provided that in the event the revised rule is the subject of a judicial stay, the waiver is extended until six months after the expiration of any such stay.

The Order also granted the Company a permanent waiver of the newspaper-broadcast cross-ownership rule to permit continued common ownership of WGN-AM, WGN-TV and the Chicago Tribune in Chicago, Illinois; a permanent "failing station" waiver of the television duopoly rule to permit continued common ownership of WTIC-TV and WTXX-TV in Hartford, Connecticut; and granted satellite station status to WTTK-TV, Kokomo, Indiana to permit continued common ownership with WTTV-TV, Bloomington, Indiana.

Various parties have filed petitions for reconsideration of the Order with the FCC, which the company opposed.  The Company also filed an appeal of the Order in the United States Court of Appeals for the District of Columbia Circuit on Dec. 3, 2007, thus automatically extending the waivers for two years or until six months after the conclusion of that appeal, whichever is longer.  The appeal has been held in abeyance pending FCC action on the petitions for reconsideration. Intervenors have filed a motion to dismiss the appeal, which the Company opposed.  A decision on the motion to dismiss has been deferred until briefing on the merits.

On Dec. 18, 2007, the FCC announced in an FCC news release the adoption of revisions to the newspaper/broadcast cross-ownership rule. The FCC, on Feb. 4, 2008, released the full text of the rule.  The revised rule establishes a presumption that the common ownership of a daily newspaper of general circulation and either a television or a radio broadcast station in the top 20 Nielsen Designated Market Areas ("DMAs") would serve the public interest, provided that, if the transaction involves a television station, (i) at least eight independently owned and operating major media voices (defined to include major newspapers and full-power commercial television stations) would remain in the DMA following the transaction and (ii) the cross-owned television station is not among the top-four ranked television stations in the DMA. Other proposed newspaper/broadcast transactions would be presumed not to be in the public interest, except in the case of a "failing" station or newspaper, or in the event that the proposed transaction results in a new source of news in the market. The FCC did not further relax the television-radio cross-ownership rules, the radio local ownership rules, or the television duopoly rules. Under the rule adopted, the Company would be entitled to a presumption in favor of common ownership in three of the four of the Company's cross-ownership markets (New York, New York, Los Angeles, California, Miami, Florida) not covered by the FCC's grant of a permanent waiver (Chicago, Illinois). Various parties, including the Company, have sought judicial review of the FCC's order

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0514076**

adopting the new rule.

Congress removed national limits on the number of broadcast stations a licensee may own in 1996. However, federal law continues to limit the number of radio and television stations a single owner may own in a local market, and caps the percentage of the national television audience that may be reached by a licensee's television stations in the aggregate at 39%.

Television and radio broadcasting licenses are subject to renewal by the FCC, at which time they may be subject to petitions to deny the license renewal applications. At March 30, 2008, the Company had FCC authorization to operate 23 television stations and one AM radio station. In order to expedite the renewal grants, the Company entered into tolling agreements with the FCC for WPIX-TV, New York, WDCW-TV, Washington, D.C., WGNO-TV, New Orleans, WXIN-TV, Indianapolis, WXMI-TV, Grand Rapids, WGN-TV, Chicago, WPHL-TV, Philadelphia, KWGN-TV, Denver, KHCW-TV, Houston, KTLA-TV, Los Angeles, KTXL-TV, Sacramento, KSWB-TV, San Diego, KCPQ-TV, Seattle/Tacoma, WTIC-TV, and WPMT-TV Harrisburg, Pennsylvania). The tolling agreements would allow the FCC to penalize the Company for rule violations that occurred during the previous license term notwithstanding the grant of renewal applications.

The television industry is in the final stages of the transition to digital television ("DTV"). By law, the transition to DTV is to occur by Feb. 17, 2009. The FCC has issued an order with the final, post-transition DTV channel assignments for every full power television station in the U.S. It also recently completed a proceeding that established the operating rules for DTV stations just before and after the transition in February 2009. Conversion to digital transmission requires all television broadcasters, including those owned by the Company, to invest in digital equipment and facilities. At March 30, 2008, all of the Company's television stations were operating DTV stations in compliance with the FCC's rules.

The FCC still has not resolved a number of issues relating to the operation of DTV stations, including the possible imposition of additional "public interest" obligations attached to broadcasters' use of digital spectrum.

From time to time, the FCC revises existing regulations and policies in ways that could affect the Company's broadcasting operations. In addition, Congress from time to time considers and adopts substantive amendments to the governing communications legislation. The Company cannot predict what regulations or legislation may be proposed or finally enacted or what effect, if any, such regulations or legislation could have on the Company's broadcasting operations.

**Variable Interest Entities**—The Company holds significant variable interests, as defined by FASB Interpretation No. 46R, "Consolidation of Variable Interest Entities," in Classified Ventures, LLC, ShopLocal, LLC and Topix, LLC, but the Company has determined that it is not the primary beneficiary of these entities. The Company's maximum loss exposure related to these entities is limited to its equity investments in Classified Ventures, LLC, ShopLocal, LLC, and Topix, LLC, which were $46 million, $33 million and $23 million, respectively, at March 30, 2008.

**Acquisition of TMCT Real Properties**—On Sept. 22, 2006, the Company amended the terms of its lease agreement with TMCT, LLC, an investment trust in which the Company formerly held an interest following the Company's acquisition of The Times Mirror Company in 2000 and from which the Company leased eight real properties (see Note 8 to the consolidated financial statements included in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007 for further information on the Company's interest in TMCT, LLC). Under the terms of the amended lease, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company exercised this option on Jan. 29, 2008 and the acquisition was completed on April 28, 2008. In connection with this acquisition, the related property financing obligation of $30 million at March 30, 2008 was extinguished (see Note 10). No gain or loss will be recorded as a result of the acquisition.

22

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only                                          TRB0514077
Highly Confidential -- Attorneys' Eyes Only

**New Accounting Standards**—In December 2007, the FASB issued FASB Statement No. 160, "Noncontrolling Interests in Consolidated Financial Statements, an Amendment of ARB No. 51" ("FAS No. 160"), which provides accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. It clarifies that an ownership interest in a subsidiary should be reported as a separate component of equity in the consolidated financial statements, requires consolidated net income to include the amounts attributable to both the parent and the noncontrolling interest and provides for expanded disclosures in the consolidated financial statements. FAS No. 160 is effective for financial statements issued for fiscal years beginning after Dec. 15, 2008 and interim periods beginning within these fiscal years. The Company is currently evaluating the impact of adopting FAS No. 160 on its consolidated financial statements.

In December 2007, the FASB issued FASB Statement No. 141 (revised 2007), "Business Combinations" ("FAS No. 141R"), which addresses, among other items, the recognition and accounting for identifiable assets acquired and liabilities assumed in business combinations. FAS No. 141R also establishes expanded disclosure requirements for business combinations. FAS No. 141R is effective for financial statements issued for fiscal years beginning after Dec. 15, 2008 and interim periods beginning within these fiscal years. The Company is currently evaluating the impact of adopting FAS No. 141R on its consolidated financial statements.

In March 2008, the FASB issued FASB Statement No. 161, "Disclosures about Derivative Instruments and Hedging Activities, an amendment of FASB Statement No. 133" (FAS No. 161), which requires enhanced disclosures for derivative and hedging activities. FAS No. 161 is effective for financial statements issued for fiscal years beginning after Dec. 15, 2008 and interim periods beginning within these fiscal years. Early adoption is permitted. The Company is currently evaluating the impact of adopting FAS No. 161 on its consolidated financial statements.

23

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0514078**

**NOTE 14:  SEGMENT INFORMATION**

Financial data for each of the Company's business segments, from continuing operations, was as follows (in thousands):

| | First Quarter | |
| --- | --- | --- |
| | 2008 | 2007 |
| **Operating revenues:** | | |
| Publishing | $ 822,966 | $ 926,371 |
| Broadcasting and entertainment | 291,682 | 283,008 |
| Total operating revenues | $ 1,114,648 | $ 1,209,379 |
| **Operating profit**(1): | | |
| Publishing | $ 36,654 | $ 140,176 |
| Broadcasting and entertainment | 135,195 | 61,382 |
| Corporate expenses | (28,497) | (19,641) |
| Total operating profit | $ 143,352 | $ 181,917 |

| | March 30, 2008 | Dec. 30, 2007 |
| --- | --- | --- |
| **Assets:** | | |
| Publishing | $ 8,057,468 | $ 8,121,133 |
| Broadcasting and entertainment | 4,029,688 | 3,993,933 |
| Corporate | 876,794 | 1,000,873 |
| Assets held for sale | 10,432 | 33,780 |
| Total assets | $ 12,974,382 | $ 13,149,719 |

(1)  Operating profit for each segment excludes interest and dividend income, interest expense, equity income and losses, non-operating items and income taxes.

24

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only                                                                                  TRB0514079
Highly Confidential -- Attorneys' Eyes Only

ITEM    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
2.       RESULTS OF OPERATIONS.

The following discussion compares the results of operations of Tribune Company and its subsidiaries (the "Company") for the first quarter of 2008 to the first quarter of 2007.  This commentary should be read in conjunction with the Company's unaudited condensed consolidated financial statements, which are also presented in this Form 10-Q.  Certain prior year amounts have been reclassified to conform with the 2008 presentation.

