**From:** Varner, Carla A. [CVarner@Sidley.com]
**Sent:** Tuesday, March 27, 2007 12:50 PM
**To:** Schaffzin, Jonathan; Horowitz, Doug; Ryan, Denise; Persily, Julie [CIB-GFI]; Chen, Robert [CIB-GFI]; Canmann, Michael S [CIB-GBKG]; Mohr, Christina [CIB-GBKG]; Kurmaniak, Rosanne [CIB-GBKG]; brit.j.bartter@jpmorgan.com; peter.cohen@jpmorgan.com; joachim.sonne@jpmorgan.com; RAJESH.KAPADIA@jpmorgan.com; natalia.klykova@jpmorgan.com; yang.chen@jpmorgan.com; Kaplan, Todd (GMI Leveraged Finance); O'Grady, Michael G. (IBK - CHI); Lewicki, David (IBK-CHI); Mayer, Carl (GMI-CAPMKTS); Paras, Stephen B. (IBK LevFin-Capital Markets); Figueroa, Mariela (GMI-CapMkts); Margolies, Greg (IBK-NY); Tuvlin, David (IBK-NY); Yurko, Mark [CIB-GBKG]; Apostolides, John T [CIB-GBKG]; Chen, Ruoxi [CIB-GBKG]; Scardigli, Michael [CIB-GBKG]; Singh, Mallika R [CIB-GFI]; Chang, Kathy [CIB-GFI]; Dahlback, Henrik (IBK-NY); Hoffman, Richard (IBK-NY); Wood, Christopher [GFI]; stuart.d.fishman@chase.com; robert.anastasio@jpmorgan.com; Kim, Caroline (IBK-NY)
**Cc:** cbigelow@tribune.com; DEldersveld@Tribune.com; Bill Pate; Nils Larsen; Philip Tinkler; Mark Sotir; Chris Hochschild; Joe Paolucci; Marc Hauser; Lewis, Robert J.; EMRosof@WLRK.com; Barden, Larry A.; Katz, Seth H.; Heinz, Michael P.; Wiginton, Sylvia
**Subject:** Project Tower: Comments to 2-step Zell Transaction

**Attachments:** 032707 Combined Comments - Second Step.pdf; 032707 Combined Comments - First Step.pdf

In preparation for this evening's call, attached please find combined comments to the commitment papers for the 2-step Zell transaction. Please note that the commitment papers have not been reviewed by certain company parties and, as such, remain subject to further review and comment.

Do not hesitate to contact us with questions or concerns.

Best regards,
Carla A. Varner
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
Phone: 312-853-7544
Facsimile: 312-853-7036 (please include cover page)

<<032707 Combined Comments - Second Step.pdf>> <<032707 Combined Comments - First Step.pdf>>

Sidley Austin LLP mail server made the following annotations on 03/27/07, 12:49:45:
--------------------------------------------------------------------------------
IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we in that, unless expressly stated otherwise, any U.S. federal tax advice contained in th communication, including attachments, was not intended or written to be used, and ca used, by any taxpayer for the purpose of avoiding any penalties that may be imposed taxpayer by the Internal Revenue Service.  In addition, if any such tax advice is us to by other parties in promoting, marketing or recommending any partnership or other investment plan or arrangement, then (i) the advice should be construed as written i with the promotion or marketing by others of the transaction(s) or matter(s) address communication and (ii) the taxpayer should seek advice based on the taxpayer's parti circumstances from an independent tax advisor.

********************************************************************************
This e-mail is sent by a law firm and may contain information that is privileged or If you are not the intended recipient, please delete the e-mail and any attachments immediately.

**CONFIDENTIAL**                                                                    **EGI-LAW 00035862**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**CONFIDENTIAL**

**EGI-LAW 00035863**

*(handwritten: Comments 03/27/07)*

MERRILL LYNCH CAPITAL CORPORATION     CITIGROUP GLOBAL MARKETS INC.
4 World Financial Center                   388 Greenwich Street
New York, NY 10080                     New York, NY 10013

J.P. MORGAN SECURITIES INC.
JPMORGAN CHASE BANK, N.A.
270 Park Avenue
New York, NY 10017

*(handwritten: [Note: Any Zell entity obligations are covered by other agreements])*

March [ ], 2007

[Holdco]
c/o Samuel Zell
Two North Riverside Plaza
Suite 600
Chicago, Illinois 60606

Re:     **Project Tower — Second Step Commitment Letter**

Ladies and Gentlemen:

[Holdco] ("you" or "Holdco") has advised Merrill Lynch Capital Corporation ("Merrill Lynch"), Citigroup Global Markets Inc. ("CGMI") on behalf of Citigroup (as defined below), J.P. Morgan Securities ("JPMorgan") and JPMorgan Chase Bank, N.A. ("JPMCB"), that (i) Holdco is a newly formed single member limited liability company owned by Samuel Zell ("Zell") and intends to enter into (together with one or more wholly-owned subsidiaries of Holdco) an acquisition agreement (the "Acquisition Agreement") with Tribune Company ("Tribune") pursuant to which a wholly-owned subsidiary of Holdco ("Merger Sub") will be merged (the "Acquisition") with and into Tribune with Tribune continuing as the surviving corporation, (ii) concurrently with the execution and delivery of the Acquisition Agreement, Zell intends to invest in Holdco and Holdco will in turn invest in Tribune $250.0 million in cash in exchange for $[ ] of common equity (the "Initial Zell Common Equity") and $[ ] million aggregate principal amount of 5% pay-in-kind convertible subordinated notes due upon the earlier to occur of the consummation of the Acquisition and the termination of the Acquisition Agreement in accordance with its terms (the "Zell Exchange Note"), (iii) concurrently with the execution and delivery of the Acquisition Agreement, Tribune will form a new employee stock ownership plan (the "ESOP") that will be a "qualified plan" under the Internal Revenue Code of 1986, as amended (the "Code") for the benefit of employees of Tribune and its subsidiaries (the administrator of the ESOP will be a fiduciary that is qualified under the Code and otherwise reasonably acceptable to the Lead Arrangers), (iv) immediately upon consummation of the Acquisition and prior to the ESOP Equity Purchase (as defined below), Zell will own 100% of the equity of Holdco which will in turn own 100% of the equity of Tribune, (v) immediately following the consummation of the Acquisition, the ESOP will acquire from Tribune (the "ESOP Equity Purchase") approximately 90% of the common equity interests of Tribune (prior to giving effect to the issuance of

*(handwritten: Send Comment in First Step)*

*(handwritten: AR Discuss Zell-specific understandings)*

CG&R DRAFT: 3/25/07 9:40 PM                           #848485 v3 (PSJ503_.DOC)

CONFIDENTIAL                                          EGI-LAW 00035864

the Warrant (as defined below) and the establishment of a management equity plan) in exchange for a $250.0 million [ ]% amortizing note of the ESOP (the "ESOP Note"), (vi) concurrently with the consummation of the Acquisition, first, Holdco will convert the Zell Exchange Note into Tribune common stock and sell all of its Tribune common stock to Merger Sub as part of the Acquisition and second, Holdco will use the cash proceeds it receives to purchase: (a) an 11 year $[ ] million initial principal amount floating rate pay-in-kind subordinated note (the "Zell Sub Note") and (b) a 20 year warrant (the "Warrant") to purchase approximately [38]% of the common stock of Tribune (on a fully diluted basis) at an exercise price of $350.0 million plus the surrender or other forgiveness of the Zell Sub Note (such exchange, the "Holdco Exchange"), (vii) Tribune intends to enter into that certain "Project Tower - First Step Commitment Letter" dated the date hereof among Tribune, the Initial Lenders and the Lead Arrangers (the "First Step Commitment Letter" and the Transactions contemplated thereby the "First Step Transactions") and consummate the First Step Transactions prior to the consummation of the Acquisition, and (viii) the sources and uses of the funds necessary to consummate the Acquisition and the other transactions contemplated hereby are set forth on Annex I to this Commitment Letter. For purposes of this Commitment Letter, "Citigroup" means CGMI, Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as may be appropriate to consummate the transactions contemplated herein. "Borrower" refers to Merger Sub prior to consummation of the Acquisition and Tribune thereafter.

*Same Comment*

In addition, you have advised Merrill Lynch, Citigroup and JPMCB (collectively, the "Initial Lenders") that in connection with the Acquisition, Borrower will (i) borrow up to $2,125 million of new term loans described in Exhibit A hereto (the "Incremental Facility") as incremental term loans provided for under the senior secured credit facilities to be entered into by Tribune as part of the First Step Transactions (the "Senior Secured Credit Facilities" and together with the Incremental Facility, the "Bank Facilities") and (ii) either (a) borrow up to $2,100 million in senior unsecured loans from one or more lenders under the senior unsecured bridge facility described in Exhibit B hereto (the "Senior Bridge Facility" and together with the Incremental Facility, the "Second Step Facilities") or (b) issue $2,100 million in aggregate principal amount of senior unsecured notes (the "Senior Notes") in a public offering or in a Rule 144A or other private placement.

The Acquisition, the incurrence of the incremental term loans under the Incremental Facility, the execution and delivery of the Senior Bridge Facility or the issuance of the Senior Notes, the ESOP Equity Purchase, the execution and delivery of the ESOP Note, the consummation of the Holdco Exchange (including the issuance of the Warrant and the Zell Sub Note) and the other transactions contemplated hereby and thereby (other than the First Step Transactions) are referred to as the "Second Step Transactions".

You have requested that the Initial Lenders commit to provide the Second Step Facilities to finance the Acquisition and to pay certain related fees and expenses.

