Before the
**Federal Communications Commission**
Washington, D.C. 20554

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| ) | MB Docket No. 07-119 |
| Shareholders of Tribune Company, ) | |
| Transferors ) | |
| ) | |
| and ) | |
| ) | |
| Sam Zell, *et al.* ) | |
| Transferees ) | |
| ) | |
| For Consent to the Transfer of Control of ) | |
| The Tribune Company ) | |
| ) | |
| and ) | |
| ) | |
| Applications for the Renewal of License of ) | File Nos. BRCT-20060811ASH, *et al.* |
| KTLA(TV), Los Angeles, California, *et al.* ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

Adopted: November 30, 2007                          Released: November 30, 2007

By the Commission: Commissioners Tate and McDowell issuing separate statements; Commissioners Copps and Adelstein dissenting and issuing separate statements.

## I. INTRODUCTION

1.      The Commission has before it for consideration the applications to transfer control of the Tribune Company and its licensee subsidiaries[1] from the existing shareholders to Sam Zell, The Tribune Employee Stock Ownership Plan ("ESOP Plan") as implemented through the Tribune Employee Stock Ownership Trust ("Tribune Trust"), and EGI-TRB, LLC ("EGI-TRB").[2]  A joint petition to deny was filed by the United Church of Christ and the Media Alliance ("UCC/MA").  Comments were filed by the International Brotherhood of the Teamsters (Teamsters), Gannett Company, Inc. ("Gannett"), the Media Institute, and the Newspaper Association of America.  Oppositions were filed by Tribune and by the proposed Transferees, to which UCC/MA and the Teamsters filed a reply.  In connection with the applications, the applicants have requested: (1) temporary waivers of the newspaper/broadcast cross-ownership ("NBCO") rule[3] in five markets[4] pending the outcome of our current rulemaking on the issue;[5]

---

[1] A list of the licenses to be transferred is attached as Exhibit 1.

[2] Zell, the ESOP Plan, the Tribune Trust and EGI-TRB will be collectively referred to as the Transferees.

[3] 47 C.F.R. § 73.3555(d)(3).  The NBCO rule prohibits common ownership of a television station and a daily newspaper if the Grade A contour of the station encompasses the entire community in which the newspaper is published.

Highly Confidential - Attorneys' Eyes Only

(2) a failing station waiver[6] to permit common ownership of WTIC-TV, Hartford, Connecticut, and WTXX(TV), Waterbury, Connecticut; and (3) a continuing satellite waiver[7] permitting common ownership of WTTV(TV), Bloomington, Indiana and WTTK(TV), Kokomo, Indiana. For the reasons stated below, we deny the petition and grant the applications, the failing station waiver and the continuing satellite waiver. Furthermore, we deny the requested waivers of the NBCO rule in each market except Chicago, where we grant a permanent waiver, and require the applicants to come into compliance with that rule as described below. [8]

2.       In addition to the transfer applications, we also have before us for consideration petitions to deny and informal objections to the applications for renewal of the licenses of WPIX(TV), New York, New York; WTIC-TV, Hartford, Connecticut; WTXX(TV), Waterbury, Connecticut; and KTLA(TV), Los Angeles, California. In each of those renewals, Tribune has asked for a permanent waiver of the NBCO rule or, in the alternative, a waiver of that rule pending the outcome of the *Media Ownership Proceeding*. Various parties have filed petitions to deny and informal objections in those renewal proceedings. Because the only issues raised by the petitioners and informal objectors remaining in those renewal proceedings are related to the requested waivers of the NBCO rule, we are consolidating our consideration of that issue in those proceedings and the instant transfer of control applications in the interest of administrative efficiency. For the reasons discussed below, we deny the petitions and informal objections, deny the requested waivers, and require the applicants to come into compliance with the NBCO rule as described below, in accordance with our ruling on the transfer applications.

3.       In the event, however, that the Commission adopts a revised NBCO rule before January 1, 2008, the applicants will receive a two-year waiver of the NBCO rule for the New York, Los Angeles, Miami, and Hartford markets. In addition, should the applicants challenge today's denial of the requested waivers in court, we grant a waiver of the NBCO rule for the New York, Los Angeles, Miami and Hartford markets that will last either for two years or until six months after the conclusion of the litigation, whichever is longer, provided that the applicants do not abandon such litigation before a court decision is reached.

---

(Continued from previous page) ————————————————————————————————
[4] A list of the stations for which NBCO waivers have been requested and the relevant newspapers is attached as Exhibit 2.

[5] See *2006 Quadrennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996; 2002 Biennial Regulatory Review— Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996; Cross-Ownership of Broadcast Stations and Newspapers; Rules and Policies Concerning Multiple Ownership of Radio Broadcast Stations in Local Markets; Definition of Radio Markets, Further Notice of Proposed Rulemaking*, 21 FCC Rcd 8834 (2006) ("*Media Ownership Proceeding*").

[6] See 47 C.F.R. § 73.3555, n, 7.

[7] See 47 C.F.R. § 73.3555, n. 5.

[8] On November 11, 2007, UCC/MA filed an Emergency Motion to Suspend Processing of Applications. Tribune and the Transferees filed a Joint Opposition. In its motion, UCC/MA sought to have the applicants file more detailed *ex parte* statements in regard to certain meetings and sought an additional week to respond to those filings. The *ex parte* statements at issue conform with the requirements of our rules and are typical of the statements filed in permit-but-disclose proceedings. In addition, UCC/MA has had considerable time since the filing of its motion to make its own *ex parte* contacts. In light of our action here today, UCC/MA's motion is dismissed as moot.

Highly Confidential - Attorneys' Eyes Only                                                    JPM_00338354

## II. DISCUSSION

### A. STANDING

4.      In their oppositions to the petitions to deny in both the transfer proceeding and the renewal proceedings, the applicants raise objections to the standing of some of the petitioners to deny. We will consider the applicants' objections in each proceeding in turn.

5.      Under the Communications Act of 1934, as amended (the "Act"), only a "party in interest" has standing to file a petition to deny.[9] The petition to deny must contain specific allegations of fact demonstrating that the petitioner is a party in interest and that a grant of the application would be inconsistent with the public interest, convenience, and necessity.[10] The allegations of fact, except for those of which official notice may be taken, shall be supported by an affidavit of a person with personal knowledge of the facts alleged.[11] Among the facts to be alleged is that the petitioner is a resident of the station's service area and a regular viewer of the station.[12] A petitioner in a transfer proceeding also must allege and prove that: (1) it has suffered or will suffer an injury-in-fact; (2) there is a causal link between the proposed assignment and the injury-in-fact; and (3) that not granting the assignment would remedy the injury-in-fact.[13]

6.      In the transfer proceeding, the Transferees argue that UCC and the Media Alliance have failed to meet the requirements for standing.  They argue that the petitioners have failed to supply the declarations required under the rules.  The Transferees state that the Media Alliance has not submitted an affidavit or declaration from a resident of the service area of any Tribune station and that UCC has not submitted an affidavit or declaration from a member claiming to be a viewer or listener in the service area of any Tribune station in markets other than Miami or New York City.[14] In reply, UCC/MA states that UCC does have members in each of the markets with a newspaper/broadcasting combination, although it presents no additional declarations of affidavits to support this assertion.  UCC/MA then claims that standing to challenge the transfer of even one of the affected stations is standing to challenge the entire transaction.

---

[9] 47 U.S.C. § 309(d); 47 C.F.R. § 73.3584.

[10] 47 U.S.C. § 309(d).

[11] *Id.*

[12] *See Rainbow/PUSH Coalition*, 330 F.3d 1235 (D.C. Cir. 2005).

[13] *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992); *MCI Communications Corp., Memorandum Opinion and Order*, 12 FCC Rcd 7790 (1997), *Timothy K. Brady*, 20 FCC Rcd 11987, *Letter from Chief, Audio Division, Media Bureau* (MB., Aud. Div. 2005).

[14] The Transferees also argue that "it is highly questionable" whether either party has alleged any injury that would be redressed by denying the applications.  Tribune contends that, if the Commission were to deny the applications, the existing newspaper/broadcast combinations would continue pending action on its license renewal applications and/or conclusion of the Commission's media ownership rulemaking.  Therefore, according to the Transferees, the loss of diversity that UCC/MA contends would result from grant of the transfer applications and the requested waivers would not actually occur.  Tribune's argument is speculative and would depend, in part, on whether it attempted to file another transfer application were the instant ones denied.  Furthermore, if Tribune's position were correct, it would effectively prevent any party from filing a petition to deny against a requested waiver of the ownership rules when non-compliant combinations are transferred to a new owner.

    JPM_00338355

7.      The requirement of an affidavit or declaration by a resident of the station's service area who is a regular viewer of the station with personal knowledge of the facts alleged in order to establish standing is unambiguous. Media Alliance has offered no such affidavit and, therefore, has not demonstrated that it has standing. UCC has only offered affidavits from viewers in the New York City and Miami markets. Contrary to UCC/MA's claims, we do not find that standing to file a petition to deny against one application that forms part of a multi-station transaction automatically confers standing to oppose every single application that is part of the transaction, especially when the opposition is based on market-specific waivers, as is the case here. Therefore, UCC has not demonstrated that it has standing to file a petition to deny against any of the transfer applications other than those for WSFL(TV), Miami, Florida and WPIX(TV), New York, New York.

