# TRIBUNE

## BOARD OF DIRECTORS MEETING
## July 18, 2007

**Master Copy**

**Confidential**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414548

Crane H. Kenney
Senior Vice President/General Counsel
& Secretary
312/222-2491

**TRIBUNE**

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
fax: 312/222-4206
e-mail: ckenney@tribune.com

July 11, 2007

Dennis J. FitzSimons                    J. Christopher Reyes
Enrique Hernandez, Jr.                  Dudley S. Taft
Betsy D. Holden                         Miles D. White
Robert S. Morrison                      Sam Zell
William A. Osborn

Enclosed is a notebook containing information that will be discussed at the Board of
Directors meeting to be held on Wednesday, July 18, 2007. Nominating & Governance
and Compensation & Organization Committee meetings will precede Wednesday's
Board meeting and an Audit Committee meeting will follow the Board meeting.
Nominating & Governance and Compensation & Organization Committee members will
also find an agenda and information for these meetings in their notebooks.

Blue books (2nd quarter financials) will be distributed to the Board via Federal Express on
Saturday, July 14th and a draft press release and the PricewaterhouseCoopers quarterly
report will be circulated to Audit Committee members at the meeting on Wednesday.
The Board and Committee meetings will take place on the 24th floor of Tribune Tower.

The schedule for Wednesday is as follows:

| *Date* | *Meeting* | *Location* | *Time* |
|--------|-----------|------------|--------|
| Wed., July 18 | Nom. & Gov. Committee | Lakeview Room | 7:30 a.m. |
| Wed., July 18 | Comp. & Org. Committee | Lakeview Room | 8:30 a.m. |
| Wed., July 18 | Board of Directors Meeting | Patterson Room | 9:00 a.m. |
| Wed., July 18 | Audit Committee | Patterson Room | ASAP |

A continental breakfast will be available at the Committee and Board meetings and there
will be an informal buffet luncheon for directors immediately following the Board
meeting. The luncheon will be held in the McCormick Room on the 24th floor of Tribune
Tower. Airport transportation will be available at the conclusion of the lunch.

I look forward to seeing you, and please contact me if you have any questions.

Sincerely,

CHK/bap

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414549**

Dennis J. FitzSimons
Chairman, President and
Chief Executive Officer
312/222-3373

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
fax: 312/222-3203
e-mail: dfitzsimons@tribune.com

*Via Federal Express*

July 11, 2007

Enrique Hernandez, Jr.                J. Christopher Reyes
Betsy D. Holden                        Dudley S. Taft
Robert S. Morrison                     Miles D. White
William A. Osborn                      Samuel Zell

Enclosed is the Board book for our July meeting.

Additionally, here is a brief overview of general business conditions and recent company developments.

<u>Publishing and Interactive</u>

Current business conditions – The newspaper industry continues to struggle through a very difficult revenue environment. Revenue declines accelerated in the second quarter, down 9% due to difficult comparisons to record real estate spending last year (especially in Florida) and weak trends in national advertising. Through aggressive cost controls, cash expenses were down 5% for the quarter, offsetting approximately half of the revenue losses. Operating cash flow for the quarter was down $54 million, or 22%.

We are focused on improving our performance in the second half, as year-over-year comparisons ease and new revenue initiatives start to positively impact Tribune results. These revenue initiatives include selling section front advertisements (including the main news section) and post-it notes in all our markets, and re-setting sales incentives to ensure that sales reps are focused on maximum revenue generation in the second half of the year.

TMN Retail – We have made great progress in forming our new national retail sales organization focused on 15 major retail accounts (which spent approximately $240 million with us in 2006). We have hired our initial team, which includes some strong sales talent from outside the company, and we have met with our initial target client list. Our plan to have a central point of contact and specialized service was received well by clients.

Staff reductions – In the second quarter, the publishing group took steps to further reduce staffing by approximately 450 FTEs, or about 3%, through a combination of voluntary and involuntary separations. These actions will yield annual savings of $33 million and a severance charge of $25 million.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414550

Page 2

Outsourcing – Last month, we began the migration of our IT help desk services to IBM Daksh in India. IBM Daksh is currently providing 100% of the call support for four of our newspapers, including the *Chicago Tribune* and the *Los Angeles Times,* and partial service for all our other newspapers. All the business units will be fully transitioned to Daksh by the end of August. Annual savings are expected to be $1.5 million.

We are close to signing an outsourcing agreement with Hewlett Packard (HP) for our advertising billing, credit and collections functions. Currently, approximately 240 FTEs perform these functions. Under the outsourced arrangement, 150 positions would be eliminated at the newspapers, certain functions would be centralized in Chicago, and HP would do a significant amount of work in Costa Rica and India. Transition will start in the third quarter, and we expect full year savings of approximately $8 million.

Labor matters – Over the past three months we have successfully negotiated two labor contracts, one with the press union in Allentown and the other with the Newspaper Guild in Baltimore. The Baltimore settlement was reached ten days before the deadline and saved the company over $1.4 million of strike preparation expenses. Additionally, the negotiations successfully maintained all of the concessions achieved in the 2003 contract and included additional work rule flexibility in the contract not seen in any other major metro newspaper labor contract.

Going forward, our chief labor focus will be on resisting union organizing efforts across other Tribune business units, including the *Los Angeles Times*. The pressmen's union in LA was recently certified by the National Labor Relations Board and negotiations for a first contract will begin in the third quarter.

Interactive – Second quarter interactive revenues increased 17% over the same period last year. Non-classified revenue was up 25% and classified revenue was up 15%. Tribune Interactive's websites drew over 16 million average monthly unique visitors during the month of May.

CareerBuilder's second quarter revenues are projected to grow by 16% over the same period last year. CareerBuilder continued to be the leading online recruitment site in North America during the second quarter with the most job seeker traffic. CareerBuilder drew 22.2 million monthly unique visitors during the second quarter, compared to Monster's 11.7 million and HotJobs' 18.5 million.

During the second quarter, Tribune Interactive began deployment of its Gen3 initiative designed to enhance users' experience on Tribune's newspaper websites. Gen3 includes new features and functionality, such as user-generated content, improved navigation and search functions, and a simplified look and feel. Gen3 also provides consistent ad positions and a common framework that will enable future website upgrades to be rolled out faster across all our markets. Hartford and Orlando were the first markets launched, and we expect the remaining markets to be rolled out in the third quarter.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Page 3

<u>Broadcasting/Entertainment</u>

Current business conditions – Second quarter ad revenue for our television group was down 10%. Excluding political, the group's ad revenue was down 8%. Advertising demand was soft across all ad categories, with the exception of telecom and entertainment. Third quarter ad revenue is better but is still pacing behind last year. Strong political spending in third quarter 2006 makes for a difficult comparison, as well as weakness in automotive and movie categories. Enthusiasm for our fourth quarter programming launches, both CW and syndicated shows, continues to be strong, and early advertising negotiations are generating average unit rate increases of better than 50%.

Network advertising upfront – The broadcast network advertising upfront concluded with estimated CPM increases averaging in the high single digits. The CW Network garnered a 10% rate increase, the highest increase among the broadcast networks. Our stations are also seeing stronger advertiser support for CW programming with third quarter CW prime revenue pacing up in the mid-teens.

**********

I look forward to seeing you at our meeting on July 18. If you have questions prior to the meeting, please feel free to call.

Sincerely,

Dennis FitzSimons

Enclosure

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**TRIBUNE COMPANY**
**BOARD OF DIRECTORS MEETING**
**WEDNESDAY, JULY 18, 2007 (9:00 a.m.)**
**PATTERSON BOARD ROOM**
**24th FLOOR, TRIBUNE TOWER**

**AGENDA**

|  | Tab No. |
|---|---|
| Executive session | |
| Approve minutes of May 9 and May 21, 2007 Board of Directors and May 9, 2007 Shareholders meetings | 1 |
| Preferred stock dividend | 2 |
| Second quarter operating results and stock price performance | 3 |
| Development update | 4 |
| SCNI update | 5 |
| Transaction update | 6 |
| Metromix presentation | |
| Compensation & Organization Committee report | |
| Nominating & Governance Committee report | |
|     -Approve committee appointment; By-law amendments | 7 |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414554

## TRIBUNE COMPANY
## BOARD OF DIRECTORS MEETING
### MAY 9, 2007

The Tribune Company Board of Directors met at 9:00 a.m. on Wednesday, May 9, 2007, at Tribune Tower, Chicago, Illinois, pursuant to notice.  The meeting was attended by Dennis J. FitzSimons, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, Dudley S. Taft and Miles D. White.  Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. participated in the meeting via telephone.

Portions of the meeting were attended by Chandler Bigelow, Donald C. Grenesko, Crane H. Kenney, Timothy J. Landon, Thomas D. Leach, Luis E. Lewin, Ruthellyn Musil, John E. Reardon and Scott C. Smith.  William Hughes, Brian Browning and Chad Rucker of Valuation Research Corporation also attended a portion of the meeting and Steve Rosenblum of Wachtell Lipton Rosen & Katz and Rick Alexander of Morris Nichols participated in a portion of the meeting via telephone.

Mr. FitzSimons acted as chairman of the meeting and Mr. Kenney acted as secretary.

Mr. FitzSimons called the meeting to order at 9:00 a.m.

## EXECUTIVE SESSION

The directors met in executive session at the beginning of the meeting.

During executive session, Mr. FitzSimons discussed the election of Samuel Zell to the Board of Directors.  Following discussion, a motion was made, seconded and approved to adopt the following resolutions, with Messrs. Chandler, Goodan and Stinehart abstaining:

> RESOLVED, that the size of this Board of Directors be, and hereby is, increased from 11 to 12 members; and

> FURTHER RESOLVED, that in order to fill the newly created directorship created by the above resolution, Samuel Zell is hereby elected as a member of this Board of Directors, effective May 9, 2007, to serve in the class of directors with terms expiring at the 2010 annual meeting of the shareholders of the Company and until his successor shall be elected and qualified or his earlier resignation or removal.

Following the conclusion of the executive session, Ms. Musil and Messrs. Grenesko, Kenney, Landon, Leach, Lewin, Reardon and Smith joined the meeting.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414555

## APPROVAL OF MINUTES

A motion was made, seconded and approved to adopt the minutes of the February 13 and April 1, 2007 meetings of the Board of Directors as submitted.

## PREFERRED STOCK DIVIDEND

A motion was made, seconded and approved to adopt the following resolutions:

> RESOLVED, that there is hereby declared a dividend of $8.9375 per share on the Series D-1 Convertible Preferred Stock of the Company payable on June 14, 2007 to stockholders of record at the start of business on June 14, 2007.

## ELECTION OF OFFICERS

Mr. FitzSimons presented a list of the officers of the Company for consideration and re-election. Mr. FitzSimons noted that the only new election to the list is Jack Rodden to Assistant Treasurer. Following discussion, a motion was made, seconded and approved to elect the following officers:

| Title | Name | Department |
|---|---|---|
| Chairman, President and Chief Executive Officer | Dennis J. FitzSimons | |
| Senior Vice President | Donald C. Grenesko | Finance & Administration |
| Senior Vice President, General Counsel and Secretary | Crane H. Kenney | Legal |
| Senior Vice President | Thomas D. Leach | Development |
| Senior Vice President | Luis E. Lewin | Human Resources |
| Senior Vice President | Ruthellyn Musil | Corporate Relations |
| Vice President and Treasurer | Chandler Bigelow | Treasury |
| Vice President | Thomas G. Caputo | Auditing |
| Vice President | James L. Ellis | Brand Management |
| Vice President, Assistant General Counsel and Assistant Secretary | Mark W. Hianik | Legal |
| Vice President | Daniel G. Kazan | Development |
| Vice President and Controller | R. Mark Mallory | Financial Reporting & Planning |
| Vice President | Susan M. Mitchell | Human Resources |
| Vice President | Irene M. F. Sewell | Compensation & Benefits |
| Vice President | Patrick M. Shanahan | Tax |
| Vice President | Shaun M. Sheehan | Washington Affairs |
| Vice President | Howard G. Weinstein | Labor & Employee Relations |
| Vice President | Gary Weitman | Communications |

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414556

| Assistant Controller | Brian F. Litman | Financial Reporting & Planning |
| Assistant Treasurer | Jack Rodden | Treasury |

## COMMITTEE APPOINTMENTS

Mr. FitzSimons presented proposed committee appointments for 2007. Following discussion, a motion was made, seconded and approved to adopt the following resolutions:

RESOLVED, that

> Betsy D. Holden
> William A. Osborn
> J. Christopher Reyes
> Dudley S. Taft

are appointed members of the Audit Committee of the Board of Directors to hold office until the next Annual Meeting of Shareholders and until their respective successors are appointed, and that Mr. Osborn is appointed Chair of the Audit Committee.

\* \* \* \*

RESOLVED, that

> Jeffrey Chandler
> Enrique Hernandez, Jr.
> Robert S. Morrison
> Miles D. White

are appointed members of the Compensation & Organization Committee of the Board of Directors to hold office until the next Annual Meeting of Shareholders and until their respective successors are appointed, and that Mr. Morrison is appointed Chairman of the Compensation & Organization Committee.

\* \* \* \*

RESOLVED, that

> Dennis J. FitzSimons
> Enrique Hernandez, Jr.
> Robert S. Morrison
> William A. Osborn
> William Stinehart, Jr.

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414557

are appointed members of the Executive Committee of the Board of Directors to hold office until the next Annual Meeting of Shareholders and until their respective successors are appointed, and that Mr. FitzSimons is appointed Chairman of the Executive Committee.

\* \* \* \*

RESOLVED, that

> Roger Goodan
> Enrique Hernandez, Jr.
> Robert S. Morrison
> J. Christopher Reyes
> William Stinehart, Jr.

are appointed members of the Nominating & Governance Committee of the Board of Directors to hold office until the next Annual Meeting of Shareholders and until their respective successors are appointed, and that Mr. Hernandez is appointed Chairman of the Nominating & Governance Committee.

\* \* \* \*

RESOLVED, that

> Dennis J. FitzSimons
> Donald C. Grenesko

are appointed to a Committee to administer the Directors' Deferred Compensation Plan to hold office until the next Annual Meeting of Shareholders and until their respective successors are appointed, and that Mr. FitzSimons is appointed Chairman of the Committee.

\* \* \* \*

RESOLVED, that

> Harry A. Amsden
> Chandler Bigelow
> Michael G. Bourgon
> Donald C. Grenesko
> Luis E. Lewin
> Ruthellyn Musil

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

John F. Poelking
Naomi B. Sachs
Irene M. F. Sewell

are appointed members of the Tribune Company Employee Benefits Committee to
hold office until the next Annual Meeting of Shareholders and until their
respective successors are appointed, and that Mr. Grenesko is appointed Chairman
and Mr. Bigelow is appointed Secretary of said Committee.

**FIRST QUARTER OPERATING RESULTS/STOCK PERFORMANCE**

Mr. Grenesko next reviewed the first quarter results of each of the Company's lines of business
and commented on factors impacting the results. Mr. Grenesko then reviewed the performance
of the Company's stock and market factors affecting the stock. Mr. Grenesko provided
projections for the second quarter and answered questions from the Board of Directors. At this
point, Mr. Bigelow joined the meeting.

**DEVELOPMENT UPDATE**

Mr. Leach reviewed the status of current development activities. A discussion followed Mr.
Leach's presentation.

**TRANSACTION UPDATE**

Mr. Kenney reported on the status of the leveraged ESOP transaction and Messrs. Grenesko and
Bigelow reported on financing progress. At this point, Messrs. Hughes, Rucker and Browning
joined the meeting and Mr. Alexander joined the meeting via telephone. Mr. Alexander advised

Redacted

Messrs. Hughes, Rucker and Browning then presented VRC's step
one solvency opinion and, following questions, delivered the opinion to the Board.

Following discussion, a motion was made, seconded and approved to adopt the following
resolutions:

WHEREAS, under Delaware law, the Company may pay dividends and repurchase or
redeem stock out of the "surplus" of the Company;

WHEREAS, for purposes of Delaware law, surplus is equal to the actual current value of
the Company's net assets less its statutory capital;

WHEREAS, the capital of the Company may be reduced by transferring to surplus (i)

5

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414559

some or all of the capital not represented by any particular class of its capital stock, (ii) some or all of the capital stock represented by issued shares of its par value capital stock which capital is in excess of the aggregate par value of such shares or (iii) some of the capital represented by issued shares of its capital stock without par value as long as, following such reduction, the assets of the Corporation remaining after such reduction shall be sufficient to pay any debts of the Corporation for which payment has not been otherwise provided;

WHEREAS, the Company has issued shares with the par value of $0.01 as well as issued shares without par value; and

WHEREAS, based on the opinion of Valuation Research Corporation delivered to the Board of Directors dated May 9, 2007, the assets of the Corporation are sufficient to pay the debts of the Corporation for which payment has not otherwise been provided,

NOW, THEREFORE, BE IT RESOLVED that the capital of the Company be reduced to an amount equal to the number of issued shares of stock of the Company multiplied by $0.01 to the extent that the capital is in excess thereof.

## REVIEW OF ANNUAL MEETING

Mr. Kenney then reported on preliminary voting results and procedures for the annual meeting. A discussion followed Mr. Kenney's presentation.

## AUDIT COMMITTEE REPORT

Mr. Osborn reported on the business discussed at the Audit Committee meeting held earlier in the day. The Committee reviewed a summary of work performed by the Internal Audit Group since February 2007. No significant issues were noted.

Mr. Osborn then reported that the Committee reviewed management's plans for the Company's Section 404 internal controls certification for 2007 and 2007 audit plan. Mr. Osborn noted that the Committee reviewed and pre-approved all services expected to be provided by PricewaterhouseCoopers in 2007 and concluded that the performance of such services would not impair PwC's independence.

Mr. Osborn then reported that the Committee had reviewed the first quarter 2007 financial results with management and PwC prior to public release as well as a draft of the Company's first quarter Form 10-Q.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414560

**ADJOURNMENT**

There being no further business to come before the Board, the meeting was adjourned at 10:30 a.m.

