# TRIBUNE

## BOARD OF DIRECTORS MEETING
## December 4, 2007

**Master Copy**

**Confidential**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414796

Crane H. Kenney
Senior Vice President/General Counsel
& Secretary
312/222-2491

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
fax: 312/222-4206
e-mail: ckenney@tribune.com

November 28, 2007

Dennis J. FitzSimons             William A. Osborn
Enrique Hernandez, Jr.           Dudley S. Taft
Betsy D. Holden                  Samuel Zell
Robert S. Morrison

Enclosed is a notebook for use at the Board of Directors meeting to be held on the 24th floor of Tribune Tower on Tuesday, December 4, 2007. Compensation & Organization and Audit Committee members will also find agendas and information for their meetings in the notebooks.

The schedule for Tuesday is as follows:

| *Date* | *Meeting* | *Location* | *Time* |
|--------|-----------|------------|--------|
| Tues., Dec. 4 | Comp. & Org. Committee | Lakeview Room | 8:00 a.m. |
| Tues., Dec. 4 | Audit Committee | McCormick Room | 8:00 a.m. |
| Tues., Dec. 4 | Board of Directors Meeting | Patterson Room | 9:00 a.m. |

A continental breakfast will be available at the Committee and Board meetings and there will be an informal buffet luncheon for directors immediately following the Board meeting. The luncheon will be held in the McCormick Room on the 24th floor of Tribune Tower. Airport transportation will be available at the conclusion of the lunch.

I look forward to seeing you, and please contact me if you have any questions.

Sincerely,

CHK/bap

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414797

Dennis J. FitzSimons
Chairman, President and
Chief Executive Officer
312/222-3373

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
fax: 312/222-3203
e-mail: dfitzsimons@tribune.com

*Via Federal Express*

November 28, 2007

Enrique Hernandez, Jr.          William A. Osborn
Betsy D. Holden                 Dudley S. Taft
Robert S. Morrison              Samuel Zell

Enclosed is the Board book for our December meeting.

Additionally, here is a brief overview of general business conditions and recent company developments.

<u>Publishing and Interactive</u>

Current business conditions – Period 11 advertising revenues were 1% ahead of our projection, down 5% for the period. This includes a benefit from the shift in Thanksgiving promotional spending from the first week of Period 12, 2006 to the last week of Period 11, 2007. This is an improvement over October when advertising revenues were down almost 11% from 2006 and continued the pattern of advertisers pulling back on spending in non-promotional periods.

Circulation – As expected, Tribune's circulation results were better than the average of the top 30 non-Tribune newspapers according to ABC's FAS-FAX for the six months ended September 2007. On Sunday, our individually paid circulation declined 3.7% compared to 4.2% for our peer group. Our daily individually paid circulation declined 2.1% vs. 4.1% for our peers. Tribune continues to lead in quality circulation mix. "Individually paid" comprises 98% of our Sunday and 96% of our daily circulation, compared to 94% and 90% for our peer group, respectively.

Interactive – Fourth quarter interactive revenues are projected to increase 9% over the same period last year. Non-classified revenue is projected to be up 30% and classified revenue is projected to be up 4%. Tribune Interactive's websites drew over 17 million average monthly unique visitors during the month of October.

CareerBuilder's fourth quarter market revenues are projected to grow 14% over the same period last year. CareerBuilder drew nearly 24 million monthly unique visitors during October, compared to Monster's 12 million and HotJobs' 20 million.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414798

Page 2

Broadcasting/Entertainment

Pacing – Tribune stations' non-political revenue was flat in October and plus 4% in November versus 2006.  On a five-week vs. five-week basis, December is projected to finish at plus 7%.

First quarter 2008 is currently pacing 57% ahead of 2007.  It is still early, but we are encouraged by the strong start to 2008.  The national broadcast and cable network market for the first quarter is very tight and our stations should see some positive impact from this in their local markets.  Combined with political spending and our stronger prime time lineups, we should continue to see positive revenue numbers.

CW Network & New Syndicated Programming – Our CW stations' primetime ratings are holding and average unit rates are up versus last year.  As we expected, *Two and a Half Men* and *Family Guy* continue to deliver solid rating increases, particularly in male demographics, over last November's programming.  Household ratings have continued to build each week since the new programming premiered.  Our station sales people have taken advantage of higher ratings from these shows to drive better rates and shares of business.  This will continue and translate into strong revenue performance in 2008.

Writers' Strike – The Writers Guild of America went on strike on November 7.  The networks have stockpiled scripts for most scripted programs, but they will likely air additional reality programming and reruns of scripted shows if the strike continues into January.  We do not expect a material financial impact because early and late fringe (not prime time) are our biggest revenue drivers.  While we could even see some short-term upside if late night talk shows stay in repeats and drive more viewers to our late fringe syndicated lineups, we would still prefer a quick resolution.

**********

I look forward to seeing you on December 4.  If you have questions prior to the meeting, please feel free to call.

Sincerely,

Dennis FitzSimons

Enclosure

**TRIBUNE COMPANY**
**BOARD OF DIRECTORS MEETING**
**TUESDAY, DECEMBER 4, 2007 (9:00 A.M.)**
**PATTERSON BOARD ROOM, 24TH FLOOR**
**TRIBUNE TOWER**

**AGENDA**

| | Tab No. |
|---|---|
| Executive session | |
| Approve minutes of October 17, November 5 and November 21, 2007 Board of Directors meetings | 1 |
| Company performance: | |
| • Projected 2007 operating results | |
| • Broadcasting update | |
| Stock performance report | 2 |
| Development update | 3 |
| FSBO divestiture | 4 |
| Transaction update | |
| • FCC | |
| • Solvency | |
| • Financing | |
| • Closing mechanics | |
| • Directors and officers liability insurance | 5 |
| Audit Committee report | |
| • Revised Audit Committee charter | 6 |
| Compensation & Organization Committee report | |
| Executive session | |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414801

## TRIBUNE COMPANY
## BOARD OF DIRECTORS MEETING
### OCTOBER 17, 2007

The Tribune Company Board of Directors met at 9:00 a.m. on Wednesday, October 17, 2007, at Tribune Tower, Chicago, Illinois, pursuant to notice. The meeting was attended by Dennis J. FitzSimons, Betsy D. Holden, Robert S. Morrison, William A. Osborn, Dudley S. Taft and Samuel Zell.

Portions of the meeting were attended by Harry A. Amsden, Chandler Bigelow, Kenneth DePaola, Donald C. Grenesko, Crane H. Kenney, Timothy J. Landon, Thomas D. Leach, John E. Reardon, Scott C. Smith and John J. Vitanovec. Tom Cole of Sidley Austin LLP, William Kunkel of Skadden, Arps, Slate, Meagher & Flom LLP, Michael Canmann, Christina Mohr and Michael Schell of Citigroup and Tom Whayne and Paul Taubman of Morgan Stanley also participated in portions of the meeting.

Mr. FitzSimons acted as chairman of the meeting and Mr. Kenney acted as secretary.

Mr. FitzSimons called the meeting to order at 9:00 a.m.

### EXECUTIVE SESSION

The directors met in executive session at the beginning of the meeting. At the conclusion of the executive session, Messrs. Grenesko, Kenney, Landon, Leach, Reardon and Smith joined the meeting.

### APPROVAL OF MINUTES

A motion was made, seconded and approved to adopt the minutes of the July 18 and September 28, 2007 Board of Directors meetings and the August 21, 2007 Special Shareholders meeting.

### PREFERRED STOCK DIVIDEND

A motion was made, seconded and approved to adopt the following resolution:

> RESOLVED, that there is hereby declared a dividend of $8.9375 per share on the Series D-1 Convertible Preferred Stock of the Company payable on December 13, 2007 to stockholders of record at the start of business on December 13, 2007.

### DEVELOPMENT UPDATE

Mr. Leach discussed a written report submitted to the Board prior to the meeting regarding the status of current development activities. As part of the report, Mr. Leach presented

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

management's request for funding a national on-line entertainment channel under the Metromix brand. Following discussion, a motion was made, seconded and approved to adopt the following resolutions:

> RESOLVED, that the Board of Directors of the Company hereby authorizes the Company (or any affiliate thereof) to invest up to $18 million (in a combination of cash and assets) in connection with the formation of an interactive joint venture with Gannett Co., Inc. under the Metromix brand (the "Metromix Joint Venture");

> FURTHER RESOLVED, that the Chairman, President and Chief Executive Officer, any Senior Vice President or any Vice President of the Company, the President, the Executive Vice President or any Vice President of Tribune Publishing Company, the President, any Senior Vice President or any Vice President of Tribune Interactive, Inc. or the President, any Senior Vice President or any Vice President of Chicago Tribune Company (the "Authorized Officers"), be and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to negotiate the terms of, document and execute agreements and instruments evidencing the Metromix Joint Venture as such Authorized Officer executing the same may approve, such approval to be conclusively evidenced by such officer's execution thereof;

> FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to make all such arrangements, to do and perform all such acts and things, to execute and deliver all such agreements, certificates, instruments and documents, to make all governmental, regulatory or other filings, to pay all such amounts, and to take all such actions as they may deem advisable or necessary in connection with the foregoing resolutions and in order to fully effectuate the purposes of the foregoing resolutions; and

> FURTHER RESOLVED, that all actions previously taken by or on behalf of the Company (or any affiliate thereof) in connection with the matters set forth in these resolutions be, and hereby are, ratified, confirmed and approved in all respects.

Mr. Leach next presented management's request for approval of the sale of Southern Connecticut Newspapers, Inc. ("SCNI"). Following discussion, a motion was made, seconded and approved to adopt the following resolutions:

> RESOLVED, that the Board of Directors of the Company hereby approves the sale by the Company (or any affiliate thereof) of SCNI for not less than $62 million (exclusive of the real property owned by SCNI) (the "SCNI Sale Transaction");

> FURTHER RESOLVED, that the Chairman, President and Chief Executive Officer, any Senior Vice President or any Vice President of the Company, the President, the Executive

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414803

Vice President or any Vice President of Tribune Publishing Company or the President or any Vice President of SCNI (the "Authorized Officers") be, and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to negotiate, document and execute agreements and instruments evidencing the SCNI Sale Transaction as such Authorized Officer executing the same may approve, such approval to be conclusively evidenced by such officer's execution thereof;

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to make all such arrangements, to do and perform all such acts and things, to execute and deliver all such agreements, certificates, instruments and documents, to make all governmental, regulatory or other filings Including, without limitation, filings pursuant to the Hart-Scott-Rodino Antitrust Improvements Act), to pay all such amounts, and to take all such actions as they may deem advisable or necessary in connection with the matters set forth in these resolutions and in order to fully effectuate the purposes of these resolutions; and

FURTHER RESOLVED, that all actions previously taken by or on behalf of the Company (or any affiliate thereof) in connection with the matters set forth in these resolutions be, and hereby are, ratified, confirmed and approved in all respects.

Mr. Leach then presented management's request for authority to sell the KTLA Studio Lot and three nearby off-site parking lots on terms and conditions to be approved by the Executive Committee of the Board of Directors. Following discussion, a motion was made, seconded and approved to adopt the following resolutions:

RESOLVED, that the Executive Committee of the Board of Directors is hereby authorized (with full power of delegation) to (i) approve the sale by the Company (or any affiliate thereof) of the KTLA Studio Lot located at 5800 Sunset Boulevard, Hollywood, California and the three nearby off-site parking lots (the "Real Property") and all related assets utilized in connection with the television studio production business (together with the Real Property, the "Property"), in each case, on terms and conditions to be approved by the Executive Committee and (ii) to structure the sale of the Real Property consistent with a deferred like-kind exchange under Section 1031 of the Internal Revenue Code;

FURTHER RESOLVED, that the Executive Committee of the Board of Directors is hereby authorized (with full power of delegation) to approve the leaseback by the Company (or any affiliate thereof) of all or a portion of the Property, in each case, on terms and conditions to be approved by the Executive Committee; and

FURTHER RESOLVED, that the Executive Committee of the Board of Directors is hereby authorized (with full power of delegation) to take all necessary actions such that

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414804

the transactions described above comply with the terms of each of the Company's indentures, including making a determination as to whether the Property, or any portion thereof, constitutes "Principal Property" as defined in the following indentures of the Company: (i) Indenture, dated as of January 1, 1997, between the Company and Citibank, N.A. (successor to Bank of Montreal Trust Company and Bank of New York), as trustee, (ii) Indenture, dated as of January 30, 1995, between the Company (as successor pursuant to the First Supplemental Indenture to The Times Mirror Company, f/k/a New TMC Inc.) and Citibank, N.A. (successor to Bank of New York, Wells Fargo Bank, N.A. and First Interstate Bank of California), as trustee, (iii) Indenture, dated as of March 19, 1996, between the Company (as successor pursuant to the Second Supplemental Indenture to The Times Mirror Company) and Citibank, N.A., as trustee, and (iv) Indenture, dated as of March 1, 1992 between the Company and Citibank, N.A. (successor to Continental Bank, National Association, Bank of Montreal Trust Company and Bank of New York), as trustee.

## THIRD QUARTER OPERATING RESULTS/FOURTH QUARTER PROJECTIONS AND STOCK PERFORMANCE REPORT

Mr. Grenesko reviewed the third quarter operating results of each of the Company's lines of business and commented on factors impacting the results. Mr. Grenesko next reviewed the performance of the Company's stock and market factors affecting the stock. Mr. Grenesko also reviewed operating performance trends for the Company compared to its industry peers. Mr. Grenesko then answered questions from the Board.

