Enterprise risk management can be expected to provide reasonable assurance regarding the achievement of objectives related to the reliability of reporting, and compliance with laws and regulations. Achievement of these objectives is within a company's control and depends on how well the company's related control activities are performed. However, the achievement of strategic and operating objectives is not always within a company's control. Enterprise risk management cannot prevent poor business judgments or decisions, or external events that can cause a company to fail to meet its goals in these areas. It does, however, increase the likelihood that management will make better decisions and can provide reasonable assurance that both management and the Board are aware of the extent to which a company is meeting its goals.

## STRATEGIC OBJECTIVES

Tribune has key strategic elements supporting strong enterprise risk management. This begins with the Company's eight fundamental values that guide management actions: Citizenship, Customer Satisfaction, Diversity, Employee Involvement, Financial Strength, Innovation, Integrity and Teamwork. These values are listed on the back of employee ID cards. The Corporate Management Committee, consisting of the CEO, group presidents, and senior corporate vice presidents, guides the day-to-day operations of the organization.

The strategic planning process is an important aspect of enterprise risk management. Traditionally, corporate, group and business unit management annually go through an extensive strategic planning process that culminates with the presentation of the strategic plan to the Board. It is through the development of the strategic plan that management identifies, evaluates and proposes responses to the various external risks facing the Company. These risks include the impact of competition, changing economic conditions and capital markets. It also addresses the impact of evolving technology, pending regulatory changes and changing customer habits. Through the strategic planning process, these external risks are evaluated, assessed and monitored. The risks are specifically addressed in the development of business unit, group and corporate strategies.

In light of the very challenging industry and economic conditions over the past few years, the Company greatly expanded its traditional strategic planning process for 2007. Management and the Board engaged in an extensive strategic review process which examined various alternatives for the Company. This review involved numerous scenarios, analyses and reports to the Board and culminated in the leveraged ESOP transactions approved by the Board in April. Also, Tribune Publishing and Interactive began a "transformative change" initiative in April of this year. A broad cross-section of nearly 80 people came together from across the business units and from multiple levels in the company to consider how to re-engineer Tribune's business plan and change its culture. They have since crafted a new overarching vision and strategies for these groups.

Other important strategic enterprise risk management components are: 1) the "Introduction to Tribune Leadership" class, designed for first level managers and held about five times per year on a regional basis (each class has approximately fifty participants); 2) the "Tribune Leadership Development Program," designed for more senior managers and usually held two to three times per year (each class has approximately thirty-five participants); and 3) the ongoing succession planning process. These programs ensure that the Company identifies and develops its future leaders to assure continuity of strong, ethical management. The evaluation and development

2

process runs throughout the organization.  A detailed review of management succession plans is presented to the Board each year.

For many years, the Company has used the internal audit department to recruit and develop financial professionals who have moved into leadership positions throughout the Company. There are currently more than 40 former Tribune internal auditors in key financial or operational leadership positions.

## OPERATING OBJECTIVES

The key operating element of enterprise risk management is the development of an annual Operating Plan.  As part of this process, business unit, group and corporate management identify and assess the risks that could prevent the Company from achieving its performance targets for the coming year.  This is a critical aspect of the planning process.  Each year corporate, group and business unit management go through a detailed operating planning process that culminates with the presentation of the operating plan to the Board.  When it is determined that risks to achieving the operating plan targets are significant, management develops contingency plans that detail actions to be taken, such as expense or capital spending reductions.

Tribune also has strong and effective Business Continuity Plans for each business unit, group and corporate function which enable the company to quickly recover and minimize the impact of any disaster that might impede operations.  Management has established uniform guidelines and requires each business unit and corporate group to maintain written plans to address various disaster scenarios.  To keep the plans up-to-date, each business unit is required to:

1.  Appoint an individual or group of individuals to be responsible for plan maintenance
2.  Review and update the plan at least semi-annually
3.  Obtain approval of the plan from the Publisher/CEO/GM annually
4.  Perform periodic testing on key elements of the plan at least annually

The group offices have also issued guidelines to business units addressing plan maintenance, accessibility, education and awareness and, as needed, hold conference calls to share ideas, discuss updates, etc.  To monitor compliance, business continuity related questions that address each of the above requirements are included in the quarterly financial questionnaire that is completed and signed by each business unit and various corporate groups.  Internal Audit also regularly reviews the responses to these questions and performs a rotation of limited scope audits of business continuity plans at all significant business units.  An update on the Company's Business Continuity Plans is covered in Exhibit I on pages 9 - 11.

The Company has an appropriate insurance program that provides coverage for all significant exposures in three primary categories:

- Workers' Compensation and Liability (auto, general, and media liability)
- Property (includes business interruption)
- Directors & Officers and Other (pension fiduciary, crime, and environmental)

Insurance is an important risk management function in that the insurance program balances the cost and availability of coverage with the Company's ability to prevent or absorb losses.  The

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414827

Corporate insurance department, working with our brokers, continuously evaluates the adequacy and cost/benefits of the insurance coverage. Exhibit II on page 12 provides a summary of Tribune's insurance programs. A separate report detailing the Company's insurance programs is included in the Board materials and will be reviewed at its meeting later in the day.

Many operating risks are regularly addressed through the management practices and procedures in place at our newspapers, television stations and other business units, as well as in the support provided by the groups, service centers, and corporate departments. A few examples are:

- The acquisition of newsprint for all of our newspapers is managed by the Publishing Group staff through the maintenance of long-term supply contracts. This process eliminates the risk of any of our newspapers not being able to obtain newsprint that meets our quality standards at competitive market prices.
- The acquisition of broadcast rights are managed by the Broadcasting Group staff to address the risk of our television stations not being able to obtain a continuous supply of quality programming at competitive market prices.
- The Finance Service Center and business units maintain appropriate customer credit standards and procedures to make sure the risk of extending credit to customers is properly balanced against the revenue generated by each customer.
- At the corporate level, the Legal Department provides a review of critical contracts that Company managers sign to avoid the risk of executing contracts with terms that may be adverse to Company interests.
- Key projects, such as systems implementations, are managed at the business unit level with appropriate oversight from group or corporate functions to ensure controls are standardized, properly implemented and operating as intended.

Key financial risks to the Company are typically identified and managed at the corporate level. Exhibit III on pages 13 - 16 outlines the key financial risks faced by Tribune and the programs in place to address those risks. The risks noted in this exhibit relate primarily to financing transactions involving debt, equity or investments. The Company's risk profile changed significantly in 2007 due to the substantial increase in debt and other financial obligations related to the leveraged ESOP transactions. The related risks are well documented and have been discussed with the Audit Committee and the full Board. They have also been disclosed in the Company's SEC filings during the year. Management believes that existing programs to monitor and control financial risks are adequate and functioning well.

These are just a few examples of management practices and procedures that address critical risks to the company's day-to-day operations. It is the responsibility of managers at all levels throughout the company to continue to focus attention on risks that can adversely impact the achievement of the operating objectives in their specific areas of responsibility.

## REPORTING OBJECTIVES

An important category of enterprise risk management is maintaining the accuracy and reliability of the company's financial reporting. This supports management's decision making and monitoring of the Company's activities and performance. Strong internal controls are an important component of enterprise risk management. This begins with the integrated use of

4

PeopleSoft financial systems throughout the Company for general ledger, payroll and other critical financial reporting and control purposes. Our television stations also have common financial and operating systems. Publishing is in the process of implementing common advertising and circulation systems.

Tribune has an executive steering committee in place as well as a director of controls and compliance to ensure that the Company adequately complies with the internal control certification requirements of Section 404 of the Sarbanes-Oxley Act. Quarterly assessments of any significant changes in internal controls are performed to ensure that controls are adequate and that no weaknesses or changes in internal control need to be reported publicly. The Company's goal is to have no significant deficiencies or material weaknesses in internal control. Periodic reports are provided to the Audit Committee and the report for this meeting is under Tab 4.

Business units and the groups prepare revised financial projections each period measured against the same period in the previous year. Monthly income statements also provide comparisons to plan/projections and the previous year. This detailed monitoring helps to quickly identify risks to achieving revenue and operating profit targets.

Business units provide quarterly income statements and balance sheets that form the basis for the corporate consolidated financial statements. Each business unit provides a report explaining variances between actual and plan/projections and last year. Each business unit, including service centers and corporate, completes a comprehensive financial reporting quarterly questionnaire, which is certified by the business unit's CEO, CFO, CTO, and circulation vice president. These detailed questionnaires contain over 100 questions covering income statement, balance sheet, internal controls and related items. The questionnaires are sent to corporate financial reporting for review. Internal Audit also regularly reviews the questionnaires and verifies the representations during each audit. The quarterly questionnaire is an important part of the overall company-wide control process.

The Company has a Corporate Disclosure Committee consisting of all of the members of the Corporate Management Committee, plus the group CFO's, corporate controller, assistant controller, audit vice president, and group vice president of circulation. The committee's responsibility is to assure that all of the financial information in the 10-Q's and 10-K is accurate and all necessary information is properly disclosed. The committee also reviews any significant internal control issues that may have surfaced during the quarter and verifies that corrective action has been taken. All members of the Disclosure Committee as well as other corporate financial officers and its chief technology officer must sign a quarterly certification attesting to the accuracy of all disclosures. This enables the CEO and CFO to certify to the accuracy of the 10-Q's and 10-K. Significant risk factors are disclosed in the 10-K and updates for significant changes in risk are disclosed on a quarterly basis in the 10-Q.

The Audit Committee of the Board of Directors plays an important role in the reporting component of enterprise risk management. The Audit Committee assists the Board in monitoring the integrity of the Company's financial statements, overseeing the Company's relationship with its independent accountants, monitoring the performance of the Company's internal audit function and its independent accountants, and monitoring the Company's

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414879

compliance and ethics program. The Audit Committee also reviews quarterly earnings releases, the 10-Q's and the 10-K before filing.

Compliance with reporting requirements of the ABC circulation rules is integral to reliable reporting of circulation statistics for each daily newspaper. The Company's circulation compliance programs are overseen by Tribune Publishing's Vice President of Circulation, and include standard policies and procedures, oversight by the business unit finance department, periodic internal audits of circulation data, annual audits by ABC, and the completion of a quarterly questionnaire by each business unit covering key circulation data.

## COMPLIANCE OBJECTIVES

Compliance is the final critical component of enterprise risk management. For a number of years, Tribune has employed a formal process for identifying the significant laws and regulations that affect the Company's business operations, determining the potential exposures in the event of non-compliance, and assessing the Company's existing compliance systems. Each key compliance area has a process owner, who is responsible for ensuring compliance with those laws or regulations. The vice president of auditing oversees the Company's compliance and ethics program and regularly confers with the general counsel's office and controller on significant matters.

In November 2004, the amended U.S. Sentencing Commission Guidelines for Organizations were enacted. These guidelines require that a company's board of directors be responsible for the oversight of the compliance and ethics program and that the board should be knowledgeable about the content and operation of that program. In Tribune's case, and for many years, the Board has delegated that oversight authority to the Audit Committee.

The vice president of auditing reports annually on the status of the compliance and ethics program to the Audit Committee. Exhibit IV on pages 17 – 22 is a summary of the Company's key compliance areas, potential exposures/risk assessments, compliance systems and the members of management responsible for ensuring that those compliance systems are effective.

The Company's Code of Business Conduct is another key element of its compliance and ethics program. The Company first adopted a Code of Business Conduct in 1988. The current Code is in full compliance with the New York Stock Exchange (NYSE) rules and was last reviewed with the Board at the July 2006 meeting. The purpose of the Code is to help maintain ethical business practices throughout the Company. The Code provides a clear statement of the kinds of conduct that violate Company policy and also provides clear guidance on how to respond when a violation is encountered. All officers and managers are responsible for communicating the Code to employees on an ongoing basis. Each business unit has the primary responsibility for monitoring compliance with the Code.

NYSE rules require all listed companies to adopt and disclose a code of business conduct applicable to directors, officers and employees. Any waiver of the code for executive officers and directors may be made only by the board of directors or a designated board committee and must be promptly disclosed to the shareholders. The rules also provide a list of the most important topics to be covered by the code of business conduct. The Company's current Code of Business Conduct is in full compliance with the NYSE rules.

