

**Katten**
Katten Muchin Rosenman LLP

# *Memorandum*

| | | | |
|---|---|---|---|
| **TO:** | Advisory Committee to the Board of Directors of the Robert R. McCormick Tribune Foundation | **cc:** | Thomas E. Chomitz |
| | Board of Directors of the Robert R. McCormick Tribune Foundation | | |
| **FROM:** | Herbert S. Wander<br>Eric A. Smith | | |
| **DATE:** | August 17, 2007 | | |
| **SUBJECT:** | Benefits to be received by Members of the Board of Directors of the Robert R. McCormick Tribune Foundation upon approval of the Merger Agreement and consummation of the transactions contemplated thereby | | |

### Introduction

The following memorandum describes the benefits that the Members of the Board of Directors of the Robert R. McCormick Tribune Foundation (the "**Foundation**") are expected to receive upon consummation of the transactions contemplated by the Merger Agreement (the "**Merger Agreement**") by and between the Tribune Company (the "**Company**") and Tribune Employee Stock Ownership Plan (the "**ESOP**"), according to the Company's July 13, 2007 proxy statement (the "**Proxy Statement**"). The Merger Agreement will result in the merger of the Company into a subsidiary of the ESOP (the "**Merger**"), and the Merger is part of a plan of reorganization under which the anticipated final result is for the ESOP to acquire the entire equity ownership of the Company (the "**Privatization Plan**").

### Messrs. Jim Dowdle and John Madigan

Messrs. Jim Dowdle and John Madigan will receive no additional benefit outside of their holdings of Company common stock, which shall be treated identically with the other shares of Company common stock.

### Messrs. Dennis FitzSimons, David Hiller and Scott Smith

As officers of the Company, Messrs. FitzSimons, Hiller and Smith will receive certain benefits, in addition to the benefits they receive as holders of Company common stock, upon approval of the Merger Agreement and consummation of the Privatization Plan.

In connection with the review by the Company's Board of Directors[1] (the "**Company Board**") of strategic alternatives for the Company beginning in September 2006, the Compensation Committee of the Company Board authorized the creation of a transaction bonus pool, which, according to the Proxy Statement, was designed to motivate management to seek a transaction that would provide the maximum return to the Company's shareholders, despite the risks such transaction would pose to management's continued employment (See Item I below). In connection with the approval of the Privatization Plan, on April 1, 2007, the Board approved certain cash compensation awards and a share equivalent plan for members of management and other key employees of the Company conditioned upon the consummation of the Merger (See Item II below). The Merger Agreement provided that the Company will maintain certain director, officer and employee exculpation, indemnification and insurance provisions for a period of time following the Merger (See Item III below). In addition, there existed certain equity based award and change in control provisions which benefit Messrs. FitzSimons, Hiller and Smith which preceded the strategic review by the Company Board (See IV and V below). Messrs. FitzSimons, Hiller and Smith will participate in certain of the awards as more fully described below.

| Item | Title | Mr. FitzSimons | Mr. Hiller | Mr. Smith |
|---|---|---|---|---|
| I. | Cash Transaction Bonus Pool | None (1) | None (1) | None (1) |
| II. | Management Equity Incentive Plan | Covered (2) | Covered (2) | Covered (2) |
| III. | Indemnification and Insurance | Covered (3) | Covered (3) | Covered (3) |
| IV. | Stock Options, Restricted Stock and Equity Based Awards | $6,869,559 (4) | $2,231,454 (5) | $2,665,784 (4) |
| V. | Transitional Compensation Plan | $14,656,725 (6) | $5,493,987 (7) | $6,403,922 (6) |

(1) According to the Proxy Statement, Messrs. FitzSimons and Smith voluntarily opted out of the Cash Transaction Bonus Pool, and the Company indicated that Mr. Hiller also voluntarily opted out of the Cash Transaction Bonus Pool.

