## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-_____ |
| Debtors. | (Joint Administration Requested) |

### AFFIDAVIT OF CHANDLER BIGELOW III, SENIOR VICE PRESIDENT AND CHIEF FINANCIAL OFFICER OF TRIBUNE COMPANY IN SUPPORT OF FIRST DAY MOTIONS

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) ss: |
| COUNTY OF COOK | ) |

CHANDLER BIGELOW III, being duly sworn, deposes and states:

1.    I am a Senior Vice President and the Chief Financial Officer of Tribune

Company, a corporation organized under the laws of Delaware and one of the above-captioned

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC (0719); KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

debtors and debtors-in-possession (collectively, the "Debtors").[2] Tribune Company is the direct

or indirect parent company of the other Debtors herein. I am generally familiar with the

Debtors' day-to-day operations, business affairs, and books and records.

  2.  On the date hereof (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code") (collectively, the "Chapter 11 Cases").

  3.  The Debtors are operating their business and managing their properties as

debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No

request has been made for the appointment of a trustee or examiner, and no official committee

has yet been appointed by the Office of the United States Trustee.

  4.  In order to enable the Debtors to minimize the adverse effects of the

commencement of the Chapter 11 Cases on their business operations, the Debtors have requested

various types of relief in certain "first day" motions (each, a "First Day Motion" and collectively,

the "First Day Motions"). The First Day Motions seek relief aimed at, among other things: (a)

preserving customer relationships; (b) maintaining vendor confidence and employee morale; (c)

ensuring the continuation of the Debtors' cash management systems and other business

operations without interruption; (d) securing post-petition financing necessary to continue the

Debtors' operations; and (e) establishing certain administrative procedures to facilitate a smooth

transition into, and uninterrupted operations throughout, the chapter 11 process. Gaining and

maintaining the support of the Debtors' customers, employees, vendors and suppliers, and

certain other key constituencies, as well as maintaining the Debtors' day-to-day business

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion (as hereinafter defined).

operations with minimal disruption, will be critical to the success of these Chapter 11 Cases and the Debtors' reorganization efforts.

5. I submit this affidavit (the "Affidavit") in support of the First Day Motions. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion (i) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (ii) constitutes a critical element in achieving a successful reorganization of the Debtors; and (iii) is in the best interests of the Debtors, their estates and creditors.

6. Except as otherwise indicated, all facts set forth in this Affidavit are based on my personal knowledge, on information supplied to me by other members of the Debtors' management teams and/or professionals retained by the Debtors, on information learned from my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtors' operations, financial condition and present liquidity needs. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Affidavit on behalf of the Debtors.

7. Part I of this Affidavit provides an overview of the Debtors' business operations and describes the Debtors' corporate history and prepetition capital and debt structure and the circumstances surrounding the commencement of these Chapter 11 Cases. Part II sets forth the relevant facts in support of each of the First Day Motions.

## PART I

### A.    Overview of the Debtors' Business Operations

8. Based in Chicago, Illinois, Tribune Company ("Tribune") is America's largest employee-owned media and entertainment company and is the ultimate parent company of each of the Debtors. Tribune is a media industry leader, reaching more than 80% of U.S.

households through its newspapers and other publications, its television and radio broadcast stations and cable channels, and its other entertainment offerings. Tribune's operations are conducted through two primary business segments: (i) publishing and (ii) broadcasting and entertainment.

### Publishing

9.      The Debtors' publishing segment currently operates eight (8) major-market daily newspapers, distributes entertainment listings and syndicated content through its Tribune Media Services business unit, and manages the Chicago area's first and only 24-hour cable news channel, CLTV. The Debtors publish daily newspapers in two of the three largest metropolitan markets and are the nation's third largest newspaper publisher in terms of revenue and circulation. The daily newspapers published by the Debtors, which have collectively garnered 83 Pulitzer Prizes, include market leading papers such as the Chicago Tribune, the Los Angeles Times, The Sun, the South Florida Sun-Sentinel, the Orlando Sentinel, the Hartford Courant, The Morning Call, and the Daily Press. The Debtors' newspapers collectively have paid circulation of 2.2 million copies daily and 3.3 million copies on Sundays. In addition, the Debtors publish over 100 "niche" publications that target various geographic, ethnographic and demographic audiences and include the upscale Chicago Magazine, the Spanish language newspaper "Hoy," which is published in Chicago and Los Angeles, and Chicago's Redeye, which targets a younger demographic. The Debtors' publishing segment also manages the websites of the Debtors' daily newspapers, television stations, and other branded sites targeting specific communities of interest. Every day, millions of people rely on the Debtors' newspapers, niche publications and websites to help them understand the world and navigate their daily lives. As of the Petition Date, the Debtors' publishing segment employed approximately 12,000 full-time equivalent employees.

### Broadcasting and Entertainment

10.    The Debtors' broadcasting and entertainment segment includes 23 television stations in 19 markets, including seven stations in the top 10 U.S. markets. The Debtors also own and operate the cable "Superstation" WGN America, which is seen in approximately 71 million homes, and Chicago radio station WGN-AM, which first went on the air in 1924 and whose call letters reflect the Chicago Tribune's longtime slogan, "the World's Greatest Newspaper." Long a broadcast innovator -- it was first to broadcast the World Series, the Indianapolis 500 and the Kentucky Derby and broke new ground by introducing microphones in the courtroom during the famous 1925 Scopes "monkey trial" -- WGN is perennially the number one radio station in the Chicagoland market. Through their television stations and WGN America, the Debtors' broadcasting and entertainment segment reaches more than 80 percent of television households in the United States. Thirteen (13) of the Debtors' stations are affiliates of The CW Television Network, America's "fifth" major broadcast network, with affiliate stations located in New York, Los Angeles, Chicago, Dallas, Washington D.C., Houston, Miami, Denver, St. Louis, Portland, Indianapolis, Hartford and New Orleans. The Debtors' broadcasting operations also include seven (7) Fox Broadcasting Network affiliates, located in Seattle, Sacramento, Indianapolis, San Diego, Hartford, Grand Rapids and Harrisburg, and one ABC television affiliate in New Orleans.[3] As of the Petition Date, the Debtors' broadcasting and entertainment segment employed approximately 2,600 full-time equivalent employees.

---

[3] The broadcasting and entertainment segment also includes the subsidiaries that own the Chicago Cubs baseball operations and an equity interest in regional sports network Comcast SportsNet Chicago, LLC, which are not Debtors in these cases.

### Recent Operations

11.     For the quarterly period ended September 28, 2008, the consolidated

financial statements of the Debtors and their non-debtor subsidiaries[4] (the "Tribune Entities")

reported approximately $7.6 billion in total assets and approximately $13.9 billion in total

liabilities.  In fiscal year 2007, the Tribune Entities recorded revenues of approximately $5.1

billion, resulting in net income of approximately $87 million.  During this time, the publishing

segment contributed approximately 72% of the Tribune Entities' revenue and the

broadcasting/entertainment segment contributed approximately 28% of the Tribune Entities'

revenue.  Advertising is the primary source of revenue for both the publishing and

broadcasting/entertainment segments.  Daily newspaper revenues are derived principally from

advertising and circulation sales, which accounted for 78% and 14%, respectively, of the

publishing segment's total revenues in 2007.  Publishing revenues decreased 9%, or $354

million, in 2007, primarily due to a decrease in advertising revenue, which declined 10%, or

$334 million, in 2007, while circulation revenues were down 7%.  Broadcasting and

entertainment revenues decreased in 2007 by 2%, or $27 million, due to decreased television

revenues which, in turn, resulted primarily from a decline in advertising revenues.

12.     While the Debtors' performance is comparable, and in some areas

superior, to that of their peers, operations have been adversely affected by the general

---

[4] The non-debtor subsidiaries are:  Chicago National League Ball Club, LLC; Chicago Cubs Dominican Baseball
Operations, LLC; Diana-Quentin, LLC; Fairfax Media, Inc.; Multimedia Insurance Company; Professional
Education Publishers International (Africa) Pty Ltd.; TMS Entertainment Guides Canada Corp.; Tribune (FN) Cable
Ventures Inc.; Tribune Hong Kong, Ltd.; Tribune Interactive, Inc.; Tribune Media Services, B.V.; Tribune National
Marketing Company; Tribune ND, Inc.; Tribune Receivables LLC; Tribune Sports Network Holdings, LLC; and
Wrigley Field Premium Tickets and Services, LLC.  For the most part, these entities are either (i) associated with
business operations that are co-owned with third parties, (ii) foreign corporations, (iii) businesses subject to
disposition, such as the Chicago Cubs baseball operations, or (v) entities for which a bankruptcy filing is not
suitable, such as Tribune Receivables, LLC, the special purpose subsidiary which is party to the Debtors'
receivables financing facility, and Multimedia Insurance Company.  Entities in which the Debtors own less than
100% of the equity are also not included in the bankruptcy filing.

deterioration in the publishing and broadcasting industries, particularly through the continuing severe decline in advertising revenue in this recession. As a result, the Debtors face increasing constraints on their liquidity, including their ability to service the approximately $13 billion in indebtedness owed to their lenders and noteholders. These Chapter 11 Cases were commenced to restructure and strengthen the Debtors' balance sheet, preserve the enterprise for the Debtors' stakeholders, including the employee owners, and improve the Debtors' liquidity going forward.

**B.**     **Corporate History and Structure**

13.     Tribune was founded in 1847 and incorporated in Illinois in 1861. In 1968, as a result of a corporate restructuring, Tribune became a holding company incorporated in Delaware. In 1983, after 136 years of private ownership, Tribune became a public company. Throughout the 1980s and 1990s, Tribune grew rapidly through a series of acquisitions spurred by a loosening of federal regulations restricting television and radio ownership. Tribune's most significant acquisition came in 2000, when it merged with The Times Mirror Company, effectively doubling the size of Tribune and securing its position among the top tier of major media companies. The Times Mirror transaction was the largest acquisition in newspaper industry history.

14.     Tribune returned to private ownership at the end of 2007. On April 1, 2007, Tribune's board of directors, based on the recommendation of a special committee of the board comprised entirely of independent directors, approved a series of transactions with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), EGI-TRB, L.L.C., a Delaware limited liability company wholly owed by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell designed to return Tribune to private ownership. These transactions ultimately resulted in the transfer of ownership of Tribune and its subsidiaries to the ESOP (the "Merger"). On December 20, 2007, Tribune completed the

Merger, culminating with the cancellation of all issued and outstanding shares of Tribune's common stock as of that date, other than shares held by Tribune or the ESOP, and with Tribune becoming wholly owned by the ESOP. As a result of the Merger, Tribune became the largest employee owned media and entertainment company in the United States.

15.    In March of 2008, Tribune filed an election to be treated as a subchapter S corporation under the Internal Revenue Code, which election was effective as of the beginning of the 2008 fiscal year, and also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries. Subject to certain limitations, Tribune and its subsidiaries are no longer subject to corporate level federal income tax. Instead, the income of Tribune and its subsidiaries is required to be reported by its shareholders. The ESOP, which is the sole shareholder, does not pay taxes on the share of income that is passed through to it because the ESOP is a qualified employee benefit plan. Although most states in which Tribune and its subsidiaries operate recognize the subchapter S corporation status, some impose income taxes at a reduced rate.

16.    Tribune directly or indirectly owns all (or virtually all) of the equity in 127 subsidiaries, of which 110 are Debtors in these cases. Tribune and certain of its subsidiaries also have equity interests (which are generally minority interests) in various businesses in which one or more third parties are also equity interest holders; these entities are not Debtors. A summary chart of the equity structure for Tribune and its subsidiaries is attached hereto as Exhibit A.

C.    **Summary of Prepetition Indebtedness**

17.    In connection with the Merger and in order to fund ongoing general corporate and working capital needs, Tribune entered into financing facilities in May, 2007 and December, 2007, as described below. Tribune is also the obligor on a series of outstanding bond issuances that predated the Merger, as further described below. Accordingly, as of the Petition Date, Tribune owed approximately $13 billion in total funded debt. Additionally, Tribune (in its

capacity as servicer) and Tribune Receivables LLC, a wholly owned special purpose subsidiary which is not a Debtor, are parties to a $300 million trade receivables securitization facility for which Barclays Bank PLC is the administrative agent and Tribune Receivables LLC is the borrower. The outstanding balance under the trade receivables securitization facility is approximately $225 million.

18.    The following is a brief overview of Tribune's debt facilities and outstanding note issuances. All of the indebtedness described below -- the Credit Agreement indebtedness, the Bridge Facility indebtedness, the Notes and the PHONES -- are obligations of the parent company, Tribune. This indebtedness is pari passu in payment priority at Tribune, except for the PHONES which are contractually subordinated to all other funded indebtedness at Tribune. The Credit Agreement indebtedness and the Notes are secured at Tribune, equally and ratably, by a stock pledge of the equity in two subsidiaries. Neither the Bridge Facility nor the PHONES is secured. Additionally, the indebtedness under the Credit Agreement and the indebtedness under the Bridge Facility constitute unsecured obligations at those Tribune subsidiaries (the "Guarantor Subsidiaries"),[5] which have guaranteed (i) the Credit Agreement

---

[5] The Guarantor Subsidiaries are those subsidiaries deemed material under the Credit Agreement, and are comprised of the following:  5800 Sunset Productions Inc.; California Community News Corporation; Channel 39, Inc.; Channel 40, Inc.; Chicago National League Ball Club, LLC; Chicago Tribune Company; Chicagoland Publishing Company; Chicagoland Television News, Inc.; Courant Specialty Products, Inc.; Distribution Systems of America, Inc.; Eagle New Media Investments, LLC; Eagle Publishing Investments, LLC; Forsalebyowner.com corp.; Forum Publishing Group, Inc.; Gold Coast Publications, Inc.; Homeowners Realty, Inc.; Homestead Publishing Company; Hoy Publications, LLC; Internet Foreclosure Service, Inc.; KIAH Inc.; KPLR, Inc.; KSWB Inc.; KTLA Inc.; KWGN Inc.; Los Angeles Times Communications LLC; New Mass. Media, Inc.; Orlando Sentinel Communications Company; Patuxent Publishing Company; Southern Connecticut Newspapers, Inc.; Star Community Publishing Group, LLC; Stemweb, Inc.; Sun-Sentinel Company; The Baltimore Sun Company; The Daily Press, Inc.; TMLH 2, Inc.; TMLS I, Inc.; TMS Entertainment Guides, Inc.; Tower Distribution Company; Tribune (FN) Cable Ventures, Inc.; Tribune Broadcast Holdings, Inc.; Tribune Broadcasting Company; Tribune Broadcasting Holdco, LLC; Tribune California Properties, Inc.; Tribune Direct Marketing, Inc.; Tribune Entertainment Company; Tribune Finance LLC; Tribune Interactive, Inc.; Tribune Los Angeles, Inc.; Tribune Manhattan Newspaper Holdings, Inc.; Tribune Media Net, Inc.; Tribune Media Services, Inc.; Tribune National Marketing Company; Tribune ND, Inc.; Tribune New York Newspaper Holdings, LLC; Tribune NM, Inc.; Tribune Television Company; Tribune Television Holdings, Inc.; Tribune Television New Orleans, Inc.; Tribune Television Northwest, Inc.; Virginia Gazette Companies, LLC; WDCW Broadcasting, Inc.; WGN Continental Broadcasting Company; WPIX, Inc.; and WTXX Inc.

indebtedness on a senior priority basis, and (ii) the Bridge Facility indebtedness on a subordinate

basis to the Credit Agreement indebtedness.  Neither the Notes nor the PHONES are guaranteed

by, or constitute obligations of, any of the subsidiaries; they are liabilities solely of Tribune.

Additionally, Tribune is obligated on a $225 million subordinated promissory note to EGI-TRB

LLC and certain permitted assignees of EGI-TRB LLC, which note is subordinate to the

indebtedness under the Credit Agreement, the Bridge Facility and the Notes.

### The Senior Credit Facility

19.     On May 17, 2007 Tribune entered into a $8.028 billion Credit Agreement

(as amended, the "Credit Agreement") with JPMorgan Chase Bank, N.A. as Administrative

Agent, Merrill Lynch Capital Corporation as Syndication Agent, Citicorp North America, Inc.,

Bank of America, N.A. and Barclays Bank PLC as Co-Documentation Agents, and the Initial

Lenders named therein.  The Credit Agreement consists of the following facilities: (a) a $1.5

billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion

Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed

Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750

million Revolving Credit Facility (the "Revolving Credit Facility"), which includes a letter of

credit subfacility in an amount up to $250 million and a swing line facility in an amount up to

$100 million.  The Credit Agreement also provided a commitment for an additional $2.105

billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility").

Accordingly, the aggregate amount of the facilities under the Credit Agreement totals $10.133

billion.  As of the Petition Date, the approximate outstanding balances on the Tranche X Facility,

Tranche B Facility and the Revolving Credit Facility are $512 million, $7.5 billion and $237

million, respectively.  This indebtedness is secured by a pledge of the equity interests of Debtors

Tribune Finance, LLC and Tribune Broadcasting Holdco, LLC ("Stock Pledge"), and is guaranteed, on a senior priority basis, by the Guarantor Subsidiaries.

