adjustment to the Dividend Rate shall be made to the extent that such dividend payment is not made out of the "earnings and profits" of the Company as determined under the Code. If, at the time of the payment of a particular dividend, it is reasonably uncertain whether such dividend (or portion thereof) will be paid out of the earnings and profits of the Company, such dividend (or portion thereof) shall be presumed not to be paid out of earnings and profits and, accordingly, no adjustment to the Dividend Rate shall be made. If, and to the extent that, such dividend is subsequently determined to have been paid out of earnings and profits, the Company shall, on the next Dividend Payment Date, increase the amount of the dividend payment to take into account the adjustment to the Dividend Rate that would have been made had the previous dividend (or portion thereof) been treated as having been paid out of earnings and profits of the Company.

The objective of this provision 2(c) is, in the event of a reduction of the DRDP, to provide holders of the Preferred Stock with the same amount of net dividends, on an after Federal tax basis, as would have been received at the time of issuance of the Preferred Stock, taking into account the highest Federal income tax rate applicable to corporations and the 70% DRD prevailing at the time of issuance of the Preferred Stock. Accordingly, if fundamental changes are made to the Federal income tax system (e.g., replacement of the DRD with a dividends received credit), no adjustment to the Dividend Rate shall be made if the dividends received by holders of the Preferred Stock, on an after Federal tax basis, is not altered. All determinations required to be made hereunder shall be made by the Board of Directors in its sole discretion.

3. Conversion at Option of the Company.

(a) General.

(i) The shares of the Series C Preferred Stock shall not be convertible at the option of the Company except (A) following receipt of a Rate Adjustment Request (as contemplated by Section 2(c)) or (B) upon the later to occur of (x) the date on which a written notice has been mailed or otherwise distributed by the Company to each record holder of the Series C Preferred Stock stating that the assets of either Chandler Trust No. 1 or Chandler Trust No. 2 have been distributed to the beneficiaries thereof and (y) February 1, 2025 (the date of receipt of a Rate Adjustment Request or such later date being the "Convertibility Date"). Subject to and upon compliance with the provisions of this Section 3, shares of Series C Preferred Stock may be converted, in whole or in part, at the election of the Company by resolution of the Board of Directors, upon notice as provided in Section 3(b), at any time or from time to time on or after the Convertibility Date. Conversion shall be made by delivering to the holders of Series C Preferred Stock, in respect of the conversion of each share of Series C Preferred Stock so converted, certificates representing the number of fully paid and non-assessable shares (the "Conversion Shares") of common stock, par value $.01 per share, of the Company ("Common Stock") equal to the quotient of (1) $500 plus accrued and unpaid dividends on such shares of Series C Preferred Stock to the Conversion Date (as hereinafter defined) divided by (2) the Common Share Value (as hereinafter defined). The aggregate number of shares of Common Stock that a holder of shares of Series C Preferred Stock that have been converted is entitled to receive pursuant to this Section 3 or Section 4 is hereinafter referred to as the "Aggregate Conversion Shares."

(ii) The "Common Share Value" shall mean the average of the closing prices of the Common Stock for the 20 days during which trades of Common Stock occurred immediately preceding the Valuation Date (as defined below), as reported in *The Wall Street Journal*, or, if no closing prices were so reported, the average of the mean between the high bid and low asked price per share of Common Stock for each of the 20 days during which trades of Common Stock occurred immediately preceding the Valuation Date in the over-the-counter market, as reported by the National Association of Securities Dealers, Inc. Automated Quotation System or such other system then in use, or, if the Common Stock is not then quoted by any such organization, the average of the mean between the closing bid and asked prices per share of Common Stock for each of the 20 days during which trades of Common Stock occurred immediately preceding the Valuation Date, as furnished by a professional market maker making a market in the Common Stock, or, if there is no such market maker, the fair market value of a share of Common Stock determined by whatever method the Board of Directors reasonably determines to use. In the case of a conversion pursuant to this Section 3, the "Valuation Date" shall mean the Conversion Notice Date (as defined in Section 3(b)), and in the case of any conversion pursuant to Section 4, the "Valuation Date" shall mean the Conversion Time (as hereinafter defined).

(b) Notice of Conversion. Notice of any conversion, setting forth (i) the Conversion Date (as defined in Section 3(c) hereof), (ii) a statement that dividends on the shares of Series C Preferred Stock to be converted will cease to accrue on such Conversion Date; and (iii) the method(s) by which the holders may surrender the certificates representing shares of Series C Preferred Stock that have been converted and obtain the Conversion Shares therefor, shall be mailed, postage prepaid, on a date (the "Conversion Notice Date") that is at least 15 days but not more than 45 days prior to said Conversion Date to each holder of record of the Series C Preferred Stock to be converted at his, her or its address as the same shall appear on the books of the Company. If less than all the shares of the Series C Preferred Stock owned by such holder are then to be converted, the notice shall specify the number of shares thereof that are to be converted and the numbers of the certificates representing such shares.

(c) Method of Conversion. The surrender of any certificate evidencing shares of Series C Preferred Stock that have been converted shall be made by the holder thereof by the surrender of the certificate or certificates formerly representing the shares of Series C Preferred Stock converted (with proper endorsement or instruments of transfer) to the Company at the principal office of the Company (or such other office or agency of the Company as the Company may designate in writing to the holder or holders of the Series C Preferred Stock) at any time during its usual business hours. Shares of Series C Preferred Stock called for conversion shall be deemed to have been converted, and the shares of Common Stock to be issued in respect of the shares of Series C Preferred Stock converted shall be deemed to have been issued, as of the close of business on the date fixed for conversion (the "Conversion Date"), without regard to when certificates evidencing such Series C Preferred Stock are surrendered pursuant to this Section 3(c) or certificates evidencing such Common Stock are issued pursuant to Section 3(d). The rights of the holder of Series C Preferred Stock that has been converted, except for the right to receive the Aggregate Conversion Shares therefor in accordance herewith (and any cash payments to which such holder is entitled pursuant to Section 3(e) hereof), shall cease on the Conversion Date. In the case of lost or destroyed certificates evidencing ownership

02/15/01  17:05 FAX 213 237 4743          LEGAL DEPT                                      ☒008

of shares of Series C Preferred Stock that have been converted, the holder shall submit proof of loss or destruction and such indemnity as shall be required by the Company.

(d) Issuance of Certificates for Common Stock.  As soon as practicable after its receipt of any certificate or certificates formerly evidencing ownership of shares of Series C Preferred Stock that have been converted, the Company shall issue and shall deliver to the person for whose account such certificates formerly representing shares of Series C Preferred Stock were so surrendered, or on his, her or its written order, a certificate or certificates for the number of full shares of Common Stock issuable upon the conversion of such shares of Series C Preferred Stock and a check or cash payment (if any) to which such holder is entitled with respect to fractional shares as determined by the Company, in accordance with Section 3(e) hereof.

(e) Fractional Shares.  No fractional shares or scrip representing fractional shares shall be issued upon the conversion of any shares of Series C Preferred Stock, but the holder thereof will receive in cash an amount equal to the value of such fractional share of Common Stock based on the Common Share Value.  If more than one share of Series C Preferred Stock shall be converted at one time for the account of the same holder, the number of full shares issuable upon conversion thereof shall be computed on the basis of the aggregate number of such shares so surrendered.

(f) Payment of Taxes.  The Company shall pay any tax in respect of the issuance of stock certificates on conversion of shares of Series C Preferred Stock.  The Company shall not, however, be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of stock in any name other than that of the holder of the shares converted, and the Company shall not be required to issue or deliver any such stock certificate unless and until the person or persons requesting the issuance thereof shall have paid to the Company the amount of any such tax or shall have established to the satisfaction of the Company that such tax has been paid.

(g) Common Stock Reserved for Conversion.  The Company shall at all times from and after the Conversion Date reserve and keep available out of its authorized and unissued Common Stock the full number of shares of Common Stock deliverable upon the conversion of all outstanding shares of Series C Preferred Stock and shall take all such action as may be required from time to time in order that it may validly and legally issue fully paid and non-assessable shares of Common Stock upon conversion of the Series C Preferred Stock.

4. Conversion at the Option of Holders.

(a) General.  After the later to occur of (i) the date on which a written notice has been mailed or otherwise distributed by the Company to each record holder of the Series C Preferred Stock stating that the assets of either Chandler Trust No. 1 or Chandler Trust No. 2 have been distributed to the beneficiaries thereof and (ii) February 1, 2025, the holder of any Series C Preferred Stock may convert pursuant to this Section 4 all or any part (in whole number of shares only) of the Series C Preferred Stock held by such holder into fully paid and non-assessable shares of Common Stock.  The number of shares of Common Stock into which a share of Series C Preferred Stock may be converted shall be equal to the quotient of (1) $500

plus accrued and unpaid dividends on such shares of Series C Preferred Stock to the Conversion Time (as hereinafter defined) divided by (2) the Common Share Value.

(b) Method of Conversion. Each conversion of Series C Preferred Stock shall be effected by the surrender of the certificate or certificates representing the shares of Series C Preferred Stock to be converted (with proper endorsement or instruments of transfer) to the Company at the principal office of the Company (or such other office or agency of the Company as the Company may designate in writing to the holder or holders of the Series C Preferred Stock) at any time during its usual business hours, together with written notice by the holder of such Series C Preferred Stock stating that such holder desires to convert the shares of Series C Preferred Stock, or a stated number of such shares, represented by such certificate or certificates, which notice shall also specify the name or names (with addresses) and denominations in which the certificate or certificates for the Common Stock shall be issued and shall include instructions for delivery thereof. Any conversion pursuant to this Section 4 shall be deemed to have been effected as of the close of business on the date on which such certificate or certificates shall have been surrendered and such notice shall have been received, and at such time (the "Conversion Time") the rights of the holder of Series C Preferred Stock (or specified portion thereof) as such holder shall cease and the person or persons in whose name or names any certificate or certificates for shares of Common Stock are to be issued upon conversion shall be deemed to have become the holder or holders of record of the shares of Common Stock represented thereby. In the case of lost or destroyed certificates evidencing ownership of shares of Series C Preferred Stock to be converted, the holder shall submit proof of loss or destruction and such indemnity as shall be required by the Company.

(c) Issuance of Certificates for Common Stock. As soon as practicable after its receipt of any certificate or certificates evidencing ownership of shares of Series C Preferred Stock to be converted pursuant to this Section 4, the Company shall issue and shall deliver to the person for whose account such shares of Series C Preferred Stock were so surrendered, or on his, her or its written order, a certificate or certificates for the number of full shares of Common Stock issuable upon the conversion of such shares of Series C Preferred Stock and a check or cash payment (if any) to which such holder is entitled with respect to fractional shares as determined by the Company, in accordance with Section 4(d) hereof.

(d) Fractional Shares. No fractional shares or scrip representing fractional shares shall be issued upon the conversion of any shares of Series C Preferred Stock, but the holder thereof will receive in cash an amount equal to the value of such fractional share of Common Stock based on the Common Share Value. If more than one share of Series C Preferred Stock shall be converted at one time for the account of the same holder, the number of full shares issuable upon conversion thereof shall be computed on the basis of the aggregate number of such shares so surrendered.

(e) Payment of Taxes. The Company shall pay any tax in respect of the issuance of stock certificates on conversion of shares of Series C Preferred Stock. The Company shall not, however, be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of stock in any name other than that of the holder of the shares converted, and the Company shall not be required to issue or deliver any such stock certificate unless and until the person or persons requesting the issuance thereof shall have paid

-7-

02/15/01   17:06 FAX 213 237 4743          LEGAL DEPT                                ☑010

to the Company the amount of any such tax or shall have established to the satisfaction of the Company that such tax has been paid.

(f) Common Stock Reserved for Conversion. The Company shall at all times from and after the Conversion Time reserve and keep available out of its authorized and unissued Common Stock the full number of shares of Common Stock deliverable upon the conversion of all outstanding shares of Series C Preferred Stock and shall take all such action as may be required from time to time in order that it may validly and legally issue fully paid and non-assessable shares of Common Stock upon conversion of the Series C Preferred Stock.

5. Voting Rights.

(a) General Voting Rights. Except as expressly provided hereinafter in this Section 5, or as otherwise from time to time required by applicable law, the Series C Preferred Stock shall have no voting rights.

(b) Voting Rights Upon Dividend Arrears.

(i) Right to Elect Directors. In the event that an amount equal to six quarterly dividend payments on the Series C Preferred Stock shall have accrued and be unpaid (the occurrence of such contingency marking the beginning of a period herein referred to as the "Default Period," which shall extend until such time as all accrued and unpaid dividends for all previous Dividend Periods and for the current Dividend Period on all shares of Series C Preferred Stock then outstanding shall have been declared and paid or declared and a sum sufficient for such full payment set apart for payment), the holders of the Series C Preferred Stock shall have the right, voting separately as a class together with holders of shares of any Parity Stock upon which like voting rights have been conferred and are exercisable (such shares of Series C Preferred Stock and shares of Parity Stock are hereinafter referred to as "Voting Parity Stock"), to elect two members of the Board of Directors, each member to be in addition to the then authorized number of directors, at the next annual meeting of stockholders or at a special meeting called as described below and thereafter until the Default Period shall have ended.

(ii) Special Meeting; Written Consent. Whenever such voting right shall vest, it may be exercised initially by the vote of the holders of a plurality of the voting power of Series C Preferred Stock and Voting Parity Stock present and voting as a single class, in person or by proxy, at a special meeting of holders of the Series C Preferred Stock and Voting Parity Stock or at the next annual meeting of stockholders. A special meeting for the exercise of such right shall be called by the Secretary of the Company as promptly as possible, and in any event within 10 days after receipt of a written request signed by the holders of record of at least 25% of the outstanding shares of the Series C Preferred Stock and Voting Parity Stock, subject to any applicable notice requirements imposed by law or regulation. Notwithstanding the provisions of this paragraph, no such special meeting shall be required to be held during the 90-day period preceding the date fixed for the annual meeting of stockholders. Any action required or permitted to be taken at any such special meeting of such holders may be taken by a consent or consents in writing of such stockholders, setting forth the action so taken, which consent or consents shall be signed by the holders of Series C Preferred Stock and Voting Parity Stock

02/15/01   17:08  FAX 213 237 4743          LEGAL DEPT                                    ☑011

representing a majority of the voting power of shares of such Series C Preferred Stock and Voting Parity Stock and shall be delivered to the Company in the manner set forth from time to time in the DGCL.

(iii)  <u>Term of Office of Directors</u>.  Any director who shall have been elected by holders of the Series C Preferred Stock and Voting Parity Stock entitled to vote in accordance with this subparagraph (b) shall hold office for a term expiring (subject to the earlier expiry of such term, as set forth below) at the annual meeting of stockholders at which the term of office of his class shall expire and during such term may be removed at any time, only for cause, by, and only by, the affirmative vote of the holders of record of a majority of the voting power of the Series C Preferred Stock and Voting Parity Stock present and voting as a single class, in person or by proxy, at a special meeting of such stockholders called for such purpose, and any vacancy created by such removal may also be filled at such meeting.  A meeting for the removal of a director elected by the holders of the Series C Preferred Stock and Voting Parity Stock and the filling of the vacancy created thereby shall be called by the Secretary of the Company as promptly as possible and in any event within 10 days after receipt of a request therefor signed by the holders of not less than 25% of the aggregate outstanding voting power of the Series C Preferred Stock and Voting Parity Stock, subject to any applicable notice requirements imposed by law or regulation.  Such meeting shall be held at the earliest practicable date thereafter, provided that no such meeting shall be required to be held during the 90-day period preceding the date fixed for the annual meeting of stockholders.  Simultaneously with the expiration of the Default Period, the terms of office of all directors elected by the holders of the shares of Series C Preferred Stock and the Voting Parity Stock pursuant hereto then in office shall, without further action, thereupon terminate unless otherwise required by law.  Upon such termination the number of directors constituting the Board of Directors of the Company shall, without further action, be reduced by two, subject always to the increase of the number of directors pursuant to the foregoing provisions in the case of the future right of holders of the shares of Series C Preferred Stock and Voting Parity Stock to elect directors as provided above.

(iv)  <u>Vacancies</u>.  Any vacancy caused by the death, resignation or removal of a director who shall have been elected in accordance with this subparagraph (b) may be filled by the remaining director so elected or, if not so filled, by a vote of holders of a plurality of the voting power of the Series C Preferred Stock and Voting Parity Stock present and voting as a single class, in person or by proxy, at a meeting called for such purpose.  Unless such vacancy shall have been filled by the remaining director as aforesaid, such meeting shall be called by the Secretary of the Company at the earliest practicable date after such death or resignation, and in any event within 10 days after receipt of a written request signed by the holders of record of at least 25% of the outstanding shares of the Series C Preferred Stock and Voting Parity Stock, subject to any applicable notice requirements imposed by law or regulation. Notwithstanding the provisions of this paragraph, no such special meeting shall be required to be held during the 90-day period preceding the date fixed for the annual meeting of stockholders.

