tive Date of a Pro Rata Repurchase, as the case may be, minus (ii) the Fair Market Value of the Extraordinary Distribution or the aggregate purchase price of the Pro Rata Repurchase, as the case may be; provided, however, that no Pro Rata Repurchase shall cause an adjustment to the Conversion Ratio unless the amount of all cash dividends and distributions made during the period of 12 months preceding the Effective Date of such Pro Rata Repurchase, when combined with the aggregate amount of all Pro Rata Repurchases including such Pro Rata Repurchase (for this purpose, including only that portion of the aggregate purchase price of each Pro Rata Repurchase which is in excess of the Fair Market value of the Common Stock repurchased as determined on the Effective Date of each such Pro Rata Repurchase), the Effective Dates of which fall within such twelve month period, exceeds ten percent (10%) of the aggregate Fair Market Value of all shares of Common Stock outstanding on the Effective Date of such Pro Rata Repurchase.  The Corporation shall send each holder of Series B Preferred Stock (i) notice of its intent to make any dividend or distribution and (ii) notice of any offer by the Corporation to make a Pro Rata Repurchase, in each case at the same time as, or as soon as practicable after, such offer is first communicated (including by announcement of a record date in accordance with the rules of any stock exchange on which the Common Stock is listed or admitted to trading) to holders of Common Stock.  Such notice shall indicate the intended record date and the amount and nature of such dividend or distribution, or the number of shares subject to such offer for a Pro Rata Repurchase and the purchase price payable by the Corporation pursuant to such offer, and the Conversion Ratio in effect at such time.

(D)  Notwithstanding any other provisions of this Section 9, the Corporation shall not be required to make any adjustment of the Conversion Ratio unless such adjustment would require an increase or decrease of at least one percent (1%) in the Conversion Ratio.  Any lesser adjustment shall be carried forward and shall be made no later than the time of, and together with, the next subsequent adjustment which, together with any adjustment or adjustments so carried forward, shall amount to an increase or decrease of at least one percent (1%) in the Conversion Ratio.

(E)  If the Corporation shall make any dividend or distribution on the Common Stock or issue any Common Stock, other capital stock or other security of the Corporation or any rights or warrants to purchase or acquire any such security, which transaction does not result in an adjustment to the Conversion Ratio pursuant to the foregoing provisions of

-17-

this Section 9, the Board of Directors of the Corporation shall in its sole discretion consider whether such action is of such a nature that it adversely affects the holders of the Series B Preferred Stock and that an adjustment to the Conversion Ratio should equitably be made in respect of such transaction.  If in such case the Board of Directors of the Corporation determines that an adjustment to the Conversion Ratio should be made, an adjustment shall be made effective as of such date, as determined by the Board of Directors of the Corporation.  The determination of the Board of Directors of the Corporation as to whether an adjustment to the Conversion Ratio should be made pursuant to the foregoing provisions of this Section 9(E), and, if so, as to what adjustment should be made and when, shall be final and binding on the Corporation and all stockholders of the Corporation.  The Corporation shall be entitled to make such additional adjustments in the Conversion Ratio, in addition to those required by the foregoing provisions of this Section 9, as shall be necessary in order that any dividend or distribution in shares of capital stock of the Corporation, subdivision, reclassification or combination of shares of stock of the Corporation or any recapitalization of the Corporation shall not be taxable to holders of the Common Stock.

(F)  For purposes of this Resolution, the following definitions shall apply:

(i)  "Business Day" shall mean each day that is not a Saturday, Sunday or a day on which state or federally chartered banking institutions in Chicago, Illinois are required or authorized to be closed.

(ii)  "Extraordinary Distribution" shall mean any dividend or other distribution (effected while any of the shares of Series B Preferred Stock are outstanding) of (x) cash, where the aggregate amount of such cash dividend or distribution together with the amount of all cash dividends and distributions made during the preceding period of 12 months, when combined with the aggregate amount of all Pro Rata Repurchases (for this purpose, including only that portion of the aggregate purchase price of each such Pro Rata Repurchase which is in excess of the Fair Market Value of the Common Stock repurchased as determined on the Effective Date of such Pro Rata Repurchase), the Effective Dates of which fall within such twelve month period, exceeds ten percent (10%) of the aggregate Fair Market Value of all shares of Common Stock outstanding on the record date for determining the shareholders entitled to receive such Extraordinary Distribution and/or (y) any shares of capital stock of the Corporation (other than shares of Common Stock),

-18-

other securities of the Corporation, evidences of indebted-
ness of the Corporation or any other person or any other
property (including shares of any subsidiary of the Corpora-
tion), or any combination thereof.  The Fair Market Value of
an Extraordinary Distribution for purposes of Section 9(C)
shall be equal to the sum of the Fair Market Value of such
Extraordinary Distribution as of the date made plus the
amount of any cash dividends which are not Extraordinary
Distributions made during such twelve month period and not
previously included in the calculation of an adjustment pur-
suant to Section 9(C).

(iii)  "Fair Market Value" shall mean, as to
shares of Common Stock or any other class of publicly traded
capital stock or securities of the Corporation or any other
issuer which are publicly traded, the average of the Current
Market Prices of such shares or securities for each day of
the Adjustment Period.  The "Fair Market Value" of any secu-
rity which is not publicly traded or of any other property
shall mean the fair value thereof as determined by an inde-
pendent investment banking or appraisal firm experienced in
the valuation of such securities or property selected in
good faith by the Board of Directors of the Corporation or a
committee thereof, or, if no such investment banking or
appraisal firm is in the good faith judgment of the Board of
Directors or such committee available to make such determi-
nation, as determined in good faith by the Board of Direc-
tors of the Corporation or such committee.

(iv)  "Current Market Price" of publicly traded
shares of Common Stock or any other class of capital stock
or other security of the Corporation or any other issuer for
a day shall mean the last reported sales price, regular way,
or, if no sale takes place on such day, the average of the
reported closing bid and asked prices, regular way, in
either case as reported on the Composite Tape for New York
Stock Exchange ("NYSE") transactions (the "Composite Tape")
or, if such security is not listed or admitted to trading on
the NYSE, on the principal national securities exchange on
which such security is listed or admitted to trading or, if
not listed or admitted to trading on any national securities
exchange, on the National Market System of the National As-
sociation of Securities Dealers, Inc. Automated Quotation
System ("NASDAQ National Market System") or, if such secu-
rity is not quoted on the NASDAQ National Market System, the
average of the closing bid and asked prices on each such day
in the over-the-counter market as reported by NASDAQ or, if
bid and asked prices for such security on each such day
shall not have been reported through NASDAQ, the average of
the bid and asked prices for such day as furnished by any

-19-

NYSE member firm regularly making a market in such security selected for such purpose by the Board of Directors of the Corporation or a committee thereof, in each case, on each trading day during the Adjustment Period.

(v)  "Adjustment Period" shall mean the period of five (5) consecutive trading days preceding, and including, the date as of which the Fair Market Value of a security is to be determined.

(vi)  "Non-Dilutive Amount" in respect of an issuance, sale or exchange by the Corporation of any right or warrant to purchase or acquire shares of Common Stock (including any security convertible into or exchangeable for shares of Common Stock) shall mean (x) the product of (I) the Fair Market Value of a share of Common Stock on the trading day immediately preceding the first public announcement of such issuance, sale or exchange and (II) the maximum number of shares of Common Stock which could be acquired on such date upon the exercise in full of such rights and warrants (including upon the conversion or exchange of all such convertible or exchangeable securities), whether or not exercisable (or convertible or exchangeable) at such date, minus (y) the aggregate amount payable pursuant to such right or warrant to purchase or acquire such maximum number of shares of Common Stock; provided, however, that in no event shall the Non-Dilutive Amount be less than zero.  For purposes of the foregoing sentence, in the case of a security convertible into or exchangeable for shares of Common Stock, the amount payable pursuant to a right or warrant to purchase or acquire shares of Common Stock shall be the Fair Market Value of such security on the date of the issuance, sale or exchange of such security by the Corporation.

(vii)  "Pro Rata Repurchase" shall mean any purchase of shares of Common Stock by the Corporation or any subsidiary thereof, whether for cash, shares of capital stock of the Corporation, other securities of the Corporation, evidences of indebtedness of the Corporation or any other person or any other property (including any shares of a subsidiary of the Corporation), or any combination thereof, effected while any of the shares of Series B Preferred Stock are outstanding, pursuant to any tender offer or exchange offer subject to Section 13(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or any successor provision of law, or pursuant to any other offer available to substantially all holders of Common Stock; provided, however, that no purchase of shares by the Corporation or any subsidiary thereof made in open market transactions shall be deemed a Pro Rata Repurchase.  For purposes of this

-20-

Section 9(F), shares shall be deemed to have been purchased by the Corporation or any subsidiary thereof "in open market transactions" if they have been purchased substantially in accordance with the requirements of Rule 10b-18, as such rule is in effect under the Exchange Act on the date shares of Series B Preferred Stock are initially issued by the Corporation, or on such other terms and conditions as the Board of Directors of the Corporation or a committee thereof shall have determined are reasonably designed to prevent such purchases from having a material effect on the trading market for the Common Stock. The "Effective Date" of a Pro Rata Repurchase shall mean the applicable expiration date (including all extensions thereof) of any tender offer which is a Pro Rata Repurchase, or the date of purchase with respect to any Pro Rata Repurchase which is not a tender offer.

(G)   Whenever an adjustment to the Conversion Ratio and the related voting rights of the Series B Preferred Stock is required pursuant hereto, the Corporation shall forthwith deliver to the transfer agent(s) for the Common Stock and the Series B Preferred Stock if there be one, and file with the Secretary of the Corporation, a statement signed by two officers of the Corporation stating the adjusted Conversion Ratio determined as provided herein, and the voting rights (as appropriately adjusted), of the Series B Preferred Stock.  Such statement shall set forth in reasonable detail such facts as shall be necessary to show the reason and the manner of computing such adjustment, including any determination of Fair Market Value involved in such computation.  Promptly after each adjustment to the Conversion Ratio and the related voting rights of the Series B Preferred Stock, the Corporation shall mail a notice thereof and of the then prevailing Conversion Ratio to each holder of Series B Preferred Stock.

Section 10.   Ranking; Attributable Capital and Adequacy of Surplus; Retirement of Shares.

(A)  The Series B Preferred Stock shall rank senior to the Series A Junior Participating Preferred Stock of the Corporation and to the Common Stock as to the payment of dividends and the distribution of assets on liquidation, dissolution and winding-up of the Corporation, and, unless otherwise provided in the Certificate, as the same may be amended, or a Certificate of Designations relating to a subsequent series of Preferred Stock, without par value, of the Corporation, the Series B Preferred Stock shall rank junior to all other series of the Corporation's Preferred Stock, without par value, as to payment of dividends and the distribution of assets on liquidation, dissolution or winding-up.

-21-

(B) In addition to any vote of stockholders required by law, the vote of the holders of a majority of the outstanding shares of Series B Preferred Stock shall be required to increase the par value of the Common Stock or otherwise increase the capital of the Corporation allocable to the Common Stock for the purpose of the Delaware Law if, as a result thereof, the surplus of the Corporation for purposes of the Delaware Law would be less than the amount of Preferred Dividends that would accrue on the then outstanding shares of Series B Preferred Stock during the following three years.

(C) Any shares of Series B Preferred Stock acquired by the Corporation by reason of·the conversion or redemption of such shares as provided hereby, or otherwise so acquired, shall be cancelled as shares of Series B Preferred Stock and restored to the status of authorized but unissued shares of preferred stock, without par value, of the Corporation, undesignated as to series, and may thereafter be reissued as part of a new series of such preferred stock as permitted by law.

### Section 11. Miscellaneous.

(A) All notices referred to herein shall be in writing, and all notices hereunder shall be deemed to have been given upon the earlier of receipt thereof or three (3) Business Days after the mailing thereof if sent by registered mail (unless first-class mail shall be specifically permitted for such notice under the terms of this Resolution) with postage prepaid, addressed: (i) if to the Corporation, to its office at 435 North Michigan Avenue, Chicago, Illinois 60611 (Attention: Secretary) or to the transfer agent for the Series B Preferred Stock, or other agent of the Corporation designated as permitted by this Resolution or (ii) if to any holder of the Series B Preferred Stock or Common Stock, as the case may be, to such holder at the address of such holder as listed in the stock record books of the Corporation (which may include the records of any transfer agent for the Series B Preferred Stock or Common Stock, as the case may be) or (iii) to such other address as the Corporation or any such holder, as the case may be, shall have designated by notice similarly given.

(B) In the event that, at any time as a result of an adjustment made pursuant to Section 9, the holder of any share of the Series B Preferred Stock upon thereafter surrendering such shares for conversion shall become entitled to receive any shares or other securities of the Corporation other than shares of Common Stock, the Conversion Ratio in

-22-

respect of such other shares or securities so receivable
upon conversion of shares of Series B Preferred Stock shall
thereafter be adjusted, and shall be subject to further
adjustment from time to time, in a manner and on terms as
nearly equivalent as practicable to the provisions with re-
spect to Common Stock contained in Section 9 hereof, and the
provisions of each of the other Sections hereof with respect
to the Common Stock shall apply on like or similar terms to
any such other shares or securities.

(C)  The Corporation shall pay any and all stock
transfer and documentary stamp taxes that may be payable in
respect of any issuance or delivery of shares of Series B
Preferred Stock or shares of Common Stock or other securi-
ties issued on account of Series B Preferred Stock pursuant
hereto or certificates representing such shares or securi-
ties. The Corporation shall not, however, be required to
pay any such tax which may be payable in respect of any
transfer involved in the issuance or delivery of shares of
Series B Preferred Stock or Common Stock or other securities
in a name other than that in which the shares of Series B
Preferred Stock with respect to which such shares or other
securities are issued or delivered were registered, or in
respect of any payment to any person with respect to any
such shares or securities other than a payment to the regis-
tered holder thereof, and shall not be required to make any
such issuance, delivery or payment unless and until the per-
son otherwise entitled to such issuance, delivery or payment
has paid to the Corporation the amount of any such tax or
has established, to the satisfaction of the Corporation,
that such tax has been paid or is not payable.

(D)  In the event that a holder of shares of Series
B Preferred Stock shall not by written notice designate the
name in which shares of Common Stock to be issued upon con-
version of such shares should be registered or to whom pay-
ment upon redemption of shares of Series B Preferred Stock
should be made or the address to which the certificate or
certificates representing such shares, or such payment,
should be sent, the Corporation shall be entitled to regis-
ter such shares, and make such payment, in the name of the
holder of such Series B Preferred Stock as shown on the rec-
ords of the Corporation and to send the certificate or cer-
tificates representing such shares, or such payment, to the
address of such holder shown on the records of the Corpora-
tion.

(E)  Unless otherwise provided in the Certificate,
as the same may be amended, all payments in the form of div-
idends, distributions on voluntary or involuntary dissolu-

-23-

tion, liquidation or winding-up or otherwise made upon the shares of Series B Preferred Stock and any other stock ranking on a parity with the Series B Preferred Stock with respect to such dividend or distribution shall be made pro rata, so that amounts paid per share on the Series B Preferred Stock and such other stock shall in all cases bear to each other the same ratio that the required dividends, distributions or payments, as the case may be, then payable per share on the shares of the Series B Preferred Stock and such other stock bear to each other.

