# TRIBUNE

## BOARD OF DIRECTORS MEETING
### May 9, 2007

## Master Copy

## Confidential

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414374

Crane H. Kenney
Senior Vice President/General Counsel
Secretary
312/222-2491

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
fax: 312/222-4206
e-mail: ckenney@tribune.com

# TRIBUNE

May 2, 2007

Jeffrey Chandler
Dennis J. FitzSimons
Roger Goodan
Enrique Hernandez, Jr.
Betsy D. Holden
Robert S. Morrison

William A. Osborn
J. Christopher Reyes
William Stinehart, Jr.
Dudley S. Taft
Miles D. White
Samuel Zell

Enclosed is a notebook containing information that will be discussed at the Board of Directors and Audit Committee meetings to be held on Wednesday, May 9, 2007. The Board and Audit Committee meetings will take place on the 24th floor of Tribune Tower. The Annual Shareholders Meeting will be held in Campbell Hall on the 7th floor of Tribune Tower, and will begin at 11:00 a.m. We will review plans for the Annual Meeting at the conclusion of the Board meeting. Please note the cancellation of the Board dinner originally scheduled for Tuesday, May 8.

For those of you participating in the Board meeting via teleconference, please use the following dial-in information:

Dial-in Numbers:    888-232-0362
                    805-240-9472 (international access only)
Participant Code:   117264

For those of you participating in the Audit Committee meeting via teleconference, please use the following dial-in information:

Dial-in Numbers:    877-214-0402
                    601-352-8646 (international access only)
Participant Code:   951084

The schedule for Wednesday is as follows:

| Date | Meeting/Event | Location | Time |
|---|---|---|---|
| Wed., May 9 | Audit Committee | McCormick Room | 7:30 a.m. |
| Wed., May 9 | Board of Directors Meeting | Patterson Room | 9:00 a.m. |
| Wed., May 9 | Shareholders Meeting | Campbell Hall | 11:00 a.m. |
| Wed., May 9 | Board Luncheon | McCormick Room | 12:00 p.m. |

A continental breakfast will be available at the Board and Committee meetings and there will be an informal buffet luncheon immediately following the Annual Meeting. The luncheon will be held in the McCormick Room on the 24th floor of Tribune Tower. Transportation to the airport will be available at the conclusion of lunch.

I look forward to seeing you, and please contact me if you have any questions.

Sincerely,

Dennis J. FitzSimons
Chairman, President and
Chief Executive Officer
312/222-3373

# TRIBUNE

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611
fax: 312/222-3203
e-mail: dfitzsimons@tribune.com

*Via Federal Express*

May 2, 2007

| | |
|---|---|
| Jeffrey Chandler | J. Christopher Reyes |
| Roger Goodan | William Stinehart, Jr. |
| Enrique Hernandez, Jr. | Dudley S. Taft |
| Betsy D. Holden | Miles D. White |
| Robert S. Morrison | Samuel Zell |
| William A. Osborn | |

Enclosed is the Board book for our May meeting.

Additionally, here is a brief overview of general business conditions and recent company developments.

Publishing and Interactive

Current business conditions—The newspaper industry is going through a very difficult first half. Difficult comparisons to record real estate spending last year (especially in Florida) and continued weakness in automotive spending caused first quarter ad revenues to be down 6%. The second quarter will also be difficult.

We have a number of initiatives in progress to improve the picture:

TMN Retail – We are in the process of forming a new national retail sales organization for our top 15 retail accounts, which spent a total of about $240 million with us in 2006. This new sales organization will establish a central point of contact using a specialized team that will optimize our sales efforts and customer service by more closely matching the centralized decision making processes of these clients. In turn, local sales teams will be reorganized to focus more on local clients and territories where they have the most opportunity to impact ad revenue results.

Offshore outsourcing – Outsourcing of our circulation customer service call centers was completed for the last of our nine daily newspapers during the first quarter. By the end of the first quarter, call center metrics had stabilized, and the outsourced centers are now providing better customer service than our employee-operated call centers. The current focus is on continuing to improve call quality and upsell capabilities. Savings for 2007 are expected to be $7.7 million.

Outsourcing our IT help desk operation to IBM Daksh in India is underway. The transition of calls to IBM will begin in June and be completed by the end of August. IBM has hired and is currently training 52 help desk agents and supervisors. Annual savings are expected to be $1.5 million.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Page 2

We are currently negotiating an outsourcing agreement with Hewlett Packard (HP) regarding our advertising billing, credit and collections functions. Currently, about 240 FTEs perform these functions. Under the proposed arrangement, 150 positions would be eliminated at the newspapers with certain functions centralized in Chicago, and HP doing a good portion of the back office work out of Costa Rica. Transition could start in the third quarter with full-year savings eventually growing to $8 million.

On the interactive front, first quarter revenues increased 17% over the same period last year. Non-classified revenue was up 34% and classified revenue was up 14% in the first quarter. Tribune Interactive's websites, including 15 news sites, 23 television sites and 8 entertainment and shopping resource sites, drew almost 15 million average monthly unique visitors during the first quarter.

CareerBuilder's first quarter revenues grew by 20% over the same period last year. CareerBuilder continues to be the leading online recruitment site in North America with the most job seeker traffic and revenue. CareerBuilder drew almost 21 million average monthly unique visitors in the first quarter, compared to Monster's nearly 12 million and HotJobs' nearly 18 million.

Regarding labor matters, *The Baltimore Sun's* current four-year contract with the Newspaper Guild, covering 489 employees, will expire in June. Management has been planning for these negotiations for months with formal talks expected to start in early May. Based on past experience, we expect the negotiations to be contentious.

In Los Angeles, we are awaiting a final decision from the National Labor Relations Board regarding their approval of the January vote of our 280 pressroom employees to unionize. We expect the NLRB will certify the election and that we will begin negotiations with the union shortly after that.

Broadcasting/Entertainment

Current business conditions – First quarter ad revenue for our television group was down 1%. Six of our top ten ad categories were flat or up, led by telecom and entertainment. Automotive, retail and movies, however, were down a combined 7%. Most of our television markets reported lower revenues in the first quarter, with New York, Los Angeles and Chicago down an average of 5%. KTLA and WGN-TV both gained market share.

April pacing finished down 3% and May is pacing down 12%. Advertising demand is currently strong in the national network marketplace but seems to be weak across all media in individual markets. Some good news is that several of our stations have recently completed sales to clients that buy time on an annual basis. Rates for our new sitcoms that will launch in September were negotiated, and results so far have been excellent with unit rates up in the 30-50% range.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Page 3

The CW Network – The performance of The CW Network's prime time programming continues to be good for our station group, particularly in New York, Los Angeles and Dallas. Advertiser response remains positive, and CW prime time rates are up in the mid-single digits for the group. The CW will announce its fall programming at its advertising upfront in New York on May 17. The network is investing more in program development this year, which should lead to further improved performance in the fall.

**********

I look forward to seeing you at our meeting on May 9.   If you have questions prior to the meeting, please feel free to call me.

Sincerely,

Dennis FitzSimons

Enclosure

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414378

TRB0414379

# TRIBUNE COMPANY
## HIGHLIGHTS OF OPERATIONS
### Report to the Board of Directors
### First Quarter, 2007

CONFIDENTIAL

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## HIGHLIGHTS OF OPERATIONS
### Report to the Board of Directors
### First Quarter, 2007

**EXECUTIVE SUMMARY**

Results of Operations Excluding Special Items,
Non-Operating Items and Discontinued Operations
First Quarter 2007 Highlights — 1
Consolidated Income Statements — 2
Consolidated Summary of Operating Cash Flow — 3
Consolidated Summary of Equity Income/(Loss) — 4

**PUBLISHING**

First Quarter 2007 Highlights — 5
Summary of Operating Revenues — 6
Summary of Operating Cash Flow — 7
Summary of Advertising Revenues and Volume — 8
Summary of Circulation Revenue and Daily Circulation — 10
Summary of Sunday Circulation — 11
Selected Operating Statistics — 12

**BROADCASTING & ENTERTAINMENT**

First Quarter 2007 Highlights — 13
Summary of Operations — 14
Television Group Summaries
Summary of Operating Revenues — 15
Summary of Operating Cash Flow — 16
Radio and Entertainment/Other
Summary of Operating Cash Flow — 17

**OTHER INFORMATION**

Capital Expenditures — 18
Overview — 19
Summary of Active Projects Over $10 Million — 20
Selected Balance Sheet Data
Consolidated Income Statements Including Special Items,
Non-Operating Items and Discontinued Operations — 21

Profession    Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414381

# EXECUTIVE SUMMARY

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## FIRST QUARTER 2007 HIGHLIGHTS
### Excluding Special Items, Non-Operating Items and Discontinued Operations (1)

### First Quarter Diluted EPS



|  | First Qtr. 2007 | Change from 2006 $ | Change from 2006 % |
|---|---|---|---|
| **COMPARISONS TO 2006** | | | |
| **Diluted EPS:** | $.28 | -$.10 | -26% |
| ◆ A decline in net income, primarily due to lower operating profit and higher interest expense, was partially offset by lower average shares outstanding. | | | |
| **Operating Profit:** | | | |
| **Publishing** | $141 M | -$46 M | -25% |
| ◆ Lower operating profit was primarily the result of a $54 million decline in revenues (advertising - $47M, circulation -$9M and other +$3M) and higher TMC postage expense ($5M), partially offset by lower newsprint and ink ($9M) and compensation ($4M) expenses. | | | |
| **Broadcasting & Entertainment** | $61 | -$6 | -9% |
| ◆ A decline in operating profit was due to lower revenues ($1M) and higher expenses ($5M). | | | |
| **Corporate Expenses** | -$19 | +$1 | +5% |
| **Total Operating Profit** | **$183 M** | **-$52 M** | **-22%** |
| **Equity Income** | $13 M | +$6 M | +94% |
| ◆ Increased equity income was primarily due to improved results at TV Food Network ($5M) and CareerBuilder ($3M), partially offset by lower TMCT equity income ($2M). The Company's investment in the TMCT I and II Portfolios was reduced from 20% to 5% in September 2006. | | | |
| **Interest Expense** | $83 M | +$34 M | +71% |
| ◆ Higher interest expense was primarily due to additional debt to finance the share repurchases in 2006 as well as higher interest rates. | | | |

The sales of the Company's Southern Connecticut newspapers (*The Advocate* and *Greenwich Time*) and the New York edition of *Hoy* were announced in the first quarter of 2007. The sale of WATL-TV in Atlanta was completed in August 2006. The sales of WLVI-TV in Boston and WCWN-TV in Albany were completed in December 2006. These businesses are reported as discontinued operations and are therefore excluded throughout this report.

(1) See page 21 for a consolidated income statement including special items, non-operating items and discontinued operations.

1

Profession:    ;yes Only
Highly Confidential -- Attorneys' Eyes Only

TRI

4382

TRB0414383

## TRIBUNE COMPANY
## CONSOLIDATED INCOME STATEMENTS
Excluding Special Items, Non-Operating Items and Discontinued Operations (A)
(In Millions, Except Per Share Amounts)

| | FIRST QUARTER | | | % Variance From | |
| | 2007 Actual | 2007 Plan | 2006 Actual | Plan | 2006 |
|---|---|---|---|---|---|
| **Operating revenues** | | | | | |
| Publishing | $ 931.5 | $ 953.7 | $ 985.3 | (2) % | (5) % |
| Broadcasting & entertainment | 283.0 | 285.3 | 284.1 | (1) | - |
| Total | $ 1,214.5 | $ 1,238.9 | $ 1,269.4 | (2) | (4) |
| **Operating expenses** | | | | | |
| Publishing | $ 790.9 | $ 805.0 | $ 798.3 | (2) | (1) |
| Broadcasting & entertainment | 221.6 | 230.4 | 216.7 | (4) | 2 |
| Corporate expenses | 19.4 | 20.1 | 20.4 | (3) | (5) |
| Total | $ 1,031.9 | $ 1,055.5 | $ 1,035.3 | (2) | - |
| **Operating profit** | | | | | |
| Publishing | $ 140.6 | $ 148.6 | $ 187.1 | (5) | (25) |
| Broadcasting & entertainment | 61.4 | 54.9 | 67.5 | 12 | (9) |
| Corporate expenses | (19.4) | (20.1) | (20.4) | 3 | 5 |
| Total | $ 182.6 | $ 183.4 | $ 234.2 | - | (22) |
| Equity income | 12.7 | 7.3 | 6.5 | 73 | 94 |
| Interest and dividend income | 3.2 | 3.0 | 2.2 | 6 | 45 |
| Interest expense | (83.2) | (83.9) | (48.8) | 1 | (71) |
| Income before income taxes | 115.2 | 109.8 | 194.1 | 5 | (41) |
| Income taxes | (46.2) | (42.0) | (76.5) | (10) | 40 |
| Net Income | $ 69.0 | $ 67.8 | $ 117.6 | 2 | (41) |
| Diluted earnings per share | $ 0.28 | $ 0.28 | $ 0.38 | - | (26) |
| Weighted average diluted shares outstanding (B) | 242.1 | 241.5 | 306.0 | - | (21) |

(A) The sales of the Southern Connecticut newspapers ("SCNI") and the New York edition of Hoy ("Hoy, New York") were announced in the first quarter of 2007. The sale of WATL-TV in Atlanta was completed in August 2006. The sales of WLVI-TV in Boston and WCWN-TV in Albany were completed in December 2006. For both years, operating results for these businesses are excluded herein and reported as discontinued operations. See page 21 for a consolidated income statement including special items, non-operating items and discontinued operations.

(B) Diluted average shares outstanding declined versus 2006 due to the repurchase of approximately 66 million shares in the second half of 2006.

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## CONSOLIDATED SUMMARY OF OPERATING CASH FLOW
### Excluding Special Items, Non-Operating Items and Discontinued Operations
(In Millions)

| | | | FIRST QUARTER | | % Variance From | |
|---|---|---|---|---|---|---|
| | 2007 Actual | 2007 Plan | 2006 Actual | | Plan | 2006 |
| **Operating cash flow** | | | | | | |
| Publishing | $ 484.7 | $ 195.4 | $ 229.2 | | (6) % | (19) % |
| Broadcasting & entertainment | 74.1 | 67.8 | 79.5 | | 9 | (7) |
| Corporate expenses | (19.2) | (19.7) | (20.0) | | 3 | 4 |
| Total | $ 239.6 | $ 243.5 | $ 288.7 | | (2) | (17) |

## FIRST QUARTER COMPARISONS TO 2006

♦ First quarter operating cash flow was down 17% at $240M compared to $289M in 2006. Publishing decreased 19% and broadcasting and entertainment fell 7%.

♦ On a consolidated basis, first quarter operating cash flow margin was 19.7%, down from 22.7% in 2006.



**First Quarter Operating Cash Flow**

| | | | |
|---|---|---|---|
| $323 | $304 | $289 | $240 |
| 2004 | 2005 | 2006 | 2007 |

Operating Cash Flow Margin: 24.9%   23.7%   22.7%   19.7%

3

Professio_   Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TF    '14384

TRB0414385

**TRIBUNE COMPANY**
**CONSOLIDATED SUMMARY OF EQUITY INCOME/(LOSS) (A)**
(In Millions)

| | | FIRST QUARTER | | % Variance From | |
| --- | --- | --- | --- | --- | --- |
| | 2007 Actual | 2007 Plan | 2006 Actual | Plan | 2006 |
| **Equity Income/(Loss)** | | | | | |
| Publishing | | | | | |
| CareerBuilder (42.5%) | $ (7.3) | $ (8.8) | $ (10.1) | 17 % | 27 |
| Classified Ventures (28%) | 0.6 | (0.7) | 0.2 | NM | 275 |
| ShopLocal (42.5%) | (1.5) | (2.5) | (1.7) | 40 | 12 |
| BrassRing, Inc. (27%) (B) | - | - | 0.3 | - | (100) |
| Other | (0.2) | (0.9) | 0.6 | 83 | NM |
| Sub-total | (8.4) | (13.0) | (10.8) | 35 | 22 |
| | | | | | |
| Broadcasting & Entertainment | | | | | |
| TV Food Network (31%) | 17.2 | 16.3 | 11.8 | 6 | 46 |
| Comcast SportsNet Chicago (25%) | 3.6 | 3.5 | 3.4 | 2 | 4 |
| Other | 0.4 | 0.4 | 0.6 | - | (30) |
| Sub-total | 21.2 | 20.2 | 15.9 | 5 | 34 |
| | | | | | |
| Corporate | (0.2) | - | 1.5 | NM | (111) |
| | | | | | |
| **Total Equity Income** | $ 12.7 | $ 7.3 | $ 6.5 | 73 | 94 |

(A)  The Company uses the equity method to account for its investments in 20-50% owned companies and for certain partnership interests.
     Under the equity method, Tribune records its share of each company's net income or loss.
(B)  Tribune's investment in BrassRing was sold in November 2006.

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

PUBLISHING

Professio.    Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414387

## PUBLISHING
## FIRST QUARTER 2007 HIGHLIGHTS
## Excluding Special Items, Non-Operating Items and Discontinued Operations

### COMPARISONS TO 2006

**Revenues:**

- Advertising revenues declined $47M (6%) compared to last year. Retail revenues were down $2M (1%); national fell $4M (2%); and classified was down $42M (14%).
- Circulation revenues were down $9M (7%), due to volume declines, mostly in single copy, and selective price discounting in order to stabilize individually paid copies.

**Expenses:**

- Newsprint and ink expenses decreased $9M (8%) compared to the prior year as a result of a 1% decrease in price, and a 6% decline in consumption.
- Compensation expense was down $4M (1%) primarily due to a 3% (600 full time equivalent positions) reduction in staffing.
- Other cash expenses grew $4M (1%) mainly due to higher TMC postage and outside services expenses.

**Operating Cash Flow:**

- Operating cash flow decreased $45M (19%) due to lower revenues.
- Operating cash flow margin was 19.8%, compared to 23.3% in 2006.





5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## PUBLISHING
## SUMMARY OF OPERATING REVENUES
### Excluding Discontinued Operations
#### (Dollars in Millions)

|  | FIRST QUARTER | | |
|---|---|---|---|
|  | 2007 Actual | 2006 Actual | % Change |
| **Operating revenues** | | | |
| Los Angeles | $ 261.8 | $ 273.8 | (4) % |
| Chicago | 200.9 | 208.4 | (4) |
| Newsday | 121.7 | 128.9 | (6) |
| South Florida | 95.0 | 109.6 | (13) |
| Orlando | 64.2 | 73.6 | (13) |
| Baltimore | 69.1 | 73.7 | (6) |
| Hartford | 46.8 | 48.9 | (4) |
| Allentown | 24.8 | 25.0 | (1) |
| Newport News | 18.8 | 19.2 | (2) |
| Tribune Media Services | 27.5 | 26.0 | 6 |
| Other | 0.9 | (1.9) | NM |
| Total | $ 931.5 | $ 985.3 | (5) |

### FIRST QUARTER COMPARISONS TO 2006

**Overall:** Operating revenues decreased $54M (5%), mainly due to lower advertising and circulation revenues.

**Los Angeles:** Advertising revenues declined $9M (4%). Retail was down $2M (3%) from weakness in department stores, furniture/home furnishings and electronics, partially offset by gains from the ADVO preprint distribution agreement. National was up $2M (3%) mainly due to higher movies, partially offset by lower auto. Classified decreased $9M (12%), due to declines in all categories. Circulation revenue was down $4M (8%), due to lower single copy volume, increased discounting and converting Recycler to a free publication in May 2006.

**Chicago:** Advertising revenues decreased $6M (4%). Retail grew $3M (5%) due to improved apparel/fashion, electronics and specialty merchandise. National declined $5M (11%), mainly due to lower auto and technology. Classified decreased $4M (9%), primarily due to weakness in real estate and recruitment. Circulation revenue was down $2M (5%), due to continued selective home delivery discounting and lower single copy.

**Newsday:** Advertising revenues fell $6M (6%), due to softness in department stores and other retail, partially offset by higher health care. National was up 2%. Classified decreased $2M (6%), primarily due to lower auto and real estate. Circulation revenue was down $1M (5%).

**South Florida:** Advertising revenues were down $14M (15%). Retail improved $1M (3%). National declined $1M (4%). Classified was down $15M (31%), due to declines in all categories with the largest in real estate. Circulation revenue was 6% lower.

**Orlando:** Advertising revenues were down $8M (14%). Retail improved $1M (4%). National was up 1%. Classified was down $9M (29%), due to declines in all categories. Circulation revenue was $1M (11%) lower.

### First Quarter 2007 Revenues



National 19%
Classified 28%
Other 7%
Circulation 15%
Retail 31%

6

TI 114388

Profession.    Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# PUBLISHING
## SUMMARY OF OPERATING CASH FLOW
### Excluding Special Items, Non-Operating Items and Discontinued Operations
(Dollars in Millions)

| | FIRST QUARTER | | |
|---|---|---|---|
| | 2007 Actual | 2006 Actual | % Change |
| **Operating cash flow** | | | |
| Los Angeles | $ 49.0 | $ 56.5 | (13)% |
| Chicago | 44.2 | 51.4 | (14) |
| Newsday | 19.0 | 20.9 | (9) |
| South Florida | 28.7 | 42.4 | (32) |
| Orlando | 14.2 | 23.2 | (39) |
| Baltimore | 10.3 | 14.9 | (31) |
| Hartford | 9.0 | 9.6 | (6) |
| Allentown | 5.6 | 5.8 | (3) |
| Newport News | 4.8 | 5.1 | (6) |
| Tribune Media Services | 5.9 | 5.3 | 11 |
| Other | (6.1) | (6.0) | 2 |
| Total | $ 184.7 | $ 229.2 | (19) |
| | | | Absolute Change |
| **Operating cash flow margin** | | | |
| Los Angeles | 18.7 % | 20.6 % | (1.9) pts. |
| Chicago | 22.0 | 24.7 | (2.7) |
| Newsday | 15.6 | 16.2 | (0.6) |
| South Florida | 30.2 | 38.7 | (8.5) |
| Orlando | 22.2 | 31.6 | (9.4) |
| Baltimore | 14.9 | 20.2 | (5.3) |
| Hartford | 19.3 | 19.6 | (0.3) |
| Allentown | 22.7 | 23.3 | (0.6) |
| Newport News | 25.5 | 26.8 | (1.3) |
| Tribune Media Services | 21.3 | 20.3 | 1.0 |
| Total | 19.8 | 23.3 | (3.5) |

### FIRST QUARTER COMPARISONS TO 2006

Los Angeles: Operating cash flow was down $7M (13%), due to lower revenues ($12M), partially offset by reduced newsprint and ink ($4M).

Chicago: Operating cash flow fell $7M (14%), mainly due to lower advertising revenues ($6M).

Newsday: Operating cash flow declined $2M (9%) due to a decline in revenues ($7M), partially offset by lower expenses for compensation ($2M), circulation ($1M) and newsprint and ink ($1M).

South Florida: Operating cash flow was down $14M (32%), mainly due to lower revenues ($15M), partially offset by reduced newsprint and ink expense ($2M).

Orlando: Operating cash flow was down $9M (39%), mainly due to lower ad revenues ($9M).

Baltimore: Operating cash flow declined $5M (31%) due to lower revenues ($5M).

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414389

# PUBLISHING
## SUMMARY OF ADVERTISING REVENUES AND VOLUME
### Excluding Discontinued Operations
(Dollars in Millions)

**Advertising Revenues**

| | FIRST QUARTER | | |
|---|---|---|---|
| | 2007 Actual | 2006 Actual | % Change |
| **Retail** | | | |
| Los Angeles | $ 73.2 | $ 75.5 | (3) % |
| Chicago | 71.4 | 68.3 | 5 |
| Newsday | 41.3 | 45.5 | (9) |
| South Florida | 32.5 | 31.7 | 3 |
| Orlando | 20.4 | 19.7 | 4 |
| Baltimore | 24.3 | 24.6 | (1) |
| Hartford | 14.9 | 15.6 | (4) |
| Other | 14.2 | 13.2 | 7 |
| Total | $ 292.3 | $ 294.1 | (1) |
| **National** | | | |
| Los Angeles | $ 75.3 | $ 73.1 | 3 |
| Chicago | 38.9 | 43.6 | (11) |
| Newsday | 20.2 | 19.9 | 2 |
| South Florida | 14.4 | 15.0 | (4) |
| Orlando | 9.6 | 9.5 | 1 |
| Baltimore | 8.8 | 9.5 | (8) |
| Hartford | 6.6 | 6.8 | (4) |
| Other | 4.1 | 4.4 | (7) |
| Total | $ 177.8 | $ 181.8 | (2) |

## FIRST QUARTER COMPARISONS TO 2006

♦ Retail revenues were down $2M (1%) mainly due to lower department stores, furniture/home furnishings and electronics, partially offset by higher home improvement stores. Los Angeles is continuing to be negatively impacted by the Federated/Rob May merger.

♦ Preprint revenues, which are primarily included in retail, improved $3M (2%) led by gains in Los Angeles related to the ADVO preprint distribution agreement, which began in August 2006.

♦ National revenues declined $4M (2%), mainly due to lower auto and technology, partially offset by higher movies and telecom/wireless.

