Exhibit II

# TRIBUNE COMPANY
# SUMMARY OF AUDITS

| 2006 Revenues (millions) | Risk Assessments | | | Location | 2007 | | | | 2006 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Materiality (1) | Other Factors (2) | Overall Risk | | Integrated Audit | Analytical Review | Circ. | Other | Integrated Audit | Analytical Review | Circ. | Other |
| | | | | **Broadcasting & Entertainment:** | | | | | | | | |
| | | | | **Television** | | | | | | | | |
| $ 179 | Moderate | Low | Moderate | **New York** | PwC/IA (3) | - | - | - | PwC/IA | - | - | IA |
| 153 | Moderate | Low | Moderate | **Los Angeles** | PwC/IA (3) | - | - | IA | PwC/IA | - | - | IA |
| | | | | **Chicago Group:** | | - | - | - | | | | |
| 162 | Moderate | Moderate | Moderate | WGN-TV | PwC/IA (3) | - | - | - | PwC/IA | - | - | IA |
| 148 | Moderate | High | Moderate | WGN-Cable, including distribution | PwC/IA | - | - | - | PwC/IA | - | - | - |
| 55 | Moderate | Low | Moderate | **Dallas** | PwC/IA (3) | - | - | - | PwC/IA | | - | - |
| 62 | Moderate | Moderate | Moderate | **Seattle (2 stations)** | PwC/IA (3) | - | - | - | PwC/IA | - | - | - |
| 45 | Low | Moderate | Moderate | **Philadelphia** | - | IA | | | PwC/IA | | - | - |
| 43 | Low | Moderate | Moderate | **Miami** | - | IA | - | - | - | IA | - | IA |
| 43 | Low | Moderate | Moderate | **Indianapolis (2 stations)** | PwC/IA (3) | - | - | - | PwC/IA | | - | - |
| 44 | Low | Low | Low | **Sacramento** | IA | - | - | - | | IA | - | - |
| 40 | Low | Low | Low | **Washington D.C.** | IA | - | - | - | - | IA | - | - |
| 38 | Low | Low | Low | **Houston** | - | IA | - | - | - | IA | - | - |
| 39 | Low | Moderate | Low | **Hartford (2 stations)** | - | IA | - | - | IA | - | - | - |
| 30 | Low | Low | Low | **Denver** | - | IA | - | - | IA | - | - | - |
| 28 | Low | Low | Low | **St. Louis** | - | IA | - | - | - | IA | - | - |
| 21 | Low | Low | Low | **San Diego** | IA | - | - | - | - | IA | - | - |
| 20 | Low | Low | Low | **Grand Rapids** | - | IA | - | - | - | IA | - | - |
| 15 | Low | Moderate | Low | **New Orleans (2 stations)** | - | IA | - | - | IA | - | - | - |
| 15 | Low | Moderate | Low | **Portland** | - | IA | - | - | IA | - | - | - |
| 14 | Low | Low | Low | **Harrisburg** | - | IA | - | - | IA | - | - | - |
| 41 | Low | Low | Low | **Chicago Radio** | - | IA | - | - | - | IA | - | - |
| 202 | Moderate | Moderate | Moderate | **Chicago Cubs** | IA | - | | | PwC/IA | - | - | - |
| 20 | Moderate | Moderate | Moderate | **Tribune Entertainment Company** | PwC/IA (3) | - | - | - | - | IA | - | - |
| - | - | Moderate | Moderate | **Broadcasting Group Office** | PwC/IA | - | - | - | PwC/IA | - | - | - |
| | | | | **Corporate:** | | | | | | | | |
| - | - | High | High | **Corporate Office** | PwC/IA | - | - | IA | PwC/IA | - | - | IA |
| - | - | High | High | **Finance Service Center** | PwC/IA | - | - | - | PwC/IA | - | - | - |

(1) Materiality is based on the business unit's relative contribution to consolidated revenue. Group and Corporate offices have no revenue.

(2) Other factors include a subjective evaluation of business unit environments and prior audit findings, as well as fraud risks. Items such as management changes, complexity of systems, unique accounting, and recent financial performance are also considered.

(3) Location tested as part of audit of Broadcasting Holding Company.

Professio' ' Eyes Only
Highly Con...ential -- Attorneys' Eyes Only

TF 114500

PRICEWATERHOUSECOOPERS

PricewaterhouseCoopers LLP
One North Wacker
Chicago, IL 60606
Telephone (312) 298-2000
Facsimile (312) 298-2001

May 9, 2007

Members of the Audit Committee of
the Board of Directors of Tribune Company

Dear Audit Committee Members:

We are pleased to provide you with this report which summarizes the results of our planning process and proposed integrated audit scope for the audit of the 2007 consolidated financial statements and internal controls of Tribune Company and its subsidiaries.

Our audit approach was designed giving careful consideration to the Company's organizational structure and its operational and financial control environment, as well as the experiences gained from the past three years' efforts to comply with the internal controls reporting requirements of Section 404 of the Sarbanes-Oxley Act.

Our audit team has met with senior management to discuss key issues facing the Company. Utilizing this input in our audit risk assessment process and in coordination with the Internal Audit Department, we have developed our audit plan for the upcoming year, as detailed within this document.

As we discussed in February 2007, our planned approach incorporates the guidance in the proposed Auditing Standard No. 5 issued by the Public Company Accounting Oversight Board.

We believe our 2007 integrated audit is appropriately designed to enable PwC to provide reasonable assurance to the shareholders of Tribune Company that the Company's financial statements are free of material misstatement, and the Company has effective internal controls over financial reporting as of December 30, 2007. We look forward to discussing this report with you.

Yours truly,

Kevin Maguire

Kevin T. Maguire
Engagement Partner



PRICEWATERHOUSECOOPERS
Integrated Audit Plan
May 2007
TRIBUNE

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414502

# Table of Contents

2007 Audit Engagement Objectives .......... 2

PCAOB Proposed Auditing Standard No. 5 .......... 2

Integrated Audit Plan .......... 3

Audit Risk Assessment .......... 3

Consideration of Fraud Risks .......... 4

Assessing the Design and Operating Effectiveness of Internal Control over Financial Reporting .......... 4

Scoping Significant Accounts and Cycles .......... 4

Reliance on the Work of Others .......... 5

Areas of Audit Emphasis .......... 5

Consideration of Leveraged ESOP Transaction .......... 6

Engagement Team .......... 6

Appendices

A. Integrated Audit Scope

B. Substantive Audit Procedures

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414503

# 2007 Audit Engagement Objectives

## Introduction and Objectives

Our audit is directed towards delivering assurance at three levels. First, for Tribune Company's shareholders and other stakeholders, we will deliver independent opinions and reports that add credibility to financial information published by the Company. Second, for the Audit Committee, we will provide assistance in discharging governance and compliance responsibilities in respect of the Company's financial reporting. Third, for management, we will provide observations and advice on financial reporting, accounting, tax and internal control matters.

PwC has primary responsibility for the following audit and audit related tasks:

- Perform an integrated audit of Tribune Company's internal controls over financial reporting and consolidated financial statements in accordance with Section 404 of the Sarbanes-Oxley Act and PCAOB auditing standards. The integrated audit includes:
  - opining on the design and operating effectiveness of internal controls; and
  - opining on the presentation of the consolidated financial statements in accordance with Generally Accepted Accounting Principles (GAAP).
- Conduct timely reviews of the Company's quarterly results of operations.
- Evaluate all of the Company's public filings for compliance with the rules and regulations of the SEC.
- Perform audits of Broadcasting Holding Company and the newly formed Tribune Finance Company financial statements for the period ended December 30, 2007 for purposes of complying with SEC rules and regulation, as these entities will become collateralized subsidiaries in connection with the leveraged ESOP transaction.
- Perform an audit of the separate financial statements of the Chicago Cubs as required by Major League Baseball.
- Conduct full-scope audits of selected employee benefit plan financial statements in order to comply with SEC requirements.
- Perform limited-scope audits of certain other employee benefit plan financial statements to comply with ERISA requirements.
- Complete certain agreed upon review procedures of executive expense reports in conjunction with Internal Audit.

In addition, Internal Audit and PwC will participate in special projects where appropriate. These projects may include due diligence reviews, audits of acquisitions, limited financial reviews of affiliated companies, and/or other special investigations.

# PCAOB Proposed Auditing Standard No. 5

As communicated at the February 13, 2007 Audit Committee meeting, the PCAOB has released its proposed Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting That is Integrated With an Audit of Financial Statements* (AS 5). The PCAOB is considering comments on the proposed standard from multiple constituents and is expected to issue a final standard in May or June 2007. We have planned our 2007 audit in contemplation of the guidance as currently drafted in the proposed standard. The new standard permits the exercise of greater professional judgment in

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

considering prior year audit results, a company's risk assessment and company-level controls for the purpose of determining the nature, timing and extent of testing. Significant modifications incorporated in our 2007 audit plan pursuant to the new guidance include:

- Elimination of the requirement to evaluate and opine on management's assessment of internal control over financial reporting;
- Refinement of scoping of multi-location testing focused on materiality and risk, including the elimination of the scoping category of locations that are significant in the aggregate but not characterized by a specified risk;
- Refinement of the nature, timing and extent of testing using a top-down, risk-based approach to focus on only the key controls;
- Increased reliance on the work of others (including walkthroughs and company-level controls);
- Focus on effective company-level controls (CLCs) that are designed to operate at a level of precision to reasonably prevent and detect a material misstatement of the financial statements.

# Integrated Audit Plan

The planning process is iterative in nature, and we continually evaluate our audit procedures as the Company's business and the regulatory reporting environment changes. We begin our audit process with a robust audit risk assessment, which includes fraud risk.

In addition to considering the impact of inherent financial statement reporting risks, we have evaluated the Company's current operating environment, including recent changes in the organization and internal control over financial reporting.

Our plan takes into consideration the significance of account balances, the significant 'cycles' for each major class of transactions affecting significant accounts and the various business units that comprise Tribune Company's consolidated financial statements. We must obtain appropriate evidence supporting the period-end financial statement balances in addition to evaluating the design and operating effectiveness of internal control over financial reporting. The scope of our planned audit procedures will be revised as necessary throughout the year.

## Audit Risk Assessment

Our risk assessment process considers multiple inputs and factors, including among others:

- The environment and markets in which Tribune Company's principal lines of business operate;
- Prior year audit coverage and results;
- Inherent risks and materiality;
- The nature and complexity of the Company's businesses.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414505

## Consideration of Fraud Risks

Auditing standard setters around the world are introducing more prescriptive guidance on how auditors should address the risk of material misstatement of financial statements due to fraud. We approach the Tribune Company audit with an open mind and the necessary degree of professional skepticism. This mindset applies to our identification and assessment of the risks associated with the Company's financial statements, to our inquiries of client management and staff and to our evaluation of audit evidence at all stages of the audit.

