# KAYE SCHOLER LLP

Jane W. Parver
212.836.8510
jparver@kayescholer.com

425 Park Avenue
New York, New York 10022-3598
212.836.8000
Fax 212.836.6510
www.kayescholer.com

July 16, 2010

**VIA FEDERAL EXPRESS**
**and E-MAIL (nnastasi@saul.com)**

Nicholas J. Nastasi, Esq.
Saul Ewing LLP
1500 Market Street, 38th Floor
Philadelphia, PA  19102-2186

    Re: In re: Tribune

Dear Nick:

    We enclose Mr. Kaplan's signed transcript and errata sheet.  For your benefit, we also enclose a copy of the transcript with the corrections handwritten on the transcript or typed in rider form.

    Upon reviewing the transcript, we and Mr. Kaplan noted that numerous questions related to discounted cash flow and other valuation methodologies related to Tribune's core publishing and broadcasting businesses.  However, the "average operating enterprise valuations" reflected in Exhibits 23 and 24 are not appreciably different from those in the VRC Solvency Analysis dated December 18, 2007.  What is significant is that Exhibits 23 and 24 reflect stress testing of the numerous assumptions underlying VRC's valuations of Tribune's non-consolidated equity investments such as CareerBuilder and TV Food Network, as well as the Cubs/CSN, real estate opportunities, the NPV of the tax savings, and the liabilities represented by the PHONES debt.  Many of these areas were novel and all were highly subjective, which account in these particular stress tests for substantially all of the differences between Merrill Lynch's analyses of VRC's work and the final VRC opinion.

    Typically, Merrill Lynch signs a commitment for a loan and closes the transaction shortly thereafter.  Here, there was a lag of some seven months between signing and closing and there were no particular processes in place during the period between the commitment and the closing.  While the Examiner and his counsel asked many questions about the Merrill Lynch "team" or who had the responsibility for preparing Exhibits 23 and 24 and similar worksheets, there was no responsibility or decision on Merrill Lynch's part to do an independent valuation analysis.  Therefore, one of the junior people involved in the transaction was generally asked to put in a variety of inputs to stress test the outputs that they understood were generated by VRC's analytical framework.  In this regard, Michael Costa was generally not involved in Step 2 financing discussions, including the review of the VRC solvency opinion.  He had stepped back from advising Tribune in the summer of 2007, at the direction of counsel and with the approval of Tribune, as the focus shifted to Step 2 financing conditions.

32007493.DOCX

CHICAGO · FRANKFURT · LONDON · LOS ANGELES · MENLO PARK · NEW YORK · SHANGHAI · WASHINGTON, DC · WEST PALM BEACH

# KAYE SCHOLER LLP

Nicholas J. Nastasi, Esq.                    - 2 -                    July 16, 2010

      Mr. Kaplan was also asked about whether he had access to other analyses of the VRC opinion or valuations prepared by persons outside of Merrill Lynch. While he does not recall ever having seen any such work product, he does recall phone calls among the lender group, generally with Cahill Gordon, in which there were discussions of what analyses or testings of the VRC opinion those members were preparing or had prepared, as well as the pros and cons of closing the loan transactions. We discussed with Mr. Kaplan some handwritten notes, which were brought to our attention yesterday, apparently prepared by one member of the lender group in connection with a call among the lender group on or about December 14, 2007. He confirmed that this was one of many instances in which lenders shared aspects of on-going analyses and engaged in discussions concerning the pros and cons of closing the transactions, as they awaited further information from the Company and VRC in connection with the solvency opinion that VRC was preparing.

      Sincerely,

      Jane W. Parver

JWP:cm
Enclosures

cc:    Madlyn Primoff, Esq.

32007493.DOCX

# ERRATA SHEET

IN RE:  TRIBUNE COMPANY, et al.                          Case No. 08-13141 (KJC)
JUDGE:  HON. KEVIN J. CAREY
JULY 16, 2010

REPORTER: DERALYN GORDON, notary public of Cook County, Illinois, License No. 084-003957

TODD KAPLAN, having reviewed the July 8, 2010 transcript of the interview by the examiner in the above referenced matter, the following are corrections to the transcript:

| PAGE | LINE | ORIGINAL | CORRECTIONS |
|---|---|---|---|
| 1 | 9 | discovery deposition | interview |
| 25 | 13-14 | is that there was a | [delete] |
| 28 | 22 | replicate | understand |
| 29 | 1 | as best we can. | as best we can.  We did not have the VRC model, so we were taking the VRC framework and trying to understand how they were generating their analytical inputs so as to understand their outputs. For example, we tested VRC's treatment of various non-core assets, such as the Company's real estate holdings and equity interests in other companies, as well as the tax savings and other issues. A lot of these inputs were extremely subjective, so we would continually test them and stress test them.  VRC made certain assumptions around these issues and we tried to test these assumptions. Even apart from solvency, many of the issues involved were novel issues that Merrill Lynch had never dealt with before. |
| 29 | 4-5 | one member of a large team | one member of a large, loosely organized team |
| 29 | 13 | I don't recall. | There was no responsibility or decision on Merrill Lynch's part to do an independent valuation analysis.  One of the junior people involved in this process was generally asked to put in a variety of inputs to stress test the outputs that we understood were generated by |

| | | | VRC's analytical framework. |
|---|---|---|---|
| 29 | 20 | I'm not sure I understand the question. | We were not doing our own analysis as we are not solvency experts. We were trying to understand VRC's analysis. |
| 30 | 2 | the RC's | VRC's |
| 30 | 6 | know. | know VRC was doing its own analysis. We were trying to understand their analysis. |
| 30 | 8 | the analysis | the VRC analysis |
| 30 | 17 | about that. | about that. But we are not solvency experts so we don't know what inputs solvency experts would use or rely upon. This is what we were trying to test. |
| 30 | 21 | the | [delete] |
| 30 | 22 | end. | end and then test or stress test VRC's assumptions about the inputs. |
| 33 | 1 | Not that I recall. | Not that I recall. I recall being on some phone calls with members of the Lender Group and Cahill Gordon in which there were discussions of what analyses or testing of the VRC opinion those members were preparing or had prepared as well as the pros and cons of closing the loan transactions. I do not recall ever being shown any of their work product. |
| 33 | 11-12 | And I state that so as to distinctly -- Citibank model | And I state that, so as to distinguish -- the term "Citibank model" |
| 33 | 16 | or | for |
| 34 | 4 | I don't recall. | I don't recall seeing a Citibank model. I do recall being on some phone calls with members of the Lender Group and Cahill Gordon in which we generally discussed analyses or testing of the VRC opinion that members had prepared or were preparing, but I do not recall seeing those analyses or stress testings. |
| 35 | 7 | a file | an SEC filed |
| 35 | 16 | was one firm | as one firm, |
| 35 | 17 | clients. | clients. The process, which is one I had never engaged in before, was even more difficult and complicated because there were several issues that were novel to Merrill Lynch, such as an S-Corp. owned by an ESOP and the valuation of |

|  |  |  | the tax benefits.  I also came to understand that some of the issues were novel to the solvency industry experts as well, so there did not appear to be one industry standard to follow. |
|----|-----|-----|-----|
| 36 | 21 | rise | arises |
| 36 | 22 | financing related | financing and related |
| 37 | 2 | experts | expert |
| 37 | 3 | bucket kind | bucket those kinds |
| 37 | 10 | expertise. | expertise.  But as I said, we did not have in-house solvency expertise. |
| 37 | 12 | a team | a loosely organized team or ad hoc group |
| 37 | 19 | this particular point in time. | this particular point in time.  It was an ad hoc group organized for this process. |
| 39 | 2 | up | down |
| 39 | 7 | That would be | [delete] |
| 40 | 19 | had gone | was going |
| 41 | 7 | I don't recall. | I don't recall apart from discussions between the lenders and Cahill in which we discussed that the transaction had become unprofitable. |
| 43 | 1 | The PHONES debt. | The PHONES are debt. |
| 43 | 2-3 | "The PHONES debt." | "The PHONES are debt." |
| 44 | 1 | many | the |
| 44 | 13 | and Market Financing | [delete] |
| 51 | 21 | is | as |
| 53 | 13 | commit today | committed to |
| 59 | 3 | breach | Bridge |
| 60 | 2 | MB | MD |
| 62 | 5 | work | worked |
| 62 | 12 | on the account. | on the account on the advisory side through the approval of the first step of the transaction. |
| 63 | 4 | at that moment. | at that moment.  He generally had stepped back from advising the company in the summer of 2007, at the direction of counsel, as the focus shifted to step two financing conditions. |
| 64 | 20 | interest | earnest |
| 65 | 22 | the what | the, what |
| 66 | 1 | call the | call, the |
| 73 | 3-4 | how the VRC was understood as | how VRC was understood to be an |
| 74 | 17 | under | understand |
| 76 | 1-3 | recall based on some of the prior e- | recall.  Based on some of the prior e- |

| | | mails.  Perhaps | mails, perhaps |
|---|---|---|---|
| 77 | 15 | Data | debt |
| 77 | 16 | an | or |
| 77 | 19 | that coupled | that, coupled |
| 77 | 20 | report lead | report, led |
| 78 | 20 | what was | that was |
| 79 | 21 | try to replicate them as best we could. | try to understand them, including how VRC was generating its analytic inputs so as to understand its outputs as best we could.  We tested and stress-tested various assumptions made by VRC with respect to certain inputs, such as the value of non-core assets (including real estate, Career Builder, the Cubs, etc.) as well as the tax savings and other issues. |
| 81 | 7 | did. | did.  We went through the exercise or process to try to ensure that there was real rigor in VRC's process, including that they were presented with all of the relevant issues and factors, especially as so many of them were novel. |
| 82 | 3 | Yes. | Yes, as well as to the step two financing. The solvency certificate, which was a condition of closing to the December 2007 step two financing agreements, expressly relies on the VRC solvency opinion. |
| 85 | 1 | per | at |
| 85 | 6 | us, willfully | us willfully |
| 85 | 21 | in the | not |
| 86 | 15 | setting | mentioning |
| 86 | 16 | that that | that they |
| 91 | 13 | It was the product of several different heads. | It was the product of several different heads.  This was not a process or exercise we were familiar with.  Typically we sign a commitment for a loan and close the transaction shortly thereafter.  Here there was a lag of seven months between signing and closing.  There was no particular process in place to address this type of situation. |
| 92 | 19 | No. | No.  Costa was not generally involved in step two financing discussions, including the review of the VRC solvency opinion. |

| 94 | 9 | Leonard | Lender |
|---|---|---|---|
| 94 | 11 | Leonard | Lender |
| 94 | 20 | improved | approved |
| 99 | 6 | the meeting | the term meeting |
| 101 | 4 | fact, being | fact, been |
| 101 | 16-17 | how an industry | how as an industry |
| 102 | 15 | with | was |
| 104 | 17 | form | former |
| 107 | 19 | or | [delete] |
| 108 | 7-8 | whether it happened or didn't happen. | whether it happened or didn't happen. He was not generally involved in step two financing discussions, including the review of the VRC solvency opinion. |
| 109 | 13 | the | [delete] |
| 112 | 7 | on ward | onward |
| 112 | 14 | areas were | areas that were |
| 117 | 10 | remembering | memory |
| 126 | 16 | characterization. | characterization.  This is an analysis of the VRC valuation analysis. |
| 127 | 3 | MB | MD |
| 128 | 22 | see the | see that the |
| 128 | 22 | all | off |
| 129 | 1 | substantially." | substantially..." |
| 129 | 3 | "is | "the New York Times is |
| 130 | 10 | Dahlback.  It's part of Leveraged | Dahlback is part of the Leveraged |
| 132 | 8 | pages | page |
| 134 | 15 | wherein | within |
| 135 | 1 | that it's a replication of the VRC | that it's an attempt to show the VRC |
| 135 | 3 | Are you | We are |
| 138 | 3-4 | that maybe | that in |
| 138 | 4 | that | [delete] |
| 141 | 17 | or they forward it on. | appropriate to forward on to VRC. |
| 144 | 16 | a positive value only in the high case. | a positive value only in the high case.  I would note that in this stress testing of the VRC opinion reflected in Exhibit 24, the values for the core businesses, meaning broadcasting and publishing, are very similar to the operating enterprise value that VRC had in their solvency opinion.  Where they appear to deviate is in the more subjective areas, such as the equity value of numerous non-consolidated investments such as CareerBuilder and TV Food Network, as well as the Cubs/CSN, real estate |

| | | | opportunities, the NPV of tax savings, and the liability represented by the PHONES debt.  Many of these areas were novel and all were subjective, which account in this particular stress testing for substantially all of the difference between the last versions of the Merrill Lynch worksheets and the final VRC opinion. |
|---|---|---|---|
| 144 | 21 | asked | was asked |
| 149 | 18 | some | sum |
| 154 | 22 | necessarily. | necessarily.  As I've noted before, inputs such as EBITDA multiples are highly subjective and because we did not know the bases for VRC's inputs, to understand the VRC opinion, we stress tested it and continually varied assumptions.  The document you are looking at reflects only some of the numerous assumptions that were tested.  As I also said before, there was no one person who ran the analysis or chose particular multiples. |
| 155 | 5 | replicate | understand |
| 155 | 9 | a valuation | a Merrill Lynch valuation |
| 160 | 3 | in | and |
| 171 | 7 | in | an |
| 171 | 8 | in | an |
| 171 | 16 | an | and |
| 172 | 17 | E substructure | ESOP structure |

