Kaplan, Todd                 CONFIDENTIAL                 July 8, 2010
                              Chicago, IL

1      THE WITNESS:  No, not that I'm aware of.

2      EXAMINER KLEE:  Why then did you hire an

3   expert to gain in-house expertise on solvency

4   opinion processes when you didn't hire an expert

5   in these other areas?

6      THE WITNESS:  I can only speak to some of

7   the things that we did decide to focus on at the

8   time.  I'm sure there are other things we could

9   have focused on.

10      We did identify this condition as seeming

11   to us the least well known.  And while that may be

12   argumentative, this was the one that we invested

13   some time in investigating.

14      EXAMINER KLEE:  Would it have been

15   beneficial to Merrill Lynch if step two did not

16   close?

17      THE WITNESS:  Yes.

18      EXAMINER KLEE:  In what way would it have

19   benefited Merrill Lynch if step two did not close?

20      THE WITNESS:  Well, I guess to try to

21   answer that more specifically, given that the

22   market value of the various loans we had committed

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

*at*

1    to were per market prices less than what we had

2    committed to pay for them, I think we simply had a

3    greater economic loss if those transactions ended

4    up closing.

5         I take it from your question closing by

6    reason other than us willfully deciding not to

7    close.

8         EXAMINER KLEE:  Yes.  I'm talking about a

9    perfectly legal nonclosure based on the failure to

10   occur of a condition as specified in either the

11   merger agreement contract or the credit agreement

12   contract.

13        THE WITNESS:  I think it's fair to say it

14   would have been better for us to not close

15   economically, absolutely.

16        EXAMINER KLEE:  Other than the fact that

17   the market price of the paper was lower, was there

18   any other reason that Merrill Lynch would have

19   benefitted from the nonclosure of step two based

20   on the failure to occur of a legal condition?

21        THE WITNESS:  No, in the that I could

22   think of.

*not*

Kaplan, Todd               CONFIDENTIAL               July 8, 2010
                            Chicago, IL

Page 86

1          EXAMINER KLEE:  Was Merrill Lynch in a

2    position to be able to syndicate the step two

3    paper had the transaction closed?

4          THE WITNESS:  Well, I think the fact that

5    it did close and we, to the best of my

6    recollection, didn't end up syndicating it, the

7    answer must be no.

8          EXAMINER KLEE:  Yes, but -- in retrospect

9    that's true obviously.

10         My question should have been in the summer

11   and fall of 2007, were you and to your knowledge

12   others at Merrill Lynch aware that it would have

13   trouble syndicating the debt had step two closed?

14         THE WITNESS:  I think it's fair to say as

15   the market prices I was setting before mentioning

16   deteriorated, we were quite aware that that they

17   indicated that we would be challenged to syndicate

18   the loans we had committed to.

19                     (Kaplan Exhibit 13 marked for

20                      identification.)

21   BY MR. MINUTI:

22   Q.   I'm going to show you now what we've

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                  Chicago, IL

Page 87

1    marked as exhibit --

2          MS. PARVER:  I just want to go back to one

3    thing on the issues of some of the questions you

4    posed.  I think that assumes that Cahill and other

5    attorneys were not well versed, and I don't think

6    that's necessarily an accurate assumption on

7    FCC opinions.

8          You asked a series of questions, why

9    didn't you hire an expert on this or that.

10          EXAMINER KLEE:  Yes.

11          MS. PARVER:  And I think that there were

12   some subject matters as to which you raised that I

13   think the various lawyers that were around at the

14   time --

15          MS. PRIMOFF:  So Cahill may have had the

16   FCC regulatory --

17          EXAMINER KLEE:  Did you let me ask him the

18   question or would you object to the question on

19   Cahill's expertise?

20          MS. PARVER:  Sorry?

21          EXAMINER KLEE:  I'd like to ask the

22   question whether the witness knows whether Cahill

Kaplan, Todd                    CONFIDENTIAL                 July 8, 2010
                                 Chicago, IL

Page 88

1    Gordon had the expertise, but if you don't want me

2    to ask the question I won't.

3            MS. PRIMOFF:  Is it limited just to that

4    portion?

5            EXAMINER KLEE:  Yes.

6            MS. PARVER:  I think he's asking, and I

7    appreciate that, because that would then implicate

8    a conversation that Todd may -- I mean, we can ask

9    the witness -- can we step out if you don't mind?

10           EXAMINER KLEE:  Absolutely.

11           MS. PARVER:  You understand.

12           EXAMINER KLEE:  I completely understand.

13           MS. PARVER:  I appreciate that.  Thank

14   you.

15           EXAMINER KLEE:  Off the record.

16                   (Recess taken from 2:57 p.m. to

17                   3:01 p.m.)

18           EXAMINER KLEE:  Why don't we go back on

19   the record.  I believe counsel has something to

20   say in response to the previous question.

21           MS. PARVER:  Rather than getting into

22   issues of attorney-client communications, I

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

1   think -- well, perhaps you can just reiterate I

2   think a prior answer with respect to Hart Scott

3   Rodino.

4           THE WITNESS:  Given the media-related

5   expertise that we had within our team, we left

6   that part of the group to ascertain issues such as

7   the FCC approval and Hart Scott Rodino.

8           Whether or not they talked to any one

9   particular expert or who that was, I wouldn't be

10  personally aware of who that might have been.

11          MS. PRIMOFF:  Todd, was there something

12  else you wanted to --

13          THE WITNESS:  Yes.  I did want to know as

14  to the Examiner's question on the consequences to

15  Merrill Lynch closing the second step that the

16  deterioration in value for the financing package

17  we've committed to was a combination both of

18  market forces and the underlying performance at

19  that time of Tribune Company.

20          EXAMINER KLEE:  Thank you.

21  BY MR. MINUTI:

22      Q.   I'm now going to hand you a document we've

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 90

1    marked as Kaplan 13.  I'll ask you to take a look

2    at that and tell me when you've had an opportunity

3    to review it.

4            EXAMINER KLEE:  The tab?

5            MR. MINUTI:  Seventy-four.

6    BY MR. MINUTI:

7       Q.   First off, who is Harris Hwang?

8       A.   I don't recall Harris.  I will assume

9    based on this message he was one of the Investment

10   Bankers on the team.

11      Q.   Is this document, which on the second page

12   is titled "Valuation Analysis of Tribune Company,"

13   is this something that you had requested?

14      A.   I don't recall.

15      Q.   Looking at it now, is this the type of

16   analysis that you were doing to understand the VRC

17   solvency opinion?

18      A.   I don't recall.  It does look like it's

19   set up in a format similar to that, so that would

20   be -- that would seem to fit, but I don't recall

21   specifically.

22      Q.   Okay.  And in terms -- and who actually

Kaplan, Todd                   CONFIDENTIAL                July 8, 2010
                                Chicago, IL

1   did this valuation, do you know?

2       A.   I don't know.

3       Q.   Was there someone on the Tribune team at

4   Merrill Lynch who was tasked with actually doing

5   the analysis?

6       A.   When you say "doing the analysis," what do

7   you mean?

8       Q.   Well, for example, generating a valuation

9   analysis like the document we've marked as Exhibit

10  No. 13.

11      A.   I don't believe that there was any one

12  particular person.  It was the product of several

13  different heads.  ✓     [Rider 91]

14      Q.   Okay.  And I looked through this document,

15  and I didn't see any reference to VRC.

16           Do you know where the information in this

17  analysis came from?

18      A.   I don't.

19      Q.   Okay.  Do you know, for example, who

20  chose, if you look on page it's Bates numbered

21  0582623, you'll see there's a multiple range of

22  8.25, a mid point of 8.75, and a high of 9.25?

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                Chicago, IL

Page 92

1      A.    Yes.

2      Q.    Okay.  Any idea who chose those multiples

3   to use?

4      A.    I don't.

5            MR. MINUTI:  This will be tab 75 from my

6   group, Exhibit 14.

7                      (Kaplan Exhibit 14 marked for

8                       identification.)

9            THE WITNESS:  Okay.

10  BY MR. MINUTI:

11     Q.    Do you recall this e-mail exchange with

12  Mr. Costa?

13     A.    I don't.

14     Q.    Do you recall any conversations with

15  Mr. Costa regarding the valuation analysis of

16  Tribune?

17     A.    Vis-a-vis this message?

18     Q.    Correct.

19     A.    No.  *Costa was not generally involved in step two financing discussions, including the review of the VRC solvency opinion.*

20     Q.    When you say in this e-mail "We

21  independently came to the same conclusion," what

22  conclusion are you referring to?

Henderson Legal Services, Inc.

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 93

1     A.    I'm not sure based on that message.

2     Q.    Okay.  Well, at any time did you reach a

3  conclusion that the Tribune had negative equity

4  value?

5     A.    I didn't reach any particular conclusion

6  in that regard.

7         EXAMINER KLEE:  In or about August 2007

8  did you reach a conclusion that the enterprise

9  value for June was in a range of minus 800 million

10  to $1.5 billion?

11         THE WITNESS:  I don't recall.

12         EXAMINER KLEE:  As you sit here today, how

13  do you interpret Michael Costa's August 27, 2007

14  e-mail to you in Kaplan 14?

15         THE WITNESS:  I'm not --

16         MS. PRIMOFF:  If you know.  You don't have

17  to guess about how you interpret it.

18         THE WITNESS:  I don't know.

19         EXAMINER KLEE:  How do you interpret the

20  phrase in Kaplan 14 "ended up with equity value

21  range of minus 800 to 1500, assuming NO multiple

22  contraction and without cash from Cubs sale,

Kaplan, Todd                    CONFIDENTIAL                July 8, 2010
                                 Chicago, IL

Page 94

1   bender"?

2          THE WITNESS:  I don't have an

3   interpretation of that.

4   BY MR. MINUTI:

5      Q.   I want to move on to a different topic.  I

6   want to talk about Murray Devine.

