Confidential

entities.

Q. What about an officer/director?

A. Neither.

MS. PARVER: Can I just ask what this is relevant to?

MR. MINUTI: I'm just trying to get an understanding of who the players are here.

MS. PRIMOFF: Off the record for a second.

(Discussion held off the record.)

MR. MINUTI: Tab 5.

MR. SCHWAB: This is Kaplan 30.

(Kaplan Exhibit 30 marked for identification.)

BY MR. MINUTI:

Q. If you look at the bottom of page 1 of this exhibit, 598182, the e-mail that begins "Was thinking of a radical approach."

A. Uh-huh.

Q. This e-mail appears to be dated November 4 of '06, so this is obviously before step one.

A. Yes.

Q. At that time are you serving as an advisor to Tribune?

A. Yes.

Q. Okay.

MS. PARVER: Merrill Lynch, as you know, is serving as an advisor to Tribune.

So are you saying you, Todd Kaplan?

MR. MINUTI: No, no. What I'm getting at is I understood that Costa was serving in that role as an advisor. It was not clear to me whether Mr. Kaplan was. I'm just trying to understand that.

THE WITNESS: I think that we had a team of people working on the Tribune account. The three primary senior people were Mr. Costa, Mr. O'Grady and myself. Each of us had different skills. We talked a little earlier about Mr. Costa and his particular M&A and media skills. I was more expert in finance-related topics.

CONFIDENTIAL

BY MR. MINUTI:

Q. Okay. But in November of '06 you are providing services to Tribune Corporation?

A. I am part of the team working for Tribune.

Q. Okay. That was really my question. And obviously this --

MS. PARVER: But if you look at the minutes of the Special Committee as it seeks to explore strategic options and ask Merrill Lynch to do that, Mr. Kaplan appears in a very specific role on finance.

MR. MINUTI: Okay.

MR. SCHWAB: Could I ask a quick question?

MR. MINUTI: Sure.

MR. SCHWAB: What was Mr. O'Grady's area of expertise?

THE WITNESS: Mr. O'Grady, as we talked a little bit earlier, who was the relationship manager, this was Michael's role.

MS. PARVER: He's in Chicago.

CONFIDENTIAL

BY MR. MINUTI:

Q. The e-mail begins "Was thinking of a radical approach," then you go on to discuss a structure involving an ESOP?

Confidential

2eb7f779-49fb-4f85-9507-b363b91be8a1

A. Uh-huh.
Q. Where did you get the idea?
A. Oh, gosh, I can't remember. It just popped up out of my memory.
Q. Was this a structure that you had familiarity with in other transactions?
A. Which part of it? Just ~~in~~ an ESOP generally?
Q. Just ~~in~~ an ESOP.
A. Sure.
Q. I'm asking a question. This looks to me like the first time the concept of an ESOP purchase comes into play here. Is that your recollection? Is this the first time?
A. I don't know that it was a first or not. I do know that we at Merrill Lynch were the first to think of ~~an~~ and develop it as a potential capital source in financing for the various permutations of alternatives we were considering.
Q. Okay. And that answer you just gave me, was that specific to Tribune or are you talking about in general?
A. Specific to Tribune.

CONFIDENTIAL

Q. Okay. And prior to this November 4 e-mail, had you had any discussions with Sam Zell or anyone on Zell's team about Tribune?

A. I believe that as part of a process earlier in the fall, the Zell organization had been asked about their interest in Tribune and had declined. So I believe that at this point there was no dialogue with the Zell organization about Tribune.

Q. Okay. But you didn't have any discussions with Zell or anyone in his organization about an ESOP structure before this e-mail?

A. I don't think so, no.

Q. And the specific structure that ultimately was used in the Tribune case of, you know, the Subchapter S structure with the ~~E substructure~~ ESOP Structure, is that something that you would have familiarity with prior to the Tribune LBO?

A. I would say that the intersection of an ESOP owning more than 50 percent of an S Corp. and the specific exemption in the tax code that essentially allows both the corporation and its

CONFIDENTIAL

CONFIDENTIAL

ESOP shareholders to avoid current taxation was something I was unaware of and surprised to find out when the Zell Team made me aware of it.

(Kaplan Exhibit 31 marked for identification.)

BY MR. MINUTI:

Q. I would ask you to take a look at that document and tell me when you're finished.

A. Okay.

Q. This goes back to one of the comments your counsel had made earlier. These are minutes of the Special Committee of the Board for January 20, 2007. The minutes reflect that you were in attendance.

A. Yes.

Q. Am I correct that if you are in attendance at the meetings of either the Board of the Special Committee, it is in your capacity as an advisor to the company on finance?

MS. PARVER: Mark, you know as well as we do that the minutes describe when Mr. Kaplan says something.

There are minutes that say in his capacity as a lender, I mean, depending on the dates and whatever.

MR. MINUTI: That was really my question. I'm not sure the minutes are that specific.

MS. PARVER: Yes, they are. If you take a look at the February 12 and 13, 2007 minutes of the Special Committee, they are that specific. If you take a look at the September I think 2006 Special Committee minutes, Mr. Kaplan was asked to describe the general financial conditions out there, I believe. But the ones in February I believe say he is asked as a lender to describe whatever.

I just think it's confusing to try to --

MR. MINUTI: Let me rephrase the question.

BY MR. MINUTI:

Q. When you appeared at meetings of the Special Committee in connection with Tribune or when you appeared at board meetings, were you appearing at -- was every appearance in your capacity as an advisor to the company?

