HIGHLY CONFIDENTIAL

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES

FRANK GARAMELLA, Derivatively)  No. BC362110
on Behalf of TRIBUNE COMPANY,)

          Plaintiff,    )  **CONFIDENTIAL**

vs.               )  HIGHLY CONFIDENTIAL

DENNIS J. FITZSIMONS, et al.,)  UNDER THE PROTECTIVE

        Defendants,   )     ORDER

  -and-           )

TRIBUNE COMPANY, a Delaware  )

corporation,         )

      Nominal Defendant.   )

                   )

The videotaped highly confidential discovery deposition of WILLIAM A. OSBORN, taken in the above-entitled cause, before DERALYN GORDON, a notary public of Cook County, Illinois, on the 16th day of May, 2007, at One South Dearborn Street, Chicago, Illinois, beginning at approximately 9:40 a.m., pursuant to Notice.

REPORTED BY:  DERALYN GORDON, CSR, RPR, CRR
LICENSE NO:  084-003957



Eastwood-Stein
DEPOSITION MANAGEMENT

550 West C Street, Suite 600
San Diego, CA 92101
800-514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001452

HIGHLY CONFIDENTIAL

1    PRESENT:

2

3    LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP

4    BY STEPHEN J. ODDO, ESQ.,

5    655 West Broadway, Suite 1900

6    San Diego, California 92101

7    (619) 231-1058

8    soddo@lerachlaw.com

9        appeared on behalf of plaintiff;

10

11   SIDLEY AUSTIN LLP

12   BY DAVID F. GRAHAM, ESQ.,

13   One South Dearborn

14   Chicago, Illinois 60603

15   (312) 853-7621

16   dgraham@sidley.com

17        appeared on behalf of the witness

18        William A. Osborn;

19

20

21

22

23

24

25

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001453

HIGHLY CONFIDENTIAL

1    PRESENT:    (CONT'D)

2

3    GIBSON, DUNN & CRUTCHER LLP

4    BY MELISSA J. EPSTEIN, ESQ.,

5    333 South Grand Avenue

6    Los Angeles, California 90071

7    (213) 229-7314

8    mepstein@gibsondunn.com

9        appeared on behalf of defendants

10        Jeffrey Chandler, Roger Goodan, and

11        William Stinehart, Jr.;

12

13

14    ALSO PRESENT:

15        Mr. Charles W. Mulaney, Jr.,

16        Mr. John Sheehan, Legal Videographer.

17

18

19

20

21

22

23

24

25

3

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001454

HIGHLY CONFIDENTIAL

1          THE VIDEOGRAPHER:  Good morning.  This

2     begins videotape number one of the videotaped

3     deposition of Mr. William A. Osborn taken in

4     the matter of Frank Garamella, et al., versus

5     Dennis J. FitzSimons, et al., in the Superior          09:40AM

6     Court of the State of California for the County

7     of Los Angeles, case number BC362110.

8          This deposition is taking place on

9     the 16th day of May, 2007.  The time now is

10    approximately 9:40 a.m.                                09:40AM

11         My name is John Sheehan in Association

12    with Eastwood-Stein Deposition Management, I'm

13    the videographer.  The court reporter is

14    Ms. Deralyn Gordon also in association with

15    Eastwood-Stein Deposition Management.                  09:40AM

16         At this time I'd like the counsel to

17    please identify themselves.

18         MR. ODDO:  Steve Oddo from Lerach Coughlin

19    on behalf of plaintiff.

20         MR. GRAHAM:  David Graham, Sidley Austin,         09:41AM

21    on behalf of the witness and other defendants.

22         MS. EPSTEIN:  Melissa Epstein from

23    Gibson, Dunn & Crutcher on behalf of defendants

24    William Stinehart, Jr., Jeffrey Chandler and

25    Roger Goodan.                                          09:41AM

                                                                4

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001455

HIGHLY CONFIDENTIAL

1          MR. MULANEY:  Charles Mulaney, Skadden,

2     Arps, Slate, Meagher & Flom on behalf of the

3     Special Committee of the Board of Directors of

4     Tribune Company.

5          THE VIDEOGRAPHER:  Will the court reporter    09:41AM

6     please administer the oath and we may begin.

7                    (Whereupon the witness was

8                     sworn.)

9               WILLIAM A. OSBORN

10     called as a witness herein, having been first duly

11     sworn, was examined and testified as follows:

12                    EXAMINATION

13     BY MR. ODDO:

14     Q.   Mr. Osborn, good morning.  My name is

15     Steve Oddo, and I will be taking your deposition    09:41AM

16     this morning.

17          Could you please state your full name for

18     the record?

19     A.   William Anderson Osborn.

20     Q.   Okay.  Have you been deposed before?    09:41AM

21     A.   I have.

22     Q.   Okay.  When was the most recent time?

23     A.   Oh, it was probably 15 years ago.

24     Q.   Okay.  Let me just go over some of the

25     ground rules to reacquaint you with the process    09:42AM

                                                            5

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001456

HIGHLY CONFIDENTIAL

1    just so we can get through this as efficiently as

2    possible.

3         My questions and your responses are going

4    to be taken down by the court reporter.  In order

5    for her to be able to effectively transcribe, we     09:42AM

6    need to avoid talking over each other.

7         So even though you may know where I'm

8    going with a question, if you can let me finish it

9    until you start -- before you start your response,

10   and I'll extend the same courtesy on your           09:42AM

11   response, I won't start another question before

12   you finish your response.  Can we do that?

13       A.   All right.

14       Q.   Another thing is you need to answer

15   audibly.  Even though you're being videotaped,      09:42AM

16   she can't describe, can't transcribe head shakes

17   or any other bodily motions, so you need to

18   respond audibly to my questions.  Can you do that?

19       A.   I understand.

20       Q.   Can you think of any reason that you       09:42AM

21   would be unable to either understand my questions

22   or formulate responses to them this morning?

23       A.   No.

24       Q.   Okay.  As I indicated, we'll try to

25   take a break every hour so when they switch         09:43AM

                                                         6

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001457

HIGHLY CONFIDENTIAL

1    the videotapes.  If you need to break at any

2    other time, just let me know, and I will try to

3    accommodate you.  And I suspect we'll be breaking

4    for lunch at some point too.

5        Can you tell me where you were educated        09:43AM

6    post secondary?

7        A.    Northwestern University.

8        Q.    Okay.  And what was your degree in?

9        A.    I have a BA and an MBA from Northwestern.

10       Q.    Any other post secondary degrees?        09:43AM

11       A.    No.

12       Q.    Are you currently employed?

13       A.    Yes.

14       Q.    With whom?

15       A.    Northern Trust Corporation.        09:43AM

16       Q.    And what's your position?

17       A.    Chairman and Chief Executive Officer.

18       Q.    How long have you been in that position,

19    those positions?

20       A.    Twelve years.        09:44AM

21       Q.    Okay.  And what are your duties and

22    responsibilities in that position?

23       A.    Well, basically I'm responsible for

24    the overall corporation, for its expansion of

25    its business, for its success in the marketplace.        09:44AM

7

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001458

HIGHLY CONFIDENTIAL

1      Q.   Okay.  In what type of business is

2   Northern Trust?

3      A.   Northern Trust is a bank but specializes

4   in global custody and private banking and asset

5   management.                                      09:44AM

6      Q.   Do you sit on any other boards of

7   directors besides the Tribune?

8      A.   I sit on the Caterpillar Board of

9   Directors.

10      Q.   I should have qualified that, I meant of   09:44AM

11   publicly traded companies.

12      A.   Yes.

13      Q.   Any other besides that?

14      A.   No, other than Northern Trust Corporation.

15      Q.   Do you sit on the board of directors of    09:45AM

16   any privately held companies?

17      A.   No.

18          MR. GRAHAM:  When you say privately held,

19   you're not including nonprofits, are you?

20          MR. ODDO:  No.                             09:45AM

21   BY MR. ODDO:

22      Q.   Do you expect to stay on as a director

23   after the tender offer in the Tribune case?

24      A.   I don't know.

25      Q.   Has that been discussed at all at the     09:45AM

8

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001459

HIGHLY CONFIDENTIAL

1   Board level?

2       A.   I've been asked by the Chairman and

3   Chief Executive Officer if I was interested, but

4   there has been no determination at this point in

5   time.                                          09:45AM

6       Q.   Would that be Mr. FitzSimons?

7       A.   Yes.

8       Q.   Have you had any discussions with Mr. Zell

9   about staying on as a director?

10      A.   No.                                    09:45AM

11      Q.   Do you have an indication of when a

12  decision will be made as to the composition of

13  the Tribune Board post tender offer?

14      A.   The timing actually has not been

15  discussed.                                      09:46AM

16      Q.   Do you know whether any of the other

17  current directors of Tribune have been asked to

18  stay on the Board after the tender offer?

19      A.   At the last Board meeting others indicated

20  they had been approached about their interest, but  09:46AM

21  I don't know whether they're interested or not.

22      Q.   And were they approached by Mr. FitzSimons

23  also?

24      A.   Yes.

25      Q.   What is the Chicago Club?               09:46AM
                                                        9

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only                TRIB-G0001460

HIGHLY CONFIDENTIAL

1      A.    The Chicago Club is a -- basically a

2  business club, luncheon club in Chicago.

3      Q.    Okay.  What is your affiliation with that

4  club?

5      A.    I'm a member.                              09:47AM

6      Q.    And are there any other members of the

7  Tribune Board who are also members of the Chicago

8  Club?

9      A.    I would imagine most of them are that are

10 resident here in Chicago.                            09:47AM

11     Q.    Okay.  What does the -- other than having

12 luncheons, what does the Chicago Club do?

13     A.    It's a place where some people hold

14 meetings there, there are dinners where you can

15 hold a dinner, a private dinner if you want, there  09:47AM

16 are meeting rooms, there are also rooms for people

17 to stay if they need to stay in the city or if

18 they have guests that are traveling in and need a

19 room and hotels are filled.  It's kind of a

20 standard club that exists.                           09:48AM

21     Q.    A social organization?

22     A.    Like the California Club in Los Angeles

23 would be the same thing.

24     Q.    I'm from San Diego, so I'm not familiar

25 with that, but I'm sure we have something similar.  09:48AM

                                                        10

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001461

HIGHLY CONFIDENTIAL

1        So it's a social type organization?

2    A.   Yes.

3    Q.   How long have you been affiliated with

4  that?

5    A.   A member of?  I'm going to guess 15 to    09:48AM

6  20 years.  I don't remember the exact time I

7  joined.

8    Q.   Okay.  What's the Commercial Club of

9  Chicago?

10    A.   The Commercial Club of Chicago is a    09:48AM

11  business club that has members from different

12  organizations in the city, and it deals with many

13  of the business issues that are out there today,

14  whether it's government or tax policy or

15  economics, things like that, and they have    09:49AM

16  meetings where people come and speak and the

17  members come and listen and ask questions.

18    Q.   Okay.  A type of forum for business

19  issues, would that be fair?

20    A.   It is.  It's a -- just a place for    09:49AM

21  business people or attorneys.  There's a whole

22  wide representation there --

23    Q.   Okay.

24    A.   -- that are able to stay informed on a

25  more direct basis with their issues of the day,    09:49AM

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001462

HIGHLY CONFIDENTIAL

1    so to speak.

2        Q.    Are there any other members of the Tribune

3    Board of Directors who are also members of the

4    Commercial Club to your knowledge?

5        A.    Yes, I mean, a number of the same members    09:49AM

6    that are part of the Chicago Club are part of the

7    Commercial Club.

8        Q.    How about the Economic Club of Chicago,

9    what is that?

10        A.    The Economic Club is just what it says,    09:50AM

11    it's an Economic Club dealing with the economic

12    issues, it meets in the evenings, probably has

13    around six or seven events a year, it's a black

14    tie affair, broad representation from the

15    community, both business and legal, and they,    09:50AM

16    you know, they have, again, economic speakers

17    typically.

18        Q.    Okay.  Are you aware of whether or not

19    any other members of the Tribune Board are also

20    members of the Economic Club?    09:50AM

21        A.    Yes, they are.

22        Q.    Do you know which ones or is it the same?

23        A.    Well, most of the Chicago -- by definition

24    people in business in Chicago are members of these

25    clubs.    09:51AM

                                                          12

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001463

HIGHLY CONFIDENTIAL

1    Q.    Okay.  So the Board members outside of

2    the ones who represent the Chandler Trusts who are

3    from Los Angeles are likely to be members of one

4    or more of these clubs?

5    A.    Oh, yes, just like all people in their          09:51AM

6    positions in this city are members of these clubs.

7    Q.    How did you come to join the Tribune Board

8    of Directors?

9    A.    I was asked by the former Chairman and

10   Chief Executive Officer, John Madigan, to join       09:51AM

11   the Board.

12   Q.    When did that take place?

13   A.    I can't -- probably 6 or 7 years ago.  I

14   don't remember the exact year.

15   Q.    Was it before or after the Times Mirror         09:51AM

16   merger?

17   A.    It was after.

18   Q.    And do you sit on any subcommittees of the

19   Board of Directors?

20   A.    I'm on the audit committee.                     09:52AM

21   Q.    And you were Chairperson of the Special

22   Committee also; is that correct?

23   A.    Yes.

24   Q.    How did you know Mr. Madigan at the time

25   that he asked you to join the Board of Directors?     09:52AM

                                                            13

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001464

HIGHLY CONFIDENTIAL

1    A.    I've known John Madigan since the

2    mid 1970s.  I was one time the relationship

3    manager, the banker, for the Tribune Company, and

4    John was the Chief Financial Officer, so I've

5    known him a long time.                          09:52AM

6    Q.    So your relationship with the Tribune

7    Company predates your appointment to the Board?

8    A.    Yes, in terms of my knowledge of the

9    company, yes.

10   Q.    Okay.  Can you describe for me the work    09:53AM

11   that you -- any work that you did for Tribune

12   prior to joining the Board of Directors?

13   A.    Well, we were as an org- -- my personal

14   work was around at that time lending money to the

15   Company in the '70s when they needed to borrow    09:53AM

16   money, and then our company has dealt with them in

17   that kind of capacity, in various banking related

18   services, through this period of time.

19   Q.    Okay.  Is it an ongoing relationship that

20   exists today also?                              09:53AM

21   A.    Yes.  Yes.

22   Q.    When was the last time that Northern Trust

23   loaned money to Tribune, do you know?

24   A.    I believe we have loans out to them right

25   now.                                            09:53AM
                                                        14

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001465

HIGHLY CONFIDENTIAL

1    Q.    Okay.  Do you know when the last one was,

2    was given?

3    A.    Well, there are credit agreements of

4    which we are a party to them along with many

5    other banks, and so when they borrow under that        09:54AM

6    agreement, we are lending money.

7         So I can't -- I'm not specific because

8    I don't -- I get involved in the day-to-day

9    activities of when the notes are rolled over.

10   Q.    Do you know Sam Zell personally?              09:54AM

11   A.    I had lunch with Sam Zell about probably

12   10 years ago; it was really the only involvement

13   I've had with Sam up until these events of the

14   Tribune transaction evolved.

15   Q.    Has Northern Trust had any business           09:54AM

16   dealings with Mr. Zell?

17   A.    No.

18   Q.    Has Northern Trust had any business

19   dealings with his organization called Equity Group

20   Investments?                                          09:55AM

21   A.    I don't know.

22   Q.    Do you know any of the other executives or

23   employees at Equity Group Investments?

24   A.    The only person that I have met that I

25   know that is involved with Sam Zell is a gentleman    09:55AM

                                                            15

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001466

HIGHLY CONFIDENTIAL

1    by the name of Bill Pate.

2        Q.    How did you come to know him?

3            MR. GRAHAM:  Meet him or know him?  When

4    you say know him, do you mean meet him?

5            MR. ODDO:  Yes, that's fine.                    09:55AM

6        A.    I met Bill Pate at the request of Sam Zell

7    to discuss the structure of a transaction that

8    they were going to propose to the Company along

9    with two members of the Tribune Company.

10   BY MR. ODDO:                                            09:56AM

11       Q.    Okay.  So prior to Mr. Zell's interest in

12   potentially acquiring Tribune, you did not know

13   Mr. Pate?

14       A.    No.

15       Q.    Do you know whether or not Mr. Zell and/or  09:56AM

16   Mr. Pate are members of any of the organizations

17   that we just talked about, the Commercial Club,

18   the Economic Club or the Chicago Club?

19       A.    I don't know.

20       Q.    How big is the membership in those          09:56AM

21   organizations, do you know?

22       A.    Large.  I really can't give you a number,

23   but they're very large.

24       Q.    It's possible for them to be members --

25       A.    It's possible to be members that I          09:56AM

                                                                 16

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only                    TRIB-G0001467

HIGHLY CONFIDENTIAL

1    don't --

2          MR. GRAHAM:  Object, calls for

3    speculation.

4    BY MR. ODDO:

5       Q.   Again, even though you know where I'm          09:56AM

6    going with the question, let me finish it before

7    you start the response.

8          Also, counsel may be objecting at various

9    times throughout the deposition.  You should let

10   your counsel make the objection, but unless you're   09:57AM

11   instructed by your counsel not to answer, you

12   should go ahead and answer the question.  Those

13   are primarily to preserve those objections for

14   trial.

