

Citicorp Center
500 West Madison Street
Suite 3700
Chicago, Illinois 60661
Tel 312.715.5000
Fax 312.715.5155
www.quarles.com

*Attorneys at Law in:*
*Phoenix and Tucson, Arizona*
*Naples and Boca Raton, Florida*
*Chicago, Illinois*
*Milwaukee and Madison, Wisconsin*

August 17, 2007

<u>CONFIDENTIAL</u>

Board of Directors
Robert R. McCormick Tribune Foundation
435 North Michigan Avenue, Suite 770
Chicago, Illinois 60611

Re:    **Merger of Tribune Company**

Dear Directors:

  You have requested of Quarles & Brady LLP, as general counsel to the Robert R. McCormick Tribune Foundation (the "Foundation"), and we have agreed to provide, our opinion concerning whether the proposed decision of the Board of Directors of the Foundation (the "Foundation Board") to vote the Company Stock (as hereinafter defined) to approve the Merger (as hereinafter defined) would be in compliance with the applicable standards for prudent investment decisions by the Directors of the Foundation under Illinois state law, and whether the proposed vote would jeopardize the Foundation's tax-exempt status or cause the Foundation or its foundation managers to incur certain penalty excise taxes under the Internal Revenue Code of 1986, as amended (the "Code").

  Our opinions with respect to the applicable standards for prudent investment decisions under Illinois state law are based on the provisions of the Illinois Compiled Statutes (the "Illinois Statutes") and applicable case law; and our opinions with respect to federal income tax matters are based upon the provisions of the Code, the Treasury Regulations issued and proposed under the Code (the "Regulations"), and interpretations of the Code by both the Internal Revenue Service (the "Service") and the federal courts; as all of the foregoing exist as of the date of this opinion, and upon certain other assumptions set forth below. The provisions of the Illinois Statutes, the Code, or the Regulations may be amended, or the interpretations of the Service or decisions of the courts may change, in each case after the date of this opinion and in a way that could affect the conclusions set forth below.

FOUN0006710

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 2

## Documents and Information Relied Upon

In rendering this opinion, we have examined and relied upon information provided to us by officers and Directors of the Foundation and members of the Advisory Committee (as hereinafter defined) and such documents as we have considered necessary or appropriate for the purposes of this opinion, including, but not limited to, those set forth below:

1.     Articles of Incorporation of the Foundation (the "Articles of Incorporation"), filed with the Secretary of State of the State of Illinois (the "Illinois Secretary of State") on December 4, 1989;

2.     By-Laws of the Foundation, as amended through February 12, 2004 (the "By-Laws");

3.     Letter from the Service to the Foundation, dated March 27, 1990, determining that the Foundation is exempt from federal income taxation as an organization described in Code Section 501(c)(3).

4.     Letter from the Service to the Foundation, dated June 9, 2003, determining that the Foundation would be treated as a public charity that is described in Code Sections 170(b)(1)(A)(vi) and 509(a)(1) as of January 1, 1998;

5.     The report of the Advisory Committee to the Foundation Board, dated August 17, 2007 (the "Advisory Committee Report"), in draft form;

6.     The written report and fairness opinion of The Blackstone Group L.P. (the "Fairness Opinion"), dated August 17, 2007;

7.     The written opinion of Advisory Research, dated August 17, 2007 (the "Advisory Research Opinion");

8.     The written legal memorandum of Katten Muchin Rosenman LLP ("Special Counsel"), dated August 16, 2007 regarding reasonableness of certain Benefits (as hereinafter defined) provided to Tribune Related Directors (as hereinafter defined) (the "Katten Legal Memorandum").

9.     The proxy statement dated July 13, 2007 issued by the Company seeking approval from the shareholders of the Merger (as hereinafter defined).

10.     Agreement and Plan of Merger dated April 1, 2007 among GreatBanc Trust Company, as trustee of the ESOP (as hereinafter defined) and the Company (as hereinafter defined).

QBCHI\527128.3

FOUN0006711

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 3

11.    Opinion of Morgan Stanley dated April 1, 2007 concluding that the consideration pursuant to the Merger Agreement is fair from a financial point of view to the holders of such shares.

12.    Opinion of Merrill Lynch dated April 1, 2007 concluding that the consideration pursuant to the Merger is fair from a financial point of view to the holders of such shares.

Documents 5 through 8 above, together with this opinion, are sometimes referred to herein as the "Process Documents."

## Assumptions

In rendering this opinion, we have made the following assumptions:

1.    All certificates of public officials examined by us are accurate;

2.    The copies of all documents submitted to us are accurate and complete, each such document that is an original is authentic, and each such document that is a copy conforms to an authentic original; and

3.    If challenged by the Service or another party, each of our conclusions would be fully litigated by competent legal counsel in the appropriate judicial tribunal.

## Relevant Facts

The relevant facts, based on our review of the documents and information described above and the assumptions stated above, are set forth below.

The Foundation is an Illinois not-for-profit corporation. It is exempt from federal income taxation under Code Section 501(a) as an organization described in Code Section 501(c)(3), and is a public charity that is described in Code Sections 170(b)(1)(A)(vi) and 509(a)(1).

In his Will, Robert R. McCormick provided for (subsequent to the death of his surviving spouse) the gratuitous transfer of shares of common stock of Tribune Company (the "Company") in part to the Robert R. McCormick Charitable Trust (the "Charitable Trust"). The Charitable Trust's stock was later gratuitously transferred to the Foundation in accordance with an order of the Circuit Court of Cook County, Illinois, which order also approved the Articles of Incorporation.

The Foundation currently owns approximately 11.8 million shares of common stock of the Company with an approximate value of $396 million, which represent approximately 10.0% of the total outstanding voting stock of the Company. The shares of common stock of the Company ("Company Stock") owned by the Foundation represent approximately 32% of the

QBCHI\527128.3

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 4

aggregate investment asset value of the Foundation (the balance of which is in marketable securities and cash) and have an approximate value of $852 million.

I.    History of the Advisory Committee

In September 2006, the Company formed an independent special committee (the "Special Committee") of its board of directors (the "Tribune Board") to oversee exploration of strategic alternatives for preserving, and creating additional, shareholder value, and to thereafter make a recommendation to the Tribune Board with respect to one or more such strategic alternatives.

At that time, the Foundation owned approximately 28.2 million shares of the Company Stock which constituted approximately 75% of the aggregate investment value of the Foundation of $1.2 billion.

In view of the Company's strategic assessment and because of the Foundation's sizeable investment in the Company, the Foundation Board, on December 14, 2006, established an advisory committee (the "Advisory Committee") consisting of John W. Madigan and James C. Dowdle, both of whom are members of the Foundation Board but are not currently employed by the Company, to analyze and evaluate the course of action that the Foundation should take with respect to its shares of Company Stock, with the members of the Foundation Board who were also executives of the Company recusing themselves from the evaluation process.

