Morningstar® Document Research℠

# FORM 10-K/A

## TIMES MIRROR CO /NEW/ - TMC

**Filed: March 30, 2000 (period: December 31, 1999)**

Amendment to a previously filed 10-K

1

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-K/A
ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934
FOR FISCAL YEAR ENDED DECEMBER 31, 1999         COMMISSION FILE NUMBER 1-13492
------------------------

THE TIMES MIRROR COMPANY
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

DELAWARE                                95-4481525
(STATE OR OTHER JURISDICTION OF         (I.R.S. EMPLOYER
INCORPORATION OR ORGANIZATION)          IDENTIFICATION NO.)
TIMES MIRROR SQUARE
LOS ANGELES, CALIFORNIA                 90053
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES)    (ZIP CODE)

REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (213) 237-3700
------------------------

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
| --- | --- |
| Series A Common Stock | New York Stock Exchange and Pacific Stock Exchange |
| Premium Equity Participating Securities | New York Stock Exchange |

------------------------

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:
Series C Common Stock
(TITLE OF CLASS)

------------------------

    Indicate by check mark whether the Registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
Registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days.  Yes [X]  No [ ]

    Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained, to the
best of Registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K.  [ ]

    The aggregate market value of the voting stock of the Registrant held by
non-affiliates of the Registrant on March 13, 2000 was approximately $2.9
billion. (For purposes of this calculation, the market value of a share of
Series C Common Stock was assumed to be the same as a share of Series A Common
Stock, into which it is convertible.)

    Number of shares of Series A Common Stock outstanding at March 13, 2000:
40,471,127, excluding 18,237,864 shares held by subsidiaries of the Registrant;
4,001,067 common shares held by TMCT, LLC, representing 80% of the common shares
held by TMCT, LLC; 12,432,973 shares held by TMCT II, LLC, representing 80% of
the shares held by TMCT II, LLC; 16,230,026 shares held by Eagle New Media
Investments, LLC and 2,589,077 shares held as treasury shares.

    Number of shares of Series C Common Stock outstanding at March 13, 2000:
18,196,797.

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

EXPLANATORY NOTE

This Form 10-K/A is being filed to amend the Annual Report on Form 10-K ("Form 10-K") of The Times Mirror Company to include the information required by Part III of that form. The Form 10-K has not been amended in any other respect except for certain minor conforming changes.

PART I

ITEM 1. BUSINESS.

GENERAL

The Times Mirror Company ("Times Mirror" or the "Company") is engaged principally in the newspaper publishing, professional information and magazine publishing businesses. The Company publishes the Los Angeles Times, Newsday, The Baltimore Sun, The Hartford Courant, The Morning Call, The (Stamford) Advocate, Greenwich Time and several smaller newspapers. The Company also provides information to the aviation market and publishes magazines.

During 1999, Times Mirror engaged in several strategic transactions including the acquisition by an investment affiliate of Newport Media, Inc., a publisher of shopper publications in the New York and New Jersey areas, ValuMail, Inc., a shared mail company that distributes preprinted advertising in Connecticut and Massachusetts, and Airspace Safety Analysis Corporation, a provider of airspace utilization and Federal Aviation Administration compliance services for the telecommunications and aviation industries. In addition, during 1999, the Company acquired New Mass. Media, Inc., a publisher of five weekly alternative newspapers in Connecticut, Massachusetts and New York, and sold Hollywood Online, Inc. and Apartment Search, Inc.

In September 1999, Times Mirror, its affiliates and its largest stockholders, the Chandler Trusts, completed a transaction that, for financial reporting purposes, reduced Times Mirror's outstanding common stock by 12.4 million shares and reduced Times Mirror's then outstanding Series C Preferred Stock by 501,000 shares. In September 1999, Times Mirror also decided to sell AchieveGlobal, Inc., its professional training company, Allen Communication, a division of AchieveGlobal that develops and markets interactive software and training courseware, The StayWell Company, a health improvement company, and The Sporting News, a national sports weekly. In February 2000, Gilat Communications Ltd. acquired Allen Communication, Vulcan Ventures Inc. agreed to acquire The Sporting News and MediMedia USA, Inc., a subsidiary of Havas MediMedia S.A., agreed to acquire The StayWell Company.

In the fourth quarter of 1999, Times Mirror formed a new Internet unit, Times Mirror interactive, focused on growing the Company's existing online franchises and developing new businesses that leverage existing capabilities. The Company continued to have an active share purchase program with a total of 3.2 million shares of Series A Common Stock acquired by the Company or its affiliates during 1999, not including shares effectively retired in the transaction with the Chandler Trusts. This more than offset the 2.0 million shares of Series A Common Stock issued as a result of the exercise of stock options.

On March 13, 2000, Times Mirror and Tribune Company (Tribune) signed a definitive agreement for the merger of the two companies in a cash and stock transaction valued at approximately $8 billion based on the closing price of Tribune common stock on March 10, 2000. Under the terms of this agreement, Tribune will make a cash tender offer for up to 28 million shares of the Company's common stock, which represents approximately 48% of the shares of common stock outstanding as of March 13, 2000, at a price of $95 per share. Following completion of the tender offer, Times Mirror and Tribune will merge in a transaction in which each share of Times Mirror common stock is converted into 2.5 shares of Tribune common stock. In addition, if fewer than 28 million Times Mirror common shares are purchased in the tender offer, Times Mirror shareholders will be permitted to elect cash, at a price of $95 per share, in the merger, up to the balance of the 28 million shares. The merger is subject to the approval of the shareholders of both companies and other customary conditions, including regulatory approvals. Times Mirror expects the tender offer to be completed in mid-April and the merger to be completed in the second or third quarter of 2000.

1

Powered by Morningstar® Document Research℠

NEWSPAPER PUBLISHING SEGMENT

Times Mirror publishes the Los Angeles Times, Newsday, The Baltimore Sun, The Hartford Courant, The Morning Call, The (Stamford) Advocate, Greenwich Time and several other daily and weekly newspapers. Local management operates each daily newspaper substantially independently in order to most effectively meet the needs of the area each newspaper serves. Editorial policies are also established by local management. The Company continues to move toward centralizing the back-office operations of its eastern newspapers and certain of its other business units. Each daily newspaper is a member of Associated Press. The Los Angeles Times and Newsday also subscribe to other supplementary news services. Production of Times Mirror's newspapers is performed on presses owned by Times Mirror.

LOS ANGELES TIMES

The Los Angeles Times has been published continuously since 1881 and, in 1999, won a Pulitzer Prize for beat reporting. It is published every morning and, for the six-month period ended September 30, 1999, as reported by the Company to the Audit Bureau of Circulations, ranked as the largest metropolitan newspaper in the United States in circulation. In 1999, its annual average unaudited circulation was 1,106,749 for Monday through Friday, 1,000,140 for Saturday and 1,381,422 for Sunday, compared with 1,097,079, 1,017,398 and 1,385,145, respectively, in 1998. Approximately 71%, 76% and 77% of the Monday through Friday, Saturday and Sunday circulation, respectively, was home-delivered in 1999, compared with 75%, 79% and 78% of the circulation, respectively, in 1998.

In 1999, the Los Angeles Times recorded full-run billed advertising volume of 3,387,845 standard advertising unit inches (hereinafter "inches"), part-run volume of 6,333,733 inches, and preprinted inserts of 1,156.0 million pieces, compared with 3,212,104 inches, 5,362,693 inches and 1,169.3 million pieces, respectively, in 1998. In addition, the Los Angeles Times derived revenue from advertising supplements distributed to non-subscribers equivalent to 1,469.2 million pieces in 1999, compared with 1,138.5 million pieces in 1998.

In addition to the daily edition covering the Los Angeles metropolitan area, the Los Angeles Times publishes daily Orange County, San Fernando Valley and Ventura County editions. The Los Angeles Times also publishes a daily national edition that is distributed primarily in Northern California, New York and Washington, D.C. In an effort to provide targeted local news coverage, the Los Angeles Times inserts daily and semi-weekly community newspapers published by Times Community Newspapers. In 1999, the Los Angeles Times also inserted 12 daily and weekly community news sections under the banner Our Times. In 1999, the Los Angeles Times also established joint distribution agreements with La Opinion, the largest Spanish-language daily newspaper in Southern California, in which the Company owns a 50% equity interest, and other local native-language newspapers. Through E Z Buy & E Z Sell Recycler Corporation, Times Mirror publishes a collection of 19 alternative classified papers in Southern California including titles such as the Recycler, AutoBuys, CycleBuys and the Renter.

In conjunction with the Washington Post, the Los Angeles Times operates a supplementary news service sold to newspapers in the United States and foreign countries. The Los Angeles Times also syndicates material to other newspapers throughout the world.

Net revenues for the Los Angeles Times, including California Community News Corporation and E Z Buy & E Z Sell Recycler Corporation, were $1,205,665,000 in 1999, $1,137,521,000 in 1998 and $1,088,822,000 in 1997, representing 39.8%, 40.9%, and 41.2% of the Company's consolidated revenues from continuing operations for such years.

NEWSDAY

Newsday, which is published seven days a week, circulates primarily in Nassau and Suffolk counties on Long Island, New York and the borough of Queens in New York City. In 1999, Newsday ranked as the sixth largest metropolitan daily newspaper in the country for Monday through Friday circulation, and as the eleventh largest for Sunday circulation. In 1999, Newsday's annual average unaudited circulation was 568,697

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

for Monday through Friday, 450,451 for Saturday, and 663,534 for Sunday, compared with 567,227, 459,732 and 658,351, respectively, in 1998. Newsday also publishes Distinction, a bi-monthly magazine designed to serve Long Island's upscale community, which is supported by advertising revenues and paid subscriptions. In addition, Newsday's affiliated alternate distribution company, DSA Community Publishing, operates This Week, a free distribution shopper with 80 editions, Newport Media, a publisher of 135 pennysaver editions, and Hoy, a Spanish-language daily newspaper for the New York metropolitan area. Newsday has won sixteen Pulitzer Prizes.

In 1999, Newsday recorded full-run billed advertising volume of 1,739,541 inches, part-run volume of 1,650,799 inches, and preprinted inserts of 863.3 million pieces, compared with 1,644,283 inches, 1,495,782 inches, and 796.5 million pieces, respectively, in 1998. In addition, Newsday, together with DSA Community Publishing, derived revenue from advertising supplements distributed to non-subscribers equivalent to 1,122.3 million pieces in 1999, compared with 1,197.2 million pieces in 1998.

THE BALTIMORE SUN

The Baltimore Sun primarily serves the Baltimore-Annapolis metropolitan area, including Anne Arundel, Baltimore, Carroll, Harford and Howard counties. The Baltimore Sun publishes a morning newspaper seven days a week. In 1999, The Sun had an annual average unaudited circulation of 319,256 for Monday through Saturday, compared with 320,138 for 1998. Annual average unaudited circulation for Sunday was 479,090 in 1999 compared with 475,644 in 1998.

In 1999, The Baltimore Sun newspapers recorded full-run billed advertising volume of 2,001,999 inches, part-run volume of 505,163 inches, and preprinted inserts of 667.0 million pieces, compared with 1,761,972 inches, 456,434 inches and 671.9 million pieces, respectively, in 1998. In addition, The Baltimore Sun newspapers derived revenues from advertising supplements delivered to non-subscribers equivalent to 147.3 million pieces in 1999, compared with 110.9 million pieces in 1998.

The Baltimore Sun also publishes a variety of weekly newspapers throughout Anne Arundel, Baltimore, Carroll, Harford and Howard counties.

THE HARTFORD COURANT

The Hartford Courant, a morning daily and Sunday newspaper that was first published in 1764, is the oldest continuously published newspaper in the United States. It is published in Hartford, Connecticut, and serves the state's northern and central regions. The Hartford Courant publishes 12 regional editions on a daily basis, which provide local news and advertising. In 1999, the annual average unaudited circulation was 210,084 for Monday through Saturday, and 298,510 for Sunday, compared with 212,606 and 302,493, respectively, in 1998.

In 1999, The Hartford Courant recorded full-run billed advertising volume of 1,423,862 inches, part-run volume of 591,946 inches, and preprinted inserts of 456.4 million pieces, compared with 1,435,662 inches, 610,391 inches and 446.2 million pieces, respectively, in 1998. In addition, The Hartford Courant derived revenues from advertising supplements distributed to non-subscribers equivalent to 84.3 million pieces in 1999, compared with 80.5 million pieces in 1998.

In 1999, The Hartford Courant won a Pulitzer Price for breaking news reporting. In addition, in 1999, The Hartford Courant acquired New Mass. Media, Inc., a publisher of five weekly alternative newspapers in Connecticut, Massachusetts and New York, and an investment affiliate of the Company acquired ValuMail, Inc., a shared mail company that distributes advertising supplements to households in Connecticut, Massachusetts and Rhode Island.

THE MORNING CALL

The Morning Call in Allentown, Pennsylvania, is published daily and primarily services Lehigh and Northampton counties in eastern Pennsylvania. In 1999, annual average unaudited circulation was 125,498 for Monday through Friday, 140,114 for Saturday, and 171,030 for Sunday, compared with 127,561, 142,182 and 175,722, respectively, in 1998.

3

In 1999, The Morning Call recorded full-run billed advertising volume of 1,291,892 inches, part-run volume of 379,782 inches, and preprinted inserts of 281.9 million pieces, compared with 1,410,190 inches, 254,436 inches and 264.2 million pieces, respectively, in 1998. In addition, The Morning Call derived revenues from advertising supplements distributed to non-subscribers equivalent to 21.8 million pieces in 1999, compared with 19.4 million pieces in 1998.

THE (STAMFORD) ADVOCATE AND GREENWICH TIME

The (Stamford) Advocate and Greenwich Time are published every morning and serve the southern part of Fairfield County, Connecticut. The Advocate circulates primarily in Stamford, Connecticut and Greenwich Time circulates in Greenwich, Connecticut. In 1999, The Advocate had an annual average unaudited circulation of 28,002 for Monday through Saturday and 37,233 for Sunday, compared with 28,003 and 38,604, respectively, in 1998. In 1999, Greenwich Time had an annual average unaudited circulation of 12,416 for Monday through Saturday and 13,866 for Sunday, compared with 12,625 and 14,071, respectively, in 1998.

In 1999, The Advocate recorded full-run billed advertising volume of 799,047 inches, and preprinted inserts of 41.8 million pieces, compared with 801,666 inches and 43.5 million pieces, respectively, in 1998. In 1999, Greenwich Time recorded full-run billed advertising volume of 808,609 inches and preprinted inserts of 13.9 million pieces, compared with 801,636 inches and 14.5 million pieces, respectively, in 1998. In addition, the newspapers derived revenues from advertising supplements distributed to non-subscribers equivalent to 22.0 million pieces in 1999, compared with 23.0 million pieces in 1998.

ELECTRONIC PUBLISHING

Times Mirror's newspapers offer numerous Web sites. The Los Angeles Times operates the Web site latimes.com, a leading online news and advertising service. Newsday (newsday.com), The Hartford Courant (ctnow.com), The Baltimore Sun (sunspot.net) and The Morning Call (mcall.com) each maintain Web sites that provide news and other information on a daily basis. The Advocate and Greenwich Time maintain an arts and entertainment Web site, goodtogo.com. During 1999, Times Mirror continued to support CareerPath.com, a national employment online service with an extensive listing of jobs on the Internet, and Classified Ventures, a company that seeks to use the Internet to expand the founding companies' positions as leading suppliers of classified advertising. Classified Ventures operates business units in the apartment (apartments.com), auto (cars.com), new home (newhomenetwork.com) and resale real estate (homehunter.com) categories. In addition to Times Mirror, the companies participating in Classified Ventures include Central Newspapers, Inc., Gannett Co., Inc., Knight-Ridder, Inc., The McClatchy Company, The New York Times Company, Tribune Company and The Washington Post Company. The Los Angeles Times, through Recycler, also provides extensive alternative classified listings on recycler.com.

In the fourth quarter of 1999, Times Mirror formed Times Mirror interactive, a new business unit focused on growing and improving existing online initiatives and building new Internet business.

COMPETITION

The Company's newspapers compete for advertising and readership with other metropolitan, suburban and national newspapers as well as with other local and national sales promotion media such as radio, broadcast television, cable television, magazines, direct mail and the Internet. Competition for advertising is based upon, among other factors, the number of, and the demographics of, subscribers, readers or viewers, as the case may be, price, service and advertiser results. Competition for circulation is based upon, among other factors, the content of the medium, service and price.

In its primary circulation areas of Los Angeles, Orange, Ventura, San Bernardino and Riverside counties, the Los Angeles Times competes for advertising and circulation with 17 local daily newspapers, with the largest having approximately 360,000 total average daily circulation, and three daily regional editions of national newspapers. In addition, there are also several hundred weekly, semiweekly and free distribution newspapers in the distribution area. Newsday competes with three major metropolitan newspapers and several daily regional editions of national newspapers. In addition, there are numerous daily, weekly, semiweekly local

4

newspapers and free distribution newspapers in its distribution area. The Baltimore Sun competes with the Washington Post in Anne Arundel and Howard counties, with The Annapolis Capital in Anne Arundel County and with The Carroll County Times in Carroll County, as well as with daily regional editions of national newspapers. In addition, there are other daily and weekly local newspapers in its distribution area. The Hartford Courant competes with a number of daily newspapers, especially in metropolitan areas on the periphery of its trade area, as well as daily regional editions of national newspapers. In addition, there are other weekly and local daily newspapers in its distribution area. The Morning Call competes with a few smaller daily and weekly newspapers, with its principal competitor being the Express Times in Easton, Pennsylvania. Both The Advocate and Greenwich Time compete with a number of larger daily newspapers which serve the New York City metropolitan area and outlying regions.

In their respective primary markets, the Company's newspapers generally also compete for advertising and readership with hundreds of national magazines, dozens of radio, broadcast and cable television stations, at least several local magazines and numerous Internet content providers. The Company's newspapers generally also compete for advertising with numerous direct mail distributors, free-distribution shopping guides and outdoor billboard displays and Internet advertising vehicles.

RAW MATERIALS

The primary raw material used by the newspapers is newsprint. Times Mirror centrally purchases newsprint for all of its newspapers in order to achieve advantageous terms from its vendors. Newsprint for all Times Mirror newspapers is obtained from United States, Canadian and overseas sources unaffiliated with Times Mirror. Times Mirror believes that it has adequate newsprint available through its various suppliers and that it is not dependent on any one supplier. Times Mirror's newsprint expense for 1999 decreased by 6.3% from 1998.

REVENUES AND SEASONALITY

The Company's newspaper revenues are derived primarily from advertising and circulation. In 1999, the percentage of revenues attributable to advertising, circulation and other items were 80.7%, 17.1% and 2.2%, respectively. Advertising rates and revenues vary among the Company's newspapers depending on, among other things, circulation, type of advertising, local market conditions, time of publication and competition.

Quarterly revenues of the Company's Newspaper Publishing segment vary slightly due to industry seasonality, with first and third quarters' results generally being minimally lower than those of the second and fourth quarters. In 1999, the quarterly revenues expressed as a percentage of total annual revenues for the Company's Newspaper Publishing segment were 22.8% for the first quarter, 25.2% for the second quarter, 24.1% for the third quarter and 27.9% for the fourth quarter.

PROFESSIONAL INFORMATION SEGMENT

Times Mirror publishes aeronautical charts, flight information and related information worldwide. In September 1999, Times Mirror decided to sell AchieveGlobal, Allen Communication and StayWell. In February 2000, Gilat Communications Ltd. acquired Allen Communication and MediMedia USA, Inc., a subsidiary of Havas MediMedia S.A., agreed to acquire StayWell. The results of AchieveGlobal, Allen Communication and StayWell are included in discontinued operations for all periods presented.

JEPPESEN

Through Jeppesen Sanderson, Inc. and its European sister company, Jeppesen & Co. GmbH, Times Mirror publishes aeronautical charts, flight information, pilot training materials and other navigational and operational information worldwide. Jeppesen DataPlan, Inc., a subsidiary of Jeppesen Sanderson, also provides computerized flight plans, weather information and other flight services. Jeppesen Sanderson offers a service called OnSight, a sophisticated operations control workstation combining its flight planning, weather and flight tracking display software. Jeppesen also delivers electronic aircraft maintenance information to air carriers. The Jeppesen companies serve all U.S. domestic airlines and the majority of airlines worldwide.

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000        Powered by Morningstar® Document Research℠

During 1999, an investment affiliate of the Company acquired Airspace Safety Analysis Corporation, a provider of airspace utilization and Federal Aviation Administration compliance services for the telecommunications and aviation industries.

The Jeppesen companies compete with various airline consortiums and governmental entities, as well as numerous vendors of training, maintenance, weather and flight planning information.

MAGAZINE PUBLISHING SEGMENT

Times Mirror publishes a number of special interest and trade magazines through its subsidiary, Times Mirror Magazines, Inc. The approximate six-month average paid circulation figures per issue for the magazines for 1999 were 1,550,000 for Popular Science (a consumer-oriented magazine about science and related issues); 1,750,000 for Field & Stream (a magazine about fishing and outdoor recreation); 1,350,000 for Outdoor Life (a magazine about hunting and outdoor recreation that is published 10 times a year); 200,000 for Outdoor Explorer (a magazine about accessible outdoor activities that is published 3 times a year); 950,000 for Today's Homeowner (a magazine for homeowners about all aspects of maintaining and improving a home that is published 10 times a year); 1,400,000 for GOLF Magazine (a magazine for golf enthusiasts); 240,000 for Senior Golfer (a magazine for mature golf enthusiasts that is published 10 times a year); 425,000 for Ski Magazine (a magazine about skiing targeted at families that is published 8 times a year); 400,000 for Skiing (a magazine about skiing targeted at younger skiers that is published 7 times a year); 112,300 for TransWorld SNOWboarding (a magazine about snowboarding targeted at the 15 to 18 year old market that is published 8 times a year); 112,000 for TransWorld SKATEboarding (a magazine about skateboarding targeted at the 15 to 18 year old market that is published 12 times a year with 2 special editions); 40,000 for Warp (a magazine about skateboarding, snowboarding and music targeted at the 15 to 18 year old market that is published 6 times a year); 35,000 for Snap (a magazine about competitive racing for bike motor-cross that is published 11 times a year); 48,000 for Ride BMX (a magazine about tricks and stunts for bike motor-cross that is published 9 times a year); 25,000 for TransWorld SURF (a youth oriented magazine about surfing aggressively that is published 7 times a year); 65,000 for Snowboard Life (a magazine about snowboarding targeted at the 19 to 25 year old market that is published 6 times a year); 133,000 for Yachting (a magazine about yachting and boating); and 150,000 for Salt Water Sportsman (a magazine about salt-water fishing). Each of these magazines is published monthly unless otherwise noted.

In addition, Times Mirror Magazines publishes The Sporting News, a national sports weekly that Times Mirror has agreed to sell to Vulcan Ventures Inc. The approximate six-month average paid circulation figure per issue for The Sporting News in 1999 was 540,000. Times Mirror Magazines also publishes Skiing Trade News, TransWorld SNOWboarding Business, TransWorld SKATEboarding Business, BMX Business News and Surf Business, controlled-circulation business magazines, and other related publications. These magazines are primarily intended for specialized markets.

In addition to print media, Times Mirror magazines offers the following Web sites that are affiliated with its titles: GOLFOnline; TSNOnline; fieldandstream/outdoor life online; outdoor explorer online; todayshomeowner online; saltwatersportsman online; yachtingnet; popsci.com; skinet; snowboarding online; skateboarding online; transworldsurf.com and freeze online.

The primary raw material used by Times Mirror Magazines is coated paper. For 1999, the prices for the grades of papers used by the Company's magazines decreased moderately. In 1999, Times Mirror Magazines centrally purchased coated paper for all of its magazines to obtain more favorable terms and reduced inventory levels due to the improved availability of coated paper. The Company believes that it has adequate coated paper available through its various suppliers and that it is not dependent on any one supplier.

Times Mirror Magazines competes nationally with numerous special interest and trade magazines and related Web sites. In addition to competing with similar national media, Times Mirror Magazines must also compete for advertising revenues with other local and national sales promotion media such as radio, newspapers, broadcast television, direct mail and the Internet. Competition for advertising is based upon, among other factors, the number of, and the demographics of, subscribers, readers or viewers, as the case may

6

Powered by Morningstar® Document Research℠

be, price, service and advertiser results. Competition for circulation is based upon, among other factors, the content of the medium, service and price.

As the Company's magazines are distributed nationally, they generally compete with hundreds of radio stations, cable and broadcast television stations, direct mailers and numerous competitors on the Internet. The Company's magazines also compete with other magazines that contain similar content. Popular Science competes with approximately 18 other magazine titles, Field & Stream with approximately 18 titles, Outdoor Life and Outdoor Explorer with approximately 8 titles, Today's Homeowner with approximately 15 titles, GOLF Magazine and Senior Golfer with approximately 6 titles, Ski Magazine and Skiing with approximately 3 titles, TransWorld SNOWboarding, TransWorld SKATEboarding, TransWorld SURF and Snowboard Life with approximately 19 titles, Snap and Ride BMX with approximately 6 titles, Yachting with approximately 25 titles, Salt Water Sportsman with approximately 12 titles and The Sporting News with approximately 12 titles.

The Company's magazine operating revenues are derived primarily from advertising and subscriptions. In 1999, the percentage of revenues attributable to advertising, subscriptions and other items were 66.7%, 27.0% and 6.3%, respectively. Advertising rates and revenues vary among the Company's magazines depending on, among other things, circulation, type of advertising, time of publication and competition.

INTELLECTUAL PROPERTY

In recognition of the fact that intellectual property (e.g., trademarks, copyrights, licenses and the like) is an important asset, the Company has dedicated internal resources to protect its intellectual property and develop these rights. The Company expects that these resources will support its ongoing efforts to grow its businesses internally, especially in the realm of electronic and online publishing activities.

EMPLOYEES

At December 31, 1999, the Company and its consolidated affiliates had 20,229 employees, 14,726 of whom were full-time employees. Approximately 3,592 employees were represented by collective bargaining agents. The Company believes that employee relations are good. Employees receive supplemental benefits ranging from various forms of group insurance coverage to retirement income programs.

ADDITIONAL INFORMATION

Prior to February 1, 1995, the Company also engaged in the ownership and operation of cable television systems, which business was divested by the merger of the Company's corporate predecessor ("Old Times Mirror") with and into Cox Communications, Inc. ("Cox"), resulting in the acquisition of Old Times Mirror's cable business by Cox (the "Cox Merger"). The Company was incorporated in the State of Delaware in June 1994 for the purpose of owning and operating Times Mirror's publishing and information businesses after the Cox Merger was completed on February 1, 1995. Old Times Mirror was incorporated in 1884 in the State of California and was reincorporated in the State of Delaware in 1986. All references to "Times Mirror" shall include the Company and the Company's subsidiaries, collectively, unless the context suggests otherwise.

See Selected Financial Data -- Five-Year Summary of Business Segment Information and the Consolidated Financial Statements and notes thereto for financial information about industry segments.

CERTAIN FACTORS AFFECTING FORWARD-LOOKING STATEMENTS

Certain plans, objectives, projections and other information regarding future performance and outcomes discussed in this Annual Report on Form 10-K are forward-looking statements that are subject to risks and uncertainties. There can be no assurances that these future results will be achieved. Readers are cautioned that the achievement of such expectations, and other aspects of the Company's performance, could be adversely affected by a number of factors, including: (a) an increase in paper, printing and distribution costs over the levels anticipated; (b) increased consolidation among major retailers or other events depressing the level of display advertising; (c) an economic downturn in the Company's principal newspaper markets or other

7

Powered by Morningstar® Document Research℠

occurrences leading to decreased circulation and diminished revenues from both display and classified advertising; (d) an increase in the use of alternate media such as the Internet for classified and other advertising; (e) an increase in expenses related to new initiatives and product improvement efforts in the flight information operating unit; (f) unfavorable foreign currency fluctuations; (g) material changes in tax liability due to unfavorable review by taxing authorities; and (h) a general economic downturn resulting in decreased consumer and corporate spending on discretionary items such as magazines or newspapers. It is not possible to foresee or identify all such factors. The Company makes no commitment to update any forward-looking statement or to disclose any facts, events, or circumstances after the date hereof that may affect the accuracy of any forward-looking statement.

ITEM 2. PROPERTIES.

The general character, location, terms of occupancy and approximate size of Times Mirror's principal plants and other materially important physical properties at December 31, 1999 are listed below.

| | APPROXIMATE AREA IN SQUARE FEET | |
|---|---|---|
| GENERAL CHARACTER OF PROPERTY | OWNED | LEASED(1)(2) |
| NEWSPAPER PUBLISHING | | |
| Printing plants, business and editorial offices, garages and warehouse space located in: | | |
| Los Angeles, California........................ | 1,714,724 | 2,150,761 |
| Hartford, Connecticut.......................... | 161,872 | 382,847 |
| Baltimore, Maryland............................ | 10,000 | 1,223,753 |
| Melville, New York............................. | -- | 1,071,107 |
| Other locations............................... | 458,189 | 109,794 |
| PROFESSIONAL INFORMATION | | |
| Business offices and warehouses in California, Colorado, New York and other locations........ | 235,208 | 181,980 |
| MAGAZINE PUBLISHING | | |
| Business and editorial offices in Connecticut, New York, Missouri and other locations............ | -- | 220,393 |
| CORPORATE | | |
| Corporate offices and garages located in California and New York........................ | -- | 500,880 |

---------------

(1) Excludes 337,640 square feet of vacant land, 419,419 square feet of space sublet to unrelated third parties and 19,339 square feet of vacant space which is available for subleasing.

(2) The Company's material lease agreements expire at various dates through 2011. In August 1997, the Company completed a transaction with its largest stockholders, the Chandler Trusts, pursuant to which, among other things, the Company contributed eight real properties with an aggregate market value of $225,850,000, constituting 3,030,000 square feet, to a limited liability company formed by the Company and the Chandler Trusts. The Company is leasing such properties from the limited liability company under a lease with an initial term of 12 years.

ITEM 3. LEGAL PROCEEDINGS.

Times Mirror and its subsidiaries are defendants in actions for various matters arising out of their business operations. In addition, from time to time, Times Mirror and its subsidiaries are involved as parties in various governmental and administrative proceedings. Times Mirror does not believe that any such proceedings currently pending will have a material adverse effect on its business or financial condition.

ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

No matters were submitted to a vote of security holders during the fourth quarter of 1999.

8

Powered by Morningstar® Document Research℠

EXECUTIVE AND KEY OFFICERS OF THE REGISTRANT

The executive and key officers of the Company as of March 8, 2000 are listed below. Executive and key officers are elected to serve until they resign or are removed, or are otherwise disqualified to serve, or until their successors are elected and qualified. Except as indicated below, all such officers were employed by the Company and its predecessor company, Old Times Mirror, for five years or more.

| NAME | AGE | POSITIONS AND OFFICES WITH TIMES MIRROR | OFFICER SINCE(1) |
| ---- | --- | --------------------------------------- | -------- |
| Mark H. Willes......... | 58 | Chairman of the Board, President and Chief Executive Officer | 1995(2) |
| Horst A. Bergmann...... | 61 | Executive Vice President, and Chairman, President and Chief Executive Officer, Jeppesen Sanderson | 1996(3) |
| Kathryn M. Downing..... | 46 | Executive Vice President, and Publisher, President and Chief Executive Officer, Los Angeles Times | 1996(4) |
| Raymond A. Jansen...... | 60 | Executive Vice President, Eastern Newspapers, and Publisher, President and Chief Executive Officer, Newsday | 1996(5) |
| Efrem Zimbalist III.... | 52 | Executive Vice President and Chief Financial Officer, Chairman and Chief Executive Officer, Times Mirror Magazines and Chairman, AchieveGlobal | 1993(6) |
| Roger H. Molvar........ | 44 | Senior Vice President and Controller | 1996(7) |
| James R. Simpson....... | 59 | Senior Vice President, Human Resources | 1983(8) |
| Michael E. Waller...... | 58 | Senior Vice President, and Publisher and Chief Executive Officer, The Baltimore Sun | 1996(9) |
| John S. Carroll........ | 58 | Vice President, and Editor and Senior Vice President, The Baltimore Sun | 1998(10) |
| Janet Clayton.......... | 44 | Vice President, and Editor of the Editorial Pages and Vice President, Los Angeles Times | 1998(11) |
| Jason E. Klein......... | 39 | Vice President, and President and Chief Operating Officer, Times Mirror Magazines | 2000(12) |
| Robert G. Magnuson..... | 48 | Vice President, and Senior Vice President, Regions, Los Angeles Times | 1998(13) |
| Anthony Marro.......... | 58 | Vice President, and Editor and Executive Vice President, Newsday | 1998(14) |
| John C. McKeon......... | 43 | Vice President, and Senior Vice President of Advertising, Los Angeles Times | 1999(15) |
| Nancy W. O'Neill....... | 40 | Vice President, and President and Chief Executive Officer, The StayWell Company | 1999(16) |
| Michael Parks.......... | 56 | Vice President, and Editor and Executive Vice President, Los Angeles Times | 1998(17) |
| Marty Petty............ | 47 | Vice President, and Publisher and Chief Executive Officer, The Hartford Courant | 1998(18) |
| William J. Rowe........ | 64 | Vice President, and Publisher and Chief Executive Officer, The (Stamford) Advocate and Greenwich Time | 1998(19) |
| Hilary A. Schneider.... | 38 | Vice President, and President and Chief Executive Officer, Times Mirror interactive | 1999(20) |
| Edward L. Blood........ | 54 | Vice President, Strategic Planning | 1997(21) |
| Rajender K. Chandhok... | 50 | Vice President and Treasurer | 1999(22) |
| Debra A. Gastler....... | 47 | Vice President, Taxes | 1994(23) |
| Bonnie Guiton Hill..... | 58 | Vice President, and President and Chief Executive Officer, The Times Mirror Foundation and Senior Vice President, Community Relations, Los Angeles Times | 1997(24) |
| Stephen C. Meier....... | 49 | Vice President, Public and Government Affairs, and Corporate Secretary | 1989(25) |
| William A. Niese....... | 63 | Vice President, General Counsel and Assistant Secretary | 1990(26) |

9

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

---------------

(1) The date indicated relates to the year in which such person first became an officer of Old Times Mirror unless the context suggests otherwise.

