*ATTORNEY-CLIENT COMMUNICATION*

## MINUTES OF A MEETING
## OF THE BOARD OF DIRECTORS OF THE
## ROBERT R. McCORMICK TRIBUNE FOUNDATION

### February 23, 2007

A meeting of the Board of Directors (the "**Board**") of the Robert R. McCormick Tribune Foundation (the "**Foundation**") was held at 10:00 a.m. Central Time on Friday, February 23, 2007 in Chicago, Illinois at the Foundation's offices. An agenda is attached.

Present at the meeting were James C. Dowdle, Dennis FitzSimons, David Hiller (participating by phone), John Madigan and Scott Smith, constituting the entire Board. Also present by invitation were Jill Greenthal and Kate Bueker of The Blackstone Group ("**Blackstone**"), Herbert S. Wander of Katten Muchin Rosenman LLP ("**Katten**") and Thomas E. Chomicz of Quarles & Brady LLP ("**Quarles & Brady**"). Mr. FitzSimons chaired the meeting and Mr. Chomicz acted as secretary of the meeting.

**Report of the Advisory Committee to the Board**

*History and Background of the Proposed Transaction*

John W. Madigan and James C. Dowdle, each of whom were independent Board directors ("**Independent Directors**") appointed by the Board to serve on the advisory committee of the Board (the "Advisory Committee"), which was formed to oversee the Foundation's role in any possible transaction involving Tribune Company ("**Company**"). The Advisory Committee began by explaining to the Board the work it had accomplished prior to this meeting. First, the Committee indicated that they had met in person a number of times in connection with (i) conducting business, financial and legal due diligence, (ii) exploring with executives of the Company, alternative plans and structures as well as reviewing financial and business projections and (iii) reviewing and analyzing the foregoing with its financial and legal advisors. Second, through its investor relations colleagues (Andy Hays, independent consultant and Harlan Teller of Financial Dynamics), the Advisory Committee monitored the press coverage and the Advisory Committee's responses thereto. Third, the Advisory Committee was kept current by counsel relating to contacts with the Office of the Attorney General of Illinois. Fourth, the Advisory Committee acknowledged that it was kept current by daily scheduled telephone conference calls each afternoon (including a number of weekend calls) with its financial and legal advisors (sometimes, there would be more than one call a day and on a few occasions, a scheduled call would be skipped). Finally, the Advisory Committee's advisors had previously supplied the Advisory Committee with numerous written legal, due diligence and financial memoranda.

The Independent Directors indicated that they had monitored each of the proposals that were officially submitted to the Company's Special Committee through the publicly available documentation, as well as through conversations with both the Company's Special Committee and members of the Company's management. The Advisory Committee learned through these

FOUN0010008

conversations that in addition to the official bids for the Company, the Company was also considering a proposal from Sam Zell involving an ESOP, however the Advisory Committee had previously been told that the completion of the Proposed Transaction (as described below) was the most likely outcome, and the Advisory Committee felt that they should focus on completing the negotiations of the Proposed Transaction in order to maximize the value of the Foundation's investment in the Company.

*Due Diligence*

Mr. Madigan then began describing to the Board the work that Katten and the Advisory Committee's other advisors had performed with respect to due diligence of the Company. Mr. Madigan noted that, since December, the Foundation and its advisors had considered a wide variety of possible transactions and deal structures, and that the due diligence investigation had evolved to reflect the goals and objectives of the Proposed Transaction (*i.e.*, the Advisory Committee and its advisors had not analyzed the Company materials as though the Foundation would be acquiring the Company). Mr. Madigan then summarized the due diligence investigation by noting that Katten had: (i) reviewed and analyzed material documents on the Company data site, of which the index itself spans for 93 pages, (ii) attended the Company management presentations and (iii) participated in numerous telephone conversations and meetings with the Company management, advisors and counsel, as well as Foundation management, advisors and counsel. Mr. Madigan also indicated that Katten had provides the Advisory Committee a lengthy, detailed due diligence memorandum previously delivered to the Advisory Committee, which summarized the *material* results of the legal due diligence investigation by Katten. Further, Quarles & Brady had advised that the Proposed Transaction will not jeopardize the Foundation's tax-exempt status under Code Section 501(a) as an organization described in Code Section 501(c)(3) or cause the Foundation or its foundation managers to incur any excise tax under Code Sections 4941, 4944 and 4958, and that, assuming the Foundation limits its ownership of voting stock in the Company as planned, the Foundation will not incur any excise tax under Code Section 4943 by virtue of its ownership of stock of the Company.

