*ATTORNEY-CLIENT COMMUNICATION*

MINUTES OF A MEETING
OF THE ADVISORY COMMITTEE OF THE
BOARD OF DIRECTORS OF THE
ROBERT R. McCORMICK TRIBUNE FOUNDATION

February 23, 2007

A meeting of the advisory committee (the "**Committee**") of the Board of Directors (the "**Board**") of the Robert R. McCormick Tribune Foundation (the "**Foundation**") was held at 7:30 a.m. Central Time on Friday, February 23, 2007 in Chicago, Illinois at the Foundation's offices. An agenda is attached.

Present at the meeting were James C. Dowdle and John W. Madigan both of whom were independent directors ("**Independent Directors**") appointed by the Board to serve on the Committee: Also present were Jill Greenthal, Kate Bueker, Sean Madnani and Miriam Tawail of The Blackstone Group ("**Blackstone**"), Herbert S. Wander, Eric Smith, Keith R. Koeneman and Emily C. Olson of Katten Muchin Rosenman LLP ("**Katten**"), Thomas E. Chomicz and Janice E. Rodgers of Quarles & Brady LLP ("**Quarles & Brady**") and Brien O'Brien of Advisory Research, Inc. ("**Advisory Research**"). Mr. Chomicz acted as secretary of the meeting.

**Report to the Advisory Committee**

*Preliminary Remarks*

The Committee began by recognizing the work it had accomplished prior to this meeting. First, the Committee met in person a number of times in connection with (i) conducting business, financial and legal due diligence, (ii) exploring with executives of Tribune Company ("**Company**") alternative plans and structures as well as reviewing financial and business projections and (iii) reviewing and analyzing the foregoing with its financial and legal advisors. Second, through its public relations colleagues (Andy Hays, independent consultant, and Harlan Teller of Financial Dynamics), the Committee monitored the press coverage and the Committee's responses thereto. Third, the Committee was kept current by counsel relating to contacts with the Office of the Attorney General of Illinois. Fourth, the Committee acknowledged that it was kept current by daily scheduled telephone conference calls each afternoon (including a number of weekend calls) with its financial and legal advisors (sometimes, there would be more than one call a day and on a few occasions, a scheduled call would be skipped). Finally, the Committee's advisors had previously supplied the Committee with numerous written legal, due diligence and financial memoranda.

*Overview of Structure*

Mr. Wander and Ms. Greenthal reviewed the currently proposed transaction structure ("**Proposed Transaction**"), which had four primary components: (i) the Company would proceed with a leveraged recapitalization involving a $20.00 per share special dividend to its stockholders funded through approximately $5.1 billion of incremental indebtedness, (ii) the Foundation would use

QBCHI\525735.1

**FOUN0010000**

approximately half the amount received from the Company dividend to purchase 25 million Company shares owned by the Chandler Trusts, (iii) the Foundation would exchange a portion of its Company stock (the "**Exchange**") from voting common to nonvoting preferred stock (with such nonvoting preferred being convertible to voting common at any time, and which would be substantially economically identical to the voting common stock), to the extent the Foundation deems necessary or advisable to ensure avoidance of penalty excise taxes under the Internal Revenue Code of 1986, as amended (the "**Code**") and (d) subject to market conditions and exchange listing requirements, the Company would split the publishing and broadcasting portions into two distinct corporate entities. Mr. Wander then briefly described the legal documents that would need to be executed by the Foundation:

1. *Stock Purchase Agreement between the Foundation and the Chandler Trusts* (the "**Purchase Agreement**"), pursuant to which the Foundation would agree to purchase 25 million shares Common Stock owned by the Chandler Trusts at a price to be determined based on future trading levels, subject to a collar of $31.00 to $29.00 per share. Mr. Wander noted that the consummation of purchase of the shares under the Purchase Agreement would be subject to a series of conditions, including the payment of the $20 per share cash dividend by the Company, the resignation by the Chandler Trusts' nominated directors from the Company's Board of Directors and a stand-still agreement by the Chandler Trusts.

