# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 11 |
| TRIBUNE COMPANY, *et al.*,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

**Objection Deadline: September 21, 2010 at 4:00 p.m. ET**
**Hearing Date: October 22, 2010 at 2:00 p.m. ET**

## SUMMARY SHEET FOR FINAL APPLICATION OF KLEE, TUCHIN, BOGDANOFF & STERN LLP FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO KENNETH N. KLEE, THE EXAMINER, FOR THE PERIOD APRIL 30, 2010 THROUGH AUGUST 20, 2010

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8655); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago National League Ball Club n/k/a Tribune CNLBC, LLC (0347); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo., Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH, Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Brook Productions, Inc. (2598); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, Inc. (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc. f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

| | |
|---|---|
| Name of Applicant: | Klee, Tuchin, Bogdanoff & Stern LLP ("KTB&S") |
| Authorized to Provide Professional Services to: | Kenneth N. Klee, as the Examiner approved in the above-captioned cases |
| Date of Retention: | May 19, 2010 (nunc pro tunc to April 30, 2010) |
| Period for Which Compensation and Reimbursement is Sought: | April 30 through August 20, 2010 (the "Final Application Period") plus amounts incurred thereafter relating to preparation of final fee applications, replies to any objections, and appearance at the hearing thereon[2] |
| Amount of Compensation for Final Application Period sought as actual, reasonable and necessary: | $4,411,195.25 |
| Amount of Expense Reimbursement for Final Application Period sought as actual, reasonable and necessary: | $74,927.81 |
| Amount of Compensation and Expense Reimbursement sought as actual, reasonable and necessary in connection with final fee applications | TBD |

This is a(n):      ☐ Monthly      ☐ Interim      ☒ Final Application.

---

[2]  The amounts referenced herein are calculated based on information received through August 25, 2010.  KTB&S intends to file one or more supplements to this Final Application, prior to the hearing thereon detailing: (a) the fees and expenses incurred in connection with the preparation and prosecution of this Final Application, and (b) any additional expenses for which KTB&S does not yet have complete or final billing information, including but not limited to, telephone expenses, PACER services, and Federal Express charges.

**PRIOR APPLICATIONS FILED**

| Date Filed and Docket No. | Application Period | Fees Requested | Expenses Requested | CNO Docket No. | Fees Approved | Expenses Approved | 20% Holdback |
|---|---|---|---|---|---|---|---|
| 8/10/2010 D.I. 5323 | 4/30/2010 | $18,538.00 | $-0- | Pending | Pending | Pending | Pending |
| 8/10/2010 D.I. 5324 | 5/1/2010 – 5/31/2010 | $1,225,927.00 | $24,580.28 | Pending | Pending | Pending | Pending |
| 8/10/2010 D.I. 5325 | 6/1/2010 – 6/30/2010 | $1,555,796.75 | $20,815.66 | Pending | Pending | Pending | Pending |
| 8/25/2010 D.I. 5526 | 7/1/2010 – 7/31/2010 | $1,566,741.75 | $17,382.57 | Pending | Pending | Pending | Pending |

**REQUESTED AMOUNTS NOT INCLUDED IN PRIOR APPLICATIONS**

| Period | Fees Requested | Expenses Requested |
|---|---|---|
| 8/1/2010-8/20/2010 ("August Period") | $44,191.75 | $12,149.30 |
| Final Fee Application Preparation and Prosecution | TBD | TBD |

2

## FEE SUMMARY FOR THE AUGUST PERIOD

| Name of Professional Individual | Position of the Applicant, Number of Years in that Position, Year of Obtaining License to Practice | Area of Expertise | Hourly Billing Rate | Total Hours Billed | Total Compensation |
|---|---|---|---|---|---|
| Lee R. Bogdanoff | Partner 1999; Member of CA Bar Since 1985 | Bankruptcy | $895.00 | 10.30 | $9,218.50 |
| Martin R. Barash | Partner 2001; Member of CA Bar Since 1992 | Bankruptcy | $715.00 | 3.40 | $2,431.00 |
| David A. Fidler | Partner 2003; Member of CA Bar Since 1997 | Bankruptcy | $680.00 | .20 | $136.00 |
| Jonathan S. Shenson | Partner 2006; Member of CA Bar Since 1996 | Bankruptcy | $680.00 | 1.00 | $680.00 |
| Brian M. Metcalf | Of Counsel 2008; Member of CA Bar Since 1999 | Bankruptcy Litigation | $625.00 | 5.60 | $3,500.00 |
| Robert J. Pfister | Of Counsel 2010; Member of CA Bar Since 2001 | Bankruptcy Litigation | $595.00 | 31.90 | $18,980.50 |
| Robert J. Pfister | Of Counsel 2010; Member of CA Bar Since 2001 | Bankruptcy Litigation | $297.50 | 15.70 | $4,670.75 |
| Shanda D. Pearson | Paralegal 2007 | Bankruptcy | $250.00 | 18.30 | $4,575.00 |

Grand Total:    $44,191.75
Total Hours:    86.40
Blended Rate:    $511.47[3]

---

[3]    In the exercise of its billing discretion, KTB&S voluntarily wrote off $38,775.00 in fees for the August Period, representing 78.00 hours of service, which hours and fees are excluded from the foregoing chart and this calculation.

124614_4.DOC            3

## COMPENSATION BY CATEGORY FOR AUGUST PERIOD

| Project Categories | Total Hours Billed | Total Fees |
|---|---|---|
| 010 – Case Administration | 11.20 | $6,143.50 |
| 040 – Fee/ Employment Applications | 23.10 | $9,272.50 |
| 080 – Asset Analysis and Recovery | 7.60 | $5,049.00 |
| 120 – Litigation | 28.80 | $19,056.00 |
| 900 – Non-Working Travel | 15.70 | $4,670.75 |
| **Total:** | **86.40** | **$44,191.75** |

## EXPENSE SUMMARY FOR THE AUGUST PERIOD

| Expense Category | Total Expenses |
|---|---|
| Duplicating | $374.40 |
| Online Research | $9,666.24 |
| Telephone (Long Distance and Conference Calls) | $119.06 |
| Travel | $1,989.60 |
| **Total:** | **$12,149.30** |

