## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | Chapter 11 |
| **TRIBUNE COMPANY, <u>et al.</u>,** | ) | |
| | ) | Case No. 08-13141(KJC) |
| | ) | |
| **Debtors.** | ) | Jointly Administered |
| | ) | |
| | ) | **Hearing Date: October 22, 2010 at 2:00 p.m. (ET)** |
| | ) | **Objections Due: October 1, 2010 at 4:00 p.m. (ET** |
| | ) | |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
## FOR ENTRY OF AN ORDER GRANTING LEAVE, STANDING
## AND AUTHORITY TO COMMENCE, PROSECUTE AND SETTLE
## <u>CERTAIN CLAIMS OF THE DEBTORS' ESTATES</u>

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Tribune

Company ("<u>Tribune</u>") and its various debtor-subsidiaries (collectively, the "<u>Debtors</u>"), by and

through its undersigned counsel, hereby files this motion (the "<u>Standing Motion</u>") for entry of an

order pursuant to 11 U.S.C. §§ 105, 1103 and 1109 granting the Committee leave, standing and

authority to commence, prosecute and settle certain claims and/or causes of action against the

D&O Defendants, the Subsidiary Defendants, the Large Shareholders, the Zell Defendants, the

Tower Defendants, Valuation Research Corporation, the Additional Parties, and the Shareholder

Defendants (each as defined below) (collectively, the "<u>Defendants</u>") on behalf of the Debtors'

estates.  In support of this Standing Motion, the Committee respectfully submits as follows:

## PRELIMINARY STATEMENT

1.      By this Standing Motion, the Committee seeks entry of an order authorizing it to pursue certain claims and causes of action against the Defendants that may substantially benefit the Debtors' estates.  The claims arise from a leveraged buyout transaction consummated by the Debtors, beginning in April of 2007 and concluding in December of 2007, which resulted in the transfer of the ownership of Tribune and its subsidiaries (the "LBO Transaction") to the newly formed Tribune Employee Stock Ownership Plan (the "ESOP").

2.      From the day it was appointed, the Committee has sought to determine whether the LBO Transaction and the obligations the Debtors incurred in connection with the LBO Transaction caused and precipitated the Debtors' spiral into bankruptcy only a year after the LBO Transaction was completed.

3.      Because very serious and significant questions exist regarding issues of solvency, due diligence and the exercise of fiduciary duties with respect to the LBO Transaction, the Committee has conducted an investigation into the Defendants' actions.  That investigation included the review of millions of pages of documents obtained from the relevant parties and other discovery.  As a result of its investigation, and on the basis of additional information adduced through this bankruptcy proceeding, the Committee has concluded that the LBO Transaction gave rise to significant claims on behalf of the Debtors and is prepared to commence an action against the Defendants.

4.      In addition to its own investigation, the Committee has had the benefit of extensive factual findings reflected in the report of Kenneth N. Klee, Esq., appointed as

2

Examiner in this proceeding pursuant to court order entered on May 11, 2010 (the "Examiner

Report"). The Examiner Report, along with numerous exhibits and interview transcripts, was

filed under seal on July 26, 2010, and thereafter made available to the public in unredacted form.

5.      By their own admission in court testimony, the Debtors have not

investigated or otherwise pursued these claims. Because several of the claims are against certain

of their current and former directors and officers, the Debtors will not pursue, and effectively

could never pursue, those claims. The Committee should therefore be granted authority to step

into the Debtors' shoes in order to pursue these claims for the benefit of the Debtors' estates.

6.      All of the legal requirements for granting the Committee derivative

standing to pursue the claims on behalf of the Debtors' estates are satisfied. Prosecution of the

claims is essential in these chapter 11 cases because it will, among other things, potentially

produce a substantial source of recovery for unsecured creditors. Given the Debtors' inability

and unwillingness to prosecute the claims, the Committee is the only party-in-interest qualified

to pursue them. Accordingly, the Committee seeks authority to pursue the claims against the

Defendants on behalf of the Debtors' estates.

7.      The Debtors' recent application to retain Jones Day as special counsel to a

newly constituted special committee of the Tribune board, *nunc pro tunc* to August 22, 2010, in

no way alters the analysis. The special committee was formed more than 20 months after the

Debtors' filing for relief under chapter 11, and only in the wake of the issuance of the Examiner

Report, which highlighted claims that the Committee had been investigating almost since the

bankruptcy filing. The Debtors' belated effort to retain counsel to a newly minted committee

that may or may not investigate claims that now already have been thoroughly and

comprehensively canvassed by both the Committee and the Examiner (and that arguably fall

outside the mandate of this special committee), is clearly too little and too late.

        8.     On September 1, 2010, the Court entered its "Order Appointing Mediator"

(Docket No. 5591). Pursuant to that Order, the Honorable Kevin Gross, United States

Bankruptcy Judge, has been appointed "to mediate disputes . . . concerning the appropriate terms

of a [plan of reorganization], including the appropriate resolution of the LBO-Related Causes of

Action" (as defined therein). The Committee wholeheartedly supports the mediation process and

the efforts of Judge Gross and the parties to achieve a consensual plan. The Standing Motion is

not filed with the intent to thwart or interfere with the mediation, and Court approval of the

Standing Motion will not have that effect. However, as Committee counsel noted on the record

of the hearing held on August 20, 2010, the December 8, 2010 statutory deadline imposed by 11

U.S.C. § 546(a)(2) is looming. *See* Transcript of Record at 56-57, *In re Tribune Co.*, No. 08-

13141 (Bankr. D. Del. Aug. 20, 2010) (KJC). Because the Committee cannot risk that valuable

estate claims will be forever lost by the passage of the filing deadline, it is filing the Standing

Motion so the Court and parties in interest have sufficient time to address the issue of standing.

