**REDACTED**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                          )
In re:                                    )    Chapter 11
                                          )
TRIBUNE COMPANY, et al.,                  )    Case No. 08-13141 (KJC)
                                          )    Jointly Administered
        Debtors.                          )
                                          )    Hearing Date:  (Expedited
                                          )    Consideration Requested)
                                          )
                                          )    Response Date:  (Expedited
                                          )    Consideration Requested)
                                          )
------------------------------------------------------------x
```

### MOTION OF AURELIUS CAPITAL MANAGEMENT, LP TO DISQUALIFY CHADBOURNE & PARKE LLP FROM ACTING ON BEHALF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN MATTERS IN WHICH IT HAS CONFLICTS OF INTEREST

Aurelius Capital Management, LP ("Aurelius"), acting on behalf of its managed funds, is one of the largest holders of pre-LBO bonds issued by Tribune Company ("Tribune" and collectively with its subsidiary debtors, the "Debtors") and is one of the largest unsecured creditors in these chapter 11 cases.  Aurelius hereby moves this Court for entry of an order (i) disqualifying Chadbourne & Parke LLP ("Chadbourne") from advising, representing or otherwise acting as legal counsel for the Official Committee of Unsecured Creditors (the "Committee") in all matters in which it has conflicts of interest, including, but not limited to, (a) the upcoming mediation pursuant to this Court's Order Appointing Mediator, entered September 1, 2010 [Docket No.5591] (the "Mediation"), and (b) any potential or actual LBO-Related Cause of Action (as defined below) or settlement thereof, and any Chapter 11 plan to the extent it deals with the foregoing, and (ii) directing that special conflicts counsel to the Committee, Zuckerman Spaeder LLP ("Zuckerman Spaeder"), solely represent the Committee in such matters without

any influence from or participation by Chadbourne.  In support of this motion (the "<u>Motion</u>"),
Aurelius respectfully states as follows:

## PRELIMINARY STATEMENT

These chapter 11 cases are at a critical juncture.  The Court-appointed examiner,
Kenneth Klee (the "<u>Examiner</u>"), has issued an extensive report (the "<u>Examiner's Report</u>")
detailing his analysis of many of the very credible fraudulent transfer claims, breach of fiduciary
duty claims, aiding and abetting claims, and other claims, causes of action, avoidance powers or
rights, and legal or equitable remedies against all parties, including, without limitation, those
parties that participated in, structured, benefitted from, and/or funded the transactions related to
the failed leveraged buyout (the "<u>LBO Transactions</u>") that precipitated the Debtors' chapter 11
cases (the "<u>LBO-Related Causes of Action</u>").  Following issuance of the Examiner's Report, the
Debtors have abandoned their efforts to confirm the Amended Joint Plan of Reorganization.
Instead, various parties-in-interest have been ordered to mediate their disputes in an effort to
settle those LBO-Related Causes of Action that lie against parties to the Mediation.

The central question in the Mediation (which is really the central question in
connection with any effort in these cases to formulate a plan) is the appropriate evaluation and
resolution of the claims and causes of action that are described in the Examiner's Report.  The
resolution of the claims against and concerning the participants in the LBO Transactions will be
critical to the Debtors' reorganization prospects and their ability to confirm a plan.

At this critical point in these cases it is more important than ever that the
Committee -- which was appointed to represent the interests of unsecured creditors, such as
Aurelius and other senior noteholders -- at all times be represented and advised by ***unconflicted***

2

counsel. Chadbourne, however, is undoubtedly conflicted and must not be permitted to represent or advise the Committee in the Mediation or in any matter implicating the LBO-Causes of Action, which are indisputably the central, driving issues in these chapter 11 cases.

Chadbourne *currently represents* numerous key lenders, agents, and advisors who participated in the LBO Transactions and who, according to the Examiner's Report, have significant exposure in LBO-Related Causes of Action. Chadbourne's conflicts of interest are obvious and acknowledged as shown both in the disclosures Chadbourne made in connection with its retention as counsel to the Committee and later in the Committee's retention of Zuckerman Spaeder as conflicts counsel to represent the Committee's interests with respect to the LBO-Related Causes of Action. Indeed, Chadbourne's conflicts involving JPMorgan, Merrill Lynch, Citigroup and other key participants in the LBO Transactions required the Committee to retain Zuckerman Spaeder.

Notwithstanding the foregoing ethical constraints, Chadbourne has ignored repeated written requests by Aurelius for Chadbourne to cease taking actions on behalf of the Committee in matters in which it is conflicted and for Chadbourne and Zuckerman Spaeder to articulate the delineation of responsibilities between the two firms. Chadbourne's and Zuckerman Spaeder's refusal to articulate the delineation of responsibilities between their respective firms is likely explained by the fact that, as described below and as shown by Chadbourne's and Zuckerman Spaeder's time records, the line of responsibilities between the two firms is completely blurred, or worse, non-existent.

The retention of conflicts counsel should not be a façade to permit Chadbourne to continue to function as counsel -- let alone lead counsel -- on the central issues in these cases as

to which Chadbourne is wholly conflicted.. To the contrary, because of Chadbourne's conflicts, Chadbourne should not be advising the Committee in any way with respect to any LBO-Related Causes of Action, nor should it be speaking on behalf of the Committee in any court proceedings, or in any Mediation session, or in private negotiations with respect to the LBO-Related Causes of Action. Moreover, with respect to matters for which it has conflicts of interest, Chadbourne should not be appearing on the record, commenting privately, responding to questions, engaging in informal discussions or negotiations, drafting pleadings or other documents, or commenting on pleadings or other documents prepared by others. Those and similar activities are the sole province of Zuckerman Spaeder. Likewise, Chadbourne should not be advising the Committee in any way with respect to the contents of the Examiner's Report, or the conclusions to be drawn from that report as to evaluation of claims and/or a reasonable resolution of such claims. Nor should Chadbourne be a resource, a sounding board, or worse, a puppeteer for Zuckerman Spaeder in connection with matters implicating the LBO-Related Causes of Action.

