**REDACTED**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

– – – – – – – – – – – – – – – – – – – – – – – – x

In re:                                            :        Chapter 11 Cases
                                                  :        Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,                          :        (Jointly Administered)
                                                  :
                              Debtors.            :        **Response Deadline:  TBD**
                                                  :        **Hearing Date:  TBD**
– – – – – – – – – – – – – – – – – – – – – – – – x

## MOTION OF
## AURELIUS CAPITAL MANAGEMENT, LP,
## FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................. 5

    A.   The Chapter 11 Filings .............................................................................. 5

    B.   The 2007 LBO ....................................................................................... 5

    C.   The Senior Notes ................................................................................... 10

    D.   The Bank Fee Dispute ........................................................................... 12

    E.   The Settlement Plan .............................................................................. 13

    F.   The Examiner and His Report ............................................................... 14

        1.   The Examiner Appointment .......................................................... 14

        2.   The Examiner's Investigation/Briefing Process .............................. 15

        3.   The Examiner's Findings and Conclusions ................................... 16

    G.   Termination of the Settlement Support Agreement ................................. 22

    H.   The Unfairness of the Settlement Plan ................................................... 23

ARGUMENT ................................................................................................. 24

I. CAUSE EXISTS FOR THE THE APPOINTMENT OF A TRUSTEE ......................... 24

    A.   The Legal Standard ................................................................................ 24

    B.   Management's Dishonesty and Fraud Are Cause to Appoint a Trustee ............... 26

        1.   Management's and Directors' Dishonesty and Mismanagement During the LBO ........................................................................ 28

        2.   The Debtors' Concealment Of Post-Petition LBO Lender Fee Reimbursements ......................................................................... 31

    C.   The Debtors' Conflicts of Interest Are Cause to Appoint a Trustee ............... 32

    D.   Acrimony Among the Parties Is Cause to Appoint a Trustee ..................... 37

    E.   Lack of Creditor Confidence and Inability to  Confirm A Plan Are Cause to Appoint a Trustee ................................................................................ 39

II. TRUSTEE APPOINTMENT IS IN THE BEST INTERESTS OF ALL
     STAKEHOLDERS ..................................................................................... 41

  A.  Legal Standard ................................................................................ 41

  B.  Appointing a Trustee Is in the Best Interests of All Stakeholders......................... 43

    1.  Appointing a Trustee is Critical in Light of Committee's
        Significant Conflicts of Interest ......................................................... 44

III. TRUSTEE APPOINTMENT IS APPROPRIATE  UNDER BANKRUPTCY CODE
     SECTION 1104(a)(3)........................................................................... 54

CONCLUSION ............................................................................................. 56

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Amdura Corp.*,
    121 B.R. 862 (Bankr. D.Colo. 1990) ........................................................... 45

*In re Bellevue Place Assocs.*,
    171 B.R. 615 (Bankr. N.D.Ill. 1994) ........................................................... 33

*In re Bibo, Inc.*,
    76 F.3d 256 (9th Cir. 1996) ........................................................................ 26

*In re Cardinal Indus.*,
    109 B.R. 755 (Bankr. S.D. Ohio 1990) ...................................................... 40

*In re Colby Constr., Inc.*,
    51 B.R. 113 (Bankr. S.D.N.Y. 1985) .......................................................... 26

*In re Colorado-Ute Elec. Ass'n, Inc.*,
    120 B.R. 164 (Bankr. D. Colo. 1990) ........................................................ 41

*Committee of Dalkon Shield Claimants v. A.H. Robins Co.*,
    828 F.2d 239 (4th Cir. 1987) ..................................................................... 25

*In re Eurospark Indus.*,
    424 B.R. 621 (Bankr. E.D.N.Y. 2010) ...................................................... 43

*In re Holly's, Inc.*,
    140 B.R. 643 (Bankr. N.D. Mich. 1992) .................................................... 33

*In re Intercat, Inc.*,
    247 B.R. 911 (Bankr. S.D.Ga. 2000) ......................................................... 25

*In re Ionosphere Clubs, Inc.*,
    113 B.R. 164 (Bankr. S.D.N.Y. 1990) ....................................................... 42

*Jackson v. Levy*,
    2000 U.S. Dist. LEXIS 825 (S.D.N.Y. Feb. 2, 2000) ................................ 33

*In re Madison Mgmt. Group, Inc.*,
    137 B.R. 275 (Bankr. N.D. Ill. 1992) .................................................... 40-41

*In re Marvel Entertainment Group*,
    140 F.3d 463 (3d Cir. 1998) ............................................................... *passim*

**Page(s)**

*In re Microwave Prods. of America,*
    102 B.R. 666 (Bankr. W.D.Tenn. 1989) ........................................ 26, 34, 35

*In re Oklahoma Refining Co.,*
    838 F.2d 1133 (10th Cir. 1988) ................................................................. 34

*In re Project Orange Associates, LLC,*
    431 B.R. 363 (Bankr. S.D.N.Y. 2010) ................................... 36, 45, 46, 53

*In re PRS Ins. Group, Inc.,*
    274 B.R. 381 (Bankr. D. Del. 2001) .................................................. 26, 34

*In re Sharon Steel Corp.,*
    871 F.2d 1217 (3d Cir. 1989) ............................................................. *passim*

*Solash v. Telex Corp.,*
    1988 WL 3587 (Del. Ch. 1988) ................................................................ 33

*In re Sundale, Ltd.,*
    400 B.R. 890 (Bankr. S.D.Fla. 2009) ....................................................... 39

*Taub v. Taub (In re Taub),*
    427 B.R. 208 (Bankr. E.D.N.Y. 2010) ............................................... 39, 42

*In re V. Savino Oil & Heating Co., Inc.,*
    99 B.R. 518 (Bankr. E.D.N.Y. 1989) ........................................... 25, 33, 42

**STATUTES**

11 U.S.C. § 108(a) ........................................................................................ 1, 54

11 U.S.C. § 327(a) ............................................................................................ 45

11 U.S.C. § 546(a) .................................................................................. 1, 53, 54

11 U.S.C. § 1104 ........................................................................................ *passim*

11 U.S.C. § 1112 ........................................................................................ 54, 55

Pursuant to 11 U.S.C. § 1104, Aurelius Capital Management, LP ("Aurelius") hereby moves the Court to appoint a trustee to administer the affairs of the above-captioned debtors and debtors in possession.

## PRELIMINARY STATEMENT

Aurelius, acting on behalf of its managed funds, is one of the largest holders of pre-LBO bonds issued by Tribune Company ("Tribune" and collectively with its subsidiary debtors, the "Debtors") and is one of the largest unsecured creditors in these chapter 11 cases.[1]

Aurelius wishes that it had the luxury of forbearing while mediation is pursued. Aurelius is nonetheless compelled to seek the expeditious appointment of a trustee because of rapidly approaching statutes of limitation. The deadline to commence avoidance actions relating to the LBO Transactions will occur on December 8, 2010. *See* 11 U.S.C. § 546(a). Moreover, the operative deadline for bringing many non-avoidance actions – such as breach of fiduciary duty and aiding and abetting breach of fiduciary duty – will occur on December 8, 2010, as a result of the extension provided by Bankruptcy Code section 108. *See* 11 U.S.C. § 108(a). While the timely appointment of a trustee would extend by one year the deadline for avoidance actions (*see* 11 U.S.C. § 546(a)(1)(B)), it would not extend the deadline for non-avoidance actions.

*Even if (as Aurelius hopes) the impending mediation results in a fully consensual settlement,* many of these actions (not yet fully investigated), against myriad defendants (not yet fully identified), will need to be instituted (or tolling agreements

---

[1]     Capitalized terms not defined in the Preliminary Statement have the meanings ascribed to them *infra.*

obtained) before December 8, 2010. Many of these actions would be against defendants (such as shareholders, officers, directors and advisors) that are not even parties to the mediation. Any consensual plan would presumably contemplate the prosecution of those actions to generate additional recoveries after Tribune emerges from Chapter 11. Even as to actions that would be settled under a plan, it would be extremely aggressive to assume that between September 20 (when mediation submissions are due) and December 8, a consensual settlement will be negotiated and fully documented; a disclosure statement will be revised, approved and distributed; and the new plan will be voted upon, will be confirmed, and will take effect. It will thus be necessary before December 8 for a truly disinterested fiduciary to identify and institute (or obtain tolling agreements for) those actions, even if, by then, they are expected to be released under a plan that has not yet taken effect. If a trustee is to attend to such important matters, there is precious little time remaining to do so.

Moreover, the mediation process itself would be benefitted by the prompt appointment of a trustee, because the participants would know that a truly disinterested fiduciary is rigorously identifying, assessing and preserving billions of dollars of claims. Putative defendants such as the LBO Lenders would participate in mediation realizing that they cannot "run out the clock" or continue to be protected by highly conflicted fiduciaries. Aurelius and other pre-LBO creditors would participate in the mediation without fear that the price for doing so will be prejudice to the causes of action that the debtors-in-possession and the Official Creditors' Committee (the "Committee") have already spent 21 months (and counting) ignoring or downplaying. And all participants would work toward a consensual plan knowing that recoveries will be maximized

through preservation of causes of action that are not within the scope of the impending mediation.

Although the Examiner did not directly address whether a trustee should be appointed, the Examiner Report portrays a textbook case for the appointment of a trustee. The Examiner found that both present and former officers appear to have acted with deliberate dishonesty and in violation of their fiduciary duties in connection with the very transactions that landed Tribune in Chapter 11.[2] Also, upon consummation of the LBO, Tribune paid $259 million to EGI-TRB, L.L.C., an entity affiliated with Samuel Zell, who is Tribune's Chairman and was its CEO for two years following the LBO. Tribune paid this amount primarily on account of the Zell Entity's holdings of Tribune stock and the economic equivalent thereof in the form of a mandatorily convertible note. Under the Debtors' plan these officers and the Zell Entity (and Mr. Zell) would have been given full releases for free, yet it is now clear that they will end up being defendants in the very causes of action Aurelius hereby seeks to place in the hands of a trustee. Also, these officers, Mr. Zell, and their present or former colleagues, would likely serve as witnesses in any estate causes of action against other defendants, such as the LBO Lenders. Unsurprisingly, the debtors in possession have already consumed 21 months trying to block investigation and prosecution of these matters at every turn, including the Examiner's investigation that proved so revealing.

---

[2] "[T]he Examiner believes that the record adduced indicates that one or more members of Tribune's senior financial management were not honest or candid in connection with key aspects of the Step Two Transactions, and that these circumstances led proximately to the Step Two Closing, to the detriment of Tribune's creditors. These acts go well beyond gross negligence or recklessness but enter into the terrain reserved for intentional misconduct. Based on the acts of dishonesty or lack of candor in the record, it is reasonably likely that a court would find that such individual or individuals also breached their fiduciary duties during this time frame, whether it be the duty of care or loyalty." (Examiner Rep. Vol. II at 386-87)

3

While an official creditors committee can serve as a representative to pursue estate causes of action, it cannot otherwise perform the duties of a trustee, and it cannot compensate for the risk of having corrupt and conflicted individuals managing the debtors' affairs.  Moreover, in this instance, the Committee itself and its principal counsel are riddled with conflicts and have an impressive track record of trying to protect the interests of LBO Lenders and management at the expense of other unsecured creditors. This was clearly demonstrated in the days after key parties withdrew their support from the Settlement Plan when, rather than take advantage of the Examiner's findings, the Committee -- while being actively advised by its conflicted legal counsel -- ███████████

███████████████████████████████████████████████████

███████████████  For this and other reasons set forth below and in Aurelius' Motion to Disqualify Chadbourne & Parke LLP from Acting on Behalf of the Official Committee of Unsecured Creditors in Matters in Which it Has Conflicts of Interest, which has been filed concurrently herewith, Aurelius is utterly lacking in confidence that the Committee will serve its fiduciary duties to unsecured creditors in connection with estate causes of action.

Even if there were not an urgent need for a trustee to preserve and pursue the LBO-Related Causes of Action – which clearly there is – Section 1104 of the Bankruptcy Code would nevertheless mandate the appointment of a trustee for "cause" under the circumstances of this case, which include the following: (i) the Debtors' management has engaged in dishonesty and/or fraud before and after the Petition Date, (ii) there is an ongoing conflict of interest between the Debtors' management and the best interests of creditors, (iii) there is unrelenting acrimony among the parties, and

4

(iv) creditors have justifiably lost confidence in the Debtors' ability to confirm a plan of reorganization. While any one of these causes would be sufficient to warrant the appointment of a trustee, all are present in the instant case and, combined with the imminent expiration of the deadlines for bringing LBO-Related Causes of Action, make such appointment an urgent necessity.

In sum, Aurelius respectfully submits that it is both urgent and compelling that a trustee be appointed in these cases.

