# EXHIBIT A

DRAFT 9/14/2010

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

TRIBUNE COMPANY et al.,

      Debtors.

_____

OFFICIAL COMMITTEE OF
UNSECURED CREDITORS, on behalf
of the Debtors' Estates,

      Plaintiff,

v.

JPMORGAN CHASE BANK, N.A.,
individually and as Administrative Agent,
MERRILL LYNCH CAPITAL CORPORATION,
individually and as Administrative Agent,
MERRILL, LYNCH, PIERCE, FENNER & SMITH
INCORPORATED,
J.P. MORGAN SECURITIES INC.,
CITICORP NORTH AMERICA, INC.,
individually and as Administrative Agent,
CITIGROUP GLOBAL MARKETS, INC.,
BANK OF AMERICA, N.A.,
BANC OF AMERICA SECURITIES, LLC, and
MORGAN STANLEY & CO. INC.,

      Defendants.

Chapter 11

Case No. 08-13141 (KJC)
Jointly Administered

Adv. No. _____

## COMPLAINT AND OBJECTION TO CLAIMS

      Plaintiff, the Official Committee of Unsecured Creditors of the Tribune Company

and of 111 of its subsidiaries (the "Debtors"),[1] by and through its undersigned special

counsel, on behalf of and as the representative of the bankruptcy estates of the Debtors,

---

[1] The Debtors in these Chapter 11 Cases are listed on Exhibit A to this Complaint.

hereby objects to the claims filed by JPMorgan Chase Bank, N.A. and Merrill Lynch Capital Corporation and further complains against the defendants as follows:

## NATURE OF THE ACTION

1.      This is an action primarily to avoid and/or equitably subordinate the obligations arising from the loans made and arranged by the defendants in 2007 to fund the failed leveraged buy out (the "LBO") of the Tribune Company (the "Company"), one of the most venerable news and media organizations in the United States. The LBO had two principal purposes: (a) to meet the demands of major shareholders of the Company that they be cashed out; and (b) to transfer control of the Company to Samuel Zell ("Zell"). To accomplish these purposes, the Company obligated itself to buy out all its shareholders, borrowed almost $12 billion – more than tripling its prior debt load – to finance the LBO (the "LBO Debt" or "LBO Loans") and caused most of its subsidiaries (the "Guarantors")[2] to guarantee that debt. The obligations assumed by the Company in connection with the LBO rendered the Company and the Guarantors insolvent at all relevant times. The LBO closed in December 2007. Less than one year later, unable to carry the massive burden of the LBO Debt, the Company and most of the Guarantors filed for relief under the Bankruptcy Code on December 8, 2008 (the "Petition Date").

2.      The Company and the Guarantors did not benefit from the LBO Debt.

      a.   Pursuant to a Plan of Merger and merger agreement (the "Merger Agreement") entered into on April 1, 2007, over $8 billion of the LBO Loans were paid to the shareholders of the Company and provided no benefit to the Company or its creditors.

---

[2] The Guarantors are those subsidiaries of the Company listed on Exhibit B to the Complaint.

b.   Over $2.5 billion of the LBO Loans was used to refinance the
Company's pre-existing bank debt, which had been arranged in
2006 (the "2006 Bank Debt").  At the time of the refinancing, the
2006 Bank Debt was held primarily by defendants.  The
refinancing materially harmed the Company by giving the lenders
better terms than the 2006 Bank Debt without benefiting the
Company or its subsidiaries.  The refinanced debt bore a higher
interest rate than the 2006 Bank Debt  and benefited from
guarantees from the subsidiary Guarantors that the 2006 Bank
Debt  did not have.

c.   The Guarantors received nothing for their guarantees of billions of
dollars in new and refinanced debt of the Company.

d.   Finally, over $200 million was transferred to the defendants and
others for fees in connection with the LBO, again providing no
benefit to the Company or its creditors.

e.   Those who did benefit from the LBO Debt were the shareholders,
whose shares were purchased with the loan proceeds and who, as a
result of the cash-out, were insulated from any adverse effect the
excessive loan burden would have on the Company or its creditors;
Sam Zell, who obtained *de facto* control of the Company while
placing a tiny portion of his own wealth at risk; and the defendants,
who received enormous fees for advising the Company to enter
into the LBO and/or for making and arranging the LBO Loans,

3

improved their security on and increased the interest rates on
existing debt, and stood to reap very high interest on the LBO
Debt.

3.      Contemporaneous e-mails and other documents in defendants' files
demonstrate that defendants recognized the LBO and the LBO Debt would render the
Company insolvent or, at a minimum, create a high risk of insolvency.  The defendants
were willing to proceed with the LBO notwithstanding the insolvency risk because they
were paid large fees up front and imposed most of the insolvency risk on others.  The
structure of the LBO Debt and the flow of payments to third parties ensured that the
Company's existing non-bank creditors (the "Non-Bank Lenders") and future creditors
would bear the primary risk of loss if the LBO were unsuccessful.  In effect, the
defendants placed a bet with the Non-Bank Lenders' money that the LBO would not
cause the Company's insolvency.  The Non-Bank Lenders included several hundred
retirees with non-qualified retirement benefit programs upon which they rely for their
retirement income.

4.      The defendants also minimized the risk they faced from the massive
leverage imposed on the Company by syndicating the debt so that their default risk on the
loan was transferred to purchasers of the debt who did not realize any of the fees.  In
addition, certain of the defendants sought to further or nurture relationships with Zell that
would lead to other profitable business.

5.      Two of the defendants acted simultaneously as financial advisors to the
Company and as lead lenders and arrangers of the LBO Loans.  While occupying these
conflicting roles, they advised the Company to proceed with an LBO transaction that

4

imposed substantial burdens on the Company and its existing creditors while providing significant and massive benefits to themselves. These defendants received hundreds of millions of dollars in fees and interest from the LBO and received higher interest and increased security for the 2006 Bank Debt.

6.    As the date for closing the LBO approached, the likelihood that it would make the Company insolvent became more and more apparent. Company management, which stood to realize substantial financial benefits if the LBO closed, responded by taking steps to ensure a favorable solvency opinion and ensure the LBO would close notwithstanding the increasing likelihood of insolvency. Those actions included making unjustifiable changes to the Company's financial projections and misleading the Company's solvency expert concerning the prospects for refinancing the LBO Debt.

7.    Morgan Stanley, financial advisor to the special committee of the Company's Board, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Morgan Stanley failed to disclose ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ its position on the prospects for refinancing the LBO Debt, to the Board.

8.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



9.    The creditors of the Company and the Company are entitled to substantial relief as a result of Defendants' wrongful conduct.  First, the Debtors' obligations on the LBO Debt, and the related guarantees and stock pledges, must be avoided because they were constructively or actually fraudulent as to the Debtors and the Non-Bank Lenders. Second, the claims of the Defendants should be equitably subordinated to the claims of the Non-Bank Lenders.  Third, the Plaintiff is entitled to recover for the benefit of the Debtors' estates almost $2 billion in repayments on the LBO Debt made by the Debtors before the bankruptcy filing, hundreds of millions of dollars in fees paid in connection with the financing of the LBO, and tens of millions of dollars in fees paid to financial advisors to the Company in connection with the LBO.  Finally, for the benefit of the Debtors' estates, Plaintiff is entitled to recover from defendant Morgan Stanley damages caused by its wrongful conduct.

10.    Based on the facts alleged herein, Plaintiff objects to the claims filed by JPMorgan Chase Bank, N.A. and Merrill Lynch Capital Corporation as Administrative Agents and counterclaims for the causes of action more fully described below.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) because the claims asserted in this adversary proceeding arise in

the above-referenced Chapter 11 bankruptcy cases.  This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this Court by reason of 28 U.S.C. §§ 1408 and 1409 and because the Debtors' bankruptcies, which have been administratively consolidated, are being administered in this Court.

## PARTIES

12.    Plaintiff is the Official Committee of Unsecured Creditors (the "Committee") appointed by this Court in the above-referenced bankruptcy proceedings. The Committee has been granted standing and authority by this Court to commence and prosecute this action on behalf of the Debtors' estates.

13.    Defendant JPMorgan Chase Bank, N.A. ("JPMCB") is named as a defendant herein individually, as Administrative Agent for the "Senior Credit Facility" as defined below, and as initial transferee of the Step One and Incremental Repayments, as defined herein.  As Administrative Agent for the Senior Credit Facility, JPMCB represents and acts as agent for all lenders that formerly owned or currently own an interest in the loans that comprise the Senior Credit Facility.

14.    Defendant Merrill Lynch Capital Corporation ("MLCC") is named as a defendant herein individually, as Administrative Agent for the $1.6 billion Senior Unsecured Interim Loan Agreement (the "Bridge Facility"), and as initial transferee of the Step Two Repayments as defined herein.  As Administrative Agent for the Bridge Facility, MLCC represents and acts as agent for all lenders that formerly owned or currently own an interest in the Bridge Facility.  MLCC also served as Syndication Agent for the Senior Credit Facility and as one of the lead arrangers for both the Senior Credit Facility and the Bridge Facility.

7

DRAFT 9/14/2010

15.     Defendant Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"), a related entity, acted as financial advisor to the Tribune Company in connection with the LBO (together with MLCC, "Merrill Lynch").

16.     Defendant J.P. Morgan Securities Inc. ("JPMS"), affiliated with JPMCB, is named as a defendant herein and served as one of the lead arrangers for both the Senior Credit Facility and the Bridge Facility (together with JPMCB, "JPM").

17.     Defendant Citicorp North America, Inc ("Citicorp") is named as a defendant herein individually and served as co-documentation agent for the Senior Credit Facility and the Bridge Facility.  As co-documentation agent, Citicorp materially facilitated the lending described below.  Citicorp also is named as a defendant as administrative agent for the preexisting debt paid off in full by the proceeds of the Senior Credit Facility.

18.     Defendant Citigroup Global Markets, Inc. ("CGMI"), an entity under common control with Citicorp, is named as a defendant herein and acted as financial advisor to the Company in connection with the LBO and served as one of the lead arrangers for both the Senior Credit Facility and the Bridge Facility (together with Citicorp, "Citigroup").

19.     Defendant Bank of America, N.A. is named as a defendant herein and served as co-documentation agent for the Senior Credit Facility and the Bridge Facility. As co-documentation agent, Bank of America, N.A. materially facilitated the lending discussed below.

20.     Defendant Banc of America Securities LLC ("BAS"), an entity under common control with Bank of America, N.A., is named as a defendant herein and served

as one of the lead arrangers for both the Senior Credit Facility and the Bridge Facility (together with Bank of America, N.A., "Bank of America").

