# EXHIBIT B

1        IN THE UNITED STATES BANKRUPTCY COURT

2             FOR THE DISTRICT OF DELAWARE

3   IN RE:                    :
                              : Chapter 11
4   TRIBUNE COMPANY, et al.,  :
                              : Case No. 08-13141 (KJC)
5       Debtors.              :
6   . . . . . . . . . . . . . .

7                    Wilmington, Delaware
                    February 18, 2010
8                      10:06 a.m.

9                  TRANSCRIPT OF HEARING
        BEFORE THE HONORABLE KEVIN J. CAREY
10            UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For the Debtors:          Norman L. Pernick, Esquire
                              Cole, Schotz, Meisel, Forman &
13                            Leonard, P.A.

14                            Bryan Krakauer, Esquire
                              James F. Conlan, Esquire
15                            James Bendernagel, Esquire
                              James Ducayet, Esquire
16                            Sidley, Austin, LLP

17  For JP Morgan Chase       Robert Stearn, Esquire
    Bank:                     Richards, Layton & Finger

18  For Citi Group:           Stephen J. Shimshak, Esquire
19                            Jeffrey M. Gorris, Esquire
                              Paul, Weiss, Rifkind, Wharton &
20                            Garrison, LLP

21  For TM Retirees and       Jay Teitelbaum, Esquire
    William Niese:            Teitelbaum & Baskin, LLP

22                            Donna Harris, Esquire
23                            Pinckney, Harris & Weidinger, LLC

24  For Aurelius Capital      Nancy Mitchell, Esquire
    Management:               Scott Cousins, Esquire
25                            Greenberg, Traurig, LLP

2

| | | |
|---|---|---|
| 1 | For the Creditors' Committee: | Thomas Macauley, Esquire |
| 2 | | Graeme Bush, Esquire |
| | | James Sottile, Esquire |
| 3 | | Zuckerman & Spaeder, LLP |
| 4 | | Blake Cleary, Esquire |
| | | Young, Conaway, Stargatt & Taylor, LLP |
| 5 | | |
| 6 | | Adam Landis, Esquire |
| | | Landis, Rath & Cobb, LLP |
| 7 | For the Official Committee of Unsecured | Howard Seife, Esquire |
| 8 | Creditors: | David LeMay, Esquire |
| | | Chadbourne & Parke, LLP |
| 9 | For Law Debenture: Trust Company: | Garvan McDaniel, Esquire |
| 10 | | Bifferato, Gentilotti |
| 11 | | Matthew Stein, Esquire |
| | | Andrew Glenn, Esquire |
| 12 | | Kasowitz, Benson, Torres & Friedman, LLP |
| 13 | For JP Morgan Chase Bank: | Damien Schaible, Esquire |
| 14 | | Dennis Glazer, Esquire |
| | | Sharon Katz, Esquire |
| 15 | | Michael Russano, Esquire |
| | | Davis, Polk & Wardwell, LLP |
| 16 | For Deutsche Bank Trust Company: | David Adler, Esquire |
| 17 | | McCarter & English, LLP |
| 18 | For Centerbridge Credit Advisors: | Daniel Golden, Esquire |
| | | Alexis Freeman, Esquire |
| 19 | | Akin, Gump, Strauss, Hauer & Feld, LLP |
| 20 | | Laura Davis Jones, Esquire |
| 21 | | Pachulski, Stang, Ziehl & Jones |
| 22 | For Credit Agreement Lenders: | Bruce Bennett, Esquire |
| | | James O. Johnston, Esquire |
| 23 | | Hennigan, Bennett & Dorman, LLP |
| 24 | For the U.S. Trustee: | Joseph J. McMahon, Jr., Esquire |
| | | U.S. Department of Justice |
| 25 | | |

```
                                                                    3

 1    For Wilmington Trust       Robert Stark, Esquire
      Company:                   William Dolan, Esquire
 2                               Martin Siegel, Esquire
                                 Brown, Rudnick
 3
                                 Jennifer Hoover, Esquire
 4                               Raymond Lemisch, Esquire
                                 Benesch, Friedlander
 5
      For Merrill Lynch:         Laurie Selber Silverstein, Esquire
 6                               Potter, Anderson & Corroon, LLP

 7    VIA TELEPHONE:

 8    For the Debtors:           Chandler Bigelow, Esquire
                                 Dave Eldersveld, Esquire
 9                               Don Liebentritt, Esquire
                                 Gary Weitman, Esquire
10                               Tribune Company

11                               Janet Henderson, Esquire
                                 Jillian McClelland, Esquire
12                               Kevin Lantry, Esquire
                                 Bryan Krakauer, Esquire
13                               Ken Kansa, Esquire
                                 Sidley & Austin
14
                                 Rushabh Vora
15                               MacQuarie Capital

16    For Grey Wolf Capital:     Jeff Armstrong
                                 Grey Wolf Capital
17
      For Morgan, Lewis &        James Bayles, Esquire
18    Bockius, LLP:              Morgan, Lewis & Bockius, LLP

19    For Mina Faltas:           Mina Faltas, Esquire
                                 Viking Global Investors
20
      For Rita Farrell:          Rita Farrell, Reporter
21                               Rita Farrell

22    For Perry Capital:         James Freeman
                                 Perry Capital
23
      For DW Investment          Raman Gambhir
24    Managements:               DW Investment Managements

25
```

