**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| TRIBUNE COMPANY, <u>et al</u>., | ) Case No. 08-13141 (KJC) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| | ) |
| | ) |

**STATEMENT OF CERTAIN CREDIT AGREEMENT LENDERS
<u>REGARDING FILING OF ALTERNATIVE PLAN OF REORGANIZATION</u>**

On September 1, 2010, the Bankruptcy Court overseeing Tribune Company's chapter 11

cases appointed a mediator and directed major constituencies in the cases to participate in a

mediation aimed at "resolving disputes in connection with the formulation and proposal of a

confirmable plan of reorganization, including the appropriate resolution of the LBO-Related

Causes of Action."

The mediation currently is scheduled to begin on September 26 and 27, 2010.  As holders

(or general partners or managers of holders) of several billion dollars of claims arising under the

Tribune Credit Agreement, certain investment funds and accounts managed by Oaktree Capital

Management, L.P. and/or its affiliates ("<u>Oaktree</u>"), Angelo, Gordon & Co., L.P. and/or certain of

its affiliates ("<u>Angelo Gordon</u>" and together with Oaktree, the "<u>Credit Agreement Proponents</u>")

are eager to participate in the mediation and hopeful that it will produce broad and far-reaching

consensus on the terms of a plan of reorganization that will facilitate Tribune's emergence from

bankruptcy.

While the Court has indicated that it will not take action on any proposed plan of

reorganization until the mediation process concludes, the Court's mediation order expressly

provides that parties are permitted to file a plan before the mediation has concluded (in

recognition of the fact that the Debtors' plan exclusivity periods have now expired).  With the

filing of their Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries Proposed

By Oaktree Capital Management, L.P. And Angelo Gordon Co., L.P. (the "<u>Credit Agreement</u>

Lender Plan") , the Credit Agreement Proponents have chosen to avail themselves of this right. The Credit Agreement Proponents anticipate that other holders of the Credit Agreement debt also will become proponents and/or supporters of the Credit Agreement Lender Plan.

First and foremost, the Credit Agreement Lender Plan is presented only as an alternative in the event that the upcoming mediation does not produce a fully-consensual resolution to these cases. As noted, the Credit Agreement Proponents would greatly prefer a restructuring that has the broad support of all material constituencies. Thus, the filing of the Credit Agreement Lender Plan is not – and should not – be viewed as any indication that the Credit Agreement Proponents are less than 100% committed to a successful mediation process.

Rather, the Credit Agreement Proponents have filed the Credit Agreement Lender Plan to minimize the harm, disruption, and value destruction that would occur in the event that the mediation does not produce a consensual resolution and, as a result, the Debtors are forced to face the prospect of remaining stuck in chapter 11 proceedings for an additional prolonged period. The Debtors' management repeatedly has stated that the pendency of the chapter 11 proceedings is harming the Tribune businesses and preventing consummation of valuable business initiatives and transactions. As such, the Credit Agreement Proponents believe that rapid consummation of a plan of reorganization (whether through a successful mediation or, alternatively, by the Credit Agreement Lender Plan) that permits the Tribune businesses to emerge from bankruptcy is critical and will benefit all stakeholders by enhancing the value of the Tribune enterprise.

At bottom, the Credit Agreement Lender Plan provides a mechanism for the Debtors to exit bankruptcy in the near future in the event that the mediation is not successful. In particular, the Credit Agreement Lender Plan is designed to maximize the value of the estates for all creditors, enabling the Debtors to avoid being trapped in chapter 11 limbo while also providing a mechanism to litigate or resolve over a longer time period various complex issues and claims relating to Tribune's Leveraged ESOP Transactions, which claims have now been analyzed and dissected in a 1,000+ page report prepared by the Examiner, Professor Kenneth Klee.

Specifically, the Credit Agreement Lender Plan allows for post-confirmation litigation of all claims and causes of action arising from what the Examiner called the "Step Two Transactions" (those consummated in December 2007 in connection with Tribune's merger with the ESOP).  Those claims include all causes of action that the Examiner found to have a prospect of success of fifty percent or better (*i.e.*, those claims found to be in "equipoise" or better), and all claims for objection, avoidance or disallowance of Credit Agreement claims for advances made in connection the "Step Two Transactions" regardless of the Examiner's view of the strength of such claims.  This is the case even though the Credit Agreement Proponents hold substantial amounts of the "Step Two" Credit Agreement debt that would be the subject of the post-bankruptcy litigation claims preserved under their own Credit Agreement Lender Plan.  All preserved claims will be transferred to a "litigation trust", run by a litigation trustee and overseen by a board to be selected by the Official Committee of Unsecured Creditors, maintaining full authority to pursue all relevant parties, including lenders, financial advisors, lawyers, shareholders, directors, and officers, in respect of those claims.

