## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x

In re:

TRIBUNE COMPANY, et al.,

        Debtors.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Chapter 11

Case No. 08-13141 (KJC)
Jointly Administered

**Ref Docket Nos. 5669, 5737, 5740, 5742, 5761, 5762, 5764, 5765, 5766, 5770**

**Hearing Date: September 22, 2010 at 1:30 p.m. (prevailing Eastern time)**

-----------------------------------------------------------x

### REPLY IN SUPPORT OF MOTION OF AURELIUS CAPITAL MANAGEMENT, LP TO DISQUALIFY CHADBOURNE & PARKE LLP FROM ACTING ON BEHALF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN MATTERS IN WHICH IT HAS CONFLICTS OF INTEREST

Aurelius Capital Management, LP ("Aurelius"), acting on behalf of its managed funds in the chapter 11 cases of the above-captioned debtors (collectively, the "Debtors"), submits this reply in support of the motion it filed on September 13, 2010, seeking an order (i) disqualifying Chadbourne & Parke LLP ("Chadbourne") from advising, representing or otherwise acting as legal counsel for the Official Committee of Unsecured Creditors (the "Committee") in all matters in which it has conflicts of interest, including, but not limited to, (a) the upcoming mediation, and (b) any potential or actual LBO-Related Cause of Action or settlement thereof, and any Chapter 11 plan to the extent it deals with the foregoing, and (ii) directing that special conflicts counsel to the Committee, Zuckerman Spaeder LLP ("Zuckerman Spaeder"), solely represent the Committee in such matters without any influence

918243.1

from or participation by Chadbourne (the "Disqualification Motion") [Docket No. 5669].[1] In

support of the Disqualification Motion, Aurelius respectfully states as follows:

## DISCUSSION

1.      In its objection to the Disqualification Motion (the "Objection") [Docket No.

5737], Chadbourne attempts to sidestep three fundamental questions raised by Aurelius in the

Disqualification Motion:  First, why have Chadbourne and Zuckerman Spaeder failed and

refused to delineate the role played by Chadbourne with respect to investing, negotiating, and

advising the Committee as to estate claims against major Chadbourne clients such as JPMorgan,

Merrill Lynch, Citigroup, and Morgan Stanley?  Second, why has Chadbourne continued to

actively negotiate settlement of the LBO-Related Causes of Action with its own clients and

others who are similarly situated when it is uncontrovertibly conflicted from taking such actions

and conflicts counsel has been retained? and Third, because the decision to sue or not to sue is

inextricably intertwined with the depth of the investigation, the analysis of the strengths and

weaknesses of the claims, and the success of the negotiations (which includes how much is

"given up" in those negotiations), how can Chadbourne ethically have any involvement in any

matters connected to the LBO-Related Causes of Action when its clients are significant targets of

such investigation?

A.      **The Court Never Authorized Chadbourne to
Act In Dereliction of Its Ethical Responsibilities**

2.      Instead of challenging Aurelius's allegations of its misbehavior, Chadbourne

takes the position that this Court has authorized it to do everything it has done with respect to

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Disqualification Motion.

2

investigating and attempting to settle the LBO-Related Causes of Action. Aurelius respectfully submits this is not what the Court has knowingly authorized Chadbourne to do.

3.      Chadbourne filed the Supplemental Affidavit of David LeMay and made additional disclosures regarding Chadbourne's conflicts and inability to investigate and/or litigate against certain key parties in order to address concerns that were informally raised by the Office of the United States Trustee (the "U.S. Trustee"). *See* Objection at ¶ 16. These additional disclosures were made by Chadbourne to respond to the U.S. Trustee's concerns and, presumably, to avoid an objection to its retention. As a result of the bargain between Chadbourne and the U.S. Trustee, the Court approved Chadbourne's retention on an uncontested basis.

4.      Nowhere in this Court's orders approving the retention of Chadbourne or Zuckerman Spaeder did the Court give Chadbourne *carte blanche* to act in dereliction of its ethical obligations.[2] Instead, Chadbourne and Zuckerman Spaeder have chosen to read the orders as providing cover to act contrary to the rules of professional responsibility and common sense. Even Chadbourne's own description of what it thinks it is specifically authorized to do would leave any sensible person scratching his head: "investigate and negotiate claims against two Case Parties that it represents in unrelated matters." Objection at ¶ 4.

