# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 08- 13141 (KJC)<br><br>Jointly Administered<br><br>**Re: D.I. 5728, 5729, 5730** |

**PRELIMINARY OBJECTION OF CERTAIN STEP ONE LENDERS TO THE DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY OAKTREE CAPITAL MANAGEMENT, L.P. AND ANGELO, GORDON & CO., L.P. AND THE ACCOMPANYING STATEMENT**

The Step One Credit Agreement Lenders ("Step One Lenders")[1] respectfully submit this Objection to the Disclosure Statement for Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P. (the "Oaktree/Angelo Gordon Plan") and accompanying Statement (collectively, the "Disclosure Statement").

## PRELIMINARY STATEMENT

1. The Disclosure Statement mischaracterizes and obfuscates the single biggest issue in the Oaktree/Angelo Gordon Plan for holders of Step One debt – which lenders should bear the financial burden if Step Two is deemed a fraudulent conveyance due to the bad faith of the Step Two Lenders. On its face, the Oaktree/Angelo Gordon Plan ostensibly allows all Step One debt, while leaving Step Two debt disputed and subject to challenge. In economic substance, however, the Oaktree/Angelo Gordon Plan forces the Step One Lenders to pay more than 21

---

[1] The Step One Lenders are fourteen lenders who collectively hold approximately $730 million of Step One debt.

cents on the dollar of their recovery to the Step Two Lenders, thus protecting the Step Two Lenders from a determination that the Step Two Transactions constitute a fraudulent conveyance ("highly likely," according to the Examiner). Rather than recovering the 88% described in the Disclosure Statement[2], the Step One Lenders would actually pay over 21 cents on the dollar of their rightful recovery to holders of Step Two debt and thus recover only 67%. The Step Two Lenders thus will insulate themselves from the misconduct detailed by the Examiner, using Step One funds.

2. The Disclosure Statement does not disclose this improper scheme. Instead, the Disclosure Statement really suggests that this result is dictated by the "sharing provisions" of the Credit Agreement[3] (the "Sharing Provision") – a provision that is exceedingly unlikely to be enforced. This attempted application of the Sharing Provision is contrary to law and common sense. Nevertheless, the Disclosure Statement fails even to disclose that the Sharing Provision is in dispute.

3. The Disclosure Statement seeks to lure creditors, particularly Step One Lenders, into what can only be described as a bait and switch. *The bait:* the Disclosure Statement describes a Plan that allows Step One Claims in full, disallows Step Two Claims (and places them in a litigation trust), and purports to pay Step One Lenders an estimated 88% in total. *The switch*: in fact, the Oaktree/Angelo Gordon Plan enforces the Sharing Provision such that the

---

[2] This percentage is derived from the sum of 4.2% on page 18 of the Disclosure Statement and 83.0% to 83.9% on page 24 of the Disclosure Statement.

[3] Under Section 2.13 of the Credit Agreement, the Borrower's payments of principal and interest shall be distributed ratably to all Lenders. (*See* Credit Agreement § 2.13(a)). Section 2.15 of the Credit Agreement requires Lenders that receive payments (including by set-off) in excess of their ratable share of payments on account of Advances obtained by all Lenders effectively to ratably "share" in excess payments with other Lenders by purchasing participations in the other Lenders' Advances to Tribune. (*See id.* § 2.15.)

2

Step Two Lenders would be paid *pro rata*, notwithstanding that the Examiner determined that the Step Two Transactions are likely fraudulent transfers, resulting in Step One Lenders only receiving 67% instead of the 88%.

4. An equitable plan would hold in trust the value that the Oaktree/Angelo Gordon Plan gives to the Step Two Lenders (upon reliance of the Sharing Provision) pending the resolution of, *inter alia*, the Sharing Provision's continued viability such that the Step One Lenders may actually receive their full 88% recovery. The Disclosure Statement has failed to provide the full and honest disclosure required and cannot be approved.

## **ARGUMENT**

### I. THE DISCLOSURE STATEMENT FAILS TO PROVIDE ADEQUATE INFORMATION

5. The disclosure requirements set forth in Section 1125 of the Bankruptcy Code are important, indeed fundamental, to the functioning of the bankruptcy process. *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.*), 848 F.2d 414, 417-18 (3d Cir. 1988), *cert denied*, 488 U.S. 967 (1988)). Disclosure under Section 1125 of the Bankruptcy Code is "crucial to the effective functioning of the federal bankruptcy system . . . [and] the importance of full and honest disclosure cannot be overstated." *Ryan Operations*, 81 F.3d at 362 (emphasis added) (internal citation omitted). Section 1125 of the Bankruptcy Code serves the purpose of assisting creditors in negotiating with debtors over the terms of a plan. *See Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 101-02 (3d Cir. 1988).

