IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------x
: Chapter 11
In re: :
: Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al., :
: (Jointly Administered)
Debtors. :
: Re: Docket No. 5680
:
---------------------------------x

## J.P. MORGAN CHASE BANK, N.A. AND JPMORGAN SECURITIES, INC.'S OBJECTION TO MOTION OF AURELIUS CAPITAL MANAGEMENT, LP, FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

JPMorgan Chase Bank, N.A. and JPMorgan Securities, Inc. (collectively, "JPMorgan") hereby submits this objection to the Motion of Aurelius Capital Management, LP ("Aurelius") for the Appointment of a Chapter 11 Trustee (the "Motion") pursuant to section 1104 of title 11 of the United States Code.

### INTRODUCTION

1.  Twenty-one months after commencement of these Chapter 11 cases, twelve months after the Court approved the Official Committee of Unsecured Creditors' (the "UCC") appointment of Special Litigation Counsel to investigate and prosecute claims arising out of the leveraged buy-out of Tribune in 2007 (the "LBO-Related Causes of Action" or the "Claims"), seven months after the UCC filed a motion seeking standing to bring the LBO-Related Causes of Action and attaching a draft Complaint asserting the Claims, five months after the Court appointed an independent Examiner to investigate the Claims, and one month after the Examiner issued his four-volume 1200-page Report (the

"Report"), Aurelius now seeks the appointment of a Chapter 11 Trustee to, once again, investigate and prosecute the Claims. Lacking a compelling legal basis to do so, Aurelius repeatedly mischaracterizes the Report and omits certain key findings in order to leave the Court with a misimpression of the Report's ultimate conclusions so as to buttress the purported need for a Trustee. As detailed below, the reality is that all conceivable claims have been exhaustively investigated by numerous interested and disinterested parties, the UCC stands poised to preserve such Claims if necessary, and various parties, including Aurelius, are preparing to file competing plans laying out their alternative conceptions of how the Claims should be resolved. Under these circumstances, with exclusivity terminated and the issues finally being joined among the real parties-in-interest based on the abundant and detailed information and analysis contained in the Report, appointment of a Trustee will do nothing more than add further cost and delay to these already costly and protracted proceedings.

2.  Moreover, as the Court is aware, on September 1, 2010, the Court issued an Order Appointing a Mediator, and on October 12, 2010, after several rounds of discussion, the Debtors announced agreement among some of the key parties in the case to a settlement of the Claims that those parties believe provides a clear path to confirmation of a plan of reorganization in these cases (the "Settlement"). It is now time to call the question: to determine whether the Settlement – or indeed any settlement – is possible in these cases. The parties supporting the Settlement – the Company (including the Special Committee of its board of directors), the UCC, JPMorgan, Oaktree Capital Management L.P. ("Oaktree") and Angelo, Gordon & Co., L.P. ("Angelo Gordon") – believe the Settlement is fair and reasonable; other parties will file competing plans and

challenge this assertion. The time has arrived for the issues to be submitted to the Court for decision. It is not the time for another new party to start a new investigation, to repeat the work that has already been done.

3.    In this context, it becomes apparent that Aurelius – which recently purchased a majority of its current holdings from former noteholder Centerbridge Partners LP at a price that is, according to press reports, inflated[1] – is simply using the Motion as a vehicle to delay resolution of the issues that are now ripe for decision as part of its strategy to extract outsized recoveries by holding the value of the estate hostage through delay. Aurelius is gambling, and gambling heavily, on its ability to do so by delaying the inevitable joining of the issues.

4.    In light of imminent consideration for confirmation of competing plans in these Cases, the Motion is, at best, premature and should at a minimum be deferred (if not outright denied at this time) until after the Court has an opportunity to consider and decide whether any of the competing conceptions of how to resolve the Claims should prevail. The Court will determine whether to confirm a plan settling the Claims or one transferring the Claims to a litigation trustee and, in either scenario, there is no need or purpose for appointment of a Chapter 11 Trustee.

