## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Related to Docket Nos. 5680, 5703** |

---

## DEBTORS' OBJECTION TO THE MOTION OF AURELIUS CAPITAL MANAGEMENT, LP, FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

The debtors and debtors in possession in the above-captioned chapter 11 cases

(each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") hereby submit this objection (the "<u>Objection</u>")

to the Motion of Aurelius Capital Management, LP ("<u>Aurelius</u>") for the appointment of a chapter

11 trustee filed on September 13, 2010 (D.I. 5680) (the "<u>Motion</u>").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347);Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

## PRELIMINARY STATEMENT

1.     Displacement of a debtor in possession through the appointment of a

trustee is a rare and extraordinary remedy, warranted in only the most egregious of

circumstances.  These circumstances typically involve gross mismanagement, pervasive fraud,

misappropriation of assets, or absolute deadlock—in short, situations where the debtor in

possession is incapable of carrying out its fiduciary duties.  To prevail on such a motion, the

proponent must show that the relief is justified by clear and convincing evidence.  Aurelius has

not met and cannot meet its heavy burden.

2.     Notably, Aurelius does not even attempt to make the allegations necessary

to support the relief it seeks.  And that is not surprising.  Since the inception of these cases, the

Debtors have done a remarkable job in stabilizing their businesses, maintaining and enhancing

operations, and preserving value for the estates.  All but one of the Debtors' operating units are

generating positive cash flow, and the Debtors' overall operating cash flow has increased

substantially in 2010 compared to 2009.  Neither Aurelius nor any other creditor has raised any

complaint about the operational performance of the Debtors during these cases or the business

strategies the Debtors are pursuing.

3.     Instead, Aurelius bases its Motion virtually exclusively on circumstances

surrounding and related to the 2007 leveraged buy out transactions that returned the Debtors to

private ownership (the "LBO Transactions").  For example, Aurelius criticizes the efforts of both

the Debtors and the Official Committee of Unsecured Creditors (the "Committee") to investigate

and preserve the potential claims and causes of action arising in connection with the LBO

Transactions (hereinafter, the "LBO-Related Claims") and goes so far as to suggest that the

Debtors failed to cooperate with the Examiner in his investigation.  But nothing could be further

from the truth.  Both the Debtors and the Committee have expended significant resources

2

investigating all potential LBO-Related Claims.  That the claims already have been extensively

investigated is evidenced not only by the thorough briefing submitted to the Examiner but also

by the voluminous Examiner's Report.  In fact, the Examiner himself praised the Debtors in his

report (the "Examiner's Report") for their complete cooperation, noting that they had "facilitated

the Investigation and were responsive to the Examiner's many requests for documents and

information." (*See* Examiner's Report, Vol. I, at 7.)

4.      Further, these claims will be preserved and either prosecuted or settled on

terms that are fair and reasonable.  The New Plan, as described more fully below, provides for

the creation of a litigation trust to prosecute many of these claims.  Moreover, the pending grant

of derivative standing to the Committee will likewise ensure that these claims are preserved.  The

Committee is fully capable of pursuing the LBO-Related Claims on behalf of the estates, and the

Court's prior appointment of special litigation counsel for the Committee ensures that the

Committee's litigation decisions will be made on the basis of independent advice not subject to

challenge on the grounds that punches may have been pulled.  Aurelius may not agree with every

decision the Debtors and the Committee have made with respect to these chapter 11 cases, but

that is hardly enough of a showing to justify subjecting the Debtors and their creditors to the

delay and risk of appointing a trustee at this late date in the bankruptcy process.

5.      Likewise deficient are Aurelius' complaints about the Joint Plan of

Reorganization for Tribune Company and its Subsidiaries, which was filed by the Debtors on

April 12, 2010 (the "Original Plan").  (D.I. 4008.)  The Original Plan was the product of

extensive and intensive arms-length negotiations and was aimed at a global resolution of the

LBO-Related Claims; one that would have permitted the Debtors to emerge from bankruptcy

without the overhang of massive and protracted litigation.  As Aurelius well knows, the

settlement embodied in the Original Plan had wide support, including from Centerbridge Credit

Advisors LLC ("Centerbridge"), which at the time purported to be the largest holder of the senior

notes that Aurelius now holds.

6.       The new settlement recently reached among the Debtors and certain of

their key creditor constituencies and set forth in the plan to be filed on October 22, 2010 (the

"New Plan")[2] further reflects the Debtors' ongoing efforts to overcome the complexities posed

by the many competing and often conflicting interests in these cases, and to achieve a reasonable

resolution of the issues that have divided the parties.  This new settlement is the product of a

mediation requested by the Debtors when, after weeks of nonstop negotiations, it became clear to

the Debtors that the various constituencies might benefit from a mediator's assistance in their

efforts to reach a consensus.  Based upon this settlement, the New Plan provides for the

resolution of certain LBO-Related Claims, resulting in the allocation of $420 million in value to

Senior Noteholders such as Aurelius, and preserves other LBO Related Claims (not otherwise

settled with Court approval prior to emergence) to be pursued post-emergence to the degree

determined to be appropriate by the Court-appointed representative of the constituencies who

will benefit from any recoveries thereon, including the Senior Noteholders.

7.       As the foregoing illustrates, there also is no merit to Aurelius' claim that

the Debtors are hopelessly conflicted and thus incapable of continuing to oversee these cases.

The fact that certain members of the Board and of management may have an interest in the

resolution of the LBO-Related Claims does not in and of itself constitute grounds for

appointment of a trustee, where the Debtors are fully capable of exercising their fiduciary duties,

including by negotiating and proposing a confirmable plan consistent with such duties.  Further,

---

[2] The proponents of the New Plan, in addition to the Debtors, are the Committee, Angelo, Gordon & Co. ("Angelo Gordon"), JPMorgan Chase Bank, N.A. ("JPMorgan"), Oaktree Capital Management, L.P. ("Oaktree") (collectively, the "Plan Proponents").

as additional protection against any possible conflict, the Board has appointed a Special

Committee to supervise the chapter 11 cases made up of independent directors who had no role

in the consideration or approval of the LBO Transactions.  In short, there is no credible basis for

the appointment of a trustee in these cases.

## ARGUMENT

**I.     APPOINTMENT OF A TRUSTEE UNDER ANY SUBSECTION OF BANKRUPTCY CODE SECTION 1104(A) IS AN EXTRAORDINARY ACT WARRANTED IN ONLY THE MOST EGREGIOUS OF CIRCUMSTANCES**

      8.      The law embodies a strong presumption that the debtor should be

permitted to remain in possession and control of its business.  Accordingly, courts have

repeatedly and consistently observed that the appointment of a trustee under any subsection of

section 1104(a) is an extraordinary and draconian remedy, reserved for the most egregious

circumstances. *See In re Marvel Entm't Group*, 140 F.3d 463, 471 (3d Cir. 1998); *In re Heck's

Properties, Inc.*, 151 B.R. 739, 756 (S.D.W.Va. 1992). *See also In re Sharon Steel Corp.*, 871

F.2d 1217, 1226 (3d Cir. 1989).  Appointment of a trustee is the exception, not the rule, *see

Sharon Steel*, 871 F.2d at 1225 (collecting cases), and may be considered only as a last resort

where no other avenues of relief appear to exist. *See In re W.R. Grace & Co.*, 285 B.R. 148, 158

(Bankr. D. Del. 2002).

