# EXHIBIT A

*Corporate Organizational Chart*



Organization Chart

Tribune Company

# EXHIBIT B

*Collective Bargaining Agreements*

### Collective Bargaining Agreements

**The Baltimore Sun Company**

    1.     Agreement, dated as of July 21, 2008, between The Baltimore Sun Company and the Washington-Baltimore Newspaper Guild

    2.     Agreement, dated as of January 1, 2005, between The Baltimore Sun Company and the Baltimore Mailers' Union Local No. 888, Baltimore, Maryland, affiliated with the International Brotherhood of Teamsters

    3.     Agreement, dated as of April 21, 2006, by and between The Baltimore Sun Company and the Graphics Communications Conference of the International Brotherhood of Teamsters Local No. 582

    4.     Contract, dated as of May 1, 2006, between The Baltimore Sun Company and the Baltimore Newspaper Graphic Communications Union Local No. 31, a subordinate Union to the Graphics Communications Conference of the International Brotherhood of Teamsters

    5.     Agreement, dated as of January 1, 2008, between The Baltimore Sun Company and Truck Drivers, Helpers, Taxicab Drivers and Garage Employees and Airport Employees Local Union No. 355 Baltimore, Maryland affiliated with the International Brotherhood of Teamsters

**Chicago Tribune Company**

    1.     Agreement, dated as of October 1, 2005, between the Chicago Tribune Company and Progressive Lodge No. 126 of the International Association of Machinists, AFL-CIO

    2.     Agreement, dated as of November, 2009, by and between the Chicago Tribune Company and the Chicago Web Printing Pressmen's Union No. 7, a subordinate union of the Graphics Communications International Union

    3.     Agreement, dated as of September 18, 2008, between Chicago Tribune Company and Newspaper, Magazine, Periodical Salesmen, Drivers, Pressmen, Division Men, District Managers, Checkers, Vendors, Handlers, and Electronic Media Workers Union Local No. 706 affiliated with I.B. of T., C., W. and H. of A.

**KTLA, Inc.**

    1.     Agreement, dated as of August 1, 2007, between KTLA, Inc. and International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada

    2.     Agreement, dated as of September 1, 2008, between American Federation of Television and Radio Artists Los Angeles Local (AFTRA) and Television Station KTLA

3.    Agreement, dated as of August 1, 2004 between the Alliance of Motion Picture and Television Producers, Inc. and International Brotherhood of Electrical Workers Local Union 40

## Los Angeles Times Communications LLC

1.    Agreement, dated as of December 11, 2008, between Los Angeles Times Communications, LLC and Graphics Communications Conference, a subordinate of the International Brotherhood of Teamsters

## The Morning Call, Inc.

1.    Agreement, dated as of May 29, 2007, between The Morning Call and the Graphic Communications Conference of the International Brotherhood of Teamsters, Local 4C

## WGN Continental Broadcasting Company

1.    Agreement, dated as of April 1, 2009, between Radio Station WGN and Radio and Television Broadcast Engineers Local Union Number 1220 of the International Brotherhood of Electrical Workers

2.    Agreement, dated as of July 1, 2008, between WGN Television and Radio and Television Broadcast Engineers Local Union Number 1220 of the International Brotherhood of Electrical Workers

2.    Agreement, dated as of July 1, 2008, between WGN Television and Newswriters Local Union Number 1220 of the International Brotherhood of Electrical Workers

4.    Agreement, dated as of April 1, 2009, by and between the American Federation of Television and Radio Artists ("AFTRA") and WGN-TV

5.    Agreement, dated as of June 1, 2008, between Television Station WGN and Theatrical Stage Employees Union, Local No. 2 of International Alliance of Theatrical Stage Employees and Moving Picture Technicians, Artists and Allied Crafts of the United States and Canada

6.    Agreement, dated as of June 2, 2008, between WGN-TV and the International Union of Operating Engineers, Local 399, affiliated with A.F. of L. - C.I.O. and C.F. of L.

## Tribune Television Company

1.    Agreement, dated as of January 1, 2010 by and between WPHL and Local Union #98 of the International Brotherhood of Electrical Workers, AFL-CIO

## WPIX, Inc.

1.    Agreement, dated as of October 21, 2005, between the Directors Guild of America, Inc. and WPIX, Inc.

2.      Agreement, dated as of April 1, 2008, between WPIX, Inc. and Theatrical Protective Union No. One, and the International Alliance of Theatrical Stage Employees and Moving Picture Technicians, Artists and Allied Crafts of the United States, its Territories and Canada

3.      Agreement, dated as of November 2005, between WPIX, Inc. and Local Union 1212 of the International Brotherhood of Electrical Workers, AFL-CIO

4.      Agreement, dated as of October 2005, between the American Federation of Television and Radio Artists and WPIX, Inc.

5.      Agreement, dated as of July 23, 2009, between the Newspaper Guild of New York, a local (No. 31003) of The Newspaper Guild/C.W.A., (AFL-CIO) and WPIX, Inc.

# EXHIBIT C

*Examiner's Report*

See Docket Nos. 5247, 5248, 5249, 5250, 5437, 5438, 5439, 5441,
5442, 5444, 5445, 5447, 5449, 5451, 5453, 5454, 5455, 5456,
5458, 5461, 5462, 5464, 5466, 5467, 5468, 5469, 5480 for a
complete copy of the Examiner's Report

# EXHIBIT D

*Liquidation Analysis*

TRIBUNE COMPANY AND ITS DEBTOR SUBSIDIARIES

LIQUIDATION ANALYSIS

A.    Introduction

Under the "best interests" of creditors test set forth in section 1129(a) (7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a Claim or Interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. Set forth herein is an analysis of the estimated aggregate amount of liquidation proceeds available to holders of Claims against and Interests in the Debtors in a chapter 7 liquidation (the "Liquidation Analysis" or "Analysis").  The Liquidation Analysis is based upon certain assumptions discussed in the General Disclosure Statement, including Exhibit F thereto (Reorganized Value Analysis), and in the global notes accompanying the Liquidation Analysis (the "Global Notes"). Capitalized terms not defined in the Global Notes shall have the meanings ascribed to them in the General Disclosure Statement.

The Liquidation Analysis estimates potential cash distributions to holders of Allowed Claims and Interests in a hypothetical chapter 7 liquidation of the Debtors' assets.[1] Asset values discussed in the Liquidation Analysis may differ materially from reorganization or going concern values referred to in the Competing Plans and the Joint Disclosure Statement.

THE LIQUIDATION ANALYSIS WAS PREPARED BY THE DEBTORS WITH THE ASSISTANCE OF THEIR ADVISORS.

PLEASE REVIEW EACH SPECIFIC DISCLOSURE STATEMENT FOR INFORMATION CONCERNING THE ALLOCATION OF PROCEEDS TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER A PARTICULAR COMPETING PLAN AS WELL AS FOR INFORMATION CONCERNING HOW SUCH ALLOCATIONS COMPARE TO RECOVERIES THAT WOULD BE RECEIVED IN A CHAPTER 7 LIQUIDATION.

B.    Scope, Intent, and Purpose of Liquidation Analysis

The determination of the costs of, and hypothetical proceeds from, the liquidation of the Debtors' assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted in preparing the Liquidation Analysis. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

---

[1] In the case of each Competing Plan, the term "Allowed" shall have the meaning ascribed to such term in the Competing Plan.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of Claims listed on the Debtors' Schedules and Proofs of Claim Filed to date. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 7 Cases, but which could be asserted and Allowed in a chapter 7 liquidation, including unpaid chapter 11 administrative expense Claims, and chapter 7 administrative claims such as wind down costs, trustee fees, and tax liabilities.  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Competing Plans. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

### Global Notes to Liquidation Analysis

1.      Conversion Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 Cases to chapter 7 liquidation cases on December 31, 2010 (the "Conversion Date"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the Estates. In addition, it is assumed that all of Tribune's direct or indirect non-debtor subsidiaries, excluding any foreign subsidiaries would commence liquidation under chapter 7 on the Conversion Date, and the Debtors' interests in various joint ventures and minority investments are assumed to be sold.  Tribune Company, its Debtor and non-Debtor direct and indirect subsidiaries are collectively referred to in the Liquidation Analysis as the "Tribune Entities".

Except as noted herein, the Liquidation Analysis is based upon the unaudited balance sheets of the Tribune Entities as of August 29, 2010 and those values, in total, are assumed to be representative of the Tribune Entities' assets and liabilities at the Conversion Date.

2.      Individual Liquidations

The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered, but not substantively consolidated proceeding therefore the Liquidation Analysis considers an entity by entity liquidation.  The Analysis takes into account post-petition administrative priority Claims against any of the Debtors held by another Debtor or a non-Debtor Affiliate (the "Post-Petition Intercompany Claims")[2], unsecured pre-petition Claims against any of the Debtors held by another Debtor or a non-Debtor Affiliate (the "Pre-Petition Intercompany Claims" and together with the Post-Petition Intercompany Claims, the "Intercompany Claims"), and the equity interests of each parent – subsidiary relationship.  In an iterative and sequential fashion, the Liquidation Analysis assumes that liquidation value is cycled among the Tribune Entities to satisfy the Intercompany Claims and Interests, which in turn adds to the liquidation value available to satisfy third party Claims at each entity[3].  The results of the individual entity by entity analysis

---

[2] Please refer to Note 18, below, for a further discussion of Post-Petition Intercompany Claims.

[3] The value from liquidating the assets of each entity net of the costs of liquidation is used to pay out Post-Petition Intercompany Claims resulting in an increase in value for those entities in a net receivable position and a decrease in value for those entities in a net payable position.  The resulting value (if any) is used to pay other administrative and priority Claims.  The residual value is allocated among the various unsecured Claims, including Pre-Petition Intercompany Claims.  Again, value flows to those entities in a net receivable position from those entities in a net payable position which results in more value to distribute among the entities other unsecured Claims.  (See Notes to lines 18, 19, 23, and 29 of the Liquidation Analysis for additional detail.)

have been incorporated into the results of Tribune Company, the combined subsidiaries (i.e. all 128 direct or indirect subsidiaries and their interests), with consolidating adjustments, for a combined total liquidation value (see Estimated Liquidation Recoveries).

3.    Liquidation Methodology

The Tribune Entities are assumed to be liquidated either through a distressed sale on a going concern basis or as part of a straight liquidation of the underlying assets depending on the best course for that entity:

- Going Concern Disposition – Typically, upon conversion of a chapter 11 case to a chapter 7 case, a business is shut down and ceases all operations.  For (i) those Tribune Entities engaged in broadcasting activities[4], (ii) Tribune Media Services[5], and (iii) Forsalebyowner.com Corp., the Liquidation Analysis assumes a sale of the business as a going concern in a "distressed sale". The broadcast entities are assumed to be liquidated through a distressed sale rather than a liquidation of the assets because the value of the broadcast licenses is most likely maximized by keeping the stations operating during the sale process.  Similar considerations exist for Tribune Media Services and Forsalebyowner.com Corp, because both are service businesses with minimal tangible assets.

  The distressed sale process is assumed to be conducted over a six-month period to minimize the disruptions to the operations of the businesses.  While some entities may be sold in a shorter timeframe, other entities may take longer, including the Debtors' broadcast operations which are subject to FCC regulation on the transfer of ownership.  The Liquidation Analysis does not take any FCC regulatory impediments into account.  Due to a number of factors including (a) the expedited nature of the sale process, (b) potential deterioration of the businesses during the chapter 7 liquidation, (c) the "as is" nature of the asset sales given the limited ability of the Trustee to provide representations, warranties, and indemnifications, and (d) the number of broadcast stations to be sold at a single time, management and their advisors believe that it is appropriate to apply discounts of 15% (high recovery) to 30% (low recovery) to the assumed going concern value of those entities[6].  It is assumed that the buyer would acquire all assets of the entity (excluding cash) and assume post-petition liabilities as well as key contracts.  It is possible a buyer may seek to refrain from assuming all of the stations' broadcast rights contracts or other liabilities resulting in additional Claims that would further reduce recoveries under a chapter 7 liquidation.

  If the Debtors' broadcast operations were shut down in their entirety, as may normally occur upon conversion to chapter 7, the Debtors believe the liquidation recoveries on the broadcast assets would be substantially lower than those reflected in the Liquidation Analysis.

- Shut Down – The Liquidation Analysis assumes that all other Tribune Entities, including those engaged in publishing activities, would cease operations immediately. Most of their employees would be severed and their assets liquidated piecemeal over a three to six month period.

---

[4] The Tribune Entities engaged in broadcasting activities excludes inactive broadcast related legal entities which are assumed to be liquidated.

[5] The Tribune Media Services ("TMS") business is comprised of Tribune Media Services, Inc., Tribune Media Services B.V., TMS Entertainment Guides, Inc., TMS Entertainment Guides Canada Corp., Tribune Hong Kong Ltd., and Los Angeles Times International, Ltd.

[6] The going concern value of these entities was determined by the Debtors' investment banker as part of the valuation analysis included as Exhibit F to the General Disclosure Statement.

The Gross Liquidation Proceeds assumed to be received as a result of the sale and liquidation of the assets and operations of the Tribune Entities, as outlined above, less the Costs Associated with Liquidation as detailed in Notes 10 to 15 below, is then used to satisfy the various Claims, including chapter 7 Claims, chapter 11 administrative Expenses and Priority Non-Tax Claims, and pre-petition Claims.  The Liquidation Analysis assumes that the Trustee would resolve Claims and other matters involving the Debtors' estates and make distributions to creditors over an 18-month period.

4.      Other Potential Recoveries and Other Potential Claims

The Liquidation Analysis does not consider recoveries from potential Claims arising from the Leveraged ESOP Transactions described in Article VII.A of the General Disclosure Statement.  It is assumed that the recoveries from these claims would be substantially similar in either a reorganization or a liquidation and thus are not included in this analysis.

Liquidation would likely result in additional Claims against the Estates, which unless specifically noted have not been quantified. One example would be Claims related to the rejection of those executory contracts and unexpired leases either not assumed by the buyer of those entities sold as a going concern or rejected as a part of the liquidation of those entities whose operations are shut down upon conversion. These rejections would create a larger number of unsecured Claims (and administrative priority Claims in the case of those leases and contracts already assumed by the Debtors). These additional Claims would dilute any potential recoveries to holders of other pre-petition unsecured Claims. No attempt has been made to estimate these additional unsecured and/or administrative Claims that may occur in a chapter 7 liquidation.

## Estimated Liquidation Recoveries

($ in 000's)

| Row # | | Tribune Company (Stand Alone) $ (Book Value) | Low $ | Low % | High $ | High % | Combined Subsidiaries (excludes Tribune Company) $ (Book Value) | Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Cash | 386,941 | 386,941 | 100.0% | 386,941 | 100.0% | 1,486,255 | 1,486,255 | 100.0% | 1,486,255 | 100.0% |
| 2 | Accounts Receivable | - | - | 55.0% | - | 80.0% | 213,095 | 117,200 | 55.0% | 170,476 | 80.0% |
| 3 | Inventory | - | - | 0.0% | - | 0.0% | 20,769 | 10,385 | 50.0% | 12,462 | 60.0% |
| 4 | Property, Plant & Equipment: | 60,145 | 24,223 | 40.3% | 37,446 | 62.3% | 833,138 | 268,791 | 32.3% | 365,755 | 43.9% |
| 5 | GW & Intangibles | - | - | 0.0% | - | 0.0% | 40,638 | - | 0.0% | - | 0.0% |
| 6 | Investments | 17,557,008 | 83,475 | 0.0% | 101,363 | 5.0% | 7,745,491 | 1,217,825 | 15.7% | 1,478,788 | 19.1% |
| 7 | Other Assets | 170,904 | - | 0.0% | 8,545 | 5.0% | 24,831 | - | 0.0% | 1,242 | 5.0% |
| 8 | Book Value of Assets of Going Concern Sal | - | - | 0.0% | - | 0.0% | 3,161,786 | 1,824,999 | 57.7% | 2,216,070 | 70.1% |
| 9 | **Gross Liquidation Proceeds** | 18,174,998 | 494,639 | 2.7% | 534,294 | 2.9% | 13,526,003 | 4,925,455 | 36.4% | 5,731,048 | 42.4% |
| | **Less (Costs) Associated with Liquidation** | | | | | | | | | | |
| 10 | Professional Fees | | (3,296) | | (4,029) | | | (54,680) | | (67,493) | |
| 11 | Taxes on Dispositions | | (64,264) | | (87,115) | | | (764,189) | | (1,100,691) | |
| 12 | Ch.7 Trustee | | (2,154) | | (2,947) | | | (68,784) | | (84,896) | |
| 13 | Sale Period Profit / (Loss) & Equity Income | | | | | | | 84,928 | | 118,828 | |
| 14 | Wind Down Costs | | (1,116) | | (1,043) | | | (25,335) | | (25,414) | |
| 15 | Severance | | (14,277) | | (14,277) | | | (151,121) | | (160,095) | |
| 16 | **Total Liquidation Costs** | | (85,107) | | (109,411) | | | (979,181) | | (1,319,761) | |
| 17 | **Value Before I/C & Investment Recovery** | | 409,532 | | 424,884 | | | 3,946,274 | | 4,411,287 | |
| | **Add Recoveries from I/C Rec. & Inv.** | | | | | | | | | | |
| 18 | Admin Priority I/C Receivables | 716,611 | 709,571 | 99.0% | 710,695 | 99.2% | 1,615,888 | 1,613,439 | 99.8% | 1,613,811 | 99.9% |
| 19 | I/C Receivables (Pre-Petition) | 4,030,389 | 129,051 | 3.2% | 149,420 | 3.7% | 26,439,391 | 94,128 | 0.4% | 119,223 | 0.5% |
| 20 | Investments in Subsidiaries | 17,526,159 | 36,515 | 0.2% | 43,750 | 0.2% | 9,037,102 | 17,177 | 0.2% | 21,969 | 0.2% |
| 21 | **Total Recoveries** | 22,273,158 | 875,137 | | 903,866 | | 37,092,381 | 1,724,744 | | 1,755,002 | |
| 22 | **Value After Recoveries (Before Ch.11 Claims)** | | 1,284,670 | | 1,328,750 | | | 5,671,018 | | 6,166,289 | |
| | **Less Ch.11 Admin & Priority Claims (Paid)** | | | | | | | | | | |
| 23 | Admin Priority I/C Payables | (855,015) | (855,015) | 100.0% | (855,015) | 100.0% | (1,477,484) | (1,467,995) | 99.4% | (1,469,491) | 99.5% |
| 24 | Admin Claims - Ch.11 Trade & Other | (132,029) | (132,029) | 100.0% | (132,029) | 100.0% | (214,069) | (182,816) | 85.4% | (195,267) | 91.2% |
| 25 | Admin Claims - Ch.11 Unpaid Prof Fees | (21,000) | (1,974) | 9.4% | (1,845) | 8.8% | (21,000) | (19,026) | 90.6% | (19,155) | 91.2% |
| 26 | Priority Tax Claims | (144,000) | (13,539) | 9.4% | (12,651) | 8.8% | (144,000) | (130,461) | 90.6% | (131,349) | 91.2% |
| 27 | **Total Ch.11 Claims (Paid)** | (1,152,045) | (1,002,558) | | (1,001,541) | | (1,856,553) | (1,800,298) | | (1,815,261) | |
| 28 | **Value After Ch.11 Admin & Priority Claims Paid** | | 282,112 | | 327,209 | | | 3,870,721 | | 4,351,027 | |
| | **Less Pre- Petition Claims (Paid)** | Est. Claim | | | | | Est. Claim | | | | |
| 29 | I/C Claims | (16,478,401) | (157,973) | 1.0% | (183,384) | 1.1% | (13,991,379) | (175,170) | 1.3% | (212,911) | 1.5% |
| 30 | Joint & Several Pension Termination Cl | (560,600) | (1,415) | 0.3% | (1,360) | 0.2% | (560,600) | (559,185) | 99.7% | (559,240) | 99.8% |
| 31 | Senior Debt | (8,638,069) | (82,810) | 1.0% | (96,131) | 1.1% | (8,789,017) | (2,601,474) | 29.6% | (2,964,805) | 33.7% |
| 32 | Bridge | (1,619,507) | (15,526) | 1.0% | (18,023) | 1.1% | (1,619,507) | (479,360) | 29.6% | (546,309) | 33.7% |
| 33 | Bonds | (1,283,056) | (12,300) | 1.0% | (14,279) | 1.1% | - | - | 0.0% | - | 0.0% |
| 34 | Other General Unsecured Claims | (264,742) | (2,538) | 1.0% | (2,946) | 1.1% | (120,000) | (1,837) | 1.5% | (2,041) | 1.7% |
| 35 | Subordinated Debt | (996,181) | (9,550) | 1.0% | (11,086) | 1.1% | - | - | 0.0% | - | 0.0% |
| 36 | **Total Pre-Petition Claims / (Claims Paid)** | (29,840,556) | (282,112) | | (327,209) | | (25,080,503) | (3,817,027) | | (4,285,306) | |
| 37 | Equity Value | | - | | - | | | 53,693 | | 65,720 | |

5

($ in 000's)

| Row # | | Eliminations - Adjustments | | | Consolidated Tribune & Subsidiaries | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Book Value $ | Low $ | High $ | $ | Low $ | Low % | High $ | High % |
| | | | | | **Book Value** | | | | |
| 1 | Cash | | | | $ 1,873,196 | $ 1,873,196 | 100.0% | $ 1,873,196 | 100.0% |
| 2 | Accounts Receivable | | | | 213,095 | 117,200 | 55.0% | 170,476 | 80.0% |
| 3 | Inventory | | | | 20,769 | 10,385 | 50.0% | 12,462 | 60.0% |
| 4 | Property, Plant & Equipment: | | | | 893,284 | 293,014 | 32.8% | 403,201 | 45.1% |
| 5 | GW & Intangibles | | | | 40,638 | - | 0.0% | - | 0.0% |
| 6 | Investments | (24,853,481) | | | 449,017 | 1,301,300 | 289.8% | 1,580,150 | 351.9% |
| 7 | Other Assets | | | | 195,735 | - | 0.0% | 9,787 | 5.0% |
| 8 | Book Value of Assets of Going Concern Sale | (1,709,780) | | | 1,452,006 | 1,824,999 | 125.7% | 2,216,070 | 152.6% |
| 9 | **Gross Liquidation Proceeds** | $ (26,563,261) | | | $ 5,137,740 | $ 5,420,094 | 105.5% | $ 6,265,342 | 121.9% |
| | Less (Costs) Associated with Liquidation | | | | | | | | |
| 10 | Professional Fees | | | | | (57,976) | | (71,522) | |
| 11 | Taxes on Dispositions | | | | | (828,453) | | (1,187,805) | |
| 12 | Ch.7 Trustee | | | | | (70,938) | | (87,843) | |
| 13 | Sale Period Profit / (Loss) & Equity Income | | | | | 84,928 | | 118,828 | |
| 14 | Wind Down Costs | | | | | (26,451) | | (26,456) | |
| 15 | Severance | | | | | (165,398) | | (174,372) | |
| 16 | **Total Liquidation Costs** | | | | | $ (1,064,288) | | $ (1,429,171) | |
| 17 | **Value Before I/C & Investment Recovery** | | | | | $ 4,355,806 | | $ 4,836,170 | |
| | Add Recoveries from I/C Rec. & Inv. | | | | | | | | |
| 18 | Admin Priority I/C Receivables | $ (2,332,499) | $ (2,323,010) | $ (2,324,506) | $ - | $ - | 0.0% | $ - | 0.0% |
| 19 | I/C Receivables (Pre-Petition) | (30,469,780) | (223,180) | (268,643) | | - | 0.0% | - | 0.0% |
| 20 | Investments in Subsidiaries | (26,563,261) | (53,692) | (65,719) | | - | 0.0% | - | 0.0% |
| 21 | **Total Recoveries** | $ (59,365,540) | $ (2,599,882) | $ (2,658,868) | $ - | $ - | | $ - | |
| 22 | **Value After Recoveries (Before Ch.11 Claims)** | | | | | $ 4,355,806 | | $ 4,836,170 | |
| | Less Ch.11 Admin & Priority Claims (Paid) | | | | | | | | |
| 23 | Admin Priority I/C Payables | $ 2,332,499 | $ 2,323,010 | $ 2,324,506 | - | - | 0.0% | - | 0.0% |
| 24 | Admin Claims - Ch.11 Trade & Other | | | | (346,098) | (314,845) | 91.0% | (327,296) | 94.6% |
| 25 | Admin Claims - Ch.11 Unpaid Prof Fees | | | | (21,000) | (21,000) | 100.0% | (21,000) | 100.0% |
| 26 | Priority Tax Claims | | | | (144,000) | (144,000) | 100.0% | (144,000) | 100.0% |
| 27 | **Total Ch.11 Claims (Paid)** | $ 2,332,499 | $ 2,323,010 | $ 2,324,506 | $ (511,098) | $ (479,845) | | $ (492,296) | |
| 28 | **Value After Ch.11 Admin & Priority Claims Paid** | | $ (276,871) | $ (334,362) | | $ 3,875,961 | | $ 4,343,874 | |
| | Less Pre- Petition Claims (Paid) | Est. Claim | | | Est. Claim | | | | |
| 29 | I/C Claims | $ 30,469,780 | $ 333,143 | $ 396,295 | | - | 0.0% | - | 0.0% |
| 30 | Joint & Several Pension Termination Claims | | | | (560,600) | (560,600) | 100.0% | (560,600) | 100.0% |
| 31 | Senior Debt | | $ (596,312) | $ (682,074) | (8,789,017) | (3,280,597) | 37.3% | (3,743,009) | 42.6% |
| 32 | Bridge | | $ 478,050 | $ 544,788 | (1,619,507) | (16,836) | 1.0% | (19,544) | 1.2% |
| 33 | Bonds | | $ (1,038) | $ (1,205) | (1,283,056) | (13,338) | 1.0% | (15,448) | 1.2% |
| 34 | Other General Unsecured Claims | | $ (214) | $ (249) | (384,742) | (4,589) | 1.2% | (5,236) | 1.4% |
| 35 | Subordinated Debt | | $ 9,550 | 11,086 | (996,181) | - | 0.0% | - | 0.0% |
| 36 | **Total Pre-Petition Claims / (Claims Paid)** | $ 30,469,780 | 223,179 | 268,642 | $ (13,633,103) | $ (3,875,961) | | $ (4,343,874) | |
| 37 | **Equity Value** | | (53,693) | (65,720) | | - | | - | |

6

5.    Note on Eliminations / Adjustments

The Eliminations / Adjustments column is used to show (a) the elimination of Intercompany Claim activity and (b) the reallocation of value among pre-petition Claims due to contractual subordination.

| ($000s) | Intercompany Elimination | | | Tribune Intercompany Subordination | | Contractual Subordination Bridge Guarantee Subordination | | Subordinated Debt Adjustment | | TOTAL | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Eliminations / Adjustments | Book Value $ | Low $ | High $ | Low $ | High $ | Low $ | High $ | Low $ | High $ | Book Value $ | Low $ | High $ |
| Admin Priority I/C Receivables | (2,332,499) | (2,323,010) | (2,324,506) | | | | | | | (2,332,499) | (2,323,010) | (2,324,506) |
| I/C Receivables (Pre-Petition) | (30,469,780) | (223,180) | (268,643) | | | | | | | (30,469,780) | (223,180) | (268,643) |
| Investments in Subsidiaries | - | (53,692) | (65,719) | | | | | | | - | (53,692) | (65,719) |
| Total Recoveries | (32,802,279) | (2,599,882) | (2,658,868) | | | | | | | (32,802,279) | (2,599,882) | (2,658,868) |
| Admin Priority I/C Claims | 2,332,499 | 2,323,010 | 2,324,506 | | | | | | | 2,332,499 | 2,323,010 | 2,324,506 |
| Total Ch.11 Claims (Paid) | 2,332,499 | 2,323,010 | 2,324,506 | | | | | | | 2,332,499 | 2,323,010 | 2,324,506 |
| I/C Claims | 30,469,780 | 223,180 | 268,643 | 109,964 | 127,652 | | | | | 30,469,780 | 333,144 | 396,295 |
| Senior Debt | | | | (109,964) | (127,652) | (479,360) | (546,309) | (6,988) | (8,112) | | (596,312) | (682,074) |
| Bridge | | | | | | 479,360 | 546,309 | (1,310) | (1,521) | | 478,050 | 544,788 |
| Bonds | | | | | | | | (1,038) | (1,205) | | (1,038) | (1,205) |
| Other General Unsecured Claims | | | | | | | | (214) | (249) | | (214) | (249) |
| Subordinated Debt | | | | | | | | 9,550 | 11,086 | | 9,550 | 11,086 |
| Total Pre-Petition Claims / (Claims Paid) | 30,469,780 | 223,180 | 268,643 | - | - | - | - | - | - | 30,469,780 | 223,180 | 268,643 |
| Total Eliminations / Adjustments | - | (53,693) | (65,720) | - | - | - | - | - | - | | (53,693) | (65,720) |

The Intercompany Elimination nets the offsetting payable and receivable balances to zero for presentation purposes to show a total combined liquidation analysis for all of the Tribune Entities.

The Contractual Subordination section details the following adjustments specified under the associated credit agreements:

- Any value that would be distributed to Guarantor Subsidiaries that are Debtors on the account of Intercompany Claims against Tribune Company is redistributed to the holders of Claims arising under the Guarantee Agreement, dated as of June 4, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and JP Morgan Chase Bank, N.A., as administrative agent, as amended, restated, supplemented or otherwise modified from time to time (the "Senior Loan Guaranty Claims");

- Any value that would be distributed to the holders of Claims arising under the Guarantee Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and Wells Fargo Bank, N.A., as administrative agent, as amended, restated, supplemented or otherwise modified from time to time (the "Bridge Loan Guaranty Claims") is redistributed to the Senior Loan Guaranty Claims; and

- Any value that would be distributed to (i) the holders of the EGI-TRB LLC Notes on account of Claims arising pursuant to the EGI-TRB LLC Notes (the "EGI-TRB LLC Notes Claims") or (ii) holders of Claims arising under or evidenced by the PHONES Notes Indenture and related documents, except any claim made by Wilmington Trust Company, as successor indenture trustee, for reasonable compensation for services under the PHONES Notes Indenture or for the reimbursement of reasonable expenses, disbursements, and advances incurred or made by Wilmington Trust Company in accordance with any provision of the PHONES Notes Indenture (the "PHONES Notes Claims") is redistributed to the holders of (a) Claims arising under the Senior Loan Agreement (other than accrued and unpaid amounts for the reasonable and documented fees, costs and expenses of the Senior Lender Professionals incurred in connection with the Chapter 11 Cases) and any Claim of the Senior Lenders or the Senior Loan Agent arising under the Pledge Agreement (the "Senior Loan Claims"), (b) Claims arising under the Bridge Loan Agreement (the "Bridge Loan Claims"), (c) Claims arising under or evidenced by the Senior

Notes Indentures and related documents and any Claim of the Senior Noteholders arising under the Pledge Agreement  (the "Noteholder Claims"), and (d) other general unsecured claims at Tribune Company on a pro rata basis.

**Notes to Specified Lines Items of Liquidation Analysis**

**Asset Liquidation Values**

1. **Cash** - 100% recovery of projected available cash balances as of the Conversion Date. Cash recovery excludes restricted cash related to (a) approximately $2 million in a segregated utility adequate assurance account and (b) approximately $16.275 million collateralizing a letter of credit. Tribune Company cash includes $368 million of cash as described in Exhibit F to the General Disclosure Statement.

2. **Trade Accounts Receivable** –The majority of the receivables consist of advertising trade receivables. They also include a smaller amount of single copy newspaper sales, home circulation, commercial printing and delivery and other miscellaneous receivables. The Liquidation Analysis assumes an estimated recovery range of between 55% and 80% of the net book value of accounts receivable consistent with the assumptions that were used in the now expired DIP Facility for the calculation of eligible trade accounts receivable.

3. **Inventory** – Inventories are comprised mainly of newsprint, ink and other supplies. Due to the costs associated with transport and handling, and possible shrinkage, the Liquidation Analysis assumes a recovery range of between 50% - 60% of net book value.

4. **Property, Plant & Equipment** includes the following:

***$000s***

|  | Book Value | Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|
| Land & Buildings | $  433,569 | $  271,587 | 63% | $  360,346 | 83% |
| Machinery & Equipment | 428,543 | 21,427 | 5% | 42,854 | 10% |
| Construction in Process | 31,172 | - | 0% | - | 0% |
| Total Property, Plant & Equipment | $  893,284 | $  293,014 | 33% | $  403,201 | 45% |

- **Land, Buildings & Leasehold Improvements** – The liquidation value for land and buildings is based upon a review conducted by the Debtors' management, which assumes a discount to prior appraisal information based on (a) current market factors, (b) a forced liquidation of empty buildings in a six-month period, and (c) maintaining the property and removing equipment.

  The majority of the liquidation value relates to properties held by Chicago Tribune Company (including Tribune Tower in downtown Chicago and the Freedom Center printing and distribution complex near downtown Chicago), Los Angeles Times Communications LLC (including the Times Mirror Square office building, printing and distribution center in downtown Los Angeles) and Tribune Company (two properties used for office, printing and distribution by The Baltimore Sun Company). Leasehold improvements are assumed to have no value.

- **Machinery & Equipment** – Primarily consists of printing presses and related equipment. Given the over-capacity in the industry and the limited universe of potential buyers (who may exist in other geographic areas & some of whom might be experiencing financial distress), it is likely that these assets would not command significant value. Therefore the expected recovery range is 5% - 10% of net book value.

- **Construction in Progress** – Primarily relates to software development and web width reduction projects which are assumed to have no recovery value given the need for additional funding to complete any outstanding projects.

5. **Goodwill & Intangibles** – As part of the Analysis, the Debtors' investment banker surveyed the current publishing marketplace for comparable transactions and was not able to find any recent transactions or public comparables that would lend support to significant value for intangible publishing assets. In addition, any goodwill is assumed to have no value.

6. **Investments** – Investments are assumed to be liquidated through a distressed sale at a 15% to 30% discount to the going concern values determined in the valuation contained in Exhibit F to the General Disclosure Statement. The primary investments include Television Food Network, G.P. (31.3% held by non-debtor Tribune (FN) Cable Ventures, Inc.), CareerBuilder, LLC (30.8% held by non-debtor Tribune National Marketing Company), Classified Ventures (27.8% ownership between Tribune Company and non-debtor Tribune National Marketing Company), Legacy.com, Inc. (49.1% owned by Tribune Company), and Chicago Baseball Holdings, LLC (5% held by Tribune Sports Network Holdings, LLC, Tribune CNLBC, LLC, Tribune DQ, LLC, and Tribune WFPT, LLC).

7. **Other Assets** –Includes prepaid, deposits, tax refunds receivable and other sundry assets which are assumed to have minimal value in a liquidation.

8. **Assets Sold as a Going Concern** –The Liquidation Analysis separates out the book value of assets of entities that are sold as a going concern. See Global Note #3 above for explanation of how the going concern value was discounted to obtain the liquidation value. The following are the entities assumed to be sold as going concerns under a distressed sale:

| | Legal Entity Name | | Legal Entity Name |
|---|---|---|---|
| 1 | Chicagoland Television News, Inc. | 14 | KSWB Inc. |
| 2 | Oak Brook Productions, Inc. | 15 | Forsalebyowner.com Corp. |
| 3 | KIAH Inc. | 16 | Forsalebyowner.com Referral Services, LLC |
| 4 | KPLR, Inc. | 17 | Tribune Television Company |
| 5 | KTLA Inc. | 18 | Tribune Television New Orleans, Inc. |
| 6 | Channel 40, Inc. | 19 | Tribune Television Holdings, Inc. |
| 7 | KWGN, Inc. | 20 | Tribune Television Northwest, Inc. |
| 8 | Tribune Media Services, Inc. | 21 | WDCW Broadcasting, Inc. |
| 9 | Tribune Media Services B.V. | 22 | Tower Distribution Company |
| 10 | TMS Entertainment Guides, Inc. | 23 | WGN Continental Broadcasting Company |
| 11 | TMS Entertainment Guides Canada Corp | 24 | WPIX, Inc. |
| 12 | Tribune Hong Kong Ltd. | 25 | Channel 39, Inc. |
| 13 | Tribune Broadcast Holdings, Inc. | 26 | Los Angeles Times International, Ltd |

**Costs Associated with Liquidation**

10. **Professional Fees** – Includes estimates for investment banking fees (1.0% of Gross Liquidation Proceeds, excluding cash,  from the sale of  Going Concern Disposition entities and Investments) real estate brokerage fees (2.0% of net proceeds from property dispositions), and chapter 7 professional fees (0.6% of Gross Liquidation Proceeds excluding cash).

11. **Taxes on Disposition** - Management and its advisors have estimated the taxes that would be paid on the net gains on the disposition of the assets of the Tribune Entities, at an assumed tax rate of 41%.

12. **Chapter 7 Trustee Fees** –Although section 326 of the Bankruptcy Code provides for statutory Trustee fees of 3.0% for liquidation proceeds in excess of $1,000,000, the Liquidation Analysis assumes that the Bankruptcy Court will only authorize Trustee fees of 2.0% of Gross Liquidation Proceeds excluding cash. Should the Bankruptcy Court authorize Trustee fees in excess of 2.0%, the liquidation proceeds available for distribution would be reduced.

