| Class | Estimated Claim Amounts[61] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[66] | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[67] | 0.0% - 8.0% | 100.0% | 100.0% | 0.0 % - 8.0% |
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% |
| PHONES Notes Claims (Class 1I). | $703 million | 0.0% | 100.0% | 0.0% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $56 million | 0.0% | 100.0% | 0.0% | 0.0% |
| Tribune Interests (Class 1L). | N/A | N/A | N/A | N/A | N/A |
| Interests in Non-Guarantor Debtors (Classes 2L-49L). | N/A | N/A | N/A | N/A | N/A |
| Interests in Guarantor Debtors (Classes 50L-111L). | N/A | N/A | N/A | N/A | N/A |

---

[66] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/LBO Lender Plan for the General Unsecured Claims (as defined in the Debtor/LBO Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[67] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/LBO Lender Plan for the General Unsecured Claims (as defined in the Debtor/LBO Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

*Chart 2 – Assumptions: (i) Step Two Lenders share in all Step One Lender recoveries even if Step Two Lender Claims are avoided; and (ii) PHONES Notes Claims are Allowed in the amount of $1.197 billion.*

The following chart depicts estimated recoveries for each Class of Claims and Interests in a liquidation scenario using the Chart 2 – Assumptions. The Initial Distribution to all Classes in the aggregate is $514 million or 13.6% of the Liquidation Value using these assumptions.

| Class | Estimated Claim Amounts[68] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 5.3% | 5.3% or 6.3%[69] | 32.1% | 42.3% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 5.3% | 5.3% or 6.3%[70] | 32.1% | 42.3% |
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 5.3% or 0.0%[71] | 0.0% | 2.7% |
| Senior Noteholder Claims (Class 1F). | $1.283 billion | 2.7% | 100.0% | 63.7% | 2.7% |

[68] For the hypothetical purpose of making Initial Distributions under a liquidation scenario, the Step One Senior Loan Claims and Step Two Senior Loan Claims would be provisionally Allowed in the amounts listed above.

[69] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[70] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[71] The higher percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The lower percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

| Class | Estimated Claim Amounts[68] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|
| Other Parent Claims (Class 1G).[72] | $154 million | 2.4% | 100.0% | 33.6% | 2.4% |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[73] | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[74] | 0.0% - 8.0% | 100.0% | 100.0% | 0.0% - 8.0% |
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% |
| PHONES Notes Claims (Class 1I). | $1.197 billion | 0.0% | 100.0% | 0.0% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $0 million | NA | NA | NA | NA |
| Tribune Interests (Class 1L). | N/A | NA | NA | NA | NA |
| Interests in Non-Guarantor Debtors (Classes 2L-49L). | N/A | NA | NA | NA | NA |
| Interests in Guarantor Debtors (Classes 50L-111L). | N/A | NA | NA | NA | NA |

[72] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/LBO Lender Plan.

[73] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/LBO Lender Plan for the General Unsecured Claims (as defined in the Debtor/LBO Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[74] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/LBO Lender Plan for the General Unsecured Claims (as defined in the Debtor/LBO Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

*Chart 3– Assumptions: (i) Step Two Lenders do not share in Step One Lender recoveries if Step Two Lender Claims are avoided; (ii) PHONES Notes Claims are Allowed in the amount of $703 million; and (iii) PHONES Notes Exchange Claims are classified as Subordinated Securities Claims and Allowed in the amount of $56 million,*

The following chart depicts estimated recoveries for each Class of Claims and Interests in a liquidation scenario using the Chart 3 – Assumptions. The Initial Distribution to all Classes in the aggregate is $706 million or 18.7% of the Liquidation Value using these assumptions.

| Class | Estimated Claim Amounts[75] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 9.9% | 9.9% or 11.8%[76] | 42.3% | 42.3% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 0.0% | 9.9% or 11.8%[77] | 0.0% | 42.3% |
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 9.9% or 0.0%[78] | 0.0% | 2.7% |

---

[75] For the hypothetical purpose of making Initial Distributions under a liquidation scenario, the Step One Senior Loan Claims and Step Two Senior Loan Claims would be provisionally Allowed in the amounts listed above.

[76] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[77] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[78] The higher percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The lower percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

| Class | Estimated Claim Amounts[75] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|
| Senior Noteholder Claims (Class 1F). | $1.283 billion | 2.7% | 100.0% | 62.8% | 2.7% |
| Other Parent Claims (Class 1G). | $154 million[79] | 2.5% | 100.0% | 41.0% | 2.5% |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[80] | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[81] | 0.0% - 8.0% | 100.0% | 100.0% | 0.0% - 8.0% |
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% |
| PHONES Notes Claims (Class 1I). | $703 million | 0.0% | 100.0% | 0.0% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $56 million | 0.0% | 100.0% | 0.0% | 0.0% |
| Tribune Interests (Class 1L). | N/A | N/A | N/A | N/A | N/A |
| Interests in Non-Guarantor Debtors (Classes 2L-49L). | N/A | N/A | N/A | N/A | N/A |

[79] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/LBO Lender Plan.

[80] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/LBO Lender Plan for the General Unsecured Claims (as defined in the Debtor/LBO Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[81] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/LBO Lender Plan for the General Unsecured Claims (as defined in the Debtor/LBO Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

| Class | Estimated Claim Amounts[75] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|
| Interests in Guarantor Debtors (Classes 50L-111L). | N/A | N/A | N/A | N/A | N/A |

*Chart 4– Assumptions: (i) Step Two Lenders do not share in Step One Lender recoveries if Step Two Lender Claims are avoided; and (ii) PHONES Notes Claims are Allowed in the amount of $1.197 billion.*

The following chart depicts estimated recoveries for each Class of Claims and Interests in a liquidation scenario using the Chart 4 – Assumptions. The Initial Distribution to all Classes in the aggregate is $402 million or 10.6% of the Liquidation Value using these assumptions.

| Class | Estimated Claim Amounts[82] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 5.3% | 5.3% or 6.3%[83] | 42.3% | 42.3% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 0.0% | 5.3% or 6.3%[84] | 0.0% | 42.3% |
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 5.3% or 0.0%[85] | 0.0% | 2.7% |
| Senior Noteholder Claims (Class 1F). | $1.283 billion | 2.7% | 100.0% | 63.7% | 2.7% |

---

[82] For the hypothetical purpose of making Initial Distributions under a liquidation scenario, the Step One Senior Loan Claims and Step Two Senior Loan Claims would be provisionally Allowed in the amounts listed above.

[83] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The higher percentage recovery is based on the outcome where all LBO-Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[84] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The higher percentage recovery is based on the outcome where all LBO-Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[85] The higher percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO Debt is avoided. The lower percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

| Class | Estimated Claim Amounts[82] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|
| Other Parent Claims (Class 1G).[86] | $154 million | 2.4% | 100.0% | 33.6% | 2.4% |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[87] | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[88] | 0.0% - 8.0% | 100.0% | 100.0% | 0.0% - 8.0% |
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% |
| PHONES Notes Claims (Class 1I). | $1.197 billion | 0.0% | 100.0% | 0.0% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $0 million | NA | NA | NA | NA |
| Tribune Interests (Class 1L). | N/A | NA | NA | NA | NA |
| Interests in Non-Guarantor Debtors (Classes 2L-49L). | N/A | NA | NA | NA | NA |
| Interests in Guarantor Debtors (Classes 50L-111L). | N/A | NA | NA | NA | NA |

---

[86] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/LBO Lender Plan.

[87] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/LBO Lender Plan for the General Unsecured Claims (as defined in the Debtor/LBO Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[88] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/LBO Lender Plan for the General Unsecured Claims (as defined in the Debtor/LBO Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

# V.

## CLASSES ENTITLED TO VOTE ON THE PRE-LBO DEBTHOLDER PLAN

The following chart describes whether each Class of Claims and Interests is entitled to vote to accept or reject the Pre-LBO Debtholder Plan.  For a complete description of voting procedures and deadlines, please see section IX of the General Disclosure Statement.

| Class | Impaired/Unimpaired | Entitled to Vote |
|---|---|---|
| Priority Non-Tax Claims[89] | Unimpaired | No |
| Other Secured Claims[90] | Unimpaired | No |
| Step One Senior Loan Claims | Impaired | Yes |
| Step One Senior Loan Guaranty Claims | Impaired | Yes |
| Step Two Senior Loan Claims | Impaired | Yes |
| Step Two Senior Loan Guaranty Claims | Impaired | Yes |
| Bridge Loan Claims | Impaired | Yes |
| Bridge Loan Guaranty Claims | Impaired | Yes |
| Senior Noteholder Claims | Impaired | Yes |
| PHONES Notes Claims | Impaired | Yes |
| EGI-TRB LLC Notes Claims | Impaired | Yes |
| Other Parent Claims | Impaired | Yes |
| Other Guarantor Debtor Claims | Impaired | Yes |
| Other Non-Guarantor Debtor Claims | Unimpaired | No |
| Intercompany Claims | Impaired | No |
| Subordinated Securities Claims | Impaired | Yes |
| Tribune Interests | Impaired | No |
| Interests in Guarantor Debtors | Unimpaired | No |
| Interests in Non-Guarantor Debtors | Unimpaired | No |

---

[89] Treatment applies to such Class at all Debtor entities.
[90] Treatment applies to such Class at all Debtor entities.

# VI.

## CERTAIN FACTORS AFFECTING THE PRE-LBO DEBTHOLDER PLAN

**A.     Certain Risk Factors Specific to the Pre-LBO Debtholder Plan**

1.     Length of Litigation

The Litigation Trust Causes of Action and State Law Avoidance Claims are complex and fact intensive in nature. As of the date hereof, none of the Trust Causes of Action have been commenced. It is difficult to estimate the length of time it will take to settle or reach a judgment regarding the Trust Causes of Action and, therefore, difficult to estimate how long it will be before Holders of Trust Interests will receive recoveries on account of the Trust Causes of Action.

2.     Impact of Timing on Value of New Common Stock/New Warrants

The length of litigation of the Litigation Trust Causes of Action may have a negative impact on the value of New Common Stock and New Warrants eventually distributed to Creditors based on the Litigation Trust Distribution Orders. Due to the need for a resolution regarding the Senior Loan Claim Sharing Resolution and PHONES Notes Claim Resolution prior to making distributions to certain Classes on account of both their Litigation Trust Interests and Creditors' Trust Interests and, further, due to the need for a resolution on certain of the Litigation Trust Causes of Action to determine which parties are entitled to receive the DEV in the Distribution Trust Reserve, the value of the New Common Stock portion of the DEV may increase or decrease if the equity value of Tribune increases or decreases over the course of such time. Accordingly, it cannot be guaranteed that the DEV held in the Distribution Trust Reserves will not decrease between the time of Confirmation and ultimate distributions to Creditors from the Distribution Trust Reserves and, therefore, Creditors might receive New Common Stock and/or New Warrants that have lower values than they had on the Confirmation Date.

3.     Outcome of Litigation Trust Causes of Action and State Law Avoidance Claims

Although the Proponents believe, based on their own review of the Litigation Trust Causes of Action and the State Law Avoidance Claims, and also based upon the Examiner's Report filed in the Chapter 11 Cases, that the Litigation Trust Causes of Action and State Law Avoidance Actions will be successful and yield substantial additional recoveries for non-LBO Lender Creditors and, potentially, even the LBO Lenders, the assumed outcomes are speculative in nature and cannot be guaranteed. Even in light of a positive result, it is impossible to determine the amount of additional recovery Holders of Trust Interests would receive on account of a settlement or judgment regarding the Litigation Trust Causes of Action and the State Law Avoidance Claims.

