THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. THIS SPECIFIC DISCLOSURE DOCUMENT IS BEING SUBMITTED IN ACCORDANCE WITH THE ORDER SCHEDULING A HEARING AND ESTABLISHING CERTAIN DEADLINES TO CONSIDER APPROVAL OF CERTAIN DISCLOSURE DOCUMENT(S) DATED OCTOBER __, 2010 AND HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. SOLICITATION OF ACCEPTANCE OR REJECTION OF THIS OR ANY COMPETING PLAN MAY OCCUR ONLY AFTER THE BANKRUPTCY COURT APPROVES A GENERAL DISCLOSURE STATEMENT.

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, et al., [1]<br><br>Debtors. | Chapter 11<br>Case No. 08-13141 (KJC)<br>Jointly Administered |

## SPECIFIC DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY CERTAIN HOLDERS OF STEP ONE SENIOR LOAN CLAIMS

Howard J. Kaplan
Deana Davidian
ARKIN KAPLAN RICE LLP
590 Madison Avenue, 35th Floor
New York, NY 10022
Telephone: 212.333.0200
Facsimile: 212.333.2350

Adam H. Friedman
Steve Wolosky
Fredrick J. Levy
OLSHAN GRUNDMAN FROME ROSENZWEIG
& WOLOSKY LLP
Park Avenue Tower
65 East 55th Street
New York, NY 10022
Telephone: 212.451.2300
Facsimile: 212.451.2222

Derek C. Abbott
MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
1201 North Market Street, 18th floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 351-9357
Facsimile: (302 425-4664
Counsel for Certain Step One Senior
Loan Claims

Evan D. Flaschen
Daniel S. Connolly
Andrew Schoulder
BRACEWELL & GIULIANI LLP
25 Asylum Street, Suite 2600
Hartford, CT 06103
Telephone: 860.947.9000
Facsimile: 860.246.3201

DATED: October 29, 2010

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the following page.

Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, lnc. (5505); Green Co, Inc. (7416); Heart & Crown Advertising,lnc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WA TL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WL VI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, IL 60611.

2

**Table of Contents**

**Page**

I.      INTRODUCTION ...................................................................................... 1

II.     IMPORTANT LEGAL INFORMATION ................................................... 1

      A.     Parties Entitled to Vote on the Step One Plan ..................................... 4

      B.     Voting Procedures, Ballots, and Voting Deadline ................................ 5

III.    BACKGROUND ........................................................................................ 5

IV.   OVERVIEW OF THE STEP ONE PLAN ............................................... 6

      A.     General Overview .................................................................................. 6

            1.     Litigation Trust ......................................................................... 7

            2.     Prosecution of the Sharing Provision Dispute .......................... 7

V.     TREATMENT OF CLAIMS AND INTERESTS ....................................... 9

      A.     Introduction ........................................................................................... 9

      B.     Key Factors and Assumptions .............................................................. 10

      C.     Summary of Allowed Claims Against and Interests in Each of the
            Debtors and of Estimated Recoveries in Respect Thereof ................. 10

            1.     Summary of Estimated Unclassified Claims Against all
                  Debtors and of Estimated Recoveries in Respect Thereof ...................... 11

            2.     Summary of Estimated Allowed Claims and Interests
                  Against Tribune and the Filed Subsidiary Debtors and of
                  Estimated Recoveries in Respect Thereof.............................. 11

            3.     Summary of Estimated Allowed Claims Against and
                  Interests for Each Guarantor Non-Debtor, if any, that
                  becomes a Debtor and of Estimated Recoveries in Respect
                  Thereof .................................................................................... 17

      D.     Settlement of the Step One LBO-Related Causes of Action ............... 19

            1.     Terms of the Settlement .......................................................... 19

            2.     Releases .................................................................................. 19

            3.     The Creditors' Trust and Litigation Trust .............................. 20

            4.     Reasonableness of the Settlement .......................................... 20

VI.   OTHER KEY PROVISIONS WHICH ARE SIGNIFICANTLY
       CHANGED FROM THE SETTLEMENT PLAN ................................... 22

      A.     Reorganized Debtor Board of Directors ............................................. 22

i

| | | |
|---|---|---|
| B. | Litigation Trust Board | 22 |
| C. | Sharing Provision Reserve and Sharing Provision Dispute | 22 |
| D. | Disbursing Agent | 22 |
| E. | Releases by Debtors and Estates | 22 |
| F. | Releases by Holders of Claims or Interests | 23 |
| G. | Preserved Causes of Action | 24 |
| H. | Bar Order | 24 |
| I. | Exculpation | 25 |

VII. PLAN PROVISIONS FOR WHICH THE STEP ONE PLAN RELIES UPON THE SETTLEMENT PLAN ........................................................ 26

| | | |
|---|---|---|
| A. | Assumption of Executory Contracts and Leases | 26 |
| B. | Assumption, Rejection and Cure Obligations | 26 |
| C. | Cure of Defaults of Assumed Executory Contracts and Unexpired Leases | 27 |
| D. | Rejection of Executory Contracts and Unexpired Leases | 28 |
| E. | Rejection Damages Bar Date | 28 |
| F. | Restructuring Transactions | 28 |
| G. | Compensation and Benefit Programs | 29 |
| H. | Intercompany Claims Settlement | 30 |
| I. | Retiree Claims Settlement | 30 |
| J. | Injunctions, Releases and Discharge | 32 |
| | 1. Discharge | 32 |
| | 2. Releases | 32 |
| | 3. Exculpation | 37 |
| | 4. Corporation Indemnities/Insurance | 37 |
| K. | Issuance and Distribution of New Securities and Related FCC Matters | 37 |
| L. | Issuance of New Securities | 38 |
| M. | Distribution of New Common Stock and New Warrants | 38 |
| N. | FCC Matters | 40 |
| | 1. FCC Media Ownership and Cross Ownership Rules | 40 |
| | 2. Issuance of New Class B Common Stock to Ensure Compliance with FCC Media Ownership and Cross-Ownership Rules | 44 |

1091124-12
1113713-1

VIII.     DESCRIPTION OF DEBT AND NEW CAPITAL STRUCTURE OF THE DEBTORS ........................................................................................ 47

    A.    New Senior Secured Term Loan Agreement ..................................... 47

    B.    Description of Exit Facility.............................................................. 47

    C.    Description of Capital Stock ............................................................ 47

IX.     BEST INTERESTS TEST AND LIQUIDATION ANALYSIS ................. 48

X.     RISK FACTORS ........................................................................................ 49

    A.    General Bankruptcy Law Considerations and Risks Related to the Step One Plan.................................................................................... 50

        1.    Objections to the Classification of Claims May Change the Composition of the Classes and the Vote Required of Each Class for the Approval of the Step One Plan........................ 50

        2.    Failure to Obtain Confirmation of the Step One Plan May Result in Liquidation or an Alternative Plan on Less Favorable Terms ..................................................................... 50

        3.    Undue Delay in Confirmation of the Step One Plan May Disrupt the Debtors' Operations............................................. 51

        4.    If the Effective Date Fails to Occur, the Debtors May Liquidate or Adopt an Alternative Plan with Less Favorable Terms ...................................................................... 51

    B.    FCC-Related Considerations and Risks Respecting the Debtors' Businesses....................................................................................... 51

        1.    The FCC Must Approve the Debtors' FCC Applications before Emergence from Bankruptcy...................................... 51

        2.    Inability to Obtain FCC Approval and Media Ownership Waivers Would Adversely Affect Ability to Consummate the Step One Plan.................................................................. 53

    C.    Risks Related to the Debtors' Businesses........................................ 56

        1.    Historical Financial Information Will Not Be Comparable ..... 56

        2.    The Debtors Could Be Faced with Additional Tax Liabilities............................................................................. 56

        3.    The Reorganized Debtors May Continue to Have Substantial Indebtedness ..................................................... 57

    D.    Risks to Creditors Who Will Receive Securities ............................. 58

        1.    The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants........................................................... 58

iii

| | | | |
|---|---|---|---|
| | 2. | Lack of Dividends May Adversely Affect Liquidity of the New Common Stock | 58 |
| | 3. | Future Sales or Issuances of Equity, Including Issuances in Respect of New Warrants to Purchase New Class A Common Stock, May Depress the Stock Price of the New Common Stock | 59 |
| | 4. | The Limited Voting Rights of the New Class B Common Stock and the Lack of Voting Rights of the New Warrants Could Impact their Attractiveness to Investors and, as a Result, their Market Value | 59 |
| | 5. | Certain Holders May be Restricted in Their Ability to Transfer or Sell Their Securities | 59 |
| E. | | Risks Related to Interests in the Litigation Trust and the Creditors' Trust | 60 |
| XI. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE STEP ONE PLAN | 61 |
| A. | | Federal Income Tax Consequences to the Debtors | 61 |
| | 1. | Termination of Subchapter S Corporation Status | 61 |
| | 2. | Cancellation of Debt and Reduction of Tax Attributes | 62 |
| B. | | Federal Income Tax Treatment of the Creditors' Trust and Litigation Trust (collectively, the "Trusts") and the Receipt and Ownership of Beneficial Interests in the Trusts | 62 |
| C. | | Federal Income Tax Treatment of the CT Reserve(s) and the LT Reserve(s) (collectively, the "Trust Reserve(s)") | 63 |
| D. | | Federal Income Tax Consequences to Holders of Claims and Interests | 64 |
| | 1. | General | 65 |
| | 2. | Market Discount | 66 |
| | 3. | Amounts Attributable to Disallowance of Disputed Claims | 66 |
| | 4. | U.S. Holders of Senior Loan Claims and Senior Guaranty Claims (not including the guaranty of the Swap Claim) | 67 |
| | 5. | U.S. Holders of Bridge Loan Claims | 68 |
| | 6. | U.S. Holders of Senior Noteholder Claims | 68 |
| | 7. | U.S. Holders of Other Parent Claims (not including the Swap Claim and Claims against Tribune arising from a Non-Qualified Former Employee Benefit Plan) | 68 |
| | 8. | U.S. Holders of General Unsecured Claims against the Filed Subsidiary Debtors (not including Claims against the | |

iv

Filed Subsidiary Debtors arising from a Non-Qualified
Former Employee Benefit Plan) .............................................. 69

9.     U.S. Holders of Convenience Claims ..................................... 69

10.    U.S. Holders of Claims arising from a Non-Qualified
Former Employee Benefit Plan ............................................. 69

11.    U.S. Holders of EGI-TRB LLC and PHONES Notes
Claims ................................................................................... 69

12.    U.S. Holders of Securities Litigation Claims ........................ 70

13.    U.S. Holders of Tribune Interests .......................................... 70

14.    Definition of "Security" ........................................................ 70

15.    Federal Income Tax Treatment of the New Senior Secured
Term Loan ............................................................................. 70

16.    Federal Income Tax Treatment of New Warrants ................. 71

17.    Non-United States Persons .................................................... 72

18.    Information Reporting and Backup Withholding ................... 72

E.    Federal Income Tax Treatment of Other Parent Claims Reserve
and Subsidiary GUC Reserve (collectively, "Reserves') ................... 73

F.    Importance of Obtaining Professional Tax Assistance ...................... 73

G.    Reservation of Rights ........................................................................ 73

XII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
OF THE STEP ONE PLAN ...................................................................... 73

A.    Continuation of The Chapter 11 Cases .............................................. 74

B.    Approval of a Competing Plan ........................................................... 74

C.    Liquidation under Chapter 7 or Chapter 11 ...................................... 74

XIII.    CONCLUSION AND RECOMMENDATION ........................................... 74

1091124-12
1113713-1

# I. INTRODUCTION

The Step One Plan provides the highest and fairest treatment to Holders of Step One Senior Loan Claims without delaying confirmation or sacrificing the recoveries of Holders of Step One Senior Loan Claims. The Step One Plan achieves this by: (a) remaining faithful to the Examiner's report and its determinations regarding the avoidability of the Step Two Transaction through the pursuit of Step Two LBO-Related Causes of Action rather than accepting a woefully inadequate settlement; (b) preserving the right to adjudicate the Sharing Provision Dispute rather than predetermining it; and (c) not providing third party releases for direct creditor claims related to Step Two LBO-Related Causes of Action.

First, unlike the plan proposed by the Debtors, the Creditors' Committee, Angelo, Gordon & Co., L.P. ("Angelo Gordon"), Oaktree Capital Management, L.P. and or its Affiliates ("Oaktree") and JPMorgan Chase Bank N.A. ("JPMorgan" and, as defined by these proponents the "Settlement Plan"), the Step One Plan provides for the prosecution, not release, of Step Two LBO-Related Causes of Action against the beneficiaries of the Step Two Transactions, including Angelo Gordon, Oaktree and JPMorgan who are among the largest Holders of Step Two Senior Loan Claims. These are causes of action that the court-appointed Examiner concluded were likely to succeed. By accepting woefully deficient consideration for settlement of those Step Two LBO-Related Causes of Action, the Settlement Plan diverts significant value away from the Estate, including the Holders of Step One Senior Loan Claims.

Second, if successful, the Sharing Dispute could result in the nullification of the Step Two Senior Loan Claims as loans made in violation of the express terms of the Senior Loan Agreement. Plainly stated, this would not only mean that Holders of Step Two Senior Loan Claims cannot benefit from the Sharing Provision, but also the subsidiary guarantees and equity pledge. The need for a court to adjudicate the Sharing Provision Dispute - and not the proponents of the Settlement Plan – cannot be made any clearer than the Settlement Plan itself. The Settlement Plan's implementation of the Sharing Provision is such that payment of the consideration for the settlement of the Step One LBO-Related Causes of Action and Step Two LBO-Related Causes of Action is pro-rata among the Senior Loan Claims. This allocation is at odds with the Examiner's finding that the Step One Senior Loan Claims are considerably less likely to be avoided as fraudulent conveyances than the Step Two Senior Loan Claims. Moreover, since Step One Senior Loan Claims are approximately three times greater than Step Two Senior Loan Claims, Holders of Step One Senior Loan Claims are paying 75% of the settlement consideration. This forces Holders of Step One Senior Loan Claims to pay the lions-share of the settlement consideration despite having a *de minimis* share of the liability being settled. The Step One Plan avoids such an inequitable result by withholding distributions to Holders of Step Two Senior Loan Claims in abeyance until the Sharing Dispute is fully and fairly litigated on the merits.

Finally, the Step One Plan does not provide third-party releases to any targets of Step Two LBO-Related Causes of Action. This will enable Holders of Step One Senior Loan Claims and Step One Senior Loan Guaranty Claims to seek redress on their direct, non-Estate, claims against the Senior Loan Agents and Senior Loan Arrangers. Indeed, such a lawsuit has been filed in New York Supreme Court by certain of the Step One Proponents. This lawsuit not only seeks money damages, it seeks to bar enforcement of the Sharing Provision.

## II. IMPORTANT LEGAL INFORMATION

THIS SPECIFIC DISCLOSURE STATEMENT SHOULD BE READ IN CONJUNCTION WITH THE GENERAL DISCLOSURE STATEMENT WHICH WILL ALSO ACCOMPANY THE PLANS AND THE BALLOTS. THE GENERAL DISCLOSURE STATEMENT SHALL BE PREPARED BY THE DEBTORS AND SHALL CONTAIN GENERAL INFORMATION CUSTOMARILY INCLUDED IN A DISCLOSURE STATEMENT PERTINENT TO, AMONG OTHER THINGS, THE DEBTORS' BUSINESS, PROPERTIES, PREPETITION LIABILITIES, CLAIMS, AND EVENTS DURING THE CHAPTER 11 CASES.

MUCH OF THE INFORMATION SET FORTH IN THIS SPECIFIC DISCLOSURE STATEMENT AND THE ACCOMPANYING PLAN IS AS SET FORTH IN THE DISCLOSURE STATEMENT PREVIOUSLY APPROVED BY THE BANKRUPTCY COURT WITH RESPECT TO THE JOINT PLAN OF REORGANIZATION PROPOSED BY THE DEBTORS. THE STEP ONE PLAN PROPONENTS BELIEVE SUCH INFORMATION TO BE ACCURATE BUT HAVE NOT INDEPENDENTLY VERIFIED IT.

FURTHER, THE INFORMATION CONTAINED IN THIS SPECIFIC DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE STEP ONE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE STEP ONE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS SPECIFIC DISCLOSURE STATEMENT AND THE GENERAL DISCLOSURE STATEMENT AND THE COMPETING PLANS IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS OR ANY COMPETING PLAN. SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN, WHICH CONTROL IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS. THE STATEMENTS CONTAINED IN THIS SPECIFIC DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS SPECIFIC DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

THIS SPECIFIC DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER, SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF ANY FOREIGN JURISDICTION.

1091124-12
1113713-1

THIS SPECIFIC DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS SPECIFIC DISCLOSURE STATEMENT. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THE GENERAL DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS APPROVED BY THE BANKRUPTCY COURT ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS SPECIFIC DISCLOSURE STATEMENT AND THE GENERAL DISCLOSURE STATEMENT AND OTHER RELATED DOCUMENTS HAVE BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

THE STEP ONE PLAN PROPONENTS RESERVE THE RIGHT TO MODIFY OR WITHDRAW THE STEP ONE PLAN IN ITS ENTIRETY OR IN PART, FOR ANY REASON. IN ADDITION, SHOULD THE STEP ONE PLAN, OR ANY INDIVIDUAL DEBTOR'S PLAN, FAIL TO BE ACCEPTED BY THE REQUISITE NUMBER AND AMOUNT OF CLAIMS AND INTERESTS VOTING, AS REQUIRED TO SATISFY SECTION 1129 OF THE BANKRUPTCY CODE, THE STEP ONE PLAN PROPONENTS RESERVE THE RIGHT TO RECLASSIFY CLAIMS OR INTERESTS OR OTHERWISE AMEND, MODIFY OR WITHDRAW THE STEP ONE PLAN IN ITS ENTIRETY OR IN PART.

CERTAIN INFORMATION CONTAINED IN THIS SPECIFIC DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND FINANCIAL PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE," "MAY, " "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN SECTION XIII, "RISK FACTORS." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. NONE OF THE DEBTORS, NOR ANY OF THE REORGANIZED DEBTORS NOR THE STEP ONE PLAN PROPONENTS, UNDERTAKE ANY OBLIGATION TO UPDATE PUBLICLY OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

1091124-12
1113713-1

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS SPECIFIC DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE FINANCIAL INFORMATION AND PROJECTIONS IN THIS SPECIFIC DISCLOSURE STATEMENT WERE PREPARED BY THE DEBTORS' MANAGEMENT, IN CONSULTATION WITH THEIR PROFESSIONAL ADVISORS. PLEASE REFER TO THE GENERAL DISCLOSURE STATEMENT FOR A DESCRIPTION OF RISK FACTORS, ASSUMPTIONS, QUALIFICATIONS AND DISCLAIMERS RELATED TO THE FINANCIAL INFORMATION AND PROJECTIONS. THE STEP ONE PLAN PROPONENTS CAUTION THAT THEY DO NOT AND CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTORS' OR THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

SUBJECT TO APPLICABLE THIRD CIRCUIT LAW, AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. SUBJECT TO APPLICABLE THIRD CIRCUIT LAW, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.]

A.    **Parties Entitled to Vote on the Step One Plan**

The following summary chart sets forth the Classes that are entitled to vote on the Step One Plan:

| Class | Description |
|---|---|
| 1C(i) | Step One Senior Loan Claims against Tribune |
| 1C(ii) | Step Two Senior Loan Claims against Tribune |
| 1D | Bridge Loan Claims against Tribune |
| 1E | Senior Noteholder Claims against Tribune |
| 1F | Other Parent Claims against Tribune |
| 1I | EGI-TRB LLC Notes Claims against Tribune |
| 1J | PHONES Notes Claims against Tribune |
| 50C(i)-111C(i)[2] | Step One Senior Loan Guaranty Claims against relevant Guarantor Debtors |
| 50C(ii)-111C(ii)[3] | Step Two Senior Loan Guaranty Claims against relevant Guarantor Debtors |
| 2E-111E | General Unsecured Claims against relevant Filed Subsidiary Debtors |

Please refer to Section 3.1 of the Step One Plan for a detailed description of the classification of Claims against and Interests in the Debtors under the Step One Plan. A list of the Debtors and the number corresponding to each Debtors for classification purposes is included as Appendix A to the Step One Plan.

**B.     Voting Procedures, Ballots, and Voting Deadline**

Detailed instructions for completing the ballot included in the package containing this Step One Plan Disclosure Statement are set forth in Article IX of the General Disclosure Statement.

### III.     BACKGROUND

On October 29, 2010, certain Step One Senior Loan Agreement Lenders, each of which is a Holder, or is a general partner or manager of an entity that is a Holder, of Step One Senior Loan Claims (collectively, the "Step One Plan Proponents" or "Plan Proponents"), filed their Joint Plan Of Reorganization For Tribune and Its Subsidiaries (as the same may be amended from time to time, the "Step One Plan" or the "Plan") with the Bankruptcy Court. A copy of the Step One Plan is attached hereto as Exhibit A. The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan also constitutes a Prepackaged Plan for any Guarantor Non-Debtors for which the commencement of a chapter 11 case becomes necessary or appropriate to conclude the restructuring provided under the Plan. The Guarantor Non-Debtors are (i) Tribune (FN) Cable Ventures, Inc.; (ii) Tribune Interactive, Inc.; (iii) Tribune ND, Inc.; and (iv) Tribune National Marketing Company.

---

[2] As set forth in Section 3.4.3(a) of the Step One Plan, the votes cast in respect of the Step One Plan by Holders of Allowed Step One Senior Loan Guaranty Claims in Classes 50C(i) through 111C(i) will also be counted as votes cast on the Prepackaged Plan of the relevant Guarantor Non-Debtors that may become Debtors.

[3] As set forth in Section 3.4.3(b) of the Step One Plan, the votes cast in respect of the Step One Plan by Holders of Allowed Step Two Senior Loan Guaranty Claims in Classes 50C(ii) through 111C(ii) will also be counted as votes cast on the Prepackaged Plan of the relevant Guarantor Non-Debtors that may become Debtors.

1091124-12
1113713-1

The Step One Plan Proponents submit this Specific Disclosure Statement pursuant to the Order Scheduling A Hearing and Establishing Certain Deadlines To Consider Approval of Certain Disclosure Statement(s), dated October 18, 2010 (D. 6022) (the "Disclosure Statement Order"). The purpose of this Specific Disclosure Statement is to describe the Step One Plan and its provisions and to provide certain information required under the Disclosure Statement Order. The Step One Plan Proponents have relied extensively on certain facts, assumptions, financial information, projections and risk factors as set forth in the Settlement Plan, and reserve the right to amend, modify or withdraw the Plan.

The Step One Plan Proponents urge all Holders of Claims entitled to vote to accept the Step One Plan, which provides significantly better distributions to Holders of Step One Senior Loan Claims and Holders of Step One Senior Loan Guaranty Claims ("Step One Lenders"), as well as to Holders of other Claims.

Creditors entitled to vote to accept or reject the Step One Plan will receive a Ballot (as defined herein) together with a General Disclosure Statement to enable them to vote on the Plan.

## IV.    OVERVIEW OF THE STEP ONE PLAN

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Specific Disclosure Statement and the Step One Plan.  The Step One Plan Proponents, moreover, reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

### A.    General Overview

The Plan described herein constitutes a separate plan of reorganization for each Debtor, and, to the extent they commence chapter 11 cases prior to the Confirmation Date, a prepackaged plan of reorganization for the Guarantor Non-Debtors.

The Step One Plan is premised upon two overarching principles: (1) the Holders of Step Two Senior Loan Claims, overwhelmingly Angelo Gordon, Oaktree and JPMorgan, are unwilling to pay fair consideration for the release of all claims against them and cannot be permitted to manipulate the Debtors' chapter 11 plan process to make the Step One Lenders pay for their losses; and (2) under applicable law, the Sharing Provision, either directly or indirectly, cannot be implemented to ameliorate the effect of any avoidance of the Step Two Senior Loan Claims or to reduce any payment due to the Estate from the Lead Banks.[4]

---

[4]    It should also be noted that the Settlement Plan uses the Sharing Provision to support its settlement, alleging "consistent with the terms of the Senior Loan Agreement, because all holders of Senior Loan Claims (i.e. Senior Loan Claims arising in connection with the Step One Transactions and Step Two Transactions) share ratably in the distributions from the Debtorrs, the Senior Lenders as a whole are not materially impacted by the avoidance of the Step Two obligations."  Specific Disclosure Statement Relating to the Settlement Plan, p. 19

1.      Litigation Trust

The Step One Plan creates a Litigation Trust to pursue Step Two LBO-Related Causes of Action as to which the court-appointed Examiner found to have a prospect of success of fifty percent or better (*i.e.*, those claims the Examiner found to be in "equipoise" or better).  There will be a Litigation Trust Board selected by the Proponents, Aurelius and the Creditors' Committee (unlike the Settlement Plan which provides for a Board of only members of the Creditors Committee), which will maintain full authority to pursue all relevant parties, including lenders, financial advisors, lawyers, shareholders, directors, and officers.  Accordingly, the Holders of Step Two Senior Loan Claims and Holders of Step Two Senior Loan Guaranty Claims (the "Step Two Lenders") will not receive a distribution until the challenge to their claims is resolved.  On the other hand, the Step One LBO-Related Causes of Action are released, consistent with the Examiner's finding that these claims had less than a fifty percent likelihood of success.  As consideration for the settlement and release of the Step One LBO-Related Causes of Action, the Step One Plan provides for payments related to the settlement described in Section V.D.1 hereof to the Holders of Senior Noteholder Claims and Other Parent General Unsecured Claims as well as a cash reserve for the Holders of the Bridge Loan Claims.  In addition, the Holders of the Step One Senior Loan Claims shall share in the distribution of the proceeds of the Step Two LBO-Related Causes of Action.

