## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

Hearing Date: November 29, 2010 at 10:00 a.m. ET
Obj. Deadline: November 19, 2010 at 4:00 p.m. ET

## MOTION OF THE DEBTORS FOR AN ORDER (I) ESTABLISHING PROCEDURES FOR SOLICITATION AND TABULATION OF VOTES TO ACCEPT OR REJECT PLANS OF REORGANIZATION; (II) APPROVING FORMS OF BALLOTS, MASTER BALLOTS AND RELATED INSTRUCTIONS; (III) APPROVING SOLICITATION PACKAGE CONTENTS AND AUTHORIZING DISTRIBUTION OF SOLICITATION AND NOTICE MATERIALS; (IV) FIXING VOTING RECORD DATE; (V) ESTABLISHING NOTICE AND OBJECTION PROCEDURES IN RESPECT OF CONFIRMATION; (VI) SETTING CONFIRMATION SCHEDULE AND ESTABLISHING PARAMETERS OF CONFIRMATION-RELATED DISCOVERY; (VII) ESTABLISHING NEW DEADLINE FOR RETURN OF MEDIA OWNERSHIP CERTIFICATIONS; (VIII) AUTHORIZING EXPANSION OF BALLOTING AND

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347);Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

**TABULATION AGENT'S RETENTION AND ALLOCATION OF COSTS OF SAME; AND (IX) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and collectively, the "Debtors")[2] hereby move this Court (the "Motion") pursuant to sections 105, 1125, 1126, 1128 and 1129 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 3003, 3017, 3018 and 3020 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 3017-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order (i) establishing procedures for the solicitation and tabulation of votes to accept or reject the four (4) plans of reorganization that have been proposed by various parties-in-interest (the "Proponents") for Tribune Company and its Subsidiaries[3] (collectively the "Plans", as such Plans may be amended or supplemented from time to time), which are identified with specificity in paragraph 1 below, (ii) approving the forms of ballots and master ballots (as described herein, the "Ballots" and "Master Ballots," respectively), together with their related balloting instructions (the "Instructions"), to be used in voting to accept or reject the Plans, (iii) approving the contents of the solicitation packages and authorizing the distribution of solicitation and notice materials as described herein, (iv) fixing the voting record date for purposes of determining which Holders of Claims against the Debtors are entitled to vote on the Plans, (v) establishing notice and objection procedures in respect of the hearing to consider confirmation of the Plans, (vi) fixing necessary dates and deadlines in

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the General Disclosure Statement (as defined herein) or, as applicable, in the Plan to which a particular term pertains.

[3] Each of the Plans is also a prepackaged plan of reorganization for certain non-Debtor affiliates of Tribune that commence chapter 11 cases after the dates the Plan was filed with the Bankruptcy Court but before the date the Plan in question may be confirmed (a "Prepackaged Plan"), and each of the Plans accordingly contains provisions regarding the classification and treatment of Claims against and Interests in any such non-Debtors. See Debtors and Co-Proponents Plan at §3.4, Bridge Plan at § 3.5, Step One Plan at § 3.4, Pre-LBO Debtholder Plan at § 3.5. Unless otherwise provided herein, all references to the Plan in this Motion are also references to any Prepackaged Plan(s).

connection with the confirmation process and establishing parameters of discovery relating to the confirmation process and confirmation hearing, (vii) establishing a renewed deadline for return of the Media Ownership Certifications (as described in ¶¶ 59-63 below), (viii) authorizing expansion of the existing retention of Epiq Bankruptcy Solutions, LLC as noticing, balloting and tabulation agent (the "Voting Agent") to include services as balloting and tabulation agent for all of the Plans, and allocating 75% of the costs and expenses of the Voting Agent equally to the proponents of the Plans other than the proponents of the Debtors and Co-Proponents Plan (as defined below), and (ix) granting related relief, all as more fully set forth below. In support of this Motion, the Debtors respectfully represent as follows:

## INTRODUCTION

1. This Motion seeks relief to permit the coordinated solicitation of votes to accept or reject the four (4) competing Plans that have been filed in the Debtors' chapter 11 cases as efficiently as possible while minimizing creditor confusion, duplication of effort, and expenditure of resources. The four (4) competing Plans are:

- the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. [D.I. 6089] (as it may be amended, the "Debtors and Co-Proponents Plan");

- the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Aurelius Capital Management, LP, on Behalf of Its Managed Entities, Deutsche Bank Trust Company Americas, in Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of New York, in Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes and Wilmington Trust Company, in Its Capacity as Successor Indenture Trustee for the PHONES Notes [D.I. 6184] (as it may be amended, the "Pre-LBO Debtholder Plan");

- the Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims [D.I. 6185] (as it may be amended, the "Step One Plan"); and

- the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. [D.I. 6186] (as it may be amended, the "Bridge Plan").

2.   In the interests of attempting to keep the solicitation process as straightforward and uncontroversial as possible, the Debtors have wherever possible kept the relief sought herein substantially similar to the relief that was already granted by the Bankruptcy Court in its prior solicitation order entered in the Debtors' cases.[4]  The relief sought herein has been modified in limited circumstances to accommodate the necessities of soliciting and tabulating votes on multiple Plans at one time.  The general structure of the notice, solicitation and tabulation regime contemplated by this Motion, however, is identical in material respects to that previously approved by the Court, and is also customary for large chapter 11 cases in this District and elsewhere.

---

[4] See Order (I) Approving Disclosure Statement; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Joint Plan of Reorganization for Tribune Company and Its Subsidiaries; (III) Establishing Deadline for Return of Media Ownership Certifications; (IV) Scheduling Confirmation Hearing; (V) Establishing Notice and Objection Procedures in Respect of Confirmation of Joint Plan of Reorganization; and (VI) Granting Related Relief entered on June 7, 2010 [D.I. 4707] (the "Prior Solicitation Order").  The Prior Solicitation Order granted, with slight modifications, the relief requested in the Motion of the Debtors for an Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Joint Plan of Reorganization for Tribune Company and Its Subsidiaries; (II) Establishing Deadline for Return of Media Ownership Certifications; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice and Objection Procedures in Respect of Confirmation of Joint Plan of Reorganization; and (V) Granting Related Relief [D.I. 4204], filed on April 29, 2010 (the "Prior Solicitation Motion").  The Prior Solicitation Order related to the Disclosure Statement previously approved by this Court for distribution to creditors (the "Prior Disclosure Statement;" [D.I. 4690]) in connection with the solicitation of votes to accept or reject the Amended Joint Plan of Reorganization for the Debtors (as further amended and modified, the "Prior Plan;" [D.I. 5205]).

3.   This Motion also seeks to have the order approving it establish new procedures, deadlines, and similar items relating to the Plans.  Although the relief sought in this Motion is procedurally similar (and often identical) to that already granted by the Court in the Prior Solicitation Order, the Debtors do not propose that the relief afforded in the Prior Solicitation Order apply to the solicitation proposed under this Motion.  Instead, the relief sought herein is intended to start afresh the process of soliciting and tabulating votes to accept or reject the Plans.  Beginning the solicitation anew will afford creditors and other stakeholders with the maximum amount of procedural fairness and a minimum of procedural confusion.

4. Finally, this Motion requests that the Court establish reasonable limitations on and a timetable for the discovery to be taken in anticipation of the confirmation hearing and the confirmation hearing itself. As the Court is aware, one ultimate issue at confirmation will be whether the settlements embodied in the various Plans that have been proposed for the Debtors are fair, reasonable, and in the best interests of the Debtors' estates. See In re Exide Techs., 303 B.R. 48, 67-68 (Bankr. D. Del. 2003) (Carey, J.). In evaluating the reasonableness of proposed settlements, the Court's mandate is not to conduct a plenary trial of the merits of the settled claims but is instead to canvass the issues determine if the settlement falls above the lowest range of reasonableness. In the two years since these proceedings commenced, the parties – and the Examiner – have conducted exhaustive investigations into the LBO-Related Causes of Action and compiled an extensive documentary and testimonial record relating to their merits. In light of the nature of the issues to be addressed at confirmation, as well as the comprehensive evidentiary base that has already been developed, confirmation-related discovery can be appropriately tailored and the confirmation hearing itself need not be overly protracted. Absent guidance from the Court, extensive, costly, and time-consuming litigation over the merits of the LBO-Related Causes of Action, including expansive discovery involving scores of fact and expert depositions, could easily occur. Accordingly, the Court should act now and, among other things, (a) determine that no additional fact discovery on the merits of the LBO-Related Causes of Action shall be taken in connection with the Confirmation Hearing, (b) limit expert testimony as to the merits of the LBO-Related Causes of Action to the reasonableness of the settlements embodied in the various Plans, and (c) set aside up to five (5) consecutive calendar days in early March 2011 for the confirmation hearing in this matter.

## STATUS OF CASE AND JURISDICTION

5.  On December 8, 2008 (the "Petition Date"), the Debtors, with one exception, each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. An additional Debtor, Tribune CNLBC, LLC, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009. In all, 111 entities are currently Debtors in these chapter 11 cases.

6.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) (the "Chapter 11 Cases"). [D.I. 43 and 2333].

7.  The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.  On December 18, 2008, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee").

9.  On March 23, 2009, the Debtors filed their schedules and statements of financial affairs (the "Schedules"). [D.I. 567-789]. The Debtors amended their Schedules on April 13, 2009 [D.I. 894-957], on June 12, 2009 [D.I. 1343-1453], on March 2, 2010 [D.I. 3548-3599], and on May 14, 2010 [D.I. 4388]. Tribune CNLBC filed its Schedules on October 12, 2009 [Case No. 09-13496; D.I. 8-9] and filed amended Schedules on December 9, 2009 [D.I. 2779] and May 14, 2010 [D.I. 4389].

10. On March 26, 2009, the Court entered its Order Establishing Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Bar Date

<u>Order</u>"), establishing June 12, 2009 at 4:00 p.m. (Eastern Time) as the final date for timely filing proofs of claim against the Debtors, except Debtor Tribune CNLBC, LLC. [D.I. 813].

11. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105, 1125, 1126, and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3003, 3017, 3018, and 3020, and Local Rule 3017-1.

## BACKGROUND

12. On April 29, 2010, Debtors filed the Prior Solicitation Motion respecting the Prior Plan. The Bankruptcy Court entered the Prior Solicitation Order on June 7, 2010. Subsequent to entry of the Prior Solicitation Order, the Debtors distributed approximately 38,200 solicitation packages and 530,000 other notices (principally Customer Program Notices and notices to counterparties to executory contracts) respecting the Prior Plan. The solicitation of votes to accept or reject the Prior Plan occurred until mid-August 2010.

