# ATTACHMENT

## RESPONSIVE STATEMENT OF
## STEP ONE PLAN PROPONENTS

**RESPONSIVE STATEMENT OF**
**STEP ONE PLAN PROPONENTS**

**THIS STATEMENT IS ADDRESSED PRIMARILY TO THE STEP ONE LENDERS,**
**WHO ARE URGED TO VOTE IN FAVOR OF THE STEP ONE PLAN AS**
**IT IS THE ONLY PLAN THAT TREATS STEP ONE LENDERS FAIRLY**
**BY OFFERING THEM A PAR RECOVERY**

Don't be fooled by the Oaktree Plan's attempt to settle "highly likely" fraud claims against the Step Two Lenders for pennies on the dollar. The Step Two Lenders should be knocked out entirely, not merely inconvenienced with a nominal settlement payment, and no distributions payable to Step One Lenders should be surcharged under the inapplicable Sharing Provisions for the benefit of the Step Two Lenders. And don't be fooled by the Aurelius Plan's and the Bridge Plan's fantastic promises of huge recoveries from the Step One Lenders. Suing the Step One Lenders on "highly unlikely" grounds will have no result other than to drain the Litigation Trust of tens of millions of dollars that would otherwise by distributed to creditors. The Step One Plan promises no more and no less than what the Examiner's Report concluded was appropriate in this case – a fair distribution on the Effective Date to the Step One Lenders and to all legitimate creditors and a fair chance to recover a second distribution upon the successful challenge to the fraudulent Step Two Transactions.

I. **PRELIMINARY STATEMENT: ONLY ONE PLAN IS CONSISTENT WITH THE EXAMINER'S REPORT**

One independent Examiner's Report. Four competing Plans. And while there are a myriad of issues addressed in each Plan, it has been abundantly clear from the beginning of this case that the one overarching issue that will determine creditor recoveries is the allegation that actual or constructive fraud drove Tribune into bankruptcy.

As the Examiner's Report makes clear, the Step Two Loans were precisely that – actual and constructive fraudulent transfers that drove Tribune into bankruptcy. Yet, the largest Step Two Lenders – Oaktree, Angelo Gordon and JPMorgan Chase -- continue their efforts to dominate and corrupt the bankruptcy process to shield themselves from fraudulent transfer liability and protect their own recoveries.

Aurelius and the Bridge Lenders offer their own restructuring views that are also starkly inconsistent with the Examiner's Report. Aurelius proposes to sue the Step One Lenders based on a single passing reference in the Examiner's Report while entirely ignoring that the Examiner explicitly concluded that any challenge to the Step One Loans is "highly unlikely" to be successful. The Bridge Lenders propose nothing less than elevating their own subordinated claims to senior status, even though the Examiner's Report concluded that the Bridge Loans were highly likely to be avoidable as fraudulent transfers.

Only the Step One Plan is consistent with the Examiner's Report. The so-called Oaktree Plan, Aurelius Plan and Bridge Plan are not only irreconcilable with the Examiner's Report but also driven by motivations and interests detrimental to the interests of the Step One Lenders. The Oaktree Plan also compounds its errors by seeking to apply sharing provisions in the Credit Agreement that, in fact, do not apply. By seeking to apply the sharing provisions, the Oaktree Plan would deny the Step One Lenders their right to a par recovery and, instead, have the Step One Lenders pay for the fraudulent transfer sins of the Step Two Lenders.

## II. EXAMINER'S REPORT: THE STEP TWO TRANSACTIONS ARE FRAUDLENT, THE STEP ONE TRANSACTIONS ARE NOT

While the exhaustive Examiner's Report spans more than a thousand pages, one need only read the first few pages to get to the contrasting punch lines for the Step Two and Step One Transactions.

On the issue of "constructive fraudulent transfer," which requires a finding that Tribune was insolvent at the time or rendered insolvent as a result of the transactions:

- "[T]he Examiner finds that it is **highly likely** that a court would conclude that Tribune was rendered insolvent and left without adequate capital after giving effect to the **Step Two Transactions**."

- Conversely, based on the Examiner's conclusion that the Step One Transactions and Step Two Transactions should not be collapsed, "it is **highly unlikely** that the Tribune Entities were rendered insolvent in **Step One**."

On the issue of "intentional fraudulent transfer":

- "[It] is **somewhat likely** that a court would conclude that the **Step Two Transactions** constituted **intentional** fraudulent transfers and fraudulently incurred obligations."

- Conversely, "the Examiner **did not find credible evidence** that the Tribune Entities entered into the **Step One Transactions** to hinder, delay or defraud creditors."

