**AURELIUS CAPITAL MANAGEMENT, LP**

535 MADISON AVENUE
22ND FLOOR
NEW YORK, NEW YORK 10022
TEL.: (646) 445-6500

MARK D. BRODSKY, CHAIRMAN

November 9, 2010

**A PERSONAL APPEAL TO TRIBUNE'S NON-LBO CREDITORS**

*The only thing necessary for the triumph of evil is for good men to do nothing.*
– Attributed to Edmund Burke

*If you pursue the matter at hand along the straight path of reason, advancing
with intensity, vigor, and grace…; if expecting nothing and fearing nothing, you
are content to act in accord with nature and to speak with heroic honesty – then
you will live well. And no power on earth can stop you.* – Marcus Aurelius

This letter is my personal appeal to your common sense and your sense of decency. With hundreds of pages of legal and financial disclosure, it is easy to lose the forest for the trees. This letter offers our view of the forest. Simply put, we ask you to do the right thing. ***Don't let the LBO Lenders hold Tribune hostage in bankruptcy to extort an unfair settlement.***

We are Tribune's largest non-LBO creditor. Our reorganization plan (the **"Pre-LBO Debtholder Plan"**) will allow Tribune to emerge from bankruptcy more reliably and promptly than the competing plans. Three indenture trustees (including two members of the Creditors' Committee) are co-proponents of our plan. ***Even if you prefer one of the other plans, you should vote for our plan as well to ensure that Tribune exits bankruptcy promptly.***

In our experience, management teams often conduct Chapter 11 cases primarily to cover up and gain releases for their own wrongdoing, defend their own mistakes, maximize their compensation, and cater to the creditors that will be controlling stockholders after the reorganization. When a wrongful transaction leads to bankruptcy, we routinely find the company's management locks arms with the very creditors who perpetrated the transaction. Often the perpetrating creditors get their legal fees paid by the company, while holders of adversely affected debt are required to reach into their own pockets to seek justice. Faced with such daunting circumstances, those debtholders often throw up their hands and accept a poor recovery that leaves the wrongdoers rewarded, emboldened, and encouraged to do more of the same.

Such is the case with Tribune, with two differences. *First*, we at Aurelius believe in the rule of law; we believe wrongdoers should be held accountable rather than rewarded; and we have decided to make a stand. In a bankruptcy world filled with abuse of power, intimidation, cynicism, and short-term thinking by bankrupt companies and their creditors, where mere lip service is often paid to the difference between right and wrong, we are unwilling to allow the LBO Lenders to extort a cheap settlement as the price for allowing Tribune to emerge from bankruptcy. Instead, we believe it is better for Tribune and fairer to its creditors to untether Tribune from the LBO-related litigation. Our plan would allow Tribune to emerge from bankruptcy expeditiously and leave all the LBO-related litigation to be addressed on a level playing field afterward.

*Second*, Tribune's creditors have the benefit of an investigative report issued by an independent Examiner appointed by the Bankruptcy Court over the objections of the very parties who now sponsor what is

known as the "**Debtor/LBO Lender Plan**" – Tribune, the LBO Lenders, and the Creditors' Committee. The Examiner's report put an end to 20 months of cover-up. It exposed flagrant wrongdoing within Tribune's executive ranks and identified billions of dollars of LBO-related actions – many of them against Tribune insiders such as Sam Zell (whose close business associate is Tribune's Chief Restructuring Officer) – that would have been released *for free* under Tribune's prior plan. The Examiner's report also revealed that the LBO Lenders face a serious risk of having their claims disallowed or subordinated and of being required to return hundreds of millions of dollars previously paid to them by Tribune. While the Examiner found that the so-called Step One LBO loans were less vulnerable than the Step Two loans, he found that Tribune has viable causes of action against the Step One lenders under each of four alternative definitions of fraudulent conveyance, and that the Step One lenders also face the serious prospect of having their claims equitably subordinated or disallowed. Despite their bravado, the Step One lenders have plenty of reason to fear litigation on the merits, which is precisely why Tribune's emergence presents the LBO Lenders with their last best opportunity to cheat other creditors of their due.

