## Attachment A

**Tribune Company And Its Subsidiary Debtors'
Response To Competing Plans Of Reorganization**

## TRIBUNE COMPANY AND ITS SUBSIDIARY DEBTORS' RESPONSE TO COMPETING PLANS OF REORGANIZATION

TO ALL HOLDERS OF CLAIMS ENTITLED TO VOTE:

You are being asked to consider the Settlement Plan proposed by the Debtors, the Official Committee of Unsecured Creditors, JPMorgan, Oaktree and Angelo Gordon, and three (3) competing plans of reorganization for Tribune Company and its Debtor Subsidiaries. You have received a separate, color-coded Ballot for each of these plans of reorganization. The plans of reorganization and their corresponding Ballot color are as follows:

- **Settlement Plan** proposed by the Debtors, the Official Committee of Unsecured Creditors, JPMorgan, Oaktree and Angelo Gordon, accompanied by a **BLUE** Ballot

- **Litigation Plan** proposed by Aurelius, Deutsche Bank, Law Debenture and Wilmington Trust Company, accompanied by a **PURPLE** Ballot

- **Bridge Plan** proposed by certain Holders of Bridge Loan Claims, accompanied by a **GREEN** Ballot

- **Step One Plan** proposed by certain Holders of Step One Senior Loan Claims, accompanied by a **YELLOW** Ballot

**TRIBUNE COMPANY AND ITS SUBSIDIARY DEBTORS URGE YOU TO SUBMIT YOUR BLUE BALLOT IN FAVOR OF THE SETTLEMENT PLAN AND INDICATE YOUR PREFERENCE FOR THE SETTLEMENT PLAN ABOVE ALL OTHER PLANS THAT YOU MAY BE CONSIDERING.**

### A. *What is the Settlement Plan?*

The formal title of the Settlement Plan is the "Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo Gordon & Co., L.P. and JPMorgan Chase Bank, N.A." The Settlement Plan has been proposed by several of the most significant constituents in these Chapter 11 Cases—the Debtors, the Official Committee of Unsecured Creditors, JPMorgan, in its capacity as Senior Loan Agent and as a Senior Lender, and Oaktree and Angelo Gordon (who are, along with JPMorgan, the largest Holders of Senior Loan Claims). The agreement that is embodied in the Settlement Plan is the result of the Mediation that was overseen by U.S. Bankruptcy Court Judge Kevin Gross, who has endorsed the settlement.

In summary, the Settlement Plan has two primary components. First, the Settlement Plan provides for certain settlements of LBO-Related Causes of Action held by the Debtors' Estates against current and former Senior Lenders (with the exception of liability for certain disgorgement claims if such parties are not participants in the Step Two/Disgorgement Settlement), the Senior Loan Agent and the Senior Loan Arrangers, participating current and

former Bridge Lenders and Bridge Loan Arrangers, and the Step One Selling Stockholders. Significant portions of the distributions to be made to Holders of Senior Noteholder Claims, Other Parent Claims (which include claims of the Retiree Claimants and other General Unsecured Claims against Tribune), Convenience Claims and General Unsecured Claims against the Filed Subsidiary Debtors are on account of and in consideration of these settlements. As a result of these settlements, on the Effective Date of the Settlement Plan, (i) the Holders of Allowed Senior Noteholder Claims will receive their Pro Rata share of $420 million in Cash (equal to 32.73% of their Allowed Claims) plus trust interests described below, (ii) the Holders of Allowed Other Parent Claims can choose to receive (a) Cash in an amount equal to 35.18% of their Allowed Claim or (b) Cash in an amount equal to 32.73% of their Allowed Claims plus trust interests described below, and (iii) the Holders of Allowed General Unsecured Claims against the Filed Subsidiary Debtors will receive Cash in an amount equal to 100% of their Allowed Claim unless such Claims exceed $150 million, in which case Holders will receive their Pro Rata share of $150 million.

       A second component of the Settlement Plan is the preservation of the Estate's remaining LBO-Related Causes of Action for the benefit of Tribune's creditors and the assignment of those causes of action to the Litigation Trust and the Creditors' Trust (collectively, the "Trusts"). As part of the settlements embodied in the Settlement Plan, the Senior Lenders have agreed to relinquish a portion of their entitlement to the proceeds of the Trusts for the benefit of Holders of Non-LBO Lender Claims against Tribune. As a result, the beneficial interests granted to Holders of Allowed Senior Noteholder Claims, PHONES Notes Claims, EGI-TRB LLC Notes Claims and electing Holders of Other Parent Claims will provide such Holders with their Pro Rata share (subject to the contractual subordination of the PHONES and EGI-TRB Notes) of (i) the first $90 million realized from the Trusts, and, thereafter and after repayment of the Trusts' Loan, (ii) sixty-five percent (65%) of the proceeds realized from the Trusts until payment in full of all of the foregoing claims. The remaining thirty-five percent (35%) of the Trusts' recoveries will be provided to Holders of Allowed Senior Loan Claims and Bridge Loan Claims.

