**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | Case No. 08-13141 (KJC) |
| | ) | Jointly Administered |
| TRIBUNE COMPANY, *et al.*, | ) | |
| | ) | **Hearing Date: November 29, 2010 at** |
| Debtors. | ) | **10:00 am (ET)** |
| | ) | |
| | ) | **Ref. Docket Nos. 6091, 6183, 6187** |

**OMNIBUS OBJECTION OF THE PRE-LBO DEBTHOLDER PLAN
PROPONENTS TO (I) THE DISCLOSURE STATEMENTS FOR THE
COMPETING PLANS AND (II) THE RESPONSIVE STATEMENTS
FILED BY THE PROPONENTS OF THE COMPETING PLANS**

Aurelius Capital Management, LP, on behalf of its managed entities ("Aurelius"),

Deutsche Bank Trust Company Americas ("Deutsche Bank"), in its capacity as Successor

Indenture Trustee for certain series of Senior Notes, Law Debenture Trust Company of New York

("Law Debenture"), in its capacity as Successor Indenture Trustee for certain series of Senior

Notes, and Wilmington Trust Company, in its capacity as the PHONES Notes Indenture Trustee

("Wilmington Trust" and, together with Aurelius, Deutsche Bank and Law Debenture, the "Pre-

LBO Debtholder Plan Proponents"),[1] by and through their respective undersigned counsel,

hereby file this objection (the "Objection") to the following documents:

(i)     the Specific Disclosure Statement Relating to Joint Plan of Reorganization for
Tribune Company and Its Subsidiaries Proposed by the Debtors, the Creditors' Committee,
Oaktree Capital Management, L.P. ("Oaktree"), Angelo Gordon & Co., L.P. ("Angelo Gordon"),

---

[1] On October 29, 2010, the Pre-LBO Debtholder Plan Proponents filed the Specific Disclosure Statement for the
Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Aurelius Capital Management,
LP, on Behalf of its Managed Entities, Deutsche Bank Trust Company Americas, in its Capacity as Successor
Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of New York, in its Capacity
as Successor Indenture Trustee for Certain Series of Senior Notes, and Wilmington Trust Company, in its Capacity
as Successor Indenture Trustee for the PHONES Notes [Docket No. 6182] (the "Pre-LBO Debtholder Disclosure
Statement") relating to the Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by
Aurelius Capital Management, LP, on Behalf of its Managed Entities, Deutsche Bank Trust Company Americas, in
its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of
New York, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, and Wilmington Trust
Company, in its Capacity as Successor Indenture Trustee for the PHONES Notes [Docket No. 6184] (the "Pre-LBO
Debtholder Plan").

and JPMorgan Chase Bank, N.A. ("JPMorgan") [Docket No. 6091] (the "Debtor/Committee/LBO Lender Disclosure Statement") relating to the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Creditors' Committee, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. [Docket No. 6089] (the "Debtor/Committee/LBO Lender Plan");

      (ii)     the Specific Disclosure Statement For Plan Of Reorganization For Tribune Company and Its Subsidiaries Proposed by Certain Holders of Certain Step One Senior Loan Claims (collectively, the "Step One Lenders") [Docket No. 6183] (the "Step One Lender Disclosure Statement") relating to the Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims [Docket No. 6185] (the "Step One Lender Plan");

      (iii)    the Specific Disclosure Statement for Joint Plan of Reorganization for Tribune and Its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. [Docket No. 6187] (the "Bridge Lender Disclosure Statement" and, together with the Debtor/Committee/LBO Lender Disclosure Statement and Step One Lender Disclosure Statement, the "Disclosure Statements") relating to the Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P., and Marathon Asset Management, L.P. [Docket No. 6186] (the "Bridge Lender Plan" and, together with the Debtor/Committee/LBO Lender Plan and the Step One Lender Plan, the "Competing Plans");[2]

      (iv)    Tribune Company and Its Subsidiary Debtors' Response to Competing Plans of Reorganization [Docket No. 6295, Attachment A] (the "Debtors' Responsive Statement");

      (v)     Responsive Statement of the Creditors' Committee to the Competing Plans [Docket No. 6295, Attachment B] (the "Creditors' Committee's Responsive Statement");

      (vi)    Senior Lender Responsive Statement – For Holders of Tribune Senior Loan Claims [Docket No. 6295, Attachment C] (the "Oaktree/Angelo Gordon/JPMorgan Responsive Statement");

      (vii)   Responsive Statement of Step One Plan Proponents [Docket No. 6292] (the "Step One Lender Responsive Statement") and

      (viii)   Responsive Statement of Bridge Proponents in Respect of Competing Plans in Chapter 11 Cases of Tribune Company and its Subsidiaries [Docket No. 6294] (the "Bridge Lender Responsive Statement" and, together with the Debtors' Responsive Statement, the Creditors' Committee's Responsive Statement, the Oaktree/Angelo Gordon/JPMorgan

---

[2] The Pre-LBO Debtholder Plan Proponents respectfully submit that each of the Competing Plans are patently unconfirmable as a matter of law. However, in light of comments made by this Court at prior hearings, the Pre-LBO Debtholder Plan Proponents do not address herein their confirmation objections to the Competing Plans which are far ranging and include, among other things, violations of the good faith requirements of Bankruptcy Code section 1129(a)(3) and the fair and equitable standard codified in Bankruptcy Code section 1129(b). As such, the Pre-LBO Debtholder Plan Proponents expressly reserve all of their rights to object to each of the Competing Plans on any and all grounds in connection with the confirmation process.

Responsive Statement and the Step One Lender Responsive Statement, the "Responsive Statements").

In support of this Objection, the Pre-LBO Debtholder Plan Proponents[3] respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      In 2007, the board of directors of Tribune Company ("Tribune"), together with the company's officers, a handful of the nation's largest banks and multi-billionaire Samuel Zell, orchestrated one of the most ill-conceived and disastrous leveraged buyouts in the history of Corporate America. The LBO[4] not only rendered the otherwise healthy Tribune entities hopelessly insolvent through their incurrence of over $10.7 billion in loans financed by, among others, JPMorgan, Merrill Lynch & Co. ("Merrill Lynch"), Citicorp North America, Inc. ("Citicorp"), Bank of America N.A. ("Bank of America") and Barclays Bank, PLC, but also precipitated the Debtors' chapter 11 filings less than one year later. Now, Tribune (the alleged fiduciary of pre-LBO creditors) and JPMorgan, two of the architects of the doomed LBO, have "negotiated" a "settlement" with Oaktree and Angelo Gordon, who, together with JPMorgan, allegedly are the largest current Holders of LBO-related debt, and a hopelessly conflicted official creditors' committee (the "Creditors' Committee")[5] to resolve over $10.9 billion in actual and constructive fraudulent conveyance claims related to the LBO and to obtain broad, sweeping

---

[3] Terms not otherwise defined herein shall have the meanings ascribed to such terms in the Pre-LBO Debtholder Plan, except where the context requires such term to have the meaning ascribed thereto in the applicable Competing Plan or Responsive Statement, in which case, such other meaning shall apply.

[4] The "LBO" was consummated in two steps. In connection with "Step One," the ESOP purchased shares of Tribune common stock and Tribune redeemed nearly fifty percent of its outstanding common stock. In order to finance Step One, Tribune and most its subsidiaries entered into the $8.028 billion Senior Loan Agreement. In connection with "Step Two," Tribune merged with an entity wholly-owned by the ESOP and Tribune became wholly owned by the ESOP. Pursuant to Step Two, Tribune and its same subsidiaries borrowed an additional $2.1 billion under the Senior Loan Agreement and $1.6 billion under the Bridge Loan Agreement and used the proceeds thereof to, among other things, redeem the remaining outstanding shares of Tribune's common stock.

[5] It is self-evident, based on the Creditors' Committee's prior opposition to an initial plan proposal from the Debtors, Oaktree and Angelo Gordon, that the members of the Creditors' Committee (other than pre-LBO creditors) had their votes to support the Debtor/Committee/LBO Lender Plan bought through the promise of a full or increased initial recovery.

releases for grossly inadequate consideration at the sole expense of the Debtors' innocent pre-LBO creditors. This self-styled "settlement plan," which ignores substantially all of the findings in the 1,200 page Examiner's Report commissioned by this Court, is nothing of the sort. Rather, it is a brazen attempt by the very targets of the LBO-Related Causes of Action to shield themselves from liability and deprive Holders of pre-LBO debt of their rightful recoveries.

2.       Pursuant to the Debtor/Committee/LBO Lender Plan, in exchange for the release of approximately $8.7 billion of avoidance claims concerning Step One senior loans (approximately $6.6 billion) and Step Two senior loans (approximately $2.1 billion) and more than $1.8 billion in Step One disgorgement claims,[6] a paltry $401 million in plan consideration is to be "redirected" from the LBO lenders to non-LBO creditors. In addition, the Debtor/Committee/LBO Lender Plan proposes an illusory $120 million payment by certain of the participating Step Two arrangers to the Holders of Senior Notes to settle $318 million in Step Two-related disgorgement claims and claims against the arrangers. Indeed, a close review of the Debtor/Committee/LBO Lender Disclosure Statement reveals that up to $108 million of this $120 million "settlement payment" may be recouped by the Step Two arrangers from Litigation Trust proceeds through the Step Two Arranger Litigation Trust Preference. These wholly inadequate settlements contemplate providing non-LBO creditors with nothing more than a sliver of the consideration that they are entitled to receive. Astoundingly, notwithstanding the proposed "settlements" of the Step One and Step Two LBO-Related Causes of Action contained in the Debtor/Committee/LBO Lender Plan, the LBO lenders have paved an avenue that leads them to potentially recoup all of the "settlement" value they are "giving up" to the non-LBO creditors through the LBO lenders' receipt of Litigation Trust Interests under the Debtor/Committee/LBO

---

[6] Disgorgement amounts referenced herein do not include prejudgment interest, which would increase the amount awarded upon successful prosecution of the disgorgement claims.

Lender Plan. The lack of disclosure of the true economics of, and beneficiaries under, the Debtor/Committee/LBO Lender Plan is just the tip of the iceberg of the many inadequacies with Debtor/Committee/LBO Lender Disclosure Statement that are addressed herein and that must be remedied before the Debtor/Committee/LBO Lender Disclosure Statement to be approved.

