**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re ) | Chapter 11 |
| ) | |
| TRIBUNE COMPANY, <u>et al.</u>,[1] ) | Case No. 08-13141 (KJC) |
| ) | |
| ) | Jointly Administered |
| Debtors. ) | |
| ) | **Related to Docket Nos. 6022, 6091, 6182, 6292, 6295** |
| ) | **Hearing Date:  November 29, 2010 at 10:00 a.m.** |
| ) | **Objection Deadline: November 16, 2010 at 4:00 p.m.** |

<u>**BRIDGE PROPONENTS' LIMITED OBJECTION TO THE SPECIFIC DISCLOSURE
STATEMENTS AND RESPONSIVE STATEMENTS IN RESPECT OF COMPETING
PLANS IN CHAPTER 11 CASES OF TRIBUNE COMPANY AND ITS SUBSIDIARIES**</u>

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

NEWYORK 7925873 (2K)

King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. (the "Bridge Proponents"[2]), in their respective capacities as Holders of Bridge Loan Claims, hereby file this limited objection (the "Objection") to (I) the Specific Disclosure Statement relating to Joint Plan of Reorganization for Tribune Company and its Subsidiaries, dated October 22, 2010 (the "Debtor/LBO Lender Specific Disclosure Statement"), proposed by the Debtors, the Official Committee of Unsecured Creditors (the "Creditors' Committee"), Oaktree Capital Management, L.P., Angelo Gordon & Co. L.P. and JPMorgan Chase Bank, N.A. [Docket No. 6091], and the related responsive statements (the "Debtor/LBO Lender Responsive Statements"), each dated November, 9, 2010 [Docket No. 6295] and (II) the Specific Disclosure Statement for the Plan of Reorganization for Tribune Company and its Subsidiaries, dated October 29, 2010 (the "Step One Lender Specific Disclosure Statement" and, together with the Debtor/LBO Lender Disclosure Statement, the "Competing Disclosure Statements"), proposed by the Holders of certain Step One Senior Loan Claims [Docket No. 6182], and the related responsive statement (the "Step One Lender Responsive Statement" and, together with the Debtor/LBO Lender Responsive Statements, the "Responsive Statements"), dated November 9, 2010 [Docket No. 6292].

## LIMITED OBJECTION

1. A disclosure statement may be approved only if it contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code. See In re Ampace Corp., 279 B.R. 145, 161 (Bankr. D. Del. 2002) (section 1125 requires sufficient information to

---

[2] On October 29, 2010, the Bridge Proponents filed their proposed Joint Plan of Reorganization for Tribune Company and its Subsidiaries [Docket No. 6186] (the "Bridge Plan"). On November 9, 2010, the Bridge Proponents filed their Responsive Statement of Bridge Proponents in Respect of Competing Plans in Chapter 11 Cases of Tribune Company and its Subsidiaries [Docket No. 6294] (the "Bridge Responsive Statement"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bridge Plan or the Bridge Responsive Statement.

"enable a hypothetical reasonable investor . . . to make an informed judgment about the plan"). In these Chapter 11 Cases, completeness, accuracy and clarity of disclosure has heightened importance, given the highly complex and bitterly contested nature of the competing plan process and the expected solicitation of four competing reorganization plans for the Debtors. See In re Werth, 29 B.R. 220, 222 (Bankr. D. Colo. 1983) (stating that, in a competing plan process, "the Disclosure Statement should clearly highlight the differences between the plans in a separate section and make clear to which plan it is referring when discussing the alternatives."); see generally Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417 (3d Cir. 1988), cert. denied, 488 U.S. 967 ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court."). The Bridge Proponents recognize that all of the principal creditor constituencies entitled to vote on the Competing Plans are sophisticated and represented in these Chapter 11 Cases by experienced law firms. Nevertheless, there are a number of critical disclosure deficiencies in the Competing Disclosure Statements and related Responsive Statements that should be addressed and remedied before solicitation commences. We address below the disclosure deficiencies in respect of each Competing Plan.

**I.     The Debtor/LBO Lender Specific Disclosure Statement and Responsive Statements**

    **A.     There is no disclosure regarding the allocation of distributable value among the Debtors' Estates or the so-called Intercompany Claims Settlement.**

2.     The allocation of distributable value between Tribune, on the one hand, and the Guarantor Subsidiaries, on the other, is a critical element of the Debtor/LBO Lender Plan, as such allocation of value has a dramatic impact on Creditor recoveries. This point is significant because the Claims of the Senior Lenders against Tribune are, under the Debtor/LBO Lender Plan, receiving *pari passu* treatment with the Claims of (i) the Bridge Loan Lenders, (ii)

2

the Senior Noteholders and (iii) other General Unsecured Creditors. (Debtor/LBO Lender Specific Disclosure Statement at 8) The Debtor/LBO Lender Plan subordinates the Bridge Loan Guaranty Claims to the Senior Loan Guaranty Claims. (<u>Id.</u>) Thus, to the extent distributable value is redirected away from Tribune and instead ascribed to the Guarantor Subsidiaries, the Senior Lenders benefit directly at the expense of Tribune-level Creditors.

