## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, et al., | ) Jointly Administered |
| | ) |
| Debtors. | ) Re: Docket Nos. 6182, 6183, 6187, 6292, 6293, and 6294 |
| | ) **Hearing date**: November 29, 2010, at 10:00 a.m. (Eastern) |
| | ) **Objection deadline**: November 16, 2010, at 4:00 p.m. (Eastern) |

## SETTLEMENT PLAN PROPONENTS' OBJECTION TO DISCLOSURE STATEMENTS AND RESPONSIVE STATEMENTS FILED WITH RESPECT TO COMPETING PLANS

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), the Official Committee of Unsecured Creditors (the "Committee"), Angelo, Gordon & Co., L.P., Oaktree Capital Management, L.P., and JPMorgan Chase Bank, N.A. (collectively, the "Settlement Plan Proponents"), as proponents of the Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries [D.I. 6089] (the "Settlement Plan"), hereby object and respond to:

      1.     The Specific Disclosure Statement (the "Litigation Plan Disclosure Statement") for the Joint Plan (the "Litigation Plan") [D.I. 6182] proposed by Aurelius Capital Management, L.P., Deutsche Bank Trust Company Americas, Law Debenture Trust Company of New York, and Wilmington Trust Company (the "Litigation Plan Proponents"), and the Responsive Statements filed by the Litigation Plan Proponents [D.I. 6293];

      2.     The Specific Disclosure Statement (the "Bridge Plan Disclosure Statement") for the Joint Plan (the "Bridge Plan") [D.I. 6187] proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P., and Marathon Asset Management, L.P. (the "Bridge Plan Proponents"), and the Responsive Statement filed by the Bridge Plan Proponents [D.I. 6294]; and

      3.     The Specific Disclosure Statement (the "Step One Plan Disclosure Statement") for the Joint Plan (the "Step One Plan") [D.I. 6183] proposed by a group of holders of so-called Step One Senior Loan Claims (the "Step One Plan Proponents"), and the Responsive Statement filed by the Step One Plan Proponents [D.I. 6292].

1657167.5

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ..................................................................... 1

II.    THE LITIGATION PLAN DISCLOSURES ................................................. 2

III.   THE BRIDGE PLAN DISCLOSURES ...................................................... 12

IV.   THE STEP ONE PLAN DISCLOSURES .................................................. 18

V.    CONCLUSION ........................................................................................ 22

1657167.5

# I. PRELIMINARY STATEMENT

With four proposed plans now pending before the Court, the risk of creditor confusion is high and the accuracy of disclosure is a paramount concern.

As advocates of the Settlement Plan, which provides creditors with substantially greater immediate recoveries than any of the other plans, the Settlement Plan Proponents are confident that, with accurate disclosure, eligible creditors will make an informed decision to accept the Settlement Plan and reject the others. Because the merits of the Settlement Plan are clear, the Settlement Plan Proponents are not concerned by the overblown rhetoric of the factions now aligned against them (and each other). However, in a number of instances, the proposed disclosure materials prepared by those factions go beyond rhetoric into the realm of outright falsehood, and thus run the risk of misleading creditors at a time when truthfulness and clarity must be the overarching objective.

The Settlement Plan Proponents submit this Objection to identify material misstatements and omissions in the disclosure documents proposed by the three groups of competing plan proponents. In raising the objections below, the Settlement Plan Proponents deliberately have used a light touch, giving the other plan proponents full artistic license with respect to their advocacy and myriad unfounded attacks on the Settlement Plan. Mindful of the Court's prior admonition that confirmation issues be left for the confirmation hearing, the Settlement Plan Proponents also have not raised the multitude of confirmation objections with respect to each of the three competing plans, all of which are reserved and will be asserted in connection with confirmation.

Rather, the objections below only address material falsehoods that run the risk of confusing creditors and thereby distorting the vote. The Settlement Plan Proponents submit that the Court should deny approval of the various disclosure documents described below unless those falsehoods are corrected or removed.

## II.    THE LITIGATION PLAN DISCLOSURES

The Litigation Plan Proponents tout the Litigation Plan as one that "will be able to go effective expeditiously and with fewer conditions than the other plans of reorganization that have been proposed in the Debtors' Chapter 11 Cases."[1]  In their Responsive Statements, the Litigation Plan Proponents explicitly and repeatedly urge creditors to vote for the Litigation Plan even if they support another plan, on the premise that the Litigation Plan is the only way "to ensure that Tribune exits bankruptcy promptly,"[2] asserting that, absent confirmation of the Litigation Plan, "these chapter 11 cases will continue to languish unresolved."[3]

## LITIGATION PLAN DISCLOSURE STATEMENT

In essence, the Litigation Plan Proponents present the Litigation Plan as a risk-free exercise for creditors, promising enormous recoveries through litigation and positioning the Litigation Plan as an uncontroversial fallback option even for creditors who prefer the Settlement Plan.  In so doing, the Litigation Plan Disclosure Statement glosses over or misstates a number of material facts and risks to creditors, including the following –

- **Inability To Describe Creditor Recoveries**.  Most fundamentally, the Litigation Plan Disclosure Statement sells to creditors safety and certainty that the Litigation Plan cannot deliver.  In fact, due to the multitude of uncertainties inherent in the Litigation Plan, the Litigation Plan Proponents are unable to state what any creditor actually will receive under the Litigation Plan.  This is largely because the Litigation Plan is not really a "plan", in the sense that

---

[1]    Litigation Plan Disclosure Statement at 6.