## FORWARD-LOOKING STATEMENTS

The discussion contained in this Item 2 (including, in particular, the discussion under "Liquidity and Capital Resources"), the information contained in the preceding notes to the unaudited condensed consolidated financial statements and the information contained in Part I, Item 3, "Quantitative and Qualitative Disclosures about Market Risk," contain certain comments and forward-looking statements that are based largely on the Company's current expectations.  Forward-looking statements are subject to certain risks, trends and uncertainties that could cause actual results and achievements to differ materially from those expressed in the forward-looking statements including, but not limited to, the items discussed in Part I, Item 1A, "Risk Factors," in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007.  Such risks, trends and uncertainties, which in some instances are beyond the Company's control, include: our ability to generate sufficient cash to service the significant debt levels and other financial obligations that resulted from the Leveraged ESOP Transactions (as defined below in "Significant Events"); our ability to comply with or obtain modifications or waivers of the financial covenants contained in our senior credit facilities, and the potential impact to our operations and liquidity as a result of the restrictive covenants in such senior credit facilities; our dependency on dividends and distributions from our subsidiaries to make payments on our indebtedness; increased interest rate risk due to our higher level of variable rate indebtedness; the ability to maintain our subchapter S corporation status; changes in advertising demand, circulation levels and audience shares; regulatory and judicial rulings; availability and cost of broadcast rights; competition and other economic conditions; changes in newsprint prices; changes in the Company's credit ratings and interest rates; changes in accounting standards; adverse results from litigation, governmental investigations or tax-related proceedings or audits; the effect of labor strikes, lock-outs and negotiations; the effect of acquisitions, investments and divestitures; the effect of derivative transactions; the Company's reliance on third-party vendors for various services; and events beyond the Company's control that may result in unexpected adverse operating results.

The words "believe," "expect," "anticipate," "estimate," "could," "should," "intend" and similar expressions generally identify forward-looking statements.  Readers are cautioned not to place undue reliance on such forward-looking statements, which are being made as of the date of this filing.  The Company undertakes no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

## SIGNIFICANT EVENTS

**S Corporation Election**—On March 13, 2008, the Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year.  The Company also elected to treat essentially all of its subsidiaries as qualified subchapter S subsidiaries.  Subject to certain limitations (such as the built-in capital gains tax applicable for ten years to gains accrued prior to the election), the Company is no longer subject to federal income tax.  Instead, the Company's income will be required to be reported by its shareholders.  The Company's Employee Stock Ownership Plan, the Company's sole shareholder (see Note 5 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof), will not be taxed on the share of income that is passed through to it because the Employee Stock Ownership Plan is a qualified employee benefit plan.  Although most states in which the Company operates recognize the S corporation status, some impose income

25

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only                                                                                    TRB0514080
Highly Confidential -- Attorneys' Eyes Only

taxes at a reduced rate.

As a result of the election and in accordance with Financial Accounting Standards Board ("FASB") Statement No. 109, "Accounting for Income Taxes", the Company has eliminated approximately $1,859 million of net deferred income tax liabilities as of Dec. 31, 2007, and has recorded such adjustment as a reduction in the Company's provision for income tax expense in the first quarter of 2008. The Company will continue to report deferred income taxes relating to states that assess taxes on S corporations, subsidiaries which are not qualified subchapter S subsidiaries, and potential asset dispositions that the Company expects will be subject to the built-in gains tax.

**Leveraged ESOP Transactions**—On April 1, 2007, the Company's board of directors (the "Board"), based on the recommendation of a special committee of the Board comprised entirely of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), EGI-TRB, L.L.C., a Delaware limited liability company (the "Zell Entity") wholly owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell. On Dec. 20, 2007, the Company completed the Leveraged ESOP Transactions which culminated in the cancellation of all issued and outstanding shares of the Company's common stock as of that date, other than shares held by the Company or the ESOP, and the Company becoming wholly owned by the ESOP. The Company has accounted for these transactions as a leveraged recapitalization and, accordingly, has maintained a historical cost presentation in its consolidated financial statements.

The Leveraged ESOP Transactions consisted of a series of transactions that included the following:

- On April 1, 2007, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust which forms a part of the ESOP, Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and the Zell Entity (solely for the limited purposes specified therein) providing for Merger Sub to be merged with and into the Company, and following such merger, the Company to continue as the surviving corporation wholly owned by the ESOP (the "Merger").

- On April 1, 2007, the ESOP purchased 8,928,571 shares of the Company's common stock from the Company at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP. Upon consummation of the Merger, the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock and represent the only outstanding shares of capital stock of the Company after the Merger.

- On April 23, 2007, pursuant to a purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), the Zell Entity made an initial investment of $250 million in the Company in exchange for (1) 1,470,588 shares of the Company's common stock at a price of $34.00 per share and (2) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million. The shares were converted at the effective time of the Merger into the right to receive $34.00 per share in cash, and the unsecured subordinated exchangeable promissory note, including approximately $6 million of interest accrued thereon, was repaid by the Company immediately prior to the Merger. Pursuant to the Zell Entity Purchase Agreement, on May 9, 2007, Mr. Zell was appointed as a member of the Board.

- On April 25, 2007, the Company commenced a tender offer to repurchase up to 126 million shares of the Company's common stock that were then outstanding at a price of $34.00 per share in cash (the "Share Repurchase"). The tender offer expired on May 24, 2007 and 126 million shares of the

26

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only                              TRB0514081

Company's common stock were repurchased and subsequently retired on June 4, 2007 utilizing proceeds from the Credit Agreement (as defined in the "New Credit Agreements" section below).

- The Company granted registration rights to Chandler Trust No. 1 and Chandler Trust No. 2 (together, the "Chandler Trusts"), which were significant shareholders of the Company prior to the Company's entry into the Leveraged ESOP Transactions. On April 25, 2007, the Company filed a shelf registration statement in connection with the registration rights granted to the Chandler Trusts.

- On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman, Sachs & Co. ("Goldman Sachs") and the Company, pursuant to which the Chandler Trusts sold an aggregate of 20,351,954 shares of the Company's common stock, which represented the remainder of the shares of the Company's common stock owned by them following the Share Repurchase, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to the shelf registration statement filed by the Company on April 25, 2007.

- On Dec. 20, 2007, the Company completed its merger with Merger Sub, with the Company surviving the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of the Company, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other than shares held by the Company, the ESOP or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes, and the Company became wholly owned by the ESOP.

- Following the consummation of the Merger, the Zell Entity purchased from the Company, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant. For accounting purposes, the subordinated promissory note and 15-year warrant were recorded at fair value based on the relative fair value method. The warrant entitles the Zell Entity to purchase 43,478,261 shares of the Company's common stock (subject to adjustment), which represents approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to share equivalents granted under a new management equity incentive plan which is described in Note 4 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof). The warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted assignees.

- On Dec. 20, 2007, the Company notified the New York Stock Exchange (the "NYSE") that the Merger was consummated and requested that the Company's common stock (and associated Series A junior participating preferred stock purchase rights) be suspended from the NYSE, effective as of the close of the market on Dec. 20, 2007. Subsequently, the NYSE filed with the Securities and Exchange Commission an application on Form 25 reporting that the shares of the Company's common stock and associated Series A junior participating preferred stock purchase rights are no longer listed on the NYSE.

The Company currently intends to dispose of an interest in the Chicago Cubs and the Company's 25% equity interest in Comcast SportsNet Chicago. The Company currently expects that proceeds from such dispositions will be used to pay down Company debt. The disposition of an interest in the Cubs is subject to the approval of Major League Baseball.

27

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**

**Highly Confidential -- Attorneys' Eyes Only**

TRB0514082

**New Credit Agreements**—On May 17, 2007, the Company entered into a $8.028 billion senior secured credit agreement, as amended on June 4, 2007 (collectively, the "Credit Agreement"). The Credit Agreement consists of the following facilities: (a) a $1.50 billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Credit Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility"). Accordingly, the aggregate amount of the facilities under the Credit Agreement equals $10.133 billion.

On June 4, 2007, proceeds from the Tranche X Facility and the Tranche B Facility were used by the Company in connection with the consummation of the Share Repurchase and to refinance the Company's former five-year credit agreement and former bridge credit agreement.

The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million. As of March 30, 2008, the Company had $65 million of letters of credit outstanding. Borrowings under the Revolving Credit Facility may be used for working capital and general corporate purposes.

On Dec. 20, 2007, the Company entered into (i) a $1.6 billion senior unsecured interim loan agreement (the "Interim Credit Agreement") and (ii) a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Credit Agreement (the Incremental Facility and Tranche B Facility are hereinafter referred to collectively as the Tranche B Facility). The Interim Credit Agreement contains a $1.6 billion twelve-month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by the Company, among other ways, in connection with the consummation of the Merger and for general corporate purposes.

Prior to the consummation of the Merger, the Tranche X Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 150 basis points or LIBOR plus a margin of 250 basis points. Pursuant to the terms of the Credit Agreement, following the closing of the Merger, the margins applicable to the Tranche X Facility increased to 175 basis points and 275 basis points, respectively.

The Tranche B Facility, Delayed Draw Facility and Revolving Credit Facility bear interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 200 basis points or LIBOR plus a margin of 300 basis points. All undrawn amounts under the Delayed Draw Facility and the Revolving Credit Facility accrue commitment fees at a per annum rate of 75 basis points and 50 basis points, respectively. With respect to the Revolving Credit Facility only, the margin applicable to base rate advances, the margin applicable to LIBOR advances and the commitment fee applicable to undrawn amounts are subject to decreases based on a leverage-based grid.