Accordingly, subject to the terms and conditions set forth below, the Initial Lenders hereby agree with you as follows:

1.    Commitment; Engagement. Each of the Initial Lenders hereby commits, severally and not jointly, to provide to Borrower 1/3 of each of the Second Step Facilities, in

-2-

CONFIDENTIAL                                                    EGI-LAW 00035865

each case, upon the terms and subject to the conditions set forth or referred to herein, in the confidential Fee Letter (the "Second Step Fee Letter") dated the date hereof and delivered to you, in the Incremental Facility Summary of Terms and Conditions attached hereto (and incorporated by reference herein) as Exhibit A (the "Incremental Term Sheet") and in the Bridge Facility Summary of Terms and Conditions attached hereto (and incorporated by reference herein) as Exhibit B (the "Bridge Term Sheet" and together with the Incremental Term Sheet, the "Term Sheets"). The commitments of the Initial Lenders hereunder with respect to the Incremental Facility are subject to the negotiation, execution and delivery of an incremental term loan amendments to the Credit Documents (as defined in the First Step Commitment Letter) and appropriate ancillary documentation necessary to include the Incremental Facility in the Senior Secured Credit Facilities (the "Incremental Amendments") reflecting substantially the terms and conditions set forth herein and in the Term Sheets and the Second Step Fee Letter and otherwise mutually agreed upon. The commitments of the Initial Lenders hereunder with respect to the Bridge Facility are subject to the negotiation, execution and delivery of definitive documents governing the Senior Bridge Facility (the "Bridge Documents" and together with the Incremental Amendments, the "Operative Documents") reflecting substantially the terms and conditions set forth herein and in the Term Sheets and the Second Step Fee Letter and otherwise mutually agreed upon. Notwithstanding anything in this Commitment Letter, the Term Sheets, the Second Step Fee Letter, the Operative Documents or any other letter agreement or other undertaking concerning the financing of the Second Step Transactions to the contrary, (i) the only representations relating to Tribune, its subsidiaries and their businesses the making of which shall be a condition to availability of the Second Step Facilities on the Second Step Closing Date shall be (A) such of the representations made by Tribune in the Acquisition Agreement as are material to the interests of the Lenders, but only to the extent that you have the right to terminate your obligations under the Acquisition Agreement as a result of a breach of such representations in the Acquisition Agreement and (B) the representations and warranties of Tribune set forth in the Credit Agreement and the Operative Documents relating to corporate status, power and authority, due authorization, execution and delivery and enforceability of the Operative Documents, Federal Reserve margin regulations and the Investment Company Act (the representations in clauses (A) and (B) together the "Specified Representations") and (ii) the terms of the Operative Documentation shall be in a form such that they do not impair availability of the Second Step Facilities on the Second Step Closing Date if the conditions set forth herein and in the Term Sheets are satisfied.

*[handwritten margin note: Please confirm scope of representation]*

2.    Syndication. The Initial Lenders reserve the right and intend, prior to or after the execution of the Operative Documents, to syndicate all or a portion of their respective commitments with respect to the Second Step Facilities to one or more financial institutions (together with the Initial Lenders, the "Lenders"). Upon the issuance by any additional Lender of its commitment with respect to any of the Second Step Facilities, the Initial Lenders' commitments with respect to such Second Step Facilities shall be reduced in the aggregate by an equal amount (and on a pro rata basis as among the Initial Lenders). The commitments of the Initial Lenders hereunder are several and not joint, and are subject to Merrill Lynch, Citigroup (or one or more of their affiliates) and JPMorgan acting as joint lead arrangers and bookrunners (the "Lead Arrangers") of, and Merrill Lynch, an affiliate of CGMI or JPMCB acting as sole and exclusive administrative agent (the "Administrative Agent") for, the Senior Bridge Facility. The Lead Arrangers (or one or more of their respective affiliates) will manage all aspects of the syndication in consultation with you, including decisions as to the selection of potential Lenders to be approached and when they will be approached, when their commitments will be accepted,

*[handwritten margin note: See comment on First Step]*

*[handwritten note: acceptable to you]*

-3-

#848485 v3 (PSJ503_.DOC)

CONFIDENTIAL

EGI-LAW 00035866

*in consultation with you*

*and the Initial Lenders*

which Lenders will participate and the final allocations of the commitments among the Lenders (which are likely not to be pro rata across facilities among Lenders). The Lead Arrangers will exclusively perform all functions and exercise all authority as customarily performed and exercised in such capacities, including selecting one law firm as counsel for the Lead Arrangers and negotiating the Operative Documents. Any agent or arranger titles (including co-agents) awarded to other Lenders with respect to the Facilities are subject to the prior approval of Borrower and the Lead Arrangers (such approval not to be unreasonably withheld or delayed) and shall not entail any role with respect to the matters referred to in this paragraph without the prior consent of the Lead Arrangers (such consent not to be unreasonably withheld or delayed). You agree that, without the consent of the Initial Lenders, Borrower shall not pay to any Lender any compensation outside the terms contained herein and in the Second Step Fee Letter in order to obtain its commitment to participate in any of the Second Step Facilities.

You understand that the Lead Arrangers intend to commence the syndication of the Second Step Facilities promptly, and you agree actively to assist them, and to use commercially reasonable efforts to cause Tribune to assist them, in achieving a timely syndication that is mutually satisfactory to the Lead Arrangers and Borrower. The syndication efforts will be accomplished by a variety of means, including direct contact during the syndication between senior management, advisors and affiliates of Borrower and Tribune on the one hand and the proposed Lenders on the other hand, and Borrower and Tribune hosting, with the Lead Arrangers, at least one meeting with prospective Lenders at such times and places as the Lead Arrangers may reasonably request. You agree, upon the reasonable request of the Lead Arrangers, to use commercially reasonable efforts to (a) provide, and cause Tribune, your subsidiaries and advisors to provide to the Lead Arrangers all information relating to you, Tribune and its subsidiaries reasonably deemed necessary by them, as and when such information becomes available, to successfully complete the primary syndication of the Second Step Facilities, including the Information and Projections (including updated projections) contemplated hereby, (b) assist, and cause Tribune, your subsidiaries and advisors to assist, the Lead Arrangers in the preparation of a Confidential Information Memorandum to be completed not later than 20 business days prior to the Second Step Closing Date (as defined in Exhibit A) and other reasonably necessary marketing materials (the contents of which, except to the extent relating to either Lead Arranger or its affiliates, you shall be solely responsible for) to be used in connection with the primary syndication of the Second Step Facilities and (c) obtain, at your expense, corporate family ratings and a monitored public rating of each of the Second Step Facilities from each of Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's, a division of the McGraw Hill Companies ("S&P") (which in the case of the Bank Facilities, may be a re-assignment of an existing rating). You also agree to use your commercially reasonable efforts to ensure that the syndication efforts of the Lead Arrangers benefit materially from Tribune's and your (and your subsidiaries') existing lending relationships. You further agree to afford the Lead Arrangers and their affiliates a period of not less than 20 business days prior to the Second Step Closing Date to syndicate the Second Step Facilities.

Without limiting your obligation to assist with the syndication efforts as set forth above, it is understood and agreed that completion of such syndication is not a condition to the Initial Lenders' commitments hereunder.

-4-

CG&R DRAFT: 3/25/07 9:40 PM

#848485 v3 (PSJ503_.DOC)

CONFIDENTIAL

EGI-LAW 00035867

3.    Fees.  As consideration for the commitments of the Initial Lenders hereunder and the agreement of the Lead Arrangers to arrange, manage, structure and syndicate the Second Step Facilities, you agree to pay to them when due the fees as set forth in the Second Step Fee Letter.

4.    Conditions.  The Initial Lenders' commitments hereunder are subject to the conditions set forth elsewhere herein and in Annex II to this Commitment Letter and your ~~compliance with your agreements in this Commitment Letter and Second Step Fee Letter in all material respects.~~  The Initial Lenders' commitments hereunder are also subject to:

(a)    the preparation, execution and delivery of mutually satisfactory definitive documentation with respect to the Second Step Facilities (including Incremental Amendments and a bridge credit agreement and related guarantees) incorporating the terms outlined in this Commitment Letter and in the Term Sheets ~~and otherwise reasonably satisfactory to the Initial Lenders and Borrower~~;

(b)    the Initial Lenders and their respective affiliates shall be satisfied that, after the date hereof and until the ~~syndication of the Second Step Facilities has been completed (as determined by them)~~, none of Tribune, Holdco, any of their respective subsidiaries or the ESOP shall have offered, placed, arranged or issued, or engaged in discussions concerning the offering, placement, arrangement or issuance of, any debt facility or debt security (including any renewal or refinancing of and increase of commitments under existing facilities or securities) prior to or during the primary syndication of the Second Step Facilities, without the prior written consent of the Lead Arrangers, other than the Second Step Facilities, any Senior Notes offered, issued or sold in connection with the First Step Transactions; and

(c)    [any event or condition has occurred or become known that in the judgment of the Initial Lenders has had or could reasonably be expected to have a material adverse effect on the business, operations or financial condition of Tribune and its subsidiaries taken as a whole (after giving effect to the Transactions) since December 31, 2006][1] (a "Material Adverse Change").

5.    Information and Investigations.  You hereby represent and warrant that to your knowledge (a) all information and data (excluding the Projections and information of a general economic or industry-specific nature) that have been or will be made available by you, Tribune or any of your or Tribune's representatives or advisors to the Initial Lenders, the Lead Arrangers or any Lender (whether prior to or on or after the date hereof) in connection with the Second Step Transactions, taken as a whole (the "Information"), is and will be complete and correct in all material respects and does not and will not, taken as a whole, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the

---

[1]    Expected to be conformed to the Business MAC in the Acquisition Agreement, subject to Lead Arranger's review.