8.      In light of the serious policy issues raised by UCC/MA, to the extent that they have not demonstrated standing to file petitions to deny against some or all of the applications, we will consider their pleadings as informal objections.[15] Informal objections do not require the submission of an affidavit or a declaration in order to be considered.[16]

9.      In the oppositions to the petitions to deny the renewal applications for WPIX(TV), WTXX(TV), and WTIC-TV, Tribune argues that the petitioner, UCC, lacks standing because it fails to aver any particularized harms that would result to it from grant of the applications and the requests that accompany it. We disagree. The cross-ownership rules were adopted to promote diversity of ownership and, thereby, viewpoints, for the benefit of the public. Accordingly, a member of the public who meets the requirements of being a resident of the viewing area and a regular viewer of the station has standing to present an argument that he or she would be harmed if the cross-ownership rules were waived. Various arguments have also been raised by the Transferors with regard to the other petitioners against the renewal applications. We find that the serious policy issues underlying petitioners' concerns similarly warrant consideration of their pleadings.

## B. THE TRANSFER OF CONTROL TRANSACTION

10.      **Background.** In the applications, the parties state that the ESOP Plan has been established to provide employees with an equity interest in the company by investing primarily in Tribune company stock.[17] They go on to state that the ESOP Plan has an effective date of January 1, 2007, and is intended to be a qualified employee benefit plan under Section 401(a) of the Internal Revenue Code and an employee stock ownership plan within the meaning of Section 4975(e)(7) of that code.[18] The stated purpose of the ESOP Plan is to invest in Tribune stock and to hold that stock for the benefit of the Tribune employees participating in the plan.

11.      According to the applications, the ESOP Plan is made up of: (1) the plan document, which is included in the application; (2) the plan committee, which determines the eligibility and

---

[15] 47 C.F.R. § 73.3587.

[16] *Id.*

[17] *See, e.g.,* Exhibit 5 to Application for Transfer of Control of WPIX(TV), New York, New York. Exhibit 5 is identical in all of the transfer applications. Exhibit 6, which is also identical in all of the applications, contains the Agreement and Plan of Merger, the Securities Purchase Agreement, the ESOP Purchase Agreement and the documents setting up the ESOP Trust.

[18] Exhibit 5 at 3.

Highly Confidential - Attorneys' Eyes Only                    JPM_00338356

entitlement to benefits of Tribune employees under the terms of the plan and which has a fiduciary obligation to act in the interest of employee participants; (3) the Tribune Trust, which holds title to the stock and whose trustee has a fiduciary obligation to hold and vote the stock placed in the ESOP Plan in accordance with the interests of the employee participants; and (4) the participating employees.[19]

12.     The applications state that, following the transfer and its associated transactions, Zell will be chairman of the board of Tribune.  Zell is also president of EGI-TRB, a single-member Delaware limited liability company.  The single member of EGI-TRB is the Sam Investment Trust, an Illinois trust that Zell established for the benefit of members of his family.  The trustee of Sam Investment Trust is Chai Trust Company, LLC, an Illinois limited liability company, whose members are trusts created by Zell for the benefit of his children.[20]

13.     The parties state that Tribune, the ESOP Plan, EGI-TRB and Zell have entered into various agreements, including a Securities Purchase Agreement and an Agreement and Plan of Merger.  Consummation of these agreements will result in Tribune: (1) converting to cash all of the shares of its common stock that are currently issued and outstanding, and (2) merging with a corporation wholly-owned by the ESOP Plan.  Tribune will then be wholly-owned by the ESOP Plan, and will issue a subordinated note and warrants, which, if exercised, would provide up to 40% of the company's stock to EGI-TRB.[21]

14.     Under the agreements, the transaction is to occur in several steps.  First, the Tribune Trust purchased $250 million in common stock from Tribune at $28 per share.  On April 23, 2007, EGI-TRB purchased $50 million of Tribune common stock at $34 per share and issued Tribune an exchangeable note for $200 million.  On May 9, 2007, Zell became a member of the board of directors of Tribune.  Concurrent with the Tribune Trust's purchase of the common stock and the execution of the Securities Purchase Agreement, the parties executed the Agreement and Plan of Merger that calls for further transactions, including the redemption of Tribune's existing common stock.[22]  On April 25, 2007, Tribune commenced a self-tender offer to repurchase Tribune common stock at $34 per share.  Neither the ESOP Plan nor EGI-TRB tendered shares pursuant to this offer.  Subject to shareholder approval and requisite regulatory approvals, Tribune plans to acquire the remaining outstanding publicly-traded shares of its common stock in a cash-for-stock merger.  Under the agreements, all of the remaining outstanding shares, other than those held by the ESOP Plan, but including those held by EGI-TRB, will be redeemed at $34 per share.[23]

15.     Following all of the transactions contemplated in the application, Tribune will emerge as the surviving corporation with all of its stock and all voting interests held by the ESOP Plan.  EGI-TRB will use a portion of the cash proceeds that it receives from the redemption of its stock in the merger to purchase from Tribune a $225 million subordinated note with an 11-year term.  It will also purchase a 15-year warrant for $90 million entitling it to acquire 40% of Tribune's common stock for a price that begins at $500 million and increases to $600 million over 10 years, with the final price to be determined at the time the warrant is exercised.

---

[19] Id.

[20] Id. at 4.

[21] Id. at 5.

[22] Id. at 5-6.

[23] Id. at 6.

Highly Confidential - Attorneys' Eyes Only

JPM_00338357

16.    **The Teamsters' Comments.** The Teamsters are the only party to file comments regarding either the actual transaction or the proposed structure of Tribune following the transaction. In their comments, the Teamsters state that Tribune employees apparently would have no voice in the governance of Tribune, even though they would be the owners of the company through the ESOP Plan.[24] The Teamsters argue that how the company is governed has important implications for the Commission's goals of localism and diversity.[25] They contend that giving Tribune's employees a voice in the governance of the company would advance our goal of localism because those employees are familiar with the needs and interests of the areas served. According to the Teamsters, these employees could serve as advocates for "the local perspective."[26] Although they do not offer any specific figures, the Teamsters claim that "[a] broad mix of minorities undoubtedly is included in the Tribune's employee base"[27] Thus, the Teamsters argue that employee participation in Tribune's management would diversify viewpoints within the company and contribute to more diverse programming.[28]

17.    In their opposition, the Transferees point out that the Teamsters do not ask that we deny the applications and do not allege that the proposed structure of the transferee violates any law or Commission policy.[29] The Transferees state that the Teamsters comments are misguided and without legal basis. First, they argue that the employees will be the majority shareholders of Tribune and will have pass-through voting rights on specified major matters, including the sale of all or substantially all of Tribune's assets, mergers, and recapitalizations.[30] They also argue that the employees' rights are protected because the trustee who votes the ESOP Plan's shares has a fiduciary obligation solely to the participants in the ESOP Plan and no obligation to Tribune. According to the Transferees, these rights of the employees under the ESOP Plan are consistent with ERISA, additional tax-related statutes and regulations, and other employee stock ownership plans.

18.    The Transferees contend that the Teamsters are not asking the Commission to determine whether the proposed transfer will serve the public interest, but whether restructuring the ESOP Plan might better serve the public interest.[31] They argue that the Act prohibits the Commission from engaging in speculation as to the public interest implications of different proposals.[32] They also argue that ERISA and other tax-related statutes recognize the public interest benefits available through plans structured like the ESOP Plan and that, in the interest of comity, the Commission should not second guess those policies. The Transferees next argue that the post-transfer Tribune will be operated in substantially the same manner as a publicly-traded company and that it is "naïve" to believe that additional voting rights for employees would either increase localism or programming diversity. The Transferees compare the

---

[24] Teamsters Comments at 2.

[25] *Id.* at 4.

[26] *Id.* at 6.

[27] *Id.* at 6-7.

[28] *Id.* at 7.

[29] Transferees Opposition at 19.

[30] *Id.* at 16.

[31] *Id.* at 17

[32] *Id.*, (citing 47 U.S.C. § 310(d)); *Plough Broadcasting Company, Memorandum Opinion and Order,* 70 FCC 2d 683, 693 (1978).

Teamsters' arguments to those formerly made in support of the concept of "integration," which, during the era of comparative hearings for new broadcast licenses, gave additional credit to prospective owners who proposed to be involved in the station's day-to-day management. They argue that this concept was held to be so speculative that the United States Court of Appeals for the District of Columbia Circuit struck it down as arbitrary and capricious.[33]  The Transferees conclude by reiterating that, although the Teamsters may have preferred a different organizational structure, they do not argue that the proposal in the applications violates any Commission rule or policy.

19.     In reply, the Teamsters argue that Section 310(d) of the Act's prohibition on considering a "person other than the proposed transferee or assignee" is inapplicable because it is only asking the Commission to consider the governance structure of the transferee that has been proposed.  The Teamsters state that the Commission regularly takes such considerations into account in the context of assignment and transfer applications, using the example of Commission review of the voting rights held by limited partners or by the shareholders of an entity.[34]  The Teamsters also argue that the Transferees' comparison of the post-transfer Tribune's structure to that of a publicly-traded company is inapposite because the equity owners of a publicly-traded company have the right to elect the board, but the Tribune employees will not have the right to elect the Trustee of the Tribune Trust, who will vote their stock.  The Teamsters next argue that ERISA and other statutes that relate to ESOP plans in general are silent on the issue of whether employees should have a meaningful voice in the governance of the company, so the issue of comity is irrelevant.   Finally, the Teamsters argue that a better analogy than "integration" for their contentions regarding the effect of revising the organizational structure on localism and diversity would be the Commission's equal employment opportunity ("EEO") policies.  The Teamsters argue that if diversity in the composition of the workforce enhances diversity of programming, diversity in the composition of the owners who have a voice in selecting the directors will also enhance the diversity of programming.