_____
Secretary

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414561

**TRIBUNE COMPANY**
**BOARD OF DIRECTORS MEETING**
**MAY 21, 2007**

The Tribune Company Board of Directors met at 9:15 a.m. on Monday, May 21, 2007, by conference telephone, pursuant to notice.  The following directors participated in the meeting: Jeffrey Chandler, Dennis J. FitzSimons, Roger Goodan, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, William Stinehart, Jr., Dudley S. Taft, Miles D. White and Samuel Zell.

Chandler Bigelow, Donald C. Grenesko, Crane H. Kenney and Thomas D. Leach also participated in the meeting.

Mr. FitzSimons acted as chairman of the meeting and Mr. Kenney acted as secretary.

Mr. FitzSimons called the meeting to order at 9:15 a.m. and reviewed progress on the FCC's review of the Company's transfer applications related to the leveraged ESOP transaction.

**FINANCING UPDATE**

Mr. Grenesko then reviewed the terms of the definitive credit facilities that support the transaction, market conditions and syndication efforts.  Mr. Grenesko described the structure of the credit facilities and the impact of the debt structure on the Company.  Mr. Zell expressed his support for the approval of the credit facilities and the Board asked Mr. Grenesko questions regarding his presentation.

Following discussion, a motion was made, seconded and approved to adopt the following resolutions, with Messrs. Chandler, Goodan and Stinehart abstaining:

> WHEREAS, on April 1, 2007, the Board of Directors approved resolutions regarding the entering into of certain credit facilities and transactions related thereto (the "April 1 Resolutions"), and such resolutions remain in full force and effect;

> WHEREAS, on May 17, 2007, the Company entered into a definitive Credit Agreement (the "Credit Agreement") by and among the Company, as borrower, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, Citicorp North America, Inc., Bank of America, N.A. and Barclay's Bank plc, as co-documentation agents, and J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners;

> WHEREAS, the Credit Agreement is consistent with the terms and conditions described in the First Step Commitment and the First Step Credit Facility as approved by the Board

of Directors pursuant to the April 1 Resolutions and the general authority delegated to the officers of the Company pursuant thereto; provided that the Credit Agreement provides for the establishment of a $1.5 billion two-year term loan and a corresponding reduction of the seven-year term loan facility from $7.015 billion to $5.515 billion; accordingly, the Credit Agreement provides for senior secured credit facilities for the Company in an aggregate principal amount of $8.028 billion, consisting of a $5.515 billion seven-year term loan, a $1.5 billion two-year term loan (with $750 million of such two-year term loan due and payable in 18 months and the remaining $750 million due and payable at the two-year maturity date), a $263 million seven-year term loan and a $750 million six-year revolving line of credit; and

WHEREAS, in connection with the Company's entry into the Credit Agreement, the Company formed Tribune Broadcasting Holdco, LLC, a newly formed Delaware limited liability company, and intends to contribute the shares of Tribune Broadcasting Company, a Delaware corporation, to Tribune Broadcasting Holdco, LLC as required by the terms of the Credit Agreement.

RESOLVED, that the Credit Agreement be, and hereby is, approved, ratified and adopted in all respects;

RESOLVED, that the proper officers of the Company be, and each of them hereby is, authorized, directed and empowered, in the name of and on behalf of the Company, subject to receipt of the necessary consents and approvals from the Federal Communications Commission, to effect the contribution of all of the Company's right, title and interest in and to the issued and outstanding shares of capital stock of Tribune Broadcasting Company to Tribune Broadcasting Holdco, LLC;

RESOLVED, that the proper officers of the Company be and hereby are authorized, directed and empowered, in the name of and on behalf of the Company, to take any and all such actions and to do any and all such things, including without limitation the execution and delivery of all such further agreements, amendments to the Credit Agreement, documents, certificates, instruments and undertakings, and to incur such fees and expenses, as in the judgment of any of the proper officers may be deemed necessary, desirable, advisable, expedient, convenient or proper to carry out or fulfill the purposes and intent of the foregoing resolutions and the April 1 Resolutions, and all acts and prior acts of such officers in any way relating to or arising from, or that are in conformity with the purposes and intent of, these resolutions and the April 1 Resolutions and the instruments and agreements referred to herein and therein are hereby approved, ratified and confirmed in all respects; and

FURTHER RESOLVED, that all actions heretofore taken by any of the directors, officers, employees, representatives or agents of the Company or any of its affiliates in connection with the foregoing resolutions and the April 1 Resolutions be, and each of the

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414563

same hereby is, ratified, confirmed and approved in all respects as the act and deed of the Company.

## MATTHEW BENDER UPDATE

Mr. Kenney reported on the Company's preparation for oral argument in the Matthew Bender tax appeal. He also reviewed settlement discussions between the Company and the Internal Revenue Service. Mr. Kenney then answered questions from the Board.

Following discussion, a motion was made, seconded and approved to adopt the following resolutions:

> RESOLVED, that the Board of Directors hereby authorizes senior management of the Company to continue settlement discussions with the Internal Revenue Service in an effort to settle the ongoing Matthew Bender and Mosby tax litigation currently on appeal to the United States Court of Appeals for the Seventh Circuit and captioned *Tribune Company, as agent and successor by merger to the former The Times Mirror Company, itself and its consolidated subsidiaries, Petitioner-Appellant, v. Commissioner of Internal Revenue, Respondent-Appellee (No. 06-3482)*;

> FURTHER RESOLVED, that the Board of Directors supports settlement of this litigation provided the Company receives not less than 25% of the total federal income taxes paid by the Company following the September 2005 Tax Court ruling against the Company;

> FURTHER RESOLVED, that the Board of Directors hereby delegates authority to approve the final terms of any settlement of the litigation to Messrs. Zell and Osborn;

> FURTHER RESOLVED, that the officers of the Company be and hereby severally are authorized and directed, in the name and on behalf of the Company, to take any and all further action and to execute all further resolutions, agreements, documents, certificates and orders in connection with the proposed settlement; and

> FURTHER RESOLVED, that all actions previously taken by any officer of the Company in connection with the proposed settlement and consistent with the foregoing resolutions are hereby adopted, ratified, confirmed and approved in all respects.

## GARAMELLA

Mr. Kenney then provided an update on the Garamella lawsuit.

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414564

## ADJOURNMENT

There being no further business to come before the Board, the meeting was adjourned at 9:45 a.m.

_____
Secretary

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414565

# TRIBUNE COMPANY
## ANNUAL MEETING OF STOCKHOLDERS
### MAY 9, 2007

The 2007 Annual Meeting of Tribune Company stockholders was held at Tribune Tower, Chicago, Illinois, on May 9, 2007, at 11:00 a.m., pursuant to notice. Dennis J. FitzSimons, Chairman, President and Chief Executive Officer, acted as Chairman of the meeting and Crane H. Kenney, Senior Vice President, General Counsel & Secretary, acted as Secretary of the meeting.

Mr. FitzSimons welcomed stockholders, called the meeting to order and described procedures for the conduct of the meeting. Mr. FitzSimons next introduced members of the Board of Directors and announced Samuel Zell's election to the Board.

## PROCEDURAL MATTERS

Mr. FitzSimons reported that lawful notice of the meeting was provided and that a quorum was present. Mr. FitzSimons described the procedures for voting by ballot at the meeting.

## OPENING OF POLLS

Pursuant to the By-Laws, Mr. FitzSimons declared that the polls were opened at approximately 11:15 a.m. for all matters to be voted upon at the meeting.

## ELECTION OF DIRECTORS

Mr. FitzSimons announced that the Company's Board of Directors, in accordance with the By-Laws, nominated Jeffrey Chandler, William A. Osborn and Miles D. White for election for three-year terms as directors of the Company. As no other nominations were made in accordance with the By-Laws, Mr. FitzSimons declared the nominations closed. He then responded to questions from shareholders regarding this proposal.

## RATIFICATION OF SELECTION OF AUDITORS

Mr. FitzSimons then moved for the ratification of the Audit Committee's selection of PricewaterhouseCoopers as independent auditors for Tribune Company for 2007. He then responded to questions from shareholders regarding this proposal.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## SHAREHOLDER PROPOSAL

Mr. FitzSimons next introduced a shareholder proposal requesting that the Board of Directors take the necessary steps to cause its members to be elected annually. Evelyn Y. Davis, the proponent of this proposal, also read a statement in support. Mr. FitzSimons reported that the Nominating & Governance Committee considered the proposal and recommended a vote against the proposal. He then responded to questions from shareholders regarding this proposal.

## CLOSING OF POLLS

Mr. FitzSimons then declared the polls closed at approximately 11:30 a.m. following collection of ballots and proxy cards.

## REPORT TO STOCKHOLDERS

Mr. FitzSimons then reviewed important events for the Company from 2006 and also provided an update on the ESOP/Zell transaction.

## VOTING RESULTS

Mr. FitzSimons then reported on the preliminary voting results. Mr. FitzSimons indicated that the director nominees had been elected and that the ratification of the selection of auditors had been approved. Mr. FitzSimons also reported that the shareholder proposal recommending the annual election of the Board of Directors was approved received a majority of the shares voted at the meeting. Mr. FitzSimons noted that the final voting results would be included in the Company's second quarter 10-Q. (The certificate of inspectors setting forth the final voting results is attached to these minutes.)

## STOCKHOLDER QUESTIONS

Mr. FitzSimons and members of management then answered questions from stockholders.

## PRESENTATION OF AWARDS

Mr. FitzSimons presented the Tribune Management Award to Larry Delia, vice president and general manager of WGNO and WNOL. Mr. FitzSimons then presented the Tribune Values Award to a team of three people from *Chicago Magazine*. The team included Dick Babcock, editor of *Chicago Magazine*, Rich Gamble, director of Finance and Operations of *Chicago Magazine* and Randy Hano, publisher of *Chicago Magazine*.

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414567

**ADJOURNMENT**

Mr. FitzSimons thanked the stockholders for attending the meeting.

There being no further business, the meeting was adjourned at 12:10 p.m.

_____
Secretary

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414568

## TRIBUNE COMPANY
## 2007 ANNUAL MEETING OF SHAREHOLDERS

### CERTIFICATION OF INSPECTORS

The undersigned hereby certify that at the 2007 Annual Meeting of Shareholders of Tribune Company held on May 9, 2007, the following votes were cast as to the matters listed below:

1. ELECTION OF DIRECTORS.

| | FOR | WITHHELD |
|---|---|---|
| Jeffrey Chandler | 204,462,640 | 17,520,682 |
| William A. Osborn | 213,683,970 | 8,299,353 |
| Miles D. White | 213,948,841 | 8,034,481 |

2. RATIFICATION OF THE SELECTION OF PRICEWATERHOUSECOOPERS LLP AS INDEPENDENT ACCOUNTANTS

| FOR | AGAINST | ABSTAIN |
|---|---|---|
| 217,312,218 | 3,188,488 | 1,548,616 |

3. SHAREHOLDER PROPOSAL CONCERNING TRIBUNE'S CLASSIFIED BOARD OF DIRECTORS

| FOR | AGAINST | ABSTAIN | NON-VOTES |
|---|---|---|---|
| 121,166,030 | 81,341,130 | 2,448,701 | 17,027,460 |

Witness the due execution hereof this 9th day of May, 2007.

_____
Thomas G. Caputo

_____
Mark W. Hianik

_____
Tammie J. Marshall

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**2**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTIONS

### (Preferred Dividend)

RESOLVED, that there is hereby declared a dividend of $8.9375 per share on the Series D-1 Convertible Preferred Stock of the Company payable on September 13, 2007 to stockholders of record at the start of business on September 13, 2007.

DPE
7/11/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414571

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414572

# TRIBUNE COMPANY
## STOCK PERFORMANCE REPORT
*As of July 10, 2007*



| | Total Returns | | |
| | (price change plus dividends) | | |
| | | Annual | |
| | YTD | 3 year | 5 year |
|---|---|---|---|
| **Tribune** | -1.0% | -9.6% | -4.6% |
| **S&P 500** | 7.5% | 12.8% | 12.4% |
| **S&P PUB** | -2.0% | 1.0% | 3.5% |

## STOCK PERFORMANCE/TRADING ACTIVITY

Since the April 2 announcement of a transaction which will result in Tribune going private at $34 per share, the stock generally has traded in the $30-32 range. On May 24 (the expiration of the tender offer which marked the completion of the first stage of the transaction) TRB traded at $33.20, its high for the year.

In June, the stock price briefly dipped below $30 per share. This followed the Chandler Trusts' sale of all their remaining shares through a block trade underwritten by Goldman Sachs & Co. This sale at just over $31 per share, weak results throughout the publishing industry and volatility in the credit markets, pressured the stock. Currently, TRB is trading in the $30-31 range, down 1% year-to-date on a total return basis.

Year-to-date average daily volume is 2.3 million shares, in line with the comparable period last year despite spikes in volume related to the going-private transaction and the sale of stock by the Chandler Trusts.

Short interest in June was 7 million shares, representing just over 4% of shares outstanding. This is below the 9% average of our newspaper peers, and up slightly from the April-May period.

We plan to release second quarter earnings on July 25; there will not be an investor conference call.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# TRIBUNE COMPANY
## STOCK PERFORMANCE REPORT

## VALUATION

In the $30 range, the stock trades at a multiple of approximately 8x enterprise value/2007 operating cash flow, in line with the newspaper group average.

Tribune currently is covered by 12 analysts; A.G. Edwards and Citigroup have suspended coverage due to analyst departures and Prudential Securities recently eliminated its research department. Eight analysts rate Tribune "hold" with two at "underperform." Merrill Lynch and Morgan Stanley are restricted because of involvement in our transaction. Most analysts' price targets are at $34, reflecting the terms of our going-private transaction.

| EV/EBITDA Multiples | |
| --- | --- |
| | July |
| **Tribune** | **8.1x** |
| Cable | 8.8x |
| Entertainment | 9.4x |
| Newspapers | 8.3x |
| Radio | 11.0x |
| Television | 12.0x |
| *Source: Merrill Lynch; based on 2007 estimated operating cash flow* | |

## SHAREHOLDER ANALYSIS

Most of Tribune's top institutional investors sold into the tender offer. Buyers of the stock are hedge funds and arbitrageurs. Stark Asset Management, a hedge fund based in Wisconsin, said in a June 28 filing that it currently holds 7.8 million shares, making it Tribune's largest institutional investor.

### TOP 10 SHAREHOLDERS
*(Shares in millions)*

| | | Shares Held | % of S/O | Style |
| --- | --- | --- | --- | --- |
| 1. | McCormick Tribune Foundation | 11.9 | 11% | n/a |
| 2. | Employees | 11.0 | 9% | n/a |
| 3. | Stark Asset Management | 7.8 | 7% | Hedge |
| 4. | T. Rowe Price Associate | 7.7 | 7% | Active |
| 5. | The Vanguard Group | 2.5 | 2% | Index |
| 6. | Barclays Global Investors | 2.2 | 2% | Index/Quant |
| 7. | State Street Global Advisors | 2.1 | 2% | Index |
| 8. | LSV Asset Management | 2.1 | 2% | Quant |
| 9. | Northern Trust Investments | 1.7 | 1% | Index |
| 10. | GAMCO Investors | 1.5 | 1% | Active |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414574

# TRIBUNE COMPANY
## BENCHMARK COMPANY TOTAL RETURNS

|  | YTD |  | 1-Year |  | 3-Year |  | 5-Year |
|---|---|---|---|---|---|---|---|
| Dow Jones[1] | 53.9% | Sinclair | 82.1% | Sinclair | 17.2% | Washington Post | 8.6% |
| Sinclair[2] | 42.0% | Dow Jones | 72.8% | Dow Jones | 14.2% | Dow Jones | 7.7% |
| Belo | 12.9% | Belo | 32.8% | Hearst-Argyle | -1.0% | Sinclair | 5.7% |
| Washington Post | 3.7% | Hearst-Argyle | 8.9% | Scripps | -3.6% | Scripps | 4.8% |
| New York Times | 0.9% | Scripps | 7.7% | Belo | -4.0% | Hearst-Argyle | 2.4% |
| **Tribune** | **-1.0%** | New York Times | 3.5% | Washington Post | -4.6% | Belo | 1.3% |
| Hearst-Argyle | -7.2% | Washington Post | 1.6% | **Tribune** | **-9.6%** | Gannett | -3.8% |
| Scripps | -8.6% | Gannett | -2.9% | Gannett | -11.0% | **Tribune** | **-4.6%** |
| Gannett | -9.7% | **Tribune** | **-5.3%** | New York Times | -16.0% | New York Times | -11.3% |
| McClatchy | -37.4% | McClatchy | -31.9% | McClatchy | -26.5% | McClatchy | -14.4% |
|  |  |  |  |  |  |  |  |
| S&P 500 | 7.5% |  | 21.4% |  | 12.8% |  | 12.4% |
| S&P Pub | -2.0% |  | 13.8% |  | 1.0% |  | 3.5% |

The "Annual" header spans the 1-Year, 3-Year, and 5-Year columns.

[1] On May 1, News Corp. made an unsolicited bid for Dow Jones. Dow Jones stock rose sharply and has maintained at a total return of nearly 54% year-to-date.

Sinclair's stock price has risen from $10.50 to $15.00 due to an improved outlook including debt repayment, lower programming costs and retransmission consent agreements.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414575

**4**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
# DEVELOPMENT UPDATE

This report summarizes the status of current development activities.

## PUBLISHING AND INTERACTIVE

### CareerBuilder

On May 8, CareerBuilder and Microsoft entered into an agreement to extend their existing domestic distribution arrangement through 2013 and create a new international distribution arrangement that will also run through 2013. The agreement will help solidify CareerBuilder's distribution in the U.S. and will serve as a vital platform for its international expansion. In connection with the agreement, Microsoft acquired a 4% equity stake in CareerBuilder for $65 million ($1.55 billion valuation). Microsoft has the right to put its equity interest back to CareerBuilder on the 7th anniversary of the investment for a price equal to the original purchase price plus a 7.5% annual return. Tribune and Gannett have agreed to pay that put price if CareerBuilder is unable to do so. Tribune and Gannett now each own 40.8% of CareerBuilder, while McClatchy owns 14.4%.