At this point, Messrs. Canmann, Cole, Kunkel, Schell, Taubman, Whayne, Amsden, Bigelow, DePaola and Vitanovec and Ms. Mohr joined the meeting.

## 5 YEAR PROJECTIONS: BASE CASE AND SENSITIVITIES

Mr. Grenesko presented an overview of a written report submitted to the Board prior to the meeting concerning information and analyses supporting the Company's current five-year financial projections. The analyses covered three operating scenarios - a management base case, a downside case and an upside case - assuming, for each scenario, financing the second step merger as planned and also at increased borrowing costs in the event the Company's four lead banks restructure the second step financing under a "full flex" scenario. Messrs. Smith, Amsden, Landon and DePaola then presented detailed projections and key assumptions for the publishing and interactive groups and answered questions from the Board. Messrs. Reardon and Vitanovec then presented detailed projections and key assumptions for the broadcasting group and answered questions from the Board.

## DEBT MARKET UPDATE

Mr. Schell then discussed the presentation from Citigroup regarding the debt market and

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414805

Citigroup's possible need to cease providing advisory services to Tribune given its obligation to finance the second step of the leveraged ESOP transaction. Ms. Mohr and Mr. Whayne separately reviewed current equity and credit market conditions and an overview of the publishing and broadcasting sectors in the context of the Company's transaction. Mr. Whayne also commented on the Company's current operating outlook and expected leverage profile following the second step merger. Ms. Mohr and Mr. Whayne answered questions from the Board and following their reports, Mr. Zell departed due to a scheduling conflict and Messrs. Canmann and Schell and Ms. Mohr departed.

## ESOP TRANSACTION UPDATE

Messrs. Kenney, Bigelow and Cole then presented an update on the status of the leveraged ESOP transaction. Mr. Kenney reported on the status of the FCC approval process. Mr. Bigelow then reported on (i) the status of Valuation Research Corporation's (VRC) due diligence review in preparation for VRC's delivery of a solvency opinion prior to closing the second step merger and (ii) the status of the second step financing in light of current market conditions and the Company's recent operating results. Messrs. Kenney and Cole then reviewed the remaining legal issues and closing logistics. The presenters then answered questions from the Board.

## AUDIT COMMITTEE REPORT

Mr. Osborn reported on the business discussed at the Audit Committee meeting held earlier in the day.

Mr. Osborn reported that the Committee reviewed third quarter financial results and a draft of the press release to be issued the following morning.

Mr. Osborn next reported on management's update on some of the Company's more significant accounting and financial reporting issues.

Mr. Osborn reported on the status of the internal controls certification project and noted that the overall results of this year's review have been excellent. To date, no material weaknesses (requiring public disclosure) or significant deficiencies (requiring disclosure to the Committee) have been identified.

Mr. Osborn next reported that the Committee reviewed the internal audit status report and that no significant issues were noted.

The Committee also discussed the results of the annual audit of executive expense reports and travel logs for the Company's fractional interest in two private aircrafts. The Committee determined that the executives complied with the Company's travel and entertainment policies and usage of the chartered flights was appropriate and adequately documented.

5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414806

Mr. Osborn then reported that the Committee reviewed (i) the Company's procedures for handling complaints relating to accounting, internal controls or auditing matters and (ii) the Company's policies regarding hiring current of former employees of its independent accountants. The Committee determined the Company's practices and policies in these two areas were satisfactory.

## EXECUTIVE SESSION/SPECIAL COMMITTEE

Management then departed the meeting and the independent directors, together with Messrs. Kunkel, Whayne and Taubman, met in executive session.

## ADJOURNMENT

There being no further business to come before the Board, the meeting was adjourned at 12:15 p.m.

_____

Secretary

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414807

**TRIBUNE COMPANY**
**BOARD OF DIRECTORS MEETING**
**NOVEMBER 5, 2007**

The Tribune Company Board of Directors met at 1:30 p.m. on Monday, November 5, 2007, by conference telephone, pursuant to notice. The following directors participated in the meeting: Dennis J. FitzSimons, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn and Dudley S. Taft.

Chandler Bigelow, Donald C. Grenesko and Crane H. Kenney participated in the meeting. Tom Cole of Sidley Austin LLP, Chip Mulaney of Skadden, Arps, Slate, Meagher & Flom LLP, Tom Whayne, Ashook Nyar and Charlie Stewart of Morgan Stanley also participated in the meeting.

Mr. FitzSimons acted as chairman of the meeting and Mr. Kenney acted as secretary.

Mr. FitzSimons called the meeting to order at 1:30 p.m.

**BUSINESS UPDATE**

Mr. Grenesko reviewed preliminary operating results for Period 10 and commented on factors impacting the results. Mr. Grenesko then answered questions from the Board.

**RATING AGENCY UPDATE**

Mr. Grenesko next reported on recent discussions with the ratings agencies and answered questions from the Board.

**SOLVENCY UPDATE**

Mr. Bigelow reported on the status of Valuation Research Corporation's ("VRC") due diligence review in preparation for VRC's delivery of the second step solvency opinion. Mr. Bigelow noted that VRC has indicated preliminarily that it is in a position to issue a favorable solvency opinion prior to the closing of the second step merger. Mr. Bigelow then answered questions from the Board.

**BANK PROPOSAL AND RESPONSE**

Mr. Bigelow reviewed the restructuring proposal tendered by representatives of the four lead banks in the credit agreement. Messrs. Whayne, Stewart and Nyar reviewed Morgan Stanley's reaction to the bank proposal. Messrs. Cole and Mulaney commented on the Company's and the Board's legal obligations under the merger agreement and the banks' legal obligations under the credit agreement. Following discussion, the Board authorized management to reject the banks'

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

restructuring proposal and to engage for further discussions that would benefit the Company and the ESOP.

## EAGLE UNWIND

Mr. Kenney next reported on the status of the Eagle unwind transactions and the latest discussions with Reed Elsevier as to timing.  Mr. Kenney

Redacted

Redacted

Following discussion, a motion was made, seconded and approved to adopt the following resolutions:

WHEREAS, the Board of Directors of the Company has previously deemed it advisable and in the best interest of the stockholders of the Company to effect, from time to time, intercompany transactions among the Company's subsidiaries to create opportunities for operational efficiencies and cost savings;

WHEREAS, the Company has entered into that certain Closing Agreement on Final Determination Covering Specific Matters by and between the Company and the Commissioner of Internal Revenue (the "Settlement");

WHEREAS, in connection with the Settlement, the Company desires to merge each of (i) TMD, Inc., a Delaware corporation, (ii) MB Parent Co., a Delaware corporation and (iii) Mosby Parent Corp., a Delaware corporation, in each case a wholly owned subsidiary of the Company, with and into the Company (the "Mergers");

WHEREAS, the Company currently contemplates that it will, subsequent to the Mergers, reacquire from certain of its subsidiaries certain shares of stock of the Company and shall thereafter retire such shares in accordance with the Company's certificate of incorporation and the applicable provisions of the DGCL; and

WHEREAS, the directors of the Company have determined it to be advisable and in the best interests of the Company and its stockholders that the Company establish, in accordance with the bylaws of the Company and the applicable provisions of the DGCL, a Subsidiary Merger Committee for the purpose of facilitating intercompany subsidiary transactions involving direct subsidiaries of the Company, including the Mergers, and the retirement of such reacquired stock.

NOW, THEREFORE, BE IT RESOLVED, that a Subsidiary Merger Committee (the "Committee") of the Board of Directors be established;

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414809

FURTHER RESOLVED, that the Committee shall have the power and authority (with full power of delegation) to (i) review, evaluate, negotiate, approve and implement all intercompany transactions involving direct subsidiaries of the Company including the Mergers (each a "Subsidiary Transaction"); (ii) take all other actions necessary or advisable to effect the Settlement; and (iii) take all actions necessary or advisable to effect the retirement of any stock of the Company reacquired from a subsidiary of the Company;

FURTHER RESOLVED, that each member of the Committee be, and hereby is, authorized in the name and on behalf of the Company, with full power of delegation, to make all such arrangements, to do and perform all such acts and things, to execute and deliver all such agreements, certificates, resolutions, instruments and documents, to make all governmental, regulatory or other filings, to pay all full amounts, and to take all such action as he may deem necessary or advisable to fully effect the purpose of the foregoing resolution and the duties of the Committee delegated to it thereunder and hereunder;

FURTHER RESOLVED, that the Committee shall have the power to authorize and direct the Company and the officers of the Company, and any of them, for and on behalf of the Company, and in its name and on its behalf, to provide the Committee with such information and assistance as is requested by the Committee in connection with reviewing, evaluating, investigating, negotiating or implementing any Subsidiary Transaction, as the Committee may deem necessary, appropriate, desirable or advisable;

FURTHER RESOLVED, that the Committee shall have the power to engage and compensate such financial, accounting and legal advisors as the Committee may deem necessary, appropriate, desirable or advisable;

FURTHER RESOLVED, that the Company is hereby authorized to pay any and all expenses and fees incurred by the Committee in giving effect to these resolutions;

FURTHER RESOLVED, that the Chief Executive Officer of the Company is hereby appointed as the sole member of the Committee;

FURTHER RESOLVED, that the appropriate officers of the Company be, and each of them hereby is, authorized and directed to take such further action and to execute and deliver the certificates and such other documents as any such officer, in his or her discretion, shall deem necessary or advisable to effect the foregoing resolutions, such further action, execution or delivery to conclusively evidence that the same have been authorized and approved in every respect by the board of directors of the Company; and

FURTHER RESOLVED, that any and all actions heretofore taken in good faith by any director or officer of the Company in furtherance of the foregoing resolutions are hereby approved, ratified and confirmed in all respects.

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414810

## FCC UPDATE

Messrs. FitzSimons and Kenney reported on the status of the FCC approval process and answered questions from the Board.  Mr. Mulaney then reviewed the responsibilities of the Board to pursue the leveraged ESOP transaction.

## ADJOURNMENT

There being no further business to come before the Board, the meeting was adjourned at 2:00 p.m.

_____
Secretary

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRIBUNE COMPANY**
**BOARD OF DIRECTORS MEETING**
**NOVEMBER 21, 2007**

The Tribune Company Board of Directors met at 9:00 a.m. on Wednesday, November 21, 2007, by conference telephone, pursuant to notice. The following directors participated in the meeting: Dennis J. FitzSimons, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn and Dudley S. Taft.

Chandler Bigelow, Donald C. Grenesko, Crane H. Kenney and Shaun Sheehan participated in the meeting. Chip Mulaney of Skadden, Arps, Slate, Meagher & Flom LLP, Tom Whayne and Paul Taubman of Morgan Stanley also participated in the meeting.

Mr. FitzSimons acted as chairman of the meeting and Mr. Kenney acted as secretary.

Mr. FitzSimons called the meeting to order at 9:00 a.m.

**FCC UPDATE**

Mr. Sheehan provided an update on the FCC process and answered questions from the Board.

**FINANCING UPDATE**

Mr. Grenesko presented an overview of the lead banks' proposal to modify the second step financing by reducing the amount to be borrowed in the second step, eliminating the "structural flex" available to the banks and adjusting the terms of the high yield notes. Mr. Whayne then provided a detailed analysis of the banks' proposal, including a comparative pro forma leverage profile and covenant analysis using the Company's five-year projections reviewed at the October Board meeting. Mr. Grenesko then reported on the status of the offering memorandum for the proposed senior notes offering. Following discussion, a motion was then made, seconded and approved to adopt the following resolutions:

> WHEREAS, this Board of Directors held meetings on April 1 and May 21, 2007 and approved the entering into of certain credit facilities and transactions related thereto, and the resolutions adopted by the Board at such meetings (the "Existing Resolutions") remain in full force and effect; and

> WHEREAS, certain modifications to the Second Step Credit Facility (as defined in the Existing Resolutions) have been requested by the lenders, which modifications are reflected in the form of a Letter Agreement attached hereto as Exhibit A (the "Letter Agreement").

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

NOW, THEREFORE, BE IT RESOLVED, that having reviewed the terms of the Letter Agreement, and based on the presentations of the Company's outside legal and financial advisors and on such other factors as the Board deemed pertinent, the Letter Agreement and the transactions contemplated thereby be, and they hereby are, approved and adopted in all respects;

FURTHER RESOLVED, that each of the Chairman, President and Chief Executive Officer, any Senior Vice President or any Vice President of the Company (such officer or officers, which are authorized to act singly or together pursuant hereto, being hereinafter designated as "Authorized Officers") be, and each of them hereby is, authorized and directed for and on behalf of the Company to take any and all actions deemed by them necessary and appropriate to carry out the purpose and intent of the foregoing resolution, including without limitation to execute for, in the name of and on behalf of the Company, and deliver to the lenders, the Letter Agreement;

FURTHER RESOLVED, that the Authorized Officers be and hereby are authorized, directed and empowered, in the name of and on behalf of the Company, to take any and all such actions and to do any and all such things, including without limitation the execution and delivery of all such further agreements, documents, certificates, instruments and undertakings, and to incur such fees and expenses, as in the judgment of any of the Authorized Officers may be deemed necessary, desirable, advisable, expedient, convenient or proper to carry out or fulfill the purposes and intent of the foregoing resolutions, and all acts and prior acts of the Authorized Officers in any way relating to or arising from, or that are in conformity with the purposes and intent of, these resolutions and the instruments and agreements referred to herein are hereby approved, ratified and confirmed in all respects; and

FURTHER RESOLVED, that all actions heretofore taken by any of the directors, officers, employees, representatives or agents of the Company or any of its affiliates in connection with the foregoing resolutions be, and each of the same hereby is, ratified, confirmed and approved in all respects as the act and deed of the Company.