6

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414880

Each year, the Code of Business Conduct is provided to all business units for distribution to the Company's employees (unless prohibited by union contracts). The annual certification process is completed on-line using a web-based tool hosted by an outside vendor, LRN. In addition, Tribune partnered with LRN to develop an online training class geared towards ethics and our Code of Business Conduct. This class, which takes about 30-45 minutes to complete, provides employees with an ethical decision-making model and ends with a quiz that each employee must pass before signing the annual compliance statement. All employees that sign the annual code compliance statement are required to take this class before completing an on-line certification statement affirming their understanding of and compliance with the Code and disclose any possible exceptions. These employees are selected based upon a risk analysis and generally include all managers and above, as well as those who handle confidential information such as finance, sales, purchasing and information technology personnel or employees who have any level of approval authority. Internal Audit and the Legal Department then review compliance statements that disclose relationships or circumstances that might be considered a violation of the Code or a conflict of interest.

Code violations or conflicts of interest are handled promptly and consistently. During the year, Internal Audit will also follow up on disclosed instances of potential conflicts of interest to ensure that adequate internal controls have been implemented by the appropriate business units. For example, if an employee has a financial interest in an outside entity that conducts business with a business unit, that business unit is responsible for implementing adequate internal controls to ensure that all such transactions are approved independently by a business unit manager.

Additionally, a Code of Ethics for the CEO and Senior Financial Officers was adopted by the Board at its meeting in May 2003. This code is required by the Sarbanes-Oxley Act and applies to Dennis FitzSimons (chief executive officer), Don Grenesko (chief financial officer) and Mark Mallory (controller).

A summary of the results from the annual Code of Business Conduct Certification and Compliance Process is included as Exhibit V on page 23. The Code of Ethics for CEO and Senior Financial Officers is also included as part of the exhibit as are copies of the respective Codes and compliance statements.

As a supplement to the Code of Business Conduct, Tribune has a Code of Editorial Principles (updated in 2006) that covers journalists and other editorial employees of Tribune Publishing and Tribune Broadcasting. This code is designed to promote that:

- Our name signifies integrity and courage in gathering and presenting the news.
- The news we deliver—as text, audio or video—is accurate and free of the influence of special interests, whether public or private, commercial or political, our own or that of our friends.
- We do not make news decisions in a self-interested manner, or needlessly damage or cause pain to those we cover.
- We respond to the needs and interests of our communities with journalism of high public purpose and broad individual appeal.

Tribune developed a Supplier Code of Conduct in 2006 that is applicable to employees, temporary employees and independent contractors that work for our suppliers. The code is

7

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414881

designed to require suppliers to conduct their business dealings with Tribune in accordance with the code and in compliance with all laws applicable to their business, wherever conducted.

The Company also has a Confidential Ethics Line managed and staffed by a third party vendor. The toll-free number provides a confidential method for employees, vendors and others to report suspected illegal or unethical behavior or violations of Tribune's Code of Business Conduct. Calls are documented and reviewed by a team made up of representatives from the Law Department, Internal Audit and Human Resources. Complaints are sent to appropriate areas of the Company for investigation. Any significant accounting, internal control or auditing matters are reported to the Audit Committee.

Tribune's Internal Audit Department plays a key role in the Company's enterprise risk management program. Internal Audit performs financial and operational audits throughout the Company. The internal audits determine if necessary internal controls are in place and functioning properly, monitor the accuracy of financial reporting systems and evaluate compliance with the Company's prescribed business practices and procedures. Internal Audit has a detailed reporting process that assures that any internal control deficiencies, inaccurate reporting, or non-compliance with Company policies or procedures are reported and corrected. Status reports summarizing the work of Internal Audit are presented at each Audit Committee meeting. This meeting's report is under Tab 5.

We believe the Company's existing compliance and ethics programs are adequate and functioning well. The Company has established appropriate standards and procedures and has communicated them to employees. The Company's training, monitoring and reporting systems are designed to identify potential problems early and reduce the risk of non-compliance. Internal resources from internal audit, finance, legal and human resources departments are used as well as outside consultants. Identified potential risks and exposures are being addressed appropriately. In addition, the internal audit department annually reviews the compliance assessments for accuracy and adequacy.

**CONCLUSION**

While not every risk can be identified and avoided, management understands the importance of risk management and practices it throughout the Company. Tribune's management believes that its existing structure, organization, business practices, policies, and procedures address the critical components of good enterprise risk management. Critical strategic, operations, reporting and compliance risks are continuously addressed in the day-to-day management of the Company.

TGC
11/27/2007

8

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414882

# TRIBUNE COMPANY
# BUSINESS CONTINUITY PLANNING UPDATE

The following are updates regarding business continuity plans for the business units and Tribune Tower.

## PUBLISHING

Under the current Publishing Group plans, the type of newspaper that could be published in the event of a major disruption depends on the magnitude and the timing of the disruption. Even in the most severe circumstances, business units will be able to publish a limited distribution "core" newspaper with little or no advertising. The Group continues to believe that creation of fully redundant production and computer systems to cover for a catastrophic destruction of office and production facilities is not cost-justified given the extremely low probability of occurrence.

Fortunately, no publishing business unit had to enact its business continuity plan during 2007. The Publishing Group continues to implement lessons learned from past hurricanes addressing unique employee issues such as the ability to locate all employees and provide them shelter, and production issues such as availability of water, gasoline and electricity. In addition, the Orlando Sentinel maintains a leadership role in the Florida Newspapers Business Continuity Group whose goal is to allow the 18 major Florida newspapers to share production capabilities for any newspapers hit by a hurricane.

To prepare the newspapers for the potential impact of an Avian flu pandemic on business operations, sales and distribution, the Orlando Sentinel developed and implemented a plan this year that will be used as a template by all Tribune newspapers for their own plans in 2008.

## TRIBUNE INTERACTIVE

The main risk for Tribune Interactive (TI) is an outage at its main hub, or "hosting" site provided by AT&T. TI does have an alternate hosting location, but it provides considerably less capacity and functionality than the main site and is only good for outages of 5 hours or less. During that time, however, the alternate location is capable of hosting a slimmed-down version of our newspapers' websites that can easily be populated with breaking news stories. Given the growing importance of interactive operations, TI management has developed a plan to establish a fully redundant alternate hosting location and is currently analyzing capital requirements.

TI's disaster scenarios include denial of service, unavailability of websites due to a communication outage, and loss of a major piece of computer software or hardware. TI management performs testing of their business continuity plan by section throughout the year and mandates that the business units test their plans as well. They also perform comprehensive, recurring communications tests during and after work hours to ensure that employees are reachable and know whom to contact.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414883

## BROADCASTING

The Broadcasting Group plans acknowledge that the incremental benefit of fully redundant back-up systems (such as back-up transmitter facilities for all stations) does not justify the cost. Instead, in the event of loss of the studio facility, each station has the capability to receive from a sister station a fully integrated program stream complete with spots and deliver it to the local market transmitter for distribution. This satellite feed is also available to cable systems and satellite providers to restore service to their customers. With this capability, a station can continue broadcasting to up to 85% of its market, even if it suffered a severe disruption at its studio or transmitter facility or both.

Like Publishing, none of the stations had to implement any portions of their business continuity plans during the year. The fires in Southern California only impacted the phone lines at the transmitter site for the San Diego station, and the station never went off the air. The Broadcasting Group continues to expand its capacity to run multiple stations out of a single location. For example, Seattle and Indianapolis stations have the ability to run four to five stations out of their respective locations. The Broadcasting Group also continues to develop back-up systems for its digital signal. Due to restricted capital, they have been phasing in these capabilities, starting with the largest stations, and are working toward total digital redundancy by 2010.

## TRIBUNE TOWER

The business continuity plan for Tribune Tower covers all of the Company's corporate departments. Some of the key elements of the plan include:

- Maintaining a crisis management team and a clearly defined notification process to inform key senior managers of major emergencies.
- Educating employees about emergency procedures through evacuation drills, educational pamphlets and informational e-mails.
- Sustaining emergency communications channels through a toll-free employee information number, Tribune's Internet and intranet websites, and emergency calling trees.
- Assessing key employee-related issues that could arise in an emergency (e.g., payroll/benefits continuation, financial assistance, modifications to existing medical policies).
- Identifying alternate workspace in Chicago that could be used if the Tower was not accessible.

Like the plans at the business units, the Tribune Tower plan is updated every six months. Periodic tests are also performed by management to ensure that all information is accurate and that employees are aware of their responsibilities in case of an emergency.

Ongoing initiatives regarding the Tower plan involve broadening testing scenarios to address a "total destruction" situation and maintaining a high level of employee awareness of the plan's key aspects. Additionally, management continues to implement Tribune Tower's fire sprinkler plan. Currently, over 50% of the building is equipped with sprinklers and the remainder of the Tower will be fitted with automatic sprinklers over the next several years.

10

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414884

## OVERALL ASSESSMENT

Management believes that the business continuity plan designs are reasonable and practical. The plans are adequately designed to minimize the impact of various levels of disaster and stabilize critical functions until normal operations can resume. The natural disasters of the past few years have been the true test of effectiveness of the Company's plans.

TGC
11/25/2007

11

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414885

Exhibit II

**TRIBUNE COMPANY**
**INSURANCE COVERAGE SUMMARY**
**FOR FISCAL 2007**
**($ in millions)**

| | | | | 2007 Expense | | |
| | | | Coverage Terms | | | Losses within | |
| | Limit | Deductible | Primary Underwriters | Premium | Deductible | Total |
|---|---|---|---|---|---|---|
| **Liability:** | | | | | | |
| Auto, General and Umbrella | $173 | $1.0 | Zurich, St. Paul, Chubb, AWAC | $2.6 | $3.1 | $5.7 |
| Workers' Compensation | Statutory | 1.0 | Zurich | 1.3 | 14.6 | 15.9 |
| Media Liability (Libel/Slander) | 161 | 1.0 | Chubb, St. Paul, Chubb, AWAC | 0.6 | - | 0.6 |
| Aviation/Helicopter use | 270 | - | Global Aerospace | 0.1 | - | 0.1 |
| Cubs (1) | 420 | | | 2.5 | - | 2.5 |
| **Property/Business Interruption (2)** | 4,000 | 2.5 | | 4.3 | - | 4.3 |
| **Other:** | | | | | | |
| Directors & Officers (3) | 200 | | Chubb, AIG, ACE, Zurich | 3.1 | - | 3.1 |
| Fiduciary (ERISA) (4) | 50 | | AIG, Chubb, Axis, HCC, St. Paul | 0.7 | - | 0.7 |
| Pollution | 100 | 0.5 | Indian Harbor/XL Capital | 0.1 | - | 0.1 |
| Fidelity (Crime) and all other | 20 | 0.25 | Chubb, AIG | 0.5 | - | 0.5 |
| Broker, Claim Admin & Attorney Fees | | | | 1.6 | | 1.6 |
| **Total Expenses** | | | | $17.4 | $17.7 | **$35.1** |

(1)  This coverage is negotiated and placed by Major League Baseball and paid by the Cubs.
(2)  Deductible is principally the greater of $2.5 million or 2% of insured values for hurricane or 5% of insured values for earthquake.
(3)  No deductible for officers and directors, the Company portion has a $25 million deductible.
(4)  No deductible for employees, $0.25 million deductible for non-securities Company claims, $5 million deductible for securities claims.

JR
11/26/2007

12

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414886**

Exhibit III

# TRIBUNE COMPANY
## SUMMARY OF MAJOR FINANCIAL RISKS

The following summary provides background on Tribune's major financial risks. These risks, which are monitored primarily by the Company's Treasury Department, include items such as liquidity, acceleration of debt payments, derivative usage and loan guarantees. The Company's financial risk profile changed significantly in 2007 due to the substantial increase in debt and other financial obligations related to the leveraged ESOP transactions. Management continues to believe that these risks are manageable. The related risks are well documented and have been previously discussed with the Audit Committee and the full Board. The material risks discussed below have been disclosed in the Company's SEC filings.

## LEVERAGED ESOP TRANSACTIONS

The leveraged ESOP transactions involve the incurrence of substantial debt. Currently, the Company has approximately $9.4 billion of debt and $700 million of cash on its balance sheet. Upon completion of the second step of the leveraged ESOP transactions, the Company will have approximately $13 billion of debt and $200 million of cash on its balance sheet.

Management believes that the Company has the financial wherewithal to support the planned capital structure. A number of independent third parties have also analyzed the transaction. Valuation Research Corporation, the Company's solvency opinion firm, will present its preliminary findings to the Board at the December 4 meeting and is expected to render a solvency opinion to the Board prior to the closing of the second step of the leveraged ESOP transactions. The four lead underwriting banks, Bank of America, Citigroup, JPMorgan and Merrill Lynch, hired their own solvency firm and spent three months conducting due diligence on the Company and its financial prospects. Moody's and Standard & Poor's also analyzed the transaction and plan to rate the Company at "B" (negative outlook) once the second step of the leveraged ESOP transactions closes.