(2) According to the Proxy Statement, following the consummation of the Privatization Plan, a New Management Equity Incentive Plan will be executed, which will likely cover Messrs. FitzSimons, Hiller and Smith.

(3) We are assuming that Messrs. FitzSimons, Hiller and Smith are both covered by the Indemnification and Insurance provisions described in the Proxy Statement.

(4) The Proxy Statement estimates the listed amounts to be the value of the stock options, restricted stock and equity-based awards for Messrs. FitzSimons and Smith upon consummation of the Merger.

---

[1] Mr. FitzSimons is also a member of the Company Board, Messrs. Hiller and Smith are not.

FOUN0000414

(5) The Proxy Statement does not estimate the value of stock options, restricted stock and equity based awards to Mr. Hiller, however the Company provided estimates of the value of the stock options, restricted stock and equity-based awards for Mr. Hiller upon consummation of the Merger.

(6) The Proxy Statement estimates the listed amounts to be the respective benefits, including the tax-gross up, to Messrs. FitzSimons and Smith should either experience a qualifying termination for purposes of the Transitional Compensation Plan.

(7) The Proxy Statement only provided information on Named Executive Officers, of which Mr. Hiller is not one, however the Company provided estimated information on Mr. Hiller's benefits, excluding the tax-gross up, to Mr. Hiller should he experience a qualifying termination for purposes of the Transitional Compensation Plan of $4,113,987. We have estimated the value of the tax-gross up to be $1,380,000.

The following describes the executive compensation provisions contemplated by the Merger Agreement, as described in the Proxy Statement:

I.   **Cash Transaction Bonus Pool**

   A.   The Company Board approved a cash transaction bonus pool with an aggregate amount of $5,400,000 for 40 individuals. This cash bonus pool will be used in lieu of approximately 285,000 restricted stock units that were authorized for issuance. Payment of these cash bonuses is conditioned upon the consummation of the Merger Agreement.

   B.   Messrs. FitzSimons, Hiller and Smith all voluntarily elected not to participate in this cash bonus pool.

II.  **Proposed Tribune Management Equity Incentive Plan**

   A.   The Merger Agreement contemplates the establishment of a new Tribune Company Management Equity Incentive Plan (the **"Plan"**) to be effective following the consummation of the Privatization Plan. The Plan will be administered by the Compensation Committee of the Board (the **"Plan Committee"**) and the Plan Committee will select who will receive awards and the terms of the awards. It is anticipated that Messrs. FitzSimons, Hiller and Smith will be covered under the Plan.

   B.   The Plan contemplates two tranches of share equivalent awards to be granted to certain members of management and other key employees. The first tranche of awards (**"Tranche One Awards"**) will include share equivalents with an economic value equal to 5% of the fully-diluted Company Common Stock and will be awarded to eligible members of Company management and other key employees. A portion of the Tranche One Awards will be granted upon the consummation of the Merger Agreement, and the remaining portion will be granted in future years. The second tranche of awards (**"Tranche Two Awards"**) will include share equivalents with an economic value equal to 3% of the fully-diluted Company Common Stock to be awarded upon consummation of the Merger Agreement to a select group of management and other key employees. At the time of the Foundation's Board of Directors meeting on August 17, we will

FOUN0000415

need to confirm that no new awards under the Plan have been awarded to any of Messrs. FitzSimons, Hiller or Smith, and if awards under the Plan have been made, the amount of such awards should be disclosed to the Board of Directors of the Foundation. In addition, if any additional awards are made prior to the meeting of the Company's stockholders on August 21, 2007, the amount of such awards should be disclosed to the Board of Directors of the Foundation.

III. **Indemnification of Directors and Officers; Directors and Officers Insurance**

A. The Merger Agreement provides that, for a period of six years after completion of the Merger, the Company will maintain in effect director, officer and employee exculpation, indemnification and advancement of expenses provisions no less favorable than those of the Company's and any of its subsidiaries' certificates of incorporation and by-laws as in effect immediately prior to the Merger or in any indemnification agreements of the Company or its subsidiaries with any of their directors, officers or employees as in effect immediately prior to the Merger.