### The "Bridge" Credit Facility

20.    On December 20, 2007, Tribune entered into (i) a $1.6 billion Senior Unsecured Interim Loan Agreement (the "Interim Credit Agreement") with Merrill Lynch Capital Corporation as Administrative Agent, JPMorgan Chase Bank, N.A. as Syndication Agent, Citicorp North America, Inc. and Bank of America, N.A. as Co-Documentation Agents, and the Initial Lenders named therein, and (ii) a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Credit Agreement. Pursuant to the Interim Credit Agreement, Tribune borrowed $1.6 billion under a twelve (12) month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by Tribune, among other ways, in connection with the consummation of the Merger and for general corporate purposes. The Bridge Facility indebtedness is unsecured but is guaranteed, on a senior subordinate basis,[6] by the Guarantor Subsidiaries. As of the Petition Date, the approximate outstanding balance of the Bridge Facility is $1.6 billion.

### The Notes and the PHONES

21.    Pursuant to Indentures entered into between 1992 and 1997, Tribune is obligated on various issues of outstanding bonds ("Notes") in the aggregate approximate amount of $1.26 billion. Each outstanding series and the approximate principal amounts owing are as follows:

---

[6] The guaranty by the Guarantor Subsidiaries of the Bridge Facility indebtedness is subordinate to the guaranty of the Credit Agreement indebtedness.

| Indenture | Interest Rate | Maturity Date | Outstanding Amount |
|---|---|---|---|
| 1992 | 6.25% | November 10, 2026 | $120,000.00 |
| 1995 | 7.25% | March 1, 2013 | $ 82,083,000.00 |
| 1995 | 7.5% | July 1, 2023 | $ 98,750,000.00 |
| 1996 | 6.61% | September 15, 2027 | $ 84,960,000.00 |
| 1996 | 7.25% | November 15, 2096 | $148,000,000.00 |
| 1997 | 4.875% | August 15, 2010 | $450,000,000.00 |
| 1997 | 5.25% | August 15, 2015 | $330,000,000.00 |
| 1997 | 5.67% | December 8, 2008 | $ 69,550,000.00 |

22.     The Notes are not guaranteed, but as a result of "equal and ratable" provisions in the various indentures, the Notes are secured by the Stock Pledge on a pari passu basis with the indebtedness under the Credit Agreement.

23.     In April, 1999, Tribune issued 8 million Exchangeable Subordinated Debentures due 2029 (the "PHONES") for an aggregate principal amount of approximately $1.3 billion. At the time of issuance, the value of one PHONES was related to the value of one "reference share" of American Online ("AOL") common stock, which was trading at $157 per share at the time. On November 22, 1999, AOL split (2:1), changing the reference to two shares of AOL for each PHONES. On January 11, 2001, AOL and Time Warner merged to form AOL Time Warner Inc. with the merged entity continuing to trade under the ticker AOL. On October 16, 2003, AOL Time Warner Inc. changed its name to Time Warner Inc. and began trading as TWX. As a result of the split and subsequent merger, two shares of TWX common now represent the "reference shares" for each PHONES share. Tribune may redeem the PHONES at any time for the higher of the principal value of the PHONES or the then current market value of two shares of Time Warner common stock, subject to certain adjustments. Holders of PHONES are contractually entitled to exchange a PHONES for an amount of cash equal to 95% (or 100% under certain circumstances) of the then current market value of two shares of Time Warner

stock. As of the Petition Date, the approximate amount of PHONES outstanding was $900,000,000. The PHONES are contractually subordinated in right of payment to all of the funded indebtedness at Tribune.

**D.    Circumstances Leading To The Commencement of These Chapter 11 Cases**

24.    The newspaper publishing industry generally is in the midst of an unprecedented decline which has only been exacerbated by the current recession. While the Debtors' newspaper advertising revenue continues to be in line with, and in some cases superior to, other large metropolitan newspapers, newspaper advertising revenue generally is in significant decline, down industry-wide approximately 15-20% over last year in major metropolitan markets, and down industry-wide nearly $2 billion, or 18%, in the third quarter of 2008 alone. Further, while the Debtors' television broadcasting stations continue to outperform the broader television broadcasting industry, the Debtors' broadcasting revenue nevertheless lags their 2007 performance, again largely as a result of declining advertising revenue. Through November, Tribune's consolidated revenue was down 10% versus last year, with publishing advertising revenues down 18% and broadcasting and entertainment revenues down 3%. On a consolidated basis, Tribune's operating cash flow (excluding equity compensation, one-time items and discontinued operations) was down 33%.

25.    The Debtors have implemented and continue to implement aggressive strategic initiatives to enhance operating cash flow and mitigate the impact of the severe economic downturn. Strategic initiatives aimed at generating incremental cash flow through cost savings include improvements in operating efficiencies, reductions in workforce, web width (newspaper page size) reductions and newspaper redesigns. They also include revenue enhancement initiatives such as entering into arrangements to print and deliver other companies' newspapers, increasing the number of hours of television news programming, and improving the

efficiency and effectiveness of the salesforce.  Additionally, in 2008 the Debtors implemented a strategy to monetize various assets, which resulted in the July, 2008 joint venture involving the Newsday operations, the April, 2008 sale of real estate associated with the Debtors' former southern Connecticut newspapers, the January, 2008 sale of a studio production lot in Hollywood, California and the September, 2008 sale of an equity stake in CareerBuilder LLC. The Debtors continue their marketing efforts in connection with the Chicago Cubs baseball operations and related assets, and in June, 2008 hired a real estate company to explore strategic options for both the historic Tribune Tower in Chicago and Times Mirror Square in Los Angeles.

26.    Notwithstanding the Debtors' aggressive efforts to enhance revenue, reduce expenses and monetize various assets, the impact of an unprecedented economic downturn has left them with weak operating results and significant liquidity challenges.  In December, 2008 alone, the Debtors face debt service and related payments of approximately $200 million, with another $1.3 billion due in 2009, including $512 million in Tranche X debt maturing in June, 2009.  Against a backdrop of declining revenues in this recession, uncertainty in the capital markets and substantial debt service requirements, the Debtors have concluded that the most responsible course of action is to restructure their balance sheet in order to restore liquidity and return to financial health.  By so doing, the Debtors seek to preserve the value of the enterprise for their stakeholders, including their employee shareholders, and continue the storied and historic Tribune legacy.

## PART II

27.    Concurrently with the filing of these Chapter 11 Cases, the Debtors have filed a number of First Day Motions, consisting of a procedural motion and motions relating to the Debtors' business operations.  The Debtors submit that approval of each First Day Motion is

an important element of their reorganization efforts and is necessary to ensure a smooth

transition into chapter 11 with minimal disruption to their operations. I have reviewed each of

the First Day Motions, including the exhibits thereto, and believe that the relief requested therein

is critical to the Debtors' ability to achieve a successful reorganization. Factual information with

respect to each First Day Motion is provided below and in each First Day Motion.

## A.    Procedural Motions

### (1)    Motion of the Debtors for an Order Directing Joint Administration of Their Related Chapter 11 Cases

28.    There are 111 affiliated Debtors in these Chapter 11 Cases. Many, if not

most, of the motions, applications, and other pleadings filed in these Chapter 11 Cases will relate

to relief sought jointly by all of the Debtors. For example, virtually all of the relief sought by the

Debtors in the first day motions filed contemporaneously with the Debtors' petitions and this

Affidavit is sought on behalf of all of the Debtors. Joint administration of the Debtors' cases for

procedural purposes only, under a single docket entry, will allow the Debtors' cases to be

administered as a single joint proceeding instead of 111 independent chapter 11 cases.

29.    Joint administration of these Chapter 11 Cases will create a centralized

location for the numerous documents that are likely to be filed and served in these cases by the

Debtors, creditors, and parties-in-interest, and for all notices and orders entered by the Court. A

single docket will also make it easier for all parties in each of the chapter 11 cases to stay

apprised of all the various matters before the Court. The Debtors will also likely realize

substantial cost savings and reduced administrative burdens by sending notices in the cases to a

single matrix of creditors and Rule 2002 list, rather than maintaining over 100 separate notice

lists.

30.     For the foregoing reasons, the Debtors believe, and I agree, that it is in the best interest of the Debtors, their estates and creditors, other parties-in-interest, and the Court that an order be entered directing the joint administration of these Chapter 11 Cases and the consolidation thereof for procedural purposes only.

**(2)     Motion for an Order Granting Debtors Additional Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs**

31.     The Debtors request an additional fifteen (15) day extension, on an interim basis, to file their schedules of assets and liabilities and the statements of financial affairs (the "Schedules and Statements") and request that the Court set a status hearing on the Motion to consider the length of a further extension. The requested extension would give the Debtors an initial total of forty-five (45) days from the Petition Date to file their Schedules and Statements. Given the sheer size and scope of the Debtors' chapter 11 cases, it is a practical impossibility for the Debtors to complete their Schedules and Statements within the 30-day extension period provided by the Bankruptcy Rules and the Local Rules, or indeed within the additional 15-day extension requested herein. The requested extension will, however, give the Debtors sufficient time to estimate the total length of time that will be required to complete and file the Schedules and Statements and seek an appropriate additional extension from this Court.

32.     The size of the Debtors' businesses and the complexity of their chapter 11 cases are extraordinary, even by the standards of the sophisticated corporate chapter 11 proceedings filed in this district. Tribune is the nation's largest employee-owned media company, operating businesses in the publishing and broadcasting and entertainment segments. The Debtors have a long and complex corporate history, including a recent series of corporate restructuring transactions that returned the Debtors to private ownership. There are 111 Debtors in these jointly administered cases, with operations in 15 states and the District of Columbia.

The Debtors maintain 38 business offices and numerous plants and processing facilities to support their business operations. The volume of materials to be gathered and analyzed from these offices and facilities in order to complete the Schedules and Statements is enormous, and presents the Debtors with a formidable task to be accomplished in limited time.

33.     The Debtors' management and employees, together with their outside legal and financial advisors, have been working diligently to compile the information necessary to complete the Schedules and Statements. While the Debtors maintain extensive books and records and a sophisticated computerized accounting system, completing the Schedules and Statements will require the collection, analysis, and compilation of a massive amount of data to ensure their completeness and accuracy. To illustrate, the Debtors have upwards of 60,000 creditors, including nearly 25,000 current and former employees. The Debtors are party to numerous contracts, leases, and licenses that must be assembled and reviewed as part of the process of completing the Schedules and Statements. Meanwhile, the Debtors are experiencing the considerable stresses of preparing for the filing of these Chapter 11 Cases, the Debtors' transition into chapter 11, and the pre-existing, ongoing responsibilities of operating the Debtors' businesses day-to-day.

34.     For the foregoing reasons, the Debtors believe, and I agree, that it is in the best interest of the Debtors that an interim order be entered extending the deadline to file the Schedules and Statements by an additional 15 days, for an initial total of 45 days from the Petition Date, with a further status hearing to be set on the Motion to consider the length of a further additional extension.

**(3)     Application for an Order Authorizing the Debtors and Debtors-in-Possession to Retain and Employ Epiq Bankruptcy Solutions, LLC as Claims, Noticing, and Balloting Agent Pursuant to 28 U.S.C. § 156(c), Rule 2002(f) of the**

**Federal Rules of Bankruptcy Procedure, and Local Rule 2002-1(f) as of the Petition Date**

35.    In connection with this Application, the Debtors have evaluated several potential candidates to serve as Claims Agent.  Following that review, and in consideration of the number of anticipated claimants and other parties-in-interest, the nature of the Debtors' businesses, and the scope of the tasks for which the Debtors will require the assistance of a claims, noticing, and balloting agent, the Debtors believe, and I agree, that the appointment of Epiq Bankruptcy Solutions, LLC ("Epiq") is in the best interests of the Debtors' estates, their creditors, parties-in-interest, and this Court.  Based on Epiq's considerable experience in providing similar services in large chapter 11 cases, the Debtors believe that Epiq is eminently qualified to serve as Claims Agent in these Chapter 11 Cases.  A detailed description of the services that Epiq has agreed to render and the compensation and other terms of the engagement are provided in the Application and the affidavit of Daniel C. McElhinney, Executive Director of Epiq and the Epiq Engagement Letter, which are attached to the Application.  I have reviewed the terms of the engagement and believe that the Debtors' estates, creditors, parties-in-interest, and this Court will benefit as a result of Epiq's experience and cost-effective methods.

**B.**    **Motions Relating to Business Operations**

**(1)**    **Motion of the Debtors for an Order (I) Authorizing Certain Debtors to Guarantee an Amended Securitization Facility and to Continue Selling Receivables and Related Rights Pursuant Thereto, (II) Authorizing the Debtors to Enter into a Letter of Credit Facility, (3) Modifying the Automatic Stay and (4) Granting Other Related Relief Pursuant to Sections 105, 362(d), 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d) And 365 of the Bankruptcy Code**

36.    In order to provide liquidity for continued operations, the Debtors seek to (i) continue for 120 days[7] their existing accounts receivable securitization facilities, as amended, with Barclays Bank PLC ("Barclays"), as Funding Agent, Administrative Agent and a lender thereunder, and (ii) enter into a Letter of Credit Agreement providing for the issuance by Barclays and other participating lenders of up to $50,000,000 in new Letters of Credit. Specifically, the Amended Agreements will permit the Originators to continue transferring the Receivables, the Related Security and the Collections (each as defined in the Receivables Loan Agreement and hereinafter, collectively, the "RPA Assets") to Tribune Receivables, allowing them to continue their prepetition practice of converting Receivables to cash as soon as possible to provide cash flow necessary for various business purposes. The Amended Agreements and related documents will (i) increase the aggregate principal amount of loans available to Tribune receivables to $300 million, (ii) authorize Tribune and the other Originators to guarantee certain of the obligations of Tribune Receivables under the Amended Agreements and to secure such guaranty obligations, and (iii) authorize the Tribune and the other Debtors to enter into a new letter of credit facility in the amount up to $50 million.

37.    The relief requested by this motion will provide the Debtors with a critical source of continued liquidity and send an important message to the numerous vendors and

---

[7] The Debtors and Barclays intend to explore the extension of the Amended Receivables Facility beyond the initial terms set forth in the Omnibus Amendment.

literally millions of customers that deal with the Debtors that the Debtors have sufficient liquidity to continue to conduct their business. Moreover, this 120 day facility provides the Debtors a reasonable period to evaluate the impact of these chapter 11 proceedings on their businesses, determine their longer term financing needs, and fully explore with Barclays and others the best alternatives for the existing financing. This is all extremely beneficial to the Debtors and these estates.

38.    The Debtors have a vital business purpose for continuing the Amended Receivables Facility. The Debtors believe, and I agree, that denial of the requested relief may impair the Debtors' relationships and dealings with their many vendors and customers. It is essential that the Debtors immediately instill their employees, vendors, service providers, and customers with confidence in the Debtors' ability to transition their businesses smoothly through the chapter 11 process and to continue to operate normally in that environment. The Amended Agreements, together with the Guaranty Security Agreement and the Letter of Credit Agreement are necessary to this objective.

39.    The Debtors believe, and I agree, that the Debtors should be permitted to enter into the Amended Receivables Facility for all the foregoing reasons. The unique opportunity to extend the existing facility promotes stability during the chapter 11 process and facilitates the Debtors' ability to operate normally and without undue disruption.

40.    The Debtors, together with their investment bankers and financial advisors, sought indications of interest in a DIP facility, but the financial institutions that were approached were unwilling to provide the Debtors with additional liquidity on an unsecured basis. The Debtors believe, and I agree, that the proposed continuation of the Amended

Receivables Facility is the best available financing option under the circumstances to meet immediate liquidity needs.

**(2)      Motion of the Debtors for an Order (I) Approving Cash Management Systems, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, (III) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis, and (IV) Granting Administrative Expense Status to Postpetition Intercompany Transactions**

**(a)      Request for Authority to Continue Using Existing Cash Management System and to Provide Protection to Cash Management Banks**

**(i)      Description of Centralized Cash Management System**

41.      In the ordinary course of their businesses, the Debtors and certain of their non-Debtor affiliates utilize a centralized cash management system to collect funds from their operations and to pay operating and administrative expenses in connection therewith (the "Centralized Cash Management System"). The Centralized Cash Management System is similar to those utilized by other large, diversified companies to collect, concentrate, and disburse funds generated by numerous operating entities in a cost-effective and efficient manner.

42.      The Centralized Cash Management System is carefully managed through oversight procedures and controls implemented by the treasury department at the Debtors' headquarters in Chicago, Illinois. The treasury department's control over the administration of the various bank accounts the Debtors' utilize to effect the collection, disbursement, and movement of cash facilitates accurate cash forecasting and reporting and enables the Debtors to monitor capably the collection and disbursement of funds.

43.      Diagrams outlining the general movement of funds within the Centralized Cash Management System are attached as Exhibits to the Cash Management Motion, and a list of the bank accounts utilized in the Centralized Cash Management System are also attached to the Cash Management Motion.

44.     As illustrated in the Exhibits attached to the Cash Management Motion and as discussed in greater detail below, the Centralized Cash Management System operates primarily through bank accounts maintained at three financial institutions—Bank of America ("BOA"), JPMorgan Chase Bank ("JPMC"), and Northern Trust Bank ("NT"). In general, all revenue received by the Debtors and certain of their non-Debtor affiliates is concentrated in two concentration accounts with JPMC (the "JPMC Primary Concentration Accounts"). Revenues reach the JPMC Primary Concentration Accounts through three concentration accounts: the BOA Receivables Concentration Account, the JPMC Receivables Concentration Account, and the BOA Concentration Account (each as defined below). These concentration accounts receive funds through three primary paths: (1) accounts held at BOA and JPMC that are utilized in connection with a receivables purchase lending facility provided by Barclays (the "Receivables Facility Accounts"), (2) circulation and business unit accounts, and (3) miscellaneous other accounts.