(v)  <u>Stockholders' Right to Call Meeting</u>.  If any meeting of the holders of the Series C Preferred Stock and Voting Parity Stock required by this subparagraph (b) to be called shall not have been called within 30 days after personal service of a written request therefor upon the Secretary of the Company or within 30 days after mailing the same within the United States of America by registered mail addressed to the Secretary of the

-9-

Company at its principal executive offices, subject to any applicable notice requirements imposed by law or regulation, then the holders of record of at least 25% of the outstanding shares of the Series C Preferred Stock and Voting Parity Stock may designate in writing one of their number to call such meeting at the expense of the Company, and such meeting may be called by such person so designated upon the notice required for annual meetings of stockholders or such shorter notice (but in no event shorter than permitted by law or regulation) as may be acceptable to the holders of a majority of the total voting power of the Series C Preferred Stock and Voting Parity Stock. Any holder of Series C Preferred Stock and Voting Parity Stock so designated shall have access to the Series C Preferred Stock and Voting Parity Stock books of the Company for the purpose of causing such meeting to be called pursuant to these provisions.

(vi) Quorum. At any meeting of the holders of the Series C Preferred Stock called in accordance with the provisions of this subparagraph (b) for the election or removal of directors, the presence in person or by proxy of the holders of a majority of the total voting power of the Series C Preferred Stock and Voting Parity Stock shall be required to constitute a quorum; in the absence of a quorum, the holders of a majority of the total number of votes present in person or by proxy shall have power to adjourn the meeting from time to time without notice other than an announcement at the meeting, until a quorum shall be present.

(c) Voting Rights on Extraordinary Matters.

(i) So long as any shares of Series C Preferred Stock shall be outstanding, the holders of the Series C Preferred Stock shall have the right, voting separately as a class together with holders of shares of any Voting Parity Stock (with two-thirds of the voting power of such stock at the time outstanding given in person or by proxy at a meeting at which the holders of such shares shall be entitled to vote separately as a class, or by a consent or consents in writing setting forth such approval, which consent shall be delivered to the Company in the manner set forth from time to time in the DGCL, required for approval by such holders), to vote on: (i) the liquidation or dissolution of the Company; (ii) any proposal to authorize, create or issue, or increase the authorized or issued amount of, any class or series of capital stock ranking pari passu with, or prior to, the shares of the Series C Preferred Stock in powers, rights or preferences upon the liquidation, dissolution or winding up of affairs of the Company or as to dividends; and (iii) any proposal to amend by merger, amendment or otherwise (or otherwise alter or repeal) the Certificate of Incorporation (or this resolution) if such amendment, alteration or repeal would increase or decrease the aggregate number of authorized shares of Series C Preferred Stock or any Voting Parity Stock, increase or decrease the par value of the shares of Series C Preferred Stock or any Voting Parity Stock, or alter or change the powers, preferences, or special rights of the shares of Series C Preferred Stock or any Voting Parity Stock so as to affect them adversely. An amendment that increases the number of authorized shares of any class or series of Preferred Stock or authorizes the creation or issuance of other classes or series of Preferred Stock, in each case ranking junior to the Series C Preferred Stock with respect to the payment of dividends and distribution of assets upon liquidation, dissolution or winding up shall not be considered to be such an adverse change.

(ii) So long as any shares of Series C Preferred Stock shall be outstanding and unless the consent or approval of a greater number of shares shall then be required by applicable law, without first obtaining the approval of the holders of at least two-

-10-

thirds of the voting power of the Series C Preferred Stock at the time outstanding (voting separately as a class together with the holders of shares of Voting Parity Stock) given in person or by proxy at a meeting at which the holders of such shares shall be entitled to vote separately as a class (or by a consent or consents in writing setting forth such approval, which consent shall be delivered to the Company in the manner set forth from time to time in the DGCL), the Company shall not either directly or indirectly or through merger or consolidation with any other entity, (i) authorize, create or issue, or increase the authorized or issued amount of, any class or series of capital stock that would place or have the effect of placing restrictions on the obligation of the Company to pay dividends to the holders of Series C Preferred Stock or to perform any of its obligations to the holders of Series C Preferred Stock at any time; or (ii) authorize, enter into or permit to exist any covenant or agreement that would place or have the effect of placing restrictions on the obligations of the Company to pay dividends to holders of Series C Preferred Stock or to perform any of its other obligations to the holders of Series C Preferred Stock at any time; provided, however, that notwithstanding the foregoing, the Company may from time to time enter into credit agreements and indentures that provide for limitations on the ability of the Company to pay dividends on its capital stock generally, so long as the Board of Directors determines, in its sole discretion, that such limitation is necessary in order to obtain financing on commercially reasonable terms.

(d) One Vote Per Share. In connection with any matter on which holders of the Series C Preferred Stock are entitled to vote as provided in subparagraphs (b) and (c) above, or any other matter on which the holders of the Series C Preferred Stock are entitled to vote as one class or otherwise pursuant to applicable law or the provisions of the Certificate of Incorporation, each holder of Series C Preferred Stock shall be entitled to one vote for each share of Series C Preferred Stock held by such holder.

6. No Sinking Fund. No sinking fund will be established for the retirement or redemption of shares of Series C Preferred Stock.

7. Liquidation Rights; Priority.

(a) In the event of any liquidation, dissolution or winding up of the affairs of the Company, whether voluntary or involuntary, after payment or provision for payment of the debts and other liabilities of the Company, the holders of shares of the Series C Preferred Stock shall be entitled to receive, out of the assets of the Company, whether such assets are capital or surplus and whether or not any dividends as such are declared, $500 per share plus an amount equal to all accrued and unpaid dividends for the then-current plus all prior Dividend Periods, and no more, before any distribution shall be made to the holders of the Common Stock or any other class of stock or series thereof ranking junior to the Series C Preferred Stock with respect to the distribution of assets upon liquidation, dissolution or winding up of the Company. Unless specifically designated as junior or senior to the Series C Preferred Stock with respect to the liquidation, dissolution or winding up of the affairs of the Company or as to dividends, all other series or classes of Preferred Stock of the Company shall rank on a parity with the Series C Preferred Stock with respect to the distribution of assets.

(b) Nothing contained in this Section 7 shall be deemed to prevent conversion of shares of the Series C Preferred Stock by the Company in the manner provided in

-11-

02/15/01   17:07 FAX 213 237 4743        LEGAL DEPT                    ☒014

Section 3.  Neither the merger nor consolidation of the Company into or with any other entity, nor the merger or consolidation of any other entity into or with the Company, nor a sale, transfer or lease of all or any part of the assets of the Company, shall be deemed to be a liquidation, dissolution or winding up of the Company within the meaning of this Section 7.

(c)  Written notice of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Company, stating a payment date and the place where the distributable amounts shall be payable, shall be given by mail, postage prepaid, no less than 30 days prior to the payment date stated therein, to the holders of record of the Series C Preferred Stock at their respective addresses as the same shall appear on the books of the Company.

(d)  If the amounts available for distribution with respect to the Series C Preferred Stock and all other outstanding stock of the Company ranking on a parity with the Series C Preferred Stock upon liquidation, dissolution or winding up are not sufficient to satisfy the full liquidation rights of all the outstanding Series C Preferred Stock and stock ranking on a parity therewith, then the holders of each series of such stock will share ratably in any such distribution of assets in proportion to the full respective preferential amount (which in the case of the Series C Preferred Stock shall mean the amounts specified in Section 7(a) and in the case of any other series of preferred stock may include accumulated dividends if contemplated by such series) to which they are entitled.

8.  Status of Shares Converted.  Shares of Series C Preferred Stock converted or purchased or otherwise acquired for value by the Company, shall, after such event, have the status of authorized and unissued shares of Preferred Stock without designation and may be reissued by the Company at any time as shares of any series of Preferred Stock.

9.  Effectiveness.  This certificate shall be effective as of 5:00 p.m., New York City time, on February 13, 2001.

-12-

IN WITNESS WHEREOF, Tribune Company has caused this certificate to be signed by Crane H. Kenney, its Senior Vice President, General Counsel and Secretary, this 13th day of February, 2001.

TRIBUNE COMPANY

By: /s/ Crane H. Kenney
    Crane H. Kenney
    Senior Vice President,
       General Counsel and Secretary

-13-

02/15/01  17:10 FAX 213 237 4743          LEGAL DEPT

STATE OF DELAWARE
SECRETARY OF STATE 03
DIVISION OF CORPORATIONS
FILED 08:10 PM 02/15/2001
010077697 - 0674607

CERTIFICATE OF AMENDMENT TO
CERTIFICATE OF DESIGNATION
OF THE
PREFERRED STOCK, SERIES D-1
(WITHOUT PAR VALUE)
OF
TRIBUNE COMPANY

Pursuant to Section 242 of the
Delaware General Corporation Law

The undersigned duly authorized officer of Tribune Company (the "Company"), a corporation organized and existing under the Delaware General Corporation Law (the "DGCL"), in accordance with the provisions of Section 103 thereof, and pursuant to Section 242 thereof, DOES HEREBY CERTIFY:

FIRST:  Pursuant to the authority conferred upon the Board of Directors by the Amended and Restated Certificate of Incorporation of the Company (the "Certificate of Incorporation"), the Board of Directors of the Company (the "Board" or "Board of Directors") on June 12, 2000 adopted resolutions creating 380,972 shares of Series D-1 Preferred Stock (as defined below), in addition to the shares of Preferred Stock, Series D-2, which were also created on such date;

SECOND: On June 12, 2000, the Company filed a Certificate of Designation establishing the rights, preferences, privileges and restrictions relating to Series D-1 Preferred Stock;

THIRD:  On February 13, 2001, the Board of Directors duly adopted and approved the amendment of the Certificate of Designation to read in its entirety as set forth herein; and

FOURTH:  The designation of and the rights, preferences, privileges and restrictions relating to Series D-1 Preferred Stock are hereby fixed as set forth herein, and the original Certificate of Designation is hereby replaced by this Certificate of Amendment to Certificate of Designation and is hereby amended to read in its entirety as follows:

RESOLVED, that pursuant to the authority expressly granted to and vested in the Board of Directors by provisions of the Certificate of Incorporation, and the DGCL, the issuance of a series of the Company's preferred stock, without par value (the "Preferred Stock"), which shall consist of 380,972 of the 12,000,000 shares of Preferred Stock that the Company now has authority to issue, be, and the same hereby is, authorized, and the Board of Directors hereby fixes the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions, of the shares of such series (in addition to the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions, set forth in the Certificate of Incorporation that may be applicable to the Preferred Stock) as follows:

1. <u>Designation and Rank</u>. The designation of such series of the Preferred Stock authorized by this resolution shall be the Preferred Stock, Series D-1 (the "Series D-1 Preferred Stock"). The number of shares of Series D-1 Preferred Stock shall be 380,972. The Series D-1 Preferred Stock shall rank prior to the Common Stock (as hereinafter defined) of the Company and to all other classes and series of equity securities of the Company now or hereafter authorized, issued or outstanding (the Common Stock and such other classes and series of equity securities not expressly designated as ranking on a parity with or senior to the Series D-1 Preferred Stock collectively may be referred to herein as the "Junior Stock") as to dividend rights and rights upon liquidation, winding up or dissolution of the Company, other than (a) the Company's (i) 8% Cumulative Convertible Preferred Stock, Series C (the "Series C Preferred Stock") and (ii) Series D-2 Preferred Stock (the "Series D-2 Preferred Stock"), with respect to which the Series D-1 Preferred Stock is expressly designated as ranking on a parity as to dividend rights and rights upon liquidation, winding up or dissolution of the Company; and (b) any other classes or series of equity securities of the Company expressly designated as ranking on a parity with (collectively with the Series C Preferred Stock and the Series D-2 Preferred Stock, the "Parity Stock") or senior to (the "Senior Stock") the Series D-1 Preferred Stock as to dividend rights and rights upon liquidation, winding up or dissolution of the Company. The Series D-1 Preferred Stock shall be subject to creation of Senior Stock, Parity Stock and Junior Stock, to the extent not expressly prohibited by the Certificate of Incorporation or Section 5(c)(i) or 5(c)(ii) hereof, with respect to the payment of dividends and upon liquidation.

2. <u>Cumulative Dividends; Priority</u>.

(a) <u>Payment of Dividends</u>.

(i) The holders of record of shares of Series D-1 Preferred Stock shall be entitled to receive, when, as and if declared by the Board of Directors out of funds legally available therefor, cumulative cash dividends from the date of issuance of such shares at the rate per annum per share of 5 8% (i.e , $29 per annum) (the "Dividend Rate"), as adjusted from time to time pursuant to Section 2(c) hereof. Dividends shall be payable quarterly on the second Thursday of March, June, September and December in each year (or if such day is a non-business day, on the next business day) with respect to the quarter ending on the last day of such month, commencing on March 8, 2001 (each of such dates a "Dividend Payment Date"). No interest, or sum of money in lieu of interest, shall be payable in respect of any dividend payment or payments on the Series D-1 Preferred Stock that may be in arrears.

(ii) Each declared dividend shall be payable to holders of record as they appear on the stock books of the Company at the close of business on such record dates, not more than 60 calendar days preceding the applicable Dividend Payment Dates therefor, as are determined by the Board of Directors (each of such dates a "Record Date"). Quarterly dividend periods (each a "Dividend Period") shall commence on and include the first day of January, April, July, and October of each year and shall end on and include the last day of March, June, September and December, respectively of such year. Dividends on the shares of Series D-1 Preferred Stock shall be fully cumulative and shall accrue (whether or not declared) from the first day of each Dividend Period; provided, however, that the amount of any dividend payable for any Dividend Period shorter than a full Dividend Period, shall be computed on the basis of a

2

02/15/01  17:10 FAX 213 237 4743          LEGAL DEPT                                    ⌀005

360-day year composed of twelve 30-day months and the actual number of days elapsed in the relevant Dividend Period.

(b) <u>Priority as to Dividends</u>.

(i) Subject to the provisions hereof, no cash dividend or other distribution (other than in Common Stock or other Junior Stock) shall be declared or paid or set apart for payment on Preferred Stock that constitutes Parity Stock or Junior Stock with respect to dividends for any Dividend Period unless full dividends on the Series D-1 Preferred Stock for the immediately preceding Dividend Period have been or contemporaneously are declared and paid (or declared and a sum sufficient for the payment thereof set apart for such payment). When dividends are not paid in full (or declared and a sum sufficient for such full payment not so set apart) upon the Series D-1 Preferred Stock and any Parity Stock, all dividends declared upon shares of Series D-1 Preferred Stock and any Parity Stock shall be declared pro rata with respect thereto, so that in all cases the amount of dividends declared per share on the Series D-1 Preferred Stock and such Parity Stock shall bear to each other the same ratio that accrued dividends for the then-current Dividend Period per share on the shares of Series D-1 Preferred Stock (which shall include any accumulation in respect of unpaid dividends for prior Dividend Periods) and dividends, including accumulations, if any, of such Parity Stock, bear to each other.

(ii) Except as provided in the preceding paragraph, full dividends on the Series D-1 Preferred Stock must be declared and paid or set apart for payment for the immediately preceding Dividend Period before (A) any cash dividend or other distribution (other than in Common Stock or other Junior Stock) shall be declared or paid or set aside for payment upon the Common Stock or any other Junior Stock of the Company or (B) any Common Stock or any other Junior Stock is redeemed, purchased or otherwise acquired by the Company for any consideration (or any moneys are paid to or made available for a sinking fund for the redemption of any shares of any such stock), except by redemption into or exchange for Junior Stock or (C) any Series D-1 Preferred Stock or Parity Stock is redeemed, purchased or otherwise acquired by the Company for any consideration (or any moneys are paid to or made available for a sinking fund for the redemption of any shares of any such stock). The Company shall not permit any subsidiary of the Company to purchase or otherwise acquire for consideration any shares of stock of the Company if under the preceding sentence, the Company would be prohibited from purchasing or otherwise acquiring such shares at such time and in such manner.

(iii) No dividend shall be paid or set aside for holders of the Series D-1 Preferred Stock for any Dividend Period unless full dividends on any Preferred Stock that constitutes Senior Stock with respect to dividends for that period have been or contemporaneously are declared and paid (or declared and a sum sufficient for the payment thereof set apart for such payment).

(c) <u>Adjustment to Dividend Rate</u>.

(i) The Dividend Rate shall not be adjusted prior to the end of the Dividend Period ending on December 31, 2001.

3

02/15/01  17:11 FAX 213 237 4743        LEGAL DEPT                                    ☑006

(ii) The Dividend Rate for each subsequent year (commencing with the year that begins on January 1, 2002) shall be adjusted upward in accordance with Schedule A attached hereto.

(iii) Increases in the Dividend Rate are subject to the following limitation: the Dividend Rate shall, under no circumstances, exceed 8.4% per annum.

3. Conversion at Option of the Company.

(a) General.