(F)  The Corporation may appoint, and from time to time discharge and change, a transfer agent for the Series B Preferred Stock.  Upon any such appointment or discharge of a transfer agent, the Corporation shall send notice thereof by first-class mail, postage prepaid, to each holder of record of Series B Preferred Stock.

-24-

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 04:26 PM 11/16/2006*
*FILED 04:26 PM 11/16/2006*
*SRV 061053127 – 0674607 FILE*

CERTIFICATE OF ELIMINATION

OF

THE SERIES C PREFERRED STOCK OF

TRIBUNE COMPANY

\* \* \* \* \* \* \*

Tribune Company, a corporation organized and existing under the General Corporation Law of the State of Delaware,

DOES HEREBY CERTIFY:

FIRST: The Board of Directors of Tribune Company (the "Company") deemed it advisable and in the best interest of the stockholders of the Company to enter into a series of transactions whereby certain shares of (i) the Company's Common Stock and Series C Preferred Stock held by TMCT, LLC and (ii) the Company's Common Stock, Series D-1 Preferred Stock and Series D-2 Preferred Stock held by TMCT II, LLC, were distributed to the Company and certain of its subsidiaries and affiliates (collectively, the "Distribution Transactions"), in each case in accordance with certain distribution agreements. The Chairman, President and Chief Executive Officer, any Senior Vice President or any Vice President of the Company, or the President or any Vice President of any of the Company's subsidiaries or affiliates who are parties to any of the documents delivered in connection with the Distribution Transactions (the "Authorized Officers"), were authorized by the Board of Directors of the Company (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to negotiate, document and execute such distribution agreements, and the related agreements, documents, instruments and certificates contemplated thereby.

SECOND: That at a meeting of the Board of Directors of Tribune Company, resolutions were duly adopted setting forth the proposed elimination of the Series C Preferred Stock as set forth herein:

> RESOLVED, that following the Distribution Transactions, none of the Company's authorized 8% Cumulative Convertible Preferred Stock, Series C, without par value (the "Series C Preferred Stock"), will be outstanding, and the Company shall not issue any shares of the Series C Preferred Stock subject to the Amended Certificate of Designation of the Preferred Stock, Series C (without par value) of the Company, dated February 13, 2001, that has been previously filed by the Company with the Secretary of State of the State of Delaware.

> FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to make all such

arrangements, to do and perform all such acts and things, to execute and deliver all such agreements, certificates, instruments and documents, to make all governmental, regulatory or other filings, to pay all such amounts, and to take all such actions as they may deem advisable or necessary in connection with the matters set forth in these resolutions and in order to fully effectuate the purposes of these resolutions.

THIRD: That the Certificate of Designation with respect to the Series C Preferred Stock was filed in the office of the Secretary of State of Delaware on June 12, 2000 and the Amended Certificate of Designation with respect to the Series C Preferred Stock was filed in the office of the Secretary of State of Delaware on February 15, 2001 (collectively, the "Certificate of Designation"). None of the authorized shares of the Series C Preferred Stock are outstanding and none will be issued.

FOURTH: That in accordance with the provisions of Section 151(g) of the General Corporation Law of the State of Delaware, the Amended and Restated Certificate of Incorporation is hereby amended to eliminate all reference to the Series C Preferred Stock and the Certificate of Designation is hereby repealed.

IN WITNESS WHEREOF, said Tribune Company has caused this certificate to be signed by Mark W. Hianik, its Vice President and Assistant General Counsel, this 16th day of November, 2006.

By: _____
Mark W. Hianik
Vice President and Assistant General Counsel

2

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 04:26 PM 11/16/2006*
*FILED 04:26 PM 11/16/2006*
*SRV 061053132 - 0674607 FILE*

# CERTIFICATE OF ELIMINATION

## OF

## THE SERIES D-2 PREFERRED STOCK OF

## TRIBUNE COMPANY

\* \* \* \* \* \* \*

Tribune Company, a corporation organized and existing under the General Corporation Law of the State of Delaware,

DOES HEREBY CERTIFY:

FIRST: The Board of Directors of Tribune Company (the "Company") deemed it advisable and in the best interest of the stockholders of the Company to enter into a series of transactions whereby certain shares of (i) the Company's Common Stock and Series C Preferred Stock held by TMCT, LLC and (ii) the Company's Common Stock, Series D-1 Preferred Stock and Series D-2 Preferred Stock held by TMCT II, LLC, were distributed to the Company and certain of its subsidiaries and affiliates (collectively, the "Distribution Transactions"), in each case in accordance with certain distribution agreements. The Chairman, President and Chief Executive Officer, any Senior Vice President or any Vice President of the Company, or the President or any Vice President of any of the Company's subsidiaries or affiliates who are parties to any of the documents delivered in connection with the Distribution Transactions (the "Authorized Officers"), were authorized by the Board of Directors of the Company (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to negotiate, document and execute such distribution agreements, and the related agreements, documents, instruments and certificates contemplated thereby.

SECOND: That at a meeting of the Board of Directors of Tribune Company, resolutions were duly adopted setting forth the proposed elimination of the Series D-2 Preferred Stock as set forth herein:

RESOLVED, that following the Distribution Transactions, none of the Company's authorized Preferred Stock, Series D-2, without par value (the "Series D-2 Preferred Stock"), will be outstanding, and the Company shall not issue any shares of the Series D-2 Preferred Stock subject to the Amended Certificate of Designation of the Preferred Stock, Series D-2 (without par value) of the Company, dated February 13, 2001, that has been previously filed by the Company with the Secretary of State of the State of Delaware.

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized (with full power of delegation) in the name and on behalf of the Company (or any affiliate thereof) to make all such

CHI 3632216v3

arrangements, to do and perform all such acts and things, to execute and deliver all such agreements, certificates, instruments and documents, to make all governmental, regulatory or other filings, to pay all such amounts, and to take all such actions as they may deem advisable or necessary in connection with the matters set forth in these resolutions and in order to fully effectuate the purposes of these resolutions.

THIRD: That the Certificate of Designation with respect to the Series D-2 Preferred Stock was filed in the office of the Secretary of State of Delaware on June 12, 2000 and the Amended Certificate of Designation with respect to the Series D-2 Preferred Stock was filed in the office of the Secretary of State of Delaware on February 15, 2001 (collectively, the "Certificate of Designation"). None of the authorized shares of the Series D-2 Preferred Stock are outstanding and none will be issued.

FOURTH: That in accordance with the provisions of Section 151(g) of the General Corporation Law of the State of Delaware, the Amended and Restated Certificate of Incorporation is hereby amended to eliminate all reference to the Series D-2 Preferred Stock and the Certificate of Designation is hereby repealed.

IN WITNESS WHEREOF, said Tribune Company has caused this certificate to be signed by Mark W. Hianik, its Vice President and Assistant General Counsel, this 16th day of November, 2006.

By: _____
Mark W. Hianik
Vice President and Assistant General Counsel

2

Exhibit B

**BY-LAWS**

of

**Tribune Company**

**a Delaware Corporation**

As amended and in effect on October 19, 2005

**ARTICLE I**

**Registered Office and Agent**

**Section 1.1 Registered Office and Agent.** The registered office of the Company in the State of Delaware shall be the office of The Corporation Trust Company in the City of Wilmington, County of New Castle, and the registered agent in charge thereof shall be The Corporation Trust Company.

**ARTICLE II**

**Meetings of Stockholders**

**Section 2.1 Place of Meeting.** Meetings of stockholders shall be held at such locations as are designated by the Board of Directors or the officers calling such meetings.

**Section 2.2 Annual Meeting.** The annual meeting of the stockholders shall be held on such date (not a legal holiday) and at such time as is designated by resolution of the Board of Directors, for the purpose of electing directors and for the transaction of such other business as may properly be brought before the meeting.

**Section 2.3 Special Meetings.** Special meetings of the stockholders may be called by the Chief Executive Officer of the Company or the Board of Directors. Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice of the meeting.

**Section 2.4 Notice of Meetings.** Unless otherwise required by statute, written notice stating the place, date and hour of each meeting of stockholders and the purpose or purposes of each such meeting shall be given to each stockholder entitled to vote at such meeting not less than ten nor more than sixty days before the date of the meeting. In the case of a meeting to vote on a merger or consolidation such notice shall be given not less than twenty nor more than sixty days before the date of the meeting. If given by mail, such notice shall be deemed to be given when deposited in the United States mail,

postage prepaid, directed to the stockholder at his address as it appears on the records of the Company.

**Section 2.5 Notice of Stockholder Business.**   At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting.  To be properly brought before an annual meeting business must be (a) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors, (b) otherwise properly brought before the meeting by or at the direction of the Board of Directors, or (c) otherwise properly brought before the meeting by a stockholder.  For business to be properly brought before an annual meeting by a stockholder, the stockholder must have given timely notice thereof in writing to the Secretary of the Company.  To be timely, a stockholder's notice must be delivered to the Secretary at the principal executive offices of the Company not later than the close of business on the 90th day nor earlier than the close of business on the 120th day prior to the first anniversary of the preceding year's annual meeting; provided, however, that in the event that the date of the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the 120th day prior to such annual meeting and not later than the close of business on the later of the 90th day prior to such annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made.  In no event shall the notice or public disclosure of an adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice as described above. A stockholder's notice to the Secretary shall set forth as to each matter the stockholder proposes to bring before the annual meeting (a) a brief description of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting, (b) the name and address, as they appear on the Company's books, of the stockholder proposing such business, (c) the class and number of shares of the Company which are beneficially owned by the stockholder, and (d) any material interest of the stockholder in such business.  Notwithstanding anything in these By-Laws to the contrary, no business shall be conducted at an annual meeting of stockholders except in accordance with the procedures set forth in this Section.  The chairman of an annual meeting shall, if the facts warrant, determine and declare to the meeting that business was not properly brought before the meeting and in accordance with the provisions of this Section, and if he should so determine, he shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted.

At any special meeting of the stockholders, only such business shall be conducted as shall have been brought before the meeting by or at the direction of the Chief Executive Officer or the Board of Directors.

Nothing in this By-Law shall be deemed to affect any rights of stockholders to request inclusion of proposals in the Company's proxy statement pursuant to Rule 14a-8 under the Securities Exchange Act.

**Section 2.6 List of Stockholders.**  The officer or agent having charge of the stock ledger of the Company shall make, at least ten days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

**Section 2.7 Inspectors.**  In advance of any meeting of stockholders, the Company, by its Board of Directors or by its Chairman or President, shall appoint one or more inspectors of voting who shall receive and count the ballots and make a written report of the results of the balloting, and who shall perform such other duties in connection therewith as is provided by law.  The Company may also designate one or more persons as alternate inspectors to replace any inspector who is unable or fails to act.

**Section 2.8 Quorum.**  The holders of record of shares of capital stock of the Company having a majority of the votes entitled to be cast at the meeting, represented in person or by proxy, shall constitute a quorum at all meetings of stockholders.  Where a separate vote by class or classes is to be held, the holders of stock having a majority of the votes entitled to be cast by such class or classes, represented in person or by proxy, shall constitute a quorum at the meeting.  Regardless of whether a quorum is present or represented, the chairman of the meeting, or stockholders represented in person or by proxy at the meeting voting a majority of the votes cast by such stockholders on the matter, shall have the power to adjourn the meeting to another time and/or place.  Unless the adjournment is for more than thirty days, or unless a new record date is set for the adjourned meeting, no notice of the adjourned meeting need be given to any stockholder; provided that the time and place of the adjourned meeting were announced at the meeting at which the adjournment was taken.  At the adjourned meeting the Company may transact any business which might have been transacted at the original meeting.

**Section 2.9 Voting of Shares; Proxies.**  The voting rights of holders of common stock and preferred stock of the Company shall be as set forth in the Amended and Restated Certificate of Incorporation, as from time to time in effect, and in resolutions of the Board of Directors providing for series of the preferred stock.  A stockholder may vote either in person, by proxy executed in writing by the stockholder or an authorized

officer, director, employee or agent of the stockholder, or by electronic transmission as provided by law. No proxy shall be voted or acted upon after three years from the date of its execution, unless the proxy provides for a longer period. Action on any question or in any election may be by a voice vote unless the presiding officer shall order that voting be by ballot. The presiding officer at the meeting shall fix and announce at the meeting the date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at the meeting.

**Section 2.10 Required Vote.** At any duly constituted meeting of stockholders, the affirmative vote of holders of a majority of the voting power of all shares represented at the meeting in person or by proxy and entitled to vote on the matter shall be necessary for the adoption or approval of any matter properly brought before the meeting, unless the proposed action is for the election of directors or is one upon which, by express provision of statute or of the Amended and Restated Certificate of Incorporation, a different affirmative vote is specified or required, in which case such express provision shall govern and control the decision of such question. In elections for directors, the nominees receiving the highest number of votes cast for the number of director positions to be filled shall be elected. Where a separate vote by class or classes is to be held, unless otherwise provided by statute or the Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of a majority of the voting power of all shares of such class or classes represented at the meeting in person or by proxy shall be the act of such class or classes.

**Section 2.11 Action Without a Meeting.** Action by the stockholders may be taken without a meeting as provided in the Amended and Restated Certificate of Incorporation.

## ARTICLE III

### Directors

**Section 3.1 Number, Tenure and Qualifications.** The business and affairs of the Company shall be managed by a Board of no less than ten (10) nor more than sixteen (16) directors, as fixed from time to time by resolution of the Board of Directors. Individuals shall be eligible to serve as a director of the Company until the annual meeting next occurring after such person's 72nd birthday. An officer of the Company shall be eligible for service as a director until either (i) such officer's resignation as an officer of the Company or (ii) the annual meeting next occurring after such officer's retirement as an officer of the Company. The Board shall be classified with respect to the time during which they hold office into three classes, as nearly equal in number as possible based on the then current membership of the Board, as determined by the Board of Directors, all as provided in the Amended and Restated Certificate of Incorporation. One class of directors shall be elected at each annual meeting of the stockholders to hold

office for the term of three years or until their respective successors are duly elected and qualified or until their earlier resignation or removal.

**Section 3.2 Nominating Procedures.**

**Section 3.2.1 Eligibility to Make Nominations.** Except as otherwise provided in Article VIII hereof, nominations of candidates for election as directors at any meeting of stockholders called for that purpose may be made by the Board of Directors or by any stockholder entitled to vote at such meeting, in accordance with the following provisions.

**Section 3.2.2 Procedure for Nominations by the Board of Directors.** Except as otherwise provided in Article VIII hereof, nominations made by the Board of Directors shall be made at a meeting of the Board of Directors, or by written consent of the directors in lieu of a meeting, not less than 30 days prior to the date of the meeting of stockholders at which directors are to be elected. At the request of the Secretary of the Company, each proposed nominee shall provide the Company with such information concerning himself or herself as is necessary for purposes of the Company's proxy statement relating to the meeting.