**Preprint Revenues**

| | First Quarter | | |
|---|---|---|---|
| | 2007 | 2006 | % Change |
| Los Angeles | $ 41.5 | $ 36.0 | 15 % |
| Chicago | 44.7 | 46.1 | (3) |
| Newsday | 17.3 | 19.1 | (9) |
| Total Group | $ 155.5 | $ 152.8 | 2 |

8

Professio  ' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414391

PUBLISHING
SUMMARY OF ADVERTISING REVENUES AND VOLUME
Excluding Discontinued Operations
(Dollars in Millions)

| | 2007 Actual | 2006 Actual | % Change |
|---|---|---|---|
| **Classified** | | | |
| Los Angeles | $ 67.0 | $ 76.3 | (12) % |
| Chicago | 47.7 | 52.2 | (9) |
| Newsday | 38.0 | 46.3 | (6) |
| South Florida | 32.2 | 46.9 | (31) |
| Orlando | 22.5 | 31.6 | (29) |
| Baltimore | 21.2 | 24.7 | (14) |
| Hartford | 14.2 | 15.1 | (6) |
| Other | 18.0 | 15.4 | 17 |
| Total | $ 260.7 | $ 302.4 | (14) |
| | | | |
| **Total Advertising** | | | |
| Los Angeles | $ 215.5 | $ 224.9 | (4) |
| Chicago | 158.0 | 164.0 | (4) |
| Newsday | 99.6 | 105.7 | (6) |
| South Florida | 79.1 | 93.6 | (15) |
| Orlando | 52.5 | 60.8 | (14) |
| Baltimore | 54.3 | 58.8 | (8) |
| Hartford | 35.7 | 37.5 | (5) |
| Other | 36.2 | 33.0 | 10 |
| Total | $ 730.8 | $ 778.3 | (6) |
| | | | |
| **Advertising Volume (000's)** | | | |
| Inches | | | |
| Full Run | 3,973 | 4,418 | (10) |
| Part Run | 4,735 | 4,960 | (5) |
| Total | 8,708 | 9,378 | (7) |
| | | | |
| Preprint Pieces | 3,484,658 | 3,328,527 | 5 |

Classified Advertising Revenues
First Quarter 2007



Real Estate 32%

Help Wanted 32%

Automotive 23%

Other 13%

FIRST QUARTER COMPARISONS TO 2006

♦ Classified revenues were down $42M (14%), due to lower real estate ($14M), recruitment ($13M) and auto ($11M).

♦ Preprint pieces were up 5%, mainly due to improvements in Los Angeles (16%) and Orlando (7%), partially offset by declines in Chicago (1%) and South Florida (3%).

9

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# PUBLISHING
## SUMMARY OF CIRCULATION REVENUE AND DAILY CIRCULATION
### Excluding Discontinued Operations
(Dollars in Millions)

| | FIRST QUARTER | | |
| --- | --- | --- | --- |
| | 2007 Actual | 2006 Actual | % Change |
| **Circulation Revenue** | | | |
| Los Angeles | $ 39.9 | $ 43.5 | (8) % |
| Chicago | 28.0 | 29.5 | (5) |
| Newsday | 19.9 | 20.8 | (5) |
| South Florida | 8.6 | 9.1 | (6) |
| Orlando | 8.6 | 9.7 | (11) |
| Baltimore | 11.2 | 12.0 | (7) |
| Hartford | 9.8 | 10.0 | (2) |
| Other (A) | 9.0 | 9.7 | (8) |
| Total | $ 134.9 | $ 144.3 | (7) |
| **Daily (Mon-Fri) Circulation** | | | |
| **Individually Paid Copies (000's) (B)** | | | |
| Los Angeles | 836 | 813 | 3 |
| Chicago | 544 | 538 | 1 |
| Newsday | 378 | 394 | (4) |
| South Florida | 236 | 240 | (2) |
| Orlando | 218 | 217 | - |
| Baltimore | 225 | 231 | (3) |
| Hartford | 167 | 176 | (5) |
| Other (A) | 185 | 189 | (4) |
| Total | 2,789 | 2,798 | - |
| **ABC Copies (000's) (C)** | | | |
| Los Angeles | 867 | 859 | 1 |
| Chicago | 562 | 567 | (1) |
| Newsday | 393 | 418 | (6) |
| South Florida | 242 | 264 | (8) |
| Orlando | 235 | 234 | - |
| Baltimore | 230 | 236 | (3) |
| Hartford | 172 | 181 | (5) |
| Other (A) | 191 | 199 | (4) |
| Total | 2,893 | 2,958 | (2) |

(A) Other includes Allentown and Newport News.
(B) Individually Paid includes home delivery and single copy circulation.
(C) ABC copies include home delivery, single copy and other paid categories, such as hotel and education copies.

**FIRST QUARTER COMPARISONS TO 2006**

Overall: Circulation revenues decreased $9M (7%), mainly due to volume declines and continued selective discounting to stabilize individually paid circulation.

Los Angeles: Circulation revenue decreased $4M (8%), due to lower single copy volume, increased discounting and converting Recycler to a free publication in May 2006.

Chicago: Circulation revenue was down $2M (5%), due to continued selective home delivery discounting and lower single copy volume.

Newsday: Circulation revenue declined $1M (5%) due to lower home delivery and single copy volumes.

South Florida: Circulation revenue decreased $1M (6%) due to continued selective home delivery discounting and lower volume.

Orlando: Circulation revenue was down $1M (11%) as a new subscriber acquisition program with higher discount rates was initiated.

Baltimore: Circulation revenue fell $1M (7%) due to continued discounting.

10

Professio  'Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## PUBLISHING
## SUMMARY OF SUNDAY CIRCULATION
### Excluding Discontinued Operations

| | FIRST QUARTER | | |
| --- | --- | --- | --- |
| | 2007 Actual | 2006 Actual | % Change |
| **Sunday Circulation** | | | |
| **Individually Paid Copies (000's) (A)** | | | |
| Los Angeles | 1,157 | 1,199 | (4) |
| Chicago | 904 | 907 | - |
| Newsday | 452 | 472 | (4) |
| South Florida | 331 | 336 | (1) |
| Orlando | 335 | 339 | (1) |
| Baltimore | 369 | 385 | (4) |
| Hartford | 247 | 262 | (6) |
| Other (B) | 252 | 257 | (2) |
| Total | 4,047 | 4,157 | (3) |
| | | | |
| **ABC Copies (000's) (C)** | | | % |
| Los Angeles | 1,170 | 1,217 | (4) % |
| Chicago | 931 | 954 | (2) |
| Newsday | 456 | 477 | (4) |
| South Florida | 332 | 349 | (5) |
| Orlando | 343 | 345 | (1) |
| Baltimore | 376 | 400 | (6) |
| Hartford | 252 | 267 | (6) |
| Other (B) | 254 | 261 | (2) |
| Total | 4,114 | 4,270 | (4) |

### FIRST QUARTER COMPARISONS TO 2006

♦ Total ABC circulation trends are lower than those for individually paid copies as the company continues to reduce "other paid" circulation.

(A) Individually Paid includes home delivery and single copy circulation.
(B) Other includes Allentown and Newport News.
(C) ABC copies include home delivery, single copy and other paid categories, such as hotel and education copies.

11

TRB0414393

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## PUBLISHING
## SELECTED OPERATING STATISTICS
### Excluding Discontinued Operations
(Dollars in Millions, Except Per Ton Amounts)

| | | FIRST QUARTER | | |
| | | 2007 Actual | 2006 Actual | % Change |
|---|---|---|---|---|
| Operating expenses | | | | |
| Newsprint & ink expense | | $ 114.6 | $ 123.9 | (8) % |
| Compensation expense | | 329.6 | 333.5 | (1) |
| Other cash expenses | | 302.6 | 298.6 | 1 |
| Depreciation and amortization | | 44.0 | 42.1 | 5 |
| | | | | |
| Total | | $ 790.9 | $ 798.3 | (1) |
| | | | | |
| Newsprint tons consumed | | 163,307 | 173,981 | (6) |
| | | | | |
| Average newsprint cost per ton | | $ 610 | $ 617 | (1) |
| | | | | |
| Full time equivalents | | 16,871 | 17,448 | (3) |

### FIRST QUARTER COMPARISONS TO 2006

♦ Newsprint expense was down $9M (8%) compared to 2006 as a result of a 6% decline in consumption and a 1% decrease in average prices.

♦ Compensation expense decreased $4M (1%), primarily due to a 3% decrease in full-time equivalent employees and lower pension/retirement benefit expenses.

♦ Full time equivalents declined by about 600 due to the impact of staff reductions across the group.



**Average Regular Newsprint Cost Per Ton**

| | | | |
|---|---|---|---|
| $617 | $610 | | |
| | -1% | | |
| Q1 '06 | Q1 '07 | | |

| $576 | $631 | $594 |
| | | -6% |
| 2005 | 2006 | 2007 Proj |
| — Full Year — |

12

Profession    Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414395

BROADCASTING & ENTERTAINMENT

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

414396

T

## BROADCASTING AND ENTERTAINMENT
## FIRST QUARTER 2007 HIGHLIGHTS
## Excluding Special Items and Discontinued Operations

### COMPARISONS TO 2006

**Revenues:**

♦ Television revenues were down $1M (1%). Station revenues in New York, Los Angeles and Chicago all showed improvement for the quarter. For the station group, softness in the auto, retail and movie categories were partially offset by gains in the telecom, entertainment/recreation and packaged goods categories.

♦ Tribune Entertainment revenues were down 5% due to lower studio revenues.

♦ Chicago Cubs revenues increased $2M (39%) mainly due to MLB shared revenue adjustments and timing of exhibition and spring training games.

♦ WGN Radio revenues were down $2M (20%) primarily due to the discontinued sponsorship of the Flower and Garden show.

**Expenses:**

♦ Television cash operating expenses were up $4M (2%) primarily due to higher compensation expense, partially offset by a decrease in broadcast rights expense.

♦ Radio and entertainment expenses were up $1M (2%) due to higher player costs at the Cubs, partially offset by the absence of Flower and Garden sponsorship costs at WGN Radio.

**Operating Cash Flow:**

♦ Total broadcasting and entertainment operating cash flow was down $5M (7%).

♦ Total broadcasting and entertainment operating cash flow margins were 26.2% in 2007, down from 28.0% in 2006.

13





Professio        ' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414397

## BROADCASTING & ENTERTAINMENT
## SUMMARY OF OPERATIONS
### Excluding Discontinued Operations
### (Dollars in Millions)



First Quarter 2007
Cash Expenses by Type
(excluding Cubs)

Other 16%
Compensation 35%
Broadcast Rights 49%

| | FIRST QUARTER | | |
| | 2007 Actual | 2006 Actual | % Change |
|---|---|---|---|
| **Operating revenues** | | | |
| Television | $ 264.4 | $ 265.8 | (1) % |
| Radio/Entertainment | 18.6 | 18.3 | 1 |
| Total | $ 283.0 | $ 284.1 | - |
| **Operating expenses** | | | |
| Television | $ 197.5 | $ 193.1 | 2 |
| Radio/Entertainment | 24.1 | 23.6 | 2 |
| Total | $ 221.6 | $ 216.7 | 2 |
| **Operating cash flow** | | | |
| Television | $ 78.0 | $ 83.5 | (6) |
| Radio/Entertainment | (3.9) | (4.0) | - |
| Total | $ 74.1 | $ 79.5 | (7) |
| **Operating profit (loss)** | | | |
| Television | $ 66.9 | $ 72.7 | (8) |
| Radio/Entertainment | (5.5) | (5.2) | (6) |
| Total | $ 61.4 | $ 67.5 | (9) |
| **Cash expenses – excluding Cubs** | | | |
| Programming | $ 95.1 | $ 98.3 | (3) % |
| Compensation | 67.6 | 64.9 | 4 |
| Other | 32.4 | 30.8 | 5 |
| Total | $ 195.1 | $ 193.9 | 1 |

14

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## TELEVISION
## SUMMARY OF OPERATING REVENUES
### Excluding Discontinued Operations
### (Dollars in Millions)



First Quarter 2007
Operating Revenues

- Other TV Stations 47%
- NY/LA/CHI 40%
- Cable 13%

| | FIRST QUARTER | | |
| | 2007 Actual | 2006 Actual | % Change |
|---|---|---|---|
| Operating revenues | | | % |
| NY/LA/Chicago | | | |
| New York | $ 40.8 | $ 40.7 | - |
| Los Angeles | 37.0 | 36.6 | 1 |
| Chicago | 27.3 | 27.1 | 1 |
| Sub-total | 105.0 | 104.3 | 1 |
| | | | |
| Other Stations | | | |
| Philadelphia | 10.4 | 11.0 | (5) |
| Dallas | 12.8 | 12.6 | 2 |
| Washington | 8.4 | 9.4 | (10) |
| Houston | 8.7 | 8.7 | - |
| Seattle | 14.7 | 14.0 | 5 |
| Miami | 9.3 | 9.9 | (6) |
| Denver | 6.1 | 7.0 | (14) |
| Sacramento | 9.8 | 10.1 | (3) |
| St. Louis | 5.1 | 5.4 | (5) |
| Portland | 3.3 | 3.3 | (1) |
| Indianapolis | 10.3 | 11.0 | (6) |
| San Diego | 4.6 | 4.8 | (4) |
| Hartford | 9.1 | 8.5 | 6 |
| Grand Rapids | 4.0 | 4.3 | (8) |
| Harrisburg | 3.1 | 3.2 | (1) |
| New Orleans | 4.1 | 2.8 | 44 |
| Sub-total | 123.9 | 126.1 | (2) |
| | | | |
| Cable | | | |
| Chicago Cable | 24.2 | 25.2 | (4) |
| WGN Cable Distribution | 10.5 | 9.3 | 13 |
| Sub-total | 34.7 | 34.5 | 1 |
| | | | |
| Total | $ 264.4 | $ 265.8 | (1) |

15

Professio   ' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414399

## TELEVISION
## SUMMARY OF OPERATING CASH FLOW
### Excluding Discontinued Operations
### (Dollars in Millions)

| | FIRST QUARTER | | |
| --- | --- | --- | --- |
| | 2007 Actual | 2006 Actual | % Change |
| **Operating cash flow** | | | |
| **NY/LA/Chicago** | | | |
| New York | $ 13.2 | $ 13.0 | 2 % |
| Los Angeles | 8.4 | 9.1 | (8) |
| Chicago | 3.6 | 4.1 | (14) |
| Sub-total | 25.1 | 26.2 | (4) |
| | | | |
| **Other Stations** | | | |
| Philadelphia | 3.1 | 2.4 | 29 |
| Dallas | 4.6 | 4.9 | (7) |
| Washington | 3.2 | 3.6 | (11) |
| Houston | 2.5 | 2.9 | (16) |
| Seattle | 4.3 | 3.9 | 12 |
| Miami | 3.3 | 4.1 | (20) |
| Denver | - | 0.7 | (106) |
| Sacramento | 3.1 | 3.5 | (12) |
| St. Louis | 0.5 | 1.0 | (54) |
| Portland | 0.1 | 0.4 | (66) |
| Indianapolis | 2.1 | 2.3 | (9) |
| San Diego | - | 0.1 | (144) |
| Hartford | 2.1 | 1.8 | 18 |
| Grand Rapids | 1.1 | 1.4 | (25) |
| Harrisburg | 0.5 | 0.5 | (6) |
| New Orleans | 0.8 | (0.2) | NM |
| Sub-total | 31.1 | 33.2 | (6) |
| | | | |
| **Cable Superstation** | | | |
| Chicago Cable | 13.6 | 14.2 | (5) |
| WGN Cable Distribution | 8.7 | 7.8 | 11 |
| Sub-total | 22.2 | 22.0 | 1 |
| | | | |
| Corporate allocation | (0.3) | 2.0 | NM |
| | | | |
| Total | $ 78.0 | $ 83.5 | (6) |

### FIRST QUARTER COMPARISONS TO 2006

Overall:   Television operating cash flow decreased $5M (6%) due to modest declines at most stations. Revenues were $1M lower and cash expenses were $4M higher due to increased compensation, partially offset by lower broadcast rights.

| TV Operating Cash Flow Margins | | |
| --- | --- | --- |
| | First Quarter | |
| | 2007 | 2006 |
| NY/LA/Chicago | 23.9% | 25.1% |
| All Other TV Stations (A) | 25.1% | 26.3% |
| Cable Superstation | 64.1% | 64.0% |
| Total Group | 29.5% | 31.4% |

16

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

RADIO AND ENTERTAINMENT/OTHER
SUMMARY OF OPERATING CASH FLOW
(Dollars in Millions)

| | FIRST QUARTER | | |
| | 2007 Actual | 2006 Actual | % Change |
| --- | --- | --- | --- |
| **Operating cash flow** | | | |
| WGN Radio | $ 1.5 | $ 1.5 | (1) % |
| Tribune Entertainment | 1.6 | 0.6 | NM |
| Chicago Cubs | (6.6) | (5.6) | (18) |
| Other | (0.4) | (0.4) | (1) |
| Total | $ (3.9) | $ (3.9) | - |

**FIRST QUARTER COMPARISONS TO 2006**

TEC: Operating cash flow improved $1M mainly due to lower legal expenses, partially offset by a decline in studio revenues.

Cubs: Operating cash flow declined $1M (18%) mainly due to higher player-related costs.

17

Professio... ' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

OTHER INFORMATION

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414401

# TRIBUNE COMPANY
## CAPITAL EXPENDITURES OVERVIEW
### At April 1, 2007

Total spending for the first quarter was $21M. Full year projected spending was reduced to $150M from the plan of $200M in response to the difficult operating environment. Capital spending is traditionally higher during the second half of the year and that trend is expected to continue in 2007.

Publishing projects to spend $115M in 2007. Major system projects for all newspaper markets that continue in 2007 are the common advertising systems project ($27M in 2007, $77M total), the common editorial system ($9M in 2007, $33M total) and the common circulation system ($5M in 2007, $22M total). Web width reductions at seven of the markets continue in 2007 ($10M in 2007, $25M total). In Chicago, the color press expansion project is nearing completion ($2M in 2007, $75M total) and the preprint project to increase targeting capabilities continues ($10M in 2007, $39M total). The remaining spending is for system and hardware replacements, refurbishing of production equipment and technology enhancements across the Publishing group.

Broadcasting is expected to spend $28M in 2007. Approximately $9M is planned spending for digital transmission and studio equipment projects, including $4M to continue the transition to high-definition news in the New York, Los Angeles and Chicago markets. The remaining planned spending includes news equipment and various smaller projects throughout the station group. The 2007 plan and projection do not include anticipated spending at New Orleans to replace assets damaged by Hurricane Katrina, as it will be fully funded by insurance proceeds.

Corporate plans to spend $7M in 2007. This includes structural repairs and improvements to Tribune Tower and various software and hardware upgrades at the technology and finance shared service centers.

| | Summary By Group | | |
|---|---|---|---|
| | **2007** | | **2006** |
| | Projection | Plan | Actual |
| Publishing | $115M | $165M | $173M |
| Broadcasting | 28 | 28 | 42 |
| Corporate | 7 | 7 | 6 |
| Total | $150M | $200M | $222M |

18

Professio    ' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

T      ‡14402

TRIBUNE COMPANY
SUMMARY OF ACTIVE PROJECTS OVER $10 MILLION
At April 1, 2007

| | Status | Amount Spent To Date | Current Estimate at Completion | Approved Amount |
|---|---|---|---|---|
| | | | (Millions) | |
| **Publishing** | | | | |
| **Chicago** | | | | |
| **Color Press Expansion Project** - Add a color-printing tower and reconfigure each of the 10 presses in operation to increase color capacity from 16 to 32 pages. | • All ten reconfigured presses are in operation. Training, testing and phased implementation of full press capabilities continues into 2007. Final acceptance of all reconfigured presses and completion of the project are scheduled for the fourth quarter of 2007. | $ 70.0 | $ 75.0 | $ 75.0 |
| **Next Generation Preprint Project** - Replace existing inserting equipment with five new high-capacity inserters. New equipment will increase capacity and improve targeting capabilities. | • The first new inserter was installed during the first quarter of 2007. Next steps include start-up and acceptance testing for the installed inserter and initial roll-out of new zoning capabilities to key customers. | 18.7 | 39.4 | 39.4 |
| **Publishing Group** | | | | |
| **Advertising Systems Replacement Project** - Replace the classified advertising front-end and advertising billing systems at all Tribune Publishing newspaper markets. | • Full system installations for classified advertising have been completed in five markets. The remaining five markets will be completed by year-end 2007. Web order entry for classified advertising has also been launched in Orlando and Chicago. In-paper advertising, preprint and billing system implementations will follow the classified system launches by approximately one year. | 41.3 | 77.0 | 77.0 |
| **Common Editorial System Project** - Replace the current editorial systems at all Tribune Publishing newspaper markets with a standardized and centralized editorial front-end and pagination system. | • Chicago was the first market to launch the new system in the first quarter of 2007. Los Angeles, South Florida and Daily Press are scheduled to launch during the second quarter of 2007. System launches for the remaining markets are staggered over the second half of 2007 and into 2008. | 14.9 | 33.0 | 33.0 |
| **Common Circulation System Project** - Replace the circulation systems at all Tribune Publishing newspaper markets with a standardized and centralized circulation system. | • Hartford was the second market to launch the centralized circulation system in the first quarter of 2007. A revised project schedule is being reviewed and approved to ensure that a system interface problem is appropriately fixed prior to the system launches in the remaining markets | 13.5 | 22.0 | 22.0 |
| **Web Width Reduction Project** - Reduce the printing press widths at seven Tribune Publishing newspaper markets to reduce newsprint costs. | • Baltimore was the first market to complete their web width reduction in the fourth quarter of 2006. The remaining markets will convert to reduced web widths on a phased schedule throughout 2007 and 2008. | 3.1 | 24.6 | 24.6 |

19

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414403

**TRIBUNE COMPANY**
**SELECTED BALANCE SHEET DATA**
(Dollars in Millions)

| | 4/1/2007 | 12/31/2006 |
|---|---:|---:|
| **Assets** | | |
| Cash and cash equivalents | $ 182 | $ 175 |
| Total current assets | 1,306 | 1,377 |
| Intangible assets | 8,588 | 8,683 |
| Time Warner stock related to PHONES | 316 | 348 |
| Other investments | 536 | 565 |
| Prepaid pension costs | 307 | 293 |
| Properties and other | 2,131 | 2,135 |
| Total assets | $ 13,184 | $ 13,401 |
| | | |
| **Liabilities & shareholders' equity** | | |
| Borrowings under bridge credit facility | $ 1,325 | $ 1,310 |
| Other debt due within one year | 23 | 119 |
| Total current liabilities | 2,447 | 2,547 |
| PHONES debt related to Time Warner stock (A) | 612 | 573 |
| Other long-term debt | 2,996 | 3,003 |
| Deferred income taxes and other long-term liabilities | 2,817 | 2,958 |
| Shareholders' equity | 4,312 | 4,320 |
| Total liabilities and shareholders' equity | $ 13,184 | $ 13,401 |
| | | |
| Intangible assets as a percent of total assets | 65% | 65% |
| | | |
| Debt to Operating Cash Flow: | | |
| Excluding PHONES | 3.5x* | 3.3x |
| Including PHONES at book value ($612M) | 3.9x* | 3.8x |

(A)  Includes $468M and $465M of discounted debt and $144M and $108M of a call option at Apr. 1, 2007 and Dec. 31, 2006, respectively, which gives the holders of the PHONES the upside on Time Warner stock in excess of $78/share.

*Debt to Operating Cash Flow as of 4/1/2007 is calculated using 2007 projected operating cash flow.

20

Professio     ` Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TI     I14404

**TRIBUNE COMPANY**
**CONSOLIDATED INCOME STATEMENTS INCLUDING**
**SPECIAL ITEMS, NON-OPERATING ITEMS AND DISCONTINUED OPERATIONS**
(Dollars in Millions, Except Per Share Data)

| | FIRST QUARTER, 2007 | | FIRST QUARTER, 2006 | |
| --- | --- | --- | --- | --- |
| | Amount | Diluted EPS | Amount | Diluted EPS |
| **Net Income from Continuing Operations, before Special Items and Non-Operating Items** | $69.0 | $.28 | $117.6 | $.38 |
| Severance | (1.1) | - | - | - |
| Newsday union related charges | - | - | (19.2) | (.04) |
| Gain on sales of properties | - | - | 1.9 | - |
| **Total Special Items before taxes** | (1.1) | - | (17.3) | (.04) |
| Loss on Change in Fair Value of 16M Time Warner Shares, net of PHONES | (69.8) | (.18) | (10.3) | (.02) |
| Net loss on investments | - | - | (3.4) | - |
| Strategic review fees | (6.8) | (.03) | - | - |
| Other, net | 0.6 | - | 0.1 | - |
| **Total Non-Operating Items before taxes** | (76.0) | (.20) | (13.6) | (.02) |
| Income Taxes on Special Items and Non-Operating Items | 27.0 | - | 12.5 | - |
| **Net Income from Continuing Operations** | 18.8 | .08 | 99.2 | .32 |
| Income (Loss) from Discontinued Operations, net of tax (A) | (34.4) | (.14) | 3.6 | .01 |
| **Net Income (Loss)** | ($15.6) | ($.06) | $102.8 | $.33 |

(A) Includes SCNI and Hoy, New York in 2007 and 2006 and the Atlanta, Albany and Boston television stations in 2006.

21

TRB0414405

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRIBUNE COMPANY
BOARD OF DIRECTORS MEETING
WEDNESDAY, MAY 9, 2007 (9:00 A.M.)
PATTERSON BOARD ROOM, 24th FLOOR
TRIBUNE TOWER

AGENDA

|  | Tab No. |
|---|---|
| Executive session |  |
| • Director election | 1 |
| Approve minutes of February 13 and April 1, 2007 meetings | 2 |
| Preferred stock dividend | 3 |
| Election of officers | 4 |
| Committee appointments | 5 |
| First quarter operating results |  |
| Stock performance report | 6 |
| Development update | 7 |
| Transaction update |  |
| • Solvency presentation |  |
| • Delaware counsel opinion |  |
| Review of Annual Meeting |  |
| • CalPERS governance proposals | 8 |
| Audit Committee report |  |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414407

## TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTIONS

### (Election of Director)

RESOLVED, that the size of this Board of Directors be, and hereby is, increased from 11 to 12 members; and

FURTHER RESOLVED, that in order to fill the newly created directorship created by the above resolution, Samuel Zell is hereby elected as a member of this Board of Directors, effective May 9, 2007, to serve in the class of directors with terms expiring at the 2010 annual meeting of the shareholders of the Company and until his successor shall be elected and qualified or his earlier resignation or removal.