Our audit approach in relation to the risk of material misstatement due to fraud incorporates the following key steps among others:

- Identification of potential risk factors through consideration of key incentives, pressures or opportunities to commit fraud, as well as analysis of financial and non-financial data;
- Assessing and testing the Company's anti-fraud program and related controls;
- Implementing specific steps, as required by auditing standards, to address risks associated with improper revenue recognition and management override of controls.

## Assessing the Design and Operating Effectiveness of Internal Controls over Financial Reporting

We develop and maintain our understanding of the Company's control environment through regular interaction with senior management. This understanding is then used to develop our point of view regarding audit risk, which, in turn, drives our integrated audit approach. PwC will begin the audit process by updating our understanding of how management controls the business at the top-level of the organization, including company-level controls that permeate the organization. Company-level controls (CLCs) are controls that are operational throughout the entire organization, both at corporate and the business unit level. Company-level controls relate to the "softer" COSO components (control environment, information and communication, monitoring, and risk assessment) as they are more judgmental in nature. By increasing our reliance on Tribune Company's CLCs, we plan to reduce the required testing of discrete control activities at the individual business units.

Our assessment of the design and operating effectiveness of the company-level controls will assist in establishing the nature, timing, and extent of our testing at the business units. We have discussed with management the opportunities for greater reliance this year on the Company's business performance reviews (e.g. brown book) that exist throughout the organization. We are currently working with management and internal audit to ensure the process for compiling such analyses and related reviews is documented and operating at an appropriate level of precision.

## Scoping Significant Accounts and Cycles

Scoping for an integrated audit under AS 5 begins with the identification of significant accounts and relevant assertions rather than the identification of individually important locations as required by AS 2. Under the new guidance, we have utilized the knowledge obtained in prior years in our assessment of inherent risk and determination of significant accounts and disclosures. We have evaluated both quantitative and qualitative factors, including fraud considerations, when identifying significant accounts. Subsequently, we have used a risk-based approach in determining the locations at which evidence will be obtained over such significant accounts and relevant assertions.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

AS 5 focuses on testing only those controls that are designed to prevent or detect on a timely basis material misstatements, individually or in the aggregate. As a result, our 2007 audit plan contemplates a reduction from prior years in the number of key controls for which we will obtain evidence about the operating effectiveness, either via independent testing or reliance on Internal Audit. The nature, timing and extent of procedures performed will vary by location based on quantitative and qualitative factors and will include a combination of walkthroughs of major classes of transactions, testing of key controls and performing substantive audit procedures over selected account balances. In addition to varying the nature, timing and extent of procedures performed by location, AS 5 encourages varying the nature, timing and extent of testing year-to-year after considering both quantitative and qualitative factors.

At locations for which we will not obtain evidence about the operating effectiveness of control activities over significant accounts, we intend to rely on company-level controls. Our plan contemplates reliance on Internal Audit for much of the evidence about the operating effectiveness of these company-level controls.

To assist the Committee in more thoroughly understanding the scope of our audit procedures we have summarized in Appendix A the significant accounts as well as the business units where PwC will be performing walkthroughs and validation of the operating effectiveness of internal controls.

## Reliance on the Work of Others

As in prior years, we will cooperate closely with Internal Audit to ensure that the total audit resource and effort is properly focused on the key business risks. Our plan contemplates increased reliance on the work of Internal Audit compared to the prior year as a result of our assessment of Internal Audit's competence and objectivity and the assessed risks of the controls and relevant assertions. We will rely entirely on the work of Internal Audit for testing of controls for certain cycles at specific locations; whereas other cycles and locations will be tested via a combination of PwC independent testing and reliance on the work of Internal Audit. Such determinations have been made based on our professional judgment and our overall risk assessment, which includes results of prior year audits.

## Areas of Audit Emphasis

We have outlined in Appendix B the key areas of audit focus as well as certain of the substantive audit procedures we have planned based on our materiality and audit risk judgments as well as our cumulative knowledge of Tribune Company and its operations. Our approach is tailored to address the nature and inherent risk of each significant cycle. For each area, we will update our understanding of the Company's processes and controls and consider the results of management's and Internal Audit's testing before concluding on the nature, timing and extent of our own independent audit testing. We will perform tests of details at certain locations across Tribune Company to gain additional assurance that the financial statements are free of material misstatement.

We intend to utilize systems and business process specialists as an integral part of our audit team, particularly when auditing the information technology environments at Tribune Company. We also intend to use PwC subject matter experts to assist us in auditing specialized areas such as income taxes, actuarial valuations, insurance reserves and stock-based compensation.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414507

### Consideration of Leveraged ESOP Transaction

As we communicated to you in April 2007, we will work closely with management as the Company considers the accounting and SEC regulatory implications of the pending leveraged ESOP transaction. The proposed capital structure will result in the Company being highly leveraged, which will result in lower pre-tax operating profit and, therefore, a reduction in our materiality threshold for scoping and planning the audit. Additionally, our planned audit effort includes time associated with various regulatory filings, consents, comfort letters and accounting consultations that are a direct result of the proposed transaction.

## Engagement Team

### Engagement Team

Our engagement team is under the direction of Kevin Maguire, whose responsibilities include the determination of the overall audit scope and the administration and coordination of the engagement. In addition, he is responsible for our communications with Tribune Company senior management and the Audit Committee. Kevin will be assisted in the execution of his responsibilities by Stephanie Potter, who returns to the engagement team for the 2007 audit as the lead Senior Manager. Jim Edam will continue to serve as the audit Quality Review Partner for Tribune Company.

Jay Henderson will continue to serve as the Senior Review Partner for Tribune Company.

### Partner Rotation Policies

Rotation of the lead (or signing) and quality review partners for Tribune is required after five years under the SEC's rules. Specialty partners such as tax and valuation specialists and PwC National office consultants are not required to rotate.

Kevin Maguire is now in his fifth and final year in the lead audit partner role. We intend to introduce Kevin's successor to the Company and the Audit Committee within the next few months. Jim Eidam, the quality review partner, is now in his third year.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

## Appendix A
## Tribune Company Integrated Audit Scope

| | PUBLISHING | LOS ANGELES TIMES | CHICAGO TRIBUNE | NEWSDAY | SOUTH FLORIDA SUN-SENTINEL | BALTIMORE SUN | BROADCASTING | WPIX-TV | KTLA-TV | WGN-TV | WGN CABLE | CORPORATE | FINANCE SERVICE CENTER | TRIBUNE PUBLISHING | TRIBUNE BROADCASTING |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Advertising Revenue & Receivables | | █ | █ | █ | █ | █ | | | | | | | █ | | |
| Circulation Revenue & Receivables | | █ | █ | | | | | | | | | | █ | | |
| Expenditures | | █ | █ | █ | | | | | | | | | █ | | |
| Inventory | | █ | █ | | | | | | | | | | | | |
| Broadcast Rights | | | | | | | | █ | █ | █ | | | | | █ |
| Payroll | | █ | █ | | | | | | | | | | █ | | |
| Fixed Assets | | █ | █ | | | | | | | | | | | █ | |
| Treasury | | | | | | | | | | | | █ | | | |
| Income Taxes | | | | | █ | | | | | | | █ | | | |
| Goodwill/Intangibles | | | | | █ | | | | | | | █ | | | |
| Investments | | | | | | | | | | | | █ | | | |
| Financing & Financial Instruments | | | | | | | | | | | | █ | | | |
| Equity | | | | | | | | | | | | █ | | | |
| Employee Benefits | | | | | | | | | | | | █ | | | |
| Financial Reporting | | █ | █ | █ | █ | █ | | █ | █ | █ | █ | █ | | | |
| IT General Controls | | █ | █ | █ | █ | █ | | █ | █ | █ | █ | █ | | █ | █ |
| Company-Level Controls | | █ | █ | █ | █ | █ | | █ | █ | █ | █ | █ | | █ | █ |

█ Included in PwC audit scope

☐ Not Included in PwC audit scope

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414509

# Appendix B
## Substantive Audit Procedures

| FINANCIAL STATEMENT AREA | AUDIT APPROACH |
|---|---|
| **REVENUES AND RECEIVABLES** | |
| • Revenue recognition | ✓ Evaluate revenue recognition, including consideration of contractual provisions<br>✓ Analytical review of disaggregated revenue |
| • Existence of receivables | ✓ Confirm a sample of accounts receivables<br>✓ Reperform reconciliation to A/R sub-ledger |
| • *Valuation of receivables ** | ✓ Assess reasonableness of bad debt and volume rebate reserve analysis |
| **ACCRUALS** | |
| • Severance accruals | ✓ Review charges and associated liabilities for compliance with GAAP and proper period |
| • Potential commitments and contingencies (proper recording and disclosure) | ✓ Identify and evaluate contingent liabilities<br>✓ Obtain and analyze representation letters from internal and external legal counsel on status of pending litigation. |
| • Self insurance liabilities (workers compensation, medical, auto/general) | ✓ Analyze estimates used in calculation of accruals (performed by PwC specialists ) |
| **PAYROLL AND EMPLOYEE BENEFITS** | |
| • *Postretirement benefits** including pension plans. | ✓ Evaluate and test key assumptions and information prepared by the actuary used to calculate post-retirement, pensions via the use of PwC specialists<br>✓ Test the valuation of plan assets |
| **BROADCAST RIGHTS** | |
| • *Broadcast rights** | ✓ Assess the net realizable value<br>✓ Test significant programming additions<br>✓ Analytical review of amortization expense |
| **INVESTMENTS** | |
| • Accounting for joint venture and/or acquisition activity in accordance with FIN 46R | ✓ Analyze significant joint ventures and acquisitions for proper accounting and application of FIN 46R |
| • Valuation of investments | ✓ Recalculate equity income for significant equity investments<br>✓ Evaluate management's conclusions regarding impairment conditions |
| **GOODWILL AND INTANGIBLE ASSETS** | |
| • *Ongoing fair market values for goodwill impairment tests** | ✓ Evaluate management's annual goodwill valuation test |
| • Impairment of intangible or other assets | ✓ Analyze intangible and other assets for potential impairment |
| **FINANCING** | |
| • Valuation and classification of cash and debt balances | ✓ Confirm cash and debt with third parties<br>✓ Test the classification of debt between short term and long term |
| • Valuation of debt security (PHONES) | ✓ Recalculate PHONES fair value adjustment |
| **EQUITY** | |
| • *Stock-based compensation** | ✓ Test the valuation of restricted stock and stock option transactions under FAS 123R, "Share Based Payments" |
| • Employee Stock Ownership Plan | ✓ Test ESOP activity for proper accounting |
| **INCOME TAXES** | |
| • Effective tax rate | ✓ Examine the 2006 tax return to provision reconciliations<br>✓ Test the effective tax rate for 2007 |
| • Current and deferred income tax accounts | ✓ Test deferred tax asset and liability balances |
| • *Income tax reserves** | ✓ Analyze tax filing positions and related reserves recorded<br>✓ Review the adoption of FIN 48 – Accounting for Uncertainties in Income Taxes |