The following sections are to be marked "Confidential:"

| (Begin) PAGE:LINE | (End) PAGE:LINE |
|---|---|
| 64:22 | 66:13 |
| 162:12 | 168:3 |
| 169:13 | 169:19 |
| 170:12 | 170:16 |
| 170:20 | 173:3 |

**IN RE:  TRIBUNE COMPANY, et al.**                    **Case No. 08-13141 (KJC)**
**JUDGE:  HON. KEVIN J. CAREY**
**JULY 8, 2010 INTERVIEW TRANSCRIPT**

## RIDERS

29A.    We did not have the VRC model, so we were taking the VRC framework and trying to understand how they were generating their analytical inputs so as to understand their outputs. For example, we tested VRC's treatment of various non-core assets, such as the Company's real estate holdings and equity interests in other companies, as well as the tax savings and other issues.  A lot of these inputs were extremely subjective, so we would continually test them and stress test them.  VRC made certain assumptions around these issues and we tried to test these assumptions.  Even apart from solvency, many of the issues involved were novel issues that Merrill Lynch had never dealt with before.

29B.    There was no responsibility or decision on Merrill Lynch's part to do an independent valuation analysis.  One of the junior people involved in this process was generally asked to put in a variety of inputs to stress test the outputs that we understood were generated by VRC's analytical framework.

29C.    We were not doing our own analysis as we are not solvency experts.  We were trying to understand VRC's analysis.

30.     But we are not solvency experts so we don't know what inputs solvency experts would use or rely upon.  This is what we were trying to test.

33.    Not that I recall.  I recall being on some phone calls with members of the Lender Group and Cahill Gordon in which there were discussions of what analyses or testing of the VRC opinion those members were preparing or had prepared as well as the pros and cons of closing the loan transactions.  I do not recall ever being shown any of their work product.

34.    I don't recall seeing a Citibank model.  I do recall being on some phone calls with members of the Lender Group and Cahill Gordon in which we generally discussed analyses or testing of the VRC opinion that members had prepared or were preparing, but I do not recall seeing those analyses or stress testings

35.    The process, which is one I had never engaged in before, was even more difficult and complicated because there were several issues that were novel to Merrill Lynch, such as an S-Corp. owned by an ESOP and the valuation of the tax benefits.  I also came to understand that some of the issues were novel to the solvency industry experts as well, so there did not appear to be one industry standard to follow.

41.    I don't recall apart from discussions between the lenders and Cahill in which we discussed that the transaction had become unprofitable.

62.    ...on the advisory side through the approval of the first step of the transaction.

63.    He generally had stepped back from advising the company in the summer of 2007, at the direction of counsel, as the focus shifted to step two financing conditions.

79.    ...understand them, including how VRC was generating its analytic inputs so as to understand its outputs as best we could.  We tested and stress-tested various assumptions made by VRC with respect to certain inputs, such as the value of non-core assets (including real estate, Career Builder, the Cubs, etc.) as well as the tax savings and other issues.

81.    We went through the exercise or process to try to ensure that there was real rigor in VRC's process, including that they were presented with all of the relevant issues and factors, especially as so many of them were novel.

82.    ...as well as to the step two financing.  The solvency certificate, which was a condition of closing to the December 2007 step two financing agreements, expressly relies on the VRC solvency opinion.

91.    This was not a process or exercise we were familiar with.   Typically we sign a commitment for a loan and close the transaction shortly thereafter.  Here there was a lag of seven months between signing and closing.  There was no particular process in place to address this type of situation.

108.    He was not generally involved in step two financing discussions, including the review of the VRC solvency opinion.

126.    This is an analysis of the VRC valuation analysis.

144.    I would note that in this stress testing of the VRC opinion reflected in Exhibit 24, the values for the core businesses, meaning broadcasting and publishing, are very similar to the operating enterprise value that VRC had in their solvency opinion.  Where they appear to deviate is in the more subjective areas, such as the equity value of numerous non-consolidated investments such as CareerBuilder and TV Food Network, as well as the Cubs/CSN, real estate opportunities, the NPV of tax savings, and the liability represented by the PHONES debt.  Many of these areas were novel and all were subjective, which account in this particular stress testing for substantially all of the difference between the last versions of the Merrill Lynch worksheets and the final VRC opinion.

154.    As I've noted before, inputs such as EBITDA multiples are highly subjective and because we did not know the bases for VRC's inputs, to understand the VRC opinion, we stress tested it and continually varied assumptions.  The document you are looking at reflects only some of the numerous assumptions that were tested.  As I also said before, there was no one person who ran the analysis or chose particular multiples.



experience *does* matter

**CASE:  In re:  Tribune Company, et al.**
**DATE:  July 8, 2010**

Enclosed is the Original of the transcript of the testimony of **Todd Kaplan** along with the errata sheet in the above-titled case.  Please have the witness read the deposition and sign the signature page before a Notary Public.

After the signature page has been notarized, please return the original transcript and errata sheets to the taking attorney within 30 days of receipt for proper filing.

Thank you for your attention to this matter and please feel free to contact us with any questions or concerns.

Sincerely,

Henderson Legal Services

Encl.

Henderson Legal Services
Phone: 202-220-4158
Fax: 202-220-4162
Website: www.hendersonlegalservices.com

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                             Chicago, IL

Page 1

                IN THE UNITED STATES BANKRUPTCY COURT

                   FOR THE DISTRICT OF DELAWARE


        In Re:                      )

        TRIBUNE COMPANY, et al.     ) No. 08-13141 (KJC)


                       CONFIDENTIAL

            The ~~discovery deposition~~ of TODD P. KAPLAN, *interview*

        taken in the above-entitled cause, before

        DERALYN GORDON, a notary public of Cook County,

        Illinois, on the 8th day of July, 2010, at

        70 West Madison Street, Suite 4100, Chicago,

        Illinois, beginning at approximately 1:12 p.m.,

        pursuant to Notice.




        REPORTED BY:  DERALYN GORDON, CSR, RPR, CRR

        LICENSE NO:  084-003957

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                              Chicago, IL

Page 2

1          PRESENT:

2

3          THE EXAMINER:

4                MR. KENNETH N. KLEE

5                1999 Avenue of the Stars, 39th Floor

6                Los Angeles, California 90067

7                (310) 407-4080

8                kklee@ktbslaw.com

9

10         ON BEHALF OF THE EXAMINER:

11               SAUL EWING LLP

12               BY:  MR. MARK MINUTI

13               222 Delaware Avenue

14               Wilmington, Delaware 19899

15               (302) 421-6840

16               mminuti@saul.com

17

18

19

20

21

22

Kaplan, Todd                     CONFIDENTIAL                July 8, 2010
                                 Chicago, IL

Page 3

1      PRESENT:  (CONT'D)

2

3      ON BEHALF OF THE EXAMINER:  (CONT'D)

4             SAUL EWING LLP

5             BY:  MR. GREGORY G. SCHWAB

6                  MR. NICHOLAS J. NASTASI

7             Centre Square West

8             1500 Market Street, 38th Floor

9             Philadelphia, Pennsylvania 19102

10            (215) 972-8445

11            gschwab@saul.com

12            nnastasi@saul.com

13

14     ON BEHALF OF MERRILL LYNCH AND THE WITNESS:

15            KAYE SCHOLER LLP

16            BY:  MS. MADLYN GLEICH PRIMOFF

17                 MS. JANE W. PARVER

18            425 Park Avenue

19            New York, New York 10022

20            (212) 836-8000

21            mprimoff@kayescholer.com

22            jparver@kayescholer.com

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

                                                        Page 4

1                       I N D E X

2                       VOLUME I

3

4    Thursday, July 8, 2010

5

6    WITNESS                          EXAMINATION

7    TODD P. KAPLAN

8         By Mr. Minuti                        16

9

10

11            DEPOSITION EXHIBITS

12               TODD P. KAPLAN

13

14   NUMBER            DESCRIPTION           IDENTIFIED

15   Exhibit 1     E-mail from Todd Kaplan to        41

16                 Chris Cormier dated 4/6/07

17                 Bates ML-TRIB-0387938 through

18                 ML-TRIB-0387942

19

20   Exhibit 2     E-mail from Todd Kaplan to        43

21                 Carl Mayer dated 8/11/07

22                 Bates ML-TRIB-0395122

Kaplan, Todd              CONFIDENTIAL              July 8, 2010
                          Chicago, IL

```
                                                         Page 5
 1                   DEPOSITION EXHIBITS

 2                   TODD P. KAPLAN

 3

 4   NUMBER              DESCRIPTION              IDENTIFIED

 5   Exhibit 3      E-mail from John Harrison to       47

 6                  Chandler Bigelow dated 8/23/07

 7                  and the Tribune Company Due

 8                  Diligence Outline

 9                  Bates ML-TRIB-0582682 through

10                  ML-TRIB-0582688

11

12   Exhibit 4      E-mail from Todd Kaplan to         49

13                  Purna Saggurti dated 9/3/07

14                  Bates ML-TRIB-0396503

15

16   Exhibit 5      E-mail from Todd Kaplan to         49

17                  Michael Costa dated 9/10/07

18                  Bates ML-TRIB-036918

19

20   Exhibit 6      E-mail from David Lewicki to       51

21                  Todd Kaplan dated 9/20/07

22                  Bates ML-TRIB-0611791
```

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

                                                          Page 6

1                    DEPOSITION EXHIBITS

2                      TODD P. KAPLAN

3

4    NUMBER              DESCRIPTION              IDENTIFIED

5    Exhibit 7    E-mail from Todd Kaplan to           55

6                 Greg Margolies dated 10/5/07

7                 Bates ML-TRIB-0585558 through

8                 ML-TRIB-0585560

9

10   Exhibit 8    E-mail from Todd Kaplan to           59

11                Blair Faulstich dated 10/21/07

12                Bates ML-TRIB-0403966

13

14   Exhibit 9    E-mail from Todd Kaplan to           61

15                Michael Costa dated 11/7/07

16                Bates ML-TRIB-0613213 and

17                ML-trib-0612314

18

19   Exhibit 10   E-mail from Bill Pate to             66

20                Todd Kaplan dated 11/13/07

21                Bates ML-TRIB-0405102

22

Kaplan, Todd          CONFIDENTIAL          July 8, 2010
                        Chicago, IL

```
                                                   Page 7
 1              DEPOSITION EXHIBITS

 2                TODD P. KAPLAN

 3

 4    NUMBER           DESCRIPTION           IDENTIFIED

 5    Exhibit 11    E-mail from Todd Kaplan to        68

 6                  Stephanie Vallillo dated 9/12/07

 7                  Bates ML-TRIB-0396935 through

 8                  ML-TRIB-0396937

 9

10    Exhibit 12    E-mail from Todd Kaplan to        75

11                  Michael Costa dated 8/17/07

12                  Bates ML-TRIB-0395566 through

13                  ML-TRIB-0395567

14    Exhibit 13    E-mail from Harris Hwang to       86

15                  Todd Kaplan dated 8/21/07, et al.,

16                  Bates ML-TRIB-0582616 through

17                  ML-TRIB-0582635

18

19    Exhibit 14    E-mail from Todd Kaplan to        92

20                  Michael Costa dated 8/27/07

21                  Bates ML-TRIB-0396419

22
```