7      A.   Okay.

8      Q.   Can you tell me to the best of your

9   recollection when it is the ~~Leonard~~ Group          *Lender*

10  engaged -- let me do it this way.

11         When did the ~~Leonard~~ Group first engage       *Lender*

12  Cahill Gordon?

13     A.   First engage Cahill Gordon?  Long before

14  the April 1st beginning part of the time frame

15  that we've been working with.  I don't recall

16  exactly when.

17     Q.   So before the step one closing.

18     A.   Oh, yes, long before.

19     Q.   I'm sorry, before the board meeting where

20  the step one was ~~improved~~?          *approved*

21     A.   Long before April 1st.

22     Q.   And why did the Lending Group decide to

Kaplan, Todd                    CONFIDENTIAL                 July 8, 2010
                                 Chicago, IL

Page 95

1    engage Cahill Gordon?

2        A.   We worked very frequently with Cahill

3    Gordon.   They're an outstanding legal firm in

4    working on leverage finance transactions.

5        Q.   If I understand correctly, Cahill Gordon

6    engaged Murray Devine; is that correct?

7        A.   That's correct.

8        Q.   Do you know when it is they engaged Murray

9    Devine?

10       A.   I don't recall exactly.

11       Q.   Why did the lenders want to engage Murray

12   Devine?

13       A.   Cahill engaged Murray Devine, so as

14   part of the process whereby the lenders were

15   ascertaining what industry practice was in the

16   rendering of solvency opinions.

17       Q.   And outside the presence of Cahill Gordon

18   did you have discussions with the other lenders

19   about retaining a solvency expert?

20       A.   No.

21       Q.   Can you describe for me the process in

22   selecting Murray Devine?  Had you worked with them

Kaplan, Todd              CONFIDENTIAL              July 8, 2010
                          Chicago, IL

1    before?

2        A.   I don't recall.  I'm relatively certain I

3    didn't work with Murray Devine before, and I don't

4    recall the process we went through to select them.

5        Q.   What was Murray Devine asked to do?

6        MS. PRIMOFF:  By whom?

7        MR. MINUTI:  By anyone to your knowledge.

8        A.   I don't recall any specific individual

9    item we asked of Murray Devine other than to

10   provide us background on the process of rendering

11   solvency opinions.

12   BY MR. MINUTI:

13       Q.   To provide background.

14            To your knowledge was Murray Devine asked

15   to render a solvency opinion?

16       MS. PARVER:  Okay.  I want you to get the

17   answers, but I don't want to get into privilege

18   waivers.

19            So when you talk about, you know, what

20   were they asked to do or not do or were they

21   asked, I'm worried that since he's already told

22   you that he's never spoken to Murray Devine

Kaplan, Todd                 CONFIDENTIAL                July 8, 2010
                             Chicago, IL

Page 97

1    outside of being with Cahill, and he never spoke

2    to other lenders about engaging in them.

3         So I think we would be -- we would avoid

4    privilege issues if you could ask him about his

5    understanding of what -- that wasn't the question.

6         MR. SCHWAB:  That wasn't the question.

7         MS. PRIMOFF:  That wasn't the question.

8         MS. PARVER:  So I'm just suggesting that

9    the way we would avoid any privilege issues is

10   just -- I think you get at the same thing.

11        MR. MINUTI:  I'm fine asking it that way.

12        MS. PARVER:  Good.

13   BY MR. MINUTI:

14   Q.   What was your understanding as to what

15   they were to do?  I'm talking about Murray Devine.

16   A.   I don't have any specific recollection,

17   but in general I would say Murray Devine was

18   brought in as an expert in the field of delivering

19   solvency opinions, and that expertise was our

20   attempt to learn more about how solvency opinions

21   were developed and rendered.

22   BY MR. MINUTI:

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                  CONFIDENTIAL                  July 8, 2010
                              Chicago, IL

Page 98

1     Q.   Did you have an understanding that Murray
2   Devine were asked to provide a solvency opinion?
3     A.   No, I did not.
4     Q.   Did you have an understanding as to
5   whether Murray Devine were asked to provide such
6   an opinion?
7          MS. PARVER:  Isn't that the same question?
8     A.   My recollection is that they were not
9   asked to do so.
10         MR. MINUTI:  That was the answer.  If I
11   didn't ask the right question, he answered the one
12   I wanted.
13         MS. PARVER:  Sorry.  I didn't understand.
14         MR. MINUTI:  I apologize.
15   BY MR. MINUTI:
16     Q.   And so I think you testified earlier that
17   you never had any discussions with anyone at
18   Murray Devine outside the presence of Cahill
19   Gordon; is that correct?
20     A.   That is correct.
21     Q.   So I don't want to ask you about those
22   conversations for that reason, but can you give me

Kaplan, Todd              CONFIDENTIAL              July 8, 2010
                          Chicago, IL

Page 99

1    an idea of how often you communicated with Murray

2    Devine?

3        A.    I personally only recall one meeting that

4    I participated in with them.

5        Q.    What about phone calls?

6        A.    I'm using the meeting to include in-person

7    and phone calls.

8             MS. PARVER:  And I don't know, but I want

9    to make sure the witness has exhausted his

10   recollection.

11            There was an early presentation I think by

12   the Company on October 1 that I believe you may or

13   may not -- I don't know if you attended.

14            THE WITNESS:  Which presentation was on

15   October 1?

16            MS. PARVER:  I think the Trib made a -- it

17   was like a big presentation.

18   BY MR. MINUTI:

19       Q.    I think you testified that you only met

20   with them once.

21       A.    That I recall.

22       Q.    And you were including phone calls?

Kaplan, Todd                CONFIDENTIAL              July 8, 2010
                            Chicago, IL

Page 100

1      A.    That I recall.

2      Q.    And what your counsel is saying that there

3   was a meeting with the company with Murray Devine.

4   Do you recall being there?

5          EXAMINER KLEE:   On October 1, 2007 at the

6   University of Chicago.

7      A.    Oh, all right, there were about 80 people

8   at that meeting.

9          MS. PARVER:   Thank you.

10     A.    That was the Company's day-long review, so

11  there were at least half the people in the room I

12  had no idea who they were.

13  BY MR. MINUTI:

14     Q.    Okay.

15     A.    Part of what we suffer from in Chicago is

16  some of them if they had spoken I might have

17  identified them, but so much of your

18  correspondence is by phone, to physically see

19  them there.

20     Q.    And Company Representatives were there at

21  that time?

22     A.    Oh, yes.

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                          Chicago, IL

Page 101

1      Q.    What was your recollection of what Murray

2   Devine did at that meeting?

3      A.    I have no recollection of Murray Devine

4   being there.  They may well have, in fact, being

5   there, but I don't have any recollection.

6            There isn't any employee then or now of

7   Murray Devine who you could offer to come up or

8   who I would identify.

9      Q.    You don't remember them making a

10  presentation or saying anything at that meeting?

11     A.    I don't even remember the name of the

12  person at Murray Devine.

13     Q.    Okay.  Did Murray & Devine ultimately help

14  you analyze the VRC solvency opinion?

15     A.    To the best of my recollection, Murray

16  Devine was asked to give us background as to how

17  an industry solvency opinions were developed and

18  rendered.

19           I don't recall us asking for them to do

20  anything specific either as to your question or

21  for anything else, and I do recall that because

22  Murray Devine did not have any background with

Kaplan, Todd                 CONFIDENTIAL               July 8, 2010
                              Chicago, IL

Page 102

1   Tribune, they did not have the body of knowledge

2   to do anything specific beyond that, at least as

3   best I can recall.

4      Q.   What is your understanding as to why the

5   lender group did not ask Murray Devine to provide

6   a solvency opinion?

7      A.   If we had wanted a solvency opinion -- and

8   in my years of Merrill Lynch I don't ever recall a

9   lending transaction where we requested one for our

10  benefit -- but if we had, that would have been

11  something we would have had to negotiate up front

12  as part of the terms of the transaction, which

13  would have included the opportunity to work with

14  us and with management on developing what I came

15  to learn ~~with~~ the type of analysis that solvency

16  experts render.  *was*

17      But, in short, because we never to my

18  knowledge asked a firm to render a solvency

19  opinion for us.  This was consistent with all of

20  those other cases.

21      MS. PARVER:  Just so the record is clear,

22  when you said, Todd, that if you had wanted,

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 103

1   unlike every other case where you had never asked

2   for one, you would have had to negotiate it up

3   front, you mean with Tribune at the beginning?

4           THE WITNESS:  With Tribune.

5           MS. PRIMOFF:  There's issues about access,

6   where a solvency firm needs access to the company,

7   its management and all of that to be in a position

8   to render -- to render an opinion.

9           MR. MINUTI:  I understand.

10          THE WITNESS:  And we had not done that.

11          MR. MINUTI:  Let me make sure I understand

12  the answer, because it sounds to me like you've

13  given me two answers.

14  BY MR. MINUTI:

15      Q.   On the one hand -- let me tell you how I

16  heard it, and you can tell me how I'm wrong.

17      A.   Sure.

18      Q.   On the one hand you said you've really

19  never done it before, so you didn't do it in this

20  case.

21      A.   Uh-huh.

22      Q.   On the other hand you said you didn't do

Kaplan, Todd          CONFIDENTIAL          July 8, 2010
                        Chicago, IL

Page 104

1    it because you didn't negotiate for it up front.

2         A.    Yes.   I would say in clarification on the

3    second point that if we as a lending group in the

4    August, September, October time frame had decided

5    gee, it would be nice to have a solvency opinion,

6    that was too late.

7              EXAMINER KLEE:  Why was it too late?

8              THE WITNESS:  We hadn't negotiated any

9    ability to do that with the company.

10             EXAMINER KLEE:  And the ability is not the

11   ability to engage a solvency expert, but is it the

12   ability to get access to the company?

13             THE WITNESS:  Correct.

14             EXAMINER KLEE:  Is it the ability to get

15   paid for the expert?

16             THE WITNESS:  No.  We're referring to the

17   ~~form.~~  *former*

18             So apologize if that was a two-part

19   answer.