A. I guess to preface my answer as opposed to advising someone else?

Q. Well, as opposed to representing Merrill Lynch as a lender.

A. I don't understand how as a lender you would be asked to make a presentation at a board meeting.

Q. So is it your understanding then that if you are at the board meeting, you are there in your capacity as an advisor to the Tribune?

A. I don't understand your question and I don't understand in what other capacity I would be there.

Q. Well, let me rephrase the question so maybe you can understand.

When you were at a meeting of the -- when you were at any meeting of the Special Board or any board meeting at Tribune, were you there as an advisor to Tribune? Is that your understanding?

A. I would say that I appeared at board meetings at the request of the Tribune Company as

2eb7f779-49fb-4f85-9507-b363b91be8a1

part of our firm's overall assignment to help them analyze and work through many different items.

(Kaplan Exhibit 32 marked for identification.)

BY MR. MINUTI:

Q. If you look at the bottom of what we've marked as Exhibit 32, it's an e-mail from Michael Costa to you. The e-mail says "Can we get a more forceful/formal expression of interest from Zell," and it goes on from there.

What was happening at this time and what was Merrill Lynch doing in terms of communicating with Mr. Zell?

MS. PARVER: In terms of what?

MR. MINUTI: Communicating with Mr. Zell.

A. I don't specifically recall. My general recollection is that at this time Sam expressed an interest in pursuing a leverage recapitalization transaction not dissimilar to what Messrs. Broad and Burkle proposed in January as well.

BY MR. MINUTI:

Q. Is it fair to say based on this e-mail

2eb7f779-49fb-4f85-9507-b363b91be8a1

exchange that you're trying to get Mr. Zell interested in the deal?

A. No, I wouldn't say that. It's what this e-mail exchange says. I think this e-mail exchange asks to find a way to get Sam to clarify in a more, as the word Michael uses here, forceful fashion what his interest is.

Q. And what was your understanding as to why Mr. Costa wanted Mr. Zell to be more forceful?

A. I don't recall why there would have been a request to be more forceful.

Q. At this time did you want Mr. Zell to pursue a transaction with Tribune?

A. I wanted Sam to do whatever he saw fit, and I wanted to work with Tribune to help them have as many options to choose from in the strategic review that they were doing.

MR. SCHWAB: This is 33.

(Kaplan Exhibit 33 marked for identification.)

BY MR. MINUTI:

Q. The exhibit we've handed you are the

minutes of the Special Committee of the Board of March 30, 2007.

You'll see that the minutes reflect a I'll use the word presentation, but you'll correct me if that's wrong, a presentation that you made about a conditionality. Are you with me on that?

A. I am.

Q. What do you recall about that presentation? What questions did the Company have about conditionality?

MS. PARVER: Do you mean the Company or the Special Committee?

MR. MINUTI: I'm sorry, the Special Committee.

A. In general, the members of the Special Committee essentially asked a series of questions to probe the events or conditions, if you will, under which the financing would not close.

BY MR. MINUTI:

Q. And were they expressing concern about that? Did they tell you why they were asking those questions?

A. It was clear that the intent was to -- if a transaction was to be entered into to enter into transactions that had a minimal risk of not closing.

Q. Okay. And the minutes reflect -- you'll see on page 2 I guess it's the first full paragraph, second sentence, "Mr. Kaplan indicated that there would have to be very substantial, and at this point highly unlikely, deterioration of the Company's operating results before the lenders would have grounds not to fund at closing." Do you see that?

A. I do see that.

Q. Do you recall making those statements to the Special Committee?

A. I don't recall the specific statement. I do recall that in discussing the conditions, one principal condition that we did focus on was material adverse effect. And that I was clear that the measurement of performance was performance -- if I'm recalling the condition correctly -- relative to a peer group as opposed

to an absolute measure of performance of the company between signing and closing.

Q. And as you sit here today, do you have a recollection of what you meant by "substantial deterioration"?

A. I don't, nor do I know whether I used those precise words or not.

MR. MINUTI: I have no further questions. Thank you very much for your time.

(Whereupon proceedings were adjourned at 5:46 p.m.)

2eb7f779-49fb-4f85-9507-b363b91be8a1

Kaplan, Todd CONFIDENTIAL July 8, 2010
Chicago, IL

Page 181

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In Re: )
TRIBUNE COMPANY, et al. ) No. 08-13141 (KJC)

This is to certify that I have read the transcript of my deposition taken in the above-entitled cause by Deralyn Gordon, Certified Shorthand Reporter, on July 8, 2010, and that the foregoing transcript accurately states the questions asked and the answers given by me as they now appear and as reflected in the attached errata sheet.

TODD P. KAPLAN

Subscribed and sworn to
before me this 16th day
of July 2010.

OFFICIAL SEAL
JIN PARK
Notary Public - State of Illinois
My Commission Expires Oct 22, 2012

Notary Public

Henderson Legal Services, Inc.
202-220-4158 www.hendersonlegalservices.com
2eb7f779-49fb-4f85-9507-b363b91be8a1

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, Deralyn Gordon, a notary public within and for the County of Cook and State of Illinois, do hereby certify that heretofore, to-wit, on the 8th of July, 2010, personally appeared before me at 70 West Madison Street, Suite 4100, Chicago, Illinois, TODD P. KAPLAN, in a cause now pending and undetermined in the United States Bankruptcy Court for the District of Delaware, In Re: Tribune Company, et al.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was not waived by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 8th day of July, 2010.

____________________________________

Notary Public, Cook County, Illinois