15         If for some reason I ask a question that        09:57AM

16   you don't understand, let me know and I'll try to

17   rephrase it to make it more understandable to you.

18   Okay?

19      A.   All right.

20      Q.   Okay.  So it's possible that these two        09:57AM

21   gentlemen could be members of those organizations,

22   but you wouldn't be aware of it?

23         MR. GRAHAM:  Objection, lack of

24   foundation, calls for speculation.

25         THE WITNESS:  Can I respond?                     09:57AM
                                                              17

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001468

HIGHLY CONFIDENTIAL

1          MR. GRAHAM:  Yes.

2     A.   The answer is yes, it's very possible.

3  BY MR. ODDO:

4     Q.   Okay.  How long have you known Ms. Holden?

5     A.   I've probably known Betsy Holden for          09:58AM

6  around 10 years.

7     Q.   How did you come to first know her?

8     A.   I first got to know Betsy because we moved

9  into a home two houses away from her home.

10     Q.   Are you aware of whether or not Ms. Holden  09:58AM

11  has any sort of business relationship with

12  Mr. Zell or EGI?

13     A.   I don't know.

14     Q.   Are you aware of whether or not Ms. Holden

15  knows Mr. Zell socially?                              09:59AM

16     A.   I don't know.

17     Q.   How long have you known Mr. Morrison?

18     A.   I probably have known Bob 15 years.

19     Q.   Okay.  How did you come to know him?

20     A.   Through the business environment.  He was   09:59AM

21  President of Kraft Foods and then he became CEO of

22  Quaker Oats.

23     Q.   Did Northern Trust do any business with

24  those entities?

25     A.   Yes.                                         09:59AM
                                                         18

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001469

HIGHLY CONFIDENTIAL

1      Q.    What type of business?

2      A.    Banking services.

3      Q.    Are you aware of whether or not

4    Mr. Morrison has any sort of business relationship

5    with Mr. Zell?                                    10:00AM

6      A.    I don't know.

7      Q.    Okay.  Are you aware of whether or not

8    he has any sort of social relationship with

9    Mr. Zell?

10     A.    I don't know.                             10:00AM

11     Q.    How long have you known Dennis FitzSimons?

12     A.    I've probably known Dennis probably for

13   8 or 9 years.

14     Q.    And how did you first come to know him?

15     A.    Primarily through the Tribune Company     10:00AM

16   Board.

17     Q.    And has his position been Chief Executive

18   and Chairman throughout your tenure on the Board?

19     A.    No.

20     Q.    Who was Chairman and Chief Executive when  10:01AM

21   you first joined the Board?

22     A.    John Madigan.

23     Q.    How long have you known Mr. Reyes?

24     A.    Probably somewhere, again, in the 10-year

25   range.                                           10:01AM

                                                          19

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001470

HIGHLY CONFIDENTIAL

1    Q.    How did you come to know him?

2    A.    I know Chris because he's a client of

3    ours.

4    Q.    And what business is Mr. Reyes in that he

5    would be a client of yours?                           10:01AM

6    A.    He runs a private company here in Chicago.

7    Q.    Okay.  Are you aware of whether or not

8    Mr. Reyes has any business relationship with

9    Mr. Zell?

10    A.    I don't know.                                   10:02AM

11    Q.    Are you aware of whether he has any social

12    relationship with Mr. Zell?

13    A.    I don't know.

14    Q.    How long have you known Mr. Taft?

15    A.    I've known Mr. Taft since I joined the          10:02AM

16    Board of Directors at the Tribune Company.

17    Q.    Are you aware of whether or not Mr. Taft

18    has any business relationship with Mr. Zell?

19    A.    I don't know.

20    Q.    Are you aware of whether he has any social  10:02AM

21    relationship with Mr. Zell?

22    A.    I don't know.

23    Q.    How long have you known Mr. White?

24    A.    I've known Mr. White for in the 10 to

25    15 year range.                                       10:02AM
                                                            20

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001471

HIGHLY CONFIDENTIAL

1    Q.    And how did you come to know him?

2    A.    I have a -- his company has a

3    relationship, Abbott Labs, with Northern Trust.

4    Q.    Are you aware of whether or not Mr. White

5    has any sort of business dealings with Mr. Zell?    10:03AM

6    A.    No.

7    Q.    Are you aware of whether or not he has any

8    sort of social relationship with Mr. Zell?

9    A.    No.

10    Q.    How long have you known Mr. Hernandez?    10:03AM

11    A.    I've known Mr. Hernandez probably -- I had

12    met him prior to going on the Tribune Board, but I

13    really didn't get to know him until I went on the

14    Board.

15    Q.    Have you had any business dealings with    10:03AM

16    Mr. Hernandez outside of your common membership on

17    the Tribune Board?

18    A.    Yes, our subsidiary in California deals

19    with him on a personal -- he and his family.

20    Q.    In what manner?    10:04AM

21    A.    Personal trust relationship.

22    Q.    Are you aware of whether or not

23    Mr. Hernandez has any business dealings with

24    Mr. Zell?

25    A.    No.    10:04AM

21

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001472

HIGHLY CONFIDENTIAL

1      Q.    Are you aware of whether or not he has any

2   social relationship with Mr. Zell?

3      A.    No.

4      Q.    When did you first become aware that

5   Mr. Broad and/or Mr. Burkle had an interest in a      10:05AM

6   potential acquisition of Tribune?

7      A.    During the process of looking at different

8   potential strategic options, the Special Committee

9   and the investment bankers for the Tribune Company

10  looked at different alternatives, including the       10:05AM

11  possible sale of the company, and it was then

12  during that process that Mr. Broad and Mr. Burkle

13  submitted an indication of interest to acquire

14  Tribune Company.

15     Q.    Okay.  Approximately when was that?          10:06AM

16     A.    That would have been during the fall of

17  2006.

18     Q.    Did they participate in the initial phase

19  of that process when the Special Committee's

20  bankers went out and solicited potential            10:06AM

21  acquirors?

22         MR. GRAHAM:  Object to the question on the

23  grounds of ambiguity.

24     A.    The -- as far as I -- you know, when I

25  remember the dates of this when they went through   10:06AM

22

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001473

HIGHLY CONFIDENTIAL

1    the process, there was a point in time where they

2    submitted their indication of interest in the

3    Tribune Company.

4    BY MR. ODDO:

5       Q.    Okay.  When do you recall that being?        10:06AM

6       A.    It was around the end of '06 and then in

7    early '07 that we -- that they became very much

8    more active.

9          MR. ODDO:  Let's mark as Exhibit No. 1 a

10   document that is Bates stamped TRIB15564.             10:07AM

11                    (Osborn Deposition Exhibit No. 1

12                     marked for identification.)

13         MR. GRAHAM:  And what was this marked?

14         MR. ODDO:  Exhibit No. 1, Osborn No. 1.  I

15   wasn't expecting you, so I don't have a copy for      10:07AM

16   you.

17         MR. MULANEY:  Sure.

18   BY MR. ODDO:

19      Q.    Have you seen this document before?

20      A.    Not that I recall.                           10:08AM

21      Q.    The document indicates that -- well, let

22   me backtrack.  Who is Mr. Crane Kenney?

23      A.    Mr. Crane Kenney is the general counsel

24   for Tribune Company.

25      Q.    Okay.  Do you recall whether or not          10:08AM
                                                           23

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001474

HIGHLY CONFIDENTIAL

1   Mr. Kenney informed the Special Committee that

2   Mr. Broad and Mr. Burkle had made a request to

3   communicate with the Chandler Trusts and/or the

4   McCormick Foundation?

5       MR. GRAHAM:  Steve, can I suggest a      10:09AM

6   reformulation of that question so we don't get

7   into privileged areas?  Why don't you just ask him

8   if he ever learned that a request had been made.

9       MR. ODDO:  Fair enough.

10  BY MR. ODDO:                       10:09AM

11    Q.   Did you ever learn that had a request had

12  been made from Mr. Broad and/or Mr. Burkle to

13  communicate with the Chandler Trusts and/or the

14  McCormick Foundation?

15    A.   I don't recall.              10:09AM

16       MR. ODDO:  Let me have you take a look at

17  what we'll mark as Osborn Exhibit No. 2, which is

18  Bates stamped TRIB37 through 38.

19            (Osborn Deposition Exhibit No. 2

20            marked for identification.)    10:11AM

21  BY MR. ODDO:

22    Q.   Can you tell me what this document is?

23    A.   These are minutes from the Special

24  Committee Meeting.

25    Q.   On December 12, 2006?          10:11AM

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001475

HIGHLY CONFIDENTIAL

1    A.   Yes.

2    Q.   And you were present for this meeting?

3    A.   I was.

4    Q.   Okay.  Calling your attention to the

5    second page, there's a description of a discussion  10:11AM

6    that the minutes indicate you outlined a possible

7    role for the McCormick Tribune and, how do you

8    pronounce that, Cantigny?

9    A.   "Can-tig-nee."

10    Q.   Cantigny Foundations and Management's  10:11AM

11    involvement with the Foundations, and also whether

12    certain bidders should be permitted to join with

13    other bidding groups and the timing of seeking

14    different proposals; do you see that?

15    A.   Yes.  10:11AM

16    Q.   Do you recall that discussion at all?

17    A.   There were periods of time because the

18    Tribune Company, you know, two of its major

19    shareholders were the McCormick Tribune Foundation

20    and the Cantigny Foundation, that there might be  10:12AM

21    some opportunity for those foundations to be

22    involved in some transactions because they may be

23    interested in continuing as an owner of Tribune

24    Company.

25        And so as we looked at various  10:12AM

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001476

HIGHLY CONFIDENTIAL

1    alternatives, we tended to open that up at times

2    in terms of trying to make certain that we were

3    getting the best kind of opportunity for the

4    shareholders.

5        Q.    Okay.  Do you recall any discussion at        10:12AM

6    this particular meeting about whether or not

7    Mr. Broad and/or Mr. Burkle should be allowed

8    to communicate with the Chandler Trusts and/or

9    the McCormick Foundation?

10       A.    I don't recall specific conversations        10:13AM

11   around that, but it doesn't mean that they didn't

12   exist.

13       Q.    Okay.  Do you recall whether or not

14   any other of the interested parties or potential

15   bidders were allowed to communicate with the        10:13AM

16   Chandler Trusts and/or the McCormick Foundation?

17           MR. GRAHAM:    At what point in time?

18           MR. ODDO:    Subsequent to December of 2006.

19       A.    The Chandler Group did get involved with

20   discussions with McCormick Tribune Foundation        10:13AM

21   later on as transactions started to come together.

22   BY MR. ODDO:

23       Q.    So they had discussions amongst -- between

24   the Chandler Trusts and the McCormick Foundation?

25       A.    But -- yes.  I don't know the exact date,    10:14AM

26

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001477

HIGHLY CONFIDENTIAL

1    but my recollection it would have been after this

2    period of time.

3        Q.    Okay.  Do you know whether any of the

4    other parties that had expressed a potential

5    interest in Tribune requested the ability to            10:14AM

6    communicate with either the McCormick/Tribune

7    Foundation or the Cantigny Foundation or the

8    Chandler Trusts?

9        A.    Well, I don't recall specific situations,

10   but, again, there were a lot of -- there was a          10:14AM

11   lack of back and forth, but I don't recall any

12   of the -- anything particular around that.

13       Q.    Okay.  Do you recall whether or not the

14   Company or the Committee's bankers submitted any

15   recommendations about who should be allowed to          10:14AM

16   talk to whom about combining on a potential

17   proposal?

18       A.    There -- at this point in time it was

19   before we had -- it was kind of in a period of

20   time where we were extending the deadline for           10:15AM

21   proposals, and at that point there was the

22   investment bankers were talking amongst various

23   bidders about different ways they could come

24   together, but I don't recall specific dialogue in

25   those conversations about the Chandlers or others       10:15AM

                                                                  27

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001478

HIGHLY CONFIDENTIAL

1  at that point in time and some of the other

2  conversations.

3          MR. ODDO:  Okay.  Let's mark as

4  Plaintiff's Exhibit -- or Osborn Exhibit No. 3

5  a document that's Bates stamped 9832.          10:15AM

6              (Osborn Deposition Exhibit No. 3

7               marked for identification.)

8  BY MR. ODDO:

9      Q.  Have you seen this document before?

10     A.  I don't recall seeing this specific      10:16AM

11  document, no.

12     Q.  Okay.  Do you recall whether or not

13  the Special Committee authorized Mr. Kenney to

14  communicate to the Broad Investment Company

15  and/or the Yucaipa Companies that they would     10:17AM

16  not be allowed to have communications with the

17  Chandler Trusts and/or the McCormick Foundation?

18     A.  If I read this letter correctly, it

19  implies that we -- they did bring this up and

20  we denied that request at the time.             10:17AM

21     Q.  Okay.  But you don't have a specific

22  recollection of doing that?

23     A.  I don't recall, given all of the dialogue

24  going on, the specifics around this.

25     Q.  Do you recall whether or not there was    10:18AM
                                                        28

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001479

HIGHLY CONFIDENTIAL

1    any discussion at the Special Committee level

2    of the rationale for not permitting Mr. Broad

3    and/or Mr. Burkle to communicate with the Chandler

4    Trusts and/or the McCormick Foundation?

5         MR. GRAHAM:  And you're talking about in        10:18AM

6    connection with the December 12th meeting?

7         MR. ODDO:  Yes.

8         MR. GRAHAM:  Asked and answered, lack of

9    foundation.

10   A.    I just don't recall the specifics around      10:18AM

11   this.

12   BY MR. ODDO:

13   Q.    Okay.  Do you recall when the first time

14   an Employee Stock Ownership Plan was discussed

15   either at the Board or the Special Committee level  10:19AM

16   as a potential structure for a transaction for

17   Tribune?

18   A.    To the best of my knowledge, we didn't

19   really talk about an ESOP until after the initial

20   bids were given, and then later on the whole        10:19AM

21   concept of an ESOP surfaced.

22        So it would have been, you know, sometime

23   probably later January or early February of '07.

24   Q.    Okay.  And was that in connection with

25   Mr. Zell's proposal?                                10:20AM

                                                          29

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001480

HIGHLY CONFIDENTIAL

1      A.    Yes.

2      Q.    Okay.  Prior to that time had the Board

3  and/or -- had the Special Committee and/or its

4  advisors discussed at all the ESOP structure as

5  a potential for a possible transaction?            10:20AM

6      A.    I don't recall specific dialogue around

7  that.

8      Q.    Were you familiar at all with the

9  structure of an Employee Stock Ownership Plan?

10     A.    I am familiar with an Employee Stock      10:20AM

11  Ownership Plan, yes.

12     Q.    Okay.  Were you familiar -- prior to

13  Mr. Zell's proposal, were you familiar at all

14  with such a structure in the context of a

15  potential acquisition of a company?               10:21AM

16     A.    No.  I'm going to elaborate.  The time

17  that I was involved, the Northern had its own

18  Employee Stock Ownership Plan, and so it was a

19  method of connecting the ownership of the company

20  with the employees and had been very successful.  10:21AM

21  So that was the context of which I was

22  knowledgeable about, employee -- which was not

23  related to an acquisition.

24     Q.    What did the Special Committee do

25  following receipt of Mr. Zell's proposal to       10:21AM
                                                       30

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001481

HIGHLY CONFIDENTIAL

1    acquaint itself with the concept of an ESOP

2    as part of a potential acquisition proposal?

3        A.    Well, we went through a whole series

4    of meetings with financial advisors, attorneys,

5    trustees to make certain that we understood the        10:22AM

6    pros and cons of the ESOP proposal, and so we

7    understood that kind of transaction as a potential

8    for what we might consider.

9        Q.    Okay.  What was your initial reaction when

10   you first learned that the Zell proposal included        10:22AM

11   the creation of an ESOP as part of -- as part of a

12   transaction proposal?

13       A.    My first reaction it was a very novel and

14   creative idea, my second reaction was that we

15   needed to understand the cash flows because there        10:23AM

16   was a high level of debt associated with that.

17       Q.    So that was clear from the outset that the

18   ESOP would require a high level of debt?

19       A.    Yes.

20       Q.    Now, the Zell proposal came after the        10:23AM

21   Special Committee had already received three

22   proposals for all or part of the Company, correct,

23   in mid January?

24       A.    Yes.

25       Q.    And those proposals were one from the        10:23AM

31

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001482

HIGHLY CONFIDENTIAL

1    Carlisle Group for the Broadcasting and

2    Entertainment section of the company; is that

3    correct?

4        A.    Yes.

5        Q.    And one from Mr. Broad and Mr. Burkle for    10:24AM

6    the entire company; is that correct?

7        A.    Yes.

8        Q.    And a proposal from the Chandler Trusts

9    for a spinoff and recapitalization; is that

10   correct?                                            10:24AM

11       A.    Yes.

12       Q.    Okay.  And the -- did the Board come to

13   any conclu- -- or did the Special Committee come

14   to any conclusion about the advisability of those

15   three proposals?                                    10:24AM

16       A.    Yes.

17       Q.    And what was that?

18       A.    The conclusion was that none of those

19   proposals were as attractive as the potential of

20   doing something in a self-help mode.                10:24AM

21       Q.    Okay.  Let's start with the Chandler

22   Trusts proposal; why was it determined that that

23   was not as attractive as a self-help plan?