The Foundation Board authorized the retention of Katten Muchin Rosenman LLP to serve as special legal counsel to the Foundation and to assist the Advisory Committee and the Foundation Board with respect to their review of potential actions that the Foundation should take with respect to the Company Stock. The Foundation Board authorized the Advisory Committee to engage an independent financial advisor for the Foundation, and the Advisory Committee thereafter retained The Blackstone Group L.P. ("Blackstone") as such independent financial advisor. The Foundation also requested Quarles & Brady LLP, general counsel to the Foundation ("General Counsel"), and Brien O'Brien of Advisory Research, the Foundation's long-time financial advisor ("O'Brien"), to assist in evaluating alternatives available to the Foundation with respect to any financial restructuring considered by the Special Committee and the Company and to provide advice to the Advisory Committee and the Foundation Board regarding related tax, legal, financial, and investment issues. (These advisors are sometimes collectively referred to herein as the "Advisors").

FOUN0006713

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 5

II.    Various Alternatives Considered

As described in the Advisory Committee Report, the Advisory Committee consulted extensively with the Advisors to assist in evaluating the possible actions available to the Foundation with respect to any financial restructuring alternatives considered by the Special Committee and related financial, investment, tax, and legal issues. The Advisory Committee had numerous in-person meetings, as well as generally daily telephonic meetings, with the Advisors over several months. It received numerous legal, informational, and due diligence memoranda prepared by Special Counsel and General Counsel, as well as detailed financial analyses provided by Blackstone and O'Brien regarding the Company, its business prospects, its existing and proposed capital structure, and a number of restructuring alternatives. The Advisory Committee considered, analyzed, and discussed these memoranda with the Advisors.

The Advisory Committee reviewed with the Advisors multiple alternative restructuring proposals and related information, as discussed in the Advisory Committee Report.

During the course of this review, the Advisory Committee and the Advisors participated in an all-day due diligence meeting with Company management, and the Advisors, on behalf of the Advisory Committee, participated in additional due diligence conferences with Company management, engaged in numerous and extensive discussions with counsel to the Company and its investment bankers, special counsel and investment bankers for the Special Committee, representatives of the Chandler Trusts, and representatives of multiple third parties.

Finally, the Advisory Committee and the Advisors discussed and considered a leveraged transaction described below as the Leveraged ESOP Transactions to be entered into by the Company with an Employee Stock Ownership Plan, and an entity controlled or governed by Mr. Samuel Zell, a Chicago businessman.

III.    Current Transaction

The Company on April 1, 2007 approved a series of transactions (collectively known as the "Leveraged ESOP Transactions") with (i) a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), (ii) a limited liability company ("Zell LLC") wholly owned by Sam Investment Trust established for the benefit of Samuel Zell and his family, and (iii) Samuel Zell ("Mr. Zell"). The Leveraged ESOP Transactions include the following series of transactions:

1.    The Zell LLC has invested $250 million in the Company in exchange for (i) approximately 1.5 million shares of the Company Stock at $34.00 per share, and (ii) an unsecured subordinated exchangeable promissory note of the Company in the amount of $200 million which would be required to be repaid prior to the Merger (as defined below). The promissory note would be exchangeable at the Company's option or

FOUN0006714

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 6

automatically under certain circumstances into approximately 5.9 million shares of
Company Stock. Mr. Zell was appointed, effective upon closing the investment in the
Company by Zell LLC, as a member of the Tribune Board. If the purchase agreement for
the investment by Zell LLC is terminated under certain specified circumstances,
including by reason of the Tribune Board's determination to accept a superior proposal,
the Company will be obligated to pay Zell LLC a termination fee of $25 million.

2.      The Company has agreed to reimburse Zell LLC for up to $2.5 million of
unreimbursed expenses following consummation of the investment by Zell LLC and up
to an additional $2.5 million of unreimbursed expenses following consummation of the
second investment by Zell LLC described in clause (6) below.

3.      The ESOP purchased on April 1, 2007, approximately 8.9 million shares of
Company Stock from the Company at a price of $28.00 per share. The ESOP paid for
this purchase with a promissory note in favor of the Company in the principal amount of
$250 million to be repaid by the ESOP over the thirty (30) year life of the note through its
use of annual contributions from the Company to the ESOP and/or distributions paid on
the shares of the Company Stock held by the ESOP.

4.      The Company has completed a tender to repurchase approximately 126 million
shares of Company Stock that were currently outstanding at a price of $34.00 per share
(the "Tender"). The Tender was not contingent on any minimum number of shares of
Company Stock being tendered. Jeffrey Chandler, Roger Goodan, and William Stinehart,
Jr., all of whom had served on the Tribune Board as representatives of the Chandler
Trusts, have resigned as directors of the Company, upon the Company's acceptance of
their shares of Company Stock for purchase in the Tender.

As a result of the Tender, the Foundation received approximately $556.3 million
for approximately 16.2 million shares of Company Stock. Immediately following the
Tender, the Foundation had cash and non-Company investments of approximately
$852 million and Company Stock with a value of $396 million (assuming a post Tender
market value of approximately $33.88 per share), significantly increasing the
diversification of the Foundation's portfolio.

5.      The Company has entered into an Agreement and Plan of Merger with GreatBanc
Trust Company as Trustee of the ESOP, Zell LLC and a separate corporation wholly
owned by the ESOP, pursuant to which such separate corporation would be merged with
and into the Company ("Merger"). Following such Merger, the Company will continue
as a surviving corporation wholly owned by the ESOP. In connection with the Merger,
all of the outstanding shares of Company Stock other than those held by the ESOP will be
exchanged for cash consideration of $34.00 per share. If the Merger does not close by

FOUN0006715

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 7

January 1, 2008, shareholders will receive an additional 8% annualized "ticking fee" calculated from January 1, 2008 to the date of closing of the Merger. The Company may participate in discussions and negotiations with, and furnish non-public information to, a party that has made a competing proposal, if the Special Committee determines in good faith that such proposal could reasonably be expected to result in a transaction or transactions that are more favorable to the Company and its shareholders than the Merger. The Merger agreement is subject to various closing conditions, including approval of the Merger by holders of a majority of the outstanding shares of Company Stock, receipt of necessary consents and approvals of the Federal Communications Commission and Major League Baseball, receipt of financing commitments, and receipt of a solvency opinion. The Merger agreement also gives each of the Company and the ESOP the right to terminate the Merger transaction if stockholder approval is not obtained or if the Merger does not close by May 31, 2008.