(2) Mark H. Willes was elected as President and Chief Executive Officer of the Company effective June 1995 and Chairman of the Board effective January 1996. From September 1997 to June 1999, he was Publisher of the Los Angeles Times. Prior to joining the Company, Mr. Willes was an executive of General Mills, Inc. from 1980 to 1995, serving as Vice Chairman upon his departure.

(3) Horst A. Bergmann was elected as an executive officer of the Company effective May 1996. After joining Jeppesen Sanderson in 1963, he was named Flight Information Services Director in 1974 and Managing Director, Jeppesen & Co. GmbH in 1977. In 1987, he was appointed Chairman, President and Chief Executive Officer of Jeppesen Sanderson.

(4) Kathryn M. Downing was elected as an executive officer of the Company effective May 1996. In March 1998, she was named President and Chief Executive Officer of the Los Angeles Times, and, in June 1999, she was named Publisher of the Los Angeles Times. She was named President and Chief Executive Officer of Matthew Bender in 1995. Prior to that time, Ms. Downing was President and Chief Executive Officer of Lawyers Cooperative Publishing, a division of Thomson Legal Publishing, beginning in 1993.

(5) Raymond A. Jansen was elected as an officer of the Company effective May 1996 and as an executive officer effective May 1999. He was named Executive Vice President, Eastern Newspapers, in 1999, and he was named Publisher, President and Chief Executive Officer of Newsday in November 1994. Prior to that time, he was Publisher and Chief Executive Officer of The Hartford Courant since 1990.

(6) Efrem Zimbalist III was elected as an officer of Old Times Mirror effective March 1993 and as an executive officer effective May 1999. He became Chief Financial Officer of the Company in January 2000. From 1995 to 1999, he was President and Chief Executive Officer of Times Mirror Magazines. Mr. Zimbalist was Chairman and Chief Executive Officer of Correia Art Glass, Inc. from 1978 until he joined Old Times Mirror in July 1992.

(7) Roger H. Molvar was elected as an executive officer of the Company effective May 1996. Prior to that time, he served as Senior Vice President and Comptroller of First Interstate Bank of California since 1989.

(8) James R. Simpson was elected as an executive officer of the Company effective January 1995 and had served as an executive officer of Old Times Mirror prior to that time.

(9) Michael E. Waller was elected as an officer of the Company effective May 1996. Mr. Waller was named Publisher and Chief Executive Officer of The Baltimore Sun in May 1996. He previously served as Editor and Vice President of The Hartford Courant since 1990, joining the newspaper in 1986 as Executive Editor and Vice President.

(10) John S. Carroll was elected as an officer of the Company effective July 1998. He has been Editor and Senior Vice President of The Baltimore Sun since 1991.

(11) Janet Clayton was elected as an officer of the Company effective July 1998. She has been Editor of the Editorial Pages of the Los Angeles Times since 1995 and a Vice President of the Los Angeles Times since 1997. From 1990 to 1995, she was Assistant Editor, Editorial Pages, of the Los Angeles Times.

(12) Jason E. Klein was elected as an officer of the Company effective February 2000. He has been President and Chief Operating Officer of Times Mirror Magazines since December 1999. From February 1999 to December 1999, he was Executive Vice President of Times Mirror Magazines and President of Corporate Sales, The Outdoor Company and Today's Homeowner. From 1995 until 1999, he was Senior Vice President of Times Mirror Magazines.

(13) Robert G. Magnuson was elected as an officer of the Company effective July 1998. He has been Senior Vice President, Regional Editions, of the Los Angeles Times since 1997. From 1990 to 1997, he was Vice President of the Los Angeles Times and President of the Orange County Edition of the Los Angeles Times.

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000

Powered by Morningstar® Document Research℠

(14) Anthony Marro was elected as an officer of the Company effective July 1998. He has been Editor of Newsday since 1987.

(15) John C. McKeon was elected as an officer of the Company effective February 1999. He has been Senior Vice President of Advertising of the Los Angeles Times since November 1998. From 1994 to November 1998, he served as Senior Vice President of Advertising and Chief Innovation Officer at Newsday. From 1992 to 1994, he was Vice President of Advertising at Newsday.

(16) Nancy W. O'Neill was elected as an officer of the Company effective February 1999. She has been President and Chief Executive Officer of The StayWell Company, the Company's health improvement unit, since February 1998. From 1997 until February 1998, she was Vice President and General Manger of Mosby Consumer Health. From 1995 to 1997, she held a variety of positions at Times Mirror Magazines. From 1990 to 1994, she served as crisis manager at Argus Management Corporation.

(17) Michael Parks was elected as an officer of the Company in February 1998. He was named editor of the Los Angeles Times in October 1997. Prior to that time, he had been managing editor since 1996 after serving as deputy foreign editor and as a correspondent for the Los Angeles Times.

(18) Marty Petty was elected as an officer of the Company in February 1998. She was named Chief Executive Officer and Publisher, The Hartford Courant, in September 1997. She had previously served as Senior Vice President and General Manager of that paper since 1994. From 1992 to 1994, she was Vice President, Sales and Marketing of The Hartford Courant.

(19) William J. Rowe was elected as an officer of the Company effective July 1998. He has been Publisher and Chief Executive Officer of The (Stamford) Advocate and Greenwich Time since 1986.

(20) Hilary A. Schneider was elected as an officer of the Company effective November 1999. From 1998 to 1999, she was general manager, The Baltimore Sun. Prior to that time, she served in several senior management positions at The Baltimore Sun directing a number of business activities, including sales, marketing, advertising and new business development.

(21) Edward L. Blood was elected as an executive officer of the Company in July 1997. Prior to that time, he was Senior Vice President, Investor Relations and Strategic Planning at Darden Restaurants since 1995. Prior to that time, he had been Vice President, Strategic Planning and Analysis at General Mills.

(22) Rajender K. Chandhok was elected as an executive officer of the Company effective May 1999. From 1998 to May 1999, he was staff Vice President, Investments and Risk Management. From 1997 to 1998, he was Assistant Treasurer, Investments and Risk Management and from 1995 to 1997, he was Assistant Treasurer, Pension and Investments.

(23) Debra A. Gastler was elected as an executive officer of Old Times Mirror effective January 1994. Prior to that time, she had been Vice President, Taxes of Pacific Enterprises since 1990 and Director of Taxes of Pacific Enterprises since 1987.

(24) Bonnie Guiton Hill was elected as an officer of the Company effective January 1997. From 1992 to 1996, she served as dean and professor of commerce at the McIntyre School of Commerce at the University of Virginia.

(25) Stephen C. Meier was elected as an officer of the Company effective January 1995 and served as an officer of Old Times Mirror prior to that time.

(26) William A. Niese was elected as an executive officer of the Company in July 1997. Prior to August 1998, he had been Senior Vice President and General Counsel of the Los Angeles Times since 1990.

11

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000

Powered by Morningstar® Document Research℠

PART II

ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS.

     The Company's Series A Common Stock is traded principally on the New York
Stock Exchange ("NYSE") and is also listed on the Pacific Stock Exchange. Times
Mirror Series C Common Stock is not traded in an established public trading
market but is convertible into Times Mirror Series A Common Stock. At March 8,
2000, there were approximately 3,000 record holders of the Company's Series A
Common Stock and approximately 1,100 record holders of Series C Common Stock.
The price ranges for the Company's Series A Common Stock and the quarterly cash
dividends declared and paid on all Company Common Stock in 1999 and 1998 are
listed below.

| | STOCK PRICE | | CASH DIVIDEND | |
| | HIGH | LOW | DECLARED | PAID |
|---|---|---|---|---|
| **1999** | | | | |
| First Quarter...................... | $59 15/16 | $53 5/16 | $.20 | $.20 |
| Second Quarter..................... | 63 5/16 | 53 3/8 | .20 | .20 |
| Third Quarter...................... | 66 13/16 | 57 1/4 | .20 | .20 |
| Fourth Quarter..................... | 72 5/8 | 62 15/16 | .20 | .20 |
| **1998** | | | | |
| First Quarter...................... | $64 9/16 | $56 15/16 | $.18 | $.18 |
| Second Quarter..................... | 65 13/16 | 58 1/16 | .18 | .18 |
| Third Quarter...................... | 63 11/16 | 52 5/16 | .18 | .18 |
| Fourth Quarter..................... | 61 7/16 | 48 15/16 | .18 | .18 |

     The payment of future dividends on common stock will depend on future
earnings, capital requirements, financial condition and other factors.

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000        Powered by Morningstar® Document Research℠

ITEM 6. SELECTED FINANCIAL DATA.

     The following selected financial data has been derived from the
consolidated financial statements that have been audited by Ernst & Young LLP,
independent auditors. The information set forth below is not necessarily
indicative of results of future operations, and should be read in conjunction
with "Management's Discussion and Analysis of Financial Condition and Results of
Operations" and the consolidated financial statements and related notes thereto
included elsewhere in this Annual Report on Form 10-K.

     SELECTED CONSOLIDATED FINANCIAL DATA AND OTHER INFORMATION

| (IN THOUSANDS, EXCEPT PER SHARE, FINANCIAL RATIOS AND OTHER) | 1999 | 1998 | 1997 | 1996 | 1995 |
|---|---|---|---|---|---|
| OPERATING RESULTS | | | | | |
| Revenues.................................. | $ 3,029,249 | $ 2,783,988 | $ 2,645,135 | $ 2,551,002 | $ 2,528,673 |
| Restructuring and one-time charges......... | -- | 155,681 | -- | -- | 412,778 |
| Operating profit (loss)................... | 470,506 | 247,798 | 391,278 | 310,685 | (268,208) |
| Net interest income (expense).............. | (56,914) | (28,595) | (33,277) | (13,939) | 6,473 |
| Income (loss) from continuing operations before income taxes...................... | 439,291 | 245,004 | 396,499 | 300,254 | (253,421) |
| Income (loss) from continuing operations... | 259,062 | 134,059 | 234,655 | 182,258 | (209,367) |
| Net income(1)............................. | 259,086 | 1,417,338 | 250,312 | 206,444 | 1,226,751 |
| PER COMMON SHARE | | | | | |
| Basic earnings (loss) from continuing operations............................... | $     3.53 | $     1.32 | $     2.18 | $     1.36 | $    (2.61) |
| Basic earnings............................ | 3.53 | 16.46 | 2.35 | 1.59 | 10.02 |
| Diluted earnings (loss) from continuing operations(2).......................... | 3.38 | 1.29 | 2.12 | 1.32 | (2.61) |
| Diluted earnings.......................... | 3.38 | 16.06 | 2.29 | 1.54 | 10.02 |
| Dividends declared(3)..................... | .80 | .72 | .55 | .30 | .24 |
| Dividends paid............................ | .80 | .72 | .55 | .36 | .45 |
| FINANCIAL DATA | | | | | |
| Current assets(4)(5)(6)................... | $   713,558 | $ 1,543,486 | $   474,833 | $   544,335 | $   745,314 |
| Property, plant and equipment, net........ | 966,095 | 903,483 | 920,995 | 1,080,642 | 1,085,341 |
| Total assets(5)(6)........................ | 3,897,371 | 4,157,929 | 3,171,828 | 3,179,395 | 3,444,641 |
| Long-term debt(6)......................... | 1,562,240 | 941,423 | 925,404 | 459,007 | 247,062 |
| Shareholders' equity(6)................... | 399,729 | 1,342,453 | 875,999 | 1,498,810 | 1,806,236 |
| Capital expenditures(7)................... | 173,484 | 131,548 | 113,081 | 87,326 | 90,819 |
| Operating profit margin(8)................ | 15.5% | 15.2% | 15.5% | 12.2% | 7.5% |
| Total debt as a % of adjusted capitalization(6)...................... | 82.0% | 48.3% | 54.9% | 23.5% | 12.1% |
| Shareholders' equity per common share(9)... | $     4.98 | $    13.45 | $     5.90 | $     9.54 | $    11.64 |
| OTHER | | | | | |
| Adjusted price range of common stock(10)... | $ 72 5/8 to 53 5/16 | $65 13/16 to 48 15/16 | $ 61 3/4 to 46 1/8 | $     56 to 30 5/8 | $ 35 1/4 to 17 1/4 |
| Number of employees at end of year........ | 20,229 | 20,619 | 21,567 | 20,803 | 21,877 |
| Weighted average shares: | | | | | |
| Basic.................................. | 68,252,398 | 84,813,581 | 92,571,618 | 102,113,298 | 113,797,192 |
| Diluted................................ | 73,090,497 | 86,927,815 | 97,013,301 | 105,372,495 | 113,797,192 |
| Common shares outstanding at end of year(11)............................. | 59,738,144 | 73,381,279 | 87,903,444 | 96,729,785 | 105,698,043 |

13

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

---------------
This summary should be read in conjunction with the consolidated financial
statements and notes thereto.

(1) Includes the following after-tax gains (charges) related to discontinued
    operations (in thousands):

|  | 1998 | 1997 | 1996 | 1995 |
| --- | --- | --- | --- | --- |
| Restructuring, one-time and other charges......... | $ (47,206) | $(7,842) | $(30,305) | $ (210,381) |
| Net gain on disposal.............................. | 1,316,686 | -- | 32,047 | 1,634,294 |
|  | $1,269,480 | $(7,842) | $ 1,742 | $1,423,913 |

(2) Includes the $.38 per share impact of the cash paid in excess of
    liquidation value on Series B preferred stock repurchases in 1995.

(3) During 1996, the Company began declaring and paying common stock dividends
    in the same quarter; previously, dividends were declared in the quarter
    prior to payment. As a result, in the third quarter of 1996, no dividends
    were declared in order to change to the new procedure.

(4) Excludes net assets of discontinued operations.

(5) Includes proceeds from reorganization in 1998 as described in Notes 4 and 5
    to the consolidated financial statements.

(6) Includes reduction of $635 million in cash and cash equivalents, $600
    million of debt issuance and an increase of $1 billion of treasury stock in
    connection with the 1999 recapitalization as described in Note 2 to the
    consolidated financial statements.

(7) Excludes capital expenditures related to discontinued operations.

(8) Excludes restructuring, one-time and other charges as follows (in
    thousands): 1998 -- $174,370; 1997 -- $18,000; 1995 -- $458,607.

(9) Based on the common shares outstanding as described in (11) below.

(10) On February 1, 1995, Times Mirror common shareholders received
     distributions having a value of $10.45 per Times Mirror common share. The
     trading prices prior to February 1, 1995 have been adjusted to reflect
     these distributions.

(11) Excludes treasury shares of 52,387,120, 38,707,883 and 24,151,014 at
     December 31, 1999, 1998 and 1997, respectively.

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000      Powered by Morningstar® Document Research℠

FIVE-YEAR SUMMARY OF BUSINESS SEGMENT INFORMATION

| (IN THOUSANDS) | 1999 | 1998 | 1997 | 1996 | 1995 |
|---|---|---|---|---|---|
| **REVENUES** | | | | | |
| Newspaper Publishing....... | $2,514,325 | $2,308,178 | $2,179,244 | $2,074,692 | $2,057,596 |
| Professional Information... | 235,356 | 211,929 | 195,339 | 185,207 | 170,849 |
| Magazine Publishing........ | 278,930 | 262,683 | 248,712 | 234,192 | 242,864 |
| Corporate and Other........ | 638 | 1,198 | 21,845 | 56,938 | 57,928 |
| Intersegment Revenues...... | -- | -- | (5) | (27) | (564) |
| | $3,029,249 | $2,783,988 | $2,645,135 | $2,551,002 | $2,528,673 |
| **OPERATING PROFIT (LOSS)(1)** | | | | | |
| Newspaper Publishing....... | $ 457,067 | $ 297,433 | $ 402,207 | $ 307,512 | $ (109,483) |
| Professional Information... | 64,789 | 43,858 | 55,659 | 55,517 | 55,742 |
| Magazine Publishing........ | 19,184 | (14,232) | 18,309 | 8,753 | (73,904) |
| Corporate and Other........ | (70,534) | (79,261) | (84,897) | (61,097) | (140,563) |
| | $ 470,506 | $ 247,798 | $ 391,278 | $ 310,685 | $ (268,208) |
| **IDENTIFIABLE ASSETS** | | | | | |
| Newspaper Publishing....... | $2,290,708 | $1,999,880 | $1,792,286 | $1,836,158 | $1,840,058 |
| Professional Information... | 125,670 | 96,765 | 87,354 | 85,866 | 77,524 |
| Magazine Publishing........ | 287,268 | 271,457 | 263,521 | 244,254 | 255,358 |
| Corporate and Other........ | 1,020,635 | 1,600,199 | 355,996 | 444,845 | 606,428 |
| Discontinued Operations.... | 173,090 | 189,628 | 672,671 | 568,272 | 665,273 |
| | $3,897,371 | $4,157,929 | $3,171,828 | $3,179,395 | $3,444,641 |
| **DEPRECIATION AND AMORTIZATION** | | | | | |
| Newspaper Publishing....... | $ 125,019 | $ 116,116 | $ 106,919 | $ 104,743 | $ 110,299 |
| Professional Information... | 7,454 | 6,852 | 6,648 | 6,675 | 5,307 |
| Magazine Publishing........ | 8,667 | 7,740 | 7,040 | 6,050 | 8,112 |
| Corporate and Other........ | 3,815 | 4,467 | 3,457 | 2,990 | 2,824 |
| | $ 144,955 | $ 135,175 | $ 124,064 | $ 120,458 | $ 126,542 |
| **CAPITAL EXPENDITURES** | | | | | |
| Newspaper Publishing....... | $ 151,807 | $ 107,479 | $ 78,760 | $ 63,698 | $ 63,014 |
| Professional Information... | 12,437 | 15,825 | 9,535 | 7,790 | 10,568 |
| Magazine Publishing........ | 3,768 | 1,651 | 2,243 | 10,849 | 1,060 |
| Corporate and Other........ | 5,472 | 6,593 | 22,543 | 4,989 | 16,177 |
| | $ 173,484 | $ 131,548 | $ 113,081 | $ 87,326 | $ 90,819 |

--------------

(1) Includes restructuring, one-time and other charges as follows (in
    thousands):

| | 1998 | 1997 | 1995 |
|---|---|---|---|
| Newspaper Publishing................. | $ 116,388 | $ 18,000 | $ 316,216 |
| Professional Information............ | 11,889 | -- | 1,913 |
| Magazine Publishing................. | 29,072 | -- | 71,672 |
| Corporate and Other................. | 17,021 | -- | 68,806 |
| | $ 174,370 | $ 18,000 | $ 458,607 |

The pretax charges in 1998 are comprised of restructuring and one-time
charges of $155,681 and other charges that did not qualify for accounting
classification as restructuring charges of $18,689.

The pretax charges in 1995 are comprised of restructuring and one-time
charges of $412,778 and other charges that did not qualify for accounting
classification as restructuring charges of $45,829.

15

Powered by Morningstar® Document Research℠

ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
        OF OPERATIONS.

OVERVIEW

     The Company's 1999 earnings per share from continuing operations increased
24.7% to $3.23 per share on a diluted basis from $2.59 per share in the prior
year, excluding a 1999 gain on the sale of Hollywood Online and 1998
restructuring, one-time and other charges. Including the gain on the sale and
the restructuring, one-time and other charges, earnings per share for 1999 and
1998 were $3.38 and $1.29 per share, respectively. Earnings per share for 1999
increased primarily as a result of the effective retirement of shares previously
held by the public and the Company's largest shareholders, the Chandler Trusts.
In addition, the Company's business segments each achieved double-digit gains in
operating profit for 1999 compared to the prior year, excluding the 1998
restructuring, one-time and other charges. Revenues rose 8.8% in 1999 compared
to 1998, including the effects of acquisitions, with revenue growth at each of
the Company's business segments.

     On March 13, 2000, Times Mirror and Tribune Company (Tribune) signed a
definitive agreement for the merger of the two companies in a cash and stock
transaction valued at approximately $8 billion based on the closing price of
Tribune common stock on March 10, 2000. Under the terms of this agreement,
Tribune will make a cash tender offer for up to 28 million shares of the
Company's common stock, which represents approximately 48% of the shares of
common stock outstanding as of March 13, 2000, at a price of $95 per share.
Following completion of the tender offer, Times Mirror and Tribune will merge in
a transaction in which each share of Times Mirror common stock is converted into
2.5 shares of Tribune common stock. In addition, if fewer than 28 million Times
Mirror common shares are purchased in the tender offer, Times Mirror
shareholders will be permitted to elect cash, at a price of $95 per share, in
the merger, up to the balance of the 28 million shares. The merger is subject to
the approval of the shareholders of both companies and other customary
conditions, including regulatory approvals. Times Mirror expects the tender
offer to be completed in mid-April and the merger to be completed in the second
or third quarter of 2000.

DISPOSITIONS

     In September 1999, Times Mirror announced its decision to sell
AchieveGlobal, Inc., a professional training company, Allen Communication, an
interactive software and training courseware developer, The StayWell Company, a
health improvement information company, and The Sporting News, a sports
magazine. The accompanying financial statements reflect AchieveGlobal, Allen
Communication and StayWell as discontinued operations for all periods presented.
The proposed sale of The Sporting News does not qualify for discontinued
operations treatment and continues to be reported in the Magazine Publishing
segment. While the Company previously expected to complete the sale of
AchieveGlobal in the first quarter of 2000, the Company now believes that
greater sales value can be realized by allowing AchieveGlobal to fully implement
certain of its strategic initiatives. Currently, the Company anticipates selling
AchieveGlobal by the end of 2000. In February 2000, the Company sold Allen
Communication to Gilat Communications Ltd. The Company also entered into
agreements in February 2000 to sell StayWell to a subsidiary of Havas MediMedia,
S.A., and to sell The Sporting News to Vulcan Ventures Inc. These dispositions
are expected to be completed in March 2000.

1999 RECAPITALIZATION

     In September 1999, the Company completed a recapitalization transaction
with its largest shareholders, the Chandler Trusts, in which the Company,
including certain of its affiliates, and the Chandler Trusts each contributed
assets worth $1.24 billion to TMCT II, LLC, a newly formed limited liability
company. The 1999 recapitalization resulted in a net effective reduction, for
financial reporting purposes, in the number of shares of the Series A and C
common stocks by 12.4 million shares and in the Company's Series C-1 and C-2
preferred stocks by 501,000 shares. Also, in connection with this
recapitalization, the Company replaced the Series C-1 and C-2 preferred stocks
with new Series D-1 and D-2 preferred stocks effective January 1, 2000. The
Series D-1 and D-2 preferred stocks are identical to the Series C-1 and C-2
preferred stocks except that the increases in the dividend rate on the Series
D-1 and D-2 preferred stocks are pursuant to a fixed and
                                    16

certain schedule. As a result of the effective reduction of preferred stocks and
the replacement of the preferred stocks, preferred stock dividends will be
reduced to $8.1 million annually beginning in 2000. In connection with the
recapitalization, the Company issued $200.0 million of 6.65% two-year notes due
October 15, 2001 and $400.0 million of 7.45% ten-year notes due October 15, 2009
(see Note 2 to the consolidated financial statements for further information on
the 1999 recapitalization).

CONSOLIDATED RESULTS OF OPERATIONS

     The following table summarizes the Company's financial results (in
millions, except share and per share amounts):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| Revenues | $3,029.2 | $2,784.0 | $2,645.1 |
| Restructuring and one-time charges | -- | 155.7 | -- |
| Operating profit | 470.5 | 247.8 | 391.3 |
| Interest expense, net | (56.9) | (28.6) | (33.3) |
| Other, net | 25.7 | 25.8 | 38.5 |
| Income from continuing operations | 259.1 | 134.1 | 234.7 |
| Discontinued operations: |  |  |  |
| Income (loss) from operations, net of taxes | -- | (33.4) | 15.7 |
| Net gain on disposal, net of taxes | -- | 1,316.7 | -- |
| Net income | 259.1 | 1,417.3 | 250.3 |
| Preferred stock dividends | 18.1 | 21.7 | 32.5 |
| Earnings applicable to common shareholders | 241.0 | 1,395.6 | 217.8 |
| Basic earnings per share: |  |  |  |
| Continuing operations | $ 3.53 | $ 1.32 | $ 2.18 |
| Discontinued operations | -- | 15.14 | .17 |
| Basic earnings per share | $ 3.53 | $ 16.46 | $ 2.35 |
| Diluted earnings per share: |  |  |  |
| Continuing operations | $ 3.38 | $ 1.29 | $ 2.12 |
| Discontinued operations | -- | 14.77 | .17 |
| Diluted earnings per share | $ 3.38 | $ 16.06 | $ 2.29 |
| Weighted average shares (in thousands): |  |  |  |
| Basic | 68,252 | 84,814 | 92,572 |
| Diluted | 73,090 | 86,928 | 97,013 |

1999 RESULTS

     Revenues for 1999 rose 8.8% compared to 1998 due to higher revenues at all
of the Company's business segments, including the effects of acquisitions (see
further discussion of segment results under the caption "Analysis by Segment").

     Operating profit for 1999 increased 11.4% compared to the prior year,
excluding 1998 restructuring, one-time and other charges, due to improvements at
each of the Company's business segments (see further discussion of segment
results under the caption "Analysis by Segment"). Pretax restructuring, one-time
and other charges in 1998 were $174.4 million, or $112.4 million after
applicable taxes. Operating profit for 1999 was impacted by lower pension
income, primarily in the Newspaper Publishing segment, due to a $16.8 million
reduction in the amortization of the unrecognized pension asset that existed
upon the 1986 adoption of the Statement of Financial Accounting Standards No.
87, "Employers' Accounting for Pensions."

     Income from continuing operations for 1999 was $248.4 million, or $3.23 per
share, compared to $246.5 million, or $2.59 per share, in the prior year,
excluding a 1999 pretax gain on the sale of Hollywood

17

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

Online, Inc. of $17.2 million ($10.7 million after applicable taxes), or $.15 per share, and the 1998 restructuring, one-time and other charges.

Net interest expense for 1999 increased compared to the prior year due primarily to higher debt levels resulting from the 1999 recapitalization (see Note 2).

Earnings per share from continuing operations increased in 1999 compared to 1998 due to a reduction in the weighted average number of shares as well as lower preferred stock dividends resulting from the 1999 recapitalization, and an increase in operating profit, which was partially offset by the impact of higher net interest expense.

1998 RESULTS

Revenues in 1998 increased 5.2% over the prior year due to higher revenues at each of the Company's business segments (see further discussion of segment results under the caption "Analysis by Segment"). The rate of growth slowed in the second half, reflecting some weakening in certain markets and advertising categories.

Operating profit totaled $422.2 million in 1998 compared to $409.3 million in 1997, excluding restructuring, one-time and other charges in both years. The increase in 1998 operating profit was due primarily to reduced expense levels in Corporate and Other, which was partially offset by decreases in operating profit in the Newspaper and Magazine Publishing segments (see further discussion of segment results under the caption "Analysis by Segment"). Including restructuring, one-time and other charges, operating profit decreased to $247.8 million in 1998.

Net interest expense declined in 1998 due to an increase in interest income resulting from investment activity of the affiliated limited liability companies created as a result of the divestitures of the Company's legal and medical publishing operations. Higher interest income more than offset a rise in interest expense due primarily to increased debt levels attributable to common stock purchases, a recapitalization in 1997 (see Note 3) and acquisitions.

Earnings per share for 1998 benefited principally from the gains on divestitures, as well as a reduction in the average number of common shares and lower preferred stock dividends. Preferred stock dividends in 1998 declined due to the 1997 recapitalization and the Company's redemption of its Series B preferred stock.

ANALYSIS BY SEGMENT

The following sections discuss the segment results of the Company's principal lines of business, excluding restructuring, one-time and other charges of $174.4 million and $18.0 million for 1998 and 1997, respectively, unless specifically stated otherwise.

NEWSPAPER PUBLISHING

Newspaper Publishing revenues and operating profit were as follows (dollars in millions):

|  | 1999 | CHANGE | 1998 | CHANGE | 1997 |
|---|---|---|---|---|---|
| Revenues: |  |  |  |  |  |
| Advertising..................... | $2,029.0 | 11.4% | $1,821.8 | 7.7% | $1,691.6 |
| Circulation.................... | 430.3 | (1.3) | 435.9 | -- | 435.8 |
| Other.......................... | 55.0 | 9.0 | 50.5 | (2.7) | 51.8 |
|  | $2,514.3 | 8.9% | $2,308.2 | 5.9% | $2,179.2 |
| Operating profit................. | $ 457.1 | 53.7% | $ 297.4 | (26.0)% | $ 402.2 |
| Operating profit excluding restructuring, one-time and other charges................. | $ 457.1 | 10.5% | $ 413.8 | (1.5)% | $ 420.2 |

18

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

1999 Results

    Newspaper Publishing revenues rose in 1999 compared to the prior year, including the addition of Newport Media, Inc., which was acquired in February 1999, and Recycler, acquired in April 1998. Excluding the impact of these acquisitions, 1999 revenues rose 5.7%, with the Los Angeles Times up 4.7% and the Eastern newspapers up 6.6% compared to 1998. Advertising revenue gains were achieved at each of the Company's newspapers in 1999 due primarily to strong gains in national advertising. Excluding the impact of acquisitions, advertising revenues for 1999 rose 7.4%, with The Times up 6.6% and the Eastern newspapers up 8.3% compared to 1998.

    Circulation revenues declined slightly as marketing strategies, largely at The Times, involving pricing and promotional discounts to stimulate circulation volume resulted in lower overall circulation revenues. Excluding the impact of acquisitions, 1999 circulation revenues for the Newspaper Publishing segment declined 1.9% compared to 1998.

    Segment operating profit for 1999 increased largely due to strong gains in national advertising and declines in newsprint expense. The 1999 improvement in operating profit was aided by a reduction in newsprint expense of 6.3% on a 7.2% decline in average newsprint prices. Newsprint expense was only partially affected by newsprint price declines due to the Company's use of newsprint hedging contracts (see further information under the caption "Liquidity and Capital Resources -- Market Risk"). Excluding newsprint and the impact of acquisitions, other expenses rose 7.6% in 1999 compared to 1998, due primarily to continuing circulation growth initiatives.

1998 Results

    In 1998, the Eastern Newspapers, including Newsday and The Baltimore Sun, achieved outstanding performance, but the Newspaper Publishing segment's operating profit overall was reduced by sluggish advertising revenues and higher expense levels at The Times related largely to ongoing growth initiatives. Accordingly, the Newspaper Publishing's operating profit margin decreased to 17.9% in 1998 from 19.3% in 1997.

    Newspaper Publishing revenues rose in 1998 due primarily to classified advertising revenue growth at the Eastern Newspapers as well as incremental revenues from acquisitions. Excluding the acquisitions of Recycler, Patuxent Publishing Company acquired in September 1997 and This Week acquired in October 1997, advertising revenues rose 4.4%. Circulation revenues for 1998 were essentially even compared to 1997 as marketing strategies involving pricing and promotional discounts resulted in circulation volume gains but reduced circulation revenues.

    For 1998, newsprint expense rose 15.1%, as average newsprint prices increased 8.1%. In addition, daily circulation gains at the Company's largest newspapers and acquisitions contributed to an increase in newsprint consumption of 6.5%. Non-newsprint expense rose 2.4% for 1998, excluding the impact of acquisitions as well as restructuring, one-time and other charges.

    In 1998, the Newspaper Publishing segment recorded $102.5 million of restructuring and one-time charges as well as $13.9 million of additional charges that did not qualify for accounting classification as restructuring charges. These charges consisted primarily of termination benefits, contract termination costs and asset write-offs. In 1997, the Newspaper Publishing segment's operating profit was impacted by $18.0 million of charges that were not classified as restructuring charges. These charges primarily related to the reorganization of the circulation department and the absorption of the corporate human resources and information systems functions by The Times.

19

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000    Powered by Morningstar® Document Research℠

PROFESSIONAL INFORMATION

     Professional Information revenues and operating profit were as follows
(dollars in millions):

|                                                                    | 1999 | CHANGE | 1998 | CHANGE | 1997 |
|--------------------------------------------------------------------|------|--------|------|--------|------|
| Revenues..................................                         | $235.4 | 11.1% | $211.9 | 8.5% | $195.3 |
| Operating profit.........................                          | $ 64.8 | 47.7% | $ 43.9 | (21.2)% | $ 55.7 |
| Operating profit excluding restructuring, one-time and other charges............................... | $ 64.8 | 16.2% | $ 55.7 | .2% | $ 55.7 |

1999 Results

     The operating results for the Professional Information segment consist
entirely of Jeppesen, the Company's flight information provider, after
reflecting AchieveGlobal, Allen Communication and StayWell as discontinued
operations for all periods presented. Jeppesen demonstrated outstanding
performance in 1999 as revenues and operating profit rose as a result of strong
product demand and growth in the commercial aviation market, as well as higher
flight planning revenues.