Mr. Madigan concluded by stating that, at this time, nothing has come to the attention of Katten or Quarles & Brady that would cause any significant legal exposure to the Foundation should the Foundation, the Chandler Trusts and the Company proceed with the Proposed Transaction.

*Negotiations with the Various Parties*

Mr. Madigan then briefly detailed the Advisory Committee's negotiations with the various parties, including the following:

1.  A proposal from the Chandler Trusts for a split-off of the Company's broadcast-related assets (**"Tribune Broadcasting"**), whereby the Foundation and other Company shareholders would receive shares of Tribune Broadcasting and a cash distribution in exchange for their shares of the Company, and the Chandler Trusts, along with other investors, would retain ownership of the remaining publishing assets of the Company (**"Tribune Publishing"**), as well as a similar alternative, but with the positions of the Foundation and the Chandler Trusts' reversed.

FOUN0010009

2.     The Broad and Burkle ("B&B") proposal, whereby B&B would make a cash infusion of $500.0 million into the Company in exchange for a 34% equity share in the Company, the Company would take on significant debt, and there would be a $27 dividend distribution received by all shareholders of the Company.

3.     A proposal by The Carlyle Group to purchase Tribune Broadcasting.

4.     Inquiries from various media companies, including Hearst, Gannett and News Corp., as to various proposed transactions, and from numerous other third parties interested in one or more potential transactions with the Company and/or the Foundation.

5.     Various "self-help" alternatives, including but not limited to the Proposed Transaction.

The discussion then turned to open issues. The Committee noted the following open items with respect to the Proposed Transaction: (i) whether the Company will amend its "poison pill" to permit the Foundation to sell or otherwise transfer shares without triggering the poison pill, (ii) whether the Company will reimburse the Foundation for its expenses related to the Proposed Transaction, (iii) the exact number of shares of Company common stock to be exchanged under the Exchange Agreement, (iv) payment of the Hart Scott Rodino filing fee and (v) certain minor points with respect to the Registration Rights Agreement. With respect to the third point (iii), Mr. Chomicz indicated that Quarles & Brady would make the calculation, consistent with the requirements of the Code, and communicate it to the Committee.

*Proposed Transaction*

Mr. Madigan and Mr. Dowdle explained the currently proposed transaction structure ("**Proposed Transaction**"), which had four primary components: (i) the Company would proceed with a leveraged recapitalization involving a $20.00 per share special dividend to its stockholders funded through approximately $5.1 billion of incremental indebtedness, (ii) the Foundation would use approximately half the amount received from the Company dividend to purchase 25 million Company shares owned by the Chandler Trusts, (iii) the Foundation would exchange a portion of its Company stock (the "**Exchange**") from voting common to nonvoting preferred stock (with such nonvoting preferred being convertible to voting common at any time, and which would be substantially economically identical to the voting common stock), to the extent the Foundation deems necessary or advisable to ensure avoidance of penalty excise taxes under the Internal Revenue Code of 1986, as amended (the "**Code**") and (d) subject to market conditions and exchange listing requirements, the Company would split the publishing and broadcasting portions into two distinct corporate entities. Mr. Madigan then briefly described the legal documents that would need to be executed by the Foundation:

1.     *Stock Purchase Agreement between the Foundation and the Chandler Trusts* (the "**Purchase Agreement**"), pursuant to which the Foundation would agree to purchase 25 million shares Common Stock owned by the Chandler Trusts at a price to be determined based on future trading levels, subject to a collar of $31.00 to $29.00 per share. Mr. Wander noted that the consummation of purchase of the shares under the Purchase Agreement would be subject to a series of conditions, including the payment of the $20 per share cash dividend by the Company, the resignation by the Chandler Trusts'

FOUN0010010

nominated directors from the Company's Board of Directors and a stand-still agreement by the Chandler Trusts.