2. *Exchange Agreement between the Foundation and the Company,* (the "**Exchange Agreement**"), pursuant to which the Foundation would have the right to transfer shares of Company common stock in exchange for shares of Company convertible preferred stock. Mr. Wander noted that it was anticipated that prior to the ex-dividend date for the $20 per share cash divided to be paid by the Company, the Foundation would exchange shares of its Company common stock for shares of Company convertible preferred stock, and that the Foundation would have the continuing right to exchange common stock for non-voting preferred stock at any time and from time to time.

3. *Registration Rights Agreement between the Foundation and the Issuer,* (the "**Registration Rights Agreement**"), pursuant to which: (i) the Foundation would be permitted to demand up to three registrations of its Company stock, subject to certain conditions, (ii) the Foundation would be granted the right to allow Foundation-owned Company common stock to be sold in conjunction with an offering of new public shares by the Company (also known as a "piggyback right"), and (iii). in the event that a spin-off would be consummated by the Company, the rights described in (i) and (ii) above would also be extended to the spun-off public entity.

4. *Letter Agreement from the Company to the Foundation, regarding the voting rights of certain shares purchased from Chandler Trusts* (the "**TMCT Letter Agreement**"), under which the Company would notify the Foundation that, upon consummation of the transactions contemplated by the Purchase Agreement, to the extent that any of Company common stock purchased by the Foundation under the Purchase Agreement was subject to Section 4.6(b) of the Distribution Agreement, dated September 21, 2006, by and among TMCT, LLC, the Company and the Chandler Trusts or the Distribution Agreement, dated September 21, 2006, by and among TMCT II, LLC, the Company, and

the Chandler Trusts, the provisions in Sections 4.6(b) relating to the voting of such shares would not apply with respect to the Foundation or to any subsequent transferee of the Foundation (other than the Chandler Trusts).

5. *Letter Agreement the Company to the Foundation, regarding the Board seats* (the "**Board Letter Agreement**"), under which the Company would provide the Foundation with the right to designate an individual for nomination or appointment to the Board of the Company, and in the event that a spin-off is consummated, the board of the spun-off company. Mr. Wander noted that, for many weeks, the Company had resisted this request by the Foundation for Board representation, but had finally agreed to it.

6. *Letter from the Special Committee of the Tribune Board,* pursuant to which the Special Committee of the Tribune Board indicating that an agreement for the purchase of the Chandler Trusts shares by the Foundation would be a material factor in the Special Committee's decision of whether to recommend the proposed restructuring and recapitalization to the full Tribune Board.

*Latest Developments*

Ms. Greenthal then noted that the Independent Directors and its advisors had worked extremely hard since the formation of the Committee, as described above. She also noted that the Committee had reviewed numerous possible transactions involving the Company and the Foundation and had analyzed the financial, investment, tax and legal issues of each. She expressed the view that the Independent Directors were fully informed on all of the latest developments, but asked if there were any questions at this time. Mr. Madigan asked Ms. Greenthal to confirm that the Chandler Trusts had not changed their negotiating position and that they continued to expect a pre-dividend price that was market-based and subject to a collar of $31.00 to $29.00 per share. Ms. Greenthal confirmed that was correct. As there were no further questions, Mr. Wander expressed the view that the Independent Directors had met their fiduciary duties of: (i) staying fully informed, (ii) maintaining their independence and (iii) negotiating at arms' length on behalf of the Foundation.

*Timing*

Ms. Greenthal communicated to the Committee that, subject to any delays that might occur, the Proposed Transaction was expected to close prior to the end of the second quarter of 2007, and that the subsequent spin-off of the Company's broadcasting assets might occur as early as in the fourth quarter of 2007.

*Open Issues*

The discussion then turned to open issues. Ms. Greenthal noted for the Committee the following open items: (i) whether the Company would amend its "poison pill" to permit the Foundation to sell or otherwise transfer shares without triggering the poison pill, (ii) whether the Company would reimburse the Foundation for its expenses related to the Proposed Transaction, (iii) the exact number of shares of Company common stock to be exchanged under the Exchange Agreement, (iv) payment of the Hart Scott Rodino filing fee and (v) certain minor points with respect to the Registration Rights Agreement. With respect to the third point (iii), Mr. Chomicz indicated that Quarles &

3

FOUN0010002

Brady would make the calculation, consistent with the requirements of the Code, and communicate it to the Committee.