## CUMULATIVE FEE SUMMARY FOR THE FINAL APPLICATION PERIOD

| Name of Professional Individual | Position of the Applicant, Number of Years in that Position, Year of Obtaining License to Practice | Area of Expertise | Hourly Billing Rate | Total Hours Billed | Total Compensation |
|---|---|---|---|---|---|
| David M. Stern | Partner 2000; Member of CA Bar Since 1975 | Bankruptcy Litigation | $895.00 | 151.70 | $135,771.50 |
| Lee R. Bogdanoff | Partner 1999; Member of CA Bar Since 1985 | Bankruptcy | $895.00 | 920.20 | $823,579.00 |
| Lee R. Bogdanoff (50% Travel Rate) | Partner 1999; Member of CA Bar Since 1985 | Bankruptcy | $447.50 | 16.00 | $7,160.00 |
| Martin R. Barash | Partner 2001; Member of CA Bar Since 1992 | Bankruptcy | $715.00 | 759.90 | $543,328.50 |
| Martin R. Barash (50% Travel Rate) | Partner 2001; Member of CA Bar Since 1992 | Bankruptcy | $357.50 | 22.10 | $7,900.75 |
| Ronn S. Davids | Partner 2004; Member of CA Bar Since 1995 | Corporate | $680.00 | 679.80 | $462,264.00 |
| David A. Fidler | Partner 2003; Member of CA Bar Since 1997 | Bankruptcy | $680.00 | 628.40 | $427,312.00 |
| David A. Fidler | Partner 2003; Member of CA Bar Since 1997 | Bankruptcy | $340.00 | 14.80 | $5,032.00 |
| Jennifer L. Dinkelman | Partner 2007; Member of CA Bar Since 1999 | Corporate | $625.00 | 663.70 | $414,812.50 |
| Jonathan S. Shenson | Partner 2006; Member of CA Bar Since 1996 | Bankruptcy | $680.00 | 121.60 | $82,688.00 |
| Jonathan S. Shenson (50% Travel Rate) | Partner 2006; Member of CA Bar Since 1996 | Bankruptcy | $340.00 | 10.60 | $3,604.00 |
| Matthew C. Heyn | Partner 2010; Member of CA Bar Since 2003 | Bankruptcy Litigation | $550.00 | 347.50 | $191,125.00 |
| Brian M. Metcalf | Of Counsel 2008; Member of CA Bar Since 1999 | Bankruptcy Litigation | $625.00 | 593.60 | $371,000.00 |
| Robert J. Pfister | Of Counsel 2010; Member of CA Bar Since 2001 | Bankruptcy Litigation | $595.00 | 664.80 | $395,556.00 |
| Robert J. Pfister (50%Travel Rate) | Of Counsel 2010; Member of CA Bar Since 2001 | Bankruptcy Litigation | $297.50 | 39.00 | $11,602.50 |
| Efrat Zisblatt | Associate 1999; Member of CA Bar Since 1997 | Bankruptcy | $595.00 | 7.70 | $4,581.50 |
| Danielle Brown | Associate 2009; Member of CA Bar Since 2004 | Bankruptcy Litigation | $490.00 | 668.70 | $327,663.00 |
| Matthew K. Larssen | Law Clerk | Bankruptcy | $170.00 | 347.30 | $59,041.00 |
| Kathryn T. Zwicker | Law Clerk | Bankruptcy | $170.00 | 219.70 | $37,349.00 |
| Shanda D. Pearson | Paralegal 2007 | Bankruptcy | $250.00 | 399.30 | $99,825.00 |

Grand Total: **$4,411,195.25**
Total Hours: **7,276.40**
Blended Rate: **$606.23**[4]

---

[4]    In the exercise of its billing discretion, KTB&S voluntarily wrote off $96,716.50 in fees for the Application Period, representing 205.60 hours of service, which hours and fees are excluded from the foregoing chart and this calculation.

## CUMULATIVE COMPENSATION BY CATEGORY
## FOR THE FINAL APPLICATION PERIOD

| Project Categories | Total Hours Billed | Total Fees |
|---|---|---|
| 010 – Case Administration | 341.40 | $168,107.00 |
| 020 – Meetings and Communications | 269.40 | $192,872.50 |
| 040 – Fee/ Employment Applications | 68.50 | $40,409.00 |
| 080 – Asset Analysis and Recovery | 5,355.00 | $3,318,320.00 |
| 095 – Legal Research re Investigation | 366.60 | $199,093.50 |
| 096 – Questions Two & Three | 435.90 | $244,172.50 |
| 097 – Witness Interviews/ Discovery | 283.90 | $179,119.50 |
| 120 – Litigation | 53.20 | $33,802.00 |
| 900 – Non-Working Travel | 102.50 | $35,299.25 |
| **Total:** | **7,276.40** | **$4,411,195.25** |

## CUMULATIVE EXPENSE SUMMARY FOR THE FINAL APPLICATION PERIOD

| Expense Category | Total Expenses |
|---|---|
| Duplicating | $22,161.30 |
| Messenger/ Overnight Services | $655.58 |
| Court Fees | $389.52 |
| Online Research | $19,724.24 |
| Parking | $533.22 |
| Telephone (Long Distance and Conference Calls) | $489.88 |
| Travel - Meals | $728.56 |
| Travel | $30,245.51 |
| **Total:** | **$74,927.81** |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 11 |
| TRIBUNE COMPANY, *et al.*,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Objection Deadline: September 21, 2010 at 4:00 p.m. ET**<br>**Hearing Date: October 22, 2010 at 2:00 p.m. ET** |

### FINAL APPLICATION OF
### KLEE, TUCHIN, BOGDANOFF & STERN LLP FOR COMPENSATION AND
### REIMBURSEMENT OF EXPENSES AS COUNSEL TO KENNETH N. KLEE, THE
### EXAMINER, FOR THE PERIOD APRIL 30, 2010 THROUGH AUGUST 20, 2010

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8655); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago National League Ball Club n/k/a Tribune CNLBC, LLC (0347); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo., Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH, Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxnet Publishing Company (4223); Publishers Forest Brook Productions, Inc. (2598); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, Inc. (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc. f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

124614_4.DOC

Klee, Tuchin, Bogdanoff & Stern LLP ("KTB&S" or "Applicant"), counsel to Kenneth N. Klee, Esq., the examiner (the "Examiner") appointed in the above-captioned chapter 11 cases (the "Chapter 11 Cases") of Tribune Company and its affiliates (collectively, the "Debtors" or "Tribune"), hereby submits its *Final Application of Klee, Tuchin, Bogdanoff & Stern LLP for Compensation and for Reimbursement of Expenses as Counsel to Kenneth N. Klee, the Examiner, for the Period April 30, 2010 through August 20, 2010* (the "Final Application") and applies to the Court for final allowance and payment of compensation for the period April 30, 2010 through and including August 20, 2010, and reimbursement of expenses for the same period of time, in respect of its retention as counsel to the Examiner.  KTB&S also requests allowance of fees and expenses incurred and to be incurred in connection with the preparation and prosecution of this final application and the final application of the Examiner.

By this Final Application, KTB&S seeks final approval of compensation and reimbursement of expenses in the total amount of $4,486,123.06, comprising: (i) professional fees in the amount of $4,411,195.25 incurred during the period April 30, 2010 through and including August 20, 2010 (the "Final Application Period"), (ii) out-of-pocket expenses incurred by KTB&S during the Final Application Period in the amount of $74,927.81, and (iii) additional amounts, to be determined, in respect of this Final Application and the final application of the Examiner, which amounts will be set forth in one more subsequent filings before the hearing on this Final Application.[2]  KTB&S requests that the Court direct the Debtors to promptly disburse to KTB&S all amounts allowed by the Court that have not already been paid to KTB&S.  KTB&S notes that the foregoing amounts do *not* include approximately $96,716 in fees, representing almost 206 hours of professional services that KTB&S has voluntarily written off, in the exercise of its billing discretion.

In support of this Final Application, KTB&S respectfully represents as follows:

---

[2]   The amounts referenced herein are calculated based on information received through August 25, 2010.  KTB&S intends to file one or more supplements to this Final Application, prior to the hearing thereon detailing: (a) the fees and expenses incurred in connection with the preparation and prosecution of this Final Application, and (b) any additional expenses for which KTB&S does not yet have complete or final billing information, including but not limited to, telephone expenses, PACER services, and Federal Express charges.