In that way, complaints can be finalized and filed in advance of the statutory deadline, to the

extent it becomes necessary to preserve the causes of action. Apart from obtaining standing,

however, it is the Committee's intention to stand down from further prosecution of the claims

while the mediation is pending before Judge Gross. This is the process specifically contemplated

by paragraph 10 of the Order Appointing Mediator, and the Committee submits that it is

appropriate given the circumstances of the case and timing of the mediation.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction to consider this Standing Motion pursuant to

28 U.S.C. §§ 157 and 1334.  Consideration of this Standing Motion is a core proceeding under

28 U.S.C. § 157(b).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory predicates for the relief requested herein are sections 105(a), 1103 (c) and 1109(b)

of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

## PROCEDURAL BACKGROUND

10.      On December 8, 2008 (the "Petition Date"), the Debtors filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate

their businesses and manage their properties as debtors-in-possession pursuant to sections 1107

and 1108 of the Bankruptcy Code.

11.      On December 18, 2008, the United States Trustee for the District of

Delaware, pursuant to section 1102 of the Bankruptcy Code, appointed the Committee to

represent the interests of all unsecured creditors in the Debtors' cases.  The current members of

the Committee are:  JPMorgan Chase Bank, N.A.,[1] in its capacity as lender; Deutsche Bank Trust

---

[1]  In accordance with the Committee's Bylaws, JPMorgan Chase Bank, N.A. has at all times been recused from any participation of any kind in the Committee's review or deliberations concerning any aspect of the LBO, and they have been carefully screened from access to any Committee professional analysis or other non-public information that relates to the LBO investigation.  Further, under those bylaws, JPMorgan Chase Bank, N.A. acknowledged its

(Cont'd on following page)

Company Americas, as successor Indenture Trustee; Wilmington Trust Company, as successor

Indenture Trustee; Warner Brothers Television; Buena Vista Television;[2] William Niese; Pension

Benefit Guaranty Corporation; and Washington-Baltimore Newspaper Guild, Local 32035.[3] *See*

Second Amended Notice of Appointment of Committee of Unsecured Creditors (May 26, 2009)

(Docket No. 1238).

      12.     On February 1, 2010, the Committee (through Zuckerman Spaeder LLP as

special counsel to the Committee) filed the Motion for Entry of an Order Granting Leave,

Standing and Authority to Commence, Prosecute and Settle Claims and Counterclaims of the

Debtors' Estates (Docket No. 3281) (the "First Standing Motion").  Pursuant to the First

Standing Motion, the Committee requested standing to assert certain objections and pursue

certain fraudulent transfer and related claims on behalf of the Debtors' estates.  The Committee

also indicated that it reserved its rights to seek further derivative standing to commence and/or

prosecute other claims and/or causes of action on behalf of the Debtors' estates.  *See* First

Standing Motion at 11.  The Committee has now determined that it is appropriate to pursue

---

(Cont'd from preceding page)

inability under the Committee's Bylaws to participate in Committee deliberations (or to see Committee work product) related to the LBO and cooperated in the screening and recusal process described above.

[2]  Buena Vista Television replaced Vertis, Inc. when the latter entity resigned in April of 2009.  Both are trade creditors of the Debtors.

[3]  Merrill Lynch Capital Corporation ("Merrill") was a member of the Committee but resigned from the Committee on September 9, 2009.  The vacancy created by Merrill's resignation was not filled.

certain claims of the Debtors' estates against the Defendants and thus files this Standing Motion

seeking derivative standing and the authority to do so.

### THE COMMITTEE'S INVESTIGATION OF POTENTIAL CLAIMS

13.    In its capacity as a fiduciary for unsecured creditors of the Debtors'

estates, the Committee has undertaken a comprehensive investigation into potential claims of the

Debtors' estates against various third parties and has identified certain meritorious claims that

the Debtors hold against third parties.  The Committee has discovered sufficient facts to support

the Standing Motion to pursue those claims.[4]

14.    This Standing Motion is based on the Committee's ongoing investigation

to date, as well as on certain factual findings reflected in the Examiner Report, and seeks an

order granting the Committee derivative standing to pursue the claims against the Defendants

and any other persons or entities that discovery may show participated in the apparent

misconduct, which are more fully described in the Committee's proposed Adversary Complaint

(the "Complaint"), substantially in the form attached hereto as Exhibit A.

15.    The claims against the Defendants are premised upon causes of action

including, but not limited to, the following:  (1) breach of fiduciary duty; (2) aiding and abetting

breach of fiduciary duty; (3) professional malpractice; (4) violation of Delaware General

---

[4] Because the Committee's investigation of potential claims continues, the Committee expressly reserves its rights
to assert additional claims on behalf of the Debtors' estates, as and when circumstances warrant, and to add
additional parties or identify Does 1-1000 as such identifications are made.