Unfortunately, and to the detriment of unsecured creditors, Chadbourne has been acting in wholesale disregard for these ethical limitations. Nor does it appear that Zuckerman Spaeder has fulfilled its parallel responsibility to insist that it act exclusively in all matters as to which Chadbourne has conflicts of interest. Chadbourne's improper behavior (and Zuckerman Spaeder's passivity) must be stopped before Chadbourne irreparably taints the Mediation by presenting materials and arguments to Judge Gross, the Court-appointed mediator, that are not in the best interest of unsecured creditors but instead reflect Chadbourne's conflicted position with respect to its other clients. Indeed, Chadbourne has made it clear to Aurelius and the other

4

Mediation participants that it intends to attend and play an active role in the Mediation on behalf of the Committee.

Accordingly, it is essential that independent, conflict-free counsel -- which Zuckerman Spaeder purports to be -- represent the Committee, without any involvement by Chadbourne, in all matters concerning claims against the LBO lenders and other Chadbourne clients, including advice and counsel with respect to such claims, negotiations, and plan proposals.  To be clear, it is Zuckerman Spaeder's responsibility, as well as Chadbourne's, to ensure that the Committee obtains the independent advice and representation it is entitled to and is completely insulated from Chadbourne.  If Zuckerman Spaeder observes conduct by Chadbourne that is inconsistent with the ethically-required limitations on Chadbourne's role, it is Zuckerman's responsibility to take all necessary action to rectify that problem and its consequences, if need be by disclosing it to unsecured creditors and seeking relief from the this Court.

Retaining special conflicts counsel to represent the Committee would be mere window-dressing if the respective roles of Chadbourne and Zuckerman Spaeder are not clearly delineated and strictly complied with.  If employment of conflicts counsel is the band-aid that is going to be used to remedy Chadbourne's disabling conflicts, such band-aid must be water tight to prevent those conflicts from infecting the Committee's and unsecured creditors' position in these cases.

The lines must be scrupulously drawn and rigidly followed, otherwise the use of conflicts counsel is a subterfuge, and mere lip service is paid to the requirement of disinterestedness.  Because the commencement of the Mediation is imminent and Chadbourne

has declined, despite Aurelius's repeated written requests, to disengage from acting on the

Committee's behalf with regards to the LBO-Related Causes of Action, Aurelius submits that

this Motion is necessary and should be granted.

## FACTUAL BACKGROUND

**A.    Retention of Chadbourne as Counsel to the Committee**

1.      On December 18, 2008, the United States Trustee appointed the Committee to

serve in the Debtors chapter 11 cases pursuant to section 1102 of title 11 of the United States

Code (the "Bankruptcy Code"). The Committee presently consists of (i) JPMorgan Chase Bank,

N.A. (collectively with its affiliates, "JPMorgan"), (ii) Deutsche Bank Trust Company Americas,

as Indenture Trustee, (iii) Wilmington Trust Company, as Successor Indenture Trustee, (iv) the

Pension Benefit Guaranty Corporation, (v) Mr. William Niese, (vi) Warner Bros. Television,

(vii) Buena Vista Television, and (viii) the Washington-Baltimore Newspaper Guild.

2.      On January 16, 2009, the Committee filed an application to employ Chadbourne

as primary counsel to the Committee[1] pursuant to sections 327 and 1103 of the Bankruptcy Code

and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Chadbourne Retention

Application") [Docket No. 243]. The Affidavit of David M. LeMay (the "LeMay Affidavit"), a

member of the firm, was attached as Exhibit A to the Chadbourne Retention Application.

3.      In the LeMay Affidavit, Chadbourne disclosed that it currently represents in other

matters numerous lenders, advisors and other entities that played key roles in the LBO

Transactions that preceded these chapter 11 cases. (LeMay Affidavit, Exhibit 2 "Conflicts

Search Summary"). Specifically, Chadbourne represents:

---

[1] Landis Rath & Cobb LLP was authorized to serve as local co-counsel to the Committee pursuant to an
order entered by this Court on February 20, 2009 [Docket No. 428].

(a)    **JPMorgan Chase & Co., JPMorgan Securities, Inc., and certain other JPMorgan affiliates**

      JPMorgan is a LBO Lender, administrative agent for the Senior Credit Agreement dated May 17, 2007 (the "<u>Senior Loan Agreement</u>"), and syndication agent for the Senior Unsecured Interim Term Loan Agreement dated December 20, 2007 (the "<u>Bridge Loan Agreement</u>"). JPMorgan Securities Inc. served as a lead arranger and bookrunner for the Senior Loan Agreement and the Bridge Loan Agreement.

(b)    **Citigroup Inc. and certain of its affiliates (Citigroup Inc. collectively with its affiliates, "<u>Citigroup</u>")**

      Citigroup is a LBO Lender, syndication agent, lead arranger, and bookrunner for the Senior Loan Agreement, and co-documentation agent, lead arranger, and bookrunner for the Bridge Loan Agreement. Citigroup also served as financial advisor to Tribune.

(c)    **Merrill Lynch & Co. (collectively with its affiliates, "<u>Merrill Lynch</u>")**

      Merrill Lynch is a LBO Lender, syndication agent, lead arranger, and bookrunner for the Senior Loan Agreement, and administrative agent, co-documentation agent, lead arranger, and bookrunner for the Bridge Loan Agreement. Merrill Lynch also served as financial advisor to Tribune.

(d)    **Bank of America, N.A. and Banc of America Securities LLC (collectively with their affiliates, "<u>BofA</u>")**

      BofA is a LBO Lender and co-documentation agent for the Senior Loan Agreement and the Bridge Loan Agreement. Banc of America Securities LLC served as lead arranger and bookrunner for the Senior Loan Agreement and the Bridge Loan Agreement.