## FACTUAL BACKGROUND

### A.    The Chapter 11 Filings

1.    On December 8, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC), Tribune's subsidiary that held the majority of the assets related to the business of the Chicago Cubs Major League Baseball franchise, commenced a Chapter 11 Case on October 12, 2009.

### B.    The 2007 LBO

2.    On April 1, 2007, Tribune's board of directors (the "Board"), based on the recommendation of the committee entrusted to oversee the LBO Transactions (the "Special Committee"), approved the 2007 leveraged buy out (the "LBO"), which consisted of certain transactions with (i) a newly formed Tribune employee stock ownership plan (the "ESOP") (ii) EGI-TRB, L.L.C. (the "Zell Entity"), and (iii) Samuel Zell (the "LBO Transactions"). The LBO Transactions were structured to occur in two principal steps.

3.      In "Step One," which was completed on June 4, 2007, the ESOP
purchased shares of Tribune common stock, and Tribune consummated a cash tender
offer for nearly fifty percent (50%) of its outstanding common stock.  In "Step Two,"
which was completed on December 20, 2007, Tribune (i) cashed out its remaining
shareholders, and (ii) merged with a Delaware corporation wholly-owned by the ESOP,
with Tribune surviving the merger.  Upon the merger, all issued and outstanding shares of
Tribune's common stock, other than shares held by Tribune or the ESOP, were cancelled,
and Tribune became wholly owned by the ESOP.

4.      In order to finance the LBO Transaction, Tribune Company entered into
the following two commitment letters on April 1, 2007 (each subsequently amended on
April 5, 2007): (i) with J.P. Morgan Securities Inc., ("JPMS"), JPMorgan Chase Bank,
N.A. ("JPMCB"), Merrill Lynch Capital Corporation ("MLCC"), Citigroup Global
Markets Inc. ("CGMI") (on behalf of certain Citigroup entities), Bank of America, N.A.
("BofA") and Banc of America Securities LLC ("BAS") (the "Step One Commitment
Letter"); and (ii) with JPMS, JPMCB, MLCC, CGMI (on behalf of certain Citigroup
entities), BofA, Banc of America Bridge, LLC and BAS (the "Step Two Commitment
Letter").

5.      Pursuant to the Step One Commitment Letter, the lenders party thereto
committed $8.028 billion of financing under a credit facility.  Pursuant to the Step Two
Commitment Letter, the lenders party thereto committed (i) $2.105 billion in financing
under an incremental credit facility, and (ii) $2.1 billion in financing under a bridge
facility.

6.      On May 17, 2007, Tribune entered into a $8.028 billion senior loan agreement (the "Senior Loan Agreement") with JPMCB, as administrative agent, MLCC, as syndication agent, Citicorp North America, Inc., BofA and Barclays Bank PLC, as co-documentation agents, and the initial lenders named therein.[3]  The Senior Loan Agreement consisted of the following facilities: (i) a $1.5 billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"); (ii) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"); (iii) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility"); and (iv) a $750 million revolving credit facility, which includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million (the "Revolving Credit Facility" and, together with the Tranche X Facility, the Tranche B Facility and the Delayed Draw Facility, the "Step One Financings").  The Senior Loan Agreement also provided for a commitment of up to $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility").  On June 4, 2007, in connection with the closing of Step One of the LBO Transactions, JPMCB and MLCC wire transferred $1.5 billion to Tribune in respect of the Tranche X Facility, and $5.515 billion to Tribune in respect of the Tranche B Facility.  Substantially all of the proceeds of the Step One Financings were used to consummate a common stock tender offer and pay down Tribune's pre-existing debt.

7.      On December 20, 2007, Tribune entered into a $1.6 billion senior unsecured interim loan agreement (the "Bridge Loan Agreement" and, together with the Incremental Facility, the "Step Two Financings"), with MLCC as administrative agent,

---

[3] Substantially all of Tribune's domestic subsidiaries (the "Guarantor Subsidiaries") provided unsecured guarantees of Tribune's indebtedness under the Senior Loan Agreement, the Incremental Facility, and the Bridge Loan Agreement.

JPMCB as syndication agent, Citicorp North America, Inc. and BofA as co-documentation agents, and the lenders named therein. That same day, in connection with the closing of Step Two of the LBO Transactions, (i) JPMCB wire transferred $2.105 billion to Tribune in respect of the Incremental Facility, and (ii) the Lead Banks wire transferred $1.6 billion to Tribune in respect of the Bridge Loan Agreement. Substantially all of the proceeds of the Step Two Financings were used to cash out Tribune's former shareholders.

8.      Prior to the Petition Date, the Debtors made $1,985,676,595 in principal and interest payments on account of the Senior Loan Agreement, the Incremental Facility, and the Bridge Loan Agreement. Also prior to the Petition Date, the Debtors paid $287,512,292 in related fees and expenses – $166,886,204 on account of Step One and $120,636,088 on account of Step Two.

9.      Upon consummation of Step Two, Tribune paid the Zell Entity $259 million by means of a credit against payments then due from the Zell Entity. As indicated in the Flow of Funds Memo prepared in connection with Step Two, this $259 million consisted of "(i) the repayment of the Zell Note ($206,418,859.46), (ii) the payment of merger consideration to [the Zell Entity] in respect of its ownership of [Tribune] common stock ($49,999,992.00) and (iii) reimbursement of expenses ($2,500,000.00) ...." (*See* Examiner Rep., Ex. 714 (Step Two Flow of Funds Memorandum)).[4] On the basis of these payments alone, the Zell Entity would be the target of various estate causes of action, including, without limitation the following:

---

[4] The "Zell Note" referred to above is what the Examiner Report (as defined below) calls the Exchangeable EGI-TRB Note, and is referred to herein as the "Exchangeable Note."

- With regard to item (ii) above, the Examiner Report (as defined below) already endorses a fraudulent conveyance action to recover merger consideration. (*See* Examiner Rep. Vol. II at 32)

- With regard to item (i) above, the Examiner Report (as defined below) indicates that the repayment of the Exchangeable Note may be avoidable as a preference. (*See* Examiner Rep. Vol. II at 312-19)

- The repayment of the Exchangeable Note should also be treated as the equivalent of merger consideration, hence subject to avoidance as a fraudulent conveyance. The Exchangeable Note was convertible at any time at the option of Tribune and was mandatorily convertible in the event the LBO merger failed to occur. As "reasonably equivalent value" for fraudulent conveyance purposes, Tribune repayment of the Exchangeable Note was no different than the payment of its obligation to shareholders under the merger agreement: if the merger occurred, Tribune would make its payment; and if the merger did not occur, the Exchangeable Note would be converted into shares and cease to exist as a liability. Although unnecessary to the argument above, it is worth noting that the price at which the Exchangeable Note was convertible into Tribune shares was $34 per share, the same price paid to shareholder in the merger. The amount Tribune paid on account of the Exchangeable Note at Step Two was therefore the same as it would have been if the Exchangeable Note had been converted at Tribune's option immediately before the merger and the resulting shares received the merger consideration paid to shareholders.

10.    The LBO Transactions proved to be disastrous to the Debtors' estates and their stakeholders and have given rise to multiple claims asserted (or stated) by various parties including claims for: (i) avoidance of all of the guarantees provided by the Guarantor Subsidiaries and avoidance of the obligations incurred and liens provided by Tribune in connection with the LBO Transactions as fraudulent transfers, (ii) avoidance and recovery for the benefit of the Debtors' estates the amounts paid to certain third parties in connection with the LBO Transactions as fraudulent transfers, (iii) avoidance, recovery and/or subordination to all creditors, including Tribune's creditors, for the benefit of the Debtors' estates, the obligations incurred and collateral granted to certain lenders and the Zell Entity in connection with the LBO Transactions as fraudulent transfers, (iv) equitable and/or statutory disallowance of all claims by certain third

9

parties, (v) recovery for the benefit of the Debtors' estates damages caused by breaches

of fiduciary and other duties in engineering, facilitating and/or approving the LBO

Transactions, (vi) recovery for the benefit of the Debtors' estates damages caused by

certain third parties having aided and abetted alleged breaches of fiduciary duties with

respect to the LBO Transactions, (vii) recovery for the benefit of the Debtors' estates

damages caused by the negligence of certain third parties related to the LBO

Transactions, (viii) recovery for the benefit of the Debtors' estates damages caused by the

negligent misrepresentations of certain third parties, and (ix) declaratory judgment to

disregard the corporate structures of certain Tribune subsidiaries on the basis of alter ego,

veil piercing, substantive consolidation, or any other doctrine of law or equity

(collectively, but not exclusively, the "LBO-Related Causes of Action").

## C.    The Senior Notes

11.    Between March 1992 and August 2005, Tribune Company ("Tribune")

issued numerous series of senior notes (the "Senior Notes"). The Senior Notes include

notes issued under the following indentures:

> (i)    that certain Indenture, dated as of March 1, 1992, by and between
>
> Tribune and Citibank, N.A. (successor to Continental Bank, National
>
> Association, Bank of Montreal Trust Company, and Bank of New York),
>
> as trustee, as amended, restated, modified, or supplemented (the "1992
>
> Indenture");

> (ii)    that certain Indenture, dated as of January 30, 1995, by and
>
> between Tribune (as successor to The Times Mirror Company f/k/a New
>
> TMC Inc.) and Citibank, N.A. (successor to Bank of New York, Wells

Fargo Bank, N.A., and First Interstate Bank of California), as trustee, as amended, restated, modified, or supplemented (the "1995 Indenture");

(iii)    that certain Indenture, dated as of March 19, 1996, by and between Tribune (successor to The Times Mirror Company) and Citibank, N.A., as trustee, as amended, restated, modified, or supplemented (the "1996 Indenture"); and

(iv)    that certain Indenture, dated as of January 1, 1997, by and between Tribune and Citibank, N.A. (successor to Bank of Montreal Trust Company and Bank of New York), as trustee, as amended, restated, modified, or supplemented (the "1997 Indenture").

Deutsche Bank Trust Company Americas ("Deutsche Bank") is the successor trustee under the 1992 Indenture, the 1995 Indenture and the 1997 Indenture, and Law Debenture Trust Company of New York ("Law Debenture") is the successor trustee under the 1996 Indenture

12.    Under the 1992 Indenture, Tribune is the issuer of the 6.25% Series D Medium-Term Notes due 2026. Under the 1995 Indenture, Tribune, as successor to New TMC Inc., is the issuer of two series of notes: (i) the 7.25% Senior Debentures due 2013; and (ii) the 7.5% Senior Debentures due 2023. Under the 1996 Indenture, Tribune, as successor to The Times Mirror Company, is the issuer two series of notes: (i) 6.61% Senior Debentures due 2027 (the "6.61% Notes"); and (ii) 7.25% Senior Debentures due 2096. Under the 1997 Indenture, Tribune is the issuer of five series of notes: (i) 4.87%

Senior Notes due 2010; (ii) 5.25% Senior Notes due 2015; (iii) 5.50% Series E Medium-

Term Notes due 2008; (iv) 5.67% Series E Medium-Term Notes due 2008; and (v) 6.35%

Series E Medium-Term Notes due 2008.

13.     As of the petition date, approximately $1.263 billion in principal was

outstanding under the Senior Notes.

**D.     The Bank Fee Dispute**

14.     On March 26, 2010, the Bankruptcy Court heard oral arguments with

respect to a motion filed by Law Debenture and joined by Centerbridge Credit Advisors

LLC ("Centerbridge") and Deutsche Bank seeking the disgorgement of approximately

$16.1 million of fees and expenses paid by the Debtors through Tribune (FN) Cable

Ventures, Inc., an affiliate of the Debtors, to certain professionals retained by JPMorgan

and a steering committee that was formed by senior lenders (the "Fee Disgorgement

Motion").

15.     As set forth in the Fee Disgorgement Motion and subsequent briefing

submitted by the parties, the Debtors and JPMorgan orchestrated a scheme to make those

payments notwithstanding the general bankruptcy prohibition on paying unsecured

creditors' attorneys fees without Court order.  At each turn, the Debtors and JPMorgan

purposefully avoided disclosing the payments to all parties-in-interest, and carefully

engineered a process intended to avoid Court oversight.  Perhaps more troubling than the

Debtors' abdication of all duties of candor, was the fact that the Debtor endorsed a

secretive scheme where massive estate dollars were used to help lenders defend against

the LBO-Related Causes of Action.

16.     The Court did not rule on the Fee Disgorgement Motion at the March 26

hearing, but instructed the Debtors to cease all such payments while the matter was under

consideration. The Court, at the hearing, did observe that there was a "concerted effort"

by the Debtors and JPMorgan "to limit notice and to avoid Court approval." (March 26,

2010 Hrg. Transcript, 11) The Court also noted that "the better thing to have done would

have been to really disclose [], not selectively as it was, the arrangement" and that

regardless of any need to disclose, the fact the Debtor did not, made "the odor linger."