21.    Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley") is named as a defendant herein and was engaged by the Company to act as a financial advisor to the Special Committee of the Board of Directors of the Company in connection with the LBO. ███████████████████████████████████ ███████████████████████████████ Morgan Stanley was also one of the lenders participating in the Step One Credit Facility.

22.    The relief sought in this action is intended to bind the Defendants and, through each of them, each of the banks and other lenders participating currently, previously or in the future in the Senior Credit Facility and the Bridge Facility (collectively, the "LBO Lenders").  The identity and interest of each of the current LBO Lenders is unknown to the Committee.  Those lenders currently owning an interest in such loans are bound by the actions of their predecessors in interest with respect to such loans, and references to actions by "LBO Lenders" therefore include actions taken by the predecessors in interest of the lenders currently owning an interest in the loans at issue. The Committee reserves the right to add as additional defendants all LBO Lenders if necessary to obtain complete relief.

## FACTUAL BACKGROUND

23.    The Company is the owner of a multitude of media businesses providing newspaper, radio, television and entertainment products and services to nearly 80% of the households in the United States.  The Company is divided into two business groups:  (a) publishing; and (b) broadcasting and entertainment.  The publishing group owns major

newspapers and related Internet web sites in many of the most significant markets in the United States, including the *Chicago Tribune*, the *Los Angeles Times*, the *Baltimore Sun*, the *Orlando Sentinel*, the *South Florida Sun Sentinel*, and the *Hartford Courant* newspapers. The broadcasting and entertainment group includes numerous radio and television stations in major markets. In addition, the Company owns many other prominent media and entertainment properties, and interests in other real estate and entertainment properties. As of the date the Company initiated these bankruptcy proceedings, the publishing segment employed approximately 12,000 full-time equivalent employees, and the broadcasting and entertainment segment an additional 2,600 full-time equivalent employees.

24.    Until the LBO closed, the Company was publicly traded with its stock listed on the New York Stock Exchange. Among the largest shareholders of the publicly traded Company prior to the LBO were Chandler Trust Nos. 1 and 2 (together, the "Chandler Trusts"), which owned the Times Mirror Company, publisher of the *Los Angeles Times* newspaper before its acquisition by the Company in 2000. Representatives of the Chandler Trusts were directors of the Company during the time leading up to the LBO.

25.    Prior to 2006, the Company's debt was modest in relation to the size of the Company's business and consisted primarily of publicly traded bonds and subordinated debentures. Between 1992 and 1997 the Company issued bonds in the aggregate amount of $1.26 billion, which were evidenced by unsecured notes with maturity dates ranging between December 8, 2008 and November 2026 (collectively, the "Bond Debt"). Each of the indentures governing the Bond Debt provides that it shares *pari passu* in payment

priority with all other non-subordinated debt owed by the Company. The Bond Debt is not, however, guaranteed by any of the Company's subsidiaries. As of the Petition Date, the outstanding amount of the Bond Debt was approximately $1,263,463,000.

26.    In April 1999, the Company issued a series of subordinated debentures in the aggregate principal amount of $1.3 billion (the "PHONES"), the trading value of which was linked to the trading value of AOL Time Warner company stock. The PHONES are subordinated in right of payment to all other funded indebtedness of the Company.

27.    The Company and its subsidiaries also owed various other debt to trade creditors and others incurred in the ordinary course of business. Among the other creditors impacted by the LBO are approximately 450 retirees of the Company, many of whom gave a lifetime of service to the Company. These retirees are beneficiaries of four non-qualified plans provided by the Company, as well as various individualized retirement agreements. The claims of these retirees against the Company as of the Petition Date exceeded $125 million as of the Petition Date.

28.    The Bond Debt, PHONES and other unsecured non-bank debt of the Company are referred to collectively as the "Non-Bank Debt."

## STRATEGIC REVIEW

29.    Beginning in late 2005, the Company's Board of Directors (the "Board") undertook a strategic review of the broadcasting and entertainment sector of the Company's business and considered possible changes to the structure and ownership of its properties. The Company retained the services of Merrill Lynch on or about October 17, 2005, to assist in this evaluation and approved in advance Merrill Lynch's

participation in financial transactions that might develop from the strategic review. The
Company later retained Citigroup to assist in the evaluation as well and provided to
Citigroup the same advance approval to participate in financial transactions resulting
from the review. Pursuant to their advisory engagements with the Company, both Merrill
Lynch and Citigroup stood to reap millions of dollars in fees, fees that would increase if
the Company entered into a transaction at the recommendation of Merrill Lynch and
Citigroup.

## CASHING OUT SHAREHOLDERS – ROUND ONE

30.     In May 2006, the Board, with the advice of Merrill Lynch and Citigroup,
decided to engage in a leveraged recapitalization transaction pursuant to which it would
borrow money to repurchase up to 75 million shares of its common stock. The Chandler
Trusts' three representatives on the Board voted against the transaction. The Company
nonetheless proceeded to repurchase 55 million shares for a total of nearly $1.8 billion
through a public tender offer and a private transaction with the Robert R. McCormick
Tribune Foundation and the Cantigny Foundation (the "Foundations"). As a result of
these share repurchases, the Chandler Trusts became the Company's largest stockholders.
The Foundations continued to be major shareholders.

31.     In June 2006, primarily to finance the share repurchases described above,
the Company entered into a credit agreement with Citicorp as administrative agent;
MLCC as syndication agent; Bank of America, N.A., Morgan Stanley Bank and JPMCB
as three of the four documentation agents; and CGMI, MLCC and JPMS as joint lead
arrangers and joint bookrunners, for the 2006 Bank Debt. As of December 31, 2006,
there was approximately $2.8 billion of the 2006 Bank Debt outstanding.

DRAFT 9/14/2010

## THE CHANDLER TRUSTS SEEK TO CASH OUT

32.    On or about June 13, 2006, the Chandler Trusts sent a letter to the Board,

stating that the Chandler Trusts would not tender their shares in the leveraged

recapitalization, which they found ill-advised and hasty.  The Chandler Trusts pressed the

Board to explore other strategic alternatives including a leveraged buy out.  The Chandler

Trusts publicly filed the letter.

33.    From the summer of 2006 until April 2007, the Chandler Trusts continued

to press the Board to take steps that would allow the Chandler Trusts to cash out some or

all of their Company shares through a sale or recapitalization of the Company.

34.    In response to the pressure from the Chandler Trusts, the Company

decided in September 2006 to pursue a sale or recapitalization and formed a special

committee of the Board (the "Special Committee") to consider and evaluate sale and

recapitalization alternatives, excluding from its membership the Chandler Trusts'

representatives.  In or around October 2006, the Company retained Morgan Stanley to act

as the financial advisor to the Special Committee.  The Company agreed to, and did, pay

Morgan Stanley $10 million in fees for serving in that role.

35.    Although Morgan Stanley was the Special Committee's financial advisor,

it was Merrill Lynch and Citigroup that solicited third parties to express interest in a

buyout of the Company.  By October 2006, 17 potential outside purchasers had expressed

interest in the Company.  Merrill Lynch and Citigroup acted as advisors to the Company

in evaluating these proposals.  However, Merrill Lynch and Citigroup each had an

inherent conflict of interest.  If any of the transactions went forward, Merrill Lynch and

Citigroup were highly likely to participate in financing the transactions and stood to make

tens of millions of dollars in fees from such financing. If no transactions took place, they would still receive millions of dollars in advisory fees, but much less than the financing fees associated with a large transaction. Merrill Lynch and Citigroup thus had a strong financial incentive to advise the Company to agree to a substantial sale or recapitalization even if doing so was not in the best interest of the Company. Both Merrill Lynch and Citigroup were in fact strong advocates for the LBO.

36.     Among the parties expressing interest in late 2006 in a buyout of the Company's shareholders was Equity Group Investments, LLC ("EGI"), owned principally by Zell, a prominent, successful Chicago-based real estate investor. Zell was advised by JPM in his structuring of the transaction. JPM later took the lead in arranging the financing of the LBO.

37.     Many companies expressed initial interest in the Company. By February 2007 only two third-party bidders (and the Chandler Trusts) remained interested in the Company, one of whom was Zell. Notwithstanding favorable overall market conditions, interest in the auction was depressed by severe deterioration in the newspaper business.

38.     Both remaining third-party bids contemplated highly leveraged transactions financed primarily by enormous loans to be taken on by the Company. Under both proposals, the bidders' equity contributions would be small in relation to the size of the transactions.

39.     In addition to the two third-party bids, the Company was considering in February 2007 a possible recapitalization of the Company and a spin-off of its broadcasting business under which the Company would pay a special dividend of $20 or more per share before the spin-off.

40.     While the bid process moved forward, the Company's financial results deteriorated. By February 2007, the Company had already lowered its internal forecast of financial results for 2007 because of lackluster results in the first month of the year. Company management and members of the Special Committee expressed concern about any deal that would require the Company to take on a large amount of debt given the weakening business outlook for newspapers.

## THE ZELL LBO STRUCTURE

41.     Under the LBO structure Zell proposed originally, the Company would increase its total debt load to over $14 billion – more than ten times its projected annual earnings before interest, taxes, depreciation and amortization ("EBITDA") – to buy out the public shareholders and refinance the 2006 Bank Debt.

42.     Under Zell's proposal, the Company would end up owned by a newly formed employee stock ownership plan ("ESOP") for the Company's employees. Zell's entity, EGI, would invest $315 million and obtain warrants entitling it to buy up to 40% of the Company, and Zell would become Chairman of the Board. This structure achieved the two goals of satisfying the large shareholders' demands to be cashed out and vesting control of the Company in Zell.

43.     The Company's financial advisors, Merrill Lynch and Citigroup, advised the Company with respect to Zell's proposal. Their inherent conflict of interest as advisors and potential lenders crystallized as the Zell proposal moved forward. At the same time Merrill Lynch and Citigroup were advising the Company on Zell's proposal, they were already negotiating to provide financing for the transaction from which they would receive millions of dollars in fees and interest at premium rates far higher than the

15

2006 Bank Debt. Because Zell's proposal called for refinancing the 2006 Bank Debt,
Merrill Lynch and Citigroup also stood to benefit, to the extent that they participated in
the 2006 Bank Debt, from increased interest rates and improved security in the form of
subsidiary guarantees. They were thus inherently biased in favor of the transaction
without regard to whether it was in the Company's interests.