4

| | | |
|---|---|---|
| 1 | For KKR Asset<br>Management: | Evan Geller<br>KKR Asset Management |
| 2 | | |
| 3 | For Citi Group: | Andrew Gordon, Esquire<br>Stuart C. McPhail, Esquire<br>Lauren Shumejda, Esquire |
| 4 | | Paul, Weiss, Rifkin, Wharton &<br>Garrison, LLP |
| 5 | | |
| 6 | | Rebecca Song, Esquire<br>Citi Group |
| 7 | For DE Shaw: | Sarah Johnson, Esquire<br>DE Shaw |
| 8 | | |
| 9 | For Bank of America: | Evan Jones, Esquire<br>O'Melveny & Myers, LLP |
| 10 | For Anna Kalenchits: | Anna Kalenchits<br>Anna Kalenchits |
| 11 | | |
| 12 | For JP Morgan Chase: | Kevin C. Kelley, Esquire<br>JP Morgan Bank, N.A. |
| 13 | For Oaktree Capital<br>Management: | Edgar Lee<br>Oaktree Capital Management |
| 14 | | |
| 15 | For SuttonBrook<br>Capital Management, LP: | John London, Esquire<br>SuttonBrook Capital Management, LP |
| 16 | For Neil S. Losquadro: | Neil S. Losquadro<br>Neil S. Losquadro, In Pro Per |
| 17 | | |
| 18 | For Latigo Partners: | Scott McCabe<br>Latigo Partners |
| 19 | For Carlson Capital: | Michael McMahon<br>Carlson Capital |
| 20 | | |
| 21 | For Merrill Lynch<br>Capital Company: | Jane Parver, Esquire<br>Madlyn G. Primoff, Esquire<br>Kaye, Scholer, LLP |
| 22 | | |
| 23 | For Aaron Rosen: | Aaron Rosen<br>Aaron Rosen, In Pro Per |
| 24 | For Aurelius Capital<br>Management: | Dennis A. Prieto<br>Aurelius Capital Management |
| 25 | | |

5

| | | |
|---|---|---|
| 1 | For Mitchell Sockett: | Mitchell Sockett, Esquire |
| 2 | | King Street Capital Management, LLC |
| 3 | For Seneca Capital: | Usman Tahir<br>Seneca Capital |
| 4 | For Contrarian Capital<br>Management: | Joshua Trump<br>Contrarian Capital Management |
| 5 | | |
| 6 | For Alvarez & Marsal,<br>Inc.: | Brian Whittman, Esquire<br>Alvarez & Marsal, Inc. |
| 7 | For James J. Williams: | James J. Williams<br>Labanche Inc. Company |
| 8 | | |
| 9 | For Carval Investor: | Teck Wong, Esquire<br>Carval Investors |
| 10 | | |
| 11 | Court Recorder: | Al Lugano |
| 12 | Transcription Service: | Perfect Pages Transcription, Inc. |
| 13 | | 18 Tuckerton Road<br>Shamong, NJ 08088 |
| 14 | | www.perfecttranscripts.com<br>(609) 654-8880 |

15  Proceedings recorded by electronic sound recording;
16  transcript produced by transcription service.

17

18

19

20

21

22

23

24

25

6

INDEX

| | Direct | Cross | Re-Direct | Re-Cross | Further Redirect |
|---|---|---|---|---|---|

Witnesses For Debtors:

David Kurtz
(By Mr. Bendernagel)    31              83
(By Mr. Sottile)              49
(By Mr. Stark)                70
(By Mr. Teitelbaum)           80

EXHIBITS:                                Marked        Received

Debtors:

1          Chart of specific meeting         41            86
           dates

1          MR. SOTTILE:  Thank you, Your Honor.

2          (Recess from 11:20 a.m. to 11:35 a.m.)