On the other hand, consistent with the comprehensive nature of the Examiner's investigation, the Credit Agreement Lender Plan provides for the Bankruptcy Court to determine, as a condition to confirmation, that it is appropriate for the Plan to resolve and release claims and causes of action arising from what the Examiner called the "Step One Transactions" (those consummated in June 2007 in connection with Tribune's recapitalization), including claims for objection, avoidance or disallowance of Credit Agreement claims for advances made in connection with what the Examiner called the "Step One Transactions."  The Examiner found those claims to have less than a fifty percent prospect of success and, consistent with the Examiner's conclusions (which the Credit Agreement Proponents believe can be confirmed by the Bankruptcy Court in the context of confirmation), the "Step One" Credit Agreement claims will be allowed and entitled to distributions from the estate in accordance with the priorities of the Bankruptcy Code and the Credit Agreement itself.

A few additional points should be emphasized:

The questions relating to the "Step One Transactions" that are to be determined and resolved in connection with confirmation of the Credit Agreement Lender Plan are distinct and severable from the many other questions and issues presented by the "Step Two Transactions." This is readily apparent from the structure and content of the Examiner's report, in which all issues related to "Step One" and "Step Two" are analyzed and treated separately.

The Credit Agreement Lender Plan does not ignore any allegations that have been leveled against anyone or seek to deprive any constituency of any right to challenge anything. Instead, it provides a framework for organizing those challenges in a way that minimizes the time that the Debtors' businesses must remain in bankruptcy.

The Credit Agreement Lender Plan is not a "take it or leave it" document. Rather, the Credit Agreement Proponents invite dialogue with all who might agree with the provisions of the Credit Agreement Lender Plan and all who might disagree. The Credit Agreement Proponents will seek to maximize consensus in all respects, including in an effort to resolve those issues and questions otherwise reserved for future determination and to reach agreement on procedures for obtaining judicial determinations of issues and questions that cannot be resolved even following good faith efforts.

Finally, as previously noted by the Credit Agreement Proponents, there remain important differences between Tribune's subsidiaries and Tribune Company (the parent). Most importantly, the Tribune subsidiaries had billions of dollars less indebtedness at the time of the "Step One" and "Step Two" Transactions, yet held substantially all of Tribune's valuable operating assets. It is quite possible that the Court could determine that the subsidiaries were solvent at the time of those transactions even if it determines that Tribune Company itself was not solvent.[1] This would have the effect of preserving all Credit Agreement claims against the

---

[1] The Examiner's report incorrectly includes the value of the Chicago Cubs ($850 million) as an asset of Tribune Company. In fact, the Chicago Cubs were owned by a Tribune guarantor subsidiary. Accordingly, the Examiner's conclusions concerning the solvency of the Tribune guarantor subsidiaries at the conclusion of "Step One" should be more forceful than the those

subsidiaries, and would enable the subsidiaries to exit bankruptcy even if Tribune Company could not.  The Credit Agreement Lender Plan contains numerous individual plans, all of which are severable and would enable the Tribune chapter 11 subsidiaries to emerge from their bankruptcy cases prior to the time that a plan for Tribune Company can be confirmed.

In sum, the Credit Agreement Lender Plan remains true to the Examiner's conclusions, enables the Debtors to exit bankruptcy in the near future, provides for a material initial distribution to holders of Credit Agreement claims (on account of the portion of Credit Agreement debt relating to the "Step One" advances), and allows structurally subordinated creditors of Tribune Company (the parent entity) to receive a pro rata distribution of the value of Tribune Company plus interests in the litigation trust formed to pursue the claims that the Examiner found to be viable.

The Credit Agreement Proponents intend to seek confirmation of the Credit Agreement Plan if the mediation does not prove successful.

Dated:  September 17, 2010          YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert S. Brady*
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telephone: (302) 571-6600
Telecopier: (302) 571-1253

- and -

---

included in his report (because the guarantors have an additional $850 million in value not accounted for in the report), and his conclusions about the solvency of the guarantors at the conclusion of "Step Two" should be a substantially closer call.  The misclassification of the Chicago Cubs has no impact on the Examiner's conclusions concerning Tribune Company's solvency at "Step One" (which was determined on an overall enterprise basis).

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett
James O. Johnston
Joshua D. Morse
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telephone:  (213) 694-1200
Telecopier:  (213) 694-1234
*Counsel to Oaktree Capital Management, L.P. and*
*Angelo, Gordon & Co., L.P.*

Dated:  September 17, 2010                 WILMER CUTLER PICKERING HALE & DORR LLP


_____*/s/ Andrew Goldman*_____
Andrew Goldman
399 Park Avenue
New York, New York  10022
Telephone: (212) 230-8800
Telecopier: (212) 230-8888
*Counsel to Angelo, Gordon & Co., L.P.*