5.      Aurelius is not seeking to disqualify Chadbourne from these cases altogether. Nor is Aurelius seeking to modify this Court's retention orders under Rule 60(b) of the Federal Rules of Civil Procedure (as Chadbourne erroneously argues in its Objection at paragraphs 27

---

[2] "[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."). *See* Del. R. Prof. Conduct 1.7(a); N.Y. R. Prof. Conduct 1.7(a).

918243.1

and 28). To the contrary, Aurelius is seeking to enforce Chadbourne's ethical obligations to the

Committee and, by extension, to the general body of unsecured creditors that the Committee

represents. Aurelius sought to accomplish this without this Court's intervention. Chadbourne

has acknowledged this. *See* Objection at ¶¶ 21-23. Unfortunately, the Disqualification Motion

became necessary when Chadbourne chose to ignore the clear warnings regarding its conflicts

raised by Aurelius, the U.S. Trustee, and the movants for both Examiner Motions, and because it

has steadfastly refused to moderate its behavior by allowing Zuckerman Spaeder to take over

with respect to matters in which Chadbourne is conflicted.

6.      Regardless of the fact that Chadbourne's retention was ultimately unopposed, this

Court has never ruled on whether Chadbourne's actions vis-à-vis the LBO-Related Causes of

Action are ethical or permissible.[3] The issue simply has not yet been adjudicated --

notwithstanding entry of unopposed retention orders. In this regard, as justification for its

actions, Chadbourne misleadingly states that the Court "found" and "determined" that

Chadbourne is disinterested. *See* Objection at ¶¶ 12 and 45. This is not true because (a) there

was never any adjudication by the Court of Chadbourne's disinterestedness and (b) regardless of

the "finding" in the unopposed retention order, Chadbourne is clearly <u>not</u> disinterested due to the

fact that major Chadbourne clients are potential defendants in the LBO-Related Causes of Action

-- the central issue in these cases.[4] Hiring Zuckerman Spaeder was an attempt by the Committee

to address the fact that Chadbourne is not disinterested; however, as described below and in the

---

[3] Similarly, this Court never had to make a ruling regarding Chadbourne's conflicts of interest when that issue was raised in the Motion of Law Debenture Trust Company of New York for Leave to Conduct Discovery Pursuant to Rule 2004 of Federal Rules of Bankruptcy Procedure of Tribune Company, its Affiliates, and Certain Third Parties, or Alternatively, for the Appointment of an Examiner (the "<u>First Examiner Motion</u>") [Docket No. 2031] or the Motion of Wilmington Trust Company for Appointment of an Examiner Pursuant to Section 1104(c) of the bankruptcy Code (the "<u>Second Examiner Motion</u>") [Docket No. 3062]. Both the First Examiner Motion and the Second Examiner Motion were resolved consensually by the parties prior to this Court's having to make a ruling.

[4] *See* cases discussed in footnote 15, *infra*.

4

918243.1

Disqualification Motion, the Committee and Chadbourne have failed to properly utilize conflicts counsel. The mere engagement of conflicts counsel does not transform an interested law firm into a disinterested law firm.

**B.**     **The Committee Has Not Properly Utilized Conflicts Counsel**

7.     The order approving Zuckerman Spaeder's retention did not relieve Chadbourne of its ethical and fiduciary obligations to the Committee and unsecured creditors. While Zuckerman Spaeder's retention was unopposed and the order approving that retention did not explicitly forbid Chadbourne from investigating, negotiating, and settling the LBO-Related Causes of Action against Chadbourne clients, that order was entered under the assumption -- implicit in all court-authorized retentions -- that Chadbourne would police itself and would not take actions it was ethically barred from taking due to its conflicts of interest.

8.     Chadbourne in its Objection makes clear that it is still not able to delineate the respective roles of Chadbourne and Zuckerman Spaeder in these cases -- something Aurelius has repeatedly asked those law firms to do.[5] Because there has been no effective delineation of roles, by default, both firms are working side-by-side to investigate and negotiate the LBO-Related Causes of Action. *See* Objection at ¶ 3. The appointment of Zuckerman Spaeder as special litigation counsel cannot remedy Chadbourne's conflicts if there is no delineation that is clear to the two firms, the Committee, creditors generally, and this Court. The failure to create and enforce such a delineation has led to an amorphous role for conflicts counsel that completely undercuts the purpose for which such counsel was retained in the first place. Aurelius submits

---

[5] *See* letter dated September 2, 2010 from Edward A. Friedman of Friedman Kaplan Seiler & Adelman LLP, counsel to Aurelius, to Howard Seife of Chadbourne and Graeme W. Bush of Zuckerman Spaeder, which was attached to the Disqualification Motion as Exhibit B.