6. The provision of adequate information is the critical element for approval of a disclosure statement. *In re Phoenix Petroleum Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("A disclosure statement may only be approved after notice and hearing, and then only if it

includes adequate information.") (internal citations omitted). "Disclosure is the 'pivotal' concept in Chapter 11 reorganization." *Kunica v. St. Jean Fin. Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) (citing 5 Lawrence P. King, Collier on Bankruptcy, 1125.03 (15th ed. 1992)); *Oneida*, 848 F.2d at 417 (citing Collier on Bankruptcy). The House Report to the Bankruptcy Reform Act of 1978 indicated that "[t]he premise of the bill's financial standard for confirmation is the same as the premise of the securities law: parties should be given adequate disclosure [and] relevant information, and they should make their own decision on the acceptability of the proposed plan [of] reorganization." H.R. REP. NO. 95-595, at 224 (1977); *Kunica*, 233 B.R. at 54 ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'") (citing *Oneida*, 848 F.2d at 417).

7. This Court has substantial discretion in determining whether a disclosure statement provides "adequate information" as required by Section 1125 of the Bankruptcy Code. *See, e.g., In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court.") (citations omitted). Section 1125 defines the concept of adequate information, essentially, as information that would enable "a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(A)(1). Adequate information will be determined based upon the facts and circumstances of each case. *See Oneida*, 848 F.2d at 417 (citations omitted); *see also Cardinal Congregate*, 121 B.R. at 764 ("Congress left vague the standard for evaluating what constitutes adequate information so as to permit a case-by-case

determination based on the prevailing facts and circumstances.") (citations omitted). If a disclosure statement does not contain adequate information within the meaning of Section 1125, then the plan cannot be confirmed under Section 1129(a)(2).

8. On its surface, the Disclosure Statement acknowledges the significantly different positions of the Step One and Step Two Lenders. For example, the Disclosure Statement at pages 16 through 26 contains charts that summarize the claims and estimated recoveries for all constituencies. These charts indicate that Step One Lenders will receive 87.2-88.1% from the holding company and subsidiaries combined, and that the Step Two Lenders will receive no recovery at the subsidiary level, but will receive their recovery at the holding company level (and be subject to further adjustment as part of a litigation trust established to resolve the potential fraudulent conveyance claims), ostensibly at a 4.2% recovery rate.

9. Oaktree/Angelo Gordon buries on page 101 of the Disclosure Statement, without explanation, that the Oaktree/Angelo Gordon Plan provides: "All such distributions shall be made by the Distribution Agent pro rata among the Holders of the Senior Loan Claims in accordance with the express distributions and sharing provisions of the Senior Loan Agreement (including, without limitation, Sections 2.13 and 2.15 thereof)." Therefore, while nowhere calculated or disclosed, the Oaktree/Angelo Gordon Plan really provides for *pro rata* distributions to Step One <u>and</u> Step Two Lenders – with Step One Lenders receiving approximately 67%, not 88%.[4] Step One Lenders reading the Disclosure Statement, especially those relying on the summary charts, will be misled as to their ultimate recovery.

10. Moreover, the Oaktree/Angelo Gordon Plan's proposed application of the Sharing

---

[4] Total outstanding bank debt is estimated at $8.571 billion, and total recovery (both at the subsidiary and holding company levels) would be roughly $5.75 billion (consisting of cash, debt and new stock).

5

Provision is fatally flawed and runs contrary to well-established principles of New York law, the Bankruptcy Code, and equity. It is a fundamental principle of New York law (which controls the Credit Agreement) that no party should benefit from its own wrongdoing. *See Messersmith v. Am. Fid. Co.*, 232 N.Y. 161, 165 (1921). The Step Two Lenders cannot benefit from intentional misconduct. *See Austro v. Niagara Mohawk Power Corp.*, 66 N.Y.2d 674, 676 (1985). Rather, such intentional misconduct constitutes a *"complete defense"* to the Step One Lenders' performance obligation under the Sharing Provision. *See Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991) (holding that the bank's bad faith in handling letters of credit and "causing the [corporation's] demise" would, if proven, constitute a *"complete defense"* to the guarantor's obligation to repay)(emphasis added); *Canterbury Realty & Equip. Corp. v. Poughkeepsie Sav. Bank*, 135 A.D.2d 102, 107 (3d Dep't 1988). The misconduct described in the Examiner's Report breached and frustrated the purpose of the Credit Agreement, and thus constitutes a "complete defense" to the Sharing Provision. Furthermore, enforcement of the Sharing Provision to allow the Step Two Lenders to share ratably in funds to which they are not otherwise entitled would eviscerate the Bankruptcy Code's avoidance provisions and create an inequitable result.