5.    Accordingly, JPMorgan respectfully requests that the Court either deny the Motion at this time or defer its consideration until after a confirmation hearing to assess the competing plans that are about to be filed.

---

[1] *See* Shira Ovide & Mike Spector, *Is Tribune Heading to the Bankruptcy Exit Ramp?*, Wall St. J. Deal Journal, http://blogs.wsj.com/deals/2010/09/28/is-tribune-heading-to-the-bankruptcy-exit-ramp (Sept. 28, 2010, 18:31 EST).

RLF1 3619610v. 1

## ARGUMENT

I. **Appointment of a Trustee in Chapter 11 Proceedings is an Extraordinary Remedy**

6. The Third Circuit has spoken unambiguously – the "appointment of a trustee should be the *exception*, rather than the rule" and there is a "*strong presumption against* appointing an outside trustee." *In re Marvel Entm't Group*, 140 F.3d 463, 471 (3d Cir. 1998) (quoting *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989) (emphasis added); *see also In re G-I Holdings, Inc.*, 385 F.3d 313, 318 (3d Cir. 2004) ("heavy 'presumption' against the appointment of an outside trustee"); *In re W.R. Grace & Co.*, 285 B.R. 148, 158 (Bankr. D. Del. 2002) (appointment of a trustee is a "last resort"); 7 *Collier on Bankruptcy* ¶ 1104.02 (2010) (appointment of a trustee is an "extraordinary remedy"). As the moving party, Aurelius bears the burden to demonstrate that this strong presumption is overcome by clear and convincing evidence. *In re Marvel*, 140 F.3d at 471.

7. Aurelius fails to demonstrate by any standard – let alone by clear and convincing evidence – that a trustee should be appointed for cause under Section 1104(a)(1). While Aurelius cites the findings by the Examiner regarding purported fraud and dishonesty on the part of Tribune's management, the real issue raised by Aurelius in continuing to press the Motion is that the proposed Settlement, arrived at under the watchful eye of the Mediator, is somehow tainted by management's role (despite the involvement of the Special Committee). If Aurelius believes this, however, it will have every opportunity at the confirmation hearing to show that its alternative treatment of the Claims in a competing plan is more appropriate. There is no need to appoint a Trustee at this time, nor will there be any prejudice to Aurelius (or any other party) from not doing

4

so given its right to file a competing plan setting forth its conception of an appropriate resolution of the Claims.

8.   Second, Aurelius points to unspecified "extreme acrimony among the parties" as a basis for appointment of a Trustee under Section 1104(a)(1), citing only the "gulf and stalemate" between the parties, that "there is no end in sight," and that the differences between the parties are "not likely to ever be bridged." Motion at ¶¶ 66-67. Putting aside the reality that the Settlement demonstrates that progress has in fact been made, much of the alleged "acrimony" about which Aurelius complains is of its own making as a result of its recent entry onto the scene and its actions since that time (including the filing of the instant motion). It is notable that Centerbridge Partners LP, the bondholder from whom Aurelius recently purchased a significant portion of its holdings (and who was represented by one of the same counsel now representing Aurelius), supported a previous settlement proposed in these Cases and continued to have ongoing settlement discussions with the relevant parties-in-interest prior to appointment of the Mediator. Aurelius' emergence has therefore been a substantial impediment, in and of itself, to productive negotiations.

9.   The one case cited by Aurelius as support, *In re Marvel*, is materially distinguishable. There, a specific creditor constituency had taken actual control of the Debtors, and new management had only recently assumed control and, therefore, appointment of a Trustee would not hinder resolution of the cases. 140 F.3d at 467, 471. Here, with no change in management, exclusivity expired and competing plans about to be solicited, appointment of a Trustee would have the opposite effect, causing substantial

5

additional delay and resulting in a further impediment to Tribune's timely emergence from Chapter 11.