      9.      Section 1104(a) of the Bankruptcy Code, 11 U.S.C. § 1104(a), permits a

court to order the appointment of a trustee under one of three circumstances.  First, a trustee may

be appointed for "cause," which is defined to include "fraud, dishonesty, incompetence, or gross

mismanagement of the affairs of the debtor by current management, either before or after the

commencement of the case." 11 U.S.C. § 1104(a)(1).  Second, a court may appoint a trustee if

"such appointment is in the interest of creditors, any equity security holders, and other interests

of the estate, or similar cause, but not including the number of holders of securities of the debtor

or the amount of assets or liabilities of the debtor." 11 U.S.C. § 1104(a)(2). Finally, a trustee may be appointed under section 1104(a)(3) "if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee . . . is in the best interests of creditors and the estate." 11 U.S.C. § 1104(a)(3).

10. Because courts view the remedy of appointing a trustee as "particularly harsh," *see* Norton's Bankruptcy Law & Practice § 99:4 (3d ed. 2010), the party requesting such relief faces a steep burden of proof: the justification for appointment under any of the subsections of section 1104(a) must be proven by "clear and convincing evidence." *See Official Comm. of Asbestos Claimants v G-I Holdings, Inc. (In re G-I Holdings, Inc.*), 385 F.3d 313 (3d Cir. 2004); *Sharon Steel*, 871 F.2d at 1226; *In re Bellevue Place Assoc.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994); *In re Madison Mgmt Group, Inc.*, 137 B.R. 275 (Bankr. N.D. Ill. 1992); *In re Cardinal Indus., Inc.*, 109 B.R. 755 (Bankr. S.D. Ohio 1990); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164 (Bankr. S.D.N.Y. 1990); *In re Microwave Prods. of Am., Inc.*, 102 B.R. 666 (Bankr. W.D. Tenn. 1989). "Evidence is 'clear and convincing' when: [i]t produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the fact finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in this issue." *In re G-I Holdings, Inc.*, 295 B.R. 502, 507-08 (D.N.J. 2003). As demonstrated below, Aurelius has failed to carry this substantial burden under any subsection of section 1104(a).

**II. AURELIUS HAS NOT AND CANNOT MEET THE HEAVY BURDEN FOR APPOINTMENT OF A TRUSTEE FOR "CAUSE" UNDER SECTION 1104(A)(1)**

11. Section 1104(a)(1) of the Bankruptcy Code provides that a trustee may be appointed for "cause." 11 U.S.C. § 1104(a)(1). Determinations of whether "cause" exists under section 1104 are fact intensive, and must be made on a case-by-case basis. *See Sharon Steel*, 871

F.2d at 1226. *See also Comm. of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d

239, 241-42 (4th Cir. 1987) (noting that the construction of section 1104 "requires that the courts

be given discretionary authority to determine whether the conduct rises to the level of 'cause'").

As the statutory language indicates, the relevant focus is upon the competence and integrity of a

debtor's current management, not the actions of past management. *See In re 1031 Tax Group,*

*LLC*, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007) ("When considering whether to appoint a trustee

for cause, a court's focus is on the debtor's current management, not the misdeeds of past

management."); *Microwave Prods. of Am.*, 102 B.R. at 671 (same). Moreover, the legislative

history makes clear that the court "may order appointment only if the protection afforded by a

trustee is needed and the costs and expenses of a trustee would not be disproportionately higher

than the value of the protection afforded." H.R. Rep. No. 95-595 (1977), *reprinted in* 1978

U.S.C.C.A.N. 5787, 5901. As explained below, Aurelius has not even come close to proving the

existence of "cause" in this case.

### A. The Debtors Business Is On A Firm Foundation And The Record Is Devoid Of Evidence of Mismanagement

12.     As an initial matter, Aurelius does not suggest that the Debtors' current

leadership team has engaged in any form of "gross mismanagement" of the Debtors' ongoing

business or in its administration of the Debtors' chapter 11 cases. Nor could it. In fact, the

Debtors have done an excellent job in stabilizing their businesses and preserving value for the

estates. Indeed, in approving the Debtors' 2009 management incentive program, the Court noted

that "the evidence demonstrated that the debtor is performing well, relative to its competitors."

(Hr'g Tr. 15:20-21, Jan. 27, 2010.) Moreover, the Debtors have exceeded their projected

operating results through the first three quarters of 2010 and expect to realize a 25% increase in

operating cash flow for the full year 2010 compared to 2009. Not surprisingly, neither Aurelius

nor any other creditor has raised any complaint about postpetition operations, the direction of the

Debtors' businesses, or the business strategy that the Debtors are currently pursuing.[3]

13.    In addition, the Debtors' management has done an excellent job in

administering the bankruptcy and guiding the companies through the process.  For instance,

substantial progress has been made with respect to the "case administration" tasks required to

bring these cases to resolution, including reconciling claims, analyzing (and in some cases

favorably renegotiating) contracts, and assuming or rejecting unexpired leases.  The Debtors and

their professionals have reviewed and reconciled more than 6,000 proofs of claim filed in these

cases and have pursued claim objections and established claims settlement procedures to ensure

timely and appropriate recognition of claims.  These efforts have resulted in 1,922 claims being

expunged and/or reduced through objections or stipulations, which represents a reduction of

approximately $52,298,000,000 in outstanding claim amounts.  Additionally, the Debtors have

identified opportunities for renegotiation of existing business relationships, resulting in the

formulation of economically favorable agreements, often with significant cost savings.  The

Debtors have also obtained orders from the Court authorizing rejection of over 70 real estate

leases and subleases for annual cost savings exceeding $15 million for properties no longer

required for the Debtors' ongoing business operations.  In addition, the Debtors successfully

consummated a complex transaction providing for the disposition of an interest in the Chicago

Cubs Major League Baseball team, generating more than $700 million in cash.

---

[3] On October 5, 2010, *The New York Times* published an article by David Carr regarding Tribune and its current management.  *See* David Carr, *At Flagging Tribune, Tales of a Bankrupt Culture*, N.Y. Times, Oct. 5, 2010.  The article suggested, among other things, that the Debtors had performed worse than the industry since the bankruptcy filing by pointing to circulation declines at the *Chicago Tribune* and *Los Angeles Times*.  In fact, however, the Debtors' operating cash flow margins of 14% for the first half of 2010 in their publishing businesses are significantly higher than peer companies such as the *Washington Post*, which had operating cash flow margins of only 2% for the first half, and is identical to the New York Times Company itself.  And, as the article itself notes, ratings for WGN-AM in the morning were up 20% in August 2010, and "cash flow is on the rise and the company has $1.6 billion in cash on hand."  *Id.*

B.  **Aurelius Has Failed To Establish The Need To Appoint A Trustee To Preserve Potential LBO-Related Claims**

14.     Aurelius' motion also seeks to justify the appointment of a trustee on the grounds that doing so is necessary to ensure that the LBO-Related Claims are fully preserved for the benefit of the Debtors' estates.  Again, this argument is wholly without merit and simply ignores the current procedural posture of the cases.  At present, there are two alternative mechanisms readily available for the preservation and prosecution of the LBO-Related Claims: (i) the New Plan, which contemplates the creation of a litigation trust to preserve certain of the LBO-Related Claims and a settlement of other LBO-Related Claims; and (ii) granting derivative standing to the Committee to prosecute the LBO-Related Claims on behalf of the estates.  Either of these steps will ensure that those claims are preserved for the benefit of creditors.  Under these circumstances, the imposition of a chapter 11 trustee to assume control of the LBO-Related Claims is entirely unwarranted.