13. **Sale Period Profit / (Loss)** –For those Tribune Entities that are assumed to be sold as a going concern, the Liquidation Analysis assumes that those entities will continue to operate during a six month sale period.  Therefore the Liquidation Analysis includes an estimated Sale Period Profit / (Loss) equal to the actual operating profit (excluding depreciation and amortization) for the six month period from January through June 2010, discounted by 30% (High) to 50% (Low).   The discount factors in reduced performance and potential additional employee retention costs during a distressed sale.

14. **Wind Down Costs** –For those entities to be Shut Down, the Liquidation Analysis assumes that operations would immediately cease upon filing of chapter 7, (e.g.; publishing entities would stop printing newspapers), and the majority of the staff would be severed (see Note 15), with minimal staff remaining to assist in the shutdown of operations and assist the chapter 7 Trustee in the wind down and sale of individual assets.

    Costs associated with the limited operation of corporate functions during the liquidation (including finance, technology, human resource and property service centers) are allocated to all the Tribune Entities on a pro rata basis, based upon Gross Liquidation Proceeds. These functions will support the collection of accounts receivable, the termination of employees, the management of payroll remittances, the ongoing operations of Tribune Entities to be sold, the maintenance and closing of accounting records, the preparation of estate tax returns and the management of asset sales during the liquidation period. These costs assume that the current corporate and service center head count of approximately 840 is immediately reduced to approximately 165 upon filing for chapter 7, and by the end of the 6 month liquidation period has been reduced to 66 full time employees.  The Liquidation Analysis assumes that employees retained beyond the start of the liquidation process are paid stay bonuses equal to three months of their base salary.

15. **Employee Severance Costs** - Employee severance is based upon the Bankruptcy Court approved severance policy.  The Liquidation Analysis assumes that for any entity sold as a going concern, the buyer(s) would offer employment to all current employees and therefore the estate would not incur any severance related costs for these entities. Pursuant to the Bankruptcy Court approved severance policy, the Analysis assumes lump sum payments without benefits continuation for all employees of entities that are liquidated. In certain instances there is insufficient value to satisfy the severance Claims in full resulting in less than 100% recovery on these Claims.

**Recoveries from Intercompany Balances and Investments in Subsidiaries**

11

18. **Administrative Priority Intercompany Receivables** –These are net Intercompany receivable and payable balances that have arisen since the commencement of the Chapter 11 Cases.[7] Per the Final Order (I) Approving Cash Management Systems, (II) Authorizing Use of Pre Petition Bank Accounts and Business Forms, and (III) Granting Superpriority Expense Status to Post Petition intercompany Transactions (the "Final Cash Management Order"), these intercompany balances have super priority status and as such are satisfied in advance of all other chapter 11 Claims. Also in accordance with the Final Cash Management Order, the administrative priority intercompany receivables & payables among Tribune Company, Tribune Finance Service Center, Inc., and Tribune Publishing Company are consolidated.

The Liquidation Analysis assumes that intercompany Claims are satisfied from the Value After Recoveries and each subsidiary receives value on account of its respective priority intercompany receivables, which in turn is value used to satisfy priority intercompany payables.

19. **Pre-Petition Intercompany Receivables** - Represents the total intercompany amounts owning among the Tribune Entities at the time of the chapter 11 filings. Consistent with the treatment of such Claims under the Final Cash Management Order, Pre-Petition Intercompany Claims and payables among Tribune Company, Tribune Finance Service Center, Inc., and Tribune Publishing Company are likewise consolidated in accordance with the Final Cash Management Order. The pre-petition intercompany recoveries are adjusted in accordance with the contractual obligations under the various credit and guarantee agreements (see Global Notes 2 & 5).

The Liquidation Analysis assumes all intercompany balances are valid at the amounts reflected in the books and records of the Tribune Entities without giving effect to any potential challenges to their validity.

20. **Investments in Subsidiaries** –Represents the equity value in direct subsidiaries. For most entities the Claims exceed the value so there is no equity value to distribute to its parent.

**Chapter 11 Administrative Claims**

23. **Administrative Priority Intercompany Claims  (See Note 18 Above)**

24. **Chapter 11 Trade Claims** –Administrative Claims arising from operation of the Debtors' businesses post petition and prior to the Conversion Date.[8]

25. **Chapter 11 Unpaid Professional Fees** –Administrative Claims for unpaid professional fees as of the Conversion Date are paid pro rata by all of the Debtors.

26. **Priority Tax Claims** –Includes an estimated Allowed amount for existing tax Claims that would occur in liquidation. Certain existing tax Claims are joint and several liabilities of all of the Debtors and the estimated Allowed amounts are consistent with the assumptions with regard to resolving outstanding tax disputes incorporated into the Debtors' business plan. These Claims are assumed to be satisfied in full pro rata across all of the Debtors.

---

[7] For all Debtors, the Intercompany Priority Claims are the balances that have arisen since December 8, 2008, except for Tribune CNLBC LLC, where the balances have arisen since it filed for chapter 11 on October 12, 2009.
[8] An estimate for 503(b)(9) Claims is not included as most 503(b)(9) Claims have already been satisfied pursuant to an order of the Bankruptcy Court.

To the extent that there is insufficient value at a given subsidiary to satisfy its proportionate share of the tax claim, the Liquidation Analysis assumes that value is used pro rata from other Tribune Entities to satisfy the tax claim in full.

**Pre-Petition Claims**

After the deduction of chapter 11 administrative priority Claims, as outlined, the Net Liquidation Value at the Tribune Entities is allocated Pro Rata to the pre-petition unsecured Claims at each entity.

29. **Pre-Petition Intercompany Claims (See Note 19 Above)**

30. **Joint and Several Pension Termination Claims** –The Liquidation Analysis assumes that the Tribune Entities would terminate their various pension plans and therefore the Pension Benefit Guarantee Corporation ("PBGC") would have a claim for the unfunded portion of the pension plans. This is a joint and several liability among all entities and has been estimated with assistance from the Debtors' actuarial consultants. It does not include potential additional Claims related to any withdrawal from multi-employer plans.

31. **Senior Debt** –Includes the estimated Allowed amounts for the Senior Loan Claims and Senior Loan Guaranty Claims. The Senior Loan Guaranty Claims include Claims asserted under that certain 1992 ISDA Master Agreement, dated as of July 2, 2007, between Barclays Bank PLC and Tribune. The Senior Loan Claims and the Senior Loan Guaranty Claims assume that all undrawn pre-petition letters of credit, which primarily backstop the self insured portion of the Tribune Entities' workers compensation liability, are drawn at the time of the liquidation.

32. **Bridge Debt** –Includes the Bridge Loan Claims and the Bridge Loan Guaranty Claims. As the Bridge Loan Guaranty Claims are subordinated to the Senior Loan Guaranty Claims, the value initially recovered on account of the Bridge Loan Guaranty is reallocated to the Senior Debt Claims (see Global Note 5).

33. **Bond Debt** - The Noteholder Claims are unsecured Claims at Tribune Company, pari-passu with the Senior Debt and Bridge Debt Claims. The Noteholder Claims are also beneficiaries of certain stock pledges; however as there is no equity value in the related entities, these are not reflected in the Liquidation Analysis.

34. **Other General Unsecured Claims** – Includes an estimate of Allowed Claims, including pre-petition trade Claims. Numerous Litigation Claims have been asserted against the Tribune Entities, which the Tribune Entities generally do not believe have validity and are likely to be disallowed. Accordingly these Litigation Claims are not included in the estimate of General Unsecured Claims. Other General Unsecured Claims at Tribune includes Claims asserted under that certain 1992 ISDA Master Agreement, dated as of July 2, 2007, between Barclays Bank PLC and Tribune.

35. **Subordinated Debt Claims** – Includes (i) the "PHONES Notes (both the unredeemed notes at face value and the unfunded redemptions at redemption value), and (ii) the "EGI-TRB LLC Notes" (see Global Note 5).

37. **Equity Value** – To the extent that a legal entity has sufficient Value After Chapter 11 Administrative and Priority Claims and its Pre-Petition Claims have been repaid in full, the Liquidation Analyses assumes any excess equity value is then available for its respective parent to repay Administrative and Pre-Petition Claims (see Note 20). There is no equity value at Tribune Company.

13

# EXHIBIT E

*Financial Projections*

The Financial Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below, as well as the assumptions, qualifications and explanations set forth in the General Disclosure Statement. See Article XII – Risks Related to the Debtors' Businesses.

THE DEBTORS DID NOT PREPARE THE FINANCIAL PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE DEBTORS' INDEPENDENT AUDITORS HAVE NEITHER EXAMINED NOR COMPILED THE FINANCIAL PROJECTIONS THAT ACCOMPANY THE GENERAL DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS. EXCEPT FOR THE PURPOSES OF THE GENERAL DISCLOSURE STATEMENT, THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH, OR OTHERWISE PUBLICLY DISCLOSE, FINANCIAL PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF A PLAN OF REORGANIZATION, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENT BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN ARTICLE XII.B OF THE GENERAL DISCLOSURE STATEMENT ENTITLED "RISK RELATED TO THE DEBTORS' BUSINESSES"), AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS AND THEIR PROFESSIONALS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY,

REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL AND WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INACCURATE. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE GENERAL DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE GENERAL DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT A PARTICULAR COMPETING PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

*Accounting Policies*

The Financial Projections have been prepared using accounting policies that are generally consistent with those applied in the Debtors' historical financial statements.

Upon emergence from chapter 11, the Reorganized Debtors will implement "fresh start" reporting pursuant to Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," as codified in Accounting Standards Codification ("ASC") Topic 852, "Reorganization." The main principles of fresh start reporting require that the reorganization value of the emerging entity be allocated to all of the entity's assets in conformity with the procedures specified by Statement of Financial Accounting Standards ("SFAS") No. 141R, "Business Combinations," as codified in ASC Topic 805, "Business Combinations," and any portion of the reorganization value that cannot be attributed to specific tangible or identifiable intangible assets of the emerging entity is required to be reported as goodwill.

*Summary of Significant Assumptions*

The Debtors, with the assistance of various professionals, including their financial advisors, prepared the Financial Projections for the fiscal years 2010 to 2013. The Financial Projections

are based on a number of assumptions with respect to the future performance of the Reorganized Debtors' operations. Although these Financial Projections have been prepared in good faith and are believed to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will be realized. Additionally, the Debtors are in the early stages of their annual budgeting process for 2011. While the Debtors have utilized the latest information available to prepare the Financial Projections, additional information could become available during the budgeting process which could impact expected future performance. As described in detail in Article XII of the General Disclosure Statement, a variety of risk factors could affect the Reorganized Debtors' financial results and should be considered. The Financial Projections should be reviewed in conjunction with a review of these assumptions, including the qualifications and footnotes set forth herein.

*General Assumptions*

The Financial Projections assume that the Effective Date will be December 27, 2010 (start of the Debtors' 2011 fiscal year) and that the Reorganized Debtors will continue to conduct operations substantially similar to their businesses currently. In addition, the Financial Projections take into account the current market environment in which the Debtors compete, including many economic and financial forces that are beyond the control of the Debtors and management. The Debtors operate in the newspaper, broadcasting and interactive markets throughout the United States. Economic growth or slowdowns on a national or regional basis may impact the Reorganized Debtors' revenues and expenses. In addition, general trends and changes within the media industries may impact performance.

*Projected Statements of Operations*

The Debtors use cash operating expenses and operating cash flow in the Projected Consolidated Statements of Operations as these are the metrics the Debtors use to evaluate internal performance. "Cash operating expenses" are defined as operating expenses before depreciation and amortization, write-downs of intangible assets and properties, stock-based compensation, certain special items (including severance), non-operating items, and reorganization items. "Operating cash flow" is defined as earnings before interest income, interest expense, equity income and losses, depreciation and amortization, write-downs of intangible assets and properties, stock-based compensation, certain special items (including severance), non-operating items, and reorganization items. "Adjusted operating cash flow" is defined as operating cash flow plus cash distributions from equity investments. Cash operating expenses, operating cash flow and adjusted operating cash flow are not measures of financial performance under Generally Accepted Accounting Principles ("GAAP") and should not be considered as a substitute for measures of financial performance prepared in accordance with GAAP.

The Projected Consolidated Statements of Operations do not reflect potential impacts from the implementation of fresh start accounting.

Tribune Company and Subsidiaries
Projected Consolidated Statements of Operations

| ($ in millions) | Pro Forma 2010 (a.) | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| **Revenues** | | | | |
| Publishing | | | | |
| Advertising | $ 1,353 | $ 1,256 | $ 1,193 | $ 1,133 |
| Circulation | 400 | 389 | 378 | 366 |
| Other | 343 | 345 | 345 | 345 |
| Total Publishing | 2,096 | 1,990 | 1,915 | 1,844 |
| Broadcasting | 1,091 | 1,061 | 1,088 | 1,082 |
| **Total Revenues** | 3,187 | 3,051 | 3,003 | 2,926 |
| | | | | |
| **Cash Operating Expenses (b.)** | | | | |
| Publishing | 1,800 | 1,744 | 1,704 | 1,663 |
| Broadcasting | 720 | 728 | 747 | 752 |
| Corporate | 51 | 51 | 50 | 51 |
| **Total Cash Operating Expenses** | 2,570 | 2,522 | 2,501 | 2,467 |
| | | | | |
| **Operating Cash Flow (b.)** | | | | |
| Publishing | 296 | 246 | 211 | 181 |
| Broadcasting | 371 | 333 | 341 | 330 |
| Corporate | (51) | (51) | (50) | (51) |
| **Total Operating Cash Flow** | 617 | 529 | 502 | 460 |
| | | | | |
| Depreciation and amortization | 185 | 159 | 163 | 165 |
| | | | | |
| **Operating Profit (b.)** | 432 | 370 | 339 | 295 |
| Income on equity investments, net | 171 | 153 | 168 | 184 |
| Interest income | 1 | 3 | 1 | 11 |
| Interest expense | (81) | (80) | (79) | (82) |
| **Income Before Income Taxes** | 522 | 446 | 430 | 407 |
| Income taxes | (214) | (183) | (176) | (167) |
| **Net Income (b.)** | $ 308 | $ 263 | $ 254 | $ 240 |
| | | | | |
| **Adjusted Operating Cash Flow (b.)** | | | | |
| Operating Cash Flow | $ 617 | $ 529 | $ 502 | $ 460 |
| Cash distributions from equity investments | 109 | 79 | 92 | 133 |
| Adjusted Operating Cash Flow | $ 725 | $ 608 | $ 595 | $ 592 |

Note: The Projected Consolidated Statements of Operations do not reflect potential impacts from the implementation of fresh start accounting

(a.) Pro forma 2010 was prepared to present the anticipated impact of a plan of reorganization as if the consumation of such plan had occurred at the beginning of fiscal year 2010.

(b.) Excludes stock-based compensation, certain special items (including severance), non-operating items and reorganization items.

Tribune Company and Subsidiaries
Projected Pro Forma Consolidated Balance Sheet – December 27, 2010

| ($ in millions) | Estimated Pre-Effective Date | Reorganization Adjustments | | Fresh Start Adjustments | | Pro Forma Reorganized |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| **Current Assets** | | | | | | |
| Cash and cash equivalents | $ 1,147 | $ (822) | (a.) | $ - | | $ 325 |
| Accounts receivable, net | 510 | - | | - | | 510 |
| Inventories | 22 | - | | - | | 22 |
| Broadcast rights | 180 | - | | - | | 180 |
| Prepaid expenses and other | 199 | - | | - | | 199 |
| Total current assets | 2,057 | (822) | | - | | 1,235 |
| **Property, plant and equipment, net** | 1,033 | - | | - | | 1,033 |
| **Other Assets** | | | | | | |
| Broadcast rights | 151 | - | | - | | 151 |
| Goodwill and other intangible assets, net | 791 | - | | 2,545 | (i.) | 3,336 |
| Restricted cash | 726 | (726) | (a.) | - | | - |
| Investments | 538 | - | | 1,299 | (j.) | 1,837 |
| Other | 86 | 20 | (b.) | - | | 106 |
| Total other assets | 2,292 | (706) | | 3,844 | | 5,430 |
| Total assets | $ 5,382 | $ (1,528) | | $ 3,844 | | $ 7,698 |
| **Liabilities and Shareholders' Equity (Deficit)** | | | | | | |
| **Current Liabilities** | | | | | | |
| Current portion of new senior secured term loan | $ - | $ 11 | (c.) | $ - | | $ 11 |
| Capital lease obligations | 2 | - | | - | | 2 |
| Contracts payable for broadcast rights | 128 | 59 | (d.) | - | | 187 |
| Deferred income | 71 | - | | - | | 71 |
| Accounts payable, accrued expenses and other current liabilities | 371 | (38) | (d.) | - | | 333 |
| Total current liabilities | 572 | 32 | | - | | 604 |
| **Long-Term Debt (less portions due within one year)** | | | | | | |
| New senior secured term loan | - | 1,089 | (c.) | - | | 1,089 |
| Capital lease obligations | 8 | - | | - | | 8 |
| Total long-term debt | 8 | 1,089 | | - | | 1,097 |
| **Other Non-Current Liabilities** | | | | | | |
| Deferred income taxes | 49 | 529 | (e.) | 533 | (k.) | 1,111 |
| Contracts payable for broadcast rights | 69 | 102 | (d.) | - | | 171 |
| Pension obligations, net | 181 | - | | - | | 181 |
| Other obligations | 151 | 83 | (d.) | - | | 234 |
| Total other non-current liabilities | 450 | 714 | | 533 | | 1,697 |
| **Liabilities Subject to Compromise** | 13,149 | (13,149) | (f.) | - | | - |
| **Common Shares Held by ESOP, net of Unearned Compensation** | 22 | (22) | (g.) | - | | - |
| **Shareholders' Equity (Deficit)** | (8,819) | 9,807 | (h.) | 3,312 | (l.) | 4,300 |
| Total liabilities and shareholders' equity (deficit) | $ 5,382 | $ (1,528) | | $ 3,844 | | $ 7,698 |

5

*Notes to Projected Pro Forma Consolidated Balance Sheet*

The pro forma balance sheet adjustments contained herein account for (i) the reorganization and estimated related adjustments pursuant to a plan of reorganization and (ii) the estimated impact from the implementation of fresh start accounting pursuant to ASC Topic 852, "Reorganization."

The Debtors have not yet completed their fresh start reporting analysis. However, for purposes of preliminary fresh start reporting, the Financial Projections incorporate estimates of the effect of fresh start reporting which are based upon an estimated Equity Value of approximately $4.3 billion. The reorganized value ultimately used by the Debtors in implementing fresh start reporting may differ from this estimate. Likewise, the Debtors' allocation of the reorganized value to individual assets and liabilities is based upon preliminary estimates that are subject to change upon the formal implementation of fresh start reporting and could result in material differences to the allocated values included in these Financial Projections. For purposes of estimating the impact of fresh start accounting, the Debtors' have assumed that the book value of all of their assets except for goodwill and other intangible assets and investments approximates fair market value. Investments are adjusted to estimated market value and the balance of reorganization value in excess of liabilities and tangible assets is shown as an increase in goodwill and other intangible assets.

(a.) Reflects estimated cash distributions in accordance with the terms of a plan of reorganization, including estimated administrative and priority claims paid in connection with emergence.

(b.) Reflects a delayed draw term loan of $20 million to fund a litigation trust assumed to be funded at emergence.

(c.) Represents the current and long-term portions of a new senior secured term loan that is assumed to be issued pursuant to a plan of reorganization, which is assumed to be in an aggregate principal amount of $1.1 billion.

(d.) Represents the reclassification of amounts previously included in liabilities subject to compromise that the Company anticipates will be assumed in accordance with the terms of a plan of reorganization.

(e.) Prior to the bankruptcy restructuring, the Company was a subchapter S corporation and nearly all of its subsidiaries were qualified subchapter S subsidiaries under the Internal Revenue Code. Subject to certain limitations as an S corporation, the Company was not subject to federal income taxes. As a result of the bankruptcy restructuring, the Company will no longer qualify for S corporation status, and accordingly will record federal and state deferred income taxes on all estimated book versus tax basis differences. The deferred income tax adjustment primarily relates to deferred tax liabilities that resulted from the contribution of assets to the Chicago Baseball Holdings, LLC and Newsday Holdings, LLC partnerships.

(f.) All liabilities subject to compromise will be settled in accordance with the terms of a plan of reorganization.

(g.) The ESOP is assumed to be terminated in accordance with the terms of a plan of reorganization.

(h.) Represents the net gain from completion of the reorganization.

(i.) The book value of goodwill and other intangible assets will increase as part of the implementation of fresh start accounting.

(j.) Represents an adjustment to reflect investments at estimated fair value.

(k.) Represents an adjustment to record deferred income taxes on the fresh start accounting adjustment to record investments at estimated fair value.

(l.) Adjustment to reflect the value for the new equity of the Reorganized Debtors.

Tribune Company and Subsidiaries
Projected Consolidated Balance Sheets

| ($ in millions) | 2011 | | 2012 | | 2013 | |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| | | | | | | |
| **Current Assets** | | | | | | |
| Cash and cash equivalents | $ | 582 | $ | 718 | $ | 865 |
| Accounts receivable, net | | 497 | | 491 | | 479 |
| Inventories | | 20 | | 19 | | 18 |
| Broadcast rights | | 190 | | 179 | | 190 |
| Prepaid expenses and other | | 133 | | 135 | | 98 |
| Total current assets | | 1,423 | | 1,541 | | 1,650 |
| | | | | | | |
| **Property, plant and equipment, net** | | 973 | | 908 | | 843 |
| | | | | | | |
| **Other Assets** | | | | | | |
| Broadcast rights | | 145 | | 80 | | 87 |
| Goodwill and other intangible assets, net | | 3,322 | | 3,309 | | 3,294 |
| Investments | | 1,911 | | 1,987 | | 2,038 |
| Other | | 106 | | 106 | | 106 |
| Total other assets | | 5,485 | | 5,482 | | 5,525 |
| Total assets | $ | 7,880 | $ | 7,932 | $ | 8,018 |
| | | | | | | |
| **Liabilities and Shareholders' Equity** | | | | | | |
| | | | | | | |
| **Current Liabilities** | | | | | | |
| Current portion of new senior secured term loan | $ | 11 | $ | 11 | $ | 11 |
| Capital lease obligations | | 2 | | 2 | | 2 |
| Contracts payable for broadcast rights | | 191 | | 175 | | 229 |
| Deferred income | | 71 | | 71 | | 71 |
| Accounts payable, accrued expenses and other current liabilities | | 322 | | 309 | | 292 |
| Total current liabilities | | 597 | | 569 | | 605 |
| | | | | | | |
| **Long-Term Debt (less portions due within one year)** | | | | | | |
| New senior secured term loan | | 1,078 | | 1,067 | | 1,056 |
| Capital lease obligations | | 5 | | 3 | | 3 |
| Total long-term debt | | 1,083 | | 1,070 | | 1,059 |
| | | | | | | |
| **Other Non-Current Liabilities** | | | | | | |
| Deferred income taxes | | 1,106 | | 1,121 | | 1,117 |
| Contracts payable for broadcast rights | | 163 | | 101 | | 63 |
| Pension obligations, net | | 184 | | 126 | | 59 |
| Other obligations | | 190 | | 140 | | 77 |
| Total other non-current liabilities | | 1,643 | | 1,488 | | 1,316 |
| | | | | | | |
| **Shareholders' Equity** | | 4,557 | | 4,804 | | 5,038 |
| | | | | | | |
| Total liabilities and shareholders' equity | $ | 7,880 | $ | 7,932 | $ | 8,018 |

8

Tribune Company and Subsidiaries
Projected Consolidated Statements of Cash Flows

*($ in millions)*

|  | 2011 | 2012 | 2013 |
|---|---|---|---|
| **Operating Activities** | | | |
| Net income | $ 263 | $ 254 | $ 240 |
| Depreciation and amortization | 159 | 163 | 165 |
| Income on equity investments, net | (153) | (168) | (184) |
| Distributions from equity investments | 79 | 92 | 133 |
| Pension costs, net of contributions | 3 | (58) | (68) |
|  | | | |
| Changes in working capital items | | | |
|    Accounts receivable | 12 | 7 | 12 |
|    Inventories, prepaid expenses and other current assets | 68 | (1) | 38 |
|    Accounts payable, accrued expenses and other current liabilities | (11) | (12) | (18) |
| Change in broadcast rights, net of liabilities | (9) | (1) | (3) |
| Deferred income taxes | (5) | 15 | (4) |
| Other obligations | (44) | (50) | (63) |
| Other | (6) | (6) | (6) |
| Net cash provided by operating activities | 356 | 234 | 243 |
|  | | | |
| **Investing Activities** | | | |
| Capital expenditures | (85) | (85) | (85) |
| Cash used for investing activities | (85) | (85) | (85) |
|  | | | |
| **Financing Activities** | | | |
| Repayments of new senior secured term loan | (11) | (11) | (11) |
| Payments on capital leases | (2) | (2) | (0) |
| Cash used for financing activities | (13) | (13) | (11) |
|  | | | |
| **Net Increase in Cash** | 257 | 136 | 147 |
| Cash, beginning of period | 325 | 582 | 718 |
| Cash, end of year | $ 582 | $ 718 | $ 865 |

*Summary of Significant Assumptions*

*Revenues*

The Financial Projections assume that total consolidated revenue is flat in 2010 and declines 4% in 2011, 2% in 2012 and 3% in 2013.

<u>Publishing</u>

The Company assumes there will be continued industry-wide pressure on both advertising and circulation revenue throughout the projection period resulting in total revenue declines of 7% in 2010, 5% in 2011, and 4% in both 2012 and 2013. Total advertising revenue is expected to decline 9% in 2010, 7% in 2011 and 5% in both 2012 and 2013 driven by the continued pressure in all categories of print advertising. Circulation revenue is expected to decline 5% in 2010 and 3% in 2011, 2012 and 2013. Other revenue is forecasted to increase 1% in both 2010 and 2011 and to be flat in 2012 and 2013. Other revenue primarily includes the operations of TMS and third-party commercial printing and delivery operations.

<u>Broadcasting</u>

Based in part on recent trends and industry estimates, the Company assumes broadcasting revenue increases 16% in 2010, declines 3% in 2011, increases 3% in 2012 and declines 1% in 2013. Television station revenue is projected to increase 16% in 2010, decline 4% in 2011, increase 1% in 2012 and decline 2% in 2013. This variability is primarily due to the year-to-year swings in political television advertising. Cable television revenue, primarily from WGN America, is expected to increase 21% in 2010, 3% in 2011, 10% in 2012, and 7% in 2013 driven by enhanced programming. Radio revenue is forecasted to decline 1% in 2010, increase 1% in both 2012 and 2013 and be flat in 2013.

*Operating Expenses*

The Financial Projections assume that total consolidated cash operating expenses decline 4% in 2010, 2% in 2011 and 1% in both 2012 and 2013.

<u>Publishing</u>

The Financial Projections assume that total Publishing expenses decline 6% in 2010, 3% in 2011 and 2% in both 2012 and 2013 in conjunction with the forecasted decline in revenue.

All categories of expenses are projected to decline with the most significant percentage decline being in newsprint and ink expense. Newsprint and ink expense is projected to decline 17% in 2010, 1% in 2011, 4% in 2012 and 6% in 2013 primarily driven by lower projected newsprint consumption, partially offset by continued newsprint price increases. The Financial Projections assume modest declines in compensation expense as a result of realizing increased efficiencies in operations.

Other cash expenses are expected to decline 7% in 2010, 4% in 2011, and 3% in both 2012 and 2013, driven by, among other items, decreases in distribution costs.

Broadcasting

The Financial Projections assume that total Broadcasting cash operating expenses increase 1% in both 2010 and 2011, 3% in 2012 and 1% in 2013 due to higher programming expense and inflationary compensation increases.

Corporate

The Financial Projections assume that total Corporate expenses decline 15% in 2010 and 1% in both 2011 and 2012 followed by an increase of 2% in 2013. The significant decline in expense for 2010 is primarily due to one-time incentive plan compensation expense recorded in 2009.

Depreciation and Amortization

Depreciation and amortization was estimated based on current book values and useful lives for existing property, plant and equipment and intangible assets subject to amortization, and includes estimated depreciation on future capital expenditures.

Income on Equity Investments, Net

Income on equity investments is expected to be in line with recent trends and is based on information provided from the companies in which the Debtors hold equity investments.

Interest Expense

The Financial Projections include interest expense and fees associated with both an exit facility and a new senior secured term loan, which are assumed to be entered into by the Reorganized Debtors in connection with a plan of reorganization. The exit facility is assumed to be an aggregate revolving commitment amount of up to $300 million including a letter of credit sub-facility of up to $100 million. The exit facility is assumed to be undrawn at emergence, but the sub-facility is assumed to have letters of credit issued. The new senior secured term loan is assumed to be in an aggregate principal amount of $1.1 billion and is assumed to be amortized at a rate of 1% per annum.

The Financial Projections assume the Reorganized Debtors will incur interest expense of $80 million in 2011, $79 million in 2012 and $82 million in 2013. These projections reflect interest expense incurred related to borrowings under the facilities described above and based on terms that reflect the current interest rate and market conditions and do not assume any interest rate hedging during the Financial Projection Period. The effective interest rate on the new senior secured term loan is assumed to be 6.75% in both 2011 and 2012 and 7.2% in 2013.

Income Taxes

The Financial Projections reflect income tax expense at an effective tax rate of 41%.

*Projected Statements of Cash Flows*

Distributions from Equity Investments

The Financial Projections only assume continued distributions from the Company's investment in TV Food Network. On August 27, 2010, Scripps Networks, LLC contributed the equity of Cooking Channel, LLC, the entity which operates the Cooking Channel, to TV Food Network. The Financial Projections assume that the Debtors' wholly owned subsidiary Tribune (FN) Cable Ventures, Inc. maintains its current ownership interest in TV Food Network through making a capital contribution in 2010 of approximately $53 million, resulting in Tribune (FN) Cable Ventures, Inc. receiving lower excess cash distributions until disparities in the capital accounts of the partners are fully accounted for.

Pension Costs, Net of Contributions

The Financial Projections assume the Reorganized Debtors make cash contributions to their defined benefit pension plans during the Financial Projection Period. The Debtors have estimated these payments based on the work of the Debtors' actuary and current interest rate and market conditions.

Working Capital

The Financial Projections assume the Reorganized Debtors' working capital accounts, including accounts receivables, inventories, prepaid expenses and accounts payables, continue to perform according to the historical relationships with respect to revenue and expense activity.

Other Obligations

The Financial Projections assume certain payments related to estimated Allowed Priority Tax Claims from emergence through 2013.

Capital Expenditures

The Financial Projections assume annual capital expenditures of $85 million in 2011 through 2013 based on the Debtors' recent levels of capital spending adjusted downward to reflect completion of web width reduction projects and digital television conversions.

# EXHIBIT F

*Reorganized Value Analysis*

## B.    Reorganization Value.

The Debtors' investment banker and financial adviser, Lazard, has undertaken a valuation analysis to (i) determine the value available for distribution to holders of Allowed Claims pursuant to a plan of reorganization for the Debtors and any of Tribune's subsidiaries for which commencement of chapter 11 cases becomes necessary or appropriate (the "Plan") and (ii) analyze the relative recoveries to such holders thereunder.[1]  The valuation analysis set forth herein supersedes Lazard's valuation analysis included in the Tribune Disclosure Statement.

1.    Overview.

Lazard has estimated the value of the Reorganized Debtors as of December 27, 2010. Lazard has undertaken this valuation analysis to determine the value available for distribution to holders of Allowed Claims pursuant to a Plan and to analyze the relative recoveries to such holders thereunder.[2]  The estimated total value available for distribution to holders of Allowed Claims, exclusive of Allowed Claims held by Tribune and by direct or indirect subsidiaries of Tribune (the "Distributable Value") was derived based on (i) a sum-of-the-parts approach of the estimated value of the Reorganized Debtors' publishing, broadcasting and corporate operations on a going concern basis (the "Enterprise Value"), plus (ii) the estimated cash balance at the Assumed Effective Date, and (iii) the value of minority equity investments (the "Other Assets").  The valuation analysis assumes that the Effective Date is December 27, 2010 (the "Assumed Effective Date") and is based on projections developed and provided by the Debtors' management ("Projections") for 2010-2015 (the "Projection Period").

Based on these Projections and solely for purposes of analyzing the value available for distribution pursuant to a Plan, Lazard estimates that the Enterprise Value of the Reorganized Debtors falls within a range from approximately $2.9 to $3.5 billion, with an approximate mid-point estimate of $3.2 billion as of the Assumed Effective Date.  Adding the value of the Other Assets of approximately $1.7 to $2.0 billion (with an approximate mid-point value of $1.9 billion) and the estimated cash balance at the Assumed Effective Date of approximately $1.7 billion to the Enterprise Value range yields a range of Distributable Value for the Reorganized Debtors from $6.3 billion to $7.1 billion with an approximate mid-point of $6.75 billion.  Approximately $564 million of the $6.75 billion estimate of Distributable Value is attributable to the value of Tribune, representing the Distributable Value to be allocated to Holders of Allowed Claims against Tribune.[3]  The $6.75 billion estimate of Distributable Value also includes approximately $1.7 billion attributable to the value of the following subsidiaries of Tribune: Tribune (FN) Cable Ventures, Inc.; Tribune Interactive, Inc.; Tribune ND, Inc.; and Tribune National Marketing Company.

Based on total estimated gross debt of $1.1 billion projected as of the Assumed Effective Date, Lazard's mid-point estimate of Distributable Value reduced by approximately $1.4 billion of cash, assumed to be distributed pursuant to a Plan implies a value for the new equity of the Reorganized Debtors (the "Equity Value") of approximately $4.3 billion.

---

[1] In the case of each Competing Plan, the term "Allowed" shall have the meaning ascribed to such term in the Competing Plan.
[2] The estimated value of the Reorganized Debtors includes the value of the Debtors' wholly-owned subsidiaries as well as the value of minority equity interests held by the Debtors and their subsidiaries.  The Debtors' minority equity interests are generally described in Section [●] of this General Disclosure Statement.
[3] The estimate of Distributable Value attributable to Tribune includes the recovery by Tribune of approximately $369 million transferred to certain of Tribune's subsidiaries just prior to the Petition Date and gives effect to the Debtors' proposed settlement of intercompany claims.

THE ENTERPRISE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD AS OF THE DATE OF THIS GENERAL DISCLOSURE STATEMENT. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD NOR ANY OF THE DEBTORS HAS ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATES.

Lazard assumed that the Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. Lazard's estimated Enterprise Value range assumes the Reorganized Debtors will achieve their Projections in all material respects, including revenue, EBITDA margins, earnings and cash flow as projected. If the business performs at levels below those set forth in the Projections, such performance may have a materially negative impact on the Enterprise Value. Conversely, if the business performs at levels above those set forth in the Projections, such performance may have a materially positive impact on the Enterprise Value.

In estimating the range of Enterprise Value and the Equity Value of the Reorganized Debtors, Lazard: (i) reviewed certain historical financial information of the Debtors for recent years and interim periods; (ii) reviewed certain internal financial and operating data of the Debtors, which data were prepared and provided to Lazard by the Debtors' management and which relate to the Reorganized Debtors' business and its prospects; (iii) met with and discussed the Debtors' operations and future prospects with the Debtors' senior management team; (iv) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally comparable to the operating business of the Reorganized Debtors; (v) considered certain economic and industry information relevant to the operating business; and (vi) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of the Reorganized Debtors' business, operating assets and liabilities and the Reorganized Debtors' business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as publicly available information.

In addition, Lazard did not independently verify the Projections in connection with preparing the estimated Enterprise Value range, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith. The estimated Enterprise Value range was developed solely for purposes of the formulation and negotiation of a Plan and the analysis of implied relative recoveries to Holders of Allowed Claims thereunder.

Lazard has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to a Plan or the prices at which they may trade in the future. The estimated Enterprise Value range of the Reorganized Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under a Plan or of the terms and provisions of a Plan.

Lazard's estimate of Enterprise Value reflects the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to a Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth

herein. None of the Debtors, Reorganized Debtors, Lazard, nor any other person assumes responsibility for any differences between the estimated Enterprise Value range and such actual outcomes. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Reorganized Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by Holders of Claims (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), developments in the Reorganized Debtors' industry and economic conditions generally, and other factors which generally influence the prices of securities.

2.      Valuation Methodology.

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its range of estimated Distributable Value for the Reorganized Debtors. In performing the financial analyses described below and certain other relevant procedures, Lazard reviewed all significant assumptions with the Debtors' management. Lazard's valuation analysis must be considered as a whole. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to Enterprise Value.

Under the sum-of-the-parts approach and the valuation methodologies summarized below, Lazard derived a range of estimated Distributable Value based on valuation estimates for each of the Reorganized Debtors' publishing operations (principally newspaper businesses plus Tribune Media Services), broadcasting operations (television, cable and radio businesses), corporate operations and Other Assets (principally minority equity investments in TV Food Network, CareerBuilder and Classified Ventures). Lazard has assumed that the Reorganized Debtors will be subject to federal and state corporate income taxation.

a.      Comparable Company Analysis.