4.     Determination of Senior Loan Claim Sharing Resolution

The Initial Distribution to Step Two Lenders is dependent upon the Senior Loan Claim Sharing Resolution resulting in an outcome that is favorable to the Step Two Lenders. It is unknown at this time whether the Bankruptcy Court will determine the Senior Loan Claim

Sharing Resolution in connection with Confirmation or at any time prior to the Effective Date of the Pre-LBO Debtholder Plan. It is also possible that the Senior Loan Claim Sharing Resolution will not be determined until a final determination regarding all LBO Related Causes of Action is reached. Accordingly, as of the date hereof, it cannot be certain that Step Two Lenders will receive an Initial Distribution on or within a reasonable time after the Initial Distribution Date. In fact, it is unknown whether Step Two Lenders will receive any distributions at all under the Pre-LBO Debtholder Plan.

Furthermore, ultimate recovery to Step One Lenders will be heavily affected by the Senior Loan Claim Sharing Resolution and the LBO-Related Causes of Action. Specifically, in the event that Step One Lender Claims are not avoided and sharing is found to apply even if Step Two Lenders Claims are avoided, the Step One Lenders will receive a significantly lower percentage of recovery due to the requirement to share all recoveries ratably with the Step Two Lenders. Conversely, if Step One Lender Claims are not avoided and the Step Two Lender Claims are avoided and sharing is found not to apply, Step One Lenders will receive a greater overall recovery not only on account of their Initial Distribution but, potentially, also on account of their Trust Interests.

### 5.    Determination of PHONES Notes Claims Resolution

As described in further detail above, prior to the Petition Date, certain Holders of PHONES Notes sought to exercise the right to redeem their PHONES Notes, as provided for in the PHONES Notes Indenture. The ultimate outcome of the PHONES Notes Claim Resolution is unknown at this time and, therefore, it cannot be determined whether Holders of PHONES Notes Exchange Claims will have such Claims treated as PHONES Notes Claims, which would be entitled to receive distributions along with Class 1I or, whether they would qualify as Subordinated Securities Claims and, thus, be classified in Class 1K, which may not be entitled to receive any distributions until a later time, if ever.

Furthermore, the Pro Rata share of Initial Distributions allocable to the PHONES Notes Claims Class will change based on the ultimate treatment of the PHONES Notes Exchange Claims – *i.e.*, if such Claims are treated as Subordinated Securities Claims, the aggregate pool of PHONES Notes Claims will be reduced by approximately $494 million to $703 million if the PHONES Notes Exchange Claims are treated as if the exchanged PHONES Notes were deemed not to be exchanged as a result of the Debtors' failure to make payments on account of such exchanged PHONES Notes. The ultimate treatment of the PHONES Notes Exchange Claims may increase or decrease the DEV allocable to other Classes that are being treated *pari passu* with the PHONES Notes Claims for purposes of allocating Initial Distributions as well as the Classes of Claim entitled o the benefit of the subordination provisions in the PHONES Notes Indenture.

### 6.    Assumptions Regarding DEV and Allocation of DEV

All estimated recoveries set forth herein rely on the Debtors' valuation and are used for illustrative purposes only. The Pre-LBO Debtholder Plan and Pre-LBO Debtholder Specific Disclosure Statement assume for illustrative purposes a $6.750 billion DEV with, such DEV allocated (again, for illustrative purposes only) 8.4% (or $564 million) to Tribune and 91.6% (or

$6.186 billion) to the Subsidiaries (on a consolidated basis).  The Proponents reserve their respective rights to assert that the DEV and the allocation of the DEV among Tribune and the Subsidiaries may be different than that set forth in the Debtor/LBO Lender Plan.  At Confirmation, the Bankruptcy Court may determine that either a higher or lower value should be used for purposes of DEV.  Furthermore, the Bankruptcy Court may determine that the allocation of DEV among Tribune and the Subsidiaries is different than that stated in the Debtors' valuation.  To the extent that the Bankruptcy Court concludes that the DEV is higher or lower and/or that the allocation of DEV should be different, the recoveries to Creditors might be materially different than set forth herein.

7.    Claims Purchase Price Caps

The Cash amounts paid pursuant to the Other Parent Claims Put Option and the Other Guarantor Debtor Claims Put Option are capped at an aggregate amount of $45.00 million, consisting of the Other Parent Claims Purchase Price Cap of $24.25 million and the Other Guarantor Debtor Claims Purchase Price Cap of $20.75 million.  Based on the Debtors' estimates of Allowed Other Parent Claims and Allowed Other Guarantor Claims, the Proponents believe that the Claims Purchase Price Caps will be sufficient to pay the Claims Purchase Price for all Other Parent Claims and Other Guarantor Debtor Claims electing the Put Option; however, until the Voting Deadline and a review of all Pre-LBO Debtholder Ballots is conducted, it is not possible for the Proponents to ensure that the Claims Purchase Price Cap will be sufficient to pay for all Put Claims.  Accordingly, there is a risk that despite making the Other Parent Put Claim Election or Other Guarantor Debtor Put Claim Election on the applicable Pre-LBO Debtholder Ballot, such Holder's Claim may not be purchased in full and such Holder may, instead, receive the applicable portion of the Claims Purchase Price (i.e., in the Cash of Other Parent Claims, 15% and in the Case of Other Guarantor Debtor Claims, 25%) for only a portion of its Other Parent Put Claim or Other Guarantor Debtor Put Claim, as applicable, and my receive Initial Distributions, Distribution Trust Interests and, in the Case of the Other Parent Claims, Creditors' Trust Interests, for the remaining portion of such Claim.

8.    FCC Related Considerations and Risks Respecting the Debtors' Businesses

The Debtors operate television broadcast stations, a radio station, and certain associated facilities under authority granted by the FCC.  Under Section 310(d) of the Communications Act, the consent of the FCC is required for the assignment of FCC licenses or for the transfer of control of an entity that holds or controls FCC licenses.  Except in the case of "involuntary" assignments, prior consent of the FCC is required before an assignment of FCC licenses or a transfer of control of FCC licensees may be consummated.  For additional information concerning FCC-related considerations and risks, see section XII of the General Disclosure Statement "General Risk Factors."

a)    *FCC Processing of Applications for Consent to Emerge from Bankruptcy*

On April 28, 2010, the Debtors filed the FCC Applications by which the Debtors sought the consent of the FCC for each of the Debtors holding FCC licenses to assign its FCC licenses to the Reorganized Debtors.  The FCC Applications included requests for waivers of the FCC's newspaper/broadcast cross-ownership rule and local television multiple ownership or "duopoly" rule, including a "failing station" waiver and continued "satellite" exemption.  The Debtors filed

16 applications for consent to assignment of broadcast station licenses, together with applications seeking consent to assign satellite earth station, private land mobile, private fixed microwave, and other categories of FCC licenses held by the Debtors. Tribune provided local public notice of the filing of the FCC Applications through broadcast announcements and notices in local newspapers servicing their broadcast markets.

On May 13, 2010, the FCC's Media Bureau issued a public notice announcing that the FCC has accepted all of the FCC Applications for filing upon initial review. Although the FCC has accepted and is currently processing the FCC Applications, the Pre-LBO Debtholder Plan Proponents anticipate that the FCC will not grant the FCC Applications until the Bankruptcy Court has confirmed the Pre-LBO Debtholder Plan and authorized the transactions proposed in the Pre-LBO Debtholder Plan.

The FCC's public notice of May 13, 2010 set a deadline of June 14, 2010 for interested persons to file petitions to deny the FCC Applications. On that date, a coalition of Washington, D.C.-based public advocacy groups (the "Washington Public Advocacy Groups); the International Brotherhood of Teamsters ("IBT"); Wilmington Trust; and Neil Ellis, a competing newspaper publisher in the Hartford market ("Neil Ellis") filed petitions to deny the FCC Applications (collectively, the "Petitions to Deny").

On June 29, 2010, Tribune and JPMorgan filed oppositions to the Petitions to Deny. On July 12, 2010, Washington Public Advocacy Groups, IBT, Wilmington Trust, and Neil Ellis filed replies to the oppositions of Tribune and JPMorgan.

Wilmington Trust will be withdrawing its petition to deny, reply and related submissions to the FCC.

The Debtors have amended the FCC Applications on several occasions, and the Proponents anticipate that further amendments will be necessary to reflect the filing of the Pre-LBO Debtholder Plan and the Pre-LBO Debtholder Specific Disclosure Statement. Although the formal pleading cycle in the FCC proceeding has closed, additional filings may be submitted so long as they are made part of the public record in the proceeding, and the FCC may request additional comment.

The FCC is reviewing the FCC Applications and all filings made by parties to the proceeding. In addition to the consideration of any waiver requests, the FCC's review of the FCC Applications will focus on whether the existing media interests (broadcast and daily newspaper holdings) of the parties to the FCC Applications, when combined with other media interests held by parties to the FCC Applications, comply with the FCC's broadcast multiple ownership rules. The FCC also will consider compliance with limitations on foreign ownership, the parties' other legal qualifications, their prior records before the FCC, and certain categories of prior adverse determinations against parties to the FCC Applications by courts and other administrative bodies. In some instances, the FCC may request that the applicants supply additional information through amendments to an application. There is no time limit on the FCC's consideration of assignment applications. The FCC has a stated goal of processing all such applications within 180 days, although processing often exceeds this time frame when petitions to deny or objections are filed.

In this case, the consummation of the Pre-LBO Debtholder Plan will not occur until the FCC has granted the FCC Applications and issued the necessary consents to implement the Pre-LBO Debtholder Plan as confirmed by the Bankruptcy Court. If the grant is made by the FCC *en banc,* parties may file petitions for reconsideration with the agency or an appeal with the D.C. Circuit within a period of 30 days of issuance of the decision. If the grant is made by the FCC's staff under delegated authority, an interested party may request that the staff reconsider its decision or the FCC review the grant *en banc* within 30 days of issuance of the decision, and the FCC may reconsider the action on its own initiative for a period of 40 days following issuance of the decision. It is highly unusual for the FCC to rescind grant of consent to an assignment or transfer upon reconsideration or review. Parties are entitled to close upon the grant of FCC consent even if petitions for reconsideration, applications for review, or judicial appeals are filed and remain pending, but any such consummation is subject to any further order that the FCC or a court might issue.

### b) *Inability to Obtain FCC Approval and Media Ownership Waivers Would Adversely Affect Ability to Consummate the Pre-LBO Debtholder Plan*

In the FCC Applications, the Debtors are seeking waivers of several of the FCC's broadcast ownership rules. Grant of these waiver requests will be necessary in order to allow the assignment of combinations of media properties currently held by the Debtors in six markets in which the combinations currently operate under waivers of the FCC ownership rules. Absent continued waivers from the FCC, Reorganized Tribune will not be able to own and operate these combinations.

As a result of a decision issued by the FCC on November 30, 2007 (the "FCC Order"), the Debtors received seven waivers that allow them to hold clusters of media properties in six markets despite non-compliance with the FCC's rules. These waivers are as follows:

i.  A "temporary" waiver of the FCC's newspaper/broadcast cross-ownership rule to own WPIX-TV and *Newsday* in New York;

ii. A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own KTLA-TV and the *Los Angeles Times* in Los Angeles;

iii. A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own WSFL-TV and the Ft. Lauderdale-based *South Florida Sun-Sentinel* in Miami;

iv. A "permanent" waiver of the newspaper/broadcast cross-ownership rule to own WGN, WGN-TV and the *Chicago Tribune* in Chicago;

v.  A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own WTIC-TV, and WCCT-TV (formerly WTTX-TV), and the *Hartford Courant* in Hartford;

vi. A "permanent" "failing station" waiver of the FCC's television local ownership or "duopoly" rule to own WTIC-TV and WCCT-TV in Hartford; and

vii. A "permanent" exemption of the FCC's "duopoly" rule to permit operation of WTTK-TV, a full-power television station licensed to Kokomo, Indiana, as a "satellite" rebroadcasting the programming of WTTV-TV, Bloomington, Indiana.