2.      Prosecution of the Sharing Provision Dispute

The Step One Plan does not enforce or predetermine the Sharing Provision Dispute. Instead, the Step One Plan recognizes this intercreditor dispute by reserving the allocable portion of the distribution that would have otherwise been made to Step Two Lenders pending a judicial determination or settlement.  In this way, all of the disputed funds and other plan consideration will be safely held in reserve account and the Plan can be confirmed without delay.  If the Step Two Senior Loan Claims and Step Two Senior Loan Guaranty Claims are not allowed, not contractually entitled to sharing, are avoided, are unenforceable, or the Lead Banks are determined by Final Order to have acted in bad faith, negligently or inequitably, they cannot receive any distribution on account of the Step Two Senior Loan Claims and Step Two Senior Loan Guaranty Claims unless and until the Sharing Provision Dispute is resolved in their favor.

The Step One Plan Proponents are confident that New York law (which governs the Senior Loan Agreement) recognizes that it is perverse to permit one who engages in bad faith or misconduct to benefit thereby.[5]  The lack of good faith of the Lead Banks identified by the Examiner should preclude the Step Two Lenders from receiving any distributions on account of avoided obligations and from enforcing the Sharing Provision.

The Examiner's report reveals lurid details of the Lead Banks possible bad faith at Step Two and is filled with evidence that the Lead Banks breached the Senior Loan Agreement and thus intentionally frustrated the purpose of the Senior Loan Agreement's terms and conditions.[6] The Examiner concluded "the Credit Agreement Agent and the lenders under the Credit Agreement should not be entitled to enforce any portion of the obligations incurred at Step Two

---

[5] *Austro v. Niagara Mohawk Power Corp.*, 66 N.Y.2d 674, 676 (1985).

[6] *See Grad v. Roberts*, 14 N.Y.2d 70, 75 (1964).

under the good faith defense." (Examiner's Report at IV.B.7.b.(3)]. Consequently, the Lead Banks' breaches and bad faith would constitute a *"complete defense"* to the Step One Lenders' performance obligation under the Sharing Provision.

Bad faith and inequitable conduct have not only been found to be a "complete defense" to enforcement of a contract in state courts, bankruptcy courts have also upheld similar equitable principles. *See*, *Sepco, Inc. v. Valley State Bank (In re Sepco, Inc.)*, 36 B.R. 279 (Bankr. S.D. 1984) ("Arlon alleges that the subordination agreement is unenforceable because it was procured by fraud; that the bank should be estopped from benefiting from its inequitable conduct; that there is a failure of consideration; and, finally, that the bank would be unjustly enriched if it were allowed to enforce the subordination agreement against Arlon. The Court has carefully examined the four defenses raised by Arlon in the light of all the evidence and concludes that the bank is precluded from enforcing the subordination agreement under each of the four theories advanced by Arlon.").

Certain Step One Plan Proponents ("Plaintiffs") have commenced litigation against JP Morgan, Merrill Lynch, Citibank, and Bank of America (the "Lead Banks") for damages and to resolve the Sharing Provision Dispute. The Plaintiffs allege claims sounding in (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) tortious interference; and (4) gross negligence. In addition, the Plaintiffs will seek a declaration that (1) JP Morgan is not entitled to rely on the indemnification provisions of the Senior Loan Agreement in defense of any damages owed to Plaintiffs; (2) Step One Lenders are not required to share ratably in distributions from the Debtors with Step Two Lenders; and (3) payments owing on the $2.1 billion purportedly loaned as part of the Step Two Incremental Facility of the Senior Loan Agreement are not subject to the Sharing Provision because the Incremental Facility never became effective by the agreement's express terms.

The Plaintiffs' claims are premised primarily upon the Lead Banks' breaches of the Senior Loan Agreement in connection with the Step Two financing, as well as JP Morgan's separate violations of its duties to the Step One Lenders by allowing the Step Two financing to occur.

Supporting the Plaintiffs' claims are the Senior Loan Agreement's express conditions to the effectiveness of the Step Two financing. As concluded by the Examiner, the Lead Banks – with the express approval of JPMorgan as Senior Loan Agent – financed the Step Two Transactions despite their knowledge that (i) the representations and warranties in the Senior Loan Agreement were likely breached; (ii) the requirements for the effectiveness of the Step Two incremental term commitments were not met; and (iii) the Step Two financing could not close under Sections 2.17 and 5.02 of the Senior Loan Agreement. Yet, JP Morgan, as administrative agent, allowed the Step Two financing to close. Moreover, JP Morgan undertook this course of conduct in the face of several letters from certain Step One Lenders repeatedly objecting to the closing of the incremental Step Two financing *in the days and weeks immediately preceding the closing*.

The Examiner's report details the misconduct of Tribune management and the Lead Banks' bad faith, if not outright fraud. The report explains, among other things, that (i) the Lead Banks knew based on their own internal analyses that the consummation of Step Two would

likely render Tribune insolvent; (ii) the Lead Banks sought to obtain additional information regarding Tribune's financial condition and did not challenge Tribune when the company refused to provide such information; (iii) the Lead Banks hired a solvency expert, but never asked the solvency expert to provide them with an opinion of whether the consummation of Step Two would render Tribune insolvent; (iv) the Lead Banks ignored numerous "red flags" – including their own internal analyses, Tribune's refusal to respond to requests for information, and the state of the market and Tribune's general financial condition – indicating that the third-party solvency opinion provided by Valuation Research Corporation ("VRC") for Tribune was tainted by false and misleading information and was altogether untrue.

In sum, the Lead Banks disregarded evidence that the financing of Step Two would drive Tribune into bankruptcy and ignored provisions of the Senior Loan Agreement that barred the financing of Step Two from even becoming effective. The Step One Lenders, as parties to the Senior Loan Agreement, were entitled to rely on the terms and protections afforded by the Senior Loan Agreement. The Lead Banks, however, were not permitted to ignore these rights and their resulting breaches directly caused Tribune's inability to pay these obligations and jeopardized Plaintiffs' interests.

Neither the Plaintiffs nor the Step One Proponents intend on permitting the Lead Banks to hijack the Debtors' chapter 11 cases to ratify their misconduct at the further expense of the Step One Lenders, the Debtors' other stakeholders and their Estates.

## V.      TREATMENT OF CLAIMS AND INTERESTS

### A.      Introduction

The following Plan Treatment section provides an overview of the treatment of different classes of Claims and Interests under the Step One Plan. The largest category of indebtedness of the Debtors is the Step One Senior Loan Claims of approximately $6.470 billion in advances made and swap liabilities incurred in connection with the tender offer for Tribune common stock that closed in June 2007 ("Step One Transactions"). Second is the Step Two Senior Loan Claims of approximately $2.101 billion in advances made in connection with the Tribune merger that closed in December 2007 ( "Step Two Transactions"). These Claims are separately classified.

The Examiner concluded that actions to avoid indebtedness incurred under the Senior Loan Agreement in connection with the Step One Transactions are unlikely to succeed, particularly with respect to Claims against Tribune's guarantor subsidiaries (which account for more than 90% of the current enterprise value of the Debtors and have $2 billion less debt than Tribune itself). The Plan therefore provides for the allowance of those Claims. Because Claims for amounts borrowed in connection with the Step One Transactions are greater than the consensus estimates of the value of the Guarantor Debtors and the Guarantor Non Debtors, the Plan provides for the value of such subsidiaries (estimated to be approximately $6.186 billion to be allocated to holders of Senior Loan Claims and other creditors of the Guarantor Debtors pursuant to the terms of the Senior Loan Agreement. In the event the Debtors further amend their valuations of either the parent and subsidiary debtors, the Step One Plan may be amended to reflect such revised valuations.

1091124-12
1113713-1

The Plan provides for the value of assets of Tribune (estimated by the Debtors to be approximately $564 million to be allocated among Claims that have been asserted against Tribune. Amounts that would be distributed in respect of Claims or portions thereof that are subject to objection by the Litigation Trust (including all Claims arising from the Step Two Transactions) are reserved pending the determination or settlement of Claims that are assigned to the Litigation Trust.

## B.      Key Factors and Assumptions

In order to determine the treatment of creditors of Tribune and each of its Subsidiary Debtors, the Step One Plan Proponents have utilized the Debtors' management and its advisors Key Factors and Assumptions contained in the Specific Disclosure Statement Relating to the Settlement Plan (p. 8), including the review of the relationship between the value of each legal entity and third-party claims and intercompany claims at each such legal entity, including the Guarantor Non-Debtors. As stated by the Debtors' management therein, for purposes of this analysis, this relationship was modeled to calculate the value available for distribution to each legal entity's creditors and stockholders taking into account the flow of value between legal entities on account of Intercompany Claims. For the purposes of this Step One Plan, the Step One Plan Proponents are relying upon certain key assumptions utilized in making those calculations which are contained in the prior Disclosure Statements filed by the Debtors and Oaktree and Angelo Gordon. In the event any of these "Key Factors and Assumptions" change or are amended, the Step One Plan Proponents reserve the right to amend their Plan consistent with such changes.

## C.      Summary of Allowed Claims Against and Interests in Each of the Debtors and of Estimated Recoveries in Respect Thereof

The following charts summarize the projected distributions to Holders of Allowed Claims and Interests under the Plan. The projections of estimated recoveries are only an estimate and subject to a number of variables, including the amount of allowed claims with any particular Class. Any estimates of Claims or Interests in this Specific Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Specific Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Plan depends upon the ability of the Step One Proponents to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. Accordingly, the recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims and Interests as well as other factors related to the Debtors' business operations and general economic conditions. Reference should be made to the entire Specific Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Interests under the Plan.

In addition, the Plan constitutes a prepackaged plan for each of the Guarantor Non-Debtors, if any, who commence Chapter 11 Cases to effectuate the restructuring contemplated under the Plan. With the exception of Senior Loan Guaranty Claims, Bridge Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, each Holder of an Allowed

Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated. In addition, except for Senior Loan Guaranty Claims, Bridge Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired and conclusively deemed to have accepted the Prepackaged Plan.

1.  Summary of Estimated Unclassified Claims
    Against all Debtors and of Estimated Recoveries in Respect Thereof

| Unclassified Claims | | | |
|---|---|---|---|
| **Affected Claims & Description** | **Estimated Allowed Claims** | **Treatment** | **Estimated Recovery** |
| **DIP Facility Claims** | $0 | **Unimpaired** | Estimated Recovery Percentage on Effective Date: **100%** <br> Form of Recovery: <br> • Cash. <br> See Section 2.1 of the Step One Plan. |
| **Administrative Expense Claims** | $125 to $175 million | **Unimpaired** | Estimated Recovery Percentage on Effective Date: **100%** <br> Form of Recovery: <br> • Cash. <br> See Section 2.2 of the Step One Plan. |
| **Priority Tax Claims** | $125 to $175 million | **Unimpaired** | Estimated Recovery Percentage on Effective Date: **100%** <br> Form of Recovery: <br> • Cash in full or in installments, together with interest. <br> See Section 2.3 of the Step One Plan. |

2.  Summary of Estimated Allowed Claims and Interests Against Tribune
    and the Filed Subsidiary Debtors and of Estimated Recoveries in Respect Thereof

| Claims Against and Interests in Tribune (Debtor 1) | | | |
|---|---|---|---|
| **Affected Claims & Description** | **Estimated Allowed Claims** | **Treatment** | **Estimated Recovery** |
| **Priority Non-Tax Claims (Class 1A)** | $0 to $1 million | **Unimpaired** | Estimated Recovery Percentage on Effective Date: **100%** <br> Form of Recovery: <br> • Reinstatement. <br> See Section 3.2.1 of the Step One Plan. |

1091124-12
1113713-1

| | | | |
|---|---|---|---|
| **Other Secured Claims (Class 1B)** | Undetermined | **Unimpaired** | <u>Estimated Recovery Percentage on Effective Date</u>: **100%** <br> <u>Form of Recovery</u>: <br> • Reinstatement. <br> <u>See</u> Section 3.2.2 of the Step One Plan. |
| **Step One Senior Loan Claims (Class 1C(i))** | $6.470 billion | **Impaired** | <u>Estimated Recovery Percentage</u> : **1.37 %** if the Sharing Provision Dispute is Resolved in favor of Step 2 (paid on Effective Date)**; 1.82%** if the Sharing Provision Dispute is Resolved in favor of Step One**.** <br> <u>Form of Recovery</u> : <br> • If the Sharing Provision Dispute is Resolved in favor of Step One, the Pro-Rata share of the Senior Loan Claims Distribution (i.e. 1.89% of Remaining Distributable Cash, 1.89% of the New Senior Secured Term Loan and 1.89% of the New Common Stock). If the Sharing Provision Dispute is Resolved in favor of Step Two, the Senior Loan Claims Distribution is shared Pro-Rata by Step One and Step Two. <br> • Class 1C(i) Litigation Trust Interests and, if such Holder has not opted out of the assignment provided in Section 14.3.1 of the Step One Plan, Class 1C(i) Creditors' Trust Interests. <br> <u>Potential Post-Effective Date Recovery</u>: <br> • If the Sharing Provision Dispute is Resolved in favor of Step One, **67.58%** of the Remaining Bridge Loan Reserve.[7] If the Sharing Provision Dispute is Resolved in favor of Step 2, same is shared Pro-Rata with Step Two. <br> <u>See</u> Section 3.2.3 of the Step One Plan. <br> Note: To the extent that Step Two is partially avoided and retains some claim, the Step One and Step Two recovery percentages described above will vary within the percentages described above and the form of recovery will vary accordingly. |

---

[7]     The Remaining Bridge Loan Reserve is an amount equal to the Bridge Loan Reserve ($77,819,000) <u>minus</u> an amount equal to the lesser of (a) (y) the amount of the Allowed Bridge Loan Claim divided by $1,619,507,000 times (z) the Bridge Loan Reserve; and (b) the Bridge Loan Reserve.

1091124-12
1113713-1

| | | | |
|---|---|---|---|
| **Step Two Senior Loan Claims (Class 1C(ii))** | $0 on the Effective Date and up to $2.101 billion if Allowed | **Impaired** | <u>Estimated Recovery Percentage:</u> **0%** if the Sharing Provision Dispute is Resolved in favor of Step One; **1.37%** if the Sharing Provision Dispute is Resolved in favor of Step One. <br> <u>Form of Recovery:</u> <br> • If the Sharing Provision Dispute is Resolved in favor of Step Two, Allowed Claims in Step One and Step Two share Pro-Rata in the Senior Loan Claims Distribution (i.e. 1.89% of Remaining Distributable Cash, 1.89% of the New Senior Secured Term Loan and 1.89% of the New Common Stock). <br> <u>Potential Post-Effective Date Recovery:</u> <br> • If the Sharing Provision Dispute is Resolved in favor of Step 2, Pro-Rata share with Step One of **67.58%** of the Remaining Bridge Loan Reserve.[8] <br> <u>See</u> Section 3.2.4 of the Step One Plan. <br> Note: To the extent that Step Two is partially avoided and retains some claim, the Step One and Step Two recovery percentages described above will vary within the percentages described above and the form of recovery will vary accordingly. |
| **Bridge Loan Claims (Class 1D)** | $0, as of the Effective Date and up to $1.620 billion if Allowed | **Impaired** | <u>Estimated Recovery Percentage on Effective Date:</u> **0%** <br> <u>Potential Post-Effective Date Recovery:</u> <br> • The Bridge Loan Distribution Amount.[9] <br> <u>See</u> Section 3.2.5 of the Step One Plan. |
| **Senior Noteholder Claims (Class 1E)** | $1.283 billion | **Impaired** | <u>Estimated Recovery Percentage on Effective Date:</u> **23.38%** <br> <u>Form of Recovery on the Effective Date:</u>[10] <br> • $300 million in Cash paid out of the Distributable Cash Pool. <br> • Class 1E Litigation Trust Interests and, if such Holder has not opted out of the assignment provided in Section 14.3.1 of the Step One Plan, Class 1E Creditors' Trust Interests. <br> <u>Potential Post-Effective Date Recovery:</u> <br> • **27.03%** of the Remaining Bridge Loan Reserve. <br> <u>See</u> Section 3.2.6 of the Step One Plan. |

---

[8]   The Remaining Bridge Loan Reserve is an amount equal to the Bridge Loan Reserve ($77,819,000) <u>minus</u> an amount equal to the lesser of (a) (y) the amount of the Allowed Bridge Loan Claim divided by $1,619,507,000 times (z) the Bridge Loan Reserve; and (b) the Bridge Loan Reserve.

[9]   The Bridge Loan Distribution Amount is an amount, after the final determination of the allowance of the Bridge Loan Claims, equal to the lesser of (a)(i) the amount of the Allowed Bridge Loan Claim divided by $1,619,507,000 times (ii) the Bridge Loan Reserve; and (b) the Bridge Loan Reserve. Thus, the portion of the $77,819,000 that the Allowed Bridge Loan Claims will receive, if any, is based on the ratio of the Allowed Claims to $1,619,507,000 (the total amount if the Bridge Loan Claims were Allowed in full).

[10]  Deutsche Bank Trust Company of Americas ("<u>DBTCA</u>"), the successor indenture trustee for the Debtors' 1992, 1995 and 1997 Indentures, asserts that the Debtors should pay for the fees and expenses of DBTCA based on the following assertions: (i) Tribune is contractually obligated to pay such fees and expenses under each of the Indentures; (ii) the fees and expenses of DBTCA are entitled to be treated as an administrative claim; and (iii) the Debtors are paying the fees and expenses of various major constituencies (including the fees and expenses of the Indenture Trustee under the 1996 Indenture) as identified in Sections 9.1.1 through 9.1.4 of the Plan. DBTCA asserts that if the Debtors do not reimburse DBTCA for its fees and expenses, DBTCA is entitled under each of the applicable Indentures to assert a lien on all property held or collected by it for reimbursement

13

| | | | |
|---|---|---|---|
| **Other Parent Claims (Class 1F)** | $260 to $350 million[11] | **Impaired** | <u>Estimated Recovery Percentage on Effective Date</u>: **25.83%**<br><u>Form of Recovery on the Effective Date</u>:<br>• At the election of each Holder of an Allowed Other Parent Claim:<br>Option 1: Cash (paid out of the Distributable Cash Pool) equal to the lesser of (a) such Holder's Pro Rata share of $90.4 million and (b) 25.83% of such Holder's Allowed Other Parent Claim; **or**<br>Option 2: Cash (paid out of the Distributable Cash Pool) equal to the lesser of (a) such Holder's Pro Rata share of $90.4 million and (b) 23.38% of such Holder's Allowed Other Parent Claim and Class 1F Litigation Trust Interests and, if such Holder has not opted out of the assignment provided in Section 14.3.1 of the Step One Plan, Class 1F Creditors' Trust Interests.<br><u>Potential Post-Effective Date Recovery</u>:<br>For claimants selecting either Option 1 or Option 2: 5.40% of the Remaining Bridge Loan Reserve.<br><u>See</u> Section 3.2.7 of the Step One Plan. |
| **Convenience Claims (Class 1G)** | $0 to $1 million | **Unimpaired** | <u>Estimated Recovery Percentage on Effective Date</u>: **100%**<br><u>Form of Recovery</u>:<br>• Cash; <u>provided</u>, <u>however</u>, that post-petition interest shall not be paid.<br><u>See</u> Section 3.2.8 of the Step One Plan. |
| **EGI-TRB LLC Notes Claims (Class 1I)** | $0, as of the Effective Date[12] | **Impaired** | <u>Estimated Recovery Percentage on Effective Date</u>: **0%**<br><u>Form of Recovery</u>:<br>• Class 1I Litigation Trust Interests and, if such Holder has not opted out of the assignment provided in Section 14.3.1 of the Step One Plan, Class 1I Creditors' Trust Interests.<br><u>See</u> Section 3.2.9 of the Step One Plan. |

of its fees and expenses. In the event DBTCA asserts such a charging lien, DBTCA has informed the Debtors that it will reimburse itself for fees and expenses prior to making any distributions to the Senior Noteholders. If DBTCA asserts a charging lien, DBTCA contends that the Holders of Senior Noteholder Claims under the 1992, 1995 and 1997 Indentures will receive a distribution that is less than that set forth in the chart above and less than that which will be received by the Holders of Senior Noteholder Claims under the 1996 Indenture. At this time, the Debtors do not take a position on whether DBTCA has the right to assert a charging lien under the applicable Indentures. However, the Debtors do not believe that DBTCA's assertion of a charging lien results in the disparate treatment of Class 1D Claims.

[11] This estimate includes the Swap Claim and the estimated Allowed amount of Claims held by the Retiree Claimants. The Swap Claim shall be Allowed against Tribune in the amount of $150,948,822. The Claims of the Retiree Claimants shall be Allowed in accordance with the Retiree Claims Settlement. Additional Other Parent Claims shall be subject to allowance or disallowance under the applicable provisions of the Step One Plan, including, but not limited to Article VIII of the Step One Plan.