13. On October 18, 2010, the Bankruptcy Court entered the Order Scheduling a Hearing and Establishing Certain Deadlines to Consider Approval of Certain Disclosure Document(s) (the "<u>Scheduling Order</u>") [D.I. 6022]. Of relevance to the instant Motion, the Scheduling Order required the Debtors to prepare and file a general disclosure document containing information about the Debtors' businesses, history, and other information of general relevance to the solicitation process (the "<u>General Disclosure Statement</u>") by October 22, 2010. In addition, the Scheduling Order required the Debtors, together with any co-proponents, to prepare and file a plan of reorganization and a specific disclosure document relating thereto ("<u>Specific Disclosure Statement</u>") on October 22, 2010. The Scheduling Order further required any parties wishing to propose competing plans of reorganization for the Debtors to do so,

together with an appropriate Specific Disclosure Statement, by October 29, 2010, and set a hearing to consider the adequacy of the General Disclosure Statement and the Specific Disclosure Statements for November 29, 2010.

14. In accordance with the Scheduling Order, the Debtors, together with the Committee, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A., prepared and filed the Debtors and Co-Proponents Plan, the General Disclosure Statement [D.I. 6090], and a Specific Disclosure Statement [D.I. 6091] respecting the Debtors and Co-Proponents Plan. On October 29, 2010, the other three (3) Plans, together with applicable Specific Disclosure Statements, were filed by the proponents of those Plans.

15. The Debtors have developed the solicitation and tabulation procedures described in this Motion to facilitate a consolidated and efficient process for soliciting and tabulating votes on all of the Plans. Those procedures are patterned after the solicitation and tabulation procedures approved by this Court for the Prior Plan.

### CLASSIFICATION AND VOTING SCHEMES UNDER THE PLANS

16. Each of the Plans proposes a generally similar classification scheme for Claims against and Interests in the Debtors, although slight differences exist from Plan to Plan. Those classification schemes, and the voting rights that attend the various Classes of Claims and Interests, are described below. For ease of reference, Classes of Claims that are entitled to vote on a particular Plan are referred to herein collectively as the "Voting Classes." Classes of Claims and Interests that are not impaired under each of the Plans, within the meaning of Section 1124 of the Bankruptcy Code, and are hence conclusively deemed to accept each of the Plans without voting thereon pursuant to Section 1126(f) of the Bankruptcy Code are referred to herein collectively as the "Unimpaired Classes." Classes of Claims and Interests that are impaired

within the meaning of Section 1124 of the Bankruptcy Code and as to which the Holders of such Claims and Interests will not receive or retain any property under any of the Plans, and hence are conclusively deemed to reject each of the Plans without voting thereon pursuant to Section 1126(g) of the Bankruptcy Code, are referred to herein collectively as the "Deemed Rejecting Classes." The Unimpaired Classes and the Deemed Rejecting Classes are referred to in this Motion together as the "Non-Voting Classes."[5] Capitalized terms in this section have the meanings ascribed to them in the particular Plan being described.

## I.        The Debtors and Co-Proponents Plan

17. Under the Debtors and Co-Proponents Plan, the following Classes are Voting Classes: Senior Loan Claims against Tribune Company (Class 1C), Bridge Loan Claims against Tribune Company (Class 1D), Senior Noteholder Claims against Tribune Company (Class 1E), Other Parent Claims against Tribune Company (Class 1F),[6] EGI-TRB LLC Notes Claims against Tribune Company (Class 1I), PHONES Notes Claims against Tribune Company (Class 1J), Senior Guaranty Claims against the Guarantor Debtors (Classes 50C through 111C),[7] and General Unsecured Claims against the Filed Subsidiary Debtors (Classes 2E through 111E).[8]

---

[5] The descriptions in this Motion of the classification schemes contained in the various Plans is for background purposes only. The inclusion of the descriptions of classification schemes in Plans other than the Debtors and Co-Proponents Plan is not, and should not be interpreted to be, an admission by the Debtors, as the filers of this Motion, that such classification schemes satisfy the requirements of the Bankruptcy Code, nor a waiver by the Debtors of their rights to object to such Plans or their attendant Specific Disclosure Statements on any grounds, including that the classification schemes in such Plans do not satisfy the requirements of the Bankruptcy Code.

[6] Holders of Other Parent Claims whose Claims are in excess of $1,000 will have the option under the Debtors and Co-Proponents Plan, through an election in Item 2B of their Ballot, to reduce their Claim in amount to $1,000 and have such Claim treated as a Convenience Claim within Class 1G under the Debtors and Co-Proponents Plan.

[7] As set forth in ¶ 54 infra, Senior Loan Claims and Senior Loan Guaranty Claims will vote jointly on one Ballot on the Debtors and Co-Proponents Plan, with such vote to be counted as a vote in each of Classes 1C and 50C through 111C under the Debtors and Co-Proponents Plan, as well as a vote on any relevant Prepackaged Plan (as discussed below).

[8] To the extent any Guarantor Non-Debtors commence chapter 11 cases, and hence propose a Prepackaged Plan, only Holders of Senior Guaranty Claims against such Guarantor Non-Debtor(s) shall be entitled to vote on the Debtors and Co-Proponents Plan. Votes cast by Holders of Senior Guaranty Claims in Classes 50C through 111C of the Debtors and Co-Proponents Plan will also be counted as votes cast on the Prepackaged Plan of any Guarantor Non-Debtors that may commence a chapter 11 case.

18. All other Classes under the Debtors and Co-Proponents Plan are Non-Voting Classes.[9] Specifically, Priority Non-Tax Claims against Tribune Company and the Filed Subsidiary Debtors (Classes 1A through 111A), Other Secured Claims against Tribune Company and the Filed Subsidiary Debtors (Classes 1B through 111B), Convenience Claims against Tribune Company (Class 1G), and Interests in Filed Subsidiary Debtors (Classes 2M through 111M) are deemed Unimpaired by the Debtors and Co-Proponents Plan, and hence, the Holders of those Claims and Interests are conclusively deemed to accept the Debtors and Co-Proponents Plan without voting. Holders of Securities Litigation Claims against Tribune Company and the Filed Subsidiary Debtors (Class 1L through 111L), Bridge Loan Guaranty Claims against the Guarantor Debtors (Classes 50D through 111D), and Tribune Interests (Class 1M) will neither receive nor retain any property under the Debtors and Co-Proponents Plan on account of such Claims and Interests, and hence are conclusively deemed to reject the Debtors and Co-Proponents Plan without voting as provided in section 1126(f) of the Bankruptcy Code.[10]

## II-III. The Bridge Plan and the Pre-LBO Debtholder Plan

19. The Bridge Plan and the Pre-LBO Debtholder Plan utilize similarly-denominated classification schemes as one another. Specifically, under those Plans, the following Classes are Voting Classes: Step One Senior Loan Claims against Tribune Company (Class 1C), Step Two Senior Loan Claims against Tribune Company (Class 1D), Bridge Loan

---

[9] Holders of Intercompany Claims are not proposed to vote on the Debtors and Co-Proponents Plan because such Holders are either Proponents of the Debtors and Co-Proponents Plan or are affiliates of such Proponents, and therefore may be presumed to accept the Debtors and Co-Proponents Plan. See Debtors and Co-Proponents Plan at § 4.3.

[10] If any Guarantor Non-Debtors commence chapter 11 cases, Holders of Claims and Interests in all Classes at such Guarantor Non-Debtor(s), other than Senior Guaranty Claims, Bridge Loan Guaranty Claims, and Securities Litigation Claims, are Unimpaired and are conclusively deemed to accept the Debtors and Co-Proponents Plan without voting. Holders of Bridge Loan Guaranty Claims and Securities Litigation Claims against any Guarantor Non-Debtor will not receive or retain any property under the Debtors and Co-Proponents Plan on account of such Claims, and hence are conclusively deemed to reject the Debtors and Co-Proponents Plan without voting; accordingly, as noted above, only the Holders of Senior Guaranty Claims would vote to accept or reject the Prepackaged Plan of any Guarantor Non-Debtor.

Claims against Tribune Company (Class 1E), Senior Noteholder Claims against Tribune

Company (Class 1F), Other Parent Claims against Tribune Company (Class 1G), EGI-TRB LLC

Notes Claims against Tribune Company (Class 1H), PHONES Notes Claims against Tribune

Company (Class 1I), Subordinated Securities Claims against Tribune Company (Class 1K), Step

One Senior Loan Guaranty Claims against the Guarantor Debtors (Classes 50C-111C), Step Two

Senior Loan Guaranty Claims against the Guarantor Debtors (Classes 50D-111D), Bridge Loan

Guaranty Claims against the Guarantor Debtors (Classes 50E-111E), and Other Guarantor

Debtor Claims (50F-111F under the Bridge Plan; 50G-111G under the Pre-LBO Debtholder

Plan).[11]

      20. All other Classes under the Bridge Plan and the Pre-LBO Debtholder Plan are

Non-Voting Classes.[12] Specifically, Holders of Priority Non-Tax Claims against Tribune

Company (Class 1A), Other Secured Claims against Tribune Company (Class 1B), Priority Non-

Tax Claims against the other Debtors (Classes 2A through 111A), Other Secured Claims against

the other Debtors (Classes 2B through 111B), Other Non-Guarantor Debtor Claims (Classes 2G-

49G), and Interests in the Debtors other than Tribune Company (Classes 2L through 111L) are

deemed unimpaired under both the Bridge Plan and the Pre-LBO Debtholder Plan, and hence,

the Holders of those Claims and Interests are conclusively deemed to accept those Plans without

---

[11] Similar to the structure referred to in footnote 7 above respecting the voting of Senior Loan Claims and Senior Guaranty Claims on the Debtors and Co-Proponents Plan, Holders of (i) Step One Senior Loan Claims in Class 1C and Step One Senior Loan Guaranty Claims in Classes 50C through 111C, (ii) Step Two Senior Loan Claims in Class 1D and Step Two Senior Loan Guaranty Claims in Classes 50D through 111D, and (iii) Bridge Loan Claims in Class 1E and Bridge Loan Guaranty Claims in Classes 50E through 111E, in each case under the Pre-LBO Debtholder Plan and the Bridge Plan, will receive a single Ballot on which to vote their Step One Senior Loan Claims/Step One Senior Loan Guaranty Claims, Step Two Senior Loan Claims/Step Two Senior Loan Guaranty Claims, and Bridge Loan Claims/Bridge Loan Guaranty Claims, as applicable.