The Step Two Transactions were fraudulent, plain and simple, and if the Step Two Lenders are not willing to provide for a fair settlement of the claims against them, they should be sued for as long as it takes to right the grievous wrongs they perpetrated. At the same time, a cost-benefit analysis makes it clear that it would be wasteful and virtually pointless to challenge the Step One Transactions. Spending tens of millions of dollars in a futile challenge to the Step One Lenders will benefit only the lawyers, no one else.[1]

---

[1] Nor can it be argued that there would be an "economy of savings" in challenging both the Step Two and Step One Transactions concurrently, because as the Examiner's Report makes clear, the facts, the circumstances, the parties, the motivations, the main legal issues and the evidentiary requirements barely overlap between Step One and Step Two.

- 3 -

III. **ONLY THE STEP ONE PLAN IS FAITHFUL TO THE CONCLUSIONS IN THE EXAMINER'S REPORT CONCERNING FRAUDULENT TRANSFER ALLEGATIONS AS TO THE STEP TWO AND STEP ONE TRANSACTIONS**

While each of the four Plans asserts that it embodies the findings set forth in the Examiner's report, only the Step One Plan is faithful to the Examiner's actual continuum of culpability for fraudulent conveyance liability -- that a fraudulent transfer challenge would be "*highly unlikely*" to succeed against the Step One Lenders and "*highly likely*" to succeed against the Step Two Lenders. Based on the Examiner's Report, an appropriate plan of reorganization would allow the claims of the Step One Lenders in full while preserving a fraudulent transfer against the Step Two Lenders. That is precisely the approach that the Step One Plan takes. The other three Plans, however, take very different approaches, each of them highly detrimental to the interests of the legitimate Step One Lenders.

A. **The Oaktree Plan Grants Full Bankruptcy Releases to the Step Two Lenders and the Step Two Agent for a Nominal Settlement Amount**

The Oaktree Plan acknowledges the validity of the Step One Lenders' claims but, rather than preserve litigation rights against the Step Two Lenders, it provides for a forced settlement of those litigation rights in exchange for a nominal settlement amount. This settlement not only eliminates any *highly likely* challenge to the claims of the Step Two Lenders and the conduct of the Step Two Agent, JPMorgan Chase, but also proposes to shield the Step Two Lenders and their Agent forever more from bankruptcy attack. Then, to add insult to injury and as discussed in more detail in the next section of this Statement, the Oaktree Plan provides that the settlement amount should be borne pro rata by the Step One Lenders, even though it is only the Step Two Loans that are subject to serious challenge.

It should be noted that this is actually the second version of the Oaktree Plan. Ironically, *the first version of the Oaktree Plan adopted exactly the same approach as the current Step One*

*Plan*. In the first Oaktree Plan dated September 17, 2010 (the "**First Oaktree Plan**"),[2] the claims of the Step One Lenders were "deemed Allowed in an aggregate amount equal to all amounts payable..., including principal, interest, and all other amounts," while the claims of the Step Two Lenders were described as "subject to challenge by the Litigation Trust."

The Oaktree Plan Proponents had it right the first time. There is no point in challenging the Step One Loans while there is every reason to challenge the Step Two Loans. That is exactly what the Step One Plan provides, neither more nor less.

### B. The Aurelius Plan Proposes To Sue Everyone without Distinction

On the other end of the spectrum is the Aurelius Plan. The problem that the Senior Noteholders face is that a successful challenge only to the Step Two Lenders would leave the Senior Noteholders with, at best, a nominal recovery, as is made clear in the recovery scenarios in Annex B to the second volume of the Examiner's Report. It is only if the claims of the Step One Lenders are also successfully challenged that there is any prospect for a substantial recovery by the Senior Noteholders.

Therefore, not surprisingly, while legitimately preserving the *highly likely* fraudulent transfer claims against the Step Two Lenders, the Aurelius Plan also illegitimately preserves the *highly unlikely* fraudulent transfer claims against the Step One Lenders. In doing so, the Aurelius Plan will impose tens of millions of dollars of incremental expense on the Litigation Trust – thus reducing and delaying creditor recoveries – in the pursuit of *highly unlikely* claims. The Aurelius Plan also "conveniently" provides Aurelius with control of the Litigation Trust, meaning it is Aurelius's lawyers who are hoping to be paid all of the Trust's litigation fees.

---

[2] Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P. [Docket Entry No. 5728].

The Aurelius Plan is trying to have it both ways. The Aurelius Plan argues that the Examiner's Report supports suing the Step Two Lenders but then ignores the fact that the Examiner's Report does *not* support suing the Step One Lenders. The Aurelius Plan should be viewed for what it is – a heavy-handed attempt to bully the Step One Lenders into putting a substantial amount of money on the table rather than risk being sued. But let there be no doubt, the Step One Lenders categorically reject such tactics.