Although Tribune's bondholders constitute substantially all of the economic beneficiaries of the LBO-related litigation, they were – at the insistence of the LBO Lenders – systematically excluded from every negotiation session leading to the Debtor/LBO Lender Plan. I have been in this business a long time, and I have never seen such a starkly one-sided "settlement" process. I analogize this to Bonnie and Clyde being caught robbing a bank and then negotiating plea bargains with each other rather than with the prosecutor.

The Creditors' Committee was no substitute for bondholders in those negotiations. The Committee and its counsel are riddled with conflicts and have provided cover for the LBO Lenders for much of this bankruptcy case. Most of the Committee members effectively had their votes bought by the LBO Lenders in return for an increased or full recovery and have little or no "skin in the game" regarding claims against the LBO Lenders. The only bondholder representatives on the Committee support our plan and oppose the Debtor/LBO Lender Plan. The Committee kept its negotiations with the LBO Lenders secret from us, their single largest constituent. Despite our repeated requests, the Committee is unable or unwilling to explain to us why it supports the Debtor/LBO Lender Plan. In our experience, these are telltale signs of conduct that cannot withstand elementary scrutiny.

According to the Debtor/LBO Lender Plan, Tribune will remain stuck in bankruptcy if the Bankruptcy Court disagrees with the LBO Lenders on even one of the following six controversial issues:

- The Bankruptcy Court would have to approve a settlement of litigation against the LBO Lenders that is incompatible with the Examiner's report, and that was reached without a single negotiation with the principal beneficiaries of those claims. *Ask yourself this:  if this settlement were fair, why would the LBO Lenders need to hold Tribune hostage in order to procure it?*

- The Bankruptcy Court would have to agree that Step One and Step Two Senior LBO Lenders should receive the same recovery, even though the Examiner found that Step Two was almost certainly a fraudulent conveyance and Step One was less likely to be one. Treating these two lender groups the same would divert millions of dollars to "cross-holders" of Step One and Step Two loans at the expense of holders of Step One-only loans.

- The Bankruptcy Court would have to allow Tribune to release *for free* former shareholders who received $4.3 billion in Step One of the LBO transaction, and certain shareholders who were cashed out in Step Two of the LBO transaction.

- The Bankruptcy Court would have to approve a so called "Bar Order" that would unfairly limit the amount pre-LBO debtholders and other creditors can collect on account of the non-settled LBO causes of action, for the sole benefit of the LBO Lenders and other parties receiving releases under the Debtor/LBO Lender Plan.

- The Bankruptcy Court would have to rule that the outstanding amount of PHONES is $761 million rather than the $1.2 billion claimed.

- The Bankruptcy Court would have to approve a gerrymandered treatment of the swap claims at Tribune and its subsidiaries that rewards Oaktree – the holder of the swap claims – with an inflated recovery.

In contrast, our plan contains none of these conditions, so it would allow Tribune to emerge from bankruptcy promptly and reliably.

Our plan is also fairer, because it would maintain a level playing field with regard to the LBO-related litigation. Both the Pre-LBO Debtholder Plan and the Debtor/LBO Lender Plan are "litigation plans," because they both propose litigation trusts to pursue LBO-related litigation after Tribune emerges from bankruptcy. The key difference is that the Debtor/LBO Lender Plan attempts to force a piecemeal settlement of that litigation with the LBO Lenders while leaving all other defendants to the normal litigation process. This discrimination tellingly reveals the unfairness that lies at the heart of the Debtor/LBO Lender Plan.

If the LBO Lenders had the courage of their convictions, they would submit themselves to the same litigation process to which they propose to consign all other defendants in the LBO-related litigation. In that process, litigation is resolved on its merits, and settlements are reached not by refusing to speak with the true adversary in interest and holding a company hostage, but by negotiating on an arms' length basis. Instead, the LBO Lenders – who will control Tribune when it emerges from bankruptcy – seek to force a cheap settlement negotiated with the officers and directors who will soon work for them. Moreover, many of those officers and directors or their colleagues and business associates will be defendants in the LBO-related litigation. They presumably hope that a cheap settlement for the LBO Lenders will facilitate a cheap settlement of their own litigation exposure, procured from a friendly litigation trustee.