FOR ADDITIONAL INFORMATION CONCERNING THE SETTLEMENT PLAN, HOLDERS OF CLAIMS SHOULD REVIEW THE SETTLEMENT PLAN AND THE SPECIFIC DISCLOSURE STATEMENT RELATING TO JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO GORDON & CO., L.P. AND JPMORGAN CHASE BANK, N.A.

    B.    *Who are the proponents of the various plans of reorganization?*

       **Settlement Plan.** Three diverse groups of constituents are proponents of the Settlement Plan, *and the Settlement Plan is the only proposed plan of reorganization that has the support of parties with fiduciary duties to all creditors in these Chapter 11 Cases*. The Debtors, which include Tribune and 110 of Tribune's subsidiaries, are fiduciaries for all stakeholders in these Chapter 11 Cases. The Debtors are proponents of the Settlement Plan because the Debtors believe the Settlement Plan is in the best interests of their stakeholders. The Official Committee of Unsecured Creditors, which is an official statutory committee appointed by the Office of the United States Trustee, is also a proponent of the Settlement Plan. Like the

Debtors, the Creditors' Committee is a fiduciary for all general unsecured creditors of the Debtors and has approved the Settlement Plan because the Creditors' Committee believes it is in the best interests of the stakeholders they represent. The final group of constituents that proposed the Settlement Plan is comprised of three of the largest Holders of Senior Loan Claims—JPMorgan, which is also the Senior Loan Agent, Oaktree and Angelo Gordon. These three Holders will initially be the largest individual holders of Tribune's New Common Stock under any of the proposed plans of reorganization.

**Litigation Plan.** The principal proponent of the Litigation Plan is Aurelius, which is a hedge fund purportedly holding Senior Notes Claims and PHONES Notes Claims. The other proponents of the Litigation Plan are Indenture Trustees for the Senior Notes and PHONES Notes. It is the Debtors' understanding that Aurelius recently purchased the majority of its Senior Notes Claims from another hedge fund that was a proponent of the original settlement plan filed by the Debtors. None of the proponents of the Litigation Plan are creditors of any of the 110 operating subsidiary Debtors. Moreover, due to the size of the Claims held by the proponents of the Litigation Plan in relation to the total debt outstanding against the Debtors and the distributable value available to such debtholders, under virtually every plausible scenario contemplated by the proposed plans of reorganization (including the Litigation Plan), the proponents of the Litigation Plan will only be eligible to receive, at most, a minority portion of the New Common Stock in Reorganized Tribune. As a result, their economic interests in the Reorganized Debtors are disproportionate to the degree of control the Litigation Plan proponents seek to exert over the fate of the Reorganized Debtors.

**Bridge Plan.** The Bridge Plan has been proposed by three hedge funds that are Holders of Bridge Loan Claims who purchased such Claims from the original Bridge Lenders.

**Step One Plan.** The Step One Plan has been proposed by a group of hedge funds that solely hold Step One Senior Loan Claims. Based upon the Debtors' information and belief, this group of hedge funds did not become actively involved in the Debtors' Chapter 11 Cases until the late summer of 2010. According to the proponents' disclosures before the Bankruptcy Court, the proponents of the Step One Plan hold less than 9.5% of the aggregate Senior Loan Claims.

### C. *What distinguishes the Settlement Plan from the other plans of reorganization?*

The cornerstone of the **Settlement Plan** is the settlement, as of the Effective Date of the Settlement Plan, of the Estate's LBO-Related Causes of Action against the Holders of Senior Loan Claims and Settling Step Two Payees in exchange for $521 million, while preserving for the benefit of Tribune's creditors LBO-Related Causes of Action against the Step Two Selling Stockholders, advisors, certain directors, certain officers, Morgan Stanley, EGI-TRB LLC, Samuel Zell and Non-Settling Step Two Payees. As a result of the settlements in the Settlement Plan, most Holders of Claims against the Debtors will receive substantial cash distributions upon the Debtors' emergence from their Chapter 11 Cases, in contrast to the minimal initial distributions of the competing plans. In addition, the immediate distributions to Non-LBO Lender creditors of the Debtors will be in the form of cash rather than common stock or a new loan. Finally, based upon the settlements in the Settlement Plan, the Non-LBO Lender

creditors of Tribune will receive the first $90 million of any Trust recoveries and, after repayment of the Trusts' loan, will receive a disproportionately larger share of any future Trust recoveries than their base entitlement.