3.      The Step One Lender Plan is, in many respects, identical to the Debtor/Committee/LBO Lender Plan.[7] The primary difference between the two plans is that the Step One Lender Plan does not propose a settlement of causes of action related to Step Two of the LBO. The Step One Lender Disclosure Statement suffers from many of the same disclosure-related infirmities as the Debtor/Committee/LBO Lender Disclosure Statement. Accordingly, substantially all of the objections contained herein to the Debtor/Committee/LBO Lender Disclosure Statement apply equally to the Step One Lender Disclosure Statement.

4.      The Bridge Lender Plan proposes three mutually exclusive settlements with respect to the LBO-Related Causes of Action against the Step One Lenders, Step Two Lenders and Bridge Loan Lenders. As with the settlements embodied in the Debtor/Committee/LBO Lender Plan, the consideration to be "paid" in exchange for these settlements is grossly inadequate, given the widely acknowledged value and merits of the LBO-Related Causes of Action. If the Bridge Lender Plan settlements are not approved, however, the Bridge Lender Plan reverts to a plan structure that is substantially similar to the Pre-LBO Debtholder Plan. Indeed, the foundation of the Bridge Lender Plan is a prior draft of the Pre-LBO Debtholder Plan that even provides for entities managed by Aurelius Capital Management, LP or its designee to be the Claims Purchaser. Aurelius, however, opposes the Bridge Lender Plan and, for the avoidance of doubt, has not discussed, let alone agreed, to act as the Claims Purchaser under the

---

[7] The Step One Lender Plan proposes to settle all of the potential claims against the Step One Lenders, including claims for equitable subordination or disallowance, for an artificially low settlement payment of $290 million.

Bridge Lender Plan.  In addition, the Bridge Lender Disclosure Statement does not provide

adequate disclosure with respect to, among other things, the treatment of Claims if one or more

of the settlements contemplated by the Bridge Lender Plan fail or how the allocation of value

among Tribune and its subsidiaries was determined.

       5.      The Responsive Statements filed by the proponents of the Competing Plans

evidence self-serving statements that intentionally mislead voting creditors regarding the bona

fides of the Competing Plans and mischaracterize the Pre-LBO Debtholder Plan.  For example,

each of the proponents of the Debtors/Committee/LBO Lender Plan refers to their plan as the

"Settlement Plan" and the Pre-LBO Debtholder Plan as the "Litigation Plan."  As discussed in

detail herein, these self-serving definitions misstate the true characterization of these plans of

reorganization and the use of such terms should not be countenanced by this Court.  Rather, this

Court should order the proponents of each of the proposed plans of reorganization to use the

defined terms contained in this Objection for each of the proposed plans (i.e.,

"Debtors/Committee/LBO Lender Plan," "Pre-LBO Debtholder Plan," "Bridge Lender Plan,"

and "Step One Lender Plan") when referring to such plans in matters relating to these Chapter 11

Cases.

       6.      For all the foregoing reasons, and the additional grounds set forth below, each of

the Disclosure Statements cannot be approved as having adequate information within the

meaning of the Bankruptcy Code section 1125 and the Responsive Statements must be modified

in order to remove misleading and factually incorrect statements.

## OBJECTION

### I.    Objections to Disclosure Statements

7.    Bankruptcy Code section 1125 defines "adequate information" as "information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant Class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). The legislative history to section 1125 of the Bankruptcy Code states that "[t]he disclosure statement was intended by Congress to be the primary source of information upon which creditors and shareholders would make an informed judgment about a plan of reorganization." *In re Jeppson*, 66 B.R. 269, 291 (Bankr. D. Utah 1986). Thus, in determining whether a plan proponent has provided "adequate information" to creditors and parties in interest, the standard is not whether the failure to disclose information would harm creditors but whether "hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take." *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) (emphasis in original).

8.    With four plans to choose from and four disclosure statements to digest, the Debtors' creditors will need to rely, even more than usual, on complete disclosure in order to evaluate and consider their options. *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.,* 337 F.3d 314, 323 (3d Cir. 2003) (noting that "creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan"). As stated by the United States Court of Appeals for the Third Circuit:

"The importance of full disclosure is underlaid by the reliance placed upon the disclosure

statement by the creditors and the court. Given this reliance, we cannot overemphasize the . . .

obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"

*Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988), *cert. denied*,

488 U.S. 967 (1988). Indeed, "the preparing and filing of a disclosure statement is a critical step

in the reorganization of a Chapter 11 debtor [and is] the pivotal concept in reorganization

procedure under the [Bankruptcy] Code." *Id.* at 417. In the absence of honest, full and fair

disclosure, a disclosure statement should not be approved. *See In re Copy Crafters Quickprint,*

*Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988).

9.      As set forth below, it is clear that each of the Disclosure Statements, as currently

proposed, cannot be found to contain "adequate information" pursuant to Bankruptcy Code

section 1125 and, thus, should not be approved absent material modification.

**A.      Objection to the Debtor/Committee/LBO Lender Disclosure Statement**

10.     The Debtor/Committee/LBO Lender Plan proponents have prepared a wholly

inadequate disclosure statement that conceals information necessary to evaluate fully the

Debtor/Committee/LBO Lender Plan. Instead, they have filed a disclosure statement that

misleads the reader with respect to the justification for, and support of, the

Debtor/Committee/LBO Lender Plan, while omitting information critical to establish a fully

informed view of this plan, the "settlements" contemplated therein and the conditions precedent

to confirmation of such plan. Indeed, the Debtor/Committee/LBO Lender Disclosure Statement

is both facially and substantively deficient and, therefore, fails to satisfy the basic disclosure

requirements of Bankruptcy Code section 1125.

11.    In order for the Debtor/Committee/LBO Lender Disclosure Statement to be approved as containing adequate information, it must be revised to address, among other things, the following material omissions:

- **Fails to Disclose Necessary Information Regarding the Settlement of the LBO-Related Causes of Action**:  The Debtor/Committee/LBO Lender Plan is premised, in large part, on the settlement of more than $10.9 billion of LBO-Related Causes of Action for only $521 million in value.  The Debtor/Committee/LBO Lender Plan proponents should disclose information regarding the process by which they reached their "settlements."  This disclosure should include a discussion of the derivation of such settlements as compared to (i) those contained in the term sheet attached to the Mediator's Report [Docket No. 5831] that was executed by and between Oaktree, Angelo Gordon and the Debtors (the "Oaktree/Angelo/Debtor Term Sheet")[8] and (ii) those contained in the term sheet attached to the Second Mediator's Report [Docket No. 5936] that was executed by Oaktree, Angelo Gordon, the Debtors, JPMorgan and the Creditors' Committee (the "Debtor/Committee/LBO Lender Term Sheet").[9]  In connection with the foregoing, for each iteration of these "settlements," the Debtor/Committee/LBO Lender Plan proponents should disclose how the "settlement consideration" in such term sheets and under the Debtor/Committee/LBO Lender Plan is allocated among (i) the different causes of action being "settled" and (ii) the Classes of Claims receiving the settlement proceeds.  In addition, the Debtor/Committee/LBO Lender Disclosure Statement must disclose how much each cause of action being "settled" would potentially be worth to the Debtors' creditors had it not been settled.  The Debtor/Committee/LBO Lender Disclosure Statement also should provide information disclosing which of the Debtors' Estates are providing the settlement consideration (i.e., which of the Debtors' Estates are paying up to $150 million to Subsidiary General Unsecured Creditors).  Without full disclosure of the amount for which each cause of action is being settled, the analyses used in arriving at the settlements and attribution of the consideration provided by the Estates and the settling parties (such as the Step One Selling Stockholders who appear to contribute no consideration whatsoever), it is impossible to evaluate the merits of such settlements.

- **Fails to Explain Why Senior Lenders are Entitled to Recover from the Proceeds of LBO-Related Causes of Action**:  The Debtor/Committee/LBO Lender Plan provides the settling Senior Lenders with interests in both the Litigation Trust and Creditors' Trust established thereunder.  The Debtor/Committee/LBO Lender Plan allocates, after (i) the payment of the $90 million Parent GUC Trust Preference, (ii) repayment of the loan to fund the Trusts and (iii) repayment of the up to $108 million Step Two Arranger Litigation Trust

---

[8] The Oaktree/Angelo/Debtor Term Sheet contemplated a settlement with respect to the Step One LBO-Related Causes of Action for just $328 million in "settlement consideration" and provided for the creation of a Litigation Trust to distribute recoveries from non-settled LBO-Related Causes of Action.  Notably, the Oaktree/Angelo/Debtor Term Sheet did not contemplate any settlements related to Step Two LBO-Related Causes of Action.

[9] The Debtor/Committee/LBO Lender Term Sheet carried over the settlement of Step One LBO-Related causes of action from the Oaktree/Angelo/Debtor Term Sheet and added a partial settlement of the Step Two LBO-Related Causes of Action for a total of approximately $401 million in settlement consideration and a settlement of Step Two disgorgement claims for $120 million in settlement consideration.

Preference, 65% of the proceeds from these Trusts to non-LBO unsecured creditors of Tribune and holders of EGI-TRB LLC Notes and 35% of the proceeds to the Step One and Step Two Lenders. Yet, in their recently filed "responsive statement" Oaktree, Angelo Gordon and JPMorgan state that the LBO-Related Causes of Action "do not have merit" and describe such causes of action as "questionable," "frivolous" and "untenable."[10] Nonetheless, the Debtor/Committee/LBO Lender Plan puts in place an arrangement that permits the LBO lender defendants to share in the proceeds of this litigation. The LBO lenders' sharing in the proceeds of the LBO-Related Causes of Action undercuts the very nature of the LBO related settlements contained in the Debtor/Committee/LBO Lender Plan. The Debtor/Committee/LBO Lender Disclosure Statement fails to explain why LBO lenders should be entitled to any Trust Interests and ignores the irony implicit in the fact that, in order for the LBO lenders to obtain any recovery on these Trust Interests, the LBO-Related Causes of Action <u>will have been successfully prosecuted and, thus, the LBO lenders' Claims should have been avoided, not settled</u>. Put another way, the granting of Trust Interests to the LBO lenders provides clear evidence of two of the gating problems with the Debtor/Committee/LBO Lender Plan: (i) the LBO-Related Causes of Action are substantially more viable than the Debtor/Committee/LBO Lender Plan proponents lead creditors to believe and (ii) the "settlement consideration" provided under the LBO Related Settlements is wholly inadequate. The Debtor/Committee/LBO Lender Disclosure Statement must disclose (i) the rationale for the LBO lenders' receipt of proceeds from the Litigation Trust and Creditors' Trust before all pre-LBO creditors are paid in full, inclusive of amounts equal to postpetition interest, (ii) how the 65%/35% allocation of proceeds was determined and (iii) whether the Senior Lenders are obtaining any benefits from the subordination provisions in the PHONES Notes Indenture or the EGI-TRB LLC Notes under the Debtor/Committee/LBO Lender Plan.