3. The Bridge Loan Agent has repeatedly in these proceedings raised its concern that the Debtors are strategically and improperly allocating value to the Guarantor Subsidiaries to enhance the Senior Lenders' recovery in these Chapter 11 Cases, without regard for the rights of the Debtors' other creditor constituencies. Specifically, under the Debtor/LBO Lender Plan, the Debtors are, among other things, strategically "resolving" in favor of the Guarantor Subsidiaries tens of thousands of Intercompany Claims totaling tens of billions of dollars, in order to satisfy the allocation of distributable value and recovery demanded by certain Senior Lenders.

4. The Bridge Proponents have addressed these important points in the Bridge Specific Disclosure Statement (at 13-14) and the Bridge Responsive Statement (at 11-12), and expect that various constituencies will conduct extensive fact and expert discovery in respect of distributable value allocation and resolution of Intercompany Claims, and will challenge this aspect of the Debtor/LBO Lender Plan (among others). Nevertheless, the Bridge Proponents believe that, as a matter of law, without more disclosure in this regard, the Debtor/LBO Lender Specific Disclosure Statement cannot be approved. Specifically:

- There is absolutely no disclosure as to how the Debtor/LBO Lender Plan allocates distributable value between Tribune, on the one hand, and the Guarantor Subsidiaries, on the other hand. Nor is there any disclosure as to how this allocation of value impacts

3

Creditor recoveries. Creditors may have or develop their own views on these issues, but they should not have to guess what the Debtors' position is on a key material economic issue. The Debtor/LBO Lender Proponents clearly have this information and should be required to disclose it.

- There is almost no disclosure regarding the so-called "Intercompany Claims Settlement" pursuant to which the Debtors purport to have resolved disputes in respect of Intercompany Claims. All that is disclosed is that such a settlement exists and how certain particular Intercompany Claims were resolved. (Debtor/LBO Lender Specific Disclosure Statement at 8, n. 12; 26) The Debtor/LBO Lender Specific Disclosure Statement states that the bulk of the information regarding the Intercompany Claims Settlement will be included in a "Plan Supplement." (Debtor/LBO Lender Specific Disclosure Statement at 26) At present, however, there is no indication that the Plan Supplement will be filed by the voting deadline or, if it is, assurance that any disclosure will be meaningful or sufficient. There is no legitimate reason for the Debtor/LBO Lender Proponents to withhold such information and, without such information, Creditors will not be adequately informed as to, among other things, the terms of the resolution of all Intercompany Claims, the basis for such resolution, who negotiated and approved such resolution, whether such resolution is proper and how the proposed resolution impacts Creditor recoveries. The Debtors should be required to fully disclose this critical information before the Debtor/LBO Lender Specific Disclosure Statement may be approved.

- There is no disclosure as to how the Debtor/LBO Lender Proponents addressed, if at all, the inherent conflict of interests between the estates when structuring the Intercompany

NEWYORK 7925873 (2K)

Claims Settlement.  See In re Adelphia Commc'ns Corp., 336 B.R. 610, 671 (Bankr. S.D.N.Y. 2006), aff'd, 342 B.R. 122 (S.D.N.Y. 2006) ("[I]f the Debtors actually took sides [in interdebtor disputes] in a way that injured one or another of the estates to whom they owed their duties of loyalty, that would result in at least the appearance of impropriety, and, the Court fears, the reality as well.").  Certainly, this information would bear on Creditors' determinations as to whether the Intercompany Claims Settlement, and the value allocation between Tribune and the Guarantor Subsidiaries (once fully disclosed), is fair.

- There is no disclosure as to how the Intercompany Claims Settlement is permissible in light of Section 7 of the Bridge Loan Guaranty Agreement, which states that "any indebtedness of [Tribune] now or hereafter held by any Guarantor is hereby subordinated in right of payment to the prior payment in full in cash of the Guaranteed Obligations . . . ."  The Bridge Proponents address in the Bridge Specific Disclosure Statement (at 14) and in the Bridge Responsive Statement (at 11) their position that the Intercompany Claims Subordination Provision must be honored, and that it is violated by the Intercompany Claims Settlement, undermining the entire structure of the Debtor/LBO Lender Plan.  However, the Debtors' position on these critical issues is highly relevant to Creditors' voting calculus and must be disclosed.