[2]    Litigation Plan Responsive Statements, Aurelius Letter at 1 ("Even if you prefer one of the other plans, you should vote for our plan as well to ensure that Tribune exits bankruptcy promptly."); *id.* at 3 ("Even if you prefer one of the other plans, you should also vote for the Pre-LBO Debtholder Plan in order to ensure that Tribune exits bankruptcy promptly."); *id.*, Responsive Statement at 2 ("Given its reserve structure, the Pre-LBO Debtholder Plan is the least conditional, and most likely Plan to be approved by the Bankruptcy Court."); *id.* at 3 ("Even if you intend to vote in favor of a competing Plan purporting to promise you a larger initial recovery than the Pre-LBO Debtholder Plan, we urge you to also vote in favor of the Pre-LBO Debtholder Plan."); *id.* at 8 ("we recommend that you vote in favor of the Pre-LBO Debtholder Plan, regardless of whether you vote to accept or reject the other competing plans").

[3]    Litigation Plan Responsive Statement at 3.

it does not resolve key issues or disputes. By withholding *up to 65% of the Debtors' enterprise value* until litigation, disposition, and appeal of all of the LBO-Related Causes of Action, the Litigation Plan more closely resembles a continuation of these chapter 11 cases for the foreseeable future rather than an actual plan of reorganization that resolves issues and provides specified distributions to creditors.

Indeed, the Litigation Plan Proponents admit that they cannot "estimate how long it will be before [creditors] will receive recoveries" on account of the billions of dollars of value that the Litigation Plan would reserve and not distribute to creditors.[4] More importantly for purposes of disclosure, the Litigation Plan Proponents cannot even specify what, if anything, creditors would receive on the effective date from the small portion of value that actually is to be distributed. This is because initial distributions under the Litigation Plan are contingent on the outcome of litigation of a number of questions separate and apart from the LBO-Related Causes of Action, including litigation over the allowed amount of the PHONES Notes, litigation over subordination of the PHONES Notes, litigation over the enterprise value of the Debtors as a whole, litigation over intercompany claims and the allocation of value among the Debtors, and litigation over intercreditor "sharing" provisions of the Senior Loan Agreement.

In addition, although the Litigation Plan is presented as a fallback option with no obstacles to confirmation, numerous issues that would have to be litigated to conclusion in order to confirm the Litigation Plan are glossed over, including the propriety of the size and contents of the proposed reserves, control over and operation of the Litigation Trust, and the proposed corporate governance of the Reorganized Debtors. Creditors should be made aware of the myriad issues that could materially impact the Court's ability to confirm the Litigation Plan and their recoveries under the Litigation Plan if confirmed.

Yet, in spite of their acknowledged inability to offer creditors certainty of any kind, in the section of the Litigation Plan Disclosure Statement entitled "Estimated Recoveries Under The

---

[4] Litigation Plan Disclosure Statement at 51.

Pre-LBO Debtholder Plan", the Litigation Plan Proponents set forth *12 pages* of misleading charts depicting "estimated recoveries" under a series of hypothetical "assumptions."[5] Those charts present a one-sided view of potential outcomes, showing recoveries in a variety of hypothetical scenarios in which so-called "non-LBO" creditors would be entitled to distributions far greater than the distributions received under the Settlement Plan, but conveniently omitting the corresponding scenarios in which those "non-LBO" creditors recover far less than they would receive under the Settlement Plan.[6]

This is confusing and misleading enough, but to make matters worse those charts do not even purport to capture the range of possible distributions, and the Litigation Plan Proponents state that the charts are provided "for illustrative purposes only",[7] in essence asking creditors to "trust us". The Litigation Plan Proponents do warn that "recoveries to Creditors might be materially different than set forth herein," but this is buried in a section of the Disclosure Statement far removed from the "estimated recovery" charts.[8] To accurately describe the risks the Litigation Plan presents, its Disclosure Statement should not provide "estimated recoveries" that are dependent on specific outcomes in the litigation of the LBO-Related Causes of Action. Providing estimated recoveries for a group of scenarios strategically selected from the myriad possible outcomes could mislead creditors by distracting them from the essential truth that their recoveries under the Litigation Plan could be anywhere in a huge range, and their minimal distributions could be the only distributions they ever receive. Creditors would be better served by the simple disclosure that their initial and ultimate recoveries cannot be predicted with any

---

[5]  Litigation Plan Disclosure Statement at 27-39.

[6]  For example, the Litigation Plan Proponents show recovery scenarios in which "Step Two" Senior Loan Claims are avoided and "Step One" Senior Loan Claims are *not* entitled to benefit from such avoidance, but they omit the corresponding scenarios in which "Step One" Senior Loan Claims *are* entitled to benefit from avoidance (scenarios in which Senior Lenders would be entitled to distributions far greater than the distributions promised in the existing hypothetical recovery charts).

[7]  Litigation Plan Disclosure Statement at 27 and 52.

[8]  Litigation Plan Disclosure Statement at 52.

certainty, and a single chart showing a minimum to maximum recovery range for each class based only on stated essential assumptions as to valuation and distribution of that value.

If "estimated recovery" charts are to be included, at a minimum those charts should disclose ***prominently*** that the scenarios potentially leading to the recoveries in the charts were selected by the Litigation Plan Proponents, that initial or ultimate distributions to be made to creditors cannot be determined with any certainty, and that actual initial and ultimate distributions may be materially different than what is set forth "for illustrative purposes". Moreover, to the extent that the Court allows the Litigation Plan Proponents to show "illustrative" recoveries, the Litigation Plan Proponents' disclosures should reflect the prospect that such projected recoveries may be dramatically reduced by unfavorable litigation outcomes. In particular, any disclosure of "illustrative" recovery scenarios in which "Step Two" Senior Loan Claims are avoided and "Step One" Senior Loan Claims are held unable to benefit from avoidance must be accompanied by the corresponding set of "illustrative" recoveries in which "Step One" claims are entitled to share ratably in benefits from avoidance (scenarios where "non-LBO" creditors recover significantly less than they do under the Settlement Plan).