On June 29, 2007, the Company repaid $100 million of the $1.5 billion of borrowings under the Tranche X Facility. The remaining principal balance of the Tranche X Facility must be repaid in an aggregate amount of $650 million on Dec. 4, 2008, which amount may be adjusted to reflect additional prepayments or other mandatory prepayments (described below) applied thereto, and the remaining outstanding amount of the Tranche X Facility, if any, must be repaid on June 4, 2009.

The Tranche B Facility is a seven-year facility which matures on June 4, 2014 and also amortizes at a rate of 1.0% per annum (payable quarterly). The Revolving Facility is a six-year facility and matures on June 4, 2013. In February 2008, the Company refinanced $25 million of its medium-term notes with borrowings under the Delayed Draw Facility. The Delayed Draw Facility automatically becomes part of the Tranche B Facility as amounts are borrowed and amortizes based upon the Tranche B Facility amortization schedule. The Company intends to use the Delayed Draw Facility to refinance approximately $238 million of its remaining medium-

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514083

term notes as they mature during 2008. Accordingly, the Company has classified its medium-term notes as long-term at March 30, 2008 and Dec. 30, 2007.

Prior to June 4, 2008, optional prepayments on the Tranche X Facility and the Tranche B Facility with the proceeds of a substantially concurrent issuance of loans under any senior secured credit facilities pursuant to the Credit Agreement must be accompanied by a prepayment fee equal to 1.0% of the aggregate amount of such prepayments if the interest rate spread applicable to such new loans is less than the interest rate applicable to the Tranche X Facility or the Tranche B Facility. Except as described in the immediately preceding sentence, borrowings under the Credit Agreement are prepayable at any time prior to maturity without penalty, and the unutilized portion of the commitments under the Revolving Credit Facility or the Delayed Draw Facility may be reduced at the option of the Company without penalty.

Upon execution of the Interim Credit Agreement, loans under the Bridge Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 350 basis points or LIBOR plus a margin of 450 basis points. On March 20, 2008, pursuant to the terms of the Interim Credit Agreement, such margins increased by 50 basis points per annum and will continue to increase by this amount each quarter, subject to specified caps, a portion of which interest may be payable through an interest payable-in-kind feature. Subject to certain prepayment restrictions contained in the Credit Agreement, the Bridge Facility is prepayable at any time prior to maturity without penalty, including in connection with the issuance of up to $1.6 billion of high-yield notes.

If any loans under the Bridge Facility remain outstanding on Dec. 20, 2008, the lenders thereunder will have the option, subject to the terms of the Interim Credit Agreement, at any time and from time to time to exchange such initial loans for senior exchange notes that the Company will issue under a senior indenture, and the maturity date of any initial loans that are not exchanged for senior exchange notes will, unless a bankruptcy event of default has occurred and is continuing on such date, automatically be extended to Dec. 20, 2015 (the "Final Interim Credit Agreement Maturity Date"). Accordingly, the Company has classified the borrowings under the Bridge Facility as long-term at March 30, 2008 and Dec. 30, 2007. The senior exchange notes will also mature on the Final Interim Credit Agreement Maturity Date. Holders of the senior exchange notes will have registration rights.

Loans under the Tranche X Facility, Tranche B Facility and Revolving Loan Facility are required to be repaid with the following proceeds, subject to certain exceptions and exclusions set forth in the Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for borrowed money by the Company or any subsidiary (other than debt permitted to be incurred under the negative covenants contained in the Credit Agreement (with certain exclusions)), (b) certain specified percentages of excess cash flow proceeds based on a leverage-based grid ranging from 50% to 0% and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Credit Agreement.

Loans under the Bridge Facility are required to be repaid with the following proceeds, in each case after the obligations under the Credit Agreement have been repaid, either as required by the Credit Agreement or repaid at the election of the Company, subject to certain exceptions and exclusions set forth in the Interim Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of certain debt for borrowed money by the Company or any subsidiary, (b) 100% of the net cash proceeds of any equity issuance consummated by the Company and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Interim Credit Agreement.

Borrowings under the Credit Agreement are guaranteed on a senior basis by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the equity interests of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two subsidiaries of the Company. The Company's other senior notes and senior debentures are secured on an equal and ratable basis with the borrowings under the Credit Agreement as

29

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514084

required by the terms of the indentures governing such notes and debentures. Borrowings under the Interim Credit Agreement are unsecured, but are guaranteed on a senior subordinated basis by certain of the Company's direct and indirect U.S. subsidiaries.

The Credit Agreement and the Interim Credit Agreement contain representations and warranties, affirmative and negative covenants, including restrictions on capital expenditures, and events of default, in each case subject to customary and negotiated exceptions and limitations, as applicable. If an event of default occurs, the lenders under the Credit Agreement and the Interim Credit Agreement will be entitled to take certain actions, including acceleration of all amounts due under the facilities.

Further, pursuant to the Credit Agreement, the Company is required to comply, on a quarterly basis, with a maximum total guaranteed leverage ratio and a minimum interest coverage ratio. For the twelve-month period ending March 30, 2008, the maximum permitted "Total Guaranteed Leverage Ratio" and the minimum permitted "Interest Coverage Ratio" (each as defined in the Credit Agreement) were 9.00 to 1.0 and 1.15 to 1.0, respectively. Both financial covenant ratios are measured on a rolling four-quarter basis and become more restrictive on an annual basis as set forth in the Credit Agreement. At March 30, 2008, the Company was in compliance with these financial covenants. The Company's ability to remain in compliance with these financial covenants will be impacted by a number of factors, including the Company's ability to continue to generate sufficient revenues and cash flows, changes in interest rates, the impact of future purchase, sale, joint venture or similar transactions involving the Company or its business units and the other risks and uncertainties set forth in Part I, Item 1A, "Risk Factors" in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007.

The Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code on March 13, 2008, which election is effective as of the beginning of the Company's 2008 fiscal year. The Credit Agreement and the Interim Credit Agreement contain affirmative covenants which required the Company to make such election and that the election be effective for fiscal year 2008. The Credit Agreement and Interim Credit Agreement further provide that if the Company fails to maintain the S corporation election for any year beginning with 2009, the Company will be required in each such year to obtain an investment in the Company in the form of common stock or subordinated debt in an amount of up to $100 million. There can be no assurance that the Company will be able to obtain such an investment and the failure to obtain such an investment in those circumstances could result in a default under the Credit Agreement and Interim Credit Agreement.

Under the terms of the Credit Agreement, the Company is required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money. On July 2, 2007, the Company entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and, on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays Bank, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to $750 million in notional amount. The Swap Documents effectively converted a portion of the variable rate borrowings under the Tranche B Facility in the Credit Agreement to a weighted average fixed rate of 5.31% plus a margin of 300 basis points. The Company accounts for these interest rate swaps as cash flow hedges in accordance with FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("FAS No. 133"). Under FAS No. 133, a cash flow hedge is deemed to be highly effective if it is expected that changes in the cash flows of the hedged item are almost fully offset by changes in the cash flows of the hedging instrument. While there will be some ineffectiveness in the future, the cash flow hedges covered by the Swap Documents are deemed to be highly effective, and therefore gains and losses resulting from changes in the fair value of these hedges, other than changes resulting from hedge ineffectiveness, are recorded in other comprehensive income (loss), net of taxes.

As of March 30, 2008, the Company had outstanding borrowings of $7.6 billion under the Tranche B Facility,

30

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514085

$1.4 billion under the Tranche X Facility, and $1.6 billion under the Bridge Facility. As of March 30, 2008, the applicable interest rate was 5.54% on the Tranche B Facility, 7.40% on the Tranche X Facility and 7.54% on the Bridge Facility.

**Publishing Discontinued Operations**—The Company announced an agreement to sell the New York edition of *Hoy*, the Company's Spanish-language daily newspaper ("*Hoy*, New York") on Feb. 12, 2007, and completed the sale on May 15, 2007. In March 2007, the Company announced its intentions to sell its Southern Connecticut Newspapers—*The Advocate* (Stamford) and *Greenwich Time* (collectively "SCNI"). The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which was sold in a separate transaction that closed on April 22, 2008. In the first quarter of 2007, the Company recorded a pretax loss of $19 million ($33 million after taxes) to write down the net assets of SCNI to estimated fair value, less costs to sell. In the first quarter of 2008, the Company recorded an additional $.5 million after-tax loss on the sale of SCNI. During the third quarter of 2007, the Company began actively pursuing the sale of the stock of one of its subsidiaries, EZ Buy & EZ Sell Recycler Corporation ("Recycler"). The sale of Recycler closed on Oct. 17, 2007.

These businesses were considered components of the Company's publishing segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations in 2007 for each of these businesses are reported as discontinued operations in the unaudited condensed consolidated statements of operations.

**Critical Accounting Policies**—As of March 30, 2008, the Company's significant accounting policies and estimates, which are detailed in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007, have not changed from Dec. 30, 2007, except for the adoption of FASB Statement No. 157, "Fair Value Measurements" ("FAS No. 157") and FASB Statement No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("FAS No. 159"), both of which were adopted effective Dec. 31, 2007. The Company has elected to account for its PHONES debt utilizing the fair value option under FAS No. 159. The effects of this election were recorded as of Dec. 31, 2007, and included a $177 million decrease in PHONES debt related to Time Warner stock, a $62 million increase in deferred income tax liabilities, an $18 million decrease in other assets, and a $97 million increase in retained earnings. In accordance with FAS No. 159, the $97 million retained earnings increase was not included in the Company's unaudited condensed consolidated statement of operations for the quarter ended March 30, 2008. See Note 10 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof for additional information regarding the Company's adoption of FAS No. 159. The adoption of FAS No. 157 had no impact on the Company's consolidated financial statements. See Note 11 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof for additional disclosures related to the fair value of financial instruments included in the Company's unaudited condensed consolidated balance sheet at March 30, 2008.