-5-

CONFIDENTIAL                                                                                  EGI-LAW 00035868

*until the flex termination Date*

statements contained therein not materially misleading in light of the circumstances under which such statements are made, and (b) all financial projections concerning Tribune and its subsidiaries and the transactions contemplated hereby (the "Projections") that have been made or will be prepared by or on behalf of you, Tribune, or any of your or Tribune's representatives or advisors and that have been or will be made available to the Initial Lenders, the Lead Arrangers or any Lender in connection with the transactions contemplated hereby have been or in the case of projections made after the date hereof, will be, prepared in good faith based upon assumptions that you reasonably believe to have been reasonable at the time made (it being understood that any such projections are subject to significant uncertainties and contingencies, many of which are beyond your control, and that no assurance can be given that such projections will be realized and that actual results may differ from such projections and such differences may be material). You agree to use commercially reasonable efforts to supplement the Information and the Projections from time to time until the Second Step Closing Date and, if requested by the Lead Arrangers, for a reasonable period thereafter ~~necessary to complete the syndication of the Second Step Facilities~~ so that the representation and warranty in the preceding sentence remains correct in all material respects. In syndicating the Second Step Facilities the Lead Arrangers will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent check or verification thereof.

You hereby acknowledge that (a) the Lead Arrangers will make available Information and Projections to the proposed syndicate of Lenders on a confidential basis through posting on IntraLinks or another similar electronic system and (b) certain of the proposed Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to Holdco, Tribune, your and its respective affiliates or any securities thereof ("Material Non-Public Information")) (each, a "Public Lender"). You hereby agree that (a) you will, and will use commercially reasonable efforts to cause Tribune to, identify that portion of the Information and Projections that may be distributed to the Public Lenders and include a reasonably detailed term sheet in such Information and that all of the foregoing that is to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC"; (b) by marking materials "PUBLIC," you shall be deemed to have authorized the Lead Arrangers and the proposed Lenders to treat such materials as not containing any Material Non-Public Information, it being understood that certain of such materials may be subject to the confidentiality requirements of the definitive credit documentation; (c) all materials marked "PUBLIC" are permitted to be made available by electronic means designated for "Public Lenders;" and (d) the Lead Arrangers shall be entitled to treat any materials that are not marked "PUBLIC" as being suitable only for posting by confidential electronic means not designated for "Public Lenders." You also acknowledge that Public Lenders employed by one or more of the Lead Arrangers or their respective affiliates, consisting of publishing debt analysts, may participate in any meetings or telephone conference calls held pursuant to Section 2 hereof; *provided* that such analysts shall not publish any information obtained from such meetings or calls until the syndication of the Second Step Facilities has been completed upon the making of allocations by the Lead Arrangers and the Lead Arrangers freeing the Second Step Facilities to trade.

6.    Indemnification.  You agree to indemnify and hold harmless each Initial Lender, each Lead Arranger, each other Lender and their respective affiliates, and each such person's respective officers, directors, employees, agents and controlling persons (each Initial Lender, each Lead Arranger and each such other person being an "Indemnified Party") from and

-6-

CONFIDENTIAL

EGI-LAW 00035869

*The foregoing restrictions shall cease to apply with respect to this Commitment Letter, the Term Sheets and the contents through once this Commitment Letter has been accepted by you.*

foregoing) incurred in connection with the negotiation, preparation, execution and delivery, waiver or modification, collection and enforcement of this Commitment Letter, the Term Sheets, the Second Step Fee Letter and the Operative Documents and whether or not such fees and expenses are incurred before or after the date hereof or any loan documentation is entered into or the Second Step Transactions are consummated or any extensions of credit are made under the Facilities or this Commitment Letter is terminated or expires, *provided* that such payment or reimbursement obligation with respect to legal counsel shall include only the reasonable fees and expenses of Cahill Gordon & Reindel LLP.

      8.    <u>Confidentiality</u>. This Commitment Letter, the Term Sheets, the contents of any of the foregoing and the Initial Lenders' and/or their affiliates' activities pursuant hereto or thereto are confidential and shall not be disclosed by or on behalf of you or any of your subsidiaries to any person without the prior written consent of the Initial Lenders, except that you may (i) disclose this Commitment Letter, the Second Step Fee Letter and the Term Sheets to your and Tribune's respective officers, directors, employees and advisors, and then only in connection with the Second Step Transactions and on a confidential need-to-know basis, (ii) file a copy of any portion of this Commitment Letter (but not the Second Step Fee Letter) and the Term Sheets in any public record in which it is required by law to be filed and (iii) make any other disclosure as you are required to make by applicable law or compulsory legal process (based on the advice of legal counsel); <u>provided</u>, <u>however</u>, that in the event of any such compulsory legal process you agree, to the extent permitted by applicable law, to give the Lead Arrangers prompt notice thereof and to cooperate, at the Lead Arrangers' expense, with the Initial Lenders in securing a protective order in the event of compulsory disclosure. You agree that you will use commercially reasonable efforts to permit the Initial Lenders to review and approve any reference to any of the Initial Lenders or any of their affiliates in connection with the Second Step Facilities or the transactions contemplated hereby contained in any press release or similar public disclosure prior to public release. Subject to the terms of the next succeeding paragraph, you agree that the Initial Lenders and their affiliates may share information concerning Tribune, you and its and your respective subsidiaries and affiliates among themselves solely in connection with the performance of their services hereunder and the evaluation and consummation of financings and Transactions contemplated hereby. You also acknowledge that the Initial Lenders or their affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to parties whose interests may conflict with yours or Tribune's. The Initial Lenders agree that they will not furnish confidential information obtained from you or Tribune to any of their other customers and that they will treat confidential information relating to you and your affiliates with the same degree of care as they treat their own confidential information. The Initial Lenders further advise you that they and their affiliates will not make available to you confidential information that they have obtained or may obtain from any other customer.

      Each Lead Arranger agrees to maintain the confidentiality of the Confidential Information (as defined below), except that Confidential Information may be disclosed (a) to its and its affiliates' partners, directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and agree to keep such Confidential Information confidential), (b) to the extent requested or required by any state, Federal or foreign authority or examiner regulating such Lead Arranger, (c) to the extent re-

-8-

CG&R DRAFT: 3/25/07 9:40 PM                          #848485 v3 (PSJ503_.DOC)

CONFIDENTIAL                                     EGI-LAW 00035870

quired by applicable law, rule or regulation or by any subpoena or similar legal process, (d) in connection with any litigation or legal proceeding relating to this Commitment Letter or the Second Step Fee Letter or any other documentation in connection therewith or the enforcement of rights hereunder or thereunder or to which such Lead Arranger or any of its affiliates may be a party, (e) to any prospective Lender (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and agree to keep such Confidential Information confidential), (f) with the consent of you or Tribune, as applicable, (g) to any rating agency when required by such rating agency or (h) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this paragraph or (ii) becomes available to such Lead Arranger on a nonconfidential basis from a source other than Tribune, you or any of its or your subsidiaries, officers, directors, employees or advisors. For the purposes of this paragraph, "Confidential Information" means all information received from Tribune, you or any of its or your subsidiaries, officers, directors, employees or advisors relating to you, Tribune or its businesses, other than any such information that is available to the Lead Arrangers on a nonconfidential basis prior to disclosure by you or Tribune. Any person required to maintain the confidentiality of Confidential Information as provided in this paragraph shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such Confidential Information as such person would accord to its own confidential information.

9.    Termination. The Initial Lenders' commitments hereunder shall terminate in their entirety on the earliest to occur of (A) ~~March~~ 31, ~~2008~~ *May* *August 31,* if the Operative Documents are not executed and delivered by Borrower and the Lenders on or prior to such date, (B) the date of execution and delivery of the Operative Documents by Borrower and the Lenders, (C) if earlier than (B), the date of termination of the Acquisition Agreement, (D) ~~June 29,~~ 2007 if the Credit Agreement has not been executed and delivered by Tribune and the lenders thereunder on or prior to such date, and (E) if the Initial Lenders determine, in their reasonable judgment, that a Material Adverse Change shall have occurred. Notwithstanding the foregoing, the provisions of Sections 6, 7, 8, 10 and 11 hereof shall survive any termination pursuant to this Section 9 (it being understood that the reimbursement and indemnification provisions contained herein shall be superseded by the reimbursement and indemnifications provisions contained in the Credit Agreement or the Bridge Documentation when the applicable Operative Documents become effective). *[Note: should be the date the Initial loans are funded]*

10.    Assignment; No Fiduciary; Etc. This Commitment Letter and the commitments of the Initial Lenders hereunder shall not be assignable by any party hereto (other than by the Initial Lenders to their respective affiliates) without the prior written consent of the other parties hereto, and any attempted assignment shall be void and of no effect; provided, however, that nothing contained in this Section 10 shall prohibit the Initial Lenders (in their sole discretion) from (i) performing any of their duties hereunder through any of their affiliates, and you will owe any related duties (including those set forth in Section 2 above) to any such affiliate, and (ii) granting (in consultation with you) participations in, or selling (in consultation with you) assignments of all or a portion of, the commitments or the loans under the Second Step Facilities pursuant to arrangements satisfactory to the Initial Lenders. This Commitment Letter is solely for the benefit of the parties hereto and does not confer any benefits upon, or create any rights in favor of, any other person.

*Insert Rider 9-A*

*Insert Rider 9-B*

-9-

#848485 v3 (PSJ503_.DOC)

CONFIDENTIAL

EGI-LAW 00035871

**Annex II**

**Project Tower**
**Summary of Additional Conditions Precedent**

Except as otherwise set forth below, the initial borrowing under each of the Second Step Facilities shall be subject to the contemporaneous or prior satisfaction of the following additional conditions precedent:

1. The Lenders shall have received *on or before* ~~audited~~ consolidated balance sheets of Tribune for the most recent fiscal year ended 75 days before the Second Step Closing Date and related statements of income, stockholders' equity and cash flows of Tribune and unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of Tribune for each fiscal quarter ended after the date of the audited financial statements provided above and ended 50 days before the Second Step Closing Date. ~~The Lenders shall have received copies of Tribune's internal management reports prepared in the ordinary course of business consistent with past practices for each fiscal month after the most recent fiscal quarter (including year-end) for which financial statements were received by the Lenders as described in the immediately preceding sentence and ended 60 days before the Second Step Closing Date.~~

2. The Lenders shall have received a pro forma consolidated balance sheet of Tribune as of the fiscal quarter (including the fourth quarter) most recently ended prior to the Second Step Closing Date, after giving effect to the Second Step Transactions ~~which balance sheet shall not be materially inconsistent with the forecasts previously provided to the Lenders, except for changes occurring in the ordinary course of business~~. The Lead Arrangers shall have received reasonably detailed pro forma consolidated financial projections prepared by or on behalf of Borrower for Tribune and its consolidated entities for the five-fiscal year period after the Second Step Closing Date ~~that are not different in a materially adverse manner as compared with those made available to the Lead Arrangers prior to the date hereof~~.