20.     **Discussion.**  Under Section 310(d) of the Act, when acting on an application for assignment or transfer of a license:

> [T]he Commission may not consider whether the public interest, convenience and necessity may be served by the transfer, assignment, or disposal of the permit or license to a person other than the proposed transferee or assignee.[35]

Although this provision confines our review of a transfer of control application to consideration of only the qualifications of the proposed transferee, we do regularly review the organizational and governing structure of an applicant.  For example, when reviewing an application for assignment of a license to a limited partnership, the staff analyzes the structure of the proposed assignee to ascertain whether it meets the insulation criteria for limited partners to avoid attribution.  However, in conducting those types of reviews, the question is whether the organizational structure of a proposed licensee complies with our rules and policies, not whether it hypothetically could be changed to better serve the public interest.  If an

---

[33] *Id. (citing Bechtel v. FCC*, 10 F.3d 875, 878-887 (D.C. Cir. 1993)).

[34] *Id. (citing Instructions to FCC Form 315, p. 6.)*

[35] 47 U.S.C. § 310(d).  In their filings, UCC/MA and Rep. Waters refer to news stories that report that other parties have indicated an interest in purchasing the *LA Times*.  UCC/MA and Rep. Waters imply a sale to those parties would better serve the public interest.  As Section § 309(d) makes clear, however, we may not consider whether a different buyer would better serve the public interest, but are limited to considering whether a transfer to the buyer specified in the application does or does not serve the public interest.

Highly Confidential - Attorneys' Eyes Only

applicant's structure results in a violation of the rules, the structure must be revised or the application will be denied. If an applicant's structure fully complies with the rules, there is no basis on which to order its revision. To engage in the type of review urged by the Teamsters would involve the Commission in endless speculation as to whether the organizational structure of each individual applicant could somehow be improved to generate an additional public interest benefit. No party has alleged that the Transferees' proposed organizational and governing structure violates any Commission rule or policy or any other statute, rule, or policy. Therefore, we decline to conduct the kind of review sought by the Teamsters and will not order any changes to the organizational or governing structure of the ESOP Plan or the Tribune Trust as a condition of granting the transfer applications.

## C. THE NBCO WAIVERS

21.    **Background.** As discussed above, the Transferees have requested temporary waivers of the NBCO rule to permit the common ownership pending the outcome of the *Media Ownership Proceeding* of:

- KTLA(TV), Los Angeles, California, and the *Los Angeles Times* ("*LA Times*"),
- WPIX(TV), New York, New York, and *Newsday*,[36]
- WGN-TV and WGN(AM), Chicago, Illinois, and *The Chicago Tribune*,
- WSFL(TV), Miami, Florida, and the Ft. Lauderdale *South Florida Sun-Sentinel*, and
- WTIC(TV), Hartford, Connecticut, WTXX-TV, Waterbury, Connecticut, and the *Hartford Courier*.[37]

In their petition to deny, UCC/MA opposed the waiver requests.[38] The Media Institute, Gannett, and the Newspaper Association of America supported the waiver request.

22.    **Discussion.** For the reasons stated below, we deny the requested waivers in all markets but Chicago, and require the Transferees to come into compliance with the NBCO, in all markets but Chicago, either by selling the non-compliant properties or placing them in a divestiture trust within 6 months of the date of this order.[39] In Chicago, we grant a permanent waiver of the NBCO rule. If, for any reason, the transaction contemplated in the transfer applications is not consummated, we deny the waivers of the NBCO rule that Tribune requested in the context of the renewals of KTLA(TV), WPIX(TV), WTIC(TV) and WTXX-TV. In those markets, Tribune must, within 6 months of the date of this order,[40] come into compliance with the NBCO rule in the Los Angeles, New York, and Hartford markets by either selling the non-compliant properties or placing them in a divestiture trust.[41] In either

---

[36] The applicants' original waiver for WPIX(TV) also sought permission for the continued cross-ownership of the Stamford, Connecticut, *Advocate*, and the Greenwich, Connecticut, *Greenwich Time* and WPIX(TV). On November 21, 2007, the applicants filed an amendment stating that they had consummated the sale of the *Advocate* and the *Greenwich Times* to the Hearst Corporation.

[37] As discussed in ¶¶ 37 to 45 *infra*, the Transferees also seek a failing station waiver to permit continued ownership of both WTIC-TV and WTXX(TV).

[38] Free Press and Findlay Publishing submitted letters stating that they are opposed to the NBCO waivers. We will treat those letters as informal objections.

[39] *See* paragraph 34-35, *infra*.

[40] *Id.*

event, the licensee, whether Tribune or the Transferees, may choose, in each market, which non-compliant property, either newspaper or broadcast station, it will divest.

23.     Section 73.3555(d)(3) of the Commission's rules (the "Rules") provides that "no license for [a] ...TV broadcast station shall be granted to any party (including all parties under common control) if such party directly or indirectly owns, operates, or controls a daily newspaper and the grant of such license will result in" the Grade A contour of that television station encompassing the entire community in which such newspaper is published.[42] At the time the rule was adopted, existing newspaper/broadcast combinations were grandfathered and allowed to continue until the stations at issue were transferred to new owners. In addition, a licensee was permitted to acquire a non-compliant newspaper in a market where it owned a broadcast station, without requesting a waiver, as long as it came into compliance with the rule prior to the end of the station's license term.[43] In addition to these two exceptions to the NBCO rule, the Commission contemplated the need for waivers to permit new cross-ownership patterns in situations where application of the rule would be unduly harsh.[44] Waivers were devised to accommodate four situations: (1) where there is an inability to dispose of an interest in order to conform to the rules; (2) where the only sale possible is at an artificially reduced price; (3) where separate ownership of the newspaper and the broadcast station cannot be supported in the locality; and (4) where, for whatever reason, the purpose of the rule would be disserved by divestiture.[45] The applicants make their waiver requests, both in the renewal proceedings and the transfer proceedings, under the fourth prong of the test. Their sole justification is the existence of the pending rulemaking

24.     Tribune began publishing *The Chicago Tribune* in 1847 and began broadcasting on WGN(AM) in 1924. In 1948, it entered the television market and began broadcasting on WGN-TV. This cross-ownership combination was grandfathered as a result of the *1975 Order*. Tribune acquired WSFL(TV) as part of its acquisition of Renaissance Communications Corporation.[46] At that time, Tribune already owned the *South Florida Sun-Sentinel*. Tribune received a temporary waiver of the NBCO rule permitting the newspaper/broadcast combination to continue pending the outcome of the *Media Ownership Proceeding.*[47]

25.     Tribune acquired the *LA Times, Newsday,* the *Advocate,* and the *Greenwich Times* in March of 2000, following its merger with the Times Mirror Company. Under the terms of the *1975 Order,* Tribune was permitted to own the newspaper(s) and the television station in each market, without

(Continued from previous page) ————————————————————

[41] If the transaction is not completed, Tribune's grandfathered combination in the Chicago market and its temporary waiver in the Miami market will continue undisturbed.

[42] 47 C.F.R. §73.3555(d)(3).

[43] *In the Matter of Amendment of Sections 73.34, 73.240, and 73.636 of the Commission's Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations, Second Report and Order,* 50 FCC 2d 1046, 1076 n. 25 (1975) ("*1975 Order*"), aff'd sub nom., *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775 (1978).

[44] *1975 Order,* 50 FCC 2d at 1077.

[45] *1975 Order,* 50 FCC 2d at 1084-85; *Washington Star Communications, Inc., Memorandum Opinion and Order,* 54 FCC 2d 669 (1975); *Metromedia Radio and Television, Inc., Memorandum Opinion and Order,* 102 FCC 2d 1334 (1985), aff'd, *Health and Medicine Policy Research Group v. FCC,* 807 F.2d 1038 (D.C. Cir. 1987)(applying standard in new, not previously grandfathered combination).

[46] *Renaissance Communications, Memorandum Opinion and Order,* 12 FCC Rcd 11866 (1997).

[47] *Renaissance Communications, Letter by Chief, Mass Media Bureau,* 13 FCC Rcd 4717 (1998).

Highly Confidential - Attorneys' Eyes Only

requesting a waiver, through the end of the stations' respective license terms.[48]  When Tribune filed applications for the renewal of the licenses of KTLA(TV) and WPIX(TV), it requested a permanent waiver of the NBCO rule, or a temporary waiver permitting the cross-ownership of the two television stations and the *Hartford Courant* until the end of the stations' renewal cycle.[49]  A petition to deny was filed against the renewal of KTLA(TV) by the Media Alliance, arguing for denial of the requested waiver.  Informal objections were filed by Representative Maxine Waters, also opposing the requested waiver and objecting to certain news coverage by Tribune.  In addition, we received several letters from the public opposing the waiver request.  A petition to deny was filed against the renewal of WPIX(TV) by UCC, also opposing the requested NBCO waiver.