McClatchy recently expressed dissatisfaction with its CareerBuilder affiliation agreement. As you may recall, McClatchy agreed to changes in its affiliation agreement last summer in connection with Tribune and Gannett buying down McClatchy's stake in CareerBuilder. Now, McClatchy is asking to renegotiate the affiliation agreement and has stated that if it cannot renegotiate in a satisfactory manner, it may try to sell its equity interest in CareerBuilder, which would enable it to terminate the affiliation agreement. We have offered to make modest changes to the affiliation agreement, but are not willing to give back too many of the concessions McClatchy made last summer that were part of our overall transaction. At this time, it is not clear whether the changes we have offered will be acceptable to McClatchy.

While we would prefer to keep McClatchy as a partner and affiliate of CareerBuilder, losing McClatchy would not have a significant negative impact on CareerBuilder. In fact, we believe operating cash flow would increase, as the marketing and other payments that are currently being paid to McClatchy would be eliminated. Tribune and Gannett have rights of first refusal on the sale of McClatchy's equity stake.

### New Interactive Joint Ventures

Tribune and Gannett continue to evaluate ways to more effectively use our combined Internet assets, with the current focus on coordinating online advertising sales and launching new, and expanding our existing, national content channels. For online ad sales, we are discussing jointly selling inventory on Tribune and Gannett's websites, with the hope of expanding that effort into an ad network that would include the websites of other newspaper groups. We continue to discuss the ad network concept with other newspaper groups.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

For new content channels, our current focus is launching a national entertainment channel under the Metromix brand. We are in the midst of discussions with Gannett about the details of this channel and will be launching Metromix in all of our newspaper and several of our television markets. Los Angeles and New York launched this week and other markets will be rolled out in the coming months.

We are also continuing discussions with Yahoo, Google, Microsoft and AOL regarding possible alliances or business relationships involving our online ad sales strategy and national content channels. Having one of these major Internet companies as a partner could aid our efforts, as each has a sophisticated technology platform and strong distribution.

**Recycler**

We signed a term sheet to sell the *Los Angeles Times'* Recycler classifieds business to its former owner, Target Media Partners, for approximately $1 million plus working capital. Target Media owns over 60 classified ad publications and their associated websites, most of which are focused on used car and truck ads. Times Mirror purchased the Recycler business in 1998 for $189 million. Since the acquisition, revenues have declined steadily from $45 million in 1999 to $27 million in 2006. Recycler had an operating loss in 2006 of $4.4 million and is expected to be close to break-even this year. Due to our high tax basis, the sale will trigger a large capital loss, resulting in a tax benefit of approximately $65 million.

The transaction is subject to satisfactory completion by Target Media of its due diligence, as well as the negotiation of mutually acceptable transaction agreements. We hope to complete this sale within the next 6-8 weeks.

**Hoy**

On May 15, we completed the sale of *Hoy* New York to ImpreMedia LLC for $6.75 million in cash. After-tax proceeds from the sale were approximately $4.5 million.

**Chicago Home & Garden Magazine**

On June 21, Chicagoland Publishing Company, a subsidiary of Chicago Tribune Company that operates several targeted publications, acquired select assets of the bi-monthly magazine *Chicago Home & Garden* for $1.9 million in cash. *Chicago Home & Garden* will be combined with our existing *Chicago HOME* magazine, with the resulting publication being called *Chicago HOME + Garden*. Combining the publications will provide *Chicago HOME* with a stronger base of paid subscribers and advertisers without the addition of significant costs.

**TMS NewsCom**

On June 29, Tribune Media Services and McClatchy completed the sale of their NewsCom LLC joint venture to Mainstream Data, Inc. for $2.7 million in cash. After-tax proceeds were approximately $2 million, with Tribune's share being approximately $1 million.

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414578

## BROADCASTING AND ENTERTAINMENT

### Chicago Cubs

We have hired J.P. Morgan to assist with the sale of the Chicago Cubs and our 25% interest in Comcast SportsNet Chicago.  We are currently in the process of preparing an offering memorandum and pre-clearing potential buyers with Major League Baseball.  We expect the sale process to be completed in the fourth quarter.


DGK
7/11/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414579

**5**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## SALE OF SOUTHERN CONNECTICUT NEWSPAPERS, INC.

## RECOMMENDATION

Management requests authority to sell Southern Connecticut Newspapers, Inc. (SCNI) on terms and conditions to be approved by the Executive Committee of the Board of Directors. Following the termination of our previous agreement to sell SCNI to Gannett, we initiated discussions with several other parties, with a goal of completing a transaction on reasonable terms as soon as possible. We have received preliminary non-binding expressions of interest from several of those parties valuing the business at or slightly above $60 million, and we believe an agreement may be reached prior to our October board meeting.

SCNI's real estate may be sold separately or to the buyer of SCNI. The real estate consists of an office building and print facility in Stamford and an office building in Greenwich. We believe the value of the real estate is at least $20 million.

## BACKGROUND

Tribune acquired SCNI as part of the Times Mirror acquisition in 2000. *The Advocate* and the *Greenwich Time* serve the Southern Connecticut cities of Stamford and Greenwich, respectively. This affluent Fairfield County market is adjacent to New York's Westchester County, where Gannett publishes the leading local paper, *The Journal News*. *The Advocate* and the *Greenwich Time* combined have daily and Sunday circulation of less than 40,000, making them by far Tribune's smallest daily newspapers.

In December, the Board approved the sale of SCNI for at least $70 million, excluding the real estate. In March, we agreed to sell SCNI to Gannett for $73 million in cash. As part of the agreement, Gannett would not agree to assume the contract with the United Auto Workers ("UAW") that covers editorial employees at *The Advocate* due to its concern that assuming that contract would set a bad precedent for its union negotiations at other business units. Although Gannett planned to rehire 32 of 36 members of the bargaining group and recognize the union, it was only willing to do so under a new contract. In May, the agreement was terminated following an arbitrator's ruling that Tribune could not sell SCNI unless the buyer assumed the existing UAW contract as a condition of the sale, which, for the reason stated above, Gannett was unwilling to do under any circumstances.

## STRATEGIC RATIONALE

Despite the attractive demographics of Fairfield County, we believe SCNI has limited prospects for growth. SCNI lacks operating scale and its cash flow margin is last

| SCNI Financials ($ in millions) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | '02 | '03 | '04 | '05 | '06 | '07E | CAGR |
| Revenues | $37.6 | $38.6 | $39.7 | $39.3 | $37.8 | $36.8 | -0.4% |
| Cash Flow | 7.0 | 6.5 | 7.0 | 7.5 | 6.5 | 6.4 | -1.8% |
| Cash Flow Margin | 18.6% | 16.8% | 17.6% | 19.1% | 17.2% | 17.4% | |
| Capital Expenditures | $ 0.7 | $ 2.9 | $ 0.8 | $ 1.0 | $ 0.8 | $ 0.2 | |

Note: '06 is presented on a 52 week basis and both '06 and '07E exclude stock-based compensation

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

among our daily newspapers. SCNI's revenue has declined approximately 0.4% annually since 2002 and the decline has been accelerating in recent years. We are projecting 2007 revenue to be down 2% due to softness in classifieds and national. We do not expect SCNI's revenue outlook to significantly improve in the near term. Similarly, prospects for operating cash flow growth are limited.

Operating cash flow has declined just under 2% annually since 2002 and we are projecting that 2007 operating cash flow will be approximately flat with 2006, primarily due to aggressive cost management. Further cost reductions will be difficult due to the inherent cost structure of operating a stand-alone local daily newspaper in a competitive, high-cost suburban market. Accordingly, we project operating cash flow growth will be roughly flat over the next 3-5 years.

Roughly $800,000, or 12%, of SCNI's cash flow comes from the royalties it receives from CareerBuilder. Those royalty payments cannot be assigned to a third party buyer (other than Gannett, who could retain them due to its existing equity ownership in CareerBuilder). In addition, SCNI receives approximately $250,000 of cash flow from sales made by Newsday, which will not occur once SCNI is sold. This $1.0 million in lost operating cash flow will be a major valuation consideration for potential buyers.

**TRANSACTION STATUS**

Following the initial agreement with Gannett, we began recording SCNI's results under "Discontinued Operations", and have continued to do so as we intend to complete a sale of the business on reasonable terms as soon as possible.

We have received several preliminary non-binding expressions of interest from parties valuing the business at or slightly in excess of $60 million. Those parties are currently conducting due diligence and we hope to reach an agreement with the highest bidder in August.

While we contemplate a price for SCNI that would generate up to $13 million less in gross proceeds than the Gannett transaction, that shortfall should be partially offset by lower severance costs than we had agreed to assume with Gannett and lower cash taxes due to our minimal tax basis in the assets. In addition, CareerBuilder's cash flow will increase by approximately $800,000 due to the elimination of the royalty payment, which will enhance the value of our of 40.8% equity interest. Lastly, we are also evaluating tax-efficient structures such as a leveraged partnership, which could help maximize our net proceeds.

TDL
7/11/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414582

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTIONS

### (Sale of Southern Connecticut Newspapers, Inc.)

RESOLVED, that the Executive Committee of the Board of Directors is hereby authorized (with full power of delegation) to approve the sale by the Company (or any affiliate thereof) of Southern Connecticut Newspapers, Inc. on terms and conditions to be approved by the Executive Committee.

DPE
7/11/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**6**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414584

**7**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only
TRB0414585

## TRIBUNE COMPANY
## NOMINATING & GOVERNANCE COMMITTEE
## BOARD COMMITTEE STRUCTURE AND MEMBERSHIP REVIEW

The Nominating & Governance Committee Charter requires the Committee to periodically review and make recommendations to the Board with respect to the size, structure or meeting frequency of the Board and Board committees.

With the recent resignations of the three Chandler Trust directors and Chris Reyes' scheduled resignation following the July Board meeting, the committee membership will be as follows:

**Audit Committee**
Betsy D. Holden
William A. Osborn, Chair
Dudley S. Taft

**Nominating & Governance Committee**
Enrique Hernandez, Jr., Chair
Robert S. Morrison

**Executive Committee**
Dennis J. FitzSimons, Chair
Enrique Hernandez, Jr.
Robert S. Morrison
William A. Osborn

**Compensation & Organization Committee**
Enrique Hernandez, Jr.
Robert S. Morrison, Chair
Miles D. White

Given the relatively short time frame anticipated between now and the merger closing, management recommends that we leave the size of the three NYSE-mandated Board committees at three members each and appoint Miles White to fill the vacancy on the Nominating & Governance Committee that will be created by Chris Reyes' resignation. A proposed resolution is attached.

MWH
7/11/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414586

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTION

### (Committee Appointment)

RESOLVED, that Miles D. White is appointed as a member of the Nominating & Governance Committee of the Board of Directors to hold office until the next Annual Meeting of Shareholders and until his successor is appointed.

MWH
7/11/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTION

### (Approval of Amended By-Laws)

RESOLVED, that the amended By-Laws, substantially in the form presented at this meeting, are hereby adopted and approved.

MWH
7/11/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414588

# BY-LAWS

## of

## Tribune Company

## a Delaware Corporation

As amended and in effect on ~~October 19, 2005~~July 18, 2007

# ARTICLE I

## Registered Office and Agent

**Section 1.1 Registered Office and Agent.** The registered office of the Company in the State of Delaware shall be the office of The Corporation Trust Company in the City of Wilmington, County of New Castle, and the registered agent in charge thereof shall be The Corporation Trust Company.

# ARTICLE II

## Meetings of Stockholders

**Section 2.1 Place of Meeting.** Meetings of stockholders shall be held at such locations as are designated by the Board of Directors or the officers calling such meetings.

**Section 2.2 Annual Meeting.** The annual meeting of the stockholders shall be held on such date (not a legal holiday) and at such time as is designated by resolution of the Board of Directors, for the purpose of electing directors and for the transaction of such other business as may properly be brought before the meeting.

**Section 2.3 Special Meetings.** Special meetings of the stockholders may be called by the Chief Executive Officer of the Company or the Board of Directors. Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice of the meeting.

**Section 2.4 Notice of Meetings.** Unless otherwise required by statute, written notice stating the place, date and hour of each meeting of stockholders and the purpose or purposes of each such meeting shall be given to each stockholder entitled to vote at such meeting not less than ten nor more than sixty days before the date of the meeting. In the case of a meeting to vote on a merger or consolidation such notice shall be given not less than twenty nor more than sixty days before the date of the meeting. If given by mail, such notice shall be deemed to be given when deposited in the United States mail,

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

postage prepaid, directed to the stockholder at his address as it appears on the records of the Company.

**Section 2.5 Notice of Stockholder Business.**   At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting.  To be properly brought before an annual meeting business must be (a) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors, (b) otherwise properly brought before the meeting by or at the direction of the Board of Directors, or (c) otherwise properly brought before the meeting by a stockholder.  For business to be properly brought before an annual meeting by a stockholder, the stockholder must have given timely notice thereof in writing to the Secretary of the Company.  To be timely, a stockholder's notice must be delivered to the Secretary at the principal executive offices of the Company not later than the close of business on the 90th day nor earlier than the close of business on the 120th day prior to the first anniversary of the preceding year's annual meeting; provided, however, that in the event that the date of the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the 120th day prior to such annual meeting and not later than the close of business on the later of the 90th day prior to such annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made.  In no event shall the notice or public disclosure of an adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice as described above. A stockholder's notice to the Secretary shall set forth as to each matter the stockholder proposes to bring before the annual meeting (a) a brief description of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting, (b) the name and address, as they appear on the Company's books, of the stockholder proposing such business, (c) the class and number of shares of the Company which are beneficially owned by the stockholder, and (d) any material interest of the stockholder in such business.  Notwithstanding anything in these By-Laws to the contrary, no business shall be conducted at an annual meeting of stockholders except in accordance with the procedures set forth in this Section.  The chairman of an annual meeting shall, if the facts warrant, determine and declare to the meeting that business was not properly brought before the meeting and in accordance with the provisions of this Section, and if he should so determine, he shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted.

At any special meeting of the stockholders, only such business shall be conducted as shall have been brought before the meeting by or at the direction of the Chief Executive Officer or the Board of Directors.

- 2 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**
TRB0414590

Nothing in this By-Law shall be deemed to affect any rights of stockholders to request inclusion of proposals in the Company's proxy statement pursuant to Rule 14a-8 under the Securities Exchange Act.

**Section 2.6 List of Stockholders.** The officer or agent having charge of the stock ledger of the Company shall make, at least ten days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

**Section 2.7 Inspectors.** In advance of any meeting of stockholders, the Company, by its Board of Directors or by its Chairman or President, shall appoint one or more inspectors of voting who shall receive and count the ballots and make a written report of the results of the balloting, and who shall perform such other duties in connection therewith as is provided by law. The Company may also designate one or more persons as alternate inspectors to replace any inspector who is unable or fails to act.

**Section 2.8 Quorum.** The holders of record of shares of capital stock of the Company having a majority of the votes entitled to be cast at the meeting, represented in person or by proxy, shall constitute a quorum at all meetings of stockholders. Where a separate vote by class or classes is to be held, the holders of stock having a majority of the votes entitled to be cast by such class or classes, represented in person or by proxy, shall constitute a quorum at the meeting. Regardless of whether a quorum is present or represented, the chairman of the meeting, or stockholders represented in person or by proxy at the meeting voting a majority of the votes cast by such stockholders on the matter, shall have the power to adjourn the meeting to another time and/or place. Unless the adjournment is for more than thirty days, or unless a new record date is set for the adjourned meeting, no notice of the adjourned meeting need be given to any stockholder; provided that the time and place of the adjourned meeting were announced at the meeting at which the adjournment was taken. At the adjourned meeting the Company may transact any business which might have been transacted at the original meeting.

**Section 2.9 Voting of Shares; Proxies.** The voting rights of holders of common stock and preferred stock of the Company shall be as set forth in the Amended and Restated Certificate of Incorporation, as from time to time in effect, and in resolutions of the Board of Directors providing for series of the preferred stock. A stockholder may vote

- 3 -

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414591

either in person, by proxy executed in writing by the stockholder or an authorized officer, director, employee or agent of the stockholder, or by electronic transmission as provided by law. No proxy shall be voted or acted upon after three years from the date of its execution, unless the proxy provides for a longer period. Action on any question or in any election may be by a voice vote unless the presiding officer shall order that voting be by ballot. The presiding officer at the meeting shall fix and announce at the meeting the date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at the meeting.

**Section 2.10 Required Vote.** At any duly constituted meeting of stockholders, the affirmative vote of holders of a majority of the voting power of all shares represented at the meeting in person or by proxy and entitled to vote on the matter shall be necessary for the adoption or approval of any matter properly brought before the meeting, unless the proposed action is for the election of directors or is one upon which, by express provision of statute or of the Amended and Restated Certificate of Incorporation, a different affirmative vote is specified or required, in which case such express provision shall govern and control the decision of such question. In elections for directors, the nominees receiving the highest number of votes cast for the number of director positions to be filled shall be elected. Where a separate vote by class or classes is to be held, unless otherwise provided by statute or the Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of a majority of the voting power of all shares of such class or classes represented at the meeting in person or by proxy shall be the act of such class or classes.

**Section 2.11 Action Without a Meeting.** Action by the stockholders may be taken without a meeting as provided in the Amended and Restated Certificate of Incorporation.