## SOLVENCY UPDATE

Mr. Bigelow reported on the status of Valuation Research Corporation's (VRC) due diligence review in preparation for VRC's delivery of the second step solvency opinion. Mr. Bigelow noted that VRC was working through a list of supplemental due diligence questions submitted by the lenders. Mr. Bigelow noted that representatives of VRC were planning to make the solvency presentation to the Board at the December meeting.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414813

## TRANSACTION TIMING

Mr. Kenney provided the Board with an update on closing matters and answered questions from the Board.

## ADJOURNMENT

There being no further business to come before the Board, the meeting was adjourned at 9:45 a.m.

_____
Secretary

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414814

# TRIBUNE

November 21, 2007

J.P. Morgan Securities Inc.
JPMorgan Chase Bank, N.A.
270 Park Avenue
New York, New York  10017

Merrill Lynch Capital Corporation
4 World Financial Center
New York, New York  10080

Citigroup Global Markets Inc.
388 Greenwich Street
New York, New York  10013

Banc of America Securities LLC
Banc of America Bridge LLC
Bank of America, N.A.
9 West 57th Street
New York, New York  10019

Ladies and Gentlemen:

Reference is hereby made to that certain Amended and Restated Second Step Fee Letter dated April 5, 2007 (the "Second Step Fee Letter"), in each case among Tribune Company ("Tribune"), J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citigroup Global Markets Inc. on behalf of itself and certain related entities, Bank of America, N.A., Banc of America Bridge LLC and Banc of America Securities LLC. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Second Step Fee Letter.

Tribune hereby acknowledges that it intends to borrow $1,600 million under the Senior Bridge Facility or through the issuance of Senior Notes, as applicable.

CHI 4073416v.4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414815

November 21, 2007
Page 2

Each of you hereby acknowledges and agrees that, if Tribune borrows no more than $1,600 million under the Senior Bridge Facility or through the issuance of Senior Notes, as applicable, then (i) you waive in full your right to reallocate up to $1,400 million of the Incremental Facility to the Senior Bridge Facility or Senior Notes as described in paragraph 3(b) of the Second Step Fee Letter and (ii) the Senior Unsecured Bridge Cap shall not exceed (A) 14.5% per annum payable in cash and (B) an additional 75 basis points per annum through (x) a PIK feature and/or (y) original issue discount ("OID") (calculated on a yield-to-maturity basis assuming the final maturity date of the notes to be issued), which component shall not be reallocated as an increase to the cash interest component stated in (A).

The Second Step Fee Letter remains in full force and effect except as set forth herein.

This letter agreement may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the parties hereto. This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York. This letter agreement may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement.

Sincerely,

TRIBUNE COMPANY

By:_____
    Chandler Bigelow
    Vice President and Treasurer

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

November 21, 2007
Page 3

**Acknowledged and agreed to by:**

MERRILL LYNCH CAPITAL CORPORATION

By:_____
    Name:
    Title:

CITIGROUP GLOBAL MARKETS INC.


By:_____
    Name:
    Title:

J.P. MORGAN SECURITIES INC.


By:_____
    Name:
    Title:

JPMORGAN CHASE BANK, N.A.


By:_____
    Name:
    Title:


BANK OF AMERICA, N.A.


By:_____
    Name:
    Title:


BANC OF AMERICA BRIDGE LLC


By:_____
    Name:
    Title:

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

November 21, 2007
Page 4

BANC OF AMERICA SECURITIES LLC

By:_____
    Name:
    Title:

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414818

November 21, 2007
Page 5

**Consented to by:**

EGI-TRB, L.L.C.

By:_____
Name:
Title:

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414819

November 21, 2007
Page 6

**Consented to by:**

GREATBANC TRUST COMPANY, not in its individual or corporate capacity, but solely as trustee of the TRIBUNE EMPLOYEE STOCK OWNERSHIP TRUST, which forms a part of the TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN


By:_____
Name: Marilyn H. Marchetti
Title: Senior Vice President

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414820

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414821

# TRIBUNE COMPANY
## STOCK PERFORMANCE REPORT
*As of November 28, 2007*



| | Total Returns (price change plus dividends) | | |
| --- | --- | --- | --- |
| | | Annual | |
| | YTD | 3 year | 5 year |
| **Tribune** | -2.0% | -9.9% | -6.8% |
| **S&P 500** | 5.4% | 9.7% | 11.4% |
| **S&P PUB** | -24.2% | -8.6% | -2.5% |

## STOCK PERFORMANCE/TRADING ACTIVITY

Since our October report to the board, the stock has traded in the $27-$30 range. Year-to-date average daily volume is 1.9 million shares. Following the late-October release of TRB's third quarter earnings and the announced sale of the Southern Connecticut Newspapers, the stock climbed as high as 30.26.

Short interest in TRB averaged 4.3 million shares or just under 4% of shares outstanding in the October-November period.

With the possible close of the ESOP/Zell transaction just three weeks away, there has been a lot of speculation in the marketplace regarding shares of TRB, which traded as low as $27.25 on Nov. 27. The next day, however, shares of TRB rose more than 10% and closed at $30, following FCC Chairman Kevin Martin's announcement that he was circulating a proposal to grant Tribune the temporary waivers needed to close our transaction by the end of the year.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# TRIBUNE COMPANY
## STOCK PERFORMANCE REPORT

### VALUATION

In the $28 range, the stock trades at a multiple of approximately 9x enterprise value/2007 operating cash flow based on current internal projections. The newspaper group average multiple declined following release of October revenues at Gannett, McClatchy and Journal Communications. It is now in the 8x range. However, when stocks that are not trading on fundamentals are excluded (like DJ), the average group multiple is approximately 7.6x.

Tribune is covered by 9 analysts. Seven analysts rate Tribune "hold," with one at "buy" and one at "underperform." Merrill Lynch and Morgan Stanley are restricted because of involvement in our transaction.

| EV/EBITDA Multiples | |
|---|---|
| | Nov |
| **Tribune** | **9.1x** |
| Cable | 8.1.x |
| Entertainment | 8.7x |
| Newspapers | 8.0x |
| Radio | 9.5x |
| Television | 10.7x |

*Source: Wachovia and Lehman November analyst reports*

### SHAREHOLDER ANALYSIS

There has been very little institutional stock activity thus far in the fourth quarter. Due to our pending transaction, hedge funds continue to be the most active buyers and sellers of TRB.

### TOP 10 SHAREHOLDERS
*(Shares in millions)*

| | | Shares Held | % of S/O | Style |
|---|---|---|---|---|
| 1. | McCormick Tribune Foundation | 11.9 | 11% | n/a |
| 2. | Employees | 11.0 | 9% | n/a |
| 3. | Stark Asset Management | 9.2 | 8% | Hedge |
| 4. | T. Rowe Price Associate | 6.3 | 5% | Active |
| 5. | Perry Partners | 4.5 | 4% | Hedge |
| 6. | D.E. Shaw | 4.5 | 4% | Hedge |
| 7. | Vanguard Group | 2.9 | 2% | Index |
| 8. | Renaissance Technologies | 2.8 | 2% | Hedge |
| 9. | Deutsche Asset Management | 2.3 | 2% | Active |
| 10. | Barclays Global Investors | 2.3 | 2% | Index |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414823

## TRIBUNE COMPANY
## BENCHMARK COMPANY TOTAL RETURNS

| | YTD | | 1-Year | | 3-Year | | 5-Year |
|---|---|---|---|---|---|---|---|
| Dow Jones[1] | 61.4% | Dow Jones | 73.2% | Sinclair | 17.9% | Dow Jones | 10.4% |
| Washington Post | 8.4% | Washington Post | 11.4% | Dow Jones | 14.6% | Scripps | 3.2% |
| Sinclair[2] | 2.3% | Sinclair | 11.4% | Scripps | -1.2% | Washington Post | 3.0% |
| **Tribune** | **-2.0%** | Belo | -1.5% | Washington Post | -4.5% | Sinclair | -3.2% |
| Belo | -3.5% | **Tribune** | **-6.0%** | Hearst-Argyle | -8.4% | Hearst-Argyle | -3.6% |
| Scripps | -10.3% | Scripps | -7.2% | **Tribune** | **-9.9%** | Belo | -3.9% |
| Hearst-Argyle | -23.5% | Hearst-Argyle | -22.7% | Belo | -10.2% | **Tribune** | **-6.8%** |
| New York Times | -29.6% | New York Times | -25.5% | Gannett | -22.1% | Gannett | -10.9% |
| Gannett | -37.8% | Gannett | -35.7% | New York Times | -23.9% | New York Times | -17.4% |
| McClatchy | -67.3% | McClatchy | -65.4% | McClatchy | -41.0% | McClatchy | -23.7% |
| | | | | | | | |
| S&P 500 | 5.4% | | 8.0% | | 9.7% | | 11.4% |
| S&P Pub | -24.2% | | -22.0% | | -8.6% | | -2.5% |

[1] On May 1, News Corp. made an unsolicited bid for Dow Jones. Dow Jones stock rose sharply and has maintained at a total return of nearly 54% year-to-date.

Sinclair's stock price rose in early 2007 from $10.87 (1/3/07) to $17.50 (4/17/07) due to an improved outlook including debt repayment, lower programming costs and retransmission consent agreements. In late April/early May the stock began declining closing as low as $9.93 in late November.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414824

**3**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414825

# TRIBUNE COMPANY
# DEVELOPMENT UPDATE

This report summarizes the status of current development activities. Resolutions requiring Board approval are attached to this report.

## PUBLISHING AND INTERACTIVE

### New Interactive Joint Ventures

*Metromix.* On October 29, we formed a joint venture with Gannett to expand a national network of local entertainment websites under the Metromix brand. To date, we have launched Metromix in all of Tribune's newspaper markets except Allentown and will begin launching in Gannett's newspaper and television markets while continuing to roll it out in Tribune's markets.

*Ad Network.* On November 2, Tribune, Gannett, Hearst, Cox and Media News signed a preliminary non-binding term sheet to form an online advertising network that will include each of our companies' newspaper.com websites and, hopefully, the sites of other newspaper groups. In addition to working on definitive agreements for the ad network, we are in discussions with various other newspaper groups about joining the network. We hope to reach agreement on the final deal terms by the end of the year so we can launch the network at the beginning of 2008.

*Other Content Verticals.* We continue to evaluate the creation of new national content channels. We are currently studying the feasibility of both a national video news channel and a national sports site with the New York Times, Washington Post and Gannett using the rich, local content of our newspapers. We are also internally reviewing other potential national verticals including sports and travel.

### All Direct Mail Services

The *Los Angeles Times* has signed a letter of intent to acquire the assets of All Direct Mail Services, Inc. ("ADMS") for approximately $2.5 million. ADMS is a family-owned direct mail business located in Sylmar, CA. This acquisition will allow Tribune Direct to expand its presence in Southern California by adding over 200 new clients and $7.5 million of revenue. There is also an opportunity to expand Tribune Direct's overall business by providing ADMS' clients with a national distribution opportunity.

We are currently negotiating documents and we expect to complete this purchase by the end of the year.

### Recycler

On October 17, the *Los Angeles Times* closed on the sale of its Recycler classifieds business to Target Media Partners for approximately $1 million plus working capital. The sale resulted in a tax benefit to Tribune of approximately $65 million.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## SCNI

On November 1, we closed our sale of Southern Connecticut Newspapers, Inc. ("SCNI") to The Hearst Corporation and MediaNews Group, Inc. for $62.4 million, subject to customary pro-ration adjustments.

We have engaged Cushman & Wakefield to sell SCNI's real estate, which was not included in the transaction with Hearst and MediaNews. SCNI has an 88,000 square foot 3 story building on 2.35 acres of land in Stamford and a 24,000 square foot 2 story office building in downtown Greenwich. We expect the properties to be sold for $22-27 million.

## BROADCASTING AND ENTERTAINMENT

### Chicago Cubs

Our process to sell the Chicago Cubs and our 25% interest in Comcast SportsNet Chicago continues. We are currently finalizing an offering memorandum and pre-clearing potential buyers with Major League Baseball. We will provide an update at the Board meeting.

### Sale of KTLA Studio Lot

In October, the Board delegated approval of the sale of the KTLA Studio Lot (the "Lot") and three nearby off-site parking lots to the Executive Committee. We have signed a letter of intent with Hudson Capital LLC to sell the properties for $142 million. Hudson Capital's offer was superior to five other bids we received through our broker, Cushman & Wakefield. We plan to sign a definitive agreement by December 4, at which time the buyer will deposit $10 million into escrow. The transaction is expected to close by December 27, although the buyer can extend the closing date by up to 45 days in order to secure financing.

As part of the transaction, KTLA-TV will lease back its current space for three years and have the right to negotiate a new longer-term lease with the buyer. While KTLA would like to remain in the Hollywood area, it is not essential that it remain on the current site and we will also explore other potential locations for a long-term KTLA lease. Tribune Entertainment will cease operating its studio rental business at the time of sale of the property.