The Company recently prepared a Five-Year Financial Outlook report which management reviewed with the Board, Valuation Research, the lead underwriters, the rating agencies and Duff & Phelps, the financial advisor to the ESOP Trustee. That report outlined the Company's financial projections under three operating scenarios (base case, upside and downside) and, in all cases, the Company expects to generate free cash flow after making its interest payments, satisfy its financial covenants and repay its debt as it becomes due.

## LIQUIDITY

The Treasury Department monitors payment obligations to creditors and/or suppliers closely by preparing daily cash, debt and interest expense projections. The Five-Year Financial Outlook report shows that in our base case forecast the Company is expected to generate approximately $1.8 billion of cumulative free cash flow after interest payments. This is before our planned $100 million of annual investments and before proceeds from planned asset sales between 2008 and 2012. In addition, the Five-Year Financial Outlook report includes a list of assets that could also be sold if necessary to raise proceeds to repay debt and reduce overall leverage. The

13

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414887

Company also has a $750 million revolving credit facility in place through June 2013 with eight banks which assures access to readily-available funds. The Treasury Department maintains constant contact with our bank group to ensure strong relationships with these lending institutions.

In terms of debt maturities within the next 18 months, the Company has $262 million of medium term notes due in 2008 which we plan to refinance through a $262 million Delayed Draw Facility already established with our banks. In addition, $650 million of Term Loan X is due in December 2008 and $750 million of Term Loan X is due in June 2009. We plan to repay these amounts with $850 million of projected net proceeds from the sale of the Cubs/Wrigley Field/Comcast SportsNet, $300 million of projected net proceeds from a planned Asset Backed Commercial Paper program, $150 million of projected net proceeds from a planned TMCT mortgage financing, and on-going free cash flow from operations.

The Company's next meaningful debt maturity is in 2010 when $450 million of Notes mature. We expect to repay them with free cash flow and, if necessary, the revolving credit facility. After that, we will need to refinance the existing bank credit facilities when they mature in 2014. In addition, the Term Loan B tranche of the bank credit facility has an annual 1% required amortization which we expect to repay through free cash flow each year. Finally, the Company's pension plan is overfunded and requires minimal cash contributions each year.

## CHANGE IN INTEREST RATES

As a result of the leveraged ESOP transactions, our capital structure will be much more sensitive to changes in short-term interest rates than our previous capital structure. Assuming the Company funds the second step of the leveraged ESOP transactions with $3.7 billion of floating-rate debt ($2.1 billion of incremental Term Loan B and $1.6 billion of bridge), approximately 61% of the Company's total debt outstanding will be exposed to interest rate volatility. In this case, a one percentage point increase in short-term rates would increase Tribune's annual interest expense by approximately $82 million, or about 6% of our expected 2008 base case adjusted operating cash flow (including cash from equity investments).

Once the Company ultimately issues $1.6 billion of long-term, fixed-rate bonds to repay the floating-rate bridge, approximately 51% of the Company's total debt outstanding will be floating and exposed to interest rate volatility. In this case, a one percentage point increase in short-term rates would increase Tribune's annual interest expense by approximately $66 million, or about 5% of our expected 2008 base case adjusted operating cash flow (including cash from equity investments).

## ACCELERATION OF DEBT PAYMENTS

The bank credit facilities include two financial covenants which require: (i) the maintenance of a leverage test (debt-to-operating cash flow ratio) and (ii) the maintenance of an interest coverage test (operating cash flow-to-interest expense). The Treasury Department monitors these ratios frequently and provides evidence of compliance to the eight banks in the credit facility quarterly. As of September 30, 2007, the Company was in compliance with these covenants. The Five-

14

Year Financial Outlook report shows that assuming the second step of the leveraged ESOP transactions closes, the Company will be in compliance with these financial ratios through 2012. If the second step of the leveraged ESOP transaction did not occur, we would need to use the $700 million of cash currently on our balance sheet to repay debt and execute the sale of the Cubs/Wrigley Field/ComcastSportsNet to ensure that we maintain our ongoing compliance with these financial covenants. Otherwise, we would begin to get close to breaching these covenants in the second half of 2008. Tribune's long-term publicly-issued bonds do not have any material financial covenants, but do contain customary negative covenants.

Separately, the PHONES security allows holders to redeem the PHONES at any time for 95% of the then current market value of Time Warner stock, which the Company could partially finance with the sale of the 16 million shares of Time Warner it owns. The Company intends to own the Time Warner shares for as long as the PHONES remain outstanding.

Finally, subject to certain exceptions, loans under the credit agreement are required to be repaid with the following proceeds: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for borrowed money by the Company or any subsidiary (other than certain debt permitted to be incurred under the negative covenants contained in the credit agreement), (b) certain specified percentages of excess cash flow proceeds based on a leverage-based grid ranging from 50% to 0% and (c) 100% of the net cash proceeds from all asset sales, dispositions, share issuances by the Company's subsidiaries and casualty events, unless the Company reinvests the proceeds pursuant to the terms of the credit agreement. The Treasury Department monitors compliance with these covenants on an ongoing basis.

## DERIVATIVE USAGE

The Company has two types of derivative securities outstanding: (i) the PHONES which is a debt instrument that effectively monetized the Company's stake in AOL (now Time Warner) and (ii) four interest rate swaps. The PHONES, which is "marked-to-market" quarterly through the income statement, requires the Company to make fixed, 2% cash interest payments to holders annually. In addition, the Company intends to hold the 16 million Time Warner shares underlying the PHONES in order to fund a possible PHONES redemption and to help finance the PHONES at maturity in 2029.

In terms of the four interest rate swaps, one effectively converts the fixed-rate interest payments related to the $100 million of 7.5% debentures due 2023 into variable payments at a rate of LIBOR less 0.53%. This swap was entered into by Times Mirror Company in 1997. Morgan Stanley is the counterparty on this swap and is currently rated "Aa3" by Moody's and "AA-" by Standard & Poor's. The three other swaps effectively convert the floating-rate interest payments related to $2.5 billion of Term Loan B into fixed-rate payments at 8.31%. We entered into these swaps in July 2007 because the bank credit facility required that the Company effectively fix at least 35% of our total debt outstanding for a minimum of two years. These swaps have staggered maturities over the next five years. Barclays Bank is the counterparty on these swaps and is currently rated "AA" by Standard & Poor's. The four swaps are recorded at fair value in the Company's quarterly balance sheets.

15

## LOAN GUARANTEES OR OTHER COMMITMENTS FOR FUTURE FINANCING

Debt under the bank credit agreement is guaranteed by certain of the Company's direct and indirect subsidiaries and secured by a pledge of capital stock of two subsidiaries. The existing publicly issued notes and debentures also enjoy the benefit of the stock pledge, but not the guarantee. Any bonds or notes issued as part of the financing of the second step of the leveraged ESOP transactions would be guaranteed on a subordinated basis. The risk that Tribune needs to fund a material, unplanned cash requirement is slight. The Company does not have any third party loan guarantees, nor does it have any material commitments for future funding of equity investees. Tribune has agreed to fund up to 50% of the purchase price for Microsoft's investment in CareerBuilder in the event CareerBuilder does not have sufficient funds to consummate the purchase of the interest pursuant to the put option in 2014. The maximum potential liability for this guaranty is approximately $55 million. In addition, Tribune has approximately $65 million of letters of credit outstanding. The majority of these letters backstop self-insured worker's compensation liabilities and are statutory requirements.

## OFF-BALANCE SHEET FINANCING

Tribune Company does not have any off-balance sheet financing transactions. Importantly, any capital and/or real estate lease over $10 million must be approved by the Board similar to capital expenditures. All of the Company's borrowings are monitored centrally by the Treasury Department. In addition, Tribune's capital structure and financing needs are monitored by the Board frequently.

## SPECIAL PURPOSE ENTITIES

Tribune Company currently does not have any special purpose entities; however, the Company plans to establish a special purpose entity in connection with the formation of the planned Asset Backed Commercial Paper program.

## FOREIGN CURRENCY EXPOSURE

Tribune Company does not have material foreign currency exposure.


CB
11/28/2007

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414890

Exhibit IV

**TRIBUNE COMPANY**
**CORPORATE COMPLIANCE SUMMARY**

## GENERAL CORPORATE LAWS & REGULATIONS

| AREA | APPLICABLE LAWS AND REGULATIONS | POTENTIAL EXPOSURE | EXISTING COMPLIANCE SYSTEM | | MANAGEMENT RESPONSIBILITY |
|---|---|---|---|---|---|
| | | | INTERNAL | EXTERNAL | |
| Antitrust | • Sherman Act<br>• Clayton Act<br>• Robinson-Patman Act<br>• Hart-Scott-Rodino Antitrust Improvements Act (HSR) | • Fines<br>• Forced divestiture of business lines<br>• Unwinding of consummated transactions<br>• Disallowance of proposed acquisitions/joint ventures<br>• Criminal sanctions | • Corporate Law Department review of all acquisitions and significant transactions<br>• HSR notices for sizable acquisitions<br>• Written policies via the intranet and legal publications<br>• Seminars as required | • Consultation on key matters with Sidley Austin LLP and Patton Boggs LLP | Crane Kenney |
| Federal Communications Commission | • Federal Communications Act<br>• Telecommunications Act of 1996<br>• FCC regulations<br>• Various state laws | • Loss of broadcast license<br>• Fines<br>• Letters of admonition<br>• Sanction at time of license renewal<br>• Non-renewal of license<br>• Litigation | • Corporate Law Department review of broadcasting procedures and practices, including one-on-one meetings<br>• Spot checks during station visits<br>• Meetings, seminars and conference calls with station management<br>• Written handbooks and memos | • Annual review and consultation on key matters with Sidley Austin LLP's Washington, D.C. office | Chuck Sennet |
| Federal Trade Commission | • Consumer Products Safety Act<br>• Can-Spam Act of 2003<br>• Telephone Consumer Protection Act<br>• Telemarketing Sales Rule<br>• Various states' DNC laws | • Small exposure as CPSA applies only to Tribune Interactive<br>• Product recalls<br>• Fines | • Seminars as required<br>• Formal Do Not Call policies<br>• Can-Spam awareness training | • Consultation on key matters with Sidley Austin LLP | Crane Kenney/<br>Vince Casanova |
| Securities Laws/ SEC/NYSE | • Securities Acts<br>• Insider Trader Enforcement Act<br>• Regulation FD (Fair Disclosure)<br>• NYSE Listing Standards<br>• Sarbanes-Oxley Act of 2002 | • Fines<br>• Criminal and civil sanctions<br>• Comments on any violations in the proxy statement<br>• Financial restatements and public disclosure of violations<br>• Securities related lawsuits against company and/or its directors or officers. | • Centralized filing procedures for Section 16(a) reports<br>• General Counsel clearance of trading in Tribune or affiliated company stock for senior executives<br>• Corporate Law Department coordination with Investor Relations regarding shareholder/analyst communications, with Human Resources regarding stock related program provisions, practices and communications, and with Risk Management to determine insurance coverage for related lawsuit exposure<br>• Corporate oversight of compliance with NYSE and Sarbanes-Oxley rules and regulations | • Consultation on key matters, including all public securities filings and corporate governance matters, with Sidley Austin LLP and Wachtell, Lipton, Rosen & Katz | Crane Kenney/<br>Don Grenesko /<br>Gary Weitman |

17

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## CORPORATE COMPLIANCE SUMMARY

### GENERAL CORPORATE LAWS & REGULATIONS (continued)

| AREA | APPLICABLE LAWS AND REGULATIONS | POTENTIAL EXPOSURE | EXISTING COMPLIANCE SYSTEM | | MANAGEMENT RESPONSIBILITY |
|---|---|---|---|---|---|
| | | | INTERNAL | EXTERNAL | |
| Ethics | • No specific law - business ethics | • Misappropriation of Company assets<br>• Shareholder lawsuits | • Annual Code of Business Conduct compliance review<br>• Annual Code of Ethics compliance review for the Corporate CEO, CFO and Controller<br>• Editorial Code of Ethics<br>• Ethics training | • PricewaterhouseCoopers (PwC) review of officer compliance statements | Thomas Caputo/<br>Gerry Kern |
| Newspaper Circulation | • Audit Bureau of Circulation Regulations | • Circulation adjustments<br>• Censure by ABC<br>• Advertiser litigation/rebates | • Standard group-wide reports and procedures regarding circulation practices<br>• Established rotation of business unit internal audit reviews<br>• Circulation specific questions included in quarterly compliance questionnaires and signed by the VP/Circulation at business units<br>• Review of key circulation statistics by business unit finance staffs<br>• Circulation training of business unit CFOs and finance staff | • ABC annual audit at all daily newspapers | Scott Smith/<br>Vince Casanova |