B. The Merger Agreement also provides that the Company will, to the fullest extent permitted under applicable law, indemnify and hold harmless each current and former director, officer or employee of the Company or any of its subsidiaries and each person who served as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise at the request of the Company against any costs or expenses, judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened action, arising out of, relating to or in connection with any action or omission occurring or alleged to have occurred whether before or after completion of the Privatization Plan.

C. Following the Privatization Plan, the Company will maintain in effect the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Company and its subsidiaries with respect to matters arising on or before the time the Company becomes a wholly owned subsidiary of the ESOP (the "**Effective Time**"), subject to a maximum annual insurance premium of 200% of the last annual premium paid by the Company prior to the date of the Merger Agreement in respect of such coverage.

D. At the Company's option, after consultation with the ESOP, the Company may purchase, prior to the Effective Time, a six-year prepaid "tail" policy (at an aggregate cost not exceeding the maximum premium multiplied by six) on terms and conditions providing substantially equivalent benefits as the current policies of directors' and officers' liability insurance and fiduciary liability insurance.

IV. **Stock Options, Restricted Stock and Other Equity-Based Awards.**

A. As of the effective time of the Merger:

FOUN0000416

1. Each outstanding Company stock option that remains outstanding immediately prior to the Effective Time, whether vested or unvested, will become fully vested, and the holder of the stock option will receive a cash payment, less applicable withholding taxes, equal to the product of (a) the number of shares subject to the option as of the Effective Time, multiplied by (b) the excess, if any, of the Merger Consideration over the exercise price per share of Company Common Stock subject to such option, less applicable tax withholding.

2. Each share of restricted Company Common Stock will vest in full and be converted into the right to receive the Merger Consideration, less any applicable withholding taxes.

3. Each other right of any kind to receive Company Common Stock or benefits measured in whole or in part by the value of a number of shares of Company Common Stock will vest and become free of any forfeiture or holding restrictions or performance, or other conditions, and will entitle the holder thereof to receive an amount in cash based on the Merger Consideration.

B. The Merger Proxy Statement estimates that the amounts that will be payable to Messrs. FitzSimons and Smith in settlement of stock options, restricted stock and other equity-based awards as follows: Mr. FitzSimons, $6,869,559 and Mr. Smith, $2,665,784 and the Company estimates that the amounts that will be payable to Mr. Hiller in settlement of stock options, restricted stock and other equity-based awards is $2,338,014. The Company has indicated that the overwhelming majority of these amounts will accrue as a result of the acceleration of the stock options and restricted stock upon consummation of the Merger, and only a small amount of these figures arise as a result of currently exercisable stock options.

V. **Transitional Compensation Plan**

A. The Transitional Compensation Plan for Executive Employees was amended and restated effective as of July 19, 2006 and was approved by the Company Board and the Compensation Committee of the Company Board as of such date. As executive officers covered by the Transitional Compensation Plan, Messrs. FitzSimons, Hiller and Smith are eligible for benefits under a Transitional Compensation Plan, which provides for payments and other benefits if they are terminated under circumstances specified in the Transitional Compensation Plan within three years following a change in control of the Company, including consummation of the Merger. The Transitional Compensation Plan is a "double trigger" plan, which requires both (i) a change of control of the Company (which the Merger will qualify as) and (ii) a qualified termination of employment within 3 months of the change in control. Under the Transitional Compensation Plan, each eligible participant would be eligible for benefits upon involuntary

FOUN0000417

termination[2] of employment within 36 months following completion of the Merger. Messrs. FitzSimons, Hiller and Smith would be eligible for benefits for termination prior to the Merger if the termination was at the request of any third party participating in or causing the Merger or otherwise in anticipation of the Merger. Transitional Compensation Plan benefits will only be available if the participant's termination of employment was not:

1. on account of his death;

2. on account of a physical or mental condition that would entitle him to long-term disability benefits under the Tribune Company Long-Term Disability Plan;

3. for conduct involving dishonesty or willful misconduct which, in either case, is detrimental in a significant way to the Company's business; or

4. on account of the employee's voluntary resignation.