45.     For example, prior to reaching the JPMC Primary Concentration Accounts, the Receivables Facility Accounts sweep into the BOA or JPMC receivables facility concentration accounts (the "Receivables Concentration Accounts"). The accounts that are not subject to the Receivables Facility (as defined below), which include certain circulation, business unit and miscellaneous other accounts, are concentrated either directly into the JPMC Primary Concentration Accounts or in a Tribune Company concentration account held at BOA (the "BOA Concentration Account"), which then funds into the JPMC Primary Concentration Accounts. Funds are then disbursed from the JPMC Primary Concentration Accounts through various disbursement accounts. As discussed below, cash balances in excess of the amount needed to fund the Debtors' daily operations are currently invested in low-risk, highly-rated U.S.

treasury obligations.  A more detailed description of the primary bank accounts utilized in the Centralized Cash Management System follows.

### (ii)    Receivables Facility Accounts

46.    During the summer of 2008, Tribune established an accounts receivables purchase facility (the "Receivables Facility").  Pursuant to that certain Receivables Purchase Agreement dated as of July 1, 2008, certain Debtors sell their accounts receivables to their parent, Tribune, which then sells the accounts receivables to a special purpose vehicle buyer, Tribune Receivables, LLC, which is not a Debtor in these proceedings.  Tribune Receivables, LLC purchases accounts receivables from Debtor Tribune through loans provided by certain lenders under the Receivables Loan Agreement.  Pursuant to a Security Agreement, dated as of July 1, 2008, between Tribune Receivables, LLC and Barclays Bank PLC ("Barclays"), Tribune Receivables, LLC grants Barclays a first-priority perfected security interest in, among other things, the Receivables Facility Accounts, the Tribune Receivables, LLC Receivables Concentration Accounts, and permitted investments held in a controlled money market fund account at BOA (the "Cash Reserve Account").  The Receivables Facility Accounts, the Receivables Concentration Accounts, and Cash Reserve Account are all subject to control agreements with Barclays.

47.    The Receivables Facility Accounts currently include 37 controlled accounts held at two banks: 31 controlled accounts are held at BOA and 6 controlled accounts are held at JPMC.  These accounts primarily collect lockbox and credit card receipts.  The majority of the funds deposited into the Receivables Facility Accounts are advertising revenue generated by the Debtors' broadcasting and publishing entities.  The Receivables Facility Accounts receive approximately 80% of the incoming cash receipts from the Debtors' operations.

48.     All Receivables Facility Accounts are zero balance controlled accounts and sweep into two Receivables Concentration Accounts: one held at BOA for the BOA Receivables Facility Accounts and the other held at JPMC for the JPMC Receivables Facility Accounts.   Funds in the BOA Receivables Concentration Account are swept into the BOA Concentration Account, which is then manually transferred to the JPMC Primary Concentration Accounts. The JPMC Receivables Concentration Account is a zero balance account that transfers directly into the JPMC Primary Concentration Accounts. Thus, the JPMC Primary Concentration Accounts contain receivables from both the BOA and JPMC Receivables Facility Accounts.

### (iii)     Other Receivables Accounts

49.     The Debtors maintain other receivables accounts for the collection of circulation revenues and revenues from other operations.  The Debtors collect circulation revenue related to their publishing operations primarily through 12 BOA accounts and 10 JPMC accounts (the "Circulation Accounts").  In addition to the Circulation Accounts, the Debtors and certain of their non-Debtor affiliates maintain 25 accounts at BOA (the "BOA Business Unit Accounts") for various other operations.  These accounts are used by the Debtors and their non-Debtor affiliates in a broad range of broadcasting, publishing, interactive, and sports and entertainment businesses.  The Circulation and BOA Business Unit Accounts are not subject to the Receivables Facility or any control agreements with the Debtors' prepetition lenders.

50.     The Circulation Accounts and the BOA Business Unit Accounts are zero balance accounts.  The BOA Circulation Accounts and the BOA Business Unit Accounts are swept into the BOA Concentration Account.  The BOA Concentration Account and the JPMC Circulation Accounts are swept into the JPMC Primary Concentration Accounts.  As a result of

these activities, substantially all of the Debtors' incoming receivables are concentrated in the JPMC Primary Concentration Accounts.

51.    Finally, in addition to the receivables accounts discussed above, the Debtors maintain other accounts at various financial institutions on behalf of certain local operations, commercial accounts, and newly-acquired businesses. These other receivables accounts include primarily publishing-related accounts, but also encompass accounts used by non-Debtor affiliate TMS Entertainment Guides Canada Corp., which funds Debtor Tribune Media Services, Inc., and Debtor InsertCo, Inc., a newly acquired subsidiary, which operates, in part, on a standalone basis from the Centralized Cash Management System. Funds from these accounts are transferred by wire transfer to the JPMC Primary Concentration Accounts.

### (iv)    Disbursements and Payroll Accounts

52.    The Debtors and their non-Debtor affiliates process and disburse substantially all of their accounts payable and payroll obligations through Tribune accounts. The overwhelming majority of accounts payable is disbursed from accounts maintained at NT. The Debtors also fund voluntary employee benefits and retiree trust accounts at NT. Most payroll for the Debtors and their non-Debtor affiliates, however, is processed through a master payroll account held at JPMC. Accounts payable and payroll disbursements are generally made by ACH debit, check, and wire transfer from the Debtors' accounts at JPMC and NT.

53.    NT Accounts Payable Accounts. The Debtors' primary disbursement accounts are maintained at NT. Debtor Tribune Finance Service Center ("Tribune FSC") is an in-house servicer for the Debtors and their non-Debtor affiliates' accounts payable. Tribune FSC is managed centrally at the Debtors' headquarters in Chicago. Most accounts payable for the Debtors and their non-Debtor affiliates are processed through the Tribune FSC controlled disbursement account ("CDA") held at NT. The JPMC Primary Concentration Accounts fund

the primary disbursement account at NT (the "Primary Disbursement Account"). The NT Primary Disbursement Account then funds the zero balance Tribune FSC CDA to disburse most accounts payable obligations.

54.    Tribune FSC transmits ACH debit instructions and a "positive pay" check file to NT daily that covers the vast majority of the accounts payable for the Debtors and certain of their non-Debtor affiliates. Checks are printed and mailed from Tribune's headquarters. Based on the instructions transmitted to NT, NT initiates ACH credits and clears checks received that have been verified against the "positive pay" check file. The NT disbursement accounts clear checks presented by mid-morning and checks presented for payment after that time clear the following day. By enforcing a cutoff time and prohibiting debits against the CDAs after that time, the Debtors are able to monitor their cash position on a daily basis.

55.    Master Payroll and Benefits Account. The Debtors and certain of their non-Debtor affiliates primarily use one master payroll account maintained at JPMC (the "JPMC Payroll Account"). For each bi-weekly, staggered payroll cycle, total budgeted payroll for the Debtors and certain of their non-Debtor affiliates is $15 to $20 million. Each payroll period, the Debtors generate a cash position report two business days before the scheduled pay date and transmit ACH debit instructions and a "positive pay" check file to the JPMC Payroll Account. The Debtors fund the JPMC Payroll Account from the JPMC Primary Concentration Accounts for the amount of payroll paid via direct deposit to employees before JPMC processes the ACH file. For employees that are instead paid by check, debits are made against the JPMC Payroll Account when checks are presented and verified with the "positive pay" file.

56.    The Debtors also fund four types of employee benefits trust accounts at NT with transfers from the JPMC Primary Concentration Accounts. These accounts are for

voluntary employee benefits contributions, retiree benefits, long-term disability, and 401(k) programs.

57.    <u>Direct Debit Postage and Tax Accounts</u>.  The Debtors maintain 7 direct debit accounts at BOA and JPMC of which 6 are for postage and one is for tax payments.  These accounts are debited by the U.S. Postal Service or tax authorities in the ordinary course of business and are paid from the JPMC Primary Concentration Accounts or the BOA Concentration Account tied to such account in an amount equal to the debited amount.

### (v)    Non-Debtor Affiliate Accounts

58.    As previously discussed, the Debtors and their non-Debtor affiliates operate in a highly integrated manner through the Centralized Cash Management System. Certain non-Debtor affiliates derive great benefits from operating a centralized cash management system; however, a by-product of the efficiencies created by this system is that certain non-Debtor affiliates do not have their own cash management capabilities and fully rely on Tribune for all of their cash management needs.  These non-Debtor affiliates must continue to use the Centralized Cash Management System to successfully meet their business needs.  The primary non-Debtor affiliates that participate in the Centralized Cash Management System are the Chicago National League Ball Club, LLC and related non-Debtor entities (the "<u>Chicago Cubs</u>"), Tribune Interactive, Inc., and certain foreign office affiliates.

59.    For example, the Chicago Cubs operate in a manner that is fully integrated with the Debtors' Centralized Cash Management System.  The BOA Business Unit Accounts for the Chicago National League Ball Club, LLC lockbox account and the Wrigley Field Premium Ticket Services, LLC account are swept automatically into the BOA Concentration Account, like all other BOA Business Unit Accounts, and are processed as receivables to Tribune.  Likewise, certain other non-Debtor affiliates, such as Tribune Interactive, Inc., are fully integrated with the

Debtors' Centralized Cash Management System. Certain foreign non-Debtor affiliates, such as Tribune Hong Kong Ltd., also interact with the Debtors' Centralized Cash Management System. Receipts for this integrated non-Debtor affiliate are received by Tribune and disbursements are made by Tribune on the behalf of such affiliate in the ordinary course of its business through one Centralized Cash Management System.

**(vi)    Continuing Use of the Debtors' Existing Cash Management
System is in the Best Interests of the Debtors' Estates and
Creditors**

60.    The Debtors seek authority to continue utilizing their Centralized Cash Management System, as described above, on a post-petition basis. The Debtors believe, and I agree, that it is critical that the Debtors remain able to manage cash and centrally coordinate transfers of funds in order to efficiently and effectively operate their large and complex business operations. Substantially disrupting the Debtors' current cash management procedures would impair the Debtors' ability to preserve and enhance their respective going concern value and to successfully reorganize during these Chapter 11 Cases.

61.    The Centralized Cash Management System utilizes the Debtors' bank accounts to effectively and efficiently collect, concentrate, and disburse funds as needed in the Debtors' business operations. The Centralized Cash Management System provides significant benefits to the Debtors, including the ability to: (a) closely track, and thus control, all corporate funds through the provision of regular status reports on the location and amount of all funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. Disruption in the Centralized Cash Management System would likely cause delays in the

collection and disbursement of funds, thus impeding the Debtors' ability to carry out their normal business operations to the detriment of employees, customers, suppliers and advertisers.

62.    With its accounting controls, the Centralized Cash Management System also enables the Debtors to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. The Debtors will continue to maintain detailed records reflecting all transfers of funds.

63.    Further, the Debtors manage the Centralized Cash Management System in an automated environment using treasury management software and bank account structures to guard against fraud and to protect the integrity of the overall system. Over many years, the Debtors developed their treasury systems to automate reporting and calculate their cash position and they continue to invest in the system. Fraud protection remains a high priority through use of "positive pay" programs, debit blocks, and limited use of direct check issuance and wire transfers by the Debtors' subsidiaries and affiliates. Any changes to the Debtors' bank accounts or their systems that report on account activity and generate wire transfers would be extremely disruptive to the Debtors' businesses and could unwind the Debtors' efforts to create a safe and effective system.

64.    Therefore, the Debtors believe, and I agree, that it is both essential and in the best interests of the Debtors' respective estates and creditors that the Centralized Cash Management System be maintained. The Debtors' reorganization efforts will be facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that would inevitably be associated with a substantial disruption in the Centralized Cash Management System. Accordingly, the Debtors respectfully request that the Court authorize their continued use of the Centralized Cash Management System.

65.    The Debtors also request that no bank participating in the Cash Management Systems (the "Cash Management Banks") that honors a prepetition check issued prior to the Petition Date or other item drawn on any of the Debtors' accounts that are the subject of this Motion (a) at the direction of the Debtors, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of an innocent mistake made despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored postpetition.  The Debtors believe, and I agree, that such flexibility accorded the Cash Management Banks is necessary in order to induce the Cash Management Banks to continue providing cash management services without additional credit exposure.

**(b)    Request for Authority to Maintain Existing Bank Accounts and Continue to Use Existing Check and Business Forms**

66.    The Debtors believe, and I agree, that requiring the Debtors to comply with the U.S. Trustee Guidelines, including the requirement that chapter 11 debtors close all existing bank accounts after filing a petition for reorganization and open new "debtor-in-possession" accounts in certain financial institutions designated as authorized depositories by the U.S. Trustee, would create significant and undue hardship on the Debtors.

67.    The Debtors represent that if the relief requested herein is granted, they will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court.  For example, concurrently with the filing of this Motion, the debtors are filing motions requesting authority to pay certain prepetition obligations to employees, taxing authorities, customers and other key constituencies in the ordinary course of business.  To prevent the possible inadvertent payment of prepetition claims, except those otherwise authorized by the Court, the Debtors will

immediately advise the Cash Management Banks not to honor checks issued prior to the Petition Date. The Debtors will work closely with the Cash Management Banks to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.

### (i)    Request for Authority to Maintain Existing Bank Accounts

68.    The Debtors therefore seek a waiver of the U.S. Trustee requirement that their bank accounts be closed and that new postpetition bank accounts be opened. If enforced in these cases, such requirements would cause enormous disruption in the Debtors' businesses and would impair the Debtors' efforts to successfully reorganize. Accordingly, the Debtors request that this Court waive the U.S. Trustee requirement that their bank accounts be closed and that new postpetition bank accounts be opened.

69.    As described in detail above, the Debtors' bank accounts comprise an established Centralized Cash Management System that the Debtors need to maintain in order to ensure smooth collections and disbursements in the ordinary course of their businesses. Therefore, to avoid delays in paying obligations incurred postpetition, and to ensure as smooth a transition into chapter 11 as possible, the Debtors should be permitted to continue to maintain their existing bank accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations. Otherwise, transferring the bank accounts will be disruptive, time consuming and expensive.

70.    Accordingly, the Debtors request that this Court waive the strict enforcement of the requirement that the Debtors open new bank accounts. The Debtors further request that the bank accounts be deemed debtor-in-possession accounts and that the Debtors be authorized to maintain and continue using these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

          **(ii)**      **Request for Authority to Continue to Use Existing Check and Business Forms**

71.     The Debtors request that they be authorized to continue to use all correspondence, check and business forms (including, but not limited to, letterhead, purchase orders, and invoices) existing immediately before the Petition Date without reference to the Debtors' status as debtors-in-possession. Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession as a result of the size and publicity surrounding the cases. The Debtors use a significant number of checks and a wide variety of business forms in the ordinary course of their business operations. If the Debtors were required to change their correspondence, check and business forms, they may be forced to choose standard forms rather than the current forms with which the Debtors' employees, customers and vendors are familiar. Such a change in operations would create a sense of disruption and potential confusion within the Debtors' organization and confusion for the Debtors' customers and vendors.

72.     The Debtors therefore request that they be authorized to use their existing check and business forms. Requiring the Debtors to revise all of their existing check and business forms would be unduly burdensome and costly, particularly when appropriate care can be taken to assure the proper usage of the existing forms.

          **(c)**      **Request that the Court Waive the Deposit Requirements of 11 U.S.C. § 345(b) on an Interim Basis**

73.     The Debtors engage in relatively simple investment activities through manual transfer of funds from their concentration accounts into investment accounts at Fidelity (the "Fidelity Accounts"). Deposits in the Fidelity Accounts are invested predominantly in U.S. Treasury obligation-based money market funds, including Fidelity's "Treasury Only Portfolio" fund and "Treasury Portfolio" fund. The Treasury Only Portfolio and Treasury Portfolio funds

invest at least 80% of their assets in U.S. Treasury securities. The Debtors' investments are executed by authorized persons, recorded, and subject to internal control procedures.

74.     The Debtors are requesting that the Court waive the requirements of section 345(b) on an interim basis and permit them to maintain their deposits in their investment accounts in accordance with their existing deposit practices until such time as the Debtors obtain this Court's approval to deviate from the guidelines imposed under section 345(b) of the Bankruptcy Code on a final basis.

75.     Given the complexity of the Debtors' existing Centralized Cash Management System and the relative security of the Centralized Cash Management System, the Debtors believe, and I believe, that cause exists to grant an interim forty-five (45) day waiver of the requirements of section 345(b) of the Bankruptcy Code.

**(d)     Request that the Court Allow Administrative Expense Status for Intercompany Transactions**

76.     In the normal course of their businesses, the Debtors and their non-Debtor affiliates routinely engage in various intercompany transactions due to their centralized cash administration system. As of the Petition Date, there are numerous intercompany claims (the "Intercompany Claims") that reflect intercompany receivables and payables made in the ordinary course between and among the Debtors and between and among the Debtors and their non-Debtor affiliates (the "Intercompany Transactions"). These Intercompany Transactions include, but are not limited to:

> a.     Accounts Receivables, Accounts Payables and Payroll. In the ordinary course of business, the Debtors and certain of their non-Debtor affiliates contribute cash and process disbursements through one Centralized Cash Management System maintained by the parent, Debtor Tribune Company. The system is so integrated that substantially all receipts are concentrated into and substantially all

disbursements are paid from parent-level concentration accounts. Also, in the ordinary course of business, the Debtors and certain of their non-Debtor affiliates may collect cash and disburse funds on behalf of other Debtors and certain other non-Debtor affiliates. The Debtors account for this intercompany movement of cash in their intercompany books and records.

b.  Centrally Billed Expenses. In the ordinary course of business, the Debtors and their non-Debtor affiliates incur centrally billed expenses, such as employee medical costs, insurance premiums, certain taxes (including real estate, franchise, sales, etc.) and leased equipment. These charges are allocated among the Debtors and their non-Debtor affiliates and are reflected on the Debtors' intercompany accounts.

c.  Corporate Expense Allocation. Charges for certain corporate expenses provided to the Debtors and their non-Debtor affiliates are allocated among the Debtors and certain of their non-Debtor affiliates based upon the cost of service provided, directly identifiable costs and other allocation methods in addition to a services fee.

d.  Capital Calls. In the ordinary course of business, the Debtors are obligated to make capital contributions pursuant to joint venture agreements with certain non-Debtor affiliates.