(i) The shares of the Series D-1 Preferred Stock shall not be convertible at the option of the Company except upon the later to occur of (x) the date on which a written notice has been mailed or otherwise distributed by the Company to each record holder of the Series D-1 Preferred Stock stating that the assets of either Chandler Trust No. 1 or Chandler Trust No. 2 have been distributed to the beneficiaries thereof and (y) February 1, 2025 (such later date being the "Convertibility Date"). Subject to and upon compliance with the provisions of this Section 3, shares of Series D-1 Preferred Stock may be converted, in whole or in part, at the election of the Company by resolution of the Board of Directors, upon notice as provided in Section 3(b), at any time or from time to time on or after the Convertibility Date. Conversion shall be made by delivering to the holders of Series D-1 Preferred Stock, in respect of the conversion of each share of Series D-1 Preferred Stock so converted, certificates representing the number of fully paid and non-assessable shares (the "Conversion Shares") of common stock, par value $.01 per share, of the Company ("Common Stock") equal to the quotient of (1) $500 plus accrued and unpaid dividends on such shares of Series D-1 Preferred Stock to the Conversion Date (as hereinafter defined) divided by (2) the Common Share Value (as hereinafter defined). The aggregate number of shares of Common Stock that a holder of shares of Series D-1 Preferred Stock that have been converted is entitled to receive pursuant to this Section 3 or Section 4 is hereinafter referred to as the "Aggregate Conversion Shares."

(ii) The "Common Share Value" shall mean the average of the closing prices of the Common Stock for the 20 days during which trades of Common Stock occurred immediately preceding the Valuation Date (as defined below), as reported in *The Wall Street Journal*, or, if no closing prices were so reported, the average of the mean between the high bid and low asked price per share of Common Stock for each of the 20 days during which trades of Common Stock occurred immediately preceding the Valuation Date in the over-the-counter market, as reported by the National Association of Securities Dealers, Inc. Automated Quotation System or such other system then in use, or, if the Common Stock is not then quoted by any such organization, the average of the mean between the closing bid and asked prices per share of Common Stock for each of the 20 days during which trades of Common Stock occurred immediately preceding the Valuation Date, as furnished by a professional market maker making a market in the Common Stock, or, if there is no such market maker, the fair market value of a share of Common Stock determined by whatever method the Board of Directors reasonably determines to use. In the case of a conversion pursuant to this Section 3, the "Valuation Date" shall mean the Conversion Notice Date (as defined in Section 3(b)), and in the case of any conversion pursuant to Section 4, the "Valuation Date" shall mean the Conversion Time (as hereinafter defined).

4

02/15/01  17:11 FAX 213 237 4743         LEGAL DEPT                                    ☒007

(b) <u>Notice of Conversion</u>. Notice of any conversion, setting forth (i) the Conversion Date (as defined in Section 3(c) hereof), (ii) a statement that dividends on the shares of Series D-1 Preferred Stock to be converted will cease to accrue on such Conversion Date, and (iii) the method(s) by which the holders may surrender the certificates representing shares of Series D-1 Preferred Stock that have been converted and obtain the Conversion Shares therefor, shall be mailed, postage prepaid, on a date (the "Conversion Notice Date") that is at least 15 days but not more than 45 days prior to said Conversion Date to each holder of record of the Series D-1 Preferred Stock to be converted at his, her or its address as the same shall appear on the books of the Company. If less than all the shares of the Series D-1 Preferred Stock owned by such holder are then to be converted, the notice shall specify the number of shares thereof that are to be converted and the numbers of the certificates representing such shares.

(c) <u>Method of Conversion</u>. The surrender of any certificate evidencing shares of Series D-1 Preferred Stock that have been converted shall be made by the holder thereof by the surrender of the certificate or certificates formerly representing the shares of Series D-1 Preferred Stock converted (with proper endorsement or instruments of transfer) to the Company at the principal office of the Company (or such other office or agency of the Company as the Company may designate in writing to the holder or holders of the Series D-1 Preferred Stock) at any time during its usual business hours. Shares of Series D-1 Preferred Stock called for conversion shall be deemed to have been converted, and the shares of Common Stock to be issued in respect of the shares of Series D-1 Preferred Stock converted shall be deemed to have been issued, as of the close of business on the date fixed for conversion (the "Conversion Date"), without regard to when certificates evidencing such Series D-1 Preferred Stock are surrendered pursuant to this Section 3(c) or certificates evidencing such Common Stock are issued pursuant to Section 3(d). The rights of the holder of Series D-1 Preferred Stock that has been converted, except for the right to receive the Aggregate Conversion Shares therefor in accordance herewith (and any cash payments to which such holder is entitled pursuant to Section 3(e) hereof), shall cease on the Conversion Date. In the case of lost or destroyed certificates evidencing ownership of shares of Series D-1 Preferred Stock that have been converted, the holder shall submit proof of loss or destruction and such indemnity as shall be required by the Company.

(d) <u>Issuance of Certificates for Common Stock</u>. As soon as practicable after its receipt of any certificate or certificates formerly evidencing ownership of shares of Series D-1 Preferred Stock that have been converted, the Company shall issue and shall deliver to the person for whose account such certificates formerly representing shares of Series D-1 Preferred Stock were so surrendered, or on his, her or its written order, a certificate or certificates for the number of full shares of Common Stock issuable upon the conversion of such shares of Series D-1 Preferred Stock and a check or cash payment (if any) to which such holder is entitled with respect to fractional shares as determined by the Company, in accordance with Section 3(e) hereof.

(e) <u>Fractional Shares</u>. No fractional shares or scrip representing fractional shares shall be issued upon the conversion of any shares of Series D-1 Preferred Stock, but the holder thereof will receive in cash an amount equal to the value of such fractional share of Common Stock based on the Common Share Value. If more than one share of Series D-1 Preferred Stock shall be converted at one time for the account of the same holder, the number of

02/15/01  17:11 FAX 213 237 4743        LEGAL DEPT                               ☑008

full shares issuable upon conversion thereof shall be computed on the basis of the aggregate number of such shares so surrendered.

(f) Payment of Taxes. The Company shall pay any tax in respect of the issuance of stock certificates on conversion of shares of Series D-1 Preferred Stock. The Company shall not, however, be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of stock in any name other than that of the holder of the shares converted, and the Company shall not be required to issue or deliver any such stock certificate unless and until the person or persons requesting the issuance thereof shall have paid to the Company the amount of any such tax or shall have established to the satisfaction of the Company that such tax has been paid.

(g) Common Stock Reserved for Conversion. The Company shall at all times from and after the Conversion Date reserve and keep available out of its authorized and unissued Common Stock the full number of shares of Common Stock deliverable upon the conversion of all outstanding shares of Series D-1 Preferred Stock and shall take all such action as may be required from time to time in order that it may validly and legally issue fully paid and non-assessable shares of Common Stock upon conversion of the Series D-1 Preferred Stock.

4. Conversion at the Option of Holders.

(a) General. After the later to occur of (i) the date on which a written notice has been mailed or otherwise distributed by the Company to each record holder of the Series D-1 Preferred Stock stating that the assets of either Chandler Trust No. 1 or Chandler Trust No. 2 have been distributed to the beneficiaries thereof and (ii) February 1, 2025, the holder of any Series D-1 Preferred Stock may convert pursuant to this Section 4 all or any part (in whole number of shares only) of the Series D-1 Preferred Stock held by such holder into fully paid and non-assessable shares of Common Stock. The number of shares of Common Stock into which a share of Series D-1 Preferred Stock may be converted shall be equal to the quotient of (1) $500 plus accrued and unpaid dividends on such shares of Series D-1 Preferred Stock to the Conversion Time (as hereinafter defined) divided by (2) the Common Share Value.

(b) Method of Conversion. Each conversion of Series D-1 Preferred Stock shall be effected by the surrender of the certificate or certificates representing the shares of Series D-1 Preferred Stock to be converted (with proper endorsement or instruments of transfer) to the Company at the principal office of the Company (or such other office or agency of the Company as the Company may designate in writing to the holder or holders of the Series D-1 Preferred Stock) at any time during its usual business hours, together with written notice by the holder of such Series D-1 Preferred Stock stating that such holder desires to convert the shares of Series D-1 Preferred Stock, or a stated number of such shares, represented by such certificate or certificates, which notice shall also specify the name or names (with addresses) and denominations in which the certificate or certificates for the Common Stock shall be issued and shall include instructions for delivery thereof. Any conversion pursuant to this Section 4 shall be deemed to have been effected as of the close of business on the date on which such certificate or certificates shall have been surrendered and such notice shall have been received, and at such time (the "Conversion Time") the rights of the holder of Series D-1 Preferred Stock (or specified portion thereof) as such holder shall cease and the person or persons in whose name or names

6

any certificate or certificates for shares of Common Stock are to be issued upon conversion shall be deemed to have become the holder or holders of record of the shares of Common Stock represented thereby. In the case of lost or destroyed certificates evidencing ownership of shares of Series D-1 Preferred Stock to be converted, the holder shall submit proof of loss or destruction and such indemnity as shall be required by the Company.

(c) Issuance of Certificates for Common Stock. As soon as practicable after its receipt of any certificate or certificates evidencing ownership of shares of Series D-1 Preferred Stock to be converted pursuant to this Section 4, the Company shall issue and shall deliver to the person for whose account such shares of Series D-1 Preferred Stock were so surrendered, or on his, her or its written order, a certificate or certificates for the number of full shares of Common Stock issuable upon the conversion of such shares of Series D-1 Preferred Stock and a check or cash payment (if any) to which such holder is entitled with respect to fractional shares as determined by the Company, in accordance with Section 4(d) hereof.

(d) Fractional Shares. No fractional shares or scrip representing fractional shares shall be issued upon the conversion of any shares of Series D-1 Preferred Stock, but the holder thereof will receive in cash an amount equal to the value of such fractional share of Common Stock based on the Common Share Value. If more than one share of Series D-1 Preferred Stock shall be converted at one time for the account of the same holder, the number of full shares issuable upon conversion thereof shall be computed on the basis of the aggregate number of such shares so surrendered.

(e) Payment of Taxes. The Company shall pay any tax in respect of the issuance of stock certificates on conversion of shares of Series D-1 Preferred Stock. The Company shall not, however, be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of stock in any name other than that of the holder of the shares converted, and the Company shall not be required to issue or deliver any such stock certificate unless and until the person or persons requesting the issuance thereof shall have paid to the Company the amount of any such tax or shall have established to the satisfaction of the Company that such tax has been paid.

(f) Common Stock Reserved for Conversion. The Company shall at all times from and after the Conversion Time reserve and keep available out of its authorized and unissued Common Stock the full number of shares of Common Stock deliverable upon the conversion of all outstanding shares of Series D-1 Preferred Stock and shall take all such action as may be required from time to time in order that it may validly and legally issue fully paid and non-assessable shares of Common Stock upon conversion of the Series D-1 Preferred Stock.

5. Voting Rights.

(a) General Voting Rights. Except as expressly provided hereinafter in this Section 5, or as otherwise from time to time required by applicable law, the Series D-1 Preferred Stock shall have no voting rights.

7

(b) <u>Voting Rights Upon Dividend Arrears</u>.

(i) <u>Right to Elect Directors</u>. In the event that an amount equal to six quarterly dividend payments on the Series D-1 Preferred Stock shall have accrued and be unpaid (the occurrence of such contingency marking the beginning of a period herein referred to as the "Default Period," which shall extend until such time as all accrued and unpaid dividends for all previous Dividend Periods and for the current Dividend Period on all shares of Series D-1 Preferred Stock then outstanding shall have been declared and paid or declared and a sum sufficient for such full payment set apart for payment), the holders of the Series D-1 Preferred Stock shall have the right, voting separately as a class together with holders of shares of the Series D-2 Preferred Stock and any other Parity Stock upon which like voting rights have been conferred and are exercisable (such shares of Series D-1 Preferred Stock, shares of Series D-2 Preferred Stock, and other shares of Parity Stock are hereinafter referred to as "Voting Parity Stock"), to elect two members of the Board of Directors, each member to be in addition to the then authorized number of directors, at the next annual meeting of stockholders or at a special meeting called as described below and thereafter until the Default Period shall have ended.

(ii) <u>Special Meeting; Written Consent</u>. Whenever such voting right shall vest, it may be exercised initially by the vote of the holders of a plurality of the voting power of Series D-1 Preferred Stock and Voting Parity Stock present and voting as a single class, in person or by proxy, at a special meeting of holders of the Series D-1 Preferred Stock and Voting Parity Stock or at the next annual meeting of stockholders. A special meeting for the exercise of such right shall be called by the Secretary of the Company as promptly as possible, and in any event within 10 days after receipt of a written request signed by the holders of record of at least 25% of the outstanding shares of the Series D-1 Preferred Stock and Voting Parity Stock, subject to any applicable notice requirements imposed by law or regulation. Notwithstanding the provisions of this paragraph, no such special meeting shall be required to be held during the 90-day period preceding the date fixed for the annual meeting of stockholders. Any action required or permitted to be taken at any such special meeting of such holders may be taken by a consent or consents in writing of such stockholders, setting forth the action so taken, which consent or consents shall be signed by the holders of Series D-1 Preferred Stock and Voting Parity Stock representing a majority of the voting power of shares of such Series D-1 Preferred Stock and Voting Parity Stock and shall be delivered to the Company in the manner set forth from time to time in the DGCL.

(iii) <u>Term of Office of Directors</u>. Any director who shall have been elected by holders of the Series D-1 Preferred Stock and Voting Parity Stock entitled to vote in accordance with this subparagraph (b) shall hold office for a term expiring (subject to the earlier expiry of such term, as set forth below) at the annual meeting of stockholders at which the term of office of his class shall expire and during such term may be removed at any time, only for cause, by, and only by, the affirmative vote of the holders of record of a majority of the voting power of the Series D-1 Preferred Stock and Voting Parity Stock present and voting as a single class, in person or by proxy, at a special meeting of such stockholders called for such purpose, and any vacancy created by such removal may also be filled at such meeting. A meeting for the removal of a director elected by the holders of the Series D-1 Preferred Stock and Voting Parity Stock and the filling of the vacancy created thereby shall be called by the Secretary of the Company as promptly as possible and in any event within 10 days after receipt

8

of a request therefor signed by the holders of not less than 25% of the aggregate outstanding voting power of the Series D-1 Preferred Stock and Voting Parity Stock, subject to any applicable notice requirements imposed by law or regulation. Such meeting shall be held at the earliest practicable date thereafter, provided that no such meeting shall be required to be held during the 90-day period preceding the date fixed for the annual meeting of stockholders. Simultaneously with the expiration of the Default Period, the terms of office of all directors elected by the holders of the shares of Series D-1 Preferred Stock and the Voting Parity Stock pursuant hereto then in office shall, without further action, thereupon terminate unless otherwise required by law. Upon such termination the number of directors constituting the Board of Directors of the Company shall, without further action, be reduced by two, subject always to the increase of the number of directors pursuant to the foregoing provisions in the case of the future right of holders of the shares of Series D-1 Preferred Stock and Voting Parity Stock to elect directors as provided above.

(iv) <u>Vacancies</u>. Any vacancy caused by the death, resignation or removal of a director who shall have been elected in accordance with this subparagraph (b) may be filled by the remaining director so elected or, if not so filled, by a vote of holders of a plurality of the voting power of the Series D-1 Preferred Stock and Voting Parity Stock present and voting as a single class, in person or by proxy, at a meeting called for such purpose. Unless such vacancy shall have been filled by the remaining director as aforesaid, such meeting shall be called by the Secretary of the Company at the earliest practicable date after such death or resignation, and in any event within 10 days after receipt of a written request signed by the holders of record of at least 25% of the outstanding shares of the Series D-1 Preferred Stock and Voting Parity Stock, subject to any applicable notice requirements imposed by law or regulation. Notwithstanding the provisions of this paragraph, no such special meeting shall be required to be held during the 90-day period preceding the date fixed for the annual meeting of stockholders.

(v) <u>Stockholders' Right to Call Meeting</u>. If any meeting of the holders of the Series D-1 Preferred Stock and Voting Parity Stock required by this subparagraph (b) to be called shall not have been called within 30 days after personal service of a written request therefor upon the Secretary of the Company or within 30 days after mailing the same within the United States of America by registered mail addressed to the Secretary of the Company at its principal executive offices, subject to any applicable notice requirements imposed by law or regulation, then the holders of record of at least 25% of the outstanding shares of the Series D-1 Preferred Stock and Voting Parity Stock may designate in writing one of their number to call such meeting at the expense of the Company, and such meeting may be called by such person so designated upon the notice required for annual meetings of stockholders or such shorter notice (but in no event shorter than permitted by law or regulation) as may be acceptable to the holders of a majority of the total voting power of the Series D-1 Preferred Stock and Voting Parity Stock. Any holder of Series D-1 Preferred Stock and Voting Parity Stock so designated shall have access to the Series D-1 Preferred Stock and Voting Parity Stock books of the Company for the purpose of causing such meeting to be called pursuant to these provisions.