**Section 3.2.3 Procedure for Nominations by Stockholders.** Any stockholder who intends to make a nomination at a meeting of stockholders at which directors are to be elected, shall deliver a notice to the Secretary of the Company setting forth (i) the name, age, business address and residence address of each nominee proposed in such notice, (ii) the principal occupation or employment of each such nominee, (iii) the number of shares of capital stock of the Company which are beneficially owned by each such nominee and (iv) such other information concerning each such nominee as would be required, under the rules of the Securities and Exchange Commission, in a proxy statement soliciting proxies for the election of such nominees. Such notice shall be accompanied by a signed consent of each proposed nominee to serve as a director of the Company if elected. To be timely, a stockholder's notice must be delivered to the Secretary at the principal executive offices of the Company not earlier than the close of business on the 120th day prior to such meeting and not later than the close of business on the later of the 90th day prior to such meeting or the 10th day following the day on which such notice of the date of the meeting is mailed to the stockholders or public announcement thereof is made, whichever occurs first. In no event shall the notice or public disclosure of an adjournment of a meeting of stockholders at which directors are to be elected commence a new time period for the giving of a stockholder's notice as described above.

**Section 3.2.4 Substitution of Nominees.** Except as otherwise provided in Article VIII hereof, in the event that a person is validly designated as a nominee in accordance with the preceding Sections and shall thereafter become unable or unwilling to stand for election to the Board of Directors, the Board of Directors or the stockholder who

proposed such nominee, as the case may be, may designate a substitute nominee. At the request of the Secretary of the Company, each substitute nominee shall provide the Company with such information concerning himself or herself as would be necessary for purposes of a proxy statement relating to the meeting.

**Section 3.2.5 Determination of Compliance with Procedures.** Except as otherwise provided in Article VIII hereof, if the chairman of the meeting of stockholders determines that a nomination for director was not made in accordance with the foregoing procedures, such nomination shall be void.

**Section 3.3 Regular Meetings.** A regular meeting of the Board of Directors shall be held without other notice than this By-Law immediately after, and at the same address as, the annual meeting of stockholders. The Board of Directors may fix the time and place for the holding of additional regular meetings. No notice or call shall be required.

**Section 3.4 Special Meetings.** Special meetings of the Board of Directors may be called by the Chairman, the President or any two directors, by notice to the Secretary of the Company. The person or persons authorized to call special meetings of the Board of Directors may fix any place as the place for holding any special meeting of the Board of Directors called by them, provided that any meeting called at the request of directors shall be held at Tribune Tower, Chicago, Illinois. Notice of any special meeting shall be given to all directors at least twenty-four hours in advance thereof (except as set forth below), either (a) personally or by telephone or (b) by mail or telegram addressed to the director at his/her address as it appears on the records of the Company. Such notice shall include the time and place at which the meeting is to be held. If mailed, such notice must be given at least five days prior to the meeting and shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is to be given by telegram, such notice shall be deemed to be delivered when the telegram is delivered to the telegraph company. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice of such meeting.

**Section 3.5 Quorum and Action.** A majority of the total number of directors then in office shall constitute a quorum for the transaction of business at any meeting, but if less than a quorum is present a majority of the directors present may adjourn the meeting from time to time without further notice. The vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, unless the act of a greater number is required by statute, the Amended and Restated Certificate of Incorporation or these By-Laws.

**Section 3.6 Vacancies.** Except as otherwise provided in Article VIII hereof, any vacancy occurring in the Board of Directors and any newly created directorship resulting from an increase in the authorized number of directors may be filled by a majority of the

directors then in office, although less than a quorum, and the directors so chosen shall hold office for the unexpired portion of their designated terms of office and until their successors are duly elected and qualified, or until their earlier resignation or removal.

**Section 3.7 Compensation of Directors.** The Board of Directors, by the affirmative vote of the majority of the directors then in office, and irrespective of any personal interest of any of the directors, shall have authority to fix the compensation of directors for services to the Company as Board members, committee members or otherwise.

**Section 3.8 Removal of Directors.** Any one or more directors may be removed from office only for cause, and only by the affirmative vote of holders of at least a majority of the voting power of all of the then outstanding shares of voting stock of the Company, voting together as a single class.

**Section 3.9 Committees.**

**Section 3.9.1 Executive Committee.** The Board of Directors, by resolution of a majority of the whole Board, shall appoint an Executive Committee to consist of not less than five members of the Board, one of whom shall be the person designated as Chief Executive Officer of the Company. The Executive Committee shall have the right to exercise the full power and authority of the Board of Directors of the Company to the fullest extent permitted by Section 141(c) of the General Corporation Law of the State of Delaware; provided, that, in addition to the restrictions provided in said Section 141(c), such Executive Committee shall not have the authority of the Board of Directors in reference to: (a) electing or removing officers of the Company or members of the Executive Committee; (b) fixing the compensation of any officer or director; (c) amending, altering or repealing these By-Laws or any resolution of the Board of Directors; (d) submission to the stockholders of any matter whatsoever; (e) action with respect to dividends; or (f) any action which either the Chief Executive Officer or two other members of the Executive Committee shall designate, by written instrument filed with the Secretary of the Company, as a matter to be considered by the full Board. All action taken by the Executive Committee between Board meetings on matters of a nature ordinarily requiring Board action shall be promptly reported to the Board of Directors.

**Section 3.9.2 Audit Committee.** The Board of Directors, by resolution of a majority of the whole Board, shall appoint an Audit Committee to consist of not less than three directors who satisfy the qualifications for Audit Committee membership set forth in the Audit Committee charter. The Audit Committee shall have the authority and responsibilities as may be set forth in the Audit Committee charter, as the same may be modified or amended from time to time.

**Section 3.9.3 Compensation & Organization Committee.** The Board of Directors, by resolution of a majority of the whole Board, shall appoint a Compensation & Organization Committee to consist of not less than three directors who satisfy the qualifications for Compensation & Organization Committee membership set forth in the Compensation & Organization Committee charter. The Compensation & Organization Committee shall have the authority and responsibilities as may be set forth in the Compensation & Organization Committee charter, as the same may be modified or amended from time to time.

**Section 3.9.4 Nominating & Governance Committee.** The Board of Directors, by resolution of a majority of the whole Board, shall appoint a Nominating & Governance Committee to consist of not less than three directors who satisfy the qualifications for Nominating & Governance Committee membership set forth in the Nominating & Governance Committee charter. Subject to Article VIII hereof, the Nominating & Governance Committee shall have the authority and responsibilities as may be set forth in the Nominating & Governance Committee charter, as the same may be modified or amended from time to time.

**Section 3.9.5 Other Committees.** In addition to the Committees provided for in Sections 3.9.1 through 3.9.4 above and in Article VIII hereof, the Board of Directors may, by resolution passed by a majority of the whole Board, designate and appoint one or more other Board committees, each such committee to consist of two or more directors of the Company. Any such Board committee, to the extent provided in the resolution creating it and authorized by statute, shall have and may exercise the powers of the Board of Directors in the management of the business and affairs of the Company, and may authorize the seal of the Company to be affixed to all papers which may require it. The Board of Directors may also appoint other committees for the administration of the affairs of the Company, whose members may or may not be directors.

**Section 3.9.6 Committee Rules and Procedures.** Every committee appointed by the Board of Directors and any committee established by Article VIII hereof may, unless the Board provides otherwise, and except as otherwise provided by law, fix its own rules of procedure and hold its meetings in accordance with such rules. The Board may designate one or more persons as alternate members of any Board or other committee, as applicable, who may replace any absent or disqualified member at any meeting of such committee.

**Section 3.9.7 Presiding Non-Management Director.** The Board of Directors, by resolution of a majority of the non-management directors, shall designate one non-management director to (a) chair meetings involving only non-management directors and (b) perform such other activities as from time to time are requested by the other directors or as circumstances dictate. The presiding non-management director shall serve until his or her successor shall be elected or until his or her earlier resignation or removal.

- 8 -

**Section 3.10 Action By Directors Without Meeting.**  Any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or committee.

**Section 3.11 Meetings By Telephone.**  Members of the Board of Directors, or any committee of the Board, may participate in a meeting of the Board or of such committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section shall constitute presence in person at such meeting.

## ARTICLE IV

### Officers

**Section 4.1 Officers of the Company.**  The officers of the Company shall consist of a Chairman and/or a President, a Secretary and a Treasurer, elected or appointed by the Board of Directors.  The Board may also elect or appoint as officers of the Company a Controller, a General Counsel and one or more Vice Chairmen, Executive Vice Presidents, Senior Vice Presidents, Vice Presidents, Deputy General Counsels, Assistant Controllers, Assistant Secretaries, Assistant Treasurers or Assistant Vice Presidents, and such other officers, as the Board may from time to time determine.  If the Board of Directors shall at any time elect or appoint both a Chairman and a President, the Board shall specify which individual is to serve as the Chief Executive Officer of the Company. Any two or more offices may be held by the same person except that neither the Chairman nor the President may also hold the office of Secretary.  All officers of the Company shall have such authority and perform such duties in the management of the property and affairs of the Company as are provided in these By-Laws or as may be determined by resolution of the Board of Directors and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board.

**Section 4.2 Election and Term of Office.**  The officers of the Company shall be elected annually by the Board of Directors at the first regular meeting of the Board of Directors held after the annual meeting of stockholders.  Each officer shall hold office until his successor is duly elected and qualified or until his earlier resignation or removal.

**Section 4.3 Removal.**  Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the whole Board of Directors, with or without cause, but such removal shall be without prejudice to the

contract rights, if any, of the person so removed. Election or appointment of an officer shall not of itself create any contract rights.

**Section 4.4 Vacancies.** A vacancy in any office by reason of death, resignation, removal, disqualification or otherwise may be filled by the Board of Directors for the unexpired portion of the term.

**Section 4.5 Delegation of Duties of Officers.** In case of the absence of any officer of the Company, or for any other reason that the Board of Directors may deem sufficient, the Board of Directors may temporarily delegate the power or duties of an officer to any other officer or to any other person.

**Section 4.6 The Chairman; Chief Executive Officer.** If the Board of Directors shall elect a Chairman, that person when present shall preside at all meetings of the stockholders and of the Board of Directors. The Chairman shall also have the power to vote shares of stock registered in the name of the Company and shall exercise such other powers and duties as from time to time may be provided in these By-Laws or as may be prescribed by the Board of Directors. If the Chairman shall be designated as Chief Executive Officer of the Company, he or she shall have the general management and direction, subject to the authority of the Board of Directors, of the Company's business and affairs and its officers and employees, with the power to appoint and to remove and discharge any and all employees of the Company not elected or appointed directly by the Board. The Chief Executive Officer shall, upon consultation with the Compensation & Organization Committee of the Board, fix the salaries and bonuses (if any) of all officers and executive employees of the Company and its subsidiaries other than himself.

**Section 4.7 The President.** If the Board of Directors shall elect a President, that person when present and in the absence of a Chairman shall preside at all meetings of the stockholders and of the Board of Directors. If there is no Chairman, or if the Board of Directors shall designate the President as the Chief Executive Officer of the Company, the President shall have all of the powers of the Chief Executive Officer enumerated in the preceding Section. The President shall also have the power to vote shares of stock registered in the name of the Company, and shall exercise such other powers and duties as from time to time may be provided in these By-Laws or as may be prescribed by the Board of Directors.

**Section 4.8 Vice Chairman, Executive Vice President, Senior Vice President, Vice President.** Each Vice Chairman, Executive Vice President, Senior Vice President or Vice President of the Company shall perform such duties as may from time to time be assigned by the Chief Executive Officer or the Board of Directors. The Chief Executive Officer or the Board of Directors may add words signifying the function or position to the title of any Vice Chairman, Executive Vice President, Senior Vice President or Vice President appointed by the Board. The persons holding the foregoing positions shall

- 10 -

each have the power to vote shares of stock registered in the name of the Company where such ownership interest constitutes less than 20% of the total voting interest of the corporation issuing the stock.

**Section 4.9 The Secretary.**  The Secretary shall record all of the proceedings of the meetings of the stockholders and directors in a book to be kept for that purpose, and shall perform like duties for the standing committees, when requested; shall have custody and care of the corporate seal, records, minutes and stock books of the Company; shall keep a suitable record of the addresses of stockholders and of directors, and shall, except as may be otherwise required by statute or these By-Laws, issue all notices required for meetings of stockholders and of the Board of Directors and committees thereof.  The Secretary shall have authority to cause the seal of the Company to be affixed to all papers requiring the seal, to attest the same, and to attest any instruments signed by an officer of the Company.  The Secretary shall perform such other duties as from time to time may be assigned by the Chairman, the President or the Board of Directors.

**Section 4.10 The Treasurer.**  The Treasurer shall have charge of the safekeeping of the Company's funds, and shall perform such other duties as may from time to time be assigned by the Chief Executive Officer or the Board of Directors.  The Treasurer may be required to give bond to the Company, at the Company's expense, for the faithful discharge of his or her duties in such form and in such amount and with such sureties as shall be determined by the Board of Directors.

**Section 4.11 The Controller.**  The Controller shall have charge of the general accounting department of the Company, and shall see that correct accounts of the Company's business are properly kept.  He or she shall perform such other duties as from time to time may be assigned by the Chief Executive Officer or the Board of Directors.  The Controller may be required to give bond to the Company, at the Company's expense, for the faithful discharge of his or her duties in such form and in such amount and with such sureties as shall be determined by the Board of Directors.

**Section 4.12 General Counsel**.  The General Counsel shall be the chief legal officer of the Company and shall be responsible for the management of the legal affairs of the Company.  The General Counsel shall perform such other duties as from time to time may be assigned by the Chief Executive Officer or the Board of Directors.

**Section 4.13 Deputy General Counsel, Assistant Controller, Assistant Secretary, Assistant Treasurer and Assistant Vice President.**  The Deputy General Counsel shall assist the General Counsel in such manner and perform such duties as may be designated from time to time by the General Counsel.  Each Assistant Vice President shall have such duties as may from time to time be assigned by the Vice President or Vice Presidents to whom he or she reports. Each Assistant Controller, Assistant Secretary and Assistant Treasurer shall assist the Controller, the Secretary or the Treasurer, as the case may be,

- 11 -

in the performance of the respective duties of such principal officers. Each Assistant Secretary shall have the authority to affix the corporate seal to any instrument requiring it, to attest the same, and to attest any instrument signed by an officer of the Company. The powers and duties of the Controller, the Secretary, the Treasurer and the General Counsel, respectively, shall in case of the absence, disability, death, resignation, or removal from office of such principal officer, and except as otherwise ordered by the Board of Directors, temporarily devolve upon the first appointed deputy or assistant who is able to serve. Deputy or assistant officers shall perform such other duties as may be assigned to them from time to time. The Chief Executive Officer or the Board of Directors may add words signifying function or position to the title of any deputy or assistant officer.

## ARTICLE V

### Capital Stock

**Section 5.1 Certificates for Shares.** Subject to the provisions of Section 5.2, every holder of fully paid stock in the Company shall be entitled to have a certificate or certificates signed in the name of the Company by the Chairman, the President or any Vice President and by the Secretary or an Assistant Secretary of the Company, representing and certifying the number of shares of the Company's capital stock owned by such holder. Any or all of the signatures on each certificate may be facsimile. In case any officer, transfer agent or registrar whose signature or facsimile signature appears on a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Company with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

**Section 5.2 Certificates for Fractional Shares.** The Board of Directors may provide that, with respect to classes or series of stock as to which the issuance and ownership of fractional shares are permitted in accordance with the Amended and Restated Certificate of Incorporation, the ownership of fractional interests shall be evidenced by scrip certificates in lieu of the certificates referred to in Section 5.1 of these By-Laws. Any or all of the signatures on each scrip certificate may be facsimile. The Board of Directors may specify from time to time, with respect to any series or class of stock, particular fractions in which ownership will be permitted and recognized and as to which certificates will be issued.