DPE
5/2/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414408



### Biography of Samuel Zell

A native Chicagoan, Samuel Zell is a graduate of the University of Michigan and the University of Michigan Law School. Mr. Zell began his career in real estate while an undergraduate at the University by managing apartment buildings throughout southeast Michigan. He continued his interests in real estate, and subsequently, non-real estate investments, with the founding of Equity Group Investments, L.L.C. (formerly known as Equity Financial and Management Company), an entrepreneurial investment firm based in Chicago where he currently serves as President and Chairman.

Mr. Zell maintains substantial interests in and serves as Chairman of the Board of various publicly traded companies which include Anixter International (AXE), a value-added provider of integrated networking and cabling solutions that support business information and network infrastructure requirements; Equity Lifestyle Properties, Inc. (ELS), an equity real estate investment trust which owns and operates manufactured home communities in 26 states; Equity Residential (EQR), the largest apartment real estate investment trust in the United States; Capital Trust (CT), a specialized real estate finance company; and Covanta Holding Corp. (CVA), a multinational owner and operator of modern waste to energy facilities. Mr. Zell also served as Chairman of the Board of Equity Office Properties Trust (EOP), a real estate investment trust which held the largest office portfolio of any publicly traded, full-service office company in the United States. EOP was sold to Blackstone in February 2007. Mr. Zell is also Chairman of Equity International, a privately-held, leading investor in real estate-related businesses outside of the United States.

Mr. Zell served a two-year term as Chairman of the National Association of Real Estate Investment Trusts (NAREIT) from 1998-2000. He serves on the JPMorgan National Advisory Board, the Eurohypo International Advisory Board, the President's Advisory Board at the University of Michigan, the Visitor's Committee at the University of Michigan Law School, and with the combined efforts of the University of Michigan Business School, established the Zell/Lurie Entrepreneurial Center. Mr. Zell's continual assistance to Michigan's MBA program has also enhanced the Business School's Polish Studies Program. He was appointed a DeRoy Visiting Professor in Honors at the College of Literature, Science and the Arts at the University of Michigan. He is a long standing supporter of the University of Pennsylvania Wharton Real Estate Center and has endowed the Samuel Zell/Robert Lurie Real Estate Center at Wharton. Mr. Zell has also endowed the Northwestern University Center for Risk Management.

Mr. Zell is an avid skier, racquetball player and enjoys riding motorcycles. He is a frequent contributor of articles to various publications and is often heard as keynote speaker throughout the United States and Europe.

SZ 2-27-07 update SZ BIO

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414409

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRIBUNE COMPANY
BOARD OF DIRECTORS MEETING
FEBRUARY 13, 2007

The Tribune Company Board of Directors met at 10:00 a.m. on Tuesday, February 13, 2007, at Tribune Tower, Chicago, Illinois, pursuant to notice. The meeting was attended by Dennis J. FitzSimons, Enrique Hernandez, Jr. Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, Dudley S. Taft and Miles D. White. Jeffrey Chandler, Roger Goodan and William Stinehart, Jr. participated via telephone.

Portions of the meeting were also attended by Chandler Bigelow, Donald C. Grenesko, Crane H. Kenney, Timothy J. Landon, Thomas D. Leach, Luis E. Lewin, Ruthellyn Musil, John E. Reardon, Scott C. Smith, Thomas A. Cole of Sidley Austin LLP, Steven A. Rosenblum of Wachtell Lipton Rosen & Katz, Charles W. Mulaney, Jr, of Skadden, Arps, Slate, Meagher & Flom, Michael Costa of Merrill Lynch, Christina Mohr of Citigroup and Paul Taubman of Morgan Stanley.

Mr. FitzSimons acted as chairman of the meeting and Mr. Kenney acted as secretary.

Mr. FitzSimons called the meeting to order at 10:00 a.m.

APPROVAL OF MINUTES

A motion was made, seconded and approved to adopt the minutes of the December 12, 2006 and January 20, 2007 meetings of the Board of Directors as submitted.

COMMON AND PREFERRED STOCK DIVIDENDS

A motion was made, seconded and approved to adopt the following resolutions:

RESOLVED, that there is hereby declared a dividend of $.18 per share on the common stock of the Company payable on March 8, 2007 to stockholders of record at the close of business on February 22, 2007; and

FURTHER RESOLVED, that there is hereby declared a dividend of $8.9375 per share on the Series D-1 Convertible Preferred Stock of the Company payable on March 8, 2007 to stockholders of record at the start of business on March 8, 2007.

EMPLOYEE BENEFITS COMMITTEE REPORT

Mr. Bigelow answered questions regarding a written report submitted to the Board prior to the meeting regarding the status and investment performance of the Company's pension and 401(k) plans. Mr. Bigelow then departed the meeting.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## OPERATING RESULTS

Mr. Grenesko reviewed the financial performance of the Company for the 2006 fourth quarter and full fiscal year and commented on the results of the first period of 2007. Mr. Grenesko then reviewed the 2006 fourth quarter and full year operating results for each line of business.

Mr. Grenesko then reviewed the Company's stock market performance for 2006, including peer company comparisons. Mr. Grenesko then answered questions from the Board.

## 2007 OPERATING PLAN

Mr. Grenesko presented the 2007 Operating Plan for approval by the Board. Mr. Grenesko noted that the operating plan does not reflect the implementation of any strategic actions currently under review by the Special Committee. Following questions from the Board, a motion was made, seconded and the 2007 Operating Plan was approved.

## DEVELOPMENT UPDATE

Mr. Leach reviewed the status of current development activities. Following his presentation, Mr. Leach answered questions from the Board.

## ANNUAL MEETING MATTERS

Mr. Kenney next presented a report on the status of preparation for the annual shareholders meeting. Mr. Kenney also reviewed the draft proxy and the matters to be submitted to the Company's shareholders for vote, including three shareholder proposals. Mr. Kenney reported that management has determined that all of the Company's outside directors are independent and that all the members of the Audit Committee meet the heightened independence requirements of the New York Stock Exchange, are financially literate and qualify as audit committee financial experts.

Following discussion, a motion was made, seconded and approved to adopt the following resolutions:

> RESOLVED, that the 2007 Annual Meeting of Shareholders of Tribune Company (the "Company") shall be held May 9, 2007 at Tribune Tower, 435 North Michigan Avenue, Chicago, Illinois, in accordance with the resolution adopted by this Board on December 12, 2006, which is hereby affirmed;

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414412

FURTHER RESOLVED, that, in the business judgment of this Board, each non-management director is "independent" under the New York Stock Exchange listing standards and the categorical standards for independence set forth in the Company's Board Governance Guidelines;

FURTHER RESOLVED, that in the business judgment of this Board, each of Betsy D. Holden, William A. Osborn, J. Christopher Reyes and Dudley S. Taft is (i) financially literate and meets the current independence and experience requirements of the New York Stock Exchange and applicable securities laws, rules and regulations for audit committee members and (ii) an "audit committee financial expert" as defined in applicable securities laws, rules and regulations;

FURTHER RESOLVED, that Jeffrey Chandler, William A. Osborn and Miles D. White be named in the proxy materials for the 2007 Annual Meeting as the Board of Directors' nominees for election as directors of the Company to hold office until the 2010 Annual Meeting and until their respective successors shall have been elected and qualified, and the Secretary is authorized and instructed to include the requisite information regarding the election of directors in the Board of Directors' proxy soliciting materials;

FURTHER RESOLVED, that the recommendation from the Audit Committee that the audited financial statements for the Company's fiscal year ended December 31, 2006 be included in the Annual Report on Form 10-K for filing with the Securities and Exchange Commission be, and it hereby is, accepted;

FURTHER RESOLVED, that a proposal to ratify the Audit Committee's appointment of PricewaterhouseCoopers LLP as the Company's independent accountants for 2007 be submitted to the stockholders at the 2007 Annual Meeting, and the Secretary is authorized and instructed to include the requisite information regarding this proposal in the Board of Directors' proxy soliciting materials;

FURTHER RESOLVED, that a shareholder proposal requesting that the stockholders of the Company recommend that this Board of Directors take the necessary steps to cause the annual election of directors be submitted to the stockholders at the 2007 Annual Meeting in accordance with the rules and regulations of the Securities and Exchange Commission, and the Secretary is authorized and instructed to include the requisite information regarding this shareholder proposal and management's response in opposition in the Board of Directors' proxy soliciting materials;

FURTHER RESOLVED, that a shareholder proposal requesting that the

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

stockholders of the Company recommend that this Board of Directors adopt a policy that the Chairman of this Board of Directors be an independent director who has not previously served as an executive officer of the Company be submitted to the stockholders at the 2007 Annual Meeting in accordance with the rules and regulations of the Securities and Exchange Commission, and the Secretary is authorized and instructed to include the requisite information regarding this shareholder proposal and management's response in opposition in the Board of Directors' proxy soliciting materials;

FURTHER RESOLVED, that a shareholder proposal requesting that the stockholders of the Company recommend that this Board of Directors take all steps necessary, in compliance with applicable law, to remove the supermajority voting requirements in the Company's Amended and Restated Certificate of Incorporation and By-Laws be submitted to the stockholders at the 2007 Annual Meeting in accordance with the rules and regulations of the Securities and Exchange Commission, and the Secretary is authorized and instructed to include the requisite information regarding this shareholder proposal and management's response in opposition in the Board of Directors' proxy soliciting materials;

FURTHER RESOLVED, that the draft forms of notice of meeting and proxy materials submitted to and reviewed by this Board at this meeting are hereby approved; that this Board adopts as its recommendations that the stockholders vote FOR the Board's nominees for director, FOR the ratification of the Audit Committee's appointment of PricewaterhouseCoopers LLP as the Company's independent accountants for 2007, AGAINST the shareholder proposal concerning the Company's classified board of directors (with Messrs. Chandler, Goodan and Stinehart voting in opposition to the Board's recommendation on this proposal), AGAINST the shareholder proposal concerning the Company's Chairman and Chief Executive Officer positions and AGAINST the shareholder proposal concerning the Company's supermajority voting provisions and that the form of notice and proxy materials submitted to and reviewed by this Board at this meeting be forwarded to each stockholder of the Company entitled to notice of the 2007 Annual Meeting, with such changes therein or additions thereto as shall be approved by the Secretary;

FURTHER RESOLVED, that Dennis J. FitzSimons and Crane H. Kenney, or either of them, are designated as proxies for the 2007 Annual Meeting, with full power and authority to vote as described in the proxy materials and as provided by law;

FURTHER RESOLVED, that Thomas G. Caputo, Mark W. Hianik and Tammie Marshall are appointed as inspectors of voting for the 2007 Annual Meeting as

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

provided in Section 2.7 of the Company's By-Laws; and

FURTHER RESOLVED, that the proper officers of the Company are hereby authorized and empowered to take all steps necessary to effect the foregoing resolutions, including executing, filing or delivering such documents as may be required by law or as may be deemed necessary or proper in connection with the matters set forth in these resolutions.

At this point, Messrs. Landon, Leach, Lewin, Reardon, Smith and Ms. Musil departed the meeting.

## AUDIT COMMITTEE REPORT

Mr. Osborn reported on the business discussed at the Audit Committee meeting held earlier in the day.

Mr. Osborn reported that the Committee reviewed the status of the Company's internal controls certification project, a summary of work performed by Internal Audit for 2006 and the results of the Company's annual impairment testing of goodwill and other intangible assets.

Mr. Osborn next reported on the status of the 2006 financial audit and noted that the Committee recommends to the Board that the Company's financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2006 for filing with the SEC.

Mr. Osborn also reported that the Committee discussed the appointment of independent auditors for 2007. Following discussion, the Committee determined to reappoint PricewaterhouseCoopers as the Company's independent auditors for 2007 subject to shareholder ratification at the 2007 annual shareholders meeting.

At this point, Messrs. Grenesko and Kenney departed the meeting.

## COMPENSATION & ORGANIZATION COMMITTEE REPORT

Mr. Morrison reported on the business discussed at the Compensation & Organization Committee meeting held earlier in the day.

Mr. Morrison reported that the Committee reviewed and approved management's recommendation to allow for the deferral of future director stock awards made under the Incentive Compensation Plan on the same terms and conditions provided for in the 1996 Nonemployee Director Stock Compensation Plan, the predecessor plan for these awards.

5

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Mr. Morrison then reported that the Committee reviewed and approved the Compensation Discussion and Analysis section and related Committee report for inclusion in the Company's annual report and proxy statement.

Mr. Morrison next reported that the Committee reviewed and approved the 2006 bonus recommendations and the financial targets for 2007 Management Incentive Plan bonuses.

Mr. Morrison reported that the Committee reviewed management's final 2007 equity compensation recommendations, which followed the general framework outlined by management and endorsed by George Paulin of Frederic W. Cook at the December Committee meeting. The Committee agreed to implement the recommendations, as appropriate, in connection with the transaction or transactions approved by the Board at the conclusion of the Special Committee's strategic review process.

Mr. Morrison reported that the Committee reviewed and approved 2006 bonuses, 2007 salary adjustments and 2007 restricted stock unit awards for the executives to be named in the 2007 proxy (other than Mr. FitzSimons) and the next 25 most highly compensated Tribune executives. At this time, Mr. FitzSimons departed the meeting.

Finally, Mr. Morrison reported that the Committee reviewed Mr. FitzSimons' performance in 2006 and approved his 2006 bonus, 2007 salary adjustment and 2007 restricted stock unit award.

A discussion followed Mr. Morrison's report.

At this point, Messrs. FitzSimons, Grenesko, Kenney and Leach rejoined the meeting.

## EXECUTIVE SESSION

The directors met in executive session at the end of the meeting regarding the ongoing strategic review process.

## ADJOURNMENT

There being no further business to come before the Board, the meeting was adjourned at approximately 1:00 p.m.

_____
Secretary

6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414416

**TRIBUNE COMPANY**
**BOARD OF DIRECTORS MEETING**
**APRIL 1, 2007**

The Tribune Company Board of Directors met at 10:20 p.m. Central time on Sunday, April 1, 2007, by conference telephone, pursuant to notice. The following directors participated in the meeting: Jeffrey Chandler, Dennis J. FitzSimons, Roger Goodan, Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, William Stinehart, Jr. and Miles D. White. Dudley S. Taft was unable to participate in the meeting.

The following Company officers and advisors also participated in the meeting: Donald C. Grenesko, Crane H. Kenney, Thomas D. Leach, Tom Cole of Sidley Austin LLP, Steve Rosenblum of Wachtell Lipton Rosen & Katz, Charles Mulaney of Skadden, Arps, Slate, Meagher & Flom LLP, Michael Costa of Merrill Lynch, Christina Mohr of Citigroup, Paul Taubman and Tom Whayne of Morgan Stanley, William W. Merten of McDermott Will & Emery, Elyse Bluth of Duff & Phelps, LLC, Marilyn Marchetti of GreatBanc Trust Company and Charles R. Smith of K&L Gates.

Mr. FitzSimons acted as chairman of the meeting and Mr. Kenney acted as secretary.

Mr. FitzSimons called the meeting to order at 10:20 p.m. Central time.

## LEVERAGED ESOP TRANSACTION

Mr. FitzSimons reported that the Compensation & Organization Committee and the Special Committee had just concluded separate telephonic meetings regarding the proposed leveraged ESOP transaction with Samuel Zell and the newly-created Tribune Employee Stock Ownership Plan (the "Proposed Transaction") and that the Special Committee was now in a position to recommend the Proposed Transaction to the full Board of Directors for approval.

Mr. Rosenblum then provided the Board with an overview of the Proposed Transaction structure and transaction documents, drafts of which were previously provided to the Directors for their review. Mr. Rosenblum noted



Redacted

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Mr. Costa then provided an updated financial overview of the Proposed Transaction, comparing it to the proposed leveraged recapitalization/Broadcasting & Entertainment spin-off transaction that the Board had previously reviewed. He also reviewed the letters submitted by another third-party group expressing that group's interest in participating in an ESOP buyout at a price of $34 per share, the same price as contemplated by the Proposed Transaction. Following discussion of these matters, Mr. Costa delivered Merrill Lynch's fairness opinion supporting the Proposed Transaction.

Mr. Whayne next discussed the comparative financial analysis of the Proposed Transaction and the proposed leveraged recapitalization/spin-off transaction, as well as the letters submitted by the third-party group, that his firm provided to the Special Committee. Mr. Whayne then advised the Board that Morgan Stanley had delivered a fairness opinion supporting the Proposed Transaction to the Special Committee and Mr. Whayne provided the same fairness opinion to the full Board.

Ms. Marchetti then reported on the ESOP Trustee's due diligence review and provided an overview of the ESOP-related components of the Proposed Transaction. Ms. Marchetti reported that (i) the ESOP Trustee had received an opinion from its financial advisor, Duff & Phelps, LLC, that the terms of the Proposed Transaction are fair and reasonable from a financial point of view, (ii) the Proposed Transaction had been approved by the ESOP Trustee's ESOP transaction review committee and (iii) the ESOP Trustee was prepared to proceed with document execution.

Following these presentations, Mr. Osborn, as Chair of the Special Committee, advised the Board that the Special Committee, following review with its independent legal and financial advisors, recommends the full Board approve the Proposed Transaction as presented at this meeting. Mr. Osborn and members of senior management then responded to questions from the Directors. During the course of this discussion, Mr. Stinehart advised the Board that he and Messrs. Chandler and Goodan would abstain from the Board vote on the Proposed Transaction, but that the Chandler Trusts would vote in favor of the merger at the special shareholders' meeting and would enter into a voting agreement with the Company evidencing this understanding.

Following discussion, Mr. Rosenblum reviewed the proposed resolutions that were before the Board. On motion duly made and seconded, the Board (with Messrs. Chandler, Goodan and Stinehart abstaining) then adopted the following recitals and resolutions:

WHEREAS, it is proposed that Tribune Company, a Delaware corporation (the "Company"), enter into certain agreements listed on Exhibit A hereto (collectively, as each may be amended, modified, waived or supplemented from time to time, the "Transaction Agreements"), which contemplate the entry into and the consummation of certain transactions and the rights and obligations of the Company with respect thereto (collectively, the "Transactions");

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414418

WHEREAS, it is deemed to be in the best interests of the Company to recognize and reward the contribution by the Company's employees to its successful operation, and to provide an incentive for such employees to increase their productivity, by enabling them to acquire stock ownership interests in the Company and to share in the profits of the Company through a plan that will qualify as an "employee stock ownership plan" within the meaning of the Internal Revenue Code of 1986, as amended, and the Employee Retirement Income Security Act of 1974, as amended, to be known as the Tribune Employee Stock Ownership Plan (the "ESOP");

WHEREAS, it is proposed that the Company enter into an Agreement and Plan of Merger (the "Merger Agreement"), by and among the Company, GreatBanc Trust Company, as trustee (in such capacity, the "ESOP Fiduciary") and on behalf of the ESOP, and Tesop Corporation, a Delaware corporation wholly owned by the ESOP ("Merger Sub"), and, for the limited purposes set forth therein, EGI-TRB L.L.C., a Delaware corporation ("Tower Acquisition");

WHEREAS, the Merger Agreement provides for, among other things, Merger Sub to be merged with and into the Company (the "Merger"), with the Company surviving the Merger (the "Surviving Corporation"), whereby, among other things and subject to the terms and on the conditions stated in the Merger Agreement, each issued and outstanding share of common stock of the Company, par value $0.01 per share ("Common Stock"), other than shares held by the ESOP or with respect to which dissenters' rights are validly exercised and not withdrawn, will be converted into the right to receive $34.00 in cash per share of Common Stock, subject to increase to the extent set forth in the Merger Agreement;

WHEREAS, it is proposed that the Company enter into a Securities Purchase Agreement, by and among the Company, Tower Acquisition, and Mr. Samuel Zell (the "Guarantor") (the "Securities Purchase Agreement"), which provides for, among other things, and subject to the terms and on the conditions stated in the Securities Purchase Agreement, (i) prior to the consummation of the Merger (the "First Closing"), (a) Tower Acquisition to acquire, and the Company to sell, 1,470,588 newly issued shares of Common Stock for $34.00 per share (the "Purchased Shares") for an aggregate purchase price of $50,000,000; and (b) an unsecured subordinated exchangeable note, issued by the Company to Tower Acquisition with an aggregate principal amount of $200,000,000, subject to certain terms and conditions stated therein (the "Exchangeable Note") for an aggregate purchase price of $200,000,000; and (ii) immediately following the consummation of the Merger (the "Second Closing"), in exchange for the consideration set forth therein, (a) an unsecured subordinated promissory note, made by the Company to Tower Acquisition with an aggregate principal amount of $225,000,000, subject to certain terms and conditions stated therein (the "Subordinated Promissory Note"); and (b) a warrant to purchase 43,478,261 shares of common stock of the Surviving Corporation (the "Warrant Agreement");

WHEREAS, it is proposed that the Company enter into an ESOP Purchase Agreement, by and among the Company and the ESOP (the "ESOP Purchase Agreement"), which provides for, among other things and subject to the terms and on the conditions stated in the ESOP Purchase Agreement, the ESOP to purchase, and the Company to sell, 8,928,571 newly issued shares of Common Stock (the "ESOP Shares") for an aggregate purchase price of $250,000,000;

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414419

**WHEREAS**, in connection with the ESOP Purchase Agreement, it is proposed that the Company enter into an ESOP Loan Agreement, by and between the Company and the ESOP (the "ESOP Loan Agreement"), which provides for, among other things, and subject to the terms and on the conditions stated in the ESOP Loan Agreement, including execution of a note (the "ESOP Note") and a pledge agreement (the "ESOP Pledge Agreement") in favor of the Company, the extension of credit by the Company to the ESOP Fiduciary to implement the terms of the ESOP Purchase Agreement and to enable the ESOP to purchase Common Stock pursuant thereto;

**WHEREAS**, in connection with the Merger Agreement, the Securities Purchase Agreement and the ESOP Purchase Agreement, it is proposed that the Company enter into an Investor Rights Agreement by and among the Company, Tower Acquisition and the ESOP (the "Investor Rights Agreement"), which provides for, among other things, the right of Tower Acquisition to designate individuals to the Board of Directors of the Company, as well as other matters in connection with the governance of the Company following the execution of said agreements and the consummation of the transactions contemplated thereby;

**WHEREAS**, in connection with the Merger Agreement, the Securities Purchase Agreement and the ESOP Purchase Agreement, it is proposed that the Company enter into a voting agreement with Chandler Trust No. 1 and Chandler Trust No. 2 (the "Voting Agreement"), whereby Chandler Trust No. 1 and Chandler Trust No. 2 each agrees to vote its respective shares of Common Stock in favor of the Merger, tender their respective shares into the Share Repurchase and take other actions designed to ensure approval of the Merger Agreement and the Merger;

**WHEREAS**, it is proposed that the Company enter into registration rights agreements with Tower Acquisition, the ESOP, Chandler Trust No. 1 and Chandler No. 2 (each agreement, a "Registration Rights Agreement"), whereby Tower Acquisition, the ESOP, Chandler Trust No. 1 and Chandler No. 2 are each provided with certain registration rights with respect to shares of Common Stock;

**WHEREAS**, it is proposed that, under the circumstances contemplated by the Merger Agreement, the Company enter into an Exchange Agreement with Eagle New Media Investments, LLC and Eagle Publishing Investments, LLC (collectively, the "Eagle Entities") (the "Exchange Agreement"), under which the Company will, immediately prior to the consummation of the Merger, issue shares of a new series of the Company's preferred stock, as contemplated by the Merger Agreement, to the Eagle Entities, in exchange for all of the shares of Common Stock and preferred stock currently held by the Eagle Entities;

**WHEREAS**, the Company and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent (the "Rights Agent"), have executed and entered into a Rights Agreement, dated as of December 12, 1997 (as amended, the "Rights Agreement");

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414420

WHEREAS, pursuant to Section 27 of the Rights Agreement, the Company and the Rights Agent may from time to time supplement or amend the Rights Agreement in accordance with the provisions thereof;

WHEREAS, it is proposed that the Board of Directors of the Company amend the Rights Agreement substantially in the form of Exhibit B hereto ("Amendment No. 3"), to clarify that the execution and performance of the Transaction Agreements do not result in any of the parties thereto being deemed to be an Acquiring Person (as defined in the Rights Agreement);

WHEREAS, it is proposed that the Company enter into a First Step Commitment Letter, by and among the Company, Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A. and/or Bank of America, N.A., Banc of America Bridge LLC and Banc of America Securities LLC (collectively, the "First Step Credit Facilities Agents") (including the Summary of Terms and Conditions appended thereto, the Fee Letter issued in connection therewith and the Engagement Letter issued in connection therewith, collectively, the "First Step Commitment"), which provides for, among other things, and subject to the terms and on the conditions stated in the First Step Commitment, the First Step Credit Facilities Agents to provide senior secured credit facilities for the Company in an aggregate principal amount of approximately $8.028 billion, consisting of a $7.015 billion seven-year term loan, a $263 million seven-year term loan and a $750 million six-year revolving line of credit (collectively, the "First Step Credit Facility"), for the uses and purposes described in the First Step Commitment;

WHEREAS, it is proposed that the Company enter into a Second Step Commitment Letter, by and among the Company, Merrill Lynch Capital Corporation, Citigroup Global Markets Inc., J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A. and/or Bank of America, N.A., Banc of America Bridge LLC and Banc of America Securities LLC (collectively, the "Second Step Credit Facilities Agents" and, together with the First Step Credit Facilities Agents, the "Credit Facilities Agents") (including the Summary of Terms and Conditions appended thereto, the Fee Letter issued in connection therewith and the Engagement Letter issued in connection therewith, collectively, the "Second Step Commitment" and, together with the First Step Commitment, the "Commitments"), which provides for, among other things, and subject to the terms and on the conditions stated in the Second Step Commitment, the Second Step Credit Facilities Agents to (i) provide an incremental term loan facility for the Company in an aggregate principal amount of approximately $2.105 billion (the "Incremental Facility" and, together with the First Step Credit Facility, the "Secured Facilities") and (ii) either provide a senior unsecured bridge facility for the Company or provide assistance in connection with the issuance of senior notes and/or senior unsecured notes by the Company, in either case in an aggregate principal amount of approximately $2.1 billion (together, the "Unsecured Facility" and the Unsecured Facility together with the Incremental Facility, the "Second Step Credit Facility" and the Second Step Credit Facility together with the First Step Credit Facility, the "Credit Facilities"), each for the uses and purposes described in the Second Step Commitment;

5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**WHEREAS**, in connection with the Company's entry into the Credit Facilities and the issuance of the Securities (as defined under the heading "Capital Market Debt Issuances" below), it is proposed that the Company enter into interest rate management transactions constituting a rate swap, basis swap, forward rate transaction, interest rate option, cap transaction, floor transaction, collar transaction, forward transaction or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, linked to one or more interest rates with respect to notional amounts of indebtedness under the Credit Facilities and under the Securities determined from time to time by the officer or officers hereafter authorized to be necessary in connection with the Company's financial operations or performance (the "Interest Rate Hedging Transactions");

**WHEREAS**, it is proposed that as promptly as practicable following the execution of the Merger Agreement, the Company commence a self-tender offer to repurchase shares of Common Stock at $34.00 per share, net to the seller in cash (the "Share Repurchase");

**WHEREAS**, a Special Committee of the Board of Directors (the "Special Committee") has been formed consisting of members of the Board of Directors of the Company (the "Board") other than members of the Company's management and representatives of Chandler Trust No. 1 and Chandler Trust No. 2;

**WHEREAS**, the Special Committee has reviewed the terms of the Transaction Agreements and the Transactions with management and its outside legal and financial advisors, and has recommended that the Board approve the Transaction Agreements and the Transactions;

**WHEREAS**, at this meeting, the Board has received the opinion of its financial advisor, Merrill Lynch & Co., Inc., and the Special Committee's financial advisor, Morgan Stanley & Co. Incorporated, with respect to the Transactions, to the effect that the Transactions are fair, from a financial point of view, to the stockholders of the Company (who are not parties to the Transaction Agreements);

**WHEREAS**, at this meeting, the Board has reviewed the terms of the Transaction Agreements and the Transactions, and on the recommendation of the Special Committee and based on the presentations of the Company's outside legal and financial advisors at this and other meetings, and on such other factors as the Board deemed pertinent, determined that entry into the Transaction Agreements and the consummation of the Transactions is advisable, fair to and in the best interests of the Company and its stockholders; and

**WHEREAS**, the Board has determined to approve the Transaction Agreements and to authorize the proper officers of the Company to take all actions necessary and proper for the execution of the Transaction Agreements and the consummation of the Transactions.