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414510

| FINANCIAL STATEMENT AREA | AUDIT APPROACH |
|---|---|
| GENERAL LEDGER AND REPORTING | |
| • Proper consolidation and elimination of inter-company activity | ✓ Re-perform and review inter-company receivable/ payables reconciliations and related entries<br>✓ Ensure elimination of intercompany sales and receivables/payables<br>✓ Examine intercompany consolidation and elimination entries, including review of post closing journal entries |
| • Manual journal entry testing | ✓ Utilize computer generated reports to identify significant and unusual manual journal entries for follow up procedures |
| • Non-operating income | ✓ Validate non-operating items and assess classification |
| • Financial statement preparation and related disclosure | ✓ Evaluate cash flow statement for presentation in accordance with GAAP<br>✓ Validate EPS calculation<br>✓ Read all documents containing financial information released to the general public and the SEC to ensure they are in accordance with required presentation and disclosure requirements |

** Items represent the more significant estimates identified as Critical Accounting Policies*

PRICEWATERHOUSECOOPERS

PricewaterhouseCoopers LLP
One North Wacker
Chicago IL 60606
Telephone (312) 298 2000
Facsimile (312) 298 2001

May 9, 2007

Mr. William A. Osborn
Director, Audit Committee Chair of Tribune Company
435 North Michigan Avenue
Chicago, IL 60604

Dear Mr. Osborn:

The purpose of this letter is to confirm our understanding of the terms of our engagement as independent accountants of Tribune Company (the "Company").

Services and related report

We will perform an integrated audit of the consolidated financial statements of the Company at December 30, 2007 and for the year then ending and of the effectiveness of the Company's internal control over financial reporting as of December 30, 2007. Upon completion of our work, we will provide the Company with our report on the audit work referred to above. If, for any reasons caused by or relating to the affairs or management of the Company, we are unable to complete our integrated audit, we may decline to issue a report as a result of this engagement.

In conjunction with the annual financial statement audit, we will perform reviews of the Company's unaudited consolidated quarterly financial information for each of the first three quarters in the year ending December 30, 2007, before the Form 10-Q is filed. These reviews will be conducted in accordance with the standards established by the Public Company Accounting Oversight Board (the "PCAOB") and are substantially less in scope than an audit. Accordingly, a review may not reveal material modifications necessary to make the quarterly financial information conform to generally accepted accounting principles. We will communicate to the audit committee and management any matters that come to our attention as a result of the review that we believe may require material modifications to the quarterly financial information to make it conform to accounting principles generally accepted in the United States of America. If, for any reasons caused by or relating to the affairs or management of the Company, we are unable to complete our review, we will notify the audit committee and management.

Our responsibilities and limitations

The objective of a financial statement audit is the expression of an opinion on the financial statements. We will be responsible for performing the audit in accordance with the standards established by the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We will consider the Company's internal control over financial reporting in determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements.

The objective of an audit of internal control over financial reporting is the expression of an opinion on the effectiveness of the Company's internal control over financial reporting. We will be responsible for performing the audit in accordance with the standards established by the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective

PRICEWATERHOUSECOOPERS

Mr. William A. Osborn
May 9, 2007

internal control over financial reporting was maintained in all material respects. The audit will include obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control over financial reporting based on the assessed risk, and performing such other procedures as we consider necessary in the circumstances.

Each of the following circumstances should be regarded as a strong indicator that a material weakness in internal control over financial reporting exists:

- An ineffective control environment, including (but not limited to):
  - Identification of fraud of any magnitude on the part of senior management.
  - Significant deficiencies that have been communicated to management and the audit committee and remain uncorrected after some reasonable period of time.
- Restatement of previously issued financial statements to reflect the correction of a misstatement.
- Identification by the auditor of a material misstatement in financial statements in the current period in circumstances that indicate the misstatement would not have been detected by the company's internal control over financial reporting.
- Ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee.
- The internal audit function or the risk assessment function is ineffective at a company for which such a function needs to be effective for the company to have an effective monitoring or risk assessment component, such as for very large or highly complex companies.
- For complex entities in highly regulated industries, an ineffective regulatory compliance function. This relates solely to those aspects of the ineffective regulatory compliance function in which associated violations of laws and regulations could have a material effect on the reliability of financial reporting.

Under the standards established by the PCAOB, the existence of one or more material weaknesses will require us to issue an adverse opinion regarding the effectiveness of the Company's internal control over financial reporting.

All significant deficiencies and material weaknesses relating to internal control over financial reporting identified while performing our work will be communicated in writing to management and the audit committee. All deficiencies in internal control over financial reporting (i.e., those deficiencies in internal control over financial reporting that are of a lesser magnitude than significant deficiencies) identified while performing our work will be communicated in writing to management of the Company, and the Audit Committee will be informed when such a communication has been made. We will communicate in writing to the Board of Directors of the Company if we conclude that the oversight of the Company's external financial reporting and internal control over financial reporting by the Company's audit committee is ineffective.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness of internal control over financial reporting from December 30, 2007, the date of our audit of the Company's internal control over financial reporting, to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

We will design our audits to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts, and of identifying material weaknesses in internal

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

PRICEWATERHOUSECOOPERS

control over financial reporting. Our audits will not include a detailed audit of transactions, such as would be necessary to identify errors or fraud that did not cause a material misstatement of the financial statements or procedures designed to identify deficiencies in internal control over financial reporting that, individually or in combination, are less severe than a material weakness. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, an audit designed and executed in accordance with the standards established by the PCAOB may not detect a material misstatement due to fraud. Characteristics of fraud include (i) concealment through collusion among management, employees, or third parties; (ii) withheld, misrepresented, or falsified documentation; and (iii) the ability of management to override or instruct others to override what otherwise appears to be effective controls. Further, while effective internal control over financial reporting reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected. However, we will communicate to the audit committee and management of the Company, as appropriate, any such matters identified during our audit.

We also are responsible for determining that the audit committee is informed about certain other matters related to the conduct of our audits, including (i) any disagreements with management about matters that could be significant to the Company's financial statements or our report thereon; (ii) any serious difficulties encountered in performing the audit; (iii) information relating to our independence with respect to the Company; (iv) other matters related to the Company's financial statements including its significant accounting policies and practices, including critical accounting policies and alternative treatments within accounting principles generally accepted in the United States; and (v) all significant deficiencies and material weaknesses identified during the audit, as previously mentioned. Lastly, we are responsible for ensuring that the audit committee receives copies of certain written communications between us and management, including management representation letters and written communications on accounting, auditing, internal control or operational matters.

The financial statement audit and the audit of the effectiveness of the Company's internal control over financial reporting will not be planned or conducted in contemplation of reliance by any specific third party or with respect to any specific transaction. Therefore, items of possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

Management's responsibilities

The Company's management is responsible for the financial statements and information referred to above including establishing and maintaining adequate internal control over financial reporting. In this regard, management is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements, the safeguarding of assets, the proper recording of transactions in the accounting records, and for reporting financial information in conformity with accounting principles generally accepted in the United States of America. Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the entity involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements; and

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

PRICEWATERHOUSECOOPERS

Mr. William A. Osborn
May 9, 2007

(ii) of its knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others. Management is responsible for (i) adjusting the financial statements to correct material misstatements and for affirming to us that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year under audit are immaterial, both individually and in the aggregate, to the financial statements taken as a whole; and (ii) notifying us of all deficiencies in the design or operation of internal control over financial reporting identified as part of management's assessment, including separately disclosing to us all such deficiencies that it believes to be significant deficiencies or material weaknesses in internal control over financial reporting. Management also is responsible for identifying and ensuring that the Company complies with the laws and regulations applicable to its activities. Furthermore, management of the Company is responsible for:

- Accepting responsibility for the effectiveness of the Company's internal control over financial reporting;
- Evaluating the effectiveness of the Company's internal control over financial reporting using suitable control criteria;
- Supporting its evaluation with sufficient evidential matter, including documentation, and
- Presenting a written assessment of the effectiveness of the Company's internal control over financial reporting as of the end of the Company's most recent fiscal year.

As part of management's responsibility for the financial statements and the effectiveness of internal control over financial reporting, management is responsible for making available to us, on a timely basis, all of the Company's original accounting records and related information and company personnel to whom we may direct inquiries. Inadequate documentation of the design of controls and the absence of sufficient documented evidence to support management's assessment of the operating effectiveness of internal control over financial reporting are internal control deficiencies that could result in a limitation on the scope of the audit.

As required by the standards of the PCAOB, we will make specific inquiries of management and others about the representations embodied in the financial statements and the internal control over financial reporting. Standards of the PCAOB also require that we obtain written representations regarding the financial statements and the internal control over financial reporting from certain members of management. The results of our tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements and the effectiveness of the Company's internal control over financial reporting. Similarly, the results of our analytical procedures, the responses to our inquiries and the written representations obtained comprise the basis for our review on the unaudited quarterly financial information.

Document retention

The Company agrees to maintain documentation sufficient to support its assessment of internal control over financial reporting as of December 30, 2007 for a period of seven years from the date of our audit report.

Other documents

Standards established by the PCAOB require that we read any annual report that contains our audit report. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements or management's assessment of the effectiveness of the Company's internal

PRICEWATERHOUSECOOPERS

control over financial reporting. We assume no obligation to perform procedures to corroborate such other information as part of our audit.

With regard to electronic filings, such as in connection with the SEC's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system, you agree that, before filing any document in electronic format with the SEC with which we are associated, management of the Company will advise us of the proposed filing on a timely basis. We will provide the Company with a signed copy of our report(s) and consent(s). These manually signed documents will serve to authorize the use of our name prior to any electronic transmission by the Company. For our files, management of the Company will provide us with a complete copy of the document as accepted by EDGAR.

The Company may wish to include our report on these financial statements and internal control over financial reporting in a registration statement proposed to be filed under the Securities Act of 1933 or in some other securities offering. You agree that the aforementioned audit report, or reference to our Firm, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

Agreement not to demand jury trial

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Company and PricewaterhouseCoopers LLP agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Company's personnel, including timely preparation of necessary schedules; 2) timely responses to our inquiries; and 3) timely communication of all significant accounting, financial, and internal control over financial reporting matters. When and if for any reason the Company is unable to provide such schedules, information and assistance, PricewaterhouseCoopers LLP and you will mutually revise the fee to reflect additional services, if any, required of us to complete our work.