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

```
                                                          Page 8
 1                  DEPOSITION EXHIBITS

 2                    TODD P. KAPLAN

 3

 4   NUMBER              DESCRIPTION              IDENTIFIED

 5   Exhibit 15   E-mail from Todd Kaplan to          105

 6                Michael Costa dated 10/17/07

 7                Bates ML-TRIB-0403872 through

 8                ML-TRIB-0403874

 9

10   Exhibit 16   E-mail from Rajesh Kapadia to       113

11                Chandler Bigelow dated 11/8/07

12                Bates ML-TRIB-0404767 through

13                ML-TRIB-0404769

14

15   Exhibit 17   VCR Memorandum from                 113

16                Bryan Browning to

17                Chandler Bigelow dated 12/7/07

18                Bates TRB0274988 through

19                TRB0274998

20

21

22
```

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                 Chicago, IL

---

                                                              Page 9

1                      DEPOSITION EXHIBITS

2                       TODD P. KAPLAN

3

4    NUMBER                DESCRIPTION              IDENTIFIED

5    Exhibit 18      Letter form VCR to Tribune         119

6                    Company Board of Directors

7                    dated 5/9/07

8                    Bates TRB01499968 through

9                    TRB0149974

10

11   Exhibit 19      Letter from VRC to Tribune         119

12                   Company Board of Directors

13                   dated 12/20/07

14                   Bates TRB0294007 through

15                   TRB0294015

16

17   Exhibit 20      E-mail from David Tuvlin to        125

18                   John Harrison dated 12/7/07

19                   Bates ML-TRIB-0406176 through

20                   ML-TRIB-0445864

21

22

---

                 Henderson Legal Services, Inc.

Kaplan, Todd                 CONFIDENTIAL                 July 8, 2010
                             Chicago, IL

1                      DEPOSITION EXHIBITS

2                        TODD P. KAPLAN

3

4    NUMBER                DESCRIPTION                IDENTIFIED

5    Exhibit 21    E-mail from David Tuvlin to            129

6                  John Harrison dated 12/9/07

7                  Bates ML-TRIB-0486284 through

8                  ML-TRIB-0445916

9

10   Exhibit 22    E-mail from Harris Hwang to            131

11                 David Lewicki dated 12/11/07

12                 Bates ML-TRIB-0486498 through

13                 ML-TRIB-0486520

14

15   Exhibit 23    E-mail from Rajesh Kapadia to          135

16                 Chandler Bigelow dated 12/11/07

17                 Bates TRB0275922 through

18                 TRB0275924

19

20

21

22

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                Chicago, IL

Page 11

1                       DEPOSITION EXHIBITS

2                       TODD P. KAPLAN

3

4    NUMBER              DESCRIPTION                    IDENTIFIED

5    Exhibit 24      E-mail from John Harrison to           142

6                    Ben Braun dated 1/8/08

7                    Bates ML-TRIB-0487160 through

8                    ML-TRIB-0487179

9

10   Exhibit 25      E-mail from James Reynolds to          152

11                   Todd Kaplan dated 12/14/07

12                   Bates ML-TRIB-0486699 through

13                   ML-TRIB-0486724

14

15   Exhibit 26      E-mail from Rajesh Kapadia to          157

16                   Peter Cohen dated 12/18/07

17                   Bates JPM_00288883 through

18                   JPM_00288884

19

20

21

22

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                 Chicago, IL

                                                                    Page 12

1                        DEPOSITION EXHIBITS

2                        TODD P. KAPLAN

3

4        NUMBER                DESCRIPTION                    IDENTIFIED

5        Exhibit 27     E-mail from Todd Kaplan to               159

6                       Crane Kenney dated 12/18/07

7                       Bates JPM_00338076 through

8                       JPM_00338077

9

10       Exhibit 28     E-mail from Crane Kenney to              161

11                      Todd Kaplan dated 12/18/07

12                      Bates ML-TRIB-1114943 through

13                      ML-TRIB-1114944

14

15       Exhibit 29     E-mail from Crane Kenney to              161

16                      Todd Kaplan dated 12/19/07

17                      Bates ML-TRIB-1115006

18

19       Exhibit 30     E-mail from Todd Kaplan to               168

20                      Michael O'Grady dated 11/5/06

21                      Bates ML-TRIB-0598182 through

22                      ML-TRIB-0598183

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

```
                                                      Page 13
  1                    DEPOSITION EXHIBITS

  2                    TODD P. KAPLAN

  3

  4   NUMBER              DESCRIPTION          IDENTIFIED

  5   Exhibit 31     Tribune Company Special              173

  6                  Committee of the Board of

  7                  Directors Meeting

  8                  January 20, 2007

  9                  Bates TRIB-G0001624 through

 10                  TRIB-G0001626

 11

 12   Exhibit 32     E-mail from Todd Kaplan to          176

 13                  Michael Costa dated 1/26/07

 14                  Bates ML-TRIB-0381221

 15

 16   Exhibit 33     Tribune Company Special             177

 17                  Committee of the Board of

 18                  Directors Meeting

 19                  March 30, 2007

 20                  Bates TRIB-G0008791 through

 21                  TRIB-G0008793

 22
```

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

1    EXAMINER KLEE:  Mr. Kaplan, I'm Ken Klee,

2    the appointed Examiner in the Tribune cases.  And

3    I've been asked by the Court to investigate three

4    questions, only one of which concerns you here

5    today, and that is the propriety and circumstances

6    surrounding the 2007 leveraged ESOP transaction of

7    the Tribune, with which you're familiar.

8         We have placed you under oath not as any

9    indictment of veracity or suspicion, but simply

10   because we only have two weeks left to get the

11   report done, and we have to have instant

12   transcripts.

13        Certain circumstances have come up in

14   the case not involving you or your company that

15   require me to take sworn testimony.

16        What we're going to do is have the court

17   reporter take down your answers verbatim, and

18   then she'll provide you and your counsel with a

19   transcript, and you'll have an opportunity to

20   review that.

21        And we ask that you sign and return it

22   within 3 business days if you can because we need

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                    CONFIDENTIAL                 July 8, 2010
                                 Chicago, IL

Page 15

1    to rely on it in preparing our report.  You'll, of

2    course, have the opportunity to make any changes

3    you want.

4           As far as your counsel is concerned,

5    you're ably represented here today by two fine

6    lawyers from Kaye Scholer.

7           And it's not necessary for them to

8    interpose objections.  They may do so anyway out

9    of habit, but under the ground rules that we're

10   setting up, all of their objections are preserved

11   to form, to substance, with respect to privileges,

12   anything they could possibly want to preserve is

13   being preserved for them.  You can take a break

14   whenever you'd like.

15          Also, because this is not a deposition,

16   we are seeking the truth to help us with our

17   investigation.

18          And so to the extent that your lawyers

19   feel it necessary to supplement your answers or to

20   provide information if you don't know something,

21   we're welcoming them to participate, which they

22   might tend to do anyway, but we're welcoming it.

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 16

1   Unlike a deposition, we are welcoming it here

2   today.

3          Also unlike a normal examination, while

4   my colleague from Saul Ewing, Mark Minuti, will be

5   asking the majority of the questions, from time

6   to time I or some of my other colleagues may

7   interject with clarifying or followup questions.

8          So thank you for taking time out of your

9   schedule to be here today.  We appreciate it.

10          THE WITNESS:  Okay.

11                  (Whereupon the witness was

12                   sworn.)

13          TODD P. KAPLAN

14   called as a witness herein, having been first duly

15   sworn, was examined and testified as follows:

16                  EXAMINATION

17   BY MR. MINUTI:

18     Q.   Mr. Kaplan, I'm Mark Minuti.  I'm with the

19   law firm of Saul Ewing.  We represent and are

20   co-counsel to the Examiner in this case.

21          All the way on the end is Nick Nastasi,

22   he's with Saul Ewing as well.  Sitting to my left

Kaplan, Todd       CONFIDENTIAL       July 8, 2010
               Chicago, IL

1   is Greg Schwab with Saul Ewing.

2        I'm going to go a little bit out of order

3   here today because it's not clear that the

4   Examiner is going to be able to stay for the

5   entire interview.  So I want to go a little bit

6   out of order.

7        I want to start the interview really by

8   focusing on the period of time between the closing

9   of step one of the transaction and the closing of

10   step two of the transaction.

11        And just so I can get an idea of how much

12   detail I need to get into in terms of reminding

13   you, tell me what did you do to prepare for today?

14   A.   I had the opportunity to talk with Madlyn

15   and Jane.  Other than that no preparation.

16   Q.   Did you review any documents before the

17   interview?

18   A.   No.

19   Q.   Let's focus on that period of time.

20        MS. PARVER:  You mean apart from anything

21   we may have shown him during our --

22        MR. MINUTI:  Correct.

Kaplan, Todd             CONFIDENTIAL              July 8, 2010
                          Chicago, IL

Page 18

1          MS. PARVER:  While we were with him?

2          MR. MINUTI:  Correct.

3          MS. PARVER:  Okay.

4    BY MR. MINUTI:

5      Q.   Again, I want to focus on the period of

6    time between the closing of step one and the

7    closing of step two during the transaction and

8    give you the time frame we're talking about,

9    between April 1 of 2007 and December 20 of 2007.

10     A.   Okay.

11         MS. PARVER:  Excuse me -- okay.  That's

12   fine on the time frame, but that's not the closing

13   date.

14         EXAMINER KLEE:  To clarify for the record

15   and to make the other transcripts clear, we have

16   been using June 4, 2007 as the closing date of

17   step one.  April 1, 2007 is the Board approval

18   date of step one.

19         MS. PARVER:  Yes.

20         EXAMINER KLEE:  And so counsel can clarify

21   which period he'd like to focus on.

22         MS. PARVER:  Thank you.

Henderson Legal Services, Inc.

2eb7f1779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd               CONFIDENTIAL          July 8, 2010
                            Chicago, IL

Page 19

1          MR. MINUTI:  I'm sorry.  Thank you for

2    that clarification.

3    BY MR. MINUTI:

4       Q.   I really want to focus on the period of

5    time between April 1 of 2007 and December 20 of

6    2007.

7       A.   Okay.

8          MR. MINUTI:  Again, thanks for that

9    clarification.

10   BY MR. MINUTI:

11      Q.   Tell me generally what sort of work was

12   Merrill Lynch doing at that time relative to the

13   transaction?

14      A.   Could you ask more specifically?  That was

15   a long period of time.

16      Q.   Well, why don't we start in April and

17   take me through as the months go by.

18          What, if anything, is happening at Merrill

19   Lynch relative to the transaction?

20          MS. PRIMOFF:  Mark, it's a bit of an

21   unfair question.  I mean, Todd can speak to what

22   he was working on and what he was supervising,

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 20

1    but Merrill Lynch is a big place, and he may not

2    be aware.

3            MR. MINUTI:  I can only ask him what he's

4    aware of.