20

21   BY MR. MINUTI:

22        Q.    And when you said it was too late at that

Henderson Legal Services, Inc.

Kaplan, Todd        CONFIDENTIAL        July 8, 2010
                Chicago, IL

1  point, and we're talking about the October time

2  frame, did you consider asking the Company at that

3  point?

4       A.   I don't have a specific recollection of

5  having the discussion.  But as we sit today talk

6  about did we, what I'm offering is that I don't

7  have any recollection, and I'm supposing it is

8  because if we had thought it was a good idea at

9  that time, we didn't have any ability to garner

10  access to the company for a solvency expert to

11  render an opinion.

12           MR. MINUTI:  Let's go to tab 78.

13           MS. PRIMOFF:  Exhibit 15 we're up to?

14           MR. SCHWAB:  Yes.

15              (Kaplan Exhibit 15 marked for

16                identification.)

17  BY MR. MINUTI:

18       Q.   I've shown you a document we've marked

19  Kaplan Exhibit 15.  I'm going to focus your

20  attention on page 2 of the document.

21          At the bottom there appears to be an

22  e-mail from Michael Costa to you in which

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 106

1    Mr. Costa states the following:  "Todd, where are

2    we in thinking thru solvency issue if company's

3    advisor thinks solvent but we think otherwise?"

4        A.    Uh-huh.

5        Q.    Were you thinking through that issue in

6    October of '07?

7        A.    No.

8        Q.    To your knowledge was anybody at Merrill

9    Lynch thinking through that issue?

10       A.    I wouldn't know.

11       Q.    Did you have a conversation with Mr. Costa

12   on that subject to tell him that nobody was

13   thinking through that issue?

14       A.    I don't recall what specific conversation

15   I did or didn't have with Michael at this time.

16       Q.    What could Merrill Lynch have done, what

17   options would be available, if you disagreed with

18   the solvency opinion?

19       MS. PARVER:  You're asking him to

20   speculate.  He's not -- this is not facts that

21   you're asking him for.

22            And to the extent you're asking about

Kaplan, Todd                    CONFIDENTIAL                July 8, 2010
                                Chicago, IL

1   options or legal conclusions, if what Mr. Kaplan

2   knows is the product of advice from his lawyer,

3   then I would ask him not to discuss that.

4

5   BY MR. MINUTI:

6       Q.   I don't want to you answer the question

7   with any information that you gained through

8   counsel or any advice of counsel.

9            I'm not asking you what you would have

10  done.  I'm simply asking what options would you

11  have had to your knowledge if you had concluded or

12  if you had disagreed with the solvency opinion?

13       MS. PRIMOFF:  But you're asking him to

14  speculate because he told you that he didn't reach

15  a conclusion that the company was insolvent, so

16  you're asking him to speculate.

17       A.   I would say this.  We're not solvency

18  experts.  So I have never reviewed and don't

19  really have an understanding of what options we 

20  otherwise might have had in the event of a finding

21  that we did not have the expertise to ascertain.

22  BY MR. MINUTI:

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                         Chicago, IL

1        Q.    In the e-mail response to Mr. Costa from

2    you that says "Thanks for the update.  We should

3    have a call to go through financing related

4    items."

5             Do you remember having a call with him?

6        A.    I don't have any specific recollection as

7    to this particular call, whether it happened or

8    didn't happen.  ✓ [Rider 108]

9        Q.    Did Merrill Lynch do anything to attempt

10   to influence the VRC opinion at stage two?

11       A.    We didn't have any contact with VRC.

12       Q.    How about the other lenders to your

13   knowledge?

14       A.    I wouldn't have knowledge as to what the

15   other lenders would do.

16             EXAMINER KLEE:  Did you have contact with

17   Tribune Company in an effort to influence VRC

18   during the fall of 2007?

19             THE WITNESS:  We had obviously a lot of

20   contact with Tribune, but certainly not to

21   influence VRC.

22             MS. PRIMOFF:  I think there's a negative

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 109

1    connotation to the term influence.

2            EXAMINER KLEE:  Did you cause questions to

3    be propounded to the company to be transmitted to

4    VRC during the fall of 2007?

5            THE WITNESS:  We did offer I believe at

6    various times certain questions to the company

7    that we recommended be considered by VRC in the

8    context of VRC's deliberations in putting together

9    the solvency opinion.

10           EXAMINER KLEE:  And what was the purpose

11   of propounding those questions?

12           THE WITNESS:  I think that we wanted to

13   ensure that the, as we saw them, relevant issues

14   had been considered in the rendering of that

15   opinion.

16           EXAMINER KLEE:  So the questions were

17   designed to affect the thought process of VRC in

18   formulating its opinion?

19           THE WITNESS:  The questions were designed

20   to make sure that all of the things that we

21   thought would be relevant had been suggested to

22   the Company for inclusion in the analysis that VRC

Kaplan, Todd                CONFIDENTIAL               July 8, 2010
                            Chicago, IL

Page 110

1   was doing with them.

2          EXAMINER KLEE:  And do you know whether

3   the Company forwarded these questions to VRC?

4          THE WITNESS:  Any particular question or

5   topic I don't know.

6          I do think in general that the Company was

7   very thorough in their review and deliberations

8   and in general took inputs from a wide variety of

9   sources in considering this and other analysis.

10         EXAMINER KLEE:  What is the basis for your

11  opinion that the Company was thorough and

12  deliberate?

13         THE WITNESS:  I don't have any one

14  specific item other than a general pattern of

15  being open and receptive to requests.  And that

16  would be over a long period, not our defined

17  April to December period.

18         EXAMINER KLEE:  Do you know whether VRC

19  answered any of the questions that you propounded

20  to the Company to be delivered to VRC in the fall

21  of 2007?

22         THE WITNESS:  I do believe that at least

Kaplan, Todd                 CONFIDENTIAL                 July 8, 2010
                             Chicago, IL

Page 111

1    some of the questions were forwarded because I do

2    recall as a general matter that VRC produced a

3    document back to the Company that was essentially

4    confirming that certain items had been considered

5    and how many had been considered.

6           EXAMINER KLEE:  And did the Company

7    forward that response to Merrill Lynch?

8           THE WITNESS:  I don't recall how it is --

9    the answer must be yes.  I have a recollection of

10   seeing it.  I don't recall getting a certain

11   particular transmission or delivery of the

12   document.

13          EXAMINER KLEE:  Do you recall whether the

14   responses were satisfactory to the lenders in

15   answering the questions?

16          THE WITNESS:  I don't have a recollection

17   as to any one or a grouping of responses

18   qualitatively other than to say that my

19   recollection was that in general the questions

20   had been forwarded, and that they had been

21   considered.

22          EXAMINER KLEE:  Do you recall whether the

Kaplan, Todd                    CONFIDENTIAL                July 8, 2010
                                 Chicago, IL

1    responses received from VRC spurred Merrill Lynch

2    to ask further questions of the Company with

3    respect to the VRC opinion?

4          THE WITNESS:  Well, I do know that we went

5    through more than one round of the sequence of

6    offering questions to the Company, delivery by the

7    questions, of the questions on ward *onward* from the

8    Company to VRC, and then a response back.

9          EXAMINER KLEE:  What was the set of

10   responses to the second set of questions that was

11   delivered to the Company if you recall?

12         THE WITNESS:  I don't recall specific sets

13   and comments.  I just have a general sense of

14   certain areas *that* were identified, offered to the

15   Company, delivered to VRC, responded to, and that

16   that happened more than once.

17         EXAMINER KLEE:  And was Murray Devine the

18   source of those questions or some of them?

19         THE WITNESS:  I don't recall who was the

20   source of any one particular question.

21         As I stated earlier, my own personal

22   recollection of Murray Devine and their

Henderson Legal Services, Inc.

Kaplan, Todd                     CONFIDENTIAL                July 8, 2010
                                 Chicago, IL

Page 113

1    involvement was as to industry background as to

2    how in general solvency opinions were developed.

3         EXAMINER KLEE:  Was Merrill Lynch the

4    source of any of the questions propounded to the

5    Company to be delivered to VRC?

6         THE WITNESS:  I don't recall specifically,

7    but I would say that it would be likely that we

8    must have been a source or involved in a

9    meaningful way in developing those questions.

10        EXAMINER KLEE:  Thank you.

11        MR. MINUTI:  Can we take just two minutes?

12   I just need to ask the Examiner a question.

13        MS. PARVER:  Do you want us to step out?

14        EXAMINER KLEE:  Yes.  We'll go off the

15   record.

16                    (Recess taken from 3:34 p.m. to

17                     3:42 p.m.)

18                    (Kaplan Exhibit 16 and Exhibit 17

19                     marked for identification.)

20   BY MR. MINUTI:

21       Q.   I'm showing you 16 and 17 at the same

22   time.  Review both.  Sixteen is I believe the

Kaplan, Todd                CONFIDENTIAL              July 8, 2010
                            Chicago, IL

Page 114

1   first set of questions provided for VRC and I

2   believe 17 are the answers.

3        A.   Do you want me to skip where there's

4   references to schedules that aren't in here?

5        Q.   Correct.

6        A.   Okay.  Okay.

7        Q.   With respect to the first document that

8   I've handed you which we've marked as 16, does

9   this refresh your recollection, does this appear

10  to be the first set of questions that was provided

11  by the lenders to VRC or to the Company to give to

12  VRC?

13       A.   It certainly seems to be a set of

14  questions.  I couldn't say whether it was the

15  first or not.

16       Q.   Okay.  Do you recognize this as -- I mean

17  earlier you testified about questions being

18  provided.

19            Does this look like a set of questions

20  that --

21       A.   It does.  It does.

22       Q.   And probably the easiest way to do this is

Kaplan, Todo                CONFIDENTIAL              July 8, 2010
                            Chicago, IL

Page 115

1   to focus on the second document, which is the VRC

2   responses.