24       A.    The reason that the Chandler proposal,

25   one of the big issues is that there would be an     10:25AM

                                                          32

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001483

HIGHLY CONFIDENTIAL

1   element of, number one, high debt, but two, a stub

2   equity of which there was some concern about its

3   value and when the investment bankers did all of

4   the analysis.

5        And, by the way, these are all of the     10:25AM

6   recommendations that we came to were based on the

7   input from the investment bankers who went through

8   all of the details on these.  And so that was --

9   it was not considered to be worth any kind of

10   really premium compared to where the stock was    10:26AM

11   trading at that point in time.

12      Q.   Do you recall specifically what the

13   concerns were about the stub equity?

14      A.   Just the valuation and the broadcasting

15   businesses, that would have been spun out.     10:26AM

16      Q.   How about the Carlisle proposal, what

17   were the reasons that that was determined not to

18   be an attractive proposal?

19      A.   It was only a transaction for a part

20   of the Company, and it was not believed to be    10:26AM

21   of the full value of what that would be worth,

22   particularly because it was a taxable transaction.

23      Q.   Okay.  And how about the Broad and Burkle

24   proposal, why was that determined not to be an

25   attractive option?     10:27AM

           33

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

HIGHLY CONFIDENTIAL

1      A.    The Broad --

2            MR. GRAHAM:   You are assuming that the

3   Broad and Burkle proposal remained on the table at

4   the time that the Board made a decision?

5            MR. ODDO:   Yes.   And I can be more          10:27AM

6   specific.

7   BY MR. ODDO:

8      Q.    The $34 per share proposal that

9   contemplated a $27 dividend, which I believe

10  was the proposal that was on the table at the time   10:27AM

11  of the Special Committee Meetings subsequent to

12  January 17th.

13     A.    Well, let me try to answer the question.

14  The initial proposal that I recall from Broad and

15  Burkle was for $27 a share, and it was -- there      10:27AM

16  was the analysis that was done by the bankers and

17  agreed to by the Special Committee that there was

18  higher leverage than we could be comfortable with

19  and that there was not really any control premium

20  in that transaction, and so the value of that was    10:28AM

21  not worth maybe as much as where the buyer

22  estimated it would be.

23            And, again, you had an issue of what

24  the stub equity would be worth afterwards.

25     Q.    Is it fair to say that the Company's         10:28AM

                                                         34

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001485

HIGHLY CONFIDENTIAL

1    advisors and the Special Committee's advisors

2    valued these three proposals at less than what

3    the entities making the proposals had valued them

4    at?

5        A.    Well, they -- there was a debate around        10:28AM

6    what the value would be based on what the, I

7    think, the buyers -- we didn't look at it what the

8    buyers were proposing and what they felt it was

9    worth, we looked at it as what the -- as a seller

10   what we would look at it and value it at.            10:29AM

11          So I can't really tell you how totally the

12   buyers would look at it.

13      Q.    No, and that's not what I intended by the

14   question.

15          My question was more that you and your        10:29AM

16   advisors came to the conclusion that these

17   proposals were worth less than what the buyers

18   believed them to be?

19      A.    Yes.

20          MR. ODDO:   Let's mark as Plaintiff's        10:30AM

21   Exhibit -- or Osborn Exhibit No. 4 a document

22   that's Bates stamped TRIB2637 through 2639.

23                    (Osborn Deposition Exhibit No. 4

24                    marked for identification.)

25                                                        10:31AM
                                                            35

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001486

HIGHLY CONFIDENTIAL

1   BY MR. ODDO:

2       Q.   Can you tell me what this document is?

3       A.   This is the minutes of the Special

4   Committee Meeting on January 20th of 2007.

5       Q.   And you were present at the meeting?          10:31AM

6       A.   I was.

7       Q.   Okay.  The minutes indicate that

8   Mr. FitzSimons made a presentation at the

9   beginning of the meeting and described the

10  process that the Company had undergone; does       10:31AM

11  that correspond with your recollection?

12      A.   Well, yes, except that I would say that

13  we had -- periodically had to review a number of

14  the times we'd get together of the process because

15  we had gone through so many meetings, people       10:32AM

16  needed to be reminded of what had been going on.

17      Q.   Okay.  So this was typical at the meetings

18  for Mr. FitzSimons to bring the committee up to

19  speed as to what had taken place since the last

20  meeting and before?                                10:32AM

21      A.   Yes.

22      Q.   Okay.  Did Mr. FitzSimons or any

23  other representative of management make

24  any recommendations with respect to the

25  three proposals that were being considered?        10:32AM
                                                          36

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001487

HIGHLY CONFIDENTIAL

1      A.    Well, I'm not certain that Dennis or

2    Mr. FitzSimons made a recommendation as much

3    as this was being laid out as the different

4    alternatives plus we had the issue that we

5    always were aware of of a self-help kind of          10:33AM

6    opportunity.

7      Q.    Okay.  Did the committee ever ask

8    management for recommendations on any of the

9    proposals it was considering?

10          MR. GRAHAM:  I'm sorry, what point in        10:33AM

11   time are we talking about?

12          MR. ODDO:  Any point in time.

13          MR. GRAHAM:  So you mean from the

14   beginning of the 6-month process to the end of

15   the 6-month process did they ever ask management    10:33AM

16   for any recommendations?

17          MR. ODDO:  On a specific proposal.

18     A.    Yes.

19   BY MR. ODDO:

20     Q.    Which proposals did the Committee ask for    10:33AM

21   a specific recommendation on?

22     A.    Well, we would -- particularly towards

23   the end we were trying to determine where the

24   Company would be comfortable in a transaction,

25   and so we asked would they be willing to support    10:33AM
                                                         37

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001488

HIGHLY CONFIDENTIAL

1    this.

2        Q.    Okay.  So the Zell proposal --

3        A.    Yes.

4        Q.    -- that was ultimately agreed to?

5        A.    Yes.                                    10:34AM

6        Q.    Okay.  Any other proposals that you

7    recall asking for a specific recommendation from

8    management about?

9        A.    Well, yes, we asked them if they would be

10   willing to support a Broad and Burkle proposal if    10:34AM

11   they could get to one given all of the financing

12   and everything else, and they said they would be

13   willing to support that also.

14       Q.    Okay.  When did that take place?

15       A.    That took place towards the end of the    10:34AM

16   process, so towards the end of March, beginning

17   of April.

18       Q.    And was that Mr. FitzSimons who conveyed

19   that they would be willing to support such a

20   transaction if the details were ironed out?        10:34AM

21       A.    Yes.

22             THE VIDEOGRAPHER:  Five minutes remaining.

23   BY MR. ODDO:

24       Q.    Okay.  It appears at this meeting that

25   Mr. Broad and Mr. Burkle made a presentation; is    10:35AM
                                                             38

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001489

HIGHLY CONFIDENTIAL

1    that your recollection?

2        A.    Yes.

3        Q.    What do you recall from that presentation?

4        A.    They basically indicated to the Committee

5    why they felt they were qualified to make a bid,      10:35AM

6    they talked about some of the action steps they

7    might take if they would acquire the Company, and

8    they answered questions from the Committee and

9    from the bankers while they were there.

10        Q.    Okay.  What were some of the action steps    10:35AM

11    that they mentioned?

12        A.    They wanted to invest more in the

13    Internet, the content area.  They felt like they

14    could get experience on running a leverage kind

15    of company.                                             10:36AM

16        Q.    Did they give any indication that they

17    might be willing to either change or improve the

18    terms of their proposal?

19        A.    I don't recall at that meeting, but we

20    ask all of them through the bankers to improve      10:36AM

21    their proposal, and, in fact, we went back to

22    Broad and Burkle because there was continued

23    interest in their transaction given the ability

24    to deliver at that point in time $27 a share,

25    which was of interest to the Committee, but there    10:36AM

                                                              39

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001490

HIGHLY CONFIDENTIAL

1    were also some questions of whether that was

2    enough or not.

3        Q.    Okay.  When did you go back to Mr. Broad

4    and Mr. Burkle?

5        A.    Well, the bankers went back to them after    10:36AM

6    that meeting.

7        Q.    And do you know what they went back to

8    Mr. Broad and Burkle with?

9        A.    Well, they were trying to get, you know,

10   better terms on the transaction.                       10:37AM

11       Q.    Do you know specifically what type of

12   better terms they were trying to --

13       A.    I don't recall because we had a number --

14   we were going back to everybody with, you know,

15   different sets.  You know, the direction was is to      10:37AM

16   improve the transactions.

17       Q.    Okay.  So you don't recall what specifics

18   about the Broad and Burkle --

19       A.    I don't, I don't recall.

20       Q.    Again, even though you know where I'm        10:37AM

21   going --

22       A.    I'm sorry.

23             MR. ODDO:  Why don't we take a quick break

24   so that the tape can be switched.

25             THE VIDEOGRAPHER:  Okay.  We're going        10:37AM

                                                            40

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001491

HIGHLY CONFIDENTIAL

1    off the record.  The time now is approximately

2    10:37 a.m.  The elapsed time on this tape is

3    approximately 58 minutes continuing on tape two.

4              (Recess taken.)

5         THE VIDEOGRAPHER:  Good morning.  This        10:50AM

6    will begin videotape number two of the deposition

7    of Mr. William A. Osborn taken the 16th day of

8    May, 2007, pursuant to case number BC362110.

9         The time now is approximately 10:49 a.m.,

10   and I'll remind the witness he remains under oath,   10:50AM

11   and we may continue.

12        MR. ODDO:  Okay.  I've handed the witness

13   what we'll mark as Plaintiff's Exhibit No. 5.

14              (Osborn Deposition Exhibit No. 5

15              marked for identification.)        10:51AM

16        MR. ODDO:  Which is a document that is

17   Bates stamped TRIB2380 through 2416, and I'll ask

18   the witness to take a look at this document.

19        Feel free to review as much or as

20   little of the document as you'd like to to feel      10:51AM

21   comfortable discussing it, but my questions are

22   going to be primarily centered on page 14.

23        THE WITNESS:  Go ahead if you want to ask

24   any questions.

25                                                10:53AM
                                                      41

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001492

HIGHLY CONFIDENTIAL

1    BY MR. ODDO:

2        Q.    Okay.  Can you tell me what this document

3    is?

4        A.    This document is a summary of information

5    prepared by the independent -- or for the                   10:53AM

6    independent committee of the Board of Directors of

7    Tribune by Merrill Lynch and Citigroup, it's dated

8    January 20th of 2007.

9    BY MR. ODDO:

10       Q.    Okay.  And have you seen this document      10:53AM

11   before?

12       A.    I've seen this document before.

13       Q.    Okay.  Let's take a look at page 14,

14   and what's your understanding of what Merrill

15   Lynch has done on this page?                          10:53AM

16       A.    This from my interpretation gives the

17   valuation estimates based on different assumptions

18   on how you come up with those valuations.

19       Q.    Okay, for the Broad and the Burkle

20   proposal?                                             10:54AM

21       A.    Yes.

22       Q.    And what assumptions did Merrill Lynch

23   make in coming up with the discounted valuations

24   of 32.20 and 31.72?

25       A.    Well, I don't recall all of the            10:54AM
                                                                42

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001493

HIGHLY CONFIDENTIAL

1   assumptions that went into the determination of

2   the numbers that went in here, but it's typically

3   around timing and it's typically around different

4   context of what the -- of the financing might be

5   and all other kind of assumptions that go into          10:54AM

6   that determination.

7       Q.   Do you recall specifically what

8   Merrill Lynch said about how they were analyzing

9   this proposal?

10      A.   I don't recall the specifics, no.            10:55AM

11      Q.   Okay.   Do you recall whether or not any

12  of the ways in which Merrill Lynch was valuing or

13  attempting to value the proposal were shared with

14  Mr. Broad or Burkle during the presentation at

15  this meeting?                                          10:55AM

16      A.   I don't recall.

17      Q.   Do you recall whether or not Mr. Broad and

18  Burkle were informed that the Committee and its

19  advisors were valuing their offer at less than the

20  $34 that they had headlined at?                        10:55AM

21          MR. GRAHAM:   At this meeting?

22          MR. ODDO:   At this meeting or subsequent

23  to this meeting.

24          MR. GRAHAM:   Okay, well, let's break those

25  out, okay, because there's also a foundation issue   10:55AM

43

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001494

HIGHLY CONFIDENTIAL

1    in terms of he said the investment bankers went

2    and talked to them.

3            MR. ODDO:  Okay.  We'll start with the

4    meeting itself.

5        A.   I don't specifically recall exactly what    10:56AM

6    was said, whether it was to Broad and Burkle or

7    whether it was to the Chandlers, but in the

8    dialogue we had, and whether they were in the

9    room or not, the discussion did get around to

10   the fact that their valuations were less than    10:56AM

11   what was submitted in terms of what they thought

12   the valuation would be.

13   BY MR. ODDO:

14       Q.   Okay.  But you don't recall whether

15   that was when Broad and Burkle were there or    10:56AM

16   whether that was part of a Committee discussion

17   afterwards?

18       A.   I don't recall.

19       Q.   Okay.

20       A.   I don't recall.    10:56AM

21       Q.   Do you have a recollection of whether or

22   not the bases for Merrill Lynch's analysis of

23   the proposal was later shared with Mr. Broad or

24   Mr. Burkle or his -- their advisors?

25           MR. GRAHAM:  Objection, compound in    10:57AM

44

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001495

HIGHLY CONFIDENTIAL

1    nature, lack of foundation.

2        A.    I don't know.

3    BY MR. ODDO:

4        Q.    Did the Special Committee ever instruct

5    any of its advisors to inform Mr. Broad and/or        10:57AM

6    Mr. Burkle of the fact that the advisors had

7    valued their offer at less than the amount that

8    they had headlined?  Do you understand the

9    question?

10        A.    I understand the question.  I don't recall    10:57AM

11    that we asked them to communicate that.  What I do

12    recall is that we wanted to continue to work with

13    Broad and Burkle, and subsequent to this meeting

14    we also -- and I think it's evidence of that

15    communication -- we gave them some revised numbers    10:58AM

16    towards -- because we had the January numbers that

17    came out that were a little softer than what they

18    had in their plans.

19            And then as a result of that, and this is

20    communication with the bankers, they lowered their    10:58AM

21    number from $27 to $23.

22        Q.    That was the dividend component of their

23    proposal, correct?

24        A.    Yes.

25        Q.    And that was after they had received the    10:58AM

45

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001496

HIGHLY CONFIDENTIAL

1   information from the Company indicating that the

2   numbers were going to be softer; is that correct?

3        A.   Yes.

4        Q.   Okay.  Let me bring you back to Exhibit 4

5   just for a minute, which that's the minutes of the    10:59AM

6   January 20th meeting, in the last page of those

7   minutes.

8        A.   (Witness complies.)

9        Q.   It says there that "The Committee

10   discussed the appropriateness of allowing one or     10:59AM

11   more parties to non-disclosure agreements with

12   the Company to enter into discussions with other

13   parties under similar agreements," and that you

14   were directed to inform the Company's advisors of

15   the decisions reached.  Do you recall what those     10:59AM

16   decisions reached were?

17        A.   Well, the decision, one of the decisions

18   reached was we wanted the management team to come

19   back and prepare a more -- a self-help proposal.

20             Up until that time we had been looking at   11:00AM

21   mainly outside alternatives, and we wanted to now

22   see what could be done.

23             And part of that was driven by the fact

24   that the bankers were telling us that from the

25   kind of proposals that were being submitted that     11:00AM

46

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001497

HIGHLY CONFIDENTIAL

1   much of that could be done yourself and get the

2   same value without the change of control that

3   would take place in there because there was no

4   premium being offered for that change in control.

5        So we wanted to see what management could    11:01AM

6   do in effect in a leverage situation where they

7   would tender and do some of the same things that

8   had been proposed in the other transactions.

9        Q.   Okay.  This notation in the minutes

10  seems to refer to the parties to nondisclosure    11:01AM

11  agreements and whether it was appropriate to allow

12  them to contact each other, I believe, at least

13  that's my interpretation.

14       And the last sentence there says that you

15  were directed to inform the Company's advisors of    11:01AM

16  the decision to reach with respect to that.

17       A.   Well, I was informing also of what I just

18  said.

19       Q.   Okay.

20       A.   All right, of the management to be able to    11:01AM

21  kind of come back.

22       Q.   So one of the instructions was to -- was

23  for management to further develop the self-help

24  plan?

25       A.   Correct.    11:02AM

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001498

HIGHLY CONFIDENTIAL

1    Q.   Okay.  And what was the other, do you

2   recall?

3    A.   I don't recall the specifics with regard

4   to this.  There was a point in time around this

5   where the dialogue of what we discussed earlier    11:02AM

6   about the McCormick Tribune Foundation being

7   engaged in some of the dialogue with some of

8   the parties to work out some alternatives.