6.    In the Merger Zell LLC will receive cash for the shares of Company Stock it owns. Immediately prior to the Merger, the Company will repay the exchangeable promissory note held by Zell LLC. Following the consummation of the Merger, Zell LLC has agreed that it will purchase from the Company a $225 million subordinated promissory note and a 15-year warrant for $90 million. The warrant will entitle Zell LLC to purchase approximately 43.4 million shares of Company Stock, which will represent approximately 40% of the economic equity interest in the Company following the Merger. The warrant will have an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first ten (10) years of the warrant, for a maximum aggregate exercise price of $600 million.

7.    The Company has agreed to grant Zell LLC and the ESOP registration rights with respect to the shares of Company Stock that Zell LLC and the ESOP purchased from the Company.

The Company has secured financing commitments from certain lenders to provide the Company with the ability to borrow the amounts required to finance the Leveraged ESOP Transactions.

After a lengthy strategic review process, including a broad auction process, the Company reported that it had not received any third party proposals which it deemed to be more attractive for the Company's shareholders than the Leveraged ESOP Transactions.

IV.    Interests of Certain Directors of the Foundation

Certain Directors of the Foundation, Dennis FitzSimons, David Hiller and Scott Smith ("Tribune Related Directors"), have interests in the Merger and the Leveraged ESOP

FOUN0006716

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 8

Transactions that are different from, or in addition to, the interest of the Foundation as a shareholder of the Company.

<u>Compensation Awards</u>

In connection with the review by the Tribune Board of the strategic alternatives for the Company beginning in September, 2006, the Compensation Committee of the Tribune Board authorized the creation of a bonus pool to motivate management to seek a transaction that would provide the maximum return to the Company's shareholders despite the risks such transaction would pose to management's continued employment. In connection with the approval of the Leveraged ESOP Transactions, on April 1, 2007, the Tribune Board approved certain cash compensation awards and share equivalent awards for members of management and other key employees, conditioned upon consummation of the Merger. The Company's principal executive officers, including, among others, the Tribune Related Directors, were authorized to participate in the awards:

<u>Cash Transaction Bonus Pool</u>

On April 1, 2007, the Board approved a cash transaction bonus pool in the aggregate amount of $6.5 million for 32 individuals. Subsequently, the management increased the number of recipients to 40 and reduced the bonus pool to $5.4 million. This cash bonus pool will be used in lieu of approximately 285,000 restricted stock units that were authorized for issuance. Payments of these cash bonuses are conditioned on consummation of the Merger and will, at that time, be payable to a select group of management and other key employees who played a key role in overseeing completion of the Leveraged ESOP Transactions. The Tribune Related Directors each have voluntarily elected not to participate in the cash bonus pool.

<u>Tribune Management Equity Incentive Plan</u>

The Merger agreement contemplates the establishment of a new Tribune Company Management Equity Incentive Plan (the "Plan") to be effective following consummation of the Merger. The Plan will be administered by the Compensation Committee of the Board ("Plan Committee"), and the Plan Committee will select who will receive the awards and specify the terms of the awards. The Plan contemplates two tranches of share-equivalent awards to be granted to certain members of management and other key employees. The first-tranche awards ("Tranche One Awards") will include share equivalents granted to

FOUN0006717

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 9

certain members of management and other key employees with an economic value equal to 5% of the outstanding Company Stock (calculated after giving effect to the warrant and subject to typical anti-dilution adjustments). A portion of Tranche One Awards will be granted upon consummation of the Merger, and the remaining portion will be granted in future years. Tranche One Awards will vest ratably over a three-year period beginning on the date of the grant. Unless the Plan Committee determines another vesting schedule is preferable and subject to re-deferral election by individual plan participants, Tranche One Awards will be payable in cash on the fifth anniversary of the grant date.

Following the grant of the Tranche One Awards, the Plan contemplates that the unvested portion of any Tranche One Awards will become fully vested upon a change of control of the Company or termination of employment due to death or disability or retirement. Upon a Plan participant's termination of employment for any other reason, the participant will be entitled to retain the then-vested portion of any Tranche One Awards with payment made on the fifth anniversary. The unvested portion of any Tranche One Awards will, upon such termination, be cancelled.

The second tranche of awards ("Tranche Two Awards") will include share equivalents, with an economic value equal to 3% of the outstanding Company Stock, to be awarded upon consummation of the Merger to a select group of management and other key employees. The Plan contemplates that 50% of the Tranche Two Awards will be fully vested upon grant, and the remaining 50% will be vested on the one year anniversary of the grant date. The Plan also contemplates that the vested portion of any Tranche Two Awards will become fully vested upon a change of control, involuntary change of employment or termination of employment due to death, disability, or retirement from the Company. The Tribune Related Directors of the Foundation will be eligible to participate in the Plan.

Transitional Compensation Plan

Under the Transitional Compensation Plan, each officer will be eligible for benefits upon termination of employment within 36 months following completion of the Merger. Transactional compensation benefits will be available only if the participant's termination of employment was not on account of death, on account of physical or mental conditions which entitle the participant to long term disability benefits, for conduct involving dishonesty or willful misconduct, which in either case is detrimental in a significant way to the Company's business, or on account of the employee's voluntary resignation. A resignation will not be

QBCHI\527128.3

considered to be voluntary (a) if the resignation by Dennis FitzSimons or David Hiller occurs during a 30-day period immediately following the first anniversary of the completion of the Merger, (b) if the resignation by Dennis FitzSimons or David Hiller occurs after a successor to the Company refuses to assume or agrees to perform the Company's obligations under the Transitional Compensation Plan, or (c) if, subsequent to the completion of the Merger and prior to such resignation(s), there has been a reduction in the nature or scope of Mr. FitzSimon's or Mr. Hiller's authority or duties, a reduction in Mr. FitzSimon's or Mr. Hiller's compensation, or benefits or change in the city in which each is required to perform his duties.

Assuming the Merger is completed on December 31, 2007 and, thereafter, a Tribune Related Director experiences a qualifying termination for purposes of the Transitional Compensation Plan, the estimated cost of cash and in kind severance benefits will be: Mr. FitzSimons, $10,657,500, Mr. Hiller, $4,113,984 and Mr. Smith, $4,794,460.

In addition, participants in the Transitional Compensation Plan are entitled to certain tax gross-up payments. If the Merger is consummated and a Tribune Related Director experiences a qualifying termination, the estimated tax gross up payment will be as follows: Mr. FitzSimons, $3,999,225, Mr. Hiller, $1,380,000, and Mr. Smith, $1,609,862. These benefits are collectively referred to herein as "Transitional Compensation Benefits."