1998 Results

     Revenues for 1998 increased primarily due to higher revenues for navigation
and standard airway manual services. Operating profit was consistent with the
prior year due to higher expenses related to chart revision activity and
technology initiatives.

     In 1998, the Company recorded $8.2 million of restructuring and one-time
charges, which consisted primarily of termination benefits, lease termination
and other costs. The Company recorded additional charges of $3.7 million that
did not qualify for accounting classification as restructuring charges. These
charges were primarily to write-off capitalized software costs related to an
abandoned project.

MAGAZINE PUBLISHING

     Magazine Publishing revenues and operating profit (loss) were as follows
(dollars in millions):

|                                                                    | 1999 | CHANGE | 1998 | CHANGE | 1997 |
|--------------------------------------------------------------------|------|--------|------|--------|------|
| Revenues:                                                          |      |        |      |        |      |
|   Advertising........................                    | $185.9 | 8.1% | $171.9 | 7.6% | $159.7 |
|   Circulation........................                    | 75.3 | (1.2) | 76.2 | 1.1 | 75.4 |
|   Other..............................                    | 17.7 | 21.8 | 14.6 | 7.3 | 13.6 |
|                                                                    | $278.9 | 6.2% | $262.7 | 5.6% | $248.7 |
| Operating profit (loss)...............                             | $ 19.2 | (100+)% | $(14.2) | (100+)% | $ 18.3 |
| Operating profit excluding restructuring, one-time and other charges............................... | $ 19.2 | 29.3% | $ 14.8 | (18.9)% | $ 18.3 |

1999 Results

     Magazine Publishing's 1999 operating profit increased significantly due
primarily to advertising revenue gains at most of the titles as well as lower
paper, printing and distribution costs. Excluding The Sporting News, 1999
operating profit was $25.9 million compared to $21.3 million in the prior year
and revenues in 1999 were $241.7 million compared to $227.1 million in the prior
year. Circulation revenues were consistent with the prior year. Other revenues
increased in 1999 compared to 1998 due primarily to subscription list rental
fees and television show sponsorships.

                                          20

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

1998 Results

    Revenues increased in 1998 due to higher advertising revenues at most of the magazines. The acquisitions of TransWorld SKATEboarding and Warp in April 1997, Ride BMX and SNAP in January 1998, InterZine Productions, Inc. in February 1998 and Senior Golfer in October 1998 also contributed to higher advertising revenues. Excluding acquisitions, revenues rose 4.2%. Magazine Publishing segment's 1998 operating profit decreased from 1997 due to investment in the relaunch of The Sporting News, higher paper costs, as well as the acquisitions of InterZine and Senior Golfer.

    Magazine Publishing segment's 1998 restructuring and one-time charges totaled $29.1 million, which consisted primarily of goodwill impairment related to two titles acquired in 1977 and 1987.

CORPORATE AND OTHER

    Corporate and Other revenues and operating losses were as follows (dollars in millions):

|  | 1999 | CHANGE | 1998 | CHANGE | 1997 |
|---|---|---|---|---|---|
| Revenues.................................... | $ .6 | (46.7)% | $ 1.2 | (94.5)% | $21.8 |
| Operating loss............................. | $70.5 | (11.0)% | $79.3 | (6.6)% | $84.9 |
| Operating loss excluding restructuring, one-time and other charges.............. | $70.5 | 13.3% | $62.2 | (26.7)% | $84.9 |

1999 Results

    Operating loss was higher in 1999 due to implementation costs to consolidate financial and human resource applications at a central processing site, as well as costs related to Times Mirror interactive, the Company's recently formed Internet unit.

1998 Results

    For 1998, revenues declined due to the dispositions of Harry N. Abrams, Incorporated and National Journal, Inc. Operating loss decreased in 1998 from 1997 due primarily to lower employee benefit costs. Additionally, information systems costs were lower in 1998 due to substantial completion of the Company's conversion to common financial systems in 1997.

    Corporate and Other's 1998 restructuring and one-time charges totaled $15.9 million and $1.1 million for other charges that did not qualify for accounting classification as restructuring charges. These charges consisted primarily of termination benefits and lease termination costs.

OTHER, NET

1999 Results

    The 1999 results included a net pretax gain on the sale of America Online, Inc. (AOL) shares and the purchase of the related 4 1/4% Premium Equity Participating Securities (PEPS), of $16.9 million, or $10.0 million after applicable taxes. The PEPS hedge the Company's investment in AOL. Such transactions may continue from time to time in the future. The Company also recorded a pretax gain on the sale of Hollywood Online, Inc. of $17.2 million, or $10.7 million after applicable taxes. In addition, the Company had other gains on non-operating items and reduced the carrying value of certain new media and other investments. The Company also recognized equity income of $4.1 million in 1999 from its investment in TMCT II which could experience significant variability in the future due to the nature of TMCT II's investments (see Note 2).

1998 Results

    In the second half of 1998, the Company sold 441,900 shares of Netscape Communications Corporation (Netscape), which was subsequently purchased by AOL, and purchased the related PEPS, for a net pretax

21

gain of $16.0 million, or $9.5 million after applicable taxes. Additionally, the Company recorded gains in 1998 on the disposition of excess real estate and other assets and recorded equity losses related to new media and other partnership investments.

INCOME TAXES

    The effective income tax rates were 41.0%, 45.3% and 40.8% in 1999, 1998 and 1997, respectively. Goodwill impairment charges for which there were no tax benefit contributed to the higher tax rate in 1998.

RESTRUCTURING, ONE-TIME AND OTHER CHARGES

    In 1998, the Company undertook a comprehensive review of its business operations to determine areas where operational efficiencies could be achieved through either product and/or facility consolidation, headcount reductions, product abandonments, contract terminations or other measures. The Company began this review in anticipation of the impact of its significant 1998 divestitures and to better align its overall cost structure and business configurations (see Note 7). A summary of the significant components of the 1998 restructuring program is as follows (dollars in millions):

| | NEWSPAPER PUBLISHING | PROFESSIONAL INFORMATION | MAGAZINE PUBLISHING | CORPORATE AND OTHER | TOTAL |
|---|---|---|---|---|---|
| Termination benefits.......... | $ 43.4 | $2.0 | $ .2 | $10.2 | $ 55.8 |
| Contract terminations......... | 51.4 | -- | 4.3 | -- | 55.7 |
| Goodwill impairments.......... | .3 | -- | 19.7 | -- | 20.0 |
| Lease termination costs....... | 2.3 | 2.8 | 1.5 | 3.1 | 9.7 |
| Technology asset write-offs... | 4.8 | 1.4 | .1 | 1.5 | 7.8 |
| Other costs................... | .3 | 2.0 | 3.3 | 1.1 | 6.7 |
| Total.............. | $102.5 | $8.2 | $29.1 | $15.9 | $155.7 |

    The following table summarizes the 1999 activity in the 1998 restructuring liability balance as well as estimated cash flows for the following years (dollars in millions):

| | DECEMBER 31, 1998 | 1999 CASH PAYMENTS | DECEMBER 31, 1999 | ESTIMATED CASH FLOWS | |
|---|---|---|---|---|---|
| | | | | 2000 | 2001 AND THEREAFTER |
| Termination benefits....... | $51.2 | $(37.2) | $14.0 | $11.4 | $2.6 |
| Contract terminations..... | 31.3 | (22.7) | 8.6 | 3.8 | 4.8 |
| Lease termination costs... | 6.2 | (2.5) | 3.7 | 2.6 | 1.1 |
| Technology asset write-offs.............. | .6 | (.5) | .1 | .1 | -- |
| Other costs............... | .7 | (.3) | .4 | .4 | -- |
| Total.......... | $90.0 | $ (63.2) | $26.8 | $18.3 | $8.5 |

    As planned, annual expense reductions resulting from the 1998 restructuring program remain in line with management's expectations. The Company believes that cash flows from operations will be adequate to cover future cash outflows under the restructuring program.

    In addition to the 1998 charges listed above, the Company also recorded $18.7 million for certain asset write-offs that did not meet the accounting criteria for classification as "restructuring and one-time charges." These charges, which principally included other operating asset write-offs, were classified within "Selling, general and administrative expenses" in the Consolidated Statements of Income.

    In 1997, the Company recorded pretax charges of $18.0 million for specifically identified cost reduction programs that were not classified as restructuring charges. The Company also recorded restructuring,

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

impairment and one-time charges in 1995. A summary of the activity with respect to the 1995 restructuring liability is as follows (dollars in millions):

|  | DECEMBER 31, 1998 | 1999 CASH PAYMENTS | DECEMBER 31, 1999 |
|---|---|---|---|
| 1995 Restructuring........................... | $22.9 | $(11.0) | $11.9 |

The remaining 1995 restructuring liability relates primarily to lease payments on unoccupied properties, which will be paid over lease periods extending to 2010.

The Company periodically assesses the adequacy of its remaining restructuring liabilities and makes adjustments, if required. The net change in the restructuring liabilities as a result of these reviews has been not significant.

LIQUIDITY AND CAPITAL RESOURCES

The Company's operating cash requirements are funded primarily by its operations. Cash generated from operating activities was used primarily to fund capital expenditures, investments in new media businesses, dividend payments and, to a lesser extent, share purchases. In 1999, funds from the Company's investment affiliates created as part of the 1998 divestitures of the Company's legal and medical publishing businesses, as well as proceeds from new debt issuances were used to finance the 1999 recapitalization and acquisitions. In the second half of 1998, the Company utilized a portion of the investment affiliates' resources for share purchases and acquisitions. During 2000, the Company plans to use proceeds from the planned dispositions of The Sporting News, StayWell, Allen Communication and AchieveGlobal to repay debt, fund acquisitions and, to a lesser extent, purchase the Company's common stock to offset the dilutive effect of stock option exercises.

CASH FLOW

The following table sets forth certain items from the Consolidated Statements of Cash Flows (dollars in millions):

|  | 1999 | 1998 |
|---|---|---|
| Net cash provided by operating activities of continuing operations................................................. | $ 349.7 | $ 248.4 |
| Capital expenditures......................................... | (173.5) | (131.5) |
| Acquisitions, net of cash acquired........................... | (173.3) | (200.8) |
| Contribution to TMCT II, LLC................................. | (1,235.3) | -- |
| Proceeds from reorganization as described in Notes 4 and 5............................................................. | -- | 2,022.2 |
| Purchase of Times Mirror's common stock, including exercise of put options, net of premiums received.................... | (211.9) | (964.7) |
| Net issuance of commercial paper, short-term borrowings and long-term debt.......................................... | 491.8 | 141.4 |

Cash generated by operating activities of continuing operations for 1999 was higher compared to 1998 due primarily to higher earnings.

Capital expenditures for 1999 were higher compared to 1998 due primarily to the Company's continuing investments for future growth, which included facility renovations within the Newspaper Publishing segment and conversion to a 50-inch web at The Times. Additionally, the Company increased capital spending related to information technology projects, including Year 2000 requirements. Capital expenditures are currently expected to approximate $180.0 million for 2000, primarily for facility renovations and upgrading business systems.

Cash and marketable securities decreased to $144.3 million at December 31, 1999 from $1.10 billion at December 31, 1998 and total debt at December 31, 1999 rose to $1.82 billion from $1.25 billion at December 31, 1998 due primarily to the 1999 recapitalization (see Note 2).

At December 31, 1999, the Company had a $400.0 million long-term revolving line of credit through a group of domestic and international banks. This line of credit is used to support a commercial paper program,

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000

Powered by Morningstar® Document Research℠

which is available for short-term cash requirements. The Company had $241.4 million and $219.0 million of commercial paper outstanding at December 31, 1999 and March 8, 2000, respectively.

At December 31, 1999, the Company had $400.0 million remaining under shelf registration statements that had not been utilized. There is no assurance that the Company will be able to utilize the amounts remaining under these shelf registration statements on terms acceptable to the Company.

ACQUISITIONS

In February 1999, Eagle New Media Investments, LLC acquired Newport Media, Inc., a publisher of shopper publications in the Long Island and New Jersey areas, for approximately $132.0 million. The Company made other acquisitions in 1999 for an aggregate consideration of $41.3 million.

In April 1998, the Company acquired the Los Angeles area business of E Z Buy & E Z Sell Recycler Corporation (Recycler), consisting primarily of the Recycler publications in the Los Angeles, Orange, Riverside, San Bernardino and Ventura counties and a portion of Santa Barbara County for $188.7 million. The Company also invested in preferred stock and provided a term loan to Target Media Partners, a new entity that owns all of the non-Los Angeles area assets of Recycler, for a total amount of $34.8 million. The Company made other acquisitions in 1998 for an aggregate consideration of $12.1 million.

DISPOSITIONS

In May 1999, the Company completed an agreement to merge Hollywood Online, Inc., and its Web site, hollywood.com, into Hollywood.com, Inc. (formerly Big Entertainment, Inc.), in exchange for newly-issued restricted stock of Hollywood.com, Inc. and a note with a then combined current value of approximately $31.5 million. Additionally, the Company completed the sale of Apartment Search, Inc. in March 1999. The estimated loss on sale of Apartment Search, including a provision for operating losses through the date of disposal, was recorded in the third quarter of 1998.

In July 1998, the Company completed the divestiture of Matthew Bender in a tax-free reorganization and the sale of the Company's 50% ownership interest in Shepard's to Reed Elsevier plc. The two transactions were valued at $1.65 billion in the aggregate. In October 1998, the Company completed the divestiture of Mosby, Inc. to Harcourt General, Inc. in a transaction valued at $415.0 million. Concurrently with the closing of the Matthew Bender and Mosby, Inc. transactions, the Company became the sole manager of Eagle New Media Investments, LLC (Eagle New Media) and Eagle Publishing Investments, LLC (Eagle Publishing). A substantial portion of the assets of Eagle New Media and Eagle Publishing were utilized in connection with the 1999 recapitalization (see Note 2). The Company intends to deploy the assets of both Eagle New Media and Eagle Publishing to finance acquisitions and investments, including purchases of the Company's common stock, and does not intend to use those funds for the Company's general working capital purposes.

COMMON SHARE PURCHASES

During 1999, the Company and Eagle New Media purchased 3.2 million shares of the Company's Series A common stock which more than offset 2.0 million shares issued as a result of the exercise of stock options (see Note 2 for further information on the effective retirement of shares resulting from the 1999 recapitalization).

The Company believes that the purchase of shares of its common stock is an attractive investment for Eagle New Media which will also enhance Times Mirror shareholder value as well as offset dilution from shares of common stock issued under the Company's stock-based employee compensation and benefit programs. The Company and its affiliates expect to make share purchases primarily to offset stock option exercises, during the next two years in the open market or in private transactions, depending on market conditions, and such purchases may be discontinued at any time. In connection with this program, the Company from time to time sells put options on its common stock. As of December 31, 1999, the Company and its affiliates are authorized to purchase 3.9 million shares of Series A common stock.

24

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

DIVIDENDS

Cash dividends of $.80 and $.72 per share of common stock were declared for the years ended December 31, 1999 and 1998, respectively. In February 2000, the Board of Directors approved an increase in the quarterly dividend on its common stock to $.22 per share, from $.20 per share, beginning with the March 10, 2000 payment date.

MARKET RISK

The Company enters into contractual agreements in the ordinary course of business to hedge its exposure to changes in interest rates, the value of foreign currencies relative to the U.S. dollar and newsprint prices. Counterparties to these agreements are major institutions. Such agreements are not entered into for trading purposes.

The Company's debt portfolio is managed to maintain a balance of fixed and variable rate obligations. The Company utilizes interest rate swap agreements to help maintain the overall interest rate parameters set by management. As such, a hypothetical 10% change in interest rates would not have a material impact on the Company's results of operations or the fair values of its market risk sensitive financial instruments.

The Company periodically enters into foreign exchange forward contracts or uses other hedging strategies to substantially limit its exposure to changes in foreign currency rates. As such, changes in currency rates would not have a material impact on the Company's results of operations.

Newsprint expense represents a significant portion of the Company's operating costs. To manage the Company's exposure to newsprint price fluctuations, the Company has entered into newsprint hedging contracts not exceeding five years. These hedging arrangements have the effect of locking in for specified periods, the newsprint prices the Company will pay for the hedged volumes. As a result, while these hedging arrangements are structured to reduce the Company's exposure to increases in newsprint prices, they also limit the benefit the Company might otherwise have received from any newsprint price decreases. The Company's operating results typically can be adversely affected to the extent that such historically volatile newsprint prices increase materially.

IMPACT OF YEAR 2000

The Company instituted a comprehensive program to address potential Year 2000 impacts and as a result, critical systems and infrastructure operated smoothly through the arrival of Year 2000 and leap year boundaries. Additionally, the Company experienced no Year 2000 related disruptions in the products and services provided by its significant suppliers or other third-party business relationships. Many of the improvements made in preparation for the Year 2000 are expected to provide the Company with long-term benefits. For example, many of the advancements in technology for the Company's editorial, advertising and circulation systems, e-mail, telephone switching, and network infrastructure are each expected to have a significant, lasting impact.

YEAR 2000 COSTS

The Company incurred costs of $39.7 million to prepare for the arrival of the Year 2000, excluding costs for employees working on the project, of which $30.5 million was capitalized and $9.2 million was expensed. These costs include 1999 capital expenditures of $14.7 million and expenses of $5.4 million. During 1999, an average of 104 employees worked on the project with related costs estimated at $8.4 million. These costs include both information technology and non-information technology systems, including capital costs associated with planned replacements previously budgeted which, incidentally, provided Year 2000 compliance. Year 2000 costs were funded through operating cash flows.

DISCONTINUED BUSINESSES

The above discussion of the Company's Year 2000 program does not include information with respect to AchieveGlobal, Allen Communication or StayWell, which are reflected as discontinued operations. However,

25

the information provided above would not be materially different if information regarding the discontinued businesses was included. The Company incurred costs of $2.6 million to prepare these businesses for the arrival of the Year 2000, excluding costs for employees working on the project, of which $1.6 million was capitalized and $1.0 million was expensed. These costs include 1999 capital expenditures and expenses of $.5 million each.

CERTAIN FACTORS AFFECTING FORWARD-LOOKING STATEMENTS

    In 1998, the Company divested Matthew Bender & Company, Incorporated and Mosby, Inc. While the Company believes that these divestitures were completed on a tax-free basis, this position may be subject to review by the Internal Revenue Service. The Company estimated deferred taxes of $176.6 million based on its assessment of the risks inherent in a contested challenge by the Internal Revenue Service. To the extent that the estimate of such deferred taxes is adjusted in the course of resolving such a challenge, the adjustment will be recorded within discontinued operations. If it is ultimately determined that these transactions were not completed on a tax-free basis, the Company's results of operations, financial position and cash flow may be materially adversely affected.

    Certain statements set forth above and elsewhere in this Annual Report on Form 10-K are forward-looking in nature and related to trends and events that may affect the Company's future financial position and operating results. Such statements are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. The term "expect," "anticipate," and "intend" and similar words or expressions are intended to identify forward-looking statements. These statements speak only as of the date of this report. These statements are based on current expectations, are inherently uncertain, are subject to risks, and should be viewed with caution. For example, there can be no assurances that he statements contained herein with respect to expected dispositions of certain businesses, share purchases, capital expenditures or the satisfactory resolution of contingent liabilities will be achieved.

    Actual results and experience may differ materially from the forward-looking statements and could be adversely affected by a number of factors, including (a) an increase in paper, printing and distribution costs over the levels anticipated; (b) increased consolidation among major retailers or other events depressing the level of display advertising; (c) an economic downturn in the Company's principal newspaper markets or other occurrences leading to decreased circulation and diminished revenues from both display and classified advertising; (d) an increase in the use of alternate media such as the Internet for classified and other advertising; (e) an increase in expenses related to new initiatives and product improvement efforts in the flight information operating unit; (f) unfavorable foreign currency fluctuations; (g) material changes in tax liability due to unfavorable reviews by taxing authorities as described above; and (h) a general economic downturn resulting in decreased consumer and corporate spending on discretionary items such as magazines or newspapers. It is not possible to foresee or identify all such factors. The Company makes no commitment to update any forward-looking statement or to disclose any facts, events, or circumstances after the date hereof that may affect the accuracy of any forward-looking statement.

DISCUSSIONS EXCLUDING RESTRUCTURING, ONE-TIME AND OTHER CHARGES

    Management's discussion and analysis of its results of operations presents information regarding operating profit as well as operating profit excluding the impact of restructuring, one-time and other charges. The Company believes that the financial information which excludes restructuring, one-time and other charges is necessary to an understanding of its operations and provides for a more comparable analysis of historical results as well as indications of future financial performance.

ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.

    This information is presented in Management's Discussion and Analysis of Financial Condition and Results of Operations under the caption "Liquidity and Capital Resources -- Market Risk."

                                        26

ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.

INDEX TO FINANCIAL STATEMENTS
AND FINANCIAL STATEMENT SCHEDULE

|  | PAGE |
|---|---|
| Report of Ernst & Young LLP, Independent Auditors........... | 28 |
| Consolidated Statements of Income -- Years Ended December 31, 1999, 1998 and 1997................................. | 29 |
| Consolidated Balance Sheets -- December 31, 1999 and December 31, 1998......................................... | 30 |
| Consolidated Statements of Shareholders' Equity -- Years Ended December 31, 1999, 1998 and 1997.................... | 32 |
| Consolidated Statements of Cash Flows -- Years Ended December 31, 1999, 1998 and 1997.......................... | 34 |
| Notes to Consolidated Financial Statements.................. | 35 |
| Financial Statement Schedule: |  |
| Schedule II -- Valuation and Qualifying Accounts and Reserves............................................... | 65 |

    All other schedules are omitted because they are not required by the
regulations or related instructions or are not applicable.

27

REPORT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS

To the Shareholders and Board of Directors
The Times Mirror Company

    We have audited the accompanying consolidated balance sheets of The Times
Mirror Company as of December 31, 1999 and 1998, and the related consolidated
statements of income, shareholders' equity and cash flows for each of the three
years in the period ended December 31, 1999. Our audits also include the
financial statement schedule listed in the Index to Financial Statements and
Financial Statement Schedule. These financial statements and schedule are the
responsibility of the Company's management. Our responsibility is to express an
opinion on these financial statements and schedule based on our audits.

    We conducted our audits in accordance with auditing standards generally
accepted in the United States. Those standards require that we plan and perform
the audit to obtain reasonable assurance about whether the financial statements
are free of material misstatement. An audit includes examining, on a test basis,
evidence supporting the amounts and disclosures in the financial statements. An
audit also includes assessing the accounting principles used and significant
estimates made by management, as well as evaluating the overall financial
statement presentation. We believe that our audits provide a reasonable basis
for our opinion.

    In our opinion, the financial statements referred to above present fairly,
in all material respects, the consolidated financial position of The Times
Mirror Company at December 31, 1999 and 1998, and the consolidated results of
its operations and its cash flows for each of the three years in the period
ended December 31, 1999, in conformity with accounting principles generally
accepted in the United States. Also, in our opinion, the related financial
statement schedule, when considered in relation to the basic financial
statements taken as a whole, presents fairly in all material respects the
information set forth therein.

                                ERNST & YOUNG LLP

Los Angeles, California
February 2, 2000

                                       28

    Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

CONSOLIDATED STATEMENTS OF INCOME
(IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

|  | YEAR ENDED DECEMBER 31 | | |
| --- | --- | --- | --- |
|  | 1999 | 1998 | 1997 |
| **REVENUES:** | | | |
| Advertising | $2,214,902 | $1,993,750 | $1,855,999 |
| Circulation | 505,598 | 512,090 | 515,941 |
| Other | 308,749 | 278,148 | 273,195 |
| Total revenues | 3,029,249 | 2,783,988 | 2,645,135 |
| **COSTS AND EXPENSES:** | | | |
| Cost of sales | 1,615,273 | 1,444,523 | 1,395,660 |
| Selling, general and administrative expenses | 943,470 | 935,986 | 858,197 |
| Restructuring and one-time charges | -- | 155,681 | -- |
| Total costs and expenses | 2,558,743 | 2,536,190 | 2,253,857 |
| OPERATING PROFIT | 470,506 | 247,798 | 391,278 |
| Interest expense | (93,368) | (68,275) | (35,628) |
| Interest income | 36,454 | 39,680 | 2,351 |
| Other, net | 25,699 | 25,801 | 38,498 |
| Income from continuing operations before income taxes | 439,291 | 245,004 | 396,499 |
| Income tax provision | 180,229 | 110,945 | 161,844 |
| Income from continuing operations | 259,062 | 134,059 | 234,655 |
| Discontinued operations: | | | |
| Income (loss) from operations, net of taxes | 24 | (33,407) | 15,657 |
| Net gain on disposal, net of taxes | -- | 1,316,686 | -- |
| NET INCOME | $ 259,086 | $1,417,338 | $ 250,312 |
| Preferred stock dividends | $ 18,066 | $ 21,697 | $ 32,481 |
| Earnings applicable to common shareholders | $ 241,020 | $1,395,641 | $ 217,831 |
| Basic earnings per common share: | | | |
| Continuing operations | $   3.53 | $   1.32 | $   2.18 |
| Discontinued operations | -- | 15.14 | .17 |
| Basic earnings per share | $   3.53 | $  16.46 | $   2.35 |
| Diluted earnings per common share: | | | |
| Continuing operations | $   3.38 | $   1.29 | $   2.12 |
| Discontinued operations | -- | 14.77 | .17 |
| Diluted earnings per share | $   3.38 | $  16.06 | $   2.29 |

See notes to consolidated financial statements.

29

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                                          Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

CONSOLIDATED BALANCE SHEETS
(IN THOUSANDS)

|  | DECEMBER 31 | |
| --- | ---: | ---: |
|  | 1999 | 1998 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents............................. | $   144,319 | $1,052,999 |
| Marketable securities................................. | -- | 49,438 |
| Accounts receivable, less allowances for doubtful | | |
| accounts and returns of $34,721 and $37,389........... | 363,361 | 311,913 |
| Inventories........................................... | 35,082 | 28,438 |
| Recoverable income taxes.............................. | 43,477 | 22,112 |
| Deferred income taxes................................. | 33,314 | 32,279 |
| Prepaid expenses...................................... | 35,526 | 30,141 |
| Net assets of discontinued operations................. | 173,090 | 189,628 |
| Other current assets.................................. | 58,479 | 16,166 |
| Total current assets............................. | 886,648 | 1,733,114 |
| Property, plant and equipment: | | |
| Land.................................................. | 49,937 | 45,065 |
| Buildings............................................. | 454,751 | 433,860 |
| Machinery and equipment............................... | 1,389,855 | 1,321,501 |
| Leasehold improvements................................ | 37,248 | 27,848 |
| Construction-in-progress.............................. | 42,375 | 41,362 |
|  | 1,974,166 | 1,869,636 |
| Less accumulated depreciation and amortization......... | (1,008,071) | (966,153) |
| Property, plant and equipment, net................ | 966,095 | 903,483 |
| Goodwill, net of accumulated amortization of $126,875 and | | |
| $105,976............................................. | 602,148 | 501,463 |
| Other intangibles, net of accumulated amortization of | | |
| $74,612 and $61,657.................................. | 192,593 | 100,373 |
| Equity investments in TMCT I, LLC and TMCT II, LLC........ | 332,846 | 96,416 |
| Other investments.................................... | 242,858 | 174,402 |
| Prepaid pension costs................................. | 445,175 | 419,471 |
| Other assets......................................... | 229,008 | 229,207 |
| Total assets..................................... | $ 3,897,371 | $4,157,929 |

See notes to consolidated financial statements.

30

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

CONSOLIDATED BALANCE SHEETS (CONTINUED)
(IN THOUSANDS, EXCEPT SHARE AND PER SHARE AMOUNTS)

| | DECEMBER 31 | |
| --- | ---: | ---: |
| | 1999 | 1998 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable...................................... | $    179,461 | $    179,415 |
| Short-term debt....................................... | 254,834 | 312,610 |
| Employees' compensation............................... | 110,311 | 93,145 |
| Unearned income....................................... | 127,760 | 146,323 |
| Restructuring......................................... | 25,795 | 91,903 |
| Other current liabilities............................. | 167,969 | 98,106 |
| Total current liabilities........................ | 866,130 | 921,502 |
| Long-term debt........................................ | 1,562,240 | 941,423 |
| Deferred income taxes................................. | 482,062 | 373,623 |
| Postretirement benefits............................... | 221,111 | 226,018 |
| Other liabilities.................................... | 338,808 | 330,350 |
| Total liabilities................................ | 3,470,351 | 2,792,916 |
| Common stock subject to put options.......................... | 27,291 | 22,560 |
| Commitments and contingencies | | |
| Shareholders' equity: | | |
| Preferred stock, $1 par value; stated at liquidation value, convertible to Series A common stock: | | |
| Series A: 900,000 shares authorized; 824,000 shares issued and outstanding............................. | 411,784 | 411,784 |
| Series B: 8,439,000 shares authorized; no shares issued or outstanding.............................. | -- | -- |
| Series C-1: 381,000 shares authorized, issued and outstanding......................................... | 190,486 | 190,486 |
| Series C-2: 245,000 shares authorized, issued and outstanding......................................... | 122,550 | 122,550 |
| Preferred stock, $1 par value; 23,035,000 shares authorized, no shares issued or outstanding........... | -- | -- |
| Common stock, $1 par value: | | |
| Series A: 500,000,000 shares authorized; 93,879,000 and 86,831,000 shares issued and outstanding..................... | 93,879 | 86,831 |
| Series B: 100,000,000 shares authorized; no shares issued or outstanding................................ | -- | -- |
| Series C: Convertible to Series A common stock; 300,000,000 shares authorized, 18,246,000 and 25,258,000 shares issued and outstanding.............. | 18,246 | 25,258 |
| Additional paid-in capital............................... | 1,299,931 | 1,278,916 |
| Retained earnings..................................... | 1,784,793 | 1,653,736 |
| Accumulated other comprehensive income.................... | 26,879 | 26,491 |
| Less treasury stock, at cost: | | |
| Series A common stock, 52,387,000 and 38,708,000 shares; Series A preferred stock, 735,000 shares; Series C-1 preferred stock, 305,000 and no shares; and Series C-2 preferred stock, 196,000 and no shares..... | (3,548,819) | (2,453,599) |
| Total shareholders' equity........................ | 399,729 | 1,342,453 |
| Total liabilities and shareholders' equity........ | $ 3,897,371 | $ 4,157,929 |

See notes to consolidated financial statements.

31

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
(IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

THREE YEARS ENDED DECEMBER 31, 1999

|  | PREFERRED STOCK | | | | COMMON STOCK | |
|---|---|---|---|---|---|---|
|  | SERIES A | SERIES B | SERIES C-1 | SERIES C-2 | SERIES A | SERIES C |
| BALANCE AT DECEMBER 31, 1996 | $411,784 | $164,595 | $ -- | $ -- | $69,757 | $26,973 |
| Comprehensive income: |  |  |  |  |  |  |
| Net income | -- | -- | -- | -- | -- | -- |
| Other comprehensive income, net of income taxes: |  |  |  |  |  |  |
| Change in net unrealized losses on securities | -- | -- | -- | -- | -- | -- |
| Minimum pension liability adjustment | -- | -- | -- | -- | -- | -- |
| Foreign currency translation adjustments | -- | -- | -- | -- | -- | -- |
| Comprehensive income | -- | -- | -- | -- | -- | -- |
| Conversion to Series A common related to: |  |  |  |  |  |  |
| Series C common | -- | -- | -- | -- | 11,127 | (11,127) |
| Series B preferred | -- | (164,595) | -- | -- | 4,446 | -- |
| Merger with Chandis Securities | -- | -- | 190,486 | 122,550 | 6,582 | 9,656 |
| Issuance/Purchase of shares: |  |  |  |  |  |  |
| Stock options and restricted stock | -- | -- | -- | -- | 1,070 | 1 |
| Acquisition | -- | -- | -- | -- | 45 | -- |
| Stock purchase program | -- | -- | -- | -- | (6,475) | -- |
| TMCT I, LLC contributed shares | -- | -- | -- | -- | -- | -- |
| Put options: |  |  |  |  |  |  |
| Sale | -- | -- | -- | -- | -- | -- |
| Exercise | -- | -- | -- | -- | -- | -- |
| Change in redemption value | -- | -- | -- | -- | -- | -- |
| Dividends declared: |  |  |  |  |  |  |
| Common stock; $.55 per share | -- | -- | -- | -- | -- | -- |
| Preferred stock | -- | -- | -- | -- | -- | -- |
| BALANCE AT DECEMBER 31, 1997 | 411,784 | -- | 190,486 | 122,550 | 86,552 | 25,503 |
| Comprehensive income: |  |  |  |  |  |  |
| Net income | -- | -- | -- | -- | -- | -- |
| Other comprehensive income, net of income taxes: |  |  |  |  |  |  |
| Change in net unrealized gains on securities | -- | -- | -- | -- | -- | -- |
| Minimum pension liability adjustment | -- | -- | -- | -- | -- | -- |
| Foreign currency translation adjustments | -- | -- | -- | -- | -- | -- |
| Comprehensive income | -- | -- | -- | -- | -- | -- |
| Conversion of Series C common to Series A common | -- | -- | -- | -- | 245 | (245) |
| Issuance/Purchase of shares: |  |  |  |  |  |  |
| Stock options and restricted stock | -- | -- | -- | -- | 34 | -- |
| Purchases of common stock | -- | -- | -- | -- | -- | -- |
| Put options: |  |  |  |  |  |  |
| Sale | -- | -- | -- | -- | -- | -- |
| Exercise | -- | -- | -- | -- | -- | -- |
| Change in redemption value | -- | -- | -- | -- | -- | -- |
| Dividends declared: |  |  |  |  |  |  |
| Common stock; $.72 per share | -- | -- | -- | -- | -- | -- |
| Preferred stock | -- | -- | -- | -- | -- | -- |
| BALANCE AT DECEMBER 31, 1998 | 411,784 | -- | 190,486 | 122,550 | 86,831 | 25,258 |
| Comprehensive income: |  |  |  |  |  |  |
| Net income | -- | -- | -- | -- | -- | -- |
| Other comprehensive income, net of income taxes: |  |  |  |  |  |  |
| Change in net unrealized losses on securities | -- | -- | -- | -- | -- | -- |
| Minimum pension liability adjustment | -- | -- | -- | -- | -- | -- |
| Foreign currency translation adjustments | -- | -- | -- | -- | -- | -- |
| Comprehensive income | -- | -- | -- | -- | -- | -- |
| Conversion of Series C common to Series A common | -- | -- | -- | -- | 776 | (776) |
| Issuance/Purchase of shares: |  |  |  |  |  |  |
| Stock options and restricted stock | -- | -- | -- | -- | 36 | -- |
| Purchases of common stock | -- | -- | -- | -- | -- | -- |
| TMCT II, LLC contributed shares | -- | -- | -- | -- | 6,236 | (6,236) |
| Put options: |  |  |  | -- |  |  |
| Sale | -- | -- | -- | -- | -- | -- |
| Exercise | -- | -- | -- | -- | -- | -- |
| Change in redemption value | -- | -- | -- | -- | -- | -- |
| Dividends declared: |  |  |  |  |  |  |
| Common stock; $.80 per share | -- | -- | -- | -- | -- | -- |
| Preferred stock | -- | -- | -- | -- | -- | -- |
| BALANCE AT DECEMBER 31, 1999 | $411,784 | $ -- | $190,486 | $122,550 | $93,879 | $18,246 |

See notes to consolidated financial statements.