2. *Exchange Agreement between the Foundation and the Company,* (the "**Exchange Agreement**"), pursuant to which the Foundation would have the right to transfer shares of Company common stock in exchange for shares of Company convertible preferred stock. Mr. Wander noted that it is anticipated that prior to the ex-dividend date for the $20 per share cash divided to be paid by the Company, the Foundation would exchange shares of its Company common stock for shares of Company convertible preferred stock, and that the Foundation would have the continuing right to exchange common stock for non-voting preferred stock at any time and from time to time.

3. *Registration Rights Agreement between the Foundation and the Issuer,* (the "**Registration Rights Agreement**"), pursuant to which: (i) the Foundation would be permitted to demand up to three registrations of its Company stock, subject to certain conditions, (ii) the Foundation would be granted the right to allow Foundation-owned Company common stock to be sold in conjunction with an offering of new public shares by the Company (also known as a "piggyback right"), and (iii) in the event that a spin-off would be consummated by the Company, the rights described in (i) and (ii) above would also be extended to the spun-off public entity.

4. *Letter Agreement from the Company to the Foundation, regarding the voting rights of certain shares purchased from Chandler Trusts* (the "**TMCT Letter Agreement**"), under which the Company would notify the Foundation that, upon consummation of the transactions contemplated by the Purchase Agreement, to the extent that any of Company common stock purchased by the Foundation under the Purchase Agreement was subject to Section 4.6(b) of the Distribution Agreement, dated September 21, 2006, by and among TMCT, LLC, the Company and the Chandler Trusts or the Distribution Agreement, dated September 21, 2006, by and among TMCT II, LLC, the Company, and the Chandler Trusts, the provisions in Sections 4.6(b) relating to the voting of such shares would <u>not</u> apply with respect to the Foundation or to any subsequent transferee of the Foundation (other than the Chandler Trusts).

5. *Letter Agreement from the Company to the Foundation, regarding the Board seats* (the "**Board Letter Agreement**"), under which the Company would provide the Foundation with the right to designate an individual for nomination or appointment to the Board of the Company, and in the event that a spin-off is consummated, the board of the spun-off company. Mr. Wander noted that, for many weeks, the Company had resisted this request by the Foundation for Board representation, but had finally agreed to it.

6. *Letter from the Special Committee of the Tribune Board,* pursuant to which the Special Committee of the Company Board indicating that an agreement for the purchase of the Chandler Trusts shares by the Foundation would be a material factor in the Special Committee's decision of whether to recommend the proposed restructuring and recapitalization to the full Company Board.

FOUN0010011

*Recommendation of the Advisory Committee*

At this point, prior to the Independent Directors making their formal recommendation to the Board to approve the Proposed Transaction, Mr. FitzSimons indicated that the Company was not planning on approving the Proposed Transaction over the weekend.   The Company had determined it was in its best interest to continue to pursue alternative transactions to the Proposed Transaction, particularly a proposed transaction structured around Sam Zell and an ESOP. Mr. FitzSimons did indicate that the Company would like the Foundation to continue to finalize the documentation necessary for the Foundation to complete its part of the Proposed Transaction, and to specifically finalize documentation with the Chandler Trusts.  In addition, the Committee was directed to meet with Andy Hayes and Harlan Teller of Financial Dynamics, the Foundation's public relations advisors, to plan the Foundation's public comments on the status of its investment in the Company and the Proposed Transactions.

There being no further business to come before the Board, the meeting was adjourned at approximately 11:00 a.m.

_____
Thomas E. Chomicz, Acting Secretary

Approved:

_____
Dennis FitzSimons, Chair

_____
James C. Dowdle

_____
David Hiller

_____
John W. Madigan

_____
Scott Smith

QBCHI\5239754                        5

FOUN0010012