**Fairness Presentation**

Blackstone then made a presentation (the "**Blackstone Presentation**") which focused on its opinion as to the fairness, from a financial point of view, of the value of the consideration to be paid by the Foundation for the 25 million Company common shares to be purchased from the Chandler Trusts as part of the Proposed Transaction. A draft of the Blackstone Presentation had been previously circulated to the Independent Directors and their advisors in preparation for the Committee meeting. Ms. Greenthal also informed the Committee that the Blackstone Opinion Committee had reviewed the presentation in detail and approved the fairness opinion. The Blackstone Presentation, each page of which Ms. Greenthal and Ms. Bueker presented to and reviewed with the Independent Directors, contained seven primary sections: (i) introduction, (ii) overview of the foundations, (iii) overview of Tribune Company, (iv) transaction summary, (v) valuation analysis, (vi) pro forma impact of the transaction and (vii) form of the fairness opinion letter. In her introduction, Ms. Greenthal noted that the Proposed Transaction would have a number of important results for the Foundation, including the following: (i) the Foundation would receive net cash proceeds of $285 - $335 million, increasing its portfolio diversification (i.e., the portion of its portfolio in Company stock would fall to approximately 50% from 75%), (ii) the purchase of stock from the Chandler Trusts and the exit of their representatives from the Company Board of Directors would create a more stable operating environment for the Company and (iii) the Foundation would become the largest stockholder of the Company and would be granted one seat on the Company's Board of Directors. The Committee discussed these points at length and asked many questions of Blackstone, Katten and Quarles & Brady. After the discussion had concluded, Ms. Bueker made a detailed presentation of Blackstone's valuation analyses, which included: (i) discounted cash flow analysis, (ii) sum-of-the-parts analysis, (iii) publicly-traded comparable companies analysis and (iv) precedent transactions analysis. In addition to describing these analyses, Ms. Bueker explained the impact that various "scenario analyses" would have on the Proposed Transaction and the potential value of the Company's stock price. The Committee asked numerous questions of Blackstone and discussed the valuation analyses at length. After the Independent Directors' questions had been satisfactorily answered, Ms. Greenthal communicated that Blackstone had concluded that the Proposed Transaction was fair to the Foundation.

Mr. O'Brien left the meeting due to a family emergency.

**Legal Analysis**

*Due Diligence*

Mr. Wander then began describing to the Committee the work that Katten and the Committee's other advisors had performed with respect to due diligence. Mr. Wander noted that one of Katten's primary responsibilities was to assist the Committee in fulfilling its fiduciary obligations to the Foundation by providing legal due diligence on the Company. Mr. Wander also noted that, since December, the Foundation and its advisors had considered a wide variety of possible transactions and deal structures, and that the due diligence investigation had evolved to reflect the goals and objectives of the Proposed Transaction (i. e., Katten had not analyzed the Company materials as though the Foundation would be acquiring the Company). Mr. Wander then summarized the due diligence investigation by noting that Katten had: (i) reviewed and analyzed material documents on the Company data site, of which the index itself spans 93 pages, (ii) attended the Company management presentations and (iii) participated in numerous telephone conversations and meetings with the Company management, advisors and counsel, as well as Foundation management, advisors and counsel. Mr. Wander also referred the Independent Directors to the lengthy, detailed due diligence memorandum previously delivered to the Committee, which summarized the *material* results of the legal due diligence investigation by Katten.

In describing the *scope* of its due diligence efforts, Mr. Wander communicated that Katten had divided the due diligence investigation matters into three tiers based on degree of importance to the Foundation: (i) areas of major investigation, (ii) areas of moderate investigation and (iii) areas of little to no investigation. According to Mr. Wander, Katten had dedicated significant efforts to investigating the following areas:

1. Voting provisions in the Company's certificate and by-laws,
2. Meetings of the Company Board of Directors,
3. Company Disclosure Committee meetings,
4. Company Employee Benefits Committee meetings,
5. Company Rights Agreement (i.e., the poison pill),
6. Company's relationship with the Chandler Trusts, including TMCT and TMCT II,
7. Contracts relating to the Tribune Publishing division,
8. Potential change-of-control payments,
9. Company partnerships, and
10. Joint ventures.