# I.

## INTRODUCTION

1.      On December 8, 2008, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On December 10, 2008, the Court entered an order providing for the joint administration of the Chapter 11 Cases.

2.      On April 20, 2010, the Court entered that certain *Agreed Order Directing the Appointment of an Examiner* [Docket No. 4120] (the "Examiner Order"), which, among other things, directed the Office of the United States Trustee (the "United States Trustee") to appoint an examiner in these cases pursuant to section 1104(c)(1) of the Bankruptcy Code.

3.      On April 30, 2010, the United States Trustee filed that certain *Notice of Appointment of Examiner* [Docket No. 4212] appointing Kenneth N. Klee, Esq. as the Examiner.  Contemporaneously therewith, the United States Trustee filed that certain *Application of the United States Trustee for Order Approving Appointment of Examiner* [Docket No. 4213].

4.      On May 7, 2010, the Examiner filed that certain *Work and Expense Plan of Examiner-Designate Kenneth N. Klee, Esq.* [Docket No. 4261] ("Work Plan").  On May 10, 2010, the Court held a status conference regarding the appointment of the Examiner and adopted the Work Plan.

5.      On May 11, 2010, the Court entered that certain *Order Approving Appointment of Examiner* [Docket No. 4320] ("Appointment Order") and that certain *Order Approving Work and Expense Plan and Modifying Examiner Order* [Docket No. 4321] ("Supplemental Order").

6.      On May 12, 2010, the Examiner filed that certain *Application of the Examiner for an Order Authorizing the Retention of Klee, Tuchin, Bogdanoff & Stern LLP as Counsel to the Examiner Nunc Pro Tunc to April 30, 2010* [Docket No. 4356].  On May 19, 2010, the Court entered that certain *Order Authorizing the Retention of Klee, Tuchin, Bogdanoff & Stern LLP as Counsel to the Examiner Nunc Pro Tunc to April 30, 2010* [Docket No. 4498], a copy of which is attached hereto as <u>Exhibit A</u>.

7.      Pursuant to the Examiner Order, as modified by the Supplemental Order, the Examiner was directed to conduct an investigation ("Investigation"), responding to each of the following Questions:

Question One: evaluate the potential claims and causes of action held by the Debtors' estates that are asserted by the Parties, in connection with the leveraged buy-out of Tribune that occurred in 2007 (the "LBO") which may be asserted against any entity which may bear liability, including, without limitation, the Debtors, the Debtors' former and/or present management, including former/present members of Tribune's Board, the Debtors' lenders and the Debtors' advisors, said potential claims and causes of action including, but not limited to, claims for fraudulent conveyance (including both avoidance of liability and disgorgement of payments), breach of fiduciary duty, aiding and abetting the same, and equitable subordination and the potential defenses asserted by the Parties to such potential claims and causes of action.

Question Two: evaluate whether Wilmington Trust Company violated the automatic stay under 11 U.S.C. § 362 by its filing, on March 3, 2010, of its Complaint for Equitable Subordination and Disallowance of Claims, Damages and Constructive Trust.

Question Three: evaluate the assertions and defenses made by certain of the Parties in connection with the Motion of JPMorgan Chase Bank, N.A., for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order (D.I. 3714).

8.    In addition, the Examiner Order specified that the Examiner would "otherwise perform the duties of an Examiner set forth in 11 U.S.C. § 1106(a)(3) and (4) (as limited by this Order)." The Examiner Order directed the Examiner to prepare and file a report in respect of the Investigation on or before July 12, 2010, unless such time shall be extended by order of the Bankruptcy Court on application by the Examiner and notice to the Parties.

9.    On June 16, 2010, the Examiner filed the *Supplement Re: Examiner's Work and Expense Plan of Court-Appointed Examiner, Kenneth N. Klee, Esq.* [Docket No. 4797], apprising the Bankruptcy Court of the progress of the Investigation and advising the Bankruptcy Court that the scope and breadth of the work required to complete the Investigation was substantially greater than anticipated when the Examiner's Work Plan was filed, prior to the commencement of the Investigation.

10.    On June 23, 2010, the Examiner filed that certain *Motion of Court-Appointed Examiner, Kenneth N. Klee, Esq. for Extension of Report Deadline* [Docket No. 4858], which requested that the Court extend the deadline to file the Report. On July 1, 2010, the Court entered that certain *Order (I)*

*Amending Certain Deadlines in (A) Discovery and Scheduling Order and (B) Solicitation Order and (II) Approving Motion of Court-Appointed Examiner, Kenneth N. Klee, Esq., for Extension of Report Deadline* [Docket No. 4928], which extended the deadline to file the Report through and including July 26, 2010.

11.    On July 23, 2010, the Examiner filed that certain *Motion of Court-Appointed Examiner, Kenneth N. Klee, Esq., for Order (I) Discharging Examiner; (II) Granting Relief From Third-Party Discovery; (III) Approving the Disposition of Certain Documents and Information; and (IV) Granting Certain Ancillary Relief* [Docket No. 5115], which, among other things, requested that the Examiner be discharged of his duties and granted related relief.

12.    On July 26, 2010, the Examiner publicly filed a version of the Report that redacted certain findings and conclusions from the Investigation that some parties had identified as potentially implicating confidential information. *See Report of Kenneth N. Klee, as Examiner (Volume One)* [Docket No. 5130]; *Report of Kenneth N. Klee, as Examiner (Volume Two)* [Docket No. 5131]; *Report of Kenneth N. Klee, as Examiner (Volume Three)* [Docket No. 5132]; *Report of Kenneth N. Klee, as Examiner (Volume Four)* [Docket No. 5133].

13.    On August 3, 2010, after issues pertaining to potentially confidential information had been resolved, the Examiner publicly filed the Report setting forth in full the findings and conclusions from the Investigation. *See Report of Kenneth N. Klee, as Examiner (Volume One)* [Docket No. 5247]; *Report of Kenneth N. Klee, as Examiner (Volume Two)* [Docket No. 5248]; *Report of Kenneth N. Klee, as Examiner (Volume Three)* [Docket No. 5249]; *Report of Kenneth N. Klee, as Examiner (Volume Four)* [Docket No. 5250].

14.    By any measure, the Report is lengthy and substantial.  The Report comprises over 1,400 pages of factual narrative and legal analysis, contains over 4,600 footnotes, addresses the 38 witness interviews conducted by the Examiner and his professionals, cites to over 600 case authorities, and references approximately 1,100 exhibits substantiating the statements and conclusions contained in the Report, which exhibits themselves comprise over 21,000 pages.