Corporation Law sections 160 and/or 173; (5) unjust enrichment; (6) constructive and/or

intentional fraudulent transfer; (7) mandatory subordination; and (8) equitable subordination

and/or disallowance.  As these causes of action are based on facts gathered to date, this list may

not be exhaustive.  Additional causes of action may be identified as the Committee's

investigation continues.

## SUMMARY OF CLAIMS

16.    The Committee seeks authority to bring an adversary proceeding to

remedy the wrongs committed by eight groups of defendants in connection with the LBO

Transaction:  (a) Tribune's board of directors (the "Director Defendants") and its officers at the

time of the LBO Transaction (the "Officer Defendants", collectively the "D&O Defendants");

(b) the boards of directors and officers of those Tribune subsidiaries that guaranteed certain

indebtedness incurred by Tribune during the transaction (the "Subsidiary Defendants");

(c) several entities, as more fully described in the Complaint, which were among Tribune's

largest shareholders during the relevant time period and effectively controlled the D&O

Defendants' actions in approving the ruinous LBO Transaction (the "Large Shareholders");

(d) Samuel Zell ("Zell"), a billionaire investor who orchestrated the takeover of Tribune, and his

affiliated entities Equity Group Investments, L.L.C. ("EGI"), EGI-TRB, L.L.C. ("EGI-TRB"),

and Sam Investment Trust (collectively, the "Zell Defendants"); (e) assignees of EGI-TRB's

interests in a certain subordinated promissory note (the "Tower Defendants"); (f) Valuation

Research Corporation ("VRC"), one of Tribune's financial advisors, which provided solvency

opinions in connection with the LBO Transaction; (g) certain persons and legal entities who

8

aided and abetted, benefited from, or otherwise participated, directly or indirectly, in the wrongful acts alleged in the Complaint, whose identities are yet to be determined (the "Additional Parties"); and (h) persons and legal entities who redeemed, sold, or traded shares of Tribune stock in connection with the LBO Transaction and, accordingly, received payments from Tribune (the "Shareholder Transfers"), most of whose identities are yet to be determined (along with the Large Shareholders, the D&O Defendants, the Subsidiary Defendants, Zell, and EGI-TRB, the "Shareholder Defendants").

17.    As more fully described in the Complaint, the eight groups of defendants engaged in the following misconduct, which collectively caused massive damage to the Debtors and gave rise to certain claims and/or causes of action (the "Claims"):

a) First, the D&O Defendants negotiated, facilitated and/or ultimately approved the LBO Transaction. As directors and officers, the D&O Defendants owed fiduciary duties to Tribune and ultimately to all of Tribune's stakeholders, including its creditors. The D&O Defendants breached their fiduciary duties by, among other actions, facilitating and approving the LBO Transaction when they knew or should have known that it was imprudent and would render the company insolvent. The D&O Defendants were enticed by financial incentives and influenced by external pressures to ignore the foreseeable catastrophic consequences of the LBO Transaction.

b) Second, Zell proposed, negotiated, and facilitated the consummation of the LBO Transaction. Zell was elected to Tribune's Board on May 9, 2007,

before the consummation of the LBO Transaction. As a director, Zell owed
fiduciary duties to Tribune and ultimately to all of Tribune's stakeholders,
including its creditors. Zell breached his fiduciary duties by, among other
actions, advocating for and facilitating consummation of the LBO Transaction
when he knew or should have known that it was imprudent and would render
the company insolvent. Zell acted in the pursuit of his own personal interests
and ignored the foreseeable catastrophic consequences of the LBO
Transaction.

c) Third, the Subsidiary Defendants approved the subsidiaries' guarantees of the
indebtedness incurred in connection with the LBO Transaction. As directors
and officers of the subsidiaries, the Subsidiary Defendants owed fiduciary
duties to Tribune and/or its subsidiaries, and ultimately to all stakeholders of
Tribune and/or its subsidiaries including creditors. The Subsidiary
Defendants breached their fiduciary duties, by, among other actions, agreeing
to guarantee the indebtedness incurred in connection with the LBO
Transaction without making any independent investigation of the transaction.
Moreover, most of the Subsidiary Defendants received financial incentives in
connection with the consummation of the LBO Transaction.

d) Fourth, the Subsidiary Defendants knowingly participated in and aided and
abetted the breaches of fiduciary duties of the D&O Defendants, by, among
other actions, agreeing to guarantee the indebtedness incurred in connection

10

with the LBO Transaction without making any independent investigation of the transaction.

e)  Fifth, the Large Shareholders functioned as controlling shareholders with respect to the LBO Transaction and, among other actions, made clear to the Tribune board that it had to comply with their demands and advance their objectives.  As controlling shareholders, the Large Shareholders owed fiduciary duties to Tribune and ultimately to all of Tribune's stakeholders, including its creditors.  The Large Shareholders breached their fiduciary duties by, among other actions, intentionally steering the D&O Defendants toward a corporate strategy aimed at enhancing exclusively the interests of the Large Shareholders at the expense of Tribune and its other stakeholders.

f)  Sixth, the Large Shareholders, along with three of Tribune's directors who represented the interests on the Tribune board of the Chandler Trusts (Tribune's largest shareholders at the time), knowingly participated in and aided and abetted the D&O Defendants' breaches of fiduciary duty by, among other actions, instigating the auction process that led to the LBO Transaction, intentionally steering the D&O Defendants toward a corporate strategy aimed at enhancing exclusively the interests of the Large Shareholders at the expense of Tribune and its other stakeholders, and exerting undue influence over the D&O Defendants in connection with the LBO Transaction.