(e)    **Barclays and Barclays Capital (collectively with their affiliates, "<u>Barclays</u>")**

      Barclays is a LBO Lender and served as co-documentation agent for the Senior Loan Agreement.

(f)    **Morgan Stanley & Co., Inc. (collectively with its affiliates, "<u>Morgan Stanley</u>")**

      Morgan Stanley served as a key financial advisor to the Debtors in connection with the LBO.

4.      In addition to the foregoing, Chadbourne's conflicts search summary also revealed that Chadbourne actively represents over one-hundred (100) of the Debtors' prepetition lenders, many of which received prepetition principal payments, interest, and fees that are now subject to disgorgement, and that are possible litigation targets in the LBO-Related Causes of Action.  (LeMay Affidavit, Exhibit 2).

5.      On February 16, 2009, Chadbourne filed the First Supplemental Affidavit of David M. LeMay in Connection with the Retention and Employment of Chadbourne & Parke LLP as Counsel to the Official Committee of Unsecured Creditors (the "Supplemental LeMay Affidavit") [Docket No. 395].

6.      In the LeMay Affidavit, Chadbourne disclosed that (i) "[f]or the two year period of 2007 through 2008, fees paid to Chadbourne by [Citigroup] have averaged approximately 4% of Chadbourne's gross revenue" and (ii) "approximately 1-3% of Chadbourne's annual gross revenue" for the "two year period of 2007 through 2008" was on account of fees paid by Morgan Stanley.  (LeMay Affidavit, ¶¶ 10 and 11).

7.      The Supplemental LeMay Affidavit also discloses that "Chadbourne obtained written confirmation from [JPMorgan] and [Merrill Lynch], respectively, of Chadbourne's ability to review and investigate certain possible avoidance and litigation issues potentially arising in connection with (i) the Senior Credit Agreement dated May 17, 2007, as amended, . . . and (ii) the Senior Unsecured Interim Term Loan Agreement dated December 20, 2007 . . . and

to negotiate with [JPMorgan] and [Merrill Lynch], respectively, concerning such issues . . . ."
(Supplemental LeMay Affidavit, ¶ 4).[2]

8.      Notwithstanding the limited waivers obtained from JPMorgan and Merrill Lynch,
the Supplemental LeMay Affidavit goes on to state that "[u]nder applicable ethical rules,
Chadbourne is not able to initiate or pursue litigation against [JPMorgan] or [Merrill Lynch]
relating to such issues and the respective letters from [JPMorgan] and [Merrill Lynch] do not
permit Chadbourne to initiate or pursue any such litigation." *Id.* ¶ 4.[3]

9.      In addition, the Supplemental LeMay Affidavit states that "as an ethical matter,
Chadbourne is not in a position to investigate or pursue possible Malpractice Claims against
[Citigroup, Merrill Lynch, and Morgan Stanley] because each of such entities is, as disclosed in
the [LeMay Affidavit], a current client of Chadbourne, albeit in unrelated matters.  Accordingly,
under applicable ethical restrictions, Chadbourne would not be able to pursue the investigation or
litigation of any Malpractice Claims against any of such entities without a specific waiver
permitting such activities." *Id.* ¶ 7.

10.      On February 20, 2009, the Court entered an order granting the Chadbourne
Retention Application [Docket No. 429] (the "Chadbourne Retention Order").  In the
Chadbourne Retention Order, the Court stated that the order was without prejudice to the
Committee seeking to employ "additional law firms to investigate and/or pursue claims and
causes of action related to the 2007 leveraged buyout." (Chadbourne Retention Order at 2).

---

[2] It is unsurprising and irrelevant that JPMorgan and Merrill Lynch would consent to be scrutinized by its own lawyers.

[3] Of course, there is no mention of how Chadbourne viewed its obligations to its other client -- the Committee -- and the general unsecured creditors whom the Committee serves.

**B.**     <u>Retention of Zuckerman Spaeder as Special Conflicts Counsel to the Committee</u>

11.     On August 12, 2009, seven (7) months after it filed the Chadbourne Retention

Application, the Committee filed an Application to Employ and Retain Zuckerman Spaeder LLP

as Special Counsel to the Official Committee of Unsecured Creditors [Docket No. 1953] (the

"<u>Zuckerman Spaeder Retention Application</u>").  The Zuckerman Spaeder Retention Application

states that

> Chadbourne advised the Creditors' Committee that, while it would
> be able to investigate and conduct settlement negotiations with the
> lenders in the Leveraged ESOP Transactions and would be able if
> necessary to pursue litigation against many of the participants in
> the Leveraged ESOP transactions, Chadbourne would be unable
> because of conflicts to bring claims against certain of such lenders
> . . . .

(Zuckerman Spaeder Retention Application, ¶ 9).

12.     The Zuckerman Spaeder Retention Application goes on to state that Zuckerman

Spaeder was being engaged

> to assist in the further investigation of the Leveraged ESOP
> Transactions, and in negotiations with respective lenders and the
> Debtors looking toward a consensual resolution of any claims if
> such a resolution can be achieved on terms that are satisfactory to
> the Committee, and in the event that negotiations do not produce
> an outcome satisfactory to the Committee, to be able to bring any
> such causes of action against the lenders as may be deemed
> appropriate by the Creditors' Committee to the extent the
> Committee may be authorized by subsequent order of the Court to
> bring such causes of action.

*Id.* ¶ 10.

13.     The Court entered an order approving the Zuckerman Spaeder Retention Order on

September 3, 2009 [Docket No. 2088].

C.    **Chadbourne's Conflicted Actions With
      Respect to the LBO-Related Causes of Action**

14.    Although the Committee retained Zuckerman Spaeder just over one year ago to

serve as special conflicts counsel to handle, *inter alia*, settlement negotiations concerning the

LBO-Related Causes of Action, and despite Chadbourne's disabling conflicts, Chadbourne has

continued to be heavily involved in the plan negotiation process, including the discussions

regarding settlement of the LBO-Related Causes of Action.