(*Id.* at 3).[5]

**E.    The Settlement Plan**

17.    Commencing in early 2010, Centerbridge (a Senior Noteholder) and Law

Debenture began direct negotiations with Angelo Gordon and JPMorgan (holders of LBO

loan claims) concerning a plan that would resolve the LBO-Related Causes of Action.

Throughout these negotiations, the Debtors, who then enjoyed exclusivity, made clear to

all parties that any settlement would have to include a release of all claims against the

Debtors' officers and directors. Likewise, the LBO Lender representatives insisted on

releases of claims against the LBO Lenders.

18.    These discussions culminated in the execution of the Settlement Support

Agreement, dated as of April 8, 2010, by Angelo Gordon, JPMorgan, Centerbridge, and

Law Debenture, pursuant to which the signatories agreed to support specified terms for a

plan of reorganization (the "Settlement Plan"). A true and correct copy of the Settlement

Support Agreement is annexed hereto as Exhibit A.

19.    On April 12, 2010, the Debtors filed the Settlement Plan. The Settlement

Plan provided for the resolution of all claims against and interests in the Debtors. A

---

[5]    As part of the Settlement Support Agreement, the Fee Disgorgement Motion was withdrawn
without prejudice to it being reinstated and a ruling sought in the event that the Settlement Support
Agreement is terminated. Following the termination of the Settlement Support Agreement, the Fee
Disgorgement Motion was reinstated on August 25, 2010. *See* [Docket No. 5507].

global settlement (the "Global Settlement") of LBO-Related Causes of Action was the
central component of the Settlement Plan.  The Settlement Plan allocated 7.4% of total
distributable value – approximately $450 million – for the benefit of Senior Noteholder
Claims and other general unsecured claims of Tribune Company and 1.4% of total
distributable value (up to approximately $150 million) for the benefit of general
unsecured creditors of subsidiary Debtors.

20.     Notably, the Settlement Support Agreement and the Global Settlement
were entered into before the Examiner released his report.

21.     Under the Settlement Plan, the LBO Lenders would receive 93% of the
total consideration they would receive if the LBO-Related Causes of Action against them
are totally <u>unsuccessful</u>.  In other words, the settlement advocated by the Debtors was
based on the implicit premise that fraudulent conveyance and other claims on behalf of
the Debtors' estates were virtually certain to be dismissed in their entirety.  As shown by
the discussion of the Examiner Report below, however, such premise is utterly devoid of
merit and could only be the product of wishful thinking, collusion, and/or a refusal to
accept a realistic appraisal of potential claims.

**F.      The Examiner and His Report**

**1.      The Examiner Appointment**

22.     On January 13, 2010, Wilmington Trust Company ("Wilmington Trust"),
as successor indenture trustee for the PHONES Notes (those certain Exchangeable
Subordinated Debentures due May 15, 2029), filed a motion seeking the appointment of
an examiner pursuant to section 1104(c) of the Bankruptcy Code to investigate the LBO
Transactions and any potential claims related thereto (the "Examiner Motion").

23.     Pursuant to the agreed order entered on April 20, 2010, the Court directed the appointment of an examiner ("Examiner Order").  On April 30, 2010, the U.S. Trustee appointed Kenneth N. Klee to be the Examiner and, on the same day, filed an application with the Court requesting approval of such appointment.  The Court approved the U.S. Trustee's application on May 10, 2010 and appointed Kenneth N. Klee as Examiner.  On May 11, 2010, the Court entered an order approving the Examiner's proposed work and expense plan and modifying the Examiner Order (the "Supplemental Order").

24.     Pursuant to the Examiner Order and Supplemental Order, the Examiner's duties were to, among other things, evaluate the potential claims and causes of action held by the Debtors' estates that are asserted by the Parties (as defined in the Examiner Order) in connection with the LBO Transactions which may be asserted against any entity which may bear liability, including, without limitation, the Debtors, the Debtors' former and/or present management, former and/or present members of Tribune's Board, the Debtors' lenders and the Debtors' advisors, and including without limitation, claims for fraudulent conveyance, breach of fiduciary duty, aiding and abetting breach of fiduciary duty and equitable subordination, and to evaluate the potential defenses asserted by the parties to such potential claims and causes of action.

**2.      The Examiner's Investigation/Briefing Process**

25.     Shortly after the Examiner's appointment, he began investigating, among other things, the viability of the estates' LBO-Related Causes of Action.  In the course of his investigation, the Debtors, along with other parties, submitted extensive briefs on those issues, the Examiner interviewed 38 witnesses (some more than once) and considered tens of thousands of pages of documentation.

15

26.     Moreover, in the course of his investigation, the Examiner and his advisors interviewed Tribune officer Chandler Bigelow (the Debtors' current Chief Financial Officer and Vice President and Treasurer of one or more Guarantor Subsidiaries) and former officer Donald Grenesko. (Examiner Rep. Vol. I at 33). The Examiner finds that Mr. Bigelow and Mr. Grenesko were insufficiently credible and less than forthright in their interviews with the Examiner about Morgan Stanley's advisory role in connection with the LBO Transactions. While not directly accusing the officers of lying in their interviews, the Examiner does not credit the officers' version of events regarding certain important issues surrounding the LBO Transactions. (Examiner Rep. Vol. II at 36-54). It is clear from the Examiner Report that the officers' behavior during the Examiner's investigation process has not only been deceitful but outright obstructive.

27.     Notwithstanding the Debtors' (and other parties') attempts to obstruct the LBO-Related Causes of Action, the Examiner Report clearly demonstrates that there is substantial evidence to support the successful prosecution of claims against, *inter alia*, the LBO Lenders, Tribune's and the subsidiaries' directors and officers, the financial advisors, and shareholders for their wrongful conduct with respect to the LBO.

**3.      The Examiner's Findings and Conclusions**

28.     On July 26, 2010, the Examiner Report was filed containing factual and legal conclusions regarding the topics of his examination.

**a.      <u>Intentional Fraud at Step Two</u>.**

29.     The Examiner concludes that, based on, *inter alia*, management misconduct, a court is "somewhat likely" to find that the Tribune entities incurred obligations and made transfers in Step Two with actual intent to hinder, delay and defraud creditors. (Examiner Rep. Vol. II at 32). The sophisticated parties and counsel

in this case are undoubtedly aware of the significance of a finding of <u>intentional</u>

fraudulent conveyance of this magnitude – and how such a finding would dramatically

increase the recovery available to innocent unsecured creditors such as the Senior

Noteholders. Yet, after the issuance of the Examiner Report, the Committee and its

conflicted counsel, Chadbourne, ███████████████████████████

████████████████████████████████████

30.    The Examiner describes substantial evidence of management's dishonesty

in connection with the LBO Transactions. The evidence tells the story of a management

team so eager to complete the LBO Transactions it was willing to and, in fact did,

mislead directors, advisors, banks, and creditors about material conditions precedent to

the closing and the prospects for the business, including financial projections and

Tribune's ability to refinance maturing debt.

31.    The Examiner Report recites the pertinent facts leading to the Examiner's

finding that "one or more members of Tribune's senior financial management were not

honest or candid in connection with key aspects of the Step Two Transactions, *and that*

*these circumstances led proximately to the Step Two Closing, to the detriment of*

*Tribune's creditors.*" and that "*these acts go well beyond gross negligence or*

*recklessness but enter into the terrain reserved for intentional misconduct.*" (Examiner

Rep. Vol. II at 386) (emphasis added).[6] In particular, the Examiner finds dishonest

conduct by Mr. Bigelow and Mr. Grenesko, who both played critical roles in the LBO

Transactions and provided misleading information to parties involved in the LBO

---

[6]    The evidence also supports findings of dishonesty and fraud at Step One. Regardless, the
dishonesty found in Step Two is more than sufficient cause for the appointment of a trustee.

Transactions in an effort to ensure the consummation of the LBO Transactions. (Examiner Rep. Vol. II at 36-47).

32.    The Examiner notes that senior management, the Board and the Special Committee may have been guided by their own self-interest while pushing the LBO Transactions through to close.   Specifically, the Examiner finds that "members of Tribune's senior management as well as directors (including Special Committee members) stood to benefit personally from the Leveraged ESOP Transactions: senior management from cash bonuses and phantom stock awards under the Special Incentive Awards, and both senior management and directors through accelerated restricted and [sic] stock options and as Selling Stockholders.  The management cash awards were significant."  (Examiner Rep. Vol. II at 25-26).

> **b.    Management's Misconduct.**

33.    The Examiner Report specifically identifies the following facts and conclusions relating to management's deceitful and wrongful conduct:

- *Tribune management intentionally misled Tribune's board (to ensure approval of Step Two) and VRC (to obtain a solvency opinion)* to believe that Morgan Stanley agreed that Tribune could successfully refinance its debts. Specifically, the Examiner found that Mr. Bigelow and/or Mr. Grenesko "pushed the envelope beyond what Morgan Stanley had said to them, in order to get past the final major hurdle standing in the way of the Step Two Closing." (Examiner Rep. Vol. II at 49-50).

- *Tribune Management also deceived Morgan Stanley.* While Tribune's responses to JPMorgan, Merrill Lynch, Citigroup and BofA's (collectively referred to herein as the "Lead Banks") questions and its representation letter to VRC indicated that Morgan Stanley supported its view that Tribune would be able to refinance its debts in the downside scenario in 2014, Morgan Stanley was not informed about these representations.  (Examiner Rep. Vol. I at 558-80; 583-86).

- The Debtors' "representation letter [to the Lead Banks in December 2007] does not appear to tell the whole truth.  It does not disclose that Morgan Stanley would not opine, formally or informally, on the refinancing question. .

18

. . [T]he letter fails to disclose that Morgan Stanley was asked and refused to ascribe to management's views on the subject of the representation." (Examiner Rep. Vol. II. at 53).

- *Tribune Management's statements to "the Lead Banks* at the December 17, 2007 conference call concerning Morgan Stanley's alleged involvement in VRC's opinion provide context and *raise particular concerns regarding Tribune's honesty in this matter*." (Examiner Rep. Vol. II at 53) (emphasis added).

- *Tribune Management intentionally manipulated the October 2007 forecast of Tribune's 2012-2017 performance.* (Examiner Rep. Vol. I at 465-70). The Examiner noted that "Tribune management's October 2007 forecast contained an important and . . . unjustifiable growth rate assumption for the years 2013 to 2017, by assuming that the consolidated growth rate of 2.4% from 2011 to 2012 (an election year) would be replicated each year from 2013-2017," and that the assumption "resulted in approximately $613 million in additional incremental value at Step Two." (Examiner Rep. Vol. II at 54, 56). *It appears this "approach was undertaken at the direction of Chandler Bigelow*[.]" (Examiner Rep. Vol. II at 62 n. 196) (emphasis added).

- Even absent direct evidence of deceit, "the Examiner finds it implausible that members of Tribune's senior financial management believed in good faith that the out-year growth assumption contained in the October 2007 forecast (or the related Tribune representation letter) represented a reasonable estimate of Tribune's future performance. Rather, this assumption *bears the earmarks of a conscious effort to counterbalance the decline in Tribune's 2007 financial performance and other negative trends in Tribune's business, in order to furnish a (very significant) source of additional value to support a solvency conclusion*." (Examiner Rep. Vol. II at 63) (emphasis added).

- "*In the Examiner's view, the instances of dishonesty or lack of candor...are evidence of consciousness that proceeding honestly and with candor would jeopardize the Step Two Closing*." (Examiner Rep. Vol. II at 76) (emphasis added).

- "The natural consequence of proceeding in this fashion is that a transaction that should not have happened, did. *It is reasonable to infer from those acts knowledge that hindering, delaying, or defrauding creditors would follow*." (Examiner Rep. Vol. II at 76) (emphasis added).

- "[T]he Examiner believes that the record adduced indicates that one or more *members of Tribune's senior financial management were not honest or candid in connection with key aspects of the Step Two Transactions, and that these circumstances led proximately to the Step Two Closing, to the detriment of Tribune's creditors. These acts go well beyond gross negligence or*

19

*recklessness but enter into the terrain reserved for intentional misconduct.*"
(Examiner Rep. Vol. II at 386) (emphasis added).

- "*Based on the acts of dishonesty or lack of candor in the record, it is
  reasonably likely that a court would find that such individual or individuals
  also breached their fiduciary duties during this time frame, whether it be the
  duty of care or loyalty.*" (Examiner Rep. Vol. II at 386-387) (emphasis
  added).