44.    The Company purportedly recognized its advisors' conflicts and sought to
mitigate them through the Company's retention of Morgan Stanley to advise the Special
Committee on the transaction. But Morgan Stanley also suffered from a conflict of
interest. It was a documentation agent and one of the lenders on the 2006 Bank Debt. At
the time Morgan Stanley was advising the Special Committee on the LBO, it knew that
the 2006 Bank Debt would be refinanced as part of the transaction at higher interest rates
and would obtain priority over the Non-Bank Debt. In addition, Morgan Stanley's
engagement letter provided for a discretionary success fee in addition to its fixed fee.
Morgan Stanley later aggressively sought such a discretionary fee, although the Company
declined to pay it. Like Merrill Lynch and Citigroup, Morgan Stanley therefore stood to
gain substantially more if the LBO proceeded than if no transaction were consummated.

## THE COMPANY DECIDES TO PROCEED WITH THE ZELL LBO

45.    On March 10, 2007, the Company informed Zell that it was reconsidering
whether to proceed with his LBO proposal because, among other things, of the high
degree of leverage under that proposal. Thereafter, the Company discussed with the
Chandler Trusts and the Foundations the possibility of pursuing a recapitalization and
spin-off transaction with a lower per share dividend to reduce the leverage required for
that transaction.

46.     The pause in the Company's interest in the Zell LBO transaction was brief.  After the other remaining third-party bidder failed to develop a satisfactory competing proposal, and notwithstanding concerns about the leverage contemplated by the Zell LBO proposal, the Board, acting with advice from Merrill Lynch, Citigroup and Morgan Stanley (through its recommendations to the Special Committee), approved the LBO proposed by Zell at a final price of $34 per share at a meeting on April 1, 2007. The Board approved the LBO as a whole, not merely the first step tender offer described *infra*, evidencing the Board's understanding that the LBO was a single integrated transaction.

47.     Also on April 1, 2007, the Board approved, and the Company signed, the Merger Agreement, which obligated it to proceed with the LBO by buying all the publicly owned shares of the Company in two steps.  As set out in the Merger Agreement, the Company agreed first to make a tender offer for purchase of approximately one-half of the outstanding shares of the Company (126,000,000 shares) at a price of $34/share ("Step One").  Total consideration for Step One was approximately $4.284 billion.  Pursuant to the Merger Agreement, the Company also committed to convert to cash the remaining publicly owned shares of the Company following regulatory approvals from the Federal Communications Commission (the "FCC"), required for certain aspects of the LBO, at a price of $34/share ("Step Two").  Total consideration associated with Step Two was some $4 billion.  The Company committed to undertake all actions necessary to consummate the LBO in its entirety.

48.     At all relevant times, consistent with the Merger Agreement and related transactional documents, the Company viewed and publicly described the LBO as a

DRAFT 9/14/2010

single integrated transaction occurring in two steps primarily to allow time to obtain approvals from the FCC. The Company intended at all relevant times to complete the LBO and was obligated, pursuant to the Merger Agreement and otherwise, to do so.

49.    For example, the Company's April 2, 2007 press release announced that the Company had entered "a transaction which will result in the company going private and Tribune shareholders receiving $34 per share" and that "[s]hareholders will receive their consideration in a two-stage transaction."

▇▇▇▇▇Documents prepared by the LBO Lenders similarly confirm that the LBO Lenders considered the LBO to be a single integrated transaction executed in two steps.



████████████████████████████████████████████

████████████████████████████████

52.    In May 2007, when Citibank's Leveraged Finance department sought final internal approval to participate in the financing of the LBO, it similarly described the transaction to take the Company private as a single one that would occur "in two steps" with two stages of financing.

53.    At the same time as the Merger Agreement, the Chandler Trusts entered into a stock voting agreement, committing them to support the LBO.  The Chandler Trusts' shares, together with the remaining shares held by the Foundations, would be cashed out at top-dollar at the expense of the Company and the Non-Bank Lenders.

### FINANCING THE LBO

54.    While negotiating the Merger Agreement, Zell and the Company also worked to develop a financing package that would enable the Company to pay the shareholders the over $8 billion necessary to the implementation of the LBO, to refinance the 2006 Bank Debt and to pay over $200 million in fees to the LBO Lenders and others.  On April 1, 2007, the same day the Company signed the Merger Agreement, a consortium of four lenders, JPM, Merrill Lynch, Citigroup, and Bank of America (the "Lead Banks"), issued two loan commitment letters, restated as of April 5, 2007 (the "Loan Commitment Letters"), committing to loan the Company some $12.233 billion needed to finance the LBO.

55.    A more detailed agreement reflecting the terms of the financing was executed on or about May 17, 2007.  This agreement formalized the Lead Banks'

agreement to lend up to $8.028 billion for Step One of the LBO (the "Step One Credit Agreement"), which was to close in early June 2007.

56.     The Step One Credit Agreement provided for financing of Step One of the LBO through several different credit facilities: a two-year term facility in the amount of $1.5 billion (the "Tranche X Facility"), a seven-year term facility in the amount of $5.515 billion (the "Tranche B Facility"), a separate seven-year delayed draw facility in the amount of up to $263 million and a revolving credit facility in the amount of up to $750 million.  Those credit facilities are referred to collectively as the "Step One Financing," and the LBO Lenders that participated in them, or that acquired an interest in the loans from the LBO Lenders that originally participated, are referred to as the "Step One Lenders."  The Step One Credit Agreement also included the LBO Lenders' agreement to provide $2.105 billion of the financing needed for Step Two of the LBO through an "Incremental Facility" that would become part of the Tranche B Facility.  The Step One Financing and the Incremental Facility, which are senior in payment priority to the Bridge Facility, make up the "Senior Credit Facility."

57.     The Lead Banks knew that the amount of debt incurred in connection with the LBO would place the Company in a precarious financial condition.  For example, a Citi employee closely involved in the transaction wrote, in an email to a colleague less than ten days before the Lead Banks committed to finance the LBO, that after reviewing information about the Zell proposal, "I am still extremely uncomfortable with Zell.  No matter the rating . . . .  Declining ebitda is scary.  Until yesterday I did not know that Q1 cash flow is down 20 from last year. . . .  I'm very concerned."

58.     The Lead Banks nevertheless aggressively promoted the transaction so

that they could collect hundreds of millions of dollars in fees, while at the same time

planning to limit their own exposure to a default in repayment of the loan by selling most

of the lending obligation to a syndicate of lenders. For example, ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

59.     One JPM analyst wrote to a colleague on April 5, 2007, the very same day

the restated Loan Commitment Letters were issued:

> There is a wide speculation that the company might have
> put so much debt that all of its assets aren't gonna cover the
> debt in case of (knock, knock) you-know-what. Well that
> is basically what we (JK and me and the rest of the group)
> are saying too, but we're doing this 'cause it's enough to
> cover our bank debt.
>
> So, lesson learned from this deal: our (here, I mean JPM's)
> business strategy for TRB, but probably not only limited to
> TRB, is "hit and run" – we'll s_ck the sponsor's a$$ as
> long as we can, s_ck $$$ out of the (dying or dead) client's
> pocket, and we don't really care as long as our a$$ is well-
> covered. Fxxk 2nd/private guys – they'll be swallowed by
> big a$$ banks like us, anyways. See graph below (total
> debt, btw is $14,639MM).

60.     JPM was highly focused on the fees it stood to earn from the transaction.

For instance, a JPM Managing Director intimately involved in JPM's activity in the LBO

made the following comments in internal emails:

- March 29, 2007: "I am on vacation in Aspen but at this
  moment getting on a plane to Chicago to go to the Trib
  Board meeting tomorrow. The actual fees to JPM will be
  closer to $75M for Trib (!!!!!!).... (But should help the
  budget!). Probably worth me losing 2 days of skiing...:-)"

DRAFT 9/14/2010

- March 29, 2007: "On Trib, which has been back and forth and hush hush, we will get paid, I think, somewhere betw $20-$40M (wooooo hoooo!) on the financing over the course of the year."

- April 2, 2007 (responding to receipt of press release announcing JPM's role in the LBO): "Thx dude. Can you say ka-ching!!"

61.     The Company similarly recognized that the degree of leverage created by the LBO left the Company in a precarious situation in which even minor underperformance compared to the Company's projections would leave the Company unable to meet its obligations as they came due. Two Company executives acknowledged in an email exchange in the week before April 1, 2007, that if the Company performed only 2% worse than projected, "there is no equity value in the first 5 yrs."

62.     Analysts and rating agencies also warned that the Company would be unable to survive the burden of the LBO Debt. For example, a Standard & Poor's research report dated April 19, 2007, identified a "default scenario" suggesting that, should the Company's performance prove worse than the Company's expectations, the Company would default on its LBO Debt obligations in 2009.

63.     While the Company and the Lead Banks worked on the financing of the LBO, the Company's financial performance worsened month by month. The financial projections on which the LBO was based were finalized in early February 2007. The Company's actual performance each month from February through May was materially worse than projected. In April 2007, the Company's total operating profit was down 15%

from the projections finalized two months earlier. Operating profit from the publishing group alone was down 26% in April from the February 2007 projections. The May results were even worse. The Company's total operating profit was down 21% from the February projections. The operating profits that the Company was counting on to pay interest on the massive debt load imposed by the LBO were disappearing as the Company and the Lead Banks finalized the financing.

## SUBORDINATING THE NON-BANK DEBT – THE GUARANTEES

64.     The Lead Banks were willing to arrange and finance the LBO only if they could effectively subordinate the Non-Bank Debt to the LBO Debt because, at all relevant times, they believed there was a high risk the Company would have to file for bankruptcy as a result of the LBO Debt. On March 28, 2007, for example, a senior JPM employee wrote in an internal e-mail that he was concerned about the structure of the LBO Debt because the LBO Lenders would not be entitled to "post [bankruptcy] petition interest." He added that "I've told the team I'm not comfortable approving the new structure for the reasons cited but would understand if Senor Mangement [sic] wanted to do this to further the Zell relationship [sic]. It's a question of lost income and leverage in a bankruptcy negotiation."

65.     The Bond Debt, by virtue of its indentures, shared *pari passu* in payment priority with other non-subordinated debt owed by the Company, thereby preventing a later lender to the Company from taking a more senior position. The Lead Banks sought to avoid the provisions of the Bond Debt indentures, and effectively subordinate the Bond Debt, by insisting that the Guarantors, which did not guarantee the Bond Debt or the 2006 Bank Debt, guarantee all of the LBO Debt, including amounts used to refinance the

2006 Bank Debt (the "Step One Guarantee"). Without the Step One Guarantee, the Bond

Debt would share with the LBO Debt *pari passu* in the equity of the Guarantors because

they were owned by the Company. By obtaining the Step One Guarantee from the

Guarantors, the Lead Banks intended to obtain priority over the Bond Debt and to ensure

that in the event of a bankruptcy, the first losses would fall disproportionately on the

Bond Debt and the Non-Bank Debt generally.