3          MR. SOTTILE:  May I proceed, Your Honor?

4          THE COURT:  You may.

5                    CROSS-EXAMINATION

6  BY MR. SOTTILE:

7  Q.  Mr. Kurtz, my name is James Sottile.  I'm a lawyer with

8  Zuckerman, Spaeder, a special litigation counsel for the

9  Committee, and I have a few questions and follow up on your

10  direct testimony.

11  A.  All right.

12  Q.  I'd like to start with one statement you made.  I think

13  you testified, and correct me if I've got this wrong, that you

14  as a representative of the Debtors have sought to act as an

15  honest broker in efforts to reach a global resolution of

16  claims relating to the LBO; is that correct, sir?

17  A.  Yes.

18  Q.  And it's both you as their representative and the Debtors

19  themselves that have sought to act as honest brokers, correct?

20  A.  Yes.

21  Q.  And the parties between whom you and the Debtors have

22  sought to broker a deal are the Senior Lenders, the Credit

23  Agreement Lenders on the one side and the Committee acting for

24  Unsecured Creditors and other representatives of different

25  Creditors on the other side; is that fair?

1    A.   Generally, yes.

2    Q.   Okay.  Is it correct that the Debtors, and you as their

3    representative in these discussions, don't see themselves as

4    potential adversaries to the Lenders that would be the

5    Defendants in the fraudulent conveyance claims relating to the

6    leverage buyout.

7    A.   We could very well be adversaries with them at some point

8    in the future with respect to a plan.

9    Q.   So you envision a situation where the Debtors may end up

10   being adversary to the Senior Lenders with respect to a

11   proposed plan of reorganization?

12   A.   That could happen.

13   Q.   And just a follow up with respect to a proposed plan.  I

14   think I heard you say that if the end of the exclusivity

15   period is reached or comes close and a settlement is not

16   reached, that you believe the Debtors will file a plan of

17   reorganization; is that right?

18   A.   Yes.

19   Q.   And that's the moment at which, in your judgment, the

20   Debtors would become at least a potential adversary to the

21   Senior Lenders?

22   A.   It could happen that way.

23   Q.   And in that circumstance where the Debtors are proposing

24   their own plan, they would also, at least, potentially be

25   adverse to the interest of the Committee and of other

51

1  Creditors?

2  A.  It could happen that way, too.

3  Q.  But you believe that notwithstanding this potential

4  adversity to all sides, that you can make progress as an

5  honest broker in the next 30 days or so; is that right?

6  A.  Yeah, absolutely given my experience in working with this

7  group over the past several months, I'm sure that I can be

8  effective in playing that role.

9  Q.  Is litigation against the Senior Lenders on fraudulent

10  conveyance claims a path that the Debtors have considered

11  pursuing to resolve those claims?

12  A.  It is a path that we have considered pursuing.  It is a

13  path that we are unlikely to pursue.

14  Q.  Is it correct that unless and until the Motion for

15  Standing presented by the Committee is granted, the Debtors

16  are the only parties that could bring such litigation against

17  the Senior Lenders?

18  A.  Yes, that's my understanding of the law.  Our intention

19  would be if global resolution can't be reached, to file a plan

20  that incorporates a settlement of the claims and pursue

21  confirmation of that plan.

22  Q.  And nowhere in the Debtors intentions is the possibility

23  that you would actually file litigation to seek to resolve the

24  claims, correct?

25  A.  That is not our current intention.

52

1  Q.  Can you think of any circumstances in which the Debtors

2  would change their view and decide to pursue litigation as the

3  best way to resolve fraudulent conveyance claims arising from

4  the leverage buyout?

5  A.  Not as I sit here today.

6  Q.  You've spoken about a global resolution of claims relating

7  to the leverage buyout, Mr. Kurtz.  I want to make sure that I

8  understand the scope of what you're describing.  Would the

9  global resolution that you've testified about include a

10  resolution of potential claims against third parties such as

11  current and former officers and directors of the company for

12  breach of fiduciary duty and other wrongs connected with the

13  leverage buyout?