5

that the Court should remedy this situation by granting the relief Aurelius seeks in the

Disqualification Motion.

9.      It should be clear that the Committee's hiring of conflicts counsel to pursue the

LBO-Related Causes of Action does not mean that both firms may together represent the

Committee in connection with the LBO-Related Causes of Action and that Zuckerman's mere

presence in these cases somehow absolves or "cancels out" Chadbourne's conflicts of interest.

Such an argument is akin to someone who is not licensed to practice law saying that he is able to

give legal advice because there also happens to be a licensed attorney in the room.  Simply put,

how does anyone police Chadbourne from doing, while Zuckerman Spaeder is in the room,

exactly what it would have done had Zuckerman Spaeder never been engaged?

10.     The events surrounding the April 13, 2010 hearing before this Court (the "April

13 Hearing") are a prime example of how conflicts counsel has not been properly utilized in

these cases and how the presence of conflicts counsel has been used to mislead creditors and this

Court.  Among the matters scheduled for the April 13 Hearing was the Second Examiner Motion.

At that hearing, prior to addressing the Second Examiner Motion, the Debtors publicly

announced that they had reached an agreement to settle the LBO-Related Causes of Action,

which deal "came together on or about March 30th," and that certain key parties (including the

Committee) had executed a Settlement Support Agreement that memorialized the proposed

settlement and formed the basis of the Joint Plan of Reorganization (the "Settlement Plan")

[Docket No. 4008], which was filed a day earlier on April 12, 2010.  (Apr. 13, 2010 Hrg.

Transcript, 4:22-5:17).[6]

---

[6] A true and correct copy of the pages of the transcript of the April 13 Hearing referenced herein are
attached hereto as Exhibit A.

918243.1

11.     After making the announcement regarding the Settlement Support Agreement and Settlement Plan, counsel to the Debtors called upon counsel from Zuckerman Spaeder -- Graeme Bush -- to "join [him] to describe [the Committee's] support." *Id.* at 5:22-5:24. As reflected on the transcript of the April 13 Hearing, Mr. Bush proceeded to make statements in support of the Settlement Plan, portraying his firm as "independent counsel" retained to "represent the Committee in connection with any settlement negotiations that may occur." *Id.* at 6:8-6:16. Mr. Bush also said that Zuckerman Spaeder "conducted an extensive legal and factual evaluation and analysis" of the LBO-Related Causes of Action, that Zuckerman Spaeder was "not constrained in any way in the work that [they] did," and that Zuckerman Spaeder "reported to the Committee, [they] did not report, or take direction from any other professional representing the Committee." *Id.* at 7:2-7:9.

12.     A look behind the scenes, however, demonstrates that, although Zuckerman Spaeder has done significant work in connection with investigating, negotiating, and pursuing the LBO-Related Causes of Action, Chadbourne performed the vast majority of the work in connection with this (unsuccessful) settlement attempt. Indeed, as set forth in the chart below, for the months of March and April 2010 -- the months during which the Settlement Plan and Settlement Support Agreement were negotiated and documented -- Zuckerman Spaeder professionals spent a fraction of the time that Chadbourne professionals spent negotiating a settlement of the LBO-Related Causes of Action (16.8% to be exact).

7

918243.1

| Billing Month | Zuckerman Spaeder Relevant Hours/Fees[7] | Chadbourne Relevant Hours/Fees[8] |
|---|---|---|
| March 2010 | 293.40 hours - $155,391.50 | 1,770.90 hours - $671,349 |
| April 2010 | 186.30 hours - $111,489.50 | 1,084.20 hours - $931,099 |
| *TOTAL* | *479.7 hours - $266,881* | *2,855.1 hours - $1,602,448* |

13.     The foregoing is a striking example of how Chadbourne has used conflicts counsel as a "smoke screen" behind which it hides its conflicted activities.  For Chadbourne to do the vast majority of the work in attempting to settle the LBO-Related of Causes of Action and then allow the Debtors to parade Zuckerman Spaeder before the Court to make it appear as if the Committee's position in connection with the Settlement Plan was free of the taint of Chadbourne's conflicts of interest is misleading to creditors and this Court.  Now, with these cases at a crucial point and Mediation about to commence, such window-dressing must end and Zuckerman Spaeder should be required and allowed to perform the role of true conflicts counsel.