11. The contemplated enforcement of the Sharing Provision and its consequences must be disclosed clearly and adequately in order to inform creditors of what they should expect to receive under the Oaktree/Angelo Gordon Plan (67% and not the 88% disclosed). Absent this information, the Disclosure Statement fails to provide meaningful "information of a kind, and in sufficient detail" that "would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan" as required by Section 1125(a)(1) of the Bankruptcy Code. 11 U.S.C. § 1125(a).

12. The Disclosure Statement also inadequately discloses the proposed $100,000,000 "Senior Loan Reserve," which is being pre-funded with the Distributable Cash to and for the benefit of JP Morgan in its capacity as Senior Loan Agent. The Disclosure Statement provides that the Senior Loan Reserve shall be used to satisfy "valid and enforceable claims of the Senior Loan Agent for indemnification from the Lenders . . . ." No disclosures are made as to the contractual or legal basis to pre-fund such an unreasonably large indemnification fund.

13. In addition, the Disclosure Statement asserts that the Oaktree/Angelo Gordon Plan is contrary to Oaktree/Angelo Gordon's own economic interest as holders of Step Two Claims because their claims are being disputed and the Step One Claims allowed. The Disclosure Statement does not even describe the holdings of Oaktree/Angelo Gordon. Such disclosure is clearly relevant given this assertion. Moreover, this statement is misleading in that the Oaktree/Angelo Gordon Plan is more (not less) favorable to Step Two Lenders because, notwithstanding the disputed Step Two Claims, the Step Two Lenders would receive full distributions out of the consideration to be paid to Step One, purportedly under the Sharing Provision. All of the distributable value to the Step Two Lenders would thus be derivative of the Step One claims, without regard to the validity of the Step Two Claims. Avoidance of the Step Two claims thus has no impact on the recovery for Step Two Lenders under the Oaktree/Angelo Gordon Plan. The Step Two Lenders would be insulated from any consequences of a fraudulent finding.

## II. THE OAKTREE/ANGELO GORDON PLAN IS NEITHER FAIR NOR EQUITABLE

14. Fundamentally, the Oaktree/Angelo Gordon Plan is neither fair nor equitable to the Step One Lenders. A fair plan would place the Sharing Provision dispute front and center rather than bury it. A fair plan would recognize the reality of the Examiner's Report. A fair plan

would recognize and disclose the obvious conflicts between the Step One and Step Two Lenders. A fair plan would consider and account for the substantially different claims and defenses of the Step One and Step Two Lenders, and preserve the parties' rights as to the Sharing Provision by establishing an escrow for the money that Oaktree/Angelo Gordon would prefer to take for themselves prior to any determination of the parties' respective rights.

## CONCLUSION

15. The Disclosure Statement does not contain sufficient information to enable a reasonable person to make an "informed judgment about the plan." Indeed, the Disclosure Statement contains serious mischaracterizations and/or omits critical and material information and facts regarding the proposed distributions to the Step One and Step Two Lenders that (i) will mislead holders of Claims or Interests and (ii) must be available to holders of Claims and Interests. In order to bring the Disclosure Statement into compliance with Section 1125(a) of the Bankruptcy Code and to make the Disclosure Statement approvable under the Bankruptcy Code, the Disclosure Statement must be modified. Unless and until it is revised, the Disclosure Statement should not be approved.

**WHEREFORE**, the Step One Lenders respectfully request that the Court enter an order disapproving the Disclosure Statement and granting the Step One Credit Agreement Lenders such other and further relief as is just and proper.

Dated: Wilmington, Delaware
September 27, 2010

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

 /s/ Daniel B. Butz
Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

-and-

Howard J. Kaplan
Deana Davidian
ARKIN KAPLAN RICE LLP
590 Madison Avenue, 35th Floor
New York, New York 10022
Telephone: (212) 333-0200
Facsimile: (212) 333-2350

-and-

Adam H. Friedman
Steve Wolosky
Fredrick J. Levy
OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY, LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Telephone: (212) 451-2300
Facsimile: (212) 451-2222

*Counsel to the Step One Lenders*

3802177.2