10. Similarly, Aurelius' contention that appointment of a Trustee is in the best interests of all material stakeholders pursuant to Section 1104(a)(2) is manifestly false in light of the imminent prospect of confirmation of a plan that either settles or preserves the Claims for litigation. Appointment of a Trustee at this time would disrupt, if not completely undermine, an orderly confirmation process and would result in needless expense and delay.

11. The choice between settlement or litigation is ripe for decision and scarcely requires intervention of a Trustee for the protection of Aurelius or any other constituency in these Cases. As the Court is keenly aware, these Cases do not suffer from a lack of investigation. In addition to the numerous investigations conducted by the various parties-in-interest, including the Debtors, Wilmington Trust Company (indenture trustee for the pre-LBO PHONES), and Law Debenture Trust Company of New York (indenture trustee for certain pre-LBO notes), the UCC conducted an extensive year-long investigation that included production of millions of pages of discovery, several depositions, and the court-approved appointment of unconflicted special litigation counsel, Zuckerman Spaeder LLP, to assert potential claims. The results of that investigation can be seen plainly in the draft complaint accompanying the UCC's motion for standing to assert claims, filed seven months prior to the Motion. [Dkt. No. 3281.] In addition, as the Court is also aware, the Examiner recently concluded an exhaustive three month, $12 million dollar investigation of virtually unlimited scope, which encompassed a review of hundreds of pages of briefing submitted by the parties, tens of thousands of

pages of documents, 38 witness interviews and an untold number of informal exchanges. That investigation resulted in the 1200-page Report attaching over 1100 exhibits and describing in great detail the Examiner's conclusions regarding all possible claims. Given this procedural history, there is no conceivable need to appoint a Trustee to assure the parties that the issue of "settlement plan versus litigation plan" will be fairly decided by this Court.

12.   Also unavailing is Aurelius' contention that appointment of a Trustee is necessary to pursue potential fraudulent conveyance claims prior to expiration of the statute of limitations in December 2010. Since the issuance of the Report in July, the UCC has filed a supplemental motion to its February 2010 motion seeking standing to pursue claims against certain LBO Lenders, and has also moved for standing to prosecute estate claims against numerous other parties including the directors and officers of Tribune and its subsidiaries, certain shareholders, Samuel Zell and his affiliated entities, and Valuation Research Corporation ("VRC").[2] Under such circumstances, this Court's denial of a motion to appoint a trustee in *U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114 (Bankr. D. Del. 2010) (Carey, J.) is instructive. There, the debtor filed a joint plan of reorganization supported by certain creditor groups, including the UCC, which later withdrew its support. *Id.* at 120. After engaging in further negotiations, the debtor filed an amended plan, and the Court entered an order,

---

[2] Aurelius devotes nearly 11 pages (or approximately 20%) of the Motion to recounting (in many instances verbatim) the allegations in its motion to disqualify Chadbourne & Parke LLP. [Dkt. No. 5669.] The Court denied that motion to the extent it sought to disqualify Chadbourne from participating in mediation [Dkt. No. 5810], and Aurelius subsequently withdrew its motion with prejudice [Dkt. No. 5919]. Having withdrawn its motion after reaching an agreement with Chadbourne, Aurelius's assertion that it is "utterly lacking in confidence that the Committee will serve its fiduciary duties to unsecured creditors in connection with the estates causes of action" (Motion at 4) as a result of Chadbourne's purported conflicts of interest must be disregarded.

*inter alia*, approving the disclosure statement and scheduling confirmation deadlines and a confirmation hearing. *Id.* at 120-21. After an unsuccessful attempt to mediate the remaining disputes, and approximately three weeks before the scheduled confirmation hearing, a group of creditors sought an order vacating the Court's order and directing the appointment of a trustee or an examiner. *Id.* at 123. The Court denied the motion in its entirety, noting with respect to the appointment of an Examiner that:

> All of the parties have had ample opportunity to conduct – and have conducted – extensive discovery, and to investigate the Debtors. Appointment of an examiner at this time, based on this record, is neither warranted nor appropriate, and would cause undue cost to the estate, which would be harmful to the Debtors and would delay the administration of this chapter 11 case. *Id.* at 128.