1.     **The LBO Transactions and LBO-Related Claims Have Been Extensively Investigated By the Debtors, the Examiner, and Parties-In-Interest in These Chapter 11 Cases**

15.     From the outset of these chapter 11 cases, it was apparent that the investigation and resolution of the LBO-Related Claims would be a central issue.  Accordingly, the Committee began its investigation not long after the Debtors filed for bankruptcy in December 2008, and the Committee subsequently retained Zuckerman Spaeder LLP as special litigation counsel to assist in that endeavor and to prosecute certain of the LBO-Related Claims if that became necessary.  During the course of its investigation, the Committee undertook discovery from over 30 entities and persons involved in the LBO Transactions and obtained and reviewed over 3.7 million pages of discovered documents.  The Committee also deposed and interviewed numerous parties, including representatives of the Debtors.  The Debtors cooperated

9

extensively with the professionals serving the Committee by providing them with informal

discovery and access to information to permit the Committee to conduct an investigation of

potential LBO-Related Claims, and by making witnesses available for formal depositions.

16.    In addition, the Debtors undertook their own substantial efforts to review

and analyze the LBO-Related Claims.  The Debtors also took steps to permit other parties,

including Law Debenture Trust Company of New York ("Law Debenture"), Centerbridge,

Angelo Gordon, JPMorgan, Oaktree, and other creditor constituencies access to the discovery

material so that they could make their own evaluation of the LBO-Related Claims.  In December

2009, the Debtors streamlined and further facilitated the review process by creating a centralized

document depository to provide the relevant parties access to all of the documents and deposition

transcripts that have been collected to date.

17.    The Examiner also conducted an intensive investigation of the LBO-

Related Claims, with the full cooperation of the Debtors.  Following his appointment, the

Examiner and his legal and financial advisors conducted in-person meetings with certain parties

involved in the LBO Transactions and invited the parties to share their views in writing on the

issues to be considered in the Examiner's Report.  The parties then submitted two rounds of

voluminous briefing with supporting documents that set forth in extensive detail the relevant

issues relating to the LBO-Related Claims, following which the Examiner and his legal and

financial advisors interviewed 38 witnesses, of which 33 interviews were conducted in person.

18.    As the Court is well aware, the Examiner filed his Report under seal on

July 26, 2010, with a summary and heavily-redacted version filed publicly.  (D.I. 5130-5133.)

On August 3, 2010, the Examiner filed a full, public version of the Report, along with

voluminous supporting exhibits and transcripts of the testimony taken by the Examiner.  (D.I.

5247-5250.) The Examiner's Report, exhibits, and transcripts provide a voluminous record of events surrounding the LBO Transactions and an assessment of the LBO-Related Claims by which the Examiner did not reach definitive conclusions regarding the issues considered in the Report but instead described a range of possible outcomes.

19.     The Debtors fully cooperated with the Examiner and his advisors in every step of this process.  As such, Aurelius' outlandish claim that the Debtors have attempted to "block investigation and prosecution of these matters at every turn, including the Examiner's Investigation" (Motion at 3) cannot be taken seriously.  To the contrary, the Examiner expressly noted that the Debtors "facilitated the Investigation and were responsive to the Examiner's many requests for documents and information."  (*See* Examiner's Report, Vol. I, at 7.)

## 2.     The Committee Has Sought Derivative Standing to Preserve and Pursue the LBO-Related Claims

20.     In February 2010, the Committee filed its first motion for standing to bring claims against certain of the lenders that participated in the LBO Transactions (collectively, the "LBO Lenders").  (D.I. 3281.)  In September 2010, the Committee supplemented that motion (D.I. 5698) and filed a second motion (D.I. 5668) seeking standing to prosecute LBO-Related Claims against numerous other parties, including certain of the Debtors' directors and officers, shareholders, and financial advisors.  On October 7, 2010, the Debtors filed their response and limited opposition to these motions.  (D.I. 5909.)[4]  Importantly, the Debtors do not oppose giving authority to the Committee to prosecute these claims, thereby ensuring that they will be preserved for the benefit of the Debtors' estates.

---

[4] As noted in the Debtors' response, the Committee does not seek standing to prosecute claims arising out of intercompany transactions between and among Tribune and its various subsidiaries.  The Debtors are working with the Committee to execute tolling agreements acceptable to the Committee pertaining to intercompany claims prior to the expiration of the two-year statute of limitations.

3.      **The Debtors Have Expended Substantial Efforts to Consensually Resolve and Preserve the LBO-Related Claims Pursuant to a Plan**

21.      Throughout these cases, the Debtors have made ongoing and substantial efforts to reach, to the extent possible, a consensual plan framework that will enable the Debtors to emerge from bankruptcy in a manner that maximizes value for all stakeholders, including with respect to the resolution of the LBO-Related Claims. They have tried to do so in various ways, including ultimately seeking the assistance of a mediator. The Debtors' efforts have not only been exhaustive, but reflective of a keen appreciation for their fiduciary duties. Clearly, nothing about this process remotely suggests that the Debtors have been acting in bad faith, much less engaging in the sort of egregious misconduct that would warrant appointment of a trustee. To the contrary, these efforts underscore the Debtors' continuing good faith efforts to achieve a reasonable resolution of the various competing interests in a way that will provide for the fair disposition of the LBO-Related Claims while allowing the Debtors to emerge from bankruptcy as quickly as feasible.

22.      Beginning over a year ago, the Debtors used the investigation of the LBO-Related Claims described above as a springboard for negotiations with their various creditor constituencies with the goal of achieving a resolution of the LBO-Related Claims that would be acceptable to a wide range of constituencies and that could form the basis for a consensual plan of reorganization. For instance, the Original Plan filed in April 2010 was the product of arms-length negotiations, was supported by creditor groups with divergent interests (including Centerbridge, Aurelius' predecessor-in-interest in respect of the senior notes then held by Centerbridge), and was designed to enable the Debtors to emerge from bankruptcy without the overhang of massive and protracted litigation. As the Debtors' advisor, David Kurtz, testified at the February 18, 2010 hearing, the Debtors' objective in investigating and facilitating the

12

exchange of information regarding the potential LBO-Related Claims was to reach a resolution, consensual so far as was feasible, pursuant to which all of the potential LBO-Related Claims would be settled, thereby enabling the Debtors to preserve "hundreds of millions of dollars of value" and to "create enterprise value" upon emergence from bankruptcy. (*See* Hr'g Tr. 40-41, Feb. 18, 2010.)

23.    To that end, the Debtors and their advisors expended considerable time and effort meeting with the principal parties-in-interest in an effort to understand each party's perspective and to facilitate a dialogue that would be conducive to achieving such a resolution. These efforts commenced in earnest in the Fall of 2009, at which time the Debtors met with the representatives of key creditor constituencies to discuss the nature of the potential LBO-Related Claims and the primary arguments that might be raised in connection therewith. These discussions, in turn, led to a series of meetings in January, February, and March of 2010, in which certain of the principal parties discussed resolution of the LBO-Related Claims.