The comparable company valuation analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise value for each selected public company was determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such company (Lazard considered debt at book value and at current market values but relied primarily on book value given current trading levels), and subsequently adding minority interests, and subtracting unconsolidated investments. Those enterprise values are commonly expressed as multiples of various measures of operating statistics, most commonly sales and earnings before interest, taxes, depreciation and amortization ("EBITDA"). In addition, each of the selected public company's operating performance, operating margins, profitability, leverage and business trends were examined. Based on these analyses, financial multiples and ratios were calculated to apply to the Reorganized Debtors' actual and projected operating performance. Lazard focused primarily on EBITDA multiples of the selected comparable companies to value the Reorganized Debtors but also gave consideration to multiples derived by measuring enterprise value against revenue.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtors. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of business, business risks, growth prospects, maturity of business, location, market presence and size and scale of operations. Lazard selected comparable companies in both the publishing and broadcasting sectors. The selection of appropriate comparable companies is often difficult, a matter of judgment, and subject to limitations due to sample size and the availability of meaningful market-based information.

Lazard selected the following publicly traded publishing companies (the "Publishing Peer Group") on the basis of general comparability to the Reorganized Debtors in one or more of the factors described above: The New York Times Company, The McClatchy Company, Lee Enterprises Inc., A.H. Belo Corporation, Washington Post Co., Gannett Co., Inc., Media General, Inc., Journal Communications Inc., and The E.W. Scripps Company.

Lazard selected the following publicly traded broadcasting companies (the "Broadcasting Peer Group," and together with the Publishing Peer Group, the "Peer Group") on the basis of general comparability to the Reorganized Debtors in one or more of the factors described above: Nexstar Broadcasting Group Inc., Sinclair Broadcast Group Inc., Gray Television Inc., Belo Corp., LIN TV Corp., Media General, Inc., The E.W. Scripps Company, Entravision Communications Corp., Discovery Communications, Inc., Scripps Networks Interactive, Inc., and Viacom, Inc.

Lazard calculated market multiples for the Peer Group by dividing the enterprise value of each comparable company by the mean projected 2010 EBITDA and 2011 EBITDA as estimated by equity research analysts. For purposes of valuing the majority of the Debtors' television stations, Lazard calculated a blended 2010 / 2011 EBITDA multiple based on relevant television comparables. In determining the applicable EBITDA multiple ranges, Lazard considered a variety of factors, including both qualitative attributes and quantitative measures such as historical and projected revenue, EBITDA and capital expenditure amounts, historical enterprise value/EBITDA trading multiples, EBITDA margins, financial distress impacting trading values, size, growth and similarity in business lines. Based on this analysis, Lazard's implied EBITDA multiple ranges are set forth in the table below.

| Segment | Enterprise Value / 2010E EBITDA | |
|---|---|---|
| | Low | High |
| Publishing[4] | 4.2x | 4.7x |
| Broadcasting[5] | 7.2x | 8.2x |

b.      Discounted Cash Flow Analysis.

The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The enterprise value of the Reorganized Debtors' business is determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows included in the Projections plus an estimate for the value of the business beyond the Projection Period known as the terminal value. The terminal value is derived by applying a multiple to the Reorganized Debtors' projected EBITDA in the final year of the Projection Period or capitalizing projected unlevered after-tax free cash flow in the same period using the Discount Rate and an assumed perpetual growth rate, discounted back to the assumed Effective Date using the Discount Rate.

---

[4]  Does not include Tribune Media Services or Forsalebyowner.com.
[5]  Implied blended 2010E EBITDA multiple for the station group, cable, and group allocations within the broadcasting segment. The majority of the television stations were, however, valued using a blended 2010E/2011E EBITDA multiple.

To estimate the Discount Rate for the Publishing and Broadcasting segments, Lazard used the cost of equity and the after-tax cost of debt for the Reorganized Debtors, based on a range of targeted debt-to-total capitalization ratios. Lazard calculated the cost of equity utilizing estimates derived from the Peer Group and the "Capital Asset Pricing Model," which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. To estimate the cost of debt, Lazard evaluated current capital market conditions and the spreads of companies with similar capital structures and operations and relied upon estimates for the Reorganized Debtors' debt financing cost as obtained by the Debtors from institutional lenders. In determining an EBITDA exit multiple, Lazard utilized a range reflecting current EBITDA multiples. Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect its cost of capital and terminal multiples. Lazard calculated its DCF valuation using the following assumptions:

| Publishing Segment | | Broadcasting Segment | |
|---|---|---|---|
| Discount Rate | Perpetual Growth Rate | Discount Rate | Terminal Multiple |
| 11.0% - 13.0% | (3.0)% - 3.0% | 9.0% - 11.0% | 7.0x – 8.0x |

In applying the above methodology, Lazard utilized management's Projections for the period beginning January 1, 2011, and ending December 31, 2015, to derive unlevered after-tax free cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital and capital expenditures. For purposes of the DCF, the Reorganized Debtors are assumed to be full taxpayers (the effective tax rate is assumed to be 41%). These cash flows, along with the terminal value, are discounted back to the Assumed Effective Date using the range of Discount Rates described above to arrive at a range of Enterprise Value.

      c.     Precedent Transactions Analysis.

The precedent transactions valuation analysis is based on the enterprise values of companies involved in public merger and acquisition transactions that have operating and financial characteristics similar to the Reorganized Debtors. Under this methodology, the enterprise value of such companies is determined by an analysis of the consideration paid and the debt assumed in the merger or acquisition transaction. As in a comparable company valuation analysis, those enterprise values are commonly expressed as multiples of various measures of operating statistics, such as revenue, EBITDA, and earnings before interest and taxes ("EBIT"). Lazard reviewed industry-wide valuation multiples, considering prices paid as a multiple of the last 12 months ("LTM") EBITDA, for companies in similar lines of business to the Broadcasting segment of the Reorganized Debtors. The derived multiples were then applied to the Reorganized Debtors' operating statistics to determine the Enterprise Value or value to a potential strategic buyer. Similar to the comparable company analysis, Lazard focused mainly on EBITDA multiples in comparing the valuations of the Reorganized Debtors and the selected broadcasting companies involved in relevant precedent transactions.

Unlike the comparable company analysis, the enterprise valuation derived using this methodology reflects a "control" premium (i.e., a premium paid to purchase a majority or controlling position in the assets of a company). Thus, this methodology generally produces higher valuations than the comparable public company analysis. In addition, other factors not directly related to a company's business operations can affect a valuation based on precedent transactions, including: (i) the market environment is not identical for transactions occurring at different periods of time, and (ii) circumstances

pertaining to the financial position of the company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no precedent merger or acquisition used in any analysis will be identical to the target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations, and prospects of each target. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis. Furthermore, the data available for all the precedent transactions may have discrepancies due to varying sources of information.

Lazard evaluated various merger and acquisition transactions that have occurred in the publishing and broadcasting industries over the last five years. Many of the publishing industry transactions in this sample were executed under drastically different fundamental, credit and other market conditions from those prevailing in the current marketplace, which factored into the determination of the relevance of this methodology and appropriate multiple range. As a result, Lazard did not give weight to the precedent transactions valuation methodology with respect to the Publishing Segment. With respect to the Broadcasting Segment, Lazard reviewed the implied premiums paid in comparable transactions relative to the then trading multiples and applied such premiums to the current trading multiples. The resulting enterprise value range implies a blended 2010E EBITDA multiple range of 9.1x to 10.1x. However the comparability and availability of this data is limited which was taken into consideration in Lazard's derivation of its overall selected valuation range for the Broadcasting Segment.

d.      Other Assets and Corporate Operations Valuation.

Lazard estimated the value of Other Assets to be approximately $1.7 to $2.0 billion (with an approximate mid-point value of $1.9 billion). The material investments included in this category are minority interests in TV Food Network, CareerBuilder, LLC and Classified Ventures, LLC. Lazard utilized standard valuation methodologies to value the minority equity investments. In addition to these assets, Lazard included an estimated cash balance of $1.7 billion at the Assumed Effective Date to derive the estimated range for Distributable Value. This cash balance includes the proceeds from the completed transaction involving the Chicago Cubs and certain related assets and includes the cash held by wholly-owned non-debtors.

Corporate activities (which represent a cost center) were valued by capitalizing an assumed run rate expense base by an assumed 10.7% blended Discount Rate. Additional calculations were performed to incorporate the present value of other cash outflows that are not reflected in corporate EBITDA. The estimated value of corporate activities was added to the cumulative segment enterprise value range to arrive at the estimated range for Enterprise Value.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, LAZARD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS

WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS.  THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

# EXHIBIT G

*Selected Historical Financial Information*

trbform10q3q2008.htm

10-Q 1 trbform10q3q2008.htm TRIBUNE COMPANY FORM 10-Q - THIRD QUARTER 2008 - DATED SEPTEMBER 28, 2008

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

## FORM 10-Q

### QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

#### FOR THE QUARTERLY PERIOD ENDED SEPTEMBER 28, 2008

Commission file number 1-8572

### TRIBUNE COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **36-1880355** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **435 North Michigan Avenue, Chicago, Illinois** | **60611** |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code:  (312) 222-9100

No Changes
(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes /✓/ No / /

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.  See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act (Check One):
Large accelerated filer / /    Accelerated filer / /    Non-accelerated filer /✓/    Smaller Reporting Company / /

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes / /  No /✓/

At November 10, 2008, there were 56,521,739 shares of the Company's Common Stock ($.01 par value per share) outstanding, all of which were held by the Tribune Employee Stock Ownership Plan.

---

### TRIBUNE COMPANY
### INDEX TO 2008 THIRD QUARTER FORM 10-Q

**Item No.**                                                                                           **Page**

# PART I. FINANCIAL INFORMATION

1.   Financial Statements (Unaudited)
       Condensed Consolidated Statements of Operations for the Third Quarters
         and First Three Quarters Ended Sept. 28, 2008 and Sept. 30, 2007                          1
       Condensed Consolidated Balance Sheets at Sept. 28, 2008 and Dec. 30, 2007                   2
       Condensed Consolidated Statements of Cash Flows for the First Three Quarters Ended
         Sept. 28, 2008 and Sept. 30, 2007                                                         4
       Notes to Condensed Consolidated Financial Statements
         Note 1:     Basis of Preparation                                                          5
         Note 2:     Discontinued Operations and Assets and Liabilities Held for Disposition       6
         Note 3:     Income Taxes                                                                  10
         Note 4:     Stock-Based Compensation                                                      11
         Note 5:     Employee Stock Ownership Plan                                                 12
         Note 6:     Pension and Other Postretirement Benefits                                     13
         Note 7:     Changes in Operations and Non-Operating Items                                 14
         Note 8:     Inventories                                                                   16
         Note 9:     Goodwill and Other Intangible Assets                                          16
         Note 10:    Debt                                                                          19
         Note 11:    Fair Value of Financial Instruments                                           26
         Note 12:    Comprehensive Income (Loss)                                                   27
         Note 13:    Other Matters                                                                 28
         Note 14:    Segment Information                                                           31
2.   Management's Discussion and Analysis of Financial Condition and Results of Operations         32
3.   Quantitative and Qualitative Disclosures About Market Risk                                    56
4.   Controls and Procedures                                                                       59

## PART II. OTHER INFORMATION

1.   Legal Proceedings                                                                             60
1A.  Risk Factors                                                                                  62
6.   Exhibits                                                                                      63

# PART I. FINANCIAL INFORMATION

## ITEM 1. FINANCIAL STATEMENTS.

### TRIBUNE COMPANY AND SUBSIDIARIES
### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(In thousands of dollars)
(Unaudited)

| | Third Quarter Ended | | First Three Quarters | |
| --- | --- | --- | --- | --- |
| | Sept. 28, 2008 | Sept. 30, 2007 | Sept. 28, 2008 | Sept. 30, 2007 |
| **Operating Revenues** | $     1,036,946 | $     1,158,553 | $     3,152,534 | $     3,422,787 |
| | | | | |
| **Operating Expenses** | | | | |
| Cost of sales (exclusive of items shown below) | 594,161 | 592,804 | 1,742,692 | 1,744,988 |
| Selling, general and administrative | 353,220 | 298,048 | 902,652 | 964,435 |
| Depreciation | 47,857 | 46,250 | 142,774 | 140,089 |
| Amortization of intangible assets | 4,645 | 4,621 | 13,965 | 13,976 |
| Write-downs of intangible assets (Note 9) | — | | 3,843,111 | |
| Total operating expenses | 999,883 | 941,723 | 6,645,194 | 2,863,488 |
| | | | | |
| **Operating Profit (Loss)** | 37,063 | 216,830 | (3,492,660) | 559,299 |
| | | | | |
| Net income on equity investments | 23,201 | 26,559 | 58,130 | 67,953 |

trbform10q3q2008.htm

|  | | | |
|---|---|---|---|
| Interest and dividend income | 2,610 | 4,923 | 9,736 | 11,902 |
| Interest expense | (231,803) | (175,003) | (694,807) | (370,661) |
| Gain (loss) on change in fair values of PHONES and related investment | (8,360) | (84,969) | 97,960 | (182,144) |
| Strategic transaction expenses | — | (3,160) | — | (38,557) |
| Gain on sales of investments, net | 78,675 | — | 67,375 | 516 |
| Gain on TMCT transactions | — | 8,329 | — | 8,329 |
| Other non-operating gain, net | 372 | 1,936 | 527 | 22,934 |
| **Income (Loss) from Continuing Operations Before Income Taxes** | (98,242) | (4,555) | (3,953,739) | 79,571 |
| Income taxes (Note 3) | (25,919) | 88,106 | 1,836,833 | 44,914 |
| **Income (Loss) from Continuing Operations** | (124,161) | 83,551 | (2,116,906) | 124,485 |
| **Income (Loss) from Discontinued Operations, net of tax (Note 2)** | 2,585 | 69,214 | (715,157) | 41,261 |
| **Net Income (Loss)** | $ (121,576) | $ 152,765 | $ (2,832,063) | $ 165,746 |

See Notes to Condensed Consolidated Financial Statements.

1

## TRIBUNE COMPANY AND SUBSIDIARIES
## CONDENSED CONSOLIDATED BALANCE SHEETS
(In thousands of dollars)
(Unaudited)

|  | Sept. 28, 2008 | Dec. 30, 2007 |
|---|---|---|
| **Assets** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 259,900 | $ 233,284 |
| Accounts receivable, net | 591,922 | 732,853 |
| Inventories | 31,792 | 40,675 |
| Broadcast rights | 256,696 | 287,045 |
| Prepaid expenses and other | 109,383 | 91,166 |
| Assets held for disposition | 59,797 | |
| Total current assets | 1,309,490 | 1,385,023 |
| **Properties** | | |
| Property, plant and equipment | 3,405,742 | 3,564,436 |
| Accumulated depreciation | (1,927,896) | (1,998,741) |
| Net properties | 1,477,846 | 1,565,695 |
| **Other Assets** | | |
| Broadcast rights | 259,700 | 301,263 |
| Goodwill (Note 9) | 1,742,295 | 5,579,926 |
| Other intangible assets, net (Note 9) | 1,431,389 | 2,663,152 |
| Time Warner stock related to PHONES debt | 227,360 | 266,400 |
| Other investments | 398,365 | 508,205 |
| Prepaid pension costs | 410,251 | 514,429 |
| Assets held for disposition | 92,585 | 33,780 |
| Other | 254,914 | 331,846 |
| Total other assets | 4,816,859 | 10,199,001 |
| **Total Assets** | $ 7,604,195 | $ 13,149,719 |

http://sec.gov/Archives/edgar/data/726513/000072651308000040/trbform10q3q2008.htm[5/18/2010 10:10:30 PM]

trbform10q3q2008.htm

See Notes to Condensed Consolidated Financial Statements.

2

## TRIBUNE COMPANY AND SUBSIDIARIES
### CONDENSED CONSOLIDATED BALANCE SHEETS
(In thousands of dollars)
(Unaudited)

| | Sept. 28, 2008 | Dec. 30, 2007 |
|---|---|---|
| **Liabilities and Shareholders' Equity (Deficit)** | | |
| **Current Liabilities** | | |
| PHONES debt related to Time Warner stock (Note 10) | $ 215,991 | $ 253,080 |
| Other debt due within one year | 619,793 | 750,239 |
| Contracts payable for broadcast rights | 343,552 | 339,909 |
| Deferred income taxes | 7,598 | 100,324 |
| Deferred income | 79,659 | 121,239 |
| Accounts payable, accrued expenses and other current liabilities | 605,935 | 625,175 |
| Liabilities held for disposition | 92,995 | — |
| Total current liabilities | 1,965,523 | 2,189,966 |
| **Long-Term Debt** | | |
| PHONES debt related to Time Warner stock (Note 10) | 64,008 | 343,960 |
| Other long-term debt (less portions due within one year) | 10,922,221 | 11,496,246 |
| Total long-term debt | 10,986,229 | 11,840,206 |
| **Other Non-Current Liabilities** | | |
| Deferred income taxes | 92,289 | 1,771,845 |
| Contracts payable for broadcast rights | 357,067 | 432,393 |
| Deferred compensation and benefits | 241,359 | 264,480 |
| Liabilities held for disposition | 5,858 | — |
| Other obligations | 221,592 | 164,769 |
| Total other non-current liabilities | 918,165 | 2,633,487 |
| **Common Shares Held by ESOP, net of Unearned Compensation (Note 5)** | 31,860 | — |
| **Shareholders' Equity (Deficit)** | | |
| Stock purchase warrants | 255,000 | 255,000 |
| Retained earnings (deficit) | (6,209,594) | (3,474,311) |
| Accumulated other comprehensive income (loss) | (342,988) | (294,629) |
| Total shareholders' equity (deficit) | (6,297,582) | (3,513,940) |
| Total Liabilities and Shareholders' Equity (Deficit) | $ 7,604,195 | $ 13,149,719 |

See Notes to Condensed Consolidated Financial Statements.

3

## TRIBUNE COMPANY AND SUBSIDIARIES
### CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands of dollars)
(Unaudited)

| | First Three Quarters | |
|---|---|---|
| | Sept. 28, 2008 | Sept. 30, 2007 |
| **Operating Activities** | | |
| Net income (loss) | $ (2,832,063) | $ 165,746 |

http://sec.gov/Archives/edgar/data/726513/000072651308000494/... 12-2-2008 (illegible)

trbform10q3q2008.htm

Adjustments to reconcile net income (loss) to net cash provided by operating activities:

| | | |
|---|---:|---:|
| Stock-based compensation related to equity-classified awards | — | 33,561 |
| ESOP compensation | 31,860 | — |
| Pension costs, net of contributions | 63,655 | (8,023) |
| Gain on sale of studio production lot | (82,371) | — |
| Gain on sales of other real estate | (24,328) | — |
| Write-off of capitalized software application costs | 24,804 | — |
| Write-off of *Los Angeles Times* plant equipment | — | 24,216 |
| Depreciation | 152,229 | 157,194 |
| Amortization of intangible assets | 14,689 | 15,500 |
| Write-downs of intangible assets (Note 9) | 3,843,111 | — |
| Net income on equity investments | (58,130) | (67,953) |
| Distributions from equity investments | 84,469 | 77,848 |
| Amortization of debt issuance costs | 58,951 | 17,331 |
| (Gain) loss on change in fair values of PHONES and related investment | (97,960) | 182,144 |
| Gain on sales of investments, net | (67,375) | (516) |
| Gain on TMCT transactions | — | (8,329) |
| Subchapter S corporation election deferred income taxes adjustment (Note 3) | (1,859,358) | — |
| Matthew Bender and Mosby income tax settlement | — | (90,704) |
| Non-cash loss on dispositions of discontinued operations | 681,055 | 20,025 |
| Changes in working capital items, excluding effects from acquisitions and dispositions: | | |
|   Accounts receivable | 49,085 | 14,003 |
|   Inventories, prepaid expenses and other current assets | 10,599 | (12,423) |
|   Deferred income, accounts payable, accrued expenses and other current liabilities | (19,944) | 83,720 |
|   Income taxes | 72,256 | (48,083) |
| Deferred compensation | (18,693) | (49,031) |
| Deferred income taxes, excluding subchapter S corporation election adjustment | (1,184) | (99,191) |
| Tax benefit on stock options exercised | — | 11,933 |
| Prepaid rent from Newsday LLC (Note 2) | 18,000 | — |
| Other, net | 42,006 | 32,597 |
| **Net cash provided by operating activities** | 85,363 | 451,565 |
| **Investing Activities** | | |
| Purchase of TMCT, LLC real estate (Note 13) | (175,141) | — |
| Other capital expenditures | (65,012) | (85,132) |
| Acquisitions and investments | (14,104) | (21,942) |
| Distribution from Newsday LLC (Note 2) | 612,000 | — |
| Proceeds from sales of subsidiaries, intangibles, investments and real estate | 318,051 | 95,848 |
| **Net cash provided by (used for) investing activities** | 675,794 | (11,226) |
| **Financing Activities** | | |
| Long-term borrowings | 25,000 | 7,015,000 |
| Issuance of exchangeable promissory note | — | 200,000 |
| Borrowings under former bridge credit facility | — | 100,000 |
| Other borrowings | 1,978 | — |
| Repayments under former bridge credit facility | — | (1,410,000) |
| Repayments of long-term debt | (979,563) | (1,633,655) |
| Repayments of commercial paper, net | — | (97,019) |
| Borrowings under trade receivables securitization facility (Note 10) | 225,000 | — |
| Long-term debt issuance costs | (6,956) | (134,085) |
| Sales of common stock to employees, net | — | 73,354 |
| Sale of common stock to Zell Entity | — | 50,000 |
| Purchases of Tribune common stock | — | (4,289,192) |
| Dividends | — | (43,247) |
| **Net cash used for financing activities** | (734,541) | (168,844) |
| **Net Increase in Cash and Cash Equivalents** | 26,616 | 271,495 |
| Cash and cash equivalents, beginning of year | 233,284 | 174,686 |
| Cash and cash equivalents, end of quarter | $ 259,900 | $ 446,181 |

See Notes to Condensed Consolidated Financial Statements.

4

---

## TRIBUNE COMPANY AND SUBSIDIARIES
## NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

## NOTE 1: BASIS OF PREPARATION

trbform10q3q2008.htm

In the opinion of management, the accompanying unaudited condensed consolidated financial statements contain all adjustments necessary for a fair statement of the financial position of Tribune Company and its subsidiaries (the "Company" or "Tribune") as of Sept. 28, 2008 and the results of their operations for the third quarters and first three quarters ended Sept. 28, 2008 and Sept. 30, 2007 and cash flows for the first three quarters ended Sept. 28, 2008 and Sept. 30, 2007. All adjustments reflected in the accompanying unaudited condensed consolidated financial statements are of a normal recurring nature. Results of operations for interim periods are not necessarily indicative of the results to be expected for the full year. Certain prior year amounts have been reclassified to conform to the 2008 presentation.

On April 1, 2007, the Company's board of directors (the "Board"), based on the recommendation of a special committee of the Board comprised entirely of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), EGI-TRB, L.L.C., a Delaware limited liability company majority-owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell. On Dec. 20, 2007, the Company completed the Leveraged ESOP Transactions which culminated in the cancellation of all issued and outstanding shares of the Company's common stock as of that date, other than shares held by the Company or the ESOP, and the Company becoming wholly-owned by the ESOP. The Company has significant continuing public debt and has accounted for these transactions as a leveraged recapitalization and, accordingly, has maintained a historical cost presentation in its consolidated financial statements.

On May 11, 2008, the Company entered into an agreement (the "Formation Agreement") with CSC Holdings, Inc. ("CSC") and NMG Holdings, Inc., each a wholly-owned subsidiary of Cablevision Systems Corporation ("Cablevision"), to form a new limited liability company ("Newsday LLC"). On July 29, 2008, the Company consummated the closing of the transactions contemplated by the Formation Agreement. Under the terms of the Formation Agreement, the Company, through Newsday, Inc. and other subsidiaries of the Company, contributed certain assets and related liabilities of the Newsday Media Group business ("NMG") to Newsday LLC, and CSC contributed cash of $35 million and newly issued senior notes of Cablevision with a fair market value of $650 million to the parent company of Newsday LLC. Concurrent with the closing of this transaction, Newsday LLC and its parent company borrowed $650 million under a new secured credit facility, and the Company received a special distribution of $612 million from Newsday LLC in cash as well as $18 million of prepaid rent under leases for certain facilities used by NMG and located in Melville, New York with an initial term ending in 2018. As a result of these transactions, CSC, through NMG Holdings, Inc., owns approximately 97% and the Company owns approximately 3% of the equity of the parent company of Newsday LLC. CSC has operational control of Newsday LLC. These transactions are further described in Note 2. NMG's operations consist of *Newsday*, a daily newspaper circulated primarily in Nassau and Suffolk counties on Long Island, New York, and in the borough of Queens in New York City; four specialty magazines circulated primarily on Long Island; several shopper guides; *amNY*, a free daily newspaper in New York City; and several websites including newsday.com and amny.com.

On Feb. 12, 2007, the Company announced an agreement to sell the New York edition of *Hoy*, the Company's Spanish-language daily newspaper ("Hoy, New York"). The Company completed the sale of *Hoy*, New York on May 15, 2007. In March 2007, the Company announced its intentions to sell its Southern Connecticut Newspapers—*The Advocate* (Stamford) and *Greenwich Time* (collectively "SCNI"). The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which was sold in a separate transaction that closed on April 22, 2008. During the third quarter of 2007, the Company began actively pursuing the sale of the stock of one of its subsidiaries, EZ Buy & EZ Sell Recycler Corporation ("Recycler"). The sale of Recycler closed on Oct. 17, 2007. The accompanying unaudited condensed consolidated financial statements reflect these businesses, including the NMG business as described above, as

5

discontinued operations for all periods presented. The prior year condensed consolidated statements of operations have been reclassified to conform to the presentation of these businesses as discontinued operations. See Note 2 for further discussion.

As described in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007, the Company reviews goodwill and certain intangible assets no longer being amortized for impairment annually, or more frequently if events or changes in circumstances indicate that an asset may be impaired, in accordance with Financial Accounting Standards Board ("FASB") No. 142 ("FAS No. 142"), "Goodwill and Other Intangible Assets." During 2008, each of the Company's major newspapers has experienced significant continuing declines in advertising revenues due to a variety of factors, including weak national and local economic conditions, which has reduced advertising demand, and increased competition, particularly from on-line media. In the second quarter of 2008, the Company performed an impairment review of goodwill attributable to its newspaper reporting unit and newspaper masthead intangible assets due to the continuing decline in newspaper advertising revenues. The review was conducted after $830 million of newspaper reporting unit goodwill and $380 million of newspaper masthead assets were allocated to the NMG transaction (see Note 2). As a result of the impairment review, the Company recorded non-cash pretax impairment charges in the second quarter of 2008 totaling $3,843 million ($3,832 million after taxes) to write down its newspaper reporting unit goodwill by $3,007 million ($3,006 million after taxes) and four newspaper mastheads by a total of $836 million ($826 million after taxes). These non-cash impairment charges are reflected as write-downs of intangible assets in the accompanying unaudited condensed consolidated statements of operations. The impairment charges do not affect the Company's operating cash flows or its compliance with its financial debt covenants. See Note 9 for a further discussion of the methodology the Company utilized to perform this impairment review in the second quarter of 2008.

As of Sept. 28, 2008, the Company's significant accounting policies and estimates, which are detailed in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007, have not changed from Dec. 30, 2007, except for the adoption of FASB Statement No. 157, "Fair Value Measurements" ("FAS No. 157") and FASB Statement No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("FAS No. 159"), both of which were adopted effective Dec. 31, 2007. The Company has elected to account for its PHONES debt utilizing the fair value option under FAS No. 159. The effects of this election were recorded as of Dec. 31, 2007, and included a $177 million decrease in PHONES debt related to

Time Warner stock, a $62 million increase in deferred income tax liabilities, an $18 million decrease in other assets, and a $97 million increase in retained earnings. In accordance with FAS No. 159, the $97 million retained earnings increase was not included in the Company's unaudited condensed consolidated statement of operations for the first three quarters ended Sept. 28, 2008. See Note 10 for additional information regarding the Company's adoption of FAS No. 159. The adoption of FAS No. 157 had no impact on the Company's consolidated financial statements. See Note 11 for additional disclosures related to the fair value of financial instruments included in the Company's unaudited condensed consolidated balance sheet at Sept. 28, 2008.

## NOTE 2:  DISCONTINUED OPERATIONS AND ASSETS AND LIABILITIES HELD FOR DISPOSITION

**Discontinued Operations**—As discussed in Note 1, on May 11, 2008, the Company entered into the Formation Agreement with CSC and NMG Holdings, Inc. to form Newsday LLC. On July 29, 2008, the Company consummated the closing of the transactions contemplated by the Formation Agreement.  Under the terms of the Formation Agreement, the Company, through Newsday, Inc. and other subsidiaries of the Company, contributed certain assets and related liabilities of NMG to Newsday LLC, and CSC contributed $35 million of cash and newly issued senior notes of Cablevision with a fair market value of $650 million to the parent company of Newsday LLC.  Concurrent with the closing of this transaction, Newsday LLC and its parent company borrowed $650 million under a new secured credit facility, and the Company received a special distribution of $612 million from Newsday LLC in cash as well as $18 million in prepaid rent under leases for certain facilities used by NMG and located in Melville, New York with an initial term ending in 2018.  The Company retained ownership of these facilities following the transaction.  Annual lease payments

6

due under the terms of the leases total $1.5 million in each of the first five years of the lease terms and $6 million thereafter.

As a result of these transactions, CSC, through NMG Holdings, Inc., owns approximately 97% and the Company owns approximately 3% of the equity of the parent company of Newsday LLC.  CSC has operational control over Newsday LLC.  Borrowings by Newsday LLC and its parent company under the secured credit facility are guaranteed by CSC and NMG Holdings, Inc. and secured by a lien on the assets of Newsday LLC and the assets of its parent company, including the senior notes of Cablevision contributed by CSC.  The Company agreed to indemnify CSC and NMG Holdings, Inc. with respect to any payments that CSC or NMG Holdings, Inc. makes under their guarantee of the $650 million of borrowings by Newsday LLC and its parent company under the secured credit facility.  In the event the Company is required to perform under this indemnity, the Company will be subrogated to and acquire all rights of CSC and NMG Holdings, Inc. against Newsday LLC and its parent company to the extent of the payments made pursuant to the indemnity.  From the closing date of July 29, 2008 through the third anniversary of the closing date, the maximum amount of potential indemnification payments (the "Maximum Indemnification Amount") is $650 million.  After the third year, the Maximum Indemnification Amount is reduced by $120 million, and each year thereafter by $35 million until January 1, 2018, at which point the Maximum Indemnification Amount is reduced to $0.  Following the transaction, the Company used $589 million of the net cash proceeds to pay down borrowings under the Company's Tranche X facility (see Note 10).  The Company accounts for its remaining $20 million equity interest in the parent company of Newsday LLC as a cost method investment.

The fair market value of the contributed NMG net assets exceeded their tax basis due to the Company's low tax basis in the contributed intangible assets.  However, the transaction did not result in an immediate taxable gain because the transaction was structured to comply with the partnership provisions of the United States Internal Revenue Code and related regulations.

During the second quarter of 2008, the Company recorded a pretax loss of $692 million ($693 million after taxes) to write down the net assets of NMG to estimated fair value.  NMG's net assets included, before the write-down, allocated newspaper reporting unit goodwill and a newspaper masthead intangible asset of $830 million and $380 million, respectively.  In the third quarter of 2008, the Company recorded a favorable $1 million after-tax adjustment to the loss on this transaction.

The Company announced an agreement to sell *Hoy*, New York on Feb. 12, 2007.  The Company completed the sale of *Hoy*, New York on May 15, 2007 and recorded a pretax gain on the sale of $2.5 million ($.1 million after taxes) in the second quarter of 2007.  In March 2007, the Company announced its intentions to sell SCNI.  The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which was sold in a separate transaction that closed on April 22, 2008 (see "Assets and Liabilities Held for Disposition" section below).  In the first quarter of 2007, the Company recorded a pretax loss of $19 million ($33 million after taxes) to write down the net assets of SCNI to estimated fair value, less costs to sell.  In the third quarter of 2007, the Company recorded a favorable $2.8 million after-tax adjustment to the expected loss on the sale of SCNI.  In the first quarter of 2008, the Company recorded an additional $.5 million after-tax loss on the sale of SCNI.  During the third quarter of 2007, the Company began actively pursuing the sale of the stock of Recycler.  The sale of Recycler closed on Oct. 17, 2007.  The Company recorded a pretax loss on the sale of Recycler of $1 million in the third quarter of 2007.  Due to the Company's high tax basis in the Recycler stock, the sale generated a significantly higher capital loss for income tax purposes.  As a result, the Company recorded a $65 million income tax benefit in the third quarter of 2007, resulting in an after-tax gain of $64 million.

These businesses were considered components of the Company's publishing segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company.  The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of these transactions, and the Company will not have any significant continuing involvement in their operations.  Accordingly, the results of operations for each of these businesses

trbform10q3q2008.htm

are reported as discontinued operations in the accompanying unaudited condensed consolidated statements of operations.

Selected financial information related to discontinued operations is summarized as follows (in thousands):

| | Third Quarter | | First Three Quarters | |
| | 2008 | 2007 | 2008 | 2007 |
|---|---|---|---|---|
| Operating revenues | $ 32,260 | $ 132,187 | $ 258,362 | $ 416,925 |
| | | | | |
| Operating profit (loss) | $ 4,441 | $ 12,390 | $ (410) | $ 46,256 |
| Interest income | — | 3 | — | 7 |
| Interest expense | (2,454) | (11,810) | (22,186) | (15,264) |
| Non-operating loss, net(1) | — | — | — | (15,000) |
| Gain (loss) on dispositions of discontinued operations | 852 | (3,067) | (691,623) | (20,025) |
| Income (loss) from discontinued operations before income taxes | 2,839 | (2,484) | (714,217) | (4,026) |
| Income taxes(2) | (254) | 71,698 | (940) | 45,287 |
| Income (loss) from discontinued operations net of tax | $ 2,585 | $ 69,214 | $ (715,157) | $ 41,261 |

(1) Discontinued operations for the first three quarters of 2007 included a pretax non-operating charge of $15 million for a civil forfeiture payment related to the inquiry by the United States Attorney's Office for the Eastern District of New York into the circulation practices of *Newsday* and *Hoy*, New York. See Note 5 to the consolidated financial statements in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007, for further information.

(2) Income taxes for the first three quarters of 2008 included tax expense of $1 million related to the $691 million pretax loss on the NMG transaction. NMG's net assets included, before the write-down of these assets to fair value in connection with the transaction, allocated newspaper reporting unit goodwill of $830 million and a newspaper masthead intangible asset of $380 million, most of which are not deductible for income tax purposes. The Company recorded an income tax benefit of $72 million related to a pretax loss of $2 million in the third quarter of 2007 and an income tax benefit of $45 million related to a pretax loss of $4 million in the first three quarters of 2007. Due to the Company's high tax basis in the Recycler stock, the sale of Recycler generated a significantly higher capital loss for income tax purposes. As a result, the Company recorded a $65 million income tax benefit in the third quarter of 2007, resulting in an after-tax gain of $64 million on the sale of Recycler. The pretax loss in the first three quarters of 2007 also included $48 million of allocated newspaper group goodwill, most of which is not deductible for income tax purposes.

The Company allocated corporate interest expense of $2.5 million and $11.8 million in the third quarters of 2008 and 2007, respectively, and $22.2 million and $15.3 million in the first three quarters of 2008 and 2007, respectively, to discontinued operations. In accordance with Emerging Issues Task Force Issue No. 87-24, "Allocation of Interest to Discontinued Operations", the amount of corporate interest allocated to discontinued operations was based on the amount of the net proceeds from the NMG transaction that were used to pay down borrowings under the Company's Tranche X facility and applying the interest rate applicable to the Tranche X facility for the periods in which these borrowings under the Tranche X facility were outstanding.

**Assets and Liabilities Held for Disposition**—Assets and liabilities held for disposition at Sept. 28, 2008 and Dec. 30, 2007 are summarized as follows (in thousands):

| | Sept. 28, 2008 | | Dec. 30, 2007 | |
| | Assets | Liabilities | Assets | Liabilities |
|---|---|---|---|---|
| Chicago Cubs and Wrigley Field | $ 136,903 | $ 98,853 | $ — | $ — |
| Studio production lot, Hollywood, California | — | — | 23,322 | — |
| SCNI real estate | — | — | 5,485 | — |
| Other real estate | 15,479 | — | 4,973 | — |
| Total assets and liabilities held for disposition | $ 152,382 | $ 98,853 | $ 33,780 | $ — |

trbform10q3q2008.htm

The Company is in the process of disposing of an interest in its Chicago Cubs operations which include the baseball team, Wrigley Field and the Company's 25% investment in Comcast SportsNet Chicago. The Company expects to complete the transaction within the next year. Accordingly, the net book value of the baseball team and Wrigley Field is included in assets and liabilities held for disposition at Sept. 28, 2008. The Company's investment in Comcast SportsNet Chicago continues to be included in other investments in the accompanying unaudited condensed consolidated balance sheets. The disposition of an interest in the Chicago Cubs baseball team is subject to the approval of Major League Baseball.