The "temporary" newspaper/broadcast cross-ownership rule waivers that resulted from the FCC Order are time limited. They extend until the latest of the following: (i) the expiration of a two-year period for the filing and evaluation of individualized waiver showings, the

commencement of which is open to interpretation, (ii) six months following the conclusion of the litigation over the FCC Order pending in the D.C. Circuit, which the Debtors initiated on December 3, 2007, or (iii) six months after the expiration of any judicial stay to which the FCC's modified waiver standards for the cross-ownership rule, as adopted in a decision dated December 18, 2007 (the "2008 Order"), may be subject.  The "permanent" waivers continue as long as the Debtors own the properties, but the waivers do not permit assignments of the combinations intact, and new waivers will be needed in order for the Reorganized Debtors to maintain their existing properties.

In the FCC Applications, the Debtors are seeking extensions of the waivers covering these seven media combinations.  In the case of the newspaper/broadcast cross-ownership rule waivers, the Debtors are requesting "permanent" relief that effectively would allow them (i) to hold the ownership combinations or interests at least until the next "long form" assignment or transfer and (ii) upon such assignment or transfer to dispose of the interests in combination to a single purchaser.  Alternatively, the Debtors are seeking a temporary waiver of the newspaper/broadcast cross-ownership rule that would extend until 18 months after the FCC completes its pending rulemaking review of that rule and the FCC's action becomes a final order no longer subject to judicial review.  In the case of the Hartford television "duopoly" and the Indianapolis "satellite" waivers, the Debtors are seeking a continuation of those "permanent" waivers that would allow the combinations to be commonly held until the next "long-form" assignment or transfer.

In the requests for waivers filed as part of the FCC Applications, the Debtors attempt to demonstrate that cross-ownership waiver relief is justified under the criteria announced in the 2008 Order, which took effect on March 23, 2010, with the Third Circuit's lifting of its stay, as well as the general "public interest" waiver test adopted with the newspaper/broadcast cross-ownership rule in 1975.  The Debtors contend that in the cross-ownership markets, synergies and efficiencies attributable to cross-ownership allow the Debtors' combined media properties to deliver an exceptional level of local news - both quantitatively and qualitatively.  The Debtors' point out that their combined properties have earned strong ratings and many journalistic awards as testament to their community service and success.  The Debtors argue that each cross-owned market is also remarkably diverse and competitive with respect to traditional media properties (broadcast, cable and print) and even more so when new technological offerings, particularly those available over the Internet and wireless services, are taken into account.  The waiver filings also argue that any forced regulatory separation of the cross-owned properties would have adverse public interest effects.

Under the standards set forth in the 2008 Order to analyze the waivers, cross-ownership relief is presumptive in New York, Los Angeles, and Miami, because, as explained in the FCC Applications, (i) those markets are among the top 20 largest designated market areas, (ii) the Debtors own only one broadcast outlet in each market, (iii) the television station at issue does not rank among the top four rated television stations and (iv) at least eight "major media voices" exist exclusive of the combination.  In Chicago and Hartford, where the Debtors hold more than one broadcast property, the Debtors are not entitled to a presumptive waiver, but their waiver requests assert that those combinations also are entitled to relief because (i) the stations have increased the amount of news provided to the market, (ii) the cross-owned properties exercise

independent news judgment, (iii) the level of concentration in the DMA is not adversely affected, and (iv) the struggling financial condition of the Debtors justifies relief.

In the FCC Applications, the Debtors also contend that continued waiver of the television "duopoly" rule for the Hartford properties is justified under either the FCC's "failed" or "failing station" standards. In the Indianapolis market, the Debtors have argued that continued operation of WTTK-TV as a "satellite" is appropriate under FCC policies.

In each of the seven requests, the Debtors stress that grant of the relief they request is required under the FCC's policies affording comity to the bankruptcy process. FCC precedent establishes that the agency is required to reconcile its policies with those underlying the bankruptcy laws. The FCC has previously taken comity into account in granting ownership waivers, and, in all seven instances involving the Debtors' properties; waivers would merely allow the Reorganized Debtors to maintain the existing combinations.

It is possible that the FCC will deny the Debtors' request for "permanent waivers," or grant temporary waivers of shorter duration than requested, with respect to one or more of the media combinations or interests for which the Debtors are seeking waivers. In the event that the FCC does not grant the requested waivers, the Debtors could be required to come into compliance with the applicable ownership rule by disposing of properties deemed non-conforming by a date set by the FCC, which date could be prior to the Debtors' emergence from bankruptcy. It is possible that the FCC will require the Debtors to place one or more properties deemed by the FCC to be non-compliant with its ownership rules into a divestiture trust prior to the Debtors' emergence from bankruptcy. If the present difficult financial climate for businesses overall and for media industries in particular persists, the Debtors could face difficulty locating buyers willing to purchase the non-conforming properties and could be forced to dispose of properties at prices that the Debtors otherwise would consider unacceptable.

In addition, it is possible that, in evaluating the FCC Applications, the FCC could determine that the Pre-LBO Debtholder Plan neither complies with nor ensures compliance with the FCC's broadcast multiple and/or cross-ownership rules and/or the twenty-five percent (25%) foreign ownership limit in Section 310(b) of the Communications Act. In that case, the FCC could require the Proponents to amend the Pre-LBO Debtholder Plan and the FCC Applications, which could delay FCC Approval and consummation of the Pre-LBO Debtholder Plan. The FCC's consideration of the Petitions to Deny or other objections also could cause a delay in FCC Approval and consummation of the Pre-LBO Debtholder Plan, increasing the cost to the Debtors of emerging from bankruptcy.

## B.    Additional Factors to Be Considered

### 1.    The Proponents Have No Duty to Update

The statements contained in the Pre-LBO Debtholder Specific Disclosure Statement are made by the Proponents as of the date hereof, unless otherwise specified herein, and the delivery of the Pre-LBO Debtholder Specific Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Proponents have

no duty to update the Pre-LBO Debtholder Specific Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

     2.     <u>No Representations Outside the Joint Disclosure Statement</u>

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Pre-LBO Debtholder Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Joint Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Pre-LBO Debtholder Plan that are other than as contained in, or included with, the Pre-LBO Debtholder Specific Disclosure Statement should not be relied upon by you in arriving at your decision.

     3.     <u>Proponents Can Withdraw the Pre-LBO Debtholder Plan</u>

Under the Pre-LBO Debtholder Plan, the Proponents can withdraw the Pre-LBO Debtholder Plan with respect to any Debtors and proceed with Confirmation of the Pre-LBO Debtholder Plan with respect to other Debtors.

     4.     <u>No Legal or Tax Advice Is Provided to You by the Pre-LBO Debtholder Specific Disclosure Statement</u>

The contents of the Pre-LBO Debtholder Specific Disclosure Statement should <u>not</u> be construed as legal, business or tax advice. Each Holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest.

The Pre-LBO Debtholder Specific Disclosure Statement is <u>not</u> legal advice to you. The Pre-LBO Debtholder Specific Disclosure Statement may <u>not</u> be relied upon for any purpose other than to determine how to vote on the Pre-LBO Debtholder Plan or object to Confirmation of the Pre-LBO Debtholder Plan.

     5.     <u>No Admission Made</u>

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Pre-LBO Debtholder Plan on the Debtors or on Holders of Claims or Interests.

     6.     <u>A Liquid Trading Market for the Trust Interests is Unlikely to Develop</u>

A liquid trading market for the Trust Interests is unlikely to develop. As of the Effective Date, the Trust Interests are not expected to be listed for trading on any stock exchange or trading system. Consequently, the trading liquidity of the Trust Interests may be limited as of the Effective Date.

**C.     Certain Tax Matters**

For a summary of certain federal income tax consequences of the Pre-LBO Debtholder Plan to Holders of Claims and Interests, see section X below, entitled "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PRE-LBO DEBTHOLDER PLAN."

## VII.

## CONFIRMATION OF THE PRE-LBO DEBTHOLDER PLAN

A.    **Requirements for Confirmation of the Pre-LBO Debtholder Plan**

    1.    Requirements of Section 1129(a) of the Bankruptcy Code

        (a)    General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in Section 1129 of the Bankruptcy Code have been satisfied:

    (i)    The Pre-LBO Debtholder Plan complies with the applicable provisions of the Bankruptcy Code.

    (ii)    The Proponents have complied with the applicable provisions of the Bankruptcy Code.

    (iii)    The Pre-LBO Debtholder Plan has been proposed in good faith and not by any means proscribed by law.

    (iv)    Any payment made or promised by the Proponents, the Debtors or by a Person issuing securities or acquiring property under the Pre-LBO Debtholder Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Pre-LBO Debtholder Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before Confirmation of the Pre-LBO Debtholder Plan is reasonable, or if such payment is to be fixed after Confirmation of the Pre-LBO Debtholder Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

    (v)    The Proponents have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Pre-LBO Debtholder Plan, as a director or officer of Reorganized Tribune, an affiliate of the Debtors participating in a plan with the Debtors, or a successor to the Debtors under the Pre-LBO Debtholder Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors, Holders of Interests and with public policy, and the Proponents have disclosed

the identity of any insider that will be employed or retained by Reorganized Tribune, and the nature of any compensation for such insider.

(vi)  With respect to each Class of Claims or Interests, each Holder of an Impaired Claim or Impaired Interest either has accepted the Pre-LBO Debtholder Plan or will receive or retain under the Pre-LBO Debtholder Plan on account of such Holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

(vii)  Except to the extent the Pre-LBO Debtholder Plan meets the requirements of Section 1129(b) of the Bankruptcy Code (discussed below), each Class of Claims or Interests has either accepted the Pre-LBO Debtholder Plan or is not Impaired under the Pre-LBO Debtholder Plan.

(viii)  Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Pre-LBO Debtholder Plan provides that Administrative Expense Claims and Priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date and that Priority Tax Claims will receive treatment in accordance with the Bankruptcy Code.

(ix)  At least one Class of Impaired Claims has accepted the Pre-LBO Debtholder Plan, determined without including any acceptance of the Pre-LBO Debtholder Plan by any insider holding a Claim in such Class.

(x)  Confirmation of the Pre-LBO Debtholder Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Pre-LBO Debtholder Plan, unless such liquidation or reorganization is proposed in the Pre-LBO Debtholder Plan. See discussion of "Feasibility" below.

(xi)  The Pre-LBO Debtholder Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in Section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to Confirmation of the Pre-LBO Debtholder Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits, if any.

(b)  <u>The Best Interests Test and the Debtors' Liquidation Analysis</u>

Pursuant to Section 1129(a)(7) of the Bankruptcy Code (often called the "Best Interests Test"), Holders of Allowed Claims and Interests must either (a) accept the Pre-LBO Debtholder Plan or (b) receive or retain under the Pre-LBO Debtholder Plan property of a value, as of the Pre-LBO Debtholder Plan's assumed Effective Date, that is not less than the value such non-accepting Holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7").

The first step in meeting the Best Interests Test is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets and properties in the context of Chapter 7 cases. The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the time of the commencement of the Chapter 7 cases. The next step is to reduce that total by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority Claims that may result from the termination of the Debtors' businesses and the use of Chapter 7 for the purposes of liquidation. Any remaining net Cash would be allocated to Creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Pre-LBO Debtholder Plan on the Effective Date.

The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a Chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases and allowed in the Chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of the Creditors' Committee appointed by the United States Trustee pursuant to Section 1102 of the Bankruptcy Code and any other committee so appointed. Moreover, in a Chapter 7 liquidation, additional Claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to, and during the pendency of, the Chapter 11 Cases.