[12] EGI-TRB LLC Notes Claims against Tribune shall be subject to challenge by the Litigation Trust pursuant to Section 5.17 of the Step One Plan.

| | | | |
|---|---|---|---|
| **PHONES Notes Claims (Class 1J)** | $760,880,790 | **Impaired** | <u>Estimated Recovery Percentage on Effective Date</u>:  **0%**<br><u>Form of Recovery</u>:<br>• Class 1J Litigation Trust Interests and, if such Holder has not opted out of the assignment provided in Section 14.3.1 of the Step One Plan, Class 1J Creditors' Trust Interests.<br><u>See</u> Section 3.2.10 of the Step One Plan. |
| **Intercompany Claims (Class 1K)** | N/A | **Impaired** | <u>Estimated Recovery Percentage on Effective Date</u>:  **N/A**<br><u>Form of Recovery</u>:<br>• The treatment set forth in the Intercompany Claims Settlement.<br><u>See</u> Section 3.2.11 of the Step One Plan. |
| **Securities Litigation Claims (Class 1L)** | Undetermined | **Impaired** | <u>Estimated Recovery Percentage on Effective Date</u>: **0%**<br><u>Form of Recovery</u>:<br>• All Securities Litigation Claims against Tribune shall be extinguished.<br><u>See</u> Section 3.2.12 of the Step One Plan. |
| **Tribune Interests (Class 1M)** | N/A | **Impaired** | <u>Estimated Recovery Percentage on Effective Date</u>: **0%**<br><u>Form of Recovery</u>:<br>• All Tribune Interests in Tribune shall be extinguished.<br><u>See</u> Section 3.2.13 of the Step One Plan. |
| **Claims Against and Interests in Filed Subsidiary Debtors (Debtors 2-111)** | | | |
| **Priority Non-Tax Claims (Classes 2A-111A)** | $0 to $1 million | **Unimpaired** | <u>Estimated Recovery Percentage on Effective Date</u>:  **100%**<br><u>Form of Recovery</u>:<br>• Reinstatement.<br><u>See</u> Section 3.3.1 of the Step One Plan. |
| **Other Secured Claims (Classes 2B-111B)** | Undetermined | **Unimpaired** | <u>Estimated Recovery Percentage on Effective Date</u>:  **100%**<br><u>Form of Recovery</u>:<br>• Reinstatement.<br><u>See</u> Section 3.3.2 of the Step One Plan. |
| **Step One Senior Loan Guaranty Claims (Classes 50C(i)-111C(i)** | $6.621 billion[13] (including Swap claim) | **Impaired** | <u>Estimated Recovery Percentage</u>:<br>**69.95%**  if the Sharing Provision Dispute is Resolved in favor of Step Two (paid on the Effective Date)**;  92.15%** if the Sharing Provision Dispute is Resolved in favor of Step One.<br><u>Form of Recovery</u>:<br>If the Sharing Provision Dispute is Resolved in favor of Step One, the Pro-Rata share of:<br>• 98.11% of the New Senior Secured Term Loan;<br>• 98.11% of the Remaining Distributable Cash; and<br>• 98.11% of the New Common Stock.<br>If the Sharing Provision Dispute is resolved in favor of Step Two, the above is shared Pro-Rata by Step One and Step Two.<br>Note: To the extent that Step Two is partially avoided and retains some claim, the Step One and Step Two recovery percentages described above will vary within the percentages described above and the form of recovery will vary accordingly. <u>See</u> Section 3.3.3 of the Step One Plan. |

---

[13]  This amount is asserted against each of the Guarantor Subsidiaries.  The estimated recovery set forth herein was calculated by taking the cumulative recovery from the Claims against each Guarantor Debtor and Guarantor Non-Debtor divided by this amount.

| Step Two Senior Loan Guaranty Claims (Classes 50C(ii)– 111C(ii)) | $0 on the Effective Date and up to $2.101 billion if Allowed | Impaired | Estimated Recovery Percentage: **0%** if the Sharing Provision Dispute is Resolved in favor of Step One (on the Effective Date)**; 69.95 %** if the Sharing Provision is Resolved in favor of Step Two. Form of Recovery: If the Sharing Provision Dispute is Resolved in favor of Step Two, Step One and Step Two share Pro-Rata: <ul><li>98.11% of the New Senior Secured Term Loan;</li><li>98.11% of the Remaining Distributable Cash; and</li><li>98.11% of the New Common Stock.</li></ul> See Section 3.3.4 of the Step One Plan. Note: To the extent that Step Two is partially avoided and retains some claim, the Step One and Step Two recovery percentages described above will vary within the percentages described above and the form of recovery will vary accordingly. |
|---|---|---|---|
| Bridge Loan Guaranty Claims (Class 50D-111D) | $0, as of the Effective Date[14] and up to $1.620 billion if Allowed | Impaired | Estimated Recovery Percentage: **0%** Form of Recovery: <ul><li>Distributions that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall be distributed to the Holders of Allowed Senior Loan Guaranty Claims. Accordingly, Bridge Loan Guaranty Claims shall be extinguished.</li></ul> See Section 3.3.5 of the Step One Plan. |
| General Unsecured Claims (Classes 2E-111E) | $85 to 150 million | Impaired | Estimated Recovery Percentage on Effective Date: **100%** Form of Recovery: <ul><li>Cash (paid out of the Distributable Cash Pool) equal to the lesser of (i) 100% of such Holders Allowed General Unsecured Claim against a Filed Subsidiary Debtor or (ii) a Pro Rata share of $150,000,000; provided, however, that post-petition interest shall not accrue or be paid.</li></ul> See Section 3.3.6 of the Step One Plan. |
| Intercompany Claims (Class 2K-111K) | N/A | Impaired | Estimated Recovery Percentage on Effective Date: **N/A** Form of Recovery: <ul><li>The treatment set forth in the Intercompany Claims Settlement.</li></ul> See Section 3.3.7 of the Step One Plan. |
| Securities Litigation Claims (Classes 2L-111L) | Undetermined | Impaired | Estimated Recovery Percentage on Effective Date: **0%** Form of Recovery: <ul><li>All Securities Litigation Claims against Tribune shall be extinguished.</li></ul> See Section 3.3.8 of the Step One Plan. |
| Interests in the Filed Subsidiary Debtors (Classes 2M-111M) | N/A | Unimpaired | Estimated Recovery Percentage on Effective Date: **100%** Form of Recovery: <ul><li>Reinstatement.</li></ul> See Section 3.3.9 of the Step One Plan. |

---

[14] Bridge Loan Guaranty Claims may be challenged by an Estate representative on or prior to the Effective Date and subsequently shall be subject to challenge by the Litigation Trust pursuant to Article XIII of the Step One Plan.

1091124-12
1113713-1

3.    Summary of Estimated Allowed Claims Against and Interests for Each Guarantor Non-Debtor, if any, that becomes a Debtor and of Estimated Recoveries in Respect Thereof

The Step One Plan also constitutes a Prepackaged Plan for the Guarantor Non-Debtors, if any, that commence cases under chapter 11 of the Bankruptcy Code.  For any Guarantor Non-Debtor that commences a chapter 11 case, such Prepackaged Plan shall classify Allowed Claims and Interests in the same manner as set forth above for the Filed Subsidiary Debtors.

The Guarantor Non-Debtors are Tribune (FN) Cable Ventures, Tribune Interactive, Inc., Tribune N.D. Inc., and Tribune National Marketing Company.  Tribune (FN) Cable Ventures, Inc. is a holding company owned by Tribune Broadcasting Company with a 31.3% interest in the Television Food Network general partnership.  Tribune Interactive, Inc. is owned by Tribune (88.5%) and Chicago Tribune Company (11.5%) and manages the website operations for Tribune's publishing and broadcasting subsidiaries and assists in the management of Tribune's various online classified businesses.  Tribune ND, Inc. is a holding company owned by Tribune with an approximate three percent (3%) interest in Newsday Holdings, LLC, which is the parent company of the entity that owns and operates Newsday.  Tribune National Marketing Company is a holding company owned by Tribune with a 30.8% interest in Career Builder (the United States' largest online job web site) and a 13.9% interest in Classified Ventures (which operates automotive and real estate classified advertising websites).  See further discussion in Article II.B.3 of the General Disclosure Statement, titled "Additional Investments."

Additional financial reporting information for the Guarantor Non-Debtors may be found in the Periodic Reports of Debtors Pursuant to Bankruptcy Rule 2015.3 filed with the Bankruptcy Court on July 29, 2009, January 29, 2010, and July 29, 2010.  Pursuant to Bankruptcy Rule 2015.3, these reports include, among other things, balance sheet, operating statement, and cash flow statement information relating to the Guarantor Non-Debtors.  Copies of these reports may be obtained from the publicly-available docket located, free of charge, on the Debtors' website: http://chapter11.epiqsystems.com/tribune.

As noted above, except for Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated.  In addition, except for Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired, and the Holders of such Claims and Interests are conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of such Claims and Interests are not entitled to vote to accept or reject the Prepackaged Plan.

The treatment of Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims under the Prepackaged Plan is as follows:

1091124-12
1113713-1

| Claims Against Guarantor Non-Debtors, If Any, That Become Debtors | | | |
|---|---|---|---|
| **Step One Senior Loan Guaranty Claims (Classes 50C(i)-111C(i)** | $6.621 billion[15] (including Swap claim) | **Impaired** | <u>Estimated Recovery Percentage on Effective Date</u>: **69.95%** if the Sharing Provision Dispute is Resolved in favor of Step Two; **92.15%** if the Sharing Provision Dispute is Resolved in favor of Step One.<br><br><u>Form of Recovery</u>:<br>In the event that the Sharing Provision Dispute is Resolved in favor of Step One, the Pro-Rata share of:<br>• 98.11% of the New Senior Secured Term Loan;<br>• 98.11% of the Remaining Distributable Cash; and<br>• 98.11% of the New Common Stock.<br>If the Sharing Provision Dispute is resolved in favor of Step Two, the above is shared Pro-Rata by Step One and Step Two.<br><u>See</u> Section 3.4.3(a) of the Step One Plan.<br>Note: To the extent that Step Two is partially avoided and retains some claim, the Step One and Step Two recovery percentages described above will vary within the percentages described above and the form of recovery will vary accordingly. |
| **Step Two Senior Loan Guaranty Claims (Classes 50C(ii)-111C(ii)** | $0 on the Effective Date and up to $2.101 billion if Alllowed | **Impaired** | <u>Estimated Recovery Percentage</u>:<br>**0%** if the Sharing Provision Dispute is Resolved in favor of Step Two; **69.95 %** if the Sharing Provision Dispute is Resolved in favor of Step One.<br><u>Form of Recovery</u>:<br>If the Sharing Provision Dispute is Resolved in favor of Step Two, Step One and Step Two share Pro-Rata:<br>• 98.11% of the New Senior Secured Term Loan;<br>• 98.11% of the Remaining Distributable Cash; and<br>• 98.11% of the New Common Stock.<br><u>See</u> Section 3.4.3(b) of the Step One Plan.<br>Note: To the extent that Step Two is partially avoided and retains some claim, the Step One and Step Two recovery percentages described above will vary within the percentages described above and the form of recovery will vary accordingly. |
| **Bridge Loan Guaranty Claims** | $0, as of the Effective Date[16] and if Allowed up to $1.620 billion | **Impaired** | <u>Estimated Recovery Percentage on Effective Date</u>:  0%<br><u>Form of Recovery</u>:<br>• Distributions that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall be distributed to the Holders of Allowed Senior Loan Guaranty Claims.  Accordingly Bridge Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be extinguished.<br><u>See</u> Section 3.4.3(c) of the Step One Plan. |

---

[15]  This amount is asserted against each of the Guarantor Subsidiaries.  The estimated recovery set forth herein was calculated by taking the cumulative recovery from the Claims against each Guarantor Debtor and Guarantor Non-Debtor divided by this amount.

[16]  Bridge Loan Guaranty Claims may be challenged by an Estate representative on or prior to the Effective Date and subsequently shall be subject to challenge by the Litigation Trust pursuant to Article XIII of the Step One Plan.  To the extent that any Bridge Loan Guaranty Claims are Allowed, Bridge Loan Guaranty Claims held by

1091124-12
1113713-1

| Intercompany Claims | Undetermined | **Impaired** | Estimated Recovery Percentage on Effective Date: N/A<br>Form of Recovery:<br>• The treatment set forth in the Intercompany Claims Settlement.<br>See Section 3.4.4 of the Step One Plan. |
| Securities Litigation Claims | Undetermined | **Impaired** | Estimated Recovery Percentage on Effective Date: 0%<br>Form of Recovery:<br>• All Securities Litigation Claims against Guarantor Non-Debtors that become Debtors shall be extinguished.<br>See Section 3.4.5 of the Step One Plan. |

### D. Settlement of the Step One LBO-Related Causes of Action

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Step One Plan constitutes a request to authorize and approve a good faith settlement of the Step One LBO-Related Causes of Action.

#### 1. Terms of the Settlement

The only settlement contained in this Step One Plan is of the Step One LBO-Related Causes of Action (the "Settlement"). All other causes of action are preserved.

Notwithstanding the low level of likelihood that the debt incurred in connection with the Step One Transaction is avoidable as a fraudulent conveyance, the Settlement provides consideration for the release of claims against Step One Lenders in the total amount of approximately $290 million, in cash from distributions relinquished by the Step One Lenders (including $210 million of the $300 million being received by the Senior Noteholders and the remainder to the Holders of Allowed Other Parent Claims, Convenience Claims and General Unsecured Claims against the Filed Subsidiary Debtors). As part of the Settlement, Holders of Step One Senior Loan Claims will be entitled to share the recoveries from Preserved Causes of Action in the Litigation and Creditor Trusts pro-rata with the Holders of claims against Tribune.

#### 2. Releases

The releases granted under the Settlement are limited in scope and are consistent with the Examiner's findings with respect to the LBO Related Causes of Action. Under the Step One Plan, the Debtors are providing general releases with respect to Step One-Related Causes of Action, but not Step Two-Related Causes of Action. The only exception made for Step Two LBO-Related Causes of Action is with respect to releases granted to certain employees who, generally, either received payment for their shares through the Tribune Company 401(k) Savings Plan, certain persons who remain employees of the Debtors as of the Effective Date but limited to the first $100,000 received in the Step Two Transactions, and certain Retiree Claimants but limited to the first $100,000 received in the Step Two Transactions.

---

the Settling Step Two Payees or their Affiliates will receive no worse treatment than other Bridge Loan Guaranty Claims unless otherwise agreed by such Settling Step Two Payees.

1091124-12<br>1113713-1

The Step One Plan's grant of third party releases is limited, however, to Holders of Step One Senior Loan Claims and Step One Senior Loan Guaranty Claims. As discussed herein, the grant of these third party releases is supported by a substantial reallocation of value that would have otherwise been distributed to these Holders under the Plan.

3. The Creditors' Trust and Litigation Trust

All of the Preserved Causes of Action shall be assigned to the Creditors' and Litigation Trusts. Together, the trusts shall be funded with a $20 million loan from Reorganized Tribune. The trusts will be jointly and severally liable for repayment of the loan, which will be repaid prior to any distribution in respect of Litigation Trust Interests. After such repayment and except as otherwise set forth in the Plan, as additional consideration for the Settlement, the net proceeds from Preserved Causes of Action shall be distributed pro-rata among the following Holders of Allowed: Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, Other Parent Claims, EGI-TRI LLC Note Claims and Phones Notes Claims.

4. Reasonableness of the Settlement

The Step One Proponents maintain that the Settlement incorporated in the Step One Plan is reasonable and in the best interests of the Debtors' estates. With regard to the Step One Transactions, the Examiner generally determined that it was not a voidable transaction and specifically determined as follows: a court is reasonably unlikely to find it to be an intentionally fraudulent transfer; a court is highly likely to find that Tribune was solvent; highly likely to find that the Guarantor Subsidiaries were solvent; a court is reasonably likely to find that each of Tribune and the Guarantor Subsidiaries were left with adequate capital; a court would be reasonably unlikely to find that the Tribune Entities intended to incur or believed they would incur debts beyond their ability to pay as such debts matured. Despite the Examiner having found less than a 50% likelihood of success on the claims being released by the Plan, the Step One Plan provides the Estate with a reallocation of approximately $290 million of Step One cash distributions and a share of the proceeds from the Preserved Causes of Action.

The Settlement resolves, for significant consideration, complex issues related to the Step One Transaction. As described herein and in the Examiner's Report, these issues would very likely be resolved in favor of the Step One Lenders and the Settlement saves significant time, money and resources by resolving it in the manner set forth in the Plan, while still preserving significant additional Claims for the Estates.

a. Complexity, Expense and Inconvenience of, and Delay From, Litigation; Paramount Interest of Creditors.

The Step One Plan Proponents believe the Settlement furthers the paramount interest of all creditors by providing for a reasonable resolution of the Step One LBO-Related Causes of Action and allowing the Debtors to emerge promptly from bankruptcy. In light of the low probability of succeeding on Step One LBO-Related Causes of Action as determined by the Examiner, the settlement proposed by the Step One Plan is not only in the best interests of creditors, but it furthers creditors interest much more so than the Settlement Plan.

Under the Step One Plan, the Step One Lenders are reallocating $290 million of their distributable cash recoveries to junior creditors, as opposed to $300 million proposed under the Settlement Plan – just under 4% less. This cash distribution is in addition to the right of junior creditors to share in the proceeds of the Preserved Causes of Action. While the Step One Plan does not provide for the $120 million payment being made under the Step Two Disgorgement Settlement in the Settlement Plan, the Step One Plan Proponents believe that the $120 million payment pales in comparison to the potential value of the Step Two LBO-Related Causes of Action that is preserved, and not released, under the Step One Plan. The Settlement Plan preserves:

- Claims to avoid Bridge Loan Claims;

- Claims to recover payments made to shareholders in connection with the Step Two Transactions;

- Claims against officers, directors and professionals;

- Claims against EGI, EGI-TRB and Zell;

- Claims against the Advisors, including Merrill Lynch, Citigroup Global Markets, Inc., and VRC; and

- The Morgan Stanley Claims

However, the Step One Plan preserves those same claims as they relate to the Step Two Transactions (other than the Morgan Stanley Claims, which are preserved in their entirety), while also preserving:

- Claims to avoid the Step Two Senior Loan Claims and Step Two Senior Loan Guaranty Claims; and

- Claims to disgorge all payments of principal, interest and fees made in respect of Step Two loans to the Lead Banks, Senior Loan Agents and Step Two Arrangers.

The benefits provided to creditors by the Step One Plan are made clear by taking, as an example, the Examiner's hypothetical recovery scenario under which Step Two Transactions are avoided as intentional fraudulent transfers at Tribune and the Guarantor Subsidiaries. In this scenario determined by the Examiner to be "somewhat likely", the Litigation Trust would have the right to pursue up to $3.92 billion of avoidance actions against Step Two Selling Stockholders. Moreover the Step One Plan preserves approximately $298.543 million of Step Two disgorgement claims against the Lead Banks, the Senior Loan Agents, the Step Two Arrangers and the Advisors.[17] Under the Settlement Plan, junior creditors were receiving only 40% of these potential disgorgement claims. The Step One Plan Proponents believe that creditors' interests are much better served with the preservation of approximately $6.318 billion of avoidance claims in lieu of $120 million of nuisance value -- a 97% haircut. Further, the

---

[17] See Examiner's Report, Vol. 2, B-19.

1091124-12
1113713-1

Examiner's report is the product of months of intense investigation, discovery, interviews and analysis. The groundwork has already been established for the Litigation Trust. The Step One Proponents believe that, with the $20 million loan to fund post-confirmation avoidance actions, the Litigation Trust is well poised to monetize these claims.

## VI. OTHER KEY DISTINCTIONS FROM THE SETTLEMENT PLAN

### A. Reorganized Debtor Board of Directors

The Step One Plan provides for four of seven of the members of the Reorganized Debtors' board of directors to be selected by the Proponents. Oaktree and Angelo Gordon each select one member and the CEO is the seventh member.

### B. Litigation Trust Board

The Step One Plan provides for the five Litigation Trust Board members to be chosen by a combination of the beneficiaries: three by Proponents, one by Aurelius Capital Management L.P. and one by the Creditors' Committee. The Litigation Trust Board will oversee the prosecution of the Preserved Causes of Action transferred to the Litigation Trust.

### C. Sharing Provision Reserve and Sharing Provision Dispute

The Step One Plans provides for the creation of a Sharing Provision Reserve to hold the Sharing Provision Reserve Amount until a Resolution of the Sharing Provision Dispute. The Step One Proponents do not believe that the placement of shares of New Common Stock in the Sharing Provision Reserve for the benefit of Step Two Lenders will result in a violation of applicable FCC regulations. The Sharing Provision Reserve will be governed by the terms of a Sharing Provision Reserve Agreement, which will provide, among other things, that if an action to Resolve the Sharing Provision Dispute has not been commenced prior to the Effective Date, the Proponents shall have until thirty days after the Effective Date to initiate such an action. If no action is commenced, the Sharing Provision Reserve Amount will be released and distributed to the Step Two Lenders.

Unlike the Settlement Plan, the Step One Plan does not seek to provide any purported lender under the Senior Loan Agreement with an advantage. Rather, the Proponents believe that the establishment of the Sharing Provision Reserve provides both Step One Lenders and Step Two Lenders with a fair and equitable opportunity to resolve the Sharing Provision Dispute.

### D. Disbursing Agent

Proponents must consent to the appointment of the Disbursing Agent.

### E. Releases by Debtors and Estates

Except for the Preserved Causes of Action, on the Effective Date and effective simultaneously with the effectiveness of the Step One Plan, the Reorganized Debtors on their own behalf and as representatives of their respective Estates and any Person seeking to exercise the rights of the Debtors' Estates (including, without limitation, any successor to the Debtors, the

Litigation Trustee on behalf of the Litigation Trust, the Creditors' Trustee on behalf of the Creditors' Trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), release unconditionally and should cause the Subsidiary Non-Debtors to release unconditionally, and should be deemed to release unconditionally, each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the Released Step One LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement or the Restructuring Transactions (the "Debtor Released Claims"). Except as the Debtors may otherwise provide prior to the Confirmation Date, the releases shall not apply to or otherwise affect the obligations of any of the Debtors' officers or directors to repay loans or advances of money or other property contractually owed to the Debtors or their Estates or with respect to loans or advances of money that the Debtors guaranteed on behalf of such officers or directors. Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of any express contractual commercial obligations arising in the ordinary course of any Person to the Debtors not directly related to the Released Step One LBO-Related Causes of Action. On the Effective Date, each Guarantor Non-Debtor will provide each Holder of a Step One Senior Loan Guaranty Claim against the Guarantor Non-Debtors, and the other Released Parties a release of scope equivalent to the release provided by the Debtors hereunder in consideration for the Guarantor Non-Debtor Release contemplated hereby.

F.     **Releases by Holders of Claims or Interests**

Except as otherwise expressly provided in the Step One Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of the Step One Plan, each Person (a) that has voted to accept the Plan or is deemed to have accepted the Plan and has not opted out from granting the releases in Section 11.3.2 of the Step One Plan, (b) that has voted to reject the Plan but has opted to grant the releases in Section 11.3.2 of the Step One Plan, or (c) who otherwise agrees to provide the releases set forth in Section 11.3.2 of the Step One Plan, shall be deemed to have unconditionally released each and all of the current and former Holders of Step One Senior Loan Claims and Step One Senior Loan Guaranty Claims of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the Step One LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claim), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, Disclosure Statement or the Restructuring Transactions (the "Holder Released Claims"); provided, however, that nothing in Section 11.3.2 of the Step One Plan shall be construed as a release of the Preserved Causes of Action or any Claims against non-Debtors arising under the Employee

Retirement Income Security Act of 1974 held by the United States Department of Labor; provided further, that no agent or indenture trustee is, by virtue of giving its own release hereunder, releasing individual claims, if any, of lenders or noteholders for which it acts or acted as agent or indenture trustee that are not themselves Released Parties; provided further that no agent, arranger or indenture trustee shall be deemed to have released any lenders or noteholders for which it acts or acted as agent or indenture trustee from any obligations under the relevant instruments. Furthermore, notwithstanding the foregoing and except as provided in Section 11.3.5 of the Step One Plan with respect to the Guarantor Non-Debtors, such release, waiver and discharge shall not operate as a release, waiver or discharge of any contractual obligation of any non-Debtor party due to any other non-Debtor party.

## G. Preserved Causes of Action

The Preserved Causes of Action are expressly preserved and shall not be subject to the releases set forth in Section 11.3.1 or 11.3.2 of the Step One Plan; provided, that the Preserved Causes of Action shall be subject to the provisions of Section 11.3 of the Step One Plan. In addition, any claims, rights or causes of action related to setoffs against amounts owing to the Debtors are expressly preserved and are not subject to the releases set forth in the Step One Plan; provided that, except as set forth in Section 7.11.2 of the Step One Plan, in no event shall the Debtors or the Disbursing Agent setoff against any distributions under the Step One Plan to Holders of Allowed Claims in Classes 1C(i), and 50C(i) through 111C(i) (other than any distributions to MSCS with respect to the Morgan Stanley Claims).

## H. Bar Order

The Confirmation Order shall provide, among other things (and the inclusion of such language, or language substantially similar to the following, and subject to Section 10.2 of the Step One Plan, shall be a condition to the Effective Date):

"ORDERED that all (i) Released Parties; (ii) Persons who have voted for or against the Plan or who are presumed to have voted for or against the Plan under Section 1126(f)-(g) of the Bankruptcy Code; and (iii) any other Persons that hold, have held or may hold a Claim or other debt or liability, or an Interest or other right of an equity holder, against, in or relating to any of the Debtors or their respective estate (collectively, the "Barred Persons"), are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Released Party (including any other non-contractual claim against the Released Parties, whether or not denominated as for contribution or indemnity, where the injury to the Barred Person is the liability of the Barred Person to the Plaintiff (as defined below)), arising out of or reasonably flowing from the claims or allegations in any of the Released Claims or the Preserved Causes of Actions, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"). If a court or tribunal determines that Barred Claims exist that would have given rise to liability of any Released Party to a Barred Person but for this Order, the Barred Persons are also entitled to the judgment reduction provisions set forth herein. This Order (the

1091124-12
1113713-1

"Bar Order") is without prejudice to the position of any party as to the existence, in the absence of this Bar Order, of any Barred Claim; and it is further

ORDERED that in the event any Person asserting a Preserved Cause of Action (a "Plaintiff") obtains a judgment or arbitration award (a "Judgment") against any Barred Person with respect to one or more Preserved Causes of Action based upon, arising from, or related to the facts, allegations, or transactions underlying any Released Claims, then the Plaintiff shall, prior to or in connection with the entry of such Judgment, provide notice of this Bar Order to the court or tribunal in which such Judgment was obtained. Such court or tribunal shall determine whether the Judgment gives rise to Barred Claims on which Released Parties would have been liable to the Barred Persons in the absence of this Bar Order. If the court or tribunal so determines, it shall reduce such Judgment against such Barred Person in an amount equal to (a) the amount of the Judgment against any such Barred Person times (b) the aggregate proportionate share of fault (expressed as a percentage) of the Released Party or Parties that would have been liable on a Barred Claim in the absence of this Bar Order. In the event that Judgment shall be entered against any Barred Person without a prior or concurrent determination as to the existence of a Barred Claim and the Released Party's liability on such Barred Claim in the absence of this Bar Order (and, in the event of such a determination, without a reduction of such Judgment), such Judgment shall not, and shall be deemed not to, give rise to any Barred Claim; and it is further

ORDERED that nothing herein shall prejudice or operate to preclude the rights of any Barred Person to assert claims, other than Barred Claims, against any party. For the avoidance of doubt, the provisions of this Bar Order, including the judgment reduction provisions set forth herein, shall not apply to (i) any contractual indemnity; (ii) any claim for which a court determines joint liability does not exist as a matter of law, equity or fact as between any Barred Person and any Released Party; or (iii) any claims for non-contractual indemnity or contribution asserted with respect to claims or causes of action that are brought by any Person other than (a) the Litigation Trust; (b) the Creditor Trust; (c) any Person asserting a claim on behalf of the Debtors' estates; or (d) any Person asserting a Preserved Cause of Action; and it is further

ORDERED that if any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transaction underlying any Released Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement; and it is further

ORDERED that this Court shall retain continuing jurisdiction with respect to all matters concerning this Bar Order.