[12] The Pre-LBO Debtholder Plan and the Bridge Plan are each Prepackaged Plans for any Subsidiary Non-Debtors that may commence chapter 11 cases. Under each of those Prepackaged Plans, only Intercompany Claims and Loan Guaranty Claims (against the Guarantor Non-Debtors only) would be impaired. Each of those Plans further proposed that only the Holders of Loan Guaranty Claims would vote thereon, and that the votes cast by the Holders of Loan Guaranty Claims on the Guarantor Debtors' Plans would also be deemed to be voted on such Prepackaged Plan. See Pre-LBO Debtholder Plan at § 3.5.3, Bridge Plan at § 3.5.3.

voting. Holders of Tribune Interests (Class 1L) will neither receive nor retain any property under the Bridge Plan or the Pre-LBO Debtholder Plan on account of such Interests, and hence are conclusively deemed to reject the those Plans without voting as provided in section 1126(f) of the Bankruptcy Code.[13]

## IV.    The Step One Plan

21. Under the Step One Plan, the following Classes are Voting Classes:  Step One Senior Loan Claims against Tribune Company (Class 1C(i)),[14] Step Two Senior Loan Claims against Tribune Company (Class 1C(ii)), Bridge Loan Claims against Tribune Company (Class 1D), Senior Noteholder Claims against Tribune Company (Class 1E), Other Parent Claims against Tribune Company (Class 1F),[15] EGI-TRB LLC Notes Claims against Tribune Company (Class 1I), PHONES Notes Claims against Tribune Company (Class 1J), Step One Senior Loan Guaranty Claims against the Guarantor Debtors (Classes 50C(i) through 111C(i)), Step Two Senior Loan Guaranty Claims against the Guarantor Debtors (Classes 50C(ii) through 111C(ii)), Bridge Loan Guaranty Claims against the Guarantor Debtors (Classes 50D through 111D), and General Unsecured Claims against the Filed Subsidiary Debtors (Classes 2E through 111E).[16]

---

[13] The Pre-LBO Debtholder Plan provides that the Holders of Intercompany Claims will be deemed to accept the Pre-LBO Debtholder Plan without voting. See Pre-LBO Debtholder Plan at §§ 3.2.10, 3.3.4, 3.4.7, 4.3. The Bridge Plan provides that the Holders of Intercompany Claims, "as insiders of the Debtors," are impaired but are not entitled to vote on the Bridge Plan. See Bridge Plan at §§ 3.2.10, 3.3.4, 3.4.7, 4.3.

[14] Similar to the structure referred to in footnote 7 above for the voting of Senior Loan Claims and Senior Guaranty Claims on the Debtors and Co-Proponents Plan, and the structure referred to in footnote 11 above for the voting of certain Classes of Claims on the Pre-LBO Debtholder Plan and the Bridge Plan, Holders of (i) Step One Senior Loan Claims in Class 1C(i) and Step One Senior Loan Guaranty Claims in Classes 50C(i) through 111C(i), (ii) Step Two Senior Loan Claims in Class 1C(ii) and Step Two Senior Loan Guaranty Claims in Classes 50C(ii) through 111C(ii), and (iii) Bridge Loan Claims in Class 1D and Bridge Loan Guaranty Claims in Classes 50D through 111D, in each case under the Step One Plan, will receive a single Ballot on which to vote their Step One Senior Loan Claims/Step One Senior Loan Guaranty Claims, Step Two Senior Loan Claims/Step Two Senior Loan Guaranty Claims, and Bridge Loan Claims/Bridge Loan Guaranty Claims, as applicable.

[15] Holders of Other Parent Claims whose Claims are in excess of $1,000 will have the option, through an election on their Ballot, to reduce their Claim in amount to $1,000 and have such Claim treated as a Convenience Claim within Class 1G under the Step One Plan.

[16] The Step One Plan is also a Prepackaged Plan for any Guarantor Non-Debtor that may commence chapter 11 cases.  Under any such Prepackaged Plan, only Intercompany Claims, Loan Guaranty Claims, and Securities

22. All other Classes under the Step One Plan are Non-Voting Classes. Specifically, Priority Non-Tax Claims against Tribune Company and the Filed Subsidiary Debtors (Classes 1A through 111A), Other Secured Claims against Tribune Company and the Filed Subsidiary Debtors (Classes 1B through 111B), Convenience Claims against Tribune Company (Class 1G), and Interests in Filed Subsidiary Debtors (Classes 2M through 111M) are deemed Unimpaired by the Step One Plan, and hence, the Holders of those Claims and Interests are conclusively deemed to accept the Step One Plan without voting. Holders of Securities Litigation Claims against Tribune Company and the Filed Subsidiary Debtors (Class 1L through 111L), and Tribune Interests (Class 1M) will neither receive nor retain any property under the Step One Plan on account of such Claims and Interests, and hence are conclusively deemed to reject the Step One Plan without voting as provided in section 1126(f) of the Bankruptcy Code.[17]

## RELIEF REQUESTED

## I. Approval of General Disclosure Statement and Specific Disclosure Statements

23. The Debtors intend for the order approving this Motion to approve as containing adequate information under Section 1125(a)(1) of the Bankruptcy Code the General Disclosure Statement and the Specific Disclosure Statement respecting the Debtors and Co-Proponents Plan. Consistent with Local Rule 3017-1(a), the Debtors and the Co-Proponents have not filed a separate motion seeking approval of those documents; instead, the Debtors have filed the General Disclosure Document as directed by the Court in the Scheduling Order, and the

---

Litigation Claims would be impaired. Furthermore, under any such Prepackaged Plan, only the Holders of Step One Senior Loan Guaranty Claims and Step Two Senior Loan Guaranty Claims would vote thereon, and that the votes cast by the Holders of Step One Loan Guaranty Claims and Step Two Senior Loan Guaranty Claims on the Guarantor Debtors' Plans would also be deemed to be voted on such Prepackaged Plan. Holders of Bridge Loan Guaranty Claims would not be entitled to vote on any such Prepackaged Plan. See Step One Plan at § 3.4.3(c).

[17] The Step One Plan provides that the Holders of Intercompany Claims will be deemed to accept the Step One Plan without voting, on the grounds that the Holders of Intercompany Claims are "proponents of this Plan (or Affiliates thereof)." See Step One Plan at § 4.3. This statement is presumably in error, and the Debtors reserve their rights in respect of same.

Debtors and the Co-Proponents have filed the Specific Disclosure Statement describing the Debtors and Co-Proponents Plan, also as contemplated by the Scheduling Order.

24. The Debtors anticipate that the Court will also consider the adequacy of the Specific Disclosure Statements respecting the other Plans at the hearing on November 29, 2010, without the need for the filing of separate motions, as contemplated by Local Rule 3017-1(a) and the Scheduling Order. The Debtors further anticipate that the order approving this Motion will also approve any other Specific Disclosure Statements that the Court determines satisfy the requirements of Section 1125 of the Bankruptcy Code. With the exception of the Debtors and Co-Proponents Plan and the Specific Disclosure Statement related thereto, the filing of this Motion by the Debtors is not, and should not be interpreted as, a waiver by the Debtors of their objections to the Specific Disclosure Statements filed by the proponents of the other Plans, and the Debtors' rights to object to those Specific Disclosure Statements, and the Plans they describe, are expressly reserved.

## II.      Fixing a Voting Record Date

25. For the purpose of soliciting votes in connection with the confirmation of a plan of reorganization, "creditors and equity security holders shall include holders of stock, bonds, debentures, notes and other securities of record on the date the order approving the disclosure statement is entered or another date fixed by the court, for cause, after notice and a hearing." Fed R. Bankr. P. 3017(d). Bankruptcy Rule 3018(a) contains a similar provision regarding determination of the record date for voting purposes. See Fed. R. Bankr. P. 3018(a).[18]

---

[18] Bankruptcy Rule 3018(a) provides in relevant part that "an equity security holder or creditor whose claim is based on a security of record shall not be entitled to accept or reject a plan unless the equity security holder or creditor is the holder of record of the security on the date the order approving the disclosure statement is entered or on another date fixed by the court, for cause, after notice and a hearing."

26. The parties from which votes to accept or reject the Plans are to be solicited include, inter alia, holders of Tribune's prepetition Senior Notes, which are publicly traded and hence have a changing ownership, as well as holders of Tribune's prepetition loan debt (i.e., the Senior Loan Claims and the Bridge Loan Claims) and the PHONES Notes. In addition, other unsecured claims against the Debtors are routinely traded. In order to provide the Voting Agent with sufficient time to obtain the necessary records to identify the Holders of all Claims in advance of the date the order approving this Motion may be entered, the Debtors propose that the Court establish **November 9, 2010** as the record date (the "Record Date") for purposes of determining which Holders of Claims are entitled to vote to accept or reject the Plans, and, in addition, the Holders of Claims and Interests that are entitled to receive Solicitation Packages (as defined below) or other notice respecting the Plans. The proposed Record Date is the first business day after the filing date of this Motion, and accordingly represents a reasonable date for fixing the identities of the Holders of Claims entitled to accept or reject the Plans.

## III. Approval of Ballots, Master Ballots, and Voting Instructions

### A. Approval of Ballots and Instructions

27. Bankruptcy Rule 3017(d) requires that a form of ballot be mailed to "creditors and equity security holders entitled to vote on the plan." Fed. R. Bankr. P. 3017(d). The Debtors accordingly propose that the Voting Agent distribute to Holders of Claims in each of the Voting Classes for all of the Plans appropriate ballots for the Claim. Forms of the ballots proposed to be used in connection with the solicitation process contemplated by this Motion are attached to this Motion as Exhibit A (the "Ballots"). The forms of the Ballots are based on Official Form No. 14 and are further based on the forms of Ballots already approved by this Court for use in the solicitation process on the Prior Plan. Those Ballots have been modified to address the particular

aspects of these chapter 11 cases and to include certain additional information that is relevant and necessary for each Class of Claims entitled to vote to accept or reject the Plans.

28. The Debtors have prepared a separate set of Ballots for each Plan. The Ballots and accompanying instructions for a given Plan will be printed in the same color for ease of reference: (a) blue for the Debtors and Co-Proponents Plan, (b) purple for the Pre-LBO Debtholder Plan, (c) green for the Bridge Plan, and (d) yellow for the Step One Plan. Furthermore, each set of Ballots is tailored to take into account the slightly differing classification and voting requirements under each of the Plans, and the differing elections called for under each of the Plans. The Debtors submit that the relief requested in this Motion is consistent with the Court's directive for a unified solicitation process and with the requirements of Bankruptcy Rule 3018(c). That rule provides that:

> [a]n acceptance or rejection [of a chapter 11 plan] shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent, and conform to the appropriate Official Form. If more than one plan is transmitted pursuant to Rule 3017, an acceptance or rejection may be filed by each creditor or equity security holder for any number of plans transmitted and if acceptances are filed for more than one plan, the creditor or equity security holder may indicate a preference or preferences among the plans so accepted.

Fed. R. Bankr. P. 3018(c). In accordance with that Rule, the Ballots provide for acceptances or rejections of the Plans to be submitted in a signed writing, certify the authority of the signatory, and permit (in Item 2 of each Ballot) the Holder of a Claim to accept or reject each of the Plans. Each Ballot will then permit the Holders of Claims to identify a particular Plan as their preferred Plan among multiple Plans accepted by checking the box in Item 2A of their Ballot. The Ballots additionally provide for Holders of Claims in the Voting Classes to make elections applicable to their Claims under each of the Plans. The Ballots are accompanied by instructions for

completing the Ballots that explain each item of the Ballots in detail, reference applicable sections of the relevant Plan, and provide clear instructions on how to complete and return the Ballots.