### C.    The Bridge Plan Is Just as Indefensible

Right next to the Aurelius Plan on the extreme end is the Bridge Plan. In addition to commenting on the Step One and Step Two Loans, the Examiner's Report also reviewed the Bridge Loans and concluded that the Bridge Loans were *"highly likely"* to be avoidable as fraudulent transfers. Yet, the Bridge Plan provides the subordinated Bridge Lenders with a recovery far in excess of what they would be entitled to under any legitimate recovery scenario, while at the same time seeking to buy the support of Senior Noteholders by promising to pay to Senior Noteholders 138% of the distributable enterprise value of Tribune. The Bridge Plan makes no sense and merits no further comment.

## IV.    THE OAKTREE PLAN IMPROPERLY APPLIES THE SHARING PROVISIONS IN THE CREDIT AGREEMENT TO THE SUBSTANTIAL DETRIMENT OF THE STEP ONE LENDERS

The current Oaktree Plan, just like the First Oaktree Plan, acknowledges that the Step One Loans are unchallengeable while conceding that the Step Two Loans are subject to legitimate challenge. However, when it comes to settling the challenge against the Step Two Loans, the Oaktree Plan provides that the settlement amount should come jointly out of the pockets of the Step One Lenders in addition to the Step Two Lenders.

While this makes no sense on its face and the Oaktree Plan makes no effort to explain it, the Oaktree Plan's logic is presumably the same as set forth in the First Oaktree Plan. Specifically, the First Oaktree Plan relied on the so-called Sharing Provisions of the Credit Agreement to assert that all distributions payable to the Step One Lenders must be shared with the Step Two Lenders. This is flat-out wrong, for a number of reasons.

A group of Step One Lenders has already filed a state court litigation against JPMorgan Chase Bank, Merrill Lynch Capital Corporation, Citicorp North America and Bank of America to resolve the Sharing Provisions dispute (the "**NY Litigation**").[3] The NY Litigation sets forth a number of grounds why the Sharing Provisions do not apply under the current circumstances and also as to the defendants' grossly improper conduct. Those grounds include, for example, breach of contract, breach of the covenant of good faith and fair dealing, inducement of breach of contract, gross negligence and willful misconduct, including willful breach of the defendants' duties under the Credit Agreement in connection with the Step Two financing.

Focusing on the Sharing Provisions, they apply only to loans that are outstanding. By definition, if the Step Two Loans are not outstanding because they have been avoided as fraudulent transfers, the Sharing Provisions do not apply to them. Further, NY law is clear that a party cannot benefit from its own misconduct and, therefore, NY law would not permit the Step Two Lenders to share in a distribution when their own actions breached the Credit Agreement and have caused their own Step Two Loans to be avoidable.

---

[3] *Alden Global Distressed Debt Opportunities Fund, et al. v. JPMorgan Chase Bank, et al.*, index 651884/2010, filed Oct, 29, 2010 in the Supreme Court of the State of New York. A copy of the Complaint in this litigation is available upon request from counsel for the Step One Plan Proponents.

Similarly the Credit Agreement provides that the Sharing Provisions are applicable to the Step Two Loans only if they qualify as "Incremental Term Loans" under the Credit Agreement. However, the Step Two Loans were incurred notwithstanding the failure to meet several of those conditions. For example, one of the conditions to qualification is that Tribune had to be solvent at the time of incurrence and after giving effect thereto. As the Examiner's Report makes abundantly clear, however, it is *highly likely* that Tribune was rendered insolvent by the Step Two Loans. The Examiner's Report also makes clear that the Step Two Loan Agent (JPMorgan Chase) was heavily involved in the solvency analysis and it is highly likely that the Agent was fully aware of Tribune's insolvent status. Given insolvency, the Step Two Loans could not have qualified as Incremental Term Loans and, therefore, the Sharing Provisions simply do not apply to the Step Two Loans as a matter of contract.

The NY Litigation asserts additional grounds on which the Sharing Provisions are not enforceable if they even apply at all, but the point is that, as the First Oaktree Plan explicitly acknowledged and the current Oaktree Plan implicitly acknowledges, the Step One Loans are valid and unchallengeable while the Step Two Loans are fraudulent and fully challengeable. The Sharing Provisions simply cannot apply in those circumstances.

## V.    CONCLUSION

The Oaktree Plan, the Aurelius Plan and the Bridge Plan all treat the Step One Loans and the Step Two Loans as though they are of equal merit from a fraudulent transfer perspective. They are not. The independent Examiner's Report concludes that challenges to the Step Two Loans are highly *likely* to succeed while challenges to the Step One Loans are highly *unlikely* to succeed. Logically, then, if the Examiner himself were to draft a plan, it would essentially provide as follows: "Step One Loans ALLOWED. Step Two Loans DISALLOWED." This is

exactly what the Step One Plan, and *only* the Step One Plan, provides. The other three Plans provide otherwise and should be rejected out of hand.

3894404.1