The Pre-LBO Debtholder Plan is simpler, less conditional, and fairer. It allows Tribune a surer and quicker path to emerge from Chapter 11 and ensures that all LBO-related claims will be dealt with afterward, on a level playing field, and in one proceeding. Not only is a level playing field fairer, it also creates the best environment for reaching a fair settlement, which is always our preference. As long as one side to a dispute feels that it can do better through highhanded tactics, abuse of power, and conflicts of interest than it can on the merits of its position, that side will do exactly what has transpired here – refuse to engage its adversary, and refuse to offer a settlement that its adversary might regret turning down.

***Unlike the LBO Lenders, we have the courage of our convictions.*** We are confident that on a level playing field, with a litigation trust run by a real fiduciary rather than a shill, the LBO Lenders will end up paying far more than they now propose and will thereby be held accountable rather than be emboldened to imperil other companies.

The pages that follow this letter lay out in detail our comparison of the competing plans, and set forth the reasons that ***the Debtor/LBO Lender Plan cannot be confirmed***. We encourage you to read these pages.

Please do the right thing. By voting to accept our plan, you will maximize the likelihood that Tribune will emerge from bankruptcy swiftly, and in the process ensure that the LBO Lenders are held accountable.

***You can vote to accept more than one plan. Even if you prefer another plan, you should also vote for the Pre-LBO Debtholder Plan in order to ensure that Tribune exits bankruptcy promptly.***

Very truly yours,

MARK D. BRODSKY

To:    **All Holders of Claims Against Tribune Company and its Debtor Subsidiaries (collectively, the "Debtors") Entitled to Vote on the Pre-LBO Debtholder Plan, Debtor/LBO Lender Plan, Step One Lender Plan and Bridge Lender Plan**

From:  **Aurelius Capital Management, LP ("Aurelius"), Deutsche Bank Trust Company Americas ("Deutsche Bank"), Law Debenture Trust Company of New York ("Law Debenture") and Wilmington Trust Company ("Wilmington Trust," and with Aurelius, Deutsche Bank and Law Debenture, collectively the "Proponents")**

Re:    **Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Aurelius, on Behalf of its Managed Entities, Deutsche Bank, in its Capacity as Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of New York, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes and Wilmington Trust, in its Capacity as Successor Indenture Trustee for the PHONES Notes (the "Pre-LBO Debtholder Plan")**

       **Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (the "Debtor/LBO Lender Plan")**

       **Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims (the "Step One Lender Plan")**

       **Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P., and Marathon Asset Management, L.P. (the "Bridge Lender Plan")**

---

*AS A CREDITOR OF THE TRIBUNE DEBTORS, YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT EACH OF THE PLANS LISTED ABOVE. AURELIUS, DEUTSCHE BANK, LAW DEBENTURE AND WILMINGTON TRUST RECOMMEND THAT YOU VOTE TO ACCEPT THE PRE-LBO DEBTHOLDER PLAN.*

*IT IS IMPORTANT FOR YOU TO KNOW THAT YOU CAN VOTE TO ACCEPT MORE THAN ONE PLAN. BY VOTING TO ACCEPT A PLAN, YOU ARE INDICATING THAT YOU WILL SUPPORT THAT PLAN IF THE BANKRUPTCY COURT APPROVES IT. THE BANKRUPTCY COURT WILL NOT APPROVE MORE THAN ONE PLAN, AND IS NOT REQUIRED TO APPROVE ANY OF THE PLANS.*

---

This letter is part of a solicitation package that contains, among other things, copies of each of the four proposed plans of reorganization listed above (collectively, the "**Plans**"), specific disclosure statements describing each of the Plans, a general disclosure statement describing the Debtors' businesses, properties, liabilities, claims and events during the Chapter 11 cases, and ballots for voting to accept or reject each of the Plans. As a creditor of the Debtors, you are entitled to vote to accept or reject each of the Plans, and you may vote to accept (or reject) more than one Plan.