In contrast, the **Litigation Plan** is premised upon no settlements and the preservation of all potential LBO-Related Causes of Action and the transfer of these causes of action to two litigation trusts. Under the Litigation Plan, upon the Debtors' emergence from their Chapter 11 Cases, each Class of creditors of the Debtors will receive only its minimum entitlement in the form of cash, new common stock and a new loan based upon the assumption that all preserved litigation claims are decided in a manner that is least favorable to such Class. Further distributions to each Class of Claims will only occur, if at all, after years of costly litigation concerning the LBO-Related Causes of Action and the completion of any appeals and after the entry of various final court orders resolving the relative entitlement of various Classes of Claims to the proceeds of the litigation. Since the Litigation Plan does not resolve any of the critical issues in these Chapter 11 Cases, not only the amount, but also the timing, of any consideration that Holders of Claims may ultimately receive under the Litigation Plan are not only speculative, but also unascertainable at present.

Like the Litigation Plan, the **Bridge Plan** provides minimal up-front distributions of cash, new common stock and a new loan, with any meaningful distributions to Holders of Non-LBO Lender Claims occurring, if at all, after years of costly litigation and appeals concerning the LBO-Related Causes of Action and after the entry of various final court orders resolving the relative entitlement of various Classes of Claims to the proceeds of the litigation. Although the Bridge Plan does contemplate various opt-in settlements that would purport to provide substantial up-front cash distributions to creditors, none of the parties that would fund these proposed settlements have agreed to the Bridge Plan, and the Debtors believe they are unlikely to do so. If the Holders of Senior Loan Claims do not accept the Bridge Plan, the Bridge Plan would provide for minimal distributions similar to the Litigation Plan, with a significant portion of the Reorganized Debtors' enterprise value held in reserve pending the outcome of protracted litigation. Accordingly, the Debtors view both the amount and timing of distributions under the Bridge Plan as highly speculative, at best.

Finally, the **Step One Plan** is a single-issue plan that is focused on providing certain Step One hedge funds and similar creditors with more favorable treatment than what they are afforded under the Settlement Plan, at the expense of virtually every other creditor constituency. In addition, the Step One Plan contemplates additional litigation involving the application of the "sharing provisions" in the Senior Loan Agreement. While the Step One Plan incorporates a settlement of LBO-Related Causes of Action against the Step One Senior Lenders, the Step One Plan proponents do not control the Class of Step One Senior Lenders and, without Class acceptance, the Step One proponents cannot impose an involuntary settlement upon the Holders of Step One Senior Loan Claims. Furthermore, the Step One Plan substantially reduces the distributions set forth in the Settlement Plan. For example, the Step One Plan does not provide for the $120 million Step Two/Disgorgement Settlement in the Settlement Plan, thereby reducing distributions to Senior Noteholders, and also provides smaller initial distributions to several classes of creditors, including Holders of Step Two Senior Loan Claims and Other Parent Claims, as compared to the Settlement Plan. Finally, the Step One Plan reduces the percentage

of litigation trust recoveries to be paid to holders of Non-LBO Lender Claims from 65% to their pro rata share, thus redirecting the bulk of these recoveries to Step One Senior Lenders.

### D. *What will be the initial distributions under the Settlement Plan as compared to the other plans of reorganization?*

The following chart depicts a comparison of the estimated recovery percentages that Classes of Claims entitled to vote will initially receive upon the Debtors' emergence from bankruptcy under the various plans of reorganization:

| Class | Settlement Plan (Blue Ballot) | Litigation Plan (Purple Ballot)[1] | Bridge Plan (Green Ballot)[1,2] | Step One Plan (Yellow Ballot) |
|---|---|---|---|---|
| **Step One Senior Loan/Guaranty Claims:** | 71.03% | 34.20% | 34.20% | 71.32%[3] |
| **Step Two Senior Loan/Guaranty Claims:** | 71.03% | 0% | 0% | 0%[4] |
| **Bridge Loan/Guaranty Claims:** | 0% | 0% | 7.70% | 0% |
| **Senior Noteholder Claims:** | 32.73% | 4.8% | 4.8% | 23.38% |
| **Other Parent Claims:** | 35.18 or 32.73% | 4.3% | 4.3% | 25.83 or 23.38% |
| **Convenience Claims against Tribune:** | 100% | 4.3% | 4.3% | 100% |

---

[1] Recovery percentages assume that (a) disputes concerning the "sharing provisions" in the Senior Loan Agreement are not resolved prior to the Effective Date, but that distributions are made to the Holders of Step One Senior Loan Claims on the Effective Date, and (b) disputes concerning the Allowed amount of the PHONES Notes Claims are not resolved prior to the Effective Date.

[2] Although the Bridge Plan provides an option for various settlements that may potentially result in greater distributions to certain creditors of Tribune as of the Effective Date, the Bridge Plan is not conditioned upon the implementation of these settlements and the Debtors believe the ability to consummate these settlements is highly unlikely.