- **<u>Fails to Disclose the Basis for the Allocation of Value among the Tribune Entities and the Terms of the Intercompany Claims Settlement</u>**: The Debtor/Committee/LBO Lender Plan is premised on a total enterprise value for the Tribune entities of $6.75 billion[11] and allocates that value 8.4% (or $564 million) to Tribune and 91.6% (or $6.186 billion) to Tribune's subsidiaries. This allocation of value has a direct bearing on the actual "value" the LBO lenders are truly "paying" for the contrived settlements in the Debtor/Committee/LBO Lender Plan as it dictates the "base-line" or "natural" recovery that pre-LBO creditors would be entitled to absent such settlements. The Debtor/Committee/LBO Lender Disclosure Statement, however, fails to provide any substantive information regarding how this allocation was determined. Rather, the only passing reference to the formulation of this allocation is in the section discussing the terms of a so-called Intercompany Claims Settlement. *See* Debtor/Committee/LBO Lender Disclosure Statement, p. 26 § II.F.4. Although the Intercompany Claims Settlement affects what may be well over $30 billion in Intercompany Claims and has a material impact on creditor recoveries, the terms of the Intercompany Claims Settlement are not disclosed despite the fact the Debtors previously disclosed that they completed their Intercompany Claims review over six months ago. *See* Debtors' April 12, 2010 Disclosure Statement, p. 8

---

[10] Oaktree/Angelo/JPMorgan Responsive Statement, p. 3.
[11] The Pre-LBO Debtholder Plan Proponents raise issues with the adequacy of the disclosure with respect to this proposed valuation below.

[Docket No. 4008] (stating that "[t]he Debtors and their advisors have reviewed the Intercompany Claims"). Instead, the Debtor/Committee/LBO Lender Disclosure Statement states that the terms of the Intercompany Claims Settlement will be withheld until 15 days prior to the deadline for objections to confirmation of the Debtor/Committee/LBO Lender Plan. The only plausible explanation for not disclosing the Intercompany Claims Settlement is to deny creditors, particularly the Pre-LBO Debtholder Plan Proponents, the opportunity to evaluate and challenge the merits of the Intercompany Claims Settlement and the resulting allocations of value upon which the Debtor/Committee/LBO Lender Plan is premised. Indeed, the most "in-depth" disclosure (if it can be so classified) regarding the Intercompany Claims Settlement can be found on page 8 of the Debtor/Committee/LBO Lender Disclosure Statement, which provides: "The review of the [Intercompany Claims] included a focus on (i) the most significant portion of these amounts which arose in the seven years preceding the Petition Date and (ii) amounts related to large, 'one time' transactions . . . . The review resulted in the identification of certain categories of transactions, which were then assessed on both the legal and financial merits in terms of the transaction(s) likely creating Allowed Intercompany Claims." Debtor/Committee/LBO Lender Disclosure Statement, p. 8. Rather than provide adequate and useful information, however, this passage raises even more questions that require further disclosure including, but not limited to:

> ➢      why the review was limited only to prepetition transactions and how, if at all, the Debtor/Committee/LBO Lender Plan addresses postpetition intercompany transactions;

> ➢      why the review was limited to the "seven years preceding the Petition Date;"

> ➢      what the material Intercompany Claims that arose prior to this seven-year period were and how the Debtor/Committee/LBO Lender Plan addresses Intercompany Claims that arose prior to this seven-year period;

> ➢      what the "large, 'one time' transactions" were, the parameters that were utilized for this classification and what Intercompany Claims fall outside of these parameters;

> ➢      what the "categories of transactions" were and what the purpose and effect of these categories were; and

> ➢      what the "legal and financial merits" analyses entailed and what the specific results of such analyses were.

The Debtor/Committee/LBO Lender Disclosure Statement raises the foregoing questions, instead of providing the necessary disclosure for creditors to evaluate these critical aspects of the Debtor/Committee/LBO Lender Plan and the settlements contained therein. Thus, in addition to attaching a copy of the Intercompany Claims Settlement, the Debtor/Committee/LBO Lender Disclosure Statement must also provide answers to the preceding questions and specific detail on how the Debtors' enterprise value is allocated on an entity by entity basis in order to satisfy the "adequate information" standard.

-    **Mischaracterizes the Examiner's Report**: The Debtor/Committee/LBO Lender Disclosure Statement mischaracterizes the Examiner's Report and the findings included therein in an attempt to mislead creditors into believing that the settlements contemplated by

the Debtor/Committee/LBO Lender Plan are supported by the Examiner's extensive findings. In an effort to support the unreasonable settlements of the LBO-Related Causes of Action, the Debtor/Committee/LBO Lender Plan proponents assert that the recovery on account of such settlements – $521 million – is less than the expected recovery for non-LBO creditors in all but 1 of 6 recovery scenarios annexed to the Examiner's Report thus, implying there is only a 1-in-6 chance that fully litigating the LBO-Related Causes of Action would achieve a superior result.[12] The Debtor/Committee/LBO Lender Disclosure Statement fails to disclose that the recovery scenarios annexed to the Examiner's Report represent only a handful of the myriad potential outcomes the Examiner found could result from prosecution of the LBO-Related Causes of Action and bear no relation to the Examiner's conclusions regarding which scenarios are more or less likely to occur. Indeed, the Examiner's Report identified dozens of legal issues regarding the potential LBO-Related Causes of Action and opined on each issue using a range of qualitative probabilities ranging from "highly likely" to "highly unlikely," with steps in between. Among other things, the Examiner concluded that it is "highly likely" that the loans and resulting repayment obligations and guarantees extended as part of Step Two of the LBO constituted avoidable fraudulent conveyances at Tribune, "reasonably likely" that Step Two of the LBO constituted a fraudulent conveyance at the Debtor subsidiaries, and "somewhat likely" that the Tribune entities committed intentional fraud at Step Two of the LBO. While the Examiner found that the Step One loans were less vulnerable than the Step Two loans, he found that Tribune has viable causes of action against the Senior Lenders under each of four alternative definitions of fraudulent conveyance, and that the Senior Lenders also face serious risk of having their Claims equitably subordinated or disallowed. These facts must be disclosed if the Debtor/Committee/LBO Lender Plan proponents are to include any discussion of the Examiner's Report in the Debtor/Committee/LBO Lender Disclosure Statement as a basis for the "reasonableness" of their settlements.

- **Omits a Critical Risk Factor**: The Debtor/Committee/LBO Lender Disclosure Statement omits from the list of "Risk Factors" to confirmation of the Debtor/Committee/LBO Lender Plan the fact that *all* of the settlements contained therein must be approved or the Debtor/Committee/LBO Lender Plan will fail by its express terms. The Debtor/Committee/LBO Lender Disclosure Statement should expressly state which settlements under the Debtor/Committee/LBO Lender Plan must be approved for such plan to be confirmed.

- **Omits Debtor/Committee/LBO Lender Plan Proponents' Claims Holdings**: The Debtor/Committee/LBO Lender Disclosure Statement asserts that three of the Debtor/Committee/LBO Lender Plan proponents (JPMorgan, Oaktree and Angelo Gordon) are the "largest Holders of Senior Loan Claims." Debtor/Committee/LBO Lender Disclosure Statement, p. 3. However, there is no disclosure regarding the type and amount of Claims that are held by each of these proponents. The Debtor/Committee/LBO Lender Plan proponents must disclose with specificity their Step One Lender Claims, Step Two

---

[12] The Debtor/Committee/LBO Lender Disclosure Statement cites to the "litigation recovery amounts" as being derived from the Examiner's Report. *See* Debtor/Committee/LBO Lender Disclosure Statement, p.17 n.32. This example and every other reference to the Examiner's Report are misleading because, among other things, the Examiner used a valuation that is $675 million lower than the $6.75 billion value upon which the Debtor/Committee/LBO Lender Plan is premised.

Lender Claims, Bridge Loan Lender Claims, Swap Claims, Senior Noteholder Claims and all other claims against and interests in the Debtors on an itemized basis. In addition, these proponents should be required to disclose how much they have received in prepetition and postpetition payments (i.e., principal, interest, fees and expenses) on account of their LBO debt holdings so creditors voting on the competing plans have a complete understanding of the exposure these parties face if their plan is not confirmed and the LBO-Related Causes of Action against them are prosecuted. In addition, the Debtor/Committee/LBO Lender Disclosure Statement should disclose any agreements or other arrangements that exist among the proponents of the Debtor/Committee/LBO Lender Plan or among such proponents and third parties with respect to voting for, supporting or not objecting to, the Debtor/Committee/LBO Lender Plan (including any agreement or arrangement that permits, either directly or indirectly, a proponent of the Debtor/Committee/LBO Lender Plan to control the vote of another creditor).

- **Misrepresents Breadth of Creditor Support**: The Debtor/Committee/LBO Lender Disclosure Statement references numerous times that there is broad creditor support for the Debtor/Committee/LBO Lender Plan and the settlements contained therein, implying that the Debtor/Committee/LBO Lender Plan has the support of a diverse group of creditors. *See, e.g.,* Debtor/Committee/LBO Lender Disclosure Statement, p. 19 ("The Debtors' judgment is shared by a cross-section of the creditor constituencies."); *id.,* p. 17 ("[the Plan Settlements have] the support of the Debtors, as well as a diverse group of creditors"). These statements, however, are disingenuous and constitute a mischaracterization of creditor support for the Debtor/Committee/LBO Lender Plan, the settlements contained therein and the general plan-formulation process. To that point, the Debtor/Committee/LBO Lender Disclosure Statement should note that the Debtor/Committee/LBO Lender Plan is opposed by (i) Aurelius, whose managed entities are, collectively, the largest Holders of Senior Notes and one of the largest Holders of PHONES Notes,[13] (ii) all three Indenture Trustees, two of which (Deutsche Bank and Wilmington Trust) are members of the Creditors' Committee, (iii) the Step One Only Lenders and (iv) the Bridge Loan Lenders.