**B.    There are other material disclosure deficiencies.**

5.    As set forth below, the Bridge Proponents believe that the Debtor/LBO Lender Specific Disclosure Statement and various associated Responsive Statements are missing material and relevant information or otherwise affirmatively misleading.

6.    First, the Debtors' disclosure of the $401 million "Litigation Settlement" is woefully deficient.  There is no discussion as to how this settlement amount was arrived at

5

(e.g., randomly, by probability weighing the likelihood of success of the various claims, or by using some other methodology) and there is no disclosure that a portion totaling $63 million is arguably attributable to a misallocation of value to the Guarantor Subsidiaries. There is no disclosure of the value of the claims released for this sum. The Bridge Proponents address these issues in detail in the Bridge Responsive Statement (at 7-8), but the Debtors' views on the viability of these arguments and associated confirmation risks are critical and should not be withheld.

       7.      Moreover, under the so-called "Step Two/Disgorgement Settlement" described in the Debtor/LBO Lender Specific Disclosure Statement, the Arrangers are supposedly paying $120 million to settle claims for the disgorgement of fees and other amounts paid in connection with step two of the Leveraged ESOP Transaction. (Debtor/LBO Lender Specific Disclosure Statement at 16) While the Bridge Loan Lenders and others are technically allowed to "participate" in the so-called "Step Two/Disgorgement Settlement," if they do not, the Arrangers apparently may recoup the respective settlement payments from disgorgement litigation recoveries obtained from the Bridge Loan Lenders and other non-participating Creditors. (Id.) The Bridge Responsive Statement (at 9) expresses the view that the settlement payment is illusory and, even if the full amount is paid by the Arrangers, such amounts are absurdly low relative to the value of the claims settled. However, the entire description of this arrangement as a "settlement" is misleading and, in any event, no disclosure is made as to the likelihood of other Creditors participating in the arrangement or how much, if anything, the Debtors expect the Arrangers will ultimately pay. Remarkably, there is also absolutely no disclosure as to how any Creditor who chooses to participate in the so-called "Step Two/Disgorgement Settlement" could actually do so, or what would be the terms of such

participation, or how much it would have to pay to participate. All of this material information must be disclosed.

8.      Further, the Debtor/LBO Lender Specific Disclosure Statement provides that the Bridge Loan Claims are disputed, but also limits the recovery of the Holders of Bridge Loan Claims at $77,819,000, even if such Claims are ultimately allowed. (Debtor/LBO Lender Specific Disclosure Statement at 5)  The Bridge Proponents believe that, if Intercompany Claims are properly addressed, the Bridge Loan Lenders' recovery would be at least $140 million if it is determined that no fraudulent conveyance occurred. If other issues are resolved in favor of the Bridge Loan Lenders, <u>the holders of Bridge Loan Claims would recover over $700 million</u>. These possibilities are addressed in the Bridge Specific Disclosure Statement (at 11, 14) and in the Bridge Responsive Statement (at 10-11). However, at a minimum, the Debtors must disclose these issues and whether they can and/or will increase the reserve on account of the Bridge Loan Claims if the Court so directs, or whether such a directive would imperil confirmation.

9.      The Responsive Statements filed by the Creditors' Committee and by certain Senior Lenders state in several places that the Bridge Settlements provide for a recovery - $125 million – which exceeds what the Bridge Loan Lenders would be entitled to if their Claims are allowed. (Creditors' Committee Responsive Statement at 7; Senior Lender Responsive Statement at 4)  This is patently misleading. As discussed above, the Bridge Proponents believe that they could recover at least over $140 million if their claims are allowed and Intercompany Claims are treated, and distributable value is allocated, as the Bridge Proponents believe is fair. (As discussed elsewhere in the Bridge Proponents' submissions, under certain circumstances, the Bridge Loan Lenders' recovery could be far in excess of $140 million.) The disclosure must be clarified and corrected.

7

10. The Debtor/LBO Lender Specific Disclosure Statement and the Responsive Statements filed by the Creditors' Committee and certain Senior Lenders contain other disclosure deficiencies, including the following:

- The Debtor/LBO Lender Specific Disclosure Statement provides no disclosure as to the rationale for providing releases to the Former Bridge Loan Agent when neither the current Bridge Loan Agent or any Bridge Loan Lender is released.

- The Debtor/LBO Lender Specific Disclosure Statement must clarify the extent to which the "Bar Order" would prohibit, limit or otherwise impair Creditor claims against third parties.