Finally, because all material distributions under the Litigation Plan are dependent on litigation outcomes, the Litigation Plan Proponents must disclose the risks associated with their proposed management of the Litigation Trust itself, which would be controlled by a Litigation Trust Advisory Board "composed of two individuals selected by Aurelius and one member selected by the PHONES Notes Indenture Trustee" and run by a Litigation Trustee designated by Aurelius.[9] The Litigation Plan Proponents should disclose the risk that the parties in control of the Litigation Trust, whether due to the prices they paid for their claims, the subordinated nature of their claims, the compensation structure of the Litigation Trust, or their own investment considerations, have different risk tolerances than other creditors with respect to the handling of the LBO-Related Causes of Action.

---

[9]  Litigation Plan §§ 5.17.3, 5.17.4.

- **Risk Associated With The Aurelius Vote Buying Scheme**. Perhaps recognizing that trade creditors are unlikely to vote in favor of a plan that hypothetically, "for illustrative purposes only", purports to provide them with an initial distribution of 4.3 cents on the dollar (for creditors of Tribune) or 8 cents on the dollar (for creditors of Tribune's subsidiaries),[10] particularly when the Settlement Plan provides those creditors with the certainty of materially greater recoveries, the Litigation Plan Proponents have crafted a scheme in which Aurelius (the lead Litigation Plan Proponent) will offer to buy trade claims for 15 cents and 25 cents on the dollar, respectively, but *only if* the applicable classes of claims vote to accept the Litigation Plan and the Litigation Plan then is confirmed and becomes effective.[11]

Notably, there is no disclosure whatsoever about the basis for the 15 cent / 25 cent purchase price, the reasons why Aurelius desires to use the plan process to acquire claims, or Aurelius' expected recoveries on the claims that it purchases. Moreover, the scheme smacks of impermissible vote buying and likely will be challenged as such in connection with confirmation and the tabulation of votes on the Litigation Plan. The Litigation Plan Disclosure Statement should disclose all of this information, and explain the risk that the alleged "cash out" option will be unenforceable and thus illusory and that votes cast in reliance on the scheme may be subject to designation or disqualification.

- **Risk And Potential Value Degradation Due To Reserves**. Compounding the problem of the Litigation Plan Proponents' inability to specify the amount and timing of any creditor's recovery is the fact that the Litigation Plan provides for up to 65% or more of the outstanding value of Reorganized Tribune to be held in reserve indefinitely, pending litigation and appeal of the LBO-Related Causes of Action and other issues left unresolved by the

---

[10]   These initial distributions – low as they may appear – actually are too high if a necessary premise of the Litigation Plan (as it purports to be) is to distribute minimum entitlements and preserve maximum upside cases for all creditors. Other estimates (including those generated by the Settlement Plan Proponents) put the initial distribution number for various classes of trade claims at closer to 2 cents on the dollar.

[11]   Litigation Plan Disclosure Statement at 17-20.

Litigation Plan. The Litigation Plan Disclosure Statement correctly observes that this burdens creditors with the risk that the distributions they ultimately receive will be worth less (potentially far less) than they would have been on the plan's effective date: "it cannot be guaranteed that the DEV ["distributable enterprise value"] held in the Distribution Trust Reserves will not decrease between the time of Confirmation and ultimate distributions to Creditors from the Distribution Trust Reserves and, therefore, Creditors might receive New Common Stock and/or New Warrants that have lower values than they had on the Confirmation Date."[12] The Litigation Plan Proponents, however, fail to describe the basis on which distributions from the reserve will be made – are creditors' entitlements fixed on the effective date, or are entitlements determined in accordance with values at the time of distribution? Who bears the risk of loss and reaps the benefit of any appreciation? This is material information that must be disclosed.

Moreover, the Litigation Plan Proponents also fail to disclose other significant risks associated with holding up to 65% of the value of Reorganized Tribune hostage for a period that could exceed five years. For one thing, the very fact of a substantial reserve likely could depress the market value of the New Common Stock that actually is distributed on the Effective Date. For another, the ability of Reorganized Tribune to operate its business and maximize value in connection with a new capital raise could likely be impaired by the substantial overhang of reserved shares. At the same time, the Distribution Trust holding all of the reserved value[13] – which apparently will be controlled by the Litigation Plan Proponents[14] – would be entitled to appoint two of the seven members of the Board of Directors of Reorganized Tribune, thus giving an entity with no direct economic stake in the ongoing affairs of the enterprise substantial influence over the operations of Tribune for the foreseeable future.

---

[12] Litigation Plan Disclosure Statement at 51.

[13] The Settlement Plan Proponents will demonstrate at confirmation that it is inappropriate to create a single reserve for distributions to be made to creditors of all of the Debtors, without regard for any creditor's specific entitlements from an individual Debtor.

[14] The procedures for selecting the Distribution Trust Advisory Board and the Distribution Trustee will be disclosed on November 23. *See* Litigation Plan §§ 7.16.4, 7.16.5. The Settlement Plan Proponents reserve all rights in this regard.

This poses a substantial risk to the viability of the very enterprise that the Litigation Plan Proponents profess to be "saving" from protracted bankruptcy proceedings through the alleged expediency of the Litigation Plan. It is difficult to comprehend how an enterprise of the size and complexity of Tribune could function with the ownership of up to 65% of its authorized stock uncertain for a period of years. The Litigation Plan Disclosure Statement must describe these risks and warn creditors that the delay occasioned by the Litigation Plan may cause material harm to the enterprise and, hence, the ultimate recoveries of creditors.

- **FCC Risk And Issues**. The Litigation Plan Disclosure Statement correctly observes that the consent of the FCC is a condition to the Litigation Plan and that the "inability to obtain FCC approval and media ownership waivers would adversely affect [the] ability to consummate the Pre-LBO Debtholder Plan."[15] The Litigation Plan Proponents, however, do not disclose that the structure of the Litigation Plan itself complicates the FCC approval process and could delay FCC approval (and thus the Debtors' emergence from bankruptcy) even further. In particular, the potential reserve of up to 65% of the value of Reorganized Tribune for distribution after all litigation is concluded could raise questions from the FCC and could lengthen the proceedings before the FCC. The Litigation Plan Proponents further fail to explain that, if a significant percentage of the value of Reorganized Tribune is reserved, an additional lengthy FCC approval process may need to be completed, *after* conclusion of litigation over the LBO-Related Causes of Action and other issues on which the Litigation Plan is contingent, before stock could be distributed to creditors. The Litigation Plan Disclosure Statement must explain these considerations and describe the increased risk of delay associated with obtaining the requisite FCC approvals.