As disclosed in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007, the Company performs its annual impairment review of goodwill and other intangible assets not subject to amortization in the fourth quarter of each year in accordance with FASB Statement No. 142, "Goodwill and Other Intangible Assets" ("FAS No. 142"). Under FAS No. 142, the impairment review of goodwill and other intangible assets not subject to amortization must be based on estimated fair values. The valuation of intangible assets requires assumptions and estimates of many critical factors, including revenue and market growth, operating cash flows, market multiples, and discount rates. The Company has experienced continued declines in its consolidated operating results during the first quarter of 2008, particularly in its publishing reporting unit. Adverse changes in expected operating results and/or unfavorable changes in other economic factors used to estimate fair values could result in a non-cash impairment charge in the future under FAS No. 142.

31

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514086

## NON-OPERATING ITEMS

The first quarters of 2008 and 2007 included several non-operating items, summarized as follows:

| (in millions) | First Quarter 2008 | | First Quarter 2007 | |
| --- | --- | --- | --- | --- |
| | Pretax Gain (Loss) | After-tax Gain (Loss) | Pretax Gain (Loss) | After-tax Gain (Loss) |
| Gain (loss) on change in fair values of PHONES and related investment | $ 69.9 | $ 69.1 | $ (69.8) | $ (42.6) |
| Strategic transaction expenses | — | — | (14.4) | (13.8) |
| Other, net | (.9) | (1.1) | .5 | (.8) |
| Income tax adjustment | — | 1,859.3 | — | — |
| Total non-operating items | $ 69.0 | $ 1,927.3 | $ (83.7) | $ (57.2) |

In the first quarter of 2008, the $70 million non-cash pretax gain on change in fair values of PHONES and related investment resulted primarily from a $115 million decrease in the fair value of the Company's PHONES, partially offset by a $45 million decrease in the fair value of 16 million shares of Time Warner common stock.  Effective Dec. 31, 2007, the Company has elected to account for its PHONES utilizing the fair value option under FAS No. 159.  As a result of this election, the Company no longer measures just the changes in fair value of the derivative component of the PHONES, but instead measures the changes in fair value of the entire PHONES debt.  See Note 10 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof for further information pertaining to the Company's adoption of FAS No. 159.  The favorable income tax adjustment of $1,859 million in the first quarter of 2008 related to the Company's election to be treated as a subchapter S corporation, which resulted in the elimination of essentially all of the Company's net deferred tax liabilities.  See Note 3 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof for further information pertaining to the Company's election to be treated as a subchapter S corporation.

In the first quarter of 2007, the $70 million non-cash pretax loss on change in fair values of PHONES and related investment resulted primarily from a $36 million increase in the fair value of the derivative component of the Company's PHONES and a $33 million decrease in the fair value of 16 million shares of Time Warner common stock.  The strategic transaction expenses in the first quarter of 2007 related to a special strategic review and the Leveraged ESOP Transactions.

## RESULTS OF OPERATIONS

The Company's results of operations, when examined on a quarterly basis, reflect the seasonality of the Company's revenues.  Second and fourth quarter advertising revenues are typically higher than first and third quarter revenues.  Results for the second quarter usually reflect spring advertising, while the fourth quarter includes advertising related to the holiday season.  Results for the 2008 and 2007 first quarters reflect these seasonal patterns.  Unless otherwise stated, the Company's discussion of its results of operations relates to continuing operations, and therefore excludes *Hoy*, New York, SCNI, and Recycler.  See the discussion under "Discontinued Operations" contained in this Item 2 for further information on the results from discontinued operations.

32

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514087

**CONSOLIDATED**

The Company's consolidated operating results for the first quarters of 2008 and 2007 are shown in the table below:

| | First Quarter | | | |
|---|---|---|---|---|
| (in millions) | 2008 | 2007 | Change | |
| Operating revenues | $ 1,115 | $ 1,209 | - | 8% |
| Operating profit(1) | $ 143 | $ 182 | - | 21% |
| Net income on equity investments | $ 17 | $ 13 | + | 32% |
| Net income: | | | | |
| Income from continuing operations(2) | $ 1,824 | $ 11 | | * |
| Loss from discontinued operations, net of tax | (1) | (34) | | * |
| Net income (loss) | $ 1,823 | $ (23) | | * |

(1) Operating profit excludes interest and dividend income, interest expense, equity income and losses, non-operating items and income taxes.
(2) Due to the Company's election to be treated as a subchapter S corporation beginning in 2008, essentially all of its net deferred tax liabilities have been eliminated as of Dec. 31, 2007. This resulted in a $1,859 million reduction in income tax expense in the first quarter of 2008.

\* Not meaningful

**Operating Revenues and Profit**—Consolidated operating revenues and operating profit by business segment for the first quarters of 2008 and 2007 were as follows:

| | First Quarter | | | |
|---|---|---|---|---|
| (in millions) | 2008 | 2007 | Change | |
| **Operating revenues** | | | | |
| Publishing | $ 823 | $ 926 | - | 11% |
| Broadcasting and entertainment | 292 | 283 | + | 3% |
| Total operating revenues | $ 1,115 | $ 1,209 | - | 8% |
| **Operating profit(1)** | | | | |
| Publishing | $ 37 | $ 140 | - | 74% |
| Broadcasting and entertainment(2) | 135 | 61 | + | 120% |
| Corporate expenses | (28) | (20) | - | 45% |
| Total operating profit | $ 143 | $ 182 | - | 21% |

(1) Operating profit for each segment excludes interest and dividend income, interest expense, equity income and losses, non-operating items and income taxes.
(2) Includes a gain of $83 million on the sale of the real estate and related assets of the Company's studio production lot located in Hollywood, California.

Consolidated operating revenues for the 2008 first quarter fell 8% to $1.12 billion from $1.21 billion in 2007 due to a decline in publishing revenues, partially offset by an increase in broadcasting and entertainment revenues.

Consolidated operating profit decreased 21%, or $39 million, in the 2008 first quarter. Publishing operating profit decreased 74%, or $103 million, in the first quarter of 2008. Publishing operating profit in the 2008 first quarter included severance and related charges of $13 million and special termination benefits of $24 million for staff reductions. Broadcasting and entertainment operating profit was up 120%, or $74 million, in the 2008 first quarter primarily due to a gain of $83 million on the sale of the real estate and related assets of its studio production lot located in Hollywood, California, partially offset by a severance charge of $9 million.

33

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514088

**Operating Expenses**—Consolidated operating expenses for the first quarters were as follows:

| (in millions) | First Quarter | | |
| | 2008 | 2007 | Change |
|---|---|---|---|
| Cost of sales (exclusive of items shown below) | $ 599 | $ 614 | - 2% |
| Selling, general and administrative | 315 | 356 | - 12% |
| Depreciation and amortization | 57 | 57 | — |
| Total operating expenses | $ 971 | $ 1,027 | - 5% |

Cost of sales decreased 2%, or $15 million, in the first quarter of 2008. Compensation expense decreased 3%, or $6 million, in the first quarter of 2008 primarily due to the impact of position eliminations during 2007. Newsprint and ink expense decreased 18%, or $20 million, as a result of a 14% drop in newsprint consumption and a 4% decline in average newsprint costs. Programming expense increased 7%, or $6 million, due to higher broadcast rights amortization.

Selling, general and administrative ("SG&A") expenses were down 12%, or $41 million, in the first quarter of 2008. SG&A expenses in the first quarter of 2008 included severance and related charges of $39 million and special termination benefits of $24 million, partially offset by compensation savings from staff reductions. The special termination benefits will be provided through enhanced pension benefits payable by the Company's pension plan. The severance and related charges included approximately $32 million of costs related to the Company's transitional compensation plan. SG&A expenses in the first quarter of 2008 also included the gain of $83 million on the sale of the studio production lot and $8 million of stock-based compensation expense related to the Company's new management equity incentive plan. SG&A expenses in the first quarter of 2007 included $18 million of stock-based compensation expense.

## PUBLISHING

**Operating Revenues and Profit**—The following table presents publishing operating revenues, operating expenses and operating profit for the first quarters of 2008 and 2007. References in this discussion to individual daily newspapers include their related businesses.

| (in millions) | First Quarter | | |
| | 2008 | 2007 | Change |
|---|---|---|---|
| Operating revenues | $ 823 | $ 926 | - 11% |
| Operating expenses | 786 | 786 | — |
| Operating profit(1) | $ 37 | $ 140 | - 74% |

(1) Operating profit excludes interest and dividend income, interest expense, equity income and losses, non-operating items and income taxes.

Publishing operating revenues decreased 11%, or $103 million, in the 2008 first quarter. The largest declines were at Los Angeles, Chicago, Newsday, South Florida and Orlando.

Operating profit for the 2008 first quarter decreased 74%, or $103 million, mainly due to the lower revenues. Operating expenses were flat in the 2008 first quarter as workforce reduction costs and an increase in circulation distribution expense were offset by decreases in newsprint and ink, outside services, promotion expenses and compensation savings from staff reductions.