3. All accrued fees and expenses (including the reasonable fees and expenses of counsel to the Lead Arrangers) of the Lead Arrangers in connection with the Operative Documents shall have been paid; provided that such fees and expenses shall have been invoiced at least two business days prior to the Second Step Closing Date.

~~4. The Lead Arrangers shall be satisfied with Tribune's capitalization on a pro forma basis for the Second Step Transactions.~~

5. As a condition to the Incremental Facility, the Lenders thereunder shall have a valid lien on and security interest in the collateral referred to in Exhibit A under "Collateral" that is equivalent to the lien in favor of the other Lenders under the Tranche B Facility.

6. As a condition to the Senior Bridge Facility, the Lead Arrangers shall have received, not later than 20 business days prior to the Second Step Closing Date and at the Second Step Closing Date, a complete printed preliminary prospectus or preliminary offering memoran-

CONFIDENTIAL                    EGI-LAW 00035872

38   dum or preliminary private placement memorandum suitable for use in a customary "high-yield
39   road show" relating to the Senior Notes, which will include (unless and to the extent that you and
40   the Lead Arrangers otherwise agree) all financial statements and other data to be included therein
41   (including all audited financial statements, all unaudited financial statements (which shall have
42   been reviewed by the independent accountants for Tribune as provided in Statement on Auditing
43   Standards No. 100) and all appropriate pro forma financial statements prepared in accordance
44   with, or reconciled to, U.S. GAAP and prepared in accordance with Regulation S-X under the
45   Securities Act), and all other data (including selected financial data) that the Securities and Ex-
46   change Commission would require in a registered offering of the Senior Notes or that would be
47   necessary the Lead Arrangers to receive customary "comfort" (including "negative assur-
48   ance" comfort) from independent accountants in connection with the offering of the Senior
49   Notes.  Upon delivery of such prospectus, offering memorandum or private placement memo-
50   randum you will, and will use commercially reasonable efforts to cause Tribune's senior man-
51   agement personnel to participate in, a customary road show for the sale of the Senior Notes.

52        7.    Other customary closing conditions, including delivery of reasonably sat-
53   isfactory legal opinions of Borrower's counsel; other financial information to be agreed; absence
54   of prepayment events under other material debt instruments; no creation of liens on Collateral (as
55   defined in Exhibit A) under other debt instruments or other agreements and no creation of mate-
56   rial liens on assets not constituting Collateral, in each case as a result of the transactions contem-
57   plated hereby; evidence of authority; and compliance with applicable laws and regulations (in-
58   cluding but not limited to ERISA, margin regulations and environmental laws) except for viola-
59   tions that, individually or in the aggregate, could not reasonably be expected to result in a mate-
60   rial adverse effect.

61        8.    The Acquisition shall have been consummated in accordance with the
62   terms and conditions of the Acquisition Agreement in substantially the form provided to the
63   Lead Arrangers prior to the date hereof marked [      ] and no provision thereof shall have been
64   waived, amended, supplemented or otherwise modified in a manner material and adverse to the
65   Lenders without the consent of the Lead Arrangers.  In connection with the execution and deliv-
66   ery of the Acquisition Agreement, Tribune's board of directors shall have taken all necessary
67   action to cause Tribune to make an election to be treated as an S Corporation under the Code,
68   subject to consummation of the Acquisition (the "S Corp. Election") and no subsequent action
69   shall have been taken to revoke such due authorization.

70        9.    Each of the First Step Transactions shall have been consummated in a
71   manner reasonably acceptable to the Lead Arrangers and the Credit Agreement (as defined in the
72   First Step Commitment Letter) shall have been executed and delivered (without any amendment
73   or waiver of any of the conditions thereto that are adverse to the Lenders), shall be in full force
74   and effect and there shall not have been any amendments, modifications or waivers thereto sub-

    Please confirm that the Acquisition Agreement will have the $60 million 401K matching give-up
    as a condition.

-2-

CG&R DRAFT: 3/25/07 9:40 PM                                    #848485 v3 (PSJ503_.DOC)

CONFIDENTIAL                                                    EGI-LAW 00035873

75  sequent to the execution and delivery thereof that are adverse to the Lenders under the Incre-
76  mental Facility in any material respect.

77         10.    As a condition to the Incremental Facility, ~~each condition thereto in the~~
78  ~~Credit Agreement shall be satisfied and~~ no default or event of default shall result from the mak-
79  ing of term loans thereunder ~~(in each case without giving effect to any amendment, modification~~
80  ~~or waiver of the Credit Agreement)~~.

*[handwritten: No reps/warranties oth... the... in term Rev.]*

81         11.    Zell and Holdco shall have entered into one or more equity commitment
82  agreements or subscription agreements whereby Zell (either directly or through Holdco) will
83  agree to invest $~~100.0~~ million on March ~~15, each year (beginning in 2008)~~ in common equity of
84  Tribune if Tribune has not made the S Corp Election on or prior to such date ~~until such time as~~
85  ~~the S Corp Election is validly made or there shall have occurred any change in the tax laws ap-~~
86  ~~plicable to Tribune or any interpretation thereof that decreases the benefits to Tribune of the S~~
87  ~~Corp Election~~; such agreements to ~~be in form and substance reasonably satisfactory to the Lead~~
88  ~~Arrangers and~~ granting third-party enforcement rights in favor of the Administrative Agent on
89  behalf of the applicable lenders (the "Zell Investment Agreements").

90         12.    The ratio of total outstanding indebtedness of Tribune that is guaranteed
91  by any of its subsidiaries and outstanding indebtedness of any of the Guarantors (on a consoli-
92  dated basis) to trailing four quarter EBITDA (as defined in Annex II to this Exhibit A) shall not
93  exceed 9.00:1.00 when measured on a pro forma basis as of the last day of the fiscal quarter end-
94  ing immediately prior to the date of the Acquisition (giving effect to the Second Step Transac-
95  tions and other customary and appropriate pro forma adjustment events, including any acquisi-
96  tions or dispositions after the beginning of the relevant determination period but prior to or si-
97  multaneous with the consummation of the Acquisition).

*[handwritten note: Note: Discuss... ability to satisfy this obligation in other ways (e.g. sale of assets)... settlement]*

98         13.    ~~The Lead Arrangers shall be reasonably satisfied that subsequent to the~~
99  ~~consummation of the First Step Transactions, there shall not have been any changes to the terms~~
100  ~~and conditions of the documentation regarding the establishment of the ESOP (including the~~
101  ~~provisions of the ESOP relating to redemptions and distributions)~~ that are material and adverse to
102  Lenders. The Lead Arrangers shall be reasonably satisfied that subsequent to the consummation
103  of the First Step Transactions, the ESOP shall not have entered into any transactions constituting
104  a "prohibited transaction" as defined in the Code.

105         14.    The Holdco Exchange, the ESOP Equity Purchase and the issuance of the
106  ESOP Note shall be consummated substantially concurrent with the consummation of the Acqui-
107  sition

CG&R DRAFT: 3/26/07 9:40 PM                                    #848485 v3 (PSJ503_.DOC)

CONFIDENTIAL                                           EGI-LAW 00035874

CONFIDENTIAL                                                    EXHIBIT A

**INCREMENTAL CREDIT FACILITY**

**SUMMARY OF TERMS AND CONDITIONS**[1]

| | |
|---|---|
| Borrower: | Merger Sub immediately prior to the consummation of the Acquisition, and thereafter, Tribune Company, a Delaware corporation ("Borrower"). |
| Joint Lead Arrangers: | Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, an affiliate of Citigroup Global Markets Inc. and J.P. Morgan Securities Inc. (the "Lead Arrangers"). |
| Lenders: | Merrill Lynch Capital Corporation (or one of its affiliates), an affiliate of Citigroup Global Markets Inc., JPMCB and a syndicate of financial institutions (the "Incremental Lenders") arranged by the Lead Arrangers in consultation with Borrower. |
| Incremental Facility: | A $2,130.0 million incremental term loan facility that will be issued under the Credit Agreement |
| Transactions: | As described in the Commitment Letter. |
| Availability/Purpose: | Incremental term loans will be available to finance the Acquisition and related transactions on the date of the consummation of the Acquisition in one draw (the "Second Step Closing Date"). |
| Documentation: | The Incremental Facility will be the "Incremental Facility" provided for under the Credit Agreement and will be incorporated into and governed by the Credit Documents (as defined in the First Step Commitment Letter). As a result, except as expressly provided herein or as the context otherwise requires, all terms, conditions and provisions of the Credit Documents that apply to the Tranche B Facility (as defined in the First Step Commitment Letter) will apply to the Incremental Facility (including, without limitation, default interest, mandatory prepayments/reduction in commitments, voluntary prepayments/reduction in commitments, representations and warranties, affirmative covenants, negative covenants, financial covenants, events of default, yield protection and increased costs, assignments and participations, required |

---

[1]  Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the attached Commitment Letter (the "Commitment Letter").