26.    In the case of Hartford, Connecticut, Tribune already owned WTIC-TV when it acquired the *Hartford Courant* in June, 2000.  At that time, its application to acquire WTXX(TV) was pending.  Tribune ultimately received a temporary waiver permitting the cross-ownership of the two television stations and the *Hartford Courant* until the end of the stations' renewal cycle.[50]  When it filed the stations' renewal applications, it requested either a permanent or temporary waiver, pending the outcome of the *Media Ownership Proceeding*, of the NBCO rule to permit it continue holding the newspaper/broadcast combination.[51]  A petition to deny was filed by UCC opposing the waiver request.

27.    The arguments presented in support of the temporary waiver of the NBCO rule in the renewal applications and the transfer application are essentially the same.  Specifically, they argue that the existence of the pending NBCO rulemaking warrants waivers in this instance.  We will, therefore, consider those requests, and the oppositions to them, simultaneously.

28.    In their requests for temporary waivers, the applicants trace the history of the NBCO rule.  In particular, they focus on the Commission's revision of the rule in the *2002 Biennial Review*,[52] which permitted newspaper/broadcast cross-ownership, without limitation, in Designated Market Areas ("DMAs") to which more than eight full-power television stations are assigned, and with certain restrictions in markets to which four to eight full-power television stations are assigned.[53]  The rules adopted in that proceeding were subsequently stayed by the Third Circuit in *Prometheus Radio*.[54]  We are currently revisiting the NBCO rule in the *Media Ownership Proceeding*.

29.    The applicants state that the *Prometheus* Court held that the decision not to retain the NBCO rule as previously formulated was justified under Section 202(h) of the Telecommunications Act

---

[48] *1975 Order*, 50 FCC 2d at fn. 25.

[49] In the transfer applications, the applicants do not repeat the request for a permanent waiver, stating that the temporary waiver will allow them to complete the transaction.  Because any grant of a permanent waiver as part of any of the stations' licenses renewal would end upon transfer of ownership of the station, and because we are ruling on both the renewal and the transfer in this decision, the request for permanent waivers of the NBCO rule made in Tribune's renewal applications is moot.

[50] *Counterpoint Communications, Memorandum Opinion and Order*, 20 FCC Rcd 8582 (2005).

[51] As in the case of KTLA(TV) and WPIX(TV), Tribune's request for a permanent waiver of the NBCO rule for WTIC-TV and WTXX(TV) is moot.

[52] *2002 Biennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules, Report and Order*, 18 FCC Rcd 13620 (2003)("*2002 Biennial Review*"), *aff'd in part, remanded in part, Prometheus Radio Project v. FCC*, 373 F.3d 372 (3rd Cir. 2004)("*Prometheus*"), *cert denied*, 545 U.S. 1123 (2005).

[53] *Id.*

[54] *Prometheus Radio*, 373 F. 3d at 435.

of 1996[55] and was supported by the record evidence. They argue that, because the Commission previously found revision of the rule was in the public interest and because the Court held that the Commission's action was justified, we are compelled to grant the temporary waiver pending the outcome of the *Media Ownership Proceeding* proceeding. In opposition, UCC/MA contends that the Commission has consistently held that it will not grant a temporary waiver of this rule because of the pendency of a rulemaking.[56] UCC/MA points out that the Commission denied such a temporary waiver to Tribune in the Hartford, Connecticut market, where Tribune instead received a time-limited waiver of the NBCO rule.[57]

30.     The NBCO rule has been under review for a significant period of time. Although the applicants are correct in asserting that the *2002 Biennial Review* found that modification of the rule was in the public interest, as part of our proceedings pursuant to the order of the Court in *Prometheus,* we have solicited and received further comments on whether the rule should be retained, abolished, or modified and will consider those comments in the process of the ultimate revision of the rule. The applicants are engaging in speculation when they take the position that their particular newspaper/broadcast combinations will comply with whatever rules are ultimately adopted. Such speculation is not sufficient to overcome our long-standing policy against granting waivers pending the outcome of rulemakings, particularly in light of the fact that such rulemakings last for an indefinite period of time.[58] Moreover, the Commission committed in its decision to grant Tribune its last waiver that it would not grant more indefinite waivers.[59] Therefore, we deny the applicants' request for a temporary waiver of the NBCO rule to permit joint ownership of television and daily newspapers in the Los Angeles, California, New York, New York, Miami, Florida, and Hartford, Connecticut, markets pending the outcome of the *Media Ownership Proceeding.*[60] As explained further below, we believe it is in the public interest to treat applicants' request for a waiver in the Chicago market differently.

31.     We will grant the six months to come into compliance with the NBCO rule in the affected markets, except for Chicago.[61] The Transferees shall come into compliance with this rule by either divesting those broadcast station licenses or the newspapers implicating the NBCO rule within the required time-frame, or by placing the non-compliant stations in a divestiture trust. If the transaction is not consummated, Tribune will come into compliance with the NBCO rule in the New York, Los Angeles, and Hartford markets within six months.

32.     In multiple-station, multiple-market merger transactions, such as the one presented here, it is not uncommon for the combined properties of the merged entity to create violations of the Commission's ownership rules in some markets. In these circumstances, the Commission has granted

---

[55] Pub. L. No. 104-104, 110 Stat. 56 (1996).

[56] Citing *Counterpoint Communications, Memorandum Opinion and Order,* 20 FCC Rcd 8582 (2005); *UTV of San Francisco, Memorandum Opinion and Order* 16 FCC Rcd 14975, 14988 (2001); *Mobilemedia Corporation, Memorandum Opinion and Order,* 14 FCC Rcd 8017 (1999).

[57] *Counterpoint Communications,* 20 FCC Rcd at 8587.

[58] *Id.*

[59] *Counterpoint Communications,* 20 FCC Rcd at 8590, para. 21.

[60] As noted above, if the transaction is not consummated, we deny the waivers of the NBCO rule that Tribune requested in the context of the renewals of WPIX(TV), KTLA(TV), WTIC(TV), and WTXX-TV.

[61] *See* paragraph 34-35, *infra.*

Highly Confidential - Attorneys' Eyes Only                                    JPM_00338363

temporary waivers of its rules, including the NBCO rule, to permit an orderly disposition of assets and avoid forced sales.[62] We have concluded that such transactional accommodation serves the public interest by promoting the free alienability of broadcast properties.[63] In evaluating the propriety and nature of such waivers, we assess the need for the waiver and the harm to the goals underlying the relevant rule as a result of the waiver. The rule barring the common ownership of broadcast stations and newspapers grew out of our twin goals of maximizing diversity, while preventing undue concentration.[64]

33.    Our decision here will require the Transferees to come into compliance with our cross-ownership rules in four separate markets and could require the divestiture of as many as five properties. Because of the large number of properties at issue, we believe that a period for coming into compliance is justified. The temporary loss of diversity will be outweighed by the advantages of an orderly transition to full compliance with the rules. We note that our decision here is consistent with our recent decision in *Shareholders of Univision*, in which we gave the transferee six months to come into compliance with the NBCO rule in multiple markets.[65] We believe that any shorter period of time to come into compliance would run a substantial risk of a forced sale.[66]

34.    In Chicago, we will grant a permanent waiver of the NBCO rules. Despite the broad nature of the rule, the Commission expressly contemplated waivers of the rule to permit cross-ownership where, *inter alia*, the purposes of the rule – to foster competition and diversity – would be disserved by divestiture.[67] As discussed above, the combination in Chicago has been in existence for almost 60 years. WGN-TV is one of the oldest television stations in the country and Tribune, which has published the *Chicago Tribune* since 1847 and went on the air with WNG(AM) in 1924, is one of the nation's oldest media pioneers. As the Transferees point out, "the Commission has granted a *permanent* waiver of the [NCBO] rule for common ownership of a newspaper and a television station in the *very market* at issue here—the third largest market in the country—as well as in a similar market."[68] Here, we find that the nature of the market involved combined with the uniquely long-term symbiotic relationship between the broadcast stations and the newspaper warrants a permanent waiver. In this regard, our examination of the record confirms "the myriad public interest benefits that have resulted over the almost 60 years of

---

[62] *See, e.g., UTV of San Francisco, supra; Metromedia Radio and Television, Inc., supra.*

[63] *Multimedia, Inc., Memorandum Opinion and Order,* 11 FCC Rcd 4883, 4885 (1995); *Stockholders of CBS, Inc., Memorandum Opinion and Order,* 11 FCC Rcd 3733, 3755 (1995).

[64] *Multiple Ownership Second Report and Order,* 50 FCC 2d at 1074.

[65] *Shareholders of Univision, Memorandum Opinion and Order,* 22 FCC Rcd 5842 (2007).

[66] In its opposition to the petitions to deny, Tribune states granting a waiver of the cross-ownership rule that requires divestiture of non-compliant stations is the equivalent of denying the applications. They cite no precedent to support such a contention. If the Applicants choose not to complete the transaction subject to the conditions specified in this order, that is their choice. However, the argument that our decision to deny the requested waivers is the same as denying the applications is specious.

[67] *Multiple Ownership – Second Report and Order,* 50 FCC 2d 1046, 1085, *on recon.* 53 FCC 2d 589 (1975), *aff'd sub nom. FCC National Citizens Committee for Broadcasting,* 436 U.S. 775 (1978).

[68] Application BTCCT-20070501AGE, Transferee's Exhibit 18 (Request for Waiver) at 38-39, citing *Fox Stations,* 8 FCC Rcd. 5341 (1993); *Field,* 65 F.C.C.2d 959 (1977). Although those decisions involved distressed stations, they are similar in that they involve large, competitive, and diverse TV markets. *See id.* ("The market at issue here contains significantly more media competition and diversity than the New York City market analyzed in 1993 and the Chicago market analyzed in 1977.")