<h1 align="center">ARTICLE III</h1>

<h3 align="center">Directors</h3>

**Section 3.1 Number, Tenure and Qualifications.** The business and affairs of the Company shall be managed by a Board of no less than ~~ten (10)~~eight (8) nor more than ~~sixteen (16)~~twelve (12) directors, as fixed from time to time by resolution of the Board of Directors. Individuals shall be eligible to serve as a director of the Company until the annual meeting next occurring after such person's 72nd birthday. An officer of the Company shall be eligible for service as a director until either (i) such officer's resignation as an officer of the Company or (ii) the annual meeting next occurring after such officer's retirement as an officer of the Company. The Board shall be classified with respect to the time during which they hold office into three classes, as nearly equal in number as possible based on the then current membership of the Board, as

- 4 -

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414592

determined by the Board of Directors, all as provided in the Amended and Restated Certificate of Incorporation. One class of directors shall be elected at each annual meeting of the stockholders to hold office for the term of three years or until their respective successors are duly elected and qualified or until their earlier resignation or removal.

**Section 3.2 Nominating Procedures.**

**Section 3.2.1 Eligibility to Make Nominations.** Except as otherwise provided in Article VIII hereof, nominationsNominations of candidates for election as directors at any meeting of stockholders called for that purpose may be made by the Board of Directors or by any stockholder entitled to vote at such meeting, in accordance with the following provisions.

**Section 3.2.2 Procedure for Nominations by the Board of Directors.** Except as otherwise provided in Article VIII hereof, nominationsNominations made by the Board of Directors shall be made at a meeting of the Board of Directors, or by written consent of the directors in lieu of a meeting, not less than 30 days prior to the date of the meeting of stockholders at which directors are to be elected. At the request of the Secretary of the Company, each proposed nominee shall provide the Company with such information concerning himself or herself as is necessary for purposes of the Company's proxy statement relating to the meeting.

**Section 3.2.3 Procedure for Nominations by Stockholders.** Any stockholder who intends to make a nomination at a meeting of stockholders at which directors are to be elected, shall deliver a notice to the Secretary of the Company setting forth (i) the name, age, business address and residence address of each nominee proposed in such notice, (ii) the principal occupation or employment of each such nominee, (iii) the number of shares of capital stock of the Company which are beneficially owned by each such nominee and (iv) such other information concerning each such nominee as would be required, under the rules of the Securities and Exchange Commission, in a proxy statement soliciting proxies for the election of such nominees. Such notice shall be accompanied by a signed consent of each proposed nominee to serve as a director of the Company if elected. To be timely, a stockholder's notice must be delivered to the Secretary at the principal executive offices of the Company not earlier than the close of business on the 120th day prior to such meeting and not later than the close of business on the later of the 90th day prior to such meeting or the 10th day following the day on which such notice of the date of the meeting is mailed to the stockholders or public announcement thereof is made, whichever occurs first. In no event shall the notice or public disclosure of an adjournment of a meeting of stockholders at which directors are to be elected commence a new time period for the giving of a stockholder's notice as described above.

- 5 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**Section 3.2.4 Substitution of Nominees.** ~~Except as otherwise provided in Article VIII hereof, in~~In the event that a person is validly designated as a nominee in accordance with the preceding Sections and shall thereafter become unable or unwilling to stand for election to the Board of Directors, the Board of Directors or the stockholder who proposed such nominee, as the case may be, may designate a substitute nominee. At the request of the Secretary of the Company, each substitute nominee shall provide the Company with such information concerning himself or herself as would be necessary for purposes of a proxy statement relating to the meeting.

**Section 3.2.5 Determination of Compliance with Procedures.** ~~Except as otherwise provided in Article VIII hereof, if~~If the chairman of the meeting of stockholders determines that a nomination for director was not made in accordance with the foregoing procedures, such nomination shall be void.

**Section 3.3 Regular Meetings.** A regular meeting of the Board of Directors shall be held without other notice than this By-Law immediately after, and at the same address as, the annual meeting of stockholders. The Board of Directors may fix the time and place for the holding of additional regular meetings. No notice or call shall be required.

**Section 3.4 Special Meetings.** Special meetings of the Board of Directors may be called by the Chairman, the President or any two directors, by notice to the Secretary of the Company. The person or persons authorized to call special meetings of the Board of Directors may fix any place as the place for holding any special meeting of the Board of Directors called by them, provided that any meeting called at the request of directors shall be held at Tribune Tower, Chicago, Illinois. Notice of any special meeting shall be given to all directors at least twenty-four hours in advance thereof (except as set forth below), either (a) personally or by telephone or (b) by mail or telegram addressed to the director at his/her address as it appears on the records of the Company. Such notice shall include the time and place at which the meeting is to be held. If mailed, such notice must be given at least five days prior to the meeting and shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is to be given by telegram, such notice shall be deemed to be delivered when the telegram is delivered to the telegraph company. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice of such meeting.

**Section 3.5 Quorum and Action.** A majority of the total number of directors then in office shall constitute a quorum for the transaction of business at any meeting, but if less than a quorum is present a majority of the directors present may adjourn the meeting from time to time without further notice. The vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, unless the act of a greater number is required by statute, the Amended and Restated Certificate of Incorporation or these By-Laws.

- 6 -

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**Section 3.6 Vacancies.** ~~Except as otherwise provided in Article VIII hereof, any~~Any vacancy occurring in the Board of Directors and any newly created directorship resulting from an increase in the authorized number of directors may be filled by a majority of the directors then in office, although less than a quorum, and the directors so chosen shall hold office for the unexpired portion of their designated terms of office and until their successors are duly elected and qualified, or until their earlier resignation or removal.

**Section 3.7 Compensation of Directors.** The Board of Directors, by the affirmative vote of the majority of the directors then in office, and irrespective of any personal interest of any of the directors, shall have authority to fix the compensation of directors for services to the Company as Board members, committee members or otherwise.

**Section 3.8 Removal of Directors.** Any one or more directors may be removed from office only for cause, and only by the affirmative vote of holders of at least a majority of the voting power of all of the then outstanding shares of voting stock of the Company, voting together as a single class.

**Section 3.9 Committees.**

**Section 3.9.1 Executive Committee.** The Board of Directors, by resolution of a majority of the whole Board, shall appoint an Executive Committee to consist of not less than five members of the Board, one of whom shall be the person designated as Chief Executive Officer of the Company. The Executive Committee shall have the right to exercise the full power and authority of the Board of Directors of the Company to the fullest extent permitted by Section 141(c) of the General Corporation Law of the State of Delaware; provided, that, in addition to the restrictions provided in said Section 141(c), such Executive Committee shall not have the authority of the Board of Directors in reference to: (a) electing or removing officers of the Company or members of the Executive Committee; (b) fixing the compensation of any officer or director; (c) amending, altering or repealing these By-Laws or any resolution of the Board of Directors; (d) submission to the stockholders of any matter whatsoever; (e) action with respect to dividends; or (f) any action which either the Chief Executive Officer or two other members of the Executive Committee shall designate, by written instrument filed with the Secretary of the Company, as a matter to be considered by the full Board. All action taken by the Executive Committee between Board meetings on matters of a nature ordinarily requiring Board action shall be promptly reported to the Board of Directors.

**Section 3.9.2 Audit Committee.** The Board of Directors, by resolution of a majority of the whole Board, shall appoint an Audit Committee to consist of not less than three directors who satisfy the qualifications for Audit Committee membership set forth in the Audit Committee charter. The Audit Committee shall have the authority and

- 7 -

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414595

responsibilities as may be set forth in the Audit Committee charter, as the same may be modified or amended from time to time.

**Section 3.9.3 Compensation & Organization Committee.** The Board of Directors, by resolution of a majority of the whole Board, shall appoint a Compensation & Organization Committee to consist of not less than three directors who satisfy the qualifications for Compensation & Organization Committee membership set forth in the Compensation & Organization Committee charter. The Compensation & Organization Committee shall have the authority and responsibilities as may be set forth in the Compensation & Organization Committee charter, as the same may be modified or amended from time to time.

**Section 3.9.4 Nominating & Governance Committee.** The Board of Directors, by resolution of a majority of the whole Board, shall appoint a Nominating & Governance Committee to consist of not less than three directors who satisfy the qualifications for Nominating & Governance Committee membership set forth in the Nominating & Governance Committee charter. ~~Subject to Article VIII hereof, the~~The Nominating & Governance Committee shall have the authority and responsibilities as may be set forth in the Nominating & Governance Committee charter, as the same may be modified or amended from time to time.

**Section 3.9.5 Other Committees.** In addition to the Committees provided for in Sections 3.9.1 through 3.9.4 above ~~and in Article VIII hereof~~, the Board of Directors may, by resolution passed by a majority of the whole Board, designate and appoint one or more other Board committees, each such committee to consist of two or more directors of the Company. Any such Board committee, to the extent provided in the resolution creating it and authorized by statute, shall have and may exercise the powers of the Board of Directors in the management of the business and affairs of the Company, and may authorize the seal of the Company to be affixed to all papers which may require it. The Board of Directors may also appoint other committees for the administration of the affairs of the Company, whose members may or may not be directors.

**Section 3.9.6 Committee Rules and Procedures.** Every committee appointed by the Board of Directors ~~and any committee established by Article VIII hereof~~ may, unless the Board provides otherwise, and except as otherwise provided by law, fix its own rules of procedure and hold its meetings in accordance with such rules. The Board may designate one or more persons as alternate members of any Board or other committee, as applicable, who may replace any absent or disqualified member at any meeting of such committee.

**Section 3.9.7 Presiding Non-Management Director.** The Board of Directors, by resolution of a majority of the non-management directors, shall designate one non-

- 8 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

management director to (a) chair meetings involving only non-management directors and (b) perform such other activities as from time to time are requested by the other directors or as circumstances dictate. The presiding non-management director shall serve until his or her successor shall be elected or until his or her earlier resignation or removal.

**Section 3.10 Action By Directors Without Meeting.** Any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or committee.

**Section 3.11 Meetings By Telephone.** Members of the Board of Directors, or any committee of the Board, may participate in a meeting of the Board or of such committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section shall constitute presence in person at such meeting.

## ARTICLE IV

### Officers

**Section 4.1 Officers of the Company.** The officers of the Company shall consist of a Chairman and/or a President, a Secretary and a Treasurer, elected or appointed by the Board of Directors. The Board may also elect or appoint as officers of the Company a Controller, a General Counsel and one or more Vice Chairmen, Executive Vice Presidents, Senior Vice Presidents, Vice Presidents, Deputy General Counsels, Assistant Controllers, Assistant Secretaries, Assistant Treasurers or Assistant Vice Presidents, and such other officers, as the Board may from time to time determine. If the Board of Directors shall at any time elect or appoint both a Chairman and a President, the Board shall specify which individual is to serve as the Chief Executive Officer of the Company. Any two or more offices may be held by the same person except that neither the Chairman nor the President may also hold the office of Secretary. All officers of the Company shall have such authority and perform such duties in the management of the property and affairs of the Company as are provided in these By-Laws or as may be determined by resolution of the Board of Directors and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board.

**Section 4.2 Election and Term of Office.** The officers of the Company shall be elected annually by the Board of Directors at the first regular meeting of the Board of Directors held after the annual meeting of stockholders. Each officer shall hold office

- 9 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414597**

until his successor is duly elected and qualified or until his earlier resignation or removal.

**Section 4.3 Removal.** Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the whole Board of Directors, with or without cause, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of an officer shall not of itself create any contract rights.

**Section 4.4 Vacancies.** A vacancy in any office by reason of death, resignation, removal, disqualification or otherwise may be filled by the Board of Directors for the unexpired portion of the term.

**Section 4.5 Delegation of Duties of Officers.** In case of the absence of any officer of the Company, or for any other reason that the Board of Directors may deem sufficient, the Board of Directors may temporarily delegate the power or duties of an officer to any other officer or to any other person.

**Section 4.6 The Chairman; Chief Executive Officer.** If the Board of Directors shall elect a Chairman, that person when present shall preside at all meetings of the stockholders and of the Board of Directors. The Chairman shall also have the power to vote shares of stock registered in the name of the Company and shall exercise such other powers and duties as from time to time may be provided in these By-Laws or as may be prescribed by the Board of Directors. If the Chairman shall be designated as Chief Executive Officer of the Company, he or she shall have the general management and direction, subject to the authority of the Board of Directors, of the Company's business and affairs and its officers and employees, with the power to appoint and to remove and discharge any and all employees of the Company not elected or appointed directly by the Board. The Chief Executive Officer shall, upon consultation with the Compensation & Organization Committee of the Board, fix the salaries and bonuses (if any) of all officers and executive employees of the Company and its subsidiaries other than himself.

**Section 4.7 The President.** If the Board of Directors shall elect a President, that person when present and in the absence of a Chairman shall preside at all meetings of the stockholders and of the Board of Directors. If there is no Chairman, or if the Board of Directors shall designate the President as the Chief Executive Officer of the Company, the President shall have all of the powers of the Chief Executive Officer enumerated in the preceding Section. The President shall also have the power to vote shares of stock registered in the name of the Company, and shall exercise such other powers and duties as from time to time may be provided in these By-Laws or as may be prescribed by the Board of Directors.

- 10 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414598**

**Section 4.8 Vice Chairman, Executive Vice President, Senior Vice President, Vice President.** Each Vice Chairman, Executive Vice President, Senior Vice President or Vice President of the Company shall perform such duties as may from time to time be assigned by the Chief Executive Officer or the Board of Directors. The Chief Executive Officer or the Board of Directors may add words signifying the function or position to the title of any Vice Chairman, Executive Vice President, Senior Vice President or Vice President appointed by the Board. The persons holding the foregoing positions shall each have the power to vote shares of stock registered in the name of the Company where such ownership interest constitutes less than 20% of the total voting interest of the corporation issuing the stock.

**Section 4.9 The Secretary.** The Secretary shall record all of the proceedings of the meetings of the stockholders and directors in a book to be kept for that purpose, and shall perform like duties for the standing committees, when requested; shall have custody and care of the corporate seal, records, minutes and stock books of the Company; shall keep a suitable record of the addresses of stockholders and of directors, and shall, except as may be otherwise required by statute or these By-Laws, issue all notices required for meetings of stockholders and of the Board of Directors and committees thereof. The Secretary shall have authority to cause the seal of the Company to be affixed to all papers requiring the seal, to attest the same, and to attest any instruments signed by an officer of the Company. The Secretary shall perform such other duties as from time to time may be assigned by the Chairman, the President or the Board of Directors.

**Section 4.10 The Treasurer.** The Treasurer shall have charge of the safekeeping of the Company's funds, and shall perform such other duties as may from time to time be assigned by the Chief Executive Officer or the Board of Directors. The Treasurer may be required to give bond to the Company, at the Company's expense, for the faithful discharge of his or her duties in such form and in such amount and with such sureties as shall be determined by the Board of Directors.

**Section 4.11 The Controller.** The Controller shall have charge of the general accounting department of the Company, and shall see that correct accounts of the Company's business are properly kept. He or she shall perform such other duties as from time to time may be assigned by the Chief Executive Officer or the Board of Directors. The Controller may be required to give bond to the Company, at the Company's expense, for the faithful discharge of his or her duties in such form and in such amount and with such sureties as shall be determined by the Board of Directors.

**Section 4.12 General Counsel.** The General Counsel shall be the chief legal officer of the Company and shall be responsible for the management of the legal affairs of the Company. The General Counsel shall perform such other duties as from time to time may be assigned by the Chief Executive Officer or the Board of Directors.

- 11 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414599

**Section 4.13 Deputy General Counsel, Assistant Controller, Assistant Secretary, Assistant Treasurer and Assistant Vice President.** The Deputy General Counsel shall assist the General Counsel in such manner and perform such duties as may be designated from time to time by the General Counsel. Each Assistant Vice President shall have such duties as may from time to time be assigned by the Vice President or Vice Presidents to whom he or she reports. Each Assistant Controller, Assistant Secretary and Assistant Treasurer shall assist the Controller, the Secretary or the Treasurer, as the case may be, in the performance of the respective duties of such principal officers. Each Assistant Secretary shall have the authority to affix the corporate seal to any instrument requiring it, to attest the same, and to attest any instrument signed by an officer of the Company. The powers and duties of the Controller, the Secretary, the Treasurer and the General Counsel, respectively, shall in case of the absence, disability, death, resignation, or removal from office of such principal officer, and except as otherwise ordered by the Board of Directors, temporarily devolve upon the first appointed deputy or assistant who is able to serve. Deputy or assistant officers shall perform such other duties as may be assigned to them from time to time. The Chief Executive Officer or the Board of Directors may add words signifying function or position to the title of any deputy or assistant officer.

**ARTICLE V**

**Capital Stock**

**Section 5.1 Certificates for Shares.** Subject to the provisions of Section 5.2, every holder of fully paid stock in the Company shall be entitled to have a certificate or certificates signed in the name of the Company by the Chairman, the President or any Vice President and by the Secretary or an Assistant Secretary of the Company, representing and certifying the number of shares of the Company's capital stock owned by such holder. Any or all of the signatures on each certificate may be facsimile. In case any officer, transfer agent or registrar whose signature or facsimile signature appears on a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Company with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

**Section 5.2 Certificates for Fractional Shares.** The Board of Directors may provide that, with respect to classes or series of stock as to which the issuance and ownership of fractional shares are permitted in accordance with the Amended and Restated Certificate of Incorporation, the ownership of fractional interests shall be evidenced by scrip certificates in lieu of the certificates referred to in Section 5.1 of these By-Laws. Any or all of the signatures on each scrip certificate may be facsimile. The Board of Directors may specify from time to time, with respect to any series or class of stock, particular

- 12 -

TRB0414600

fractions in which ownership will be permitted and recognized and as to which certificates will be issued.

**Section 5.3 Registration and Transfer of Shares.** The Company will maintain or cause to be maintained a register for the registration of shares of its capital stock. Transfers of shares and exchanges of stock certificates shall be recorded on the books of the Company only at the request of the holder of record thereof or by his legal representative, who shall furnish proper evidence of authority to transfer, or by his attorney thereunto authorized by power of attorney duly executed and filed with the Secretary of the Company, and only upon the surrender for cancellation of the certificate or certificates for such shares.

**Section 5.4 Only Holder of Record Entitled to Recognition.** The Company shall be entitled to treat the holder of record of any share or shares as the owner thereof for all purposes and accordingly shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by law.