The transaction is structured as a Section 1031 like-kind exchange in conjunction with the purchase of the TMCT real estate in the first half of 2008. This will allow Tribune to defer the capital gain on the sale of the Lot.

Since we have not yet sought Executive Committee approval, we will request approval of the full Board at the meeting. Resolutions are attached.

TL/DGK
11/28/07

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414827

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTIONS

### (Sale of KTLA Studio Lot)

WHEREAS, the Company has entered into a non-binding letter of intent with Hudson Capital LLC ("Hudson") pursuant to which it is proposed that the Company (or any affiliate thereof) will sell to Hudson (or any affiliate thereof) the KTLA Studio Lot located at 5800 Sunset Boulevard, Hollywood, California and the three nearby off-site parking lots (the "Real Property") and all related assets utilized in connection with the television studio production business (together with the Real Property, the "Property"), for an aggregate cash purchase price of $142 million;

WHEREAS, it is contemplated that the sale of the Real Property will be structured in a manner consistent with a deferred like-kind exchange under Section 1031 of the Internal Revenue Code;

WHEREAS, in connection with the sale of the Property, it is proposed that KTLA Inc. (or any other affiliate of the Company) will enter into a lease agreement (the "Lease Agreement") with Hudson (or any affiliate thereof) pursuant to which KTLA Inc. (or any affiliate thereof) will lease back the portion of the Real Property that is currently used by KTLA Inc. and certain other affiliates of the Company for a term of approximately three years and on other terms and conditions to be approved by the Authorized Officers (as defined below);

WHEREAS, the Company is party to that certain (i) Indenture, dated as of March 1, 1992 between the Company and Citibank, N.A. (successor to Continental Bank, National Association, Bank of Montreal Trust Company and Bank of New York), as trustee (the "1992 Indenture"), (ii) Indenture, dated as of January 30, 1995, between the Company (as successor pursuant to the First Supplemental Indenture to The Times Mirror Company, f/k/a New TMC Inc.) and Citibank, N.A. (successor to Bank of New York, Wells Fargo Bank, N.A. and First Interstate Bank of California), as trustee ("the "1995 Indenture"), (iii) Indenture, dated as of March 19, 1996, between the Company (as successor pursuant to the Second Supplemental Indenture to The Times Mirror Company) and Citibank, N.A., as trustee (the "1996 Indenture"), and (iv) Indenture, dated as of January 1, 1997, between the Company and Citibank, N.A. (successor to Bank of Montreal Trust Company and Bank of New York), as trustee (the "1997 Indenture" and, together with the 1992 Indenture, the 1995 Indenture and the 1996 Indenture, the "Indentures");

WHEREAS, the Indentures each contain certain restrictions on the Company's and its subsidiaries' ability to enter into sale and lease-back transactions for terms in excess of three years with respect to "Principal Property" (as defined in the relevant Indenture), in each case, subject to certain exceptions;

WHEREAS, the 1992 Indenture and the 1997 Indenture each define "Principal Property" as "any manufacturing or printing plant, warehouse, office building, power plant or transmission facility owned by the Company or any Subsidiary or any property or right owned by or granted to the Company or any Subsidiary and used or held for use in the newspaper, newsprint, radio or television business conducted by the Company or any Subsidiary, except any manufacturing or

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

printing plant, warehouse, office building, power plant or transmission facility or property or right which in the opinion of the Board of Directors of the Company is not of material importance to the total business conducted by the Company and its Subsidiaries considered as one enterprise"; and

WHEREAS, the 1995 Indenture and the 1996 Indenture (pursuant to an Officers' Certificate dated September 9, 1997) each define "Principal Property" as "any manufacturing plant or facility located within the United States of America (other than its territories or possessions) and owned by the Company or any Subsidiary, except any such plant or facility which, in the opinion of the Board of Directors of the Company, is not of material importance to the business conducted by the Company and its Subsidiaries, taken as a whole."

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors of the Company hereby approves the sale by the Company (or any affiliate thereof) to Hudson (or any affiliate thereof) of the Property for an aggregate cash purchase price of not less than $135 million (the "Sale Transaction");

FURTHER RESOLVED, that the Board of Directors of the Company hereby authorizes the sale of the Real Property pursuant to the Sale Transaction to be structured in a manner consistent with a deferred like-kind exchange under Section 1031 of the Internal Revenue Code;

FURTHER RESOLVED, that, in connection with the sale of the Property, the Board of Directors of the Company hereby authorizes KTLA Inc. (or any other affiliate of the Company) to enter into a lease agreement (the "Lease Agreement") with Hudson (or any affiliate thereof) pursuant to which KTLA Inc. (or any affiliate thereof) will lease back the portion of the Real Property that is currently used by KTLA Inc. and certain other affiliates of the Company (the "Leased Premises") for a term of approximately three years and on other terms and conditions to be approved by the Authorized Officers (as defined below);

FURTHER RESOLVED, that for purposes of each of the Indentures, the Board of Directors of the Company hereby determines that the Leased Premises do not constitute "Principal Property" as defined in each of the Indentures;

FURTHER RESOLVED, that the Chairman, President and Chief Executive Officer, any Senior Vice President or any Vice President of the Company, the President or any Vice President of Tribune Broadcasting Company, the President or any Vice President of KTLA Inc., or the President or any Vice President of Tribune California Properties, Inc. (the "Authorized Officers"), be and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to negotiate, document and execute agreements and instruments evidencing the Sale Transaction, the Lease Agreement and the other transactions contemplated by the these resolutions as such Authorized Officer executing the same may approve, such approval to be conclusively evidenced by such officer's execution thereof;

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to make all such arrangements, to do and perform all such acts and things, to execute and

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

deliver all such agreements, certificates, instruments and documents, to make all governmental, regulatory or other filings (including, without limitation, filings pursuant to the Hart-Scott-Rodino Antitrust Improvements Act), to pay all such amounts, and to take all such actions as they may deem advisable or necessary in connection with the matters set forth in these resolutions and in order to fully effectuate the purposes of these resolutions; and

FURTHER RESOLVED, that all actions previously taken by or on behalf of the Company (or any affiliate thereof) in connection with the matters set forth in these resolutions be, and hereby are, ratified, confirmed and approved in all respects.

DPE
11/28/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414830

**4**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414831

## TRIBUNE COMPANY
## TRANSFER OF FORSALEBYOWNER.COM
## TO CLASSIFIED VENTURES

### RECOMMENDATION

Management requests authority to transfer ForSaleByOwner.com (the "Company") to
Classified Ventures ("CV") for at least $90 million. Tribune purchased the Company in
May 2006 for $55.3 million, consisting of an initial purchase price of $42.5 million and a
$12.8 million earn-out that was paid based on the Company's achievement of certain
EBITDA targets.

Tribune and our other CV newspaper partners (McClatchy, Gannett, Washington Post
and Belo) want to accelerate CV's growth in real estate and we believe that a
combination of ForSaleByOwner.com and CV's real estate assets will better position CV
to achieve that growth. In addition, while the Company has performed well since our
acquisition, we think its growth prospects will be enhanced through affiliate relationships
with the newspapers owned by our CV partners. Lastly, this transaction will enable
Tribune to realize a significant return on our investment, while still being able to
participate in the Company's continued growth through our 27.8% ownership stake in
CV.

### BACKGROUND

ForSaleByOwner.com is a leading online destination for buyers and sellers in the for-
sale-by-owner ("FSBO") market. Through its national website, the Company enables
homeowners to sell their homes on their own, without real estate agent participation and
related brokerage fees. We project the Company's revenue will grow to $15.2 million in
2007, up from $13.6 million in 2006, and its EBITDA will grow to $5.2 million, up from
$4.0 million in 2006. We expect the Company's growth to slow next year, as it has in
recent months, due to the difficult residential real estate environment.

Prior to our purchase of ForSaleByOwner.com, CV had evaluated, but had elected not to
pursue, an acquisition of the Company because some of the CV owners were concerned
that real estate agents and brokers would pull advertising from their newspapers to protest
their acquisition of a FSBO business. We believed the risk was manageable through
careful communications with the broker community and, therefore, chose to pursue the
acquisition on our own. To date, there has been no meaningful backlash from the broker
community.

### STRATEGIC RATIONALE

Over the past few years, we have taken many steps to strengthen our presence in the
online real estate marketplace. In the rental category, CV continues to own and operate
Apartments.com, a leading website for large, multi-tenant residential rental properties. In

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

the resale category, CV acquired HomeGain.com, a leader in resale lead generation, in 2005, and in the past several years, CV has continued to invest in its Homescape product, which is the platform on which our newspaper.coms' real estate businesses are built. Had it not been for the broker backlash concerns of some CV owners, CV, rather than Tribune, would likely have purchased ForSaleByOwner.com in 2006.

Now, in an effort to accelerate CV's real estate growth, the CV partners have preliminarily agreed to pursue an aggressive national real estate strategy, much like CV has done with cars.com in the automotive category, and ForSaleByOwner.com will be an important component of that strategy. CV plans to launch a nationally branded real estate site that offers consumers a comprehensive set of real estate information (e.g., MLS, broker and new construction listings, mortgage data, maps, valuation tools, local community information, etc.) and provides advertisers a wide array of products to reach their desired audience. The site will benefit from affiliate relationships with the various newspapers owned by the CV partners, which newspapers will promote the brand and sell the products in their local markets. Importantly, CV's site will be able to differentiate itself from other national real estate sites by also offering FSBO listings from the Company and open house listings from its newspaper partners. Many of the large national real estate websites, such as Homestore.com/Realtor.com, are unable to offer those types of listings. In this regard, Tribune is also planning to contribute the domain name "openhouses.com" to CV for approximately $2 million.

In addition to being an important component of CV's national real estate strategy, we believe ForSaleByOwner.com's growth prospects, which are already excellent, will be even better as part of CV. Through an affiliation with each of the newspapers owned by the CV partners, the Company should be able to widen its audience, through distribution on each CV-affiliated newspaper.com site, and increase its number of listings, by displaying FSBO listings sold by the newspapers. These increases should drive more revenue opportunities, such as partnerships with major portals and sponsorships with large advertisers.

In conjunction with its growth strategy, the CV partners have also been discussing splitting CV into two entities – one focused on automotive and the other focused on real estate. The automotive entity would operate the successful cars.com business in the same manner in which it is operated today and the real estate entity would be operated in furtherance of the national real estate strategy described above. While we believe such a split-up would be beneficial to CV, we have not reached complete agreement with the other CV partners and it is not certain whether or when such a split-up would occur. The transfer of the Company to CV is not contingent on the split-up occurring.

## TRANSACTION STATUS

We have reached a preliminary agreement with CV on a transaction that values the Company at $98 million. Since we own 27.8% of CV, we can maximize our after-tax proceeds by structuring the transaction as a sale of approximately 72.2% of the Company to CV and a capital contribution of the other 27.8%. After-tax proceeds to Tribune will

2

TRB0414833

be approximately $75 million and we will continue to benefit from the performance of the Company through our 27.8% ownership interest in CV.

The transaction is subject to CV's completion of due diligence, the negotiation of definitive agreements, the approval of the boards of directors of each CV partner and Hart-Scott-Rodino clearance. We believe the transaction will close in the first quarter of 2008.


DGK
11/28/07

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414834**

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTIONS

### (Transfer of ForSaleByOwner.com)

RESOLVED, that the Board of Directors of the Company hereby approves the transfer by the Company (or any affiliate thereof) of Stemweb, Inc. (the parent holding company of ForSaleByOwner.com Corp.) ("FSBO") to Classified Ventures, LLC ("CV") for not less than $90 million through a combination of (i) a capital contribution to CV of at least 27.8% of FSBO common stock and (ii) the sale to CV of the remaining shares of FSBO common stock (collectively, the "Transaction");

FURTHER RESOLVED, that the Chairman, President and Chief Executive Officer, any Senior Vice President or any Vice President of the Company, the President, the Executive Vice President or any Vice President of Tribune Publishing Company, the President, any Senior Vice President or any Vice President of Tribune Interactive, Inc. or the President or Vice President of Eagle New Media Investments, LLC (the "Authorized Officers") be, and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to negotiate, document and execute agreements and instruments evidencing the Transaction as such Authorized Officer executing the same may approve, such approval to be conclusively evidenced by such officer's execution thereof;

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to make all such arrangements, to do and perform all such acts and things, to execute and deliver all such agreements, certificates, instruments and documents, to make all governmental, regulatory or other filings Including, without limitation, filings pursuant to the Hart-Scott-Rodino Antitrust Improvements Act), to pay all such amounts, and to take all such actions as they may deem advisable or necessary in connection with the matters set forth in these resolutions and in order to fully effectuate the purposes of these resolutions; and

FURTHER RESOLVED, that all actions previously taken by or on behalf of the Company (or any affiliate thereof) in connection with the matters set forth in these resolutions be, and hereby are, ratified, confirmed and approved in all respects.

MWH
11/28/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## DIRECTORS AND OFFICERS LIABILITY INSURANCE

Tribune Company indemnifies its directors and officers for personal liability that may arise from the performance of their duties. Tribune also carries $200 million of Directors and Officers (D&O) liability insurance. We renewed our current policies on August 31, 2007 for an annual premium of approximately $3 million, about $500,000 less than last year due to better overall market conditions and strong relationships between Tribune and our underwriters.