### ENVIRONMENTAL, SAFETY & HEALTH, PROPERTIES AND RISK MANAGEMENT LAWS AND REGULATIONS

| Environmental | • Federal Environmental Protection laws<br>  - Hazardous Waste (RCRA)<br>  - Superfund (CERCLA)<br>  - Air Emissions/Permitting (CAA)<br>  - Spills, Releases & Discharges<br>    (CWA, SARA, EPCRA, POTW) | • Regulatory citations and penalties<br>• Participation in site remediation activities or contribution to Superfund cleanup for historic waste disposal<br>• Third party litigation for property damage and health<br>• Adverse publicity originating from an environmental mishap | • Corporate oversight and risk assessment with Legal Dept., Financial Reporting and Risk Management<br>• Established network of responsible business unit representatives<br>• Written procedures and communication where exposure is identified<br>• Due diligence reviews on all acquired properties with appropriate follow-up<br>• Electronic deadline management program<br>• Regular conference calls, information updates and site visits | • Consultation on key matters with Tribune Law Department and external legal counsel<br>• Consultation with environmental engineers and remediation experts | Business Units Coordinated by Mark Anderson (Los Angeles Times) |
|---|---|---|---|---|---|
| Safety and Health | • Employee safety & health laws:<br>  - Occupational Safety and Health Act regulations (OSHA)<br>  - Department of Transportation regulations<br>  - Americans with Disabilities Act | • Regulatory citations and penalties.<br>• Worker's compensation costs<br>• Third party litigation stemming from product liability actions<br>• Adverse publicity originating from a serious incident | • Established network of responsible business unit representatives<br>• Written procedures and communication where exposure is identified<br>• Regular conference calls | • Consultation on key matters with Tribune Labor & Employee Relations Department, and external legal counsel<br>• Consultation with workplace safety and health experts, industrial hygienist and management advisors | Mark Thomas/<br>Mark Anderson/<br>Myna Ramirez/<br>Business Units |

18

Professionals' Eyes Only<br>Highly Confidential -- Attorneys' Eyes Only

TRB0414892

**TRIBUNE COMPANY**
**CORPORATE COMPLIANCE SUMMARY**

## ENVIRONMENTAL, SAFETY & HEALTH, PROPERTIES AND RISK MANAGEMENT LAWS AND REGULATIONS (continued)

| AREA | APPLICABLE LAWS AND REGULATIONS | POTENTIAL EXPOSURE | EXISTING COMPLIANCE SYSTEM | | MANAGEMENT RESPONSIBILITY |
|------|---------------------------------|--------------------|-----------|--------|---------------------------|
| | | | INTERNAL | EXTERNAL | |
| Risk Management | • State insurance laws and regulations<br> - Workers' Compensation<br> - Auto Liability<br> - General Liability<br> - Captive Insurance Company | • Employee and third party litigation on work related injuries, auto liability or public/general liability hazards<br>• State/regulatory penalties<br>• Workers' Compensation Commission oversight<br>• Revocation of insurance license or restriction of business plan by Vermont regulators | • Corporate oversight of insurance programs and risk management function<br>• Established network of business unit contacts for insurance issues, claim investigations and litigation support<br>• Periodic claim review meetings with Corporate Law Department<br>• Participation of Corporate HR in serious complex claims<br>• Participation of Corporate Labor/Employee Relations in serious or complex claims<br>• Internal Multimedia Insurance Company officers and directors | • Consultation on key matters with insurance brokers Aon and Marsh and with external legal counsel<br>• National service agreement with Gallagher Bassett to administer Tribune claims<br>• Aon actuarial services<br>• Aon Vermont captive management firm<br>• External Multimedia Insurance Company officers and directors<br>• Vermont auditor Johnson Lambert | Jack Rodden/<br>Cara Leeman |
| Building Codes (Tribune Tower) | • Local building codes and fire safety regulations<br>• Commission of Chicago Landmarks regulations | • Penalties and fines<br>• Licenses and permits not renewed<br>• Remediation costs | • Written procedures and communication where exposure is identified<br>• Ongoing inspections<br>• Tracking system for permits, inspections, licenses<br>• Review meetings<br>• Ongoing training<br>• Documented and approved fire sprinkler implementation plan | • Licensed contractors<br>• Ongoing inspections<br>• Consultation on structural engineering matters with Wiss, Janey, Elstner Associates | Mary Jo Mandula |

## FINANCIAL LAWS AND REGULATIONS

| AREA | APPLICABLE LAWS AND REGULATIONS | POTENTIAL EXPOSURE | INTERNAL | EXTERNAL | MANAGEMENT RESPONSIBILITY |
|------|---------------------------------|--------------------|----------|----------|---------------------------|
| Income Taxes - Federal, State, Local and International | • Internal Revenue Code<br>• Treasury regulations<br>• State and local laws and regulations<br>• International tax laws & treaties | • Additional tax liabilities<br>• Penalties, interest and fines<br>• Criminal and civil sanctions | • Corporate oversight and risk assessment<br>• Centralized preparation and review of all income tax returns<br>• Established network of responsible business representatives<br>• Hiring of technically competent tax staff and maintaining that competence through a regular program of continuing education<br>• Consultation with business units on sales and use taxes | • Consultation on key matters with PwC, KPMG and legal counsel including Mayer Brown Rowe & Maw, Horwood Marcus & Berk, Sidley Austin LLP | Pat Shanahan/<br>Mark Mallory |

19

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414893

# TRIBUNE COMPANY
## CORPORATE COMPLIANCE SUMMARY

### FINANCIAL LAWS AND REGULATIONS (continued)

| AREA | APPLICABLE LAWS AND REGULATIONS | POTENTIAL EXPOSURE | EXISTING COMPLIANCE SYSTEM | | MANAGEMENT RESPONSIBILITY |
|---|---|---|---|---|---|
| | | | INTERNAL | EXTERNAL | |
| Financial Policies and Procedures | • Generally accepted accounting principles (GAAP)<br>• Securities and Exchange Commission (SEC) rules and regulations<br>• Sarbanes-Oxley Act of 2002<br> - including Section 404 covering internal controls over financial reporting | • Penalties and fines<br>• Financial restatements<br>• SEC sanctions<br>• Shareholder litigation<br>• Criminal sanctions | • Centralized preparation of all consolidated financial statements<br>• Company-wide financial policies<br>• Quarterly compliance questionnaires, signed by controller, CFO and CEO, and schedules completed by all business units<br>• Disclosure Committee and Audit Committee review of annual 10-Ks and quarterly 10-Qs, earnings press releases, significant accounting and internal control issues, and audit plan<br>• Regular discussions with group and business unit personnel about financial information<br>• Centralized project team and steering committee managing Section 404 Internal Controls Certification project<br>• Internal audits/compliance reviews<br> - including work necessary to be in compliance with Section 404<br>• Anti-fraud program<br>• Due diligence reviews on all acquired companies with appropriate follow-up<br>• Hiring of technically competent financial staff and maintaining that competence through a regular program of continuing education | • PwC integrated financial and internal control audits, including reviews of 10-Ks and 10-Qs<br>• Consultation on key matters, including special filings, with PwC, Sidley Austin LLP and Wachtell, Lipton, Rosen & Katz<br>• Audit Committee reviews of earnings press releases and 10-Q/10-K filings | Mark Mallory/ Brian Litman |
| Escheatment | • State laws governing uncashed checks and other unclaimed property that must be remitted to the states after specified time periods | • Penalties and fines<br>• Interest on amounts owed | • Established network of responsible business unit representatives<br>• Comprehensive survey for all acquired companies with appropriate follow-up<br>• Written policies and procedures | • Assistance from Kimberly Unclaimed Property Services (KUPS) with due diligence, processing and filing of escheatable items | Mark Mallory/ Jennifer Uson |
| Treasury | • Statutory requirements | • Penalties and fines<br>• Interest on amounts owed | • Daily cash and debt projections<br>• $750 million revolving credit facility<br>• Board approval for capital expenditures and leases over $10 million | • Consultation on key matters with relationship banks | Chandler Bigelow |
| Credit Card Information | • Payment Card Industry (PCI) security standards | • Industry specific fines for non-compliance (credit cards)<br>• Public disclosure requirements for any security breach of data covered by privacy laws | • Annual PCI-required network scans and surveys | • National service agreement with Cynergistics to complete network scans | Kathy Beiriger |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414894

## TRIBUNE COMPANY
## CORPORATE COMPLIANCE SUMMARY

### LABOR LAWS AND REGULATIONS

| AREA | APPLICABLE LAWS AND REGULATIONS | POTENTIAL EXPOSURE | EXISTING COMPLIANCE SYSTEM | | MANAGEMENT RESPONSIBILITY |
|------|---------------------------------|--------------------|------------------------------|--|--------------------------|
| | | | INTERNAL | EXTERNAL | |
| Employee Benefits | • Employee Retirement Income Security Act (ERISA)<br>• Internal Revenue Code<br>• Department of Labor Regulations<br>• Social Security Act<br>• Consolidated Omnibus Budget Reconciliation Act (COBRA)<br>• Health Insurance Portability and Accountability Act (HIPAA)<br>• Federal and state privacy laws<br>• Sarbanes-Oxley Act of 2002 | • Penalties and fines<br>• Disqualification of benefit plans<br>• Disallowance of tax deductions<br>• Criminal and civil sanctions<br>• Imputed income to employees if a plan is disqualified<br>• ERISA or fiduciary related lawsuits | • Centralized benefits administration<br>• Employee Benefits Committee review of all significant matters<br>• Written procedures<br>• Ongoing reviews and reconciliations of trust and plan accounts<br>• Monthly reconciliation of pension plan activity<br>• Daily reconciliation of 401(k) activity<br>• Coordination with Risk Management and Law Department on lawsuits | • Consultation on key matters with McDermott Will & Emery, and Hewitt Associates<br>• PwC limited review of plan financial statements and preparation of IRS information returns (Form 5500)<br>• Periodic audits of vendors by outside firms such as Hewitt | Luis Lewin/<br>Mark Harris/<br>Chandler Bigelow |
| Employee Relations/ Employment Law | • Drug Free Workplace Act<br>• Employee Polygraph Protection Act<br>• Age Discrimination in Employment Act<br>• Americans with Disabilities Act<br>• Family Medical Leave Act<br>• Immigration Reform and Control Act<br>• Title VII (EEOC)<br>• Worker Adjustment and Retraining Notification Act<br>• Executive Order 11246 (obligations of federal contractors)<br>• 42 United States Code Sections 1981 and 1983(local civil and human rights ordinance)<br>• The Fair Credit Reporting Act<br>• The Rehabilitation Act<br>• Uniformed Services Employment and Reemployment Act<br>• Federal Bankruptcy Act<br>• State Unfair Competition Statutes<br>• State Laws relating to personnel records<br>• Civil Rights Acts of 1866 and 1991<br>• State and Municipal Human Rights Acts<br>• CA law AB1825 - harassment training | • Liquidated damages<br>• Punitive damages<br>• Additional pay<br>• Penalties and fines<br>• Attorney fees<br>• Federal contract debarment<br>• Compensatory damages<br>• Orders to reinstate employment | • Corporate oversight and coordination by the Labor & Employee Relations Department and Human Resource Service Center<br>• Established network of responsible, trained business unit representatives<br>• Written policies and procedures<br>• Ongoing training efforts<br>• Periodic employment/HR audits | • Consultation on key matters with Seyfarth Shaw, and other selected outside legal counsel | Luis Lewin/<br>Jim Osick/<br>Howard Weinstein |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414895

## TRIBUNE COMPANY
## CORPORATE COMPLIANCE SUMMARY

**LABOR LAWS AND REGULATIONS (continued)**

| AREA | APPLICABLE LAWS AND REGULATIONS | POTENTIAL EXPOSURE | EXISTING COMPLIANCE SYSTEM | | MANAGEMENT RESPONSIBILITY |
|---|---|---|---|---|---|
| | | | INTERNAL | EXTERNAL | |
| Labor Relations | • National Labor Relations Act<br>• State Labor Relations Statutes | • Cease and desist orders<br>• Bargaining orders<br>• Orders to reinstate<br>• Back pay | • Corporate oversight and coordination<br>• Established network of responsible, trained business unit representatives<br>• Targeted training as required | • Consultation on key matters with Seyfarth Shaw, and other selected outside legal counsel | Luis Lewin/<br>Jim Osick/<br>Howard Weinstein |
| Wage & Hour Laws | • Fair Labor Standards Act<br>• Equal Pay Act<br>• State wage & hour statutes | • Retroactive benefits awards<br>• Back contributions<br>• Reclassification of independent contractors as employees<br>• Payroll tax rate adjustments based on experience<br>• Liquidated damages<br>• Penalties and fines | • Corporate oversight and coordination by Labor & Employee Relations Department<br>• Established network of responsible, trained business unit representatives | • Consultation on key matters with Seyfarth Shaw, and other selected outside legal counsel | Luis Lewin/<br>Jim Osick/<br>Howard Weinstein |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414896

Exhibit V

# TRIBUNE COMPANY
## CODE OF BUSINESS CONDUCT AND CODE OF ETHICS

In August, the Code of Business Conduct was provided to all business units for distribution to all Company employees. Employees at all locations, union and non-union, are now receiving the Code, with one exception. At the Baltimore Sun, due to restrictive labor contracts, the Company has had to negotiate the right to implement the Code with each of the Sun's six labor unions. To date, the Code is distributed to all of the Sun's non-union employees and 96% of its unionized employees. The balance of unionized employees will be receiving the Code as each of their contracts come up for renegotiation.