B. For purposes of the Transitional Compensation Plan, a resignation would not be considered to be "voluntary" if:

1. the resignation by Mr. FitzSimons or Mr. Hiller occurs during the 30-day period immediately following the first anniversary of the completion of the Merger; or

2. the resignation occurs after a successor refuses to assume and agree to perform Tribune's obligations under the Transitional Compensation Plan; or

3. subsequent to the completion of the Merger and prior to such resignation, there has been a reduction in the nature or scope of the participant's authority or duties, a reduction in the participant's compensation or benefits, or a change in the city in which he is required to perform his duties.

C. Upon a termination under the circumstances outlined above, Messrs. FitzSimons, Hiller and Smith would be entitled to a lump sum payment equal to three times the sum of:

1. the highest annual rate of the executive's base salary in effect within three years of the date of the participant's termination, plus

---

[2] A voluntary resignation by Mr. FitzSimons or Mr. Hiller which occurs during the 30-day period immediately following the first anniversary of the completion of the Merger is considered an involuntary termination under the Transitional Compensation Plan.

FOUN0000418

2.  200% of the participant's target bonus payable for the year in which the change in control occurs.

D.  The Transitional Compensation Plan would also provide outplacement benefits in an amount up to 25% of a participant's base salary and continuation of medical, life insurance and disability benefits for up to three years.

E.  In addition, the Transitional Compensation Plan provides that each eligible employee is entitled to a "gross-up" payment to make the executive whole for any federal excise tax imposed on change in control or severance payments or benefits received by the eligible employee.

F.  Assuming the Privatization Plan is completed on December 31, 2007 and that thereafter Messrs. FitzSimons, Hiller or Smith experiences a qualifying termination for purposes of the Transitional Compensation Plan on that date, the Proxy Statement indicates that the estimated cost of the cash and in-kind severance benefits with respect to Messrs. Fitzsimmons, Hiller and Smith would be as follows: Mr. FitzSimons, $10,657,500, Mr. Hiller $4,113,984 and Mr. Smith, $4,794,460.

G.  In addition, as described above, participants in the Transitional Compensation Plan are entitled to certain tax gross-up payments. Assuming the Privatization Plan is completed on December 31, 2007 and that thereafter each Messrs. FitzSimons, Hiller or Smith experiences a qualifying termination for purposes of the Transitional Compensation Plan on that date, the estimated tax gross-up payments to the Messrs. FitzSimons, Hiller or Smith would be as follows: Mr. FitzSimons, $3,999,22, Mr. Hiller, $1,380,000[3] and Mr. Smith, $1,609,862.

## Conclusion

We believe that each of the benefits that Messrs. FitzSimons, Hiller and Smith of the Board of Directors of the Foundation are expected to receive upon consummation of the Merger have a valid business purpose, are commercially reasonable and are standard in transactions of this type. We believe that each of these benefits were negotiated at arm-length between the Company, the ESOP and the Zell Entity, and they serve a business purpose for the Company both before and after the consummation of the Merger and were either approved and/or recommended by a special committee of the Company Board made up of independent directors of the Company (and none of Messrs. FitzSimons, Hiller and Smith served on that committee). Moreover, Items IV and V above were in place prior to the strategic review by the Company Board and were also approved and/or recommended by an independent committee of the Company Board which does not include any members of the Foundation's Board of Directors. In our experience, it is

---

[3] The Company did not provide the value of the tax-gross up for Mr. Hiller, so we have estimated it at $1,380,000.

FOUN0000419

typical that management of a Company and the acquiring entity will negotiate employment and equity arrangements similar to the arrangements described herein.

60579976

FOUN0000420