77.    The Debtors maintain records of all Intercompany Transactions and can ascertain, trace and account for all Intercompany Transactions between and among the Debtors and between and among the Debtors and their non-Debtor affiliates. Certain non-Debtor affiliates, which do not have independent cash management systems, operate within the Centralized Cash Management System. Therefore, the Debtors believe, and I agree, that continuation of the existing cash management system among the Debtors and their non-Debtor

affiliates is critical to preserving the nature of their businesses and avoiding highly disruptive operational distractions.

78.    To ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims against a Debtor by another Debtor or non-Debtor affiliate arising after the Petition Date as a result of Intercompany Transaction be accorded administrative priority expense status. If all Intercompany Claims are accorded administrative priority expense status, each entity will continue to bear ultimate repayment responsibility for such ordinary course transactions.

**(e)    Other Relief**

79.    Finally, JPMC and BOA are creditors of most of the Debtors. It is possible that JPMC and BOA may assert rights of setoff or banker's liens against monies of the Debtors held at the Petition Date in these institutions. The Debtors do not seek to prejudice such rights by this Motion and the relief sought herein. Consequently, the Debtors request, and I concur, that any order granting this Motion further provide that "to the extent a bank has a valid and enforceable right of setoff or lien in cash present in a Debtor's account at such bank at the moment of the filing of the petition commencing the chapter 11 case of such Debtor (the "Petition Date Cash"), and to the extent such cash is thereafter used by such Debtor, such bank is hereby granted (i) a replacement lien in the Debtors' cash, and such replacement lien shall be of the same extent and priority as such bank's interest, as of the filing of the petition commencing the chapter 11 case of such Debtor, in the Petition Date Cash subsequently used by the Debtors and (ii) an administrative expense claim to the extent of any diminution of Petition Date Cash after the petition commencing the case is filed." The Debtors believe that a relatively small or even de minimis amount of funds is subject to this relief.

(3)    **Motion of the Debtors for an Order Authorizing, but not Directing, the Payment of Certain Prepetition Sales, Use, Franchise and Property Taxes, Licensing Fees, and Similar Obligations ("Tax Motion")**

80.    In the ordinary course of business, the Debtors incur certain sales, use, franchise and real and personal property taxes, fees for licenses and reporting, and other similar charges and assessments (collectively, the "Taxes") that are payable directly to various state and local taxing authorities (collectively, the "Taxing Authorities") as such payments become due. As described above, the Debtors have facilities and operations located throughout the United States; accordingly, they are subject to the payment of Taxes to numerous Taxing Authorities located throughout the country.

81.    I have been advised that the Debtors are current on all of their Taxes that have become due as of the Petition Date.  Because many of such Taxes are paid on a periodic basis (and in arrears) there is often a lag between the time when the Debtors incur an obligation to pay the Taxes and the date such Taxes become due and payable.  Various Taxing Authorities may therefore have claims against the Debtors for Taxes that have accrued but remain unpaid as of the Petition Date, and for certain other Taxes that will come due during the pendency of these cases.

82.    Through the Tax Motion, the Debtors seek authority, in their discretion, to pay the relevant Taxing Authorities any Taxes that have accrued, but were not yet due and owing or were not paid in full, as of the Petition Date, together with any prepetition Taxes that arose prior to the Petition Date that become due and owing during the pendency of these cases in the ordinary course of business.  I estimate that as of the Petition Date, the Debtors' accrued and unpaid liabilities for Taxes included approximately $2.7 million in sales and use taxes, $4.6 million in personal property taxes, $8.2 million in real property taxes, $24,000 in franchise taxes,

$1.0 million in certain state and local taxes, licensing fees, charges, and similar assessments, and $142,000 in other, similar tax obligations. In addition, the Debtors are subject to certain audit investigations and may be subject to further audit investigations (the "Audits") during the pendency of these cases that may result in additional prepetition Taxes (the "Audit Amounts"). The Debtors have included such real and potential Audit Amounts in their estimates in the Tax Motion, and the Debtors seek authority, in their discretion, to satisfy any such Audit Amounts in the ordinary course of business.

83. Payment of the Taxes as requested by the Motion will prevent disruption of the Debtors' businesses as they enter these Chapter 11 Cases. In certain cases, as described in the Tax Motion, some Taxing Authorities may audit the Debtors if such Taxes are not timely paid. The Debtors believe, and I agree, that such audits would needlessly divert the Debtors' attention from their reorganization efforts. In addition, were some Taxing Authorities to impose liens on the Debtors' assets on account of unpaid "trust fund" Taxes, such liens would require time, effort and expense for the Debtors to challenge and remove. An improper lien or the failure to pay certain Taxes might also affect the Debtors' good standing in a particular state, potentially affecting the Debtors' ability to continue operating in the ordinary course. The Debtors believe, and I agree, that timely payment of the Taxes is necessary to avoid such consequences of the chapter 11 filing, and is thus in the best interests of the Debtors and their estates.

84. In addition, to the extent that any "trust fund" taxes remain unpaid by any of the Debtors, their officers could be subject to civil liability or criminal prosecution during the pendency of these Chapter 11 Cases. The possibility of any such lawsuit or criminal prosecution

would distract the Debtors and their officers in their effort to implement a successful reorganization strategy to the detriment of all parties-in-interest.

85.    The Debtors further believe, and I agree, that their successful reorganization will require good standing within the states in which they do business and a complete devotion of effort by their officers and directors to these cases. The Debtors operate in 15 states and the District of Columbia, often with more than one facility in each state, and have sales in most, if not all states. Therefore there are a vast number of state and local taxing authorities with which the Debtors interact. If any of the Taxing Authorities attempt to exercise certain remedies against the Debtors, the Debtors believe that it would have the devastating effect of distracting the attention of the Debtors' management and professionals away from the important task of the Debtors' successful reorganization. For these reasons, the Debtors believe, and I agree, that if the relief requested in the Tax Motion is not granted, the tax obligations described above would cause the Debtors' estates immediate and irreparable harm.

(4)    **Motion of the Debtors for (I) an Order Authorizing, on an Emergency Basis, Payment of Certain Prepetition Claims of Critical Vendors and (II) an Order Authorizing, but not Directing, after Notice and a Hearing, the Debtors to pay Certain Obligations Arising in Connection with Goods Received by the Debtors within the Twenty Day Period Before the Petition Date (the "Critical Vendor Motion")**

86.    By the Critical Vendor Motion, the Debtors seek to pay (i) on an emergency basis, in their discretion, the prepetition claims of critical vendors that delivered goods or provided services to the Debtors before the Petition Date and (ii) after notice and a hearing, in their discretion, certain administrative expense priority claims for obligations arising in connection with goods supplied by certain vendors that were received by the Debtors in the

ordinary course of business within the twenty day period before the Petition Date (the "Twenty Day Period").[8]

87.    Specifically, certain vendors (the "Critical Vendors") have claims for providing (i) essential goods to the Debtors that were received by the Debtors before the Petition Date and/or (ii) essential services that were rendered to, or on behalf of, the Debtors before the Petition Date (collectively, the "Critical Vendor Claims"). By the Critical Vendor Motion, the Debtors request authority to pay, in their discretion, the prepetition claims of such Critical Vendors in an aggregate amount not to exceed $20,350,000 (the "Critical Vendor Cap").

88.    Prior to making this request, the Debtors examined whether the payment of Critical Vendor Claims is necessary and will ensure that the Debtors have access to adequate amounts of trade credit on a postpetition basis. Specifically, the Debtors reviewed their accounts payable and undertook a process to identify those vendors who are essential to the Debtors' operations. The Debtors also developed certain procedures, which are specified in the Critical Vendor Motion, that, when implemented, will ensure that vendors receiving payment of Critical Vendor Claims will continue to supply trade credit necessary to the Debtors' operations on a postpetition basis. The Debtors also consulted with appropriate members of their management team to identify those vendors that are most likely essential to the Debtors' operations using the following criteria: (a) whether the vendor in question is a "sole-source" provider, (b) whether certain customizations prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe, (c) if a vendor is not a sole provider, whether the Debtors have sufficient goods in inventory to continue operations while a replacement vendor is secured, and (d) whether a vendor meeting the standards of (a) or (b) is likely to refuse

---

[8] The Debtors also seek the authority, where applicable and consistent with the relief sought in this Motion, to "pay" certain of the Critical Vendor Claims and Twenty Day Claims (each as defined below) by cancelling out certain postpetition amounts that may be owed to the Debtors (a "Cancellation").

to continue providing goods or services to the Debtors postpetition if its prepetition balances are not paid.

89.     After carefully assessing the universe of vendors against the foregoing criteria, the Debtors estimated the total payments that would be necessary to ensure the continued supply of critical goods and services to the Debtors in calculating the Critical Vendor Cap.   These Critical Vendors can be broken down into the following categories: (i) newsprint and other printing related raw materials, (ii) commercial printing, and (iii) broadcasting, transmissions and related services, each of which is described in further detail below.

**(a)     Newsprint and Other Printing Related Raw Materials**

90.     Newsprint constitutes the principal raw material used by the Debtors to complete the printing of their various publications.  The price of newsprint has historically been volatile and the consolidation of North American newsprint mills over the years has reduced the number of newsprint suppliers which, over the last year, has created increases in newsprint prices.  The Debtors believe, and I agree, that failure to pay the prepetition amounts owing to their newsprint suppliers on a timely basis could negatively impact their existing relationships with newsprint suppliers and, therefore, could adversely impact newsprint prices in the future. Further, due to recent market downturns in the newsprint industry, any failure to promptly pay newsprint suppliers may severely impact the financial condition of the newsprint suppliers. Moreover, should the newsprint suppliers fail to supply newsprint continuously and promptly to the Debtors, the Debtors' business operations would be significantly disrupted.

91.     In addition to newsprint, the Debtors' ability to complete the printing of their various publications is dependent on several other raw materials.  For example, the Debtors' printing process is heavily reliant on a continuous ink supply.  As another example, the Debtors must have a sufficient inventory of custom-fit newspaper plates to ensure that ink images can

successfully be transferred to newsprint.  The Debtors must also maintain an adequate inventory

of polybags and shrink-wrap to guarantee that their newspapers are appropriately assembled for

and adequately protected during the newspaper delivery process.  Each of these raw materials is

essential to the production of the Debtors' publications.  Further, several of the raw materials are

customized to fit the Debtors' needs and, as a result, are purchased by the Debtors from a single

or limited number of suppliers.  Due to the critical nature of the continuous supply of these

materials to the production of the Debtors' publications, the Debtors believe, and I agree, that it

is essential to the Debtors' reorganization efforts that the delivery of these raw materials

continues without any delay.

### (b)    Commercial Printers

92.    While the Debtors handle a significant amount of their printing and

inserting requirements, the Debtors outsource certain of these obligations to third-party

commercial printers (the "Commercial Printers").  Specifically, the Debtors utilize Commercial

Printers to prepare inserts and print certain items that, due to specific formatting requirements

and printing specifications, are either inefficiently handled or incapable of being handled by the

Debtors' printing presses.  For example, several of the Debtors' advertisers request the Debtors

to provide direct mailing services, whereby the Debtors print and deliver advertisements or other

materials directly to the advertisers' customers.  These advertisements often require unique

printing configurations that are not available on the Debtors' printing presses.  In order to meet

these printing requirements, the Debtors utilize Commercial Printers with appropriately

configured printing presses.  The Debtors also utilize Commercial Printers to print certain

sections of their publications, such as the comics section, that require specially configured

printing presses otherwise unavailable to the Debtors.

93.    The delivery of materials printed by the Commercial Printers in accordance with a specified time line is critical to the Debtors' ability to meet the demands of their advertisers, subscribers and other customers.  Due to the time sensitive and customized nature of the products provided by the Commercial Printers, the Debtors believe, and I agree, that it is essential to the Debtors' reorganization efforts that the Commercial Printers continue to provide customized printing without any delay.

(c)    **Broadcasting, Transmissions and Related Services**

94.    Certain Critical Vendors supply services that are essential to the Debtors' maintenance of a competitive position in the broadcasting and related advertising industry. Specifically, the Debtors' broadcast television and radio stations compete for audiences and advertising opportunities with other broadcast television and radio stations, cable television, and other media serving the same markets.  Competition for audience and advertising is based upon various interrelated factors, including programming content.  The Debtors have negotiated the right with certain third-parties to provide programming currently in high demand by their audiences and also utilize a third-party service to monitor, track, and bill advertisers for all ads run during their broadcast programs (the "Broadcast Trafficking").  Any interruption of the Debtors' programming or Broadcast Trafficking services would significantly impede the Debtors' ability to run, track and bill millions of dollars of advertising.

95.    The Debtors' broadcasting businesses are also dependent on various transmission service providers to ensure reliable transmission of their broadcast programming (the "Transmission Services").  For example, the Debtors' broadcast transmissions are entirely dependent on certain custom configured satellite Transmission Services.  As another example, during certain programming, the Debtors rely on live or real-time transmissions captured by highly customized retro-fit helicopters.  Any interruptions in the Debtors' broadcast

programming — due to a Transmissions Service interruption or otherwise — would significantly impede the Debtors' ability to schedule, track and bill for millions of dollars of advertisements run during their broadcast programs.

96.     As detailed above, maintaining the goods and services provided by the Critical Vendors is necessary to avoid immediate and irreparable harm to the Debtors estates, and is also vital to the Debtors' continuing business operations and the success of these Chapter 11 Cases. In addition, and as also detailed above, the Debtors have conducted an extensive analysis and review of the Debtors immediate trade needs and supplier base and have concluded that there is a significant risk that the Critical Vendors will cease doing business with the Debtors unless their Critical Vendor Claims are paid. Should any Critical Vendor stop supplying goods or services to the Debtors, or choose to significantly downgrade the Debtors' trade terms, their businesses would be adversely affected as a result of, among other things, an adverse impact on the Debtors' ability to timely produce publications and maintain a competitive broadcasting and online presence. This, in turn, could result in lost advertising and circulation revenue, as well as overall subscriber and advertiser dissatisfaction. As such, the Debtors believe, and I agree, that the amount of the Critical Vendor Cap pales in comparison to the likely damage to the Debtors' businesses and estates should the relief requested in the Critical Vendor Motion not be granted.

97.     In addition to the relief related to Critical Vendor Claims in the Critical Vendor Motion, by the Critical Vendor Motion, the Debtors also seek authority to pay, after notice and a hearing, at their discretion, certain claims for the delivery of non-critical goods in the 20 days before the Petition Date.

98.     Specifically, in the ordinary course of their businesses, the Debtors receive goods on a daily basis that are used in their operations. As such, the Debtors have received

goods (the "Twenty Day Goods") from various vendors, including certain Critical Vendors, (the "Twenty Day Vendors"), in the ordinary course of their businesses within the Twenty Day Period for which payment has not yet been made. By the Critical Vendor Motion, the Debtors seek to pay, in the ordinary course, certain prepetition claims of Twenty Day Vendors for those undisputed obligations arising from Twenty Day Goods received by the Debtors (the "Twenty Day Claims"). The Debtors estimate that they have received approximately $30,000,000 of Twenty Day Goods, which have not yet been paid for. The Debtors believe, and I agree, that payment of such Twenty Day Claims is necessary in order to maintain and ensure timely delivery of postpetition goods from the Twenty Day Vendors and to help ensure that the Debtors have access to postpetition trade credit from the Twenty Day Vendors.

**(5)**     **Motion of the Debtors for an Order Authorizing, but not Requiring, the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business ("Customer Programs Motion")**

99.     Prior to the Petition Date, and in the ordinary course of their business operations, the Debtors engaged in certain practices to develop and sustain a positive reputation for their publications, syndicated content offerings, broadcast stations, cable networks and interactive websites with subscribers and advertisers and in the marketplace generally (collectively, the "Customer Programs"). The Customer Programs, many of which are customary in the Debtors' industries, include, among others, rebates, prepayments, refunds, adjustments, customer service programs and delivery programs, each of which is described in greater detail below. The goals of the Customer Programs are to meet competitive pressures, ensure customer and advertiser satisfaction and generate goodwill for the Debtors, thereby retaining current customers and advertisers, attracting new ones and ultimately enhancing revenue and profitability.

100.    By the Customer Programs Motion, the Debtors seek entry of an order, authorizing the Debtors, in their discretion, to (i) perform the Debtors' prepetition obligations related to the Customer Programs as they determine advisable and (ii) continue, renew, replace, and/or terminate any of the Customer Programs, as the Debtors determine advisable, in the ordinary course of business, without further application to this Court.  Accordingly, the Debtors desire to continue during the postpetition period those Customer Programs that they believe are beneficial to the Debtors' businesses.  The Debtors believe, and I agree, that such relief is necessary to preserve the Debtors' critical customer and advertiser relationships.  It is my understanding that the total operational and administrative costs to the Debtors to continue the Customer Programs is relatively insignificant when compared to the revenue that the Debtors generate from their subscribers and advertisers.  As a result, it is in the best interests of the Debtors and their estates to continue, in the ordinary course of business, the Customer Programs.