(vi) <u>Quorum</u>. At any meeting of the holders of the Series D-1 Preferred Stock called in accordance with the provisions of this subparagraph (b) for the election or removal of directors, the presence in person or by proxy of the holders of a majority of the total voting power of the Series D-1 Preferred Stock and Voting Parity Stock shall be required to

9

02/15/01   17:13 FAX 213 237 4743        LEGAL DEPT        ☒012

constitute a quorum; in the absence of a quorum, the holders of a majority of the total number of votes present in person or by proxy shall have power to adjourn the meeting from time to time without notice other than an announcement at the meeting, until a quorum shall be present.

## (c) Voting Rights on Extraordinary Matters.

(i) So long as any shares of Series D-1 Preferred Stock shall be outstanding, the holders of the Series D-1 Preferred Stock shall have the right, voting separately as a class together with holders of shares of any Voting Parity Stock (with two-thirds of the voting power of such stock at the time outstanding given in person or by proxy at a meeting at which the holders of such shares shall be entitled to vote separately as a class, or by a consent or consents in writing setting forth such approval, which consent shall be delivered to the Company in the manner set forth from time to time in the DGCL, required for approval by such holders), to vote on: (i) the liquidation or dissolution of the Company; (ii) any proposal to authorize, create or issue, or increase the authorized or issued amount of, any class or series of capital stock ranking pari passu with, or prior to, the shares of the Series D-1 Preferred Stock in powers, rights or preferences upon the liquidation, dissolution or winding up of the affairs of the Company or as to dividends; and (iii) any proposal to amend by merger, amendment or otherwise (or otherwise alter or repeal) the Certificate of Incorporation (or this resolution) if such amendment, alteration or repeal would increase or decrease the aggregate number of authorized shares of Series D-1 Preferred Stock or any Voting Parity Stock, increase or decrease the par value of the shares of Series D-1 Preferred Stock or any Voting Parity Stock, or alter or change the powers, preferences, or special rights of the shares of Series D-1 Preferred Stock or any Voting Parity Stock so as to affect them adversely. An amendment that increases the number of authorized shares of any class or series of Preferred Stock or authorizes the creation or issuance of other classes or series of Preferred Stock, in each case ranking junior to the Series D-1 Preferred Stock with respect to the payment of dividends and distribution of assets upon liquidation, dissolution or winding up shall not be considered to be such an adverse change.

(ii) So long as any shares of Series D-1 Preferred Stock shall be outstanding and unless the consent or approval of a greater number of shares shall then be required by applicable law, without first obtaining the approval of the holders of at least two-thirds of the voting power of the Series D-1 Preferred Stock at the time outstanding (voting separately as a class together with the holders of shares of Voting Parity Stock) given in person or by proxy at a meeting at which the holders of such shares shall be entitled to vote separately as a class (or by a consent or consents in writing setting forth such approval, which consent shall be delivered to the Company in the manner set forth from time to time in the DGCL), the Company shall not either directly or indirectly or through merger or consolidation with any other entity, (i) authorize, create or issue, or increase the authorized or issued amount of, any class or series of capital stock that would place or have the effect of placing restrictions on the obligation of the Company to pay dividends to the holders of Series D-1 Preferred Stock or to perform any of its obligations to the holders of Series D-1 Preferred Stock at any time; or (ii) authorize, enter into or permit to exist any covenant or agreement that would place or have the effect of placing restrictions on the obligations of the Company to pay dividends to holders of Series D-1 Preferred Stock or to perform any of its other obligations to the holders of Series D-1 Preferred Stock at any time; provided, however, that notwithstanding the foregoing, the Company may from time to time enter into credit agreements and indentures that provide for limitations on the

10

ability of the Company to pay dividends on its capital stock generally, so long as the Board of Directors determines, in its sole discretion, that such limitation is necessary in order to obtain financing on commercially reasonable terms.

(d) One Vote Per Share. In connection with any matter on which holders of the Series D-1 Preferred Stock are entitled to vote as provided in subparagraphs (b) and (c) above, or any other matter on which the holders of the Series D-1 Preferred Stock are entitled to vote as one class or otherwise pursuant to applicable law or the provisions of the Certificate of Incorporation, each holder of Series D-1 Preferred Stock shall be entitled to one vote for each share of Series D-1 Preferred Stock held by such holder.

(e) Except as otherwise required by law, the holders of Series D-1 Preferred Stock and holders of Series D-2 Preferred Stock will vote together as a single class.

6. No Sinking Fund. No sinking fund will be established for the retirement or redemption of shares of Series D-1 Preferred Stock.

7. Liquidation Rights; Priority.

(a) In the event of any liquidation, dissolution or winding up of the affairs of the Company, whether voluntary or involuntary, after payment or provision for payment of the debts and other liabilities of the Company, the holders of shares of the Series D-1 Preferred Stock shall be entitled to receive, out of the assets of the Company, whether such assets are capital or surplus and whether or not any dividends as such are declared, $500 per share plus an amount equal to all accrued and unpaid dividends for the then-current plus all prior Dividend Periods, and no more, before any distribution shall be made to the holders of the Common Stock or any other class of stock or series thereof ranking junior to the Series D-1 Preferred Stock with respect to the distribution of assets upon liquidation, dissolution or winding up of the Company. The Series D-2 Preferred Stock and, unless specifically designated as junior or senior to the Series D-1 Preferred Stock with respect to the liquidation, dissolution or winding up of the affairs of the Company or as to dividends, all other series or classes of Preferred Stock of the Company shall rank on a parity with the Series D-1 Preferred Stock with respect to the distribution of assets.

(b) Nothing contained in this Section 7 shall be deemed to prevent conversion of shares of the Series D-1 Preferred Stock by the Company in the manner provided in Section 3. Neither the merger nor consolidation of the Company into or with any other entity, nor the merger or consolidation of any other entity into or with the Company, nor a sale, transfer or lease of all or any part of the assets of the Company, shall be deemed to be a liquidation, dissolution or winding up of the Company within the meaning of this Section 7.

(c) Written notice of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Company, stating a payment date and the place where the distributable amounts shall be payable, shall be given by mail, postage prepaid, no less than 30 days prior to the payment date stated therein, to the holders of record of the Series D-1 Preferred Stock at their respective addresses as the same shall appear on the books of the Company.

11

02/15/01   17:14 FAX 213 237 4743        LEGAL DEPT                                    ☑014

(d) If the amounts available for distribution with respect to the Series D-1 Preferred Stock and all other outstanding stock of the Company ranking on a parity with the Series D-1 Preferred Stock upon liquidation, dissolution or winding up are not sufficient to satisfy the full liquidation rights of all the outstanding Series D-1 Preferred Stock and stock ranking on a parity therewith, then the holders of each series of such stock will share ratably in any such distribution of assets in proportion to the full respective preferential amount (which in the case of the Series D-1 Preferred Stock shall mean the amounts specified in Section 7(a) and in the case of any other series of preferred stock may include accumulated dividends if contemplated by such series) to which they are entitled.

8. Status of Shares Converted. Shares of Series D-1 Preferred Stock converted or purchased or otherwise acquired for value by the Company, shall, after such event, have the status of authorized and unissued shares of Preferred Stock without designation and may be reissued by the Company at any time as shares of any series of Preferred Stock.

9. Effectiveness. This certificate shall be effective as of 5:00 p.m., New York City time, on February 13, 2001.

12

IN WITNESS WHEREOF, Tribune Company has caused this certificate to be signed by Crane H. Kenney, its Senior Vice President, General Counsel and Secretary, this 13th day of February, 2001.

TRIBUNE COMPANY

By: /s/ Crane H. Kenney
    Crane H. Kenney
    Senior Vice President,
       General Counsel and Secretary

13

## Schedule A

### Dividend Rates

| Year | Dividend Rate |
|------|---------------|
| 2000 | 5.80% |
| 2001 | 5.80% |
| 2002 | 6.01% |
| 2003 | 6.22% |
| 2004 | 6.44% |
| 2005 | 6.67% |
| 2006 | 6.91% |
| 2007 | 7.15% |
| 2008 | 7.41% |
| 2009 | 7.67% |
| 2010 | 7.95% |
| 2011 | 8.23% |
| 2012 and thereafter | 8.40% |

STATE OF DELAWARE
SECRETARY OF STATE     FAX 213 237 4743        LEGAL DEPT. _____
DIVISION OF CORPORATIONS
FILED 08:16 PM 02/15/2001
010077698 - 0674607

S ////STATE/OF/DELAWARE///// V
T ///SECRETARY/OF/STATE///// O
A DIVISION/OF/CORPORATIONS// I
M FILED/08/16/RM/02/15/2001/ D
P ///010077698/-/0674607////
BY April Wright

## CERTIFICATE OF AMENDMENT TO
## CERTIFICATE OF DESIGNATION
## OF THE
## PREFERRED STOCK, SERIES D-2
## (WITHOUT PAR VALUE)
## OF
## TRIBUNE COMPANY

### Pursuant to Section 242 of the
### Delaware General Corporation Law

The undersigned duly authorized officer of Tribune Company (the "Company"), a corporation organized and existing under the Delaware General Corporation Law (the "DGCL"), in accordance with the provisions of Section 103 thereof, and pursuant to Section 242 thereof, DOES HEREBY CERTIFY:

FIRST: Pursuant to the authority conferred upon the Board of Directors by the Amended and Restated Certificate of Incorporation of the Company (the "Certificate of Incorporation"), the Board of Directors of the Company (the "Board" or "Board of Directors") on June 12, 2000 adopted resolutions creating 245,100 shares of Series D-2 Preferred Stock (as defined below), in addition to the shares of Preferred Stock, Series D-1, which were also created on such date;

SECOND: On June 12, 2000, the Company filed a Certificate of Designation establishing the rights, preferences, privileges and restrictions relating to Series D-2 Preferred Stock;

THIRD: On February 13, 2001, the Board of Directors duly adopted and approved the amendment of the Certificate of Designation to read in its entirety as set forth herein; and

FOURTH: The designation of and the rights, preferences, privileges and restrictions relating to Series D-2 Preferred Stock are hereby fixed as set forth herein, and the original Certificate of Designation is hereby replaced by this Certificate of Amendment to Certificate of Designation and is hereby amended to read in its entirety as follows:

RESOLVED, that pursuant to the authority expressly granted to and vested in the Board of Directors by provisions of the Certificate of Incorporation, and the DGCL, the issuance of a series of the Company's preferred stock, without par value (the "Preferred Stock"), which shall consist of 245,100 of the 12,000,000 shares of Preferred Stock that the Company now has authority to issue, be, and the same hereby is, authorized, and the Board of Directors hereby fixes the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions, of the shares of such series (in addition to the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions, set forth in the Certificate of Incorporation that may be applicable to the Preferred Stock) as follows:

1. <u>Designation and Rank</u>. The designation of such series of the Preferred Stock authorized by this resolution shall be the Preferred Stock, Series D-2 (the "Series D-2 Preferred Stock"). The number of shares of Series D-2 Preferred Stock shall be 245,100. The Series D-2 Preferred Stock shall rank prior to the Common Stock (as hereinafter defined) of the Company and to all other classes and series of equity securities of the Company now or hereafter authorized, issued or outstanding (the Common Stock and such other classes and series of equity securities not expressly designated as ranking on a parity with or senior to the Series D-2 Preferred Stock collectively may be referred to herein as the "Junior Stock") as to dividend rights and rights upon liquidation, winding up or dissolution of the Company, other than (a) the Company's (i) 8% Cumulative Convertible Preferred Stock, Series C (the "Series C Preferred Stock") and (ii) Series D-1 Preferred Stock (the "Series D-1 Preferred Stock"), with respect to which the Series D-2 Preferred Stock is expressly designated as ranking on a parity as to dividend rights and rights upon liquidation, winding up or dissolution of the Company; and (b) any other classes or series of equity securities of the Company expressly designated as ranking on a parity with (collectively with the Series C Preferred Stock and the Series D-1 Preferred Stock, the "Parity Stock") or senior to (the "Senior Stock") the Series D-2 Preferred Stock as to dividend rights and rights upon liquidation, winding up or dissolution of the Company. The Series D-2 Preferred Stock shall be subject to creation of Senior Stock, Parity Stock and Junior Stock, to the extent not expressly prohibited by the Certificate of Incorporation or Section 5(c)(i) or 5(c)(ii) hereof, with respect to the payment of dividends and upon liquidation.

2. <u>Cumulative Dividends; Priority</u>.

(a) <u>Payment of Dividends</u>.

(i) The holders of record of shares of Series D-2 Preferred Stock shall be entitled to receive, when, as and if declared by the Board of Directors out of funds legally available therefor, cumulative cash dividends from the date of issuance of such shares at the rate per annum per share of 5.8% (*i.e.*, $29 per annum) (the "Dividend Rate"), as adjusted from time to time pursuant to Section 2(c) hereof. Dividends shall be payable quarterly on the second Thursday of March, June, September and December in each year (or if such day is a non-business day, on the next business day) with respect to the quarter ending on the last day of such month, commencing on March 8, 2001 (each of such dates a "Dividend Payment Date"). No interest, or sum of money in lieu of interest, shall be payable in respect of any dividend payment or payments on the Series D-2 Preferred Stock that may be in arrears.

(ii) Each declared dividend shall be payable to holders of record as they appear on the stock books of the Company at the close of business on such record dates, not more than 60 calendar days preceding the applicable Dividend Payment Dates therefor, as are determined by the Board of Directors (each of such dates a "Record Date"). Quarterly dividend periods (each a "Dividend Period") shall commence on and include the first day of January, April, July, and October of each year and shall end on and include the last day of March, June, September and December, respectively of such year. Dividends on the shares of Series D-2 Preferred Stock shall be fully cumulative and shall accrue (whether or not declared) from the first day of each Dividend Period; provided, however, that the amount of any dividend payable for any Dividend Period shorter than a full Dividend Period shall be computed on the basis of a

360-day year composed of twelve 30-day months and the actual number of days elapsed in the relevant Dividend Period.

### (b) Priority as to Dividends.

(i) Subject to the provisions hereof, no cash dividend or other distribution (other than in Common Stock or other Junior Stock) shall be declared or paid or set apart for payment on Preferred Stock that constitutes Parity Stock or Junior Stock with respect to dividends for any Dividend Period unless full dividends on the Series D-2 Preferred Stock for the immediately preceding Dividend Period have been or contemporaneously are declared and paid (or declared and a sum sufficient for the payment thereof set apart for such payment). When dividends are not paid in full (or declared and a sum sufficient for such full payment not so set apart) upon the Series D-2 Preferred Stock and any Parity Stock, all dividends declared upon shares of Series D-2 Preferred Stock and any Parity Stock shall be declared pro rata with respect thereto, so that in all cases the amount of dividends declared per share on the Series D-2 Preferred Stock and such Parity Stock shall bear to each other the same ratio that accrued dividends for the then-current Dividend Period per share on the shares of Series D-2 Preferred Stock (which shall include any accumulation in respect of unpaid dividends for prior Dividend Periods) and dividends, including accumulations, if any, of such Parity Stock, bear to each other.

(ii) Except as provided in the preceding paragraph, full dividends on the Series D-2 Preferred Stock must be declared and paid or set apart for payment for the immediately preceding Dividend Period before (A) any cash dividend or other distribution (other than in Common Stock or other Junior Stock) shall be declared or paid or set aside for payment upon the Common Stock or any other Junior Stock of the Company or (B) any Common Stock or any other Junior Stock is redeemed, purchased or otherwise acquired by the Company for any consideration (or any moneys are paid to or made available for a sinking fund for the redemption of any shares of any such stock), except by redemption into or exchange for Junior Stock or (C) any Series D-2 Preferred Stock or Parity Stock is redeemed, purchased or otherwise acquired by the Company for any consideration (or any moneys are paid to or made available for a sinking fund for the redemption of any shares of any such stock). The Company shall not permit any subsidiary of the Company to purchase or otherwise acquire for consideration any shares of stock of the Company if under the preceding sentence, the Company would be prohibited from purchasing or otherwise acquiring such shares at such time and in such manner.

(iii) No dividend shall be paid or set aside for holders of the Series D-2 Preferred Stock for any Dividend Period unless full dividends on any Preferred Stock that constitutes Senior Stock with respect to dividends for that period have been or contemporaneously are declared and paid (or declared and a sum sufficient for the payment thereof set apart for such payment).

### (c) Adjustment to Dividend Rate.

(i) The Dividend Rate shall not be adjusted prior to the end of the Dividend Period ending on December 31, 2001.

3

(ii) The Dividend Rate for each subsequent year (commencing with the year that begins January 1, 2002) shall be adjusted upward in accordance with Schedule A attached hereto.

(iii) Increases in the Dividend Rate are subject to the following limitation: the Dividend Rate shall, under no circumstances, exceed 8.4% per annum.

### 3. Conversion at Option of the Company.

(a) General.