**Section 5.3 Registration and Transfer of Shares.** The Company will maintain or cause to be maintained a register for the registration of shares of its capital stock. Transfers of shares and exchanges of stock certificates shall be recorded on the books of the Company only at the request of the holder of record thereof or by his legal representative, who shall furnish proper evidence of authority to transfer, or by his

attorney thereunto authorized by power of attorney duly executed and filed with the Secretary of the Company, and only upon the surrender for cancellation of the certificate or certificates for such shares.

**Section 5.4 Only Holder of Record Entitled to Recognition.**  The Company shall be entitled to treat the holder of record of any share or shares as the owner thereof for all purposes and accordingly shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by law.

**Section 5.5 Fixing Record Date.**  For the purpose of determining stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a date as the record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which shall not be more than sixty nor less than ten days (or, in the case of a meeting to vote on a merger or consolidation, not more than sixty nor less than twenty days) before the date of such meeting, nor more than sixty days prior to any other action.  The record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be as provided by law.  The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.  When a determination of stockholders entitled to notice of or to vote at any meeting of stockholders has been made as provided in this Section, such determination shall apply to any adjournment thereof; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

**Section 5.6 Lost Certificates.**  If an outstanding certificate of stock shall be lost, destroyed or stolen, the holder thereof may have a new certificate issued to him or her upon producing evidence satisfactory to the Company of such loss, destruction, or theft, and also upon furnishing to the Company a bond of indemnity deemed sufficient by the Secretary to protect the Company and any registrar or transfer agent against claims under the certificate alleged to be lost, destroyed or stolen; provided, however, that upon good cause shown the Board of Directors may waive the furnishing of such bond of indemnity.

## ARTICLE VI

### Miscellaneous

- 13 -

**Section 6.1 Execution of Instruments.** Contracts and other written documents of the Company shall be executed as the Board of Directors may from time to time direct. In the absence of specific directions by the Board, the officers of the Company shall duly execute all necessary contracts and other written instruments properly coming within the scope of their respective powers and duties. When the execution of any contract or other written instrument of the Company has been authorized by the Board of Directors without specification of the executing officers, the Chairman, the President, any Vice Chairman or any Vice President may execute the same in the name and on behalf of the Company and the Secretary or any Assistant Secretary may attest the same and affix the corporate seal thereto.

**Section 6.2 Loans.** No loans (except loans for current expenses) shall be incurred on behalf of the Company and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Board of Directors or a duly authorized committee thereof. Such authority may be general or confined to specific instances. No loans shall be made by the Company to any director or officer except upon the affirmative vote of a majority of the disinterested directors.

**Section 6.3 Bank Deposits and Check Authorization.** The funds of the Company shall be deposited to its credit in such banks, trust companies or other financial institutions as may be determined from time to time by the Chairman or President and the Secretary of the Company, evidenced by joint written action. By such joint written action, filed with the minutes of the Board of Directors, the Chairman or President together with the Secretary may authorize (a) the opening of one or more deposit accounts at any such institution and (b) the designation of, or a change in the designation of, the officers or employees upon whose signature checks may be written or funds withdrawn on any Company account at any such institution, provided that the signature of one person other than the Chairman, President and Secretary shall be required therefor. By the adoption of this Section 6.3 of these By-Laws the Board of Directors adopts the form of any resolution or resolutions requested by or acceptable to any financial institution in connection with the foregoing actions, provided that the Secretary of the Company (x) believes that the adoption of such resolution or resolutions is necessary or advisable and (y) files such resolution or resolutions with the minutes of the Board of Directors.

**Section 6.4 Fiscal year.** The fiscal year of the Company shall begin on the first Monday after the last Sunday in December of each year and end on the last Sunday in the following December.

**Section 6.5 Seal.** The corporate seal shall be in the form of a circle and shall have inscribed thereon the name of the Company and the words "Corporate Seal, Delaware". The seal may be used by causing it or a facsimile thereof to be impressed, affixed, printed

- 14 -

or otherwise reproduced. The Board of Directors may give general authority to any officer to affix the seal of the Company and to attest the fixing by his or her signature.

**Section 6.6 Waiver of Notice.** Whenever any notice whatever is required to be given by statute, by the Amended and Restated Certificate of Incorporation of the Company, by these By-Laws or otherwise, in connection with any meeting of stockholders, directors or members of a committee of directors, a written waiver thereof, signed by the person entitled to such notice, whether before or after the event as to which such notice is required, shall be deemed equivalent to such required notice. In addition, attendance by a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of such meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any meeting of stockholders, directors or members of a committee of directors need be specified in any written waiver of notice.

## ARTICLE VII

### Amendments of By-Laws

**Section 7.1** Except as otherwise provided in Article VIII hereof, these By-Laws may be altered, amended or repealed and new by-laws may be made (a) by the stockholders as provided in the Amended and Restated Certificate of Incorporation or (b) by the affirmative vote of a majority of the whole Board of Directors at any regular or special meeting thereof.

## ARTICLE VIII
### CT Directors

**Section 8.1 Effectiveness and Interpretation**. This Article VIII shall be in effect from the Effective Time of the Merger, as such terms are defined in the Agreement and Plan of Merger, dated March 13, 2000, between the Company and The Times Mirror Company (the "Merger Agreement"), until the earlier of (a) the end of the term currently provided for in Chandler Trust I and Chandler Trust II (collectively, the "CTs") without giving effect to any extension thereof or any amendment of the CTs following the date of the Merger Agreement, and (b) the sale, distribution or other disposition by the CTs of more than 15% of the aggregate number of shares of common stock of the Company issued to the CTs in the Merger. Upon the earlier to occur of the events set forth in clauses (a) and (b) of the foregoing sentence (the "Article VIII Termination Date"), the terms and provisions of this Article VIII shall immediately and automatically terminate and no longer have any force or effect. Upon the termination of Article VIII pursuant to this Section 8.1, the provisions of these By-Laws, other than Article VIII, shall be the By-Laws of the Company until amended, modified or repealed in accordance with the terms hereof. In the event of any conflict between the provisions of this Article VIII and any other provisions of these By-Laws or, to the extent that any of the provisions of this Article VIII overlap with and/or are more specific or more restrictive than any other provisions contained in these By-Laws, the provisions of this Article VIII shall govern.

**Section 8.2 CT Nominating Committees**. There is hereby established a committee of the Board of Directors to be known as the CT Nominating Committee. The CT Nominating Committee shall be comprised exclusively of the CT Directors. "CT Directors" means (i) the three directors designated as such in Schedule 6.8 of the Merger Agreement and (ii) each other director nominated or appointed by the CT Nominating Committee in accordance with this Article VIII.

**Section 8.3 CT Nominating Procedures**.

**Section 8.3.1** Prior to each meeting of the stockholders of the Company at which directors are to be elected, in addition to any other persons nominated by the Board of Directors or another committee, the CT Nominating Committee shall nominate such number of persons, if any, as may be necessary to ensure that, assuming the election of such person or persons nominated by the CT Nominating Committee, there will be three CT Directors on the Board of Directors following such election. So long as the Board of Directors shall remain classified into three classes, one CT Director shall serve in each class. Neither the Board of Directors nor any other committee thereof shall nominate any person in opposition to the person or persons nominated by the CT Nominating Committee.

**Section 8.3.2**  At each meeting of the stockholders at which directors are to be elected, in addition to presenting nominees for other directorships, the officer of the Company presiding at such meeting shall present for election, on behalf of the CT Nominating Committee, any person or persons nominated by the CT Nominating Committee in accordance with paragraph 8.3.1 above, and such nomination shall be deemed for purposes of Section 3.2.2 hereof to be made at the direction of the Board of Directors.

**Section 8.4  CT Director Vacancies.**  If any CT Director is removed from the Board of Directors, resigns, retires, dies or otherwise cannot continue to serve as a member of the Board of Directors, then the remaining members of the CT Nominating Committee shall have the exclusive authority to appoint a person to fill such vacancy, and the person so appointed shall become a member of the CT Nominating Committee.

**Section 8.5  CT Director Service on Board Committees**.  Subject to the CT Director meeting applicable independence criteria for service on audit, nominating/corporate governance and compensation committees, at least one CT Director shall serve on each of the committees of the Board of Directors, unless otherwise agreed by the CT Nominating Committee.

**Section 8.6  Article VIII Amendment**.  No provision of this Article VIII (for so long as such Article VIII is in effect) may be altered, amended or repealed, nor may any provision inconsistent therewith be adopted, including by means of merger, consolidation, asset transfer or other transaction with any affiliated entity in which the Company is not the surviving or continuing entity, except by the affirmative vote of all of the holders of the outstanding stock of the Company entitled to vote or all of the members of the Board of Directors.

Exhibit C

**TRIBUNE COMPANY**
**BOARD OF DIRECTORS MEETING**
**APRIL 1, 2007**

The Tribune Company Board of Directors met at 10:20 p.m. Central time on Sunday, April 1, 2007, by conference telephone, pursuant to notice.  The following directors participated in the meeting: Jeffrey Chandler, Dennis J. FitzSimons, Roger Goodan, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, William Stinehart, Jr. and Miles D. White.  Dudley S. Taft was unable to participate in the meeting.

The following Company officers and advisors also participated in the meeting: Donald C. Grenesko, Crane H. Kenney, Thomas D. Leach, Tom Cole of Sidley Austin LLP, Steve Rosenblum of Wachtell Lipton Rosen & Katz, Charles Mulaney of Skadden, Arps, Slate, Meagher & Flom LLP, Michael Costa of Merrill Lynch, Christina Mohr of Citigroup, Paul Taubman and Tom Whayne of Morgan Stanley, William W. Merten of McDermott Will & Emery, Elyse Bluth of Duff & Phelps, LLC, Marilyn Marchetti of GreatBanc Trust Company and Charles R. Smith of K&L Gates.

Mr. FitzSimons acted as chairman of the meeting and Mr. Kenney acted as secretary.

Mr. FitzSimons called the meeting to order at 10:20 p.m. Central time.

**LEVERAGED ESOP TRANSACTION**

Mr. FitzSimons reported that the Compensation & Organization Committee and the Special Committee had just concluded separate telephonic meetings regarding the proposed leveraged ESOP transaction with Samuel Zell and the newly-created Tribune Employee Stock Ownership Plan (the "Proposed Transaction") and that the Special Committee was now in a position to recommend the Proposed Transaction to the full Board of Directors for approval.

Mr. Rosenblum then provided the Board with an overview of the Proposed Transaction structure and transaction documents, drafts of which were previously provided to the Directors for their review.  Mr. Rosenblum noted that the closing of the first-step tender offer is conditioned, among other things, on (i) receipt of the first-step financing on the terms set forth in the financing commitments issued by Merrill Lynch, Citigroup and JPMorgan and (ii) the receipt of an opinion from Valuation Research Corporation (or another nationally recognized firm acceptable to the Board) as to the solvency of the Company after giving effect to the tender offer.  He also noted that the merger closing is conditioned, among other things, on (i) receipt of the second-step financing on the terms set forth in the financing commitments issued by the same three banks, (ii) FCC approval, (iii) a majority of the shareholders voting in favor of the merger and (iv) the receipt of an opinion as to the solvency of the Company after giving effect to the merger.  Mr. Rosenblum said that, in addition to the solvency opinions contemplated, Delaware counsel would also opine with respect to certain Delaware law matters in connection with the tender offer and the merger.  Mr. Rosenblum then answered questions from the Board.

Mr. Costa then provided an updated financial overview of the Proposed Transaction, comparing it to the proposed leveraged recapitalization/Broadcasting & Entertainment spin-off transaction that the Board had previously reviewed. He also reviewed the letters submitted by another third-party group expressing that group's interest in participating in an ESOP buyout at a price of $34 per share, the same price as contemplated by the Proposed Transaction. Following discussion of these matters, Mr. Costa delivered Merrill Lynch's fairness opinion supporting the Proposed Transaction.

Mr. Whayne next discussed the comparative financial analysis of the Proposed Transaction and the proposed leveraged recapitalization/spin-off transaction, as well as the letters submitted by the third-party group, that his firm provided to the Special Committee. Mr. Whayne then advised the Board that Morgan Stanley had delivered a fairness opinion supporting the Proposed Transaction to the Special Committee and Mr. Whayne provided the same fairness opinion to the full Board.

Ms. Marchetti then reported on the ESOP Trustee's due diligence review and provided an overview of the ESOP-related components of the Proposed Transaction. Ms. Marchetti reported that (i) the ESOP Trustee had received an opinion from its financial advisor, Duff & Phelps, LLC, that the terms of the Proposed Transaction are fair and reasonable from a financial point of view, (ii) the Proposed Transaction had been approved by the ESOP Trustee's ESOP transaction review committee and (iii) the ESOP Trustee was prepared to proceed with document execution.

Following these presentations, Mr. Osborn, as Chair of the Special Committee, advised the Board that the Special Committee, following review with its independent legal and financial advisors, recommends the full Board approve the Proposed Transaction as presented at this meeting. Mr. Osborn and members of senior management then responded to questions from the Directors. During the course of this discussion, Mr. Stinehart advised the Board that he and Messrs. Chandler and Goodan would abstain from the Board vote on the Proposed Transaction, but that the Chandler Trusts would vote in favor of the merger at the special shareholders' meeting and would enter into a voting agreement with the Company evidencing this understanding.