6

NOW, THEREFORE, BE IT:

## Establishment of ESOP and Appointment of Trustee

RESOLVED, that the Board hereby establishes a plan designed to invest primarily in stock of the Corporation, which will qualify as an "employee stock ownership plan" within the meaning of Section 4975(e)(7) of the Internal Revenue Code of 1986, as amended and Section 407(d)(6) of the Employee Retirement Income Security Act of 1974, as amended;

FURTHER RESOLVED, that the form of employee stock ownership plan that has been presented to the Board, to be known as the "Tribune Employee Stock Ownership Plan," be and hereby is approved and adopted, effective as of January 1, 2007;

FURTHER RESOLVED, that the form of employee stock ownership trust that has been presented to the Board, to be known as the "Tribune Employee Stock Ownership Trust," be and hereby is approved and adopted, effective as of February 7, 2007;

FURTHER RESOLVED, that the appointment of GreatBanc Trust Company to serve as trustee of the Tribune Employee Stock Ownership Trust is hereby ratified;

FURTHER RESOLVED, that the Tribune Company Employee Benefits Committee is hereby appointed to serve as the Administrator under Section 1.4 of the Tribune Employee Stock Ownership Plan and under Section 2.2 of the Tribune Employee Stock Ownership Trust;

FURTHER RESOLVED, that the proper officers of the Corporation are authorized and directed to execute the agreement memorializing the Tribune Employee Stock Ownership Trust on behalf of the Company, to obtain an execution of such agreement by the ESOP Fiduciary and to execute a certification with respect to the adoption of the ESOP; and

FURTHER RESOLVED, that the proper officers of the Company are authorized and directed to work with counsel to submit to the Internal Revenue Service copies of the Plan and other documents ancillary thereto, with a request that the Internal Revenue Service issue a determination letter that the Plan is qualified under Code Section 401(a) and that it constitutes an employee stock ownership plan within the meaning of Code 4975(e)(7).

## Approval of the Transaction Agreements and the Transactions

FURTHER RESOLVED, that having reviewed the terms of the Transaction Agreements and the Transactions, and on the recommendation of the Special Committee and based on the presentations of the Company's outside legal and financial advisors at this and other meetings, and on such other factors as the Board deemed pertinent, the Board determines that entry into the Transaction Agreements and the consummation of the Transactions is advisable, fair to and in the best interests of the Company and its stockholders;

7

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414423

**FURTHER RESOLVED,** that the Board hereby approves the form of temporary certificate representing the ESOP Shares to be executed by the President of the Company and attested to by the Secretary or any Assistant Secretary of the Company;

**FURTHER RESOLVED,** that the Board hereby approves the issuance of the Purchased Shares to Tower Acquisition pursuant to the terms of the Securities Purchase Agreement, the issuance of shares of Common Stock to Tower Acquisition pursuant to the terms of the Exchangeable Note (the "Exchange Shares"), and the issuance of the ESOP Shares to the ESOP pursuant to the terms of the ESOP Purchase Agreement, and such shares will be validly issued, fully paid and nonassessable, when the certificates representing the Purchased Shares, Exchange Shares and ESOP Shares, respectively, have been duly executed, countersigned and registered and duly delivered to Tower Acquisition or the ESOP, as applicable, against payment of the agreed consideration therefor in accordance with the Securities Purchase Agreement, the Exchangeable Note and the ESOP Purchase Agreement, respectively;

**FURTHER RESOLVED,** that the Board hereby approves the execution and performance of the Transaction Agreements and the consummation of the Transactions, and intends that the foregoing approval and adoption render inapplicable to the execution of the Transaction Agreements and the Transactions contemplated thereby, including the Merger, all "fair price," "merger moratorium," "control share acquisition," or other antitakeover or similar statutes or regulations, including, without limitation, Section 203 of the Delaware General Corporation Law, that apply or purport to apply to such agreements or transactions, and hereby takes all action necessary to exempt such agreements and transactions therefrom;

**FURTHER RESOLVED,** that the proper officers of the Company be, and each of them hereby is, authorized for and on behalf of the Company to execute and deliver each of the Transaction Agreements in substantially the form presented to the Board at this meeting, with such changes as such officer executing the same may approve, the execution and delivery of each of the Transaction Agreements by such officer to be deemed conclusive evidence that the Board and the Company have approved and adopted, and do approve and adopt, each of the Transaction Agreements as executed; and

**FURTHER RESOLVED,** that the proper officers of the Company be, and each hereby is, authorized to file, execute, verify, acknowledge and deliver, for and on behalf of the Company, any and all notices, certificates, agreements, amendments, instruments and other documents and to perform or do or cause to be performed or done any and all such acts or things and to pay or cause to be paid all necessary fees and expenses, in each case in the name and on behalf of the Company, as they or any of them may deem necessary or advisable to enable, effectuate or carry out the provisions of each of the Transaction Agreements or the intentions and purposes of the foregoing resolutions in connection with the Transactions, the taking of any such action to be deemed conclusive evidence that the Board and the Company have authorized such action.

8

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414424

### Credit Facilities and Related Matters

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized for and on behalf of the Company to (i) execute for, in the name of and on behalf of the Company, and deliver to the Credit Facilities Agents, individually and/or as agents for themselves and the other lenders that may participate in the Credit Facilities, any and all instruments, documents and agreements deemed necessary or desirable by the Credit Facilities Agents in order to evidence the Credit Facilities properly in accordance with the requirements of the Commitments and the Credit Facilities contemplated thereby and any other requirements established by the Credit Facilities Agents or any of the other lenders, including without limitation promissory notes, loan or credit agreements, joinder agreements, indemnity agreements, pledge agreements, security agreements, guarantees, certificates, affidavits, applications, notices, financing statements or any other agreements or instruments evidencing the indebtedness of the Company for the monies so borrowed, with interest thereon, including renewals, extensions and/or amendments of said promissory notes, loan or credit agreements, joinder agreements, indemnity agreements, pledge agreements, security agreements, guaranties, certificates, affidavits, applications, notices, financing statements or any other agreements or instruments (individually and collectively, the "Credit Facilities Documents"), all in the form required by the Credit Facilities Agents and approved by the proper officers of the Company executing same, the execution of same by such officers to constitute conclusive evidence of the approval of same, (ii) enter into the Interest Rate Hedging Transactions on terms as, in the judgment of the officer or officers hereafter authorized, the Company may from time to time hereafter require, (iii) take from time to time any actions deemed necessary or desirable by the proper officers of the Company to establish the Credit Facilities and to evidence the Credit Facilities properly in accordance with the requirements of the Commitments and the Credit Facilities Documents contemplated thereby and any other requirements established by the Credit Facilities Agents and/or any of the other lenders, and to cause the Company to enter into and perform all of its obligations pursuant to the Credit Facilities Documents or otherwise in connection with the Credit Facilities and (iv) execute from time to time renewals, extensions and/or amendments of the Credit Facilities Documents;

**FURTHER RESOLVED**, that the proper officers, be and they are each hereby authorized, directed and empowered, in the name of the Company, to execute and deliver for the benefit of each counterparty to the Interest Rate Hedging Transactions ISDA master agreements, confirmations, schedules, joinder agreements, pledge agreements, security agreements, financing statements or other agreements or instruments evidencing the obligations of the Company under such Interest Rate Hedging Transactions, and each of said Authorized Officers are authorized to from time to time execute renewals, extensions and/or amendments of said ISDA master agreements, confirmations, schedules, joinder agreements, pledge agreements, security agreements, financing statements or other agreements or instruments;

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized for and on behalf of the Company to, as security for the indebtedness and other obligations of the Company to the Credit Facilities Agents, individually and/or as agents for

9

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414425

themselves, the other lenders that may participate in the Secured Facilities and each party that may act as a counterparty to an Interest Rate Hedging Transaction, whether arising pursuant to this resolution or otherwise, if required by the Commitments, grant, transfer, pledge, mortgage, assign, or otherwise hypothecate to the Credit Facilities Agents, individually and/or as agents for themselves, the other lenders that may participate in the Secured Facilities and each party that may act as a counterparty to an Interest Rate Hedging Transaction, or deed in trust for its and/or their benefit, any assets belonging to the Company, including without limitation the capital stock of each of the direct and indirect subsidiaries of the Company, to secure all indebtedness under the Secured Facilities at any time owing to the Credit Facilities Agents, individually and/or as agents for themselves and the other lenders that may participate in the Secured Facilities and, if required by the Commitments, to execute and deliver to the Credit Facilities Agents, individually and/or as agents for themselves, the other lenders that may participate in the Secured Facilities and each party that may act as a counterparty to an Interest Rate Hedging Transaction, any and all grants, transfers, pledge agreements, mortgages, deeds of trust, financing statements, security agreements and other hypothecation agreements; said instruments, and the promissory notes and other instruments and agreements referred to in the preceding paragraph, may contain such provisions, covenants, recitals and agreements as the Credit Facilities Agents, individually and/or as agents for themselves, the other lenders that may participate in the Secured Facilities and each party that may act as a counterparty to an Interest Rate Hedging Transaction, may require and any of said officers may approve, and the execution thereof by said officers shall be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized for and on behalf of the Company to, as security for the indebtedness and other obligations of the Company to one or more trustees on behalf of the noteholders holding certain of the Company's outstanding senior notes (the "Existing Notes"), if required by the indentures pursuant to which such Existing Notes were issued, grant, transfer, pledge, mortgage, assign, or otherwise hypothecate to such trustee(s) for the benefit of such noteholders, or deed in trust for its and/or their benefit, any assets belonging to the Company as are pledged to Credit Facilities Agents, individually and/or as agents for themselves and the other lenders that may participate in the Secured Facilities, pursuant to the Secured Facilities, to secure, on an equal and ratable basis, all indebtedness at any time owing to such noteholders under such indentures and, if required by such indentures, to execute and deliver to such trustees on behalf of such holders of Existing Notes, any and all grants, transfers, pledge agreements, mortgages, deeds of trust, financing statements, security agreements and other hypothecation agreements; said instruments, and the promissory notes and other instruments and agreements referred to in the preceding paragraph, may contain such provisions, covenants, recitals and agreements as are contained in the grants, transfers, pledge agreements, mortgages, deeds of trust, financing statements, security agreements and other hypothecation agreements executed and delivered pursuant to the Secured Facilities and any of said officers may approve, and the execution thereof by said officers shall be conclusive evidence of such approval;

**FURTHER RESOLVED**, that the performance by the Company of its obligations under the Commitments, the Credit Facilities and the Interest Rate Hedging Transactions and any

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414426

agreements or documents referred to herein or therein be, and it hereby is, ratified, confirmed, approved and adopted in all respects;

**FURTHER RESOLVED**, that the proper officers of the Company be, and each hereby is, authorized to file, execute, verify, acknowledge and deliver, for and on behalf of the Company, any and all notices, certificates, agreements, amendments, instruments and other documents and to perform or do or cause to be performed or done any and all such acts or things and to pay or cause to be paid all necessary fees and expenses, in each case in the name and on behalf of the Company, as they or any of them may deem necessary or advisable to enable, effectuate or carry out the provisions of each of the Commitments or the intentions and purposes of the foregoing resolutions in connection with the Credit Facilities and the Interest Rate Hedging Transactions, the taking of any such action to be deemed conclusive evidence that the Board and the Company have authorized such action; and

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized for and on behalf of the Company to designate such individual employee(s) of the Company as they deem appropriate to execute and deliver on behalf of the Company certificates, reports and other documents as may be required from time to time in conjunction with the Commitments and the Credit Facilities and the Interest Rate Hedging Transactions, and the actions of such individual(s) shall be binding and enforceable against the Company.

## Capital Markets Debt Issuances

**FURTHER RESOLVED**, that the Board of Directors hereby authorizes and approves the issuance and sale by the Company from time to time, in one or more public or Rule 144A or other privately negotiated offerings, of up to $2.1 billion (in aggregate principal amount, or, if issued at an original issue discount, in aggregate offering price or purchase price, in U.S. dollars or the equivalent in foreign denominated currency or composite currency) (the "Authorized Amount") of unsecured notes, debentures or other debt securities (which may be senior, subordinated, senior subordinated, junior subordinated or any combination of the foregoing) ("Debt Securities") and/or warrants to purchase Debt Securities ("Warrants"). Such Debt Securities and Warrants are collectively referred to herein as the "Securities." The Securities shall be created, issued and sold, subject to the limitations set forth in this resolution, on such terms and conditions as shall be determined by the Special Committee of members of this Board established in the resolution immediately following this resolution;

**FURTHER RESOLVED**, that the officers of the Company are severally authorized and directed to prepare and execute, in the name and on behalf of the Company, a Registration Statement on Form S-3, or other appropriate form under the Securities Act of 1933, as amended (the "Securities Act"), for the registration of the Securities up to the Authorized Amount (the "Registration Statement") and the qualification under the Trust Indenture Act of 1939, as amended, of an indenture providing for the issuance of the Debt Securities. Upon execution of the Registration Statement by a majority of the directors of the Company, the officers of the Company are directed to cause the Registration Statement to be filed with the Securities and

11

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Exchange Commission (the "SEC") (which registration may, but shall not be required to, be made pursuant to Rule 415 of the Securities Act), and to execute and file, in the name and on behalf of the Company, all such other certificates, instruments and documents, to make all such payments and do all such other acts and things, including the execution and filing of amendments or post-effective amendments (including any registration statements or other filings under Rule 462 of the Securities Act) to the Registration Statement and amendments or supplements to any prospectus constituting a part thereof, as they may deem necessary or desirable;

**FURTHER RESOLVED**, that each officer and director of the Company who may be required to execute the Registration Statement or any amendment thereto or document in connection therewith (whether for and on behalf of the Company or otherwise) is authorized and empowered to execute a power of attorney appointing Chandler Bigelow, Donald C. Grenesko and Crane H. Kenney, or any of them, his or her true and lawful attorney-in-fact and agent to sign in his or her name, place and stead, in any such capacity, any and all amendments (including post-effective amendments) to the Registration Statement and any and all other documents in connection therewith, and to file the same with the SEC, said attorney-in-fact to have the power and authority to do and perform, in the name and on behalf of such officers and directors who shall have executed such a power of attorney, every act whatsoever that such attorney may deem necessary, appropriate or advisable to be done in connection therewith as fully as such officers and directors might or could do in person;

**FURTHER RESOLVED**, that the senior Vice President, General Counsel and Secretary of the Company, or his appointed designee, is designated as the agent for service who shall be duly authorized to receive communications and notices from the SEC with respect to the Registration Statement and with the powers conferred upon him as agent therefore by the Securities Act and the rules and regulations of the SEC thereunder;

**FURTHER RESOLVED**, there is hereby established a Special Pricing Committee of directors, consisting of Messrs. FitzSimons, Hernandez, Morrison, Osborn and Stinehart, to provide for the issuance of the Securities from time to time. The Special Pricing Committee is hereby expressly authorized (with the full power of delegation to one or more officers of the Company), with the full power of this Board to the extent provided by law, to consider all matters and to take and authorize to be taken any and all action which might otherwise be taken or authorized by this Board in connection with the offering, sale, issuance and registration of the Securities, including, without limitation, to authorize one or more issues of such Securities and in connection with any such issue to determine, approve or appoint (as applicable): (a) the type, title, designation and form of the Securities, provided that no Securities shall be secured by or convertible into any equity securities of the Company; (b) the aggregate principal amount and denominations; (c) the maturity or maturities, including the terms of any extension thereof; (d) the mode of sale and distribution and, as applicable, the particular underwriters, managing underwriters, agents, dealers and purchasers; (e) the form of any indenture, warrant agreement or underwriting, agency, sales, dealer and/or purchase agreement; (f) the price to be received by the Company for the Securities (which may reflect an original issue discount), and any public offering price or privately negotiated sale price, discount or commission paid or allowed in

12

connection therewith; (g) the interest rate or rates, if any, or the formula by which such rate or rates may be established and the dates from which such interest shall accrue; (h) any sinking fund or similar redemption requirement and related redemption prices; (i) optional redemption rights, if any, of the Company or the holders of Securities, and related redemption prices and/or limitations; (j) exchange rights, if any, of the Company or holders of Securities and/or limitations; (k) the ranking of such Securities (senior or subordinated) and, if applicable, the subordination provisions of any subordinated Debt Securities; (l) defeasance provisions, if any; (m) the applicable currency or composite currency, and related payment terms; (n) in the case of Warrants, the designation and amount of Debt Securities for which they are exercisable, and the dates, price and other terms of such exercise; (o) additional affirmative or restrictive covenants, if any, to be imposed on the Company with respect to any Securities; (p) any trustees, warrant agents, authentication, calculation, transfer or paying agents and registrars and such other agents as the Special Committee shall deem appropriate (q) any events of default; and (r) such other terms, conditions and provisions, not inconsistent herewith, as the Special Pricing Committee shall deem appropriate;

**FURTHER RESOLVED**, that the proper officers, be and they are each hereby authorized, directed and empowered, in the name of the Company, to execute and deliver for the benefit of each counterparty to the Interest Rate Hedging Transactions ISDA master agreements, confirmations, schedules, joinder agreements, pledge agreements, security agreements, financing statements or other agreements or instruments evidencing the obligations of the Company under such Interest Rate Hedging Transactions, and each of said Authorized Officers are authorized to from time to time execute renewals, extensions and/or amendments of said ISDA master agreements, confirmations, schedules, joinder agreements, pledge agreements, security agreements, financing statements or other agreements or instruments;

**FURTHER RESOLVED**, that the proper officers are severally authorized to execute, attest and deliver, in the name and on behalf of the Company, an appropriate indenture or indentures and an appropriate warrant agreement or warrant agreements in substantially the forms as approved by the Special Pricing Committee, including indentures and warrant agreements supplemental thereto in forms as approved by the Special Pricing Committee with such changes as the executing officers may approve, such approval to be conclusively evidenced by such execution, and such officers are severally authorized to perform any and all acts that they may deem necessary or advisable to make any indenture or warrant agreement the valid and effective act and agreement of the Company, including, without limitation, any and all acts necessary or appropriate to qualify any indenture under the Trust Indenture Act of 1939, as amended;

**FURTHER RESOLVED**, that the proper officers are severally authorized to execute, in the name and on behalf of the Company, appropriate underwriting agreements, agency agreements, sales agreements, dealer agreements and/or purchase agreements (collectively, the "Sales Agreements"), substantially in the form as approved by the Special Pricing Committee, with such changes as the executing officers may approve, such approval to be conclusively evidenced by such execution, and such officers are severally authorized to perform any and all acts that they

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414429

may deem necessary or advisable to make any Sales Agreement the valid and effective act and agreement of the Company;

**FURTHER RESOLVED,** that the proper officers are severally authorized to execute the Securities (including any Securities issued in global form), under the corporate seal of the Company attested by its Secretary or Assistant Secretary, and to cause the Securities to be delivered to the trustee or warrant agent therefor, together with an executed authentication and delivery request from the Company, for authentication and delivery by such trustee or warrant agent in accordance with such request. The signatures of the proper officers and the Company seal appearing on the definitive Debt Securities and Warrant Certificates may be engraved, lithographed or facsimiles, and the Company adopts for such purpose the facsimile seal of the Company and the facsimile signatures of Dennis J. FitzSimons, Donald C. Grenesko, Chandler Bigelow and Crane H. Kenny, as Chairman, President and Chief Executive Officer, Senior Vice President/Finance and Administration, Vice President and Treasurer and Senior Vice President, General Counsel and Secretary, respectively, whether or not any of such persons actually holds such office at the time Securities are executed, authenticated or delivered;

**FURTHER RESOLVED,** that the proper officers of the Company are severally authorized to provide for the filing of a registration statement on Form 8-A under the Securities Exchange Act of 1934, as amended, to be filed with the SEC in connection with the listing of one or more issues of Securities on the New York Stock Exchange, to file an application, and amendments thereto as necessary, with the New York Stock Exchange for the listing of such Securities on such Exchange upon official notice of issuance; to execute and deliver, in the name and on behalf of the Company, such other documents and agreements (including, without limitation, indemnity agreements in form acceptable to such Exchange for the purpose of such listings),to appear before the staff of such Exchange with authority to make such changes in any such application, or to make or amend such documents and agreements relative thereto, as may be necessary to conform with the listing requirements of such Exchange and to take such other action as such officers may deem necessary or advisable to list the Securities on such Exchange; and

**FURTHER RESOLVED,** that the proper officers are severally authorized to determine the states and such other jurisdictions (including, without limitation, foreign jurisdictions) in which appropriate action shall be taken to qualify or register for sale (or exempt therefrom) all or such part of the Securities as the proper officers may deem advisable. The proper officers are severally authorized to perform on behalf of the Company any and all such acts as they may deem necessary or advisable in order to comply with the applicable laws of any such states or other jurisdictions, and in connection therewith to execute and file all requisite papers and documents (including, without limitation, applications, reports, surety bonds, irrevocable consents and appointments of attorneys for service of process); and the execution by such officers of any such paper or document or the doing by them of any act in connection with the foregoing matters shall conclusively establish their authority therefor from the Company and the approval and ratification by the Company of the papers and documents so executed and the action so taken, and any resolution of this Board that is required or appropriate in connection

14

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414430

therewith shall be deemed to have been adopted by this resolution and may be so certified by the Secretary or Assistant Secretary of the Company.

### Appointment of Director

**FURTHER RESOLVED**, that concurrently with the occurrence of the First Closing of the Securities Purchase Agreement, or at such later time as may be mutually agreed, Mr. Samuel Zell be appointed as a director of the Company, to serve for a term expiring at the third annual election following consummation of the Merger or upon his earlier death, removal or resignation.

### Vote of Stockholders

**FURTHER RESOLVED**, that the Board directs that the Merger Agreement be submitted to a vote of the stockholders entitled to vote thereon at a special or annual meeting of such stockholders (the "Stockholder Meeting"), along with the Board's recommendation (unless, subject to and in accordance with the terms of the Merger Agreement, such recommendation is withdrawn or modified prior to such submission) that such stockholders adopt the Merger Agreement and that the proper officers of the Company be, and each of them hereby is, authorized and directed, in the name and on behalf of the Company, to communicate such recommendation to, and to solicit proxies on behalf of the Board from, such stockholders entitled to vote at the Stockholder Meeting in favor of such adoption;

**FURTHER RESOLVED**, that the secretary of the Company be, and hereby is, authorized and directed, subject to the terms of the Merger Agreement, to fix hereafter the date, time and place of the Stockholder Meeting, and the record date for determining the stockholders entitled to notice of and to vote at the Stockholder Meeting (the "Record Date"); and

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized and directed, in the name and on behalf of the Company, to mail to the stockholders of record as of the close of business on the Record Date, a notice of the Stockholder Meeting, accompanied by a Proxy Statement (as defined below).

### Self Tender Offer

**FURTHER RESOLVED**, that as promptly as practicable following the execution of the Merger Agreement, the Company shall commence the Share Repurchase, by causing to be commenced a self-tender offer to repurchase up to 126 million shares of Common Stock at $34.00 per share, net to the seller in cash; and

**FURTHER RESOLVED**, that the Board of Directors hereby determines to recommend that the Company's stockholders tender their shares in the tender offer.