Our fees are based on the time required by the individuals assigned to the engagement. We estimate our fees for this integrated audit engagement will be $1,825,000, plus an estimated additional $135,000 for fees related to a S-3 shelf registration statement and a related consent, a Regulation 144A Bond Offering and a related comfort letter, and a S-4 registration statement required by the Regulation 144A Bond Indenture. We will update you on significant changes in our fee estimate, if any, as the audit progresses.

We also will bill the Company for our reasonable out-of-pocket expenses and our internal per ticket charges for booking travel. Our internal per ticket travel charge is an allocation of estimated costs of running our travel department in a manner to maximize cost savings and minimize total costs. We estimate out-of-pocket expenses to be $165,000.

Invoices rendered are due and payable upon receipt.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414516

PRICEWATERHOUSECOOPERS

Mr. William A. Osborn
May 9, 2007

Other matters

PricewaterhouseCoopers LLP is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs. Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

PricewaterhouseCoopers LLP, a Delaware limited liability partnership ("PricewaterhouseCoopers"), is the U.S. firm of the global network of PricewaterhouseCoopers firms (exclusive of PricewaterhouseCoopers, the "PricewaterhouseCoopers Firms"). In the course of providing the services hereunder, we may, in our discretion, draw on the resources of other PricewaterhouseCoopers Firms. You agree that we may provide any information we receive in connection with this engagement to other PricewaterhouseCoopers Firms for the purpose of providing the services set forth in this engagement letter and/or for internal administrative and regulatory compliance purposes.

Any additional services that may be requested and we agree to provide will be the subject of separate arrangements.

In the event we are requested or authorized by the Company or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the Company, the Company will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Company agrees that it will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers LLP arising out of this engagement to anyone, except to an entity with which the Company merges or an entity which acquires all or substantially all of the assets of the Company and where, in either case, the assignee entity agrees to be bound by this provision.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

* * * * *

If there are any questions, please call Kevin T. Maguire at (312) 298-2590. If the services outlined herein are in accordance with your requirements and if the above terms are acceptable, please have one copy of this letter signed in the spaces provided below and return it to us.

Very truly yours,

PricewaterhouseCoopers LLP

cc: Mr. Dennis J. FitzSimons
Mr. Donald C. Grenesko

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

PRICEWATERHOUSECOOPERS

Mr. William A. Osborn
May 9, 2007

The services and terms as set forth in this letter are agreed to.

Tribune Company by and through its Audit Committee

By: ______________________________
William A. Osborn
Audit Committee Chair

______________________________
(Date)

By signing below I acknowledge and agree to my obligation to ensure that the responsibilities of the Company and its management as set forth herein are properly discharged:

By: ______________________________
Dennis J. FitzSimons
Chairman, Pesident and Chief Excutive Officer

______________________________
(Date)

By: ______________________________
Donald C. Grenesko
Senior Vice President, Finance and Administration

______________________________
(Date)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414518

PRICEWATERHOUSECOOPERS

May 9, 2007

PricewaterhouseCoopers LLP
One North Wacker
Chicago IL 60606
Telephone (312) 298 2000
Facsimile (312) 298 2001

Mr. William A. Osborn
Director, Audit Committee Chair of Tribune Company
435 North Michigan Avenue
Chicago, IL 60604

Dear Mr. Osborn:

The purpose of this letter is to confirm our understanding of the terms of our engagement as independent accountants of Tribune Broadcasting Company (the "Company"), a wholly owned subsidiary of Tribune Company.

Services and related report(s)

We will audit the financial statements of the Company at December 30, 2007 and for the year then ending. Upon completion of our audit, we will provide the Company with our audit report on the financial statements referred to above. If, for any reasons caused by or relating to the affairs or management of the Company, we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

Our responsibilities and limitations

The objective of a financial statement audit is the expression of an opinion on the financial statements. We will be responsible for performing that audit in accordance with standards established by the PCAOB. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

We will consider the Company's internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any significant deficiencies and material weaknesses relating to internal control over financial reporting identified during our audit will be communicated to the audit committee. All deficiencies in internal control (i.e., those deficiencies in internal control over financial reporting that are of a lesser magnitude than significant deficiencies) relating to internal control over financial reporting identified while performing our work will be communicated to management of the Company.

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Our audit will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, particularly those involving

PRICEWATERHOUSECOOPERS

Mr. William A. Osborn
May 9, 2007

concealment through collusion, falsified documentation and management's ability to override controls, an audit designed and executed in accordance with standards established by the PCAOB may not detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected. However, we will communicate to the audit committee and management of the Company, as appropriate, any such matters identified during our audit.

We also are responsible for determining that the audit committee is informed about certain other matters related to the conduct of the audit, including (i) any disagreements with management about matters that could be significant to the Company's financial statements or our report thereon; (ii) any serious difficulties encountered in performing the audit; (iii) information relating to our independence with respect to the Company; and (iv) other matters related to the Company's financial statements including its accounting policies and practices; and (v) all significant deficiencies and material weaknesses identified during the audit, as previously mentioned. Lastly, we are responsible for ensuring that the audit committee receives copies of certain written communications between us and management, including management representation letters and written communications on accounting, auditing, internal control or operational matters.

The audit will not be planned or conducted in contemplation of reliance by any specific third party or with respect to any specific transaction. Therefore, items of possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

<u>Management's responsibilities</u>

The Company's management is responsible for the financial statements and information referred to above. In this regard, management is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements, the safeguarding of assets, the proper recording of transactions in the accounting records, and for reporting financial information in conformity with accounting principles generally accepted in the United States of America. Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the entity involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others. Management is responsible for (i) adjusting the financial statements to correct material misstatements and for affirming to us that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year under audit are immaterial, both individually and in the aggregate, to the financial statements taken as a whole; and (ii) notifying us of all material weaknesses, including other significant deficiencies, in the design or operation of the Company's internal control over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report external financial data reliably in accordance with generally accepted accounting principles. Management also is responsible for identifying and ensuring that the Company complies with the laws and regulations applicable to its activities.

As part of management's responsibility for the financial statements and the effectiveness of its system of internal control over financial reporting, management is responsible for making available to us, on a

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414520

PRICEWATERHOUSECOOPERS

timely basis, all of the Company's original accounting records and related information and company personnel to whom we may direct inquiries. As required by standards of the PCAOB, we will make specific inquiries of management and others about the representations embodied in the financial statements and the effectiveness of internal control over financial reporting. Standards of the PCAOB also require that we obtain written representations covering audited financial statements from certain members of management. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements. Similarly, the results of our analytical procedures, the responses to our inquiries and the written representations obtained comprise the basis for our review on the unaudited quarterly financial information.

Other documents

Standards established by the PCAOB require that we read any annual report that contains our audit report. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. We assume no obligation to perform procedures to corroborate such other information as part of our audit.

With regard to electronic filings, such as in connection with the SEC's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system, you agree that, before filing any document in electronic format with the SEC with which we are associated, management of the Company will advise us of the proposed filing on a timely basis. We will provide the Company with a signed copy of our report(s) and consent(s). These manually signed documents will serve to authorize the use of our name prior to any electronic transmission by the Company. For our files, management of the Company will provide us with a complete copy of the document as accepted by EDGAR.

The Company may wish to include our report on these financial statements in a registration statement proposed to be filed under the Securities Act of 1933 or in some other securities offering. You agree that the aforementioned audit report, or reference to our Firm, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

Agreement not to demand jury trial

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Company and PricewaterhouseCoopers LLP agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Company's personnel, including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. When and if for any reason the Company is unable to provide such schedules, information and assistance, PricewaterhouseCoopers LLP and you will mutually revise the fee to reflect additional services, if any, required of us to complete the audit.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

PRICEWATERHOUSECOOPERS

Mr. William A. Osborn
May 9, 2007

Our fee estimates are based on the time required by the individuals assigned to the engagement. We estimate our fees for this audit engagement will be $275,000, subject to the terms and conditions above. We will advise you should any other circumstances arise that may cause actual time to exceed that estimate.

We also will bill the Company for our reasonable out-of-pocket expenses and our internal per ticket charges for booking travel. Our internal per ticket travel charge is an allocation of estimated costs of running our travel department in a manner to maximize cost savings and minimize total costs.

Invoices rendered are due and payable upon receipt.

Other matters

PricewaterhouseCoopers LLP is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs. Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

PricewaterhouseCoopers LLP, a Delaware limited liability partnership ("PricewaterhouseCoopers"), is the U.S. firm of the global network of PricewaterhouseCoopers firms (exclusive of PricewaterhouseCoopers, the "PricewaterhouseCoopers Firms"). In the course of providing the services hereunder, we may, in our discretion, draw on the resources of other PricewaterhouseCoopers Firms. You agree that we may provide any information we receive in connection with this engagement to other PricewaterhouseCoopers Firms for the purpose of providing the services set forth in this engagement letter and/or for internal administrative and regulatory compliance purposes.

Any additional services that may be requested and we agree to provide will be the subject of separate arrangements.

In the event we are requested or authorized by the Company or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the Company, the Company will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Company agrees that it will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers LLP arising out of this engagement to anyone, except to an entity with which the Company merges or an entity which acquires all or substantially all of the assets of the Company and where, in either case, the assignee entity agrees to be bound by this provision.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

* * * * *

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only
TRB0414522

PRICEWATERHOUSECOOPERS

If there are any questions, please call Kevin T. Maguire at (312)-298-2590. If the services outlined herein are in accordance with your requirements and if the above terms are acceptable, please have one copy of this letter signed in the spaces provided below and return it to us.

Very truly yours,

PricewaterhouseCoopers LLP

cc: Mr. Dennis J. FitzSimons
Mr. Donald C. Grenesko

The services and terms as set forth in this letter are agreed to for Tribune Broadcasting Company by and through the Audit Committee of its parent Tribune Company.

By: ______________________________
William A. Osborn
Audit Committee Chair
Tribune Company

______________________________
(Date)

By signing below, I acknowledge and agree to my obligation to ensure that the responsibilities of the Company and its management as set forth herein are properly discharged.

By: ______________________________
Dennis J. FitzSimons
Chairman, President and Chief Executive Officer
Tribune Company

______________________________
(Date)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

PRICEWATERHOUSECOOPERS

Mr. William A. Osborn
May 9, 2007

By: ______________________________
Donald C. Grenesko
Senior Vice President, Finance and Administration
Tribune Company

______________________________
(Date)

6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0414524

PRICEWATERHOUSECOOPERS

May 9, 2007

PricewaterhouseCoopers LLP
One North Wacker
Chicago IL 60606
Telephone (312) 298 2000
Facsimile (312) 298 2001

Mr. William A. Osborn
Director, Audit Committee Chair of Tribune Company
435 North Michigan Avenue
Chicago, IL 60604

Dear Mr. Osborn:

The purpose of this letter is to confirm our understanding of the terms of our engagement as independent accountants of Tribune Finance LLC. (the "Company"), a wholly owned subsidiary of Tribune Company.