5            MS. PRIMOFF:  Okay.

6        A.    Okay.  To start with something in that

7    time frame, we moved quickly to a marketing phase

8    for the financing for step one.  And that started

9    I think almost immediately after that April 1st --

10   if that was the announcement date, if you will,

11   I think it started immediately in order to arrange

12   for the syndication of some of the financing to

13   close the first step, which I think came pretty

14   quickly.

15   BY MR. MINUTI:

16       Q.    And what role specifically did you have in

17   the marketing?

18       A.    At that time I was, as I am today,

19   a Senior Banker in the Chicago office

20   and for Merrill Lynch, what is now Bank of America

21   Merrill Lynch.

22            What did I specifically have?  I think

Kaplan, Todd                 CONFIDENTIAL                 July 8, 2010
                              Chicago, IL

                                                          Page 21

1    that there was a great deal of work that went

2    into preparing marketing materials that I was

3    part of a large group reviewing during that time

4    frame.

5        Q.   Okay.  Are you leading this exercise or

6    are you part of the team?

7        A.   No.  There's a group that we called

8    then and probably is called today the Capital

9    Markets and Syndication Effort that has the

10   primary responsibility to pull that sort of thing

11   together.

12           So I'm part of the team helping to review

13   the materials.

14       Q.   And would you have had knowledge of the

15   success that the team was having in marketing the

16   debt?

17       A.   Generally, yes, I would be aware of what

18   we were doing.

19       Q.   Was the team having success or were they

20   having trouble marketing the debt?

21       A.   Which piece?

22       Q.   In that step one.

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                 CONFIDENTIAL              July 8, 2010
                              Chicago, IL

Page 22

1        A.    Which piece of the financing?

2        Q.    Any piece.

3            EXAMINER KLEE:  Let's take them one at a

4    time.  Let's talk about Term Loan B.

5            THE WITNESS:  That was lead by

6    J.P. Morgan, so I would have less insight into

7    what was going on.

8            EXAMINER KLEE:  Do you know was

9    J.P. Morgan able to syndicate Term Loan B fully?

10            THE WITNESS:  My memory is that they

11    syndicated if not all substantially all that we

12    were attempting to do, but that we ended up

13    altering the terms of what we offered in order

14    to do that.

15            EXAMINER KLEE:  Merrill Lynch was in

16    charge of syndicating the notes?

17            THE WITNESS:  The bridge loan.

18            EXAMINER KLEE:  Right.

19            THE WITNESS:  Yes.  And the bridge loan

20    would ultimately turn into notes, yes.

21            EXAMINER KLEE:  Tell us about the

22    syndication efforts in the April to June 4, 2007

Kaplan, Todd              CONFIDENTIAL              July 8, 2010
                          Chicago, IL

Page 23

1   time frame with your respect to syndicating the

2   bridge loan.

3          THE WITNESS:  My memory is that we

4   actually ended up faring relatively well on the

5   syndication of that piece, and that that went

6   well in comparison to the Term Loan B offering,

7   which seemed to be more difficult.

8          EXAMINER KLEE:  And was there a Term Loan

9   X at step one?

10         THE WITNESS:  My memory, which may be

11  imprecise, was that we did not start with a Term

12  Loan X, but as J.P. struggled as the chosen bank

13  to lead our effort to fully syndicate that first

14  step that the terms were modified.  And one of

15  the major modifications were to insert the Term

16  Loan X.

17         EXAMINER KLEE:  How did the syndication of

18  the Term Loan X go, if you recall?

19         THE WITNESS:  That part went very well

20  because that was an attractive piece -- that was

21  added to help I believe the whole of the Term

22  Loan B over the line.

Kaplan, Todd                CONFIDENTIAL               July 8, 2010
                            Chicago, IL

Page 24

1          EXAMINER KLEE:  And was part of the

2     attraction to that case the short maturity?

3          THE WITNESS:  Yes.

4          EXAMINER KLEE:  Were there other elements

5     of the financing in step one that were required to

6     be syndicated, such as the revolver?

7          THE WITNESS:  I don't recall.

8     BY MR. MINUTI:

9     Q.    With respect to the difficulty that was

10    being experienced by J.P. Morgan with regard to

11    syndicating the term B piece, did you have a view

12    at the time as to whether that was a result of the

13    market in general or something specifically about

14    the transaction?

15         MS. PARVER:  Is there a particular time

16    frame that we're talking about now, Mark?

17         MR. MINUTI:  Yes.  This would be May of

18    '07.

19    A.    I believe because -- and one particular

20    date is not going to stand out in my memory --

21    that it was a combination of the two.  That was

22    the early part of what ended up being a long

Kaplan, Todd                 CONFIDENTIAL                July 8, 2010
                             Chicago, IL

Page 25

1   market slide in terms of market deterioration,

2   and that investor receptivity was not what we

3   had hoped for for the basic proposition of the

4   transaction.

5   BY MR. MINUTI:

6       Q.    And tell me what is happening with the

7   Company's performance -- and you can pick a time

8   frame, you can start in May of '07 carrying

9   through until we get to December?

10      A.    I don't recall a particular month without

11  the data in front of me, which I'm sure you have

12  as well as I do.

13            My recollection is that there was a ~~is~~

14  ~~that there was a~~ general deterioration from the

15  business performance from that April 1st date

16  onward.

17      Q.    And what about the economy in general

18  during that period of time?

19      A.    I don't recall.  I don't recall exactly

20  what the economic conditions were right at that

21  point in time.

22      Q.    Well, in your line of business -- I mean,

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd          CONFIDENTIAL          July 8, 2010
                      Chicago, IL

Page 26

1    this is something you deal with every day -- is
2    it your recollection things were getting better,
3    getting worse, staying flat?
4         MS. PRIMOFF:  I don't understand the
5    question.  I mean, to say the "economy"?  Is there
6    something we could say that's not quite so broad
7    as the "economy"?
8         A.   I echo Madlyn's comments.  Perhaps
9    something more specific?
10   BY MR. MINUTI:
11        Q.   Well, let me ask this question.  What is
12   happening to the trading price of Tribune's debt
13   and stock during that period of time?
14        A.   I would, again, say without being able
15   to remember any discrete point in time that
16   generally from the April 1st point onward there
17   was deterioration in those prices.
18        Q.   What about the market in terms of what
19   you -- the line of business you were in, the
20   market to finance LBO transactions during that
21   period of time?
22             Did that market stay the same, get better,

Kaplan, Todd                CONFIDENTIAL              July 8, 2010
                            Chicago, IL

Page 27

1    get worse?

2        A.    To iterate what I said earlier, my

3    memory is that the spring of '07 was the beginning

4    of some deterioration in that marketplace.

5        Q.    Now, during this time period, really

6    beginning in the summer of '07 up until the step

7    two transaction in December of '07, is Merrill

8    Lynch internally doing valuation analyses of the

9    Tribune Company?

10       A.    We are continuing to do due diligence on

11   the company.

12       Q.    Tell me what you mean by "due diligence."

13       A.    We are continuing to have inputs of their

14   results, and we are continuing to, as part of our

15   role as a major lender, to monitor that.

16       Q.    Okay.  When you say your continuing I

17   think you said input of the results, what do you

18   mean by that?

19       A.    As each month goes by, we get the monthly

20   results from the Company and review those with the

21   Company.

22       Q.    Okay.  Beyond simply reviewing those

Kaplan, Todd               CONFIDENTIAL               July 8, 2010
                            Chicago, IL

Page 28

1   numbers with the Company, is Merrill Lynch doing

2   anything else with that information?

3       A.   At what point in time are we asking about?

4       Q.   Let's start in the summer.  Let's say

5   August of 2007.

6       A.   Without recalling if it was August or

7   something close to that, at a certain point we

8   start to focus on the closing of the second step.

9   And we are aware that one of the conditions to

10  close is the receipt of and opinion from a firm

11  called VRC that the company is solvent.

12          So within that generalized time frame,

13  we begin to do some analysis to ascertain whether

14  or not VRC is going to be able to deliver that

15  opinion.

16      Q.   Okay.  And what analysis are you doing?

17  And I'm talking generally.

18          Are you doing your own evaluations to

19  compare against VRC?

20      A.   No.  We're attempting, because we're not

21  solvency experts, to ascertain how the elements of

22  a solvency opinion are developed and to replicate.

understand

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd          CONFIDENTIAL          July 8, 2010
Chicago, IL

Page 29

[Rider 29A] ✓

1    that analysis as best we can.

2        Q.    And tell me specifically what is your role

3    in that process during that time?

*loosely organized*

4        A.    I'm a Senior Banker, one member of a large

5    team reviewing the analysis as it comes through.

6        Q.    And do you remember who else -- who were

7    the other members of that team at Merrill Lynch at

8    that time?

9        A.    I don't recall.  It was a big team.

10       Q.    Okay.  Are there any specific people that

11   had, you know, the responsibility for coming up

12   with a model, for example?

[Rider 29B] ✓

13       A.    I don't recall.

14       Q.    And as you were attempting to understand

15   the VRC report and you're doing your own analysis,

16   during this period of time did you have any

17   reservations about the quality of the work that

18   the Merrill Lynch team was doing to understand the

19   VRC report?

[Rider 29C] ✓

20       A.    I'm not sure I understand the question.

21       Q.    I'll rephrase the question.

22       A.    Okay.

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                Chicago, IL

Page 30

1     Q.    As I understand what you've said to me is
2  your team is analyzing the RC's analysis.            • VRC's
3     A.    Uh-huh.
4     Q.    And they're coming up with their own
5  analysis; is that correct?
6     A.    As best I know        VRC was doing its own analysis.
                                   We were trying to understand their
                                   analysis.
7     Q.    Okay.  And, as I understand it, as part
                                                    • VRC
8  of that team you're looking at the analysis that
9  the Merrill Lynch team is coming up with, correct?
10    A.    (Nodding head.)
11    Q.    You have to say yes.
12    A.    Yes.
13    Q.    And my question is at that time did you
14 have any reservations about the quality of the
15 work that the Merrill Lynch team was performing?
16    A.    No, I don't recall having any reservations
17 about that.  [Rider 30]
18    Q.    You felt confident in the work product?
19    A.    I felt confident that the team was working
20 hard to try to generate a similar construct to
21 what we thought the VRC might be doing on their
22 end    and then test or stress test VRC's assumptions
               about the inputs.

Henderson Legal Services, Inc.

Kaplan, Todd              CONFIDENTIAL              July 8, 2010
                          Chicago, IL

Page 31

1    Q.    Okay.  Do you think that the team achieved

2    that?

3    A.    I think everyone worked hard and did the

4    best they could.  I don't recall having any

5    particular reservations or qualms about it.

6    Q.    That was my question.

7          Now, the exercise that you're describing,

8    is that a typical exercise that's done when you're

9    involved in a loan of this type or was this

10   something unique?

11   A.    I would say that the majority of

12   transactions don't have this sort of closing

13   condition in them.  So I would certainly not

14   say it was a regular process to do this sort of

15   analysis.

16   Q.    Have you been involved prior to this in

17   other transactions where there was this solvency

18   certificate required?

19   A.    When you use the phrase "solvency

20   certificate," are you referring to the opinion

21   delivered by the VRC?

22   Q.    Let me rephrase it.

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                 CONFIDENTIAL                 July 8, 2010
                              Chicago, IL

Page 32

1        EXAMINER KLEE:  Let me just interrupt and

2   state for the record that in other transcripts we

3   have been using "solvency certificate" to mean the

4   officer certificate issued by a senior officer of

5   a company attesting to solvency, which was a

6   condition of the credit agreement, and the

7   "solvency opinion" to refer to VRC's solvency

8   opinion which was issued in the condition to the

9   merger agreement.  So I think it's very important

10  to use the terminology precisely.

11       While I have the floor and have

12  interrupted, I want to withdraw his question and

13  ask you during August to December of 2007, did you

14  or others at Merrill Lynch that you're aware of

15  have access to analysis of the VRC opinion

16  prepared by parties other than Merrill Lynch?