3        A.    Uh-huh.

4        Q.    That would be No. 17.

5        A.    Uh-huh.

6        Q.    Because I believe the VRC lists the

7   questions here and then the responses.

8              I want to move through these fairly

9   quickly, but if we could go to page 3, the first

10  question listed is "Summarize the preliminary

11  conclusions, nature and due diligence

12  investigation and scope of review."

13             Any idea who authored that question?

14       A.    No.

15       Q.    And why was it important to ask that

16  question?

17       A.    I don't recall.

18       Q.    Were you satisfied with the answer that

19  the VRC provided?

20       A.    I don't recall being satisfied or not

21  satisfied with any particular answer.

22       Q.    And looking at it today, does that help

Kaplan, Todd                CONFIDENTIAL              July 8, 2010
                            Chicago, IL

Page 116

1    refresh your recollection at all?

2        A.    Not as to whether it was satisfactory.    I

3    think in general we weren't looking to be

4    satisfied by the responses.

5            We were simply offering questions to

6    ensure that the issues had been considered.

7        Q.    Let's move on to question number 2, which

8    appears on page 4.    Can you tell me who authored

9    that question?

10       A.    I don't know.

11       Q.    Why was it important to ask those

12   questions?

13       A.    As to this specific question, I couldn't

14   say.

15       Q.    And, again, were you satisfied with the

16   responses?

17       A.    The schedule is not here, so I can't

18   answer that specifically, but I would reiterate

19   what I said, which is I don't have any

20   recollection of being satisfied or dissatisfied.

21           And my recollection is that we weren't

22   really looking to be satisfied, only to ensure

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 117

1    that the issues had been considered.

2        Q.    Let's look at question number 3.  Again,

3    do you know who authored that question?

4        A.    I don't.

5        Q.    Let me handle it this way.  As you've had

6    a chance to review the questions and the answers,

7    do you have a specific recollection as to who

8    authored any of the questions that were provided?

9        A.    No.  No.

10       Q.    Okay.  And do you have a (remembering) as    *Memory*

11   you sit here today as to why any specific question

12   was important to the Lending Group?

13       A.    As to any one specific question?  No.

14       Q.    And as you sit here today, do you have a

15   recollection as to whether you were satisfied with

16   the responses provided?

17       A.    To reiterate my earlier answer, my

18   recollection is that we were not looking to be

19   satisfied as the opinion was not being delivered

20   for our benefit.

21             We solely wanted to ensure that the issues

22   had all been considered.

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                             Chicago, IL

Page 118

1      Q.    Were you satisfied based on the responses

2   that the issues, in fact, had been considered?

3      A.    Well, I don't have a specific recollection

4   of that, but to the extent that I do recall that

5   we went through more than one iteration of this,

6   the iterations must have been serial attempts to

7   ensure that all of the issues had been considered.

8      Q.    I want to switch gears for a moment.   I

9   want to talk about when VRC delivered its solvency

10  opinion in connection with stage two of the

11  transaction.

12     A.    Uh-huh.

13     Q.    Did you go back and compare the step two

14  solvency opinion with the opinion that VRC had

15  provided at step one?

16     A.    I don't recall if --

17          MS. PARVER:   When you say "delivered the

18  opinion," my recollection is there were at least

19  one or two drafts that were --

20          MR. MINUTI:   I'm talking about the final

21  opinion.

22          THE WITNESS:   I don't recall whether I did

Kaplan, Todd                 CONFIDENTIAL                 July 8, 2010
                              Chicago, IL

Page 119

1    or didn't.

2              MS. PARVER:  Okay.

3    BY MR. MINUTI:

4        Q.    Do you recall as you sit here today

5    whether you had noticed any differences in

6    methodology between the solvency opinion that was

7    provided at step one versus the solvency opinion

8    that was provided at step two?

9        A.    I don't recall.  I don't have any memory

10   of having changed, but I don't recall whether it

11   did or didn't.

12                   (Kaplan Exhibit 18 and Exhibit 19

13                    marked for identification.)

14   BY MR. MINUTI:

15       Q.    I'm showing you now what we've marked as

16   Kaplan Exhibit 18 and Exhibit 19.  I'll represent

17   to you that 18 is the solvency opinion provided by

18   VRC at stage one, and 19 is the solvency opinion

19   provided at stage two.  Let me know when you've

20   had an opportunity to -- I'm not going to ask you

21   any detailed questions about it.  So if I ask you

22   a question that you need to review it in detail,

Kaplan, Todd                  CONFIDENTIAL                  July 8, 2010
                              Chicago, IL

Page 120

1    you can do that.

2            At this point I'd like you to just satisfy

3    yourself that my representation to you is correct.

4            MS. PARVER:  Mark, is there come an 18A or

5    something?  Didn't in May in connection with the

6    step one opinion VRC do a separate analysis?

7            MR. SCHWAB:  You're talking about

8    something that looks like a slide deck?

9            MS. PARVER:  It doesn't look like a slide

10   deck.  It may not be totally -- maybe it does --

11   totally in the form of an opinion letter, but I

12   think they are considering the effect of step two.

13           MR. MINUTI:  I don't -- I just don't know.

14           MS. PARVER:  Okay.

15   BY MR. MINUTI:

16       Q.   My first question for you is when you look

17   at the two opinions, and if you turn to page 2 of

18   each, there are some defined terms.  Are you with

19   me?

20       A.   I'm turning.  I've got one of them on

21   page 2 and now I've got both.

22       Q.   Okay.  And if you look at what we've

Kaplan, Todd                 CONFIDENTIAL                 July 8, 2010
                             Chicago, IL

Page 121

1    marked as Exhibit 18, which is the first one,

2    you can see the definition of fair value.  Are

3    you with me?

4        A.   Yes.

5        Q.   And then let's look at the second one,

6    Exhibit 19.  And you can see that the definition

7    of fair value has changed to take into account the

8    S Corporation and the fact that it's owned by an

9    ESOP.  Do you see that?

10       A.   I do see that.

11       Q.   Okay.  Did you agree with the change made

12   in the definition of fair value?

13       A.   I don't recall any discussion or change in

14   this nor would it have been my purview to agree or

15   disagree with any of this.  This was between

16   Tribune and VRC.

17       Q.   Do you have a view as you sit here today

18   in looking at the definition of fair value as to

19   whether, in fact, you should take into account

20   the --

21       A.   Seeing as these are VRC's -- I'm sorry.  I

22   didn't let you finish.

Kaplan, Todd                 CONFIDENTIAL              July 8, 2010
                              Chicago, IL

Page 122

1      Q.   The question really is do you have a view

2   as you sit here today if you're trying to

3   determine at stage two the fair value of the

4   assets whether you should take into account the

5   structure, the Sub S Corporation and the

6   ESOP structure.

7      A.   As I'm not a solvency expert, the

8   definition by experts -- and I'm assuming VRC is

9   such -- as to what a defined term means, in this

10  case fair value, would be for them to determine,

11  not me.

12     Q.   Okay.  Same question as to the definition

13  of present fair saleable value.  When you look at

14  the exhibits you can see there's a difference.

15     A.   Same answer.

16     Q.   Do you recall any discussion among the

17  lending group about this issue?

18         MS. PARVER:  Again, I'm just going to

19  caution the witness not to disclose conversations

20  if they involved the presence of counsel or advice

21  from counsel.

22     A.   To the best of my recollection, the

Kaplan, Todd                  CONFIDENTIAL                July 8, 2010
                              Chicago, IL

Page 123

1    discussions vis-a-vis these types of materials

2    amongst lenders all occurred with Cahill Gordon

3    present.

4    BY MR. MINUTI:

5        Q.   Were you aware that in -- that there was a

6    difference in the projections utilized by VRC

7    between the first opinion, Exhibit 18, and the

8    second opinion, Exhibit 19?

9             And specifically as I understand it in

10   connection with the first opinion, they base their

11   analysis on a 5-year projection whereas in the

12   second opinion they base the analysis on a 10-year

13   projection.  Were you aware of that?

14       A.   Because your question has two parts or I

15   think at least it does, I'll try to answer the two

16   parts.

17            As to the one shift, if you will, from 5

18   to 10 years, I don't recall that.

19            As to the were you aware that the

20   projections were different from step one to step

21   two, yes.

22       Q.   Okay.  In what way were you aware they

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 124

1    were different?

2        A.    Going back to some of the materials we

3    read earlier, there was a process that began in

4    the summer of reforecasting given the Company's

5    performance experience in the April to summer

6    time frame.  And I think for all constituents

7    whatever the projections were at April 1st and

8    May, they were different by the time we got to

9    November and December.

10       Q.    Okay.  But separate from the projections,

11   I'm really talking about methodology.

12       A.    Okay.

13       Q.    Because on the one hand we're using 5-year

14   projections --

15       A.    That piece I didn't recall.

16       Q.    You don't recall any discussions among the

17   Lender Group about that?

18       A.    (Shaking head.)

19       MS. PRIMOFF:  Just going back a second,

20   Mark, the merger obviously didn't occur in step

21   one.  So to the extent that there are tax savings

22   resulting from the merger, those would only come

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd          CONFIDENTIAL          July 8, 2010
                       Chicago, IL

Page 125

1    into play at step two.

2          MR. MINUTI:  In the 10 years.

3          MS. PRIMOFF:  You know, I don't know

4    anything about 5 years and 10 years.  But to the

5    extent that I think your earlier set of questions

6    relating -- was relating to the effect of the

7    S Corp. And the tax, the merger only happens at

8    step two, so that's only an issue that comes into

9    play at step two.

10          MR. MINUTI:  Right.  I'm not debating

11   whether the 5 or 10 -- whether the change was

12   reasonable.

13          I'm just trying to get a sense for whether

14   folks were aware of that.  That's really where my

15   question goes to.

16          MS. PRIMOFF:  Okay.

17                    (Kaplan Exhibit 20 marked for

18                     identification.)