9    Q.   You're not sure whether this particular

10   discussion --                                     11:02AM

11    A.   I just don't recall.

12    Q.   Okay.  Do you have any recollection

13   of whether or not Mr. Broad and Mr. Burkle ever

14   renewed their request to communicate with the

15   Chandler Trusts or the McCormick Foundation       11:03AM

16   sometime after their initial request was denied?

17    A.   I just don't recall.

18    Q.   Okay.  What was the Committee's response

19   to the Broad/Burkle proposal after the dividend

20   portion was reduced from 27 to $23?               11:03AM

21    MR. GRAHAM:   Object, lack of foundation,

22   assumes that there was a proposal that was made at

23   that figure.

24    A.   During the period in February, which would

25   have been in this period of time, the revised     11:04AM

                                                       48

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001499

HIGHLY CONFIDENTIAL

1    number down corresponded with a -- the beginning

2    of a Zell type of proposal, and the attractiveness

3    of the Broad/Burkle without any more specifics

4    became -- they kind of went quiet, and this is the

5    words from the investment bankers.                     11:04AM

6         So I don't recall, it's kind of like they

7    weren't as engaged and didn't feel once they lower

8    the price, they didn't seem to show as much

9    enthusiasm for the transaction.

10    Q.    Okay.  Once they lowered the price, did      11:05AM

11    the Special Committee or its advisors communicate

12    to Broad and Burkle that their offer was -- or

13    that the proposal was inadequate?

14    A.    I don't know that -- I don't know -- I

15    don't recall the communication at that point in     11:05AM

16    time.

17    Q.    Okay.  Do you recall whether or not the

18    Special Committee and/or its advisors communicated

19    to Broad and Burkle that they needed to improve

20    their proposal in order for it to be considered by  11:05AM

21    the Board or by the Special Committee?

22    A.    I don't, I just don't recall the

23    communication that went on with Broad and Burkle.

24    Q.    Who was primarily responsible for

25    communications with Broad and Burkle?               11:05AM
                                                              49

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001500

HIGHLY CONFIDENTIAL

1      A.    That would have been the investment

2  bankers, Merrill Lynch, and I think to some degree

3  Citibank, they were the two financial advisors for

4  the company.

5      Q.    And Mr. Costa primarily?                    11:06AM

6      A.    Mr. Costa would have been one of the

7  people engaged, but I cannot tell you specifically

8  who was communicating to Broad and Burkle.

9      Q.    Outside of the January 20th meeting where

10 Mr. Broad and Mr. Burkle attended, did you have      11:06AM

11 any direct communications with either of them?

12          MR. GRAHAM:  When you say direct

13 communications, do you mean other than by letter?

14 Do you mean an actual conversation?

15          MR. ODDO:  Yes, verbal communications.      11:06AM

16     A.    I don't recall.  Eli Broad called me

17 at one time, and I don't remember whether it was

18 before or after that meeting, to tell me of his

19 interest, you know, in the transaction.

20 BY MR. ODDO:                                          11:07AM

21     Q.    Did you know either of these gentlemen

22 prior to their expressing an interest in Tribune?

23     A.    I had met Ron Burkle, but I did not know

24 Mr. Broad.

25     Q.    Had you had any business dealings with     11:07AM
                                                             50

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001501

HIGHLY CONFIDENTIAL

1    Mr. Burkle?

2        A.    Yes, he was involved in buying a company

3    called Dominick's Food Stores in the Chicago area,

4    and Dominick's had been and was a client of ours,

5    and so I had met at one time with Mr. Burkle in        11:07AM

6    conjunction with that.

7        Q.    Okay.  That's the only time you met

8    Mr. Burkle?

9        A.    Yes.

10           MR. ODDO:  Let's mark as Plaintiff's        11:09AM

11    Exhibit No. 7 -- 6 a document that's Bates stamped

12    TRIB53 to 54.

13                      (Osborn Deposition Exhibit No. 6

14                       marked for identification.)

15    BY MR. ODDO:                                       11:10AM

16        Q.    Can you tell me what this document is?

17        A.    These are the minutes of the Special

18    Committee dated February 13, 2007.

19        Q.    Okay.  And you were present at this

20    meeting?                                           11:10AM

21        A.    I was.

22        Q.    On the second page there's reference to an

23    extended discussion having taken place and then

24    you summarizing the sense of the Committee; do you

25    see that?                                          11:11AM
                                                          51

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

HIGHLY CONFIDENTIAL

1    A.    Yes.

2    Q.    Do you recall what you told the other

3    Committee members?

4    A.    Well, the -- I don't recall the exact

5    words on this, but as we would go through any of        11:11AM

6    the meetings from time to time, we'd try to figure

7    out exactly where we were in reviewing proposals.

8    And at that point in time this is where

9    the -- after the revision in some of the numbers

10   and the projections based on the month of January      11:11AM

11   and based on the input from the investment bankers

12   in terms of values here, this really put in I

13   think the context of where we were at that time

14   in looking at the different alternatives where at

15   that point then the Broad and Burkle proposal did      11:12AM

16   not appear to be based on input we were receiving

17   from the investment bankers as an attractive

18   transaction as the self-help, and clearly we had

19   some of the beginning aspects of this ESOP

20   proposal coming from Zell, which still needed to       11:12AM

21   be baked but had some attractive numbers beginning

22   to be associated with it, and then there was the

23   issue of still where Broadcasting might go and

24   what we would do if we would ever do a self-help

25   then maybe a spin of Broadcasting.                     11:12AM

52

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001503

HIGHLY CONFIDENTIAL

1    Q.   Okay.  Was it the sense of the Committee

2    at this time that the most attractive proposals

3    going forward were potentially the Zell proposal

4    and the self-help proposal?

5    A.   Well, the Zell proposal was still kind of,  11:13AM

6    I think, coming along at that point.

7         I would say the interest in the Zell

8    proposal was in a conceptual stage for a period

9    of time, and I can't tell you exactly the day in

10   February/early March where it started to take more  11:13AM

11   of a substantive meaning to us.

12   Q.   Do you recall whether or not the Committee

13   instructed Merrill Lynch or the other advisors to

14   inform Mr. Broad and Burkle that their offer was

15   not considered as attractive by the Special       11:13AM

16   Committee?

17        MR. GRAHAM:  Asked and answered.

18   A.   Yeah, I don't recall the communication

19   going on with -- in -- with Broad and Burkle as a

20   result of these discussions.                       11:14AM

21   BY MR. ODDO:

22   Q.   Okay.  Do you recall whether the

23   Special Committee gave any instructions to

24   Merrill Lynch --

25   A.   I don't recall.                                11:14AM

                                                         53

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001504

HIGHLY CONFIDENTIAL

1    Q.   So you don't have any independent

2    knowledge of what was communicated to Broad and

3    Burkle after this meeting about their proposal at

4    that point in time?

5    A.   No.                                    11:14AM

6    Q.   There's a reference here to seeking

7    from Carlisle its highest and best offer for the

8    Broadcasting assets of the Company; was that an

9    instruction that was given to Merrill Lynch to go

10   out and seek?                               11:15AM

11   A.   My recollection is that there was still

12   a number on the table from Carlisle that if we

13   could get them to move it up, and there was

14   discussion about this, it would make it attractive

15   enough that we should consider it, but it was      11:15AM

16   going to have to be able to make up for the tax

17   considerations of selling the business.

18        And so while we were pushing them to try

19   to come back with a higher number, I believe that

20   there was a sense both from the bankers and from    11:16AM

21   the Committee that that was probably not going to

22   be something that would take place.

23   Q.   Okay.   Do you recall any similar

24   discussion about Broad and Burkle at this

25   meeting?                                    11:16AM

                                                        54

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001505

HIGHLY CONFIDENTIAL

1    A.    The discussions that I recall is that

2    they had lowered the price, and the attractiveness

3    relative to the other proposals was not measuring

4    up.

5         Now, what I don't recall is whether there    11:16AM

6    was any dialogue of communication back.  As I

7    said, that was taking place with the investment

8    bankers.

9    Q.    Do you recall whether or not your advisors

10   did go back to Carlisle and seek to secure their    11:16AM

11   best offer for the Broadcasting assets?

12   A.    I don't recall other than to know that

13   in the end there we couldn't get them to the point

14   where it was attractive to us.

15   Q.    When was the next contact you recall    11:17AM

16   having with -- let me rephrase that.

17        When is the next communication you recall

18   the Special Committee having with Mr. Broad and/or

19   Mr. Burkle?

20        MR. GRAHAM:  Again, when you say    11:18AM

21   communication, before you were defining that as

22   oral communications; is that what you're referring

23   to again?

24        MR. ODDO:  I'll say any type of

25   communication, oral or written, here.    11:18AM
                                                        55

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001506

HIGHLY CONFIDENTIAL

1    A.    Well, to the best of my knowledge, the

2    next time we heard from them was when they sent a

3    letter through the Company to the Board towards --

4    sometimes toward the end of March indicating that

5    they were interested in a Zell type of                    11:19AM

6    transaction.

7    BY MR. ODDO:

8        Q.    Okay.  Now, between the time of that

9    letter and the meeting that we just looked at,

10   which was in mid February, had there been any        11:19AM

11   other communications that you were aware of

12   between the Special Committee and/or its advisors

13   and/or Mr. Broad or Burkle?

14       A.    Well, as we discussed earlier, after

15   the meeting there was a communication about the      11:20AM

16   revised forecast, they came back with the revised

17   number, and then I don't recall what communication

18   or remember anything that went on from that period

19   of time, which would have been sometime in, you

20   know, mid February, say, until towards the end of    11:20AM

21   March.

22           MR. ODDO:  Okay.  All right.  Let's mark

23   as Plaintiff's Exhibit No. 7 a document that's

24   Bates stamped TRIB12048 through 12051.

25                                                        11:21AM
                                                         56

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001507

HIGHLY CONFIDENTIAL

1          (Osborn Deposition Exhibit No. 7

2            marked for identification.)

3    BY MR. ODDO:

4      Q.    Okay.   Can you tell me what this document

5    is?                                        11:21AM

6      A.    This is an e-mail from Dennis FitzSimons

7    to me with a copy to Crane Kenney, and it's

8    forwarding on an e-mail that he received from

9    Michael Costa regarding a letter that had come in

10   from Broad and Burkle to the Board of Directors,   11:22AM

11   and that letter was dated March 23rd.

12     Q.    Okay.   Is this the letter you were

13   referring to?

14     A.    Yes.

15     Q.    Let's take a look at the e-mail from     11:22AM

16   Mr. Costa to Mr. FitzSimons that was ultimately

17   forwarded to you.

18     A.    (Witness complies.)

19     Q.    There's a reference there to where he says

20   "You may recall they withdraw their $34 offer and   11:22AM

21   lowered $27 cash component substantially after

22   reviewing reforecast."  Do you see that?

23         Was it your understanding that they had

24   withdrawn their offer?

25         We talked about the fact that they had     11:23AM
                                                    57

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001508

HIGHLY CONFIDENTIAL

1    reduced the cash component, but was it your

2    understanding that they had actually withdrawn

3    their offer?

4        A.    I did -- I don't recall that they withdrew

5    the offer.  I recall that it just went quiet.        11:23AM

6            MR. GRAHAM:  When you say you don't

7    recall, do you mean one way or the other?

8            THE WITNESS:  I don't.  It was -- the

9    issue of -- I don't recall that we got into a

10   debate about withdrawal, they just weren't there.    11:23AM

11   So whether it was withdrawn or whether they just

12   weren't interested, I wasn't certain.

13   BY MR. ODDO:

14       Q.    Between February 13th and when you

15   received this letter, do you recall whether        11:23AM

16   any -- whether you or any of the other members of

17   the Special Committee inquired of Merrill Lynch as

18   to what the status was with Mr. Broad and

19   Mr. Burkle?

20       A.    I don't recall that we inquired directly.   11:24AM

21   I do recall that it was viewed, and I don't

22   remember the circumstances, that they just seemed

23   to go quiet.  They used the word they're quiet,

24   they're just not -- as though they weren't

25   engaged.                                            11:24AM
                                                          58

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001509

HIGHLY CONFIDENTIAL

1    Q.    And when you say "they," are you referring

2    to the advisors?

3    A.    Yes.  The advisors were telling us that

4    Broad and Burkle had gone quiet.

5    Q.    But you don't remember any specific        11:24AM

6    instances where the committee or its members asked

7    the advisors specifically about what the status

8    was?

9    A.    I don't remember whether we did or did

10    not.                                            11:24AM

11    Q.    Okay.  There's a reference in the

12    letter which begins on the third page where it

13    says "...we received information that suggested

14    that some critical information affected" --

15        MR. GRAHAM:  I'm sorry, which paragraph     11:25AM

16    are you at?

17        MR. ODDO:  I'm sorry, the bottom of the

18    second paragraph, the sentence that begins "Our

19    prior efforts..."

20    BY MR. ODDO:                                    11:25AM

21    Q.    It says "...we received information that

22    suggested some critical information affecting

23    Tribune's value was not made available to us as

24    we were developing our original proposal."

25        Do you have any understanding what they     11:25AM
                                                        59

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001510

HIGHLY CONFIDENTIAL

1    may have been referring to there?

2            MR. GRAHAM:  Objection, lack of

3    foundation.

4        A.    I don't know what they were referring to.

5    BY MR. ODDO:                                    11:25AM

6        Q.    Okay.  Did the special -- upon -- let me

7    rephrase that.

8            This letter was shared with the other

9    members of the Special Committee; is that correct?

10       A.    Yes.                                   11:26AM

11       Q.    Did the Special Committee give any

12   instructions to its advisors as to how to respond

13   to the letter?

14       A.    Yes.

15       Q.    What were those instructions?          11:26AM

16       A.    Well, we had actually --

17           MR. GRAHAM:  Hold on one second.

18           THE WITNESS:  Okay.

19           MR. GRAHAM:  I need to talk to him about a

20   privilege matter in connection with this because   11:26AM

21   you haven't distinguished legal and financial

22   advisors here.

23           MR. ODDO:  I can distinguish that for you.

24           MR. GRAHAM:  Okay.  If you do that, then

25   maybe --                                          11:26AM
                                                       60

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001511

HIGHLY CONFIDENTIAL

1        MR. ODDO:  Yes.

2    BY MR. ODDO:

3        Q.    I'm talking about the financial advisors.

4    I'm not asking for any legal advice that you or

5    the Committee may have received.                    11:26AM

6            What I'm asking is whether the Special

7    Committee instructed its financial advisors to

8    respond in any way to this letter.

9        A.    The Special Committee did not; I did.

10       Q.    Okay.  How did you --                      11:27AM

11       A.    I told them that they should provide

12   information, any information that is needed, the

13   data room should continue to be open to them, and

14   they should have all of the information everybody

15   should have.                                         11:27AM

16       Q.    Okay.  Were you aware of whether or not

17   Messrs. Broad and Burkle made any specific request

18   for information?

19            MR. GRAHAM:  Do you mean other -- apart

20   from this letter did they make a request for        11:27AM

21   information through their investment advisors to

22   one of the financial advisors?

23            MR. ODDO:  I'm just asking whether he was

24   aware of whether or not -- after this letter he

25   was aware that they had requested any information.   11:27AM
                                                          61

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001512

HIGHLY CONFIDENTIAL

1    A.    Not after this letter.  In fact, you'll

2    find somewhere that I responded to this letter

3    because there are facts in this that we did not

4    agree with.

5    BY MR. ODDO:                                    11:28AM

6    Q.    Okay.  And what were the facts you didn't

7    agree with, the idea that the Company had come up

8    with the ESOP proposal, was that one of them?

9    A.    Well, no, excuse me, that's not correct.

10   Q.    Okay.                                      11:28AM

11   A.    The fact of the matter is that Zell came

12   up with the proposal for the ESOP --

13   Q.    Understood.

14   A.    -- not the Company.

15   Q.    And that's one of the things you took     11:28AM

16   issue with in the letter, correct?

17   A.    That's correct.

18   Q.    Because the letter implies that the

19   Company developed the proposal when you're saying

20   that the proposal was actually developed by      11:28AM

21   Mr. Zell, correct?

22   A.    That's correct.

23   Q.    Okay.  Any other issues that you had with

24   the letter that you responded to?

25   A.    There were a variety of issues, and I --   11:29AM
                                                       62

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001513

HIGHLY CONFIDENTIAL

1   there should be a copy of the letter that we wrote

2   that addressed some of those in there, and I don't

3   recall all of them, but it was about data, it was

4   around the communication, and the perception of

5   who stopped the communication and things like          11:29AM

6   that.

7       Q.   What's your recollection of what happened

8   next with Messrs. Broad and Burkle following this

9   letter and your response?

10          MR. GRAHAM:  When you say his response, I    11:30AM

11  just want to make sure you don't mean his response

12  to -- in writing to this letter, you mean the

13  response that he gave to his investment advisors,

14  financial advisors?

15          MR. ODDO:  No, I was talking about the        11:30AM

16  letter.

17          MR. GRAHAM:  I'm sorry, I'm not following.

18  You're talking about following his response by

19  letter to this letter?

20          MR. ODDO:  Yes.                               11:30AM

21  BY MR. ODDO:

22      Q.   What is your recollection of what happened

23  next with Broad and Burkle?