Stock Options, Restricted Stock and Other Equity Based Awards

As of the effective time of the Merger, each outstanding Company Stock option which remains outstanding immediately prior to the effective time of the Merger, whether vested or unvested, is to become fully vested, and the holder of the stock option will receive a cash payment, less applicable withholding taxes, equal to the product of (1) the number of shares subject to the option and (2) the excess, if any, of the Merger Price over the exercise price per share of Company Stock.

Each share of restricted Company Stock will vest in full and be converted into the right to receive the Merger Price, less any applicable withholding taxes.

Each right of any kind to receive Company Stock or benefit measured in whole or in part by the value of the number of shares of Company Stock will vest and become free of any forfeiture or holding restrictions or performance, or other conditions and will entitle the holder thereof to receive an amount in cash based on the Merger Price.

QBCHI 527128.3

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 11

The estimated amounts that will be payable to the Tribune Related Directors under this program are as follows: Mr. FitzSimons, $6,869,550, Mr. Hiller, $2,231,454, and Mr. Smith, $2,665,784. These benefits are collectively referred to herein as "Equity Based Awards".

<u>Indemnification of Directors and Officers; Directors and Officers Insurance</u>

In addition to the above, the Merger agreement provides that for a period of six years after completion of the Merger, the Company will maintain in effect director, officer and employee exculpation, indemnification and advances of expenses provisions no less favorable than those of the Company as in effect prior to the Merger. The Merger agreement also provides that the Company will to the fullest extent permitted under applicable law, indemnify and hold harmless each current and former director, officer or, employee of the Company and each person who served as a director, officer, member, trustee or fiduciary at the request of the Company, against any other costs, expenses, judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened action, arising out of or relating to or in connection with any act or omission occurring or alleged to have occurred, whether before or after the Merger. Following the Merger, the Company will maintain in effect the current policy of the directors and officers liability insurance and fiduciary liability insurance maintained by the Company and its subsidiaries with respect to matters arising on or before the effective date of the Merger, subject to a maximum annual insurance premium of 200% of the last annual premium paid by the Company prior to the Merger. At the Company's option, after consultation with the ESOP, the Company may purchase, prior to the effective date, a six year prepaid "tail" policy on the terms and conditions providing substantially equivalent benefits as the current policy for the directors and officers liability and fiduciary liability insurance. The indemnification and insurance to be provided are collectively referred to herein as "<u>Indemnification</u>".

The Tribune Management Equity Incentive Plan, the Transitional Compensation Plan, Equity Based Awards and Indemnification are referred to herein as the "<u>Benefits Plans</u>". Benefits payable under such Benefits Plans are collectively referred to herein as the "<u>Benefits</u>".

FOUN0006720

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 12

V.    The Blackstone Fairness Opinion

Blackstone has advised the Advisory Committee and the Foundation Board that the Foundation should vote to approve the Merger and surrender its shares of Company Stock for the consideration set forth in the Merger Agreement (the "Merger Price").

The Fairness Opinion states in Blackstone's opinion that the proposed Merger Price, in the context of the Leveraged ESOP Transactions, is fair to the Foundation from a financial point of view and the sale of the Company Stock at the Merger Price increases the diversification of the investment portfolio of the Foundation.

VI.    The Katten Legal Memorandum

Special Counsel has provided the Katten Legal Memorandum, concluding that the Benefits to be provided to the Tribune Related Directors under the Benefits Plans as provided herein have a valid business purpose, are commercially reasonable, and are standard in transactions comparable to the proposed Merger, and further that the Benefits were negotiated at arms-length between the Company, the ESOP, and the Zell LLC and were either approved or recommended by committees of the Tribune Board that did not include any members of the Foundation Board.

VII.    Advisory Research Opinion

Advisory Research has provided its opinion that a decision by the Foundation Board to vote to approve the Merger and receive the Merger Price would be a prudent investment decision, in the context of the Foundation's overall investment portfolio.

VIII.    Foundation Approval Process

The Advisory Committee met on August 17, 2007, to receive reports and discuss the proposed Merger with representatives of Blackstone, O'Brien, Special Counsel, and General Counsel, and decided to recommend to the Foundation Board that the Foundation's Company Stock be voted in favor of the Merger.

The Advisory Committee has presented the Advisory Committee Report to the Foundation Board, and the Foundation Board will have an opportunity to review and consider the Process Documents.

Immediately following the meeting of the Advisory Board, the full Foundation Board will meet with representatives of the Advisors to receive their final reports and to receive the opinions described above, and discuss the Merger, Merger Price, and related issues. The Foundation Board will ask such questions and engage in such discussions as its members deem necessary and appropriate and will then make its considered decision whether or not to vote the

QBCHI527128.3

FOUN0006721

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 13

Foundation's Company Stock to approve the Merger, taking into account all of the factors mentioned in the Advisory Committee Report and all of those discussed in this opinion.

**Legal Principles**

I.    Articles of Incorporation

The Articles of Incorporation provide that the Foundation is organized for "exclusively charitable, religious, literary, scientific and educational purposes, including, for such purposes, but not limited to, the making of distributions to organizations that qualify as exempt organizations under Code section 501(c)(3)." Article 4.

The Articles of Incorporation authorize (but do not require) the Foundation Board to retain and continue to hold Tribune Company stock owned by Robert R. McCormick at the time of his death. Specifically, Section 3 of Article 8 of the Articles of Incorporation provides as follows:

Section 3. SALE OF TRIBUNE COMPANY STOCK. The corporation may at any time sell all shares of stock in Tribune Company owned by the corporation. Such stock, or any portion thereof, shall be sold at such time, at such prices, upon such terms and to such persons or corporations as the Directors may deem suitable, fair, just and proper.

The Directors, in making any decision to sell should not be guided solely by the best offered price but also by the other terms and by qualifications of the purchaser or purchasers and, as expressed in the Will, Robert R. McCormick's hope that such stock be sold to purchasers who understand and value the ideals and principles which guided him during the period of his management of Tribune Company and that the terms of sale should be fair but liberal as to credit and security. Except as prohibited by law, any of the Directors may purchase any portion or all of such stock for his or her individual account in the same manner and to the same extent as if he or she had never been a Director, provided a majority of the other Directors in office shall approve of the terms of such purchase.

Without limiting the generality of the foregoing, the Directors may sell any stock of Tribune Company (1) to any employee or employees of Tribune Company or of any subsidiary thereof, and may accept in payment of the purchase price the promissory note of such employee purchaser, payable in installments over a period of as much as ten years' time, or (2) to any employee benefit or employee retirement plan, including but not limited to any employee share ownership plan, created for any employees of Tribune Company or any subsidiary thereof, and may provide for a reasonable extension of credit in connection therewith.