32

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000          Powered by Morningstar® Document Research℠

```
     -----------------------------------------------------------------------
                            ACCUMULATED
       ADDITIONAL              OTHER
        PAID-IN     RETAINED  COMPREHENSIVE   TREASURY
        CAPITAL     EARNINGS    INCOME         STOCK         TOTAL
       ----------  ----------  ------------  -----------   ----------

     $  225,934  $  546,881    $52,886     $      --     $1,498,810
           --       250,312        --           --         250,312
           --          --       (38,170)        --         (38,170)
           --          --         1,902          --           1,902
           --          --        (3,814)         --          (3,814)
                                                           ----------
           --          --          --            --         210,230
           --          --          --            --            --
        160,119        (8)         --            --            (38)
        807,834        --          --       (1,125,064)      12,044
         45,711     (17,509)       --          32,741        62,014
          2,354        --          --            --           2,399
        (16,190)   (309,734)       --         (132,382)    (464,781)
           --          --          --         (380,093)    (380,093)
          3,227        --          --            --           3,227
          (419)        --          --           (6,527)      (6,946)
         24,572        --          --            --          24,572
           --       (50,885)       --            --         (50,885)
           --       (34,554)       --            --         (34,554)
       ----------  ----------  -------     -----------   ----------
      1,253,142     384,503     12,804      (1,611,325)     875,999
           --     1,417,338        --            --       1,417,338
           --          --        16,106          --          16,106
           --          --        (1,169)         --          (1,169)
           --          --        (1,250)         --          (1,250)
                                                           ----------
           --          --          --            --       1,431,025
           --          --          --            --            --
         31,906     (65,952)       --          125,229       91,217
           --          --          --         (947,203)    (947,203)
          2,891        --          --            --           2,891
           (63)        --          --          (20,300)     (20,363)
         (8,960)       --          --            --          (8,960)
           --       (60,456)       --            --         (60,456)
           --       (21,697)       --            --         (21,697)
       ----------  ----------  -------     -----------   ----------
      1,278,916   1,653,736     26,491      (2,453,599)   1,342,453
           --       259,086        --            --         259,086
           --          --        (8,864)         --          (8,864)
           --          --        (1,692)         --          (1,692)
           --          --        10,944          --          10,944
                                                           ----------
           --          --          --            --         259,474
           --          --          --            --            --
         22,823     (53,265)       --          120,442       90,036
           --          --          --         (196,471)    (196,471)
           --          --          --       (1,000,817)  (1,000,817)
          2,923        --          --            --           2,923
         (4,731)       --          --          (18,374)     (18,374)
           --       (56,698)       --            --         (56,698)
           --       (18,066)       --            --         (18,066)
       ----------  ----------  -------     -----------   ----------
     $1,299,931  $1,784,793    $26,879    $(3,548,819)  $  399,729
       ==========  ==========  =======     ===========   ==========
```

33

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

CONSOLIDATED STATEMENTS OF CASH FLOWS
(IN THOUSANDS)

|  | YEAR ENDED DECEMBER 31 | | |
|---|---|---|---|
|  | 1999 | 1998 | 1997 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Income from continuing operations......................... | $ 259,062 | $ 134,059 | $234,655 |
| Adjustments to derive cash flows from continuing operating activities: | | | |
| Depreciation and amortization........................... | 144,955 | 135,175 | 124,064 |
| Restructuring and other charges: | | | |
|   Impairments and other asset write-offs............... | -- | 52,783 | -- |
|   Net change in restructuring liability................. | (74,228) | 69,849 | (15,764) |
| Amortization of debt discount........................... | 21,466 | 16,998 | 9,299 |
| Gain on asset sales and writedowns, net................. | (21,832) | (31,564) | (36,302) |
| Provision for doubtful accounts......................... | 18,643 | 19,240 | 22,307 |
| Provision for deferred income taxes..................... | 44,764 | 11,417 | 41,587 |
| Changes in assets and liabilities: | | | |
|   Accounts receivable................................. | (68,541) | (23,302) | (36,625) |
|   Inventories......................................... | (6,453) | 2,755 | (740) |
|   Prepaid pension costs............................... | (25,704) | (52,664) | (39,872) |
|   Accounts payable.................................... | (6,695) | (21,557) | 18,172 |
|   Income taxes........................................ | 18,777 | (18,285) | (31,826) |
| Other, net.............................................. | 45,517 | (46,534) | 66,098 |
| Net cash provided by continuing operating activities.... | 349,731 | 248,370 | 355,053 |
| Net cash provided by (used in) discontinued operating activities........................................... | 31,495 | 72,906 | (1,702) |
|   Net cash provided by operating activities............. | 381,226 | 321,276 | 353,351 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Capital expenditures.................................... | (173,484) | (131,548) | (113,081) |
| Acquisitions, net of cash acquired...................... | (173,337) | (200,786) | (37,580) |
| Purchases of investments................................ | (84,270) | (57,433) | (10,811) |
| Proceeds from sales of investments and other assets....... | 71,455 | 38,473 | 120,774 |
| Sale (purchase) of marketable securities, net........... | 49,438 | (49,438) | -- |
| Decreases (increases) in notes receivable, net........... | 13,000 | (69,120) | -- |
| Proceeds from reorganization as described in Notes 4 and 5...................................................... | -- | 2,022,224 | -- |
| Other, net.............................................. | (7,242) | 10,211 | 8,520 |
| Net cash provided by (used in) investing activities of continuing operations.............................. | (304,440) | 1,562,583 | (32,178) |
| Net cash used in investing activities of discontinued operations............................................. | (10,232) | (29,697) | (153,335) |
|   Net cash provided by (used in) investing activities... | (314,672) | 1,532,886 | (185,513) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Contribution to TMCT II, LLC............................ | (1,235,252) | -- | -- |
| Purchases of Times Mirror common stock.................... | (196,471) | (947,203) | (464,781) |
| Dividends paid.......................................... | (74,764) | (82,153) | (85,439) |
| Net proceeds (repayments) of commercial paper and short-term borrowings................................. | (57,485) | 212,983 | 92,187 |
| Principal repayments of debt............................ | (46,567) | (71,550) | (5,769) |
| Exercise of put options, net of premiums received........ | (15,451) | (17,472) | (3,719) |
| Proceeds from issuance of long-term debt................. | 595,896 | -- | 445,429 |
| Proceeds from exercise of stock options.................. | 67,195 | 59,277 | 36,431 |
| Contribution to TMCT I, LLC............................. | -- | -- | (249,266) |
| Other, net.............................................. | (12,335) | 161 | (17,098) |
|   Net cash used in financing activities................. | (975,234) | (845,957) | (252,025) |
| Increase (decrease) in cash and cash equivalents.......... | (908,680) | 1,008,205 | (84,187) |
| Cash and cash equivalents at beginning of year........... | 1,052,999 | 44,794 | 128,981 |
| Cash and cash equivalents at end of year................. | $ 144,319 | $1,052,999 | $ 44,794 |

See notes to consolidated financial statements.

34

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000      Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 1 -- SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Principles of Consolidation. The consolidated financial statements include the accounts of the Company and its subsidiaries as well as affiliates that are controlled by the Company, as described in Note 5, after elimination of all significant intercompany transactions and balances. Other affiliated companies in which the Company owns a 20% to 50% interest or has significant influence are accounted for by the equity method.

Presentation. Certain amounts in previously issued financial statements have been reclassified to conform to the 1999 presentation. Financial information presented in the notes to consolidated financial statements excludes discontinued operations, except where noted.

Use of Estimates. Financial statements prepared in accordance with generally accepted accounting principles require management to make estimates and judgments that affect amounts and disclosures reported in the financial statements. Actual results could differ from those estimates.

Changes in Accounting Principles. As of January 1, 1999, the Company adopted the American Institute of Certified Public Accountants Statement of Position (SOP) 98-1, "Accounting for the Costs of Computer Software Developed or Obtained for Internal Use." SOP 98-1 requires the capitalization of certain costs incurred after the date of adoption in connection with developing or obtaining software for internal use. In prior years, the Company's accounting policies for internal use software were generally consistent with the requirements of SOP 98-1. Accordingly, the adoption of this pronouncement did not have a material effect on the Company's financial position or results of operations.

Cash and Cash Equivalents. Cash equivalents consist of investments that are readily convertible into cash and mature within three months from date of purchase. Cash equivalents of $113.9 million and $997.7 million at December 31, 1999 and 1998, respectively, consist of commercial paper, money market funds or certificates of deposit. The Company has an investment policy for short-term investments covering eligible types of instruments, maximum investment terms, credit quality and individual issuer limits.

Under the Company's cash management system, the bank notifies the Company daily of checks presented for payment against its primary disbursement accounts. The Company transfers funds from other sources such as short-term investments or commercial paper issuance to cover the checks presented for payment. This program results in a book cash overdraft in the primary disbursement accounts as a result of checks outstanding. The book overdraft, which was reclassified to accounts payable, was $27.4 million and $41.3 million at December 31, 1999 and 1998, respectively.

Marketable Securities. Marketable securities consist of investments in commercial paper that have maturities over three months but less than one year from date of purchase.

Inventories. Inventories are stated at the lower of cost or market. Newsprint is valued under the last-in, first-out (LIFO) method and paper and certain finished products are valued primarily under the weighted average cost method.

Property, Plant and Equipment. Property, plant and equipment is stated on the basis of cost. Maintenance and repairs are charged to expense as incurred. Additions, improvements and replacements are capitalized.

Depreciation is provided on a straight-line basis over the estimated useful lives as follows:

Buildings.................................... 10 - 45 years
Machinery and equipment...................... 3 - 20 years
Leasehold improvements....................... Lesser of useful life or lease term

Goodwill and Other Intangibles. Goodwill recognized in business combinations accounted for as purchases is being amortized on a straight-line basis primarily over periods of 15 to 40 years, with a weighted

35

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000          Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

average amortization period of 35 years. Goodwill amortization expense was $22.5 million, $18.0 million and $13.9 million for the years ended December 31, 1999, 1998 and 1997, respectively.

Other intangibles arising in connection with acquisitions are being amortized on a straight-line basis over their estimated useful lives ranging primarily from 5 to 30 years, with a weighted average life of 27 years. Amortization expense was $15.1 million, $9.9 million and $7.6 million for the years ended December 31, 1999, 1998 and 1997, respectively.

The Company assesses on an ongoing basis the recoverability of long-lived assets, including goodwill and other intangible assets, based on estimates of future undiscounted cash flows for the applicable business compared to net book value. If the future undiscounted cash flows estimate were less than net book value, net book value would then be reduced to fair value based on an estimate of discounted cash flows. The Company also evaluates the amortization periods of these assets to determine whether events or circumstances warrant revised estimates of useful lives.

Deferred Charges. Magazine subscription procurement costs are charged to expense over the same period as the related revenue is earned.

Derivative Financial Instruments. Interest rate swaps (see Note 9) are used to manage exposure to market risk associated with changes in interest rates. Interest rate swaps are accounted for on the accrual basis. Payments made or received are recognized as an adjustment to interest expense. Amounts received or paid in connection with initiating or terminating swaps are amortized on a straight-line basis as a reduction or increase in interest expense over the term of the swaps.

Premium equity participating debt securities (see Note 12) are used to manage the Company's exposure to market risk associated with changes in the fair value of the Company's investment in the common stock of America Online, Inc. (AOL).

The Company's exposure to market risk associated with fluctuations in the value of foreign currencies relative to the U.S. dollar may be managed with foreign currency forward contracts, currency options, currency swaps or other risk management instruments permitted by the Company's internal policy guidelines. The Company's forward contracts and other risk management instruments were not significant.

Commodity price hedging contracts (see Note 9) are used to manage the Company's exposure to market risk associated with fluctuations in newsprint prices. These contracts are accounted for on the accrual basis. Periodic settlement payments made or received are recognized as an adjustment to the cost basis of newsprint inventory. Amounts paid in connection with initiating these contracts are amortized on a straight-line basis as an adjustment to the cost basis of newsprint inventory over the term of the contracts.

Put options are used in conjunction with the Company's common stock purchase program. These contracts are entered into based on market conditions as well as other factors. The costs or benefits derived from these equity-based financial instruments are recorded in shareholders' equity on the date of the transaction. The potential obligation under these put options outstanding at December 31, 1999 and 1998 has been transferred from shareholders' equity to "Common stock subject to put options."

Revenue Recognition. Revenues from certain products sold with the right of return, are recognized net of a provision for estimated returns. Revenues from newspaper and magazine subscriptions and annual subscriptions for aeronautical charts are deferred as unearned income at the time of the sale. A pro rata share of the newspaper and magazine subscription price is included in revenue as products are delivered to subscribers. Annual subscription revenues for aeronautical charts are recognized on a straight-line basis over the life of the subscription service.

36

Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

Advertising and Promotion Costs. Advertising and promotion costs, which are expensed as incurred, amounted to $70.9 million, $59.9 million and $64.8 million for the years ended December 31, 1999, 1998 and 1997, respectively.

Foreign Currency Translation. The assets and liabilities of foreign operations are translated at year-end exchange rates. Results of operations are translated at average exchange rates in effect during the year. Translation adjustments are included in "Accumulated other comprehensive income" in the Consolidated Balance Sheets and Statements of Shareholders' Equity.

Stock-Based Compensation. Employee stock options (see Note 14) are accounted for under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," which requires the recognition of expense when the option price is less than the fair value of the stock at the date of grant. The Company awards options for a fixed number of shares at an option price equal to the fair value at the date of grant. Accordingly, the financial statements do not include any expense related to employee stock option awards. The Company has adopted the disclosure-only provisions of Statement of Financial Accounting Standards (SFAS) No. 123, "Accounting for Stock-Based Compensation."

Future Accounting Requirement. In June 1998, the Financial Accounting Standards Board (FASB) issued Statement No. 133 "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133). Subsequently, the FASB issued Statement No. 137, "Accounting for Derivative Instruments and Hedging Activities -- Deferral of the Effective Date of FASB Statement No. 133" which deferred the effective date of SFAS 133 for one year. This standard is effective for all fiscal quarters of all fiscal years beginning after June 15, 2000. SFAS 133 will require the Company to record all derivatives as assets or liabilities at fair value. Changes in derivative fair values will either be recognized in earnings, offset against changes in the fair value of the related hedged assets, liabilities and firm commitments or, for forecasted transactions, recorded as a component of accumulated other comprehensive income in shareholders' equity until the hedged transactions occur and are recognized in earnings. The ineffective portion of a hedging derivative's change in fair value will be recognized in earnings immediately. The impact of SFAS 133 on the Company's financial statements will depend on a variety of factors, including, the extent of the Company's hedging activities, the types of hedging instruments used and the effectiveness of such instruments. The effect of adopting SFAS 133 is currently being evaluated, however, management does not anticipate that the adoption of this standard will have a significant effect on earnings or the financial position of the Company.

NOTE 2 -- 1999 RECAPITALIZATION

In September 1999, the Company completed a transaction (1999 recapitalization) involving agreements with its largest shareholders, Chandler Trust No. 1 and Chandler Trust No. 2 (Chandler Trusts). The 1999 recapitalization resulted in the formation of a new limited liability company, TMCT II, LLC (TMCT II).

Pursuant to the TMCT II contribution agreement, the Company, Eagle New Media Investments, LLC and Eagle Publishing Investments, LLC (Eagle Companies) and the Chandler Trusts made the following capital contributions to TMCT II:

1. The Company contributed preferred units issued by the operating partnerships of 8 unrelated real estate investment trusts (OP REIT Interests) with an aggregate purchase price of $600.0 million and $2.0 million in cash;

2. The Eagle Companies contributed a total of $633.3 million in cash or cash equivalents; and

3. The Chandler Trusts contributed 9.3 million shares of the Company's Series A common stock, 6.2 million shares of the Company's Series C common stock, 381 thousand shares of the Company's Series C-1 preferred stock and 245 thousand shares of the Company's Series C-2 preferred stock (TMCT II Contributed Shares).

37

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

The Company's purchase of the OP REIT Interests was funded with the proceeds of a $550.0 million short-term bank line of credit provided by Citicorp and its commercial paper line. The Company refinanced this line of credit in October 1999 (see Note 12). The cash contributed by the Company and the Eagle Companies was used by TMCT II to purchase a portfolio of securities (TMCT II Portfolio).

The Company, the Eagle Companies and the Chandler Trusts share in the cash flow of the various assets held by TMCT II. The cash flow from the OP REIT Interests and the TMCT II Portfolio is largely allocated to the Chandler Trusts with the remaining portion of the cash flow from the OP REIT Interests and the TMCT II Portfolio primarily allocated to the Eagle Companies. The cash flow from the TMCT II Contributed Shares is largely allocated to the Company with the remaining portion of the cash flow from the TMCT II Contributed Shares primarily allocated to the Chandler Trusts. Due to the allocations of the economic benefits in TMCT II, for financial reporting purposes, 80% of the TMCT II Contributed Shares are included in treasury stock, 80% of the preferred stock dividends on the Series C-1 and C-2 preferred stock are excluded from preferred stock dividends and 80% of the dividends on the common stock are effectively eliminated. The Company and the Eagle Companies account for their investment in the TMCT II OP REIT Interests and the TMCT II Portfolio under the equity method and this net investment at December 31, 1999. During 1999, the Company and the Eagle Companies recognized $4.1 million of equity income related to this investment.

At December 31, 1999, the assets of TMCT II, excluding the TMCT II Contributed Shares, consisted primarily of $600.0 million of OP REIT Interests, $475.6 million of fixed income investments, $93.0 million of private equity investments and $69.6 million of cash and cash equivalents. TMCT II may invest a total of $560.0 million in venture capital or private equity investments. TMCT II recognizes unrealized losses on its venture capital and private equity investments and defers the recognition of unrealized gains on these investments until realized. In the fourth quarter of 1999, the Company and Eagle New Media Investments, LLC sold certain venture capital investments with a cost basis of $16.2 million to TMCT II for proceeds of $31.4 million and has deferred recognition of any gain until these investments are sold by TMCT II to third parties unaffiliated with the Company. These proceeds are included in "Proceeds from sales of investments and other assets" in the Consolidated Statements of Cash Flows.

In connection with the 1999 recapitalization, the Company replaced the Series C-1 and C-2 preferred stocks with Series D-1 and D-2 preferred stocks effective January 1, 2000. The Series D-1 and D-2 preferred stocks are identical to the Series C-1 and C-2 preferred stocks except that the increases in the dividend rate on the Series D-1 and D-2 preferred stocks are pursuant to a fixed and certain schedule.

As a result of the 1999 recapitalization, for financial reporting purposes, the following number of shares have been included as treasury stock and excluded from earnings per share calculations:

1. 12.4 million shares of Series A and C common stocks;

2. 305 thousand shares of Series C-1 preferred stock;

3. 196 thousand shares of Series C-2 preferred stock.

NOTE 3 -- 1997 RECAPITALIZATION

During the third quarter of 1997, the Company completed a transaction (1997 recapitalization) involving agreements with its largest shareholders, the Chandler Trusts. The 1997 recapitalization consisted of two components: (a) the merger of Chandis Securities Company (Chandis), a holding company owned by Chandler Trust No. 2 and affiliated minority investors, into Chandis Acquisition Corporation (CAC), a Delaware corporation and wholly-owned subsidiary of the Company (Merger) and (b) the formation of a new limited liability company by the Chandler Trusts and the Company.

38

Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

On August 8, 1997, Chandis merged with and into CAC. Pursuant to the Merger Agreement, the Chandis shareholders received 6.6 million shares of Series A common stock, 9.7 million shares of Series C common stock, 381 thousand shares of new Series C-1 preferred stock, and 245 thousand shares of new Series C-2 preferred stock. At the time of the Merger, Chandis owned 8.6 million shares of Series A common stock, 9.7 million shares of Series C common stock, and 381 thousand shares of Series A preferred stock as well as an interest in undeveloped real estate and certain other assets and liabilities. CAC is not a "permitted transferee" as defined in the Company's Certificate of Incorporation, therefore, the Series C common stock was converted to Series A common stock as a result of the Merger. The Company's shares owned by CAC are reported as treasury stock for financial reporting purposes. The Merger was a tax-free transaction.

Concurrent with the consummation of the Merger, the Company (including certain of its subsidiaries) and the Chandler Trusts formed TMCT, LLC (TMCT I), a Delaware limited liability company, and the following capital contributions were made to TMCT I:

1.  The Company contributed $249.3 million in cash and 8 real properties (Real Properties) with an aggregate market value of $225.9 million;

2.  The Chandler Trusts contributed 5.0 million shares of Series A common stock and 443 thousand shares of Series A preferred stock (TMCT I Contributed Shares).

The cash contributed by the Company was used by TMCT I to purchase a portfolio of securities (TMCT I Portfolio). The Company has leased the Real Properties from TMCT I under a lease with minimum lease payments equal to the fair values and with an initial term of 12 years. During 1999 and 1998, the Company made annual lease payments to TMCT I of $24.2 million. The lease is accounted for as a financing arrangement and, accordingly, the Real Properties' book value remains on the Company's consolidated balance sheet and continues to be depreciated at the rates in effect prior to the contribution of the Real Properties to TMCT I. The depreciation, along with a reduction of property, plant and equipment of $168.0 million, which represents the estimated net book value of the Real Properties at the end of the lease term, will result in a net book value of zero for the Real Properties at August 3, 2009. At that time, the Company has the option to purchase all the Real Properties for their fair market value. If the Real Properties are not purchased by the Company, they will remain the assets of TMCT I and may be leased by the Company at a fair value rent as provided for under the terms of the lease agreement. The lease provides for two additional 12-year lease terms with fair value purchase options at the end of each lease term. The lease is included as a property financing in the Company's outstanding debt obligations (see Note 12).

The Company and the Chandler Trusts share in the cash flow of the various assets held by TMCT I. The cash flow from the Real Properties and the TMCT I Portfolio is largely allocated to the Chandler Trusts and the cash flow from the TMCT I Contributed Shares is largely allocated to the Company. Due to the allocations of the economic benefits in the TMCT I, 80% of the TMCT I Contributed Shares are included in treasury stock for financial reporting purposes and 80% of the preferred stock dividends on the Series A preferred stock are excluded from preferred stock dividends. The Company accounts for the investment in the TMCT I Portfolio under the equity method. This net investment was $86.0 million and $96.4 million at December 31, 1999 and 1998, respectively. During 1999 and 1998, the Company recognized an equity loss of $3.5 million and equity income of $3.7 million related to this investment, respectively. The assets of TMCT I, excluding the TMCT I Contributed Shares, primarily consist of Real Properties of $205.8 million and $214.0 million, fixed income investments of $207.3 million and $213.2 million, and equity investments of $46.2 million and $45.3 million at December 31, 1999 and 1998, respectively.

39

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

As a result of the 1997 recapitalization, for financial reporting purposes, the following number of shares have been included as treasury stock and excluded from earnings per share calculations:

1. 6.0 million shares of Series A common stock;

2. 735 thousand shares of Series A preferred stock.

NOTE 4 -- DISCONTINUED OPERATIONS

In September 1999, Times Mirror announced its decision to sell AchieveGlobal, Inc., a professional training company, Allen Communication, an interactive software and training courseware developer, and The StayWell Company, a health improvement information company. The Company decided to sell these businesses in order to concentrate on its core strengths in newspaper publishing, flight information and magazine publishing. While the Company previously expected to complete the sale of AchieveGlobal in the first quarter of 2000, the Company now believes that greater sales value can be realized by allowing AchieveGlobal to fully implement certain of its strategic initiatives. Currently, the Company anticipates selling AchieveGlobal by the end of 2000. The accompanying financial statements reflect these businesses as discontinued operations for all periods presented.

During the second quarter of 1998, the Company reached agreements to divest Matthew Bender & Company, Incorporated (Matthew Bender), the Company's legal publisher, in a tax-free reorganization (see Note 5) and its 50% ownership interest in legal citation provider Shepard's. The two transactions were valued at $1.65 billion in the aggregate and were completed in the third quarter of 1998. The disposition of the Company's 50% interest in Shepard's was consummated by a transfer of the respective partnership interests owned by two subsidiaries of the Company to affiliates of Reed Elsevier plc for a cash consideration of $274.7 million. The Company recorded a net gain on these two transactions in the amount of $1.11 billion, net of expenses and $163.6 million of income taxes, primarily consisting of tax reserves (see Note 11). Also during the second quarter of 1998, the Company reached an agreement to divest Mosby, Inc. (Mosby), the Company's health science/medical publisher, in a tax-free reorganization (see Note 5). The transaction was valued at $415.0 million and was completed in the fourth quarter of 1998. The Company recorded a net gain on this transaction in the amount of $239.0 million, net of expenses and $55.6 million of income taxes, primarily consisting of tax reserves (see Note 11). While the Company believes that the Matthew Bender and Mosby transactions were completed on a tax-free basis, this position may be subject to review by the Internal Revenue Service. These divestitures represent the final dispositions of the Company's professional and higher education publishing businesses and, as such, have been reflected as discontinued operations in the accompanying financial statements for all periods presented.

During the third quarter of 1998, the Company decided to discontinue Apartment Search, Inc., its apartment location business. In 1998, the Company recorded an estimated loss on disposal including a provision for operating losses of $3.4 million during the phase-out period. The total estimated loss of $47.6 million, or $28.2 million after applicable tax benefit, is included in discontinued operations in "Net gain on disposal, net of taxes" in the Consolidated Statements of Income. The Company completed the sale of Apartment Search, Inc. in March 1999.

40

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

A summary of the combined results of operations and net gain on disposal
for all discontinued entities are as follows (in thousands):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| Revenues.......................................... | $186,578 | $  507,475 | $673,393 |
| Income (loss) before income taxes(1).............. | $  2,271 | $  (25,521) | $ 20,808 |
| Income tax provision.............................. | 2,247 | 7,886 | 5,151 |
| Income (loss) from discontinued operations........ | 24 | (33,407) | 15,657 |
| Net gain on disposal, net of taxes(2)............. | -- | 1,316,686 | -- |
| Total discontinued operations........... | $    24 | $1,283,279 | $ 15,657 |

---------------

(1) It is the Company's policy to allocate interest expense among business
    segments including discontinued operations. The allocation to discontinued
    operations is based on the ratio of net assets of discontinued operations
    plus consolidated debt, other than debt of the discontinued operations that
    will be assumed by the buyer and debt that can be directly attributed to the
    discontinued operations. Income (loss) before income taxes includes a charge
    for interest expense of $7.6 million, $18.1 million and $17.0 million for
    the years ended December 31, 1999, 1998 and 1997, respectively. The results
    of discontinued operations include pretax restructuring, one-time and other
    charges of $59.1 million and $12.8 million for the years ended December 31,
    1998 and 1997, respectively.

(2) Net of income taxes of $198.0 million in 1998.

The assets and liabilities of discontinued operations have been classified
in the Consolidated Balance Sheets as net assets of discontinued operations and
consist of the following (in thousands):

|  | DECEMBER 31 | |
|---|---|---|
|  | 1999 | 1998 |
| Accounts receivable, net.................................... | $ 33,373 | $ 58,256 |
| Other current assets........................................ | 27,289 | 49,310 |
| Property, plant and equipment, net.......................... | 12,638 | 14,838 |
| Goodwill, net............................................... | 57,236 | 62,861 |
| Other intangibles, net...................................... | 65,066 | 68,256 |
| Other assets................................................ | 18,213 | 21,986 |
| Total assets................................... | 213,815 | 275,507 |
| Current liabilities......................................... | 32,922 | 77,164 |
| Non-current liabilities..................................... | 7,803 | 8,715 |
| Total liabilities............................... | 40,725 | 85,879 |
| Net assets of discontinued operations...................... | $173,090 | $189,628 |

41

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

The major components of cash flow for discontinued operations are as follows (in thousands):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| Income (loss) from discontinued operations........ | $    24 | $(33,407) | $  15,657 |
| Depreciation and amortization...................... | 9,620 | 25,572 | 31,319 |
| Amortization of product costs..................... | 4,796 | 16,550 | 22,655 |
| Other, net........................................ | 17,055 | 64,191 | (71,333) |
| Net cash provided by (used in) discontinued operating activities........................ | $ 31,495 | $ 72,906 | $  (1,702) |
| Capitalization of product costs................... | $ (5,994) | $(16,852) | $ (21,490) |
| Acquisitions, net of cash acquired............... | -- | -- | (96,213) |
| Capital expenditures............................. | (4,256) | (11,485) | (16,836) |
| Other, net....................................... | 18 | (1,360) | (18,796) |
| Net cash used in investing activities of discontinued operations..................... | $(10,232) | $(29,697) | $(153,335) |

NOTE 5 -- REORGANIZATION

During the third quarter of 1998, the Company completed the disposition of Matthew Bender in a tax-free reorganization with Reed Elsevier plc. The disposition of Matthew Bender was accomplished through the merger of an affiliate of Reed Elsevier with and into Matthew Bender, with Matthew Bender as the surviving corporation in the merger. As a result of the merger, TMD, Inc., a wholly-owned subsidiary of Times Mirror, received all of the issued and outstanding common stock of CBM Acquisition Parent Co. (MB Parent). MB Parent is a holding company that owns controlling voting preferred stock of Matthew Bender with a stated value of $61.6 million and participating preferred stock of Matthew Bender. MB Parent is also the sole member of Eagle New Media Investments, LLC (Eagle New Media). Affiliates of Reed Elsevier own voting preferred stock of MB Parent with a stated value of $68.8 million which affords them voting control over MB Parent, subject to certain rights held by Times Mirror with respect to Eagle New Media. Concurrently, with the closing of the merger, the Company became the sole manager of Eagle New Media and controls its operations and assets. The consolidated financial statements of the Company include the accounts of Eagle New Media.

During the fourth quarter of 1998, the Company completed the disposition of Mosby in a tax-free reorganization with Harcourt General, Inc. The disposition of Mosby was accomplished through the merger of an affiliate of Harcourt General, Inc. with and into Mosby, with Mosby as the surviving corporation in the merger. As a result of the merger, the Company received all of the issued and outstanding common stock of Mosby Parent Corp. (Mosby Parent). Mosby Parent is a holding company that owns controlling voting preferred stock of Mosby with a stated value of $48.3 million and participating preferred stock of Mosby. Mosby Parent is also the sole member of Eagle Publishing Investments, LLC (Eagle Publishing). An affiliate of Harcourt General, Inc. owns voting preferred stock of Mosby Parent with a stated value of $50.0 million which affords it voting control over Mosby Parent, subject to certain rights held by the Company with respect to Eagle Publishing. Concurrently with the closing of the merger, the Company became the sole manager of Eagle Publishing and controls its operations and assets. The consolidated financial statements of the Company include the accounts of Eagle Publishing.

The Company intends to deploy the assets of both Eagle New Media and Eagle Publishing to finance acquisitions and investments, including purchases of the Company's common stock, and does not intend to use those funds for the Company's general working capital purposes.

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

NOTE 6 -- ACQUISITIONS, DISPOSITIONS AND WRITEDOWNS

Acquisitions. In February 1999, Eagle New Media acquired Newport Media, Inc., a publisher of shopper publications in the Long Island and New Jersey areas, for approximately $132.0 million. This acquisition resulted in goodwill of $68.5 million and other intangible assets of $90.8 million, which are being amortized primarily over a period of 30 years. The Company also made other acquisitions during 1999 for an aggregate consideration of $41.3 million. These other acquisitions resulted in goodwill of $26.8 million and other intangible assets of $15.2 million, which are being amortized over periods of 5 to 25 years.