According to Mr. Wander, Katten had dedicated a moderate amount of resources to investigating the following areas:

FOUN0010004

1.  The Eagle LLCs,
2.  Tax issues, including the Matthew Bender litigation,
3.  Union issues,
4.  Debt and indentures,
5.  Litigation,
6.  Insurance,
7.  Other corporate issues,
8.  Other financial issues, and
9.  Other material agreements.

According to Mr. Wander, Katten had performed little to no due diligence investigation in any other areas, including:

1.  Tribune Broadcasting division,
2.  Real estate,
3.  Environmental,
4.  Business,
5.  Technical,
6.  Information technology,
7.  Employment law,
8.  Intellectual property, or
9.  Compliance issues.

Mr. Wander concluded by stating that, at that time, nothing had come to Katten's attention that would cause any significant legal exposure to the Foundation should the Foundation, the Chandler Trusts and the Company proceed with the Proposed Transaction.

*Filing and Disclosure Requirements*

The discussion then turned to filing and disclosure requirements associated with the Proposed Transaction. Mr. Wander noted that the Foundation would need to complete certain SEC filings, such as a Form 4 and a Form 13-D, as well as a Hart-Scott Rodino filing with the Federal Trade Commission in order to complete the transaction. Mr. Wander communicated that he believed that Katten and Quarles & Brady would be able complete these filings on behalf of the Foundation as soon as necessary.

QBCHI\525735.1

FOUN0010005

*Legal Standards and Opinions*

Mr. Chomicz then reviewed for the Committee the substance of Quarles & Brady's draft legal opinion to the Foundation with respect to the Proposed Transaction, focusing on two issues: (i) whether the Foundation would be in compliance with applicable standards for prudent investment decisions by the directors of the Foundation under Illinois state law if the Directors approved the Proposed Transaction in the manner expected, and (ii) whether the Proposed Transaction would jeopardize the Foundation's tax-exempt status or cause the Foundation to incur certain penalty excise taxes under the Internal Revenue Code. With respect to the first issue, Mr. Chomicz communicated that Quarles & Brady had determined that the Foundation's directors would have satisfied their duties of care under Illinois law by considering all of the relevant circumstances prior to deciding whether to enter into the agreements which would affect the Proposed Transaction. With respect to the second issue, Mr. Chomicz communicated that Quarles & Brady had determined that the Purchase will not jeopardize the Foundation's tax-exempt status under Code Section 501(a) as an organization described in Code Section 501(c)(3) or cause the Foundation or its foundation managers to incur any excise tax under Code Sections 4941, 4944 or 4958, and that, assuming the Foundation limits its ownership of voting stock in the Company as planned, the Foundation will not incur any excise tax under Code Section 4943 by virtue of its ownership of stock of the Company.

**Approval of the Proposed Transaction**

The Committee further discussed the Proposed Transaction, approved it unanimously and decided to recommend that the Board of the Foundation also approve the Proposed Transaction.

There being no further business to come before the Committee, the meeting was adjourned at 9:50 a.m.

_____
Thomas E. Chomicz, Acting Secretary

Approved:

_____
James C. Dowdle, Advisory Committee Member

_____
John W. Madigan, Advisory Committee Member

**MEETING OF THE ADVISORY COMMITTEE**
**OF THE**
**ROBERT R. McCORMICK TRIBUNE FOUNDATION**

AGENDA

Meeting to be held at Foundation's office:
435 N. Michigan Suite 770
Chicago, IL

February 23, 2007

7:30 a.m.

| | | |
|---|---|---|
| 1. | Report to the Advisory Committee | Blackstone |
| | | Quarles & Brady |
| | Overview of Structure | Katten |
| | Latest Developments | |
| | Timing | |
| | Open Issues | |
| | Questions and Answers | |
| 2. | Fairness Presentation | Blackstone |
| 3. | Legal Analysis | Quarles & Brady |
| | | Katten |
| | Due Diligence | |
| | Filing and Disclosure requirements | |
| | Legal Standards and Opinions | |
| 4. | Committee Consideration and Determination | Independent Directors |
| 5. | Executive Session | Independent Directors |

8

QBCHI\525735.1

**FOUN0010007**