15.     Thereafter, on July 23, 2010, the Examiner filed his motion seeking a discharge of his duties, relief from third-party discovery, relief relating to the disposition of certain documents and information gathered during the course of the Investigation, and related relief ("Discharge Motion"). *Motion to Authorize Motion of Court-Appointed Examiner, Kenneth N. Klee, Esq., for Order (I) Discharging Examiner; (II) Granting Relief from Third-Party Discovery; (III) Approving the Disposition of Certain Documents and Information; and (IV) Granting Certain Ancillary Relief* [Docket No. 5115]. The Debtors filed a response to the Discharge Motion urging the Court to delay ruling on that Motion, *see Response to Motion of Court-Appointed Examiner, Kenneth N. Klee, Esq., for Order (I) Discharging Examiner; (II) Granting Relief from Third-Party Discovery; (III) Approving the Disposition of Certain Documents and Information; and (IV) Granting Certain Ancillary Relief* [Docket No. 5382], to which the Examiner filed a reply arguing otherwise. *See Reply of Court-Appointed Examiner, Kenneth N. Klee, Esq., in Further Support of His Motion for an Order (I) Discharging Examiner; (II) Granting Relief from Third-Party Discovery; (III) Approving the Disposition of Certain Documents and (IV) Granting Certain Ancillary Relief* [Docket No. 5405]. Informally, the Debtors also made certain other requests, to which the Examiner did not agree, regarding the relief to be granted under the Discharge Motion. On August 20, 2010, the Court held a hearing on the Discharge Motion and adopted the Examiner's views on the scope of the relief and granted the Motion.

16.     On August 26, 2010, the Court entered its *Order Approving Motion of Court-Appointed Examiner, Kenneth N. Klee, Esq., for Order (I) Discharging Examiner; (II) Granting Relief from Third-Party Discovery; (III) Approving the Disposition of Certain Documents and Information; and (IV) Granting Certain Ancillary Relief* [Docket No. 5541], which discharged the Examiner of his duties effective as of August 20, 2010, and authorized the other related relief requested by the Examiner.

17.     This Court has jurisdiction over this Final Application under 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The statutory predicates for relief requested

herein are sections 105(a) and 330 of the Bankruptcy Code, as well as Rules 2016 and 2016-2 of the Bankruptcy Rules and Local Rules, respectively.

## II.

### COMPENSATION TO BE PAID AND ITS SOURCE

18.     All services for which KTB&S requests compensation were performed for or on behalf of the Examiner in the discharge of his duties in these cases.

19.     KTB&S has received no payment and no promises for payment from any source for services rendered or to be rendered in any capacity whatsoever in connection with the matters covered by this Final Application. There is no agreement or understanding between KTB&S and any other person, other than the partners of KTB&S, in which the Examiner is also a partner, for the sharing of compensation to be received for services rendered in these cases.

20.     Prior to the scheduled hearing on this Final Application, KTB&S anticipates being paid from the Debtors' estates in respect of its monthly applications listed the Summary Sheet that accompanies this Final Application, in accordance with the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 225] (the "Interim Compensation Order").

21.     Following the scheduled hearing on this Final Application, and subject to the Court's ruling thereon, KTB&S likewise anticipates being paid from the Debtors' estates in respect of the "holdback" amounts under the monthly applications, and such additional amounts as are requested herein.

## III.

### OVERVIEW OF THE ENGAGEMENT[3]

22.     The task assigned to the Examiner in these cases was highly unusual, if not unprecedented. In most large cases in which examiners have been appointed – for instance in the Enron and Lehman Bros. chapter 11 cases – the examiner not only was given an extended period of

---

[3]     Capitalized terms used in this Section III that are not otherwise defined in this Final Application shall have the meanings that are ascribed to them in the Report.

time to conduct an investigation and prepare a report, but was only asked to analyze whether claims or defenses are colorable. In the present case, the Examiner was afforded a very brief period of time to conduct the Investigation. Moreover, following consultation with the "Parties" identified in the Examiner Order, it became very clear to the Examiner that the Parties wanted the Examiner to go far beyond the previous kinds of analysis, actually weighing the facts and legal issues underlying potential claims and, to the extent possible, drawing conclusions about those issues.

23.    This mandate was echoed by the Court at the initial status conference regarding the Examiner's appointment and memorialized in the Supplemental Order. Further, with respect to the analysis potential avoidance claims in connection with Question One, the Examiner was requested to analyze and address the potential remedies that might be available to the estates if one or more transfers or obligations were avoided and the effect of such remedies on distributions on account of prepetition claims.[4]

24.    At the time of the Examiner's appointment, the Debtors' cases had been pending for well over a year, the Parties had engaged in extensive negotiations, the Debtors had proposed to settle and compromise those claims under a plan, and the parties had engaged – to a degree – in their own analysis and investigation of potential claims. Thus, by the time the Examiner was appointed, many of the Parties already believed there were colorable claims. The question presented was: *what are the strengths and weaknesses of those claims?*

25.    Answering this question required the Examiner to delve deeply into the factual record and conduct as thorough an investigation as time and resources permitted. This was necessary so that the Examiner would be in a position to draw the kinds of conclusions he was requested to make. Early on, the Examiner developed a seven-point, graduated scale for drawing conclusions, ranging from highly unlikely to highly likely, with gradations in between. This methodology not only allowed the Examiner to draw conclusions, but to do so in a manner that would allow the reader to understand the

---

[4]    By their terms, Questions Two and Three required that the Examiner "evaluate" the matters posed. In contrast, as originally formulated, Question One reasonably could have been read to charge the Examiner simply with determining whether there were potential claims, causes of action, and defenses that *might* have been asserted. *See* Work Plan at ¶ 21. The Supplemental Order clarified this ambiguity as discussed above.

strength of each conclusion reached.  Neither the Examiner nor KTB&S believe that any examiner has done this before, at least in a case of this magnitude.

26.    Question One was broad, the record massive, and the time provided to conduct the Investigation and produce the Report was short.  Prior to the Examiner's appointment, the Parties had produced and/or received over 3 million pages of potentially relevant documents, which were contained on approximately 150 different compact disks; the documents were not organized in any discernable fashion.  The challenge facing the Examiner and his professionals was to figure out how to become familiar with and analyze the evidence adduced as of that date, identify the universe of specific claims and legal issues that needed to be addressed in the Investigation and Report, identify the factual issues that required further evidentiary development, determine the appropriate witnesses to interview, prepare for and conduct those interviews, and draft a report that meaningfully addressed these issues – all in just two and one-half months.

27.    As a starting point, the Examiner and KTB&S quickly developed and implemented a "quasi-judicial" process designed to refine the issues, identify key documents, and enable the Examiner and his professionals to capitalize on the research and analysis already conducted by the Parties. Specifically, the Examiner requested that the Parties submit initial briefs and reply briefs addressing the subject matter of the Investigation.  The Examiner also requested that the Parties provide electronic copies of the documents on which the Parties relied in making the factual contentions set forth in their briefs.  Moments after the conclusion of the Court's hearing on approval of Mr. Klee's appointment as Examiner, KTB&S disseminated a lengthy letter to the Parties explaining this process, identifying the issues to be addressed by the Parties in their briefs, and providing guidelines on the form and format of those submissions.

28.    While the Parties were preparing their initial briefs, the Examiner and his professional advisors used the time to get up to speed on the issues presented by the Investigation.  During that period they began receiving informal submissions from certain parties identifying key documents and issues, reviewing documents, and conducting preliminary legal research.  During this period, the Examiner and his professional advisors also (i) arranged and began conducting informal meetings with

various financial advisors to the Parties, in order to begin understanding the financial issues raised by the Investigation and the differing points of view of the Parties and their advisors with respect to those issues, (ii) established an online repository for the Examiner's professionals to share documents, drafts and other information, (iii) began consolidating the 150-disk "Document Depository" into a single, searchable database, and (iv) established a secure online website through which the Parties could make their submissions, access the submissions of other Parties, and receive information from the Examiner.