11

g) Seventh, the Zell Defendants knowingly participated in and aided and abetted the breaches of fiduciary duties of the D&O Defendants by, among other actions, proposing and orchestrating the imprudent and inevitably ruinous LBO Transaction, and exerting undue influence over the decision-making of the D&O Defendants by enticing and inducing them to enter into the LBO Transaction through payment of substantial financial incentives.

h) Eighth, VRC knowingly participated in and aided and abetted the breaches of fiduciary duties of the D&O Defendants by, among other actions, ignoring or failing to give effect to information known by or made known or available to VRC that should have been considered under reasonable valuation and financial practices, and being induced to provide solvency opinions that cannot be justified in light of applicable professional standards.

i) Ninth, VRC committed professional malpractice by, among other actions, failing to use reasonable professional judgment in reaching its solvency determinations, failing to use appropriate valuation and financial practices in its solvency determinations, and ignoring or failing to give effect to information known by or made known or available to VRC that should have been considered under reasonable valuation and financial practices.

j) Tenth, the Director Defendants and Zell violated sections 160 and/or 173 of the Delaware General Corporation Law (the "DGCL") by providing cash and/or property to Tribune's shareholders in connection with the LBO

Transaction. Those payments were, in substance, unlawful dividends and/or stock purchases in violation of the DGCL.

k) Eleventh, through their wrongful acts and omissions, and through the wrongful receipt of proceeds and other benefits from the LBO Transaction, the Defendants have unjustly retained benefits that belong to Tribune, and Defendants' unjust enrichment violates fundamental principles of justice, equity and good conscience.

l) Twelfth, the Shareholder Transfers were made within two years of the Petition Date, and Tribune received less than reasonably equivalent value in exchange for the Shareholder Transfers. Tribune, by and through certain of its officers and directors acting in knowing and willful violation of their fiduciary duties, made the Shareholder Transfers with the actual intent to hinder, delay and defraud Tribune's creditors. Accordingly, the Shareholder Transfers constitute intentional fraudulent transfers and should be avoided and recovered pursuant to Bankruptcy Code sections 548(a)(1)(A) & 550(a) and applicable non-bankruptcy law.

m) Thirteenth, the D&O Defendants received cash bonuses, phantom stock awards, and other non-salary payments and transfers from Tribune in connection with the LBO Transaction (the "D&O Transfers"). The D&O Transfers were made within two years of the Petition Date, and Tribune received less than reasonably equivalent value in exchange for the D&O

13

Transfers. Tribune, by and through certain of its officers and directors acting in knowing and willful violation of their fiduciary duties, made the D&O Transfers with the actual intent to hinder, delay and defraud Tribune's creditors. Accordingly, the D&O Transfers constitute constructive and/or intentional fraudulent transfers and should be avoided and recovered pursuant to Bankruptcy Code sections 548(a)(1)(A)-(B) & 550(a) and applicable non-bankruptcy law.

n) Fourteenth, Tribune made payments to VRC for certain fees and expenses in connection with the LBO Transaction (the "VRC Transfers"). The VRC Transfers were made within two years of the Petition Date, and Tribune received less than reasonably equivalent value in exchange for the VRC Transfers. Tribune, by and through certain of its officers and directors acting in knowing and willful violation of their fiduciary duties, made the VRC Transfers with the actual intent to hinder, delay and defraud Tribune's creditors. Accordingly, the VRC Transfers constitute constructive and/or intentional fraudulent transfers and should be avoided and recovered pursuant to Bankruptcy Code sections 548(a)(1)(A)-(B) & 550(a) and applicable non-bankruptcy law.

o) Fifteenth, Tribune made payments to EGI-TRB as reimbursement for legal fees and other expenses in connection with the LBO Transaction (the "EGI-TRB Transfers"). The EGI-TRB Transfers were made within two years

of the Petition Date, and Tribune received less than reasonably equivalent value in exchange for the EGI-TRB Transfers. Tribune, by and through certain of its officers and directors acting in knowing and willful violation of their fiduciary duties, made the EGI-TRB Transfers with the actual intent to hinder, delay and defraud Tribune's creditors. Accordingly, the EGI-TRB Transfers constitute constructive and/or intentional fraudulent transfers and should be avoided and recovered pursuant to Bankruptcy Code sections 548(a)(1)(A)-(B) & 550(a) and applicable non-bankruptcy law.

p) Sixteenth, all the claims of the D&O Defendants and Subsidiary Defendants reflected on the Debtors' schedules, or any proofs of claim filed by, or on behalf of, any of the D&O Defendants and Subsidiary Defendants that relate to the LBO Transaction, are subject to mandatory subordination under section 510(b) of the Bankruptcy Code.

q) Seventeenth, the D&O Defendants, Subsidiary Defendants, and Zell Defendants engaged in a pattern of misconduct to enrich themselves at the expense of the Debtors and their stakeholders. All claims of the D&O Defendants, Subsidiary Defendants, Zell Defendants, and Tower Defendants reflected on the Debtors' schedules, or any proofs of claim filed by, or on behalf of, any of the D&O Defendants, Subsidiary Defendants, Zell Defendants, and Tower Defendants are subject to equitable subordination and/or disallowance.