15.    For example, in its most recent fee application covering July 2010, Chadbourne

disclosed the following activities:

- 107.8 hours ($72,222.00) participating in regular and special Committee meetings
  where they discussed, *inter alia*, plan and confirmation issues and the LBO/ESOP
  investigation.  *See* Nineteenth Monthly Application of Chadbourne Parke LLP for
  Compensation of and Reimbursement of Expenses for the period July 1, 2010 to July
  31, 2010, ¶ 15 [Docket No. 5502].

- 243.8 hours ($148,679.00) on matters related to the Examiner's Report and the LBO-
  Related Causes of Action.  *Id.* ¶ 34.  Specifically, "Chadbourne's team of
  professionals analyzed and researched various discrete issues raised in the report.  In
  addition, Chadbourne participated in discussions with the Committee's financial
  advisors to review and consider various recovery scenarios as a result of the
  Examiner's conclusions as well as implications on plan confirmation.  Based on its
  substantive review, Chadbourne prepared a detailed factual and legal analysis of the
  Examiner's report for presentation to the Committee." *Id.* ¶ 37.

- 661.80 hours ($415,040.00) "researching and developing alternative steps that the
  Committee might take in the event the proposed plan of reorganization was not
  confirmed." *Id.* ¶ 26.  During this time, the Committee prepared for the scheduled
  August 29, 2010 confirmation hearing and "[a]s part of the process, Chadbourne's
  team of professionals met and conferred on a regular basis with certain key supporters
  of the Debtors' plan . . . to discuss various confirmation issues and address pending
  motions that were inconsistent with the Committee's and Plan Supporters' position."
  *Id.* ¶ 27.  Chadbourne also "collaborated with and provided comments on the
  Debtors' and Plan Supporters' responsive pleadings and reviewed and provided
  comments on the Debtors' amended scheduling order." *Id.*

- 1,155.8 hours ($635,170.00) "actively engaged in preparing for the contested hearing
  on confirmation of the plan." *Id.* ¶ 39.  This included "considering confirmation

hearing scenarios and researching and analyzing potential legal/factual issues as well as potential challenges to confirmation," "[f]requent meetings . . . with the Debtors' professionals and other plan supporters to address various confirmation-related challenges" and "frequent meetings and discussions with plan proponents and the Debtors' professionals in a collaborative effort to address the myriad of issues raised in preparing for confirmation[.]"  In all respect, Chadbourne "continued to update the Committee on the progress of these efforts." *Id.* ¶¶ 39-43.

16.     In other fee applications covering periods after the Committee's retention of conflicts counsel, Chadbourne disclosed the following:

- Chadbourne "assumed the task of preparing a comprehensive submission to the Examiner relating to the Committee's investigation of the LBO/ESOP Transaction." Sixteenth Monthly Application of Chadbourne Parke LLP for Compensation of Chadbourne & Parke LLP for the period April 1, 2010 to April 30, 2010, ¶ 34 [Docket No. 4601] (the "Sixteenth Chadbourne Fee Application").

- "Chadbourne's analysis was significant to the negotiations of the settlement of the claims and causes of action arising from the LBO/ESOP Transaction.  Chadbourne's LBO/ESOP investigation team expended great efforts in the negotiations and various settlement permutations which resulted in the approval of a Settlement Support Agreement reached with certain creditor constituencies on April 7, 2010." *Id.* ¶ 39.

- "Chadbourne and the Committee's other professionals also participated in meetings and discussions with key players in the 2007 LBO/ESOP Transaction in a collective effort to address issued raised during the investigation process and consider settlement options."  Fourteenth Monthly Application of Chadbourne Parke LLP for Compensation and Reimbursement of Expenses for period February 1, 2010 through February 28, 2010, ¶ 36 [Docket No. 3865].

- "Chadbourne attorneys expended substantial time on the ongoing comprehensive review of the Debtors' prepetition financing documents and capital structure as part of the Committee's review and analysis of potential challenges that could be asserted with respect to certain prepetition LBO/ESOP Transactions." *Id.* ¶ 32.

17.     Indeed, review of the time records attached to Chadbourne's fee applications referenced above reveals that partners of the firm were actively negotiating the settlement of the LBO-Related Causes of Action, drafting settlement agreements, and meeting with attorneys for JPMorgan regarding such settlement.

18.     During the six month period between January 1 and June 30, 2010, Chadbourne

professionals billed 5,388.1 hours (totaling $2,803,742 of fees) to "Matter 19 - Review of

Prepetition Financings." During that same period, Zuckerman Spaeder professionals spent only

2,377 hours on the parallel category, "Bank Claims" for a total of $1,174,493.50. This means

that Chadbourne professionals spent *more than double* the amount of time that Zuckerman

Spaeder did in connection with investigating the LBO Transactions and pursuing the LBO-

Related Causes of Action. The actual discrepancy between the time spent by Chadbourne -- who

should not have spent any time on these matters -- and Zuckerman Spaeder -- who should have

been the only firm working on these matters -- is even larger. This is because, while Zuckerman

Spaeder's only billing category for work relating to the LBO-related Causes of Action is "Bank

Claims," the time spent by Chadbourne professionals in connection with the LBO-Related

Causes of Action falls under other billing categories in addition to "Matter 19 - Review of

Prepetition Financing." Specifically, during the same six month period from January 1 through

June 30, 2010, Chadbourne professionals billed approximately 1,900 hours -- just shy of $1.4

million -- to "Matter 11 - Plan and Disclosure Statement" and "Matter 21 - Plan Litigation." A

significant portion of these 1,900 hours were spent negotiating and pursuing confirmation of the

Settlement Plan, which, as described above, would have settled the LBO-Related Causes of

Action. The foregoing demonstrates that notwithstanding its conflicts of interest, Chadbourne,

not Zuckerman Spaeder, has taken the lead in investigating and attempting to settle the LBO-

Related Causes of Action.