- "[U]nlike the process in which the Financial Advisors evaluated VRC's
  opinion in the period between the Tribune Board's April 1, 2007 approval of
  the Leveraged ESOP Transactions and the Step One closing, *the Tribune
  Board took up the critical question whether the Step Two Transactions would
  render Tribune insolvent without retaining an outside advisor to evaluate
  management's projections or VRC's work.*" (Examiner Rep. Vol. II at 64)
  (emphasis added).

- "Tribune and its senior management were effectively acting without engaged
  financial advisors during a critical time period in the transaction." (Examiner
  Rep. Vol. I at 639).

- "[N]o duly adopted minutes memorializing the Special Committee's
  proceedings on December 18, 2007 exist." (Examiner Rep. Vol. II at 67).  In
  addition, *the Examiner found that the unsigned draft minutes contained
  material inaccuracies.* (Examiner Rep. Vol. II at 67-71) (emphasis added).
  Specifically, the Examiner found that "[t]he statement in the draft minutes
  attributing to Mr. Whayne [of Morgan Stanley] the conclusion 'that VRC's
  solvency analysis was conservative and that VRC's opinion was something
  upon which a director could reasonably rely,' . . . appears to be incorrect."
  (Examiner Rep. Vol. II at 71).

34.    As stated by the Examiner, the above acts go "well beyond gross

negligence or recklessness[,] [and] enter into the terrain reserved for intentional

misconduct." (Examiner Rep. Vol. II at 386).  In addition, the Examiner found that

"based on the acts of the dishonesty or lack of candor in the record, it is reasonably likely

that a court would find that such individual or individuals also breached their fiduciary

duties during this time frame, whether it be the duty of care or loyalty." (Examiner Rep.

Vol. II at 386-87).

c.   **LBO Lender Bad Faith.**

35.   With respect to the LBO Lenders, the Examiner finds that a court is reasonably likely to find that the Lead Banks did not act in good faith with respect to Step Two.  (Examiner Rep. Vol. II at 264, 278, 280-81, 282, 283).

- The Examiner concludes: "*JPMCB and the other Lead Banks had sufficient knowledge to be placed on inquiry notice regarding Tribune's possible insolvency as Step Two approached.* Those indicia included, among other things, the highly-leveraged nature of the LBO Transactions (which would be magnified by a Step Two Closing and the addition of the Step Two Debt to the balance sheet), the deterioration in Tribune's operating performance in the months following Step One, the decline in Tribune's Common Stock price as well as certain of its debt instruments during this same period, the tightening in the credit markets during the summer and leading into the fall of 2007, and the difficulties the Lead Banks were facing in syndicating the LBO Lender Debt. Moreover, the fact that the Lead Banks, acting together through jointly retained counsel, determined in the fall of 2007 to retain Murray Devine, a valuation advisory firm, to assist in the banks' due diligence concerning Tribune's insolvency demonstrates that the question of Tribune's solvency as Step Two approached is tangible evidence that the Lead Banks not only were on inquiry notice, but were inquiring." (Examiner Rep. Vol. II at 265-66; *see* Examiner Rep. Vol. I at 605-34) (emphasis added).

- The Examiner finds it reasonably likely that a court would conclude that JPMorgan and the Lead Banks did not act in good faith.  The Examiner explains: "[h]aving been placed on inquiry notice, therefore, JPMCB and the other Lead Banks not only had a duty to investigate the facts, but are charged with the knowledge that a creditor reasonably would have obtained after due inquiry.  The Examiner finds that had JPMCB and the other Lead Banks conducted that inquiry, they would have reasonably determined that the Step Two Transactions would render Tribune insolvent. . . . *JPMCB and the other Lead Banks should have known that the Step Two Transactions would render Tribune insolvent and, therefore, it is reasonably likely that they cannot be found to have acted in good faith in connection with the Step Two Transactions.*" (Examiner Rep. Vol. II at 267) (emphasis added).

The Examiner also cites compelling evidence showing that the Lead Banks performed their own internal valuation analysis that demonstrated insolvency. The Examiner finds "the evidence is abundant that these institutions knew or had reason to know that the case for insolvency was, to say the least, closer than VRC had opined. Particularly in light of

witness testimony that their institutions did not have the in-house capacity to perform a

solvency valuation, at a minimum these analyses support the conclusion that the Lead

Banks should have retained their own outside solvency expert if they wished to make the

case for good faith under these circumstances." (Examiner Rep. Vol. II at 276).

**G.      Termination of the Settlement Support Agreement**

36.    On August 9, 2010, certain parties to the Settlement Support Agreement

delivered a notice terminating their obligations under the Settlement Support Agreement.

As a result of this withdrawal, the Settlement Support Agreement is now null and void.

37.    On August 20, 2010, the Debtors finally advised the Court what had been

apparent at least to some parties for almost two weeks – that the so-called "Settlement

Plan" was dead-on-arrival. The Debtors also advised the Court that another plan would

be filed by the Debtors on August 27, 2010. The Debtors did not reveal the contents of

such plan but ominously suggested that it would reflect the Debtors' own view of rough

justice. Of course, the Debtors' view of "justice" must be taken with a large grain of salt

given their conflicted agenda.

38.    Rather than filing a revised plan, however, the Debtors requested that the

Court order mediation with respect to the disputes surrounding the formulation of a plan

of reorganization for the Debtors. On September 1, 2010, the Court entered an order

appointing the Honorable Kevin Gross as mediator to conduct mediation concerning the

terms of a plan of reorganization, including the appropriate resolution of the LBO-

Related Causes of Action (the "Mediation"). While Aurelius welcomes the opportunity

to participate in the Mediation, the initiation of that process has not obviated the need for

the prompt appointment of a trustee in these cases. As discussed below, regardless of

whether the Mediation results in a settlement of all plan-related issues, it is essential that

a disinterested fiduciary be appointed to proceed with investigating and asserting

valuable estate causes of action, which are due to soon expire. Although, as discussed

below, the appointment of a trustee is warranted for several reasons, the running of these

statutes of limitation has compelled Aurelius to seek the appointment of a Trustee at this

time.

**H.    The Unfairness of the Settlement Plan**

39.    The Examiner Report laid bare the unfairness of the Settlement Plan by

highlighting the extent to which the Settlement Plan undervalued the LBO-Related

Causes of Action. The Examiner Report lays out at least three independent pathways to

payment in full for Senior Noteholders and substantial recoveries for other pre-LBO

creditors, each of which has a significant likelihood of success. These include:

> **1. Avoidance of Step One and Step Two by (i) avoiding Step One as
> an intentional fraudulent transfer** ("reasonably unlikely," Examiner
> Report Vol. II at 22) **and avoiding Step Two as an intentional or
> constructive fraudulent transfer** ("somewhat likely" as to intent; "highly
> likely" as to insolvency of Tribune and "reasonably likely" as to
> insolvency of the Guarantor Subsidiaries, Examiner Rep. Vol. II at 32,
> 271, 277), **or (ii) collapsing Step One and Step Two** (a "close question"
> but "somewhat unlikely" as to collapse, Examiner Rep. Vol. II at 160,
> 173, 177), **and avoiding substantially all debt incurred at Step One
> and Step Two** (as to solvency of Tribune at Step One following collapse,
> "somewhat likely" but a "very close call," Examiner Rep. Vol. II at 187,
> 206, and as to solvency of the Guarantors at Step One following collapse,
> "somewhat more likely" than solvency of Tribune, Examiner Rep. Vol. II
> at 207); or
>
> **2. (i) Avoidance of Step Two as either (a) an intentional fraudulent
> transfer or (b) a constructive fraudulent conveyance** ("somewhat
> likely" as to intent; "highly likely" as to insolvency of Tribune and
> "reasonably likely" as to insolvency of the Guarantor Subsidiaries,
> Examiner Rep. Vol. II at 32, 271, 277), **coupled with (ii) Estoppel of
> Step One Lenders from benefiting from the avoidance of Step Two**
> ("equipoise," Examiner Rep. Vol. II at 301-02); or

**3. Equitable subordination or equitable disallowance of the LBO Lender claims** ("somewhat unlikely" but "additional investigation is warranted," Examiner Rep. Vol. II at 332, 334).

40.     Although Aurelius maintains that the Examiner Report understates the likelihood of full recovery under one or more of the above scenarios, any sensible reading of the Examiner's conclusions and the recovery scenarios included in Annex B makes it abundantly clear that the Examiner views a full recovery for the Senior Noteholders and a substantial recovery for the other pre-LBO creditors as a credible possibility. Thus, the Report on its face thus demonstrates that there are credible, substantial claims at every level, and that these claims have considerable value. For these reasons, among others, serious weight <u>must</u> be given to these matters in any settlement. That the Debtors and the Committee continued to support the Settlement Plan following the issuance of the Examiner Report illustrates the extent to which they are subject to conflicts of interest. In fact, the Debtors and the Committee continued to support the Settlement Plan until the withdrawal of certain LBO Lenders.

## ARGUMENT

### I.

### CAUSE EXISTS FOR THE THE APPOINTMENT OF A TRUSTEE.

**A.**     <u>The Legal Standard</u>

41.     Section 1104(a)(i) of the Bankruptcy Code provides that a court *shall* appoint a trustee for *cause*, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause. . ." (Emphasis added).

24

42.    The list of items constituting "cause" set forth in Section 1104(a)(1) –
such as fraud or gross mismanagement – is not exhaustive, and "a determination of cause
. . . is within the discretion of the court." *In re Sharon Steel Corp.* (hereinafter, "*Sharon
Steel*"), 871 F.2d 1217, 1226 (3d Cir. 1989) (quoting *Committee of Dalkon Shield
Claimants v. A.H. Robins Co.* (hereinafter, "*Dalkon Shield*"), 828 F.2d 239, 242 (4th Cir.
1987)); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y.
1989) ("[T]he words "including" and "or similar cause" [in Section 1104(a)(1)] ...
indicate that the grounds for appointing a reorganization trustee are not even limited to
the derelictions specifically enumerated."). "[C]ourts must be given the discretion
necessary to determine if the debtor-in-possession's 'conduct shown rises to a level
sufficient to warrant the appointment of a trustee.'" *In re Marvel Entertainment Group*
(hereinafter, "*Marvel*"), 140 F.3d 463, 472 (3d Cir. 1998) (quoting *Dalkon Shield*, 828
F.2d at 242)).  In determining whether "cause" exists, courts have considered various
factors, including (i) the materiality of the misconduct, (ii) lack of evenhandedness in
dealings with insiders or affiliates vis-à-vis other creditors, (iii) the existence of pre-
petition voidable preferences or fraudulent transfers, (iv) the inability or unwillingness of
management to pursue estate causes of action, (v) managerial conflicts of interest that
interfere with management's ability to fulfill fiduciary obligations, and (vi) self-dealing
by management or waste of corporate assets. *See In re Intercat, Inc.*, 247 B.R. 911, 921
(Bankr. S.D.Ga. 2000).

43.    Because "cause" is fact-driven and section 1104(a)(1) is inclusive rather
than exclusive, management misconduct, such as that found by the Examiner in these
cases, is not the only "cause" that would support the appointment of a trustee, and indeed

is not the only "cause" present in this case. As will be discussed below, the conflicts that pervade the Debtors, the LBO Lenders, and the Committee, and which infect their self-interested actions, leading to needless acrimony and deadlock, also strongly compels the appointment of a trustee.

**B.    Management's Dishonesty and Fraud Are Cause to Appoint a Trustee**

44.    The appointment of a trustee is mandatory where, as here, management acts dishonestly or fraudulently. *See In re PRS Ins. Group, Inc.*, 274 B.R. 381, 385 (Bankr. D. Del. 2001) (appointing a trustee for cause and holding that the debtor's inability to provide any explanation for diversion of funds was evidence of incompetence, gross mismanagement, or fraud); *see also In re Bibo, Inc.*, 76 F.3d 256, 257-58 (9th Cir. 1996) (appointment of a trustee was mandated where management had siphoned funds from the debtor through kickbacks); *Sharon Steel*, 871 F.2d at 1228 (systematic siphoning of debtor's assets to other companies under shareholder's common control constituted cause for appointment of trustee); *In re Colby Constr., Inc.*, 51 B.R. 113, 116 (Bankr. S.D.N.Y. 1985) (majority shareholder's "deliberate and unabashed conversion of corporate assets to acquire another company in his own name indicates the scienter implicit in fraud as that term is used in § 1104(a)(1) or at least the dishonesty contemplated by that section"). In other words, improper conduct by a debtor's management has long been held to require the appointment of a trustee. Moreover, courts have found that a debtor cannot avoid appointment of a trustee by making last-minute management changes. *See Sharon*, 871 F.2d at 1229 ("Corrective measures that are too few too late cannot defeat a change in command."); *In re Microwave Prods. of America*, 102 B.R. 666, 676 (Bankr. W.D.Tenn. 1989) ("While the debtor argues that it has shored

up its operations by employing a management group, corrective measures that are too few and too late, cannot defeat a change in management.").