66.    The Step One Credit Agreement required the Guarantors to issue

guarantees in favor of the Step One Lenders jointly and severally guaranteeing the full

amount of the Step One Financing, plus the amount of future disbursements contemplated

to take place under the Incremental Facility in connection with the Step Two Financing.

By executing the Step One Guarantee, each of the Guarantors became jointly and

severally liable for up to $10.133 billion of debt, an amount far exceeding the net worth

as of June 4, 2007, of each individual Guarantor and of all Guarantors collectively.

67.    The Guarantors did not receive anything in exchange for the Step One

Guarantee.

68.    The Lead Banks also took other steps that were intended to make it more

difficult for the holders of the Non-Bank Debt to share recoveries equitably with the LBO

Debt in the event of a bankruptcy. Those steps included the creation of two new

subsidiaries of the Company, Tribune Broadcasting Holdco, LLC ("Holdco") and

Tribune Finance, LLC ("Finance"). Holdco became the holding company for the

Company's broadcasting subsidiaries through the Company's transfer to Holdco of the

stock of the previous broadcasting holding company, Tribune Broadcasting Company.

Finance became a creditor of the Company's principal publishing subsidiaries through a

DRAFT 9/14/2010

complex circle of transactions in which some $3 billion of the Step One Financing was first distributed by the Company to Finance, then loaned by Finance to the publishing subsidiaries and finally returned to the Company from the publishing subsidiaries by means of dividends, so that the $3 billion ended up right where it had started. The only difference was that now the publishing subsidiaries were obligated on substantial intercompany obligations in favor of Finance. All of these circular transactions occurred simultaneously by means of book entries on the day of the closing of Step One.

69.    Holdco and Finance are among the Guarantors of the LBO Debt. The Company also pledged its stock in Holdco and Finance to further secure the LBO Debt (the "Pledge"). The holders of the Bond Debt share *pari passu* in the Pledge by virtue of the bond indentures, but other holders of Non-Bank Debt do not.

70.    The Company and the Lead Banks agreed to the creation of Holdco and Finance and the complex related transactions in part to hinder, delay and impede the ability of Non-Bank Lenders to challenge the guarantees as fraudulent in the event of a bankruptcy. As newly created entities, Holdco and Finance had no pre-existing creditors, unlike the other Guarantors. The Lead Banks apparently believed, incorrectly, that this fact would make it more difficult for the Non-Bank Lenders to challenge the Holdco and Finance guarantees as fraudulent. Holdco and Finance effectively controlled all the value of the other Guarantors through Holdco's ownership of the broadcasting subsidiaries and Finance's loans to the publishing subsidiaries.

## CLOSING STEP ONE

71.    On or about June 4, 2007, the Company closed the tender offer for 126,000,000 shares. The tender offer was heavily oversubscribed. Approximately

224,000,000 shares, over 90% of the total shares outstanding, were tendered.  Pursuant to

the terms of the tender offer, the Company purchased the 126,000,000 shares it had

offered to purchase at Step One on a pro rata basis from the shares tendered.

72.    The Step One Financing also closed on June 4, 2007, and $7.015 billion of

loan proceeds was disbursed as follows:  $4.284 billion was paid out to shareholders;

$2.534 billion was paid to Citicorp as administrative agent for the 2006 Bank Debt to pay

it off in full; and hundreds of millions of dollars were paid out as fees, costs or expenses

associated with the LBO.

73.    In order to obtain the Step One Financing, the Company had to increase

the interest rate on the Tranche B Facility by one-half point above what had been initially

contemplated and to carve out of the Tranche B Facility a $1.5 billion Tranche X Facility

with a shorter, two-year term.  Half of the Tranche X principal, $750 million, was due

eighteen months after the initial draw.

74.    The Company retained Valuation Research Corp. ("VRC") in March 2007

to opine on the Company's solvency in connection with both steps of the LBO.  The

Company took a number of steps to ensure that it would obtain positive solvency

opinions from VRC.  Before Step One closed, the Company, among other things: (i)

agreed to pay VRC one of the largest fees it had ever received for issuing solvency

opinions in connection with both Step One and Step Two; (ii) decided not to revise the

overly optimistic performance projections upon which VRC relied uncritically for its

Step One solvency opinion despite the fact that by early March 2007 the Company was

materially underperforming relative to its plan; (iii) obtained a preliminary analysis from

VRC, in May 2007, showing that the Company would be solvent after Step Two; and (iv)

directed VRC to ignore Step Two in opining on solvency at Step One. The Company's efforts succeeded in connection with the closing of Step One. VRC issued opinions, dated May 17 and May 24, 2007, concluding that the Company would be solvent after giving effect to Step One of the LBO.

## THE COMPANY'S FINANCIAL PERFORMANCE WORSENS

75.      The Company's financial performance, particularly in the publishing side of its business, continued to fall far below the February 2007 projections after the Step One Financing closed on June 4, 2007. The Company's operating profits from its publishing division for the first nine months of 2007 were down 24% from its February projections. Operating profits for the Company as a whole were down 14% from the February projections for the first nine months of 2007.

## ENSURING THE CLOSURE OF STEP TWO

76.      The closing of Step Two depended upon issuance of a solvency opinion indicating that the Company was solvent after giving effect to Step Two. Over and above the several steps it had previously taken to ensure that VRC opined that the LBO would not render the Company insolvent, senior management of the Company took additional steps between October and December 2007 to ensure that VRC would issue an opinion finding solvency at Step Two.

77.      On information and belief, those steps included: (1) preparing revised financial projections in October 2007 that dramatically increased the Company's projected growth rate in later years as compared to the February 2007 projections, even though the Company had consistently failed to meet the February projections; (2) instructing VRC to use the Company's inflated growth rate projections for later years,

27

projections that VRC accepted uncritically; (3) instructing VRC to use a definition of "fair market value" that was contrary to well-established valuation principles, which VRC agreed to do; and (4) misleading VRC to believe that Morgan Stanley had opined that the Company would be able to refinance the LBO Debt when it came due in 2014 and 2015.

78.    In October 2007, in anticipation of the closing of Step Two, the Company revised the February 2007 long-term financial projections on which the LBO was based. The Company sought to offset the effect of its deteriorating financial performance by making unjustifiable changes in the assumptions used for its February 2007 projections.

79.    Most notably, the Company's October 2007 projections assumed that the Company's operating cash flows would grow by 2.4% per year from 2012-2017, matching the projected growth rate from 2011-2012, a presidential election year in which the Company expected its advertising revenues to receive a substantial boost from election-related advertising.  In sharp contrast, the Company's February 2007 projections assumed that operating cash flows would grow by less than .5% per year from 2012-17. In other words, even though the Company was consistently falling short of its February 2007 projections, the October 2007 projections increased the assumed 2012-17 growth rate more than threefold.

80.    The Company's October 2007 projections also increased the assumed growth rate for the Company's interactive business from the February 2007 projections. Although the Company had missed its February 2007 projections for the interactive business by more than 4% through September 2007, its October 2007 projections

28

increased the assumed growth of the interactive business starting in 2009. There was no reasonable justification for this changed assumption.

81.    The Company provided its October 2007 projections to VRC for use in preparing a solvency opinion in connection with Step Two, and VRC uncritically relied upon those projections in giving its December 20, 2007 solvency opinion.

82.    On information and belief, Company management instructed VRC to change its methodology to use the Company's projected growth rate for 2012-17, and VRC agreed to adjust its approach without making an independent judgment whether this change was appropriate. VRC's May 2007 solvency opinions for Step One did not rely on the 2012-2017 growth rates from the Company's February 2007 projections but instead calculated a "terminal value" for the Company's 2012 and later operating cash flows that implied an annual growth rate (after correction for a calculation error) of 0.8%. In sharp contrast, VRC's December 2007 opinion used the inflated 2.4% growth rate assumptions for 2012-2017 from the Company's October projections. Donald Grenesko, the Company's Chief Financial Officer, supplied VRC with a representation letter supporting the 2.4% growth rate for 2012-2017, and VRC accepted and used that inflated projection without making any effort to determine whether there was any reasonable basis for it.

83.    These two unjustifiable changes helped to ensure that VRC would issue a favorable solvency opinion by increasing the Company's enterprise valuation by more than $600 million from what it would have been had the Company and VRC used the same assumptions they had used earlier in the year.

84.    As a condition of issuing its December 20, 2007 solvency opinion, VRC also sought a representation from Company management concerning the Company's ability to refinance approximately $8 billion in LBO Debt when it came due in 2014 and 2015.  On or about December 1, 2007, Mose Rucker, a VRC Managing Director, called Chandler Bigelow, then Tribune's Treasurer, and told him that VRC needed a representation from the Company that it was reasonable for VRC to assume the Company would be able to refinance the LBO Debt.  Mr. Rucker also asked that Mr. Bigelow speak to the Company's financial advisor to make sure that the advisor agreed that the refinancing assumption was reasonable.

85.    On or about December 2, 2007, Mr. Bigelow, Mr. Grenesko and other members of Company management called Bryan Browning, a VRC Senior Vice President.  During that conversation, Bigelow and/or Grenesko stated that Morgan Stanley, financial advisor to the Special Committee, had agreed that the Company could refinance its debt in 2014 even in a "downside" scenario.  Upon information and belief, Morgan Stanley had not told the Company that it agreed with management's refinancing assumptions.

86.    The Company provided a representation letter to VRC, signed by Mr. Grenesko and dated December 20, 2007, that stated in part:  "Based upon (i) management's best understanding of the debt and loan capital markets and (ii) management's recent discussions with Morgan Stanley, management believes it is reasonable and appropriate for VRC to assume that Tribune . . . would be able to refinance."  VRC's Step Two solvency opinion relied in part on that representation letter, expressly citing management's purported discussions with Morgan Stanley regarding the

company's ability to refinance its debt when it came due.  Upon information and belief,

Morgan Stanley in fact had not advised management that it was reasonable and

appropriate for VRC to assume that Tribune would be able to refinance the LBO Debt.

### MORGAN STANLEY AND STEP TWO



90.

Morgan Stanley representatives were also present at several other meetings of the Company's Board between October 17 and December 18, 2007, when they attended a meeting of the Special Committee of the Board.

92.

In May 2007, Morgan Stanley had already been paid the full $10 million due it under its engagement agreement for work relating to the LBO. It was owed no further payments for work it performed on the LBO after that date, although its engagement letter did provide for a possible discretionary fee. Obtaining the additional discretionary payment was the principal way for Morgan Stanley to receive additional compensation for its work

DRAFT 9/14/2010

on the LBO.  After completion of

the LBO, Morgan Stanley in fact aggressively sought a discretionary fee from the

Company, but the Company declined Morgan Stanley's request.