14  A.  Yeah.  Global would mean global.  All claims against all

15  parties would be resolved.

16  Q.  Oh.  And if a resolution were reached that did not include

17  resolution of the third-party claims, do I understand you

18  correctly that in that situation the Debtors would go ahead

19  and file a plan because there would be no global resolution?

20  A.  I think what I testified to is that in the absence of a

21  global resolution, we will likely file a plan, a Settlement

22  Plan, that proposes our view of what a fair settlement should

23  be.

24  Q.  And the global resolution that you're speaking about, just

25  to be absolutely clear, includes a settlement of claims

53

1   against current officers and directors for breach of fiduciary

2   duty relating to the LBO.

3   A.   Yeah, it does.  And, you know, the interesting thing about

4   that is everybody has understood that from the first

5   conversation, that that was the goal, global means everyone.

6   And I've been pleased that people, all of the participants,

7   were willing to engage with us on that basis.  So that's been

8   our intention and that's been the basis upon which these

9   discussions have occurred.

10  Q.   Have there been -- and I don't want to inquire into the

11  substance of discussions, but I just want you to tell me

12  whether or not, in fact, there have been any.  Have there been

13  any substantive settlement discussions between the Debtors and

14  the Committee with respect to potential third-party claims

15  against individuals including current and former officers and

16  directors of the company?

17  A.   Well, the subject has come up.

18         MR. BENDERNAGEL:  Objection, Your Honor.  I don't --

19  we're getting pretty close to the line of talking about

20  substance.

21         THE COURT:  Well, I don't disagree that we're

22  getting close, but I guess I would say to myself, I'd be

23  surprised if such discussions hadn't taken place.

24         MR. BENDERNAGEL:  Okay.  Well, got a guess when we

25  get to the lines that -- thank you, Your Honor.

54

1        THE COURT:  We're all in the business of drawing

2   lines.  You may proceed.

3        THE WITNESS:  I think I answered.

4   BY MR. SOTTILE:

5   Q.  I didn't hear the answer, Mr. Kurtz.

6   A.  The answer was those -- what was your question again?  I

7   -- it was some form of yes.  My answer was some form of yes,

8   but --

9   Q.  Well, why don't I try a different question and see if I

10  can keep the yes.

11  A.  Okay.

12  Q.  Just to be clear on the record, Mr. Kurtz, the question

13  is, have there been substantive settlement discussions

14  involving on the one hand the Debtors and on the other hand

15  the Committee that relate to settlement of potential

16  third-party claims against persons, including current and

17  former officers and directors of the company, without

18  revealing the substance of any such negotiations?

19  A.  Thank you.  Now I've got it.  The answer is, yes.  That

20  issue has come up in the context of settlement discussions

21  that we have had with the Creditors' Committee.

22  Q.  Now, when did it first come up in substantive --

23  A.  I can't tell you when it first came up.  That's my answer.

24  I don't remember when it first came up.

25  Q.  Did it come up at any time prior to February of this year?

55

1  A.  I don't recall.

2  Q.  You're not able to testify that such discussions took

3  place prior to February of this year?

4  A.  Well, you know what, it all kind of blends together in my

5  mind, so I couldn't draw a line and say it happened, you know,

6  on this side of the line and not that side.  I just -- I don't

7  remember it that way.  I don't know.

8  Q.  It's the 18th of February now.  You're not able to tell us

9  whether or not those discussions first took place between the

10  Committee and the Debtors in the last 17 days?

11  A.  Whether they first took place?

12  Q.  That's the question, sir.

13  A.  It -- my answer is I don't recall.  If I had to guess, I'd

14  say probably not, but I don't crisply recall and I'd rather

15  not guess.

16  Q.  Thank you.  Mr. Kurtz, you've been closely working with

17  representatives of the Debtors since Lazard was retained in

18  late 2008; is that correct?

19  A.  It is.

20  Q.  Do the persons that you have worked with include, Mr.

21  Liebentritt, their general counsel of the company?

22  A.  Yes.

23  Q.  Is it fair to say that he is the principal person you

24  report to in the course of your work?

25  A.  I would say that that's not true.

56

1   Q.   Who is the principal person that you report to?

2   A.   I would say there is not a principal person.  There are

3   different persons depending upon the issue.

4   Q.   Could you identify those persons and the issues to the

5   extent they relate to claims concerning the LBO?  I'm not

6   interested in reports on other matters.