14.     Further, with respect to the proper use of conflicts counsel, the closing paragraphs of Chadbourne's Objection make clear that Chadbourne just does not get it.  First of all, Chadbourne points to the fact that the Special Committee of the Debtors' Board of Directors recently hired Jones Day to serve as its special counsel as somehow validating Chadbourne's inadequate approach to its conflicts of interest.  Objection at ¶ 46.  The fact that the Debtors in these cases are so conflicted due to the potential liability of certain officers and directors who participated in the LBO Transactions that the Debtors felt the need to establish a special

---

[7] The Zuckerman Spaeder hours/fees reflected in this column are the hours and fees for billing matter # 1 ("Bank Claims"), as reflected on the Eighth and Ninth Monthly Applications of Zuckerman Spaeder LLP for Interim Allowance of Compensation and Reimbursement of Expenses Filed by Special Counsel to the Official Committee of Unsecured Creditors [Docket Nos. 4179 and 4664, respectively].

[8] The Chadbourne hours/fees reflected in this column are the sum of the hours billed and the fees requested for billing matter # 11 ("Plan and Disclosure Statement"), matter # 17 ("General Litigation"), and matter 19 ("Review of Pre-Petition Financings"), as reflected on the Fifteenth Monthly Application of Chadbourne Parke LLP for Compensation of Chadbourne & Parke LLP for the period March 1, 2010 to March 31, 2010 [Docket No. 4160] and the Sixteenth Monthly Application of Chadbourne Parke LLP for Compensation of Chadbourne & Parke LLP for the period April 1, 2010 to April 30, 2010 [Docket No. 4601].

918243.1

committee of "independent" directors and hire special counsel for that committee is hardly a

shining example of why Chadbourne's conflicts should likewise continue to permeate these

cases. Chadbourne appears to be so blinded by its own conflicts of interest that it cannot see the

irony in looking for justification of its conduct in the fact that the Debtors are hopelessly

conflicted as well. While it is true that the Debtors are hobbled by their own conflicts of interest,

that does not mean the Committee should be hobbled as well. What are pre-LBO creditors to

think about this sad state of affairs? In what universe is it a "tactic" for innocent creditors to be

troubled by the facts that the two so-called case fiduciaries -- the "debtor-in-possession" and the

"official" committee of unsecured creditors -- are not only plagued by conflicts, but also that

these conflicted fiduciaries are actively trying to settle the LBO-Related Causes of Action which

underpin their conflicts?

15.    Chadbourne also states that "it is now widely prevalent, if not standard practice to

obtain special counsel for creditors' committees in major bankruptcy cases." *Id.* at 48. In

support of this statement Chadbourne cites several major chapter 11 cases where the major issue

in the case was not whether a creditors' committee should pursue estate causes of action arising

out of a failed LBO. *Id.* Chadbourne's blasé approach regarding conflicts counsel demonstrates

that it views the hiring of conflicts counsel as merely a procedural hoop to jump through rather

than a substantive bar to be respected.

C.    **Disclosure of Conflicts and Limited Waivers Do Not Relieve Chadbourne From Its Ethical Obligations to the Committee and Unsecured Creditors**

16.    Chadbourne's uncontested and irrelevant assertion that "the connections and

alleged 'conflicts' at issue were fully disclosed to the Committee, the Court and to all parties

when Chadbourne was retained" has no bearing on the relief sought in the Disqualification

Motion. *See* Objection at ¶ 11. Aurelius is not challenging Chadbourne's disclosures in this

918243.1

matter; Aurelius is challenging Chadbourne's refusal to cease taking actions on behalf of the

Committee it is ethically barred from taking. As was made clear in the *Project Orange* case

(which Chadbourne weakly attempts to distinguish), disclosing a conflict of interest and a lack of

objection does not absolve the firm from the consequences of being conflicted. *See In re Project*

*Orange Assocs., LLC*, 431 B.R. 363, 374 n.4 (Bankr. S.D.N.Y. 2010) ("Identifying conflicts does

not involve a game of 'gotcha,' where disclosure of a conflict party in one schedule excuses

counsel from the consequences of a conflict if no one finds the earlier disclosure and objects.").