The Court further held that for these same reasons, it would not appoint a trustee because doing so was not "in the best interests of the estate or its creditors and would unduly delay confirmation and cause the Debtors to incur unnecessary costs." *Id.* Similarly, here, there is simply no need for yet another independent party to recreate the efforts undertaken by the Examiner.

## II. Aurelius' Motion is Replete With Mischaracterizations and Omissions of the Examiner Report and the Record

### A. Aurelius Misstates the Examiner's Conclusions Regarding the Purported Value of the LBO-Related Causes of Action

13. As set forth above, Aurelius is unable to demonstrate cause for appointment of a Trustee. In failing to do so, it makes numerous material mischaracterizations and omissions regarding the Examiner's conclusions that warrant a corrective response.

14. First, Aurelius incorrectly states that "any sensible reading of the Examiner's conclusions and recovery scenarios" makes it clear that the Examiner viewed

8

payment in full to the noteholders and a "substantial recovery" for other pre-LBO creditors as a "credible possibility." Motion at ¶ 40. In reality, and to the contrary, of the eight recovery scenarios outlined by the Examiner, the noteholders recover less than $113 million or 8.78 cents on the dollar in all cases except where Step One is found to be a fraudulent transfer at both Tribune and the Guarantor Subsidiaries or where the existence of an intentional fraudulent transfer at Step Two makes recoveries available from shareholders (as opposed to from the Senior Lenders). Report Vol. 2, Annex B. Under both the settlement contemplated in the Original Plan[3] and the Settlement, Senior Lenders provide a recovery far in excess of the $113 million maximum recovery if Step One is validated, and claims against shareholders are fully preserved for the benefit of the estates. Additionally, in all plausible scenarios, the Examiner concluded that holders of the pre-LBO PHONES Notes recover nothing. Report Vol. 2, B-18 - B-21. Aurelius' statement that the settlement incorporated in the Original Plan "undervalued the LBO-Related Causes of Action" is pure artifice. Motion ¶ 39.

15.   Second, having only studied Aurelius' summary of the Report, a reader would be without the benefit of the Examiner's most important and relevant conclusions – that "Step One" was a distinct transaction from "Step Two," that Step One was not an intentional or constructive fraudulent transfer, and that, as a result, the over $6.4 billion of Senior Lender claims with respect to Step One are valid and enforceable.[4] Report Vol. 2 at 22, 187-188. Because almost all of the Debtors' distributable value is therefore

---

[3] The Original Plan provided noteholders with 7.4% of net distributable value, valued at approximately $450 million at plan valuation.

[4] As with all of the Examiner's conclusions, they are presented along a sliding scale of probability.

absorbed by the valid Step One claims, even if a court were to conclude that Step Two was a fraudulent transfer, such conclusion would have no material impact on creditor recoveries. Additionally, the Report does not, as Aurelius contends, "endorse[]" a fraudulent conveyance action with respect to Step Two. Motion ¶ 9. To the contrary, the Examiner concluded that a court is only "somewhat likely" to find that a claim for actual fraudulent conveyance could be supported with respect to Step Two. Report Vol. 2 at 32.[5] As the Report makes clear, it is Aurelius, not the Senior Lenders, that refuses "to accept a realistic appraisal of the claims." Motion ¶ 21.

16.     Third, Aurelius disingenuously titles a section in the Motion, "LBO Lender Bad Faith." Motion at 21. In reality, the Examiner found no evidence whatsoever that JPMorgan or any Senior Lender acted in bad faith at any time. The Examiner's only conclusion, limited to Step Two, was that, for the purposes of satisfying the objective good-faith standard for application of the Section 548(c) safe harbor, it was "reasonably likely" a court would conclude that the lenders did not act in good faith.[6] Report Vol. 2 at 264, 267-268.