24.    In February 2010, while this process was ongoing, the Debtors requested a further extension of exclusivity, and made an evidentiary submission, including the testimony of the Debtors' advisor David Kurtz, demonstrating that the Debtors were proceeding diligently and in good faith in seeking a consensual resolution of the cases. After hearing the evidence, the Court granted this further extension of exclusivity. (*See* Order Further Extending Debtors' Exclusive Periods Within Which to File a Chapter 11 Plan and to Solicit Acceptances Thereof, D.I. 3533.)

25.    These negotiations ultimately resulted in the execution by certain major creditors of the Settlement Support Agreement, followed by the Debtors' filing of the Original Plan on April 12, 2010. The Original Plan had the support of a wide cross section of the

Debtors' creditor constituencies, including JPMorgan, Angelo Gordon, Law Debenture, Centerbridge, the Committee, and a group of 200 retirees.

26.     These efforts continued after the Settlement Support Agreement was terminated in August, 2010.  Informed by the Examiner's Report and their own independent assessment of the LBO-Related Claims, the Debtors continued to attempt to negotiate a consensual plan framework.  After marathon negotiating sessions throughout August yielded no consensus, however, the Debtors concluded that the assistance of a mediator might facilitate the resolution of these cases.  Accordingly, on August 26, 2010, the Debtors asked the Court to appoint a mediator to assist the parties in achieving a consensual plan, and on September 1 the Court entered an order approving the appointment of the Honorable Kevin Gross as mediator. (D.I. 5591.)  Mediation ensued on September 26-27, 2010, and has continued into October. More than 100 representatives of the Debtors and their creditor constituencies have participated in the mediation.

27.     As a result of the mediation and with the considerable assistance of Judge Gross, the Debtors and the other Plan Proponents were able to forge the settlement incorporated in the New Plan that (i) settles certain claims related to the LBO Transactions, resulting in the reallocation of $522 million in value that would otherwise be recovered by senior lenders to other Tribune creditors, including $420 million in cash to the Senior Noteholders, and (ii) preserves all other LBO-Related Claims for the benefit of creditors, including Senior Noteholders such as Aurelius, by transferring these Claims to a litigation trust.  The Plan Proponents expect to file the New Plan on October 22, 2010.[5]

---

[5] The New Plan does not provide for global releases of the estate's LBO-Related Causes of Action; thus, Aurelius' argument that the appointment of a trustee is justified by the scope of the proposed releases contemplated by the Original Plan no longer has any relevancy.

28.    The results of the meditation to date are summarized in the two Mediator's Reports filed with this Court.  On September 28, the Mediator filed his first Mediator's Report concerning the results of the meditation sessions occurring on September 26-27, including the settlement initially reached at such sessions.  (*See* Mediator's Report, D.I. 5831.)  On October 12, the Mediator filed the Mediator's Second Report, describing the additional mediation sessions and the expanded settlement resulting therefrom, which has precipitated the filing of the New Plan.  (*See* Mediator's Second Report, D.I. 5936.)  As with the first Mediator's Report, the Second Mediator's Report attached the settling parties' plan Term Sheet and concluded by expressly leaving the mediation open, stating that "the Mediator . . . will continue to seek to include additional parties."  (*Id.*)  The Mediator's Report and the Mediator's Second Report are attached hereto as <u>Exhibits A</u> and <u>B</u>, respectively.  Despite Aurelius' gross distortions, the foregoing makes clear that the Debtors have acted responsibly, in good faith, and with an ardent desire to achieve an outcome that fairly balances all of the competing interests at stake.  In short, the Debtors have carried out their fiduciary duties.  None of this could possibly support the draconian remedy of appointment of a trustee.

C.    **<u>The Debtors Do Not Suffer from Irreconcilable Conflicts of Interest and Any Alleged or Perceived Conflicts Have Been Fully Addressed By The Debtors' Creation of a Special Committee and the Committee's Retention of Separate Litigation Counsel</u>**

29.    Contrary to Aurelius' repeated accusations, neither the Debtors nor the Committee are operating under irreconcilable conflicts of interest.  As noted above, the Debtors' administration of the bankruptcy is now under the aegis of a Special Committee of the Tribune Board.  The Special Committee consists of four independent directors who were not involved in the consideration or approval of the 2007 LBO Transactions – namely, Mark Shapiro (Chairman), Jeffrey S. Berg, Maggie Wilderotter, and Frank Wood.  The Special Committee has

CHI 5498301v.5

been specifically charged with the following matters (collectively, the "Special Committee

Matters"):

- reviewing, evaluating and approving, from time to time as appropriate or advisable, the structure, terms or conditions of, and authorizing the execution and filing of, any plan of reorganization and any and all amendments, modifications, supplements and exhibits thereto;

- taking such action from time to time, as the Special Committee deems appropriate or advisable, to resolve any and all claims, causes of action, avoidance powers or rights, and legal or equitable remedies against the Company or any of its subsidiaries ("Claims") including, without limitation, any Claims arising out of the LBO Transaction;

- reviewing, evaluating and approving, and authorizing the execution and filing of, any and all petitions, schedules, motions, lists, applications, pleadings and other papers, and to taking any and all further actions the Special Committee deems appropriate or advisable in connection with the chapter 11 cases; and

- taking such other actions to assist the Board in carrying out its responsibilities as the Board may delegate to or request of the Special Committee form time to time.

The Special Committee was also authorized to retain professional advisors to assist it in carrying

out its duties, and subsequently selected Jones Day LLP as counsel. By order dated September

15, 2010, the Court approved the retention of Jones Day, *nunc pro tunc* to August 22, 2010.

(D.I. 5704.)

        30.    Aurelius has argued, without support, that any such remedial action on the

part of the Debtors is "too little too late." (Motion ¶ 60.) This argument completely ignores the

current status of this case. The Special Committee was created not long after the Examiner's

Report was filed and the Settlement Support Agreement was terminated. The Special

Committee, through its counsel, has actively participated in all the mediation and has been fully

involved in the plan negotiation process. The New Plan is not merely an amendment to the

Original Plan; it is an entirely new plan unanimously approved by the Special Committee after a thorough review of the material Plan terms and their implications.[6]

31.    Any alleged conflict on the part of the Debtors also is checked by the actions of the Committee, specifically including the Committee's pending motions seeking standing to derivatively pursue the LBO-Related Claims on the Debtors' behalf.  As noted, the Debtors do not oppose a grant of standing to the Committee to preserve and if necessary prosecute such claims.  As the courts have recognized, in such circumstances, the participation of a committee undercuts the need for appointment of a trustee.  As the Fifth Circuit has noted, where inherent conflicts exist between a debtor's management and creditors, "[i]t takes but little imagination to discern the benefits of permitting a creditor's committee to proceed in lieu of appointing a trustee for that purpose."  *La. World Exposition v. Fed. Ins. Co.* (*In re La. World Exposition*), 858 F.2d 233, 251 (5th Cir. 1988).  The court in that case further stated that "[i]n cases in which the debtor in possession is conducting its affairs without objection but for its failure to prosecute a handful of claims against insiders, granting leave to the creditors' committee to pursue these actions may be less expensive than the appointment of a trustee and the awarding of his commission . . . and it is also less disruptive than conversion of a chapter 11 proceeding to chapter 7."  *Id.*, citing *In re Philadelphia Light Supply Co.*, 39 B.R. 51, 52 (Bankr. E.D. Pa. 1984).