During the third quarter of 2007, the Company commenced a process to sell the real estate and related assets of its studio production lot located in Hollywood, California. Accordingly, the $23 million carrying value of the land, building and equipment of the studio production lot was included in assets held for disposition at Dec. 30, 2007. The sale of the studio production lot closed on Jan. 30, 2008, and the Company received net proceeds of $122 million, of which $119 million was placed into an escrow fund immediately following the closing of the sale. Simultaneous with the closing of the sale, the Company entered into a five-year operating lease for a portion of the studio production lot utilized by the Company's KTLA-TV station. The sale resulted in a total pretax gain of $99 million. The pretax gain related to the portion of the studio production lot currently utilized by the Company's KTLA-TV station was $16 million and represented more than a minor portion of the fair value of the studio production lot. Accordingly, this gain was deferred and will be amortized as reduced rent expense over the five-year life of the related operating lease. The remaining pretax gain of $83 million recorded in the first quarter of 2008 was included as a reduction of selling, general and administrative expenses.

As noted above, the Company sold the SCNI real estate in Stamford and Greenwich, Connecticut on April 22, 2008. The $5 million carrying value of the real estate was included in assets held for disposition at Dec. 30, 2007. The Company received net proceeds of $29 million on the sale of the SCNI real estate, which proceeds were placed into an escrow fund immediately following the closing of the sale. The Company recorded a pretax gain of $23 million as a reduction of selling, general and administrative expenses in the second quarter of 2008. On April 28, 2008, the $29 million of net proceeds from the sale of the SCNI real estate, the $119 million of net proceeds from the sale of the studio production lot and available cash were utilized to purchase eight real properties that were previously leased from TMCT, LLC (see Note 13 for additional information pertaining to the Company's acquisition of the TMCT real properties). The purchase was structured as a like-kind exchange, which allowed the Company to defer income taxes on nearly all of the gains from these dispositions. In December 2006, the Company commenced a process to sell the land and building of one of its other facilities. The $5 million carrying value of the land and building approximates fair value less costs to sell and is also included in assets held for disposition at Sept. 28, 2008 and Dec. 30, 2007. During the third quarter of 2008, the Company commenced a process to sell two of the properties acquired in April 2008 as part of the acquisition of the eight real properties from TMCT, LLC. On Oct. 31, 2008, the Company concluded a transaction to sell one of these properties for net proceeds of approximately $5 million. The Company will recognize a pretax gain of approximately $1 million on the sale in the fourth quarter of 2008. The $10 million carrying value of these two properties approximates fair value less costs to sell and is also included in assets held for disposition at Sept. 28, 2008.

9

## NOTE 3:  INCOME TAXES

**S Corporation Election**—On March 13, 2008, the Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. The Company also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries. Subject to certain limitations (such as the built-in gain tax applicable for ten years to gains accrued prior to the election), the Company is no longer subject to federal income tax. Instead, the Company's income will be required to be reported by its shareholders. The Company's ESOP, the Company's sole shareholder (see Note 5), will not be taxed on the share of income that is passed through to it because the ESOP is a qualified employee benefit plan. Although most states in which the Company operates recognize the S corporation status, some impose income taxes at a reduced rate.

As a result of the election and in accordance with FASB Statement No. 109, "Accounting for Income Taxes", the Company eliminated approximately $1,859 million of net deferred income tax liabilities as of Dec. 31, 2007, and recorded such adjustment as a reduction in the Company's provision for income tax expense in the first quarter of 2008. The Company continues to report deferred income taxes relating to states that assess taxes on S corporations, subsidiaries which are not qualified subchapter S subsidiaries, and potential asset dispositions that the Company expects will be subject to the built-in gain tax.

**PHONES Interest**—In connection with the routine examination of the Company's federal income tax returns for 2000 through 2003, the Internal Revenue Service ("IRS") proposed that the Company capitalize the interest on the PHONES as additional tax basis in the Company's 16 million shares of Time Warner common stock, rather than allowing the Company to currently deduct such interest. The National Office of the IRS has issued a Technical Advice Memorandum that supports the proposed treatment. The Company disagrees with the IRS's position and requested that the IRS administrative appeals office review the issue. The effect of the treatment proposed by the IRS would be to increase the Company's tax liability by approximately $199 million for the period 2000 through 2003 and by approximately $259 million for the period 2004 through the third quarter of 2008.

During the fourth quarter of 2006, the Company reached an agreement with the IRS appeals office regarding the deductibility of the PHONES interest expense. The agreement will apply for the tax years 2000 through the 2029 maturity date of the PHONES. In December of 2006, under the terms of the agreement reached with the IRS appeals office, the Company paid approximately $81 million of tax plus interest for tax years 2000 through 2005. The tax payments were recorded as a reduction in the Company's deferred tax liability, and the interest was recorded as a reduction in the Company's income tax reserves. The Company filed its 2006 and 2007 tax returns reflecting the agreement reached with the IRS appeals office. The agreement reached with the appeals office is being reviewed by the Joint Committee on Taxation. A decision from the Joint Committee on Taxation is expected within the

trbform10q3q2008.htm

next twelve months.

**Matthew Bender and Mosby Income Tax Liability**—During the third quarter of 2007, the Company settled its appeal of the United States Tax Court decision that disallowed the tax-free reorganization of Matthew Bender and Mosby, former subsidiaries of The Times Mirror Company, with the United States Court of Appeals for the Seventh Circuit. As a result of the settlement, the Company received refunds of federal income taxes and interest of $4 million on Sept. 26, 2007 and $340 million on Oct. 1, 2007. After consideration of income taxes on the interest received, the net cash proceeds totaled approximately $286 million. These refunds, together with related state income tax benefits of $29 million, were accounted for as a $91 million reduction in third quarter 2007 income tax expense and a $224 million reduction in goodwill recorded on the Company's consolidated balance sheet. The September and October 2007 refunds of the previously paid income taxes and interest were accounted for in accordance with Emerging Issues Task Force ("EITF") Issue No. 93-7, "Uncertainties Related to Income Taxes in a Purchase Business Combination" ("EITF 93-7"). The portion of the refunds representing after-tax interest applicable to periods following the acquisition of The Times Mirror reduced income tax expense, and the remainder reduced goodwill.

10

---

**Other**—Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which has been provided by the Company.

In the third quarter and first three quarters of 2008, income taxes applicable to continuing operations amounted to a net expense of $26 million and a net benefit of $1,837 million, respectively. The net expense in the third quarter of 2008 included a provision of $27 million related to the Company's gain on the sale of a 10 percent interest in CareerBuilder, LLC (see Note 7). The net benefit in the first three quarters of 2008 included the favorable $1,859 million deferred income tax adjustment discussed above. The $3,007 million write-down of the Company's publishing goodwill in the second quarter of 2008 resulted in an income tax benefit of only $1 million for financial reporting purposes because almost all of the goodwill is not deductible for income tax purposes (see Note 9). The effective tax rate on income from continuing operations in the 2007 third quarter and first three quarters were affected by certain non-operating items that were not deductible for tax purposes and the Matthew Bender/Mosby income tax adjustment (see Note 7 for a summary of non-operating items). Excluding all non-operating items, the effective tax rate on income from continuing operations in the third quarter and first three quarters of 2007 were 43.3% and 41.1%, respectively.

## NOTE 4: STOCK-BASED COMPENSATION

Stock-based compensation expense for the third quarters and first three quarters of 2008 and 2007 was as follows (in thousands):

| | Third Quarter | | First Three Quarters | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| Management equity incentive plan | $ 2,922 | $ — | $ 15,456 | $ — |
| Options(1) | — | 555 | — | 1,879 |
| Restricted stock units(1) | — | 6,385 | — | 30,103 |
| Employee stock purchase plan(2) | — | — | — | 723 |
| Total stock-based compensation expense | $ 2,922 | $ 6,940 | $ 15,456 | $ 32,705 |

(1) Pursuant to an Agreement and Plan of Merger (the "Merger Agreement") entered into by the Company on April 1, 2007 with Great Banc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust which forms a part of the ESOP, Tesop Corporation, a Delaware corporation wholly-owned by the ESOP ("Merger Sub"), and the Zell Entity (solely for the limited purposes specified therein), which provided for Merger Sub to be merged with and into the Company, and following such merger, the Company to continue as the surviving corporation wholly-owned by the ESOP (the "Merger"), on Dec. 20, 2007, the Company redeemed for cash all outstanding stock awards, each of which vested in full upon completion of the Merger, with positive intrinsic value relative to $34.00 per share. All remaining outstanding stock awards under the Tribune Company Incentive Plan (the "Incentive Plan") as of Dec. 20, 2007 that were not cash settled pursuant to the Merger Agreement were cancelled. The Company does not intend to grant any new equity awards under the Incentive Plan.

(2) In April 2007, the Company suspended further contributions to the employee stock purchase plan, which was discontinued as of Dec. 20, 2007, following the consummation of the Merger.

On Dec. 20, 2007, the Board approved the Company's 2007 Management Equity Incentive Plan (the "MEIP"). The MEIP provides for phantom units (the "Units") that generally track the fair value of a share of the Company's common stock, as determined by the trustee of the Company's Employee Stock Ownership Plan (see Note 5). MEIP awards have been made to eligible members of the Company's management and other key employees at the discretion of the Board.

The Company accounts for the Units issued under the MEIP as liability-classified awards. As a result, the Company is required to adjust its MEIP liability to reflect the most recent estimate of the fair value of a share of the Company's common stock. In the third quarter and first three quarters of 2008, the Company recorded $2.9 million and $15.5 million of compensation expense, respectively, in connection with the MEIP, of which $3.8 million recorded in the third quarter of 2008 and $14.1 million recorded in the first three quarters of 2008

trbform10q3q2008.htm

11

were based on the estimated fair value of the Company's common stock. The Company's liability under the MEIP is included in other non-current liabilities on the Company's unaudited condensed consolidated balance sheet and totaled $17 million and $16 million at Sept. 28, 2008 and Dec. 30, 2007, respectively. The estimated fair value per share of the Company's common stock did not change during the third quarter of 2008.

For the first three quarters of 2008, total stock-based compensation expense excluded $552,000 of costs related to discontinued operations. For the third quarter of 2007, total stock-based compensation expense excluded $190,000 of costs related to discontinued operations and $32,000 of capitalized costs. For the first three quarters of 2007, total stock-based compensation expense excluded $678,000 of costs related to discontinued operations and $176,000 of capitalized costs.

## NOTE 5:  EMPLOYEE STOCK OWNERSHIP PLAN

On April 1, 2007, the Company established the ESOP as a long-term employee benefit plan.  On that date, the ESOP purchased 8,928,571 shares of the Company's common stock. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP.  Upon consummation of the Merger, the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock.

The ESOP provides for the allocation of the Company's common shares it holds on a noncontributory basis to eligible employees of the Company.  None of the shares held by the ESOP had been committed for release or allocated to employees at Dec. 30, 2007.  For fiscal year 2008, as the ESOP repays the loan through its use of contributions from the Company, shares will be released and allocated to eligible employees in proportion to their eligible compensation.  The shares that are released for allocation on an annual basis will be in the same proportion that the current year's principal and interest payments bear in relation to the total remaining principal and interest payments to be paid over the life of the $250 million ESOP loan.  The Company will recognize compensation expense based on the estimated fair value of the shares of the Company's common stock that are allocated in each annual period.  In the third quarter and first three quarters of 2008, the Company recognized $9.3 million and $32 million, respectively, of compensation expense related to the ESOP.

The Company's policy is to present unallocated shares held by the ESOP at book value, net of unearned compensation, and allocated shares, which include shares expected to be released as of the end of the year, at fair value in the Company's consolidated balance sheet. Pursuant to the terms of the ESOP, participants who receive distributions of shares of the Company's common stock can require the Company to repurchase those shares within a specified time period following such distribution.  Accordingly, the shares of the Company's common stock held by the ESOP are classified outside of shareholders' equity (deficit), net of unearned compensation, in the Company's consolidated balance sheets. The amounts at Sept. 28, 2008 and Dec. 30, 2007 were as follows (in thousands):

| | Sept. 28, 2008 | Dec. 30, 2007 |
|---|---|---|
| ESOP shares (at fair value)(1) | $ 31,860 | $ — |
| Unallocated ESOP shares (at book value) | 236,579 | 250,000 |
| Unearned compensation related to ESOP | (236,579) | (250,000) |
| Common shares held by ESOP, net of unearned compensation | $ 31,860 | $ — |

(1)  Represents 3,034,342 shares expected to be released with respect to fiscal year 2008 as measured on Sept. 28, 2008.

12

At Sept. 28, 2008 and Dec. 30, 2007, the estimated fair value of the unallocated shares held by the ESOP was approximately $562 million and $593 million, respectively.  In accordance with the terms of the ESOP, the fair value per share of the Company's common stock is determined as of each fiscal year end by the trustee of the ESOP.  The estimated fair value of the Company's common stock has not been changed during the third quarter and first three quarters of 2008.

## NOTE 6: PENSION AND OTHER POSTRETIREMENT BENEFITS

The components of net periodic benefit cost (credit) for Company-sponsored pension and other postretirement benefits plans for the third quarters and first three quarters of 2008 and 2007 were as follows (in thousands):

| | Pension Benefits Third Quarter | | Other Postretirement Benefits Third Quarter | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |

trbform10q3q2008.htm

| | | | | | | | |
|---|---:|---|---:|---|---:|---|---:|
| Service cost | $ | 5,216 | $ | 611 | $ | 219 | $ | 322 |
| Interest cost | | 21,942 | | 21,232 | | 1,946 | | 2,125 |
| Expected return on plans' assets | | (36,016) | | (35,198) | | — | | — |
| Recognized actuarial loss (gain) | | 5,493 | | 11,844 | | (396) | | 127 |
| Amortization of prior service costs (credits) | | 306 | | 96 | | (203) | | (362) |
| Special termination benefits(1) | | 28,240 | | — | | — | | — |
| Curtailment gain(2) | | — | | — | | (4,544) | | — |
| Net periodic benefit cost (credit)(3) | $ | 25,181 | $ | (1,415) | $ | (2,978) | $ | 2,212 |

| | Pension Benefits First Three Quarters | | Other Postretirement Benefits First Three Quarters | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| Service cost | $ 16,334 | $ 1,484 | $ 738 | $ 968 |
| Interest cost | 66,539 | 63,000 | 5,633 | 5,869 |
| Expected return on plans' assets | (109,105) | (104,524) | — | — |
| Recognized actuarial loss (gain) | 16,809 | 35,326 | (876) | 135 |
| Amortization of prior service costs (credits) | 1,042 | 165 | (931) | (1,084) |
| Special termination benefits(1) | 59,528 | — | — | — |
| Curtailment (gain) loss(2) | 17,147 | — | (4,544) | — |
| Net periodic benefit cost (credit)(3) | $ 68,294 | $ (4,549) | $ 20 | $ 5,888 |

(1) Represents one-time pension benefits related to the elimination of approximately 700 positions in the third quarter of 2008 and 1,600 positions in the first three quarters of 2008. The first three quarters of 2008 includes $7.4 million of one-time pension benefits related to discontinued operations. These position eliminations in the first three quarters of 2008, excluding those related to discontinued operations, did not constitute a curtailment as defined in FASB Statement No. 88, "Employers' Accounting for Settlements and Curtailments of Defined Benefit Pension Plans and for Termination Benefits". Additional position eliminations in the fourth quarter of 2008 may result in a curtailment and remeasurement of Company-sponsored pension plan obligations and assets.

(2) Relates entirely to the NMG transaction and is included in discontinued operations.

(3) Includes benefit costs related to discontinued operations, other than the amounts related to special termination benefits and the curtailment (gain) loss described above, of $.6 million and $.3 million for the third quarters of 2008 and 2007, respectively, and $1.8 million and $.8 million for the first three quarters of 2008 and 2007, respectively.

For the year ending Dec. 28, 2008, the Company plans to contribute $6 million to certain of its union and non-qualified pension plans and $13 million to its other postretirement plans. In the first three quarters of 2008, the Company made $5 million of contributions to its union and non-qualified pension plans and $10 million of contributions to its other postretirement plans.

13

The Company accounts for its company-sponsored pension and other postretirement benefits plans in accordance with FAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106 and 132(R)", which requires the Company to recognize the overfunded or underfunded status of its defined benefit pension and other postretirement plans as an asset or liability in its statement of financial position. Certain Company-sponsored pension plan assets are comprised of investments in stocks, bonds, fixed income securities, mutual funds and other investment securities. As a result of the current global economic instability, the fair value of these pension plan assets has experienced increased volatility. The funded status of the Company-sponsored pension plans presented in the Company's consolidated balance sheet will be remeasured at Dec. 28, 2008 utilizing, among other things, updated actuarial assumptions and the fair value of pension plan assets as of that date. In addition, the impact of potential changes in the fair value of pension plan assets on future minimum required contributions to these plans, if any, cannot be determined at this time.

**NOTE 7: CHANGES IN OPERATIONS AND NON-OPERATING ITEMS**

**Non-operating items**—The third quarter and first three quarters of 2008 included several non-operating items, summarized as follows (in thousands):

| | Third Quarter 2008 | | First Three Quarters 2008 | |
|---|---|---|---|---|
| | Pretax Gain (Loss) | After-tax Gain (Loss) | Pretax Gain (Loss) | After-tax Gain (Loss) |
| Gain (loss) on change in fair values of PHONES and related investment | $ (8,360) | $ (8,262) | $ 97,960 | $ 96,803 |

| | | | |
|---|---|---|---|
| Gain on sales of investments, net | 78,675 | 54,594 | 67,375 | 43,202 |
| Other, net | 372 | 368 | 527 | 523 |
| Income tax adjustment | — | — | — | 1,859,358 |
| Total non-operating items | $ 70,687 | $ 46,700 | $ 165,862 | $ 1,999,886 |

In the third quarter of 2008, the $8 million non-cash pretax loss on change in fair values of PHONES and related investment resulted primarily from a $4 million increase in the fair value of the Company's PHONES and a $3 million decrease in the fair value of 16 million shares of Time Warner common stock. In the first three quarters of 2008, the $98 million non-cash pretax gain on change in fair values of PHONES and related investment resulted primarily from a $140 million decrease in the fair value of the Company's PHONES, partially offset by a $39 million decrease in the fair value of 16 million shares of Time Warner common stock. Effective Dec. 31, 2007, the Company has elected to account for its PHONES utilizing the fair value option under FAS No. 159. As a result of this election, the Company no longer measures just the changes in fair value of the derivative component of the PHONES, but instead measures the changes in fair value of the entire PHONES debt. See Note 10 for further information pertaining to the Company's adoption of FAS No. 159. On Sept. 2, 2008, the Company sold a 10 percent interest in CareerBuilder, LLC to Gannett Co., Inc. ("Gannett") for $135 million and recorded a $79 million non-operating pretax gain in the third quarter of 2008. The Company utilized $81 million of the net proceeds from this transaction to pay down the Company's Tranche X Facility (see Note 10). On June 30, 2008, the Company sold its 42.5% investment in ShopLocal, LLC ("ShopLocal") to Gannett and received net proceeds of $22 million. The Company recorded a $10 million non-operating pretax loss in the second quarter of 2008 to write down its investment in ShopLocal to the amount of net proceeds received. The favorable income tax adjustment of $1,859 million in the first three quarters of 2008 related to the Company's election to be treated as a subchapter S corporation, which resulted in the elimination of nearly all of the Company's net deferred tax liabilities. See Note 3 for further information pertaining to the Company's election to be treated as a subchapter S corporation.

14

The third quarter and first three quarters of 2007 included several non-operating items, summarized as follows (in thousands):

| | Third Quarter 2007 | | First Three Quarters 2007 | |
|---|---|---|---|---|
| | Pretax Gain (Loss) | After-tax Gain (Loss) | Pretax Gain (Loss) | After-tax Gain (Loss) |
| Loss on change in fair values of PHONES and related investment | $ (84,969) | $ (51,831) | $ (182,144) | $ (111,108) |
| Strategic transaction expenses | (3,160) | (3,160) | (38,557) | (32,588) |
| Gain on TMCT transactions | 8,329 | 5,081 | 8,329 | 5,081 |
| Other, net | 1,936 | 1,180 | 23,450 | 14,305 |
| Income tax adjustment | — | 90,704 | — | 90,704 |
| Total non-operating items | $ (77,864) | $ 41,974 | $ (188,922) | $ (33,606) |

In the third quarter of 2007, the $85 million non-cash pretax loss on change in fair values of PHONES and related investment resulted primarily from a $41 million increase in the fair value of the derivative component of the Company's PHONES and a $43 million decrease in the fair value of 16 million shares of Time Warner common stock. In the first three quarters of 2007, the $182 million non-cash pretax loss on change in fair values of PHONES and related investment resulted primarily from a $125 million increase in the fair value of the derivative component of the Company's PHONES and a $55 million decrease in the fair value of 16 million shares of Time Warner common stock. Strategic transaction expenses in the third quarter and first three quarters of 2007 related to the Company's strategic review and the Leveraged ESOP Transactions. These expenses for the first three quarters of 2007 included a $13.5 million pretax loss from refinancing certain credit agreements. The gain on TMCT transactions in the third quarter of 2007 included an $8 million gain related to the redemption of the Company's remaining interests in TMCT, LLC and TMCT II, LLC. Other, net in the first three quarters of 2007 included an $18 million pretax gain from the settlement of the Company's Hurricane Katrina insurance claim. The third quarter of 2007 included a favorable $91 million income tax expense adjustment related to the settlement of the Company's Matthew Bender and Mosby income tax appeal (see Note 3).

**Employee reductions—** The Company reduced staffing levels related to its continuing operations by approximately 800 positions in the third quarter of 2008 and 1,500 positions in the first three quarters of 2008. The Company recorded pretax charges related to these reductions of $44.6 million and $115.2 million in the third quarter and first three quarters of 2008, respectively. These amounts included $28.2 million and $52.1 million, respectively, of special termination benefits payable by the Company's pension plan (see Note 6) and related to the elimination of approximately 700 positions in the third quarter of 2008 and 1,400 positions in the first three quarters of 2008. The amounts for the first three quarters of 2008 excluded the elimination of approximately 200 positions and a pretax charge of $13.2 million related to discontinued operations, of which $7.4 million related to special termination benefits.

In the third quarter and the first three quarters of 2007, the Company reduced its staffing levels by approximately 120 and 580 positions, respectively, and recorded pretax charges of $4 million and $32 million, respectively. These amounts for the first three quarters of 2007 excluded eliminations of approximately 20 positions and a pretax charge of $.3 million related to discontinued operations.

trbform10q3q2008.htm

**Write-off of capitalized software costs**—During the third quarter of 2008, the Company recorded a non-cash pretax charge of $25 million for the write-off of certain capitalized software application costs related to software that the Company no longer intends to utilize. This non-cash charge is included in selling, general and administrative expense in the Company's unaudited condensed consolidated statement of operations.

15

## NOTE 8: INVENTORIES

Inventories consisted of the following (in thousands):

|  | Sept. 28, 2008 | Dec. 30, 2007 |
|---|---|---|
| Newsprint | $ 20,447 | $ 28,664 |
| Supplies and other | 11,345 | 12,011 |
| Total inventories | $ 31,792 | $ 40,675 |

Newsprint inventories valued under the LIFO method were less than current cost by approximately $17 million at Sept. 28, 2008 and $10 million at Dec. 30, 2007.

## NOTE 9: GOODWILL AND OTHER INTANGIBLE ASSETS

Goodwill and other intangible assets consisted of the following (in thousands):

|  | Sept. 28, 2008 | | | Dec. 30, 2007 | | |
|---|---|---|---|---|---|---|
|  | Gross Amount | Accumulated Amortization | Net Amount | Gross Amount | Accumulated Amortization | Net Amount |
| **Intangible assets subject to amortization** |  |  |  |  |  |  |
| Subscribers (useful life of 15 to 20 years) | $ 174,980 | $ (80,945) | $ 94,035 | $ 189,879 | $ (81,698) | $ 108,181 |
| Network affiliation agreements (useful life of 40 years)(1) | 278,034 | (34,776) | 243,258 | 278,034 | (29,552) | 248,482 |
| Other (useful life of 3 to 40 years) | 30,610 | (13,392) | 17,218 | 25,381 | (11,707) | 13,674 |
| Total | $ 483,624 | $ (129,113) | 354,511 | $ 493,294 | $ (122,957) | 370,337 |
| **Goodwill and other intangible assets not subject to amortization** |  |  |  |  |  |  |
| Goodwill |  |  |  |  |  |  |
| Publishing |  |  | 301,667 |  |  | 4,138,685 |
| Broadcasting and entertainment |  |  | 1,440,628 |  |  | 1,441,241 |
| Total goodwill |  |  | 1,742,295 |  |  | 5,579,926 |
| Newspaper mastheads |  |  | 197,000 |  |  | 1,412,937 |
| FCC licenses |  |  | 871,946 |  |  | 871,946 |
| Tradename |  |  | 7,932 |  |  | 7,932 |
| Total |  |  | 2,819,173 |  |  | 7,872,741 |
| **Total goodwill and other intangible assets** |  |  | $ 3,173,684 |  |  | $ 8,243,078 |

(1) Network affiliation agreements, net of accumulated amortization, included $170 million related to FOX affiliations, $70 million related to CW affiliations and $3 million related to MyNetworkTV affiliations as of Sept. 28, 2008.

16

The changes in the carrying amounts of intangible assets during the first three quarters ended Sept. 28, 2008 were as follows (in thousands):

**Broadcasting**

http://sec.gov/Archives/edgar/data/726513/000072651300000404/ 1.5 - 10q3 2008 ... 6/14/2010 10:18:20 PM

trbform10q3q2008.htm

| | Publishing | | and Entertainment | | Total | |
|---|---|---|---|---|---|---|
| **Intangible assets subject to amortization** | | | | | | |
| Balance as of Dec. 30, 2007 | $ | 70,905 | $ | 299,432 | $ | 370,337 |
| Amortization expense | | (6,236) | | (7,729) | | (13,965) |
| Acquisitions | | 6,003 | | — | | 6,003 |
| Disposition of discontinued operations (see Note 2) | | (7,819) | | — | | (7,819) |
| Foreign currency translation adjustment | | (45) | | — | | (45) |
| Balance as of Sept. 28, 2008 | $ | 62,808 | $ | 291,703 | $ | 354,511 |
| **Goodwill** | | | | | | |
| Balance as of Dec. 30, 2007 | $ | 4,138,685 | $ | 1,441,241 | $ | 5,579,926 |
| Disposition of discontinued operations (see Note 2) | | (830,481) | | — | | (830,481) |
| Reclassification to assets held for disposition (see Note 2) | | — | | (613) | | (613) |
| Acquisitions | | 475 | | — | | 475 |
| Impairment write-down of goodwill | | (3,007,000) | | — | | (3,007,000) |
| Foreign currency translation adjustment | | (12) | | — | | (12) |
| Balance as of Sept. 28, 2008 | $ | 301,667 | $ | 1,440,628 | $ | 1,742,295 |
| **Other intangible assets not subject to amortization** | | | | | | |
| Balance as of Dec. 30, 2007 | $ | 1,420,869 | $ | 871,946 | $ | 2,292,815 |
| Disposition of discontinued operations (see Note 2) | | (379,826) | | — | | (379,826) |
| Impairment write-down of newspaper masthead assets | | (836,111) | | — | | (836,111) |
| Balance as of Sept. 28, 2008 | $ | 204,932 | $ | 871,946 | $ | 1,076,878 |
| **Total goodwill and other intangibles as of Sept. 28, 2008** | $ | 569,407 | $ | 2,604,277 | $ | 3,173,684 |

On March 13, 2008, the Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code, which election was effective as of the beginning of the Company's 2008 fiscal year. As a result, approximately $1,859 million of the Company's net deferred tax liabilities were eliminated and such adjustment was recorded as a reduction in the Company's provision for income tax expense in the first quarter of 2008 (see Note 3). This adjustment resulted in an increase in the carrying values of the Company's reporting units.

As disclosed in Note 1 and in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007, the Company reviews goodwill and certain intangible assets no longer being amortized for impairment annually in the fourth quarter of each year, or more frequently if events or changes in circumstances indicate that an asset may be impaired, in accordance with FAS No. 142.

During 2008, each of the Company's major newspapers has experienced significant continuing declines in advertising revenues due to a variety of factors, including weak national and local economic conditions, which has reduced advertising demand, and increased competition, particularly from on-line media. The largest decreases in advertising revenue have been in the real estate and recruitment classified advertising categories. The advertising shortfalls have caused significant declines in the Company's publishing segment operating profit. Due to the declines in actual and projected newspaper advertising revenues, the Company performed an impairment review of goodwill attributable to its newspaper reporting unit and newspaper mastheads in the second quarter of 2008. The review was conducted after $830 million of newspaper reporting unit goodwill and $380 million of the newspaper masthead assets were allocated to the NMG transaction (see Note 2). As a result of the impairment review conducted in the second quarter of 2008, the Company recorded non-cash pretax impairment charges totaling $3,843 million ($3,832 million after taxes) to write down its newspaper reporting unit goodwill by $3,007 million ($3,006 million after taxes) and four newspaper mastheads by a total

17

of $836 million ($826 million after taxes). These non-cash impairment charges are reflected as write-downs of intangible assets in the Company's unaudited condensed consolidated statements of operations. The impairment charges do not affect the Company's operating cash flows or its compliance with its financial debt covenants.

In accordance with FAS No. 142, the impairment review performed in the second quarter of 2008 was based on estimated fair values. The total fair value of the Company's newspaper reporting unit was estimated based on projected future discounted cash flow analyses and market valuations of comparable companies. Under FAS No. 142, the estimated fair value of goodwill of a reporting unit is determined by calculating the residual fair value that remains after the total estimated fair value of the reporting unit is allocated to its net assets other than goodwill. The Company's impairment review performed in the second quarter of 2008 resulted in an estimated fair value for newspaper reporting unit goodwill of $185 million, which compared to a book value before the impairment charge at June 29, 2008 of $3,192 million following the reclassification of goodwill attributable to NMG (see Note 2) and therefore resulted in the pretax impairment charge of $3,007 million for goodwill. The estimated fair values of the Company's newspaper mastheads

trbform10q3q2008.htm

were based on discounted future cash flows calculated utilizing the relief-from-royalty method. Newspaper mastheads had a total book value of $1,413 million at Dec. 30, 2007, and pertained to five newspapers, including *Newsday*, which were acquired as part of the Company's purchase of The Times Mirror Company in 2000.

The determination of estimated fair values of goodwill and other intangible assets not being amortized requires many judgments, assumptions and estimates of several critical factors, including revenue and market growth, operating cash flows, market multiples, and discount rates, as well as specific economic factors in the publishing and broadcasting industries. Adverse changes in expected operating results and/or unfavorable changes in other economic factors used to estimate fair values could result in additional non-cash impairment charges related to the Company's publishing and/or broadcasting and entertainment segments.

18

## NOTE 10: DEBT

Debt consisted of the following (in thousands):

| | Sept. 28, 2008 | Dec. 30, 2007 |
|---|---|---|
| Tranche B Facility due 2014, interest rate of 5.79% and 7.91%, respectively | $ 7,554,825 | $ 7,587,163 |
| Tranche X Facility due 2009, interest rate of 5.54% and 7.99%, respectively | 512,000 | 1,400,000 |
| Bridge Facility due 2008, interest rate of 8.79% and 9.43%, respectively | 1,600,000 | 1,600,000 |
| Medium-term notes due 2008, weighted average interest rate of 5.6% in 2008 and 2007 | 237,585 | 262,585 |
| Trade receivables securitization facility due July 1, 2010, interest rate of 4.90% | 225,000 | — |
| Property financing obligation, effective interest rate of 7.7% (Note 13) | — | 35,676 |
| 4.875% notes due 2010, net of unamortized discount of $295 and $410, respectively | 449,705 | 449,589 |
| 7.25% debentures due 2013, net of unamortized discount of $1,536 and $1,794, respectively | 80,547 | 80,289 |
| 5.25% notes due 2015, net of unamortized discount of $1,087 and $1,205, respectively | 328,913 | 328,795 |
| 7.5% debentures due 2023, net of unamortized discount of $3,555 and $3,732, respectively | 95,194 | 95,016 |
| 6.61% debentures due 2027, net of unamortized discount of $2,017 and $2,095, respectively | 82,943 | 82,864 |
| 7.25% debentures due 2096, net of unamortized discount of $17,785 and $17,926, respectively | 130,215 | 130,073 |
| Subordinated promissory notes due 2018, effective interest rate of 17%, net of unamortized discount of $164,935 and $165,000, respectively | 68,343 | 60,315 |
| Interest rate swaps | 131,629 | 119,029 |
| Other notes and obligations | 45,115 | 15,091 |
| Total debt excluding PHONES | 11,542,014 | 12,246,485 |
| 2% PHONES debt related to Time Warner stock, due 2029 | 279,999 | 597,040 |
| Total debt | $ 11,822,013 | $ 12,843,525 |

Debt was classified as follows in the unaudited condensed consolidated balance sheets (in thousands):

| | Sept. 28, 2008 | Dec. 30, 2007 |
|---|---|---|
| **Current liabilities:** | | |
| PHONES debt related to Time Warner stock | $ 215,991 | $ 253,080 |
| Other debt due within one year | 619,793 | 750,239 |
| Total current debt | 835,784 | 1,003,319 |
| **Long-term debt:** | | |
| PHONES debt related to Time Warner stock | 64,008 | 343,960 |
| Other long-term debt | 10,922,221 | 11,496,246 |
| Total long-term debt | 10,986,229 | 11,840,206 |
| **Total debt** | $ 11,822,013 | $ 12,843,525 |

trbform10q3q2008.htm

**Credit Agreements**—On May 17, 2007, the Company entered into a $8.028 billion senior secured credit agreement, as amended on June 4, 2007 (collectively, the "Credit Agreement"). The Credit Agreement consists of the following facilities: (a) a $1.50 billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Credit Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the

19

"Incremental Facility"). Accordingly, the aggregate amount of the facilities under the Credit Agreement equals $10.133 billion.

On June 4, 2007, proceeds from the Tranche X Facility and the Tranche B Facility were used by the Company in connection with the consummation of the Company's tender offer to repurchase 126 million shares of the Company's common stock that were then outstanding at a price of $34.00 per share in cash and to refinance the Company's former five-year credit agreement and former bridge credit agreement.

The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million. As of Sept. 28, 2008, the Company had $98 million of letters of credit outstanding. Borrowings under the Revolving Credit Facility may be used for working capital and general corporate purposes. On Oct. 17, 2008, the Company sent a notice to draw $250 million in principal amount under the Revolving Credit Facility, of which $237 million was funded. The shortfall of approximately $13 million is a result of the fact that Lehman Brothers Commercial Bank, which provides a commitment in the amount of $40 million under the Company's $750 million Revolving Credit Facility, declined to participate in the Company's $250 million funding request. Lehman Brothers Commercial Bank is an affiliate of Lehman Brothers Holdings Inc., which filed a petition under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York on Sept. 15, 2008. Although Lehman Brothers Commercial Bank is not a party to that bankruptcy proceeding, it has informed the Company that it does not intend to participate in any funding requests under the Revolving Credit Facility. The Company can provide no assurances that it could obtain replacement loan commitments from other banks. The Company borrowed under the Revolving Credit Facility to increase its cash position to preserve its financial flexibility in light of current uncertainty in the credit markets. The remaining undrawn amount available under the Revolving Credit Facility after giving effect to this borrowing and the $98 million of outstanding letters of credit is approximately $415 million, including the $40 million Lehman Brothers Commercial Bank commitment.

On Dec. 20, 2007, the Company entered into (i) a $1.6 billion senior unsecured interim loan agreement (the "Interim Credit Agreement") and (ii) a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Credit Agreement (the Incremental Facility and Tranche B Facility are hereinafter referred to collectively as the Tranche B Facility). The Interim Credit Agreement contains a $1.6 billion twelve-month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by the Company, among other ways, in connection with the consummation of the Merger and for general corporate purposes.

Prior to the consummation of the Merger, the Tranche X Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 150 basis points or LIBOR plus a margin of 250 basis points. Pursuant to the terms of the Credit Agreement, following the closing of the Merger, the margins applicable to the Tranche X Facility increased to 175 basis points and 275 basis points, respectively.

The Tranche B Facility, Delayed Draw Facility and Revolving Credit Facility bear interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 200 basis points or LIBOR plus a margin of 300 basis points. All undrawn amounts under the Delayed Draw Facility and the Revolving Credit Facility accrue commitment fees at a per annum rate of 75 basis points and 50 basis points, respectively. With respect to the Revolving Credit Facility only, the margin applicable to base rate advances, the margin applicable to LIBOR advances and the commitment fee applicable to undrawn amounts are subject to decreases based on a leverage-based grid.