The foregoing types of Claims, costs, expenses, fees and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-Chapter 11 priority and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior Creditors are paid in full, with interest, and no equity holder receives any distribution until all Creditors are paid in full, with interest.

The Debtors, with the assistance of their restructuring and financial advisors, have prepared a hypothetical liquidation analysis (the "Liquidation Analysis") in connection with the General Disclosure Statement. See Exhibit D to the General Disclosure Statement. The Proponents adopt the Liquidation Analysis in its entirety for illustrative purposes relating to the Pre-LBO Debtholder Specific Disclosure Statement.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a Chapter 7 case, including (i) the

increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) where applicable, the erosion in value of assets in a Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, the Proponents have determined that in a Chapter 7 case, Confirmation of the Pre-LBO Debtholder Plan will provide each Creditor of the Debtors and each Holder of a Claim or Interest with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS MADE BY THE DEBTORS AND THEIR ADVISORS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS AND THEIR MANAGEMENT. FURTHERMORE, THE PROPONENTS HAVE NOT CONDUCTED AN INDEPENDENT ANALYSIS OF THE DEBTORS' LIQUIDATION ANALYSIS AND CANNOT ENSURE THE ACCURACY THEREOF. THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH IN THE GENERAL DISCLOSURE STATEMENT. THE PROPONENTS ARE USING THE DEBTORS' ANALYSIS SOLELY FOR ILLUSTRATIVE PURPOSES.

(c)    Feasibility

The Bankruptcy Code requires a plan proponent to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Pre-LBO Debtholder Plan meets this requirement, the Proponents have analyzed the Debtors' ability to meet their financial obligations as contemplated thereunder. As part of this analysis, the Proponents have reviewed preliminarily the Financial Projections and Reorganized Value Analysis prepared by the Debtors and annexed to the General Disclosure Statement as Exhibits E and F, respectively. The Financial Projections are based upon the estimated value of the Reorganized Debtors as of December 27, 2010. While the Proponents did not have a sufficient opportunity to review the Financial Projections in order to, among other things, make an informed judgment as to the appropriate DEV, based upon the Financial Projections, the Proponents believe the Debtors will be able to make all payments required to be made pursuant to the Pre-LBO Debtholder Plan.

2.    Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Pre-LBO Debtholder Plan over the rejection or deemed rejection of the Pre-LBO Debtholder Plan by a Class of Claims or Interests if the Pre-LBO Debtholder Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class.

(a)    No Unfair Discrimination.

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under a plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

(b)    Fair and Equitable Test.

This test applies to Classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no Class of Claims receives more than 100% of the Allowed amount of the Claims in such Class. As to the dissenting Class, the test sets different standards, depending on the type of Claims or Interests in such class:

(i)    Secured Claims. Each Holder of an Impaired secured Claim either (i) retains its Liens on the property (or if sold, on the proceeds thereof) to the extent of the Allowed amount of its secured Claim and receives deferred Cash payments having a value, as of the effective date of the Pre-LBO Debtholder Plan, of at least the Allowed amount of such Claim or (ii) receives the "indubitable equivalent" of its Allowed secured Claim. Secured Claims are not Impaired under the Pre-LBO Debtholder Plan.

(ii)    Unsecured Claims. Either (i) each Holder of an Impaired unsecured Claim receives or retains under the Pre-LBO Debtholder Plan property of a value equal to the amount of its Allowed unsecured Claim or (ii) the Holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive or retain any property under the Pre-LBO Debtholder Plan.

(iii)    Interests. Either (i) each Interest Holder will receive or retain under the Pre-LBO Debtholder Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the Holders of Interests that are junior to the Interests of the dissenting Class will not receive or retain any property under the Pre-LBO Debtholder Plan.

The Proponents believe the Pre-LBO Debtholder Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement notwithstanding that Class 1L (Tribune Interests) is deemed to reject the Pre-LBO Debtholder Plan, because there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such dissenting Class will receive or retain any property on account of the Claims or Interests in such Class.

# VIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PRE-LBO DEBTHOLDER PLAN

If the Pre-LBO Debtholder Plan is not confirmed and consummated, alternatives to the Pre-LBO Debtholder Plan include (i) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code, (ii) confirmation of a Competing Plan or (iii) confirmation of another plan of reorganization proposed in the Chapter 11 Cases.

## A.    Liquidation Under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a Chapter 7 liquidation would have on the recovery of Holders of Claims and Interests and the Debtors' liquidation analysis are set forth in section VII above, entitled "CONFIRMATION OF THE PRE-LBO DEBTHOLDER PLAN OF REORGANIZATION"; Requirements for Confirmation of the Pre-LBO Debtholder Plan of Reorganization; Consensual Confirmation; Best Interests Test."  The Proponents believe that liquidation under Chapter 7 would result in smaller distributions being made to Creditors than those provided for in the Pre-LBO Debtholder Plan because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a Chapter 7 trustee and (iii) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

## B.    Alternative Plan of Reorganization

If the Pre-LBO Debtholder Plan is not confirmed, the Proponents or any other party in interest in the Chapter 11 Cases (including the Debtors) could attempt to formulate a different chapter 11 plan of reorganization.  Such a plan of reorganization might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets under chapter 11.  With respect to an alternative plan, the Proponents have explored various alternatives in connection with the formulation and development of the Pre-LBO Debtholder Plan.  The Proponents believe that the Pre-LBO Debtholder Plan, as described herein, enables Creditors of the Debtors to realize the most value under the circumstances.  In a liquidation under chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in chapter 7.  Further, if a trustee were not appointed, because such appointment is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case.  Although preferable to a chapter 7 liquidation, the Proponents believe that any alternative liquidation under Chapter 11 is a much less attractive alternative to Creditors of the Debtors than the Pre-LBO Debtholder Plan because of the greater return provided by the Pre-LBO Debtholder Plan.

## IX.

## CERTAIN FEDERAL, STATE AND FOREIGN SECURITIES LAW CONSIDERATIONS

**A.    Federal and State Securities Law Considerations.**

Upon consummation of the Pre-LBO Debtholder Plan, the Proponents and the Debtors will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the shares of New Common Stock, the New Warrants, the Distribution Trust Interests and the Creditors' Trust Interests from the registration requirements of the Securities Act and of any state or local securities or "blue sky" laws. Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or interest in, or a claim for an administrative expense in a case concerning, the debtor under the plan. The Proponents believe that Reorganized Tribune is a successor to Tribune under the Pre-LBO Debtholder Plan for purposes of section 1145 of the Bankruptcy Code and that the offer and sale of the shares of New Common Stock and the New Warrants under the Pre-LBO Debtholder Plan satisfies the requirements of section 1145 and is therefore exempt from the registration requirements of the Securities Act and state or local securities laws. The Proponents further believe that each of the Distribution Trust and the Creditors' Trust is a successor to Tribune under the Pre-LBO Debtholder Plan for purposes of section 1145 of the Bankruptcy Code, and that the distribution of Distribution Trust Interests and Creditors' Trust Interests under the Pre-LBO Debtholder Plan, to the extent they constitute "securities" within the meaning of federal and state or local securities laws, satisfies the requirements of section 1145 and is therefore exempt from the registration requirements of the Securities Act and state or local securities laws.

**B.    Subsequent Transfers of New Securities.**

In general, recipients of the New Common Stock and the New Warrants, and recipients of Distribution Trust Interests and Creditors' Trust Interests, to the extent such interests constitute "securities" within the meaning of federal and state or local securities laws, will be able to resell their shares of New Common Stock or New Warrants, Distribution Trust Interests and Creditors' Trust Interests without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the Holder of such stock, warrant or interest is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code. In addition, the New Common Stock, the New Warrants, the Distribution Trust Interests and Creditors' Trust Interests generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of the New Common Stock, the New Warrants, the Distribution Trust Interests and Creditors' Trust Interests issued under the Pre-LBO Debtholder Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (i) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (ii)

offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (iv) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act. Under Section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

To the extent that recipients of the New Common Stock or New Warrants, and recipients of Distribution Trust Interests and Creditors' Trust Interests, to the extent such interests constitute "securities" within the meaning of federal and state or local securities laws, under the Pre-LBO Debtholder Plan are deemed to be "underwriters," the resale of the shares of New Common Stock, New Warrants, Distribution Trust Interests and Creditors' Trust Interests, received by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable laws. Persons deemed to be "underwriters" may, however, be permitted to resell such New Common Stock, New Warrants, Distribution Trust Interests and Creditors' Trust Interests without registration pursuant to the provisions of Rule 144 under the Securities Act if certain conditions are met. This rule permits the public resale of securities if current information regarding the issuer is publicly available and if certain volume limitations and other conditions are met.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW COMMON STOCK, THE NEW WARRANTS, THE DISTRIBUTION TRUST INTERESTS OR THE CREDITORS' TRUST INTERESTS, NONE OF THE PROPONENTS, THE DEBTORS OR REORGANIZED DEBTORS MAKE ANY REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE SHARES OF NEW COMMON STOCK, THE NEW WARRANTS, THE DISTRIBUTION TRUST INTERESTS OR THE CREDITORS' TRUST INTERESTS ISSUED UNDER THE PRE-LBO DEBTHOLDER PLAN. THE PROPONENTS RECOMMEND THAT HOLDERS OF CLAIMS OR INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

## X.

### CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PRE-LBO DEBTHOLDER PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Pre-LBO Debtholder Plan to Holders of Claims and Interests and the Debtors. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations (the "Treasury Regulations") promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Pre-LBO Debtholder Specific Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. No rulings or determinations of the IRS or any other taxing authorities have been sought or obtained with respect to the tax consequences discussed herein, and the discussion below is

not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. Events occurring after the date of this Pre-LBO Debtholder Specific Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Pre-LBO Debtholder Plan.

For purposes of the following discussion, a "United States Person" is any individual who is a citizen or resident of the United States, or any entity (i) that is a corporation (or entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof, (ii) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source or (iii) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control or (b) that has elected to continue to be treated as a United States Person for U.S. federal income tax purposes. In the case of a partnership, the U.S. federal income tax treatment of its partners will depend on the status of the partner and the activities of the partnership. A "Non-United States Person" is any person or entity (other than a partnership) that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "U.S. Holder" means a beneficial owner of a Claim or Interest that is a United States Person. A "Non-U.S. Holder" means a beneficial owner of a Claim or Interest that is a Non-United States Person.

Generally, this discussion does not apply to Holders of Claims and Interests that are not United States Persons, but a brief discussion of the general consequences to Non-U.S. Holders is included in this discussion. This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to such Holders in light of their individual circumstances. This discussion does not address tax issues with respect to the Swap Claim. This discussion does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies). In addition, this summary does not address estate, gift, foreign, state, or local tax consequences of the Pre-LBO Debtholder Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PRE-LBO DEBTHOLDER PLAN.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS PRE-LBO DEBTHOLDER SPECIFIC DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS PRE-LBO

DEBTHOLDER SPECIFIC DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE PRE-LBO SPECIFIC DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

*     *     *     *

**A.**     **Federal Income Tax Consequences to the Debtors**

1.     <u>Termination of Subchapter S Corporation Status</u>

On March 13, 2008, Tribune filed an election to be treated as a subchapter S corporation under the Tax Code, which election became effective as of the beginning of its 2008 fiscal year. Tribune also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries. Subject to certain limitations (such as the built-in gains tax applicable to Tribune's net unrealized gains as of the beginning of the 2008 fiscal year that are recognized in the subsequent ten taxable years), Tribune and its subsidiaries are not currently subject to corporate level federal income tax.  Instead, the income of Tribune and its subsidiaries is required to be reported by its stockholders.  The ESOP, which, as of the Petition Date, was the sole stockholder of Tribune, does not pay taxes on the income that is passed through to it because the ESOP is an employee benefit plan that qualifies for favorable tax treatment under Section 401(a) of the Tax Code. Although most states in which Tribune and its subsidiaries operate recognize the subchapter S corporation status, some impose taxes at a reduced rate.