I.      Exculpation

To the fullest extent permitted under applicable law, none of the Proponents and none of the Related Persons to Proponents, shall have or incur any liability to any person or entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, negotiation of any plans of reorganization, including the Step One Plan, pursuit of confirmation of any plans of reorganization, including the Step One Plan, the administration, consummation

and implementation of the Plan or the property to be distributed under the Plan, the Specific Disclosure Statement, the General Disclosure Statement, the Restructuring Transactions, the Plan Supplement, the releases and injunctions, or the management or operation of the Debtors (except for any liability that results from willful misconduct or gross negligence as determined by a Final Order). Any of the Proponents shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration thereof.

## VII. PLAN PROVISIONS FOR WHICH THE STEP ONE PLAN RELIES UPON THE SETTLEMENT PLAN

### A. Assumption of Executory Contracts and Leases

Under section 365 of the Bankruptcy Code, the Debtors have the right, subject to Bankruptcy Court approval, to assume or reject executory contracts and unexpired leases to which the Debtors are a party. If a Debtor rejects an executory contract or unexpired lease that it entered into prior to the Petition Date, such contract or lease will be treated as if it were breached by the applicable Debtor(s) on the date immediately preceding the Petition Date, and the other party to the agreement may assert a claim for damages incurred as a result of the rejection, which will be treated as a prepetition unsecured claim pursuant to section 365(g) of the Bankruptcy Code. In the case of the rejection of unemployment agreements and real property leases, damages are subject to certain limitations imposed by sections 365 and 502 of the Bankruptcy Code.

### B. Assumption, Rejection and Cure Obligations

On the Effective Date, all executory contracts or unexpired leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is an executory contract or unexpired lease that is included in the Global Contract Motion, (iv) is an executory contract or unexpired lease that is expressly excluded from the assumptions set forth in Section 6.5 of the Step One Plan or is set forth on Exhibit 6.3 to the Step One Plan, to be filed with the Plan Supplement, or (v) is an executory contract or unexpired lease that is included in a pending motion to reject such executory contract or unexpired lease. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed during the Chapter 11 Cases or pursuant to Article 6 of the Step One Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor, including any successor to such Reorganized Debtor after giving effect to the Restructuring Transactions, in accordance with its terms, except as modified by the provisions of the Step One Plan, agreement of the parties thereto, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

1091124-12
1113713-1

Subject to the terms of Article VII and Section 6.1.1 of the Step One Plan and except for any Customer Program otherwise designated on Exhibit 6.3 to the Step One Plan, all refund and subscriber credit programs or similar obligations of the Debtors to subscribers or former subscribers to any of the Debtors' publications under the Customer Programs shall be deemed assumed effective as of the Effective Date and the proposed cure amount with respect to each shall be zero dollars. Nothing contained in Section 6.1.2 of the Step One Plan shall constitute or be deemed to be a waiver of any claim or cause of action that the Debtors may hold against any Person. Except with respect to any Customer Programs included on Exhibit 6.3 to the Step One Plan, as a result of the deemed assumption of the Debtors' refund, subscriber credit and other obligations under the Customer Programs to subscribers and former subscribers pursuant to Section 6.1.2 of the Step One Plan, all Proofs of Claim on account of or in respect of any such obligations shall deemed withdrawn automatically and without any further notice to or action by the Bankruptcy Court, and the Debtors' Claims Agent shall be authorized as of the Effective Date to expunge such Proofs of Claim from the claims register.

The Step One Plan Proponents have not yet determined how to treat certain insurance policies issued by ACE American Insurance Company and/or its affiliates (collectively, "ACE") to or on behalf of the Debtors and any related agreements (hereinafter, the "ACE Policies and Agreements"), including whether or not such agreements are executory and whether they will be assumed. Subject to the Debtors' rights, if any, to assume or to reject such contracts, nothing contained in this Step One Plan Disclosure Statement, the Step One Plan, the Confirmation Order, any exhibit to the Step One Plan, any Plan Supplement or any other Step One Plan document (including any provision that purports to be peremptory or supervening), shall in any way operate to, or have the effect of, waiving or impairing in any respect the legal, equitable or contractual rights or defenses of the parties to the ACE Policies and Agreements. For the avoidance of doubt, nothing in this Step One Plan Disclosure Statement or in the Step One Plan shall be read to authorize the unilateral amendment by the Debtors of any of the terms of the ACE Policies and Agreements. In any event, ACE has reserved all of its rights and defenses under the ACE Policies and Agreements and applicable non-bankruptcy law with respect to the ACE Policies and Agreements.

### C.    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases

The Bankruptcy Code provides for the calculation of "cure amounts" which may, in some instances, be payable by the Debtors to the non-Debtor party in connection with executory contracts or unexpired leases that are assumed by the Debtors. The proposed cure amount for any executory contract or unexpired lease that is assumed pursuant to the Step One Plan shall be zero dollars unless otherwise indicated in a schedule to be filed with the Bankruptcy Court as part of the Plan Supplement or other pleading approved by the Step One Plan Proponents and the Debtors. Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default and not subsequently cured shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section

1091124-12
1113713-1

365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed conditionally assumed by the relevant Debtor unless otherwise ordered by the Bankruptcy Court.

### D. Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, each executory contract and unexpired lease that is listed on Exhibit 6.3 to the Step One Plan shall be rejected pursuant to section 365 of the Bankruptcy Code. Each contract or lease listed on Exhibit 6.3 to the Step One Plan, to be filed with the Plan Supplement, shall be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. The Debtors reserve their right to amend Exhibit 6.3 to the Step One Plan to delete any unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto. Listing a contract or lease on Exhibit 6.3 to the Step One Plan shall not constitute an admission by a Debtor nor a Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that such Debtor or Reorganized Debtor has any liability thereunder.

### E. Rejection Damages Bar Date

If the rejection by a Debtor, pursuant to the Step One Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed and served upon counsel to the Debtors within thirty (30) days after service of the notice that the executory contract or unexpired lease has been rejected.

### F. Restructuring Transactions

During the Chapter 11 Cases, the Debtors and their advisors undertook an analysis of the Debtors' corporate structure. These efforts have focused on, among other things, identifying modifications to the corporate structure that would reduce administrative inefficiencies and expenses, streamline post-emergence tax reporting and facilitate future strategic decision making. Consistent with the terms of Section 5.2 of the Step One Plan, the Debtors retain the right to implement these initiatives through a Plan Supplement. Restructuring Transactions may include, among other transactions, (i) converting certain of the Reorganized Debtors into limited liability companies, or merging certain of the Reorganized Debtors into newly formed limited liability companies in jurisdictions where conversion is not available and (ii) consolidating and reallocating certain operations of the Reorganized Debtors within the organizational structure of Reorganized Tribune.

The Step One Plan provides that on or prior to the Effective Date, any Debtor and, after the Effective Date, any Reorganized Debtor, may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor or Reorganized Debtor to be necessary or appropriate to affect such Restructuring Transactions. The actions to effect the Restructuring Transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are

1091124-12
1113713-1

consistent with the terms herein and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms herein and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions. The Restructuring Transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the applicable Debtors or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transactions for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Reorganized Debtors.

The Step One Plan provides that in each case in which the surviving, resulting or acquiring person in any such Restructuring Transaction is a successor to a Debtor or Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Debtor or Reorganized Debtor pursuant to the Step One Plan to pay or otherwise satisfy the Allowed Claims against such Debtor or Reorganized Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Debtor or Reorganized Debtor will perform such obligations. Implementation of the Restructuring Transactions shall not affect any distributions, discharges, exculpations, releases or injunctions set forth in the Step One Plan. Exhibit 5.2 to the Step One Plan, which shall be filed with the Plan Supplement, shall set forth the Restructuring Transactions and a detailed description of the actions and steps required to implement each Restructuring Transaction. On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in Section 5.2 of the Step One Plan. The Restructuring Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code and section 303 of title 8 of the Delaware Code, if applicable, without any further notice, action, third-party consents, court order or process of any kind, except as otherwise set forth herein or in the Confirmation Order. To the extent that any Restructuring Transaction may require the prior consent of the FCC to an assignment of FCC Licenses or a transfer of control of a holder of FCC Licenses, no such Restructuring Transaction shall be consummated until all necessary prior consents of the FCC shall have been obtained.

G. **Compensation and Benefit Programs**

With the exception of the Compensation and Benefit Programs described in Article III.C.6–III.C.11 of the General Disclosure Statement (i.e., the Management Equity Incentive Program, the Equity-Based Compensation Provisions of the Incentive Compensation Plan, the Employee Stock Ownership Plan, the Transitional Compensation Plan, the Nonqualified Retirement / Deferred Compensation Plans, and Certain Individual Letter Agreements), the Reorganized Debtors shall continue to perform their obligations under all Employee Benefit

Plans and all such Employee Benefit Plans shall be assumed by the applicable Reorganized Debtors; provided, however, that nothing in the Step One Plan shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, causes of action, or other rights with respect to the interpretation, application or enforcement of any such Employee Benefit Plan or the payment of any Employee Benefit Claim, including the Reorganized Debtors' rights to amend, modify or terminate any such Employee Benefit Plan either prior to or after the Effective Date.

### H.    Intercompany Claims Settlement

The Step One Plan provides for the settlement and compromise of all Intercompany Claims.  The terms of the Intercompany Claims Settlement shall be set forth in Exhibit 1.1.122 to the Step One Plan, which will be filed with the Plan Supplement.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Step One Plan, of the Intercompany Claims Settlement and the Bankruptcy Court's finding that the Intercompany Claims Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

### I.    Retiree Claims Settlement

The Step One Plan will implement a settlement between the Debtors and approximately 200 individuals holding claims arising from Non-Qualified Former Employee Benefit Plans relating to their former employment with various of the Debtors or their predecessors (the "Retiree Claims").  This settlement is embodied in the Stipulation Between Debtors and Retiree Claimants Settling and Allowing Claims (the "Retiree Claimant Settlement Agreement"), which is attached to the Step One Plan as Exhibit 5.15.4.

The majority of the Retiree Claims arise from non-qualified pension claims and deferred compensation claims.  The Debtors scheduled the Retiree Claims in an aggregate amount of approximately $82 million.  The holders of the Retiree Claims (the "Retiree Claimants") asserted, through individual proofs of claim, an aggregate amount of approximately $113 million on account of the Retiree Claims.  The proposed settlement establishes the Allowed amount of each Retiree Claim, with the total Allowed amount of all Retiree Claims being approximately $103 million.  The Retiree Claimant Settlement Agreement resolves the disputes between the Debtors and the Retiree Claimants regarding: (i) the discount rates and mortality tables most appropriately applied to those Retiree Claims that are based on future annuity payments; (ii) whether the Retiree Claims for deferred compensation are entitled to interest for the prepetition period of the 2008 calendar year; and (iii) with respect to some of the Retiree Claims, the factual basis for such claims, including whether the claimant was entitled to annuity or other benefit payments, the type of annuity or other benefit, and the specific amounts owed.  The Debtors and counsel for the Retiree Claimants worked closely with the Creditors' Committee and a committee of certain Senior Lenders in negotiating the Retiree Claimant Settlement Agreement.

In accordance with the Retiree Claimants Settlement Agreement, each of the Retiree Claims will be Allowed General Unsecured Claims in the "Total Agreed Amount" indicated on Schedule A to the Retiree Claimants Settlement Agreement.  To the extent a Retiree Claim is a

1091124-12
1113713-1

claim for future annuity payments, that component of the Total Agreed Amount has been calculated pursuant to a formula for determining the present value of future annuity payments and the applicable mortality tables (the "Annuity Formula"). The Annuity Formula utilizes the United States Internal Revenue Code § 417(e) Lump Sum Rates for 2008 plan year payments, with (i) applicable interest rates for 2008 plan year payments determined as of January 1, 2008 with a two-month lookback to the November 2007 segment rates of 4.60%, 4.82% and 4.91%, and (ii) the RP-2000 Healthy mortality table (weighted 50% male and 50% female), using scale AA for (x) seven (7) years from the valuation date for annuitants and (y) fifteen (15) years from the valuation date for non-annuitants. An additional 5.165% of the present value of the future annuity payments (the "Litigation Adjustment") has also been included in the Total Agreed Amounts for those Retiree Claims involving future annuity payments, to represent the compromise, based on the potential cost and outcome of litigating the differences between the discount rates and mortality tables used by the Debtors and those used by the Retiree Claimants. To the extent any Retiree Claim listed on Schedule A to the Retiree Claimants Settlement Agreement is a claim for deferred compensation payments, that component of the Total Agreed Amount has been calculated to include one half of the amount of interest allocable to the prepetition portion of the 2008 calendar year ("Allowed 2008 Deferred Compensation Interest") that the Retiree Claimants argue accrued under the terms of the relevant plans and agreements. Each Total Agreed Amount listed on Schedule A to the Retiree Claimants Settlement Agreement shall constitute an Allowed General Unsecured Claim against the specific Debtor identified on the same row as such Total Agreed Amount on Schedule A to the Retiree Claimants Settlement Agreement.

Pursuant to the Retiree Claimants Settlement Agreement, the agreed Allowed amounts of the Retiree Claims are conditioned upon confirmation of the Step One Plan, as amended from time to time, or another plan of reorganization, in each case providing for the classification and treatment of the Retiree Claims consistent with their classification and treatment under the Step One Plan.

With respect to claims that are similar in nature to the Retiree Claims but not a part of the Retiree Claimants Settlement Agreement ("Similar Claims"), the Debtors intend to liquidate such Similar Claims consistent with the formulas and principles applicable to the Retiree Claims under the Retiree Claimants Settlement Agreement, including the Annuity Formula, the Allowed 2008 Deferred Compensation Interest, and the Litigation Adjustment. In order to achieve this result, the Debtors will engage in negotiations with holders of Similar Claims and, as necessary, employ the procedures for objecting to claims described in this Specific Disclosure Statement and the Step One Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Step One Plan, of the Retiree Claimant Settlement Agreement and the Bankruptcy Court's finding that the Retiree Claimant Settlement Agreement is in the best interests of the Debtors, the Reorganized Debtors, their respective Debtors' Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

## J. Injunctions, Releases and Discharge

The releases granted under the Step One Plan are reasonable, narrow in scope, and give deference to the Examiner's findings on culpability vis-à-vis participants to the Step One Transactions and the Step Two Transactions. The Step One Plan accomplishes this by preserving claims against, among others, the Debtors' directors, officers, Advisors and Samuel Zell to the extent arising from the Step Two Transactions, as well as, among others, Step Two Lenders and Step Two Selling Stockholders (with a limited exception for Released Step Two Stockholder Parties discussed above). In light of the Examiner's finding of less than a 50% probability of avoiding the Step One Transactions as fraudulent conveyances, the Proponents believe that the reallocation of $290 million of the Step One Lenders' recoverable cash to junior classes constitutes a substantial contribution to the Debtors' estates and reasonable consideration for the releases granted under the Step One Plan. Further, the Step One Plan limits the grant of third party releases to Step One Lenders. However, the third party releases are subject to the right of parties to "opt-out" without any economic penalty.

To facilitate the Settlement and ensure that the settling parties obtain a full resolution of all potential claims, the Step One Plan provides for a bar order forbidding prosecution of claims sounding in contribution against the settling parties based on the claims that have been released by the Settlement. The Proponents do not believe that the grant of such relief will prejudice any other party-in-interest.

### 1. Discharge

Except as otherwise provided in the Step One Plan, the confirmation of the Step One Plan shall, as of the Effective Date, (i) discharge the Debtors from all Claims or other debts that arose before the Effective date and all debts of the kind specified in sections 502(g) or 502(i) of the Bankruptcy Code and (ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors. As of the Effective Date, except as otherwise provided in the Step One Plan, all Persons are precluded and enjoined from asserting against the Debtors or the Reorganized Debtors or their property any Claims, causes of action or Interests based upon any prepetition act, omission, transaction or activity, and all Persons holding discharged Claims or terminated equity Interests are permanently enjoined from pursuing any judicial or non judicial enforcement actions or other proceedings of any kind against the Debtors, Reorganized Debtors or their property on account of such discharged Claims or terminated Interests.

### 2. Releases

#### a) Releases by Debtors and Estates

As discussed above, the key distinction between the releases granted by the Debtors under the Settlement Plan and those granted under the Step One Plan is that the Proponents do not support a release of the Step Two Lenders or the Senior Loan Agents and Senior Loan Arrangers with respect to the Step Two Transactions.

Otherwise and except for the Preserved Causes of Action, on the Effective Date and effective simultaneously with the effectiveness of the Step One Plan, under the Step One Plan the Reorganized Debtors on their own behalf and as representatives of their respective Estates and

any Person seeking to exercise the rights of the Debtors' Estates (including, without limitation, any successor to the Debtors, the Litigation Trustee on behalf of the Litigation Trust, the Creditors' Trustee on behalf of the Creditors' Trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), release unconditionally and should cause the Subsidiary Non-Debtors to release unconditionally, and should be deemed to release unconditionally, each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the Released Step One LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement or the Restructuring Transactions (the "Debtor Released Claims"). Except as the Debtors may otherwise provide prior to the Confirmation Date, the releases shall not apply to or otherwise affect the obligations of any of the Debtors' officers or directors to repay loans or advances of money or other property contractually owed to the Debtors or their Estates or with respect to loans or advances of money that the Debtors guaranteed on behalf of such officers or directors. Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of any express contractual commercial obligations arising in the ordinary course of any Person to the Debtors not directly related to the Released Step One LBO-Related Causes of Action. On the Effective Date, each Guarantor Non-Debtor will provide each Holder of a Step One Senior Loan Guaranty Claim against the Guarantor Non-Debtors, and the other Released Parties a release of scope equivalent to the release provided by the Debtors hereunder in consideration for the Guarantor Non-Debtor Release contemplated hereby.

b) Releases by Holders of Claims or Interests

As discussed above, the key distinction between the releases granted by third parties, subject to the opt-out right, under the Settlement Plan and those granted under the Step One Plan is that the Proponents only support the grant of such releases in favor of the Step One Lenders.

Otherwise and except as otherwise expressly provided in the Step One Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of the Step One Plan, each Person (a) that has voted to accept the Plan or is deemed to have accepted the Plan and has not opted out from granting the releases in Section 11.3.2 of the Step One Plan, (b) that has voted to reject the Plan but has opted to grant the releases in Section 11.3.2 of the Step One Plan, or (c) who otherwise agrees to provide the releases set forth in Section 11.3.2 of the Step One Plan, shall be deemed to have unconditionally released each and all of the current and former Holders of Step One Senior Loan Claims and Step One Senior Loan Guaranty Claims of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the Step One LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claim), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise,

1091124-12
1113713-1

that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, Disclosure Statement or the Restructuring Transactions (the "Holder Released Claims"); provided, however, that nothing in Section 11.3.2 of the Step One Plan shall be construed as a release of the Preserved Causes of Action or any Claims against non-Debtors arising under the Employee Retirement Income Security Act of 1974 held by the United States Department of Labor; provided further, that no agent or indenture trustee is, by virtue of giving its own release hereunder, releasing individual claims, if any, of lenders or noteholders for which it acts or acted as agent or indenture trustee that are not themselves Released Parties; provided further that no agent, arranger or indenture trustee shall be deemed to have released any lenders or noteholders for which it acts or acted as agent or indenture trustee from any obligations under the relevant instruments. Furthermore, notwithstanding the foregoing and except as provided in Section 11.3.5 of the Step One Plan with respect to the Guarantor Non-Debtors, such release, waiver and discharge shall not operate as a release, waiver or discharge of any contractual obligation of any non-Debtor party due to any other non-Debtor party.

> c) Release of Guarantor Non-Debtors from Senior Guaranty Claims and Bridge Loan Guaranty Claims

All Holders of Loan Guaranty Claims against the Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and the Guarantor Non-Debtors shall be unconditionally relieved from any liability to the Senior Lenders or the Bridge Lenders on account of the Senior Guaranty Claims or the Bridge Loan Guaranty Claims and the Senior Loan Agent and the Bridge Loan Agent, respectively, shall be unconditionally relieved from any liability of any nature whatsoever to such Holders as a result of the release of the Guarantor Non-Debtors from any and all Senior Guaranty Claims and Bridge Loan Guaranty Claims; provided, however, that the Guarantor Non-Debtor Release is dependent upon and only effective upon (i) the execution by each of the Guarantor Non-Debtors of a guaranty of the New Senior Secured Term Loan pursuant to and to the extent provided in Section 5.6 of the Step One Plan, (ii) the unconditional release by each of the Guarantor Non-Debtors, in form and substance acceptable to the Step One Plan Proponents, as of the Effective Date, of each of the Holders of Senior Guaranty Claims and the Senior Loan Agents of and from any and all Debtor Released Claims, and (iii) the granting by the Guarantor Non-Debtors of Liens on certain property of the Guarantor Non-Debtors pursuant to and to the extent provided in Section 5.6 of the Settlement Plan. Pursuant to Bankruptcy Rule 9019 and/or 11 U.S.C. § 1123(b)(3), the Bankruptcy Court's entry of the Confirmation Order shall constitute its approval of this good faith settlement and compromise of the claims released by the Guarantor Non-Debtor Release and adequate factual findings that the Guarantor Non-Debtor Release is: (i) fair, equitable and reasonable; (ii) necessary and essential to the Debtors' successful reorganization; (iii) in exchange for good and valuable consideration provided by the Guarantor Non-Debtors and the Agents; (iv) warranted by the exceptional and unique circumstances of the Debtors' reorganization; and (v) consistent with public policy and due process principles. Notwithstanding the foregoing, in the event that the Guarantor Non-Debtor Release set forth in Section 11.2.5 of the Step One Plan does not become effective for any reason whatsoever, all Senior Guaranty Claims against the Guarantor Non-Debtors and any and all rights of subordination in respect of the Bridge Loan Guaranty Agreement shall and shall be deemed to

34

have been assigned and transferred as of the Effective Date by the Senior Lenders and the Senior Loan Agent to the Senior Guaranty Claim Assignee.

d) Non-Release of Certain Defined Benefit Plans

Notwithstanding anything to the contrary in the Step One Plan, with respect to any Defined Benefit Plan that has not been terminated or does not terminate by its terms prior to the entry of the Confirmation Order, all Claims of, or with respect to, such a Defined Benefit Plan (including any based on fiduciary duties under the ERISA) and all Claims of the Pension Benefit Guaranty Corporation, whether or not contingent, under 29 U.S.C. § 1362(b) for unfunded benefit liabilities, under 29 U.S.C. § 1306(a)(7) for termination premiums, and under 29 U.S.C. § 1362(c) for due and unpaid employer contributions shall not be discharged, released, exculpated or otherwise affected by the Settlement Plan (including Section 11.2 of the Step One Plan), the entry of the Confirmation Order or the Chapter 11 Cases. Notwithstanding anything to the contrary in the Step One Plan, in the event that a Defined Benefit Plan does not terminate prior to the entry of the Confirmation Order, obligations of the Debtors under the Defined Benefit Plan as of the Effective Date shall become obligations of the applicable Reorganized Debtors and, as required by the Internal Revenue Code of 1986, as amended, or the ERISA, the controlled group members.

e) Injunction Related to Releases

Except as provided in the Step One Plan or Confirmation Order, as of the Effective Date all Persons holding a Released Claim are permanently enjoined from pursuing, on account of or based on the Released Claims, any judicial or non judicial enforcement actions or other actions or proceedings of any kind against the Released Parties or their property.

f) Preserved Causes of Action

The Preserved Causes of Action are expressly preserved and shall not be subject to the releases set forth in Section 11.3.1 or 11.3.2 of the Step One Plan; provided, that the Preserved Causes of Action shall be subject to the provisions of Section 11.3 of the Step One Plan. In addition, any claims, rights or causes of action related to setoffs against amounts owing to the Debtors are expressly preserved and are not subject to the releases set forth in the Step One Plan; provided that, except as set forth in Section 7.11.2 of the Step One Plan, in no event shall the Debtors or the Disbursing Agent setoff against any distributions under the Step One Plan to Holders of Allowed Claims in Classes 1C(i), and 50C(i) through 111C(i) (other than any distributions to MSCS with respect to the Morgan Stanley Claims).

g) Bar Order

The Confirmation Order shall provide, among other things (and the inclusion of such language, or language substantially similar to the following, and subject to Section 10.2 of the Step One Plan, shall be a condition to the Effective Date):

"ORDERED that all (i) Released Parties; (ii) Persons who have voted for or against the Plan or who are presumed to have voted for or against the Plan under Section 1126(f)-(g) of the Bankruptcy Code; and (iii) any other Persons that hold, have held or may hold a Claim or other

debt or liability, or an Interest or other right of an equity holder, against, in or relating to any of the Debtors or their respective estate (collectively, the "Barred Persons"), are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Released Party (including any other non-contractual claim against the Released Parties, whether or not denominated as for contribution or indemnity, where the injury to the Barred Person is the liability of the Barred Person to the Plaintiff (as defined below)), arising out of or reasonably flowing from the claims or allegations in any of the Released Claims or the Preserved Causes of Actions, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"). If a court or tribunal determines that Barred Claims exist that would have given rise to liability of any Released Party to a Barred Person but for this Order, the Barred Persons are also entitled to the judgment reduction provisions set forth herein. This Order (the "Bar Order") is without prejudice to the position of any party as to the existence, in the absence of this Bar Order, of any Barred Claim; and it is further

ORDERED that in the event any Person asserting a Preserved Cause of Action (a "Plaintiff") obtains a judgment or arbitration award (a "Judgment") against any Barred Person with respect to one or more Preserved Causes of Action based upon, arising from, or related to the facts, allegations, or transactions underlying any Released Claims, then the Plaintiff shall, prior to or in connection with the entry of such Judgment, provide notice of this Bar Order to the court or tribunal in which such Judgment was obtained. Such court or tribunal shall determine whether the Judgment gives rise to Barred Claims on which Released Parties would have been liable to the Barred Persons in the absence of this Bar Order. If the court or tribunal so determines, it shall reduce such Judgment against such Barred Person in an amount equal to (a) the amount of the Judgment against any such Barred Person times (b) the aggregate proportionate share of fault (expressed as a percentage) of the Released Party or Parties that would have been liable on a Barred Claim in the absence of this Bar Order. In the event that Judgment shall be entered against any Barred Person without a prior or concurrent determination as to the existence of a Barred Claim and the Released Party's liability on such Barred Claim in the absence of this Bar Order (and, in the event of such a determination, without a reduction of such Judgment), such Judgment shall not, and shall be deemed not to, give rise to any Barred Claim; and it is further

ORDERED that nothing herein shall prejudice or operate to preclude the rights of any Barred Person to assert claims, other than Barred Claims, against any party. For the avoidance of doubt, the provisions of this Bar Order, including the judgment reduction provisions set forth herein, shall not apply to (i) any contractual indemnity; (ii) any claim for which a court determines joint liability does not exist as a matter of law, equity or fact as between any Barred Person and any Released Party; or (iii) any claims for non-contractual indemnity or contribution asserted with respect to claims or causes of action that are brought by any Person other than (a) the Litigation Trust; (b) the Creditor Trust; (c) any Person asserting a claim on behalf of the Debtors' estates; or (d) any Person asserting a Preserved Cause of Action; and it is further

ORDERED that if any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any

36

transaction underlying any Released Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement; and it is further

ORDERED that this Court shall retain continuing jurisdiction with respect to all matters concerning this Bar Order.