**B.**     **Approval of Master Ballots for Senior Noteholder Claims and PHONES Notes Claims**

29. With respect to Senior Noteholder Claims and PHONES Notes Claims, the Debtors propose that the Voting Agent deliver Ballots and accompanying instructions to such record holders together with a Master Ballot. Forms of Master Ballots for the Senior Noteholder Claims and the PHONES Notes Claims are proposed to be substantially in the form attached hereto as Exhibit B. The record holders of Senior Noteholder Claims and PHONES Notes Claims include, without limitation, representatives such as brokers, banks, commercial banks, transfer agents, trust companies, dealers, or other agents or nominees (collectively, the "Voting Nominees"). The Voting Agent will provide each Voting Nominee with reasonably sufficient numbers of Solicitation Packages, including sufficient consolidated beneficial ballots (the "Beneficial Ballots"), to distribute to the beneficial owners of the Senior Noteholder Claims or PHONES Notes Claims, as applicable, for whom such Voting Nominee acts (collectively, the "Beneficial Owners"). Upon written request with supporting documentation, the Voting Agent will reimburse each Voting Nominee's reasonable, actual, and necessary out-of-pocket expenses associated with the distribution of the Solicitation Packages, which will in turn be part of the Voting Agent's costs allocated pro rata among the proponents of the various Plans, discussed at ¶¶ 57-58, infra.

30. Each Voting Nominee will be required to forward a Solicitation Package to each Beneficial Owner for voting and include a return envelope addressed to the Voting Nominee so that the Beneficial Owner may return the completed Beneficial Ballot to the Voting

Nominee by such deadline as may be established by the Voting Nominee. Each Voting Nominee then will summarize the individual votes of its respective Beneficial Owners from their Beneficial Ballots on the Master Ballot and return the Master Ballot to the Voting Agent so that it is received prior to the Voting Deadline. The Voting Nominees will be required to retain Beneficial Ballots for inspection for a period of at least one (1) year following the Voting Deadline.

31. These procedures are customary for the voting of securities in large chapter 11 cases, adequately recognize the complex structure of the securities industry, enable the Debtors and Voting Nominees to transmit materials to the Holders of the Senior Notes and the PHONES Notes in a timely and cost-effective manner, and afford Beneficial Owners of the Senior Notes and the PHONES Notes a fair and reasonable opportunity to vote to accept or reject the Plans. In addition, these procedures were previously approved by this Court for the voting of Senior Noteholder Claims with respect to the Prior Plan. Accordingly, such procedures should be approved for the instant solicitation process as well.

## IV. Approving Contents of Solicitation Packages and Authorizing Distribution of Solicitation Packages to Holders of Claims in Voting Classes and Distribution of Materials to Holders of Claims and Interests in Non-Voting Classes

### A. Contents of the Solicitation Packages and Distribution of Same

32. The materials that must be provided to holders of claims and equity interests for the purpose of soliciting their votes and providing adequate notice of the hearing on confirmation of a plan of reorganization are set forth in Bankruptcy Rule 3017(d), which provides that:

> Upon approval of a disclosure statement,—except to the extent that the court orders otherwise with respect to one or more unimpaired classes of creditors or equity security holders—the debtor in possession, trustee, proponent of the plan, or clerk as the court

orders, shall mail to all creditors and equity security holders, and in a chapter 11 reorganization case shall transmit to the United States trustee,

    (i)      the plan or a court-approved summary of the plan;

    (ii)     the disclosure statement approved by the court;

    (iii)    notice of the time within which acceptances and rejections of the plan may be filed; and

    (iv)    any other information as the court may direct, including any court opinion approving the disclosure statement or a court-approved summary of the opinion.

In addition, notice of the time fixed for filing objections and the hearing on confirmation shall be mailed to all creditors and equity security holders in accordance with Rule 2002(b), and a form of ballot conforming to the appropriate Official Form shall be mailed to creditors and equity security holders entitled to vote on the plan.

Fed. R. Bankr. P. 3017(d).

33. In accordance with the requirements of Bankruptcy Rule 3017(d), after the Court has approved the General Disclosure Statement and any Specific Disclosure Statements as containing adequate information pursuant to section 1125 of the Bankruptcy Code, the Voting Agent will distribute, to Holders of Claims in Voting Classes by first-class mail, solicitation packages (the "Solicitation Packages") containing copies of:

    a.  a CD-ROM containing the General Disclosure Statement and any Specific Disclosure Statements as are approved by the Bankruptcy Court and Plans that

are authorized by the Bankruptcy Court to have votes solicited on them, and other exhibits annexed thereto;[19]

b.  the Solicitation Order, excluding exhibits annexed thereto;

c.  the Confirmation Hearing Notice (as defined below);

d.  an appropriate number of Ballots[20] (as defined below), together with applicable Instructions and one or more pre-paid return envelopes;

e.  the Responsive Statements (as defined in the Scheduling Order); and

f.  any other supplemental materials that the Court may order to be included in the Solicitation Packages.

The Debtors propose that the Responsive Statements filed by the various Proponents in accordance with the Scheduling Order be included in the Solicitation Packages in hard copy, with the Responsive Statements bound together by group of Proponents, so that there are four (4) bound booklets of Responsive Statements, one booklet each for the Proponents of a particular Plan.

34. In addition, to the extent that the following parties have not otherwise received a Solicitation Package, the order approving this Motion will direct the Voting Agent to distribute (a) a CD-ROM containing the General Disclosure Statement and any Specific

---

[19] The General Disclosure Statement, the Specific Disclosure Statements, the Plans, and the various exhibits relating to those documents, will doubtless total thousands of pages of information in the aggregate. Accordingly, to reduce administrative costs associated with printing and mailing such large documents, the Debtors propose that such documents be served via CD-ROM to the extent practicable. This procedure was approved by this Court as part of the Prior Solicitation Order in connection with the distribution of the Prior Disclosure Statement and the Prior Plan. Such procedure has been approved in numerous other large chapter 11 cases as well. See, e.g., In re Merisant Worldwide, Inc., Case No. 09-10059 (PJW) (Bankr. D. Del. Oct. 23, 2009); In re Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. Dec. 16, 2008); In re Sea Containers Ltd., Case No. 06-11156 (KJC) (Bankr. D. Del. Sept. 22, 2008); In re Calpine Corp., Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Sept. 26, 2007); In re Delta Air Lines, Inc., Case No. 05-17923 (CGM) (Bankr. S.D.N.Y. Feb. 7, 2007). However, any party receiving the CD-ROM may request hard copies of some or all of the documents contained in the Solicitation Package, without charge, from the Voting Agent (as defined below). In addition, the order approving this Motion requests authority for the Voting Agent to distribute hard copies of the documents comprising the Solicitation Packages as may be necessary to effect timely distribution of the Solicitation Packages.

[20] Consistent with securities industry practices in bankruptcy solicitations, Solicitation Packages will not be distributed directly to Holders of Senior Noteholder Claims or PHONES Notes Claims. Instead, Solicitation Packages will be distributed to Voting Nominees, who will then in turn distribute Solicitation Packages to the beneficial Holders of Senior Noteholder Claims and PHONES Notes Claims. In accordance with customary practice, the Master Ballots will be distributed to Voting Nominees after the initial distribution of Solicitation Packages to such Voting Nominees.

Disclosure Statements as are approved by the Bankruptcy Court and Plans that are authorized by the Bankruptcy Court to have votes solicited on them, and other exhibits annexed thereto, (b) the Solicitation Order, excluding exhibits annexed thereto, and (c) the Confirmation Hearing Notice to: (i) the Office of the United States Trustee; (ii) counsel for the Committee; (iii) counsel for each of the Proponents; (iv) counsel to the Loan Agents for Tribune Company's pre-petition loan facilities; (v) counsel to the administrative agent for the Debtors' post-petition financing facility; and (vi) all parties having requested notice pursuant to Bankruptcy Rule 2002. Service on such parties of the General Disclosure Statement, such Specific Disclosure Statements as are approved by the Bankruptcy Court and Plans that are authorized to have votes solicited on them, together with their exhibits and other materials in the Solicitation Packages, fulfills the obligations of the proponents of the relevant Plans under Bankruptcy Rules 2002(b) and 3017(d). The order approving this Motion will further provide that if a Claim has been temporarily disallowed for voting purposes pursuant to an order of the Court, the holder of such Claim shall not be entitled to receive a Solicitation Package.

35. With respect to any transferred Voting Claim, the Debtors propose that the transferee will be entitled to receive a Solicitation Package and cast Ballots on the relevant Plans on account of such transferred Claim, but only to the extent that the relevant transfer or assignment is properly noted on the Court's docket and is effective pursuant to Bankruptcy Rule 3001(e) as of the close of business on the Record Date. In the event a Claim is transferred after the transferor has completed the applicable Ballot(s), the transferee of such Claim shall be bound by any vote (and the consequences thereof) and, if applicable, any election(s) made on the Ballot(s) by the Holder as of the Record Date of such transferred Claim.

**B. Scope of Notice to Holders of Non-Voting Claims and Interests**

36. As discussed above, Holders of Claims and Interests in the Non-Voting Classes are not entitled to vote those Claims or Interests on any of the Plans. As a result, such Holders need not receive a full Solicitation Package, and Bankruptcy Rule 3017(d) expressly authorizes a bankruptcy court to order that a plan and disclosure statement need not be distributed to such Holders as part of the solicitation process.[21] Accordingly, as part of the solicitation process, the Debtors propose that Holders of Claims and Interests in the Non-Voting Classes should receive a non-voting package consisting of (a) the Confirmation Hearing Notice and (b) the Solicitation Order, excluding exhibits annexed thereto. The Debtors further propose that the Holders of Claims that are unclassified under each of the Plans (i.e., DIP Facility Claims, Priority Tax Claims, and Administrative Expense Claims) receive an identical non-voting package, provided that Holders of Administrative Expense Claims relating to ordinary course obligations of the Debtors need not receive such a package. These procedures follow those that were approved in the Prior Solicitation Order, and should be approved here as well.

37. To the extent that a Class of Claims is entitled to vote under one or more of the Plans but is not entitled to vote under other Plans, then the Holders of such Claims will be provided with a full Solicitation Package, the contents of which are described above. That Solicitation Package will include appropriate Ballots for voting to accept or reject those of the Plans on which the relevant Holder of Claims is entitled to vote. In addition, the Confirmation Hearing Notice (as defined in ¶ 73, infra), which will be sent to Holders of Claims and Interests in the Non-Voting Classes, also advises any party wishing to obtain copies of the Joint

---

[21] Bankruptcy Rule 3017(d) provides that a plan or court-approved summary of a plan, together with a disclosure statement and certain notices, must be distributed to creditors and equity security holders "except to the extent that the court orders otherwise with respect to one or more unimpaired classes of creditors or equity security holders." Fed. R. Bankr. P. 3017(d).

Disclosure Statement and the Plans free of charge that they may do so by accessing the documents on the Internet at http://chapter11.epiqsystems.com/ tribune or by contacting the Voting Agent by first-class mail, overnight mail, or telephone (with contact details for each method provided in the Confirmation Hearing Notice).