Aurelius, one of the co-proponents of the Pre-LBO Debtholder Plan, is the largest holder of Tribune's Senior Notes and one of the largest holders of Tribune's exchangeable subordinated notes known as PHONES. The Senior Notes and the PHONES – often referred to as the "Pre-LBO Bonds" – were issued prior to the 2007 leveraged buyout transaction (the "**LBO**") that saddled the Debtors with approximately $8.0 billion in additional debt – but provided Tribune and its subsidiaries with no benefit of any kind – and swiftly led to Tribune's bankruptcy. Joining Aurelius as co-proponents of the Pre-LBO Debtholder Plan are Deutsche Bank, Law Debenture Trust Company of New York and Wilmington Trust, all three indenture trustees for the Pre-LBO Bonds.

The primary issue in these bankruptcy cases is, and always has been, how estate claims and causes of action arising out of the LBO should be treated in a plan of reorganization. Resolution of this question is a necessary precondition to the Debtors' emergence from bankruptcy, as it will determine how the Debtors' value will be distributed among its creditors and, thus, drastically impact creditor recoveries. The Pre-LBO Debtholder Plan is the **only** Plan that provides all creditors with a level playing field, by providing that only distributions that would be made regardless of the outcome of the LBO-related causes of action will be made upon confirmation, and allowing the remaining distributions to be determined post-confirmation through litigation of the LBO-related causes of action by conflict free litigation trusts.

In sharp contrast, the Debtor/LBO Lender Plan proposed by the Debtors, the Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), Oaktree Capital Management, L.P. ("**Oaktree**"), Angelo, Gordon & Co., L.P. ("**Angelo Gordon**"), and JPMorgan Chase Bank, N.A. ("**JPMorgan**") includes a piecemeal settlement of certain of the LBO-related causes of action for grossly inadequate consideration, and, in certain instances, no consideration at all. If approved, the settlements contained in the Debtor/LBO Lender Plan, including settlements to shield JPMorgan, who served as the Senior Agent for the LBO debt and who holds a large portion of the LBO debt, and Angelo Gordon and Oaktree, two of the largest holders of the LBO debt, from LBO-related liabilities, will deprive pre-LBO creditors of billions of dollars in distributions which they would likely be awarded if the lawsuits are allowed to proceed in due course. The Step One Lender Plan and the Bridge Lender Plan are premised on similar settlements, designed, again, to benefit the parties proposing the Plans at the expense of the Debtors' pre-LBO creditors.

Given its reserve structure, the Pre-LBO Debtholder Plan is the least conditional, and most likely Plan to be approved by the Bankruptcy Court. Conversely, the Debtor/LBO Lender Plan, the Step One Lender Plan, and the Bridge Lender Plan all require Court approval of, among other things, the hotly-contested settlements embodied therein and, thus, face significant, if not impossible, hurdles to confirmation. Accordingly, while the Debtor/LBO Lender Plan, the Step

2

One Lender Plan, and the Bridge Lender Plan purport to offer larger initial recoveries for certain creditor constituencies than the initial recoveries provided by the Pre-LBO Debtholder Plan, it is unlikely that these Plans will be approved by the Bankruptcy Court and, thus, unlikely that such recoveries will ever be realized.  Even if you intend to vote in favor of a competing Plan purporting to promise you a larger initial recovery than the Pre-LBO Debtholder Plan, we urge you to also vote in favor of the Pre-LBO Debtholder Plan.  In the event that there is no Plan that is approved by both creditors *and* the Bankruptcy Court, these chapter 11 cases will continue to languish unresolved while the parties endeavor to formulate a plan that is both confirmable and acceptable to creditors.  The Pre-LBO Debtholder Plan is the only Plan that prevents this outcome, by providing for a confirmable structure for distributions to creditors that will bring these chapter 11 cases to their conclusion.