[3] If the disputes concerning the "sharing provisions" in the Senior Loan Agreement are resolved in a manner that is favorable to the Step One Senior Lenders prior to the Effective Date, the initial distribution to the Holders of Step One Senior Loan Claims may potentially be higher than that set forth above.

[4] If the disputes concerning the "sharing provisions" in the Senior Loan Agreement are resolved in a manner that is favorable to the Step Two Senior Lenders prior to the Effective Date, the initial distribution to the Holders of Step Two Senior Loan Claims may potentially be higher than that set forth above.

5

| Class | Settlement Plan (Blue Ballot) | Litigation Plan (Purple Ballot)[1] | Bridge Plan (Green Ballot)[1,2] | Step One Plan (Yellow Ballot) |
|---|---|---|---|---|
| General Unsecured Claims against *Guarantor Subsidiaries*: | 100% | 8.0% | 8.0% | 100% |
| General Unsecured Claims against *Non-Guarantor Subsidiaries*:[5] | 100% | 100% | 100% | 100% |
| EGI-TRB LLC Notes Claims: | 0% | 0% | 0% | 0% |
| PHONES Notes Claims: | 0% | 0% | 0% | 0% |

E. ***Will the Trusts provide significant recoveries to Holders of Claims against the Debtors?***

It is impossible for any party to predict with certainty the recoveries, if any, that Holders of Claims may receive from the various litigation and creditors' trusts. Consequently, it is conceivable that certain creditors may only receive the distributions set forth in the chart above. In order for Holders of Non-LBO Lender Claims to receive as much under the Litigation Plan or the Bridge Plan as they are receiving under the Settlement Plan, the proposed litigation and creditors' trusts will need to recover in excess of $521 million[6] (even before taking into account the time value of money) net of litigation expenses, which will likely be significant, or there would need to be a reallocation of such amount from the Holders of Senior Loan Claims to the Holders of Non-LBO Lender Claims. Unbridled post-bankruptcy litigation concerning the LBO-Related Causes of Action will undoubtedly be fact intensive, time consuming and extraordinarily costly. The recoveries from any such litigation are speculative, at best. As a result, the Debtors have concluded that the Settlement Plan, which provides greater up-front recoveries to Holders of Claims, and less back-end litigation risk, cost, delay and uncertainty, is in the best interests of their creditors as a whole.

---

[5] General Unsecured Claims against the Non-Guarantor Subsidiary Debtors represent less than 5% of the aggregate General Unsecured Claims against the Subsidiary Debtors.

[6] Under the Settlement Plan, the aggregate cash distributions to Holders of Senior Noteholder Claims, Other Parent Claims, Convenience Claims and General Unsecured Claims against the Filed Subsidiary Debtors will be approximately $598 million. Of the $598 million in total cash recoveries, $77 million is the "natural" or "base case" recovery, and the remaining $521 million is being provided as settlement consideration by the current Senior Lenders and the Settling Step Two Payees, including $358 million to Holders of Senior Noteholder Claims, $80 million to Holders of Other Parent Claims, and $83 million to Holders of General Unsecured Claims against the Filed Subsidiary Debtors.

F.  *Which plan of reorganization provides the best overall result for Tribune's creditors?*

The Settlement Plan provides for substantial initial distributions to the Debtors' creditors and a significant reduction in post-emergence litigation through fair and reasonable settlements that are in the best interests of the Estates and the parties in interest in these Chapter 11 Cases. Under the Settlement Plan, there are no uncertainties as to the identity of the future owners of Reorganized Tribune, and the market for the New Common Stock will be unclouded by the possibility of unknown owners or future dilution as New Common Stock is released from a "Distribution Trust." The Settlement Plan accounts for the substantial progress that has been made with the Debtors' stakeholders during the Debtors' time in chapter 11, including the valuable input from the Mediator, Judge Kevin Gross. These efforts are lost under the Litigation Plan, which does not resolve any of the LBO-Related Causes of Action or any issues related to the priority of distributions among various creditor constituents. After nearly two years in bankruptcy, Tribune is poised to emerge from chapter 11 with a deleveraged balance sheet. The Debtors believe that the Settlement Plan provides the best outcome for their stakeholders and other parties in interest as a whole.

**For the foregoing reasons, the Debtors urge all Holders of Claims to vote in favor of the Settlement Plan by checking the ACCEPT box on the BLUE Ballot and indicate your preference for the SETTLEMENT PLAN above all other plans.**

Respectfully,

TRIBUNE COMPANY (for itself and on behalf of the other Debtors, as Debtors and Debtors in Possession, and the Guarantor Non-Debtors and Non-Guarantor Non-Debtors)

By: /s/ Donald J. Liebentritt
Name: Donald J. Liebentritt
Title: Co-President, Chief Restructuring Officer, Tribune