- **Fails to Disclosure the Effect of the Proposed Bar Order**: The Debtor/Committee/LBO Lender Disclosure Statement fails to provide adequate disclosure with respect to the effect of the proposed Bar Order, pursuant to which any judgment obtained by the Litigation Trust and the Creditors' Trust against a non-settling defendant will be reduced by amounts that such non-settling defendant potentially could have recovered for contribution from a settling defendant (collectively, the "Settling LBO Defendants"). While this provision is clearly in the best interest of the Settling LBO Defendants, it is highly unfair to the parties whose recoveries are dependent on the success or failure of these causes of action, such as the pre-LBO creditors and these limitations on recovery must be disclosed.

- **Contains Inadequate Disclosure with Respect to the Unilateral Resolution of the PHONES Notes Dispute**: The Debtor/Committee/LBO Lender Plan unilaterally declares

---

[13] Entities managed by Aurelius Capital Management, LP beneficially own Senior Notes with a face value of approximately $657.7 million and PHONES Notes with a face value of approximately $165.9 million (assuming an Original Principal Amount (as defined in the PHONES Notes Indenture) of $157.00 per PHONES Note).

that the PHONES Notes Claims will be allowed at approximately $761 million, rather than the approximately $1.197 billion asserted by Wilmington Trust, the Indenture Trustee for the PHONES Notes. *See* Debtor/Committee/LBO Lender Plan, § 3.2.9(b) ("The PHONES Notes Claims shall together be deemed Allowed in the aggregate amount of $760,880,790."). Notwithstanding this clear dispute – which the Debtors acknowledge in the General Disclosure Statement – the Debtor/Committee/LBO Lender Plan purports to resolve this issue in favor of the Debtor/Committee/LBO Lender Plan proponents. Among other things, the Debtor/Committee/LBO Lender Disclosure Statement contains no disclosure with respect to how this unilateral resolution was arrived, the basis for the resolution or the effect of the resolution on the Senior Notes who are the beneficiaries of certain subordination provisions with respect to the PHONES Notes. Moreover, the Debtor/Committee/LBO Lender Disclosure Statement must disclose how, based on this resolution, Holders of PHONES Notes will be treated as compared to Holders of Claims arising from PHONES Notes that were exchanged.

- **Contains Inadequate Disclosure Regarding the Treatment of Creditors' Claims**: The treatment of a creditor's claim is an essential component of any disclosure statement. *See In re 183 Lorraine St. Assocs.*, 198 B.R. 16, 28 (Bankr. E.D.N.Y. 1996) ("The purpose of the disclosure statement is to classify claims into groups and to enable these groups of creditors to be fully informed . . . ."). A disclosure statement that fails to provide sufficient claims treatment disclosure must be found to not contain adequate information and must be modified or not approved for solicitation. *See In re Kiklis*, 352 B.R. 355, 359-361 (Bankr. D. Mass. 2006) (holding that a disclosure statement was insufficient in that it did not provide a creditor necessary information regarding the proposed treatment of unsecured claim); *In re Silberkraus*, 253 B.R. 890, 900 (Bankr. C.D. Cal. 2000) (noting court's previous order requiring debtor to make changes to disclosure statement where, among other things, the disclosure statement was not clear with respect to treatment of claims). Indeed, a disclosure statement must inform a creditor, with specificity, (i) what value they are going to get, (ii) when they are going to get it and (iii) what contingencies there are to getting their distribution. *See In re Keisler*, 2009 Bankr. LEXIS 1814, at *10-11 (Bankr. E.D. Tenn. June 29, 2009). In particular, the Debtor/Committee/LBO Lender Disclosure Statement fails to provide adequate information with respect to the treatment of claims under the Debtor/Committee/LBO Lender Plan in the following respects:

  ➢ The Application of the Subordination Rights to "Natural Recoveries": The Debtor/Committee/LBO Lender Disclosure Statement states that the Senior Notes' subordination rights will be upheld, but does not adequately describe the application of creditor subordination rights with respect to the EGI-TRB LLC Notes and the PHONES Notes or describe who will benefit from the subordination and why. *See, e.g.,* Debtor/Committee/LBO Lender Disclosure Statement, pp. 41-44. The Debtor/Committee/LBO Lender Disclosure Statement estimates a recovery of 32.73% for both Senior Noteholder Claims and the Other Parent Claims without explaining how the percentage recoveries for both Classes can be the same when Holders of Senior Noteholder Claims have the benefit of the subordination provisions in the PHONES Notes Indenture and EGI-TRB LLC Notes while Holders of Other Parent Claims (i.e., retiree claims and trade claims) do not. *See id.* pp. 10-11.

➢ The Application of the Subordination Rights to Trust Recoveries:  The language
in the Debtor/Committee/LBO Lender Disclosure Statement must be revised to
clarify (i) the types of Claims entitled to share in the Parent GUC Trust
Preference and (ii) who among the participants in the Parent GUC Trust
Preference will be the beneficiaries of the subordination provisions in the
PHONES Notes Indenture and EGI-TRB LLC Notes.  The
Debtor/Committee/LBO Lender Disclosure Statement is ambiguous because it
contains language that appears to suggest that certain Senior Loan Claims may
be entitled to share in the Parent GUC Trust Preference and all recoveries
allocable to the PHONES Notes Claims and EGI-TRB LLC Notes Claims
through the subordination provisions in the PHONES Notes Indenture and EGI-
TRB LLC Notes.  *Id.*, p. 4, n. 4; p. 11, n. 20, p. 11, n. 21.  To the extent the
Senior Lenders are waiving any rights they may have to assert that they are
entitled to the benefit of these subordination provisions, the
Debtor/Committee/LBO Lender Disclosure Statement and the related plan of
reorganization should expressly state as such.

➢ The Treatment of the Swap Claim:  The classification of the Swap Claim under
the Debtor/Committee/LBO Lender Plan appears to be gerrymandered to
provide an increased recovery on account of such Claim.  The Swap Claim,
which is owned by Oaktree, should be classified with the Senior Loan Claims at
Tribune and the Senior Loan Guaranty Claims at the Subsidiary Debtors, as it
was when the Debtors' filed their initial plan in April.  The
Debtor/Committee/LBO Lender Disclosure Statement states that the respective
minimum recoveries of those Classes are 1.09% and 69.95%, which would yield
an aggregate recovery of approximately 71% on the Swap Claim.  *See id.*, pp.9-
14.  Yet, without explanation for the disparity in treatment (or the departure from
the terms of the Debtors' April plan), the Debtor/Committee/LBO Lender Plan
classifies the Swap Claim as an "Other Parent Claim" (i.e., a general unsecured
claim) at Tribune, while classifying it as a Senior Guaranty Claim at the
Subsidiary Debtors.  *See, e.g.,* Debtor/Committee/LBO Lender Plan §§ 3.2.6;
3.3.3.  This inappropriate classification will result in an inflated recovery of over
100% to Oaktree on account of the Swap Claim, to the detriment of other
creditors at Tribune.  At a minimum, the Debtor/Committee/LBO Lender
Disclosure Statement must explain (i) the differing treatment for the Swap Claim
and (ii) whether the treatment of the Swap Claim as both an Other Parent Claim
against Tribune <u>and</u> a Senior Loan Guaranty Claim against the Subsidiary
Debtors will provide the holder(s) of the Swap Claim with a recovery in excess
of 100%.

➢ The Treatment of Step Two Arrangers' Bridge Loan Claims:  The
Debtor/Committee/LBO Lender Disclosure Statement fails to reveal that
JPMorgan, Merrill Lynch, Citicorp and Bank of America, as holders of Bridge
Loan Claims <u>and</u> LBO defendants, will receive the same treatment as all other
holders of Bridge Loan Claims without being subject to equitable subordination
(which they might be subject to absent the plan-related settlements).  *See*
Debtor/Committee/LBO Lender Plan, § 3.2.4.  Further, the

Debtor/Committee/LBO Lender Disclosure Statement does not disclose that this discriminatory treatment in favor of the Step Two Arrangers is an integral part of the settlements contained in the Debtor/Committee/LBO Lender Plan and if it is not approved, the plan will fail.

➤ The Treatment of MSCS's Claims:  Pursuant to the Debtor/Committee/LBO Lender Plan, the Senior Notes owned by MSCS will be subject to challenge by the Litigation Trust (as well as subject to reduction, disallowance, subordination, set off or counterclaim).  *See id.* § 3.2.5.  The Debtor/Committee/LBO Lender Disclosure Statement does not disclose the treatment of MSCS's Senior Noteholder Claims (*e.g.*, for temporary allowance and/or distribution purposes) in the interim period between the Effective Date and the ultimate adjudication of MSCS's Claims.  The Debtor/Committee/LBO Lender Disclosure Statement must disclose if the initial recovery on account of the MSCS Claims will be reserved or will be distributed to other Holders of Senior Notes and, if reserved, who will receive the reserved value of the MSCS Senior Noteholder Claims that are not allowed.

➤ The Remaining Bridge Loan Reserve:  The Debtor/Committee/LBO Lender Plan provides that holders of Senior Loan Claims will receive a pro rata share of 71.64% of the Remaining Bridge Loan Reserve and that holders of Senior Noteholder Claims will receive a Pro Rata share of 23.51% of the Remaining Bridge Loan Reserve.  *See id.*, §§ 3.2.3; 3.2.5.  The Debtor/Committee/LBO Lender Disclosure Statement must disclose the basis for these percentage splits.