- The Responsive Statements filed by the Creditors' Committee and certain Senior Lenders contain identical charts showing the recovery for each constituency under each Competing Plan, which are misleading as to the Bridge Plan because they do not take into account the possibility of the settlements offered under the Bridge Plan being accepted and approved. (Creditors' Committee Responsive Statement at 2; Senior Lender Responsive Statement at 2). At a minimum, these charts should include a footnote similar to the footnote in the identical chart provided in the Debtors' Responsive Statement, which addresses the settlements proposed in the Bridge Plan.

**II.     The Step One Lender Specific Disclosure Statement and Responsive Statement**

11. The Step One Lender Specific Disclosure Statement has most of the disclosure deficiencies of the Debtor/LBO Lender Plan (<u>i.e.</u> allocation of value, Intercompany Claims, etc.) and, accordingly, requires the additional disclosures discussed above.

12. Moreover, the Step One Lender Responsive Statement includes a number of material misrepresentations and omissions, including the following:

- The Step One Proponents state that the Bridge Plan provides the Bridge Loan Lenders with "a recovery far in excess of what they would be entitled to under any legitimate recovery scenario." (Step One Lender Responsive Statement at 6)  This is a blatant misrepresentation because it is contrary to the Bridge Proponents' interpretation of a proper treatment of Intercompany Claims and the Bridge Loan Subordination Provision, and it also contradicts the recovery scenario in the Examiner's Report, which provides a <u>potential $278.61 million recovery for the Bridge Loan Lenders</u>.

- The Step One Proponents state that the Examiner determined that the possibility of a court holding that step one of the Leveraged ESOP Transaction was a fraudulent conveyance was "highly unlikely." (Step One Lender Responsive Statement at 1-5, 8) This statement is misleading.  While the Examiner did conclude that "it is highly unlikely that the Tribune Entities were rendered insolvent at Step One if only the Step One Debt is considered" (Examiner's Report, Volume One at 17-18), the Examiner also concluded that it is only "somewhat unlikely that a court would collapse Step One and Step Two together for solvency purposes" (<u>Id.</u> at 16) and that if a court "were to collapse Step One and Step Two together or treat the Step Two Debt as a liability for solvency purposes at Step One, it is somewhat unlikely (although an exceedingly close call) that a court would conclude that the Tribune Entities were rendered insolvent in that scenario."  (<u>Id.</u> at 18).

- The Step One Proponents misrepresent that the Bridge Plan proposes to elevate the Bridge Loan Claims to senior status, "even though the Examiner concluded that the Bridge Loans were highly likely to be avoidable as fraudulent transfers." (Step One Lender Responsive Statement at 2)  The Bridge Proponents believe that, if both step one and step two of the Leveraged ESOP Transaction are collapsed and avoided, the Bridge

9

Loan Subordination Provision may not be enforced. This is consistent with the Examiner's conclusions.

- The Step One Proponents state that the Bridge Plan "seek[s] to buy the support of Senior Noteholders by promising to pay to Senior Noteholders 138% of the distributable enterprise value of Tribune." (Step One Lender Responsive Statement at 6)  This is a misrepresentation because it ignores the Bridge Proponents' argument regarding the misallocation of distributable value as between Tribune, on the one hand, and the Guarantor Subsidiaries, on the other, upon which the Debtor/LBO Lender Plan is premised. It also ignores the reality that, if step one of the Leveraged ESOP Transaction is avoided, then substantial additional Guarantor Subsidiary value will be made available for distribution to the Senior Noteholders.

## RESERVATION OF RIGHTS

13. The Bridge Proponents or their representatives are seeking discovery and expressly reserve their right to supplement or amend this Objection and raise any additional objections following discovery. Further, the Bridge Proponents reserve the right to respond, further object, join in, or amend any objection herein with respect to any argument or objection made by any person relating to the Competing Disclosure Statements or Responsive Statements, or any hearing in connection therewith.

10

## **CONCLUSION**

14. The Bridge Proponents respectfully requests that the Court direct modification of the Competing Disclosure Statements and the Responsive Statements to address the objections contained herein.

Dated: November 16, 2010
       Wilmington, Delaware

FOX ROTHSCHILD LLP

/s/ Jeffrey M. Schlerf
Jeffrey M. Schlerf (No. 3047)
Eric M. Sutty (No. 4007)
John H. Strock (No. 4965)
Citizens Bank Center, Suite 1600
919 North Market Street
Wilmington, DE  19801
Telephone: (302) 654-7444

- and-

David G. Hille
Scott Greissman
Andrew W. Hammond
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY  10036
Telephone: (212) 819-8200

- and-

Thomas E Lauria
WHITE & CASE LLP
200 South Biscayne Boulevard, Suite 4900
Miami, FL  33131
Telephone: (305) 371-2700

*Attorneys for the Bridge Proponents*