Moreover, there is a conflict between the Litigation Plan and the Litigation Plan Disclosure Statement with respect to FCC issues. The Litigation Plan states that the Litigation Plan Proponents will file new applications with the FCC "as promptly as practicable."[16] The

---

[15] Litigation Plan Disclosure Statement at 55.

[16] Litigation Plan §§ 1.1.106, 5.16.

Litigation Plan Disclosure Statement, however, indicates that the Litigation Plan Proponents intend to "amend" the Debtors' existing applications to accommodate the Litigation Plan.[17] If the Litigation Plan involves the filing of "new" FCC applications, the FCC process – as well as Reorganized Tribune's emergence from bankruptcy – could be substantially delayed. The Litigation Plan Proponents need to correct this inconsistency and make accurate disclosures in this regard.

- **Forced Acceptance Of The Litigation Plan By The Debtors.** Despite the fact that the Debtors are proponents of the competing Settlement Plan, the Litigation Plan deems holders of Intercompany Claims (*i.e.*, the Debtors) to ***accept*** the Litigation Plan, while expressly stating that the claims held by the Debtors against each other are "Impaired".[18] At a minimum, the Litigation Plan Proponents should disclose the alleged basis for disenfranchising the Debtors with respect to the Litigation Plan or afford holders of Intercompany Claims the opportunity to vote on the Litigation Plan.

- **Failure To Classify Securities Litigation Claims Against Subsidiaries**. The Litigation Plan mysteriously fails to include any classes of Securities Litigation Claims against the subsidiary Debtors. The Litigation Plan Disclosure Statement should explain how the Litigation Plan purports to treat such claims if allowed.

## LITIGATION PLAN RESPONSIVE STATEMENTS

The Litigation Plan Responsive Statements are filled with over-the-top rhetoric, allegations, and inflammatory innuendo. Aurelius goes so far as to describe the Tribune reorganization as a battle between "good" and "evil" and to denigrate those with fiduciary duties to the estates and creditors in these cases (the Debtors and the Committee) as "riddled with conflicts."[19]

---

[17]  Litigation Plan Disclosure Statement at 54.

[18]  Litigation Plan §§ 3.2.10(c), 3.3.4(c), 3.4.7(c).

[19]  Litigation Plan Responsive Statements, Aurelius Letter at 1.

For example, with respect to the Committee, Aurelius alleges that "[m]ost of the Committee members effectively had their votes bought by the LBO Lenders in return for an increased or full recovery and have little or no 'skin in the game' regarding claims against the LBO Lenders."[20] The allegation that the LBO Lenders "bought" off Committee members is preposterous on its face, as is the suggestion that Committee fiduciaries have no "skin in the game". Aurelius further alleges that, "[d]espite our repeated requests, the Committee is unable or unwilling to explain to us why it supports the Debtor/LBO Lender Plan."[21] This too is patently untrue. In addition to the numerous discussions that the Committee professionals have had with Aurelius' professionals regarding the Settlement Plan, Aurelius need only look at the Committee's Responsive Statement filed with the Court to understand exactly why the Committee believes that the Settlement Plan is a better option for general unsecured creditors. Aurelius' attempt to prejudice creditors by making false accusations against the Committee should not be permitted and these statements should be stricken.

Similarly, with respect to the Debtors, Aurelius suggests that the Debtors' management conducted these chapter 11 cases to "cover up" and gain releases for their own wrongdoing and to "maximize their compensation". The Court knows there has been no "cover up" in these cases. Moreover, the Settlement Plan flatly contradicts Aurelius' allegations, as it does *not* provide any of the Debtors' current or former officers and directors releases from wrong-doing related to the LBO. Similarly, there is no evidence that the Debtors' management somehow used these chapter 11 cases to "maximize their compensation". These false statements must also be stricken.

In any event, given that Aurelius recently purchased its claims with the apparent goal of attempting to extract holdup value with aggressive litigation tactics, Aurelius' shrill accusations ring particularly false. With accurate disclosure, the Settlement Plan Proponents are confident

---

[20]  Litigation Plan Responsive Statements, Aurelius Letter at 2.

[21]  Litigation Plan Responsive Statements, Aurelius Letter at 2.

that creditors will see through these ridiculous statements. However, as with the Litigation Plan Disclosure Statement itself, the Litigation Plan Responsive Statements contain a number of obvious factual errors that, together with the false statements identified above, must be corrected so that creditors are not misled. Among other things –

- Aurelius claims that bondholders were "systematically excluded from every negotiation session leading to the Debtor/LBO Lender Plan" and that the Settlement Plan was "reached without a single negotiation with the principal beneficiaries" of the alleged LBO-Relates causes of action.[22] This is patently false. The Settlement Plan was the result of an extensive mediation overseen by Judge Gross. Aurelius, as well as the Committee and other Settlement Plan Proponents, attended the mediation at the times and in the manner directed by Judge Gross, who organized and conducted the mediation in his own judgment as to the most effective and efficient manner for reaching a possible resolution.

- Aurelius asserts that the Settlement Plan is contingent on a Bankruptcy Court determination that "Step One and Step Two Senior LBO Lenders should receive the same recovery."[23] In fact, the Settlement Plan does not require the Court to make such a determination and is not at all contingent in this regard. This is a direct consequence of the settlement embodied in the Settlement Plan (which provides for allowance of the Senior Loan Claims), a compromise that, if approved, will foreclose any assertion that "Step One" and "Step Two" claims somehow should be treated differently.