34

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514089

Publishing operating revenues, by classification, for the first quarters of 2008 and 2007 were as follows:

| (in millions) | First Quarter | | |
| | 2008 | 2007 | Change |
|---|---|---|---|
| Advertising | | | |
| Retail | $ 269 | $ 292 | - 8% |
| National | 161 | 178 | - 10% |
| Classified | 186 | 256 | - 27% |
| Total advertising | 616 | 726 | - 15% |
| Circulation | 130 | 135 | - 3% |
| Other | 77 | 65 | + 17% |
| Total revenues | $ 823 | $ 926 | - 11% |

Total advertising revenues were down 15%, or $110 million, in the 2008 first quarter. Retail advertising revenues were down 8%, or $23 million, primarily due to declines in the hardware/home improvement stores, furniture/home furnishings, specialty merchandise, department stores, and other retail categories, partially offset by an increase in the food and drug stores category. Preprint revenues decreased 8%, or $12 million, in the first quarter primarily due to decreases at Los Angeles, South Florida, Chicago, and Hartford. National advertising revenues decreased 10%, or $17 million, in the first quarter primarily due to decreases in the telecom/wireless and auto categories, partially offset by increases in the healthcare and media categories. Classified advertising revenues decreased 27%, or $70 million, in the first quarter of 2008. The decline was primarily due to a 41% decrease in real estate, a 33% decline in help wanted and an 8% reduction in auto advertising. Interactive revenues, which are included in the above advertising categories, were flat as increases in retail and national were offset by a decrease in classified advertising due to declines in the classified help wanted and real estate categories, partially offset by an increase in the classified auto category.

Publishing advertising volume for the first quarters was as follows:

| Inches (in thousands) | First Quarter | | |
| | 2008 | 2007 | Change |
|---|---|---|---|
| Full run | | | |
| Retail | 1,156 | 1,213 | - 5% |
| National | 686 | 701 | - 2% |
| Classified | 1,706 | 2,065 | - 17% |
| Total full run | 3,548 | 3,979 | -- 11% |
| Part run | 3,725 | 4,715 | - 21% |
| Total inches | 7,273 | 8,694 | - 16% |
| | | | |
| Preprint pieces (in millions) | 3,140 | 3,435 | - 9% |

Full run advertising inches decreased 11% in the 2008 first quarter. Full run retail advertising inches decreased 5% in the first quarter due to declines at Chicago, Orlando and Los Angeles. Full run national advertising inches were down 2% in the first quarter, as increases at Newport News and Los Angeles were more than offset by decreases at Chicago, South Florida, Newsday and Hartford. Full run classified advertising inches declined 17% in the first quarter due to decreases at Orlando, South Florida, Chicago, Newsday and Baltimore. Part run advertising inches decreased 21% in the first quarter primarily due to decreases at Los Angeles, Chicago, South Florida and Orlando. Preprint advertising pieces decreased 9% in the first quarter mainly due to decreases at Los Angeles, Chicago, South Florida and Baltimore.

Circulation revenues were down 3% due to a decline in total net paid circulation copies for both daily and Sunday, partially offset by selective price increases. The largest revenue declines were at Los Angeles, Chicago and Newsday. Circulation revenues increased at South Florida and Orlando. Total net paid circulation averaged 2.7 million copies daily (Mon-Fri) in the first quarter, down 6% from the prior year, and 3.9 million copies Sunday, representing a decline of 5% from the prior year. Individually paid circulation

35

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

(home delivery plus single copy) in the first quarter of 2008 was down 6% for both daily and Sunday.

Other revenues are derived from advertising placement services; the syndication of columns, features, information and comics to newspapers; commercial printing operations; delivery of other publications; direct mail operations; cable television news programming; distribution of entertainment listings; and other publishing-related activities. Other revenues increased 17%, or $12 million, in the first quarter primarily due to increased delivery revenue for third-party publications.

**Operating Expenses**—Publishing operating expenses for the first quarters were as follows:

| (in millions) | First Quarter | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2008** | | **2007** | | **Change** | |
| Compensation | $ | 348 | $ | 328 | + | 6% |
| Newsprint and ink | | 94 | | 114 | - | 18% |
| Circulation distribution | | 124 | | 119 | + | 5% |
| Outside services | | 72 | | 75 | - | 4% |
| Promotion | | 20 | | 22 | - | 6% |
| Depreciation and amortization | | 44 | | 44 | | — |
| Other | | 84 | | 84 | | — |
| Total operating expenses | $ | 786 | $ | 786 | | — |

Publishing operating expenses were flat in the 2008 first quarter. Compensation expense increased 6%, or $20 million, in the first quarter of 2008 primarily due to $14 million of severance and related charges and $24 million of special termination benefits, partially offset by the impact of a 5% (860 full-time equivalent positions) reduction in staffing and a decrease of $3 million in stock-based compensation. Newsprint and ink expense decreased 18%, or $20 million, as a result of a 14% drop in consumption and a 4% decline in average newsprint costs. Circulation distribution expense increased 5%, or $5 million, in the first quarter due to delivery of additional products. Outside services expense was down 4%, or $3 million, largely due to a decrease in outside printing. Promotion expense decreased 6%, or $2 million, due to the Company's efforts to reduce costs in 2008.

36

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514091

**BROADCASTING AND ENTERTAINMENT**

**Operating Revenues and Profit**—The following table presents broadcasting and entertainment operating revenues, operating expenses and operating profit for the first quarters of 2008 and 2007.  Entertainment includes Tribune Entertainment and the Chicago Cubs.

| (in millions) | First Quarter | | | | | |
| | 2008 | | 2007 | | Change | |
| --- | --- | --- | --- | --- | --- | --- |
| **Operating revenues** | | | | | | |
| Television | $ | 278 | $ | 264 | + | 5% |
| Radio/entertainment | | 14 | | 19 | - | 28% |
| Total operating revenues | $ | 292 | $ | 283 | + | 3% |
| | | | | | | |
| **Operating expenses** | | | | | | |
| Television | $ | 215 | $ | 198 | + | 9% |
| Radio/entertainment(2) | | (59) | | 24 | | * |
| Total operating expenses | $ | 156 | $ | 222 | - | 29% |
| | | | | | | |
| **Operating profit (loss)(1)** | | | | | | |
| Television | $ | 63 | $ | 67 | - | 6% |
| Radio/entertainment(2) | | 72 | | (6) | | * |
| Total operating profit | $ | 135 | $ | 61 | + | 120% |

(1)  Operating profit excludes interest and dividend income, interest expense, equity income and losses, non-operating items and income taxes.

(2)   Includes the gain of $83 million on the sale of the studio production lot.

* Not meaningful

Broadcasting and entertainment operating revenues increased 3%, or $9 million, in the 2008 first quarter.  Television revenues were up 5%, or $14 million, in the first quarter of 2008 primarily due to higher national advertising revenues.  Radio/entertainment revenues were down 28%, or $5 million, primarily due to lower revenues at Tribune Entertainment.

Operating profit for broadcasting and entertainment was up 120%, or $74 million, in the 2008 first quarter.  Television operating profit decreased 6%, or $4 million, primarily due to higher operating expenses.  Radio/entertainment operating profit increased $78 million, primarily due to a gain of $83 million on the sale of the studio production lot, partially offset by the decline in revenues.

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514092

**Operating Expenses**—Broadcasting and entertainment operating expenses for the first quarters of 2008 and 2007 were as follows:

| (in millions) | First Quarter | | |
| | 2008 | 2007 | Change |
|---|---|---|---|
| Compensation | $   83 | $   74 | +   13% |
| Programming | 89 | 83 | +   7% |
| Depreciation and amortization | 13 | 13 | — |
| Other | 54 | 52 | +   4% |
| Gain on sale of assets(1) | (83) | — | * |
| Total operating expenses | $   156 | $   222 | -   29% |

(1)  Gain on sale of assets represents the gain on sale of the studio production lot.

* Not meaningful

Broadcasting and entertainment operating expenses decreased 29%, or $66 million, in the 2008 first quarter.  Compensation expense increased 13%, or $9 million, in the first quarter of 2008 primarily due to a $9 million severance charge.  Programming expense increased 7%, or $6 million, due to higher broadcast rights amortization.  Other cash expenses were up 4%.

## CORPORATE EXPENSES

Corporate expenses for the 2008 first quarter increased $9 million, or 45%, from the first quarter of 2007 primarily due to severance and related charges of $16 million and approximately $1 million of special termination benefits, partially offset by a decrease of $6 million in stock-based compensation expense.

## EQUITY RESULTS

Net income on equity investments increased $4 million to $17 million in the 2008 first quarter.  The increase was due primarily to an improvement at TV Food Network.

## INTEREST AND DIVIDEND INCOME, INTEREST EXPENSE, AND INCOME TAXES

Interest and dividend income for the 2008 first quarter increased $1 million to $4 million due to higher average cash balances and an increase in Time Warner dividend income.  Interest expense for the 2008 first quarter increased to $263 million from $83 million due to higher debt levels.  Debt was $12.6 billion at the end of the 2008 first quarter, compared with $5.0 billion at the end of the first quarter of 2007.  The increase was primarily due to higher debt levels in connection with the consummation of the Leveraged ESOP Transactions.

In the first quarter of 2008, income tax expense applicable to continuing operations amounted to a net benefit of $1,854 million and was comprised of the favorable $1,859 million deferred income tax adjustment that resulted from the Company's S corporation election and a provision of $5 million.  The provision was primarily for interest on uncertain tax positions.  The effective tax rate on income from continuing operations was 63.1% in the first quarter of 2007.  The effective tax rate for the 2007 first quarter was affected by certain non-operating items that were not deductible for tax purposes.  See Note 7 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof for a summary of non-operating items.  In the aggregate, non-operating items increased the effective tax rate in the first quarter of 2007 by 23.0 percentage points.