CONFIDENTIAL                                          EGI-LAW 00035875

| | | |
|---|---|---|
| 35 | | lenders, expenses and indemnification, governing law and |
| 36 | | waiver of jury trial). |
| 37 | Guarantors: | Identical to the Tranche B Facility.  Each guarantor of any of the |
| 38 | | Bank Facilities is herein referred to as a "Guarantor" and its |
| 39 | | guarantee is referred to herein as a "Guarantee"; Borrower and |
| 40 | | the Guarantors are herein referred to as the "Credit Parties".  The |
| 41 | | Guarantors will unconditionally guarantee, on a joint and several |
| 42 | | and senior basis, all obligations of Borrower under the Incre- |
| 43 | | mental Facility. |

*(handwritten: May 31)*

| | | |
|---|---|---|
| 44 | Collateral: | Identical to the Tranche B Facility. |
| 45 | Termination of Commitments: | The commitments in respect of the Incremental Facility (includ- |
| 46 | | ing pursuant to the Commitment Letter) will terminate in their |
| 47 | | entirety on ~~March 31~~, 2008 if the initial funding under the In- |
| 48 | | cremental Facility does not occur on or prior to such date. |
| 49 | Final Maturity: | Identical to the Tranche B Facility. |
| 50 | Amortization Schedule: | Identical to the Tranche B Facility |
| 51 | Interest Rates and Fees: | Borrower will be entitled to make borrowings based on the ABR |
| 52 | | plus the Applicable Margin or LIBOR plus the Applicable Mar- |
| 53 | | gin.  The "Applicable Margin" for the Incremental Facility shall |
| 54 | | be (A) 2.50% per annum for LIBOR Loans and (B) 1.50% per |
| 55 | | annum for ABR Loans. |
| 56 | Conditions to Effectiveness | The effectiveness of the Incremental Facility and the making of |
| 57 | and to Loans on Second Step | incremental term loans thereunder shall be subject to the |
| 58 | Closing Date: | conditions precedent to the Incremental Facility set forth in the |
| 59 | | Credit Agreement and: |

1. The absence of any Material Adverse Change and the
   absence of any event that has had or could reasonably be
   expected to have a material adverse effect on (a) the
   rights and remedies of the Incremental Lenders under
   any Credit Document or (b) the ability of Borrower to
   perform its obligations under any Credit Document.

2. Certification as to the solvency of Tribune and its sub-
   sidiaries, taken as a whole, from the chief financial offi-
   cer of Tribune.[2]

*(handwritten margin note: Tribune will deliver CFO cert relying upon the 3rd party solvency opinion - subject to discussions with opinion provider)*

---

[2]    If there will be a solvency opinion, is it possible to have the Lenders as co-addressees?

A-1-2

#848486 v3 (PSJ603_.DOC)

CONFIDENTIAL

EGI-LAW 00035876

CONFIDENTIAL                                                                    **EXHIBIT B**

<u>**SENIOR UNSECURED BRIDGE FACILITY**</u>

**SUMMARY OF TERMS AND CONDITIONS**[3]

All capitalized terms used herein but not defined herein shall have the meanings provided in the Commitment Letter relating to this Summary of Principal Terms and Conditions.

| | |
|---|---|
| Borrower: | Merger Sub immediately prior to the consummation of the Acquisition, and thereafter, Tribune Company, a Delaware corporation ("<u>Borrower</u>"). |
| Joint Lead Arrangers: | Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, an affiliate of Citigroup Global Markets Inc. and JPMorgan (the "<u>Lead Arrangers</u>"). |
| Administrative Agent: | Merrill Lynch Capital Corporation, an affiliate of Citigroup Global Markets Inc. or JPMCB (in such capacity, the "<u>Administrative Agent</u>"). |
| Bridge Lenders: | Merrill Lynch Capital Corporation (or one of its affiliates), an affiliate of Citigroup Global Markets Inc., JPMCB (together, the "<u>Initial Bridge Lenders</u>"), and a syndicate of financial institutions (the "<u>Bridge Lenders</u>") arranged by the Lead Arrangers in consultation with you. |
| Initial Senior Unsecured Loans: | The Bridge Lenders will make loans (the "<u>Initial Senior Loans</u>") to Borrower on the Second Step Closing Date in an aggregate principal amount not to exceed $2,100.0 million. |
| Purpose and Availability of Initial Senior Loans: | The proceeds of the Initial Senior Loans and the Incremental Facility will be used solely as set forth in the Sources and Uses of Funds. The Bridge Lenders will make the Initial Senior Loans simultaneously with (a) the consummation of the Acquisition and (b) the funding under the Incremental Facility. Amounts borrowed under the Senior Unsecured Facility and repaid or prepaid may not be reborrowed. |

---

[3]   Capitalized terms used herein and not defined shall have the meanings assigned to such terms in the attached Commitment Letter.

B-1

**CONFIDENTIAL**                                                                    **EGI-LAW 00035877**

| | |
|---|---|
| Initial Maturity Date and Exchange of the Initial Senior Loans: | The Initial Senior Loans will mature on the first anniversary (the "Initial Maturity Date") of the Second Step Closing Date; provided, however, that subject to "Conditions to Extension" below, the maturity of the Initial Senior Loans will be automatically extended on the Initial Maturity Date until the eighth anniversary of the Second Step Closing Date (the "Extended Maturity Date" and, such extended maturity loans, the "Extended Senior Term Loans"). At any time on or after the Initial Maturity Date at the option of the applicable holder, Extended Senior Term Loans may be exchanged in whole or in part for senior unsecured exchange notes (the "Senior Exchange Securities") having an equal principal amount; provided that Borrower shall not be obligated to issue Senior Exchange Securities until it has received requests therefor in respect of Initial Senior Loans or Extended Senior Term Loans having an aggregate principal amount of at least $50.0 million (an "Exchange Request"). The Extended Senior Term Loans will be governed by the provisions of the Bridge Documents and will have the same material terms as the Initial Senior Loans except as set forth in this exhibit. When issued, the Senior Exchange Securities will be governed by an indenture to be entered into between Borrower and a trustee that is reasonably acceptable to Borrower and the Lead Arrangers, that shall have the same material terms as the Initial Senior Loans except as set forth in this exhibit. |
| Conditions to Extension: | Extension of the maturity of the Initial Senior Loans is subject to neither Borrower nor any significant subsidiary thereof that is a guarantor of the Initial Senior Loans being subject to a bankruptcy or other insolvency proceedings. |
| Availability of the Senior Exchange Securities: | The Senior Exchange Securities will be available only in exchange for the Initial Senior Loans and Extended Senior Term Loans. The principal amount of any Senior Exchange Security will equal 100% of the aggregate principal amount (including any accrued interest not required to be paid in cash) of the Initial Senior Loan for which it is exchanged. Borrower will issue Senior Exchange Securities under an indenture which complies with the Trust Indenture Act of 1939, as amended. |
| Guarantee: | The obligations of Borrower in respect of the Initial Senior Loans and the Senior Exchange Securities will be unconditionally and irrevocably guaranteed on a senior subordinated basis (the "Subordinated Guarantees") by all of Borrower's |

B-2

CONFIDENTIAL

EGI-LAW 00035878

*(handwritten annotation: Subsidiary Guarantors)*   *(handwritten annotation: (each, a "Subsidiary Guarantor"))*

subsidiaries that guarantee the Bank Facilities for so long as such subsidiaries guarantee the Bank Facilities. A Subordinated Guarantee shall be automatically released at the time any subsidiary's guarantee of the Bank Facilities is released thereunder in accordance with its terms. The Subordinated Guarantees are intended to eliminate structural subordination of the ~~Senior Bridge Facility and, accordingly~~, will apply to all ~~direct and indirect subsidiaries~~ of Borrower.

| | |
|---|---|
| Collateral: | None. |
| Final Maturity Date: | The Final Maturity Date of the Senior Exchange Securities and the Extended Senior Term Loans will be the eighth anniversary of the Second Step Closing Date. |
| Interest Rates and Fees: | As set forth on Annex I hereto and in the Fee Letter and Engagement Letter. |
| Ranking: | The Initial Senior Loans, the Extended Senior Term Loans and the Senior Exchange Securities shall be pari passu for all purposes. |

Borrower's obligations under the Bank Facilities, the Initial Senior Loans, the Extended Senior Term Loans and the Senior Exchange Securities shall constitute senior debt. With respect to the Bank Facilities, the Subsidiary Guarantors' Subordinated Guarantees shall constitute senior subordinated debt pursuant to subordination provisions customary for high-yield securities. Any future senior debt of a Subsidiary Guarantor will be senior to its Subordinated Guarantee. Any future subordinated debt of a Subsidiary Guarantor will be either pari passu with or junior to such Subsidiary Guarantor's Subordinated Guarantee.

| | |
|---|---|
| Mandatory Redemption: | Borrower will be required to prepay Initial Senior Loans and Extended Senior Term Loans and redeem the Senior Exchange Securities (or in the case of Fixed Rate Senior Exchange Securities (as defined below), offer to purchase such Fixed Rate Senior Exchange Securities) on a pro rata basis subject, in certain circumstances, to the non-call provisions of any Fixed Rate Exchange Security, at par plus accrued and unpaid interest (without penalty or premium) or, in the case of Fixed Rate Senior Exchange Securities, at par plus accrued and unpaid interest plus any applicable premiums), from the net cash proceeds (after deduction of, among other things, mandatory repayments and permitted reinvestments under the Bank Facilities) from the incurrence of certain debt (to be agreed) by Borrower or any of its subsidiaries or |

B-3

CONFIDENTIAL                                                                    EGI-LAW 00035879

Exchange Securities will be callable prior to such 4th anniversary at a redemption price equal to par plus accrued interest plus a make whole premium calculated on the basis of a discount rate equal to the then Treasury Rate plus one-half of one percent (0.50%).

**Representations and Warranties:** The documentation governing the Initial Senior Loans will have representations and warranties that are ~~used for facilities and transactions of this type and~~ substantially similar to (but no more restrictive than) those provided in the Credit Agreement.