Highly Confidential - Attorneys' Eyes Only

Tribune's common ownership of WGN-TV, WGN(AM), and the *Chicago Tribune* in the Chicago DMA."[69] In addition, unlike Chicago, Tribune knew at the time it created the combinations in the other markets that they did not comply with the Commission's rules and that divestiture ultimately was required unless those rules changed. We conclude that in the unique circumstances present here, forced separation of the Tribune, WGN-TV, and WGN(AM) would diminish the strength of important sources of quality news and public affairs programming in the Chicago market and that any detriment to diversity caused by the common ownership is negligible given the nature of the market. Therefore, we conclude that the purposes of the rule would not be served by divestiture.

35.    In a separate proceeding, we note that the Chairman has set forth a proposal to revise the NBCO rule, and the Commission is currently scheduled to vote on a revised NBCO rule at its December 18, 2007 meeting. Consistent with the bedrock principle that similarly situated regulated entities should be treated in a similar manner, we believe that Tribune should be able to take advantage of any revised NBCO rule that may emerge in the imminent future, notwithstanding the particular timing of this transaction. As a result, we take the following two steps. First, the six-month clock for coming into compliance with the NBCO rule in New York, Los Angeles, Miami, and Hartford will not begin running until January 1, 2008. And second, should the Commission adopt a revised NBCO rule before January 1, 2008, that six-month clock will not begin to run. Rather, the applicants will receive a two-year waiver of the NBCO rule for the New York, Los Angeles, Miami, and Hartford markets.[70] The purpose of such a conditional waiver is twofold. As an initial matter, this waiver would allow the applicants a sufficient period of time to come into compliance with any revised NBCO rule. We note, for example, that the Chairman's proposed NBCO rule would require the Commission to make an individualized public interest determination with respect to each newspaper-broadcast combination. Therefore, in the event that his proposal is adopted, the Commission would need a sufficient period of time to consider input from the applicants along with other interested parties and make such a determination with respect to the applicants' combinations in New York, Los Angeles, Miami, and Hartford. Furthermore, the conditional two-year waiver would account for potential litigation that may arise from any revised NBCO rule that the Commission may adopt.[71]

36.    In addition, we recognize the possibility that the applicants may choose to challenge today's denial of waivers from the NBCO rule in court. Should they do so, given the unique circumstances of this case, we do not believe that it would be appropriate for us to mandate divestitures while the applicants' court challenge is pending. In particular, we note the admittedly unusual and uncertain status of the current NBCO rule as well as the harm that applicants would suffer were they forced to divest properties but then win their court challenge. As a result, should applicants challenge today's decision in court, we grant a temporary waiver of the NBCO rule for the New York, Los Angeles, Miami, and Hartford markets.[72] This waiver will last either for two years or until six months after the

---

[69] Application BTCCT-20070501AGE, Transferee's Exhibit 18 (Request for Waiver) at 30. *See id.* at 30-33.

[70] Should the Commission adopt a revised NBCO rule between January 1, 2008, and the conclusion of the six-month clock for divestures, the applicants are free to return to the Commission and to seek appropriate relief in light of that revised rule, and this Order should not be viewed as prejudging any such request.

[71] In the event that applicants are not able to come into compliance with any revised NBCO rule during this two-year period because that revised rule is subject to a judicial stay, then the conditional waiver will extend until six months after the expiration of any such stay.

[72] In order to allow applicants to seek judicial review of our denial of their waiver requests immediately, we waive the requirements of 47 C.F.R. § 1.110. In light of the unusual and uncertain status of the NBCO rule as described above and because any further reconsideration or hearing would be futile, we believe that the "overall public interest (continued....)

conclusion of the litigation, whichever is longer.[73] This conditional waiver will allow applicants sufficient time to bring any litigation to a close and divest properties in an orderly manner should their litigation efforts prove to be unsuccessful.

## D. THE FAILING STATION WAIVER

37.    In the transfer applications for WTXX(TV) and WTIC-TV, the Transferees request a waiver of Section 73.3555(b)(2) of the Rules, the television duopoly rule, to permit the joint ownership of the stations, which are in the same Nielsen DMA and whose Grade B contours overlap. For the reasons stated below, we grant the waiver.

38.    Under Section 73.3555(b)(2) of the Rules currently in effect,[74] two television stations licensed in the same DMA that have Grade B overlap may be commonly owned if: (1) at least one of the stations is not ranked among the top four stations in the DMA; and (2) at least eight independently owned and operating, full power commercial and non-commercial educational television stations would remain in the DMA after the merger.[75] The Hartford-New Haven DMA, where the stations are located, does not contain eight independently owned and operated television voices, so the Transferees are requesting a waiver on the basis that WTXX(TV) is a "failing station."[76]

39.    The Commission's *Local Ownership Order* established the criteria for a waiver of the television duopoly rule for a "failing station" as one which has been struggling for "an extended period of time both in terms of its audience share and financial performance. These criteria are:

    a)   One of the merging stations has had a low all-day audience share (*i.e.* 4 percent or lower);

    b)   The financial condition of one of the merging stations is poor. "A waiver is more likely to be granted where one…of the stations has had a negative cash flow for the previous three years;"

    c)   The merger will produce public interest benefits. "A waiver will be granted where the

(Continued from previous page) ───────────────────────────────

would best be served by resolving this matter expeditiously." *Nationwide Wireless Network Corp.*, 9 FCC Rcd 3635, 3644 (1994).

[73] In the event, however, that the applicants abandon litigation before a court decision is reached, the conditional waiver will automatically terminate, and the aforementioned six-month clock for divestitures will begin.

[74] 47 C.F.R. § 73.3555(b)(2). As discussed above, on June 2, 2003, the Commission adopted revised media ownership rules, *2002Biennial Regulatory Review*, 18 FCC Rcd 13620 (2003), which were stayed in *Prometheus Radio*, 373 F.3d at 435. As is the case with the NBCO rule, the stay on the revised local multiple ownership rules is still in effect.

[75] 47 C.F.R. § 73.3555(b)(2).

[76] *See* 47 C.F.R. § 73.3555, Note 7, *See also Review of the Commission's Regulations Governing Television Broadcasting, Report and Order*, 14 FCC Rcd 12903, 12935-50 (1999)("*Local Ownership Order*"), recon. granted in part, 16 FCC Rcd 1067 (2001). Tribune previously received a "failing station" waiver permitting the duopoly at issue. *Counterpoint Communications*, 16 FCC Rcd 15044 (2001). Like all ownership waivers, that waiver must be re-evaluated in the context of a long-form transfer of control application. *See K. Rupert Murdoch*, 21 FCC Rcd at 11500.

Highly Confidential - Attorneys' Eyes Only

applicant demonstrates that the tangible and verifiable public interest benefits of the merger outweigh any harm to competition and diversity;" and

    d)   The in-market buyer is the only reasonably available candidate willing and able to acquire and operate the station; selling the station to an out-of-market buyer would result in an artificially depressed price.[77]

If the applicant satisfies each criterion, a waiver of the rule will be presumed to be in the public interest.

    40.    As part of their waiver request, the Transferees have attached a chart showing Nielsen reported audience shares for the all-day share of WTXX(TV). The chart shows that WTXX(TV)'s highest audience share between May 2004 and February 2007 was a 2.8 share, earned in November 2004.[78] Over the most recent 12 periods in which WTXX(TV)'s share was measured, WTXX(TV) averaged only a 2.3 share, and earned a low of 1.8 as recently as July 2006.

    41.    With respect to WTXX (TV)'s financial condition, the Transferees have appended financial data which shows negative cash flow for the station for 2004-2006.[79] In addition, the Transferees state that WTXX(TV) has incurred over $4 million in net losses over the last three fiscal years. They further state that, over that same period, WTXX(TV)'s cumulative cash flow deficit from operations was $2.6 million, and capital expenditures were an additional $1.2 million.

    42.    The Transferees contend that grant of the waiver will benefit the public interest. They argue that the combination of WTIC-TV and WTXX(TV) provides programming and public interest benefits that WTXX(TV) could not have provided absent the common ownership with WTIC-TV. They state that these benefits range from the upgrade and stabilization of WTXX(TV)'s analog facilities to the construction of WTXX(TV)'s transitional DTV facility, both of which have involved millions of dollars in capital expenditures by Tribune. They also state that Tribune has succeeded in providing the public with enhanced news specials, news coverage, public affairs programs, and public interest services as a result of the WTXX(TV)/WTIC-TV combination. The Transferees point to Tribune's establishment of a Waterbury news bureau and coverage of stories of specific interest to Waterbury residents as examples of the advantages to news coverage from the combination. They also state that coverage of politics and local sports, including high school sports in Waterbury, has been enhanced by the combined ownership.

    43.    In regard to the fourth criterion, the Transferees state that Tribune has attempted to find a buyer for WTXX, and/or for the combined stations, since before the time it acquired WTXX(TV). They state that no prospective purchaser made an offer that did not include unacceptable terms or that was not well below the price Tribune needed to receive a fair exchange for its investment in the stations. They state that Tribune's efforts have continued to the present day and include an extensive description of the efforts, both past and present, to find a buyer. In its petition to deny, UCC/MA challenges the claim that Tribune has made extensive efforts to sell its stations.[80] UCC/MA, however, does not make a showing

---

[77] *Local Ownership Order,* 14 FCC at 12939.

[78] Exhibit 1 to Attachment A (Declaration of Gina M. Mazzaferri).