**Section 5.5 Fixing Record Date.** For the purpose of determining stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a date as the record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which shall not be more than sixty nor less than ten days (or, in the case of a meeting to vote on a merger or consolidation, not more than sixty nor less than twenty days) before the date of such meeting, nor more than sixty days prior to any other action. The record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be as provided by law. The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto. When a determination of stockholders entitled to notice of or to vote at any meeting of stockholders has been made as provided in this Section, such determination shall apply to any adjournment thereof; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

**Section 5.6 Lost Certificates.** If an outstanding certificate of stock shall be lost, destroyed or stolen, the holder thereof may have a new certificate issued to him or her upon producing evidence satisfactory to the Company of such loss, destruction, or theft, and also upon furnishing to the Company a bond of indemnity deemed sufficient by the Secretary to protect the Company and any registrar or transfer agent against claims under the certificate alleged to be lost, destroyed or stolen; provided, however, that upon

- 13 -

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414601

good cause shown the Board of Directors may waive the furnishing of such bond of indemnity.

## ARTICLE VI

### Miscellaneous

**Section 6.1 Execution of Instruments.**  Contracts and other written documents of the Company shall be executed as the Board of Directors may from time to time direct.  In the absence of specific directions by the Board, the officers of the Company shall duly execute all necessary contracts and other written instruments properly coming within the scope of their respective powers and duties.  When the execution of any contract or other written instrument of the Company has been authorized by the Board of Directors without specification of the executing officers, the Chairman, the President, any Vice Chairman or any Vice President may execute the same in the name and on behalf of the Company and the Secretary or any Assistant Secretary may attest the same and affix the corporate seal thereto.

**Section 6.2 Loans.**  No loans (except loans for current expenses) shall be incurred on behalf of the Company and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Board of Directors or a duly authorized committee thereof.  Such authority may be general or confined to specific instances.  No loans shall be made by the Company to any director or officer except upon the affirmative vote of a majority of the disinterested directors.

**Section 6.3 Bank Deposits and Check Authorization.**  The funds of the Company shall be deposited to its credit in such banks, trust companies or other financial institutions as may be determined from time to time by the Chairman or President and the Secretary of the Company, evidenced by joint written action.  By such joint written action, filed with the minutes of the Board of Directors, the Chairman or President together with the Secretary may authorize (a) the opening of one or more deposit accounts at any such institution and (b) the designation of, or a change in the designation of, the officers or employees upon whose signature checks may be written or funds withdrawn on any Company account at any such institution, provided that the signature of one person other than the Chairman, President and Secretary shall be required therefor.  By the adoption of this Section 6.3 of these By-Laws the Board of Directors adopts the form of any resolution or resolutions requested by or acceptable to any financial institution in connection with the foregoing actions, provided that the Secretary of the Company (x) believes that the adoption of such resolution or resolutions is necessary or advisable and (y) files such resolution or resolutions with the minutes of the Board of Directors.

- 14 -

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**Section 6.4 Fiscal year.**  The fiscal year of the Company shall begin on the first Monday after the last Sunday in December of each year and end on the last Sunday in the following December.

**Section 6.5 Seal.**  The corporate seal shall be in the form of a circle and shall have inscribed thereon the name of the Company and the words "Corporate Seal, Delaware". The seal may be used by causing it or a facsimile thereof to be impressed, affixed, printed or otherwise reproduced.  The Board of Directors may give general authority to any officer to affix the seal of the Company and to attest the fixing by his or her signature.

**Section 6.6 Waiver of Notice.**  Whenever any notice whatever is required to be given by statute, by the Amended and Restated Certificate of Incorporation of the Company, by these By-Laws or otherwise, in connection with any meeting of stockholders, directors or members of a committee of directors, a written waiver thereof, signed by the person entitled to such notice, whether before or after the event as to which such notice is required, shall be deemed equivalent to such required notice.  In addition, attendance by a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of such meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any meeting of stockholders, directors or members of a committee of directors need be specified in any written waiver of notice.

**ARTICLE VII**

**Amendments of By-Laws**

**Section 7.~~1  Except as otherwise provided in Article VIII hereof, these~~**These By-Laws may be altered, amended or repealed and new by-laws may be made (a) by the stock-holders as provided in the Amended and Restated Certificate of Incorporation or (b) by the affirmative vote of a majority of the whole Board of Directors at any regular or special meeting thereof.

- 15 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414603

ARTICLE VIII

CT Directors

Section 8.1  Effectiveness and Interpretation.  This Article VIII shall be in effect from the Effective Time of the Merger, as such terms are defined in the Agreement and Plan of Merger, dated March 13, 2000, between the Company and The Times Mirror Company (the "Merger Agreement"), until the earlier of (a) the end of the term currently provided for in Chandler Trust I and Chandler Trust II (collectively, the "CTs") without giving effect to any extension thereof or any amendment of the CTs following the date of the Merger Agreement, and (b) the sale, distribution or other disposition by the CTs of more than 15% of the aggregate number of shares of common stock of the Company issued to the CTs in the Merger.  Upon the earlier to occur of the events set forth in clauses (a) and (b) of the foregoing sentence (the "Article VIII Termination Date"), the terms and provisions of this Article VIII shall immediately and automatically terminate and no longer have any force or effect.  Upon the termination of Article VIII pursuant to this Section 8.1, the provisions of these By-Laws, other than Article VIII, shall be the By-Laws of the Company until amended, modified or repealed in accordance with the terms hereof.  In the event of any conflict between the provisions of this Article VIII and any other provisions of these By-Laws or, to the extent that any of the provisions of this Article VIII overlap with and/or are more specific or more restrictive than any other provisions contained in these By-Laws, the provisions of this Article VIII shall govern.

Section 8.2  CT Nominating Committees.  There is hereby established a committee of the Board of Directors to be known as the CT Nominating Committee.  The CT Nominating Committee shall be comprised exclusively of the CT Directors.  "CT Directors" means (i) the three directors designated as such in Schedule 6.8 of the Merger Agreement and (ii) each other director nominated or appointed by the CT Nominating Committee in accordance with this Article VIII.

Section 8.3  CT Nominating Procedures.

Section 8.3.1  Prior to each meeting of the stockholders of the Company at which directors are to be elected, in addition to any other persons nominated by the Board of Directors or another committee, the CT Nominating Committee shall nominate such number of persons, if any, as may be necessary to ensure that, assuming the election of such person or persons nominated by the CT Nominating Committee, there will be three CT Directors on the Board of Directors following such election.  So long as the Board of Directors shall remain classified into three classes, one CT Director shall serve in each class.  Neither the Board of Directors nor any other committee thereof shall nominate any person in opposition to the person or persons nominated by the CT Nominating Committee.

- 16 -

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

~~Section 8.3.2  At each meeting of the stockholders at which directors are to be elected, in addition to presenting nominees for other directorships, the officer of the Company presiding at such meeting shall present for election, on behalf of the CT Nominating Committee, any person or persons nominated by the CT Nominating Committee in accordance with paragraph 8.3.1 above, and such nomination shall be deemed for purposes of Section 3.2.2 hereof to be made at the direction of the Board of Directors.~~

~~Section 8.4  CT Director Vacancies.  If any CT Director is removed from the Board of Directors, resigns, retires, dies or otherwise cannot continue to serve as a member of the Board of Directors, then the remaining members of the CT Nominating Committee shall have the exclusive authority to appoint a person to fill such vacancy, and the person so appointed shall become a member of the CT Nominating Committee.~~

~~Section 8.5  CT Director Service on Board Committees.  Subject to the CT Director meeting applicable independence criteria for service on audit, nominating/corporate governance and compensation committees, at least one CT Director shall serve on each of the committees of the Board of Directors, unless otherwise agreed by the CT Nominating Committee.~~

~~Section 8.6  Article VIII Amendment.  No provision of this Article VIII (for so long as such Article VIII is in effect) may be altered, amended or repealed, nor may any provision inconsistent therewith be adopted, including by means of merger, consolidation, asset transfer or other transaction with any affiliated entity in which the Company is not the surviving or continuing entity, except by the affirmative vote of all of the holders of the outstanding stock of the Company entitled to vote or all of the members of the Board of Directors.~~

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only                    TRB0414605

NOMINATING & GOVERNANCE
COMMITTEE

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## NOMINATING & GOVERNANCE COMMITTEE MEETING
### WEDNESDAY, JULY 18, 2007 (7:30 a.m.)
### LAKEVIEW ROOM
### 24TH FLOOR, TRIBUNE TOWER

## AGENDA

|  | Tab No. |
|---|:---:|
| Approve minutes of February 13, 2007 meeting | 1 |
| Director candidate | 2 |
| Board committee structure and membership review | 3 |
| Governance documents review | 4 |

**Nominating & Governance Committee**
Enrique Hernandez, Jr., Chairman
Robert S. Morrison

**Tribune Company**
Dennis J. FitzSimons
Crane H. Kenney

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414608

**TRIBUNE COMPANY**
**NOMINATING & GOVERNANCE COMMITTEE MEETING**
**FEBRUARY 13, 2007**

The Nominating & Governance Committee met at 1:10 p.m. on Tuesday, February 13, 2007 at Tribune Tower, Chicago, Illinois, pursuant to notice. The meeting was attended by Enrique Hernandez, Jr., Robert S. Morrison and J. Christopher Reyes. Roger Goodan and William Stinehart, Jr. participated via telephone. Dennis J. FitzSimons, Crane H. Kenney, Tom Cole of Sidley Austin LLP and Charles W. Mulaney, Jr. of Skadden, Arps, Slate, Meagher & Flom also attended the meeting.

Mr. Hernandez acted as Chairman of the meeting. Messrs. FitzSimons, Kenney, Cole and Mulaney were present as the meeting was called to order. The following business was discussed by the Committee:

1. The minutes of the December 12, 2006 Committee meeting were approved.

2. The Committee discussed a written report outlining the annual assessment of the Board's independence and the Audit Committee's independence and financial experience. Following discussion, the Committee determined that all of the Company's outside directors are independent and that all the members of the Audit Committee (i) meet the heightened independence requirements of the NYSE and are financially literate and (ii) qualify as audit committee financial experts.

3. The Committee discussed a written report regarding the new related person transactions disclosure rule, which requires the Company to describe in the proxy its policies and procedures for the review and approval of certain related person transactions. The Committee also reviewed a proposed Related Person Transactions Policy developed to enable the Company to comply with the new disclosure rule. Following discussion, the Committee approved the proposed Related Person Transactions Policy in the form modified at the meeting.

4. Mr. Kenney then reviewed the Corporate Governance disclosures to be included in the Company's 2007 Proxy Statement. Following discussion, the Committee approved the Corporate Governance proxy disclosures in the form presented.

5. Mr. Kenney ~~Redacted~~ ~~Redacted~~ Following discussion, the Committee agreed to recommend that the Board oppose all three shareholder proposals (with Messrs. Goodan and Stinehart voting in opposition to the Committee's recommendation on the Board declassification proposal). Mr. Kenney then ~~Redacted~~

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**



6.   Mr. Hernandez then led a discussion of proposed Committee assignments. Following discussion, the Committee agreed to recommend that the Board adopt resolutions seeking to confirm the current committee assignments at the May Board meeting, subject to any changes that may be necessitated by the strategic alternatives review.

There being no further business to come before the Committee, the meeting was adjourned at 2:00 p.m.

_____
Enrique Hernandez, Jr.
Chairman

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414611



*Welcome to the New Frontier*

## *Maggie Wilderotter*

### Chairman and Chief Executive Officer



Maggie Wilderotter, 52, became Chairman and CEO of Citizens Communications on January 1, 2006. She joined the company on November 1, 2004 as President and Chief Executive Officer and a member of the Board of Directors. Before this, Ms. Wilderotter was Senior Vice President of Worldwide Public Sector at Microsoft, responsible for strengthening customer and partner outreach in the government and education markets, as well as working across Microsoft's business divisions on developing and coordinating forward-looking strategies.

Previously, Ms. Wilderotter was President and Chief Executive Officer of Wink Communications Inc., where she led efforts to develop low-cost, end-to-end e-commerce systems to enable advertisers, merchants, and broadcast and cable networks to create interactive enhancements for traditional television advertisements and programs. Before joining Wink Communications, Ms. Wilderotter was the Executive Vice President of National Operations for AT&T Wireless Services Inc. and Chief Executive Officer of AT&T's Aviation Communications Division. She also served as Senior Vice President of McCaw Cellular Communications Inc. and was a Regional President managing the company's California, Nevada, and Hawaii Region.

Ms. Wilderotter has received national recognition for her contributions to the television industry. In 2000, the National Cable Television Association (NCTA) honored her outstanding work in the industry, awarding her the Vanguard Award for Distinguished Leadership. The award is the most prestigious of NCTA's national

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

awards, recognizing the best and the brightest in cable television. The NCTA also gave her the award in 1989, making Ms. Wilderotter one of only 20 individuals to have received two Vanguard Awards since the award's inception in 1965. In addition, she received the 1999 Outstanding Mentor Award from the Women in Cable and Telecommunications Foundation and its Top 10 Women in Cable & Telecommunications Award in 1989 for her support of the foundation and advocacy of women in the cable industry.

Ms. Wilderotter serves on the board of directors of a number of non-profit organizations and on the boards of The McClatchy Co. and the Xerox Corporation.

Ms. Wilderotter holds a bachelor's degree in economics and business administration from Holy Cross College.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414613



Home Page

Subscribe
Unsubscribe

Advertising

Comments About ITVT

Features

Industry Jobs

ScreenShot Gallery

Relevant Books

Company Profiles

Events

Research & Papers

Glossary

Writers

Contact Us



# Feature: [itvt] Interview with Maggie Wilderotter



## EXCLUSIVE

*Wink CEO, Maggie Wilderotter, is stepping down after nearly 6 years at the helm of the company. In an exclusive interview with [itvt]'s Tracy Swedlow, she talks about the secrets of Wink's success, about Liberty's decision to place the company under the OpenTV umbrella, about Peter Boylan (who is heading up Liberty's ITV efforts and recently became chairman of OpenTV), about her new consulting role at OpenTV, about the new direction taken by OpenTV's longtime rival, Liberate, and other topics.*

[itvt]: Could you tell us a little bit about your background?

Wilderotter: I was born in Neptune, NJ, on the Jersey Shore. Grew up there, went to college in Massachusetts, at Holy Cross College.

[itvt]: What did you study?

Wilderotter: Economics and Business Administration.

[itvt]: Did you know what you wanted to be at the time?

Professionals' Eyes Only                                    TRB0414614
Highly Confidential -- Attorneys' Eyes Only

Wilderotter: No. Absolutely not. I got married right after college, and moved west. Wound up in Phoenix, AZ, for the first 6 months of my married life, working at the Arizona Bank. My husband was a pilot trainee. He was an Air Force Academy grad.

[itvt]: "Top Gun" kind of thing?

Wilderotter: Yes. That type of thing. And then we moved to California, because that was the first place he was stationed: in Sacramento. It was the first time for either of us in California. I answered an ad in the paper and went to work at CableData. I was the accounts-receivable supervisor when I started in 1978. Within a year, I was running the accounting department for the company.

[itvt]: And you were how old?

Wilderotter: 23 years old.

[itvt]: What was your trajectory up to Wink?

Wilderotter: Well, I spent 12 years at CableData, and basically left there as the general manager of US, Canadian and European operations for the company. So I went from being the accounts receivable supervisor to being the person running their top 3 businesses.

[itvt]: And you were only in your early thirties?

Wilderotter: Right. I was then recruited away by Craig Macaw of Macaw Cellular. I spent 5 years at Macaw Cellular, as president of the California, Nevada and Hawaii regions, and built out our wireless networks in those 3 states. So I took the business from about $100 million to $750 million in revenue during that period of time. And then, AT&T bought Macaw, and I moved to Seattle for 2 years as the COO of AT&T Wireless and the CEO of the Aviation division, which are the phones on the planes.

[itvt]: And you weren't thinking about ITV at this point?

Wilderotter: No.

[itvt]: Did you believe that wireless, that is, cellular phone technology, was the thing you wanted to stay with?

Wilderotter: Well, when I was with CableData, cable was the

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414615

new thing. The late 70's and the 80's were the go-go years for cable. And then I joined wireless at about the same point in the trajectory of its growth curve. But even in the 80's, when I was at CableData, we were the largest provider of management information systems for cable TV, before software was cool. And because we were the billing arm for the cable operators, we did all the interfaces with the early interactive trials, like QUBE and Videotron. So I was very familiar with the early days of ITV, when I was in the cable industry.

[itvt]: These were billing interfaces?

Wilderotter: Yes. So, if you bought something instantaneously, like a movie, we did the integration to the set-top boxes that were the first interactive boxes out there, in order to bill the customer for the service.

[itvt]: I grew up in Columbus, OH, so we...

Wilderotter: Right, so Columbus was a good example of a QUBE system, one of the early systems in the United States for ITV.

[itvt]: At the time, did you think that QUBE was something really promising?

Wilderotter: Yeah, I think all of us in the industry saw the promise of ITV; but I do think that the hardware was clunky, and it was expensive, and the networks really weren't robust enough to do the things that would really drive revenue on that platform. However, if you look at any of those big QUBE metro systems that were used back in the 80's--in Columbus, Houston, Dallas and Cincinnati--the revenue per customer in every one of those markets, even today, is about 20 percent higher than the revenue in other cable systems. Because people got used to buying on-demand movies very early on. And that habit's been there for almost 20 years. So anyway, I was familiar with ITV, then I went to wireless. And after 2 years under the AT&T umbrella, I left to become CEO of Wink.

[itvt]: Did someone recruit you to work for them?

Wilderotter: Yes, I was recruited by Ramsey Beirne, which was a major recruiting company in the 90's. It's still around. It actually recruited Jim Barksdale to Netscape, and Jim was my boss at Macaw. So Jim told the Ramsey Beirne guy, when they were talking about this specific job, "Well, you've got to call Maggie Wilderotter, because she's got experience both in

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414616

wireless and in cable." And at the time, the Wink technology worked on both cell phones and pagers, as well as set-top boxes.