## SUMMARY OF COVERAGE

The current policies provide $200 million of coverage in two layers. The first $100 million provides insurance (including defense costs) over three broad coverage categories:

- Coverage A: Provides directors and officers coverage, with no deductible, for claims that are not indemnified by the Company. An example of a non-indemnifiable claim would be a lawsuit brought by shareholders on behalf of the Company against directors. Coverage A would also pay an indemnifiable claim if the Company could not pay because of insolvency. Coverage A is non-rescindable.
- Coverage B: Provides reimbursement to the Company for claims for which the Company indemnifies its directors and officers. ($25 million deductible.)
- Coverage C: Provides the Company coverage if it is named as a defendant in a securities claim. ($25 million deductible.)

The second layer provides an additional $100 million for Coverage A claims only. This coverage is also non-rescindable and fills coverage gaps in the event that underlying coverage for Tribune's directors and officers fails or refuses to respond to a claim.

To preserve the full $200 million of coverage for the benefit of directors and officers in the unlikely event of bankruptcy, the policy includes the following relevant provisions:

- Coverage A claims must be paid before any Coverage B or C claims are paid.
- The Company waives its rights to coverage in the event of bankruptcy.
- Directors and officers are covered in the event that the bankruptcy trustee sues them.

The policies do not apply to claims against directors and officers related to:

- Criminal or deliberately fraudulent acts
- Personal profit or advantage obtained illegally
- Remuneration that required prior shareholder approval, if not obtained
- Violations of short swing profit rules of the Securities Exchange Act
- Claims brought by one director or officer against another

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Chubb provides the first $15 million of coverage and AIG the second $15 million. A total of thirteen additional carriers underwrite the remaining $170 million. All of the insurance companies are rated A- or better by AM Best Insurance ratings.

## FIDUCIARY LIABILITY INSURANCE

Separate Fiduciary liability policies respond to the wrongful acts of fiduciaries that cause monetary loss to pension plans or other funded benefit plan beneficiaries. Insured persons include any past, present or future directors, officers or other employees, fiduciaries, administrators or trustees of a Plan, including GreatBanc. The coverage has a $50 million limit with no deductible for non-indemnified claims against individuals, a $250,000 deductible for indemnified non-securities claims, and a $5 million deductible for securities or cash balance claims. AIG provides the first $10 million of coverage and Chubb provides the second $10 million. Three additional carriers underwrite the remaining $30 million.

## RUNOFF COVERAGE

As required by the merger agreement, a six-year runoff period of coverage has been negotiated and will become effective upon closure of the leveraged ESOP transaction. The current D&O and Fiduciary policies will be placed into runoff at the time the transaction closes. Persons who were insured prior to the leveraged ESOP transaction will remain insured during the runoff period, for acts prior to the transaction date. The cost of this coverage including fees, will be approximately $5 million for D&O and Fiduciary liability.

## PRIVATE ENTITY COVERAGE

Upon closure of the leveraged ESOP transaction, new D&O and Fiduciary policies for the private company will become effective. These new policies will provide the same level of coverage, but at a slightly lower annual cost due to our private company status.

JR/CL
11/28/07

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414838

**6**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414839

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTION

### (Adoption of Revised Audit Committee Operating Charter)

RESOLVED, that the revised Operating Charter of the Audit Committee, in the form presented at this meeting, is hereby adopted and approved.

MWH
11/28/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Exhibit I

## TRIBUNE COMPANY
## AUDIT COMMITTEE OF THE BOARD OF DIRECTORS
## OPERATING CHARTER
### (As reviewed with the Audit Committee on December 4, 2007)

### PURPOSE

The Audit Committee is appointed by the Board of Directors to assist the Board in monitoring (a) the integrity of the Company's financial statements, (b) the independent accountants' qualifications and independence, (c) the performance of the Company's internal audit function and independent accountants, and (d) the Company's compliance and ethics program.

### COMMITTEE MEMBERSHIP

The Committee shall consist of no fewer than three members. The members of the Committee shall meet the independence and experience requirements of the New York Stock Exchange, Section 10A(m)(3) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules and regulations of the Securities and Exchange Commission (the "Commission"). At least one member of the Audit Committee shall be an audit committee financial expert as defined by the Commission and as determined by the Board of Directors. The members and chairperson of the Committee shall be appointed and replaced by the Board of Directors.

### MEETINGS

The Committee shall meet as often as it determines, but not less frequently than quarterly. The Committee shall meet periodically with management, the internal auditors and the independent accountants in separate executive sessions. The Committee may request any officer or employee of the Company or the Company's outside counsel or independent accountants to attend a meeting of the Committee or to meet with any members of, or consultants to, the Committee.

### COMMITTEE AUTHORITY AND RESPONSIBILITIES

The Committee shall have the sole authority to appoint or replace the independent accountants (subject to shareholder ratification). The Committee shall be directly responsible for the compensation and oversight of the work of the independent accountants (including resolution of disagreements between management and the independent accountants regarding financial reporting) for the purpose of preparing or issuing an audit report or related work. The independent accountants shall report directly to the Committee.

The Committee shall pre-approve all auditing services and permitted non-auditing services (including the fees and terms thereof) to be performed for the Company by the independent accountants, subject to the de minimus exceptions for non-audit services described in

1

Section 10A(i)(1)(B) of the Exchange Act which are approved by the Committee prior to the completion of the audit.

The Committee may form and delegate authority to subcommittees consisting of one or more members when appropriate, including the authority to grant preapprovals of audit and permitted non-audit services, provided that decisions of such subcommittees to grant preapprovals shall be presented to the full Committee at its next scheduled meeting.

The Committee shall have the authority, to the extent it deems necessary or appropriate, to retain independent legal, accounting or other advisors. The Company shall provide for appropriate funding, as determined by the Committee, for payment of compensation to the independent accountants for the purpose of rendering or issuing an audit report and to any advisors employed by the Committee.

The Committee shall make regular reports to the Board of Directors. The Committee shall review and reassess the adequacy of this Charter annually and shall submit any proposed substantive changes to the Board of Directors for approval. The Committee shall annually review its own performance.

The Committee shall prepare the report required by the rules of the Commission to be included in the Company's annual proxy statement.

The Committee, to the extent it deems necessary or appropriate, shall:

**Financial Statement and Disclosure Matters**

1. Meet to review and discuss with management and the Company's independent accountants the annual audited financial statements, including the Company's specific disclosures made in management's discussion and analysis, and recommend to the Board of Directors whether the audited financial statements should be included in the Company's Form 10-K.

2. Review and discuss with management and the Company's independent accountants the annual reports on internal controls over financial reporting that will be included in the Company's Form 10-K in accordance with Section 404 of the Sarbanes-Oxley Act. Review and discuss any significant deficiencies or material weaknesses in the Company's internal controls over financial reporting that are disclosed to the Committee by management or the independent accountants, and the steps being taken to resolve them.

3. Meet to review and discuss with management and the independent accountants the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the Company's specific disclosures made in management's discussion and analysis and the results of the independent accountants' reviews of the quarterly financial statements.

4. Discuss with management and the independent accountants significant financial reporting issues and judgments made in connection with the preparation of the

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414842

Company's financial statements, including any significant changes in the Company's selection or application of accounting principles.

5.  Review and discuss reports from the independent auditors on:

    (a)  All critical accounting principles and practices to be used.

    (b)  All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent accountants.

    (c)  Other material written communications between the independent accountants and management.

6.  Discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally, consisting of discussing the types of information to be disclosed and the types of presentations to be made.

7.  Discuss with management and the independent accountants the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements.

8.  Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

9.  Discuss with the independent accountants the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

10. Review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls over financial reporting or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

**Oversight of the Company's Relationship with the Independent Accountants**

11. Review and evaluate the lead partner of the independent accountants' team.

12. Obtain and review a report from the independent accountants at least annually regarding (a) the independent accountants' internal quality-control procedures,

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414843

(b) any material issues raised by the most recent internal quality-control review, or publicly disclosed findings resulting from reviews of public oversight bodies or investigations by governmental authorities within the preceding five years respecting one or more independent audits carried out by the firm, (c) any steps taken to deal with any such issues or findings, and (d) all relationships between the independent accountants and the Company. Evaluate the qualifications, performance and independence of the independent accountants, including considering whether the accountants' quality controls are adequate and the provision of permitted non-audit services is compatible with maintaining the accountants' independence, and taking into account the opinions of management and internal auditors. The Committee shall present its conclusions with respect to the independent accountants to the Board of Directors.

13. Ensure the rotation of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit as required by law.

14. Set policies for the Company's hiring of employees or former employees of the independent accountants who participated in any capacity in the audit of the Company.

15. Meet with the independent accountants prior to the audit to discuss the planning and staffing of the audit.

### Oversight of the Company's Internal Audit Function

16. Review the appointment and replacement of the senior internal auditing executive.

17. Review the significant issues raised in reports to management prepared by the internal auditing department and management's responses.

18. Discuss with the independent accountants and management the internal audit department responsibilities, budget and staffing and any recommended changes in the planned scope of the internal audit function.

### Compliance and Ethics Program Oversight Responsibilities

19. Obtain from the independent accountants assurance that Section 10A(b) of the Exchange Act regarding illegal acts has not been implicated.

20. Obtain reports from management, the Company's senior internal auditing executive and the Company's chief compliance officer that the Company has an effective compliance and ethics program that is in conformity with applicable legal requirements and the Company's Code of Business Conduct, including the provisions related to insider trading and conflicts of interest. Advise the Board of

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414844

Directors with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and ethics and with the Company's Code of Business Conduct.

21.    Review procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting control or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

22.    Discuss with management and the independent accountants any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies.

23.    Review and act on transactions submitted to the Audit Committee in accordance with the Company's Related Person Transactions Policy.

24.    Discuss with the Company's General Counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies.

## LIMITATION OF AUDIT COMMITTEE'S ROLE

While the Audit Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Audit Committee to plan or conduct audits or to determine that the Company's financial statements and disclosures are complete and accurate and are in accordance with generally accepted accounting principles and applicable rules and regulations.  These are the responsibilities of management and the independent accountants.

5

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414845

# AUDIT COMMITTEE

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**TRIBUNE COMPANY**
**AUDIT COMMITTEE MEETING**
**TUESDAY, DECEMBER 4, 2007 (8:00 A.M.)**
**McCORMICK ROOM**
**24th FLOOR, TRIBUNE TOWER**

**AGENDA**

|  | Tab No. |
|---|---|
| Approve Minutes of October 17 and November 21, 2007 Audit Committee Meetings | 1 |
| Audit Committee Responsibility Summary | 2 |
| Update on Significant Accounting Issues | 3 |
| • Impairment of Intangible Assets | |
| • PHONES Tax Issue | |
| 2007 Internal Controls Certification Update | 4 |
| Internal Audit Status Report | 5 |
| Enterprise Risk Management | 6 |
| • Summary of Significant Changes and Conclusions | |
| • Overview of Enterprise Risk Management | |
| • Review of Major Financial Risk Exposures | |
| • Business Continuity Planning Update | |
| • Summary of Compliance and Ethics Program | |
| • Code of Business Conduct | |
| • Code of Ethics for CEO and Senior Financial Officers | |
| Reassessment of Audit Committee Charter | 7 |
| Private Sessions | |

**PARTICIPANTS**

***Audit Committee***
Betsy D. Holden (by phone)
William A. Osborn, Chair

***PricewaterhouseCoopers LLP***

| Jay Henderson | Chicago Office Managing Partner |
|---|---|
| Kevin Maguire | Engagement Partner |
| Stephanie Potter | Engagement Senior Manager |

***Management***

| Tom Caputo | Vice President, Auditing |
|---|---|
| Dennis FitzSimons | Chairman, President and Chief Executive Officer |
| Don Grenesko | Sr. Vice President, Finance & Administration |
| Mark Mallory | Vice President and Controller |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414848

# TRIBUNE COMPANY
## AUDIT COMMITTEE MEETING
### OCTOBER 17, 2007

The Audit Committee met on Wednesday, October 17, 2007 at 7:30 a.m.  The meeting was held at Tribune Tower, Chicago, Illinois, pursuant to notice.  The meeting was attended by Betsy Holden, William Osborn and Dudley Taft of the Audit Committee; Bill England, Jay Henderson and Kevin Maguire of PricewaterhouseCoopers (PwC); and Thomas Caputo, Dennis FitzSimons, Don Grenesko and Mark Mallory of Tribune Company.

Mr. Osborn acted as Chairman of the meeting and Mr. Caputo as Secretary.

The following business was discussed at the meeting:

1.  Mr. Henderson introduced Mr. England to the Committee indicating that Mr. England will serve as the Company's audit partner for 2008.  He will be replacing Mr. Maguire who is in his fifth year as the Company's audit partner and as such will be required to rotate off the engagement after the 2007 audit is complete.

2.  The Committee approved the minutes of the May 9 and July 18, 2007 Audit Committee meetings.

3.  Mr. Grenesko gave a brief overview of the Company's third quarter 2007 operating results.  He compared actual revenue, cash expenses and operating cash flow to the projections for the third quarter that were presented at the July board meeting.  He also commented on changes from 2006 in operating cash flow and diluted EPS.  He then indicated that a more complete review of operating results would be presented to the full board later that day.  Mr. Grenesko also handed out a draft of the Company's third quarter earnings press release and asked the members of the Committee to read it and call him with any questions that they may have.  He indicated that the press release is similar in content and presentation to those from previous quarters.

    Mr. Maguire then discussed PricewaterhouseCoopers' report on their review of the Company's third quarter results.  Mr. Maguire noted that they were substantially complete with their review and that there were no disagreements with management and no proposed adjustments.