Similar to prior years, about 12,000 employees were required to sign this year's code compliance statement. These employees were also required to score 80% or higher on the quiz at the end of the on-line ethics training class before signing their compliance statements. About 750 employees made some type of disclosure in their compliance statements, which is consistent with prior years. The vast majority of these consisted of minor issues such as the receipt of small gifts, second part-time jobs, relatives that work for competitors or advertisers, etc. After review by Internal Audit, only 30 of these disclosures were significant enough to warrant further investigation. For these items, appropriate actions were taken and the identified conflicts or exceptions were not material individually or taken as a whole. The coverage of employees asked to sign compliance statements this year was satisfactory and was applied consistently across the Company. Code violations or conflicts of interest were handled promptly and consistently, and there are no unresolved issues. A copy of the Code and related compliance statements are attached to this exhibit.

The Code of Business Conduct also requires that the Audit Committee review a summary of political contributions made by the Company since last year's corporate compliance report. The Code requires all contributions to be expressly permitted by law, recommended by the Vice President, Washington Affairs, and authorized by the Company's President and Chief Executive Officer. Our review indicated that the Company made only one political contribution during the past 12 months. In August 2007, the Cubs made a $1,500 contribution to the campaign fund of a local alderman. This payment was in compliance with the Code's requirements for political contributions.

Finally, no changes in existing laws or the NYSE listing standards have occurred this year that would necessitate any revisions to the Code of Ethics for the CEO and Senior Financial Officers. Tribune Company's CEO, CFO and Controller are in full compliance with all provisions of the document. A copy of the Code is attached to this exhibit.

TGC
11/26/2007

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414897

**TRIBUNE COMPANY**

**CODE OF BUSINESS CONDUCT**

<u>TABLE OF CONTENTS</u>

|        |                                                    | <u>PAGE</u> |
|--------|----------------------------------------------------|------|
| I.     | INTRODUCTION                                       | 1    |
| II.    | COMPLIANCE WITH LAWS AND COMPANY POLICIES          | 1    |
| III.   | AUTHORIZED TRANSACTIONS AND ACCURATE ACCOUNTING    | 1    |
| IV.    | IMPROPER PAYMENTS                                  | 2    |
| V.     | COMPETITION AND FAIR DEALING                       | 2    |
| VI.    | CONFLICTS OF INTEREST                              | 2    |
| VII.   | CORPORATE OPPORTUNITIES                            | 3    |
| VIII.  | CONFIDENTIALITY                                    | 4    |
| IX.    | PROTECTION AND PROPER USE OF COMPANY ASSETS        | 4    |
| X.     | POLITICAL CONTRIBUTIONS                            | 4    |
| XI.    | SECURITIES LAWS                                    | 4    |
| XII.   | FINANCIAL REPORTING                               | 6    |
| XIII.  | OPERATIONS REPORTING                              | 6    |
| XIV.   | WAIVERS OF THE CODE OF BUSINESS CONDUCT           | 6    |
| XV.    | REPORTING ANY ILLEGAL OR UNETHICAL BEHAVIOR       | 6    |
| XVI.   | COMPLIANCE PROCEDURES                             | 6    |
| XVII.  | REVIEW AND AMENDMENT                              | 7    |

July 2006

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414898

I.    INTRODUCTION

Integrity is one of the fundamental values to which Tribune Company (and, together with its subsidiaries, the "Company") is committed in carrying out its mission.  Truth, objectivity, and independence are the foundation of our business.  They are the standards that every employee, officer and director should meet in all business conduct.

The Code of Business Conduct is intended to help ensure compliance with the highest legal and ethical standards.  It is the responsibility of every employee, officer and director of the Company to understand and adhere to the Code.  Adherence to the Code is in no way intended to abridge the First Amendment rights of Tribune or its employees, discourage appropriate participation in community life or prohibit reasonable outside work.

Any employee who knowingly violates any provision of this Code will be subject to disciplinary action, including reprimand, suspension and/or termination.  It is also the responsibility of every officer and manager of the Company to ensure that employees reporting to them understand and comply with the Code.  *Employees who have questions concerning the Code or become aware of a possible violation of the Code should promptly contact their supervisor or Company legal counsel, or should follow the guidelines described in Article XIV of this Code.*

II.    COMPLIANCE WITH LAWS AND COMPANY POLICIES

It is Company policy to comply with all laws and government regulations applicable to our business.  With respect to the Company's business practices, the Company is committed to cooperating with government inquiries and takes seriously any investigation or review.  Notwithstanding this commitment, the Company reserves the right to protect the newsgathering and editorial process from inappropriate intrusion.  Employees should consult their supervisor or Company legal counsel about instances where there is doubt or ambiguity concerning legal requirements or appropriate practices.  Employees should also consult with Company legal counsel regarding any request for information, other than in the ordinary course of business, from any government official or agency before any information is furnished and before there is any agreement or understanding to furnish such information.

Additionally, employees are required to understand and comply with all applicable Company policies including, but not limited to, anti-harassment, equal employment opportunity, safe and secure workplace, substance abuse, employee confidential information and credit card information.  Employees may only include their eligible dependents in coverage under the Company's health and welfare benefit plans.

III.    AUTHORIZED TRANSACTIONS AND ACCURATE ACCOUNTING

Expenditures of Company funds and use of Company property should be made only as properly authorized.  The Company requires accurate and complete accounting in compliance with accepted accounting rules and controls.  All expenditures and payments should be properly recorded and documented.  Employees who suspect financial or accounting irregularities or fraud should report it immediately to their supervisor or Company legal counsel.

Revised July 2006

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414899

IV.    IMPROPER PAYMENTS

The Company does not permit or condone any illegal or improper payments, transfers or receipts. Employees should not offer, give, solicit or accept any money or anything else of value for the purpose of obtaining or bestowing business or preferential treatment. (This rule does not prohibit authorized and appropriate business entertainment and gifts. See Section V, below.)

No outside consultant, attorney, accountant, contractor, vendor, or agent of any kind should be used in any manner that would be contrary to this prohibition against illegal or improper payments. Fees, commissions and expenses that are paid to such outside agents should be based upon proper billings and reasonable standards for services rendered. As a general rule, payments should be for services or activities of such nature as to qualify for income tax deductibility.

V.    COMPETITION AND FAIR DEALING

We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices. Each employee, officer and director should endeavor to deal fairly with the Company's customers, suppliers, competitors and employees. With respect to our competitors, none should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other intentional unfair-dealing practice.

Employees should not provide or accept, from any person or entity doing business with the Company, discounts, business entertainment and/or gifts that exceed reasonable business standards. Employees should never solicit such discounts, entertainment or gifts. No cash or cash equivalents, such as gift certificates, should be accepted.

All funds expended for business entertainment and gifts must be fully and accurately documented and reflected in the books and records of the Company.

VI.    CONFLICTS OF INTEREST

It is Company policy that employees should avoid any personal or business relationships, dealings or investments that might create a personal interest that conflicts with the best interests of the Company. A conflict situation can arise when an employee, officer or director takes actions or has interests that may make it difficult to perform his or her Company work objectively and effectively. It is not possible to foresee or define with precision every situation that may constitute a conflict of interest. Conflicts may be actual, potential and even matters of perception. In addition, conflicts may occur in, but are not limited to, situations where an employee, officer or director, or a closely-related family member:[1]

---

[1]    Closely-related family members generally include an employee's, officer's or director's spouse (or other significant relationship), children, parents, brothers and sisters, and any person dependent on the employee for support.

Revised July 2006

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414900

1.   Has a significant financial interest[2] in, or obligation to, a competitor, supplier, or customer of the Company.

2.   Is employed, part-time or otherwise, by a competitor, supplier or customer of the Company (in the case of a family member, as a supervisor or manager), or sells products to Company employees or recruits Company employees to sell or distribute products.

3.   Serves on the board of directors of, or acts as a consultant or advisor to, a competitor, supplier or customer of the Company (other than at the request of the Company).

4.   Transacts business with the Company, including buying from or selling to the Company any goods or services (other than transactions in the ordinary course of the Company's businesses, e.g., newspaper subscriptions).

5.   Uses equipment, computer software and services, materials, supplies, content (including outtakes), data and other information or business relationships obtained in the course of employment with the Company to advance personal interests.

6.   Has a personal business interest that is similar or related to work the employee, the Company, or any of its business units performs or produces.

7.   Receives improper personal benefits as a result of his or her position in the Company.

8.   Receives a loan or loan guarantee from the Company.

Failure to disclose an actual or potential conflict of interest is a violation of the Code.  Conflicts of interest may not always be clear-cut, so if you have a question, you should consult with higher levels of management or Company legal counsel.  Any employee, officer or director who becomes aware of a conflict or potential conflict should bring it to the attention of a supervisor, manager or other appropriate personnel or consult the procedures described in Section XIV of this Code.

VII.   <u>CORPORATE OPPORTUNITIES</u>

Employees, officers and directors are prohibited from taking for themselves personally opportunities that are discovered through the use of corporate property, information or position without the consent of the Board of Directors.  No employee may use corporate property, information, or position for improper personal gain, and no employee may compete with the Company directly or indirectly.  Employees, officers and directors owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

---

[2]      An interest amounting to less than one percent of any class of securities listed on any of the national securities exchanges or regularly traded over-the-counter will not be regarded as a "significant" financial interest in the absence of unusual circumstances.

Revised July 2006

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414901

## VIII.  CONFIDENTIALITY

Employees, officers and directors must maintain the confidentiality of confidential information entrusted to them by the Company or its customers, except when disclosure is authorized by Company legal counsel or required by laws or regulations.  Confidential information includes all non-public information that might be of use to competitors, or harmful to the Company or its customers, if disclosed.  It also includes information that employees, suppliers and customers have entrusted to us.  The obligation to preserve confidential information continues even after employment ends.

## IX.  PROTECTION AND PROPER USE OF COMPANY ASSETS

All employees, officers and directors should endeavor to protect the Company's assets and ensure their efficient use.  Theft, carelessness and waste have a direct impact on the Company's profitability.  Any suspected incident of fraud or theft should be immediately reported for investigation.  Company equipment should not be used for non-Company business, though incidental personal use may be permitted.

The obligation of employees to protect the Company's assets includes its proprietary information.  Proprietary information includes intellectual property such as trade secrets, patents, trademarks and copyrights, as well as business, marketing and service plans, engineering and manufacturing ideas, designs, databases, records, salary information and any unpublished financial data and reports.  Unauthorized use or distribution of this information would violate Company policy.  It could also be illegal and result in civil or even criminal penalties.

## X.  POLITICAL CONTRIBUTIONS

No Company funds or assets may be contributed to any political candidate or political party, unless such contribution is expressly permitted by law, recommended by the Vice President, Washington Affairs, and authorized by the Company's President and Chief Executive Officer.  Any such payments shall be reported to the Audit Committee annually.  This prohibition relates only to the use of Company funds or assets.  It is not intended to discourage employees from making personal contributions to political candidates or parties of their choice.  (Other Company policies relating to editorial independence restrict personal contributions in some circumstances.)  Employees shall not be reimbursed by the Company in any way for personal contributions.