101.    In addition, in light of the fact that some of the Customer Programs, as they relate to prepetition agreements regarding the Debtors' publishing and broadcast and entertainment businesses, may represent unperformed prepetition obligations, by the Customer Program Motion, the Debtors seek this Court's authorization to perform the Debtors' obligations related to the Customer Programs.[9]  Because the Debtors' industries are highly competitive, the Debtors believe that some of their subscribers may cease to purchase the Debtors' publications and turn to other sources if the Debtors fail to timely perform their obligations under the Customer Programs.  Similarly, parties who advertise in or subscribe to the Debtors' products

---

[9] In the Customer Program Motion the Debtors make clear that nothing contained in the Customer Program Motion shall constitute, nor shall it be construed as, a request to assume or adopt any executory contract with respect to any Customer.  The Debtors also expressly reserve all rights with respect to the continuation or cessation of any contract with any Customer and the assumption, adoption, modification or rejection of any executory contract with any Customer.  Furthermore, the Debtors reserve the right to contest the amounts claimed to be due, if any, by any Customer in the ordinary course of business.

may cease to conduct business with the Debtors due to the Debtors' failure to honor their obligations under the Customer Programs. For these reasons, and those discussed above, the Debtors believe, and I agree, that maintaining the Customer Programs is necessary in order for the Debtors to stay competitive and maintain their customer base during the course of these Chapter 11 Cases.

102.    The Debtors seek to continue the Debtors' Customer Programs because they have produced positive results in the past and are responsible for generating valuable goodwill, repeat business and increased revenue. Continuing these Customer Programs in the ordinary course of business during these Chapter 11 Cases is essential to maximizing the value of the Debtors' estates for the benefit of all creditors. Furthermore, all of the Debtors' Customer Programs are standard in the Debtors' industries and are therefore necessary in order to keep pace with the Debtors' competitors. The following are general descriptions of the prepetition obligations relating to the Debtors' Customer Programs.

(a)    **Advertising Programs**

103.    The vast majority of the Debtors' revenue comes from advertising, with the remainder coming mostly from subscriptions. Advertising revenue accounts for approximately 73% of the Debtors' total publishing revenue, and approximately 95% of the Debtors' total broadcasting revenue.[10] There are several types of Customer Programs related to the Debtors' advertising services (the "Advertising Programs"). The Debtors' Advertising Programs, each of which is described more fully below, include (i) advertising rebates and related discounts or price adjustments (the "Rebate Program"); (ii) broadcasting audience delivery guarantees (the "Make-Good Program"); (iii) online audience guarantees (the "Online

---

[10] This estimate excludes advertising revenue generated by a certain non-debtor affiliate.

Advertisement Program"); and (iv) correction of improperly run ads (the "Error Credit Program").

**(b)      The Rebate Program**

104.      The Debtors offer rebates, allowances, discounts and other price adjustments (the "Rebates") to certain advertisers to incentivize such advertisers to purchase large volumes of print advertising from the Debtors.  These Rebates, which are limited to those advertisers purchasing the largest volume of print advertising, are custom-negotiated by the Debtors and the advertisers to fit the specific demands of the advertisers.  The Rebate program is consistent with customary industry practice and has been employed by the Debtors for several years.

105.      Typically, the Debtors will accrue Rebates monthly, with such amounts paid in cash or otherwise credited to the advertiser monthly, quarterly, or annually, depending on the specific terms of the applicable Rebate agreement.  As of the Petition Date, the Debtors estimate that there is approximately $5,000,000 of potential liability outstanding in connection with the Rebates.  However, in light of the fact that many of these Rebates are granted in the form of a credit applied to a particular advertiser's account, the Debtors believe, and I agree, that their actual cash liability to their advertisers with respect to Rebates will be considerably lower.  By the Customer Programs Motion, the Debtors request the authority, but not direction, to continue the Rebate Program and to honor any prepetition amounts outstanding in connection therewith.

**(c)      The Make-Good Program**

106.      The Debtors' also provide television and radio advertising services to their advertisers.  If, in connection with these services, an advertisement does not reach a requisite audience base or demographic, the Debtors will, in accordance with their Make-Good Program,

rerun the advertisement to make up for the audience underdelivery (the "Audience Underdelivery") at no additional charge to the Debtors' advertiser.[11]

107.    In order to estimate the value of advertising spots that may be owed on account of a failure to deliver a requisite audience base, the Debtors utilize a standardized valuation methodology which measures the estimated audience for an advertisement. An estimate is generated from this valuation, and, at any point during a specified year, this figure represents a reasonable estimate against which the Debtors calculate Audience Underdelivery liability. The Debtors estimate that, as of the Petition Date, up to approximately $4,600,000 of potential liability is outstanding in connection with the Make-Good Program. However, the Debtors anticipate that little, if any, cash payments will actually be made to advertisers on account of this liability. Instead, the Debtors anticipate that this liability will be satisfied by providing additional advertising services to their advertisers.

108.    The Make-Good Program is intended to ensure the satisfaction of the Debtors' advertisers and to retain their long term business. The Debtors believe, and I agree, that failure to honor the Make-Good Program could severely undermine advertiser satisfaction and may potentially result in the loss of advertisers to competitors providing similar programs. Accordingly, the Make-Good Program is essential to preserving the goodwill of the Debtors' advertisers and ensuring that they do not seek alternatives for their advertising needs. By the Customer Programs Motion, the Debtors request the authority, but not direction, to continue the Debtors' Make-Good Program and to honor all prepetition obligations owed in connection therewith.

---

[11] In very limited circumstances the Debtors may issue a credit to the advertiser's account to be credited towards future advisements. However, the Debtors believe that no such liability currently exists.

### (d)    Online Advertisement Program

109.    The Debtors' business operations include several interactive websites related to their daily newspapers, television stations, and other branded sites targeting specific communities of interest. Among other things, the Debtors' websites provide online advertisements on behalf of various businesses. Parties utilizing the Debtors' online advertisement services are generally billed by the number of times an online advertisement is viewed ("Impressions"). The Debtors often guarantee their advertisers a certain number of Impressions for each advertisement. If the requisite number of Impressions is not achieved, under the Online Advertisement Program, an advertiser may generally elect to either pay only for those Impressions that were delivered or to have the Debtors continue the advertisement for an additional period of time at no added cost.

110.    The Debtors generally do not issue cash refunds to their advertisers in connection with the Online Advertising Program. As a result, the Debtors do not believe that there is any cash liability owing to advertisers as of the Petition Date on account of the Online Advertisement Program. Instead, the Debtors believe that their obligations related to this program are primarily to provide additional advertisement slots to advertisers or to issue credits to such advertisers for future advertising services. This program is an essential component to maintaining the satisfaction of their advertisers utilizing online advertisement services. Therefore, by the Customer Programs Motion, the Debtors request the authority to continue the Online Advertisement Program and to honor all prepetition obligations related thereto.

### (e)    Error Credit Program

111.    The Debtors regularly print advertisements in their various publications for advertisers. Despite the Debtors' best efforts, given the enormous size of the Debtors' print advertising businesses, from time to time advertisements are run with errors or are otherwise not

to the advertiser's satisfaction. To the extent such issues occur, under the Error Credit Program, the Debtors will rerun the advertisement at no additional charge. In certain limited circumstances, if an advertising error cannot be corrected by rerunning the advertisement, the Debtors will issue a credit to the advertiser's invoice.

112.    As of the Petition Date, the Debtors estimate that there may be as much as $1,500,000 of potential liability outstanding with respect to the Error Credit Program. However, because the Debtors' primary obligations associated with the Error Credit Program are to rerun advertisements or, where necessary, to issue a credit to the advertiser's invoice, the Debtors do not believe that there are any cash payments outstanding to their advertisers as of the Petition Date on account of the Error Credit Program.

113.    The Debtors' ability to continue providing the services rendered in connection with the Error Credit Program is an essential element of their print advertising business. Accordingly, by the Customer Programs Motion, the Debtors request the authority, but not direction, to continue the Error Credit Program and to honor all prepetition obligations related thereto.

### (f)    Delivery Service Program

114.    The Debtors provide delivery services for certain non-affiliated newspaper companies (the "Newspaper Companies") in defined geographical areas (the "Delivery Service Program"). These delivery services, which vary among each Newspaper Company, include "home delivery" and "single copy" delivery services. For home delivery service, the Debtors deliver newspapers directly to the Newspaper Companies' subscribers. For single copy delivery services, the Debtors deliver the Newspaper Companies' newspapers to newsstands, stores, or other retail locations. As a part of their services to the Newspaper Companies, the Debtors collect the proceeds owed to the Newspaper Companies from these retail locations. In some

instances, the Debtors also agree to buy newspapers from the Newspaper Companies at a wholesale price which the Debtors then resell to retailers. The Debtors collect the proceeds from such retail sales.

115.    As compensation for the delivery services, the Debtors are generally paid a set price per copy delivered.[12]  In certain instances, the Debtors remit the proceeds collected on behalf of the Newspaper Companies to such companies who in turn separately forward payment to the Debtors for the Debtors' services. However, in most instances, the Debtors deduct the fees they are owed in connection with the Delivery Service Program from the proceeds collected from the retailers. To the extent the proceeds exceed the amounts due to the Debtors under the Delivery Service Program, the Debtors remit such excess to the appropriate Newspaper Company.

116.    As of the Petition Date, the Debtors estimate that due to the deduction of fees owed to the Debtors, the Debtors do not have any cash payment obligations to the Newspaper Companies. However, by the Customer Program Motion, the Debtors request the authority, but not direction, to honor all prepetition obligations to the Newspaper Companies, including the exercise of any setoff rights with respect to amounts owed to the Newspaper Companies, and to otherwise honor the Delivery Service Program.

(g)    **Direct Mail Program**

117.    The Debtors also provide certain direct marketing services to customers seeking to distribute advertisements and similar materials directly to the homes and offices of a geographically defined market base. These services typically involve mailing a customers' print media directly to a specified mailing list on or before a certain date (the "Direct Mail Program").

---

[12] In rare instances, the Debtors are paid a set price per copy delivered and an additional flat fee.

Under the Direct Mail Program, the Debtors' customers are responsible for paying postage costs associated with the delivery of their direct mailing products. The USPS is the primary method the Debtors use to ship such direct mailing products. The Debtors typically provide their customers with an estimate of the postage charges (the "Postage Estimate") approximately seven (7) to ten (10) days before the direct mailing products are scheduled to be shipped. Customers may either (i) remit the amount due under the Postage Estimate directly to the Debtors, (ii) write checks made payable to the USPS to be delivered to the USPS by the Debtors, or (iii) pay USPS directly. If the customer chooses to pay the Debtors rather than the USPS, their payment is deposited in a centralized Direct Mail Program account (the "Postage Account"). The Debtors then pay the USPS out of the Postage Account. To the extent a customer provides the Debtors with postage-related funds in excess of the actual postage charges, such excess funds are returned to the customer.

118.    As of the Petition Date, the Debtors estimate that they have in their possession approximately $2,600,000 in respect of postage funds advanced by customers under the Direct Mail Program. The Direct Mail Program provides an enormous benefit to the Debtors' direct marketing customers not only through access to a certain marketing demographic, but also by relieving the customers from the burden of mailing the print media themselves. To the extent that the Debtors' fail to honor their obligations under the Direct Mail Program, the Debtors' customers will likely seek other providers for such services and cease doing business with the Debtors. Accordingly, by the Customer Programs Motion, the Debtors request the authority, but not direction, to honor any prepetition obligations outstanding in connection with the Direct Mail Program.

### (h)    Billing Adjustments

119.    Despite the Debtors best efforts, from time to time in the Debtors' publishing and broadcast and entertainment businesses, subscribers and advertisers are invoiced in error for amounts that they did not actually incur.  Such errors include improper invoicing (when the invoice created does not properly reflect the items ordered by a customer), duplicate payment (when a customer makes two payments on account of the same order), mis-pricing (when a customer is charged or pays an incorrect price – either too high or too low – for the Debtors products), mis-run advertisements (where the wrong version of a radio or television advertisement is aired or the advertisement is aired at the incorrect time), and various other billing and payment errors (collectively, the "Invoicing Errors").  Where a customer pays for such amounts invoiced in error, the Debtors correct the Invoicing Errors through billing adjustments (the "Billing Adjustments").

120.    Because there is some delay from the time the invoice is first issued to the time the Invoicing Error is first realized, it is difficult to predict with certainty the amount outstanding on account of such errors.  However, as of the Petition Date, the Debtors estimate that approximately $4,500,000 is outstanding in connection with Billing Adjustments.  It is essential that the Debtors be able to continue to refund amounts due under such Invoicing Errors to their customers in order to maintain the customers' business and preserve the long-term goodwill of the Debtors businesses.  By the Customer Programs Motion, the Debtors request authority, but not direction, to continue issuing Billing Adjustments and to honor the prepetition amounts owed in connection therewith.

### (i)    Customer Service Program

121.    In order to best serve their customers, the Debtors have engaged the services of certain third-party customer service representatives to address inquiries and issues

related to the Debtors' advertising services and publications, including, but not limited to, newspaper subscription issues, delivery issues, billing questions, advertising customer accounting, online technical issues, and debt collection services (the "Customer Service Providers"). The Customer Service Providers provide these services primarily through outsourced customer call centers.

122.    The Customer Service Providers function as a critical intermediary between the Debtors and their customers. Due to the direct level of contact between the Customer Service Providers and the Debtors' customers, many customers perceive the Customer Service Providers as direct employees of the Debtors. As a result, the failure of the Customer Service Providers to adequately perform their services could severely undermine customer loyalty. Furthermore, the services provided by the Customer Service Providers are based on countless hours of planning, organization and training by both the Debtors and the Customer Service Providers. The cost to the Debtors' estates to formulate an alternative program with new providers and to train new customer service representatives would greatly outweigh the cost of paying the Customer Service Providers for their prepetition services.

123.    Customer Service Providers generally invoice the Debtors for services rendered in the previous month in an amount based on the volume of calls received. [13] Because the Customer Service Providers generally bill in arrears, the Debtors estimate that, as of the Petition Date, approximately $825,000 is due and owing to Customer Service Providers. As set forth above, it is imperative that the Debtors be authorized to pay any prepetition amounts owing to the Customer Service Providers and continue to honor their obligations to the Customer

---

[13] Customer Service Providers providing debt collection services on the Debtors' behalf (the "Collection Agents") are paid on a contingency fee basis. Specifically, the Collection Agents are paid a set percentage of overdue debt that is successfully collected on the Debtors' behalf. The Collection Agents net out the set percentage due to them from the amounts collected from the Debtors' customers before remitting the collected amounts to the Debtor.

Service Providers. By the Customer Programs Motion, the Debtors request the authority, but not direction, to pay all prepetition amounts outstanding on account of the services provided by the Customer Service Providers and to continue utilizing the Customer Service Providers, in the ordinary course of business.

### (j)    Prepayments

124.    There are certain instances when the Debtors receive payments from their customers in advance of providing goods and services (the "Prepayments"). For instance, in the Debtor's publishing businesses, nearly all subscribers prepay for newspaper subscriptions in advance of being provided the newspapers (the "Prepaid Subscriptions"). The Debtors' also receive payments from certain advertisers in advance of providing broadcasting or publication advertising slots for such advertisers (the "Prepaid Advertisements"). Additionally, certain customers prepay the Debtors to place customer inserts, such as weekly magazines and other media inserts, into the Debtors' newspapers (the "Prepaid Inserts"). The Debtors generally do not incur actual cash liability on account of the Prepaid Subscriptions, Prepaid Advertisements, and Prepaid Inserts, but instead incur the obligation to deliver the prepaid subscriptions, advertisements, and inserting services. However, in the event a Prepaid Subscription, Prepaid Advertisement, or Prepaid Insert is cancelled by a customer, in certain instances, the Debtors are obligated to return unused prepaid amounts (the "Refunds"). Generally, the Debtors issue Refunds totaling approximately $13,000,000- $14,000,000 per year.

125.    Continuing the Debtors' practices with respect to Prepayments and Refunds is essential to the maintenance of the Debtors' ongoing business operations. For example, newspaper subscriptions represent approximately 13% of the Debtors' publishing revenue. If the Debtors were to cease to be able to issue Refunds to subscribers who cancel Prepaid Subscriptions, or otherwise be unable to perform their obligations to their prepaid

subscribers, the Debtors' goodwill could be severely undermined, and, consequently, the Debtors could lose subscribers. It is therefore crucial that the Debtors be able to issue such Refunds and generally perform their obligations to deliver Prepaid Subscriptions to their subscribers.

126.    Similarly, as mentioned above, advertising provides the largest source of the Debtors' revenue. Accordingly, the revenue generated by the Debtors from their advertisers represents a significant portion of the Debtors' total revenue. The Refunds issued to advertisers are comparatively minute in contrast to the amount of revenue generated by the advertisers. Any suspension in the Debtors' performance of their obligations on account of Prepaid Advertisements may result in the loss of advertisers and could have devastating effects on the Debtors' ability to generate revenue going forward. Similarly, with respect to Prepaid Inserts, any failure of the Debtors to issue Refunds to customers for unused Prepayments could jeopardize the Debtors' ability to continue doing business with such customers in the future. The Debtors believe, and I agree, that it is therefore crucial that the Debtors be able to issue Refunds to their advertisers and generally perform their obligations to run advertisements and distribute inserts that have been prepaid.