(i) The shares of the Series D-2 Preferred Stock shall not be convertible at the option of the Company except upon the later to occur of (x) the date on which a written notice has been mailed or otherwise distributed by the Company to each record holder of the Series D-2 Preferred Stock stating that the assets of either Chandler Trust No. 1 or Chandler Trust No. 2 have been distributed to the beneficiaries thereof and (y) February 1, 2025 (such later date being the "Convertibility Date"). Subject to and upon compliance with the provisions of this Section 3, shares of Series D-2 Preferred Stock may be converted, in whole or in part, at the election of the Company by resolution of the Board of Directors, upon notice as provided in Section 3(b), at any time or from time to time on or after the Convertibility Date. Conversion shall be made by delivering to the holders of Series D-2 Preferred Stock, in respect of the conversion of each share of Series D-2 Preferred Stock so converted, certificates representing the number of fully paid and non-assessable shares (the "Conversion Shares") of common stock, par value $.01 per share, of the Company ("Common Stock") equal to (subject to Section 3(h) hereof) the quotient of (1) $500 plus accrued and unpaid dividends on such shares of Series D-2 Preferred Stock to the Conversion Date (as hereinafter defined) divided by (2) the Common Share Value (as hereinafter defined). The aggregate number of shares of Common Stock (and, if applicable, "Conversion Preferred," as such term is defined below) that a holder of shares of Series D-2 Preferred Stock that have been converted is entitled to receive pursuant to this Section 3 or Section 4 is hereinafter referred to as the "Aggregate Conversion Shares."

(ii) The "Common Share Value" shall mean the average of the closing prices of the Common Stock for the 20 days during which trades of Common Stock occurred immediately preceding the Valuation Date (as defined below), as reported in *The Wall Street Journal*, or, if no closing prices were so reported, the average of the mean between the high bid and low asked price per share of Common Stock for each of the 20 days during which trades of Common Stock occurred immediately preceding the Valuation Date in the over-the-counter market, as reported by the National Association of Securities Dealers, Inc. Automated Quotation System or such other system then in use, or, if the Common Stock is not then quoted by any such organization, the average of the mean between the closing bid and asked prices per share of Common Stock for each of the 20 days during which trades of Common Stock occurred immediately preceding the Valuation Date, as furnished by a professional market maker making a market in the Common Stock, or, if there is no such market maker, the fair market value of a share of Common Stock determined by whatever method the Board of Directors reasonably determines to use. In the case of a conversion pursuant to this Section 3, the "Valuation Date" shall mean the Conversion Notice Date (as defined in Section 3(b)), and in the case of any

4

ı

02/15/01   17:17 FAX 213 237 4743          LEGAL DEPT                              ☑007

conversion pursuant to Section 4, the "Valuation Date" shall mean the Conversion Time (as hereinafter defined).

(b) Notice of Conversion. Notice of any conversion, setting forth (i) the Conversion Date (as defined in Section 3(c) hereof), (ii) a statement that dividends on the shares of Series D-2 Preferred Stock to be converted will cease to accrue on such Conversion Date, and (iii) the method(s) by which the holders may surrender the certificates representing shares of Series D-2 Preferred Stock that have been converted and obtain the Conversion Shares therefor, shall be mailed, postage prepaid, on a date (the "Conversion Notice Date") that is at least 15 days but not more than 45 days prior to said Conversion Date to each holder of record of the Series D-2 Preferred Stock to be converted at his, her or its address as the same shall appear on the books of the Company. If less than all the shares of the Series D-2 Preferred Stock owned by such holder are then to be converted, the notice shall specify the number of shares thereof that are to be converted and the numbers of the certificates representing such shares. If applicable, the notice shall also specify the "Maximum Number" applicable to, and the amount of "Conversion Cash" to be received by (absent an election pursuant to Section 3(h)(v) hereof to receive "Conversion Preferred") such holder (as such terms are defined below).

(c) Method of Conversion. The surrender of any certificate evidencing shares of Series D-2 Preferred Stock that have been converted shall be made by the holder thereof by the surrender of the certificate or certificates formerly representing the shares of Series D-2 Preferred Stock converted (with proper endorsement or instruments of transfer) to the Company at the principal office of the Company (or such other office or agency of the Company as the Company may designate in writing to the holder or holders of the Series D-2 Preferred Stock) at any time during its usual business hours. Shares of Series D-2 Preferred Stock called for conversion shall be deemed to have been converted, and the shares of Common Stock (and, if applicable, Conversion Preferred) to be issued in respect of the shares of Series D-2 Preferred Stock converted shall be deemed to have been issued, as of the close of business on the date fixed for conversion (the "Conversion Date"), without regard to when certificates evidencing such Series D-2 Preferred Stock are surrendered pursuant to this Section 3(c) or certificates evidencing such Common Stock (and, if applicable, Conversion Preferred) are issued pursuant to Section 3(d). The rights of the holder of Series D-2 Preferred Stock that has been converted, except for the right to receive the Aggregate Conversion Shares therefor in accordance herewith (and any cash payments to which such holder is entitled pursuant to Sections 3(e) and (h) hereof), shall cease on the Conversion Date. In the case of lost or destroyed certificates evidencing ownership of shares of Series D-2 Preferred Stock that have been converted, the holder shall submit proof of loss or destruction and such indemnity as shall be required by the Company.

(d) Issuance of Certificates for Common Stock. As soon as practicable after its receipt of any certificate or certificates formerly evidencing ownership of shares of Series D-2 Preferred Stock that have been converted, the Company shall issue and shall deliver to the person for whose account such certificates formerly representing shares of Series D-2 Preferred Stock were so surrendered, or on his, her or its written order, a certificate or certificates for the number of full shares of Common Stock (and, if applicable, Conversion Preferred) issuable upon the conversion of such shares of Series D-2 Preferred Stock and a check or cash payment (if any) to which such holder is entitled with respect to fractional shares or Conversion

5

Cash as determined by the Company, in accordance with Sections 3(e) and (h) hereof, respectively.

(e) <u>Fractional Shares</u>. No fractional shares or scrip representing fractional shares shall be issued upon the conversion of any shares of Series D-2 Preferred Stock, but the holder thereof will receive in cash an amount equal to the value of such fractional share of Common Stock based on the Common Share Value. If more than one share of Series D-2 Preferred Stock shall be converted at one time for the account of the same holder, the number of full shares issuable upon conversion thereof shall be computed on the basis of the aggregate number of such shares so surrendered.

(f) <u>Payment of Taxes</u>. The Company shall pay any tax in respect of the issuance of stock certificates on conversion of shares of Series D-2 Preferred Stock. The Company shall not, however, be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of stock in any name other than that of the holder of the shares converted, and the Company shall not be required to issue or deliver any such stock certificate unless and until the person or persons requesting the issuance thereof shall have paid to the Company the amount of any such tax or shall have established to the satisfaction of the Company that such tax has been paid.

(g) <u>Common Stock Reserved for Conversion</u>. The Company shall at all times from and after the Conversion Date reserve and keep available out of its authorized and unissued Common Stock the full number of shares of Common Stock deliverable upon the conversion of all outstanding shares of Series D-2 Preferred Stock and shall take all such action as may be required from time to time in order that it may validly and legally issue fully paid and non-assessable shares of Common Stock upon conversion of the Series D-2 Preferred Stock.

(h) <u>Limitation on the Number of Shares of Common Stock</u>

(i) The number of shares of Common Stock into which the Series D-2 Preferred Stock may be converted shall be limited, as set forth herein.

(ii) The maximum number of shares of Common Stock into which the Series D-2 Preferred Stock may be converted is, in the aggregate, 7,392,355 shares of Common Stock (the "Maximum Number"). If the Company in any manner subdivides or combines the outstanding shares of Common Stock, then the Maximum Number shall be adjusted appropriately.

(iii) On conversion, no holder shall be entitled to receive more shares of Common Stock than its pro rata share of the Maximum Number (a holder's "Pro Rata Number"), which shall be calculated by dividing (A) the number of shares of Series D-2 Preferred Stock held by such holder which are then being converted, by (B) 245,100.

(iv) If, as a result of Section 3(h)(iii), immediately above, a holder's Pro Rata Number is less than the number of shares of Common Stock to which such holder would otherwise be entitled (a holder's "Unrestricted Number"), then, such holder shall be entitled to receive from the Company a cash payment ("Conversion Cash") equal to:

6

02/15/01  17:18 FAX 213 237 4743      LEGAL DEPT _____                    ☒009

(A) the Common Share Value, multiplied by

(B) the positive difference between (a) such holder's Unrestricted Number minus (b) such holder's Pro Rata Number.

(v) In lieu of Conversion Cash, a holder may elect, by providing written notice to the Company, which notice must be received by the Company at least five days prior to the Conversion Date, to exchange, in lieu of conversion, the number of shares of Series D-2 Preferred Stock held by such holder which as a result of Section 3(h)(iii) cannot be fully converted into such holder's Unrestricted Number, for a like number of shares of a new series of preferred stock of the Company (the "Conversion Preferred") which shall be identical to the Series D-2 Preferred Stock, except that it shall (A) not be convertible into or exchangeable for Common Stock and (B) be redeemable, at liquidation value plus accrued but unpaid dividends, by the Company at any time.

4. Conversion at the Option of Holders.

(a) General. After the later to occur of (i) the date on which a written notice has been mailed or otherwise distributed by the Company to each record holder of the Series D-2 Preferred Stock stating that the assets of either Chandler Trust No. 1 or Chandler Trust No. 2 have been distributed to the beneficiaries thereof and (ii) February 1, 2025, the holder of any Series D-2 Preferred Stock may convert pursuant to this Section 4 all or any part (in whole number of shares only) of the Series D-2 Preferred Stock held by such holder into fully paid and non-assessable shares of Common Stock. Subject to Section 4(g) below, the number of shares of Common Stock into which a share of Series D-2 Preferred Stock may be converted shall be equal to the quotient of (1) $500 plus accrued and unpaid dividends on such shares of Series D-2 Preferred Stock to the Conversion Time (as hereinafter defined) divided by (2) the Common Share Value.

(b) Method of Conversion. Each conversion of Series D-2 Preferred Stock shall be effected by the surrender of the certificate or certificates representing the shares of Series D-2 Preferred Stock to be converted (with proper endorsement or instruments of transfer) to the Company at the principal office of the Company (or such other office or agency of the Company as the Company may designate in writing to the holder or holders of the Series D-2 Preferred Stock) at any time during its usual business hours, together with written notice by the holder of such Series D-2 Preferred Stock stating that such holder desires to convert the shares of Series D-2 Preferred Stock, or a stated number of such shares, represented by such certificate or certificates, which notice shall also specify the name or names (with addresses) and denominations in which the certificate or certificates for the Common Stock (and, if applicable, Conversion Preferred) shall be issued and shall include instructions for delivery thereof. If such holder desires to receive Conversion Preferred in lieu of any Conversion Cash that may be payable to such holder, the notice shall so state. Any conversion pursuant to this Section 4 shall be deemed to have been effected as of the close of business on the date on which such certificate or certificates shall have been surrendered and such notice shall have been received, and at such time (the "Conversion Time") the rights of the holder of Series D-2 Preferred Stock (or specified portion thereof) as such holder shall cease and the person or persons in whose name or names any certificate or certificates for shares of Common Stock (and, if applicable, Conversion

02/15/01   17:18 FAX 213 237 4743        LEGAL DEPT                    ☒010

Preferred) are to be issued upon conversion shall be deemed to have become the holder or holders of record of the shares of Common Stock (and, if applicable, Conversion Preferred) represented thereby. In the case of lost or destroyed certificates evidencing ownership of shares of Series D-2 Preferred Stock to be converted, the holder shall submit proof of loss or destruction and such indemnity as shall be required by the Company.

(c) <u>Issuance of Certificates for Common Stock</u>. As soon as practicable after its receipt of any certificate or certificates evidencing ownership of shares of Series D-2 Preferred Stock to be converted pursuant to this Section 4, the Company shall issue and shall deliver to the person for whose account such shares of Series D-2 Preferred Stock were so surrendered, or on his, her or its written order, a certificate or certificates for the number of full shares of Common Stock (and, if applicable, Conversion Preferred) issuable upon the conversion of such shares of Series D-2 Preferred Stock and a check or cash payment (if any) to which such holder is entitled with respect to fractional shares or Conversion Cash as determined by the Company, in accordance with Sections 4(d) and (g) hereof, respectively.

(d) <u>Fractional Shares</u>. No fractional shares or scrip representing fractional shares shall be issued upon the conversion of any shares of Series D-2 Preferred Stock, but the holder thereof will receive in cash an amount equal to the value of such fractional share of Common Stock based on the Common Share Value. If more than one share of Series D-2 Preferred Stock shall be converted at one time for the account of the same holder, the number of full shares issuable upon conversion thereof shall be computed on the basis of the aggregate number of such shares so surrendered.

(e) <u>Payment of Taxes</u>. The Company shall pay any tax in respect of the issuance of stock certificates on conversion of shares of Series D-2 Preferred Stock. The Company shall not, however, be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of stock in any name other than that of the holder of the shares converted, and the Company shall not be required to issue or deliver any such stock certificate unless and until the person or persons requesting the issuance thereof shall have paid to the Company the amount of any such tax or shall have established to the satisfaction of the Company that such tax has been paid.

(f) <u>Common Stock Reserved for Conversion</u>. The Company shall at all times from and after the Conversion Time reserve and keep available out of its authorized and unissued Common Stock the full number of shares of Common Stock deliverable upon the conversion of all outstanding shares of Series D-2 Preferred Stock and shall take all such action as may be required from time to time in order that it may validly and legally issue fully paid and non-assessable shares of Common Stock upon conversion of the Series D-2 Preferred Stock.

(g) <u>Limitation on the Number of Shares of Common Stock</u>.

(i) The number of shares of Common Stock into which the Series D-2 Preferred Stock may be converted shall be limited, as set forth herein.

(ii) On conversion, no holder shall be entitled to receive more shares of Common Stock than its Pro Rata Number.

8

(iii) If, as a result of Section 4(g)(ii), immediately above, a holder's Pro Rata Number is less than such holder's Unrestricted Number, then such holder shall be entitled to receive from the Company the Conversion Cash.

(iv) In lieu of Conversion Cash, a holder may elect, by providing notice of such election in the notice of conversion delivered pursuant to Section 4(b), to exchange, in lieu of conversion, the number of shares of Series D-2 Preferred Stock held by such holder which as a result of Section 4(g)(iii) cannot be fully converted into such holder's Unrestricted Number, for a like number of shares of Conversion Preferred.

## 5. Voting Rights.

(a) General Voting Rights. Except as expressly provided hereinafter in this Section 5, or as otherwise from time to time required by applicable law, the Series D-2 Preferred Stock shall have no voting rights.

### (b) Voting Rights Upon Dividend Arrears.

(i) Right to Elect Directors. In the event that an amount equal to six quarterly dividend payments on the Series D-2 Preferred Stock shall have accrued and be unpaid (the occurrence of such contingency marking the beginning of a period herein referred to as the "Default Period," which shall extend until such time as all accrued and unpaid dividends for all previous Dividend Periods and for the current Dividend Period on all shares of Series D-2 Preferred Stock then outstanding shall have been declared and paid or declared and a sum sufficient for such full payment set apart for payment), the holders of the Series D-2 Preferred Stock shall have the right, voting separately as a class together with holders of shares of the Series D-1 Preferred Stock and any other Parity Stock upon which like voting rights have been conferred and are exercisable (such shares of Series D-1 Preferred Stock, shares of Series D-2 Preferred Stock, and other shares of Parity Stock are hereinafter referred to as "Voting Parity Stock"), to elect two members of the Board of Directors, each member to be in addition to the then authorized number of directors, at the next annual meeting of stockholders or at a special meeting called as described below and thereafter until the Default Period shall have ended.

(ii) Special Meeting; Written Consent. Whenever such voting right shall vest, it may be exercised initially by the vote of the holders of a plurality of the voting power of Series D-2 Preferred Stock and Voting Parity Stock present and voting as a single class, in person or by proxy, at a special meeting of holders of the Series D-2 Preferred Stock and Voting Parity Stock or at the next annual meeting of stockholders. A special meeting for the exercise of such right shall be called by the Secretary of the Company as promptly as possible, and in any event within 10 days after receipt of a written request signed by the holders of record of at least 25% of the outstanding shares of the Series D-2 Preferred Stock and Voting Parity Stock, subject to any applicable notice requirements imposed by law or regulation. Notwithstanding the provisions of this paragraph, no such special meeting shall be required to be held during the 90-day period preceding the date fixed for the annual meeting of stockholders. Any action required or permitted to be taken at any such special meeting of such holders may be taken by a consent or consents in writing of such stockholders, setting forth the action so taken, which consent or consents shall be signed by the holders of Series D-2 Preferred Stock and

@012

Voting Parity Stock representing a majority of the voting power of shares of such Series D-2 Preferred Stock and Voting Parity Stock and shall be delivered to the Company in the manner set forth from time to time in the DGCL.