Following discussion, Mr. Rosenblum reviewed the proposed resolutions that were before the Board. On motion duly made and seconded, the Board (with Messrs. Chandler, Goodan and Stinehart abstaining) then adopted the following recitals and resolutions:

**WHEREAS**, it is proposed that Tribune Company, a Delaware corporation (the "Company"), enter into certain agreements listed on Exhibit A hereto (collectively, as each may be amended, modified, waived or supplemented from time to time, the "Transaction Agreements"), which contemplate the entry into and the consummation of certain transactions and the rights and obligations of the Company with respect thereto (collectively, the "Transactions");

2

**WHEREAS**, it is deemed to be in the best interests of the Company to recognize and reward the contribution by the Company's employees to its successful operation, and to provide an incentive for such employees to increase their productivity, by enabling them to acquire stock ownership interests in the Company and to share in the profits of the Company through a plan that will qualify as an "employee stock ownership plan" within the meaning of the Internal Revenue Code of 1986, as amended, and the Employee Retirement Income Security Act of 1974, as amended, to be known as the Tribune Employee Stock Ownership Plan (the "ESOP");

**WHEREAS**, it is proposed that the Company enter into an Agreement and Plan of Merger (the "Merger Agreement"), by and among the Company, GreatBanc Trust Company, as trustee (in such capacity, the "ESOP Fiduciary") and on behalf of the ESOP, and Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and, for the limited purposes set forth therein, EGI-TRB L.L.C., a Delaware corporation ("Tower Acquisition");

**WHEREAS**, the Merger Agreement provides for, among other things, Merger Sub to be merged with and into the Company (the "Merger"), with the Company surviving the Merger (the "Surviving Corporation"), whereby, among other things and subject to the terms and on the conditions stated in the Merger Agreement, each issued and outstanding share of common stock of the Company, par value $0.01 per share ("Common Stock"), other than shares held by the ESOP or with respect to which dissenters' rights are validly exercised and not withdrawn, will be converted into the right to receive $34.00 in cash per share of Common Stock, subject to increase to the extent set forth in the Merger Agreement;

**WHEREAS**, it is proposed that the Company enter into a Securities Purchase Agreement, by and among the Company, Tower Acquisition, and Mr. Samuel Zell (the "Guarantor") (the "Securities Purchase Agreement"), which provides for, among other things, and subject to the terms and on the conditions stated in the Securities Purchase Agreement, (i) prior to the consummation of the Merger (the "First Closing"), (a) Tower Acquisition to acquire, and the Company to sell, 1,470,588 newly issued shares of Common Stock for $34.00 per share (the "Purchased Shares") for an aggregate purchase price of $50,000,000; and (b) an unsecured subordinated exchangeable note, issued by the Company to Tower Acquisition with an aggregate principal amount of $200,000,000, subject to certain terms and conditions stated therein (the "Exchangeable Note") for an aggregate purchase price of $200,000,000; and (ii) immediately following the consummation of the Merger (the "Second Closing"), in exchange for the consideration set forth therein, (a) an unsecured subordinated promissory note, made by the Company to Tower Acquisition with an aggregate principal amount of $225,000,000, subject to certain terms and conditions stated therein (the "Subordinated Promissory Note"); and (b) a warrant to purchase 43,478,261 shares of common stock of the Surviving Corporation (the "Warrant Agreement");

**WHEREAS**, it is proposed that the Company enter into an ESOP Purchase Agreement, by and among the Company and the ESOP (the "ESOP Purchase Agreement"), which provides for, among other things and subject to the terms and on the conditions stated in the ESOP Purchase Agreement, the ESOP to purchase, and the Company to sell, 8,928,571 newly issued shares of Common Stock (the "ESOP Shares") for an aggregate purchase price of $250,000,000;

3

**WHEREAS,** in connection with the ESOP Purchase Agreement, it is proposed that the Company enter into an ESOP Loan Agreement, by and between the Company and the ESOP (the "ESOP Loan Agreement"), which provides for, among other things, and subject to the terms and on the conditions stated in the ESOP Loan Agreement, including execution of a note (the "ESOP Note") and a pledge agreement (the "ESOP Pledge Agreement") in favor of the Company, the extension of credit by the Company to the ESOP Fiduciary to implement the terms of the ESOP Purchase Agreement and to enable the ESOP to purchase Common Stock pursuant thereto;

**WHEREAS,** in connection with the Merger Agreement, the Securities Purchase Agreement and the ESOP Purchase Agreement, it is proposed that the Company enter into an Investor Rights Agreement by and among the Company, Tower Acquisition and the ESOP (the "Investor Rights Agreement"), which provides for, among other things, the right of Tower Acquisition to designate individuals to the Board of Directors of the Company, as well as other matters in connection with the governance of the Company following the execution of said agreements and the consummation of the transactions contemplated thereby;

**WHEREAS,** in connection with the Merger Agreement, the Securities Purchase Agreement and the ESOP Purchase Agreement, it is proposed that the Company enter into a voting agreement with Chandler Trust No. 1 and Chandler Trust No. 2 (the "Voting Agreement"), whereby Chandler Trust No. 1 and Chandler Trust No. 2 each agrees to vote its respective shares of Common Stock in favor of the Merger, tender their respective shares into the Share Repurchase and take other actions designed to ensure approval of the Merger Agreement and the Merger;

**WHEREAS,** it is proposed that the Company enter into registration rights agreements with Tower Acquisition, the ESOP, Chandler Trust No. 1 and Chandler No. 2 (each agreement, a "Registration Rights Agreement"), whereby Tower Acquisition, the ESOP, Chandler Trust No. 1 and Chandler No. 2 are each provided with certain registration rights with respect to shares of Common Stock;

**WHEREAS,** it is proposed that, under the circumstances contemplated by the Merger Agreement, the Company enter into an Exchange Agreement with Eagle New Media Investments, LLC and Eagle Publishing Investments, LLC (collectively, the "Eagle Entities") (the "Exchange Agreement"), under which the Company will, immediately prior to the consummation of the Merger, issue shares of a new series of the Company's preferred stock, as contemplated by the Merger Agreement, to the Eagle Entities, in exchange for all of the shares of Common Stock and preferred stock currently held by the Eagle Entities;

**WHEREAS,** the Company and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent (the "Rights Agent"), have executed and entered into a Rights Agreement, dated as of December 12, 1997 (as amended, the "Rights Agreement");

4

**WHEREAS**, pursuant to Section 27 of the Rights Agreement, the Company and the Rights Agent may from time to time supplement or amend the Rights Agreement in accordance with the provisions thereof;

**WHEREAS**, it is proposed that the Board of Directors of the Company amend the Rights Agreement substantially in the form of Exhibit B hereto ("Amendment No. 3"), to clarify that the execution and performance of the Transaction Agreements do not result in any of the parties thereto being deemed to be an Acquiring Person (as defined in the Rights Agreement);

**WHEREAS**, it is proposed that the Company enter into a First Step Commitment Letter, by and among the Company, Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A. and/or Bank of America, N.A., Banc of America Bridge LLC and Banc of America Securities LLC (collectively, the "First Step Credit Facilities Agents") (including the Summary of Terms and Conditions appended thereto, the Fee Letter issued in connection therewith and the Engagement Letter issued in connection therewith, collectively, the "First Step Commitment"), which provides for, among other things, and subject to the terms and on the conditions stated in the First Step Commitment, the First Step Credit Facilities Agents to provide senior secured credit facilities for the Company in an aggregate principal amount of approximately $8.028 billion, consisting of a $7.015 billion seven-year term loan, a $263 million seven-year term loan and a $750 million six-year revolving line of credit (collectively, the "First Step Credit Facility"), for the uses and purposes described in the First Step Commitment;

**WHEREAS**, it is proposed that the Company enter into a Second Step Commitment Letter, by and among the Company, Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A. and/or Bank of America, N.A., Banc of America Bridge LLC and Banc of America Securities LLC (collectively, the "Second Step Credit Facilities Agents" and, together with the First Step Credit Facilities Agents, the "Credit Facilities Agents") (including the Summary of Terms and Conditions appended thereto, the Fee Letter issued in connection therewith and the Engagement Letter issued in connection therewith, collectively, the "Second Step Commitment" and, together with the First Step Commitment, the "Commitments"), which provides for, among other things, and subject to the terms and on the conditions stated in the Second Step Commitment, the Second Step Credit Facilities Agents to (i) provide an incremental term loan facility for the Company in an aggregate principal amount of approximately $2.105 billion (the "Incremental Facility" and, together with the First Step Credit Facility, the "Secured Facilities") and (ii) either provide a senior unsecured bridge facility for the Company or provide assistance in connection with the issuance of senior notes and/or senior unsecured notes by the Company, in either case in an aggregate principal amount of approximately $2.1 billion (together, the "Unsecured Facility" and the Unsecured Facility together with the Incremental Facility, the "Second Step Credit Facility" and the Second Step Credit Facility together with the First Step Credit Facility, the "Credit Facilities"), each for the uses and purposes described in the Second Step Commitment;

**WHEREAS**, in connection with the Company's entry into the Credit Facilities and the issuance of the Securities (as defined under the heading "Capital Market Debt Issuances" below), it is proposed that the Company enter into interest rate management transactions constituting a rate swap, basis swap, forward rate transaction, interest rate option, cap transaction, floor transaction, collar transaction, forward transaction or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, linked to one or more interest rates with respect to notional amounts of indebtedness under the Credit Facilities and under the Securities determined from time to time by the officer or officers hereafter authorized to be necessary in connection with the Company's financial operations or performance (the "Interest Rate Hedging Transactions");

**WHEREAS**, it is proposed that as promptly as practicable following the execution of the Merger Agreement, the Company commence a self-tender offer to repurchase shares of Common Stock at $34.00 per share, net to the seller in cash (the "Share Repurchase");

**WHEREAS**, a Special Committee of the Board of Directors (the "Special Committee") has been formed consisting of members of the Board of Directors of the Company (the "Board") other than members of the Company's management and representatives of Chandler Trust No. 1 and Chandler Trust No. 2;

**WHEREAS**, the Special Committee has reviewed the terms of the Transaction Agreements and the Transactions with management and its outside legal and financial advisors, and has recommended that the Board approve the Transaction Agreements and the Transactions;

**WHEREAS**, at this meeting, the Board has received the opinion of its financial advisor, Merrill Lynch & Co., Inc., and the Special Committee's financial advisor, Morgan Stanley & Co. Incorporated, with respect to the Transactions, to the effect that the Transactions are fair, from a financial point of view, to the stockholders of the Company (who are not parties to the Transaction Agreements);

**WHEREAS**, at this meeting, the Board has reviewed the terms of the Transaction Agreements and the Transactions, and on the recommendation of the Special Committee and based on the presentations of the Company's outside legal and financial advisors at this and other meetings, and on such other factors as the Board deemed pertinent, determined that entry into the Transaction Agreements and the consummation of the Transactions is advisable, fair to and in the best interests of the Company and its stockholders; and

**WHEREAS**, the Board has determined to approve the Transaction Agreements and to authorize the proper officers of the Company to take all actions necessary and proper for the execution of the Transaction Agreements and the consummation of the Transactions.

**NOW, THEREFORE, BE IT:**

### Establishment of ESOP and Appointment of Trustee

**RESOLVED,** that the Board hereby establishes a plan designed to invest primarily in stock of the Corporation, which will qualify as an "employee stock ownership plan" within the meaning of Section 4975(e)(7) of the Internal Revenue Code of 1986, as amended and Section 407(d)(6) of the Employee Retirement Income Security Act of 1974, as amended;

**FURTHER RESOLVED,** that the form of employee stock ownership plan that has been presented to the Board, to be known as the "Tribune Employee Stock Ownership Plan," be and hereby is approved and adopted, effective as of January 1, 2007;

**FURTHER RESOLVED,** that the form of employee stock ownership trust that has been presented to the Board, to be known as the "Tribune Employee Stock Ownership Trust," be and hereby is approved and adopted, effective as of February 7, 2007;

**FURTHER RESOLVED,** that the appointment of GreatBanc Trust Company to serve as trustee of the Tribune Employee Stock Ownership Trust is hereby ratified;

**FURTHER RESOLVED,** that the Tribune Company Employee Benefits Committee is hereby appointed to serve as the Administrator under Section 1.4 of the Tribune Employee Stock Ownership Plan and under Section 2.2 of the Tribune Employee Stock Ownership Trust;

**FURTHER RESOLVED,** that the proper officers of the Corporation are authorized and directed to execute the agreement memorializing the Tribune Employee Stock Ownership Trust on behalf of the Company, to obtain an execution of such agreement by the ESOP Fiduciary and to execute a certification with respect to the adoption of the ESOP; and

**FURTHER RESOLVED,** that the proper officers of the Company are authorized and directed to work with counsel to submit to the Internal Revenue Service copies of the Plan and other documents ancillary thereto, with a request that the Internal Revenue Service issue a determination letter that the Plan is qualified under Code Section 401(a) and that it constitutes an employee stock ownership plan within the meaning of Code 4975(e)(7).

### Approval of the Transaction Agreements and the Transactions

**FURTHER RESOLVED,** that having reviewed the terms of the Transaction Agreements and the Transactions, and on the recommendation of the Special Committee and based on the presentations of the Company's outside legal and financial advisors at this and other meetings, and on such other factors as the Board deemed pertinent, the Board determines that entry into the Transaction Agreements and the consummation of the Transactions is advisable, fair to and in the best interests of the Company and its stockholders;

7

**FURTHER RESOLVED**, that the Board hereby approves the form of temporary certificate representing the ESOP Shares to be executed by the President of the Company and attested to by the Secretary or any Assistant Secretary of the Company;

**FURTHER RESOLVED**, that the Board hereby approves the issuance of the Purchased Shares to Tower Acquisition pursuant to the terms of the Securities Purchase Agreement, the issuance of shares of Common Stock to Tower Acquisition pursuant to the terms of the Exchangeable Note (the "Exchange Shares"), and the issuance of the ESOP Shares to the ESOP pursuant to the terms of the ESOP Purchase Agreement, and such shares will be validly issued, fully paid and nonassessable, when the certificates representing the Purchased Shares, Exchange Shares and ESOP Shares, respectively, have been duly executed, countersigned and registered and duly delivered to Tower Acquisition or the ESOP, as applicable, against payment of the agreed consideration therefor in accordance with the Securities Purchase Agreement, the Exchangeable Note and the ESOP Purchase Agreement, respectively;

**FURTHER RESOLVED**, that the Board hereby approves the execution and performance of the Transaction Agreements and the consummation of the Transactions, and intends that the foregoing approval and adoption render inapplicable to the execution of the Transaction Agreements and the Transactions contemplated thereby, including the Merger, all "fair price," "merger moratorium," "control share acquisition," or other antitakeover or similar statutes or regulations, including, without limitation, Section 203 of the Delaware General Corporation Law, that apply or purport to apply to such agreements or transactions, and hereby takes all action necessary to exempt such agreements and transactions therefrom;

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized for and on behalf of the Company to execute and deliver each of the Transaction Agreements in substantially the form presented to the Board at this meeting, with such changes as such officer executing the same may approve, the execution and delivery of each of the Transaction Agreements by such officer to be deemed conclusive evidence that the Board and the Company have approved and adopted, and do approve and adopt, each of the Transaction Agreements as executed; and

**FURTHER RESOLVED**, that the proper officers of the Company be, and each hereby is, authorized to file, execute, verify, acknowledge and deliver, for and on behalf of the Company, any and all notices, certificates, agreements, amendments, instruments and other documents and to perform or do or cause to be performed or done any and all such acts or things and to pay or cause to be paid all necessary fees and expenses, in each case in the name and on behalf of the Company, as they or any of them may deem necessary or advisable to enable, effectuate or carry out the provisions of each of the Transaction Agreements or the intentions and purposes of the foregoing resolutions in connection with the Transactions, the taking of any such action to be deemed conclusive evidence that the Board and the Company have authorized such action.