15

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## Regulatory Matters

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized and directed, pursuant to the terms of the Transaction Agreements, in the name and on behalf of the Company, promptly to prepare, sign and file, or cause to be filed, with any applicable federal, state, local or foreign country regulatory or supervisory body or stock markets and self-regulatory organizations including, without limitation, the Antitrust Division of the United States Department of Justice (the "DOJ"), the Federal Trade Commission (the "FTC"), the SEC and the Federal Communications Commission (the "FCC") (collectively, "Governmental Entities") all applications, requests for approval, consents, interpretations, or other determinations, notices and other information and documents, and any modifications or supplements thereto, as may be necessary or advisable in connection with the Transaction Agreements and the Transactions, including the Merger, together with all agreements and other information and documents required or appropriate, and any publications required, in connection therewith; and

**FURTHER RESOLVED**, that, subject to the terms and on the conditions stated in the Merger Agreement, the proper officers of the Company be, and each of them hereby is, authorized and directed, pursuant to the terms of the Merger Agreement, to use reasonable best efforts to cooperate with the other parties thereto in (i) determining whether any filings are required to be made with, or consents, permits, authorizations, waivers or approvals are required to be obtained from, any third parties or Governmental Entities in connection with the execution and delivery of the Merger Agreement and the consummation of the transactions contemplated thereby, (ii) timely making all such filings and timely seeking all such consents, permits, authorizations or approvals, and (iii) using reasonable best efforts to take, or cause to be taken, all other actions and doing, or causing to be done, all other things necessary, proper or advisable to consummate and make effective the transactions contemplated by the Merger Agreement, including taking all such further action as reasonably may be necessary to resolve such objections, if any, as the FCC, the FTC, the DOJ, state antitrust enforcement authorities or competition authorities of any other nation or other jurisdiction or any other person may assert under regulatory law with respect to the transactions contemplated by the Merger Agreement, and to avoid or eliminate each and every impediment under any law that may be asserted by any Governmental Entity with respect to the Merger so as to enable the consummation of the Merger to occur as soon as reasonably possible.

## Securities Law Filings

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized and directed, in the name and on behalf of the Company, with the assistance of counsel, to prepare, sign and file, or cause to be filed, with the SEC any and all statements, reports or other information concerning the Transactions that may be deemed advisable or may be required under the Securities Act of 1933 or the Exchange Act of 1934, each as amended, and the rules and regulations of the SEC promulgated thereunder, including without limitation (i) a proxy statement for delivery to the stockholders of the Company (as it may be amended or supplemented, the "Proxy Statement"), together with any other documents required or

16

appropriate in connection therewith; (ii) a tender offer statement on Schedule TO (as it may be amended or supplemented, the "Schedule TO"); (iii) a transaction statement on Schedule 13E-3 in connection with each of the Proxy Statement and the Schedule TO; and (iv) all other reports, statements, documents and information required to be filed with the SEC by the Company in connection with the Transaction Agreements and the Transactions.

## Section 16(b) Exemption

**FURTHER RESOLVED,** that the Board determines to, and hereby does, for purposes of exempting each sale or exchange of Common Stock owned by the individuals named in Exhibit C hereto that occurs pursuant to the terms of the Merger Agreement or in connection with the Share Repurchase, and each (i) exchange of options to purchase Common Stock, (ii) sale or exchange of restricted stock and restricted stock units and (iii) sale or exchange of other equity and equity-based awards, in each case by the individuals listed on such exhibit that occurs pursuant to the terms of the Merger Agreement or in connection with the Share Repurchase, approve each such sale, exchange or disposition as an exempt disposition under Rule 16b-3 promulgated under the Securities Exchange Act of 1934.

## Equity Compensation Matters

**FURTHER RESOLVED,** that, in the event that the Company divests a business unit during the period beginning on the date on which the Company announces a transaction that would constitute a Change in Control (within the meaning of the Company's Incentive Compensation Plan) and the date on which such Change in Control is consummated, the Company shall cause any Company restricted stock units and stock options held by any employee of such divested business unit to be fully vested;

**FURTHER RESOLVED,** that, in the event that the Company eliminates an employee's position during the period beginning on the date on which the Company announces a transaction that would constitute a Change in Control (within the meaning of the Company's Incentive Compensation Plan) and the date on which such Change in Control is consummated, the Company shall cause any Company restricted stock units and stock options held by such employee to be fully vested effective as of the consummation of such Change in Control;

**FURTHER RESOLVED,** that, in the event of a Change in Control (within the meaning of the Company's Incentive Compensation Plan), each participant in the Tribune Company 401(k) Savings and Profit Sharing Plan whose employment with the Company is terminated by the Company other than for cause or is constructively terminated within one year following such Change in Control shall be fully vested in all employer contributions held on such participant's behalf under such plan; and

**FURTHER RESOLVED,** that the Tribune Company Employee Stock Purchase Plan shall be terminated as soon as reasonably practicable and, the Tribune Company Employee Benefits Committee or the proper officers of the Company be, and each of them hereby is, authorized and

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414433

directed, in the name of and on behalf of the Company, to take or cause to be taken any and all action, and to execute and deliver or cause to be executed and delivered any and all agreements, amendments, certificates, reports, applications, notices, letters or other documents as, in the opinion of such committee or any such officer, may be necessary, appropriate or desirable to terminate the Tribune Company Employee Stock Purchase Plan as soon as reasonably practicable.

## Miscellaneous

**FURTHER RESOLVED**, that the Board hereby adopts, as if expressly set forth herein, the form of any resolution required by any governmental authority to be filed in connection with any applications, consents to service, issuer's covenants or other documents, applications, reports or filings relating to the foregoing resolutions if (i) in the opinion of the officer of the Company executing the same, the adoption of such resolutions is necessary or desirable and (ii) the Secretary or an Assistant Secretary of the Company evidences such adoption by inserting in the minutes of this meeting copies of such resolutions, which will thereupon be deemed to be adopted by the Board with the same force and effect as if presented at this meeting;

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized and directed, in the name of and on behalf of the Company, to take or cause to be taken any and all action which they may deem necessary or appropriate to communicate the position of the Board, as set forth in these resolutions, to the Company's stockholders, including, without limitation, the dissemination of such position by means of press releases, letters to stockholders of the Company and filings with the SEC, the taking of any such action conclusively to evidence the due authorization and approval thereof by the Board;

**FURTHER RESOLVED**, that the proper officers of the Company be, and each of them hereby is, authorized, empowered and directed, in the name of and on behalf of the Company, to execute and deliver or cause to be executed and delivered any and all agreements, amendments, certificates, reports, applications, notices, letters or other documents and to do or cause to be done any and all such other acts and things as, in the opinion of any such officer, may be necessary, appropriate or desirable in order to enable the Company fully and promptly to carry out the purposes and intent of the foregoing resolutions, and any such action taken or any agreement, amendment, certificate, report, application, notice, letter or other document executed and delivered by them or any of them in connection with any such action shall be conclusive evidence of their or his authority to take, execute and deliver the same; and

**FURTHER RESOLVED**, that all actions heretofore taken by any of the directors, officers, employees, representatives or agents of the Company or any of its affiliates in connection with the Transaction Agreements and the Transactions or otherwise referred to in the foregoing resolutions be, and each of the same hereby is, ratified, confirmed and approved in all respects as the act and deed of the Company.

18

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414434

## ADJOURNMENT

There being no further business to come before the Board, the meeting was adjourned at 11:15 p.m.

_____
Secretary

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414435

## EXHIBIT A

Merger Agreement
Securities Purchase Agreement
Exchangeable Note
Subordinated Promissory Note
Warrant Agreement
ESOP Purchase Agreement
ESOP Loan Agreement
ESOP Note
ESOP Pledge Agreement
Investor Rights Agreement
Exchange Agreement
Voting Agreement – Chandler Trusts
Registration Rights Agreement of Chandler Trusts
Registration Rights Agreement of EGI & ESOP
Amendment No. 3 to Rights Plan
First Step Commitment
Second Step Commitment

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414436

**EXHIBIT B**

**AMENDMENT NO. 3 TO RIGHTS AGREEMENT**

This Amendment No. 3 to Rights Agreement (this "Amendment No. 3"), dated as of April 1, 2007, by and between Tribune Company, a Delaware corporation (the "Company"), and Computershare Trust Company, N.A. (formerly known as EquiServe Trust Company, N.A., formerly known as First Chicago Trust Company of New York), as Rights Agent (the "Rights Agent"), amends the Rights Agreement, dated as of December 12, 1997, as previously amended by Amendment No. 1 thereto, dated as of June 12, 2000, and Amendment No. 2 thereto, dated as of September 21, 2006 (the "Rights Agreement"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such term in the Rights Agreement.

**RECITALS**

WHEREAS, the Company and the Rights Agent have executed and entered into the Rights Agreement;

WHEREAS, pursuant to Section 27 of the Rights Agreement, the Company and the Rights Agent may from time to time supplement or amend the Rights Agreement in accordance with the provisions of Section 27 thereof;

WHEREAS, the Company proposes to enter into: (1) an Agreement and Plan of Merger with GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation wholly owned by the ESOP, and, for the limited purposes set forth therein, EGI-TRB, L.L.C., a Delaware limited liability company ("Tower Acquisition"); (2) a Securities Purchase Agreement with Tower Acquisition and Mr. Samuel Zell, as guarantor; (3) an ESOP Purchase Agreement with the ESOP; (4) an Investor Rights Agreement with Tower Acquisition and the ESOP; (5) a voting agreement with Chandler Trust No. 1 and Chandler Trust No. 2; (6) registration rights agreements with (a) Tower Acquisition and the ESOP, and (b) Chandler Trust No. 1 and Chandler Trust No. 2; and (7) other agreements contemplated by the foregoing or necessary to implement the transactions contemplated by the foregoing (such agreements in clauses (1) through (7), the "Transaction Agreements"); and

WHEREAS, the Board of Directors of the Company has determined that it is in the best interest of the Company and its stockholders to amend the Rights Agreement as set forth below to provide that the execution, delivery and performance of the Transaction Agreements and the transactions contemplated thereby will not result in any Person becoming an Acquiring Person;

NOW, THEREFORE, the Rights Agreement is hereby amended as follows:

1.    The definition of Acquiring Person in Section 1(a) of the Rights Agreement, as previously amended, is hereby further modified and amended by adding the following sentence at

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

the end of the last sentence thereof:

> Notwithstanding anything in this Agreement to the contrary, no Person shall be deemed to be an Acquiring Person solely by virtue of the execution, delivery or performance of any of the Transaction Agreements or the transactions contemplated thereby.

2.     A new Section 1(ee) is hereby added to Section 1 of the Rights Agreement, which shall read in its entirety as follows:

> "Transaction Agreements" shall mean the following agreements dated as of April 1, 2007: (1) an Agreement and Plan of Merger by and among the Company, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation wholly owned by the ESOP, and, for the limited purposes set forth therein, EGI-TRB, L.L.C., a Delaware limited liability company ("Tower Acquisition"); (2) the Securities Purchase Agreement by and among the Company, Tower Acquisition and Mr. Samuel Zell, as guarantor; (3) the ESOP Purchase Agreement by and between the Company and the ESOP; (4) the Investor Rights Agreement by and among the Company, Tower Acquisition and the ESOP; (5) the Voting Agreement by and among the Company, Chandler Trust No. 1 and Chandler Trust No. 2; (6) the Registration Rights Agreements by and among the Company and (a) Tower Acquisition and the ESOP, and (b) Chandler Trust No. 1 and Chandler Trust No. 2; and (7) other agreements contemplated by the foregoing agreements or necessary to implement the transactions contemplated by the foregoing agreements.

3.     This amendment may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same instrument.

4.     This Amendment shall be deemed to be a contract made under the laws of the State of Delaware and for all purposes shall be governed by and construed in accordance with the laws of such State applicable to contracts to be made and performed entirely within such State.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414438

IN WITNESS WHEREOF, this Amendment has been duly executed by the Company and the Rights Agent as of the day and year first written above.

TRIBUNE COMPANY

By:_____
Name:
Title:

COMPUTERSHARE TRUST COMPANY, N.A.

By:_____
Name:
Title:

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414439

## EXHIBIT C

For a description of the terms of equity awards (including, without limitation, options) referenced below, reference is made to the Company's equity incentive plans and to the Merger Agreement.

| Name of Officer or Director | Number of Shares of Company Common Stock Beneficially Owned | Number of Shares of Company Common Stock Underlying Equity Awards (Including Restricted Stock Units and Stock Options) |
| --- | --- | --- |
| Jeffrey Chandler | 11,187 | 19,200 |
| Dennis J. FitzSimons | 498,299 | 1,936,556 |
| Roger Goodan | 17,246 | 45,200 |
| Donald C. Grenesko | 242,188 | 759,040 |
| Enrique Hernandez, Jr. | 11,330 | 15,200 |
| Betsy D. Holden | 8,661 | 7,200 |
| Crane H. Kenney | 51,669 | 578,397 |
| Timothy J. Landon | 45,982 | 431,015 |
| Thomas D. Leach | 50,741 | 315,742 |
| Luis Lewin | 22,710 | 458,978 |
| R. Mark Mallory | 108,234 | 248,679 |
| Robert S. Morrison | 13,148 | 11,200 |
| Ruthellyn M. Musil | 65,391 | 398,046 |
| William A. Osborn | 11,959 | 11,200 |
| John E. Reardon | 63,782 | 416,821 |
| J. Christopher Reyes | 14,969 | 0 |
| Scott C. Smith | 225,273 | 707,394 |
| William Stinehart, Jr. | 12,650 | 31,700 |
| Dudley S. Taft | 94,660 | 31,200 |
| Miles D. White | 6,419 | 0 |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414441

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTIONS

### (Preferred Dividend)

RESOLVED, that there is hereby declared a dividend of $8.9375 per share on the Series D-1 Convertible Preferred Stock of the Company payable on June 14, 2007 to stockholders of record at the start of business on June 14, 2007.

DPE
5/2/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414443

# TRIBUNE COMPANY
## ELECTION OF OFFICERS

| Title | Name | Role |
|---|---|---|
| Chairman, President and Chief Executive Officer | Dennis J. FitzSimons | |
| Senior Vice President | Donald C. Grenesko | Finance & Administration |
| Senior Vice President, General Counsel and Secretary | Crane H. Kenney | Legal |
| Senior Vice President | Thomas D. Leach | Development |
| Senior Vice President | Luis E. Lewin | Human Resources |
| Senior Vice President | Ruthellyn Musil | Corporate Relations |
| Vice President and Treasurer | Chandler Bigelow | Treasury |
| Vice President | Thomas G. Caputo | Auditing |
| Vice President | James L. Ellis | Brand Management |
| Vice President, Assistant General Counsel and Assistant Secretary | Mark W. Hianik | Legal |
| Vice President | Daniel G. Kazan | Development |
| Vice President and Controller | R. Mark Mallory | Financial Reporting & Planning |
| Vice President | Susan M. Mitchell | Human Resources |
| Vice President | Irene M. F. Sewell | Compensation & Benefits |
| Vice President | Patrick M. Shanahan | Tax |
| Vice President | Shaun M. Sheehan | Washington Affairs |
| Vice President | Howard G. Weinstein | Labor & Employee Relations |
| Vice President | Gary Weitman | Communications |
| Assistant Controller | Brian F. Litman | Financial Reporting & Planning |
| Assistant Treasurer | Jack Rodden | Treasury |

DPE/bap
5/2/07

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414444

5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414445

# TRIBUNE COMPANY

## PROPOSED BOARD OF DIRECTORS RESOLUTIONS

### (Committee Appointments)

RESOLVED, that

> Betsy D. Holden
> William A. Osborn
> J. Christopher Reyes
> Dudley S. Taft

are appointed members of the Audit Committee of the Board of Directors to hold office until the next Annual Meeting of Shareholders and until their respective successors are appointed, and that Mr. Osborn is appointed Chair of the Audit Committee.

\* \* \* \*

RESOLVED, that

> Jeffrey Chandler
> Enrique Hernandez, Jr.
> Robert S. Morrison
> Miles D. White

are appointed members of the Compensation & Organization Committee of the Board of Directors to hold office until the next Annual Meeting of Shareholders and until their respective successors are appointed, and that Mr. Morrison is appointed Chairman of the Compensation & Organization Committee.

\* \* \* \*

RESOLVED, that

> Dennis J. FitzSimons
> Enrique Hernandez, Jr.
> Robert S. Morrison
> William A. Osborn
> William Stinehart, Jr.

are appointed members of the Executive Committee of the Board of Directors to hold office until the next Annual Meeting of Shareholders and until their respective successors are appointed, and that Mr. FitzSimons is appointed Chairman of the Executive Committee.

\* \* \* \*

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

RESOLVED, that

> Roger Goodan
> Enrique Hernandez, Jr.
> Robert S. Morrison
> J. Christopher Reyes
> William Stinehart, Jr.

are appointed members of the Nominating & Governance Committee of the Board of Directors to hold office until the next Annual Meeting of Shareholders and until their respective successors are appointed, and that Mr. Hernandez is appointed Chairman of the Nominating & Governance Committee.

\* \* \* \*

RESOLVED, that

> Dennis J. FitzSimons
> Donald C. Grenesko

are appointed to a Committee to administer the Directors' Deferred Compensation Plan to hold office until the next Annual Meeting of Shareholders and until their respective successors are appointed, and that Mr. FitzSimons is appointed Chairman of the Committee.

\* \* \* \*

RESOLVED, that

> Harry A. Amsden
> Chandler Bigelow
> Michael G. Bourgon
> Donald C. Grenesko
> Luis E. Lewin
> Ruthellyn Musil
> John F. Poelking
> Naomi B. Sachs
> Irene M. F. Sewell

are appointed members of the Tribune Company Employee Benefits Committee to hold office until the next Annual Meeting of Shareholders and until their respective successors are appointed, and that Mr. Grenesko is appointed Chairman and Mr. Bigelow is appointed Secretary of said Committee.

DPE
5/2/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414447

6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414448

# TRIBUNE COMPANY
## STOCK PERFORMANCE REPORT
*as of May 1, 2007*



### Total Returns
(price change plus dividends)

| | YTD | Annual 3 year | 5 year |
|---|---|---|---|
| **Tribune** | 7.2% | -10.1% | -4.3% |
| **S&P 500** | 5.4% | 12.3% | 8.6% |
| **S&P PUB** | 1.2% | -0.2% | 2.8% |

## STOCK PERFORMANCE/TRADING ACTIVITY

Since the April 2 announcement of a transaction which will result in Tribune going private and shareholders receiving $34 per share, the stock has traded in the $32 range. Tribune stock is up over 7% for the year on a total return basis, above both the S&P 500 Index and the S&P Publishing Index.

Average daily volume year-to-date is 2 million shares, up from 1.8 million shares during the comparable period last year. However, since April 2 (when 16.5 million shares traded), average daily volume is 3.2 million shares.

Short interest currently is 6 million shares, representing about 3% of shares outstanding. This is below the 6% average of our newspaper peers, and given our transaction, short selling is not expected to increase significantly unless there is a perceived risk of closing.

## VALUATION

In the $32 range, the stock trades at a 9x multiple (enterprise value/2007 operating cash flow), slightly above the newspaper group average.

First quarter earnings, announced April 19, were 2 cents below analysts' consensus estimates, although the stock was unaffected. Tribune is now covered by 15 analysts, as Credit Suisse and Thomas Weisel recently suspended coverage of the publishing industry. Twelve analysts rate Tribune "hold" with one "underperform." Merrill Lynch and Morgan Stanley are restricted because of involvement in our transaction. Analysts who have price targets are at $34, reflecting the terms of our transaction; the stock is neither being valued, nor trading, on fundamentals.

| EV/EBITDA Multiples | |
|---|---|
| | May |
| Tribune | 9.0x |
| Cable | 8.5x |
| Entertainment | 9.5x |
| Newspapers | 8.3x |
| Radio | 10.8x |
| Television | 11.7x |

*Source: Merrill Lynch*
*Based on 2007 estimated operating cash flow.*

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# TRIBUNE COMPANY
## STOCK PERFORMANCE REPORT

### SHAREHOLDER ANALYSIS

Most of Tribune's top institutional investors have not sold shares since the April 2 announcement. Our stockwatch service believes they waited to sell into the recently launched tender. Exceptions include Ariel Capital, which has sold approximately 8.5 million shares to date and Fidelity, which has sold 2.5 million shares. Robert Torray liquidated its position of 1.8 million shares.

As expected, buyers of the stock have been hedge funds and arbitrageurs. While hard to identify because they trade constantly, Westchester Capital Management, an "arb mutual fund" is believed to have a position of 1.3 million shares in its "merger fund." All other identifiable arb or hedge funds currently hold fewer than 1 million shares.

### TOP 15 SHAREHOLDERS
*As of 4/20/2007*
*(Shares in millions)*

|     |                                    | Shares Held | %<br>of S/O | Style       |
| --- | ---------------------------------- | ----------- | ----------- | ----------- |
| 1.  | Chandler Trusts                    | 48.1        | 20.0%       | n/a         |
| 2.  | McCormick Tribune Foundation       | 31.3        | 13.0%       | n/a         |
| 3.  | Employees                          | 23.3        | 10.0%       | n/a         |
| 4.  | T. Rowe Price Associates           | 20.2        | 8.4%        | Active      |
| 5.  | Ariel Capital Management           | 6.1         | 2.5%        | Active      |
| 6.  | Morgan Stanley Investment Management | 5.6       | 2.3%        | Active      |
| 7.  | The Vanguard Group                 | 5.5         | 2.3%        | Index       |
| 8.  | Barclays Global Investors          | 5.3         | 2.2%        | Index/Quant |
| 9.  | State Street Global Advisors       | 5.0         | 2.1%        | Index       |
| 10. | LSV Asset Management               | 4.8         | 2.0%        | Quant       |
| 11. | Northern Trust Investments         | 4.0         | 1.7%        | Index       |
| 12. | GAMCO Investors                    | 3.3         | 1.4%        | Active      |
| 13. | Nelson Peltz                       | 2.8         | 1.2%        | Activist    |
| 14. | Dimensional Fund Advisors          | 2.6         | 1.1%        | Quant       |
| 15. | Northern Trust Global Advisors     | 1.9         | 0.8%        | Active      |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414450

# TRIBUNE COMPANY
## BENCHMARK COMPANY TOTAL RETURNS
*Through May 1, 2007*

|  | YTD |  | 1-Year |  | 3-Year |  | 5-Year |
|---|---|---|---|---|---|---|---|
| Sinclair[1] | 59.1% | Sinclair | 121.3% | Sinclair | 14.1% | Sinclair | 6.6% |
| Dow Jones[2] | 49.9% | Dow Jones | 56.3% | Dow Jones | 9.7% | Washington Post | 4.8% |
| Belo | 8.7% | **Tribune** | **16.5%** | Hearst-Argyle | 1.0% | Dow Jones | 3.3% |
| **Tribune** | **7.2%** | Hearst-Argyle | 14.9% | Washington Post | -5.1% | Scripps | 2.5% |
| Washington Post | 3.2% | Belo | 11.2% | Scripps | -5.5% | Hearst-Argyle | 0.0% |
| Hearst-Argyle | 3.1% | Gannett | 8.0% | Belo | -9.5% | Belo | -1.5% |
| New York Times | 1.6% | New York Times | 2.1% | **Tribune** | **-10.1%** | Gannett | -3.0% |
| Gannett | -3.3% | Washington Post | 1.0% | Gannett | -10.9% | **Tribune** | **-4.3%** |
| Scripps | -13.1% | Scripps | -5.1% | New York Times | -16.9% | New York Times | -10.4% |
| McClatchy | -31.6% | McClatchy | -33.6% | McClatchy | -24.5% | McClatchy | -12.3% |
| | | | | | | | |
| S&P 500 | 5.4% | | 15.5% | | 12.3% | | 8.6% |
| S&P Pub | 1.2% | | 17.4% | | -0.2% | | 2.8% |

[1] Sinclair's stock price has risen from $10.50 to $16.55 due to an improved outlook: debt repayment, lower programming costs and recent retransmission consent agreements.

[2] On May 1, publishing peers rose sharply after News Corp. made an unsolicited bid for Dow Jones. Dow Jones stock rose 55% on the news and is now up 50% year-to-date. Prior to this development, the S&P Publishing Index, which includes Dow Jones, was down 2%.

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414451

**7**

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# TRIBUNE COMPANY
## DEVELOPMENT UPDATE

This report summarizes the status of current development activities.

## PUBLISHING AND INTERACTIVE

### CareerBuilder

CareerBuilder and Microsoft continue to negotiate an agreement to (i) extend their existing domestic distribution agreement through 2013, (ii) enter into a new international distribution agreement through 2013, and (iii) have Microsoft acquire a 4% equity stake in CareerBuilder for $65 million ($1.55 billion valuation). A number of factors, including the pendency of Tribune's strategic alternatives review process, caused these negotiations to slow at the beginning of this year. Recently, the pace of these discussions has accelerated and we are now working through a few remaining issues.

One remaining issue concerns Microsoft's right to put its equity interest back to CareerBuilder on the 7th anniversary of the investment for a price equal to the original purchase price plus a 7.5% annual return. As discussed at our December board meeting, both Gannett and Tribune have agreed to make additional cash contributions to CareerBuilder if needed to pay the put price. Microsoft has further suggested that, under certain circumstances, it would be more appropriate for Gannett and Tribune to make that payment directly to Microsoft rather than having it flow through CareerBuilder. In order to complete this transaction, we may concede this point.

### New Interactive Joint Ventures

Tribune and Gannett continue to evaluate ways to more effectively use our combined Internet assets, with the current focus on creating an online advertising network and launching new national content channels. The ad network would include each of our companies' newspaper.com websites and, hopefully, the sites of other newspaper groups, and would establish a standard online advertising platform across a large segment of the newspaper industry. The new content channels would likely cover areas such as entertainment, travel and parenting.