Services and related report(s)

We will audit the financial statements of the Company at December 30, 2007 and for the year then ending. Upon completion of our audit, we will provide the Company with our audit report on the financial statements referred to above. If, for any reasons caused by or relating to the affairs or management of the Company, we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

Our responsibilities and limitations

The objective of a financial statement audit is the expression of an opinion on the financial statements. We will be responsible for performing that audit in accordance with standards established by the PCAOB. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

We will consider the Company's internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any significant deficiencies and material weaknesses relating to internal control over financial reporting identified during our audit will be communicated to the audit committee. All deficiencies in internal control (i.e., those deficiencies in internal control over financial reporting that are of a lesser magnitude than significant deficiencies) relating to internal control over financial reporting identified while performing our work will be communicated to management of the Company.

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Our audit will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if

PRICEWATERHOUSECOOPERS

Mr. William A. Osborn
May 9, 2007

they exist, may not be detected. Because of the characteristics of fraud, particularly those involving concealment through collusion, falsified documentation and management's ability to override controls, an audit designed and executed in accordance with standards established by the PCAOB may not detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected. However, we will communicate to the audit committee and management of the Company, as appropriate, any such matters identified during our audit.

We also are responsible for determining that the audit committee is informed about certain other matters related to the conduct of the audit, including (i) any disagreements with management about matters that could be significant to the Company's financial statements or our report thereon; (ii) any serious difficulties encountered in performing the audit; (iii) information relating to our independence with respect to the Company; and (iv) other matters related to the Company's financial statements including its accounting policies and practices; and (v) all significant deficiencies and material weaknesses identified during the audit, as previously mentioned. Lastly, we are responsible for ensuring that the audit committee receives copies of certain written communications between us and management, including management representation letters and written communications on accounting, auditing, internal control or operational matters.

The audit will not be planned or conducted in contemplation of reliance by any specific third party or with respect to any specific transaction. Therefore, items of possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

Management's responsibilities

The Company's management is responsible for the financial statements and information referred to above. In this regard, management is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements, the safeguarding of assets, the proper recording of transactions in the accounting records, and for reporting financial information in conformity with accounting principles generally accepted in the United States of America. Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the entity involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others. Management is responsible for (i) adjusting the financial statements to correct material misstatements and for affirming to us that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year under audit are immaterial, both individually and in the aggregate, to the financial statements taken as a whole; and (ii) notifying us of all material weaknesses, including other significant deficiencies, in the design or operation of the Company's internal control over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report external financial data reliably in accordance with generally accepted accounting principles. Management also is responsible for identifying and ensuring that the Company complies with the laws and regulations applicable to its activities.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

PRICEWATERHOUSECOOPERS

Mr. William A. Osborn
May 9, 2007

As part of management's responsibility for the financial statements and the effectiveness of its system of internal control over financial reporting, management is responsible for making available to us, on a timely basis, all of the Company's original accounting records and related information and company personnel to whom we may direct inquiries. As required by standards of the PCAOB, we will make specific inquiries of management and others about the representations embodied in the financial statements and the effectiveness of internal control over financial reporting. Standards of the PCAOB also require that we obtain written representations covering audited financial statements from certain members of management. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements. Similarly, the results of our analytical procedures, the responses to our inquiries and the written representations obtained comprise the basis for our review on the unaudited quarterly financial information.

Other documents

Standards established by the PCAOB require that we read any annual report that contains our audit report. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. We assume no obligation to perform procedures to corroborate such other information as part of our audit.

With regard to electronic filings, such as in connection with the SEC's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system, you agree that, before filing any document in electronic format with the SEC with which we are associated, management of the Company will advise us of the proposed filing on a timely basis. We will provide the Company with a signed copy of our report(s) and consent(s). These manually signed documents will serve to authorize the use of our name prior to any electronic transmission by the Company. For our files, management of the Company will provide us with a complete copy of the document as accepted by EDGAR.

The Company may wish to include our report on these financial statements in a registration statement proposed to be filed under the Securities Act of 1933 or in some other securities offering. You agree that the aforementioned audit report, or reference to our Firm, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

Agreement not to demand jury trial

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Company and PricewaterhouseCoopers LLP agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Company's personnel, including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. When and if for any reason the Company is unable to provide such schedules, information and

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

PRICEWATERHOUSECOOPERS

assistance, PricewaterhouseCoopers LLP and you will mutually revise the fee to reflect additional services, if any, required of us to complete the audit.

Our fee estimates are based on the time required by the individuals assigned to the engagement. We estimate our fees for this audit engagement will be $25,000, subject to the terms and conditions above. We will advise you should any other circumstances arise that may cause actual time to exceed that estimate.

We also will bill the Company for our reasonable out-of-pocket expenses and our internal per ticket charges for booking travel. Our internal per ticket travel charge is an allocation of estimated costs of running our travel department in a manner to maximize cost savings and minimize total costs.

Invoices rendered are due and payable upon receipt.

Other matters

PricewaterhouseCoopers LLP is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs. Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

PricewaterhouseCoopers LLP, a Delaware limited liability partnership ("PricewaterhouseCoopers"), is the U.S. firm of the global network of PricewaterhouseCoopers firms (exclusive of PricewaterhouseCoopers, the "PricewaterhouseCoopers Firms"). In the course of providing the services hereunder, we may, in our discretion, draw on the resources of other PricewaterhouseCoopers Firms. You agree that we may provide any information we receive in connection with this engagement to other PricewaterhouseCoopers Firms for the purpose of providing the services set forth in this engagement letter and/or for internal administrative and regulatory compliance purposes.

Any additional services that may be requested and we agree to provide will be the subject of separate arrangements.

In the event we are requested or authorized by the Company or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the Company, the Company will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Company agrees that it will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers LLP arising out of this engagement to anyone, except to an entity with which the Company merges or an entity which acquires all or substantially all of the assets of the Company and where, in either case, the assignee entity agrees to be bound by this provision.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

* * * * *

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

PRICEWATERHOUSECOOPERS

If there are any questions, please call Kevin T. Maguire at (312)-298-2590. If the services outlined herein are in accordance with your requirements and if the above terms are acceptable, please have one copy of this letter signed in the spaces provided below and return it to us.

Very truly yours,

PricewaterhouseCoopers LLP

cc: Mr. Dennis J. FitzSimons
Mr. Donald C. Grenesko

The services and terms as set forth in this letter are agreed to for Tribune Finance LLC. by and through the Audit Committee of its parent Tribune Company

By: ______________________________
William A. Osborn
Audit Committee Chair
Tribune Company

______________________________
(Date)

By signing below I acknowledge and agree to my obligation to ensure that the responsibilities of the Company and its management as set forth herein are properly discharged.

By: ______________________________
Dennis J. FitzSimons
Chairman, President and Chief Executive Officer
Tribune Company

______________________________
(Date)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

PRICEWATERHOUSECOOPERS

Mr. William A. Osborn
May 9, 2007

By: ______________________________
Donald C. Grenesko
Senior Vice President, Finance and Administration
Tribune Company

______________________________
(Date)

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

Tribune Company
435 North Michigan Avenue
Chicago, Illinois 60611

# TRIBUNE

312/222-9100

February 21, 2007

PricewaterhouseCoopers LLP
One North Wacker Dr.
Chicago, IL 60606

We are providing this letter in connection with your audits of (1) the consolidated financial statements of Tribune Company (the "Company") as of December 31, 2006 and December 25, 2005 and for each of the three years in the period ended December 31, 2006 for the purpose of expressing an opinion as to whether such consolidated financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of Tribune Company in conformity with accounting principles generally accepted in the United States of America; and (2) the Company's internal control over financial reporting as of December 31, 2006 for the purpose of expressing opinions as to whether management's assessment that the Company maintained effective internal control over financial reporting is fairly stated, in all material respects, and whether the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). We confirm that we are responsible for the fair presentation in the consolidated financial statements of financial position, results of operations, and cash flows in conformity with generally accepted accounting principles, for establishing and maintaining effective internal control over financial reporting, and for performing an assessment of the effectiveness of internal control over financial reporting based on criteria established in *Internal Control—Integrated Framework* issued by the COSO.

Certain representations in this letter are described as being limited to those matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief, as of February 21, 2007 the date of your report, the following representations made to you during your audit(s):

1. The consolidated financial statements referred to above are fairly presented in conformity with accounting principles generally accepted in the United States of America, and include all disclosures necessary for such fair presentation and disclosures otherwise required to be included therein by the laws and regulations to which the Company is subject.

2. We have made available to you all:

   a. Financial records and related data.
   b. Minutes of the meetings of stockholders, directors, and Audit or other committees of directors, and summaries of actions of recent meetings for which minutes have not yet

been prepared. The most recent meetings held were: Board of Directors and Board Committees – February 13, 2007, for which meeting minutes are not yet approved. We have provided you with a draft of such minutes, which are substantially accurate and complete.

3. There have been no communications from regulatory agencies concerning noncompliance with or deficiencies in financial reporting practices.

4. There are no material transactions, agreements or accounts that have not been properly recorded in the accounting records underlying the consolidated financial statements.

5. We have performed an assessment of the effectiveness of the Company's internal control over financial reporting based on criteria established in Internal Control—Integrated Framework issued by the COSO.

6. We did not use any of your procedures performed during your audits of internal control over financial reporting or the financial statements as part of the basis for our assessment of the effectiveness of internal control over financial reporting.

7. We have concluded that the Company has maintained effective internal control over financial reporting based on criteria established in Internal Control—Integrated Framework issued by the COSO as of December 31, 2006.

8. We have disclosed to you all deficiencies in the design or operation of internal control over financial reporting (whether or not remediated) identified as part of our assessment of the effectiveness of internal control over financial reporting as of December 31, 2006. We have also disclosed to you that we believe that none of these deficiencies are significant deficiencies or material weaknesses in internal control over financial reporting.

9. As of December 31, 2006, we have remediated all significant deficiencies that you communicated to us and the Audit Committee during the previous audit of internal control over financial reporting as of December 25, 2005.

10. We acknowledge our responsibility for the design and implementation of programs and controls to provide reasonable assurance that fraud is prevented and detected.

11. Other than matters previously disclosed to you affecting Recycler, Newsday, SCNI and Hoy, New York, we have no knowledge of any fraud or suspected fraud affecting the Company involving:

    a. Senior management,
    b. Management or other employees who have significant roles in internal control over financial reporting, or
    c. Others where the fraud could have a material effect on the consolidated financial statements.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

12. Other than the complaints described herein, or previously disclosed to you, we have no knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, former employees, analysts, regulators, short sellers, or others.