17       THE WITNESS:  Analysis?  To make sure I'm

18  understanding your question, others -- analysis by

19  others of what we thought -- what they thought

20  VRC's work would be?

21       EXAMINER KLEE:  Yes.

22       THE WITNESS:  I'm not sure.  Not that I

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                Chicago, IL

[Rider 33]

Page 33

1    recall.

2              EXAMINER KLEE:  Did you receive a Citibank

3    model of what VRC was doing?

4              THE WITNESS:  To make sure I'm

5    understanding your question, when you say

6    "Citibank model," during a long period of working

7    with Tribune where we were partners with Citibank,

8    there was a lengthy period where Citibank would

9    process a lot of inputs by others and output

10   analytics.

                                                    distinguish

11             And I state that so as to distinctly --

     the term "

12   Citibank model gives imprimatur, if you recall,

13   of their judgments and valuations as opposed to

14   just processing analytics for others.

15             Do you mean Citibank's own view on it or

                                                    or for

16   just analytics that were produced by Citibank or

17   other purposes?

18             EXAMINER KLEE:  Any analytics that were

19   produced by Citibank that were not Merrill Lynch

20   generated.

21             I'm trying to find out if during this

22   period you saw other analyses.

Kaplan, Todd                 CONFIDENTIAL                 July 8, 2010
                             Chicago, IL

Page 34

1          MS. PARVER:  Wait, concerning VRC you're

2    saying?

3          It's got to be concerning --        [Rider 34]

4          THE WITNESS:  I don't recall.

5          EXAMINER KLEE:  Go ahead, Mark.

6    BY MR. MINUTI:

7      Q.   With respect to valuation analysis that

8    VRC has done, were you familiar at that time with

9    a typical valuation or the valuation methodologies

10   that VRC used?

11         Let me rephrase that so it's clear.  Were

12   you aware at that time and had you had familiarity

13   with the type of methodologies that VRC used?

14         And I'm specifically talking about the

15   comparable company's approach, some of the parts

16   approach or the discounted cash flow approach.

17     A.   I would say that beginning, again, if I

18   could use in August as generalized around that

19   time frame, we at Merrill Lynch realized that we

20   had essentially no in-house solvency expertise at

21   all.

22         So we then began to build up as best we

Kaplan, Todd                 CONFIDENTIAL                 July 8, 2010
                              Chicago, IL

Page 35

1   could some understanding about how solvency

2   experts generally, of which VRC was one, developed

3   the analytics, if you will, behind their opinions.

4   Was there an industry practice or standard as to

5   how this was done.

6            *an SEC filed*          As a subset of that, we did, because it

7   was *a file* document, go back and review the VRC

8   opinion from the first step.

9            But I would say more broadly we were

10  seeking how the industry of solvency experts as

11  a community did that sort of analysis and made the

12  assumption that as a part of that community, VRC

13  did the same thing as opposed to just trying to

14  figure out how VRC did their work because we

15  didn't have any manner in which to figure out how

16  *as* VRC *was* one firm did this as a practice with other

17  clients. *[Rider 35]*

18       Q.   I guess what I'm trying to understand is

19  you personally, did you have familiarity at this

20  time with these methodologies?

21            In other words, did you have a general

22  understanding of what a discounted cash flow

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                  CONFIDENTIAL                July 8, 2010
                              Chicago, IL

                                                              Page 36

1    valuation was or analysis?

2         A.   As a banker, certainly we would understand

3    what a discounted cash flow analysis was, yes.

4         Q.   Okay.  Same answer as to, for example, a

5    sum of the parts valuation analysis?

6         A.   Depending on what is meant by "sum of the

7    parts."

8              I guess I would ask you what -- for

9    certain phrases like that people can mean

10   different things when they say that so.

11        Q.   What I'm trying to get at is I appreciate

12   that what you've told me regarding solvency

13   expertise, but now really I'm just talking more

14   generally about valuation.  And I'm trying to get

15   an idea of whether you personally have some

16   familiarity with these concepts and generally how

17   these valuation methodologies work.  That's all

18   I'm trying to get at.

19        A.   Understood.  I have familiarity with the

20   concepts.

21             My expertise as a broad matter ~~rise~~ *arises* in

22   *and* financing related topics.  So as part of our team

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                  Chicago, IL

Page 37

1    constructs, while I'm aware of these sorts of

2    analysis, I don't tend to be the ultimate expert(s)

3    if you were to bucket ^those kinds of valuation issues as

4    a group in that area.

5        Q.    Now, were there "experts" at Merrill Lynch

6    on valuation that were a part of your team?

7        A.    I would say that our Mergers &

8    Acquisitions Group generally would be the

9    place where we would have the most valuation

10   expertise. ↓ But as I said, we did not have in-house solvency
                  expertise.

11       Not to pick on words too much, I didn't

12   view it as "my team" so much as a ~~team~~ we were a   ← loosely organized team
                                                                or
13   part of.  As a general matter, it would be the            ad hoc
                                                                group
14   M&A group that we would look to for expertise.

15       Q.    And were there members of the M&A team

16   involved in this analysis that you were doing

17   relative to the VRC opinion?

18       A.    I don't recall who populated the team at

19   this particular point in time. ( And I would say as

20   a -- I'm sorry.  Go ahead.   ← It was an ad hoc group
                                     organized for this process.

21       Q.    Now, sort of just generally as we move

22   from the summer, okay, of 2007 to December of

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                 CONFIDENTIAL                 July 8, 2010
                             Chicago, IL

Page 38

1    2007, and we're looking at these different

2    valuation methodologies, based on what was

3    happening with the company and what was happening

4    in the economy in general, as we move through that

5    period of time, would you expect, for example,

6    the EBITDA multiples used in the company

7    valuations to go up or down?

8           MS. PRIMOFF:  Do you understand the

9    question?

10          THE WITNESS:  I'm not sure I do.

11   BY MR. MINUTI:

12       Q.   Do you understand in doing a comparable

13   company's valuation analysis, you use EBITDA

14   multiples?

15       A.   I do understand that that is a way of

16   doing it.

17       Q.   Okay.  And my question really goes to as

18   we move from the summer to December of 2007,

19   would you expect in doing these valuations that

20   the EBITDA multiples would be going up or going

21   down given what was going on with the company or

22   what was happening in the economy in general?

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 39

1        A.    I would expect that they would be going

2   up. ← down

3        Q.    Okay.  And what about the discount rate

4   you would use for discounted cash flow analysis

5   during that period of time?  Would you expect the

6   discount rate to go up, down, or remain flat?

7        A.    That would be I would need more

8   information to answer that.  I don't recall what

9   was happening with base long term rates at that

10  point.  And that's as a function of other things

11  that as a whole discount rate I'm not sure what

12  the answer to that would be.

13       Q.    Okay.  Apart from Tribune had you ever

14  been involved in a transaction which required a

15  solvency opinion where the solvency opinion was

16  delivered, but a lender did not lend because they

17  disagreed with it?

18       A.    Could you say that one more time?

19            MS. PARVER:  And you didn't mean to

20  preface it by saying "apart from Tribune?"

21            EXAMINER KLEE:  Let's take it in phases.

22  Apart from Tribune you've been involved in other

Kaplan, Todd                CONFIDENTIAL               July 8, 2010
                            Chicago, IL

Page 40

1   financial transactions on or before December 20,

2   2007 in which a solvency opinion was issued?

3            THE WITNESS:  Delivered to us at Merrill

4   Lynch?

5            EXAMINER KLEE:  Delivered to the company.

6            MS. PARVER:  As a condition of closing?

7            EXAMINER KLEE:  As a condition of closing.

8            THE WITNESS:  While I'm sure there must be

9   an example, I can't recall one.

10           EXAMINER KLEE:  Go ahead, Mark.

11           MR. MINUTI:  Okay.

12  BY MR. MINUTI:

13     Q.   Let's take the time frame of let's say

14  November of '07 to December of '07.

15           Did you have any reservations at that time

16  about closing step two?

17     A.   I don't recall.  My particular feelings

18  were I do know that we were working hard to

19  ascertain whether or not the transaction ~~had gone~~ I was going

20  to close, but beyond that I don't recall what my

21  particular feelings were at that time.

22     Q.   Were you having discussions at that

Henderson Legal Services, Inc.

Kaplan, Todd                CONFIDENTIAL              July 8, 2010
                            Chicago, IL

Page 41

1    time -- well, you must have been having

2    discussions at that time with the other lenders?

3         A.   Yes.

4         Q.   Did any of the other lenders express to

5    you that they had reservations about closing step

6    two?

7         A.   I don't recall. [Rider 41]

8         Q.   I'm now going to show you a document that

9    we're going to mark as Kaplan Exhibit No. 1?

10                   (Kaplan Exhibit 1 marked for

11                    identification.)

12   BY MR. MINUTI:

13        Q.   What I would ask you to do is read through

14   that and tell me when you're done.

15        A.   Okay.

16        Q.   The question I have I just want to focus

17   your attention on the first page of this document

18   about the middle of the page.

19             This looks to me to be an April 6 e-mail

20   from Chris -- is it Cormier?

21        A.   It's Cormier.

22        Q.   And who is Chris Cormier?

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                           Chicago, IL

Page 42

1        A.    He's a Managing Director in our Media

2    Group.

3        Q.    Okay.  I want to go down.  I want to ask a

4    question about the first -- it's the sentence that

5    begins with a star.  It says "A decent amount of

6    investment grade debt that can serve as the

7    'equity' here."  And then it goes on.

8              What was your understanding of what he was

9    referring to in that sentence?

10             Is that the PHONES debt that he's talking

11   about?

12       A.    I don't recall what I thought at the time.

13   If in reading this I would guess because he used

14   the phrase "investment grade debt" that he meant

15   the outstanding debt of the company in its

16   totality.

17       Q.    When this transaction, when the

18   LBO transaction was put together, did you view the

19   PHONES debt as an equity cushion?

20       A.    I viewed the PHONES debt as subordinated

21   capital.

22       Q.    Is there a difference in your eyes?

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 43

1        A.    Yes.    The PHONES debt. *are*

2             MS. PRIMOFF:    So he said "The PHONES *are*

3        debt."

4             MR. MINUTI:    I'm going to show you another

5        document we'll mark as Kaplan Exhibit 2.

6                       (Kaplan Exhibit 2 marked for

7                        identification.)

8             EXAMINER KLEE:    Did you view the other

9        debt of the Tribune Company as structurally

10       subordinated debt under the terms of this

11       transaction?

12            THE WITNESS:    Yes.

13            MS. PARVER:    You said preexisting debt?

14            EXAMINER KLEE:    Yes.

15            THE WITNESS:    Yes.

16            EXAMINER KLEE:    That was his testimony.

17       The question was just about the phones.    So I

18       was just trying to establish for the record that

19       he also viewed the other preexisting debt as

20       subordinated debt because it's structurally

21       subordinated because of the upstream guaranties

22       or the stock pledge.

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                        Chicago, IL

Page 44

1        MS. PARVER:  Or ~~many~~ *the* lack of restrictive

2   covenants.

3        THE WITNESS:  That's correct.

4   BY MR. MINUTI:

5        Q.   Again, I've now handed you a document

6   we've marked as Kaplan Exhibit 2.  I would ask

7   that you read the document and tell me when you've

8   had an opportunity to review it.

9        A.   Okay.

10       Q.   This appears to be an e-mail from you to

11  Carl Mayer.  Who was Mr. Mayer?

12       A.   He was the head of our Capital Markets and

13  Syndication Efforts ~~and Market Financing~~ at

14  Merrill Lynch.

15       Q.   And tell me how did this e-mail come

16  about?  Why did you send it?

17       A.   I don't recall specifically why I sent it

18  at the time.

19            In reading it though I would say that this

20  was probably part of a communication we were

21  having as we worked on restructuring the financing

22  for the second step.

Henderson Legal Services, Inc.

202-220-4158                www.hendersonlegalservices.com

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 45

1    Q.    And why were you working on restructuring

2    the financing for the second step?