19   BY MR. MINUTI:

20      Q.   I've now handed you a document we've

21   marked Kaplan 20.  I'll ask you to take a look at

22   it and tell me when you've had an opportunity to

Kaplan, Todd          CONFIDENTIAL          July 8, 2010
                       Chicago, IL

Page 126

1   review it.

2     A.   Is there a difference between 76 and 77

3   versus 78?  Okay.  I got it.

4      MR. SCHWAB:  It's just different parts of

5   the same chain.

6      THE WITNESS:  Got it.  Got it.

7   BY MR. MINUTI:

8     Q.   I'm trying to move this along.  Forgive me

9   if I'm cutting right to it.  We can slow down it

10   you like.

11      This appears to me to be an e-mail chain

12   that starts with a valuation analysis, and then

13   different folks at Merrill Lynch are providing

14   some input and analysis related thereto.  Is that

15   a fair characterization?

16     A.   That's a fair characterization. ✓ (Rider 126)

17     Q.   And tell me again why is it that this

18   analysis is being done?

19     A.   To ascertain the delivery or lack thereof

20   of a solvency opinion by the VRC.

21     Q.   And starting with the last page of the

22   e-mail chain which begins "This looks like an

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

1    e-mail from John Harrison," and, again, did I ask

2    this question, who is Mr. Harrison?

3        A.    He at this time is an MB or Director --      MD

4             MS. PARVER:  Okay.  Can I -- now I just

5    want the record to reflect that Kaplan 20 appears

6    to be two separate documents that were put

7    together as one.  Okay?

8             Certainly the first two pages, four pages,

9    whatever you want to say, but the ones that start

10   out 406176 and go through 40 -- 406179, I mean, it

11   may be the same as what the TRIB-0440845 is.  I'm

12   not quite sure since we don't have the pretab that

13   apparently accompanied that last.

14            But the questions on the first couple of

15   pages appear to refer to a VRC draft, does it not?

16            MR. SCHWAB:  The originating e-mail in all

17   of the chains is the same.  It's a 914 PN e-mail.

18            MS. PARVER:  I understand.  It's just a

19   little confusing.  I'm sure, you know, no one says

20   anything is deliberate or anything.

21            All I'm saying, for example, the first

22   e-mail or it should be the first, but the last

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 128

1    e-mail in the chain on 0406176 says "My thoughts/

2    questions on the VRC analysis" to start with

3    page 5.  And there's a reference to a definitional

4    phrase.

5          That has nothing to do with page 5 of the

6    document that's attached to these two pages of

7    e-mails.

8          MR. MINUTI:  I agree.  And I'm not trying

9    to confuse the witness.  You know, this is part of

10   the way it was delivered to us.  And I'm trying to

11   put it all together.

12         I mean, let me ask my question.

13         MS. PARVER:  Sure.

14         MR. MINUTI:  I don't think your

15   clarification is going to be relevant.  But if

16   there's any confusion, you jump in and let me know

17   that.

18   BY MR. MINUTI:

19         Q.  When I look at the beginning of this

20   e-mail chain which appears to be an e-mail from

21   Mr. Harrison, he says in the second paragraph ⌐off

22   that "You will see the trading comp benchmarks are all

Kaplan, Todd                    CONFIDENTIAL                July 8, 2010
                                Chicago, IL

1    substantially."  And moving forward specifically

2    he talks about Gannett and McClatchy and then he

3    says "is a bit higher."  the New York Times

4           And then he says "Our range for the

5    publishing business is 5.75x to 6.75x and the

6    high end may be generous."

7           I guess what I'm asking you is if you know

8    is Mr. Harrison, is he choosing those multiples to

9    your knowledge or is he getting those multiples

10   from VRC or somebody else do you know?

11        A.    I don't know.

12        Q.    Did you understand that Mr. Harrison was

13   doing his own independent analysis without regard

14   to VRC for purposes of comparing it to VRC?

15        A.    I don't have any recollection of this

16   specific message or what John may or may not have

17   been thinking.

18             MR. MINUTI:  Let's go to tab 82.

19                  (Kaplan Exhibit 21 marked for

20                  identification.)

21             MR. SCHWAB:  This is Kaplan 21.

22             MS. PARVER:  So it's two separate e-mails

Kaplan, Todd                CONFIDENTIAL              July 8, 2010
                            Chicago, IL

Page 130

1    are part of Kaplan 21?

2              MR. SCHWAB:  Yes.

3              MR. MINUTI:  Correct.

4              THE WITNESS:  Okay.

5    BY MR. MINUTI:

6         Q.   I'm just going to draw your attention to

7    the first page of this exhibit.  It's an e-mail

8    from John Harrison to a Henrik Dahlback.  Who is

9    Mr. Dahlback?

10        A.   Dahlback  It's part of Leveraged Finance

11   group.  I take it at this time he's an Associate.

12        Q.   There's also an e-mail, David Tuvlin.  Who

13   is Mr. Tuvlin?

14        A.   David is a Managing Director in our

15   Leveraged Finance Group.

16        Q.   Mr. Harrison says the question "Quick

17   question - What are we using this for?"

18             In fairness it doesn't appear you're

19   copied on this.

20             "What are we using this for?  Are we

21   planning to challenge the report? "

22             And then Mr. Tuvlin responds "Potentially

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                              Chicago, IL

Page 131

1    I guess."

2          Were you aware that Mr. Tuvlin and

3    Mr. Harrison were having this conversation at or

4    about December 9?

5          A.    No.  No.

6          Q.    Okay.  Were you aware of anyone at Merrill

7    Lynch who was asking whether an analysis was being

8    done to challenge the VRC report?

9          A.    I don't recall anyone bringing that to my

10   attention.

11         Q.    Okay.  So Mr. Tuvlin never had a

12   conversation with you about that subject?

13         A.    Not that I recall.

14         Q.    Okay.  Same thing, Mr. Harrison didn't

15   have a conversation with you about that?

16         A.    (Shaking head.)

17         Q.    Okay.

18         MR. MINUTI:  Let's go with 86.

19         MR. SCHWAB:  Kaplan 22.

20               (Kaplan Exhibit 22 marked for

21                identification.)

22   BY MR. MINUTI:

Kaplan, Todd                   CONFIDENTIAL                   July 8, 2010
                               Chicago, IL

Page 132

1      Q.    I've shown you now what we've marked as

2    Exhibit 22.   I'll ask to you review it and tell me

3    when you've had a chance to look at it.

4      A.    Okay.

5      Q.    Drawing your attention to the first page,

6    Mr. Hwang writes "Attached please find our

7    analysis in replicating the DCF results from the

8    VRC report; the third page re-attaches the NPV of

9    tax savings analysis in Dave's e-mail below.

10   We've also included our version internal valuation

11   analysis."

12          As I look at this document -- and tell me

13   if I'm wrong or tell me if I'm correct -- but it

14   looks like the first document attached to this

15   e-mail is the DCF analysis where Merrill Lynch is

16   comparing its own internal analysis and shows the

17   differences with VRC.   Is that how you read the

18   document?

19     A.    No.   That's not how I read it.

20     Q.    Okay.   How do you read it?

21     A.    It seems to me to be an analysis of VRC's

22   work.

CONFIDENTIAL

Page 133

1    Q.   Let me ask you are you looking at -- let's

2    look at the second page of the -- and I apologize

3    that these aren't numbered.

4         The first page says "DCF Analysis of

5    Tribune Company."  Are you with me?

6    A.   Yes.

7    Q.   And then you turn to the second page and

8    it says "Tribune DCF Analysis Summary," correct?

9    A.   I'm sorry, which page?

10   Q.   The Bates is on the side.  It looks like

11   it's 0486500.

12   A.   Yes.  Yes, this page right here.

13   Q.   Okay.  And this looks to me like what's

14   being shown is the difference between VRC's

15   discount rate, for example, and the internal

16   discount rate used by Merrill Lynch in its own

17   analysis.

18   A.   I guess I'm looking at something that

19   shows discount rates of 6 and a half to 8 and a

20   half and then a little box that says VRC 6 and a

21   half to 8 and a half.

22   Q.   Okay.  And then if you go to the

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

1   middle of the page where we're looking at the

2   "PV of Terminal Value using a Current Year Exit

3   Multiple," are you with me?

4       A.   Yes.

5       Q.   You'll see there's a box that says VRC I

6   think that's a 6.7 to 10.5?

7       A.   I think it's a 5.

8       Q.   Okay.

9       A.   5.7 to 10.5. You could be right.  I don't

10  know.

11      Q.   It looks to me like that number is

12  different than what appears below the heading

13  "PV of Terminal Value."

14      A.   It seems that we just picked kind of a

15  middle point wherein that range. *Within*

16      Q.   I'm just trying to understand what this

17  document does.

18           It looks to me like this is the internal

19  analysis that Merrill Lynch is doing and then

20  comparing it to VRC.  Am I wrong?

21      A.   I would not be in a position to say you're

22  wrong, but my quick reading of this document is

Kaplan, Todd                 CONFIDENTIAL                July 8, 2010
                              Chicago, IL

*an attempt to re-show*

1    that it's a replication of the VRC analysis with

2    more detail than what VRC provided us.

3    *We are*    Are you taking their inputs and trying to

4    do the calculations with more depth than what was

5    shared with us.

6         Q.    And then next document in this package

7    which begins at Bates number 0486504 is titled

8    "Internal Discussion Materials Regarding:

9    Valuation Analysis of Tribune Company."

10        A.    Uh-huh.

11        Q.    Is this an analysis based on the VRC

12   report?

13        A.    It seems to be, but I don't --

14             MS. PRIMOFF:  But you're --

15        A.    I don't know for certain.

16             I think within this time frame there was a

17   lot of working analysis being bandied back and

18   forth.

19             MR. MINUTI:  Let's do 87.

20                      (Kaplan Exhibit 23 marked for

21                      identification.)

22   BY MR. MINUTI:

Kaplan, Todd               CONFIDENTIAL                July 8, 2010
                           Chicago, IL

1      Q.    I'm now showing you a document we've

2    marked as Exhibit 23.  I'm going to ask you to

3    take a look at that and tell me when you've had an

4    opportunity to review it.