24          MR. GRAHAM:  I still don't understand the

25  time frame for the question.  Maybe if you could    11:30AM

63

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001514

HIGHLY CONFIDENTIAL

1    give him a copy of his letter in terms of the

2    date, because the dates come into play here.

3    BY MR. ODDO:

4        Q.    Are you confused as far as the time frame

5    I'm talking about?                                    11:31AM

6        A.    Well, the letter that we received --

7    this was all towards a pretty rapid fire week of

8    activity, and we -- the Committee and we discussed

9    to make certain that there was information

10   available to Broad and Burkle.                         11:31AM

11       They then came back and said we would

12   like to do a similar transaction -- I believe

13   there probably is a letter indicating that

14   somewhere along the way -- at $34 a share as

15   we were in the process of trying to finalize          11:31AM

16   the arrangements on the Zell transaction and

17   evaluate that against the self-help.

18       And so that communication came in, I

19   believe, like on the Thursday or Friday before

20   our meetings on Saturday and Sunday where we were     11:32AM

21   trying to move forward with our decision.

22       That letter was just a letter with a --

23   and the conditionality of it, the fact that it

24   was an improvement over where we were drove us to

25   where we should make a decision to go with the        11:32AM
                                                            64

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001515

HIGHLY CONFIDENTIAL

1   Zell proposal.

2          And one of the things that we made certain

3   in that proposal was there was a breakup fee that

4   was relatively modest so that if there were a

5   better transaction that Broad and Burkle or anyone    11:32AM

6   wanted to pursue, that there would be the ability

7   to do so.

8          MR. ODDO:  Okay.  Let's take a look at

9   that letter; it's what we'll mark as Exhibit

10  No. 8.  It's Bates stamped TRIB6184.                  11:33AM

11                 (Osborn Deposition Exhibit No. 8

12                 marked for identification.)

13  BY MR. ODDO:

14     Q.   Is this the letter that you were referring

15  to just before?                                       11:34AM

16     A.   Yes.

17     Q.   And is it your recollection that you and

18  the other Committee members received this on or

19  about the 29th of March?

20     A.   The 29th or the 30th, yes, near there.        11:34AM

21     Q.   And was there a Special Committee

22  discussion about this letter?

23     A.   Yes.

24     Q.   And what was the substance of that

25  discussion?                                           11:34AM
                                                            65

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001516

HIGHLY CONFIDENTIAL

1    A.   The substance of the discussion was at the

2    late hour that we were working with the self-help

3    versus the Zell proposal, and the complexity to

4    get the final documents done on a transaction

5    like that, is it -- was it necessary that we, in          11:35AM

6    effect, seriously take this proposal or should we

7    move forward with the recommendation that we ended

8    up going with.

9        And so we had a discussion around the

10   facts that this was -- there was not a trustee          11:35AM

11   engaged in this, while there were indications of

12   financing, the terms and documentation required

13   around it were not there, and the fact that we

14   had a transaction fully prepared to go forward,

15   and that, particularly with the environment that          11:35AM

16   we were in where the business was not necessarily

17   improving, in fact, it was deteriorating, we

18   wanted to move forward as soon as possible to

19   execute a transaction that we thought made sense

20   for all shareholders.                                      11:36AM

21   Q.   Okay.  At the time you received this

22   letter from Broad and Burkle, what was the amount

23   of the Zell proposal, do you recall the dollar

24   amount?

25   A.   The dollar amount of the -- do you mean          11:36AM
                                                               66

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001517

HIGHLY CONFIDENTIAL

1    the initial -- the transaction overall?

2            For the shareholders it was $34 a share.

3    Q.   Understood.  But it began at 33,

4    correct --

5    A.   Yes.                                      11:36AM

6    Q.   -- the initial proposal?

7    A.   Yes.

8    Q.   And at the time you received this letter,

9    do you recall where Mr. Zell was as far as the

10   financial terms?                               11:36AM

11   A.   We were in the midst of negotiating.  I

12   think -- well, pardon my -- my recollection is

13   that we had moved to 33.50 a share.

14   Q.   Okay.  Was the receipt of this letter used

15   at all as a basis for trying to get Mr. Zell to   11:37AM

16   increase his offer from 33.50?

17   A.   No.

18   Q.   Okay.  Mr. Zell ultimately did increase

19   his offer to 34, correct?

20   A.   Yes.                                      11:37AM

21   Q.   Do you recall whether there was any effort

22   to seek to have Mr. Broad and Mr. Burkle increase

23   the amount of the proposal that's described in

24   this letter from $34?

25   A.   No.                                       11:38AM
                                                      67

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001518

HIGHLY CONFIDENTIAL

1    Q.    You don't recall or there wasn't?

2    A.    I don't recall that there was any.

3    Q.    Okay.  Now, you mentioned previously that

4    there were some -- or that the Special Committee

5    had some issues with the substance of the proposal    11:38AM

6    contained in the letter, one of them being that it

7    didn't reference a trustee for the ESOP, correct?

8    A.    Yes.

9    Q.    Had a trustee already been established

10   for the ESOP that was contemplated by the Zell    11:38AM

11   transaction?

12   A.    Yes.

13   Q.    And when had that been done?

14   A.    That had been done several weeks prior.

15   Q.    Okay.  And you indicated that there were    11:38AM

16   issues about the financing of the Broad and Burkle

17   proposal; is that correct?

18   A.    Yes.

19   Q.    Do you recall specifically what those

20   issues were?    11:39AM

21   A.    Well, the issues were -- and what was done

22   is that Merrill and Citibank agreed to provide

23   overall financing for whoever might be bidding on

24   the transaction, but agreement and documenting

25   that and getting all of the terms and conditions    11:39AM
                                                            68

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001519

HIGHLY CONFIDENTIAL

1  completed as we had just gone through takes

2  several weeks to get done.

3      Q.    Okay.  Was any suggestion made that

4  Merrill and/or Citigroup communicate with Broad

5  and Burkle about the financing arrangements for        11:40AM

6  their proposal?

7      A.    It is my understanding that Broad and

8  Burkle knew and had been communicated by Merrill

9  and Citi about the availability of financing.

10     Q.    Okay.  Subsequent to their March 29th       11:40AM

11  letter, do you know whether there were any

12  discussions between Mr. Broad and Burkle and

13  Merrill and Citigroup?

14     A.    I just don't recall.

15          MR. GRAHAM:  When you say Mr. Broad and       11:40AM

16  Burkle, you're including their financial advisors?

17          MR. ODDO:  Yes.  Okay.

18               (Discussion held off the

19               record.)

20  BY MR. ODDO:                                          11:41AM

21     Q.    So in addition to the lack of a designated

22  trustee and the financing issues, were there any

23  other concerns that the Special Committee had with

24  the substance of the Broad/Burkle proposal?

25     A.    There may have been other elements, but I    11:41AM

69

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001520

HIGHLY CONFIDENTIAL

1    don't recall those right now.

2        Q.    Did the Special Committee and/or its

3    advisors respond to Mr. Broad and Mr. Burkle

4    following receipt of this letter?

5        A.    To my knowledge --                          11:41AM

6            MR. GRAHAM:  Objection, lack of

7    foundation.

8            Go ahead.

9        A.    To my knowledge there was communication

10   going on between the investment bankers and Broad    11:42AM

11   and Burkle, but I don't recall the specifics

12   around this that took place.

13   BY MR. ODDO:

14       Q.    Did the Special Committee give the bankers

15   any instructions as to how to deal with Mr. Broad    11:42AM

16   and Mr. Burkle after receiving this letter?

17           MR. GRAHAM:  I'm sorry, could you just

18   reread that question.

19           MR. ODDO:  Could you read it back.

20               (Record read.)                            11:42AM

21           MR. GRAHAM:  Thank you.

22       A.    I don't recall the specifics of the

23   communication back to Broad and Burkle from after

24   this.

25           MR. ODDO:  Okay.  Let's mark as              11:43AM
                                                             70

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001521

HIGHLY CONFIDENTIAL

1    Plaintiff's Exhibit No. 9 a document that's

2    Bates stamped TRIB66805 through 66806.

3                    (Osborn Deposition Exhibit No. 9

4                    marked for identification.)

5    BY MR. ODDO:                              11:44AM

6        Q.    Can you tell me what this document is?

7        A.    This is a letter dated March 30th to

8    Mr. Broad and Mr. Burkle in response to their

9    letter of March 23rd, and this is signed by me.

10       Q.    Okay.  This was dated March 30th.  Do you    11:45AM

11    recall whether you had received the March 29th

12    letter also when you sent this letter?

13       A.    I don't recall.

14       Q.    Okay.  Now, in the first paragraph you say

15    "Prior to receiving your letter, we had not been    11:45AM

16    contacted by you or your representatives for over

17    three weeks, even though our advisors have always

18    been ready, willing and able to respond to your

19    inquiries or information requests."

20            Do you have any recollection of whether or  11:45AM

21    not Merrill and/or Citigroup or Morgan Stanley for

22    that matter contacted Broad and Burkle during this

23    period?

24            MR. GRAHAM:  During that three-week

25    period?                                   11:46AM
                                                   71

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001522

HIGHLY CONFIDENTIAL

1          MR. ODDO:  Yes.

2     A.   I don't know.

3          THE VIDEOGRAPHER:  Five minutes on the

4     tape.

5     BY MR. ODDO:                                    11:46AM

6     Q.   Now, the last sentence there says "After

7     your decision not to pursue further discussions

8     with us over a month ago, we are happy to respond

9     to your renewed interest."

10          What were you basing your statement        11:46AM

11     there that they had made a decision not to pursue

12     further discussions?

13     A.   Because they had not been in contact with

14     us.

15     Q.   Okay.  So based on the fact that neither    11:46AM

16     they nor their representatives had contacted

17     either the Special Committee or --

18     A.   The advisors.

19     Q.   -- the advisors.

20          But you don't have any independent          11:47AM

21     recollection of whether or not the advisors made

22     any attempt to contact?

23     A.   No.

24          MR. GRAHAM:  Did you get a verbal answer

25     on that?                                         11:47AM

                                                            72

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only                    TRIB-G0001523

HIGHLY CONFIDENTIAL

1        THE COURT REPORTER:  Yes.  The answer was

2    "no."

3        MR. ODDO:  Why don't we break here.

4        MR. GRAHAM:  It was too soft.

5        THE VIDEOGRAPHER:  This concludes        11:47AM

6    videotape number two.  The time now is

7    approximately 11:46 a.m., and the elapsed time on

8    number two is 57 minutes.  We will continue on

9    tape number three.

10          (Recess taken.)        11:47AM

11        THE VIDEOGRAPHER:  Good afternoon.  This

12    begins videotape number three of the deposition

13    of Mr. William A. Osborn taken on the 16th day

14    of May, 2007.  The time now is approximately

15    12:00 a.m. --        12:00PM

16        MR. GRAHAM:  No, p.m.

17        THE VIDEOGRAPHER:  P.m., sorry.  You're

18    right.  Case number BC362110.  And I'll remind the

19    witness he remains under oath, and you may

20    continue.        12:01PM

21        MR. ODDO:  Let's mark as Plaintiff's

22    Exhibit No. 10 a document that's Bates stamped

23    TRIB6159.

24          (Osborn Deposition Exhibit No. 10

25          marked for identification.)    12:01PM
                                            73

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001524

HIGHLY CONFIDENTIAL

1    BY MR. ODDO:

2        Q.    Can you tell me what this document is?

3        A.    This is a letter from Mr. Broad and

4    Mr. Burkle to the Board of Directors of Tribune

5    Company dated March 31, 2007.                          12:02PM

6        Q.    Have you seen this letter before?

7        A.    Yes.

8        Q.    Can you recall approximately when you saw

9    it for the first time?

10       A.    Well, it was probably the weekend of the    12:02PM

11   31st or the 1st.  It was -- I think we saw it on

12   the 1st in the morning.

13       Q.    Okay.  And was there Board discussion

14   about this letter?

15           MR. GRAHAM:  Do you mean Special            12:02PM

16   Committee?

17           MR. ODDO:   Special Committee discussion

18   about the letter.

19       A.    Yes.

20   BY MR. ODDO:                                           12:02PM

21       Q.    And what was that?

22       A.    It was in conjunction with the prior

23   letters that you've referenced and the

24   communication between Broad and Burkle and the

25   Company and the Board, and this was a request        12:02PM

                                                             74

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001525

HIGHLY CONFIDENTIAL

1   that they had, you know, in conjunction with the

2   -- really the prior letters and the offer.

3       Q.   Did the Special Committee take any action

4   in response to this letter?

5       A.   We had made our advisors available to the        12:03PM

6   Company and --

7           MR. GRAHAM:  I'm sorry, when you say to

8   the Company --

9           THE WITNESS:  Excuse me, to Broad and

10  Burkle, I'm sorry, to Broad -- their effort to        12:03PM

11  acquire the Company.

12      A.   And the issue that I recall around this

13  is that they wanted the specific documents that

14  Mr. Zell had proposed, had given us, and we

15  were willing to give them markups, but not those        12:03PM

16  specific documents because of -- for confidential

17  reasons.

18  BY MR. ODDO:

19      Q.   Okay.  Maybe you can explain what the

20  difference between those two is for me.        12:03PM

21      A.   Well, I'm not a lawyer, so you'll have to

22  explain the difference to me.

23      Q.   What's your understanding of the

24  difference?

25      A.   My understanding of the difference is that  12:04PM

                                                              75

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001526

HIGHLY CONFIDENTIAL

1   the terms and conditions and all aspects of the

2   transaction were to be kept from Broad and Burkle,

3   and just the legal language and not -- they could

4   look at markups but not the specifics.

5       Q.   Okay.  Markups which included provisions      12:04PM

6   related to an ESOP?

7       A.   Yes.

8       Q.   Okay.  Did they give any, to your

9   knowledge, did they give any specific reason for

10   wanting the actual contracts and/or language in      12:04PM

11   the Zell agreement?

12       A.   Well, I don't recall that they gave a

13   reason why, I mean, what you have here is a desire

14   to have the same documents in the same terms in

15   the same negotiated outcome which needs to be done  12:05PM

16   between a number of parties, and Zell obviously

17   wouldn't want that distributed out.

18       Q.   Okay.  Do you have an understanding of

19   whether or not the markups were provided to Broad

20   and Burkle and/or their representatives?            12:05PM

21       A.   I believed that it was my understanding

22   that they would be made available for them.

23       Q.   Okay.  Do you --

24       A.   I don't know whether they actually took

25   delivery of them or whether they're e-mailed or     12:05PM

76

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001527

HIGHLY CONFIDENTIAL

1    that kind of thing.

2        Q.    Okay.  And when were they supposed to have

3    been made available to them?

4        A.    That weekend.

5        Q.    Was there any discussion amongst the          12:05PM

6    Special Committee of asking Broad and Burkle

7    to increase the consideration that they were

8    proposing to offer?

9        A.    We didn't view the -- their offer to be

10   complete.  It was like an option out there, and    12:06PM

11   they wanted us to be able to take that without

12   getting everything completed and negotiating the

13   right way among all of the parties.

14            And so we didn't really follow up to get

15   -- see if they wanted to offer a higher price      12:06PM

16   because we had at that time a price that we

17   felt was appropriate, and we had all of the

18   documentation and all of the details completed.

19       Q.    Okay.  Do you have any knowledge of

20   whether or not Broad and Burkle were informed     12:07PM

21   of the time frame that the Special Committee was

22   working under?

23       A.    I don't know; I wasn't involved in the

24   direct communication with them.

25       Q.    Okay.  Did the Special Committee give      12:07PM
                                                            77

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001528

HIGHLY CONFIDENTIAL

1    any sort of instruction to its advisors to let

2    Mr. Broad or Mr. Burkle know what type of time

3    constraints the Special Committee was working

4    under?

5         A.    Well, the time frame that we were working    12:07PM

6    under was actually by that point quite public.

7    There was a -- we had given out a press release

8    earlier that by the end of March, we would make a

9    decision.  If you read any of the papers, this was

10   out in the press.                                      12:08PM

11        So I'm not -- I can't speak as to whether

12   or not they were told the specific time frame,

13   but the fact that all of these letters were

14   coming in conjunction with that tells me that

15   they knew.                                             12:08PM

16        Q.    Okay.  Did you, in fact, make a decision

17   by the end of the quarter?

18        A.    We made a decision by the 1st of April,

19   which was that weekend.

20        Q.    Okay.  When did the Company's quarter end?   12:08PM

21        A.    Well, the Company has a -- they go on

22   so many weeks in a year, so it's not exactly a

23   calendar year.  So I'm not certain.

24        I think they're -- they actually ended on

25   the 1st of April because -- as opposed to the 31st    12:09PM

78

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001529

HIGHLY CONFIDENTIAL

1    was their quarter end.

2        Q.    Okay.    What are you basing that on, that

3    understanding on?

4        A.    What am I basing it on?    Well, I'm

5    actually basing it on the fact that because            12:09PM

6    Morgan Stanley had to give an opinion, and the

7    opinion was on the 31st of April, and we had to --

8            MR. GRAHAM:    Do you mean 31st of April?

9            THE WITNESS:    Excuse me, the 1st of April.

10   And we had to put that expense into the first         12:09PM

11   quarter told me that that was a first quarter

12   expense.    So it was a -- you know, there's a day

13   difference.    The way they handle the calendar,

14   that's how it works.