QBCHI\527128.3

FOUN0006722

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 14

Any disposition by the corporation of stock of Tribune Company shall require approval of a majority of Directors in office.

Further, Section 4 of Article 8 of the Articles of Incorporation grants the Foundation Board the powers:

C.    To vote in person or by proxy at any meeting of the stockholders of any corporation, the stock of which shall be a part of the corporation's assets on any question whatsoever coming before the meeting;

• • •

E.    To consent to the reorganization, merger, consolidation, readjustment of the financial structure, or sale of assets of any corporation or other organization the investment in which constitutes a part of the corporation's assets, and to take any action with reference to such investments which in the opinion of the Directors is necessary to obtain the benefit of any such reorganization, merger, consolidation, readjustment or sale; to exercise any conversion privileges or subscription rights given to the corporation as the owner of any investment constituting a part of the corporation's assets; and to accept and hold as part of the corporation's assets the investments resulting from such reorganization, merger, consolidation, readjustment, sale, conversion or subscription.

Any action taken with respect to the sale of Tribune Company shall require approval of a majority of the Directors in office.

II.    Illinois Law

Three Illinois statutory provisions and related case law interpretations are relevant to the applicable standards for prudent investment decisions by the Directors of the Foundation: the Illinois General Not For Profit Corporation Act of 1986, the Illinois Uniform Management of Institutional Funds Act, and the Illinois Prudent Investor Rule.

A.    Illinois General Not For Profit Corporation Act of 1986 (ILNFP)

Under ILNFP, each Illinois not-for-profit corporation has the following powers:

To purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, loan, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in, or obligations of, other domestic or foreign corporations, whether for profit or not for profit, associations, partnerships or individuals. 805 ILCS 105/103.10(d) (West 2007).

QBCHI\527128.3

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 15

B.    Uniform Management of Institutional Funds Act (UMIFA)

1.    Statutory Language

The Illinois UMIFA, 760 Ill.Comp.Stat.Ann. 50/1 (West 2007), applies generally to the governing board of an "incorporated or unincorporated organization organized and operated exclusively for educational, religious, charitable or other eleemosynary purposes." *Id.* at 50/2.03, 2.05 (West 2007). UMIFA intends, in part, to clarify the standards applicable to directors of nonprofit institutions in making prudent investment decisions. Unif. Mgmt. of Inst. Funds Act (U.L.A.) prefatory note (2006).

UMIFA does not specify any specific standard in exercising the decision to vote on a specific matter. In deciding, however, to make, sell or retain investments, the Illinois UMIFA requires the governing board to exercise "ordinary business care and prudence under the facts and circumstances prevailing" at the time of the decision. *Id.* at 50/7. In satisfying this standard, the governing board must consider the "long and short term needs of the institution in carrying out its educational, religious, charitable, or other eleemosynary purposes, its present and anticipated financial requirements, expected total return on its investments, price level trends, and general economic conditions." *Id.* This same standard should apply to the decision of the Board of the Foundation with respect to the vote in favor of the Merger.

2.    Case Law Interpretation

No reported cases were identified in which the Illinois UMIFA was considered. The official comments to UMIFA, however, indicate that the statute is intended to require directors of nonprofit corporations "to act in the utmost good faith and to exercise ordinary business care and prudence." Unif. Mgmt. of Inst. Funds Act (U.L.A.) § 6 cmt (2006). This standard of care intentionally differs from that applicable to trustees, because "[t]he proper standard of responsibility [for a director of a nonprofit corporation] is more analogous to that of a director of a business corporation than that of a professional private trustee." *Id.* at prefatory note.

In Illinois, a director can meet the ordinary business care standard, which is often referred to as a counterpart to the business judgment rule, by making informed decisions after considering the available alternatives. CHARLES W. MURDOCK, BUSINESS ORGANIZATIONS, 7 IL. PRAC. SERIES S.13.1 (1996). Illinois courts have recognized that a director satisfies the business judgment rule by

FOUN0006724

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 15

      B.     Uniform Management of Institutional Funds Act (UMIFA)

      1.     Statutory Language

      The Illinois UMIFA, 760 Ill.Comp.Stat.Ann. 50/1 (West 2007), applies generally to the governing board of an "incorporated or unincorporated organization organized and operated exclusively for educational, religious, charitable or other eleemosynary purposes." *Id.* at 50/2.03, 2.05 (West 2007). UMIFA intends, in part, to clarify the standards applicable to directors of nonprofit institutions in making prudent investment decisions. Unif. Mgmt. of Inst. Funds Act (U.L.A.) prefatory note (2006).

      UMIFA does not specify any specific standard in exercising the decision to vote on a specific matter. In deciding, however, to make, sell or retain investments, the Illinois UMIFA requires the governing board to exercise "ordinary business care and prudence under the facts and circumstances prevailing" at the time of the decision. *Id.* at 50/7. In satisfying this standard, the governing board must consider the "long and short term needs of the institution in carrying out its educational, religious, charitable, or other eleemosynary purposes, its present and anticipated financial requirements, expected total return on its investments, price level trends, and general economic conditions." *Id.* This same standard should apply to the decision of the Board of the Foundation with respect to the vote in favor of the Merger.

      2.     Case Law Interpretation

      No reported cases were identified in which the Illinois UMIFA was considered. The official comments to UMIFA, however, indicate that the statute is intended to require directors of nonprofit corporations "to act in the utmost good faith and to exercise ordinary business care and prudence." Unif. Mgmt. of Inst. Funds Act (U.L.A.) § 6 cmt (2006). This standard of care intentionally differs from that applicable to trustees, because "[t]he proper standard of responsibility [for a director of a nonprofit corporation] is more analogous to that of a director of a business corporation than that of a professional private trustee." *Id.* at prefatory note.

      In Illinois, a director can meet the ordinary business care standard, which is often referred to as a counterpart to the business judgment rule, by making informed decisions after considering the available alternatives. CHARLES W. MURDOCK, BUSINESS ORGANIZATIONS, 7 IL. PRAC. SERIES S.13.1 (1996). Illinois courts have recognized that a director satisfies the business judgment rule by

QBCHI\527128.3

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 16

making decisions "on an informed basis, in good faith, and with the honest belief that the course taken was in the best interests of the corporation." *Ferris Elevator Company, Inc. v. Neffco, Inc.*, 674 N.E.2d 449, 452 (Ill. App. Ct. 1996). A director's duty of care is the duty to "exercise in the management of corporate affairs the degree of care which prudent men, prompted by self-interest, would exercise in the management of their own affairs. . . . Under this standard of care, directors have a duty to attend and to participate in regular board meetings, and the duty to inform themselves of the material facts necessary to exercise their judgment." *Stamp v. Touche Ross & Co.*, 636 N.E.2d 616, 620-21 (Ill. App. Ct. 1993); *see also Fields v. Sax*, 462 N.E.2d 983 (Ill. App. Ct. 1984).