In April 1998, the Company acquired the Los Angeles area business of E Z Buy & E Z Sell Recycler Corporation (Recycler), consisting primarily of the Recycler publications in the Los Angeles, Orange, Riverside, San Bernardino and Ventura counties and a portion of Santa Barbara county for $188.7 million. This acquisition resulted in goodwill of $147.5 million and other intangible assets of $69.4 million, which are being amortized primarily over 30 years. The Company also invested in preferred stock and provided a term loan to Target Media Partners, a new entity which owns all of the non-Los Angeles area assets of Recycler, for a total amount of $34.8 million. The Company also made other acquisitions during 1998 for an aggregate consideration of $12.1 million. Goodwill of $13.8 million related to these other acquisitions is being amortized primarily over 15 years.

In 1997, the Company acquired Patuxent Publishing Company, a publisher of 13 community weeklies in Maryland and This Week Publications, Inc., a free weekly shopper distributed in Queens and Long Island, New York. These and other small acquisitions resulted in goodwill of $69.5 million, which is being amortized over periods of 15 to 30 years.

These acquisitions were accounted for by the purchase method with the results of operations included in the Company's financial statements from the dates of acquisition. Pro forma results for 1999, 1998 and 1997, assuming these acquisitions occurred on January 1 of the respective year, are not materially different from the results reported.

Dispositions and Writedowns. In September 1999, the Company announced its decision to sell the properties of The Sporting News, a sports magazine, including its Web site sportingnews.com. The assets and liabilities of The Sporting News have been classified as held for sale and are included in "Other current assets" and "Other current liabilities" in the Consolidated Balance Sheets. The assets of The Sporting News totaled $46.6 million at December 31, 1999 and consisted primarily of accounts receivable and deferred charges. The liabilities of The Sporting News totaled $54.0 million at December 31, 1999 and were comprised primarily of unearned income. During 1999, The Sporting News had revenues of $37.2 million and an operating loss of $6.7 million.

In May 1999, the Company completed an agreement to merge Hollywood Online, Inc. and its Web site, hollywood.com, into Hollywood.com, Inc. (formerly Big Entertainment, Inc.) in exchange for newly-issued restricted stock of Hollywood.com, Inc. and a note with a then combined current value of approximately $31.5 million. The Company recorded a gain of $17.2 million, or $10.7 million after applicable income taxes, related to this disposition.

During 1999, the Company sold 316 thousand shares of its holdings in AOL common stock and purchased an equal proportion of its 4 1/4% Premium Equity Participating Securities (PEPS) obligation in the open market. The PEPS hedge the Company's investment in AOL (see Note 12). These transactions resulted in a net gain of $16.9 million, or $10.0 million after applicable income taxes. Additionally, the Company recorded gains on other non-operating items and reduced the carrying value of certain new media and other investments. The total net gains of $27.1 million are included in "Other, net" in the Consolidated Statements of Income.

43

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                     Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

During 1998, the Company sold 442 thousand shares of its holdings in Netscape Communications Corporation (Netscape) common stock (subsequently purchased by AOL) and purchased an equal proportion of its PEPS obligation in the open market. These transactions resulted in a net gain of $16.0 million, or $9.5 million after applicable income taxes. The Company also disposed of various excess real estate and other assets for an aggregate gain of $16.1 million, or $9.6 million after applicable income taxes. The total gains of $32.1 million are included in "Other, net" in the Consolidated Statements of Income.

During 1997, the Company sold certain equity investments, including Tejon Ranch Co., WebTV Network, Inc., Netscape, Speedvision Network, LLC and Outdoor Life Network, LLC, for an aggregate gain of $75.6 million, or $47.7 million after applicable income taxes. Additionally, the Company had writedowns and expenses related to non-operating items as well as losses on the sale of Harry N. Abrams, Inc., National Journal, Inc. and other assets of $39.3 million, or $29.8 million after applicable income taxes. The total net gains of $36.3 million are included in "Other, net" in the Consolidated Statements of Income.

NOTE 7 -- RESTRUCTURING, ONE-TIME AND OTHER CHARGES

In 1998, the Company undertook a comprehensive review of its business operations to determine areas where operational efficiencies could be achieved through either product and/or facility consolidation, headcount reductions, product abandonments, contract terminations or other measures. The Company began this review in anticipation of the impact of its significant 1998 divestitures and to better align its overall cost structure and business configurations. The Company's review led to a major restructuring program that resulted in the recording of $155.7 million in 1998.

A summary of the significant components of the 1998 restructuring program is as follows (in thousands):

|  | NEWSPAPER PUBLISHING | PROFESSIONAL INFORMATION | MAGAZINE PUBLISHING | CORPORATE AND OTHER | TOTAL |
|---|---|---|---|---|---|
| Termination benefits........ | $ 43,406 | $2,021 | $   156 | $10,270 | $ 55,853 |
| Contract terminations....... | 51,386 | -- | 4,330 | -- | 55,716 |
| Goodwill impairments........ | 324 | -- | 19,715 | -- | 20,039 |
| Lease termination costs..... | 2,307 | 2,764 | 1,500 | 3,045 | 9,616 |
| Technology asset write-offs................ | 4,772 | 1,378 | 100 | 1,504 | 7,754 |
| Other costs................. | 310 | 2,011 | 3,271 | 1,111 | 6,703 |
|  | $102,505 | $8,174 | $29,072 | $15,930 | $155,681 |

A discussion of the specific restructuring activities follows:

Termination Benefits. Staff reductions were implemented at substantially all operating units with the majority of these actions performed within the Newspaper Publishing segment. The Los Angeles Times recorded severance charges related to 358 full-time and 534 part-time employees through either voluntary or involuntary programs, primarily occurring in the fourth quarter of 1998. The Baltimore Sun's termination charges included 81 full-time employees and Newsday determined that 23 full-time and 26 part-time employees would be released. The staff reductions within the Newspaper Publishing segment were the result of identified efficiencies from outsourcing opportunities, elimination of duplicate functions and technological improvements to the Company's processes. In total, termination benefits, which were largely severance costs, covered 576 full-time and 578 part-time employees company-wide of which 189 employees had been released by the end of 1998 with the majority of employees released by the second quarter of 1999. Termination benefits for these employees were substantially paid by the end of 1999. However, certain employees will receive payments over an extended period of time.

Contract Terminations. In reviewing the Company's processes, supply contracts and strategic alliances, the Company identified certain long-term contracts and relationships which were no longer providing benefits

44

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                              Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

to the Company's current operations. As a result, the Company recorded charges for contract terminations which included (i) the termination of a long-term contract related to Newsday's pre-print distribution business for $34.3 million, (ii) the termination of The Hartford Courant's long-standing bonus arrangement for $12.0 million and (iii) the termination of 56 distribution contracts with outside agents at the Los Angeles Times for $4.9 million.

Goodwill Impairments. In accordance with SFAS No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of," impairment charges were taken related to goodwill associated with two of the Company's magazine titles. These charges were taken as the result of disappointing market penetration and operating results and were based on discounted estimated cash flows from future operations.

Lease Termination Costs. In connection with the Company's downsizing and/or relocation of offices primarily at the Los Angeles Times and at Jeppesen's German operation, the Company recorded charges for future operating lease payments and write-offs of leasehold improvements related to facilities it will vacate. The total lease payment accrual for periods through 2010 is net of estimated sublease income of $3.4 million. No amounts have been included for any period in which the operating units will continue to occupy the premises.

Technology Asset Write-offs. During mid-1998, the Company determined that its long standing policy of allowing each operating unit to independently determine its technology requirements and make related equipment and software purchases was both inefficient as well as expensive in terms of maintenance, help desk, networking and other support costs. In connection with this decision, the Company established common hardware and software configurations to provide consistency across all business units. As a result, many operating units were required to dispose of a significant amount of technology resources to conform to the common platform. Total asset write-offs of technology-related equipment were taken in the quarter in which the equipment was replaced.

Other Costs. In performing a review of its businesses and product offerings, expenses were recognized for the termination of an Internet venture in the Magazine Publishing segment, in addition to costs for the abandonment of certain projects at Jeppesen.

Other Program Charges. In addition to the charges listed above, the Company also recorded $18.7 million for certain asset write-offs that did not meet the accounting criteria for classification as "restructuring and one-time charges." These charges, which principally included other operating asset write-offs, have been classified within "Selling, general and administrative expenses" in the Consolidated Statements of Income.

45

Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

A summary of the activity in the restructuring liabilities is as follows (in thousands):

|  | 1998 RESTRUCTURING | 1995 RESTRUCTURING | TOTAL |
|---|---|---|---|
| Balance at December 31, 1996.................... | $    -- | $ 58,819 | $ 58,819 |
| Cash payments................................ | -- | (24,483) | (24,483) |
| Other(1)..................................... | -- | 8,719 | 8,719 |
| Balance at December 31, 1997.................... | -- | 43,055 | 43,055 |
| Charged to costs and expenses................ | 155,681 | -- | 155,681 |
| Cash payments................................ | (31,654) | (19,321) | (50,975) |
| Asset write-offs............................. | (35,204) | -- | (35,204) |
| Other........................................ | 1,176 | (829) | 347 |
| Balance at December 31, 1998.................... | 89,999 | 22,905 | 112,904 |
| Cash payments................................ | (63,236) | (10,992) | (74,228) |
| Balance at December 31, 1999.................... | $ 26,763 | $ 11,913 | $ 38,676 |

---------------
(1) Includes primarily transfers from discontinued operations for restructuring liabilities not assumed by purchasers of discontinued operations.

The balance sheet classification of restructuring liabilities is as follows (in thousands):

|  | DECEMBER 31 | |
|---|---|---|
|  | 1999 | 1998 |
| Restructuring -- current liabilities |  |  |
| 1995 Restructuring........................................ | $ 7,555 | $ 15,722 |
| 1998 Restructuring........................................ | 18,240 | 76,181 |
| Other liabilities |  |  |
| 1995 Restructuring........................................ | 4,358 | 7,183 |
| 1998 Restructuring........................................ | 8,523 | 13,818 |
|  | $38,676 | $112,904 |

The current portion of restructuring liabilities relates primarily to severance and lease payments while the non-current portion principally relates to contract terminations and extended payout of severance arrangements, as well as lease payments which will be paid over lease periods extending to 2010. The Company made severance payments under all programs which totaled $37.8 million, $7.5 million and $5.6 million during 1999, 1998 and 1997, respectively. At December 31, 1999, the remaining liability for severance costs aggregated $15.1 million.

The Company periodically assesses the adequacy of its remaining restructuring liabilities and makes adjustments if required. During 1999 and 1998, these adjustments resulted in recoveries of prior year's restructuring reserves which were largely offset by restructuring requirements in those years. The net change in the restructuring liabilities as a result of these reviews has not been significant.

46

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

NOTE 8 -- SUPPLEMENTAL CASH FLOW INFORMATION

Supplemental cash flow information is as follows (in thousands):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| Interest paid...................................... | $ 65,383 | $68,571 | $  33,545 |
| Income taxes paid.................................. | 104,630 | 47,406 | 138,567 |
| Liabilities assumed in connection with acquisitions...................................... | 53,793 | 9,910 | 17,194 |
| Stock and notes receivable received from divestiture...................................... | 31,503 | -- | -- |
| Merger with Chandis: |  |  |  |
| Times Mirror stock received...................... | -- | -- | 1,116,058 |
| Other assets received............................ | -- | -- | 21,050 |
| Times Mirror stock issued........................ | -- | -- | 1,137,108 |
| Fair value of properties contributed to TMCT I..... | -- | -- | 225,850 |
| Property financing obligation, net of original issue discount.................................. | -- | -- | 57,829 |
| Notes issued in connection with an acquisition..... | -- | -- | 39,209 |

NOTE 9 -- FINANCIAL INSTRUMENTS

Financial instruments consist of the following (in thousands):

|  | DECEMBER 31 | | | |
|---|---|---|---|---|
|  | 1999 | | 1998 | |
|  | CARRYING VALUE | FAIR VALUE | CARRYING VALUE | FAIR VALUE |
| Short-term assets........................ | $  507,680 | $  507,680 | $1,414,350 | $1,414,350 |
| Long-term investments.................... | 185,299 | 185,299 | 129,364 | 129,364 |
| Notes receivable......................... | 91,056 | 91,056 | 74,082 | 74,082 |
| Short-term liabilities................... | 434,295 | 434,295 | 492,025 | 492,025 |
| Long-term debt........................... | 1,562,240 | 1,711,004 | 941,423 | 1,017,245 |
| Unrealized net gain on interest rate swaps................................... | -- | 12,959 | -- | 43,246 |

Short-Term Assets and Liabilities. The fair values of cash and cash equivalents, marketable securities, accounts receivable, accounts payable and short-term debt approximate their carrying values due to the short-term nature of these financial instruments.

Long-Term Investments. Investments in publicly traded securities are classified as available-for-sale and are stated at fair value based on quoted market prices. All other investments are recorded at the lower of cost or estimated net realizable value. The cost of the investments was $81.1 million and $42.2 million at December 31, 1999 and 1998, respectively. Unrealized gains are included in "Accumulated other comprehensive income" (see Note 18).

Notes Receivable. The carrying value of notes receivable is estimated to approximate fair values. Although there are no quoted market prices available for these instruments, the fair value estimates were based on the changes in interest rates and risk related interest rate spreads since the notes origination dates.

Long-Term Debt. The fair value of long-term debt is based primarily on the Company's current refinancing rates for publicly issued fixed rate debt with comparable maturities, except for the PEPS whose fair value is based on the open market (see Note 12).

Interest Rate Swaps. Interest rate swap agreements outstanding at December 31, 1999 were for notional amounts of $200.0 million, $170.1 million and $100.0 million expiring in 2001, 2002 and 2023, respectively, with $170.1 million and $100.0 million notional amounts also outstanding at December 31, 1998. In 1999, two

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

swaps which were outstanding as of December 31, 1998 with notional amounts of $148.0 million and $250.0 million expired during the year. The Company's swaps effectively convert a portion of the long-term fixed rate debt to a variable rate obligation based on LIBOR or the Commercial Paper rate. The fair values of the interest rate swaps are the amounts at which they could be settled based on estimates of market rates.

Commodity Price Hedging Contracts. The Company enters into various commodity hedging contracts to manage the Company's exposure to fluctuations in newsprint prices. As of December 31, 1999, the Company had newsprint swap agreements for a total notional amount of 261 thousand metric tons per year expiring in 2001, 2002 and 2003 at a weighted average contract price of $609 per metric ton. Also, the Company has a newsprint option contract for a total notional amount of 30 thousand metric tons per year expiring in 2001 at a contract price of $585 per metric ton. This option contract limits the maximum payment to $115 per metric ton above the contract price on an annual basis. At December 31, 1999, the index rate used for these contracts was $515 per metric ton. In addition to the newsprint hedging contracts, the Company has a swap contract for coated paper used in its Magazine Publishing operations for a total notional amount of 5 thousand short tons per year expiring in 2000 at a contract price of $1,047 per short ton. As no liquid forward market for newsprint or coated paper exists, it was not practicable to estimate the fair value of the commodity hedging contracts.

NOTE 10 -- INVENTORIES

Inventories consist of the following (in thousands):

|  | DECEMBER 31 | |
| --- | --- | --- |
|  | 1999 | 1998 |
| Newsprint, paper and other raw materials.................... | $28,125 | $23,404 |
| Finished products......................................... | 5,894 | 4,051 |
| Work-in-progress.......................................... | 1,063 | 983 |
|  | $35,082 | $28,438 |

Inventories determined by the last-in, first-out method were $18.1 million and $13.7 million at December 31, 1999 and 1998, respectively, and would have been higher by $15.6 million in 1999 and $16.1 million in 1998 had the first-in, first-out method (which approximates current cost) been used.

NOTE 11 -- INCOME TAXES

Income tax expense from continuing operations consists of the following (in thousands):

|  | 1999 | 1998 | 1997 |
| --- | --- | --- | --- |
| Current: |  |  |  |
|  Federal......................................... | $ 89,117 | $ 77,412 | $ 94,422 |
|  State........................................... | 33,499 | 9,515 | 13,099 |
|  Foreign......................................... | 12,849 | 12,601 | 12,736 |
| Deferred: |  |  |  |
|  Federal......................................... | 42,764 | (716) | 29,898 |
|  State........................................... | 2,000 | 12,133 | 11,689 |
|  | $180,229 | $110,945 | $161,844 |

48

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000          Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

The difference between actual income tax expense and the U.S. Federal statutory income tax expense for continuing operations is reconciled as follows (in thousands):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| Income from continuing operations before income taxes: | | | |
| United States................................... | $409,028 | $220,235 | $369,596 |
| Foreign........................................ | 30,263 | 24,769 | 26,903 |
| | $439,291 | $245,004 | $396,499 |
| Federal statutory income tax rate................. | 35% | 35% | 35% |
| Federal statutory income tax expense.............. | $153,752 | $ 85,751 | $138,775 |
| Increase (decrease) in income taxes resulting from: | | | |
| State and local income tax expense, net of Federal effect............................... | 23,074 | 14,071 | 16,112 |
| Goodwill amortization not deductible for tax purposes.................................... | 6,007 | 5,979 | 4,424 |
| Foreign tax differentials........................ | 1,327 | (1,474) | 1,439 |
| Basis difference in asset sales.................. | (420) | (2,193) | 5,249 |
| Writedown of assets............................. | -- | 6,900 | -- |
| Other........................................... | (3,511) | 1,911 | (4,155) |
| | $180,229 | $110,945 | $161,844 |

The tax effect of temporary differences results in deferred income tax assets (liabilities) and balance sheet classifications as follows (in thousands):

|  | DECEMBER 31 | |
|---|---|---|
|  | 1999 | 1998 |
| TEMPORARY DIFFERENCES | | |
| Postretirement benefits................................... | $ 84,656 | $ 86,534 |
| Other employee benefits................................... | 65,873 | 54,872 |
| State and local income taxes.............................. | 26,484 | 25,801 |
| Restructuring and one-time charges........................ | 9,035 | 26,374 |
| Valuation and other reserves.............................. | 5,657 | 6,092 |
| Other deferred tax assets................................. | 9,781 | 5,782 |
| Total deferred tax assets............................. | 201,486 | 205,455 |
| Transaction tax reserve................................... | (176,585) | (176,585) |
| Retirement and health benefits........................... | (176,505) | (153,572) |
| Depreciation and other property, plant and equipment differences............................................. | (146,546) | (158,950) |
| Intangible asset differences.............................. | (73,313) | (2,378) |
| Unrealized investment gains............................... | (25,946) | (33,055) |
| Other deferred tax liabilities............................ | (51,339) | (22,259) |
| Total deferred tax liabilities........................ | (650,234) | (546,799) |
| | $(448,748) | $(341,344) |
| BALANCE SHEET CLASSIFICATIONS | | |
| Current deferred tax assets............................... | $ 33,314 | $ 32,279 |
| Noncurrent deferred tax liabilities....................... | (482,062) | (373,623) |
| | $(448,748) | $(341,344) |

In connection with the dispositions of Matthew Bender and Mosby as discussed in Notes 4 and 5, the Company has recorded a tax reserve of $176.6 million. While the Company believes that these transactions

49

Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

were completed on a tax-free basis, this position may be subject to review by
the Internal Revenue Service. The results of such a review are unpredictable and
could result in a tax liability that is significantly higher or lower than that
which has been provided by the Company.

NOTE 12 -- DEBT

Debt consists of the following (dollars in thousands):

|  | DECEMBER 31 | |
| --- | --- | --- |
|  | 1999 | 1998 |
| Short-term debt: |  |  |
| Commercial paper at weighted average interest rates of 5.9% and 5.3%......................................... | $ 241,381 | $298,603 |
| Current maturities of long-term debt..................... | 7,149 | 7,440 |
| Other notes payable at interest rates of 6.4% and 5.4%.... | 6,304 | 6,567 |
| Total short-term debt................................. | $ 254,834 | $312,610 |
| Long-term debt: |  |  |
| 7.45% Notes due October 15, 2009, net of unamortized discount of $513......................................... | $ 399,487 | $    -- |
| 6.61% Debentures due September 15, 2027, net of unamortized discount of $95 and $98.................... | 249,905 | 249,902 |
| 4.75% Liquid Yield Option Notes due April 15, 2017, net of unamortized discount of $277,946 and $288,129.......... | 222,054 | 211,871 |
| 6.65% Notes due October 15, 2001, net of unamortized discount of $123......................................... | 199,877 | -- |
| 7 1/4% Debentures due March 1, 2013....................... | 148,215 | 148,215 |
| 7 1/4% Debentures due November 15, 2096, net of unamortized discount of $553 and $559.................. | 147,447 | 147,441 |
| 7 1/2% Debentures due July 1, 2023........................ | 98,750 | 98,750 |
| 4 1/4% PEPS due March 15, 2001; 512,050 and 863,100 securities stated at fair value........................ | 64,006 | 45,596 |
| Property financing obligation expiring on August 8, 2009, net of unamortized discount of $149,932 and $158,080, with an effective interest rate of 4.3%................ | 39,648 | 47,088 |
|  | 1,569,389 | 948,863 |
| Less current maturities..................................... | (7,149) | (7,440) |
| Total long-term debt................................. | $1,562,240 | $941,423 |

Interest rate swaps converted the weighted average interest rate on the
6.61% Debentures, the Liquid Yield Option Notes (LYONs(TM)), the 6.65% Notes,
the 7 1/4% Debentures due 2096, and the 7 1/2% Debentures from 6.4% to 6.0% for
the year ended December 31, 1999.

In connection with the 1999 recapitalization, the Company issued $200.0
million of 6.65% two-year notes maturing on October 15, 2001 and $400.0 million
of 7.45% ten-year notes maturing on October 15, 2009. The Company also entered
into a two-year interest rate swap agreement for a notional amount of $200.0
million expiring in October 2001. The swap agreement effectively converts the
Company's $200.0 million fixed rate debt at 6.65% to a variable rate obligation
based on LIBOR.

In September 1997, the Company issued $250.0 million of 6.61% Debentures
due September 15, 2027 (Debentures) with interest payable semiannually
commencing March 15, 1998. The Debentures are redeemable at the option of the
Company, in whole or in part, at any time after September 15, 2004 at a

50

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000            Powered by Morningstar® Document Research℠

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

redemption price equal to the greater of (a) 100% of the principal amount or (b) the sum of the present values of the remaining scheduled payments of principal and interest discounted to the redemption date. The Debentures may be put to the Company on September 15, 2004 at 100% of face value plus accrued interest.

In April 1997, the Company received gross proceeds of $195.5 million from the issuance of the LYONs. The LYONs are zero coupon subordinated notes with an aggregate face value of $500.0 million and a yield to maturity of 4.75%. Each LYON has a $1,000 face value and is convertible at the option of the holder any time prior to maturity. If conversion is elected, the Company will, at its option, deliver 5.828 shares of Series A common stock per each LYON or (b) cash equal to the market value of such shares. On or after April 15, 2002, the LYONs may be redeemed at any time by the Company for cash equal to the issuance price plus accrued original discount through the date of redemption. In addition, each LYON may be redeemed for cash at the option of the holder on April 15, 2002, 2007 or 2012. The cash payable for each LYON at these redemption dates is approximately $495, $625 and $791, respectively, which is equal to the issuance price plus accrued original discount through the date of redemption. The Company has an interest rate swap agreement for a notional amount of $170.1 million, expiring April 15, 2002, to exchange a fixed interest rate of 4.75% for a variable rate based on six-month LIBOR less 2.458%.

The 4 1/4% PEPS hedge the Company's investment in the common stock of AOL. The amount payable at maturity with respect to each PEPS will equal 1.8 times the average market price of one share of AOL common stock for the ten trading days ending on the second business day prior to the maturity date, subject to adjustment as a result of certain dilution events involving AOL. Holders of the PEPS bear the full risk of a decline in the value of AOL. The Company is not obligated to hold the AOL stock for any period or sell the AOL stock prior to the PEPS maturity or redemption date.

The PEPS are redeemable at the option of the Company, in whole or in part, at any time after December 15, 2000. The redemption value of each PEPS is the product of (a) the redemption ratio, as defined below, (b) 1.8 and (c) the average market price of one share of AOL common stock for the ten trading days ending on the second business day prior to the redemption date, plus cash in an amount equal to all unpaid interest, whether or not accrued, that would have been payable on the PEPS through the maturity date. The redemption ratio will equal (a) 1.0, if the market value of one share of AOL common stock is less than $21.81, or (b) a fraction, the numerator of which is $21.81 and the denominator of which is the market value of AOL common stock, if such market value is equal to or exceeds $21.81 but less than or equal to $25.08, or (c) .8696, if the market value of AOL common stock exceeds $25.08.

The PEPS are recorded at fair market value as determined in the open market and will generally move in tandem with changes in the fair market value of AOL common stock. The net unrealized loss on the PEPS at December 31, 1999 and 1998 is $26.0 million and $6.9 million, respectively, net of applicable income taxes, and is included in "Accumulated other comprehensive income." During 1999, the Company sold 316 thousand shares of AOL stock and purchased a proportionate share of its PEPS in the open market (see Note 6).

The Company has an agreement with several domestic and foreign banks for unsecured long-term revolving lines of credit that expire in April 2002. This agreement provides for borrowings up to $400.0 million at interest rates based on, at the Company's option, the banks' base rates, Eurodollar rates or competitive bid rates. The commitment fee is approximately 0.065% per annum. The lines of credit are used to support a commercial paper program. The Company's revolving lines of credit contain restrictive provisions relating primarily to interest expense coverage. The Company's earnings before interest expense, income taxes, depreciation and amortization, divided by interest expense, must be greater than or equal to 5.0.

The Company has $5.9 million of undrawn standby letters of credit at December 31, 1999.

51

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

At December 31, 1999, the aggregate principal maturities of the Company's debt are as follows (in thousands):

| | |
|---|---:|
| 2000 | $    7,149 |
| 2001 | 270,654 |
| 2002 | 6,292 |
| 2003 | 5,699 |
| 2004 | 4,975 |
| Thereafter | 1,274,620 |
| | ---------- |
| | $1,569,389 |
| | ========== |

NOTE 13 -- CAPITAL STOCK AND STOCK PURCHASE PROGRAM

Preferred Stocks. Series A, Series C-1 and Series C-2 preferred stocks are cumulative, non-voting stocks with annual dividends of 8%, 5.8% and 5.8%, respectively, based on liquidation value. Series A preferred stock was entitled to dividends effective March 1, 1995. In connection with the 1999 recapitalization, the Company replaced the Series C-1 and C-2 preferred stocks with Series D-1 and D-2 preferred stocks effective January 1, 2000. Dividends on Series D-1 and Series D-2 preferred stocks will increase pursuant to a fixed and certain schedule. Series A, Series D-1 and Series D-2 preferred stocks are convertible into Series A common stock in 2025 at the earliest. The conversion factor is calculated by dividing $500 plus accrued and unpaid dividends by the average closing prices of Series A common stock for the 20 trading days immediately preceding the conversion date. The maximum number of shares of Series A common stock into which Series D-2 preferred stock can be converted is limited to 3.0 million shares.

On February 28, 1997, the Series B preferred stock was called for redemption and was redeemed on April 2, 1997 for 4.4 million shares of Series A common stock. The conversion ratio, determined pursuant to the original terms of the Series B preferred stock, was .57083 of a share of Series A common stock. At the redemption date, the Company had forward purchase contracts for 3.9 million shares of Series B preferred stock with a weighted average forward price of $28.475 per share. These contracts provided for early termination and, in May 1997, the termination of the contract resulted in the purchase by the Company of 2.2 million shares of Series A common stock for an aggregate cost of $111.5 million.

Preferred stock is issuable in series under such terms and conditions as the Board of Directors may determine.

Common Stocks. Shares of Series A and Series C common stock are identical, except with respect to voting rights, restrictions on transfer of Series C common shares and the right to convert Series C common shares into Series A common shares. Series A common shares are entitled to one vote per share and Series C common shares are entitled to ten votes per share. Series C common shares are subject to mandatory conversion into Series A common shares upon transfer to any person other than a "Permitted Transferee" as defined in the Company's Certificate of Incorporation or upon the occurrence of certain regulatory events. Series B common stock is entitled to one-tenth vote per share and is available for common stock issuance transactions, such as underwritten public offerings and acquisitions.

Cash dividends of $.80 and $.72 per share of common stock were declared for the years ended December 31, 1999 and 1998, respectively. In February 2000, the Board of Directors approved an increase in the quarterly dividend on its common stock to $.22 per share, from $.20 per share, beginning with the March 10, 2000 payment date.

Treasury Stock. Treasury stock includes shares of Series A common stock and Series A, Series C-1 and Series C-2 preferred stock owned by affiliates as well as Series A common stock purchased by the Company as part of the stock purchase program. At December 31, 1999, 15.2 million, 4.0 million, 18.2 million and

52

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000

Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

12.4 million shares of Series A common stock included in treasury stock are owned by Eagle New Media, TMCT I, CAC and TMCT II, respectively. Also, 354 thousand and 381 thousand shares of Series A preferred stock, which are owned by TMCT I and CAC, respectively, and 305 thousand and 196 thousand shares of Series C-1 and C-2 preferred stock, respectively, which are owned by TMCT II, are included in treasury stock at December 31, 1999.

At December 31, 1998, 13.3 million, 4.0 million and 18.2 million shares of Series A common stock included in treasury stock are owned by Eagle New Media, TMCT I and CAC, respectively, and 354 thousand and 381 thousand shares of Series A preferred stock, which are owned by TMCT I and CAC, respectively, are included in treasury stock.

Stock Purchases. During 1999, the Company and Eagle New Media purchased 2.9 million common shares for a total cost of $196.5 million. An additional 325 thousand common shares were purchased for $15.5 million, net of premiums received, as a result of the exercise of put options. At December 31, 1999, the Company had 400 thousand put options outstanding with a weighted average strike price of $68.23 per common share. The cash received from the issuance of put options during 1999 and 1998 was not significant. The put options entitle the holder to sell shares of Times Mirror Series A common stock to the Company at the strike price on the expiration date of the put option. The unexpired put options are at strike prices ranging from $67.09 to $69.69. These put options expire on various dates through March 2000.

During 1998, the Company and Eagle New Media purchased 16.4 million common shares for a total cost of $947.2 million. An additional 350 thousand common shares were purchased for $17.5 million, net of premiums received, as a result of the exercise of put options. Included in the 1998 share purchases were 4.0 million shares that were purchased in the fourth quarter of 1998 as part of an accelerated purchase agreement. The shares were purchased at the closing price on the date of the agreement for $54.69 per share. The agreement provides for a purchase price adjustment based on a pro-rata settlement over a one-year period and was settled in December 1999.

During 1997, the Company purchased 8.9 million shares of Series A common stock for a total cost of $464.8 million. An additional 120 thousand shares of Series A common stock were purchased for $3.7 million, net of premiums received, as a result of the exercise of put options.

The aggregate remaining shares authorized for purchase at December 31, 1999 was approximately 3.9 million shares. The Company believes that the purchase of shares of its common stock is an attractive investment for Eagle New Media which will also enhance Times Mirror shareholder value as well as offset dilution from shares of common stock issued under the Company's stock-based employee compensation and benefit programs.

NOTE 14 -- STOCK OPTION AND AWARD PLANS

The Company has various stock option plans under which options may be granted to purchase shares of Series A common stock at a price equal to the fair market value at the date of grant. Options that are not exercised expire ten years from the date of grant. Options granted to key employees generally vest over a four-year period. Grants made under a broad-based stock option plan, for employees not eligible for other stock option grants, are fully vested three years after the date of grant. Restricted stock is also awarded to key employees. The number of restricted stock awards, including matching awards in connection with the annual incentive bonus program, is not material.

53

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

Options granted, exercised and forfeited were as follows:

|  | NUMBER OF SHARES | WEIGHTED AVERAGE EXERCISE PRICE |
|---|---|---|
| Options outstanding December 31, 1996 | 7,771,489 | $26.12 |
| Granted | 4,686,643 | 47.85 |
| Exercised | (1,617,045) | 22.47 |
| Forfeited | (571,732) | 34.03 |
| Options outstanding December 31, 1997 | 10,269,355 | 36.17 |
| Granted | 4,370,240 | 59.58 |
| Exercised | (2,145,260) | 27.58 |
| Forfeited | (1,084,989) | 50.00 |
| Options outstanding December 31, 1998 | 11,409,346 | 45.44 |
| Granted | 4,739,378 | 55.46 |
| Exercised | (1,964,992) | 34.08 |
| Forfeited | (1,520,628) | 50.76 |
| Options outstanding December 31, 1999 | 12,663,104 | $50.31 |

Information regarding stock options outstanding and exercisable as of December 31, 1999 is as follows:

| | PRICE RANGE | | | | |
|---|---|---|---|---|---|
| | $11.43 TO $17.29 | $18.06 TO $23.94 | $30.06 TO $44.94 | $46.56 TO $57.94 | $58.03 TO $69.13 |
| Options outstanding: | | | | | |
| Number | 37,510 | 687,081 | 1,354,985 | 6,686,343 | 3,897,185 |
| Weighted average exercise price | $16.63 | $18.51 | $34.35 | $52.11 | $58.71 |
| Weighted average remaining contractual life | 2 years | 4 years | 6 years | 8 years | 8 years |
| Options exercisable: | | | | | |
| Number | 37,510 | 687,081 | 1,307,569 | 986,416 | 613,425 |
| Weighted average exercise price | $16.63 | $18.51 | $34.11 | $48.11 | $58.52 |

At December 31, 1999 and 1998 shares reserved for future grants and awards were 6.4 million and 9.7 million, respectively.