29.     The key to conducting the Investigation and drafting the Report within the available time frame was to clearly define which professional firms were responsible for which tasks, to ensure that members of the Examiner's professional team kept abreast of each other's activities and the discoveries made during the course of the Investigation, and to coordinate their efforts in order to produce a single, integrated Report. Working under the Examiner's guidance and supervision, KTB&S had overall responsibility for organizing and coordinating the Investigation and assigning tasks among the advisors. As summarized below, Saul Ewing and LECG played vital roles in connection with the Instigation and the preparation of the Report.

30.     As soon as the first round of briefs had been submitted by the Parties, KTB&S prepared a comprehensive analysis identifying the factual and legal issues raised by the Parties. KTB&S also prepared a preliminary outline of the Report. Thereafter, over the Memorial Day weekend, the Examiner and members of KTB&S, Saul Ewing and LECG met for two days in Los Angeles to review and discuss the issues raised by the Parties, share the results of their preliminary factual and legal research, identify matters requiring additional investigation, and coordinate their efforts going forward. Prior to the meeting, individuals were assigned responsibility to lead the discussion and present his/her analysis of each of the key issues.

31.     This meeting was critical to the development of the Investigation and the Report. Specifically, the meeting provided a forum for the Examiner's advisors to share their preliminary views of the issues and respond to each other, for the Examiner to hear and consider multiple viewpoints, and for the Examiner to provide his preliminary views on the issues and guidance to his professionals on the drafting of the Report – all in real time.

32.    As a result of this meeting, KTB&S developed and distributed an "internal work plan," setting forth specific, issue-by-issue responsibilities and deadlines for preparation of the Report, including both factual and legal discussions. In this manner, the Examiner's team sought not only to ensure that all sections of the Report were timely researched and drafted, but to avoid duplication of effort between and among the dozens of professionals working at the three firms to produce the Report under an extremely tight timeframe.

33.    The Examiner recognized early in the process that the Report would require a massive statement of facts. In order to get a head-start, the Examiner requested and obtained a bare-bones statement of facts from the Debtors' counsel. KTB&S reviewed and verified the Debtors' bare-bones factual submission, and added substantial additional background and analysis to that work product. KTB&S also developed certain "factual silos" or clusters of disputed facts that were at the core of the disputes underlying Question One – and assigned either KTB&S, Saul Ewing, or LECG to research the record and develop the facts with respect to these disputed matters, and draft the factual narratives addressing them.

34.    These silos included, for instance, Tribune's financial performance and the market performance of its securities before the Step One Closing, between Step One and Step Two, and after the Step Two Closing; the extent of the knowledge of the foregoing by Tribune officers and directors, particular Tribune lenders and advisors; the activities of key lender entities, financial advisors, equity holders and others in connection with each of the Step One Transactions and Step Two Transactions – to name just a few.

35.    Along with its responsibility for developing certain factual narratives, LECG was primarily responsible for all financial analysis. KTB&S was responsible for interfacing with LECG, addressing all of the legal issues bearing on the financial aspects of the Investigation, and assisting in drafting the financial sections of the report. KTB&S was primarily responsible for preparing the initial draft of the legal analysis of the standards governing the bankruptcy-related claims. Saul Ewing was primarily responsible for preparing the initial draft of the legal analysis of the standards governing the common law claims, as well as equitable subordination and equitable disallowance. KTB&S reviewed

124614_4.DOC                                                11

and finalized all legal analysis and was principally responsible for applying the legal analyses to the facts. KTB&S also handled all matters relating to Question Two and Question Three, independent of the other two professional firms.

36.     The breadth of the Investigation and the extent of the work was driven in significant part by the number of issues raised by the Parties in their briefs to the Examiner. The Parties raised dozens of claims and defenses, each with sub-issues and special complexities that required the careful evaluation of the Examiner and his advisors.

37.     Moreover, although the Parties took advantage of the opportunity to annotate their submissions with documents allegedly supporting their factual contentions and legal positions, on close inspection the Examiner and his advisors determined that many of the documents did not support the contentions for which they were cited. The interviews conducted by the Examiner and his advisors, discussed below, also identified facts and raised issues that had not been adequately fleshed out by the Parties in their submissions. As a result, the Examiner and his advisors were required to delve more deeply into an investigation of the facts than they originally anticipated.

38.     The Examiner and his advisors were surprised to learn at the outset of the Investigation that – notwithstanding the extensive legal and factual analyses prepared by the Parties and the wide-ranging and factually-intensive allegations concerning, among other things, intentional fraudulent transfer, bad faith, breach of fiduciary duty, and aiding and abetting fiduciary duty breaches – only seven Rule 2004 examinations relating to the Leveraged ESOP Transactions had been conducted. The Examiner determined that it was necessary to identify and quickly arrange and conduct interviews of key witnesses, not all of whom were physically located in the same city.

39.     Because of the very short amount of time available to conduct the Investigation, by necessity the Examiner attempted to narrow the list of interviewees to those persons that the Examiner believed could meaningfully clarify or augment the factual record. All told, the Examiner and his advisors conducted 38 interviews over 46 days in four cities. Of these, the Examiner attended 33 interviews in person (of which three were attended by video conference). Of the five interviews not attended by the Examiner (principally because he was conducting another interview at the same time

or traveling to attend a scheduled interview), the Examiner has stated his belief that he adequately apprised himself of what transpired. Participating in most of the interviews enabled the Examiner to personally evaluate witness demeanor and credibility, and actively participate in questioning.

40.     Saul Ewing was principally responsible for arranging, preparing for and conducting with the Examiner the witness interviews relating to Question One, whereas KTB&S was principally responsible for arranging, preparing for and conducting with the Examiner the witness interviews relating to Question Three. The Examiner actively participated in the interviews, asking incisive questions of the witnesses.

41.     In connection with the witness interviews relating to Question One, Saul Ewing analyzed documents relating to the matters anticipated to be the subject of the witness interviews and otherwise assisted the Examiner in preparing for the witness interviews. For each witness, Saul Ewing drafted a detailed witness interview outline for the Examiner. Saul Ewing also prepared an indexed witness binder for each witness, which held the documents the Examiner intended to review with the witnesses during the interview. As a direct result of the tight timeframe for conducting the examination, many of the interviews were scheduled back to back for consecutive days. Given the compressed time frame, it was necessary to have more than one attorney present at some of the interviews to ensure continuity and efficiency in compiling the information from one interview to another. Additionally, at the request of the Examiner, Saul Ewing staffed each untranscribed interview with attorneys who were asked to use their legal judgment to prepare notes of relevant portions of the interview. With respect to certain of the interviews, certain KTB&S personnel (*e.g.,* Rob Pfister, Matthew Heyn, and Lee Bogdanoff) assisted with these responsibilities, including interviews bearing on issues for which such personnel had Report drafting responsibilities. KTB&S personnel also handled the preparation for and conduct of certain interviews relating specifically to Question Three.

42.     LECG was principally responsible for all financial analyses related to the Investigation and the corresponding sections of the Report, which analyses comprise a significant part of the Report. LECG's analyses included (i) solvency and capital adequacy analyses in connection with Step One and Step Two for the Debtors and the so-called Subsidiary Guarantors, (ii) individual subsidiary solvency

analysis, (iii) financial analyses of the value received by the Debtors in connection with the transactions effectuated at Step One and Step Two, (iv) analyses of transfers and payments made during the relevant periods, and (v) comprehensive recovery analyses. LECG also undertook substantial responsibilities in connection with the factual narrative contained in the Report bearing on financial matters. KTB&S worked with LECG, where appropriate, on these matters.