## RELIEF REQUESTED

18.     By this Standing Motion, and pursuant to sections 105, 1103 and 1109 of

the Bankruptcy Code, the Committee requests that the Court enter an order authorizing and

appointing the Committee to commence, prosecute and, if appropriate, settle the Claims against

the Defendants.  The Committee requires the requested relief to fulfill its fiduciary

responsibilities, as mandated by Congress pursuant to sections 1103(c) and 1109 of the

Bankruptcy Code.

19.     The Bankruptcy Code authorizes the trustee or the debtor-in-possession to

pursue causes of action on behalf of the estate and obligates such estate representative to

maximize the estate's value for the benefit of creditors.  *See, e.g., Commodity Futures Trading

Comm'n* v. *Weintraub*, 471 U.S. 343, 352 (1985) ("the trustee is accountable for all property

received, and has the duty to maximize the value of the estate") (internal citations and quotation

omitted); *see also, In re Commodore Int'l Ltd.*, 262 F.3d 96, 99 (2d Cir. 2001) ("the [debtor in

possession] has an obligation to pursue all actions that are in the best interests of creditors and

the estate") (citation omitted).

20.     Nevertheless, it has long been acknowledged that the "debtor-in-

possession often acts under the influence of conflicts of interest" which prevents it from pursuing

potentially viable claims that would result in a benefit to unsecured creditors.  *See, e.g.,

Canadian Pac. Forest Prods. Ltd.* v. *J.D. Irving Ltd.* (*In re Gibson Group, Inc.*), 66 F.3d 1436,

1441 (6th Cir. 1995).  In order to address the problem that arises where a debtor is unwilling or

unable to fulfill its obligation to maximize the value of the estate, "[t]he practice of authorizing

the prosecution of actions on behalf of an estate by committees . . . upon a showing that such is

in the interests of the estate, is one of long standing, and nearly universally recognized." *In re*

*Adelphia Commc'ns Corp.*, 330 B.R. 364, 373 (Bankr. S.D.N.Y. 2005) (citations omitted).

Granting a creditors' committee standing to prosecute actions on behalf of a debtor's estate

> provides creditors and other stakeholders with the comfort that potentially
> valuable (and sometimes critical) claims on behalf of the estate will be
> prosecuted- without requiring bankruptcy judges to . . . resort[] to much more
> draconian or ineffective mechanisms to ensure the prosecution of those claims,
> with the destruction to going concern value and creditor recoveries that would
> frequently be the result. *Id.*

In fact, it has been noted by courts in this circuit that the primary purpose of official unsecured

creditor committees "is to represent the interests of unsecured creditors and to strive to maximize

the bankruptcy dividend paid to that class of creditors." *See, e.g., In re Nationwide Sports*

*Distribs., Inc.*, 227 B.R. 455, 463 (Bankr. E.D. Pa. 1998).

        21.    It is well settled within this and other circuits that bankruptcy courts may

allow a creditors' committee to pursue litigation on behalf of the estate under appropriate

circumstances. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*,

330 F.3d 548, 575 (3d Cir. 2003); *Official Comm. of Unsecured Creditors v. Barron (In re*

*Polaroid Corp.)*, No. 03-56404, 2004 WL 1397582 (Bankr. D. Del. June 22, 2004); *Official*

*Comm. of Unsecured Creditors v. Cablevision Sys. Corp. (In re Valley Media, Inc.)*, No. 01-

11353, 2003 WL 21956410 (Bankr. D. Del. Aug. 14, 2003); *Official Comm. of Unsecured*

*Creditors v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214 (Bankr. W.D. Pa. 2004), *aff'd* 326 B.R.

532 (W.D. Pa. 2005); *Liberty Mut. Ins. Co. v. Official Unsecured Creditors Comm. (In re*

*Spaulding Composites Co.*), 207 B.R. 899, 904 (B.A.P. 9th Cir. 1997); *La. World Exposition* v.

*Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988); *Unsecured Creditors Comm.* v. *Noyes* (*In re*

*STN Enters.*), 779 F.2d 901, 904 (2d Cir. 1985).

        22.     Indeed, creditors' committees have an "implied, but qualified, right . . . to

initiate adversary proceedings in the name of the debtor in possession under 11 U.S.C.

§§ 1103(c)(5) and 1109(b)." *In re STN Enters.*, 779 F.2d at 904; *see also Cybergenics*, 330 F.3d

at 568 (a bankruptcy court may, in appropriate circumstances, utilize its equitable powers to

authorize derivative standing). As the Third Circuit has explained, the statutory language of the

Bankruptcy Code suggests that:

> [C]ongress intended for creditors' committees to perform services on behalf of the
> estate, and that Congress consciously built a measure of flexibility into the scope
> of those services. As the question before us today is whether a bankruptcy court
> can authorize a creditors' committee to represent the estate when the usual
> representative is delinquent, the "flexible representation" role evidenced in
> § 1103(c)(5) militates in the affirmative. *Cybergenics*, 330 F.3d at 563.