19.     For instance, it is noteworthy that on March 2, 2010, Howard Seife of

Chadbourne had a "conference with G. Bush ([Zuckerman Spaeder]) regarding LBO issues (.8)"

and then, two days later, Mr. Seife prepared for and attended a "meeting with JPM regarding

settlement" that lasted over 2 hours.  Fifteenth Monthly Application of Chadbourne Parke LLP

for Compensation of Chadbourne & Parke LLP for the period March 1, 2010 to March 31, 2010,

Exhibit A - Invoice for Matter 19 (Review of Prepetition Financings) (the "Fifteenth Chadbourne

Fee Application") [Docket No. 4160].  Time records also show that David LeMay of

Chadbourne and James Sottile of Zuckerman Spaeder also attended the March 4 settlement

meeting with JPMorgan and that, on that same date, Graeme Bush of Zuckerman Spaeder had

approximately one (1) hour of telephone conferences with Messrs. Seife and Sottile "regarding

settlement."  *Id.*; Eighth Monthly Application of Zuckerman Spaeder LLP for Interim Allowance

of Compensation and Reimbursement of Expenses Filed by Special Counsel to the Official

Committee of Unsecured Creditors, Exhibit A at 4, 11 (the "Eighth Zuckerman Spaeder Fee

Application") [Docket No. 4179].

     20.    The following is a further sampling of examples from Chadbourne time records of

work that Chadbourne partners performed relating to settling the LBO-Related Causes of Action.

Chadbourne's time records are replete with similar instances -- too voluminous to list here -- of

improper work aimed at settling the LBO-Related Causes of Action:

- On March 15, 2010, Mr. Seife "[p]repar[ed] for conference call with JPM and DPW"[4] and participated in conference calls "with Lenders regarding settlement" and with "negotiation group." (Fifteenth Chadbourne Fee Application Exhibit A - Invoice for Matter 19 (Review of Prepetition Financings)). Exhibit A to the Eighth Zuckerman Spaeder Fee Application shows that Messrs. Bush and Sottile also participated on at least portions of these conference calls. Eighth Zuckerman Spaeder Fee Application, Exhibit A at 5, 12.

- On April 5 and 6, 2010, Mr. Seife "[w]ork[ed] on settlement agreement/term sheet" and had "telephone conferences/emails with DPW regarding settlement" (Sixteenth Monthly Fee Application, Exhibit A - Invoice for Matter 19 (Review of Prepetition Financings)) Moreover, on April 8, 2010, Mr. Seife "[r]eview[ed] and revise[d]

---

[4] "DPW" is presumably a reference to Davis, Polk and Wardwell LLP, counsel to JPMorgan in these chapter 11 cases.

settlement term sheet and letter," "review[ed] and revise[d] slide presentation regarding term sheet," and had a "conference with D LeMay regarding settlement terms."

- On April 1, 2010, Douglas Deutsch "participate[d] in meeting with JPMorgan counsel (Damian Schiable) re: term sheet and next steps" (Sixteenth Monthly Fee Application, Exhibit A - Invoice for Matter 11 (Plan and Disclosure Statement))

- On April 6 and 7, 2010, David LeMay "negotiate[ed] and revis[ed] Plan Support Letter, Term Sheet and Support Agreement" and "[d]raft[ed] Plan Term Sheet, Committee Support Letter and CB/JPM Support Agreement" (*Id.*)

## D.    Chadbourne's Attempts to Settle the LBO-Related Causes of Action

21.    Despite its conflicts[5] and the Committee's engagement of conflicts counsel, Chadbourne has been actively involved in efforts to settle the LBO-Related Causes of Action by counseling the Committee to support the Debtors' now-abandoned Amended Joint Plan of Reorganization (the "Settlement Plan"). The Settlement Plan incorporated a settlement of the LBO-Related Causes of Action that, in light of the Examiner's findings, was wholly inadequate. In furtherance of these efforts, at a hearing on July 29, 2010, Chadbourne argued against **_any_** extension of the deadline to vote on the Settlement Plan.[6] At the time, the voting deadline was officially August 6, 2010 and for all practical purposes a day or two earlier than that. At stake was whether the imminent deadline would afford unsecured creditors sufficient time to review the Examiner's Report, and discuss it with each other and their counsel, before deciding whether to accept the proposed settlement of claims against the participants in the LBO Transactions, many of whom are Chadbourne's clients.

22.    Even if the position advocated by Chadbourne at the hearing (and presumably advocated by it to the Committee before then) were defensible, the subject should have been

---

[5] It is also worth noting that Chadbourne

[6] Chadbourne's remarks in this regard appear at pages 31-36 of the transcript for the July 29, 2010 hearing. Attached hereto as Exhibit A is a true and correct copy of those pages.

15

completely off-limits to Chadbourne. Both the import of the Examiner's Report and the appropriateness of affording unsecured creditors some modicum of time to consider it go to the heart of Chadbourne's conflicts. Zuckerman Spaeder should have been advising and representing the Committee on those issues, to the complete exclusion of Chadbourne. What is the reason for Chadbourne's insistence on dealing with these issues? Even if Chadbourne says it is not motivated by its conflict of interest, the attendant unseemliness is precisely what the requirement of disinterestedness and the ethical precepts governing attorney conflicts of interest are designed to prevent.