45.    Notably, section 1104(a)(1) of the Bankruptcy Code requires a trustee appointment based on *either* pre-petition *or* post-petition bad acts by current management. *Sharon Steel*, 871 F.2d at 1228 (upholding trustee appointment where debtor's "management appears to have engaged on the eve of bankruptcy in a systematic siphoning of Sharon's assets to other companies under common control"). Pre-petition actions are pertinent to post-petition reorganization efforts because "such behavior raises grave questions about current management's ability to fulfill its fiduciary duty as debtor-in-possession to [its] creditors." *Id.* But last-minute or after-the-fact management changes (or a "Hail Mary" plan that is thrown out for the parties to wrestle over) will not cure the harm already done. These cases are two years old. The recently withdrawn "Settlement Plan" was the product of unremedied and unchecked conflicts of interest – the desire of the fraudulent transferors to protect their management, and the desire of the fraudulent transferees to maximize their return and minimize their exposure. The process by which the architects and the beneficiaries of these destructive transactions sought to hijack these cases has left no room for any continuing role by the Debtors.

46.    The Debtors' well-documented pattern of dishonesty both pre- and post-petition leaves no doubt that they cannot be trusted as caretakers of the estates for the benefit of creditors. Numerous current members of management and the Board are the same individuals that have their fingerprints on the LBO Transactions. A key obstacle to resolution of these cases has been clear since the outset: the Debtors have too much leverage and have chosen to abandon the interests of their stakeholders in favor of

protecting management, directors and the LBO Lenders.  This is a case that screams out for appointment of a trustee.

### 1.  Management's and Directors' Dishonesty and Mismanagement During the LBO

47.     Management's dishonesty relating to the LBO Transactions is well-documented and supported by the Examiner's independent conclusions.  As discussed above, the Examiner generally found that acts of certain members of senior management "go well beyond gross negligence or recklessness but enter into the terrain reserved for intentional misconduct."  Specifically, the Examiner found, among other things, the following instances of management dishonesty or mismanagement:

- Acting with dishonesty or lack of candor to accomplish Step Two of the LBO – a transaction severely prejudicial to creditors, but highly profitable for management and shareholders.  (Examiner Rep. Vol. II at 25-26; 76).

- Misrepresentations to the board, the Company's advisors and the LBO Lenders regarding Morgan Stanley's agreement about Tribune's ability to refinance.  (Examiner Rep. Vol. I at 558-80; 583-86).

- Deliberately misstating financial projections for the out-years, 2013 to 2017.  (Examiner Rep. Vol. I at 465-70).

48.     With respect to the Debtors' financial projections, the Examiner determined that it is:

> implausible that members of Tribune's senior financial management believed in good faith that the out-year growth assumption contained in the October 2007 forecast (or the related Tribune representation letter) represented a reasonable estimate of Tribune's future performance.  Rather, this assumption bears the earmarks of a conscious effort to counterbalance the decline in Tribune's 2007 financial performance and other negative trends in Tribune's business, in order to furnish a (very significant) source of additional value to support a solvency conclusion.

(Examiner Rep. Vol. II at 63).  The Examiner went on to state that "the instances of dishonesty and lack of candor [exhibited by senior financial management in connection

with the LBO Transactions] are *evidence of consciousness that proceeding honestly and with candor would jeopardize the Step Two Closing*." (Examiner Rep. Vol. II at 76-77) (emphasis added).

49.    Likewise, the Examiner found that management misled the Board, VRC and the LBO Lenders regarding the Debtors' ability to refinance maturing debts – which led directly to the closing of the LBO Transactions and, thus, the Debtors' insolvency. Specifically, the Examiner concluded that:

> (i) the statements of Mr. Grenesko and/or Mr. Bigelow [Tribune's senior financial management] to Mr. Browning [of VRC] on December 2, 2007 concerning Morgan Stanley's views on the refinancing questions *were not accurate*; (ii) these statements appear to have served as a predicate on which VRC concluded that it would accept Tribune's representation on Tribune's ability to refinance; (iii) the statements contained in Tribune's representation letter to VRC on refinancing referring to management's discussions with Morgan Stanley *created a false impression* that Morgan Stanley told management it concurred with management's views concerning the refinancing question; (iv) the statements apparently made by Tribune to the Lead Banks concerning Morgan Stanley's involvement in VRC's opinion *were false*; and (v) the preceding events led directly to VRC's issuance of its Step Two opinion letter, the solvency certificate, the solvency representation, and hence the Step Two Closing."

(Examiner Rep. Vol. II at 42-43). As discussed above, the Examiner further found that management's dishonesty may have been motivated by self-interest – namely, the desire to receive cash bonuses and stock awards. (Examiner Report. Vol. II at 25-26).

50.    Neither was the Board or the Special Committee free from blame. Far from it. The Examiner found that "when the baton was handed from Tribune management to the Tribune Board and Special Committee in December 2007 to consider the question of VRC's solvency opinion, *the directors failed to adequately perform their responsibilities*." (Examiner Rep. Vol. II at 63) (emphasis added). The Examiner found that "had anyone performed a relatively simple mathematical calculation before Step

Two closed, it would have been readily apparent that … VRC's [solvency] opinion was

highly suspect." (Examiner Rep. Vol. II at 63). Notably, the Board failed to retain an

outside advisor in connection with VRC's work at Step Two (Examiner Rep. Vol. II at

64-65; 72-73) and the Special Committee only "met once after the Step One Financing

Closing Date [for only fifteen (15) minutes] . . . to consider the question of Tribune's

solvency and VRC's solvency opinion." (Examiner Rep. Vol II at 64-65, 67). The

Examiner determined that the Board and Special Committee virtually ignored all of the

red flags associated with the LBO Transactions, and knew or should have known that:

> (i) the Tribune Entities' financial performance had deteriorated
> appreciably after Step One and that the Step Two Closing would subject
> the Tribune Entities to $3.6 billion more debt; (ii) management's February
> 2007 projections had missed the mark only shortly after those projections
> were issued; (iii) management's October 2007 projections served as the
> foundation for VRC's opinion and members of senior management were
> to receive significant additional compensation if Step Two closed and
> might be looking for continued employment under the auspices of the new
> owners; (iv) VRC was relying on management's projections as the critical
> underpinning of its solvency opinion; (v) VRC had been required in its
> engagement letter to use a definition of "fair market value" and "fair
> saleable value" that was contrary to long-established principles of sound
> valuation and that directly affected VRC's solvency conclusions at Step
> Two; and (vi) market indicia were strongly suggesting that incurrence of
> the Step Two Debt would render Tribune insolvent.

(Examiner Report Vol. II at 73). The Examiner found that the Board and Special

Committee, like management, may have been enticed by lucrative stock awards.

Whether it was blind self-interest or merely apathy, it is clear that the Board and the

Special Committee abandoned their responsibilities in the Debtors' time of need, and that

"their acquiescence [in management's conduct] allowed Step Two to close when it should

not have." (Examiner Report Vol. II at 76).

    51.    In sum, the Examiner identified multiple instances of dishonesty and self-

dealing by, among others, Mr. Bigelow. Mr. Bigelow remains, to this day, the CFO of

Tribune and the Vice President and Treasurer of certain Guarantor Subsidiaries, and presumably participated in formulating the Debtors' Settlement Plan. In addition, the Examiner found that management's actions went virtually unchecked by the Board and the Special Committee – in dereliction of the Board and Special Committee's responsibilities. Despite the Examiner's findings, the Debtors have failed to terminate Mr. Bigelow for the misconduct cited in the Examiner Report. Nor have the Debtors taken any remedial measures with respect to their Board. In fact, certain of the Debtors' Board members who allowed the LBO Transactions to proceed are still serving on the Debtors' Board, each expecting a release from any liability resulting from the transactions that left the Debtors' insolvent, and none required to contribute in any way to recovery by the Debtors' creditors.

52.     If the Debtors' CFO cannot be trusted, and the Board cannot adequately supervise its officers, the Debtors cannot be trusted to carry out their duties and fiduciary obligations. This alone is "cause" for appointment of a trustee under Bankruptcy Code section 1104(a)(1).

## 2.     The Debtors' Concealment Of Post-Petition LBO Lender Fee Reimbursements

53. The Debtors' undisclosed payment of certain LBO lenders' bank fees also exemplifies the Debtors' lack of candor and disregard of the policy of transparency inherent to every chapter 11 proceeding. As became evident from the disputes surrounding the Fee Disgorgement Motion, the Debtors schemed with JPMorgan to circumvent appropriate disclosure to the Court and creditors (other than the Committee and the United States Trustee) that a non-Debtor affiliate reimbursed approximately $16.1 million of the LBO lenders' fees and expenses relating to these chapter 11 cases,

*including the prospective defense of claims relating to the LBO Transactions.  See*
Motion of Law Debenture Trust Company of New York to Terminate Debtor Affiliates
Undisclosed Payment of LBO Lenders Fees and Expenses, for an Accounting, and for
Disgorgement of Past Payments Filed by Law Debenture Trust Company of New York
[Docket No. 2407] at 5-10; Reply of Law Debenture Trust Company of New York in
Support of its Motion to Terminate Debtor Affiliates Undisclosed Payment of LBO
Lenders Fees and Expenses, for an Accounting, and for Disgorgement of Past Payments
[Docket No. 2631] at 2-4; Stipulated Facts in Connection With March 26, 2010 Hearing
on Law Debenture Trust Company of New York to Terminate Debtor Affiliates
Undisclosed Payment of LBO Lenders Fees and Expenses, for an Accounting, and for
Disgorgement of Past Payments [Docket No. 3657] at ¶ 72.  Thus, the Debtors not only
continued their lack of candor, but they did so for the benefit of parties seeking to thwart
the estates' claims against the LBO Lenders.

C.      **The Debtors' Conflicts of Interest Are Cause to Appoint a Trustee**

54.      Cause for trustee appointment is not limited to fraud, dishonesty,
incompetence or gross mismanagement, but can occur where, as here, the debtor's
conflicts of interest taint the restructuring process.  *See Marvel,* 140 F.3d at 472 ("It is
significant that the language of § 1104(a)(1) does not promulgate an exclusive list of
causes for which a trustee must be appointed, but rather provides that a trustee shall be
appointed 'for cause, including fraud, dishonesty, incompetence, or gross
mismanagement . . . *or similar cause*'") (internal citations omitted) (emphasis added).

55.      "The willingness of Congress to leave a debtor-in-possession is premised
on an expectation that current management can be depended upon to carry out the
fiduciary responsibilities of a trustee.  And if the debtor-in-possession defaults in this

32

respect, Section 1104(a)(1) *commands* that the stewardship of the reorganization effort must be turned over to an independent trustee." *Marvel*, 140 F.3d at 474 (internal citations omitted) (emphasis added). Indeed, the "inability to fulfill fiduciary duties of a debtor-in-possession is itself cause to appoint a trustee." *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D.Ill. 1994).

56.    "As a *de jure* trustee, the debtor-in-possession holds its powers in trust for the benefit of creditors," *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 524-25 (Bankr. E.D.N.Y. 1989), and the "debtor-in-possession's fiduciary obligation to its creditors includes refraining from acting in a manner that could damage the estate or waste its assets." *Jackson v. Levy*, 2000 U.S. Dist. LEXIS 825, at *19 (S.D.N.Y. Feb. 2, 2000); *see also In re Holly's, Inc.*, 140 B.R. 643, 686 (Bankr. N.D. Mich. 1992) ("When a debtor in possession breaches its fiduciary duties, this section provides a meaningful remedy to remove the debtor in possession and obtain an independent trustee fiduciary to administer the estate").[7] As described in paragraph 33, *supra*, the Examiner found that management's misconduct in connection with Step Two was intentional – going far beyond gross negligence or recklessness, and that, as a result of this intentional misconduct, it is "reasonably likely" that a court would find that management breached its fiduciary duties to the Debtors. (Examiner Rep. Vol. II at 386-87). Consequently, the Debtors have an inherent and irreconcilable conflict in supporting – let alone bringing – a fraudulent transfer action that, at its core, is based on management's misconduct.

---

[7]    Delaware law, which governs the Debtors' internal corporate affairs, precludes fiduciaries from exalting their own interests at the expense of corporate stakeholders. *See Solash v. Telex Corp.*, 1988 WL 3587, *7 (Del. Ch. 1988) ("[T]he duty of loyalty is transgressed when a corporate fiduciary, whether director, officer, or controlling shareholder, uses his or her corporate office or, in the case of a controlling shareholder, control over corporate machinery, to promote, advance, or effectuate a transaction between the corporation and such person. . . and that transaction is not substantially fair to the corporation.").