93.    On information and belief, Morgan Stanley had ample notice that, in

connection with VRC's Step Two solvency opinion, the Company and VRC were

representing that Morgan Stanley had concurred that the Company would be able to

refinance the LBO Debt in 2014.  However, Morgan Stanley failed to inform the Board

or the Special Committee that the Company's and VRC's reliance on Morgan Stanley

was in error as to this issue.  Nor did Morgan Stanley otherwise clarify for the Company

(or VRC directly) its view on the Company's ability to refinance.  Morgan Stanley had

the same incentive not to upset an important basis for VRC's Step Two solvency opinion

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ disclosure could jeopardize the

LBO and thus Morgan Stanley's ability to obtain a discretionary fee payment from the

Company.

## THE SENIOR LENDERS AND STEP TWO

94.    As Step Two of the LBO approached, the Defendants knew that Company

performance continued to decline and that piling the Step Two Debt on the Company,

which was already highly leveraged after Step One, made insolvency a reasonably likely

result of the LBO.

95.    In the summer of 2007, the LBO Lenders were aware that financial

analysts were expressing concern about the Company's ability to survive the LBO.  On

33

August 14, 2007, the Lehman Brothers analyst tracking the Company warned that "[i]f the privatization deal does end up going through [as a result of Step Two], we continue to think the probability of significant financial difficulty at Tribune is much, much greater than 50%/50% – given the secularly declining fundamentals and the large amount of leverage involved which is currently at 9.6 times 2008E EBITDA and would rise to nearly 12 times if the second tranche occurs. . . .  So by our calculations, if the second tranche of the privatization deal happens, the company will not be able to cover the estimated annual interest expense from operations let alone have excess free cash flow to pay down debt each year."

96.     Also in August 2007, S&P lowered Tribune's corporate credit rating from BB- to B+, and the bank loan rating from BB+ to BB.  The downward change "reflect[ed] deterioration in expected operating performance and cash flow generation compared to previous expectations."

97.     Moreover, certain LBO Lenders, including JPMCB, MLCC, and Citicorp, performed internal analyses between September and December 2007 that showed that, in reasonably foreseeable circumstances, completion of the LBO would render the Company insolvent.

98.     The LBO Lenders were concerned enough about the Company's solvency to retain their own solvency firm, Murray Devine, to assist them in understanding issues bearing on the Company's solvency.  The LBO Lenders instructed Murray Devine not to provide them with an opinion of whether the Company was solvent or would be after Step Two.

## CLOSING STEP TWO

99.    The Company obtained the necessary regulatory approvals from the FCC on November 30, 2007. Step Two closed on December 20, 2007, triggering the conversion of the remaining outstanding shares of the Company to cash at $34 per share, as provided in the Merger Agreement.

100.    The financing for Step Two had been committed by the Lead Banks in the Commitment Letters and consisted of two facilities: the Incremental Facility of $2.105 billion and up to $2.1 billion in the Bridge Facility (together, "Step Two Financing"). The Incremental Facility funding was provided through a series of "Increased Joinders" executed on or about December 20, 2007, by which various LBO Lenders added this funding to the Tranche B Facility originated in the Step One Financing. Because of this structure, the Incremental Facility loan was accorded the priority of the Tranche B Facility and was covered by the Step One Guarantee.

101.    Concerns about the continued deterioration of the Company's financial performance led to negotiations regarding the amount of the Step Two Financing. These negotiations led to an agreement between the Company and the Lead Banks to reduce the amount of the Bridge Facility from $2.1 billion to $1.6 billion. The result of this reduction was to reduce the exposure of the LBO Lenders on the highest risk portion of the LBO Debt.

102.    On December 20, 2007, the day Step Two closed, the Company issued notes in favor of JPMCB as Administrative Agent for the Senior Credit Facility with respect to the Incremental Facility and in favor of MLCC as Administrative Agent for the Bridge Facility (together, the "Step Two Notes").

103.    At the same time, the Guarantors executed a separate guarantee of the $1.6 billion Bridge Facility (the "Step Two Guarantee"), subordinate to the Step One Guarantee, by which the Guarantors jointly and severally unconditionally guaranteed repayment of the Bridge Facility.  Through the execution of the Step Two Guarantee, the Guarantors increased their obligation to $11.733 billion.  The amount of indebtedness guaranteed by the Step Two Guarantee far exceeded the net worth as of December 20, 2007 of the Company and of each individual Guarantor and of all Guarantors collectively.

104.    Furthermore, in connection with and at the same time as the Guarantors executed the Step Two Guarantee, the Guarantors executed two Indemnity, Subrogation and Contribution Agreements (the "Subordination Agreements"), one for Step One and one for Step Two.  The Subordination Agreement respecting the Step One Financing was executed by the Guarantors six months after the Step One Financing transaction as an attachment to the Increased Joinders executed by certain lenders and the Company for the funding of the Incremental Facility.  It had the effect of subordinating indemnity, subrogation and/or contribution claims from a Guarantor and the Company or between or among Guarantors to the claims of the Step One Lenders.  The Subordination Agreement respecting the Step Two Financing was executed by the Guarantors at the time of the Step Two Financing and subordinated to the Bridge Facility all of the Guarantors' rights to assert indemnity, subrogation and/or contribution claims such Guarantors then had or thereafter acquired against the Company or other Guarantors.  The effect of the Subordination Agreements was to divert additional value in the Guarantors away from the Non-Bank Lenders in the event of non-payment by the Company of the debt incurred

in the Step One or Step Two Financings and thereby to reduce the equity value of the

Guarantors available to the Company or to its Non-Bank Lenders.

105.    Thus, in connection with the Step Two Financing, the Company and the

Guarantors became liable for the additional sum of approximately $3.7 billion, which was

used entirely, along with prior borrowings, to complete the conversion of the remaining

117,115,055 shares of stock to a right to receive $34 per share, for a total of

$3,981,911,860.

106.    The Guarantors did not receive anything in exchange for the Step Two

Guarantee.

107.    In conjunction with the closings of the Step One and Step Two Financings

(together, the "LBO Financing"), over $200 million in fees were paid to the Lead Banks

(the "LBO Fees"). The Lead Banks were motivated to make the LBO Loans by the

prospect of earning these substantial fees and because they intended to substantially limit

their exposure on the underlying credit by syndicating and selling the majority of the

LBO Debt to third-party financial institutions.

## PRE-BANKRUPTCY PAYMENTS TO LBO LENDERS

108.    After completion of the Step One Financing and prior to the filing of

Chapter 11 proceedings in the bankruptcy court on December 8, 2008, the Company paid

to JPMCB, as Administrative Agent for the Senior Credit Facility and MLCC as

Administrative Agent for the Bridge Facility a total of approximately $1.98 billion,

consisting of over $900 million of interest and over $1.078 billion of principal (the "LBO

Repayments"). Of the total LBO Repayments, approximately $1.73 billion applied to the

Step One Financing (the "Step One Repayments"); approximately $143.4 million applied

37

to the Incremental Facility (the "Incremental Repayments"); and over $114.5 million

applied to the Bridge Financing ("Bridge Repayments," and together with the

Incremental Repayments, the "Step Two Repayments"). A list of the LBO Repayments

made by the Company prior to the Petition Date is set forth on Exhibit ___ hereto.

109.    Of these repayments, the Company paid about $166.5 million within the

90 days preceding the Petition Date. A list of the Company's repayments during the 90

days preceding the Petition Date is set forth on Exhibit ___ hereto.

## BANKRUPTCY PETITION FILING

110.    The Company's financial performance after the LBO closed was

consistently far below the Company's February 2007 projections. The bankruptcy that

the Lead Banks had contemplated before the Step One Financing became inevitable as

the Company struggled under the weight of the enormous debt it had taken on to buy out

the shareholders and pay off the 2006 Bank Debt. By late 2008, the Company had begun

active planning for a bankruptcy filing. Unsurprisingly, given the financing structure

designed to impose the first losses on the Non-Bank Debt, it was an impending payment

due on the Bond Debt that immediately precipitated the filing.

111.    The Bond Debt included a series of bonds issued in 1997 which was due

to mature on December 8, 2008, when the Company would be obligated to make a

principal payment of $69,500,000. Recognizing that a payment of that magnitude would

affect the funds available for repayment of the LBO Debt, Zell approached JPM and

others – including two of the Company's advisors and one of Zell's – and the Board and

recommended the initiation of these bankruptcy proceedings to avoid having to make the

$69,500,000 payment to the holders of the Bond Debt. Upon approval of the Board, and

38

after consultation with the LBO Lenders, the Company and 110 of its affiliates filed
voluntary petitions under Chapter 11 of the Bankruptcy Code on the Petition Date.
Subsequently, the Official Committee of Unsecured Creditors was appointed and granted
the authority to bring this action.







DRAFT 9/14/2010



125.

## THE CLAIMS OF THE AGENTS

126.   JPMCB and Merrill Lynch, as Administrative Agents for the Senior Credit Facility and the Bridge Facility, respectively, each filed proofs of claim in the bankruptcy case of the Tribune Company based on claims arising under the Senior Credit Facility and the Bridge Facility, respectively (the "Bank Claims").

127.   JPMCB, as Administrative Agent for the Senior Credit Facility, also filed proofs of claim in each of the bankruptcy cases of the Debtors who are obligated on the Step One Guarantee or the Step Two Guarantee (the "Guarantee Claims").  MLCC, as

Administrative Agent for the Bridge Facility did not file proofs of claim against any of the Debtors other than the Company.

128.    All other allowed claims against the Company shall be referred to as the "Non-Bank Claims."

## COUNT ONE

## CONSTRUCTIVE FRAUD AGAINST JPMCB AND MLCC AS AGENTS TO AVOID THE LBO OBLIGATIONS AND TO RECOVER THE LBO REPAYMENTS (11 U.S.C. § 548(a)(1)(B) and 550(a))

129.    Plaintiff incorporates by reference paragraphs 1 – __ of this Complaint as if set forth again in full.

130.    Pursuant to the Merger Agreement executed April 1, 2007, the First Step Credit Agreement executed on May 17, 2007, and the Second Step Credit Agreement executed on December 20, 2007 (collectively, the "LBO Agreements"), the Company executed certain promissory notes in an aggregate amount exceeding $11.7 billion in connection with the financing for the LBO (the "LBO Notes").