7   A.   (Indiscernible.)

8   Q.   You're quite right.

9   A.   Then I would say it is Mr. Liebentritt.

10  Q.   Thank you.

11  A.   But ultimately the board makes these determinations of

12  course.

13  Q.   But day to day in the course of these discussions about a

14  resolution of LBO claims, the person you talk to and report to

15  is Mr. Liebentritt.

16  A.   Yes.

17  Q.   And he's currently the general counsel of the Tribune; is

18  that right?

19  A.   Correct.

20  Q.   Is it fair to say that Mr. Liebentritt is a long-time

21  business associate of Mr. Samuel Zell?

22  A.   It is correct.

23  Q.   And Mr. Zell was the moving force behind the leverage

24  buyout of the Tribune?

25  A.   No, he was a force.

57

1   Q.   I think we can stipulate to that.

2   A.   Yes.

3   Q.   Are you aware that -- of a company called Equity Group

4   Investments associated with Mr. Zell?

5   A.   I am.

6   Q.   What's the relationship of that company, if any, to the

7   leverage buyout transactions?

8   A.   Well, Equity Group Investments is a company controlled by

9   Mr. Zell.  I can't tell you whether it was through Equity

10  Group Investments or some other vehicle that Mr. Zell invested

11  in the Tribune.

12  Q.   Are you aware that Mr. Liebentritt was president of Equity

13  Group Investments from 2000 to 2005?

14  A.   Actually, I don't think I ever knew that.

15  Q.   But you were aware that he's had a long-time business

16  association with Mr. Zell?

17  A.   I am, and I'm aware that he's an employee of Equity Group

18  Investments.

19  Q.   Are you aware that he is currently acting as a senior

20  advisor to Equity Group Investments?

21  A.   I know he has a role in Equity Group Investments.  I don't

22  know exactly what that role is.

23  Q.   Are you aware of what role, if any, Mr. Liebentritt played

24  in connection with the leverage buyout transaction?

25  A.   My understanding is none.

58

1   Q.   I think you've testified that in the phase one process

2   that you described for settlement negotiations, there was a

3   major effort to gather the facts and present them to all

4   parties; is that a fair description?

5   A.   I think what I said was facilitate the dissemination of

6   information, so that's pretty close to what you said.

7   Q.   Close enough.  And is it correct that before disseminating

8   all the facts to other parties, the company had to do a

9   factual investigation itself?

10  A.   Yeah, I think that's fair to say.

11  Q.   Is it correct that that factual investigation was led by

12  the law firm of Sidley & Austin?

13  A.   Yes.

14  Q.   I think you also testified that one thing that you did was

15  inform yourself about the merits of the legal issues relating

16  to claims concerning the LBO; is that correct?

17  A.   To familiarize myself with those issues, yes.

18  Q.   And is it correct that the lawyers you turned to for that

19  familiarization would be the law firm of Sidley & Austin?

20  A.   Sidley & Austin was the law firm involved in that exercise

21  working with me.

22  Q.   Are you aware that Sidley & Austin either currently or

23  formally represents some of the Lenders, Senior Lenders,

24  including JP Morgan and Merrill Lynch?

25  A.   Yes.

59

1   Q.   Is it correct that to your understanding Sidley & Austin

2   either can't because of ethical rules or is not prepared to

3   act as litigation counsel for the Tribune with respect to

4   claims arising from the LBO against Senior Lenders?

5   A.   My understanding is that they would not be able to pursue

6   a litigation against JP Morgan and Merrill Lynch.

7   Q.   Has the company retained other counsel that could pursue

8   such litigation without disabling conflicts?

9   A.   Not that I'm aware of.

10  Q.   To your knowledge, has anyone acting on behalf of the

11  company prepared a Complaint for an action against the Senior

12  Lenders asserting fraudulent conveyance claims arising from

13  the LBO?

14  A.   Not to my knowledge.  As I indicated earlier, our plan if

15  global settlement can't be achieved would be to file a

16  Settlement Plan and so we're not working on a Complaint.

17  Q.   I think you indicated, Mr. Kurtz, that you have acted in

18  several different bankruptcy restructurings in which

19  fraudulent conveyance claims have been at issue; is that

20  correct?

21  A.   It is.

22  Q.   In any of those cases, have you recommended litigation as

23  a means of resolving the fraudulent conveyance claims?

24  A.   I've recommended litigation if satisfactory settlement

25  couldn't be achieved.