      17.    It is quite telling that, while Chadbourne early in the case obtained written limited

waivers from current Committee member JPMorgan and former Committee member Merrill

Lynch,[9] Chadbourne apparently did not attempt until September 10, 2010, to document any

waiver from the Committee for Chadbourne to continue to represent JPMorgan and Merrill

Lynch -- not to mention Citigroup, Morgan Stanley, and the more than one hundred (100) other

prepetition lenders that are Chadbourne clients potentially or actually adverse to the Committee.

Rule 1.7(b) of the New York Rules of Professional Conduct and the Delaware Lawyers' Rules of

Professional Conduct provide that:

> Notwithstanding the existence of a concurrent conflict of interest ...
> a lawyer may represent a client if:
>
> (1) the lawyer reasonably believes that the lawyer will be able to
> provide competent and diligent representation to each affected
> client;
>
> (2) the representation is not prohibited by law;
>
> (3) the representation does not involve the assertion of a claim by
> one client against another client represented by the lawyer in the
> same litigation or other proceeding before a tribunal; **and**
>
> (4) *each* **affected client gives informed consent in writing.**

---

[9] Merrill Lynch resigned from the Committee on September 9, 2009.

918243.1

Del. R. Prof. Conduct 1.7(b); N.Y. R. Prof. Conduct 1.7(b).

18.    In the Committee's second reply in connection with the Disqualification Motion (the "Second Chadbourne Reply")[Docket No. 5764], which responds to the papers Deutsche Bank Trust Company Americas ("Deutsche Bank") and Wilmington Trust Company filed in support of the Disqualification Motion [Docket Nos. 5740, 5742, respectively], Chadbourne states that a resolution of the Committee adopted on September 10, 2010 by a 5-2 vote[10] (the "Committee Resolution") "expressly confirms its waiver of conflicts with respect to Chadbourne." *Second Chadbourne Reply* at 7, Ex. A.[11]

19.    The belated Committee Resolution is clearly a *post-hoc* attempt to preempt the arguments Aurelius raised in its Disqualification Motion.  The Committee Resolution is suspect because it purports to "confirm" a prior "waiver of conflicts arising from Chadbourne & Parke's representation of JPMorgan and Merrill Lynch."  *Id.*  The accuracy of the content of the Committee Resolution is undercut by paragraph 6 of the Second Chadbourne Reply.  In paragraph 6, Chadbourne acknowledges that the purported waiver of Chadbourne's conflict was never explicit but instead was a deemed waiver based on a lack of objection after Chadbourne had disclosed its connections.  If that is the case, then what exactly was the Committee "confirming" on September 10, 2010?  Moreover, the Committee Resolution makes no mention

---

[10] It is noteworthy that the five Committee members that voted in favor of the Committee Resolution are the trade and pension representatives on the Committee (*i.e.,* the PBGC, William Niese on behalf of retirees, the Washington-Baltimore Newspaper Guild, Buena Vista Television, and Warner Bros. Television).  Under the Debtors' now-abandoned Amended Joint Plan of Reorganization, all subsidiary-level trade creditors were to be paid in full.  Several of the TM Retirees represented by Mr. Niese also hold claims against subsidiary debtors and were to receive payment in full under that plan.  Moreover, the claims of the PBGC were to be reinstated under section 11.2.7 of that plan.  Accordingly, at least four of the five "yes" votes came from creditors who do not have a "dog in the hunt" because the prior plan would have and paid them off in full or reinstated their claims.  The people who do have a dog in the hunt are pre-LBO bondholders, whose claims dwarf those of trade creditors and whose indenture trustees were the dissenting votes on the Committee.

[11] As discussed below, Chadbourne and the Committee do not identify the "prior" waiver that is supposedly being confirmed in this self-serving document.

918243.1

of the fact that Chadbourne has conflicts stemming from its representation of Morgan Stanley, Citigroup, and the more than one hundred (100) other prepetiton lenders Chadbourne actively represents. To be clear, any conflict waiver by an official committee cannot preclude an unsecured creditor from raising the conflict and objecting to counsel's actions that implicate such conflict. This is because an official committee is not simply another client of a law firm but rather a fiduciary for the unsecured creditors at large.