---

[5] The Examiner also noted that the Step Two transactions "do not fit the ordinary pattern of an intentional fraudulent transfer." Report Vol. 2 at 76. In fact, the Report noted several factors that weigh against a finding of intentional fraud, including: (1) the lack of evidence that Tribune's board of directors intentionally committed fraud; (2) Zell's desire to proceed with the Merger; and (3) the Arrangers' willingness to close the Merger. Report Vol. 2 at 74-75.

[6] JPMorgan strongly disagrees with the Examiner's conclusion that the good faith defense is not available at Step Two, particularly in the face of his conclusion that the lenders were contractually obliged to close. Report Vol. 2 at 268 (expressing "sympathy for the predicament that the Lead Banks found themselves in at Step Two."). JPMorgan and the other lenders acted in good faith at the time of Step Two. Rather than take Tribune's representation of Step Two solvency at face value, the lenders conducted extensive diligence of the VRC opinion underlying Tribune's solvency certificate. Further, given the lenders' own contemporaneous analyses demonstrating solvency in the most likely scenarios, they were contractually obligated to fund – a fact the Examiner both recognized and affirmed in noting that the lenders were primarily motivated by their contractual obligations. Moreover, the Examiner's conclusion appears colored by the Examiner's own misperception that Tribune's alleged insolvency at Step 2 was not a

### B.     JPMorgan Did Not Fail To Disclose Payments

17.     Aurelius similarly distorts the record regarding the reimbursement by a non-debtor subsidiary of Tribune of Agent fees and expenses under the senior credit facility and pursuant to valid and independent contractual obligations of that non-debtor subsidiary. Without any regard for the facts or the law, Aurelius contends that JPMorgan and the Debtors "orchestrated a scheme" to make certain payments to JPMorgan in violation of the Bankruptcy Code and "purposefully avoided disclosing payments to all parties-in-interest." Motion ¶¶ 15, 53, 75.

18.     In reality, as the exhaustively litigated record demonstrates, even Aurelius grudgingly acknowledges that JPMorgan and the Debtors disclosed the payments to both the UCC and the U.S. Trustee. Motion ¶ 53. As reflected by the extensive evidentiary record regarding these payments, at no time did JPMorgan attempt to "engineer" a "scheme" to avoid disclosing payments, and JPMorgan respectfully refers the Court to that record.

---

"close call," and from his improper exclusion of S-Corp tax benefits in his determination of value. *See Paloian v. Lasalle Bank, N.A.*, 2010 U.S. App. LEXIS 17915 (7th Cir. 2010) (holding that bankruptcy court erred in failing to account for S-Corp. tax benefits when assessing balance sheet solvency). At minimum, the circumstances of this case are distinguishable from those cited by the Examiner, where lenders were found to have been willfully blind because they failed to conduct any meaningful investigation. Here, there is no such evidence; rather, robust diligence was performed.

RLF1 3619610v. 1

## CONCLUSION

19. For the reasons set forth above, JPMorgan respectfully requests that the Court either deny the Motion at this time or, in the alternative and in light of the imminent consideration of competing Chapter 11 plans in these cases, defer further consideration of the Motion until after the Court has an opportunity to determine whether one of the competing plans will be confirmed.

Dated: October 15, 2010
       Wilmington, Delaware

Respectfully submitted,

/s/ Robert J. Stearn

Mark D. Collins (Bar No. 2981)
Robert J. Stearn, Jr. (Bar No. 2915)
Drew G. Sloan (Bar No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone (302) 651-7700
Facsimile (302) 651 7701

-and-

Dennis E. Glazer
Elliot Moskowitz
Michael Russano
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4500

*Attorneys for JPMorgan Chase Bank, N.A. and JPMorgan Securities, Inc.*

12

RLF1 3619610v. 1