---

[6] None of the cases cited by Aurelius suggest that the actions taken by the Debtors are insufficient to remedy conflicts of interest to the extent such conflicts existed.  *See Microwave Prods. of Am.*, 102 B.R. 666 (appointing trustee based on interests of parties in interest, rather than cause, and finding that the hiring of a management group was not a sufficient remedy where (i) the debtor needed significant operational support, (ii) management had been a "revolving door" throughout the chapter 11 cases, and the only continuity in management was found to lack the necessary skills to operate the debtor from an operations standpoint, and (iii) the contract with the management group still left the debtor with an uncertain future); *Sharon Steel*, 871 F.2d at 1228 (finding that the bankruptcy court did not abuse discretion in appointing a trustee where, despite certain postpetition management improvements, the systematic siphoning of the debtor's assets on the eve of bankruptcy, failure to close the prepetition books, failure to negotiate a reduction on the interest of the debtor's operating loan, and continuing losses raised "grave questions" about management's ability to fulfill its fiduciary duties).

17

32.     Other courts have similarly found that where a debtor may not pursue causes of action due to a conflict, a debtor may fulfill its fiduciary duties by allowing creditor groups to litigate the disputes on behalf of the estate. *See, e.g., In re Adelphia Commc'ns. Corp.*, 342 B.R. 122, 129 (S.D.N.Y. 2006) (affirming the bankruptcy court's determination that cause did not exist for appointment of trustee despite significant intercreditor disputes regarding intercompany claims and noting that the bankruptcy court "found that the Debtors fulfilled their fiduciary duties by allowing creditor groups to litigate the interdebtor disputes on behalf of each Debtor"). The Committee also has retained Zuckerman Spaeder as independent litigation counsel, which is not alleged to be tainted by any conflicts of interest. The Committee will therefore be making decisions affecting all of its constituents, including but not limited to Aurelius, on the basis of independent expert legal advice. In addition, the Debtors are working with the Committee to execute tolling agreements pertaining to the intercompany claims prior to the expiry of the two-year statute of limitations.

### D.   The Actions of the Management and Board of Directors in Connection with the LBO Do Not Support the Appointment of a Chapter 11 Trustee[7]

33.     Aurelius contends that a member of Tribune's current senior management (in particular, its current Chief Financial Officer, Chandler Bigelow) engaged in misconduct in connection with the Step Two LBO Transaction and that current members of Tribune's Board breached their fiduciaries duties in connection with the LBO Transactions, and that such purported misconduct warrants appointment of a trustee. It does not.

34.     With respect to Mr. Bigelow, it is important to recognize that the Examiner expressly did *not* determine that he or any other specific individual engaged in wrongdoing. Rather, he noted that it would be "premature" to "draw conclusions regarding

---

[7] Novack and Macey joins this brief only as to matters addressed in this section relating to Morgan Stanley.

specific individuals." (*See* Examiner's Report, Vol. II, at 54 ("Given the compressed time frame, the Examiner simply was not able to conduct the inquiry necessary to conclusively identify specific individuals as having engaged in dishonesty…[I]t would be premature to draw conclusions regarding specific individuals. The Examiner cautions that the Report's use of the phrase, 'one or more senior financial management members,' should not cast a shadow of suspicion on individuals who acted innocently and in good faith."))

35.     Further, the Debtors have fully investigated the allegations relating to Mr. Bigelow, which relate principally to a discrete issue – *i.e.*, whether Mr. Bigelow accurately represented his and others' discussions with Morgan Stanley on the issue of whether management could provide a representation to its solvency firm, Valuation Research Corporation ("VRC"), that it would be reasonable to assume for purposes of VRC's analysis that the Company could refinance its debts in 2014.[8] The purpose of that investigation was to determine whether sufficient evidence existed to take disciplinary action with respect to Mr. Bigelow or any other member of current management.

36.     As part of that investigation, the Board was presented with an assessment of the evidence on which the Examiner had identified as the basis for his conclusions. This evidence consisted principally of certain handwritten notes as well as the Examiner's assessments of the relative credibility of Morgan Stanley's witnesses and the Debtors' witnesses. The Board was told that, as regards the two sets of handwritten notes on which reliance was placed, the Examiner's interpretation of those notes seemed to be at odds with certain of the

---

[8] Aurelius also raises the issue of whether the Company's "out year" forecasts (*i.e.*, its forecasts for 2013-2017) were "deliberately misstated." (Motion ¶ 47.) However, the only evidence that the Examiner cited with respect to this issue as it related to Mr. Bigelow were emails between Mr. Bigelow and the employee of Citibank who was responsible for maintaining Tribune's complex projection models, in which Mr. Bigelow sought guidance on this issue. That Citibank employee testified that she believed that the assumptions in the forecasts were reasonable. (*See* Examiner's Report, Vol. II, at 62, n.196.)

evidence elicited during the investigation.[9]  Likewise, in assessing credibility, the Examiner did

not take into consideration certain evidence relating to Morgan Stanley's involvement in the Step

Two LBO Transaction as well as its possible motivations in testifying in the manner that it did.[10]

      37.     Other factors brought to the Board's attention included (i) that there was

no evidence that Mr. Bigelow or any other member of management believed that the Company

would not be able to refinance its debt in 2014; or that they believed that the Company would be

rendered insolvent by the Step Two LBO Transactions;[11] (ii) that evidence cited by the Examiner

suggested that Morgan Stanley had conveyed to the Company's management its belief that the

refinancing representation provided by the Company in support of the Step Two solvency

opinion delivered by VRC was reasonable;[12] (iii) that the assertion that management sought to

hide the refinancing representation from Morgan Stanley was inconsistent with the evidence

cited by the Examiner;[13] and (iv) that the claim that VRC and the LBO Lenders relied on the

---

[9] For example, the Examiner relied heavily on VRC's notes of a December 2, 2007 telephone conversation with Mr. Bigelow and other members of the Company's senior management, notwithstanding the fact that the notes were not created contemporaneously with the call and the author (Bryan Browning) could not recall whether the statements were actually made by the Company's representatives. (*See* Bryan Browning and Mose Rucker Interview of June 30, 2010 at 258-59.)  As for the notes of the December 17, 2007 call with the senior lenders, the Examiner conceded that he had not had sufficient time to fully investigate the matter and in reaching his conclusions, did not rely on the testimony of any of the witnesses. (*See* Examiner's Report, Vol. II, at 41-42.)

[10] *See, e.g.*, Morgan Stanley Presentation, "Prior VRC Analyses Performed," MS 79629-40 at 79638-40; Morgan Stanley Presentation, "Internal Materials," October 17, 2007, MS 72138-70; Morgan Stanley Presentation, "Overview of Morgan Stanley's Role in the Tribune Special Committee Review Process," December 3, 2007, MS 69130-7.

[11] To the contrary, the testimony was to the opposite. *See, e.g.*, Bigelow Interview of June 7, 2010, at 258; Osborn Interview of June 24, 2010, at 41-42; FitzSimons Interview of June 25, 2010, at 81; Kenney Interview of July 8, 2010, at 72.

[12] For example, Thomas Whayne told the Examiner that he personally believed that the representation was reasonable (*see* Examiner's Report, Vol. II, at 44 n.140), and that he may have told the Company that it was reasonable for management to make the representation. (*See* Examiner's Report, Vol. II, at 44; Whayne Interview of July 2, 2010 at 75-76.)  Further, Morgan Stanley provided comparable transaction data in response to a request from the Company (*see* Examiner's Report, Vol. II, at 44), and there is no evidence that Morgan Stanley ever communicated to the Company or its advisors that it believed that the representation was unreasonable.