On June 29, 2007, the Company repaid $100 million of the $1.5 billion of borrowings under the Tranche X Facility. During the third quarter of 2008, the Company repaid an aggregate of $888 million of the borrowings under the Tranche X Facility, utilizing the net cash proceeds of $218 million from a million trade receivables securitization facility entered into on July 1, 2008 (see discussion below), $589 million of the net cash proceeds from the NMG transaction (see Note 2) and $81 million of the net cash proceeds from the sale of a

20

10 percent interest in CareerBuilder, LLC to Gannett (see Note 7). The prepayments in the third quarter of 2008 satisfied a required principal repayment of $650 million on the Tranche X Facility that was otherwise due on Dec. 4, 2008. The remaining principal balance on the Tranche X facility of $512 million must be repaid on June 4, 2009, which amount may be adjusted to reflect additional prepayments or other mandatory prepayments (as described below) applied thereto prior to that date.

The Tranche B Facility is a seven-year facility which matures on June 4, 2014 and also amortizes at a rate of 1.0% per annum (payable quarterly). The Revolving Credit Facility is a six-year facility and matures on June 4, 2013. In February 2008, the Company refinanced $25 million of its medium-term notes with borrowings under the Delayed Draw Facility. The Delayed Draw Facility automatically becomes part of the Tranche B Facility as amounts are borrowed and amortizes based upon the Tranche B Facility amortization schedule. On Oct. 6, 2008, the Company refinanced an additional $168 million of the remaining medium-term notes with additional borrowings under the Delayed Draw Facility. The Company intends to use the Delayed

http://sec.gov/Archives/edgar/data/726513/000072651308000040/trbform10q3q2008.htm/15/18/2010 10:10:20 PM]

Draw Facility to refinance the remaining $70 million of its medium-term notes as they mature during 2008. Accordingly, the Company has classified its medium-term notes as long-term at Sept. 28, 2008 and Dec. 30, 2007.

Borrowings under the Credit Agreement are prepayable at any time prior to maturity without penalty, and the unutilized portion of the commitments under the Revolving Credit Facility or the Delayed Draw Facility may be reduced at the option of the Company without penalty.

Upon execution of the Interim Credit Agreement, loans under the Bridge Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 350 basis points or LIBOR plus a margin of 450 basis points. Pursuant to the terms of the Interim Credit Agreement, such margins increased by 50 basis points per annum on March 20, 2008, June 20, 2008 and Sept. 20, 2008 and will continue to increase by this amount in each succeeding quarter, subject to specified caps, a portion of which interest may be payable through an interest payable-in-kind feature. Subject to certain prepayment restrictions contained in the Credit Agreement, the Bridge Facility is prepayable at any time prior to maturity without penalty, including in connection with the issuance of up to $1.6 billion of high-yield notes. Effective Oct. 21, 2008, the Company made an election under its Interim Credit Agreement to convert the variable interest rate applicable to its borrowings under the Bridge Facility from LIBOR plus a margin of 600 basis points to an applicable base rate plus 500 basis points.

If any loans under the Bridge Facility remain outstanding on Dec. 20, 2008, the lenders thereunder will have the option, subject to the terms of the Interim Credit Agreement, at any time and from time to time to exchange such initial loans for senior exchange notes that the Company will issue under a senior indenture, and the maturity date of any initial loans that are not exchanged for senior exchange notes will, unless a bankruptcy event of default has occurred and is continuing on such date, automatically be extended to Dec. 20, 2015 (the "Final Interim Credit Agreement Maturity Date"). Accordingly, the Company has classified the borrowings under the Bridge Facility as long-term at Sept. 28, 2008 and Dec. 30, 2007. The senior exchange notes will also mature on the Final Interim Credit Agreement Maturity Date. Holders of the senior exchange notes will have registration rights.

Loans under the Tranche X Facility, Tranche B Facility and Revolving Credit Facility are required to be repaid with the following proceeds, subject to certain exceptions and exclusions set forth in the Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for borrowed money by the Company or any subsidiary (other than debt permitted to be incurred under the negative covenants contained in the Credit Agreement (with certain exclusions)), (b) certain specified percentages of excess cash flow proceeds based on a leverage-based grid ranging from 50% to 0% and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Credit Agreement. As noted above, aggregate repayments of the Tranche X facility of $888 million were made during the third quarter of 2008 pursuant to these provisions.

Loans under the Bridge Facility are required to be repaid with the following proceeds, in each case after the obligations under the Credit Agreement have been repaid, either as required by the Credit Agreement or repaid at the election of the Company, subject to certain exceptions and exclusions set forth in the Interim Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of certain debt for borrowed money by the Company or any subsidiary, (b) 100% of the net cash proceeds of any equity issuance consummated by the Company and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Interim Credit Agreement.

Borrowings under the Credit Agreement are guaranteed on a senior basis by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the equity interests of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two subsidiaries of the Company. The Company's other senior notes and senior debentures are secured on an equal and ratable basis with the borrowings under the Credit Agreement as required by the terms of the indentures governing such notes and debentures. Borrowings under the Interim Credit Agreement are unsecured, but are guaranteed on a senior subordinated basis by certain of the Company's direct and indirect U.S. subsidiaries.

The Credit Agreement and the Interim Credit Agreement contain representations and warranties, affirmative and negative covenants, including restrictions on capital expenditures, and events of default, in each case subject to customary and negotiated exceptions and limitations, as applicable. If an event of default occurs, the lenders under the Credit Agreement and the Interim Credit Agreement will be entitled to take certain actions, including acceleration of all amounts due under the facilities.

Further, pursuant to the Credit Agreement, the Company is required to comply, on a quarterly basis, with a maximum total guaranteed leverage ratio and a minimum interest coverage ratio. For each of the four fiscal quarters of the Company's 2008 fiscal year, the Credit Agreement covenants require a maximum "Total Guaranteed Leverage Ratio" of 9.00 to 1.00 and a minimum "Interest Coverage Ratio" (each as defined in the Credit Agreement) of 1.15 to 1.00. Both of these financial covenant ratios are measured on a rolling four-quarter basis and become more restrictive on an annual basis. For each of the four fiscal quarters of the Company's 2009 fiscal year, the maximum Total Guaranteed Leverage Ratio required by the covenants will be reduced to 8.75 to 1.00 and the minimum Interest Coverage Ratio will be increased to 1.20 to 1.00. At Sept. 28, 2008, the Company was in compliance with these financial covenants. The Company's ability to maintain compliance with these financial covenants is dependent, however, on various factors, certain of which are outside of the Company's control. Such factors include the Company's ability to generate sufficient revenues and earnings from operations, the Company's ability to achieve reductions in it outstanding indebtedness, changes in interest rates, the impact on earnings, cash flow or indebtedness from sale, purchase, joint venture or similar transactions involving the Company's assets, investments and liabilities and the other risks and uncertainties set forth in Part I, Item 1A, "Risk Factors" in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007 and in Part II, Item 1A, "Risk Factors" in this Form 10-Q.

trbform10q3q2008.htm

On March 13, 2008, the Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. The Credit Agreement and the Interim Credit Agreement contain affirmative covenants which required the Company to make such election and that the election be effective for fiscal year 2008. The Credit Agreement and Interim Credit Agreement further provide that if the Company fails to maintain the S corporation election for any year beginning with 2009, the Company will be required in each such year to obtain an investment in the Company in the form of common stock or subordinated debt in an amount of up to $100 million. There can be no assurance that the Company will be able to obtain such an investment and the failure to obtain such an investment in those circumstances could result in a default under the Credit Agreement and Interim Credit Agreement.

Under the terms of the Credit Agreement, the Company is required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money. On July 2, 2007, the Company entered into an International Swap and Derivatives Association, Inc.

("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and, on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays Bank, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to $750 million in notional amount. The Swap Documents effectively converted a portion of the variable rate borrowings under the Tranche B Facility in the Credit Agreement to a weighted average fixed rate of 5.31% plus a margin of 300 basis points. On Aug. 12, 2008, the Company entered into an ISDA Master Agreement, and, on Aug. 14, 2008, the Company entered into an interest rate cap confirmation with Citibank, N.A. This transaction effectively caps LIBOR at 4.25% with respect to $2.5 billion in notional amount outstanding under the Tranche B Facility for a three-year period expiring July 21, 2011. The premium owed under the interest rate cap confirmation is approximately $29 million, which represented the fair value of the interest rate cap at inception. Through Sept. 28, 2008, the Company has accounted for these interest rate swaps and the interest rate cap as cash flow hedges in accordance with FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("FAS No. 133"). Under FAS No. 133, a cash flow hedge is deemed to be highly effective if it is expected that changes in the cash flows of the hedged item are almost fully offset by changes in the cash flows of the hedging instrument. Effective Oct. 21, 2008, the Company made an election under its Credit Agreement to convert the variable interest rate applicable to its borrowings under the Tranche B Facility from LIBOR plus a margin of 300 basis points to an applicable base rate plus 200 basis points. As a result of this election, the Company will no longer account for these interest rate swaps and the interest rate cap as cash flow hedges in accordance with FAS No. 133 and instead will recognize currently in its statement of operations the changes in the fair values of these instruments beginning in the fourth quarter of 2008.

As of Sept. 28, 2008, the Company had outstanding borrowings of $7.6 billion under the Tranche B Facility, $512 million under the Tranche X Facility, and $1.6 billion under the Bridge Facility. As of Sept. 28, 2008, the applicable interest rate was 5.79% on the Tranche B Facility, 5.54% on the Tranche X Facility and 8.79% on the Bridge Facility.

**Trade Receivables Securitization Facility**—On July 1, 2008, the Company and Tribune Receivables LLC, a wholly-owned subsidiary of the Company (the "Receivables Subsidiary"), entered into a $300 million trade receivables securitization facility with a term of two years. The Receivables Subsidiary borrowed $225 million under this facility and incurred transaction costs totaling $7 million. The net proceeds of $218 million were utilized to pay down the borrowings under the Tranche X Facility.

Pursuant to a receivables purchase agreement, dated as of July 1, 2008, among the Company, the Receivables Subsidiary and certain other subsidiaries of the Company (the "Operating Subsidiaries"), the Operating Subsidiaries sell certain trade receivables and related assets (the "Receivables") to the Company on a daily basis. The Company, in turn, sells such Receivables to the Receivables Subsidiary, also on a daily basis. Receivables transferred to the Receivables Subsidiary are assets of the Receivables Subsidiary and not of the Company or any of the Operating Subsidiaries.

The Receivables Subsidiary has also entered into a receivables loan agreement, dated as of July 1, 2008 (the "Receivables Loan Agreement"), among the Company, as servicer, the Receivables Subsidiary, as borrower, certain entities from time to time parties thereto as conduit lenders and committed lenders (the "Lenders"), certain financial institutions from time to time parties thereto as funding agents, and Barclays Bank PLC, as administrative agent. Pursuant to the Receivables Loan Agreement, the Lenders, from time to time, make advances to the Receivables Subsidiary. The advances are secured by, and repaid through collections on, the Receivables owned by the Receivables Subsidiary. The aggregate outstanding principal amount of the advances may not exceed $300 million. The Receivables Loan Agreement requires the Company to comply with the financial covenants described in the "Credit Agreements" section of this Note 10. The Company (directly and indirectly through the Operating Subsidiaries) services the Receivables, and the Receivables Subsidiary pays a fee to the Company for such services. The Receivables Subsidiary will pay a commitment fee on the undrawn portion of the facility and administrative agent fees.

In accordance with FASB Statement No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities", the

http://sec.gov/Archives/edgar/data/726513/000072651308000040/trbform10q3q2008.htm[6/18/2010 10:10:30 PM]

Company accounts for this arrangement as a secured borrowing by the Receivables Subsidiary and includes the pledged assets in accounts receivable and the cash advances as long-term debt in its consolidated balance sheet. At Sept. 28, 2008, pledged assets included in accounts receivable were $489 million and outstanding advances under this facility were $225 million. Advances under the Receivables Loan Agreement that are funded through commercial paper issued by the Lenders will accrue interest based on the applicable commercial paper interest rate or discount rate, plus a margin. All other advances will accrue interest at (i) LIBOR, (ii) the prime rate or (iii) the federal funds rate, in each case plus an applicable margin. As of Sept. 28, 2008, the applicable interest rate for this facility was 4.9%. The Receivables Loan Agreement includes customary early amortization events and events of default for facilities of this nature. The Receivables Subsidiary is required to repay the advances in full by no later than July 1, 2010.

**Interest Rate Hedging Instruments**—As noted above, the Company is party to three interest rate swaps covered under the Swap Documents and an interest rate cap, each related to borrowings under the Tranche B Facility. At Sept. 28, 2008, the fair value of the three interest rate swaps had declined since their inception date of July 3, 2007 by $100 million, of which $16 million is included in short-term debt and $84 million is included in long-term debt. The Company determined that $9 million of this change resulted from hedge ineffectiveness. In addition, at Sept. 28, 2008, the fair value of the interest rate cap declined by $3 million since its inception date of Aug. 18, 2008. The remaining $91 million change in fair value of the three interest rate swaps and the $3 million change in the fair value of the interest rate cap is included, net of taxes, in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit) at Sept. 28, 2008. As a result of the Company's election on Oct. 21, 2008 described above to convert the variable interest rate applicable to its borrowings under the Tranche B Facility to an applicable base rate plus 200 basis points, the Company will reclassify the previously unrecognized losses on these instruments included in accumulated other comprehensive income (loss), net of taxes, into interest expense beginning in the fourth quarter of 2008. At Sept. 28, these losses totaled $94 million before taxes.

The Company is also party to an additional interest rate swap agreement related to the $100 million 7.5% debentures due in 2023 which effectively converts the fixed 7.5% rate to a variable rate based on LIBOR.

**Debt Due Within One Year**—Debt due within one year at Sept. 28, 2008 included $512 million of borrowings under the Tranche X Facility, $79 million of borrowings under the Tranche B Facility, and $216 million related to PHONES. As noted above, during the third quarter of 2008, the Company repaid an aggregate of $888 million of the borrowings under the Tranche X facility. Debt due within one year at Dec. 30, 2007 included $650 million of borrowings under the Tranche X Facility, $76 million of borrowings under the Tranche B Facility, $253 million related to PHONES, and $24 million of property financing and other obligations. The Company expects to fund interest and principal payments due in the next twelve months through a combination of cash flows from operations, available borrowings under the Revolving Credit Facility, and, if necessary, dispositions of assets or operations. The Company's ability to make scheduled payments or prepayments on its debt and other financial obligations will depend on its future financial and operating performance and its ability to dispose of assets on favorable terms. There can be no assurances that the Company's businesses will generate sufficient cash flows from operations or that future borrowings under the Revolving Credit Facility will be available in an amount sufficient to satisfy debt maturities or to fund other liquidity needs or that any such asset dispositions can be completed. The Company's financial and operating performance is subject to prevailing economic and industry conditions and to financial, business and other factors, some of which are beyond the control of the Company.

If the Company's cash flows and capital resources are insufficient to fund debt service obligations, the Company will likely face increased pressure to reduce or delay capital expenditures, dispose of assets or operations, further reduce the size of its workforce, seek additional capital or restructure or refinance its indebtedness. These actions could have a material adverse effect on the Company's business, financial condition and results of operations. In addition, the Company cannot assure the ability to take any of these actions, that these actions would be successful and permit the Company to meet scheduled debt service

obligations or that these actions would be permitted under the terms of the Company's existing or future debt agreements, including the Credit Agreement and the Interim Credit Agreement. For example, the Company may need to refinance all or a portion of its indebtedness on or before maturity. There can be no assurance that the Company will be able to refinance any of its indebtedness on commercially reasonable terms or at all. In the absence of improved operating results and access to capital resources, the Company could face substantial liquidity problems and might be required to dispose of material assets or operations to meet its debt service and other obligations. The Credit Agreement and the Interim Credit Agreement provide certain restrictions on the Company's ability to dispose of assets and the use of proceeds from the disposition. The Company may not be able to consummate those dispositions or to obtain the proceeds realized. Additionally, these proceeds may not be adequate to meet the debt service obligations then due.

If the Company cannot make scheduled payments or prepayments on its debt, the Company will be in default and, as a result, among other things, the Company's debt holders could declare all outstanding principal and interest to be due and payable and the Company could be forced into bankruptcy or liquidation or be required to substantially restructure or alter business operations or debt obligations.

**Exchangeable Subordinated Debentures due 2029 ("PHONES")**—In 1999, the Company issued 8 million PHONES for an aggregate principal amount of approximately $1.3 billion. The principal amount was equal to the value of 16 million shares of Time Warner common stock at the closing price of $78.50 per share on April 7, 1999. Quarterly interest payments are made to the PHONES holders at an annual rate of 2% of the initial principal. Effective Dec. 31, 2007, the Company has elected to account for the PHONES utilizing the fair value option under FAS No. 159. Prior to the adoption of FAS No. 159, the Company recorded both cash and non-cash interest expense on the discounted debt component of the PHONES. Following the

trbform10q3q2008.htm

adoption of FAS No. 159 for the PHONES, the Company records as interest expense only the cash interest paid on the PHONES. See below for further information pertaining to the Company's adoption of FAS No. 159.

The PHONES debenture agreement requires principal payments equal to any dividends declared on the 16 million shares of Time Warner common stock. A payment of $.125 per PHONES was made in the first, second and third quarters of 2008 for a Time Warner dividend declared in the fourth quarter of 2007 and in the first and second quarters of 2008. A payment of $.125 per PHONES will be due in the fourth quarter of 2008 for a Time Warner dividend declared in the third quarter of 2008. The Company records the dividends it receives on its Time Warner common stock as dividend income and accounts for the related payments to the PHONES holders as reduction of principal.

The Company may redeem the PHONES at any time for the higher of the principal value of the PHONES ($155.64 per PHONES at Sept. 28, 2008) or the then market value of two shares of Time Warner common stock, subject to certain adjustments. At any time, holders of the PHONES may exchange a PHONES for an amount of cash equal to 95% (or 100% under certain circumstances) of the market value of two shares of Time Warner common stock. On Sept. 26, 2008, 20 PHONES were exchanged for cash pursuant to this provision. At Sept. 28, 2008, the market value per PHONES was $35.00, and the market value of two shares of Time Warner common stock was $28.42. The amount PHONES holders could have received if they had elected to exchange their PHONES for cash on Sept. 28, 2008 was $216 million, which is included in current liabilities at Sept. 28, 2008.

Prior to the adoption of FAS No. 159, the Company accounted for the PHONES under the provisions of FAS No. 133. Under FAS No. 133, the PHONES consisted of a discounted debt component, which was presented at book value, and a derivative component, which was presented at fair value. Changes in the fair value of the derivative component of the PHONES were recorded in the statement of operations. At Dec. 30, 2007, the Company performed a direct valuation of the derivative component of the PHONES utilizing the Black-Scholes option-pricing model. As noted above, effective Dec. 31, 2007, the Company has elected to account for the PHONES utilizing the fair value option under FAS No. 159. As a result of this election, the PHONES no longer consists of a discounted debt component, presented at book value, and a derivative component, presented at fair value, but instead is presented based on the fair value of the entire PHONES debt. The

25

Company made this election as the fair value of the PHONES is readily determinable based on quoted market prices. Changes in the fair value of the PHONES are recorded in the statement of operations.

The following table summarizes the impact of the adoption of FAS No. 159 for the PHONES on the Company's unaudited condensed consolidated balance sheet (in thousands):

|  | Balances Prior To Adoption | Net Gain/(Loss) Upon Adoption | Balances After Adoption |
|---|---|---|---|
| PHONES debt (current and long-term portions) | $ (597,040) | $ 177,040 | $ (420,000) |
| Unamortized debt issuance costs related to PHONES included in other non-current assets | $ 18,384 | (18,384) | $ — |
| Pretax cumulative effect of adoption |  | 158,656 |  |
| Increase in deferred income tax liabilities |  | (61,876) |  |
| Cumulative effect of adoption (increase to retained earnings) |  | $ 96,780 |  |

In accordance with FAS No. 159, the $97 million after-tax cumulative effect of adoption was recorded directly to retained earnings and was not included in the Company's unaudited condensed consolidated statement of operations for the first three quarters ended Sept. 28, 2008.

The market value of the PHONES, which are traded on the New York Stock Exchange, was $280 million and $420 million at Sept. 28, 2008 and Dec. 30, 2007, respectively. The outstanding principal balance of the PHONES was $1,245 million and $1,248 million at Sept. 28, 2008 and Dec. 30, 2007, respectively.

## NOTE 11: FAIR VALUE OF FINANCIAL INSTRUMENTS

As discussed in Note 1, the Company adopted FAS No. 157 effective Dec. 31, 2007. FAS No. 157 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. In February 2008, the FASB issued Staff Position No. 157-2 ("FSP No. 157-2") which defers the effective date of FAS No. 157 for all nonfinancial assets and liabilities, except those items recognized or disclosed at fair value on an annual or more frequently recurring basis, until one year after the adoption of FAS No. 157. The Company is currently evaluating the impact of FAS No. 157 on the Company's assets and liabilities within the scope of FSP 157-2, the provisions of which will become effective beginning in the Company's first quarter of 2009.

In accordance with FAS No. 157, the Company has categorized its financial assets and liabilities into a three-level hierarchy as outlined below.

- **Level 1** – Financial assets and liabilities whose values are based on unadjusted quoted prices for identical assets or liabilities in an

trbform10q3q2008.htm

active market. Level 1 financial assets for the Company include its investment in Time Warner stock related to its PHONES debt and other investments in the securities of public companies that are classified as available for sale. Level 1 financial liabilities for the Company include its PHONES debt related to Time Warner stock (see Note 10 for additional information pertaining to the fair value of the Company's PHONES debt).

- **Level 2** – Financial assets and liabilities whose values are based on quoted prices in markets where trading occurs infrequently or whose values are based on quoted prices of instruments with similar attributes in active markets. Level 2 financial assets and liabilities also include assets and liabilities whose values are derived from valuation models whose inputs are observable. Level 2 financial assets and liabilities for the Company include its interest rate swaps and its interest rate cap (see Note 10 for additional information on the Company's interest rate hedging instruments).

- **Level 3** – Financial assets and liabilities whose values are based on valuation models or pricing techniques that utilize unobservable inputs that are significant to the overall fair value measurement. The Company does not currently have any Level 3 financial assets or liabilities.

26

The following table presents the financial assets and liabilities measured at fair value on a recurring basis on the Company's unaudited condensed consolidated balance sheet at Sept. 28, 2008 (in thousands):

|  | Sept. 28, 2008 | |
|---|---|---|
|  | Level 1 | Level 2 |
| **Financial assets:** |  |  |
| Time Warner stock related to PHONES | $ 227,360 | $ — |
| Other investments in securities of public companies | 3,073 |  |
| Interest rate hedging instruments | — | 61,601 |
| Total | $ 230,433 | $ 61,601 |
| **Financial liabilities:** |  |  |
| PHONES debt related to Time Warner stock | $ 279,999 | $ — |
| Interest rate hedging instruments |  | 131,629 |
| Total | $ 279,999 | $ 131,629 |

## NOTE 12: COMPREHENSIVE INCOME (LOSS)

Comprehensive income (loss) reflects all changes in the net assets of the Company during the period from transactions and other events and circumstances, except those resulting from stock issuances, stock repurchases and dividends. The Company's comprehensive income (loss) includes net income (loss) and other gains and losses.

The Company's comprehensive income (loss) was as follows (in thousands):

|  | Third Quarter | | First Three Quarters | |
|---|---|---|---|---|
|  | 2008 | 2007 | 2008 | 2007 |
| Net income (loss) | $ (121,576) | $ 152,765 | $ (2,832,063) | $ 165,746 |
| Change in unrecognized benefit plan losses, net of taxes | — | — | (57,109) | — |
| Adjustment for previously unrecognized benefit plan losses included in net income, net of taxes | 5,278 | 7,072 | 15,994 | 21,071 |
| Unrealized loss on marketable securities, net of taxes | (110) | (2,109) | (2,206) | (4,440) |
| Unrecognized gains (losses) on cash flow hedging instruments: |  |  |  |  |
| Gains (losses) on cash flow hedging instruments arising during the period, net of taxes | 496 | (29,251) | (12,536) | (29,251) |
| Adjustment for losses on cash flow hedging instruments included in net income, net of taxes | 9,259 | — | 7,642 | — |
| Unrecognized gains (losses) on cash flow hedging instruments, net of taxes | 9,755 | (29,251) | (4,894) | (29,251) |
| Change in foreign currency translation adjustments, net of taxes | (79) | 272 | (144) | 476 |
| Other comprehensive income (loss) | 14,844 | (24,016) | (48,359) | (12,144) |
| Comprehensive income (loss) | $ (106,732) | $ 128,749 | $ (2,880,422) | $ 153,602 |

27

## NOTE 13: OTHER MATTERS

**Media Ownership Rules**—Various aspects of the Company's operations are subject to regulation by governmental authorities in the United States. The Company's television and radio broadcasting operations are subject to Federal Communications Commission ("FCC") jurisdiction under the Communications Act of 1934, as amended. FCC rules, among other things, govern the term, renewal and transfer of radio and television broadcasting licenses, and limit the number of media interests in a local market that a single entity can own. Federal law also regulates the rates charged for political advertising and the quantity of advertising within children's programs.

On Nov. 30, 2007, the FCC issued an order (the "Order") granting applications of the Company to transfer control of the Company from the shareholders to the ESOP. In the Order, the FCC granted the Company temporary waivers of the newspaper/broadcast cross-ownership rule in Miami, Florida (WSFL-TV and the *South Florida Sun-Sentinel*); Hartford, Connecticut (WTXX-TV/WTIC-TV and the *Hartford Courant*); and Los Angeles, California (KTLA-TV and the *Los Angeles Times*) for a six-month period beginning Jan. 1, 2008. The waiver also encompassed New York, New York (allowing for the common ownership of WPIX-TV and *Newsday*); however, following the consummation of the NMG transaction on July 29, 2008 (see Note 2), the Company no longer has an attributable interest in both a television station and a newspaper in that market. The six-month waiver could be automatically extended under two conditions: (1) if the Company appeals the Order, the waivers are extended for the longer of two years or six months after the conclusion of the litigation over the Order; or (2) if the FCC adopts a revised newspaper-broadcast cross-ownership rule prior to Jan. 1, 2008, the waivers are extended for a two-year period to allow the Company to come into compliance with any revised rule, provided that in the event the revised rule is the subject of a judicial stay, the waiver is extended until six months after the expiration of any such stay.

The Order also granted the Company a permanent waiver of the newspaper-broadcast cross-ownership rule to permit continued common ownership of WGN-AM, WGN-TV and the Chicago Tribune in Chicago, Illinois; a permanent "failing station" waiver of the television duopoly rule to permit continued common ownership of WTIC-TV and WTXX-TV in Hartford, Connecticut; and granted satellite station status to WTTK-TV, Kokomo, Indiana to permit continued common ownership with WTTV-TV, Bloomington, Indiana.

Various parties have filed petitions for reconsideration of the Order with the FCC, which the Company opposed. The Company also filed an appeal of the Order in the United States Court of Appeals for the District of Columbia Circuit on Dec. 3, 2007, thus automatically extending the waivers for two years or until six months after the conclusion of that appeal, whichever is longer. The appeal has been held in abeyance pending FCC action on the petitions for reconsideration. Intervenors have filed a motion to dismiss the appeal, which the Company opposed. A decision on the motion to dismiss has been deferred until briefing on the merits.

On Dec. 18, 2007, the FCC announced in an FCC news release the adoption of revisions to the newspaper/broadcast cross-ownership rule. The FCC, on Feb. 4, 2008, released the full text of the rule. The revised rule establishes a presumption that the common ownership of a daily newspaper of general circulation and either a television or a radio broadcast station in the top 20 Nielsen Designated Market Areas ("DMAs") would serve the public interest, provided that, if the transaction involves a television station, (i) at least eight independently owned and operating major media voices (defined to include major newspapers and full-power commercial television stations) would remain in the DMA following the transaction and (ii) the cross-owned television station is not among the top-four ranked television stations in the DMA. Other proposed newspaper/broadcast transactions would be presumed not to be in the public interest, except in the case of a "failing" station or newspaper, or in the event that the proposed transaction results in a new source of news in the market. The FCC did not further relax the television-radio cross-ownership rules, the radio local ownership rules, or the television duopoly rules. Under the rule adopted, the Company would be entitled to a presumption in favor of common ownership in two of the three of the Company's cross-ownership markets (Los Angeles, California and Miami, Florida) not covered by the FCC's grant of a permanent waiver (Chicago, Illinois).

28

Various parties, including the Company, have sought judicial review of the FCC's order adopting the new rule.

Congress removed national limits on the number of broadcast stations a licensee may own in 1996. However, federal law continues to limit the number of radio and television stations a single owner may own in a local market, and caps the percentage of the national television audience that may be reached by a licensee's television stations in the aggregate at 39%.

Television and radio broadcasting licenses are subject to renewal by the FCC, at which time they may be subject to petitions to deny the license renewal applications. At Sept. 28, 2008, the Company had FCC authorization to operate 23 television stations and one AM radio station. In order to expedite the renewal grants, the Company entered into tolling agreements with the FCC for WPIX-TV, New York, WDCW-TV, Washington, D.C., WGNO-TV, New Orleans, WXIN-TV, Indianapolis, WXMI-TV, Grand Rapids, WGN-TV, Chicago, WPHL-TV, Philadelphia, KWGN-TV, Denver, KHCW-TV, Houston, KTLA-TV, Los Angeles, KTXL-TV, Sacramento, KSWB-TV, San Diego, KCPQ-TV, Seattle/Tacoma, WTIC-TV, and WPMT-TV

trbform10q3q2008.htm

Harrisburg, Pennsylvania. The tolling agreements would allow the FCC to penalize the Company for rule violations that occurred during the previous license term notwithstanding the grant of renewal applications.

The television industry is in the final stages of the transition to digital television ("DTV"). By law, the transition to DTV is to occur by Feb. 17, 2009. The FCC has issued an order with the final, post-transition DTV channel assignments for every full power television station in the U.S. It also recently completed a proceeding that established the operating rules for DTV stations just before and after the transition in February 2009. Conversion to digital transmission requires all television broadcasters, including those owned by the Company, to invest in digital equipment and facilities. At Sept. 28, 2008, all of the Company's television stations were operating DTV stations in compliance with the applicable FCC rules or policies.

The FCC still has not resolved a number of issues relating to the operation of DTV stations, including the possible imposition of additional "public interest" obligations attached to broadcasters' use of digital spectrum.

From time to time, the FCC revises existing regulations and policies in ways that could affect the Company's broadcasting operations. In addition, Congress from time to time considers and adopts substantive amendments to the governing communications legislation. The Company cannot predict what regulations or legislation may be proposed or finally enacted or what effect, if any, such regulations or legislation could have on the Company's broadcasting operations.

**Variable Interest Entities**—The Company holds significant variable interests, as defined by FASB Interpretation No. 46R, "Consolidation of Variable Interest Entities," in Newsday LLC, Classified Ventures, LLC and Topix, LLC, but the Company has determined that it is not the primary beneficiary of these entities. The Company's maximum loss exposure related to Classified Ventures, LLC and Topix, LLC is limited to its equity investments in these entities, which were $33 million and $22 million, respectively, at Sept. 28, 2008. The Company's equity investment in the parent company of Newsday LLC was $20 million at Sept. 28, 2008. As discussed in Note 2, the Company agreed to indemnify CSC and NMG Holdings, Inc. with respect to any payments that CSC or NMG Holdings, Inc. makes under their guarantee of the $650 million of borrowings by Newsday LLC and its parent company under the secured credit facility. In the event the Company is required to perform under this indemnity, the Company will be subrogated to and acquire all rights of CSC and NMG Holdings, Inc. against Newsday LLC and its parent company to the extent of the payments made pursuant to the indemnity. From the closing date of July 29, 2008 through the third anniversary of the closing date, the maximum amount of potential indemnification payments is $650 million. After the third year, the Maximum Indemnification Amount is reduced by $120 million, and each year thereafter by $35 million until January 1, 2018, at which point the Maximum Indemnification Amount is reduced to $0.

29

---

**New Operating Agreements**—Effective Oct. 3, 2008, the Company entered into a shared services agreement for its KPLR-TV station in St. Louis, Missouri and a local marketing agreement for its KWGN-TV station in Denver, Colorado, each with subsidiaries of Local TV Holdings, LLC ("Local TV"). The agreements will allow the Company to combine the operations of these stations with the FOX Network affiliates owned by Local TV in each market, including combining operating facilities, news operations and sharing certain programming.

**Acquisition of TMCT Real Properties**—On Sept. 22, 2006, the Company amended the terms of its lease agreement with TMCT, LLC, an investment trust in which the Company formerly held an interest following the Company's acquisition of The Times Mirror Company in 2000 and from which the Company leased eight real properties (see Note 8 to the consolidated financial statements included in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007 for further information on the Company's interest in TMCT, LLC). Under the terms of the amended lease, the Company was granted an accelerated option to acquire the eight properties during the month of January 2008 for $175 million. The Company exercised this option on Jan. 29, 2008 and the acquisition was completed on April 28, 2008. In connection with this acquisition, the related property financing obligation of $28 million at April 28, 2008 was extinguished (see Note 10). No gain or loss was recorded as a result of the acquisition.

**New Accounting Standards**—In December 2007, the FASB issued FASB Statement No. 160, "Noncontrolling Interests in Consolidated Financial Statements, an Amendment of ARB No. 51" ("FAS No. 160"), which provides accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. It clarifies that a noncontrolling ownership interest in a subsidiary should be reported as a separate component of equity in the consolidated financial statements, requires consolidated net income to include the amounts attributable to both the parent and the noncontrolling interest and provides for expanded disclosures in the consolidated financial statements. FAS No. 160 is effective for financial statements issued for fiscal years beginning after Dec. 15, 2008 and interim periods beginning within these fiscal years. The Company is currently evaluating the impact of adopting FAS No. 160 on its consolidated financial statements.

In December 2007, the FASB issued FASB Statement No. 141 (revised 2007), "Business Combinations" ("FAS No. 141R"), which addresses, among other items, the recognition and accounting for identifiable assets acquired and liabilities assumed in business combinations. FAS No. 141R also establishes expanded disclosure requirements for business combinations. FAS No. 141R is effective for financial statements issued for fiscal years beginning after Dec. 15, 2008 and interim periods beginning within these fiscal years. The Company is currently evaluating the impact of adopting FAS No. 141R on its consolidated financial statements.

In March 2008, the FASB issued FASB Statement No. 161, "Disclosures about Derivative Instruments and Hedging Activities, an amendment of FASB Statement No. 133" ("FAS No. 161"), which requires enhanced disclosures for derivative and hedging activities. FAS No. 161 is effective for financial statements issued for fiscal years beginning after Dec. 15, 2008 and interim periods beginning within these fiscal years. Early adoption is permitted. The

trbform10q3q2008.htm

Company is currently evaluating the impact of adopting FAS No. 161 on its consolidated financial statements.

In October 2008, the FASB issued Staff Position No. 157-3, "Determining the Fair Value of a Financial Asset when the Market for that Asset is not Active" ("FSP No. 157-3"), which clarifies the application of FAS No. 157 in a market that is not active and provides an example to illustrate key considerations in determining the fair value of a financial asset when the market for that financial asset is not active. This pronouncement was effective upon issuance, including prior periods for which financial statements have not been issued. The adoption of FSP No. 157-3 did not have a material impact on the Company's consolidated financial statements.

In April 2008, the FASB issued Staff Position No. 142-3, "Determination of the Useful Life of Intangible Assets" ("FSP No. 142-3"), which requires that in developing assumptions about renewal or extension used to

30

determine the useful life of a recognized intangible asset, an entity shall consider its own historical experience in renewing or extending similar arrangements; however, these assumptions should be adjusted for entity-specific factors. In the absence of that experience, an entity shall consider the assumptions that market participants would use about renewal or extension (consistent with the highest and best use of the asset by market participants), adjusted for the entity-specific factors. For a recognized intangible asset, an entity shall disclose information that enables users of financial statements to assess the extent to which the expected future cash flows associated with the asset are affected by the entity's intent and/or ability to renew or extend the arrangement. This guidance is effective for financial statements issued for fiscal years beginning after December 15, 2008, and interim periods beginning within these fiscal years. Early adoption is prohibited. The guidance for determining the useful life of a recognized intangible asset shall be applied prospectively to intangible assets acquired after the effective date. The disclosure requirements shall be applied prospectively to all intangible assets recognized as of, and subsequent to, the effective date. The Company is currently evaluating the impact of adopting FSP No. 142-3 on its consolidated financial statements.