As a result of the implementation of the Pre-LBO Debtholder Plan, Tribune will no longer be eligible to be treated as a subchapter S corporation beginning on the Effective Date. Accordingly, Reorganized Tribune will be subject to entity-level tax on all of its income and gains beginning on the Effective Date at corporate income tax rates.  As described below, Reorganized Tribune is expected to have limited tax attributes available to offset such income and gains.

2.     <u>Cancellation of Debt and Reduction of Tax Attributes</u>

As a result of the Pre-LBO Debtholder Plan, the Debtors' aggregate outstanding indebtedness will be substantially reduced.  In general, absent an exception, a debtor will recognize cancellation of debt ("<u>COD</u>") income upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price.  The amount of COD income, in general, is the excess of (a) the adjusted issue price of the indebtedness discharged, over (b) the sum of the issue price of any new indebtedness of the taxpayer issued, the amount of Cash paid and the fair market value of any other consideration, including stock of the Reorganized Debtors, given in exchange for such indebtedness at the time of the exchange.

A debtor is not, however, required to include any amount of COD income in gross income if such debtor is under the jurisdiction of a court in a chapter 11 bankruptcy proceeding and the discharge of debt occurs pursuant to that proceeding.  Instead, as a price for the exclusion of COD income under the foregoing rule, Section 108 of the Tax Code requires the debtor to

reduce its tax attributes by the amount of COD income which it excluded from gross income. Any reduction in tax attributes in respect of COD incurred does not occur until the end of the taxable year after such attributes have been applied.  As a general rule, tax attributes will be reduced in the following order: (i) net operating losses ("NOLs"); (ii) most tax credits; (iii) capital loss carryovers; (iv) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); and (v) foreign tax credits.  A debtor with COD income may elect first to reduce the basis of its depreciable assets under Tax Code Section 108(b)(5).

The Proponents expect that the Debtors will realize substantial COD income as a result of the implementation of the Pre-LBO Debtholder Plan.  The precise amount of COD income will depend on, among other things, the fair market value of the New Common Stock, which cannot be known with certainty until after the Effective Date.  Pursuant to Section 108 of the Tax Code, this COD Income will not be included in the Debtors' taxable income, but the Debtors will be required to reduce their tax attributes after calculating the tax for the taxable year of discharge.

As a subchapter S corporation, Tribune does not currently have any NOLs or other significant tax attributes other than tax basis in assets.  Although the projected COD income may exceed the Debtors' aggregate tax basis in assets, the Debtors' will not be required to reduce such basis below their total liabilities after the discharge.

## B.    Federal Income Tax Consequences to Holders of Claims and Interests

The U.S. federal income tax consequences of the transactions contemplated by the Pre-LBO Debtholder Plan to U.S. Holders of Claims and Interests will depend upon a number of factors. The U.S. federal income tax consequences to U.S. Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Pre-LBO Debtholder Plan and the distributions provided for thereby will depend upon, among other things: (i) the manner in which a U.S. Holder acquired a Claim; (ii) the length of time the Claim has been held; (iii) whether the Claim was acquired at a discount; (iv) whether the U.S. Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (v) whether the U.S. Holder has previously included in income accrued but unpaid interest with respect to the Claim; (vi) the method of tax accounting of the U.S. Holder; (vii) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (viii) whether the Claim is a capital asset in the hands of the U.S. Holder.

To the extent that a Holder receives a Distribution Trust Interest, such Holder should review "Tax Treatment of the Distribution Trust and Holders of Distribution Trust Interests," in addition to the applicable discussion of tax consequences of its exchange.

To the extent that a Holder does not make the Non-Contribution Election and receives Creditors' Trust Interests, such Holder should review "Tax Treatment of the Creditors' Trust and Holders of Creditors' Trust Interests."  Holders receiving Creditors' Trusts Interests should also review "Basis Allocation," for a discussion of allocation of basis between the Creditors' Trust Interests and other consideration received by such Holders pursuant to the Pre-LBO Debtholder Plan.

1.    Consequences of Exchanges

(a)    *Consequences to U.S. Holders of Step One Senior Loan Claims (Class 1C) and Step One Senior Loan Guaranty Claims (Classes 50C through 111C)*

Pursuant to the Pre-LBO Debtholder Plan, Holders of Step One Senior Loan Claims and Step One Senior Loan Guaranty Claims will receive their Pro Rata share of (i) the Step One Lender Initial Distribution,[91] (ii) their designated Distribution Trust Interests and (iii) if applicable, their designated Creditors' Trust Interests.

The Step One Lender Initial Distribution consists of a certain percentage of New Common Stock, New Senior Secured Term Loan, and Distributable Cash, along with the Distribution Trust Interests also received by Holders.

Each such U.S. Holder will realize gain or loss equal to the difference between the adjusted tax basis in its surrendered Claim, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the New Common Stock received, (ii) any Cash received, (iii) the "issue price" of the New Senior Secured Term Loan received and (iv) the value of the Distribution Trust Interests received (to the extent it is not allocable to accrued interest). See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of the New Senior Secured Term Loan. The Distribution Trustee will provide Holders with the value of the Distribution Trust Interests, from time to time, as relevant for tax purposes.  See "Tax Treatment of Distribution Trust and Holders of Distribution Trust Interests," below, for further details regarding the valuation of Distribution Trusts Interests.

The tax consequences to a U.S. Holder of a Step One Senior Loan Claim and Step One Senior Loan Guaranty Claim depend on whether the Senior Secured Term Loan and the New Senior Secured Term Loan are each a "security" for U.S. federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances.  Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument.  These authorities have indicated that an initial term of less than five years is evidence that the instrument is generally not a security, whereas an initial term of ten years or more is evidence that it is a security.  Treatment of an instrument with an initial term between five and ten years is generally unsettled.  Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

---

[91] For the avoidance of doubt, Initial Distributions, if any,  to Holders of Step One Senior Loan Claims and Step One Senior Loan Guaranty Claims will be on account of their Step One Lender Claims against both Tribune and the Guarantor Debtors, with the ultimate allocation of such distribution among Tribune and the Guarantor Debtors determined in connection with the Litigation Distribution Orders.

The Senior Secured Term Loan has a term of five years, and may or may not be treated as a security for U.S. federal income tax purposes.

If the Claim does not constitute a security for U.S. federal income tax purposes, the exchange of such Claim for New Common Stock, the New Senior Secured Term Loan, Cash, and Distribution Trust Interests will be a taxable transaction, and the U.S. Holder of such Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange. In such a case, a U.S. Holder's initial tax basis in its New Common Stock will equal the fair market value of the New Common Stock after the Effective Date. A U.S. Holder's tax basis in its New Senior Secured Term Loan will equal the issue price of the New Senior Secured Term Loan on the Effective Date. A U.S. Holder's tax basis in the Distribution Trust Interests should equal their fair market value as of the Effective Date. A U.S. Holder's holding period in such assets will commence on the day after the Effective Date. See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of the New Senior Secured Term Loan.

If the Claim constitutes a security for U.S. federal income tax purposes, the exchange of such Claim will be treated as a recapitalization for U.S. federal income tax purposes. In such a case, a U.S. Holder of such a Claim who realizes a loss on the exchange will not be permitted to recognize such loss, except to the extent of any loss attributable to accrued but unpaid interest with respect to such Claim.

If the exchange of the Claim is a recapitalization and the New Senior Secured Term Loan is a "security" for U.S. federal income tax purposes, a U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the amount of Cash and the value of the Distribution Trust Interests received as part of the exchange. A U.S. Holder's tax basis in the New Senior Secured Term Loan and the New Common Stock received in exchange for its Claim will equal its allocable adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the amount of Cash received as part of the exchange. Such basis will be allocated between the New Senior Secured Term Loan and the New Common Stock received in proportion to their relative fair market values. A U.S. Holder's tax basis in the Distribution Trust Interests received should equal their fair market value as of the Effective Date. A U.S. Holder's holding period in the New Senior Secured Term Loan and the New Common Stock will include the holding period in its surrendered Claim. A U.S. Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

If the exchange of the Claim is a recapitalization and the New Senior Secured Term Loan is not a "security" for U.S. federal income tax purposes, a U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the sum of (a) the amount of Cash, (b) the value of the Distribution Trust Interests and (c) the issue price of the New Senior Secured Term Loan received as part of the exchange. A U.S. Holder's tax basis in the New Common Stock received in exchange for its Claim will equal its allocable adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of (i) the Cash received in the exchange and (ii) the fair market value of the New Senior Secured Term Loan received. A U.S. Holder's tax basis in the Distribution Trust Interests received should equal their

fair market value as of the Effective Date.  A U.S. Holder's holding period in the New Common Stock will include the holding period in its Claim surrendered.  In this case, however, a U.S. Holder's holding period in the New Senior Secured Term Loan and the Distribution Trust Interests would begin on the day following the Effective Date.

In each case, Holders of Step One Senior Loan Claims not making the Non-Contribution Election and, accordingly, receiving Creditors' Trust Interests should see "Basis Allocation," below, for a discussion of basis allocation among Creditors' Trust Interests and consideration received pursuant to the Pre-LBO Debtholder Plan as described by this section.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," below, for a discussion related to the tax considerations of holding the New Senior Secured Term Loan.

It is plausible that a Holder could treat the transaction as an "open" transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Distribution Trust Interests received. The U.S. federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

(b)     *Consequences to U.S. Holders of Step Two Senior Loan Claims (Class 1D) and Step Two Senior Loan Guaranty Claims (Classes 50D through 111D)*

Pursuant to the Pre-LBO Debtholder Plan, Holders of Step Two Senior Loan Claims and Step Two Senior Loan Guaranty Claims shall receive their Pro Rata share of (i) their designated Distribution Trust Interests, (ii) if applicable, their designated Creditors' Trust Interests and (iii) only in the event the Senior Loan Claim Sharing Resolution determines that the sharing provisions of the Senior Loan Agreement are enforceable regardless of whether Step Two Lender Claims are avoided, the Step Two Lender Initial Distribution.[92]

The Step Two Lender Initial Distribution, if received, consists of a certain percentage of New Common Stock, New Senior Secured Term Loan, and Distributable Cash, along with the Distribution Trust Interests also received by Holders.

If the Holders of Step Two Senior Loan Claims and Step Two Senior Loan Guaranty Claims receive the Step Two Lender Initial Distribution under the Pre-LBO Debtholder Plan, the consequences to the Holders will be the same as those described in "Consequences to U.S. Holders of Step One Senior Loan Claims (Class 1C) and Step One Senior Loan Guaranty Claims (Classes 50C through 111C)," above.

If the Holders do not receive the Step Two Lender Initial Distribution, those Holders will receive only their designated Distribution Trust Interests on account of their Claims. The amount received, if any, from the Distribution Trust is contingent on the value obtained

---

[92] For the avoidance of doubt, Initial Distributions to Holders of Step Two Senior Loan Claim and Step Two Senior Loan Guaranty Claims will be made on account of their Step Two Lender Claims against both Tribune and the Guarantor Debtors, with the ultimate allocation of such distribution among Tribune and the Guarantor Debtors determined in connection with the Litigation Distribution Orders.

from the Distribution Trust Reserves and the proceeds of the Litigation Trust Causes of Action. The Holder should recognize gain or loss equal to the difference between (i) the fair market value as of the Effective Date of the Distribution Trust Interests received (to the extent it is not allocable to accrued interest) and (ii) the Holder's allocable tax basis in the Claims surrendered by the Holder. The character of such gain or loss will depend on a number of factors as described in the paragraph above. To the extent that any portion of the Distribution Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest. A Holder's tax basis in the beneficial interests received should equal their fair market value as of the Effective Date. A Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

In each case, Holders of Step Two Senior Loan Claims not making the Non-Contribution Election and, accordingly receiving Creditors' Trust Interests should see "Basis Allocation," below, for a discussion of basis allocation among Creditors' Trust Interests and consideration received pursuant to the Pre-LBO Debtholder Plan as described by this section.