3.     Exculpation

The Step One Plan provides that, to the fullest extent permitted by law, none of the Step One Plan Proponents (including without limitation the Special Committee of Tribune's Board of Directors formed during the Chapter 11 Cases), none of the current or former members of the Creditors' Committee, in their capacities as such, and none of the respective Related Persons to any of the foregoing, shall have any liability to any person or entity for acts or omissions in connection with, relating to, or arising out of the Chapter 11 Cases, negotiation of any plans of reorganization, including the Step One Plan, pursuit of confirmation or implementation of any plans of reorganization, including the Step One Plan, the property to be distributed under the Step One Plan, the Disclosure Statement, Restructuring Transactions, Plan Supplement, releases and injunctions under the Step One Plan or the management or operation of the Debtors (except for liability resulting from willful misconduct or gross negligence as determined by a Final Order).

4.     Corporation Indemnities/Insurance

For purposes of the Step One Plan, the indemnification or reimbursement obligations of Tribune and the other Debtors to any Persons who are or were directors, officers or employees of the Debtor on or after the Petition Date against and for any obligations, pursuant to corporate governance documents, laws or regulations, agreements or any combination of the foregoing, but excluding any obligations of Tribune and the other Debtors to any Person in respect of indemnification or reimbursement in connection with any LBO-Related Causes of Action arising prior to the Petition Date, shall survive confirmation of the Step One Plan. In accordance with the Order Authorizing Tribune Company to Purchase Tail Coverage Respecting the Debtors' Existing Directors and Officers and Fiduciary Liability Insurance Policies [Docket No. 3190], the Debtors may in their discretion purchase "Tail Coverage" as defined in motion with respect to such Order.

**K.     Issuance and Distribution of New Securities and Related FCC Matters**

Certain of the Debtors' business operations are subject to regulation by the Federal Communications Commission (the "FCC") under the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, as amended (the "Communications Act"). Television and radio stations may not operate in the United States without the authorization of the FCC; and FCC approval is required for the issuance, renewal, transfer, and assignment of station operating licenses. The FCC also regulates the multiple and combined ownership of television and radio broadcast stations as well as the cross-ownership of broadcast stations and newspapers in the same market. Because the Debtors' operations include newspapers, television stations, and a radio station, the Step One Plan must comply with certain FCC-related multiple and cross-ownership requirements and restrictions.

The Step One Plan must also comply with limitations on foreign ownership and foreign voting rights of broadcast licensees administered by the FCC.

Both the Debtors' commencement of the Chapter 11 Cases and their emergence from bankruptcy require the consent of the FCC. The FCC previously granted consent for the assignment of the Debtors' FCC licenses from the Debtors to the Debtors as "debtors-in-possession" under chapter 11 of the Bankruptcy Code. For the Reorganized Debtors to continue the operation of the Debtors' broadcast stations, the Debtors filed applications with the FCC (the "FCC Applications") to obtain prior approval of the FCC for the assignment of the FCC licenses from the Debtors as "debtors-in-possession" to the Reorganized Debtors (the "FCC Approval").

### L.   Issuance of New Securities

On the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Step One Plan without further act or action under applicable law, regulation, order or rule. Except as otherwise provided in the Step One Plan, including as specifically provided in Section 5.4.2 of the Step One Plan, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Step One Plan will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Step One Plan Proponents of its desire to receive instead such New Class B Common Stock by the date announced by the Step One Plan Proponents in a filing with the Bankruptcy Court, with such date to be no earlier than the first day of the Confirmation Hearing. The Certificate of Incorporation, substantially in the form of Exhibit 5.3.1(1) to the Step One Plan, which shall be filed with the Plan Supplement, sets forth the rights and preferences of the New Common Stock. The Certificate of Incorporation may contain customary provisions restricting the sale, transfer, assignment, conversion or other disposal of such shares of New Common Stock. To the extent the shares of New Class A Common Stock or New Class B Common Stock are certificated, such certificates may contain a legend restricting the sale, transfer, assignment, conversion or other disposal of such shares. The New Warrant Agreement substantially in the form of Exhibit 1.1.154 to the Step One Plan, which shall be filed with the Plan Supplement, sets forth the rights of the holders of the New Warrants. The issuance of the New Common Stock and the New Warrants and the distribution thereof under the Step One Plan shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Step One Plan, including, without limitation, the Exit Facility Credit Agreement (if any), the New Senior Secured Term Loan Agreement (if any), and any other agreement entered into in connection with the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

### M.   Distribution of New Common Stock and New Warrants

If the Effective Date occurs, on the Effective Date Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents

required to be issued or distributed pursuant to the Step One Plan without further act or action under applicable law, regulation, order or rule. The Step One Plan authorizes the Debtors to issue two classes of New Common Stock: New Class A Common Stock and New Class B Common Stock. New Class A Common stock will have voting rights consistent with standard voting common stock. New Class B Common Stock will have more limited voting rights and is designed to be non-attributable under the FCC's rules. As set forth in Section 3.3.3 of the Step One Plan, the Sharing Provision Reserve Amount represented by New Common Stock and New Warrants will be deposited with the Sharing Provision Reserve pending Resolution of the Sharing Provision Dispute. All New Common Stock and New Warrants will be held by the Sharing Provision Reserve in a manner acceptable to the FCC. The Proponents do not believe that the establishment of such a reserve conflicts with applicable FCC rules and regulations.

Holders of New Class B Common Stock will be entitled to vote as a separate class on any amendment, repeal, or modification of any provision of the Restated Certificate of Incorporation for Reorganized Tribune that adversely affects the rights of the New Class B Common Stock in a manner different from the rights of the New Class A Common Stock. In addition, the holders of New Class B Common Stock will be entitled to vote together with holders of the New Class A Common Stock on the following non-ordinary course transactions to the extent that these matters are submitted to a vote of the holders of New Class A Common Stock: (i) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking *pari passu* with or senior to the New Class A Common Stock or New Class B Common Stock as to dividends or liquidation preference, including with respect to an increase in the number of New Class A Common Stock or New Class B Common Stock; (ii) any amendment to the Restated Certificate of Incorporation or the Bylaws of Reorganized Tribune; (iii) any amendment to any stockholders or comparable agreement; (iv) any sale, lease, or other disposition of all or substantially all of the assets of Reorganized Tribune through one or more transactions; (v) any recapitalization, reorganization, share exchange, consolidation or merger of Reorganized Tribune or its capital stock; (vi) any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of Reorganized Tribune, including any stock option or stock incentive plan; (vii) any redemption, purchase or other acquisition by Reorganized Tribune of any of its capital stock (except for purchases from employees upon termination of employment); and (viii) any liquidation, dissolution, distribution of assets or winding-up of Reorganized Tribune.

Each Holder of a Claim that is entitled to receive a distribution of New Common Stock and/or New Warrants pursuant to the Step One Plan will be required to demonstrate to the Debtors' satisfaction that the issuance of New Common Stock to such Holder would not impair the ability of the Reorganized Debtors to comply with FCC-related ownership requirements and restrictions and would not impair the ability of the Reorganized Debtors to obtain the grant of the FCC Applications necessary to implement the Step One Plan. Applicable FCC ownership requirements and restrictions, which are discussed in more detail below, include (i) FCC broadcast multiple ownership and cross-ownership restrictions, and (ii) restrictions in Section 310(b) of the Communications Act on the direct or indirect ownership or control of broadcast licensees by non-U.S. persons.

1091124-12
1113713-1

### N. FCC Matters

In order for certain combinations of the existing broadcasting and newspaper assets of the Debtors to continue to be held by Reorganized Tribune under the Step One Plan, waivers of certain FCC broadcast multiple and cross-ownership rules must be obtained. Specifically, the Debtors will need to obtain waivers of the FCC's newspaper/broadcast cross-ownership rule and local television ownership or "duopoly" rule.[18] In addition, there are specific FCC-related ownership restrictions and requirements for equity holders of entities that hold FCC broadcast licenses. Applicable FCC ownership requirements and restrictions, which are discussed in more detail below, include (i) FCC broadcast multiple ownership and cross-ownership restrictions, and (ii) restrictions in Section 310(b) of the Communications Act on the direct or indirect ownership or control of broadcast licensees by non-U.S. persons.

THE FOLLOWING SUMMARY OF CERTAIN FCC RULES AND POLICIES IS FOR INFORMATION PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN ADVISORS AS TO FCC OWNERSHIP ISSUES AND OTHER CONSEQUENCES OF THE STEP ONE PLAN.

#### 1. FCC Media Ownership and Cross Ownership Rules

Certain multiple ownership and cross-ownership rules promulgated by the FCC prohibit common ownership of "attributable interests" in certain combinations of broadcast and other media properties. The following is a summary of the FCC's principal policies on identifying and assessing "attributable interests" in media outlets. "Attributable interests" generally include the following interests in a media company: general partnership interests or managing membership interests in a limited liability company, non-insulated limited partnership or limited liability company interests, positions as an officer or director (or the right to appoint officers or directors), five percent (5%) or greater direct or indirect interests in the voting stock of a corporation, time brokerage agreements between same-market radio or television stations, joint sales agreements between same-market radio broadcast stations, and certain significant investment interests coupled with some same-market media interests or significant programming arrangements.

Attribution traces through chains of ownership. In general, an individual or entity that has an attributable interest in another entity will also be deemed to hold each of that entity's attributable media interests. In addition, the FCC treats all partnership interests as attributable, except for those limited partnership interests that are "insulated" by the terms of the limited partnership agreement from "material involvement" in the media-related activities of the partnership. The FCC applies the same attribution and insulation standards to limited liability companies and other new business forms.

---

[18] The Debtors will not request any waivers in or regarding the FCC Applications, however, to accommodate separate media interests held by prospective stockholders independent of their interest in the Debtors. Instead, any prospective stockholders that might need independent waivers will receive New Class B Common Stock (or New Warrants) such that waivers are no longer necessary.

1091124-12
1113713-1

Currently, a minority stockholder in a media corporation with a single majority stockholder (i.e., a single holder of more than fifty percent (50%) of the outstanding voting power of the corporation) is not deemed to hold an attributable interest in that corporation or its media outlets based on the ownership of a minority voting stock interest of five percent (5%) or more. The FCC is considering whether or not to retain the single majority stockholder exemption in a pending rulemaking proceeding.

Combinations of direct and indirect equity and debt interests exceeding thirty-three percent (33%) of the total asset value (equity plus debt) of a media outlet may be deemed attributable if the holder has another attributable broadcast or daily newspaper interest in the same market or provides more than fifteen percent (15%) of the programming to the broadcast station in which the interest is held. Also, a person or entity that provides more than fifteen percent (15%) of the weekly programming for a television or radio station and has an attributable interest in another television or radio station in the same market is deemed to hold an attributable interest in the station to which it provides programming.

The FCC's broadcast multiple ownership and cross-ownership rules limit certain combinations of attributable interests in television broadcast stations and radio broadcast stations, and its cross-ownership rules restrict the ownership in the same market of attributable interests in (i) combinations of radio stations and television stations and (ii) combinations of radio or television stations with daily newspapers of general circulation. The FCC regards an entity with an "attributable interest" in a media outlet as an "owner" of that media outlet for purposes of applying these rules. Thus, prospective stockholders that may hold five percent (5%) or more of the New Class A Common Stock of Reorganized Tribune or persons who are officers or directors of Reorganized Tribune will need to assess (a) what attributable interests they may hold in daily newspapers of general circulation or other radio or television licensees and (b) whether the attributable media interests that they hold would conflict with their holding attributable interests in the daily newspapers or broadcast licensees of the Reorganized Debtors.

As explained in more detail below, the permissibility of particular combinations of attributable media interests may depend upon market size and other market characteristics. Generally, the FCC's media ownership rules place limits on (i) same-market ownership of broadcast stations and a daily newspaper of general circulation published in the market's dominant language; (ii) local television station ownership; (iii) local radio station ownership; (iv) same-market ownership of television and radio stations; and (v) nationwide television station ownership. The FCC has pending proceedings to revise some of these rules and to adopt new rules, and the FCC's broadcast ownership rules are being challenged in the courts. No waivers will be sought and no special showings will be submitted to accommodate separate media interests of prospective stockholders independent of their interests in the Reorganized Debtors. Certain rules that could give rise to a prohibited combination for a prospective stockholder of Reorganized Tribune include the following:

- Newspaper/Broadcast Cross-Ownership Rule. The FCC generally prohibits the cross-ownership of a daily newspaper and either a television or radio broadcast station in the same market, absent a waiver. In a decision dated December 18, 2007 (the "2008 Order"), the FCC adopted modified waiver standards; however, those changes are the subject of a pending appeal to the Third Circuit. In March 2010, the Third Circuit lifted

the stay it had issued in September 2003 in connection with its review of the FCC's changes to its media ownership rules and allowed the 2008 Order to become effective. Under the 2008 Order, a daily newspaper is one that is published at least four days per week in the dominant language of the market and which is circulated generally in the community of publication. The revised waiver standards adopted in the 2008 Order presumptively allow the ownership of attributable interests in a broadcast station and a daily newspaper of general circulation that is published in the market served by the broadcast station only when (i) the market at issue is one of the 20 largest "Designated Market Areas" or "DMAs" as determined by the Nielsen television ratings service; (ii) the combination involves only one daily newspaper and only one radio or television station; and (iii) if the combination involves a television station, (a) at least eight independently-owned and operating major newspapers and/or full-power television stations would remain in the DMA and (b) the television station is not among the top four ranked stations in the DMA. The FCC also presumptively permits cross-ownership if either the newspaper or the broadcast station is deemed "failed" or "failing" under FCC standards or if the proposed cross-ownership would result in a new source of local television news totaling at least seven hours per week. All other newspaper/broadcast combinations are presumed not to be in the public interest; however, that presumption can be overcome if the parties can demonstrate that, post-merger, the cross-owned entity would increase the diversity of independent news outlets and increase competition among independent news sources in the relevant market.

- <u>Local Television Station Ownership Rule (Duopoly Rule)</u>. Under the local television ownership rule (often called the "duopoly rule"), a single entity may have attributable interests in two television stations in the same DMA if (i) the two stations do not have overlapping service areas, or (ii) notwithstanding the combination there are at least eight independently owned and operating full-power commercial and non-commercial television stations serving the DMA and at least one of the combining stations is not ranked among the top four stations in the DMA. In addition, if any entity with an attributable interest in a television station provides more than fifteen percent (15%) of the programming of another station in the same market pursuant to a time brokerage or local marketing agreement, then for purposes of applying this rule, the entity will be deemed to hold an attributable interest in the station to which it provides programming. The FCC has initiated a rule making proceeding to determine whether it should treat television joint sales agreements as attributable interests under its ownership rules and, if so, whether it should use a standard comparable to the one in effect for radio joint sales agreements, under which the FCC treats joint sales agreements as attributable if they cover fifteen percent (15%) or more of the brokered station's weekly commercial time. The FCC's duopoly rule and policies regarding ownership of television stations in the same market apply only to full-power television stations and not to television satellite stations, Class A or low power television stations, or television translator stations.

- <u>Local Radio Station Ownership Rule</u>. The FCC's local radio multiple ownership rule limits the number of radio stations in which one entity may hold an attributable interest in a local geographic market. In determining the size of a market, the rules consider both commercial and non-commercial stations and use a definition of a local radio market based on Arbitron "Metro" markets and, when there is no defined Arbitron market, a

definition based upon the composite service contours of commonly owned stations with overlapping service areas. These limits are as follows: In a radio market with 45 or more radio stations, a party may hold an attributable interest in up to eight radio stations, not more than five of which are in the same broadcast service (AM or FM); in a radio market with between 30 and 44 radio stations, a party may hold an attributable interest in up to seven radio stations, not more than four of which are in the same broadcast service; in a radio market with between 15 and 29 radio stations, a party may hold an attributable interest in up to six radio stations, not more than four of which are in the same broadcast service; and in a radio market with 14 or fewer radio stations, a party may hold an attributable interest in up to five radio stations, not more than three of which are in the same broadcast service, except that a party may not hold an attributable interest in more than fifty percent (50%) of the stations in the market.

- Radio/Television Station Cross-Ownership Rule. The FCC's radio/television cross-ownership rule permits the common attributable ownership of more than one full-power AM and/or FM radio station and up to two television stations in the same market. The total number of radio stations permitted to be under common attributable ownership depends on the number of independently-owned media voices in the local market as follows: (i) in markets with at least 20 independently owned media voices, a single entity may hold attributable interests in up to two television stations and six radio stations. Alternatively, such an entity may hold an attributable interest in one television station and seven radio stations in the same market; (ii) in a market that includes at least ten independently-owned media voices, a single entity may hold attributable interests in up to two television stations and up to four radio stations; and (iii) regardless of the number of independently-owned media voices in a market, a single entity may hold an attributable interest in up to two television stations and one radio station in any market. Under all of these scenarios, the requirements of the local television and local radio ownership rules also must be met.

- National Television Station Ownership Rule. By statute, one party may hold attributable interests in television stations that reach, in the aggregate, no more than thirty-nine percent (39%) of all United States television households. The corresponding FCC rule on national television ownership limits provides that, when calculating a television station's nationwide aggregate audience, all UHF stations are considered to serve only fifty percent (50%) of the households in their DMA and all VHF stations are considered to serve all households in their DMA, including households that cannot naturally receive such a VHF station over the air. The FCC currently is considering whether to initiate a proceeding to modify or abolish this so-called UHF discount in light of the changes resulting from the transition to digital television broadcasting. If a broadcast licensee has an attributable interest in a second television station in a market, whether by virtue of ownership, a time brokerage agreement or a parent-satellite operation, the audience for that market will not be counted twice for purposes of determining compliance with the national cap.

1091124-12
1113713-1

2. Issuance of New Class B Common Stock to Ensure Compliance with FCC Media Ownership and Cross-Ownership Rules

In processing the FCC Applications, the FCC will consider, among other things, whether the prospective licensees and those considered to be "parties" to the applications possess the legal, character, and other qualifications to hold an interest in a broadcast station. The FCC Applications require the Debtors to include information about the Reorganized Debtors and the "parties" to the FCC Applications – including certain of the proposed stockholders of the Reorganized Debtors – sufficient for the FCC to grant its consent to the transactions contemplated by the Step One Plan. Prospective stockholders of the Reorganized Debtors, including those under common ownership or control, that would hold or control five percent (5%) or more of the New Class A Common Stock in Reorganized Tribune under the Step One Plan will be parties to the FCC Applications and required to report certain information for FCC regulatory purposes. Specifically, each Holder of a Claim that is entitled to receive a distribution of New Common Stock and/or New Warrants pursuant to the Step One Plan will be required to demonstrate to the Step One Plan Proponents' satisfaction that the issuance of New Common Stock to such Holder would not impair the ability of the Reorganized Debtors to comply with FCC-related ownership requirements and restrictions and would not impair the ability of the Reorganized Debtors to obtain the grant of the FCC Applications necessary to implement the Step One Plan.

To be eligible to receive five percent (5%) or more of the New Class A Common Stock, a Claim Holder will be required to submit a Media Ownership Certification that provides information about the Holder and its affiliates to establish that the issuance of New Class A Common Stock to that Holder would not result in a violation of law, impair the qualifications of the Reorganized Debtors to hold FCC broadcast licenses, or impede the grant of any FCC Applications on behalf of the Reorganized Debtors. In general, the information provided in the Media Ownership Certifications will enable the Debtors to establish that prospective "parties" to the FCC Applications (i) have the requisite "character" qualifications required by the FCC and (ii) do not hold media interests that, together with their prospective interest in the Reorganized Debtors, would create an unlawful media combination under the FCC's rules. Specifically, to be eligible to receive five percent (5%) or more of New Class A Common Stock, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Step One Plan will be required to provide a Media Ownership Certification by the deadline established by the Bankruptcy Court or to the reasonable satisfaction of the Step One Plan Proponents, in accordance with the instructions set forth in the Media Ownership Certification document that may be distributed to any such Holder. Such Holders will also be required to certify to and inform the Step One Plan Proponents of any changes in the information provided in their Media Ownership Certifications between the submission of the certification and the Effective Date by executing an amended Media Ownership Certification. Any such Holder that fails to provide the Media Ownership Certification by the deadline established by the Bankruptcy Court, or that does not do so to the reasonable satisfaction of the Step One Plan Proponents, may be allocated New Class B Common Stock in lieu of New Class A Common Stock at the Step One Plan Proponents' discretion; provided, however, that to the extent a Step One Proponent has been approved by the FCC as a party to the FCC Applications, Reorganized Tribune shall not be entitled to issue shares of New Class B Common Stock to such Step One Plan Proponent at emergence without its express consent unless the issuance of Class A Common Stock to a Step One Plan Proponent

44

would result in a violation of the Communications Act or the FCC's rules or unless such Step One Plan Proponent has failed to comply with or satisfy any conditions imposed by the FCC as part of the FCC Approval or any commitment made in the FCC Applications, in which case Reorganized Tribune may issue shares of New Class B Common Stock to such Step One Plan Proponent only to the minimum extent necessary to cure or avoid such violation or non-compliance. Notwithstanding the foregoing, the Debtors will not request any waivers under the Communications Act or the FCC's rules in or regarding the FCC Applications to accommodate separate media interests held by a Step One Plan Proponent independent of the interest in Reorganized Tribune. Specifically, Reorganized Tribune in its discretion, may issue shares of New Class B Common Stock in lieu of shares of New Class A Common Stock if the Step One Plan Proponents determine, based on the Holder's Media Ownership Certification (or failure to provide the Media Ownership Certification or otherwise comply with applicable provisions of the Step One Plan), that such Holder may have other media interests that could impair the ability of Reorganized Tribune to comply with the Communications Act or the FCC's rules if such Holder were issued the shares of New Class A Common Stock that it otherwise would be eligible to receive pursuant to the Step One Plan. Except as otherwise provided in the Step One Plan, each Holder of a Claim that is eligible to receive a distribution of New Common Stock will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Step One Plan Proponents of its intent to receive such New Class B Common Stock by the date announced by the Step One Plan Proponents in a filing with the Bankruptcy Court and that will be no earlier than the first day of the Confirmation Hearing.

a)      Limitations on Foreign Ownership or Control of Broadcast Licensees

Section 310(b) of the Communications Act restricts, among other things, foreign ownership or control of FCC broadcast licenses. Foreign entities may not have direct or indirect ownership or voting rights of more than twenty-five percent (25%) in a corporation controlling the licensee of a broadcast station if the FCC finds that the public interest will be served by the refusal or revocation of such a license due to such foreign ownership or voting rights. The FCC has interpreted this provision to mean that the agency must make an affirmative public interest finding before it will permit the twenty-five percent (25%) foreign ownership cap to be exceeded. With very few exceptions, the FCC has not made such an affirmative finding in connection with the assignment of a broadcast license; the provision, therefore, generally serves as a prohibition on foreign ownership or voting interests exceeding twenty-five percent (25%). In assessing compliance with the twenty-five percent (25%) foreign ownership limitation, the FCC calculates the voting rights separately from the equity ownership percentage, and the twenty-five percent (25%) ceiling must be met for both. Warrants and other future interests typically are not counted by the FCC toward the foreign ownership ceiling unless and until converted. The FCC historically has treated partnerships with foreign partners as foreign controlled if any general partner is foreign, or if any foreign limited partner is not adequately insulated (using FCC criteria) from material involvement in the partnership's media activities and business. In a few specific circumstances, the FCC also has treated certain economic interests in a company other than direct equity interests as "ownership" for purposes of its foreign ownership determination. The FCC uses a "multiplier" to determine the ownership interest of each entity in the chain of ownership in cases of indirect ownership, such as a

situation in which there are layers of investment short of control between the entity to be acquired and the licensee.

b)     Issuance of a Combination of New Common Stock and New Warrants to Ensure Compliance with Applicable Limitations on Foreign Ownership and Control of Broadcast Licensees

Each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Step One Plan will be required (i) to provide the Foreign Ownership Certification by the deadline established by the Bankruptcy Court and (ii) to report any changes in foreign ownership percentages between the submission of the Foreign Ownership Certification and the Effective Date or such other deadline established by the Bankruptcy Court by providing an amended Foreign Ownership Certification and, upon request of the Debtors, confirm the absence of any changes. Any such Holder that fails to provide the Foreign Ownership Certification by the deadline established by the Bankruptcy Court, that fails to provide an amended Foreign Ownership Certification if one is required, that does not provide a Foreign Ownership Certification that is reasonably satisfactory to the Step One Plan Proponents or that fails to provide a timely confirmation, if required, that its foreign ownership and voting rights percentages have not changed may be deemed to be an entity that is foreign-owned and controlled for purposes of determining the allocation of New Common Stock and New Warrants.