**C.      Notice to Holders of Customer Program Claims**

38. In the Prior Solicitation Order, the Court authorized the Debtors to provide limited notice of the Prior Plan and the confirmation hearing thereon to the Holders of Customer Program Claims.  By this Motion, the Debtors request that the Proponents be excused from providing any further notice respecting the Plans to the Holders of Customer Program Claims. The Customer Program Claims, as described in detail in the Prior Solicitation Motion (at ¶¶ 25-26) are claims for prepetition subscription or advertising credits, or other, similarly-based refunds, with the overwhelming majority of such credits and refunds being *de minimis* in amount (i.e., less than $25 per party).  These credits and refunds are principally for unused subscription balances, classified advertising, and similar items.  The total amount of such credits and refunds is approximately $6.0 million.  The Debtors have authority, though not the obligation, to pay Customer Program Claims pursuant to this Court's first-day Customer Programs Order[22] and have attempted to make payments to many of these parties both before the Petition Date and, pursuant to the authority granted to the Debtors in the Customer Programs Order, since the Petition Date.  In all or virtually all cases, however, the person or entity to which the credit or refund is owed has not responded to the Debtors' efforts, often because the person or entity has moved or ceased to do business.

---

[22] The Customer Programs Order is the Order Authorizing, But Not Requiring, the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business, which was signed by the Bankruptcy Court on December 10, 2008 [D.I. 50].

39. The Debtors distributed approximately 325,000 Credit/Refund Notices to Holders of Customer Program Claims in connection with the solicitation of votes to accept or reject the Prior Plan, in accordance with the Prior Solicitation Order. The Credit/Refund Notices provided recipients with the location, date and time of the then-scheduled confirmation hearing, and further advised recipients that the Debtors' books and records showed that they may have an unused subscription or advertiser credit with one of the Debtors, and that the recipient may be entitled to vote on the Prior Plan or, in the alternative, to receive payment of its Customer Program Claim pursuant to the Customer Programs Order.

40. The Debtors received approximately one (1) response for every 325 Credit/Refund Notices to Holders of Customer Program Claims sent in accordance with the Prior Solicitation Order. The Debtors have paid the relevant Customer Program Claim pursuant to the authority granted to them under the Customer Programs Order in virtually all cases, with the only exceptions being cases where parties asserted they were Holders of Customer Program Claims but as to which the Debtors had no record of such a Claim. In such cases, the Debtors have requested more information from the relevant Holder to substantiate the Claim. In no cases did the Debtors provide solicitation packages for voting on the Prior Plan to the Holders of a Customer Program Claim, given that the Debtors have exercised their authority to pay such Claims where they can be demonstrated either by the Debtors' books and records or the claimant.

41. The Debtors request that the Proponents be excused from providing Solicitation Packages, or any other form of notice of the Plans and/or the Confirmation Hearing, to the Holders of Customer Program Claims given (i) the extremely low response to the prior notice sent to Holders of Customer Program Claims (i.e., roughly one-third of one percent), (ii) the considerable cost to the Proponents that providing approximately 325,000 new notices would

entail, (iii) the likelihood that providing such notices will cause more confusion among Holders of Customer Program Claims than it would resolve, and (iv) the fact that the Debtors have in nearly all instances elected to satisfy such Customer Program Claims under the Customer Programs Order rather than sending a Solicitation Package to the Holder of any such Claim. Sending roughly 325,000 Solicitation Packages or other notices to persons and entities that have not responded for over a year (and, in many cases, longer) to efforts to reach out to them and pay whatever Claims they may have – including a failure to respond to the Credit/Refund Notice – would be a costly and futile action that would ultimately harm the Debtors' creditors and estates as a whole. The costs of preparing and mailing Solicitation Packages or other notices to all such parties would consume a large portion of the aggregate face amount of credits and refunds owed to such parties, according to the Debtors' estimates. Accordingly, the Debtors request that this Court's order approving this Motion excuse the Proponents from providing any further notice to any Holders of Customer Program Claims respecting the Plans or the Confirmation Hearing.

**D.    Non-Delivery of Solicitation Packages to Holders of Intercompany Claims**

42. The Holders of Intercompany Claims under each of the Plans are definitionally either Debtors or non-Debtor affiliates of the Debtors. See Debtor and Co-Proponent Plan at §1.1.121; Pre-LBO Debtholder Plan at § 1.1.128; Step One Plan at § 1.1.121; Bridge Plan at §1.1.140. Each of the Plans, in its claims treatment sections and at section 4.3 thereof, provides that Intercompany Claims are not entitled to vote to accept or reject such Plan for varying reasons, although all of the Plans provide that Intercompany Claims are impaired thereunder.

43. Given the unique status of the Intercompany Claims, the Debtors propose that the order approving this Motion excuse the Proponents from needing to serve Solicitation

Packages upon the Holders of Intercompany Claims. This proposal does not entail an agreement by the Debtors that the Holders of Intercompany Claims should not be entitled to vote on the Plans other than the Debtors and Co-Proponents Plan, a point on which the Debtors and their non-Debtor affiliates expressly reserve their rights. Rather, the Debtors believe that given their knowledge and that of their affiliates respecting the Debtors' chapter 11 proceedings, it is both an expensive and wasteful exercise to serve thousands of Solicitation Packages upon the Holders of Intercompany Claims, many of which hold Intercompany Claims against more than one Debtor. Accordingly, the Debtors request that the requirement to serve Solicitation Packages upon the Holders of Intercompany Claims be excused in this instance.

E.     **Non-Delivery of Solicitation Packages to Undeliverable Addresses**

44. The Debtors previously distributed (i) notices relating to the hearing to approve the Prior Disclosure Statement and (ii) solicitation and notice materials relating to the Prior Plan, some of which were returned to the Voting Agent by the United States Postal Service as undeliverable. The notices and materials returned as undeliverable described in this paragraph are referred to as the "Undeliverable Notices". It would be costly and wasteful to distribute Solicitation Packages or any other materials or notices (including any updates, supplements, amendments or modifications thereto) to persons or entities at addresses from which one or more Undeliverable Notices have already been returned. Accordingly, the Debtors request that the order approving this Motion relieve the Voting Agent from the need to distribute, on behalf of the Proponents, Solicitation Packages or other materials relating to the solicitation of votes on and noticing of the Plans to any party from which an Undeliverable Notice has been returned, unless the Voting Agent has been or is provided with an accurate address in writing from any such entity prior to the distribution of the solicitation and/or notice materials.

## V.    Approval of Proposed Solicitation and Tabulation Procedures

### A.    Establishing Voting Deadline for Receipt of Ballots and Master Ballots and Deadline for Filing of Tabulation Report

45. Bankruptcy Rule 3017(c) provides that, on or before approval of a disclosure statement, the court shall fix a time within which the holders of claims or interests may vote to accept or reject a plan.  Fed. R. Bankr. P. 3017(c).  Following entry of the order approving this Motion, the Debtors propose that the Voting Agent have ten (10) business days to complete the printing and mailing of the Solicitation Packages and other notices relating to the Plans. Assuming that the order approving this Motion is entered on November 29, 2010 (the scheduled hearing date on the Motion) or shortly thereafter, mailing of the Solicitation Packages and other notices relating to the Plans would accordingly be completed by mid-December 2010.

46. Given that timeframe, the Debtors respectfully request that the Court set the deadline by which all Ballots and Master Ballots respecting all of the Plans must be properly executed, completed, delivered to, and received by the Voting Agent (the "Voting Deadline") for a date approximately 45 to 60 days from the date the mailing of the Solicitation Packages is anticipated to be completed.  The precise date for the Voting Deadline will be specified by the Court in the order approving this Motion.  The Debtors further request that the order approving this Motion specify that Ballots and Master Ballots must be returned to the Voting Agent by first-class mail postage prepaid, by personal delivery, or by overnight courier, and may not be transmitted by e-mail, facsimile, or other electronic means.  The Debtors submit that the proposed Voting Deadline takes into account the complexities of the solicitation and noticing of multiple Plans and affords the Holders of Claims entitled to vote on some or all of the Plans with a more-than-adequate period to review the Plans, the General Disclosure Statement, and the Specific Disclosure Statements for those Plans authorized by the Court to have votes solicited on

them, and make an informed decision to accept or reject each of the Plans and return their Ballots in a timely fashion.

47. The Voting Agent should further be required to file the results of its tabulation of votes to accept or reject the Plans no later than fourteen (14) days following the Voting Deadline. This will ensure both that the Voting Agent has sufficient opportunity to complete tabulation of the Ballots respecting all of the Plans in a proper fashion and will further permit the Proponents and other parties in interest to obtain the tabulation reports in advance of the anticipated commencement of the Confirmation Hearing.

**B.      Approval of Ballot Tabulation Procedures**

48. The Debtors propose, solely for purposes of voting to accept or reject the Plans, and not for any other purposes, and without prejudice to the rights of any party (including, without limitation, any of the Proponents) in any other context, that each Holder of a Claim in a Voting Class be entitled to vote the amount of such Claim as set forth in the Debtors' filed Schedules (as may be amended from time to time) unless such Holder has timely filed a proof of claim,[23] in which event such Holder would be entitled to vote the amount of such Claim as set forth in such proof of claim, subject to the following provisions, which are set forth in the form of proposed order approving this Motion:

      a.   if a Claim is deemed "Allowed" in accordance with any of the Plans or an order of the Court, such Claim shall be allowed for voting purposes in the "Allowed" amount set forth in the applicable Plan or the Court's order;

      b.   if a Claim has been estimated or otherwise allowed for voting purposes by order of the Court, such Claim shall be

---

[23] For the avoidance of doubt, the Debtors propose that where a proof of claim has been filed after the applicable bar date (as set by the Court in the Bar Date Order) without such filing having been expressly authorized by the Court, the Holder of the Claim reflected in such proof of claim would not be entitled to vote to accept or reject any of the Plans on account of such Claim.

temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only;

c.   if no proof of claim has been timely filed and the Claim has not been disallowed, then the vote amount shall be the non-contingent, liquidated, and undisputed amount as set forth in the Schedules;

d.   if a proof of claim has been timely filed and the Claim has not been disallowed, and the Claim is not (i) the subject of a pending objection, (ii) contingent (as determined on the face of the claim or after a reasonable review of the supporting documentation by the Voting Agent), or (iii) filed entirely in an unknown, unliquidated or undetermined amount (as determined on the face of the claim or after a reasonable review of the supporting documentation by the Voting Agent), the vote amount is the liquidated amount as set forth on the proof of claim;[24]

e.   if a proof of claim has been timely filed and the Claim has not been disallowed, and the Claim is (i) contingent (as determined on the face of the claim or after a reasonable review of the supporting documentation by the Voting Agent), or (ii) filed entirely in an unknown, unliquidated or undetermined amount (as determined on the face of the claim or after a reasonable review of the supporting documentation by the Voting Agent), such claim shall be temporarily allowed for voting purposes only, and not for any other purposes and without prejudice to the rights of any of the Proponents in any other context, at $1.00;

f.   if (i) a proof of claim has been timely filed and is the subject of a pending objection, or (ii) if the Debtors have amended or supplemented the Schedules to (a) eliminate a Claim or (b) to change the nature or characterization of a Claim but the thirty (30) day period specified in the Bar Date Order for the relevant Holder of such Claim to file a proof of claim in response to such amendment has not yet passed, then such Claim shall be disallowed for voting purposes, except to the extent and in the manner as may be set forth in the relevant objection, amendment or supplement;

g.   to the extent that a Holder of Claims has filed or purchased duplicative claims that are classified in the same Class under a

---

[24] For the avoidance of doubt, if a proof of claim has been filed in a liquidated amount but also purports to include other, unliquidated amounts, the vote amount shall be solely the liquidated, non-disputed amount set forth on the proof of claim.

particular Plan, such Holder shall be provided with a single Solicitation Package and a single Ballot for voting a single Claim in such Class, regardless of whether an objection has been filed to the allowance of such duplicate Claims;

h. where a Holder of Claims has asserted its Claims against no particular Debtor, or against all Debtors without filing separate proofs of claim against each Debtor as required by the Bar Date Order, and the Voting Agent is not able to determine which Debtor such Claims should properly be asserted against after the exercise of reasonable diligence, such Holder shall not be entitled to a vote on account of such Claims; and

i. Claims, whether scheduled or filed, for $0.00 will be disallowed for voting purposes.