I.    **The Appropriate Resolution Of The LBO-Related Causes of Action Has Always Been The Linchpin Of These Bankruptcy Cases**

a.    **The LBO**

On April 1, 2007, the board of directors of Tribune approved the LBO, which was orchestrated by certain of Tribune's largest shareholders and Samuel Zell, in concert with Tribune's directors and management team.  The LBO was structured in two principal and interrelated steps.  "Step One" involved the purchase by Tribune's employee stock ownership plan (the "ESOP") of shares of Tribune common stock and the consummation by Tribune of a cash tender offer for nearly 50% of its outstanding common stock.  "Step Two" was completed through Tribune cashing out its remaining stockholders and merging with a Delaware corporation that was wholly-owned by the ESOP, with Tribune surviving the merger.  As a result of the LBO, the Debtors were saddled with in excess of $10.7 billion of loans financed by various banking entities, including JPMorgan, Merrill Lynch & Co., Citicorp North America, Inc., Bank of America N.A., and Barclays Bank, PLC, pursuant to advice given by the investment banking arms of some of these same banks.  These banking entities received more than $200 million in fees and expenses for arranging this ruinous debt.  The banks and others involved in the LBO imposed the risk of these loans on Tribune's existing bondholders, who were now structurally subordinated to more than $10.3 billion in senior bank debt that was guaranteed by the Debtors' operating subsidiaries, and required to share the value of Tribune with the holders of this additional debt.

b.    **The Chapter 11 Cases and the Appointment of The Examiner**

The amount of debt incurred in connection with the LBO foreseeably left the Tribune entities unable to withstand the economic downturn that had begun to ravage the media industry even before the LBO was completed.  Buried in debt, and facing a future of looming maturities and crushing interest payments, the Debtors filed for chapter 11 protection on December 8, 2008, less than one year after the LBO was fully consummated.

On August 26, 2009, Law Debenture and Wilmington Trust sought Bankruptcy Court approval to conduct discovery relating to the LBO-related causes of action.   Law Debenture argued that disabling conflicts precluded the Creditors' Committee from adequately representing the interests of the Debtors' pre-LBO bondholders.  Wilmington Trust noted that two of the

primary lenders that funded the LBO are members of the Creditors' Committee, and that both of them, JPMorgan and Merrill Lynch,[1] are clients of the Creditors' Committee's lead counsel, Chadbourne & Parke LLP. On January 13, 2010, Wilmington Trust once again raised concerns about the Creditors' Committee's ability to adequately represent pre-LBO creditor interests, when it requested the appointment of an examiner to investigate potential LBO-related claims.

The Bankruptcy Court granted Wilmington Trust's request on April 20, 2010, over the objections of the Debtors, the Creditors' Committee, agents and arrangers of the LBO debt J.P. Morgan, Merrill Lynch Capital Corporation, Citicorp North America, Inc., Citigroup Global Markets Inc., Banc of America Securities LLC, and Bank Of America, N.A., an ad hoc group of former employees of the Times Mirror Company, and an ad hoc group of LBO lenders led by Oaktree. Kenneth Klee was appointed as Examiner to, among other things, "evaluate whether there are potential claims and causes of action held by the Debtors' estates in connection with the [LBO] . . . and whether there are potential defenses which may be asserted against such potential claims and causes of action." Following an exhaustive investigation that included the review of more than 3 million pages of documents and 38 interviews, the Examiner submitted a comprehensive report spanning more than 1,200 pages. The Examiner's report identified dozens of legal issues regarding the potential LBO-related claims and defenses, and opined on each issue using a range of qualitative probabilities from "highly likely" to "highly unlikely," with steps in between. Among other things, the Examiner concluded that it is "highly likely" that the loans and resulting repayment obligations extended as part of Step Two of the LBO constituted avoidable fraudulent conveyances at Tribune, "reasonably likely" that Step Two of the LBO constituted a fraudulent conveyance at the Debtor subsidiaries, and "somewhat likely" that the Tribune entities committed intentional fraud at Step Two of the LBO. While the Examiner found that the Step One loans were less vulnerable than the Step Two loans, he found that Tribune has viable causes of action against the Step One lenders under each of four alternative definitions of fraudulent conveyance, and that the Step One lenders also face serious risk of having their claims equitably subordinated or disallowed.