• **Lacks Adequate Disclosure With Respect to the Trust "Preferences"**:  The Trust structure described in the Debtor/Committee/LBO Lender Disclosure Statement provides two distribution preferences:  (i) the Parent GUC Trust Preference and (ii) the Step Two Arranger Litigation Trust Preference in favor of the Step Two Arrangers who "backstop" the $120 million Step Two/Disgorgement Settlement.  However, calling the Parent GUC Trust Preference a "preference" is a misnomer because it may be subordinate to the Step Two Litigation Preference.  Although the Debtor/Committee/LBO Lender Disclosure Statement misleadingly cites as justification for the settlements that the Parent GUC Trust Preference entitles non-LBO lender creditors at Tribune to receive the "first" $90 million realized from Net Creditors' Trust Proceeds and Net Litigation Trust Proceeds, in fact, up to the first $108 million of Litigation Trust proceeds may go to the Step Two Arrangers, who have a higher priority preference in the form of the Step Two Arranger Litigation Trust Preference.  *See* Debtor/Committee/LBO Lender Disclosure Statement, § II.A.  The Debtor/Committee/LBO Lender Disclosure Statement should be revised to clarify this point.  Additionally, in order to understand the Parent GUC Trust Preference, the Step Two Arranger Litigation Trust Preference and other Trust issues adequately, disclosure regarding the following is required:  (i) the exposure of each of JPMorgan, Merrill Lynch, Citicorp and Bank of America, as Step Two Arrangers; (ii) the Step Two Arranger backstop fee, if any; (iii) the Step Two Arrangers' allocable share of the $318 million that would be subject to disgorgement absent the Step Two/Disgorgement Settlement in the Debtor/Committee/LBO Lender Plan; (iv) the justification for including Holders of EGI-TRB LLC Notes Claims in the Parent GUC Trust Preference, which appears to be for the benefit of non-LBO creditors as the EGI-TRB LLC

Notes were issued in connection with the LBO; and (v) whether the Bridge Loan Lender Claims will be entitled to receive Trust proceeds.

- **Contains Inadequate Disclosure on Releases and Exculpation**: The Debtor/Committee/LBO Lender Disclosure Statement provides inadequate disclosure on the proposed releases and exculpation contained in the Debtor/Committee/LBO Lender Plan. The Debtor/Committee/LBO Lender Plan grants broad, sweeping releases and exculpation to a veritable laundry list of parties in exchange for woefully inadequate consideration and, in certain instances, no consideration at all. The Debtor/Committee/LBO Lender Disclosure Statement provides limited detail on, and almost no justification for, such releases and exculpation, nor does it specify the consideration each released or exculpated party is providing. This information must be included for the Debtor/Committee/LBO Lender Disclosure Statement to be approved.

- **Additional Plan Settlement Disclosure Issues**: In order to satisfy the adequate disclosure requirement, the Debtor/Committee/LBO Lender Disclosure Statement also must be modified to provide additional disclosure regarding the following issues:

  - ➢ <u>Valuation</u>: Annex F to the General Disclosure Statement includes a valuation prepared by Lazard, the Debtors' financial advisor. This valuation is qualified by, among other things, the statement that the valuation "does not purport to be a complete description of the analyses performed by Lazard. The preparation of a valuation estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in particular circumstances . . . . In performing these analyses, Lazard and the Debtors made numerous assumptions with respect to industry performance, business and economic conditions and other matters." General Disclosure Statement, Ex. F, pp. 6-7. The Debtors should be required to disclose all analyses performed by Lazard as well as the various determinations and assumptions made by Lazard and the Debtors in connection with the preparation of the valuation.

  - ➢ <u>Intentional Fraudulent Conveyances</u>: The Debtor/Committee/LBO Lender Plan provides that constructive fraudulent transfer claims against the Step Two Selling Shareholders will be transferred to the Creditors' Trust but excludes claims for intentional fraudulent conveyance against the Step Two Selling Shareholders from the Creditors' Trust. The Debtor/Committee/LBO Lender Disclosure Statement should explain why the Creditors' Trust assets do not include these claims and causes of action.

  - ➢ <u>Pre-Effective Date Settled Claims</u>: The Debtor/Committee/LBO Lender Disclosure Statement provides that "Preserved Causes of Action do not include any claims, causes of action, suits or proceedings that are settled on or prior to the Effective Date." Debtor/Committee/LBO Lender Disclosure Statement, p. 21 n. 36. The Debtor/Committee/LBO Lender Disclosure Statement does not, however, disclose how the proceeds of such settlements will be distributed to creditors under the Debtor/Committee/LBO Lender Plan. This information must be included in the Debtor/Committee/LBO Lender Disclosure Statement.

➢ Preference Claims:  The Debtor/Committee/LBO Lender Disclosure Statements fails to provide any information regarding the disposition of preference claims and other chapter 5 claims that are not otherwise subsumed within the claims and causes of action settled or transferred to the Trusts under the Debtor/Committee/LBO Lender Plan.  The Debtor/Committee/LBO Lender Disclosure Statement must disclose who will prosecute these claims and causes of action following the Effective Date and who the beneficiaries of such claims and causes of action will be.

➢ Postpetition Interest:  The Debtor/Committee/LBO Lender Disclosure Statement fails to disclose that the Debtor/Committee/LBO Lender Plan provides that postpetition interest may be paid to Senior Loan Guaranty Claims, notwithstanding the fact that such Claims are unsecured and the Debtors are insolvent, nor does it explain the entitlement to such interest.  *See*, *e.g.*, Debtor/Committee/LBO Lender Plan, § 3.3.3.  Further, the Debtor/Committee/LBO Lender Disclosure Statement fails to disclose why pre-LBO creditors are not entitled to the equivalent of postpetition interest from Trust proceeds, but that the LBO lenders are entitled to such amounts.  *See*, *e.g.*, *id.*, § 7.2.2(b) ("no Holder of an Allowed General Unsecured Claim shall receive post-petition interest").  Appropriate disclosure on these issues is required.

➢ Assumed Indemnity and Guaranty Obligations:  The Debtor/Committee/LBO Lender Plan provides that the Debtors' indemnification or guaranty obligations contained in (i) that certain Indemnity Agreement between CSC Holdings, Inc., NMG Holdings, Inc. and Tribune dated July 29, 2008, (ii) that certain Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Credit Agreement Loans (as defined therein) and the Private Placement Notes (as defined therein) and (iii) that certain Subordinated Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Loans (as defined therein) shall continue in full force and effect.  *See id.*, § 5.8.2.  The Debtor/Committee/LBO Lender Disclosure Statement must disclose (i) the parties to these agreements, (ii) the exact nature and scope of the Debtors' indemnification and guaranty obligations pursuant to these agreements, (iii) the beneficiaries of these indemnification and guaranty obligations and (iv) the rationale for the postpetition assumption of these agreements.

➢ Claims Objections:  The Debtor/Committee/LBO Lender Disclosure Statement fails to disclose the mechanism for claims objections, i.e., who will prosecute claims objections and how the claims objection process will interface with the operation of the Trusts and Reorganized Tribune.

**B.      Objection to the Step One Lender Disclosure Statement**

12.     The Step One Lender Disclosure Statement suffers from many of the same

disclosure-related infirmities as the Debtor/Committee/LBO Lender Disclosure Statement, in

large part because the Step One Lender Plan is a carbon copy of the Debtor/Committee/LBO

Lender Plan in most respects.  Accordingly, all of the aforementioned objections to the

Debtor/Committee/LBO Lender Disclosure Statement apply equally to the Step One Lender

Disclosure Statement except for the limited number of objections that are specific solely to the

Debtor/Committee/LBO Lender Disclosure Statement, such as the Step Two/Disgorgement

Settlement, the breadth of creditor support, the Trust "preferences," the disposition of proceeds

from additional pre-Effective Date settled Claims and the payment of $6 million to individual

Creditors' Committee members.  In addition, the Step One Disclosure Statement also suffers

from the following defects:

- **Releases**:  The Step One Lender Disclosure Statement fails to provide adequate disclosure of the parties being released under the Step One Lender Plan.  Accordingly, the Step One Lender Disclosure Statement should disclose that the Step One Lender Plan provides releases to certain Step Two Stockholders and it must clarify whether any Step One shareholders are receiving releases.

- **Step Two LBO-Related Causes of Action**:  The Step One Lender Disclosure Statement states that "[t]he Step One Lender Plan creates a Litigation Trust to pursue Step Two LBO-Related Causes of Action as to which the court-appointed Examiner found to have a prospect of success of fifty percent or better."  Step One Lender Disclosure Statement, § IV.A.1.  The Step One Lender Disclosure Statement should disclose each specific Step Two LBO-Related Cause of Action that would be transferred to the Litigation Trust.

**C.      Objection to the Bridge Lender Disclosure Statement**

13.     The primary fault with the Bridge Lender Disclosure Statement is that it

inadequately discloses the treatment and expected recoveries for Classes of Claims under the

Bridge Lender Plan if one or more of the three plan settlements contemplated by the Bridge

Lender Plan is not approved by the Bankruptcy Court. In addition, the Bridge Lender Disclosure

Statement also must provide additional disclosure regarding the following:

- **Releases**: The Bridge Lender Disclosure Statement provides inadequate disclosure on the proposed releases provided for under the Bridge Lender Plan. The Bridge Lender Disclosure Statement must (i) thoroughly detail these releases and the effect such releases will have on creditors, (ii) set forth the legal and factual justification for such releases, and (iii) disclose the consideration each released or exculpated party is providing.

- **Creditors' Trust Interests**: The Bridge Lender Disclosure Statement should disclose whether the Bridge Lenders would still receive the Creditors' Trust Interests if the Step Two Lender Settlement is not approved.

- **Disgorgement**: The Bridge Lender Plan provides that all current and former Holders of Step One Senior Loan Claims and all Loan Agents and advisors that received payments in respect of such Claims or in connection with the incurrence of obligations in respect of the LBO by the Debtors prior to the Effective Date (whether on account of principal, interest, fees, expenses or otherwise) may be required to disgorge such amounts based on the final resolution of the Litigation Trust Causes of Action. This potential disgorgement appears to contradict the terms of the settlements contemplated in the Bridge Lender Plan. The Bridge Lender Disclosure Statement should disclose whether approval of the settlements would render such disgorgement inapplicable.

- **Subordination**: The Bridge Lender Disclosure Statement should disclose why, in the event the Step Two Lender Settlement is approved, the Holders of Other Parent Claims recover 58.7% versus the 58.5% recovered by Holders of Senior Noteholder Claims, given that the Holders of Senior Notes are entitled to the benefit of the subordination provisions of the PHONES Notes Indenture and EGI-TRB LLC Notes but the Holders of Other Parent Claims are not entitled to such benefit. Additionally, the Bridge Lender Disclosure Statement should disclose, under the settlements contemplated by the Bridge Lender Plan, the basis for Holders of PHONES Notes Claims to receive and retain consideration before the Holders of Senior Noteholder Claims are paid in full on account of their prepetition Claims, which is inconsistent with the subordination provisions of the PHONES Notes Indenture.