- Aurelius claims that the Settlement Plan is contingent on a Bankruptcy Court determination as to the allowed amount of the PHONES Notes.[24] This too is false, and effectiveness of the Settlement Plan is not contingent on the amount of the PHONES Notes.

---

[22] Litigation Plan Responsive Statements, Aurelius Letter at 1, 2.

[23] Litigation Plan Responsive Statements, Aurelius Letter at 2.

[24] Litigation Plan Responsive Statements, Aurelius Letter at 3.

- The Litigation Plan Proponents assert that "the Debtor/LBO Plan releases . . . certain shareholders who were cashed out at Step Two of the LBO, for no consideration at all."[25] This statement is misleading and incomplete, at best. The Litigation Plan Responsive Statement should clarify that the releases in question are limited in scope and are subject to strict and small dollar caps. The narrowly-tailored releases specifically cover individuals who redeemed stock through Tribune's 401(k) retirement program and certain retiree claimants and current employees. The releases also will not protect "bad actors" to be identified by the Settlement Plan Proponents, and the claims being released against current employees are only claims that are $100,000 or less. These limited exclusions were incorporated into the Settlement Plan because they benefit the Debtors' ongoing business operations and thus provide value for all.

These false statements must be corrected and revisions must be made to the Litigation Plan Disclosure Statement and the Litigation Plan Responsive Statements to correct the above-noted factual errors and to reduce creditor confusion with respect to the Litigation Plan.

## III. THE BRIDGE PLAN DISCLOSURES

The Bridge Plan Proponents tout the Bridge Plan as a "settlement plan", but in reality it is no such thing. The Bridge Plan nominally provides for three settlements: (a) a "Step One Lender Settlement" that would distribute $695 million in value to "non-LBO" creditors of Tribune (including holders of Senior Notes, PHONES Notes, and Other Parent Claims), plus 75% of all recoveries on LBO-Related Causes of Action to be pursued by a Litigation Trust, at the expense of Senior Lenders; (b) a "Step Two Lender Settlement" that would divert an additional $197 million to such other Tribune creditors; and (c) a "Bridge Loan Lender Settlement" that would guarantee Bridge Lenders $125 million in cash (a recovery substantially

---

[25] Litigation Plan Responsive Statements at 6.

higher than their realistic entitlements even if the Bridge Loan Claims were allowed in full) at the expense of other creditors.[26]

These are "settlements" in name only, as they were not negotiated with or supported by the estate fiduciaries with ownership and control over the allegedly settled causes of action (the Debtors and the Committee) or the targets of those causes of action (the Senior Lenders), who almost certainly will not support them (as they provide substantially higher settlement "give ups" by Senior Lenders than does the Settlement Plan itself). They are – in the truest sense – "settlements" that the Bridge Lenders negotiated with themselves and only themselves. The fact that the "settlements" on which the Bridge Plan relies are not supported by any of the parties that would need to approve them is essential information that must be disclosed to creditors being asked to vote on the Bridge Plan.

If those "settlements" are not accepted by the relevant constituencies and approved by the Court, as they almost certainly will not be, the Bridge Plan reverts to something almost identical to the Litigation Plan, with more than half of Tribune's distributable enterprise value being held back for the foreseeable future.[27] In fact, the Bridge Plan even incorporates Aurelius' purported offer to purchase claims for Tribune trade creditors – without actually disclosing whether Aurelius has agreed to purchase claims in support of a competing plan to which it is opposed.

## BRIDGE PLAN DISCLOSURE STATEMENT

With this context, it is readily apparent that the Bridge Plan Disclosure Statement is seriously misleading. Among other things –

- **Failure To Disclose Recoveries And Risks Under Litigation Plan Scenario**. The most fundamental defect in the Bridge Plan Disclosure Statement is that it provides absolutely no disclosure whatsoever regarding what minimal distributions creditors can expect to receive and the risks to which they can expect to be exposed if the self-serving "settlements" are

---

[26] Bridge Plan Disclosure Statement at 6-15.

[27] Bridge Plan Disclosure Statement at 14-19.

not accepted and approved. The "recovery chart" in the Bridge Plan Disclosure Statement only summarizes recoveries in the event the purported settlements are approved,[28] and it misleadingly states that risks in respect of the Bridge Plan "are similar to those described in the [Settlement] Plan Disclosure Statement."[29] Nothing could be further from the truth – the Settlement Plan provides for substantial immediate distributions, while the Bridge Plan offers no certainty whatsoever and promises only extended litigation.

At least the Litigation Plan Proponents attempted to describe to creditors what "illustrative" recoveries they might receive in various hypothetical scenarios – the Bridge Plan Proponents do not even do that. At a minimum, the Bridge Plan Disclosure Statement must make all the disclosures made by the Litigation Plan Disclosure Statement, revised as set forth above, including disclosures regarding the risks related to the minimal (if any) distributions to be made on the plan effective date, disclosures regarding the litigation-contingent nature of virtually all distributions, disclosures regarding the number of years creditors likely will have to wait for litigation to conclude before distributions could be made (if they are to be made at all), and disclosures regarding the other risks attendant to a "litigation only" option that will leave creditors in limbo for years. Without those disclosures, creditors simply will have no idea what they may receive, or when, under the most likely scenario in which none of the Bridge Plan "settlements" are approved. At the very least, creditors should know what they are voting for.

Similarly, the Bridge Plan Disclosure Statement currently only provides a "best interests of creditors" and liquidation analysis on the assumption that each of the three hypothetical Bridge Plan settlements are authorized and approved.[30] The Bridge Plan Proponents must also compare the recoveries in the event that only the Bridge Lender settlement was accepted to the results to which parties would be entitled if the Bridge Claims and Senior Loan Claims are allowed. This is a significant issue, as such an analysis will show that Senior Lenders (and

---

[28]  Bridge Plan Disclosure Statement at 7.