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514093

**DISCONTINUED OPERATIONS**

The Company announced an agreement to sell *Hoy*, New York on Feb. 12, 2007 and completed the sale on May 15, 2007.  In March 2007, the Company announced its intentions to sell SCNI.  The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which was sold in a separate transaction that closed on April 22, 2008.  In the first quarter of 2007, the Company recorded a pretax loss of $19 million ($33 million after taxes) to write down the net assets of SCNI to estimated fair value, less costs to sell.  In the first quarter of 2008, the Company recorded an additional $.5 million after-tax loss on the sale of SCNI.  During the third quarter of 2007, the Company began actively pursuing the sale of the stock of Recycler.  The sale of Recycler closed on Oct. 17, 2007.

These businesses were considered components of the Company's publishing segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company.  The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of the sales, and the Company will not have any significant continuing involvement in their operations.  Accordingly, the results of operations in 2007 for each of these businesses are reported as discontinued operations in the unaudited condensed consolidated statements of operations.

**Summarized Financial Information**—Selected financial information related to discontinued operations is summarized as follows:

| (in thousands) | First Quarter | |
| --- | --- | --- |
| | 2008 | 2007 |
| Operating revenues | $ — | $ 15,657 |
| Operating loss | $ (63) | $ (2,460) |
| Loss on sales of discontinued operations | (516) | (19,442) |
| Loss from discontinued operations before income taxes | (579) | (21,902) |
| Income taxes(1) | 31 | (12,743) |
| Loss from discontinued operations, net of tax | $ (548) | $ (34,645) |

(1) Income taxes for the first quarter of 2007 included tax expense of $14 million related to the $19 million pretax loss on sale of SCNI.  The pretax loss included $54 million of allocated newspaper group goodwill, most of which is not deductible for income tax purposes.

39

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**LIQUIDITY AND CAPITAL RESOURCES**

Cash flow generated from operating activities is the Company's primary source of liquidity. Net cash provided by operating activities was $51 million in the first quarter of 2008, down 62% from $135 million in the first quarter of 2007, primarily due to lower operating profit and higher interest expense.

Net cash used for investing activities totaled $13 million in the first quarter of 2008 compared to $16 million in the first quarter of 2007. The Company's capital expenditures and investments totaled $23 million and $2 million, respectively, in the first quarter of 2008. The Company received $131 million in proceeds from the sales of certain investments and real estate in the first quarter of 2008. The proceeds included $122 million from the sale of the studio production lot, of which $119 million was placed into an escrow fund immediately following the closing of the sale.

On April 22, 2008, the Company sold the SCNI real estate in Stamford and Greenwich, Connecticut for net proceeds of $29 million, which were placed into an escrow fund. On April 28, 2008, the Company acquired the real estate formerly leased from TMCT, LLC for $175 million (see Note 13 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof). The proceeds from the sales of the studio production lot and the SCNI real estate, along with available cash, were used to fund the purchase. The purchase was structured as a like-kind exchange, which allowed the Company to defer income taxes on essentially all of the gains from these dispositions.

Net cash used for financing activities was $25 million in the first quarter of 2008. The Company refinanced $25 million of its medium term notes with borrowings under its Delayed Draw Facility. In addition, the Company made $19 million of scheduled Tranche B Facility amortization payments and reduced its property financing obligation by $5 million.

The Company expects to fund capital expenditures, interest and principal payments due in 2008 and other operating requirements through a combination of cash flows from operations, available borrowings under the Revolving Credit Facility, and, if necessary, disposals of assets or operations. The Company's ability to satisfy financial covenants in its credit agreements and to make scheduled payments or prepayments on its debt and other financial obligations will depend on future financial and operating performance and the ability to dispose of assets on favorable terms. There can be no assurances that the Company's businesses will generate sufficient cash flows from operations or that any such asset dispositions can be completed. In addition, there can be no assurances that future borrowings under the Revolving Credit Facility will be available in an amount sufficient to satisfy debt maturities or to fund other liquidity needs. The Company's financial and operating performance, and the market environment for divestiture transactions, are subject to prevailing economic and industry conditions and to financial, business and other factors, some of which are beyond the control of the Company.

If the Company's cash flows and capital resources are insufficient to fund debt service obligations, the Company will likely face increased pressure to reduce or delay capital expenditures, dispose of assets or operations, further reduce the size of its workforce, seek additional capital or restructure or refinance its indebtedness. These actions could have a material adverse effect on the Company's business, financial condition and results of operations. In addition, the Company cannot assure the ability to take any of these actions, that these actions would be successful and permit the Company to meet scheduled debt service obligations or that these actions would be permitted under the terms of the Company's existing or future debt agreements, including the Credit Agreement and the Interim Credit Agreement. For example, the Company may need to refinance all or a portion of its indebtedness on or before maturity. There can be no assurance that the Company will be able to refinance any of its indebtedness on commercially reasonable terms or at all. In the absence of improved operating results and access to capital resources, the Company could face substantial liquidity problems and might be required to dispose of material assets or operations to meet its debt service and other obligations. As described in the "New Credit Agreements" section contained in this Item 2, the

40

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514095

Credit Agreement and the Interim Credit Agreement require that proceeds from the disposition of assets be used to repay borrowings under such agreements, subject to certain exceptions. The Company may not be able to consummate those dispositions or to obtain the proceeds realized. Additionally, these proceeds may not be adequate to meet the debt service obligations then due.

If the Company cannot maintain compliance with the financial covenants in its credit agreements or make scheduled payments or prepayments on its debt, the Company will be in default and, as a result, among other things, the Company's debt holders could declare all outstanding principal and interest to be due and payable and the Company could be forced into bankruptcy or liquidation or required to substantially restructure or alter business operations or debt obligations. See Part I, Item 1A, "Risk Factors" in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007 for further discussion of the risks associated with the Company's ability to service all of its existing indebtedness. In addition, see the "Significant Events" section herein for additional information regarding the Leveraged ESOP Transactions and a summary of the Company's obligations under the Credit Agreement and for definitions of capitalized terms used in this discussion.

As of April 21, 2008, the Company's corporate credit ratings were as follows: "B-" with stable outlook by Standard & Poor's Rating Services, "B3" on review for a possible downgrade by Moody's Investor Service and "B-" with negative outlook by Fitch Ratings.

The Company has for several years maintained active debt shelf registration statements for its medium-term note program and other financing needs. A shelf registration statement was declared effective in July 2006. The shelf registration statement does not have a designated amount, but the Company's Board of Directors has authorized the issuance and sale of up to $3 billion of debt securities. Proceeds from any future debt issuances under the new shelf registration statement would be used for general corporate purposes, including repayment of short-term and long-term borrowings, capital expenditures, working capital and financing of acquisitions, in each case, subject to the terms of the Credit Agreement and the Interim Credit Agreement.

Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

**Off-Balance Sheet Arrangements**—Off-balance sheet arrangements, as defined by the Securities and Exchange Commission, include the following four categories: obligations under certain guarantees or contracts; retained or contingent interests in assets transferred to an unconsolidated entity or similar arrangements; obligations under certain derivative arrangements; and obligations under material variable interests. The Company has not entered into any material arrangements that would fall under any of these four categories, which would be reasonably likely to have a current or future material effect on the Company's financial condition, revenues or expenses, results of operations, liquidity or capital expenditures.

41

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0514096

**ITEM 3.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

The following represents an update of the Company's market-sensitive financial information.  This information contains forward-looking statements and should be read in conjunction with the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007.

**INTEREST RATE RISK**

All of the Company's borrowings are denominated in U.S. dollars. The Company manages interest rate risk by issuing a combination of both fixed and variable rate debt.  In addition, the Company enters into hedge arrangements as required under the terms of the Credit Agreement as defined and described in the "Significant Events" section contained in Part I, Item 2, hereof.

Information pertaining to the Company's debt at March 30, 2008 is shown in the table below (in thousands):

| Maturities | Fixed Rate Debt | Weighted Avg Interest Rate | Variable Rate Debt | Weighted Avg Interest Rate | Total Debt |
|---|---|---|---|---|---|
| 2008(1) | $   234,843 | 2.6% | $   707,933 | 7.2% | $   942,776 |
| 2009(2) | 9,534 | 8.0% | 857,399 | 7.2% | 866,933 |
| 2010(3) | 451,772 | 4.9% | 141,179 | 5.5% | 592,951 |
| 2011 | 2,130 | 9.2% | 78,830 | 5.5% | 80,960 |
| 2012(4) | 2,113 | 9.5% | 148,055 | 5.5% | 150,168 |
| Thereafter(5) | 1,150,573 | 4.1% | 8,819,800 | 5.9% | 9,970,373 |
| Total at March 30, 2008 | $   1,850,965 | | $   10,753,196 | | $   12,604,161 |
| Fair Value at March 30, 2008(6) | $   1,186,440 | | $   8,093,487 | | $   9,279,927 |

(1)   Fixed rate debt includes $211 million related to the Company's 2% PHONES which represents the cash exchange value of the PHONES at March 30, 2008.  Also included is $23 million of property financing obligation (see Note 10 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof).  Variable rate debt includes $650 million related to the portion of the Tranche X facility due on Dec. 4, 2008 and $58 million related to the Tranche B facility, which is payable in quarterly increments of approximately $19 million until maturity in 2014 when the remaining principal balance is due in full (see Note 10 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof).