**Conditions Precedent to Initial Senior Loans:** ~~Usual and customary for facilities and transactions of this type, including those~~ specified in the Summary of Additional Conditions Precedent as described in Annex II to the Commitment Letter (and subject to the limitations set forth in the Commitment Letter).

**Affirmative Covenants:** ~~In the case of the Initial Senior Loans, usual and customary for facilities and transactions of this type (to be applicable to Borrower and its restricted subsidiaries), including the following and such other covenants as may be mutually agreed upon and subject, in each case, to exceptions that are no more restrictive than~~ those provided in the Credit Agreement.

*affirmative covenants ~~that are~~ substantially similar to*

1. Preservation of corporate existence; conduct of business.

2. Material compliance with laws (including ERISA and applicable environmental laws).

3. Payment of taxes.

4. Payment or performance of obligations.

5. Delivery of independently audited annual consolidated financial statements and unaudited quarterly (including fourth quarter) consolidated financial statements.

6. Notice of reports to shareholders, notices of defaults, litigation and any Material Adverse Change, and other information customarily supplied in facilities similar to the Senior Bridge Facility.

B-5

CONFIDENTIAL

EGI-LAW 00035880

7. Maintenance of books and records; annual meetings, visitation and inspection rights and access to books and records.

8. Maintenance of properties and insurance.

9. Use of proceeds.

10. Commercially reasonable efforts to obtain and maintain S Corporation treatment under the Code.

In the case of the Senior Exchange Securities, usual and customary for facilities and transactions of this type (to be applicable to Borrower and its restricted subsidiaries), including the following and such other covenants as may be mutually agreed upon, and subject, in each case, to customary exceptions to be agreed and in no event more restrictive than similar provisions in the Credit Agreement:

1. Performance of obligations.

2. Delivery of reports filed with the Securities and Exchange Commission.

3. Delivery of compliance certificates.

4. Commercially reasonable efforts to obtain and maintain S Corporation treatment under the Code.

Following the Initial Maturity Date, all outstanding Senior Extended Term Loans will be automatically modified to bear affirmative covenants substantially similar to the affirmative covenants of the Senior Exchange Securities.

Negative Covenants:

*[handwritten: negative covenants that are substantially similar to]*

In the case of the Initial Senior Loans, usual and customary for facilities and transactions of this type (to be applicable to Borrower and its restrictive subsidiaries), including the following and such other covenants as may be mutually agreed upon, and subject in each case to exceptions that are no more restrictive than those in the Credit Agreement taken as a whole, including exceptions necessary to permit the Second-Step Transactions:

1. Limitations on liens.

2. Limitations on debt.

3. Limitation on dividends, redemptions and repur-

B-6

CONFIDENTIAL

EGI-LAW 00035881

chases with respect to capital stock.

4. Limitations on other prepayments, redemptions and repurchases of other debt.

5. Limitations on loans and investments (other than permitted acquisitions).

6. Limitations on mergers and disposition of all or substantially all assets.

7. Limitations on transactions with affiliates.

8. Limitations on changes in business conducted.

9. Limitations on amendment of debt, ESOP structure, PHONES and other material agreements (including without limitation, any Zell Investment Agreements (as defined in the First Step Commitment Letter) and the agreements relating to the ESOP) in a manner adverse to Lenders in any material respect.

10. Limitations on the issuance and sale of capital stock of restricted subsidiaries.

11. Limitations on dividend and other payment restrictions affecting material subsidiaries.

12. Limitation on activities of Tribune Finance LLC.

In the case of the Senior Exchange Securities, incurrence based and usual and customary for facilities and transactions of this type (to be applicable to Borrower and its restricted subsidiaries), including the following and such other covenants as may be mutually agreed upon, and subject in each case to exceptions no event more restrictive than those provided in the Credit Agreement (taken as a whole):

1. Limitations on debt.

2. Limitations on liens.

3. Limitations on mergers, consolidations, asset dispositions and sale/leaseback transactions.

4. Limitations on the issuance and sale of capital stock of restricted subsidiaries.

B-7

CG&R DRAFT: 3/25/07 2:47 PM

#848486 v3 (PSJ603_.DOC)

CONFIDENTIAL

EGI-LAW 00035882

5. Limitations on restrictions on distributions from subsidiaries.

6. Limitations on transactions with affiliates.

7. Limitations on restricted payments.

8. Limitations on amendment of ESOP structure, PHONES and other material agreements (including, without limitation, any Zell Investment Agreements (as defined in the First Step Commitment Letter) and the agreements relating to the ESOP) in a manner adverse to holders in any material respect

9. Limitation on activities of Tribune Finance LLC.

Following the Initial Maturity Date, all outstanding Senior Extended Term Loans will be automatically modified to bear negative covenants substantially similar to the negative covenants of the Senior Exchange Securities.

**Events of Default:**

In the case of the Initial Senior Loans, usual and customary for facilities and transactions of this type (to be applicable to Borrower and its subsidiaries), including the following and such other covenants as may be mutually agreed upon, and subject, in each case, to exceptions that are no more restrictive than those provided in the Credit Agreement (taken as a whole):

*[handwritten: events of default that are substantially similar to]*

1. Failure to pay, when due, any principal with respect to the Senior Initial Loans.

2. Failure to pay interest, fees or other amounts after a period of five business days.

3. Any representation or warranty made or deemed made/shall prove to have been incorrect in any material respect when made or deemed made.

4. Breach or violation by any Credit Party of covenants or other provisions of the Senior Bridge Facility documentation (with notice and cure periods as applicable).

5. Cross-default and cross-acceleration to debt aggregating $75,000,000 or more.

6. Judgments or decrees in excess of $75,000,000 individually or in the aggregate against Borrower or any

B-8

CG&R DRAFT: 3/25/07 2:47 PM                     #848486 v3 (PSJ603_.DOC)

CONFIDENTIAL

EGI-LAW 00035883

subsidiary that are not stayed, discharged, paid (including by insurance) or bonded within 60 days.

7. Bankruptcy or insolvency events with respect to Borrower or any material subsidiary.

8. Standard ERISA defaults.

9. Actual or Credit Party asserted invalidity of any Guarantee or any other Operative Document.

In the case of the Senior Exchange Securities, usual and customary for facilities and transactions of this type and others to be reasonably specified by the Agent, including the following and such other events default as may be mutually agreed upon, and subject, in each case, to exceptions that are no more restrictive than those provided in the Credit Agreement (taken as a whole):

1. Failure to pay, when due, an principal with respect to the Senior Exchange Securities.

2. Failure to pay interest, fees or other amounts after a period of five business days.

3. Any representation or warranty made or deemed made shall prove to have been incorrect in any material respect when made or deemed made

4. Breach or violation by any Credit Party of covenants or other provisions of the Senior Exchange Securities (or the related indenture) (with notice and cure periods as applicable).

5. Cross-acceleration to debt aggregating $75,000,000 or more.

6. Judgments or decrees in excess of $75,000,000 individually or in the aggregate against Borrower or any subsidiary that are not stayed, discharged, paid (including by insurance) or bonded within 60 days.

7. Bankruptcy or insolvency events with respect to Borrower or any material subsidiary.

8. Actual or Credit Party asserted invalidity of any Guarantee or any other Operative Document.

B-9

CONFIDENTIAL

EGI-LAW 00035884

Following the Initial Maturity Date, all outstanding Senior Extended Term Loans will be automatically modified to bear events of default substantially similar to the events of default of the Senior Exchange Securities.

Registration Rights with
Respect to Senior Exchange Securities:    Borrower will use its commercially reasonable efforts to cause to become effective as soon as practicable after receipt of any first Exchange Request (such date the "Trigger Date"), a shelf registration statement with respect to the Senior Exchange Securities (a "Shelf Registration Statement") and/or a registration statement (an "Exchange Offer Registration Statement") whereby Borrower has offered registered notes having terms identical to the Senior Exchange Securities (the "Substitute Notes") in exchange for all outstanding Senior Exchange Securities (a "Registered Exchange Offer"). If a Shelf Registration Statement is filed, Borrower will use its commercially reasonable efforts to keep such registration statement effective and available (subject to customary exceptions) until it is no longer needed to permit unrestricted resales of Senior Exchange Securities (but in no event longer than two years from the Trigger Date).

*Consider deleting registration rights.*

If within 255 days from the Trigger Date,

(a)    a Shelf Registration Statement for the Exchange Securities has not been declared effective, or

(b)    Borrower has not effected the Registered Exchange Offer, or

(c)    the holders of Senior Exchange Securities have not received Substitute Notes through the Registered Exchange Offer which, in the opinion of counsel, would be freely saleable by such holders without registration or requirement for delivery of a current prospectus under the Securities Act (other than a prospectus delivery requirement imposed on a broker-dealer who is exchanging Senior Exchange Securities acquired for its own account as a result of market making or other trading activities) and Borrower has not made available a Shelf Registration Statement with respect to such Senior Exchange Securities (each such event referred to in clauses (a) through (c), a "Registration Default"),

then Borrower will pay liquidated damages to each holder of Senior Exchange Securities from and including the date on

B-10

CG&R DRAFT: 3/25/07 2:47 PM

#848486 v3 (PSJ603_.DOC)

CONFIDENTIAL

EGI-LAW 00035885

81    ANNEX I
82    to Exhibit B

83                                                Senior Unsecured Facility
84                                                  Interest Rates and Fees

Initial Senior Loans:                    Before the Initial Maturity Date, the Initial Senior Loans
                                         will accrue interest at a rate per annum equal to, at Bor-
                                         rower's election, either (i) 3 month reserve-adjusted LIBOR
                                         plus a spread (the "LIBOR Spread," as defined below), or
                                         (ii) the ABR (as defined below) plus a spread (the "ABR
                                         Spread," as defined below).