[79] The applicants requested confidential treatment for this information.

[80] UCC/MA does not challenge the waiver request under the other three criteria. Under the fourth criterion, UCC/MA purports to challenge Tribune's claim by incorporating pleadings from another adjudicatory proceeding. Specifically, they refer to the UCC petition to deny filed against the renewal applications of WTIC-TV and WTXX(TV). Petitioners, however, do not specify what they are incorporating and which of Tribune's efforts to sell (continued....)

that there is, in fact, a reasonably available candidate other than Tribune willing to operate WTXX(TV). Other than a vague conclusion, made in the context of the WTXX(TV)/WTIC-TV renewal proceeding, that Tribune is asking too much money, Petitioners have not made a showing as to how Tribune's efforts to sell the stations are inadequate.

44.      We will grant the applicants' request for a waiver of the television duopoly rule. On balance, based on the showings submitted under the waiver criteria established in the *Local Ownership Order*, we are persuaded that grant of a waiver is warranted on the grounds that WTXX(TV) is a failing station. Specifically, the applicants have demonstrated that the station has a low audience share that has not even approached four percent during the last three years. In addition, the financial documents submitted by the applicants show that the station has consistently had a poor financial condition and continues to do so. In reviewing the financial information, we are persuaded that WTXX(TV) is failing to such an extent that its ability to be a viable voice in the Hartford-New Haven market will be severely hampered absent the waiver. In spite of these problems, Tribune has made substantial efforts to make WTXX(TV) a strong news presence in the market and in Waterbury in particular. In addition, Tribune has made substantial investments in the physical facilities of the WTXX(TV). We believe that these efforts have had substantial public interest benefits. Finally, the applicants have made a substantial showing that the Transferees are the only reasonably available buyer for the station at this time.

45.      Consistent with the *Local Ownership Order*, we find that the combined operations of WTIC-TV and WTXX(TV) will pose minimal harm to our diversity and competition goals because WTXX(TV)'s financial situation hampers its ability to be a viable voice in the market absent the requested waiver. Under these circumstances, allowing the continuation of the combined ownership, which has already resulted in improved news coverage, will benefit the public interest. Therefore, we will grant the requested waiver.

## E. THE SATELLITE WAIVER

46.      The Transferees have requested a continuing satellite waiver[81] permitting common ownership of WTTV(TV), Bloomington, Indiana and WTTK(TV), Kokomo, Indiana. Both stations are located in the Indianapolis, Indiana, DMA. For the reasons stated below, we grant the waiver.

47.      In *Television Satellite Stations*,[82] the Commission established the requirement that all applicants seeking to transfer or assign satellite stations justify continued satellite status by demonstrating compliance with a three-part "presumptive" satellite exemption standard applicable to new satellite stations. The presumptive satellite exemption is met if the following three public interest criteria are satisfied: (1) there is no City Grade overlap between the parent and the satellite; (2) the proposed satellite would provide service to an underserved area; and (3) no alternative operator is ready and able to construct or to purchase and operate the satellite as a full-service station. [83]If an applicant does not

(Continued from previous page) ————————————————————————
they find objectionable. Furthermore, petitions to deny must "*contain* specific allegations of fact," 47 C.F.R § 73.3584 (emphasis added), not vaguely allude to other pleadings where those facts can supposedly be found. Because we have consolidated the renewal and transfer proceedings, we have chosen to consider Petitioners' arguments from the renewal proceeding in the context of the transfer. That we chose to do so should not be taken as a sign that we find the petition to deny in the transfer proceeding to meet the pleading standard on the issue of the "failing station" waiver.

[81] *See* 47 C.F.R. § 73.3555, Note 5.

[82] 6 FCC Rcd 4212, 4215 (1991) (subsequent history omitted).

[83] *Id.* at 4213-14.

Highly Confidential – Attorneys' Eyes Only

qualify for the presumption, the Commission will evaluate the proposal on an *ad hoc* basis, and grant the application if there are compelling circumstances that warrant approval.[84]

48.     As to the first criterion, the applicants have submitted evidence which demonstrates that there is no City Grade contour overlap between WTTV(TV) and WTTK(TV).[85] Thus, the proposed satellite operation meets the first component of the presumption. With respect to the second criterion, applicants can use two different tests to demonstrate that an area is underserved. Under the "transmission test" a proposed satellite community of license is considered undeserved if there are two or fewer television stations already licensed to it.[86] WTTK(TV) is the only full service station licensed to Kokomo. Accordingly, Kokomo qualifies as an underserved area, thereby satisfying the second component of the presumption.

49.     Regarding the third criterion, an applicant must show that no alternative operator is ready and able to construct, or to purchase and operate, the proposed satellite as a full-service station.[87] Initially, we note that the Applicants do not base their satisfaction of the third criterion on efforts to sell station WTTK(TV). They state that WTTK(TV) has been on the air since 1988 and has been operated continuously as a satellite of WTTV(TV). They note that on four separate occasions, the Commission has approved the transfer of WTTK(TV) as a satellite of WTTV(TV).[88]

50.     According to the applicants, WTTK(TV) faces numerous obstacles against successful operation as a stand-alone station. Relying on the Fratrik Report, the applicants first state that, because all major network affiliates are represented in the Indianapolis market, WTTK(TV) would have difficulty securing a network affiliation, and instead would be required to obtain its programming independently.[89] They state that obtaining programming independently, without the benefit of an association with a network, would be extremely costly for WTTK(TV) and less likely to generate substantial advertising revenue than other stations in the market.[90] They go on to state that the anticipated growth of television advertising revenues through 2010 is not sufficient to support an additional full-service television station in the market.[91] With limited revenue possibilities from a lack of network affiliation and limited advertising revenues, the applicants argue that it would be difficult for WTTK(TV) to incur the costs associated with independent operation. They assert that over the next couple of years, WTTK(TV) will have to incur the additional capital costs of the transition to digital television, estimated to be between $1.5 and $2 million dollars. In addition, they claim that if WTTK(TV) were to convert from a satellite to a full-service station, WTTK(TV) would have to incur significant additional capital investment for facilities and staff.[92] The applicants assert that, operating alone, WTTK(TV) would not have the revenue streams sufficient to account for these additional expenditures attendant to independent operation.

---

[84] *Id.* at 4212.

[85] Statement of Mark R. Fratrik, Vice President of BIA Financial Network (Fratrik Report), Exhibit 18, File No. BTCCT-20070501AFL.

[86] *Television Satellite Stations*, 6 FCC Rcd at 4215.

[87] *Id.*

[88] Fratrik Report at 3 n.1.

[89] *Id.* at 6.

[90] *Id.* at 10.

[91] *Id.* at 7-8.

[92] *Id.* at 11-12.

Highly Confidential - Attorneys' Eyes Only

51.    The applicants also argue that WTTK(TV)'s signal coverage has a negative impact on its ability to function as a stand-alone station in the market. They claim that WTTK(TV)'s location in Kokomo, Indiana, makes it unable to reach the entire Indianapolis market. According to the applicants, WTTK(TV) reaches approximately 1,214,207 people, or approximately 45.33% of the local television market, within its Grade B contour.[93] They contrast this with the other commercial stations in the market, all of which reach in excess of 66% of the population in the Indianapolis market. Thus, they claim that WTTK(TV) would face a significant disadvantage in competing with these other stations. In addition, they argue that the low percentage of population coverage in the market makes WTTK(TV)'s ability to obtain cable carriage as a stand-alone station uncertain, and thus has a further negative impact on its revenues. However, they assert that, in combination with WTTV(TV), the two stations provide excellent coverage throughout the Indianapolis market, reaching over 90% of the population.[94] The applicants go on to argue that, the continued operation of WTTK(TV) as a satellite is vital for the competitive viability of WTTV(TV) as well. The top three affiliated stations each reach approximately 90% of the population in the Indianapolis market.[95] According to the Applicants, WTTV(TV), does not reach as far north as most of its competitors in the market, and therefore reaches only 77.6% of the population.[96] They conclude that, only when allied with WTTK(TV) as a satellite is WTTV(TV) able to cover the entire market and compete effectively with the other stations in the market.[97]

52.    Based on our review of the materials submitted, we find that the applicants have set forth information sufficient to warrant continued satellite operation for WTTK(TV) under our *ad hoc* analysis. Because of the steep financial challenges that would face WTTK(TV) if it were to transition to a full-service station, the likely inability of the station to obtain a network affiliation and the limited signal coverage by the station in its home market, we agree with the applicants that it is unlikely that WTTK(TV) would be viable as a stand-alone station. We therefore find that the continued operation of WTTK(TV) as a satellite of WTTV(TV) would be in the public interest.

## F. OTHER MATTERS

53.    **The Validity of the Applications.** UCC and the Media Alliance, jointly in their petition to deny the transfer and in Media Alliance's separate petition to deny the renewal of KTLA(TV), argue that the applications should be dismissed as defective. In the case of the KTLA (TV) renewal, Media Alliance argues that the application for renewal of KTLA(TV) was defective on its face and should be dismissed because Tribune did not come into compliance with the NBCO rule in Los Angeles before filing the application. In the UCC/MA petition to deny the transfer proceeding, they similarly argue that, because Tribune still owned newspapers in Los Angeles, New York, and Hartford at the time it filed the renewal applications, Tribune violated the NBCO rule. Because the renewal applications violated the rule, and because the license expiration dates have passed, the petitioners argue that there is nothing to transfer.