[itvt]: In what way?

Wilderotter: Well, it could bring interactive services--just like WAP does today--on a cell phone. We were a competitor to the WAP format back in the mid-90's. But when I came into the company and looked at how nascent the wireless market was for data, I felt that data would not be a factor for at least 4 to 5 years, which was correct. And because we were a small startup, we really couldn't focus on both industries and do them both well. So we shifted our focus over to cable--or I should say multi-channel video--versus focusing on wireless.

[itvt]: Are you surprised wireless is coming back into the ITV realm?

Wilderotter: No, I'm not. I think that, just like anything, you have to get a maturity of networks in reliability and capabilities, and the price curve has to go down on the equipment for that to happen, for it to become economically viable. And I still think it's probably another 4 or 5 years away before it has any mass-market potential.

[itvt]: So did you become a believer in ITV when you came to Wink or before that?

Wilderotter: I was always a believer in ITV, but I was a skeptic in terms of timing, skeptical that the right network or system was in place in order to deliver it. At first, I didn't want to interview for the Wink job because, you know: "ITV, been there, done that, it doesn't work, right?" But then I came down and saw the technology capability that [Wink founder] Brian Dougherty had designed, which was very elegant in its simplicity--it wasn't rocket science, and it actually resided on current networks. And for under $2 a box you could deliver this capability. So it was the first economic model I had seen that really had viability to get mass-market deployed, and that's what got me excited about it. So I took the plunge, and it would have been 6 years in December since I joined Wink.

[itvt]: Does any specific incident stand out that really made you realize that Wink was on an upward swing? What convinced broadcasters, manufacturers and MSO's to take a risk with the company?

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414617

Wilderotter: Well, there's a whole host of factors--timing, skill, etc.--that go into how companies become successful. But I would say that one of the "Aha!s" for us, there are really 2: there was getting Charter Communications to agree to launch Wink everywhere. And I think, based on Paul Allen's vision of ITV and his ability to take risks differently than a traditional cable operator, it gave Wink some momentum, to have distribution in the United States. That, coupled with the DirecTV win for us, which showed the broadcast networks and advertisers how we could straddle the cable network and the satellite network to deliver audience for them. These wins solidified and reinforced the leadership that we had in delivering an end-to-end interactive service. So I would say those 2 wins were huge for us. And NBC, of course, was a very early partner of ours: actually they became a partner in 1996, and were always very supportive and believed in interactive services. So we had these kernels of major players that gave us credibility. And I think what we tried to do was to build on that momentum-wave in getting other cable operators and getting EchoStar and broadcast cable networks to jump on board.

[itvt]: Wink has always seemed like a steamroller to me: you guys seemed to move slowly and steadily, continuing to make deals despite the emergence of the middleware companies and other competitors. Quite a few people expected Wink to fall by the wayside, but you didn't. You moved very carefully. What was the strategy here?

Wilderotter: One part of it is that we decided to focus on the existing set-top boxes that were being deployed in the United States. Whereas the middleware companies were all waiting for the next generation because they couldn't really fit in these processing- and memory-constrained devices.

[itvt]: When did you make that decision?

Wilderotter: I made that decision back in 1997/1998. Because we were on the analog platform in 1997, we launched first on analog boxes: with Time Warner New York, with Time Warner Cincinnati, with Cox Palos Verdes, and with several Charter systems, such as St. Louis. So we started out on the Scientific-Atlanta and Motorola advanced analog platforms as our first boxes. And then, after the DCT1000's started to ship, and the DCT2000 came fairly quickly after that, I made a decision to say, "Look, I know this industry and there's no way a set-top box that costs 4 or 500 bucks can be justified in the home today. There's no way that's going to happen. So let's stick with

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only                                    TRB0414618

Case 08-13141-RLS Doc 5461-37 Filed 08/20/10 Page 72 of 128

what we know these guys are going to deploy, and stay focused on that, and not get pulled into the siren song of 'Oh, let's build for the next generation.'" Because, in the cable industry, sometimes the next generation is 10 years away, and as a small company we couldn't afford to do that. So that, coupled with the fact that I also recognized that technology is only one aspect of how companies are successful. It's about relationships. It's about trust. And it's about delivering on what you say you're going to do. And I have a very good reputation with customers for doing that over the years that I was in the industry. And people I work with trust me. So we kept our heads down. We said "no" to a lot of stuff, where most companies were placing bets everywhere. And we stayed focused on what our strategy was.

[itvt]: Can you say what you said "no" to?

Wilderotter: Absolutely. We didn't develop on the DCT5000, we didn't develop a middleware product, we didn't go after a guide solution, we didn't go after the browser or high-speed data world. We stayed focused on our niche of enhanced broadcasting: synchronized data with video, and virtual channel capability. Because that's what we were good at. That's what we do.

[itvt]: Yet people in the ITV industry would often say, "Oh, Wink is very simple. It can't do A,B,C &D." What gave you the confidence to continue to develop a robust, effective, simple solution? What gave you the confidence that broadcasters would buy into it?

Wilderotter: Consumers. Because we were deployed, and people were using the system like crazy. Because they weren't intimidated by it, it was easy for them to use. They couldn't get into trouble with it, it was TV-centric. It wasn't trying to put the Internet on television. Back in those days, that's all anybody was talking about. We did not get drawn into that. We stayed focused on what consumers did in their living rooms with television. And that was: sit back, lean back, and watch. And 1 or 2 button clicks, we felt, was all they were really willing to do in that type of environment. And from the early days, over a 5-year window, we still have around 80 percent of all households that have Wink use it an average of 10 times a week.

[itvt]: The Weather Channel has reported impressive figures.

Wilderotter: Yeah, millions and millions of transactions a week. And the same with ESPN and CNN. And I think we had a

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only          TRB0414619

hugely compelling story that we could tell our partners. It was: "Look, this isn't rocket science, and we're not trying to revolutionize television. We're giving people a little bit more to do when they watch. And you know what? They'll do that." Will they do more than that? I don't know: it's a huge leap. It doesn't seem like they will. But we know that they'll do this.

[itvt]: Would you say that this simple, pragmatic approach was Wink's major contribution to the emergence of ITV?

Wilderotter: Absolutely. What we did is we developed the basic interactive system, the baseline service that everybody can use. And it's free, and it's simple, and it's easy. And it gets consumers a little more "leaned-in" than what they were used to. I think from that platform you can build more sophisticated services as the hardware and the networks get more robust. And there'll be niche groups of those baseline customers that will use those niche services differently. Whether it's video-on-demand, or it's email and chat on their television, or whatever other applications come down the pike. I do think that from this baseline group you will get niches that will use other products and services.

[itvt]: While we're on the topic of what's coming down the pike, could you talk a little bit about your relationship with OpenTV-- or is it more with Liberty Broadband Interactive Television (LBIT)?

Wilderotter: Well, both. OpenTV has now purchased Wink. So they own Wink today. They bought it from LBIT. LBIT bought it first, and then they turned around and sold it to OpenTV. OpenTV has, I think, a very solid middleware product. And they have done an extremely good job of getting it deployed around the world. You know, their one deployment here in the United States, which is really a robust deployment, is EchoStar, where they're in millions of households. And EchoStar has chosen Wink also. So, over the last 10 months, we have been working very closely with OpenTV on getting Wink launched as an application riding on their middleware platform. So it's a very complementary relationship anyway. Plus, OpenTV doesn't have any of the backend transaction-processing capabilities. So they get to leverage that on the Wink network, which makes a whole lot of sense for what they want to do in the long run-- which is deliver more robust applications on their middleware platform. I think it's a very good strategic fit for the 2 companies to come together. It allows OpenTV to take their 27 million households around the world and add Wink as an application. And it allows Wink, with our 7 million households in the United

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only                              TRB0414620

States, to evangelize that OpenTV's capability can work very well in conjunction with the application that we have.

[itvt]: You don't think that Wink interactivity competes with application development by OpenTV?

Wilderotter: Well, I think it does on some level. On the virtual channel level it does. But I think providing broadcasters and cable programming networks with one way to write applications that can work for both the Wink technology and the OpenTV technology will be huge for them. By bringing these companies together, we can provide an interface that you can use to develop an application, and that application will then run on either platform.

[itvt]: Why do you think Liberty decided to bring Wink and ACTV under the OpenTV umbrella rather than run them directly from LBIT?

Wilderotter: For 2 reasons. One reason is that when you buy 3 public companies, in order to really maximize the synergies of those companies, you have to put them together. Otherwise you wind up with a whole host of overhead, from running 3 separate companies. Secondly, I think the OpenTV shareholders, in seeing a Wink or an ACTV 100% owned by LBIT, up at the LBIT level, and OpenTV being a public company where the ownership is only in the 40-50% level, were worried about the transfer pricing that would go back and forth between the companies. I think in this day of Enron and WorldCom…you know, nobody wants to get into these related 3rd-party environments where you have these dollars flowing back and forth between companies. So I think cleaning all that up, by pulling these 3 companies together into one, eliminated all of those questions that would come up. Plus, OpenTV is a publicly traded vehicle that has upside in its stock and has capital-raising capacity because it is on the public market.

[itvt]: Can you talk a little about [LBIT CEO and OpenTV Chairman] Peter Boylan, and how he will move OpenTV forward? And could you also give us an idea of what your consulting role at OpenTV will be?

Wilderotter: Well, I think Pete is a very smart guy. He has been around a long time, between United Video and his Gemstar days, and he has a lot of experience in the ITV field. I think he knows the pitfalls of what happened at Gemstar and doesn't want to repeat those with the assets he's purchased recently. He knows he has to have partnership relationships with

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only                                    TRB0414621

customers in order to get deployment. So I think he's going to try to be very smart about how he pulls these assets together and gets customers to use them. And I think he's going to try to befriend the customer base in order to do that. So I believe that he has the right strategy and he's a contrarian: he looks at the market, where ITV is sort of a distressed set of assets today, and he can pick them up almost for their cash value and provide the patience to wait until things turn around. So he's a patient investor from that perspective. Because Liberty is not driven by earnings. They're one of the few companies that don't worry about whether a transaction's accretive or not in the first 12 months, and that's very important with these type of assets. Now, for me, from a consulting perspective, I'm really going to be moving on and doing other things, but I truly believe in what these guys are doing, and if they have questions, or if there's something in particular I can help them with, I told them that I would be more than happy to do so, on a case-by-case basis.

[itvt]: Can you give some examples of the kinds of things you might consult on?

Wilderotter: Well, I've been working with [OpenTV CEO] James Ackerman on the integration plan for the companies. Another thing I'm interested in is the strategy of how you look at a new business model when you have multiple product sets. Where the different product sets have different business models today, like licensing versus transactions versus revenue-share. And how do you package that together so there's rationality to the customer base? That might be an example of something I might participate in.

[itvt]: You mentioned that you are "going to be doing other things." Will these things be ITV-related?

Wilderotter: They could. I don't really know yet. I'm exploring lots of different options in terms of what I would do next. Some of them are within the industry, but not necessarily ITV. You know, I will not--and this is just sort of my DNA--but I'm not going to go run a company that would compete with what OpenTV and LBIT are trying to accomplish. Not because I'm precluded from doing so, but because I spent 6 years building Wink. I really believe in those capabilities and I'm not looking to go do something that would try to hurt those assets. Because I believe in those assets. But that's not to say I wouldn't do something with the cable industry or media or entertainment or DBS. I have a lot of experience and relationships and knowledge about those businesses. But I'm also looking at other options: in technology, I mean. I've run technology

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414622

companies for 15 years. So, just like I went from cable to wireless, there are new things out there that might be of interest that are different than what I've done in the past. I'm definitely thankful for the experience that I've had these last 5 1/2 years at Wink. It's taught me so much. I've learned and grown so much in that period of time, it's been amazing.

[itvt]: Do you have any observations about Liberate's move into "triple-play" [i.e. technologies that allow network operators to offer packages of video/voice/data services] and how that will affect the ITV industry? Do you think that Liberate will aggressively compete with OpenTV?

Wilderotter: Well, I've not really done a lot to study what Mitchell [Liberate chairman, Mitchell Kertzman] is trying to do with triple-play. I will say that the head-on collision between OpenTV and Liberate in the middleware wars is, of course, not healthy for either company. I think that Mitchell is trying to move into areas that are more complementary to what OpenTV is doing rather than competitive. And I think that's a good thing. Because I believe there's enough opportunity with ITV that you don't need multiple players all doing the same thing. But I still think it remains to be seen what the business model is, what the adoption will be for triple-play, and how MSO's and customers will use products and services.

[itvt]: About the ITV industry in general: what are the unanswered questions that need to be resolved, and what are the specific areas you think would be good for some more development?

Wilderotter: Well, I do think that everybody is still dabbling. There are very few companies in that whole business area that have jumped in with both feet and that are really taking some risks in pushing the envelope on what works and what doesn't work. And I mean that from the customer perspective. I think definitely LBIT and OpenTV are in with both feet, just like Liberate is and others that provide the capabilities. But the capabilities are only as good as what gets presented to the customer. And I think that until MSO's really embrace the capabilities--like DirecTV is embracing them--and until this is done more wholesale across the board, and the cable programming networks, instead of doing a little bit here and a little bit there, really start to look at interactivity as a strategy for keeping viewers and providing advertisers with competitive advantage…these are the kind of sparks that need to happen with several players. Just like in the beginning, when DirecTV, Charter, and NBC jumped on the bandwagon. We need that

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only                    TRB0414623

Case 08-13141-BLS Doc 5461-37 Filed 08/20/10 Page 77 of 128

next jumping-on-the-bandwagon to take place, where certain people take some risks, and really start to change their models of how they present product to the customer.

[itvt]: Do you think that News Corp. might once again try to purchase DirecTV, and that, if that happens, we will see DirecTV embrace ITV to an even greater extent?

Wilderotter: Well, I think DirecTV embraces ITV better than anybody in the country today. I don't think anybody discounts that Rupert Murdoch would love to have DirecTV as an asset in his portfolio. I think he's always been interested in that asset; he's made no bones about it, and if it's going to be up for grabs again, I'm sure he's going to be waiting in line.

[itvt]: We've noticed recently that there's been an increase in the number of ITV content stories that we find ourselves covering. Deployments seem to be increasing. Are there any specific deployments that have been exciting for you?

Wilderotter: Well, I do think from the programming perspective, ESPN is aggressive. They believe in the space, they are investment-spending in the space because they know interactivity and sports go hand-in-hand. I do think that some of the networks are definitely jumping on the bandwagon: we are seeing more stuff happen from a content perspective. I also think that there's a lot more interest from advertisers that we're seeing over the last couple of months, because the advertising market on TV has come back. And there are now 7 million households for Wink, and when we launch with OpenTV on EchoStar, that will add another 4 to 5 million overnight. So by the first part of next year you're going to see Wink in 10 to 12 million households. That's a huge number for advertisers. It starts to get them excited about this one-on-one connection into the house. So I do think that things are happening. You know, when we hit that 5 million mark a couple months ago, it really got the advertisers to sit up and take notice.

[itvt]: In general, what do you think is the importance of ITV?

Wilderotter: I think it's an opportunity to provide new products and services, and generate new revenue streams, and build loyalties in existing customers, that aren't there today. I think that some of the things that have happened with the Internet, in terms of people being able to click and get instantaneous information at their fingertips, is something that consumers are now demanding out of devices in their home. And I think that interactivity can deliver a whole host of services to the

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414624

household in a TV-centric way, that can provide value to the consumer which that consumer will in turn pay for.

[itvt]: Looking back, what would you say was your greatest contribution to the ITV industry?

Wilderotter: Well, I would say that we have built the number-one ITV service in America with 7 million households. No one thought that anybody was ever going to be able to do that. And we pulled together 250 different stakeholders--that's what it took in order to make that happen. I think we proved not only that we could do it and deliver a mass market, but that consumers really like the stuff and they use it, and they click on it.

\*\*\*

Copyright 1998 - 2004 [itvt] | Swedlow. All rights reserved



Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only                    TRB0414625

Quick Links | Home | Worldwide

Search Microsoft.com for:

Go

# Microsoft

## PressPass - Information for Journalists

PressPass Home    | PR Contacts | Fast Facts About Microsoft | Site Map | Advanced Search | RSS F

**Microsoft News**

Product News

Consumer News

International Contacts

Legal News

Security & Privacy News

Events

News Archive

**Corporate Information**

Microsoft Executives

Fast Facts About Microsoft

Image Gallery

Broadcast Room

**Related Sites**

Analyst Relations

Community Affairs

Essays on Technology

Executive E-Mail

Global Citizenship

Investor Relations

Microsoft Research





## Microsoft Hires Maggie Wilderotter as Senior Vice President To Manage Business Strategy
### Nationally Recognized Cable and Telecommunications Industry Leader Brings Extensive Customer and Partner Engagement Experience to Microsoft

**REDMOND, Wash., Nov. 7, 2002** — Microsoft Corp. today announced that Maggie Wilderotter, a recognized cable and telecommunications industry leader, is joining the company as senior vice president of business strategy.

Wilderotter will join Microsoft Nov. 26 and brings more than a decade of experience in leading partner and customer engagement, as well as public affairs efforts in the cable and telecommunications industry. She will report to Craig Mundie, chief technical officer for Advanced Strategies and Policy, working closely with him on strengthening customer and partner outreach in the government and education markets, as well as working across various business divisions on developing and coordinating forward-looking strategies.



**Maggie Wilderotter**

"Maggie Wilderotter has the depth of experience to help take our business strategy to the next level and will provide the leadership to help Microsoft build stronger relationships in government and education markets," Mundie said. "I am excited to have someone with Maggie's talent and enthusiasm join my team; she will be a great addition."

Wilderotter said she decided to join Microsoft to continue her professional experience with a company committed to expanding its resources in a way that enables stronger engagement with partners and a more solution-focused approach with customers. "Through my previous experiences with Microsoft, I was impressed by the company's desire to understand the unique drivers of our business," Wilderotter said. "I look forward to the opportunity to get closer to customers' business challenges and seek opportunities to help Microsoft provide solutions that address their unique market dynamics."