    Messrs. Grenesko, Mallory and Maguire answered questions from the members of the Committee during the presentation.

4.  Mr. Mallory provided a brief update on some of the Company's more significant accounting and tax issues that had been reviewed at previous Committee meetings.  He discussed the required impairment review of goodwill and other intangible assets indicating that as of the third quarter, no impairment writedowns are necessary.  He noted that in view of the potential impact of continued operating cash flow declines on future impairment reviews, footnote disclosures related to this area will be enhanced in the third quarter Form 10-Q.  Mr. Mallory also discussed the recording of an additional $18 million of copyright royalties, the receipt of a

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

$344 million refund from the IRS of federal income taxes and interest related to the Matthew Bender and Mosby tax issue, and the status of an appeal with the IRS related to the deductibility of PHONES interest expense. PwC was in agreement with management in each of the areas presented.

Messrs. Grenesko, Mallory and Maguire answered questions from the members of the Committee during the presentation.

5.  Mr. Mallory reviewed the status of the internal controls certification process. He reviewed the approach and process improvements for 2007 and discussed the impact of the new auditing standard from the Public Company Accounting Oversight Board (AS 5) and the new guidance for management regarding the assessment of internal controls over financial reporting issued by the SEC. Mr. Mallory then stated that the overall results of this year's review have been excellent to date and that audits have yielded very few control deficiencies. He also indicated that management and Internal Audit have not identified any significant deficiencies, which would need to be reported to the Audit Committee, or material weaknesses, which must be disclosed publicly.

Messrs. Caputo, Maguire and Mallory answered questions from the members of the Committee during the presentation.

6.  Mr. Caputo gave an internal audit status report. He reviewed a summary of audits performed during May through September 2007 which provided an overall assessment of the results. Mr. Caputo noted that the Company has made good progress in addressing system issues identified during the centralized circulation system implementation audit. He also stated that an investigation was being conducted of three anonymous calls that were received regarding circulation practices in one sales area of the Los Angeles Times.

Members of the Committee then inquired about future circulation system implementations as well as the status of the new advertising system implementations at the Company's major daily newspapers. Messrs. Caputo, FitzSimons, Grenesko and Mallory answered questions from the Committee during the presentation.

7.  Mr. Caputo discussed the results of the annual audit of executive expense reports and the use of the two jets in which the Company owns a fractional interest. He noted that the review disclosed no significant problems or violations.

Messrs. Caputo and Maguire answered questions from members of the Committee during the presentation.

8.  Mr. Caputo discussed the Company's procedures for handling complaints related to accounting, internal controls or auditing matters. He indicated that the procedures had not changed since last year and were adequate, and that no changes were proposed. After discussion, the Committee approved the Company's existing procedures for handling complaints for the next 12 months.

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

9. Mr. Caputo also reviewed the Company's policies regarding hiring current or former employees of its independent accountants.  He indicated the procedures had not changed and that the Company has been in full compliance.  Mr. Caputo also stated that the procedures were adequate and that no changes were proposed.  After discussion, the Committee approved the Company's existing hiring policies regarding former PwC employees for the next 12 months.

10. At this point, all Company employees left the meeting, and the Committee met privately with the PwC representatives.  Messrs. England, Henderson and Maguire then left the meeting, and the Committee met privately with Mr. Caputo.

There being no further business to come before the Committee, the meeting was adjourned at 8:45 a.m.


_____
Thomas Caputo

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414851

# TRIBUNE COMPANY
## AUDIT COMMITTEE MEETING
### NOVEMBER 21, 2007

The Audit Committee met on Wednesday, November 21, 2007, at 8:30 a.m.  The meeting was held via conference call at Tribune Tower, Chicago, Illinois, pursuant to notice.  The meeting participants included Betsy Holden, William Osborn and Dudley Taft of the Audit Committee; Kevin Maguire and Dan Drobac of PricewaterhouseCoopers; and Dennis FitzSimons, Donald Grenesko, Brian Litman and Mark Mallory of Tribune Company.

Mr. Osborn acted as Chairman of the meeting and Mr. Mallory as Secretary.

The following business was discussed at the meeting:

1.  Mr. Grenesko reviewed the Company's updated consolidated financial statements for the three years ended December 31, 2006.  He explained that the Company was required to update the financial statements because they will be included in a preliminary bond offering memorandum to be distributed soon to the four lead banks underwriting the offering.  The income statement was updated to present Recycler, Southern Connecticut Newspapers and *Hoy*, New York as discontinued operations.  These three businesses were sold after the 2006 10-K was originally filed.  In addition, a subsequent events footnote was added that discusses the three additional discontinued operations, the leveraged ESOP transactions, the new credit agreement, and the Matthew Bender income tax settlement.

    Messrs. FitzSimons, Grenesko, Maguire and Mallory answered various questions from the members of the Committee during the presentation.

2.  Messrs. Maguire and Drobac then reviewed PricewaterhouseCoopers' updated report on their 2006 audit.  Because PwC is issuing an updated opinion on the 2004-2006 financial statements, they are also required to update and reissue their required Audit Committee communications.  PwC noted that there were no disagreements with management and no proposed adjustments.

3.  After all questions had been addressed, the Committee approved the Company's updated consolidated financial statements for the three years ended December 31, 2006 for inclusion in the Company's bond offering memorandum.

There being no further business to come before the Committee, the meeting was adjourned.

_____
R. Mark Mallory

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# TRIBUNE COMPANY
## AUDIT COMMITTEE RESPONSIBILITY SUMMARY

Management has prepared the attached summary of Audit Committee responsibilities to aid in planning Audit Committee meetings and to ensure that all responsibilities specified in the Audit Committee charter are fulfilled each year.  The summary specifies the expected timetable for discussing each area of responsibility.  We have made no changes to the summary since the last Audit Committee meeting.  All topics slated for discussion at this Audit Committee meeting are covered in the remaining sections of the meeting materials.

RMM
11/15/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRIBUNE COMPANY**
**AUDIT COMMITTEE RESPONSIBILITY SUMMARY**
**AND TIMETABLE**

| Responsibility | Charter Reference | Meetings | | | | Quarterly Calls | As Needed |
|---|---|---|---|---|---|---|---|
| | | Feb. | May | Oct. | Dec. | | |
| **General:** | | | | | | | |
| 1. Meet periodically and privately with the independent accountants and internal auditors. | * | X | X | X | X | | X |
| 2. Meet periodically and privately with management. | * | X | | | | | X |
| 3. Appoint (after reviewing estimated fees for services to be performed) or replace the independent accountants. | * | X | | | | | |
| 4. Resolve any disagreements between management and the independent accountants regarding financial reporting. | * | | | | | | X |
| 5. Pre-approve all services performed by the independent accountants (including the fees and terms). | * | | X | | | | X |
| 6. Make regular reports to the Board of Directors. | * | X | X | X | X | | |
| 7. Reassess the adequacy of the Audit Committee Charter annually. | * | | | | X | | |
| 8. Self-assess Audit Committee performance (performed each July in conjunction with the overall Board self-assessment). | * | | | | | | |
| 9. Approve the Audit Committee report required by the SEC to be included in Tribune's annual proxy statement. | * | X | | | | | |
| **Financial Statement and Disclosure Matters:** | | | | | | | |
| 10. Meet to review the annual financial statements and disclosures with management and the independent accountants. | 1 | X | | | | | |
| 11. Make a recommendation to the Board regarding inclusion of the financial statements in the Company's 10-K. | 1 | X | | | | | |
| 12. Review the annual Section 404 internal control reports with management and the independent accountants. | 2 | X | | | | | |

\* These items are included in the "Meetings" and "Committee Authority and Responsibilities" sections of the Audit Committee Charter.

**December 2007**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414855

**TRIBUNE COMPANY**
**AUDIT COMMITTEE RESPONSIBILITY SUMMARY**
**AND TIMETABLE**

| Responsibility | Charter Reference | Feb. | May | Oct. | Dec. | Quarterly Calls | As Needed |
|---|---|---|---|---|---|---|---|
| 13. Review any significant deficiencies or material weaknesses in internal controls, and the steps being taken to resolve them, with management and the independent accountants. | 2 | X | | | | | X |
| 14. Meet to review the quarterly financial statements and disclosures with management and the independent accountants prior to each 10-Q filing. | 3 | | | X (3rd Qtr) | | X (1st and 2nd Qtrs) | |
| 15. Review the results of the independent accountants' quarterly reviews. | 3 | | | X (3rd Qtr) | | X (1st, 2nd & 4th Qtrs) | |
| 16. Review significant financial reporting issues and judgments related to the financial statements with management and the independent accountants. | 4 | X | X | X | X | X | |
| 17. Review reports from the independent accountants regarding material accounting and financial reporting issues. | 5 | X | | | | | X |
| 18. Discuss the quarterly earnings releases with management. | 6 | | | | | X | |
| 19. Discuss financial information and earnings guidance provided to analysts and rating agencies with management. | 6 | | | | | X | X |
| 20. Discuss the effect of regulatory and accounting initiatives and off-balance sheet structures with management and the independent accountants. | 7 | | | | | | X |
| 21. Discuss major financial risk exposures and related risk management policies with management. | 8 | | | | X | | X |
| 22. Discuss with the independent accountants matters related to the annual audit, including any difficulties encountered, scope restrictions, or significant management disagreements. | 9 | X | | | | | |
| 23. Review any disclosures made by the CEO or CFO during the certification process regarding internal control weaknesses and/or fraud. | 10 | X (4th Qtr) | | X (3rd Qtr) | | X (1st and 2nd Qtrs) | |

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414856

**TRIBUNE COMPANY**
**AUDIT COMMITTEE RESPONSIBILITY SUMMARY**
**AND TIMETABLE**

| Responsibility | Charter Reference | Timetable | | | | | |
|---|---|---|---|---|---|---|---|
| | | Meetings | | | | Quarterly Calls | As Needed |
| | | Feb. | May | Oct. | Dec. | | |
| **Oversight of the Company's Relationship with the Independent Accountants:** | | | | | | | |
| 24. Evaluate the independent accountants' lead partner. | 11 | X | | | | | |
| 25. Review the independent accountants' quality control procedures and any material issues raised by recent internal or external reviews. | 12 | X | | | | | |
| 26. Evaluate the qualifications, performance, and independence of the independent accountants and present conclusions to the Board. | 12 | X | | | | | |
| 27. Ensure rotation of the independent accountants' partners as required by law. | 13 | | X | | | | |
| 28. Set and review policies for hiring current and former employees of the independent accountants. | 14 | | | X | | | |
| 29. Discuss the planning and staffing of the independent audit. | 15 | | X | | | | |
| **Oversight of the Company's Internal Audit Function:** | | | | | | | |
| 30. Review the appointment and replacement of the senior internal auditing executive. | 16 | | | | | | X |
| 31. Review significant issues and management's responses raised in internal audit reports. | 17 | X | X | X | X | | X |
| 32. Discuss the internal audit department's responsibilities and planned scope of activities, budget, and staffing with the independent accountants and management. | 18 | | X | | | | |
| **Compliance Oversight Responsibilities:** | | | | | | | |
| 33. Obtain assurance from the independent accountants that they did not become aware of any illegal acts during their audit. | 19 | X | | | | | |
| 34. Review reports from management, internal audit and the chief compliance officer regarding the Company's compliance and ethics program and its Code of Business Conduct. | 20 | | | | X | | |

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414857

### TRIBUNE COMPANY
### AUDIT COMMITTEE RESPONSIBILITY SUMMARY
### AND TIMETABLE

| Responsibility | Charter Reference | Timetable | | | | | |
|---|---|---|---|---|---|---|---|
| | | Meetings | | | | Quarterly Calls | As Needed |
| | | Feb. | May | Oct. | Dec. | | |
| 35. Advise the Board regarding the effectiveness of the Company's compliance and ethics program. | 20 | | | | X | | |
| 36. Review the procedures for handling complaints and employee concerns regarding accounting and auditing matters. | 21 | | | X | | | |
| 37. Review any significant complaints and employee concerns regarding accounting and auditing matters. | 21 | | | | | | X |
| 38. Discuss the results of the annual review of executive expense reports performed by the independent accountants and the internal auditors. | N/A | | | X | | | |
| 39. Discuss the Company's business continuity plans and the related reviews performed by the internal auditors. | N/A | | | | X | | |
| 40. Discuss with management and the independent accountants correspondence with regulators or governmental agencies regarding material accounting and financial reporting issues. | 22 | | | | | | X |
| 41. Discuss legal matters that may materially affect the Company's financial statements or compliance policies with the Company's General Counsel. | 23 | | | | | | X |

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414858

**3**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414859

## TRIBUNE COMPANY
## UPDATE ON SIGNIFICANT ACCOUNTING ISSUES

This report provides brief updates on two accounting issues that were discussed with the Audit Committee at the October meeting.

### IMPAIRMENT OF INTANGIBLE ASSETS

Goodwill and other intangible assets totaled $8.4 billion and represented about 61% of the Company's total assets at the end of this year's third quarter. We are in the process of performing our annual impairment review of goodwill and other intangible assets that are not being amortized, which include mastheads and FCC licenses. The impairment review compares estimated fair values to book values. The valuation of intangible assets requires assumptions and estimates of many critical factors, including revenue and market growth, operating cash flow, market multiples, and discount rates.