## XI.  SECURITIES LAWS

Insider Trading Is Prohibited.  Under the federal securities laws and this policy, directors, officers and other employees of the Company are prohibited from buying or selling Tribune Company securities while they are in possession of **material inside information** concerning the Company.  "Inside information" is any information that has not been publicly disclosed.  "Material information" is any information that would be of significance to an investor in deciding whether to buy, sell or hold a security or if it would have a substantial effect on the market price of a security if it were disclosed. These prohibitions apply not only to the employee but also to the employee's spouse,

Revised July 2006

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414902

children, relatives who share the individual's residence and certain trusts, partnerships or other entities controlled by the individual.

The Prohibition Also Applies To Other Companies' Securities. The insider trading prohibition also applies to securities of other companies. Employees who learn material inside information about other companies through their work at the Company are prohibited from trading securities of that company while they are in possession of material inside information about that company. This situation could arise in many contexts, including in regard to information employees may learn during the course of the preparation or release of news reports, and information employees may learn about existing or potential customers, suppliers, acquisition targets or business partners of the Company.

Inside Information Should Not Be Provided To Others. It is also a violation of the federal securities laws and this policy to provide other people (friends, financial advisors, business associates, etc.) with any material inside information. This is known as "tipping" and it can result in liability to the employee as well as the other person, even if the employee did not receive monetary profit from the other person's illegal trading. Accordingly, all employees should exercise extreme care when they are in possession of material inside information to ensure that such information is not disclosed, either on purpose or by accident, to any other person other than those to whom the information is essential for Company-related business, and even in that situation, the employee should make it known that such information has not been publicly disclosed.

Penalties For Violations Can Be Severe. In addition to being required to disgorge any profit from a securities trade made in violation of the insider trading prohibition, an individual is subject to a civil penalty of up to three times the profit gained or loss avoided and criminal penalties not exceeding $5,000,000 and/or imprisonment for 20 years. In addition, a "controlling person" (directors, officers, possibly supervisors and the Company itself) could be subject to a civil penalty equal to the greater of $1,000,000 or three times the profit gained or loss avoided by the violator.

Examples of Material Inside Information. Some examples of information about a company that might be material are:

- A proposed acquisition or divestiture.
- A stock split or a change in the dividend rate.
- A significant expansion or curtailment of operations.
- A significant change in revenues or earnings from those from a prior period or from those publicly projected.
- A significant product development or significant information regarding a product.
- The institution of a stock repurchase program.
- Extraordinary management or business developments.

If this type of information is known to an employee and has not been publicly disclosed by the company to which it relates, that employee is prohibited from trading in the securities of that company or encouraging others to trade in those securities.

Revised July 2006

5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414903

Employees are urged to contact their manager or supervisor if they have any questions regarding these rules. These standards related to the securities laws and the insider trading prohibition are not intended to prevent our journalists from reporting previously undisclosed information as part of their news reporting duties.

## XII.    FINANCIAL REPORTING

All employees involved in the Company's financial reporting process are responsible for ensuring that financial information is reported fully, accurately and in accordance with Company policies. Employees involved in the Company's reporting obligations as a publicly traded company are responsible for ensuring full, fair, accurate, timely and understandable disclosure in reports and documents filed or submitted to the Securities and Exchange Commission and in other public communications. Employees who suspect financial reporting irregularities or fraud should report it immediately to their supervisor or Company legal counsel.

## XIII.    OPERATIONS REPORTING

Employees involved in the Company's reporting regarding operations, including circulation reporting, are responsible for ensuring full, accurate and timely disclosure, adherence to the Company's policies and compliance with the rules set forth by third party reporting agencies, such as the Audit Bureau of Circulations. Employees who suspect any irregularities or fraud in connection with operations reporting matters should report it immediately to their supervisor or Company legal counsel.

## XIV.    WAIVERS OF THE CODE OF BUSINESS CONDUCT

Any waiver of this Code for executive officers or directors may be made only by the Board or a Board committee and will be promptly disclosed as required by law or stock exchange regulation.

## XV.    REPORTING ANY ILLEGAL OR UNETHICAL BEHAVIOR

Employees should talk to supervisors, managers or other appropriate personnel about observed illegal or unethical behavior and when in doubt about the best course of action in a particular situation. It is the policy of the Company not to allow retaliation for reports of misconduct by others made in good faith by employees. Employees are expected to cooperate in internal investigations of misconduct.

## XVI.    COMPLIANCE PROCEDURES

We must all work to ensure prompt and consistent action against violations of this Code. However, in some situations it is difficult to know right from wrong. Since we cannot anticipate every situation that will arise, it is important that we have a way to approach a new question or problem. These are the steps to keep in mind:

Revised July 2006

6

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414904

- <u>Make sure you have all the facts</u>. In order to reach the right solutions, we must be as fully informed as possible.

- <u>Ask yourself: What specifically am I being asked to do? Does it seem unethical or improper</u>? This will enable you to focus on the specific question you are faced with, and the alternatives you have. Use your judgment and common sense; if something seems unethical or improper, it probably is.

- <u>Clarify your responsibility and role</u>. In most situations, there is shared responsibility. Are your colleagues informed? It may help to get others involved and discuss the problem.

- <u>Discuss the problem with your supervisor</u>. This is the basic guidance for all situations. In many cases, your supervisor will be more knowledgeable about the question, and will appreciate being brought into the decision-making process. Remember that it is your supervisor's responsibility to help solve problems.

- <u>Seek help from Company resources</u>. In the rare case where it may not be appropriate to discuss an issue with your supervisor, or where you do not feel comfortable approaching your supervisor with your question, discuss it locally with your office manager or your Human Resources manager. If you prefer to write, address your concerns to: General Counsel, Tribune Company, 435 North Michigan Avenue, 6th Floor, Chicago, Illinois 60611. Alternatively, you can submit your question or issue via a confidential hotline by dialing 1-800-216-1772.

- <u>You may report ethical violations in confidence and without fear of retaliation</u>. If your situation requires that your identity be kept secret, your anonymity will be protected. The Company does not permit retaliation of any kind against employees for good faith reports of ethical violations.

- <u>Always ask first, act later</u>: If you are unsure of what to do in any situation, seek guidance <u>before you act.</u>

## XVII.  REVIEW AND AMENDMENT

Management shall periodically review and reassess the adequacy of this Code and recommend changes to the Board for approval. The Board reserves the right to amend this Code from time to time as it determines to be desirable or appropriate.

Revised July 2006

7

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414905

## TRIBUNE COMPANY
## STATEMENT OF COMPLIANCE WITH THE CODE OF BUSINESS CONDUCT
### (For Those Employees Required to Sign Quarterly Questionnaires)

I have received and read the Company's Code of Business Conduct, and I agree to comply with its provisions. I also affirm that my answers to the following questions are true and correct to the best of my knowledge. I understand that any intentional omission or misrepresentation of information on this form may result in disciplinary action, including termination. I further understand that, as an executor of the Company's Quarterly Questionnaires: (i) the Company will rely upon the accuracy and completeness of my Quarterly Questionnaires and (ii) I will have possession of confidential information that may preclude me from trading in the Company's securities at various times. I understand and agree that if a Quarterly Questionnaire is incomplete or inaccurate in any material respect, or if I engage in any act of fraud, insider trading or other securities law violation, the Company may (i) suspend or terminate my employment, (ii) suspend or cancel all of my outstanding stock options, both vested and non-vested and (iii) require me to forfeit to the Company any (A) cash bonus compensation and (B) shares received on the exercise of any Company stock options, in each case retroactive to the date of the inaccuracy or violation.

**If the answer to any question is yes, describe below or on an attached sheet. Even if you have disclosed an incidence in prior years, you must disclose it again, if still applicable.**

1.  Have you violated any provision of the Code? If yes, please describe.

    Yes [  ]          No [  ]

2.  Are you aware of any actual or possible conflict of interest (as described in Section VI of the Code) involving you or a closely-related family member? If yes, please describe (e.g., if you serve on the board of directors, or have a significant personal interest in a competitor, supplier, advertiser or customer, describe fully the interest and any transactions between such entity and the Company of which you are aware).

    Yes [  ]          No [  ]

3.  During the last twelve months, were you employed by, or did you act as an independent contractor, representative or agent for an entity other than the Company? (Exclude activities prior to beginning employment with the Company.) If yes, describe your responsibility for the other entity.

    Yes [  ]          No [  ]

4.  During the last twelve months, did you accept any single business gift, purchase discount or other benefit with a value in excess of one hundred dollars? If yes, describe the gift, discount or other benefit and provide the estimated value.

    Yes [  ]          No [  ]

5.  During the past five years, have you been convicted or pleaded guilty in a criminal proceeding (excluding minor traffic violations)? If yes, please describe.

    Yes [  ]          No [  ]


_____          _____
Name (Print or Type)                      Signature


_____          _____
Position / Department                     Date


_____          _____
Supervisor                                Phone number

---

FOR OFFICE USE ONLY:

___ Conflict      ____ Possible Conflict      _____ No Conflict (Check One)

_____ Department Head's Initials      _____ H.R. Initials      _____ C.E.O.'s Initials

Resolution/Action:  (e.g. if a possible conflict, describe management's procedure to ensure arms length dealings.)

_____

Revised 6/04

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414906

# TRIBUNE COMPANY

## STATEMENT OF COMPLIANCE WITH THE CODE OF BUSINESS CONDUCT

I have received and read the Company's Code of Business Conduct, and I agree to comply with its provisions. I also affirm that my answers to the following questions are true and correct to the best of my knowledge. I understand that any intentional omission or misrepresentation of information on this form may result in disciplinary action, including termination.

**If the answer to any question is yes, describe below or on an attached sheet. Even if you have disclosed an incidence in prior years, you must disclose it again, if still applicable.**

1.  Have you violated any provision of the Code? If yes, please describe.

    Yes [  ]          No [  ]

2.  Are you aware of any actual or possible conflict of interest (as described in Section VI of the Code) involving you or a closely-related family member? If yes, please describe (e.g., if you serve on the board of directors, or have a significant personal interest in a competitor, supplier, advertiser or customer, describe fully the interest and any transactions between such entity and the Company of which you are aware).

    Yes [  ]          No [  ]

3.  During the last twelve months, were you employed by, or did you act as an independent contractor, representative or agent for an entity other than the Company? (Exclude activities prior to beginning employment with the Company.) If yes, describe your responsibility for the other entity.

    Yes [  ]          No [  ]

4.  During the last twelve months, did you accept any single business gift, purchase discount or other benefit with a value in excess of one hundred dollars? If yes, describe the gift, discount or other benefit and provide the estimated value.

    Yes [  ]          No [  ]

5.  During the past five years, have you been convicted or pleaded guilty in a criminal proceeding (excluding minor traffic violations)? If yes, please describe.

    Yes [  ]          No [  ]

_____          _____
Name (Print or Type)                                      Signature

_____          _____
Position / Department                                     Date

_____          _____
Supervisor                                                Phone number

FOR OFFICE USE ONLY:

____ Conflict        ____ Possible Conflict        ____ No Conflict (Check One)

_____ Department Head's Initials          _____ H.R. Initials          _____ C.E.O.'s Initials

Resolution/Action:  (e.g. if a possible conflict, describe management's procedure to ensure arms length dealings.)

Revised 6/04

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414907

## CODE OF ETHICS FOR CEO AND SENIOR FINANCIAL OFFICERS
Adopted and effective as of May 6, 2003

All of the employees of Tribune Company (the "Company") are bound by the provisions set forth in the Company's Code of Business Conduct relating to ethical conduct, conflicts of interest and compliance with law. In addition, Tribune's Chief Executive Officer ("CEO"), Senior Vice President, Finance and Administration ("CFO") and Vice President and Controller ("Controller"), are subject to the following additional policies:

1.  The CEO, CFO and Controller are responsible for full, fair, accurate, timely and understandable disclosure in the periodic reports filed by the Company with the SEC and in other public communications. Accordingly, it is the responsibility of the CEO, CFO and Controller promptly to bring to the attention of the Disclosure Committee any material information that affects the disclosures made by the Company in its public filings.

2.  The CEO, CFO and Controller shall promptly bring to the attention of the Disclosure Committee, the Audit Committee and the Company's auditors any information concerning (a) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

3.  The CEO, CFO and Controller shall promptly bring to the attention of the General Counsel and the Audit Committee any information concerning (a) any violation of this Code, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls and (b) evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

4.  The Board of Directors shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of this Code by the CEO, CFO or Controller. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to this Code. In determining what action is appropriate in a particular case, the Board of Directors or such designee shall take into account all relevant information, including the nature and severity of the violation, whether the violation was a single occurrence or a repeated occurrence, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the violation as to the proper course of action and whether or not the individual in question had committed other violations in the past.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414908

Any waiver of this Code for the CEO, CFO or Controller may be made only by the Board or a Board committee and will be promptly disclosed as required by law or stock exchange regulation.