127.    As of the Petition Date, the Debtors believe that they are holding approximately $62,700,000 on account of Prepayments, and that there is approximately $500,000 outstanding in connection with Refunds. By the Customer Programs Motion, the Debtors request the authority, but not direction, to honor their prepetition obligations with respect to Prepaid Subscriptions, Prepaid Advertisements, Prepaid Inserts, and other prepaid customers, and to issue Refunds for any amounts owed to customers in connection therewith, whether by check directly to the customer or through the customers' applicable credit card company.

128.    Maintaining the Debtors' ability to generate revenue is absolutely crucial to the Debtors' long-term success and profitability. In addition, as described above, the damage to the Debtors' prospects for rehabilitation if the Debtors were put in a position where their Customer Programs could no longer be honored is clearly disproportionate to the relatively small cost of maintaining the Customer Programs.   Accordingly, maintenance of the Customer Programs is critical to the Debtors' reorganization efforts.

(6)    **Motion of the Debtors for an Order Authorizing, but not Directing, the Payment of Prepetition Claims of Shippers and Lien Claimants (the "Shippers and Lien Claimants Motion")**

129.    By the Shippers and Lien Claimants Motion, the Debtors seek authority to pay certain prepetition claims held by Shippers (as defined below) in amounts the Debtors determine necessary or appropriate to (i) maintain a reliable, efficient and smooth transportation system and (ii) induce critical Shippers to continue timely transporting the Debtors' publications. In addition, in order to avoid undue delay and to facilitate the continued operation of the Debtors' businesses, the maintenance of their properties, and the completion of the repairs and upgrades in process for their property, equipment, or other assets, the Debtors also seek authority to pay and discharge, on a case-by-case basis and in their discretion, the claims of all Lien Claimants (as defined below) that have given or could give rise to a Statutory Lien against the Debtors' property, equipment, or other assets, regardless of whether such Lien Claimants have already perfected their interests.

(a)    **Description of Shippers**

130.    As mentioned above, the Debtors' business operations involve both the publication of multiple newspapers and the placement of advertisements in these publications and otherwise. The advertisement placement services provided by the Debtors include certain direct-mailing services, whereby the Debtors print and deliver advertisements or other materials

directly to their advertisers' customers (the "Direct-Mail Advertisements"). The Debtors

frequently utilize reputable third-party common carriers and truckers (collectively, the

"Shippers") to directly and indirectly transport completed publications from the Debtors'

printing facilities to the Debtors' distribution centers.[14] The Debtors also utilize the services of

Shippers to transport Direct-Mail Advertisements from the Debtors' printing facilities[15] to the

appropriate third-party distributor, which is typically the United States Postal Service (the

"USPS"). The Debtors employ approximately thirty-eight (38) Shippers to ensure that their

delivery network runs smoothly. The Debtors anticipate that, as of the Petition Date, certain of

the Shippers will have outstanding invoices for the transportation services provided to the

Debtors prior to the Petition Date (the "Shipping Claims").

      131.    The Shippers provide services to the Debtors on a daily basis and, as a

result, in the ordinary course of business, Shippers regularly have possession of the Debtors'

publications and Direct-Mail Advertisements. Specifically, each day, the Debtors rely on the

Shippers to transport several hundred thousand copies of their publications from their printing

facilities to their distribution centers, following which the Debtors arrange to have the

publications delivered from the distribution centers to their subscribers. Because the

publications must arrive at the Debtors' distribution centers before they can be delivered to the

Debtors' subscribers, if a Shipper's deliveries are delayed by even one day, the Debtors would be

unable to deliver their publications to several hundred thousand subscribers. Any such delay

would not only jeopardize the Debtors' ability to satisfy their obligations to their subscribers, but

---

[14] In certain instances, the Shippers transport completed publications directly to the Debtors' various distribution centers. In other instances, the Shippers transfer completed publications from the Debtors' printing facilities to other Shippers, who then transport the completed publications to the Debtors' distribution centers.

[15] On certain occasions, the Debtors outsource the printing of Direct-Mail Advertisements. In these situations, the Shippers transport the Direct-Mail Advertisements from an outsourced printing facility to the USPS or other appropriate distribution facility.

could, in turn, endanger the Debtors' ability to meet the audience base expectations of various advertisers who advertise in the Debtors' publications. Similarly, each day, the Debtors also rely on the Shippers to transport their Direct-Mail Advertisements, which generate a substantial amount of advertising revenue for the Debtors, from their printing facilities to the USPS. Because the Direct-Mail Advertisements are often time sensitive materials, it is imperative that they be delivered with no interruption or delay.

132.    Accordingly, with respect to transportation of both completed publications and Direct-Mail Advertisements, the Debtors believe, and I agree, that the potential injury to the Debtors if they are not permitted to pay their Shippers is likely greatly to exceed the amount of Shipping Claims held by such parties. As explained above, should the Shippers refuse to deliver even a single day's publications or Direct-Mail Advertisements, the Debtors' business operations could be negatively impacted. Accordingly, by the Shippers and Lien Claimants Motion, the Debtors seek authority to pay certain prepetition claims held by Shippers when, in the Debtors' discretion and business judgment, a failure to pay would unduly disrupt the Debtors' business operations.

133.    The Debtors seek to pay such claims and discharge, on a case-by-case basis and in their discretion, the Shipping Claims, as of the Petition Date, in an amount not to exceed $5,000,000 and in accordance with the terms and conditions specified in the Shippers and Lien Claimants Motion. The Debtors believe, and I agree, that the total amount to be paid to the Shippers on account of their prepetition claims is minimal compared to the importance and necessity of the Shippers to the Debtors' business operations and the direct and indirect losses that the Debtors would suffer as a consequence of a Shipper's refusal to deliver the Debtors' publications or Direct-Mail Advertisements to the appropriate distribution centers.

**(b)    Description of Lien Claimants**

134.    The Debtors operate approximately 300 printing plants, business and editorial offices, and warehouse spaces.[16]  The Debtors routinely transact business with a number of third-parties (collectively, the "Lien Claimants") who, under applicable state law, have the potential to assert liens against the Debtors and their property or other assets if the Debtors fail to pay for goods or services rendered prior to the Petition Date ("Statutory Liens").  The Lien Claimants perform various services for the Debtors, including repairing, upgrading, and servicing equipment, as well as assisting with maintenance and construction activities conducted at the Debtors' printing plants, business and editorial offices, and warehouse spaces.

135.    While many of the services performed by the Lien Claimants are routine repair and maintenance services, the Debtors also utilize a significant number of Lien Claimants in connection with certain large, ongoing construction and equipment upgrade projects.  As of the Petition Date, it is my understanding that the Debtors' largest ongoing projects include a (i) Los Angeles Reinforcement Project and (ii) Web-Width Reduction Projects.[17]

**(c)    The Los Angeles Reinforcement Project**

136.    The primary office building for one of the daily newspapers published by the Debtors, the Los Angeles Times, is located in downtown Los Angeles, California.  A multi-year project is in process to make certain reinforcements to the building needed to satisfy

---

[16] Certain of these properties are owned by the Debtors and others are leased by the Debtors from third-parties.

[17] In addition to these projects, in order to maintain a leading market position in the broadcasting industry, the Debtors are continually expanding the scope of their high definition television services (the "HD Transition").  This expansion involves, among other things, the upgrade of video cameras, lighting equipment, and other broadcasting equipment to support high definition transmissions.  In addition, on February 17, 2009, all full-power broadcast television stations in the United States must stop broadcasting on analog airwaves and begin broadcasting only in digital format.  In order to ensure that their broadcast television stations are able to meet this deadline, the Debtors have significant equipment alterations and upgrades in progress (the "DT Transition", and together with the HD Transition, the "Television Broadcasting Transition Project").  Due to the various pieces of equipment and related components requiring upgrade in connection with the Television Broadcasting Transition Project, there may potentially be Lien Claimants associated with the project.

recently implemented building code requirements (the "Los Angeles Reinforcement Project").

These reinforcements primarily involve seismic structural enhancements designed to protect the

building structure from the effects of earthquake activity. In addition to satisfying applicable

building code requirements, these enhancements will ultimately provide additional safety to the

Debtors' employees working in the building, as well as added protection for the Debtors'

equipment and inventory located inside the building.

137.    Due to the magnitude of concurrent tasks required to complete the Los

Angeles Reinforcement Project, the Debtors have engaged the services of a general contractor

who, in turn, hires a significant number of subcontractors to complete various projects, each of

which I understand may potentially be Lien Claimants.

### (d)    The Web-Width Reduction Projects

138.    The Debtors have several ongoing Web-Width Reduction Projects (the

"Web-Width Reduction Projects"). The Web-Width Reduction Projects seek to reduce the

printing press widths in several of the Debtors newspaper markets. The reduction in printing

press widths is anticipated to provide the Debtors with a substantial reduction in overall printing

costs.

139.    The Web-Width Reduction Projects involve the replacement of several

key components of the Debtors' printing presses. Because the Debtors are currently

implementing web-width reductions in several markets, at any given time, I understand that there

may be Lien Claimants working on or in possession of various pieces of the Debtors' printing

presses.

140.    In order to avoid undue delay and to facilitate the continued operation of

the Debtors' businesses, the maintenance of their properties, and the completion of the repairs

and upgrades in process for their property, equipment, or other assets, by the Shippers and Lien

Claimants Motion, the Debtors seek, authority to pay and discharge, on a case-by-case basis and in their discretion, the claims of all Lien Claimants that have given or could give rise to a Statutory Lien against the Debtors' property, equipment, or other assets, regardless of whether such Lien Claimants have already perfected their interests (the "Lien Claimant Claims") in an amount not to exceed $12,000,000 and in accordance with the terms and conditions specified in the Shippers and Lien Claimants Motion.

141.    As described above, it is vital to the Debtors' reorganization efforts that they be authorized to pay both the Shipping Claims and Lien Claimant Claims in order to avoid immediate and irreparable harm to their business operations and to maintain the confidence and goodwill of their subscribers, advertisers, and other customers. The Debtors believe, and I agree, that the total amount to be paid to the Shippers and Lien Claimants on account of their prepetition claims is minimal compared to the importance and necessity of the Shippers and Lien Claimants to the Debtors' business operations.

(7)    **Motion of the Debtors for an Order Pursuant to 11 U.S.C. §§ 363(b) and 363(c)(1) Authorizing, but not Requiring, the Debtors to Continue to Operate in the Ordinary Course, Including Payment of Prepetition Date Claims with Respect to Brokers (the "Broker Motion")**

142.    The Debtors' operations generate revenue from two primary sources: (i) advertising purchased by customers and (ii) subscriptions purchased by customers. The Debtors obtain new customers and maintain long-term customer relationships with certain of their advertising customers and subscription customers through various channels of sale and distribution. The Debtors' sales efforts are conducted through a combination of individuals employed by the Debtors (the "Employees") and relationships that have been formed with various third-party sales providers. Specifically, it is my understanding that the Debtors' utilize the services of (i) third-party telemarketing firms (the "Telemarketing Firms"); (ii) third-party

marketing firms (the "Marketing Firms"); (iii) third-party advertising firms (the "Advertising Firms"); and (iv) Employee and third-party sales representatives (collectively, the "Sales Representatives" and, together with the Telemarketing Firms, Marketing Firms, Advertising Firms, and other similar sales force relationships, the "Brokers").[18]

143.    In general, the Brokers are responsible for the promotion, sale, solicitation and confirmation of orders from advertisers and subscribers for the Debtor's advertising services and publications. In addition, the Brokers are responsible for directly communicating with advertisers and subscribers in connection with the sale and marketing of the advertising services and publications. Among other things, the Brokers generally provide the Debtors with information regarding any complaints or other problems with these items. Some of the Brokers are party to contracts with the Debtors, while others are not.

144.    As of the Petition Date, the Debtors' estimate the aggregate amount of accrued and outstanding prepetition obligations with respect to their Brokers to be approximately $9,300,000. By the Broker Motion, the Debtors request the entry of an order granting the Debtors authority, in their discretion, to operate in the ordinary course of business and to maintain their business relationships with the Brokers, including the performance or payment of certain prepetition obligations the Debtors owe to their Brokers. The Debtors believe, and I agree, that a failure to pay the prepetition amounts owing to the Brokers is likely to immediately and irreparably damage the Debtors' ability to reorganize.

145.    Among other things, the strength of the Debtors' businesses is based upon the Debtors' continued and substantial presence in several markets, including the publishing and

---

[18] The Broker Motion seeks relief with respect to Employees that are Sales Representatives (the "Employee Sales Representatives") solely in connection with the commissions that are owed on account of prepetition services provided by such Employee Sales Representatives. The Debtors have requested relief with respect to other obligations that may be outstanding to the Employee Sales Representatives in the Employee Wage Motion.

broadcasting industries. The Debtors rely heavily on their Brokers to sell their many publications and to place advertisements in their publications and on their broadcast radio and television stations and cable networks. Indeed, approximately 45% of the Debtors' circulation subscription sales are derived through publication subscription sales generated by Brokers, and approximately 35% of the Debtors' advertising sales are derived through television, radio, and print advertisement sales generated by Brokers. It is my understanding that the following services are provided by certain Brokers:

### (a)    Telemarketing Firms

146.    The Debtors utilize the services of approximately fourteen (14) third-party Telemarketing Firms. These firms, which are located in different geographic regions, provide a variety of marketing and subscription sales services for the Debtors' various publications. For example, certain Telemarketing Firms promote and sell, by telephone, publication subscriptions to first-time customers of the Debtors. Other Telemarketing Firms target the Debtors' prior customers, focusing instead on continuing or restarting previous customer relationships. In either scenario, the sales efforts of the Telemarketing Firms are generally focused on a particular publication and a particular geographic region.

147.    The Telemarketing Firms are generally paid either or a combination of (i) commissions calculated based on the amount of subscriptions sold by the Telemarketing Firms to subscribers located in a specific geographic region and/or (ii) a flat hourly fee for trained associates. In most cases, the Telemarketing Firms are paid one week in arrears. As a result of this payment structure, as of the Petition Date, there are amounts outstanding to some or all of the Telemarketing Firms.

**(b)    Marketing Firms**

148.    The Debtors conduct a substantial amount of publication subscription sales through the use of approximately fifty-seven (57) Marketing Firms.  The Marketing Firms, each of which covers a specified geographic region, generate subscription sales for the Debtors' publications through various direct-marketing methods.  For example, certain Marketing Firms solicit subscription sales at kiosks, tables, and booths set up in various retail locations or at planned special events, such as sporting events.  Other Marketing Firms solicit sales through door crews that directly knock on home doors in search of new customers.

149.    While the payment terms may differ among various Marketing Firms, the Debtors generally issue, on a weekly basis, commission payments to each Marketing Firm for subscriptions solicited by that Marketing Firm.[19]  To the extent a Marketing Firm does not solicit any such subscriptions, the Debtors generally are not required to issue any payments to the Marketing Firm.  Because the Marketing Firms are paid only after a subscription is solicited, as of the Petition Date, there are amounts due and outstanding to certain Marketing Firms on account of prepetition services.

**(c)    Advertising Firms**

150.    The Debtors have contracted with approximately fifteen (15) independent Advertising Firms to procure advertisement agreements and contracts for their various publications, radio station, television stations, and cable networks.  In addition to placing advertisements in the Debtors' publications, the Advertising Firms serve as sales representatives for radio and television's time, programs, program packages, and facilities for advertising purposes.

---

[19] It is my understanding that, in certain cases, a subscription must be maintained by a Subscriber for a specified period of time before any commission payments are issued.

151.    Agreements with the Advertising Firms generating advertisements for the Debtors' publications are generally entered on a non-exclusive basis. However, with respect to television advertisements, the Debtors have entered an exclusive contract with one of its Advertising Firms for solicitation of certain national spot advertisements.[20] Similarly, with respect to radio advertisements, the Debtors have entered an exclusive contract with one of its

**(d)      Advertising Firms for solicitation of certain national broadcast advertisements.**

152.    The Advertising Firms are generally paid a set commission for their services. With respect to certain Advertising Firms, amounts that are owed by advertisers on account of advertisements generated by the Advertising Firms are collected from the advertisers by the Advertising Firms. The Advertising Firms then net out the set commission percentage due to them before remitting the remaining collected amounts to the Debtor. With respect to other Advertising Firms, the Debtors bill and collect amounts due from their advertisers for advertisements generated by the Advertising Firms. The Debtors then remit a set commission to the Advertising Firms for the advertisements generated during the previous monthly period. Because the Advertising Firms are paid in arrears, as of the Petition Date, amounts are outstanding to certain Advertising Firms on account of prepetition services.

**(e)      Sales Representatives**

153.    The Debtors also utilize approximately 1,657 Sales Representatives to solicit new advertising agreements and contracts for their various publications and related websites.[21] The Sales Representatives have developed relationships that consistently generate a certain volume of advertising for the Debtors. With respect to certain advertisers, the Debtors'

---

[20] Subject to certain exceptions, national spot or broadcast advertising generally refers to broadcast advertising time that is procured outside a station's home market.

[21] Approximately six (6) of the Sales Representatives are third-parties and approximately 1,651 of the Sales Representatives are Employee Sales Representatives.

advertising revenue generation is entirely dependent upon the existing relationships that the Sales Representatives maintain. In many situations, these advertisers work exclusively through the Sales Representatives.