(iii) <u>Term of Office of Directors</u>.  Any director who shall have been elected by holders of the Series D-2 Preferred Stock and Voting Parity Stock entitled to vote in accordance with this subparagraph (b) shall hold office for a term expiring (subject to the earlier expiry of such term, as set forth below) at the annual meeting of stockholders at which the term of office of his class shall expire and during such term may be removed at any time, only for cause, by, and only by, the affirmative vote of the holders of record of a majority of the voting power of the Series D-2 Preferred Stock and Voting Parity Stock present and voting as a single class, in person or by proxy, at a special meeting of such stockholders called for such purpose, and any vacancy created by such removal may also be filled at such meeting.  A meeting for the removal of a director elected by the holders of the Series D-2 Preferred Stock and Voting Parity Stock and the filling of the vacancy created thereby shall be called by the Secretary of the Company as promptly as possible and in any event within 10 days after receipt of a request therefor signed by the holders of not less than 25% of the aggregate outstanding voting power of the Series D-2 Preferred Stock and Voting Parity Stock, subject to any applicable notice requirements imposed by law or regulation.  Such meeting shall be held at the earliest practicable date thereafter, provided that no such meeting shall be required to be held during the 90-day period preceding the date fixed for the annual meeting of stockholders. Simultaneously with the expiration of the Default Period, the terms of office of all directors elected by the holders of the shares of Series D-2 Preferred Stock and the Voting Parity Stock pursuant hereto then in office shall, without further action, thereupon terminate unless otherwise required by law.  Upon such termination the number of directors constituting the Board of Directors of the Company shall, without further action, be reduced by two, subject always to the increase of the number of directors pursuant to the foregoing provisions in the case of the future right of holders of the shares of Series D-2 Preferred Stock and Voting Parity Stock to elect directors as provided above.

(iv) <u>Vacancies</u>.  Any vacancy caused by the death, resignation or removal of a director who shall have been elected in accordance with this subparagraph (b) may be filled by the remaining director so elected or, if not so filled, by a vote of holders of a plurality of the voting power of the Series D-2 Preferred Stock and Voting Parity Stock present and voting as a single class, in person or by proxy, at a meeting called for such purpose.  Unless such vacancy shall have been filled by the remaining director as aforesaid, such meeting shall be called by the Secretary of the Company at the earliest practicable date after such death or resignation, and in any event within 10 days after receipt of a written request signed by the holders of record of at least 25% of the outstanding shares of the Series D-2 Preferred Stock and Voting Parity Stock, subject to any applicable notice requirements imposed by law or regulation. Notwithstanding the provisions of this paragraph, no such special meeting shall be required to be held during the 90-day period preceding the date fixed for the annual meeting of stockholders.

(v) <u>Stockholders' Right to Call Meeting</u>.  If any meeting of the holders of the Series D-2 Preferred Stock and Voting Parity Stock required by this subparagraph (b) to be called shall not have been called within 30 days after personal service of a written request therefor upon the Secretary of the Company or within 30 days after mailing the same

10

02/15/01   17:19 FAX 213 237 4743          LEGAL DEPT                                      ☒013

within the United States of America by registered mail addressed to the Secretary of the Company at its principal executive offices, subject to any applicable notice requirements imposed by law or regulation, then the holders of record of at least 25% of the outstanding shares of the Series D-2 Preferred Stock and Voting Parity Stock may designate in writing one of their number to call such meeting at the expense of the Company, and such meeting may be called by such person so designated upon the notice required for annual meetings of stockholders or such shorter notice (but in no event shorter than permitted by law or regulation) as may be acceptable to the holders of a majority of the total voting power of the Series D-2 Preferred Stock and Voting Parity Stock. Any holder of Series D-2 Preferred Stock and Voting Parity Stock so designated shall have access to the Series D-2 Preferred Stock and Voting Parity Stock books of the Company for the purpose of causing such meeting to be called pursuant to these provisions.

(vi) Quorum. At any meeting of the holders of the Series D-2 Preferred Stock called in accordance with the provisions of this subparagraph (b) for the election or removal of directors, the presence in person or by proxy of the holders of a majority of the total voting power of the Series D-2 Preferred Stock and Voting Parity Stock shall be required to constitute a quorum; in the absence of a quorum, the holders of a majority of the total number of votes present in person or by proxy shall have power to adjourn the meeting from time to time without notice other than an announcement at the meeting, until a quorum shall be present.

(c) Voting Rights on Extraordinary Matters.

(i) So long as any shares of Series D-2 Preferred Stock shall be outstanding, the holders of the Series D-2 Preferred Stock shall have the right, voting separately as a class together with holders of shares of any Voting Parity Stock (with two-thirds of the voting power of such stock at the time outstanding given in person or by proxy at a meeting at which the holders of such shares shall be entitled to vote separately as a class, or by a consent or consents in writing setting forth such approval, which consent shall be delivered to the Company in the manner set forth from time to time in the DGCL, required for approval by such holders), to vote on: (i) the liquidation or dissolution of the Company; (ii) any proposal to authorize, create or issue, or increase the authorized or issued amount of, any class or series of capital stock ranking pari passu with, or prior to, the shares of the Series D-2 Preferred Stock in powers, rights or preferences upon the liquidation, dissolution or winding up of the affairs of the Company or as to dividends; and (iii) any proposal to amend by merger, amendment or otherwise (or otherwise alter or repeal) the Certificate of Incorporation (or this resolution) if such amendment, alteration or repeal would increase or decrease the aggregate number of authorized shares of Series D-2 Preferred Stock or any Voting Parity Stock, increase or decrease the par value of the shares of Series D-2 Preferred Stock or any Voting Parity Stock, or alter or change the powers, preferences, or special rights of the shares of Series D-2 Preferred Stock or any Voting Parity Stock so as to affect them adversely. An amendment that increases the number of authorized shares of any class or series of Preferred Stock or authorizes the creation or issuance of other classes or series of Preferred Stock, in each case ranking junior to the Series D-2 Preferred Stock with respect to the payment of dividends and distribution of assets upon liquidation, dissolution or winding up shall not be considered to be such an adverse change.

(ii) So long as any shares of Series D-2 Preferred Stock shall be outstanding and unless the consent or approval of a greater number of shares shall then be

required by applicable law, without first obtaining the approval of the holders of at least two-thirds of the voting power of the Series D-2 Preferred Stock at the time outstanding (voting separately as a class together with the holders of shares of Voting Parity Stock) given in person or by proxy at a meeting at which the holders of such shares shall be entitled to vote separately as a class (or by a consent or consents in writing setting forth such approval, which consent shall be delivered to the Company in the manner set forth from time to time in the DGCL), the Company shall not either directly or indirectly or through merger or consolidation with any other entity, (i) authorize, create or issue, or increase the authorized or issued amount of, any class or series of capital stock that would place or have the effect of placing restrictions on the obligation of the Company to pay dividends to the holders of Series D-2 Preferred Stock or to perform any of its obligations to the holders of Series D-2 Preferred Stock at any time; or (ii) authorize, enter into or permit to exist any covenant or agreement that would place or have the effect of placing restrictions on the obligations of the Company to pay dividends to holders of Series D-2 Preferred Stock or to perform any of its other obligations to the holders of Series D-2 Preferred Stock at any time; provided, however, that notwithstanding the foregoing, the Company may from time to time enter into credit agreements and indentures that provide for limitations on the ability of the Company to pay dividends on its capital stock generally, so long as the Board of Directors determines, in its sole discretion, that such limitation is necessary in order to obtain financing on commercially reasonable terms.

(d) One Vote Per Share. In connection with any matter on which holders of the Series D-2 Preferred Stock are entitled to vote as provided in subparagraphs (b) and (c) above, or any other matter on which the holders of the Series D-2 Preferred Stock are entitled to vote as one class or otherwise pursuant to applicable law or the provisions of the Certificate of Incorporation, each holder of Series D-2 Preferred Stock shall be entitled to one vote for each share of Series D-2 Preferred Stock held by such holder.

(e) Except as otherwise required by law, the holders of Series D-2 Preferred Stock and holders of Series D-1 Preferred Stock will vote together as a single class.

6. No Sinking Fund. No sinking fund will be established for the retirement or redemption of shares of Series D-2 Preferred Stock.

7. Liquidation Rights; Priority.

(a) In the event of any liquidation, dissolution or winding up of the affairs of the Company, whether voluntary or involuntary, after payment or provision for payment of the debts and other liabilities of the Company, the holders of shares of the Series D-2 Preferred Stock shall be entitled to receive, out of the assets of the Company, whether such assets are capital or surplus and whether or not any dividends as such are declared, $500 per share plus an amount equal to all accrued and unpaid dividends for the then-current plus all prior Dividend Periods, and no more, before any distribution shall be made to the holders of the Common Stock or any other class of stock or series thereof ranking junior to the Series D-2 Preferred Stock with respect to the distribution of assets upon liquidation, dissolution or winding up of the Company. The Series D-2 Preferred Stock and, unless specifically designated as junior or senior to the Series D-2 Preferred Stock with respect to the liquidation, dissolution or winding up of the affairs of the Company or as to dividends, all other series or classes of Preferred Stock of the

12

Company shall rank on a parity with the Series D-2 Preferred Stock with respect to the distribution of assets.

(b) Nothing contained in this Section 7 shall be deemed to prevent conversion of shares of the Series D-2 Preferred Stock by the Company in the manner provided in Section 3. Neither the merger nor consolidation of the Company into or with any other entity, nor the merger or consolidation of any other entity into or with the Company, nor a sale, transfer or lease of all or any part of the assets of the Company, shall be deemed to be a liquidation, dissolution or winding up of the Company within the meaning of this Section 7.

(c) Written notice of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Company, stating a payment date and the place where the distributable amounts shall be payable, shall be given by mail, postage prepaid, no less than 30 days prior to the payment date stated therein, to the holders of record of the Series D-2 Preferred Stock at their respective addresses as the same shall appear on the books of the Company.

(d) If the amounts available for distribution with respect to the Series D-2 Preferred Stock and all other outstanding stock of the Company ranking on a parity with the Series D-2 Preferred Stock upon liquidation, dissolution or winding up are not sufficient to satisfy the full liquidation rights of all the outstanding Series D-2 Preferred Stock and stock ranking on a parity therewith, then the holders of each series of such stock will share ratably in any such distribution of assets in proportion to the full respective preferential amount (which in the case of the Series D-2 Preferred Stock shall mean the amounts specified in Section 7(a) and in the case of any other series of preferred stock may include accumulated dividends if contemplated by such series) to which they are entitled.

8. <u>Status of Shares Converted</u>. Shares of Series D-2 Preferred Stock converted or purchased or otherwise acquired for value by the Company, shall, after such event, have the status of authorized and unissued shares of Preferred Stock without designation and may be reissued by the Company at any time as shares of any series of Preferred Stock.

9. <u>Effectiveness</u>. This certificate shall be effective as of 5:00 p.m., New York City time, on February 13, 2001.

13

IN WITNESS WHEREOF, Tribune Company has caused this certificate to be signed by Crane H. Kenney, its Senior Vice President, General Counsel and Secretary, this 13th day of February, 2001.

TRIBUNE COMPANY

By: /s/ Crane H. Kenney
     Crane H. Kenney
     Senior Vice President,
         General Counsel and Secretary

14

02/15/01   17:20 FAX 213 237 4743        LEGAL DEPT                              ☑017

## Schedule A

### Dividend Rates

| Year | Dividend Rate |
|------|---------------|
| 2000 | 5.80% |
| 2001 | 5.80% |
| 2002 | 6.01% |
| 2003 | 6.22% |
| 2004 | 6.44% |
| 2005 | 6.67% |
| 2006 | 6.91% |
| 2007 | 7.15% |
| 2008 | 7.41% |
| 2009 | 7.67% |
| 2010 | 7.95% |
| 2011 | 8.23% |
| 2012 and thereafter | 8.40% |

15

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 03/21/2001
010139074 - 0674607

## CERTIFICATE OF CHANGE OF LOCATION OF REGISTERED OFFICE
## AND OF REGISTERED AGENT

It is hereby certified that:

The name of the corporation (herein after called the "corporation") is Tribune Company.

2. The registered office of the corporation within the State of Delaware is hereby changed to 2711 Centerville Road, Ste. 400, City of Wilmington 19808, County of New Castle.

3. The registered agent of the corporation within the State of Delaware is hereby changed to Corporation Service Company, the business office of which is identical with the registered office of the corporation as hereby changed.

4. The corporation has authorized the changes herein before set forth by resolution of its Board of Directors.

Signed on   March 7, 2001

_____

Mark W. Hianik, Vice President

DE BC D-COA CERTIFICATE OF CHANGE 01/98 (#163)

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 09:00 AM 10/24/2001*
*010541544 - 0674607*

**CERTIFICATE OF CORRECTION
TO THE
AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
TRIBUNE COMPANY**

**Pursuant to Section 103(f) of the
Delaware General Corporation Law**

Tribune Company (the "Corporation"), a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

1.      The name of the Corporation is Tribune Company. The date of the filing of its original Certificate of Incorporation with the Secretary of State was March 19, 1968. The date of the filing of its Amended and Restated Certificate of Incorporation (the "Amended and Restated Certificate of Incorporation") with the Secretary of State was June 12, 2000.

2.      The Amended and Restated Certificate of Incorporation requires correction as permitted by Section 103(f) of the Delaware General Corporation Law.

3.      The inaccuracies or defects of the Amended and Restated Certificate of Incorporation to be corrected by this Certificate of Correction to the Amended and Restated Certificate of Incorporation are (a) the omission in Article Fourth of a reference to Exhibit A, containing the terms of the Corporation's Series B Convertible Preferred Stock as have been in effect since April 4, 1989, and (b) the attachment of Exhibit A to the Amended and Restated Certificate of Incorporation.

4.      Article Fourth of the Amended and Restated Certificate of Incorporation in corrected form is as follows:

"FOURTH: The total number of shares of stock which the corporation shall have authority to issue is one billion four hundred twelve million (1,412,000,000) shares, consisting of (A) twelve million (12,000,000) shares of Preferred Stock, without par value, issuable in one or more series as hereinafter provided, and (B) one billion four hundred million (1,400,000,000) shares of Common Stock, par value $.01 per share. The terms of the Series B Convertible Preferred Stock of the corporation, as in effect since April 4, 1989, are set forth in Exhibit A.

.

The Common Stock of the corporation may be issued from time to time by authority of the Board of Directors of the corporation in accordance with applicable law. All shares of Preferred Stock at any time having the status of authorized and unissued shares of Preferred Stock may be issued from time to time in one or more series in such amounts per series and with such designations as may be provided by the Board of Directors of the corporation, and shares of any such series (a) may have such full or limited voting powers, or no voting powers, (b) may have such sinking fund provisions or redemption price or prices and terms and conditions, (c) may be entitled to receive dividends (cumulative or non-cumulative) at such rate or rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or series of capital stocks, (d) may have such rights upon the liquidation or dissolution of, or upon any distribution of the assets of, the corporation, (e) may be made convertible into, or exchangeable for, shares of any other class or classes or of any other series of the same or any other class or classes of the capital stock of the corporation, at such price or prices or at such rates of exchange, and with such adjustments, and (f) shall have such other preferences and relative, participating, optional or other special rights, qualifications, limitations or restrictions thereof, all as shall be stated and expressed in the resolution or resolutions providing for the issuance of such Preferred Stock from time to time adopted by the Board of Directors of the corporation. Authority is hereby granted to and vested in the Board of Directors of the corporation to establish and designate, by resolution adopted by such Board, additional series of Preferred Stock from the authorized and unissued shares of the Preferred Stock and in such resolution to determine and fix the various terms, rights and preferences of the shares of any such series as specified in clauses (a) through (f) above, subject, however, to such restrictions and limitations as are, or may be, from time to time provided by law or contained in this Amended and Restated Certificate of Incorporation in its present form or as hereinafter amended. The stated value of the shares of each series of Preferred Stock shall be fixed by the Board of Directors of the corporation in the resolution establishing such series. All shares of any one series of Preferred Stock shall be alike in all respects.

The corporation shall not be required to issue fractional shares of any class of stock or to maintain or record fractional shares upon the books and records of the corporation. The Board of Directors of the corporation may determine by resolution from time to time whether or not fractional shares of any new or existing class or series of stock shall be permitted or recognized. In the event (a) the Board of Directors determines at any time to eliminate fractional shares of a class or series of stock as to which fractional shares are then outstanding or (b) corporate action is taken at any time which would result in the ownership of fractional interests in shares of any class or series of stock as to which the Board of Directors has determined that fractional shares are not permitted or recognized, the corporation shall arrange for the disposition of such fractional interests in such shares by the persons entitled thereto or pay in cash the fair value of such fractional interests or make other provision with respect thereto, in each case in such manner as may be permitted or required by law.

2

Each stockholder of record of Common Stock shall be entitled to one vote for every full share standing in his name on the books of the corporation on all matters presented for a vote of stockholders at a meeting thereof. A stockholder of record owning a fractional share of Common Stock (when permitted) shall be entitled to exercise fractional voting rights, to receive dividends thereon and to participate in the assets of the corporation in the event of liquidation, in each case proportionate to such fractional interest.

In consideration of the issue by the corporation, and the purchase by the holders thereof, of shares of the capital stock of the corporation, each and every present and future holder of shares of the capital stock of the corporation shall be conclusively deemed, by acquiring or holding such shares, to have agreed that the voting rights of such holders and the restrictions and qualifications thereof shall be as set forth in the Amended and Restated Certificate of Incorporation of the corporation, as now or hereafter amended pursuant to law, and in resolutions providing for series of Preferred Stock of the corporation."