### Credit Facilities and Related Matters

**FURTHER RESOLVED,** that the proper officers of the Company be, and each of them hereby is, authorized for and on behalf of the Company to (i) execute for, in the name of and on behalf of the Company, and deliver to the Credit Facilities Agents, individually and/or as agents for themselves and the other lenders that may participate in the Credit Facilities, any and all instruments, documents and agreements deemed necessary or desirable by the Credit Facilities Agents in order to evidence the Credit Facilities properly in accordance with the requirements of the Commitments and the Credit Facilities contemplated thereby and any other requirements established by the Credit Facilities Agents or any of the other lenders, including without limitation promissory notes, loan or credit agreements, joinder agreements, indemnity agreements, pledge agreements, security agreements, guarantees, certificates, affidavits, applications, notices, financing statements or any other agreements or instruments evidencing the indebtedness of the Company for the monies so borrowed, with interest thereon, including renewals, extensions and/or amendments of said promissory notes, loan or credit agreements, joinder agreements, indemnity agreements, pledge agreements, security agreements, guarantees, certificates, affidavits, applications, notices, financing statements or any other agreements or instruments (individually and collectively, the "Credit Facilities Documents"), all in the form required by the Credit Facilities Agents and approved by the proper officers of the Company executing same, the execution of same by such officers to constitute conclusive evidence of the approval of same, (ii) enter into the Interest Rate Hedging Transactions on terms as, in the judgment of the officer or officers hereafter authorized, the Company may from time to time hereafter require, (iii) take from time to time any actions deemed necessary or desirable by the proper officers of the Company to establish the Credit Facilities and to evidence the Credit Facilities properly in accordance with the requirements of the Commitments and the Credit Facilities Documents contemplated thereby and any other requirements established by the Credit Facilities Agents and/or any of the other lenders, and to cause the Company to enter into and perform all of its obligations pursuant to the Credit Facilities Documents or otherwise in connection with the Credit Facilities and (iv) execute from time to time renewals, extensions and/or amendments of the Credit Facilities Documents;

**FURTHER RESOLVED,** that the proper officers, be and they are each hereby authorized, directed and empowered, in the name of the Company, to execute and deliver for the benefit of each counterparty to the Interest Rate Hedging Transactions ISDA master agreements, confirmations, schedules, joinder agreements, pledge agreements, security agreements, financing statements or other agreements or instruments evidencing the obligations of the Company under such Interest Rate Hedging Transactions, and each of said Authorized Officers are authorized to from time to time execute renewals, extensions and/or amendments of said ISDA master agreements, confirmations, schedules, joinder agreements, pledge agreements, security agreements, financing statements or other agreements or instruments;

**FURTHER RESOLVED,** that the proper officers of the Company be, and each of them hereby is, authorized for and on behalf of the Company to, as security for the indebtedness and other obligations of the Company to the Credit Facilities Agents, individually and/or as agents for

themselves, the other lenders that may participate in the Secured Facilities and each party that may act as a counterparty to an Interest Rate Hedging Transaction, whether arising pursuant to this resolution or otherwise, if required by the Commitments, grant, transfer, pledge, mortgage, assign, or otherwise hypothecate to the Credit Facilities Agents, individually and/or as agents for themselves, the other lenders that may participate in the Secured Facilities and each party that may act as a counterparty to an Interest Rate Hedging Transaction, or deed in trust for its and/or their benefit, any assets belonging to the Company, including without limitation the capital stock of each of the direct and indirect subsidiaries of the Company, to secure all indebtedness under the Secured Facilities at any time owing to the Credit Facilities Agents, individually and/or as agents for themselves and the other lenders that may participate in the Secured Facilities and, if required by the Commitments, to execute and deliver to the Credit Facilities Agents, individually and/or as agents for themselves, the other lenders that may participate in the Secured Facilities and each party that may act as a counterparty to an Interest Rate Hedging Transaction, any and all grants, transfers, pledge agreements, mortgages, deeds of trust, financing statements, security agreements and other hypothecation agreements; said instruments, and the promissory notes and other instruments and agreements referred to in the preceding paragraph, may contain such provisions, covenants, recitals and agreements as the Credit Facilities Agents, individually and/or as agents for themselves, the other lenders that may participate in the Secured Facilities and each party that may act as a counterparty to an Interest Rate Hedging Transaction, may require and any of said officers may approve, and the execution thereof by said officers shall be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized for and on behalf of the Company to, as security for the indebtedness and other obligations of the Company to one or more trustees on behalf of the noteholders holding certain of the Company's outstanding senior notes (the "Existing Notes"), if required by the indentures pursuant to which such Existing Notes were issued, grant, transfer, pledge, mortgage, assign, or otherwise hypothecate to such trustee(s) for the benefit of such noteholders, or deed in trust for its and/or their benefit, any assets belonging to the Company as are pledged to Credit Facilities Agents, individually and/or as agents for themselves and the other lenders that may participate in the Secured Facilities, pursuant to the Secured Facilities, to secure, on an equal and ratable basis, all indebtedness at any time owing to such noteholders under such indentures and, if required by such indentures, to execute and deliver to such trustees on behalf of such holders of Existing Notes, any and all grants, transfers, pledge agreements, mortgages, deeds of trust, financing statements, security agreements and other hypothecation agreements; said instruments, and the promissory notes and other instruments and agreements referred to in the preceding paragraph, may contain such provisions, covenants, recitals and agreements as are contained in the grants, transfers, pledge agreements, mortgages, deeds of trust, financing statements, security agreements and other hypothecation agreements executed and delivered pursuant to the Secured Facilities and any of said officers may approve, and the execution thereof by said officers shall be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the performance by the Company of its obligations under the Commitments, the Credit Facilities and the Interest Rate Hedging Transactions and any

agreements or documents referred to herein or therein be, and it hereby is, ratified, confirmed, approved and adopted in all respects;

**FURTHER RESOLVED**, that the proper officers of the Company be, and each hereby is, authorized to file, execute, verify, acknowledge and deliver, for and on behalf of the Company, any and all notices, certificates, agreements, amendments, instruments and other documents and to perform or do or cause to be performed or done any and all such acts or things and to pay or cause to be paid all necessary fees and expenses, in each case in the name and on behalf of the Company, as they or any of them may deem necessary or advisable to enable, effectuate or carry out the provisions of each of the Commitments or the intentions and purposes of the foregoing resolutions in connection with the Credit Facilities and the Interest Rate Hedging Transactions, the taking of any such action to be deemed conclusive evidence that the Board and the Company have authorized such action; and

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized for and on behalf of the Company to designate such individual employee(s) of the Company as they deem appropriate to execute and deliver on behalf of the Company certificates, reports and other documents as may be required from time to time in conjunction with the Commitments and the Credit Facilities and the Interest Rate Hedging Transactions, and the actions of such individual(s) shall be binding and enforceable against the Company.

<u>**Capital Markets Debt Issuances**</u>

**FURTHER RESOLVED**, that the Board of Directors hereby authorizes and approves the issuance and sale by the Company from time to time, in one or more public or Rule 144A or other privately negotiated offerings, of up to $2.1 billion (in aggregate principal amount, or, if issued at an original issue discount, in aggregate offering price or purchase price, in U.S. dollars or the equivalent in foreign denominated currency or composite currency) (the "<u>Authorized Amount</u>") of unsecured notes, debentures or other debt securities (which may be senior, subordinated, senior subordinated, junior subordinated or any combination of the foregoing) ("<u>Debt Securities</u>") and/or warrants to purchase Debt Securities ("<u>Warrants</u>"). Such Debt Securities and Warrants are collectively referred to herein as the "<u>Securities</u>." The Securities shall be created, issued and sold, subject to the limitations set forth in this resolution, on such terms and conditions as shall be determined by the Special Committee of members of this Board established in the resolution immediately following this resolution;

**FURTHER RESOLVED**, that the officers of the Company are severally authorized and directed to prepare and execute, in the name and on behalf of the Company, a Registration Statement on Form S-3, or other appropriate form under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), for the registration of the Securities up to the Authorized Amount (the "<u>Registration Statement</u>") and the qualification under the Trust Indenture Act of 1939, as amended, of an indenture providing for the issuance of the Debt Securities. Upon execution of the Registration Statement by a majority of the directors of the Company, the officers of the Company are directed to cause the Registration Statement to be filed with the Securities and

Exchange Commission (the "SEC") (which registration may, but shall not be required to, be made pursuant to Rule 415 of the Securities Act), and to execute and file, in the name and on behalf of the Company, all such other certificates, instruments and documents, to make all such payments and do all such other acts and things, including the execution and filing of amendments or post-effective amendments (including any registration statements or other filings under Rule 462 of the Securities Act) to the Registration Statement and amendments or supplements to any prospectus constituting a part thereof, as they may deem necessary or desirable;

**FURTHER RESOLVED**, that each officer and director of the Company who may be required to execute the Registration Statement or any amendment thereto or document in connection therewith (whether for and on behalf of the Company or otherwise) is authorized and empowered to execute a power of attorney appointing Chandler Bigelow, Donald C. Grenesko and Crane H. Kenney, or any of them, his or her true and lawful attorney-in-fact and agent to sign in his or her name, place and stead, in any such capacity, any and all amendments (including post-effective amendments) to the Registration Statement and any and all other documents in connection therewith, and to file the same with the SEC, said attorney-in-fact to have the power and authority to do and perform, in the name and on behalf of such officers and directors who shall have executed such a power of attorney, every act whatsoever that such attorney may deem necessary, appropriate or advisable to be done in connection therewith as fully as such officers and directors might or could do in person;

**FURTHER RESOLVED**, that the senior Vice President, General Counsel and Secretary of the Company, or his appointed designee, is designated as the agent for service who shall be duly authorized to receive communications and notices from the SEC with respect to the Registration Statement and with the powers conferred upon him as agent therefore by the Securities Act and the rules and regulations of the SEC thereunder;

**FURTHER RESOLVED**, there is hereby established a Special Pricing Committee of directors, consisting of Messrs. FitzSimons, Hernandez, Morrison, Osborn and Stinehart, to provide for the issuance of the Securities from time to time. The Special Pricing Committee is hereby expressly authorized (with the full power of delegation to one or more officers of the Company), with the full power of this Board to the extent provided by law, to consider all matters and to take and authorize to be taken any and all action which might otherwise be taken or authorized by this Board in connection with the offering, sale, issuance and registration of the Securities, including, without limitation, to authorize one or more issues of such Securities and in connection with any such issue to determine, approve or appoint (as applicable): (a) the type, title, designation and form of the Securities, provided that no Securities shall be secured by or convertible into any equity securities of the Company; (b) the aggregate principal amount and denominations; (c) the maturity or maturities, including the terms of any extension thereof; (d) the mode of sale and distribution and, as applicable, the particular underwriters, managing underwriters, agents, dealers and purchasers; (e) the form of any indenture, warrant agreement or underwriting, agency, sales, dealer and/or purchase agreement; (f) the price to be received by the Company for the Securities (which may reflect an original issue discount), and any public offering price or privately negotiated sale price, discount or commission paid or allowed in

connection therewith; (g) the interest rate or rates, if any, or the formula by which such rate or rates may be established and the dates from which such interest shall accrue; (h) any sinking fund or similar redemption requirement and related redemption prices; (i) optional redemption rights, if any, of the Company or the holders of Securities, and related redemption prices and/or limitations; (j) exchange rights, if any, of the Company or holders of Securities and/or limitations; (k) the ranking of such Securities (senior or subordinated) and, if applicable, the subordination provisions of any subordinated Debt Securities; (l) defeasance provisions, if any; (m) the applicable currency or composite currency, and related payment terms; (n) in the case of Warrants, the designation and amount of Debt Securities for which they are exercisable, and the dates, price and other terms of such exercise; (o) additional affirmative or restrictive covenants, if any, to be imposed on the Company with respect to any Securities; (p) any trustees, warrant agents, authentication, calculation, transfer or paying agents and registrars and such other agents as the Special Committee shall deem appropriate (q) any events of default; and (r) such other terms, conditions and provisions, not inconsistent herewith, as the Special Pricing Committee shall deem appropriate;

**FURTHER RESOLVED,** that the proper officers, be and they are each hereby authorized, directed and empowered, in the name of the Company, to execute and deliver for the benefit of each counterparty to the Interest Rate Hedging Transactions ISDA master agreements, confirmations, schedules, joinder agreements, pledge agreements, security agreements, financing statements or other agreements or instruments evidencing the obligations of the Company under such Interest Rate Hedging Transactions, and each of said Authorized Officers are authorized to from time to time execute renewals, extensions and/or amendments of said ISDA master agreements, confirmations, schedules, joinder agreements, pledge agreements, security agreements, financing statements or other agreements or instruments;

**FURTHER RESOLVED,** that the proper officers are severally authorized to execute, attest and deliver, in the name and on behalf of the Company, an appropriate indenture or indentures and an appropriate warrant agreement or warrant agreements in substantially the forms as approved by the Special Pricing Committee, including indentures and warrant agreements supplemental thereto in forms as approved by the Special Pricing Committee with such changes as the executing officers may approve, such approval to be conclusively evidenced by such execution, and such officers are severally authorized to perform any and all acts that they may deem necessary or advisable to make any indenture or warrant agreement the valid and effective act and agreement of the Company, including, without limitation, any and all acts necessary or appropriate to qualify any indenture under the Trust Indenture Act of 1939, as amended;

**FURTHER RESOLVED,** that the proper officers are severally authorized to execute, in the name and on behalf of the Company, appropriate underwriting agreements, agency agreements, sales agreements, dealer agreements and/or purchase agreements (collectively, the "Sales Agreements"), substantially in the form as approved by the Special Pricing Committee, with such changes as the executing officers may approve, such approval to be conclusively evidenced by such execution, and such officers are severally authorized to perform any and all acts that they

may deem necessary or advisable to make any Sales Agreement the valid and effective act and agreement of the Company;

**FURTHER RESOLVED**, that the proper officers are severally authorized to execute the Securities (including any Securities issued in global form), under the corporate seal of the Company attested by its Secretary or Assistant Secretary, and to cause the Securities to be delivered to the trustee or warrant agent therefor, together with an executed authentication and delivery request from the Company, for authentication and delivery by such trustee or warrant agent in accordance with such request. The signatures of the proper officers and the Company seal appearing on the definitive Debt Securities and Warrant Certificates may be engraved, lithographed or facsimiles, and the Company adopts for such purpose the facsimile seal of the Company and the facsimile signatures of Dennis J. FitzSimons, Donald C. Grenesko, Chandler Bigelow and Crane H. Kenny, as Chairman, President and Chief Executive Officer, Senior Vice President/Finance and Administration, Vice President and Treasurer and Senior Vice President, General Counsel and Secretary, respectively, whether or not any of such persons actually holds such office at the time Securities are executed, authenticated or delivered;

**FURTHER RESOLVED**, that the proper officers of the Company are severally authorized to provide for the filing of a registration statement on Form 8-A under the Securities Exchange Act of 1934, as amended, to be filed with the SEC in connection with the listing of one or more issues of Securities on the New York Stock Exchange, to file an application, and amendments thereto as necessary, with the New York Stock Exchange for the listing of such Securities on such Exchange upon official notice of issuance, to execute and deliver, in the name and on behalf of the Company, such other documents and agreements (including, without limitation, indemnity agreements in form acceptable to such Exchange for the purpose of such listings),to appear before the staff of such Exchange with authority to make such changes in any such application, or to make or amend such documents and agreements relative thereto, as may be necessary to conform with the listing requirements of such Exchange and to take such other action as such officers may deem necessary or advisable to list the Securities on such Exchange; and

**FURTHER RESOLVED**, that the proper officers are severally authorized to determine the states and such other jurisdictions (including, without limitation, foreign jurisdictions) in which appropriate action shall be taken to qualify or register for sale (or exempt therefrom) all or such part of the Securities as the proper officers may deem advisable. The proper officers are severally authorized to perform on behalf of the Company any and all such acts as they may deem necessary or advisable in order to comply with the applicable laws of any such states or other jurisdictions, and in connection therewith to execute and file all requisite papers and documents (including, without limitation, applications, reports, surety bonds, irrevocable consents and appointments of attorneys for service of process); and the execution by such officers of any such paper or document or the doing by them of any act in connection with the foregoing matters shall conclusively establish their authority therefor from the Company and the approval and ratification by the Company of the papers and documents so executed and the action so taken, and any resolution of this Board that is required or appropriate in connection

therewith shall be deemed to have been adopted by this resolution and may be so certified by the Secretary or Assistant Secretary of the Company.