While McClatchy had been part of these discussions over the past six months, they recently announced that they are joining a consortium of twelve other newspaper companies, including Hearst, Media News and Belo, in an advertising and content transaction with Yahoo!. Based on discussions we have had with other newspaper companies, such as The Washington Post Company, The New York Times Company and Advance Publications, it does not appear the entire industry wants to move to the Yahoo! platform. Therefore, we are continuing conversations with various newspaper groups to determine whether they would join a national online advertising network led by Tribune and Gannett.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Tribune and Gannett have not ruled out the possibility of entering into an ad network arrangement with Yahoo!, but we are also continuing discussions with Google, Microsoft and AOL to make sure we get the best possible deal, both for our ad network and for our new and existing content channels.

## Hoy

We are finalizing an agreement to sell the assets of *Hoy* New York to ImpreMedia LLC for $6.75 million in cash. ImpreMedia publishes Spanish language newspapers in six markets, including daily newspapers *El Diario La Prensa* in New York and *La Opinion* in Los Angeles, and weekly newspaper *La Raza* in Chicago. The transaction is expected to close within the next few weeks. After-tax proceeds from this sale will be approximately $5.0 million.

## SCNI

In March, we agreed to sell Southern Connecticut Newspapers ("SCNI") to Gannett for $73 million in cash. The Gannett transaction does not include SCNI's real estate, which we expect to sell separately for $20-25 million.

As part of the transaction, Gannett would not agree to assume the newspaper's collective bargaining agreement with the United Auto Workers ("UAW") that covers editorial employees. Although Gannett planned to rehire 32 of 36 members of the bargaining group and recognize the union, they were only willing to do so under a new contract. During the Hart-Scott-Rodino waiting period, the UAW received an injunction, and ultimately a binding arbitration decision, that the failure by Gannett to assume the existing union contract was a violation of the agreement. We are not able to complete the transaction without reaching an agreement acceptable to all parties.

The parties have started discussions in an attempt to reach a new agreement in the next several weeks. We are also exploring other options that would allow the deal to proceed. Gannett maintains they will terminate the agreement to buy SCNI if the only solution is for them to assume the existing collective bargaining agreement.

## Recycler

The *Los Angeles Times* is in discussions to sell its Recycler classifieds business to its former owner. Recycler produces over 25 weekly classified ad publications that are distributed through thousands of retail outlets in the Los Angeles area and also operates the Recycler.com website. Times Mirror purchased the Recycler business in 1998 for $189 million. Since the acquisition, revenues have declined steadily from $45 million in 1999 to $27 million in 2006. Recycler had an operating loss in 2006 of $4.4 million.

Due to the decline in the business and market conditions, we believe any proceeds from the transaction would be minimal; however, a sale would trigger a capital loss and result in a tax benefit of approximately $65 million.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414454

**TMS Interactive Program Guide Assets**

Tribune Media Services ("TMS") closed on the sale of its interactive program guide assets to JLB Ventures, LLC for $10.4 million in cash on February 22. JLB is a joint venture comprised of three anonymous parties, self-described as "well-funded U.S. corporations, including a major telecommunications services provider and two consumer electronics companies."

**TMS NewsCom**

TMS and McClatchy are in discussions to sell our NewsCom LLC joint venture to Getty Images for approximately $1.6 million. NewsCom's primary business is to aggregate and sell third party photos on an a la carte basis to news organizations throughout the world. Current annual revenue is approximately $5.0 million, and the venture is operating near break-even. NewsCom was formed in 2001 by combining PressLink, a Knight-Ridder entity, and NewsCom, a former Times Mirror property.

Getty Images, a public company with $750 million in sales, is a major distributor of photos worldwide. The transaction is subject to the completion of due diligence and the negotiation of definitive agreements.

TL/DGK
5/2/07

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414455

8

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only



**CalPERS**
*75 Years*

**Investment Office**
P.O. Box 2749
Sacramento, CA 95812-2749
Telecommunications Device for the Deaf - (916) 795-3240
(916) 795-3400 FAX (916) 795-2842

March 9, 2007

Dennis J. FitzSimons                                    <u>**Via Overnight Courier**</u>
Chairman, President and CEO
Tribune Company
435 North Michigan Avenue
Chicago, Il. 60611

Dear Mr. FitzSimons:

I am writing in response to the teleconference we had with you and your colleagues on
March 6, 2007. Although, we believe a meeting in-person would have been beneficial,
we found the discussions to be both informative and productive. We specifically
appreciate the participation by Tribune board members: Mr. Enrique Hernandez, Chair
of the Nominating & Governance Committee and Mr. Bob Morrison, Chair of the
Compensation & Organization Committee. The perspective of board members provides
valuable insight and we consider their input critical to our engagement process.

I am writing to confirm a number of issues we would like the Board of Tribune to address.
Although, Tribune is reviewing its strategic alternatives, all of the following governance
issues to date have not been addressed. I wish to ensure that we both have a clear
understanding of these issues, so please contact me if you have any questions. We
strongly believe that your adoption of these measures will represent an additional step
taken by the Board to convey a very positive message about Tribune's commitment to
building long-term shareowner value and will help to ensure the company's long-term
success.

During our teleconference we discussed takeover defenses that we believe are tied to
diminished shareowner value at Tribune. CalPERS believes that superior corporate
governance practices can help to ensure a company's long-term success. Accordingly,
we request that you take the following actions:

1.  Seek and support shareowner approval to eliminate your classified board
    structure. We believe that a classified board structure ultimately serves as a tool
    for entrenchment by not allowing the owners to elect their representatives on an
    annual basis. We found that 53% of the S&P 500 have declassified its boards and
    within Tribune's industry and peer group more that 66% have agreed to annual
    elections.

**California Public Employees' Retirement System**
Lincoln Plaza East - 400 Q Street, Suite E4800 - Sacramento, CA 95814

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Dennis J. FitzSimons
Tribune Company
March 9, 2007
Page 2

2. Seek and support shareowner approval to eliminate the supermajority voting requirements required in Tribune's Amended and Restated Certification of Incorporation and By-Laws. We found that 58% of the S&P 500 do not have any supermajority voting requirements to amend the bylaws. CalPERS is a strong supporter of shareowner rights which include the right of a majority of proxies cast to amend the Company's By-Laws and Certificate of Incorporation.

3. Adopt a majority vote policy for directors in the Company's By-laws that includes a required resignation policy for any director that receives a withhold vote of greater than 51% in an uncontested election. We believe that such a policy is necessary to fully represent the voting preference of shareowners. Shareowner rights include that a majority of proxies cast should be able to remove a director with or without cause.

4. Seek shareowner approval of your shareowner rights plan at the 2007 Annual Meeting, or expedite the expiration of your existing plan and develop a policy that would require shareowner approval for any future rights plan. We understand the current pill expires on January 5, 2008.

5. Amend the Company's by-laws to adopt a policy to seek shareowner approval of any severance (termination or change in control) agreement that provides alone or together with any other severance agreement, severance benefits that exceed 2.99 times named executive officers' base compensation.

6. Develop and implement a clawback policy for recapturing bonus and incentive payments that were made to executives on the basis of having met or exceeded performance targets during a period of fraudulent activity or a material negative restatement of financial results for which executives are found personally responsible. This policy should be applicable to all executives, and therefore extend beyond the requirements of Sarbanes-Oxley.

We understand that implementing many of these items in the near-term may be difficult as Tribune evaluates its strategic alternatives. Nonetheless, we recommend that Tribune's board address CalPERS requests in a timely manner. As a long-term shareowner in Tribune, our primary interest is in the creation of sustained improvement in firm value. We believe issues stated above are important to improving shareowner rights and the value of Tribune and would expect to continue to work with you and the Board towards an appropriate resolution.

Thank you for your consideration of these points. We request that you present this letter on our behalf to your Board at the next scheduled meeting, and provide us with feedback from their discussion. If you need additional clarification please do not hesitate to contact Dennis Johnson, Senior Portfolio Manager of Corporate Governance at (916) 795-2731.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414458

Dennis J. FitzSimons
Tribune Company
March 9, 2007
Page 3

Sincerely,

Christianna Wood
Senior Investment Officer
Global Equity

cc:    Tribune Board of Directors
       Fred Buenrostro, Chief Executive Officer – CalPERS
       Russell Read, Chief Investment Officer – CalPERS
       Dennis Johnson, Senior Portfolio Manager – CalPERS
       File

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414459

DRAFT

May __, 2007

*Via Federal Express*
Ms. Christianna Wood
Senior Investment Officer – Global Equity
California Public Employees' Retirement System
Lincoln Plaza East
400 Q Street, Suite E4800
Sacramento, CA 95814

Dear Ms. Wood:

I am writing in response to your March 9, 2007 letter, which you sent to us following our March 6th telephone conference.

As promised, we discussed the six action items set forth in your letter with our Board of Directors at our regular Board meeting on May 9. Given the pending leveraged ESOP transaction that will result in Tribune becoming a private company, we are not in a position to formally commit to any changes in our current corporate governance structure. That said, I can provide some color on the Board's current thinking on each of the six points you raise.

1.  As you know, a proposal sponsored by Evelyn Y. Davis seeking to eliminate our classified board structure was submitted to a shareholder vote at this year's annual meeting. The proposal received ___% of the shares voted at the meeting. **[Response will be driven by whether the proposal achieves a majority of votes cast or not. If the proposal receives a majority of votes cast:** In the event Tribune remains a public Company, the Nominating & Governance Committee will determine whether to propose a charter amendment to eliminate the classified board structure at the 2008 annual shareholders meeting. **If the proposal falls short of a majority of votes cast:** For the reasons articulated in this year's annual meeting proxy statement, the Board continues to believe that a classified board structure is better for Tribune and its shareholders than a board that would be elected annually and is not inclined to take further action at this time.

2.  The elimination of the supermajority provisions in the Company's governing documents was the subject of your proposal. The Board does not support a complete elimination of all supermajority provisions in our governing documents. Each supermajority provision serves a somewhat different purpose, is intended to preserve and maximize shareholder value and provides

Ms. Christianna Wood
May __, 2007
Page 2 of 3

protection to all shareholders against self-interested actions by one or a few shareholders. I suspect we will continue to debate the merits of your proposal if we remain a public company.

3.  The Nominating & Governance Committee has been closely monitoring developments in the majority vote movement for some time. It is possible that some form of majority voting may be implemented in time for next proxy season if the Company remains public.

4.  As you correctly point out in your letter, our existing shareholder rights plan expires on January 5, 2008. The Board is considering the merits of letting the plan expire pursuant to its terms.

5.  The Tribune Company Transitional Compensation Plan for Executive Employees provides for varying levels of change of control benefits to approximately 45 senior executives and other key employees. The Compensation & Organization Committee believes the plan is an important part of overall compensation and helps the Company recruit and retain quality executive talent. Benefits payable under the plan currently range from a high of three times the total of base salary and 200% of target bonus for the individuals in the highest benefit tier (including the current named executive officers) down to one times the total of base salary and 100% of target bonus for individuals in the lowest of the three benefit tiers. The Board believes the current limitations are sufficient and is not inclined to take action on your suggestion to implement a shareholder approval requirement for severance payments that exceed 2.99 times named executive officers' base compensation.

6.  While not extensively publicized, following the circulation improprieties uncovered at Newsday in 2004, we implemented a claw back policy that enables the Company to recoup cash bonuses and equity compensation grants (both vested and unvested) received by employees involved in fraud, insider trading or other securities law violations. The claw back policy extends to more than 12,000 Company employees who sign annual Code of Business Conduct compliance statements, including all members of senior management throughout the Company.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Ms. Christianna Wood
May __, 2007
Page 3 of 3

If you have any questions regarding the foregoing, please feel free to call either Crane
Kenney, our General Counsel, at (312) 222-2491 or Mark Hianik, our Assistant General
Counsel, at (312) 222-4303.

Sincerely,


Dennis J. FitzSimons

DJF/cn

cc:    Crane H. Kenney
       Mark W. Hianik

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414463



AUDIT COMMITTEE

Professionals' Eyes Only
Highly Confidential --- Attorneys' Eyes Only

# TRIBUNE COMPANY
## AUDIT COMMITTEE MEETING
### WEDNESDAY, MAY 9, 2007 (7:30 A.M.)
### McCORMICK ROOM
### 24th FLOOR, TRIBUNE TOWER

## AGENDA

|  | Tab No. |
|---|:---:|
| Approve Minutes of February 13 and April 18, 2007 Audit Committee Meetings | 1 |
| Audit Committee Responsibility Summary | 2 |
| Internal Audit Status Report | 3 |
| 2007 Internal Controls Certification Project Plan | 4 |
| 2007 Audit Plan and Fees | 5 |
| Private Sessions |  |

## PARTICIPANTS

***Audit Committee***
Betsy D. Holden
William A. Osborn, Chair
J. Christopher Reyes
Dudley S. Taft

***Other Board Members***
Jeffrey Chandler
Roger Goodan

***PricewaterhouseCoopers LLP***
| Kevin Maguire | Engagement Partner |
| Stephanie Potter | Engagement Senior Manager |

***Management***
| Tom Caputo | Vice President, Auditing |
| Dennis FitzSimons | Chairman, President and CEO |
| Don Grenesko | Sr. Vice President, Finance & Administration |
| Mark Mallory | Vice President and Controller |

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

1

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414465

TRIBUNE COMPANY
AUDIT COMMITTEE MEETING
FEBRUARY 13, 2007

The Audit Committee met on Tuesday, February 13, 2007 at 7:30 a.m.  The meeting was held at
Tribune Tower, Chicago, Illinois, pursuant to notice.  The meeting was attended by Betsy
Holden, William Osborn, J. Christopher Reyes and Dudley Taft of the Audit Committee; Roger
Goodan of the board of directors (by phone); Jay Henderson, Kevin Maguire and Stephanie
Potter of PricewaterhouseCoopers (PwC); and Gerald Agema, Harry Amsden, Thomas Caputo,
Brian Litman and Mark Mallory of Tribune Company.

Mr. Osborn acted as Chairman of the meeting and Mr. Caputo as Secretary.

The following business was discussed at the meeting:

1.  The Committee approved the minutes of the December 12, 2006 and February 1, 2007 Audit
    Committee meetings.

2.  Mr. Agema reviewed the status of the internal controls certification project.  He indicated
    that management and PwC have substantially finished their work, but they needed to wait
    for the Company's Form 10-K to be finalized before they can complete their respective
    assessments.  He noted that to date, no material weaknesses had been identified, and that
    management is confident that PwC will be issuing a clean opinion regarding Tribune's
    internal controls over financial reporting.  Mr. Agema also indicated that no significant
    deficiencies were anticipated.

    Mr. Agema then discussed guidance being proposed by the Securities and Exchange
    Commission regarding how companies should evaluate internal controls over financial
    reporting, as well as a new auditing standard (AS 5) for external auditors being proposed by
    the Public Company Accounting Oversight Board.  He indicated that the proposed changes
    would likely result in a substantial reduction in time and costs involved with this
    certification process.

    Messrs. Agema, Caputo, Maguire and Mallory answered questions from members of the
    Committee during the presentation.

3.  Mr. Caputo then gave an Internal Audit status report.  He indicated that the majority of the
    audit plan presented to the Audit Committee in May 2006 will be completed by the end of
    March, but that certain low risk audits had to be moved to 2007 due to higher priority
    special projects.  He reviewed with the Committee a summary of results from all of the
    audits during the past year.  He noted that all significant issues noted during these reviews
    have been reported to the Committee during previous meetings and were appropriately
    addressed by management.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Mr. Caputo then reviewed open senior level financial positions within the Company, discussed assistance that Internal Audit is providing to PwC regarding its audit of Tribune Broadcasting, and reviewed the status of two fraud investigations at Recycler and Southern Connecticut Newspapers, Inc. He also indicated that the Company had received a letter alleging that the Los Angeles Times has been entering into contracts to purchase its own newspapers in order to inflate circulation numbers. Mr. Caputo noted that the letter did not provide any meaningful details and that merits of the allegations are questionable given results of recent audits by the Audit Bureau of Circulations and Internal Audit. He stated that regardless of these facts, a team including the Senior Vice President, Legal for the Los Angeles Times, Tribune's Vice President, Circulation and Vice President, Auditing has been assembled to investigate the allegations and that an update would be provided to the Committee at its next meeting.

Messrs. Amsden, Caputo and Henderson answered questions from the members of the Committee during the presentation.

4. Mr. Mallory discussed the Company's required annual impairment review of goodwill and other intangible assets that are not being amortized. He noted that no write-downs of these assets were required. He also noted that the 2006 fair value estimate for television was about the same as calculated in 2005, while the fair value estimate for newspapers fell due to declines in both operating cash flow and market multiples. Mr. Mallory stated that management will monitor this closely throughout the coming year as further declines could lead to goodwill impairment charges in the future, especially for newspapers. Mr. Maguire indicated that management's methodology is consistent with prior years and that all inputs have been properly benchmarked. He then confirmed that PwC is comfortable with management's testing approach and conclusions.

The Committee members asked questions regarding methods used to calculate market multiples used for both newspapers and television. They also asked if goodwill for the television reporting unit would be impaired if the multiple dropped three points from 11 to 8. Both management and PwC representatives indicated that goodwill for the television group would not be impaired under that scenario.

Messrs. Henderson, Mallory and Maguire answered questions from members of the Committee during the presentation.

5. Mr. Mallory discussed the Company's expected timetable for filing its 2006 Form 10-K with the SEC. He noted that that the document was a preliminary draft and that, similar to last year, management would communicate to the Committee any significant changes from this version before the 10-K is filed. He then highlighted the more significant items in this year's document including the TCMT transactions, the sale of the Atlanta, Albany and Boston television stations, and two new accounting rules that became effective in 2006 related to stock-based compensation and employee benefit plans.

Mr. Litman then reviewed the Company's preliminary draft Form 10-K for 2006 in more detail and highlighted new and/or significant items. He discussed the Company's

2

TRB0414467

disclosures regarding critical accounting policies and estimates, income tax reserves, common stock repurchases, credit agreements, TMCT transactions, discontinued operations, acquisition of additional equity in CareerBuilder, ShopLocal and Topix, formation of the CW network, stock-based compensation, pension and postretirement benefits, and the Company's exploration of strategic alternatives. He also reviewed management's report on internal controls over financial reporting and CEO and CFO certifications contained in the 10-K.

Messrs. Litman, Maguire and Mallory answered questions from members of the Committee during the presentations. Mr. Osborn complimented management on the comprehensiveness and clarity of presentation of the Company's financial information.

6.  Ms. Potter and Messrs. Henderson and Maguire then discussed PwC's report on the 2006 audit. Mr. Maguire indicated that PwC's integrated audit of the financial statements and internal controls over financial reporting was substantially complete and will be finished when the 10-K is finalized. He confirmed that no material weaknesses had been identified to date, and that no significant deficiencies had been noted or are anticipated.

Ms. Potter commented on several accounting matters including income tax reserves, impairment assessment for intangible assets, TMCT transactions, remaining press equipment from the closed San Fernando Valley plant, special charges related to the elimination of 400 positions in Publishing, recognition of revenue from copyright royalties, broadcast rights, formation of the CW network and accounting for employee benefit plans and stock-based compensation.

Mr. Maguire then reviewed the more significant changes included in a new auditing standard (AS 5) for external auditors that has been proposed by the Public Company Accounting Oversight Board. He also reviewed a summary of estimated fees for all services being provided by PwC during fiscal year 2006. After review, the Committee determined that non-audit services provided by PwC during 2006 did not impair their independence from management or Tribune. PwC's final fees for 2006 will be approved at the May Audit Committee meeting. Mr. Maguire also reviewed preliminary fees planned for 2007. He indicated that amounts are lower than 2006, but that they were not the result of a detailed planning process. He stated that these amounts were provided to the Committee solely for the purposes of pre-approving the proposed services for 2007. Detailed fees for 2007 will be presented for approval at the May Audit Committee meeting.

Mr. Maguire reviewed required communications with the Audit Committee. He commented that PwC encountered no difficulties in performing the audit, found the Company's accounting estimates, decisions and disclosures to be satisfactory, and no disagreements with management existed. He stated that no financial adjustments were noted during their audit to-date, and they did not become aware of any fraud or illegal acts involving senior management. Mr. Maguire asked whether the Audit Committee was aware of any fraud or illegal acts involving senior management, and each member indicated that they were not.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414468

Mr. Henderson reviewed PwC's letter of independence confirming they are independent accountants with respect to the Company. He then discussed PwC's quality control procedures, their most recent peer review, and material issues arising from government investigations. Mr. Henderson stated that nothing in these areas would impair PwC's ability to perform their audit of the Company.

During the presentation, PwC and management representatives answered questions from members of the Committee regarding results of internal and external audit examinations, the Company's internal controls, the quality and acceptability of the Company's financial reporting and accounting practices, and PwC's independence from management and the Company, as well as their qualifications and performance.

7. After all questions had been addressed, the Committee agreed to recommend to the Board of Directors that the Company's audited financial statements for 2006 be included in the Company's Form 10-K for filing with the SEC, subject to the completion of the work.

8. Mr. Caputo then reviewed a draft of the Audit Committee report and other related disclosures that will be included in this year's proxy statement. Mr. Caputo indicated that the Audit Committee report and related disclosures met all requirements. After review, the Committee approved the report and the other disclosures for inclusion in this year's proxy statement.

9. At this point, all Company employees left the meeting, and the Committee met privately with the PwC representatives. Ms. Potter and Messrs. Henderson and Maguire then left the meeting, and the Committee met privately with Messrs. Agema and Caputo.

10. After Messrs. Agema and Caputo left the meeting, the Committee discussed the appointment of independent auditors for 2007. After considering PwC's qualifications, their performance, and their independence from management and the Company, the Committee decided to reappoint PwC as the Company's independent auditors for 2007 (subject to shareholder ratification).

There being no further business to come before the Committee, the meeting was adjourned at 8:55 a.m.

_____
Thomas Caputo

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414469

**TRIBUNE COMPANY**
**AUDIT COMMITTEE MEETING**
**APRIL 18, 2007**

The Audit Committee met on Wednesday, April 18, 2007, at 7:00 a.m.  The meeting was held via conference call at Tribune Tower, Chicago, Illinois, pursuant to notice.  The meeting participants included Betsy Holden, William Osborn, Christopher Reyes and Dudley Taft of the Audit Committee; Kevin Maguire and Stephanie Potter of PricewaterhouseCoopers; and Dennis FitzSimons, Donald Grenesko, Brian Litman and Mark Mallory of Tribune Company.

Mr. Osborn acted as Chairman of the meeting and Mr. Litman as Secretary.

The following business was discussed at the meeting:

1.  Mr. Grenesko reviewed the Company's first quarter 2007 operating results.  He commented on changes in revenues, operating expenses, operating profit, equity income, interest expense, and diluted EPS.  Mr. Grenesko also discussed the non-operating items that were recorded in the first quarter and highlighted the presentation of SCNI and the New York edition of Hoy as discontinued operations due to the announced sales.

    Messrs. FitzSimons and Grenesko answered various questions from the members of the Committee during the presentation.

2.  Mr. Mallory then reviewed a draft of the Company's first quarter earnings press release.

3.  Mr. Maguire and Ms. Potter then discussed PricewaterhouseCoopers' report on their review of the Company's first quarter results.  They noted that there were no disagreements with management and no proposed adjustments.

4.  Mr. Mallory then commented on the first quarter 2007 10-Q.  He noted that no significant changes in format or presentation were anticipated and that a draft of the 10-Q would be mailed to the Audit Committee on April 26th for their review prior to the Company filing the 10-Q with the SEC on May 4th.  Mr. Mallory indicated that any significant changes to items previously reported or new required disclosures would be highlighted in the draft.  He also requested that the Audit Committee members call with any comments or questions by Wednesday, May 2nd and indicated that a conference call could be arranged if the Committee determined further discussion was warranted.

There being no further business to come before the Committee, the meeting was adjourned.

_____
Brian Litman

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414470

2

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414471

# TRIBUNE COMPANY
## AUDIT COMMITTEE RESPONSIBILITY SUMMARY

Management has prepared the attached summary of Audit Committee responsibilities to aid in planning Audit Committee meetings and to ensure that all responsibilities specified in the Audit Committee charter are fulfilled each year.  The summary specifies the expected timetable for discussing each area of responsibility.  We have made no changes to the summary since the last Audit Committee meeting.  All topics slated for discussion at this Audit Committee meeting are covered in the remaining sections of the meeting materials.

RMM
4/27/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414472

TRIBUNE COMPANY
AUDIT COMMITTEE RESPONSIBILITY SUMMARY
AND TIMETABLE

| Responsibility | Charter Reference | Timetable | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Meetings | | | | Quarterly Calls | As Needed |
| | | Feb. | May | Oct. | Dec. | | |
| **General:** | | | | | | | |
| 1. Meet periodically and privately with the independent accountants and internal auditors. | * | X | X | X | X | | X |
| 2. Meet periodically and privately with management. | * | X | | | | | X |
| 3. Appoint (after reviewing estimated fees for services to be performed) or replace the independent accountants. | * | X | | | | | |
| 4. Resolve any disagreements between management and the independent accountants regarding financial reporting. | * | | | | | | X |
| 5. Pre-approve all services performed by the independent accountants (including the fees and terms). | * | | X | | | | X |
| 6. Make regular reports to the Board of Directors. | * | X | X | X | X | | |
| 7. Reassess the adequacy of the Audit Committee Charter annually. | * | | | | X | | |
| 8. Self-assess Audit Committee performance (performed each July in conjunction with the overall Board self-assessment). | * | | | | | | |
| 9. Approve the Audit Committee report required by the SEC to be included in Tribune's annual proxy statement. | * | X | | | | | |
| **Financial Statement and Disclosure Matters:** | | | | | | | |
| 10. Meet to review the annual financial statements and disclosures with management and the independent accountants. | 1 | X | | | | | |
| 11. Make a recommendation to the Board regarding inclusion of the financial statements in the Company's 10-K. | 1 | X | | | | | |
| 12. Review the annual Section 404 internal control reports with management and the independent accountants. | 2 | X | | | | | |

*   These items are included in the "Meetings" and "Committee Authority and Responsibilities" sections of the Audit Committee Charter.