(As to items 10, 11 and 12, we understand the term "fraud" to mean those matters described in Statement on Auditing Standards No. 99.)

13. There have been no violations or possible violations of laws or regulations whose effects should be considered for disclosure in the consolidated financial statements or as a basis for recording a loss contingency.

14. The Company has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

15. The following, if material, have been properly recorded or disclosed in the consolidated financial statements:

   a. Related-party transactions, including sales, purchases, loans, transfers, leasing arrangements, and guarantees, and amounts receivable from or payable to related parties. (We understand the term "related party" to include those entities described in Statement on Auditing Standards No. 45, footnote 1.)

   b. Guarantees, whether written or oral, under which the Company is contingently liable.

   c. Significant estimates and material concentrations known to management that are required to be disclosed in accordance with the AICPA's Statement of Position 94-6, *Disclosure of Certain Significant Risks and Uncertainties*. (Significant estimates are estimates at the balance sheet date that could change materially within the next year. Concentrations refer to volumes of business, revenues, available sources of supply, or markets or geographic areas for which events could occur that would significantly disrupt normal finances within the next year.)

16. The Company has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral, except as disclosed in the consolidated financial statements.

17. The Company has complied with all aspects of contractual agreements that would have a material effect on the consolidated financial statements in the event of noncompliance.

18. Receivables recorded in the consolidated financial statements represent bona fide claims against debtors for sales or other charges arising on or before the balance sheet dates and are not subject to discount except for normal cash discounts. Receivables classified as current do not include any material amounts which are collectible after one year. All receivables have been appropriately reduced to their estimated net realizable value.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

19. Inventories recorded in the consolidated financial statements are stated at the lower of cost or market, cost being determined on the basis of LIFO for newsprint and FIFO or average cost basis for all other inventories. Due provision was made to reduce all slow-moving, obsolete, or unusable inventories to their estimated useful or scrap values. Inventory quantities at the balance sheet dates were determined from physical counts or from the Company's perpetual inventory records, which have been adjusted on the basis of physical inventories taken by competent employees at various times during the year. Liabilities for amounts unpaid are recorded for all items included in inventories at balance sheet dates and all quantities billed to customers at those dates are excluded from the inventory balances.

20. All liabilities of the Company of which we are aware are included in the consolidated financial statements at the balance sheet dates. There are no other liabilities or gain or loss contingencies that are required to be accrued or disclosed by Financial Accounting Standards Board (FASB) Statement No. 5, Accounting for Contingencies, and no unasserted claims or assessments that our legal counsel has advised us are probable of assertion and required to be disclosed in accordance with that Statement.

21. The Company has appropriately reconciled its books and records (e.g., general ledger accounts) underlying the consolidated financial statements to their related supporting information (e.g., sub ledger or third-party data). All related reconciling items considered to be material were identified and included on the reconciliations and were appropriately adjusted in the consolidated financial statements. There were no material unreconciled differences or material general ledger suspense account items that should have been adjusted or reclassified to another account balance. There were no material general ledger suspense account items written off to a balance sheet account, which should have been written off to an income statement account and vice versa. All consolidating entries have been properly recorded. All intracompany and intercompany accounts have been eliminated or appropriately measured and considered for disclosure in the consolidated financial statements.

22. The unaudited interim financial information has been prepared and presented in conformity with accounting principles generally accepted in the United States of America applicable to interim financial information and with Item 302(a) of Regulation S-K. The unaudited quarterly financial information for the year ended December 31, 2006 also has been prepared on a basis consistent with the corresponding interim periods in the year ended December 25, 2005 and, to the degree appropriate, with the consolidated financial statements for the years ended December 31, 2006 and December 25, 2005. The unaudited interim financial information for the three months ended December 31, 2006 and December 25, 2005 does not include any material amount of year-end adjustments that have not been disclosed or any material amounts that should have been included in earlier interim periods of the respective fiscal years.

23. We assume responsibility for the findings of specialists in evaluating the fair value of intangible assets, actuarial valuations of pension, postretirement and long-term disability benefit obligations, incurred but not reported medical claims and workers' compensation claims and have adequately considered the qualifications of the specialists in determining the amounts and disclosures used in the consolidated financial statements and underlying

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

accounting records. We did not give nor cause any instructions to be given to specialists with respect to the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the objectivity of the specialists.

24. All material costs that have been deferred to future periods meet the definition of an asset as defined in the Statement of Financial Accounting Concepts No. 6, *Elements of Financial Statements* and are realizable.

25. We have reviewed goodwill and indefinite-lived intangibles for impairment in accordance with FASB Statement No. 142, *Goodwill and Other Intangible Assets*, and conclude that no impairment exists with the exception of the matter described below. The estimated fair values calculated for the impairment reviews are done so based on market multiples of cash flows and projected future discounted cash flows. These assumptions reflect management's best estimates but involve inherent uncertainties considering market conditions and general economic factors outside of management's control.

    In the fourth quarter of fiscal 2004, the Company elected to early adopt the provisions of EITF D-108, *Use of the Residual Method to Value Acquired Assets* which requires the use of a direct valuation method for valuing intangible assets, such as FCC licenses, and reviewing them for impairment. As disclosed in Note 1 to the consolidated financial statements, the effect of changing to a direct valuation method for the 2004 FCC licenses impairment review was a pretax charge of $29 million ($18 million after-tax). The charge was recorded in the fourth quarter 2004 as a cumulative effect of a change in accounting principle in the consolidated statements of income.

26. All cash and bank accounts and all other properties and assets of the Company of which we are aware are included in the consolidated financial statements at December 31, 2006 and December 25, 2005.

27. There are no material arrangements with financial institutions involving compensating balances or other arrangements involving restrictions on cash balances, line of credit, or similar arrangements which would require disclosure in our consolidated financial statements included in Form 10-K.

28. The Company has adopted and applied the relevant provisions of FASB Interpretation No. 46 (FIN 46), *Consolidation of Variable Interest Entities* or FASB Interpretation No. 46R (revised December 2003) (FIN 46R), *Consolidation of Variable Interest Entities,* and related FASB Staff Positions (FSPs) for all variable interest entities (VIEs) in accordance with the effective dates in paragraphs 29-31 of FIN 46R and paragraph 27 of FIN 46. The Company has properly:

    a. Identified variable interests currently held in entities and determined whether the entity is a variable interest entity. In making this assessment, management considered whether any reconsideration events occurred.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

b. Determined that it is not the primary beneficiary of any of the VIE's in which it holds an interest. No reconsideration events, as defined by FIN 46 and related guidance, occurred during 2006, except as noted below. In making its assessment, management considered related party and defacto agency relationships.

c. Complied with the disclosures requirements of FIN 46 or FIN 46R regarding VIEs that are not consolidated by the Company, but which the Company holds a significant variable interest.

29. During the fiscal quarter ended September 24, 2006, the Company increased its ownership interests in Classified Ventures, LLC, ShopLocal, LLC and Topix, LLC, thereby triggering a reconsideration event under FIN 46R, "Consolidation of Variable Interest Entities, an Interpretation of ARB No.51". Management has concluded that CareerBuilder is no longer a variable interest entity under the standard. Moreover, management concluded that Tribune is not the primary beneficiary, as that term is defined, for any of these investments and, accordingly, will continue to account for them under the equity method rather than the consolidation method. In making its assessment, management considered related party and defacto agency relationships.

30. All borrowings and financial obligations of the Company of which we are aware are included in the consolidated financial statements at December 31, 2006 and December 25, 2005, as appropriate. We have fully disclosed to you all borrowing arrangements of which we are aware.

i. The Company has appropriately classified as current and non-current its commercial paper and PHONES obligations in the Company's classified balance sheet as of December 31, 2006 and December 25, 2005 in accordance with the appropriate authoritative guidance, including but not limited to FAS 6, *Classification of Short-Term Obligations Expected to Be Refinanced*; FAS 78, *Classifications That Are Callable by the Creditor*; FTB 79-3, *Subjective Acceleration Clauses in Long-Term Debt Agreements*; EITF Topic D-61, *Classification by the Issuer of Redeemable Instruments That Are Subject to Remarking Agreements*; EITF 86-5, *Classifying Demand Notes with Repayment Terms*; EITF 86-30, *Classification of Obligations When a Violation is Waived by the Creditor*; and EITF 95-22, *Balance Sheet Classification of Revolving Credit Agreements That Include a Subjective Acceleration Clause and a Lock-Box Arrangement*. In evaluating the appropriate classification of its commercial paper and PHONES obligations, the Company considered all relevant facts and circumstances, such as the contractual terms, the existence of call options, subjective acceleration clauses, material adverse changes clauses, lock-box arrangements, covenant violations, renewal features, conversion features, redemption features, and ability and intent to refinance.

ii. As of December 31, 2006 and for the year then ended, the Company was in compliance with the covenants on its credit agreements. We have made available to

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

you the credit agreements and the calculation of the loan covenants as of December 31, 2006 and for the year then ended.

31. As of December 31, 2006, the Company has excluded $331 million related to the 2.0% PHONES obligations, the value of the PHONES exchange right, from short-term obligations. As of December 25, 2005, the Company has excluded $638 million of commercial paper and $293 million of medium-term notes scheduled to mature by December 25, 2006, and $269 million related to the 2.0% PHONES obligations, the value of the PHONES exchange right, from short-term obligations. The Company has classified these balances as long-term because it has the ability and intent to consummate a refinancing of the 2006 amounts using the financing agreement referred to in Note 9 to the consolidated financial statements and had the ability and intent to consummate a refinancing under the previous revolving credit agreement for the 2005 amounts.

As of June 27, 2006, management had no knowledge of any material breach of the representations and warranties set forth in the last sentence of Section 4.01(e)(i) or Section 4.01(f) of the Company's Amended and Restated Credit Agreement and Amended and Restated Bridge Credit Agreement, each dated June 27, 2006, in each case, as of June 19, 2006, June 27, 2006 and July 5, 2006.

As of June 27, 2006, management had no knowledge of any material adverse change in the consolidated financial condition, results of operations or prospects of the Company and its subsidiaries taken as a whole during the periods from December 25, 2005 to June 27, 2006, the effective date of the Company's amended and restated credit agreements and July 5, 2006, the date of the initial draw down on the facilities thereunder.

32. The Company has properly recorded the exchange of its previous revolving credit agreements for the new $750 million unsecured revolving facility pursuant to EITF 98-14, "Debtor's Accounting for Changes in Line-of-Credit or Revolving Debt Arrangements." We have fully disclosed to you the terms of the new unsecured revolving facility.