3    A.    We, we being the banks, had contractual

4    terms that allowed for a flexing, i.e., an

5    alteration option on our part, that would shift

6    financing amounts from the bank loan into the bond

7    piece, i.e., increase the size of the bond piece,

8    decrease the size of the remaining Term Loan B.

9         The Company made it quite clear to us that

10   they really did not want us to exercise that

11   option.

12        In response to that we as a group of banks

13   endeavored to put forth an alternative proposal

14   that we and the Company could agree to instead of

15   using our flex option.

16   Q.    Okay.  And why did the banks want to

17   restructure the debt at all?

18   A.    We didn't start with wanting to

19   restructure the debt.  We were responding to a

20   company request not to exercise the contractual

21   option we already had.

22   Q.    Okay.  Thanks for that clarification.

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                Chicago, IL

Page 46

1          Now I want to draw your attention to the

2    sentence that says "Idea is not to increase."  Do

3    you see that?

4          A.    Uh-huh.

5          Q.    It says "Idea is not to increase

6    interest," then it goes on, "but to allow

7    increased principal amount to improve noteholders

8    claim in a reorg type analysis."

9          What did you mean by "reorg type

10   analysis?"

11         Are you talking about a bankruptcy

12   reorganization?

13         A.    Without remembering exactly what I was

14   writing at the time, I must have been referring to

15   some sort of downside event like a bankruptcy

16   reorganization.

17         Q.    Was that a concern that you had for

18   Tribune at the time you wrote this e-mail?

19         A.    I don't recall, but I would offer that

20   all of our structural analysis when we are working

21   with loans and bonds is all designed around what

22   the investor rights are in the downside scenario

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 47

1    of reorganization or some other type of proceeding

2    like that.

3        Q.   I'm now going to show you a document we're

4    going to mark as Exhibit No. 3.  This is tab 50.

5                   (Kaplan Exhibit 3 marked for

6                    identification.)

7    BY MR. MINUTI:

8        Q.   I would ask that you review this.  I'm not

9    going to ask you specific questions about the

10   documents, but take as much time as you want to

11   look at it.

12       A.   Okay.  Okay.

13       Q.   What was the purpose of providing this due

14   diligence list to the company?

15       A.   I don't recall this particular message,

16   but I in looking at it would think that this was a

17   due diligence outline that we presented to the

18   Company as the Company was reprojecting future

19   results in this time period.

20       Q.   Okay.  An outline like this, is this a

21   fairly typical procedure that you would go

22   through?

Kaplan, Todd                CONFIDENTIAL            July 8, 2010
                            Chicago, IL

Page 48

1      A.    This would be a fairly typical procedure.

2      Q.    Okay.  And is it your recollection that

3  the Company did respond to this outline?

4      A.    I believe they did, yes.

5      Q.    And then once you get the information from

6  the Company, what does Merrill Lynch do with that

7  information?

8      A.    I don't recall what we did in this

9  specific case, but looking at the date of this

10 message and understanding the transaction dates

11 generally, I'm sure that a big part of this was

12 our initial preparation to put together marketing

13 materials for the second step.

14     Q.    Okay.  Who is Purna Saggurti?

15     A.    Purna Saggurti is a Senior Merrill Lynch

16 Investment Banker.  Today he is the Head of our

17 Investor Banker Group at Bank of America Merrill

18 Lynch.

19         MS. PARVER:  Is the name here, Mark?

20         MR. MINUTI:  No, it's not.  I'm moving

21 along.

22         MS. PARVER:  You're too fast for me.

Page 49

1    Okay.

2                      (Kaplan Exhibit 4 marked for

3                       identification.)

4              MR. MINUTI:  This is tab 51, Ken.

5

6    BY MR. MINUTI:

7        Q.    The question is why is it that you wanted

8    to speak with Mr. Saggurti if you recall?

9        A.    I don't recall precisely, but in reading

10   this message and in looking at the time line, I

11   believe at this point Purna has been named the

12   Head of the America's Investment Banking Group.  I

13   don't recall precisely when that was.  It was

14   sometime in 2007.

15             I would infer from this message that as

16   the leader of the overall Investment Banking

17   effort, we were reaching out to give up an update

18   on something related to Tribune.

19       Q.    But you don't remember the specifics?

20       A.    (Shaking head.)

21                      (Kaplan Exhibit 5 marked for

22                       identification.)

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

                                                          Page 50

1    BY MR. MINUTI:

2        Q.    I'm now going to show you a document we've

3    marked as Exhibit 5.   It's going to be tab 52.

4            MS. PRIMOFF:   Todd, we've been going on

5    hour, so just let us know when you want a break.

6            THE WITNESS:   Okay.

7    BY MR. MINUTI:

8        Q.    If you could review that and tell me when

9    you're done.

10       A.    Okay.   Okay.

11       Q.    Do you have a recollection as to the

12   substance of your conversation -- well, let me

13   back up.

14           Who's the "Sam" that you're referring to

15   in this e-mail?   Do you recall?

16       A.    Well, I don't recall the specific message.

17   It most certainly is Mr. Zell and Bill P. would be

18   Bill Pate.

19       Q.    And do you recall the substance of the

20   conversation you had with them?

21       A.    No.

22       Q.    I'm now going to show what you we're going

Kaplan, Todd                    CONFIDENTIAL                July 8, 2010
                                Chicago, IL

Page 51

1   to mark as Kaplan Exhibit No. 6.  It's tab 53.

2                       (Kaplan Exhibit 6 marked for

3                       identification.)

4   BY MR. MINUTI:

5       Q.    Let me know when you've had an opportunity

6   to review it.

7       A.    Okay.

8       Q.    This e-mail, and we don't have the model

9   that was attached, but this e-mail suggests to me

10  that the Company is responding to some questions

11  or giving some information that the lenders have

12  requested.  Is that your recollection?

13      A.    That's what this message seems to say.  I

14  don't recall this particular message, but that

15  seems to clearly be what Chandler's e-mail is

16  saying.

17      Q.    Okay.  Do you recall that the lenders

18  asked the Company to run a model with the downside

19  and the sensitivity reference to this e-mail?

20      A.    I would say asking for downside scenarios

21  is a part of discussing potential or projected

22  results is pretty standard.

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 52

1       So while I don't remember any one

2   particular specific request here, that seems

3   pretty consistent with what we would do in a lot

4   of cases.

5       Q.   Okay.  And give me a sense for -- I mean,

6   this e-mail is in September of '07.  How often are

7   you speaking with the other lenders regarding

8   Tribune during this time frame?

9       A.   I don't recall.

10      Q.   There's a reference here to Craig Huber of

11  Lehman Brothers.

12      A.   Yes.

13      Q.   Do you have a recollection as to what his

14  research report showed?

15      A.   I don't remember precisely what it showed,

16  but I do have a clear recollection Craig Huber was

17  an Equity Research Analyst at Lehman Brothers who

18  covered the publishing companies.

19       And his report in August -- I guess it

20  says here it was August of '07 was particularly

21  negative and dire relative to those of other

22  analysts.

Kaplan, Todd                CONFIDENTIAL                 July 8, 2010
                            Chicago, IL

Page 53

1        Q.    You told me this is a fairly routine that

2    lenders could do, ask companies to run these sorts

3    of models.

4              As a lender, what do you do with the

5    information once you receive it?

6        A.    As to this particular case or just in any

7    case?

8        Q.    Well, do you remember specifically as to

9    this case?

10       A.    No, I don't.

11       Q.    What would you do in general?

12       A.    If we were to say between any time frame

13   where we have already commit today [committed to] certain

14   financing but it has not yet closed, much of what

15   we would do was work that was preparation for

16   syndication of loans and notes and other types of

17   financing packages.

18       Q.    And based on the timing of this e-mail,

19   would that be your recollection as to what was

20   going on in the case of Tribune, this information

21   was requested for the syndication?

22       A.    I don't recall, but I would say that

Kaplan, Todd              CONFIDENTIAL              July 8, 2010
                          Chicago, IL

Page 54

1    would be a fair conclusion given the timing of

2    this e-mail and its content.

3         Q.   Okay.  And do you recall in terms of the

4    downside of the sensitivity case that the Company

5    ran, did the lenders provide the Company with the

6    metrics or is that something the Company came up

7    with on their own?

8         A.   What would the metrics be?

9         Q.   In other words, you know, if the request

10   was, you know, 2 percent decline in revenue, who

11   would come up with what the downside would be is

12   the question.

13        A.   I think this message seems to clearly say

14   that the Company produced the parameters of this

15   particular set of scenarios.

16        Q.   Okay.  And is that fairly typical in your

17   experience?

18        A.   I think as a general thought because

19   companies are the experts in their business we

20   rely on their insight and expertise to produce

21   scenarios as to potential performance.

22        Q.   Okay.  Did you think their downside case

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 55

1    was reasonable?

2         A.    I don't recall what my view was on any one

3    of these particular cases.

4         Q.    Did you have discussions with the other

5    lenders about that?

6              MS. PARVER:   About what?

7              MR. MINUTI:   About whether the Company's

8    downside case was reasonable.

9         A.    I'm sure there were a number of

10   discussions amongst lenders given the volume of

11   work we were doing at that time, but I don't

12   recall a specific discussion on these particular

13   identified scenarios in Chandler's e-mail.

14             MR. MINUTI:   I'm now going to mark a

15   document as Kaplan Exhibit No. 7 tab 56.

16                  (Kaplan Exhibit 7 marked for

17                   identification.)

18   BY MR. MINUTI:

19        Q.    This looks to me to be an e-mail chain

20   that starts in the back with an e-mail from I

21   guess Mr. Kapadia?

22        A.    Kapadia.

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 56

1        Q.    It begins "We think that it would be

2    helpful for the 4 underwriters to get together and

3    discuss structural ideas/alternatives on Step 2

4    financing."  And this looks to be in the

5    October time frame.

6            My question is why were the lenders at

7    that time talking about restructuring or changes

8    to the financing?

9        A.    I think if you read through the whole

10   thing, you would see that the genesis of this is

11   the option we had as lenders to essentially change

12   the mix of the second step and move a meaningful

13   amount of that financing into what for the company

14   was more expensive notes.

15           So as part of a negotiation with the

16   company to do something other than what was

17   contractually outlined in the initial terms, we

18   as a group sat down and game planned our way

19   through various alternatives to that approach as

20   part of the process of then engaging with the

21   company.

22       Q.    And I guess the point of this was to make

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 57

1    it more attractive to the lenders?

2        A.    Yes.

3        Q.    Okay.  And was that a --

4        A.    What is this?

5        Q.    Make the financing.

6        A.    No.  I think it was actually most

7    attractive for us to just exercise our flex option

8    as stated in the contract.  And as a negotiated

9    settlement with the Company, we agreed to do

10   something different.

11       Q.    And why is it you agreed to do something

12   different if you had the leverage and the ability

13   to do the flex?

14       A.    I think we often in working with companies

15   on complex transactions will deviate from the

16   contractual terms to the extent that both we and

17   the Company find it agreeable.

18            MR. MINUTI:  Let's mark 8, 57.

19            EXAMINER KLEE:  Before you move from this

20   one, Mr. Kaplan, at the bottom of the first page

21   of Kaplan 7.  Is this 7?  Yes.  There's an e-mail

22   from you to Carl Mayer, among other people.

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 58

1          THE WITNESS:  Yes.

2          EXAMINER KLEE:  And then if you turn over

3     to the next page that has the Bates stamp

4     ML000585559, it says toward the bottom of that

5     e-mail right before you sign off "Are there any

6     changes or alterations that would allow an

7     investor who accepted syndication of the bridge to

8     void the agreement."