5      A.    Okay.

6      Q.    How did this set of questions come about?

7      A.    I don't recall.

8      Q.    Do you have any general recollection of

9    followup questions regarding the first set of

10   questions provided by VRC?

11     A.    I have a general recollection of lenders

12   at the Cahill meeting generating questions,

13   proffering them to the Company, and the Company

14   then deciding to forward them on to VRC.

15     Q.    Okay.  And looking at the questions which

16   appear on page 2 of the exhibit, can you tell me

17   who was the author -- or do you know who the

18   author was of any of these questions?

19     A.    I do not.

20     Q.    And tell me why it is it was important to

21   ask, for example, the questions that fall under

22   heading number 1?

Kaplan, Todd                  CONFIDENTIAL                July 8, 2010
                              Chicago, IL

Page 137

1        A.    I couldn't speak to the importance of any

2   particular question other than I would surmise

3   that we felt these were areas that we considered

4   should be addressed by VRC in rendering their

5   opinion.

6        Q.    But you don't have a specific recollection

7   of why any particular question was important?

8        A.    No.

9        Q.    Did the Company ever respond to these --

10  I'm sorry.

11            Did VRC ever respond to these questions?

12       A.    My recollection is that in general they

13  did respond.  And my previously described cycle of

14  we proffer questions to the Company, they're

15  forwarded on to VRC, and then they deliver

16  responses back to the Company.

17       Q.    And the Company would provide them to the

18  lender group?

19       A.    Uh-huh.

20       Q.    That's a yes?

21       A.    That's a yes.

22       Q.    We have not been able to find any writing,

Kaplan, Todd                 CONFIDENTIAL                 July 8, 2010
                             Chicago, IL

1    any written response to these questions.

2            Do you recall a written response?

3        A.   I would have actually recollected that

4    ~~maybe~~ *in* each of the cycles I just described ~~that~~

5    everything transpired by writing.

6            So my recollection is faulty I guess if

7    you can't find any written responses.

8        Q.   Were you satisfied with the responses that

9    the Debtor provided?

10       A.   I don't have any particular recollection

11   of being satisfied or not satisfied.

12       Q.   If you look at question number 2, it says

13   "Reference is made to VRC's answer to Question 18

14   in the Response in which VRC indicates that it is

15   relying, in part, on a representation from Tribune

16   which states that based upon recent discussions

17   with Morgan Stanley, the Company would be able to

18   refinance debt in its downside forecasts without

19   the need for additional assets sales."

20           What can you tell me about discussions

21   among the Lender Group related to Morgan Stanley's

22   representations as set forth in this question

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 139

1   number 2?

2        A.   I don't have any recollection of this

3   point or any discussions about it.

4        Q.   Was Morgan Stanley's belief that the

5   Company could refinance the debt an important

6   factor to the Lending Group?

7        A.   I just stated I didn't have any

8   recollection of it.   I think by definition I can't

9   answer your question as stated.

10       Q.   Sitting here today let's say that Morgan

11  Stanley had not represented to the Company that

12  the Company would be able to refinance the debt in

13  2014.

14       A.   Uh-huh.

15       Q.   Would that have been a material fact in

16  your decision as to whether or not to close step

17  two?

18       MS. PRIMOFF:   Again, you're asking him to

19  speculate.

20       What we understand is that VRC said that

21  they needed that in order to render their opinion,

22  and they wanted Morgan Stanley to opine as to the

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                  Chicago, IL

Page 140

1    refinancability of the debt, that that's not a

2    customarily given opinion on Wall Street.  So

3    Morgan Stanley wouldn't give that opinion, but

4    that the Company made representations to VRC.

5          MR. MINUTI:  I'm just trying to get a

6    sense for whether that was a -- whether that was

7    material to the Lending Group.

8          MS. PRIMOFF:  No.  Only to the --

9          MS. PARVER:  That's a speculative.

10         What was material was --

11         MS. PRIMOFF:  It was material to VRC

12   because they were the ones asking for it.

13         MR. MINUTI:  The Lending Group is asking

14   questions about it.

15     A.    I think the Lending Group is offering

16   questions that we want to ensure the Company and

17   VRC are considering.

18   BY MR. MINUTI:

19     Q.    Is it your testimony that's not a material

20   issue for the Lending Group?

21         MS. PRIMOFF:  This is part of getting an

22   update.  VRC said they would only give the opinion

Kaplan, Todd                     CONFIDENTIAL                     July 8, 2010
                                 Chicago, IL

Page 141

1    if they could have this opinion from Morgan

2    Stanley.  So the Lending Group is essentially

3    asking about the status of those discussions

4    between VRC and Morgan Stanley not because the

5    Lending Group necessarily cares about the answer,

6    but because VRC made it a prerequisite to

7    delivering their opinion.

8            MS. PARVER:  I mean, that's what's

9    material.  And that is why he can't answer that.

10           MR. MINUTI:  That's my question.

11   BY MR. MINUTI:

12      Q.   Do you not care about the answer as

13   represented by your counsel?

14      A.   I think we wanted to ensure that the

15   question had been raised so that it could be

16   considered by the Company and VRC if the Company

17   deemed it ~~or they forward it on~~ *appropriate to forward on to VRC.*

18      Q.   That's a yes-or-no question.  Did you care

19   about the answer?

20           MS. PARVER:  He doesn't have to answer it

21   yes or no.

22      A.   I believe that I had answered the

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                 Chicago, IL

                                                              Page 142

1    question.

2                        (Kaplan Exhibit 24 marked for

3                         identification.)

4            THE WITNESS:  So these December 16th

5    materials are in an attachment between

6    Mr. Harrison and Mr. Braun on January 8th?

7            MR. MINUTI:  Correct.  I say correct.

8    That's the way they were produced to us.  I'm

9    assuming as such.

10           THE WITNESS:  I just wanted to make sure

11   we weren't missing pages.  Okay.

12   BY MR. MINUTI:

13      Q.    As you pointed out a moment ago, the date

14   of the valuation analysis is December 16 and the

15   cover e-mail is dated January 8th.

16      A.    Uh-huh.

17      Q.    This is the only way we've been able to

18   attempt to identify the final version of the

19   valuation analysis, and that's why I've given it

20   to you together.

21           As you sit here today and you look at the

22   valuation analysis which begins on page 2 of this

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

1    exhibit, do you have any reason to believe that

2    this is not the final valuation analysis done by

3    Merrill Lynch?

4        A.    I guess --

5              MS. PARVER:  Don't guess, please.

6              THE WITNESS:  Yes.

7        A.    I don't know why there would be a final,

8    as there was not a stated conclusory step we were

9    moving toward.  We were simply I know through many

10   iterations as we've gone through trying to

11   ascertain the deliverability or lack thereof of an

12   opinion by VRC.

13             So if in the absence of your delivering

14   this, I would not have said there would be a final

15   because there wouldn't be a final step or

16   conclusory step.

17             MS. PRIMOFF:  Just to add to that, the

18   word "final" on the e-mail also has a natural

19   reading of it's the last one.

20             MR. MINUTI:  That's all I'm getting at.

21   I'm just trying to figure out if this is the last

22   one that was done before step two.

Kaplan, Todd            CONFIDENTIAL              July 8, 2010
                        Chicago, IL

Page 144

1           THE WITNESS:  Perhaps my simple answer

2    would be I don't know.

3    BY MR. MINUTI:

4       Q.   Let's turn to the valuation itself, which

5    is I guess page 2.  It has Bates numbers 0487162.

6    And here if you look on the right side, we have a

7    summary.

8       A.   Yes.

9       Q.   Is my reading of this correct that

10   Merrill Lynch's analysis as of this point was that

11   in only the high case did the Company have a

12   positive equity value?

13      A.   I would conclude that this analysis which

14   in these iterations was one of many attempts to

15   ascertain the analysis VRC was doing does indicate

16   a positive value only in the high case. [Rider 144]

17      Q.   And, again, I asked you a couple of

18   questions earlier, but in terms of your team who

19   was performing this analysis, you had 100 percent

20   confidence in their work product; is that correct?

21      A.   That wasn't what I was asked earlier.  You

22   asked if I had concerns about the quality of their

Henderson Legal Services, Inc.

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                    CONFIDENTIAL                July 8, 2010
                                 Chicago, IL

Page 145

1    work product.

2        Q.    I was trying to cut through it.

3              Did you have any reservations or concerns?

4        A.    Not that I recall.

5        Q.    Okay.  So you felt this was work product

6    you could rely upon?

7        A.    In this particular case I don't recall

8    particularly since this was not, at least in this

9    version, copied to me.

10             But my general recollection is that the

11   team did a fine job given the circumstances.

12       Q.    If you look in the summary in terms of the

13   valuation methods, there's a reference to the sum

14   of the parts.

15       A.    Yes.

16       Q.    Do you see that?

17             And then there's a paren and it says

18   "pretax."

19       A.    Yes.

20       Q.    And it looks to me -- and I'm just trying

21   to cut through some of the e-mails, but it looked

22   to me like there was some e-mail traffic about

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                    CONFIDENTIAL                July 8, 2010
                                Chicago, IL

Page 146

1   whether the valuation on a sum of the parts basis

2   should be done on a pretax or post tax basis.

3           Do you remember any internal discussion

4   about that?

5       A.   I have a general recollection, and this

6   is in furtherance of a comment Madlyn made

7   earlier, that prior to the deal closing, like all

8   corporations when pieces of the company are sold

9   for more than the basis for tax purposes, there's

10  gain.  And that post the merger as an S Corp.,

11  given the change in the design and the federal

12  taxation consequences, there may well not be gain

13  that needed to be paid.

14          So I do remember a debate as to how does

15  one think about that when rendering a solvency

16  opinion.

17      Q.   And did you reach a conclusion that it was

18  appropriate to do it on a pretax basis?