15   BY MR. ODDO:                                           12:10PM

16       Q.    Do you have any recollection of whether

17   or not the Company's advisors or the Special

18   Committee advisors made any progress with Broad

19   and Burkle or their advisors on execution of a

20   definitive agreement?                                  12:10PM

21           MR. GRAHAM:    That weekend you're talking

22   about?

23           MR. ODDO:    Yes.

24       A.    No.    The input we had from our advisors

25   was similar to what the letters -- there were not    12:11PM

79

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001530

HIGHLY CONFIDENTIAL

1    complete documents, they had not picked an ESOP

2    trustee, it was viewed based on the input we had

3    from our legal advisors and our financial advisors

4    is while there was a number put out there, there

5    was a lot of work to be done to be able to get          12:11PM

6    that transaction really documented and closed.

7    BY MR. ODDO:

8        Q.    Okay.  Do you know whether or not Broad

9    and Burkle were informed of what they needed to do

10   in order to get their proposal into acceptable          12:11PM

11   form?

12       A.    Well, I don't know the details of how --

13   what they were informed about, but they -- these

14   are businessmen that have been down this path many

15   times before.                                           12:12PM

16       Q.    Okay.  You're not aware of what your

17   advisors may or may not have told them about any

18   deficiencies in -- purported deficiencies in their

19   proposal?

20       A.    Not the specifics, no.                        12:12PM

21            MR. ODDO:  Let's mark as Exhibit No. 11 a

22   document that's Bates stamped TRIB2923.

23                      (Osborn Deposition Exhibit No. 11

24                      marked for identification.)

25                                                           12:13PM
                                                                  80

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001531

HIGHLY CONFIDENTIAL

1    BY MR. ODDO:

2        Q.    Have you seen this document before?

3        A.    Yes.

4        Q.    Okay.  And what is this document?

5        A.    It's a letter to the Board of Directors        12:13PM

6    from Mr. Broad and Mr. Burkle dated April 5, 2007.

7        Q.    Okay.  Was there any sort of Special

8    Committee discussion about the substance of this

9    letter after it was received?

10       A.    There was really very little discussion        12:14PM

11   about this letter.  I don't recall any specifics.

12       Q.    Okay.  With respect to the second

13   paragraph referencing the Los Angeles Times, have

14   there been any discussions with these gentlemen or

15   their advisors about the Los Angeles Times            12:14PM

16   subsequent to April 5th?

17            MR. GRAHAM:  I'm sorry, I just didn't hear

18   the question.  Can you just reread it back?

19            MR. ODDO:  Sure.

20   BY MR. ODDO:                                          12:14PM

21       Q.    Have there been any discussions subsequent

22   to receipt of this letter on April 5th about the

23   Los Angeles Times with Mr. Broad or Mr. Burkle?

24       A.    Not to my knowledge.

25       Q.    Okay.  Had there been any discussion on      12:14PM
                                                              81

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001532

HIGHLY CONFIDENTIAL

1    the 31st of March or the 1st of April when the

2    Special Committee was reaching its conclusion

3    to approve the Zell transaction about giving

4    Mr. Broad and Mr. Burkle an opportunity to present

5    a best and final offer?                                    12:15PM

6        A.    Well, first of all, there was a -- as we

7    indicated earlier, as I indicated earlier, there

8    was so much conditionality around the existing

9    offer, and it was no -- there was just so much

10   that needed to be done from a documentation        12:16PM

11   standpoint and a negotiation standpoint that

12   we did not go back.

13       Q.    Had Mr. Zell imposed any sort of time

14   constraints on his offer?  In other words, had he

15   at any point in the process said that my proposal    12:16PM

16   or my offer is only valid until such-and-such a

17   date?

18       A.    In the dialogue between Mr. Zell and

19   myself, the push to accomplish a transaction in

20   a time frame was obvious, and while I don't recall  12:16PM

21   a threat about a time frame, it was clear that

22   this was something that we were down to get

23   accomplished over the weekend.

24           And we further because of the, you know,

25   deterioration and the overall business, it was     12:17PM

                                                          82

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001533

HIGHLY CONFIDENTIAL

1    viewed by the Special Committee that the sooner we

2    were able to commit and get a transaction that was

3    really fair to all shareholders that we were best

4    doing so.

5        Q.    Okay.  Did you have any direct            12:17PM

6    communications with Mr. Zell over that weekend?

7        A.    Yes.

8        Q.    Phone calls?

9        A.    Yes.

10       Q.    Okay.  Approximately how many?            12:17PM

11       A.    Probably three or four.

12       Q.    Okay.  And what was the substance of those

13   calls?

14             MR. GRAHAM:  And just to be clear,

15   you don't -- do you mean to include or exclude        12:17PM

16   meetings or whatever or are you just assuming

17   there weren't any meetings?

18             MR. ODDO:  I'll ask it separately.

19             MR. GRAHAM:  That's fine.  I just wanted

20   to make sure.                                        12:17PM

21   BY MR. ODDO:

22       Q.    I'm just talking about calls right now.

23       A.    The substance of my calls were negotiating

24   the final terms that we were able to work out with

25   Mr. Zell.                                            12:18PM

                                                          83

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001534

HIGHLY CONFIDENTIAL

1    Q.    Okay.  And what were the final terms that

2  were negotiated?

3    A.    The final terms were the price of $34 a

4  share, the final terms included the timing of a

5  ticking fee, the final terms included the nature        12:18PM

6  and form of the warrant and the amount of money

7  that he would put in with regard to that warrant,

8  and the amount of cash that he would be putting in

9  up front.  Those were the primary factors that I

10 was involved in.                                         12:18PM

11    Q.    Okay.  And these were issues that you were

12 negotiating directly with him over the weekend?

13    A.    Yes.

14    Q.    Was this on the phone or face to face or

15 both?                                                    12:19PM

16    A.    On the phone.

17    Q.    And ultimately you got him to increase the

18 consideration from 33.50 to 34; is that correct?

19    A.    Yes.

20    Q.    And what were the parameters of the           12:19PM

21 discussions on the ticking fee?

22    A.    The debate on the ticking fee was when it

23 would start and hence the movement around the

24 price that we would pay up front with regard to

25 that.                                                    12:19PM

84

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001535

HIGHLY CONFIDENTIAL

1    Q.   Okay.  When was he proposing that the

2    ticking fee start?

3    A.   Well --

4         MR. GRAHAM:  I'm sorry, at which price

5    level?                                          12:19PM

6         THE WITNESS:  Yes.

7    BY MR. ODDO:

8    Q.   At his proposal for 33.50, when was he

9    proposing that the ticking fee start?

10   A.   The -- he was proposing at one time --     12:20PM

11   this moved around from January 1st to whether it

12   should be September 30, depending on the price

13   that they'd be willing to pay, and we ended up set

14   willing on the $34 price with the ticking fee

15   beginning January 1.                            12:20PM

16        And then in conjunction with that more

17   cash coming in up front as opposed to borrowing

18   and also more back end equity coming in through

19   the price of the warrant.

20   Q.   Okay.                                       12:20PM

21   A.   The exercise price of the warrant.

22   Q.   How much more cash up front?

23   A.   Oh, boy, I can't recall the exact

24   specifics.  I worked with our advisor, Morgan

25   Stanley, on the details, and I negotiated the     12:21PM

85

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only                    TRIB-G0001536

HIGHLY CONFIDENTIAL

1    number.

2        Q.    Okay.  Who at Morgan Stanley?

3        A.    Paul Taubman and Tom Whayne.

4            MR. ODDO:  Let's mark as Exhibit No. 12 a

5    document that's Bates stamped TRIB13614 through       12:21PM

6    13616.

7                    (Osborn Deposition Exhibit No. 12

8                    marked for identification.)

9            MR. ODDO:  I'll just note for the record

10   that there's a fax notation on the top of this        12:22PM

11   page that is not part of the original document.

12   It's a fax from my law firm to me, so just for

13   your reference that obviously was not part of the

14   original document.

15   BY MR. ODDO:                                          12:22PM

16       Q.    Can you tell me what this document is?

17       A.    This is a letter to the Board of

18   Directors from Equity Group Investments LLC

19   signed by Sam Zell with an acquisition proposal.

20       Q.    And this was -- you've seen this document   12:23PM

21   before?

22       A.    Yes.

23       Q.    Okay.  The proposal contemplates an

24   Employee Stock Ownership Plan, correct?

25       A.    Yes.                                         12:23PM
                                                            86

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001537

HIGHLY CONFIDENTIAL

1    Q.   Okay.  Was this the first indication of

2    interest that the Special Committee or the Board

3    had received from Mr. Zell?

4         MR. GRAHAM:  Regarding an ESOP plan or

5    anything at all?                              12:24PM

6         MR. ODDO:  Regarding any sort of

7    acquisition proposal of Tribune.

8    A.   Well, it's my recollection that they

9    actually signed a confidentiality agreement in

10   the late fall, and I can't recall exactly when    12:24PM

11   the ESOP discussion came up whether this was --

12   there was dialogue with the investment bankers,

13   but this was, I think, the first time a written

14   proposal came forward.

15   BY MR. ODDO:                                  12:24PM

16   Q.   Okay.  Were you aware that -- at the

17   time you received this letter, were you aware

18   that Mr. Zell retained some sort of interest in

19   pursuing a proposal with Tribune or was the letter

20   your first indication that he was still interested 12:25PM

21   in the process?

22        MR. GRAHAM:  Steve, can I clarify your

23   question?

24        You said at the time you received this

25   letter were you aware.  Do you mean before he      12:25PM

87

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001538

HIGHLY CONFIDENTIAL

1    received the letter was he aware?

2         MR. ODDO:  Let me rephrase it.

3    BY MR. ODDO:

4         Q.    Prior to receiving this letter, were

5    you aware that Mr. Zell was still interested in      12:25PM

6    pursuing a potential acquisition of Tribune?

7         A.    Yes.

8         Q.    Okay.  How were you aware of that?

9         A.    Mr. Zell, and I don't recall the exact

10   timing, but it was around this time, called me       12:25PM

11   and asked to have a meeting with -- and I

12   explained this earlier -- with Bill Pate to

13   go over an ESOP structure.  And I immediately

14   called Dennis FitzSimons who sent over

15   Crane Kenney and Don Grenesko, who's the             12:26PM

16   Chief Financial Officer, to meet with Bill Pate.

17   I facilitated that discussion getting started and

18   then I left the discussion.

19        Q.    So were you physically present there?

20        A.    At the beginning, yes.                     12:26PM

21        Q.    And then you left?

22        A.    Yes.

23        Q.    How far before February 6th did that

24   meeting take place?

25        A.    I don't recall, but it was very close.  It  12:26PM
                                                              88

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001539

HIGHLY CONFIDENTIAL

1    was either the end of January or early February,

2    around that time frame.

3        Q.    Okay.  What do you recall from the time

4    that you participated in the meeting what was

5    discussed?                                              12:26PM

6        A.    They were basically -- Bill Pate was

7    explaining the structure and the concept of

8    the ESOP as a transaction that could benefit all

9    shareholders and would be of interest, just it

10   would be of interest to the Company as an            12:27PM

11   alternative.

12       Q.    Okay.  Did they explain why they

13   were considering proposing this type of

14   structure?

15       A.    They explained, Bill explained basically  12:27PM

16   that it is -- this would be a very large ESOP, the

17   largest done, but it was a very tax effective way

18   and a way to move forward that actually would

19   allow the employees to have majority ownership

20   of the Company and move it into, you know, allow    12:27PM

21   the shareholders to benefit and actually move it

22   private all at once.

23       Q.    Did the Committee's advisors participate

24   in this meeting at all?

25       A.    No.                                         12:28PM
                                                                89

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only                              TRIB-G0001540

HIGHLY CONFIDENTIAL

1    Q.    Did you convey to the advisors that this

2    meeting was taking place?

3    A.    Not at that time.  This was -- this

4    happened over the course of an hour, and they --

5    I did advise them later, and, of course, the          12:28PM

6    Company then spent some time looking at this to

7    determine whether this was a course of action that

8    would make sense for them.

9    Q.    Okay.

10    MR. GRAHAM:  By the way, Steve, in          12:28PM

11    connection with this line of inquiry, I was

12    informed by people working on this matter

13    that there's a document that apparently was

14    inadvertently not produced that we're going

15    to be producing to you, I've got a copy of it          12:28PM

16    here, which may assist you in timing in connection

17    with this.  It's a document Bates stamped

18    TRIB066839.

19    MR. ODDO:  Okay.

20    BY MR. ODDO:          12:30PM

21    Q.    In connection with the discussions with

22    the Zell Group about a potential transaction,

23    do you know whether or not EGI or its

24    representatives were given access to Tribune's

25    auditors and accountants, Ernst & Young?          12:30PM
                                                              90

EASTWOOD-STEIN
Deposition Management (800) 514-2714

HIGHLY CONFIDENTIAL

1    A.    I don't know.

2    Q.    You're not aware of whether or not that

3    was part of the process?

4    A.    No.    What I -- they were -- as I

5    understand, they were given access to the data          12:30PM

6    room and had a chance to meet with the people

7    involved, the publishers of the different

8    newspapers and the broadcasting executives,

9    much as every other organization that signed

10   the confidentiality agreement had an opportunity       12:30PM

11   to do.

12   Q.    You're not aware of what contact, if any,

13   they had with Ernst & Young?

14   A.    No, but PricewaterhouseCoopers, they're

15   the outside auditors.                                    12:31PM

16   Q.    Does Ernst & Young have any sort of

17   affiliation with Tribune?

18   A.    They may have been used in some form here,

19   but I'm not -- they're not their -- if you pick up

20   their financials, it's not Ernst & Young, it's          12:31PM

21   PricewaterhouseCoopers.

22   Q.    Okay.    Now, what steps did the Special

23   Committee take to evaluate this proposal from EGI?

24   A.    Well, the process was that the financial

25   advisors and the Zell advisors and the Company          12:32PM

91

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001542

HIGHLY CONFIDENTIAL

1    looked at different aspects of the proposal to

2    determine whether it was something that we should

3    consider.

4        And the conclusion was that we should

5    look at this as one of the options because the        12:32PM

6    price was one that was at a point where it had

7    a, you know, had a dollar amount that was

8    attractive relative to the other bids that we

9    had received.

10       Q.   Okay.  Now, the dollar amount that was        12:32PM

11   presented here was $33?

12       A.   Correct.

13       Q.   Okay.  Were there -- earlier in the

14   deposition we took a look at the methods that

15   Merrill Lynch undertook to assess the value         12:33PM

16   attributable to the various proposals that the

17   Board received, and based on various assumptions

18   they lowered the value.

19       Did they undertake the same type of

20   analysis with respect to this proposal?           12:33PM

21       MR. GRAHAM:  Object to the

22   characterization and the prefatory comments to

23   the question and move that it be stricken.

24       MR. ODDO:  You can go ahead and answer.

25       THE WITNESS:  Does that mean I can answer?  12:33PM
                                                           92

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001543

HIGHLY CONFIDENTIAL

1          MR. GRAHAM:  You may answer.

2      A.    All of the financial transactions we

3   looked at, I mean all of the bids, were put

4   through the same kind of scrutiny by our

5   financial advisors.                          12:33PM

6   BY MR. ODDO:

7      Q.    Okay.  Was there any input from

8   Merrill Lynch or any of the other advisors that

9   the $33 that was proposed was, you know, a number

10   they were proposing but not necessarily the value   12:34PM

11   that Merrill Lynch believed the proposal was

12   worth?

13      A.    Yes.

14      Q.    And what -- do you recall where the

15   advisors came in on what the values were?        12:34PM

16          MR. GRAHAM:  I'm sorry, at which point

17   in time?

18          MR. ODDO:  Let's start with the initial

19   review of the proposal.

20      A.    Yes.  The -- part of the challenge -- I'm   12:34PM

21   sorry, I've got to digress a second.

22          Part of the challenge on this is we kept

23   having a moving target, so bids kept being changed

24   around, we talked about Broad and Burkle were

25   lowered, and we -- so we had to revise everything   12:34PM
                                                      93

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001544

HIGHLY CONFIDENTIAL

1    at that point in time and look back at everything

2    to make certain that we were looking at everything

3    on an apples to apples basis.

4         With the Zell transaction the biggest

5    deficiency on this was that it was a future value    12:35PM

6    of a future closing.  And so the initial review

7    of this was that it wasn't worth $33 a share.

8         But this gets into that activity that

9    happened for the Company in a major way from the

10   initial reviews at the end of January to our final   12:35PM

11   determination at the end of March where we were

12   trying to get more money up front sooner so that

13   we could get a greater time value of money and

14   take more risk out of the transaction for our

15   shareholders.                                         12:35PM

16        And so this proposal evolved from the

17   beginning to where it was a future payment to

18   where there is now a fair amount of upfront

19   cash going to the proceeds with the tender offer

20   and then a back-end merger that will pay out the     12:36PM

21   rest.