C.    Prudent Investor Rule

Although the Illinois Prudent Investor Rule, 760 Ill.Comp.Stat.Ann. 5/5 (West 2007), applies directly only to trusts and trustees, the Illinois Attorney General may take the position that the standards expressed in the statute apply to all charitable organizations in Illinois, including the Foundation.

The Illinois Prudent Investor Rule requires that trustees exercise "reasonable care, skill, and caution" when managing and investing trust assets. *Id.* at 5/5(a)(1). The statute also requires that trustees consider the trust's purposes and the overall context of the trust's investment portfolio when making investment decisions. *Id.* Further, the statute provides that trustees have a duty to diversify trust investments unless, under the circumstances, the trustees reasonably believe that a decision *not* to diversify furthers the purposes of the trust and is in the interest of the trust's beneficiaries. *Id.* at 5/5(a)(3). Finally, the statute provides that express trust provisions can expand, restrict, eliminate, or alter the aforementioned statutory rules. *Id.* at 5/5(b).

III.    Federal Tax Law Rules

A.    Code Section 501(c)(3): Private Benefit and Private Inurement

Section 501(c)(3) of the Code requires that an entity, in order to be tax-exempt, must be organized and operated so that no part of its net earnings inures to the benefit of any private shareholder or individual, and may not confer more than an incidental benefit on an individual. Code §501(c)(3). Section 1.501(c)(3)-1(c)(2) of the Regulations further provides that an organization is not operated exclusively for one or more tax-exempt purposes if its net earnings inure in whole or in part to the benefit of private shareholders or individuals, and Section 1.501(c)(3)-1(d)(1)(ii) of the Regulations requires that, in order to be tax-exempt, an organization must be organized and operated to serve public rather than private interests.

QBCHI:S27128.3

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 17

Under the private inurement doctrine, none of the income or assets of a charitable organization may be permitted to unduly benefit, directly or indirectly, an individual or other person who has a close relationship to the organization, particularly one who is in a position to exercise a significant degree of control over the organization (*e.g.*, directors and officers). *See* BRUCE R. HOPKINS, THE LAW OF TAX-EXEMPT ORGANIZATIONS 484 (8th ed. 2003.) The law is designed to inhibit what the Service has called a "disproportionate share of the benefits of the exchange" flowing to an insider, and the private inurement doctrine requires that a standard of reasonableness must be used to evaluate these transactions (for example, how similar organizations, acting prudently, transact their affairs in similar circumstances). PLR 9130002 (1991).

Where a substantial purpose of an organization's operations is to increase the income of a related for-profit organization, even if it furthers other exempt purposes, the non-profit will be deemed not to have been operated exclusively for exempt purposes and therefore will not qualify for tax exemption under Code Section 501(c)(3). *International Postgraduate Medical Foundation v. Commissioner of Internal Revenue*, T.C. Memo. 1989-36. An organization engaging in non-exempt activities, however, can maintain its tax-exempt status provided that such activities are only incidental and less than substantial (which is a question of fact to be determined in light of all relevant facts and circumstances). *Id.*

In *International Postgraduate Medical Foundation*, the Court held that a substantial non-exempt purpose of a not-for-profit corporation's operations was to provide benefits to a for-profit tour agency, of which the founder and director of the not-for-profit organization was the sole shareholder and president. *Id.* In this case, the not-for-profit organization distributed and produced brochures that solicit customers for tours arranged by the for-profit, and approximately 90% of the not-for-profit organization's total revenue in one year was spent on the production and distribution of these brochures. The not-for-profit failed to establish that the recreational tours described in its brochure were insubstantial or only incidental to its educational purposes, and therefore the Court held that the organization served a private rather than public interest. *Id.*

In Revenue Ruling 67-5, 1967-1 C.B. 123, the Service held that a private foundation (controlled by the creator's family) operated to enable the creator and his family to engage in financial activities that were beneficial to them, but detrimental to the foundation, and therefore was operated for a private rather than a public interest. The creator and his family contributed and sold shares of common stock in their family-owned corporation to the foundation, and concurrently the family increased its ownership of the corporation's preferred stock. The corporation issued dividends only to the preferred shareholders. Despite the absence of dividends, the trustees of the foundation continued to purchase the corporation's common stock and failed to invest in other assets

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 18

productive of income. As a result, the foundation was able to carry out negligible charitable activities because the foundation's principal asset was the corporation's common stock and the income it received from this investment was negligible in relation to the net asset value of its total holdings. The Service held that the foundation was being operated for the interests of the family and not for public benefit. *Id.*

Although not directly on point to private inurement, Section 53.4941(d)-2(f)(9) of the Regulations regarding self-dealing indicates that simply voting foundation stock in favor of management will not result in private inurement. That Regulation provides the following example:

> Private foundation Y owns voting stock in corporation Z, the management of which includes certain disqualified persons with respect to Y. Prior to Z's annual stockholder meeting, the management solicits and receives the foundation's proxies. The transfer of such proxies in and of itself shall not be an act of self-dealing.

The private foundation rules are generally consistent with or even stricter than the rules with respect to private inurement. Accordingly, although the foregoing example does not specifically reference the private inurement doctrine, if the voting of any stock owned by a tax-exempt organization in accordance with management recommendations will not, in and of itself, constitute impermissible self-dealing, it likewise should not constitute prohibited private inurement.

No other relevant authority has been identified.

B.    Code Section 4958: Excess Benefit Transactions

Code Section 4958(a)(1) imposes a penalty excise tax on "excess benefit transactions." An excess benefit transaction is one in which an economic benefit is provided by a Section 501(c)(3) organization (other than a private foundation), directly or indirectly to or for the use of any "disqualified person," if the value of the economic benefit provided exceeds the value of the consideration received (including performance of services). Code §§4958(c)(1)(A), 4958(e). A "disqualified person" includes, among others, any person who was at any time during the five-year period ending on the date of the transaction in a position to exercise substantial influence over the affairs of the organization, Code §4958(f)(1), and specifically includes directors and certain officers. Regs. §§53.4958-3(c)(1)-(3).

A transaction that would be an excess benefit transaction if the organization engaged in it <u>directly</u> with a disqualified person is likewise an excess benefit transaction

FOUN0006727

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 19

when it is accomplished _indirectly_.  A tax-exempt organization may provide an excess benefit _indirectly_ to a disqualified person through a controlled entity or through an intermediary.  Regs. §53.4958-4(a)(2)(i).