If the Company recognized employee stock option-related compensation expense in accordance with SFAS 123 and used the Black-Scholes option valuation model for determining the weighted average fair value of options granted after December 31, 1994, its net income and earnings per share would have been as follows (in thousands, except per share amounts):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| Net income -- as reported | $259,086 | $1,417,338 | $250,312 |
| Pro forma stock compensation expense, net | (23,207) | (18,709) | (13,000) |
| Pro forma net income | $235,879 | $1,398,629 | $237,312 |
| Pro forma basic earnings per share | $ 3.19 | $ 16.23 | $ 2.21 |
| Pro forma diluted earnings per share | $ 3.07 | $ 15.89 | $ 2.16 |

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000          Powered by Morningstar® Document Research℠

54

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000

Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

For purposes of the pro forma expense, the weighted average fair value of the options is amortized over the vesting period. The pro forma effect on net income through 1998 may not be representative of future years' impact because options granted prior to 1995 are excluded from the pro forma calculations. Options are granted every year and the pro forma expense in future years will grow due to the added layers of amortization for succeeding grants. In 1999, however, the pro forma results include a full four years' worth of option grants.

The weighted average fair value of stock options on the date of grant, and the assumptions used to estimate the fair value using the Black-Scholes option valuation model, were as follows:

|                                                     | 1999    | 1998    | 1997    |
|-----------------------------------------------------|---------|---------|---------|
| Weighted average fair value of stock options granted.... | $ 13.14 | $ 12.78 | $ 11.90 |
| Risk-free interest rate................................. | 5.2%    | 5.5%    | 6.2%    |
| Expected life......................................... | 5 years | 5 years | 5 years |
| Expected volatility.................................... | .23     | .20     | .22     |
| Expected dividend yield................................ | 2.33%   | 2.33%   | 2.33%   |

The Black-Scholes option valuation model was developed for use in estimating the fair value of traded options. The Company's employee stock options have characteristics significantly different from those of traded options such as vesting restrictions and lack of transferability. In addition, the assumptions used in option valuation models are highly subjective, particularly with respect to the expected stock price volatility for the underlying stock. Because changes in these subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not provide a reliable single measure of the fair value of its employee stock options.

NOTE 15 -- PENSION PLANS AND POSTRETIREMENT BENEFITS

The Company has defined benefit pension plans and various other contributory and noncontributory retirement plans covering substantially all employees. In general, benefits under the defined benefit plans are based on years of service and the employee's compensation during the last five years of employment. The majority of the Company's employees are covered by one defined benefit plan. Funding for this plan is not expected to be required in the near future as the plan is overfunded.

Postretirement health care benefits provided by the Company are unfunded and cover certain employees hired before January 1, 1993. The various plans have significantly different provisions for lifetime maximums, retiree cost-sharing, health care providers, prescription drug coverage and other benefits. Postretirement life insurance benefits are generally insured by life insurance policies and cover employees who retired on or before December 31, 1993. Life insurance benefits vary by plan, ranging from $1,000 to $250,000. Certain employees become eligible for the postretirement health care benefits if they meet minimum age and service requirements and retire from full-time, active service.

55

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

The following information regarding pension and postretirement benefit plans includes discontinued operations. Changes in benefit obligations and in plan assets and the funded status of the plans are as follows (in thousands):

| | PENSION PLANS | | POSTRETIREMENT BENEFITS | |
| --- | --- | --- | --- | --- |
| | 1999 | 1998 | 1999 | 1998 |
| CHANGE IN BENEFIT OBLIGATIONS | | | | |
| Benefit obligations at January 1...... | $ 787,091 | $ 662,385 | $ 141,678 | $ 132,601 |
| Service cost......................... | 40,683 | 37,377 | 3,331 | 3,052 |
| Interest cost........................ | 52,610 | 49,367 | 7,623 | 7,909 |
| Plan amendments...................... | -- | 2,813 | -- | -- |
| Participant contributions............ | -- | -- | 2,042 | 2,073 |
| Actuarial losses (gains)(1)........... | (57,128) | 86,647 | (18,672) | 4,996 |
| Curtailment gains.................... | -- | (8,898) | -- | (327) |
| Dispositions......................... | (7,000) | -- | -- | -- |
| Special termination benefits......... | -- | -- | 365 | -- |
| Benefits paid........................ | (47,500) | (42,600) | (8,453) | (8,626) |
| Benefit obligations at December 31.... | $ 768,756 | $ 787,091 | $ 127,914 | $ 141,678 |
| CHANGE IN PLAN ASSETS | | | | |
| Fair value of plan assets at January 1................................ | $1,146,168 | $1,080,160 | $ -- | $ -- |
| Actual return on plan assets.......... | 277,703 | 102,355 | -- | -- |
| Acquisitions......................... | 1,509 | 3,310 | -- | -- |
| Dispositions......................... | (7,000) | -- | -- | -- |
| Company contributions................ | 2,630 | 2,943 | 6,411 | 6,553 |
| Participant contributions............ | -- | -- | 2,042 | 2,073 |
| Benefits paid........................ | (47,500) | (42,600) | (8,453) | (8,626) |
| Fair value of plan assets at December 31................................ | $1,373,510 | $1,146,168 | $ -- | $ -- |
| FUNDED STATUS | | | | |
| Funded status (underfunded) at December 31........................ | $ 604,754 | $ 359,077 | $(127,914) | $(141,678) |
| Unrecognized net actuarial losses (gains)(2)........................ | (185,134) | 40,896 | (50,739) | (34,984) |
| Unrecognized prior service cost....... | (4,886) | (4,309) | (42,458) | (49,356) |
| Unrecognized net transition asset..... | (869) | (3,656) | -- | -- |
| Net amount recognized................. | $ 413,865 | $ 392,008 | $(221,111) | $(226,018) |

--------------

(1) The actuarial gains relate primarily to changes in the assumed discount rate.

(2) The unrecognized net actuarial gains relate primarily to the higher actual return on plan assets than was assumed and changes in the assumed discount rate.

Amounts applicable to the Company's pension plans with accumulated benefit obligations in excess of plan assets are (in thousands):

| | DECEMBER 31 | |
| --- | --- | --- |
| | 1999 | 1998 |
| Projected benefit obligations.............................. | $62,353 | $61,044 |
| Accumulated benefit obligations............................ | 56,138 | 51,134 |
| Fair value of plan assets.................................. | 13,420 | 13,348 |

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

The following sets forth the amounts recognized in the Consolidated Balance Sheets (in thousands):

| | PENSION PLANS | | POSTRETIREMENT BENEFITS | |
| | DECEMBER 31 | | DECEMBER 31 | |
| | 1999 | 1998 | 1999 | 1998 |
|---|---|---|---|---|
| Prepaid pension cost.................. | $445,175 | $419,471 | $      -- | $      -- |
| Accrued benefit liability............. | (45,941) | (40,319) | (221,111) | (226,018) |
| Intangible asset...................... | 4,593 | 5,545 | -- | -- |
| Deferred income taxes................. | 3,950 | 2,915 | -- | -- |
| Accumulated other comprehensive income............................. | 6,088 | 4,396 | -- | -- |
| Net amount recognized................. | $413,865 | $392,008 | $(221,111) | $(226,018) |

Net periodic benefit cost (income) is as follows (in thousands):

| | PENSION PLANS | | | POSTRETIREMENT BENEFITS | | |
| | 1999 | 1998 | 1997 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|---|
| Service cost................. | $ 40,683 | $ 37,377 | $ 33,164 | $ 3,331 | $ 3,052 | $ 2,732 |
| Interest cost................ | 52,610 | 49,367 | 47,287 | 7,623 | 7,909 | 8,204 |
| Expected return on plan assets..................... | (110,815) | (103,857) | (93,753) | -- | -- | -- |
| Amortization of transition asset...................... | (2,787) | (21,560) | (21,560) | -- | -- | -- |
| Amortization of prior service cost........................ | 577 | 620 | (44) | (6,898) | (6,992) | (6,992) |
| Recognized net actuarial loss (gain)..................... | 528 | 241 | (47) | (2,918) | (5,446) | (3,218) |
| Special termination benefits................... | -- | -- | -- | 365 | -- | -- |
| Benefit cost (income)........ | (19,204) | (37,812) | (34,953) | 1,503 | (1,477) | 726 |
| Curtailment gains............ | -- | (8,898) | -- | -- | (327) | -- |
| Benefit cost (income) after curtailments............... | $ (19,204) | $ (46,710) | $(34,953) | $ 1,503 | $(1,804) | $   726 |

Assumptions used in the actuarial computations were as follows:

| | PENSION PLANS | | | POSTRETIREMENT BENEFITS | | |
| | DECEMBER 31 | | | DECEMBER 31 | | |
| | 1999 | 1998 | 1997 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|---|
| Discount rate........................... | 7.25% | 6.75% | 7.50% | 7.25% | 6.75% | 7.50% |
| Expected return on plan assets........... | 9.75% | 9.75% | 9.75% | N/A | N/A | N/A |
| Rate of compensation increase........... | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |

At December 31, 1999, the health care trend rate of 8.0% was assumed to ratably decline to 4.75% by 2009 and remain at that level. The assumed health care cost trend rate can significantly affect postretirement expense and liabilities. A change of 1% in the health care cost trend rate would have the

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

following effects (in thousands):

|  | 1-PERCENTAGE-POINT INCREASE | 1-PERCENTAGE-POINT DECREASE |
|---|---|---|
| Effect on total service and interest cost component...... | $ 1,323 | $(1,099) |
| Effect on postretirement benefit obligation.............. | 10,934 | (9,372) |

57

Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

Benefits provided by the Employee Stock Option Plan (ESOP) are coordinated with certain pension benefits and, as a result, the defined benefit plan obligations are net of the actuarially equivalent value of the benefits earned under the ESOP, with the maximum offset equal to the value of the benefits earned under the defined benefit plan. The fair value of the ESOP assets was $291.3 million and $264.7 million as of December 31, 1999 and 1998, respectively. At December 31, 1999, the ESOP held 2.9 million shares of Series A common stock and 1.4 million shares of Series C common stock. The final contribution to the ESOP was in 1994 and the ESOP has been amended to discontinue contributions by the Company. There are no unallocated shares in the ESOP at December 31, 1999.

Substantially all employees over age 21 with one year of service are eligible to participate in the Company's Savings Plus Plan. Eligible employees may contribute from 1% to 15% of their basic compensation. The Company makes matching contributions equal to 50% of employee before-tax contributions from 1% to 6%. Employees may choose among twelve investment options, including a Company common stock fund, for investing their contributions and the Company's matching contribution. Defined contribution plan expense, primarily related to the Savings Plus Plan, was $15.1 million, $15.1 million and $15.5 million for the years ended December 31, 1999, 1998 and 1997, respectively.

NOTE 16 -- SEGMENT INFORMATION

The Company has three reportable business segments, Newspaper Publishing, Professional Information and Magazine Publishing. The reportable segments are each managed separately because they provide different products and services. The Newspaper Publishing segment publishes daily metropolitan newspapers in the east coast and west coast regions of the United States, as well as several weekly newspapers. The Professional Information segment publishes aeronautical charts and flight information. The Magazine Publishing segment publishes special interest and trade magazines.

The accounting policies of the segments are the same as those described in the summary of significant accounting policies (see Note 1). The Company evaluates performance based on several factors, of which the primary financial measure is segment operating profit. Total revenue by industry segment includes sales to unaffiliated customers and intersegment sales, which are recorded at market price. Revenues are attributed to geographic areas based on the location of the assets producing the revenues.

Corporate and Other includes operations not directly related to the operating segments and general corporate activities including corporate overhead expenses, corporate investment income, interest expense on corporate debt and the activities of the Company's affiliates, Eagle New Media and Eagle Publishing. The Corporate and Other assets are principally comprised of cash and cash equivalents, marketable securities and other investments. Substantially all of the Company's investments accounted for under the equity method are in Corporate and Other.

58

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

Financial data for the Company's segments is as follows (in thousands):

| | 1999 | 1998 | 1997 |
|---|---|---|---|
| **REVENUES** | | | |
| Newspaper Publishing......................... | $2,514,325 | $2,308,178 | $2,179,244 |
| Professional Information..................... | 235,356 | 211,929 | 195,339 |
| Magazine Publishing.......................... | 278,930 | 262,683 | 248,712 |
| Total reportable segments................ | 3,028,611 | 2,782,790 | 2,623,295 |
| Corporate and Other.......................... | 638 | 1,198 | 21,845 |
| Intersegment Revenues........................ | -- | -- | (5) |
| | $3,029,249 | $2,783,988 | $2,645,135 |
| **OPERATING PROFIT (LOSS)(1)** | | | |
| Newspaper Publishing......................... | $ 457,067 | $ 297,433 | $ 402,207 |
| Professional Information..................... | 64,789 | 43,858 | 55,659 |
| Magazine Publishing.......................... | 19,184 | (14,232) | 18,309 |
| Total reportable segments................ | 541,040 | 327,059 | 476,175 |
| Corporate and Other.......................... | (70,534) | (79,261) | (84,897) |
| | $ 470,506 | $ 247,798 | $ 391,278 |
| **IDENTIFIABLE ASSETS** | | | |
| Newspaper Publishing......................... | $2,290,708 | $1,999,880 | $1,792,286 |
| Professional Information..................... | 125,670 | 96,765 | 87,354 |
| Magazine Publishing.......................... | 287,268 | 271,457 | 263,521 |
| Total reportable segments................ | 2,703,646 | 2,368,102 | 2,143,161 |
| Corporate and Other.......................... | 1,020,635 | 1,600,199 | 355,996 |
| Discontinued Operations...................... | 173,090 | 189,628 | 672,671 |
| | $3,897,371 | $4,157,929 | $3,171,828 |
| **DEPRECIATION AND AMORTIZATION** | | | |
| Newspaper Publishing......................... | $ 125,019 | $ 116,116 | $ 106,919 |
| Professional Information..................... | 7,454 | 6,852 | 6,648 |
| Magazine Publishing.......................... | 8,667 | 7,740 | 7,040 |
| Total reportable segments................ | 141,140 | 130,708 | 120,607 |
| Corporate and Other.......................... | 3,815 | 4,467 | 3,457 |
| | $ 144,955 | $ 135,175 | $ 124,064 |
| **CAPITAL EXPENDITURES** | | | |
| Newspaper Publishing......................... | $ 151,807 | $ 107,479 | $ 78,760 |
| Professional Information..................... | 12,437 | 15,825 | 9,535 |
| Magazine Publishing.......................... | 3,768 | 1,651 | 2,243 |
| Total reportable segments................ | 168,012 | 124,955 | 90,538 |
| Corporate and Other.......................... | 5,472 | 6,593 | 22,543 |
| | $ 173,484 | $ 131,548 | $ 113,081 |

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000        Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

----------------
(1) Includes restructuring, one-time and other charges as follows (in
    thousands):

|  | 1998 | 1997 |
|---|---|---|
| Newspaper Publishing........................................ | $116,388 | $18,000 |
| Professional Information................................... | 11,889 | -- |
| Magazine Publishing........................................ | 29,072 | -- |
| Total reportable segments................................ | 157,349 | 18,000 |
| Corporate and Other........................................ | 17,021 | -- |
|  | $174,370 | $18,000 |

    The pretax charges in 1998 are comprised of restructuring and one-time
charges of $155.7 million and other charges that did not qualify for
accounting classification as restructuring charges of $18.7 million.

    Substantially all revenues and assets of the Company's reportable segments
are attributed to or located in the United States. Non-U.S. revenues represent
less than 3% of total revenues and are principally related to the Company's
flight information business in Germany.

    The Company does not have a single external customer who represents 10% or
more of its revenue.

    Significant non-cash items excluding depreciation and amortization, were
non-cash restructuring, one-time and other charges in 1998 as follows (in
thousands):

|  | 1998 |
|---|---|
| Newspaper Publishing........................................ | $19,043 |
| Professional Information................................... | 6,967 |
| Magazine Publishing........................................ | 20,718 |
| Total reportable segments................................ | 46,728 |
| Corporate and Other........................................ | 6,055 |
|  | $52,783 |

    A reconciliation of operating profit to income from continuing operations
before income taxes is set forth in the Consolidated Statements of Income.

60

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

NOTE 17 -- EARNINGS PER SHARE

The following table sets forth the calculation of basic and diluted earnings per share (in thousands, except per share amounts):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| Earnings: |  |  |  |
| Income from continuing operations................ | $259,062 | $134,059 | $234,655 |
| Preferred stock dividends........................ | (18,066) | (21,697) | (32,481) |
| Earnings applicable to common shareholders for basic earnings per share...................... | 240,996 | 112,362 | 202,174 |
| Effect of dilutive securities: |  |  |  |
| LYONs interest expense, net of tax............ | 6,076 | -- | 3,925 |
| Earnings applicable to common shareholders for diluted earnings per share................... | $247,072 | $112,362 | $206,099 |
| Shares: |  |  |  |
| Weighted average shares for basic earnings per share........................................ | 68,252 | 84,814 | 92,572 |
| Effect of dilutive securities: |  |  |  |
| Stock options................................ | 1,924 | 2,114 | 2,358 |
| LYONs convertible debt....................... | 2,914 | -- | 2,083 |
|  | 4,838 | 2,114 | 4,441 |
| Adjusted weighted average shares and assumed conversions for diluted earnings per share.... | 73,090 | 86,928 | 97,013 |
| Basic earnings per share from continuing operations................................... | $  3.53 | $  1.32 | $  2.18 |
| Diluted earnings per share from continuing operations................................... | $  3.38 | $  1.29 | $  2.12 |

The Company has convertible preferred stock and certain stock options outstanding which are not included in the calculation of diluted earnings per share because the effects are antidilutive. The convertible preferred stock, stock options and the LYONs are described in Note 13, Note 14 and Note 12, respectively.

NOTE 18 -- OTHER COMPREHENSIVE INCOME

Other comprehensive income primarily consists of unrealized gains (losses) on available-for-sale securities as follows (in thousands):

|  | 1999 | 1998 | 1997 |
|---|---|---|---|
| Unrealized gains (losses) arising during period, net of taxes of $3,555, $17,712 and $(12,929)......... | $  5,421 | $25,753 | $(18,850) |
| Reclassification adjustments for gains realized in net income, net of taxes of $9,825, $6,703 and $13,398............................................ | (14,285) | (9,647) | (19,320) |
| Change in net unrealized gains (losses) on securities....................................... | $ (8,864) | $16,106 | $(38,170) |

Accumulated other comprehensive income for each classification is as follows (in thousands):

Powered by Morningstar® Document Research℠

| | DECEMBER 31 | |
|---|---|---|
| | 1999 | 1998 |
| Net unrealized gains on securities, net of the change in PEPS fair value (see Note 12)............................................... | $35,708 | $ 44,572 |
| Minimum pension liability adjustment......................... | (6,088) | (4,396) |
| Foreign currency translation adjustments.................... | (2,741) | (13,685) |
| | $26,879 | $ 26,491 |

61

Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

NOTE 19 -- COMMITMENTS AND CONTINGENCIES

The future net minimum lease payments as of December 31, 1999 for all noncancelable operating leases, excluding future obligations included in the restructuring liabilities on the Consolidated Balance Sheets, are as follows (in thousands):

| | |
|---|---:|
| 2000................................................... | $ 28,916 |
| 2001................................................... | 26,566 |
| 2002................................................... | 23,051 |
| 2003................................................... | 19,586 |
| 2004................................................... | 17,095 |
| Thereafter............................................. | 65,384 |
| Total......................................... | $180,598 |

Rental expense under operating leases was $38.5 million, $34.2 million and $36.9 million for the years ended December 31, 1999, 1998 and 1997, respectively. Capital leases, contingent rentals and sublease income are not significant.

To assure a long-term supply of newsprint, the Company has certain agreements with suppliers to purchase specified quantities of newsprint over terms not exceeding five years at prevailing market prices.

The Company and its subsidiaries are defendants in various actions for matters arising out of their business operations. In addition, from time to time, the Company and its subsidiaries are involved as parties in various governmental and administrative proceedings. The Company does not believe that any such proceedings currently pending will have a material adverse effect on its consolidated financial position, although an adverse resolution in any reporting period of one or more of these matters could have a material impact on results of operations for that period.

NOTE 20 -- SUBSEQUENT EVENTS (UNAUDITED)

In February 2000, Gilat Communications Ltd. acquired Allen Communication. The Company also entered into agreements in February 2000 to sell StayWell to a subsidiary of Havas MediMedia S.A., and to sell The Sporting News to Vulcan Ventures Inc. These dispositions are expected to be completed in March 2000.

On March 13, 2000, Times Mirror and Tribune Company (Tribune) signed a definitive agreement for the merger of the two companies in a cash and stock transaction valued at approximately $8 billion based on the closing price of Tribune common stock on March 10, 2000. Under the terms of this agreement, Tribune will make a cash tender offer for up to 28 million shares of the Company's common stock, which represents approximately 48% of the shares of common stock outstanding as of March 13, 2000, at a price of $95 per share. Following completion of the tender offer, Times Mirror and Tribune will merge in a transaction in which each share of Times Mirror common stock is converted into 2.5 shares of Tribune common stock. In addition, if fewer than 28 million Times Mirror common shares are purchased in the tender offer, Times Mirror shareholders will be permitted to elect cash, at a price of $95 per share, in the merger, up to the balance of the 28 million shares. The merger is subject to the approval of the shareholders of both companies and other customary conditions, including regulatory approvals. Times Mirror expects the tender offer to be completed in mid-April and the merger to be completed in the second or third quarter of 2000.

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

NOTE 21 -- QUARTERLY RESULTS OF OPERATIONS (UNAUDITED)

A summary of the unaudited quarterly results of operations is as follows (in thousands, except per share amounts):

| | 1999 QUARTERS ENDED | | | |
| --- | --- | --- | --- | --- |
| | MARCH 31 | JUNE 30 | SEPTEMBER 30 | DECEMBER 31 |
| Revenues.................................. | $699,207 | $753,751 | $739,730 | $836,561 |
| Costs and expenses: | | | | |
| Cost of sales........................... | 391,037 | 417,759 | 393,432 | 413,045 |
| Selling, general and administrative expenses........................... | 215,869 | 202,483 | 238,157 | 286,961 |
| Operating profit......................... | 92,301 | 133,509 | 108,141 | 136,555 |
| Interest expense, net.................... | (6,301) | (10,428) | (13,910) | (26,275) |
| Other, net............................... | 1,035 | 20,983 | 2,070 | 1,611 |
| Income from continuing operations before income taxes........................... | 87,035 | 144,064 | 96,301 | 111,891 |
| Income tax provision..................... | 36,986 | 59,505 | 39,366 | 44,372 |
| Income from continuing operations........ | 50,049 | 84,559 | 56,935 | 67,519 |
| Discontinued operations, net............. | (1,236) | 755 | 130 | 375 |
| Net income............................... | $ 48,813 | $ 85,314 | $ 57,065 | $ 67,894 |
| Basic earnings (loss) per common share(1): | | | | |
| Continuing operations................... | $    .61 | $   1.10 | $    .76 | $   1.10 |
| Discontinued operations................. | (.02) | .01 | -- | -- |
| Basic earnings per share................. | $    .59 | $   1.11 | $    .76 | $   1.10 |
| Diluted earnings (loss) per common share(1): | | | | |
| Continuing operations................... | $    .60 | $   1.04 | $    .73 | $   1.03 |
| Discontinued operations................. | (.02) | .01 | -- | -- |
| Diluted earnings per share............... | $    .58 | $   1.05 | $    .73 | $   1.03 |

63

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                                         Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

|  | 1998 QUARTERS ENDED | | | |
|---|---|---|---|---|
|  | MARCH 31 | JUNE 30 | SEPTEMBER 30 | DECEMBER 31 |
| Revenues.................................... | $658,767 | $698,007 | $ 677,128 | $750,086 |
| Costs and expenses: |  |  |  |  |
| Cost of sales........................... | 366,130 | 369,804 | 368,140 | 340,449 |
| Selling, general and administrative |  |  |  |  |
| expenses.............................. | 206,812 | 206,789 | 216,303 | 306,082 |
| Restructuring and one-time charges...... | -- | 34,850 | 46,262 | 74,569 |
| Operating profit........................... | 85,825 | 86,564 | 46,423 | 28,986 |
| Interest expense, net...................... | (8,001) | (13,831) | (5,008) | (1,755) |
| Other, net................................. | (487) | 7,811 | 9,173 | 9,304 |
| Income from continuing operations before |  |  |  |  |
| income taxes............................ | 77,337 | 80,544 | 50,588 | 36,535 |
| Income tax provision....................... | 31,915 | 31,928 | 31,293 | 15,809 |
| Income from continuing operations......... | 45,422 | 48,616 | 19,295 | 20,726 |
| Discontinued operations, net.............. | (161) | 585 | 1,057,254 | 225,601 |
| Net income................................. | $ 45,261 | $ 49,201 | $1,076,549 | $246,327 |
| Basic earnings per common share(1): |  |  |  |  |
| Continuing operations................... | $ .45 | $ .49 | $ .16 | $ .19 |
| Discontinued operations................. | -- | .01 | 12.55 | 2.86 |
| Basic earnings per share.................. | $ .45 | $ .50 | $ 12.71 | $ 3.05 |
| Diluted earnings per common share(1): |  |  |  |  |
| Continuing operations................... | $ .44 | $ .48 | $ .16 | $ .19 |
| Discontinued operations................. | -- | .01 | 12.26 | 2.80 |
| Diluted earnings per share................ | $ .44 | $ .49 | $ 12.42 | $ 2.99 |

--------------
(1) Quarterly and annual earnings per share amounts are calculated independently
    based on the weighted average number of shares outstanding for each period.

64

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

THE TIMES MIRROR COMPANY

SCHEDULE II -- VALUATION AND QUALIFYING ACCOUNTS AND RESERVES
(IN THOUSANDS)

| | BALANCE AT BEGINNING OF PERIOD | CHARGED TO COSTS AND EXPENSES OR REVENUES | CHARGED TO OTHER ACCOUNTS | DEDUCTIONS FROM RESERVES | BALANCE AT END OF PERIOD |
|---|---|---|---|---|---|
| Year ended December 31, 1999 | | | | | |
| Allowance for doubtful accounts...... | $25,956 | $18,643 | $ 2,423 | $(20,741) | $26,281 |
| Allowance for returns................ | 11,433 | 61,885 | (2,160) | (62,718) | 8,440 |
| | $37,389 | $80,528 | $ 263(A) | $(83,459) | $34,721 |
| Year ended December 31, 1998 | | | | | |
| Allowance for doubtful accounts...... | $27,708 | $19,240 | $ 1,610 | $(22,602) | $25,956 |
| Allowance for returns................ | 11,131 | 59,191 | (15) | (58,874) | 11,433 |
| | $38,839 | $78,431 | $ 1,595(A) | $(81,476) | $37,389 |
| Year ended December 31, 1997 | | | | | |
| Allowance for doubtful accounts...... | $25,659 | $22,307 | $ 836 | $(21,094) | $27,708 |
| Allowance for returns................ | 13,699 | 53,905 | (1,506) | (54,967) | 11,131 |
| | $39,358 | $76,212 | $ (670)(A) | $(76,061) | $38,839 |

---------------
(A) Primarily allowances of businesses acquired and sold.

Note: A detailed schedule of restructuring liabilities has been provided in Note
       7 to the consolidated financial statements.

65

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
       FINANCIAL DISCLOSURE.

       Not applicable.

                                PART III

ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT.

DIRECTORS OF THE REGISTRANT

   CLASS II -- SERVING UNTIL THE 2000 ANNUAL MEETING AND UNTIL THEIR RESPECTIVE
   SUCCESSORS ARE ELECTED AND QUALIFIED.

     JOHN E. BRYSON, 56, has been a director of Times Mirror since 1991 and is a
member of the Nominating Committee and the Audit Committee. He is Chairman of
the Board and Chief Executive Officer of Edison International Company and its
largest subsidiary, Southern California Edison Company, a public utility. He has
held those positions since October 1990. Mr. Bryson holds a B.A. degree from
Stanford University and a J.D. degree from Yale Law School. Mr. Bryson is also a
director of The Boeing Co. and the W.M. Keck Foundation and a trustee of
Stanford University.

     BRUCE CHANDLER, 63, has been a director of Times Mirror since 1975 and is a
member of the Finance Committee. He has decided not to stand for reelection at
the 2000 annual meeting of stockholders. He has been a private investor since
1989. From 1968 to 1989, he practiced law in the State of California. Mr.
Chandler is a graduate of the University of Southern California and holds a J.D.
degree from the University of San Diego School of Law. He is also related to
three other directors (Susan Babcock, Roger Goodan and Warren B. Williamson) and
is a beneficiary of Times Mirror largest stockholders, the Chandler Trusts. See
"Certain Relationships and Related Transactions".

     ROGER GOODAN, 53, has been a director of Times Mirror since December 1998
and is a member of the Finance Committee. He is Vice President of Marketing for
Schlumberger GeoQuest. He has held this position since February 1999. Prior to
that, Mr. Goodan has held management positions throughout Schlumberger including
positions in operations, engineering and finance since 1973. Mr. Goodan holds
B.A. degrees from the University of California at Berkeley and Stanford
University. Mr. Goodan is also a director of the Stanford University Department
of Athletics. He is also related to three of other directors (Susan Babcock,
Bruce Chandler and Warren B. Williamson) and is a beneficiary of the Company's
largest stockholders, the Chandler Trusts. See "Certain Relationships and
Related Transactions".

     DR. ALFRED E. OSBORNE, JR., 55, has been a director of Times Mirror since
1980 and is Chairman of the Audit Committee and a member of the Compensation
Committee, the Executive Compensation Subcommittee of the Compensation Committee
and the Nominating Committee. He is Director of the Harold Price Center for
Entrepreneurial Studies and Associate Professor of Business Economics at the
John E. Anderson Graduate School of Management at the University of California,
at Los Angeles. He has been with UCLA since 1972. From August 1977 to July 1979,
Dr. Osborne served as a Brookings Institution Economic Policy Fellow at the
Securities and Exchange Commission. He holds a Bachelor's Degree in Electrical
Engineering, a Master's Degree in Economics, a Master of Business Administration
in Finance and a Doctorate in Business -- Economics, all from Stanford
University. He is also a director of Greyhound Lines, Inc., Nordstrom, Inc. and
United States Filter Corporation. He is a trustee of WM Group of Funds and an
independent general partner of Technology Funding Venture Partners V, both of
which are 1940 Investment Company Act companies.

     DR. EDWARD ZAPANTA, 61, has been a director of Times Mirror since 1988 and
is Chairman of the Nominating Committee and a member of the Audit Committee, the
Compensation Committee and the Executive Compensation Subcommittee of the
Compensation Committee. He is a practicing physician providing neurosurgical
care in the Los Angeles area. He has been in private practice since 1970. Dr.
Zapanta attended UCLA, received his M.D. degree from the University of Southern
California School of Medicine, and currently serves as a trustee of the
University of Southern California. He is a clinical professor of surgery,
department of Neurological Surgery, at the University of Southern California.
Dr. Zapanta is also Senior

                                    66

Medical Director of HealthCare Partners Medical Group and a director of Edison International, East-West Bancorp, Inc. and the Irvine Foundation.

CLASS III -- SERVING UNTIL THE 2001 ANNUAL MEETING AND UNTIL THEIR RESPECTIVE SUCCESSORS ARE ELECTED AND QUALIFIED.

SUSAN BABCOCK, 34, has been a director of Times Mirror since March 2000. She currently holds a position at Sameday.com, a distribution and fulfillment company serving e-commerce enterprises. Prior to that, Ms. Babcock served at the Los Angeles Times in a variety of operations management positions from 1988 to 1995 and again from 1998 to 1999. Ms. Babcock is a graduate of Trinity College and received an M.B.A. from the Stanford Graduate School of Business and an M.A. degree from Stanford University School of Education. She is a trustee of the National Parks Conservation Association. She is also related to three of other directors (Bruce Chandler, Roger Goodan and Warren B. Williamson) and is a beneficiary of Times Mirror's largest stockholders, the Chandler Trusts. See "Certain Relationships and Related Transactions".

CLAYTON W. FRYE, JR., 69, has been a director of Times Mirror since 1988 and is Chairman of the Compensation Committee and the Executive Compensation Subcommittee of the Compensation Committee. He is the Senior Associate of Laurance S. Rockefeller. He has served in that capacity since 1973 and is responsible for overseeing and directing Mr. Rockefeller's business, real estate and investment interests as well as managing his own business and real estate interests. Mr. Frye is a graduate of Stanford University where he received both a B.A. degree and an M.B.A. degree. He is a partner in Rockefeller and Associates Realty, and several privately-held companies including King Ranch, Inc. Mr. Frye is a Trustee of The White House Historical Association, Historic Hudson Valley, Inc., and is Chairman of The Woodstock Foundation and Jackson Hole Preserve, Inc.

WILLIAM STINEHART, JR., 56, has been a director of Times Mirror since 1991 and is a member of the Nominating Committee and the Finance Committee. He is a partner in the law firm of Gibson, Dunn & Crutcher LLP where he has practiced law since 1969. Gibson, Dunn & Crutcher LLP has provided legal services to the Company and its subsidiaries for many years and may continue to do so in the future. Mr. Stinehart holds a B.A. degree from Stanford University and a J.D. degree from UCLA Law School, and is a member of the Board of Trustees of the Harvey and Mildred Mudd Foundation. He is also a trustee of Times Mirror's largest stockholders, the Chandler Trusts. See "Certain Relationships and Related Transactions".