43.   The Investigation as well as the drafting of the Report were particularly challenging because the "record" continued to evolve during the relatively compressed schedule for completing the Investigation and the Report. Thus, both discovery and the drafting of the Report were occurring in real time. As interviews were conducted new information came to light – but also new questions were raised – necessitating additional investigation, additional requests for documents, and additional interviews by the Examiner and his advisors. As a result of this ongoing effort, Parties were continually providing the Examiner and his advisors new documents and new information that needed to be analyzed, considered and integrated, and the Report was continually supplemented and modified – up until it was filed.

44.   As the process unfolded, and new information was adduced in the interviews and during the Investigation, it became apparent that the Examiner would need an additional two weeks to complete the interviews necessary to prepare the Report than originally provided by the Court. Thus, the Examiner requested and obtained an extension of time to file the Report. The last interview was conducted telephonically on July 16, 2010.

45.   The efficiency of all of these efforts was greatly enhanced by weekly, all hands teleconferences in which the Examiner and a group of his advisors from all three firms, among other things, reported on their activities and the progress achieved, discussed new factual or legal discoveries that impacted the research and work product being prepared by professionals at more than one firm, raised any problems or challenges they were facing, coordinated their efforts, and obtained guidance from the Examiner and/or KTB&S on all manner of issues – both substantive and logistical. It simply would not have been possible – let alone in the compressed time frame – for the Examiner's advisors to conduct a single, coordinated investigation and a produce a single, coherent report of the scope

required, without the benefit of these regular, weekly conferences. The length of these calls was kept to a minimum. A strict agenda was prepared and used to ensure that the time was spent efficiently. The Examiner and his advisors could not have fulfilled the mandates of the Investigation without these weekly all hands meetings, which facilitated the free flow of information and the coordination of all tasks.

46.    As indicated, personnel from each of the three firms made significant contributions to researching and preparing significant portions of the Report. As an overall matter, KTB&S was responsible for revising, harmonizing, and integrating the factual narratives and legal analyses – and all of the Exhibits accompanying them – into a single Report, and the Examiner was responsible for overseeing and directing the process, and reviewing and editing the Report.

47.    Another significant challenge facing the Examiner and his advisors were the significant confidentiality restrictions governing most of the documents that were the subject of the Investigation. From the outset of their involvement, the Examiner and his advisors learned that nearly every document produced in these chapter 11 cases was marked "confidential" or "highly confidential" and that their contents could not be publicly disclosed. The "confidential" or "highly confidential" designations of some documents verged on the absurd, and included, among other things, underlying credit agreements and even documents filed with the SEC. To the best of the Examiner's knowledge, no Party had challenged the designation of as much as a single document as "confidential" or "highly confidential."

48.    The Examiner Order expressly provided that the Examiner was subject to any applicable orders of the Bankruptcy Court governing confidentiality. On the other hand, it also was clear from the Examiner Order, and from the record of the Chapter 11 Cases, that the Bankruptcy Court expected the Report to be filed publicly.

49.    In an effort to reconcile this apparent conflict, as discussed in the Examiner's Work Plan, the Examiner required that following the formal exchange of briefs and documents, each Party identify to the Examiner by June 14, 2010 those particular documents accompanying the briefs that the Party believed in good faith were entitled to protection from public disclosure under applicable law,

and that the Examiner should not publicly disclose in the Report. The Examiner made clear to the Parties, repeatedly, that the standard the Parties should apply to determine whether to designate documents for continued nondisclosure should not be whether the disclosure would be embarrassing to a particular Party, or even harmful to its position in existing or potential litigation, but whether there was a *bona fide* legal basis to prevent its public disclosure.

50.    After the June 14, 2010 deadline, in a series of communications, the Examiner identified to the Parties, and other entities that had produced documents denominated as confidential, certain documents that were not submitted with the briefs but which the Examiner might determine to quote from or refer to in the Report. The Examiner set deadlines for each Party and other entities to identify which of those accompanying documents the Party believed in good faith were entitled to protection from public disclosure under applicable law and that the Examiner should not publicly disclose in the Report.

51.    The process was laborious and taxing, requiring the Examiner's counsel, among other things, to identify documents that *might* be used in the Report (even before the Report was fully drafted), review and catalogue the source of those documents to determine whether they were potentially confidential, post the documents for the Parties to review, and analyze their responses. In response to the notifications provided by the Examiner, certain Parties designated certain documents that such Parties maintained should remain confidential.

52.    References to those items were so numerous and, in many instances, wide-ranging that the Examiner had no choice but to (i) redact the entire factual narrative of Volume One and the substantive analysis contained in Volume Two from the version of the Report originally filed as matter of public record, and (ii) file a motion seeking authority to publicly file the unredacted Report, all of its exhibits, and all of the professionally transcribed interview transcripts on which it relied. The Examiner strongly advocated for the public release of the Report and these related materials – over the vociferous objection of certain of the Parties – and ultimately prevailed.

53.    Following the Court's granting of the Examiner's motion for the public release of the Report and related materials, the Examiner filed and made publicly available the complete, unredacted

Report, each of approximately 1,100 exhibits on which the Report relies, each of the professionally transcribed witness interview transcripts to which it refers, and each of the exhibits utilized and made part of the transcript of each of those interviews.

## IV.

## SUMMARY OF SERVICES BY CATEGORY

54.    To the best of KTB&S's knowledge, this Final Application complies with section 330 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Interim Compensation Order and that certain *Order Appointing Fee Examiner and Establishing Related Procedures for Compensation and Reimbursement of Expenses for Professionals and Considerations of Fee Applications* [Docket No. 546] (the "Fee Examiner Order"). Copies of KTB&S's detailed invoices for services provided during the months of April, May, June and July 2010 are attached to the monthly applications for each of those months, as referenced above. KTB&S's detailed time entries for the period August 1, 2010 through August 20, 2010, are attached hereto as Exhibit B. In all cases, the invoices sort the services rendered by activity category and identify the names of the professionals who rendered services in these cases during those periods, along with the number of hours for each individual and the total compensation sought for each category.

55.    KTB&S was retained by the Examiner as his counsel in connection with the Investigation, the preparation of the Report, and other matters described in the Examiner Order. The services rendered by KTB&S during the Final Application Period are grouped into categories as set forth below. KTB&S placed the services provided in the category that best relates to such services. Because certain services may relate to one or more categories, however, services pertaining to one category may in fact be included in another category. The services performed are generally described below and sorted by activity category, with a more detailed identification of the actual services rendered in the invoices that are attached to the monthly applications for the months of April, May, June and July 2010, and the invoice for the period August 1, 2010 through August 20, 2010, which is attached hereto as Exhibit B.