Bankruptcy courts in this district have consistently found that Congress intended to allow them

to authorize derivative suits prosecuted by creditors' committees. *Id.* at 565. Indeed, the Third

Circuit has recognized that granting derivative standing to a creditors committee "[p]rovides a

critical safeguard to prevent against lax pursuit" of claims "that would amount to reputational

self-immolation" for a debtor or its managers. *Id.* at 573.

        23.     Furthermore, courts have held that breach of fiduciary duty claims against

a debtor's board of directors are appropriate causes of action for a creditors' committee to pursue

on behalf of the debtor's estate. *See La. World Exposition,* 858 F.2d at 252-53; *Official Comm.*

*of Asbestos Claimants of G-I Holding, Inc.* v. *Heyman*, 277 B.R. 20, 28 (S.D.N.Y. 2002);

*Aluminum Mills Corp.* v. *Citicorp N. Am., Inc.* (*In re Aluminum Mills Corp.*), 132 B.R. 869, 891-

92 (Bankr. N.D. Ill. 1991).

        24.     Accordingly, this Court has the authority to grant permission to the

Committee to prosecute the Claims, and the Court should grant such permission here. The

Debtors, who have actual and potential conflicts of interest, have not prosecuted and cannot

prosecute the Claims. The Committee, in contrast, stands ready to protect the interests of the

estates and to seek to hold responsible the accountable parties. A failure to grant the Committee

authority to prosecute the Claims would result in a loss to the estates and their creditors, and

would unjustly allow the Defendants to benefit from their misconduct.

## BASIS FOR RELIEF

### A.    Standard for Derivative Standing

        25.     Generally, the prerequisites for derivative standing are: (i) whether a

colorable claim exists that would affect distributions to unsecured creditors; (ii) whether the

debtor has unjustifiably refused to bring the claim itself; and (iii) whether the committee sought

permission from the bankruptcy court to initiate the action. *See Infinity Investors Ltd.* v.

*Kingsborough* (*In re Yes! Entm't Corp.*), 316 B.R. 141, 145 (D. Del. 2004). Numerous courts in

this and other circuits have applied these same or similar standards. *See, e.g., Fogel* v. *Zell*, 221

F.3d 955, 965 (7th Cir. 2000); *In re Gibson Group, Inc.*, 66 F.3d at 1438; *La. World Exposition*,

858 F.2d at 247; *In re STN Enters.*, 779 F.2d at 904-05. Here, all requirements for derivative

standing have been met.

**B.**     **The Committee Clearly Satisfies the Test for Derivative Standing**

    **(a)**     **The Claims Are Colorable And Would Benefit The Estates**

        26.     The first element of the derivative standing test is that the Committee must assert "a colorable claim or claims for relief that on appropriate proof would support a recovery." *In re STN Enters.*, 779 F.2d at 905.  The requisite "colorable" claim showing is a relatively low standard to satisfy.  *See, e.g., In re Adelphia Commc'ns Corp.*, 330 B.R. at 369 (noting that the Court need only be satisfied that there is "some factual support" for the claims); *Official Comm. of Unsecured Creditors* v. *Fishbein & Co., P.C.* (*In re Corell Steel*), No. 91-4919, 1992 WL 196768, at *2 n.3 (E.D. Pa. Aug. 10, 1992) (creditors' committee seeking to prosecute estate causes of action need only demonstrate that its proposed claims are "potentially meritorious"); *Official Comm. of Unsecured Creditors* v. *Hudson United Bank* (*In re Am.'s Hobby Ctr., Inc.*), 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998) (noting that standing to sue should be denied where claims are "facially defective").

        27.     In determining whether a claim is colorable, the Court is not required to conduct a mini-trial.  Instead, the Court may "weigh the 'probability of success and financial recovery', as well as the anticipated costs of litigation, as part of a cost/benefit analysis" to determine whether the prosecution of claims is likely to benefit the estate.  *In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003) (citing *In re Am.'s Hobby Ctr.,* 223 B.R. at 282).  Thus, the Committee need only establish the existence of a plausible claim -- which it has easily done.  *See* Exhibit A.  Moreover, if nothing else, the Examiner Report provides line and verse of all

manner of colorable claims arising out of the LBO Transaction, including those contained in the

Complaint.

28.    Recently in a case in this District, Judge Shannon expounded on the

colorability standard in granting a creditors' committee's motion for derivative standing. *In re*

*Fedders N. Am., Inc.*, Case No. 07-11176 (BLS) (Bankr. D. Del. Mar. 24, 2008).  Judge Shannon

rejected a line-by-line or claim-by-claim analysis of a proposed complaint under a Rule 12(b)(6)

legal standard, noting:

> I cannot believe that that is the appropriate analysis.  Rather I think when we
> consider colorability, [] the threshold consideration the Court has is that this is at
> a stage prior to the commencement of litigation . . . .  So the allegations, the
> sufficiency of the allegations simply cannot be to a Rule 12(b)(6) standard,
> because we haven't even filed the complaint yet.

*Id.*, Transcript of Hearing at 97 (relevant pages attached hereto as Exhibit B).  Thus, in

determining colorability, rather then examining whether a claim would overcome a summary

judgment motion, the court should instead look to the import of what had been alleged. *Id.* at 98.