23.    Chadbourne's representation of the Committee concerning the extension of the voting deadline in the wake of the Examiner's Report was inappropriate regardless of the position advocated; but in fact the position advocated was extreme and indefensible. It was appalling that the Committee, of all parties, should fight against unsecured creditors receiving *any* extra time to read the Examiner's extremely important and revealing exposé of that which the Debtors, the LBO Lenders and indeed the Committee itself had, for 20 months, swept under the carpet. Indeed, at the time Mr. LeMay of Chadbourne was arguing against a voting extension, only the heavily redacted version of the Examiner's Report was publicly available, it had only been available for a few days, and the Examiner had filed a motion seeking to make the un-redacted version publicly available. It turned out that on August 3, 2010, the Court ordered that the unredacted report be publicly filed, however, there was no way anyone, including Mr. LeMay, could have known on July 29 when the Examiner's motion would have been decided and when an unredacted Report might be available to creditors.

16

24.      Moreover, at that same July 29 hearing, Mr. LeMay offered his own on-the-record

summary of the Examiner's Report and his view that the Examiner's conclusions supported

confirmation of the Settlement Plan.  Specifically, Mr. LeMay said:

> And truly, Your Honor, from the point of view of a typical
> investor, I think the Examiner's conclusions not only can be
> adequately summed up in 15 or 20 pages, I actually tried to do it
> and I think it can be done in about four sentences…. Let's look at
> the general unsecured creditors, people like the ones I represent.
> They've got a pretty -- they've got a choice and the Examiner tells
> them what to think about.  And what the Examiner tells them is
> well, okay, you can vote in favor of this plan and then get what we
> think is a very good recovery and a very meaningful recovery to
> general unsecured creditors, or you can roll the dice on the
> litigation option pursuing the selling shareholders, pursuing the
> option -- the officers and directors and you can get in line with $7
> billion of senior debt that the Examiner has said is probably
> unassailable.  We might disagree with that at a trial, but basically
> the Examiner is telling the investor in my clients' class well, take
> the plan, take the recovery or take the litigation option, but if you
> take the litigation option you might be sharing and share alike with
> $7 billion of senior debt from step one…. Basically I think the
> Examiner's report lays out kind of a road map of where they stand.

(July 29, 2010 Hrg. Transcript, 33-34).  These remarks are inaccurate and improvident.  Why is

Chadbourne articulating a view that might be expected from counsel to the LBO Lenders, the

shareholders, the officers and the directors?  And, whatever the Chadbourne view of the

Examiner's Report and the implications for settlement, the responsibility to offer views on behalf

of the Committee -- and provide advice to the Committee -- starkly belongs to Zuckerman

Spaeder, not Chadbourne.  If this is not proscribed for Chadbourne, what is?  If neither

Chadbourne nor Zuckerman Spaeder is unconcerned with such conduct when it occurs in open

court, why should unsecured creditors have confidence that the ethical boundaries attendant to

Chadbourne's conflicts – which go to the very heart of this case – will be honored behind closed

doors?

25.     Another recent and glaring example of why the Committee needs advice from legal counsel whose loyalty is beyond question and who is not tainted by conflicts of interest is the chain of events that occurred shortly after key parties withdrew from the Settlement Plan, causing its demise.

26.     Having been freed from the restrictions of the Settlement Support Agreement upon which the Settlement Plan was based, and at last having the benefit of the eye-opening Examiner's Report, the Committee should have taken its time and attempted to negotiate a plan of reorganization that would provide significantly better treatment for the non-LBO unsecured creditors including the Senior Noteholders.

27.     However, rather than take advantage of the Examiner's findings, the Committee -- while being actively advised by its conflicted legal counsel, Chadbourne -- ███████████

████████████████████████████████████████████████████████████

██████████████████████████.

28.     Aurelius believes that Chadbourne's involvement in this kind of pivotal discussion █████████████████████████████████████████████████████████

████████████████████████ is completely inconsistent with its ethical and fiduciary duties to the Committee and, by extension, to the non-LBO creditors represented by the Committee. Likewise, a Committee guided by a conflicted professional cannot be assured its decisions are untainted by its counsel's conflict.  Even if Chadbourne has a contrary view that, despite the strength of the Examiner's Report, the proposed alternative plan would have been fair to Senior Noteholders under the circumstances of these cases, Chadbourne's involvement in the process has completely undermined the integrity and validity of the Committee's deliberations with respect to settling the LBO-Related Causes of Action.  Nor is Zuckerman Spaeder blameless.

Zuckerman Spaeder cannot fulfill its duties by shadowing Chadbourne. Rather, it must assume the preeminent and exclusive role as the Committee's legal counsel on all matters relating to the LBO-Related Causes of Action.

**E.**    **Chadbourne's Failure to Adequately Respond to Demands that It Cease All Activities In Connection With the LBO-Related Causes of Action**

29.    As one of the largest unsecured creditors in these chapter 11 cases, Aurelius is greatly concerned that, during this critical stage in these cases, the Committee is being steered and advised by conflicted counsel with respect to the strategy for pursuing or settling the LBO-Related Causes of Action.

30.    Over the past month, counsel to Aurelius has written to attorneys at Chadbourne and Zuckerman Spaeder more than once to express its concerns that Chadbourne continues to advise the Committee and negotiate with key constituencies on the Committee's behalf with respect to potential settlements of the LBO-Related Causes of Action.[7] Each of these communications has demanded that Chadbourne immediately cease to have any involvement in negotiating or advising the Committee with respect to matters that affect JPMorgan, Merrill Lynch, or any of the other Chadbourne clients that are potential defendants in the LBO-Related Causes of Action, which negotiations and advice should be the sole purview of conflicts counsel.

31.    As of the date hereof, Chadbourne and Zuckerman Spaeder have failed to provide any meaningful response to such communications or articulate their views on the delineation of responsibilities between the two firms. Indeed, the letter that just arrived (referred to in fn. 7

---

[7] One such written communication was a letter dated September 2, 2010 from Edward A. Friedman of Friedman Kaplan, Seiler & Adelman LLP, counsel to Aurelius, to Howard Seife of Chadbourne and Graeme W. Bush of Zuckerman Spaeder. A true and correct copy of that letter is attached hereto as Exhibit B. Literally, as this Motion was going out the door for filing, a response to that letter from Messrs. Bush and Seife arrived by fax. It is attached as Exhibit C.