57.    Where, as here, a conflict results in a debtor's unwillingness to pursue causes of action against insiders or third parties, cause exists to appoint a trustee. *See, e.g., Sharon Steel*, 871 F.2d at 1220-21 (affirming appointment of trustee due, in part, to the debtor's refusal to pursue avoidance actions); *In re PRS Insurance Group, Inc.*, 274 B.R. at 388-89 (holding that appointment of trustee was warranted where debtor was unwilling to pursue valuable causes of action against insiders); *In re Oklahoma Refining Co.*, 838 F.2d 1133, 1135-36 (10th Cir. 1988) (appointment of trustee was required where the debtor would have to sue affiliates for accounts receivable due); *In re Microwave Prods. of America, Inc.*, 102 B.R. 666, 676 (Bankr. W.D.Tenn. 1989) (holding that debtor's failure to investigate potential avoidable transfers to insiders "weigh[s] heavily in favor of appointing a trustee.").

58.    Further, the Debtors have repeatedly attempted to obstruct the LBO-Related Causes of Action as evidenced by their delay in commencing an investigation of those causes of action and by opposing the appointment of an Examiner. The Debtors' malaise in this regard is likely a result of the fact that the Debtors' management and directors are fearful of (i) exposing themselves to litigation and/or (ii) losing their jobs in the event the LBO Lenders end up owning a significant amount of the Debtors' equity.

59.    The Debtors' conflicts and their resulting unwillingness to date to pursue the LBO-Related Causes of Action against insiders and the LBO Lenders has tainted their ability to formulate a confirmable plan and constitutes mismanagement warranting appointment of a trustee. Absent plan releases, the Debtors' lead decision-makers – including Samuel Zell and Mr. Bigelow – face massive litigation exposure. Clearly, the management and the directors have a vested interest in ensuring that any plan releases

34

them from (or minimizes) liability. Moreover, the same banks that would be targets of LBO-Related Causes of Action are set to be the future owners of the company under the proposed Plan. These banks have exerted a great amount of control over the plan process, and are doing everything in their power to ensure that they too are released from any potential liability without adequately compensating the pre-LBO creditors. The Debtors' self-interest coupled with fiduciary duties to all creditors creates an irreconcilable conflict of interest. Like in *Marvel*, that "deep-seeded conflict" prevents the Debtors from carrying out their obligations independently and dutifully, and has caused the stakeholders to lose further confidence in the Debtors' ability to act as fiduciaries.

60.    The Debtors' recent – and belated – establishment of another "Special Committee" of independent directors to structure a plan of reorganization and address "the appropriate resolution of causes of action relating to the LBO" (the "New Special Committee") is too little too late. *See* Application for an Order Authorizing the Retention of Jones Day As Special Counsel for the Special Committee of Tribune Company's Board of Directors [Docket No. 5562] at 4. Indeed, courts have found that a debtor cannot avoid appointment of a trustee by making such last-minute leadership changes. *See Sharon*, 871 F.2d at 1229 ("Corrective measures that are too few too late cannot defeat a change in command."); *In re Microwave Prods. of Am.*, 102 B.R. at 676 ("While the debtor argues that it has shored up its operations by employing a management group, corrective measures that are too few and too late, cannot defeat a change in management.").

61.     The Debtors' actions in this regard are akin to the burglar who puts the silver back in the china cabinet when the homeowner switches on the lights.  Now that the Examiner has turned on the lights in these cases, the only way to restore creditor confidence and put integrity back into the process is to remove the Debtors from the plan process and replace them with a trustee.  Indeed, Aurelius is unaware of any law of corporate governance that prevents the Debtors from disbanding the New Special Committee whenever they choose.  After all, the Debtors delayed appointing the New Special Committee until now and a contrary whim could just as easily cause them to disband it.  That the establishment of the New Special Committee is mere window dressing is evidenced by the fact that counsel for the New Special Committee *and* counsel for the Debtors are participating in the Mediation.  If the New Special Committee were truly intended to be the Debtors' decision-making body with respect to the negotiation of a plan of reorganization (including the resolution of the LBO-Related Causes of Action), there would be no need for the Debtors and the New Special Committee to each be represented in the Mediation.[8]  Moreover, if the Debtors were truly concerned about their conflicts in connection with the LBO-Related Causes of Action, they would have sought to establish the New Special Committee long before the conflict-plagued Settlement Plan was formulated and declared dead on arrival.

---

[8] On this point, it bears noting that not only are the Debtors themselves riddled with conflicts but their counsel – Sidley Austin LLP ("Sidley Austin") – appears conflicted as well.  According to the LBO documents, it appears that Sidley Austin was intricately involved in the tainted LBO Transactions.  For example, the Senior Loan Agreement (i) required "favorable written opinions (or reliance letters) of . . . Sidley Austin LLP, special counsel for the Loan Parties;" *see* Senior Loan Agreement at 59; and (ii) provides that notices should be made to the Borrower, "with a copy to Sidley Austin LLP, at 1 South Dearborn Street, Chicago, Illinois 60603, Attention: Robert Lewis, Esq." *Id.* at 92.  Regardless of whether any parties previously objected to Sidley Austin's conflict in negotiating a settlement of claims arising from transactions that it helped orchestrate, the absence of such objections does not make the conflicts go away.  *In re Project Orange Associates, LLC*, 431 B.R. 363, 374 n.4 (Bankr. S.D.N.Y. 2010) ("Identifying conflicts does not involve a game of 'gotcha,' where disclosure of a conflict party in one schedule excuses counsel from the consequences of a conflict if no one finds the earlier disclosure and objects.").

36

62.     The simple, stark reality is that the record in these cases readily demonstrates that the Debtors have not acted as a neutral fiduciary in the plan process. The Debtors have also consistently denied the strength of the LBO-Related Causes of Action as evidenced by their pursuit of the Settlement Plan and by opposing the appointment of an Examiner.  Additionally, numerous current members of management and the Board are the same individuals that have their fingerprints on the LBO Transactions.

**D.    Acrimony Among the Parties Is Cause to Appoint a Trustee**

63.     In cases of extreme acrimony among the parties, courts have found that "cause" exists to appoint a trustee.  In *Marvel Entertainment*, the Third Circuit held that a "court may find cause to appoint a trustee for 'acrimony' . . . when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor, or . . . when the parties 'begin working at cross-purposes.'"  *Marvel*, 140 F.3d at 474-75.

64.     The *Marvel* court noted three key lower court findings supporting appointment of a trustee.  First, the Third Circuit observed that "[t]he intense and high-stakes bickering between the Icahn interests and the Lenders does not instill confidence that the Icahn interests could fairly negotiate with the creditors to whom they owe these duties, nor that reorganization will occur effectively."  *Id.* at 474.  In other words, the lower court and Court of Appeals saw "no reasonable likelihood of any cooperation between the parties in the near future."  *Id.* at 473.  Second, the Third Circuit noted that that due to the Icahn parties' dual roles as both lenders and debtors-in-possession, an "unhealthy conflict of interest was manifest in the 'deep-seeded conflict and animosity' between the Icahn-controlled debtor and the Lenders and in the lack of confidence all creditors had in the Icahn interests' ability to act as fiduciaries."  *Id.*  Third, the Court

37

found that "this is a large and messy bankruptcy that promises to get worse without a disinterested administrator at the helm." *Id.*

65.     Here, there is abundant cause to appoint a trustee on the basis of acrimony and deadlock. The Debtors' dishonesty and conflicts have impeded a resolution of these cases and have created acrimony warranting the appointment of a Chapter 11 trustee. Likewise, the unwillingness of the LBO Lenders to properly heed the credible litigation risks validated by the Examiner Report has led to a deadlock. In short, the Debtors, the LBO Lenders and the pre-LBO creditors are at an impasse that may or may not be overcome through mediation. The Debtors, on one hand, are controlled by parties who were active participants in the downfall of the company, and who are either potential targets of the LBO-Related Causes of Action or persons trying to protect those targets. As a consequence, the Debtors have been strongly lobbying in favor of a plan that included releases for their officers and directors. On the other hand, you have the LBO Lenders (and future owners of the Debtors), who are also potential targets of the LBO-Related Causes of Action for the avoidance of debt and the recovery of over $2 billion in principal payments, interest and fees that are subject to disgorgement. They too want releases and are doing everything possible to validate otherwise avoidable claims and to protect from disgorgement the amounts received from the Debtors on account of such claims. Finally, you have the pre-LBO creditors, including the Senior Noteholders, who are innocent bystanders most entitled to the benefits of avoidance of the fraudulent transfers – caught in a vise between the self-interested Debtors and self-interested LBO Lenders.

38

66.    The gulf and stalemate between creditor constituencies in theses cases is
further evidenced by the factions that have developed among the LBO Lenders. For
example, certain Step One Lenders – who do not have material exposure to Step Two
debt – have recently formed a separate ad hoc committee and retained counsel. *See*
Notice of Appearance Filed by Ad Hoc Committee of Step One Senior Lenders [Docket
No. 5493].

67.    This Court has noted on numerous occasions, including most recently at
the August 20th hearing, and all parties will agree, that these Chapter 11 cases have been
highly "contentious" and have "lurched along" without resolution for far too long.
Indeed, December of this year will mark the two-year anniversary of these cases, and the
parties find themselves no further along in the plan process than they were months ago.
To the contrary, as of the date of this Motion, there is no end in sight. Clearly, without an
independent trustee, the differences between the parties – with such disparate and
conflicted interests – are not likely to ever be bridged.

**E.    Lack of Creditor Confidence and Inability to
Confirm A Plan Are Cause to Appoint a Trustee**

68.    "Cause" also exists to appoint a trustee because the stakeholders have
completely lost confidence in management's ability to act as an "honest broker" or to
propose a confirmable plan. It is well-established that appointment of a trustee is
warranted "when a debtor's failure to move a case forward in the direction of a successful
reorganization has caused the creditors to lose confidence that reorganization is, in fact,
possible with current management at the helm." *Taub v. Taub (In re Taub)*, 427 B.R.
208, 228 (Bankr. E.D.N.Y. 2010) (quoting *In re Sundale, Ltd.*, 400 B.R. 890, 909-10
(Bankr. S.D.Fla. 2009)). For the reasons set forth above, including dishonesty by the

Debtors both before and after the Petition Date, conflicts of interest, and the already existing (and rising) acrimony among the parties, Aurelius has lost all confidence that the Debtors can or will propose a confirmable plan.

69.     The Debtors' actions, which include vigorously opposing the appointment of an Examiner, have proven that the Debtors are ineffective brokers and refuse to resolve issues globally. The Debtors want to protect management and appease their new owners – the LBO Lenders. This myopic view of the world renders the Debtors unable to dispassionately accept the Examiner Report for the game-changing document that it is. Instead, the Debtors choose to view the Report as a mere speed bump on the exit ramp from Chapter 11. The problem is that holders of <u>billions</u> of dollars of pre-LBO debt do not see it that way. The Debtors' actions, inactions, and management allegiances, surrounded by bitter fighting among all parties "do[] not instill confidence that the [Debtors] could fairly negotiate with the creditors to whom they owe [] duties, nor that reorganization will occur effectively." *Marvel*, 140 F.3d at 474; *see also In re Cardinal Indus.*, 109 B.R. 755, 765-66 (Bankr. S.D. Ohio 1990) ("The fundamental problem in these cases is that there has been a serious and general loss of confidence in the Debtors' management. The alleged loss of confidence does not appear to the Court to be a ploy, but follows good faith efforts by the Creditors to permit the Debtors to direct their own reorganizations. The confidence problem has not resulted from one specific problem, but came about because of many events which, when seen in combination, make it appear that the Debtors are not properly in control of their reorganizations and should no longer be permitted to direct the process . . . . Further erosion resulted from the continued appearance of certain conflicts of interest . . . ."); *In re Madison Mgmt. Group, Inc.*, 137

B.R. 275, 281 (Bankr. N.D. Ill. 1992) ("lack of confidence in the debtor's management

may constitute cause" under section 1104(a)(1)); *In re Colorado-Ute Elec. Ass'n, Inc.*,

120 B.R. 164, 176 (Bankr. D. Colo. 1990) (creditor's "sincere[] and justifiabl[e] lack

confidence in management" supported appointment of trustee under section 1104(a)(1)).

70.     Resolving those conflicts and restoring confidence in the process requires

an independent fiduciary without a stake in the litigation.  The Debtors' insistence on

releases, and willingness to abandon the interests of their creditors to achieve them,

derails any productive discussions.  Accordingly, Aurelius respectfully submits that

ample "cause" exists to appoint a trustee under Bankruptcy Code section 1104(a)(1).

Moreover, for the reasons discussed in detail in Section II, *infra*, appointing a Chapter 11

trustee is in the best interests of all stakeholders, as it shall pave the way for an effective

reorganization, which now is unattainable.