131.    Pursuant to the LBO Agreements, the Guarantors executed the unconditional Step One Guarantee and Step Two Guarantee, respectively, (together, the "LBO Guarantees") in favor of the LBO Lenders.  By the LBO Guarantees, the Guarantors purported to guarantee jointly and severally the full and complete payment of the obligations incurred by the Company in the LBO Loans.  The LBO Notes, LBO Guarantees, and Pledge are collectively referred to as the "LBO Obligations."

132.    The Pledge of stock in Holdco and Finance was intended, at least in part, to consolidate the priority of the LBO Notes over all other debt of the Company other than the Bond Debt.

43

133.    The Debtors did not receive reasonably equivalent value in exchange for incurring the LBO Obligations.  Most of the money advanced in connection with the LBO Loans was applied to purchase outstanding shares of the Company's stock from shareholders pursuant to the tender offer which closed on June 4, 2007 and the merger that closed on December 20, 2007.

134.    At the time each of the LBO Obligations was incurred, taking into consideration the LBO as a whole, the Company's obligations under the Merger Agreement and otherwise to complete the LBO, reasonable projections of the performance of the Company's businesses and the fair value of its assets and liabilities, the Debtors were insolvent, or became insolvent as a result of incurring such LBO Obligations, within the meaning of 11 U.S.C. § 101(32)(A).

135.    The Debtors were left with unreasonably small capital to operate their businesses as a result of and following the incurrence of the LBO Obligations.

136.    At the time of the incurrence of the LBO Obligations, the Debtors intended to incur or believed they would incur debts beyond the Debtors' ability to pay as such debts matured.

137.    The LBO Obligations must therefore be avoided.

138.    The LBO Repayments were made with respect to the LBO Obligations that must be avoided.  Plaintiff is therefore entitled to recover the LBO Repayments.

WHEREFORE, (i) the LBO Obligations must be avoided pursuant to 11 U.S.C. § 548(a)(1)(B); (ii) the Bank Claims, to the extent that they arise from the LBO Notes, must be subordinated to the Non-Bank Claims; and (iii) the Guarantee Claims, to the extent that they arise from the LBO Guarantees or the Pledge, must be disallowed; and

44

(iv) the Committee must recover the total amount of the LBO Repayments pursuant to 11 U.S.C. § 550(a) for the benefit of the estate from JPMCB and MLCC as the initial transferees or as the entities for whose benefit the transfers were made, together with interest from the date of each particular Repayment, attorney's fees and costs of suit and collection allowable by law.

**COUNT TWO**

**ACTUAL FRAUD AGAINST JPMCB, JPMS, MLCC, CITICORP AND BANK OF AMERICA AS AGENTS TO AVOID LBO OBLIGATIONS, 2006 REPAYMENT, AND LBO FEES AND TO RECOVER THE 2006 REPAYMENT, LBO REPAYMENTS, AND LBO FEES (11 U.S.C. §§ 548(a)(1)(A) and 550(a))**

139.    Plaintiff incorporates by reference paragraphs 1 – __ of this Complaint as if set forth again in full.

140.    The Debtors structured the LBO Financing, incurred the LBO Obligations, repaid the 2006 Bank Debt and paid the LBO Fees, all with actual intent to hinder, delay or defraud the Non-Bank Lenders.  The Debtors and JPMCB, JPMS, MLCC, Citigroup, and Bank of America acted with actual knowledge, or willful blindness or recklessness that amount to knowledge, that the LBO would render the Company insolvent, or at a minimum posed a high risk of insolvency, as detailed herein.

141.    The LBO Financing was structured and designed by the Lead Banks and agreed to by the Debtors for the purpose of elevating the 2006 Bank Debt, as replaced by the LBO Notes, and the LBO Debt above the Bond Debt in terms of priority of payment. This result was achieved primarily through the Guarantees, which operated solely for the benefit of the LBO Lenders, imposed obligations far exceeding the net worth of each of the Guarantors and for which the Guarantors received no value.

45

142.    The creation of Holdco and Finance, the circular transactions by which certain Guarantors incurred some $3 billion in intercompany notes to Finance, and the Pledge of Holdco and Finance stock, were also intended, at least in part, to consolidate the priority of the LBO Notes over all other debt of the Company.

143.    The Lead Banks insisted on this structure for the LBO Financing because they knew or acted with willful blindness or recklessness that the LBO would render the Company insolvent or posed a high risk of insolvency and wanted to ensure that their claims would be paid ahead of those of the Non-Bank Lenders in that event.  On information and belief, neither JPMCB nor MLCC gave actual notice to the indenture trustees on behalf of the Bond Debt of the scheme to make the LBO Notes structurally superior to the Bond Debt and other debt of the Company.

144.    In connection with the LBO Financing, the Debtors made a transfer of an interest of the Debtors in property of $2,534,437,415.56 to Citicorp as Administrative Agent for the 2006 Bank Debt to satisfy that debt in full (the "2006 Repayment").  That transfer was made with actual intent to hinder, impede or defraud the Non-Bank Lenders by converting the 2006 Bank Debt from an obligation that would share *pari passu* with the Non-Bank Lenders to one that would have structural superiority to the Non-Bank Lenders by virtue of the Guarantees.

145.    In connection with the LBO, the Debtors transferred or caused to be transferred an interest of the Debtors in property to JPMCB, JPMS, MLCC, Citigroup, and Bank of America, or to parties acting on their behalf approximately $200 million in LBO Fees.  The transfers of the LBO Fees were made with actual intent to hinder, impede or defraud the Non-Bank Lenders because, at the time those transfers were made,

the Debtors, JPMCB, JPMS, MLCC, Citigroup and Bank of America acted with actual

knowledge, or willful blindness or recklessness that amounts to knowledge, that the LBO

would render the Company insolvent, or at a minimum posed a high risk of insolvency

146.    CGMI and Merrill Lunch acted as advisors to the Company with respect to

the auction and the LBO and, as a result, had access to inside information.

147.    Citicorp, as part of Citigroup, knew or should have known that the Debtors

were incurring debt as a result of the LBO beyond the Debtors' means to repay, given the

declining newspaper business.

148.    By obtaining the payoff of the 2006 Bank Debt and participating in the

LBO Debt, Citigroup was able to increase the interest rate and improve the security with

respect to the money it and others had loaned to the Company.

149.    The LBO Repayments were made with respect to the LBO Obligations

that must be avoided.  Plaintiff is therefore entitled to recover the LBO Repayments.

WHEREFORE, the LBO Obligations, the 2006 Repayment, the LBO Fees, and

the LBO Repayments must be avoided pursuant to 11 U.S.C. § 548(a)(1)(A), and the

Committee requests (i) the disallowance of each of the Bank Claims and Guarantee

Claims, (ii) that the Committee recover the total amount of the 2006 Repayment pursuant

to 11 U.S.C. § 550(a) for the benefit of the estate from Citicorp as Administrative Agent

for the 2006 Bank Debt as the initial transferee or as the entity for whose benefit the

transfers were made, and (iii) that the Committee recover the total amount of the LBO

Repayments and LBO Fees pursuant to 11 U.S.C. § 550(a) for the benefit of the estate

from JPMCB and MLCC as the initial transferees or as the entities for whose benefit the

transfers were made, together with interest from the date of each particular transfer, attorney's fees and costs of suit and collection allowable by law.

## COUNT THREE

### ACTUAL FRAUD AGAINST JPMCB, JPMS, MLCC AND CITICORP AS AGENTS TO AVOID STEP TWO NOTES, STEP TWO GUARANTEES, STEP TWO REPAYMENTS AND LBO FEES PAID IN CONNECTION WITH STEP TWO (11 U.S.C. §§ 548(a)(1)(A) and 550(a))

150.    Plaintiff incorporates by reference paragraphs 1 – __ of this Complaint as if set forth again in full.

151.    The Debtors executed the Step Two Notes in connection with the Step Two Financing, executed the Step Two Guarantees, made the Step Two Repayments and paid LBO Fees in connection with Step Two, all with actual intent to hinder, delay or defraud the holders of the Bond Debt.

152.    Such actual intent to hinder, delay, or defraud is evidenced by the facts and circumstances set forth in detail above, including:

- Misrepresentations by Company management to VRC that Morgan Stanley had agreed that the Company would be able to refinance the LBO Debt in 2014, when Morgan Stanley had not so agreed;

- Actions by Company management to ensure that VRC would issue a favorable Step Two solvency opinion, including increasing the Company's projected long-term growth rate more than threefold, without justification, in October 2007, in the face of consistent underperformance by the Company relative to projections; instructing VRC to change its methodological approach to the

48

long-term growth rate; and instructing VRC to use a definition of "fair market value" that was contrary to well-established valuation principles, all changes that VRC accepted uncritically.

- Actions and knowledge of certain lead LBO Lenders at and around the completion of the LBO, including developing but not acting upon internal analyses showing likely insolvency of the Company as a result of Step Two, and hiring a solvency firm to counsel the LBO Lenders on issues concerning the Company's solvency, but purposefully instructing the solvency firm not to offer a view as to whether the Company was solvent at or before Step Two.

153.    The Step Two Repayments, made pursuant to the avoidable Step Two Notes, must also be avoided.  Plaintiff is therefore entitled to recover the Step Two Repayments.

WHEREFORE, the Step Two Notes, Step Two Guarantees, and Step Two Repayments must be avoided pursuant to 11 U.S.C. § 548(a)(1)(A), and the Committee requests (i) the disallowance of each of the Bank Claims and Guarantee Claims to the extent based on the Step Two Debt or Step Two Guarantees, and (ii) that the Committee recover the total amount of the Step Two Repayments for the benefit of the estate from MLCC and JPMCB as the initial transferees or as the entities for whose benefit the transfers were made.

## COUNT FOUR
## CONSTRUCTIVE FRAUD AGAINST JPMCB, JPMS, MLCC, CITIGROUP, AND BAS TO AVOID AND RECOVER PAYMENT OF LBO FEES (11 U.S.C. §§ 548(a)(1)(B) and 550(a))

154.    Plaintiff incorporates by reference paragraphs 1 – ___ of this Complaint as if set forth again in full.

155.    In connection with the LBO, the Debtors transferred or caused to be transferred an interest of the Debtors in property to JPMCB, JPMS, MLCC, Citigroup, and BAS or to parties acting on their behalf consisting of the LBO Fees.

156.    The Debtors did not receive reasonably equivalent value in exchange for payment of the LBO Fees.

157.    At the time of payment of the LBO Fees, taking into consideration the LBO as a whole, the Company's obligations under the Merger Agreement and otherwise to complete the LBO, reasonable projections of the performance of the Company's businesses and the fair value of its assets and liabilities, the Debtors were insolvent within the meaning of 11 U.S.C. § 101(32)(A).