20.     The fact that there were two votes against the self-serving Committee Resolution is notable because it shows that not all members of the Committee feel that Chadbourne's conflicts have been properly screened from this case. Indeed, the joinder of Committee member Washington-Baltimore Newspaper Guild [Docket No. 5776] (the "WBNG Joinder") aptly demonstrates the blinders worn by several members of the Committee. In that pleading, Washington-Baltimore Newspaper Guild states that "[t]he Committee was fully aware at the time that Chadbourne's clientele included JPMorgan Chase & Co., and Merrill Lynch & Co., *but these known and limited conflicts were of no moment to the Committee and were overshadowed by the expertise that Chadbourne would bring to this important proceeding*." WBNG Joinder at ¶ 1 (emphasis added). This statement suggests either that Chadbourne's very significant conflicts were given short shrift by the Committee or that the Committee was relying on Chadbourne's conflicted description of its circumstances when it made its pitch to be selected as counsel.

21.     Although JPMorgan and Merrill Lynch granted waivers for Chadbourne to investigate and negotiate with them, such waivers invite the very problems creditors have faced in this case. The danger of allowing a conflicted firm to investigate and negotiate with its own clients -- as Chadbourne argues it has been authorized to do here -- is that it will favor the client

12

who is the target of the investigation by advocating no action be taken against that client or negotiating a settlement that is too favorable to the target client. In other words, investigating and negotiating are elemental and implicate Chadbourne's conflicts just as much as (if not more than) filing a complaint.

22.     Chadbourne also appears to believe that a majority of the Committee members can simply choose to hire counsel that is conflicted on the central issue in the case -- the LBO-Related Causes of Action -- and that is the end of the story.[12]  *See* Sep. 15, 2010 Hrg. Transcript, 53:1-53:6 (where Mr. LeMay states "I basically am pleading guilty, if that's the word, to the fact that Chadbourne and Park is representing its client and obviously in our justice system generally it's clients, not third parties, who get to decide who they want to hire as lawyers and under what circumstances."). Chadbourne, however, does not state in its papers whether JPMorgan and/or Merrill Lynch recused themselves from the Committee's decision on hiring Chadbourne. It cannot be the case that the Committee's improper decision to hire Chadbourne notwithstanding its conflicts is final when it comes to light that Chadbourne has failed to police itself with regards to those very conflicts. Nor can it be the case that the creditor body at large, the very group to which the Committee's duties run, are bound by the mistaken actions of some of the members of the Committee.

**D.     The Timing of the Disqualification Motion Was Appropriate and Necessary**

23.     Chadbourne complains that Aurelius has belatedly moved to disqualify Chadbourne in order to deprive the Committee of its chosen counsel on the eve of the Mediation. Objection at ¶ 1, 5.

---

[12] Aurelius does not concede and strenuously disagrees that a majority of or even all of the seven Committee members can waive a conflict of interest -- a fundamental client decision -- on behalf of dissenting Committee members and unsecured creditors that do not have a seat on the Committee.

13

918243.1

24.     First of all, Aurelius does not seek to disqualify Chadbourne from these cases; the Disqualification Motion only seeks to disqualify Chadbourne from matters in which it has conflicts of interest.  Moreover, as Chadbourne admits, Aurelius raised its concerns regarding Chadbourne's conflicted behavior in an email to Chadbourne and Zuckerman Spaeder on August 14, 2010 -- weeks before the Court ordered mediation on September 1 -- and again in a letter on September 2, 2010.  *See* Objection at ¶¶ 21-23.  For Chadbourne to essentially ignore Aurelius's written communications regarding these issues and then feign surprise that Aurelius filed the Disqualification Motion is disingenuous.  The timing of the Disqualification Motion, which seeks limited and targeted relief, is appropriate considering that the Mediation is imminent and Chadbourne has refused repeated requests to police itself and abstain from advising the Committee on matters in which it is conflicted.[13]  Nor is this the first time these issues have been raised.  How many warning shots need to be fired?

25.     As Deutsche Bank points out in its response in support of the Disqualification Motion [Docket No. 5740], Aurelius does not (as Chadbourne alleges) seek to deprive the Committee of counsel during the Mediation or to dictate the Committee's choice of counsel.  Aurelius simply seeks to have the Committee utilize Zuckerman Spaeder at the Mediation and in all negotiations regarding the LBO-Related Causes of Action.  After all, ***Zuckerman Spaeder is the firm that the Committee chose and retained over a year ago to pursue the LBO-Related Causes of Action because of Chadbourne's conflicts of interest***.  In fact, Aurelius challenges

---

[13] In case there was any doubt that Chadbourne's conflicted influence with respect to the LBO-Related Causes of Action has been a constant in these cases, the joinder to Chadbourne's Objection filed by Committee member William A. Niese states: "Chadbourne has been the Committee's general counsel, and has coordinated and spearheaded the team of legal and financial advisors retained by the Committee to advise the Committee on ***all aspects of the bankruptcy process and the impact of litigation versus settlement***."  Joinder of William A. Niese to the Objection [Docket No. 5770] (emphasis added).