[13] For example, the evidence showed that Mr. Bigelow had forwarded an email to Mr. Whayne in which the representation and management's discussions were discussed. (*See* Examiner's Report, Vol. II, at 38-39.  In addition, Morgan Stanley was invited to and attended two Board meetings in which VRC made presentations discussing the representation. (*See* Examiner's Report, Vol. II, at 38-39; Examiner's Report Exhibits 11, 704.)

reference to Morgan Stanley in the refinancing representation was also inconsistent with the evidence cited by the Examiner.[14]  Finally, it was reported that no issues have been identified regarding Mr. Bigelow's performance as Chief Financial Officer during 2010 or subsequent to the LBO Transactions; in fact, his reviews had been uniformly positive.

38.     On the basis of that investigation and the Board's own assessment of Mr. Bigelow's performance and integrity, the Board unanimously resolved that the allegations raised in the Examiner's Report with respect to current management and Mr. Bigelow did not justify taking any disciplinary action against any member of current management, including Mr. Bigelow.

39.     As to the allegations regarding certain members of the Board at the time of the LBO Transactions, it is important to recognize that, while the Examiner was critical of the certain aspects of the process followed by the Board and special committee established in connection with the LBO Transactions, he also expressly determined that "nothing in the record suggests that the Tribune Board or the members of the Special Committee knowingly or intentionally committed any fraud or acts of dishonesty" in connection with the Step One or the Step Two LBO Transactions.  (*See* Examiner Report, Vol. I, at 13).  Nevertheless, as noted above, to the extent that this may bear on the issue of a potential conflict of interest, the Board of Directors has appointed the Special Committee to make decisions concerning the Debtors' plan and confirmation process.

---

[14] Neither VRC nor the LBO Lenders testified that they relied on the reference to Morgan Stanley in the representation.  (*See* Bryan Browning and Mose Rucker Interview of June 30, 2010 at 236; Examiner's Report, Vol. II, at 40 n.128.)

CH1 5498301v.5

E.  **The Lender Fee Payments Do Not Support the Appointment of a Chapter 11 Trustee**

40.     Aurelius alleges that the payment of certain lender professional fees by Tribune (FN) Cable Ventures, Inc. ("TCV"), a non-debtor affiliate of Tribune Company, which was a party to the Senior Loan Guaranty Agreement, constitutes dishonest and fraudulent conduct rising to the level of cause under section 1104(a)(1).  This matter was raised in a motion filed by Law Debenture in October 2009 (D.I. 2407) (the "Fee Motion").  The Fee Motion, which has already been the subject of discovery and two hearings before the Court, and as to which the Court has not issued a ruling on the merits, in no way provides a basis for the appointment of a trustee.

41.     Prior to the hearing on the merits of the Fee Motion, the Debtors, TCV, Law Debenture, JPMorgan, certain LBO Lenders, Centerbridge, and the Committee submitted a joint stipulation of undisputed facts.  (*See* Stipulated Facts in Connection with March 26, 2010 Hearing on Law Debenture Trust Company of New York's Motion to Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders' Fees and Expenses, for an Accounting, and for Disgorgement of Past Payments D.I. 3657, corrected at D.I. 3730 (the "Fee Motion Stipulation"); *see also* Joint Exhibit, D.I. 3660.)

42.     Those undisputed facts establish that the fees at issue were paid by a non-debtor guarantor pursuant to its obligations under the Senior Loan Guaranty Agreement, and the proposed payment of such fees was fully disclosed to the Committee and the United States Trustee prior to the time the payments commenced.  Accordingly, the payments were not "secretive" and involved no estate assets.  Indeed, discussions on this topic with the Committee and the United States Trustee ensued over a period of weeks before any such payments were ever commenced, with the Committee even setting forth in writing the specific conditions for its

22

"non-objection" to such payments.  Following the commencement of payments, the Debtors'

financial advisors provided regular weekly and monthly reporting to the Committee's advisors,

which included disclosure as to any such fee payments made in the prior period.  The Debtors

also included the payments made by TCV within the appropriate line item in their financial

reports filed pursuant to Bankruptcy Rule 2015.3.  (*See* Fee Motion Stipulation ¶ 78.)  Finally,

the Debtors have filed and served periodic "stand alone" disclosures in respect of such payments,

first in December 2009 after the initial hearing on the Fee Motion (D.I. 2826), again in late April

2010 after the resumption of such payments following the April 8, 2010 Settlement Support

Agreement and the stipulated withdrawal of the Fee Motion (see below) (D.I. 4206), and once

again in late July 2010 at or about the time the Debtors last filed their Bankruptcy Rule 2015.3

reports.  (D.I. 5211).

    43. The evidence further shows that shortly after this issue was first raised

with the Court in December 2009, further payments by TCV were voluntarily halted and such

payments were resumed only after (i) the execution by Law Debenture and others of the

Settlement Support Agreement, which expressly contemplated the withdrawal without prejudice

of the Fee Motion and the resumption of such payments (D.I. 4013), (ii) the Debtors' filing of a

Notice indicating an intent by the Non-Debtor subsidiaries and guarantors, including TCV, to

recommence the fee payments in light of such stipulated withdrawal of the Fee Motion (D.I.

3997), and (iii) the Court's entry of an order on April 15, 2010 approving the stipulation

withdrawing the Fee Motion (D.I. 4057).  Moreover, once the Settlement Support Agreement

was terminated and the Fee Motion was reinstated, the Debtors notified their lenders that further

payments would cease pending a ruling or other resolution of the issues raised in the Fee Motion.[15]

44.    Finally, it is worth noting that the appointment of a trustee will have no impact on the resolution of this issue.  The reinstated Fee Motion has been fully briefed and argued and is presently pending before this Court awaiting ruling.  Consequently, the appointment of a chapter 11 trustee will not affect the outcome of that motion.  Aurelius' concerns regarding the payment of fees by a non-debtor can and will be appropriately addressed by the Court in the context of the Fee Motion.  In circumstances where the concerns raised by creditors can be otherwise addressed, the appointment of a trustee is unwarranted and unnecessary.  *See G-I Holdings*, 385 F.3d at 321 (rejecting motion for appointment of trustee and noting that "some of the most contentious disputes will presumably be addressed in other pending litigation").

## F.    Claimed Acrimony Among The Parties And Purported Loss of Confidence In The Debtors On The Part Of A Single Creditor Group Does Not Justify the Appointment of a Chapter 11 Trustee

45.    Aurelius asserts that a trustee should be appointed because of the alleged acrimony and deadlock among the parties involved in these chapter 11 cases.  (Motion ¶¶ 63-67.)