## NOTE 14: SEGMENT INFORMATION

Financial data for each of the Company's business segments, from continuing operations, was as follows (in thousands):

| | Third Quarter | | First Three Quarters | |
| --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2008 | 2007 |
| **Operating revenues:** | | | | |
| Publishing | $ 653,590 | $ 752,502 | $ 2,068,242 | $ 2,340,769 |
| Broadcasting and entertainment | 383,356 | 406,051 | 1,084,292 | 1,082,018 |
| Total operating revenues | $ 1,036,946 | $ 1,158,553 | $ 3,152,534 | $ 3,422,787 |
| | | | | |
| **Operating profit (loss)(1):** | | | | |
| Publishing(2) | $ (26,218) | $ 110,372 | $ (3,755,915) | $ 317,298 |
| Broadcasting and entertainment | 74,289 | 117,787 | 312,887 | 286,903 |
| Corporate expenses | (11,008) | (11,329) | (49,632) | (44,902) |
| Total operating profit (loss) | $ 37,063 | $ 216,830 | $ (3,492,660) | $ 559,299 |

| | Sept. 28, 2008 | Dec. 30, 2007 |
| --- | --- | --- |
| **Assets:** | | |
| Publishing(3) | $ 2,821,396 | $ 8,121,133 |
| Broadcasting and entertainment(3) | 3,747,588 | 3,993,933 |
| Corporate | 882,829 | 1,000,873 |
| Assets held for disposition | 152,382 | 33,780 |
| Total assets | $ 7,604,195 | $ 13,149,719 |

(1) Operating profit (loss) for each segment excludes interest and dividend income, interest expense, equity income and losses, non-operating items and income taxes.

(2) The operating loss for the third quarter of 2008 for the publishing segment included a non-cash pretax charge of $25 million for the write-off of certain capitalized software application costs related to software that the Company no longer intends to utilize (see Note 7). The first three quarters of 2008 operating loss for the publishing segment included non-cash pretax impairment write-downs of intangible assets totaling $3,843 million recorded in the second quarter of 2008 (see Note 9).

(3) Publishing and broadcasting and entertainment segment assets include receivables of $267 million and $222 million, respectively, which are pledged as collateral under the Company's Trade Receivables Securitization Facility (see Note 10).

trbform10q3q2008.htm

## ITEM 2.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.

The following discussion compares the results of operations of Tribune Company and its subsidiaries (the "Company") for the third quarter and first three quarters of 2008 to the third quarter and first three quarters of 2007. This commentary should be read in conjunction with the Company's unaudited condensed consolidated financial statements, which are also presented in this Form 10-Q. Certain prior year amounts have been reclassified to conform with the 2008 presentation.

### FORWARD-LOOKING STATEMENTS

The discussion contained in this Item 2 (including, in particular, the discussion under "Liquidity and Capital Resources"), the information contained in the preceding notes to the unaudited condensed consolidated financial statements and the information contained in Part I, Item 3, "Quantitative and Qualitative Disclosures about Market Risk," contain certain comments and forward-looking statements that are based largely on the Company's current expectations. Forward-looking statements are subject to certain risks, trends and uncertainties that could cause actual results and achievements to differ materially from those expressed in the forward-looking statements including, but not limited to, the items discussed in Part I, Item 1A, "Risk Factors," in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007 and Part II, Item 1A, "Risk Factors" in this Form 10-Q. Such risks, trends and uncertainties, which in some instances are beyond the Company's control, include: our ability to generate sufficient cash to service the significant debt levels and other financial obligations that resulted from the Leveraged ESOP Transactions (as defined below in "Significant Events"); our ability to comply with or obtain modifications or waivers of the financial covenants contained in our senior credit facilities, and the potential impact to our operations and liquidity as a result of the restrictive covenants in such senior credit facilities; continuing instability or disruptions in the credit and financial markets; the impact of continuing adverse economic conditions; our dependency on dividends and distributions from our subsidiaries to make payments on our indebtedness; increased interest rate risk due to our higher level of variable rate indebtedness; the ability to maintain our subchapter S corporation status; changes in advertising demand, circulation levels and audience shares; consumer, advertiser and general market acceptance of various new marketing and product initiatives that the Company has introduced or may pursue in the future and the Company's ability to implement such initiatives without disruption or other adverse impact on the Company's business and operations; regulatory and judicial rulings, including changes in tax laws or policies; availability and cost of broadcast rights; competition and other economic conditions; changes in newsprint prices; changes in the Company's credit ratings and interest rates; changes in the market value of the Company's pension plan assets; changes in accounting standards; adverse results from litigation, governmental investigations or tax-related proceedings or audits; the effect of labor strikes, lock-outs and negotiations; the effect of acquisitions, joint ventures, investments and divestitures; the effect of derivative transactions; the Company's reliance on third-party vendors for various services; and other events beyond the Company's control that may result in unexpected adverse operating results.

The words "believe," "expect," "anticipate," "estimate," "could," "should," "intend," "continue," "will," "plan," and similar expressions generally identify forward-looking statements. Readers are cautioned not to place undue reliance on such forward-looking statements, which are being made as of the date of this filing. The Company undertakes no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

### SIGNIFICANT EVENTS

**Write-downs of Intangible Assets**—As described in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007, the Company reviews goodwill and certain intangible assets no longer being amortized for impairment annually, or more frequently if events or changes in circumstances indicate that an asset may be impaired, in accordance with Financial Accounting Standards Board ("FASB") Statement No. 142, "Goodwill and Other Intangible Assets" ("FAS No. 142"). During 2008, each of the Company's major newspapers has experienced significant continuing declines in advertising revenues due to a variety of factors,

including weak national and local economic conditions, which has reduced advertising demand, and increased competition, particularly from on-line media. Due to the decline in actual and projected newspaper advertising revenues, the Company performed an impairment review of goodwill attributable to its newspaper reporting unit and of newspaper masthead intangible assets in the second quarter of 2008. The review was conducted after $830 million of newspaper reporting unit goodwill and $380 million of newspaper masthead intangible assets were allocated to the Newsday Media Group ("NMG") transaction (see the discussion under "Discontinued Operations" below). As a result of the impairment review conducted in the second quarter of 2008, the Company recorded non-cash pretax impairment charges in the second quarter of 2008 totaling $3,843 million ($3,832 million after taxes) to write down its newspaper reporting unit goodwill by $3,007 million ($3,006 million after taxes) and four newspaper mastheads by a total of $836 million ($826 million after taxes). These non-cash impairment charges are reflected as "Write-downs of intangible assets" in the Company's

trbform10q3q2008.htm

unaudited condensed consolidated statements of operations in Part I, Item 1, hereof. These non-cash impairment charges do not affect the Company's operating cash flows or its compliance with its financial debt covenants. See Note 9 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof for a further discussion of the methodology the Company utilized to perform this impairment review.

Under FAS No. 142, the impairment review of goodwill and other intangible assets not subject to amortization must be based on estimated fair values. The determination of estimated fair values of goodwill and other intangible assets not being amortized requires many judgments, assumptions and estimates of several critical factors, including revenue and market growth, operating cash flows, market multiples, and discount rates, as well as specific economic factors in the publishing and broadcasting industries. Adverse changes in expected operating results and/or unfavorable changes in other economic factors used to estimate fair values could result in additional non-cash impairment charges related to the Company's publishing and/or broadcasting and entertainment segments.

**S Corporation Election**—On March 13, 2008, the Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. The Company also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries. Subject to certain limitations (such as the built-in gain tax applicable for ten years to gains accrued prior to the election), the Company is no longer subject to federal income tax. Instead, the Company's income will be required to be reported by its shareholders. The Company's Employee Stock Ownership Plan, the Company's sole shareholder (see Note 5 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof), will not be taxed on the share of income that is passed through to it because the Employee Stock Ownership Plan is a qualified employee benefit plan. Although most states in which the Company operates recognize the S corporation status, some impose income taxes at a reduced rate.

As a result of the election and in accordance with FASB Statement No. 109, "Accounting for Income Taxes", the Company eliminated approximately $1,859 million of net deferred income tax liabilities as of Dec. 31, 2007, and recorded such adjustment as a reduction in the Company's provision for income tax expense in the first quarter of 2008. The Company continues to report deferred income taxes relating to states that assess taxes on S corporations, subsidiaries which are not qualified subchapter S subsidiaries, and potential asset dispositions that the Company expects will be subject to the built-in gain tax.

**Leveraged ESOP Transactions**—On April 1, 2007, the Company's board of directors (the "Board"), based on the recommendation of a special committee of the Board comprised entirely of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune Employee Stock Ownership Plan (the "ESOP"), EGI-TRB, L.L.C., a Delaware limited liability company (the "Zell Entity") majority-owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell. On Dec. 20, 2007, the Company completed the Leveraged ESOP Transactions which culminated in the cancellation of all issued and outstanding shares of the Company's common stock as of that date, other than shares held by the Company or the ESOP, and the Company becoming wholly-owned by the ESOP. The Company has significant continuing public debt and has accounted for these transactions as a leveraged

recapitalization and, accordingly, has maintained a historical cost presentation in its consolidated financial statements.

The Leveraged ESOP Transactions consisted of a series of transactions that included the following:

? On April 1, 2007, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust which forms a part of the ESOP, Tesop Corporation, a Delaware corporation wholly-owned by the ESOP ("Merger Sub"), and the Zell Entity (solely for the limited purposes specified therein) providing for Merger Sub to be merged with and into the Company, and following such merger, the Company to continue as the surviving corporation wholly-owned by the ESOP (the "Merger").

? On April 1, 2007, the ESOP purchased 8,928,571 shares of the Company's common stock from the Company at a price of $28.00 per share. The ESOP paid for this purchase with a promissory note of the ESOP in favor of the Company in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from the Company to the ESOP and/or distributions paid on the shares of the Company's common stock held by the ESOP. Upon consummation of the Merger, the 8,928,571 shares of the Company's common stock held by the ESOP were converted into 56,521,739 shares of common stock and represent the only outstanding shares of capital stock of the Company after the Merger.

? On April 23, 2007, pursuant to a purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), the Zell Entity made an initial investment of $250 million in the Company in exchange for (1) 1,470,588 shares of the Company's common stock at a price of $34.00 per share and (2) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million. The shares were converted at the effective time of the Merger into the right to receive $34.00 per share in cash, and the unsecured subordinated exchangeable promissory note, including approximately $6 million of interest accrued thereon, was repaid by the Company immediately prior to the Merger. Pursuant to the Zell Entity Purchase Agreement, on May 9, 2007, Mr. Zell was appointed as a member of the Board.

? On April 25, 2007, the Company commenced a tender offer to repurchase up to 126 million shares of the Company's common stock that

trbform10q3q2008.htm

were then outstanding at a price of $34.00 per share in cash (the "Share Repurchase"). The tender offer expired on May 24, 2007 and 126 million shares of the Company's common stock were repurchased and subsequently retired on June 4, 2007 utilizing proceeds from the Credit Agreement (as defined in the "Credit Agreements" section below).

? The Company granted registration rights to Chandler Trust No. 1 and Chandler Trust No. 2 (together, the "Chandler Trusts"), which were significant shareholders of the Company prior to the Company's entry into the Leveraged ESOP Transactions. On April 25, 2007, the Company filed a shelf registration statement in connection with the registration rights granted to the Chandler Trusts.

? On June 4, 2007, the Chandler Trusts entered into an underwriting agreement with Goldman, Sachs & Co. ("Goldman Sachs") and the Company, pursuant to which the Chandler Trusts sold an aggregate of 20,351,954 shares of the Company's common stock, which represented the remainder of the shares of the Company's common stock owned by them following the Share Repurchase, through a block trade underwritten by Goldman Sachs. The shares were offered pursuant to the shelf registration statement filed by the Company on April 25, 2007.

? On Dec. 20, 2007, the Company completed its merger with Merger Sub, with the Company surviving the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of the Company, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other

34

than shares held by the Company, the ESOP or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34.00, without interest and less any applicable withholding taxes, and the Company became wholly-owned by the ESOP.

? Following the consummation of the Merger, the Zell Entity purchased from the Company, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant. For accounting purposes, the subordinated promissory note and 15-year warrant were recorded at fair value based on the relative fair value method. The warrant entitles the Zell Entity to purchase 43,478,261 shares of the Company's common stock (subject to adjustment), which represents approximately 40% of the economic equity interest in the Company following the Merger (on a fully-diluted basis, including after giving effect to share equivalents granted under a new management equity incentive plan which is described in Note 4 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof). The warrant has an initial aggregate exercise price of $500 million, increasing by $10 million per year for the first 10 years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted assignees.

? On Dec. 20, 2007, the Company notified the New York Stock Exchange (the "NYSE") that the Merger was consummated and requested that the Company's common stock (and associated Series A junior participating preferred stock purchase rights) be suspended from the NYSE, effective as of the close of the market on Dec. 20, 2007. Subsequently, the NYSE filed with the Securities and Exchange Commission an application on Form 25 reporting that the shares of the Company's common stock and associated Series A junior participating preferred stock purchase rights are no longer listed on the NYSE.

**Credit Agreements**—On May 17, 2007, the Company entered into a $8.028 billion senior secured credit agreement, as amended on June 4, 2007 (collectively, the "Credit Agreement"). The Credit Agreement consists of the following facilities: (a) a $1.50 billion Senior Tranche X Term Loan Facility (the "Tranche X Facility"), (b) a $5.515 billion Senior Tranche B Term Loan Facility (the "Tranche B Facility"), (c) a $263 million Delayed Draw Senior Tranche B Term Loan Facility (the "Delayed Draw Facility") and (d) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"). The Credit Agreement also provided a commitment for an additional $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility"). Accordingly, the aggregate amount of the facilities under the Credit Agreement equals $10.133 billion.

On June 4, 2007, proceeds from the Tranche X Facility and the Tranche B Facility were used by the Company in connection with the consummation of the Share Repurchase and to refinance the Company's former five-year credit agreement and former bridge credit agreement.

The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million. As of Sept. 28, 2008, the Company had $98 million of letters of credit outstanding. Borrowings under the Revolving Credit Facility may be used for working capital and general corporate purposes. On Oct. 17, 2008, the Company sent a notice to draw $250 million in principal amount under the Revolving Credit Facility, of which $237 million was funded. The shortfall of approximately $13 million is a result of the fact that Lehman Brothers Commercial Bank, which provides a commitment in the amount of $40 million under the Company's $750 million Revolving Credit Facility, declined to participate in the Company's $250 million funding request. Lehman Brothers Commercial Bank is an affiliate of Lehman Brothers Holdings Inc., which filed a petition under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York on Sept. 15, 2008. Although Lehman Brothers Commercial Bank is not a party to that bankruptcy proceeding, it has informed the Company that it does not intend to participate in any funding requests under the Revolving

35

trbform10q3q2008.htm

Credit Facility. The Company can provide no assurances that it could obtain replacement loan commitments from other banks. The Company borrowed under the Revolving Credit Facility to increase its cash position to preserve its financial flexibility in light of the current uncertainty in the credit markets. The remaining undrawn amount available under the Revolving Credit Facility after giving effect to this borrowing and the $98 million of outstanding letters of credit is approximately $415 million, including the $40 million Lehman Brothers Commercial Bank commitment.

On Dec. 20, 2007, the Company entered into (i) a $1.6 billion senior unsecured interim loan agreement (the "Interim Credit Agreement") and (ii) a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Credit Agreement (the Incremental Facility and Tranche B Facility are hereinafter referred to collectively as the Tranche B Facility). The Interim Credit Agreement contains a $1.6 billion twelve-month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by the Company, among other ways, in connection with the consummation of the Merger and for general corporate purposes.

Prior to the consummation of the Merger, the Tranche X Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 150 basis points or LIBOR plus a margin of 250 basis points. Pursuant to the terms of the Credit Agreement, following the closing of the Merger, the margins applicable to the Tranche X Facility increased to 175 basis points and 275 basis points, respectively.

The Tranche B Facility, Delayed Draw Facility and Revolving Credit Facility bear interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 200 basis points or LIBOR plus a margin of 300 basis points. All undrawn amounts under the Delayed Draw Facility and the Revolving Credit Facility accrue commitment fees at a per annum rate of 75 basis points and 50 basis points, respectively. With respect to the Revolving Credit Facility only, the margin applicable to base rate advances, the margin applicable to LIBOR advances and the commitment fee applicable to undrawn amounts are subject to decreases based on a leverage-based grid.

On June 29, 2007, the Company repaid $100 million of the $1.5 billion of borrowings under the Tranche X Facility. During the third quarter of 2008, the Company repaid an aggregate of $888 million of the borrowings under the Tranche X Facility, utilizing the net cash proceeds of $218 million from a $300 million trade receivables securitization facility entered into on July 1, 2008 (see discussion below), $589 million of the net cash proceeds from the NMG transaction (see Note 2 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof), and $81 million of the net cash proceeds from the sale of a 10 percent interest in CareerBuilder, LLC to Gannett Co., Inc. (see Note 7 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof). These prepayments satisfied a required principal repayment of $650 million on the Tranche X Facility that was otherwise due on Dec. 4, 2008. The remaining principal balance on the Tranche X facility of $512 million must be repaid on June 4, 2009, which amount may be adjusted to reflect additional prepayments or other mandatory prepayments (described below) applied thereto prior to that date.

The Tranche B Facility is a seven-year facility which matures on June 4, 2014 and also amortizes at a rate of 1.0% per annum (payable quarterly). The Revolving Credit Facility is a six-year facility and matures on June 4, 2013. In February 2008, the Company refinanced $25 million of its medium-term notes with borrowings under the Delayed Draw Facility. The Delayed Draw Facility automatically becomes part of the Tranche B Facility as amounts are borrowed and amortizes based upon the Tranche B Facility amortization schedule. On Oct. 6, 2008, the Company refinanced $168 million of the remaining medium-term notes with additional borrowings under the Delayed Draw Facility. The Company intends to use the Delayed Draw Facility to refinance the remaining $70 million of its medium-term notes as they mature during 2008. Accordingly, the Company has classified its medium-term notes as long-term at Sept. 28, 2008 and Dec. 30, 2007.

Borrowings under the Credit Agreement are prepayable at any time prior to maturity without penalty, and the unutilized portion of the commitments under the Revolving Credit Facility or the Delayed Draw Facility may be reduced at the option of the Company without penalty.

Upon execution of the Interim Credit Agreement, loans under the Bridge Facility bore interest per annum at a variable rate equal to, at the Company's election, the applicable base rate plus a margin of 350 basis points or LIBOR plus a margin of 450 basis points. Pursuant to the terms of the Interim Credit Agreement, such margins increased by 50 basis points per annum on March 20, 2008, June 20, 2008 and Sept. 20, 2008 and will continue to increase by this amount in each succeeding quarter, subject to specified caps, a portion of which interest may be payable through an interest payable-in-kind feature. Subject to certain prepayment restrictions contained in the Credit Agreement, the Bridge Facility is prepayable at any time prior to maturity without penalty, including in connection with the issuance of up to $1.6 billion of high-yield notes. Effective Oct. 21, 2008, the Company made an election under its Interim Credit Agreement to convert the variable interest rate applicable to its borrowings under the Bridge Facility from LIBOR plus a margin of 600 basis points to an applicable base rate plus 500 basis points.

If any loans under the Bridge Facility remain outstanding on Dec. 20, 2008, the lenders thereunder will have the option, subject to the terms of the Interim Credit Agreement, at any time and from time to time to exchange such initial loans for senior exchange notes that the Company will issue under a senior indenture, and the maturity date of any initial loans that are not exchanged for senior exchange notes will, unless a bankruptcy event of default has occurred and is continuing on such date, automatically be extended to Dec. 20, 2015 (the "Final Interim Credit Agreement Maturity Date"). Accordingly, the Company has classified the borrowings under the Bridge Facility as long-term at Sept. 28, 2008 and Dec. 30, 2007. The senior exchange notes will also mature on the Final Interim Credit Agreement Maturity Date. Holders of the senior exchange notes will have registration rights.

Loans under the Tranche X Facility, Tranche B Facility and Revolving Credit Facility are required to be repaid with the following proceeds, subject to certain exceptions and exclusions set forth in the Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of debt for

trbform10q3q2008.htm

borrowed money by the Company or any subsidiary (other than debt permitted to be incurred under the negative covenants contained in the Credit Agreement (with certain exclusions)), (b) certain specified percentages of excess cash flow proceeds based on a leverage-based grid ranging from 50% to 0% and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Credit Agreement.  As noted above, aggregate repayments of the Tranche X facility of $888 million were made during the third quarter of 2008 pursuant to these provisions.

Loans under the Bridge Facility are required to be repaid with the following proceeds, in each case after the obligations under the Credit Agreement have been repaid, either as required by the Credit Agreement or repaid at the election of the Company, subject to certain exceptions and exclusions set forth in the Interim Credit Agreement: (a) 100% of the net cash proceeds from the issuance or incurrence of certain debt for borrowed money by the Company or any subsidiary, (b) 100% of the net cash proceeds of any equity issuance consummated by the Company and (c) 100% of the net cash proceeds from all asset sales, certain dispositions, share issuances by the Company's subsidiaries and casualty events unless, in each case, the Company reinvests the proceeds pursuant to the terms of the Interim Credit Agreement.

Borrowings under the Credit Agreement are guaranteed on a senior basis by certain of the Company's direct and indirect U.S. subsidiaries and secured by a pledge of the equity interests of Tribune Broadcasting Holdco, LLC and Tribune Finance, LLC, two subsidiaries of the Company.  The Company's other senior notes and senior debentures are secured on an equal and ratable basis with the borrowings under the Credit Agreement as required by the terms of the indentures governing such notes and debentures. Borrowings under the Interim Credit Agreement are unsecured, but are guaranteed on a senior subordinated basis by certain of the Company's direct and indirect U.S. subsidiaries.

37

---

The Credit Agreement and the Interim Credit Agreement contain representations and warranties, affirmative and negative covenants, including restrictions on capital expenditures, and events of default, in each case subject to customary and negotiated exceptions and limitations, as applicable. If an event of default occurs, the lenders under the Credit Agreement and the Interim Credit Agreement will be entitled to take certain actions, including acceleration of all amounts due under the facilities.

Further, pursuant to the Credit Agreement, the Company is required to comply, on a quarterly basis, with a maximum total guaranteed leverage ratio and a minimum interest coverage ratio.  For each of the four fiscal quarters of the Company's 2008 fiscal year, the Credit Agreement covenants require a maximum "Total Guaranteed Leverage Ratio" of 9.00 to 1.00 and a minimum "Interest Coverage Ratio" (each as defined in the Credit Agreement) of 1.15 to 1.00.  Both of these financial covenant ratios are measured on a rolling four-quarter basis and become more restrictive on an annual basis.  For each of the four fiscal quarters of the Company's 2009 fiscal year, the maximum Total Guaranteed Leverage Ratio required by the covenants will be reduced to 8.75 to 1.00 and the minimum Interest Coverage Ratio will be increased to 1.20 to 1.00.  At Sept. 28, 2008, the Company was in compliance with these financial covenants. The Company's ability to maintain compliance with these financial covenants is dependent, however, on various factors, certain of which are outside of the Company's control.  Such factors include the Company's ability to generate sufficient revenues and earnings from operations, the Company's ability to achieve reductions in its outstanding indebtedness, changes in interest rates, the impact on earnings, cash flow or indebtedness from sale, purchase, joint venture or similar transactions involving the Company's assets, investments and liabilities and the other risks and uncertainties set forth in Part I, Item 1A, "Risk Factors," in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007 and in Part II, Item 1A, "Risk Factors" in this Form 10-Q.

On March 13, 2008, the Company filed an election to be treated as a subchapter S corporation under the Internal Revenue Code, which election is effective as of the beginning of the Company's 2008 fiscal year. The Credit Agreement and the Interim Credit Agreement contain affirmative covenants which required the Company to make such election and that the election be effective for fiscal year 2008. The Credit Agreement and Interim Credit Agreement further provide that if the Company fails to maintain the S corporation election for any year beginning with 2009, the Company will be required in each such year to obtain an investment in the Company in the form of common stock or subordinated debt in an amount of up to $100 million. There can be no assurance that the Company will be able to obtain such an investment and the failure to obtain such an investment in those circumstances could result in a default under the Credit Agreement and Interim Credit Agreement.

Under the terms of the Credit Agreement, the Company is required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money.  On July 2, 2007, the Company entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and, on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays Bank, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount and (iii) a five-year hedge with respect to $750 million in notional amount. The Swap Documents effectively converted a portion of the variable rate borrowings under the Tranche B Facility in the Credit Agreement to a weighted average fixed rate of 5.31% plus a margin of 300 basis points. On Aug. 12, 2008, the Company entered into an ISDA Master Agreement and on Aug. 14, 2008, the Company entered into an interest rate cap confirmation with Citibank, N.A.  This transaction effectively caps LIBOR at 4.25% with respect to $2.5 billion in notional amount outstanding under the Tranche B Facility for a three-year period expiring July 21, 2011.  The premium owed under the interest rate cap confirmation is approximately $29 million, which represented the fair value of the interest rate cap at inception. Through Sept. 28, 2008, the Company has accounted for these interest rate swaps and the interest rate cap as cash flow hedges in accordance with FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("FAS No. 133").  Under FAS 133, a cash flow hedge is deemed to be highly effective if it is expected that changes in the cash flows of the hedged item are almost fully offset by changes in the cash flows of the hedging instrument. Effective Oct. 21, 2008, the Company made an election

38

under its Credit Agreement to convert the variable interest rate applicable to its borrowings under the Tranche B Facility from LIBOR plus a margin of 300 basis points to an applicable base rate plus 200 basis points. As a result of this election, the Company will no longer account for these interest rate swaps and the interest rate cap as cash flow hedges in accordance with FAS No. 133 and instead will recognize currently in its statement of operations the changes in fair values of these instruments beginning in the fourth quarter of 2008. The Company will reclassify the previously unrecognized losses on these instruments included in accumulated other comprehensive income (loss) into interest expense beginning in the fourth quarter of 2008.

As of Sept. 28, 2008, the Company had outstanding borrowings of $7.6 billion under the Tranche B Facility, $512 million under the Tranche X Facility, and $1.6 billion under the Bridge Facility. As of Sept. 28, 2008, the applicable interest rate was 5.79% on the Tranche B Facility, 5.54% on the Tranche X Facility and 8.79% on the Bridge Facility.

**Trade Receivables Securitization Facility**—On July 1, 2008, the Company and Tribune Receivables LLC, a wholly-owned subsidiary of the Company (the "Receivables Subsidiary"), entered into a $300 million trade receivables securitization facility with a term of two years. The Receivables Subsidiary borrowed $225 million under this facility and incurred transaction costs totaling $7 million. The net proceeds of $218 million were utilized to pay down the borrowings under the Tranche X facility.

Pursuant to a receivables purchase agreement, dated as of July 1, 2008, among the Company, the Receivables Subsidiary and certain other subsidiaries of the Company (the "Operating Subsidiaries"), the Operating Subsidiaries sell certain trade receivables and related assets (the "Receivables") to the Company on a daily basis. The Company, in turn, sells such Receivables to the Receivables Subsidiary, also on a daily basis. Receivables transferred to the Receivables Subsidiary are assets of the Receivables Subsidiary and not of the Company or any of the Operating Subsidiaries.

The Receivables Subsidiary has also entered into a receivables loan agreement, dated as of July 1, 2008 (the "Receivables Loan Agreement"), among the Company, as servicer, the Receivables Subsidiary, as borrower, certain entities from time to time parties thereto as conduit lenders and committed lenders (the "Lenders"), certain financial institutions from time to time parties thereto as funding agents, and Barclays Bank PLC, as administrative agent. Pursuant to the Receivables Loan Agreement, the Lenders, from time to time, make advances to the Receivables Subsidiary. The advances are secured by, and repaid through collections on, the Receivables owned by the Receivables Subsidiary. The aggregate outstanding principal amount of the advances may not exceed $300 million. The Receivables Loan Agreement requires the Company to comply with the financial covenants described in the "Credits Agreements" section contained in this Item 11. The Company (directly and indirectly through the Operating Subsidiaries) services the Receivables, and the Receivables Subsidiary pays a fee to the Company for such services. The Receivables Subsidiary will pay a commitment fee on the undrawn portion of the facility and administrative agent fees.

In accordance with FASB Statement No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities", the Company accounts for this arrangement as a secured borrowing by the Receivables Subsidiary and includes the pledged assets in accounts receivable and the cash advances as long-term debt in its consolidated balance sheet. At Sept. 28, 2008, pledged assets included in accounts receivable were $489 million and outstanding advances under this facility were $225 million. Advances under the Receivables Loan Agreement that are funded through commercial paper issued by the Lenders will accrue interest based on the applicable commercial paper interest rate or discount rate, plus a margin. All other advances will accrue interest at (i) LIBOR, (ii) the prime rate or (iii) the federal funds rate, in each case plus an applicable margin. As of Sept. 28, 2008, the applicable interest rate for this facility was 4.9%. The Receivables Loan Agreement includes customary early amortization events and events of default for facilities of this nature. The Receivables Subsidiary is required to repay the advances in full by no later than July 1, 2010.

**Discontinued Operations**—On May 11, 2008, the Company entered into an agreement (the "Formation Agreement") with CSC Holdings, Inc. ("CSC") and NMG Holdings, Inc., each a wholly-owned subsidiary of

Cablevision Systems Corporation ("Cablevision"), to form a new limited liability company ("Newsday LLC"). On July 29, 2008, the Company consummated the closing of the transactions contemplated by the Formation Agreement. Under the terms of the Formation Agreement, the Company, through Newsday Inc. and other subsidiaries of the Company, contributed certain assets and related liabilities of NMG to Newsday LLC, and CSC contributed $35 million of cash and newly issued senior notes of Cablevision with a fair market value of $650 million to the parent company of Newsday LLC. Concurrent with the closing of this transaction, Newsday LLC and its parent company borrowed $650 million under a new secured credit facility, and the Company received a special distribution of $612 million from Newsday LLC in cash as well as $18 million in prepaid rent under leases for certain facilities used by NMG and located in Melville, New York with an initial term ending in 2018. The Company retained ownership of these facilities following the transaction. Annual lease payments due under the terms of the leases total $1.5 million in each of the first five years of the lease terms and $6 million thereafter.

As a result of these transactions, CSC, through NMG Holdings, Inc., owns approximately 97% and the Company owns approximately 3% of the equity of the parent company of Newsday LLC. CSC retains operational control over Newsday LLC. Borrowings by Newsday LLC and its parent company under the secured credit facility are guaranteed by CSC and NMG Holdings, Inc. and secured by a lien on the assets of Newsday LLC and the assets of its parent company, including the senior notes of Cablevision contributed by CSC. The Company agreed to indemnify CSC and NMG Holdings, Inc. with respect to any payments that CSC or NMG Holdings, Inc. makes under their guarantee of the $650 million of borrowings by Newsday LLC and its parent company under the secured credit facility. In the event the Company is required to perform under this indemnity, the Company will be subrogated to and acquire all rights of CSC and NMG Holdings, Inc. against Newsday LLC and its parent company to the extent of the payments made

trbform10q3q2008.htm

pursuant to the indemnity. From the closing date of July 29, 2008 through the third anniversary of the closing date, the maximum amount of potential indemnification payments (the "Maximum Indemnification Amount") is $650 million. After the third year, the Maximum Indemnification Amount is reduced by $120 million, and each year thereafter by $35 million until January 1, 2018, at which point the Maximum Indemnification Amount is reduced to $0. Following the transaction, the Company used $589 million of the net cash proceeds from the NMG transaction to pay down borrowings under the Company's Tranche X facility. The Company accounts for its remaining $20 million equity interest in the parent company of Newsday LLC as a cost method investment.

The fair market value of the contributed NMG net assets exceeded their tax basis due to the Company's low tax basis in the contributed intangible assets. However, the transaction did not result in an immediate taxable gain because the transaction was structured to comply with the partnership provisions of the United States Internal Revenue Code and related regulations.

NMG's operations consist of *Newsday*, a daily newspaper circulated primarily in Nassau and Suffolk counties on Long Island, New York, and in the borough of Queens in New York City; four specialty magazines circulated primarily on Long Island; several shopper guides; *amNY*, a free daily newspaper in New York City; and several websites including newsday.com and amny.com. During the second quarter of 2008, the Company recorded a pretax loss of $692 million ($693 million after taxes) to write down the net assets of NMG to estimated fair value. NMG's net assets included, before the write-down, allocated newspaper reporting unit goodwill and a newspaper masthead intangible asset of $830 million and $380 million, respectively. In the third quarter of 2008, the Company recorded a favorable $1 million after tax adjustment to the loss on this transaction.

The Company announced an agreement to sell the New York edition of *Hoy*, the Company's Spanish-language daily newspaper ("*Hoy*, New York") on Feb. 12, 2007 and completed the sale on May 15, 2007. In March 2007, the Company announced its intentions to sell its Southern Connecticut Newspapers—*The Advocate* (Stamford) and *Greenwich Time* (collectively "SCNI"). The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which was sold in a separate transaction that closed on April 22, 2008. In the first quarter of 2007, the Company recorded a pretax loss of $19 million ($33 million after taxes) to write down the net assets of SCNI to estimated fair value, less costs to

40

sell. In the third quarter of 2007, the Company recorded a favorable $2.8 million after-tax adjustment to the expected loss on the sale of SCNI. In the first quarter of 2008, the Company recorded an additional $.5 million of after-tax loss on the sale of SCNI. During the third quarter of 2007, the Company began actively pursuing the sale of the stock of one of its subsidiaries, EZ Buy & EZ Sell Recycler Corporation ("Recycler"). The sale of Recycler closed on Oct. 17, 2007. The Company recorded a pretax loss on the sale of Recycler of $1 million in the third quarter of 2007. Due to the Company's high tax basis in the Recycler stock, the sale generated a significantly higher capital loss for income tax purposes. As a result, the Company recorded a $65 million income tax benefit in the third quarter of 2007, resulting in an after-tax gain of $64 million.

These businesses were considered components of the Company's publishing segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of these transactions, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations for each of these businesses are reported as discontinued operations in the accompanying unaudited condensed consolidated statements of operations.

**Critical Accounting Policies**—As of Sept. 28, 2008, the Company's significant accounting policies and estimates, which are detailed in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007, have not changed from Dec. 30, 2007, except for the adoption of FASB Statement No. 157, "Fair Value Measurements" ("FAS No. 157") and FASB Statement No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("FAS No. 159"), both of which were adopted effective Dec. 31, 2007. The Company has elected to account for its PHONES debt utilizing the fair value option under FAS No. 159. The effects of this election were recorded as of Dec. 31, 2007, and included a $177 million decrease in PHONES debt related to Time Warner stock, a $62 million increase in deferred income tax liabilities, an $18 million decrease in other assets, and a $97 million increase in retained earnings. In accordance with FAS No. 159, the $97 million retained earnings increase was not included in the Company's unaudited condensed consolidated statement of operations for the first three quarters ended Sept. 28, 2008. See Note 10 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof for additional information regarding the Company's adoption of FAS No. 159. The adoption of FAS No. 157 had no impact on the Company's consolidated financial statements. See Note 11 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof for additional disclosures related to the fair value of financial instruments included in the Company's unaudited condensed consolidated balance sheet at Sept. 28, 2008.

**NON-OPERATING ITEMS**

The third quarter and first three quarters of 2008 included several non-operating items, summarized as follows:

| (in millions) | Third Quarter 2008 | | First Three Quarters 2008 | |
| --- | --- | --- | --- | --- |
| | Pretax Gain (Loss) | After-tax Gain (Loss) | Pretax Gain (Loss) | After-tax Gain (Loss) |
| Gain (loss) on change in fair values of PHONES and related investment | $ (8.4) | $ (8.3) | $ 98.0 | $ 96.8 |
| Gain on sales of investments, net | 78.7 | 54.6 | 67.4 | 43.2 |

http://sec.gov/Archives/edgar/data/726513/000072651308000040/trbform10q3q2008.htm[5/18/2010 10:10:20 PM]

trbform10q3q2008.htm

| | | | |
|---|---|---|---|
| Other, net | .4 | .4 | .5 | .5 |
| Income tax adjustment | — | — | — | 1,859.4 |
| Total non-operating items | $ 70.7 | $ 46.7 | $ 165.9 | $ 1,999.9 |

In the third quarter of 2008, the $8 million non-cash pretax loss on change in fair values of PHONES and related investment resulted primarily from a $4 million increase in the fair value of the Company's PHONES and a $3 million decrease in the fair value of 16 million shares of Time Warner common stock. In the first three quarters of 2008, the $98 million non-cash pretax gain on change in fair values of PHONES and related

41

investment resulted primarily from a $140 million decrease in the fair value of the Company's PHONES, partially offset by a $39 million decrease in the fair value of 16 million shares of Time Warner common stock. Effective Dec. 31, 2007, the Company has elected to account for its PHONES utilizing the fair value option under FAS No. 159. As a result of this election, the Company no longer measures just the changes in fair value of the derivative component of the PHONES, but instead measures the changes in fair value of the entire PHONES debt. See Note 10 to the Company's unaudited condensed consolidated financial statements in Part 1, Item 1, hereof for further information pertaining to the Company's adoption of FAS No. 159. On Sept. 2, 2008, the Company sold a 10 percent interest in CareerBuilder, LLC to Gannett Co., Inc. ("Gannett") for $135 million and recorded a $79 million non-operating pretax gain in the third quarter of 2008. Following the transaction, the Company used $81 million of the net cash proceeds to pay down borrowings under the Company's Tranche X facility. On June 30, 2008, the Company sold its 42.5% investment in ShopLocal, LLC ("ShopLocal") to Gannett and received net proceeds of $22 million. The Company recorded a $10 million non-operating pretax loss in the second quarter of 2008 to write down its investment in ShopLocal to the amount of net proceeds received. The favorable income tax adjustment of $1,859 million in the first three quarters of 2008 related to the Company's election to be treated as a subchapter S corporation, which resulted in the elimination of nearly all of the Company's net deferred tax liabilities. See Note 3 to the Company's unaudited condensed consolidated financial statements in Part 1, Item 1, hereof for further information pertaining to the Company's election to be treated as a subchapter S corporation.