It is plausible that a Holder could treat the transaction as an "open" transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Liquidation Trust beneficial interests received. The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

(c)  *Consequences to U.S. Holders of Senior Noteholder Claims (Class 1F)*

Pursuant to the Pre-LBO Debtholder Plan, Holders of Senior Noteholder Claims will receive their Pro Rata share of (i) the Senior Noteholder Initial Distribution, (ii) their designated Distribution Trust Interests and (iii) if applicable, their designated Creditors' Trust Interests.

The Senior Noteholder Initial Distribution consists of a certain percentage of New Common Stock, New Senior Secured Term Loan, and Distributable Cash, along with the Distribution Trust Interests also received by Holders.

Each such U.S. Holder will realize gain or loss equal to the difference between the adjusted tax basis in its surrendered Claim, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the New Common Stock received, (ii) any Cash received, (iii) the "issue price" of the New Senior Secured Term Loan received, and (iv) value of the Distribution Trust Interests received (to the extent it is not allocable to accrued interest). See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of the New Senior Secured Term Loan. The Distribution Trustee will provide Holders with the value of the Distribution Trust Interests, from time to time, as relevant for tax purposes. See "Tax Treatment of Distribution Trust and Holders of Distribution Trust Interests," below, for further details regarding the valuation of Distribution Trusts Interests.

The tax consequences to a U.S. Holder of a Senior Noteholder Claim depend on whether the Senior Notes and the New Senior Secured Term Loan are securities for U.S. federal income tax purposes. See discussion of the definition of a security above. The Senior Notes have terms exceeding ten years, and accordingly, the Debtors expect to treat the Senior Notes as securities.

Since the Senior Noteholder Claims constitute securities for U.S. federal income tax purposes, the exchange of such Claim will be treated as a recapitalization for U.S. federal income tax purposes. In such a case, a U.S. Holder of such a Claim who realizes a loss on the exchange will not be permitted to recognize such loss, except to the extent of any loss attributable to accrued but unpaid interest with respect to such Claim.

If the exchange of the Claim is a recapitalization and the New Senior Secured Term Loan is a "security" for U.S. federal income tax purposes, a U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the amount of Cash and the value of the Distribution Trust Interests received as part of the exchange. A U.S. Holder's tax basis in the New Senior Secured Term Loan and the New Common Stock received in exchange for its Claim will equal its allocable adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the amount of Cash and the value of the Distribution Trust Interests received as part of the exchange. Such basis will be allocated between the New Senior Secured Term Loan and the New Common Stock received in proportion to their relative fair market values. A U.S. Holder's tax basis in the Distribution Trust Interests received should equal their fair market value as of the Effective Date. A U.S. Holder's holding period in the New Senior Secured Term Loan and the New Common Stock will include the holding period in its surrendered Claim. A U.S. Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

If the exchange of the Claim is a recapitalization and the New Senior Secured Term Loan is not a "security" for U.S. federal income tax purposes, a U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the sum of (a) the amount of Cash, (b) the value of the Distribution Trust Interests and (c) the issue price of the New Senior Secured Term Loan received as part of the exchange. A U.S. Holder's tax basis in the New Common Stock received in exchange for its Claim will equal its allocable adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of the items specified in clauses (a), (b) and (c) of the preceding sentence. A U.S. Holder's tax basis in the Distribution Trust Interests received should equal their fair market value as of the Effective Date. A U.S. Holder's holding period in the New Common Stock will include the holding period in its Claim surrendered. A U.S. Holder's holding period in the New Senior Secured Term Loan and the Distribution Trust Interests would begin on the day following the Effective Date.

In each case, Holders of Senior Noteholder Claims not making the Non-Contribution Election and, accordingly, receiving Creditors' Trust Interests should see "Basis Allocation," below, for a discussion of basis allocation among Creditors' Trust Interests and consideration received pursuant to the Pre-LBO Debtholder Plan as described by this section.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," below, for a discussion related to the tax considerations of holding the New Senior Secured Term Loan.

It is plausible that a Holder could treat the transaction as an "open" transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Distribution Trust Interests received. The U.S. federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

     (d)    *Consequences to U.S. Holders of Bridge Loan Claims (Class 1E) and Bridge Loan Guaranty Claims (Classes 50E through 111E)*

Pursuant to the Pre-LBO Debtholder Plan, Holders of Bridge Loan Claims and Bridge Loan Guaranty Claims will receive their Pro Rata share of their designated Distribution Trust Interests.

The amount received, if any, from the Distribution Trust (on account of the Distribution Trust Interests held) is contingent on the value obtained from the Distribution Trust Reserves and the proceeds of the Litigation Trust Causes of Action. The Holder should recognize gain or loss equal to the difference between (i) the fair market value as of the Effective Date of the Distribution Trust Interests received after the impact of the subordination provisions and to the extent it is not allocable to accrued interest, and (ii) the Holder's tax basis in the Claims surrendered by the Holder. The character of such gain or loss will depend on a number of factors as described in the paragraph above. To the extent that any portion of the Distribution Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest. A Holder's tax basis in the beneficial interests received should equal their fair market value as of the Effective Date. A Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

Holders of Bridge Loan Claims, not making the Non-Contribution Election and receiving Creditors' Trust Interests should see "Basis Allocation," below, for a discussion of basis allocation among Creditors' Trust Interests and consideration received pursuant to the Pre-LBO Debtholder Plan as described by this section.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Distribution Trust beneficial interests received. The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

     (e)    *Consequences to U.S. Holders of EGI-TRB LLC Notes Claims (Class 1H) and PHONES Notes Claims (Class 1I)*

Pursuant to the Pre-LBO Debtholder Plan, Holders of EGI-TRB LLC Notes Claims and PHONES Notes Claims will receive their Pro Rata share of (i) their designated

Distribution Trust Interests and (ii) if applicable, their designated Creditors' Trust Interests both subject to the subordination provisions of the EGI-TRB Notes and PHONES Notes Indenture.

The amount received, if any, from the Distribution Trust (on account of the Distribution Trust Interests held) is contingent on the value obtained from the Distribution Trust Reserves and the proceeds of the Litigation Trust Causes of Action. The Holder should recognize gain or loss equal to the difference between (i) the fair market value as of the Effective Date of the Distribution Trust Interests received after the impact of the subordination provisions and to the extent it is not allocable to accrued interest, and (ii) the Holder's tax basis in the Claims surrendered by the Holder. The character of such gain or loss will depend on a number of factors as described in the paragraph above. To the extent that any portion of the Distribution Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest. A Holder's tax basis in the beneficial interests received should equal their fair market value as of the Effective Date. A Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

Holders of these Claims are also entitled to their Pro Rata Share of Parent DEV, but, pursuant to the Pre-LBO Debtholder Plan, such shares will be turned over to the Senior Noteholders in accordance certain subordination provisions set forth in the EGI-TRB Notes. U.S. Holders will not be subject to any federal tax consequences for these Pro Rata shares turned over to the Senior Noteholders.

Holders of EGI-TRB LLC Notes Claims and PHONES Notes Claims not making the Non-Contribution Election and receiving Creditors' Trust Interests (subject to the subordination provisions set forth in the EGI-TRB Notes) should see "Basis Allocation," below, for a discussion of basis allocation among Creditors' Trust Interests and consideration received pursuant to the Pre-LBO Debtholder Plan as described by this section.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Distribution Trust beneficial interests received. The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

(f)    *Consequences to U.S. Holders of Other Parent Claims (Class 1G)*

Pursuant to the Pre-LBO Debtholder Plan, Holders of Other Parent Claims receive their Pro Rata share of (i) the Other Parent Claims Initial Distribution, (ii) their designated Distribution Trust Interests and (iii) if applicable, their designated Creditors' Trust Interests; *provided, however*, if the Class of Other Parent Claims votes in favor of the Pre-LBO Debtholder Plan, each Holder of an Other Parent Claim, Allowed as of the Voting Record Date, that does not make the Non-Contribution Election shall have the right to put its Allowed Other Parent Claim to the Claims Purchaser in exchange for payment in Cash in the amount of 15% of such Holder's Allowed Other Parent Claim.

The Other Parent Claims Initial Distribution shall consist of a certain percentage of New Common Stock, New Senior Secured Term Loan, and Distributable Cash, along with the Distribution Trust Interests also received by Holders. The Other Guarantor Debtor Claims Initial Distribution shall consist of Cash.

The consequences to the Holders of Other Parent Claims will be the same as those described in "Consequences to U.S. Holders of Step One Senior Loan Claims (Class 1C) and Step One Senior Loan Guaranty Claims (Classes 50C through 111C)," above.

In each case, Holders of Other Parent Claims not making the Non-Contribution Election (and not electing the Other Parent Claims Put Option if applicable) and, accordingly receiving Creditors' Trust Interests should see "Basis Allocation," below, for a discussion of basis allocation among Creditors' Trust Interests and consideration received pursuant to the Pre-LBO Debtholder Plan as described by this section.

It is plausible that a Holder could treat the transaction as an "open" transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Distribution Trust beneficial interests received. The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

      (g)    *Consequences to U.S. Holders of Other Non-Guarantor Debtor Claims (Classes 2G – 49G)*

Pursuant to the Pre-LBO Debtholder Plan, Holders of Other Non-Guarantor Debtor Claims will receive payment in full, in Cash (including Postpetition Interest).

A Holder should recognize capital gain or loss (which capital gain or loss would be a long-term capital gain or loss to the extent that the Holder has held its Claim for more than one year) in an amount equal to the amount of Cash received over the Holder's adjusted basis in its Claim. To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder should recognize ordinary interest income. See "Accrued but Unpaid Interest" below.

      (h)    *Consequences to U.S. Holders of Other Guarantor Debtor Claims (Classes 50G-111G)*

Holders of Other Guarantor Debtor Claims shall receive their Pro Rata share of (i) the Other Guarantor Debtor Claims Initial Distribution and (ii) designated Distribution Trust Interests; *provided*, *however*, if the applicable Class of Other Guarantor Debtor Claims votes in favor of the Pre-LBO Debtholder Plan, each Holder of an Other Guarantor Debtor Claim that is Allowed as of the Voting Record Date shall have the right to put its Allowed Other Guarantor Debtor Claim to the Claims Purchaser in exchange for payment in Cash in the amount of 25% of such Holder's Allowed Other Guarantor Debtor Claim.

Each such U.S. Holder will realize gain or loss equal to the difference between the adjusted tax basis in its surrendered Claim, determined immediately prior to the Effective Date,

and the sum of (i) any Cash received and (ii) the value of the Distribution Trust Interests received (to the extent it is not allocable to accrued interest). The Distribution Trustee will provide Holders with the value of the Distribution Trust Interests, from time to time, as relevant for tax purposes. See "Tax Treatment of Distribution Trust and Holders of Distribution Trust Interests," below, for further details regarding the valuation of Distribution Trusts Interests. The character of such gain or loss will depend on a number of factors as described in the paragraph above. To the extent that any portion of the Distribution Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest. A Holder's tax basis in the beneficial interests received should equal their fair market value as of the Effective Date. A Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

It is plausible that a Holder could treat the transaction as an "open" transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Distribution Trust beneficial interests received. The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

      (i)    *Consequences to U.S. Holders of Intercompany Claims (Class 1J and Classes 2J through 111J)*

Pursuant to the Pre-LBO Debtholder Plan, Intercompany Claims against Tribune will be reinstated, discharged or otherwise satisfied in accordance with the terms of the Confirmation Order and/or the Litigation Distribution Orders. As of the date hereof, the ultimate treatment of the Intercompany Claims has not been determined.