Any Holder of a Claim that is eligible to receive New Common Stock under the Step One Plan that, based on the Holder's Foreign Ownership Certification (or failure to provide the Foreign Ownership Certification or otherwise comply with the applicable provisions of the Step One Plan), is or is deemed pursuant to the applicable provisions of the Step One Plan to be, more than twenty-five percent (25%) foreign owned or controlled, on either a voting or an equity basis, as determined pursuant to Section 310(b) of the Communications Act, shall receive New Warrants, New Common Stock, or a combination of New Warrants and New Common Stock based on an allocation mechanism that is to be determined. The allocation mechanism shall ensure, based on the aggregated results of the Foreign Ownership Certifications, the compliance of Reorganized Tribune with Section 310(b) of the Communications Act.

HOLDERS OF CLAIMS ELIGIBLE TO RECEIVE NEW COMMON STOCK UNDER THE STEP ONE PLAN THAT ARE REQUIRED TO EXECUTE MEDIA OWNERSHIP CERTIFICATIONS MUST COMPLETE AND RETURN A MEDIA OWNERSHIP CERTIFICATION PRIOR TO THE DEADLINE ESTABLISHED BY THE BANKRUPTCY COURT AND SUPPLEMENT SUCH CERTIFICATIONS AS AND WHEN REQUIRED. ALL HOLDERS OF CLAIMS ELIGIBLE TO RECEIVE NEW COMMON STOCK UNDER THE STEP ONE PLAN MUST COMPLETE AND RETURN A FOREIGN OWNERSHIP CERTIFICATION BY THE DEADLINE ESTABLISHED BY THE BANKRUPTCY COURT AND SUPPLEMENT SUCH CERTIFICATIONS AS AND WHEN REQUIRED. ALL SUCH HOLDERS ARE ENCOURAGED TO CONSULT THEIR OWN ADVISORS CONCERNING THE COMPLETION OF THE MEDIA OWNERSHIP CERTIFICATION AND FOREIGN OWNERSHIP CERTIFICATION AND THEIR TREATMENT UNDER THE STEP ONE PLAN.

46

## VIII.  DESCRIPTION OF DEBT AND NEW CAPITAL STRUCTURE OF THE DEBTORS

### A.  New Senior Secured Term Loan Agreement

Section 5.6 of the Step One Plan provides that on the Effective Date, if the Step One Plan Proponents and the Debtors have not elected to have the Reorganized Debtors replace the New Senior Secured Term Loan in its entirety with distributions of Cash (a) Reorganized Tribune, as borrower, (b) the other Reorganized Debtors and U.S. Subsidiary Non-Debtors (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions, but excluding any entities identified by the Step One Plan Proponents in consultation with the Debtors) as guarantors, (c) the administrative agent party thereto, and (d) the Holders of Claims receiving a distribution of the New Senior Secured Term Loan under the Step One Plan shall become parties to the New Senior Secured Term Loan Agreement regardless of whether any party actually executes the New Senior Secured Term Loan Agreement.  If issued, the New Senior Secured Term Loan shall be in an aggregate principal amount of not more than the lesser of (i) $1.1 billion or (ii) two times the Debtors' trailing twelve month operating cash flow excluding minority equity interest as of the end of the fiscal quarter most recently ended prior to the Effective Date.

For purposes of formulating the Financial Projections, attached as Exhibit E to the General Disclosure Statement, the Debtors have estimated the New Senior Secured Term Loan to be in an aggregate principal amount of $1.1 billion, to be amortized at a rate of 1% per annum, and to have an effective interest rate of 6.75% in 2011 and 2010 and 7.20% in 2013, which represent the Debtors' estimates as to market terms as of the date hereof based on information the Debtors have received from potential financing sources.  However, the actual terms of the New Senior Secured Term Loan Agreement may vary, in whole or in part, from the aforementioned terms, based upon, among other things, changes in market conditions for loan facilities of this type and the Debtors' business and financial needs at emergence from Chapter 11.  The principal terms of the New Senior Secured Term Loan shall be consistent with the Terms of the New Senior Secured Term Loan that will be filed with the Plan Supplement as Exhibit 5.6 to the Step One Plan.

### B.  Description of Exit Facility

Section 5.10 of the Step One Plan provides that on the Effective Date, without any requirement of further action by security holders or directors of the Debtors or Reorganized Debtors, the Debtors and Reorganized Debtors shall be authorized, but not directed, to enter into the Exit Facility Credit Agreement, if any, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.  The terms of the Exit Facility shall be consistent with those that will be disclosed in Exhibit 5.10 to the Step One Plan, which will be filed with the Plan Supplement.

### C.  Description of Capital Stock

1091124-12
1113713-1

The Step One Plan provides that on the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Step One Plan without further act or action under applicable law, regulation, order or rule. The powers, preferences and rights, as well as certain limitations, qualifications and restrictions associated with the New Common Stock shall be set forth in their entirety in the Certificate of Incorporation of Reorganized Tribune a form of which will be filed with the Plan Supplement as Exhibit 5.3.1(1) to the Step One Plan. The terms of the New Warrants shall be set forth in their entirety in the New Warrant Agreement, a form of which will be filed with the Plan Supplement as Exhibit 1.1.154 to the Step One Plan.

## IX. BEST INTERESTS TEST AND LIQUIDATION ANALYSIS

As discussed in Article X.B.4 of the General Disclosure Statement, the "best interests" test under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of an Impaired Claim or Impaired Interest receive property with a value not less than the amount such holder would receive in a chapter 7 liquidation. The Debtors, with the assistance of their advisors, have prepared a hypothetical liquidation analysis, attached as Exhibit D to the General Disclosure Statement (the "Liquidation Analysis"), which details, among other things, the estimated hypothetical recovery range for holders of Claims against and Interests in the Debtors in a chapter 7 liquidation. To demonstrate that the proposed Step One Plan satisfies the "best interests" test, the Debtors, with the assistance of their advisors, have also prepared the chart below, which compares the estimated recovery of each Impaired Class of Claims under the Step One Plan against the high end of the hypothetical recovery range set forth in the Liquidation Analysis for such Claims in a chapter 7 liquidation.

($ in MM)

| Claims | Estimated Allowed Claims & Bridge Claim | Estimated Plan Recovery [2] | | Liquidation Analysis (High Values) | | Difference Recovery $ (Liquidation vs. Plan) |
|---|---|---|---|---|---|---|
| | | Recovery $ | Recovery % | Recovery $ | Recovery % | |
| Senior Loan [1] | $ 8,722 | $ 6,221 | 71.32% | $ 3,743 | 42.91% | $ (2,478) |
| Bridge Loan [2] | 1,620 | 78 | 4.81% | 20 | 1.21% | (58) |
| Senior Noteholder | 1,283 | 300 | 23.38% | 15 | 1.21% | (285) |
| PHONES Notes | 761 | - | 0.00% | - | 0.00% | - |
| EGI-TRB LLC Notes | 235 | - | 0.00% | - | 0.00% | - |
| Other Parent [1] | 265 | 68 | 25.83% | 3 | 1.21% | (65) |
| Subsidiary GUC [3] | 85 | 85 | 100.00% | 2 | 2.40% | (83) |
| **Total** | $ 12,970 | $ 6,752 | | $ 3,783 | | $ (2,969) |

Notes to Table:

1. The $150.9 million Swap Claim is included in (i) the Senior Loan Claim at the Filed Subsidiary Debtors, and (ii) Other Parent Claims at Tribune Company. The Senior Loan Claims and the Senior Guaranty Claims may increase by as much as $66 million to account for undrawn letters of credit being drawn in a liquidation. The recovery in the Liquidation Analysis assumes that these letters of credit are drawn.

48

2. For purposes of this analysis, Step Two Senior Loan Claims and Bridge Loan Claims are assumed to be Allowed; however, pursuant to the terms of the Step One Plan, they are subject to challenge by the Litigation Trust, and distributions with respect to them are reserved pending allowance of the Step Two Senior Loan Claims and Bridge Loan Claims. Per Sections 3.2.3, 3.2.5, and 3.2.6 of the Step One Plan, if the Step Two Senior Loan Claims or Bridge Loan Claims are not Allowed, such reserve would be allocated to the Holders of Allowed Senior Loan Claims, Allowed Senior Noteholder Claims, and Allowed Other Parent Claims. Similarly, if the Step Two Senior Loan Claims or Bridge Loan Claims were not Allowed in a chapter 7 liquidation, estimated recoveries on account of such Claims would flow to the Holders of Step One Senior Loan Claims, Senior Noteholder Claims, and Other Parent Claims.

3. The Subsidiary GUC claim may increase by as much as $35 million in a liquidation as a result of contract cure costs shifting to unsecured claims. The recovery in the Liquidation Analysis reflects $120 million of Subsidiary General Unsecured Claims.

Under the Step One Plan, all non-subordinated prepetition Claims recover substantially more than under a hypothetical liquidation; therefore, the Step One Plan Proponents believe that the "best interests" of creditors test is satisfied. The subordinated Claims (PHONES Notes and EGI-TRB LLC Notes) receive no initial recovery in either instance but may benefit from recoveries from the Litigation or Creditors' Trust, subject to subordination.

As described in Exhibit D to the General Disclosure Statement, the Liquidation Analysis does not consider recoveries from potential Claims arising from the Leveraged ESOP Transactions. As explained in herein, the Step One Plan provides for the settlement of certain Claims related the Leveraged ESOP Transactions (subject to Bankruptcy Court approval of the Step One Plan) and for certain other Claims related to the Leveraged ESOP Transactions to be assigned to the Litigation Trust. In either event, it is assumed that the recoveries from these Claims would be substantially similar in either a reorganization or a liquidation and thus not change the conclusion regarding the "best interests" test.

In addition, as noted in Exhibit D to the General Disclosure Statement, the Liquidation Analysis does not incorporate the Intercompany Claims Settlement embodied in the Step One Plan. The Liquidation Analysis assumes that all Intercompany Claims, including prepetition Intercompany Claims and post-petition Intercompany Claims, are satisfied under a hypothetical liquidation in their respective order of priority at the value detailed in the Debtors' books and records, without consideration to any potential adjustments and/or settlement of Claim amounts that might be made to the value of the Intercompany Claims under the Step One Plan.

## X.  RISK FACTORS[19]

THE IMPLEMENTATION OF THE STEP ONE PLAN IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW.

IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT THE STEP ONE PLAN, HOLDERS OF CLAIMS AGAINST ANY OF THE DEBTORS ENTITLED TO VOTE ON THE STEP ONE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS SPECIFIC DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE IN THE STEP ONE PLAN), PRIOR TO VOTING TO ACCEPT OR REJECT THE STEP ONE PLAN. THESE SPECIFIC RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISK INVOLVED IN CONNECTION WITH THE STEP ONE

---

[19] The Step One Plan Proponents have adopted the Risk Factors contained in the Settlement Plan.

PLAN AND THEIR IMPLEMENTATION, OR ALTERNATIVES TO THE STEP ONE PLAN. FOR ADDITIONAL RISK FACTORS PLEASE SEE ARTICLE XII OF THE GENERAL DISCLOSURE STATEMENT ENTITLED "GENERAL RISK FACTORS."

**A.      General Bankruptcy Law Considerations and Risks Related to the Step One Plan**

1.      Objections to the Classification of Claims May Change the Composition of the Classes and the Vote Required of Each Class for the Approval of the Step One Plan

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Plan Proponents believe that the Step One Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Step One Plan to be confirmed. In such event, the Step One Plan Proponents intend, to the extent permitted by the Bankruptcy Court and the Step One Plan, to make such reasonable modifications of the classifications under the Step One Plan to permit Confirmation and to use the acceptances of the Step One Plan received in response to this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such holder was initially a member, or any other Class under the Step One Plan, by changing the composition of such Class and the vote required of that Class for approval of the Step One Plan.

2.      Failure to Obtain Confirmation of the Step One Plan May Result in Liquidation or an Alternative Plan on Less Favorable Terms

Although the Step One Plan Proponents believe that the <u>Step One Plan</u> will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Though the Step One Plan Proponents disagree with this contention, and, again, believe that the <u>Step One Plan</u> will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that modifications to the <u>Step One Plan</u> will not be required for confirmation or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes in support of the <u>Step One Plan</u>.

The Step One Plan provides that the Step One Plan Proponents reserve the right to seek confirmation of the Step One Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by various Classes of Claims and Interests under the Step One Plan. In the event such Classes fail to accept the Step One Plan in accordance with section 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Step One Plan Proponents reserve the right: (a) to request that the Bankruptcy Court confirm the Step One Plan in accordance with section 1129(b) of the Bankruptcy Code; and/or (b) to modify the Step One Plan in accordance with Section 13 thereof.  While the Step One Plan Proponents believe that the Step One Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the

50

Bankruptcy Code because the Step One Plan does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes that reject or are deemed to reject the Step One Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can be no assurance that any such challenge to the requirements for non-consensual confirmation will not delay the Debtors' emergence from chapter 11 or prevent confirmation of the Step One Plan.

If the Step One Plan is not confirmed, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the holders of Claims against any of the Debtors as the terms of the Step One Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would substantially erode to the detriment of all stakeholders.

3. Undue Delay in Confirmation of the Step One Plan May Disrupt the Debtors' Operations

Although the Step One Plan is designed to minimize the length of the Debtors' bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties-in-interest that the Step One Plan will be confirmed. The continuation of the Chapter 11 Cases, particularly if the Step One Plan is not approved or confirmed in the timeframe currently contemplated, could adversely affect operations and relationships with the Debtors' customers, vendors, employees, regulators and partners. If confirmation and consummation of the Step One Plan does not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses.

4. If the Effective Date Fails to Occur, the Debtors May Liquidate or Adopt an Alternative Plan with Less Favorable Terms

There can be no assurance with respect to timing of the Effective Date. The occurrence of the Effective Date is also subject to the conditions precedent described in Section 10.1 of the Step One Plan. Failure to meet any of these conditions could result in the Step One Plan not being consummated.

If the Effective Date of the Step One Plan does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the holders of Claims against any of the Debtors as the terms of the Step One Plan.

**B.      FCC-Related Considerations and Risks Respecting the Debtors' Businesses**

1. The FCC Must Approve the Debtors' FCC Applications before Emergence from Bankruptcy

The Debtors operate television broadcast stations, a radio station, and certain associated facilities under authority granted by the FCC. Under Section 310(d) of the Communications Act, the consent of the FCC is required for the assignment of FCC licenses or for the transfer of control of an entity that holds or controls FCC licenses. Except in the case of "involuntary"

assignments, prior consent of the FCC is required before an assignment of FCC licenses or a transfer of control of FCC licensees may be consummated. For additional information concerning FCC-related considerations and risks see Article XII of the General Disclosure Statement "General Risk Factors."

a)     FCC Processing of Applications for Consent to Emerge from Bankruptcy

On April 28, 2010, the Debtors filed the FCC Applications, by which Debtors sought the consent of the FCC for each of the Debtors holding FCC licenses to assign its FCC licenses to the Reorganized Debtors. The FCC Applications included requests for waivers of the FCC's newspaper/broadcast cross-ownership rule and local television multiple ownership or "duopoly" rule, including a "failing station" waiver and continued "satellite" exemption. The Debtors filed 16 applications for consent to assignment of broadcast station licenses, together with applications seeking consent to assign satellite earth station, private land mobile, private fixed microwave, and other categories of FCC licenses held by the Debtors. Tribune provided local public notice of the filing of the FCC Applications through broadcast announcements and notices in local newspapers servicing their broadcast markets. The Debtors have amended the FCC Applications from time to time.

On May 13, 2010, the FCC's Media Bureau issued a public notice announcing that the FCC has accepted all of the FCC Applications for filing upon initial review. Although the FCC has accepted and is currently processing the FCC Applications, the Step One Plan Proponents anticipate that the FCC will not grant the FCC Applications until the Bankruptcy Court has confirmed the Step One Plan and authorized the transactions proposed in the Step One Plan.

The FCC's public notice of May 13, 2010 set a deadline of June 14, 2010 for interested persons to file petitions to deny the FCC Applications. On that date, a coalition of Washington, D.C.-based public advocacy groups (the "Washington Public Advocacy Groups"); the International Brotherhood of Teamsters ("IBT"); Wilmington Trust; and Neil Ellis, a competing newspaper publisher in the Hartford market ("Neil Ellis") filed petitions to deny the FCC Applications (collectively, the "Petitions to Deny").

On June 29, 2010, Tribune and JPMorgan filed oppositions to the Petitions to Deny. On July 12, 2010, Washington Public Advocacy Groups, IBT, Wilmington Trust, and Neil Ellis filed replies to the oppositions of Tribune and JPMorgan. The pleading cycle in this proceeding is now closed.

The Debtors have amended the FCC Applications on several occasions and anticipate that further amendments will be necessary to reflect the filing of the Step One Plan and the Step One Plan Disclosure Statement. Although the formal pleading cycle in the FCC proceeding has closed, additional filings may be submitted so long as they are made part of the public record in the proceeding, and the FCC may request additional comment.

The FCC is reviewing the FCC Applications and all filings made by parties to the proceeding. In addition to the consideration of any waiver requests, the FCC's review of the FCC Applications will focus on whether the existing media interests (broadcast and daily newspaper holdings) of the parties to the FCC Applications, when combined with other media

52

interests held by parties to the FCC Applications comply with the FCC's broadcast multiple ownership rules. The FCC also will consider compliance with limitations on foreign ownership, the parties' other legal qualifications, their prior records before the FCC, and certain categories of prior adverse determinations against parties to the FCC Applications by courts and other administrative bodies.

In some instances, the FCC may request that the applicants supply additional information through amendments to an application. There is no time limit on the FCC's consideration of assignment applications. The FCC has a stated goal of processing all such applications within 180 days, although processing often exceeds this timeframe when petitions to deny or objections are filed.

In this case, the consummation of the Step One Plan will not occur until the FCC has granted the FCC Applications and issued the necessary consents to implement the Step One Plan as confirmed by the Bankruptcy Court. If the grant is made by the FCC *en banc*, parties may file petitions for reconsideration with the agency or an appeal with the D.C. Circuit within a period of 30 days of issuance of the decision. If the grant is made by the FCC's staff under delegated authority, an interested party may request that the staff reconsider its decision or the FCC review the grant *en banc* within 30 days of issuance of the decision, and the FCC may reconsider the action on its own initiative for a period of 40 days following issuance of the decision. It is highly unusual for the FCC to rescind grant of consent to an assignment or transfer upon reconsideration or review. Parties are entitled to close upon the grant of FCC consent even if petitions for reconsideration, applications for review, or judicial appeals are filed and remain pending, but any such consummation is subject to any further order that the FCC or a court might issue.

     2.      Inability to Obtain FCC Approval and Media Ownership Waivers Would Adversely Affect Ability to Consummate the Step One Plan

In the FCC Applications, the Debtors are seeking waivers of several of the FCC's broadcast ownership rules. Grant of these waiver requests will be necessary in order to allow the assignment of combinations of media properties currently held by the Debtors in six markets in which the combinations currently operate under waivers of the FCC ownership rules. Absent continued waivers from the FCC, Reorganized Tribune will not be able to own and operate these combinations.

As a result of a decision issued by the FCC on November 30, 2007 (the "FCC Order"), the Debtors received seven waivers that allow them to hold clusters of media properties in six markets despite non-compliance with the FCC's rules. These waivers are as follows:

     1)      A "temporary" waiver of the FCC's newspaper/broadcast cross-ownership rule to own WPIX-TV and *Newsday* in New York;

     2)      A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own KTLA-TV and the *Los Angeles Times* in Los Angeles;

     3)      A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own WSFL-TV and the Ft. Lauderdale-based *South Florida Sun-Sentinel* in Miami;

4)      A "permanent" waiver of the newspaper/broadcast cross-ownership rule to own WGN, WGN-TV and the *Chicago Tribune* in Chicago;

5)      A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own WTIC-TV, and WCCT-TV (formerly WTTX-TV), and the *Hartford Courant* in Hartford;

6)      A "permanent" "failing station" waiver of the FCC's television local ownership or "duopoly" rule to own WTIC-TV and WCCT-TV in Hartford; and

7)      A "permanent" exemption of the FCC's "duopoly" rule to permit operation of WTTK-TV, a full-power television station licensed to Kokomo, Indiana, as a "satellite" rebroadcasting the programming of WTTV-TV, Bloomington, Indiana.

The "temporary" newspaper/broadcast cross-ownership rule waivers that resulted from the FCC Order are time limited.  They extend until the latest of the following:  (i) the expiration of a two-year period for the filing and evaluation of individualized waiver showings, the commencement of which is open to interpretation, (ii) six months following the conclusion of the litigation over the FCC Order pending in the D.C. Circuit, which the Debtors initiated on December 3, 2007, or (iii) six months after the expiration of any judicial stay to which the FCC's modified waiver standards for the cross-ownership rule as adopted in the 2008 Order may be subject.  The "permanent" waivers continue as long as the Debtors own the properties, but the waivers do not permit assignments of the combinations intact, and waivers will be needed in order for the Reorganized Debtors to maintain their existing properties.

In the FCC Applications, the Debtors are seeking extensions of the waivers covering these seven media combinations.  In the case of the newspaper/broadcast cross-ownership rule waivers, the Debtors are requesting "permanent" relief that effectively would allow them (i) to hold the ownership combinations or interests at least until the next "long form" assignment or transfer and (ii) upon such assignment or transfer to dispose of the interests in combination to a single purchaser.  Alternatively, the Debtors are seeking a temporary waiver of the newspaper/broadcast cross-ownership rule that would extend until 18 months after the FCC completes its pending rulemaking review of that rule and the FCC's action becomes a final order no longer subject to judicial review.  In the case of the Hartford television "duopoly" and the Indianapolis "satellite" waivers, the Debtors are seeking a continuation of those "permanent" waivers that would allow the combinations to be commonly held until the next "long-form" assignment or transfer.

In the requests for waivers filed as part of the FCC Applications, the Debtors intend to demonstrate that cross-ownership waiver relief is justified under the criteria announced in the 2008 Order, which took effect on March 23, 2010, with the Third Circuit's lifting of its stay, as well as the general "public interest" waiver test adopted with the newspaper/broadcast cross-ownership rule in 1975.  In the cross-ownership markets, synergies and efficiencies attributable to cross-ownership allow the Debtors' combined media properties to deliver an exceptional level of local news – both quantitatively and qualitatively.  The Debtors' combined properties have earned strong ratings and many journalistic awards as testament to their community service and success.  Each cross-owned market is also remarkably diverse and competitive with respect to traditional media properties (broadcast, cable and print) and even more so when new

technological offerings, particularly those available over the Internet and wireless services, are taken into account.