Notwithstanding the foregoing, the Debtors further propose that the Holders of Senior Loan Claims, Senior Guaranty Claims (or Senior Loan Guaranty Claims), the Swap Claim, Bridge Loan Claims, Bridge Loan Guaranty Claims, Senior Noteholder Claims, and PHONES Notes Claims as of the Record Date shall be entitled to vote to accept or reject all of the Plans, regardless of whether such Claims are deemed disputed under one or more of the Plans or are the subject of a pending objection.

49. The order approving this Motion will also specify that following types of Ballots will <u>not</u> be counted in determining whether the Plans have been accepted or rejected:

a. any Ballot or Master Ballot that is otherwise properly completed, executed and timely returned to the Voting Agent, but does not indicate an acceptance or rejection of the relevant Plan, or that indicates both acceptance and rejection of the relevant Plan;

b. any Ballot or Master Ballot received after the Voting Deadline, unless the Proponents of the relevant Plan, in their sole discretion, shall have granted in writing an extension of the Voting Deadline with respect to such Ballot or Master Ballot;

c. any Ballot or Master Ballot containing a vote that the Bankruptcy Court determines, after notice and a hearing, was not in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code;

d.   any Ballot or Master Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

e.   any Ballot cast by a person or entity that does not hold a Claim in a Voting Class;

f.   any Ballot or Master Ballot without an original signature; and any Ballot transmitted to the Voting Agent by facsimile or other electronic means.

50. In addition, the Debtors propose that the following voting procedures and standard assumptions be used in tabulating the Ballots, subject to any contrary order(s) of the Bankruptcy Court:

a.   The method of delivery of Ballots to be sent to the Voting Agent is at the election and risk of each creditor, but such delivery will be deemed made only when the original, executed Ballot or Master Ballot (as applicable) is actually received by the Voting Agent.

b.   The Proponents of a particular Plan, in their sole discretion, may waive any defect in any Ballot or Master Ballot at any time, including failure to file such Ballot or Master Ballot in a timely manner, either before or after the Voting Deadline, and without notice. Unless the Ballot or Master Ballot being furnished is submitted on or prior to the Voting Deadline, the Proponents of a particular Plan, in their sole discretion, may reject any defective or late-filed Ballot or Master Ballot as invalid and, therefore, decline to utilize it in connection with confirmation of the applicable Plan.

c.   After the Voting Deadline, no vote may be withdrawn without the prior consent of the Proponents of the particular Plan on which the vote has been cast, or authorization from the Bankruptcy Court.

d.   Any defects or irregularities in connection with deliveries of Ballots or Master Ballots must be cured within such time as the Proponents of the relevant Plan (or the Court) determine, and delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.

e.   Neither the Proponents, nor any other person or entity, will be under any duty to provide notification to Holders of Claims of defects or irregularities with respect to deliveries of Ballots or Master Ballots, nor will any of them incur any liabilities for failure to provide such notification. Ballots or Master Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will not be counted.

The Proponents shall provide reports of any waivers or consents granted under the foregoing subsections (b) through (d) to the Voting Agent, and the Voting Agent shall maintain a record of any waivers or consents granted under the subsections of this paragraph.

51. With respect to the tabulation of Master Ballots and Beneficial Ballots for Senior Noteholder Claims and PHONES Notes Claims cast by Voting Nominees and Beneficial Owners, respectively, the principal amount held by Voting Nominees and Beneficial Owners on the Record Date, as evidenced by the record and depository listings, is specified to be used as the amount to tabulate acceptance or rejection of the Plans (although any principal amounts may be adjusted by Epiq to account for prepetition interest). The Debtors further propose that the following additional rules apply to the tabulation of Master Ballots and Beneficial Ballots cast by Voting Nominees and Beneficial Owners on each of the Plans:

a.  Votes cast by Beneficial Owners through a Voting Nominee will be compared to the positions held by such Beneficial Owners in the PHONES Notes or the applicable tranche of Senior Notes as of the Record Date, as evidenced by the record and depository listings. Votes submitted by a Voting Nominee, pursuant to a Master Ballot, will not be counted in excess of the Record Amount of Senior Notes or PHONES Notes held by such Voting Nominee.

b.  To the extent that conflicting votes or "overvotes" are submitted by a Voting Nominee, the Voting Agent, in good faith, will attempt to reconcile discrepancies with the Voting Nominees.

c.  To the extent that overvotes on a Master Ballot are not reconcilable prior to the preparation of the vote certification, the Voting Agent will apply the votes to accept and to reject each Plan in the same proportion as the votes to accept and reject such Plan submitted on the Master Ballot that contained the overvote, but only to the extent of the Voting Nominee's position in the PHONES Notes or the applicable tranche of Senior Notes.

d.  Where a Beneficial Owner holds its Senior Notes or PHONES Notes through more than one Voting Nominee, it must execute a separate Beneficial Ballot for each block of Senior Notes or PHONES Notes, as applicable. However, such Beneficial Owner must vote all of its Senior Noteholder Claims or PHONES Notes Claims in the same manner, to either accept or reject each Plan. Accordingly, if such Beneficial Owner

returns more than one Beneficial Ballot to more than one Voting Nominee voting different Senior Noteholder Claims or PHONES Notes Claims, and the Beneficial Ballots are not voted in the same manner, as reflected on such separate Master Ballots, such votes will not be counted.

52. In addition to the foregoing tabulation procedures, the Debtors further request that in the event a Holder of Claims or a Voting Nominee casts multiple Ballots or Master Ballots, respectively, voting the same Claim(s) before the Voting Deadline, the last dated and valid Ballot or Master Ballot received before the Voting Deadline be deemed to reflect the voter's intent and supersede any prior Ballots or Master Ballots. If a Holder of Claims or a Voting Nominee casts multiple Ballots or Master Ballots received by the Voting Agent on the same day, but which are voted inconsistently, the Debtors request that, unless a supplemental Ballot or Master Ballot respecting such Claim(s) is subsequently filed, such Ballots or Master Ballots not be counted.

53. The Debtors further request that a Holder of Voting Claims in more than one Voting Class under a particular Plan be required to execute a separate Ballot for its Claims in each such Class, and in the case of the Senior Notes and the PHONES Notes, each Beneficial Owner must execute a separate Beneficial Ballot for each block of securities that it holds through any Voting Nominee and must return each such Beneficial Ballot to the appropriate Voting Nominee.

54. The Debtors further request that, in the case of (i) Senior Loan Claims and Senior Guaranty Claims or Senior Loan Guaranty Claims (whether or not classified into Step One Senior Loan Claims/Step One Senior Loan Guaranty Claims and Step Two Senior Loan Claims/Step Two Senior Loan Guaranty Claims) and (ii) Bridge Loan Claims and Bridge Loan Guaranty Claims, the Holders of such Claims be provided with a single Ballot that will be used jointly to vote the Senior Loan Claims and Senior Guaranty Claims (or Senior Loan Guaranty

Claims) and/or a single Ballot that will be used jointly to vote the relevant Bridge Loan Claims and Bridge Loan Guaranty Claims. Such votes will also be, to the extent specified in each of the Plans, votes to accept or reject the Prepackaged Plan of any Guarantor Non-Debtor that becomes a Debtor in the relevant Classes.[25]

55. The procedures for the voting of Claims on the Plans proposed herein are substantially identical to the procedures approved by this Court in the Prior Solicitation Order. In addition, the solicitation and tabulation procedures sought to be approved by this Motion are substantially identical to those approved by Courts in this District in numerous other recent chapter 11 cases. See, e.g., In re Smurfit-Stone Container Corp., 09-10235 (BLS) (Bankr. D. Del. Jan. 29, 2010); In re Spansion Inc., 09-10690 (KJC) (Bankr. D. Del. Dec. 14, 2009); In re Merisant Worldwide, Inc., Case No. 09-10059 (PJW) (Bankr. D. Del. Oct. 23, 2009); In re R.H. Donnelley Corp., Case No. 09-11833 (KG) (Bankr. D. Del. Oct. 21, 2009). Such procedures provide for a fair and equitable voting process and should be approved.

### C. Submission of Rule 3018 Motions

56. If any Holder of a Claim wishes to have its Claim allowed for purposes of voting to accept or reject one or more of the Plans in a manner that is inconsistent with the amount or classification(s) set forth on the Ballot it received, or if any party that did not receive a Ballot wishes to have its Claim temporarily allowed for voting purposes only, such Holder must serve on the Proponents and file with the Bankruptcy Court, on or before **January 15, 2011**, a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for purposes of voting (the "3018 Motion"). Any such 3018 Motion must set forth, with

---

[25] Under the Debtors and Co-Proponents Plan, each vote to accept the Plan in each of Classes 50C through 111C (Senior Guaranty Claims) will also be counted as an acceptance of the compromise and settlement set forth in section 11.2.5 of the Debtors and Co-Proponents Plan. Similarly, under the Step One Plan, each vote to accept the Plan in Classes 50C(i) through 111C(i) and 50C(ii) through 111C(ii) will be counted as an acceptance of the compromise and settlement set forth in Section 11.3.5 of the Step One Plan.

particularity, the amount and classification in which such Holder believes its Claim should be allowed for voting purposes and the evidence in support of its belief, as well as the Plan(s) as to which such Holder seeks to have its Claim allowed for voting purposes. In respect of any timely-filed 3018 Motion, the Ballot in question shall be counted against the Plans specified by the Holder of the relevant Claim (a) in the amount established by the Bankruptcy Court in an order entered on or before the Voting Deadline, or (b) if such an order has not been entered by the Voting Deadline and unless the Proponents of the applicable Plans and the party submitting the 3018 Motion have come to an agreement as to the relief requested in the 3018 Motion, in an amount equal to (i) the liquidated, non-contingent, and non-disputed amount of such Claim as set forth in the Schedules; (ii) if a proof of claim has been timely filed in respect of such Claim, the liquidated, non-contingent, and non-disputed amount set forth in such proof of claim; or (iii) if neither (i) nor (ii) applies, such party shall not have a Ballot counted at all. Any such 3018 Motions that are filed shall be heard by the Bankruptcy Court on a date prior to the Voting Deadline to be established by the Bankruptcy Court, which date shall be included in the order approving this Motion.