### c.  Mediation and the Commencement of the Competing Plan Process

On September 1, 2010, at the Debtors' request, the Bankruptcy Court appointed the Honorable Kevin Gross, Bankruptcy Judge for the Bankruptcy Court for the District of Delaware, to conduct a non-binding mediation concerning the terms of a potential plan of reorganization for Tribune and its affiliated Debtors. On October 12, 2010, a mediator's report was issued that attached a term sheet supported by Oaktree, Angelo Gordon, the Debtors, JPMorgan, as a senior lender and agent under the senior loan agreements, and the Creditors' Committee (the "**LBO Lender Term Sheet**"). The LBO Lender Term Sheet contained settlements with respect to both the Step One and Step Two LBO-related causes of action and, ultimately, formed the basis for the Debtor/LBO Lender Plan filed on October 22, 2010. Pursuant to the Debtor/LBO Lender Plan, the LBO lenders are foregoing only $401 million in potential plan distributions, in exchange for the release of $8.7 billion of avoidance claims concerning Step One senior loans (approximately $6.6 billion) and Step Two senior loans

---

[1] Merrill Lynch has since resigned from the Committee.

(approximately $2.1 billion), and more than $1.8 billion in Step One disgorgement claims.[2] Astonishingly, this $401 million in "settlement consideration" is only $73 million more than the Debtors, Oaktree and Angelo Gordon previously proposed to settle only Step One avoidance and disgorgement claims. Accordingly, $2.1 billion in Step Two debt avoidance claims are being settled for only $73 million. Furthermore, all of this $73 million is going to other general unsecured creditors (excluding holders of senior notes and PHONES notes) to buy their support for the Debtor/LBO Lender Plan.

The Debtor/LBO Lender Plan also releases all former shareholders, who were paid approximately $4.3 billion at Step One of the LBO, and certain shareholders who were cashed out at Step Two of the LBO, for no consideration at all. In addition, the Debtor/LBO Lender Plan settles the Step Two Lenders' approximately $318 million of Step Two disgorgement liability for only an additional $120 million. Accordingly, the Debtor/LBO Lender Plan settles claims for approximately $8.7 billion in avoidable debt and $2.2 billion in potential disgorgement, and releases more than $4.3 billion in potential disgorgement claims against shareholders, all for aggregate settlement consideration of a mere $521 million.

Recognizing that the Debtor/LBO Debtholder Plan did not achieve a consensus among the Debtors' various creditor constituencies, the Bankruptcy Court set forth procedures for a competing plan process, as embodied in the Bankruptcy Court order dated October 18, 2010. Pursuant to such order, on October 29, 2010, the Pre-LBO Debtholder Plan, Step One Plan and Bridge Lender Plan were filed with the Bankruptcy Court.

## II.     The Debtor/LBO Lender Plan Is Unconfirmable

The Debtor/LBO Lender Plan is subject to a number of conditions and flaws that render it unconfirmable as a matter of law, making it essential that you vote for the Pre-LBO Debtholder Plan, regardless of how you vote on the Debtor/LBO Lender Plan. Specifically:

•      **The Debtor/LBO Lender Plan requires Bankruptcy Court approval of highly contentious, and legally questionable, settlements that forego valuable causes of action for grossly disproportionate consideration**. To cite but one example, the Debtor/LBO Lender Plan cannot be confirmed unless the LBO-related settlements, which purport to settle the Debtors' more than $10.9 billion worth of LBO-related causes of action against the Step One and Step Two LBO Lenders for only $521 million, are approved by the Bankruptcy Court. In an effort to support this grossly disproportionate settlement amount, the proponents of the Debtor/LBO Lender Plan disingenuously assert that $521 million is less than the recovery provided to non-LBO creditors in all but one of six recovery scenarios annexed to the Examiner's Report. The proponents of the Debtor/LBO Lender Plan fail to disclose, however, that the recovery scenarios annexed to the Examiner's Report represent only a handful of the myriad potential outcomes the Examiner found could result from prosecution of the LBO-related causes of action, and bear no relation to the Examiner's conclusions regarding which of these or the other possible scenarios is