- **Trusts Structure and Governance**: The Bridge Lender Disclosure Statement does not disclose (i) the composition of, and the procedures for selecting, the Creditors' Trust Advisory Board, the Distribution Trust Advisory Board and the Liquidation Trust Advisory Board and (ii) the procedures for selecting the Creditors' Trustee, the Distribution Trustee and the Liquidation Trustee. These disclosures are required.

- **Claims Purchaser**: The Bridge Lender Disclosure Statement should disclose that Aurelius has not agreed to be the Claims Purchaser as contemplated in the Bridge Lender Plan. *See id.*, §1.1.37.

- **Intercompany Claims**: The Bridge Lender Plan provides that "Intercompany Claims shall be Allowed Claims against Tribune in the aggregate amount of $31.329 billion." *Id.*, §3.2.10. The Bridge Lender Disclosure Statement should disclose how the Bridge Lenders determined this amount as well as their allocation of this amount among each of the Debtors and their non-Debtor affiliates.

- **Allocation of Value**: The Bridge Lender Disclosure Statement submits that the "Plan Settlements are, to varying extents, predicated on the Debtors having total DEV of $6.75 billion (with $5.825 billion, or 86.3%, allocated to the Filed Subsidiary Debtors and the remaining $925 million, or 13.7%, allocated to Tribune)." Bridge Lender Disclosure Statement, p. 5. The Bridge Lender Disclosure Statement should disclose the basis for the allocation of value between the Filed Subsidiary Debtors and Tribune.

## II.    Objections to Responsive Statements

14.    As set forth in detail below, the Responsive Statements filed by the proponents of the respective Competing Plans contain numerous inaccurate and misleading statements. These material misrepresentations must be corrected before the competing Disclosure Statements and accompanying Responsive Statements are provided to creditors in connection with the plan solicitation process.

### A.    Objections to the Debtors' Responsive Statement

15.    The following inaccurate and misleading statements in the Debtors' Responsive Statement must be corrected:

- **Use of Misleading and Self-Serving Terms to Define the Competing Plans**: The proponents of the Debtor/Committee/LBO Lender Plan refer, in their respective Responsive Statements, to their plan as the "Settlement Plan" and the Pre-LBO Debtholder Plan as the "Litigation Plan." *See* Debtors' Responsive Statement; p. 1; Creditors' Committee Responsive Statement, p. 1; Oaktree/Angelo/JPMorgan Responsive Statement, p. 1. The Debtors and their co-proponents appear to believe that they gain a tactical advantage before this Bankruptcy Court and with creditors entitled to vote on the respective plans by mischaracterizing the competing plans of reorganization in this fashion. Indeed, the Debtor/Committee/LBO Lender Plan, like the Pre-LBO Debtholder Plan, contemplates the establishment of a Litigation Trust and Creditors' Trust to pursue the viable LBO-Related Causes of Action following the Debtors' emergence from chapter 11. The Pre-LBO Debtholder Plan Proponents object to the terms used to describe these plans and respectfully submit that the Bankruptcy Court should order the various plan proponents to refer to each of the plans on file in these cases appropriately. In that regard, the Pre-LBO Debtholder Plan Proponents propose that each of the respective plan proponents be ordered to use the defined terms contained in this Objection (i.e., Debtor/Committee/LBO Lender Plan, Step One

21

Lender Plan, Bridge Lender Plan and Pre-LBO Debtholder Plan) for each of the plans and for all purposes related to these Chapter 11 Cases.

- **Overstates the Amount of Settlement Consideration Provided to Senior Noteholders**: The Debtors incorrectly assert that, under the Debtor/Committee/LBO Lender Plan, Holders of Allowed Senior Noteholder Claims will receive $420 million in cash to settle certain LBO-Related Causes of Action. *See* Debtors' Responsive Statement, p. 2. This statement, however, obscures (perhaps intentionally) the fact that the $420 million of purported "settlement" consideration includes recoveries that Senior Noteholders will receive – irrespective of any settlement – as part of their "natural" or "baseline" recovery. The proper amount of such baseline recovery and the resulting "settlement" recovery must be identified so as to prevent the "settlement" from being overstated.

- **The Recovery Table Contains a Number of Inaccuracies**: The recovery chart included in the Debtors' Responsive Statement contains a number of errors. *See id.*, p. 5. First, the comparison in purported recoveries under the Debtor/Committee/LBO Lender Plan as compared to the Pre-LBO Debtholder Plan is "apples to oranges" and, therefore, extremely misleading. Specifically, the Debtor/Committee/LBO Lender Plan presupposes that the Bankruptcy Court both enforces the sharing provisions in the Senior Loan Agreement and determines that the PHONES Notes Claims should be allowed in the amount of approximately $760 million. However, when showing recoveries under the Pre-LBO Debtholder Plan, the Debtors assume that neither of these issues is resolved prior to the Debtors' emergence from chapter 11. The Debtors should revise the recovery chart to show the numbers in table 1 of the Pre-LBO Debtholder Disclosure Statement to reflect a correct "apples to apples" comparison of creditor recoveries. Second, the Debtors' table fails to show the range of recoveries under the Pre-LBO Debtholder Plan for Step One Lender Claims and Step Two Lender Claims. As set forth in the Pre-LBO Debtholder Disclosure Statement, such Claims could in fact receive a recovery in excess of 38% in the Initial Distribution alone. Third, the Debtors' table fails to show recoveries under the Pre-LBO Debtholder Plan for Holders of Other Parent Claims and Other Guarantor Debtor Claims electing to exercise their respective Put Options. As set forth in the Pre-LBO Debtholder Disclosure Statement, by exercising the Put Option, such Holders can substantially increase their recoveries at emergence. Fourth, the Debtors' table fails to disclose how the Swap Claim is being treated under the various plans. The Debtors must disclose how the Swap Claim is being treated under their plan and how, if at all, the classification of the Swap Claim will affect recoveries for the other Classes of Claims.

- **Lacks Adequate Disclosure With Respect to the First $90 Million of Trust Proceeds "Relinquished" by the Senior Lenders**: The Debtors state that the "first $90 million realized from the Trusts" will be distributed to Holders of Allowed non-LBO lender Claims against Tribune. *See id.*, pp. 2, 4. This assertion may be incorrect because up to the first $108 million of proceeds related to Step Two disgorgement from the Litigation Trust will be distributed to the Step Two Arrangers as a result of the Step Two Arranger Litigation Trust Preference.

- **Lacks Adequate Disclosure Regarding the Application of the Creditor Subordination Provisions to Other Parent Claims**: The Debtors state that Holders of Senior Noteholder Claims and Other Parent Claims will both receive an initial 32.73% recovery under the Debtor/Committee/LBO Lender Plan. *See* Debtors' Responsive Statement, p. 2. As noted above, this treatment plainly violates the contractual subordination provisions in the PHONES Notes Indenture and EGI-TRB LLC Notes of which the Holders of Senior Noteholder Claims, but not Holders of Other Parent Claims, are beneficiaries. The Debtors have either disregarded these subordination provisions entirely or improperly allowed Other Parent Claims to benefit from such provisions. In either case, the Debtors must explain how they are applying the subordination provisions to Other Parent Claims and why such Claims receive the same recovery as Senior Noteholder Claims.

- **Misleads Creditors on Future Ownership of Reorganized Tribune**: The Debtors assert that the non-LBO debtholder beneficiaries of the Litigation Trust Causes of Action will, at best, be minority owners in Reorganized Tribune pursuant to the Pre-LBO Debtholder Plan. *See* Debtors' Responsive Statement, p. 3. What the Debtors fail to disclose, however, is any information regarding any single creditor being anything other than a minority shareholder in Reorganized Tribune under the Pre-LBO Debtholder Plan. Indeed, to the extent the LBO-Related Causes of Action against the Senior Lenders are successful, Holders of non-LBO debt will own more than 33% of the equity in Reorganized Tribune and, collectively, may be the constituency in these cases with the largest stake in the Reorganized Debtors. The Debtors should make this disclosure accurate.

- **Lacks Adequate Disclosure with Respect to the Debtors' Co-Proponents**: The Debtors assert that the Debtor/Committee/LBO Lender Plan is supported by "three diverse groups of constituents." Debtors' Responsive Statement, p. 3. This statement is misleading for several reasons. First, while the Creditors' Committee is, in theory, supposed to be a fiduciary for all general unsecured creditors, the Creditors' Committee in these Chapter 11 Cases is, as set forth above, hopelessly conflicted and the full Creditors' Committee does not support the Debtor/Committee/LBO Lender Plan. *See supra*, Preliminary Statement, p. 3. At a minimum, the Debtors must disclose that the two pre-LBO debtholder representatives on the Creditors' Committee – Wilmington Trust and Deutsche Bank – do not support the Debtor/Committee/LBO Lender Plan and are, in fact, co-proponents of the Pre-LBO Debtholder Plan. Second, the Debtors should explain why they refer to Aurelius, the proponents of the Step One Lender Plan and the proponents of the Bridge Lender Plan all as hedge funds, but neglect to state that two of their co-proponents – Oaktree and Angelo Gordon – are also hedge funds. Third, the Debtors fail to disclose that their co-proponents – JPMorgan, Oaktree and Angelo Gordon – are three of the primary targets in the LBO litigation and, therefore, have every incentive to settle the LBO-Related Causes of Action. Thus, despite the facade of broad creditor support, the proponents of the Debtor/Committee/LBO Lender Plan in fact have narrow self-interested goals and certainly are not acting in the best interests of all stakeholders. *See* Debtors' Responsive Statement, p. 3.

- **Mischaracterizes Numerous Features of the Pre-LBO Debtholder Plan**: The following mischaracterizations of the Pre-LBO Debtholder Plan must be corrected:

➢ Form of Consideration to be Received by Creditors: The Debtors incorrectly state that "each Class of creditors of the Debtors will receive only its minimum entitlement in the form of cash, new common stock and a new loan . . . ." under the Pre-LBO Debtholder Plan. *Id.*, p. 3. This statement is wrong. Several Classes of creditors (*e.g.*, Other Guarantor Debtors, Other Non-Guarantor Debtors, Other Parent Claims) will receive all cash distributions or the option to receive all cash distributions upon the Effective Date of the Pre-LBO Debtholder Plan. In addition, under the Pre-LBO Debtholder Plan, all Classes of creditors will have the opportunity to receive a full recovery on their Claims.