[29]  Bridge Plan Disclosure Statement at 23.

[30]  Bridge Plan Disclosure Statement at 22-23.

possibly other creditors) fare worse under the Bridge Plan than they would even if the Bridge

Lenders won the litigation and the Bridge Claims were allowed in full, thereby calling into

question the viability of the Bridge Lender settlement.

- **Lack Of Disclosure Regarding Bridge Plan Settlement**.  The Bridge Plan

Disclosure Statement also omits other material disclosures regarding the self-serving "Bridge

Loan Lender Settlement" included as part of the Bridge Plan.  Among other things, disclosure

must be made (a) that Bridge Lenders would receive substantially less than the $125 million

settlement amount if the claims of the Bridge Lenders and the Senior Lenders ultimately were

allowed and the Debtors' value was as calculated by the Debtors' financial advisors and set forth

in the General Disclosure Statement; (b) of the basis for the Bridge Plan Proponents' purported

allocation of 13.7% of the Debtors' distributable enterprise value to Tribune[31] (as opposed to the

8.5% calculated by the Debtors' financial advisors for the reasons set forth in the General

Disclosure Statement); (c) of the incremental value (or lack thereof) provided to other creditors

by the "Bridge Loan Lender Settlement" and the basis for the calculation thereof; (d) of the basis

for the proposed discriminatory treatment for the so-called "Original Bridge Loan Lenders"

(JPMorgan, Citibank, Bank of America, and Merrill Lynch); and (e) to inform creditors that

recoveries to Bridge Lenders under the settlement would exceed the stated 7.7% (possibly very

substantially) if the Original Bridge Loan Lenders still hold Bridge Loan Claims and are stripped

of their ratable distributions as required by the Bridge Loan Lender Settlement (indeed, it is

patently misleading to calculate recoveries under the Bridge Loan Lender Settlement "assuming"

that no Original Bridge Loan Lender owns Bridge Loan Claims when it is known that this is not

the case).  This information is material to creditors' assessments of whether the Bridge Loan

Lender Settlement component of the Bridge Plan possibly could be approved by the Court.

- **Mischaracterization Of The Settlement Plan**.  The Bridge Plan Disclosure

Statement states that "[n]o material 'plaintiffs' to the LBO-Related Causes of Action have agreed

---

[31]    Bridge Plan Disclosure Statement at 5.

to the so-called settlement in such competing plan."[32] This is categorically false. The settlement embodied in the Settlement Plan was negotiated with and agreed to by the Committee, a fiduciary for all general unsecured creditors with the right to pursue the claims subject to the settlement. This misstatement must be removed.

## BRIDGE PLAN RESPONSIVE STATEMENT

The Bridge Plan Responsive Statement repeats the fundamental errors of the Bridge Plan Disclosure Statement. Most notably, it fails to disclose or discuss the fact that the Bridge Plan is highly likely to revert to something identical to the Litigation Plan (indeed, it criticizes the Litigation Plan as "resolv[ing] almost nothing at Confirmation" and "leav[ing] the Debtors with burdensome litigation"[33]), and it utterly fails to explain to creditors that, in all likelihood, the Bridge Plan will be substantially identical to the Litigation Plan, their initial distributions will be minuscule, and their recoveries will be contingent on prevailing in litigation that could last years. Without such critical disclosures, the Bridge Plan Responsive Statement is seriously misleading.

Similarly, when criticizing the Settlement Plan, the Bridge Plan Proponents cross the line from advocacy to deception in several regards, including –

- The Bridge Plan Proponents denigrate the $120 million in settlement payments to be made pursuant to the Step Two/Disgorgement Settlement in the Settlement Plan as being "less than the fees earned by the Arrangers in connection with the Leveraged ESOP Transaction (the Examiner determined that the advisory and facility fees exceeded $235 million)."[34] This is deceptive because the Settlement Plan preserves, and does not settle, claims against all entities for advisory services to Tribune – hence, advisory fees remain subject to post-confirmation disgorgement under the Settlement Plan.

---

[32] Bridge Plan Disclosure Statement at 5.
[33] Bridge Plan Responsive Statement at 13.
[34] Bridge Plan Responsive Statement at 9.

- The Bridge Plan Proponents state that "the amount paid on account of the so-called 'Step Two/Disgorgement Settlement' may be even less than $120 million (and perhaps nothing at all)."[35] This is false. Due to the backstop undertaking provided by the Arrangers, this component of the Settlement Plan will provide a *guaranteed minimum* of $120 million cash, with the possibility of *greater* recoveries if not all disgorgement defendants settle and some then lose at trial.

- The Bridge Plan Proponents claim that "it is not even disclosed how a Bridge Loan Lender could participate in the settlement" under the Settlement Plan, implying that Bridge Lenders are somehow excluded from the Step Two/Disgorgement Settlement.[36] This, too, is false. The Settlement Plan clearly states that procedures for participating in the settlement will be filed with the Court prior to the disclosure statement hearing.[37]

- The Bridge Plan Proponents say that "[n]o parties that would materially benefit from the pursuit of the LBO-Related Causes of Action currently support the Debtor/LBO Lender Plan."[38] This is inaccurate, as evidenced by the Committee's support and sponsorship of the Settlement Plan. The Committee acts as a fiduciary for *all* general unsecured creditors. The Bridge Plan Responsive Statement should be revised to note that the Committee, acting as a fiduciary, supports the Settlement Plan as the best plan for all general unsecured creditors, and statements asserting that the Committee speaks mainly for retirees and trade creditors should be stricken.

For all of these reasons, revisions must be made to the Bridge Plan Disclosure Statement and the Bridge Plan Responsive Statement to correct the above-noted factual errors and to reduce creditor confusion with respect to the Bridge Plan.

---

[35] Bridge Plan Responsive Statement at 9.

[36] Bridge Plan Responsive Statement at 9.

[37] Settlement Plan § 5.15.1.