(2)   Variable rate debt includes $750 million related to the portion of the Tranche X facility due on June 4, 2009 and $29 million related to an interest rate swap agreement through 2009 on $750 million of the variable rate borrowings under the Tranche B facility effectively converting the variable rate to a fixed rate of 5.25% plus a margin of 300 basis points.

(3)   Variable rate debt includes $62 million related to an interest rate swap agreement through 2010 on $1 billion of the variable rate borrowings under the Tranche B facility effectively converting the variable rate to a fixed rate of 5.29% plus a margin of 300 basis points.

(4)   Variable rate debt includes $69 million related to an interest rate swap agreement through 2012 on $750 million of the variable rate borrowings effectively converting the variable rate to a fixed rate of 5.39% plus a margin of 300 basis points.

(5)   Fixed rate debt includes the remaining $94 million of book value related to the Company's 2% PHONES, due 2029.  The Company may redeem the PHONES at any time for the greater of the principal value of the PHONES ($155.86 per PHONES at March 30, 2008) or the then market value of two shares of Time Warner common stock, subject to certain adjustments. Quarterly interest payments are made to the PHONES holders at an annual rate of 2% of the initial principal. Fixed rate debt also includes $34 million related to the interest rate swap agreement on the $100 million 7.5% debentures due in 2023 effectively converting the fixed 7.5% rate to a variable rate based on LIBOR. Fixed rate debt also includes $238 million related to the Company's medium-term notes that the Company intends to refinance using the Delayed Draw Facility as they mature during 2008.  Accordingly, the Company has classified its medium-term notes as long-term at March 30, 2008.  Variable rate debt includes the $1.6 billion Bridge Facility, which has been classified as long-term because the borrowings under the Bridge Facility will be converted into long-term senior exchange notes or similar instruments prior to the Bridge Facility's initial maturity date of Dec.

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**                                                                    **TRB0514097**

20, 2008 (see Note 10 to the Company's unaudited consolidated financial statements in Part I, Item 1, hereof). Variable rate debt also includes $7.2 billion related to the amount due in 2014 on the Tranche B facility after all quarterly payments have been made (see Note 10 to the Company's unaudited consolidated financial statements in Part I, Item 1, hereof).

(6)    Fair value of the Company's variable rate borrowings, senior notes and debentures was estimated based on quoted market prices for similar issues or on current rates available to the Company for debt of the same remaining maturities and similar terms. The carrying value of all other components of the Company's debt approximates fair value.

**Variable Interest Rate Debt**—As described in the "Significant Events" section contained in Part I, Item 2, hereof, on June 4, 2007 and Dec. 20, 2007, the Company entered into borrowings under the Credit Agreement and the Interim Credit Agreement. In general, borrowings under the Credit Agreement bear interest at a variable rate based on LIBOR plus a spread ranging from 2.75% to 3.00%. Upon execution of the Interim Credit Agreement, loans under the Bridge Facility bore interest based on LIBOR plus 4.50%. On March 20, 2008, pursuant to the terms of the Interim Credit Agreement, such margins increased by 50 basis points per annum and will continue to increase by this amount each quarter, subject to specified caps. As of March 30, 2008, the Company had $10.657 billion of variable rate borrowings outstanding under these credit facilities. At this borrowing level, and before consideration of the Company's existing interest rate swap agreements, a hypothetical one percent increase in the underlying interest rates for the Company's variable rate borrowings under these agreements would result in an additional $107 million of annual pretax interest expense. The Company is currently a party to four interest rate swap agreements. One of the swap agreements relates to the $100 million fixed 7.5% rate debentures due in 2023 and effectively converts the fixed 7.5% rate to a variable rate based on LIBOR. The other three swap agreements were initiated on July 3, 2007, and effectively converted $2.5 billion of the variable rate borrowings to a weighted-average fixed rate of 5.31% plus a margin of 300 basis points.

## EQUITY PRICE RISK

**Available-For-Sale Securities**—The Company has common stock investments in publicly traded companies that are subject to market price volatility. Except for 16 million shares of Time Warner common stock (see discussion below), these investments are classified as available-for-sale securities and are recorded on the balance sheet at fair value with unrealized gains or losses, net of related tax effects, reported in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit).

The following analysis presents the hypothetical change at March 30, 2008 in the fair value of the Company's common stock investments in publicly traded companies that are classified as available-for-sale, assuming hypothetical stock price fluctuations of plus or minus 10%, 20% and 30% in each stock's price. As of March 30, 2008, the Company's common stock investments in publicly traded companies consisted primarily of 237,790 shares of Time Warner common stock unrelated to PHONES (see discussion below in "Derivatives and Related Trading Securities") and 3.4 million shares of AdStar, Inc.

| (in thousands) | Valuation of Investments Assuming Indicated Decrease in Stock's Price | | | March 30, 2008 Fair Value | Valuation of Investments Assuming Indicated Increase in Stock's Price | | |
|---|---|---|---|---|---|---|---|
| | -30% | -20% | -10% | | +10% | +20% | +30% |
| Common stock investments in public companies | $2,746 | $3,139 | $3,531 | $3,923(1) | $4,316 | $4,708 | $5,100 |

(1) Excludes 16 million shares of Time Warner common stock. See discussion below in "Derivatives and Related Trading Securities."

During the last 12 quarters preceding March 30, 2008, market price movements caused the fair value of the Company's common stock investments in publicly traded companies to change by 10% or more in five of the quarters, by 20% or more in five of the quarters and by 30% or more in four of the quarters.

43

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514098

**Derivatives and Related Trading Securities**—The Company issued 8 million PHONES in April 1999 indexed to the value of its investment in 16 million shares of Time Warner common stock. Since the second quarter of 1999, this investment in Time Warner has been classified as a trading security, and changes in its fair value, net of the changes in the fair value of the PHONES, have been recorded in the statement of operations.

At maturity, the PHONES will be redeemed at the greater of the then market value of two shares of Time Warner common stock or the principal value of the PHONES ($155.86 per PHONES at March 30, 2008). At March 30, 2008, the PHONES carrying value was approximately $305 million. Since the issuance of the PHONES in April 1999, changes in the fair value of the PHONES have partially offset changes in the fair value of the related Time Warner shares. There have been and may continue to be periods with significant non-cash increases or decreases to the Company's net income pertaining to the PHONES and the related Time Warner shares.

The following analysis presents the hypothetical change in the fair value of the Company's 16 million shares of Time Warner common stock related to the PHONES, assuming hypothetical stock price fluctuations of plus or minus 10%, 20% and 30% in the stock's price.

| (in thousands) | Valuation of Investment Assuming Indicated Decrease in Stock's Price | | | March 30, 2008 Fair Value | Valuation of Investment Assuming Indicated Increase in Stock's Price | | |
|---|---|---|---|---|---|---|---|
| | -30% | -20% | -10% | | +10% | +20% | +30% |
| Time Warner common stock | $155,344 | $177,536 | $199,728 | $221,920 | $244,112 | $266,304 | $288,496 |

During the last 12 quarters preceding March 30, 2008, market price movements have caused the fair value of the Company's 16 million shares of Time Warner common stock to change by 10% or more in three of the quarters, by 20% or more in one of the quarters and by 30% or more in none of the quarters.

44

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514099

**ITEM 4.  CONTROLS AND PROCEDURES.**

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures**

Under the supervision and with the participation of the Company's management, including its principal executive officer and principal financial officer, the Company conducted an evaluation of its disclosure controls and procedures, as such term is defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as of March 30, 2008.  Based upon that evaluation, the principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures are effective.

**Changes in Internal Control Over Financial Reporting**

There has been no change in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended March 30, 2008 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

45

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0514100**

# PART II.  OTHER INFORMATION

## ITEM 1.  LEGAL PROCEEDINGS.

The Company and its subsidiaries are defendants from time to time in actions for matters arising out of their business operations.  In addition, the Company and its subsidiaries are involved from time to time as parties in various regulatory, environmental and other proceedings with governmental authorities and administrative agencies.

*Newsday* **and** *Hoy,* **New York Circulation Misstatements**—In February 2004, a purported class action lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* and *Hoy,* New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications. The purported class action also alleges that entities that paid a *Newsday* subsidiary to deliver advertising flyers were overcharged.  The Company is vigorously defending this suit.  In July 2004, another lawsuit was filed in New York Federal Court by certain advertisers of *Newsday* alleging damages resulting from inflated *Newsday* circulation numbers as well as federal and state antitrust violations.  On Feb. 11, 2008, this suit was settled with all remaining plaintiffs.

In addition to the advertiser lawsuits, several class action and shareholder derivative suits were filed against the Company and certain of its current and former directors and officers as a result of the circulation misstatements at *Newsday* and *Hoy,* New York.  These suits alleged breaches of fiduciary duties and other managerial and director failings under Delaware law, the federal securities laws and the Employee Retirement Income Security Act ("ERISA").  The consolidated shareholder derivative suit filed in Illinois state court in Chicago was dismissed with prejudice on March 10, 2006.  The appeal of this dismissal to the Illinois State Court of Appeals was voluntarily dismissed by the plaintiff following the closing of the Company's going private transaction.  The consolidated securities class action lawsuit and the consolidated ERISA class action lawsuit filed in Federal District Court in Chicago were both dismissed with prejudice on Sept. 29, 2006.  The dismissals were appealed to the United States Court of Appeals for the Seventh Circuit.  On April 2, 2008, the Seventh Circuit issued an opinion affirming the dismissal of both the securities class action lawsuit and the ERISA class action lawsuit.  Plaintiffs in the securities class action lawsuit have filed a petition for a rehearing en banc by the Seventh Circuit, which is currently pending.  The Company continues to believe these suits are without merit and will continue to vigorously defend them.