                                         The "LIBOR Spread" will initially be 450 basis points. If
                                         Borrower chooses to pay interest at the rate specified in
                                         clause (i), and the Initial Senior Loans are not repaid in
                                         whole within the three-month period following the Second
                                         Step Closing Date, the LIBOR Spread will increase by 50
                                         basis points at the end of such three-month period and shall
                                         increase by an additional 50 basis points at the end of each
                                         three month period thereafter until, but excluding, the Initial
                                         Maturity Date.

                                         The "ABR Spread" will initially be 350 basis points. If Bor-
                                         rower chooses to pay interest at the rate specified in clause
                                         (ii), and the Initial Senior Loans are not repaid in whole
                                         within the three-month period following the Second Step
                                         Closing Date, the ABR Spread will increase by 50 basis
                                         points at the end of such three-month period and shall in-
                                         crease by an additional 50 basis points at the end of each
                                         three-month period thereafter until, but excluding, the Initial
                                         Maturity Date.

                                         "ABR" means the highest of (i) Citibank, N.A.'s base rate,
                                         (ii) the certificate of deposit rate plus 1/2 of 1%, and (iii) the
                                         Federal Funds Effective Rate plus 1/2 of 1%.

                                         Notwithstanding the foregoing, the interest rate in effect at
                                         any time before the Initial Maturity Date shall not exceed
                                         the Senior Unsecured Bridge Cap.  In no event shall the in-
                                         terest rate on the Initial Senior Loans exceed the highest rate
                                         permitted under applicable law.

                                         Calculation of interest shall be on the basis of actual days
                                         elapsed in a year of 360 days (or 365 or 366 days, as the
                                         case may be, in the case of ABR loans, except where ABR
                                         is determined pursuant to clause (iii) of the definition
                                         thereof).

                                                        B-1-1

CONFIDENTIAL                                            EGI-LAW 00035886

1                                                        *HIGHLY CONFIDENTIAL*

MERRILL LYNCH CAPITAL CORPORATION        CITIGROUP GLOBAL MARKETS INC.
4 World Financial Center                         388 Greenwich Street
New York, NY 10080                              New York, NY 10013

J.P. MORGAN SECURITIES INC.
JPMORGAN CHASE BANK, N.A.
270 Park Avenue
New York, NY 10017

2
3                                                        March [ ], 2007

4    [Holdco]
5    c/o Samuel Zell
6    Two North Riverside Plaza
7    Suite 600
8    Chicago, Illinois 60606

9                        Re:  Project Tower – Second Step Fee Letter

10    Ladies and Gentlemen:

11            Reference is made to the Project Tower - Second Step Commitment Letter dated the date
12    hereof between Merrill Lynch Capital Corporation ("Merrill Lynch"), Citigroup Global Markets Inc.
13    ("CGMI") on behalf of Citigroup, J.P. Morgan Securities Inc. ("JPMorgan"), JPMorgan Chase Bank,
14    N.A. ("JPMCB") and you (the "Second Step Commitment Letter"). Capitalized terms used but not de-
15    fined in this letter agreement (and references to "you") have the meanings assigned thereto in the Second
16    Step Commitment Letter (including attachments thereto).

17            1.    Facilities Fees. As consideration for the Initial Lenders' agreements under the
18    Second Step Commitment Letter in respect of the Second Step Facilities and their services in structuring
19    and arranging the Second Step Facilities, you agree to pay or cause to be paid the following fees to the
20    Initial Lenders (or the Administrative Agent in the case of the Agency Fees):

21    Underwriting Fees:                    (A)  Incremental Facility.

22                                          An underwriting fee (the "Underwriting Fee") in an amount
23                                          equal to 1.75% of the aggregate amount of the commitments
24                                          pursuant to the Second Step Commitment Letter in respect of
25                                          the Incremental Facility, 1/3 of which will be allocated to
26                                          each Initial Lender, which fee shall be earned and due and
27                                          payable on the Second Step Closing Date.

CG&R DRAFT: 3/25/07 3:39 PM                              #848487 v3 (PSJ703_.DOC)

CONFIDENTIAL                                        EGI-LAW 00035887



119 stantially on the terms and conditions disclosed by you to the Initial Lenders or on other terms and condi-
120 tions that are as favorable, taken as a whole, as such terms and conditions.

121         3.     Market Flex.   Notwithstanding anything to the contrary in this letter agreement,
122 the Second Step Commitment Letter or Term Sheets, we shall have the right in our commercially reason-
123 able judgment (with the consent of each of the Lead Arrangers but without the consent of, but in consulta-
124 tion with, you) prior to the Flex Termination Date to change the following terms of the Incremental Facil-
125 ity or the Senior Bridge Facility if in our commercially reasonable judgment such change is necessary to
126 achieve a successful syndication of the Incremental Facility or the Senior Bridge Facility, as the case may
127 be:

*(Insert Rider 4-A)*

128         (a)     the interest rate margins applicable to the Incremental Facility; *provided* that if
129 the corporate credit ratings for Tribune are B2 (no negative outlook) or better by Moody's and B
130 (no negative outlook) or better by S&P, then such interest rate margins may not be increased by
131 more than 50 basis points from the highest applicable interest margins set forth in the Incremental
132 Facility Term Sheet; *provided, further* that any increase in the interest margins permitted by the
133 foregoing may, at the option of the Lead Arrangers, (i) take the form of original issue discount
134 with original issue discount being equated to such interest margins in a manner determined by the
135 Lead Arrangers and consistent with generally accepted financial practice based on an assumed
136 four-year life to maturity or (ii) be accomplished by a combination of an increase in interest rates
137 and such original issue discount

138         (b)     reallocate up to $1,400 million of the Incremental Facility to the Senior Bridge
139 Facility or Senior Notes; and

*(Insert Rider 4-B)*

140         (c)     provide that any Senior Notes are secured on a second lien basis (with such inter-
141 creditor terms as may be customary for similar issuances of second lien notes at the time issued)
142 with any or all of the collateral securing the Senior Secured Credit Facilities.

143     The Initial Lenders' rights under this paragraph will survive the execution of the Incremental
144 Amendments and Bridge Documents and any related borrowings and continue in effect until the earlier
145 date (the "Flex Termination Date") of (a) the date each Initial Lender's aggregate exposure under the In-
146 cremental Facility shall be $0 and (b) 45 days following the Second Step Closing Date. In the event that
147 the Incremental Amendments and Bridge Documents are executed and delivered prior to the Flex Termi-
148 nation Date, so long as (i) such amendments are not otherwise inconsistent with applicable law and
149 (ii) Borrower shall have received reasonable notice of such amendments and a reasonable opportunity to
150 review and comment thereon, you agree to execute and deliver all amendments and waivers to the Opera-
151 tive Documents to give effect to the foregoing. The provisions of this paragraph shall survive the Second
152 Step Closing Date and are an express condition to our commitment under the Second Step Commitment
153 Letter.

*To be discussed*

154         4.     Securities Offering.   Reference is made to Section 2 of the Engagement Letter
155 pursuant to which the Lead Arrangers (or one or more of their affiliates) have been engaged to act as un-
156 derwriters, bookrunners, placement agents and/or initial purchasers in connection with one or more secu-
157 rities offerings, the proceeds of which will be used to refinance the Senior Bridge Facility. You agree
158 that, upon written notice by the Lead Arrangers (a "Debt Securities Notice"), at any time and from time to
159 time from and after the 90th day after the date of Second Step Closing Date and prior to the first anniver-
160 sary date thereof, Borrower will issue and sell such aggregate principal amount of senior debt securities
161 (with senior subordinated guarantees from all subsidiaries that guarantee the Bank Facilities) (the "Securi-
162 ties") as will generate gross proceeds sufficient to replace (in whole or in part as determined by the Lead
163 Arrangers in their reasonable discretion applied consistently with other similarly situated clients of the

*unsecured*

-4-

CG&R DRAFT: 3/25/07 3:39 PM                            #848487 v3 (PSJ703_.DOC)

*FN - Discuss cap on flex in all ratings scenarios*

EGI-LAW 00035888

164 Lead Arrangers ("commercially reasonable discretion")) the commitments in respect of, or refinance (in
165 whole or in part as determined by the Lead Arrangers in their commercially reasonable), the Senior
166 Bridge Facility, in each case upon such terms and conditions as may be specified by the Lead Arrangers
167 in the Debt Securities Notice; *provided, however,* that (i) the Lead Arrangers, in their commercially rea-
168 sonable discretion after consultation with you, shall determine whether such securities will be issued
169 through a registered public offering or a private placement for resale pursuant to Rule 144A; (ii) such se-
170 curities will not mature any earlier than six months after the final maturity of the Tranche B Facility and
171 will contain such terms, including registration rights (in the event of a private placement or Rule 144A
172 offering), covenants, events of default, subordination provisions, floating or fixed interest rate, yield and
173 redemption prices and dates and conditions as are customary for similar financings as determined, in con-
174 sultation with Borrower, by the Lead Arrangers in their commercially reasonable discretion; *provided,*
175 *however,* that, without Borrower's consent, the weighted average yield *per annum* payable on such securi-
176 ties, together with any Senior Bridge Loans that will remain outstanding after the application of the net
177 proceeds of such issuance, shall not exceed 11.5% (the "Senior Unsecured Bridge Cap") and (iii) all other
178 arrangements with respect to such securities shall be reasonably satisfactory in all respects to the Lead
179 Arrangers in light of then prevailing market conditions and the financial condition of Borrower and its
180 subsidiaries (taken as a whole) at the date of sale. The Lead Arrangers' rights under this paragraph will
181 survive the execution of the Operative Documents and the funding of the Senior Bridge Facility.

182             5.      Confidentiality. The parties hereto hereby agree that this letter agreement is sub-
183 ject to the confidentiality provisions in the Second Step Commitment Letter.