54.    As Tribune points out in its opposition, the Commission's renewal policy specifically

---

[93] *Id.* at 9.

[94] *Id.* at 10.

[95] *Id.* at 6.

[96] *Id.*

[97] *Id.* at 10-11.

Highly Confidential - Attorneys' Eyes Only

JPM_00338370

contemplates the filing of waiver requests.[98]  A renewal application is not patently defective and will not be dismissed if it contains an appropriate waiver request.  Furthermore, a station's license remains in effect until we act on the renewal.[99]  Therefore, Tribune's licenses are still in effect.  Also, their pending renewal status at the time of the transfer applications does not invalidate those applications.[100]

55.      We have reviewed the proposed merger, the transfer applications, the petitions to deny, informal objections and related pleadings.  We conclude that the transferee is fully qualified to hold the licenses and that grant of the applications, subject to the conditions set forth herein and with the waiver granted herein, will serve the public interest, convenience and necessity.  We have also reviewed the renewal applications of stations KTLA(TV), Los Angeles, California, WPIX(TV), New York, New York, and WTIC-TV, Hartford, Connecticut, and the petitions to deny those applications and related pleadings, and conclude that the stations have, during their license terms, served the public interest, convenience, and necessity, and have not committed any serious violations of the Communications Act or the Commission's rules, or any pattern of violations that, taken together, would constitute a pattern of abuse.

## III.  ORDERING CLAUSES

56.      ACCORDINGLY, IT IS ORDERED, that the petition to deny and the informal objections to the license renewal application of television station KTLA(TV), Los Angeles, California (File No. BRCT-20060811ASH), filed by the Media Alliance and filed by Representative Maxine Waters, respectively; the petition to deny the license renewal application of  television station WPIX(TV), New York, New York (File No. BRCT-20070201BPA), filed by the United Church of Christ; and the petition to deny the license renewal applications of  television station WTXX(TV), Waterbury, Connecticut (File No. BRCT-20061201APT) and television station WTIC-TV, Hartford, Connecticut (File No. BRCT-20061201AJE), filed by the United Church of Christ ARE DENIED

57.      IT IS FURTHER ORDERED, that the request by the Tribune Company for a permanent or temporary waiver of the newspaper/broadcast cross-ownership rule, 47 C.F.R. § 73.3555(d)(3), to permit the common ownership of KTLA(TV) and *The Los Angeles Times*;  WPIX(TV) and *Newsday*; and WTXX(TV), WTIC-TV and *The Hartford Courant* ARE DENIED.

58.      IT IS FURTHER ORDERED that  the applications for renewal of the licenses of KTLA(TV) (File No. BRCT-20060811ASH), WPIX(TV) (File No. BRCT-20070201BPA), WTXX(TV) (File No. BRCT-20061201APT), and WTIC-TV, Hartford, Connecticut (File No. BRCT-20061201AJE) ARE GRANTED SUBJECT TO THE FOLLOWING CONDITIONS:  Tribune Company shall, within six months of January 1, 2008, come into compliance with the newspaper/broadcast cross-ownership rule in the affected markets by either divesting all of its interests in newspapers in the Los Angeles, California, New York, New York, and Hartford, Connecticut markets or divesting those broadcast station licenses implicating the newspaper/broadcast cross-ownership rule in those markets.  To ensure that Tribune no longer owns or controls properties implicating the newspaper/broadcast cross-ownership rule in the above markets after the deadline, the Tribune Company shall, within 60 days of release of this Order, file applications seeking to assign those broadcast licenses implicating the newspaper/broadcast cross-ownership rule to a divestiture trust, including a copy of the trust agreement, which the Commission shall grant, if the applicants are so qualified and full compliance with the newspaper/broadcast cross-ownership

---

[98] *See, e.g.,* 47 C.F.R. § 73.3566 (2006).

[99] 47 U.S.C. § 307(c)(2000); 47 C.F.R. § 1.62 (2006).

[100] In any event, we are granting the renewal applications in this order.

Highly Confidential - Attorneys' Eyes Only

rule has not been achieved by the deadline.

59.     IT IS FURTHER ORDERED, that, should the Commission adopt a revised NBCO rule before January 1, 2008, we grant applicants a two-year waiver of the NBCO rule for the New York, Los Angeles, Miami, and Hartford markets.

60.     IT IS FURTHER ORDERED, that, should Tribune challenge today's denial of the requested waivers for the New York, Los Angeles, Miami, and Hartford markets in court, we grant a waiver of the NBCO rule for the New York, Los Angeles, Miami, and Hartford markets that will last either for two years or until six months after the conclusion of the litigation, whichever is longer, provided that should the applicants abandon such litigation before a court decision is reached, the conditional waiver automatically terminates, and the aforementioned six-month clock for divestitures will begin.

61.     IT IS FURTHER ORDERED, that the petition to deny and the informal objections to the transfer of control applications listed in Exhibit 1 hereto, filed by the United Church of Christ and the Media alliance and by Free Press and Findlay Publishing, respectively, ARE DENIED.

62.     IT IS FURTHER ORDERED, that the Transferee's requests for waiver of the local television multiple ownership rules, 47 C.F.R. § 73.3555(b)(3), to permit the common ownership of station WTIC-TV, Hartford, Connecticut and station WTXX(TV), Waterbury, Connecticut, pursuant to Note 7 of that rule, and to permit satellite operation of station WTTK(TV), Kokomo, Indiana by station WTTV(TV), Bloomington, Indiana, pursuant to Note 5 of that rule are GRANTED.

63.     IT IS FURTHER ORDERED, that the request by Sam Zell, The Tribune Employee Stock Ownership Plan, as implemented through the Tribune Employee Stock Ownership Trust , and EGI-TRB, LLC for a temporary waiver of the newspaper/broadcast cross-ownership rule, 47 CF.R. Sec. 73.3555, to permit the common ownership of WGN, WGN-TV and the *Chicago Tribune*, pending the Commission's final decision in the Media Ownership Rulemaking is DENIED.

64.     IT IS FURTHER ORDERED, that a permanent waiver of the newspaper/broadcast cross-ownership rule, 47 CF.R. Sec. 73.3555, to permit the common ownership of WGN, WGN-TV and the *Chicago Tribune* by Sam Zell, The Tribune Employee Stock Ownership Plan, as implemented through the Tribune Employee Stock Ownership Trust, and EGI-TRB, LLC IS GRANTED.

65.     IT IS FURTHER ORDERED, that applications for transfer of control of the stations listed in Exhibit 1 hereto, from the Shareholders of the Tribune Company to Sam Zell, The Tribune Employee Stock Ownership Plan, as implemented through the Tribune Employee Stock Ownership Trust, and EGI-TRB, LLC ARE GRANTED SUBJECT TO THE FOLLOWING CONDITIONS:  Subject to the conditional waivers set forth in paragraphs 58 and 59, the post-merger licensee shall come into compliance with the newspaper/broadcast cross-ownership rule in the affected markets by within six months of January 1, 2008, by either divesting all of its interests in newspapers in the Los Angeles, California, New York, New York, Miami, Florida and Hartford, Connecticut markets or divesting those broadcast station licenses implicating the newspaper/broadcast cross-ownership rule in those markets.  To ensure that the post-consummation licensee no longer owns or controls properties implicating the newspaper/broadcast cross-ownership rule in the above markets after deadline, the parties must ensure that within 60 days of release of this Order, the then licensee files applications seeking to assign those broadcast licenses implicating the newspaper/broadcast cross-ownership rule to a divestiture trust, including a copy of the trust agreement, which the Commission shall approve, if the applicants are so qualified and full compliance with the newspaper/broadcast cross-ownership rule has not been achieved

Highly Confidential - Attorneys' Eyes Only

by the deadline.  In the event that the transaction proposed in the transfer applications is not consummated, Tribune shall divest all its interests in newspapers in the Los Angeles, California, New York, New York, and Hartford , Connecticut markets by the deadline as per the requirements of paragraph 58, *supra*.[101]

66.    IT IS FURTHER ORDERED, that Section 1.110 of the Commission's rules, 47 C.F.R. § 1.110 IS WAIVED.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[101] If the transaction is not consummated, Tribune's existing grandfathered  newspaper/broadcast combination in Chicago, Illinois will remain undisturbed.  Likewise, its existing waiver of the NBCO rule in the Miami, Florida market shall continue under the terms set out in *Renaissance Communications*, 12 FCC Rcd 11866 (1997).