Previously, Wilderotter was president and chief executive officer of Wink Communications Inc. where she led the company's efforts to provide complete end-to-end systems for low-cost electronic commerce on television, giving advertisers, merchants, and broadcast and cable networks the ability to create interactive enhancements for traditional television advertisements and programs. Before joining Wink Communications, Wilderotter was executive vice president of national operations for AT & T Wireless Services Inc. and chief executive officer of AT & T's Aviation Communications Division. Earlier in her career, she spent 12 years with U.S. Computer Services Inc./Cable Data as senior vice president and general manager responsible for driving greater customer focus for the engineering and technology company's sales efforts.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414626

Case 08-13141-BLS   Doc 5461-37   Filed 08/20/10   Page 80 of 128

Recently, the National Cable Television Association (NCTA) honored her outstanding work in the industry, awarding her the association's most prestigious award: the Vanguard Award for Distinguished Leadership. In 1999, she was awarded the first Outstanding Mentor Award by the Women in Cable & Telecommunications Foundation. She also received the Top 10 Women in Cable & Telecommunications (WICT) Award in 1989 for her support of the association and advocacy of women in the cable industry.

Wilderotter is a member of the board of directors for several companies including The McClatchy Co. and Airborne Express as well as a number of nonprofit organizations.

Founded in 1975, Microsoft (Nasdaq "MSFT" ) is the worldwide leader in software, services and Internet technologies for personal and business computing. The company offers a wide range of products and services designed to empower people through great software -- any time, any place and on any device.

Microsoft is a registered trademark of Microsoft Corp. in the United States and/or other countries.

The names of actual companies and products mentioned herein may be the trademarks of their respective owners

*Note to editors:* If you are interested in viewing additional information on Microsoft, please visit the Microsoft® Web page at http://www.microsoft.com/presspass/ on Microsoft's corporate information pages. Web links, telephone numbers and titles were correct at time of publication, but may since have changed. For additional assistance, journalists and analysts may contact Microsoft's Rapid Response Team or other appropriate contacts listed at http://www.microsoft.com/presspass/contactpr.asp .

↑ Top of page
Printer-Friendly Version   Send This Page   Add to Favorites

© 2007 Microsoft Corporation. All rights reserved. Terms of Use | Trademarks | Privacy Statement

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only                    TRB0414627

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414628

**TRIBUNE COMPANY**
**NOMINATING & GOVERNANCE COMMITTEE**
**BOARD COMMITTEE STRUCTURE AND MEMBERSHIP REVIEW**

The Nominating & Governance Committee Charter requires the Committee to periodically review and make recommendations to the Board with respect to the size, structure or meeting frequency of the Board and Board committees.

With the recent resignations of the three Chandler Trust directors and Chris Reyes' scheduled resignation following the July Board meeting, the committee membership will be as follows:

**Audit Committee**
Betsy D. Holden
William A. Osborn, Chair
Dudley S. Taft

**Nominating & Governance Committee**
Enrique Hernandez, Jr., Chair
Robert S. Morrison

**Executive Committee**
Dennis J. FitzSimons, Chair
Enrique Hernandez, Jr.
Robert S. Morrison
William A. Osborn

**Compensation & Organization Committee**
Enrique Hernandez, Jr.
Robert S. Morrison, Chair
Miles D. White

Given the relatively short time frame anticipated between now and the merger closing, management recommends that we leave the size of the three NYSE-mandated Board committees at three members each and appoint Miles White to fill the vacancy on the Nominating & Governance Committee that will be created by Chris Reyes' resignation. A proposed resolution is attached.

MWH
7/11/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414629

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTION

### (Committee Appointment)

RESOLVED, that Miles D. White is appointed as a member of the Nominating & Governance Committee of the Board of Directors to hold office until the next Annual Meeting of Shareholders and until his successor is appointed.

MWH
7/11/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414630

**4**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414631

## TRIBUNE COMPANY
## NOMINATING & GOVERNANCE COMMITTEE
## GOVERNANCE DOCUMENTS REVIEW

**By-Laws**



**Board Governance Guidelines**

Redacted

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414632

**Redacted**

**Nominating & Governance Committee Charter**

Redacted

MWH
7/11/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414633

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTION

### (Approval of Amended By-Laws)

RESOLVED, that the amended By-Laws, substantially in the form presented at this meeting, are hereby adopted and approved.

MWH
7/11/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414634

**DRAFT**
**ANNEX A**

**BY-LAWS**

**of**

**Tribune Company**

**a Delaware Corporation**

As amended and in effect on ~~October 19, 2005~~July 18, 2007

### ARTICLE I



### ARTICLE II



Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only



- 2 -

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414636



Redacted

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only



## ARTICLE III



- 4 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414638



- 5 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414639



- 6 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414640**



Redacted

- 7 -

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only



Redacted

- 8 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414642**



## ARTICLE IV



**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414643**



Redacted

- 10 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414644**



Redacted

- 11 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414645



**ARTICLE V**



**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414646**



Redacted

- 13 -

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414647



## ARTICLE VI

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414648



## ARTICLE VII



**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414649



- 16 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414650**



- 17 -

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414651

**ANNEX B**

## BOARD OF DIRECTORS GOVERNANCE GUIDELINES
### (As amended and in effect on October 19, 2005)

1.  **Director Qualifications**

    The Board will have a majority of directors who meet the criteria for independence required by the New York Stock Exchange (NYSE), with a preference that no more than three members of the Board be employees of the Company. The Board has adopted categorical standards, set forth in Annex A to these guidelines, to assist it in determining director independence under the NYSE independence criteria. The Board seeks members from diverse professional backgrounds who combine a broad spectrum of experience and expertise with a reputation for integrity. Directors should have experience in positions with a high degree of responsibility, be leaders in the organizations with which they are affiliated, be selected based upon contributions they can make to the Board and management and be free from relationships or conflicts of interest that could interfere with the director's duties to the Company and its shareholders.

2.  **Size of Board**

    The number of directors shall not exceed a number that can function efficiently as a body. The Nominating & Governance Committee, in consultation with the Chairman and CEO (if the Chairman is not the CEO), considers and makes recommendations concerning the appropriate size and membership needs of the Board. Normally, the number of directors will be approximately 12-13; however the availability of uniquely qualified candidates or succession planning considerations may justify size increases.

3.  **Selection of New Directors**

    The Nominating & Governance Committee will be responsible for identifying and making recommendations regarding new director candidates. The Board expects the Nominating & Governance Committee to consider the views of the Chairman and CEO (if the Chairman is not the CEO) in making appointments, but it is the Nominating & Governance Committee's responsibility to make director recommendations to the full Board for approval. The Nominating & Governance Committee will consider director candidates recommended by shareholders who, in the sole discretion of the Nominating & Governance Committee, satisfy the director qualifications set forth above and are otherwise determined to be suitable director candidates. Shareholders who choose to submit director nominees to the Nominating & Governance Committee shall provide the information, and follow the procedures, outlined in the Company's By-Laws.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**
**TRB0414652**

4. **Retirement Policy**

Mandatory retirement for non-employee directors is required at the Annual Meeting of Shareholders immediately following their 72nd birthday. An officer of the Company shall retire promptly following (i) such officer's resignation as an officer of the Company or (ii) at the Annual Meeting of Shareholders immediately following such officer's retirement as an officer of the Company.

5. **Term Limits**

The Board does not believe it should establish term limits. Term limits have the disadvantage of losing the contribution of directors who have been able to develop, over a period of time, increasing insight into the Company and its operations and, therefore, provide an increasing contribution to the Board as a whole.

6. **Classified Board**

The Board believes that electing directors for three-year terms on a classified basis with one class coming up for election each year is beneficial, as it promotes consistency in governance. The Board also believes it is important for the Company to control its own destiny and supports maintaining structural protections that will allow the Company to deal with potential suitors on its own terms and in the best interests of its shareholders.

7. **Directors Changing Their Present Job Responsibility**

The Board expects directors who change the responsibility they held when they were elected to the Board to promptly advise the Nominating & Governance Committee for review and recommendation to the Board. It is not the sense of the Board that in every instance the directors who retire or change from the position they held when they came on the Board should necessarily leave the Board. There should, however, be an opportunity for the Board through the Nominating & Governance Committee to review the continued appropriateness of Board membership under the circumstances.

8. **Director Responsibilities**

The basic responsibility of Directors is to exercise their business judgment and act in what they reasonably believe to be in the best interests of the Company and its shareholders. In discharging that obligation, Directors should be entitled to rely on the honesty and integrity of the Company's senior executives and its outside advisors and auditors. The Directors shall also be entitled to have the Company purchase reasonable directors' and officers' liability insurance on their behalf, to the benefits of indemnification to the fullest extent permitted by law and the Company's charter, by-laws and any indemnification agreements, and to exculpation as provided by state law and the Company's charter.

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414653

Directors are expected to attend Board meetings and meetings of committees on which they serve, and to spend the time needed and meet as frequently as necessary to properly discharge their responsibilities. Directors are also expected to attend annual meetings of shareholders.

Directors are expected to act ethically at all times and to adhere to the policies comprising the Company's Code of Business Conduct.

9.    **Board Committees**

The Board will have at all times an Audit Committee, a Nominating & Governance Committee and a Compensation & Organization Committee. All of the members of these committees will be independent directors under the criteria established by the New York Stock Exchange and the Securities and Exchange Commission. The Board may also have an Executive Committee, which may contain one or more management directors. There will, from time to time, be occasions in which the Board may want to form a new committee depending upon the circumstances. Members of the committees are recommended to the Board by the Nominating & Governance Committee in consultation with the Chairman and CEO (if the Chairman is not the CEO). Committee members shall possess such skill and experience as is appropriate for the committee or committees on which they serve.

Each of the Audit Committee, the Nominating & Governance Committee and the Compensation & Organization Committee will have its own charter. The charters will set forth the purposes, goals and responsibilities of these committees as well as qualifications for committee membership, procedures for committee member appointment and removal, committee structure and operations, and committee reporting to the Board. The responsibilities of these and any other Board committees are also provided in the Company's by-laws.

The Nominating & Governance Committee shall recommend the chair of each committee to the Board, in consultation with the Chairman and CEO (if the Chairman is not the CEO). The committee chair, in consultation with committee members, shall determine committee agendas and the length and frequency of committee meetings, consistent with any requirements set forth in the committee's charter, if applicable. The meeting schedule for each committee will be furnished to all Directors.

10.    **Rotation of Committee Assignments**

The Board believes that committee assignments should be based on the director's knowledge, interests and areas of expertise. The Board believes experience and continuity are more important than rotation and that Board members should only be rotated if rotation is likely to improve committee performance or facilitate committee work.

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

11.  **Agendas of Board Meetings**

The Chairman, in consultation with members of the Board when appropriate, will establish the agenda for Board meetings.

12.  **Distribution of Materials for Board Meetings**

The Board believes it is critical for members to have materials on topics to be discussed sufficiently in advance of the meeting date and for Board members to be kept abreast of developments between Board meetings. The Company regularly informs Board members of Company and competitive developments and, except in the case of special meetings, distributes, generally a week in advance, written materials for use at Board and Board committee meetings.

13.  **Executive Sessions of Directors**

Executive sessions are those sessions that include only non-employee directors and those members of management or legal, financial or other advisors whose participation is requested. Executive sessions should occur on a regular basis at the discretion of the directors. If, at any time, the group of non-employee directors includes one or more directors who do not satisfy the then current independence criteria of the NYSE, the Company shall, at least one time per year, schedule an executive session including only those non-employee directors who satisfy the then current NYSE independence criteria. The Board of Directors, by resolution of a majority of the non-employee directors, shall designate one non-employee director to preside at these sessions and his or her name will be disclosed in the annual proxy statement. Potential topics for executive sessions shall be provided to the incumbent presiding director, who shall schedule such sessions as needed.

14.  **Attendance of Management at Board Meetings**

The Board believes it is important for directors to know the Company's key senior officers well and believes that their regular attendance at and participation in Board and Board committee meetings is helpful.

15.  **Board Access to Senior Management and Independent Advisors**

Board members have complete access to the Company's management and its auditors. It is assumed that Board members will use judgment to be sure that such contact is not distracting to the business operation of the Company and that the Chairman and CEO (if the Chairman is not the CEO) is appropriately advised of any such contact.

The Board and each committee have the power to hire independent legal, financial or other advisors as they may deem necessary, without consulting or obtaining the approval of any officer of the Company in advance.

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414655

16. **Director Compensation**

The Compensation & Organization Committee will determine the form and amount of director compensation in accordance with policies and principles established by the Committee from time to time.  The Compensation & Organization Committee will consider that directors' independence may be jeopardized if director compensation and perquisites exceed customary levels, if the Company makes substantial charitable contributions to organizations with which a director is affiliated, or if the Company enters into consulting contracts with (or provides other indirect forms of compensation to) a director or an organization with which a director is affiliated.

It is appropriate for Company management to report once a year to the Compensation & Organization Committee regarding the status of director compensation in relation to comparable U.S. companies.  In addition, the Compensation & Organization Committee will conduct periodic reviews of director compensation.  Changes in director compensation, if any, should come as a recommendation of the Compensation & Organization Committee following discussion and concurrence by the Board.

17. **Annual Performance Evaluations**

Board Effectiveness Review.  The Board will conduct an annual self-evaluation to determine whether it and its committees are functioning effectively.  The Nominating & Governance Committee, in conjunction with the presiding non-management director, will review comments from all directors and report to the Board with an assessment of the Board's performance and any recommendations following each such review.  All directors are free to make suggestions on improvement of the Board's practices at any time and are encouraged to do so.

Director Evaluation.  The Nominating & Governance Committee shall be responsible for reviewing with the Board, on an annual basis, the requisite skills and characteristics of prospective Board members as well as the composition of the Board as a whole.  This assessment will include members' qualification as independent, as well as consideration of diversity, age, skills and experience in the context of the needs of the Board.  The Board expects that the Nominating & Governance Committee will take action to effect changes in incumbent directors if, in the opinion of the Committee after discussion with the Chairman and CEO (if the Chairman is not the CEO), such changes are deemed to be appropriate.

5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414656

18. **Succession Planning and Management Development**

The CEO will make an annual report to the Board on succession planning. There should also be available, on a continuing basis, the CEO's recommendation as a successor should he/she be unexpectedly disabled.

The CEO will make an annual report to the Board on the Company's program for management development. This report should be given to the Board at the same time as the succession planning report.

19. **Formal Evaluation of Chairman/CEO**

The Compensation & Organization Committee conducts the Chairman and CEO (if the Chairman is not the CEO) evaluations in the context of its review of the Company's performance for purposes of awarding compensation. The Compensation & Organization Committee Chairman reports to the Board on the evaluation in an Executive Session.

20. **Separate Positions of Chairman and CEO**

The Board has no policy with respect to the separation of the offices of Chairman and CEO. The Board believes that this issue is part of the succession planning process and that it is in the best interest of the Company for the Board to make a determination each time it elects a new Chairman or CEO.

21. **Former CEO Status on Board**

When the Chairman is also the CEO of the Company, the Board expects the Chairman to resign upon retirement as CEO. There may be circumstances where the Board's policy to accept the resignation would not apply, including to accommodate the transition for the new Chairman or where the current Chairman cedes the title of CEO to another individual.

22. **Board Interaction with Media, Institutional Investors, Peers, Customers, etc.**

The Board believes that under ordinary circumstances, management speaks for the Company and the Chairman speaks for the Board. It is expected that communication between Board members or retired Board members and constituencies outside the Company would be done with the knowledge of management and, except as approved by the Nominating & Governance Committee, only at the request of management.

6

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414657**

23. **Director Orientation and Continuing Education**

All new non-management directors must participate in the Company's orientation program, which should be conducted within two months of the meeting at which they are elected. This orientation will include presentations by senior management to familiarize new directors with the Company's strategic plans, its significant financial, accounting and risk management issues, its compliance programs, its Code of Business Conduct, its principal officers and its internal and independent auditors. The orientation program will include visits to the Company's headquarters and, to the extent practical, certain of the Company's significant facilities. All other directors will be invited to attend the orientation program.

24. **Review and Amendment**

The Nominating & Governance Committee shall periodically review and reassess the adequacy of these guidelines and recommend changes to the Board for approval. The Board reserves the right to amend these Guidelines from time to time as it determines to be desirable or appropriate.

7

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414658

**Annex A**

## CATEGORICAL STANDARDS

To be considered independent under the rules of the New York Stock Exchange, the Board must determine that a director has no direct or indirect material relationship with the Company. The Board has established the following categorical standards to assist it in making this determination. A director is not independent under these categorical standards if:

- The director is, or has been within the last three years, an employee of the Company, or an immediate family member of the director is, or has been within the last three years, an executive officer, of the Company.
- The director has received, or has an immediate family member who has received, during any twelve-month period within the last three years, more than $100,000 in direct compensation from the Company, other than director and committee fees and pension or other forms of deferred compensation for prior service (provided such compensation is not contingent in any way on continued service).
- (i) The director or an immediate family member is a current partner of a firm that is the Company's internal or external auditor; (ii) the director is a current employee of such a firm; (iii) the director has an immediate family member who is a current employee of such a firm and who participates in the firm's audit, assurance or tax compliance (but not tax planning) practice; or (iv) the director or an immediate family member was within the last three years (but is no longer) a partner or employee of such firm and personally worked on the Company's audit within that time.
- The director or an immediate family member is, or has been within the last three years, employed as an executive officer of another company where any of the Company's present executive officers at the same time serves or served on that company's compensation committee.
- The director is a current employee, or an immediate family member is a current executive officer, of a company that has made payments to, or received payments from, the Company for property or services in an amount which, in any of the last three fiscal years, exceeded the greater of $1 million or 2% of such other company's consolidated gross revenues.
- The director is a current employee, or an immediate family member is a current executive officer, of a company which was indebted to the Company, or to which the Company was indebted, where the total amount of either company's indebtedness to the other, in any of the last three fiscal years, exceeded 5% or more of such other company's total consolidated assets.
- The director or an immediate family member is a current officer, director or trustee of a charitable organization where the Company's (or an affiliated charitable foundation's) annual discretionary charitable contributions to the charitable organization, in any of the last three fiscal years, exceeded the greater of $1 million or 5% of such charitable organization's consolidated gross revenues.

i

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414659

Direct or indirect ownership of even a significant amount of Company stock by a director who is otherwise independent as a result of the application of the foregoing standards will not, by itself, bar an independence finding as to such director.