Goodwill impairment testing is performed by first aggregating similar business units into "reporting units", as defined by the rules. For example, all of our daily newspapers comprise one reporting unit, and all of our television stations are another reporting unit. The fair value of each reporting unit is then estimated and compared to its book value. In contrast, each masthead and FCC license must be tested separately to determine if its fair value exceeds book value. No aggregating is permitted by the rules.

Last year's review determined that no impairment writedowns were required as estimated fair value exceeded book value for each of the intangible assets reviewed. The only asset that was close was goodwill at our newspaper reporting unit. We estimated a fair value of $7.3 billion for the newspaper reporting unit, compared to a book value of $7.1 billion.

This year, we have improved valuation data as a result of the work performed in the first quarter by Valuation Research Corporation (VRC) in connection with our going-private transactions. In particular, their work has provided us with greater insight into the fair values of our interactive equity investments. In addition, the book value of our newspaper reporting unit is lower this year primarily due to reduced capital spending and the Matthew Bender tax settlement, which reduced our newspaper goodwill by $224 million. Based on this updated information, we concluded as of the end of our third quarter that fair value exceeded book value for both the newspaper and the television reporting units. However, as part of our fourth quarter review, we will need to consider the new valuations now being formulated by VRC and our latest financial projections.

### Newspaper Mastheads

The mastheads acquired from Times Mirror have a book value of $1.5 billion. Their initial fair values were based on an independent appraisal performed by Ernst & Young, who calculated the estimated benefit of owning, rather than licensing the mastheads. If the Company did not own the mastheads, it would have to license them from another entity and make royalty payments. The present values of these theoretical future royalty payments represent the estimated fair values of the

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

mastheads. We are in the process of finalizing the projected revenues, royalty rates and discount rate to be used in the calculations, and we do not anticipate there will be an impairment charge for any of our mastheads.

**FCC Licenses**

A television station's most valuable asset is its FCC license. The book values of our FCC licenses total $872 million. The fair value of a FCC license in a given market is determined by estimating the average value of a FCC license in that market. We use a financial model that was developed by Standard & Poors, an independent valuation firm. The model derives the likely cash flows from start up for a station that would ultimately achieve an average market share and profitability in a particular market. The estimated cash flows are then discounted at an interest rate approximating the average cost of capital of likely buyers of a FCC license. We are in the process of finalizing the market assumptions and discount rate for the 2007 FCC license valuations. At this point, we do not expect any write downs will be required.

We will present the final results of our review at the February 2008 Audit Committee meeting.

**PHONES TAX ISSUE**

In connection with the examination of the Company's federal income tax returns for 2000 through 2003, the IRS proposed that the Company capitalize the interest on its PHONES debt securities as additional tax basis in the Company's 16 million shares of Time Warner common stock, rather than allowing the Company to currently deduct such interest. The Company disagreed and asked the IRS administrative appeals office to review the issue. During the fourth quarter of 2006, the Company reached an agreement with the IRS appeals office that would permit the Company to deduct 72.5% of the PHONES interest expense. The agreement would apply for the tax years 2000 through 2029. In December of 2006, under the terms of the agreement reached with the IRS appeals office, the Company paid approximately $81 million of tax plus interest for tax years 2000 through 2005.

The agreement reached with the appeals office is being reviewed by the Joint Committee on Taxation. The Joint Committee has not yet reached a decision, but its staff is still discussing the settlement percentage with the IRS appeals office. Each 1% change in the settlement percentage would increase our taxes and interest by about $5 million.

RMM
11/15/07

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414861

**4**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414862

## TRIBUNE COMPANY
## 2007 INTERNAL CONTROLS CERTIFICATION UPDATE

Internal Audit has completed audits at 16 of the 22 locations included in this year's certification process. PricewaterhouseCoopers (PwC) has made 14 of their 15 visits, 3 of which still require IT audit work to be performed. The remaining reviews are expected to be completed by late January. Internal Audit will begin follow-up audit work this month at previously audited locations to allow management to attest to the adequacy of controls as of year-end. PwC will also shortly begin their follow-up audit work for the purpose of their year-end opinion. (See Exhibit I on page 3 for the status of all audit work.)

As control deficiencies have been identified, the business units have developed action plans to resolve each issue. The action plans specify the corrective action required, the person(s) responsible, and the timetable. Internal Audit, the Director of Controls and Compliance and the Internal Control steering committee receive regular reports from the business units to monitor the status of their action plans.

## CURRENT STATUS

The results to date continue to be excellent, as testing has yielded relatively few control deficiencies at all business units. For example, WPIX-TV (New York) has no open items and Newsday has only three open items after reviews by both Internal Audit and PwC. Management, Internal Audit and PwC have recently begun to aggregate open deficiencies across the business units tested. At this point, no common issues or significant concerns have been identified. None of the open items have been deemed to be a significant deficiency, which would need to be reported to the Audit Committee, or a material weakness, which would need to be reported publicly. By year-end, only a small number of miscellaneous control deficiencies are expected to be open. These open items were identified late in the process and not enough instances of the controls exist to properly test that they are operating effectively. Overall, the key internal controls over financial reporting appear to be reasonably designed and functioning as intended, and the documentation prepared by these business units accurately reflects the manual and automated controls in place.

> **Results To Date:**
> - No significant deficiencies or material weaknesses
> - Minimal number of deficiencies identified at all locations
> - No common issues have emerged across business units
> - Only a small number of miscellaneous control deficiencies are expected to be open at year-end

## NEXT STEPS

Internal Audit and the steering committee will continue to have frequent contact with the in-scope business units to help ensure open items are being properly closed. Follow-up audit work at these locations by PwC and Internal Audit will be finalized during February as will testing of the Company's year-end financial reporting process. The final aggregation and

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

evaluation of any open deficiencies will be performed afterwards. We are confident that we will not have any material weaknesses and at this point, management is not anticipating any significant deficiencies for the 2007 certification process. We will update the Committee on these items and review our final assessments at the February meeting.

## PwC FEE UPDATE

Management has asked PwC to provide updates on costs and time incurred so that their fees can be tracked against the estimate provided at the May meeting. To date, fees for the integrated audits are tracking on plan as the number and significance of deficiencies identified have been very low, and PwC has been able to increase reliance on Internal Audit's work and on management's company-level controls as originally planned. However, PwC's updated fees for SEC filings and related comfort letters are $100,000 higher due to PwC's required involvement with filings and a comfort letter not contemplated in the budget, a re-issuance of PwC's 2006 audit report as required by SEC regulations, and additional assistance in connection with the Company's delivery of a draft bond offering memorandum and related comfort letter. PwC's updated fees for the leveraged ESOP transactions are $30,000 over the May estimate due to the nature, volume and complexity of the related accounting issues. Fees for benefit plan audits are $28,800 higher because one plan required an additional audit. All other fee estimates are in line with the estimates provided in May. A revised PwC fee summary is included in Exhibit II on page 4.

RMM/TGC
11/28/2007

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**Exhibit I**

### TRIBUNE COMPANY
### 2007 SARBANES-OXLEY INTERNAL CONTROLS CERTIFICATION
### KEY BUSINESS UNIT AUDITS AS OF 11/28/2007

| | PRIMARY AUDIT WORK | | | FOLLOW-UP AUDIT WORK (1) | |
|---|---|---|---|---|---|
| **Key Business Units** | **IA (2)** | **PwC -Finance** | **PwC - IT** | **IA** | **PwC** |
| **Publishing:** | | | | | |
| LA Times | Sept 10 - Oct 19 | Dec 3 - Dec 14 | Dec 10 - Dec 14 | Dec - Feb '08 | Jan - Feb '08 |
| Chicago Tribune | July 2 - Aug 10 | Aug 20 - Aug 31 | Oct 8 - Oct 12 | Dec - Feb '08 | Jan - Feb '08 |
| Newsday | Aug 13 - Sept 7 | Sept 17 - Sept 28 | Sept 17 - Sept 21 | Dec - Feb '08 | Jan - Feb '08 |
| South Florida Sun-Sentinel | Sept 10 - Oct 19 | Nov 12 - Nov 16 | Nov 12 - Nov 16 | Dec - Feb '08 | Jan - Feb '08 |
| Baltimore Sun | July 2 - Aug 10 | Sept 10 - Sept 14 | Oct 15 - Oct 19 | Dec - Feb '08 | Jan - Feb '08 |
| Orlando Sentinel | Nov 26 - Dec 21 | N/A | N/A | N/A | N/A |
| Tribune Media Services | Dec 31 - Jan 25 | N/A | N/A | N/A | N/A |
| Group Office | May 28 - June 22 | Oct 22 - Oct 26 | Nov 19 - Nov 30 | Dec - Feb '08 | Jan - Feb '08 |
| Customer Accounting | Apr 30 - May 25 | Aug 13 - Aug 17 | Nov 19 - Nov 30 | Dec - Feb '08 | Jan - Feb '08 |
| Tribune Interactive | Nov 26 - Dec 21 | N/A | N/A | N/A | N/A |
| Hartford Courant | Nov 26 - Dec 21 | N/A | N/A | N/A | N/A |
| Star Community Publishing | Dec 31- Feb 1 | N/A | N/A | N/A | N/A |
| Recycler | Jan 8 - Jan 26, '07 | N/A | N/A | N/A | N/A |
| | | | | | |
| **Broadcasting & Entertainment:** | | | | | |
| New York TV | Aug 13 - Sep 7 | Sept 24 - Sept 28 | Sept 17 - Sept 18 | Dec - Feb '08 | Jan - Feb '08 |
| Los Angeles TV | July 9 - Aug 10 | Nov 5 - Nov 10 | Nov 8 - Nov 9 | Dec - Feb '08 | Jan - Feb '08 |
| Chicago TV | Aug 13 - Sep 7 | Nov 5 -Nov 10 | Nov 5 - Nov 10 | Dec - Feb '08 | Jan - Feb '08 |
| Chicago Cubs | Dec 31 - Jan 25 | N/A | N/A | Dec - Feb '08 | N/A |
| Group Office | May 28 - June 22 | July 30 - Aug 3 | Nov 12 - Nov 16 | Dec - Feb '08 | Jan - Feb '08 |
| WGN-Cable | Aug 13 - Sep 7 | Nov 5 - Nov 10 | N/A | Dec - Feb '08 | Jan - Feb '08 |
| | | | | | |
| **Corporate:** | | | | | |
| Corporate Office | Sept 10 - Oct 19 | Oct 15 - Nov 9 | Nov 19 - Nov 30 | Dec - Feb '08 | Dec - Feb '08 |
| Finance Service Center (Purchasing, Payables, Payroll) | May 28 - June 29 | July 9 - July 20 | N/A | Dec - Feb '08 | Jan - Feb '08 |
| PeopleSoft Support Group | Apr 2 - May 11 | July 9 - July 20 | July 30 - Aug 3 | Dec - Feb '08 | Jan - Feb '08 |

(1)  Updates of the reviews that were completed earlier in the year will be performed to allow us to attest to the
adequacy of controls as of year-end.  These follow-up reviews are generally performed from Chicago.

(2)  Internal Audit dates include both Finance and IT work.

*Note: Shading indicates audit has been completed.*

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414865

Exhibit II

## TRIBUNE COMPANY
## UPDATED PwC FEE SUMMARY
## DECEMBER 2007

| | 2007 Estimates | | 2006 |
| | December | May | Actual |
|---|---|---|---|
| **Audit Services:** | | | |
| Integrated financial statement audit | $ 1,825,000 | $ 1,825,000 | $ 2,100,000 |
| Out-of-pocket expenses | 165,000 | 165,000 | 165,000 |
| TMCT Transactions | - | - | 130,000 |
| SEC filings and related comfort letters (1) | 235,000 | 135,000 | 40,000 |
| Total audit services | 2,225,000 | 2,125,000 | 2,435,000 |
| **Audit Related Services:** | | | |
| Employee benefit plan audits (2) | 443,800 | 415,000 | 424,500 |
| Audits of the TMCT LLC's | - | - | 70,000 |
| Audit of the Chicago Cubs | 52,000 | 52,000 | 50,000 |
| Broadcasting Project (3) | 450,000 | 450,000 | 998,700 |
| Broadcasting Holding Co. audit (4) | 275,000 | 275,000 | - |
| Tribune Finance Co. audit (4) | 25,000 | 25,000 | - |
| Leveraged ESOP transactions (5) | 280,000 | 250,000 | - |
| Total audit related services | 1,525,800 | 1,467,000 | 1,543,200 |
| **Tax Services** | 10,000 | 10,000 | - |
| **Other Services (6)** | 177,500 | 177,500 | 162,200 |
| **Total Services** | $3,938,300 | $ 3,779,500 | $ 4,140,400 |

(1) Increase in estimated fees from May due to PwC's required involvement with filings and a comfort letter not contemplated in the budget, a re-issuance of PwC's 2006 audit report as required by SEC regulations, and additional assistance in connection with the Company's delivery of a draft bond offering memorandum and related comfort letter. December estimate excludes fees for a debt registration statement that may be required in 2008.

(2) Increase from May estimate is due to an additional audit that was required for one of the benefit plans.

(3) Represents fees for the three-year financial audit in anticipation of the previously contemplated sale or spin-off of Tribune Broadcasting.

(4) SEC rules require separate audit opinions for these entities because their stock is pledged as collateral under the Company's new credit agreement.

(5) Fees represent the time incurred to date for accounting consultations associated with the ESOP transactions. Increase from May estimate due to the nature, volume and complexity of the related accounting issues.