Management shall periodically review and reassess the adequacy of this Code and recommend changes to the Board for approval. The Board reserves the right to amend this Code from time to time as it determines to be desirable or appropriate. Any amendment of this Code will be promptly disclosed as required by law or stock exchange regulation.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414909

7

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only
TRB0414910

## TRIBUNE COMPANY
## REASSESSMENT OF AUDIT COMMITTEE CHARTER

New York Stock Exchange (NYSE) rules require audit committees to have a written charter describing the committee's purpose, mission, duties, responsibilities, relationships with the independent accountants and the internal audit function, and access to outside consultants. The Audit Committee's current charter was approved by the full board in February 2006. The Audit Committee's charter requires the Audit Committee to review and reassess the charter's adequacy each year.

In February 2007, the Company implemented a Related Person Transactions Policy in response to corporate governance disclosure rules that were amended by the SEC in late 2006. In Tribune's case, the Board has delegated the initial review and approval of related party transactions to the Audit Committee.

Related persons include the Company's executive officers, directors, 5% or more beneficial owners of Tribune common stock, immediate family members of these persons, and entities in which one of these persons has a direct or indirect material interest. Procedurally, the Company's General Counsel is to advise the Audit Committee when he becomes aware of a transaction with a related party exceeding $120,000. The Audit Committee is then required to consider all relevant factors when determining whether to approve the transaction including whether the terms of the proposed transaction are at least as favorable to the Company as those that might be achieved with an unaffiliated third party. Among other relevant factors, the Audit Committee needs to consider the following:

- The size of the transaction and the amount payable to a related person.
- The nature of the interest of the related person.
- Whether the transaction may involve a conflict of interest.

Since the Related Person Transactions Policy specifically delegates responsibility for reviewing related person transactions to the Audit Committee, management recommends adding the responsibility as a specific item in the Audit Committee charter. Management has also conferred with outside counsel who agrees that this item should be added. A revised charter that includes the amended wording is attached as Exhibit I. It has been marked to show the changes from the current charter. The revised charter is in full compliance with existing rules, and management does not propose any further changes. If approved by the Audit Committee, the revised charter will be submitted to the full Board for approval at its December 4th meeting. For reference purposes, a copy of the Related Person Transactions Policy is also attached to this report.

TGC
11/28/2007

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Exhibit I

**TRIBUNE COMPANY**
**AUDIT COMMITTEE OF THE BOARD OF DIRECTORS**
**OPERATING CHARTER**
**<u>(As reviewed with the Audit Committee on December 4, 2007)</u>**

## PURPOSE

The Audit Committee is appointed by the Board of Directors to assist the Board in monitoring (a) the integrity of the Company's financial statements, (b) the independent accountants' qualifications and independence, (c) the performance of the Company's internal audit function and independent accountants, and (d) the Company's compliance and ethics program.

## COMMITTEE MEMBERSHIP

The Committee shall consist of no fewer than three members. The members of the Committee shall meet the independence and experience requirements of the New York Stock Exchange, Section 10A(m)(3) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules and regulations of the Securities and Exchange Commission (the "Commission"). At least one member of the Audit Committee shall be an audit committee financial expert as defined by the Commission and as determined by the Board of Directors. The members and chairperson of the Committee shall be appointed and replaced by the Board of Directors.

## MEETINGS

The Committee shall meet as often as it determines, but not less frequently than quarterly. The Committee shall meet periodically with management, the internal auditors and the independent accountants in separate executive sessions. The Committee may request any officer or employee of the Company or the Company's outside counsel or independent accountants to attend a meeting of the Committee or to meet with any members of, or consultants to, the Committee.

## COMMITTEE AUTHORITY AND RESPONSIBILITIES

The Committee shall have the sole authority to appoint or replace the independent accountants (subject to shareholder ratification). The Committee shall be directly responsible for the compensation and oversight of the work of the independent accountants (including resolution of disagreements between management and the independent accountants regarding financial reporting) for the purpose of preparing or issuing an audit report or related work. The independent accountants shall report directly to the Committee.

The Committee shall pre-approve all auditing services and permitted non-auditing services (including the fees and terms thereof) to be performed for the Company by the independent accountants, subject to the de minimus exceptions for non-audit services described in

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414912

Section 10A(i)(1)(B) of the Exchange Act which are approved by the Committee prior to the completion of the audit.

The Committee may form and delegate authority to subcommittees consisting of one or more members when appropriate, including the authority to grant preapprovals of audit and permitted non-audit services, provided that decisions of such subcommittees to grant preapprovals shall be presented to the full Committee at its next scheduled meeting.

The Committee shall have the authority, to the extent it deems necessary or appropriate, to retain independent legal, accounting or other advisors. The Company shall provide for appropriate funding, as determined by the Committee, for payment of compensation to the independent accountants for the purpose of rendering or issuing an audit report and to any advisors employed by the Committee.

The Committee shall make regular reports to the Board of Directors. The Committee shall review and reassess the adequacy of this Charter annually and shall submit any proposed substantive changes to the Board of Directors for approval. The Committee shall annually review its own performance.

The Committee shall prepare the report required by the rules of the Commission to be included in the Company's annual proxy statement.

The Committee, to the extent it deems necessary or appropriate, shall:

### Financial Statement and Disclosure Matters

1.  Meet to review and discuss with management and the Company's independent accountants the annual audited financial statements, including the Company's specific disclosures made in management's discussion and analysis, and recommend to the Board of Directors whether the audited financial statements should be included in the Company's Form 10-K.

2.  Review and discuss with management and the Company's independent accountants the annual reports on internal controls over financial reporting that will be included in the Company's Form 10-K in accordance with Section 404 of the Sarbanes-Oxley Act. Review and discuss any significant deficiencies or material weaknesses in the Company's internal controls over financial reporting that are disclosed to the Committee by management or the independent accountants, and the steps being taken to resolve them.

3.  Meet to review and discuss with management and the independent accountants the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the Company's specific disclosures made in management's discussion and analysis and the results of the independent accountants' reviews of the quarterly financial statements.

4.  Discuss with management and the independent accountants significant financial reporting issues and judgments made in connection with the preparation of the

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414913

Company's financial statements, including any significant changes in the Company's selection or application of accounting principles.

5.    Review and discuss reports from the independent auditors on:

    (a)    All critical accounting principles and practices to be used.

    (b)    All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent accountants.

    (c)    Other material written communications between the independent accountants and management.

6.    Discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally, consisting of discussing the types of information to be disclosed and the types of presentations to be made.

7.    Discuss with management and the independent accountants the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements.

8.    Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

9.    Discuss with the independent accountants the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

10.    Review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls over financial reporting or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

## Oversight of the Company's Relationship with the Independent Accountants

11.    Review and evaluate the lead partner of the independent accountants' team.

12.    Obtain and review a report from the independent accountants at least annually regarding (a) the independent accountants' internal quality-control procedures,

3

(b) any material issues raised by the most recent internal quality-control review, or publicly disclosed findings resulting from reviews of public oversight bodies or investigations by governmental authorities within the preceding five years respecting one or more independent audits carried out by the firm, (c) any steps taken to deal with any such issues or findings, and (d) all relationships between the independent accountants and the Company. Evaluate the qualifications, performance and independence of the independent accountants, including considering whether the accountants' quality controls are adequate and the provision of permitted non-audit services is compatible with maintaining the accountants' independence, and taking into account the opinions of management and internal auditors. The Committee shall present its conclusions with respect to the independent accountants to the Board of Directors.

13. Ensure the rotation of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit as required by law.

14. Set policies for the Company's hiring of employees or former employees of the independent accountants who participated in any capacity in the audit of the Company.

15. Meet with the independent accountants prior to the audit to discuss the planning and staffing of the audit.

## Oversight of the Company's Internal Audit Function

16. Review the appointment and replacement of the senior internal auditing executive.

17. Review the significant issues raised in reports to management prepared by the internal auditing department and management's responses.

18. Discuss with the independent accountants and management the internal audit department responsibilities, budget and staffing and any recommended changes in the planned scope of the internal audit function.

## Compliance and Ethics Program Oversight Responsibilities

19. Obtain from the independent accountants assurance that Section 10A(b) of the Exchange Act regarding illegal acts has not been implicated.

20. Obtain reports from management, the Company's senior internal auditing executive and the Company's chief compliance officer that the Company has an effective compliance and ethics program that is in conformity with applicable legal requirements and the Company's Code of Business Conduct, including the provisions related to insider trading and conflicts of interest. Advise the Board of

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414915

Directors with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and ethics and with the Company's Code of Business Conduct.

21.    Review procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting control or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

22.    Discuss with management and the independent accountants any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies.

23.    <u>Review and act on transactions submitted to the Audit Committee in accordance with the Company's Related Person Transactions Policy.</u>

24.    Discuss with the Company's General Counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies.


## LIMITATION OF AUDIT COMMITTEE'S ROLE

While the Audit Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Audit Committee to plan or conduct audits or to determine that the Company's financial statements and disclosures are complete and accurate and are in accordance with generally accepted accounting principles and applicable rules and regulations. These are the responsibilities of management and the independent accountants.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414916

# TRIBUNE COMPANY
# RELATED PERSON TRANSACTIONS POLICY

## POLICY

Each Related Person Transaction must be approved or ratified in accordance with the guidelines set forth in this policy (i) by the Audit Committee of the Board of Directors or (ii) if the Audit Committee of the Board of Directors determines that the approval or ratification of such Related Person Transaction should be considered by all of the disinterested members of the Board of Directors, by such disinterested members of the Board of Directors by the vote of a majority thereof.

In considering whether to approve or ratify any Related Person Transaction, the Audit Committee or the disinterested members of the Board of Directors, as the case may be (the "Reviewing Directors"), shall consider all factors that are relevant to the Related Person Transaction, including, without limitation, the following:

- the size of the transaction and the amount payable to a Related Person;

- the nature of the interest of the Related Person in the transaction;

- whether the transaction may involve a conflict of interest; and

- whether the transaction involves the provision of goods or services to the Company that are available from unaffiliated third parties and, if so, whether the transaction is on terms and made under circumstances that are at least as favorable to the Company as would be available in comparable transactions with or involving unaffiliated third parties.

## PROCEDURE

The General Counsel shall advise both the Chairman of the Audit Committee and the Chairman of the Nominating & Governance Committee of any Related Person Transaction of which he becomes aware. The Audit Committee shall consider such Related Person Transaction at its next regularly scheduled meeting or, if it deems it advisable, prior thereto at an interim meeting called for such purpose, unless the Audit Committee determines that the approval or ratification of such Related Person Transaction should be considered by all of the disinterested members of the Board of Directors, in which case such disinterested members of the Board of Directors shall consider such Related Person Transaction at its next regularly scheduled meeting or, if it deems it advisable, prior thereto at an interim meeting called for such purpose. Except as set forth below, any Related Person Transaction not approved in advance by the reviewing directors shall not be entered into by the Company unless the consummation of such Related Person Transaction is expressly subject to ratification by the reviewing directors. If the reviewing directors do not ratify such Related Person Transaction, the Company shall not consummate such Related Person Transaction.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414917

If the Company enters into a transaction that (i) the Company was not aware constituted a Related Person Transaction at the time it was entered into but which it subsequently determines is a Related Person Transaction prior to full performance thereof or (ii) did not constitute a Related Person Transaction at the time such transaction was entered into but thereafter becomes a Related Person Transaction prior to full performance thereof, then in either such case the Related Person Transaction shall be presented for ratification in the manner set forth above. If such Related Person Transaction is not ratified by the reviewing directors, then the Company shall take all reasonable actions to attempt to terminate the Company's participation therein.

## DISCLOSURE

The Company shall disclose all Related Person Transactions as may be required under applicable securities laws and regulations, including, without limitation, Item 404 of Regulation S-K. Consideration and approval of any particular transaction by the Reviewing Directors shall not be dispositive in determining whether such transaction requires disclosure under applicable securities laws. The Audit Committee shall timely advise the Board of Directors of all Related Person Transactions, if any, approved or ratified by the Audit Committee.

## DEFINITIONS

For purposes of this policy, the following definitions shall apply:

- "Executive Officer" means the President, any Vice President in charge of a principal business unit, division or function of the Company or any officer or other person who performs a policy making function for the Company, including any executive officer of a subsidiary of the Company if such person performs policy making functions for the Company.