154.    The Sales Representatives are compensated primarily on a commission basis,[22] and are generally paid only after payment for a generated advertisement is received by the Debtors. Because the Sales Representatives are paid in arrears, as of the Petition Date, the Debtors owed amounts to certain Sales Representatives on account of prepetition services.

155.    As described above, the Brokers are a key component of the Debtors' promotion, sale, solicitation and confirmation of orders from advertisers and subscribers. Authorizing, but not requiring, the Debtors to perform their prepetition obligations owed to the Brokers is necessary to maintain the Debtors' business relationships with the Brokers and, in turn, the advertisers and subscribers serviced by the Brokers. Because of the importance of the Brokers to the Debtors' overall industry presence and operations, the Debtors believe, and I agree, that paying such prepetition claims to the Brokers is integral to the Debtors' business going forward and their ability to maintain their enterprise value and to serve their advertisers and subscribers.

**(8)**    **Motion of the Debtors for an Order Authorizing Them to (i) Pay Installments Under Prepetition Insurance Premium Finance Arrangement, (ii) Continue Prepetition Insurance Programs, and (iii) Pay All Prepetition Obligations in Respect Thereof ("Insurance Motion")**

156.    In connection with the day-to-day operations of their businesses, the Debtors maintain various insurance programs (the "Insurance Programs") and related insurance policies (as set forth on a non-exhaustive list attached to the Insurance Motion as Exhibit A, the

---

[22] It is my understanding that certain Sales Representatives receive different compensation structures which may include, among other things, a fixed salary component or bonuses.

"Insurance Policies") through several different insurance providers (the "Insurance Providers").[23]
The Debtors operate a large and sophisticated business and have numerous Insurance Policies
covering a variety of matters such as general liability, media liability, directors' and officers'
liability, fiduciary liability, property, travel, and aviation, among others.

157.    The Debtors are required to pay premiums under the Insurance Programs
based on a fixed amount established and billed by each Insurance Provider.  The aggregate
annual premiums under Insurance Programs, excluding the Financed Premium Policy are
approximately $10.2 million.  Depending on the particular Insurance Policy, premiums are either
(i) paid in monthly installments or (ii) pre-paid at a policy's inception or renewal.

158.    Nearly all premiums under the Debtors' Insurance Policies are paid at the
policy's inception, and hence were paid in full prior to the Petition Date.  Those Insurance
Policies under which premiums are paid in monthly installments were paid in full prior to the
Petition Date.  I have been advised that, according to the Debtors' records, the Debtors have
satisfied any other financial obligations under those Insurance Policies.  Out of an abundance of
caution, however, in order to prevent any disruption of the Debtors' Insurance Policies and any
attendant harm to the Debtors' businesses that such disruption would cause, the Debtors seek
authorization, but not the direction, to make any prepetition premium payments as necessary and
to perform any other prepetition obligations that may be necessary to maintain the Insurance
Policies.

---

[23] One of the Insurance Providers, Multimedia Insurance Company, is a Vermont corporation and a wholly-owned
direct subsidiary of Debtor Tribune Company.  Multimedia Insurance Company did not commence a chapter 11 case
on the Petition Date.

159.    In one case, the Debtors have entered into a premium finance arrangement (the "Premium Finance Arrangement"), to finance payment of the $2,374,081 premium[24] under their property insurance policy (the "Financed Insurance Policy") with Factory Mutual Insurance Company ("FMIC"). The Debtors executed the Premium Finance Arrangement with Premium Financing Specialists, Inc. ("PFS") on August 19, 2008, covering the Financed Insurance Policy, which is effective from September 1, 2008 through July 1, 2009. Under the Premium Finance Arrangement, PFS paid $2,172,782.55 in upfront insurance premiums to FMIC in connection with the Financed Insurance Policy. In return, the Debtors were obligated to pay eleven (11) monthly installments of $201,298.45 (the "PFS Payments") at an annual interest rate of 3.8 percent (the "Finance Payments") to PFS as provided in the schedule to the Premium Financing Arrangement.

160.    The Debtors have made all PFS Payments that came due prior to the Petition Date. The Debtors are required to pay the next PFS Payment on January 1, 2009. By the Insurance Motion, the Debtors seek authority to make the January 1 payment and, for the avoidance of doubt, all remaining payments under the Premium Finance Arrangement, which total $1,207,790.

161.    In view of the importance of maintaining the insurance coverage with respect to their business activities and the preservation of the Debtors' cash flow by financing their property insurance premium, the Debtors believe that it is in the best interests of their estates and their creditors for the Court to authorize the Debtors to honor their obligations under the Insurance Programs and the Premium Finance Arrangement. Any other alternative would likely require considerable cash expenditures, result in the Debtors obtaining insurance coverage

---

[24]   Prior to entering into the Premium Financing Arrangement the Debtors made a single cash down payment of $201,298.45 thereby reducing the portion of the premium financed under the Premium Financing Agreement to $2,172,782.55.

on less desirable terms than their current coverage, and would be detrimental to the Debtors' restructuring efforts.

162.    The Debtors believe that they have compelling business reasons for seeking to maintain their Insurance Policies in force. The insurance coverage provided under the Debtors' Insurance Policies are essential for preserving the Debtors' businesses, property, and assets, and, in many cases, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business. If the Debtors do not continue to perform their obligations under the Insurance Policies and the Premium Finance Arrangement, their coverage under the Insurance Policies could be voided. Disruption of their insurance coverage would expose the Debtors to serious risks, including: (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Providers under the Insurance Policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Providers under the Insurance Policies; (c) the possible loss of good-standing certification to conduct business in states that require the Debtors to maintain certain levels of insurance coverage; (d) the possible inability to obtain similar types of insurance coverage; and (e) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage. Any or all of these consequences would be seriously harmful to the Debtors' business and restructuring efforts, as they would expose the Debtors to higher costs and increased risks of loss at a minimum.

163.    The Debtors believe that any interruption in insurance coverage caused by the Debtors' inability to pay prepetition claim amounts or generally satisfy their obligations as they come due under the Insurance Policies and the Premium Finance Arrangement will cause immediate and irreparable harm to the Debtors' estates. The Debtors believe that maintaining

continued and uninterrupted insurance coverage under the favorable terms and conditions
provided by the Insurance Policies and the Premium Finance Arrangement clearly is in the best
interests of the Debtors, their estates, and their creditors. Accordingly, the Debtors seek
authority for to pay all postpetition installment payments under the Premium Finance
Arrangement and the Insurance Policies as they come due.

    **(9)**    **Motion of the Debtors for a Bridge Order and a Final Order Pursuant to
Sections 105(a) and 366(b) of the Bankruptcy Code (I) Prohibiting Utility
Providers from Altering, Refusing, or Discontinuing Utility Services, (II)
Deeming Utility Providers Adequately Assured of Future Performance, and
(III) Establishing Procedures for Determining Adequate Assurance of
Payment ("Utility Motion")**

    164.    In connection with the operation of their businesses and management of
their properties, the Debtors incur utility expenses in the ordinary course of business for, among
other things, water, sewer service, electricity, gas, local and long-distance telecom service, data
service, fiber transmission, waste disposal and other similar services (the "Utility Services"). On
a monthly basis, the Debtors spend approximately $5,510,000 for the various Utility Services.
These Utility Services are provided by approximately 200 Utility Providers nationwide, with
which one or more of the Debtors may have multiple utility accounts. A non-exhaustive list of
the Utility Providers is attached to the Utility Motion as Exhibit A thereto.

    165.    Uninterrupted Utility Services are essential to the Debtors' ongoing
operations and the success of the Debtors' reorganization efforts. A disruption of the Utility
Services at any of the Debtors' facilities would likely be costly to the Debtors and harmful to
their businesses, as the Debtors would be forced from the outset of these Chapter 11 Cases to
focus on finding replacement Utility Providers and services, rather than focusing on the
operation and restructuring of their businesses. Moreover, the business disruption that would
likely result from interruption of the Utility Services would damage customer relationships,

revenues, and profits and would adversely affect the Debtors' restructuring efforts, to the detriment of their estates, creditors, and employees. The Debtors believe that it is therefore critical that Utility Services to the Debtors continue uninterrupted.

166. The Debtors intend to pay all postpetition obligations to the Utility Providers in a timely manner, consistent with the ordinary course of operating their businesses postpetition. The Debtors further propose to make the Adequate Assurance Deposit, as described in the Utility Motion. As a result, the Debtors do not believe that any Utility Provider should require assurance of payment beyond that afforded by the Adequate Assurance Payment.

**(10)** **Motion for an Order (I) Authorizing: (A) Payment of Prepetition Employee Wages, Salaries, Non-Insider Bonuses, and Other Compensation; (B) Payment of Prepetition Compensation Owed to Independent Contractors and Temporary Workers; (C) Reimbursement of Prepetition Employee Business Expenses; (D) Payments for Which Prepetition Payroll and Tax Deductions Were Made; (E) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (F) Payment of Workers' Compensation Obligations; and (G) Payment to Third Parties of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (II) Authorizing and Directing Applicable Banks and Other Financial Institutions to Honor and Pay All Checks and Transfers Drawn on the Debtors' Payroll Accounts To Make The Foregoing Payments**

167. The Debtors currently employ approximately 13,940 full-time and 2,450 part-time employees (the "Employees"). In addition, the Debtors normally utilize the services of approximately 12,000 independent contractors (as more fully defined below) (the "Independent Contractors") and approximately 770 full-time equivalent hourly temporary workers (the "Temporary Workers").

168. Approximately sixteen percent (16%) of the Employees of the Tribune Entities' publishing segment and approximately twenty-four percent (24%) of the Employees of the Tribune Entities' broadcasting and entertainment segment are represented by unions (the

"Union Employees") and covered under various collective bargaining agreements (the "CBAs").[25]

169.    The Employees' skills, knowledge, and understanding of the Debtors' businesses are the Debtors' most valuable asset. Without the continued services of the Employees, an effective reorganization of the Debtors will not be possible.

170.    The Independent Contractors are those individuals whose skill sets and services are directly involved in the actual operations of the Debtors' businesses. With respect to the publishing segment, such individuals would include Independent Contractors who are involved in the physical printing, assembly, and distribution of the newspapers, the majority of whom are newspaper carriers and truck drivers. The Independent Contractors involved in the broadcasting and entertainment segment include the talent involved in the on-air television and radio broadcasts and the camera crews, which are relied upon for news stories and sporting events. With respect to the direct mail business, the Independent Contractors are involved in the production and labeling of the mail brochures, which the Debtors prepare and assemble for their customers. The services provided by the Independent Contractors are critical to the smooth functioning of the Debtors' (i) publishing, (ii) broadcasting and entertainment, and (iii) direct mail businesses..

171.    The Temporary Workers are hourly workers who perform various tasks, including packaging, mailing, assisting with advertising inserts, printing processes, technology, and administrative tasks. The same individual Temporary Workers are regularly used by the

---

[25] For purposes of this Motion only, the Employees other than the Union Employees shall be collectively referred to as the "Non-Union Employees". As a result of the different CBAs entered into by the Debtors, the contractual terms of Union Employees' hours worked, overtime, vacation, and other benefits vary slightly depending upon the particular CBA.

Debtors and thus have developed expertise and experience that are necessary to the smooth functioning of the Debtors' operations.

172.    The Debtors believe, and I agree, that if the Debtors are not immediately granted authority to pay the employee-related obligations, the Employees will suffer great hardship and, in many instances, financial difficulties, since these monies are needed to enable them to meet their personal obligations.  In addition, without the requested relief, the Debtors' stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment.

### (a)    Prepetition Employee Obligations

### (i)    Wages, Salaries, Non-Insider Bonuses, and other Compensation

173.    The Debtors' average gross monthly compensation for their Employees' wages is approximately $79.7 million ("Wages").  More than 90% of payroll payments are made by direct deposit through electronic transfer of funds directly to the Employees, and the remaining Employees are paid via check.  Most Employees are paid one week in arrears on a staggered, bi-weekly basis (each a "Pay Day").  Wages are generally handled on a centralized basis and without a third party payroll processor.[26]

174.    Because most of the Debtors' Employees are paid in arrears, as of the Petition Date, some of the Debtors' Employees have not been paid all of their prepetition wages. Additionally, compensation may be due and owing as of the Petition Date because some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.

---

[26]Debtor InsertCo, Inc.'s payroll processing is handled through Automated Data Processing, Inc. ("ADP").

175.    As of the Petition Date, the aggregate amount of accrued wages (excluding the Payroll Taxes and Deductions) earned prior to the Petition Date that remains unpaid to the Debtors' Employees is approximately $18.0 million (the "Unpaid Wages"). By this Motion, the Debtors request the authority to pay all such Unpaid Wages to their Employees in the ordinary course of business. The Debtors have made careful inquiries and have taken diligent steps to ensure that their Employees are not owed more than $10,950 for Unpaid Wages as of the Petition Date. Accordingly, if this Motion is granted, the Debtors are confident that no Employee should be paid more than $10,950 for such Unpaid Wages.

176.    The number of Independent Contractors engaged by the Debtors varies from month to month. The Debtors typically spend an average of $25.6 million per month on Independent Contractors. Depending on the type of service rendered, Independent Contractors are paid on a weekly or monthly basis or on a per assignment basis. As of the Petition Date, the Debtors estimate that they owe approximately $8.5 million for the unpaid and accrued services of the Independent Contractors. Given the relatively low amount paid to the Debtors' Independent Contractors, most of whom are newspaper carriers, the Debtors are confident that no Independent Contractor is owed more than $10,950 as of the Petition Date. By this Motion, the Debtors request authority to pay all prepetition amounts owing for the services of their Independent Contractors.

177.    The number of Temporary Workers engaged by the Debtors varies from month to month, and the number of Temporary Workers can increase by as much as 30% around the end of the calendar year. Payment for the services of the Temporary Workers is generally made on a weekly basis. As of the Petition Date, the Debtors estimate that they owe approximately $1.1 million for the unpaid and accrued services of Temporary Workers. Given

that the hourly wages of the Temporary Workers range from $9 - $15 per hour, the Debtors are confident that no Temporary Worker is owed $10,950 as of the Petition Date. By this Motion, the Debtors request authority to pay all prepetition amounts owing for the services of their Temporary Workers.

### (ii)    Reimbursement of Prepetition Employee Business Expenses

178.    Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors directly or indirectly reimbursed Employees for certain expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses"). The Reimbursable Expenses are expenses for air travel, lodging, ground transportation, meals, and other business-related expenses.[27]

179.    The Debtors have existing arrangements with American Express Travel Related Services Company ("American Express") that provide approximately 3,500 Employees who incur the greatest amount of Reimbursable Expenses with corporate credit cards that are to be used solely for incurring Reimbursable Expenses on behalf of the Debtors. The Debtors remit payment for these Reimbursable Expenses directly to American Express on a weekly basis after the Employees have submitted the appropriate receipts and expense reports.

180.    While most of the Reimbursable Expenses are paid through the use of the American Express cards, a portion of the Reimbursable Expenses are incurred by Employees on behalf of the Debtors through use of personal funds or credit cards. After submission and approval of expense reports, such Employees are reimbursed through the regular bi-weekly payroll process.

---

[27] The total for Reimbursable Expenses includes amounts paid to members of the Board of Directors in connection with attendance at board meetings.

181.    The Debtors spend an average of approximately $3.1 million per month on Reimbursable Expenses incurred by Employees either through the use of the American Express corporate cards or through the use of personal funds or credit cards.

182.    Because Employees do not submit expense reports with perfect regularity, it is difficult to determine with precision the aggregate amount of outstanding Reimbursable Expenses.  However, the Debtors estimate that as of the Petition Date, approximately $3 million in Reimbursable Expenses have been incurred but remain unpaid.

183.    The Reimbursable Expenses were all incurred on the Debtors' behalf and with the understanding that they would be reimbursed.  Accordingly, to avoid harming the individual Employees who incurred the Reimbursable Expenses, it is necessary to (a) make all payments to American Express and (b) pay all unpaid Reimbursable Expenses that accrued prepetition or relate to the prepetition period.

### (iii)    Prepetition Withholdings and Deductions

184.    The Debtors are required by law to withhold from an Employee's wages amounts related to, among other things, federal, state and local income taxes, and social security and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state or local taxing authorities.  The Debtors must then match from their own funds for social security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes").  The Debtors' current monthly Payroll Taxes total approximately $32.4 million.  The Debtors' Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authorities at the same time Employee payroll checks are administered.  As of the Petition Date, the Debtors estimate

that the amount of accrued and outstanding prepetition obligations with respect to the Payroll Taxes to be approximately $9.0 million.

185.    During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, (a) union dues and union fund contributions, (b) garnishments, child support, and similar deductions, (c) deductions for voluntary charitable contributions, and (d) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits or insurance premiums) (collectively, the "Deductions") and forward those amounts (with the exception of any amounts owing on account of self-insured programs) to various third party recipients.  On average, the Debtors have historically deducted approximately $12 million in Deductions from the Employees' paychecks per month.  As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding Deductions was approximately $12 million.

**(b)    Prepetition Employee Benefits**

186.    The Debtors provide their Employees, directly or indirectly, and in the ordinary course of business, with a number of employee benefits, including, but not limited to (a) a broad range of medical and health care programs, (b) vacation, sick, holiday and leave benefits, (c) savings plans, and (d) certain other specific employee benefits, described in greater detail below (collectively, the "Specified Employee Benefits").