5.    Except as expressly set forth herein, this Certificate of Correction to the Amended and Restated Certificate of Incorporation does not correct any other provision of the Corporation's (a) Amended and Restated Certificate of Incorporation, (b) Certificate of Designation of Series A Junior Participating Preferred Stock, as amended, (c) Certificate of Designation of the Preferred Stock, Series C, as amended, (d) Certificate of Designation of the Preferred Stock, Series D-1, as amended, or (e) Certificate of Designation of the Preferred Stock, Series D-2, as amended.

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Correction to the Amended and Restated Certificate of Incorporation to be executed this 24th day of October, 2001.

TRIBUNE COMPANY

By:_____
    Mark W. Hianik
    Vice President

3

EXHIBIT A

OF THE

AMENDED AND RESTATED

CERTIFICATE OF INCORPORATION

OF

TRIBUNE COMPANY

Series B Convertible Preferred Stock

Section 1.  Designation and Amount; Special Purpose Restricted Transfer Issue.

(A)  The shares of this series of Preferred Stock shall be designated as "Series B Convertible Preferred Stock" and the number of shares constituting such series shall be 1,600,000.  The shares of this series shall have no par value, but shall have a stated value of $.01 per share.

(B)  Shares of Series B Preferred Stock shall be issued only to a trustee acting on behalf of an employee stock ownership plan or other employee benefit plan of the

-1-

Corporation. In the event of any transfer of shares of Se-
ries B Preferred Stock, including a distribution to partici-
pants of an employee benefit plan, to any person other than
the Corporation or the trustee of any such plan, the shares
of Series B Preferred Stock so transferred, upon such trans-
fer and without any further action by the Corporation or the
holder, shall be automatically converted into shares of the
Corporation's Common Stock, without par value (the "Common
Stock"), pursuant to Section 5 hereof and no such transferee
shall have any of the voting powers, preferences and rela-
tive, participating, optional or special rights ascribed to
shares of Series B Preferred Stock hereunder but, rather,
only the powers and rights pertaining to the Common Stock
into which such shares of Series B Preferred Stock shall be
so converted. In the event of such a conversion, the trans-
feree of the shares of Series B Preferred Stock shall be
treated for all purposes as the record holder of the shares
of Common Stock into which such shares of Series B Preferred
Stock have been automatically converted as of the date of
such transfer; _provided, however,_ that the pledge of Series
B Preferred Stock as collateral under any credit agreement
for the financing or refinancing of the initial purchase of
the Series B Preferred Stock by such employee stock owner-
ship plan or other employee benefit plan of the Corporation
shall not constitute a transfer for purposes of this Section
1. Certificates representing shares of Series B Preferred
Stock shall be legended to reflect such restrictions on
transfer. Notwithstanding the foregoing provisions of this
Section 1(B), shares of Series B Preferred Stock (i) may be
converted into shares of Common Stock pursuant to Section 5
hereof and the shares of Common Stock issued upon such con-
version may be transferred by the holder thereof as permit-
ted by law and (ii) shall be redeemable by the Corporation
upon the terms and conditions provided by Sections 6, 7 and
8 hereof.

## Section 2.  Dividends and Distributions.

(A)  Subject to the provisions for adjustment here-
inafter set forth, the holders of shares of Series B Pre-
ferred Stock shall be entitled to receive, when, as and if
declared by the Board of Directors out of funds legally
available therefor, cash dividends ("Preferred Dividends")
in an amount per share equal to $17.05 per share per annum,
and no more, payable semi-annually in arrears, one-half on
the 15th day of December and one-half on the 15th day of
June of each year (each a "Dividend Payment Date") commenc-
ing on June 15, 1989, to holders of record at the start of
business on such Dividend Payment Date. In the event that
any Dividend Payment Date shall occur on any day other than

-2-

a "Business Day" (as defined in Section 9(F)(i)), the dividend payment due on such Dividend Payment Date shall be paid on the Business Day immediately preceding such Dividend Payment Date.  Preferred Dividends shall begin to accrue on outstanding shares of Series B Preferred Stock from the date of issuance of such shares of Series B Preferred Stock. Preferred Dividends shall accrue on a daily basis whether or not the Corporation shall have earnings or surplus at the time.  Preferred Dividends accrued after the date of issuance for any period less than a full semi-annual period between Dividend Payment Dates shall be computed on the basis of a 360-day year of 30-day months and in lieu of the initial semi-annual dividend, such a proportional dividend shall accrue for the period from the date of issuance until June 15, 1989.  Accumulated but unpaid Preferred Dividends shall cumulate as of the Dividend Payment Date on which they first become payable, but no interest shall accrue on accumulated but unpaid Preferred Dividends.

          (B)  So long as any Series B Preferred Stock shall be outstanding, no dividend shall be declared or paid or set apart for payment on any other series of stock ranking on a parity with the Series B Preferred Stock as to dividends ("Parity Stock"), unless there shall also be or have been declared and paid or set apart for payment on the Series B Preferred Stock dividends for all dividend payment periods of the Series B Preferred Stock ending on or before the dividend payment date of such Parity Stock, ratably in proportion to the respective amounts of dividends accumulated and unpaid through such dividend payment period on the Series B Preferred Stock, and accumulated and unpaid on such Parity Stock through the dividend payment period on such Parity Stock next preceding such dividend payment period.  So long as any Series B Preferred Stock shall be outstanding, in the event that full cumulative dividends on the Series B Preferred Stock have not been declared and paid or set apart for payment when due, the Corporation shall not declare or pay or set apart for payment any dividends or make any other distributions on, or make any payment on account of the purchase, redemption or other retirement of any other class of stock or series thereof of the Corporation ranking, as to dividends or as to distributions in the event of a liquidation, dissolution or winding-up of the Corporation, junior to the Series B Preferred Stock ("Junior Stock") until full cumulative and unpaid dividends on the Series B Preferred Stock shall have been paid or declared and set apart for payment; provided, however, that the foregoing shall not apply to (i) any dividend payable solely in any shares of any Junior Stock, or (ii) the acquisition of shares of any Junior Stock either (x) pursuant to any employee or director

-3-

incentive or benefit plan or arrangement (including any employment, severance or consulting agreement) of the Corporation or any subsidiary of the Corporation heretofore or hereafter adopted or (y) in exchange solely for shares of any other Junior Stock. Subject to the foregoing provisions of this Section 2(B), the Board of Directors may declare and the Corporation may pay or set apart for payment dividends and other distributions on any other Junior Stock or Parity Stock, and may purchase or otherwise redeem any of the Junior Stock or Parity Stock or any warrants, rights, or options or other securities exercisable for or convertible into any of the Junior Stock or Parity Stock and the holders of shares of the Series B Preferred Stock shall not be entitled to share therein.

Section 3.  Voting Rights.  The holders of shares of Series B Preferred Stock shall have the following voting rights:

(A)  The holders of Series B Preferred Stock shall be entitled to vote on all matters submitted to a vote of the holders of Common Stock of the Corporation, voting together with the holders of Common Stock as one class. Each share of the Series B Preferred Stock shall be entitled to 4.58 votes or, if greater, a number of votes equal to the number of shares of Common Stock into which such share of Series B Preferred Stock could be converted on the record date for determining the stockholders entitled to vote, rounded to the nearest one-tenth of a vote; it being understood that whenever the "Conversion Ratio" (as defined in Section 5 hereof) is adjusted pursuant to Section 9 hereof, the voting rights of the Series B Preferred Stock shall also be similarly adjusted if such adjustment would result in each share of Series B Preferred Stock being entitled to more than 4.58 votes.

(B)  Except as otherwise required by law or set forth herein, holders of Series B Preferred Stock shall have no special voting rights and their consent shall not be required (except to the extent they are entitled to vote with holders of Common Stock as set forth herein) for the taking of any corporate action; provided, however, that the vote of at least 66-2/3% of the outstanding shares of Series B Preferred Stock, voting separately as a series, shall be necessary to adopt any alteration, amendment or repeal of any provision of the Restated Certificate of Incorporation of the Corporation (the "Certificate") or this Certificate of Designations (excluding any such alteration, amendment or repeal effected by any merger or consolidation in which the Corporation is the surviving or resulting corporation or

-4-

which complies with the terms of Section 8 hereof), if such amendment, alteration or repeal would alter or change the powers, preferences or special rights of the shares of Series B Preferred Stock so as to affect them adversely.

### Section 4.   Liquidation, Dissolution or Winding-Up.

(A)  Upon any voluntary or involuntary liquidation, dissolution or winding-up of the Corporation, the holders of Series B Preferred Stock shall be entitled to receive out of assets of the Corporation which remain after satisfaction in full of all valid claims of creditors of the Corporation and which are available for payment to stockholders, and subject to the rights of the holders of any stock of the Corporation ranking senior to or on a parity with the Series B Preferred Stock in respect of distributions upon liquidation, dissolution or winding-up of the Corporation, before any amount shall be paid or distributed among the holders of Common Stock or any other shares ranking junior to the Series B Preferred Stock in respect of distributions upon liquidation, dissolution or winding-up of the Corporation, liquidating distributions in the amount of $220.00 per share (the "Liquidation Preference"), plus an amount equal to all accrued and unpaid dividends thereon to the date fixed for distribution, and no more.  If upon any liquidation, dissolution or winding-up of the Corporation, the amounts payable with respect to the Series B Preferred Stock and any other stock ranking as to any such distribution on a parity with the Series B Preferred Stock are not paid in full, the holders of the Series B Preferred Stock and such other stock shall share ratably in any distribution of assets in proportion to the full respective preferential amounts to which they are entitled.  After payment of the full amount to which they are entitled as provided by the foregoing provisions of this Section 4(A), the holders of shares of Series B Preferred Stock shall not be entitled to any further right or claim to any of the remaining assets of the Corporation.

(B)  Neither the merger, consolidation or combination of the Corporation with or into any other corporation, nor the sale, lease, transfer or other exchange of all or any portion of the assets of the Corporation (or any purchase or redemption of some or all of the shares of any class or series of stock of the Corporation), shall be deemed to be a dissolution, liquidation or winding-up of the affairs of the Corporation for purposes of this Section 4, but the holders of Series B Preferred Stock shall nevertheless be entitled in the event of any such merger or consolidation to the rights provided by Section 8 hereof.

-5-

(C)  Written notice of any voluntary or involuntary
liquidation, dissolution or winding-up of the Corporation,
stating the payment date or dates when, and the place or
places where, the amounts distributable to holders of Series
B Preferred Stock in such circumstances shall be payable,
and stating that such payment will be made only after the
surrender of such holder's certificates representing shares
of Series B Preferred Stock, shall be given by first-class
mail, postage prepaid, mailed not less than twenty (20) days
prior to any payment date stated therein, to the holders of
Series B Preferred Stock, at the address shown on the books
of the Corporation or any transfer agent for the Series B
Preferred Stock; provided, however, that a failure to give
notice as provided above or any defect therein shall not
affect the Corporation's ability to consummate a voluntary
or involuntary liquidation, dissolution or winding-up of the
Corporation.

### Section 5.  Conversion into Common Stock.

(A)  A holder of shares of Series B Preferred Stock
shall be entitled, at any time prior to the close of busi-
ness on the date fixed for redemption of such shares pursu-
ant to Section 6, 7 or 8 hereof, to cause any or all of such
shares to be converted into shares of Common Stock, ini-
tially at a conversion rate equal to the ratio of four
shares of Common Stock for each one share of Series B Pre-
ferred Stock, and which shall be adjusted as hereinafter
provided (and, as so adjusted, rounded to the nearest ten-
thousandth, is hereinafter sometimes referred to as the
"Conversion Ratio"); provided, however, that, if the shares
of Common Stock have a par value, in no event shall the Con-
version Ratio be greater than the Liquidation Preference
divided by the par value of one share of Common Stock.

(B)  Any holder of shares of Series B Preferred
Stock desiring to convert such shares into shares of Common
Stock shall surrender the certificate or certificates repre-
senting the shares of Series B Preferred Stock being con-
verted, duly assigned or endorsed for transfer to the Corpo-
ration (or accompanied by duly executed stock powers
relating thereto), at the principal executive office of the
Corporation or the offices of the transfer agent for the
Common Stock or such office or offices in the continental
United States of an agent for conversion as may from time to
time be designated by notice to the holders of Series B Pre-
ferred Stock, accompanied by written notice of conversion.
Such notice of conversion shall specify (i) the number of
shares of Series B Preferred Stock to be converted and the
name or names in which such holder wishes the certificate or

-6-

certificates for Common Stock and for any shares of Series B Preferred Stock not to be so converted to be issued, and (ii) the address to which such holder wishes delivery to be made of such new certificates to be issued upon such conversion.

(C) Upon surrender of a certificate representing a share or shares of Series B Preferred Stock for conversion, the Corporation or the transfer agent for the Common Stock shall issue and send by hand delivery (with receipt to be acknowledged) or by first class mail, postage prepaid, to the holder thereof or to such holder's designee, at the address designated by such holder, a certificate or certificates for the number of shares of Common Stock to which such holder shall be entitled upon conversion.  In the event that there shall have been surrendered a certificate or certificates representing shares of Series B Preferred Stock, only part of which are to be converted, the Corporation or the transfer agent for the Common Stock shall issue and deliver to such holder or such holder's designee a new certificate or certificates representing the number of shares of Series B Preferred Stock which shall not have been converted.

(D) The issuance by the Corporation of shares of Common Stock upon a conversion of shares of Series B Preferred Stock into shares of Common Stock made at the option of the holder thereof shall be effective as of the earlier of (i) the delivery to such holder or such holder's designee of the certificates representing the shares of Common Stock issued upon conversion thereof and (ii) the commencement of business on the second Business Day after the surrender of the certificate or certificates for the shares of Series B Preferred Stock to be converted, duly assigned or endorsed for transfer to the Corporation (or accompanied by duly executed stock powers relating thereto) as provided herein.  On and after the effective date of conversion, the person or persons entitled to receive the Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock, but no allowance or adjustment shall be made in respect of dividends payable to holders of Common Stock in respect of any period prior to such effective date.  The Corporation shall not be obligated to pay any dividends which shall have been declared and shall be payable to holders of shares of Series B Preferred Stock on a Dividend Payment Date if such Dividend Payment Date for such dividend shall coincide with or be on or subsequent to the effective date of conversion of such shares.

-7-

(E)  The Corporation shall not be obligated to deliver to holders of Series B Preferred Stock any fractional share or shares of Common Stock issuable upon any conversion of such shares of Series B Preferred Stock, but in lieu thereof may make a cash payment in respect thereof in any manner permitted by law.

(F)  The Corporation shall at all times reserve and keep available out of its authorized and unissued Common Stock, solely for issuance upon the conversion of shares of Series B Preferred Stock as herein provided, free from any preemptive rights, such number of shares of Common Stock as shall from time to time be issuable upon the conversion of all the shares of Series B Preferred Stock then outstanding.  Nothing contained herein shall preclude the Corporation from issuing shares of Common Stock held in its treasury upon the conversion of shares of Series B Preferred Stock into Common Stock pursuant to the terms thereof.  The Corporation shall prepare and shall use its best efforts to obtain and keep in force such governmental or regulatory permits or other authorizations as may be required by law, and shall comply with all requirements as to registration or qualification of the Common Stock, in order to enable the Corporation lawfully to issue and deliver to each holder of record of Series B Preferred Stock such number of shares of its Common Stock as shall from time to time be sufficient to effect the conversion of all shares of Series B Preferred Stock then outstanding and convertible into shares of Common Stock.

(G)  Whenever the Corporation shall issue shares of Common Stock upon any conversion of shares of Series B Preferred Stock as contemplated by this Section 5, the Corporation shall issue together with each share of Common Stock one right to purchase Series A Junior Participating Preferred Stock of the Corporation pursuant to the Rights Agreement by and between the Corporation and The First National Bank of Chicago, dated as of December 22, 1987, as the same may be amended from time to time thereafter, or any rights issued to holders of the Common Stock in addition thereto or in replacement therefor, whether or not such rights shall be exercisable or tradeable separately from the Common Stock at such time, but only if the rights issued pursuant to such Rights Agreement are outstanding and have not expired or been redeemed or exchanged.

Section 6.  Redemption At the Option of the Company.