### Appointment of Director

**FURTHER RESOLVED,** that concurrently with the occurrence of the First Closing of the Securities Purchase Agreement, or at such later time as may be mutually agreed, Mr. Samuel Zell be appointed as a director of the Company, to serve for a term expiring at the third annual election following consummation of the Merger or upon his earlier death, removal or resignation.

### Vote of Stockholders

**FURTHER RESOLVED,** that the Board directs that the Merger Agreement be submitted to a vote of the stockholders entitled to vote thereon at a special or annual meeting of such stockholders (the "Stockholder Meeting"), along with the Board's recommendation (unless, subject to and in accordance with the terms of the Merger Agreement, such recommendation is withdrawn or modified prior to such submission) that such stockholders adopt the Merger Agreement and that the proper officers of the Company be, and each of them hereby is, authorized and directed, in the name and on behalf of the Company, to communicate such recommendation to, and to solicit proxies on behalf of the Board from, such stockholders entitled to vote at the Stockholder Meeting in favor of such adoption;

**FURTHER RESOLVED,** that the secretary of the Company be, and hereby is, authorized and directed, subject to the terms of the Merger Agreement, to fix hereafter the date, time and place of the Stockholder Meeting, and the record date for determining the stockholders entitled to notice of and to vote at the Stockholder Meeting (the "Record Date"); and

**FURTHER RESOLVED,** that the proper officers of the Company be, and each of them hereby is, authorized and directed, in the name and on behalf of the Company, to mail to the stockholders of record as of the close of business on the Record Date, a notice of the Stockholder Meeting, accompanied by a Proxy Statement (as defined below).

### Self Tender Offer

**FURTHER RESOLVED,** that as promptly as practicable following the execution of the Merger Agreement, the Company shall commence the Share Repurchase, by causing to be commenced a self-tender offer to repurchase up to 126 million shares of Common Stock at $34.00 per share, net to the seller in cash; and

**FURTHER RESOLVED,** that the Board of Directors hereby determines to recommend that the Company's stockholders tender their shares in the tender offer.

## Regulatory Matters

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized and directed, pursuant to the terms of the Transaction Agreements, in the name and on behalf of the Company, promptly to prepare, sign and file, or cause to be filed, with any applicable federal, state, local or foreign country regulatory or supervisory body or stock markets and self-regulatory organizations including, without limitation, the Antitrust Division of the United States Department of Justice (the "DOJ"), the Federal Trade Commission (the "FTC"), the SEC and the Federal Communications Commission (the "FCC") (collectively, "Governmental Entities") all applications, requests for approval, consents, interpretations, or other determinations, notices and other information and documents, and any modifications or supplements thereto, as may be necessary or advisable in connection with the Transaction Agreements and the Transactions, including the Merger, together with all agreements and other information and documents required or appropriate, and any publications required, in connection therewith; and

**FURTHER RESOLVED**, that, subject to the terms and on the conditions stated in the Merger Agreement, the proper officers of the Company be, and each of them hereby is, authorized and directed, pursuant to the terms of the Merger Agreement, to use reasonable best efforts to cooperate with the other parties thereto in (i) determining whether any filings are required to be made with, or consents, permits, authorizations, waivers or approvals are required to be obtained from, any third parties or Governmental Entities in connection with the execution and delivery of the Merger Agreement and the consummation of the transactions contemplated thereby, (ii) timely making all such filings and timely seeking all such consents, permits, authorizations or approvals, and (iii) using reasonable best efforts to take, or cause to be taken, all other actions and doing, or causing to be done, all other things necessary, proper or advisable to consummate and make effective the transactions contemplated by the Merger Agreement, including taking all such further action as reasonably may be necessary to resolve such objections, if any, as the FCC, the FTC, the DOJ, state antitrust enforcement authorities or competition authorities of any other nation or other jurisdiction or any other person may assert under regulatory law with respect to the transactions contemplated by the Merger Agreement, and to avoid or eliminate each and every impediment under any law that may be asserted by any Governmental Entity with respect to the Merger so as to enable the consummation of the Merger to occur as soon as reasonably possible.

## Securities Law Filings

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized and directed, in the name and on behalf of the Company, with the assistance of counsel, to prepare, sign and file, or cause to be filed, with the SEC any and all statements, reports or other information concerning the Transactions that may be deemed advisable or may be required under the Securities Act of 1933 or the Exchange Act of 1934, each as amended, and the rules and regulations of the SEC promulgated thereunder, including without limitation (i) a proxy statement for delivery to the stockholders of the Company (as it may be amended or supplemented, the "Proxy Statement"), together with any other documents required or

appropriate in connection therewith; (ii) a tender offer statement on Schedule TO (as it may be amended or supplemented, the "Schedule TO"); (iii) a transaction statement on Schedule 13E-3 in connection with each of the Proxy Statement and the Schedule TO; and (iv) all other reports, statements, documents and information required to be filed with the SEC by the Company in connection with the Transaction Agreements and the Transactions.

## Section 16(b) Exemption

**FURTHER RESOLVED**, that the Board determines to, and hereby does, for purposes of exempting each sale or exchange of Common Stock owned by the individuals named in Exhibit C hereto that occurs pursuant to the terms of the Merger Agreement or in connection with the Share Repurchase, and each (i) exchange of options to purchase Common Stock, (ii) sale or exchange of restricted stock and restricted stock units and (iii) sale or exchange of other equity and equity-based awards, in each case by the individuals listed on such exhibit that occurs pursuant to the terms of the Merger Agreement or in connection with the Share Repurchase, approve each such sale, exchange or disposition as an exempt disposition under Rule 16b-3 promulgated under the Securities Exchange Act of 1934.

## Equity Compensation Matters

**FURTHER RESOLVED**, that, in the event that the Company divests a business unit during the period beginning on the date on which the Company announces a transaction that would constitute a Change in Control (within the meaning of the Company's Incentive Compensation Plan) and the date on which such Change in Control is consummated, the Company shall cause any Company restricted stock units and stock options held by any employee of such divested business unit to be fully vested;

**FURTHER RESOLVED**, that, in the event that the Company eliminates an employee's position during the period beginning on the date on which the Company announces a transaction that would constitute a Change in Control (within the meaning of the Company's Incentive Compensation Plan) and the date on which such Change in Control is consummated, the Company shall cause any Company restricted stock units and stock options held by such employee to be fully vested effective as of the consummation of such Change in Control;

**FURTHER RESOLVED**, that, in the event of a Change in Control (within the meaning of the Company's Incentive Compensation Plan), each participant in the Tribune Company 401(k) Savings and Profit Sharing Plan whose employment with the Company is terminated by the Company other than for cause or is constructively terminated within one year following such Change in Control shall be fully vested in all employer contributions held on such participant's behalf under such plan; and

**FURTHER RESOLVED**, that the Tribune Company Employee Stock Purchase Plan shall be terminated as soon as reasonably practicable and, the Tribune Company Employee Benefits Committee or the proper officers of the Company be, and each of them hereby is, authorized and

17

directed, in the name of and on behalf of the Company, to take or cause to be taken any and all action, and to execute and deliver or cause to be executed and delivered any and all agreements, amendments, certificates, reports, applications, notices, letters or other documents as, in the opinion of such committee or any such officer, may be necessary, appropriate or desirable to terminate the Tribune Company Employee Stock Purchase Plan as soon as reasonably practicable.

### Miscellaneous

**FURTHER RESOLVED**, that the Board hereby adopts, as if expressly set forth herein, the form of any resolution required by any governmental authority to be filed in connection with any applications, consents to service, issuer's covenants or other documents, applications, reports or filings relating to the foregoing resolutions if (i) in the opinion of the officer of the Company executing the same, the adoption of such resolutions is necessary or desirable and (ii) the Secretary or an Assistant Secretary of the Company evidences such adoption by inserting in the minutes of this meeting copies of such resolutions, which will thereupon be deemed to be adopted by the Board with the same force and effect as if presented at this meeting;

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized and directed, in the name of and on behalf of the Company, to take or cause to be taken any and all action which they may deem necessary or appropriate to communicate the position of the Board, as set forth in these resolutions, to the Company's stockholders, including, without limitation, the dissemination of such position by means of press releases, letters to stockholders of the Company and filings with the SEC, the taking of any such action conclusively to evidence the due authorization and approval thereof by the Board;

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized, empowered and directed, in the name of and on behalf of the Company, to execute and deliver or cause to be executed and delivered any and all agreements, amendments, certificates, reports, applications, notices, letters or other documents and to do or cause to be done any and all such other acts and things as, in the opinion of any such officer, may be necessary, appropriate or desirable in order to enable the Company fully and promptly to carry out the purposes and intent of the foregoing resolutions, and any such action taken or any agreement, amendment, certificate, report, application, notice, letter or other document executed and delivered by them or any of them in connection with any such action shall be conclusive evidence of their or his authority to take, execute and deliver the same; and

**FURTHER RESOLVED**, that all actions heretofore taken by any of the directors, officers, employees, representatives or agents of the Company or any of its affiliates in connection with the Transaction Agreements and the Transactions or otherwise referred to in the foregoing resolutions be, and each of the same hereby is, ratified, confirmed and approved in all respects as the act and deed of the Company.

**ADJOURNMENT**

There being no further business to come before the Board, the meeting was adjourned at 11:15 p.m.

_____
Secretary

# EXHIBIT A

Merger Agreement
Securities Purchase Agreement
Exchangeable Note
Subordinated Promissory Note
Warrant Agreement
ESOP Purchase Agreement
ESOP Loan Agreement
ESOP Note
ESOP Pledge Agreement
Investor Rights Agreement
Exchange Agreement
Voting Agreement – Chandler Trusts
Registration Rights Agreement of Chandler Trusts
Registration Rights Agreement of EGI & ESOP
Amendment No. 3 to Rights Plan
First Step Commitment
Second Step Commitment

**EXHIBIT B**

**AMENDMENT NO. 3 TO RIGHTS AGREEMENT**

This Amendment No. 3 to Rights Agreement (this "Amendment No. 3"), dated as of April 1, 2007, by and between Tribune Company, a Delaware corporation (the "Company"), and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent (the "Rights Agent"), amends the Rights Agreement, dated as of December 12, 1997, as previously amended by Amendment No. 1 thereto, dated as of June 12, 2000, and Amendment No. 2 thereto, dated as of September 21, 2006 (the "Rights Agreement").  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such term in the Rights Agreement.

RECITALS

WHEREAS, the Company and the Rights Agent have executed and entered into the Rights Agreement;

WHEREAS, pursuant to Section 27 of the Rights Agreement, the Company and the Rights Agent may from time to time supplement or amend the Rights Agreement in accordance with the provisions of Section 27 thereof;

WHEREAS, the Company proposes to enter into:  (1) an Agreement and Plan of Merger with GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation wholly owned by the ESOP, and, for the limited purposes set forth therein, EGI-TRB, L.L.C., a Delaware limited liability company ("Tower Acquisition"); (2) a Securities Purchase Agreement with Tower Acquisition and Mr. Samuel Zell, as guarantor; (3) an ESOP Purchase Agreement with the ESOP; (4) an Investor Rights Agreement with Tower Acquisition and the ESOP; (5) a voting agreement with Chandler Trust No. 1 and Chandler Trust No. 2; (6) registration rights agreements with (a) Tower Acquisition and the ESOP, and (b) Chandler Trust No. 1 and Chandler Trust No. 2; and (7) other agreements contemplated by the foregoing or necessary to implement the transactions contemplated by the foregoing (such agreements in clauses (1) through (7), the "Transaction Agreements"); and

WHEREAS, the Board of Directors of the Company has determined that it is in the best interest of the Company and its stockholders to amend the Rights Agreement as set forth below to provide that the execution, delivery and performance of the Transaction Agreements and the transactions contemplated thereby will not result in any Person becoming an Acquiring Person;

NOW, THEREFORE, the Rights Agreement is hereby amended as follows:

1.      The definition of Acquiring Person in Section 1(a) of the Rights Agreement, as previously amended, is hereby further modified and amended by adding the following sentence at

the end of the last sentence thereof:

> Notwithstanding anything in this Agreement to the contrary, no Person shall be deemed to be an Acquiring Person solely by virtue of the execution, delivery or performance of any of the Transaction Agreements or the transactions contemplated thereby.

2.    A new Section 1(ee) is hereby added to Section 1 of the Rights Agreement, which shall read in its entirety as follows:

> "Transaction Agreements" shall mean the following agreements dated as of April 1, 2007: (1) an Agreement and Plan of Merger by and among the Company, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation wholly owned by the ESOP, and, for the limited purposes set forth therein, EGI-TRB, L.L.C., a Delaware limited liability company ("Tower Acquisition"); (2) the Securities Purchase Agreement by and among the Company, Tower Acquisition and Mr. Samuel Zell, as guarantor; (3) the ESOP Purchase Agreement by and between the Company and the ESOP; (4) the Investor Rights Agreement by and among the Company, Tower Acquisition and the ESOP; (5) the Voting Agreement by and among the Company, Chandler Trust No. 1 and Chandler Trust No. 2; (6) the Registration Rights Agreements by and among the Company and (a) Tower Acquisition and the ESOP, and (b) Chandler Trust No. 1 and Chandler Trust No. 2; and (7) other agreements contemplated by the foregoing agreements or necessary to implement the transactions contemplated by the foregoing agreements.

3.    This amendment may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same instrument.

4.    This Amendment shall be deemed to be a contract made under the laws of the State of Delaware and for all purposes shall be governed by and construed in accordance with the laws of such State applicable to contracts to be made and performed entirely within such State.

IN WITNESS WHEREOF, this Amendment has been duly executed by the Company and the Rights Agent as of the day and year first written above.

TRIBUNE COMPANY

By:_____
Name:
Title:


COMPUTERSHARE TRUST COMPANY, N.A.