**May 2007**

1

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414473

## TRIBUNE COMPANY
## AUDIT COMMITTEE RESPONSIBILITY SUMMARY
## AND TIMETABLE

| Responsibility | Charter Reference | Timetable Meetings Feb. | May | Oct. | Dec. | Quarterly Calls | As Needed |
|---|---|---|---|---|---|---|---|
| 13. Review any significant deficiencies or material weaknesses in internal controls, and the steps being taken to resolve them, with management and the independent accountants. | 2 | X | | | | | X |
| 14. Meet to review the quarterly financial statements and disclosures with management and the independent accountants prior to each 10-Q filing. | 3 | | | X (3rd Qtr) | | X (1st and 2nd Qtrs) | |
| 15. Review the results of the independent accountants' quarterly reviews. | 3 | | | X (3rd Qtr) | | X (1st, 2nd & 4th Qtrs) | |
| 16. Review significant financial reporting issues and judgments related to the financial statements with management and the independent accountants. | 4 | X | X | X | X | X | |
| 17. Review reports from the independent accountants regarding material accounting and financial reporting issues. | 5 | X | | | | | X |
| 18. Discuss the quarterly earnings releases with management. | 6 | | | | | X | |
| 19. Discuss financial information and earnings guidance provided to analysts and rating agencies with management. | 6 | | | | | X | X |
| 20. Discuss the effect of regulatory and accounting initiatives and off-balance sheet structures with management and the independent accountants. | 7 | | | | | | X |
| 21. Discuss major financial risk exposures and related risk management policies with management. | 8 | | | | X | | X |
| 22. Discuss with the independent accountants matters related to the annual audit, including any difficulties encountered, scope restrictions, or significant management disagreements. | 9 | X | | | | | |
| 23. Review any disclosures made by the CEO or CFO during the certification process regarding internal control weaknesses and/or fraud. | 10 | X (4th Qtr) | | X (3rd Qtr) | | X (1st and 2nd Qtrs) | |

2

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414474

TRIBUNE COMPANY
AUDIT COMMITTEE RESPONSIBILITY SUMMARY
AND TIMETABLE

| Responsibility | Charter Reference | Timetable | | | | | |
|---|---|---|---|---|---|---|---|
| | | Meetings | | | | Quarterly Calls | As Needed |
| | | Feb. | May | Oct. | Dec. | | |
| **Oversight of the Company's Relationship with the Independent Accountants:** | | | | | | | |
| 24. Evaluate the independent accountants' lead partner. | 11 | X | | | | | |
| 25. Review the independent accountants' quality control procedures and any material issues raised by recent internal or external reviews. | 12 | X | | | | | |
| 26. Evaluate the qualifications, performance, and independence of the independent accountants and present conclusions to the Board. | 12 | X | | | | | |
| 27. Ensure rotation of the independent accountants' partners as required by law. | 13 | | X | | | | |
| 28. Set and review policies for hiring current and former employees of the independent accountants. | 14 | | | X | | | |
| 29. Discuss the planning and staffing of the independent audit. | 15 | | X | | | | |
| **Oversight of the Company's Internal Audit Function:** | | | | | | | |
| 30. Review the appointment and replacement of the senior internal auditing executive. | 16 | | | | | | X |
| 31. Review significant issues and management's responses raised in internal audit reports. | 17 | X | X | X | X | | X |
| 32. Discuss the internal audit department's responsibilities and planned scope of activities, budget, and staffing with the independent accountants and management. | 18 | | X | | | | |
| **Compliance Oversight Responsibilities:** | | | | | | | |
| 33. Obtain assurance from the independent accountants that they did not become aware of any illegal acts during their audit. | 19 | X | | | | | |
| 34. Review reports from management, internal audit and the chief compliance officer regarding the Company's compliance and ethics program and its Code of Business Conduct. | 20 | | | | X | | |

3

**Professionals' Eyes Only**
**Highly Confidential — Attorneys' Eyes Only**

TRB0414475

## TRIBUNE COMPANY
### AUDIT COMMITTEE RESPONSIBILITY SUMMARY
### AND TIMETABLE

| Responsibility | Charter Reference | Timetable | | | | | |
|---|---|---|---|---|---|---|---|
| | | Meetings | | | | Quarterly Calls | As Needed |
| | | Feb. | May | Oct. | Dec. | | |
| 35. Advise the Board regarding the effectiveness of the Company's compliance and ethics program. | 20 | | | | X | | |
| 36. Review the procedures for handling complaints and employee concerns regarding accounting and auditing matters. | 21 | | | X | | | |
| 37. Review any significant complaints and employee concerns regarding accounting and auditing matters. | 21 | | | | | | X |
| 38. Discuss the results of the annual review of executive expense reports performed by the independent accountants and the internal auditors. | N/A | | | X | | | |
| 39. Discuss the Company's business continuity plans and the related reviews performed by the internal auditors. | N/A | | | | X | | |
| 40. Discuss with management and the independent accountants correspondence with regulators or governmental agencies regarding material accounting and financial reporting issues. | 22 | | | | | | X |
| 41. Discuss legal matters that may materially affect the Company's financial statements or compliance policies with the Company's General Counsel. | 23 | | | | | | X |

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

3

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414477

## TRIBUNE COMPANY
## INTERNAL AUDIT STATUS REPORT

Internal Audit regularly provides reports to the Audit Committee summarizing the results of recent audits. Significant issues that we report to the Committee typically include:

- Identified and/or unresolved significant deficiencies or material weaknesses in internal controls over financial reporting
- Significant weaknesses in other control areas that could jeopardize material systems, operations or processes
- Significant financial statement adjustments ($500,000 or greater)
- Any fraud committed by an employee with considerable responsibility for internal controls, or a sizeable fraud committed by any level of employee ($25,000 or greater)
- Material circulation adjustments (2% of total circulation or greater)

Since our last report in February, Internal Audit has primarily focused its efforts on circulation audits, system implementation reviews, analytical reviews, completing the internal controls certification process for 2006 and planning 2007 audits. The results are summarized below and in Exhibit I on page 4. No significant financial adjustments, circulation adjustments or material weaknesses in internal controls were identified. One location did, however, receive a "Needs Improvement" rating regarding the implementation of the new centralized circulation system. More detail is provided below along with updates on previously identified significant issues, key open senior level financial positions, and fraud investigations. Internal Audit continued to provide assistance to Newsday and also performed financial audits at the Dallas, Seattle and Indianapolis television stations to assist PwC with their Broadcasting audits.

## AUDITS

Since the last Audit Committee meeting, integrated audits were completed at the corporate office and the television stations in Seattle and Portland. Internal Audit also completed follow-up audit work at the Company's significant locations to allow management to attest to the adequacy of controls at year-end. Audits of circulation figures and related controls at the Los Angeles Times, Newsday, Chicago Tribune and Sun-Sentinel were recently completed as were the remaining three analytical reviews from the 2006 audit plan. No significant issues or adjustments were noted.

## OTHER REVIEWS/UPDATES

### Daily Press Discus System Implementation Review

Internal Audit recently conducted a post-implementation review of Daily Press's new circulation system (Discus). Some of the key objectives of the audit were to identify any significant risks of system, procedural or control failure; evaluate the testing methodology, the adequacy of test scripts and the resolution of testing defects; assess the sufficiency of security administration and controls; and review the end-user training approach.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

Given the size of the Daily Press, it was chosen as the first location to go-live on the new centralized version of Discus in order to minimize overall risk. During the audit, Internal Audit noted that various manual work-arounds were created to compensate for missing functionality and several key reports were not available after the go-live date. While a certain amount of workarounds and "bugs" are part of any first installation of a new system, the level of such items noted during this review was higher than expected. Additionally, the testing procedures utilized prior to the system going live were not robust enough to properly identify all system, data or functionality problems. Daily Press has subsequently experienced reporting, billing, reconciliation and user access administration issues. These issues have not resulted in any significant financial statement adjustments to date, but the observations are considerable enough to warrant a "Needs Improvement" rating for this audit. The Publishing group office has been actively involved in resolving these issues. Additionally, Internal Audit is planning a follow-up audit at the Daily Press next month.

Some overall issues with the new system were also identified during this review. The general ledger interface for recording circulation revenue and expense is not working as intended, and several reports needed to perform key controls for compliance with Sarbanes-Oxley requirements are not available or functioning properly. The vendor has put together a proposal to fix the general ledger interface and develop the necessary reports. It will take 8 - 10 weeks to make the programming changes and then another 6 - 8 weeks to test the changes. The central project team and steering committee within the Publishing group have decided that no further Discus implementations will occur until these issues are resolved. At this point, the only other location using the new centralized Discus system is the Hartford Courant. The original plan was to have all the major daily newspapers up on the centralized system by the end of 2007. A new implementation schedule is currently being developed. We will provide an update at the Committee's next meeting.

## OPEN SENIOR-LEVEL FINANCIAL POSITIONS

The Controller position at the Los Angeles Times has been open since mid-January. Responsibilities have been effectively reassigned to others within their finance department and management is currently considering whether this position can be eliminated. The CFO position at the Daily Press is now open as she filled the open CFO position at the Sun-Sentinel. Daily Press management is currently considering some potential internal candidates.

## FRAUD INVESTIGATIONS

### Los Angeles Times

As discussed at the February meeting, Tribune's General Counsel received a letter in January from a Los Angeles law firm indicating that it is conducting an investigation of the Los Angeles Times based on allegations that the newspaper has been entering into contracts to purchase its own papers in order to inflate circulation numbers. The letter also implies that this conduct has been ongoing for up to a decade. No other meaningful details are provided.

**Professionals' Eyes Only**
Highly Confidential -- Attorneys' Eyes Only

TRB0414479

The merits of the allegations are questionable. In recent years, the Audit Bureau of Circulations (ABC) has increased the scope and depth of its audits at all newspapers, and both Internal Audit and ABC have performed circulation audits at the Los Angeles Times without any significant adjustments. Also, most of the newspaper's higher risk circulation programs such as single copy street sales (hawkers), Newspapers in Education, hotel copies and third party bulk sales have either been eliminated or drastically reduced.

A team including the Senior Vice President, Legal for the Los Angeles Times, Tribune's Vice President, Circulation and the Vice President, Auditing was assembled to investigate. The law firm has been contacted several times and no additional information has been provided. In the meantime, both Internal Audit and ABC have completed circulation audits at the Los Angeles Times and found no issues. This matter is currently considered closed unless any new information is brought forward.

TGC
5/02/07

3

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**TRB0414480**

Exhibit I

TRIBUNE COMPANY
SUMMARY OF AUDITS
FEBRUARY - APRIL 2007

| 2006 Revenues (millions) | Location | Type of Audit | | | |
|---|---|---|---|---|---|
| | | Integrated Audit | Analytical Review | Circulation Audit | Other Audits |
| | **Publishing:** | | | | |
| | LA Times Group: | | | | |
| $ 1,026 | LA Times | | | ███ | |
| 11 | Times Community News | | | In Progress | |
| | **Chicago Tribune Group:** | | | | |
| 759 | Chicago Tribune Company | | | ███ | |
| 43 | Tribune Direct Marketing, Inc. (direct mail) | | ███ | | |
| | **Newsday Group:** | | | | |
| 416 | Newsday, Inc. | | | ███ | |
| 19 | amNew York (free daily commuter paper) | In Progress | | | |
| | **Fort Lauderdale Group:** | | | | |
| 346 | Sun-Sentinel | | | ███ | |
| | **Baltimore Group:** | | | | |
| 235 | Baltimore Sun | | | | ███ Circ. System: Pre-Implementation |
| | **Orlando Group:** | | | | |
| 277 | Orlando Sentinel | | | | In Progress  Circ. System: Pre-Implementation |
| | **Hartford Group:** | | | | |
| 174 | Hartford Courant | | | | In Progress  Circ. System: Post-Implementation |
| | **Tribune Media Services Group:** | | | | |
| 48 | TV Data (print and interactive TV guides/content) | | ███ | | |
| | **Allentown Group:** | | | | |
| 97 | Morning Call | | | | In Progress  Adv. System: Pre-Implementation |
| | **Daily Press Group:** | | | | |
| 64 | The Daily Press, Inc. | | | | ███ Circ. System: Post-Implementation |
| | **Broadcasting & Entertainment:** | | | | |
| | **Television** | | | | |
| 55 | Dallas | | | | ███ Broadcasting Audits |
| 15 | Portland | ███ | | | ███ Broadcasting Audits |
| 62 | Seattle (2 stations) | ███ | | | ███ Broadcasting Audits |
| 38 | Houston | | ███ | | |
| 43 | Indianapolis (2 stations) | | | | ███ Broadcasting Audits |
| 40 | Washington D.C. | In Progress | | | |
| - | Broadcasting Group Office | | | | In Progress  Email / MicroSoft Exchange Server |
| | **Corporate:** | | | | |
| - | Corporate Office | ███ | | | |
| - | Finance Service Center | In Progress | | | |

  Satisfactory Audit Rating
Needs Improvement Audit Rating
Unsatisfactory Audit Rating

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414481

4

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## TRIBUNE COMPANY
## 2007 INTERNAL CONTROLS CERTIFICATION PLAN

### OVERVIEW

The Securities and Exchange Commission (SEC) requires companies to include in their Form 10-K a management report on the adequacy of internal controls over financial reporting. This report is mandated by Section 404 of the Sarbanes-Oxley Act, which also requires the company's independent accountants to report on the adequacy of the company's internal controls over financial reporting. Detailed documentation to support management's assertion is necessary so that the independent accountants have an adequate body of evidence upon which to base their own opinion.

### CHANGES FOR 2007

#### Controls Streamlining Project

Late last year, management completed a controls streamlining project. This entailed the development of a rigorous financial statement and internal controls risk assessment process that allows us to further increase our focus on higher risk areas, place more reliance on company level controls (like anti-fraud programs, reviews of operating results, etc.), and reduce the time-consuming tests of routine, transactional processing controls. The project resulted in a 33% reduction in controls that need to be documented and tested at the business unit, group and service center levels. Information Technology General Controls were standardized to the extent possible given our decentralized IT systems. Internal Audit will use the work performed to date as a basis to refine and reduce each business unit's controls during the 2007 planned site visits.

#### Proposed Guidance and New Auditing Standard

In December 2006, the SEC released preliminary guidance for management regarding a company's assessment of internal controls over financial reporting. The guidance emphasizes two main principles:

1. Management should evaluate the design of its controls to determine whether there is a reasonable possibility that a material misstatement would go undetected. This principle promotes efficiency by allowing management to focus only on those controls that are needed to prevent or detect material misstatements in the financial statements.

2. Management should analyze evidence regarding controls based on its assessment of the risk associated with those controls. This allows management to align the nature and extent of its testing procedures with those areas that pose the greatest risks.

In addition, the Public Company Accounting Oversight Board (PCAOB) released a draft of a proposed new auditing standard that allows auditors to exercise greater professional judgment when determining the nature, timing and extent of testing. It also requires use of a risk-based, top-down approach that focuses testing only on those controls that are designed to prevent or detect a material misstatement on a timely basis. (More detail regarding this new auditing standard is included in the 2007 audit plan under tab 5.) The SEC will try to ensure that its guidance for management and the PCAOB's new auditing standard are properly aligned. Our controls streamlining efforts will allow us to take full advantage of the proposed SEC and PCAOB guidance, which is expected to be finalized and issued in May or June 2007.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

**Outsourced Functions**

Tribune has several initiatives either underway or in place to outsource certain functions or systems support. These include PeopleSoft system support, outsourced to Hexaware in India, Publishing's customer accounting function, to be outsourced in September 2007 to Hewlett Packard in Costa Rica and India, and Broadcasting's advertising traffic system maintenance, outsourced to Harris Corporation in the U.S. Currently, the overall impact to the Sarbanes-Oxley 404 certification is limited to Publishing's customer accounting functions and Broadcasting's advertising traffic system maintenance, as all of the key controls related to the PeopleSoft support group have remained in our finance service center.

Detailed statements of work that include Sarbanes-Oxley 404 requirements have been documented and included in the vendor outsourcing agreements. Regarding the pending outsourcing of Publishing's customer accounting function, the finance service center and the vendor will both be performing key controls over financial reporting. Based on the nature of these controls, Internal Audit will perform both Chicago-based testing and testing at the vendor's remote facilities to ensure the controls are operating effectively. For Broadcasting's advertising traffic system, the vendor has the ability to make changes to the production system so testing of related traffic system controls will need to be performed. This can be done locally from Chicago.

## 2007 APPROACH

Mark Mallory, Vice President/Controller, will again chair the internal controls certification process steering committee for 2007. The steering committee consists of the Vice President/Chief Technology Officer, the Vice President/Auditing, group chief financial officers and Don Grenesko. The director of controls and compliance reports to the steering committee and works closely with various cross-functional teams of finance and information technology personnel from Corporate, Internal Audit, the group offices and the business units to help manage the process, develop control and process improvements, and monitor previously reported issues.

Management's main objective in this process is the successful completion of the 2007 internal control assessment with no material weaknesses and no significant deficiencies. In addition, management expects to reduce overall hours spent at the business units on Sarbanes-Oxley 404 compliance by 20%, or 15,000 hours, due to the reduction in controls that need to be documented and tested, increased reliance on company-level controls, and reduced transaction-based testing of lower risk areas.

> **2007 Internal Controls Certification Goals:**
> - No material weaknesses
> - No significant deficiencies
> - Fully-leverage proposed SEC and PCAOB guidance
> - Reduce hours spent at the business units on Sarbanes-Oxley 404 compliance by 20% without compromising effectiveness of the assessment

Management's scope assumes the adoption of the proposed SEC and PCAOB guidance as drafted. As such, the scoping process emphasized a top-down approach and risk assessment that began with the identification of significant accounts. Test plans were then created for each location, business cycle and control depending upon the level of identified risk. Management is

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414484

also requiring the business units and groups to provide a more precise description of certain company-level controls, particularly performance of variance analyses and other reviews of operating results. These controls are critical to preventing and detecting a material misstatement on a timely basis. We are placing increased reliance on such controls in order to decrease the amount of testing that needs to be performed on transaction-level controls. The following locations and business cycles are included in this year's scope. Again, the number of cycles to be tested at each location and the type of testing will vary based upon assessed risk.

| BUSINESS UNITS IN SCOPE | BUSINESS CYCLES IN SCOPE |
|---|---|
| Corporate | Company-level Controls |
| Finance Service Center (FSC) | Financial Reporting |
| Tribune Publishing Company | Consolidation |
| Los Angeles Times | Corporate Accounting |
| Chicago Tribune | Benefits |
| Newsday | Compensation |
| Sun-Sentinel | Tax |
| Baltimore Sun | Treasury |
| Orlando Sentinel | Advertising Revenue |
| Hartford Courant | Circulation Revenue |
| Tribune Media Services | Expenditures |
| Star Community Publishing | Payroll |
| Recycler | Fixed Assets |
| Tribune Broadcasting Company | Broadcast Rights |
| WPIX-TV (New York) | IT General Controls |
| KTLA-TV (Los Angeles) | |
| WGN-TV (Chicago) / WGN-Cable | |
| Chicago Cubs | |

Management has reduced self-testing requirements at these business units and will be placing more reliance on the independent testing that will be performed by Internal Audit. The results from the reviews at the above locations will be the primary basis for management's overall assessment of the Company's internal controls over financial reporting. For the remaining smaller business units, Internal Audit will test Sarbanes-Oxley 404 controls as part of the regular audit rotation.

As in prior years, Internal Audit's visits will be made prior to PwC's to give the business units the opportunity to enhance controls documentation and begin to implement action plans recommended by Internal Audit. It also allows PwC to reduce their work by placing reliance on the work of Internal Audit. This is even more important this year, as the proposed new auditing standard provides much more latitude for PwC to rely on the work of others.

**CURRENT STATUS**

The company-wide kick-off of the annual process occurred in April, and Internal Audit began auditing the FSC last month. Internal Audit's reviews will be completed by late October and PwC's will be completed shortly before year-end. Updates of our reviews will be required at some locations late in the fourth quarter to allow us to attest to the adequacy of controls as of year-end. We will continue to provide updates to the Committee at each meeting.

KAC/TGC/RMM
5/2/2007

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414485

5

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414486

## TRIBUNE COMPANY
## 2007 AUDIT PLAN SUMMARY

Each year, Tribune Internal Audit and PricewaterhouseCoopers LLP (PwC) develop an audit plan for the Company. This report is an overview of the 2007 audit plan and is intended to provide the Audit Committee with a description of the audit objectives and approach, our overall risk assessments, and our audit scope and procedures. The report also provides information on staffing levels and qualifications as well as estimated PwC audit fees.

## I.   AUDIT MISSION AND OBJECTIVES

### Mission

Tribune Internal Audit's mission is to systematically evaluate and audit the Company's financial information and internal controls, and to report its evaluations and related recommendations to management and the Audit Committee. PwC's mission is to provide independent opinions and reports that add credibility to the Company's financial information, and to assist the Audit Committee in discharging its responsibilities with respect to the Company's financial reporting.

All of the Company's activities are subject to audit, and Internal Audit and PwC have unrestricted access to all records, properties and personnel.

### Objectives

Internal Audit has primary responsibility for the following audit objectives:

- Evaluate financial statements and assess and monitor internal controls over financial reporting. The results from these audits are used by management for its internal controls certification.

- Assess and monitor other financial, operational, compliance and fraud risks and the programs to address these risks. Conduct related audits as needed such as analytical reviews, circulation audits, reviews of business continuity plans, audits of non-financial or production systems, and pre- and post-implementation reviews of new systems.

- Test financial statement accounts and internal controls at selected business units to assist with PwC's audit objectives and thereby reduce related fees.

PwC has primary responsibility for the following audit objectives:

- Perform an integrated audit of Tribune Company's internal controls over financial reporting and consolidated financial statements, including timely limited reviews of the Company's quarterly results of operations.

- Perform a full-scope audit of the separate financial statements of the Chicago Cubs as required by Major League Baseball (pending potential sale prior to year-end).

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

- Perform audits of the financial statements of Broadcasting Holding Company and Tribune Finance Company in compliance with SEC rules. (Broadcasting Holding Company owns the stock of most of the Company's stations and Tribune Entertainment. Tribune Finance Company was recently formed and holds inter-company receivables from the Company's major newspapers. These entities will become collateralized subsidiaries in connection with the proposed financing for the ESOP transaction for which separate audit opinions on their financial statements are required.)

- Conduct audits of employee benefit plan financial statements in order to comply with SEC and ERISA requirements.

- Complete certain agreed-upon review procedures of executive expense reports in conjunction with Internal Audit.

In addition, Internal Audit and PwC will participate in special projects where appropriate. These projects may include due diligence reviews, audits of acquisitions, limited financial reviews of affiliated companies, and/or other special investigations. As in prior years, PwC will work closely with Internal Audit to ensure audit work is properly coordinated and overall audit effort is properly focused on key business risks. PwC also intends to rely on Internal Audit's work to the fullest extent practicable and allowed under current auditing standards.

## II.  AUDIT TEAM

### Tribune Internal Audit Staff

- Tom Caputo, vice president/auditing, has primary responsibility for all internal audit work. Tom has 21 years of financial and operational management experience. Tom currently reports to Jerry Agema, vice president/corporate compliance and risk management. Jerry has decided to retire at the end of May, and his position will be eliminated. Going forward, Tom will report to Mark Mallory, vice president and controller and will continue to have direct access to the chief executive officer, the chief financial officer and the Audit Committee.

- Internal Audit's average staff size for the past 2 years has been 25. The 2007 budgeted amount was recently reduced from 28 to 24 as a result of decreased Sarbanes-Oxley testing requirements and cost constraints. The staff size is currently 22 due to recent promotions to business units. Replacing staff has been difficult because of high market demand for auditors combined with the uncertainty that surrounded the Company during the strategic review process. Internal Audit uses contractors to supplement staffing shortages.

- The Internal Audit staff has an average of 6 years of professional experience, while the management team has an average of 19 years of experience. Most of the financial auditors are Certified Public Accountants and have public accounting experience. Four of the information systems auditors are Certified Information Systems Auditors. Two of the staff members are Certified Internal Auditors and ten have graduate degrees in accounting, management information systems or business administration.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414488

- Internal Audit recruits and develops personnel and acts as a source of experienced financial and operational managers for the Company. Auditors spend about two years in the department. This is common among large companies and is considered a best practice. In the past 5 years, 29 auditors have been promoted to other positions within the Company.

- The current expense projection for Internal Audit's 2007 activities is $3.8 million, which is the same as last year's actual expenses. The majority of 2007 spending, $2.6 million, is for compensation. The remaining $1.2 million is for travel, training, outside services and other miscellaneous office expenses.

| Internal Audit Staffing and Expense Summary | | |
|---|---|---|
| | 2007 Projected | 2006 Actual |
| **Staff:** | | |
| Avg. Staff Size | 24 | 25 |
| Actual Staff Size (as of May) | 22 | 26 |
| **Annual Expenses:** | | |
| Compensation | $2.6M | $2.7M |
| Travel, Training, Outside Services, etc. | 1.2M | 1.1M |
| Total | $3.8M | $3.8M |

- Internal Audit formally communicates its findings to business unit management and Tribune senior management. Follow-up on all Sarbanes-Oxley related audit points is performed prior to management's year-end assessment. Follow-up on all other audit recommendations is performed after six months and then again during the next visit to the business unit.

## PricewaterhouseCoopers LLP

- PwC's audit team leadership will be the same as last year with Kevin Maguire again serving as Engagement Partner. This will be his fifth year in this role and, as such, he will be required to rotate off of the engagement after this year. He will be assisted by Stephanie Potter who, for the second year, will serve as the Engagement Senior Manager.