33. The Company reviewed the classification of the loss on extinguishment of debt, recognized in the year ended December 26, 2004 in the consolidated financial statements, in accordance with FAS 145, *Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections*. The Company has not classified $140.5 million related to the extinguishment of debt as an extraordinary item because that loss does not meet the criteria in APB 30, *Reporting the Results of Operations - Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transactions*, for classification as an extraordinary item.

34. We have adopted FASB Statement No. 133, Accounting for Derivative Instruments and Hedging Activities as amended by FASB Statement No. 138 and FASB Statement No. 149 and interpreted by Derivatives Implementation Group issues (together, "FAS 133") as of the beginning of the fiscal year 1999 second quarter.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

result in a measure of fair value appropriate for financial statement measurement and disclosure purposes in accordance with FAS 133.

b. We have adequately disclosed each significant concentration of credit risk arising from all financial instruments whether from an individual counterparty or groups of counterparties in accordance with FASB Statement No. 107, *Disclosures about Fair Value of Financial Instruments*, as amended by FAS 133.

c. We have evaluated the contracts into which we have entered to determine whether any such contracts are in effect hybrid instruments that contain embedded derivative instruments. For those embedded derivative instruments that (1) possess economic characteristics that are not clearly and closely related to the host contract and (2) meet the definition of a derivative instrument when considered on a stand-alone basis, we have bifurcated the embedded derivative instrument and accounted for it separately at fair value pursuant to the provisions of FAS 133.

d. For all transactions to which hedge accounting is applied we have identified, linked and documented the relationship between the derivative instrument and the hedged item (or transaction).

e. Both at the hedge's inception and on an ongoing basis, we have formally assessed and documented whether the derivative instrument is highly effective in offsetting the changes in fair value or cash flows of the hedged item. We believe that all transactions currently accounted for as hedges are and will be effective throughout the designated hedge period.

f. We have evaluated the expected timing of hedged forecasted transactions and believe that those forecasted transactions are probable of occurring in the period(s) specified in our hedge documentation or within an additional two-month period of time thereafter.

g. We have evaluated all contracts and financial instruments to determine whether they meet the definition of a derivative under FAS 133 paragraphs 6-11 and the related Derivatives Implementation Group issues.

h. We have evaluated all derivative contracts that are subject to FAS 133 to determine if an other-than-insignificant financing element is present at inception and, if so, have reported all cash inflows and outflows associated with that derivative instrument as a financing activity in the statement of cash flows.

35. Provision has been made for the loss that is probable from environmental remediation liabilities associated with Orlando TCE. We believe that such estimate is reasonable based on available information. We believe the liability is immaterial and does not require separate disclosure in the consolidated financial statements included with the Form 10-K.

36. The Company has reviewed tangible long-lived assets, operating lease agreements that contain return provisions that require the leased assets to be returned in the same condition

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

that existed at lease inception (i.e., the agreement requires the removal of any leasehold improvements at the end of the lease term) and other agreements for associated asset retirement obligations (AROs), in accordance with FASB Statement No. 143, *Accounting for Asset Retirement Obligations* and FIN 47 *Accounting for Conditional Asset Retirement Obligations*. No liability associated with AROs has been recognized because we have determined that the AROs are immaterial individually and in the aggregate to the Company's financial position and results of operations.

37. Capital stock repurchase options or agreements or capital stock reserved for options, warrants, conversions, or other requirements have been properly disclosed.

38. All the pertinent rights and privileges of the Company's outstanding equity securities have been properly disclosed. Transactions that occurred after December 31, 2006 (the end of the most recent fiscal period), but before February 21, 2007 (the date of your report), that would have materially changed the number of common shares or potential common shares outstanding at the end of the period if the transaction had occurred prior to the end of the period have been properly disclosed.

39. Broadcast rights recorded in the consolidated financial statements at December 31, 2006 and December 25, 2005 represent costs of rights to broadcast feature films, syndicated and other programs. The amounts recorded as reserves for broadcast rights at December 31, 2006 and December 25, 2005 are sufficient to reflect the broadcast rights at the lower of unamortized cost or estimated net realizable value in accordance with Financial Accounting Standards Board (FASB) Statement No. 63.

40. We have evaluated our portfolio of securities and recorded an impairment charge for other-than-temporary declines in value. Any other declines in value below original cost are deemed to be temporary and are securities for which we have the ability and intent to hold until recovery.

41. The Company's investment in Time Warner common stock related to PHONES debt is classified as non-current in the consolidated financial statements. The Company does not reasonably expect this asset to be realized in cash or sold during the normal operating cycle of the business.

42. The actuarial assumptions and methods used to measure liabilities and costs for financial accounting purposes for pension and other postretirement benefits are appropriate in the circumstances. The discount rate assumptions used in the actuarial valuation of our pension and other postretirement benefit obligations were determined using an acceptable methodology developed on a consistent basis and taking into account the individual characteristics of each plan, such as projected cash flow patterns and payment durations. The rate of return on plan assets assumptions used in the actuarial valuation of our pension and other postretirement benefit obligations were determined using an acceptable methodology developed on a consistent basis and representing the average rate of earnings expected on existing plan assets and contributions expected to be received during the current year, to provide for the benefits included in the projected pension or OPEB obligation.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

43. The narrative descriptions of (a) investment policies and strategies, including the target allocation percentages or range of percentages for each major category of plan assets, and (b) the basis used to determine the overall expected long-term rate of return on assets assumption, represent an accurate description of the processes used by management to make investment decisions and to determine the overall expected long term rate of return on assets.

44. The amount used for disclosure purposes of employer contributions expected to be paid to the benefit plan(s) during the next fiscal year of $21 million represents management's best estimate at December 31, 2006.

45. The Company has evaluated its postretirement benefit arrangements in accordance with FSP FAS 106-2, *Accounting and Disclosure Requirements Related to the Medicare Prescription Drug, Improvement and Modernization Act of 2003,* and has appropriately applied the guidance therein.

46. The Company has adopted and applied the recognition and disclosure provisions of FASB Statement No.158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans,* as of December 31, 2006. In this process the Company has measured the funded status of all defined benefit pension and other postretirement plans on a plan-by-plan basis and recognized all previously unrecognized prior service costs and credits, net gains/losses, and transition assets and obligations as a component of accumulated other comprehensive income, net of taxes, in stockholders' equity. All unfunded and underfunded plans have been aggregated to record a net benefit liability; all overfunded plans have been aggregated to record a net benefit asset. The net benefit assets and net benefit liabilities have not been aggregated and presented on a net basis. The current liability recorded for unfunded plans represents the benefits payable in the next 12 months. The current liability recorded for underfunded plans represents the amount of benefits payable in the next 12 months that exceeds the fair value of plan assets.

47. The voluntary employee-termination plan establishes the benefits to be paid to employees and specifically identifies the number of employees to be terminated, their job classification or functions, and their location. Any costs accrued under a voluntary-termination plan relate to benefits that the employees have accepted prior to December 31, 2006.

48. The involuntary one-time employee-termination arrangement establishes the benefits to be paid to employees and specifically identifies the classifications or functions of those employees, their locations, and the expected completion date. All employees have been informed about the terms of the benefit arrangement, including the benefits that employees will receive upon termination (including but not limited to cash payments), in sufficient detail to enable employees to determine the type and amount of benefits they will receive. For those employees, if any, that are required to render service beyond a minimum retention period, the Company will recognize the liability ratably over the future service period.

49. The Company has identified all nonmonetary transactions and has applied the relevant provisions of APB 29, *Accounting for Nonmonetary Transactions*, as amended by FAS 153.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

50. Changes in lease provisions, including renewals or extensions of the terms of the lease have been evaluated by the Company based on FAS 13, *Accounting for Leases*, par. 9, in order to determine whether the change gives rise to a new lease with a classification different from the previous classification.

51. We have reviewed the criteria for revenue recognition included in SAB 104, namely, evidence of arrangement, delivery, fixed price and collectibility and are recognizing revenue in accordance with SAB 104.

52. We have fully disclosed to you all sales terms (whether written or oral), including all customer-acceptance provisions, rights of return or price adjustments, and all warranty provisions.

53. Each of our television subsidiaries is authorized to enter into oral sales agreements with local customers for the provision of advertising services. These agreements frequently include offers to provide free advertising services in the future if certain projected ratings levels are not achieved. We estimate the value of undelivered "make good" commitments to be approximately $3 million at December 31, 2006. This amount has been recorded as a deferred revenue liability in the consolidated financial statements.

54. The Company's newspaper subsidiaries enter into oral agreements for the provision of advertising services that the Company and its legal counsel have concluded are the terms of and enforceable contracts. These oral agreements include orders taken by order entry and customer service personnel and the terms of volume pricing and rebate programs for which signed contracts are not obtained in a timely manner. Management monitors and tracks the status of negotiations and terms agreed through oral arrangements and have made appropriate provision for the value of all related commitments in the consolidated financial statements.

55. We did not issue any side letters in regards to our sales agreements.

56. The Company has identified all revenue arrangements involving multiple deliverables and adopted and applied the relevant provisions of EITF 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables*, as of September 2003 for applicable arrangements that are within the scope of EITF 00-21.

57. For revenue arrangements involving multiple deliverables that are within the scope of EITF 00-21, the Company has properly:

    (a) Considered whether a deliverable(s) in an arrangement is within the scope of other existing higher-level authoritative literature and applied such literature to the extent that it provides guidance regarding whether and/or how to separate multiple-deliverable arrangements and how to allocate value among those separate units of accounting.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

(b) Determined whether revenue arrangements with multiple deliverables consist of more than one unit of accounting at inception of the arrangement and as each item in the arrangement is delivered.

58. Pursuant to paragraphs 10-15 of FASB Statement No. 131 (FAS 131), *Disclosures about Segments of an Enterprise and Related Information*, including the operating results regularly reviewed by the Chief Operating Decision Maker, Dennis FitzSimons, Chairman, President and Chief Executive Officer, management has identified following operating segments: (1) publishing and (2) broadcasting and entertainment.

59. The consolidated financial statements disclose all the relevant factors used to identify the Company's reportable segments, including whether operating segments have been aggregated.

60. The deferred tax asset valuation allowance of $37.5 million has been determined pursuant to the provisions of FASB Statement No. 109, *Accounting for Income Taxes,* and based on the weight of the available evidence is adequate to reduce the total deferred tax asset to an amount that will, more likely than not, be realized.

61. The Company has the ability to implement the tax strategies identified to support realization of the deferred tax asset, such strategies are prudent and feasible, and management intends to implement them unless the need to do so is eliminated in future years. The Company has considered the effect of expenses and losses attributable to the implementation of such tax planning strategies in its evaluation of the realizability of the deferred tax asset.