9          THE WITNESS:  Uh-huh.

10         EXAMINER KLEE:  What did you mean by that?

11         THE WITNESS:  Not remembering precisely

12    what I wrote here, in reading this I think what

13    I'm referring to here is that when we syndicated

14    part of our upfront bridge loan, it is that

15    syndication itself is subject to its own set of

16    terms and conditions.  So that as we think through

17    a restructuring of the second step financing in a

18    way that deviates from what the original contract

19    called for, I'm reminding the team that one of the

20    constituents we need to be mindful of, basically

21    their contractual terms, are those people to whom

22    we syndicated the bridge loans up front.

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                Chicago, IL

Page 59

1          EXAMINER KLEE:  And that would be part of

2     an inter-creditor agreement that you have with

3     them when you do the ~~breach~~ syndication?          *Bridge*

4          THE WITNESS:  Yes.

5          EXAMINER KLEE:  Thank you.

6          THE WITNESS:  Would it be possible to take

7     a break at this point?

8          EXAMINER KLEE:  Any time you want.

9     Absolutely.  Off the record.

10

11                    (Recess taken from 2:11 p.m. to

12                     2:22 p.m.)

13                    (Kaplan Exhibit 8 marked for

14                     identification.)

15     BY MR. MINUTI:

16        Q.    I've now handed you a document we've

17     marked as Kaplan Exhibit No. 8.  I would ask you

18     to take a look at that and tell me when you've had

19     an opportunity to review it.

20        A.    Okay.

21        Q.    Who is -- is it Mr. Faulstich?

22        A.    Faulstich.

Henderson Legal Services, Inc.

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                    CONFIDENTIAL                July 8, 2010
                                Chicago, IL

                                                              Page 60

1       Q.    Faulstich.                      MD
2       A.    He's an (MB) in our Media Group.
3       Q.    And he's talking about exploring a
4    relationship with Gannett in this e-mail.  Is that
5    how you read it?
6       A.    Yes, he is.
7       Q.    Tell me about your recollection of this
8    e-mail or this exchange.
9       A.    I don't have any recollection of this
10   particular exchange.
11      Q.    Gannett is another newspaper company,
12   correct?
13      A.    They are, yes.
14      Q.    This e-mail is October of '07?
15      A.    Uh-huh.
16      Q.    Do you recall whether Gannett had any
17   interest in acquiring any of Tribune's assets at
18   that time?
19      A.    I don't recall.
20            I do know that they had a significant
21   partnership with Tribune, and those two weren't
22   the only partners, on something called Monster,

                  Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

Kaplan, Todd          CONFIDENTIAL          July 8, 2010
                      Chicago, IL

Page 61

1   which was an online help wanted thing -- I'm

2   sorry, Career Builder.  Monster was a competitor.

3   But I don't recall otherwise.

4           MR. MINUTI:  Okay.  We'll now mark a

5   document as Exhibit No. 9.  This is tab 59.

6                   (Kaplan Exhibit 9 marked for

7                    identification.)

8   BY MR. MINUTI:

9       Q.   If you turn to the second page of this

10  document, there's a section of the e-mail that

11  begins "Financing proposal."

12      A.   Uh-huh.

13      Q.   It talks about the Company rejecting that

14  proposal.

15          Was this the lender's sort of alternative

16  to the flex that we were talking about earlier?

17      A.   It is.

18      Q.   So the Company had rejected that?

19      A.   That's what it says.  I don't recall that,

20  but that is what this says.

21      Q.   Okay.  And then we have on the first page

22  there's an e-mail from Michael Costa.  Can you

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 62

1   tell me who is Mr. Costa?

2       A.    Mr. Costa was an M&A professional in the

3   Media Group who was essentially the center or most

4   critical partner on the Tribune account having

    Worked

5   work on it for many, many years.

6       Q.    Okay.  Would he be like in my world the

7   relationship partner?

8       A.    We tend to title people Relationship

9   Managers.  But because Michael was the          [Rider 62]

10  M&A specialist, because he had the greatest

11  depth of history with the company, he effectively

12  became the critical Senior Partner on the account.

13      Q.    Is he doing work?  I mean, is he doing

14  work relative to the transaction as of this time

15  frame?

16          MS. PRIMOFF:  Which transaction?

17          MR. MINUTI:  I'm talking about the

18  LBO transaction.

19          MS. PRIMOFF:  But there's different

20  components, so there's --

21      A.    You asked the question what is he doing on

22  November 7th?

Henderson Legal Services, Inc.

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                 CONFIDENTIAL                    July 8, 2010
                              Chicago, IL

Page 63

1    BY MR. MINUTI:

2        Q.    Correct.

3        A.    I don't recall what exactly Michael's

4    responsibility or role was at that moment.  ✓ [Rider 63]

5        Q.    And I'm just curious as to why he would

6    be -- why you would be providing this information

7    to him at this time.

8        A.    He was the Senior Partner on the account

9    who actually asked me initially when I first began

10   working on Tribune to be part of the effort.

11       Q.    Okay.  If you look at his e-mail, the

12   second sentence, it says "We should make an

13   institutional judgment as to whether closing into

14   existing papers and preserving flexibility to

15   restructure when the new board is in place is in

16   our interests."

17             What was your understanding of what he was

18   getting at there?

19       A.    I don't recall what my understanding was

20   or wasn't.

21       Q.    Well, looking at it now what is your --

22   based on your read of this, what do you think he

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd          CONFIDENTIAL          July 8, 2010
                      Chicago, IL

Page 64

1   said?

2       A.   Michael because he was more of an

3   M&A expert rather than a financing expert is I

4   think making a suggestion here that -- I don't

5   know quite what he's asking, but I can't surmise

6   what he was trying to figure out here.  That may

7   have been why I asked to have a live conversation.

8       Q.   And do you recall having a live

9   conversation?

10      A.   Not this particular one, no.

11      Q.   During this period of time, which looks

12  to be November of '07, are you personally having

13  discussions with Sam Zell or any member of

14  Sam Zell's team?

15      A.   On the topic of Tribune?

16      Q.   Correct.

17      A.   No.

18      Q.   How about on any other topic?

19      A.   Lots of other topics.  I worked with Sam    *earnest*

20  and his companies in ~~interest~~ for many years at

21  Merrill Lynch.

22      Q.   How far back does your relationship with    *Confidential*

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd               CONFIDENTIAL               July 8, 2010
                           Chicago, IL

Page 65

1      Mr. Zell go?

2          A.    I started work in 1986, and one of the

3      first projects I worked on was for one of

4      Mr. Zell's companies.

5          Q.    Did there come a time when Mr. Zell

6      offered you a job?

7          A.    There was.

8          Q.    And when was that?

9          A.    That was early '08, I want to say March.

10         Q.    Okay.  So after step two had closed?

11         A.    Uh-huh.

12         Q.    That's a yes?

13         A.    That's a yes.

14         Q.    Okay.  Thanks.

15               And did you take that job?

16         A.    For a period of about 3 days I told Sam

17     that I was going to take the job.  I ultimately

18     decided not to and stayed at Merrill Lynch.

19         Q.    I'm sorry, I may have just said this, but

20     what was the job that was offered to you?

21         A.    I was going to be one of his Senior

22     Partners on his investment team on the what he

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                Chicago, IL

Page 66

1    would call the operating company piece.

2           Sam has many different investment

3    interests.   I distinguish operating companies from

4    a lot of the real estate ventures he has owning

5    office buildings, apartments, what have you.

6        Q.    So how many transactions throughout your

7    career would you say you've done with Mr. Zell,

8    one of his companies?

9        A.    I couldn't even guess.

10       Q.    Are we talking about 10?

11       A.    More than 10.

12       Q.    Hundreds?

13       A.    Less than hundreds.

14           MR. MINUTI:  Let's now mark 60.

15                    (Kaplan Exhibit 10 marked for

16                     identification.)

17   BY MR. MINUTI:

18       Q.    I'll ask you to review that and tell me

19   when you're done.

20       A.    Okay.

21       Q.    Starting at the bottom it looks like

22   Mr. Bigelow is asking you if you had time to catch

Kaplan, Todd               CONFIDENTIAL               July 8, 2010
                           Chicago, IL

Page 67

1    up.

2        A.    Uh-huh.

3        Q.    Then you send an e-mail to Mr. Pate.  You

4    say "...wanted to know if he was up to speed on

5    the topics we hit this morning."

6              Do you have any recollection of the

7    conversations that are referenced in this e-mail

8    chain?

9        A.    I don't.

10             EXAMINER KLEE:  At some time in the fall

11   of 2007 were you advised by anyone at EGI or by

12   Mr. Zell or Mr. Nils Larson that they were going

13   to promote Chandler Bigelow to Chief Financial

14   Officer of the Tribune?

15             THE WITNESS:  While I don't have any

16   specific recollection, that sounds very familiar,

17   but I don't recall any one specific conversation.

18             EXAMINER KLEE:  In terms of the familiar

19   sound, do you have some general recollection of

20   when you first became aware that Chandler Bigelow

21   was going to become promoted to CFO of Tribune?

22             THE WITNESS:  I would say there was no,

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                Chicago, IL

Page 68

1    there was no conversation.  I don't think he

2    officially became CFO until after the transaction

3    closed, but I do know that functionally he was

4    taking on a great deal of the day-to-day

5    responsibility with us and all of the various

6    permutations of activities that we had.

7              MR. MINUTI:  Let's mark 64.

8                        (Kaplan Exhibit 11 marked for

9                         identification.)

10   BY MR. MINUTI:

11       Q.   I've now shown you a document we've marked

12   as Kaplan Exhibit No. 7.  I'm going to draw your

13   attention to the second page of the document.

14       A.   Do you mean No. 11?

15       Q.   I beg your pardon.

16       A.   I just want to make sure I'm on right

17   page.

18       Q.   Thank you very much for correcting me.

19   Kaplan No. 11.  I want to draw your attention to

20   page 2.

21       A.   Uh-huh.

22       Q.   You'll see shortly down from the top

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

                                                          Page 69

1   there's what looks to be an e-mail from you dated

2   September 12, 2007?

3       A.   Yes.

4       Q.   There's a line on this e-mail that says

5   "Also, noticed that we sold down some of the

6   TRB paper."  I assume that's Tribune?

7       A.   Uh-huh.

8       Q.   "Was curious who we sold to and at what

9   price."

10           Was this something that you would

11  routinely monitor in your position at Merrill

12  Lynch?

13           MS. PARVER:  Was what something?

14           MR. MINUTI:  Whether the company --

15  whether Merrill Lynch was selling down the paper.

16           MS. PARVER:  Selling Tribune paper?

17           MR. MINUTI:  Correct.

18       A.   At this time I believe I was Chairman of

19  our Leveraged Finance Group, and I think I was

20  generally copied on most of the reporting of some

21  of the major items that the group handled, one of

22  which was additions to and subtractions from

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 70

1  outstanding loan positions on transactions that we

2  had participated in.

3  BY MR. MINUTI:

4      Q.    Do I understand the time frame, this is

5  before step two closes?

6      A.    It is.

7      Q.    In this case we're talking about paper

8  relative to step one?

9      A.    That must be the case.

10     Q.    Okay.  And was the -- strike that.

11          EXAMINER KLEE:  Do you recall whether the

12  paper that was being sold by Merrill Lynch, the

13  Tribune paper, was being sold at or below par at

14  this time?

15          THE WITNESS:  I'm fairly certain it was

16  below par, because I don't think there was a

17  period if we're still in our April 1 to

18  December 20 time frame where it was ever above

19  par or at par.

20          EXAMINER KLEE:  If you look on the first

21  page of Kaplan 11, there is a September 12th

22  e-mail from Stephanie --

Kaplan, Todd                    CONFIDENTIAL                July 8, 2010
                                 Chicago, IL

Page 71

1          MS. PRIMOFF:  "Va-lill-lo."

2          EXAMINER KLEE:  -- Vallillo to you, among

3     others, which indicates, among other things,

4     Tribune -- Merrill Lynch sold on June 21, 2007

5     $79 million of the revolver at a price of 89, and

6     on July 11, 2007 sold $10 million of the revolver

7     at a price of 89.875.