19      A.   I don't recall where we landed on that.

20  And I think our desire to determine that was

21  solely to determine where VRC was going as opposed

22  to independently come up with what we thought was

Kaplan, Todd                 CONFIDENTIAL              July 8, 2010
                              Chicago, IL

Page 147

1    the right answer.

2        Q.    Okay.  Same question if you look down

3    there's the sort of adding back or adding in the

4    net present value of the S Corp. tax savings.

5        A.    Uh-huh.

6        Q.    Again, I recall some e-mail traffic where

7    there is some discussion internally about whether

8    that's appropriate and what the appropriate number

9    should be.

10       A.    Uh-huh.

11       Q.    Do you recall that discussion?

12       A.    As a general category, yes.

13       Q.    Did you ultimately agree with what is set

14   forth in this exhibit, that, in fact, it should be

15   added back in?

16       A.    I think, again, to be repetitive, I don't

17   think we were trying to determine it should or

18   shouldn't.

19            We were trying to ascertain what VRC's

20   analysis was.

21            And my recollection is at this point we

22   had seen at least a couple of drafts from VRC that

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 148

1   had included an entry for S Corp. tax savings.

2       Q.    Okay.  If you'll turn to page 5 of the

3   document, which is Bates number 0487166, this is

4   the -- are you with me?

5       A.    Uh-huh.

6       Q.    This is the valuation analysis the

7   comparable trading multiple analysis.

8       A.    Yes.

9       Q.    You'll see here on this page a multiple

10  range of 7, 8 and 9?

11      A.    Yes.

12      Q.    Is that correct?

13      A.    That is.

14      Q.    Who came up with that particular range, do

15  you know?

16      A.    I don't recall.

17      Q.    Okay.  Did you disagree with that range,

18  think it was too high, think it was too low?

19      A.    I don't recall.

20      Q.    Okay.  Turning to page 7 this is Bates

21  number 0487168.

22      A.    Uh-huh.

Kaplan, Todd                 CONFIDENTIAL                July 8, 2010
                             Chicago, IL

Page 149

1      Q.   Now we're talking about the DCF analysis.

2      A.   Uh-huh.

3      Q.   And you'll see that the discount rate

4   being used is between 8 percent and 11 percent.

5      A.   Uh-huh.

6      Q.   Are you with me on that?

7      A.   I am.  I see that.

8      Q.   Can you tell me who chose that range of

9   the discount rate?

10     A.   Again, I would say I don't think it was

11  any one particular person.  And if it was, I don't

12  recall.

13     Q.   Okay.  And as you sit here today, do you

14  remember whether you agreed or disagreed with that

15  range?

16     A.   I don't recall.

17     Q.   I'm sorry.  If you'll turn back to        sum

18  page 6, this is the private market ~~some~~ of the

19  parts valuation.

20     A.   Uh-huh.

21     Q.   And here we have multiple ranges?

22     A.   Uh-huh.

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 150

1      Q.    For broadcasting it's 11, 12 and 13?

2      A.    Uh-huh.

3      Q.    For publishing it's 7, 8 and 9?

4      A.    Uh-huh.

5      Q.    Same question, do you know who chose those

6    multiples?

7      A.    I don't.

8      Q.    As you sit here today do you recall

9    agreeing/disagreeing with those multiples?

10      A.    I don't recall.

11      Q.    If you'll turn to page 11.

12           MS. PRIMOFF:  Eleven?  Help me out.

13           MS. PARVER:  The Bates numbers.

14      A.    172.

15           MR. SCHWAB:  It's 0487172.

16    BY MR. MINUTI:

17      Q.    Now, this is an analysis of the VRC

18    VCF analysis.

19      A.    Uh-huh.

20      Q.    And you'll see the multiple ranges that

21    they're using are 6.5 to 8.5?

22      A.    Uh-huh.

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                 Chicago, IL

Page 151

1     Q.    That's lower than what appears previously?

2     A.    Uh-huh.

3     Q.    Is that correct?

4     A.    Let me flip back.  Lower than the ones on

5   page -- I'll do the last three digits -- 168?

6     Q.    Correct.

7     A.    It actually seems higher, unless I'm

8   misreading.

9     Q.    I'm talking about the discount rate.

10    A.    I'm sorry.  I thought you were talking

11   about the multiples.

12    Q.    I'm talking about the discount rate.

13    A.    Sorry.  Yes.  Those are lower.

14    Q.    Okay.  And do you recall any internal

15   discussion about the difference?

16    A.    I don't.

17    Q.    Did you form a view as to what rates were

18   more appropriate in this analysis?

19    A.    I don't recall forming a view as to any

20   particular rates in either part of this analysis.

21    Q.    And turning back again to the summary

22   which shows only positive equity value in the high

Kaplan, Todd                 CONFIDENTIAL              July 8, 2010
                             Chicago, IL

Page 152

1   range, did you form any opinions at or around

2   December 16th as to whether Tribune was solvent or

3   insolvent?

4       A.   I'm not a solvency expert.  I wasn't

5   attempting to ascertain that.

6       Q.   But leaving aside whether you're an expert

7   or not, did you have a view?

8       A.   It was a way of answering your question no

9   with some explanation.  No, I do not.

10                      (Kaplan Exhibit 25 marked for

11                       identification.)

12  BY MR. MINUTI:

13      Q.   I'm going to show you now a document we've

14  marked as Kaplan 25.  I would ask that you keep 24

15  handy because I'm going to ask you to look at the

16  documents at the same time.

17      A.   Sure.

18           MS. PRIMOFF:  Do you want to take a break

19  before we do that?

20           THE WITNESS:  Is that okay?

21           MR. MINUTI:  I could use one too.

22                      (Recess taken from 4:47 p.m. to

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 153

1                        4:59 p.m.)

2     BY MR. MINUTI:

3         Q.    Did you get a chance to take a look at

4     that?

5         A.    I did not look at 25.

6         Q.    Take your time.  If you could take a look

7     at the -- what I want to do is just compare a

8     couple of things in what looks like the

9     December 16th analysis to the December 13th

10    analysis.

11              Let's start with the December 13th

12    analysis and go to page --

13              MS. PARVER:  Oh, here, do you have the --

14    okay.  This is Kaplan 25?

15              MR. SCHWAB:  Yes.

16              MR. MINUTI:  Yes.  I'm going to give you a

17    Bates number.  Bates number 0486707.

18    BY MR. MINUTI:

19        Q.    If you'll go to the equivalent page on

20    Exhibit 24, which is Bates number 0487166, are you

21    with me?

22        A.    I am.

Kaplan, Todd            CONFIDENTIAL            July 8, 2010
                        Chicago, IL

Page 154

1      Q.    And just looking at the EBITDA multiples,

2   you'll see in the December 13th version the low

3   range is 6, the mid is 7, and the high is 8.  But

4   when we get to the December 16 version, the

5   multiples go from 7 to 8 to 9.  Do you see that?

6      A.    I do see that.

7      Q.    Do you know why that changed?

8      A.    I don't know why that changed.

9      Q.    Any idea whose decision it was to make

10  that change?

11     A.    I don't know.

12          MS. PARVER:  Objection.  I'm sorry.  When

13  you say "decision to make that change," do you

14  mean who the person was that ran this particular

15  analysis with those different multiples?

16          THE WITNESS:  It may have been two

17  different people.

18  BY MR. MINUTI:

19     Q.    If the answer is you don't know, you don't

20  know.

21     A.    We're just stating it's not a change

22  necessarily.  [Rider 154]

Kaplan, Todd                    CONFIDENTIAL                    July 8, 2010
                                Chicago, IL

Page 155

1      Q.   Understood.  All right.

2      A.   I'd like to reiterate too that throughout

3   this is not a Merrill Lynch valuation analysis.

4           This is, as I recall and as I look at it

5   today, our attempt to ~~replicate~~ how VRC was          *understand*

6   developing their work and providing an opinion

7   to the Company to satisfy the closing condition.

8           I would state that that to me is separate

9   and distinct from us doing a valuation analysis.    *Merrill Lynch*

10     Q.   If you look at the same slide on each

11  exhibit, and you'll see there's a row "Equity

12  Investments."

13     A.   Yes.

14     Q.   You'll see in the December 13th version

15  the number is 2360.  Do you see that?

16     A.   Yes.

17     Q.   You'll see in the later version it's 1710.

18     A.   Yes.

19     Q.   Do you have a recollection as to why that

20  change occurred or why they're different?

21     A.   I don't know that they're even necessarily

22  measuring the same thing.

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                              Chicago, IL

Page 156

1          MS. PRIMOFF:  Mark, there's really no

2     foundation for these documents.

3          MR. MINUTI:  If he's never seen them and

4     he doesn't know, he could just tell me he doesn't

5     know.

6          MS. PRIMOFF:  I don't think you've asked

7     him those questions, whether he's seen this

8     before, who prepared it.

9          MR. MINUTI:  Okay.

10         MS. PRIMOFF:  What were the assumptions

11    going into these documents.  I don't think you've

12    asked him any, you know, basic foundation

13    questions.

14         MR. MINUTI:  Well, then I'll ask him that.

15    BY MR. MINUTI:

16     Q.   With regard to the document we've

17    identified as Exhibit 25, have you seen this

18    document before?

19     A.   I can't recall any one specific document

20    in what was clearly a series of similar types of

21    worksheets that were produced over several weeks

22    and months.

Kaplan, Todd                CONFIDENTIAL              July 8, 2010
                            Chicago, IL

Page 157

1      Q.    Okay.  And so do you know who prepared it?

2      A.    I do not.

3      Q.    With regard to what we've now marked as

4    Exhibit 25 --

5      A.    Did you ask on 24?

6      Q.    Let's just make sure the record is clear.

7            Were you answering as to Exhibit 25?

8      A.    I was answering as to 25.

9      Q.    Okay.  Let me ask you the same question as

10   to 24.

11     A.    Same answer for 24.

12     Q.    Okay.  Let me go back then and ask

13   you to look at the -- strike that.  I'm going

14   to move on.