22   BY MR. ODDO:

23        Q.    Okay.  The -- how does the current

24   proposal that was approved differ from what was

25   originally proposed by Mr. Zell?                      12:36PM
                                                           94

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001545

HIGHLY CONFIDENTIAL

1      A.    Well, as I just said, it provides

2    near term cash, it -- I would have to go through

3    and compare all of this in various forms, but this

4    changed a modest -- I mean, some amount in terms

5    of its mechanics to be -- to make it I think a          12:36PM

6    better proposal for all of the shareholders of

7    Tribune.

8      Q.    Okay.  Obviously the price was increased,

9    but of the mechanics what specifically do you

10   recall having changed from --                           12:36PM

11     A.    Well, first of all, the first effort

12   was around a closing for the ESOP and everything

13   that would be later in the transaction, and we

14   were able to move it so that there would be a

15   tender offer for more money up front, which is,        12:37PM

16   you know, the tender document that is out there

17   right now.

18     Q.    Okay.

19     A.    That was the most substantive piece of the

20   structure changes.                                      12:37PM

21     Q.    How is it determined how many of the

22   Tribune shares would be subject to the initial

23   tender offer?

24     A.    Actually, I don't know the answer to

25   that question.  It was in the negotiation, it was      12:37PM

95

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001546

HIGHLY CONFIDENTIAL

1    in the financing aspect of it to my knowledge.

2        Q.   Was that an aspect that was negotiated by

3    the advisors?

4        A.   Yes.

5        Q.   By the financial advisors?                    12:37PM

6        A.   Yes.

7        Q.   Did you solicit the opinions of the

8    Chandler Trusts and the McCormick Foundation as

9    to the Zell proposal?

10           MR. GRAHAM:  At what point in time?            12:38PM

11   BY MR. ODDO:

12       Q.   After receipt of the Zell proposal, did

13   you and/or the Special Committee solicit the

14   opinions of the McCormick Foundation and the

15   Chandler Trusts?                                       12:38PM

16           MR. GRAHAM:  Same objection in terms of

17   at what point in time you're asking about, but go

18   ahead.

19       A.   During the period of receipt of this

20   proposal and closing, there was a period of time      12:38PM

21   where we asked the McCormick Tribune Foundation

22   and the Chandlers to look at this proposal because

23   we felt it had merit for consideration.

24           And so we spent some time and they spent

25   some time understanding what this transaction was     12:39PM

96

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001547

HIGHLY CONFIDENTIAL

1    all about.

2    BY MR. ODDO:

3        Q.    Okay.  At the same time they had been

4    in certain negotiations concerning share purchase

5    in connection with the self-help plan; is that          12:39PM

6    correct?

7        A.    Correct.

8            MR. ODDO:  Okay.  Let's have you take

9    a look first at what we will designate as

10   Exhibit 13.                                              12:39PM

11           And I will just note for the record that

12   this was part of the Morgan Stanley production,

13   and it appears in the reproduction of the document

14   the Bates stamps have been cut off.

15           The document that I have that shows          12:40PM

16   partial -- shows some of the Bates stamps

17   indicates that the document is labeled

18   Morgan Stanley 02 through 03, but that does not

19   appear on the document you're going to get.

20                    (Osborn Deposition Exhibit No. 13  12:40PM

21                    marked for identification.)

22   BY MR. ODDO:

23        Q.    Can you tell me what this document is?

24        A.    This is a letter from the Chandler Trusts

25   signed by Bill Stinehart to the Special Committee    12:41PM

                                                              97

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001548

HIGHLY CONFIDENTIAL

1    of the Tribune and addressed to me with regard to

2    the ESOP proposal.

3        Q.   And you've seen this document before?

4        A.   Yes, I have.

5        Q.   Was there a Special Committee discussion        12:41PM

6    about the Chandlers' response to the Zell

7    proposal?

8        A.   I don't recall whether there was a

9    Special Committee, I mean, discussion specifically

10   about this, but this was in conjunction with a        12:42PM

11   lot of dialogue going on at the time with regard,

12   which we were just talking about, the Zell

13   proposal relative to the self-help proposal and

14   different ways that we could improve the

15   transaction.                                           12:42PM

16       Q.   Okay.  Were the concerns raised in the

17   letter discussed by the Special Committee?

18       A.   The concerns here have been -- were

19   addressed, and I don't remember whether it

20   was the Special Committee or the advisors.            12:42PM

21       Q.   Now, what did you understand based

22   on your review of the letter and/or any

23   conversations you may have had with any of

24   the Chandler representatives about their

25   primary concerns about the ESOP structure as         12:42PM

                                                            98

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001549

HIGHLY CONFIDENTIAL

1    proposed by Mr. Zell?

2        A.    Well, this was -- and I would have to

3    look at the -- and talk to the financial advisors

4    around the timing and the structure, but as I

5    alluded to earlier, the original structure had a        12:43PM

6    payout that was conditional on FCC approval, and

7    it was going -- so that the timing of everything

8    was later, and the transaction that we ended up

9    working on would put -- was allowing us to, you

10   know -- which eventually transpired would allow        12:43PM

11   us to close part of the transaction earlier, and,

12   therefore, take some of the risk out of this,

13   which was one of the challenges that they proposed

14   about the ESOP structure.

15       Q.    Okay.  And that's the tender offer?        12:44PM

16       A.    The tender offer, yes.

17       Q.    Okay.  With respect to the shares that

18   are remaining that are not tendered, those are

19   expected to be cashed out at the back end merger;

20   is that correct?                                       12:44PM

21       A.    Correct.

22       Q.    Do you have an estimate of when that's

23   going to take place?

24       A.    The estimate, which we are -- we don't

25   know exactly when it's conditional on FCC approval    12:44PM

99

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001550

HIGHLY CONFIDENTIAL

1    and Board approval and other aspects that may

2    happen between now and then, but it is anticipated

3    it will be around the end of the year.

4        Q.    Okay.  What are the contingencies to your

5    understanding of the back end merger?                12:44PM

6        A.    Well, there are, you know, the

7    contingencies are FCC approval, Board

8    recommendation, the solvency opinion, I think

9    we have another -- I'd have to check with my

10   attorneys -- I think there's another, you know,     12:45PM

11   ESOP oversight solvency opinion that comes along

12   with this, and there are a few others, but those

13   are the major ones, and continuing -- you know,

14   the financing that has been arranged right now is

15   part of all that too.  It's underwritten but it's   12:45PM

16   not syndicated.

17       Q.    Now, the ticking fee that was negotiated

18   kicks in on January 1, 2008, correct?

19       A.    Correct.

20       Q.    So prior to that point in time there       12:45PM

21   is no increase in the potential consideration

22   that shareholders who are cashed out in the

23   merger would get; is that correct?

24       A.    Correct.

25       Q.    There's a reference here to the time       12:46PM

                                                          100

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001551

HIGHLY CONFIDENTIAL

1    that it's expected to take to get FCC approval,

2    and --

3            MR. GRAHAM:  You're looking at Osborn

4    Exhibit 13?

5            MR. ODDO:  Yes.                                    12:46PM

6    BY MR. ODDO:

7       Q.    That Tribune's management estimated --

8    this is the representation in the letter --

9    Tribune's management estimated it would take

10   6 months; whereas apparently the Chandler Trusts    12:46PM

11   representatives had a conversation with Tribune's

12   outside counsel that said more realistic it would

13   take 9 to 12 months.

14           Did the Special Committee come to any

15   sort of understanding as to what the appropriate    12:47PM

16   time might be?

17           MR. GRAHAM:  I'm sorry, when you say the

18   appropriate time, do you mean how much time it

19   would be?

20           MR. ODDO:  Yes.  Appropriate is probably    12:47PM

21   not the best word, what the estimated time

22   would be.  Obviously there are contingencies in

23   play.

24       A.    You tell me how Washington works, and

25   we'll tell you what the time frame might be on     12:47PM
                                                                 101

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001552

HIGHLY CONFIDENTIAL

1   this.

2           Sure, we talked about the different

3   issues of time frame.   There was some elements of

4   discussions about getting a short form approval

5   done quickly, there were views from different        12:47PM

6   law firms about how long it would take, whether

7   it be 6 or 9 months, and the reality is is that

8   we settled on we thought it would be done in --

9   within 9 months.

10  BY MR. ODDO:                                          12:48PM

11      Q.   That was the consensus at the Special

12  Committee level --

13      A.   Yes.

14      Q.   -- at approximately 9 months?

15      A.   Yes.                                         12:48PM

16          MR. GRAHAM:   Should we break at this point

17  for lunch?

18          MR. ODDO:   Let's just go through the

19  Foundation letter, and then we'll take a break.

20          MR. GRAHAM:   Is that okay with you, Bill?   12:48PM

21          THE WITNESS:   (Indicating.)

22          MR. ODDO:   And, again, I apologize but in

23  the reproduction the Bates number has been cut

24  off.   This is another Morgan Stanley production

25  document.   On the copy that I have it indicates    12:48PM
                                                             102

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001553

HIGHLY CONFIDENTIAL

1      that the Bates number were MSTRIB4 through 6.

2                    (Osborn Deposition Exhibit No. 14

3                    marked for identification.)

4      BY MR. ODDO:

5         Q.   Can you tell me what this document is?        12:49PM

6         A.   This is a letter from the McCormick

7      Tribune Foundation, and their independent

8      directors to the Special Committee Tribune

9      Company regarding the ESOP proposal.

10        Q.   And did the McCormick Tribune Foundation      12:50PM

11     raise any concerns that were different from the

12     Chandler Trusts or were they essentially the same

13     ones?

14        A.   The issues raised were similar to what had

15     been raised by the Chandler Trusts.                   12:50PM

16        Q.   So the time value of money and the

17     execution risks?

18        A.   Yes.

19             MR. ODDO:  Okay.  Why don't we take a

20     break.                                                12:50PM

21             THE VIDEOGRAPHER:  This will

22     conclude videotape number four.  The time now

23     is approximately 12:49 p.m.  The elapsed time

24     is 50 minutes.

25                    (Lunch recess taken.)                  12:51PM
                                                             103

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001554

HIGHLY CONFIDENTIAL

1        THE VIDEOGRAPHER:  Good afternoon,

2    this begins videotape number four of the

3    deposition of Mr. William A. Osborn taken the

4    16th day of May, 2007.  The time now is

5    approximately 1:21 p.m. taken in the matter of        01:23PM

6    case number BC362110.

7        I'll remind the witness

8    he remains under oath, and we may continue.

9    BY MR. ODDO:

10    Q.    We were talking before the break about        01:23PM

11    the letters the Special Committee received

12    from the McCormick Foundation and the Chandler

13    Trusts.

14        Did the Chandler Trusts ever indicate

15    that they would not support an ESOP structured        01:23PM

16    transaction unless there was some sort of upfront

17    consideration?

18    A.    No, I don't recall that.  I don't recall

19    that as a condition from them.

20    Q.    What about --        01:23PM

21    A.    I think you get -- I don't mean to get

22    into a debate about it, but when someone says

23    timing of payments and structure, it could mean

24    the same thing.

25    Q.    Did you interpret what they set forth in        01:24PM
                                                                       104

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001555

HIGHLY CONFIDENTIAL

1    their response as an indication that they probably

2    would not support it unless there was some sort of

3    upfront consideration?

4        A.    To be fair we didn't -- we had the letters

5    for both McCormick Tribune and the Chandlers that        01:24PM

6    really had very little to do with how we

7    eventually structured the deal.  They were not the

8    drivers to what we were trying to do.

9            We wanted ourselves to get more money

10   upfront, we felt that was an important issue.  So        01:24PM

11   we were -- some of their issues that they may

12   raise we were already trying to do because we

13   wanted to get a higher portion of certainty in

14   terms of payment for the shareholders.

15       Q.    Was it important for the Special Committee      01:25PM

16   to have their support in favor of whatever

17   transaction the Special Committee ultimately would

18   recommend?

19       A.    Well, they were major shareholders,

20   clearly we needed to listen to them, but our job         01:25PM

21   was not to pay attention to their demands but to

22   think of the broader shareholder base.

23           And the only issue that we were concerned

24   with of support was Zell wanted to make certain

25   that the Chandlers were supportive so he would           01:25PM
                                                                  105

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001556

HIGHLY CONFIDENTIAL

1  have -- because one of his conditions was the

2  fact that they would vote for the proposal.

3      Q.    Okay.  Did he have any communications

4  directly with either one of those groups?

5          MR. GRAHAM:  Objection, lack of                01:25PM

6  foundation.

7  BY MR. ODDO:

8      Q.    To the extent that you know?

9      A.    I don't know.

10     Q.    What was the first step that the             01:25PM

11 Company took to initiate the formation of the

12 Employee Stock Ownership Plan?

13         MR. GRAHAM:  Objection, lack of

14 foundation.

15     A.    To the best of my knowledge, I did not       01:26PM

16 kind of deal with the points in sequence, but

17 clearly they needed to engage and spend some

18 time regarding finding an ESOP trustee.

19 BY MR. ODDO:

20     Q.    How involved was the Special Committee       01:26PM

21 in the process of the actual creation of the

22 ESOP?

23     A.    Well, we went through the steps, we had

24 legal advice and financial advice and all sorts

25 of parties involved around both the selection     01:27PM
                                                        106

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001557

HIGHLY CONFIDENTIAL

1    of the ESOP trustee and then a solvency opinion

2    around the Company at the time.  So these were all

3    part of the transaction and the formation of the

4    ESOP.

5        Q.   And what was the Special Committee's          01:27PM

6    involvement in that?

7        A.   We would hear presentations and -- from

8    those different organizations because they're

9    conditional to the transaction.

10       Q.   Did the Special Committee make the            01:27PM

11   decision as to who would be hired as the

12   trustee?

13       A.   I don't know whether we -- I can't recall

14   whether we formally voted on it.  We were in --

15   we had dialogue around the selection of GreatBanc    01:28PM

16   because they had been viewed in the marketplace

17   as one of the organizations most familiar with

18   this kind of transaction, particularly on a going-

19   private basis, but I don't know whether formally

20   during the process we had to opine on that, I just   01:28PM

21   don't remember.

22       Q.   Was that -- whose ultimate decision was it

23   as to who would be hired as the trustee?

24       A.   Well, I don't even know if I can answer

25   the question.  I mean, it was somewhere between     01:28PM

                                                              107

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001558

HIGHLY CONFIDENTIAL

1    the Company and the Special Committee, and I --

2    when you asked the question did we formally

3    approve it, we were involved in it and I just

4    don't remember.

5         So I can't answer the question whether          01:29PM

6    the Company's management chose them or whether we

7    chose them.  Clearly we were involved with that

8    decision.

9    Q.    So you didn't object to that decision

10   but you're not certain whether or not the           01:29PM

11   Special Committee took any formal action to

12   approve it; is that fair?

13        MR. GRAHAM:  Object to the question

14   as mischaracterizing when you say you didn't

15   object to the decision.  His testimony indicated    01:29PM

16   that they were involved in the decision.

17        MR. ODDO:  Okay.

18   BY MR. ODDO:

19   Q.    Did I mischaracterize your testimony?

20   A.    I don't know between the two of you what      01:29PM

21   I should be -- let me repeat it one more time and

22   then maybe that will be clarification around it.

23        The Company was involved in presentations

24   by GreatBanc, we clearly had engagement around

25   that, you know -- whether we formally approved       01:30PM
                                                          108

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001559

HIGHLY CONFIDENTIAL

1    that I don't recall, but there was certainly no

2    one objected to GreatBanc as being part of from

3    the Special Committee.

4        Q.    And you don't have a recollection of whose

5    ultimate decision it was?                          01:30PM

6        A.    I just don't remember.  I mean, I'm sure

7    the documents show that somewhere.

8        Q.    Okay.  What other steps were taken by the

9    Company to implement the ESOP after the choice of

10   trustee?                                           01:31PM

11       A.    Well, there was a law firm and there was

12   a -- the choice of an organization, I think it was

13   called Valuation Research, with regard to

14   solvency.  So there were a number of pieces of

15   putting together the ESOP of which all of them     01:31PM

16   were designed to mitigate some of the risks that

17   were weighed in terms of getting there.  And I

18   believe, you know, the Committee felt comfortable

19   along the way that we were doing the right thing

20   and were handling those issues in the right        01:31PM

21   manner.

22       Q.    Okay.  Did there have to have been certain

23   things in place prior to the -- with respect to

24   the ESOP prior to entering into an agreement with

25   Mr. Zell for the transaction?                      01:32PM
                                                        109

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001560

HIGHLY CONFIDENTIAL

1          MR. GRAHAM:  Object to the question on the

2     grounds of ambiguity.

3     BY MR. ODDO:

4          Q.    If you don't understand, I can try and

5     rephrase it.                                          01:32PM

6          A.    Why don't you rephrase that.

7          Q.    Okay.  During the negotiations with

8     Mr. Zell and EGI, did it become -- or was it

9     apparent that certain structural -- how best

10    to phrase this?  Let me start over.                   01:33PM

11          Did you have an understanding based

12    on your involvement in the negotiations with

13    Mr. Zell as to whether or not the Company had to

14    have anything in place prior to actually signing

15    an agreement with Mr. Zell with respect to the        01:33PM

16    ESOP?

17          MR. GRAHAM:  I mean, just to -- I'm sure

18    this is inadvertent, but the agreement that was

19    signed was not just with Equity Group Investments,

20    EGI, the entity affiliated with Mr. Zell, it was      01:33PM

21    with the ESOP itself.  So I'm having problems

22    understanding the question, and it may be on

23    certain false assumptions.