Control by the exempt organization means, in the case of a stock corporation, ownership by vote or value of more than 50% of the stock of the corporation.  Regs. §53.4958-4(a)(2)(ii)(B)(_1_)(_i_).

An intermediary is any person, including a taxable entity, that participates in a transaction with one or more disqualified persons of the exempt organization.  For purposes of Code Section 4958, an economic benefit provided by an intermediary will be treated as provided by the tax-exempt organization when (a) the tax-exempt organization provides an economic benefit to the intermediary; and (b) in connection with the receipt of the benefit by the intermediary (i) there is evidence of an oral or written agreement or understanding that the intermediary will provide an economic benefit to or for the use of the disqualified person or (ii) the intermediary provides an economic benefit to or for the use of the disqualified person without a significant business purpose of its own.  Regs. §53.4958-4(a)(2)(iii).

In _Continental Water Company v. U.S._, 49 A.F.T.R.2d 82-1070 (Ct. Cl. 1982), the Court addressed how to value stock in determining whether the purchase price paid by a disqualified person was an amount that equaled or exceeded the fair market value of the stock sold by a private foundation for purposes of qualifying for an exception to the self-dealing rules.  The Court held, "In the absence of extraordinary circumstances that would affect market reliability, if there is an open and active market, stock exchange quotations on the valuation date are recognized as the best evidence of value." _Id._ at 82-1074.  The Court further provided, "In valuing stock, the prices of publicly traded stock on or near the date of purchase of the stock to be valued are the best reflection of market factors on that date." _Id._ at 82-1077.

Section 53.4958-4(b)(2) of the Regulations provides that the "facts and circumstances to be taken into consideration in determining reasonableness of a fixed payment . . . are those existing on the date the parties enter into the contract pursuant to which the payment is made." Section 53.4958-4(a)(3)(ii)(A) of the Regulations provides the following definition of a "fixed payment":

[A]n amount of cash or other property specified in the contract, or determined by a fixed formula specified in the contract, which is to be paid or transferred in exchange for the provision of specified services or property.  A fixed formula may incorporate an amount that depends upon future specified events or contingencies, provided that no person exercises

QBCH:527128.3

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 20

discretion when calculating the amount of a payment or deciding whether to make a payment (such as a bonus). *Id.*

No other relevant authority has been identified.

## Analysis

I.    State Law

The Articles of Incorporation specifically authorize the Directors to vote in person or by proxy the Company Stock that is part of the assets of the Foundation.

Further, the Articles of Incorporation authorize the Directors to sell the Company Stock to any employee of the Company and/or to any employee benefit or employee retirement plan such as those described as part of the Leveraged ESOP Transactions. In addition, the Directors, in making any decision to sell, should not be guided solely by the best offered price, but by the qualifications of the purchasers and the hope expressed in the Will of Robert R. McCormick that the Company Stock be sold to purchasers who understand and value the ideals and principles which guided him in the management of the Company.

The decision by the Foundation Board to vote its Company Stock to approve the Merger will not violate the applicable standards for prudent investment decisions by the Directors of the Foundation under Illinois law.

The Foundation is organized and operated exclusively for charitable, religious, literary, scientific and educational purposes. *See* Article 4 of the Articles of Incorporation. The Illinois UMIFA applies generally to the governing board of an organization "organized and operated exclusively for educational, religious, charitable or other eleemosynary purposes," and therefore applies to the Foundation Board. 760 Ill. Comp. Stat. Ann. 50/2.03, 2.05 (West 2007). The decision to vote to approve the Merger clearly will not violate the standard for prudent investment decisions under that law.

The Illinois Attorney General may argue that the Illinois Prudent Investor Rule applies to the Foundation. We do not agree because the Foundation is a corporation rather than a trust, but even if it did apply, the decision to vote to approve the Merger also does not violate those higher standards.

The Foundation's Directors have met the applicable standards for making prudent investment decisions under Illinois law by considering all of the circumstances described herein prior to deciding whether to vote to approve the Merger.

QBCHI 527128.3

**FOUN0006729**

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 21

The Advisory Committee retained the Advisors to assist it and engaged in a number of in-person meetings and numerous (generally daily) telephonic meetings, and reviewed various detailed financial analyses, evaluations, and strategies with the Advisors. These consultations considered: (a) the charitable purposes of the Foundation; (b) the Foundation's long- and short-term needs and strategic goals with respect to the Company Stock; (c) liquidity needs of the Foundation; (d) the role of Company Stock in the Foundation's overall investment portfolio; (e) potential transactions being considered by the Company; (f) proposals that the Company received from certain parties with respect to the purchase of all or a portion of the assets of the Company or other restructuring proposals with respect to the Company; (g) tax and other legal matters related to their decisions; and (h) the actions that the Foundation should take in light of the foregoing. In the course of its review and analysis, the Advisory Committee and the Advisors engaged in numerous and lengthy meetings and discussions with: (a) Company management (in a due diligence presentation), legal counsel and investment bankers; (b) special counsel and investment bankers for the Special Committee; (c) other shareholders of the Company, including representatives of the Chandler Trusts, and (d) numerous other third parties who were interested in one or more potential transactions with the Company and/or the Foundation.

The Advisory Committee has secured for the Foundation the Fairness Opinion, the Advisory Research Opinion, the Katten Legal Memorandum, and a draft of this opinion and has carefully considered all of these.

These various actions clearly satisfy both the Illinois UMIFA and the Illinois Prudent Investor Rule standards for investment decisions. Illinois UMIFA requires the Foundation's Directors to "exercise ordinary business care and prudence under the facts and circumstances prevailing at the time of the action or decision." 760 Ill.Comp.Stat.Ann. 50/7 (West 2007). Those facts and circumstances include the Foundation's long- and short-term needs in carrying out its charitable purposes to benefit the public interest and charities generally, as well as its financial requirements, expected total return on its investments, and general economic conditions. Each of these facts and circumstances was exhaustively considered as a part of the Advisory Committee's activities.

Further, the Illinois Prudent Investor Rule requires trustees to "invest and manage trust assets as a prudent investor would, considering the purposes, terms, distribution requirements, and other circumstances of the trust." 760 Ill.Comp.Stat.Ann. 5/5(a)(1)(West 2007). Trustees may consider the role each investment or course of action plays within the overall portfolio." *Id.* at 5/5(a)(6). Again, the Advisory Committee extensively discussed and evaluated those factors as part of its review process. The recommendation of the Advisory Committee is supported by the Fairness Opinion and the Advisory Research Opinion that a vote in favor of the Merger is prudent and in the best interests of the Foundation.