MARK H. WILLES, 58, is Chairman of the Board, President and Chief Executive Officer of Times Mirror. A director of Times Mirror since June 1, 1995, Mr. Willes was also elected President and Chief Executive Officer of Times Mirror at that time. He was elected Chairman of the Board effective January 1, 1996. In addition, he served as Publisher of the Los Angeles Times from October 1997 to June 1999. Prior to joining Times Mirror, Mr. Willes was employed by General Mills, Inc., commencing in 1980, where he held a variety of positions including Chief Financial Officer, President and Chief Operating Officer and, at the time of his departure, Vice Chairman of the Board of Directors. He was also a director of that company. Mr. Willes was President of the Federal Reserve Bank of Minneapolis from 1977 to 1980. In 1971, Mr. Willes joined the Philadelphia Reserve Bank where he held a number of positions including Director of Research and First Vice President. He was Assistant Professor of Finance and Commerce at the University of Pennsylvania from 1967 to 1971. Mr. Willes received an undergraduate degree from Columbia College and a doctorate from Columbia Graduate School of Business. He is also a director of The Black & Decker Corporation and The Talbots, Inc.

CLASS I -- SERVING UNTIL THE 2002 ANNUAL MEETING AND UNTIL THEIR RESPECTIVE SUCCESSORS ARE ELECTED AND QUALIFIED.

DONALD R. BEALL, 61, has been a director of Times Mirror since 1990 and is a member of the Compensation Committee, the Executive Compensation Subcommittee of the Compensation Committee and the Nominating Committee. He is Chairman of the Executive Committee and Retired Chairman of the Board and Chief Executive Officer of Rockwell International Corporation, a leader in industrial automation, avionics and communications systems markets. Prior to assuming his positions as Chairman of the Board and Chief Executive Officer in February 1988, Mr. Beall served as President and Chief Operating Officer of Rockwell International for ten years. Mr. Beall received a B.S. degree from San Jose State University and a M.B.A.

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

degree from the University of Pittsburgh. Currently, he is a director of Rockwell International Corporation, Procter & Gamble Company, Meritor Automotive, Inc. and Conexant Systems, Inc. Mr. Beall is an active investor, director and/or advisor with several venture capital firms, individual companies and investment partnerships. Mr. Beall is also active in a diverse group of business, professional, educational, public service and philanthropic activities.

SHERRY L. LANSING, 55, has been a director of Times Mirror since December 1998 and is a member of the Compensation Committee. She is Chairman and Chief Executive Officer of the Motion Picture Group of Paramount Pictures, a leading global entertainment company. She is responsible for overseeing all aspects of motion picture operations of Paramount Picture's Motion Picture Group. Prior to being named Chairman in 1992, Ms. Lansing headed her own independent production company. Ms. Lansing received a B.S. degree from Northwestern University.

DAWN GOULD LEPORE, 46, has been a director of Times Mirror since December 1998 and is a member of the Finance Committee. She is Vice Chairman and Chief Information Officer of the Charles Schwab Corporation, one of the nation's largest financial service firms. She is responsible for the Charles Schwab Corporation's worldwide use of information technology, including all telecommunications, operations and customer and business applications. Prior to assuming her position in 1993, Ms. Lepore was Senior Vice President of Information Technology for the Charles Schwab Corporation and had held other positions since joining the Company in 1983. Ms. Lepore received a B.A. degree from Smith College. She is also a director of eBay, Inc. and Viador, Inc.

ROBERT W. SCHULT, 50, has been a director of Times Mirror since July 1998 and is a member of the Audit Committee and the Finance Committee. He was President and Chief Operating Officer of Nestle USA, Inc., a subsidiary of Nestle S.A., a food company from July 1996 until January 2000. Prior to that, Mr. Schult served as President of the Nestle Food Company, an operating company of Nestle USA, for 6 years. Mr. Schult received a B.A. degree from the University of North Carolina.

WARREN B. WILLIAMSON, 71, has been a director of Times Mirror since 1977 and is Chairman of the Finance Committee and a member of the Compensation Committee. He is related to three other directors (Susan Babcock, Bruce Chandler and Roger Goodan) and is Chairman of the Board of Trustees and a beneficiary of the Company's largest stockholders, the Chandler Trusts. See "Certain Relationships and Related Transactions". In 1989, Mr. Williamson retired from Crowell, Weedon and Co., a stock brokerage firm with which he had been associated since 1970. Mr. Williamson is a graduate of Claremont Men's College. He is a director of Hollywood Park, Inc. and Chairman Emeritus of the Trustees of the Art Center College of Design.

EXECUTIVE AND KEY OFFICERS OF THE REGISTRANT

See "Part I -- Executive and Key Officers of the Registrant" for information about the Company's executive and key officers.

SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Exchange Act requires Times Mirror's executive officers and directors, and persons who beneficially own more than 10% of Times Mirror's Common Stock, to file initial reports of ownership and changes in ownership with the Securities and Exchange Commission. Based on a review of the copies of such forms furnished to Times Mirror and written representations from Times Mirror's executive officers and directors, Times Mirror believes that all forms were filed in a timely manner during fiscal 1999, except a Form 3 for Raymond Jansen, an Executive Vice President, that was filed late.

ITEM 11. EXECUTIVE COMPENSATION.

The following table sets forth information with respect to compensation of the chief executive officer of the Company, each of the four most highly compensated executive officers of the Company (other than the chief executive officer) serving in such capacity at December 31, 1999. It also includes information with respect to a former Chief Financial Officer, Thomas Unterman, who resigned as such effective December 27, 1999. This table includes information for each individual for services in all capacities to the Company for the

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

fiscal years ended December 31, 1999, 1998 and 1997, unless otherwise noted.
Additionally, in March 2000 the Times Mirror Board adopted compensation and
severance payments for certain executive officers upon a change of control.

## SUMMARY COMPENSATION TABLE

| | | | | | LONG-TERM COMPENSATION | | |
| | | ANNUAL COMPENSATION | | | AWARDS | | PAYOUTS |
| NAME AND PRINCIPAL POSITION | YEAR | SALARY ($) | BONUS ($)(1) | OTHER ANNUAL COMPENSATION ($)(2) | RESTRICTED STOCK AWARDS ($)(3) | SECURITIES UNDERLYING STOCK OPTIONS (#)(4) | LTIP PAYOUTS ($) | ALL OTHER COMPENSATION ($)(5) |
|---|---|---|---|---|---|---|---|---|
| Mark H. Willes..................... | 1999 | 924,519 | 2,081,250 | 69,936 | 522,827 | 200,000 | -- | 8,825 |
| Chairman of the Board, President | 1998 | 900,000 | 2,025,000 | 37,642 | 508,002 | 200,000 | -- | 9,015 |
| and Chief Executive Officer | 1997 | 905,770 | 1,968,750 | 9,700 | 494,606 | 200,000 | -- | 69,972 |
| Kathryn M. Downing................. | 1999 | 499,039 | 534,750 | 12,737 | 134,351 | 40,000 | -- | 56,978 |
| Executive Vice President, | 1998 | 448,923 | 712,501 | 7,076 | 112,914 | 40,000 | -- | 143,471 |
| and Publisher, Los Angeles Times | 1997 | 389,808 | 325,277 | 1,536 | 81,754 | 30,000 | -- | 6,694 |
| Raymond A. Jansen, Jr............. | 1999 | 441,519 | 506,250 | 1,351 | 127,211 | 40,000 | -- | 6,707 |
| Executive Vice President, | 1998 | 390,000 | 402,750 | 0 | 101,074 | 30,000 | -- | 6,625 |
| Eastern Newspapers | 1997 | 374,808 | 360,000 | 0 | 90,443 | 36,000 | -- | 6,507 |
| Horst A. Bergmann................. | 1999 | 447,307 | 372,938 | 17,427 | 93,713 | 40,000 | -- | 6,757 |
| Executive Vice President, | 1998 | 427,885 | 195,000 | 14,425 | 48,948 | 30,000 | -- | 6,731 |
| President and Chief Executive Officer, Jeppesen | 1997 | 369,617 | 354,375 | 5,853 | 89,043 | 30,000 | -- | 6,505 |
| Efrem Zimbalist III............... | 1999 | 399,327 | 318,750 | 0 | 80,087 | 40,000 | -- | 6,503 |
| Executive Vice President, | 1998 | 361,923 | 389,375 | 0 | 97,731 | 30,000 | -- | 6,319 |
| and Chief Financial Officer | 1997 | 301,654 | 315,000 | 0 | 0 | 25,000 | -- | 3,781 |
| Thomas Unterman(6)............... | 1999 | 599,038 | -- | 21,028 | 169,575 | 50,000 | -- | 682,413 |
| | 1998 | 549,999 | 1,562,500 | 12,226 | 141,142 | 65,000 | -- | 11,124 |
| | 1997 | 517,308 | 506,250 | 3,621 | 127,179 | 65,000 | -- | 7,084 |

---------------

(1) An officer may elect to take his or her bonus award in the form of cash or
    deferred cash. An officer may also elect to take 25% of such bonus award in
    shares of Series A Common Stock. The amounts shown in this column for 1998
    include special bonus payments of $1,000,000 for Mr. Unterman and $450,000
    for Ms. Downing in recognition of the successful completion of the
    divestitures of Matthew Bender & Company, Incorporated, Shepard's Company
    and Mosby, Inc. The amounts include bonuses earned in the indicated year and
    paid in the subsequent year and exclude bonuses paid in the indicated year
    but earned in the preceding year.

(2) Represents amounts paid in cash as allowances for certain perquisites or to
    reimburse the named officers for the tax impact of certain perquisites. Also
    represents amounts credited on deferred compensation at above-market
    interest rates. None of the named executive officers received perquisites or
    other personal benefits in an amount sufficient to require inclusion in this
    column.

(3) Restricted stock grants relate to Times Mirror's Series A Common Stock.
    Dollar amounts shown in this column equal the number of shares of restricted
    stock awarded multiplied by the closing market price of Times Mirror's
    Series A Common Stock on the grant date, net of any consideration paid. The
    restricted shares granted for special restricted stock awards vest 25%
    commencing on the second anniversary of the date of award and 25% on each
    successive anniversary of the award date. Under Times Mirror's matching
    bonus restricted stock program under The Times Mirror Company 1996
    Management Incentive Plan, certain officers of Times Mirror can elect to
    place shares of Series A Common Stock on deposit with Times Mirror in an
    amount equal to 25% of their bonus, which Times Mirror then matches with the
    same number of restricted shares. The restricted shares granted on February
    5, 1998 for 1997 compensation, February 4, 1999 for 1998 compensation and on
    February 3, 2000 for 1999 compensation, under the matching restricted stock
    program will vest 100% after four years or upon a change of control,
    provided that the officer does not terminate employment with Times Mirror
    prior to that time or withdraw the shares deposited with Times Mirror for
    the match. An amount equal to regular dividends is paid on restricted
    shares. As of December 31, 1999, the number and value of restricted stock
    award holdings, which do not include the restricted shares granted on
    February 3, 2000 for 1999 compensation were as follows: 33,729 ($2,259,843)
    for Mr. Willes, 7,908 ($529,836) for Ms. Downing, 5,082 ($340,494) for

69

Mr. Jansen, 3,264 ($218,688) for Mr. Bergmann, 1,783 ($119,461) for Mr. Zimbalist and 13,175 ($882,725) for Mr. Unterman.

(4) Options reported for Mr. Unterman for 1997 and 1998 include a special performance award of 15,000 stock options. Options reported for Messrs. Jansen and Zimbalist for 1999 include a promotional award of 10,000 stock options granted on March 5, 1999. Options reported for Mr. Jansen for 1997 include a special performance award of 6,000 stock options.

(5) The amounts shown in this column for 1999 consist of the following:(i) Mr. Willes, $4,025 of term life insurance premiums paid and $4,800 for matching Company contributions under the Times Mirror Saving's Plus Plan (the "Savings Plan"); (ii) Ms. Downing, $50,000 housing differential payment (see "Certain Relationships and Related Transactions"), $2,178 of term life insurance premiums paid and $4,800 for matching Company contributions under the Savings Plan; (iii) Mr. Jansen, $1,907 of term life insurance premiums paid and $4,800 for matching Company contributions under the Savings Plan; (iv) Mr. Bergmann, $1,957 of term life insurance premiums paid and $4,800 for matching Company contributions under the Savings Plan; (v) Mr. Zimbalist, $1,703 of term life insurance premiums paid and $4,800 for matching Company contributions under the Savings Plan; and (vi) Mr. Unterman, $675,000 as a special payment (see "Certain Relationships and Related Transactions"), $2,613 of term life insurance premiums paid and $4,800 for matching Company contributions under the Savings Plan. The amounts shown in this column for 1998 consist of the following: (i) Mr. Willes, $4,215 of term life insurance premiums paid and $4,800 for matching Company contributions under the Savings Plan; (ii) Ms. Downing, $50,000 housing differential payment (see "Certain Relationships and Related Transactions"), $86,595 for relocation assistance, $2,106 of term life insurance premiums paid and $4,800 for matching Company contributions under the Savings Plan; (iii) Mr. Jansen, $1,825 of term life insurance premiums paid and $4,800 for matching Company contributions under the Savings Plan; (iv) Mr. Bergmann, $1,931 of term life insurance premiums paid and $4,800 for matching Company contributions under the Savings Plan; (v) Mr. Zimbalist, $1,638 of term life insurance premiums paid and $4,681 for matching Company contributions under the Savings Plan; and (vi) Mr. Unterman, $2,574 of term life insurance premiums paid, $4,800 for matching Company contributions under the Savings Plan and $3,750 as a special payment. The amounts shown under this column for 1997 consist of the following: (i) Mr. Willes, $62,102 for relocation assistance (see "Certain Relationships and Related Transactions"), $3,120 of term life insurance premiums paid and $4,750 for matching Company contributions under the Savings Plan; (ii) Ms. Downing, $1,944 for term life insurance premiums paid and $4,750 for matching Company contributions under the Savings Plan; (iii) Mr. Jansen, $1,757 of term life insurance premiums paid and $4,750 for matching Company contributions under the Savings Plan; (iv) Mr. Bergmann, $1,755 of term life insurance premiums paid and $4,750 for matching Company contributions under the Savings Plan; (v) Mr. Zimbalist, $1,451 of term life insurance premiums paid and $2,330 for matching Company contributions under the Savings Plan; and (vi) Mr. Unterman, $2,334 of term life insurance premiums paid and $4,750 for matching Company contributions under the Savings Plan.

(6) Mr. Unterman was Executive Vice President and Chief Financial Officer until December 27, 1999, at which time he resigned from his positions and terminated active employment with Times Mirror. Mr. Unterman remains, however, an employee of Times Mirror on terminal leave of absence pursuant to the terms of a severance agreement. In lieu of his 1999 bonus incentive award, Mr. Unterman received a special severance payment (reflected in the last column) of $675,000. See also "Certain Relationships and Related Transactions".

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000          Powered by Morningstar® Document Research℠

OPTION GRANTS TABLE

    The following table sets forth all grants of stock options with respect to
shares of Series A Common Stock for 1999 to the named executive officers of the
Company under the Company's 1996 Management Incentive Plan.

OPTION GRANTS FOR FISCAL YEAR 1999

INDIVIDUAL GRANTS

| NAME | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED(#)(1) | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES FOR 1999 | EXERCISE OR BASE PRICE ($/SH) | EXPIRATION DATE | GRANT DATE PRESENT VALUE($)(2) |
| ---- | ------------- | --------- | ----------- | ---------- | ----------- |
| Mark H. Willes.................. | 200,000 | 4.532 | 54.6250 | 2/4/09 | 2,490,000 |
| Kathryn M. Downing.............. | 40,000 | 0.906 | 54.6250 | 2/4/09 | 498,000 |
| Raymond A. Jansen, Jr........... | 30,000 | 0.680 | 54.6250 | 2/4/09 | 373,500 |
| | 10,000(3) | 0.227 | 55.9688 | 3/5/09 | 132,800 |
| Horst A. Bergmann............... | 40,000 | 0.906 | 54.6250 | 2/4/09 | 498,000 |
| Efrem Zimbalist III............. | 30,000 | 0.680 | 54.6250 | 2/4/09 | 373,500 |
| | 10,000(3) | 0.227 | 55.9688 | 3/5/09 | 132,800 |
| Thomas Unterman................. | 50,000 | 1.133 | 54.6250 | 2/4/09 | 622,500 |

--------------
(1) These options were granted at fair market value on February 4, 1999 (unless
    otherwise indicated) and related to compensation for 1999. These options
    were granted under Times Mirror's 1996 Management Incentive Plan ("MIP"),
    have a ten-year term and may be initially exercised as to 25% of the
    underlying shares on the first anniversary of the grant date, an additional
    25% becoming exercisable on each successive anniversary date, with full
    vesting on the fourth anniversary date. Upon a change in control as
    described under the MIP, any previously unexercisable portion of the options
    becomes exercisable.

(2) Present value determinations were made using the Black-Scholes option
    pricing model. There is no assurance that any value realized by optionees
    will be at or near the value estimated by that model. The ultimate values of
    the options will depend on the future market price of the Series A Common
    Stock, which cannot be forecast with reasonable accuracy. The actual value,
    if any, an optionee will realize upon exercise of an option will depend upon
    the excess, if any, of the market value of the Series A Common Stock on the
    date the option is exercised over the exercise price of the option. For the
    options granted on February 4, 1999, the model assumes (a) volatility of .23
    derived by averaging the weekly historical volatility of Times Mirror over
    the 52 week period prior to February 4, 1999; (b) a risk-free rate of return
    based on the rate (4.87%) available on the grant date on zero-coupon U.S.
    Government issues with a remaining term equal to the expected life of the
    options (5 years); and (c) a dividend yield of 2.33% derived by taking Times
    Mirror's target payout ratio divided by Times Mirror's static price to
    earnings ratio. The Black-Scholes ratio for the options granted on February
    4, 1999 was applied to the average of the low and high prices for the
    trading day of February 4, 1999. For the options granted on March 5, 1999,
    the model assumes (a) volatility of .23 derived by averaging the weekly
    historical volatility of Times Mirror over the 52 week period prior to March
    5, 1999; (b) a risk-free rate of return based on the rate (5.34%) available
    on the grant date on zero-coupon U.S. Government issues with a remaining
    term equal to the expected life of the options (5 years); and (c) a dividend
    yield of 2.33% derived by taking Times Mirror's target payout ratio divided
    by Times Mirror's static price to earnings ratio. The Black-Scholes ratio
    for the options granted on March 5, 1999 was applied to the average of the
    low and high prices for the trading day of March 5, 1999.

(3) These options were granted at fair market value on March 5, 1999.

AGGREGATED OPTION EXERCISES IN 1999 AND OPTION VALUES AS OF DECEMBER 31, 1999

    The following table sets forth certain information with respect to
exercises by the named executive officers of stock options with respect to
shares of Series A Common Stock during 1999, the number of

71

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

securities underlying unexercised options held by the named executive officers
at December 31, 1999 and the value of unexercised in-the-money options as of
December 31, 1999.

| NAME | SHARES ACQUIRED ON EXERCISE | VALUE REALIZED | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AS OF DECEMBER 31, 1999(#) | | VALUE OF UNEXERCISED IN-THE-MONEY OPTIONS AS OF DECEMBER 31, 1999($)(1) | |
| | | | EXERCISABLE | UNEXERCISABLE | | |
| ---- | ----------- | -------- | ----------- | ------------- | ---- | ---- |
| Mark H. Willes................. | -- | -- | 438,200 | 450,000 | 13,711,540 | 5,851,570 |
| Kathryn M. Downing............. | -- | -- | 83,350 | 91,250 | 2,278,910 | 1,228,517 |
| Raymond A. Jansen, Jr......... | 24,211 | 862,042 | 68,400 | 85,500 | 1,737,029 | 1,176,798 |
| Horst A. Bergmann............. | -- | -- | 103,592 | 83,750 | 3,492,166 | 1,161,252 |
| Efrem Zimbalist III........... | 12,450 | 365,402 | 13,700 | 75,000 | 271,866 | 937,266 |
| Thomas Unterman............... | -- | -- | 129,065 | 131,250 | 3,927,173 | 1,716,135 |

---------------

(1) Represents the difference between the closing price of the Company's Series
    A Common Stock on December 31, 1999 ($67.00) and the option price on the
    date of grant.

RETIREMENT PLANS

    The following table illustrates the maximum annual benefits payable as a
single life annuity under the basic benefit formula in the Pension Plan (see
below) to an officer or employee retiring at age 65 with the specified
combination of final average salary and years of credited service.

                          PENSION PLAN TABLE

| FINAL AVERAGE SALARY | YEARS OF CREDITED SERVICE AT RETIREMENT | | | | |
| | 5 | 10 | 15 | 20 | 25 |
| -------------------- | -------- | -------- | -------- | ---------- | ---------- |
| $ 300,000................................ | $ 26,250 | $ 52,500 | $ 78,750 | $ 105,000 | $ 131,250 |
| 400,000................................ | 35,000 | 70,000 | 105,000 | 140,000 | 175,000 |
| 500,000................................ | 43,750 | 87,500 | 131,250 | 175,000 | 218,750 |
| 600,000................................ | 52,500 | 105,000 | 157,500 | 210,000 | 262,500 |
| 700,000................................ | 61,250 | 122,500 | 183,750 | 245,000 | 306,250 |
| 800,000................................ | 70,000 | 140,000 | 210,000 | 280,000 | 350,000 |
| 900,000................................ | 78,750 | 157,500 | 236,250 | 315,000 | 393,750 |
| 1,000,000................................ | 87,500 | 175,000 | 262,500 | 350,000 | 437,500 |
| 1,250,000................................ | 109,375 | 218,750 | 328,125 | 437,500 | 546,875 |
| 1,500,000................................ | 131,250 | 262,500 | 393,750 | 525,000 | 656,250 |
| 1,750,000................................ | 153,125 | 306,250 | 459,375 | 612,500 | 765,625 |
| 2,000,000................................ | 175,000 | 350,000 | 525,000 | 700,000 | 875,000 |
| 2,250,000................................ | 196,875 | 393,750 | 590,625 | 787,500 | 984,375 |
| 2,500,000................................ | 218,750 | 437,500 | 656,250 | 875,000 | 1,093,750 |
| 2,750,000................................ | 240,625 | 481,250 | 721,875 | 962,500 | 1,203,125 |
| 3,000,000................................ | 262,500 | 525,000 | 787,500 | 1,050,000 | 1,312,500 |

    The Company maintains a retirement income plan (the "Pension Plan") which
is a funded, qualified, non-contributory, defined benefit plan that covers most
employees including executive officers. The Pension Plan provides benefits based
on the participant's highest average salary for five consecutive years within
the ten years prior to retirement and the participant's length of service, which
is generally up to a maximum of 30 years beginning in 2006. Benefit amounts will
be offset by a portion of the primary Social Security benefit to be received by
the participant. A survivor's annuity for the beneficiary of a vested
participant is also provided.

    In general, compensation covered by the Pension Plan includes salary and
wages, but does not include bonuses, overtime pay, income from exercises of
stock options or other unusual or extraordinary compensation. For the persons
whose compensation is shown in the Summary Compensation Table on page 69, up to
$160,000 paid in 1999 and designated as salary in that table is covered by the
Pension Plan. Credited years of

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

service under the Pension Plan as of December 31, 1999 were approximately 5 years for Mr. Willes, 4 years for Ms. Downing, 28 years for Mr. Jansen, 36 years for Mr. Bergmann, 8 years for Mr. Zimbalist and 7 years for Mr. Unterman.

The amounts shown in the Pension Plan Table above have been calculated without adjustment for Social Security benefits, and thus may be subject to reduction to recognize primary Social Security benefits to be received by the participant. The amounts shown in the Table above have also been calculated without reference to the maximum limitations ($130,000 in 1999) imposed by the Internal Revenue Code on benefits which may be paid under a qualified defined benefit plan. Optional forms of payment available under the Pension Plan may result in substantially reduced payments to an employee electing such an option.

In addition to the amounts shown in the above Pension Plan Table, certain active participants employed on March 29, 1985 were eligible for a past service benefit improvement as a single sum equal to 2% of their 1984 base salary (for participants in the Supplemental Executive Retirement Plan (the "SERP"), 2% of their aggregated 1984 base salary and 1984 annual bonus) multiplied by the years of credited service before 1985. This amount will be increased by an amount equal to interest, currently at 7% per annum, until termination or retirement and then may be paid as a single sum or converted into an equivalent annuity commencing at retirement. The estimated annual past service improvement benefit from the pension plan and the SERP for the persons named in the Summary Compensation Table and employed by the Company on March 29, 1985 is $8,304 for Mr. Jansen.

The Company also maintains an Employee Stock Ownership Plan (the "ESOP"). Benefits provided by the ESOP are coordinated with benefits provided under the Pension Plan so that benefits payable under the ESOP will be offset against benefits otherwise payable under the Pension Plan. Effective January 1, 1995, the Company discontinued its contributions to the ESOP for plan years after 1994. Certain officers of the Company were eligible to participate in the ESOP and, subject to applicable limitations imposed by the Internal Revenue Code and by the Employee Retirement Income Security Act of 1974 ("ERISA"), will be entitled to receive shares which have been allocated to their accounts and other benefits provided by the ESOP. Estimated individual account balances of Series A and Series C Common Stock (aggregated for each individual) as of December 31, 1999 were as follows: 616 shares for Mr. Zimbalist and 726 shares for Mr. Unterman.

The Company also maintains the SERP to provide retirement benefits for certain officers of the Company designated by the Compensation Committee of the Board of Directors. Participants in the SERP will be entitled to receive vested benefits under the SERP in addition to benefits payable under all other employee benefit plans. Prior to 1999, the Compensation Committee designated all the persons named in the Summary Compensation Table as participants in the SERP.

Benefits payable under the SERP will be determined in substantially the same manner as under the Pension Plan except that (a) covered compensation includes both base salary and awards under the bonus-incentive program, and (b) the amount payable will be calculated without regard to the provisions of Section 415 of the Internal Revenue Code or other legal limits on benefits under a qualified pension plan. The SERP provides that each participant will receive benefits under the SERP at least equal to the difference between the amount he or she would have been entitled to receive without regard to the maximum limitations imposed by the Internal Revenue Code and the amount such participant is entitled to receive under the Pension Plan. If a participant dies, his or her beneficiary will be entitled to receive a lifetime annuity equal to approximately one-half the amount the participating officer would have been entitled to receive under the SERP as of the date of the participant's death.

The SERP is unfunded. Participants become vested under the same schedule as in the Pension Plan or upon a change in control and each such participant will be entitled to receive his or her benefits under the SERP commencing upon retirement, provided that any such benefit commencing prior to age 65 will be actuarially reduced to reflect its commencement prior to age 65.

The Company has established an ERISA excess retirement plan (the "Excess Plan") to provide pension benefits for certain employees including officers of the Company but excluding participants in the SERP. The Excess Plan provides that each participant will receive benefits under the Excess Plan equal to the difference

73

between the amount he or she would have been entitled to receive without regard to the maximum limitations imposed by the Internal Revenue Code and the amount such participant is entitled to receive under the Pension Plan. Participants will be vested under the Excess Plan under the same vesting provisions as the Pension Plan. The Excess Plan is unfunded.

COMPENSATION OF DIRECTORS

The Board of Directors presently has fourteen directors, one of whom is a salaried employee of Times Mirror. Salaried employees receive no additional compensation or benefits for their service as directors. Except as noted below, during 1999, each non-employee director received an annual retainer of 500 shares of Series A Common Stock. In addition, each of them received a cash payment equal to the value of 500 shares of such stock, based on an average of the prevailing market prices at the time. Non-employee chairpersons of committees of the Board also received an annual retainer of 60 shares of Series A Common Stock and a cash payment equal to the value of 60 shares of such stock. A director may also elect to receive the cash portion of the annual retainer or the chairperson retainer in the form of Series A Common Stock .

Non-employee directors also receive annually an option grant for 5,000 shares of Series A Common Stock under Times Mirror's 1997 Directors Stock Option Plan. These stock options are immediately exercisable at a price equal to the fair market value of the Series A Common Stock on the date of grant and have a term of ten years.

Non-employee directors may elect to defer the receipt of any part of their retainer. If a director defers receipt of the cash portion and/or stock portion of the retainer, an amount valued with reference to shares of Series A Common Stock will be credited to an unfunded stock unit account. During the deferral period, this account will be credited with additional stock units equal to the value of dividends declared on the Series A Common Stock represented by stock units in the account. The aggregate value of the stock units will be distributed in shares of Series A Common Stock under The Times Mirror Non-Employee Directors Stock Plan at the end of the deferral period and over the payment period selected by the director.

Prior to December 31, 1996, non-employee directors participated in Times Mirror's Pension Plan for Directors, which provided for the payment after retirement from the Board of an annual benefit equal to the sum of the amount of the annual retainer at the time of retirement plus the amount of the Board and committee attendance fees paid or payable for the calendar year preceding retirement. The duration of the payment equaled the number of years of service as an outside director.

In January 1997, the Board determined that benefit accruals under the Pension Plan for Directors would cease effective December 31, 1996, and that no future directors would be entitled to participate in the plan. Directors who retired prior to 1997 will continue to receive benefits previously earned under that pension plan and directors who were on the Board as of January 1, 1997 have received or will receive (either in a lump sum payment or in installments) an amount in lieu of benefits accrued under the pension plan as of December 31, 1996. For each director who elected to receive a future payment of such amount, Times Mirror entered into an agreement with that director specifying Times Mirror's obligation to accumulate amounts at 9% compounded annually and to make payments at the date and over the period specified by the director.

For each non-employee director, Times Mirror provides $150,000 life insurance coverage and $100,000 travel accident insurance for travel on Times Mirror business.

ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT.

OWNERSHIP OF VOTING SECURITIES

As of March 8, 2000, Times Mirror had, for voting purposes, 36,286,678 shares of Series A Common Stock issued and outstanding and 18,196,797 shares of Series C Common Stock issued and outstanding. Each share of Series A Common Stock is entitled to one vote and each share of Series C Common Stock is entitled to ten votes on all matters. The stockholders have the right to elect directors by cumulative voting, with each share allocated a number of votes equal to the votes to which the share is entitled times the number of directors to be elected, which votes may be cast for one candidate or distributed among any two or more candidates.

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

BENEFICIAL OWNERSHIP OF CERTAIN STOCKHOLDERS

The following table sets forth the ownership of the outstanding shares of the voting securities of Times Mirror as of March 8, 2000 (except as otherwise noted), held by persons known to Times Mirror to beneficially own more than 5% of the outstanding shares of a class of voting securities of Times Mirror and by certain employee benefit plan trusts maintained by Times Mirror for various qualified retirement plans for employees of Times Mirror and its subsidiaries. Unless otherwise indicated, beneficial ownership numbers represent shares over which the beneficial owner has sole voting and dispositive power.

| NAME AND ADDRESS OF BENEFICIAL OWNER | SERIES A COMMON STOCK | PERCENT OF SERIES(1) | SERIES C COMMON STOCK | PERCENT OF SERIES(1) |
|---|---|---|---|---|
| The Trustees of the Chandler Trusts(2)(3)............<br>350 West Colorado Boulevard Suite 230<br>Pasadena, CA 91105 | -- | -- | 14,521,654 | 79.80% |
| The Times Mirror Employee Stock Ownership Trust(4)...<br>Times Mirror Square<br>Los Angeles, CA 90053 | 2,864,934 | 7.90% | 1,356,244 | 7.45% |
| Times Mirror Savings Plus Plan Trust(5)..............<br>Times Mirror Square<br>Los Angeles, CA 90053 | 2,057,887 | 5.67% | 137,092 | * |
| Putnam Investments, Inc.(6)..........................<br>Marsh & McLennan Companies, Inc.<br>Putnam Investment Management, Inc.<br>The Putnam Advisory Company, Inc.<br>One Post Office Square<br>Boston, MA 02109 | 4,932,511 | 13.59% | -- | -- |
| FMR Corp.(7).........................................<br>82 Devonshire Street<br>Boston, MA 02109 | 4,227,771 | 11.65% | -- | -- |

---------------
 *  Less than one percent

(1) The percentages are based on the number of shares outstanding for voting purposes of each class of voting securities as of March 8, 2000, as reflected in the records of Times Mirror. Shares of Series C Common Stock automatically convert into shares of Series A Common Stock upon being transferred, other than transfers to certain permitted transferees as specified in Times Mirror's Amended and Restated Certificate of Incorporation.