17

**A.    Case Administration -- 010.**

56.    KTB&S devoted time in this category to addressing a wide array of discrete matters essential to the efficient and successful prosecution of the Investigation and the discharge of the Examiner's duties, including the following: (a) drafting pleadings and attending hearings regarding the appointment of the Examiner, (b) drafting and preparing pleadings related to the Examiner's work plan, as well as a request for a short extension of time to submit the Report, (c) identifying, analyzing and developing the parameters and sequence of the Investigation, outlining the numerous issues to be evaluated, and preparing work plans, (d) delegating work among the Examiner's counsel and financial advisors and managing their activities, (e) communicating with the Parties and the United States Trustee regarding the appointment of the Examiner, the scope of the Investigation, the Examiner's work plan, and confidentiality issues, (f) establishing and managing a secure document website for the Examiner and his professionals to share, organize and maintain documents collected during the course of the Investigation, and for the Parties to both upload and download confidential submissions to the Examiner, (g) working with LECG to establish a searchable online database containing all of the documents comprising the so-called "Document Depository" compiled by the Parties, (h) managing the thousands of exhibits and potential exhibits to the Report and addressing the confidentiality assertions of the Parties with respect to those documents, (i) drafting pleadings relating to the Examiner's request to make the Report and its exhibits public, and his request to temporarily submit an unredacted version of the Report under seal while confidentiality issues were resolved, and (j) responding to and addressing requests from the Parties regarding access to the Report and its exhibits, and related confidentiality issues.

Fees: $168,107.00    Hours: 341.40

**B.    Meetings and Communications -- 020.**

57.    KTB&S devoted time in this category to engaging in meetings and communications that were necessary to the Investigation and the discharge of the Examiner's duties, including the following: (a) arranging, conducting and attending several in-person meetings with the Parties and their advisors during which they presented their respective positions to the Examiner on the matters subject to the

Investigation, (b) attending meetings and communicating with the Parties regarding the submission of briefs, procedural issues, confidentiality issues, and other matters related to the Investigation, (c) attending meetings and communicating with the United States Trustee regarding matters related to the appointment of the Examiner, progress of the Investigation, production of the Report, confidentiality issues, and other matters related to the Investigation, (d) conducting and attending in-person meetings with the Examiner, Saul Ewing and LECG concerning the scope and subject matter of the Investigation, and (e) engaging in periodic email communications and conducting and participating in weekly teleconferences with the Examiner, Saul Ewing and LECG concerning new and emerging developments in the Investigation, the coordination, delegation and management of work being performed by the Examiner's professionals, the progress of the Investigation, and related matters, all of which were crucial to efficiently conduct the Investigation and produce the Report within the deadline established by the Court.

Fees: $192,872.50    Hours: 269.40

**C.**    **Fee/Employment Applications -- 040**

58.    KTB&S devoted time in this category to addressing matters related to the appointment of the Examiner, the retention of his professionals and requests for compensation and reimbursement of expenses, including the following: (a) preparing and revising the verified statements of the Examiner concerning his appointment and connections with potential parties in interest, (b) preparing the Examiner's applications to employ KTB&S as his counsel and LECG as his financial advisor, as well as affidavits and related materials in support of those applications, (c) preparing monthly fee applications for KTB&S for April, May, June and July 2010, and (d) communicating with the United States Trustee regarding certain matters related to the appointment of the Examiner and the retention of his legal and financial advisors.

Fees: $40,409.00    Hours: 68.50

**D.**    **Asset Analysis and Recovery -- 080.**

59.    KTB&S devoted time in this category to critical tasks that were at the heart of the Investigation: assisting the Examiner in analyzing the highly complex issues implicated by Question

One of the Investigation, and reaching factual and legal conclusions regarding those issues and preparing the Report. These activities included: (a) closely reviewing and analyzing thousands of documents related to the Tribune leveraged buy-out transactions, including extremely complicated transactional documents, solvency reports and valuation analyses, recovery analyses, witness interview transcripts, notes and exhibits, communications among the Parties, internal documents prepared by the Parties, reports and briefs prepared and submitted by the Parties and others, projections and lender payment analyses, minutes of board of directors meetings, and other materials as they were provided by the Parties during the Investigation, (b) preparing and updating summaries of available and recently obtained documents and information for the Examiner's review and analysis, (c) analyzing and evaluating numerous intricate and nuanced legal and factual issues implicated by the Tribune leveraged buy-out transactions and the potential claims, causes of action and defenses arising in connection therewith, (d) assisting the Examiner in developing his findings, analyses and conclusions regarding Question One, (e) communicating with the Examiner and his advisors concerning the Examiner's findings, analyses and conclusions regarding Question One, (f) drafting, updating, finalizing and preparing the various sections of the Report setting forth the summary of the Investigation and the Examiner's findings and conclusions, the factual background related to the Tribune leveraged buy-out transactions and other issues related to the Investigation, and the Examiner's findings and conclusions concerning Question One (all of the foregoing ultimately aggregating in excess of 1,400 pages of factual narrative and legal analysis), (g) reviewing and analyzing thousands of potential Exhibits to the Report, which ultimately were whittled down to approximately 1,100 exhibits (comprising over 21,000 pages), and preparing appendices and exhibit lists for the Report, (h) addressing with the Parties the confidentiality issues they raised related to information contained in the Report and the exhibits, and communicating with the Parties regarding such matters, and (i) finalizing and preparing redacted and unredacted versions of the Report and exhibits for public filing and dissemination.

Fees: $3,318,320.00  Hours: 5,355.00

E.    **Legal Research re Investigation -- 095.**

60.    KTB&S spent time in this category conducting legal research necessary to evaluate the strengths and weaknesses of the potential claims and causes of action arising from the Tribune leveraged buy-out transactions that were the subject of Question One of the Investigation, including numerous legal issues implicated by constructive and intentional fraudulent transfer claims arising from the transactions and associated defenses (including the tests for insolvency, capital adequacy and reasonably equivalent value and application of good faith and Bankruptcy Code section 546(e) defenses), preferential transfer claims and defenses (including ordinary course of business and new value defenses), treatment and characterization of intercompany claims, and other causes of action raised by the Parties in connection with Question One. KTB&S also researched issues necessary to enable to Examiner to apply the factual record to the legal standards prepared by members of the Examiner's team.

Fees: $199,093.50    Hours: 366.60

F.    **Questions Two & Three -- 096.**

61.    KTB&S devoted time in this category to addressing various matters related to Question Two (the allegations that WTC violated the automatic stay) and Question Three (the allegations that WTC violated certain orders of the Court governing confidential documents and breached its fiduciary duties as a member of the creditors' committee) of the Investigation, including the following: (a) researching and analyzing numerous material legal issues related to Questions Two and Three, including application of the automatic stay to fraudulent transfer and equitable subordination claims, the scope of property of the estate and the characterization of fraudulent transfer and equitable subordination claims as property of the estate, the standards governing violations of discovery orders and potential sanctions in connection with any such violations, the fiduciary duties of creditors' committee members, and other legal issues, (b) analyzing information obtained through witness interviews, documents obtained from the Parties and additional supplemental materials that addressed factual issues related to Questions Two and Three, (c) communicating with the Examiner regarding his findings, analyses and conclusions regarding Questions Two and Three, and (d) drafting, preparing and

finalizing the sections of the Report discussing the Examiner's findings and conclusions regarding Questions Two and Three.