29.    Here, prosecution of the Claims is likely to substantially augment the

Debtors' resources, and could yield significant value to the unsecured creditors.  In addition, the

costs of the proposed litigation are dwarfed by the potential recoveries that the Claims could

achieve for the Debtors' estates.  Even if a contentious litigation were to ensue, "the cost of

prosecution will be relatively modest (by the standards of the amount at stake)." *In re Adelphia*

*Commc'ns Corp.*, 330 B.R. at 384.  Under such circumstances, the determination of whether the

pursuit of litigation by the creditors' committee would benefit the estates is, "[t]o be blunt about

it, an easy one." *Id.*

**(b)**    **Demand Is Excused Under The Circumstances**

30.    Derivative standing is generally granted where a debtor unjustifiably or unreasonably refuses to pursue claims that the Bankruptcy Court finds would benefit the estate. *See, e.g., Cybergenics*, 330 F.3d at 561 (citing *Fogel*, 221 F.2d at 965-66). Moreover, a committee may be excused from making a demand that a debtor pursue claims if the demand would be futile. *See, e.g., In re G-I Holdings, Inc.*, 313 B.R. 612, 630 (Bankr. D.N.J. 2004) ("[I]t cannot be said that a formal request, in order to obtain a formal refusal, a request which would surely be refused, should be required.") (citation omitted).

31.    Here, the Committee has not formally demanded that the Debtors prosecute the Claims because such a demand would plainly be futile given the deep and acknowledged conflicts of interest facing the Debtors. First, the Debtors themselves approved the LBO Transaction and thus would not want to pursue an action that attacks their own decision to enter into the LBO Transaction. Second, the Debtors have displayed no interest in litigating the Claims against the Defendants and in fact have indicated no intent to litigate. Finally, the Debtors are still managed by certain of the Defendants and therefore are hopelessly conflicted from making an independent determination regarding the Claims. The testimony of the Debtors' own witness, David Kurtz ("Kurtz") of Lazard Freres & Co. LLC, the Debtors' Investment Banker and Financial Advisor,[5] at the hearing held before the Court on February 18, 2010,

---

[5]  Order Authorizing Debtors to Employ and Retain Lazard Freres & Co. LLC (March 13, 2009) (Docket No. 524).

starkly delineates and demonstrates these conflicts. Kurtz's testimony conclusively shows that a demand would be futile.

32.    Kurtz testified that the Debtors at that time had no intention of filing litigation to seek a resolution of potential claims against third parties such as current and former directors and officers of the company. *See* Transcript of Hearing at 51-53, *In re Tribune Co.*, No. 08-13141 (KJC) (Bankr. D. Del. Feb. 18, 2010) (relevant pages attached hereto as Exhibit C). Coupled with this unwillingness to pursue the Claims is the apparent inability to do so, as the Debtors' bankruptcy counsel is conflicted from pursuing the Claims. *Id.* at 59. This alone is sufficient to grant the Committee the authority to pursue the Claims. *See In re Valley Media, Inc.*, 2003 WL 21956410, at *2 (noting that where a debtor's counsel suffers from "a conflict of interest in pursuing an estate claim so that it is effectively disqualified from pursuing an action which is otherwise a colorable claim, the debtor . . . can be viewed as delinquent and the creditors committee should be authorized to pursue the cause of action.").[6]

33.    Finally, Kurtz's testimony confirms the practical impossibility that the Debtors will pursue the Claims. For example, Kurtz testified that the principal person he reports to with respect to matters arising from the LBO Transaction was, at the time, the Debtors' general counsel, Donald J. Liebentritt. Exhibit C at 56. Mr. Liebentritt has just recently been

---

[6] The Debtors' belated application to retain Jones Day as special counsel to the newly constituted special committee has been submitted too late to cure this infirmity. The timing and circumstances of this application raise serious questions concerning the proposed special counsel's role, authority and familiarity with the facts at a time when, due to statute of limitations issues, time is of the essence.

named as Tribune's chief restructuring officer.[7]  Besides holding a decision-making position with

respect to potential claims concerning the LBO Transaction, Mr. Liebentritt is a current

employee of EGI, the former president of EGI,[8] and a long-time business associate of Zell, *id.* at

57; EGI and Zell are both parties against whom the Committee believes the Claims could

successfully be asserted.  *See* Exhibit A.  Kurtz's testimony therefore reveals explicitly that not

only have the Debtors failed to take any meaningful steps towards prosecuting the Claims, but

also that at least one of the Debtors' principals in charge of claims concerning the LBO is

hopelessly conflicted from making an independent decision on their merits.

       34.     "[I]t is difficult objectively to determine whether a potential action is

meritorious when one would be a defendant in that action." *Cybergenics*, 330 F.3d at 575.  Here,

the likelihood that the Debtors could maintain such objectivity is slim, because the Claims stem

from transactions negotiated and implemented by the Debtors' current and former officers and

directors, who are implicated in the misconduct that would be the subject of any suit.  In fact,

many of the D&O Defendants are still serving in various managerial capacities.  *See* Exhibit A.

For example, proposed defendants Zell, Betsy D. Holden and William A. Osborn are, as of the

---

[7] *See* Press Release, Tribune, Tribune Appoints David Eldersveld as General Counsel (Sept. 8, 2010),
http://www.prnewswire.com/news-releases/tribune-appoints-david-eldersveld-as-general-counsel-102438209.html
(last visited Sept. 8, 2010).