19

*supra*) indicates that Chadbourne does not intend to stop advising and negotiating on behalf of

the Committee with respect to the LBO-Related Causes of Action.

## BASIS FOR RELIEF

32.     At this crucial stage in these cases, it is an absolute necessity that Committee and

unsecured creditors have adequate and unconflicted representation.

33.     Mediation aimed at, *inter alia*, formulating a confirmable plan of reorganization --

which necessarily entails addressing and possibly settling the LBO-Related Causes of Action --

is scheduled to commence shortly and Mediation Statements are due by September 20, 2010

from all Mediation parties (including the Committee).  Chadbourne has made it clear to Aurelius

and the other Mediation participants that it plans to attend and participate in the Mediation on the

Committee's behalf.  Because it is critical that the Committee be adequately represented by

**unconflicted** counsel in connection with the Mediation, Aurelius is compelled to file this Motion

and seek this Court's intervention to ensure that the Mediation is not tainted by Chadbourne's

conflicted position.

34.     Section 1103(b) of the Bankruptcy Code provides that "[a]n attorney ... employed

to represent a committee appointed under section 1102 of this title may not, while employed by

such committee, represent any other entity having an adverse interest in connection with the

case." Section 1103(b) certainly comes into play where (as here) counsel to an official

committee *currently represents* parties who are significant litigation targets of the estate.  The

Committee certainly recognized this fundamental ethical principle when it engaged Zuckerman

Spaeder as conflicts counsel.  Moreover, section 328(c) of the Bankruptcy Code unequivocally

requires that a professional employed by the Committee at all times be disinterested.  *See In re*

*Greystone Holdings, L.L.C.*, 305 B.R. 456, 460 (Bankr. N.D. Ohio 2003) (applying adverse

interest *and* disinterestedness standards in denying committee's application to retain financial advisor).

35.    However, recognizing the rules of the road is not enough.  The rules must be obeyed.

36.    In this regard, courts have recognized that the policy behind section 1103(b) is to "prohibit[] concurrent representation if it would 'interfere with counsel's vigorous advocacy for either client, jeopardize counsel's undivided loyalty to either client, or endanger the confidences and secrets of either client . . . It also prohibits dual representation where there exists even the appearance of impropriety." *In re 3dfx Interactive, Inc.*, 2007 Bankr. LEXIS 1941 (Bankr. N.D. Cal. June 1, 2007) (quoting *In re National Liquidators, Inc.*, 182 B.R. 186, 192 (S.D. Oh. 1995)).

37.    Courts overseeing large and complex chapter 11 cases -- which these cases undoubtedly are -- have approved the employment of conflicts counsel to address conflicts of interest on the part of debtors' or committees' counsel. *See, e.g., In re Enron Corp.*, No. 01-16034 (AJG), 2002 WL 32034346, at *9-10 (Bankr. S.D.N.Y. May 23, 2002) (refusing to disqualify committee's main counsel because, *inter alia*, conflicts counsel was employed to and actually was handling investigations where firm had an adverse interest).

38.    Indeed, just over one year ago, this Court approved the retention of Zuckerman Spaeder -- a competent and seemingly unconflicted firm -- as special conflicts counsel to the Committee to deal with the fact that Chadbourne currently represents (and derives a significant portion of its revenues) from certain key potential defendants in the LBO-Related Causes of Action.  In order for this delineation of responsibilities to have any effect or meaning, Chadbourne should have wholly disengaged, and Zuckerman Spaeder should have been the only counsel (other than unconflicted local counsel) for the Committee with respect to the subject

matter of Chadbourne's conflicts (which includes, among other things, the LBO-Related Causes

of Action covered by the Examiner's Report). *See In re Project Orange Assocs., LLC,* 431 B.R.

363, 374 n.4 (Bankr. S.D.N.Y. 2010) (a recent case in which conflicts counsel was hired but not

utilized properly, resulting in the court rejecting a settlement negotiated and presented by the

conflicted law firm).

39.      There are many parallels between the facts surrounding Chadbourne's conflicted

position in these cases and the recent *Project Orange* decision, in which Bankruptcy Judge

Glenn of the Southern District of New York disqualified a firm seeking to be retained as debtor's

counsel because it had a conflict of interest with a creditor that was central to the issues in that

case. *Id.* at 375-76. In *Tribune*, Chadbourne has a conflict of interest with numerous key

creditors that were deeply involved in the LBO Transactions and are litigation targets in the

LBO-Related Causes of Action, including JPMorgan, Merrill Lynch, Morgan Stanley, and

Citigroup. It is undeniable that the LBO-Related Causes of Action are the central, driving issue

in this case.

40.      Further, in *Project Orange* the conflicted law firm derived between .92% and

1.6% of its revenue for the prior three years from work for that particular creditor unrelated to

the bankruptcy. *Id.* at 368. As set forth above, the LeMay Affidavit clearly shows that

Chadbourne derives a significant portion of its revenue -- much more than the firm at issue in

*Project Orange* -- from work for the entities from which Chadbourne's conflicts of interest arise.

Specifically, "[f]or the two year period of 2007 through 2008, fees paid to Chadbourne by

[Citigroup] have averaged approximately 4% of Chadbourne's gross revenue" and

"approximately 1-3% of Chadbourne's annual gross revenue" for the "two year period of 2007

through 2008" was on account of fees paid by Morgan Stanley. (LeMay Affidavit, ¶¶ 10 and

22

11). Including the undisclosed revenues from JPMorgan, Merrill Lynch, and the numerous other LBO lenders Chadbourne currently represents, it is clear that Chadbourne derives a significant portion of its revenue from potential defendants in the LBO-Related Causes of Action.