## II.

## TRUSTEE APPOINTMENT IS IN THE BEST
## INTERESTS OF ALL STAKEHOLDERS

### A.     Legal Standard

71.     Section 1104(a)(2) of the Bankruptcy Code requires trustee appointment if

such appointment is in the interest of creditors, any equity security holders, and other

interests of the estate.  A court's determination under section 1104(a)(2) is made by

applying a "flexible standard," *Marvel*, 140 F.3d at 474, and "courts eschew rigid

absolutes and look to the practical realities and necessities. "Subsection (a)(2) allows

appointment of a trustee even when no 'cause' exists" if doing so would be in the best

interest of the debtor's estate and its creditors. *Sharon Steel*, 871 F.2d at 1226. Among

the factors considered are: (i) the trustworthiness of the debtor; (ii) the debtor in

possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence – or lack thereof – of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (internal citations omitted).

72.    While the interests of all stakeholders should be taken into account in the Court's determination of whether to appoint a trustee, where, as here, there is a large group (the pre-LBO creditors) whose interests are under assault by Debtors who are unwilling to challenge their own LBO (which would mean acknowledging the misconduct, self-dealing, and lack of good faith of its management and gross negligence of its Board) and by LBO Lenders who want to evade financial responsibility for sinking the Debtors with excessive debt and draining it with huge payments of principal, interest and fees, special regard must be given to the rights of those besieged stakeholders in order to assure that there is a level playing field. A trustee provides that level playing field.

73.    As characterized in *In re V. Savino Oil & Heating Company*, "[Section] 1104(a)(2) reflects the practical reality that a trustee is needed [and] [w]here . . . no meaningful progress towards reorganization is possible because of deep rooted animosities between a Debtor and major creditors, an independent reorganization trustee may well be necessary to insulate the reorganization process from paralytic conflict." 99 B.R. at 527; *see also In re Taub*, 427 B.R. at 229 (appointing trustee where "the record shows by clear and convincing evidence that the Debtor has not been successful in navigating the Chapter 11 process in a productive way" because"[t]he Debtor's

relationships with many of her creditors, tenants, and other parties in interest are contentious, acrimonious, and unproductive . . . [and] extend well beyond the healthy conflicts that always exist between debtor and creditor"); *In re Eurospark Indus.*, 424 B.R. 621, 630 (Bankr. E.D.N.Y. 2010) ("acrimony between the creditors and the debtor's management, standing alone, has been found to be a basis to appoint a chapter 11 trustee under § 1104(a)(2)").

**B.    Appointing a Trustee Is in the Best Interests of All Stakeholders**

74.    Without an independent trustee, it is unlikely that a plan can get confirmed and that the Debtors will emerge from bankruptcy in the near future. Thus, the "practical realities and necessities" mandate trustee appointment.

75.    The situation here falls squarely within the *Ionosphere* factors. First, given the Examiner's findings of dishonesty and obfuscation, as well as the Debtors' post-petition, clandestine dealings, the Debtors' management team and, thus, the Debtors are not trustworthy. Second, inasmuch as the Debtors are unable to act as honest brokers in the plan process and to reconcile conflicting views in an arena of extreme hostility, there is no reasonable likelihood of a reorganization with the Debtors at the helm. Third, Aurelius has lost all confidence in management in light of their dishonest behavior in ramming through the grossly injurious LBO Transactions, surreptitious payment of LBO Lenders' fees and expenses, as well more recent schemes perpetrated by management in an effort to protect its members and the LBO Lenders, without regard to costs inflicted on others. Fourth, the benefits of trustee appointment -- *e.g.*, representation of the interests of all stakeholders by a neutral intermediary lacking any agenda or design, who shall conduct meaningful and productive plan negotiations – vastly outweigh any corresponding costs. It is anticipated that the Debtors will argue that trustee appointment

43

will interrupt business operations, but that is simply not true; a trustee is free to retain whichever managers and employees he or she sees fit (and finds honest) to ensure that business continues as usual.

### 1.    Appointing a Trustee is Critical in Light of Committee's Significant Conflicts of Interest

76.    Aside from Aurelius's concerns about the Debtors, appointing a trustee is especially critical in these Chapter 11 Cases, where the Committee is advised by conflicted legal counsel and has seemingly abandoned its largest constituency by acting in the interest of certain of its members to the detriment of others. The Committee and its counsel are severely conflicted because one of the Co-Chairs of the Committee is an LBO Lender (JPMorgan) and main Committee counsel ("Chadbourne") represents JPMorgan, numerous LBO Lenders, certain of the financial advisors engaged in connection with the LBO Transactions, and certain of Tribune's insurance carriers in other matters. In light of the findings in the Examiner Report, it is clear that resolution of the LBO-Related Causes of Action is critical to the Debtor's reorganization prospects and their ability to confirm a plan. As such, Chadbourne's conflicts with LBO Lenders and others have undermined the ability of the Committee to act for the benefit of its principal constituents, including the Senior Noteholders, and it has utterly failed to effectively represent those interests.[9]

77.    In a recent case decided by the United States Bankruptcy Court for the Southern District of New York, the court stressed the importance of retained professionals being free from conflict with respect to critical parties to a debtor's Chapter

---

[9] The issues concerning Chadbourne's conflicts of interest have been presented to the Court in the Motion of Aurelius Capital Management, LP to Disqualify Chadbourne & Park LLP from Acting on Behalf of the Official Committee of Unsecured Creditors in Matters in Which It Has Conflicts of Interest, which has been filed concurrently herewith.

11 case. Specifically, the court held that, where main counsel has a conflict with a creditor that is "central to the debtor's reorganization[,]" the retention of conflicts counsel will not save conflicted main counsel from disqualification. *In re Project Orange Associates*, LLC, 431 B.R. 363, 376 (Bankr. S.D.N.Y. 2010) [hereinafter "*Project Orange*"] (citing *In re Amdura Corp.*, 121 B.R. 862 (Bankr. D.Colo. 1990). In *Project Orange*, DLA Piper sought retention as debtor's counsel under Bankruptcy Code section 327(a). *Id.* at 365. In connection with their retention application, DLA Piper disclosed that the firm represented General Electric, one of the debtor's largest creditors who was critical to the debtor's reorganization prospects, and that "DLA Piper's work for the GE entities constituted .92% of revenue in 2008, 1.6% of revenue in 2009, and has accounted for .90% of revenues to date in 2010." *Id.* at 368. DLA Piper asserted that it was "disinterested" for the purposes of Bankruptcy Code section 327(a) because, among other things, the debtor had retained conflicts counsel to "handle all matters for which DLA Piper cannot adequately represent the Debtor," including matters involving GE. *Id.* at 368-69. The court disagreed, holding that DLA Piper could not be retained as lead counsel under Bankruptcy Code section 327(a) because it was conflicted with a creditor with a central role in the case. *Id.* Indeed, where a professional is conflicted with a party with whom resolution of disputes "could be the 'lynch-pin of the case,'" that conflict cannot be "resolved through the use of alternative counsel." *Id.* (quoting *Amdura Corp.*, 121 B.R. at 867).

78.     As in *Project Orange*, Chadbourne's relationship with JPMorgan, numerous LBO Lenders, and others – parties at the center of the LBO-Related Causes of Action and who are critical to the Debtors' reorganization – disqualifies the firm from

purporting to represent the interests of all unsecured creditors, which of course, includes the Senior Noteholders. The Affidavit of David M. LeMay, filed in connection with Chadbourne's retention application, discloses that "[f]or the two year period of 2007 through 2008, fees paid to Chadbourne by [Citigroup Inc. and its affiliates] have averaged approximately 4% of Chadbourne's gross revenue." (LeMay Affidavit, ¶ 10). In addition, "approximately 1-3% of Chadbourne's annual gross revenue" for the "two year period of 2007 through 2008" was on account of fees paid by Morgan Stanley. (LeMay Affidavit, ¶11). By Committee counsel's own account, those two interested parties, alone, make up 7% of Chadbourne's gross revenue – significantly more than the disabling conflicts present in *Project Orange*. But the conflicts do not stop there. Chadbourne's conflicts search summary reveals, *inter alia*, that Chadbourne actively represents over one-hundred (100) of the Debtors' prepetition lenders, including JPMorgan, Merrill Lynch, Deutsche Bank, Bank of America, Oaktree Capital Management, LLC and numerous other financial institutions that received prepetition principal payments, interest and fees that are now subject to disgorgement, and that are possible litigation targets in the LBO-Related Causes of Action. (LeMay Affidavit, Exhibit 2). As a result of these disabling conflicts, Chadbourne is not an adequate representative of all of its stakeholders – and definitely not an adequate representative for the Senior Noteholders.

79.     In response to the foregoing, Chadbourne may point out that its February 16, 2009 supplemental affidavit disclosed that "Chadbourne obtained written confirmation from [JPMorgan] and Merrill Lynch, respectively, of Chadbourne's ability to review and investigate certain possible avoidance and litigation issues potentially

arising in connection with (i) the Senior Credit Agreement dated May 17, 2007, as

amended, . . . and (ii) the Senior Unsecured Interim Term Loan Agreement dated

December 20, 2007 . . . and to negotiate with [JPMorgan] and Merrill Lynch,

respectively, concerning such issues . . . ." First Supplemental Affidavit of David M.

LeMay in Connection with the Retention and Employment of Chadbourne & Parke LLP

as Counsel to the Official Committee of Unsecured Creditors [Docket No. 395] ¶ 4.

80.    However, notwithstanding the fact that JPMorgan and Merrill Lynch have

consented to Chadbourne negotiating with them on behalf of the Committee – which is

hardly surprising – it is not in the interests of *the unsecured creditors* for Chadbourne to

be representing them in negotiations against these major financial firms that are important

clients of Chadbourne.  In light of the significance of the LBO-Related Causes of Action

to the Debtors' estates, it seems patently improper for conflicted counsel such as

Chadbourne to be representing the Committee with respect to the evaluation, negotiation

and possible settlement of such claims.  Such cozy arrangement may be acceptable to

JPMorgan and Merrill Lynch, but it is not in the interest of unsecured creditors on whose

behalf Chadbourne is purporting to advocate in a fiduciary capacity.

81.    Moreover, the retention of "conflicts" counsel is ineffective where, as

here, main counsel has been involved in advising Committee members concerning

negotiations with the LBO Lenders and the LBO-Related Causes of Action.  Indeed, the

Committee's application to retain Zuckerman Spaeder LLP ("Zuckerman") as conflicts

counsel states that "Chadbourne advised the Creditors' Committee that, while it would be

able to *investigate and conduct settlement negotiations with the lenders in the Leveraged

ESOP Transactions and would be able if necessary to pursue litigation against many of*

*the participants in the Leveraged ESOP transactions*, Chadbourne would be unable

because of conflicts to bring claims against certain of such lenders . . . ." Application to

Employ and Retain Zuckerman Spaeder LLP as Special Counsel to the Official

Committee of Unsecured Creditors [Docket No. 1953] ¶ 9 (emphasis added).  The

application goes on to state that Zuckerman is being engaged "to *assist* in the further

investigation of the leveraged ESOP Transactions, and in negotiations with respective

lenders, and the Debtors toward a consensual resolution of any claims if such a resolution

can be achieved on terms that are satisfactory to the Committee . . . ." *Id.* ¶ 10 (emphasis

added).

　　　　82.　　Thus, although the Committee retained special conflicts counsel to handle,

*inter alia*, settlement negotiations, and despite their disabling conflicts, Chadbourne has

continued to be actively involved in the plan negotiation process and the LBO-Related

Causes of Action.[10]  For example, in their most recent fee application covering July 2010,

Chadbourne disclosed the following activities:

>　　• 243.8 hours ($148,679.00) on matters related to the Examiner's Report
>　　and the LBO-Related Causes of Action.  Nineteenth Monthly
>　　Application of Chadbourne Parke LLP for Compensation of and
>　　Reimbursement of Expenses for the period July 1, 2010 to July 31,
>　　2010 ¶ 34 [Docket No. 5502].  Specifically, "Chadbourne's team of
>　　professionals analyzed and researched various discrete issues raised in
>　　the report.  In addition, Chadbourne participated in discussions with
>　　the Committee's financial advisors to review and consider various
>　　recovery scenarios as a result of the Examiner's conclusions as well as
>　　implications on plan confirmation.  Based on its substantive review,
>　　Chadbourne prepared a detailed factual and legal analysis of the
>　　Examiner's report for presentation to the Committee." *Id.* ¶ 37.

---

[10] Moreover, conflicts counsel was only engaged by the Committee after Centerbridge, Law Debenture and
Deutsche Bank urged the Committee to do so.  Absent the efforts of Centerbridge, Law Debenture and
Deutsche Bank, the Committee would have likely remained completely tone deaf to important conflict
issues.

- 107.8 hours ($72,222.00) participating in regular and special Committee meetings where they discussed, *inter alia*, plan and confirmation issues and the LBO/ESOP investigation. *Id.* ¶ 15.