158.    The Debtors were left with unreasonably small capital to operate its business as a result of the LBO Fees.

159.    At the time of the transfer of the LBO Fees, the Debtors intended to incur or believed they would incur debts beyond the Debtors' ability to pay as such debts matured.

WHEREFORE, the transfers of the LBO Fees must be avoided pursuant to 11 U.S.C. § 548(a)(1)(B), and the Committee shall recover the total amount of the LBO Fees pursuant to 11 U.S.C. § 550(a) for the benefit of the estates from JPMCB, JPMS, MLCC, Citigroup, and BAS as the initial transferees or as the entities for whose benefit the transfers were made, together with interest from the date of the transfer, attorney's fees and costs of suit and collection allowable by law.

DRAFT 9/14/2010

## COUNT FIVE

## UNJUST ENRICHMENT AGAINST JPMCB AND MLCC AS AGENTS TO RECOVER LBO REPAYMENTS, AND AGAINST JPMCB, MLCC, CITIGROUP, AND BANK OF AMERICA TO RECOVER THE LBO FEES

160.    Plaintiff incorporates by reference paragraphs 1 – ___ of this Complaint as if set forth again in full.

161.    Between the closing of the Step One Financing and the Petition Date, the Debtors made the Step One Repayments totaling $1,730,320,761 in principal and interest to JPMCB as Administrative Agent for the Senior Credit Facility on account of the Step One Notes.

162.    Between the closing of the Step Two Financing and the Petition Date, the Debtors made payments totaling $143,452,540 in principal and interest to JPMCB as Administrative Agent for the Senior Credit Facility on account of the Step Two Notes relating to the Incremental Facility (the "Incremental Repayments").

163.    Between the closing of the Step Two Financing and the Petition Date, the Debtors made payments totaling $114,529,555 in interest to MLCC as Administrative Agent for the Bridge Facility on account of the Step Two Notes relating to the Bridge Facility (the "Bridge Repayments").

164.    The Step One Repayments, Bridge Repayments, and Incremental Repayments are referred to collectively as the "LBO Repayments."

165.    In connection with the LBO Financing, the Company paid the defendants the LBO Fees.

166.    The LBO Obligations should be avoided as alleged above.

51

167.    It would be unjust and inequitable under the circumstances of the fraudulent conveyances alleged herein, including the knowledge, intent, and conduct of JPMCB and MLCC, to allow JPMCB and MLCC as Administrative Agents for the LBO Financing to retain the LBO Repayments or the LBO Fees.

WHEREFORE, to the extent that the LBO Obligations are avoided, the Committee shall recover (i) the amount of the Step One and Incremental Repayments from JPMCB and the amount of the Bridge Repayments from MLCC, as Administrative Agents respectively, and as the initial transferees or as the entities for whose benefit the transfers were made, respectively, and (ii) the LBO Fees paid to JPMCB, MLCC, Citigroup, and Bank of America, respectively, together with interest from the date of each particular transfer, attorney's fees and costs of suit and collection allowable by law.

## COUNT SIX
### UNJUST ENRICHMENT AGAINST JPMCB AS AGENT TO PREVENT WINDFALL FROM AVOIDANCE OF STEP TWO OBLIGATIONS, STEP TWO REPAYMENTS AND LBO FEES PAID IN CONNECTION WITH STEP TWO

168.    Plaintiff incorporates by reference paragraphs 1 – ___ of this Complaint as if set forth again in full.

169.    The Step Two Notes, the Step Two Guarantee and the Subordination Agreements (the "Step Two Obligations") should be avoided.

170.    The Step Two Repayments and the LBO Fees paid in connection with Step Two (the "Step Two Fees") should be avoided and recovered.

171.    The Lead Banks, including JPM, arranged or participated both in Step One and in Step Two and were parties to the Loan Commitment Letters, which enabled the Company to undertake the LBO.

172.    Absent the relief requested, JPMCB, as Administrative Agent for the Senior Credit Facility, will receive a greater distribution in the chapter 11 cases if the Step Two Obligations and the Step Two Fees are avoided and recovered.

173.    Absent the relief requested, the Non-Bank Claims will not receive a materially greater distribution in the chapter 11 cases if the Step Two Obligations and the Step Two Fees are avoided and recovered.

174.    It would be unjust and inequitable under the circumstances of the fraudulent conveyances alleged herein, including the knowledge, intent, and conduct of the Lead Banks, to allow JPMCB, as Administrative Agent for the Senior Credit Facility, to receive any benefit as a result of the avoidance of the Step Two Obligations and the Step Two Fees.

WHEREFORE, to the extent that the Step Two Obligations are avoided and the Step Two Fees are recovered, the Committee shall recover the amount of the resulting benefits to the Senior Credit Facility from JPMCB as Administrative Agent for the Senior Credit Facility and as the initial transferee or as the entity for whose benefit the transfers were made.

## COUNT SEVEN
## PREFERENCE AGAINST JPMCB AND MLCC AS AGENTS TO AVOID AND RECOVER LBO PREFERENCES (11 U.S.C. §§ 547(b) and 550(a))

175.    Plaintiff incorporates by reference paragraphs 1 – ___ of this Complaint as if set forth again in full.

176.    On or within ninety (90) days preceding the Petition Date, the Debtors made transfers of an interest of the Debtors in property to JPMCB as Administrative

Agent for the Senior Credit Facility totaling at least $131,927,496 (the "Senior Preferences").

177.    On or within ninety (90) days preceding the Petition Date, the Debtors made a transfer of an interest of the Debtors in property to MLCC as Administrative Agent for the Bridge Facility totaling $34,570,444 (the "Bridge Preference").

178.    The Senior Preferences and Bridge Preference are referred to collectively as the "LBO Preferences."

179.    Each of the LBO Preferences were to or for the benefit of a creditor, for or on account of antecedent debt and made while the Debtors were insolvent.

180.    Each of the LBO Preferences enabled such creditors to receive more than such creditor would receive if the cases were under chapter 7 of the Bankruptcy Code, the transfers had not been made and such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

WHEREFORE, the transfers comprising the LBO Preferences must be avoided pursuant to 11 U.S.C. § 547(b), and the Committee shall recover the total amount of the LBO Preferences pursuant to 11 U.S.C. § 550(a) for the benefit of the estates from JPMCB and MLCC, as Administrative Agents for the Senior Credit Facility and Bridge Facility, respectively, as the initial transferees, or as the entities for whose benefit the transfers were made, together with interest from the date of each particular transfer, attorney's fees and costs of suit and collection allowable by law.

**COUNT EIGHT**

## CONSTRUCTIVE FRAUD AGAINST MERRILL LYNCH, CITIGROUP, AND MORGAN STANLEY TO AVOID AND RECOVER PAYMENT OF FINANCIAL ADVISORY FEES (11 U.S.C. §§ 548(a)(1)(B) and 550(a))

181.    Plaintiff incorporates by reference paragraphs 1 – ___ of this Complaint as if set forth again in full.

182.    By October 2006, the Company engaged Merrill Lynch and Citigroup to advise it in connection with a potential financial transaction.

183.    By October 2006, the Company engaged Morgan Stanley to advise the Special Committee to the Tribune Board in connection with a potential financial transaction.

184.    Pursuant to the Company's engagement of Merrill Lynch, Citigroup, and Morgan Stanley, the Debtors transferred or caused to be transferred over $30 million in advisory fees in connection with the LBO Financing to Merrill Lynch, Citigroup, and Morgan Stanley (the "Advisory Fees").

185.    The Debtors did not receive reasonably equivalent value in exchange for payment of the Advisory Fees.

186.    At the time of payment of the Advisory Fees, taking into consideration the LBO as a whole, the Company's obligations under the Merger Agreement and otherwise to complete the LBO, reasonable projections of the performance of the Company's businesses and the fair value of its assets and liabilities, the Debtors were insolvent within the meaning of 11 U.S.C. § 101(32)(A).

187.    The Debtors were left with unreasonably small capital to operate its business as a result of and following the closing of the Step One Financing.

55

188.    At the time of the closing of the Step One Financing, the Debtors intended to incur or believed they would incur debts beyond the Debtors' ability to pay as such debts matured.

WHEREFORE, the transfers of the Advisory Fees must be avoided pursuant to 11 U.S.C. § 548(a)(1)(B), and the Committee shall recover the total amount of the Advisory Fees pursuant to 11 U.S.C. § 550(a) for the benefit of the Non-Bank Claims from Merrill Lynch, Citigroup, and Morgan Stanley as the initial transferees or as the entities for whose benefit the transfers were made, together with interest from the date of the transfers, attorney's fees and costs of suit and collection allowable by law.

## COUNT NINE

## PROFESSIONAL NEGLIGENCE AGAINST MORGAN STANLEY

189.    Plaintiff incorporates by reference paragraphs 1 – __ of this Complaint as if set forth again in full.

190.    Morgan Stanley ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ continued to provide advice to the Special Committee in connection with Step Two.

191.    In providing professional financial advice to the Company and the Special Committee, Morgan Stanley had a duty to use the same degree of knowledge, skill, and ability as would an ordinarily prudent professional in similar circumstances.

192.    Morgan Stanley deviated from the standard of care expected of a professional financial advisor under these circumstances by, among other things, ██████

██████████████████████████████████████████

████████████████████████████████████████

████████████ failing to inform the Company or the Special Committee of its position on the Company's ability to refinance the LBO Debt.

193.    The Company has been substantially damaged as a direct and proximate result of Morgan Stanley's professional negligence, as set forth herein.

WHEREFORE, Plaintiff demands judgment against Morgan Stanley for the compensatory damages caused by its professional negligence in an amount to be proven at trial, costs and such other and further relief as the Court may deem just and proper.

## COUNT TEN

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST MORGAN STANLEY, JPMCB, MLCC, CITIGROUP, AND BANK OF AMERICA

194.    Plaintiff incorporates by reference paragraphs 1 – __ of this Complaint as if set forth again in full.

195.    The officers of Tribune, including Messrs. Grenesko and Bigelow, owed Tribune and its stockholders a fiduciary duty of good faith, care and loyalty.

196.    The Company's management, including Messrs. Grenesko and Bigelow, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care and loyalty by, among other things, (a) making unjustifiable assumptions for the Company's October 2007 financial projections and instructing VRC to use such unreliable projections, which VRC did uncritically; (b) instructing VRC to make unjustifiable and unreasonable assumptions in connection with its Step Two solvency opinion, which VRC agreed to do; (c) representing to VRC that Morgan Stanley agreed with the Company's assumptions

concerning refinancing of the LBO when, on information and belief, Morgan Stanley had not so agreed; (d) representing to VRC that the Company would be solvent after giving effect to Step Two without a reasonable basis for such representation; and (e) failing to advise the Board that they had represented to VRC that Morgan Stanley agreed with the Company's assumptions concerning refinancing of the LBO Debt when, on information and belief, Morgan Stanley had not agreed.