Chadbourne to explain at the hearing on the Disqualification Motion what exactly the prejudice would be *to the Committee* if the relief sought in the Disqualification Motion were granted?

**E.      Pre-LBO Creditors Lack Faith In Chadbourne's Ability to Advise the Committee With Respect to the LBO-Related Causes of Action Free of Bias**

26.      A curious aspect of Chadbourne's Objection is how it attempts to rewrite history regarding the Settlement Plan and the Examiner's Report.  In summarizing what it views as the relevant factual history of these cases, Chadbourne states in a cursory manner that the Second Examiner Motion was granted pursuant to an agreed order, that Kenneth Klee was appointed examiner, that Mr. Klee filed a report on July 26, 2010, and that "[f]ollowing the release of the Examiner's Report, the parties tried to reach resolution of the issues through further intense and difficult negotiations.  To date, those negotiations have not been successful." Objection at ¶¶ 17-19.

27.      Notably absent from Chadbourne's version of the history of these cases is any mention of the Settlement Plan that was feverishly introduced to derail the appointment of the Examiner.  This is the same plan that Chadbourne tried to push through even after the Examiner's Report demonstrated that the settlement embedded in the plan was inadequate.  This is the same plan that would have given releases to Chadbourne's clients.  In fact, as described in the Disqualification Motion, before the Examiner's Report had been filed in unredacted form, Chadbourne opposed delaying the vote on the Settlement Plan to allow unsecured creditors -- its supposed constituency -- the opportunity to review the unredacted Examiner's Report; indeed a lawyer from Chadbourne made dismissive remarks in open court about the value of the Examiner's Report to unsecured creditors.  *See* Disqualification Motion at ¶ 24.

28.      It is disingenuous for Chadbourne to now attempt to take credit for the Examiner's Report and its conclusions regarding the strength of the LBO-Related Causes of

15

Action when Chadbourne openly opposed the appointment of an Examiner and advocated for confirmation of the Settlement Plan -- a plan that would have settled and released far too cheaply the very causes of action the Examiner found to have significant prospects for success. *See* Objection at ¶ 44.

29.    Chadbourne argues that it does not represent an interest adverse to the estate because its conflicts involving JPMorgan, Merrill Lynch, Citigroup, etc. stem from Chadbourne's representation of those parties in unrelated matters. Objection at ¶ 34. Chadbourne's blanket statement disregards the severity of the conflicts in this case. Because of the centrality of the LBO-Related Causes of Action to these cases, Chadbourne's conflicts give rise to an interest adverse to the estates. Major Chadbourne clients are likely defendants with potentially billions of dollars of exposure in the LBO-Related Causes of Action. There is a crucial difference between committee counsel representing an ordinary trade creditor in an unrelated matter and committee counsel representing in unrelated matters clients who are key defendants in a multi-billion dollar estate cause of action *that the Committee seeks standing to pursue.*[14]

30.    Chadbourne also attempts to distance itself from the "disinterestedness" standard. It cannot. First of all, Chadbourne has already acknowledged that this standard is applicable to it. Chadbourne invoked the disinterestedness standard in its retention papers and explicitly told the Court in its retention papers that it was disinterested. *See* Chadbourne Retention Application at ¶ 14. As part of its backpedaling, Chadbourne now attempts to distinguish the highly relevant

---

[14] *See In re Leslie Fay Companies, Inc.*, 175 B.R. 525, 534 (Bankr. S.D.N.Y. 1994) ("Weil Gotshal's connections to Tarnapol and Friedman were not insignificant, as Weil Gotshal would have this court find. Both held positions in the highest tier of Bear Stearns and Odyssey, respectively, which were large and valuable clients of Weil Gotshal. Thus, Weil Gotshal had a perceptible economic incentive not to pursue the possibility of claims against Tarnapol and Friedman with the same vigor and intensity it might have otherwise applied").

918243.1

*Project Orange* case on the basis that it involved disqualification of debtor's counsel under the

allegedly "significantly more stringent standard of section 327 that applies to debtor's counsel."

*See* Objection at ¶ 35.