---

[15]  On October 12, 2010, Law Debenture filed a Supplement to its Fee Motion (the "Supplement"), attaching certain recent correspondence with Debtors' counsel and mischaracterizing the facts.  First, the Supplement fails to attach Law Debenture's initial October 1 letter to Debtors' counsel, which incorrectly assumed that the periodic fee payment disclosures in December 2009, April 2010, and July 2010 (discussed above) had not been made, notwithstanding that each such disclosure had not only been made but had been served on Law Debenture's counsel.  Second, the Supplement alleges that certain retainers paid to Davis Polk & Wardwell and FTI Consulting in April 2010, following the withdrawal of the Fee Motion and consensual resumption of the fee payments, had never been "contemplated by the parties" to the Settlement Support Agreement and "enabled the Lenders to violate the Settlement Support Agreement".  In fact, before TCV ever paid these retainers, it received prior written confirmation that Centerbridge, for whom Law Debenture was the indenture trustee, had agreed to their payment.  Finally, no ruling on the merits has yet been made on the Fee Motion and, contrary to Law Debenture's assertions, the Settlement Support Agreement and stipulation withdrawing the Fee Motion negotiated by Law Debenture, Centerbridge, and certain lenders (the Debtors were not a party) contained no "understanding" as articulated by Law Debenture as to the payment of fees in the event that the Settlement Support Agreement was terminated.  In any event, after the Fee Motion was reinstated, the Debtors advised the lenders that payments would be halted.  The Debtors intend shortly to file a response to Law Debenture's Supplement.

This argument is likewise without merit. The Third Circuit has made clear "there is no per se rule by which mere conflicts or acrimony between debtor and creditor mandate the appointment of a trustee." *Marvel Entm't*, 140 F.3d at 473. Here, the tension that exists between the parties stems not from breaches of fiduciary duty or working at cross-purposes but from the constituents' widely-divergent views on the merits of the LBO-Related Claims and the appropriate resolution of such claims.

46.     Notably, Aurelius fails even to assert that these tensions will subside following the appointment of a trustee, highlighting the lack of any basis for appointing one. As the bankruptcy court in *In re Adelphia Communications Corp.* correctly observed:

> Appointment of a trustee would be unlikely to make the intercreditor acrimony go away, and would simply result in expense and delay that would reduce creditor recoveries and decrease the pot they were fighting over. In *Marvel*, cited by this Court above and discussed by the [noteholders] repeatedly, where the Third Circuit ruled that Judge McKelvie's appointment of a trustee was not an abuse of a discretion, the acrimony was between the debtor and the creditors, and replacing the debtor eliminated one of the two feuding parties. Here that would not be the case. In fact, even then, as the Third Circuit noted, "[w]e expressly hold that there is no per se rule by which mere conflicts or acrimony between debtor and creditor mandate the appointment of a trustee."

*In re Adelphia Commc'ns Corp.*, 336 B.R. at 661 fn. 126 (internal citations omitted).

47.     Moreover, acrimony or conflict among the creditor constituencies, no matter how bitter, does not necessitate the appointment of a chapter 11 trustee where such disputes may be resolved in other proceedings. *See In re Sundale, Ltd.*, 400 B.R. 890, 910-11 (Bankr. S.D. Fla. 2009) (acknowledging the "tremendous" amount of rancor and acrimony among the parties, but declining to appoint a chapter 11 trustee in part because the disputes were being resolved in pending proceedings and the debtor had not yet had an opportunity to test the confirmability of the proposed plan). The disputes among the creditor constituencies in this case

can be adequately resolved through the plan confirmation process, where the parties will have an opportunity to propose their own plans and raise objections to other plans, as well as through the litigation of certain LBO-Related Claims, whether pursued by the Committee or a litigation trust established by a plan of reorganization.

48.    Equally unpersuasive is Aurelius' assertion that it has no confidence in the ability of the Debtors' management or the Board of Directors to confirm a plan of reorganization or fairly resolve the LBO-Related Claims.  (Motion ¶¶ 68-70.)  Courts that find cause to appoint a chapter 11 trustee based on a lack of creditor confidence generally do so where the circumstances are egregious, such as when management demonstrates such a lack of business acumen that the creditors lose all faith in management's ability to "keep the power on"[16] or when there is such an "insurmountable impasse" between the debtor and creditors that the creditors lose confidence in the debtor's ability to confirm a plan.[17]

49.    As noted above, Aurelius has not challenged the Debtors' ability to run their day-to-day business operations.  Further, the displacement of management engendered by the appointment of a trustee would in fact disrupt the Debtors' operations to the detriment of creditors, as discussed in ¶¶ 52-56, *infra*.

---

[16] *See In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 176 (Bankr. D. Colo. 1990) (in which the court was "deeply concerned that due to management and the board's lack of business acumen, they cannot conduct the required independent evaluation of proposals and recommendations made by the hired professionals or by interested suitors"); *Cardinal Indus.*, 109 B.R. at 766 (finding that creditors' loss of confidence in the debtors' competence to operate the business (based on debtors' questionable operational and financial decisions, failure to respond to requests for information, failure to keep accurate or complete financial records, lack of direction for future operations, and decision to fire the legal counsel that contributed significantly to the positive developments in the case), which had risen to "crisis proportions," was cause to appoint a trustee); *Taub v. Taub*, 427 B.R. 208, 228 (Bankr. E.D.N.Y. 2010) (determining that the appointment a trustee was in the interest of the estate in part because of the debtor's inability to move the case forward, and noting that the debtor had retained at least eight counsel over the twenty-one months that the case has been pending, failed to meet administrative obligations, including payment of expenses necessary to maintain assets, and failed to comply with court orders).

[17] *See, e.g., In re Eurospark Indus., Inc.*, 424 B.R. 621, 632 (Bankr. E.D.N.Y. 2010) (finding that the appointment of a chapter 11 trustee was in the best interests of the estate because, after the case had been pending for 10 years, "there is no genuine possibility of reorganization, the secured creditor and administrative creditors have no confidence in [the principal's] ability to carry out the fiduciary obligations of a debtor-in-possession").

50.     Nor has Aurelius provided any evidence for the proposition that the

Debtors are "ineffective brokers" or that reorganization is "unattainable." (Motion ¶¶ 69-70.)

Indeed, at the hearings held on October 4 and 13, 2010, the Court implemented procedures,

including a near term deadline, for the filing of reorganization plans.  Specifically, the Court has

directed that the Debtors and the Plan Proponents must file a plan and disclosure statement by

October 22, any creditor wishing to propose its own plan of reorganization must file such plan

and its "plan-specific" disclosure statement by October 29, and the Debtors will file a "master"

disclosure statement to be used in tandem with the plan-specific disclosures.  The hearing to

consider the adequacy of the disclosure statements as well as the approval of proposed

solicitation procedures is scheduled for November 29, following which the solicitation and

confirmation process for all such plans will presumably occur simultaneously.  (*See* Hr'g Tr. 32-

33, Oct. 13, 2010).  Therefore, while Aurelius argues that the cases will not move forward

without the appointment of a trustee, in fact, a process has been established to move towards

confirmation and the Debtors' emergence from bankruptcy.

51.     Finally, while these cases have been contentious, that is nothing new or

novel in large chapter 11 cases.  Were contentiousness among disparate creditors with conflicting

interests sufficient to justify the appointment of a trustee, trustees would be the norm in many if

not most large chapter 11 cases.  But they are not.  Aurelius' singular unhappiness does not

translate into "cause" or the best interests of creditors generally.

## III.    AURELIUS HAS NOT SHOWN THAT A TRUSTEE SHOULD BE APPOINTED UNDER OTHER SUBSECTIONS OF SECTION 1104(A)

### A.    Aurelius Cannot Establish That Appointment Of A Trustee Is Warranted Pursuant To Section 1104(A)(2)

52.     Under section 1104(a)(2) of the Bankruptcy Code, the Court may order

appointment of a trustee even if cause is not established if such appointment is in the interests of

creditors, any equity security holders, and other interests of the estate.  11 U.S.C. § 1104(a)(2).