The third quarter and first three quarters of 2007 included several non-operating items, summarized as follows:

| | Third Quarter 2007 | | First Three Quarters 2007 | |
|---|---|---|---|---|
| (In millions) | Pretax Gain (Loss) | After-tax Gain (Loss) | Pretax Gain (Loss) | After-tax Gain (Loss) |
| Loss on change in fair values of PHONES and related investment | $ (85.0) | $ (51.8) | $ (182.1) | $ (111.1) |
| Strategic transaction expenses | (3.2) | (3.2) | (38.6) | (32.6) |
| Gain on TMCT transactions | 8.3 | 5.1 | 8.3 | 5.1 |
| Other, net | 1.9 | 1.2 | 23.5 | 14.3 |
| Income tax adjustment | — | 90.7 | — | 90.7 |
| Total non-operating items | $ (77.9) | $ 42.0 | $ (188.9) | $ (33.6) |

In the third quarter of 2007, the $85 million non-cash pretax loss on change in fair values of PHONES and related investment resulted primarily from a $41 million increase in the fair value of the derivative component of the Company's PHONES and a $43 million decrease in the fair value of 16 million shares of Time Warner common stock. In the first three quarters of 2007, the $182 million non-cash pretax loss on change in fair values of PHONES and related investment resulted primarily from a $125 million increase in the fair value of the derivative component of the Company's PHONES and a $55 million decrease in the fair value of 16 million shares of Time Warner common stock. Strategic transaction expenses in the third quarter and first three quarters of 2007 related to the Company's strategic review and the Leveraged ESOP Transactions. These expenses for the first three quarters of 2007 included a $13.5 million pretax loss from refinancing certain credit agreements. The gain on TMCT transactions in the third quarter of 2007 included an $8 million gain related to the redemption of the Company's remaining interests in TMCT, LLC and TMCT II, LLC. Other, net in the first three quarters of 2007 included an $18 million pretax gain from the settlement of the Company's Hurricane Katrina insurance claim. The third quarter of 2007 included a favorable $91 million income tax expense adjustment as a result of the settlement of the Company's appeal of the United States Tax Court decision that disallowed the tax-free reorganizations of Matthew Bender and Mosby, former subsidiaries of The Times Mirror Company (see Note 3 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1).

42

RESULTS OF OPERATIONS

The Company's results of operations, when examined on a quarterly basis, reflect the seasonality of the Company's revenues. Second and fourth quarter advertising revenues are typically higher than first and third quarter revenues. Results for the second quarter reflect spring advertising, while the fourth quarter includes advertising related to the holiday season. Results for the 2008 and 2007 third quarters reflect these seasonal patterns. The Company's first three quarters of 2008 operating results included non-cash pretax impairment charges totaling $3,843 million recorded in the second quarter of 2008 to write down the Company's newspaper reporting unit goodwill by $3,007 million and four newspaper masthead intangible assets by $836 million.

trbform10q3q2008.htm

Unless otherwise stated, the Company's discussion of its results of operations relates to continuing operations, and therefore excludes NMG, *Hoy*, New York, SCNI and Recycler. See the discussion below in the "Discontinued Operations" section of this Item 2 for further information on the results from discontinued operations.

## CONSOLIDATED

The Company's consolidated operating results for the third quarters and first three quarters of 2008 and 2007 are shown in the table below:

| (in millions) | Third Quarter | | | First Three Quarters | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2007 | Change | 2008 | 2007 | Change |
| Operating revenues | $ 1,037 | $ 1,159 | - 10% | $ 3,153 | $ 3,423 | - 8% |
| Operating profit (loss)(1): | | | | | | |
| Before write-downs of intangible assets | $ 37 | $ 217 | - 83% | $ 350 | $ 559 | - 37% |
| Write-downs of intangible assets(2) | — | — | — | (3,843) | — | * |
| After write-downs of intangible assets | $ 37 | $ 217 | - 83% | $ (3,493) | $ 559 | * |
| Net income (loss): | | | | | | |
| Income (loss) from continuing operations(3) | $ (124) | $ 84 | * | $ (2,117) | $ 124 | * |
| Income (loss) from discontinued operations, net of tax | 3 | 69 | 96% | (715) | 41 | * |
| Net income (loss) | $ (122) | $ 153 | * | $ (2,832) | $ 166 | * |

(1) Operating profit (loss) excludes interest and dividend income, interest expense, equity income and losses, non-operating items and income taxes.

(2) Write-downs of intangible assets included a $3,007 million non-cash write-down of the Company's newspaper reporting unit goodwill and an $836 million non-cash write-down of newspaper masthead intangible assets recorded in the second quarter of 2008.

(3) Due to the Company's election to be treated as a subchapter S corporation beginning in 2008, nearly all of its net deferred tax liabilities have been eliminated as of Dec. 31, 2007. This resulted in a $1,859 million reduction in income tax expense in the first quarter of 2008.

\* Not meaningful

---

43

---

**Operating Revenues and Profit (Loss)**—Consolidated operating revenues and operating profit (loss) by business segment for the third quarters and first three quarters of 2008 and 2007 were as follows:

| (in millions) | Third Quarter | | | First Three Quarters | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2007 | Change | 2008 | 2007 | Change |
| **Operating revenues** | | | | | | |
| Publishing | $ 654 | $ 753 | - 13% | $ 2,068 | $ 2,341 | - 12% |
| Broadcasting and entertainment | 383 | 406 | - 6% | 1,084 | 1,082 | — |
| Total operating revenues | $ 1,037 | $ 1,159 | - 10% | $ 3,153 | $ 3,423 | - 8% |
| **Operating profit (loss)(1)** | | | | | | |
| Publishing: | | | | | | |
| Before write-downs of intangible assets | $ (26) | $ 110 | * | $ 87 | $ 317 | - 73% |
| Write-downs of intangible assets(2) | — | — | — | (3,843) | — | * |
| After write-downs of intangible assets | (26) | 110 | * | (3,756) | 317 | * |
| Broadcasting and entertainment | 74 | 118 | - 37% | 313 | 287 | + 9% |
| Corporate expenses | (11) | (11) | + 3% | (50) | (45) | - 11% |
| Total operating profit (loss) | $ 37 | $ 217 | - 83% | $ (3,493) | $ 559 | * |

(1) Operating profit (loss) for each segment excludes interest and dividend income, interest expense, equity income and losses, non-operating items and income taxes.

trbform10q3q2008.htm

(2) Write-downs of intangible assets included a $3,007 million non-cash write-down of the Company's newspaper reporting unit goodwill and an $836 million non-cash write-down of newspaper masthead intangible assets recorded in the second quarter of 2008.

\* Not meaningful

Consolidated operating revenues for the 2008 third quarter fell 10% to $1.04 billion from $1.16 billion in 2007, and for the first three quarters of 2008 decreased 8% to $3.15 billion from $3.42 billion. These declines were due to decreases in publishing and broadcasting and entertainment revenues in the third quarter of 2008 and a decline in publishing revenues for the first three quarters of 2008. Broadcasting and entertainment revenues in the third quarter of 2007 included an additional $18 million of cable copyright royalties.

Consolidated operating profit decreased 83%, or $180 million, in the 2008 third quarter and consolidated operating profit before write-downs of intangible assets decreased 37%, or $209 million, in the first three quarters of 2008. Publishing incurred an operating loss of $26 million in the third quarter of 2008 compared to operating profit of $110 million in the third quarter of 2007. The Publishing operating loss in the third quarter of 2008 reflected severance and related charges of $13 million, special termination benefits of $28 million, a charge of $25 million for the write-off of certain capitalized software application costs, and stock-based compensation of $1 million related to the Company's new management equity incentive plan. In the first three quarters of 2008, Publishing operating profit before write-downs of intangible assets decreased 73%, or $230 million, and included severance and related charges of $34 million, special termination benefits of $52 million, the $25 million capitalized software application costs write-off, and stock-based compensation of $8 million related to the Company's new management equity incentive plan, which were offset in part by a $23 million gain on the sale of the SCNI real estate in Stamford and Greenwich, Connecticut. Publishing operating profit in the third quarter of 2007 included severance and related charges of $4 million and stock-based compensation of $4 million. Publishing operating profit in the first three quarters of 2007 included severance and related charges of $29 million, a charge of $24 million for the write-off of *Los Angeles Times* plant equipment related to the previously closed San Fernando Valley facility and stock-based compensation of $4 million. Broadcasting and entertainment operating profit was down 37%, or $43 million, in the 2008 third quarter and included severance and related charges of $4 million and stock-based compensation related to the Company's new management equity incentive plan of $1 million. In the first three quarters of 2008, Broadcasting and entertainment operating profit increased 9%, or $26 million, and included a gain of $82 million from the sale of the Company's studio production lot located in Hollywood, California, partially offset

44

by severance and related charges of $13 million. Broadcasting and entertainment operating profit in the 2007 third quarter and in the first three quarters of 2007 included stock-based compensation of $2 million and $6 million, respectively.

**Operating Expenses**—Consolidated operating expenses for the third quarters and first three quarters of 2008 and 2007 were as follows:

| (in millions) | Third Quarter | | | | First Three Quarters | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | | 2007 | | Change | 2008 | | 2007 | | Change |
| Cost of sales (exclusive of items shown below) | $ | 594 | $ | 593 | — | $ | 1,743 | $ | 1,745 | — |
| Selling, general and administrative | | 353 | | 298 | + 19% | | 903 | | 964 | - 6% |
| Depreciation and amortization | | 53 | | 51 | + 3% | | 157 | | 154 | + 2% |
| Total operating expenses before write-downs of intangible assets | | 1,000 | | 942 | + 6% | | 2,802 | | 2,863 | - 2% |
| Write-downs of intangible assets(1) | | — | | — | — | | 3,843 | | — | \* |
| Total operating expenses | $ | 1,000 | $ | 942 | + 6% | $ | 6,645 | $ | 2,863 | \* |

(1) Write-downs of intangible assets included a $3,007 million non-cash write-down of the Company's newspaper reporting unit goodwill and an $836 million non-cash write-down of newspaper masthead intangible assets recorded in the second quarter of 2008.

\* Not meaningful

Cost of sales was flat in both the third quarter and first three quarters of 2008. Compensation expense was flat in both the third quarter and first three quarters of 2008 as the decrease in compensation expense at publishing for these periods due to lower staffing levels was offset by increased compensation at broadcasting and entertainment, principally at the Chicago Cubs. Newsprint and ink expense was flat in the 2008 third quarter as a result of an 18% drop in consumption, offset by a 25% increase in average newsprint costs. Newsprint and ink expense decreased 8%, or $22 million, in the first three quarters of 2008 as a result of a 15% drop in consumption, offset by an 11% increase in average newsprint costs. Circulation distribution expense increased 2%, or $2 million, in the third quarter of 2008 and 3%, or $11 million, in the first three quarters of 2008 due to the delivery of additional third-party publications including certain Sun-Times Media Group publications in the Chicago metropolitan area.

Selling, general and administrative ("SG&A") expenses increased 19%, or $55 million, in the 2008 third quarter and decreased 6%, or $62 million, in the first three quarters of 2008. SG&A expenses in the third quarter and first three quarters of 2008 included severance and related charges of $16 million and $63 million, respectively, special termination benefits of $28 million and $52 million, respectively, and stock-based compensation of $3 million and

trbform10q3q2008.htm

$15 million, respectively. These expenses were partially offset in both the third quarter and first three quarters of 2008 by lower compensation expense due to staff reductions and the Company's efforts to reduce costs in 2008. The special termination benefits will be provided through enhanced pension benefits payable by the Company's pension plan. The severance and related charges included approximately $11 million and $51 million of costs related to the Company's transitional compensation plan in the 2008 third quarter and first three quarters of 2008, respectively. SG&A expenses in the 2008 third quarter and first three quarters of 2008 included a charge of $25 million for the write-off of certain capitalized software application costs. SG&A expenses in the first three quarters of 2008 included a $23 million gain on the sale of the SCNI real estate in Stamford and Greenwich, Connecticut and a net gain of $82 million on the sale of the studio production lot. SG&A expenses in the third quarter and first three quarters of 2007 included severance and related charges of $4 million and $32 million, respectively, and stock-based compensation of $7 million and $32 million, respectively. The first three quarters of 2007 included a charge of $24 million for the write-off of *Los Angeles Times* plant equipment related to the previously closed San Fernando Valley facility.

45

## PUBLISHING

**Operating Revenues and Profit (Loss)**—The following table presents publishing operating revenues, operating expenses and operating profit (loss) for the third quarters and first three quarters of 2008 and 2007. References in this discussion to individual daily newspapers include their related businesses.

| (in millions) | Third Quarter | | | | First Three Quarters | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2007 | Change | | 2008 | 2007 | Change | |
| Operating revenues | $ 654 | $ 753 | - 13% | | $ 2,068 | $ 2,341 | - 12% | |
| Operating expenses: | | | | | | | | |
| Before write-downs of intangible assets | $ 680 | $ 642 | + 6% | | $ 1,981 | $ 2,023 | - 2% | |
| Write-downs of intangible assets(1) | — | — | - | | 3,843 | — | * | |
| After write-downs of intangible assets | $ 680 | $ 642 | + 6% | | $ 5,824 | $ 2,023 | * | |
| Operating profit (loss): | | | | | | | | |
| Before write-downs of intangible assets | $ (26) | $ 110 | * | | $ 87 | $ 317 | - 73% | |
| Write-downs of intangible assets(1) | — | — | - | | (3,843) | — | * | |
| After write-downs of intangible assets | $ (26) | $ 110 | * | | $ (3,756) | $ 317 | * | |

(1) Write-downs of intangible assets included a $3,007 million non-cash write-down of the Company's newspaper reporting unit goodwill and an $836 million non-cash write-down of newspaper mastheads recorded in the second quarter of 2008.

\* Not meaningful

Publishing operating revenues decreased 13%, or $99 million, in the 2008 third quarter and 12%, or $273 million, in the first three quarters of 2008 primarily due to lower advertising revenue at each of the Company's daily newspapers. The largest declines in advertising revenue were at Los Angeles, Chicago and South Florida.

Operating profit for the 2008 third quarter decreased $137 million primarily due to the decline in revenues and an increase in operating expenses. Operating profit before write-downs of intangible assets decreased 73%, or $230 million, in the first three quarters of 2008 primarily due to the decline in revenues, partially offset by lower operating expenses before write-downs of intangible assets.

Publishing operating revenues, by classification, for the third quarters and first three quarters of 2008 and 2007 were as follows:

| (in millions) | Third Quarter | | | | First Three Quarters | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2007 | Change | | 2008 | 2007 | Change | |
| Advertising | | | | | | | | |
| Retail | $ 220 | $ 243 | - 10% | | $ 692 | $ 758 | - 9% | |
| National | 112 | 142 | - 21% | | 375 | 435 | - 14% | |
| Classified | 135 | 193 | - 30% | | 443 | 618 | - 28% | |
| Total advertising | 467 | 578 | - 19% | | 1,511 | 1,811 | - 17% | |
| Circulation | 107 | 110 | - 2% | | 328 | 337 | - 3% | |
| Other | 79 | 65 | + 22% | | 229 | 193 | + 19% | |
| Total revenues | $ 654 | $ 753 | - 13% | | $ 2,068 | $ 2,341 | - 12% | |

Total advertising revenue decreased 19%, or $111 million, in the 2008 third quarter and 17%, or $300 million, in the first three quarters of 2008.  Retail advertising revenues were down 10%, or $24 million, in the 2008 third quarter and 9%, or $66 million, in the first three quarters of 2008 primarily due to declines in the

furniture/home furnishings, hardware/home improvement stores, department stores, specialty merchandise, personal services, and other retail categories.  Preprint revenues, which are primarily included in retail advertising, decreased 15%, or $20 million, in the 2008 third quarter and 11%, or $46 million, in the first three quarters of 2008 primarily due to decreases at Los Angeles, Chicago, South Florida, Baltimore and Hartford.  National advertising revenues decreased 21%, or $30 million, in the 2008 third quarter primarily due to decreases in the movies, telecom/wireless, auto, media and transportation categories.  National advertising revenues declined 14%, or $60 million, in the first three quarters of 2008 primarily due to decreases in the telecom/wireless, movies, auto, transportation, and resorts categories, partially offset by an increase in the healthcare category.  Classified advertising revenues decreased 30%, or $58 million, in the 2008 third quarter and 28%, or $174 million, in the first three quarters of 2008.  The decline in the 2008 third quarter was primarily due to a 44% decrease in real estate, a 37% drop in help wanted, and an 11% reduction in auto advertising.  The decline in the first three quarters of 2008 was primarily due to a 42% decrease in real estate, a 35% drop in help wanted, and a 10% reduction in auto advertising.  Interactive revenues, which are included in the above advertising categories, decreased 7%, or $4 million, in the 2008 third quarter and 4%, or $7 million, in the first three quarters of 2008 due to a decline in classified advertising, partially offset by increases in retail and national advertising.

Publishing advertising volume for the third quarters and first three quarters of 2008 and 2007 were as follows:

| Inches (in thousands) | Third Quarter | | | First Three Quarters | | |
|---|---|---|---|---|---|---|
| | 2008 | 2007 | Change | 2008 | 2007 | Change |
| Full run | | | | | | |
| Retail | 1,086 | 1,112 | -    2% | 3,374 | 3,433 | -    2% |
| National | 579 | 623 | -    7% | 1,841 | 1,875 | -    2% |
| Classified | 1,390 | 1,814 | -  23% | 4,605 | 5,570 | -  17% |
| Total full run | 3,055 | 3,549 | -  14% | 9,820 | 10,878 | -  10% |
| Part run | 3,188 | 4,121 | -  23% | 10,187 | 12,817 | -  21% |
| Total inches | 6,243 | 7,670 | -  19% | 20,007 | 23,695 | -  16% |
| **Preprint pieces (in millions)** | 2,495 | 2,895 | -  14% | 7,855 | 8,955 | -  12% |

Full run advertising inches decreased 14% in the 2008 third quarter and 10% in the first three quarters of 2008.  Full run retail advertising inches decreased 2% in the 2008 third quarter due to declines at Los Angeles, Newport News, and Orlando, partially offset by increases at Allentown and Chicago.  Full run retail advertising inches decreased 2% in the first three quarters of 2008 as declines at Los Angeles, Chicago, Baltimore, and Orlando were partially offset by an increase at South Florida.  Full run national advertising inches were down 7% in the 2008 third quarter due to declines at Chicago, South Florida, and Orlando, partially offset by increases at Newport News and Allentown.  Full run national advertising inches were down 2% in the first three quarters of 2008, as decreases at Chicago, South Florida, Hartford, and Orlando were partially offset by increases at Newport News and Allentown.  Full run classified advertising inches were down 23% in the 2008 third quarter and 17% in the first three quarters of 2008, due to decreases at all daily newspapers.  Part run advertising inches decreased 23% in the 2008 third quarter and 21% in the first three quarters of 2008 due to declines at all daily newspapers except Newport News.  Preprint advertising pieces decreased 14% in the 2008 third quarter and 12% in the first three quarters of 2008 primarily due to declines across all daily newspapers.

Circulation revenues were down 2%, or $2 million, in the 2008 third quarter, and 3%, or $8 million, in the first three quarters of 2008 primarily due to a decline in total net paid circulation copies for both daily (Mon-Fri) and Sunday, partially offset by selective price increases.  The largest revenue declines in the third quarter and first three quarters of 2008 were at Chicago, Los Angeles and Hartford.  Circulation revenues increased at South Florida and Orlando in both periods.  Total daily net paid circulation for the third quarter and first three quarters of 2008 averaged 2.2 million and 2.3 million copies, respectively, down 7% and 6%, respectively, from the comparable prior year periods.  Total Sunday net paid circulation for the third quarter and first three

quarters of 2008 averaged 3.3 million and 3.4 million copies, respectively, representing a decline of 5% from the comparable prior year periods.  Individually paid circulation (home delivery plus single copy) in the third quarter and first three quarters of 2008 was down 7% and 6%, respectively, for daily and down 6% in both periods for Sunday.

Other revenues are derived from advertising placement services; the syndication of columns, features, information and comics to newspapers; commercial printing operations; delivery of additional third-party publications; direct mail operations; cable television news programming; distribution

trbform10q3q2008.htm

of entertainment listings; and other publishing-related activities. Other revenues increased 22%, or $14 million, in the third quarter and 19%, or $36 million, in the first three quarters of 2008 primarily due to higher delivery revenue for third-party publications including certain Sun-Times Media Group publications in the Chicago metropolitan area.

**Operating Expenses**—Publishing operating expenses for the third quarters and first three quarters of 2008 and 2007 were as follows:

| (In millions) | Third Quarter | | | | | First Three Quarters | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | | 2007 | | Change | 2008 | | 2007 | | Change |
| Compensation | $ | 281 | $ | 259 | + 8% | $ | 841 | $ | 825 | + 2% |
| Newsprint and ink | | 83 | | 83 | - | | 252 | | 274 | - 8% |
| Circulation distribution | | 103 | | 101 | + 2% | | 318 | | 308 | + 3% |
| Outside services | | 57 | | 63 | - 9% | | 178 | | 190 | - 6% |
| Promotion | | 17 | | 26 | - 33% | | 54 | | 68 | - 21% |
| Depreciation and amortization | | 39 | | 38 | + 4% | | 118 | | 115 | + 2% |
| Other | | 99 | | 72 | + 39% | | 220 | | 244 | - 10% |
| Total operating expenses before write-downs of intangible assets | | 680 | | 642 | + 6% | | 1,981 | | 2,023 | - 2% |
| Write-downs of intangible assets(1) | | — | | — | | | 3,843 | | — | * |
| Total operating expenses | $ | 680 | $ | 642 | + 6% | $ | 5,824 | $ | 2,023 | * |

(1) Write-downs of intangible assets included a $3,007 million non-cash write-down of the Company's newspaper reporting unit goodwill and an $836 million non-cash write-down of newspaper masthead intangible assets recorded in the second quarter of 2008.

* Not meaningful

Operating expenses increased 6%, or $38 million, in the 2008 third quarter. Operating expenses before write-downs of intangible assets decreased 2%, or $42 million, in the first three quarters of 2008. Compensation expense increased 8%, or $21 million, in the 2008 third quarter primarily due to an increase of $9 million in severance and related charges and $28 million in special termination benefits, partially offset by the impact of a 10% (1,300 full-time equivalent positions) reduction in staffing and a decrease of $3 million in stock-based compensation. Compensation expense increased 2%, or $15 million, in the first three quarters of 2008 primarily due to an increase of $4 million in severance and related charges and $52 million of special termination benefits, offset by the impact of a 7% (1,000 full-time equivalent positions) reduction in staffing and a decrease of $8 million in stock-based compensation. Newsprint and ink expense was flat in the 2008 third quarter as a result of an 18% drop in consumption, offset by a 25% increase in average newsprint costs. Newsprint and ink expense decreased 8%, or $22 million, in the first three quarters of 2008 as a result of a 15% drop in consumption, offset by an 11% increase in average newsprint costs. Circulation distribution expense increased 2%, or $2 million, in the 2008 third quarter and 3%, or $11 million, in the first three quarters of 2008 due to the delivery of additional third-party publications including certain Sun-Times Media Group publications in the Chicago metropolitan area. Outside services expense was down 9%, or $6 million, in the 2008 third quarter and 6%, or $12 million, in the first three quarters of 2008 largely due to a decrease in outside printing. Promotion expense decreased 33%, or $9 million, in the 2008 third quarter and 21%, or $14 million, in the first three quarters of 2008 due to the Company's efforts to reduce costs in 2008. Other expenses in the third quarter and first three quarters of 2008 included a charge of $25 million for the write-off

48

of certain capitalized software application costs. Other expenses also included for the first three quarters of 2008 a $23 million gain on the sale of the SCNI real estate in Stamford and Greenwich, Connecticut and for the first three quarters of 2007 a charge of $24 million for the write-off of *Los Angeles Times* plant equipment related to the previously closed San Fernando Valley facility.

**BROADCASTING AND ENTERTAINMENT**

**Operating Revenues and Profit**—The following table presents broadcasting and entertainment operating revenues, operating expenses and operating profit for the third quarters and first three quarters of 2008 and 2007. Entertainment includes Tribune Entertainment and the Chicago Cubs.

| (in millions) | Third Quarter | | | | | First Three Quarters | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | | 2007 | | Change | 2008 | | 2007 | | Change |
| **Operating revenues** | | | | | | | | | | |
| Television | $ | 264 | $ | 288 | - 8% | $ | 834 | $ | 840 | - 1% |
| Radio/entertainment | | 119 | | 118 | + 1% | | 250 | | 242 | + 3% |
| Total operating revenues | $ | 383 | $ | 406 | - 6% | $ | 1,084 | $ | 1,082 | — |

**Operating expenses**

trbform10q3q2008.htm

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Television | $ | 211 | $ | 201 | + | 5% | $ 638 | $ 597 | + 7% |
| Radio/entertainment(1) | | 98 | | 87 | + | 12% | 134 | 199 | - 33% |
| Total operating expenses | $ | 309 | $ | 288 | + | 7% | $ 771 | $ 795 | - 3% |

**Operating profit**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Television | $ | 53 | $ | 87 | - | 39% | $ 197 | $ 243 | - 19% |
| Radio/entertainment(1) | | 21 | | 31 | - | 31% | 116 | 44 | * |
| Total operating profit | $ | 74 | $ | 118 | - | 37% | $ 313 | $ 287 | 9% |

(1) Radio/entertainment operating expenses and operating profit for the first three quarters of 2008 included the gain of $82 million on the sale of the studio production lot.

* Not meaningful

Broadcasting and entertainment operating revenues decreased 6%, or $23 million, in the 2008 third quarter and were essentially flat in the first three quarters of 2008. Television revenues were down 8%, or $24 million, in the 2008 third quarter, primarily due to lower cable copyright royalties and soft advertising demand, partially offset by station revenue share gains in most markets. The third quarter of 2007 included an additional $18 million of cable copyright royalties at Chicago and WGN Cable. The additional cable copyright royalties related to WGN-TV Chicago copyrighted programming aired in prior years on WGN America (formerly SuperStation WGN) and distributed on national cable and satellite systems. Television revenues were down 1%, or $5 million, in the first three quarters of 2008 due to the lower cable copyright royalties, partially offset by higher advertising revenues. Radio/entertainment revenues were up 1%, or $1 million, in the 2008 third quarter and 3%, or $8 million, in the first three quarters of 2008 as higher revenues for the Chicago Cubs and WGN Radio were partially offset by lower revenues at Tribune Entertainment.

Operating profit for broadcasting and entertainment decreased 37%, or $43 million, in the 2008 third quarter and increased 9%, or $26 million, in the first three quarters of 2008. Television operating profit decreased 39%, or $34 million, and 19%, or $46 million, in the 2008 third quarter and the first three quarters of 2008, respectively, primarily due to the decrease in revenues and higher operating expenses. Television operating expenses reflected increased severance and related charges of $4 million and $13 million in the third quarter and first three quarters of 2008, respectively. Radio/entertainment operating profit decreased 31%, or $9 million, in the 2008 third quarter due to higher player compensation at the Chicago Cubs and two fewer home

49

games in 2008, partially offset by lower operating expenses at Tribune Entertainment. Radio/entertainment operating profit increased $72 million in the first three quarters of 2008 due to a gain of $82 million related to the sale of the Company's Hollywood studio production lot in the first quarter of 2008, partially offset by lower revenues at Tribune Entertainment.

**Operating Expenses**—Broadcasting and entertainment operating expenses for the third quarters and first three quarters of 2008 and 2007 were as follows:

| (in millions) | Third Quarter | | | First Three Quarters | | |
|---|---|---|---|---|---|---|
| | 2008 | 2007 | Change | 2008 | 2007 | Change |
| Compensation | $ 159 | $ 135 | + 18% | $ 393 | $ 346 | + 13% |
| Programming | 82 | 83 | - 1% | 254 | 247 | + 3% |
| Depreciation and amortization | 13 | 13 | — | 38 | 38 | — |
| Other | 55 | 57 | - 5% | 169 | 164 | + 3% |
| Gain on sale of studio production lot assets | — | — | — | (82) | — | * |
| Total operating expenses | $ 309 | $ 288 | + 7% | $ 771 | $ 795 | - 3% |

* Not meaningful

Broadcasting and entertainment operating expenses increased 7%, or $21 million, in the 2008 third quarter and decreased 3%, or $24 million, in the first three quarters of 2008. Compensation expense increased 18%, or $24 million, in the 2008 third quarter and 13%, or $46 million, in the first three quarters of 2008 primarily due to higher player compensation at the Chicago Cubs, the expansion of news programming at television, and higher severance charges of $4 million and $13 million, respectively. Programming expense decreased 1%, or $1 million, in the 2008 third quarter. Programming expense increased 3%, or $7 million, in the first three quarters of 2008 due to higher broadcast rights amortization. Other cash expenses were down 5%, or $3 million, in the 2008 third quarter primarily due to a decrease in promotion expense, partially offset by an increase in outside services. Other cash expenses increased 3%, or $5 million, in the first three quarters of 2008 primarily due to news expansions, partially offset by a decrease in promotion expense.

**CORPORATE EXPENSES**

trbform10q3q2008.htm

Corporate expenses were down 3% in the 2008 third quarter. Corporate expenses were up 11%, or $5 million, in the first three quarters of 2008 due to a $14 million increase in severance and related charges, offset by a decrease of $7 million in stock-based compensation expense and the impact of staff reductions and other cost savings.

## EQUITY RESULTS

Net income on equity investments decreased $3 million to $23 million in the 2008 third quarter, and declined $10 million to $58 million in the first three quarters of 2008. The decrease in the 2008 third quarter was primarily due to an additional $4 million write-down at one of the Company's interactive investments. The decrease in the first three quarters of 2008 was primarily due to a $16 million write-down at one of the Company's interactive investments, partially offset by an improvement at TV Food Network.

## INTEREST AND DIVIDEND INCOME, INTEREST EXPENSE, AND INCOME TAXES

Interest and dividend income for the 2008 third quarter decreased $2 million to $3 million in the third quarter of 2008 and declined $2 million to $10 million for the first three quarters of 2008 primarily due to lower interest rates and lower average cash balances, partially offset by an increase in Time Warner dividend income. Interest expense applicable to continuing operations for the 2008 third quarter increased to $232 million from $175 million and for the first three quarters of 2008 increased to $695 million from $371 million primarily due to higher debt levels, partially offset by lower interest rates. Debt was $11.8 billion at the end of

50

the 2008 third quarter, compared with $9.4 billion at the end of the third quarter of 2007. The increase in debt was primarily due to the consummation of the Leveraged ESOP Transactions.

As discussed further in the "Discontinued Operations" section below, the Company allocated to discontinued operations corporate interest expense of $2.5 million and $11.8 million in the third quarters of 2008 and 2007, respectively, and $22.2 million and $15.3 million in the first three quarters of 2008 and 2007, respectively.

In the third quarter and first three quarters of 2008, income taxes applicable to continuing operations amounted to a net expense of $26 million and a net benefit of $1,837 million, respectively. The net expense in the third quarter of 2008 included a provision of $27 million related to the Company's gain on the sale of a 10 percent interest in CareerBuilder, LLC (see Note 7 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof). The net benefit in the first three quarters included the favorable $1,859 million deferred income tax adjustment discussed in the "Significant Events – S Corporation Election" section of this Item 2. The $3,007 million write-down of the Company's publishing goodwill in the second quarter of 2008 resulted in an income tax benefit of only $1 million for financial reporting purposes because almost all of the goodwill is not deductible for income tax purposes (see Note 9 to the Company's unaudited condensed consolidated financial statements included in Part I, Item 1, hereof). The effective tax rate on income from continuing operations in the 2007 third quarter and first three quarters of 2007 were affected by certain non-operating items that were not deductible for tax purposes and the Matthew Bender/Mosby income tax adjustment (see Note 7 to the Company's unaudited condensed consolidated financial statements included in Part I, Item 1, hereof for a summary of non-operating items). Excluding all non-operating items, the effective tax rate on income from continuing operations in the third quarter and the first three quarters of 2007 was 43.3% and 41.1%, respectively.

## DISCONTINUED OPERATIONS

As discussed in the "Significant Events – Discontinued Operations" section of this Item 2, on May 11, 2008, the Company entered into the Formation Agreement with CSC and NMG Holdings, Inc. to form Newsday LLC. On July 29, 2008, the Company consummated the closing of the transactions contemplated by the Formation Agreement. Under the terms of the Formation Agreement, the Company, through Newsday, Inc. and other subsidiaries of the Company, contributed certain assets and related liabilities of NMG to Newsday LLC, and CSC contributed $35 million of cash and newly issued senior notes of Cablevision with a fair market value of $650 million to the parent company of Newsday LLC. Concurrent with the closing of this transaction, Newsday LLC and its parent company borrowed $650 million under a new secured credit facility, and the Company received a special distribution of $612 million from Newsday LLC in cash as well as $18 million in prepaid rent under leases for certain facilities used by NMG and located in Melville, New York with an initial term ending in 2018. The Company retained ownership of these facilities following the transaction. Annual lease payments due under the terms of the leases total $1.5 million in each of the first five years of the lease terms and $6 million thereafter.

As a result of these transactions, CSC, through NMG Holdings, Inc., owns approximately 97% and the Company owns approximately 3% of the equity of the parent company of Newsday LLC. CSC retains operational control over Newsday LLC. Borrowings by Newsday LLC and its parent company under the secured credit facility are guaranteed by CSC and NMG Holdings, Inc. and secured by a lien on the assets of Newsday LLC and the assets of its parent company, including the senior notes of Cablevision contributed by CSC. The Company agreed to indemnify CSC and NMG Holdings, Inc. with respect to any payments that CSC or NMG Holdings, Inc. makes under their guarantee of the $650 million of borrowings by Newsday LLC and its parent company under the secured credit facility. In the event the Company is required to perform under this indemnity, the Company will be subrogated to and acquire all rights of CSC and NMG Holdings, Inc. against Newsday LLC and its parent company to the extent of the payments made pursuant to the indemnity. From the closing date of July 29, 2008 through the third anniversary of the closing date, the maximum amount of potential

trbform10q3q2008.htm

indemnification payments is $650 million. After the third year, the Maximum Indemnification Amount is reduced by $120 million, and each year thereafter by $35 million until January 1, 2018, at which point the Maximum Indemnification Amount is reduced to $0. Following the transaction, the

51

Company used $589 million of the net cash proceeds to pay down borrowings under the Company's Tranche X facility. The Company accounts for its remaining $20 million equity interest in the parent company of Newsday LLC as a cost method investment.

The fair market value of the contributed NMG net assets exceeded their tax basis due to the Company's low tax basis in the contributed intangible assets. However, the transaction did not result in an immediate taxable gain because the transaction was structured to comply with the partnership provisions of the United States Internal Revenue Code and related regulations.

During the second quarter of 2008, the Company recorded a pretax loss of $692 million ($693 million after taxes) to write down the net assets of NMG to estimated fair value. NMG's net assets included, before the write-down, allocated newspaper reporting unit goodwill and a newspaper masthead intangible asset of $830 million and $380 million, respectively. In the third quarter of 2008, the Company recorded a favorable $1 million after tax adjustment to the loss on this transaction.

The Company announced an agreement to sell *Hoy*, New York on Feb. 12, 2007. The Company completed the sale of *Hoy*, New York on May 15, 2007 and recorded a pretax gain on the sale of $2.5 million ($.1 million after taxes) in the second quarter of 2007. In March 2007, the Company announced its intentions to sell SCNI. The sale of SCNI closed on Nov. 1, 2007, and excluded the SCNI real estate in Stamford and Greenwich, Connecticut, which was sold in a separate transaction that closed on April 22, 2008. In the first quarter of 2007, the Company recorded a pretax loss of $19 million ($33 million after taxes) to write down the net assets of SCNI to estimated fair value, less costs to sell. In the third quarter of 2007, the Company recorded a favorable $2.8 million after tax adjustment to the expected loss on sale of SCNI. In the first quarter of 2008, the Company recorded an additional $.5 million after-tax loss on the sale of SCNI. During the third quarter of 2007, the Company began actively pursuing the sale of the stock of Recycler. The sale of Recycler closed on Oct. 17, 2007. The Company recorded a pretax loss on the sale of Recycler of $1 million in the third quarter of 2007. Due to the Company's high tax basis in the Recycler stock, the sale generated a significantly higher capital loss for income tax purposes. As a result, the Company recorded a $65 million income tax benefit in the third quarter of 2007, resulting in an after-tax gain of $64 million.

These businesses were considered components of the Company's publishing segment as their operations and cash flows could be clearly distinguished, operationally and for financial reporting purposes, from the rest of the Company. The operations and cash flows of these businesses have been eliminated from the ongoing operations of the Company as a result of these transactions, and the Company will not have any significant continuing involvement in their operations. Accordingly, the results of operations for each of these businesses are reported as discontinued operations in the accompanying unaudited condensed consolidated statements of operations in Part I, Item 1, hereof.