      (j)    *Consequences to U.S. Holders of Subordinated Securities Claims (Class 1K – 111K)*

Pursuant to the Pre-LBO Debtholder Plan, Holders of Subordinated Securities Claims will receive their Pro Rata Share of (i) their designated Distribution Trust Interests and (ii) if applicable, Creditors' Trust Interests.

The amount received, if any, from the Distribution Trust (on account of the Distribution Trust Interests held) is contingent on the value obtained from the Distribution Trust Reserves and the proceeds of the Litigation Trust Causes of Action. The Holder should recognize gain or loss equal to the difference between (i) the fair market value as of the Effective Date of the Distribution Trust Interests received after the impact of the subordination provisions and to the extent it is not allocable to accrued interest, and (ii) the Holder's tax basis in the Claims surrendered by the Holder. The character of such gain or loss will depend on a number of factors as described in the paragraph above. To the extent that any portion of the Distribution Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest. A Holder's tax basis in the beneficial interests received should equal their fair market value as of the Effective Date. A Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

In each case, Holders of Subordinated Securities Claims not making the Non-Contribution Election and receiving Creditors' Trust Interests should see "Basis Allocation," below, for a discussion of basis allocation among Creditors' Trust Interests and consideration received pursuant to the plan as described by this section.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Distribution Trust beneficial interests received. The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

(k)    *Consequences to U.S. Holders of Tribune Interests (Class 1L)*

Pursuant to the Pre-LBO Debtholder Plan, all Tribune Interests will be extinguished, and U.S. Holders of Tribune Interests will receive nothing in exchange for such Tribune Interests. As a result, each U.S. Holder of Tribune Interests generally will recognize a loss equal to the U.S. Holder's adjusted tax basis in such Tribune Interests extinguished under the Pre-LBO Debtholder Plan, except to the extent that such U.S. Holder previously claimed a loss with respect to such Tribune Interests under its regular method of accounting. However, U.S. Holders of Tribune Interests are urged to consult with their own tax advisors regarding their own specific situation and tax consequences. Generally, a Holder should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the Holder has held the debt instrument underlying its claim for more than one year) if the Claim is a capital asset in the Holder's hands.

## C.    Consequences of Holding Exchanged Consideration

1.    <u>Federal Income Tax Treatment of the New Senior Secured Term Loan</u>

At this time, it is anticipated that the New Senior Secured Term Loan will be "publicly traded." Accordingly, its issue price is generally expected to equal its fair market value on the Effective Date. If the New Senior Secured Term Loan is not publicly traded, its issue price will depend on whether the debt instrument giving rise to a U.S. Holder's Claim is publicly traded. If the debt instrument giving rise to such U.S. Holder's Claim is publicly traded, the issue price of the New Senior Secured Term Loan is generally expected to equal the portion of the fair market value of the Claim surrendered which is allocable to the New Senior Secured Term Loan. If the debt instrument giving rise to such U.S. Holder's Claim is not publicly traded, the issue price of the New Senior Secured Term Loan is generally expected to equal its stated redemption price at maturity. For these purposes, a debt instrument generally is treated as publicly traded if, at any time during the 60 day period ending 30 days after the issue date, (i) the debt is listed on a national securities exchange or quoted on an interdealer quotation system sponsored by a national securities association, (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales

transactions or (iii) if, in certain circumstances, price quotations are readily available from dealers, brokers or traders.

A U.S. Holder who receives the New Senior Secured Term Loan will generally be required to include stated interest on the New Senior Secured Term Loan in income in accordance with U.S. Holder's regular method of tax accounting. In addition, if the New Senior Secured Term Loan is treated as issued with original issue discount ("OID") for U.S. federal income tax purposes, a U.S. Holder of the New Senior Secured Term Loan will be required to include in income the amount of such original issue discount over the term of the New Senior Secured Term Loan based on the constant yield method. In such a case, a U.S. Holder will be required to include amounts in income before they are received. A U.S. Holder's tax basis in the New Senior Secured Term Loan will be increased by the amount of original issue discount included in income and reduced by the amount of Cash (other than payments of stated interest) received with respect to the New Senior Secured Term Loan.

    2.    <u>Ownership and Disposition of New Common Stock</u>

        (a)    *Dividends on New Common Stock*

Distributions made with respect to New Common Stock received under the Pre-LBO Debtholder Plan generally will be treated as dividends to a U.S. Holder to the extent of current and accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles at the end of the tax year of the distribution. To the extent the distributions exceed the current and accumulated earnings and profits, the excess will be treated first as a tax-free return of capital to the extent of the U.S. Holder's adjusted tax basis in the New Common Stock, and thereafter as capital gain. Corporate holders generally will be entitled to claim the dividends received deduction with respect to dividends paid on New Common Stock, subject to applicable restrictions, including satisfaction of applicable holding period requirements.

        (b)    *Sale or Other Disposition of New Common Stock*

Upon the sale or other disposition of New Common Stock received under the Pre-LBO Debtholder Plan, a U.S. Holder generally will recognize capital gain or loss equal to the difference between (i) the amount of Cash and the fair market value of any property received upon the sale or other disposition and (ii) the U.S. Holder's adjusted tax basis in the New Common Stock. Such capital gain or loss will be long-term if the U.S. Holder's holding period in respect of such New Common Stock is more than one year. The deductibility of capital losses is subject to limitations, see discussion below.

    3.    <u>Tax Treatment of the Distribution Trust and Holders of Distribution Trust Interests</u>

        (a)    *Classification of the Distribution Trust*

The Distribution Trust (of which the Litigation Trust is a sub-trust) is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as

a "grantor trust" (*i.e.*, a pass-through type entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Distribution Trust has been structured with the intention of complying with such general criteria. Pursuant to the Pre-LBO Debtholder Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Distribution Trustee, and the Holders of Distribution Trust Interests) are required to treat, for U.S. federal income tax purposes, the Distribution Trust as a grantor trust of which the Holders of Distribution Trust Interests are the owners and grantors. The following discussion assumes that the Distribution Trust will be so respected for U.S. federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Distribution Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of the Distribution Trust, the U.S. federal income tax consequences to the Distribution Trust, the Holders of Distribution Trust Interests and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Distribution Trust).

(b)    *General Tax Reporting by the Distribution Trust and Beneficiaries*

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Distribution Trustee, and the Holders of Distribution Trust Interests) must treat the transfer of the Distribution Trust Assets to the Distribution Trust in accordance with the terms of the Pre-LBO Debtholder Plan. Pursuant to the Pre-LBO Debtholder Plan, the Distribution Trust Assets are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the Holders of the respective Claims in satisfaction of their Claims (with each Holder receiving an undivided interest in such assets in accord with their economic interests in such assets), followed by the transfer by the Holders to the Distribution Trust of such assets in exchange for Distribution Trust Interests. Accordingly, all parties must treat the Distribution Trust as a grantor trust of which the Holders of Distribution Trust Interests are the owners and grantors, and treat the Holders of Distribution Trust Interests as the direct owners of an undivided interest in the Distribution Trust Assets, consistent with their economic interests therein, for all U.S. federal income tax purposes.

Pursuant to the Pre-LBO Debtholder Plan, the Distribution Trustee shall provide a good faith valuation of the Litigation Trust Causes of Action as soon as practicable following the Effective Date (that comprise part of the Distribution Trust Assets), and the Distribution Trustee will in good faith value the remaining Distribution Trust Assets. All parties to the Distribution Trust (including, without limitation, the Debtors, the Distribution Trustee and the Holders of Distribution Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Allocations of taxable income of the Distribution Trust among the Holders of Distribution Trust Interests shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Distribution Trust had distributed all its assets (valued at their tax book value) to the Holders of the Distribution

81

Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Distribution Trust. Similarly, taxable loss of the Distribution Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Distribution Trust Assets. The tax book value of the Distribution Trust Assets for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

Taxable income or loss allocated to a Holder of a Distribution Trust Asset will be treated as income or loss with respect to such Holder's undivided interest in the Distribution Trust Assets, and *not* as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the Holder.

The U.S. federal income tax obligations of a Holder with respect to its Distribution Trust Interests are not dependent on the Distribution Trust distributing any Cash or other proceeds. Thus, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of Distribution Trust income even if the Distribution Trust does not make a concurrent distribution to the Holder. In general, a distribution of Cash by the Distribution Trust will not be separately taxable to a Holder of Distribution Trust Interests since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Distribution Trust).

The Distribution Trustee will file with the IRS returns for the Distribution Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Distribution Trustee will annually send to each Holder of a Distribution Trust Interest a separate statement regarding the receipts and expenditures of the Distribution Trust as relevant for U.S. federal income tax purposes and will instruct all such Holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such Holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

4.    Tax Treatment of the Creditors' Trust and Holders of Creditors' Trust Interests

In general, pursuant to the Pre-LBO Debtholder Plan, Holders of Allowed Step One Senior Loan Claims, Step Two Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, Other Parent Claims, PHONES Notes Claims, EGI-TRB LLC Notes Claims and Subordinated Securities Claims that do not make the Non-Contribution Election will receive Creditors' Trust Interests in exchange for their State Law Avoidance Claims and may be entitled to distributions from the Creditors' Trust based on the Creditors' Trust Distribution Orders.

(a)    *Tax Treatment of Creditors' Trust*

The Creditors' Trust is intended to qualify as, and the discussion below assumes that the Creditors' Trust will be respected as, a liquidating trust for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity for U.S. federal income

tax purposes, but is instead treated as a grantor trust, *i.e.*, a passthrough entity. No ruling has been requested from the IRS, and no opinion of counsel has been requested concerning the tax status of the Creditors' Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS successfully to challenge such classification, the U.S. federal income tax consequences to the Creditors' Trust, the Creditors' Trust Beneficiaries and the Debtors could vary significantly from those discussed herein, including with respect to the potential for an entity level tax on the Creditors' Trust's income.

In Revenue Procedure 94-45, the IRS set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Title 11 plan. In general, the Creditors' Trust has been structured with the intention of complying with the criteria of Revenue Procedure 94-45. Pursuant to the Pre-LBO Debtholder Plan, and in conformity with Revenue Procedure 94-45, all parties are required to treat, for U.S. federal income tax purposes, the Creditors' Trust as a grantor trust of which the Creditor Trust Beneficiaries are the owners and grantors. For U.S. federal income tax purposes, all parties (including the Debtors, the Creditors' Trustee and the Creditors' Trust Beneficiaries) must treat the transfer of the Creditor Trust Assets as a transfer of such assets directly to the Creditors' Trust Beneficiaries, followed by the beneficiaries' transfer of such assets to the Creditors' Trust. Subject to the terms of the Creditors' Trust Agreement, and the powers of any advisory board established thereunder, the Creditors' Trustee will determine the fair market value of the Creditors' Trust Assets as soon as possible after the Effective Date, and the Creditors' Trust Beneficiaries and the Creditors' Trustee must consistently use this valuation for all U.S. federal income tax purposes, including for determining gain, loss or tax basis.