The waiver filings also argue that any forced regulatory separation of the cross-owned properties would have adverse public interest effects. First, in today's challenging media marketplace, the assumption that an alternative purchaser would be willing and able to acquire any of the properties simply is not valid. Second, even assuming that such a purchaser could be found, it is unlikely that the new owners would have the resources and, absent efficiencies from cross-ownership, the ability to maintain the amount and caliber of local news, information, and community services currently offered by each cross-owned combination.

Under the standards set forth in the 2008 Order to analyze the waivers, cross-ownership relief is presumptive in New York, Los Angeles, and Miami, because, as explained in the FCC Applications, (i) those markets are among the Top 20 largest DMAs, (ii) the Debtors own only one broadcast outlet in each market, (iii) the television station at issue does not rank among the top four rated television stations, and (iv) at least eight "major media voices" exist exclusive of the combination. In Chicago and Hartford, where the Debtors hold more than one broadcast property, the Debtors are not entitled to a presumptive waiver, but their waiver requests assert that those combinations also are entitled to relief because (i) the stations have increased the amount of news provided to the market, (ii) the cross-owned properties exercise independent news judgment, (iii) the level of concentration in the DMA is not adversely affected, and (iv) the struggling financial condition of the Debtors justifies relief.

In the FCC Applications, the Debtors also contend that continued waiver of the television "duopoly" rule for the Hartford properties is justified under either the FCC's "failed" or "failing station" standards. In the Indianapolis market, the Debtors have argued that continued operation of WTTK-TV as a "satellite" is appropriate under FCC policies.

In each of the seven requests, the Debtors stress that grant of the relief they request is required under the FCC's policies affording comity to the bankruptcy process. FCC precedent establishes that the agency is required to reconcile its policies with those underlying the bankruptcy laws. The FCC has previously taken comity into account in granting ownership waivers, and, in all seven instances involving the Debtors' properties; waivers would merely allow the Reorganized Debtors to maintain the existing combinations.

It is possible that the FCC will deny the Debtors' request for "permanent waivers," or grant temporary waivers of shorter duration than requested, with respect to one or more of the media combinations or interests for which the Debtors are seeking waivers. In the event that the FCC does not grant the requested waivers, the Debtors could be required to come into compliance with the applicable ownership rule by disposing of properties deemed non-conforming by a date set by the FCC, which date could be prior to the Debtors' emergence from bankruptcy. It is possible that the FCC will require the Debtors to place one or more properties deemed by the FCC to be non-compliant with its ownership rules into a divestiture trust prior to the Debtors' emergence from bankruptcy. If the present difficult financial climate for businesses overall and for media industries in particular persists, the Debtors could face difficulty locating buyers willing to purchase the non-conforming properties and could be forced to dispose of properties at prices that the Debtors otherwise would consider unacceptable.

1091124-12
1113713-1

In addition, it is possible that, in evaluating the FCC Applications, the FCC could determine that the Step One Plan neither complies with nor ensures compliance with the FCC's broadcast multiple and/or cross-ownership rules and/or the twenty-five percent (25%) foreign ownership limit in Section 310(b) of the Communications Act. For example, the FCC may not agree with the Debtors and determine that the New Class B Common Stock should be considered attributable rather than non-attributable under its rules. Such a finding could cause the FCC to determine that certain prospective stockholders of the Reorganized Debtors would not be in compliance with the FCC's broadcast multiple and/or cross-ownership rules upon consummation of the currently proposed Step One Plan. Further, the FCC could require the Step One Plan Proponents to amend the Step One Plan and the FCC Applications, which could delay FCC Approval and consummation of the Step One Plan. The FCC's consideration of the Petitions to Deny also could cause a delay in FCC Approval and consummation of the Step One Plan, increasing the cost to the Debtors of emerging from bankruptcy.

3.      Under the Step One Plan, all New Common Stock held by the Sharing Provision Reserve. shall be held by the Sharing Provision Reserve in a manner acceptable to the FCC. While the Step One Plan Proponents believe the Sharing Provision Reserve can hold the New Common Stock in a manner acceptable to the FCC, it is possible that the FCC could determine that an alternative structure is required or that the new Common Stock cannot be held in the Sharing Provision Reserve.

## C.      Risks Related to the Debtors' Businesses

1.      Historical Financial Information Will Not Be Comparable

As a result of the consummation of the Step One Plan and the transactions contemplated thereby, the Debtors will be operating their current businesses under a new capital structure and will be subject to the fresh start accounting rules. Accordingly, the Debtors' financial condition and results of operations from and after the Effective Date will not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

2.      The Debtors Could Be Faced with Additional Tax Liabilities

The Debtors are subject to federal and state income taxes and are regularly audited by federal and state taxing authorities. In the years currently under audit, or eligible for future audit, the Debtors consummated certain significant business transactions that they treated or intend to treat as not resulting in gain for income tax purposes but as resulting in gain or loss for financial accounting purposes. In addition, the Debtors treated or intend to treat significant amounts of income as not subject to tax because of the Debtors' status as an S corporation. Significant judgment is required in evaluating the Debtors' tax positions and in establishing appropriate reserves. The Debtors analyze their tax positions and reserves on an ongoing basis and make adjustments when warranted based on changes in facts and circumstances. The resolutions of the Debtors' tax positions are unpredictable and could result in tax liabilities and associated cash payments that are significantly higher or lower than that which has been provided for by the Debtors. In addition, a change in the tax laws of the United States and adjustments to tax positions as a result of audits could materially affect the consequences of the Step One Plan to the Debtors and/or their stockholders.

1091124-12
1113713-1

3.      The Reorganized Debtors May Continue to Have Substantial Indebtedness

The Reorganized Debtors may continue to have substantial indebtedness following the Effective Date, which may include a New Senior Secured Term Loan in an aggregate principal amount of not more than the lesser of (a) $1.1 billion or (b) two times the Debtors' trailing twelve month operating cash flow, excluding minority equity interest, as of the end of the fiscal quarter most recently ended prior to the Effective Date.  For purposes of the Financial Projections attached as Exhibit E to the General Disclosure Statement, the aggregate principal amount of the New Senior Secured Term Loan is assumed to be $1.1 billion.  While the Reorganized Debtors' management believes that future operating cash flow, together with financing arrangements, will be sufficient to finance operating requirements under the Reorganized Debtors' business plan, the Reorganized Debtors' leverage and debt service requirements could make it more vulnerable to economic downturns in the markets the Reorganized Debtors serve or in the economy generally.

The degree to which the Reorganized Debtors will be indebted could have important consequences because it may:

require the Reorganized Debtors to dedicate a substantial portion of their cash flows to the payment of principal and interest on their debt which will reduce the funds available for other purposes;

limit the Reorganized Debtors liquidity and operational flexibility and their ability to respond to the challenging general and industry-specific economic and business conditions that currently exist or that the Reorganized Debtors may face in the future;

require the Reorganized Debtors in the future to defer planned capital expenditures, further reduce the size of the Reorganized Debtors' workforce, reduce discretionary spending, dispose of assets or forgo acquisitions or other strategic opportunities, any of which decisions may affect the Reorganized Debtors' revenues and place them at a competitive disadvantage compared to their competitors with less debt or with comparable debt at more favorable interest rates and who, as a result, may be better positioned to withstand economic downturns or pursue key acquisitions or other strategic opportunities;

limit the Reorganized Debtors' ability to obtain additional financing in the future;

expose the Reorganized Debtors to increased interest rate risk because a substantial portion of the Reorganized Debtors' debt obligations may be at variable interest rates; and

place the Reorganized Debtors at a competitive disadvantage because they may be more highly leveraged than some of their competitors.

In addition, any new financing facility that the Reorganized Debtors may enter into as of the Effective Date pursuant to the Step One Plan will likely contain covenants that impose operating and financial restrictions on the Reorganized Debtors. These covenants could adversely affect the Reorganized Debtors' ability to finance future operations, potential acquisitions or capital needs or to engage in business activities that may be in their interest, including implementing the Reorganized Debtors' Step One Plan.

**D.      Risks to Creditors Who Will Receive Securities**

The ultimate recoveries under the Step One Plan to Holders of Claims that receive shares of New Common Stock or New Warrants to purchase shares of New Common Stock pursuant to the Step One Plan will depend on the realizable value of the shares of New Common Stock. Shares of New Common Stock are subject to a number of material risks, including, but not limited to, those specified below. Prior to voting on the Step One Plan, each Holder of Claims that are to be satisfied in whole or part through a distribution of New Common Stock should carefully consider the risk factors specified or referred to below, as well as all of the information contained in the Step One Plan.

1.      The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants

No established market exists for the New Common Stock or New Warrants and there can be no assurance that an active market for the shares of the New Common Stock or New Warrants will develop, nor can any assurance be given as to the prices at which such securities might be traded. Although Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the NYSE or for quotation in the NASDAQ stock market, there can be no assurance that the listing or quotation of the New Class A Common Stock will be accepted or that an active or liquid trading market will develop for the New Class A Common Stock. If a trading market does not develop or is not maintained, holders of shares of the New Common Stock and New Warrants may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such market were to exist, such securities could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Step One Plan, depending upon many factors, including, without limitation, markets for similar securities, industry conditions, the Reorganized Debtors' performance and investor expectations thereof. In addition, some persons who receive shares of the New Common Stock and/or the New Warrants may prefer to liquidate their investment in the near term rather than hold such securities on a long-term basis. Accordingly, any market for such securities may be volatile, at least for an initial period following the Effective Date, and may be depressed until the market has had time to absorb any such sales and to observe the Reorganized Debtors' performance.

2.      Lack of Dividends May Adversely Affect Liquidity of the New Common Stock

The Debtors do not anticipate that cash dividends or other distributions will be made with respect to the New Common Stock in the foreseeable future. In addition, covenants in certain debt instruments to which the Reorganized Debtors will be a party may restrict their ability to pay dividends and make certain other payments. Further, such restrictions on dividends may have an adverse impact on the market demand for the New Common Stock as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Step One Plan.

1091124-12
1113713-1

3.      Future Sales or Issuances of Equity, Including Issuances in Respect of New Warrants to Purchase New Class A Common Stock, May Depress the Stock Price of the New Common Stock

If holders of New Common Stock sell substantial amounts of New Common Stock or Reorganized Tribune issues substantial additional amounts of its equity securities, or there is a belief that such sales or issuances could occur, the market price of the New Common Stock could decline significantly. Reorganized Tribune may issue New Warrants to purchase shares of New Class A Common Stock in certain circumstances. If Holders who receive New Warrants in connection with the implementation of the Step One Plan exercise such warrants and purchase a significant number of shares of New Class A Common Stock, the market price of the New Class A Common Stock may be adversely affected. In addition, any new issuances of equity securities by Reorganized Tribune including as a result of warrant exercises, may be dilutive to existing stockholders of Reorganized Tribune.

4.      The Limited Voting Rights of the New Class B Common Stock and the Lack of Voting Rights of the New Warrants Could Impact their Attractiveness to Investors and, as a Result, their Market Value

In certain circumstances, Reorganized Tribune may issue shares of New Class B Common Stock and/or New Warrants. The New Class A Common Stock and New Class B Common Stock generally provide identical economic rights, but holders of the New Class B Common Stock have limited voting rights, including that such holders have no right to vote in the election of directors. The holders of the New Warrants have no voting rights. The difference in voting rights of the New Class A Common Stock on the one hand, and New Class B Common Stock and New Warrants on the other hand, could diminish the value of the New Class B Common Stock and the New Warrants to the extent that investors or potential future purchasers of the New Class B Common Stock or the New Warrants ascribe value to the superior voting rights of the New Class A Common Stock. The Certificate of Incorporation of Reorganized Tribune, which will be filed with the Plan Supplement as Exhibit 5.3.1(1) to the Step One Plan, contains more information about the rights and limitations associated with the New Class B Common Stock. In addition, the New Warrant Agreement, which will be filed with the Plan Supplement as Exhibit 1.1.154 to the Step One Plan, contains more information about the rights and limitations associated with the New Warrants.

5.      Certain Holders May be Restricted in Their Ability to Transfer or Sell Their Securities

To the extent that New Common Stock, New Warrants or any other securities are issued under the Step One Plan and are covered by section 1145(a)(1) of the Bankruptcy Code, they may be resold by the holders thereof without registration unless the holder is an "underwriter" with respect to such securities. Resales by Persons who receive New Common Stock or New Warrants pursuant to the Step One Plan that are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such Persons would be permitted to sell such New Common Stock or New Warrants without registration if they are able to comply with the provisions of rule 144 under the Securities Act.

1091124-12
1113713-1

Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the NYSE or for quotation in the NASDAQ stock market but will have no liability if it is unable to do so. As noted above (see "The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants"), there can be no assurance that the listing or quotation of the New Class A Common Stock will be accepted or that an active or liquid trading market will develop for the New Class A Common Stock. Efforts to list the New Class A Common Stock, if successful, would include registering the New Class A Common Stock under the Exchange Act. Registration under the Exchange Act is a separate process from registration under the Securities Act and would not be sufficient to permit resales by persons who receive New Common Stock or New Warrants pursuant to the Step One Plan and who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code. Reorganized Tribune has no current plans to list the New Class B Common Stock on the NYSE or for quotation on the NASDAQ Stock Market or to register the New Class B Common Stock or New Warrants under the Securities Act, the Exchange Act or under equivalent state securities laws such that the recipients of the New Class B Common Stock or New Warrants would be able to resell their securities pursuant to an effective registration statement.

The Certificate of Incorporation contains restrictions on stockholders' ability to transfer New Common Stock and New Warrants designed to ensure compliance with the FCC broadcast multiple ownership and cross-ownership rules and the limitations on foreign ownership or control of FCC broadcast licenses imposed by the Communications Act. Furthermore, certificates for shares of New Common Stock and certificates for New Warrants may bear a legend restricting the sale, transfer, assignment, conversion or other disposal of such securities.

### E.       Risks Related to Interests in the Litigation Trust and the Creditors' Trust

Distributions on account of interests in the Litigation Trust and the Creditors' Trust will be dependent upon the successful liquidation of the Litigation Trust Assets and Creditors' Trust Assets and the proceeds of such Litigation Trust Assets and Creditors' Trust Assets being in excess of certain liabilities and expenses of the Litigation Trust and Creditors' Trust, as the case may be. The Step One Plan Proponents can make no assurances that there will be any distributions from the Litigation Trust or the Creditors' Trust.

### F.       Litigation Risks Relating to the Sharing Provision Reserve Amount

Distributions on account of the Sharing Provision Reserve Amount will be dependent upon the outcome of litigation in the Bankruptcy Court and in the New York State Action regarding the bad faith, negligence and inequitable conduct of the Senior Loan Agents and the Senior Loan Arrangers, and the enforceability of the Sharing Provision under the terms of the Senior Loan Agreement and under the circumstances of the Step Two LBO-Related Causes of Action, including whether the Step Two Senior Loan Claims (i) are entitled to sharing, (ii) are Allowed, (iii) are avoided and/or (iv) are enforceable. Litigation is inherently uncertain and the Step One Proponents can make no assurances as to the ultimate recipients of any distributions of the Sharing Provision Reserve Amount or as to the timing of such distributions.

1091124-12
1113713-1

# XI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE STEP ONE PLAN[20]

The following discussion is a summary of certain U.S. federal income tax aspects of the Step One Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Step One Plan with respect to a particular holder of a Claim or Interest.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Step One Plan.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Step One Plan.  No representations or assurances are being made to the U.S. Holders of Claims or Interests with respect to the U.S. federal income tax consequences described in the Step One Plan.

*        *        *        *

Any discussion of U.S. federal tax issues set forth in this Step One Plan Disclosure Statement was written solely in connection with the confirmation of the Step One Plan to which the transactions described in this Step One Plan Disclosure Statement are ancillary.  Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties that may be imposed on such person.  Each holder of a Claim or Interest should seek advice based on its particular circumstances from an independent tax advisor.

*        *        *        *

## A.    Federal Income Tax Consequences to the Debtors

1.    Termination of Subchapter S Corporation Status

On March 13, 2008, Tribune filed an election to be treated as a subchapter S corporation under the IRC, which election became effective as of the beginning of its 2008 fiscal year.  Tribune also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries.  Subject to certain limitations (such as the built-in gains tax applicable to Tribune's net unrealized gains as of the beginning of the 2008 fiscal year that are recognized in the subsequent ten taxable years), Tribune and its qualified subchapter S subsidiaries are not currently subject to corporate level federal income tax.  Instead, the income of Tribune and such subsidiaries is required to be reported by its stockholders.  The ESOP, which, as of the Petition Date, was the sole stockholder of Tribune, does not pay taxes on the income that is passed through to it because the ESOP is an employee benefit plan that qualifies for favorable tax treatment under Section 401(a) of the IRC.

---

[20] The Step One Plan Proponents have adopted the Risk Factors contained in the Settlement Plan.

Although most states in which Tribune and its subsidiaries operate recognize the subchapter S corporation status, some impose taxes at a reduced rate.

As a result of the implementation of the Step One Plan, Tribune will no longer be eligible to be treated as a subchapter S corporation beginning on the Effective Date. Accordingly, Reorganized Tribune and its subsidiaries will be subject to entity-level tax on all of their income and gains beginning on the Effective Date at corporate income tax rates. As described below, Reorganized Tribune is expected to have limited tax attributes available to offset such income and gains.

2.      Cancellation of Debt and Reduction of Tax Attributes

A debtor generally must recognize income from the cancellation of debt ("COD Income") to the extent that its debt is discharged for consideration less than the amount of such debt. For these purposes, consideration includes the amount of cash and the fair market value of property, including stock of the debtor. COD Income is not required to be included in taxable income, however, if the debtor is in bankruptcy (the "Bankruptcy Exception"). Instead, the debtor is required to reduce certain of its tax attributes by the amount of excluded COD Income, generally in the following order: net operating losses ("NOLs"), general business credit carryforwards, minimum tax credit carryforwards, capital loss carryforwards, the tax basis of the debtor's assets, passive activity loss or credit carryovers, and, finally, foreign tax credit tax carryforwards (collectively, "Tax Attributes"). Generally, the reduction in the tax basis of assets cannot exceed the excess of the total bases of the debtor's property held immediately after the debt discharge over the total liabilities of the debtor immediately after the discharge (the "Liability Floor Rule").

The Debtors expect to realize substantial COD Income as a result of the implementation of the Step One Plan. The precise amount of COD Income will depend on, among other things, the fair market value of the New Common Stock and New Warrants, which cannot be known with certainty until after the Effective Date. Pursuant to the Bankruptcy Exception, this COD Income will not be included in the Debtors' taxable income, but they will have to reduce their Tax Attributes after calculating the tax for the taxable year of discharge.

As a subchapter S corporation, Tribune does not currently have any NOLs or other significant Tax Attributes other than tax basis in assets. Although the projected COD Income is expected to exceed the Debtors' aggregate tax basis in assets, under the Liability Floor Rule the Debtors' will not be required to reduce such basis below their total liabilities after the discharge.

**B.      Federal Income Tax Treatment of the Creditors' Trust and Litigation Trust (collectively, the "Trusts") and the Receipt and Ownership of Beneficial Interests in the Trusts**

It is intended that each of the Trusts will qualify as a "liquidating trust" for U.S. federal income tax purposes. A liquidating trust is generally treated as a grantor trust for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. Consistent with the requirements for liquidating trust treatment, the Creditors' Trust Agreement and the Litigation Trust Agreement (collectively, the "Trust Agreements") will each require all relevant

parties to treat, for U.S. federal income tax purposes, the transfer of each of the Creditors' Trust Assets or the Litigation Trust Assets, as applicable (the "Trust Assets"), to the relevant Trust as (i) a transfer of the Trust Assets (other than amounts set aside in Trust Reserves on account of Disputed Claims if such Trust Reserves are subject to entity-level tax, as discussed below) to the Creditors' Trust Beneficiaries or the Litigation Trust Beneficiaries, as applicable (the "Trust Beneficiaries"), which transfer should be taxable (as described below) to each such Trust Beneficiary in its taxable year that includes the Effective Date, followed by (ii) a transfer of such Trust Assets by the Trust Beneficiaries to the Trust, with the Trust Beneficiaries being treated as the grantors and owners of the Trust.

The Step One Plan generally provides that, subject to the terms of Trust Agreements, promptly after the Effective Date, the Creditors' Trustee and the Litigation Trustee (each, a "Trustee"), as applicable, will determine and file with the court the estimated fair market value of the assets of each such Trust as of the Effective Date. The Trust Beneficiaries and the Trustees will each be required to use such valuation consistently for all U.S. federal income tax purposes, including for determining tax basis and gain or loss.

Consistent with the treatment of each Trust as a liquidating trust, the Trust Agreements will require each Trust Beneficiary to report on its U.S. federal income tax return its allocable share of each Trust's income, losses, if any, and expenses (the relevant Trust's "Tax Items"). Therefore, a Trust Beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of the income of each Trust whether or not the Trust has made any distributions to such Trust Beneficiary. The ability of a Trust Beneficiary to benefit from any deduction or losses may depend on the particular situation of that Trust Beneficiary.

The Trustees will each file with the Internal Revenue Service ("IRS") tax returns for the Trusts as grantor trusts and will also send to each Trust Beneficiary separate statements setting forth such holder's share of each Trust's Tax Items. Each Trust Beneficiary will be required to report such Tax Items on its U.S. federal income tax return.

This discussion assumes each Trust will be respected as a grantor trust owned by the Trust Beneficiaries for U.S. federal income tax purposes. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Trusts and the Trust Beneficiaries could differ materially from those discussed herein. For instance, it is possible that all income of each Trust could be subject to entity-level tax. It is also possible that the IRS might assert that the rights of the Trust Beneficiaries to receive Trust distributions should defer the ability of a Trust Beneficiary to claim a loss until the liquidation of the respective Trust is completed. Trust Beneficiaries should consult their own tax advisors about the tax consequences of their beneficial interests in the Trusts.

C.      **Federal Income Tax Treatment of the CT Reserve(s) and the LT Reserve(s) (collectively, the "Trust Reserve(s)")**

Each Trustee may establish one or more Trust Reserves on account of Disputed Claims. The amount(s) held back in the Trust Reserve(s) will be equal to the amount(s) necessary to satisfy the distributions to which the Holders of Disputed Claims would be entitled if all such Disputed Claims were to be subsequently Allowed.

For U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), each Trustees may (i) make an election pursuant to Treasury Regulation Section 1.468B-9 to treat the Trust Reserve(s) as a "disputed ownership fund" within the meaning of that Section, (ii) allocate taxable income or loss to the Trust Reserve(s), with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed Claims), and (iii) distribute assets from the Trust Reserve(s) as, when, and to the extent, such Disputed Claims either become Allowed or are otherwise resolved. The Trust beneficiaries will be bound by such election, if made by the Trustee, and as such will be required, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

The Trust Reserve(s) may be structured in a manner intended to cause it to be subject to a separate entity-level tax on any income earned by the Trust Reserve(s), including any taxable income of the Trusts allocable to the Trust Reserve(s). Therefore, distributions from the Trust Reserve(s) may be reduced to satisfy any taxes payable by the Trust Reserve(s).

Holders of Claims should note the tax treatment of the Trust Reserve(s) is unclear and should consult their own tax advisors.

### D.      Federal Income Tax Consequences to Holders of Claims and Interests

The U.S. federal income tax consequences of the transactions contemplated by the Step One Plan to Holders of Claims and Interests that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any individual who is a citizen or resident of the United States, or any entity (i) that is a corporation (or entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof, (ii) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source or (iii) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control; or (b) that has elected to continue to be treated as a United States Person for U.S. federal income tax purposes. In the case of a partnership, the U.S. federal income tax treatment of its partners will depend on the status of the partner and the activities of the partnership. A "Non-United States Person" is any person or entity (other than a partnership) that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "U.S. Holder" means a beneficial owner of a Claim or Interest that is a United States Person. The general U.S. federal income tax consequences to Holders of Claims or Interests that are Non-United States Persons are discussed below.

The U.S. federal income tax consequences to U.S. Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Step One Plan and the distributions provided for thereby will depend upon, among other things, (i) the manner in which a U.S. Holder acquired a Claim; (ii) the length of time the Claim has been held; (iii) whether the Claim was acquired at a discount; (iv) whether the U.S. Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (v) whether the U.S. Holder has previously included in income accrued but unpaid interest with respect to the Claim; (vi) the method of tax accounting of the U.S. Holder; (vii) whether the Claim is an

installment obligation for U.S. federal income tax purposes; and (viii) whether the Claim is a capital asset in the hands of the U.S. Holder.  Certain holders of Claims or Interests (such as foreign persons, subchapter S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary.  In addition, this summary does not discuss consequences to holders of the Swap Claim.  There also may be state, local, and/or non-U.S. income or other tax considerations or U.S. federal estate and gift tax considerations applicable to holders of Claims or Interests that are not addressed in this discussion.

The discussion that follows does not describe the tax consequences of the receipt and holding of beneficial interests in the Trusts, which are discussed above.