## VI.    Authorizing Expansion of Retention of Epiq Bankruptcy Solutions, LLC to Act as Noticing, Voting, and Tabulation Agent for All of the Plans and Allocating 75% of the Voting Agent's Costs and Expenses to the Proponents of the Pre-LBO Debtholder Plan, the Bridge Plan, and the Step One Plan

57. Pursuant to an order of this Court entered on December 10, 2008, the Debtors retained Epiq Bankruptcy Solutions, LLC ("Epiq") as the Debtors' claims, noticing, and balloting agent.[26] Epiq previously acted as voting agent with respect to the solicitation and tabulation of votes to accept or reject the Prior Plan, pursuant to the Prior Solicitation Order. See

---

[26] See Order Authorizing the Debtors and Debtors in Possession to Retain and Employ Epiq Bankruptcy Solutions, LLC as Claims, Noticing, and Balloting Agent Pursuant to 28 U.S.C. § 156(c), Rule 2002(f) of the Federal Rules of Bankruptcy Procedure and Local Rule 2002-1(f) as of the Petition Date. [D.I. 44].

Prior Solicitation Order at ¶ 26. The Debtors have confirmed with Epiq that Epiq is able and willing to perform all services relating to the noticing, solicitation and tabulation process as described herein.

58. Given Epiq's nearly two-year involvement with the Debtors' chapter 11 cases as claims, noticing and voting agent, and given further its involvement as Voting Agent under the Prior Solicitation Order, the Debtors submit that Epiq should be retained as Voting Agent for the consolidated noticing, solicitation, and tabulation process respecting the Plans. In light of the complexities of the solicitation and noticing of multiple Plans, the Debtors further submit that 75% of Epiq's fees, costs and expenses in performing its duties in connection with that process be allocated to the Proponents of the Pre-LBO Debtholder Plan, the Bridge Plan, and the Step One Plan (and paid pro rata by those Proponents). This process would provide for efficient performance of the noticing, solicitation, and tabulation of the Plans, while equitably allocating the costs relating to those services. The only apparent alternative to such proposal is for each group of Proponents to retain their own Voting Agent, which will necessarily entail significant duplication of services, redundant filings with the Court (e.g., multiple tabulation reports) and will maximize costs to all of the parties while providing no apparent benefit. The interests of all Proponents and other parties are served by using the services of a single Voting Agent, and the proposal described herein should be approved by the Court.

## VII. Establishing New Deadline for Return of Media Ownership Certifications

59. All of the Plans, at section 5.4.2(b) thereof, contemplate the provision of Media Ownership Certifications, as had the Prior Plan. The Media Ownership Certifications, in brief, are certifications to be provided by parties that may receive more than five percent (5%) or more of the common stock of Reorganized Tribune at emergence that will permit the Debtors to

comply with certain regulations for broadcast businesses set by the Federal Communications Commission (the "FCC").[27]

60. To implement section 5.4.2(b) of each of the Plans, and for the purpose of ensuring that the FCC Applications contain the information required by the FCC for all potential "parties," the Debtors request that any Holder of a Claim or Claims that (i) is anticipated to receive New Common Stock or New Warrants under any Plan at emergence, (ii) believes that the amount of its Claims (or Claims that it intends to acquire prior to the Effective Date of a confirmed Plan) may entitle it to receive (for any reason, including, but not limited to, as a result of the distribution of New Warrants or New Class B Common Stock in lieu of New Class A Common Stock to other Holders of applicable Claims, as contemplated in section 5.4.2 of each of the Plans) five percent (5%) or more of the New Class A Common Stock at emergence under a Plan (a "Potential 5% Holder"), and (iii) wishes to remain eligible to receive 5% or more of the New Class A Common Stock at emergence, be required to contact the Proponents of the applicable Plan(s) and execute and submit to such Proponents a Media Ownership Certification on or prior to **January 15, 2011** (the "Certification Deadline"). For the avoidance of doubt, a Claim Holder would not be deemed a Potential 5% Holder if such Claim Holder could not potentially receive 5% or more of the New Class A Common Stock under one or more of the Plans at emergence, but rather only pursuant to the outcome of litigation or subsequent to Reorganized Tribune's emergence from its chapter 11 case.

61. The Debtors further request that, in the event a Potential 5% Holder does not submit an executed Media Ownership Certification by the Certification Deadline, and/or is not

---

[27] The Prior Solicitation Motion contained a detailed discussion of the Media Ownership Certifications and the FCC requirements relating to such certifications. See Prior Solicitation Motion at ¶¶ 47-53. The Debtors do not reproduce that discussion herein, but instead incorporate the background and necessity of the Media Ownership Certifications from the Prior Solicitation Motion by reference.

made a "party" to the FCC Applications (as defined in the Plans), in accordance with section 5.4.2 of each of the Plans, such Potential 5% Holder may, in the event it otherwise would be entitled under any Plan to receive five percent (5%) or more of the New Class A Common Stock at emergence, receive as many shares of New Class B Common Stock in lieu of New Class A Common Stock under such Plan in the event such Plan is confirmed to the extent the Proponents of such confirmed Plan deem necessary to ensure compliance with the Communications Act or the FCC rules and/or to avoid a substantial delay in obtaining the FCC Approval.[28]

62. The Debtors further request that, in the event one of the Plans is confirmed, consistent with section 5.4.2 of the applicable Plan, Reorganized Tribune be authorized to issue shares of New Class B Common Stock in lieu of shares of New Class A Common Stock to any Potential 5% Holders if the Proponents of such Plans determine, based on the relevant Holder's Media Ownership Certification (or failure to provide the Media Ownership Certification or otherwise comply with applicable provisions of the Plans), that such Holder may have other media interests that could impair the ability of Reorganized Tribune to comply with the Communications Act or the FCC's rules if such Holder were issued the shares of New Class A Common Stock that it otherwise would be eligible to receive pursuant to any of the Plans.

63. The number of Potential 5% Holders is necessarily limited, and the Debtors have already communicated with several of such Holders. Furthermore, the Prior Solicitation Order established July 1, 2010 as the date by which Media Ownership Certifications, as described in section 5.4.2(b) of the Prior Plan (which description is reproduced in section 5.4.2(b) of each of the Plans). Prior to that deadline, the Debtors received no credible Media

---

[28] For the avoidance of doubt, any issuance of New Common Stock or New Warrants pursuant to any of the Plans is necessarily subject to confirmation of such Plan, and the form of proposed order approving this Motion so provides, together with preserving the rights of all parties to interpose an objection to any of the Plans at the Confirmation Hearing, to the extent a party otherwise has standing to raise such an objection respecting such issue.

Ownership Certifications from parties not already known to them to be Potential 5% Holders.[29] Based on such experience and the limited universe of Potential 5% Holders, the Debtors do not believe it is necessary or beneficial to distribute Media Ownership Certifications with the Solicitation Packages. The Confirmation Hearing Notice, however, will advise all Claim Holders that are eligible to receive New Common Stock in Reorganized Tribune to contact the Proponents of the relevant Plan in the event they believe they are or may be a Potential 5% Holder, and of the prospect that Potential 5% Holders who do not obtain and complete a Media Ownership Certification by the Certification Deadline (and thus are not made "parties" to the FCC Applications) may in certain circumstances receive New Class B Common Stock in lieu of New Class A Common Stock. Following contact from a Potential 5% Holder, the Proponents of the relevant Plan will work with such Holder as appropriate to evaluate whether such Holder should be a party to the FCC Applications and, if warranted, provide such Holder with a Media Ownership Certification.

## VIII. Scheduling of the Confirmation Hearing and Related Deadlines and Establishing Parameters of Confirmation-Related Discovery

### A. Establishing Parameters of Confirmation-Related Discovery

64. As this Court is aware, one of its principal tasks at confirmation will be to consider the settlements in the Plans put forward by the various proponents against the backdrop of a variety of factors spelled out in the case law and thereby determine which settlement is fair and reasonable and in the best interests of the estate. See, e.g., Exide, 303 B.R. at 67-68 ("the Court's task is not to 'decide the numerous questions of law and fact raised by [objections] but

---

[29] The Debtors received a single document purporting to be a Media Ownership Certification by the deadline established under the Prior Solicitation Order from a party that was not already known to the Debtors. The Debtors determined upon review of the document that the party that submitted the purported Media Ownership Certification did not appear, in fact, to be a Holder of any cognizable Claim against any of the Debtors, much less a party that could legitimately claim to be a Potential 5% Holder.

rather to canvass the issues to see whether the settlement fall[s] below the lowest point of the range of reasonableness'") (citations omitted); In re New Century TRS Holdings, Inc., 390 B.R. 140, 167 (Bankr. D. Del. 2008) (Carey, J.) (same), rev'd on other grounds, 407 B.R. 576 (D. Del. 2009); see also In re Spansion, Inc., 2009 Bankr. LEXIS 1283, at *22 (Bankr. D. Del. June 2, 2009) (Carey, J.). Importantly, "[i]n determining whether to approve a settlement, the court is not supposed to have a mini-trial on the merits" of the settled claims, In re Key3Media Group, Inc. v. Pulver.com, Inc. (In re Key3Media Group, Inc.), 336 B.R. 87, 93 (Bankr. D. Del. 2005) (quotation omitted).

65. To date, the parties, the Committee and the Examiner have conducted exhaustive investigations and compiled an extensive record relating to the LBO-Related Causes of Action. The parties who have participated in the investigations include all of the proponents of the various Plans as well as Centerbridge, the entity from whom Aurelius purchased a substantial portion of its claimed position in the Senior Notes. The Committee's investigation included production of four million pages of documents (accessible to interested parties, including the proponents of all of the Plans, via the Document Depository for several months), several depositions, and the court-approved appointment of unconflicted special litigation counsel, Zuckerman Spaeder LLP, to assert potential claims.

66. The Examiner has been similarly active. Upon appointment by this Court, the Examiner was asked to "evaluate the potential claims and causes of action held by the Debtors' estate that are asserted by the parties, in connection with the leveraged buy-out of Tribune that occurred in 2007 . . . including, but not being limited to, claims for fraudulent conveyance (including both avoidance of liability and disgorgement of payments), breach of fiduciary duty, aiding and abetting the same, and equitable subordination and the potential defenses asserted by

the Parties to such potential claims and causes of action."[30] Over the course of three months and at a cost of over $12 million, the Examiner reviewed hundreds of pages of briefing submitted by the parties as well as tens of thousands of pages of documents and also conducted 38 witness interviews and a number of informal exchanges. The Examiner's work resulted in a 1200-page Examiner's Report attaching over 1100 exhibits and describing in detail the Examiner's conclusions regarding numerous factual and legal issues relating to the LBO-Related Causes of Action, including, *inter alia*:

- Whether Step One and Step Two were independent transactions;
- Whether Tribune was rendered insolvent or was left with unreasonably small capital by Step One if the transactions are considered to be independent;
- Whether Tribune was rendered insolvent or was left with unreasonably small capital by Step One even if Step Two debt is included;
- Whether Tribune was rendered insolvent or was left with unreasonably small capital by Step Two;
- Whether the Guarantor Subsidiaries were left with unreasonably small capital in connection with either Step One or Step Two;
- Whether Tribune received reasonably equivalent value in exchange for the Step One and/or Step Two loans;
- Whether the Transactions were intentional fraudulent transfers;
- Whether the LBO Lenders acted in good faith for purposes of the section 548(c) defense in connection with both Step One and Step Two;
- Applicability of the section 546(e) defense;
- The merits of equitable subordination claims;
- The merits of breach of fiduciary duty claims against various parties;
- The merits of aiding and abetting breach of fiduciary duty claims against various parties; and
- The merits of unjust enrichment claims.