---

[2] Disgorgement amounts referenced herein do not include pre-judgment interest, which would increase the amount awarded upon successful prosecution of the disgorgement claims.

more likely to occur.[3] For example, although the Examiner found that it is *at least "reasonably likely"* that the Step Two debt will be avoided *in its entirety*, only three of the six recovery scenarios cited by the Debtor/LBO Lender Plan proponents include this assumption. Similarly, two of the six scenarios are predicated on an element the Examiner found to be "highly *un*likely," and two are predicated on an element the Examiner found to be "reasonably *un*likely." Moreover, although the Examiner found that there is a 50% chance that the Step One Lenders will not be able to "benefit from avoidance of payments made and obligations incurred in the Step Two LBO transactions," *none* of the recovery scenarios relied upon by the Debtor/LBO Lender Plan Proponents to support the LBO-related settlement account for that possibility, which could result in pre-LBO creditors receiving a full recovery on account of their claims. In sum, it is highly questionable whether the LBO-related settlements will meet the standard for Bankruptcy Court approval – a threshold the Bankruptcy Court has already cautioned is "not a give me" [sic] – given the astounding disparity between the potential value of the claims being settled and the consideration being paid in exchange for the settlement.

• **The Debtor/LBO Lender Plan grants sweeping releases in exchange for woefully inadequate consideration, and in certain instances no consideration at all.** Courts in the Third Circuit, including the Bankruptcy Court, consider a number of factors in determining whether third party releases granted by a debtor constitute a reasonable exercise of a debtor's business judgment, including whether the non-debtor receiving the release has made a substantial contribution of assets to the reorganization. Here, notwithstanding the grossly inadequate consideration being provided by the LBO lenders in connection with the LBO-related settlements, the Debtor/LBO Lender Plan grants (i) full releases to the Step One lenders in their capacities as such, and (ii) releases to the Step Two lenders with respect to the avoidability of their claims against the Debtors. Moreover, for no additional consideration, the Debtor/LBO Lender Plan provides full releases to the Step One agents and arrangers in their capacity as such, notwithstanding that they received approximately $134 million in fees and expenses from the Debtors prior to the commencement of these cases. The Debtor/LBO Lender Plan also releases the Step Two and Bridge lenders, agents and arrangers for disgorgement liability associated with approximately $318 million of payments in principal, interest, fees and expenses for consideration of only $120 million. And, to exacerbate the unfairness of the proposed LBO-related settlements, the Debtor/LBO Lender Plan releases all former shareholders who were cashed out at Step One of the LBO, and certain shareholders who were cashed out at Step Two of the LBO, for no consideration at all. Such a waste of estate assets cannot stand under well-settled law.

• **The Debtor/LBO Lender Plan prejudices the beneficiaries of the preserved LBO-related causes of action through a so-called "Bar Order" that purports to reduce any LBO-related judgment obtained by the trusts by the amount of liability that could have been apportioned against the settling defendants but for the LBO-related settlements.**

---

[3] The Examiner explicitly stated that "[t]he Recovery Scenarios only address the effect of fraudulent transfer actions on creditor recoveries and do not consider the potential effect of preferences, equitable subordination, equitable disallowance, or common law claim recoveries. These claims are evaluated in the Report but the Recovery Scenarios do not take into account the potential effect on recoveries resulting from these possible remedies, claims and causes of action."

While this provision is clearly in the best interest of the settling defendants, it is highly unfair to the parties whose recoveries are dependent on the success or failure of these causes of action, and will be vigorously opposed at the confirmation hearing.

- **The Debtor/LBO Lender Plan unilaterally declares that the PHONES notes claims will be allowed at approximately $761 million, rather than the approximately $1.2 billion asserted by Wilmington Trust, indenture trustee for the PHONES.** Notwithstanding this clear dispute – which the Debtors acknowledge in their general disclosure statement – the Debtor/LBO Lender Plan purports to definitively resolve this issue in favor of the Debtor/LBO Lender Plan Proponents. It is far from certain, however, that the Bankruptcy Court will agree with this treatment.

- **Without explanation, the LBO Debtholder Plan classifies the swap claim at Tribune as an "Other Parent Claim" (i.e., a general unsecured claim), while classifying an identical claim at the subsidiary debtors as a Senior Loan Guaranty Claim.** This gerrymandered classification results in an inflated recovery for the holder of the swap claim (which, upon information and belief, is Oaktree), to the detriment of other creditors at Tribune.

IF THE BANKRUPTCY COURT DISAGREES WITH THE PROPONENTS OF THE DEBTOR/LBO LENDER PLAN WITH REGARD TO ANY ONE OF THESE, AND A NUMBER OF OTHER, HIGHLY CONTENTIOUS ISSUES, THE DEBTOR/LBO LENDER PLAN WILL, BY ITS EXPRESS TERMS, FAIL.

### III.    The Step One Lender Plan And Bridge Lender Plan Are Also Unconfirmable

#### a.    The Step One Lender Plan

The Step One Lender Plan suffers from many of the same infirmities as the Debtor/LBO Lender Plan and is equally unconfirmable. While the Step One Lender Plan does not propose a settlement of the payments made in connection with the Step Two portion of the LBO transaction, the Step One Lender Plan purports to settle all of the potential claims against the Step One Lenders, including claims for equitable subordination or disallowance, for only $290 million, and is otherwise substantially similar to the Debtor/LBO Lender Plan. The confirmability of the Step One Lender Plan is further compromised by the fact that it not supported by any pre-LBO creditor, or any other LBO creditor, the Debtors or the Creditors' Committee.

#### b.    The Bridge Lender Plan

The Bridge Lender Plan proposes three settlements that purport to settle the LBO-related causes of action against Step One lenders, Step Two lenders and Bridge lenders. Like the settlements embodied in the Debtor/LBO Lender Plan, the consideration to be paid in exchange for these settlements is grossly inadequate, given the value and merits of the LBO-related causes of action. If the Bridge Lender Plan settlements are not approved, the Bridge Lender Plan reverts to a structure that is substantially similar to the Pre-LBO Debtholder Plan. As with the Step One Lender Plan, the confirmability of the Bridge Lender Plan is further compromised by the fact that

it is not supported by any pre-LBO creditor, or any other LBO creditor, the Debtors or the Creditors' Committee.

### IV.    The Pre-LBO Debtholder Plan Is The Only Proposed Plan That Is Confirmable

In stark contrast to the other competing Plans, the Pre-LBO Debtholder Plan is the only proposed Plan that has a high likelihood of being confirmed. The Pre-LBO Debtholder Plan provides for substantial recoveries on the effective date of the Plan, while still preserving all creditors' rights to receive the portion of the Debtors' value to which they are ultimately determined to be entitled. Accordingly, the Pre-LBO Debtholder Plan does not contain releases of any of the parties that participated in the LBO, nor does it presuppose the amounts to which the non-LBO creditors may be entitled. As a result, the only conditions to confirmation of the Pre-LBO Debtholder Plan, in addition to approval by the Bankruptcy Court, are (i) that the trust documents are executed and the trusts are established, (ii) that certain standard corporate documents are adopted and filed, and (iii) that certain consents, authorizations, certifications and approvals necessary to implement the Pre-LBO Debtholder Plan are obtained.

IN SUM, THE PRE-LBO DEBTHOLDER PLAN IS THE ONLY PLAN THAT IS CONFIRMABLE AND REPRESENTS A REALISTIC OPPORTUNITY FOR (I) THE DEBTORS TO EMERGE FROM CHAPTER 11 QUICKLY AND RELIABLY, (II) INITIAL DISTRIBUTIONS TO BE MADE TO CREDITORS AND (III) THE TRUSTS TO BE ESTABLISHED TO PURSUE ALL PRESERVED AND STATE LAW CAUSES OF ACTION. ACCORDINGLY, WE RECOMMEND THAT YOU VOTE IN <u>FAVOR</u> OF THE PRE-LBO DEBTHOLDER PLAN, REGARDLESS OF WHETHER YOU VOTE TO ACCEPT OR REJECT THE OTHER COMPETING PLANS.