➢ Unsubstantiated Comments About Cost and Delay of Litigation: The Debtors make numerous baseless, unsupported assertions regarding the duration and cost of the litigation relating to the LBO-Related Causes of Action. *See id.*, pp. 4, 6. While the LBO-related litigation could be lengthy and costly, it is also equally possible that, if the LBO-Related Causes of Action are allowed to go forward, then the defendants in those litigations could agree to settle at a price that is reasonable and fair to pre-LBO creditors. In such a scenario, the length and cost of the LBO-related litigation would be minimal. Moreover, the cost to the Debtors' Estates of the litigation is capped at the $40 million contribution to the Distribution Trust. Unlike a scenario in which the LBO-Related Causes of Action proceeded during the pendency of the Chapter 11 Cases, the cost to the Debtors' Estates of such litigation is finite. Nobody can know, with certainty, what the length of the LBO-related litigation will be and, therefore, the Bankruptcy Court should not allow the Debtors and LBO defendants to engage in rank speculation about the duration and costs of such litigation for the obvious purpose of artificially influencing the voting creditors.

➢ Misrepresentation of Issue Resolution: The Debtors allege that the Pre-LBO Debtholder Plan does not resolve any of the critical issues in these Chapter 11 Cases. *See id.*, p. 4. To the contrary, the Pre-LBO Debtholder Plan resolves *the most critical issue* of these Chapter 11 Cases – namely, the Pre-LBO Debtholder Plan provides the only viable path for the Debtors to emerge from chapter 11 in a timely fashion while ensuring that each creditor will receive its just and proper recovery on account of its Claims.

➢ Inaccurate Statements Regarding Extent of Litigation Success: The Debtors incorrectly state that in order for "Holders of Non-LBO Lender Claims to receive as much under the [Pre-LBO Debtholder Plan] . . . as they are receiving under the [Debtor/Committee/LBO Lender Plan], the proposed litigation and creditors' trusts will need to recover in excess of $521 million . . . *net of litigation expenses* . . . ." *Id.*, p. 6 (emphasis added). Under the Pre-LBO Debtholder Plan, the Debtors' Estates will provide the Distribution Trust with a one-time grant of $40 million for the prosecution of causes of action transferred to the respective Trusts thereunder, with any excess funding being returned to Reorganized Tribune. As noted above, this initial funding is a limit on the Estates' funding requirements of all causes of action to be prosecuted by the Trusts after the Debtors emerge from chapter 11. This is in contrast to where, as

is the norm, LBO-related causes of action and other claims are prosecuted during the chapter 11 cases, in which circumstance, the debtors are exposed to unlimited funding obligations. Moreover, the Pre-LBO Debtholder Plan Proponents submit that $521 million is an easily achievable threshold and that the LBO-Related Causes of Action will result in substantially greater recoveries to non-LBO creditors than is contemplated by any of the Competing Plans.

> Misrepresentation Regarding Dilution of New Common Stock: The Debtors suggest, without any explanation, that the release of New Common Stock from the Distribution Trust will have a dilutive effect on stock trading in the market. *See id.*, p. 7. There is no difference from a dilution perspective between the New Common Stock and the New Warrants. Moreover, once the New Warrants (or New Common Stock if New Warrants are converted) are distributed by the Distribution Trust to holders of Distribution Trust Interests, the rightful recipients will receive the plan consideration to which they are otherwise entitled and, thus, there will have not be a dilutive effect.

**B.    Objections to the Creditors' Committee Responsive Statement**

16.    The Creditors' Committee's Responsive Statement is replete with many of the same misleading and inaccurate statements found in the Debtors' Responsive Statement. Specifically, the Creditors' Committee's Responsive Statement: (i) uses misleading and self-serving terms to define the competing plans of reorganization; (ii) lacks adequate disclosure with respect to the co-proponents of the Debtor/Committee/LBO Lender Plan; (iii) lacks adequate disclosure with respect to the first $90 million of trust proceeds "relinquished" by the Senior Lenders; (iv) mischaracterizes the findings of the Examiner's Report; [14] and (v) includes a recovery table that is inaccurate and contains a number of misleading statements. *See generally* Creditors' Committee Responsive Statement, pp. 1-4. For the reasons set forth above in section II.A of this Objection, each of these misrepresentations and errors must be corrected.

17.    In addition to the foregoing, the Creditors' Committee's Responsive Statement contains several additional statements that are inaccurate or misleading which must be rectified:

•    **Mischaracterizes which Classes Are Entitled to Receive Initial Distributions**: The Creditors' Committee incorrectly states that, under the Debtor/Committee/LBO Lender Plan,

---

[14] *See supra*, Part I.A, pp. 11-12.

non-LBO Creditors will receive "significant and fixed recoveries immediately upon the effectiveness" of said plan. *See* Creditors' Committee's Responsive Statement, p. 2. However, Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims are not entitled to any initial distributions under the Debtor/Committee/LBO Lender Plan. Furthermore, the Creditors' Committee incorrectly states that the only absolute and assured recovery to the Senior Noteholder Claims in the Pre-LBO Debtholder Plan is 4.3%, when in fact it is 4.8%. *See id.*, p. 4.

- **Grossly Misstates Recoveries for Senior Lenders**: The Creditors' Committee states that, under the Pre-LBO Debtholder Plan, there is "a very real risk, initial distributions to all Senior Lenders would be 0.00%." *Id.*, p. 2, n. 1.   This statement is completely false. As set forth in the Pre-LBO Debtholder Disclosure Statement, Step One Lender Claims are guaranteed – irrespective of the outcome of the LBO-Related Causes of Action or the Senior Loan Claim Sharing Resolution –a recovery of at least 34.2% and up to 38.7% on account of their Initial Distribution and will receive such recovery on the Initial Distribution Date.[15] Furthermore, Step Two Lenders are guaranteed – again, irrespective of the outcome of the LBO-Related Causes of Action – a recovery of at least 34.2% and up to 38.7% in their Initial Distribution if the Senior Loan Claim Sharing Resolution is adjudicated in favor of the Step Two Lenders.[16]

- **Mischaracterizes Numerous Features of the Pre-LBO Debtholder Plan**:

  ➢ Likelihood of Success in Litigation: The Creditors' Committee asserts, without any basis, that the Put Options reflect a "more indicative measure of expected value to unsecured creditors." Creditors' Committee's Responsive Statement, p. 4. It is stunning that the Creditors' Committee – the statutory fiduciary representative for all unsecured creditors and the members of which are proposed to advise the Trusts to be established under the Debtor/Committee/LBO Lender Plan – would suggest that causes of action to be put into the Trusts will yield a recovery to general unsecured creditors of between 15% to 25%. The purpose of the Put Options, as the Creditors' Committee well knows, was to give trade creditors the opportunity to receive a greater Initial Distributions if they did not want to hold Trust Interests. If the Creditors' Committee, in fact, believes that the Put Options represent the value of the LBO-Related Causes of Action, what other evidence is needed to demonstrate that the Creditors' Committee and its members (other than Wilmington Trust and Deutsche Bank) should have nothing to do with the Trusts established under the Debtor/Committee/LBO Lender Plan?

  ➢ Legality of the Put Options: The Creditors' Committee asserts, without any explanation, that there may be a dispute as to whether the Put Options are legally permissible. *See id.*, p. 5, n. 4. The Creditors' Committee needs to provide a legal basis for its bald, unsupported allegation.

---

[15] *See* Pre-LBO Debtholder Disclosure Statement, Part III.
[16] *See id.*

26

18.     The Creditors' Committee is doing a great disservice to the Debtors' general unsecured creditors by recommending that they vote against the Pre-LBO Debtholder Plan. If a Class of general unsecured creditors votes against the Pre-LBO Debtholder Plan, then any such Class will lose the right to exercise its Put Option if the Pre-LBO Debtholder Plan is confirmed. If the Creditors' Committee were truly interested in serving as a fiduciary, then it would recommend that the Debtors' general unsecured creditors vote for both the Pre-LBO Debtholder Plan and the Debtor/Committee/LBO Lender Plan.

**C.      Objection to the Oaktree/Angelo Gordon/JPMorgan Responsive Statement**

19.     Not surprisingly, the Oaktree/Angelo Gordon/JPMorgan Responsive Statement contains many of the same misrepresentations that are found in the Debtor/Committee/LBO Lender Disclosure Statement and the Responsive Statements filed respectively by the Debtors and the Creditors' Committee. Specifically, the Oaktree/Angelo Gordon/JPMorgan Responsive Statement: (i) uses misleading and self-serving terms to define the Competing Plans; (ii) fails to explain why Senior Lenders are entitled to recover from the proceeds of the LBO-Related Causes of Action;[17] (iii) makes numerous baseless, unsupported assertions regarding the duration and cost of the litigation relating to the LBO-Related Causes of Action; [18] (iv) grossly misstates

---

[17] *See supra*, Part I.A., pp. 9-10.
[18] It is also important to note that, under the Pre-LBO Debtholder Plan, distributions of trust proceeds may be made on a rolling basis as issues are resolved through settlement or litigation. The allegation made by Oaktree, Angelo Gordon and JPMorgan that trust proceeds will not be distributed "until each and every LBO-Related Cause of Action . . . has been fully and finally litigation, appealed, and resolved" is contrary to the explicit provisions of the Pre-LBO Debtholder Plan. *See* Oaktree/Angelo Gordon/JPMorgan Responsive Statement, p. 3.

recoveries for Senior Lenders;[19] (v) mistakenly states that creditors (including the Senior

Lenders) bear the costs of the Litigation Trust; and (vi) includes a recovery table that is

inaccurate and contains a number of misleading statements.[20] *See generally id.*, pp 1-5. For the

reasons set forth above in sections II.A and II.B of this Objection, each of these

misrepresentations and errors must be corrected.

20.    In addition to the foregoing misrepresentations, the Oaktree/Angelo

Gordon/JPMorgan Responsive Statement contains several additional statements that are self-

serving, inaccurate or misleading and must be modified or eliminated:

- **<u>Self-Serving Statements Regarding Viability of Litigation</u>**: The Senior Lenders
conveniently describe the LBO-Related Causes of Action (of which they are among the
primary targets) as "bet the farm litigation," "frivolous" and "untenable." *Id.*, p. 3. The
Senior Lenders fail to disclose, however, that the Bankruptcy Court authorized the Creditors'
Committee to commence such litigation because, among other things, the Bankruptcy Court
and others (including, without limitation, the Examiner) determined that the LBO-Related
Causes of Action are colorable. Moreover, depending upon the success of the LBO-Related
Causes of Action, pre-LBO creditors could very well obtain *full recoveries*. Oaktree, Angelo
Gordon and JPMorgan should be required to disclose those undisputed facts. In addition, if
Oaktree, Angelo Gordon and JPMorgan truly believe that the LBO-Related Causes of Action
are "frivolous" and "untenable" they should be required to disclose in their Responsive
Statement why (i) they did not object to the Creditors' Committee's motion for standing to
commence the LBO-Related Causes of Action and (ii) they are insisting on receiving
Litigation Trust Interests under the Debtor/Committee/LBO Lender Plan.

---

[19] Oaktree, Angelo Gordon and JPMorgan incorrectly state that the Pre-LBO Debtholder Plan provides only
"negligible (if any) initial distributions to creditors (including Senior Lenders) and that "it is very possible that the
Bankruptcy Court could order that *all* distributions to Senior Lenders (including Step One claims) be reserved and
withheld, meaning that Senior Lenders could be forced to wait years before receiving any distribution whatsoever
from the bankruptcy estates." *See* Oaktree/Angelo Gordon/JPMorgan Responsive Statement at 5 (emphasis in
original). The foregoing statements are false and are foreclosed by the express terms of the Pre-LBO Debtholder
Plan. Indeed, Oaktree, Angelo Gordon and JPMorgan's allegations are belied by their own recovery table, which
shows that Step One Lender Claims are guaranteed to receive an initial recovery of at least 34.2% under the Pre-
LBO Debtholder Plan. *See id.* at 2.

[20] It is important to note that the Senior Lenders' table mischaracterizes recoveries for Other Non-Guarantor Debtor
Claims under the Pre-LBO Debtholder Plan by stating that they receive only an 8.0% recovery, when in fact they
receive a *100% recovery* under the Pre-LBO Debtholder Plan. *See* Pre-LBO Debtholder Disclosure Statement, Part
III. Moreover, the recovery table improperly gives Other Parent Claims the benefit of the subordination provisions
contained in the PHONES Notes Indenture and EGI-TRB LLC Notes. The Debtor/Committee/LBO Lender Plan
proponents must explain how they are applying those subordination provisions to Other Parent Claims and why such
Claims receive the same recovery as Senior Noteholders Claims.

- **Unsubstantiated Assumptions About the Effects of the Litigation Pertaining to the LBO-Related Causes of Action**: Oaktree, Angelo Gordon and JPMorgan assert, without any explanation, that the Litigation Trust will (i) impair Tribune's ability to operate its businesses and raise new capital, (ii) complicate interactions with the FCC and (iii) depress the market value of the New Common Stock. *See id.*, p. 3. Oaktree, Angelo Gordon and JPMorgan should be required to provide support for these statements as (i) the Debtor/Committee/LBO Lender Plan likewise contemplates a trust structure, (ii) the Debtor/Committee/LBO Lender Plan contemplates a similar organizational and capital structure, and (iii) collectively, the same amount of New Common Stock and New Warrants will be outstanding under the Pre-LBO Debtholder Plan as the Debtor/Committee/LBO Lender Plan. Indeed, from a financial, organization and operational perspective, there is virtually no difference between the Pre-LBO Debtholder Plan and the Debtor/Committee/LBO Lender Plan.

- **Erroneously Asserts that the Distribution Trust Under the Pre-LBO Debtholder Plan has No Economic Stake in the Reorganized Debtors**: Oaktree, Angelo Gordon and JPMorgan assert that the Distribution Trust to be established under the Pre-LBO Debtholder Plan should not have the ability to appoint two members to the board of Reorganized Tribune because it will have "no economic stake in the enterprise." *Id.* However, as clearly stated in the Pre-LBO Debtholder Plan, the Distribution Trust will have fiduciary duties to the holders of Distribution Trust Interests (certain holders of which will receive the New Warrants held in the Distribution Trust) and, thus, an obligation to ensure that the "enterprise" is operated in a manner to maximize the value of the New Common Stock and New Warrants. Accordingly, this misleading statement should be removed.

- **Fails to Disclose Why the Debtor/Committee/LBO Lender Plan Is Not Self-Serving**: Oaktree, Angelo Gordon and JPMorgan accuse the Bridge Loan Lenders of "crafting a plan that is premised around a series of self-serving settlements." *Id.*, p. 4. Oaktree, Angelo Gordon and JPMorgan should be required to disclose how the purported settlements embodied in the Debtor/Committee/LBO Lender Plan are not likewise self-serving, if not even more self-serving than those contained in the Bridge Lender Plan.

## D. Objection to the Step One Lender Responsive Statement

21. The Step One Lender Plan, which does not have the support of any of the "counterparties" to the "settlements" contained in the Step One Lender Plan, has little to no chance of being confirmed. The Step One Lenders also incorrectly state that Aurelius proposes to sue the Step One Lenders "based on a single passing reference in the Examiner's Report while entirely ignoring that the Examiner explicitly concluded that any challenge to the Step One Loans is 'highly unlikely'" and that the "Aurelius Plan is irreconcilable with the Examiner's Report." Step One Lender Responsive Statement, p. 2. These statements grossly

mischaracterize the Examiner's findings. While the Examiner found that the Step One Lender Claims were less vulnerable than the Step Two Lender Claims, he nonetheless found that there are viable causes of action against the Step One Lenders under each of four alternative definitions of fraudulent conveyance, and that the Step One Lenders face the serious prospect of having their Claims equitably subordinated or disallowed in *multiple* scenarios.[21]

22.      Additionally, the Step One Lenders incorrectly state that the Pre-LBO Debtholder Plan "provides Aurelius with control of the Litigation Trust." Step One Lender Responsive Statement, p. 5. To be clear, the Litigation Trust will be controlled by the Litigation Trust Advisory Board (not Aurelius), and the Litigation Trust Advisory Board has not yet been constituted. Moreover, the attorneys for the Litigation Trust have not been designated and, if the Pre-LBO Debtholder Plan is confirmed, those lawyers will be selected by the Litigation Trust Advisory Board (not Aurelius). Accordingly, the Step One Lenders baseless suggestion that the Pre-LBO Debtholder Plan – a plan that could result in a full recovery for all pre-LBO creditors – is being driven by "Aurelius' lawyers who are hoping to be paid all of the Trust's litigation fees" is absurd. *See* Step One Lender Responsive Statement, p. 5.

### E.      Objection to the Bridge Lender Responsive Statement

23.      The Bridge Lender Plan, like the Step One Lender Plan, does not have the support of any of the "counterparties" to the "settlements" contained in the Bridge Lender Plan and, therefore, has little to no chance of being confirmed. The inaccuracies and misrepresentations in the Bridge Lender Responsive Statement are summarized briefly as follows: (i) the Bridge Loan Lenders fail to disclose adequately why the settlements contained in their plan are not self-serving; (ii) the Bridge Loan Lenders fail to support their assertions that the Bridge Lender Plan

---

[21] The Step One Lenders also mischaracterize the Examiner's Report in many of the same ways described above with respect to the other Responsive Statements.

provides for a reasonable and balanced path and is the most likely plan to be confirmed; (iii) the Bridge Loan Lenders mischaracterize the findings of the Examiner's Report; (iv) the Bridge Loan Lenders do not disclose adequately what happens if one or more of the three settlements contemplated in the Bridge Lender Plan is not approved; (v) the Bridge Loan Lenders' range of recoveries is premised on a model contained in the Examiner's Report, which is based on a valuation lower than the $6.75 billion amount used by the other Competing Plans; and (vi) the Bridge Loan Lenders assert, without support, that the Pre-LBO Debtholder Plan improperly provides for postpetition interest. The proponents of the Bridge Lender Plan should correct their Responsive Statement accordingly.

## RESERVATION OF RIGHTS

24.    The Pre-LBO Debtholder Plan Proponents continue to analyze and review the Competing Plans, the related Disclosure Statements and the Responsive Statements. As such, this Objection is submitted without prejudice to, and with a full reservation of, the Pre-LBO Debtholder Plan Proponents' rights to supplement this Objection in advance of or in connection with the hearing to consider the Disclosure Statements and/or confirmation of the Competing Plans. In addition, the Pre-LBO Debtholder Proponents reserve their respective rights to object to confirmation of the Competing Plans or any other plan of reorganization proposed in these cases on any and all grounds.

**CONCLUSION**

**WHEREFORE**, for the foregoing reasons, the Pre-LBO Debtholder Proponents submit that, unless and until the requested modifications set forth herein are adopted by the various plan proponents, the Bankruptcy Court (i) deny approval of the Debtor/Committee/LBO Lender Disclosure Statement, the Step One Lender Disclosure Statement and the Bridge Lender Disclosure Statement; (ii) prohibit the inclusion of the Responsive Statements filed by the proponents of the Competing Plans in the solicitation materials; and (iii) provide the Pre-LBO Debtholder Proponents with such other and further relief as the Bankruptcy Court may deem just, proper and equitable.

Dated: November 16, 2010

Respectfully submitted,

ASHBY & GEDDES, P.A.
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*and*

AKIN GUMP STRAUSS HAUER & FELD
LLP
Daniel H. Golden
Philip C. Dublin
One Bryant Park
New York, NY 10036
(212) 872-1000

*Counsel for Aurelius Capital Management, LP*

BIFFERATO GENTILOTTI LLC
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel: (302) 429-1900
Fax: (302) 429-8600

*and*

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
David S. Rosner
Richard F. Casher
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

*Counsel for Law Debenture Trust Company of
New York, solely in its capacity as successor
Indenture Trustee for certain series of Senior
Notes*

33

*Indenture Trustee for certain series of Senior
Notes*

McCARTER & ENGLISH, LLP
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

*and*

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

*Counsel for Deutsche Bank Trust Company
Americas, solely in its capacity as successor
Indenture Trustee for certain series of Senior
Notes*

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
302-428-8191

*and*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

*Counsel for Wilmington Trust Company, solely
in its capacity successor Indenture Trustee for
the PHONES Notes*

34

McCARTER & ENGLISH, LLP
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

*and*

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

*Counsel for Deutsche Bank Trust Company*
*Americas, solely in its capacity as successor*
*Indenture Trustee for certain series of Senior*
*Notes*

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
302-428-8191

*and*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

*Counsel for Wilmington Trust Company, solely*
*in its capacity successor Indenture Trustee for*
*the PHONES Notes*

33