[38] Bridge Plan Responsive Statement at 3, 5, 6.

## IV.    THE STEP ONE PLAN DISCLOSURES

The Step One Plan is proposed by a small group of holders of so-called Step One Senior Loan Claims (*i.e.*, Senior Loan Claims other than those in respect of "Incremental Term Borrowings" under the Senior Loan Agreement).  It is premised on a one-sided "settlement" of LBO-Related Causes of Action benefiting only the Step One Senior Loan Claims, while holding back the recoveries of the so-called Step Two Senior Loan Claims and reducing the distributions to other creditors.  The very first sentence of the Step One Plan Disclosure Statement reveals the Step One Plan Proponents' parochial view of this reorganization, noting that "[t]he Step One Plan provides the highest and fairest treatment to Holders of Step One Senior Loan Claims without delaying confirmation or sacrificing the recoveries of Holders of Step One Senior Loan Claims."[39]

As with the Bridge Plan, the Step One Plan contemplates a "settlement" to which none of the necessary constituencies are parties.  No estate representative (neither the Debtors nor the Creditors' Committee) negotiated the Step One Plan or supports it.  Moreover, a vast majority of holders of Step One Senior Loan Claims also oppose the Step One Plan, meaning that the plan truly embodies a "settlement" with no one and that it therefore has no prospect of being approved or confirmed.

## STEP ONE PLAN DISCLOSURE STATEMENT

This problem is compounded by the Step One Plan Disclosure Statement, which is missing several critical categories of information, without which it is impossible for creditors to understand the proposed settlement offered by the Step One Proponents or the consequences of confirmation of that plan.  Among other things –

- **Failure To Disclose Nature Of Or Basis For Sharing Provision Reserve Amount**.  The Step One Plan is premised on allowance of the Step One Senior Loan Claims but not the Step Two Senior Loan Claims, which would remain subject to post-confirmation challenge by a litigation trust, with distributions "that would have otherwise been made to Step

---

[39]    Step One Plan Disclosure Statement at 1.

Two lenders" reserved pending litigation over enforceability of the "sharing provisions" of the Senior Loan Agreement (which provide for holders of Step Two claims to share in distributions made in respect of Step One claims even if Step Two claims are avoided or otherwise unenforceable against the Tribune Debtors).[40]

This clearly will result in a massive reserve of New Common Stock in Reorganized Tribune. However, the Step One Plan Disclosure Statement never discloses how much stock and other consideration is to be reserved, the mechanism for determining the amount of the reserve, the source of the reserved consideration, or the procedures for distributing the reserve after litigation. Moreover, like the Litigation Plan Disclosure Statement, the Step One Plan Disclosure Statement says nothing about the myriad risks associated with holding large quantities of stock in reserve for years – risks both to creditors (due to inability to sell shares in the face of fluctuations in market prices and economic conditions) and to Tribune itself (due to impairment of ability to raise capital, downward pressure on the value of the outstanding stock, and related matters). All of this information must be added to the Step One Disclosure Statement so that creditors can appreciate the risks forced upon them by the Step One Plan.

- **FCC Risks And Issues**. As the Step One Disclosure Statement acknowledges, the "Sharing Provision Reserve" of New Common Stock contemplated in the Step One Plan may not be acceptable to the FCC.[41] Because the Step One Disclosure Statement fails to explain how much stock is to be reserved, how the reserve is to be governed pending the outcome of litigation, or the procedures for distributing the reserve after all litigation is concluded, the FCC-related risks associated with the Step One Plan cannot properly be assessed.

- **Misstatements And Omissions Regarding Settlement Plan**. The Step One Plan Disclosure Statement attempts to compare the Step One Plan to the Settlement Plan, claiming that the Step One Plan provides better recoveries than the Settlement Plan not only for holders of

---

[40]   Step One Plan Disclosure Statement at 7.

[41]   Step One Plan Disclosure Statement at 56.

Step One Senior Loan Claims (the sole beneficiaries of the Step One Plan) but also for "Holders of other Claims."[42] This is false. There is no constituency other than the Step One Lenders themselves that fares better under the Step One Plan than under the Settlement Plan. In fact, trade and other general unsecured creditors of Tribune fare materially worse under the Step One Plan, as they would receive smaller initial distributions and a smaller percentage interest in the Litigation Trust. Bondholders similarly fare poorly, because the Step One Plan does not provide for the $120 million in cash recoveries guaranteed by the Step Two/Disgorgement Settlement included as a part of the Settlement Plan or for the bondholder-favorable priority distributions of Litigation Trust recoveries under the Settlement Plan.

Simply put, if the Step One Plan Proponents wish to compare the Step One Plan to the Settlement Plan, they must make accurate disclosures regarding the Settlement Plan and not try to fool creditors into thinking that the two proposed plans are comparable.

- **Misstatements Regarding Debtor Preparation Of Step One Plan Materials**. Finally, the Step One Disclosure Statement incorrectly states that the "financial information and projections" it contains were "were prepared by the Debtors' management, in consultation with the Debtors' advisors."[43] In fact, however, a significant amount of the financial information in the Step One Disclosure Statement, including estimated recovery percentages, was prepared by the Step One Plan Proponents with no input or assistance from the Debtors.

Similarly, the Step One Disclosure Statement falsely provides that, "[t]o demonstrate that the proposed Step One Plan satisfies the 'best interests' test, the Debtors, with the assistance of their advisors, have also prepared the chart below, which compares the estimated recovery of each Impaired Class of Claims under the Step One Plan against the high end of the hypothetical recovery range set forth in the Liquidation Analysis for such Claims in a chapter 7 liquidation."[44] The Debtors, however, did not prepare that material for the Step One Plan Proponents. Finally,

---

[42] Step One Plan Disclosure Statement at 6.

[43] Step One Plan Disclosure Statement at 4.

[44] Step One Plan Disclosure Statement at 48.

the Step One Plan itself provides that holders of Intercompany Claims (*i.e.*, the Debtors) are proponents of the Step One Plan – an obvious falsehood given the Debtors' opposition to the Step One Plan.[45]

To remove any implication that the Debtors somehow have endorsed the Step One Plan, these statements must be corrected.

## STEP ONE PLAN RESPONSIVE STATEMENT

The Step One Responsive Statement is also misleading and must be corrected in several instances, including –

- The Step One Plan Proponents assert that it cannot "be argued that that would be an 'economy of savings' in challenging both the Step Two and Step One Transactions concurrently, because as the Examiner's Report makes clear, the facts, the circumstances, the parties, the motivations, the main legal issues and the evidentiary requirements barely overlap between Step One and Step Two."[46] The Committee (the entity with standing to pursue the claims) has stated on the record to the contrary, asserting that there are significant disadvantages in pursuing any action in a piecemeal fashion (*i.e.*, asserting claims against one faction of the Senior Lenders, "Step One" or "Step Two", and not the other) and that doing so would complicate pursuit of the claims as a whole. The Step One Responsive Statement should be modified to reflect the Committee's views in this regard.

- The Step One Plan Responsive Statement asserts that "[t]he current Oaktree Plan [the Settlement Plan] . . . acknowledges that the Step One Loans are unchallengeable." This is patently false – the Settlement Plan embodies a settlement in which "Step One" lenders provide significant consideration to settle the alleged LBO-Related Causes of Action.

---

[45]  Step One Plan § 4.3.

[46]  Step One Responsive Statement at 3 n.1

While the Step One Plan proponents are entitled to assert their opinions, these misstatements, at a minimum, must be corrected in order that the Responsive Statement does not mislead voting creditors.

## V.    CONCLUSION

For all of the foregoing reasons, the false statements identified above in each of the competing plan disclosure materials must be corrected to reduce creditor confusion and ensure that an informed creditor electorate makes decisions with respect to the competing plans on the basis of adequate and accurate information.[47]

Dated: Wilmington, Delaware  
      November 16, 2010

Respectfully submitted,

*/s/   Kate Stickles*  
Norman L. Pernick (No. 2290)  
J. Kate Stickles (No. 2917)  
Patrick J. Reilley (No. 4451)  
COLE, SCHOTZ, MEISEL,  
FORMAN & LEONARD, P.A.  
500 Delaware Avenue, Suite 1410  
Wilmington, DE 19801  
Telephone: (302) 652-3131  
Facsimile: (302) 652-3117

- and-

---

[47] This Objection does not address a number of obvious mistakes contained in the various disclosure documents and plans. For example, (a) the Litigation Plan utilizes the Settlement Plan Proponents' Exhibit 6.3 as the Litigation Plan's list of *assumed* contracts when in fact Exhibit 6.3 to the Settlement Plan is a list of *rejected* contracts (*see* Litigation Plan § 6.3); (b) the Litigation Plan Disclosure Statement asserts that "the Debtors' Liquidation Analysis does not set forth a split between Tribune and its Subsidiaries" when, in fact, pages 5 and 6 of Exhibit D to the General Disclosure Statement do just that (*see* Litigation Plan Disclosure Statement at 40); (c) the total amount of the purported "settlement" in the Step One Plan appears to be mathematically incorrect (*see* Step One Disclosure Statement § V.D.1); (d) the Litigation Plan Disclosure Statement incorrectly (and inconsistently) suggests that the Disputed Claims Reserve will be treated as owned by Reorganized Tribune for federal tax purposes; and (e) the Bridge Plan Disclosure Statement does not contain any tax disclosures at all. The Settlement Plan Proponents anticipate these matters and others like them will be corrected in advance of the hearing on these matters and reserve all rights if they are not.

-22-

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-0199
Facsimile: (312) 853-7036

*Attorneys For Debtors And Debtors
In Possession*


/s/  *Adam G. Landis*
Adam G. Landis (Bar No. 3407)
Matthew B. McGuire (Bar No. 4366)
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone (302) 467-4400
Facsimile (302) 467-4450

- and-

Howard Seife
David M. LeMay
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone (212) 408-5100
Facsimile (212) 541-5369

*Attorneys for the Official Committee of Unsecured
Creditors*

- and -

Graeme Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone (202) 778-1800
Facsimile (202) 822-8106

*Special Counsel to the Official Committee of
Unsecured Creditors*

1657167.5

*/s/    Robert J. Stearn, Jr.*
Mark D. Collins (Bar No. 2981)
Robert J. Stearn, Jr. (Bar No. 2915)
Drew G. Sloan (Bar No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone (302) 651-7700
Facsimile (302) 651 7701

-and-

Donald S. Bernstein
Dennis E. Glazer
Elliot Moskowitz
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
(212) 450-4500

*Attorneys for JPMorgan Chase Bank, N.A.*

*/s/    Robert J. Stearn, Jr.*
Mark D. Collins (Bar No. 2981)
Robert J. Stearn, Jr. (Bar No. 2915)
Drew G. Sloan (Bar No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone (302) 651-7700
Facsimile (302) 651 7701

-and-

Andrew N. Goldman
WILMER CUTLER PICKERING HALE &
DORR LLP
399 Park Avenue
New York, New York 10022
Telephone (212) 230-8800

*Attorneys for Angelo, Gordon & Co., L.P.*

_/s/   M. Blake Cleary_
Robert S. Brady (Bar No. 2847)
M. Blake Cleary (Bar No. 3614)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware  19899
Telephone (302) 571-6600
Facsimile (302) 571-1253

-and-

Bruce Bennett
James O. Johnston
Joshua M. Mester
HENNIGAN, BENNETT & DORMAN LLP
865 South Figueroa Street, Suite 2900
Los Angeles, California  90017
Telephone (213) 694-1200

_Attorneys for Oaktree Capital Management, L.P._
_and Angelo, Gordon & Co., L.P._

1657167.5