**PHONES Indenture**—The Company received a letter dated April 9, 2007, (1) stating that it was written on behalf of two hedge funds purporting to hold approximately 37% of the Company's 8,000,000 PHONES Exchangeable Subordinated Debentures due 2029 (the "PHONES"), (2) purporting to give a "notice of default" that the Company has violated the "maintenance of properties" covenant in the indenture under which the PHONES were issued (the "PHONES Indenture") and (3) informing the Company that failure to remedy such purported violation within 60 days of notice will result in an "event of default" under the PHONES Indenture (which could, if properly declared, result in an acceleration of principal and interest payable with respect to the PHONES).  On April 27, 2007, the Company received a letter from the law firm purporting to represent the two hedge funds stating that the law firm also purported to represent a third hedge fund, which, together with the first two hedge funds, purported to hold 55% of the Company's PHONES and reiterating the claims set forth in the April 9, 2007 letter.

The particular covenant in question, Section 10.05 of the PHONES Indenture, requires the Company to "cause all properties used or useful in the conduct of its business or the business of any Subsidiary to be maintained and kept in good condition, repair and working order (normal wear and tear excepted) and supplied with all necessary equipment… all as in the judgment of the Company may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times…."  Section 10.05 of the PHONES Indenture expressly provides that the covenant does not "prevent the Company from discontinuing the operation and maintenance of any such properties, or disposing of any of them, if such discontinuance or disposal is, in the judgment of the Company or of the Subsidiary concerned, desirable in the

46

---

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514101

conduct of its business or the business of any Subsidiary and not disadvantageous in any material respect to the Holders [of the PHONES]." The letters suggest that the Company's recent sales of three television stations, announced intention to dispose of an interest in the Chicago Cubs baseball team and recent and proposed issuances of debt and return of capital to stockholders violated or will violate this maintenance of properties covenant.

On May 2, 2007, the Company sent a letter to the law firm purporting to represent the hedge funds rejecting their purported "notice of default" as defective and invalid because the Company was not in default of Section 10.05, the entities the law firm purported to represent were not "Holders" as defined in the PHONES Indenture, and because the law firm had provided no evidence that it was an agent duly appointed in writing as contemplated by Section 1.04 of the PHONES Indenture. The law firm sent a letter to the Company on May 8, 2007 responding to the Company's May 2, 2007 letter, reiterating its claim that the Company was in default of Section 10.05 and stating that it had properly noticed a default pursuant to Section 5.01(4) of the Indenture. The Company further responded by letter dated May 18, 2007 reaffirming its rejection of the purported "notice of default" and reiterating its position that the Company was not in default of Section 10.05 and that the entities the law firm purported to represent were not entitled to provide a notice of default under Section 5.01(4) of the PHONES Indenture.

On July 23, 2007, the Company received a letter from the law firm purporting to represent the hedge funds, purported to hold 70% of the Company's PHONES, stating that the Company has breached Section 10.05 of the PHONES Indenture, such breach was continuing on the date of such letter, which was more than 60 days after the purported "notice of default" had been given, and that pursuant to Section 5.01(4) of the Indenture, an "event of default" under the PHONES Indenture had occurred and was continuing. The July 23, 2007 letter further stated that the hedge funds were declaring the outstanding principal of $157 per share of all of the outstanding PHONES, together with all accrued but unpaid interest thereon to be due and payable immediately, and were demanding immediate payment of all such amounts. On July 27, 2007, the Company sent a letter to the trustee under the PHONES Indenture and the law firm purporting to represent the three hedge funds rejecting the allegations made in such law firm's July 23, 2007 letter and reiterating the Company's position that the Company is not in default of Section 10.05 and that such hedge funds are not entitled under the PHONES Indenture to provide the purported notice of default.

On Aug. 10, 2007, the law firm purporting to represent the three hedge fund holders sent a letter to the trustee under the PHONES Indenture stating that the PHONES holders intended to institute proceedings to confirm the alleged covenant default and acceleration notice. On Sept. 17, 2007, the Company received copies of default notices from Cede & Co., the record holder of the PHONES, on behalf of the three hedge fund holders. These purported notices of default indicate that they were issued at the request of each of the hedge funds by Cede & Co., the holder of record for the notes beneficially owned by each of the hedge funds. The letter stated that Tribune was required to remedy the purported default within 60 days of the date of the letter and that failure to do so would constitute an "Event of Default" under the PHONES Indenture. On Dec. 26, 2007, the Company received copies of notices of acceleration from Cede & Co., purportedly on behalf of the three hedge fund holders. These purported notices of acceleration indicate that they were issued at the request of each of the hedge funds by Cede & Co., the holder of record for the notes beneficially owned by each of the hedge funds. To date, the trustee under the PHONES Indenture has not initiated any action on behalf of the PHONES holders. On January 9, 2008, the Company sent a letter to the trustee under the PHONES Indenture and the law firm purporting to represent the three hedge funds rejecting the purported notices of acceleration for the reasons previously set forth in the Company's July 27, 2007 letter.

The Company continues to believe that the hedge funds' claims are without merit and that the Company remains in full compliance with Section 10.05 of the PHONES Indenture. The Company will enforce and defend vigorously its rights under the PHONES Indenture.

In addition, the information contained in Note 3 and Note 13 to the unaudited condensed consolidated financial statements in Part I, Item 1, hereof is incorporated herein by reference.

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0514102

**ITEM 1A.  RISK FACTORS.**

There have been no material changes to the Company's risk factors as disclosed in Item 1A, "Risk Factors", in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30. 2007.

**ITEM 6.  EXHIBITS.**

    (a) Exhibits.

| | |
|---|---|
| 31.1 | Rule 13a-14 Certification of Chief Executive Officer |
| 31.2 | Rule 13a-14 Certification of Chief Financial Officer |
| 32.1 | Section 1350 Certification of Chief Executive Officer |
| 32.2 | Section 1350 Certification of Chief Financial Officer |

48

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**TRIBUNE COMPANY**
(Registrant)

Date:  May 8, 2008

By:    /s/ Brian Litman
        _____
        Brian Litman
        Vice President and Controller
        (on behalf of the registrant
        and as Chief Accounting Officer)

49

Source: TRIBUNE CO, 10-Q, May 08, 2008

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0514104

Source: TRIBUNE CO, 10-Q, May 08, 2008

**FORM 10-Q CERTIFICATION**

I, Samuel Zell, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Tribune Company;

2.  Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.  Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present, in all material respects, the financial condition, results of operations and cash flows of Tribune Company as of, and for, the periods presented in this quarterly report;

4.  Tribune Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Tribune Company and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Tribune Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of Tribune Company's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

    d)  Disclosed in this quarterly report any change in Tribune Company's internal control over financial reporting that occurred during Tribune Company's most recent fiscal quarter (Tribune Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, Tribune Company's internal control over financial reporting; and

5.  Tribune Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Tribune Company's auditors and the audit committee of Tribune Company's board of directors:

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Tribune Company's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in Tribune Company's internal control over financial reporting.

Date:  May 8, 2008                              By: /s/ Samuel Zell
                                                    Samuel Zell
                                                    Chairman and
                                                    Chief Executive Officer

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**                              **TRB0514106**
**Highly Confidential -- Attorneys' Eyes Only**

EXHIBIT 31.2

## FORM 10-Q CERTIFICATION

I, Chandler Bigelow, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Tribune Company;

2.  Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.  Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present, in all material respects, the financial condition, results of operations and cash flows of Tribune Company as of, and for, the periods presented in this quarterly report;

4.  Tribune Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Tribune Company and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Tribune Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of Tribune Company's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

    d)  Disclosed in this quarterly report any change in Tribune Company's internal control over financial reporting that occurred during Tribune Company's most recent fiscal quarter (Tribune Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, Tribune Company's internal control over financial reporting; and

5.  Tribune Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Tribune Company's auditors and the audit committee of Tribune Company's board of directors:

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Tribune Company's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in Tribune Company's internal control over financial reporting.

Date: May 8, 2008

By: /s/ Chandler Bigelow
   Chandler Bigelow
   Senior Vice President and
   Chief Financial Officer

Source: TRIBUNE CO, 10-Q, May 08, 2008

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

EXHIBIT 32.1

**CERTIFICATION PURSUANT TO
18 UNITED STATES CODE SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Samuel Zell, the Chairman and Chief Executive Officer of Tribune Company, certify that (i) Tribune Company's Form 10-Q for the quarter ended March 30, 2008 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Form 10-Q for the quarter ended March 30, 2008 fairly presents, in all material respects, the financial condition and the results of operations of Tribune Company.

By: /s/ Samuel Zell
     Samuel Zell
     Chairman and
     Chief Executive Officer

May 8, 2008

**Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only**

**CERTIFICATION PURSUANT TO**
**18 UNITED STATES CODE SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**


I, Chandler Bigelow, the Senior Vice President and Chief Financial Officer of Tribune Company, certify that (i) Tribune Company's Form 10-Q for the quarter ended March 30, 2008 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Form 10-Q for the quarter ended March 30, 2008 fairly presents, in all material respects, the financial condition and the results of operations of Tribune Company.



By: /s/ Chandler Bigelow
     Chandler Bigelow
     Senior Vice President and
     Chief Financial Officer


May 8, 2008


Created by 10KWizard    www.10KWizard.com

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**
**TRB0514109**