184             6.      Miscellaneous. It is understood and agreed that this letter agreement shall not
185 constitute or give rise to any obligation to provide any financing; such an obligation will arise only under
186 the Second Step Commitment Letter if accepted in accordance with its terms. This letter agreement may
187 not be amended or any provision hereof waived or modified except by an instrument in writing signed by
188 each of the parties hereto. This letter agreement shall be governed by, and construed in accordance with,
189 the laws of the State of New York. This letter agreement may be executed in any number of counterparts,
190 each of which shall be an original and all of which, when taken together, shall constitute one agreement.
191 Delivery of an executed counterpart of a signature page of this letter agreement by facsimile transmission
192 shall be effective as delivery of a manually executed counterpart of this letter agreement.

-5-

CONFIDENTIAL

EGI-LAW 00035889

*Highly Confidential*

MERRILL LYNCH, PIERCE, FENNER &             CITIGROUP GLOBAL MARKETS INC.
SMITH INCORPORATED                                       388 Greenwich Street
4 World Financial Center                                      New York, NY  10013
New York, NY  10080

J.P. MORGAN SECURITIES INC.
270 Park Avenue
New York, NY  10017

March [  ], 2007

[Holdco]
c/o Samuel Zell
Two North Riverside Plaza
Suite 600
Chicago, Illinois  60606

Re: <u>Project Tower — Second Step Engagement Letter</u>

Ladies and Gentlemen:

[Holdco] ("<u>you</u>") has advised Merrill Lynch, Pierce, Fenner & Smith Incorporated ("<u>MLPF&S</u>"), Citi-
group Global Markets Inc. ("<u>Citigroup</u>") and J.P. Morgan Securities Inc. ("<u>JPMorgan</u>" and, together
with MLPF&S and Citigroup, the "<u>Underwriters</u>") that you desire to establish the Second Step Facili-
ties, the proceeds of which would be used to finance the Second Step Transactions described in the
commitment letter with respect to the Second Step Facilities (the "<u>Second Step Commitment Letter</u>")
of even date herewith relating to such facilities between you and Merrill Lynch Capital Corporation,
Citigroup, JPMorgan and JPMorgan Chase Bank, N.A.. Capitalized terms used in this Engagement
Letter but not defined herein shall have the meanings given to them in the Second Step Commitment
Letter. For purposes of this Engagement Letter, "Citigroup," "we" or "us" shall mean Citigroup
Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of
their affiliates as Citigroup shall determine to be appropriate to provide the services contemplated
herein.

Accordingly, the parties hereto agree as follows:

1.    **Engagement of the Underwriters.** You hereby engage Citigroup, MLPF&S and JPMorgan
to provide to you such capital markets and other financial advisory services in connection with the
Second Step Transactions, including the financing and refinancing thereof, as you may reasonably re-
quest, and you shall engage Underwriters to be the joint bookrunning managers and the exclusive lead
underwriters of, or exclusive lead placement agents for, or exclusive lead initial purchasers of, any

CG&R DRAFT: 3/25/07 12:37 PM                                    #848489 v3 (PSJ903_.DOC)

-4-

*[handwritten annotation: or (z) the termination of the Second Step Commitment Letter, pursuant to Section 9 hereof.]*

114  You acknowledge that each of the Underwriters is a securities firm that is engaged in securities trading
115  and brokerage activities, as well as providing investment banking and financial advisory services.  In
116  the ordinary course of trading and brokerage activities, each of the Underwriters and their respective
117  affiliates thereof may at any time hold long or short positions, and may trade or otherwise effect trans-
118  actions, for their own account or the accounts of customers, in debt or equity securities of entities that
119  may be involved in the transactions contemplated hereby.  Each of the Underwriters recognizes its re-
120  sponsibility for compliance with federal securities laws in connection with such activities.

121  You acknowledge that each of the Underwriters will be acting pursuant to a contractual relationship on
122  an arm's length basis and in no event do the parties intend that each of the Underwriters act or be re-
123  sponsible as a fiduciary to you, your management, stockholders, creditors or any other person.  You
124  and the Underwriters each hereby expressly disclaim any fiduciary relationship and agree that they are
125  each responsible for making their own independent judgments with respect to any transactions entered
126  into between them.

127  3.    **Termination.** This Engagement Letter may be terminated by the Underwriters at any time
128  upon not less than 10 days' prior written notice to you.  This Engagement Letter may be terminated by
129  you upon not less than 10 days prior written notice to the Underwriters after the earliest to occur of (x)
130  the issuance of the aggregate principal amount of Notes required (together with the Incremental Facil-
131  ity) to complete the Acquisition prior to, on or after the Second Step Closing Date for which the Un-
132  derwriters have acted in the capacities and been paid the fees set forth in this Engagement Letter, (y)
133  ~~March~~ 31, 2008 or (z) the date on which all outstanding Initial Senior Loans are repaid in full.  Upon
134  any termination of this Engagement Letter, the obligations of the parties hereunder shall terminate,
135  except for their obligations under paragraphs 4, 5(b), 7 and 8 below, which in each case shall survive
136  in accordance with its terms. *[handwritten: May]*

137  4.    **Indemnification.**  You shall indemnify and hold harmless the Underwriters and the other In-
138  demnified Persons referred to therein to the extent set forth in <u>Annex I</u> hereto to the extent set forth
139  therein, which annex is incorporated by reference herein and constitutes a part hereof; *provided* that to
140  the extent any underwriting agreement, placement agency agreement, purchase agreement shall be
141  executed by any Underwriter in connection with an Offering, then any claim by such Underwriter as
142  an Indemnified Person for indemnity shall be made pursuant to the indemnity provisions of that docu-
143  ment.

144  5.    **Fees and Expenses.** (a) <u>Underwriting Fee</u>.  In any Offering that is consummated before ter-
145  mination of this Engagement Letter and in which the Underwriters act as lead underwriters, lead
146  placement agents or lead initial purchasers, you shall pay (or cause to be paid) aggregate underwriters'
147  or initial purchasers' discounts, or placement agency fees, as applicable, equal to 2.00% of the gross
148  proceeds of such Offering (the "<u>Underwriting Fee</u>"), 1/3 of which will be allocated to each Under-
149  writer, payable at the closing of such Offering.  If prior to the termination of our engagement here-
150  under any Offering is consummated other than with each of the Underwriters acting in the capacities
151  specified in Section 1 of this Engagement Letter (other than any Offering in which any such Under-
152  writer has declined in writing to participate), then upon consummation thereof you shall pay (or cause
153  to be paid) to the Underwriters a fee of 2.00% of the aggregate principal amount of Notes offered
154  thereby, 1/3 of which will be allocated to each Underwriter.  You acknowledge that additional fees

**CONFIDENTIAL**                                                                      **EGI-LAW 00035891**

*Conform to comments on First Step*

ANNEX I
to the Engagement Letter

All capitalized terms used herein but not defined herein shall have the meanings provided in the Engagement Letter to which this Annex I is attached (the "Engagement Letter").

In connection with the Underwriters' engagement to render financial advisory and investment banking services to you in connection with the transactions proposed by the Engagement Letter, you or the relevant issuers (the "Indemnifying Party") will indemnify and hold harmless each of the Underwriters, their respective affiliates, and their respective directors, officers, agents, advisors, controlling persons or employees (hereinafter collectively, the "Indemnified Persons"), to the full extent lawful, from and against, and the Indemnified Persons shall have no liability to the Indemnifying Parties, their respective affiliates, officers, directors, employees, advisors, controlling persons, agents (collectively, the "Representatives"), creditors or security holders for, any damages, losses, expenses, claims or proceedings including shareholder actions (collectively, "losses") (i) related to or arising out of (A) oral or written information provided by an Indemnifying Party, which an Indemnifying Party or any Indemnified Person provides to any actual or potential buyers, sellers, investors or offerees, or (B) other action or failure to act by an Indemnifying Party or any Representative, or by any Indemnified Person at the request or with the consent of an Indemnified Person or any Representative, or (ii) otherwise related to or arising out of such engagement or any transaction or conduct in connection therewith (including, without limitation, in connection with any action, suit or proceeding), except that this clause (ii) shall not apply with respect to any losses finally judicially determined by a court of competent jurisdiction to have resulted from such Indemnified Person's bad faith, gross negligence or willful misconduct.

If the foregoing indemnity is unavailable to the Indemnified Person for any reason (other than as provided in the immediately preceding paragraph), the Indemnifying Party will contribute to any claims, damages, liabilities or expenses related to or arising out of such engagement or any transaction or conduct in connection therewith. For such losses referred to in clause (i) of the immediately preceding paragraph, the Indemnifying Party and the Underwriters shall contribute in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Indemnified Persons and by the Indemnifying Party from the actual or proposed transaction giving rise to such engagement; provided that the Indemnified Persons' aggregate contribution to the amount paid or payable under this paragraph shall not exceed the aggregate amount of the fees actually received by the respective Underwriters under the Engagement Letter. For any other losses, or for losses referred to in clause (i) of the first paragraph hereof if the allocation provided by the immediately preceding sentence is unavailable for any reason, the Indemnifying Party and the Underwriters shall contribute in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of each of them in connection with the statements, omissions or other conduct which resulted in such losses, as well as any other relevant equitable considerations; provided the Indemnified Persons' aggregate contribution to the amount paid or payable under this paragraph shall not exceed the aggregate amount of the fees actually received by such Underwriter under the Engagement Letter. Benefits received (or anticipated to be received) by the Indemnifying Party and its affiliates shall be deemed to be equal to the aggregate cash consideration and value of securities or any other property payable, exchangeable, issuable or transferable in such transaction or proposed transaction, and benefits received by any Indemnified Person (or anticipated to be received) shall be deemed to be equal to the compensation payable by you to such Indemnified Person in connection with such engagement. Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct relates to information provided by an Indemnifying Party or other conduct by an Indemnifying Party (or any Representative) or by an Indemnified Person at the

A-1

EGI-LAW 00035892