Highly Confidential - Attorneys' Eyes Only                                        JPM_00338373

Federal Communications Commission                    FCC 07-211

## Exhibit 1

| File Number | Call Sign | ID | Community |
|---|---|---|---|
| BTCCT-20070501AEY | WPIX | 73881 | New York, NY |
| BTCCT-20070501AEZ | WTXX | 14959 | Waterbury, CT |
| BTCCT-20070501AFC | KDAF | 22201 | Dallas, TX |
| BTCCT-200705101AFD | WTIC | 146 | Hartford, CT |
| BTCCT-20070501AFE | WPMT | 10213 | York, PA |
| BTCCT-20070501AFF | WPHL | 73879 | Philadelphia, PA |
| BTCCT-20070501AFG | WXIN | 147 | Indianapolis, IN |
| BTCCT-20070501AFJ | KWGN | 35883 | Denver, CO |
| BTCCT-20070501AFK | KTLA | 35670 | Los Angeles, CA |
| BTCCT-20070501AFL | KRCW | 10192 | Salem, OR |
| BTCCT-20070501AFM | WTTV | 56523 | Bloomington, IN |
| BTCCT-20070501AFN | WTTK | 56526 | Kokomo, IN |
| BTCCT-20070501AFR | KTXL | 10205 | Sacramento, CA |
| BTCCT-20070501AFS | KMYQ | 69571 | Seattle, WA |
| BTCCT-20070501AFT | WXMI | 68433 | Grand Rapids, MI |
| BTCCT-20070501AFZ | KPLR | 35417 | St. Louis, MO |
| BTCCT-20070501AGB | WSFL | 10203 | Miami, FL |
| BTCCT-20070501AGC | KHCW | 23394 | Houston, TX |
| BTCCT-20070501AGE | WGN | 72115 | Chicago, IL |
| BTCCT-20070501AGG | KCPQ | 33894 | Tacoma, WA |
| BTCCT-20070501AGL | KSWB | 58827 | San Diego, CA |
| BTCCT-20070501AGM | WDCW | 30576 | Washington, DC |
| BTCCT-20070501AGO | WGNO | 72119 | New Orleans, LA |
| BTCCT-20070501AGP | WNOL | 54280 | New Orleans, LA |
| BTCCT-20070501AFO | K20ES | 12671 | Pendleton, OR |
| BTCCT-20070501AFP | K24DX | 12678 | Pendleton, OR |
| BTCCT-20070501AFQ | KRCW-LP | 35151 | Portland, OR |
| BTCCT-20070501AFU | K25CH | 69575 | Centralia, WA |
| BTCCT-20070501AFV | K29ED | 69574 | Everett, WA |
| BTCCT-20070501AFW | W42CB | 64440 | Hesperia, MI |
| BTCCT-20070501AFX | W52DB | 64442 | Muskegon, MI |
| BTCCT-20070501AGH | K25CG | 33898 | Aberdeen, WA |
| BTCCT-20070501AGI | K42CM | 33895 | Centralia, WA |
| BTCCT-20070501AGJ | K54DX | 33896 | Ellensburg-Kittitas, WA |
| BTCCT-20070501AGK | K64ES | 33899 | Chelan, WA |
| BTCCT-20070501AGN | W51CY | 64680 | Chambersburg, PA |

Highly Confidential - Attorneys' Eyes Only

Federal Communications Commission                                    FCC 07-211

## EXHIBIT 2

| Station | Community | Newspaper |
|---------|-----------|-----------|
| KTLA(TV) | Los Angeles, California | *Los Angeles Times (LA Times)* |
| WPIX(TV) | New York, New York | *Newsday* |
| WGN-TV/WGN(AM) | Chicago, Illinois | *The Chicago Tribune,* |
| WSFL(TV) | Miami, Florida | *South Florida Sun-Sentinel* |
| WTIC(TV) | Hartford, Connecticut | *Hartford Courier* |
| WTXX-TV | Waterbury, Connecticut | *Hartford Courier* |

Highly Confidential - Attorneys' Eyes Only

### DISSENTING STATEMENT OF
### COMMISSIONER MICHAEL J. COPPS

*Re: In the Matter of the Applications of Shareholders of Tribune Company, Transferors and Sam Zell, et al., Transferees, for Consent to the Transfer of Control of the Tribune Company and Applications for the Renewal of License of KTLA(TV), Los Angeles, California, et al. – MB Docket No. 07-119.*

If this Order were a newspaper, the banner headline would read "FCC Majority Uses Legal Subterfuge to Push for Total Elimination of Cross-Ownership Ban."

I have to admit, part of me admires the clever legal maneuvering. If the majority simply granted a two-year waiver to Tribune – which would have been the straightforward thing to do – Tribune would have been unable to go to court because a party cannot file an appeal if their waiver request is granted. So what does this Order do? It *denies* the waiver request but offers an automatic (and unprecedented) waiver extension as soon as Tribune runs to the courthouse door, lasting for two years or until the litigation concludes -- whichever is *longer*. Presto! Tribune gets at least a two-year waiver plus the ability to go to court immediately and see if they can get the entire rule thrown out. And most important, Tribune is *not* required to seek a hearing before the very court which expressly retained jurisdiction when it remanded the general newspaper-broadcast cross-ownership ban. Instead, Tribune can end run the Third Circuit and petition for review before what it may hope is a more sympathetic court.

The more I think about this approach, however, the more troubled I become. Publicly, the Chairman claims to want only a "modest" relaxation of the cross-ownership ban. Privately, he enlists Tribune as an accomplice to try and get the ban overturned in court. If the Chairman wants to eliminate the ban, he should stand up and say so. It's time to end the charade.

Although I object to the entire Order, I note that the permanent cross-ownership waiver in Chicago has absolutely no basis in the record or Commission precedent. None of these properties are in distress, and the fact that Chicago is a large market does not distinguish this case from scores of other combinations that exist now or could be formed in the future. Nor is a permanent waiver justified by the "long-term symbiotic relationship" among the properties. When these and other combinations were grandfathered, the Commission made clear that when they were voluntarily sold, it had to be to separate buyers. Thus, the Commission's policy, upheld by the Supreme Court, was to increase competition and diversity over time without disrupting existing service. *See FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775 (1978); *Capital Cities/ABC Inc.*, 11 FCC Rcd 5841 (1995). To argue now that the passage of time argues for a permanent waiver is a brazen reversal of thirty years of settled precedent.

I dissent.

Highly Confidential - Attorneys' Eyes Only

## DISSENTING STATEMENT OF
## COMMISSIONER JONATHAN S. ADELSTEIN

Re:      *Applications of Shareholders of Tribune Company, Transferors and Sam Zell, et al., Transferees*
         *For Consent to the Transfer of Control of The Tribune Company and Applications for the*
         *Renewal of License of KTLA(TV), Los Angeles, California, et al.*

Pursuant to Sections 214(a) and 310(d) of the Act, the fundamental standard of review of a transfer of control by the Commission is whether the proposed transfer will serve the public interest, convenience, and necessity. Faced with any merger, it is our obligation to analyze the record evidence and determine whether the public will be served better by the transaction being approved or being denied, and what conditions, if any, may be necessary to mitigate harms to consumers. The box being checked off by the majority for Today's order reads "None of the above." Instead, today's order is a regulatory hostage taking -- a desperate maneuver to use the Tribune transaction as a human shield, while the Commission marches down the treacherous path toward greater media consolidation. Notwithstanding congressional rebuke and widespread public opposition, this Commission is determined to use any conceivable ploy to achieve its misguided goals.

The ploy in today's order involves "denying" the requested waivers of the cross ownership rules, with the exception of one market - Chicago - where a permanent waiver is granted. In a feat of rare regulatory contortionism, the majority grants the applicants a two-year waiver of any revised cross ownership rules for the New York, Los Angeles, Miami and Hartford markets *if " the Commission adopts a revised NBCO [newspaper broadcast cross ownership] rule before January 1, 2008."* For safe measure, the item also ties any appeal of this order by Tribune to the media ownership proceeding under review by granting a waiver of our media ownership rules until the longer of six months post any litigation or two years.

While I disagree with the final decision in this case, I am more disappointed with the majority's disregard for Commission precedent and legacy. A simple two-year waiver would have accomplished the goals of the majority and the applicants. But instead, the Order employs certain novel, ill-advised and back-breaking legal gymnastics that will surely leave observers with their heads spinning.

Highly Confidential - Attorneys' Eyes Only

## STATEMENT OF
## COMMISSIONER DEBORAH TAYLOR TATE

It is the role of the Federal Communications Commission to make sound policy decisions that will encourage continued investment in local news and information, the cornerstones of our democracy, as we move into the digital age.

This is a good day for the 20,000 employees whose jobs depend on the outcome of this transaction, and for the *Chicago Tribune* newspaper, a Chicago landmark since 1924.

Long before there was a Federal Communications Commission, this company was taking advantage of the efficiencies of cross-ownership.  In light of their historic business model, they were granted a waiver from the FCC's 1975 ban on newspaper-broadcast cross-ownership.  Their multi-platform, resource-sharing approach led to many of the innovations we see in today's newsrooms.

I thank the Chairman and the Commission staff for their committed effort to complete this process in a timely manner.

Highly Confidential - Attorneys' Eyes Only

JPM_00338378

### STATEMENT OF
### COMMISSIONER ROBERT M. McDOWELL

*The Applications of Tribune Company, Transferors and Sam Zell, et al., Transferees, For Consent to the Transfer of Control of The Tribune Company and Applications for the Renewal of License of KTLA(TV), Los Angeles, California, et al.,*

I am pleased to support the transfer of control of the Tribune Company to a new team headed by Sam Zell. I am also pleased that today's Order gives Tribune's new owners the opportunity to keep their combined newspaper-broadcast properties.

Approving this transaction allows the new owners to breathe new life into Tribune's newspapers and broadcast properties. Tribune's readers, viewers and listeners will benefit from its strengthened and more efficient news-gathering operations. Allowing for continued cross-ownership of the company's newspapers and broadcast stations furthers the Commission's statutory duty to promote competition, diversity and localism by invigorating a voice that might otherwise fade. Our Order today also allows Tribune to compete against a growing chorus of new media voices in the information, opinion and entertainment market place that do not live, and would not have developed, under a multi-platform cross-ownership ban.

I thank the Chairman for bringing this matter to a vote this week, and I thank the Media Bureau staff for their hard work on this proceeding.

Highly Confidential – Attorneys' Eyes Only