For purposes of these categorical standards, "immediate family member" includes a director's spouse, parents, children, siblings, mothers and fathers-in-law, sons and daughters-in-law, brothers and sisters-in-law, and anyone (other than domestic employees) who share such director's home. When applying the three-year look back provision to the foregoing categorical standards, the Company need not consider individuals who are no longer immediate family members as a result of legal separation or divorce, or those who have died or become incapacitated.

For purposes of these categorical standards, "executive officer" means a company's president, principal financial officer, principal accounting officer (or controller), any vice president in charge of a principal business unit, division or function (such as sales, administration or finance), or other officer who performs a policy-making function, or any other person who performs similar policy-making functions for the company. Officers of a company's subsidiaries shall be deemed officers of the company if they perform such policy-making functions for the company.

The Board will annually review all relationships between the Company and its outside directors and publicly disclose whether its outside directors are independent.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414660

ANNEX C

## NOMINATING & GOVERNANCE COMMITTEE CHARTER
### (As in effect on October 19, 2005)

### Purpose

The Nominating & Governance Committee is appointed by the Board of Directors to: (a) identify and make recommendations regarding new director candidates; (b) review and recommend the renomination of incumbent directors; (c) review and recommend committee appointments; (d) review and recommend changes to the Board of Director Governance Guidelines; (e) in conjunction with the presiding non-management director, lead the Board in its annual review of the Board's performance; and (f) perform other related tasks, including studying the size, committee structure or meeting frequency of the Board, as may be requested from time to time by the Board of Directors.

### Committee Membership

The Nominating & Governance Committee shall consist of no fewer than three members. The members of the Committee shall meet the independence requirements of the New York Stock Exchange. The members of the Committee, including a chairperson, shall be appointed and replaced by the Board of Directors based on the recommendations of the Committee.

### Committee Authority and Responsibilities

1.  The Committee shall identify individuals qualified to become Board members, as such qualifications are defined in the Board's Governance Guidelines, for recommendation to the Board.

2.  The Committee shall also consider and evaluate other director candidates brought to the Committee's attention, including shareholder nominees, taking into account the qualifications for director nominees set forth in the Board's Governance Guidelines.

3.  The Committee shall recommend to the Board (i) the nominees for election as directors at each annual or special meeting of shareholders where directors are to be elected, (ii) the persons to be appointed by the Board to fill any Board vacancies and (iii) the membership of the individual Board committees, including this Committee.

4.  The Committee shall, in conjunction with the presiding non-management director, lead the Board in an annual performance evaluation, including soliciting comments from all directors, preparing a report to the Board with an assessment of the performance of the Board and making recommendations for improvements of the Board's operations.

5.  The Committee shall lead the Board in an annual review of the skills and characteristics of individual Board members as well as the composition of the

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Board as a whole and the individual Board committees, including assessments of independence of non-management directors, and shall take action to effect changes in incumbent directors if deemed appropriate.

6.  The Committee shall periodically review and make recommendations to the Board with respect to the size, structure or meeting frequency of the Board and Board committees

7.  The Committee shall periodically review and reassess the adequacy of the Board's Governance Guidelines and recommend changes to the Board for approval.

8.  The Committee shall have the sole authority to retain and terminate any search firm used to identify director candidates and shall have sole authority to approve the search firm's fees and other retention terms.

9.  The Committee shall have the authority to obtain advice and assistance from internal or external legal, accounting or other advisors.

10.  The Committee may form and delegate authority to subcommittees when appropriate.

11.  The Committee shall make regular reports to the Board.

12.  The Committee shall review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval. The Committee shall annually review its own performance.

13.  The Committee shall review procedures for the receipt, retention and treatment, by either the Committee chairperson or the non-management directors as a group, of communications received by the Company regarding corporate governance matters, and the submission by interested parties of concerns regarding corporate governance matters.

14.  The Committee shall review all shareholder proposals submitted for inclusion in the Company's annual proxy materials or for consideration at any shareholders meeting and make recommendations on such proposals to the full Board as appropriate.

15.  The Committee shall review and approve the corporate governance disclosures to be included in the Company's annual proxy statement or annual report on Form 10-K filed with the SEC.

16.  The Committee shall carry out such other duties as may be delegated to it from time to time by the Board.

2

TRB0414662

COMPENSATION & ORGANIZATION
COMMITTTEE

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414663

**TRIBUNE COMPANY**
**COMPENSATION & ORGANIZATION COMMITTEE MEETING**
**WEDNESDAY, JULY 18, 2007 (8:30 A.M.)**
**LAKEVIEW ROOM**
**24TH FLOOR, TRIBUNE TOWER**

**AGENDA**

| | Tab No. |
|---|---|
| Approve minutes of February 13 and April 1, 2007 meetings | 1 |
| Compensation review | 2 |

**Compensation & Organization Committee**
Enrique Hernandez, Jr.
Robert S. Morrison, Chairman
Miles D. White

**Tribune Company**
Dennis J. FitzSimons
Donald C. Grenesko
Crane H. Kenney

**Frederic W. Cook & Co., Inc.**
George Paulin (by telephone)

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414665

## TRIBUNE COMPANY
## COMPENSATION & ORGANIZATION COMMITTEE MEETING
### FEBRUARY 13, 2007

The Compensation & Organization Committee met at 7:30 a.m. on Tuesday, February 13, 2007 at Tribune Tower, Chicago, Illinois, pursuant to notice. The meeting was attended by Enrique Hernandez, Jr., Robert S. Morrison and Miles D. White. Jeffrey Chandler and George B. Paulin of Frederic W. Cook & Co., Inc. participated via telephone. Dennis J. FitzSimons, Donald C. Grenesko and Crane H. Kenney attended a portion of the meeting.

Mr. Morrison acted as Chairman of the meeting. Messrs. FitzSimons, Grenesko and Kenney were present as the meeting was called to order and Messrs. Chandler and Paulin were on the telephone. The following business was discussed by the Committee:

1.    The minutes of the December 12, 2006 Committee meeting were approved.

2.    Mr. Kenney presented management's recommendation to allow for the deferral of future director stock awards made under the Incentive Compensation Plan on the same terms and conditions provided for in the 1996 Nonemployee Director Stock Compensation Plan, the predecessor plan for these awards. Following discussion, the Committee approved management's recommendation.

3.    Mr. Kenney



4.    Mr. Grenesko presented management's 2006 bonus payout recommendations. Following discussion, the Committee approved the aggregate 2006 bonus payout recommendations as presented. The Committee also approved operating cash flow and equity income as the financial performance criteria for the determination of 2007 MIP bonuses, as well as the specific operating cash flow and equity income targets by group for 2007.

5.    Mr. Grenesko then reviewed the final 2007 equity compensation recommendations, which followed the general framework outlined by management and endorsed by Mr. Paulin at the December Committee meeting. These recommendations include: (i) accelerated vesting of equity awards in certain change in control transactions; (ii) full vesting of all non-union employees in their 401(k) company contribution accounts in the

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

event of both a change in control of Tribune and involuntary or constructive termination of employment; (iii) adjustments to outstanding equity grants held by Tribune Broadcasting employees in connection with a potential spin-off of the Broadcasting group; (iv) the payment of any special cash dividend in a leveraged recapitalization transaction to holders of restricted stock units; (v) the resetting of stock ownership guidelines following a leveraged recapitalization transaction; and (vi) the termination of the Employee Stock Purchase Plan. These recommendations will be implemented, as appropriate, in connection with the transaction or transactions approved by the Board at the conclusion of the Special Committee's strategic review process.

6.     Mr. Grenesko then reviewed management's recommendation for restricted stock unit awards to key employees of the Company. Following discussion, the Committee approved, with Mr. Chandler abstaining for purposes of Exchange Act Rules 16b-3(d)(1) and 16b-3(b)(3), the grant of up to 2 million restricted stock units to approximately 780 employees. The terms of the restricted stock unit awards are as follows:

| | |
|---|---|
| Date of Grant: | February 13, 2007 |
| Clawback: | Restricted stock units may be suspended, canceled or forfeited and gains may be forfeited if participant engages in any act of fraud, insider trading or other securities law violation |
| Retirement, death or disability: | Immediate vesting |
| Vesting: | 33 1/3% per year beginning February 13, 2008 |
| Dividends: | Dividend equivalents accumulated in stock and paid in additional shares at vesting |
| Voting rights: | None, prior to vesting |

The Committee also approved the grant of 100,000 restricted stock units to be used by management to attract and retain management talent. At this point, Messrs. Grenesko and Kenney departed the meeting.

7.     The Committee next reviewed compensation analyses and supporting market data for the four executive officers to be named in the 2007 proxy statement (other than Mr. FitzSimons). Following discussion, the Committee, with Mr. Chandler abstaining from the approval of the restricted stock unit awards for purposes of Securities Exchange Act Rules 16b-3(d)(1) and 16b-3(b)(3), approved 2006 bonuses (based on the achievement of previously approved financial targets and individual performance goals), 2007 salary

2

adjustments and 2007 restricted stock unit awards for the executives to be named in the proxy (other than Mr. FitzSimons) and the next 25 most highly compensated Tribune executives. At this point, Mr. FitzSimons departed the meeting.

8. The Committee next reviewed a compensation analysis and supporting data for Mr. FitzSimons. After discussion, the Committee approved an increase in Mr. FitzSimons' salary of approximately 3% to $1,015,000. The Committee also approved a 2006 bonus of $1.4 million under the MIP (based on the achievement of previously approved financial targets and individual performance goals) and, with Mr. Chandler abstaining for purposes of Securities Exchange Act Rules 16b-3(d)(1) and 16b-3(b)(3), a 2007 restricted stock unit award of 135,000 shares.

There being no further business to come before the Committee, the meeting was adjourned at 10:00 a.m.

_____
Robert S. Morrison
Chairman

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414668

**TRIBUNE COMPANY**
**COMPENSATION & ORGANIZATION COMMITTEE MEETING**
**APRIL 1, 2007**

The Compensation & Organization Committee met at 9:45 p.m. Central time on Sunday, April 1, 2007, by conference telephone, pursuant to notice. The following committee members participated in the meeting: Jeffrey Chandler, Enrique Hernandez, Jr. and Robert S. Morrison. Dennis J. Fitzsimons, Donald C. Grenesko and Crane H. Kenney also participated in portions of the meeting.

Mr. Morrison acted as Chairman of the meeting. Messrs. FitzSimons, Grenesko and Kenney participated as the meeting was called to order. The meeting was convened to discuss a special cash bonus pool and phantom stock plan proposed by management in connection with, and conditioned upon consummation of, the proposed leveraged ESOP transaction (the "ESOP Transaction").

1.  The Committee first considered special incentive awards comprised of (i) a cash bonus pool totaling $6.5 million to be awarded to approximately 32 management and other key employees who were critical to the strategic review process and (ii) the establishment of a 3% phantom stock pool in the surviving company to be awarded to approximately 17 members of senior management who were directly involved with the ESOP Transaction, such awards to be made, in each case, in respect of past and future services as employees of the Company (the "Special Incentive Awards").

2.  The Committee next considered the establishment of a 5% phantom stock pool in the surviving company to be awarded to approximately 200 members of management and other key employees as a long term incentive, such awards to be made in respect of past and future services as employees of the Company (the "Management Equity Incentive Plan Awards").

3.  Following discussion, the Committee approved the Special Incentive Awards and the Management Equity Incentive Plan Awards, substantially in accordance with the terms outlined in Exhibit A, respectively and, in each case, subject to such modifications as management shall reasonably determine in connection with the negotiation of the ESOP Transaction or otherwise, and adopted the following resolution:

> RESOLVED, that the Special Incentive Awards and the Management Equity Incentive Plan Awards and other matters contemplated thereby be, and they hereby are, approved as employment compensation or other employee benefit arrangements.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

There being no further business to come before the Committee, the meeting was adjourned at 10:00 p.m.


_____
Robert S. Morrison
Chairman

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414670

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**Tribune Company**
**Compensation and Organization Committee**
**Executive Compensation Update**

## 2007 Management Incentive Plan

At the February meeting, the Board and Compensation Committee approved the 2007 Operating Plan and Management Incentive Plan. Consistent with past practice, the MIP targets for the corporate office, publishing and broadcasting and entertainment groups, and individual business units are based upon operating cash flow and, in certain cases, equity income.

Publishing's advertising revenues through six periods are coming in well below expectations, partially offset by lower newsprint and staffing levels. Operating cash flow is well below plan. Broadcasting's revenues, expenses and operating cash flow are somewhat below plan. For the first half, equity income from CareerBuilder, Classified Ventures, TV Food Network and Comcast Sports Net is higher than anticipated. We have reset sale goals to incent better sales performance in the 3rd and 4th quarters and are working on additional cost saving initiatives to reduce the OCF shortfall.

Based on first half results, we expect bonuses for the Publishing Group and individual newspapers to average about 50% of target, Broadcasting about 90% and the Corporate Office should earn around 65% of target. According to the merger agreement, bonuses will be calculated on our established formulas and paid consistent with past practices.

## Special Incentive Awards

At a meeting on April 1, the Committee approved special incentive awards to recognize the exceptional performance of certain members of management in structuring and negotiating the ESOP/Zell transaction. This unique transaction structure created over $1B in shareholder value above Tribune's unaffected stock price.

The Committee approved cash awards of $6.5 million to 32 individuals to be paid at the close of the transaction. At management's recommendation, 275,000 restricted stock units ($9.3 million) previously approved by the Committee that had not yet been awarded were cancelled. Subsequent to the April 1 meeting, management decided to increase the number of participants to 40 while reducing the total amount of the cash award to $5.4 million. (Exhibit I)

The Committee also approved a 3% pool of phantom stock in the new company to be awarded to 17 members of senior management who played critical roles in the transaction. Because this award is directly related to the successful completion of the ESOP/Zell transaction, individual awards will be approved by the Committee at the close of the transaction.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**Long-Term Equity Incentive**

In addition to the above, the Committee approved a 5% phantom stock pool in the new company as a long-term incentive for the management team.  Management is recommending that about 3-1/2% of the pool be awarded at, or shortly after, the close of the transaction to around 200 individuals.  The number of participants is well below the 775 who received restricted stock in February, but more in line with private equity practices.  The remaining phantom stock would be awarded annually over the next several years.  This 5% pool is not directly related to the completion of the transaction but was created to motivate operational performance going forward.  Therefore, individual awards should be formally approved by the Compensation Committee of the new company.

The Zell organization and GreatBanc, the ESOP trustee, have previously approved the special cash and equity incentive awards and the long-term equity plan.

DCG/jo
07/11/07

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414673

Exhibit I

**Tribune Company**
**Special Incentive Awards**
**Approved Terms**

**Cash Bonus**

| | |
|---|---|
| Date of Payment: | Close of ESOP/Zell transaction |
| Payout: | To be made to all awardees including in event of involuntary termination between the signing and the close of the transaction.  Will not be paid to those who voluntarily terminate. |

**3% Phantom Stock**

| | |
|---|---|
| Date of Grant: | Close of ESOP/Zell transaction |
| Vesting: | (1)  50% upon closing of the transaction; remaining 50% vested one year later. |
| | (2)  100% upon a Change in Control of the Company or termination of employment due to death, disability, retirement or involuntary termination. |
| Payment: | 1/3 of award will be settled and paid in cash on the fourth, sixth, and eighth anniversary of date of grant. |

**Participants**

| | Cash Bonuses | Preliminary 3% Equity Pool |
|---|---|---|
| Dennis FitzSimons | Declined | 0.35% |
| Don Grenesko | $400,000 | 0.25 |
| David Hiller | Declined | 0.25 |
| Crane Kenney | 600,000 | 0.25 |
| Bob Gremillion | 250,000 | 0.20 |
| Tim Knight | 250,000 | 0.20 |
| Tim Landon | 300,000 | 0.20 |
| Tom Leach | 400,000 | 0.20 |
| John Reardon | 200,000 | 0.175 |
| Scott Smith | Declined | 0.175 |
| John Vitanovec | 300,000 | 0.15 |
| Kathy Waltz | 100,000 | 0.15 |
| Chandler Bigelow | 400,000 | 0.10 |
| Dan Kazan | 350,000 | 0.10 |
| Harry Amsden | 150,000 | 0.05 |
| Betty Ellen Berlamino | 75,000 | 0.05 |
| Tom Ehlman | 75,000 | 0.05 |
| Vinnie Malcolm | 75,000 | 0.05 |
| 25 at $25-175,000 | 1,125,000 | - |
| | $5,400,000 | 2.95% |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414674

**Exhibit II**

**Zell/ESOP Transaction**
**5% Management Equity Incentive Plan**

| | |
|---|---|
| **General Pool:** | 5% phantom stock |
| **Date of Grant:** | 3-1/2% at close of transaction; 1-1/2% over next several years |
| **Vesting:** | 33% per year<br>100% upon a Change in Control of the Company or termination due to death, disability or retirement |
| **5% Pool:** | Up to 200 awardees<br>Publisher and most department heads at large and mid-size papers<br>Publisher and key department heads at small papers<br>GMs at all TV stations plus head of sales at 10 largest stations<br>Certain Corporate and Group SVPs and VPs<br>Certain high potential employees throughout Company |
| **Payout:** | 5th anniversary of award; can be deferred additional 5 years |
| **Valuations:** | Based upon ESOP trustee valuation |

DCG/jo
07/11/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414675