(6) Fees relate primarily to employee benefit plan annual reports (Form 5500).

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

5

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414867**

# TRIBUNE COMPANY
# INTERNAL AUDIT STATUS REPORT

Internal Audit regularly provides reports to the Audit Committee summarizing the results of recent audits.  Significant issues that we report to the Committee typically include:

- Identified and/or unresolved significant deficiencies or material weaknesses in internal controls over financial reporting
- Significant weaknesses in other control areas that could jeopardize material systems, operations or processes
- Significant financial statement adjustments ($500,000 or greater)
- Any fraud committed by an employee with considerable responsibility for internal controls, or a sizeable fraud committed by any level of employee ($25,000 or greater)
- Material circulation adjustments (2% of total circulation or greater)

Since our last report in October, Internal Audit primarily focused its efforts in three areas: integrated audits of financial statements and internal controls over financial reporting, reviews of business continuity plans, and financial audits performed at broadcasting locations on behalf of PwC.  Internal Audit continued its investigation of the three anonymous calls received regarding circulation sales practices at the Los Angeles Times and reviewed corporate compliance procedures and Code of Business Conduct responses.  Internal Audit also continued to monitor the Publishing Group's progress with the centralized circulation system implementation.

The results from the audits performed since the last meeting are summarized below and in Exhibit I on page 4.  Updates on the Los Angeles Times investigation and the circulation system implementation are also included.  Results from the reviews of corporate compliance procedures and Code of Business Conduct responses are noted in the Enterprise Risk Management Report under Tab 6.

No significant financial adjustments or material weaknesses in internal controls were identified.  In addition, no senior-level financial positions are currently open across the company.

**INTEGRATED AUDITS (audits of financial statements and internal controls over financial reporting)**

The integrated audits completed since the Committee's October meeting focused on the business units needed to support management's internal controls certification for 2007.  These reviews included the Los Angeles Times, Sun-Sentinel and the corporate office.  Results from these audits were covered in the Internal Controls Certification Update under Tab 4.  No significant issues or adjustments were noted.  Also, an integrated audit at the Daily Press is currently in progress and includes follow-up procedures on issues identified during our review of the new circulation system implementation performed earlier this year.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**BUSINESS CONTINUITY PLAN REVIEWS**

Internal Audit performed testing of the business continuity plans for Tribune Tower, Chicago Tribune, Los Angeles Times, Newsday, Sun-Sentinel, KTLA-TV (Los Angeles), WPIX-TV (New York), and KHCW-TV (Houston). These reviews included an evaluation of whether the plan is current, conforms to Tribune's recommended format and guidelines, identifies critical business processes, and describes clear procedures for recovery. We also examined the test results and the restoration of backups, ensured that personnel knew their responsibilities and reviewed the effectiveness of communication methods. No significant issues were noted during these reviews. Remaining reviews at Tribune Interactive and the television stations in Chicago and New Orleans are expected to be performed during the first quarter.

**AUDITS FOR PWC**

PwC is performing a financial statement audit of Broadcasting Holding Company (BHC) because its stock is being pledged as collateral under the Company's new credit agreement. (SEC rules require separate opinions on the financial statements of subsidiaries whose stock is pledged.) BHC includes the Company's television stations and Tribune Entertainment. PwC is auditing the television stations in Chicago, New York, Los Angeles, Dallas, Seattle and Sacramento as well as Tribune Entertainment. To help reduce related audit fees, Internal Audit is currently performing financial statement audits at Dallas, Seattle and Sacramento under PwC's supervision. No significant adjustments or issues have been noted to date.

**CENTRALIZED CIRCULATION SYSTEM IMPLEMENTATION**

As discussed at the Committee's October meeting, the Publishing Group's central project team and the vendor have made good progress on functional issues identified with the new centralized circulation system. The general ledger interface for recording circulation revenue and expense has been fixed, and various other system fixes and new reports have been delivered and have been tested. Additionally, a new implementation schedule has been developed for the remaining newspapers, and resource and testing requirements have been adjusted since deficiencies in those areas were the primary catalysts for the issues noted during the initial implementation at the Daily Press.

Internal Audit recently began performing more follow-up procedures on the issues noted at the Daily Press as part of the integrated audit that is currently underway. Internal Audit is also currently performing implementation review procedures at the Morning Call which is the next business unit scheduled to go live on the new circulation system. We will provide an update on these reviews at the Committee's next meeting.

**ANONYMOUS CALLS INVESTIGATION (Los Angeles Times)**

As discussed during the October Committee meeting, three anonymous calls have been received on the ethics hotline basically alleging that the Los Angeles Times has been inflating their circulation numbers for the past two years by knowingly accepting and paying for bad orders from third party field sales contractors (foot crews). Two of the calls were received in May and

2

the other call was received in September of this year. The September call also alleged that three Los Angeles Times sales managers are accepting kickbacks of sales commissions from these contractors, and that one sales manager has an ownership interest in one of the contractors. Vince Casanova, Vice President/Circulation for Tribune Publishing, Julie Xanders, the Times' Senior Vice President/Legal, and Gwen Murakami, the Times' Vice President/Human Resources, have been assisting Internal Audit with the investigation. We have also engaged an outside investigative firm to look into the ownership structures of the field sales contractors and the allegations regarding kickbacks.

The investigation is ongoing. Work to date continues to suggest that the Los Angeles Times has solid order verification control procedures, and that the risk of any significant circulation misstatement is low. We are, however, uncovering evidence that indicates possible undisclosed conflicts of interest with one of more of the sales managers mentioned in the calls. We also believe that one of the field sales contractors has been soliciting orders over the internet without the Los Angeles Times' knowledge or authorization and may be submitting these internet orders as field sales orders in order to collect commissions. We will continue to update the Committee on these issues.

TGC
11/28/2007

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414870

Exhibit I

**TRIBUNE COMPANY**
**SUMMARY OF AUDITS**
**OCTOBER - NOVEMBER 2007**

| 2006 Revenues (millions) | Location | Type of Audit | | |
| --- | --- | --- | --- | --- |
| | | Integrated Audit | Business Continuity Plan Review | Other Audits |
| | **Publishing:** | | | |
| | **LA Times Group:** | | | |
| $ 1,026 | LA Times | ▓▓▓ | | |
| | **Chicago Tribune Group:** | | | |
| 759 | Chicago Tribune | | ▓▓▓ | |
| | **Newsday Group:** | | | |
| 416 | Newsday | | ▓▓▓ | |
| | **Fort Lauderdale Group:** | | | |
| 346 | Sun-Sentinel | ▓▓▓ | | |
| | **Daily Press Group:** | | | |
| 64 | The Daily Press, Inc. | In Progress | | In Progress    Circ. System Implementation Follow-up |
| | **Broadcasting & Entertainment:** | | | |
| | **Television** | | | |
| $ 179 | **New York** | | ▓▓▓ | |
| 153 | **Los Angeles** | | ▓▓▓ | |
| 62 | **Seattle (2 stations)** | | | In Progress    Financial Audit for PwC |
| 55 | **Dallas** | | | In Progress    Financial Audit for PwC |
| 44 | **Sacramento** | | | In Progress    Financial Audit for PwC |
| 38 | **Houston** | | ▓▓▓ | |
| | **Corporate:** | | | |
| - | **Corporate Office** | ▓▓▓ | | |



Satisfactory Audit Rating
Needs Improvement Audit Rating
Unsatisfactory Audit Rating

4

**6**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# TRIBUNE COMPANY
## ENTERPRISE RISK MANAGEMENT
### SUMMARY OF SIGNIFICANT CHANGES AND CONCLUSIONS

The Company's annual enterprise risk management report is attached. Since the report is fairly lengthy and much of the content is similar to what has been presented to the Committee at previous December meetings, we have provided the following information to summarize the significant changes in the report from last year and highlight the key conclusions. Overall, management believes that its existing structure, organization, business practices, policies, and procedures are functioning well and address the critical components of good enterprise risk management.

## PERSONNEL

In May 2007, Jerry Agema, vice president of corporate compliance and risk management, retired. Mr. Agema was primarily responsible for overseeing the administration of the Company's insurance programs and monitoring Tribune's various compliance and ethics programs. Since the position was not replaced, his responsibilities were split between the Treasury department and Internal Audit. Jack Rodden, assistant treasurer, took over administration of the insurance programs. Tom Caputo, vice president/auditing, became principally responsible for oversight of the Company's compliance and ethics programs, but he regularly confers with the general counsel's office and Mark Mallory, vice president/controller, on any significant matters.

## STRATEGIC PLANNING PROCESS

In light of the very challenging industry and economic conditions over the past few years, the Company greatly expanded its traditional strategic planning process. Management and the Board engaged in an extensive strategic review process during the last two years which examined various alternatives for the Company. This review involved numerous scenarios, analyses and reports to the Board and culminated in the leveraged ESOP transactions approved by the Board in April.

Also, Tribune Publishing and Interactive began a "transformative change" initiative in April of this year. A broad cross-section of nearly 80 people came together from across the business units and from multiple levels in the Company to consider how to re-engineer Tribune's business plan and change its culture. They have since crafted a new overarching vision and strategies for these groups which have also been previously communicated to the Board.

## MAJOR FINANCIAL RISK EXPOSURES

A summary of major financial risk exposures is included in the attached report as Exhibit III on pages 13 – 16. This exhibit has been revamped and expanded this year to provide appropriate detail regarding the change in the Company's risk profile due to the substantial increase in debt and other financial obligations related to the leveraged ESOP transactions. The related risks are well documented and have been previously discussed with the Committee and the full Board.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

They have also been disclosed in the Company's SEC filings during the year. Management believes that existing programs to monitor and control financial risks are adequate and functioning well.

## BUSINESS CONTINUITY PLANNING

An update on the Company's business continuity planning is included in the attached report as Exhibit I on pages 9 – 11. There have been no significant changes to the plans in the past year, but each group continues to test and improve the plans. Fortunately, management has not had to enact any of the plans during the past year and believes that the business continuity plan designs continue to be reasonable and practical.

## COMPLIANCE AND ETHICS PROGRAM

A summary of the Company's compliance and ethics program is included as Exhibit IV on pages 17 - 22. It outlines applicable laws and regulations, potential consequences of non-compliance, and existing internal and external compliance systems. There have been no significant changes in compliance systems or existing/potential exposures during the past year. We continue to believe that the Company's existing compliance and ethics programs are adequate and functioning well.

## ANNUAL CODE OF BUSINESS CONDUCT CERTIFICATION AND COMPLIANCE PROCESS

An update on the annual Code of Business Conduct Certification and Compliance Process is included as Exhibit V on page 23. No significant changes in the Code, compliance process or results have occurred in the past year. The Company's current Code is in full compliance with the New York Stock Exchange (NYSE) rules, and the coverage of employees asked to sign statements of compliance with the Code is satisfactory and was applied consistently across the Company. Code violations or conflicts of interest were handled promptly and consistently, and there are no unresolved issues. None of the exceptions or violations were material individually or taken as a whole.

## CODE OF ETHICS FOR THE CEO AND SENIOR FINANCIAL OFFICERS

The Code of Ethics for the CEO and Senior Financial Officers is also included as part of Exhibit V on page 23. No changes in the Code of Ethics have occurred in the past year. The current Code complies with the NYSE rules, and the Company's CEO, CFO and Controller are in full compliance with all provisions of the Code.

TGC
11/27/2007

2

## TRIBUNE COMPANY
## ENTERPRISE RISK MANAGEMENT REPORT

### INTRODUCTION

Enterprise risk management is a comprehensive, systematic approach to the identification, assessment and control of risk on a company-wide basis. Risk is the possibility that an event will occur and adversely impact the achievement of company objectives. Risks and uncertainties affect every aspect of a business organization, and the ability to implement programs to mitigate and monitor the broad array of risks helps a company create and preserve shareholder value.

In an effort to improve the quality of financial reporting, enhance corporate governance, increase management accountability, improve the consistency of performance and avoid disruptive negative events, companies have implemented various types of enterprise risk management programs. These programs focus on a wide range of concerns from internal controls and regulatory compliance to the assessment and monitoring of the company's strategic and operating risks.

Some companies have implemented a centralized enterprise risk management structure, which monitors and assesses risks for the entire organization. Others, like Tribune, address enterprise risk management through various corporate, group and business unit management functions and programs in place throughout the organization. We believe that the identification, assessment, monitoring and control of risk are the responsibility of management at all levels throughout the Company.

The Company has a number of programs in place that encompass various aspects of enterprise risk management. The purpose of this report is to review these programs and identify the management processes and procedures in place to ensure that these programs continue to operate effectively.

### ENTERPRISE RISK MANAGEMENT FRAMEWORK

The enterprise risk management framework has four categories of objectives (1) Strategic – addressing risks to the high-level goals supporting the company's mission, (2) Operations – relating to effective and efficient use of a company's resources (3) Reporting – assuring reliability and accuracy of financial reporting, and (4) Compliance – assuring that the company is in compliance with all applicable laws and regulations.

Across these four categories, there are several key components of enterprise risk management. First, the company's internal management environment must set the proper standards for ethics and integrity and have an organizational structure that supports the achievement of the company's goals and objectives. Second, processes must be in place to identify and assess significant risks. Management must also develop the appropriate responses to critical risks based on their risk tolerance and establish policies and procedures to ensure that the response is carried out. Third, management must continually monitor the risk management process and communicate the results through the management reporting structure and up to the Board of Directors.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**