- "Immediate Family Member" means, with respect to any person, any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law of such person, and any individual (other than a tenant or employee) sharing the household of such person.

- "Related Person" means any of the following: (i) an Executive Officer or director of the Company or a nominee for director of the Company, (ii) a beneficial owner of more than 5% of any class of voting securities of the Company or (iii) an Immediate Family Member of any of the persons identified in clauses (i) or (ii) hereof.

- "Related Person Transaction" means any transaction involving an amount in excess of $120,000 in which the Company is a participant and in which a Related Person has or will have a direct or indirect material interest, including without limitation any financial transaction, arrangement or relationship (including any indebtedness or guarantee of indebtedness) or any series of similar transactions, arrangements or relationships, but excluding: (i) any indebtedness incurred for the purchase of goods

2

and services subject to usual trade terms, for ordinary business travel and expense payments and for other transactions in the ordinary course of business; (ii) any indebtedness incurred with respect to a beneficial owner of more than 5% of any class of voting securities of the Company or any Immediate Family Member thereof; (iii) any transaction in which the rates or charges involved in connection therewith are determined by competitive bids; (iv) any transaction in which a person is deemed a Related Person solely on the basis of such person's equity ownership and all holders of that class of equity receive the same benefit on a pro rata basis; or (v) any transaction involving compensation payable to an Executive Officer or director of the Company for services in such capacity which compensation has been approved by the Compensation & Organization Committee of the Board of Directors or by the Board of Directors on the recommendation of the Compensation & Organization Committee.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414919

**COMPENSATION & ORGANIZATION
COMMITTTEE**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414920

**TRIBUNE COMPANY**
**COMPENSATION & ORGANIZATION COMMITTEE MEETING**
**TUESDAY, DECEMBER 4, 2007 (8:00 A.M.)**
**LAKEVIEW ROOM, 24TH FLOOR**
**TRIBUNE TOWER**

## AGENDA

|  | Tab No. |
|---|---|
| Approve minutes of July 18, 2007 meeting | 1 |
| Committee charter review | 2 |
| Compensation review | 3 |

Compensation & Organization Committee
Enrique Hernandez, Jr.
Robert S. Morrison, Chairman

Tribune Company
Dennis J. FitzSimons
Donald C. Grenesko
Crane H. Kenney

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414921

**1**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414922**

# TRIBUNE COMPANY
## COMPENSATION & ORGANIZATION COMMITTEE MEETING
### JULY 18, 2007

The Compensation & Organization Committee met at 8:40 a.m. on Wednesday, July 18, 2007 at Tribune Tower, Chicago, Illinois, pursuant to notice. The meeting was attended by Miles D. White. Enrique Hernandez, Jr. and Robert S. Morrison participated in the meeting via telephone. Dennis J. FitzSimons, Donald C. Grenesko and Crane H. Kenney attended the meeting and George B. Paulin of Frederic W. Cook & Co., Inc participated in the meeting via telephone.

Mr. Morrison acted as Chairman of the meeting. Messrs. FitzSimons, Grenesko and Kenney were present as the meeting was called to order and Messrs. Hernandez, Morrison and Paulin were on the telephone. The following business was discussed by the Committee:

1.    The minutes of the February 13, 2007 Committee meeting were approved as amended and the minutes of April 1, 2007 Committee meeting were approved as submitted.

2.    The Committee reviewed an executive compensation update presented by management. The update covered expected 2007 MIP payouts based on year-to-date operating results and a recap of the special incentive and long-term equity incentive awards previously approved by the Committee. A discussion followed Mr. Grenesko's report.

There being no further business to come before the Committee, the meeting was adjourned at 9:00 a.m.

_____
Robert S. Morrison
Chairman

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414924

**TRIBUNE COMPANY**
**COMPENSATION & ORGANIZATION COMMITTEE**
**COMMITTEE CHARTER REVIEW**

Redacted

MWH
11/28/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414925

## COMPENSATION & ORGANIZATION COMMITTEE CHARTER
### (As in effect on December 12, 2006)

**Purpose**

The Compensation & Organization Committee is appointed by the Board of Directors to: (a) discharge the Board's responsibilities relating to compensation of the directors and officers of the Company and its subsidiaries; (b) assist the Board of Directors with management development and succession planning; and (c) perform other related tasks, as may be requested from time to time by the Board of Directors.

**Committee Membership**

The Compensation & Organization Committee shall consist of no fewer than three members. The members of the Committee shall meet the independence requirements of the New York Stock Exchange. The members of the Committee, including a chairperson, shall be appointed and replaced by the Board of Directors based on recommendations of the Nominating & Governance Committee.

**Committee Authority and Responsibilities**

1. The Committee shall annually review and approve corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and either as a committee or together with the other independent directors (as directed by the Board), determine and approve the CEO's compensation level based on this evaluation.

2. The Committee shall annually review and approve for the CEO and the senior executive officers of the Company, (i) the annual base salary level, (ii) the annual incentive opportunity level, (iii) the long-term incentive opportunity level, (iv) employment agreements, severance arrangements, and change in control agreements/provisions, in each case, when and if appropriate, and (v) any special or supplemental benefits.

3. The Committee shall fix and determine awards to employees of stock, stock options, stock appreciation rights, restricted stock, restricted stock units or other forms of equity compensation pursuant to any of the Company's employee stock option or equity compensation plans now or from time to time hereafter in effect and exercise such other power and authority as may be permitted or required under such plans.

4. The Committee shall annually consult with the CEO and make recommendations with respect to non-CEO executive officer compensation, and incentive compensation and equity-based plans that are subject to Board approval.

5. The Committee: (i) shall, from time to time, make recommendations to the Board with respect to those equity compensation plans that are subject to shareholder

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

approval and (ii) may, from time to time, make recommendations to the Board with respect to those equity compensation plans that are not subject to shareholder approval or any other incentive compensation, deferred compensation, retirement or welfare benefit plans.

6. The Committee shall periodically review and make recommendations to the Board with respect to the compensation of outside directors.

7. The Committee shall periodically review and make recommendations to the Board with respect to stock ownership guidelines applicable to Company employees and outside directors.

8. The Committee shall (i) review and discuss with management the Compensation Discussion and Analysis required to be included in the Company's annual report on Form 10-K and annual proxy statement filed with the Securities and Exchange Commission and (ii) ensure that it is sufficiently satisfied with the disclosure in order to be in a position to recommend to the Board that the Compensation Disclosure and Analysis be included in the annual report and proxy statement. .

9. The Committee shall participate in the annual management development and succession planning process and shall make recommendations to the Board, concerning management development and succession planning matters.

10. The Committee shall have the sole authority to retain and terminate any compensation consultant used to assist in the evaluation of director, CEO or other senior executive compensation and shall have sole authority to approve the consultant's fees and other retention terms. Compensation consultants used to evaluate compensation of non-executive employees shall remain at the discretion of management.

11. The Committee shall have the authority to obtain advice and assistance from internal or external legal, accounting or other advisors.

12. The Committee may form and delegate authority to subcommittees when appropriate.

13. The Committee shall make regular reports to the Board.

14. The Committee shall review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval. The Committee shall annually review its own performance.

15. The Committee shall carry out such other duties as may be delegated to it from time to time by the Board.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414927

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## Tribune Company
## Compensation Update

Introduction

Several years ago, the Compensation and Organization Committee requested a preview each December of management's compensation recommendations before final approval at the February Committee meeting. This report is for informational purposes only, and no Committee action is required at this time.

2007 Management Incentive Plan (MIP)

Consistent with past practice and the ESOP/Zell merger agreement, this year's MIP payouts will be based upon the formulas and operating plan approved at the February 2007 Board and Committee meetings. This past year has been a very difficult advertising environment for the entire media industry, particularly newspapers. Tribune Publishing's advertising revenues are $230 million below expectation, partially offset by $118 million in below-plan cash expenses. These expense savings were achieved primarily through lower newsprint pricing and usage as well as significantly reduced staffing levels. Operating cash flow is also below plan. As shown on Exhibit I, the Publishing Group expects to achieve about 55% of its overall bonus target. Newsday is close to its operating cash flow target while Los Angeles, South Florida, Orlando and Baltimore will miss their minimum cash flow objectives and their bonus payouts will be discretionary. Overall, the Broadcasting Group is above plan although a number of our TV stations are operating in difficult local marketplaces, and their bonuses will be discretionary. Based on consolidated results, Corporate is expected to achieve a 76% payout.

Also consistent with past practice, we have excluded the following discontinued operations and one-time extraordinary items from the MIP calculations:

- Actual results and target levels for Hoy New York, Southern Connecticut newspapers and Recycler which have been sold
- $32 million of severance charges and a $24 million write-off of press equipment
- $70 million expected gain on the sale of the KTLA lot
- $340 million IRS refund for the settlement of the Matthew Bender Tax Case
- $8 million gain on unwind of TMCT's

2007 401(k) Profit Sharing Allocation

Tribune's current retirement plan is comprised entirely of contributions to the 401(k) Plan. Employees receive a 4% allocation of eligible pay throughout the year and a year-end profit sharing allocation ranging from 0 to 5% of pay depending on the year's consolidated operating results. Because of the decline in 2007's cash flow compared to both plan and 2006's results, management is not planning to make a year-end profit sharing contribution. Originally, we had expected a 2 1/2% ($25 million) contribution. In 2008, the current 401(k) Plan is being replaced by the 5% ESOP allocation and 3% Cash Balance Plan for a total non-cash retirement benefit equal to 8% of eligible compensation.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## 2008 Salary Increases

The Company expects to award general merit increases of 2.5% for 2008, down from 3% in recent years. As in past years, merit increases will take effect following the February Committee meeting.

## Phantom Stock Awards

On April 1, the Committee approved a 3% pool of Phantom Stock to be awarded to 17 members of senior management who played critical roles in the ESOP/Zell Transaction. The Committee also approved a 5% Phantom Stock pool in the new Company as a long-term incentive for the management team. The Zell organization and GreatBanc, the ESOP Trustees, have previously approved the principal terms of this phantom stock plan. Management is currently finalizing the details of this plan document with the Zell Group with only modest changes from the April 1 outline. The final plan and all individual awards under both the 3% and 5% plans will be presented to the Committee and Board for approval at the close of the transaction.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414930

Exhibit I

# TRIBUNE COMPANY
## 2007 MIP BONUS PROJECTION

| | | Achievement % of Target |
|---|---|---|
| | **BROADCASTING** | |
| | Television | |
| 1 | New York | 130% |
| 2 | Chicago Cable | 176% |
| 3 | Chicago Television | 200% |
| 4 | Seattle | 200% |
| 5 | New Orleans | 200% |
| 6 | Philadelphia | 138% |
| 7 | Dallas | 114% |
| 8 | Washington | 76% |
| 9 | Houston | 179% |
| 10 | Portland | 101% |
| 11 | Chicago Radio | 43% |
| 12 | Chicago Cubs | 100% |
| 13 | Tribune Entertainment | 98% |
| 14 | Broadcasting Group Office | 119% |
| | **Discretionary Bonuses:** | |
| 15 | Los Angeles | 0% |
| 16 | Indianapolis | 0% |
| 17 | Hartford | 0% |
| 18 | Denver | 0% |
| 19 | Miami | 0% |
| 20 | Sacramento | 0% |
| 21 | St. Louis | 0% |
| 22 | San Diego | 0% |
| 23 | Grand Rapids | 0% |
| 24 | Harrisburg | 0% |
| 25 | **Total Broadcasting** | 119% |
| | **PUBLISHING** | |
| 26 | Chicago | 68% |
| 27 | New York | 91% |
| 28 | Hartford | 71% |
| 29 | Allentown | 99% |
| 30 | Newport News | 87% |
| 31 | Tribune Media Services | 82% |
| 32 | Interactive Group | 100% |
| 33 | Publishing Group Office | 55% |
| | **Discretionary Bonuses:** | |
| 34 | Los Angeles | 0% |
| 35 | Ft. Lauderdale | 0% |
| 36 | Orlando | 0% |
| 37 | Baltimore | 0% |
| 38 | **Total Publishing** | 55% |
| 39 | **CORPORATE (CONSOLIDATED)** | 76% |

- Business unit bonuses are based on achievement of operating cash flow targets.  Group
  office bonuses are based on achievement of total group operating cash flow and equity targets.
  Corporate office bonuses are based on consolidated operating cash flow and equity results.
- Business units that are below 40% of their operating cash flow targets have discretionary bonuses.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414931