### (i)    Health Care Programs

187.    The Debtors offer several programs to eligible full-time and part-time Employees[28] for health, prescription drug, dental, and vision care coverage (the "Health Care Programs"). A majority of the Debtors' Health Care Programs are provided through self-insured programs currently administered by Blue Cross Blue Shield of Illinois ("Blue Cross Blue Shield") and CIGNA, Inc., but which will be subsequently administered by United Healthcare beginning January 1, 2009 (the "Self-Insured Health Programs").[29] The Debtors also maintain insured medical, dental, prescription drug and vision care policies for approximately twenty percent (20%) of their Employees with a variety of other health care insurers (the "Insured Health Programs"). The Health Care Programs are funded through contributions by the Debtors and participating Employees. The Debtors contribute a majority of the costs for both the Self-Insured Health Programs and the Insured Health Programs, and the percentage contributed by the Employee varies depending on whether the Employee's family members or partners and any dependent is covered. Employee contributions are deducted from Employees' paychecks.

188.    On average, the Debtors pay approximately $10.85 million per month for both the Self-Insured Health Programs and the Insured Health Programs. In addition, the Debtors' average monthly administrative fees currently paid for Self-Insured Health Programs total approximately $494,000. As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding prepetition obligations with respect to the Health Care Programs to be approximately $14.48 million.

---

[28] Generally, active, regular, full-time Employees are eligible to participate in the Health Care Programs. However, eligibility of part-time Employees to participate in the Health Care Programs is determined by individual business units. Temporary Workers and Independent Contractors are not eligible to participate in the Health Care Programs.

[29] The Debtors provide prescription drug coverage to full-time Employees participating in the Blue Cross Blue Shield and CIGNA plans through Caremark and self-insured vision care coverage to all full-time Employees through Vision Service Plan.

### (ii)    Vacation, Sick, Holiday, and Leave Benefits

189.    The Debtors provide vacation time to their Employees as a paid time-off benefit (the "Vacation Time"). The duration of vacation benefits varies based on the Employee's location, position, amount of time employed by the Debtors, and may be governed by CBAs (where applicable).  When used, Employees are generally paid for Vacation Time at their regular hourly or salaried rates.  Other than where mandated by state law or CBA, accrued but unused Vacation Time does not carry over to the following calendar year.

190.    In the ordinary course of business, the Debtors provide sick leave ("Sick Leave") to certain of their Employees.  Although sick leave for Union Employees may vary depending on the applicable CBA, generally eligible Employees receive five (5) paid sick days per year.  Accrued but unused Sick Leave does not carry over to the following calendar year.

191.    The Debtors also provide paid holidays for all Employees ("Holiday Pay").  While local practices on Holiday Pay may vary, Non-Union Employees are generally entitled to ten (10) paid holidays per calendar year.  With respect to Union Employees, the number of paid holidays and the provisions governing Holiday Pay are typically governed by the applicable CBA, and may vary based on, among other things, length of service and shift worked.

192.    In addition to the primary leave policies discussed above, the Debtors offer additional leave policies to certain subsets of their Employees (the "Additional Leave Policies"; and together with the Vacation Time, Sick Leave, and Holiday Pay, the "Leave Pay").  For example, Non-Union Employees are entitled to take paid time off on account of (i) jury duty service and (ii) bereavement or funeral leave.  Moreover, because the benefit programs for Union and Non-Union Employees sometimes differ, and because the benefit provisions in the CBAs are not always the same, the Debtors may offer other leave programs, some of which are only applicable to small subsets of the Debtors' Employees.

193.    Costs of Leave Pay that accrued prepetition will be honored through the payroll process by the continuation of pay during the Employees applicable leave. Thus, with the exception of accrued but unused Vacation Time, the costs of Leave Pay are included in the "Unpaid Wages" total set forth in section (a)(i) above. In most states, the Debtors' policy is that all unused Vacation Time must be utilized before the end of the calendar year. Consequently, the estimated amount of unused Vacation Time is relatively small – approximately $ 8.6 million as of the Petition Date.

### (iii)    Employee Savings Plans

194.    Prior to the Petition Date, and in the ordinary course of business, the Debtors maintained three savings plans for the benefit of their Employees: the Tribune Company 401(k) Savings Plan, the Tribune Company Defined Contribution Plan, and the Times Mirror Savings Plus Plan (collectively, the "Employee Savings Plans"). The Employee Savings Plans generally provide for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating Employee's paycheck. Approximately 12,800 Employees currently participate in the Tribune Company 401(k) Savings Plan, and they have contributed approximately $47.40 million of their own funds into this plan during the first ten months of 2008. Approximately 1,300 Employees currently participate in the Tribune Company Defined Contribution Plan, and they have contributed approximately $5.66 million of their own funds into this plan during the first ten months of 2008. Approximately 190 Employees currently participate in the Times Mirror Savings Plus Plan, and they have contributed approximately $203,000 of their own funds into this plan during the first ten months of 2008. The Debtors also make varying contributions, which are indexed to Employee contributions, to the Employee Savings Plans for certain participating Employees. During the first ten (10) months of 2008, the Debtors have paid their contributions to these Employee

Savings Plans in the amount of approximately $1.37 million with respect to the Tribune

Company 401(k) Savings Plan, $1.39 million with respect to the Tribune Company Defined

Contribution Plan, and $52,000 with respect to the Times Mirror Savings Plus Plan.

### (iv)    Specified Employee Benefits

#### a.    Disability

195.    The Debtors provide full-time Employees with self-funded short-term

disability benefits (the "Short-Term Disability Benefits"). Short-Term Disability Benefits are

self-funded, and eligible Non-Union Employees are entitled to, among other things, certain

continuations of salary in the event of a short-term medical disability due to a non-work related

illness or injury. Short-Term Disability Benefits begin after a Non-Union Employee is absent

from work for eight (8) consecutive days and may be continued for a maximum of twenty-six

(26) weeks. Depending on the Employee's location, the amount of Short-Term Disability

Benefits that an Employee is eligible to receive may be based on the number of years of service

or may be based on a fixed schedule. For example, to the extent an Employee's eligibility to

receive Short-Term Disability Benefits is based on the number of years of service, an Employee

who has completed between six (6) months and four (4) years of service is eligible to receive

100% of the Employee's base salary for the first six weeks of disability but only 60% for weeks

seven (7) through twelve (12) while on disability.[30] For Union Employees, Short-Term

Disability Benefits, if any, are typically governed by the CBA at issue and accordingly, the terms

and conditions of such policies may vary. The Debtors currently pay approximately $430,000

per month with respect to Short-Term Disability Benefits. Amounts owed on account of Short-

Term Disability Benefits that accrued prepetition will be honored through the payroll process by

---

[30] Unless governed by a CBA, beginning January 1, 2009, each Employee will be eligible to receive Short-Term Disability Benefits in the amount of 40% of the Employee's base salary for up to twenty-six (26) weeks while receiving Short-Term Disability Benefits regardless of the Employee's location.

the continuation of pay to Employees receiving Short-Term Disability Benefits. Thus, outstanding amounts owed on account of Short-Term Disability Benefits are included in the "Unpaid Wages" total set forth in section (a)(i) above. The Debtors request authority to pay all prepetition amounts owed on account of Short-Term Disability Benefits and to otherwise continue this program in the ordinary course of business.

196.    The Debtors currently provide full-time Employees with long-term disability benefits (the "Long-Term Disability Benefits") through an insured program with Metropolitan Life Insurance Company ("MetLife"). Generally, full-time Employees may receive Long-Term Disability Benefits after six (6) months of employment with the Debtors and, in most instances, become eligible for Long-Term Disability Benefits after the Employee's Short-Term Disability Benefits end. The Long-Term Disability Benefits are generally paid at a rate of 50% of a participating Employee's base salary, with a maximum monthly benefit of $15,000.[31]

197.    In prior years, the Debtors maintained self-insured long-term disability programs for their full-time Employees for income and medical benefits. Beginning in January of 2005, the Debtors instituted a fully-insured long-term disability program to cover long-term disability income benefits, while continuing to provide limited healthcare benefits to Employees receiving Long-Term Disability Benefits.

198.    The monthly premium for the current insured Long-Term Disability Benefits is approximately $279,000, and it has been paid through the end of this calendar year. The Debtors currently pay approximately $110,000 per month with respect to the self-insured portion of their Long-Term Disability Benefits. The Debtors maintain a credit balance with MetLife, which administers the self-funded portion of the Long-Term Disability Benefits.

---

[31] Unless governed by a CBA, beginning January 1, 2009, the Debtors' long-term disability program will become entirely voluntary.

Accordingly, there are no outstanding amounts owed on account of the Long-Term Disability Benefits as of the Petition Date.

### b.    Life Insurance

199.    The Debtors provide company-paid basic life insurance coverage ("Life Insurance") for eligible Employees through MetLife, which coverage entitles the Employee's beneficiary to receive an amount equal to the Employee's annual base salary up to a maximum of $2,000,000. Virtually all of the Debtors' Employees participate in the Life Insurance program, which costs the Debtors $121,000 per month. As of the Petition Date, the Debtors believe that approximately $121,000 is owed to MetLife in connection with the Life Insurance program.

### c.    Voluntary Insurance Programs

200.    In addition, eligible Employees may enroll for and purchase supplemental long-term disability, supplemental life insurance, and accidental death and dismemberment coverage (the "Voluntary Insurance Programs"). As participating Employees pay all premiums in connection with the Voluntary Insurance Programs, the Debtors anticipate that all amounts outstanding with respect to the Voluntary Insurance Programs will be handled through payroll deductions.

### d.    Flexible Spending

201.    The Debtors offer their Employees the ability to contribute a portion of their compensation, which amounts are generally deducted automatically from each participating Employee's paycheck, into flexible spending accounts for health and dependent care through Wage Works, Inc., which operates as a third party administrator to the plans (the "Flexible Spending Program"). Approximately 3,800 Employees participate in the Flexible Spending Program, which costs the Debtors approximately $26,000 per month. As of the Petition Date,

the Debtors believe that approximately $30,000 remains outstanding in connection with the Flexible Spending Program.

### e.    Employee Relocation Program

202.    The Debtors also pay relocation expenses incurred by certain of its Employees in connection with their employment (the "Employee Relocation Program"). During the first ten months of 2008, the Debtors have expended approximately $2.68 million on account of such services. As of the Petition Date, there are no amounts owed in connection with the Employee Relocation Program.

### f.    Retiree Medical Programs

203.    The Debtors maintain approximately 60 plans that provide different levels of medical, dental, life insurance, and prescription drug programs to approximately 2,500 retired Non-Union Employees and to retired Union Employees pursuant to various CBAs (collectively, the "Retiree Medical Benefits"). The Debtors spend an average of $1.4 million on Retiree Medical Benefits per month.[32]

204.    In recent months and weeks prior to the Petition Date and in the ordinary course of business, the Debtors terminated the employment of certain employees for reasons other than cause, of which approximately 950 of them continue to receive healthcare benefits (the "Severed Employees"). As part of these severance arrangements, the Debtors agreed to provide these Severed Employees with continued pay at their regular base rate and continue healthcare benefits for varying periods of time as well as certain outplacement services. As of

---

[32] The Debtors modified their self-insured and insured healthcare programs for Employees and retirees prior to the Petition Date by making arrangements for all healthcare to be provided by one administrator and carrier, United Healthcare. Employees and retirees were notified of these changes a number of months prior to the Petition Date, and the overall changes were orchestrated prepetition. These changes to the Debtors' healthcare programs will be fully operational as of January 1, 2009.

the Petition Date, the Debtors have discontinued the remaining unpaid severance pay to these Severed Employees.

205.    As of the Petition Date, there are approximately 460 Severed Employees who are 55 years old or older.  The Debtors estimate that providing Continued Healthcare Benefits to all Severed Employees during the Notice Period and for the Severed Employees who are 55 years old or older for the balance of the duration of the promised severance benefits will cost the Debtors approximately $717,000.

### g.    Workers' Compensation Program

206.    The Debtors maintain workers' compensation insurance policies with a variety of providers (the "Workers' Compensation Program") for all Employees in all states in which they operate.

207.    The current Workers' Compensation Program provides coverage in excess of a $1 million deductible up to applicable statutory limits.  Most of the Debtors' workers' compensation claims are under the deductible amount and are thus self-funded.  The Debtors estimate that their annual payments to claimants for all prior and current Workers' Compensation Programs are approximately $14 million, and an additional $2 million is paid annually for premiums and claims administration.  The premiums under the current Workers' Compensation Program are paid monthly from March to December 1st, and therefore, as of the Petition Date, there is no outstanding premium amount on account of the Workers' Compensation Program.  In prior years, the Debtors' workers' compensation policies provided for varying ranges of deductibles.  The premiums on these policies have been fully paid.

208.    As of the Petition Date, there are approximately 750 workers' compensation claims (the "Workers' Compensation Claims") pending against the Debtors arising out of alleged injuries incurred by Employees during the course of their employment.

209.    The Debtors believe, and I agree, that any delay in paying any of the Employee-related wages, deductions, reimbursements and benefits described in the Employee Wage Motion (the "Employee Wages and Benefits"), (including, without limitation, the compensation owed to Independent Contractors and Temporary Workers) could severely disrupt the Debtors' relationship with their Employees and dedicated non-Employee personnel and irreparably impair the Employees' morale at the very time that their dedication, confidence, and cooperation are most critical. The Debtors face the risk that their operations may be severely impaired if the Debtors are not immediately granted authority to pay the Employee Wages and Benefits. At this critical stage, the Debtors simply cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure to pay the Employee Wages and Benefits in the ordinary course of their businesses.

### (c)    Prepetition Employees and Benefits and $10,950 Priority Cap

210.    The Debtors have taken numerous steps to avoid circumstances where any of their Employees or Independent Contractors will receive payments for wages or other benefits that are in excess of the $10,950 statutory cap in the event the relief sought by the Wage Motion is granted.

211.    First, the Debtors designed a model to determine the amount of Unpaid Wages owed to each of their Employees on any given day. Second, the Debtors analyzed the outstanding amounts of various benefits that were likely to be owed to their Employees whose Unpaid Wages were closest to exceeding the $10,950 cap as of the Petition Date. Third, based on the foregoing information, the Debtors determined that to avoid the chance that any Employees would be paid in excess of $10,950, no Employee should have more than $8,000 in Unpaid Wages as of the Petition Date. Fourth, prior to the Petition Date, the Debtors arranged

for an interim payroll and paid sufficient amounts to 50 Employees to ensure than no Employee was owed more than $8,000 in Unpaid Wages.

212.    In conducting the foregoing analysis, the Debtors conservatively made arrangements to ensure that the outstanding amounts of various benefits that might be interpreted to be within the $10,950 cap were considered, and if necessary, prepaid before the Petition Date. For example, to avoid any risk that Employees with the larger amounts of Unpaid Wages might have claims exceeding $10,950, the Debtors prepaid $720,000 to American Express to minimize the amount of the Employees' outstanding Reimbursable Expenses, even though Employees are not primarily liable to American Express for the Reimbursable Expenses they incur on their corporate AMEX cards. Likewise, notwithstanding the Debtors' policy that Employees are not entitled to receive cash payment for Vacation Time but can only collected earned vacation through continuance of their employment and payroll during vacations, the Debtors reviewed the identity and job responsibilities of all Employees whose Unpaid Wages were getting close to or higher than $8,000 to determine if they had remaining Vacation Time as of the Petition Date and if they were likely to take such Vacation Time before it would expire at the end of the calendar year. The Debtors conducted these types of analyses and actions to minimize the chance that any Employee would be paid more than the $10,950 cap if the relief sought by the Wage Motion is granted.

213.    With respect to Independent Contractors, the Debtors analyzed the amounts typically paid to their individual Independent Contractors and the intervals of time between such payments, and concluded that virtually all Independent Contractors would not be owed in excess of $10,950 as of the Petition Date, with the exception of four of the Debtors'

broadcasting talent, who were in turn provided with interim compensation to ensure that they were not owed more than $10,950 as of the Petition Date.

214.    Notwithstanding all these efforts, I cannot be absolutely certain that if the relief sought by the Wage Motion is granted, no Employee or Independent Contractor will receive payment or benefits on account of their prepetition services that is in excess of $10,950. It would take literally hundreds of thousands of dollars of accounting manpower to be absolutely certain that the Debtors will not provide any Employee Wages and Benefits that might be deemed to have accrued pre-petition that do not exceed $10,950.  More importantly, seeking to establishing and enforce that accounting machinery would be very harmful to the morale of our Employees and Independent Contractors, and if it were determined, based on those efforts, that certain Employees' wages or benefits needed to be stopped to keep from exceeding the $10,950 cap, the Debtors would immediately file an additional motion with this Court seeking to honor those additional obligations to our Employees or Independent Contractors.  Our Employees and Independent Contractors are the Debtors' most valuable asset, and I am certain that allowing the very basic Employees Wages and Benefits sought by our Wage Motion to be interrupted would cause immediate and irreparable harm to the Debtors business and our reorganization efforts.

I believe that the commencement of these Chapter 11 Cases is in the best interests of the Debtors' stakeholders and other parties-in-interest.  As they did during the prepetition period, the Debtors, with the assistance of their professionals, will continue to maintain and enhance the going concern value of the companies while pursuing their reorganization strategy.

_____
Chandler Bigelow III
Senior Vice President & Chief Financial
Officer
Tribune Company

Sworn to and subscribed before me this
8TH  day of December, 2008.


_____
Notary Public

"OFFICIAL SEAL"
Margaret M. Weimer
Notary Public, State of Illinois
My Commission Expires Feb. 1, 2009