(A)  The Series B Preferred Stock shall be redeemable, in whole or in part, at the option of the Corporation

-8-

(i) at any time after April 4, 1994, or (ii) at any time after the date of issuance if permitted by paragraph (D) of this Section 6, at the following percentages of the Liquidation Preference:

| During the Twelve-Month Period Beginning April 4, | Percentage of Liquidation Preference |
|---|---|
| 1989 | 107.750% |
| 1990 | 106.975 |
| 1991 | 106.200 |
| 1992 | 105.425 |
| 1993 | 104.650 |
| 1994 | 103.875 |
| 1995 | 103.100 |
| 1996 | 102.325 |
| 1997 | 101.550 |
| 1998 | 100.775 |

and thereafter at the Liquidation Preference, plus, in each case, an amount equal to all accrued and unpaid dividends thereon to the date fixed for redemption. Payment of the redemption price shall be made by the Corporation in cash or shares of Common Stock, or a combination thereof, as permitted by paragraph (E) of this Section 6. From and after the date fixed for redemption, dividends on shares of Series B Preferred Stock called for redemption will cease to accrue, such shares will no longer be deemed to be outstanding and all rights in respect of such shares of the Corporation shall cease, except the right to receive the redemption price. No interest shall accrue on the redemption price after the date fixed for redemption. If less than all of the outstanding shares of Series B Preferred Stock are to be redeemed, the Corporation shall either redeem a portion of the shares of each holder determined pro rata based on the number of shares held by each holder or shall select the shares to be redeemed by lot, as may be determined by the Board of Directors of the Corporation.

(B)  Unless otherwise required by law, notice of redemption pursuant to paragraphs (A), (C) or (D) of this Section 6 will be sent to the holders of Series B Preferred Stock at the address shown on the books of the Corporation or any transfer agent for the Series B Preferred Stock by first class mail, postage prepaid, mailed not less than twenty (20) days nor more than sixty (60) days prior to the redemption date. Each such notice shall state:  (i) the redemption date; (ii) the total number of shares of the Series B Preferred Stock to be redeemed and, if fewer than all

-9-

the shares held by such holder are to be redeemed, the number of such shares to be redeemed from such holder; (iii) the redemption price; (iv) the place or places where certificates for such shares are to be surrendered for payment of the redemption price; (v) that dividends on the shares to be redeemed will cease to accrue on such redemption date; and (vi) the conversion rights of the shares to be redeemed, the period within which conversion rights may be exercised, and the Conversion Ratio in effect at the time. Upon surrender of the certificate for any shares so called for redemption and not previously converted (properly endorsed or assigned for transfer, if the Board of Directors of the Corporation shall so require and the notice shall so state), such shares shall be redeemed by the Corporation at the date fixed for redemption and at the redemption price set forth pursuant to this Section 6.

(C)  In the event (i) there is a change in the federal income tax laws of the United States of America or a determination by a court of competent jurisdiction, in either case, which has the effect of precluding the Corporation from claiming any of the tax deductions for dividends paid on the Series B Preferred Stock when such dividends are used as provided under Section 404(k)(2) of the Internal Revenue Code of 1986, as amended (the "Code"), as in effect on the date shares of Series B Preferred Stock are initially issued, or (ii) the Tribune Company Employee Stock Ownership Plan, as the same may be amended, or any successor plan (the "Plan") is determined by the Internal Revenue Service not to be qualified within the meaning of Sections 401(a) and 4975(e)(7) of the Code, the Corporation may, in its sole discretion and notwithstanding anything to the contrary in Section 6(A), elect to redeem any or all of the shares of Series B Preferred Stock for the amount payable in respect of such shares upon liquidation of the Corporation pursuant to Section 4 hereof, and otherwise on the terms and conditions set forth in paragraphs (A) and (B) of this Section 6.

(D)  Notwithstanding anything to the contrary in paragraph (A) of this Section 6, the Corporation may elect to redeem any or all of the shares of Series B Preferred Stock at any time on or prior to April 4, 1994 on the terms and conditions set forth in paragraphs (A) and (B) of this Section 6, if the Corporation terminates an employee stock ownership plan pursuant to which shares of Series B Preferred Stock are then held by a trustee (in which case only the shares held pursuant to such plan may be so redeemed).

(E)  The Corporation, at its option, may make payment of the redemption price required upon redemption of

-10-

shares of Series B Preferred Stock pursuant to Section 6 or
7 hereof in cash or in shares of Common Stock, or in a com-
bination of such shares and cash, any such shares of Common
Stock to be valued for such purpose at their Fair Market
Value (as defined in Section 9(F)(iii); provided, however,
that in calculating their Fair Market Value the Adjustment
Period (as defined in Section 9(F)(v)) shall be deemed to be
the five (5) consecutive trading days preceding, and includ-
ing, the date of redemption).

## Section 7.   Other Redemption Rights.

Subject to the restrictions of the Delaware Law,
shares of Series B Preferred Stock shall be redeemed by the
Corporation for cash or, if the Corporation so elects, in
shares of Common Stock, or a combination of such shares and
cash (any such shares of Common Stock to be valued for such
purpose in accordance with the formula set forth in Section
6(E)), at a redemption price equal to the Liquidation Pref-
erence plus accrued and unpaid dividends thereon to the date
fixed for redemption, at the option of the holder, at any
time and from time to time upon notice to the Corporation
given not less than five (5) business days prior to the date
fixed by the holder in such notice for such redemption,
(i) when and to the extent necessary for such holder to pro-
vide for distributions required to be made under, or to sat-
isfy an investment election provided to participants in
accordance with, the Plan to participants in the Plan or
(ii) in the event that the Plan is not determined by the
Internal Revenue Service to be qualified within the meaning
of Sections 401(a) and 4975(e)(7) of the Code.

## Section 8.   Consolidation, Combination, Merger, etc.

(A)  In the event that the Corporation shall con-
summate any consolidation, combination, merger or similar
business combination transaction, pursuant to which the out-
standing shares of Common Stock are by operation of law
exchanged solely for or changed, reclassified or converted
solely into stock of any successor or resulting company
(including the Corporation) that constitutes "qualifying
employer securities" with respect to a holder of Series B
Preferred Stock within the meaning of Section 409(1) of the
Code and Section 407(d)(5) of the Employee Retirement Income
Security Act of 1974, as amended, or any successor provi-
sions of law, and, if applicable, for a cash payment in lieu
of fractional shares, if any, the shares of Series B Pre-
ferred Stock of such holder shall in connection therewith be
assumed by and shall become preferred stock of such succes-
sor or resulting company, having in respect of such company

-11-

insofar as possible the same powers, preferences and rela-
tive, participating, optional or other special rights
(including the redemption rights provided by Sections 6, 7
and 8 hereof), and the qualifications, limitations or
restrictions thereon, that the Series B Preferred Stock had
immediately prior to such transaction, except that after
such transaction each share of the Series B Preferred Stock
shall be convertible, otherwise on the terms and conditions
provided by Section 5 hereof, into the number and kind of
qualifying employer securities so receivable by a holder of
the number of shares of Common Stock into which such shares
of Series B Preferred Stock could have been converted imme-
diately prior to such transaction; provided, however, that
if by virtue of the structure of such transaction, a holder
of Common Stock is required to make an election with respect
to the nature and kind of consideration to be received in
such transaction, which election cannot practicably be made
by the holders of the Series B Preferred Stock, then the
shares of Series B Preferred Stock shall, by virtue of such
transaction and on the same terms as apply to the holders of
Common Stock, be converted into or exchanged for the aggre-
gate amount of stock, securities, cash or other property
(payable in kind) receivable by a holder of the number of
shares of Common Stock into which such shares of Series B
Preferred Stock could have been converted immediately prior
to such transaction if such holder of Common Stock failed to
exercise any rights of election to receive any kind or
amount of stock, securities, cash or other property (other
than such qualifying employer securities and a cash payment,
if applicable, in lieu of fractional shares) receivable upon
such transaction (provided that, if the kind or amount of
qualifying employer securities receivable upon such transac-
tion is not the same for each non-electing share, then the
kind and amount of qualifying employer securities receivable
upon such transaction for each non-electing share shall be
the kind and amount so receivable per share by a plurality
of the non-electing shares). The rights of the Series B
Preferred Stock as preferred stock of such successor or
resulting company shall successively be subject to adjust-
ments pursuant to Section 9 hereof after any such transac-
tion as nearly equivalent as practicable to the adjustments
provided for by such Section prior to such transaction. The
Corporation shall not consummate any such merger, consolida-
tion or similar transaction unless all then outstanding
shares of the Series B Preferred Stock shall be assumed and
authorized by the successor or resulting company as afore-
said.

(B)  In the event that the Corporation shall con-
summate any consolidation, combination, merger or similar

-12-

business combination transaction, pursuant to which the out-
standing shares of Common Stock are by operation of law
exchanged for or changed, reclassified or converted into
other stock or securities or cash or any other property, or
any combination thereof, other than any such consideration
which is constituted solely of qualifying employer securi-
ties (as referred to in Section 8(A)) and cash payments, if
applicable, in lieu of fractional shares, outstanding shares
of Series B Preferred Stock shall, without any action on the
part of the Corporation or any holder thereof (but subject
to Section 8(C)), be automatically converted by virtue of
such merger, consolidation, combination or similar business
combination transaction immediately prior to its consumma-
tion into the number of shares of Common Stock into which
such shares of Series B Preferred Stock could have been con-
verted at such time so that each share of Series B Preferred
Stock shall, by virtue of such transaction and on the same
terms as apply to the holders of Common Stock, be converted
into or exchanged for the aggregate amount of stock, securi-
ties, cash or other property (payable in like kind) receiv-
able by a holder of the number of shares of Common Stock
into which such shares of Series B Preferred Stock could
have been converted immediately prior to such transaction;
provided, however, that if by virtue of the structure of
such transaction, a holder of Common Stock is required to
make an election with respect to the nature and kind of con-
sideration to be received in such transaction, which elec-
tion cannot practically be made by the holders of the Series
B Preferred Stock, then the shares of Series B Preferred
Stock shall, by virtue of such transaction and on the same
terms as apply to the holders of Common Stock, be converted
into or exchanged for the aggregate amount of stock, securi-
ties, cash or other property (payable in kind) receivable by
a holder of the number of shares of Common Stock into which
such shares of Series B Preferred Stock could have been con-
verted immediately prior to such transaction if such holder
of Common Stock failed to exercise any rights of election as
to the kind or amount of stock, securities, cash or other
property receivable upon such transaction (provided that, if
the kind or amount of stock, securities, cash or other prop-
erty receivable upon such transaction is not the same for
each non-electing share, then the kind and amount of stock,
securities, cash or other property receivable upon such
transaction for each non-electing share shall be the kind
and amount so receivable per share by a plurality of the
non-electing shares).

(C)  In the event the Corporation shall enter into
any agreement providing for any consolidation, combination,
merger or similar business combination transaction described

in Section 8(B), then the Corporation shall as soon as practicable thereafter (and in any event at least ten (10) business days before consummation of such transaction) give notice of such agreement and the material terms thereof to each holder of Series B Preferred Stock and each such holder shall have the right to elect, by written notice to the Corporation, to receive, upon consummation of such transaction (if and when such transaction is consummated), from the Corporation or the successor of the Corporation, in redemption and retirement of such Series B Preferred Stock, a cash payment equal to the amount payable in respect of shares of Series B Preferred Stock upon redemption pursuant to Section 6(A) hereof. No such notice of redemption shall be effective unless given to the Corporation prior to the close of business on the second Business Day prior to consummation of such transaction, unless the Corporation or the successor of the Corporation shall waive such prior notice, but any notice of redemption so given prior to such time may be withdrawn by notice of withdrawal given to the Corporation prior to the close of business on the second Business Day prior to consummation of such transaction.

## Section 9.  Anti-dilution Adjustments.

(A) In the event the Corporation shall, at any time or from time to time while any of the shares of the Series B Preferred Stock are outstanding, (i) pay a dividend or make a distribution in respect of the Common Stock in shares of Common Stock, (ii) subdivide the outstanding shares of Common Stock, or (iii) combine the outstanding shares of Common Stock into a smaller number of shares, in each case whether by reclassification of shares, recapitalization of the Corporation (including a recapitalization effected by a merger or consolidation to which Section 8 hereof does not apply) or otherwise, the Conversion Ratio in effect immediately prior to such action shall be adjusted by multiplying such Conversion Ratio by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately after such event, and the denominator of which is the number of shares of Common Stock outstanding immediately before such event. An adjustment made pursuant to this Section 9(A) shall be given effect, upon payment of such a dividend or distribution, as of the record date for the determination of shareholders entitled to receive such dividend or distribution (on a retroactive basis) and in the case of a subdivision or combination shall become effective immediately as of the effective date thereof.

(B) In the event the Corporation shall, at any time or from time to time while any of the shares of Series

-14-

B Preferred Stock are outstanding, issue, sell or exchange shares of Common Stock (other than pursuant to (i) any right or warrant to purchase or acquire shares of Common Stock (including as such a right or warrant any security convertible into or exchangeable for shares of Common Stock), (ii) the Rights Agreement by and between the Corporation and The First National Bank of Chicago, dated as of December 22, 1987, as the same may be amended from time to time thereafter (the "Rights Agreement") and (iii) any employee or director incentive, compensation or benefit plan or arrangement (including any employment, severance or consulting agreement) of the Corporation or any subsidiary of the Corporation heretofore or hereafter adopted) for a consideration having a Fair Market Value on the date of issuance, sale or exchange less than the Fair Market Value of such shares on the date of issuance, sale or exchange, then, subject to the provisions of paragraphs (D) and (E) of this Section 9, the Conversion Ratio in effect immediately prior to such issuance, sale or exchange shall be adjusted by multiplying such Conversion Ratio by a fraction, the numerator of which shall be the product of (i) the Fair Market Value of a share of Common Stock on the day immediately preceding the first public announcement of such issuance, sale or exchange and (ii) the sum of the number of shares of Common Stock outstanding on such day plus the number of shares of Common Stock so issued, sold or exchanged by the Corporation, and the denominator of which shall be the sum of (i) the Fair Market Value of all the shares of Common Stock outstanding on the day immediately preceding the first public announcement of such issuance, sale or exchange and (ii) the Fair Market Value of the consideration on the date received by the Corporation in respect of such issuance, sale or exchange of shares of Common Stock.  In the event the Corporation shall, at any time or from time to time while any shares of Series B Preferred Stock are outstanding issue, sell or exchange any right or warrant to purchase or acquire shares of Common Stock (including as such a right or warrant any security convertible into or exchangeable for shares of Common Stock), other than any such issuance to holders of shares of Common Stock as a dividend or distribution (including by way of a reclassification of shares or a recapitalization of the Corporation) and other than pursuant to (i) the Rights Agreement or (ii) any employee or director incentive, compensation or benefit plan or arrangement (including any employment, severance or consulting agreement) of the Corporation or any subsidiary of the Corporation heretofore or hereafter adopted, for a consideration having a Fair Market Value on the date of such issuance, sale or exchange less than the Non-Dilutive Amount (as defined in Section 9(F)(vi)), then, subject to the provi-

-15-

sions of paragraphs (D) and (E) of this Section 9, the Con-
version Ratio shall be adjusted by multiplying such Conver-
sion Ratio by a fraction, the numerator of which shall be
the product of (i) the Fair Market Value of a share of Com-
mon Stock on the day immediately preceding the first public
announcement of such issuance, sale or exchange and (ii) the
sum of the number of shares of Common Stock outstanding on
such day plus the maximum number of shares of Common Stock
which could be acquired pursuant to such right or warrant at
the time of the issuance, sale or exchange of such right or
warrant (assuming shares of Common Stock could be acquired
pursuant to such right or warrant at such time), and the
denominator of which shall be the sum of (i) the Fair Market
Value of all the shares of Common Stock outstanding on the
day immediately preceding the first public announcement of
such issuance, sale or exchange, (ii) the Fair Market Value
of the consideration received by the Corporation in respect
of such issuance, sale or exchange of such right or warrant
and (iii) the Fair Market Value as of the time of such issu-
ance of the consideration which the Corporation would
receive upon exercise in full of all such rights or warrants.

(C)  In the event the Corporation shall, at any
time or from time to time while any of the shares of Series
B Preferred Stock are outstanding, make an Extraordinary
Distribution (as defined in Section 9(F)(ii)) in respect of
the Common Stock, whether by dividend, distribution, reclas-
sification of shares or recapitalization of the Corporation
(including a recapitalization or reclassification effected
by a merger, combination or consolidation to which Section 8
hereof does not apply) or effect a Pro Rata Repurchase (as
defined in Section 9(F)(vii)) of Common Stock, the Conver-
sion Ratio in effect immediately prior to such Extraordinary
Distribution or Pro Rata Repurchase shall, subject to para-
graphs (D) and (E) of this Section 9, be adjusted by multi-
plying such Conversion Ratio by a fraction, the numerator of
which shall be the product of (i) the number of shares of
Common Stock outstanding immediately before such Extraordi-
nary Distribution or Pro Rata Repurchase minus, in the case
of a Pro Rata Repurchase, the number of shares of Common
Stock repurchased by the Corporation and (ii) the Fair Mar-
ket Value of a share of Common Stock on the record date with
respect to an Extraordinary Distribution or on the Effective
Date (as defined in Section 9(F)(viii)) of a Pro Rata Repur-
chase, as the case may be, and the denominator of which
shall be (i) the product of (x) the number of shares of Com-
mon Stock outstanding immediately before such Extraordinary
Distribution or Pro Rata Repurchase and (y) the Fair Market
Value of a share of Common Stock on the record date with
respect to an Extraordinary Distribution, or on the Effec-

-16-