By:_____
Name:
Title:

## EXHIBIT C

For a description of the terms of equity awards (including, without limitation, options) referenced below, reference is made to the Company's equity incentive plans and to the Merger Agreement.

| Name of Officer or Director | Number of Shares of Company Common Stock Beneficially Owned | Number of Shares of Company Common Stock Underlying Equity Awards (Including Restricted Stock Units and Stock Options) |
|---|---|---|
| Jeffrey Chandler | 11,187 | 19,200 |
| Dennis J. FitzSimons | 498,299 | 1,936,556 |
| Roger Goodan | 17,246 | 45,200 |
| Donald C. Grenesko | 242,188 | 759,040 |
| Enrique Hernandez, Jr. | 11,330 | 15,200 |
| Betsy D. Holden | 8,661 | 7,200 |
| Crane H. Kenney | 51,669 | 578,397 |
| Timothy J. Landon | 45,982 | 431,015 |
| Thomas D. Leach | 50,741 | 315,742 |
| Luis Lewin | 22,710 | 458,978 |
| R. Mark Mallory | 108,234 | 248,679 |
| Robert S. Morrison | 13,148 | 11,200 |
| Ruthellyn M. Musil | 65,391 | 398,046 |
| William A. Osborn | 11,959 | 11,200 |
| John E. Reardon | 63,782 | 416,821 |
| J. Christopher Reyes | 14,969 | 0 |
| Scott C. Smith | 225,273 | 707,394 |
| William Stinehart, Jr. | 12,650 | 31,700 |
| Dudley S. Taft | 94,660 | 31,200 |
| Miles D. White | 6,419 | 0 |

**Resolutions adopted by the Board of Directors of Tribune Company on May 21, 2007:**

WHEREAS, on April 1, 2007, the Board of Directors approved resolutions regarding the entering into of certain credit facilities and transactions related thereto (the "April 1 Resolutions"), and such resolutions remain in full force and effect;

WHEREAS, on May 17, 2007, the Company entered into a definitive Credit Agreement (the "Credit Agreement") by and among the Company, as borrower, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, Citicorp North America, Inc., Bank of America, N.A. and Barclay's Bank plc, as co-documentation agents, and J.P. Morgan Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc. and Banc of America Securities LLC, as joint lead arrangers and joint bookrunners;

WHEREAS, the Credit Agreement is consistent with the terms and conditions described in the First Step Commitment and the First Step Credit Facility as approved by the Board of Directors pursuant to the April 1 Resolutions and the general authority delegated to the officers of the Company pursuant thereto; provided that the Credit Agreement provides for the establishment of a $1.5 billion two-year term loan and a corresponding reduction of the seven-year term loan facility from $7.015 billion to $5.515 billion; accordingly, the Credit Agreement provides for senior secured credit facilities for the Company in an aggregate principal amount of $8.028 billion, consisting of a $5.515 billion seven-year term loan, a $1.5 billion two-year term loan (with $750 million of such two-year term loan due and payable in 18 months and the remaining $750 million due and payable at the two-year maturity date), a $263 million seven-year term loan and a $750 million six-year revolving line of credit; and

WHEREAS, in connection with the Company's entry into the Credit Agreement, the Company formed Tribune Broadcasting Holdco, LLC, a newly formed Delaware limited liability company, and intends to contribute the shares of Tribune Broadcasting Company, a Delaware corporation, to Tribune Broadcasting Holdco, LLC as required by the terms of the Credit Agreement.

RESOLVED, that the Credit Agreement be, and hereby is, approved, ratified and adopted in all respects;

RESOLVED, that the proper officers of the Company be, and each of them hereby is, authorized, directed and empowered, in the name of and on behalf of the Company, subject to receipt of the necessary consents and approvals from the Federal Communications Commission, to effect the contribution of all of the Company's right, title and interest in and to the issued and outstanding shares of capital stock of Tribune Broadcasting Company to Tribune Broadcasting Holdco, LLC;

RESOLVED, that the proper officers of the Company be and hereby are authorized, directed and empowered, in the name of and on behalf of the Company, to take any and all such actions and to do any and all such things, including without limitation the execution and delivery of all such further agreements, amendments to the Credit Agreement, documents, certificates, instruments and undertakings, and to incur such fees and expenses, as in the judgment of any of the proper

officers may be deemed necessary, desirable, advisable, expedient, convenient or proper to carry out or fulfill the purposes and intent of the foregoing resolutions and the April 1 Resolutions, and all acts and prior acts of such officers in any way relating to or arising from, or that are in conformity with the purposes and intent of, these resolutions and the April 1 Resolutions and the instruments and agreements referred to herein and therein are hereby approved, ratified and confirmed in all respects; and

FURTHER RESOLVED, that all actions heretofore taken by any of the directors, officers, employees, representatives or agents of the Company or any of its affiliates in connection with the foregoing resolutions and the April 1 Resolutions be, and each of the same hereby is, ratified, confirmed and approved in all respects as the act and deed of the Company.

## [TRIBUNE COMPANY]

**WHEREAS**, the Tribune Company Board of Directors (the "Board") held a meeting on April 1, 2007 (the "April 1 Meeting"), and approved the entering into of certain credit facilities and transactions related thereto;

**WHEREAS**, the resolutions adopted by the Board at the April 1 Meeting (the "April 1 Resolutions") remain in full force and effect;

**WHEREAS**, certain changes to the First Step Credit Facility (as defined in the April 1 Resolutions) have been requested by the lenders thereunder since the April 1 Meeting, including but not limited to the substitution of a $1.50 billion two-year term loan and $5.515 billion seven-year term loan for a $7.015 billion seven-year term loan and certain changes relating to pricing terms (collectively, the "First Step Credit Facility Changes"); and

**WHEREAS**, in connection with the Company's entry into the Credit Facilities, the Company intends to form two new limited liability companies and contribute the shares of Tribune Broadcasting Company, a Delaware corporation ("Tribune Broadcasting") to one of such new limited liability companies.

## NOW, THEREFORE, BE IT:

### First Step Credit Facility Changes

**RESOLVED**, that the First Step Credit Facility Changes be, and they hereby are, approved and adopted in all respects;

**FURTHER RESOLVED**, that each of the Chairman, President and Chief Executive Officer, any Senior Vice President or any Vice President of the Company (such officer or officers, which are authorized to act singly or together pursuant hereto, being hereinafter designated as "Authorized Officers") be, and each of them hereby is, authorized and directed for and on behalf of the Company to take any and all actions deemed by them necessary and appropriate to carry out the purpose and intent of the foregoing resolution;

### Authorization to form Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC

**RESOLVED**, that the Authorized Officers be, and each of them hereby is, authorized, directed and empowered, in the name of and on behalf of the Company to take any and all such action necessary to form two new Delaware limited liability companies wholly owned by the Company named Tribune Broadcasting Holdco, LLC ("Broadcasting Holdco") and Tribune Finance, LLC, or such other names as determined by the Authorized Officers;

## Authorization of Contribution to Broadcasting Holdco

**RESOLVED**, that the Authorized Officers be, and each of them hereby is, authorized, directed and empowered, in the name of and on behalf of the Company, subject to receipt of the necessary consents and approvals from the Federal Communications Commission, to effect the contribution of all of the Company's right, title and interest in and to the issued and outstanding shares of capital stock of Tribune Broadcasting to Broadcasting Holdco;

## Further Authorization

**RESOLVED**, that the Authorized Officers be and hereby are authorized, directed and empowered, in the name of and on behalf of the Company, to take any and all such actions and to do any and all such things, including without limitation the execution and delivery of all such further agreements, documents, certificates, instruments and undertakings, and to incur such fees and expenses, as in the judgment of any of the Authorized Officers may be deemed necessary, desirable, advisable, expedient, convenient or proper to carry out or fulfill the purposes and intent of the foregoing resolutions, and all acts and prior acts of the Authorized Officers in any way relating to or arising from, or that are in conformity with the purposes and intent of, these resolutions and the instruments and agreements referred to herein are hereby approved, ratified and confirmed in all respects; and

**FURTHER RESOLVED**, that all actions heretofore taken by any of the directors, officers, employees, representatives or agents of the Company or any of its affiliates in connection with the foregoing resolutions be, and each of the same hereby is, ratified, confirmed and approved in all respects as the act and deed of the Company.

Exhibit D

# Delaware

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THAT "TRIBUNE COMPANY" IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE NOT HAVING BEEN CANCELLED OR DISSOLVED SO FAR AS THE RECORDS OF THIS OFFICE SHOW AND IS DULY AUTHORIZED TO TRANSACT BUSINESS.

THE FOLLOWING DOCUMENTS HAVE BEEN FILED:

CERTIFICATE OF INCORPORATION, FILED THE NINETEENTH DAY OF MARCH, A.D. 1968, AT 1:05 O'CLOCK P.M.

CERTIFICATE OF AGREEMENT OF MERGER, FILED THE TWENTY-FIFTH DAY OF JUNE, A.D. 1968, AT 1 O'CLOCK P.M.

RESTATED CERTIFICATE, FILED THE NINTH DAY OF APRIL, A.D. 1974, AT 11:30 O'CLOCK A.M.

CERTIFICATE OF DESIGNATION, FILED THE ELEVENTH DAY OF APRIL, A.D. 1974, AT 12 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE TWELFTH DAY OF APRIL, A.D. 1976, AT 10 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE TWENTY-SECOND DAY OF APRIL, A.D. 1977, AT 10 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE SEVENTH DAY OF APRIL, A.D.



Harriet Smith Windsor, Secretary of State

0674607   8310

070662466

AUTHENTICATION: 5722756

DATE: 06-01-07

# Delaware

## The First State

1983, AT 12:30 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE SECOND DAY OF MAY, A.D. 1985, AT 1 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE TWENTY-FIRST DAY OF APRIL, A.D. 1987, AT 1:01 O'CLOCK P.M.

RESTATED CERTIFICATE, FILED THE TWENTY-FIRST DAY OF APRIL, A.D. 1987, AT 1:03 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE THIRTY-FIRST DAY OF DECEMBER, A.D. 1987, AT 10 O'CLOCK A.M.

CERTIFICATE OF DESIGNATION, FILED THE FOURTH DAY OF APRIL, A.D. 1989, AT 11:45 O'CLOCK A.M.

CERTIFICATE OF AGREEMENT OF MERGER, FILED THE TWENTY-EIGHTH DAY OF JULY, A.D. 1993, AT 11:30 O'CLOCK A.M.

CERTIFICATE OF DESIGNATION, FILED THE TWENTY-SECOND DAY OF JANUARY, A.D. 1998, AT 2 O'CLOCK P.M.

CERTIFICATE OF OWNERSHIP, FILED THE TWENTY-SEVENTH DAY OF APRIL, A.D. 1998, AT 11:40 O'CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE TWELFTH DAY OF JUNE, A.D. 2000, AT 5 O'CLOCK P.M.

RESTATED CERTIFICATE, FILED THE TWELFTH DAY OF JUNE, A.D.

Harriet Smith Windsor, Secretary of State

0674607   8310

070662466

AUTHENTICATION: 5722756

DATE: 06-01-07

# Delaware

PAGE  3

## The First State

2000, AT 5:01 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE TWELFTH DAY OF JUNE, A.D. 2000, AT 5:02 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE TWELFTH DAY OF JUNE, A.D. 2000, AT 5:03 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE TWELFTH DAY OF JUNE, A.D. 2000, AT 5:04 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE TWELFTH DAY OF JUNE, A.D. 2000, AT 5:05 O'CLOCK P.M.

CERTIFICATE OF OWNERSHIP, FILED THE TWENTY-SIXTH DAY OF DECEMBER, A.D. 2000, AT 6:55 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF OWNERSHIP IS THE THIRTY-FIRST DAY OF DECEMBER, A.D. 2000.

CERTIFICATE OF OWNERSHIP, FILED THE TWENTY-EIGHTH DAY OF DECEMBER, A.D. 2000, AT 11:30 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF OWNERSHIP IS THE THIRTY-FIRST DAY OF DECEMBER, A.D. 2000.

CERTIFICATE OF AMENDMENT, FILED THE FIFTEENTH DAY OF

Harriet Smith Windsor, Secretary of State

0674607  8310

070662466

AUTHENTICATION: 5722756

DATE: 06-01-07

# Delaware

PAGE   4

### The First State

FEBRUARY, A.D. 2001, AT 8:10 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE FIFTEENTH DAY OF
FEBRUARY, A.D. 2001, AT 8:13 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE FIFTEENTH DAY OF
FEBRUARY, A.D. 2001, AT 8:16 O'CLOCK P.M.

CERTIFICATE OF CHANGE OF REGISTERED AGENT, FILED THE
TWENTY-FIRST DAY OF MARCH, A.D. 2001, AT 9 O'CLOCK A.M.

CERTIFICATE OF CORRECTION, FILED THE TWENTY-FOURTH DAY OF
OCTOBER, A.D. 2001, AT 9 O'CLOCK A.M.

CERTIFICATE OF DESIGNATION, FILED THE SIXTEENTH DAY OF
NOVEMBER, A.D. 2006, AT 4:26 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE SIXTEENTH DAY OF
NOVEMBER, A.D. 2006, AT 4:26 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID
CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE
AFORESAID CORPORATION, "TRIBUNE COMPANY".

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES
HAVE BEEN PAID TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE
BEEN FILED TO DATE.

Harriet Smith Windsor
Harriet Smith Windsor, Secretary of State

0674607   8310

070662466

AUTHENTICATION: 5722756

DATE: 06-01-07

# Delaware

PAGE 1

### The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS FILED FROM AND INCLUDING THE RESTATED CERTIFICATE OR A MERGER WITH A RESTATED CERTIFICATE ATTACHED OF "TRIBUNE COMPANY" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

RESTATED CERTIFICATE, FILED THE TWELFTH DAY OF JUNE, A.D. 2000, AT 5:01 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE TWELFTH DAY OF JUNE, A.D. 2000, AT 5:02 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE TWELFTH DAY OF JUNE, A.D. 2000, AT 5:03 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE TWELFTH DAY OF JUNE, A.D. 2000, AT 5:04 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE TWELFTH DAY OF JUNE, A.D. 2000, AT 5:05 O'CLOCK P.M.

CERTIFICATE OF OWNERSHIP, FILED THE TWENTY-SIXTH DAY OF DECEMBER, A.D. 2000, AT 6:55 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF OWNERSHIP IS THE THIRTY-FIRST DAY



0674607  8100X

070666266

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 5724455

DATE: 06-01-07

# Delaware

PAGE 2

*The First State*

OF DECEMBER, A.D. 2000.

CERTIFICATE OF OWNERSHIP, FILED THE TWENTY-EIGHTH DAY OF DECEMBER, A.D. 2000, AT 11:30 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF OWNERSHIP IS THE THIRTY-FIRST DAY OF DECEMBER, A.D. 2000.

CERTIFICATE OF AMENDMENT, FILED THE FIFTEENTH DAY OF FEBRUARY, A.D. 2001, AT 8:10 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE FIFTEENTH DAY OF FEBRUARY, A.D. 2001, AT 8:13 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE FIFTEENTH DAY OF FEBRUARY, A.D. 2001, AT 8:16 O'CLOCK P.M.

CERTIFICATE OF CHANGE OF REGISTERED AGENT, FILED THE TWENTY-FIRST DAY OF MARCH, A.D. 2001, AT 9 O'CLOCK A.M.

CERTIFICATE OF CORRECTION, FILED THE TWENTY-FOURTH DAY OF OCTOBER, A.D. 2001, AT 9 O'CLOCK A.M.

CERTIFICATE OF DESIGNATION, FILED THE SIXTEENTH DAY OF NOVEMBER, A.D. 2006, AT 4:26 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE SIXTEENTH DAY OF NOVEMBER, A.D. 2006, AT 4:26 O'CLOCK P.M.

Harriet Smith Windsor, Secretary of State

0674607    8100X

070666266

AUTHENTICATION: 5724455

DATE: 06-01-07