- Jim Eidam will continue as Quality Review Partner and provide support and consultation on significant matters involving audit scope, accounting principles and financial statement disclosure. Likewise, Jay Henderson, who is the managing partner for PwC's Chicago office, will return as Senior Review Partner.

## III. RISK ASSESSMENTS AND AUDIT ROTATION

### Audit Risk Assessments

We begin our audit process with thorough audit risk assessments which consider factors such as the environment and markets in which the Company operates, prior year audit results (PwC, Internal Audit, ABC, etc.), changes in business and regulatory environments, recent financial performance, and the nature and complexity of the Company's businesses, accounting policies and information systems. We also consider the impact of recent events such as staff reductions/turnover, outsourced operations and new system implementations.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414489

Regarding fraud risk, we assess management's anti-fraud program, evaluate key incentives, pressures or opportunities to commit fraud, analyze financial and non-financial data and address opportunities for improper revenue recognition, diversion of Company funds or management override of controls. Fraud risk assessments are also performed annually by management across the Company. Each location assesses various potential fraud schemes that could materially impact their business and financial statements and then identifies whether any key controls exist to mitigate and/or eliminate these risks.

The relative materiality of each business unit is a standalone risk due to its direct impact on the financial statements. Business units with annual revenues in excess of $250 million are considered "high;" those with revenues between $50 and $250 million are "moderate;" and those with revenues below $50 million are "low."

The risk assessment results are summarized in Exhibit II starting on page 12. As noted in the exhibit, 11 locations have one or more high risk factors. A summary of these business units and their high risk factors is included below.

- **Tribune Corporate Office**: material areas centralized under its control, such as cash management, debt, income taxes and employee benefits; implementation of new accounting standards; new ownership structure and debt agreements; additional reporting requirements related to collateralized subsidiaries; staff reductions.

- **Finance Service Center (including PeopleSoft support)**: high volume and dollar value of transactions processed; current and planned outsourced functions.

- **Los Angeles Times, Chicago Tribune**: high materiality relative to Tribune Company's consolidated financial statements; new classified advertising order entry and editorial system implementations; staff reductions; revenue, expense and circulation pressures.

| Key Audit Risks |
| --- |
| - Revenue, expense and circulation pressures |
| - Staff reductions |
| - Outsourced functions |
| - New system implementations |
| - New accounting standards |
| - New ownership structure, debt agreements and related reporting requirements |

- **Newsday**: high materiality; new classified advertising order entry system implementation; revenue, expense and circulation pressures.

- **Baltimore Sun**: high materiality; new circulation system implementation; senior management turnover; revenue, expense and circulation pressures.

- **Orlando Sentinel**: high materiality; new classified advertising order entry and circulation system implementations; revenue, expense and circulation pressures.

- **Sun-Sentinel**: high materiality; new classified advertising order entry and circulation system implementations; significant turnover in finance area; revenue, expense and circulation pressures.

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

- *WGN-TV group (Chicago)*: unique cable and distribution operations; relatively high materiality.
- *Tribune Interactive*: complex, fast-growing operations; unique accounting rules.
- *Recycler (Los Angeles Times subsidiary)*: complexity of its operations; key management changes; internal control issues identified during past audits.

## Audit Rotation

Internal Audit also performs a separate risk assessment to address operational and information technology risks and monitor compliance with various regulations and Company policies that are not covered by Section 404 of the Sarbanes-Oxley Act. This risk assessment is used to prioritize other areas to be audited in the upcoming year and to create audit rotation guidelines which indicate the minimum frequency that audits should be performed. Current Internal Audit rotation guidelines are included in Exhibit I on page 11 and are essentially unchanged from last year.

## IV.  2007 AUDITS

Our 2007 plan consists of two main types of audits:

1.  Audits supporting opinions and certifications (performed by PwC and Internal Audit)
2.  Audits that assess and monitor other risks (performed only by Internal Audit)

### Audits Supporting Opinions/Certifications (Integrated Audits)

The audit approach for 2007 regarding integrated audits of financial statement and internal controls over financial reporting will be considerably different. In prior years, the primary focus was on attaining a certain level of coverage of the Company's operations. A considerable amount of duplicated auditing effort also took place between Internal Audit and PwC because of various limitations imposed by the current auditing standard. However, as discussed at the February meeting, the PCAOB released its proposed Auditing Standard No. 5 (AS 5). The new standard allows external auditors to exercise greater professional judgment when determining the nature, timing and extent of testing. It also requires the use of a risk-based, top-down approach that focuses testing only on those controls that are designed to prevent or detect a material misstatement on a timely basis. Some of the proposed changes include:

- Eliminating the requirement for the external auditor to provide an opinion on management's process for its assessment of internal controls.
- Focusing testing on significant accounts and controls that address the areas of highest risk vs. obtaining a certain level of "coverage" of the company's operations.
- Allowing the auditor to leverage company-level controls, risk assessments and knowledge gained in prior audits when determining the nature, timing and extent of testing.
- Increasing the auditor's ability to use the work of others and vary the nature, timing and extent of testing by location.

5

TRB0414491

The proposal is expected to be finalized and released in May or June and we do not anticipate any substantial changes in the final version. As such, we have planned the 2007 audit in accordance with the standard as drafted.

### *Integrated Audits – PwC*

Using the guidance under AS 5, PwC identified the significant accounts for inclusion in this year's audit. They then used a risk-based approach to determine where and how these accounts will be tested. Their plans rely heavily on company-level controls, particularly the reviews of financial statement variances and operations performance that are performed by management throughout the organization. The ability of these controls to prevent or detect a material misstatement on a timely basis allows them to reduce or eliminate testing of certain transaction-level controls. Depending upon the level of risk, they can also vary the nature, timing and extent of testing procedures at each location (i.e., not all business cycles need to be tested at each location, and the testing can range from walk-throughs to detailed testing of several transactions). As such, even though they will be visiting the same business units as last year, the overall quantity of testing will be reduced. PwC will also place significantly more reliance on Internal Audit's work given the increased latitude that AS 5 provides.

Procedures are planned for the following locations. The coverage achieved comprises 50-60% of the Company's consolidated assets and revenues.

| | | |
|---|---|---|
| Los Angeles Times | KTLA-TV (Los Angeles) | Corporate Office |
| Chicago Tribune | WPIX-TV (New York) | Tribune Publishing |
| Newsday | WGN-TV (Chicago) | Tribune Broadcasting |
| Sun-Sentinel | WGN-Cable | Finance Service Center |
| Baltimore Sun | | |

In general, PwC's procedures will include the following in varying degrees depending upon assessed risk:

- Testing the design and operating effectiveness of company-level controls as well as manual and automated transaction level controls.

- Reviewing and testing general information system controls for systems associated with these key controls.

- Performing substantive tests of account balances and analyzing key financial ratios and income statement variances as deemed necessary.

Regarding the consolidated financial statements, PwC will continue to focus its efforts on the areas of greatest audit risk, including significant non-recurring transactions, items involving significant management judgment or complexity (e.g., revenue recognition, stock-based compensation, goodwill and intangible assets), investments in equity and debt securities, income taxes, financing activities, consolidation, and implementation of any new accounting pronouncements.

6

*Integrated Audits – Internal Audit*

Using the SEC's guidance for management that was discussed under Tab 4, Internal Audit utilized a similar top-down, risk-based approach to determine the locations and extent of testing required to provide support for management's report on internal controls over financial reporting. The number of locations and extent of testing at each business unit is slightly higher than PwC's given management's certification requirements and PwC's planned reliance on the work of Internal Audit. As such, in addition to the business units mentioned above, Internal Audit will also perform procedures at the Orlando Sentinel, Hartford Courant, Tribune Media Services, Star Publications (a Newsday subsidiary), Recycler and the Cubs. Depending upon assessed risk, Internal Audit will also vary the nature, timing and extent of testing procedures at each location. The coverage achieved through this process comprises 60-70% of the Company's consolidated assets and revenues.

Internal Audit will also perform integrated audits at another nine locations in accordance with its audit rotation. These integrated audits will include the following additional procedures:

- Additional tests of account balances.
- Tests of selected operational and compliance controls not covered by Section 404 of the Sarbanes-Oxley Act.
- Verification of compliance with quarterly management representations.
- Tests of selected expense reports and procurement card transactions.

*Collateralized Subsidiary Audits*

PwC will perform the required financial statement audits for Broadcasting Holding Company and Tribune Finance Company, which are the entities that will become collateralized subsidiaries in connection with the proposed financing for the ESOP transaction. SEC rules require separate opinions on the related financial statements. For Broadcasting Holding Company, the business units to be audited include Tribune Entertainment and the television stations in Chicago, New York, Los Angeles, Dallas, Seattle and Indianapolis. Internal Audit will perform work at some of these locations under PwC's supervision to help reduce related audit fees. Audit work for Tribune Finance Company will be performed at the corporate office.

**Assessment and Monitoring of Other Risks**

The second component of our plan primarily relates to reviewing financial statements and related controls at less material locations, addressing operational and information technology risks, and monitoring compliance with various regulations and Company policies that are not covered by Section 404 of the Sarbanes-Oxley Act. Internal Audit performs all of these audits.

*Analytical Reviews*

Internal Audit annually performs one or more of the following analytical procedures for each business unit that will not be visited by Internal Audit during the year:

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414493

- Review significant balance sheet/income statement variances, unusual balances, etc.
- Analyze key financial ratios and metrics.
- Request and review a sample of key account reconciliations.
- Review key circulation statistics.

Internal Audit also performs "surprise" account reconciliation reviews each quarter for a sample of business units. These procedures are designed to be able to surface issues similar to those that have arisen at some of our smaller business units in the recent past, such as reconciliation issues, unsupported account balances and financial adjustments.

### Circulation Audits

Starting in 2004, Internal Audit began performing circulation audits at the Company's major daily newspapers. These audits, which review reported circulation and evaluate related controls, are in addition to the work already performed by the Audit Bureau of Circulations (ABC) or other third-party auditors. These reviews include all publications where circulation numbers are reported publicly or relied upon by advertisers. Procedures focus on higher risk circulation areas and entail various ABC auditing techniques such as subscriber order testing, field observations and interviews with distributors and other third parties.

In addition to reviewing circulation figures, Internal Audit also reviews underlying controls that ensure the numbers are accurately reported. For locations not audited by ABC (such as those that have free distribution), Internal Audit will perform similar procedures but will adjust the scope to fit the size and risk profile of the publication.

### Other Audits

Because certain controls are not covered by any of the above audits, Internal Audit will periodically perform audits of major operating systems, data centers, computer networks, and data and systems security administration. Internal Audit will also perform business continuity plan (BCP) audits at selected locations as well as pre- and post-implementation reviews at locations planning to install new systems. (See Exhibit I on page 11).

### Acquisition Audits

Internal Audit initiates a financial audit and internal controls review within the first 60 days of an acquisition of a business unit. Limited follow-up procedures are performed after six months. Internal Audit then returns to newly acquired business units during the following year to perform an additional financial audit to monitor progress and assess business risk.

### 2007 Audit Plan Summary

The table below summarizes the locations, hours and types of audits planned for 2007. The impact of AS 5 and the controls streamlining project is evident in the decrease in hours for the integrated audits. The 2007 and 2006 audit schedules for all locations are found in Exhibit II starting on page 12.

8

TRB0414494

| 2007 Audit Plan Summary | | | | |
|---|---|---|---|---|
| | Locations | | Hours | |
| | 2007 | 2006 | 2007 | 2006 |
| **Integrated Audits** | | | | |
| PwC | 13 | 13 | 8,000 | 9,400 |
| Internal Audit | 28 | 33 | 22,000 | 30,000 |
| **Audits of Collateralized Subsidiaries** | | | | |
| PwC | 5 | - | 1,280 | - |
| Internal Audit | 3 | - | 500 | - |
| **Other Audits (Internal Audit only)** | | | | |
| Analytical Reviews | 29 | 30 | 1,700 | 2,000 |
| Circulation Audits | 10 | 12 | 7,500 | 9,000 |
| System Implementation Audits, Business Continuity Plan Reviews, etc. | 23 | 15 | 13,000 | 8,000 |

## V. 2007 AUDIT FEES

A summary of PwC's estimated fees for 2007 is provided below. Actual fees for 2006 and 2005, along with the 2007 estimate from the February Audit Committee meeting, are also included for comparative purposes.

### PWC FEE SUMMARY

| | 2007 Estimates | | 2006 | 2005 |
|---|---|---|---|---|
| | May | February | Actual | Actual |
| **Audit Services:** | | | | |
| Integrated financial statement audit | $ 1,825,000 | $ 1,890,000 | $ 2,100,000 | $ 1,958,000 |
| Out-of-pocket expenses | 165,000 | 165,000 | 165,000 | 195,000 |
| TMCT Transactions | - | - | 130,000 | - |
| SEC filings and related comfort letters | 135,000 | - | 40,000 | - |
| Total audit services | 2,125,000 | 2,055,000 | 2,435,000 | 2,153,000 |
| **Audit Related Services:** | | | | |
| Employee benefit plan audits | 415,000 | 415,000 | 424,500 | 370,000 |
| Audits of the TMCT LLC's | - | - | 70,000 | 65,500 |
| Audit of the Chicago Cubs | 52,000 | 52,000 | 50,000 | 47,000 |
| Broadcasting Project | 450,000 | 450,000 | 998,700 | 174,000 |
| Broadcasting Holding Co. audit | 275,000 | - | - | - |
| Tribune Finance Co. audit | 25,000 | - | - | - |
| Leveraged ESOP transaction | 250,000 | - | - | - |
| Other | - | - | - | 30,000 |
| Total audit related services | 1,467,000 | 917,000 | 1,543,200 | 686,500 |
| **Tax Services** | 10,000 | 10,000 | - | - |
| **Other Services** | 177,500 | 177,500 | 162,200 | 164,300 |
| **Total Services** | $ 3,779,500 | $ 3,159,500 | $ 4,140,400 | $ 3,003,800 |

9

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414495

Fees for the audit of the 2007 consolidated financial statements total $1,825,000, slightly less than the preliminary estimate of $1,890,000 presented at the February Audit Committee meeting. The current 2007 fee estimate includes a budget of 8,000 hours, which is a reduction of 1,400 hours from last year due to the planned adoption of the proposed auditing standard AS 5. PwC's audit plan contemplates increased reliance on Internal Audit and on management's company-level controls, specifically various the financial statement variance reviews that are performed. The decrease in hours is partially offset by a rate increase of approximately 4.5%.

Total estimated 2007 fees of $3,779,500 are higher than the preliminary estimate by $620,000 due to SEC filing requirements and comfort letters necessitated by the leveraged ESOP transactions, the new financial statement audit requirements for Broadcasting Holding Company and Tribune Finance Company, and accounting and consultation work with respect to the leveraged ESOP transactions, offset by lower fees for the base integrated audit. Looking ahead to fiscal 2008, the fees associated with the regulatory filings and leveraged ESOP transaction would not recur, resulting in a reduction in fees of approximately $385,000. Additionally, the 2007 fees associated with Broadcasting Project of $450,000 are one-time in nature. The Broadcasting Project consisted of a three-year financial audit in anticipation of a potential sale or spin-off of Tribune Broadcasting.

The $177,500 of fees estimated for other services includes $176,000 for the preparation of employee benefit plan annual reports (Form 5500). The 2007 increase reflects a higher number of filings due to changes in the Company's benefit plan structure during 2006. This category also includes the $1,500 annual license fee for PwC's accounting research software.

The Audit Committee must pre-approve the above services. Any additional services not listed will require specific pre-approval by the Audit Committee. The Audit Committee has delegated pre-approval authority to its chair who reports any decisions to the full committee at its next scheduled meeting. Management and PwC have reviewed the fee schedule and believe that the current request for services is consistent with the SEC's rules on auditor independence.

## VI. PWC REQUIRED AUDIT COMMITTEE COMMUNICATIONS

PwC is required to provide the Audit Committee with a detailed report on their audit plan along with drafts of the engagement letters for the audits of Tribune Company, Broadcasting Holding Company and Tribune Finance Company. These documents are attached. PwC's detailed audit plan has been provided for informational purposes only, as the major points have been covered in this summary report. Because PwC is appointed by and reports to the Audit Committee, the engagement letters must be signed by the Chair of the Audit Committee as well as by the Company's CEO and CFO. PwC is also required to provide the Audit Committee with copies of all material written communications between PwC and management. Attached to this report is the management representation letter provided to PwC at the conclusion of the 2006 audit. The letter contains customary representations that auditors have required as part of their normal audit procedures for many years. No formal Audit Committee action is required.

TGC/KTM
5/02/07

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414496

Exhibit I

## TRIBUNE COMPANY
## INTERNAL AUDIT ROTATION GUIDELINES

| | Integrated Audits | Analytical Reviews | Circulation Audits | Other Audits (1) |
|---|---|---|---|---|
| | **Frequency (in years)** | | | |
| **Publishing** | | | | |
| 1  Group Office | Annual | - | - | |
| 2  Big-Three Newspapers | Annual | - | Annual | |
|    *- Los Angeles Times, Chicago Tribune, Newsday* | | | | |
| 3  Mid-Sized Units (Revenues Greater that $150 million) | Two | Annual | Two | |
|    *- Sun-Sentinel, Baltimore Sun, Orlando Sentinel, Hartford Courant* | | | | |
| 4  All Other Business Units (and subsidiaries of main business units) | Three | Annual | Three | A<br>S |
| **Broadcasting and Entertainment** | | | | N |
| 5  Group Office | Annual | - | - | E |
| 6  Big-Three Television Stations | Annual | - | - | E<br>D |
|    *- WGN-TV (Chicago), WPIX-TV (New York), KTLA-TV (Los Angeles)* | | | | E |
| 7  Mid-Sized Units (Revenues Greater that $50 million) | Two | Annual | - | D |
|    *- KDAF-TV (Dallas), KCPQ-TV/KMYQ-TV (Seattle), WGN-Cable, Cubs* | | | | |
| 8  All Other Business Units | Three | Annual | - | |
| **Corporate** | | | | |
| 9  Corporate Office | Annual | - | - | |
| 10  Finance Service Center | Annual | - | - | |

(1) Audits are performed as needed based upon risk assessments.  For 2007 this includes the following audits:

| System Implementation Reviews | | | BCP Reviews | IT Reviews |
|---|---|---|---|---|
| *Adv. Order Entry* | *Circulation* | *Editorial* | Tribune Tower | Email System |
| L.A. Times | Baltimore Sun | L.A. Times | L.A. Times | |
| Chicago Tribune | Sun-Sentinel | Chicago Tribune | Chicago Tribune | |
| Newsday | Orlando Sentinel | | Newsday | |
| Sun-Sentinel | Hartford Courant | | Orlando Sentinel | |
| Orlando Sentinel | Morning Call | | KTLA-TV | |
| Hartford Courant | Daily Press | | | |
| Morning Call | | | | |
| Daily Press | | | | |

Note:  Internal Audit will alter the rotation plan as necessary during the year to reflect changes in the risk environment at any of the business units and may perform unplanned audits of business units, as warranted.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0414497

Exhibit II

## TRIBUNE COMPANY
## SUMMARY OF AUDITS

| 2006 Revenues (millions) | Risk Assessments Materiality (1) | Risk Assessments Other Factors (2) | Risk Assessments Overall Risk | Location | 2007 Integrated Audit | 2007 Analytical Review | 2007 Circ. | 2007 Other | 2006 Integrated Audit | 2006 Analytical Review | 2006 Circ. | 2006 Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Publishing:** | | | | | | | | |
| | | | | **LA Times Group:** | | | | | | | | |
| $1,026 | High | Moderate | High | LA Times | PwC/IA | - | IA | IA | PwC/IA | - | IA | IA |
| 27 | Low | High | Moderate | Recycler Classifieds | IA | - | - | - | IA | - | - | - |
| 36 | Low | Low | Low | California Community News (inserting operation) | - | IA | - | - | - | IA | - | - |
| | | | | **Chicago Tribune Group:** | | | | | | | | |
| 759 | High | Moderate | High | Chicago Tribune Company | PwC/IA | - | IA | IA | PwC/IA | - | IA | IA |
| 43 | Low | High | Moderate | Tribune Direct Marketing, Inc. (direct mail) | - | IA | IA | - | - | IA | IA | - |
| 19 | Low | Moderate | Low | Chicago Magazine | - | IA | IA | - | - | IA | IA | - |
| 12 | Low | Moderate | Low | Chicagoland Publishing Company (apartment guides) | - | IA | IA | - | - | IA | IA | - |
| | | | | **Newsday Group:** | | | | | | | | |
| 416 | High | Moderate | High | Newsday, Inc. | PwC/IA | - | IA | IA | PwC/IA | - | IA | IA |
| 70 | Moderate | Moderate | Moderate | Star Community Publishing (weekly shoppers) | IA | - | IA | - | IA | - | IA | - |
| 4 | Low | Moderate | Low | Island Publications (magazines) | IA | IA | IA | - | IA | - | IA | - |
| 19 | Low | Moderate | Moderate | amNew York (free daily commuter paper) | IA | IA | - | - | - | IA | IA | - |
| 18 | Low | Moderate | Low | DSA Community Publishing | - | IA | - | - | - | IA | - | - |
| | | | | **Fort Lauderdale Group:** | | | | | | | | |
| 346 | High | High | High | Sun-Sentinel | PwC/IA | - | IA | IA | PwC/IA | - | IA | IA |
| 24 | Low | Moderate | Low | Gold Coast Publications, Inc. (weekly shoppers) | - | IA | - | - | IA | IA | - | - |
| 20 | Low | Moderate | Low | Forum Publishing Group (weekly/monthly newspapers) | - | IA | - | - | IA | IA | - | - |
| | | | | **Baltimore Group:** | | | | | | | | |
| 235 | High | High | High | Baltimore Sun | PwC/IA | - | IA | IA | PwC/IA | - | - | IA |
| 32 | Low | Moderate | Low | Patuxent Publishing (weekly newspapers / magazines) | IA | - | - | - | IA | - | - | - |
| 18 | Low | Moderate | Low | Homestead Publishing (weekly newspapers) | IA | - | - | - | IA | - | - | - |
| | | | | **Orlando Group:** | | | | | | | | |
| 277 | High | Moderate | Moderate | Orlando Sentinel | PwC/IA | - | - | IA | PwC/IA | - | - | IA |

(1) Materiality is based on the business unit's relative contribution to consolidated revenue. Group and Corporate offices have no revenue.
(2) Other factors include a subjective evaluation of business unit environments and prior audit findings, as well as fraud risks. Items such as management changes, complexity of systems, unique accounting, and recent financial performance are also considered.
(3) Location tested as part of audit of Broadcasting Holding Company.

12

Professio... 'Eyes Only
Highly Con...ential -- Attorneys' Eyes Only

TP   114498

Exhibit II

## TRIBUNE COMPANY
## SUMMARY OF AUDITS

| 2006 Revenues (millions) | Risk Assessments Materiality (1) | Other Factors (2) | Overall Risk | Location | 2007 Integrated Audit | 2007 Analytical Review | 2007 Circ. | 2007 Other | 2006 Integrated Audit | 2006 Analytical Review | 2006 Circ. | 2006 Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Hartford Group:** | | | | | | | | |
| 174 | Moderate | Moderate | Moderate | Hartford Courant | PwC/IA | - | - | IA | PwC/IA | - | IA | IA |
| 11 | Low | Moderate | Low | New Mass Media (weekly newspapers) | IA | - | - | - | IA | IA | IA | - |
| 8 | Low | Moderate | Low | ValuMail (total market coverage product) | IA | - | - | - | IA | IA | IA | - |
| | | | | **Tribune Media Services Group (4):** | | | | | | | | |
| 19 | Low | Low | Moderate | Tribune Media Services, Inc. (syndicated content) | PwC/IA | - | - | - | PwC/IA | - | - | IA |
| 38 | Low | Low | Low | TV Publishing, Inc. (print TV programming guides) | - | IA | - | - | - | IA | - | - |
| 48 | Low | Low | Low | TV Data (print and interactive TV guides/content) | - | IA | - | - | - | IA | - | - |
| 2 | Low | Moderate | Low | Tribune Media Services International (syndicated content) | - | IA | - | - | - | IA | - | - |
| | | | | **Atlantown Group:** | | | | | | | | |
| 97 | Moderate | Moderate | Moderate | Morning Call | - | IA | - | - | - | IA | - | IA |
| 3 | Low | Moderate | Low | Direct Mail Associates (print, insertion and mail provider) | - | IA | - | - | - | IA | - | - |
| | | | | **Daily Press Group:** | | | | | | | | |
| 64 | Moderate | Moderate | Moderate | The Daily Press, Inc. | - | IA | IA | IA | - | IA | - | IA |
| 12 | Low | Moderate | Low | Virginia Gazette (weekly newspapers / magazines) | - | IA | IA | - | - | IA | - | - |
| | | | | **Spanish Language Newspaper Group:** | | | | | | | | |
| 21 | Low | Moderate | Moderate | Hoy - New York, Chicago, Los Angeles | IA | IA | IA | - | IA | - | IA | IA |
| 0 | Moderate | High | Moderate | Tribune Interactive | IA | - | - | - | PwC/IA | IA | - | - |
| 12 | Low | Low | Low | ChicagoLand Television News (CLTV) | - | IA | - | - | IA | IA | - | - |
| (0) | - | Low | Low | Tribune Media Net (national sales organization) | - | IA | - | - | - | IA | - | - |
| - | - | Moderate | Moderate | Publishing Group Office | PwC/IA | - | - | - | PwC/IA | - | - | - |

(1) Materiality is based on the business unit's relative contribution to consolidated revenue. Group and Corporate offices have no revenue.
(2) Other factors include a subjective evaluation of business unit environments and prior audit findings, as well as fraud risks. Items such as management changes, complexity of systems, unique accounting, and recent financial performance are also considered.
(3) Location tested as part of audit of Broadcasting Holding Company.
(4) Due to Tribune Media Services' unique group structure, it was also evaluated as an entire entity. As such, it has Moderate materiality and Moderate other risk factors.

13

TRB0414499