62. The method used to determine our liabilities for potential assessments from taxing authorities has been applied on a basis consistent with that of the prior year and the resulting liabilities are supported by specifically identified income tax exposures. In cases where it is only reasonably possible that a loss has been incurred, or the amount of loss cannot be reasonably estimated, appropriate disclosures have been provided.

63. Changes to the liabilities for specific income tax exposures were recognized in the appropriate period, including the appropriate interim period, to which they relate and all individually significant changes to such liabilities have been properly disclosed in the consolidated financial statements, even if the net amount of all such changes was insignificant.

64. We have provided you with all information related to all significant income tax uncertainties of which we are aware. We have also provided you with access to all opinions and analyses that relate to positions we have taken in regard to significant income tax matters. The most significant change to the reserve balance in 2006 was the release of a substantial portion of the PHONES reserve. In the fourth quarter, the Company recorded a favorable $31 million income tax expense adjustment (including current year interest) as a result of reaching an agreement with the Internal Revenue Service appeals office regarding the deductibility of interest expense on the Company's PHONES debt securities.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

65. The Company has appropriately reconciled its deferred tax asset and deferred tax liability books and records underlying the consolidated financial statements to their related supporting information. All related reconciling items considered to be material were identified and included on the reconciliations and were appropriately adjusted in the consolidated financial statements.

66. In August, the Company reached settlement with the state of California on certain tax issues relating to the Times Mirror acquisition. As a result, the Company reduced tax reserves in the amount of $15.8 million during the year ended December 31, 2006, $12 million of which was recorded as a reduction of goodwill and $3.8 million as a reduction to the provision for income taxes.

67. We have not completed the process of evaluating the impact that will result from adopting FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes* ("FIN 48"), which is effective for fiscal years beginning after December 15, 2006. The Company will adopt FIN 48 as of January 1, 2007 and as discussed in Note 1 to the consolidated financial statements, does not believe that the adoption of the standard will have a material impact on the Company's consolidated financial statements.

68. We have reviewed long-lived assets to be held and used or to be disposed of by sale for impairment in accordance with FASB Statement No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets,* whenever events or changes in circumstances have indicated that the carrying amount of assets might not be recoverable, and have appropriately recorded the adjustment.

The plan-of-sale criteria in paragraph 30 of FAS 144 are met (except as permitted by paragraph 31, if applicable) for the land and building in Hicksville, New York and Tribune Media Service's Interactive Program Guide patents and accordingly long-lived assets have been appropriately classified as held for sale.

69. During the fourth quarter of 2006, the Company concluded that certain press equipment idled in the shut down of the San Fernando Valley production facility in 2005 would not be redeployed elsewhere in the publishing group and therefore, recorded a charge of $4.1 million to dispose of the equipment. As of December 31, 2006, certain remaining press equipment ($26 million net book value) is idle and continues to be depreciated over original useful lives. Management is evaluating alternative uses; however, we believe that the most likely scenario is that all presses will be redeployed within the publishing group in a fashion consistent with historical uses and accordingly has concluded that as of December 31, 2006 the net book value of these assets is fully recoverable. Management expects to complete its plans in 2007.

70. During the fourth quarter of fiscal 2006, the Company sold its 27% interest in BrassRing. The Company received cash proceeds of $24.4 million and an escrow holdback from the sale in the amount of $3.1 million. Management believes that the entire $3.1 million escrow

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

receivable is recoverable as of December 31, 2006 and does not anticipate any future material purchase price adjustments.

71. The Financial Statement Schedule provided to you and included in Part IV, Item 14(a)2 of the Company's Annual Report on Form 10-K for the year ended December 31, 2006 includes all information required by Regulation S-X. Such information has been prepared in conformity with accounting principles generally accepted in the United States of America for all periods presented. We are not aware of any matters or occurrences up to the present time that would materially affect that information.

72. The Company has adopted and applied the provisions of FASB Statement No. 123 (revised 2004), *Share Based Payment,* ("FAS 123(R)") and its related guidance as of January 1, 2006. We have properly:

   a. determined the requisite service period and recognized the fair value of stock-based compensation over that period:

   b. determined the attribution method;

   c. determined and applied a forfeiture rate assumption;

   d. classified stock-based compensation awards as either equity or a liability;

   e. presented the tax effects of windfall tax benefits on the cash flow statement; and

   f. selected and consistently applied our accounting policies for the income tax effect of stock-based compensation awards.

73. All matters of judgment involved in the calculation and determination of the fair value of stock-based compensation under FAS 123(R), including the use of an option-pricing model and all related assumptions, are the responsibility of management. The assumptions we used are reasonable and supportable and developed in compliance with FAS 123(R). We have also reviewed and considered the interpretations under Staff Accounting Bulletin No. 107, *Share-Based Payment.* We believe that the assumptions used in option-pricing models have been developed in accordance with both SAB 107 and FAS 123(R). Additionally, we represent that the assumptions and the process from which they were developed are completely and adequately disclosed in the condensed consolidated financial statements according to the requirements of FAS 123(R) and SAB 107.

74. The listings provided to you of stock-based compensation awards granted, exercised, cancelled, and forfeited during the reporting period are complete and accurate.

75. We elected the method provided by paragraph 81 of FAS 123(R), Share-Based Payment ("long-form method") to calculate the Company's historical pool of windfall tax benefits.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

We maintained and used complete and accurate records to calculate the historical pool of windfall tax benefits that would have been recorded under FASB Statement No. 123, *Share Based Payment,* ("FAS 123"), had the company been following its recognition provisions from the Company's effective date of FAS 123 to the effective date of FAS 123(R). In so doing, we have excluded (1) windfall tax benefits from share-based arrangements that are outside the scope of FAS 123(R) and (2) windfall benefits that have not been realized as such amounts are embedded in a net operating loss carryforward.

76. We have determined the grant date of stock-based compensation awards to be the date when (1) we have a mutual understanding of the key terms and conditions of the award with the employee, (2) we are obligated to issue shares or transfer assets to employees who fulfill their vesting requirement, (3) the employee begins to be affected by the subsequent changes in the price of the stock, and (4) the award has been approved by the compensation committee of the Company in accordance with FAS 123(R), Share-Based Payment. We have a mutual understanding of the key terms and conditions of the award with the employee on the date when the award has been approved by the compensation committee of the Company and (1) the recipient of the award no longer has the ability to negotiate the key terms and conditions of the award, and (2) the key terms and conditions of the award will be communicated to the recipient in a relatively short time period from the approval date in accordance with FASB Staff Position FAS 123(R)-2.

77. The Company has concluded that the net assets of the Company's television stations in Atlanta (WATL), Albany (WCWN) and Boston (WLVI) are components of the entity with operations and cash flows that can be clearly distinguished, operationally and for financial reporting purposes from the rest of the Company, as required by FASB Statement No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*. The components meet the requirements for held for sale and discontinued operations classification under FAS 144 in a transaction that will eliminate the component's operations and cash flows from the Company's ongoing operations, and the Company will not have any significant continuing involvement in the operations of the component following the disposal, as described in EITF 03-13 *Applying the Conditions in Paragraph 42 of FAS 144 in Determining Whether to Report Discontinued Operations*. The sales of all three stations were closed as of December 31, 2006.

78. In conjunction with its acquisition of ForSaleByOwner.com, the Company has properly:

a) Concluded that the acquisition is a business combination as defined in FASB Statement No. 141, *Business Combinations*.

b) Identified, valued, and recorded all the acquired assets and liabilities, including all intangible assets meeting the criteria for separate recognition outlined in paragraph 39 of FASB Statement No. 141, *Business Combinations*.

c) Allocated the acquired assets and liabilities, including goodwill, to the appropriate reporting units in accordance with paragraphs 32-35 of FASB Statement No. 142, *Goodwill and Other Intangible Assets*.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

d) Assessed the useful lives of the acquired intangible assets subject to amortization and those with indefinite useful lives.

79. The Company's current and past restructuring activities have not in substance created a benefit arrangement that should be accounted for in accordance with FAS 112, "Employers Accounting For Post-employment Benefits".

80. On September 21, 2006, the Company and the Chandler Trusts entered into agreements to restructure TMCT, LLC and TMCT II, LLC. Under the terms of the agreements, on September 22, 2006, in exchange for substantially all of its ownership interests, the Company received 38.9 million shares of the Company's common stock and 1.1 million shares of the Company's preferred stock from TMCT and TMCT II. These transactions reduced the Company's interests in each of TMCT and TMCT II to approximately five percent. The agreements also provide for certain put and call options, which are exercisable at fair market value beginning in September 2007, relating to the Company's remaining ownership interests in TMCT and TMCT II. As a result of the sale in the third quarter of 2006, the Company recorded a one-time gain for financial reporting purposes of $48 million, net of tax; increased its common treasury stock by $161 million and its preferred treasury stock by $106 million; and reduced its combined investment in TMCT and TMCT II by $195 million. The gain recorded on these transactions is net of a $16 million reserve, representing management's best estimate of a potential tax obligation.

81. In conjunction with the redemption transactions, the Company and TMCT also amended the lease agreement for the eight properties the Company leases from TMCT. Under the terms of the amended lease, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company engaged a third party, independent appraiser to value the properties in April 2006 and has concluded that the option does not have significant value; therefore, management concludes that there is no accounting impact on the Company's financial statements as of December 31, 2006 with respect to this option.

82. The Company earns royalties primarily related to the distribution of WGN programming on national cable and satellite systems. Royalty fees are collected and distributed by the Copyright Royalty Tribunal ("CRT"), a branch of the Library of Congress. The royalty receivable balance is $32.6 million at December 31, 2006 as compared to $28.7 million at December 25, 2005. The Company's receivable is comprised of amounts pertaining to broadcasts from 1998 to 2006. The Company received a disbursement of $3 million on January 2, 2007, which was a partial payment of cable royalties earned in 2003. Management believes the Company will receive approximately $19 million in 2007 relating to royalties earned during the period 1998-2002, and believes that the receivable is fully realizable at December 31, 2006.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

To the best of our knowledge and belief, there were no (1) events that have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to or disclosure in the aforementioned consolidated financial statements; and (2) changes in internal control over financial reporting or other factors that might significantly affect internal control over financial reporting, including any corrective actions taken by us with regard to significant deficiencies and material weaknesses, that have occurred subsequent to December 31, 2006 and through the date of this letter.

Dennis J. FitzSimons
Chariman, President and Chief Executive Officer

Donald C. Grenesko
Senior Vice President, Finance and Administration

R. Mark Mallory
Vice President and Controller

Crane H. Kenney
Senior Vice President, General Counsel and Secretary

Gerald W. Agema
Vice President, Corporate Compliance/Risk Management

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only