8          THE WITNESS:  Uh-huh.

9          EXAMINER KLEE:  Would this be responsive

10    to the questions you were asking in the e-mail on

11    the second page about the sale of the paper,

12    Tribune paper?

13         THE WITNESS:  I think so, yes.

14    BY MR. MINUTI:

15    Q.    Earlier we talked about the solvency

16    analysis that was performed by a company called

17    VRC.

18    A.    Uh-huh.

19    Q.    Prior to the Tribune transaction, did you

20    have any experience with VRC?

21    A.    No, not that I recall.

22    Q.    Okay.  Were you aware of their reputation

Kaplan, Todd                  CONFIDENTIAL                  July 8, 2010
                              Chicago, IL

Page 72

1    in general?

2        A.    I had never heard of them before the

3    Tribune transaction.

4        Q.    When you learned that VRC was the firm

5    that was going to provide the solvency opinions,

6    did you do any due diligence of VRC?

7        A.    No.  No, I did not.

8        MS. PARVER:  Do you include in that asking

9    others to find out about it?

10        MR. MINUTI:  Yes.

11        MS. PARVER:  Or were you told about them?

12        THE WITNESS:  My recollection is that our

13    counsel, Cahill Gordon, suggested this particular

14    firm as a qualified firm in the arena of solvency

15    opinions.

16        MS. PARVER:  This is VRC he's asking.

17        EXAMINER KLEE:  I think you're talking

18    about Murray Devine.

19        MR. MINUTI:  You're talking about

20    Murray Devine.

21        THE WITNESS:  Sorry.  Perhaps I'm

22    confused.

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 73

1          I don't recall performing any particular

2     due diligence, other than understanding.  And I'm

3     not recalling exactly how the VRC was understood

      *to be →*

4     ~~as~~ an accomplished firm within the solvency

5     opinion arena.

6     BY MR. MINUTI:

7          Q.    Did you talk to any of the other lenders

8     in terms of whether they had any experience with

9     VRC?

10         MS. PARVER:  Let me just caution Todd at

11    this point that he's free to answer, but not to

12    the extent that this would involve discussions

13    with -- if these discussions, for example, with

14    other lenders were with Cahill Gordon on that

15    subject.

16         THE WITNESS:  Thank you.

17         A.    I don't recall whether or not we had

18    discussions on that topic.

19    BY MR. MINUTI:

20         Q.    Earlier you told me that leading up to

21    step two Merrill Lynch was doing some internal

22    analysis to understand the VRC solvency opinion in

Kaplan, Todd          CONFIDENTIAL          July 8, 2010
                        Chicago, IL

Page 74

1    step two, correct?

2       A.    Uh-huh.

3       Q.    We have seen very little in the documents

4    that have been provided to suggest that a similar

5    analysis was being done in step one.

6            Do you recall whether such an analysis was

7    done?

8       A.    It's highly likely that it wasn't given

9    that the leveraging effects of step one were far

10   less dramatic than step two, which was on top of

11   step one.

12      Q.    Now, when you first learned of VRC,

13   were you aware at that time that the company had

14   approached other companies about giving a solvency

15   opinion?

16      A.    I was aware of that.

17      Q.    Okay.  Who did you ~~under~~ *understand* the Company

18   contacted?

19      A.    I believe that they asked both Duff and

20   Phelps and Houlihan Lokey, and they both were

21   conflicted given that they had roles -- and I

22   don't recall what their specific roles were --

Kaplan, Todd          CONFIDENTIAL          July 8, 2010
                      Chicago, IL

Page 75

1  but they had roles with various constituents in

2  the area of the ESOP expertise required to develop

3  the leveraged ESOP design.

4           MR. MINUTI:  We're now going to go to

5  Exhibit No. 12.  This will be tab 73.

6                    (Kaplan Exhibit 12 marked for

7                     identification.)

8

9  BY MR. MINUTI:

10     Q.    Again, let me know when you've had an

11  opportunity to review it.

12     A.    Okay.

13     Q.    Earlier you had testified about internal

14  analysis at Merrill Lynch to understand the VRC

15  opinion.

16           Is this the beginning of that analysis?

17     A.    It seems to be, yes.

18     Q.    Okay.  Was there something about the

19  timing here, August of '07?

20           I guess what I'm asking is --

21     A.    Relative to?

22     Q.    -- why did it start in August of '07?

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 76

Based

1      A.   I don't recall based on some of the prior

2    e-mails.

perhaps    Perhaps at this point in time the

4    Craig Huber report came around, and I think that

5    was a notable event in this time period that may

6    have catalyzed desire on our part to try to

7    understand the solvency opinion better than we

8    did.

9      Q.   Based on the tone of the e-mail, was

10   there any -- was there a question in your mind at

11   this time as to whether Tribune was going to be

12   able to get a solvency opinion to close step two?

13         MS. PRIMOFF:  Mark, can you ask that

14   without the "based on the tone of the e-mail"?

15         MR. MINUTI:  Sure.

16         MS. PRIMOFF:  Can you just ask the

17   question?

18   BY MR. MINUTI:

19     Q.   Was there a question in your mind in

20   August of '07 was to whether or not Tribune was

21   going to be able to get a solvency opinion to

22   close step two?

Kaplan, Todd                CONFIDENTIAL              July 8, 2010
                            Chicago, IL

Page 77

1    A.   As best I recall, we began this analysis

2  because we realized that we had no in-house

3  expertise on the topic of solvency opinions

4  whatsoever.

5    Q.   And you had indicated to me that you

6  didn't do a similar analysis at step one.

7         Why again did you think it was necessary

8  at step two?

9         MS. PARVER:  He actually said he didn't

10  recall that it was likely that they did not or in

11  all probability did not.

12    A.   As best I recall, in this general time

13  frame there was a dramatic deterioration in a

14  number of market prices, both prices for Tribune

15  ~~Data~~ and prices for other similar types of

16  companies in the publishing and media arena.

17         Without recalling this exact message or

18  time, but having read some of the messages we

19  reviewed earlier, I suspect that coupled with the

20  Craig Huber report lead us to focus on the closing

21  conditions and created a realization on our part

22  that we really didn't have any insight or

Kaplan, Todd     CONFIDENTIAL    July 8, 2010
           Chicago, IL

Page 78

1 expertise as to how solvency opinions were

2 developed.

3    MS. PARVER:  I'm just going to ask you not

4 to -- I mean, I know it may all seem logical.  You

5 read these various things.  But don't speculate.

6    THE WITNESS:  Okay.

7 BY MR. MINUTI:

8  Q. Well, it occurred to you -- if I

9 understand what you just told me, it occurred to

10 you that you didn't have the in-house expertise.

11    Did you do anything to change that?

12  A. No.

13  Q. Let me ask you now to look at what we will

14 mark as Kaplan 13.

15    MS. PARVER:  Were you asking to add

16 something?

17    THE WITNESS:  If you mean change that

18 by permanently altering the configuration of

19 personnel we had at Merrill Lynch to include

20 solvency expertise, what was what I was answering

21 no to.

_that_

22 BY MR. MINUTI:

Kaplan, Todd                   CONFIDENTIAL                July 8, 2010
                               Chicago, IL

Page 79

1    Q.    It was really broader than that.  Did you

2    do anything?

3    A.    I guess I'll ask you what is "that"?

4    Q.    Here's what I'm struggling to understand.

5    What you've said to me, or at least what I

6    understand you've said to me, is you realize you

7    didn't have in-house expertise to understand

8    really what VRC was doing.

9    A.    Yes.

10   Q.    And yet in house you were doing analysis

11   relative to the VRC opinion?

12   A.    Yes.

13   Q.    Okay.  If you don't have the expertise in

14   house to do it, you know, I guess my question is

15   how do you wind up feeling comfortable with the

16   analysis that Merrill Lynch is doing?

17   A.    My recollection is that at this point we

18   did two simple things.  One was to begin to

19   ascertain by reviewing the first step opinion

20   delivered from VRC their methodology so that we

21   could try to replicate them as best we could. [Rider 79]

22            The second thing we did, although I do

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 80

1    not recall precisely when this occurred, either at

2    this time, earlier or later, was to reach out to

3    Murray Devine in order to learn more about the

4    solvency opinion industry practices.

5        Q.    As you were doing your analysis of the

6    VRC opinion, assume for the moment that that

7    analysis disagreed with VRC.  What would you do

8    with that analysis?  What were you going to do?

9        MS. PARVER:  I don't -- this is all -- I

10    don't know what you're referring to.  And you're

11    just asking him to assume this, to assume -- he's

12    a fact person here.

13        MS. PRIMOFF:  It's speculative.  If you

14    think, then what would you have done.

15        MS. PARVER:  If this happened, what would

16    you have done there.  I don't think that's a

17    question that can be answered.

18        MR. MINUTI:  Let me rephrase it then.

19    BY MR. MINUTI:

20        Q.    You're going through this exercise so you

21    can understand the VRC analysis, okay?

22            At the end of the day did you agree with

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

                                                              Page 81

1    VRC's opinion?

2        A.   I don't think we were attempting to come

3    to agreement with VRC.

4             I think we were trying to ascertain

5    whether or not VRC would ultimately deliver the

6    solvency opinion per the transaction terms, and

7    they ultimately did. ✓ →[Rider 81]

8        Q.   So the analysis was being done just to

9    determine whether they could reach the opinion?

10       A.   Yes.

11       Q.   That's your testimony?

12       A.   Yes.

13            EXAMINER KLEE:  And why was Merrill Lynch

14   or you trying to determine whether VRC would

15   deliver its solvency opinion?

16            THE WITNESS:  As an analysis of whether or

17   not the transaction would close.

18            EXAMINER KLEE:  Was it your view that if

19   VRC did not deliver its solvency opinion, the

20   transaction would not close?

21            THE WITNESS:  My recollection is that that

22   was a closing condition.

Kaplan, Todd                 CONFIDENTIAL              July 8, 2010
                              Chicago, IL

Page 82

1              EXAMINER KLEE:  A closing condition to the

2       merger?                                    → [Rider 82]

3              THE WITNESS:  Yes

4              EXAMINER KLEE:  Why were you trying to

5       figure out what VRC would do?

6              Did you have any ability to influence

7       VRC's ability to deliver its opinion?

8              THE WITNESS:  No, we did not.  We were

9       trying to simply ascertain whether the transaction

10      would close or not.

11             EXAMINER KLEE:  Why?

12             THE WITNESS:  Why were we trying to

13      ascertain whether it would close?

14             EXAMINER KLEE:  Yes.

15             THE WITNESS:  I think as a major

16      participant in the transaction trying to determine

17      whether or not it would close would seem like a

18      relatively straight forward objective.

19             EXAMINER KLEE:  Did you do due diligence

20      to determine whether the FCC was going to issue an

21      approval of the transaction?

22             THE WITNESS:  When you say "due

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 83

1    diligence," we certainly were aware of the

2    importance of what the FCC ultimately would

3    render, so we waited for them to render their

4    decision, but I'm not sure what you mean by due

5    diligence.

6            EXAMINER KLEE:  In the summer and fall of

7    2007, did Merrill Lynch hire an expert to educate

8    it on the process of FCC approval?

9            THE WITNESS:  No, we did not.

10           EXAMINER KLEE:  Did you hire an expert to

11   educate you on Major League Baseball approval?

12           THE WITNESS:  No, we did not.

13           EXAMINER KLEE:  Did you hire an expert to

14   educate you on Hart Scott Rodino approval?

15           THE WITNESS:  No, we did not.

16           EXAMINER KLEE:  Did you have in-house

17   expertise on FCC approval?

18           THE WITNESS:  Given our media practice, I

19   think we felt we had some insight into that, but I

20   don't know one would say that we had expertise.

21           EXAMINER KLEE:  Did you have in-house

22   expertise on Major League Baseball approval?

Henderson Legal Services, Inc.

2eb7f779-49fb-4f85-9507-b363b91be8a1