15           MR. MINUTI:  Let's mark tab 92.

16                    (Kaplan Exhibit 26 marked for

17                     identification.)

18   BY MR. MINUTI:

19     Q.    We've marked a document as Exhibit 26.  I

20   ask you to let me know when you've had an

21   opportunity to take a look at that.

22     A.    Okay.  I have seen this.

Kaplan, Todd                  CONFIDENTIAL                    July 8, 2010
                              Chicago, IL

Page 158

1     Q.    Tell me how this document came about.

2     A.    I don't recall.

3           By "document" do you mean Raj's e-mail?

4     Q.    Correct.

5     A.    I don't recall.

6     Q.    Do you recall a discussion among the

7  Lending Group about asking the Company additional

8  questions?

9     A.    As I stated previously, there were several

10 different occasions upon which we generally

11 discussed issues that we thought the Company

12 should consider and look forward to VRC for

13 consideration.

14        I don't remember one particular session or

15 discussion, but that is my general recollection.

16    Q.    Do you recall if the Company responded to

17 these questions?

18    A.    My general recollection, which I'll

19 reiterate from our earlier discussion, is that my

20 recollection was that in general there had been a

21 response to the questions that we've offered to

22 the Company and requested that they pass along to

Kaplan, Todd                     CONFIDENTIAL                     July 8, 2010
                                 Chicago, IL

Page 159

1    VRC.

2        Q.    And do you know who authored these

3    questions?

4        A.    I do not.

5        Q.    And why was it important to ask the

6    Company to ask VRC these followup questions?

7        A.    These particular questions or the

8    general --

9        Q.    I'm talking about these questions, these

10   particular questions.

11       A.    I don't have any recollection as to any

12   one of these questions being important or not

13   important.

14                     (Kaplan Exhibit 27 marked for

15                      identification.)

16   BY MR. MINUTI:

17       Q.    This appears to be an e-mail from you to

18   Mr. Kenney at the Tribune; is that correct?

19       A.    It is.

20       Q.    Do you remember sending this e-mail?

21       A.    I don't.

22       Q.    Were you the author of the questions that

Kaplan, Todd                CONFIDENTIAL              July 8, 2010
                            Chicago, IL

Page 160

1    are listed in this e-mail?

2        A.   I believe that in all likelihood this was

3    the product of a discussion amongst the lenders *and*

4    Cahill.

5            So in that regard I don't think I can

6    answer that question.

7        Q.   The other questions that had been posed

8    seem to have come from J.P. Morgan Chase.  Is

9    there a reason why you were sending these

10   questions as opposed to someone else?

11       A.   When you say "came from J.P. Morgan

12   Chase," you say that in the sense physically

13   transmitted as opposed to questions generated by?

14       Q.   Correct.  That's what I'm talking about.

15       A.   I would agree in all of the previous

16   documents the questions were sent by Raj.  I don't

17   recall why Raj was asked as a member of the Lender

18   Group would be the one to transmit the questions.

19   I don't know why at this particular point it may

20   have shifted to me.

21       Q.   Why was it important to ask these

22   questions?

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                           Chicago, IL

Page 161

1         MS. PARVER:  I just -- if Mr. Kaplan

2    has an understanding independent of advice from

3    counsel or discussions with counsel, then

4    obviously he's free to answer.  But if his

5    understanding is informed by advice by counsel,

6    then I would ask that you not disclose it.

7         You have to answer the question in some

8    way though.

9      A.   I believe that this would have been the

10   product of discussions amongst the lenders and

11   counsel.

12   BY MR. MINUTI:

13     Q.   The e-mail references an earlier

14   discussion with Mr. Kenney.  Do you recall that

15   discussion?

16     A.   I do not.

17     Q.   Did the Company answer these questions?

18     A.   I don't recall.

19        MR. MINUTI:  Let's do 294 and 95 at the

20   same time.

21             (Kaplan Exhibit 28 and Exhibit 29

22             marked for identification.)

Kaplan, Todd                    CONFIDENTIAL                July 8, 2010
                                Chicago, IL

Page 162

1    BY MR. MINUTI:

2        Q.    I've shown you Exhibit 28 and Exhibit 29.

3    Does that help refresh your recollection as to

4    whether or not the Company ever responded to the

5    questions you posed?

6        A.    It certainly does.

7        Q.    And were you satisfied with those

8    responses?

9        A.    I don't recall how I felt about it at the

10   time.

11       Q.    I'm going to switch topics now.

12             Do I understand correctly that you left

13   Merrill Lynch in 2008?

14       A.    I did.

15       Q.    Where did you go after you left Merrill

16   Lynch?

17       A.    I started work with a company here in

18   Chicago called Citadel in March of 2009.  I left

19   there in January of 2010.

20       Q.    To come back to Merrill Lynch?

21       A.    No.  I left there in January of 2010 with

22   no plans and having had no discussions with Bank

CONFIDENTIAL

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 163

1   of America Merrill Lynch or anyone else.

2         In summary, I was not anticipating prior

3   to a sequence of events at that time that I was

4   not going to be at Citadel.  So that came to a

5   conclusion.  And I ended up rejoining the firm now

6   Bank of America Merrill Lynch in late February of

7   this year.

8       Q.   What were the circumstances under which

9   you left in 2008?

10      A.   Could you be more specific?

11      Q.   Were you let go?  Did you leave of your

12  own choosing?

13      A.   No, I left of my own choosing.

14      Q.   Did you think it was a better opportunity

15  at Citadel?

16      A.   I was not in any discussions or aware of

17  even a potential opportunity of Citadel when I

18  left Merrill Lynch.

19      Q.   Why did you decide to leave?

20      A.   Is that relevant to this discussion?

21      Q.   Let me ask it this way.  Did it have

22  anything to do with the Tribune case?

CONFIDENTIAL

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                             Chicago, IL

Page 164

1       A.    No.   Categorically no.

2            MS. PARVER:  You may want to ask what he

3    did for the year prior.

4            THE WITNESS:  In short summary, I spent

5    really most of my time from March until I left

6    in the fall working on a series of increasingly

7    rapid and challenge transactions to help

8    Merrill Lynch avoid our own liquidity and capital

9    crisis, including leading our negotiations on what

10   was the redemption of our stake in Bloomberg back

11   to the mayor's company, the exploration of the

12   sale -- well, I can't mention that one.  Other

13   opportunities we explored and didn't end up

14   pursuing.

15   BY MR. MINUTI:

16       Q.    When I look at the file in this case, and

17   I'm talking about the overall transaction, both

18   step one and step two, it appears to me that there

19   are several different Merrill Lynch entities that

20   are involved, Merrill Lynch & Co.,  Merrill Lynch,

21   Pierce, Fenner & Smith, and Merrill Lynch credit

22   Corporation.

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                         Chicago, IL

Page 165

1          Can you tell me what each --

2          MS. PRIMOFF:  I think you meant to say

3     Merrill Lynch Capital Corporation.

4          MR. SCHWAB:  It's one of those Cs.

5     BY MR. MINUTI:

6     Q.    Can you tell me what are the distinctions

7     between those entities?

8     A.    I would say in general Merrill Lynch & Co.

9     was our holding company.  That was the parent,

10    the publicly traded entity.  Merrill Lynch,

11    Pierce, Fenner & Smith was the primary -- was the

12    primary broker dealer entity within Merrill Lynch

13    & Co.  And Merrill Lynch Capital Corp. was an

14    unregulated entity that we conducted a lot of

15    lending and other types of counter-party business

16    out of.

17    BY MR. MINUTI:

18    Q.    In terms of your division, where did your

19    division lie?

20    A.    As an Investment Banker I was an employee

21    of Merrill Lynch, Pierce, Fenner & Smith.  But I

22    was as a Senior Vice President also an officer of

CONFIDENTIAL

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd                CONFIDENTIAL              July 8, 2010
                           Chicago, IL

1    Merrill Lynch & Co.

2        Q.    When Merrill Lynch entity actually did the

3    lending in this case?

4        A.    I would -- I'm not supposed to guess.  I

5    would be surprised if it was anything other than

6    Merrill Lynch Capital Corp., but it is possible

7    that a certain percentage of the loans we retained

8    were ultimately loans made out of one of our bank

9    entities, such as Merrill Lynch Bank USA.

10       Q.    So you didn't hold a position at Merrill

11   Lynch Capital Corp.?

12       A.    I didn't say that.  I don't know.  I would

13   have thought that our financing commitments were

14   made out of Merrill Lynch Capital Corp.

15       Q.    Okay.

16       A.    And that if we retained a piece, it was in

17   Merrill Lynch Capital Corp., but as part of the

18   practice of our leveraged finance business there

19   were certain times when commitments or loans made

20   by Capital Corp. were then ultimately transferred

21   to Merrill Lynch Bank USA.

22       Q.    Is Merrill Lynch Bank USA a separate

CONFIDENTIAL

Kaplan, Todd                CONFIDENTIAL                July 8, 2010
                            Chicago, IL

Page 167

1    corporation?

2        A.    It is.

3        Q.    And do you hold a position at Merrill

4    Lynch Bank USA?

5        A.    I do not.

6        Q.    So --

7        A.    I did not and I do not.

8        Q.    Let me make sure that I understand.  You

9    were an employee of both Merrill Lynch & Co. and

10   Merrill Lynch, Pierce, Fenner & Smith?

11       A.    I think as a technical matter I was just

12   an employee of Merrill Lynch, Pierce, Fenner &

13   Smith, and I was also designated as an officer of

14   Merrill Lynch & Co.

15            If you're going to ask me what it means to

16   be an officer I can't answer that question.

17       Q.    Okay.  You did hold such a position with

18   Merrill Lynch Capital Corporation?

19       A.    No, I did not.

20       Q.    Same question as to the banking entity,

21   Merrill Lynch Bank USA?

22       A.    I was never an employee at one of our bank

C O N F I D E N T I A L

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

2eb7f779-49fb-4f85-9507-b363b91be8a1