24          Obviously there had to be an ESOP in

25    existence in order to sign an agreement with an       01:33PM
                                                            110

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only                    TRIB-G0001561

HIGHLY CONFIDENTIAL

1    ESOP.

2            MR. ODDO:  Okay.  And I'm getting at that

3    but probably not the best way possible, so let me

4    try again.

5    BY MR. ODDO:                                    01:34PM

6        Q.   So the deal with EGI contemplated that --

7    did the deal with EGI contemplate that an ESOP

8    had to be established prior to that deal being

9    signed?

10       A.   At which point in time?  Are you asking at  01:34PM

11   the end?

12       Q.   We'll start at the end.

13       A.   Yeah, as a condition to the transaction

14   that we all put together, there were, you know,

15   a number of parties, of which the ESOP was one   01:34PM

16   of them, and putting the ESOP together so the

17   ESOP could buy shares early was part of the

18   overall transaction.

19       Q.   Okay.  When did it become apparent that

20   that would have to be the case, that the ESOP    01:34PM

21   would have to be established prior to entering

22   into the agreement?

23       A.   I really don't know.  It was all part of

24   the negotiation from this time that Zell sent

25   this letter on the 6th to the change in the      01:35PM

                                                          111

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001562

HIGHLY CONFIDENTIAL

1    structure that allowed us to have the ESOP and

2    Zell put in this money early and then the tender

3    offer in order to get the maximum amount of value

4    to the shareholders earlier.

5         So it was all part -- it all fit as part       01:35PM

6    of the transaction.

7    Q.    Okay.  Was there any discussion at the

8    Special Committee level as to whether or not

9    the creation of the ESOP would make -- had the

10   potential to make the company less attractive to     01:36PM

11   any third party that might be interested in a

12   potential transaction?

13   A.    No.  We felt that along the way as long

14   as we had a modest breakup fee and we would

15   continue to be able to, you know -- we'd be          01:36PM

16   continually available in the marketplace if

17   someone wanted to put together a higher bid

18   for the entire company.  I mean, it was part of

19   the negotiation that we were legitimately focused

20   on.                                                  01:37PM

21   Q.    How involved was the Special Committee

22   with the decision to loan the ESOP the money to

23   buy the shares?

24   A.    Well, I think it was part of the

25   transaction, so it was laid out in the overall       01:37PM
                                                          112

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001563

HIGHLY CONFIDENTIAL

1    pieces of everything coming together.

2         So the Company was, you know, very

3    cognizant of what -- I mean, the Special Committee

4    of the structure of this, and, in fact, that's a

5    normal process of how these are done.              01:37PM

6    Q.    When you say these, are you talking about

7    ESOP --

8    A.    ESOPs, yes.

9    Q.    Okay.  Was there any discussion about

10   whether or not that aspect of the ESOP might      01:38PM

11   make the Company less attractive to somebody

12   who might have an interest in coming forward with

13   a proposal after the announcement of the Zell

14   deal?

15   A.    The only discussion we had was that         01:38PM

16   what we were doing would not prohibit others

17   from being able to make an offer for the Company,

18   and, in fact, I think the structure allows for a

19   flow-through.

20        So it -- we felt like we were              01:38PM

21   continuing -- even though we had done what was

22   right for the shareholders of all of the options

23   we looked at at the time, that we were in the

24   position that if someone wanted to come in and

25   offer a higher dollar amount that's better for    01:39PM
                                                              113

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only                    TRIB-G0001564

HIGHLY CONFIDENTIAL

1    the shareholders with a relatively modest breakup

2    fee at, you know, 10 cents a share, that this was

3    an opportunity for others to do if they wanted.

4        Q.    When you said the structure allows for a

5    flow-through, what did you mean by that?                    01:39PM

6        A.    Well, if there's a purchaser out there,

7    the, you know, the stock can be -- it would be

8    liquidated and the loan would be paid off from the

9    proceeds of that acquisition of the stock.  So it

10   is in balance, in effect.                                   01:39PM

11       Q.    Now, the ESOP transaction also

12   contemplated the purchase by Mr. Zell of

13   stock, correct?

14       A.    Yes.

15       Q.    Okay.  Was there any discussion about         01:39PM

16   whether or not that aspect of the transaction

17   might make it less likely that a third party

18   would come forward with a superior proposal?

19       A.    Again, the amount of shares that were

20   purchased by Zell or the ESOP relative to the         01:40PM

21   total outstanding is still quite small, so the

22   amount of shares and the limitation on anybody

23   coming forward is, you know, it really didn't

24   change with the tender.

25            So we looked at this as a, you know, the      01:40PM
                                                                  114

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001565

HIGHLY CONFIDENTIAL

1   ability to constantly be able to provide someone

2   who could come in and do something if they felt it

3   was necessary.

4        As a matter of fact, if you go with the

5   tender being completed, you've actually only put      01:40PM

6   the Company in the kind of self-help mode that it

7   was already in before, and someone could still

8   come in and do a transaction.

9        All the way along here we were always

10  looking, you know, how do we make certain that       01:41PM

11  we're -- while we may come down to one decision

12  that we weren't going to limit ourselves in terms

13  of somebody coming in with a higher bid.

14       Q.   Did the Special Committee have a specific

15  discussion about how these aspects of the ESOP       01:41PM

16  structure could impact the ability of a third

17  party to come forward with a proposal?

18       MR. GRAHAM:   I'm going to object to the

19  question on the grounds of ambiguity.  When you

20  refer to the phrase these aspects of the ESOP        01:41PM

21  structure, I'd appreciate it if you would specify

22  what you were talking about.

23  BY MR. ODDO:

24       Q.   The sale of shares to Zell and to the

25  ESOP.                                                01:42PM

                                                         115

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001566

HIGHLY CONFIDENTIAL

1        MR. GRAHAM:  Asked and answered.

2        MR. ODDO:  I'm asking whether or not the

3   Special Committee had a discussion.  I understand

4   his explanation of the issue.  I'm asking whether

5   there was a discussion about the potential impact    01:42PM

6   on a third party coming forward.

7        MR. GRAHAM:  Do you mean whether there

8   would be any potential impact?

9        MR. ODDO:  Yes.

10   A.   The dialogue was with our financial         01:42PM

11   advisors and our legal advisors around are we

12   continuing to keep this open.  I don't --

13        MR. GRAHAM:  Can I -- just keep it to the

14   financial advisors.

15        THE WITNESS:  Yes, I'm sorry.             01:42PM

16        MR. GRAHAM:  Because --

17        THE WITNESS:  Well, there's a legal -- I'm

18   sorry.

19        But the whole issue was is could somebody

20   else come in.  And we were assured that, you know,  01:42PM

21   we had a transaction that would allow others to

22   come in and effect a higher transaction if that

23   were appropriate.

24   BY MR. ODDO:

25   Q.   Do you recall whether or not there were    01:43PM

116

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001567

HIGHLY CONFIDENTIAL

1    any specific discussions either amongst the

2    Special Committee or with its advisors about

3    the potential impact of those two characteristics

4    of the ESOP structure that was agreed to on a

5    potential party coming forward?                          01:43PM

6        A.    No, I'm not aware of anything specific

7    around that.  I don't remember that part.

8        Q.    Was there a discussion about the potential

9    impact of the ESOP structure on the Company's

10   credit rating?                                           01:44PM

11       A.    Yes.

12       Q.    Okay.  What was the substance of that

13   discussion?

14       A.    The substance was whether the Company

15   could get a double B rating, and there was a             01:44PM

16   presentation that they made in New York to the

17   rating agencies, and they were able to get the

18   kind of rating that made us comfortable and made

19   the financial advisors comfortable that the

20   financing could be arranged, which it was.               01:44PM

21       Q.    Has anything happened to the Company's

22   credit rating since announcement of the

23   transaction?

24       A.    Well, there hasn't been any deterioration

25   from where they were told they would -- how their        01:44PM
                                                                  117

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001568

HIGHLY CONFIDENTIAL

1    debt would be rated when their transaction was

2    consummated, and so they're in the process.

3        I'm sure they're on the -- I don't know

4    for a fact, but I'm sure they're on the watch for

5    downgrade once this gets completed.                    01:45PM

6        Q.    And that was something that was

7    anticipated?

8        A.    Oh, yes.

9        Q.    Was there any discussion about whether the

10   possibility of a downgrade might operate to deter     01:45PM

11   an interested third party from coming forward with

12   a potential superior proposal?

13       A.    No.

14            MR. ODDO:  What number are we on?

15            THE COURT REPORTER:  Fifteen.                 01:46PM

16            MR. ODDO:  Let's mark as Exhibit No. 15 a

17   document that's Bates stamped TRIB2648 through

18   2650.

19                      (Osborn Deposition Exhibit No. 15

20                      marked for identification.)         01:47PM

21   BY MR. ODDO:

22       Q.    Can you tell me what this document is?

23       A.    This is the minutes from the Special

24   Committee Meeting on March 30, 2007.

25            MR. GRAHAM:  Have you had time to review      01:47PM
                                                           118

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001569

HIGHLY CONFIDENTIAL

1    the document?

2          THE WITNESS:  Well, I just quickly scanned

3    it.  If you ask me specific questions, I'll go to

4    that --

5          MR. GRAHAM:  Why don't you make sure you       01:48PM

6    go through it just...

7          THE WITNESS:  Okay.  Okay.

8    BY MR. ODDO:

9       Q.   You've had a chance to take a look?

10      A.   Yes.                                          01:50PM

11      Q.   Okay.  At the bottom of the second page

12   and the top of the third there's a discussion

13   about the contingencies and uncertainties

14   associated with Mr. Zell's proposal; at this point

15   in time what did you understand those to be?         01:50PM

16      A.   There were some legal issues that

17   had to be worked through of which they were not

18   considered to be major but needed to be dealt

19   with.

20      Q.   When you say legal issues, what do you        01:50PM

21   mean?

22      A.   Well, just some conditions on trying to

23   work out some of the legal language.  The lawyers

24   were saying we have some issues to get resolved.

25   I don't even know that we talked much about them     01:50PM
                                                          119

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001570

HIGHLY CONFIDENTIAL

1    other than the fact that they were not considered

2    to be of significant importance, things that they

3    felt that could be done.

4           And then the other issues were, again, we

5    were still working on -- this was on the 30th I        01:51PM

6    think, and so we were still working on some of the

7    aspect of some of the pricing with regard to the

8    transaction.

9           And I can't recall whether at this stage

10   we were up -- that we got Sam to -- whether we had    01:51PM

11   him yet to 34 from 33.50, and the issue of the

12   warrant was something we were working on too.

13        Q.   Do you recall when Zell went from 33 to

14   33.50?

15           MR. GRAHAM:  Do you mean which day?          01:51PM

16           MR. ODDO:  Yes.

17        A.   Oh, boy.

18   BY MR. ODDO:

19        Q.   And if you don't remember which day, was

20   it --                                                 01:51PM

21        A.   It was during the -- I can't tell you

22   exactly which day, but it was during the last

23   several days before April 1.

24        Q.   Okay.  Within the last week before?

25        A.   Yes.  Yes.                                  01:52PM

                                                          120

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001571

HIGHLY CONFIDENTIAL

1       Q.   Okay.  So prior to that time he had been

2    at 33?

3       A.   Yes.

4       Q.   Okay.  And sometime during the last few

5    days before the 30th and the 1st he increased it     01:52PM

6    to 33.50?

7       A.   Correct.

8       Q.   And ultimately to 34.

9            It says here that the Committee directed

10   you to contact Mr. Zell to improve the deal terms    01:52PM

11   for the Company.  Besides price was there anything

12   that you were instructed to talk to him about?

13      A.   Primarily just what I mentioned to you

14   was the price and, you know, I think it -- we were

15   still -- at that point I think the ticking fee had   01:52PM

16   been resolved.

17           But the issues that I've raised to you

18   earlier were the ones that I covered with or were

19   working out with him.

20      Q.   Okay.  And then it indicates that the        01:53PM

21   Committee instructed Merrill Lynch to tell

22   Ms. Broad and Burkle that the Company had not --

23           MR. GRAHAM:  That the Committee had not

24   yet reached a decision.

25           MR. ODDO:  What did I say?               01:53PM
                                                         121

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

HIGHLY CONFIDENTIAL

1          MR. GRAHAM:   Company.

2          MR. ODDO:  I'm sorry.

3    BY MR. ODDO:

4      Q.    Committee had not yet reached a decision

5    about a transaction for the Company and would          01:53PM

6    continue to provide them with additional due

7    diligence.

8          Do you have an awareness of whether they

9    actually did so?

10     A.    I don't know.                                   01:53PM

11     Q.    Okay.  Did they report back to the

12   Committee at all about any conversations that they

13   had had with Broad and Burkle?

14     A.    I don't remember actually.

15         MR. ODDO:  Let's mark as Exhibit No. 16 a         01:54PM

16   document that was taken from one of the company's

17   SEC filings.

18                 (Osborn Deposition Exhibit No. 16

19                 marked for identification.)

20   BY MR. ODDO:                                            01:54PM

21     Q.    Feel free to review as much or as little

22   of the document that you'd like to.  I'm going to

23   ask you about four specific pages, 1, 2, 5 and 11.

24     A.    Yes.

25     Q.    Okay.  Have you seen this document before?     01:56PM

                                                            122

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

HIGHLY CONFIDENTIAL

1       A.    Yes.

2       Q.    And what is it?

3       A.    This is a report from Merrill Lynch and

4    Citigroup prepared for the Committee of

5    Independent Directors of Tribune with regard to        01:56PM

6    the transactions of Zell self-help.

7            MR. GRAHAM:  And for the record, as you

8    said, you pulled this off of the SEC filing.  The

9    SEC filing contains certain redactions that would

10   not have been in the original of this document.        01:56PM

11           MR. ODDO:  Understood.

12   BY MR. ODDO:

13      Q.    Okay.  Taking a look at page 1, which is

14   actually the third page of the document, there's a

15   reference to -- or there's a description of what       01:57PM

16   I'm assuming is the Broad and Burkle proposal; as

17   Mr. Graham indicated, there's certain redactions

18   in here.

19           But does that to your recollection reflect

20   the description of the Broad and Burkle proposal?      01:57PM

21      A.    The page 1?

22      Q.    Yes.

23           MR. GRAHAM:  He's talking about the -- if

24   you take a look at the three boxes, the third box.

25      A.    The bottom one, excuse me, yes, I            01:57PM
                                                            123

EASTWOOD-STEIN
Deposition Management (800) 514-2714

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only                                   TRIB-G0001574

HIGHLY CONFIDENTIAL

1    apologize.  The answer is yes.

2    BY MR. ODDO:

3        Q.   The bottom sentence there says "Structure

4    would combine initial cash return to shareholders

5    with subsequent purchase by ESOP and              01:58PM

6    S Corporation."

7            Was that structure similar to what was

8    contemplated by the Zell transaction?

9            MR. GRAHAM:  Objection, compound in

10   nature.  There are at least two different parts to   01:58PM

11   that, there's the initial cash return and there's

12   the subsequent purchase by ESOP and S Corporation;

13   those should be asked separately.

14           MR. ODDO:  David, I can ask the questions,

15   you know, any way I want.  I read what's in there,   01:58PM

16   and I'm asking his understanding of that.

17           MR. GRAHAM:  You asked were those part of

18   the Zell structure, and my point is that that is a

19   compound question, so break it up.

20   BY MR. ODDO:                                         01:58PM

21       Q.   You can answer.

22       A.   Okay, thank you.

23           The -- when we went over this, and this

24   goes back obviously a little bit of time, but it's

25   my understanding at the time was we were looking     01:59PM
                                                          124

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001575

HIGHLY CONFIDENTIAL

1    at a transaction that would be similar to the Zell

2    transaction from Broad and Burkle.

3    BY MR. ODDO:

4        Q.    Okay.

5        A.    Even though we didn't have all of the          01:59PM

6    details and everything that I talked about

7    earlier.

8        Q.    Yeah, and I understand you discussed

9    the --

10       A.    Conditionality.                                01:59PM

11       Q.    -- purported deficiencies with that

12   proposal.

13       A.    Right.

14       Q.    Aside from that did it differ in any

15   respects from what was contemplated by the Zell         01:59PM

16   transaction?

17       A.    Well, based on the -- you know, there's a

18   -- that's a very difficult question, actually, to

19   answer because there are so many pieces.  This was

20   a letter versus documents like that, and I would        01:59PM

21   say that in terms of headline value, you know,

22   headline structure the answer is yes, it looks

23   like it's similar but there are a lot of details

24   to work out.

25       Q.    Okay.                                          02:00PM
                                                              125

Professionals' Eyes Only
Highly Confidential - Attorneys' Eyes Only

TRIB-G0001576