QBCHB\527128.3

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 22

II.    Federal Tax Law

A.    Code Section 501(c)(3):  Private Benefit and Private Inurement

The primary purposes of the Foundation in voting to approve the Merger are:
(1) to sell the remaining shares of Company Stock at the Merger Price, which represents a
fair price to the Foundation and (2) to create liquidity and provide an opportunity for the
Foundation to create greater diversification in its investment portfolio.

The Tribune Related Directors, as a result of the Merger, would become eligible
to receive distributions under certain Benefits Plans as heretofore described.  *See* the
Katten Legal Memorandum.  Any distribution under the Benefits Plans that the Tribune
Related Directors may receive in connection with the completion of the Merger would be
in the discretion of the Tribune Board or Compensation Committee of the Tribune Board
and not the Foundation Board.  *See* the Katten Legal Memorandum.

Any benefit received by the Foundation's Directors, including in their capacity as
Tribune Related Directors and Company shareholders, is purely incidental and tenuous to
the Merger and therefore should not give rise to a finding that the Merger results in any
private inurement.

B.    Code Section 4958:  Excess Benefit Transactions

The Foundation reasonably expects to be classified as a public charity at the time
it exercises its vote to approve the Merger and therefore the Foundation will be subject to
the Code Section 4958 rules governing excess benefit transactions.  Voting to approve the
Merger, however, would not constitute an excess benefit transaction.

Voting to approve the Merger would not constitute an excess benefit transaction
both because the terms of the Merger and the Merger Price are fair to the Foundation, *see*
the Fairness Opinion, and because the Foundation has not conferred any benefits on any
of its disqualified persons.  The Merger Price will reflect the fair market value of the
Company Stock, determined based on the facts and circumstances available as of the date
of the approval of the Merger.  The Foundation, as a 10% shareholder of the Company,
does not control the approval of the Merger, which depends on the collective action of the
shareholders of the Company holding more than 50% of the Company Stock voting in
favor of the Merger.

Any and all benefits accruing to the Foundation as a result of the approval of the
Merger are benefits that protect or enhance the Foundation's existing financial stability.
By virtue of the Foundation's approving the Merger, the shares of Company Stock owned

QBCHI:527128.3

FOUN0006731

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 23

by the Foundation will be purchased at the Merger Price, which will increase the overall liquidity and diversification of the Foundation's investment portfolio, thereby limiting the Foundation's level of risk. *See* the Fairness Opinion and the Advisory Research Opinion.

Any benefit received by the Foundation's Directors, including in their capacity as officers of the Company, as a director of the Company, or as Company shareholders, as the case may be, is purely incidental to the Merger and is not provided either directly or indirectly by the Foundation, and therefore the Merger would not constitute an excess benefit transaction. Further, as a result of the Merger, Tribune Related Directors may be awarded certain Benefits by the Company. Accordingly, one might assert that, by reason of the Merger, the Benefits are to be paid to the Company management, including Tribune Related Directors. Thus, an excess benefit arguably might be provided to such Directors, either by reason of control by the Foundation of the Company or because an economic benefit is provided by the Foundation to the Company as an intermediary, which provided for payment to the Tribune Related Directors of the Company. *See* the Katten Legal Memorandum.

The Foundation, as a 10% shareholder, does not control the Company, so there cannot be an indirect benefit paid by a controlled entity. In addition, no payment through an intermediary is being made as the Foundation is receiving fair value for the Shares as a result of the Merger. *See* Fairness Opinion. Further, the Company adopted various Benefits Plans in order to reward employees for their involvement in consideration of various restructuring alternatives prior to the negotiations of the Merger or the other restructuring alternatives. The Transitional Compensation Benefits provide economic protection for the officers, encourage their support for the Merger, and provide economic incentives to continue to operate the Company in an effective and profitable manner. Thus, the Company had a significant business purpose in adopting each of the Benefits Plans, negating any potential excess benefit transaction. *See* the Katten Legal Memorandum. In addition, they are not the result of any prearrangements between the Company and the Foundation. Any Benefits the Tribune Related Directors may receive in connection with the completion of the Merger would be in the discretion of the Tribune Board and not the Foundation Board. The Benefits were recommended or approved by a special committee of the Company Board (and none of the Tribune Related Directors served on that committee). *See* the Katten Legal Memorandum. Further, any such Benefits which could be received by the Tribune Related Directors in connection with the completion of the Merger were adopted without any regard given to whether the Foundation was or was not involved or by reason of any consideration provided by the Foundation. *See* the Katten Legal Memorandum. Importantly, the Equity Based Awards and the Transactional Compensation Benefits were in place prior to the strategic review by the Company Board and were also recommended or approved by

FOUN0006732

Board of Directors
Robert R. McCormick Tribune Foundation
August 17, 2007
Page 24

an independent committee of the Company Board which does not include any members of the Foundation Board of Directors. *See* the Katten Legal Memorandum.

### Opinion

This opinion is intended to comply in all material respects with the American Bar Association Committee's Revised Formal Opinion No. 346 and United States Treasury Department Circular 230. It should be noted that this opinion is not a representation or guarantee of any tax or other results, and has no binding effect or official status of any kind. Rather, it represents our views as to the interpretation of existing law. No assurance can be given that the conclusions reached in this opinion would be sustained by a court if contested by the Service or any other party.

Based upon the foregoing and subject to the qualifications and limitations contained herein, and based on the facts and review of documents and information described above, it is our opinion: (1) that the proposed decision of the Foundation Board to vote the Foundation's Company Stock to approve the Merger will be in compliance with the applicable standards for prudent investment decisions by the Directors of the Foundation under Illinois state law, and (2) that the Merger will not jeopardize the Foundation's tax-exempt status under Code Section 501(a) as an organization described in Code Section 501(c)(3) or cause the Foundation or its foundation managers to incur any excise tax under Code Section 4958.

To comply with Section 10.35(e)(3) of Circular 230, we state that (a) this opinion is limited to the Federal tax issues addressed in the opinion, (b) additional issues may exist that could affect the Federal tax treatment of the matter that is the subject of this opinion and this opinion does not consider or provide a conclusion with respect to any additional issues, and (c) with respect to any significant Federal tax issues outside the limited scope of this opinion, this opinion was not written, and cannot be used, for the purpose of avoiding penalties that may be imposed.

This letter is limited solely to the Illinois state laws, to the federal income tax laws, and to the matters expressly stated herein, and no opinion is implied or may be inferred beyond the matters expressly stated or as of another date. This opinion is given as of the date hereof, and we assume no obligation to update or supplement it in response to subsequent changes in the law or future events affecting the matters considered herein. This opinion is intended solely for the addressee hereof.

Very truly yours,

QUARLES & BRADY LLP

QBCHI\5.27128\3