(2) On March 8, 2000, the Chandler Trusts owned in the aggregate 14,521,654 shares of Series C Common Stock. In addition to her interests in shares held by the Chandler Trusts, Gwendolyn Garland Babcock, a trustee of the Chandler Trusts, holds 23,800 shares of Series A Common Stock (over all of which Mrs. Babcock has sole voting and dispositive power), including 20,000 shares of Series A Common Stock which she may acquire upon exercise of outstanding stock options and 2,057 stock units deferred under The Times Mirror Non-Employee Directors Stock Plan. Her husband holds 900 shares of Series A Common Stock and 448 shares of Series C Common Stock. In addition to Mrs. Babcock, four other trustees of the Chandler Trusts own Series A Common Stock individually or as trustee as follows: 113,801 shares of Series A Common Stock and 57,264 shares of Series C Common Stock owned by Camilla Chandler Frost plus 106,650 shares of Series A Common Stock held by a foundation controlled by her, her son, and William Stinehart, Jr.; 9,330 shares by William Stinehart, Jr. (of which he has sole voting and dispositive power over 8,587 shares), including 5,000 shares of Series A Common Stock which he may acquire upon the exercise of outstanding stock options, 3,587 stock units deferred under The Times Mirror Non-Employee Directors Stock Plan and 1,243 shares held as co-trustee, of which he disclaims beneficial ownership; and 24,865 shares by Warren B. Williamson (over all of which Mr. Williamson has sole voting and dispositive power), including 20,000 shares of Series A Common Stock which he may acquire upon the exercise of outstanding stock options and 4,582 stock units deferred

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000                    Powered by Morningstar® Document Research℠

under The Times Mirror Non-Employee Directors Stock Plan. On March 8, 2000, the individuals who act as trustees of the Chandler Trusts (see "Certain Relationships and Related Transactions") beneficially owned, or indirectly, in their capacities as individuals and as trustees of the Chandler and other trusts an aggregate of 279,346 shares of Series A Common Stock and 14,579,366 shares of Series C Common Stock constituting 0.77% of the shares of Series A Common Stock and 80.12% of the shares of Series C Common Stock outstanding on that date, representing 66.93% of the total voting interests of all outstanding shares of Series A and Series C Common Stock. Unless otherwise indicated, all beneficial ownership figures reported in this footnote represent shares over which the beneficial owner shares voting and dispositive power with others.

(3) The number of shares indicated above excludes 5,001,334 shares of Series A Common Stock held by TMCT, LLC and 15,541,216 shares of Series A Common Stock held by TMCT II, LLC. Such shares may be deemed to be beneficially owned by the Chandler Trusts under Section 13(d) of the Exchange Act. The Chandler Trusts and their respective trustees, however, disclaim beneficial ownership of such shares. In addition, TMCT, LLC holds 411,784 shares of Series A Preferred Stock and TMCT II, LLC holds 380,972 shares of Series D-1 Preferred Stock and 245,100 shares of Series D-2 Preferred Stock. The Chandler Trusts and their respective trustees disclaim beneficial ownership of such shares.

(4) Based on holdings as of January 31, 2000, shares of Times Mirror stock allocated to participants' accounts in The Times Mirror Employee Stock Ownership Plan ("ESOP") are voted by the participants themselves on matters presented at meetings of stockholders. Shares with respect to which no participant directions are received are customarily voted by Fidelity Management Trust Company ("Fidelity"), as the trustee of the ESOP. The Plan Administration Committee, which is appointed by the Board of Directors of Times Mirror, also has authority and responsibility for the disposition of the investment of the assets held in the ESOP, including the stock. This Committee consists of four officers of Times Mirror, three of whom are Mark H. Willes, Kathryn M. Downing and Efrem Zimbalist III.

(5) Based on holdings as of January 31, 2000, shares of Times Mirror stock held in the Times Mirror Savings Plus Plan accounts or allocated to participants' Payroll-Based Stock Ownership Plan ("PAYSOP") accounts are voted by the participants themselves on matters presented at meetings of stockholders. Shares allocated to the Times Mirror Savings Plus Plan accounts with respect to which no participant directions are received will remain unvoted. Shares allocated to the PAYSOP accounts with respect to which no participant directions are received are customarily voted by Fidelity Management Trust Company, as trustee of the Times Mirror Savings Plus Plan.

(6) This information is based solely on a Schedule 13G, dated March 6, 2000 filed with the Securities and Exchange Commission by Putnam Investments, Inc. ("PI"). PI, a wholly owned subsidiary of Marsh & McLennan Companies, Inc., wholly owns Putnam Investment Management, Inc. ("PIM"), which is the investment adviser to the Putnam family of mutual funds, and The Putnam Advisory Company, Inc. ("TPAC"), which is the investment adviser to Putnam's institutional clients. PIM and TPAC both have dispositive power over the shares as investment managers, but each of the mutual fund's trustees have voting power over the shares held by each fund, and TPAC has shared voting power over the shares held by the institutional clients.

(7) This information is based solely on a Schedule 13G dated February 14, 2000 filed with the Securities and Exchange Commission by FMR Corp. as a parent holding company on behalf of certain stockholders of FMR Corp. and its investment advisory subsidiary Fidelity Management & Research Company ("FMRC"). FMRC is the beneficial owner of 2,152,017 shares of Series A Common Stock as a result of acting as investment advisor to various registered investment companies. Edward C. Johnson 3d, Chairman of FMR Corp., FMR Corp., through its control of FMRC, and the investment companies, each has sole power to dispose of the 2,152,017 shares owned by the investment companies. Neither Mr. Johnson nor FMR Corp. has the sole power to vote the 2,152,017 shares owned directly by the investment companies, which power resides in the board of trustees of the investment companies. Fidelity Management Trust Company ("FMTC"), a subsidiary of FMR Corp., is the beneficial owner of 2,075,754 shares of Series A Common Stock as a result of it serving as investment manager of institutional accounts. Mr. Johnson and FMR Corp., through its control of FMTC, each has sole dispositive power over 2,075,754 shares and sole power to vote 2,075,754 shares of Class A Common

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000        Powered by Morningstar® Document Research℠

Stock owned by the institutional accounts. Strategic Advisers, Inc. ("SAI"), a subsidiary of FMR Corp. and a registered investment adviser, does not have sole power to vote or direct the voting of shares of certain securities held for clients and has sole dispositive power over such securities. As such, FMR Corp.'s beneficial ownership may include shares beneficially owned through SAI. See also Notes 4 and 5 above.

BENEFICIAL OWNERSHIP OF MANAGEMENT

     The following table shows the beneficial ownership as of March 8, 2000 (except as otherwise noted) of Times Mirror's common stock, including shares as to which a right to acquire ownership exists within the meaning of Rule 13d-3(d)(1) under the Securities Exchange Act of 1934, of each director, each person listed in the Summary Compensation Table on page 69, and a group of such persons and other executive officers. For this purpose, the rules of the Securities and Exchange Commission require that every person who has or shares the power to vote or dispose of shares of stock be reported as a "beneficial owner" of all shares as to which such power exists. As a consequence, many persons may be deemed to be the "beneficial owners" of the same securities and for this reason all shares of Series C Common Stock held by the trustees of the Chandler Trusts (see Notes (2) and (3) beginning on page 75) are included in the shares reported in the table below as "beneficially owned" by each director who is also a trustee of the Chandler Trusts. None of the persons listed below beneficially owns any shares of Times Mirror's Cumulative Redeemable Preferred Stock, Series A, Series D-1 Preferred Stock or Series D-2 Preferred Stock (see Note 3 on page 76). Unless otherwise indicated, beneficial ownership numbers represent shares over which the beneficial owner has sole voting and dispositive power.

                    TABLE OF BENEFICIAL OWNERSHIP OF MANAGEMENT

|  | SERIES A COMMON STOCK | | SERIES C COMMON STOCK | |
| --- | --- | --- | --- | --- |
| NAME | TOTAL(1)(2) | PERCENT OF SERIES(3) | TOTAL(1) | PERCENT OF SERIES(3) |
| ---- | ----------- | ---------- | ---------- | ---------- |
| Susan Babcock.............................. | 6,356 | * | 152 | * |
| Donald R. Beall............................ | 25,334(4)(5) | * | -- | -- |
| Horst A. Bergmann.......................... | 140,496(6) | * | 1,890 | * |
| John E. Bryson............................. | 26,970(4) | * | -- | -- |
| Bruce Chandler............................. | 22,248 | * | 14,521,654(7) | 79.80% |
| Kathryn M. Downing......................... | 129,234(6) | * | -- | -- |
| Clayton W. Frye, Jr........................ | 28,453 | * | 190 | * |
| Roger Goodan............................... | 12,590(5) | * | -- | -- |
| Raymond A. Jansen, Jr...................... | 117,761(6) | * | -- | -- |
| Sherry L. Lansing.......................... | 11,440 | * | -- | -- |
| Dawn Gould Lepore.......................... | 12,503(4) | * | -- | -- |
| Dr. Alfred E. Osborne, Jr.................. | 25,787(4) | * | 385 | * |
| Robert W. Schult........................... | 13,973 | * | -- | -- |
| William Stinehart, Jr...................... | 9,330(4)(5) | * | 14,521,654(7) | 79.80% |
| Thomas Unterman(9)......................... | 196,184(6) | * | 258 | * |
| Mark H. Willes............................. | 694,815(6) | 1.88% | -- | -- |
| Warren B. Williamson....................... | 24,865(4) | * | 14,521,654(7) | 79.80% |
| Dr. Edward Zapanta......................... | 20,278(4)(8) | * | -- | -- |
| Efrem Zimbalist III........................ | 47,426(6) | * | 219 | * |
| All directors and executive officers as a group (25 persons, including those named above).... | 1,827,373 | 4.83% | 14,535,128 | 79.88% |

---------------

 *  Less than 1%

(1) Includes shares held under Times Mirror's Savings Plus Plan (including the
    PAYSOP) and Employee Stock Ownership Plan and allocated to the accounts of
    the executive officers as of February 8, 2000. Also includes shares held in
    Times Mirror's Dividend Reinvestment Plan as of December 31, 1999. Shares of
    Series C Common Stock automatically convert into shares of Series A Common
    Stock upon being

                                    77

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000          Powered by Morningstar® Document Research℠

transferred, other than transfers to certain permitted transferees as specified in Times Mirror's Amended and Restated Certificate of Incorporation.

(2) Includes shares which may be acquired upon the exercise of outstanding stock options and that are currently exercisable within 60 days of March 8, 2000 as follows: 4,170 by Ms. Babcock; 20,000 by Mr. Beall; 128,592 by Mr. Bergmann; 23,653 by Mr. Bryson; 110,850 by Mr. Chandler; 110,850 by Ms. Downing; 20,000 by Mr. Frye; 10,400 by Mr. Goodan; 94,900 by Mr. Jansen; 10,400 by Ms. Lansing; 10,400 by Ms. Lepore; 20,000 by Dr. Osborne; 12,700 by Mr. Schult; 5,000 by Mr. Stinehart; 174,065 by Mr. Unterman; 588,200 by Mr. Willes; 20,000 by Mr. Williamson; 15,000 by Dr. Zapanta; and 37,450 by Mr. Zimbalist.

(3) The percentages are based upon the numbers of shares outstanding for voting purposes for each class of voting securities as of March 8, 2000, as reflected in the records of Times Mirror.

(4) Includes shares deferred under The Times Mirror Company Non-Employee Directors Stock Plan.

(5) Includes shares held in trust, or other capacities, as to which beneficial ownership is disclaimed. Mr. Beall shares voting and dispositive power with respect to 1,243 shares. Includes 150 shares owned by Mr. Goodan's daughter, who lives in his household. See Note (2) beginning on page 75 for voting and dispositive power of other persons indicated.

(6) Includes shares of restricted stock, including shares granted under the matching restricted stock program of The Times Mirror Company 1996 Management Incentive Plan.

(7) Includes shares held in the Chandler Trusts. See Notes (2) and (3) beginning on page 75 and "Certain Relationships and Related Transactions".

(8) Includes shares held in an Individual Retirement Account.

(9) On terminal leave of absence pursuant to the severance agreement dated as of December 27, 1999.

ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS.

    Four of Times Mirror's present directors (Susan Babcock, Bruce Chandler, Roger Goodan and Warren B. Williamson) are cousins. Gwendolyn Garland Babcock, Jeffrey Chandler, Camilla Chandler Frost, Douglas Goodan, William Stinehart, Jr., Judy C. Webb and Warren B. Williamson are the trustees of two trusts known as the "Chandler Trusts." Jeffrey Chandler is the brother of Bruce Chandler and is the cousin of the other directors named above (other than Mr. Stinehart). Camilla Chandler Frost and Judy C. Webb are cousins of each of the directors named above (other than Mr. Stinehart). Douglas Goodan is the uncle of Roger Goodan and is the cousin of the other directors named above (other than Mr. Stinehart and Roger Goodan). Gwendolyn Garland Babcock is mother of Susan Babcock and is the cousin of the other directors named above (other than Mr. Stinehart and Susan Babcock). The trustees (other than Mr. Stinehart) and others of their relatives are beneficiaries of the Chandler Trusts. The Chandler Trusts, their trustees and the general family group of which they are members may be deemed to be "parents" of Times Mirror within the meaning of the Securities Act of 1933, as amended.

    In September 1999, Times Mirror, including certain of its affiliates, and the Chandler Trusts completed a recapitalization transaction pursuant to which each contributed assets worth $1.24 billion to TMCT II, LLC, a newly formed limited liability company ("TMCT II"). Times Mirror contributed preferred units issued by the operating partnerships of eight unrelated real estate investment trusts and $2,000,000 in cash and certain of its affiliates contributed a total of $633,300,000 in cash or cash equivalents. The Chandler Trusts contributed 9,305,624 shares of Series A Common Stock, 6,235,592 shares of Series C Common Stock, 380,972 shares of the Series C-1 Preferred Stock and 245,100 shares of Series C-2 Preferred Stock. In connection with the recapitalization, Times Mirror replaced the Series C-1 and C-2 Preferred Stock with Series D-1 and D-2 Preferred Stock effective January 1, 2000. The Series D-1 and D-2 Preferred Stock are identical to the Series C-1 and C-2 Preferred Stock except that the increases in the dividend rate on the Series D-1 and D-2 Preferred Stock are pursuant to a fixed and certain schedule. Pursuant to the allocations of TMCT II approximately $1,530,000 of dividends received on Times Mirror's stock by TMCT II in 1999 were allocated to the Chandler Trusts.

    In connection with that transaction, in September 1999, TMCT II invested $500,000,000 in a newly formed investment fund, TMCT Ventures, L.P. ("TMCT Ventures"), the general partner of which is Rustic

78

Canyon Partners LLC ("Rustic Canyon Partners"). Rustic Canyon Partners, LCC is entitled to receive 20% of the profits generated by TMCT Ventures, as calculated in accordance with the limited partnership agreement of TMCT Ventures. Rustic Canyon Partners did not earn any amount under this provision during 1999. Another entity, Rustic Canyon Management, LLC ("Rustic Canyon Management"), will earn a management fee of $7,500,000 per year for managing TMCT Ventures for the next several years. For the period from September to December 1999, Rustic Canyon Management earned $2,445,000 in such fees. Mr. Unterman, who resigned from his positions with Times Mirror in December 1999, founded, and owns approximately two-thirds of the equity of, Rustic Canyon Partners and Rustic Canyon Management. During the period from September 4, 1999 through December 27, 1999 Mr. Unterman worked primarily on matters related to TMCT Ventures. Rustic Canyon Management reimbursed Times Mirror for a portion of Mr. Unterman's 1999 compensation and for all the compensation of certain Rustic Canyon Management employees as well as for facilities costs and costs of administrative support for the period from September 4, 1999 to the end of the year. In connection with Mr. Unterman's resignation, he entered into a severance agreement with Times Mirror. This severance agreement provides for a one-time payment of $675,000 and annual payments of $50,000 until December 31, 2004 in exchange for Mr. Unterman's availability to provide consulting services to Times Mirror. Stock options granted to Mr. Unterman continue to vest under this severance agreement and restrictions on restricted stock previously granted to Mr. Unterman will continue to lapse in accordance with the terms of the grant. The agreement further provides for certain continuing employee benefits. The agreement recognizes that during the term of the leave of absence that Mr. Unterman will be providing services to TMCT, LLC, TMCT II, LLC and the Chandler Trusts.

    In August 1997, Times Mirror and the Chandler Trusts consummated a transaction that consisted of two parts. First, Times Mirror and the Chandler Trusts made contributions of assets to a new limited liability company, TMCT, LLC. Second, Chandis Securities Company, a company principally owned by one of the Chandler Trusts, was merged into a subsidiary of Times Mirror. In forming TMCT, LLC, Times Mirror contributed real property having an appraised value of $226,000,000 and $249,000,000 in cash. The Chandler Trusts contributed approximately 5 million shares of Series A Common Stock, valued at $254,000,000, and $221,000,000 stated value of 8% Series A Preferred Stock. The real property was leased back to Times Mirror under long-term leases and the cash was invested in a portfolio of securities of unrelated issuers. Pursuant to the allocations of TMCT, LLC, approximately $19,333,000 of the lease payments and $4,341,000 of dividends received on Times Mirror's stock by TMCT, LLC in 1999 were allocated to the Chandler Trusts.

    Times Mirror entered into an agreement with Mr. Willes when he joined Times Mirror in 1995 relating to the terms of his employment with Times Mirror. Under that agreement, Mr. Willes was to serve as President and Chief Executive Officer until January 1, 1996 and also as Chairman of the Board after that date. The agreement specified his initial salary, target annual incentive bonus and long-term incentive award and provided for Times Mirror to assume various costs and obligations in connection with Mr. Willes' relocation to Los Angeles. Mr. Willes is entitled to participate in retirement, deferred compensation, insurance and other employee benefit programs. The agreement defined a special supplemental retirement benefit to compensate Mr. Willes for the potential future loss of retirement benefits resulting from his termination of employment with his former employer. During the past few years, the Compensation Committee has reviewed the level of benefits provided to Mr. Willes under this agreement and has periodically made changes to the special retirement benefits to be provided to Mr. Willes upon his retirement from Times Mirror to bring Mr. Willes' retirement benefits into line with competitive practices for treatment of Chief Executive Officers of comparable companies.

    The latest of these amendments was approved by the Executive Compensation Subcommittee of the Compensation Committee of the Times Mirror Board (the "Executive Compensation Subcommittee") at its special meeting on March 2, 2000 and later reviewed, ratified and approved by the Times Mirror Board at its special March 11, 2000 meeting. Under the March 2000 amendment, in the event that Mr. Willes remains in his current position through the term of his contract (which date was initially to be March 31, 2002, and was then changed to be the earlier of the effective time of the proposed merger of Times Mirror into Tribune Company, or March 31, 2002), in the event of Mr. Willes' death or disability before the end of the term of the contract, or in the event that his employment is terminated by Times Mirror before the term of the contract, Mr. Willes will receive a special retirement benefit of $970,000 per year commencing on April 1, 2002 and

                                          79

payable as a 50% joint and survivor annuity with his wife as the joint annuitant. This benefit equals the total pension benefit from Times Mirror, including benefits earned under the Times Mirror Pension Plan and the SERP. In the event that Mr. Willes voluntarily terminates his employment prior to the term of his contract, he will receive a retirement benefit determined under the terms of the SERP, based on the highest 5 year average salary plus the highest 5 year average bonus, and the aggregate of his benefit service earned with Times Mirror and his former employer (which would increase his benefit service by 15 years of service, for a total of approximately 20 years), offset by $204,332, the benefit he earned under the pension plans maintained by his former employer.

The original employment agreement further provides that if Mr. Willes terminates employment with Times Mirror prior to age 60 for "good reason" or if his employment is terminated other than for "cause" or disability (as those terms are defined in the agreement), Times Mirror will (a) pay two years' salary and target bonus, (b) pay Mr. Willes' target annual bonus incentive award for the year of termination, pro rated for the number of months of active employment in such year, (c) treat such termination as an early termination for purposes of determining benefits under various benefit plans, (d) seek to have the restrictions on his restricted stock treated according to the terms applicable in situations of early retirement, (e) provide for continued participation and service credit under various retirement, deferred compensation, insurance and other employee benefit programs, and (f) provide such other benefits as are offered to retiring officers. In actions taken in March 2000 by the Executive Committee Subcommittee, and later reviewed, ratified and approved by the Times Mirror Board, the term of Mr. Willes' contract was amended to cease on the earlier of March 31, 2002 or the effective time of the proposed merger of Times Mirror into Tribune Company. Further, in accordance with Times Mirror's practices established by the Compensation Committee in July 1997, if Mr. Willes continues his employment through the term of his contract or if his employment is terminated by Times Mirror before the term of his contract, Mr. Willes will be provided with company-paid furnished and functional office space and secretarial support for seven years after the termination of his employment.

On July 15, 1998, Times Mirror entered into an agreement with Ms. Downing that after she transferred to the Los Angeles Times, Times Mirror would pay her $50,000 per year, less appropriate withholding, to assist in her relocation to Southern California. This amount is to be paid to her in an annual lump sum payment for each of the next five years. The first payment was made as of July 1, 1998, and future payments will be made as of the next four anniversaries from that date. These payments will be reduced for appropriate tax withholding but will not be grossed up for taxes. These payments will cease in the event that her employment with Times Mirror terminates during the five-year period.

PART IV

ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K.

(a)(1) and (a)(2) Financial Statements and Financial Statement Schedules filed as part of this report:

As listed in the Index to Financial Statements and Financial Statement Schedule on page 27 hereof.

(a)(3) Exhibits filed as part of this report:

As listed in the Exhibit Index beginning on page 82 hereof.

(b) Reports on Form 8-K:

The Company filed a Current Report on Form 8-K dated October 12, 1999 filing a Statement of Eligibility of Trustee on Form T-1 of Citibank, N.A.

The Company filed a Current Report on Form 8-K dated October 19, 1999 relating to the issuance of $200,000,000 of Times Mirror's 6.65% Notes due October 15, 2001 and of $400,000,000 of Times Mirror's 7.45% Notes due October 15, 2009.

80

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

THE TIMES MIRROR COMPANY

By:    /s/ EFREM ZIMBALIST III
    ------------------------------------
        Efrem Zimbalist III
       Executive Vice President
     and Chief Financial Officer

Dated: March 29, 2000

81

EXHIBIT INDEX

Exhibits marked with an asterisk (*) are incorporated by reference to documents previously filed by Times Mirror, or its predecessor Old Times Mirror, with the Securities and Exchange Commission, as indicated. All other documents listed are filed with this report, unless otherwise indicated.

EXHIBIT
NO.
-------

| | |
|---|---|
| *2.1 | Contribution Agreement among Times Mirror, certain subsidiaries thereof, Chandler Trust No. 1 and Chandler Trust No. 2, dated August 8, 1997 (Exhibit 10.2 to Current Report on Form 8-K, dated August 8, 1997) |
| *2.2 | Amended and Restated Agreement and Plan of Merger, dated as of April 27, 1998, by and among Reed Elsevier U.S. Holdings Inc., Reed Elsevier Overseas BV, CBM Acquisition Parent Co., CBM MergerSub Corp., Times Mirror, TMD, Inc. and Matthew Bender Company, Incorporated (Exhibit 2.1 to Times Mirror's Current Report on Form 8-K, dated July 31, 1998) |
| *2.3 | Partnership Interest Purchase Agreement, dated as of April 26, 1998, by and among Times Mirror, Shepard's Inc., TM ShepCo, Inc., Reed Elsevier Inc. and Reed Books Inc. (Exhibit 2.2 to Times Mirror's Current Report on Form 8-K dated July 31, 1998) |
| *2.4 | Amended and Restated Agreement and Plan of Merger, dated as of October 8, 1998 by and among Harcourt Brace & Company, Mosby Parent Corp., Mosby Acquisition Corp., Times Mirror and Mosby, Inc. (Exhibit 2.1 to Times Mirror's Current Report on Form 8-K, dated October 9, 1998) |
| *2.5 | Contribution Agreement among Times Mirror, certain subsidiaries thereof, Eagle New Media Investments, LLC, Eagle Publishing Investments, LLC and Chandler Trust No. 1 and Chandler Trust No. 2, dated September 3, 1999 (Exhibit 10.2 to Times Mirror's Current Report on Form 8-K, dated September 3, 1999 and filed with the Securities and Exchange Commission on September 7, 1999) |
| *2.6 | Agreement and Plan of Merger dated as of March 13, 2000 between Tribune Company and Times Mirror (Exhibit 2.1 to Times Mirror's Current Report on Form 8-K, dated October 13, 2000) |
| *2.7 | Voting Agreement dated as of March 13, 2000 by and among Tribune Company and the other parties set forth on the signature pages thereto (Exhibit 2.2 to Times Mirror's Current Report on Form 8-K, dated October 13, 2000) |
| *3.1 | Restated Certificate of Incorporation of Times Mirror, as filed with the Secretary of State of the State of Delaware on January 23, 1995 (Exhibit to Times Mirror's Registration Statement on Form S-4 (File No. 33-87482)) |
| *3.2 | Certificate of Amendment to Certificate of Incorporation of Times Mirror, as filed with the Secretary of State of the State of Delaware on February 1, 1995 (Exhibit to Times Mirror's Registration Statement on Form S-4 (File No. 33-87482)) |
| *3.3 | Certificate of Designations of Series C Common Stock, as filed with the Secretary of State of the State of Delaware on January 23, 1995 (Exhibit to Times Mirror's Registration Statement on Form S-4 (File No. 33-87482)) |
| *3.4 | Amended and Restated Bylaws of Times Mirror (Exhibit 3.4 to Times Mirror's 1998 Annual Report on Form 10-K) |
| *3.5 | Certificate of Designations of Series A Preferred Stock (Exhibit 3.5 to Times Mirror's 1995 Annual Report on Form 10-K) |
| *3.6 | Certificate of Designations of Series B Preferred Stock (Exhibit 3.6 to Times Mirror's 1995 Annual Report on Form 10-K) |
| *3.7 | Certificate of Designation of Series C-1 Preferred Stock (Exhibit 4.1 to Times Mirror's Current Report on Form 8-K, dated August 8, 1997) |

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000          Powered by Morningstar® Document Research℠

EXHIBIT
NO.
-------

*3.8      Certificate of Designation of Series C-2 Preferred Stock
          (Exhibit 4.2 to Times Mirror's Current Report on Form 8-K,
          dated August 8, 1997)

*3.9      Certificate of Designation of Series D-1 Preferred Stock
          (Exhibit 3.9 to Times Mirror's 1999 Annual Report on Form
          10-K)

*3.10     Certificate of Designation of Series D-2 Preferred Stock
          (Exhibit 3.10 to Times Mirror's 1999 Annual Report on Form
          10-K)

*4.1      Indenture by and between New TMC Inc. (subsequently changed
          to The Times Mirror Company) and Wells Fargo Bank (successor
          to First Interstate Bank of California), as Trustee for the
          7 1/4% Debentures due 2013 and 7 1/2% Debentures due 2023,
          dated January 30, 1995 (Exhibit 4.1 to Times Mirror's 1995
          Annual Report on Form 10-K)

*4.2      Specimen Note for 7 1/4% Debenture due March 1, 2013 (New
          TMC Inc., subsequently changed to The Times Mirror Company)
          (Exhibit 4.2 to Times Mirror's 1995 Annual Report on Form
          10-K)

*4.3      Specimen Note for 7 1/2% Debenture due July 1, 2023 (New TMC
          Inc., subsequently changed to The Times Mirror Company)
          (Exhibit 4.3 to Times Mirror's 1995 Annual Report on Form
          10-K)

*4.4      Indenture dated March 19, 1996, by and between The Times
          Mirror Company and Citibank, N.A., as Trustee for the 4 1/4%
          PEPS due March 15, 2001 and the 7 1/4% Debentures due
          November 15, 2096 (Exhibit 4.1 to Times Mirror's Current
          Report on Form 8-K, dated March 19, 1996)

*4.5      Officers' Certificate dated as of March 19, 1996
          establishing the terms of the PEPS and attaching the
          Specimen Certificate for the 4 1/4% PEPS due March 15, 2001
          and the Specimen Certificate of Global PEPS (Exhibit 4.2 to
          Times Mirror's Current Report on Form 8-K, dated March 19,
          1996)

*4.6      Officers' Certificate dated November 13, 1996 establishing
          the terms of the 7 1/4% Debentures due November 15, 2096 and
          attaching the specimen Form of Debenture (Exhibit 4.2 to
          Times Mirror's Current Report on Form 8-K, dated November
          13, 1996)

*4.7      Indenture dated April 15, 1997 between Times Mirror and
          Citibank, N.A., as trustee (Exhibit 4.1 to Times Mirror's
          Current Report on Form 8-K, dated April 9, 1997)

*4.8      Officer's Certificate dated September 9, 1997 establishing
          the terms of the 6.61% Debentures due September 15, 2027 and
          attaching the specimen Form of Debenture (Exhibit 4.2 to
          Times Mirror's Current Report on Form 8-K, dated September
          9, 1997)

*4.9      Officers' Certificate dated October 19, 1999 establishing
          the terms of the 6.65% Notes due October 15, 2001 and the
          7.45% Notes due October 15, 2009 and attaching specimen
          Forms of Notes (Exhibit 4.2 to Times Mirror's Current Report
          on Form 8-K, dated October 19, 1999)

*4.10     First Supplemental Indenture dated as October 19, 1999
          between Times Mirror and Citibank, N.A., as trustee (Exhibit
          4.3 to Times Mirror's Current Report on Form 8-K, dated
          October 19, 1999)

*10.1     Deferred Compensation Plan for Executives (Exhibit 10.1 to
          Times Mirror's 1994 Annual Report on Form 10-K)

*10.2     1987 Restricted Stock Plan (Exhibit II to Old Times Mirror's
          definitive Proxy Statement, dated March 27, 1987)

*10.3     1984 Executive Stock Option Plan (Exhibit A to Old Times
          Mirror's definitive Proxy Statement, dated April 23, 1984)

*10.4     1988 Executive Stock Option Plan (Exhibit A to Old Times
          Mirror's Proxy Statement, dated March 30, 1988)

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000          Powered by Morningstar® Document Research℠

```
EXHIBIT
  NO.
-------

*10.5      Deferral Plan for Directors' Fees (Exhibit 10.8 to Old Times
           Mirror's 1981 Annual Report on Form 10-K)
*10.6      The Times Mirror Pension Plan for Directors, as Amended and
           Restated on March 5, 1987 (Exhibit 10.11 to Old Times
           Mirror's 1986 Annual Report on Form 10-K)
*10.7      Deferred Compensation Plan for Non-Employee Directors
           (Exhibit 10.7 to Times Mirror's 1994 Annual Report on Form
           10-K)
*10.8      Non-Employee Director Stock Option Plan (Appendix A to Old
           Times Mirror's definitive Proxy Statement, dated March 21,
           1994)
*10.9      Agreement dated April 29, 1985 between Old Times Mirror and
           Otis Chandler (Exhibit 10.10 to Old Times Mirror's 1985
           Annual Report on Form 10-K)
*10.10     Letter Agreement amended and restated as of August 28, 1995
           between Times Mirror and Mark H. Willes (Exhibit 10.10 to
           Times Mirror's 1995 Annual Report on Form 10-K)
*10.11     1992 Key Employee Long-Term Incentive Plan (Appendix A to
           Old Times Mirror's Proxy Statement, dated March 20, 1992)
*10.12     1996 Management Incentive Plan (Exhibit 10.12 to Times
           Mirror's 1995 Annual Report on Form 10-K)
*10.13     Non-Employee Directors Stock Plan (Exhibit 10.13 to Times
           Mirror's 1995 Annual Report on Form 10-K)
*10.14     The Times Mirror Company Non-Employee Directors Stock Plan
           as amended and restated effective January 1, 1997 (Exhibit
           10.14 to Times Mirror's 1996 Annual Report on Form 10-K)
*10.15     The Times Mirror Company 1997 Directors Stock Option Plan
           (Exhibit 10.15 to Times Mirror's 1996 Annual Report on Form
           10-K)
*10.16     Limited Liability Company Agreement of TMCT, LLC, dated
           August 8, 1997 (Exhibit 10.1 to Times Mirror's Current
           Report on Form 8-K, dated August 8, 1997)
*10.17     Lease Agreement between TMCT, LLC and Times Mirror, dated
           August 8, 1997 (Exhibit 10.4 to Times Mirror's Current
           Report on Form 8-K, dated August 8, 1997)
*10.18     Amended and Restated Limited Liability Company Agreement of
           TMCT II, LLC, dated September 3, 1999 (Exhibit 10.1 to Times
           Mirror's Current Report on Form 8-K, dated September 3, 1999
           and filed with the Securities and Exchange Commission on
           September 7, 1999)
*10.19     Letter Agreement between Times Mirror and Mary E. Junck
           dated April 5, 1999 (Exhibit 10.19 to Times Mirror's 1999
           Annual Report on Form 10-K)
*10.20     Letter Agreement between Times Mirror and Thomas Unterman
           dated December 22, 1999 (Exhibit 10.20 to Times Mirror's
           1999 Annual Report on Form 10-K)
*11        Computation of Earnings Per Share (Exhibit 11 to Times
           Mirror's 1999 Annual Report on Form 10-K)
*12        Computation of Ratio of Earnings to Fixed Charges and Ratio
           of Earnings to Fixed Charges and Preferred Stock Dividends
           (Exhibit 12 to Times Mirror's 1999 Annual Report on Form
           10-K)
*21        Subsidiaries of the Registrant (Exhibit 21 to Times Mirror's
           1999 Annual Report on Form 10-K)
 23        Consent of Ernst & Young LLP, Independent Auditors
*27        Financial Data Schedule (Exhibit 27 to Times Mirror's 1999
           Annual Report on Form 10-K)
```

84

Source: TIMES MIRROR CO /NEW/, 10-K/A, March 30, 2000    Powered by Morningstar® Document Research℠

EXHIBIT 23

CONSENT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS

We consent to the incorporation by reference in the Registration Statements
(Form S-3 Nos. 333-38605, 333-34691, 333-30773 and 333-86807) and in the
Registration Statements (Form S-8 Nos. 333-32773 and 33-65259) of our report
dated February 2, 2000, with respect to the consolidated financial statements
and schedule of The Times Mirror Company included in its Annual Report (Form
10-K/A) for the year ended December 31, 1999.

ERNST & YOUNG LLP

Los Angeles, California
March 28, 2000

**Created by** Morningstar® Document Research
http://documentresearch.morningstar.com