Fees: $244,172.50    Hours: 435.90

**G.    Witness Interviews / Discovery -- 097.**

62.    KTB&S devoted time in this category interviewing Parties and other witnesses and conducting discovery to develop the factual background and record necessary for the Examiner to develop and issue his findings and conclusions in connection with the Investigation, including the following: (a) scheduling, attending and conducting multiple in-person and video conference witness interviews on an expedited schedule in several different cities covering various topics related to Questions One, Two and Three of the Investigation (as mentioned above, the Examiner and his advisors conducted 38 interviews over 46 days in four cities), (b) preparing for witness interviews by drafting certain witness interview outlines and examining and preparing documents and exhibits for such interviews (when not prepared by Saul Ewing), (c) drafting and preparing summaries and notes from certain of the interviews memorializing the testimony of the witnesses for the Examiner and his advisors (when not prepared by Saul Ewing), (d) preparing requests for documents and information from the Parties, and (e) reviewing documents and other materials provided by the Parties and obtained through discovery.

Fees: $179,119.50    Hours: 283.90

**H.    Litigation -- 120.**

63.    KTB&S devoted limited time in this category addressing certain litigation issues and disputed matters arising in connection with the Investigation, including the following:  (a) preparing a motion and related pleadings that requested entry of an order permitting the Examiner to employ Bankruptcy Rule 2004 to obtain discovery in support of the Investigation, (b) preparing a reply to the Debtors' response to the Discharge Motion, (c) preparing an order granting the Discharge Motion, (d) communicating with the Examiner and his advisors regarding such matters, and (e) attending hearings for the foregoing requests for relief.

Fees: $33,802.00    Hours: 53.20

**I.      Non-Working Travel -- 900.**

64.      Throughout the Final Application Period, KTB&S was required to travel for multiple witness interviews, hearings and other meetings related to, and arising in connection with, the Investigation.  To the extent that KTB&S did not or was unable to engage in other work during such travel, such time has been charged to this category at (50%) of such professional's rate as non-working travel.

Fees: $35,299.25      Hours: 102.50

**V.**

**ACTUAL AND NECESSARY EXPENSES BY CATEGORY**

65.      KTB&S is seeking reimbursement of $74,927.81 in costs and expenses it incurred during the Final Application Period.  The following is a description of KTB&S's accounting procedures for the general categories of costs and expenses for which it is seeking reimbursement.  These costs and expenses are being billed to the Debtors' estates at the same rates that KTB&S customarily bills its non-debtor clients.  Itemized statements of the costs and expenses incurred by KTB&S for the months of April, May, June and July 2010 are attached to the monthly applications for each of those months, as referenced above.  An itemized statement of the costs and expenses incurred by KTB&S for the period August 1, 2010 through August 20, 2010 is set forth on Exhibit C attached hereto.

**A.      Duplicating.**

66.      In accordance with Rule 2016-2 of the Local Rules of this Court, KTB&S charged the Debtors' estates $0.10 per page for its internal duplicating projects.  The total amount of duplicating expenses incurred by KTB&S during the Final Application Period was $22,161.30.

**B.      Messenger / Overnight Services.**

67.      When exigencies required, KTB&S used messenger services and overnight courier services, such as Federal Express, to deliver documents.  The total amount of messenger / overnight services expenses incurred by KTB&S during the Final Application Period was $655.58.

**C.    Court Fees.**

68.    KTB&S incurred expenses in this category in connection with fees charged to telephonically attend hearings and access the docket through PACER. The total amount of expenses attributable to court fees incurred by KTB&S during the Final Application Period was $389.52.

**D.    Online Research.**

69.    In the course of its representation of the Examiner, it sometimes became necessary and cost efficient to research by means of computer research services such as LEXIS/NEXIS. KTB&S bills the actual cost of these services directly to its clients without any surcharge. The total amount of online research expenses incurred by KTB&S during the Final Application Period was $19,724.24.

**E.    Parking.**

70.    This category includes costs incurred by KTB&S for parking fees associated with travel for meetings, interviews and/or Court hearings. The total amount of parking expenses incurred by KTB&S during the Final Application Period was $533.22.

**F.    Telephone (Long Distance and Conference Calls).**

71.    KTB&S only seeks reimbursement for actual charges in this expense category. The total amount of telephone expenses incurred by KTB&S during the Final Application Period was $489.88.

**G.    Travel – Meals.**

72.    KTB&S incurred incidental costs for out-of-the-area meals. The total amount of meals expenses incurred by KTB&S during the Final Application Period was $728.56.

**H.    Travel.**

73.    This category includes taxi and/or car service used to/from the airport and meetings, mileage reimbursement, and hotel and airfare (lowest refundable coach rate) expenses. KTB&S seeks only reimbursement for actual charges in this category. The total amount of travel expenses incurred by KTB&S during the Final Application Period was $30,974.07.

## VI.

### CONCLUSION

74.     In accordance with the factors enumerated in section 330 of the Bankruptcy Code, KTB&S respectfully submits that its fees are fair and reasonable given (a) the complexity of these cases, (b) the time expended, (c) the nature and extent of the services rendered, (d) the value of such services, and (e) the costs of comparable services other than in a case under the Bankruptcy Code.  Moreover, KTB&S also has reviewed the requirements of Rule 2016, Local Rule 2016-2, the Interim Compensation Order, and the Fee Examiner Order and believes that this Final Application complies with such rules and orders.

**WHEREFORE,** KTB&S respectfully requests that the Court enter an order (A) granting a final award in favor of KTB&S for (i) professional fees incurred during the Final Application Period of $4,411,195.25, (ii) out-of-pocket expenses incurred by KTB&S during the Final Application Period in the amount of $74,927.81, (iii) additional amounts that may be set forth in one or more subsequent filings before the hearing on this Final Application in respect of miscellaneous expenses as to which KTB&S has not yet received a final or complete billing; (B) granting a final award of professional fees and out-of-pocket expenses incurred in connection with the preparation and prosecution of this Final Application and the final application of the Examiner, including any fees and costs incurred in responding to any formal and informal objections, inquiries and responses thereto, and appearing at the hearing thereon; and (C) directing the Debtors to promptly disburse to KTB&S all amounts allowed by the Court that have not already been paid to KTB&S.

Dated:  August 31, 2010
        Los Angeles, California

KLEE, TUCHIN, BOGDANOFF & STERN LLP

By: _____
        Martin R. Barash

1999 Avenue of the Stars, 39th Floor
Los Angeles, CA  90067
Telephone:  (310) 407-4000
Facsimile:  (310) 407-9090

Counsel to the Examiner

## **VERIFICATION**

STATE OF CALIFORNIA          :

                             :

COUNTY OF LOS ANGELES        :

I, Martin R. Barash, Esq., after being duly sworn according to law, deposes and says:

a)      I am a partner in the applicant law firm Klee, Tuchin, Bogdanoff & Stern LLP ("KTB&S").

b)      I am thoroughly familiar with the legal services rendered by KTB&S as counsel to the Examiner, including the work performed on behalf of the Examiner by other professionals at KTB&S.

c)      I have reviewed the foregoing Final Application. The facts set forth therein are true and correct to the best of my knowledge, information and belief. Moreover, I have reviewed the Local Bankruptcy Rules for the District of Delaware and submit that the Final Application substantially complies with such rules.

Martin R. Barash, Esq.

SWORN AND SUBSCRIBED
before me this 21 st day of August 2010.

Notary Public
My Commission Expires:

APRYL CAROL BOND
Commission # 1871893
Notary Public - California
Los Angeles County
My Comm. Expires Nov 22, 2013