[8] According to Mr. Liebentritt's biography, available on Tribune's website, he served as President of EGI from
2000-2005. *See* About Tribune: Executive Management - Donald J. Liebentritt,
http://www.tribune.com/about/bios/liebentritt.html (last visited Sept. 8, 2010).

date of this Standing Motion, currently serving on Tribune's board of directors.[9]  This is exactly

the situation contemplated by the Third Circuit in *Cybergenics*, where it noted:

> [t]his situation immediately gives rise to the proverbial problem of the fox
> guarding the henhouse. . . . One suspects that if managers can devise any
> opportunity to avoid bringing a claim that would amount to reputational self-
> immolation, they will seize it.  *Cybergenics*, 330 F.3d at 573.

Given all of these facts, it is clear that in this case the Committee should be excused from

making a formal demand that the Debtors take action.  *See In re Nat'l Forge Co.*, 326 B.R. 532,

545 (Bankr. W.D. Pa. 2005) (affirming bankruptcy court's excusal of the committee's failure to

petition the debtor when the record is plain that a formal request to file suit would have been

futile).

        35.     Policy considerations similarly support excusing the Committee from

making a formal demand that the Debtors themselves pursue the Claims.  As stated by the court

in *National Forge*:

> The policy concerns underlying the general requirement of a formal demand are
> to ensure that the debtor is (i) informed of the committee's intent to assert the
> subject claims and (ii) afforded an opportunity to explain its reasons, if any, for
> declining to pursue the claims itself.  *In re Nat'l Forge Co.*, 326 B.R. at 544.

Here, both of the foregoing concerns have been satisfied.  The Debtors have been advised

repeatedly through discussions among counsel that the Committee intended to pursue the Claims

set forth in the attached Complaint.  Those discussions also afforded the Debtors an opportunity

---

[9]  *See* About Tribune: Board of Directors, http://www.tribune.com/about/bios/board_index.html (last visited Sept. 8, 2010).

to explain their reasons for declining to pursue the Claims.  As such, there is no prejudice to the

Debtors arising from the Committee's decision not to formally request that the Debtors file suit.

The Committee therefore respectfully submits that a formal demand that the Debtors prosecute

the Claims would have been futile and, given the circumstances here and the case law supporting

such determination, that the Committee be excused from making such formal demand.

       **(c)**     **The Committee Is Seeking Prior
Court Approval to Prosecute the Claims**

      36.     The third factor this Court considers when deciding whether to grant a

Committee derivative standing is whether the Committee has sought Court approval prior to

asserting claims on behalf of the estate.  That factor is satisfied by the relief sought herein.

      37.     Therefore, pursuant to Bankruptcy Code sections 1103 and 1109 and

relevant Third Circuit case law, the Committee should be granted standing to commence and

prosecute causes of action on behalf of the Debtors' estates against the Defendants.

**C.**    **An Action Brought by the Committee
Could Potentially Enhance Insurance Recoveries**

      38.     Finally, there is an additional, practical reason why the Committee here

should be granted standing to pursue the Claims.  Under one of Tribune's executive liability

insurance policies, certain exceptions to coverage that may be available to Tribune's insurer

would <u>not</u> be applicable for claims brought by a creditors' committee.  Therefore, an action

brought by the Committee could increase the potential recoveries to the Debtors' unsecured

creditors.

## RESERVATION OF RIGHTS

39.     The Committee reserves its rights to seek authority to commence and prosecute other claims and/or causes of action on behalf of the Debtors' estates against the Defendants or any other participant in or beneficiary of the LBO Transaction.

## NO PRIOR REQUEST

40.     No prior request for the relief sought herein has been made to this or any other court.

## NOTICE

41.     Notice of this motion has been given to (a) the Debtors; (b) counsel to the Debtors; (c) the Office of the United States Trustee for the District of Delaware; and (d) all other parties that have filed a notice of appearance in these cases.  The Committee submits that such notice is sufficient and that no further notice of the relief requested in the Standing Motion is required.

## CONCLUSION

42.     This Court can and should authorize the Committee to bring the Claims on behalf of the Debtors' estates to recover damages caused by the Defendants' misconduct in connection with the ruinous LBO Transaction.  The Committee therefore respectfully requests that the Court:  (i) grant standing and authority to the Committee to commence, prosecute and, if necessary, settle the Claims on behalf of the Debtors' estates; and (ii) grant such other and further relief as the Court deems just and proper.

Dated:  September 13, 2010
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_[signature]_

Adam G. Landis (No. 3407)
Daniel B. Rath (No. 3022)
Rebecca L. Butcher (No. 3816)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450

- and -

Howard Seife
Thomas J. McCormack
David M. LeMay
Marc D. Ashley
**CHADBOURNE & PARKE LLP**
30 Rockefeller Plaza
New York, New York 10112
Telephone:  (212) 408-5100
Facsimile:  (212) 541-5369

- and -

Graeme W. Bush
James Sottile
Andrew N. Goldfarb
Thomas G. Macauley
**ZUCKERMAN SPAEDER LLP**
1800 M Street, N.W., Suite 1000
Washington, DC  20036
Telephone:  (202) 778-1800
Facsimile:  (202) 822-8106

_Counsel to the Official Committee of Unsecured Creditors_