41.    Notwithstanding the foregoing and the undeniable fact that the Committee engaged conflicts counsel due to Chadbourne's many conflicts of interest, Chadbourne has not scrupulously followed the delineation of responsibilities meant to prevent Chadbourne from providing conflicted advice to and taking conflicted actions on behalf of the Committee. As its time records confirm, Chadbourne attorneys have expended hundreds of hours investigating, analyzing, negotiating, and advising the Committee with respect to the LBO-Related Causes of Action. Moreover, Chadbourne attorneys have spent hundreds of hours negotiating and formulating any plan of reorganization that would settle the LBO-Related Causes of Action that the Examiner concluded were colorable and strong.

42.    Because Chadbourne's current clients, such as JPMorgan, Citigroup, Merrill Lynch, and Morgan Stanley, are potential defendants in the LBO-Related Causes of Action and, thus, potentially subject to billions of dollars of avoidance and/or disgorgement liability, Chadbourne's actions described above cannot be allowed to continue. And given the alignment of interests of the various lenders, and the commonality of facts and legal issues among all potential defendants, Chadbourne cannot feasibly negotiate with one lender who is not one of its clients and not with another lender who is one of its clients. Furthermore, to the extent that claims are assertable against parties other than the LBO lenders, such as officers, directors, shareholders, and advisors, those claims are closely related, both factually and legally, to claims that should be asserted against the LBO lenders.

43.    Moreover, any ethical proscription on Chadbourne's conduct applies regardless of whether Zuckerman Spaeder is also participating.  Anything Chadbourne might say or do within the pertinent subject areas would be presumptively tainted by conflicts even if Zuckerman Spaeder is theoretically in a position to express disagreement with Chadbourne.  Indeed, since Zuckerman Spaeder presumably is capable of handling the representation within the areas of Chadbourne's conflict, Chadbourne's participation in matters within the scope of Zuckerman Spaeder's engagement could potentially compromise or undermine Zuckerman Spaeder's independence or the Committee's reliance on any advice from Zuckerman Spaeder with which Chadbourne disagrees.  Zuckerman Spaeder should not be put in the position of having to debate the advice from a conflicted co-counsel, and the Committee should not be in the untenable position of having to choose between the advice of unconflicted counsel and the advice of conflicted counsel.

44.    In addition, the fact that JPMorgan and Merrill Lynch have consented to Chadbourne negotiating with them on behalf of the Committee is unsurprising and irrelevant.  It is quite apparent why those firms found it in their interest to consent to their own lawyers negotiating with them (but not suing them).  For the same reason, however, it is not in the interests of the unsecured creditors for Chadbourne to be representing or advising them in negotiations against those firms.  *See Project Orange,* 431 B.R. at 374-5 (debtor's counsel disqualified because, *inter alia,* limited conflicts waiver from the party-in-interest prohibited counsel from threatening to or actually bringing suit against such party).

45.    It is too clever by half for Chadbourne to argue that its actions are unconflicted because, based on these waivers, it can negotiate with JPMorgan and Merrill Lynch.  Because Chadbourne is ethically forbidden from bringing the LBO-Related Causes of Action against its

current clients -- and, as discussed above, those similarly situated -- Chadbourne is also ethically barred from taking any actions relating to the merits of such LBO-Related Causes of Action, such as engaging in negotiations aimed at settling those causes of action through the Mediation or in any other setting.

46.     The two egregious examples described in paragraphs 21-28 above of Chadbourne's active involvement in steering the Committee towards a settlement of the LBO-Causes of Action demonstrate exactly why the relief sought herein is necessary.  Chadbourne's continuing active involvement in the matters for which Zuckerman Spaeder was engaged makes a mockery of the engagement of conflicts counsel and calls into question the entire process. Unless Chadbourne is excluded from all further investigation, discussion, litigation and/or settlement negotiations concerning the LBO-Related Causes of Action -- including the Mediation -- no one will be confident that the interests of non-LBO unsecured creditors are being properly safeguarded.

47.     Any settlement of these valuable LBO-Related Causes of Action that are central to these chapter 11 cases on behalf of the unsecured creditors must be done based on the advice and with the assistance of counsel that (a) is not beholden to the potential defendants in such actions and (b) is ethically permitted to sue such defendants.  This is advice and assistance that Chadbourne cannot provide.  Any hint of impropriety must be avoided so that unsecured creditors can be confident the Committee's actions are untainted.  Accordingly, Aurelius submits that the relief it seeks in this Motion should be granted and Chadbourne should immediately be disqualified from taking any further action on behalf of the Committee in connection with the LBO-Related Causes of Action, including participating in the Mediation in which the LBO-Related Causes of Action are certain to play a central role.

## NO PRIOR REQUEST

48.     No previous request for the relief sought herein has been made by Aurelius to this Court or any other court.

## CONCLUSION

49.     For the reasons set forth above, Aurelius respectfully requests that the Court (i) disqualify Chadbourne from taking any action on behalf of the Committee in matters in which it has conflicts of interest, including, but not limited to, the Mediation and any investigation, discussion, litigation and/or settlement negotiations concerning the LBO-Related Causes of Action, (ii) direct that Zuckerman Spaeder solely represent the Committee in such matters for which Chadbourne has conflicts of interest without any influence from Chadbourne, and (iii) grant such further relief as the Court deems appropriate.

Dated:   Wilmington, Delaware
         September 13, 2010

                                ASHBY & GEDDES, P.A.

                                William P. Bowden (I.D. No. 2553)
                                Amanda M. Winfree (I.D. No. 4615)
                                500 Delaware Avenue
                                P.O. Box 1150
                                Wilmington, DE 19899
                                (302) 654-1888

                                - and -

                                Edward A. Friedman
                                William P. Weintraub
                                Hal Neier
                                **FRIEDMAN KAPLAN SEILER &**
                                   **ADELMAN LLP**
                                1633 Broadway
                                New York, NY 10019-6708
                                (212) 833-1100

                                *Attorneys for Aurelius Capital Management, LP*

26