- 661.80 hours ($415,040.00) "researching and developing alternative steps that the Committee might take in the event the proposed plan of reorganization was not confirmed." *Id.* ¶ 26. During this time, the Committee prepared for the scheduled August 29, 2010 confirmation hearing and "[a]s part of the process, Chadbourne's team of professionals met and conferred on a regular basis with certain key supporters of the Debtors' plan . . . to discuss various confirmation issues and address pending motions that were inconsistent with the Committee's and Plan Supporters' position." *Id.* ¶ 27. Chadbourne also "collaborated with and provided comments on the Debtors' and Plan Supporters' responsive pleadings and reviewed and provided comments on the Debtors' amended scheduling order." *Id.*

- 1,155.8 hours ($635,170.00) "actively engaged in preparing for the contested hearing on confirmation of the plan." *Id.* ¶ 39. This included "considering confirmation hearing scenarios and researching and analyzing potential legal/factual issues as well as potential challenges to confirmation," "[f]requent meetings . . . with the Debtors' professionals and other plan supporters to address various confirmation-related challenges" and "frequent meetings and discussions with plan proponents and the Debtors' professionals in a collaborative effort to address the myriad of issues raised in preparing for confirmation[.]" In all respect, Chadbourne "continued to update the Committee on the progress of these efforts." *Id.* ¶¶ 39-43.

83.    In other fee applications covering periods *after* the Committee's retention

of conflicts counsel, Chadbourne disclosed the following:

- Chadbourne "assumed the task of preparing a comprehensive submission to the Examiner relating to the Committee's investigation of the LBO/ESOP Transaction." Sixteenth Monthly Application of Chadbourne Parke LLP for Compensation of Chadbourne & Parke LLP for the period April 1, 2010 to April 30, 2010, ¶ 34 [Docket No. 4601].

- "Chadbourne's analysis was significant to the negotiations of the settlement of the claims and causes of action arising from the LBO/ESOP Transaction. Chadbourne's LBO/ESOP investigation team expended great efforts in the negotiations and various settlement permutations which resulted in the approval of a Settlement Support Agreement reached with certain creditor constituencies on April 7, 2010." *Id.* ¶ 39.

49

- "Chadbourne and the Committee's other professionals also participated in meetings and discussions with key players in the 2007 LBO/ESOP Transaction in a collective effort to address issues raised during the investigation process and consider settlement options." Fourteenth Monthly Application of Chadbourne Parke LLP for Compensation and Reimbursement of Expenses for period February 1, 2010 through February 28, 2010, ¶ 36 [Docket No. 3865].

- "Chadbourne attorneys expended substantial time on the ongoing comprehensive review of the Debtors' prepetition financing documents and capital structure as part of the Committee's review and analysis of potential challenges that could be asserted with respect to certain prepetition LBO/ESOP Transactions." *Id.* ¶ 32.

84.    Indeed, review of the time records attached to Chadbourne's fee applications referenced above reveals that partners of the firm were actively negotiating the settlement of the LBO-Related Causes of Action, drafting settlement agreements, and meeting with attorneys for JPMorgan regarding such settlement.

85.    For instance, it is noteworthy that on March 2, 2010, Howard Seife of Chadbourne had a "conference with G. Bush ([Zuckerman Spaeder]) regarding LBO issues (.8)" and then, two days later, Mr. Seife prepared for and attended a "meeting with JPM regarding settlement" that lasted over 2 hours. Fifteenth Monthly Application of Chadbourne Parke LLP for Compensation of Chadbourne & Parke LLP for the period March 1, 2010 to March 31, 2010, Exhibit A - Invoice for Matter 19 (Review of Prepetition Financings) (the "Fifteenth Chadbourne Fee Application") [Docket No. 4160]. Time records also show that David LeMay of Chadbourne and James Sottile of Zuckerman Spaeder also attended the March 4 settlement meeting with JPMorgan and that, on that same date, Graeme Bush of Zuckerman Spaeder had approximately one (1) hour of telephone conferences with Messrs. Seife and Sottile "regarding settlement." *Id.*; Eighth Monthly Application of Zuckerman Spaeder LLP for Interim Allowance of Compensation and Reimbursement of Expenses Filed by Special Counsel to the Official

Committee of Unsecured Creditors, Exhibit A at 4, 11 (the "Eighth Zuckerman Spaeder

Fee Application") [Docket No. 4179].

      86.    The following is a further sampling of examples from Chadbourne time

records of work that Chadbourne partners performed relating to settling the LBO-Related

Causes of Action.  Chadbourne's time records are replete with similar instances -- too

voluminous to list here -- of improper work aimed at settling the LBO-Related Causes of

Action:

- On March 15, 2010, Mr. Seife "[p]repar[ed] for conference call with JPM and DPW"[11] and participated in conference calls "with Lenders regarding settlement" and with negotiation group." (Fifteenth Chadbourne Fee Application Exhibit A - Invoice for Matter 19 (Review of Prepetition Financings)).  Exhibit A to the Eighth Zuckerman Spaeder Fee Application shows that Messrs. Bush and Sottile also participated on at least portions of these conference calls.  Eighth Zuckerman Spaeder Fee Application, Exhibit A at 5, 12.

- On April 5 and 6, 2010, Mr. Seife "[w]ork[ed] on settlement agreement/term sheet" and had "telephone conferences/emails with DPW regarding settlement" (Sixteenth Monthly Fee Application, Exhibit A - Invoice for Matter 19 (Review of Prepetition Financings))  Moreover, on April 8, 2010, Mr. Seife "[r]eview[ed] and revise[d] settlement term sheet and letter," "review[ed] and revise[d] slide presentation regarding term sheet," and had a "conference with D LeMay regarding settlement terms."

- On April 1, 2010, Douglas Deutsch "participate[d] in meeting with JPMorgan counsel (Damian Schiable) re: term sheet and next steps" (Sixteenth Monthly Fee Application, Exhibit A - Invoice for Matter 11 (Plan and Disclosure Statement))

- On April 6 and 7, 2010, David LeMay "negotiate[ed] and revis[ed] Plan Support Letter, Term Sheet and Support Agreement" and "[d]raft[ed] Plan Term Sheet, Committee Support Letter and CB/JPM Support Agreement" (*Id.*)

      87.    Indeed, during the six month period between January 1 and June 30, 2010,

---

[11] "DPW" is presumably a reference to Davis, Polk and Wardwell LLP, counsel to JPMorgan in these chapter 11 cases.

Chadbourne professionals billed 5,388.1 hours (totaling $2,803,742 of fees) to "Matter 19 - Review of Prepetition Financings." During that same period, Zuckerman Spaeder professionals spent only 2,377 hours on the parallel category, "Bank Claims" for a total of $1,174,493.50. This means that Chadbourne professionals spent *more than double* the amount of time that Zuckerman Spaeder did in connection with investigating the LBO Transactions and pursuing the LBO-Related Causes of Action. The actual discrepancy between the time spent by Chadbourne -- who should not have spent any time on these matters -- and Zuckerman Spaeder -- who should have been the only firm working on these matters -- is even larger. This is because, while Zuckerman Spaeder's only billing category for work relating to the LBO-related Causes of Action is "Bank Claims,"[12] the time spent by Chadbourne professionals in connection with the LBO-Related Causes of Action falls under other billing categories in addition to "Matter 19 - Review of Prepetition Financing." Specifically, during the same six month period from January 1 through June 30, 2010, Chadbourne professionals billed approximately 1,900 hours -- just shy of $1.4 million -- to "Matter 11 - Plan and Disclosure Statement" and "Matter 21 - Plan Litigation." A significant portion of these 1,900 hours were spent negotiating and pursuing confirmation of the Settlement Plan, which, as described above, would have settled the LBO-Related Causes of Action. The foregoing demonstrates that notwithstanding its conflicts of interest, Chadbourne, not Zuckerman Spaeder, has taken the lead in investigating and attempting to settle the LBO-Related Causes of Action.

88.     In short, since the Committee's retention of conflicts counsel, Chadbourne – in its capacity as main Committee counsel – has (i) investigated their own clients in

---

[12] The only other categories Zuckerman Spaeder uses are "Retention/Fee Applications" and "Non-Working Travel Time."

connection with the LBO, (ii) taken the laboring oar in preparing submissions to the

Examiner regarding the Committee's view if the LBO-Related Causes of Action, (iii)

undertaken preparations to defend the Settlement Plan (that provided for releases to the

LBO Lenders) against objections expected from creditors (which would include general

unsecured creditors), and (iv) conducted discussions with key players in the LBO to

facilitate the negotiation of claims against their own clients.

      89.    In light of Chadbourne's conflicts, it is simply incredible that Chadbourne

arranged to insert itself in such a major way in the investigation and negotiations on

behalf of the Creditors' Committee regarding claims against the LBO Lenders.  Even if

no party has previously objected to Chadbourne's blatantly conflicted role, the

aforementioned conflicts are no less problematic.  *Project Orange*, 431 B.R. at 374 n.4

("Identifying conflicts does not involve a game of 'gotcha,' where disclosure of a conflict

party in one schedule excuses counsel from the consequences of a conflict if no one finds

the earlier disclosure and objects.").

      90.    Finally, the Committee's delay in seeking standing to pursue the LBO-

Related Causes of Action is further evidence of their conflict and thus of the need for a

trustee.  The Committee has had months to seek standing to pursue the LBO-Related

Causes of Action, but the Committee's standing motion lies dormant while the Debtors

and the LBO Lenders run out the two-year clock.  Due to the Debtors' refusal to

commence litigation and the Committee's delay in prosecuting its standing motion, no

action has been brought since the Debtors commenced the Chapter 11 Cases in December

2008.  The result is that the statutory deadline to commence an action is quickly

approaching.  See 11 U.S.C. § 546(a).  A trustee solves this critical problem because if a

trustee is appointed within two years of the petition date, the trustee will have an additional one year from appointment to commence estate causes of action.  11 U.S.C. § 546(a)(1).

91.    Aside from the one-year extension, a trustee is needed to assert such causes of action because, as explained above, the Debtors and the Committee are plagued by conflicts of interest which prevent them from zealously pursuing those actions.  The concern raised by these conflicts applies with even greater force to certain LBO-Related Causes of Action against third parties – such as claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty – because the deadline to bring such actions will not be extended by the appointment of a trustee.[13]  In other words, a disinterested person must be appointed to promptly assert those claims or else they will be lost. Appointing a trustee is thus in the best interests of all stakeholders because it will also ensure that the LBO-Related Causes of Action can be commenced by a trusted fiduciary before the relevant statutes of limitation expire.

## III.

## TRUSTEE APPOINTMENT IS APPROPRIATE UNDER BANKRUPTCY CODE SECTION 1104(a)(3)

92.    Pursuant to Bankruptcy Code section 1104(a)(3), a court shall order the appointment of a trustee "if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee . . . is in the best interests of creditors and the estate."  Bankruptcy Code section 1112(b)(1) provides, in pertinent part, that a court shall "convert a case under [Chapter 11] to a case under chapter 7 or

---

[13] Moreover, any extension provided by Bankruptcy Code section 108 to pursue such claims is quickly approaching and will expire on the two-year anniversary of the Petition Date. *See* 11 U.S.C. § 108(a).

dismiss a case . . ., whichever is in the best interests of creditors, if the movant establishes cause." "Cause" under section 1112 includes, *inter alia*, gross mismanagement and the inability of a debtor to propose a confirmable plan.  11 U.S.C. § 1104(b)(4).

93.    For the reasons stated above, including (i) the deadlock between the Debtors and the LBO Lenders, on one side, and the pre-LBO creditors, on the other, and (ii) the Debtors' inability to propose a confirmable plan, Aurelius respectfully submits that grounds exist to convert or dismiss these cases under Bankruptcy Code section 1112 and, as such, appointment of a trustee is appropriate under Bankruptcy Code section 1104(a)(3).

## CONCLUSION

For the foregoing reasons, Aurelius respectfully requests that this Court

enter an order appointing a trustee for the Debtors in these Chapter 11 cases, pursuant to

11 U.S.C. § 1104(a)(1), (2) and (3).

Dated: September 13, 2010
      Wilmington, Delaware

        **ASHBY & GEDDES, P.A.**

        William P. Bowden (I.D. No. 2553)
        Amanda M. Winfree (I.D. No. 4615)
        500 Delaware Avenue
        P.O. Box 1150
        Wilmington, DE 19899
        (302) 654-1888

              - and -

        Edward A. Friedman
        William P. Weintraub
        Hal Neier
        **FRIEDMAN KAPLAN SEILER &**
           **ADELMAN LLP**
        1633 Broadway
        New York, NY 10019-6708
        (212) 833-1100

        *Attorneys for Aurelius Capital Management,*
        *LP*