197.    Morgan Stanley, JPMCB, MLCC, Citigroup, and Bank of America knew that the Company's officers had the fiduciary duties alleged herein.

198.    Morgan Stanley, as professional financial adviser to the Company and Special Committee had an obligation to advise them of facts relevant to the scope of its engagement ███████████████████████████████████████████████████

███████████████ Morgan Stanley aided and abetted the breaches of fiduciary duties by Company management, including Messrs. Grenesko and Bigelow, and was an active and knowing participant in those breaches of fiduciary duties by, among other things, failing to disclose to the Board or the Special Committee: █████████████████

█████████████████████████████████████████████████████████

███████████████████████ (b) the representations by Messrs. Grenesko and Bigelow that Morgan Stanley agreed with the Company's assumptions concerning refinancing of the LBO Debt when in fact it had not so agreed; ████████████

████████████████████████████████

199.    JPMCB, MLCC, Citigroup, and Bank of America aided and abetted Company management's breaches of fiduciary duties, and were active and knowing participants in those breaches of fiduciary duties by, among other things, proceeding to

close the Step Two Financing while knowing or being willfully blind to the facts: (a) that the October 2007 financial projections and VRC's Step Two solvency were unreliable, (b) that the assumption that the Company could refinance the LBO Debt was unjustifiable; and (c) that the LBO would or was highly likely to render the Company insolvent.

200.    The Company has been substantially damaged as a direct and proximate result of Morgan Stanley's, JPMCB's, MLCC's, Citigroup's, and Bank of America's aiding and abetting the breaches of fiduciary duties set forth herein.

WHEREFORE, Plaintiff demands judgment against Morgan Stanley, JPMCB, MLCC, Citigroup, and Bank of America for compensatory damages in an amount to be proved at trial, costs and such other and further relief as the Court may deem just and proper.

## COUNT ELEVEN





210.

**COUNT TWELVE**



███████████████████████████████████

████████████████

## COUNT THIRTEEN

## EQUITABLE SUBORDINATION AND DISALLOWANCE AGAINST ALL DEFENDANTS

217.    Plaintiff incorporates by reference paragraphs 1 – __ of this Complaint as if set forth again in full.

218.    The defendants engaged in a pattern of egregious misconduct to enrich themselves at the expense of the Debtors and the holders of the Non-Bank Debt by advising and supporting the Debtors' entry into the LBO in the first place and incur debt well beyond their means to repay it given the circumstances at the time.

219.    The defendants developed and caused the Debtors to implement a scheme that effectively elevated the priority of the 2006 Bank Debt over that the Bond Debt and expanded the size of the first-priority debt so that the Bond Debt and the other debt of the Company would not be repaid in the event of the Debtors' subsequent failure and insolvency.

220.    As detailed above, the defendants were aware prior to the closing of the Step One Financing that there was a high risk that the Debtors would not be able to repay the LBO Debt and would be rendered insolvent by the LBO.

221.    As detailed above, the defendants were also aware prior to the closing of the Step Two Financing that there was a high risk that the Debtors would not be able to repay the LBO Debt and would be rendered insolvent by the LBO, and the defendants engaged in fraudulent conduct in connection with Step Two.

63

222.    By obtaining the LBO Guarantees from the Guarantors, the defendants were able to ensure that the first losses from any bankruptcy would fall primarily on the holders of the Bond Debt and other debt of the Company. The defendants took further steps to hinder recoveries by such creditors, including the creation of Holdco and Finance and the transactions relating to those entities that sought to divert value away from the rights of such creditors.

223.    Merrill, Citigroup, and Morgan Stanley acted as advisors to the Company and/or the Special Committee of its Board with respect to the auction and the LBO and, as a result, had access to inside information and were able to exercise influence over the directors and officers. The relationship between Merrill, Citigroup, and Morgan Stanley and the Company was not at arm's length.

224.    The defendants earned millions of dollars in fees for providing the financing and to increase the interest rates on, and improve their security with respect to, the 2006 Bank Debt.

225.    The misconduct of the defendants described herein was inequitable and resulted in injury to the holders of the Non-Bank Debt by depriving them of the equity in the Guarantors that existed prior to the LBO as a source of repayment of their debt.

226.    The defendants who participated in both the Step One and Step Two Financing should not profit from their fraud at Step Two. Accordingly, all claims of such defendants to obtain the benefits of avoided Step Two obligations or transfers should be disallowed or equitably subordinated to the claims of Non-Bank Lenders.

227.    Equitable subordination and disallowance of the claims of the defendants is consistent with the provisions of the Bankruptcy Code.

WHEREFORE, the Bank Claims must be equitably subordinated to the Non-Bank Claims, and the LBO Guarantee Claims must be equitably disallowed.

## COUNT FOURTEEN
### FRAUDULENT CONVEYANCE AGAINST CITICORP AS AGENT TO AVOID AND RECOVER REPAYMENT OF 2006 BANK DEBT (NY Debtor and Creditor Law § 273)

228.    Plaintiff incorporates by reference paragraphs 1 – ___ of this Complaint as if set forth again in full.

229.    At the time of the closing of the Step One Financing, the Company made the 2006 Repayment to Citicorp as Administrative Agent for the 2006 Bank Debt to satisfy that debt in full.

230.    Citigroup acted as an advisor to the Company with respect to the auction and the LBO and, as a result, had access to inside information and earned millions of dollars in fees for providing the LBO Financing.

231.    Citicorp, as part of Citigroup, knew or should have known that the Debtors were incurring debt as a result of the LBO beyond the Debtors' means to repay, given the declining newspaper business.

232.    By obtaining the payoff of the 2006 Bank Debt and participating in the LBO Debt, Citigroup was able to increase the interest rate and improve the security with respect to the money it and others had loaned to the Company.

233.    The Company did not receive fair consideration in exchange for the 2006 Repayment.

234.    At the time of the closing of the Step One Financing, taking into consideration the LBO as a whole, the Company's obligations under the Merger Agreement and otherwise to complete the LBO, reasonable projections of the performance of the Company's businesses and the fair value of its assets and liabilities, the Debtors were insolvent.

235.    The Company was left with unreasonably small capital to operate its business as a result of and following the closing of the Step One Financing.

236.    At the time of the closing of the Step One Financing, the Company intended to incur or believed they would incur debts beyond the Company's ability to pay as such debts matured.

237.    At all times since the closing of the Step One Financing, actual creditors of the Company remained creditors of the Company and continued to remain creditors as of the Petition Date.

WHEREFORE, the transfer comprising the repayment of the 2006 Bank Debt must be avoided pursuant to §§ 273-275 of the New York Debtor and Creditor Law, and the Committee shall recover the total amount of the repayment pursuant to 11 U.S.C. § 550(a) for the benefit of the estate from Citigroup as Administrative Agent for the 2006 Bank Debt, as the initial transferee, together with interest from the date of each particular transfer, attorney's fees and costs of suit and collection allowable by law.

## COUNT FIFTEEN

## CLAIM DISALLOWANCE

238.    Plaintiff incorporates by reference paragraphs 1 - ___ of this Complaint as if set forth again in full.

239.    Plaintiff has brought numerous causes of action, enumerated above, against the defendants seeking to avoid the LBO Obligations.

240.    To the extent that Plaintiff is ultimately successful in avoiding any of the LBO Obligations, Plaintiff is entitled to judgment disallowing any claim held by the defendants pursuant to 11 U.S.C. § 502(d), pending payment or turnover of the avoided property.

Dated: September ___, 2010

ZUCKERMAN SPAEDER LLP

_____
Thomas G. Macauley (ID No. 3411)
919 Market Street, Suite 990
Wilmington, DE  19801
Telephone:  (302) 427-0400
Facsimile:  (302) 427-8242

- and -

Graeme W. Bush, Esquire
James Sottile, Esquire
Andrew N. Goldfarb, Esquire
1800 M Street, N.W., Suite 1000
Washington, DC  20036
Telephone:  (202) 778-1800
Facsimile:  (202) 822-8106

Special Counsel to the Official Committee
of Unsecured Creditors

DRAFT 9/14/2010

EXHIBIT A

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-

Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

DRAFT 9/14/2010

EXHIBIT B

The Guarantors providing guarantees are: 5800 Sunset Productions Inc.; California Community News Corporation; Channel 39, Inc.; Channel 40, Inc.; Chicago National League Ball Club, LLC n/k/a Tribune CNLBC, LLC; Chicago Tribune Company, Chicagoland Publishing Company; Chicagoland Television News, Inc.; Courant Specialty Products, Inc.; Distribution Systems of America, Inc.; Eagle New Media Investments, LLC; Eagle Publishing Investments, LLC; Forsalebyowner.com Corp.; Forum Publishing Group, Inc.; Gold Coast Publications, Inc.; Homeowners Realty, Inc.; Homestead Publishing Company; Boy Publications, LLC; Internet Foreclosure Service, Inc.; KIAI-I Inc.; KPLR, Inc.; KSWB Inc.; KTLA Inc.; KWGN Inc.; Los Angeles Times Communications, LLC; New Mass. Media, Inc.; Orlando Sentinel Communications Company; Patuxent Publishing Company; Southern Connecticut Newspapers, Inc.; Star Community Publishing Group, LLC; Stemweb, Inc.; Sun-Sentinel Company; The Baltimore Sun Company; The Daily Press, Inc.; TMLH 2, Inc.; TMLS 1, Inc.; TMS Entertainment Guides, Inc.; Tower Distribution Company; Tribune (FN) Cable Ventures, Inc.; Tribune Broadcast Holdings, Inc.; Tribune Broadcasting Company; Tribune Broadcasting Holdco, LLC; Tribune California Properties, Inc.; Tribune Direct Marketing, Inc.; Tribune Entertainment Company; Tribune Finance LLC; Tribune Interactive, Inc.; Tribune Los Angeles, Inc.; Tribune Manhattan Newspaper Holdings, Inc.; Tribune Media Net, Inc.; Tribune Media Services, Inc.; Tribune National Marketing Company; Tribune ND, Inc.; Tribune New York Newspaper Holdings, LLC; Tribune NM, Inc.; Tribune Television Company; Tribune Television Holdings, Inc.; Tribune Television New Orleans, Inc.; Tribune Television Northwest, Inc.; Virginia Gazette Companies, LLC; WCCT, Inc., f/k/a WTXX Inc. (1268); WDCW Broadcasting, Inc.; WGN Continental Broadcasting Company; and WPIX. Inc.