31.    Although courts have held that the disinterestedness standard does in fact apply to

committee counsel -- *see In re Enron Corp.*, Case No. 01-14034 (AJG), 2002 WL 32034346 at

*7 (Bankr. S.D.N.Y. May 23, 2002) (applying section 327(a) disinterestedness standard in ruling

on motion to disqualify committee counsel) -- Aurelius does not need to rely on those cases.  The

disinterestedness standard is applicable here because the Committee is requesting that this Court

grant it **standing** to pursue **as an estate representative** the LBO-Related Causes of Action, which

are **estate causes of action**.  *See* Docket Nos. 5668 and 5698.  Accordingly, when it comes to the

LBO-Related Causes of Action, Committee counsel should be held to the same ethical standards

as debtor's counsel with respect to such estate causes of action.  Hypothetically, if a debtor's

counsel were conflicted as Chadbourne is here, and consequently not disinterested and therefore

barred under section 327(a) from pursuing or settling causes of action against a party it actively

represents in other matters, it follows that committee counsel should similarly be barred when it

seeks to step into the debtor's shoes.[15]

---

[15] Bankruptcy courts have broad discretion "in determining whether actual conflicts exist 'in light of the particular facts of each case.'"  *In re BH&P Inc.*, 949 F.2d 1300, 1315 (3d Cir. 1991) (citations omitted).  Courts have held that the representation by debtor's counsel of a creditor that is central to the bankruptcy case in an unrelated matter creates an "actual conflict" that mandates disqualification. *See, e.g., In re Pillowtex, Inc.*, 304 F.3d 246 (3d Cir. 2002) ("[A]" conflict is actual, and hence per se disqualifying, if it is likely that a professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest."); *In re Envirodyne Indus., Inc.*, 150 B.R. 1008 (Bankr. N.D. Ill. 1993) (holding that law firm failed to satisfy disinterestedness requirement for employment as debtor's counsel where firm represented a "substantial creditor" of the debtor and that creditor was a "substantial client" of the law firm); *In re American Printers & Lithographers, Inc.*, 148 B.R. 862 (Bankr N.D. Ill. 1992) (disqualifying law firm from representing debtor where firm represented creditor that held interest that was adverse to the debtor.  The representation of the creditor in matters unrelated created an "actual conflict," requiring disqualification of the law firm, irrespective of the fact that the creditor and debtor had waived the conflict after disclosure thereof); *In re Amdura Corp.*, 121 B.R. 862 (Bankr. D.Colo. 1990) (holding that law firm was not "disinterested" and should be disqualified as debtor's counsel where law firm represented significant creditors of the debtor in unrelated matters).

918243.1

## CONCLUSION

32.     Chadbourne has consistently advised the Committee in ways that are antithetical to how one would expect unbiased counsel to an official committee of unsecured creditors to act. As a result, unsecured creditors (other than perhaps the Committee members who joined the Chadbourne Objection) have reason to be concerned that the Committee's actions concerning the LBO-Related Causes of Action have resulted from conflicted advice by Chadbourne.  In order to prevent the uncertainty regarding Chadbourne's conflicted motivations from irreparably tainting the Mediation and any proceedings that may follow, the Disqualification Motion should be granted.

33.     For the reasons set forth above, in the Disqualification Motion, and in the joinders thereto filed by Wilmington Trust Company and Deutsche Bank, Aurelius respectfully requests that the Court (i) disqualify Chadbourne from taking any action on behalf of the Committee in matters in which it has conflicts of interest, including, but not limited to, the Mediation and any investigation, discussion, litigation and/or settlement negotiations concerning the LBO-Related Causes of Action, (ii) direct that Zuckerman Spaeder solely represent the Committee in such

918243.1

matters for which Chadbourne has conflicts of interest without any influence from Chadbourne,

and (iii) grant such further relief as the Court deems appropriate.

Dated:   Wilmington, Delaware
         September 22, 2010

                              **ASHBY & GEDDES, P.A.**


                              *[signature]*
                              William P. Bowden (I.D. No. 2553)
                              Amanda M. Winfree (I.D. No. 4615)
                              500 Delaware Avenue
                              P.O. Box 1150
                              Wilmington, DE 19899
                              (302) 654-1888

                                   - and -

                              Edward A. Friedman
                              William P. Weintraub
                              Hal Neier
                              **FRIEDMAN KAPLAN SEILER &
                                  ADELMAN LLP**
                              1633 Broadway
                              New York, NY 10019-6708
                              (212) 833-1100

                              *Attorneys for Aurelius Capital Management, LP*

19