When determining whether to appoint a trustee under section 1104(a)(2), "[a] determination

must be made that a trustee will accomplish the goals of the chapter 11 plan more efficiently and

effectively than present management."  *Microwave Prods. Of Am.*, 102 B.R. at 672-73.  The

traditional factors examined in this analysis include (a) the trustworthiness of the debtor; (b) the

debtor's past and present performance and prospects for rehabilitation; (c) whether the business

community and creditors of the estate have confidence in the debtor and present management;

and (d) whether the benefits derived by the appointment of a trustee outweigh the costs.

*Ionosphere Clubs*, 113 B.R. at 168; *Cardinal Indus.*, 109 B.R. at 766 (same); *In re Sanders*, 2000

Bankr. LEXIS 263, 14-15 (Bankr. N.D. Ill. Mar. 2, 2000) (same); *Madison Mgmt. Group*, 137

B.R. at 282 (same).

       53.    Due consideration must be given to the various interests involved in the

bankruptcy proceeding.  *See A.H. Robins Co.*, 828 F.2d at 242; *In re Bellevue Place Assoc.*, 171

B.R. at 623 (same); *Cardinal Indus.*, 109 B.R. at 766-67 (weighing the "trauma and risk of a

trustee" against the need for an independent party to direct the reorganization); *In re General Oil

Distribs., Inc.*, 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984) (the court "cannot ignore competing

benefit *and harm* that such an appointment may place upon the estate") (emphasis in original).

*See also Schuster v. Dragone*, 266 B.R. 268 (D. Conn. 2001) (finding no abuse of discretion

where movant had not met burden under section 1104(a)(2), noting that "equitable remedies are

a special blend of what is necessary, what is fair and what is workable").  Here, Aurelius has

failed to establish that appointment of a trustee is in the interests of creditors, any equity security

holders, and other interests of the estate.

28

54.     For all the same reasons that appointment of a trustee is not justified under section 1104(a)(1), the appointment of a trustee would not be in the interests of creditors. *See* ¶¶ 8-51, *supra*. A trustee will provide no "magic bullet" to facilitate resolution; to the contrary, the appointment of a trustee will almost certainly further prolong these cases and delay efforts to achieve a consensual plan. At the most basic level, it is apparent that the appointment of a trustee would effectively halt progress, as the trustee undertakes to climb the steep learning curve of these cases; by, for example, familiarizing himself or herself with the many players and the almost two years of case history and developments, including the status of negotiations and open issues, learning all facets of the operations of 111 Debtors and digesting all relevant facts and law concerning the LBO Transactions and LBO-Related Claims. In addition, in a case with no shortage of professionals, the costs of a trustee charged with such a massive undertaking would doubtless be nothing short of daunting.

55.     Further, as noted previously, a trustee is not necessary either for further investigation of the LBO-Related Claims or for the preservation of such Claims. Nor is a trustee required in order to ensure competent management. As documented, management has a proven track record in these cases both in terms of operating performance and case administration. In this regard, the serious prejudice that would likely result from the displacement of management and disruption in the operation of the Debtors' businesses, which include approximately 53 revenue-generating business units should not be underestimated. It is simply not credible to suggest that the sudden imposition of a trustee to run businesses of the complexity and size of the Debtors' would have anything other than deleterious and destabilizing consequences. Risking such serious harm is entirely unjustified in light management's performance in operating these

CHI 5498301v.5

companies and administering these cases since the Petition Date, and the fact that no creditors

have been heard to complain about management's post petition performance.[18]

56.    Finally, it must be underscored that the appointment of a chapter 11

trustee at this juncture will significantly interrupt the reorganization process, a process that has

been recently re-energized by the meditation and which has resulted in a New Plan brokered with

the assistance of such mediation.    The Court's recent directive requiring proposed plans of

reorganization and related disclosure documents to be filed by the Debtors by October 22, 2010

and by other creditors by October 29, 2010, and setting a hearing on the adequacy of such

disclosure documents for November 29, 2010, provides the groundwork for filing and

consideration of competing plans.    The delays attendant to the appointment of a trustee would

disrupt that process and further impede confirmation and the Debtors' emergence from

bankruptcy.

**B.    Aurelius Cannot Establish That Appointment Of A Trustee Is Warranted Pursuant To Section 1104(a)(3)**

57.    As a final matter, section 1104(a)(3) simply has no application here.

Section 1104(a)(3) of the Bankruptcy Code contains an exception to the requirement in section

1112(b)(1) that the court shall convert or dismiss a chapter 11 cases upon a showing of cause,[19]

where "the court determines that the appointment of a trustee or examiner is in the best interests

of creditors and the estate." 11 U.S.C. § 1104(a)(3).    As is plain from the statutory language,

section 1104(a)(3) only applies when (i) a party in interest seeks to convert or dismiss a chapter

---

[18] While Aurelius disputes the fact that the appointment of a trustee will interrupt business operations because a trustee could elect to retain current managers and employees to ensure that the business continues as usual, this argument ignores the significant delay, uncertainty, and disruption that will occur while the trustee becomes familiar with the Debtors' complex business operations and knowledgeable enough to make such personnel decisions.

[19] Section 1112(b)(1) provides that "except as provided in ... section 1104(a)(3), on request of a party in interest, and after notice and a hearing ... the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause." 11 U.S.C. § 1112(b)(1).

CH1 5498301v.5

11 case, (ii) the court determines that cause exists to convert or dismiss the case under section 1112(b), but (iii) the court determines that a chapter 11 trustee is better for the estate and its creditors than conversion or dismissal. *See In re Prods. Int'l Co.*, 395 B.R. 101 (Bankr. D. Ariz. 2008) ("If cause has been shown by the moving party, the Court must consider whether to dismiss the case, convert the case to one under Chapter 7, or appoint a Chapter 11 trustee, whichever result is in the best interest of creditors."); *see also* 7 Collier on Bankruptcy 1104.2 (15th ed. rev.) ("[I]t appears that there will be two "interests" screens for the courts to consider in reaching a decision to order the appointment of a trustee under this paragraph. The first, in section 1112(b), seems to go to the interests of creditors and the estate in whether the court should act at all under that section; the second, in section 1104(a)(3), seems to go to the question of whether, once the court has decided to act, the best course of action is to dismiss, convert, or order the appointment of a trustee.")

58.    Aurelius has completely failed to carry its burden under section 1104(a)(3). No party in interest has requested (and Aurelius does not argue) that these cases should be converted or dismissed and the Court has made no determination that a basis for conversion or dismissal exists. Second, for the reasons set forth above, Aurelius' assertions that the parties are deadlocked and the Debtors are unable to propose a confirmable plan (Motion ¶ 93) are factually untrue. And, third, even if section 1104(a)(3) were applicable, which it is not, Aurelius has failed to establish that appointment of a trustee is in the best interests of creditors and the estate.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

Dated: Wilmington, Delaware
      October 15, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
James F. Bendernagel
Jillian K. Ludwig
Allison E. Ross
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile:  (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile:  (302) 652-3117

-and-

NOVACK AND MACEY LLP
Stephen Novack
Donald A. Tarkington
100 North Riverside Plaza
Chicago, IL 60606-1501
Telephone: (312) 419-6900
Facsimile:  (312) 419-6928

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

CH1 5498301v.5