52

Selected financial information related to discontinued operations is summarized as follows:

| (in thousands) | Third Quarter | | First Three Quarters | |
| --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2008 | 2007 |
| Operating revenues | $ 32,260 | $ 132,187 | $ 258,362 | $ 416,925 |
| Operating profit (loss) | $ 4,441 | $ 12,390 | $ (410) | $ 46,256 |
| Interest income | — | 3 | 2 | 7 |
| Interest expense | (2,454) | (11,810) | (22,186) | (15,264) |
| Non-operating loss, net(1) | — | — | — | (15,000) |
| Gain (loss) on dispositions of discontinued operations | 852 | (3,067) | (691,623) | (20,025) |
| Income (loss) from discontinued operations before income taxes | 2,839 | (2,484) | (714,217) | (4,026) |
| Income taxes(2) | (254) | 71,698 | (940) | 45,287 |
| Income (loss) from discontinued operations, net of tax | $ 2,585 | $ 69,214 | $ (715,157) | $ 41,261 |

(1) Discontinued operations for the first three quarters of 2007 included a pretax non-operating charge of $15 million for a civil forfeiture payment related to the inquiry by the United States Attorney's Office for the Eastern District of New York into the circulation practices of *Newsday* and *Hoy*, New York. See Note 5 to the consolidated financial statements in the Company's Annual Report on Form 10-K for the fiscal year ended

trbform10q3q2008.htm

Dec. 30, 2007, for further information.

(2) Income taxes for the first three quarters of 2008 included tax expense of $1 million related to the $691 million pretax loss on the NMG transaction. NMG's net assets included, before the write-down of these assets to fair value in connection with the transaction, allocated newspaper reporting unit goodwill of $830 million and a newspaper masthead intangible asset of $380 million, most of which are not deductible for income tax purposes. The Company recorded an income tax benefit of $72 million related to a pretax loss of $2 million in the third quarter of 2007 and an income tax benefit of $45 million related to a pretax loss of $4 million in the first three quarters of 2007. Due to the Company's high tax basis in the Recycler stock, the sale of Recycler generated a significantly higher capital loss for income tax purposes. As a result, the Company recorded a $65 million income tax benefit in the third quarter of 2007, resulting in an after-tax gain of $64 million on the sale of Recycler. The pretax loss in the first three quarters of 2007 also included $48 million of allocated newspaper group goodwill, most of which is not deductible for income tax purposes.

The Company allocated corporate interest expense of $2.5 million and $11.8 million in the third quarters of 2008 and 2007, respectively, and $22.2 million and $15.3 million in the first three quarters of 2008 and 2007, respectively, to discontinued operations. In accordance with Emerging Issues Task Force Issue No. 87-24, "Allocation of Interest to Discontinued Operations", the amount of corporate interest allocated to discontinued operations was based on the amount of the net proceeds from the NMG transaction that were used to pay down the Tranche X facility (see Note 10 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof) and applying the interest rate applicable to the Tranche X facility for the periods in which borrowings under the Tranche X facility were outstanding.

## LIQUIDITY AND CAPITAL RESOURCES

Cash flow generated from operating activities is the Company's primary source of liquidity. Net cash provided by operating activities in the first three quarters of 2008 was $85 million, down 81% from $452 million in 2007, primarily due to lower operating profit and higher interest expense, partially offset by more favorable changes in working capital items.

Net cash provided by investing activities totaled $676 million in the first three quarters of 2008. In the first three quarters of 2008, the Company purchased real estate from TMCT LLC for $175 million (see discussion below). The Company's other capital expenditures and acquisitions and investments totaled $65 million and

$14 million, respectively, in the first three quarters of 2008. The Company received $318 million in net proceeds from the sales of real estate and investments in the first three quarters of 2008, including $135 million from the sale of a 10 percent interest in CareerBuilder, LLC to Gannett (see Note 7 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof), $122 million from the sale of the studio production lot located in Hollywood, California, $29 million from the sale of the SCNI real estate in Stamford and Greenwich, Connecticut, and $32 million from the sale of its investment in ShopLocal. The Company also received a special distribution of $612 million in connection with the NMG transaction (see Note 2 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof).

On April 28, 2008, the Company acquired the real estate formerly leased from TMCT, LLC for $175 million (see Note 13 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof). The proceeds from the sales of the studio production lot and the SCNI real estate, along with available cash, were used to fund the purchase. The purchase was structured as a like-kind exchange, which allowed the Company to defer income taxes on nearly all of the gains from these dispositions.

Net cash used for financing activities was $735 million in the first three quarters of 2008. The Company repaid an aggregate of $888 million of the borrowings under the Tranche X Facility, utilizing the net cash proceeds of $218 million from a trade receivables securitization facility entered into on July 1, 2008 (see Note 10 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof), $589 million of the net cash proceeds from the NMG transaction and $81 million of the net cash proceeds from the CareerBuilder transaction. In addition, the Company made $57 million of scheduled Tranche B Facility amortization payments and reduced its property financing obligation by $8 million prior to its retirement in connection with the acquisition of the TMCT, LLC real estate described above. The Company refinanced $25 million of its medium term notes with borrowings under its Delayed Draw Facility and borrowed $225 million under the trade receivables securitization facility.

On Oct. 6, 2008, the Company refinanced another $168 million of its medium-term notes with additional borrowings under the Delayed Draw Facility and on Oct. 17, 2008, the Company sent a notice to draw $250 million in principal amount under the Revolving Credit Facility, of which $237 million was funded. The shortfall of approximately $13 million is a result of the fact that Lehman Brothers Commercial Bank, which provides a commitments in the amount of $40 million under the Company's $750 million Revolving Credit Facility, declined to participate in the Company's $250 million funding request. Lehman Brothers Commercial Bank is an affiliate of Lehman Brothers Holdings Inc., which filed a petition under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York on Sept. 15, 2008. Although Lehman Brothers Commercial Bank is not a party to that bankruptcy proceeding, it has informed the Company that it does not intend to participate in any funding requests under the Revolving Credit Facility. The Company can provide no assurances that it could obtain replacement loan commitments from other banks. The Company borrowed under the Revolving Credit Facility to increase its cash position to preserve its financial flexibility in light of the current uncertainty in the credit markets. The remaining undrawn amount available under the Revolving Credit Facility after giving effect to this

trbform10q3q2008.htm

borrowing and the $98 million of outstanding letters of credit is approximately $415 million, including the $40 million Lehman Brothers Commercial Bank commitment.

Since the completion of the Leveraged ESOP Transactions in December 2007, the Company has implemented management changes and has undertaken various new revenue enhancement and cost reduction initiatives designed to strengthen the Company's market position and improve its financial performance. These initiatives will require time before the intended benefits can be realized, and given current adverse economic conditions and the rapidly changing media landscape, it is impossible to predict what their possible financial impact ultimately will be.

The Company expects to fund capital expenditures, interest and principal payments due in the next 12 months and other operating requirements through a combination of cash flows from operations, available borrowings under the Revolving Credit Facility, and, if necessary, disposals of assets or operations. The Company's ability to satisfy financial covenants in its credit agreements and to make scheduled payments or prepayments

54

on its debt and other financial obligations will depend on its future financial and operating performance and its ability to dispose of assets on favorable terms. There can be no assurances that the Company's businesses will generate sufficient cash flows from operations or that any such asset dispositions can be completed. In addition, there can be no assurances that future borrowings under the Revolving Credit Facility will be available in an amount sufficient to satisfy debt maturities or to fund other liquidity needs. The Company's financial and operating performance, and the market environment for divestiture transactions, are subject to prevailing economic and industry conditions and to financial, business and other factors, some of which are beyond the control of the Company.

If the Company's cash flows and capital resources are insufficient to fund debt service obligations, the Company will likely face increased pressure to reduce or delay capital expenditures, dispose of assets or operations, further reduce the size of its workforce, seek additional capital or restructure or refinance its indebtedness. These actions could have a material adverse effect on the Company's business, financial condition and results of operations. In addition, the Company cannot assure the ability to take any of these actions, that these actions would be successful and permit the Company to meet scheduled debt service obligations or that these actions would be permitted under the terms of the Company's existing or future debt agreements, including the Credit Agreement and the Interim Credit Agreement. For example, the Company may need to refinance all or a portion of its indebtedness on or before maturity. There can be no assurance that the Company will be able to refinance any of its indebtedness on commercially reasonable terms or at all. In the absence of improved operating results and access to capital resources, the Company could face substantial liquidity problems and might be required to dispose of material assets or operations to meet its debt service and other obligations. As described in the "Credit Agreements" section contained in this Item 2, the Credit Agreement and the Interim Credit Agreement require that proceeds from the disposition of assets be used to repay borrowings under such agreements, subject to certain exceptions. The Company may not be able to consummate those dispositions or to obtain the proceeds realized. Additionally, these proceeds may not be adequate to meet the debt service obligations then due.

If the Company cannot maintain compliance with the financial covenants in its credit agreements and Receivables Loan Agreement or make scheduled payments or prepayments on its debt, the Company will be in default and, as a result, among other things, the Company's debt holders could declare all outstanding principal and interest to be due and payable and the Company could be forced into bankruptcy or liquidation or be required to substantially restructure or alter business operations or debt obligations. See Part I, Item 1A, "Risk Factors" in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007 and Part II, Item 1A, "Risk Factors" in this Form 10-Q, for further discussion of the risks associated with the Company's ability to service all of its existing indebtedness and ability to maintain compliance with financial covenants in its credit facilities. In addition, see the "Significant Events" section of this Item 2 for additional information regarding the Leveraged ESOP Transactions and a summary of the Company's obligations under the Credit Agreement and for definitions of capitalized terms used in this discussion.

As of Nov. 7, 2008, the Company's corporate credit ratings were as follows: "B-" with negative outlook by Standard & Poor's Rating Services, "Caa2" with negative outlook by Moody's Investor Service and "CCC" with negative outlook by Fitch Ratings.

Although management believes its estimates and judgments are reasonable, the resolutions of the Company's tax issues are unpredictable and could result in tax liabilities that are significantly higher or lower than that which have been provided by the Company.

**Off-Balance Sheet Arrangements**—Off-balance sheet arrangements, as defined by the Securities and Exchange Commission, include the following four categories: obligations under certain guarantees or contracts; retained or contingent interests in assets transferred to an unconsolidated entity or similar arrangements; obligations under certain derivative arrangements; and obligations under material variable interests. The Company has not entered into any material arrangements that would fall under any of these four categories, which would be reasonably likely to have a current or future material effect on the Company's financial condition, revenues or expenses, results of operations, liquidity or capital expenditures.

55

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

trbform10q3q2008.htm

The following represents an update of the Company's market-sensitive financial information. This information contains forward-looking statements and should be read in conjunction with the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007.

## INTEREST RATE RISK

All of the Company's borrowings are denominated in U.S. dollars. The Company manages interest rate risk by issuing a combination of both fixed and variable rate debt. In addition, the Company enters into hedge arrangements as required under the terms of the Credit Agreement as defined and described in the "Significant Events" section contained in Part I, Item 2, hereof.

Information pertaining to the Company's debt at Sept. 28, 2008 is shown in the table below (in thousands):

| Maturities | Fixed Rate Debt | Weighted Avg Interest Rate | Variable Rate Debt | Weighted Avg Interest Rate | Total Debt |
|---|---|---|---|---|---|
| 2008(1) | $ 216,467 | 2.0% | $ 24,242 | 5.8% | $ 240,709 |
| 2009(2) | 3,939 | 6.0% | 613,653 | 5.6% | 617,592 |
| 2010(3) | 451,825 | 4.9% | 353,402 | 5.2% | 805,227 |
| 2011 | 2,284 | 8.4% | 86,499 | 5.8% | 88,783 |
| 2012 | 2,479 | 8.5% | 123,449 | 5.8% | 125,928 |
| Thereafter(4) | 1,123,976 | 4.1% | 8,819,798 | 6.3% | 9,943,774 |
| Total at Sept. 28, 2008 | $ 1,800,970 | | $ 10,021,043 | | $ 11,822,013 |
| Fair value at Sept. 28, 2008(6) | $ 1,098,287 | | $ 6,332,847 | | $ 7,431,134 |

(1) Fixed rate debt includes $216 million of the Company's 2% PHONES which represents the cash exchange value of the PHONES at Sept. 28, 2008. Variable rate debt includes $20 million related to the Tranche B facility, which is payable in quarterly increments of approximately $20 million until maturity in 2014 when the remaining principal balance is due in full (see Note 10 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof).

(2) Variable rate debt includes a $512 million principal payment due under the Tranche X facility on June 4, 2009 and $16 million related to an interest rate swap agreement through 2009 on $750 million of the variable rate borrowings under the Tranche B facility effectively converting the variable rate to a fixed rate of 5.25% plus a margin of 300 basis points.

(3) Variable rate debt includes $40 million related to an interest rate swap agreement through 2010 on $1 billion of the variable rate borrowings under the Tranche B facility effectively converting the variable rate to a fixed rate of 5.29% plus a margin of 300 basis points.

(4) Fixed rate debt includes the remaining $64 million of book value related to the Company's 2% PHONES, due 2029. The Company may redeem the PHONES at any time for the greater of the principal value of the PHONES ($155.64 per PHONES at Sept. 28, 2008) or the then market value of two shares of Time Warner common stock, subject to certain adjustments. Quarterly interest payments are made to the PHONES holders at an annual rate of 2% of the initial principal. Fixed rate debt also includes $31 million related to the interest rate swap agreement on the $100 million 7.5% debentures due in 2023 effectively converting the fixed 7.5% rate to a variable rate based on LIBOR. Fixed rate debt also includes $238 million related to the Company's medium-term notes. On Oct. 6, 2008, the Company refinanced $168 million of the remaining medium-term notes with additional borrowings under the Delayed Draw Facility. The Company intends to use the Delayed Draw Facility to refinance the remaining $70 million of its medium-term notes as they mature during 2008. Accordingly, the Company has classified its medium-term notes as long-term at Sept. 28, 2008. Variable rate debt includes $45 million related to an interest rate swap agreement through 2012 on $750 million of the variable rate borrowings under the Tranche B facility effectively converting the variable rate to a fixed rate of 5.39% plus a margin of 300 basis points. Variable rate debt also includes the $1.6 billion Bridge Facility, which has been classified as long-term because the borrowings under the Bridge Facility will be exchanged for long-term senior exchange notes or similar instruments prior to the Bridge Facility's initial maturity date of Dec. 20, 2008 (see Note 10 to the Company's unaudited consolidated financial statements in Part I, Item 1, hereof). Variable rate debt also includes $7.2 billion related to the amount due in 2014

56

on the Tranche B facility after all quarterly payments have been made (see Note 10 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof).

(5) Fair value of the Company's variable rate borrowings, senior notes and debentures was estimated based on quoted market prices for similar issues or on current rates available to the Company for debt of the same remaining maturities and similar terms. The carrying value of all other components of the Company's debt approximates fair value.

**Variable Interest Rate Debt**—As described in the "Significant Events" section contained in Part I, Item 2, hereof, on June 4, 2007 and Dec. 20, 2007, the Company entered into borrowings under the Credit Agreement and the Interim Credit Agreement. In general, borrowings under the Credit

trbform10q3q2008.htm

Agreement bear interest at a variable rate based on LIBOR plus a spread ranging from 275 basis points to 300 basis points. Upon execution of the Interim Credit Agreement, loans under the Bridge Facility bore interest based on LIBOR plus 450 basis points. Pursuant to the terms of the Interim Credit Agreement, such margins increased by 50 basis points per annum on March 20, 2008, June 20, 2008 and Sept. 20, 2008 and will continue to increase by this amount each subsequent quarter, subject to specified caps. As of Sept. 28, 2008, the Company had $9.667 billion of variable rate borrowings outstanding under these credit facilities. At this borrowing level, and before consideration of the Company's existing interest rate swap agreements and interest rate cap, a hypothetical one percent increase in the underlying interest rates for the Company's variable rate borrowings under these agreements would result in an additional $97 million of annual pretax interest expense. Effective Oct. 21, 2008, the Company made an election under its Credit Agreement to convert the variable interest rate applicable to its borrowings under the Tranche B Facility from LIBOR plus a margin of 300 basis points to an applicable base rate plus 200 basis points. The Company also made an election under its Interim Credit Agreement to convert the variable interest rate applicable to its borrowings under the Bridge Facility from LIBOR plus a margin of 600 basis points to an applicable base rate plus 500 basis points. The Company is currently a party to four interest rate swap agreements and an interest rate cap. One of the swap agreements relates to the $100 million fixed 7.5% rate debentures due in 2023 and effectively converts the fixed 7.5% rate to a variable rate based on LIBOR. The other three swap agreements were initiated on July 3, 2007, and effectively converted $2.5 billion of the variable rate borrowings to a weighted-average fixed rate of 5.31% plus a margin of 300 basis points. On Aug. 14, 2008, the Company entered into an interest rate cap confirmation that effectively caps LIBOR at 4.25% with respect to $2.5 billion in variable rate borrowings for a three-year period expiring July 21, 2011. As a result of the election made by the Company on Oct. 21, 2008, the Company will no longer account for the three interest rate swaps initiated on July 3, 2007 and the interest rate cap as cash flow hedges in accordance with FAS No. 133 and instead will recognize currently in its statement of operations the changes in fair values of these instruments beginning in the fourth quarter of 2008.

On July 1, 2008, the Company and Receivables Subsidiary, entered into a $300 million trade receivables securitization facility. The Receivables Subsidiary borrowed $225 million under this facility and incurred transaction costs totaling $218 million. The net proceeds of $218 million were utilized to pay down the borrowings under the Tranche X Facility. Advances under the Receivables Loan Agreement that are funded through commercial paper issued by the Lenders (Receivables Loan Agreement and Lenders each as defined in the "Significant Events – Trade Receivables Securitization Facility" section included in Part I, Item 2, hereof) will accrue interest based on the applicable commercial paper interest rate or discount rate, plus a margin. All other advances will accrue interest at (i) LIBOR, (ii) the prime rate or (iii) the federal funds rate, in each case plus an applicable margin. At Sept. 28, 2008, the applicable interest rate for this facility was 4.9%. See Note 10 to the Company's unaudited condensed consolidated financial statements in Part I, Item 1, hereof, for a further description of the terms of this facility.

**EQUITY PRICE RISK**

**Available-For-Sale Securities**—The Company has common stock investments in publicly traded companies that are subject to market price volatility. Except for 16 million shares of Time Warner common stock (see discussion below), these investments are classified as available-for-sale securities and are recorded on the balance sheet at fair value with unrealized gains or losses, net of related tax effects, reported in the accumulated other comprehensive income (loss) component of shareholders' equity (deficit).

57

The following analysis presents the hypothetical change at Sept. 28, 2008 in the fair value of the Company's common stock investments in publicly traded companies that are classified as available-for-sale, assuming hypothetical stock price fluctuations of plus or minus 10%, 20% and 30% in each stock's price. As of Sept. 28, 2008, these investments consisted primarily of 203,790 shares of Time Warner common stock unrelated to the PHONES (see discussion below in "Derivatives and Related Trading Securities") and 3.4 million shares of AdStar, Inc.

| (in thousands) | Valuation of Investments Assuming Indicated Decrease in Stock's Price | | | Sept. 28, 2008 Fair Value | Valuation of Investments Assuming Indicated Increase in Stock's Price | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | **-30%** | **-20%** | **-10%** | | **+10%** | **+20%** | **+30%** |
| Common stock investments in public companies | $2,151 | $2,458 | $2,765 | $3,073 (1) | $3,380 | $3,687 | $3,995 |

(1) Excludes 16 million shares of Time Warner common stock. See discussion below in "Derivatives and Related Trading Securities."

During the last 12 quarters preceding Sept. 28, 2008, market price movements have caused the fair value of the Company's common stock investments in publicly traded companies that are classified as available-for-sale to change by 10% or more in five of the quarters, by 20% or more in five of the quarters and by 30% or more in two of the quarters.

**Derivatives and Related Trading Securities**—The Company issued 8 million PHONES in April 1999 indexed to the value of its investment in 16 million shares of Time Warner common stock. Since the second quarter of 1999, this investment in Time Warner has been classified as a trading security, and changes in its fair value, net of the changes in the fair value of the PHONES, have been recorded in the statement of operations. On Sept. 26, 2008, 20 PHONES were exchanged, at the election of the holders of those PHONES, for cash based on 95% of the market value of two shares of Time Warner common stock in accordance with the terms of the PHONES.

trbform10q3q2008.htm

At maturity, the PHONES will be redeemed at the greater of the then market value of two shares of Time Warner common stock or the principal value of the PHONES ($155.64 per PHONES at Sept. 28, 2008). At Sept. 28, 2008, the PHONES carrying value was $280 million. Since the issuance of the PHONES in April 1999, changes in the fair value of the PHONES have partially offset changes in the fair value of the related Time Warner shares. There have been and may continue to be periods with significant non-cash increases or decreases to the Company's net income pertaining to the PHONES and the related Time Warner shares.

The following analysis presents the hypothetical change in the fair value of the Company's 16 million shares of Time Warner common stock related to the PHONES, assuming hypothetical stock price fluctuations of plus or minus 10%, 20% and 30% in the stock's price.

| (in thousands) | Valuation of Investment Assuming Indicated Decrease in Stock's Price | | | Sept. 28, 2008 Fair Value | Valuation of Investment Assuming Indicated Increase in Stock's Price | | |
|---|---|---|---|---|---|---|---|
| | -30% | -20% | -10% | | +10% | +20% | +30% |
| Time Warner common stock | $159,152 | $181,888 | $204,624 | $227,360 | $250,096 | $272,832 | $295,568 |

During the last 12 quarters preceding Sept. 28, 2008, market price movements have caused the fair value of the Company's 16 million shares of Time Warner common stock to change by 10% or more in three of the quarters, by 20% or more in one of the quarters and by 30% or more in none of the quarters.

## ITEM 4. CONTROLS AND PROCEDURES.

### Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures

Under the supervision and with the participation of the Company's management, including its principal executive officer and principal financial officer, the Company conducted an evaluation of its disclosure controls and procedures, as such term is defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as of Sept. 28, 2008. Based upon that evaluation, the principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures are effective.

### Changes in Internal Control Over Financial Reporting

There has been no change in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended Sept. 28, 2008 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

## PART II. OTHER INFORMATION

## ITEM 1. LEGAL PROCEEDINGS.

Tribune Company and its subsidiaries are defendants from time to time in actions for matters arising out of their business operations. In addition, Tribune Company and its subsidiaries are involved from time to time as parties in various regulatory, environmental and other proceedings with governmental authorities and administrative agencies.

*Newsday* and *Hoy,* New York Circulation Misstatements—In February 2004, a purported class action lawsuit was filed in New York federal court by certain advertisers of *Newsday* and an affiliate publication, *Hoy,* New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications. The purported class action also alleges that entities that paid a *Newsday* subsidiary to deliver advertising flyers were overcharged. The Company is vigorously defending this suit. In July 2004, another lawsuit was filed in New York federal court by certain advertisers of *Newsday* alleging damages resulting from inflated *Newsday* circulation numbers as well as federal and state antitrust violations. On Feb. 11, 2008, this suit was settled with all remaining plaintiffs.

In addition to the advertiser lawsuits, several class action and shareholder derivative suits were filed against the Company and certain of its current and

trbform10q3q2008.htm

former directors and officers as a result of the circulation misstatements at *Newsday* and *Hoy*, New York. These suits alleged breaches of fiduciary duties and other managerial and director failings under Delaware law, the federal securities laws and the Employee Retirement Income Security Act ("ERISA"). The consolidated shareholder derivative suit filed in Illinois state court in Chicago was dismissed with prejudice on March 10, 2006. The appeal of this dismissal to the Illinois State Court of Appeals was voluntarily dismissed by the plaintiff following the closing of the Company's going private transaction. The consolidated securities class action lawsuit and the consolidated ERISA class action lawsuit filed in Federal District Court in Chicago were both dismissed with prejudice on Sept. 29, 2006. The dismissals were appealed to the United States Court of Appeals for the Seventh Circuit. On April 2, 2008, the Seventh Circuit issued an opinion affirming the dismissal of both the securities class action lawsuit and the ERISA class action lawsuit. Plaintiffs in the securities class action lawsuit have filed a petition for a rehearing en banc by the Seventh Circuit, which is currently pending. The Company continues to believe these suits are without merit and will continue to vigorously defend them.

**PHONES Indenture**—The Company received a letter dated April 9, 2007, (1) stating that it was written on behalf of two hedge funds purporting to hold approximately 37% of the Company's 8,000,000 PHONES Exchangeable Subordinated Debentures due 2029 (the "PHONES"), (2) purporting to give a "notice of default" that the Company has violated the "maintenance of properties" covenant in the indenture under which the PHONES were issued (the "PHONES Indenture") and (3) informing the Company that failure to remedy such purported violation within 60 days of notice will result in an "event of default" under the PHONES Indenture (which could, if properly declared, result in an acceleration of principal and interest payable with respect to the PHONES). On April 27, 2007, the Company received a letter from the law firm purporting to represent the two hedge funds stating that the law firm also purported to represent a third hedge fund, which, together with the first two hedge funds, purported to hold 55% of the Company's PHONES and reiterating the claims set forth in the April 9, 2007 letter.

The particular covenant in question, Section 10.05 of the PHONES Indenture, requires the Company to "cause all properties used or useful in the conduct of its business or the business of any Subsidiary to be maintained and kept in good condition, repair and working order (normal wear and tear excepted) and supplied with all necessary equipment... all as in the judgment of the Company may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times...." Section 10.05 of the PHONES Indenture expressly provides that the covenant does not "prevent the Company from discontinuing the operation and maintenance of any such properties, or disposing of any of them, if such discontinuance or disposal is, in the judgment of the Company or of the Subsidiary concerned, desirable in the

conduct of its business or the business of any Subsidiary and not disadvantageous in any material respect to the Holders [of the PHONES]." The letters suggest that the Company's recent sales of three television stations, announced intention to dispose of an interest in the Chicago Cubs baseball team and recent and proposed issuances of debt and return of capital to stockholders violated or will violate this maintenance of properties covenant.

On May 2, 2007, the Company sent a letter to the law firm purporting to represent the hedge funds rejecting their purported "notice of default" as defective and invalid because the Company was not in default of Section 10.05, the entities the law firm purported to represent were not "Holders" as defined in the PHONES Indenture, and because the law firm had provided no evidence that it was an agent duly appointed in writing as contemplated by Section 1.04 of the PHONES Indenture. The law firm sent a letter to the Company on May 8, 2007 responding to the Company's May 2, 2007 letter, reiterating its claim that the Company was in default of Section 10.05 and stating that it had properly noticed a default pursuant to Section 5.01(4) of the Indenture. The Company further responded by letter dated May 18, 2007 reaffirming its rejection of the purported "notice of default" and reiterating its position that the Company was not in default of Section 10.05 and that the entities the law firm purported to represent were not entitled to provide a notice of default under Section 5.01(4) of the PHONES Indenture.

On July 23, 2007, the Company received a letter from the law firm purporting to represent the hedge funds, purported to hold 70% of the Company's PHONES, stating that the Company has breached Section 10.05 of the PHONES Indenture, such breach was continuing on the date of such letter, which was more than 60 days after the purported "notice of default" had been given, and that pursuant to Section 5.01(4) of the Indenture, an "event of default" under the PHONES Indenture had occurred and was continuing. The July 23, 2007 letter further stated that the hedge funds were declaring the outstanding principal of $157 per share of all of the outstanding PHONES, together with all accrued but unpaid interest thereon to be due and payable immediately, and were demanding immediate payment of all such amounts. On July 27, 2007, the Company sent a letter to the trustee under the PHONES Indenture and the law firm purporting to represent the three hedge funds rejecting the allegations made in such law firm's July 23, 2007 letter and reiterating the Company's position that the Company is not in default of Section 10.05 and that such hedge funds are not entitled under the PHONES Indenture to provide the purported notice of default.

On Aug. 10, 2007, the law firm purporting to represent the three hedge fund holders sent a letter to the trustee under the PHONES Indenture stating that the PHONES holders intended to institute proceedings to confirm the alleged covenant default and acceleration notice. On Sept. 17, 2007, the Company received copies of default notices from Cede & Co., the record holder of the PHONES, on behalf of the three hedge fund holders. These purported notices of default indicate that they were issued at the request of each of the hedge funds by Cede & Co., the holder of record for the notes beneficially owned by each of the hedge funds. The letter stated that Tribune was required to remedy the purported default within 60 days of the date of the letter and that failure to do so would constitute an "Event of Default" under the PHONES Indenture. On Dec. 26, 2007, the Company received copies of notices of acceleration from Cede & Co., purportedly on behalf of the three hedge fund holders. These purported notices of acceleration indicate that they were issued at the request of each of the hedge funds by Cede & Co., the holder of record for the notes beneficially owned by each of the hedge funds. To date, the trustee under the PHONES Indenture has not initiated any action on behalf of the PHONES holders. On Jan. 9, 2008, the Company sent a letter to the trustee under the PHONES Indenture and the law firm purporting to represent the three hedge funds rejecting the purported notices of acceleration for the reasons previously set forth in the Company's July 27, 2007 letter.

http://sec.gov/Archives/edgar/data/726513/000072651308000040/trbform10q3q2008.htm[5/18/2010 10:10:20 PM]

trbform10q3q2008.htm

The Company continues to believe that the hedge funds' claims are without merit and that the Company remains in full compliance with Section 10.05 of the PHONES Indenture. The Company will enforce and defend vigorously its rights under the PHONES Indenture.

**Other Matters**—In September 2008, a lawsuit was filed in the United States District Court for the Central District of California by one current and five former employees of the *Los Angeles Times*. The lawsuit names as defendants a former and certain current directors of the Company, the trustee of the Tribune Employee

61

Stock Ownership Plan (the "ESOP"), the Tribune Employee Benefits Committee, EGI-TRB, L.L.C., and, nominally, the ESOP. The lawsuit alleges breaches by defendants of duties and obligations under the Employer Retirement Income Security Act of 1974 and state law. The lawsuit seeks relief, including damages, for the benefit of the ESOP. The Company and other defendants believe that this lawsuit is without merit and intend to defend the lawsuit vigorously.

In addition, the information contained in Note 3 and Note 13 to the unaudited condensed consolidated financial statements in Part I, Item 1, hereof is incorporated herein by reference.

## ITEM 1A.  RISK FACTORS.

The following risk factor should be read in conjunction with the Company's risk factors as disclosed in Item 1A, "Risk Factors", in the Company's Annual Report on Form 10-K for the fiscal year ended Dec. 30, 2007.

**Continuing Adverse Economic, Financial and Industry Conditions Could Affect Our Ability to Maintain Compliance With Financial Covenants In Our Credit Facilities or to Access the Credit Markets.**

Certain financial covenants in our Credit Agreement and our receivables loan agreement entered into in connection with the trade receivables securitization facility require us to comply, on a quarterly basis, with a maximum permitted "Total Guaranteed Leverage Ratio" and a minimum permitted "Interest Coverage Ratio" (each as defined in the Credit Agreement). Both of these financial covenant ratios are measured on a rolling four-quarter basis and become more restrictive on an annual basis. For each of the four fiscal quarters of our 2008 fiscal year, the Credit Agreement covenants require a maximum Total Guaranteed Leverage Ratio of 9.00 to 1.00 and a minimum Interest Coverage Ratio of 1.15 to 1.00. For each of the four fiscal quarters of our 2009 fiscal year, the maximum Total Guaranteed Leverage Ratio required by the covenants will be reduced to 8.75 to 1.00 and the minimum Interest Coverage Ratio will be increased to 1.20 to 1.00.

For the four fiscal quarters ended Sept. 28, 2008, we were in compliance with both the Total Guaranteed Leverage Ratio and Interest Coverage Ratio financial covenants. Our ability to maintain compliance with these financial covenants is dependent, however, on various factors, certain of which are outside of our control. Such factors include our ability to generate sufficient revenues and earnings from our operations, our ability to achieve reductions in our outstanding indebtedness, changes in interest rates and the impact on our earnings, cash flow or indebtedness from sale, purchase, joint venture or similar transactions involving our assets, investments and liabilities.

Given the disruptions in the credit and financial markets in recent months, and the continuing impact of adverse economic, financial and industry conditions on the demand for advertising, uncertainty exists as to whether we will be able to generate results from operations or consummate transactions sufficient to enable us to remain in compliance with our financial covenants for the four quarters ending Dec. 28, 2008 or subsequent periods.

The disruptions in the credit and financial markets have also limited access to capital and credit for many companies. We rely on a number of financial institutions and the credit and financial markets to meet our financial commitments and short-term liquidity needs if internal funds are not available, and to execute transactions. Continuing instability or disruptions of these markets could prohibit or make it more difficult for us to access new capital, significantly increase the cost of capital or limit our ability to refinance existing indebtedness or effect transactions.

62

## ITEM 6.  EXHIBITS.

(a) Exhibits.

Exhibits marked with an asterisk (*) are incorporated by reference to the documents previously filed by Tribune Company with the Securities and Exchange Commission, as indicated. All other documents are filed with this Report.

trbform10q3q2008.htm

| 31.1 | Rule 13a-14 Certification of Chief Executive Officer |
| 31.2 | Rule 13a-14 Certification of Chief Financial Officer |
| 32.1 | Section 1350 Certification of Chief Executive Officer |
| 32.2 | Section 1350 Certification of Chief Financial Officer |

63

# SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

TRIBUNE COMPANY
(Registrant)

Date:  November 10, 2008

By: /s/ Brian Litman
Brian Litman
Vice President and Controller
(on behalf of the registrant
and as Chief Accounting Officer)

64

exhibit31zell.htm

EX-31.1 2 exhibit31zell.htm FORM 10-Q CERTIFICATION - SAMUEL ZELL

**EXHIBIT 31.1**

## FORM 10-Q CERTIFICATION

I, Samuel Zell, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Tribune Company;

2.  Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.  Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present, in all material respects, the financial condition, results of operations and cash flows of Tribune Company as of, and for, the periods presented in this quarterly report;

4.  Tribune Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Tribune Company and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Tribune Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of Tribune Company's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

    d)  Disclosed in this quarterly report any change in Tribune Company's internal control over financial reporting that occurred during Tribune Company's most recent fiscal quarter (Tribune Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, Tribune Company's internal control over financial reporting; and

5.  Tribune Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Tribune Company's auditors and the audit committee of Tribune Company's board of directors:

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Tribune Company's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in Tribune Company's internal control over financial reporting.

Date: November 10, 2008

By: /s/ Samuel Zell
_____
Samuel Zell
Chairman, President and
Chief Executive Officer

exhibit31bigelow.htm

EX-31.2 3 exhibit31bigelow.htm FORM 10-Q CERTIFICATION - CHANDLER BIGELOW

**EXHIBIT 31.2**

**FORM 10-Q CERTIFICATION**

I, Chandler Bigelow, certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Tribune Company;

2.    Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.    Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present, in all material respects, the financial condition, results of operations and cash flows of Tribune Company as of, and for, the periods presented in this quarterly report;

4.    Tribune Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Tribune Company and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Tribune Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of Tribune Company's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

   d) Disclosed in this quarterly report any change in Tribune Company's internal control over financial reporting that occurred during Tribune Company's most recent fiscal quarter (Tribune Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, Tribune Company's internal control over financial reporting; and

5.    Tribune Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Tribune Company's auditors and the audit committee of Tribune Company's board of directors:

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Tribune Company's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in Tribune Company's internal control over financial reporting.

Date:  November 10, 2008                                    By: /s/ Chandler Bigelow
                                                              Chandler Bigelow
                                                              Senior Vice President and
                                                              Chief Financial Officer

exhibit32zell.htm

EX-32.1 4 exhibit32zell.htm FORM 10-Q SARBANES-OXLEY - SAMUEL ZELL

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO**
**18 UNITED STATES CODE SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Samuel Zell, the Chairman, President and Chief Executive Officer of Tribune Company, certify that (i) Tribune Company's Form 10-Q for the quarter ended Sept. 28, 2008 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Form 10-Q for the quarter ended Sept. 28, 2008 fairly presents, in all material respects, the financial condition and the results of operations of Tribune Company.

By: /s/ Samuel Zell
     Samuel Zell
     Chairman, President and
     Chief Executive Officer

     November 10, 2008

exhibit32bigelow.htm

EX-32.2 5 exhibit32bigelow.htm FORM 10-Q SARBANES-OXLEY - CHANDLER BIGELOW

**EXHIBIT 32.2**

**CERTIFICATION PURSUANT TO
18 UNITED STATES CODE SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Chandler Bigelow, the Senior Vice President and Chief Financial Officer of Tribune Company, certify that (i) Tribune Company's Form 10-Q for the quarter ended Sept. 28, 2008 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Form 10-Q for the quarter ended Sept. 28, 2008 fairly presents, in all material respects, the financial condition and the results of operations of Tribune Company.

By: /s/ Chandler Bigelow
Chandler Bigelow
Senior Vice President and
Chief Financial Officer

November 10, 2008