(b)    *General Tax Reporting by the Creditors' Trust and Beneficiaries*

Assuming the Creditors' Trust qualifies as a liquidating trust, the U.S. federal income tax consequences of the Creditors' Trust and the Creditors' Trust Beneficiaries generally should be similar to those described above with respect to the Distribution Trust and the Holders of Distribution Trust Interests (other than the Reorganized Debtors). The Creditors' Trustee will file with the IRS tax returns for the Creditors' Trust treating such trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). Such trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction or credit, and will instruct the holder to report such items on its U.S. federal income tax return or to forward the appropriate information to the beneficial owners with instructions to report such items on their U.S. federal income tax returns.

(c)    *Tax Treatment of CT Reserve*

Pursuant to the Pre-LBO Debtholder Plan, the Creditors' Trustee may hold the assets of the Creditors' Trust allocable to, or retained on account of, Claims that are Disputed, as determined from time to time, separately from other assets of the Creditors' Trust in the CT Reserve. The Creditors' Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), make an election to treat the CT Reserve as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9. In addition, all parties must report consistently with such treatment.

Under section 468B(g) of the Tax Code, amounts earned in an escrow account, settlement fund or similar fund are generally subject to tax on a current basis, as the amounts are earned. A disputed ownership fund is generally subject to a separate entity level tax in a manner similar to either a corporation or a QSF depending upon the nature of the assets transferred to the fund. The Debtors currently expect that the CT Reserve will be subject to tax in a manner similar to a corporation.

In general, in determining the CT Reserve's taxable income, (i) any amounts transferred by the Debtors to the reserve will be excluded from the reserve's income, (ii) any sale or exchange of property by the CT Reserve (including recoveries on litigation assets to the extent allocated to the CT Reserve) will result in the recognition of gain or loss equal to the difference between such property's fair market value on the date of disposition and the reserve's adjusted tax basis in such property and (iii) any interest income or other earnings with respect to the CT Reserve's assets will be included in the reserve's taxable income.

Pursuant to the Pre-LBO Debtholder Plan, the Creditors' Trustee will take into account in determining the CT Reserve's taxable income or loss with respect to any given taxable year the portion of the Creditors' Trust's taxable income or loss that would have been allocated to the Holders of Claims that are Disputed had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are Disputed), and as a distribution from the CT Reserve any assets previously allocated to or retained on account of Claims that are Disputed as and when, and to the extent, such Claims are subsequently resolved (following which time such assets will no longer be held in the CT Reserve).

5.      Basis Allocation

Holders receiving Creditors' Trust Interests will not recognize gain or loss upon receipt of the Creditors' Trust Interests in exchange for the Holders' State Law Avoidance Claims. Such Holders will have a carryover basis in the Creditors' Trust Interests. However, Holders receiving Creditors' Trusts Interests in addition to other consideration received pursuant to the Pre-LBO Debtholder Plan should allocate their basis among all consideration received pursuant to the Pre-LBO Debtholder Plan. With this basis allocation, Holders should use the relative fair market value of the Creditors' Trust Interests to allocate basis between the Creditors' Trusts Interests and other consideration received.

6.      Limitations on Capital Losses

A Holder of a Claim who recognizes a capital loss as a result of the distributions under the Pre-LBO Debtholder Plan will be subject to limits on the use of such capital loss. For a non-corporate holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns) or (ii) the excess of the capital losses over the capital gains. A non-corporate holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, capital losses may only be used to offset capital gains. A corporate holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three

taxable years preceding the capital loss year, but may carry over unused capital losses for the five taxable years following the capital loss year.

## D.    Additional Considerations

### 1.    Accrued but Unpaid Interest

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Pre-LBO Debtholder Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Pre-LBO Debtholder Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Pre-LBO Debtholder Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

### 2.    Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged

in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

**E.    Non-U.S. Holders**

    1.    <u>General Consequences to Non-U.S. Holders</u>

A Holder of a Claim that is a Non-United States Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Pre-LBO Debtholder Plan, unless (i) such Non-U.S. Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes or (ii) such Non-U.S. Holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

    (a)    *Non-U.S. Holders of Distribution Trust Interests and Creditors' Trust Interests*

The Distribution Trustee will comply with all applicable governmental withholding requirements. Thus, in the case of any Non-U.S. Holders of Distribution Trust Interests or Creditors' Trust Interests, the Distribution Trustee or Creditors' Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). Significantly, as discussed above, a Holder of Distribution Trust Interests or Creditors' Trust Interests is treated for federal income tax purposes as holding an undivided interest in the underlying assets of the Distribution Trust or Creditors' Trust. Accordingly, the Distribution Trustee will treat any amounts received by the Distribution Trust or the Creditors' Trust, the economic benefit of which inures to a Holder of Distribution Trust Interests or Creditors' Trust Interests on the basis described above with respect to the allocation of taxable income as received by the beneficiary in respect of the underlying asset, and *not* in respect of its Allowed Claim. Absent the receipt of a ruling from the IRS or an opinion of counsel (that is satisfactory to the Distribution Trustee or Creditors' Trustee) that no withholding is required, the Debtors expect that the Distribution Trustee or Creditors' Trustee would withhold with respect to such ordinary income.

    (b)    *Non-U.S. Holders of New Common Stock*

If a Non-U.S. Holder receives New Common Stock under the Pre-LBO Debtholder Plan, dividends made with respect to the New Common stock will be subject to withholding up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).

    (c)    *Non-U.S. Holders of New Senior Secured Term Loan*

Subject to the discussion below concerning backup withholding, payments of interest on the New Senior Secured Term Loan to a Non-U.S. Holder generally will not be subject to U.S. federal income tax or withholding tax, if the Non-U.S. Holder:

(i)     does not own, actually or constructively, for U.S. federal income tax purposes, ten percent (10%) or more of the total combined voting power of all classes of the voting stock of the company that is the applicable borrower;

(ii)    is not, for U.S. federal income tax purposes, a "controlled foreign corporation" related, directly or indirectly, to the company through stock ownership under applicable rules of the Code;

(iii)   is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code; and

(iv)    in each case, the certification requirement, as described below, is fulfilled with respect to the beneficial owner of the New Senior Secured Term Loan.

The certification requirement referred to above generally will be fulfilled if the Non-U.S. Holder provides to the Company or its paying agent an IRS Form W-8BEN (or successor form), signed under penalties of perjury, which includes the Non-U.S. Holder's name and address and a certification as to the Non-U.S. Holder's non-U.S. status. Other methods might be available to satisfy the certification requirements described above, depending on a Non-U.S. Holder's particular circumstances.

In general, the gross amount of payments of interest that do not qualify for the exception from withholding described above will be subject to U.S. withholding tax at a rate of thirty percent (30%) unless (i) the Non-U.S. Holder provides a properly completed IRS Form W-8BEN (or successor form) claiming an exemption from or reduction in withholding under an applicable tax treaty or (ii) such interest is effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business and the Non-U.S. Holder provides a properly completed IRS Form W-8ECI (or successor form).

As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Pre-LBO Debtholder Plan does not generally address the consequences to Non-U.S. Holders; accordingly, such Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Pre-LBO Debtholder Plan, including owning an interest in the Distribution Trust.

## F.    Information Reporting and Backup Withholding

All distributions to Holders of Claims under the Pre-LBO Debtholder Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (i) fails to furnish its social

security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, as discussed above under "General Consequences to Non-U.S. Holders," a Holder of a Distribution Trust Interest that is a *not* a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate.  A Non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Pre-LBO Debtholder Plan.  As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Pre-LBO Debtholder Plan does not generally address the consequences to Non-U.S. holders of Allowed Claims.

      1.    <u>Recent Legislation</u>

Under legislation recently enacted into law, certain payments made after December 31, 2012 to certain foreign entities (including foreign accounts or foreign intermediaries) would be subject to a 30% withholding tax unless various U.S. information reporting and due diligence requirements have been satisfied.  Payments subject to such requirements include dividends on and the gross proceeds of dispositions of New Common Stock and likely include distributions by the Distribution Trust.  These requirements are different from, and in addition to, the withholding tax requirements described above under "General Consequences to Non-U.S. Holders."  Non-U.S. holders should consult their tax advisor concerning the application of this legislation to their particular circumstances.

**G.**    **Federal Income Tax Treatment of Disputed Claims Reserves**

Reorganized Tribune may establish one or more Disputed Claims Reserves ("Reserves") to make distributions to Holders of Disputed Claims that become Allowed Claims after the Effective Date.  Distributions from each such Reserve will be made to Holders of Disputed Claims when such Claims are subsequently Allowed, and to Holders of Allowed Claims (whether such Claims were Allowed on or after the Effective Date) when any Disputed Claims are subsequently disallowed.

Reorganized Tribune may elect to treat each Reserve as a as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 for U.S. federal income tax purposes.  As a disputed ownership fund, the assets of such Reserve would be treated as directly owned by Reorganized Tribune.

Pursuant to such election to treat such Reserve as a disputed ownership fund, such Reserve will likely be taxable as a "qualified settlement fund" ("QSF"), separate and apart from Reorganized Tribune, subject to a separate entity level tax on its income at the highest rate

applicable for trusts and estates upon any amounts earned by such reserve. Therefore, distributions from each such Reserve may be reduced to satisfy any taxes payable by the QSF.

Holders of Disputed Claims should note the tax treatment of such Reserves is unclear, especially in light of the uncertainty of treating the Litigation Trust and Distribution Trust as one trust, and should consult their own tax advisors.

**H.      Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PRE-LBO DEBTHOLDER PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PRE-LBO DEBTHOLDER PLAN.

# XI.

## CONCLUSION

The Proponents believe that Confirmation and implementation of the Pre-LBO Debtholder Plan is in the best interests of all Creditors, and urge Holders of Impaired Claims and Interests to vote to accept the Pre-LBO Debtholder Plan and to evidence such acceptance by returning their Pre-LBO Debtholder Ballots so that they will be received no later than the Voting Deadline.

Dated: New York, New York
       October 29, 2010

AURELIUS CAPITAL MANAGEMENT, LP
on behalf of its managed entities

By:     Dan Gropper
Title:   Managing Director


WILMINGTON TRUST COMPANY
as Successor Indenture Trustee for the PHONES Notes

_____
By:     Patrick Healy
Title:   Vice President


DEUTSCHE BANK TRUST COMPANY AMERICAS
as Successor Indenture Trustee for certain series of Senior Notes

_____
By:     Michael Dunlaevy
Title:   Director


_____
By:     Rodney Gaughan
Title:   Vice President

AURELIUS CAPITAL MANAGEMENT, LP
on behalf of its managed entities

_____

By:     Dan Gropper
Title:   Managing Director


WILMINGTON TRUST COMPANY
as Successor Indenture Trustee for the PHONES Notes

_____

By:     James A. Hanley
Title:   Vice President



DEUTSCHE BANK TRUST COMPANY AMERICAS
as Successor Indenture Trustee for certain series of Senior Notes

_____

By:     Michael Dunlaevy
Title:   Director


_____

By:     Rodney Gaughan
Title:   Vice President

Signature Page to Specific Disclosure Statement for Pre-LBO Debtholder Plan

AURELIUS CAPITAL MANAGEMENT, LP
on behalf of its managed entities

By:    Dan Gropper
Title:   Managing Director


WILMINGTON TRUST COMPANY
as Successor Indenture Trustee for the PHONES Notes

By:    Patrick Healy
Title:   Vice President


DEUTSCHE BANK TRUST COMPANY AMERICAS
as Successor Indenture Trustee for certain series of Senior Notes

By:    Michael Dunlaevy
Title:   Director


By:    Rodney Gaughan
Title:   Vice President

LAW DEBENTURE TRUST COMPANY OF NEW YORK
as Successor Indenture Trustee for certain series of Senior Notes

By:    ~~James Heaney~~ Robert Rywka

Title:  ~~Managing Director~~ Director of Fiduciary Services

**EXHIBIT A**

**THE PRE-LBO DEBTHOLDER PLAN**