EACH U.S. HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE STEP ONE PLAN IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE STEP ONE PLAN.

1.     General

A U.S. Holder of a Claim may recognize ordinary income or loss with respect to any portion of its Claim attributable to accrued but unpaid interest.  A U.S. Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Step One Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as a payment of interest, regardless of whether such U.S. Holder realizes an overall gain or loss as a result of surrendering its Claim.  In general, a U.S. Holder that previously included in its income accrued but unpaid interest attributable to its Claim will recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such U.S. Holder realizes an overall gain or loss as a result of the distribution it may receive under the Step One Plan on account of its Claim.  Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors intend to allocate for U.S. federal income tax purposes the consideration paid pursuant to the Step One Plan with respect to a Claim first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim.  Accordingly, in cases where a U.S. Holder receives consideration in an amount that is less than the principal amount of its Claim, the Debtors intend to allocate the full amount of consideration transferred to such U.S. Holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such U.S. Holder is attributable to accrued interest.  There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Subject to the foregoing rules relating to accrued interest, gain or loss recognized for U.S. federal income tax purposes as a result of the consummation of the Step One Plan by U.S. Holders of Claims or Interests that hold their Claims or Interests as capital assets generally will be treated as a gain or loss from the sale or exchange of such capital asset.  Capital gain or loss will be long-term if the Claim or Interest was held by the U.S. Holder for more than one year and

65

otherwise will be short-term.  Any capital losses realized generally may be used by a corporate U.S. Holder only to offset capital gains, and by an individual U.S. Holder only to the extent of capital gains plus $3,000 of other income.

2. Market Discount

The market discount provisions of the IRC may apply to holders of certain Claims.  In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its revised issue price) exceeds, by more than a statutory de minimis amount, the tax basis of the debt obligation in the holder's hands immediately after its acquisition (any such excess, "market discount").  In general, a market discount obligation is treated as having accrued market discount as of any date equal to the total market discount multiplied by a fraction, the numerator of which is the number of days the holder has owned the market discount obligation and the denominator of which is the total number of days that remained until maturity at the time the holder acquired the market discount obligation.  If a U.S. Holder has Claims that were acquired with market discount and such U.S. Holder realizes gain upon the exchange of its Claims for property pursuant to the Step One Plan, such U.S. Holder may be required to include as ordinary income some or all of such market discount to the extent of such realized gain.  U.S. Holders who have Claims with market discount should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances.  In particular, U.S. Holders of Claims that are "securities" for U.S. federal income tax purposes and that are exchanged for New Common Stock and, if applicable, New Warrants should consult their tax advisors regarding possible recognition of ordinary income upon a subsequent disposition of such New Common Stock or New Warrants. See "Definition of Security," below.

3. Amounts Attributable to Disallowance of Disputed Claims

Certain Holders of Allowed Claims have a contingent right to receive additional distributions on account of the disallowance of Disputed Claims.  It is possible that such contingent claims should be ignored until such cash is received, at which time the recipient would account for such cash by reference to the accounting that would have resulted if such cash had been received at the time the recipient received its initial distribution pursuant to the Step One Plan.  The existence of such a contingent right may also affect the timing of recognition of any loss by such Holder.  Alternatively, such a contingent claim might be ascribed value in determining the tax consequences of the initial distribution pursuant to the Step One Plan, with any difference between such ascribed value and the amount of cash actually received accounted for when such cash is actually received.  Holders with such contingent rights to receive additional distributions should consult their own tax advisors regarding the treatment of such rights.  For ease of discussion, the existence of such contingent rights will not be referred to in the discussion that follows.

1091124-12
1113713-1

4. U.S. Holders of Senior Loan Claims and Senior Guaranty Claims (not including the guaranty of the Swap Claim)

U.S. Holders of Allowed Senior Loan and Senior Guaranty Claims will receive New Common Stock (and where applicable, New Warrants), Cash, Creditors' Trust Interests and Litigation Trust Interests (collectively, "Trust Interests") and may receive interests in the New Senior Secured Term Loan, in exchange for their Claims.

Each such U.S. Holder will realize gain or loss in an amount equal to the difference between the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the New Common Stock and any New Warrants received, (ii) the fair market value of the Holder's share of Trust Assets, if any, (iii) the Cash received, and (iv) the "issue price" of the Holder's interest in the New Senior Secured Term Loan, if received. See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of an interest in the New Senior Secured Term Loan.

The tax consequences to a U.S. Holder of a Senior Loan and Senior Guaranty Claim depend on whether its Claim is a "security" for U.S. federal income tax purposes. Although not free from doubt, the New Senior Secured Term Loan will likely not constitute a security for U.S. federal income tax purposes. See "Definition of 'Security'," below. U.S. Holders are encouraged to consult with their tax advisors in connection with the determination of whether the New Senior Secured Term Loan constitutes a security for U.S. federal income tax purposes. The remainder of this discussion assumes that the New Senior Secured Term Loan will not constitute a security for U.S. federal income tax purposes.

If the Claim does not constitute a security for U.S. federal income tax purposes, the exchange of the Claim for New Common Stock (and where applicable, New Warrants), the Holder's share of Trust Assets, Cash and the Holder's interest in the New Senior Secured Term Loan, if received, will be a taxable transaction, and the U.S. Holder of such Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange. In such a case, a U.S. Holder's tax basis in the New Common Stock, the Holder's share of the Trust Assets, if any, and any New Warrants received in the exchange will equal the fair market value of such assets on the date received. A U.S. Holder's tax basis in its interest in the New Senior Secured Term Loan, if received, will equal the issue price of the Holder's interest in the New Senior Secured Term Loan. A U.S. Holder's holding period in such assets will commence on the day after the date received. See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of a Holder's interest in the New Senior Secured Term Loan.

If the Claim constitutes a security for U.S. federal income tax purposes, the exchange of such Claim will be treated as a recapitalization for U.S. federal income tax purposes. In such a case, a U.S. Holder of such Claim who realizes a loss on the exchange will not be permitted to recognize such loss, except to the extent of any loss attributable to accrued but unpaid interest with respect to such Claim. A U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the sum of (a) the issue price of the Holder's interest in the New Senior Secured Term Loan, if

67

received, (b) the fair market value of the Holder's share of Trust Assets, if any, and (c) the amount of Cash received as part of the exchange. A U.S. Holder's tax basis in the New Common Stock and any New Warrants received in exchange for its Claim will equal its adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of (i) the fair market value of the Holder's interest in the New Senior Secured Term Loan, if received, (ii) the fair market value of the Holder's share of Trust Assets, if any, and (iii) the amount of Cash received as part of the exchange. If a U.S. Holder receives both New Common Stock and New Warrants in exchange for its Claim, such basis will be allocated between the New Common Stock and the New Warrants in proportion to their relative fair market values on the date received. A U.S. Holder's holding period in the New Common Stock and any New Warrants will include the holding period in its Claim surrendered. A U.S. Holder's tax basis in its share of Trust Assets, if any, will equal the fair market value of such assets on the date received. A U.S. Holder's holding period in its share of Trust Assets, if any, will commence on the day after the date received. A U.S. Holder's tax basis in the Holder's interest in the New Senior Secured Term Loan, if received, will equal the issue price of the Holder's interest in the New Senior Secured Term Loan. A U.S. Holder's holding period in the Holder's interest in the New Senior Secured Term Loan, if received, will commence on the day after the date received.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," below, for a discussion related to the tax considerations of holding an interest in the New Senior Secured Term Loan.

5.     U.S. Holders of Bridge Loan Claims

U.S. Holders of Allowed Bridge Loan Claims will receive Trust Interests and Cash in exchange for their Claims. Accordingly, a U.S. Holder of such a Claim should generally recognize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of the Trust Assets, and (ii) the amount of Cash received.

6.     U.S. Holders of Senior Noteholder Claims

U.S. Holders of Allowed Senior Noteholder Claims will receive Trust Interests and Cash in exchange for their Claims. Accordingly, a U.S. Holder of such a Claim should generally recognize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of Trust Assets, and (ii) the amount of Cash received.

7.     U.S. Holders of Other Parent Claims (not including the Swap Claim and Claims against Tribune arising from a Non-Qualified Former Employee Benefit Plan)

U.S. Holders of Allowed Other Parent Claims will receive Cash and may receive Trust Interests in exchange for their Claims. Accordingly, a U.S. Holder of an Allowed Other Parent Claim should generally recognize income or loss in an amount equal to the difference between

the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the amount of Cash received, and (ii) the fair market value of the Holder's share of Trust Assets.

8.   U.S. Holders of General Unsecured Claims against the Filed Subsidiary Debtors (not including Claims against the Filed Subsidiary Debtors arising from a Non-Qualified Former Employee Benefit Plan)

U.S. Holders of Allowed General Unsecured Claims will receive Cash in exchange for their Claims.  Each U.S. Holder of an Allowed General Unsecured Claim will recognize income or loss equal to the difference between (i) the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the amount of Cash received.

9.   U.S. Holders of Convenience Claims

U.S. Holders of Allowed Convenience Claims will receive Cash in exchange for their Claims.  Each U.S. Holder of a Convenience Claim will recognize income or loss in an amount equal to the difference between (i) the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the amount of Cash received.

10.   U.S. Holders of Claims arising from a Non-Qualified Former Employee Benefit Plan

U.S. Holders of Allowed Claims arising from a Non-Qualified Former Employee Benefit Plan will receive Cash and may receive Trust Interests in exchange for their Claims.  The amount of Cash received as part of the exchange (including any cash subsequently received on account of the disallowance of Disputed Claims) and the fair market value of the U.S. Holder's share of Trust Assets will likely be treated as compensation income to a U.S. Holder.  Under Treasury Regulations promulgated under Section 409A of the IRC, such a payment may be treated as an acceleration of deferred compensation, and, if so, would be subject to an additional twenty percent (20%) tax, and interest would be due at the federal underpayment rate plus one percent (1%) on the underpayments of income tax on the amount of such deferred compensation had it been included in income in the first year it was no longer subject to a substantial risk of forfeiture.

11.   U.S. Holders of EGI-TRB LLC and PHONES Notes Claims

U.S. Holders of Allowed EGI-TRB LLC Claims and PHONES Notes Claims will receive Trust Interests in exchange for their Claims.  Accordingly, a U.S. Holder of such a Claim should generally recognize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of Trust Assets, if any.

1091124-12
1113713-1

12.     U.S. Holders of Securities Litigation Claims

Pursuant to the Step One Plan, all Securities Litigation Claims will be extinguished, and U.S. Holders of Securities Litigation Claims will receive nothing in exchange for such Claims. As a result, each U.S. Holder of a Securities Litigation Claim generally will recognize a loss equal to the U.S. Holder's adjusted tax basis, if any, in such Claim, except to the extent that such U.S. Holder previously claimed a loss with respect to such Claim under its regular method of accounting.

13.     U.S. Holders of Tribune Interests

Pursuant to the Step One Plan, all Tribune Interests will be extinguished, and U.S. Holders of Tribune Interests will receive nothing in exchange for such Tribune Interests.  As a result, each U.S. Holder of Tribune Interests generally will recognize a loss equal to the U.S. Holder's adjusted tax basis in such Tribune Interests extinguished under the Step One Plan, except to the extent that such U.S. Holder previously claimed a loss with respect to such Tribune Interests under its regular method of accounting.

14.     Definition of "Security"

The term "security" is not defined in the IRC or in the Treasury Regulations.  Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances.  Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument.  These authorities have indicated that an initial term of less than five years is evidence that the instrument is generally not a security, whereas an initial term of ten years or more is evidence that it is a security.  Treatment of an instrument with an initial term between five and ten years is generally unsettled.  Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

15.     Federal Income Tax Treatment of the New Senior Secured Term Loan

If interests in the New Senior Secured Term Loan are "publicly traded," the issue price of an interest is generally expected to equal its fair market value on the Effective Date.  If interests in the New Senior Secured Term Loan are not publicly traded, the issue price of an interest will depend on whether a substantial amount of the New Senior Secured Term Loan is exchanged for debt instruments that are publicly traded, in which case the issue price of interests in the New Senior Secured Term Loan is generally expected to be determined by reference to the fair market value of the publicly traded debt for which a substantial amount of the New Senior Secured Term Loan has been exchanged.  Otherwise, the issue price of an interest in the New Senior Secured Term Loan is generally expected to equal its stated redemption price at maturity.  For these purposes, a debt instrument generally is treated as publicly traded if, at any time during the 60 day period ending 30 days after the issue date, (i) the debt is listed on a national securities

exchange or quoted on an interdealer quotation system sponsored by a national securities association, (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions or (iii) if, in certain circumstances, price quotations are readily available from dealers, brokers or traders.

A U.S. Holder who receives an interest in the New Senior Secured Term Loan will generally be required to include stated interest on the New Senior Secured Term Loan in income in accordance with U.S. Holder's regular method of tax accounting. In addition, if the New Senior Secured Term Loan is treated as issued with original issue discount for U.S. federal income tax purposes, a U.S. Holder of an interest in the New Senior Secured Term Loan will also be required to include in income as interest the amount of such original issue discount over the term of the New Senior Secured Term Loan based on the constant yield method. In such a case, a U.S. Holder will also be required to include amounts in income before they are received. A U.S. Holder's tax basis in its interest in the New Senior Secured Term Loan will be increased by the amount of original issue discount included in income and reduced by the amount of Cash (other than payments of stated interest) received with respect to its interest in the New Senior Secured Term Loan.

16.    Federal Income Tax Treatment of New Warrants

In general, a U.S. Holder of a New Warrant will recognize gain or loss upon the sale of the New Warrant in an amount equal to the difference between the amount realized on the sale and such Holder's adjusted tax basis in the New Warrant. Gain or loss attributable to the sale of a New Warrant will generally be capital gain or loss.

Although the U.S. federal income tax consequences of the exercise of a New Warrant on a cashless basis are not entirely clear, a U.S. Holder should not recognize any gain or loss in respect of the receipt of New Common Stock upon the cashless exercise of a New Warrant because such exchange should be treated as a recapitalization for U.S. federal income tax purposes. A U.S. Holder's tax basis in the New Common Stock received upon the exercise of a New Warrant should equal such Holder's tax basis in the New Warrant exercised. The holding period for the New Common Stock received upon the exercise of a New Warrant should include such Holder's holding period for the New Warrant. Due to the absence of authority on the U.S. federal income tax treatment of the exercise of warrants on a cashless basis, there can be no assurance that the IRS or a court would take a similar position as described above. Accordingly, U.S. Holders should consult their tax advisors concerning the possible tax consequences of the cashless exercise of the New Warrants.

A U.S. Holder should not recognize any gain or loss in respect of the receipt of New Common Stock upon the exercise of a New Warrant for a cash payment of the exercise price, which is expected to be a nominal amount. A U.S. Holder's tax basis in the New Common Stock received upon the exercise of a New Warrant should equal such Holder's tax basis in the New Warrant exercised plus the exercise price paid by the Holder. It is not clear whether the exercise of a New Warrant for a cash payment of equal to the exercise price should be treated as a

purchase of the entirety of the New Common Stock received or as a purchase of only a portion of the New Common Stock worth the cash paid, with the rest of the New Common Stock treated as received pursuant to a recapitalization with consequences described in the preceding paragraph. If such exercise were treated as a purchase of the entirety of the New Common Stock received, a U.S. Holder's holding period for the Common Stock would commence upon the day following the date the New Warrant is exercised (or possibly on the date of exercise). U.S. Holders should consult their tax advisors regarding the tax consequences of exercise of a New Warrant by payment of the exercise price.

17.     Non-United States Persons

A holder of a Claim that is a Non-United States Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Step One Plan, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) such holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

18.     Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims pursuant to the Step One Plan, may be subject to information reporting by the payor to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of twenty-eight percent (28%)) under certain circumstances. Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) is notified by the IRS of a failure to report interest or dividends properly, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is correct and that the holder is a United States person that is not subject to backup withholding. Certain persons are exempt from backup withholding, including, under certain circumstances, corporations and financial institutions. Holders of Allowed Claims and Interests are urged to consult their own tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

Recent legislation generally imposes withholding of 30% on payments to certain foreign entities (including financial intermediaries), after December 31, 2012, of dividend payments on and the gross proceeds of dispositions of U.S. common stock and possibly warrants, unless various U.S. information reporting and due diligence requirements (that are in addition to, and potentially significantly more onerous than, the requirement to deliver an IRS Form W-8BEN) have been satisfied. Non-U.S. Holders should consult their tax advisers regarding the possible implications of this legislation for their receipt of interests in the New Common Stock and New Warrants.

1091124-12
1113713-1

E.    **Federal Income Tax Treatment of Other Parent Claims Reserve and Subsidiary GUC Reserve (collectively, "Reserves')**

Reorganized Tribune may establish one or more Reserves to make distributions to Holders of Disputed Claims that become Allowed Claims after the Effective Date. Distributions from each such Reserve will be made to Holders of Disputed Claims when such Claims are subsequently Allowed, and to Holders of Allowed Claims (whether such Claims were Allowed on or after the Effective Date) when any Disputed Claims are subsequently disallowed.

Each Reserve may be structured in a manner intended to cause it to be subject to a separate entity-level tax on its income. Therefore, distributions from each such Reserve may be reduced to satisfy any taxes payable by the Reserve.

Holders of Claims should note the tax treatment of such Reserve(s) is unclear and should consult their own tax advisors.

F.    **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE STEP ONE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE STEP ONE PLAN.

G.    **Reservation of Rights**

Article VI of the Step One Plan is subject to change (possibly substantially) based on subsequent changes to other provisions of the Step One Plan. The Step One Plan Proponents and their advisors reserve the right to further modify, revise or supplement Article VI of the Step One Plan and the other tax related sections of the Step One Plan up to ten days prior to the date by which objections to Confirmation of the Step One Plan must be filed and served.

## XII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE STEP ONE PLAN

If the Step One Plan is not confirmed, the alternatives include (i) continuation of the Chapter 11 Cases, (ii) approval of a Competing Plan, or (iii) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

1091124-12
1113713-1

## A.    Continuation of The Chapter 11 Cases

If the Debtors remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as Debtors in Possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors could continue as viable going concerns in protracted Chapter 11 Cases.  If the Debtors remain in chapter 11 for an extended period of time, they could have difficulty operating with the high costs, operating financing and the eroding confidence of their employees, customers and trade vendors.

In addition, if the Debtors fail to settle outstanding Claims through the Step One Plan, litigation of certain Claims may be required, which litigation may take years to resolve, be burdensome and expensive, prolong the Chapter 11 Cases, and have a detrimental impact on the Debtors' businesses and enterprise value.

## B.    Approval of a Competing Plan

**The Step One Plan Proponents believe that the Step One Plan provides the best option for restructuring the Debtors.  Please refer to the Step One Plan Proponents' Responsive Statement included in Volume III of the Joint Disclosure Statement for a detailed discussion of the Step One Plan Proponents' views regarding the inferiority of other Competing Plans.**

## C.    Liquidation under Chapter 7 or Chapter 11

If the Step One Plan or another plan of reorganization is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code.  In chapter 7, a trustee would be appointed to liquidate the assets of the Debtors.  The Debtors believe that in a liquidation under chapter 7 additional administrative expenses involved in the appointment of a trustee and professionals to assist such trustee, along with expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the estates.  In addition, the Step One Plan Proponents believe that the Liquidation Analysis attached as Exhibit D to the General Disclosure Statement is speculative as it is necessarily premised upon assumptions and estimates.  As such, the Liquidation Analysis can give no assurance as to the value which would be realized in chapter 7 liquidation.  Further, as demonstrated in Article IV above, the Step One Plan Proponents believe that recoveries to creditors in a chapter 7 liquidation would be substantially lower less than those provided pursuant to the Step One Plan.

The Debtors could also be liquidated under a chapter 11 plan of reorganization.  In a chapter 11 liquidation, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7 and a trustee would not be required.  Thus, chapter 11 liquidation might result in larger recoveries than in chapter 7 liquidation; however, the delay in distributions could result in lower present values being received and higher administrative costs.

## XIII.   CONCLUSION AND RECOMMENDATION

74

The Step One Plan Proponents believe that the Step One Plan furthers the paramount interest of all creditors by providing for the resolution of the LBO-Related Causes of Action and a reasonable procedure for the resolution of other causes of action for the benefit of certain creditors through the creation and funding of the Creditors' Trust and the Litigation Trust. This will allow the Debtors to emerge promptly from bankruptcy while preserving the opportunity for certain creditors to pursue additional recoveries through litigation.

**The Step One Plan Proponents urge all Holders of Claims to (i) vote to <u>accept</u> the Step One Plan and (ii) return their ballots so that they are received no later than [●] (prevailing Eastern Time) on [●], 2010.**

1091124-12
1113713-1

ALDEN GLOBAL OPPORTUNITIES
MASTER FUND, L.P.

By: _____
    Name:
    Title:

        Jonathan Gross
        Alden Global Capital
        Chief Operating Officer


ALDEN GLOBAL DISTRESSED
OPPORTUNITIES FUND, L.P.

By: _____
    Name:
    Title:

        Jonathan Gross
        Alden Global Capital
        Chief Operating Officer

ALLEN GLOBAL PARTNERS LP

By: _____
     Name:  TAL GURION
     Title:  VP of General Partner


ALLEN GLOBAL PARTNERS OFFSHORE

By: _____
     Name:  TAL GURION
     Title:  Managing Director of Investment Manager.

ARROWGRASS MASTER FUND LTD.

By: _____

    Name: SWATI PATEL

    Title: GENERAL COUNSEL


ARROWGRASS DISTRESSED
OPPORTUNITIES FUND LIMITED

By: _____

    Name: SWATI PATEL

    Title: GENERAL COUNSEL

BENNETT OFFSHORE RESTRUCTURING
FUND, INC.

By: _____
   Name:
   Title:


BENNETT RESTRUCTURING FUND, L.P.

By: _____
   Name:
   Title:


BRF SENIOR INCOME, L.P.

By: _____
   Name:
   Title:

BLUE MOUNTAIN CREDIT
ALTERNATIVES MASTER FUND, L.P.
By: BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, its authorized investment advisor

By: _____
Name: David Rubenstein, CFO/GC
Title:


BLUEMOUNTAIN DISTRESSED MASTER
FUND L.P.
By: BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, its authorized investment advisor

By: _____
Name: David Rubenstein, CFO/GC
Title:


BLUEMOUNTAIN LONG/SHORT CREDIT
MASTER FUND L.P.
By: BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, its authorized investment advisor

By: _____
Name: David Rubenstein, CFO/GC
Title:


BLUEMOUNTAIN TIMBERLINE LTD
By: BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, its authorized investment advisor

By: _____
Name: David Rubenstein, CFO/GC
Title:

CFIP MASTER FUND, LTD.
By:     Chicago Fundamental Investment Partners, LLC,
        its Investment Manager

By: _____
     Name: Eric Baer
     Title: Principal & Portfolio Manager

CITADEL SECURITIES LLC

By: _____
Name:
Title: ERICA L. TARPEY
        Authorized Signatory

Chisoo Kim

COOPERSTOWN MASTER FUND, LTD.

By: _____

Name:
Title: Peter A. Couri

Principal

ECO MASTER FUND, LTD.

By: _____

Name:
Title:

Steven M. Friedman
Director

GREYWOLF CAPITAL OVERSEAS
MASTER FUND
By:     Greywolf Capital Management LP, its
        investment manager

By:     _____
        Name: Dave Ray
        Title: Authorized Signatory


GREYWOLF CAPITAL PARTNERS II LP
By:     Greywolf Advisors LLC, its General
        Partner

By:     _____
        Name: Dave Ray
        Title: Authorized Signatory


GREYWOLF CLO I, LTD.
By:     Greywolf Capital Management LP,
        its collateral manager

By:     _____
        Name: Dave Ray
        Title: Authorized Signatory

NORMANDY HILL CAPITAL, L.P.
By:  Normandy Hill S Corp., its general partner

By:  _____
    Name:    Michael Connell
    Title:    Vice President, Normandy Hill S Corp.

OCP INVESTMENT TRUST, by Onex Credit Partners, LLC, its Manager

By: _____
Name: Steven Gutman
Title: General Counsel


ONEX DEBT OPPORTUNITY FUND, LTD., by Onex Credit Partners, LLC,
its Investment Manager

By: _____
Name: Steven Gutman
Title: General Counsel

QUANTUM PARTNERS LP

By:  QP GP LLC, its General Partner

By: _____
    Name: Thomas L. O'Grady
    Title: Attorney-In-Fact

SCOGGIN CAPITAL MANAGEMENT L.P.

By: _____

Name: A DEU Chody

Title: MANAGING MEMBER

WATERSTONE CAPITAL MANAGEMENT
L.P.

By: _____
Name: Martin Kalish
Title: COO

WEXFORD SPECTRUM INVESTORS LLC

By: _____
Name: JOHN V. DOYLE
Title: VICE PRESIDENT


DEBELLO INVESTORS LLC

By: _____
Name: JOHN V. DOYLE
Title: VICE PRESIDENT