67. The Examiner also did extensive work relating to the financial issues underlying the LBO-Related Causes of Action. For example, the Examiner worked "closely with [his] financial advisor. . .which developed a reasonably comprehensive financial analysis of the issues presented. . .Among other things, [the financial advisor] analyzed issues concerning

---

[30] Agreed Order Directing the Appointment of an Examiner [Dkt. No. 4120 at ¶ 2(i)], as amended by the Order Approving Work and Expense Plan and Modifying Examiner Order [Dkt. No. 4321 at ¶ 3].

solvency, unreasonable capital, the flow of funds, and matters pertaining to intercompany claims." Report Vol. 1 at 37. Although the Examiner's financial advisor used the analyses prepared by various parties, it "conducted its own independent investigation of the financial matters at issue on behalf of the Examiner." Report Vol. 1 at 37-38. To this end, the Report attached both a DCF valuation analysis and various recovery analyses which calculated potential recoveries to non-LBO creditors with respect to claims against the LBO Lenders in six different scenarios.[31]

68. In this regard, it is noteworthy that all of the evidence amassed by the Examiner is publicly available to all of the Proponents. This includes not only the complete, unredacted text of the Report itself, but also the 1100 supporting exhibits as well, including the transcripts of all of the Examiner's transcribed witness interviews.

69. Accordingly, the exhaustive investigations already conducted and the extensive record already developed should guide the structure of the confirmation process relating to the LBO-Related Causes of Action. Indeed, the Court previously has noted as much, explaining that the Examiner's Report would "probably inform not just the parties, but the Court about the scope...of the confirmation hearing." 7/14/10 Tr. at 44-45. See also In re Mirant Corp., 348 B.R. 725, 744 (Bankr. N.D. Tex. 2006); In re FiberMark, Inc., Case No. 04-10463, 2005 Bankr. LEXIS 2472 at *11-12 (Bankr. D. Vt. Dec. 2, 2005).

70. Judge Christopher Sontchi's recent opinion in In re Capmark Financial Group Inc., No. 09-13684 (Bankr. D. Del. Nov. 1, 2010) (the "Opinion") is also particularly instructive here. In Capmark, the court approved the Debtors' settlement of potential fraudulent transfer claims against secured lenders over the objection of the creditors' committee and an ad

---

[31] There are two additional recovery scenarios, which are variants of one of these six scenarios. Those additional scenarios contemplate recoveries to non-LBO creditors resulting from avoidance actions against Step Two Selling Stockholders. These claims are placed into a Litigation Trust by the Debtors and Co-Proponents Plan.

hoc committee of unsecured creditors (the "Opposing Creditors"). Id. at 1-2. In spite of the complexity of the underlying transactions and of the legal and factual issues implicated in the case, the court determined that, because of the extensive record that had been developed and submitted with briefing, the court was able to consider and decide the issues properly without first permitting wide-ranging discovery and following a four-day evidentiary hearing featuring the testimony of five witnesses in support of the settlement and one in opposition. Opinion at 3, 6-7. The same result follows here *a fortiori*. In this case, the existing evidentiary record is far more extensive than in Capmark, where no examiner was involved, and the settlement is not only supported by the Committee but also is the product of an unimpeachable arms-length negotiation overseen and endorsed by the Mediator.

71. In short, there is no reason why confirmation-related discovery should be other than narrowly tailored or why the confirmation hearing should be overly protracted. Establishing reasonable parameters on discovery will ultimately benefit the Debtors' estates and creditors as a whole. Indeed, if the Court does not provide a framework for the confirmation process, months of needless, duplicative, and expensive litigation will likely result. This issue is not a theoretical one – the parties collectively designated eighteen (18) expert witnesses in connection with the Prior Plan, and one party supporting a competing Plan has recently proposed that each party involved in the confirmation process be permitted to notice twenty (20) fact depositions as well as undertake limitless expert discovery and briefing. While the Proponents intend to meet and confer with one another, it is already apparent that there is likely to exist significant disagreement among the parties about the appropriate scope of the Confirmation Hearing and the discovery leading up to it.

72. Accordingly, to maintain efficient and effective progress toward the Confirmation Hearing without needless duplication of past work, the Court should act now and, among other things, (a) determine that no additional fact discovery regarding the merits of the LBO-Related Causes of Action shall be taken in connection with the Confirmation Hearing, (b) limit expert testimony on the merits of the LBO-Related Causes of Action to the reasonableness of the settlements embodied in the various Plans and (c) set aside up to five (5) consecutive calendar days in early March 2011 for the Confirmation Hearing.

**B.      Scheduling the Confirmation Hearing**

73. Bankruptcy Rule 3017(c) provides:

> On or before approval of the disclosure statement, the court shall fix a time within which the holders of claims and interests may accept or reject the plan and may fix a date for the hearing on confirmation.

Fed. R. Bankr. P. 3017(c).  In accordance with Bankruptcy Rule 3017(c) and in light of the Debtors' proposed solicitation schedule outlined herein, the Debtors propose that the Court fix a period of up to five consecutive calendar days in or around early March 2011 to consider confirmation of those Plans that are authorized by the Court to have votes solicited on them (the "Confirmation Hearing").  Such date will provide the Proponents sufficient time to solicit votes on the Plans in accordance with the schedule described herein and to notify the required parties of the Confirmation Hearing date.  The Debtors also request that the Court order that the Confirmation Hearing may be continued from time to time without further notice to creditors or other parties in interest.

**C.      Establishing Procedures for Notice of the Confirmation Hearing**

74. Bankruptcy Rules 2002(b) and (d) require not less than twenty-eight (28) days notice to all creditors, indenture trustees and equity security holders of the time fixed for filing

objections to confirmation of a plan of reorganization and the hearing to consider confirmation of a plan of reorganization. In accordance with the Bankruptcy Rules, the Debtors propose to provide all known creditors, parties filing a notice of appearance in these cases, governmental units having an interest in these cases, indenture trustees and equity interest holders, each as of the Record Date, with a copy of the notice of the confirmation hearing (the "Confirmation Hearing Notice"), substantially in the form annexed to this Motion as Exhibit C. Such notice will be sent with the Solicitation Packages and non-voting materials. The Confirmation Hearing Notice provides recipients with key information concerning the Plans and the Confirmation Hearing, as well as information concerning the casting of votes to accept or reject the Plans, the deadline for and manner for submitting objections to confirmation of the Plans, and other information useful for stakeholders concerning the Plans, the Confirmation Hearing, and important deadlines relating thereto.

75. Furthermore, the Debtors request that the order approving this Motion provide, pursuant to Bankruptcy Rule 2002(l), which permits the Court to "order notice by publication if it finds that notice by mail is impracticable or that it is desirable to supplement notice," that the mailed notice of the Plans be supplemented by published notice of the Confirmation Hearing (the "Publication Notice"), substantially in the form annexed to this Motion as Exhibit D, being placed once each in the national editions of The Wall Street Journal, The New York Times, the Los Angeles Times, and the Chicago Tribune not less than twenty-eight (28) days before the Objection Deadline. In light of the size of these Chapter 11 Cases, such Publication Notice provides adequate notice of the Objection Deadline and the Confirmation Hearing to persons who will not otherwise receive notice by mail, and the Debtors

request that the Court order that the scope and form of Publication Notice are adequate for such purpose.

**D. Establishing Procedures for Filing Objections to Confirmation of the Plans**

76. Bankruptcy Rule 3020(b) provides that objections to confirmation of a proposed plan of reorganization must be filed with the Bankruptcy Court and served on the debtor, the trustee, any committee appointed under the Bankruptcy Code, and on any other entity designated by the Bankruptcy Court, within a time specified by the Bankruptcy Court. Fed. R. Bankr. P. 3020(b). The Debtors request that the Court fix a date approximately four (4) weeks before the date scheduled for the commencement of the Confirmation Hearing as the last date for filing and serving written objections to confirmation of the Plans (including any supporting memoranda) (the "Objection Deadline"). The Debtors request that the Court direct that objections to confirmation of the Plans, if any, (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Court, together with proof of service, and served so that they are received on or before the Objection Deadline on the Proponents of each of the Plans that is/are being objected to in a particular objection.

77. The Debtors further propose that they, together with the other Proponents, be afforded an opportunity to file a response to any objections to confirmation of their respective Plans by a date to be scheduled by the Court approximately two (2) weeks prior to the date scheduled for the commencement of the Confirmation Hearing. The Debtors further propose that at that time the Debtors and the other Proponents further be required to file their proposed findings of fact and conclusions of law as well as their memoranda of law in support of confirmation of their respective Plans.

### E. Establishing Discovery Deadlines Respecting the Plans and Confirmation Hearing

78. In addition to the various deadlines relating to the solicitation process and the Confirmation Hearing proposed above, the Debtors propose that the order approving this Motion establish additional deadlines respecting discovery relating to the Plans.[32] These additional deadlines would include (i) the deadline for all parties in interest to serve written discovery requests and the deadline for parties to respond to written discovery requests, (ii) the date after which fact depositions may commence, (iii) the deadline for all parties in interest to comply with the requirements of Bankruptcy Rule 7026 and Federal Rule of Civil Procedure 26(a)(2)(B) with respect to experts (i.e., the deadline for the filing of written expert reports with the Bankruptcy Court), (iv) the date after which expert depositions may commence, and (v) the deadline for the filing of a Joint Pretrial Memorandum, in accordance with this Court's Chambers Procedures.

### NO PRIOR REQUEST

79. Other than seeking the relief that was previously granted by this Court in the Prior Solicitation Order, the Debtors have not previously sought the relief requested herein from this Court or any other court.

### NOTICE

80. Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) counsel to the Proponents; (iii) counsel for the Committee; (iv) counsel to the Loan Agents for Tribune Company's pre-petition loan facilities; (v) counsel to the administrative agent for the Debtors' post-petition financing facility; (vi) counsel to the proponents of all of the Plans; and (vii) all parties having requested notice pursuant to Bankruptcy Rule 2002. In light of the

---

[32] One of the Proponents of the Pre-LBO Debtholder Plan, Aurelius Capital Management, LP, has already proposed a discovery schedule in writing to the Debtors. The Debtors are presently reviewing the Aurelius letter.

nature of the relief requested herein, the Debtors submit that no other or further notice is

necessary.

[Remainder of the page intentionally left blank]

WHEREFORE, the Debtors respectfully request that this Court enter an order granting (i) the relief requested herein and (ii) such other and further relief as is just and proper.

Dated: Wilmington, Delaware
November 8, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
Kenneth P. Kansa
D'Lisia E. Bergeron
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-0199
Facsimile: (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION